# Exhibit 2

**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**REBUTTAL EXPERT REPORT OF GRAHAM WADE**

**FEBRUARY 1, 2022**

**Table of Contents**

I.      **INTRODUCTION** ...................................................................................................1

II.    **SUMMARY OF OPINIONS ON DR. CARR'S AND MR. WARREN'S REPORTS** .............2

     A.      **Summary of Opinions on Dr. Carr's Report** ..................................................2

     B.      **Summary of Opinions on Mr. Warren's Report** ..............................................3

III.   **BASES FOR OPINIONS ON DR. CARR'S REPORT** .........................................................4

     A.      **Opinion 1: The Solo Transactions Were Not Real, but Even if They Were, Dr. Carr Fails to Recognize That They Were Not Commercial, Arm's-Length Transactions** ..............6

          1.    There Were No Shares .......................................................................6

          2.    The Trades Were Not and Could Not be Settled .................................................9

          3.    There Were No Dividends ...................................................................11

          4.    Credit Terms Were Ignored or Not on an Arm's-Length Basis.......................12

          5.    These Were Not Genuine Investment Strategies by the Pension Plans ..........................19

          6.    The Number of Shares and Financing Arrangements Were Implausible ......................22

     B.      **Opinion 2: The Counterparties to Solo Were Not Genuine Arm's-Length Market Participants with the Financial Capacity to Conduct the Purported Solo Trades with the Pension Plans** ..............27

          1.    The Kaye Scholer Plans ....................................................................27

          2.    The Amalthea Counterparty ...............................................................30

          3.    The Colbrook Counterparty ...............................................................33

     C.      **Opinion 3: The Solo Trades Were Not Dividend Arbitrage Strategies of the Sort Cited to in the Academic Literature That Dr. Carr Cites** .........................................................34

     D.      **Opinion 4: Dr. Carr's trade analysis, which is based on the selective review of parts of the circular Solo trades, is incomplete, incorrect, and substantially misrepresents the two transactions he analyzed. This narrow approach also ignores the obvious circularity of the fabricated Cum-Ex scheme. All of the opinions in respect of the Solo Transactions in the Wade Initial Report apply equally to these transactions.** ........................................................42

          1.    The RJM MAERSKB 2013 Transaction ................................................42

          2.    Proper Pacific CHRH 2014 Transaction................................................51

          3.    Basalt Ventures MAERSKB 2015 Transaction ........................................57

     E.      **Opinion 5: Dr. Carr Ignores the Fact That Designing the Cum-Ex Transactions to Include Multiple Pension Plans and IDBs Appears to Have Had No Legitimate Purpose Other than to Further Conceal the Scale and Deception of the Trades. Numerous Aspects of Their Design Raise Regulatory Concerns Related to: Money Laundering, Know Your Customer ("KYC") Rules, Prearranged Wash Trading in Futures and Netting Practices, Position Size Disclosure Requirements and Restrictions, and Capital Requirements. These transactions could only have been executed because their structural improprieties were disregarded by participants in the first place.** ..........................................................62

**F.**      **Opinion 6: Dr. Carr's Understanding of the Nature of Cum-Ex Transactions and the Meaning of Ex-Dividend Date Are Both Wrong and Undermine the Analysis Which Flows from These Errors** ..........................................................................................72

**IV.**    **SUMMARY OF OPINIONS ON MR. WARREN'S REPORT** ...................................78

   **A.**      **Background** ..........................................................................................78

   **B.**      **Organization of My Response to the Warren Report** ...........................81

   **C.**      **Summary of Opinions Related to the Warren Report** ..........................82

   **D.**      **Comparison of Nomenclature and Categorization Mapping in the Warren and Wade Initial Reports** ....................................................................................83

   **E.**      **Background on SWIFT Messages** ..........................................................85

      1.    SWIFT Message Format .......................................................................86

      2.    SWIFT MT566 Messages ......................................................................86

      3.    SWIFT MT545 Messages ......................................................................88

   **F.**      **Explanation of The Analysis Performed in Respect of the Transactions in TDC shares in March 2014** ......................................................................................90

**V.**     **BASES FOR OPINIONS ON MR. WARREN'S REPORT** ....................................93

   **A.**      **Opinion 7: The Custody Records Show That the Only TDC Shares That ED&F Man Actually Owned Over the March 11, 2014 Record Date Were Those from Cum-Cum Transactions** ..............................................................................................93

   **B.**      **Opinion 8: For the Reasons Given in the Wade Initial Report and Expanded on Further Below, the Pension Plans Never Acquired the Shares Related to the Tax Vouchers Issued by ED&F Man for the Cum-Ex Transactions but Instead Settled the Cum-Ex Transactions in Matching, Same Day, In-and-Out, Small Shapes of Shares which Facilitated Settling Large Transactions with a Much Smaller Quantity of Shares** ..................................95

   **C.**      **Opinion 9: The Only Real Dividends Received by ED&F Man in respect of TDC shares on March 12, 2014 Were from The Cum-Cum Transactions.  The Pension Plans Did Not Receive Any Real Dividends in Respect of the Cum-Ex Transactions, and, in Fact, the Analysis Produced in the Warren Report Supports This Conclusion and Is Consistent with the Opinions I Expressed in the Wade Initial Report on This Matter** .................................99

      1.    Extension of TDC March 2014 Conclusions to Other Dividend Events ......................101

**Appendix A: Materials Considered** ..........................................................................105

**List of Appendices**

Appendix A: Materials Considered

## I.      INTRODUCTION

1.       I have been asked by Counsel for SKAT, the Customs and Tax Administration of the Kingdom of Denmark, to respond to the reports of Mr. Adam L. Warren ("Warren Report") and Dr. Emre Carr ("The Carr Report"), dated December 31, 2021.  For purposes of this report, I incorporate the definitions, background, analyses, and opinions detailed in my report dated December 31, 2021 ("Wade Initial Report").[1]  My qualifications were detailed in Section II of the Wade Initial Report and my curriculum vitae was also included in that report as Appendix A.

2.       I affirm that this report is my independent work product and contains my objective unbiased opinions in relation to matters within my expertise.  I believe that the facts and analyses stated in this expert report are true, and the opinions I have expressed represent my true and complete professional opinions.

3.       I have prepared this report to state my expert opinions; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data which I considered in reaching my opinions; and to make all other appropriate disclosures.  My opinions in this report are based on specialized knowledge arising from my education, training, study, and experience (which is set out in Section II of the Wade Initial Report).  I express no legal opinions in this report and the information in this report is based upon discovery to date and the information that is currently available.  I have considered and compiled materials as cited herein with the assistance of various CRAI personnel working under my direction and supervision.[2]  In addition to the materials considered in the Wade Initial Report, a listing of additional materials that I have considered for this matter as of the date of this report is

---

[1] See, Expert Report of Graham Wade In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.

[2] I confirm that all opinions which I express in this report are mine alone, and not necessarily reflective of the opinions of CRAI or any of its personnel.

contained in Appendix A, as well as the citations in the footnotes to the text and tables presented in this report.

4.     The remainder of this report is organized as follows. In Section II I summarize my opinions in response to Dr. Carr's and Mr. Warren's reports.  In Section III, I offer opinions specific to Dr. Carr's Report.  In Sections IV and V, I offer opinions specific to Mr. Warren's Report.

5.     Throughout this report capitalized terms which are not otherwise defined take their meaning from the Wade Initial Report.


## II.     SUMMARY OF OPINIONS ON DR. CARR'S AND MR. WARREN'S REPORTS

### A.     Summary of Opinions on Dr. Carr's Report

6.     The following are my opinions on the Carr Report:

1.  **Opinion 1:** The Solo transactions were not real, but even if they were, Dr. Carr fails to recognize that they were not commercial, arm's-length transactions.

2.  **Opinion 2:** The counterparties to Solo were not genuine arm's-length market participants with the financial capacity to conduct the purported Solo trades with the Pension Plans.

3.  **Opinion 3:** The Solo transactions were not dividend arbitrage strategies of the kind referred to in the academic literature that Dr. Carr cites.

4.  **Opinion 4:** Dr. Carr's trade analysis, which is based on the selective review of parts of the circular Solo trades, is incomplete, incorrect, and substantially misrepresents the two transactions he analyzed.  This narrow approach also ignores the obvious circularity of the fabricated Cum-Ex scheme.  All of the opinions in respect of the Solo Transactions in the Wade Initial Report apply equally to these transactions.

5. **Opinion 5:** Dr. Carr ignores the fact that designing the Cum-Ex transactions to include multiple pension plans and IDBs appears to have had no legitimate market purpose other than to further conceal the scale and deception of the trades. Numerous aspects of their design raise regulatory concerns related to money laundering, Know Your Customer ("KYC") rules, prearranged wash trading in futures and netting practices, position size disclosure requirements and restrictions, and capital requirements. These transactions could only have been executed because their structural improprieties were disregarded by participants in the first place.

6. **Opinion 6:** Dr. Carr's understanding of the nature of Cum-Ex transactions and the meaning of Ex-Dividend Date are both wrong and undermine the analysis which flows from these errors.

## B.   Summary of Opinions on Mr. Warren's Report

7. The following are my opinions on Mr. Warren's Report:

1. **Opinion 7:** The custody records show that the only TDC shares that ED&F Man actually owned over the March 11, 2014 Record Date were those from Cum-Cum transactions.

2. **Opinion 8:** For the reasons given in the Wade Initial Report and expanded on further below, the Pension Plans never acquired the shares related to the Tax Vouchers issued by ED&F Man for the Cum-Ex transactions but instead settled the Cum-Ex transactions using matching, same day, in-and-out, small shapes of shares that facilitated settlement of large transactions with a much smaller quantity of shares.

3. **Opinion 9:** The only real dividends received by ED&F Man in respect of TDC shares on March 12, 2014 were from the Cum-Cum transactions. The Pension Plans did

not receive any real dividends in respect of the Cum-Ex transactions, and, in fact, the Warren Report's analysis supports this conclusion and is consistent with the opinions expressed in the Wade Initial Report on this matter.

### III.   BASES FOR OPINIONS ON DR. CARR'S REPORT

8.   Dr. Carr's observations and opinions appear to attempt to normalize and explain the Solo transactions that are the subject of this matter as if they were customary dividend arbitrage strategies.  In his report, Dr. Carr describes the Solo transactions as follows:

> "The Analyzed Transactions that I discuss in detail in this report are an example of dividend arbitrage strategies."[3]

> "Dividend arbitrage strategies are neither new nor unique examples of how tax incentives influence financial decisions and investment strategies. Academic research has shown that investors in numerous countries have engaged in dividend arbitrage."[4]

9.   The Solo transactions that form the basis for Dr. Carr's opinions are anything but customary; and were in fact not even real.  The theoretical and academic underpinnings[5] that form the basis for Dr. Carr's opinions on dividend arbitrage[6] are wholly unrelated in practice to, and ignore the actual facts of, the Solo transactions.  As explained in the Wade Initial Report, and further described herein, the Solo transactions did not involve trading any actual shares of Danish companies or any receipt of any actual dividends of Danish companies, and even if they did, no reputable market participant would have considered the Cum-Ex transactions that were executed by Solo, its affiliates, and captive IDBs as legitimate or customary.[7]

---

[3] Carr Report, Summary of Opinions, ¶ 17.

[4] Ibid.

[5] Carr Report, Section, ¶¶ 129 - 143.

[6] Carr Report, Section VII, ¶¶ 144 – 150.

[7] In this report, I use the terms "Solo Cum-Ex transactions" and "Solo transactions" to refer to the transactions that I analyzed in the Wade Initial Report as well as additional transactions that I have analyzed in this report.  It is my

10.     Further, the Solo transactions were not dividend arbitrage transactions.  They were not even legitimate trading strategies, either when taken in the context of the literature which Dr. Carr cites or based on the customs and practices that I have witnessed throughout my career in equity finance and structured transactions.  More importantly, the Solo trades were not real.  Even without factoring in the absence of shares or dividends in the Solo trades, these transactions raise a number of serious issues which would have deterred any reputable market participant from participating in or facilitating them.  This view is corroborated by concerns raised about wash trading in futures by JP Morgan and SEB,[8] the subsequent removal of Solo's regulatory license, the FCA's imposition of fines for serious financial crime control failings in relation to Cum-Ex trading involving Solo, and the ongoing censure of various captive Solo counterparties.[9]

11.     Finally, Dr. Carr fundamentally misunderstands and misconstrues the characteristics of the Solo Cum-Ex transactions.  Dr. Carr inappropriately dismisses as inconsequential detail crucially important matters related to the design of the transactions, settlement, receipt of real dividends, and the requirements to make legitimate tax reclaims, as well as the significant legal and regulatory issues which appear to have been ignored by the participants.[10]  Many of these ignored or misapprehended issues are readily apparent from the evidence I have reviewed related to the transactions at issue in this matter and should

---

understanding that the transactions I have reviewed are representative of the other transactions by the Solo defendants, and my opinions apply equally to these other trades to the extent my understanding is correct.

[8] ELYSIUM-01746161; ELYSIUM-02521340.

[9] Regulators have imposed various penalties on brokerage firms that purportedly executed trades for Solo clients, including the Pension Plan defendants in this case.  For Sunrise Brokers LLP, see, https://www.fca.org.uk/news/press-releases/sunrise-brokers-llp-fine-serious-financial-crime-control-failings, accessed January 11, 2022.  For Sapien Capital Limited, see, https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf, accessed January 11, 2022.

[10] According to Dr. Carr, "upon the trade's execution, the investor immediately bears the economic risk of holding [the] shares and is exposed to any gains (or losses) from price changes from that moment onwards… This is true, irrespective of the time taken to complete the '**background**' [emphasis added] processes of clearing and settling the trade." Carr Report, ¶ 36.  Dr. Carr also states that post-trade execution services "are **operational in nature** [emphasis added] and generally occur after the trade date."  Carr Report, ¶ 43 e.

be obvious to anyone with an understanding of the actual customs and practices in equity financing.  I discuss these issues in detail in this report.[11]

### A.    Opinion 1: The Solo Transactions Were Not Real, but Even if They Were, Dr. Carr Fails to Recognize That They Were Not Commercial, Arm's-Length Transactions

#### 1.    There Were No Shares

12.    It cannot be over-emphasized that there were no shares involved in any of the Solo transactions.  As explained in the Wade Initial Report, none of the sub-custodians used by Solo actually ever held any Danish shares on Solo's behalf.[12]   The FCA has publicly stated that it "has found no evidence of ownership of the shares by the Solo Clients, nor custody of the shares or settlement of the trades by the Solo Group.  This, coupled with the high volumes of shares purported to have been traded, is highly suggestive of sophisticated financial crime."[13]

13.    Dr. Carr cites multiple rules and provides descriptions of the operational logistics of VP Securities, the Denmark Central Securities Depository ("CSD").[14]   However, these references are irrelevant since there were no shares held or settled at VP Securities by Solo or its clients.

---

[11] Throughout this report I may discuss a Solo transaction's individual characteristic or component as if it were a real transaction.  However, such reference should not be interpreted as my implicit acceptance of any of these transactions, in whole or in part, as real.

[12] Wade Initial Report, ¶ 234 - 237.

[13] See, https://www.fca.org.uk/news/press-releases/sunrise-brokers-llp-fine-serious-financial-crime-control-failings, last accessed January 11, 2022.

[14] See, for example, Carr Report ¶¶ 46, 48, 50, 51, 58, 60, and 62.

14.     There is no evidence to suggest that Solo itself was a member of VP Securities.[15]   Only JP Morgan, SEB, or Société Generale, in their roles as sub-custodians, could have settled securities transactions for Solo on behalf of its clients and the confirmations referenced above make clear that they did not. In addition, Sanjay Shah has admitted that throughout the relevant period its claim to shares and dividend payments from its sub-custodian "netted off" such that it "held claims against JP Morgan and SEB in the sum of zero".[16]   Therefore, none of the share transactions in the purported Solo trades were even processed by VP Securities.  As a result, VP Securities made no book entries in respect of any of the legs of the Solo transactions.

15.     In any event, had the Solo transactions been genuine, independent trades, it is highly unlikely that Solo could have met Denmark's VP Securities' liquidity buffer requirements or that the sub-custodian would have been prepared to provide this liquidity on its behalf without Solo providing an unencumbered pool of high-quality collateral of an equivalent value.[17] It also seems improbable that Solo would have met the U.K.'s FCA's capital requirements for processing the purported transactions on its clients' behalf. A liquidity buffer refers to the amount of funds a custodian is expected to provide to complete transactions on behalf of its clients to ensure that fails by a CSD's members do not impact other transactions. Custodians who provide funds to settle their clients' failed trades are responsible for following up with the clients to resolve the fails.   Separately, the FCA requires custodians to maintain sufficient capital

[15] It would be very surprising to me, based on my experience, if a firm like Solo had been a member of VP Securities because typically the membership would be restricted to clearing banks, domestic custodians, and the largest international custodians.

[16] In the High Court of Justice, Business and Property Courts of England & Wales, Commercial Court, SKAT v. Solo Capital Partners (in Special Administration) & Others, *Sanjay Shah Defendants' Response to Claimant's Request Dated June 4, 2019, for Further Information Under CPR 18* ("Shah Response"), p. 15, Response 21.

[17] VP Rule Book Part 4 (Settlement Rules), November 22, 2021, 7.1.4 p. 6 of 21, "Each Settlement Participant must compute a liquidity buffer, having particular regard to the consequences if a part of delivery is delayed or not delivered."  Available at: https://www.vp.dk/Legal-Framework/VP-Rulebook, accessed January 11, 2022. Causing the failure of or failing to have the appropriate liquidity buffer in place attracts penalties in the form of fines.  The liquidity buffer requirement would have been significant for the size Solo purportedly transacted.

resources to cover any of their exposures, including credit and settlement exposure.[18]  The sizes of the

purported Solo transactions in individual Danish companies that I have reviewed go up to DKK7 billion.[19]

For comparison, Solo's equity capital was approximately DKK168 million.[20]   A fail on a single

transaction would have required Solo to provide cash liquidity to cover the full settlement balance.

Further, had a transaction fail resulted from a customer credit event, a share price move of 5% in the

wrong direction for the relevant Danish shares would have been enough to completely wipe out Solo's

equity capital, which is further evidence that these transactions could not and did not really happen.

16.     Dr. Carr makes various points about the problems which can arise in trying to trace transactions

through custodians and sub-custodians to the underlying CSD, including in particular issues for shares

held by U.K. custodians in an omnibus account.[21]   However, none of these issues arise in the Solo

transactions because neither JP Morgan, SEB, nor Société Générale ever held any Danish shares. In other

words, Dr. Carr's discussion of a complicated chain of custody is completely irrelevant since the first link

in the chain never existed.

---

[18] A full discussion of these rules is beyond the scope of this report. Current liquidity buffer requirement rules are explained in the FCA Handbook in the General Prudential ("GENPRU") sourcebook. Available at: https://www.handbook.fca.org.uk/handbook/GENPRU/1/?date=2016-03-07&view=chapter, last accessed January 22, 2022.[19] In just one day, April 11, 2013, Solo purportedly served as the custodian for class A and class B shares of A.P. Maersk A/S with a notional value of just above DKK 7 billion, which is equivalent to GBP 0.8 billion at the prevailing exchange rate (1GBP:8.5724DKK. Source: Bloomberg).  ELYSIUM-01553174 and ELYSIUM-01555519 (transaction summaries from the two executing brokers, FGC Securities and Novus Capital, show twenty equity purchase transactions in each share class, i.e., 40 purchase transactions overall).

[19] In just one day, April 11, 2013, Solo purportedly served as the custodian for class A and class B shares of A.P. Maersk A/S with a notional value of just above DKK 7 billion, which is equivalent to GBP 0.8 billion at the prevailing exchange rate (1GBP:8.5724DKK. Source: Bloomberg).  ELYSIUM-01553174 and ELYSIUM-01555519 (transaction summaries from the two executing brokers, FGC Securities and Novus Capital, show twenty equity purchase transactions in each share class, i.e., 40 purchase transactions overall).

[20] Solo Capital Partners LLP, Report and financial statements for the period ended March 31, 2013, available at Companies House, https://find-and-update.company-information.service.gov.uk/company/OC367979/filing-history?page=3, last accessed January 23, 2022. This was the equivalent of DKK 168m at the exchange rate on 11 April 2013 (GBP1:8.5724DKK Source: Bloomberg)

[21] Carr Report, ¶¶ 61 – 65.

## 2.     The Trades Were Not and Could Not be Settled

17.     Second, while Dr. Carr's discussion of post-trade execution clearing and settlement[22] is a textbook-like description of some of the main theoretical concepts that apply to post-trade operations in the securities market, it completely ignores the fact that none of Solo's customers ever obtained shares of the relevant Danish companies and, as a result, any internal netting of book entries to establish ownership by its customers was pure fiction.

18.     The Solo trades could not have been and were not actually ever settled. Dr. Carr discusses the fact that the Solo Trades settled on non-market standard dates. But his view that the choice of settlement date could be a function of various factors[23] overlooks the crucial fact that none of the transactions in the Solo trades ever settled at all.

19.     It is my understanding that Solo's position is that two offsetting positions between clients justify Solo's unilaterally creating entries in its records as if the Pension Plans had established a real long position in the shares without regard to the existence of shares or cash to support those positions.  This position is plainly wrong and is not one that any reputable custodian would have permitted.  Solo's position overlooks the fact that to create a genuine position the custodian needs to settle the transactions.

20.      The European Central Bank describes the role of a custodian in respect of settling transactions as follows: "When securities are bought or sold, the custodian takes care of the delivery and receipt of securities against the agreed amount of cash. This process, i.e., the exchange of securities against funds, is commonly called 'settlement'".[24]  Similarly, the Solo Client Custody Agreement states that Solo "will settle all transactions undertaken by the Custodian subject to holding or receiving all necessary documents

---

[22] Carr Report, ¶¶ 44 – 52.

[23] Carr Report, ¶ 50.

[24] ECB Occasional Paper No.68, August 2007, "The Securities Custody Industry", section 1.1.1, p. 6, available at: https://www.ecb.europa.eu/pub/pdf/scpops/ecbocp68.pdf, last accessed January 23, 2022.

or funds and will do so on such basis as is market practice for the type of investment and market concerned and normally on the basis of 'cash vs delivery'."[25]  The allusion to cash against delivery is a reference to DVP, which I explained in the Wade Initial Report.[26]  However, it is not possible to give effect to a DVP settlement without first having actual shares in the custodian's possession.

21.     Reinforcing this point, through various legislation, EU regulators have been clear on their intent to prohibit the creation or reduction of issued securities.  For example, Article 37 of the Central Securities Depositaries Regulation ("CSDR") EU 909/2014 requires the "integrity of the issue" to be maintained, CSDs to take "appropriate reconciliation measures to verify that the number of securities making up a securities issue … is equal to the sum of securities recorded on the accounts [of its participants]", and also states that "securities overdrafts, debit balances or securities creation shall not be allowed."[27]

22.     It is also important to understand the transactions Solo purportedly settled and, on whose behalf, the purported settling was done.   To illustrate, in the Delvian Carlsberg 2013 transaction described in the Wade Initial Report[28] there were three transactions to be settled:

    1.     a Cum-Ex purchase between Delvian and Gulf Management Group;

    2.     a stock loan between Gulf Management Group and Aquila; and

    3.     a stock loan between Aquila and Delvian.

---

[25] See, Section 7.1 of the Client Custody Agreement between Solo Capital Limited and The Batavia Capital Pension Plan, which I understand to be typical of the agreements with other Pension Plans. MPSKAT00000961 – 89, at 65.

[26] Wade Initial Report, ¶¶ 51 – 52.

[27] Available at: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014R0909&rid=1, last accessed January 16, 2022.

[28] Wade Initial Report, ¶¶ 227 – 233 and Figure 11.

23.     Each transaction created distinct legal obligations between each pair of counterparties and each transaction needed to be independently settled.  None of these transactions could be independently settled by the counterparties because none of them had any shares nor could they obtain the cash for the offsetting transactions without shares to provide in exchange.

24.     From the custody and client agreements that I have seen for Solo, there was no basis for Solo to step in and settle these transactions for its clients.[29]  Moreover, even if there was a legal basis, Solo could not have settled these transactions because it did not actually have the shares or sufficient cash for all of the transactions it purported to undertake.

25.     Thus, I conclude that the entries in the statements issued by Solo were fictitious and do not represent transactions which actually settled.

### 3.     There Were No Dividends

26.     Finally, there were no dividends at all.  I have never witnessed the creation of dividends from thin air.  Solo's position essentially appears to be that as long as two counterparties use the same custodian, there is literally no limit to the long and short positions they can generate.  In fact, neither the Pension Plans nor the other Solo counterparties held any shares before, during, or after the Record Date.[30] Despite the absence of shares, the Pension Plans were credited with an amount equal to the net dividend and Solo produced a Tax Voucher as if the amounts received by the Pension Plans were real dividends.[31] It is hard to describe such transactions as anything other than fictitious.

---

[29] In any event, settling transactions for its clients is a highly unusual and inappropriate thing for a custodian to do.

[30] See the extensive discussion earlier in the report concerning the fact that no Solo client ever held any Danish shares.

[31] See, Roadcraft - SKAT_MDL_001_00056852.

27.     Following this to its logical conclusion, there is no limit on the reclaims that could have been claimed.  To illustrate, if the Cum-Ex scheme was legitimate, why not just buy 100% or even 200% of the Maersk or Carlsberg share capital as long as one has a counterparty willing to turn a blind eye and take the opposite position?  Solo's position suggests that two parties can simply generate dividends and tax reclaims from thin air by exchanging automated emails without either party ever having any real shares. This is complete fiction.

28.     In fact, we learn from the testimony of Mr. Markowitz that the real limit on the size of artificially created dividends was a determination to avoid large holding disclosure rules, which I discuss in more detail later in this report.[32]

### 4.     Credit Terms Were Ignored or Not on an Arm's-Length Basis

29.     None of the Solo counterparties could legitimately have entered into the purported transactions on the basis Solo claims.  As I will explain in Opinion 2 below, the Pension Plans and counterparties are shell-like entities with minimum capital which was wholly inadequate to support the types of transactions they claimed occurred.

---

[32] See the testimony of Mr. Markowitz, which explains that the true cap was based on reporting rules.  According to Mr. Markowitz, "A My recollection of these financial models is that one of the variables is a cap or constraint relative to market cap; 5 percent, 3 percent, as it states above.  And that was a limit. The number of shares that an investor bought would be based on the liquidity in the marketplace.  It could have been lower than that amount, equal to that amount. But even if the liquidity was more than 5 percent, the model would not allow or not factor into any more purchases above that cap.  Q And why was that cap being used, 5 percent? A I believe 5 percent was being used because, under German regulatory rules, if an investor exceeded 5 percent, similar to the SEC rules, they would have to have some reporting requirement to the company or to the stock exchange. And in Belgium, we think -- I think the understanding was that it was a 3 percent limit."  Deposition Transcript of Richard Markowitz, April 8, 2021, 143: 1 – 23.  I completely discount his comment on liquidity on the grounds that this is not a concern when there are no actual shares being sourced. Mr. Markowitz further testified they "could have put [the liquidity allocated by Shah] into one entity, but that probably would have required certain reporting requirements."  Ibid, at 356:3-6.

Email correspondence from Mr. Markowitz shows that, in relation to potential reclaims to Belgium, Solo was concerned with the volume of reclaims submitted based on what was typically filed in Belgium by others seeking reclaims.  See WH_MDL_00461595.  See also, WH_MDL_00476560.

Taken together, I infer that the avoidance of detection was a primary design feature for this scheme.

30.     The only security arrangements between the parties to the trades that I am aware of are guarantees from Solo to some of the IDBs.[33]  I consider these guarantees to be of fairly limited value to the IDBs given Solo's limited equity capital of £20m (approximately DKK170m),[34] an amount that could scarcely protect the IDB from a complete failure of even one of the Pension Plans.  Furthermore, the lack of transparency that the IDBs would have had regarding Solo's other transactions, which is entirely normal for a Broker/Custodian and its third-party counterparties, meant that the IDBs could not rely on a claim against Solo's equity capital because they had no way of knowing which other IDBs or counterparties could have had similar claims.

31.     It is my view that the Solo guarantees would have been a necessary but insufficient condition for genuine arm's-length transactions.  The guarantees would have served as evidence to a third party that Solo had some 'skin in the game' but they would not have adequately mitigated credit concerns associated with the purported transactions' sizes.

32.     For example, according to Dr. Carr, in a forward contract "the party with a gain would face credit risk as the counterparty may not honor the obligation to pay the amount required under the contract."[35] Dr. Carr's observation here is correct and in fact, the Wade Initial Report discussed similar issues that

---

[33] See, for example, the Guarantee Deed Solo Capital Partners LLP entered into in respect of the obligations of the Delvian Pension Plan in favor of FGC Securities, which I understand to be typical of the other guarantees provided.  FGC_SKAT-0000780.

[34] See Solo Capital Partners Report and Financial Statements for the Period Ended 31 March 2012; Solo Capital Partners Report and Financial Statements for the Period Ended 31 March 2013; Solo Capital Partners Report and Financial Statements for the Period Ended 31 March 2014; Solo Capital Partners Report and Financial Statements for the Period Ended 31 March 2015. These statements are public records and are available at https://find-and-update.company-information.service.gov.uk/company/OC367979/filing-history, last accessed February 1, 2022

The currency conversion uses the GBP: DKK rate from Bloomberg for July 31, 2013.  The exchange rate varied during the period the purported transactions occurred, so the value of Solo's capital ranges from approximately DKK170m to approximately DKK212m.  I have used the lowest value in the range because from a regulatory capital perspective Solo would have been required to manage with exchange rate fluctuations in its regulatory capital and would also have had to maintain buffers to cover realistic stress scenarios as part of its Internal Capital Adequacy Assessment process.  For more details, see https://www.handbook.fca.org.uk/handbook/IFPRU/2/2.html, last accessed January 27, 2022.

[35] Carr Report, ¶ 84.

arose related to stock loans and futures.  In the Roadcraft Novozymes Class-B (NZYMB) 2015 transaction, Roadcraft, the Pension Plan, purchased 681,437 NZYMB shares on February 25, 2015 for approximately DKK220m and simultaneously entered a forward contract to sell them to Sole Capital Limited ("Sole").[36]  The forward contract matured on June 19, 2015, approximately 4 months after the initial transaction.  Prior to the forward's expiration, NZYMB share prices varied by nearly 15%, with a high of DKK344.9 and a low of DKK301.2.  Compared to Roadcraft's net assets of DKK0.4m[37], peak exposure under the forward was approximately DKK16.9m.[38]  Had this been a genuine arm's-length transaction, the counterparty to the forward would have demanded significant collateral.  Likewise, Roadcraft would have been concerned about Sole's corresponding obligation to complete the forward.

33.     In view of Roadcraft's limited capital, the absolute minimum collateral amount that a true arm's-length counterparty would have required was a pledge of the shares underlying the forward contract.  Absent such a pledge (which Roadcraft could not have made since it had already used the shares as collateral for the stock loan to obtain the cash used to purchase the shares), initial and daily maintenance margin requirements would have been at least as onerous as the margin requirements for the equivalent future, which would have been at the upper end of customary requirements for a counterparty like Roadcraft - meaning 10% of the gross notional of the future (i.e., DKK22m simply to execute future in the first place).[39]  Roadcraft was not in a position to provide such collateral because apart from the

---

[36] ELYSIUM-03853867, ELYSIUM-03860310.

[37] According to an account statement from Solo, Roadcraft's cash assets peaked at approximately USD61,000 in 2015, equivalent to DKK0.4m. ELYSIUM-07639612. Roadcraft's starting capital at its formation in 2014 was even smaller, at USD100, or about DKK667. ELYSIUM-10259211. (I use the exchange rate on Feb. 27, 2015, 1USD: 6.668DKK)

[38] Calculated as: (Maximum difference between the forward price and the spot price) x Number of shares i.e., (DKK344.9 – DKK320.1105) x 681,437 = DKK16,892,483.  Data obtained from Bloomberg.

[39] For comparison the current Key Information Document on Single Stock Futures issued by ICE Futures Europe (one of the largest exchanges in Europe) indicates that margin will include: "Initial margin (approximately 5% - 10% of total contract value)".  See https://www.theice.com/publicdocs/futures/Futures_Europe_Single_Stock_Futures_KID.PDF. Last accessed January 27, 2022.

minimal balances in the Solo custody account discussed above, it appears that the only other asset which Roadcraft had at this time was USD28 in its Wells Fargo bank account.[40]  Moreover, even if Roadcraft had provided such collateral, additional guarantees, control account agreements, or covenants would have been required by Sole to agree to enter into such a forward.  No such negotiations appear to have occurred as to the basis on which Roadcraft and Sole would enter into the forward.

34.     Fourth, as discussed at length in the Wade Initial Report, various stock loan terms including loan pricing were completely off-market which further demonstrates the contrived circularity of the Solo transactions.[41]  Dr. Carr cites a Securities and Exchange Commission ("SEC") report on securities loans which found that "90% of securities lending transactions [in the U.S.] take place with collateral margins in the range of 100% to 111%."[42]  He then points out that the stock loan in the RJM MAERSKB 2013 transaction had collateral of 106.6%.[43]  However, this fact is completely irrelevant to the transactions at hand for two reasons:

> 1.  The vast majority of securities loans occur between the world's largest banks and entities such as large pension funds, investment managers, and agent lenders, which are all highly regulated and well-capitalized counterparties that often use third-party custodians to manage collateral.[44]

---

[40] This amount reflects the original USD100 deposited when the Roadcraft account was set up, less monthly fees to Wells Fargo of USD12 per month.  See, RC00000056, at 56.  In his deposition, Mr. Ronald Altbach, who set up Roadcraft, confirms that this USD100 was the only amount deposited for this Pension Plan.  See, Deposition Transcript of Ronald Altbach, October 30, 2020, 146-147.

[41] See, for example, Wade Initial Report, ¶¶ 160 – 166.

[42] Carr Report, ¶ 116 (footnotes omitted).

[43] Carr Report, ¶ 117.

[44] For example, the International Securities Lending Association ("ISLA") estimated that 43% of all European stock lending took place through tri-party lending arrangements, which are arrangements that involve a major clearing bank or custodian providing segregation of collateral and cash to protect the borrower and lender in the transaction (Clearstream, Euroclear, JP Morgan, Bank of New York, and State Street are the primary providers).

2.  The 106.6% collateral in the RJM MAERSKB 2013 transaction is a random amount that resulted from the deliberate decision to misprice the stock loan by using an out-of-date price in order to ensure the settlement date cash flows matched perfectly.[45]  Dr. Carr arrives at the 106.6% figure by taking the difference between the trade price used for the Cum-Ex purchase and the closing price on the day immediately prior to the settlement. Independent from the fact that the stock loan trade confirmation actually states that the contractual haircut is 0% (meaning that the cash collateral should exactly equal the market value of the shares), Dr. Carr's basic assertion is wrong, since one can easily see that even if the parties had used this closing price to set the margin, it was the equivalent of agreeing on a collateral margin level by the equivalent of rolling dice.  For example, I have looked at what the collateral margin rate would have been had the parties entered into the same trades over the same time period over which the RJM MAERSKB 2013 transaction took place.[46]  Specifically, I have assumed that: (i) a stock loan is executed on each date between April 16, 2013 and June 13, 2013 and (ii) the value of the cash collateral provided is based on the $T - 3$ closing price of the shares (consistent with what the Solo Pension Plans did).  The chart below shows the effective margin provided, which is the ratio of the value of shares given to the value of cash collateral provided.  The

---

See the Securities Lending Market Report, September 2019, available at: https://www.islaemea.org/assets/smart-pdfs/isla-securities-lending-market-report/files/downloads/ISLA_SLReport_Sep2019.pdf, last accessed January 22, 2022.

[45] To explain this point, in the RJM MAERSKB 2013 transaction (which I discuss in detail later in this report) RJM purchased 10,400 MAERSKB shares for approximately DKK454.3m on 11 April 2013.  On the day the stock loan was executed, the market value of the 10,400 shares was approximately DKK426m, meaning that if the stock loan had been executed at the market level and with no haircut, as prescribed by the stock loan confirmation, the Pension Plan would have had a shortfall of DKK28.3m.  This is the same shortfall which Dr. Carr claims is a margin of 6.6%.  Other than its arithmetical accuracy, this claim is completely wrong and inconsistent with both the evidence terms of the stock loan and market practice. See ELYSIUM-01574029 (RJM confirmation for stock loan to Colbrook with no haircut.)

[46] This is the period that the stock loan was in place for this particular transaction.  Source: Refinitiv Eikon data. Had I chosen any random time period, the result would likely have been very similar because over any given 3-day window, the movement of share prices is unpredictable.

results of this analysis clearly and unsurprisingly show that the margin level is entirely dependent on 3-day market price moves which are random in nature and range from 95% to 107% of the cash collateral received.  Therefore, far from justifying the collateral margin terms, Dr Carr's analysis simply highlights the non-commercial and contrived nature of the arrangements.

**Figure 1**



3.   Finally, and to conclusively demonstrate the point made above, I note that in at least one transaction which I have reviewed the approach led to a negative haircut.  In the Delvian COLOB 2014 transaction, Delvian claims to have purchased 649,227 shares on May 8, 2014, at the price of DKK468.1 per share for a total consideration DKK303.9m[47]. Delvian financed this position by entering into a stock loan with Colbrook on May 13,

---

[47] ELYSIUM-03064431.

17

2014, using the same price[48].  The market price for the shares lent under the stock loan on May 13, 2014, was DKK473.6[49] per share meaning that the market value of the shares which Delvian financed was DKK307.5m.  Using the approach put forward by Dr. Carr, the margin level of the cash collateral was 98.8% (or put another way there was a negative haircut of 1.2%).  The suggestion that the back-dated pricing of the stock loans was a deliberate or arms'-length security arrangement is clearly nonsensical.  The parties used back-dated prices for the stock loans purely to ensure there was no net cash to transfer on the settlement date because none of the parties had sufficient cash to execute the trades they claim to have undertaken.

35.     The final point to note in respect of the stock loans is that under section 5.4 of the GMSLA, which Dr. Carr highlights in his report, there is a requirement for the parties to perform a daily mark-to-market of the shares and collateral provided and to adjust the collateral balances accordingly.  The custody statements for RJM include various schedules of the calculations of the stock lending fees and a "Daily MTM" column throughout the life of the stock loan but there is no evidence in the cash account statements suggesting that any variation margin was actually settled between the counterparties.[50]  In fact, there are three entries in the EUR cash statement for Initial Margin, Variation Margin and Stock Margin which are all zero.[51]  Even if they had performed a daily mark-to-market accounting of the shares and collateral

---

[48] ELYSIUM-03078154.

[49] Source: Refinitiv Eikon.

[50] See, MPSKAT00068151 (GMSLA between RJM Capital and Colbrook), MPSKAT00135581 (custody statement for RJM Capital, 2013).  The stock loan calculations in respect of the 10,400 MAERSKB shares are on p. 23 of the custody statement.

[51] The EUR Cash statement is the relevant one because the GMSLA has a Base Currency of Euro (Section 2 of the Schedule at MPSKAT00068151, at 83), although there are similar zero entries in the DKK Cash account (see, MPSKAT00135581, at 49 onwards for the Cash Statements)

provided in order to adjust the collateral balances accordingly, these would simply have been fictitious book entries because RJM did not have any cash to make the variation margin adjustments anyway.

## 5.  These Were Not Genuine Investment Strategies by the Pension Plans

36.     An analysis of the profit and loss outcomes of the transactions makes it clear that the transactions were strictly part of a tax reclaim generating scheme with no other commercial drivers or opportunities for gain or loss.

37.     Dr. Carr does not include the stock loans in his profit and loss calculations, yet they were clearly critical to the transactions.  Accordingly, I have computed the profit and loss from the two trades in the Wade Initial Report and independently recomputed the two additional transactions analyzed by Dr. Carr.[52]

38.     The following table shows that these transactions were entirely circular and the only pre-tax economic consequences for the parties were the transaction fees paid to Solo and the IDBs.  Solo carefully managed the pricing of the instruments to generate zero net cash flows for all parties (excluding transaction fees and the tax reclaim), which is a clear indicator that these were not market transactions.[53]

39.     It is also apparent that the effective dividend pricing in these transactions was 73% (i.e., the Pension Plan acquired a net dividend compensation payment for consideration equal to the net dividend), which is well below the market level established by the contemporaneous ED&F Man Cum-Cum transactions.  Had the Pension Plan genuinely acquired Cum-Dividend shares it would have had to compensate the seller or lender around 90% of the gross dividend (meaning that it would have had to pass

---

[52] My detailed analysis of the RJM Maersk B 2013 transaction and the Proper Pacific CHRH 2014 transaction are included later in this report.

[53] It is not credible that one could execute a stock purchase, forward, and stock loan so that the cash flows net out to zero so perfectly.  As I explained earlier, the stock loan was priced using a backdated price and the rates were carefully managed to obtain the desired result (sometimes by ignoring the terms of the trades executed as explained in my original report).  See, Wade Initial Report, ¶260.

about 62% (= (90% - 73%)/27%) of the value of the tax reclaim to the share seller/lender[54].  However, the Solo transactions were structured so that the Pension Plan received 100% of the tax reclaim.

40.     I have calculated the pre-tax profit for each of the four transactions, which is the net result from all of the transactions and ignores transaction fees and the tax reclaim.  I then show the impact of transaction fees on the net pre-tax profit.  As seen in the table below, the net pre-tax profit was always a small negative number which not more than 0.03% of the transaction notional amounts.  In trading terms, each transaction amounted to a loss of between 0 and 3 basis points.

**Table 1: Net Pre-Tax Profit for Various Solo Transactions**

| Solo Transaction | Number of shares | Cum-Ex Purchase Price | Notional (DKK) | Trade Profit | Transaction Fees | Adjusted Net Profit | Adjusted Net Loss (% of net profit compared to Notional % (and bps) |
|---|---|---|---|---|---|---|---|
| RJM Maersk B 2013 | 10,400 | 43,680.29 | 454,275,009 | 22,085 | (31,340) | (9,254) | - 0.002 % (0.2 bps) |
| Proper Pacific CHRH 2014 | 839,500 | 258.90 | 217,346,550 | 0 | (63,944) | (63,944) | - 0.030 % (3bps) |
| Delvian CARLB 2013 | 600,000 | 586.4698 | 351,881,880 | 31,490 | (52,395) | (20,905) | - 0.006 % (0.6bps) |
| Roadcraft NZYMB 2015 | 681,437 | 322.5 | 219,763,433 | 0 | (2,763) | (2,763) | - 0.001 % (0.1bps) |

41.     It is completely implausible that the Pension Plans or IDBs entered into transactions with notional sizes of DKK200-500m where the net result, excluding the tax reclaim, was no gain or loss, give or take a few basis points.  Further, as I explained in the Wade Initial Report[55] and also address later in this report, in some cases even these marginal outcomes appear to have been retrospectively corrected by Solo to ensure the Pension Plans precisely made no gain or loss.[56]

---

[54] See, Wade Initial Report, ¶¶ 264 and 265.

[55] Wade Initial Report, ¶¶ 259 – 266.

[56] The only plausible conclusion to be drawn is that while the trades were structured so that that all trades should net perfectly to zero, because some of the transactions involved entering into futures and forwards and then

42.     The marginal trade profit of DKK 31,490 made by Delvian on the alleged Carlsberg transactions appear to have been ultimately lost through retrospectively corrected interest rates on other DKK trades, according to the Delvian 2013 annual statement from Solo.[57]  As shown in the Wade Initial Report, Solo transactions were altered after the fact to ensure that the trades netted nearly perfectly to zero.[58]  Solo's annual statement for Delvian shows evidence of this conduct too. The statement shows that the sum of all of Delvian positions was DKK -83.87 at the end of the year.[59]   This amount is only achieved by artificially increasing some of the interest payments beyond what was purportedly agreed to in the original trade confirmations.   For example, the interest payment made by Delvian in connection with its Novozymes A/S Class B 2013 transaction is calculated as 1.87%,[60] even though the relevant trade confirmation states that the interest rate would be DKK Overnight LIBOR + 70 basis points, meaning that the correct rate was around 0.79%.[61]  A similar adjustment is made on other interest payments in  the statement, including Delvian's interest payments in connection with its Novo Nordisk Class B 2013 transaction.[62]  Furthermore, the annual statement for 2013 no longer uses the amended interest rate for the Chr. Hansen trades reflected on the March 2013 statement outlined in the Wade Initial Report.[63]

---

terminating them with offsetting contracts before their contractual maturity, it was impossible to guarantee the results perfectly due to interest rate breakage costs.  The stock loan fee adjustments were used to deal with such minor fluctuations.

[57] MPSKAT00166249

[58] Wade Initial Report, ¶ 264.  As I have explained earlier in this report it is simply not plausible that this occurred either by chance or as a result of true arm's-length pricing.

[59] This is the total of the alleged DKK equity settlements, dividends, stock loan interest & fees and the realized futures loss. MPSKAT00166249 at 328.

[60] MPSKAT00166249 at 269.

[61] ELYSIUM-01365057. DKK Overnight LIBOR did not exceed 0.09% during the period, as shown, for example, in the calculation of Delvian's stock lending fees for the same transaction. MPSKAT00166249, at 271.

[62] See ELYSIUM-01482447. The calculation is found in MPSKAT00166249, at 275. The interest rate used in this case was 1.40%.

[63] Wade Initial Report, ¶ 264.

Instead, the amended interest rate payments on other interest payments on Danish shares now negate the profit, leading to a net trading loss across all DKK trades for Delvian in 2013 of DKK83.87.

43.     Based on this analysis, these transactions could not have represented real trading or investment opportunities.  Instead, they were carefully constructed circular shams that were designed to create the illusion of real positions and real dividends for the Pension Plans to facilitate the filing of tax reclaims. This fact is apparent from the complete analysis of the trades, which demonstrates they were circular.  Dr. Carr ignores the circularity of the transactions and as a result fails to grapple with the reality of this scheme.

### 6.     The Number of Shares and Financing Arrangements Were Implausible

44.     The Pension Plans purportedly purchased very significant positions in Danish shares without having any agreed funding in place to finance the purchases.  Notably, but inexplicably, the Trade Date for the stock loans was three trading days after the Trade Date for the Cum-Ex Purchases, meaning that the Pension Plans were exposed to the obligation to settle purchases of a large number of shares for up to five days, but had no confirmed means by which to do so.[64]  I have seen no evidence and nothing in the testimony of the Pension Plan participants suggests that the Pension Plans had access to independent liquidity facilities.[65]  It is simply inconceivable that a broker/custodian would have authorized clients like the Pension Plans to commit to such large purchases without ensuring they had adequate funding lines in

---

[64] See for example, the Wade Initial Report ¶¶ 227 – 233, where I show that the Cum-Ex purchase in the Delvian CARLB 2013 transaction had a Trade Date of March 21, 2013 and the stock loan was transacted on the Record Date which was March 26, 2013.

[65] Liquidity facilities here refer to pre-agreed lending facilities from a bank or prime broker that would have allowed the Pension Plans to draw funds on demand.  For example, some hedge funds have pre-agreed borrowing facilities that they use to fund leveraged trading positions.  Such borrowing facilities are typically subject to specific terms and conditions, including collateral and diversification requirements.

place or itself agreeing to provide the required funding.[66]  If the Pension Plans' intention was to refinance the shares and use them to fund the purchase, the broker/custodian would have required that such borrowing be confirmed prior to the purchase.  Likewise, a prudent Pension Plan would not have placed an order for what, at times, was several multiples of the ADTV[67] of the shares of a listed company and extreme multiples of the net assets of the Pension Plan without some significant due diligence on the ability of its counterparty to locate and deliver the shares.[68]

45.     As discussed in the Wade Initial Report, there would have been significant challenges and stiff competition to locate positions of this size, particularly around Record Date, and yet these hurdles appear to have been completely ignored by the parties. A settlement failure by either Pension Plan or Broker would have posed an existential risk[69] to the transaction counterparties as well as Solo, but it seems to have been completely disregarded by the participants.

46.     The testimony of Richard Markowitz is telling as to the artificiality of these trades. He testified as follows: [70]

> Q        …Typically, in a stock lending transaction when you negotiate the price and the terms, the starting point is what's the market value of the shares today, and then, do we need a haircut or a premium. Isn't that how it typically works?

---

[66] I note that the Solo Client Custody Agreements do envisage the theoretical possibility of the Custodian advancing funds to settle transactions.  See, for example, Section 4 of the agreement for the Batavia Capital Pension Plan, MPSKAT00000961, at 63).  However, I dismiss this possibility for the following reasons: (i) as previously discussed in detail, Solo did not have access to cash to settle the trades anyway, (ii) had Solo actually intended to use these provisions, I would have expected to see clear terms providing for credit limits, collateral requirements, etc. and (iii) in any event, for the reasons discussed earlier in this report, Solo would not have had enough regulatory capital to support such lending.

[67] Average Daily Trading Volume: the average number of shares of a given stock traded in a single day.

[68] For example, in the Proper Pacific CHRH 2014 transaction detailed later in the report, Proper Pacific claims to have purchased 839,500 shares which was approximately 384% of the ADTV of these shares around the dividend date as shown in Appendix D of the Wade Initial Report.

[69] An existential risk is a loss that would potentially have resulted in the counterparty becoming insolvent or otherwise unable to conduct its other business.

[70] Deposition Transcript of Richard Markowitz, Vol. 1, April 8, 2021, 183:1 – 184:24.

A      Yes.

Q      Okay.    But here, with respect to the shares purchased in Danish securities, in every case, the stock lending transaction that takes place six days later is at the same price as the purchase   price from six days earlier. Isn't that right?

A      Yes.

Q      Okay.    And that -- sometimes that market might have gone up on certain shares, sometimes it might have gone down, and in varying amounts. Correct?

…

Q       Is that right? six days, in every case, the stock lender gave the amount of money based on the price of the purchase six days earlier. Right?

A      In every case, that's what the pension plan requested in terms of collateral to be posted.

Q      Okay.    And regardless of whether the share price had gone up, down, or something in between, in every case, the lender was willing to meet the request of the pension plan to use the price at the time of the purchase?

A      Again, the pension plan had hedged its position, so it knew exactly what the value of its assets were.   Its asset value was -- between the shares it owned, and the futures contract it sold was a price below the price at which it purchased the shares. And so, in every case, the stock loan was for an amount in excess of the value in the pension plan's hands.    You're ignoring the hedging transaction that is critical to an investor in these trades.

Q      Right.    And that's -- the hedging

A      Yes.

47.    A security purchase such as that described above may be hedged with the sale of a future or forward contract, but in actuality there is no such thing as a 'perfect hedge'.  The security and futures or forward prices may become uncoupled for various reasons, including liquidity issues, slippage in trade execution, priority differences in potential default, settlement issues, and different views about the interest rate during the holding period.  This uncoupling is reflected in different market prices between subsets of securities holders on one hand and forward or futures holders on the other and is precisely why futures exchanges demand initial margin requirements to protect against the possibility of loss, even where a trade involves hedging.

48.    Mr. Markowitz also ignores another fundamental point about the consequences of the Pension Plans failing to settle their purchases as a result of the stock loan either not being executed or failing.  If such a situation occurred in a real arm's-length situation, then the Pension Plan would default on its Cum-

Ex purchase.  Regardless of whether the default was sufficient to cause the Pension Plan to become insolvent, it would need to notify the forward counterparty of its default and then it would entirely be up to the forward counterparty to determine the price at which to unwind the forward.[71]  The ISDA convention is that non-defaulting counterparty can re-establish its own hedge in whatever way it sees fit and use the new hedging price as the unwind value for the existing forward.[72]  In an arm's-length situation such a default would in all likelihood have led to very significant losses for the Pension Plan.

49.     Furthermore, Mr. Markowitz's testimony completely mischaracterizes the risk that the stock loan counterparty actually undertakes.  The stock loan counterparty provides financing in the form of cash collateral but only has the shares it receives in return as security.[73]  Notwithstanding that the Pension Plan has a future or forward hedge in the trades I have reviewed, it is of no value to the stock loan counterparty in the event of a default by the Pension Plan.  The counterparty only has a right to liquidate the shares and then make an unsecured claim against the estate of the Pension Plan for any shortfall.  As I have already demonstrated earlier in this report, the ratio of the value of the shares to the value of the cash collateral exhibits significant volatility.  For example, a default on the Settlement Date of the RJM MAERSKB 2013 transaction by RJM would have left the stock loan counterparty, Colbrook, with

---

[71] See, for example, MPSKAT00119640, which is a long form confirmation for a forward undertaken by a Pension Plan and I understand is typical of all the forwards undertaken.  According to it, the calculation agent is the counterparty entering into the forward with the Pension Plan, and it does not have any protections that would be customary in an arm's-length situation (e.g., reference to independent price sources or panel of dealers).  As a result, the forward counterparty has significant discretion to decide what price to terminate the forward at.

[72] Based on my experience structuring, executing, and managing ISDA-based contracts and disputes thereon, there are numerous situations which could easily transpire where the forward close out price could depart significantly from the share price for all contracts, for example, if the market moved significantly during the default period, if the forward counterparty could not easily find an alternative hedging transaction (which would be highly likely given the size of positions), or if there were simply funding or execution costs for the forward counterparty.

[73] Recall in the Solo transactions there was, of course, no actual cash or shares.

unsecured exposure of DKK28.3m (i.e., precisely the same amount which Dr. Carr described as margin in his report).[74]

50.      Settlement risk, a serious concern for regulators and reputable market participants, is formally addressed in the EU's Central Securities Depositories Regulation ("CSDR").[75]   The CSDR imposes formal rules which permit parties to failed trades to effectively cancel their trades, 'buy-in'[76] the missing securities from another counterparty, require the failing party to provide compensation for any losses incurred, as well as impose penalties.   Long before formal regulations were introduced, market participants would carefully monitor and report their settlement exposures to risk functions and regulators.   To take the RJM Maersk B 2013 transaction as an example, the gross settlement risk was equal to the share purchase price of DKK454.3m.   A 5-day settlement delay could easily have seen share price moves of 5% of more leading to a potential risk of loss of DKK22.7m on a single transaction. Without considering the other transactions they were party to this amount alone could not have been sustained by the Pension Plans or stock loan counterparties and would have wiped out well over 10% of Solo's regulatory capital.[77]   The only plausible explanation for the fact that this risk was ignored entirely is that all the parties knew that they were entering into entirely circular and self-cancelling trades.

---

[74] The RJM MAERSK 2013 transaction is discussed in full later in this report and the stock loan discrepancies were discussed in the previous section.

[75] See, EU Regulation 909/2014, available at: https://op.europa.eu/en/publication-detail/-/publication/e58428b4-2e81-11e4-8c3c-01aa75ed71a1/language-en, last accessed January 16, 2022.

[76] The International Capital Markets Association ("ICMA") describes the buy-in as a mechanism that "provide[s] a buyer of securities the contractual right to source the securities elsewhere (usually for guaranteed delivery), cancel the original trade, and settle between the two original counterparties any differences arising from the net costs of the original transaction and the buy-in transaction."  See, ICMA briefing note on CSDR Settlement Discipline – Mandatory Buy-ins (August 2019).  Available at:
https://www.icmagroup.org/assets/documents/Regulatory/Secondary-markets/CSDR-Settlement-Regulation/CSDR-Brochure-August-2019-190819.pdf, last accessed January 16, 2022.

[77] Earlier in this report, I mentioned that I estimated Solo's equity capital as approximately DKK170m.  So, this loss would be approximately 12.5% of its capital (=DKK22.7m/DKK170m).  Notably, the illustrative 5% move in the market that I chose was far from the worst-case scenario in view of the volatility of individual share prices.

B.     **Opinion 2: The Counterparties to Solo Were Not Genuine Arm's-Length Market Participants with the Financial Capacity to Conduct the Purported Solo Trades with the Pension Plans**

1.     **The Kaye Scholer Plans**

51.     The testimony of Robert Klugman provides an insight into certain of the Solo Counterparties. Mr. Klugman was involved in setting up approximately 40 Pension Plan accounts that traded with Solo.[78] Minimum capital requirements were waived for the Kaye Scholer Plans.[79] Their accounts were established with as little as USD1,000 to USD2,000 in initial capital.[80] Not a single Solo custodian required the Kaye Scholer Plans to put up cash in the custodial accounts.[81] Mr. Klugman essentially rejected the notion that there was counterparty risk in the Solo trades, except as to the forward

---

[78]"Q: At the time of that dinner, do you know how many plans had been set up between you, Mr. Markowitz, and Mr. Van Merkensteijn? A: I don't know. It was -- it could have been the full 40. There were fits and starts. I think not all of the plans traded in August. I'm having trouble remembering exactly, but it would have been -- you know, it would have been somewhere along the spectrum between zero and 40, or between six and 40, since I had six set up."  Deposition Transcript of Robert Klugman, January 28, 2021, 66:19 – 67:5.  One of Mr. Klugman's six plans – The TENS Services LLC 401k Plan – did not receive any reclaims from SKAT. *Id.* at 86:19-25.  I refer to these Pension Plans as the "Kaye Scholer Plans" because Mr. Klugman, Mr. Markowitz, and Mr. van Merkensteijn used the services of defendant Michael Ben-Jacob and the law firm Kaye Scholer LLP in establishing and maintaining these Pension Plans.  See Deposition Transcript of Robert Klugman, January 28, 2021, 62:23 – 64:9.

[79]"Q What about this -- the minimum, 500,000 Euro? What -- how was it that you did not put 500,000 Euro into your plan accounts?  A It wasn't required by the custodian. Q And can you tell us, was there any -- how did that come to be? Because you can see here, it says, "The plan is required unless otherwise waived in writing." Was there a waiver in writing? A There may have been. I don't know. Q When you say it wasn't required, tell us what you mean.  A Solo Capital didn't require 500,000 Euros. I believed they asked for 40,000 -- $40,000, perhaps.  Q And what did you do when they asked for the 40,000? A Well, I remember there was an issue of transferring money into that plan, a personal tax issue on my part. So, I had asked if it could be waived for all my plans. Q So, for all of your plans, the 40,000 requirement was waived? A Yes."  Ibid, 87:15 – 88:16.

[80] "Q In terms of an initial funding, did you ever make any initial funding of your plan accounts with any -- with any cash? A Yes, I did. Q And how much in cash did you put into your plan accounts?  A It was smaller amounts. It was -- it would have been like 1,000 or $2,000."  Ibid, 83:10 to 84:9.

[81] "Q Did anyone from any custodian ever contact you and tell you that you needed to transfer cash to meet a minimum account balance? A No, I don't remember that happening."  Ibid, 102:6 – 11.

counterparty.[82]   According to him, if the pricing had moved against the Plans, the transactions would

unwind with no loss to his Pension Plan:[83]

> "Q And what is that risk?
>
> A Well, that would be if -- if the stock went -- let me make sure I got the direction correct. **If the stock went down, and they -- the forward counterparty owed us money and couldn't pay it. Q Was there any other counterparty risk if the stock loan party fails and doesn't deliver cash? Is that a counterparty risk?**
>
> **A Not really, no.**
>
> **Q Why not?**
>
> **A Well, because then the transactions would unwind with no loss to the -- to my plan** [emphasis added]."

---

[82] "Q And what did the counterparties here -- well, let me ask you. What did you do to determine -- what due diligence did you do to determine whether -- what the significance of the counterparty risk was with respect to the people -- to the counterparties that the plans were trading with? MR. ALLISON: Object to form. A Well, the only -- the only real counterparty risk that I can think of, and now I don't know whether this was what I was thinking then or thinking now, would be from the forward counterparty. Q And what is that risk?  A Well, that would be if -- if the stock went -- let me make sure I got the direction correct. If the stock went down, and they -- the forward counterparty owed us money and couldn't pay it. Q Was there any other counterparty risk if the stock loan party fails and doesn't deliver cash? Is that a counterparty risk? A Not really, no. Q Why not? A Well, because then the transactions would unwind with no loss to the -- to my plan.  Q And what if there's a custodian fail? Is there a risk of loss there? A In what way -- a custodian fail? Q The stock was not available to one or more counterparties because the custodian has failed. A I'm -- I'm sorry. I'm missing – I understood how you described the other fails, but I'm -- I'm not seeing how the custodian fails, or you're -- I'm not understanding the hypothetical. I apologize. Q You're familiar with the financial crisis, obviously? A Yes. Q And the failure of some large banks, including Lehman? A Yes. Q And you're aware that some – for some fairly lengthy period of time, hedge funds and other market participants were not able to access securities at certain institutions? A Yes. Q Okay. So you're aware that that caused some hedge funds to have considerable distress and even failures? A I imagine so, yes."  Ibid, 127:14 - 129:20.

[83] Ibid, 128:3 – 18.

52.      When establishing the Plans, Mr. Klugman performed no due diligence to evaluate the counterparty risk,[84] claiming there was little counterparty risk associated with the stock lending counterparty (similar to the claims he made about the forward counterparty).[85]  He testified that:[86]

> "A If it's just -- let's say the stock is 100, and then, on the date of the settlement -- I'm just going to use a very simplified example -- it goes down to 95. So you've -- or maybe I have the wrong – it should be -- no, because we're talking about the failure of the stock loan.  I'm trying to figure out which way the risk is. Let's say it's 105. I think it's 105 -- let's use 95. And if it doesn't work out in the right direction, I'm going to go to 105. Ninety-five, the stock's gone down by five, and it's time to pay for the stock and no one has given us a hundred dollars. And so, gosh, we've lost five dollars on that stock. Someone is going to have to it pay for it. And someone is going to come to look for us -- when I say "us," the pension plan, someone's going to look to the pension plan for five dollars. And right now, the pension plan has nothing except it does. It does have a five-dollar asset in the form of the forward contract, which is a perfect hedge. So at the end of the day, yes, they'll never take delivery of the shares because no one's -- because they can't pay it unless they find some other stock lender at the time, which I guess is possible. **But there's no real loss because they would unwind the forward contract and somehow get the five dollars that is owed to them on the forward contract, use that to pay off the cost of the failure on the stock purchase, and that's it [emphasis added]**. Does that make sense?
>
> Q Well, just except for one thing. How would the plan unwind the forward contract if there had been a default?

---

[84] "Q And are you aware of any due diligence that anyone performed on any forward counterparty? A Specific due diligence? No. Q Are you aware of any due diligence that any forward counterparty performed on any plan or any other participant in the Danish trading transactions? MR. ALLISON: Object to form. A No, I'm not familiar with that, no. Q Are you aware of any due diligence that any party to the Danish trading transactions performed on any other party? MR. ALLISON: Object to form. A Well, I do know there was a lot of due diligence done originally on Solo Capital by the Argre team. There [was] various successful transactions done over the years and I don't know specifically what was done in 2012, 2013, and in the first part of 2014, before I got involved. But I know they were -- all the transactions were successful and there were no failures involved. Q Is there any due diligence that you're aware of, by any party, that was done by any other party to the Danish trading transactions, other than what the Argre team did with Solo and the earlier successful transaction? A Well, I also know that Kaye Scholer was involved in those earlier transactions as well, as well as other law firms involved in -- in the -- you know, reviewing all the documents on other transactions. Specifically, what exactly they did, I can't speak to. Q Okay. So other than what the Argre people may have done, and the Kaye Scholer law firm may have done, are you aware of any due diligence by any party, on any other party to the Danish trading transaction? A Other than what the Argre team did and Kaye Scholer, no, I'm not aware of anything other than those parties. Q And what can you tell us about the due diligence on Solo that the Argre team did? A Well, when they were initially contemplating transactions with them, I know they did a crawl search, both on Sanjay Shah and on Solo Capital. Q Anything else? A I don't know other -- I mean, before entering into any transactions, like before even contemplating transactions, looking at transaction documents, et cetera, no, I don't know of anything else."  Ibid, 133:25 – 136:7.

[85] For a more detailed discussion of the issue, see, Ibid, 136:21 – 142:17.

[86] Ibid, 140:15 – 142:17.

A I imagine there's an early settlement provision in the forward contract, or it could be a negotiated early settlement provision. You know, the forward counterparty again -- the forward counterparty would probably be interested in doing that.

Q But if it was unable to negotiate, then you would have -- if the plan was not able to negotiate an early settlement, then it would be uncovered?

A Theoretically, yes."

53.     In the end, with none of the Pension Plans' Solo custodian accounts funded with more than $40,000, and some with no money at all, and with little to no counterparty due diligence, the 40 Kaye Scholer Plans would go on to trade in transactional volume in the range of billions of dollars over a one-month period.[87]  Such massive-scale transactions would simply not have been possible if the transactions conducted by Solo had been legitimate market-facing competitive trades between arm's-length counterparties.

### 2.     The Amalthea Counterparty

54.     Additional documents produced in this matter are also helpful in shedding light on the nature of the counterparties to the Solo transactions.   One of the counterparties to the Solo transactions was Amalthea Enterprises Limited ("Amalthea").  It was incorporated in the Cayman Islands on February 14, 2013.[88]   According to Amalthea's Memorandum of Association, its capital at registration was

---

[87] "Q Okay. Were you aware at any time that the 40 plans had billions of dollars of holdings in Danish stock? MR. ALLISON: Object to form. A I knew we made, over the time, billions of -- likely made billions of purchases. I don't know what is the determination for the TIC Form S reporting of how they calculate purchases of foreign equities. Q So you understood that, over time, plans had purchased many billions of dollars' worth of Danish stock. Is that correct? A Again, I'd have to look back, but I wouldn't be surprised at overall purchases in -- what is that -- ten figures or 11, whatever, in the billions, yeah.  Q But do you understand this report is not over all time? This is over a one-month period and has the holdings during that period. A I don't know if it has the holdings during that period. It has the purchases. Q Right. Okay. So were you -- A I don't know -- I don't know what -- you know, I -- from these forms, there's always different calculation methods and different determinations. So I don't know exactly what went into putting these numbers in. Q Were you aware that, under any calculation method, the 40 plans had many billions of dollars of purchases of Danish shares during May of 2015? A I'd have to look back. I don't know how much trading was done in May of 2015. Q You did receive this e-mail. Right? A Yes, I did. I was copied on it." Ibid, 146:17 to 148:8.

[88] ELYSIUM-09758834. See also CAYMAN_00004211 (Affidavit of Cory Macculloch of Sterling Trust (Cayman), Amalthea's Corporate Services Provider).

USD50,000.[89]  There is no indication that its capital increased, since Amalthea issued no changes to its Memorandum of Association.

55.     According to its onboarding documents with Solo that were filed a week after Amalthea's incorporation,[90] 100% of Amalthea's shares were owned by Guenther Grant-Klar, who was also the firm's director and its sole authorized trader and authorized signatory.[91]  Apart from Mr. Grant-Klar, I found no record of any additional staff who worked at the company.

56.     Mr. Grant-Klar, resided in Dubai at the time and was known to Solo at the time of Amalthea's onboarding, as Solo already had an account for Daintree Capital, where he was a director and owner.[92] Moreover, until 2012 (i.e., approximately a year before Amalthea was incorporated), Mr. Grant-Klar had been an employee or affiliate of Solo, both in the U.K. and in Dubai.[93]

57.     Based, it appears, on its declaration only, Solo approved Amalthea's treatment as a professional counterparty.  Acting on behalf of Amalthea, Mr. Grant-Klar declared his intent to transact in trades larger than EUR 500,000 with Solo.[94]  He received Solo's approval on March 1, 2013.[95]

---

[89] "The share capital of the Company is USD 50,000.00 divided into 50,000.00 Ordinary shares of par value USD 1.00 each."  Ibid.

[90] ELYSIUM-01307083.

[91] Ibid.

[92] According to Companies House, Daintree Capital was incorporated on October 5, 2012. Guenter Grant-Klar was its sole director. The company issued one share at par value of GBP 1.00. See, https://find-and-update.company-information.service.gov.uk/company/08242493/filing-history, last accessed January 27, 2022.

[93] According to Companies House, Grant-Klar was a director of FTJ (Non-Trading) Limited, whose registered address was as Solo Capital Ltd., through its dissolution on January 31, 2012. See, https://find-and-update.company-information.service.gov.uk/company/07101175, last accessed January 27, 2022. Grant-Klar was also listed as a secretary of Elysium Global (Dubai) Limited, a subsidiary of Solo Capital Ltd., through January 24, 2012.  See, https://www.difc.ae/public-register/elysium-global-dubai-limited/, last accessed January 27, 2022.

[94] ELYSIUM-01307083.

[95] ELYSIUM-01342518.

58.     A few days later, Mr. Grant-Klar signed GMSLA agreements with 34 counterparties, which included the Solo Pension Plans and various counterparties to their transactions.[96] Within days of signing the GMSLA agreements, Amalthea was a party to stock loans of Danish stocks with a notional value of close to DKK 1 billion, that were transacted with seven of these counterparties.[97]

59.     Its account statement from Solo showed no cash, even as it purportedly engaged in stock lending and borrowing transactions with notional values in billions of DKK and USD.[98]

60.     In sum, this record paints a clear picture that far from being an arm's-length counterparty, Amalthea was a shell company that appears to be nothing but a cover for Mr. Grant-Klar's fictitious trading activity and an entity designed to obfuscate the circularity of the transactions in the Solo scheme. Put differently, Amalthea is the very picture of extreme counterparty risk. No prudent or reputable market participant would have traded with such a counterparty.

61.     According to its 2014 Q1 statement from Solo, Amalthea was party to 504 forward purchases during the quarter, with an aggregate notional value of over DKK330 billion. All of these positions were open at the end of the quarter. Even a 0.1% adverse change in the value of the underlying Danish stocks would have caused a mark-to-margin loss of over DKK330m. Yet there is no indication that Solo or any of Amalthea's counterparties were concerned about this risk or took any action to protect themselves. This is further evidence that these purported forward transactions were fictitious.

---

[96] ELYSIUM-01450347.

[97] See, Stock Loan Transaction Statement (ELYSIUM-01744706), showing Amalthea borrowed over 20 million shares of TDC A/S on March 12, 2013 from five different pension plans, and lent the same shares to other counterparties.

[98] ELYSIUM-01744706.

### 3.     The Colbrook Counterparty

62.     Amalthea is, in fact, just one of many counterparties that were incorporated in late 2012 or early 2013.[99]   Colbrook Limited ("Colbrook") is another example of a counterparty with the characteristics I just described.   Colbrook was incorporated in the Cayman Islands on February 18, 2013,[100] four days after the incorporation of the Amalthea counterparty.   According to its Memorandum of Association, its capital at registration was also USD50,000.[101]   There is also no indication that the capital increased, as Colbrook's Amended and Restated Memorandum of Association also stated that the share capital of the company was USD50,000.[102]

63.     According to a Cayman Islands document, as of March 8, 2013, the company's directors were Alexander Glen Smith and Martin Glen Smith.[103]   Martin Smith was the sole owner and authorized signatory, and Alex Smith was an authorized trader.[104]   Both individuals provided Solo with telephone numbers registered in the United Arab Emirates ("UAE").[105]

64.     Following the same steps as Amalthea, Colbrook was quickly onboarded into the Solo system. On March 12, 2013, less than a month after its incorporation, Colbrook also engaged in exactly the same trades Amalthea did, except with different Pension Plans and counterparties: it borrowed TDC A/S shares

---

[99] Aquila (Cayman) Limited, D.D.C (Cayman), BluMarble Capital, Chem Capital, Gulf Management Group and SPK 23 (Cayman) Inc were all incorporated in 2012 or 2013. CAYMAN_00004215, CAYMAN_00002756, ELYSIUM-00879476, CAYMAN_00002658, ELYSIUM-01363300 and CAYMAN_00000083.

[100] ELYSIUM-01475804. See also CAYMAN_00005688 (Affidavit of Brian Kevin Mulvihill of Harney Fiduciary (Cayman), Colbrook's Corporate Services Provider).

[101] "The share capital of the Company is USD 50,000.00 divided into 50,000.00 Ordinary shares of par value USD 1.00 each."  Ibid.

[102] CAYMAN_00002698, at 99.

[103] Ibid.

[104] ELYSIUM-01311710.

[105] Ibid.

from 10 different Pension Plans and lent them back to two other counterparties, D.D.C (Cayman) and Chem Capital. [106] The total notional value of these loans was DKK 2.2bn.[107]

65.      Similar to Amalthea, the documents I have reviewed paint a clear picture of Colbrook.  Far from being an arm's-length counterparty, Colbrook was a shell company that appears to be nothing but a cover for the trading activity of Mr. Smith. Colbrook presented as much counterparty risk as Amalthea.  Not coincidentally, these two, supposedly independent, traders performed exactly the same trades, on the same terms, except with different counterparties.[108]  I conclude that both Amalthea and Colbrook were not real counterparties; rather, they were integral parts of Solo's trade loops.[109]

### C.      Opinion 3: The Solo Trades Were Not Dividend Arbitrage Strategies of the Sort Cited to in the Academic Literature That Dr. Carr Cites

66.      Dr. Carr argues that the Pension Plans' strategy is supported by academic research.  According to him, "the Pension Plan strategy pursued in the Analyzed Transactions is a hedged dividend capture strategy and is a type of dividend arbitrage"[110] and "dividend arbitrage strategies are neither new nor unique examples of how tax incentives influence financial decisions and investment strategies."[111]  Dr.

---

[106] Chem Capital was also incorporated shortly before the trading at Solo allegedly commenced. Chem Capital was incorporated on November 29, 2012.  CAYMAN_00002658. See also CAYMAN_00005688 (Affidavit of Brian Kevin Mulvihill of Harney Fiduciary (Cayman), Chem Capital's Corporate Services Provider).

[107] ELYSIUM-01744940.

[108] Compare ELYSIUM-01744940 (Colbrook's custody statement for March-April 2013), with ELYSIUM-01744706 (the same for Amalthea.)

[109] Mr. Smith was the sole or partial ultimate beneficial owner of another seven entities that traded on the Solo platform, and Mr. Grant-Klar was the sole or partial ultimate beneficial owner of two others.  ELYSIUM-05822425.  I see no reason for these individuals to use multiple entities to engage in near identical trades except to illegitimately avoid the reporting requirements mentioned elsewhere in this report and to obfuscate the true nature of the scheme.

[110] Carr Report, ¶ 129 (footnotes omitted).

[111] Carr Report, ¶ 133 (footnotes omitted).

Carr cites several academic articles[112] about dividend arbitrage strategies in the U.S., Australia, Finland, and Taiwan and concludes that "in short, academic research has shown that investors in numerous countries have engaged in dividend arbitrage strategies."[113]

67.     I agree with Dr. Carr that dividend arbitrage trading strategies are neither new nor novel.  In fact, evidence of dividend arbitrage strategies is well established as a matter of both economic theory and empirical fact, which include the studies cited by Dr. Carr.  However, for various reasons that I explain below, there is no way in which one can look at the studies Dr. Carr cites and infer anything about the legitimacy of the Solo transactions and any attempts to do so are misplaced.

68.     First, as I discussed earlier, the Solo trades were not real.  In contrast, all the studies on dividend arbitrage refer to transactions involving real trades.

69.     Second, even if the Solo trades were real, they would pertain to a different type of dividend arbitrage from the literature Dr. Carr cites in his report.  As background, dividend arbitrage is a term which covers a wide range of activities including:

1.     Individuals acquiring shares that are taxed beneficially to supplement retirement income or disposing of shares or exchange traded funds ("ETFs") shortly before the income payment date to convert income to capital gains which generally receive preferential tax treatment depending on jurisdiction and investor type.

2.     Sophisticated market participants such as hedge funds expressing outright market risk positions through complex trades of particular shares that are based on statistical theories of price movements around dividend date.

---

[112] Carr Report, ¶¶ 133 – 142.

[113] Carr Report, ¶ 142.

3.      Moving shares from tax disadvantaged holders to more advantaged holders through cross-border equity financing transactions.

70.    Dr. Carr attempts to characterize the Solo transactions as if they belong in the third category, stating that:[114]

> Modern finance theory recognizes that investors hold different portfolios, and these differences reflect the differences in investors' financial situations, including their wealth, risk tolerance, investment horizon, tax status, and expectations about the future performance of investments.  In particular, some investors are more willing to invest in dividend-paying stocks than others.
>
> Dividend arbitrage strategies are neither new nor unique examples of how tax incentives influence financial decisions and investment strategies.  Tax motivated arbitrage trading has been studied in the literature for decades.

71.    However, several studies cited by Dr. Carr belong in the first two categories, which renders the trading strategies they use to be non-comparable to the Solo transactions that Dr. Carr analyzes. Below is an illustrative list of papers cited by Dr. Carr that belong to the first two categories of dividend arbitrage strategies:

1.      Henry and Koski (2017)[115] studies the trades of institutional investors, who are sophisticated market participants that are able to detect and quickly act on any mispricing, which places the study in the second dividend arbitrage category.

2.      Rantapuska (2008)[116] examines the profitability of overnight trading around the Ex-Dividend date.  The paper's sample primarily consist of taxable domestic investors (87% of the sample), who would fit in the first dividend arbitrage category.  The

---

[114] Carr Report, ¶¶ 132 – 133 (footnotes omitted).

[115] Henry, Tyler R. and Jennifer L. Koski, "Ex-Dividend Profitability and Institutional Trading Skill," *Journal of Finance*, 2017, 72(1), pp. 461 - 493.

[116] Rantapuska, Elias, "Ex-Dividend Day Trading: Who, How, and Why? Evidence from the Finnish Market," *Journal of Financial Economics*, 2008, 88(2), pp. 355 – 374.

remaining trade observations relate to nontaxable investors (11%) and foreigners (2%). The nontaxable investors are mutual funds and nonprofit institutions, who fall in the second dividend arbitrage category. Foreign investors' trades can only be seen at the nominee institution level, which makes it difficult to establish their reasons to trade.

3. Koski and Scruggs (1998)[117] examines securities dealers' trades around ex-dividend days, which places the study in the second dividend arbitrage category. Again, it is not really possible for the researchers to know what the reasons for any given trades were.

72. Third, Dr. Carr's attempts to characterize the Solo transactions as if they belong in the third dividend arbitrage category (moving shares from tax disadvantaged holders to more advantaged holders through cross-border equity financing transactions) are misguided on account of the lack of evidence of the Solo transactions being executed to move securities from a legitimate tax-disadvantaged holder to a tax-advantaged party. This is because the purported sellers of shares in the Solo trades did not hold the shares and were not going to be subject to any tax.

73. Fourth, even if one were willing to accept that the Pension Plans' strategy was similar to dividend arbitrage studies that have been studied in the literature, numerous features of the settings of the studies cited by Dr. Carr are markedly different from the Solo trades he analyzed. For example, Dr. Carr does not address certain distinguishing features of the Solo transactions or assert that any of the transactions that are the subject of the literature he cites shared similar features with the Solo transactions. A key feature of the Solo transactions is that they were structured to hedge away any possible economic gain,

---

[117] Koski, Jennifer L. and John T. Scruggs, "Who Trades Around the Ex-Dividend Day? Evidence from NYSE Audit File Data," *Financial Management*, 1998, 27(3), pp. 58 - 72.

and therefore netted to zero (meaning zero gain or loss).  Another feature of the Solo transactions is that they involved zero investment of a Pension Plan's own money to acquire Danish shares because all the funding to buy the shares was provided by a stock loan counterparty orchestrated by Solo.  Dr. Carr does not assert that any of the transactions that are the subject of the literature share either of those features.  For illustrative purposes below I enumerate a few additional differences in detail between the Solo trades and the literature Dr. Carr cites:

1.  **Unhedged market risk and holding periods**: One of the papers cited by Dr. Carr as an example of a setting where dividend arbitrage occurs (Brown and Lummer (1984)) examines trading in the U.S. around dividend events.[118]  The suggested strategy in Brown and Lummer (1984) involves a U.S. investor buying shares with U.S. dividends and benefitting from the dividend received deduction ("DRD").[119]  However, U.S. rules in place at the time of the study required investors who wanted to benefit from the deduction to hold shares for 46 out of 90 trading days around a dividend event.  The Brown and Lummer (1984) strategy involved being long a share with only a call option hedge, which is a very different risk proposition with considerable unhedged market risk, unlike the forwards and futures in this case.  Such a transaction would be punitive from a regulatory capital perspective because the call option hedge does not hedge the share position in all market circumstances[120]

---

[118] Brown, Keith C., and Scott L. Lummer, "The Cash Management Implications of a Hedged Dividend Capture Strategy," *Financial Management*, 1984, pp. 7-17.

[119] The dividends received deduction ("DRD") is a federal provision in the U.S. under which "for tax years beginning before 31 December 2017, a US corporation generally may deduct 70% of dividends received from other US corporations in determining taxable income.  The... DRD is increased from 70% to 80% if the recipient of the dividend distribution owns at least 20% but less than 80% of the distributing corporation… For tax years beginning after 31 December 2017, P.L. 115-97 reduces the 70% DRD to 50% and the 80% DRD to 65%."  See, https://taxsummaries.pwc.com/united-states/corporate/income-determination, last accessed January 15, 2022.

[120] For instance, if the share price was lower than the call option's strike price at expiry, the call option would not be exercised, and the investor would be exposed to the full share price decline.  In market parlance the delta of a call option is below 1 unless the share price of the equities is substantially above the strike price of the option.

and is nothing like what the Solo Pension Plans claimed they did with forwards and futures.  The trades in Brown and Lummer (1984) would not have been permitted on financial institutions' equity finance desks, even at the largest banks, due to the significant price risk exposure.

2.   **Settlement cycles**: Dr. Carr cites a paper by Koski and Scruggs (1998).[121]  According to Dr. Carr, Koski and Scruggs (1998) "find 'strong evidence of significant abnormal volume by securities dealers around ex-dividend days.' They report 'strong evidence that securities dealers sell these high-yield stocks cum-dividend and buy ex-dividend.'"[122]  However, the trades in Koski and Scruggs (1998) exclude trades with non-standard settlements.[123]  The authors exclude such trades precisely because they are looking for evidence of different trading behavior around the Ex-Dividend Date and they understand that the Ex-dividend Date for non-standard settlement trades is not the same as that for market standard settlement transactions..  In contrast, all the Solo trades involved non-standard settlement terms, which were longer than the standard settlement cycle.[124]  The longer settlement cycles that were characteristic

---

The relevant EU rules on calculating market risk regulatory requirements require the delta to be calculated and applied in such transactions.  See, Capital Requirements Regulation (CRR), Regulation (EU) No. 575/2013, Chapter 2 (Prudential Consolidation), available at: https://www.eba.europa.eu/regulation-and-policy/single-rulebook/interactive-single-rulebook/504, last accessed January 23, 2022.

[121] Koski, Jennifer L. and John T. Scruggs, "Who Trades Around the Ex-Dividend Day? Evidence from NYSE Audit File Data," *Financial Management*, 1998, 27(3), pp. 58-72.

[122] Carr Report, ¶ 136.

[123] See, Koski, Jennifer L. and John T. Scruggs, "Who Trades Around the Ex-Dividend Day? Evidence from NYSE Audit File Data," *Financial Management*, 1998, 27(3), pp. 58-72, footnote 4.

[124] As another example, the Carr Report cites a study in Italy by Michaely and Murgia (1995) and states that "the authors 'bring evidence consistent with the hypothesis that a significant portion of the ex-[dividend] day [trading] activity is motivated by differential dividend tax[es].'" Carr Report, ¶ 140.  The Solo trades would not have worked in the Italian stock market which is a forward market where "actual settlement of the trade occurs anywhere between 15 and 45 days after the purchase order." Michaely, Roni and Maurizio Murgia, "The Effect of Tax Heterogeneity on Prices and Volumes around the Ex-Dividend Day: Evidence from the Milan Stock Exchange," *Review of Financial Studies*, 1995, 8(2), pp. 369-399, p. 396.

of the Solo trades render them non-comparable to the trades examined by Koski and
Scruggs (1998).

3.   **Profitability/Returns to dividend arbitrage**: Several of the papers cited by Dr. Carr
note that the returns to dividend arbitrage strategies are quite small even before
including transaction costs.[125]   This is in large part because they are market risk
taking transactions unlike the Solo transactions.   In addition, because the Solo
Pension Plans did not in fact source any shares, they were not even subject to the
normal dividend pricing elements which apply in genuine equity finance
transactions, which I explained in the Wade Initial Report, so I do not see any valid
comparison.   However, it is worth highlighting that some of the research which Dr.
Carr cites demonstrates the reasons why few investors would actually undertake the
types of strategies being discussed in the papers.   For example, Henry and Koski
(2017) find the small returns to the strategy are not significantly positive after
including transaction costs, except for trading desks that are highly skilled – although
again they have no real basis for reaching this conclusion as they in fact attempt to
infer motive and behavior from an anonymized dataset.[126]  In Rantapuska (2008), the
average trading profit from overnight buy/sell transactions is EUR 1,594.94 for
Finnish households (87% of the sample's trades) and EUR 17,776.89 for foreign
investors.   The trading profits are even smaller when one looks at the median, with

---

[125] See, for example, Henry, Tyler R. and Jennifer L. Koski, "Ex-Dividend Profitability and Institutional Trading
Skill," *Journal of Finance*, 2017, 72(1), pp. 461-493; Rantapuska, Elias, "Ex-Dividend Day Trading: Who, How,
and Why? Evidence from the Finnish Market," *Journal of Financial Economics*, 2008, 88(2), pp. 355 – 374;
Chen, Hung-Ling, Edward H. Chow, and Cheng-Yi Shiu, "Ex-Dividend Prices and Investor trades: Evidence from
Taiwan," *Pacific-Basin Finance Journal*, 2013, 24, pp. 39-65; Brown, Keith C., and Scott L. Lummer, "The Cash
Management Implications of a Hedged Dividend Capture Strategy," *Financial Management*, 1984, pp. 7-17.

[126] See Henry, Tyler R. and Jennifer L. Koski, "Ex-Dividend Profitability and Institutional Trading Skill," *Journal
of Finance*, 2017, 72(1), pp. 461-493.   The authors state that, "Although we do not have identifying information
from Abel Noser about the institutions in our sample, we explore some cross-sectional characteristics of their
trading activity to try to infer their identity and economic motives."

EUR 1,230.36 for Finnish households and EUR 177.10 for foreign investors.  Such

returns would have been too small to justify the risk associated with the purported

Solo trades, a view that is informed by my experience that paper profits from back

testing are never as good in real life.  Generally, it is very typical that a trade with a

Sharpe ratio of 2 in back testing yields a Sharpe Ratio of 1 in real life, which is

reflective of a combination of real-life factors that cannot be incorporated in a model,

such as sampling bias and market impact.[127]  Moreover, academic researchers

recognize that the estimated returns to dividend arbitrage strategies are not reflective

of actual returns that can be earned in practice.  According to Boyd and Jagannathan

(1994), one of the papers Dr. Carr cites, "a stock's suitability for arbitrage or

dividend capturing trading depends on other features besides its dividend yield-

especially its risk, transaction costs, and the quantity of stock available.  These other

attributes are either unknown or imperfectly observed by the researcher."[128]

4.     **Investor type**: Most of the cited papers focus on profitability of trades for different

types of investors (e.g., a combination of domestic and foreign investors; a

---

[127] The Sharpe Ratio is "commonly used to gauge the performance of an investment by adjusting for risk.  The higher the ratio, the greater investment return relative to the amount of risk taken, and thus, the better the investment." See, https://corporatefinanceinstitute.com/resources/knowledge/finance/sharpe-ratio-definition-formula/, accessed January 9, 2022.

The following are Sharpe Ratio grading thresholds: less than 1 is bad; 1 – 1.99 is adequate/good; 2 – 2.99 is very good; greater than 3 is excellent. Ibid.

Market impact refers to the fact that as soon as an investor begins to trade an investment strategy, those trades affect the market price and many other market participants will either try to copy the investor's trades or trade against the investor (hedge funds often use sophisticated algorithms to detect trading patterns of other market participants), thus reducing the arbitrage the investor is trying to capture.

[128] Boyd, John H. and Ravi Jagannathan, "Ex-Dividend Price Behavior of Common Stocks," *Review of Financial Studies*, 1994, 7(4), pp. 711-741.

combination of financial and nonfinancial investors)[129], whereas the Solo trades

solely involve foreign investors. Further, due to the type of data the authors cited by

Dr. Carr use, it is impossible to know the full terms and arrangements of their actual

trades or their motivations.  Different investors have different reasons to engage in

trading around dividend events.  Dr. Carr is silent on any of the different participants'

identities or motivations and whether these attributes are relevant for the Solo trades.

74.     In summary, none of the academic literature cited in the Carr Report is relevant to, applicable

to, or supportive of the purported dividend arbitrage strategies that the Solo Pension Plans engaged in.

>  **D.     Opinion 4: Dr. Carr's trade analysis, which is based on the selective review of parts
>  of the circular Solo trades, is incomplete, incorrect, and substantially misrepresents
>  the two transactions he analyzed.  This narrow approach also ignores the obvious
>  circularity of the fabricated Cum-Ex scheme.  All of the opinions in respect of the
>  Solo Transactions in the Wade Initial Report apply equally to these transactions.**
>  **[130]**

75.     Dr. Carr reviewed two transactions. The first transaction was the RJM Mærsk B 2013

transaction and the second was The Proper Pacific CHRH 2014 transaction. A description of the

economics of the two transactions analyzed in the Carr Report follows below.

>  **1.     The RJM MAERSKB 2013 Transaction**

76.     Dr. Carr analyzes the RJM Capital Pension Plan's ("RJM") trades around the dividend issued by

A.P. Møller Mærsk A/S ("Mærsk") for its Class B shares in April 2013.  Below, I review these trades and

---

[129] See, for example, Rantapuska, Elias, "Ex-Dividend Day Trading: Who, How, and Why? Evidence from the
Finnish Market," *Journal of Financial Economics*, 2008, 88(2), pp. 355 – 374; Michaely, Roni and Maurizio
Murgia, "The Effect of Tax Heterogeneity on Prices and Volumes around the Ex-Dividend Day: Evidence from
the Milan Stock Exchange," *Review of Financial Studies*, 1995, 8(2), pp. 369-399.

[130] Solo was an FCA-regulated entity and should not therefore have undertaken these transactions.  In addition,
many of the counterparties or the participants who acted as officers for these entities held or had held Approved
Person status at regulated firms. It is my experience that anyone with such status was subject to various education
and certification requirements which cover many, if not all, of the regulatory issues I raise in this report.

calculate the actual economic profit earned by RJM.  I show that in all material respects, this transaction is identical to the Delvian transaction I analyzed in the Wade Initial Report.[131]

77.     As background, the parties to the transaction were:

1.   RJM, a U.S. Pension Plan that was a client of Solo.

2.   FGC Securities ("FGC"), a U.S. broker-dealer which served as an executing broker and futures intermediary.

3.   Colbrook Ltd. ("Colbrook"), a Cayman-registered entity which served as a stock loan intermediary.

4.   D.D.C. (Cayman) ("DDC"), a Cayman-registered entity which served as a short seller.

78.     Mærsk declared a dividend of DKK1,200 for its Class-B shares on February 22, 2013.  The Ex-Date was April 12, 2013, the Record Date was April 16, 2013, and the Payment Date was April 17, 2013.[132]

79.     On April 11, 2013, RJM purportedly bought 10,400 Mærsk Class-B ("MAERSKB") shares, at a price of DKK43,680.2893 per share.[133]  The settlement date was April 17, 2013, i.e., this was a T+4 trade, one business day longer than the standard settlement period at the time.[134]  The trade was executed by FGC Securities.[135]  Dr. Carr does not mention or identify the counterparty to the trade. He explains:

---

[131] Wade Initial Report, ¶¶ 227-233 and Figure 11.

[132] Carr Report, ¶ 152 and Exhibit 4.

[133] ELYSIUM-03200803; see also MPSKAT00135581, at 82.

[134] Ibid.

[135] Carr Report, ¶¶43, 154; see also, ELYSIUM-01552935 (trade approval from Solo), ELYSIUM-01554930 (trade confirmation from FGC).

"Consistent with the trade confirmation, the account statement shows only the RJM Plan's side of the trade, not that of any counterparty."

80.     Dr. Carr is curiously blinkered here. The production evidence, in fact, clearly shows that the counterparty to the trade was DDC which has the same set of documents that Dr. Carr cites for RJM's side of the transaction: a give-up agreement ("GUA") between RJM, Solo, and FGC,[136] a trade approval from Solo,[137] a trade confirmation from FGC,[138] and an account statement from Solo.[139]  The latter three documents all show that DDC took the exact opposite trade to RJM Capital.

81.     DDC, like Colbrook and other counterparties, was incorporated shortly before participating in the alleged trading of Danish shares. DDC was incorporated on September 19, 2012, less than six months before the MAERSKB 2013 Transaction.[140]  Evidence in the record indicates that DDC took part in circular trades at Solo as early as on November 30, 2012, less than three months after incorporation.[141]

82.     Further evidence is provided by an FGC Securities summary spreadsheet which shows all MAERSKB trades the broker executed on April 11, 2013.  The spreadsheet lists parties to a given trade together under the same "Ticket #".[142]

---

[136] ELYSIUM-01354486.

[137] ELYSIUM-01552936.

[138] ELYSIUM-08521698.

[139] ELYSIUM-01744925.

[140] CAYMAN_00002756. See also, CAYMAN_00005688 (Affidavit of Brian Kevin Mulvihill of Harney Fiduciary (Cayman), DDC's Corporate Services Provider).

[141] ELYSIUM-01001178.

[142] ELYSIUM-01553174, "Stock" tab. The RJM-DDC equity trade is Ticket #7.

83.     Also, on April 11, 2013, RJM hedged its stock purchase by selling forward 104 single-stock futures contracts for MAERSKB at a price of DKK 42,821.31.[143]  The trade was also executed by FGC,[144] and the counterparty again was DDC.[145]

84.     On April 16, 2013 (the Record Date), RJM financed its stock purchase by agreeing to lend its MAERSKB shares to Colbrook, to settle on the next day.  The shares were valued at the original purchase price of DKK43,680.2893, and margin was 100%.[146] The shares were lent at an interest rate of Overnight DKK LIBOR plus 70 basis points, and the lending fee was Overnight DKK LIBOR plus 49.55 basis points.[147]  RJM and Colbrook had already signed a GMSLA.[148]

85.     Dr. Carr does not ask or identify how Colbrook came up with the necessary cash.  Again, the production record is very clear: Colbrook re-lent the shares to DDC, on the same day and exactly under the same terms.[149]

86.     Colbrook and DDC also had also signed a GMSLA.[150] The GMSLAs were highlighted by Dr. Carr when he compared the executed agreement to the standard GMSLA,[151] presumably to indicate that they were standard GMSLAs.  My observation, based on my experience negotiating many GMSLAs and

---

[143]Carr Report, ¶¶ 87-89, 154. See also ELYSIUM-01552940 (trade approval from Solo), ELYSIUM-01554930 (trade confirmation from FGC).

[144] Ibid.

[145] ELYSIUM-01552933. See also ELYSIUM-01553174, tab "Futures". The RJM-DDC futures trade is Ticket #7.

[146] Carr Report, ¶ 117.

[147] ELYSIUM-01574029. See also Carr Report, ¶ 155.

[148] Carr Report ¶ 157 and Ex. 11.

[149] ELYSIUM-01574028. Colbrook's account statement from Solo does not show any DKK cash balance. ELYSIUM-01744940.

[150] ELYSIUM-09318785.

[151] Carr Report, Footnote 133.

similar agreements, is somewhat different.  It is notable to me based on the comparison of the documents that the parties appear to have had no meaningful negotiation of these GMSLA and there is no notable departure from the standard GMSLA terms.  It is also notable that the Equities Annex, which covers various situations that arise in equity security-based stock lending, appears to have been omitted.  I do not consider these GMSLAs to have been properly negotiated on an arm's-length basis.

**Figure 2**



87.     As in the Delvian transaction that I analyzed in the Wade Initial Report, the RJM MAERSKB 2013 transaction is a complete circle.  The purported source of the shares DDC was to deliver to RJM on the Settlement Date was a stock loan from Colbrook, who borrowed the same shares from RJM.  The purported source of the cash RJM would deliver to DDC as payment on the Settlement Date was the 100% collateral posted by Colbrook, who in turn received the same collateral from DDC. The trading

pattern between the Delvian and RJM MAERSKB 2013 transactions is identical; the only differences are the identities of the players and the stock over which a dividend event arose.

88.    On June 13, 2013, the trade loop began moving in the opposite direction:

    1.     RJM recalled its loan to Colbrook, who in turn recalled its loan to DDC.[152]

    2.     RJM sold its shares back to DDC, again through FGC Securities.[153]  The shares were priced at DKK40,750.2863 per share.[154]

    3.     RJM bought back the futures contracts it had sold forward in April 2013. Again, FGC intermediated, and DDC was the counterparty.[155] The contracts were traded based on an underlying price of DKK40,750.94 per share.[156]

89.    Dr. Carr offers a calculation of the profitability of the trade to RJM[157] (which deviates significantly from the calculation made in RJM's annual statement from Solo),[158] yet is silent as to the possible reasons for this difference. There are two main differences between both sets of calculations:

---

[152] ELYSIUM-01860759 (recall approval from Solo to RJM), ELYSIUM-01860774 (recall approval from Solo to Colbrook).  See also Carr Report, ¶ 159, where Dr. Carr mentions only the recall by RJM, but ignores the corresponding recall by Colbrook.

[153] ELYSIUM-01823054 (trade approval from Solo to RJM), ELYSIUM-01823066 (trade approval from Solo to DDC). See also Carr Report, ¶¶ 56 and 158, where Dr. Carr mentions only the RJM side of the trade and ignores the counterparty.

[154] Ibid.

[155] ELYSIUM-01823083 (trade approval from Solo to RJM), ELYSIUM-01823082 (trade approval from Solo to DDC). See also Carr Report, ¶ 158, where Dr. Carr mentions only the RJM side of the trade and ignores the counterparty.

[156] Ibid.

[157] Carr Report, ¶¶ 160-162 and Table 1.

[158] MPSKAT00135581.

1.    Dr. Carr appropriately includes the tax reclaim in the profit calculation, whereas the Solo annual statement treats it as a separate global payment which is then offset against global invoices from Solo.

2.    Dr. Carr appropriately includes the trading and clearing fees in his calculation, whereas the Solo annual statement treats those as separate payments.

90.    By ignoring these differences between his own, theoretically correct calculation, and the quite unusual calculation presented in the Solo annual statement, Dr. Carr has presumably avoided drawing attention to a telling feature of the Solo transactions, which is that they all net-off to essentially zero.[159]

91.    Dr. Carr calculates a net profit of DKK3,360,345.58 in the RJM MAERSKB 2013 Transaction. The following table, however, presents the calculation based on the Solo annual statement alone:

---

[159] I reference this feature of the Solo transactions in my initial report, in the context of a Delvian Chr. Hansen 2012 transaction. Wade Initial Report, ¶¶ 259-266.

**Table 2**

| Step | Value (DKK) |
|------|-------------|
| Equity Buy | (454,275,008.72) |
| Futures Sale | 445,341,624.00 |
| Net Dividend | 9,110,400.00 |
| Equity Sale | 423,802,977.52 |
| Futures Purchase | (423,809,776.00) |
| Stock Loan Interest | (588,401.43) |
| Stock Loan Fee | 440,269.76 |
| **Total to RJM** | 22,085.13[160] |

Source: MPSKAT00135581.

92.     In other words, by treating the tax reclaim and all broker, exchange, and clearing fees separately, the transaction nets off to DKK22,085 (the equivalent of approximately USD3,900).  In fact, accounting for the trading and clearing fees, which Dr. Carr calculates as DKK31,339.55,[161] the RJM MAERSKB

---

[160] For reference this net result is less than 0.5 basis points of the Cum-Ex purchase notional of DKK454.3m and is the equivalent of approximately USD3.9k using the exchange rate of 0.1757 USD per DKK.  This was the exchange rate on April 11, 2013, the date of the first trade in this series of transactions. Source: Refinitiv Eikon.

[161] Carr Report, Ex. 16.

2013 transaction resulted in a small loss to the Pension Plan.  Put differently, Dr. Carr's calculated net profit of DKK 3,360,345.58 is almost entirely driven by the tax reclaim of DKK3,369,600.00.[162]

93.      As shown in the Wade Initial Report, some Solo transactions were altered after the fact to ensure that the trades netted nearly perfectly to zero.[163]  Solo's annual statement for RJM shows evidence of this conduct too.  The statement shows that the sum of all of RJM's positions was DKK-2.13 (less than USD0.50) at the end of the year, an amount which is essentially zero.[164]  However, this amount is only achieved by artificially increasing some of the interest payments beyond what was purportedly agreed to in the original trade confirmations.  For example, the interest payment made by RJM in connection with its Carlsberg Class B 2013 transaction is calculated as 1.44%,[165] even though the relevant trade confirmation states that the interest rate would be DKK Overnight LIBOR + 70 basis points, meaning that the correct rate was around 0.77%.[166]  A similar adjustment is made in the statement for RJM's interest payments in connection with its Novo Nordisk Class B 2013 transaction.[167]

94.      I conclude that this RJM MAERSKB 2013 transaction analyzed by Dr. Carr shares all the essential fictitious features with the Delvian transaction analyzed in the Wade Initial Report. The opinions in the Wade Initial Report with respect to the Delvian transaction therefore apply in full to the RJM MAERSKB 2013 transaction analyzed here.

---

[162] The calculated net profit comprises 99.7% of the amount of tax reclaim.

[163] Wade Initial Report, ¶ 264.  As I have explained earlier in this report it is simply not plausible that this occurred either by chance or as a result of true arms'-length pricing.

[164] MPSKAT00135581, at 581, 649.

[165] MPSKAT00135581, at 593.

[166] ELYSIUM-01488492. DKK Overnight LIBOR did not exceed 0.07% during the period, as shown, for example, in the calculation of RJM's stock lending fees for the same transaction. MPSKAT00135581, at 595.

[167] See ELYSIUM-01482371. The calculation is found in MPSKAT00135581, at 592. The interest rate used in this case was 1.52%.

## 2. Proper Pacific CHRH 2014 Transaction

95.     The second transaction analyzed by Dr. Carr is the Proper Pacific CHRH 2014 Transaction.  Dr. Carr analyzed the Proper Pacific LLC 401(k) Plan ("Proper Pacific") trades around the dividend paid by Chr. Hansen Holding A/S ("Chr. Hansen" for the company or "CHRH" for the shares) in November 2014. Below, I review these trades and calculate the economic profit accrued to Proper Pacific.

96.     The parties to the transaction were:

1.      Old Park Lane Capital Ltd. ("Old Park Lane"), which served as custodian.

2.      Proper Pacific, a U.S. Pension Plan which was a client of Old Park Lane.

3.      Bastion Capital London Ltd. ("Bastion Capital"), a U.K. broker-dealer which served as an executing broker.

4.      Ballygate Capital Ltd, a Cayman-registered entity which served as an equity intermediary.

5.      Amalthea, a Cayman-registered entity which served as a forward counterparty.

6.      LDW Consultants Ltd. ("LDW"), a British Virgin Islands-registered entity which served as a forward intermediary.

7.      Gnosis Capital Ltd. ("Gnosis"), a British Virgin Islands-registered entity which served as a stock loan intermediary.

8.      Esengi Investments Ltd. ("Esengi"), a Cayman-registered entity which served as a stock loan intermediary.

9.      Aronex Partners Ltd. ("Aronex"), an entity which served as a short seller and ultimate forward counterparty.

97.     Most of the non-broker parties to the transaction were incorporated shortly before taking part in this or other similar circular transactions of Danish shares. Amalthea took part in alleged trading less than a month after its incorporation.[168]   Aronex was incorporated on September 16, 2013 and took part in alleged Danish transactions less than six months later, on February 26, 2014.[169]  Esengi was incorporated on September 30, 2013 and took part in alleged Danish transactions less than a year later on August 12, 2014.[170]  Gnosis Capital was incorporated on June 25, 2014 and took part in alleged Danish transactions less than two months later on August 12, 2014.[171]

98.     Chr. Hansen declared a dividend of DKK3.77 on October 22, 2014. The Ex-Date was November 28, 2014, the Record Date was December 1, 2014, and the Payment Date was December 2, 2014.[172]

99.     On November 27, 2014, Proper Pacific bought 839,500 CHRH shares, at a price of DKK258.90 per share.[173]  The Settlement Date was December 2, 2014, i.e., this was a T+3 trade at a time when the standard settlement in Europe was T+2.[174]  The trade was executed by Bastion Capital.[175] To satisfy the demand for Chr. Hansen shares, Bastion Capital purchased 20,892,979 shares from Ballygate Capital, again under exactly the same terms.[176]

---

[168] Supra, ¶ 58.

[169] BVI_00016570, ELYSIUM-02997512. See also BVI_00016691 (Affidavit of Rexella Hodge of Vistra (BVI) Ltd., Aronex's Corporate Services Provider).

[170] ELYSIUM-02301014, ELYSIUM-03436516. See also CAYMAN_00000002 (Affidavit of David Lloyd of Bell Rock Group Financial Services Ltd., Esengi's Corporate Services Provider).

[171] ELYSIUM-03255608, ELYSIUM-07232611. See also BVI_00016680 (Affidavit of Macia Payne of Harneys Corporate Services Ltd., Gnosis's Corporate Services Provider).

[172] Carr Report, ¶ 164 and Exhibit 13.

[173] Carr Report, ¶ 166. See also, ELYSIUM-03572348 (trade approval from Old Park Lane).

[174] Ibid.

[175] Ibid. See also, PROPPACIF00001323 (trade confirmation from Bastion Capital).

[176] ELYSIUM-03572340.

100.    On December 1, 2014, the Record Date, Proper Pacific financed its stock purchase by lending its CHR shares to Gnosis, to settle on the next day.  The shares were valued at the original purchase price of DKK258.90, and there was no haircut.[177]  The shares were lent at a fixed interest rate of 70 basis points, and the lending fee was 35.67 basis points.[178]

101.    As an aside, I note that Proper Pacific and Gnosis had already signed a GMSLA for this stock loan.[179]  Again, Dr. Carr does not ask how Gnosis came up with the necessary cash and, again, the production record provides the answer: Gnosis re-lent the shares to Esengi, on the same day and under similar terms.[180]  Esengi, in turn, re-lent the shares to Aronex Partners.[181] Aronex, in turn, sold the shares to Ballygate Capital.[182]

---

[177] Carr Report, ¶ 117. ELYSIUM-03582169.

[178] ELYSIUM-03582169.  See also, Carr Report, ¶ 155.

[179] Carr Report, ¶ 169, citing to PROPPACIF00001035.  The same points made earlier in respect of the Colbrook GMSLA not being a properly negotiated GMSLA similarly apply to this transaction.

[180] ELYSIUM-03582197.  Esengi would pay a slightly higher lending fee to Gnosis, at 40.67.

[181] ELYSIUM-03582227.  Aronex would pay 45.67 basis points as a lending fee to Esengi.

[182] ELYSIUM-03572332.

**Figure 3**



102.    Just like the other Solo transactions, the Proper Pacific transaction is a complete circle. The purported source of the shares Bastion Capital would deliver to Proper Pacific on the settlement date was a sale from Ballygate Capital, who bought the shares from Aronex Partners, who in turn borrowed the same shares, via Gnosis and Esengi, from Proper Pacific.  The purported source of the cash Proper Pacific would deliver to Bastion Capital as payment on the settlement date was the 100% collateral posted by Gnosis, who in turn received the same collateral from Aronex, via Esengi.  Aronex's cash, in turn, came from Bastion Capital, via Ballygate Capital.

103.    Also, on November 27, 2014, Proper Pacific hedged its stock purchase by selling forward 839,500 shares, expiry date March 20, 2015, at a price of DKK256.42.[183]  The trade was matched by Old

---

[183] ELYSIUM-03572456.

Park Lane and the counterparty was Amalthea.[184] On the same day Amalthea sold a near-identical forward to LDW Consultants Ltd., which then sold a near-identical forward to Aronex Partners.[185]

104.     As was the case in the RJM Mærsk B 2013 Transaction which Dr. Carr analyzed and the two transactions that I analyzed in the Wade Initial Report, on December 16, 2014, as it was unwound the entire loop began moving in the opposite direction for the Proper Pacific trade:

1.     Proper Pacific recalled its loan to Gnosis,[186] who in turn recalled its loan to Esengi,[187] who in turn recalled its loan to Aronex.[188]

2.     Proper Pacific sold its shares back to Bastion Capital, who turned around and sold them to Ballygate Capital, who in turn sold the same shares back to Aronex.[189]

3.     Proper Pacific bought forward the same number of CHR shares, at the same expiry date, that it had sold forward in November. The counterparty was again Amalthea. The price was DKK261.22.[190] Amalthea, in turn, bought the same number of shares from LDW Consultants, who bought them forward in turn from Aronex.[191]

---

[184] Ibid.

[185] ELYSIUM-03572445; ELYSIUM-03572522.

[186] ELYSIUM-03638605.

[187] ELYSIUM-03638673.

[188] ELYSIUM-03638676.

[189] ELYSIUM-03638582 (trade approval from Old Park Lane to Proper Pacific), ELYSIUM-03638558 (trade approval from Old Park Lane to Aronex, citing Ballygate Capital as the counterparty), and ELYSIUM-03638540 (trade approval from Old Park Lane to Ballygate Capital, citing Bastion Capital as the counterparty). See also Carr Report, ¶ 170, where Dr. Carr only mentions the Proper Pacific side of the trade but ignores the rest of the loop.

[190] ELYSIUM-03638592.

[191] ELYSIUM-03638569, ELYSIUM-03638508.

105.     As in the case of RJM, Dr. Carr's calculation of Proper Pacific's net profit differs significantly from the calculation based on the annual statement to Proper Pacific from Old Park Lane. That calculation, not surprisingly, nets off perfectly to zero:

**Table 3**

| Step | Value (DKK) |
|------|-------------|
| Equity Buy | (217,346,550.00) |
| Forward Sale | 215,264,590.00 |
| Net Dividend | 2,310,387.95 |
| Equity Sale | 219,109,500.00 |
| Forward Purchase | (219,294,190.00) |
| Stock Loan Interest | (67,618.93) |
| Stock Loan Fee | 23,880.98 |
| **Total to Proper Pacific** | 0.00 |

Source: PROPPACIFIC00000955.

106.     Because Defendants' own expert, Dr. Carr, only addressed part of the circular structure of the Solo trades in his report, he failed to identify in his report the essentially fictitious nature of the full cycle of the Solo trade loop. All of my general comments about the RJM MAERSKB 2013 transaction apply equally to this transaction.  In particular, again I note that if you adjust Dr. Carr's calculated "Gross

56

Profit"[192] of DKK898,265 by the net stock loan fees paid of DKK43,737.95 included in the table above the corrected Gross Profit is exactly equal to the tax reclaim of DKK854,527.05.   This demonstrates yet again the true nature of these Solo Cum-Ex schemes as tax reclaims generating fictions.[193]

### 3.    Basalt Ventures MAERSKB 2015 Transaction

107.    I have also reviewed the trades done by Basalt Ventures LLC Roth 401(k) Plan ("Basalt Ventures") associated with Mærsk's March 2015 dividend.   This series of trades is identical, in all material respects, to the Proper Pacific and Roadcraft transactions analyzed elsewhere. Like those trades, the trades form a non-market facing loop, and the profits to the pension plan, apart from trading fees, net off to zero. Below, I review these trades and calculate the economic profit accrued to Basalt Ventures.

108.    The parties to the transaction were:

1.    Telesto Market LLP ("Telesto"), which served as custodian.

2.    Basalt Ventures, a U.S. Pension Plan which was a client of Telesto.

3.    Brokers: Bastion Capital London Ltd., Sunrise Brokers.

4.    Equity intermediaries: Mako Financial Markets LLP, Arian Financial.

5.    Stock loan intermediaries:  Trance Services Limited, Relative Value Trading GmbH.

6.    Short seller and ultimate forward counterparty: Metis Cayman Limited.

7.    Forward counterparty: Connaught Global Limited.

---

[192] Carr Report, p. 60.

[193] I have also reviewed a diagram of the purported trading that was contained in Solo's records. ELYSIUM-06020028. My review of the Proper Pacific plan's Chr. Hansen trades and the Basalt plan's Maersk trades discussed below shows that the email trade confirms match the structure in the Solo diagram.

8.      Forward intermediary: Ystwyth Trading Limited.

109.    Most of the non-broker parties were incorporated shortly before taking part in this transaction. Connaught Global Limited was incorporated on December 12, 2014.[194]  Trance Services Limited was incorporated on October 21, 2014.[195]  Ystwyth Trading Limited was incorporated on December 9, 2014.[196]

110.    Mærsk declared a dividend for its Class-B shares (MAERSKB) of DKK1,971.00 on March 30, 2015. The Ex-Date was March 31, 2015, the Record Date was April 1, 2015, and the Payment Date was April 7, 2015.

111.    On March 30, 2015, Basalt Ventures bought 7,877 MAERSKB shares, at a price of DKK16,410.00 per share, for a notional value of DKK129,261,570.00.[197]  The Settlement Date was April 7, 2015.[198]  The trade was executed by Sunrise Brokers.[199]

112.    Sunrise Brokers purchased the same number of shares, on the same terms, from Arian Financial[200], who, in turn, purchased them, again on the same exact terms, from Metis Cayman Limited.[201]

---

[194] BVI_00004227.  See also BVI_00016680 (Affidavit of Macia Payne of Harneys Corporate Services Ltd., Connaught Global's Corporate Services Provider). BVI_00004227.

[195] BVI_00013784.  See also BVI_00016680 (Affidavit of Macia Payne of Harneys Corporate Services Ltd., Trance Services's Corporate Services Provider). BVI_00013784

[196] BVI_00014746.  See also BVI_00016680 (Affidavit of Macia Payne of Harneys Corporate Services Ltd., Ystwyth Trading's Corporate Services Provider). BVI_00014746

[197] ELYSIUM-04029726.

[198] Ibid.  This was a T+3 trade since April 2,3 and 6 were public holidays in Denmark.

[199] Ibid.

[200] ELYSIUM-04030897.

[201] ELYSIUM-04028325.  As further evidence that these trades were not arms-length, Solo Capital Partners' Report and Financial Statements for the Period Ended 31 March 2014 lists Metis Cayman Ltd as a "related party," i.e., one "where the ultimate controlling party of Solo Capital partners LLP has a significant influence."

113.    On April 1, 2015, the Record Date, Basalt Ventures financed its stock purchase by lending its MAERSKB shares to Trance Services Limited, to settle on the next business day, April 7, 2015.  The shares were valued at the original purchase price of DKK16,410.00, and margin was 100%.[202]  The shares were lent at a fixed interest rate of 70 basis points, and the lending fee was 87.5968 basis points.[203]

114.    Trance Services re-lent the shares to Relative Value Trading GmbH ("RVT"), on the same day and under similar terms.[204]  RVT, in turn, re-lent the shares to Metis Cayman, on the same day and at the same price.[205]

115.    Almost a carbon copy of the Proper Pacific transaction analyzed by Dr. Carr, and like the other Solo transactions, the Basalt Ventures transaction is a complete circle.  The purported source of the shares that Sunrise Brokers would deliver to Basalt Ventures on the settlement date was a sale from Arian Financial, who bought the shares from Metis Capital, who in turn borrowed the same shares, via Trance Services and RVT, from Basalt Ventures. The purported source of the cash Basalt Ventures would deliver to Sunrise Brokers as payment on the settlement date was the 100% collateral posted by Trance Services, who in turn received the same collateral from Metis Cayman, via RVT. Metis Cayman's cash, in turn, came from Sunrise Brokers, via Arian Financial.

116.    Also, on March 30, 2015, Basalt Ventures hedged its stock purchase by selling forward 7,877 shares, expiry date June 19, 2015, at a price of DKK14,965.5352.[206]  The trade was matched by Telesto,

---

[202] ELYSIUM-04053345.

[203] Ibid.

[204] ELYSIUM-04052784.  RVT would pay a slightly higher lending fee to Trance Services, at 92.5968.

[205] ELYSIUM-04052746.  Metis Cayman would pay yet a higher lending fee to RVT, at 97.5968.

[206] ELYSIUM-04029719.

and the counterparty was Connaught Global Ltd.[207] On the same day Connaught Global Ltd sold forward 7,877 shares to Ystwyth Trading Ltd that sold forward 7,877 shares to Metis Cayman Ltd.[208]

117.    As was the case in the other Solo transactions analyzed by Dr. Carr and in my initial report, the entire loop began moving in the opposite direction to unwind the Basalt Ventures trade:

1.    The forward contracts Basalt had sold were set to expire on June 19, 2015. On June 16, 2015 Basalt Ventures rolled its hedge forward to September 18, 2015. The counterparty was again Connaught Global. The price difference was DKK5.1476 per share.[209] Connaught Global rolled its own position forward vis-à-vis Ystwyth Trading, which did the same vis-à-vis Metis Cayman.[210]

2.    On June 26, 2015, Basalt Ventures recalled its loan to Trance Services,[211] who in turn recalled its loan to RVT,[212] who in turn recalled its loan to Metis Cayman.[213]

3.    Also, on June 26, 2015, Basalt Ventures sold its shares to Bastion Capital[214], at DKK12,440.00 per share, settling on June 30, 2015. Bastion Capital sold the same share on

---

[207] Ibid.

[208] ELYSIUM-04121959 (Ystwyth statement showing trades with Connaught Global (CON01) and Metis Cayman (MET02)).

[209] ELYSIUM-04450231, ELYSIUM-05087718.  Basalt Ventures closed it hedge at DKK12,069.3881 a share, and opened a new hedge at DKK12,064.2405.

[210] ELYSIUM-04443491, ELYSIUM-04443787, ELYSIUM-04449409 and ELYSIUM-04449621.

[211] ELYSIUM-04520674.

[212] ELYSIUM-04520612.

[213] ELYSIUM-04520438.

[214] ELYSIUM-04520662.

the same terms to Mako Financial Markets LLP,[215] who in turn sold the same shares on the same terms to Metis Cayman.[216]

4.    Lastly, on June 26, 2015, Basalt Ventures closed its hedge, at DKK12,434.0449 per share.[217] Connaught Global closed in position vis-à-vis Ystwyth Trading, which did the same vis-à-vis Metis Cayman.[218]

118.    Similar to the Proper Pacific CHR 2014 and Roadcraft NZYMB 2015 transactions, Basalt Ventures' annual statement from its custodian (Telesto in this case) shows that the net profit from the sequence of trades is exactly zero:

---

[215] ELYSIUM-04520288.

[216] ELYSIUM-04520295.

[217] ELYSIUM-04520623.

[218] ELYSIUM-04520454, ELYSIUM-04520595.

**Table 4**

| Step | Value (DKK) |
|------|-------------|
| Equity Buy | (129,261,570.00) |
| Forward Sale | 117,883,520.77 |
| Net Dividend | 11,333,663.91 |
| Forward Rollover | (40,547.64) |
| Equity Sale | 97,989,880.00 |
| Forward Purchase | (97,942,971.68) |
| Stock Loan Interest | (211,127.23) |
| Stock Loan Fee | 249,151.87 |
| **Total to Basalt Ventures** | 0.00 |

Source: ELYSIUM-05087718.

> **E.      Opinion 5: Dr. Carr Ignores the Fact That Designing the Cum-Ex Transactions to Include Multiple Pension Plans and IDBs Appears to Have Had No Legitimate Purpose Other than to Further Conceal the Scale and Deception of the Trades. Numerous Aspects of Their Design Raise Regulatory Concerns Related to: Money Laundering, Know Your Customer ("KYC") Rules, Prearranged Wash Trading in Futures and Netting Practices, Position Size Disclosure Requirements and Restrictions, and Capital Requirements.  These transactions could only have been executed because their structural improprieties were disregarded by participants in the first place.**

119.    Any reputable financial institution that had been approached to participate in the Solo transactions would not have been able to simply ignore the then-prevailing securities industry regulatory duties that were in place at the time of the trades.  In addition, the institution would also not have been

able to ignore the market conventions, customs, and practices that were typical of equity financing transactions at the time of these trades.

120.    As explained in the Wade Initial Report, no reputable market participant would have considered the Solo trades to be legitimate trading strategies or would have executed them on the basis which Solo purportedly did.  In general terms, the circularity of trades conducted through multiple counterparties in a closed loop involved equal and opposite "wash" futures transactions without actual shares of securities or dividends.  The transactional results of these trades netted to almost precisely breakeven outcomes when the tax reclaim is excluded.

121.    These non-market facing trades gave rise to a range of regulatory and compliance issues, each of which would have either prompted serious consideration about participating in these trades or prevented the execution of them by any reputable market participant. In fact, the regulatory and compliance issues that arose from these trades would have given rise to the need to file Suspicious Activity Reports ("SARs") or Suspicious Transaction and Order Reports ("STORs") or both.[219]

---

[219] According to the FCA, "The FCA is the EU competent authority for the Market Abuse Regulation (MAR) in the UK.  As part of our remit, we receive STORs from firms that are required under MAR to notify us and supervise the regime in the UK.  The National Crime Agency (NCA) is responsible for receiving SARs."  The FCA's reporting requirements for filing a STOR set out that "any person professionally arranging or executing transactions shall establish and maintain effective arrangements, systems and procedures to detect and report suspicious orders and transactions.  Where such a person has a reasonable suspicion that an order or transaction in any financial instrument, whether placed or executed on or outside a trading venue, could constitute insider dealing, market manipulation or attempted insider dealing or market manipulation, the person shall notify the … competent authority… without delay."  These requirements apply broadly to market participants responsible for arranging or executing transactions and include "buy side firms, such as investment management firms… as well as firms professionally engaged in trading on own account."  Finally, "firms that know or suspect that criminal offences may have also occurred will need to consider whether there is an obligation… to submit a SAR to the NCA." See, a letter clarifying the application of the SAR and STOR regimes to firms, available at: https://www.fca.org.uk/publication/correspondence/letter-uk-finance-sars-stors.pdf, last accessed January 15, 2022.

122.     Had I been asked to review the Solo trades when I worked as an Approved Person[220] in an FCA

regulated firm I would have escalated these transactions to the firm's compliance team and would have

expected the firm to file a SAR.  The FCA has confirmed that this was its expected response.[221]

123.     Some of the concerns raised by the Solo trades include:

## 1.   Money Laundering and Know Your Customer ("KYC") Rules

a.     **Money Laundering Rules**: The goal of money laundering rules as expressed in FINRA Rule

3310[222] is to ensure that, among other things, "the program must include appropriate risk-

based procedures for conducting ongoing customer due diligence, including (i)

understanding the nature and purpose of customer relationships for the purpose of developing

a customer risk profile; and, (ii) conducting ongoing monitoring to identify and report

suspicious transactions and, on a risk basis, to maintain and update customer information,

including information regarding the beneficial owners of legal entity customers".[223]

The FCA has a similar rule that requires firms that fall under its purview to undertake money

laundering risk assessments because "the assessment of money laundering risk is at the core

of the firm's AML [Anti-Money Laundering] effort and is essential to the development of

---

[220] The term "Approved Person" is used to describe an individual who is authorized by the FCA or Prudential
Regulation Authority ("PRA") to conduct regulated activity for a registered firm in the U.K.

[221] In its final notice to Sunrise Brokers, one of the failings enumerated by the FCA is the failure to identify or
escalate any of the failings during the relevant period.  See, Final Notice to Sunrise Brokers LLP, November 12,
2021, ¶ 2.20, available at: https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf, last
accessed January 14, 2022.  I understand this failure to mean that the FCA expected Sunrise Brokers to escalate
the aforementioned failings through appropriate regulatory notifications, including a SAR for matters related to
financial crime.

[222] The European Union had very similar rules during the Relevant Period in the third EU Directive on the
prevention of the use of the financial system for the purpose of money laundering and terrorist financing
(2005/60/EC), available at:  https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32013R0575, last
accessed January 22, 2022.

[223] See, https://www.finra.org/rules-guidance/key-topics/aml, last accessed January 29, 2022.

effective AML policies and procedures."[224]   Among other provisions, such firms must implement "systems and controls [that] must be comprehensive and proportionate to the nature, scale and complexity of a firm's activities" and "must regularly review their risk assessment to ensure it remains current.[225]

b.   **Know Your Customer ("KYC") Rules**: FINRA Rule 2090 specifies that "every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer".[226]

The FCA has similar rules which require firms to conduct customer due diligence checks where they "must identify their customers, and where applicable, their beneficial owners, and then verify their identities.  Firms must also understand the purpose and intended nature of the customer's relationship with the firm and collect information about the customer and, where relevant, beneficial owner.  This should be sufficient to obtain a complete picture of the risk associated with the business relationship and provide a meaningful basis for subsequent monitoring.[227]

---

[224] See, FCA Financial Crime Guide: A firm's guide to countering financial crime risks (FCG), FCG 3: Money laundering and terrorist financing, ¶ 3.2.3, available at: https://www.handbook.fca.org.uk/handbook/FCG.pdf, last accessed January 15, 2022.

[225] Ibid.

[226] See, https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090, last accessed January 26, 2022.

[227] See, FCA Financial Crime Guide: A firm's guide to countering financial crime risks (FCG), FCG 3: Money laundering and terrorist financing, ¶ 3.2.4, available at: https://www.handbook.fca.org.uk/handbook/FCG.pdf, last accessed January 15, 2022.

124.     In fact, the combined trading involved a labyrinthian series of related party transactions that were not conducted at arm's-length. It should come as no surprise then, that the FCA made findings that bear on the very issues associated with Solo clients' failures to abide by money laundering and KYC rules.

125.     According to the FCA, "Sunrise staff had in place inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading and money laundering in relation to business introduced by four authorised entities known as the Solo Group. In addition, Sunrise staff did not exercise due skill, care and diligence in applying AML [Anti-Money Laundering] policies and procedures and in failing to properly assess, monitor and mitigate the risk of financial crime in relation to the Solo Group business."[228]

126.     The FCA also noted that "Sunrise failed to properly review and analyze the KYC materials that were provided by the Solo Clients or ask appropriate follow up questions to red flags in the KYC materials… Even after a number of red flags appeared, Sunrise failed to conduct any ongoing monitoring, allowing the Solo Clients to purportedly trade equities totaling approximately £36.6 billion."[229]

### 2.    Prearranged Wash Trading in Futures and Netting Practices

127.     Nasdaq rules prohibits wash trading and state that:[230]

> All Orders should be entered in good faith for the purpose of executing bona fide transactions. An Authorized Trader should not accept such Orders if that person knows, or reasonably should know, that the Orders are for the same account owner and the purpose of the Orders is to avoid taking a bona fide market position exposed to market risk.   Similarly, an Authorized Trader should not accept buy and sell orders for different accounts with common

---

[228] See, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶ 4.3, available at: https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf, last accessed January 14, 2022.

[229] See, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶ 2.20, available at: https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf, last accessed January 14, 2022.

[230] See, https://www.nasdaq.com/docs/98477_wash-trading-faq-.pdf, last accessed January 14, 2022.

beneficial ownership that are entered with the intent to negate market risk or price competition.

The CFTC [Commodity Futures Trading Commission] has held that market participants may be found to have unknowingly engaged in wash trades if they facilitate a wash result without having made sufficient inquiry as to the propriety of such orders prior to their execution. The failure of a market participant to undertake such inquiry may support an inference of knowing participation in wash trades.

Similarly, prearranged wash trading is strictly prohibited under FINRA rules, which state that:[231]

(b) No member shall, for the purpose of creating or inducing a false or misleading appearance of activity in a designated security or creating or inducing a false or misleading appearance with respect to the market in such security:

(1) execute any transaction in such security which involves no change in the beneficial ownership thereof; or

(2) enter any order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties; or

(3) enter any order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, and at substantially the same price, for the purchase of any such security, has been or will be entered by or for the same or different parties.

…

(d) No member shall participate or have any interest directly, or indirectly, in the profits of a manipulative operation or knowingly manage or finance such a manipulative operation.

128.   Very similar rules applied in the U.K. and EU under the Market Abuse Regulation.[232]

---

[231] FINRA Rules and Guidance, Rule 6140 Other Trading Practices, available at: https://www.finra.org/rules-guidance/rulebooks/finra-rules/6140, last accessed January 14, 2022.

[232] See for example MAR 1.6 of the FCA Handbook, available at: https://www.handbook.fca.org.uk/handbook/MAR/1/6.html?date=2016-03-07, last accessed January 26, 2022.

129.     Again, evidence of wash trading, which is prohibited, should have been a warning about potential transaction impropriety.[233]   However, use of wash trading within Solo helped sustain the Solo loop in precisely the manner in which the rules warn about i.e., facilitating a manipulative operation and negating market risk and price competition.

### 3.   Position Size Disclosures and Restrictions

130.     Solo's purported trades involved transaction sizes that would have triggered regulatory scrutiny and reporting requirements relating to substantial holdings.  According to the FCA, "the purported OTC trades executed by Sunrise on Brokermesh did not have access to liquidity from public exchanges, yet the purported trades were filled within a matter of minutes, almost invariably, and represented up to 20% of the shares outstanding in companies listed on the Danish stock exchange… The volumes also equated to an average of 36 times … the volume of all Danish stocks… traded on European exchanges, on the relevant last cum dividend trading date."[234]

131.     The FCA's investigation of the Solo trades involved analyzing transaction reporting data and material received from Solo and other broker firms. This investigation revealed that "the combined volume of the purported Cum-Dividend Trading across the six Broker Firms was between 15% - 61% of the shares outstanding in the Danish stocks… These volumes are considered implausible, especially in circumstances where there is an obligation to publicize holders of over 5% of Danish… listed stocks."[235]

---

[233] In fact, both JPMorgan and SEB raised concerns about wash trading.  See, Wade Initial Report, ¶¶ 256 – 257. It seems likely to me that Solo switched from futures to forwards in the later transactions at issue in this matter because it could no longer find a clearing party to clear futures for it, given the questionable explanations it appears to have provided for the transactions.

[234] See, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶ 2.6, available at: https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf, last accessed January 14, 2022.

[235] See, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶ 2.7, available at: https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf, last accessed January 14, 2022.

According to the Danish Companies Act, "any holder of shares in a limited liability company [public or private] must notify the company if… the voting rights attaching to the shares represent 5% or more of the voting rights of

As I have already pointed out, the participants in the Solo scheme created a large number of Pension Plans, generally with minimal capital.[236] It seems clear that at least one of the factors behind the decision to involve many Pension Plans was a desire to avoid large holding disclosure rules and even more significantly, mandatory takeover rules.[237] Under Danish law, a shareholder with one third or more of the voting rights must submit a mandatory public offer to the remaining shareholders.[238] It is my experience, that dividing shares between multiple entities under common control or coordination is prohibited and that in fact this is a key design element of these rules which were introduced precisely to ensure that a person building a stake in a listed company has to make their ownership public.[239]

132.    To illustrate, in the transactions discussed at the deposition of Mr. Markowitz by the Argre Plans, it was noted that there were eight Pension Plans, each of which was to be allocated up to a maximum cap

---

the share capital or represent 5% or more of the share capital." See, Danish Act on Public and Private Limited Companies (the Danish Companies Act), 55(1). Available at: https://danishbusinessauthority.dk/sites/default/files/danish_companies_act.pdf, accessed January 14, 2022.

[236] For example, Mr. Klugman confirms that he was aware of 40 plans which were created by him, Rich Markowitz, and John Van Merkensteijn. See, Deposition Transcript of Robert Klugman, January 28, 2021, p. 19.

[237] For example, as I discussed earlier in this report it is clear that the Solo trading limits in other markets were driven by a preference to avoid disclosure. Based on my experience, it appears this approach was applied to Denmark. The following excerpt of the deposition of Mr. Markowitz is instructive: "Q And why was that cap being used, 5 percent? A I believe 5 percent was being used because, under German regulatory rules, if an investor exceeded 5 percent, similar to the SEC rules, they would have to have some reporting requirement to the company or to the stock exchange. And in Belgium, we think -- I think the understanding was that it was a 3 percent limit." See, Deposition Transcript of Richard Markowitz, April 8, 2021, 143:15 – 23. As noted above, Mr. Markowitz testified in relation to the Danish trades saying that they "could have put [the liquidity allocated by Shah] into one entity, but that probably would have required certain reporting requirements." Ibid, at 356:3-5.

[238] See, https://content.next.westlaw.com/3-585-3525?__lrTS=20210717033739649&transitionType=Default&contextData=(sc.Default)&firstPage=true#co_anchor_a561904, Question 16, last accessed January 23, 2022.

[239] For example, Article 10 of Directive 2004/109/EC of the European Parliament and of the Council of 15 December 2004 on the harmonization of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market and amending Directive 2001/34/EC ("Transparency Directive") specifies eight different circumstances where shares must be treated as held by a common shareholder for the purposes of determining if a threshold has been crossed. Given the close coordination and common interests of Solo and the Pension Plans, no reputable market participant would have concluded that positions should not be aggregated, and my experience is that reputable participants take a prudent approach to these rules.

of 0.75% of the shares in issue.[240]   Had such shares been truly acquired this would have taken the

ownership of the Argre Plans to 6%, which would have required regulatory disclosure in Denmark.[241]

133.    The creation of shell Pension Plans to reduce the shareholding of any one Pension Plan is a clear

red flag that would have raised significant compliance issues at any reputable financial institution.

### 4.   Capital Requirements

134.    Solo and some of the IDBs involved in these alleged transactions were regulated by the FCA.   As

such, they were subject to U.K. capital requirements, which during the relevant period were primarily

found in the EU Capital Requirements Regulation ("CRR") and associated guidance, rules, and

regulations.   These regulations call for all regulated firms to hold appropriate levels of capital to cover

the risks their activities give rise to.   In particular, firms are required to consider and quantify credit,

market, and settlement risks.   Capital requirements are then applied to these identified risk exposures.   A

full discussion of the regulatory requirements of these transactions is beyond the scope of this report, but

put simply, the starting point for the Solo Cum-Ex transactions would have been recognition that all stock

loans and forwards required capital[242]   for credit risk on the gross exposure under the instruments (i.e.,

the notional of the stock loan or forward ignoring any collateral).   A risk weight conversion factor would

then have been applied.   I have seen no evidence that any of the Pension Plans or stock loan counterparties

---

[240] "Okay. So if you turn to the spreadsheet that he attached, on the top left, the very top, it says "Max percentage of market cap traded: .75 percent." Do you know what that refers to? A limit that's placed in the model to the extent no trades would exceed .75 percent of the outstanding shares of a company."  See, Deposition Transcript of Richard Markowitz, April 8, 2021, 280:5 - 12.

[241]    Defendants Markowitz, van Merkensteijn, Klugman, and Ben-Jacob were aware of the Danish reporting requirements and decided to not report the holdings, in part because the "Danish FSA does not have authority beyond its borders." GUNDERSON00009928; *see also* WH_MDL_00317825.  In my experience, no legitimate market participants would justify not complying with regulatory reporting for this reason.

[242] Regulated firms need to hold capital (generally issued equity and any retained profits) to cover the requirements calculated under the CRR.

were rated by a recognized credit rating agency,[243] so this risk weight would likely have been 100%.[244] 100% risk weight for transactions of the size Solo purportedly engaged in would have been unsustainable for Solo based on its capital levels.

135.    Assuming that these requirements were not simply ignored, the only prospect the counterparties had to reduce the transactions' risk exposure was the use of acceptable credit risk mitigation techniques that are spelled out in Chapter 4 of the Capital Requirements Regulation, which is an EU regulation that includes provisions on the calculation of prudential minimum capital requirements, liquidity, leverage ratio and large exposures. Taking the stock loans as an example, it would have been possible to acquire some relief from the gross exposures by factoring the collateral received under the stock loans.  However, such actions entail very significant and onerous legal and operational requirements,[245] and still result in

---

[243] In addition, based on the analysis of the shell-like nature of the Pension Plans and the high volumes of trading it is inconceivable to me that they would have achieved an investment grade rating anyway.

[244] CRR, Article 121.

[245] See Article 207(4) CRR.  Institutions shall fulfil all the following operational requirements:

(a) they shall properly document the collateral arrangements and have in place clear and robust procedures for the timely liquidation of collateral.

(b) they shall use robust procedures and processes to control risks arising from the use of collateral, including risks of failed or reduced credit protection, valuation risks, risks associated with the termination of the credit protection, concentration risk arising from the use of collateral and the interaction with the institution's overall risk profile.

(c) they shall have in place documented policies and practices concerning the types and amounts of collateral accepted.

(d) they shall calculate the market value of the collateral, and revalue it accordingly, at least once every six months and whenever they have reason to believe that a significant decrease in the market value of the collateral has occurred.

(e) where the collateral is held by a third party, they shall take reasonable steps to ensure that the third party segregates the collateral from its own assets.

material required regulatory capital amounts because the value of the collateral is subject to a haircut and there are minimum floors.  Furthermore, because Solo provided guarantees for some of the affiliated counterparties, it would have had to calculate a counterparty credit risk exposure in respect of those guarantees and this could also have been a substantial capital requirement.  Based on the sizes of transactions claimed to have been undertaken and the capital held by Solo and the other entities, it is inexplicable to me how these rules could have been complied with.

136.    In summary, the manner in which this Cum-Ex scheme was structured gave rise to multiple regulatory issues, many of which appear to have been ignored or not properly disclosed to the relevant authorities.

### F.    Opinion 6: Dr. Carr's Understanding of the Nature of Cum-Ex Transactions and the Meaning of Ex-Dividend Date Are Both Wrong and Undermine the Analysis Which Flows from These Errors

137.    Dr. Carr suggests that one should only focus on the Trade Date and examine whether there were corresponding book entries of trade to determine the rightful claimant to a share dividend.[246, 247]   For support, he states the following:

---

(f) they shall ensure that they devote sufficient resources to the orderly operation of margin agreements with OTC derivatives and securities-financing counterparties, as measured by the timeliness and accuracy of their outgoing margin calls and response time to incoming margin calls.

(g) they shall have in place collateral management policies to control, monitor and report the following:

    (i) the risks to which margin agreements expose them.

    (ii) the concentration risk to particular types of collateral assets.

    (iii) the reuse of collateral including the potential liquidity shortfalls resulting from the reuse of collateral received from counterparties.

    (iv) the surrender of rights on collateral posted to counterparties.

[246] See, for example, Carr Report, ¶¶ 29 – 31, 43, and 52.

[247] A book entry following a new trade execution occurs on the trade date because the economic exposure of an investor starts as soon as the trade is executed. See, for example, Francotte, Pierre, International Monetary Fund, "Current Developments in Monetary and Financial Law," Vol. 1, 1999, pp. 271-289, Chapter 10: Clearing and

In the case of dematerialized shares, security holdings and related transfers are tracked through what is commonly called "book entry."[248]

Book entry is a method of tracking transfers and ownership of securities where no physical security is given to investors. The importance of book entry for security transactions and ownership is generally recognized in law.[249]

138.    According to Dr. Carr, "as soon as a trade is executed, the economic risk associated with holding the underlying shares is instantly transferred from the seller of the shares to the buyer… Upon the trade's execution, the investor immediately bears the economic risk … irrespective of the time taken to complete the 'background' processes of clearing and settling the trade."[250]  Dr. Carr's view, which suggests that the transaction date alone, viewed in isolation, is determinative of the dividend rights of the purchaser of share, is incorrect.

139.    In actual practice, each transaction must be viewed in its totality and with proper regard to the terms of the trade, which, although often executed in shorthand terms are nevertheless part of a legal contract for the purchase and sale of shares.  A proper analysis shows that the Solo Cum-Ex purchases were contracts to acquire shares after the dividend's Record Date.[251]  Therefore, irrespective of the date the trades were executed, the rights purchased under the contract do not include the right to a dividend.

---

Settlement of Book-Entry Securities Transactions, p. 275, which states that "all transfers take place through movements in the accounts of the seller and the buyer of the securities (or more generally of the transferor and the recipient, since the underlying transaction need not be a sale, but could be a pledge or any other form of transfer). This is called a 'book-entry' transfer of securities."

The Danish CSD VP Securities, uses book entry to track securities on its system. See, Euronext Securities, "VP Rule Book, Book Entry Rules," October 11, 2021, available at: https://www.vp.dk/Legal-Framework/VP-Rulebook, last accessed December 29, 2021.

[248] Carr Report, ¶ 29.

[249] Carr Report, ¶ 29.

[250] Carr Report, ¶ 36.

[251] This point is explained more fully in the Wade Initial Report.  See for example, Wade Initial Report, ¶¶ 227 – 233 and Figure 11.

Accordingly, I do not accept that purchasers had an "economic claim to the forthcoming dividend amount" as suggested by Dr. Carr.[252]

140.    As I pointed out in the Wade Initial Report,[253] the parties needed to pay dividend compensation payments only because the purchase price under the Cum-Ex purchase was inflated.  Dr. Carr's discussion of the no-arbitrage price of forwards and futures indicates that he would agree with this logic, although because he has not focused on the settlement terms, he appears to not have followed his own logic through to its conclusion.

141.    He notes that when pricing a forward contract, its price varies depending on the timing of the forward contract relative to the dividend dates.[254]  This is precisely because determination of the appropriate no-arbitrage price for a forward requires the parties to carefully consider whether it is the buyer or seller[255] that will receive the dividend on the underlying shares.[256]  There is no economic difference between a Cum-Ex Transaction and a forward contract executed on the day before the Ex-Dividend Date with delivery on the day after the Record Date.  In both cases the shares received will be Ex-Dividend shares and the purchaser will not receive a dividend.

142.    To explain this point in more detail I start by considering what the Ex-Dividend Date actually means.  Nasdaq, a company which owns and operates stock exchanges in the U.S. and Europe including

---

[252] Carr Report, ¶ 17 c.

[253] Wade Initial Report ¶ 85-90.

[254] Carr Report, ¶ 77.

[255] Importantly, there is no requirement for the seller to own the underlying shares.  The no-arbitrage principle is so called because if the parties agreed to trade the forward at any other price than the net return from a person who holds the shares as a hedge for the delivery under the forward, then it would be possible for an arbitrageur to earn a risk-free profit by executing the forward at the different price and using the shares as a hedge.

[256] Although Dr. Carr's view on the general principle of forward pricing is correct, his view of the Trade Date and Ex-Dividend Date in the discussion of the change in forward price is incorrect. See, Carr Report, ¶¶ 67 - 94.  The parties need to determine the owner of the shares at close of business on the Record Date because the owner of the shares at this point in time is the one that receives the dividend.

the Copenhagen Stock Exchange,[257] defines the Ex-Dividend Date as "the first day of trading when the buyer of a stock is no longer entitled to the most recently announced dividend payment (i.e., the trade will settle the day after the record date, too late for the buyer to appear on the shareholder record and receive the dividend)."[258]  Nasdaq adds that the Ex-Dividend Date for specific shares is set by the relevant exchange on which the shares trade.[259]  This explanation relies on the implicit assumption, and often regulatory requirement, that trades will be executed in accordance with the applicable rules of the exchange where the securities trade.[260]  The vast majority of listed equity transactions are executed in accordance with exchange rules.[261]

143.    The parties to the Solo transactions agreed to enter into Cum-Ex purchases with non-standard settlement terms (i.e., T + 4 prior to October 2014 (and T+3 thereafter) when the standard market settlement was T + 3 (T + 2)).  As a result, the trades occurred outside standard market settlement terms, which in turn meant that the transactions were over-the-counter transactions.  It also meant that the Cum-Ex purchases were guaranteed to result in the receipt of shares without dividend rights.  The Ex-Dividend

---

[257] Nasdaq is a "global technology company serving the capital markets and other industries" that owns and operates stock exchanges in the U.S. and Europe.  See, Nasdaq Form 10-K for the fiscal year ended December 31, 2020, p. F-9, available at: https://ir.nasdaq.com/static-files/de0486ee-a34c-4c00-90b5-b0d1446cf72b, last accessed January 12, 2022.

[258] See, https://www.nasdaq.com/glossary/e/ex-dividend-date, accessed January 12, 2022.

[259] Ibid.

[260] For example, the SEC's amended Settlement Cycle Rule (Rule 15c6-1(a)), effective May 30, 2017, requires the vast majority of transactions executed on U.S. stock exchanges by brokers to settle no later than T+2. See, https://www.sec.gov/rules/final/2017/34-80295.pdf, accessed January 12, 2022.

In Denmark, Nasdaq OMX implemented a two-day standard settlement cycle for securities trading on the exchange effective October 6, 2014.  See, https://www.nasdaq.com/about/press-center/nasdaq-omx-implements-t2-standard-settlement-its-nordic-and-baltic-markets, accessed January 12, 2022.

[261] According to the SEC, "its belief that the usage of the override provision of Rule 15c6-1(a) was intended to apply only to unusual transactions, such as seller's option trades that typically settle as many as sixty days after execution as specified by the parties to the trade at execution." SEC's amended Settlement Cycle Rule (Rule 15c6-1(a)), effective May 30, 2017, available at: https://www.sec.gov/rules/final/2017/34-80295.pdf, p. 48 of 145, accessed January 12, 2022.

Date for a T+3 settled trade is Record Date – 2.[262]  The Ex-Dividend Date for a T+4 settled trade is Record Date – 3.[263]  Accordingly, although the Solo trades were executed before the Ex-Dividend Date for market standard settlement trades, they were nevertheless agreements which provided that shares be delivered after the Record Date.

144.    Put another way, the Cum-Ex purchases are nothing more than an agreement executed on the day before the Ex-Dividend Date with delivery on the day after the Record Date, or (to quote the Nasdaq definition of a forward) they are "a contract that specifies the price and quantity of an asset to be delivered in the future".[264]

145.    Having established the economic equivalence of a Cum-Ex Transaction and a forward contract executed on the day before the Ex-Dividend Date with delivery on the day after the Record Date, I now turn to the appropriate pricing of a Cum-Ex transaction.  As Dr. Carr rightly points, out the no-arbitrage price for such a forward contract is given by:

*Forward Price = Current Market Price + Interest - Expected Dividends*

146.    Ignoring the interest component in the equation above given the low interest rates during the Relevant Period and the transaction's short time period, the correct Cum-Ex price is actually the Ex-Dividend price, which can be observed as follows:[265]

---

[262] Under a T + 3 settlement cycle, a trade on Record Date – 2 would settle three business days later, on Record Date + 1 (=Record Date – 2 + 3), a day later than the last date on which a registered owner of shares is entitled to receive a dividend.

[263] Under a T + 4 settlement cycle, a trade on Record Date – 3 would settle four business days later, on Record Date + 1 (=Record Date – 3 + 4), a day later than the last date on which a registered owner of shares is entitled to receive a dividend.

[264] See, https://www.nasdaq.com/glossary/f/forward-contract, last accessed January 29, 2022.

[265] As explained in the Wade Initial Report, structuring the Cum-Ex purchases to be traded at the Cum-Dividend price had two advantages in the Solo transactions: (i) the reported trade price matched the market price, and (ii) it meant a dividend compensation payment was required to return the excess purchase price and this compensation

*Cum-Ex Price = 4-day Forward Price[266]*

*4-day Forward Price = Cum-Dividend Price[267] - Expected Dividends = Ex-Dividend Price*

147.     To conclude this analysis, I address Dr. Carr's assertion that a party had an economic claim to a dividend simply by virtue of the date or price at which a trade was executed.[268]  This is an entirely novel concept and not one that any practitioner of legitimate equity finance transactions would recognize.  For example, the longstanding practice of dividend and coupon stripping would not exist if it were not possible to trade the right to income ("fruit"), distinct from the shares ("tree").[269]

148.     In any case, what is evident from these Cum-Ex transactions is that:

1.   The purchase agreement was for the delivery of shares without rights to dividends at the time they were received.

2.   No shares were actually received.

3.   None of the parties in the Solo transactions received a real dividend.

---

payment was used to justify the production of Tax Vouchers and a tax reclaim.  See, Wade Initial Report, ¶¶ 85 – 90.

[266] Here I assume that market standard settlement is T+3 and the Cum-Ex Purchase has T+4 settlement.  Similar logic applies for a T+3 Cum-Ex Purchase when market standard settlement is T+2.

[267] The market Current Market Price is a Cum-Dividend price because the Cum-Ex trade is executed before the Ex-Dividend Date.

[268] Carr Report, ¶ 17 c.

[269] In many civil law jurisdictions like France this may be achieved with a usufruct agreement where the bare ownership of the shares is separated from the rights to income.  In addition, the OECD notes that the owner of a dividend and the owner of the underlying shares may well be different.  See, ¶ 12.4 of the commentary on Article 10 of the Model Tax Treaty, available at: https://read.oecd-ilibrary.org/taxation/model-tax-convention-on-income-and-on-capital-2017-full-version_8dc818b1-en#page6, last accessed January 22, 2022.

149.     Therefore, I see no basis for Dr. Carr's conclusion that the dividend compensation payment purportedly received by the Pension Plans, if analyzed correctly, was a real dividend or even a payment representative of a real dividend which entitled them to a tax reclaim.

## IV.     SUMMARY OF OPINIONS ON MR. WARREN'S REPORT

### A.     Background

150.     Mr. Warren's report has drawn certain "conclusions" from the evidentiary record.[270]   Those conclusions, which are demonstrably false, can be divided into two separate categories: (i) conclusions about the share ownership of the Acer Pension Plans, and (ii) conclusions about the receipt of real dividends by those Pension Plans. I address each of those categories separately in this report.

151.     The facts that formed the basis for Mr. Warren's conclusions, as well as the examples he has used in his own analysis, fully support the opinions I express in the Wade Initial Report and the additional opinions expressed in this report.  I will address certain of those facts first and will describe my opinions thereafter.

152.     Based on SWIFT messaging, Mr. Warren concludes that all the shares related to 72 Acer Tax Vouchers were acquired by Acer Pension Plans before and were held by them until the Ex-Dividend Date.[271]  This is demonstrably false based on the same evidentiary record Mr. Warren cites.  Mr. Warren's conclusion is, by definition, false for all the Cum-Ex transactions undertaken by the Acer Pension Plans, because the shares were not contracted to settle and did not settle in the Pension Plans' custody account until after the Record Date.[272]  In fact, in his own analysis Mr. Warren points out several examples of

---

[270] Warren Report, ¶ 11.

[271] Warren Report, ¶ 11 i, j.

[272] Depending on the standard market settlement terms in force during the Relevant Period, the Record Date is one or two trading days after the Ex-Dividend Date.

Acer trades settling after the Record Date.[273]  Furthermore, all the Cum-Ex related settlements are same-day matched in-and-out movements in the custody account, so these shares were never held in any real sense by the Pension Plans at all.   As explained in the Wade Initial Report and further below, in many cases it appears that the same shares were used to settle multiple transactions.

153.    Again, relying on SWIFT messaging, Mr. Warren draws another "conclusion" that a real dividend payment[274] was received on all Acer transactions other than in Annex E Schedule 1.[275]  In fact, there is no evidence of any real dividend payment for the Acer Cum-Ex trades.[276] Further, based on a combination of emails and SWIFT messages, he appears to suggest that the reader should infer that Acer had a legitimate right to a tax reclaim on the alleged dividends.[277] This claim is also demonstrably false. Using the same record that Mr. Warren cites, it is evident that the expected SWIFT MT566 message was received for all Acer Cum-Cum transactions.[278]   For the Acer Cum-Ex transactions, on the other hand, there is no evidence consistent with the receipt of a real dividend and the limited number of SWIFT

---

[273] See, for example, Mr. Warren's Notes to Appendix 1, Annex E Schedule 2, March 2014 TDC dividend.

[274] I note that Mr. Warren uses the somewhat ambiguous term "dividend payment" which is not defined in his report although I proceed on the basis that he means real dividend.  I use "real dividend" to indicate a payment in respect of an actual right to a dividend as a result of being shareholder on the Record Date, as opposed to "dividend compensation payment" to indicate a payment which arises under a contract for the transfer of shares.

[275] See the Warren Report, ¶ 11 k.

[276] It would be surprising if there were because, again by definition, a Cum-Ex purchase is a contract to acquire Ex-Dividend shares.

[277] In particular he refers to a "ceded dividend from the party from whom ED&F Man acquired the shares" (Warren Report ¶ 11 k(i)).  For all the reasons given earlier there is no ceding of any dividend under a Cum-Ex purchase.  The parties agreed to structure the Cum-Ex purchases to include a contractual payment of an amount representative of the dividend but that is very different from the real dividend.

[278] For all but one of these Cum-Cum transactions, the SWIFT MT566 is a standard dividend confirmation.  The outlier is for a payment received in respect of 2,000,000 shares for the August 2014 TDC dividend, the SWIFT MT566 is labelled with the "CLAI" Qualifier indicating that it is a dividend compensation payment.  This is because the Cum-Cum trade settlement failed.  It can be thought of as an unintentional Cum-Ex transaction.  This point is also highlighted by Mr. Warren in his report in footnote 33.  See ED&F-00042905 at 76.

In addition, as explained further below, the receipt of a SWIFT MT566 message in this situation is a necessary, but not sufficient, condition for evidence of the receipt of a real dividend as opposed to a market claim or manufactured dividend.

MT566 messages actually received were either reversed or clearly indicate that the received payments are dividend compensation payments, not actual dividends.[279]  ED&F Man have conceded that the Tax Vouchers in respect of the Annex E Cum-Ex transactions were invalid.[280]  I have not seen any evidence which contradicts my view that the non-Annex E Cum-Ex transactions were substantially identical to the Annex E Cum-Ex transactions in this respect.  As I will demonstrate, the evidence which is available suggests that the IDBs did not own the shares either, but instead the non-Annex E Cum-Ex transactions were settled using shares held by ED&F Man which were acquired for Cum-Cum transactions.

154.     Finally, Mr. Warren states that for the majority of the documentation that he reviewed there was a SWIFT message and therefore a dividend was received.[281]  Mr. Warren's claim is somewhat disingenuous in the context of the issues being discussed, because while Mr. Warren may have reviewed fewer Cum-Ex transactions compared to the Cum-Cum transactions, many Acer trade packs that he reviewed indicate that the relevant Pension Plan claimed tax vouchers on far more Cum-Ex purchases than Cum-Cum ones.[282]  These trade packs contain SWIFT messages representing only the Cum-Cum

---

[279] There is one Cum-Ex MT566 associated with a Cubix-managed pension plan in ED&F-00026581 at 94.  It is not clear why this Cum-Ex transaction had an MT566 which did not have the CLAI designation (which I explain later in this report).  I think it is most likely a misclassification by BNP Paribas which was not picked up due to its relatively small size (DKK39k of withholding tax).  In any event, for the reasons given in the Wade Initial Report the receipt of cash equal to the net dividend does not mean that one has received a real dividend.

[280] In a letter to Pinsent Masons dated January 11, 2021, Rosenblatt conceded that, "MPT Dubai was unable to pay the Pension Plans' dividends" because "it did not have a right to the relevant Danish Shares on the Trade Date and thus did not receive the dividends from the underlying Danish company."  Rosenblatt also wrote that, "[Michael Meade of ED&F Man] did not understand at the time that the payments received by the Pension Plans could not constitute dividends net of WHT [withholding taxes] (i.e., although equivalent in value, they were not dividends which had been paid by the underlying Danish company)."

[281] Warren Report, ¶ 27 a.

[282] See, for example, the March 2014 TDC dividend, in which the following 3 Acer Pension Plans held more Cum-Ex shares than Cum-Cum shares.

    a.   AIG claimed 5 million shares, of which 1 million were purchased Cum-Cum and 4 million were purchased Cum-Ex (ED&F-00040919 at 76; Warren Report, Notes to Appendix 1, ¶¶ 55-57).

shares, not the larger Cum-Ex position, yet, nonetheless Mr. Warren seems to conclude that the entire position in the Tax Voucher is backed by a SWIFT MT566 message.

155.    Nothing in Mr. Warren's report contradicts the opinion in the Wade Initial Report that there were, in fact, no real dividends received by ED&F Man in respect of the Cum-Ex transactions.

### B.    Organization of My Response to the Warren Report

156.    It is useful to provide detailed information about SWIFT messages and the tracking of settlements through custody accounts in order to explain the bases for my opinions in response to the Mr. Warren's report.  Accordingly, I frame my discussion as follows.

157.    First, I explain the use of different transaction referencing approaches in the Wade Initial Report compared to Mr. Warren's report.  His Tax Vouchers referencing approach can be confusing because different types of transactions can impact the same Tax Voucher.

158.    Next, I provide detailed information about SWIFT messages and what can and cannot be determined from such messages.  There are two key SWIFT message types which are relied upon by market participants:

1.    MT566 Messages – This type of message is related to corporate action.  Contrary to the impression created by Mr. Warren, it is important to note that an MT566 Message is not the same as a dividend.

---

b.    Kamco LP Profit Sharing Plan claimed 5 million shares, of which 1 million were purchased Cum-Cum and 4 million were purchased Cum-Ex (ED&F-00041108 at 65; Warren Report, Notes to Appendix 1, ¶¶ 58-60).

c.    Moira Associates LLC 401k Plan claimed 6 million shares, all of which were purchased Cum-Ex (ED&F-00041236 at 75; Warren Report, Notes to Appendix 1, ¶¶ 61-62).  I note that while Mr. Warren correctly does not cite an MT566 associated with Moira for this dividend, he does attribute an MT566 to them on the last page of his Appendix 1.

2.     MT545 Messages – This type can be thought of as a statement balance update message which is used to confirm the movement of securities into and out of a custody account.

159.    With that as background, I am able to track the settlement of TDC shares to specific transactions in the BNP Paribas custody account.

160.    An analysis of the BNP Paribas custody account transactions demonstrates that the only shares held by ED&F Man in its BNP Paribas custody account over the Record Date related to Cum-Cum transactions.

161.    Next, I explain how ED&F Man would have been able to settle its Cum-Ex transactions with a much smaller number of shares than the gross number of shares ED&F Man and its clients purportedly owned, and the evidence suggests that this is exactly what happened.

162.    Finally, I discuss how to determine what evidence there is in the transactions for the receipt of real dividends by ED&F Man

### C.      Summary of Opinions Related to the Warren Report

163.    Based on the steps outlined above I have formed the following opinions:

1.     **Opinion 7:** The custody records show that the only TDC shares that ED&F Man actually owned over the March 11, 2014 Record Date were all from Cum-Cum transactions.

2.     **Opinion 8:** For the reasons given in the Wade Initial Report and expanded on further below, the Pension Plans never acquired the shares related to the Tax Vouchers issued by ED&F Man for the Cum-Ex transactions.  Instead, they settled the Cum-

Ex transactions using matching, same day, in and out small shapes of shares that facilitated settlement of large transactions with a much smaller quantity of shares.

3.    **Opinion 9:** The only real dividends received by ED&F Man in respect of TDC shares on March 12, 2014 were from the Cum-Cum transactions.  The Pension Plans did not receive any real dividends in respect of the Cum-Ex transactions, and, in fact, the Warren Report's analysis supports this conclusion and is consistent with the opinions expressed in the Wade Initial Report on this matter.

**D.    Comparison of Nomenclature and Categorization Mapping in the Warren and Wade Initial Reports**

164.    Before addressing Mr. Warren's Report, it is important to clarify some differences in the ways that Mr. Warren has categorized the trades and how his categorization compares to the nomenclature used in the Wade Initial Report.

The principal difference is that Mr. Warren generally groups the transactions by the Tax Voucher which they were included in whereas I have categorized trades by the nature of the individual trade execution terms.  The following table shows the mapping:

**Table 5**

| Warren Report Categorization | Wade Report Categorization | Wade Report Appendix |
|---|---|---|
| 37 Annex E Schedule 1 Tax Vouchers | Annex E Cum-Ex transactions | Appendix C – marked as Annex E in Trade Class column |
| 5 Annex E Schedule 2 Vouchers | Combination of Cum-Ex and Cum-Cum transactions[283] | Appendices C and F |
| 30 Non-Annex E Tax Vouchers | Cum-Cum transactions (with one exception)[284] | Appendix F, plus trade number 13 in Appendix C |

165.    Throughout the rest of the report, I continue to use the categorization from the Wade Initial Report because I think it is more precise and accurate.  In addition, Mr. Warren has to deconstruct his different groups when making some of his points and conclusions.  He refers to transactions which settled on or before the Record Date at various points in his report.  I refer to such trades as Cum-Cum transactions.  He also refers to trades which settle after the Record Date.  I refer to such trades as Cum-Ex transactions. By focusing on the details of the relevant transaction and not the Tax Voucher on which it appears, no such issues arise.

---

[283] For example, Mr. Warren includes 5,000,000 shares acquired by AIG in respect of the TDC dividend with Record Date March 11, 2014 in his schedule of these 5 trades in his Appendix 1.  However, these shares relate to three different trades which are numbered 22, 25 in Appendix C and number 6 in Appendix F of the Wade Initial Report.  They are all found in trade pack ED&F-00040919.  This Tax Voucher comprises a Cum-Cum transaction of 1,000,000 shares, an Annex E Cum-Ex transaction of 2,000,000 shares, and a non-Annex E Cum-Ex transaction of 2,000,000 shares.

[284] The exception is for the AIG COLOB 2013 transaction noted in the Warren Report ¶ 20 and footnote 14.

166.   In Mr. Warren's Opinion k,[285] which relates to the 30 Non-Annex E Tax Vouchers and the 5 Annex E – Schedule 2 Tax Vouchers, there are two sub-sections which map straightforwardly to my definitions:

1.   In his point (i) he refers to "each instance in which the equity settled on or before the record date."  These are all Cum-Cum transactions.

2.   In his point (ii) he refers to "each instance in which the equity settled after the record date."  These are all Cum-Ex transactions.

167.   Finally, I can confirm that all of the transactions which are reflected on Mr. Warren's 72 Tax Vouchers are included in Appendix C or Appendix F of the Wade Initial Report, so that there are no transactions which are addressed by Mr. Warren which are not included in my Initial Report.  I note too that Mr. Warren has only included trade packs for Pension Plans managed by Acer in his report, whereas I have included all of the same Acer trade packs included by Mr. Warren as well as 42 additional trade packs related to other managers including Cubix, Zeta, and Duet.

### E.   Background on SWIFT Messages

168.   SWIFT messages are used by financial institutions as a reliable, secure, and efficient messaging service for a range of trade, reporting, and settlement needs.[286]  Often, in settlement processes, a custodian or clearing bank treats a SWIFT or two matching SWIFT messages as a binding legal instruction to perform an action, such as settling a transaction or moving money from one account to another.  There are two key SWIFT message types ('MT') that are relevant to the analysis of the AIG Plan's TDC transactions. The background of these messages is explained below.

---

[285] Warren Report, ¶ 11 k.

[286] See, SWIFT website https://www.swift.com/about-us/discover-swift/messaging-and-standards, last accessed January 14, 2021.

### 1.      SWIFT Message Format

169.    The SWIFT messages I reviewed are made up of a series of rows (or Index numbers in the ED&F

Man screenshots included in the production documents).  I use the following nomenclature in this report:

1.      Index/Row – The position at which the given part of the SWIFT message can be found.  Each SWIFT message is a series of consecutive rows of information which fully define the contents of the message when taken together.

2.      Tag – A SWIFT defined code e.g., 20C or 22F.  These codes indicate the type of information on that row and the syntax which the remainder of that row should use.

3.      Qualifier – Defines the specific type of information on that row further.  Each Tag has a range of permitted Qualifiers.

4.      Field – Not part of an actual SWIFT Message but the Generic Field Name is used by SWIFT to explain in common parlance what that Field is for.

170.    When referring to a specific SWIFT message in the ED&F production the labelling of Index-Tag-Qualifier defines exactly which part of the message is being referred to.  For example, 4-22F-DVCA means Row 4 of a SWIFT MT566 Message with Tag 22F, which indicates a dividend corporate action event in its Qualifier.

171.    SWIFT Messages have alternative information that can vary from message to message as related to the Index or Row number.  However, the ordering of the Tags and Qualifiers (including sub-sequences thereof) is clearly defined by SWIFT.

### 2.      SWIFT MT566 Messages

172.    The SWIFT MT566 Corporate Action message covers a wide range of corporate actions ranging from dividends, to mergers, liquidations, and rights issues.

173.    The type of event is included in the "Indicator" Field[287] which is labelled with Tag 22F.   The relevant Qualifier for the corporate actions in this case is DVCA which means Cash Dividend.[288]

174.    Notably, simply having a DVCA label in the Qualifier does not mean that the payment is an actual dividend.   Instead, it means that the corporate action that the payment relates to is a cash dividend. Again, there can be a wide range of messages sent, all of which relate to a cash dividend.[289]   For example, an MT566 message which relates to the dividend corporate action event can be the real dividend, a market claim, a reversal, or a different type of message.   This is clearly highlighted by the numerous SWIFT messages included in respect of transactions executed around the TRYG dividend with Record Date of April 23, 2013, which I will discuss further below.[290]   Later, I show that a number of SWIFT MT566 Messages are actually reversals (indicated by the "REVR" Qualifier) or contractual payments that are not real dividends (indicated by the "CLAI" Qualifier).

175.    Also relevant to this matter is the coding of the cash movement, which may contain a range of information.   There can be one or more optional sub-sequences of Rows which relate to a given cash

---

[287] See, https://www.iso20022.org/15022/uhb/finmt566.htm, last accessed January 12, 2022.

[288] See, https://www.iso20022.org/15022/uhb/mt566-4-field-22f.htm, last accessed January 12, 2022.

[289] The ISO 20022 Guidance states "This message is used to confirm to the account owner that securities and/or cash have been credited/debited to an account as the result of a corporate action event. This message may also be used to:

- reverse a previously sent corporate action confirmation

- re-send a corporate action confirmation previously sent

- provide a third party with a copy of the message.".

See, https://www.iso20022.org/15022/uhb/finmt566.htm last accessed January 12, 2022.

[290] This event was covered by trades on behalf of a number of plans including Hamlyn LP. ED&F-00044265 contains several of the relevant SWIFT messages and the dividend reconciliation worksheet for this event.

movement.  Those Rows include one or more "Amount" fields (message Row 83) which have Tag 19B,[291] and they can also include Tag 23B descriptive information.

176.    Amount fields can contain a range of qualifiers to indicate what the amount relates to.  Examples which are included in the MT566 messages I have reviewed include:

**Table 6**

| Qualifier | Description |
|-----------|-------------|
| GRSS | Gross Amount |
| NETT | Net Amount |
| WITF | Withholding Tax |

### 3.    SWIFT MT545 Messages

177.    An MT545 SWIFT message is "a message sent by an account servicer (account servicing institution) to an account owner."[292]  An MT545 message is seen in the trade packs corresponding to all of the Cum-Ex purchases.  These are effectively a message from BNP Paribas or SEB to ED&F Man confirming the movement of shares in or out of the omnibus custody account.  Note that this message is a form of confirmation statement which can be used for a number of reasons in addition to confirming a settlement.[293]  In and of itself, an MT545 message does not mean that any particular transaction by a Pension Plan has been validly settled or completed.

---

[291] https://www.iso20022.org/15022/uhb/mt566-83-field-19b.htm last accessed January 9, 2022.

[292] https://www.iso20022.org/15022/uhb/finmt545.htm.  Last accessed January 15, 2022

[293] This message is used to:

- confirm the receipt of financial instruments against payment, physically or by book-entry, from a specified party (the function of the message is NEWM).

- cancel a confirmation of a receipt against payment previously sent by the account servicer (the function of the message is CANC); and

178.    For example:

    1.    Trades may be broken into multiple shapes[294] such that the trade is not fully settled until all shapes are complete.

    2.    These are messages from BNP Paribas or SEB as one custodian to ED&F Man in its capacity as a parent custodian.  As the shares are in an omnibus account, proper account needs to be taken of any arrangements or agreements that gave rise to the share movements.  If it is important to establish clear ownership of shares for legal, tax or security perfection reasons, market participants will typically avoid omnibus accounts with title transfer re-hypothecation rights or situations where multiple in and out transactions settle on the same date.

179.    Again, the message contains detailed information about the settlement in the fields of the transaction.  The most relevant for this discussion are:

---

    •    reverse a confirmation of a receipt against payment previously sent by the account servicer (the function of the message is RVSL).

The message is also used to pre-confirm settlement or to confirm a partial settlement of a receipt of financial instruments against payment.  Ibid.

[294] Hamlyn LP is shown to "hold" 24,000,000 shares on Record Date, but this was in fact settled in 4 separate movements each of 6,000,000 shares.  See ED&F-00041059 at 67 and 72-77.

**Table 7**

| Tag | Qualifier | Field |
|-----|-----------|-------|
| 20C | SEME | Senders Reference i.e., the reference BNP Paribas has given to the SWIFT message[295] |
| 35B | ISIN | The ISIN for the trade.  As this review is focused on TDC, this is always DK0060228559[296] |
| 36B | ESTT | Number of shares settled[297] |
| 98A | TRAD | Trade Date[298] |
| 98A | SETT or ESET | Settlement Date[299] |
| 19A | ESTT | The settled amount, which is the total consideration for the settlement. [300] |

 

**F.**     **Explanation of The Analysis Performed in Respect of the Transactions in TDC shares in March 2014**

180.    In this section, I provide information that shows that ED&F Man's transactions as reported in their trade packs can be tracked through their custodian BNP Paribas' account statements and dividend histories.  The settlement of the relevant trades in the Excel copies of the BNP Paribas custody account records can be traced using the BNP Paribas references as explained below.[301]

---

[295] https://www.iso20022.org/15022/uhb/mt564-3-field-20c.htm.

[296] See, https://www.iso20022.org/15022/uhb/mt545-29-field-35b.htm, last accessed January 29, 2022.

[297] See, https://www.iso20022.org/15022/uhb/mt545-36-field-36b.htm, last accessed January 29, 2022.

[298] See, https://www.iso20022.org/15022/uhb/mt545-14-field-98a.htm, last accessed January 29, 2022.

[299] Ibid.

[300] See, https://www.iso20022.org/15022/uhb/mt545-77-field-19a.htm, last accessed January 29, 2022.

[301] ED&F-00604196.xlsx relates to BNP Paribas Account 778523F which is the main account and settles the vast majority of transactions. ED&F-00604678.xlsx Relates to BNP Paribas Custody Account 778045F and was used to settle the trades with Lutetia, which can be observed by the fact that the shares were received in this account

181.    As described in the Wade Initial Report, TDC approved a dividend of DKK2.20 per share at the company's Annual General Meeting in March 2014.[302]  The Record Date for this dividend was March 11, 2014, and the Ex-Dividend Date, using a standard settlement cycle of T + 3, was March 7, 2014.[303]

182.    I continue to adopt the nomenclature from the Wade Initial Report below to discuss the "AIG – Lutetia TDC 2014" transaction,[304] which was documented by ED&F Man in a trade pack of related emails, trade confirmations, account statements, and SWIFT messages.[305]  Because these conclusions apply to the entire TDC March 2014 dividend event, they also apply to the "AIG – MPT Dubai TDC 2014" transaction that I reviewed in Appendix E of the Wade Initial Report, although the prices and sizes of those trades are different.

183.    In the initial Cum-Ex purchase leg of this transaction, 2 million shares were purchased by ED&F Man at a price of DKK52.55 per share for a total purchase consideration of DKK105,101,320.[306]  These shares were purchased on a Cum-Ex basis, because this initial equity purchase has a Trade Date of March 6, 2014, one day prior to the Ex-Dividend Date, and a T+4 settlement date of March 12, 2014, one day after the Record Date.[307]

184.    In order to unpack some of the details of this Cum-Ex purchase, I examined the corresponding SWIFT MT545.  Across the trades I examined, ED&F Man's MT545 messages correspond to the book

---

from RBC which I understand from ED&F-00040919 was used by Lutetia.  Filtering the tab "DK0060228559" (ISIN of TDC) for rows with an "intitule tiers" (third party title) of RBC INV SERV BANK SA yields several records logging the receipt of shares from RBC.

[302] Wade Initial Report, ¶ 120.

[303] Wade Initial Report, Figure 3.

[304]Wade Initial Report, ¶ 97.

[305] ED&F-00040919.

[306] Wade Initial Report, ¶¶ 121 and 136; ED&F-00040919, at 56, 76, and 81.

[307] Wade Initial Report, Figure 3; ED&F-00040919, at 76 and 81.

entries given in the "Shadow Data" pages of each trade pack,[308] albeit with more detail in the MT545 message Tags.

185.    The SWIFT MT545 message corresponding to this purchase is included in ED&F Man's trade pack, on page ED&F-00040979.  This correspondence can be established using, for example, the SWIFT message's Tag 36B which gives a share quantity of 2 million; Tag 19A which gives a settled amount of DKK105,101,320 and matches the (negative) proceeds given for this equity purchase on AIG's account statement 2 pages later in the trade pack;[309] and Tag 98A, which gives a Trade Date of March 6, 2014 and a Settlement Date of March 12, 2014, which also match AIG's account statement.[310]

186.    Another feature of this MT545 message is the sender's reference, PG311BIE0A001 (2-20C-SEME).[311]  The same reference appears in BNP's transaction-level custody statements, albeit with the last 4 characters removed.  In ED&F-00604196.xlsx, tab "DKK0060228559" which is the ISIN of TDC, the Transaction Ref PG311BIE0 appears in 3 rows in column "refexterne,"[312] i.e., "external reference".

187.    For every settlement of TDC shares in March 2014, similar correspondence has been identified between the MT545 SWIFT Messages in the trade packs and the BNP custody records using the SEME Field.  For every transaction that settled in March 2014, there are three rows in the BNP Custody records

---

[308] See, for example, ED&F-00040919, at 76.

[309] ED&F-00040919, at 81.

[310] ED&F-00040919, at 79; ISO Data Field Dictionary, available at: https://www.iso20022.org/data-field-dictionary, last accessed January 14, 2022.

[311] ED&F-00040919, at 79.

[312] ED&F-00604196.xlsx.

(apart from two trades which relate to stock loans transactions, which I believe to be cancelled and amended bookings).[313]

188.    It appears that the trades marked with 11X00 in the "racine" column are the actual settlement leg of the relevant rows for each trade.  I conclude this because the quantity, Trade Date, and Settlement Date columns in these rows of the BNP record also match the MT545 in the ED&F Man trade packs.  The other two rows for each trade are presumably related to pre-settlement matching, confirmation, or internal allocation messages.

189.    Based on a complete mapping of the transactions from ED&F Man records, trade confirms and SWIFT Messages to these BNP Paribas custody records, I make the observations detailed below.

## V.    BASES FOR OPINIONS ON MR. WARREN'S REPORT

### A.    Opinion 7: The Custody Records Show That the Only TDC Shares That ED&F Man Actually Owned Over the March 11, 2014 Record Date Were Those from Cum-Cum Transactions

190.    By reconciling the BNP Paribas custody unique identifiers to the sizes, dates, and other relevant trade details, one can confirm that all transactions settled by BNP Paribas relate to the Cum-Cum transactions, including two stock loans (one with Macquarie and one with Jefferies which both extended across the Record Date).  One can also see that the balance of shares in the BNP Paribas accounts gradually increases as it acquires shares prior to the Record Date from a balance of zero at open of

---

[313] The first relates to a stock borrow from Jefferies International which appears to amend the date of the transaction and the second relates to a stock loan to JP Morgan which appears to have been initially booked incorrectly to Chase Bank instead of JP Morgan.  Since the JP Morgan transaction occurs after the settlement of the Cum-Ex transactions, it does not impact my analysis.  It appears to be ED&F Man using the Cum-Cum shares as collateral for an overnight financing transaction.

business on March 6, 2014 to a balance of 24,845,000 at close of business on the Record Date of March 11, 2014 and then back to zero by close of business on March 17, 2014.[314]

191.    The figure of 24,845,000 matches the final entry in the 'noveau_solde' column in the BNP Paribas custody records, which translates roughly to updated balance (i.e., each row has a quantity change in the 'quantite_mvt' column followed by an updated balance after that change).

192.    This figure also matches the ED&F Man dividend reconciliation worksheet at ED&F-00040983-84.[315]  This worksheet breaks out ED&F Man's holdings of TDC shares as of this dividend event by Pension Plan.  It provides matching accounts where each Pension Plan's shares are held and sums the total numbers of shares held by ED&F Man in aggregate.  The total number of shares included as long holdings on the ED&F Man Dividend Reconciliation Worksheet is 163,445,000.[316]  All of the Tax Vouchers that I reviewed in my Initial Report which relate to this particular dividend event are included in that balance.  Of those shares, 24,845,000 (or 15.2%)[317] are held at BNP Paribas[318] in account 778523F, the omnibus account for the Pension Plans on the Record Date of March 11, 2014.[319]  The rest of the shares are listed as being held at Volcafe, ED&F Man Professional Trading (Dubai) Limited, and Equity Finance vs IDB.[320]  The reference to these shares being held at these IDBs is self-serving fiction, as there

---

[314] ED&F-00604196.

[315] ED&F-00040919.

[316] ED&F-00040919, at 84.  64,300,000 of these shares relate to Volcafe.

[317] Wade Initial Report, Figure 10.

[318] ED&F-00040919, at 83.

[319] Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts, at p. 3.

[320] ED&F-00040919, at 83-84.

were no actual shares held by ED&F Man on the Record Date and ED&F Man is treating unsettled Cum-Ex purchases as if they are real holdings of shares that give rights to a dividend, which they do not.[321]

193.    Thus, based on the relevant records of BNP Paribas and ED&F Man that show a total holding of 24,485,000 shares on the Record Date and no pre-Record Date settlement for all the shares related to Cum-Ex transactions, I conclude that all shares held by ED&F Man on the Record Date relate to the Cum-Cum transactions.

**B.    Opinion 8: For the Reasons Given in the Wade Initial Report and Expanded on Further Below, the Pension Plans Never Acquired the Shares Related to the Tax Vouchers Issued by ED&F Man for the Cum-Ex Transactions but Instead Settled the Cum-Ex Transactions in Matching, Same Day, In-and-Out, Small Shapes of Shares which Facilitated Settling Large Transactions with a Much Smaller Quantity of Shares**

194.    As explained in the Wade Initial Report, ED&F Man could not have genuinely acquired the number of shares that it claimed it did in the Cum-Ex transactions due to the very large numbers involved.[322]  ED&F Man used settlement strategies involving a significantly smaller number of shares to purportedly settle the transactions for which it produced Tax Vouchers.

195.    I illustrate this point with an analysis of how ED&F settled trades involving more than 161 million shares of TDC on March 12, 2014.  The total number of TDC shares included as "long holdings" on the ED&F Man Dividend Reconciliation Worksheet is 163,445,000[323].  All of the Tax Vouchers that I reviewed in my Initial Report which relate to this particular dividend event are included in that total and can be matched to movements in the BNP Paribas accounts on March 12, 2014.  As I have previously

---

[321] ED&F Man have confirmed that the only custody accounts used for settling Danish shares at this time were the BNP Paribas accounts which I have reviewed. Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts, p. 9.

[322] See, Wade Initial Report, ¶¶ 204 – 209 and Figure 9.

[323] ED&F-00040919, at 83.

explained, only 24,485,000 shares were actually held at BNP Paribas at close of business on the Record Date of March 11, 2014.

196.    On March 12, 2014, there were 34 transfers in and 33 transfers out of the BNP Paribas accounts, resulting in a net 495,000 shares leaving the accounts. This was comprised of gross movements of 161,095,000 (being movements in of 80,300,000 and movements out of 80,795,000)[324], compared to the 138,600,000 total "long holdings" in the reconciliation worksheet excluding the Cum-Cum "long holdings".[325]   The maximum 'shape' which moves in or out is 6,000,000 shares.[326]

197.    As explained in the Wade Initial Report, it would simply not have been possible to acquire these amounts of TDC shares on March 12, 2014.[327]   The ADTV for transactions around the March 2014 dividend event was 2,393,898, meaning that ED&F Man settled nearly 67 times the ADTV for TDC on a single day.[328]   It is also about 6.5 times the amount that ED&F Man managed to acquire in Cum-Cum transactions.   Given that ED&F Man was active in the market, no doubt trying to source whatever supply it could for its clients, the amount of actual Cum-Cum trading is a much more realistic view of ED&F Man's likely true ability to acquire real TDC shares.

198.    The only plausible conclusion from my analysis of the BNP Paribas custody records is that ED&F Man did not acquire 138.6 million TDC shares (or anything like that amount).   Instead, ED&F Man settled

---

[324] In: 74,300,000 in 778523F plus the 6,000,000 shares in 778045F.

Out: 74,795,000 in 778523F plus the 6,000,000 shares in 778045F.

See ED&F-00604196.xlsx and ED&F-00604678.xlsx, tabs "DK0060228559" (ISIN of TDC).

[325] 163,445,000 shares on the schedule ED&F-00040919, at 83 less 24,485,000 shares which were held from Cum-Cum transactions.

[326] ED&F-00604196.xlsx.

[327] See, Wade Initial Report, ¶¶ 204-209.

[328] See Appendix D of the Wade Initial Report for the relevant ADTV data.  Even if you count each in an out as a single settlement this is still over 30 times the ADTV.

some of the trades in smaller shapes by recycling and reusing the same shares over and over again.  Based on my experience of how such settlement processes would work, I consider it likely that these settlement loops were started by re-hypothecating some of the Cum-Cum shares.  Those shares were likely used to settle most, if not all, of the 161,095,000 shares which actually settled.

199.    Despite the wide range of holdings by the different Pension Plans clients of ED&F Man which were purportedly reflected on the dividend reconciliation worksheet, it is evident that the majority of settlements were for common shape sizes.

**Figure 4**

Most of the TDC Trades that Settled in BNP Accounts 778523F and 778045F
on March 12, 2014 Had the Same Few Shape Sizes



37 of 67 trades (55%) settled in the same 2 shape sizes, and 49 of 67 trades (73%) settled in the same 5 shape sizes.

Source: ED&F-00604196.xlsx  and ED&F-00604678.xlsx,  tabs "DK0060228559".
Only trades with racine=11X00 included, although removal of that condition yields a similar distribution.

97

200.     Based on my experience of the processes used for managing settlement cycles, efficient collateral management, availability of cash funding lines, and settlement credit risk capacity, it is obvious that these settlements were carefully optimized to generate the maximum sizes of Cum-Ex transactions that could be accommodated from the shares that were available from the re-hypothecation of shares held for Cum-Cum transactions.  This is corroborated by the evidence included in my Initial Report[329] that ED&F Man and its Pension Plans were clearly seeking to maximize the "holdings" claimed with the minimum number of shares actually acquired as highlighted by the email chain between Sara Mina of ED&F Man and Acer in which she stated that "Denmark is slightly more efficient settlement wise than Belgium so 25% coverage should suffice."[330]   This confirms that the parties knew that they could settle multiple transactions on the same day re-using  the actual shares that they were able to source.

201.     As explained in the Wade Initial Report, in the non-Annex E Cum-Ex transactions, the IDB (IDB1) which was counterparty to the Cum-Ex purchase by the Pension Plan and the other IDB (IDB2) that ED&F Man sold the shares to allegedly found each other directly or indirectly in the market such that IDB2 sold or lent the same shares directly or indirectly back to IDB1.  This created a circular loop similar to the Solo trades. Notwithstanding that there were different IDBs in different transactions, if they all settled their trades through the same custodian (or perhaps 2 or 3 custodians) it would still have been possible for most of the settlements to occur in a single processing batch.  Given that there 7 batches per day at VP Securities, it would have been relatively straightforward to settle 161,095,000 shares across 67 transactions in one day.[331]

---

[329] Wade Initial Report, ¶¶ 185-203

[330] ED&F-00201236.  In fact, this particular settlement was effected with only 10% of the TDC shares (3,030,000 out of 30,300,000). Ibid.

[331] VP Securities has 7 batch settlements per day which allow multiple transactions to be simultaneously settled. See Section 3.2 Net Settlement of the VP Securities Settlement Rules (Part 4, VP Rule Book. https://www.vp.dk/Legal-Framework/VP-Rulebook. Last accessed January 30, 2022). It is also possible to do real time settlement outside the batches although these cannot use the same matching rules to settle all matchable trades simultaneously as explained in the Settlement Rules.

202.    I have also read one Bloomberg chat that suggests knowledge among the participating traders that the number of shares they were able to acquire for these transactions was limited by market supply more than appetite.  In the trade pack ED&F-00042261, at 93, Oliver Bottomley of ED&F Man asks Billy Kwong of Morgan Stanley for liquidity: "looking for up to 5m shs @ 88 if you have any to go."[332]  Mr. Kwong is able to source the shares, and the chat continues for a few pages until Mr. Bottomley asks, "think you'll have anymore to show."[333]  Mr. Kwong replies, "so much for the max 5mm :-) im still waiting to hear back from a few guys", to which Mr. Bottomley responds, "haha theres always a new max :-)".[334]  While these messages do not directly discuss recycling shares, taken along with the other evidence from the BNP custody record and my own professional knowledge and experience, they corroborate my view that the  24,845,000 shares actually held on the Record Date was the true capacity of ED&F Man to locate and acquire TDC shares for this dividend event.

### C.   Opinion 9: The Only Real Dividends Received by ED&F Man in respect of TDC shares on March 12, 2014 Were from The Cum-Cum Transactions.  The Pension Plans Did Not Receive Any Real Dividends in Respect of the Cum-Ex Transactions, and, in Fact, the Analysis Produced in the Warren Report Supports This Conclusion and Is Consistent with the Opinions I Expressed in the Wade Initial Report on This Matter

203.    Based on my review of the SWIFT messages for this TDC Dividend event, I can confirm that I agree with Mr. Warren, that in all Cum-Cum transactions where ED&F Man actually held the underlying TDC shares, the expected MT566 messages were received.

---

[332] ED&F-00042261 at 93.

[333] ED&F-00042261 at 95.

[334] Ibid.

204.     No such messages were received, however, for the Cum-Ex transactions associated with this dividend event.[335]

205.     As Mr. Warren states, the evidence for all the dividends on shares that were actually held by BNP Paribas on the Record Date, i.e., Cum-Cum transactions, is from the expected SWIFT MT566 Messages.[336]

206.     In this dividend event none of dividend compensation payments on the Cum-Ex transactions were processed by BNP Paribas as the settling custodian, meaning the normal SWIFT messages were not produced.[337]   The ED&F Man trade pack for AIG only includes ShadowSuite screenshots in the last 3 pages,[338] rather than actual SWIFT messages.[339]

207.     Instead, the parties appear to have agreed to these payments via email and then made payments manually.[340]   In the case of the Annex E Cum-Ex transactions, the normal SWIFT corporate action process could not be followed because ED&F Man has admitted to not owning the required shares.[341] The paying custodian cannot process a market claim if it does not have the relevant shares.

---

[335]ED&F trade packs associated with this dividend event, Wade Initial Report, Appendices C and F.

[336] Warren Report, ¶ 11 k. i.

[337] None of the cum-ex dividend compensation payments were processed by BNP over this dividend event, as indicated by the absence of MT566's relating to cum-ex transactions from the trade packs as well as BNP's dividend sheet ED&F-00603586.

[338] ED&F-00040919 at 88-90.

[339] This point is also highlighted by the reversal of the market claims initially processed in error by BNP Paribas on the TRYG 23 April 2013 Record Date dividend.  These were initially credited to ED&F Man's BNP Paribas account but subsequently reversed on June 27, 2013.  Pierre-Antoine Patinet of BNP Paribas confirmed in his email of June 26, 2013 that this was because the claims had been rejected because the "contractual date > record date" which I understand to be explaining that they cannot pass on a dividend when the shares did not settle before the Record Date.  See ED&F-00137236.

[340] See for example, ED&F-00040919, at 86-87.

[341] See, Wade Initial Report, ¶ 115.

208.    Only one SWIFT MT566 message appears in the AIG trade pack in this TDC March 2014 example.[342]   However, this SWIFT message relates to the 24,845,000 shares which have already been established as being related to the Cum-Cum transaction positions that ED&F Man and BNP's records both confirm involve shares that BNP actually held during this dividend event.[343]

### 1.    Extension of TDC March 2014 Conclusions to Other Dividend Events

209.    I have reviewed all of the other trade packs for the trades in Appendix C and Appendix F of my Initial Report and found a similar pattern.  There are SWIFT MT566 messages representing dividends on each the share balances held at BNP Paribas or SEB over the Record Date, all of which relate to the Cum-Cum transactions.

210.    For the Cum-Ex transactions, however, there are no such SWIFT MT566 messages in nearly all cases, except a handful cases which help to corroborate my understanding of what happened, which is that the payments received were not real dividends, but instead were contractual payments.

211.    First, there are numerous SWIFT messages included in respect of transactions executed around the TRYG dividend with Record Date of April 23, 2013.[344]   In total, there are 11 SWIFT Messages, five of which have the Qualifier of "NEWM" in Tag 23G (meaning new message), and the remaining six have the Qualifier "REVR" (meaning message sent to reverse a previous posting).[345]   These are a series of market claims which were initially credited to ED&F Man shortly after the Record Date but then subsequently reversed such that the money was debited from the ED&F Man account.

---

[342] ED&F-00040919, at 85.

[343] See 16-93B-CONB of the SWIFT message in ED&F-00040919, at 85.  CONB means confirmed balance. See, https://www.iso20022.org/15022/uhb/mt566-26-field-93a.htm, last accessed January 16, 2022.

[344] ED&F-00044265.

[345] https://www.iso20022.org/15022/uhb/mt566-3-field-23g.htm.

212.    All these SWIFT Messages have the Qualifier "DIVI//REGR" in one of the 22F Tags (meaning it relates to a regular dividend), and most of them have the additional Qualifier "ADDB//CLAI" indicating that they are contractual claims not real dividends.[346]

213.    This and another reversal[347] in the summer of 2013 are discussed in an email thread[348] between ED&F Man and BNP Paribas that I have reviewed.  At the beginning of the thread, on June 26, 2013, Pierre-Antoine Patinet of BNP wrote to Miguel Senra of ED&F Man saying, "as the counterpart did not agree (contractual date > record date) with the claims on trades attached, please liaise directly with your counterpart to solve this break".[349]  This email demonstrates that because the contractual date (Settlement Date) of the trades in question was after the Record Date, i.e., the trades were Cum-Ex transactions, the custodian of the counterparty who sold the shares chose to reject the claim when BNP Paribas requested a net dividend, which is the expected behavior in my experience.[350]   In other words, ED&F Man's custodian, BNP Paribas, realized it had made a mistake and then articulated its view that a Cum-Ex trade does not entitle ED&F Man's clients to a dividend.

214.    The rejection of these market claims seems to have caused a stir within ED&F Man.  Mr. Senra replied to Mr. Patinet, "Why has DKK market been such an issue this year?  Huge compensation payments with little or no success?  Is this because of the complexities of our trades?  Please advise, this [sic] is extremely worrying, that a big institution like yourselves are unable to market claim these huge

---

[346] https://www.iso20022.org/15022/uhb/mt566-37-field-22f.htm.

[347] ED&F-00076918, at 31-42.

[348] ED&F-00137236.

[349] ED&F-00137236, at 41.

[350] For the reasons explained in the Wade Initial Report, in all likelihood the selling party's custodian did not receive delivery of the shares itself until after the Record Date and so would not have had any funds to cover the market claim.

amounts.  As a % of success, I believe this has been quite poor, I need to understand why?"[351]  Later, an email about a payment made by Mitsubishi on July 5, 2013 shows that ED&F Man was very intent on sorting out the manual process to replace these reversed payments.  In particular, Sagar Ahamed of ED&F Man Operations stated, "Many thanks for all your help in getting the DKK resolved.  As discussed, please please please can you get this payment out this morning before the DKK cut-off."[352]

215.   The reason these claims had "little or no success" is that a purchase of a dividend-paying stock needs to settle before or on the Record Date in order to entitle the buyer to the dividend.  By definition, a Cum-Ex trade settles after the Record Date.

216.   From the date of the email thread onwards, there are no more SWIFT MT566 Messages on any Cum-Ex transactions, either from BNP Paribas or from SEB when ED&F Man switched to using SEB as its custodian for Danish shares[353].

217.   Excluding the market claims which were reversed, I have only found one SWIFT MT566 message from BNP Paribas related to a Cum-Ex transaction which is not marked as a market claim via the "CLAI" Qualifier indicating that it is a contractual payment not a real dividend.  This MT566 relates to a dividend paid by CHRH on December 3, 2012, and the total withholding tax suffered by ED&F Man was DKK39,150.[354]  Based on the relatively small amount and given that this was one of the earliest

---

[351] Ibid.

[352] ED&F-00113963.

[353] There is one MT566 from December 2013 that is erroneously included in the Cum-Ex trade pack ED&F-00026628.  The first page of this trade pack is a Tax Voucher for Cambridge Way, indicating ownership of 1,326,000 shares of Christian Hansen Holdings A/S.  The dividend reconciliation sheet in this trade pack at 47 shows that these shares were not held at BNP, and that instead, 5,831,700 shares allocated to other pension plans were held at BNP.  The MT566 in this trade pack at 49 is from BNP, because the Message ID begins with "OPARBFRPP", and the share count visible in Index 21, Tag 93B, Tag CONB / UNIT is 5,831,700, matching the ED&F dividend sheet.  Thus, this MT566 is not associated with Cambridge Way's shares.

[354] ED&F-00025681, at 94 SWIFT 37-19B-WITF.

transactions undertaken, I am of the view that this is most likely a mis-booking which was not picked up by BNP Paribas.

218.    MT566 messages from SEB, which are distinguishable via an SEB contact phone number in one of the message fields[355] as well as a Message ID prefix of "OESSO" rather than "OPARBFRPP" for BNP Paribas,[356] are only ever associated with Cum-Cum transactions in the trade packs from Appendices C and F in the Wade Initial Report.

219.    In summary, as Mr. Warren himself acknowledges, there is no evidence of real dividend receipts by ED&F Man on any of the Cum-Ex transactions (Annex E or otherwise).[357]  Such a real dividend receipt would have been a threshold prerequisite for ED&F Man to pass on a real dividend to its Pension Plan clients. Accordingly, absent a real dividend, it is not possible that the Pension Plans were entitled to make a tax reclaim and ED&F Man should not have issued any Tax Vouchers on these transactions.


Based on my review of the facts and circumstances in this litigation, various documents produced in this litigation, and the analyses presented in this expert report, I submit that the opinions contained herein are an accurate representation of my views on this matter.


Submitted by:

Graham Wade
February 1, 2022

---

[355] See, for example, ED&F-00049870, at 903.

[356] Mr. Warren establishes the same distinction in the SWIFT message identifiers.  Warren Report, ¶ 22 a.

[357] For Annex E transactions, Mr. Warren notes the admission by ED&F Man that there were no shares and for the other Cum-Ex transactions he concludes only that ED&F Man received a payment from the Cum-Ex Purchase counterparty.  See, Warren Initial Report, ¶¶ 9(a) and 11 k(ii).

**Appendix A: Materials Considered**

## I.    Expert Reports

- Expert Report of Adam L. Warren In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.

- Expert Report of Emre Carr In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.

- Expert Report of Graham Wade In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation, December 31, 2021.

## II.    Specific Bates Stamped Documents

| | | |
|---|---|---|
| BVI_00004227 | ELYSIUM-00873871 | ELYSIUM-01860774 |
| BVI_00013784 | ELYSIUM-00879476 | ELYSIUM-02301014 |
| BVI_00014746 | ELYSIUM-01001178 | ELYSIUM-02521340 |
| BVI_00016570 | ELYSIUM-01307083 | ELYSIUM-02997512 |
| BVI_00016680 | ELYSIUM-01311710 | ELYSIUM-03064431 |
| BVI_00016691 | ELYSIUM-01342518 | ELYSIUM-03078154 |
| CAYMAN_00000002 | ELYSIUM-01354486 | ELYSIUM-032000803 |
| CAYMAN_00000083 | ELYSIUM-01363300 | ELYSIUM-03200803 |
| CAYMAN_00002658 | ELYSIUM-01365057 | ELYSIUM-03255608 |
| CAYMAN_00002698 | ELYSIUM-01365057 | ELYSIUM-03436516 |
| CAYMAN_00002756 | ELYSIUM-01450347 | ELYSIUM-03572332 |
| CAYMAN_00004211 | ELYSIUM-01475804 | ELYSIUM-03572340 |
| CAYMAN_00004215 | ELYSIUM-01482371 | ELYSIUM-03572348 |
| CAYMAN_00005688 | ELYSIUM-01482447 | ELYSIUM-03572445 |
| ED&F-00025681 | ELYSIUM-01488492 | ELYSIUM-03572456 |
| ED&F-00025694 | ELYSIUM-01552933 | ELYSIUM-03572522 |
| ED&F-00026581 | ELYSIUM-01552935 | ELYSIUM-03582169 |
| ED&F-00040919 | ELYSIUM-01552936 | ELYSIUM-03582197 |
| ED&F-00041059 | ELYSIUM-01552940 | ELYSIUM-03582227 |
| ED&F-00041108 | ELYSIUM-01553174 | ELYSIUM-03638508 |
| ED&F-00041236 | ELYSIUM-01553174 | ELYSIUM-03638540 |
| ED&F-00042261 | ELYSIUM-01554930 | ELYSIUM-03638558 |
| ED&F-00042905 | ELYSIUM-01555519 | ELYSIUM-03638569 |
| ED&F-00044265 | ELYSIUM-01574028 | ELYSIUM-03638582 |
| ED&F-00047428 | ELYSIUM-01574029 | ELYSIUM-03638592 |
| ED&F-00049870 | ELYSIUM-01574029 | ELYSIUM-03638605 |
| ED&F-00076918 | ELYSIUM-01744706 | ELYSIUM-03638673 |
| ED&F-00137236 | ELYSIUM-01744925 | ELYSIUM-03638676 |
| ED&F-00201236 | ELYSIUM-01744940 | ELYSIUM-03853867 |
| ED&F-00603586 | ELYSIUM-01746161 | ELYSIUM-03860310 |
| ED&F-00604196 | ELYSIUM-01823054 | ELYSIUM-04028325 |
| ED&F-00604678 | ELYSIUM-01823066 | ELYSIUM-04029719 |
| ED&F-00605994 | ELYSIUM-01823082 | ELYSIUM-04029726 |
| ED&F-00605995 | ELYSIUM-01823083 | ELYSIUM-04030897 |
| ED&F-00605996 | ELYSIUM-01860759 | ELYSIUM-04052746 |

| | | |
|---|---|---|
| ELYSIUM-04052784 | ELYSIUM-04520662 | MPSKAT00119640 |
| ELYSIUM-04053345 | ELYSIUM-04520674 | MPSKAT00135581 |
| ELYSIUM-04121959 | ELYSIUM-05087718 | MPSKAT00166249 |
| ELYSIUM-04443491 | ELYSIUM-05822425 | PROPPACIF00001035 |
| ELYSIUM-04443787 | ELYSIUM-06020028 | PROPPACIF00001323 |
| ELYSIUM-04449409 | ELYSIUM-07232611 | RC00000056 |
| ELYSIUM-04449621 | ELYSIUM-07639612 | SKAT_MDL_001_00056852 |
| ELYSIUM-04450231 | ELYSIUM-08521698 | SKAT_MDL0100056852 |
| ELYSIUM-04520288 | ELYSIUM-09318785 | WH_MDL_00317825 |
| ELYSIUM-04520295 | ELYSIUM-09758834 | WH_MDL_00317825 |
| ELYSIUM-04520420 | ELYSIUM-10259211 | WH_MDL_00461595 |
| ELYSIUM-04520454 | FGC_SKAT-0000780 | WH_MDL_00462434 |
| ELYSIUM-04520595 | GUNDERSON00009928 | WH_MDL_00464384 |
| ELYSIUM-04520612 | MPSKAT00000961 | WH_MDL_00476560 |
| ELYSIUM-04520623 | MPSKAT00068151 | |

## III.   Deposition Transcripts

- Deposition Transcript of Richard Markowitz, April 8, 2021.

- Deposition Transcript of Robert Klugman, January 28, 2021.

- Deposition Transcript of Ronald Altbach, October 30, 2020.

## IV.   Legal Documents

- Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts.

- The High Court of Justice, Business and Property Courts of England & Wales, Commercial Court, SKAT v. Solo Capital Partners (in Special Administration) & Others, Sanjay Shah Defendants' Response to Claimant's Request Dated June 4, 2019 for Further Information Under CPR 18.

## V.   Statutes and Rules

- Capital Requirements Regulation (CRR): REGULATION (EU) No 575/2013 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of 26 June 2013 on prudential requirements for credit institutions and investment firms

- Directive 2004/109/EC of the European Parliament and of the Council of 15 December 2004 on the harmonization of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market and amending Directive 2001/34/EC.

## VI.   Publicly Available Documents

- https://content.next.westlaw.com/3-585-3525?__lrTS=20210711033739649&transitionType=Default&contextData=(sc.Default)&firstPage=true#co_anchor_a561904

- https://corporatefinanceinstitute.com/resources/knowledge/finance/sharpe-ratio-definition-formula/
- https://danishbusinessauthority.dk/sites/default/files/danish_companies_act.pdf
- https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32013R0575
- https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014R0909&rid=1
- https://find-and-update.company-information.service.gov.uk/company/07101175
- https://find-and-update.company-information.service.gov.uk/company/08242493/filing-history
- https://find-and-update.company-information.service.gov.uk/company/OC367979/filing-history?page=3
- https://ir.nasdaq.com/static-files/de0486ee-a34c-4c00-90b5-b0d1446cf72b
- https://op.europa.eu/en/publication-detail/-/publication/e58428b4-2e81-11e4-8c3c-01aa75ed71a1/language-en
- https://read.oecd-ilibrary.org/taxation/model-tax-convention-on-income-and-on-capital-2017-full-version_8dc818b1-en#page6
- https://taxsummaries.pwc.com/united-states/corporate/income-determination
- https://www.difc.ae/public-register/elysium-global-dubai-limited/
- https://www.eba.europa.eu/regulation-and-policy/single-rulebook/interactive-single-rulebook/504
- https://www.ecb.europa.eu/pub/pdf/scpops/ecbocp68.pdf
- https://www.fca.org.uk/news/press-releases/sunrise-brokers-llp-fine-serious-financial-crime-control-failings
- https://www.fca.org.uk/publication/correspondence/letter-uk-finance-sars-stors.pdf
- https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf
- https://www.finra.org/rules-guidance/key-topics/aml
- https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090
- https://www.finra.org/rules-guidance/rulebooks/finra-rules/6140
- https://www.handbook.fca.org.uk/handbook/FCG.pdf
- https://www.handbook.fca.org.uk/handbook/FCG.pdf
- https://www.handbook.fca.org.uk/handbook/GENPRU/1/?date=2016-03-07&view=chapter
- https://www.handbook.fca.org.uk/handbook/IFPRU/2/2.html
- https://www.handbook.fca.org.uk/handbook/MAR/1/6.html?date=2016-03-07
- https://www.icmagroup.org/assets/documents/Regulatory/Secondary-markets/CSDR-Settlement-Regulation/CSDR-Brochure-August-2019-190819.pdf
- https://www.islaemea.org/assets/smart-pdfs/isla-securities-lending-market-report/files/downloads/ISLA_SLReport_Sep2019.pdf
- https://www.iso20022.org/15022/uhb/finmt545.htm
- https://www.iso20022.org/15022/uhb/finmt566.htm
- https://www.iso20022.org/15022/uhb/finmt566.htm
- https://www.iso20022.org/15022/uhb/mt535-34-field-35b.htm
- https://www.iso20022.org/15022/uhb/mt545-14-field-98a.htm
- https://www.iso20022.org/15022/uhb/mt545-36-field-36b.htm
- https://www.iso20022.org/15022/uhb/mt545-77-field-19a.htm
- https://www.iso20022.org/15022/uhb/mt564-3-field-20c.htm
- https://www.iso20022.org/15022/uhb/mt566-26-field-93a.htm
- https://www.iso20022.org/15022/uhb/mt566-37-field-22f.htm
- https://www.iso20022.org/15022/uhb/mt566-3-field-23g.htm

- https://www.iso20022.org/15022/uhb/mt566-4-field-22f.htm
- https://www.iso20022.org/15022/uhb/mt566-83-field-19b.htm
- https://www.nasdaq.com/about/press-center/nasdaq-omx-implements-t2-standard-settlement-its-nordic-and-baltic-markets
- https://www.nasdaq.com/docs/98477_wash-trading-faq-.pdf
- https://www.nasdaq.com/glossary/e/ex-dividend-date
- https://www.nasdaq.com/glossary/f/forward-contract
- https://www.sec.gov/rules/final/2017/34-80295
- https://www.sec.gov/rules/final/2017/34-80295.pdf
- https://www.swift.com/about-us/discover-swift/messaging-and-standards
- https://www.theice.com/publicdocs/futures/Futures_Europe_Single_Stock_Futures_KID.PDF
- https://www.vp.dk/Legal-Framework/VP-Rulebook
- https://www.vp.dk/Legal-Framework/VP-Rulebook
- https://www.vp.dk/Legal-Framework/VP-Rulebook
- Solo Capital Partners LLP Report and Financial Statements for the Year Ended 31 March 2012.
- Solo Capital Partners LLP Report and Financial Statements for the Year Ended 31 March 2013.
- Solo Capital Partners LLP Report and Financial Statements for the Year Ended 31 March 2014.
- Solo Capital Partners LLP Report and Financial Statements for the Year Ended 31 March 2015.


**VII.   Correspondence**

- Letter to Pinsent Masons, January 11, 2021.


**VIII.   Other**

- Bloomberg.

- Boyd, John H. and Ravi Jagannathan, "Ex-Dividend Price Behavior of Common Stocks," Review of Financial Studies, 1994, 7(4), pp. 711-741.

- Brown, Keith C., and Scott L. Lummer, "The Cash Management Implications of a Hedged Dividend Capture Strategy," Financial Management, 1984, pp. 7-17.

- Chen, Hung-Ling, Edward H. Chow, and Cheng-Yi Shiu, "Ex-Dividend Prices and Investor trades: Evidence from Taiwan," Pacific-Basin Finance Journal, 2013, 24, pp. 39-65.

- Francotte, Pierre, International Monetary Fund, "Current Developments in Monetary and Financial Law," Vol. 1, 1999, pp. 271-289.

- Henry, Tyler R. and Jennifer L. Koski, "Ex-Dividend Profitability and Institutional Trading Skill," Journal of Finance, 2017, 72(1), pp. 461 - 493.

- Koski, Jennifer L. and John T. Scruggs, "Who Trades Around the Ex-Dividend Day? Evidence from NYSE Audit File Data," Financial Management, 1998, 27(3), pp. 58 - 72.

- Michaely, Roni and Maurizio Murgia, "The Effect of Tax Heterogeneity on Prices and Volumes around the Ex-Dividend Day: Evidence from the Milan Stock Exchange," Review of Financial Studies, 1995, 8(2), pp. 369-399

- Rantapuska, Elias, "Ex-Dividend Day Trading: Who, How, and Why? Evidence from the Finnish Market," Journal of Financial Economics, 2008, 88(2), pp. 355 – 374.

- Refinitiv Eikon.