# Exhibit 4

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2                CASE NO.  18-MD-2865 (LAK)

3

4      _____)
                                       )
5      IN RE:                          )
                                       )
6      CUSTOMS AND TAX ADMINISTRATION OF )
       THE KINGDOM OF DENMARK          )
7      (SKATTEFORVALTNINGEN) TAX REFUND )
       SCHEME LITIGATION               )
8      _____)

9

10

11

12

13              C O N F I D E N T I A L

14

15

16

17      REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

18                    EXAMINATION OF

19                    GRAHAM WADE

20

21              DATE: March 16, 2022

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR

1    potentially be one thing that you would want

2    to take into account.

3        Q     The HMRC is the party who

4    ultimately decides whether tax is due on

5    particular transactions or income.

6            Right?

7            MR. OXFORD:  Objection to the form.

8        A     Unfortunately, that's incorrect.  I

9    believe it's -- it's the law, and ultimately

10   the courts that decide what tax is due.

11           But they are the administrative

12   branch of the tax system.

13       Q     Okay.  And so the ultimate question

14   of whether tax is due is a legal one.

15           Right?

16           MR. OXFORD:  Objection to form.

17       A     Again, that's quite a wide-ranging

18   question.  So to be more precise in my

19   answer, I think you need to narrow it down a

20   bit.

21           But certainly in the U.K., taxes

22   paid under tax law, and the question of how

23   to interpret that tax law, is ultimately a

24   question for the courts.

25       Q     Okay.  Are you aware of any similar

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 55

```
 1    I do not believe I expressed legal opinions

 2    in the report.

 3         Q    Okay.  We agree that you've not

 4    expressed legal opinions in the report.

 5              Right?

 6              MR. OXFORD:  Objection to form.

 7         A    As I said, my opinions in my report

 8    are the opinions taken as a whole and they're

 9    my opinions, so.

10         Q    Okay.  Can you go to Paragraph 9 on

11    Page 3, please?

12              At the end of the second line, can

13    we agree that you wrote, "I do not express

14    legal opinions in this report?"

15         A    Sorry.  Just let me read it.

16              Paragraph 9?

17         Q    Correct.

18         A    (Witness reviewing.)

19              Yeah.

20         Q    Okay.  And you are not expressing

21    legal opinions on securities law in this

22    report.

23              Right?

24         A    I'm expressing opinions about my

25    understanding of the facts of the transaction
```

```
 1    and my experience as a financial practitioner

 2    in the securities markets.

 3         Q    Okay.  But you're not expressing

 4    legal opinions on the securities laws in this

 5    report.

 6             Right?

 7         A    I'm expressing --

 8             MR. OXFORD:  Objection to form.

 9         A    I'm expressing my view on the

10    facts.  It's not my place to, you know,

11    determine the legal consequences of

12    those -- of my opinions.

13         Q    Okay.  I'm just asking you a

14    yes-or-no question.

15             You're not expressing legal

16    opinions on securities law in this report.

17             Right?

18         A    Well, I've said I do not express

19    legal opinions in this report, so.

20         Q    Okay.  And likewise, you're not

21    expressing legal opinions on tax law in this

22    report.

23             Right?

24         A    Correct.

25         Q    Okay.  You're not expressing legal
```

```
1    opinions on principles of Danish tax

2    administration in this report.

3             Right?

4             MR. OXFORD:  Objection to form.

5        A    I have expressed no opinions

6    whatsoever on the practices of Danish tax

7    administration.

8        Q    Okay.  If we go back to Paragraph 1

9    now on Page 1 -- are you there?

10       A    Yeah.

11       Q    Okay.  If you look at the last part

12   of the sentence after the semicolon, it says,

13   "and whether the financial transactions

14   executed by the various defendants would

15   entitle an entity or individual to a

16   dividend."

17            Do you see that?

18       A    I see that.

19       Q    So we just established that you're

20   not expressing legal opinions in this report.

21            Right?

22       A    I don't believe I need to express a

23   legal opinion to -- for example, in the case

24   of the Solo transactions, to conclude if

25   there's no shares and there were no
```

1    shares, and so there were no dividends.

2         And so I think that's a fairly

3    straightforward conclusion to draw from my

4    study of these transactions.

5    Q    Okay.  Other than for the trades

6    that you say were used for more than one tax

7    voucher -- withdrawn.  Let me re-ask that

8    question.

9         Other than trades for which you say

10   shares were used to support more than one tax

11   voucher, is there any other basis for

12   concluding that any of the ED&F transactions

13   did not entitle the pension plans to

14   dividends?

15        MR. OXFORD:  Objection.

16   A    There are a number of -- as I said,

17   all of the bases for my opinions are included

18   in my reports and they should be taken as a

19   whole.  So if you have a question on a

20   specific one, I'm very happy to answer it.

21        But it's a combination of all the

22   factors that I've covered in my report taken

23   together.

24   Q    Okay.  Can you tell me what those

25   factors are?  Can you summarize them for me?

CONFIDENTIAL
Graham Wade - March 16, 2022

1          MR. OXFORD:  Objection to form.

2      A    Okay.  Well, apart from

3  the -- apart from the absence of shares, the

4  other most fundamental reason, although, as

5  I've said, there are others in my report, is

6  that the nature of the way the cum ex

7  transactions were structured is that even if

8  there had been shares, it would still not

9  have been the receipt of the dividend.  It

10  would have been a receipt of a dividend

11  compensation payment.

12      Q    Okay.  And whether something is a

13  dividend or a dividend compensation payment,

14  that's informed by legal principles.

15          Right?

16          MR. OXFORD:  Objection to form.

17      A    I think it's formed by an

18  understanding of the market practice that

19  relates to security financing and equity

20  finance transactions.

21      Q    Okay.  So it's your testimony that

22  whether something is a manufactured dividend

23  or a real dividend or a dividend compensation

24  payment is not informed by any legal

25  principles?

```
 1    transactions.

 2            And it's for all the reasons given

 3    in my report.

 4        Q    Okay.  The transactions that you

 5    analyzed in your report, are you aware of any

 6    regulations that impact, in the securities

 7    contract, whether the securities contract did

 8    or did not intend to confer a dividend right

 9    on the buyer?

10            MR. OXFORD:  Objection to form.

11        A    Well, I think the -- the reasons,

12    I've given a number of reasons in my report

13    as to why I concluded that the nature of the

14    transactions between the parties were not

15    intended to deliver a dividend to the pension

16    plan, the overriding one of which is there

17    weren't shares to support the dividend and

18    that the pricing clearly indicated that the

19    seller did not receive a dividend.  And so

20    the seller could not have entered into a

21    transaction intending to sell a dividend that

22    it didn't actually have.

23            But there are a range of other

24    factors that I've taken into account in

25    arriving at those conclusions.  And again,
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    it's all the facts and circumstances taken

2    together.

3             And the regulatory status and

4    market conduct rules that apply to these

5    transactions were relevant in understanding

6    the facts and circumstances of what actually

7    happened.

8       Q    Okay.  Which regulations are you

9    referring to at the end of that last answer?

10      A    Well, if you --

11           MR. OXFORD:  Object to form.

12      A    If you -- you know, if you want me

13   to go back through my report and identify all

14   the regulations that I've considered in

15   arriving at my conclusions, I'm happy to do

16   that.  But I've -- you know, at various

17   points I've discussed, you know, market

18   conduct regulations, transaction reporting

19   regulations, you know, short-selling

20   regulations, Prudential capital regulations.

21           There's a wide range -- because you

22   have to understand the nature of the, you

23   know, what the counterparties could and

24   couldn't have done, and how sophisticated

25   financial institutions transact with each

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 93

```
 1    other.
 2            So all of those are relevant in
 3    terms of understanding what the nature of the
 4    securities transactions between the cum ex
 5    seller and ED&F Man was.
 6       Q    Mr. Wade, respectfully, I'm asking
 7    you specifically about the securities
 8    contract.
 9            Can you identify for me one example
10    of a regulation that you're aware of that
11    dictates whether or not a securities contract
12    intends or does not intend to confer a right
13    to a dividend on a buyer?
14            MR. OXFORD:  Objection, asked and
15         answered.
16       A    And I'm respectfully telling you
17    that your question is misplaced.  Because in
18    order to understand the nature of the
19    transaction between the two counterparties,
20    one needs to understand all the facts and
21    circumstances and what's the regulatory
22    status, what the market conduct rules were.
23            And for all the reasons I have
24    given in my report, it is clear to me that
25    the transactions were not intended to deliver
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 94

```
1    a real dividend to the pension plan because
2    there were no shares and there were
3    no -- there were no real dividends to pass
4    on.
5            So -- but that requires a full
6    understanding of all the facts and
7    circumstances, which includes all the
8    regulations I've cited to in my report.
9        Q    Okay.  And so you've outlined a
10   number of ED&F Man transactions in the
11   context of your report.
12           For any of those ED&F transactions,
13   can you identify any regulation that is
14   relevant to whether the terms of the
15   securities contract between ED&F and its
16   counterparty did or did not intend to confer
17   the right to a dividend?
18           MR. OXFORD:  Object to the form.
19       A    As I've said, my job is to
20   understand all the facts and circumstances
21   around each of the transactions that I've
22   looked at, and understand the nature of how
23   they executed those transactions, how they
24   hedged them, how they priced them, what the
25   relevant regulations that applied to the
```

1    counterparties were, and for all the reasons

2    I have given in my report.

3             It is clear to me that the nature

4    of those transactions were that they

5    were -- that they did not deliver dividends

6    to the pension plans.

7         Q    So the answer to my question is

8    "no?"

9             MR. OXFORD:  Object to the form.

10        A    I don't actually remember what your

11   previous question was, but I don't think my

12   answer was "no."

13            But maybe you can remind me what

14   the previous question was.

15        Q    I asked you, given that you've

16   outlined a number of ED&F Man transactions in

17   the context of your report, whether, for any

18   of those transactions, you can identify any

19   single regulation that is relevant to whether

20   the terms of the securities contract between

21   ED&F and its counterparty did or did not

22   intend to confer a right to a dividend?

23            MR. OXFORD:  Objection, asked and

24        answered.

25        A    And my response to that is that in

1    order to arrive at my conclusion about what

2    the nature of the transactions were between

3    the cum ex sellers and the pension plans, I

4    need to understand the full facts and

5    circumstances.  And that includes the

6    regulatory rules that applied to the various

7    counterparties and market conduct

8    regulations.

9            And that is all as detailed in my

10   report.

11       Q    And that's your complete answer to

12   the question that I asked?

13           MR. OXFORD:  Object to the form.

14       A    Yeah, I think I've been clear on

15   what my answer to the question is.

16       Q    All right.  If ED&F were to take

17   the position in this litigation that "a share

18   is acquired or disposed of at the time when a

19   final and binding agreement exists on the

20   acquisition or disposal of the share," would

21   you agree with that?

22           MR. OXFORD:  Objection to the form.

23       A    Sorry?  If ED&F Man were to take

24   what position?

25       Q    The position in this litigation

CONFIDENTIAL
Graham Wade - March 16, 2022

1    that "a share is acquired or disposed of at

2    the time when a final and binding agreement

3    exists on the acquisition or disposal of the

4    share," would you agree with that?

5            MR. OXFORD:  Object to the form.

6        A    And for what?  In what context?

7        Q    I'm asking you, as a general

8    principle of securities trading, whether or

9    not you would agree with the principle that

10   "a share is acquired or disposed of at the

11   time when a final and binding agreement

12   exists on the acquisition or disposal of the

13   share?"

14           MR. OXFORD:  Objection to the form.

15       A    Well, there's a number of terms in

16   that question that would need to be a bit

17   more precisely defined.  For example, for

18   what purpose do you mean "disposed" and what

19   do you mean by "disposed?"

20           So I -- I don't think I'm able to

21   agree with that or necessarily disagree with

22   it.

23       Q    Okay.  Would you agree or disagree

24   with the principle that "the ownership right

25   in the share is transferred at the time that

1    a final and binding agreement exists on the

2    acquisition or sale of the share?"

3              MR. OXFORD:  Object to the form.

4        A    No, I wouldn't.  Again, I wouldn't

5    agree with that one because I don't think

6    that's right in terms of when ownership

7    rights associated with shares do change

8    hands.

9              But I would also ask you to be a

10    bit more precise in defining what you mean by

11    "ownership rights."

12        Q    Would you agree with the principle

13    that "a buyer of a share owns the share at

14    the time when a final and binding agreement

15    exists on the acquisition of the share?"

16              MR. OXFORD:  Object to the form.

17        A    No.

18        Q    Would you agree with that statement

19    if I told you that that principle is being

20    advanced by me in the context of Danish tax

21    law?

22              MR. OXFORD:  Object to the form.

23        A    I think, as I've stated earlier,

24    I'm not expressing opinions as to Danish tax

25    law.  So I would -- I would not have an

CONFIDENTIAL
Graham Wade - March 16, 2022

1    opinion on that question as it relates to

2    Danish tax law.

3        Q    Okay.  Would you agree that when a

4    final and binding agreement to acquire a

5    share exists, that the buyer is therefore the

6    only person liable to taxation in respect to

7    any dividend that's received?

8            MR. OXFORD:  Object to the form.

9        A    Well, firstly, the -- you need to

10   define the circumstances that relate to that,

11   what tax jurisdiction you're talking about,

12   what the circumstances of the trade are.

13           And so, on its face, I can't really

14   answer that.

15       Q    Okay.  If I specify Denmark as a

16   jurisdiction, would that help you?

17           MR. OXFORD:  Object to the form.

18       A    Well, then, I'm not here to

19   express, and I don't believe I've expressed

20   any opinions in my reports as to Danish tax

21   law and how that would apply to any

22   particular transaction.

23       Q    How about on securities

24   transactions in Denmark?  Do you consider

25   yourself to be expressing an opinion on

1        A    I'm sorry -- sorry to do this, but

2    right at the end of your question, it broke

3    up, so I didn't hear the end of the question.

4            Can you repeat it again?

5        Q    No problem.  If you ever need me to

6    repeat a question, I'm happy to do that.

7            Do you understand anything about

8    what VP Securities' involvement in paying a

9    dividend to holders of Danish shares that are

10   listed on Danish exchanges is?

11           MR. OXFORD:  Object to the form.

12       A    Well, as I've said, it is my

13   understanding that VP Securities maintains

14   the ultimate share register.  And so, at the

15   point in time, i.e. the record date, it is

16   VP Securities who ultimately confirms the

17   underlying record holders and will therefore

18   be involved in directing the payment from the

19   issuing company to those record holders.

20           Obviously, in many cases, those

21   record holders will be a custodian or

22   sub-custodian.  So VP Securities is not the

23   only person involved in that process, but

24   they do have an important role in there.

25       Q    Okay.  And do you understand that

CONFIDENTIAL
Graham Wade - March 16, 2022

1    VP Securities satisfied its role to direct

2    the dividends to the proper party if it paid

3    the amount of the dividends to the person on

4    the register?

5            MR. OXFORD:  Object to the form.

6        A    I understand that from the issues

7    perspective, it pays the dividend to the

8    holders of record as determined by

9    VP Securities.  But that may not necessarily

10   be the end of the process, because, as I

11   said, there's other -- they'd most likely be

12   custodians, sub-custodians, and a number of

13   other things involved in the overall process.

14       Q    Okay.  And you would agree with the

15   fact that the person on the register is not

16   necessarily the person who ultimately had the

17   right to receive the dividend?

18           MR. OXFORD:  Object to the form.

19       A    Yeah, I'd agree with that, yeah.

20       Q    Okay.  And would you agree with the

21   fact that where the person on the register

22   was not the one who ultimately had the right

23   to receive the dividend, that the person to

24   whom VP Securities paid the dividend would

25   have received it on behalf of the actual

1    legal owner of the shares?

2              MR. OXFORD:  Object to the form.

3        A    That requires making a series of

4    assumptions about who the holder on

5    the -- who the holder of record actually was,

6    and what their -- what are all the

7    circumstances surrounding that particular

8    holder of record.

9              But as I've said, in general, it

10   would typically be a custodian or

11   sub-custodian who was the holder of record at

12   the level of VP Securities.  And so one would

13   need to fully understand in what capacity the

14   custodian is holding those shares in order to

15   determine what happens once the payment gets

16   to that custodian.

17       Q    Okay.  Would you agree with the

18   principle that the legal owner of the shares

19   is the one who ultimately receives the

20   dividends, who's liable to taxation on the

21   dividend, and who's suffered WHT?

22             MR. OXFORD:  Object to the form.

23       A    There's such a wide-ranging number

24   of terms in that.  And it's so general that,

25   no, I would not agree as a general --

```
 1    have -- you know, there are a whole range of

 2    different forms of legal ownership.

 3            So I need you to be a bit more

 4    precise.

 5       Q    Okay.  Is it your understanding

 6    that what it means to own a share depends on

 7    the legal circumstances in which you're

 8    asking that question?

 9            MR. OXFORD:  Objection to form.

10       A    Again, the question of what

11    ownership means for the particular purposes

12    in which that question's asked, I need to

13    know what purposes it's asked, and all the

14    facts and circumstances that surround that

15    particular share.

16            So if you give me a specific

17    example, I can give you my thoughts.

18       Q    Is it your testimony that you're

19    unable to tell me, as a general principle,

20    what it means to be a legal owner of a share

21    in Denmark?

22            MR. OXFORD:  Objection.

23       A    What I'm saying is that over the

24    course of my career I spent a long time and I

25    understand that the question you're asking me
```

1    can be a much more complex question than it

2    appears because it requires understanding the

3    exact facts and circumstances, for what

4    purpose, i.e., you know, is it tax, is it

5    accounting, is it regulation, is it, you

6    know, record holder from the issuer's

7    perspective?

8           There's a range of different ways

9    in which one can think about who the owner of

10   a share is.  And without the full facts and

11   circumstances and the specifics and for what

12   purpose the question is being asked, I -- I

13   can't answer it.

14       Q    Is it your understanding that the

15   legal owner of a share can be a different

16   person in different circumstances?

17          MR. OXFORD:  Object to the form.

18       A    It would be highly unusual if a

19   given share for the same -- going back to my

20   point about there are different

21   purposes -- if we're talking about a specific

22   definition of "ownership," in my experience,

23   it would be highly unusual if two people can

24   be the same owner of the share for the same

25   purpose.

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1        Q    What about whether two people can
 2   be the same owner of the share for different
 3   purposes?
 4             MR. OXFORD:  Sorry.  Just let me --
 5        let me get my objection in, please,
 6        Mr. Wade.
 7             So can you just repeat that
 8        question, Greg?
 9             MR. PRUDEN:  Yeah.  There was an
10        error in my question anyway, so let me
11        re-ask it.
12        Q    What about whether two people can
13   be the owner of the same share for different
14   purposes?
15             MR. OXFORD:  Object to the form.
16        A    That's possible, yeah.
17        Q    Okay.  What's your understanding
18   that the owner can be a different person in
19   different circumstances based on?
20             MR. OXFORD:  Object to the form.
21        A    My -- over the course of my career,
22   you know, as I said, you've got accounting
23   regulation, you've got nominee ownership.  It
24   is possible and I've seen instances over the
25   course of my career where the owner for one
```

1    of those can be different from another owner.

2        Q    Can you give me an example?

3        A    Yeah.  So for accounting purposes,

4    you know, I mean, in most cases, the nominee

5    owner is the custodian taking Danish

6    securities.  The custodian registered with

7    VP Securities would be the nominee owner for

8    accounting purposes.

9            It's quite unlikely that that

10   person is the accounting owner of the shares.

11   It's possible they are, but it's unlikely.

12       Q    Okay.  You use the word "owner" a

13   lot, but you didn't really refer to a legal

14   owner.  Just let me re-ask the question.

15           Is it your testimony that the

16   accounting owner of a share is equivalent to

17   being a legal owner of a share?

18           MR. OXFORD:  Object to the form.

19       A    It depends —— again, it depends for

20   what purpose and what your definition of

21   "legal owner" of a share is, which I don't

22   know what you mean.

23           So I can't really answer that

24   question.

25       Q    Okay.  Would you agree with the

CONFIDENTIAL
Graham Wade - March 16, 2022

1        Asked and answered.

2        A    I'm saying, and I think it's been

3    my consistent response, that "legal

4    ownership" can mean a number of different

5    things in a number of different contexts, and

6    that without the context or precision on

7    exactly for what purpose you're asking it, I

8    can't answer that.

9            So if you want to give me a very

10   specific example of a trade, and then a very

11   specific definition of what you mean by

12   "legal ownership," I will do my best to

13   answer it.

14       Q    In the transactions that you

15   analyzed in this case, when did the buyer of

16   the shares become the owner of the shares?

17           MR. OXFORD:  Object to the form.

18       A    It's the same point.  For what

19   purpose do -- what do you mean by "owner?"

20           Do you mean nominee owner?  Do you

21   mean tax owner?  Do you mean accounting

22   owner?

23           There are lots of different

24   definitions.

25       Q    Is it your testimony you can't tell

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 124

1    me what it means to be an owner of a share?

2          MR. OXFORD:  Objection, asked and

3       answered.

4       A    It is my testimony that in order to

5    answer that question, I need to understand

6    the context in which you're asking that

7    question, and all the facts and circumstances

8    surrounding that particular transaction.

9       Q    Okay.  And so you have no general

10   definition available to you of what it means

11   to be the owner of a share?

12          MR. OXFORD:  Objection to form.

13      A    My position is, as I've explained

14   earlier, that over the course of my career

15   working in structured finance, I'm well aware

16   that what it means to be the owner of a

17   security can take a number of different

18   meanings, and that precision is required.

19          And like I said, if you give me a

20   precise set of facts and a precise definition

21   of what you mean by the particular type of

22   ownership, I will do my best to answer it.

23      Q    Okay.  For the purposes of making a

24   tax application in Denmark, in the

25   transactions that you analyzed in this case,

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1              And my opinions are fundamentally
 2     that those three statements are false.  But I
 3     have offered no opinion as to, you know, what
 4     the Danish tax consequences of -- as a result
 5     of that are.
 6        Q    Okay.  Well, you said that -- you
 7     told me in response to a question that I
 8     asked you, Mr. Wade, whether and in what
 9     context I was using the term "ownership"
10     would inform your answer to my question.
11              I'm not asking you about opinions
12     that you provided or not.  What I'm asking
13     you right now is whether you understand that
14     for the purpose of making a tax reclaim in
15     Denmark, when, in a securities transaction,
16     the ownership would transfer from the seller
17     to the buyer?
18        MR. OXFORD:  Object to the form.
19        A    And my response is that given the
20     opinions that I gave and the fact that I am
21     not giving opinions on Danish tax law, I have
22     not given an opinion on the question of what
23     the precise conditions required are to obtain
24     a Danish tax reclaim.
25              But it's my opinion that the three
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    key pieces of information on the tax voucher,

2    which I understand to have formed a very

3    important part of that tax group claim, in my

4    opinion, and based on my review, and for all

5    the reasons given in my report, that

6    information is false.  So it seems highly

7    unlikely to me that that would mean that the

8    person is the owner for Danish tax purposes.

9         But that is not something I've

10   expressed an opinion on.

11   Q    Okay.  For the purposes of

12   determining whether a payment made from a

13   seller to a buyer in reference to a dividend

14   is a dividend or a manufactured dividend,

15   when do you understand that legal ownership

16   transfers in a securities transaction from

17   the seller to the buyer?

18        MR. OXFORD:  Object to the form.

19   A    I just don't think that's a

20   question that makes sense on its own terms.

21   A -- as I think I defined in my report, a

22   dividend compensation payment is a

23   contractual payment that arises under a

24   transfer -- a contract for the transfer of

25   securities.

```
 1              So I -- I don't think that your
 2   question makes sense on its own terms.
 3       Q    Okay.  Well, that's your
 4   understanding of the definition of
 5   "manufactured dividends?"
 6       A    Amongst other things, and, as laid
 7   out in my reports, extensive experience over
 8   the course of my career in understanding
 9   equity finance transactions.
10       Q    What is the definition of
11   "manufactured dividends?"
12       A    I think -- I think I just gave a
13   definition which is, I believe, the one I
14   used in my report, which is it's a
15   contractual payment representative of a
16   dividend that arises under a contract for the
17   transfer of securities.
18              That, I think, is the generally
19   accepted definition based on my market
20   practice.
21       Q    And what determines whether a
22   payment that's representative of a dividend
23   is, itself, a dividend or a manufactured
24   dividend?
25              MR. OXFORD:  Object to form.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1        A    Well, I think -- I don't -- I don't
 2   really understand that question because my --
 3   under my definition, which I think is the --
 4   well, I know, based on my market practice, is
 5   the accepted market definition of a dividend
 6   compensation payment -- a dividend
 7   compensation payment is a contractual payment
 8   made under the contract for transfer of
 9   securities.
10           So it's definitionally not a
11   dividend.
12        Q    Okay.  So your testimony is that a
13   payment that's made from the seller to a
14   buyer of securities can never represent a
15   real dividend?
16           MR. OXFORD:  Object to the form,
17        misstates his testimony.
18        A    That's -- that's not what I said.
19        Q    Okay.  Is it your testimony that a
20   contractual payment that represents a
21   dividend from the seller to a buyer of shares
22   is always a manufactured dividend?
23           MR. OXFORD:  Object to the form.
24        A    I don't think I said that.  I
25   defined -- I gave my definition, which is the
```

1      generally accepted market definition, that a

2      dividend compensation payment -- or a

3      manufactured dividend, if you prefer that --

4      is a contractual payment made under contract

5      for the transfer of securities.

6            Q    Okay.  And can that ever be

7      considered a real dividend?

8                 MR. OXFORD:  Object to the form.

9            A    For what purpose?

10           Q    For the purposes of determining

11     whether the payment received is a dividend?

12                MR. OXFORD:  Object to the form.

13           A    Well, my understanding of the term

14     "dividend" is a dividend is a payment from an

15     issuing company made to a shareholder in

16     respect of that person's being the owner of

17     shares in a company.

18                So, in that sense, a dividend and a

19     manufactured dividend, as I've previously

20     just defined them and are included in my

21     report, cannot be the same thing under

22     those -- as defined for those purposes.

23           Q    Okay.  Well, how do you determine

24     whether somebody is the owner of shares in a

25     company?

CONFIDENTIAL
Graham Wade — March 16, 2022

```
 1              MR. OXFORD:  Object to the form.
 2        A     Again, I'm going to ask you to
 3    define for what purpose.
 4        Q     Mr. Wade, I'm using your words.
 5    You told me a second ago that your
 6    understanding of the term "dividend" is "a
 7    dividend is a payment from an issuing company
 8    made to a shareholder in respect of that
 9    person being an owner of shares in a
10    company."
11              What do you mean when you say that
12    the person is the "owner of shares in a
13    company" in that context?
14        A     Okay.  In that particular context,
15    I mean that the person is the -- in whatever
16    format that particular -- depending on the
17    articles of association of that company and
18    whatever form the register is held, that that
19    person is, at the time when the dividend
20    right accrues, i.e., the record date, that
21    person is the record holder on the company's
22    share register, and that the issuing company
23    pays the dividend to.
24        Q     Okay.  So if you are not on the
25    share register, you are not the owner of the
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    shares.

2         Is that your testimony?

3         MR. OXFORD:  Object to the form.

4    A    No, that's a -- that's completely

5    different because you've expanded my -- I

6    said for the purposes of knowing -- in

7    defining "dividend," I have defined

8    "shareholder" in the way I just defined it.

9         I didn't say anything about who the

10   owner of the shares is, because that could

11   mean -- depending on what the context is and

12   what circumstances are, "owner" is a very

13   broad term that can mean all kinds of things.

14   Q    Okay.  And so, for the purposes of

15   determining who receives a dividend, the

16   owner is synonymous with the person on the

17   share register.

18        Is that your testimony?

19        MR. OXFORD:  Object to the form,

20        asked and answered.

21   A    You asked me to define "dividend."

22   I defined it as being -- in the way that I

23   did.

24        And then that requires -- the

25   dividend is paid by the issuing company to

1    the shareholder of record on the record date,

2    and the shareholder of record is the person

3    who, in whatever format the shareholder

4    registry is maintained, is the person who is

5    on the record at that time.

6            That was the purpose —— that is a

7    definition in which I've defined "dividend,"

8    and for those purposes, that's what I mean by

9    "shareholder."

10    Q    I asked you about the definition of

11    "owner."  I'm asking you whether the

12    definition of "owner," for the purposes of

13    determining whether you received a dividend,

14    is synonymous with the person on the share

15    register?

16            MR. OXFORD:  Objection.

17    A    And I did not give a general

18    definition of "owner."  You asked me for a

19    definition of "dividend" which I gave.

20            And for those purposes, the owner

21    of the shares is the person who's on the

22    register, but only for those purposes.  Maybe

23    for other purposes as well, but I'm just

24    being very precise on —— as I said, you know,

25    across the course of my career, I have

1    learned that it's very important that the

2    definition of "owner," "legal owner," all

3    these kind of terms can have a number of

4    different meanings in different contexts.

5         So I'm just trying to be very

6    precise.

7    Q    Okay.  So your definition of who

8    receives a dividend is the person on the

9    share register?

10        Full and final answer?

11        MR. OXFORD:  Object to the form.

12   A    I think I actually defined

13   "dividend" as being a payment by the issuer

14   company.  That was -- that was what I was

15   defining.

16        And the issuer company pays it to

17   the person who is on the shareholder register

18   at the date of record that the company

19   determines the dividend will be paid.

20   Q    Okay.  I'm asking you, for the

21   purposes of determining who is deemed to have

22   received a dividend, what determines who is

23   the owner of the share on which the dividend

24   is paid?

25        MR. OXFORD:  Object to form.

1        A    I'm sorry, but you just introduced

2    the word "deemed" there, so deemed for what

3    purpose?  What's the context?  What's the

4    transaction?

5              I just -- my experience over many

6    years involved in structured finance

7    transactions is that precision is required.

8    And so, if you give me precision, I will do

9    my best to answer.

10       Q    Okay.  I want to go back to what

11   you told me again, and that's that "the

12   dividend is a payment from an issuing company

13   made to a shareholder in respect to that

14   person being an owner of shares in a

15   company."

16             I'm asking you whether being an

17   owner of shares in a company in that context

18   is synonymous with being on the share

19   register?

20             MR. OXFORD:  Object to the form.

21       A    For the purpose -- in the way I

22   defined what a dividend is, the dividend is a

23   payment made by the issuing company to the

24   person -- we can call them the owner for

25   these purposes -- who is on the shareholder

1    register on the record date.

2              So, for these purposes, "owner"

3    means the person on the shareholder register.

4    But "owner" in any other context may well

5    have a completely different meaning.

6         Q    Okay.  And for these purposes, when

7    does the person who is considered to be the

8    owner -- using your definition

9    again -- become the owner?

10             MR. OXFORD:  Object to the form.

11        A    It would depend on the full details

12   of the article of association of the company

13   and exactly how it works.  But in simple

14   terms, it would be when whoever the registrar

15   for the company is puts that person onto the

16   shareholder register as being the current

17   owner of that share.

18        Q    Do you reference the details of the

19   articles of association of any of the Danish

20   issuers whose transactions you analyzed in

21   this case?

22             MR. OXFORD:  Object to the form.

23        A    No, but that's not necessary in the

24   context of understanding these particular

25   transactions because, first of all, the

CONFIDENTIAL
Graham Wade - March 16, 2022

1    specific definition that we've been talking

2    about I don't think is actually relevant to

3    any of my opinions.

4              And secondly, it's my

5    understanding, based on a combination of

6    market practice and the documents I've

7    reviewed in this case, that the nominee

8    holder of a share on the record date is

9    determined by VP Securities and what register

10   they maintain, which is the ultimate and only

11   record of who the nominee holder of the share

12   is, but purely for the purposes of defining

13   who the issuing company pays a dividend to.

14       Q    Okay.  Have you reviewed any

15   documents in this case that would indicate to

16   you who was the owner of a share?

17             MR. OXFORD:  Object to the form.

18       A    I'm sorry, but you're just using

19   the phrase "owner," and I think I've been

20   clear that unless you're precise about what

21   you mean by ownership, I can't give an answer

22   to that.

23       Q    Okay.  As a matter of general

24   English, have any documents you've reviewed

25   in this case offered you any opinion on who

CONFIDENTIAL
Graham Wade — March 16, 2022

1    is an owner of a share?

2              MR. OXFORD:  Object to the form.

3         A    As I said, based on my extensive

4    experience over many years in the structured

5    finance industry, it would be very imprudent

6    of me to use the general English meaning of

7    "owner" when we're talking about securities

8    transactions where "owner" may well be

9    defined in a number of different ways

10   depending on what the situation and the

11   context and the facts are.

12        Q    Okay.  And have any of the

13   documents you reviewed in this case formed a

14   basis for your opinion as to who is

15   determined to have received a dividend paid

16   by an issuer?

17             MR. OXFORD:  Object to the form.

18        A    My -- my opinions are as they are

19   covered in the report in detail, and all the

20   facts and circumstances and the documents

21   that I've relied on are as covered in my

22   report.  So if there's a specific aspect of

23   that that you'd like to go through, I'm happy

24   to.

25        Q    Okay.  Can you give me one example

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1              MR. OXFORD:  Object to the form,
 2         asked and answered.
 3         A    My -- my opinions on the recycling
 4    are as laid out in my reports.  And for all
 5    the transactions that I have reviewed, and
 6    based on contemporaneous evidence from
 7    ED&F Man, a study of the settlement records,
 8    it is my opinion that that is a technique
 9    that was being used to settle the
10    transactions for all the reasons laid out in
11    my report.
12         Q    Okay.  I want to know whether your
13    opinion about the pension plan's right to a
14    dividend on the specifically non-annex E
15    cum ex transactions that you analyzed is
16    based on anything other the recycling of
17    shares.
18              MR. OXFORD:  Objection to form.
19         A    It's based on all the reasons I
20    give in my report, which is that is one of
21    the reasons, but it's not the only reason.
22         Q    Can you say more than that about
23    what the basis is for your opinion that the
24    non-annex E cum ex transactions did not
25    confer a right to a dividend right now at
```

1    this deposition?

2            MR. OXFORD:  Object to the form.

3        A    Yeah.  So amongst the other

4    reasons, and the full reasons are given in my

5    report, the pricing clearly indicates that

6    the cum ex sellers were not transferring a

7    real dividend.

8            And it's further my view that on

9    all the facts and circumstances that are

10   relevant to me reaching my decision, there

11   are no -- there are no particularly

12   meaningful differences between the non-annex

13   E cum ex transactions and the annex E cum ex

14   transactions other than in the case of the

15   annex E cum ex transactions, MPT Dubai, it

16   was an internal IDB, and in the non-annex E

17   cum ex transactions, it was an external IDB.

18           That -- and that's the -- you know,

19   there are other -- there are other facts and

20   circumstances that I have taken into account,

21   but that's the essence of why I don't think

22   there's any meaningful difference between the

23   two types of transaction, in addition to the

24   share recycling.

25       Q    Okay.  So is it your -- withdrawn.

```
 1    to my question, "Are there any other reasons

 2    that you can tell me as you sit here today?"

 3              MR. OXFORD:  Object to the form,

 4         asked and answered.

 5         A    Yeah.  My answer to that question

 6    is that all the reasons are contained across

 7    my three reports, and that if you want to

 8    discuss any of those specific reasons, I'm

 9    very happy to.

10         Q    Okay.  But I would have to direct

11    you to the portion of the report to do that?

12              MR. OXFORD:  Object to the form.

13         A    Well, I think I've already given

14    you some of the key reasons.  But all the

15    reasons are contained in my report.

16         Q    Okay.  And it's your opinion that a

17    share has to settle by the record date in

18    order for the buyer of the share to be

19    entitled to a dividend.

20              Right?

21              MR. OXFORD:  Objection.  Objection

22         to the form.

23         A    Sorry.  Can you repeat that

24    question?

25         Q    Sure.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1          It's your opinion that a share has

2    to settle by the record date in order for the

3    buyer to be entitled to a dividend.

4          Right?

5          MR. OXFORD:  Same objection.

6     A    My answer to that is:  It depends.

7     Q    What does it depend on?

8     A    It depends on all the facts and

9    circumstances of the case, who the buyer and

10   seller are, what the nature of the

11   transaction is, how it's settled.

12         All the facts and circumstances.

13    Q    Why does it depend on who the buyer

14   and the seller are?

15    A    Well, because without knowing that,

16   you may not know the nature of the

17   arrangement between the counterparties, where

18   do the shares come from, for what purpose was

19   the buy transaction done, and --

20         (Whereupon a discussion was held

21   off the record.)

22         MR. OXFORD:  Mr. Wade, do you know

23     where you were in your answer?

24    A    I didn't know I was in an answer,

25   actually, so sorry.

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1            MR. OXFORD:  Mike, would you mind
 2        reading back the question and what
 3        Mr. Wade got through of his answer
 4        before call-in user Number 3 decided to
 5        make his or her presence felt?
 6            (Whereupon the record was read back
 7        by the reporter.)
 8     A    I think I'd just add "and all the
 9  other facts and circumstances."
10     Q    Okay.  Is it your view that in the
11  transactions you analyzed in this case that
12  the transaction date and agreed price terms
13  of the trades that were executed typically
14  indicated that the buyer of securities will
15  receive a dividend?
16            MR. OXFORD:  Objection to the form.
17     A    Which -- which transactions are we
18  talking about?  Because in each transaction
19  there are buys and sells.
20            So if you give me a specific
21  transaction, I'm happy to -- I'm happy to
22  discuss it.
23     Q    I'm asking you whether it's your
24  view, for cum ex transactions that you
25  analyzed in this case, that the transaction
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 152

1    date and agreed price terms typically

2    indicate that the buyer of securities will

3    receive a dividend?

4            MR. OXFORD:  Object to the form.

5        A    It's -- it's my position based on

6    market practice and understanding how the

7    equity finance markets work that the -- and I

8    think I've laid this out quite extensively in

9    my report -- that in a cum ex transaction,

10   the whole point of a cum ex transaction is

11   that a -- the seller is not selling the real

12   dividend because they don't have it.

13           So -- but we'd have to get into a

14   very specific cum ex transaction and go

15   through the details of that if you'd like me

16   to give you a more precise answer.

17       Q    Okay.  So, as a general matter,

18   it's not accurate that the transaction date

19   and the agreed price terms for the cum ex

20   transactions you analyzed typically indicate

21   that the buyer of the securities will receive

22   a dividend?

23           That's my question.

24           MR. OXFORD:  Object to the form.

25       A    In the specific cum ex transactions

1    that I have reviewed, it is my opinion that

2    it is clear that there was no intention to

3    sell a dividend from the cum ex seller to the

4    cum ex buyer, not least of which because the

5    cum ex seller did not, itself, have a

6    dividend to sell.

7              And that's fairly obvious from all

8    the facts and circumstances surrounding the

9    trades, the way they were settled, the way

10   they were priced, and my experience over many

11   years of looking at structured financial

12   transactions.

13        Q    Okay.  If the seller in the cum ex

14   transaction did have the right to a dividend,

15   is it the case that the transaction date and

16   the agreed price terms typically indicate

17   that the buyer of the securities would

18   receive the dividend?

19              MR. OXFORD:  Object to the form.

20        A    Sorry.  What transaction are we

21   talking about?  Are we talking about a cum ex

22   transaction?

23        Q    Yes.  In the cum ex transactions,

24   if the buyer -- sorry -- if the seller of the

25   shares did have the right to a dividend when

CONFIDENTIAL
Graham Wade - March 16, 2022

1   it sold the shares, would it be the case that

2   the transaction date and agreed price terms

3   would typically indicate that the buyer of

4   securities will receive the dividend?

5           MR. OXFORD:  Objection to form.

6       A    No.

7       Q    It's not?

8       A    Sorry?

9       Q    I just want to confirm -- I tried

10  to confirm that you said it's not the case

11  that the transaction date and the agreed

12  price terms would typically indicate that the

13  buyer would receive a dividend?

14      A    That's correct.  Because the -- the

15  very nature of a cum ex transaction is that

16  what the seller is agreeing to do is to

17  deliver ex-dividend shares, using the

18  definition of cum ex in my report.

19          So what the -- what the arrangement

20  is is an arrangement to deliver ex-dividend

21  shares, which, by that point, will not have a

22  right to a dividend attached to them anymore.

23      Q    Okay.  Would it surprise you that

24  someone wrote in your report that you signed

25  that in a cum ex transaction, "the

1    transaction date and agreed price terms

2    typically indicate that the buyer of the

3    securities will receive the dividend?"

4              MR. OXFORD:  Objection, object to

5         the form.  You can answer.

6         A    Can you -- can you direct me to

7    where in my report it says that?

8         Q    Yeah, Paragraph 25.

9              MR. OXFORD:  This is Exhibit 5001,

10        Greg?

11             MR. PRUDEN:  Yeah.  It's the same

12        exhibit we've been on the whole time.

13             MR. OXFORD:  Oh, I didn't realize

14        we were on an exhibit the whole time.

15        A    Well, I think if I -- if I read

16   back the whole sentence, it says, "As

17   described more fully below, in a cum ex

18   transaction, the transaction date and agreed

19   price terms typically indicate that the buyer

20   of the securities will receive the dividend,

21   but the settlement cycle is extended, so the

22   buyer of the securities does not receive the

23   shares until after the record date, and so

24   the buyer does not actually receive the

25   dividend."

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 156

```
 1              So I don't know what -- I think
 2      that's entirely consistent with what I said a
 3      few minutes ago.
 4          Q    And your understanding is that the
 5      buyer doesn't receive a dividend because the
 6      settlement cycle of the shares is extended so
 7      the buyer of the securities does not receive
 8      the shares until after the record date.
 9              Is that right?
10          MR. OXFORD:  Object to form.
11          A    That's in respect of the overall
12      cum ex transaction.  That's not the only
13      reason why I understand that.
14              But that is -- that is an important
15      element of that understanding, yes.
16          Q    Okay.  Well, is that the only
17      reason to determine that the buyer doesn't
18      receive a dividend in these transactions you
19      analyzed?
20          MR. OXFORD:  I'm sorry, Greg.  The
21          audio was bad on our end.
22              Would you mind repeating the
23          question?
24          MR. PRUDEN:  Sure.
25          Q    I asked:  Is that a sufficient
```

1    reason to determine that the buyer doesn't

2    receive a dividend in the cum ex transactions

3    that you analyzed?  Is that fact, standing

4    alone, a sufficient reason?

5         MR. OXFORD:  Object to the form.

6    A    I think my -- my conclusions as

7    regards the overall transactions in this case

8    are based on the full facts and

9    circumstances.

10        But my point is that the very

11   nature and essence of the design of a cum ex

12   transaction is that it is designed to deliver

13   ex-dividend shares.  That is -- that's the

14   fundamental nature of a cum ex transaction.

15        So it's almost inherent in what the

16   nature of a cum ex transaction is that it is

17   the seller -- if anyone, the seller may not

18   receive the dividend because they may, like

19   in these transactions, be selling short.

20        But it is not the buyer who is

21   going to receive the dividend.  That sort of

22   is the whole point of a cum ex transaction.

23        That's my -- that's my opinions as

24   in this report and it's also based on, you

25   know, market practice.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 158

```
 1        Q    Okay.  And so your opinion in this
 2   case is based on the view that all cum ex
 3   transactions necessarily involve shares to
 4   which there's not a dividend right?
 5             MR. OXFORD:  Objection to form.
 6        A    Based on the definition of "cum ex"
 7   that I've used in my report, that -- yeah.
 8        Q    Okay.  And so that your conclusion
 9   relies on your own definition of "cum ex"
10   that you've used in your report?
11        A    I don't think it's my -- I don't
12   think it's my own definition.  I think it is
13   an accepted market definition of what a
14   cum ex transaction is.
15        Q    Okay.  And what's your -- what's
16   your basis for your definition in the market
17   of what a cum ex transaction is?
18             MR. OXFORD:  Object to the form.
19        A    Well, I think it's -- you know,
20   based on my experience over the course of my
21   career, the -- it's my understanding that
22   across a wide range of market participants
23   that that is -- if you refer to a cum ex
24   transaction, what people understand that to
25   mean is a transaction where you're going to
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1   execute a trade before the trade date, but

2   only deliver ex-dividend shares.

3       Q    Okay.  And is your only basis for

4   stating that ex-dividend shares were

5   delivered that the shares were delivered

6   after the record date?

7               MR. OXFORD:  Object to the form.

8       A    No, because -- and again, what

9   does -- what does "delivered" mean?  That's a

10  slightly imprecise term.

11              But in the transactions in this

12  case and for all the reasons given in the

13  report, including the way they were

14  settled -- the pricing, who the

15  counterparties were, the nature of all the

16  arrangements -- it is clear to me that what

17  the parties intended to do was have a

18  contract where the cum ex seller had agreed a

19  trade under which they were going to deliver

20  ex-dividend shares.

21              That's -- that's my opinion.

22      Q    Mr. Wade, I used your term.  You

23  said, "What people understand that to mean is

24  a transaction where you're going to execute a

25  trade before the trade date but only deliver

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1      Q    Sorry, I --
 2           MR. OXFORD:  Hold on.  Greg, you
 3      asked him the question.  Please let him
 4      finish.
 5      A    Sorry.  Can we have the question
 6   back again, please?
 7      Q    I'll ask another question.
 8           Is it your assertion that all
 9   cum ex sales are short sales?
10           MR. OXFORD:  Objection.  You can
11      answer.
12      A    By that question, do you mean
13   generally or in the context of the specific
14   transactions which I've given opinions on?
15      Q    Let's start generally first.
16           Is it your assertion generally that
17   all cum ex sales are short sales?
18           MR. OXFORD:  Object to the form.
19      A    I couldn't possibly give an opinion
20   on all cum ex sales that have ever been done,
21   but my point earlier is that, in my
22   experience, it would be somewhat unusual to
23   do a cum ex sale, because the only situation
24   which, in all my market experience I've ever
25   seen a cum ex sale being done, is in order to
```

1    give rise to a tax reclaim on a contract,

2    which is the contract for delivery of

3    ex-dividend shares.

4            And if someone were long

5    immediately before doing a cum ex, so they

6    were doing a cum ex out of a long position,

7    that is not an impossible thing to happen,

8    but it would be a quite unusual thing to be

9    done.

10   Q    And what's the basis for that

11   testimony?

12   A    The basis for that testimony is

13   being responsible and working in the

14   structured finance industry for many years.

15   Q    Have you ever executed cum ex

16   transactions yourself?

17   A    No.

18   Q    Have you, as far as you're aware,

19   worked for an institution that ever entered

20   into cum ex transactions?

21           MR. OXFORD:  Object to form.

22   A    I believe it's a matter of public

23   record that Barclays has executed cum ex

24   transactions, but limited to -- as I say in

25   my report, the nature of cum ex transactions

CONFIDENTIAL
Graham Wade — March 16, 2022

1    changed significantly, so not in 2012.

2           In my experience, prior to my

3    involvement in this case, it was only ever my

4    understanding that cum ex transactions were

5    executed in Germany and prior to the various

6    legislative changes that were made in

7    Germany.

8      Q    Okay.  So you, prior to this case,

9    had no understanding of cum ex transactions

10   being executed in any context other than in

11   the German market prior to 2012.

12          Is that right?

13          MR. OXFORD:  Object to the form,

14       misstates his testimony.

15     A    Yeah.  My answer was, I think, that

16   Barclays, to my knowledge, only undertook

17   cum ex transactions prior to the legislative

18   changes in Germany and only ever undertook

19   them in respect of German shares, the reason

20   for that being that based on my market

21   experience and extensive understanding of the

22   European securities, no market participant or

23   advisor who I ever dealt with ever considered

24   the outside of those parameters, that a

25   cum ex transaction was effective.

CONFIDENTIAL
Graham Wade - March 16, 2022

1          So maybe they executed them

2     in -- nobody at Barclays would have executed

3     them.  Let's put it that way.

4          Q    Okay.  And so is your familiarity

5     with cum ex transactions limited to the

6     manner in which Barclays has executed them?

7               MR. OXFORD:  Object to the form.

8          A    No.  I -- over the course of my

9     time at Barclays, you are not just aware of

10    transactions that Barclays is executing.  You

11    are aware of a wide range of practice going

12    on in the market.

13         Q    Okay.  Well, what other executions

14    of cum ex transactions are you aware of in

15    the market?

16              MR. OXFORD:  Object to form.

17         A    I think my -- my point is that up

18    until no later than the beginning of 2012,

19    there were a wide range of

20    counterparties -- I think this is a matter of

21    public record -- who were undertaking cum ex

22    transactions in Germany based on their

23    understanding of a very specific procedural

24    rule, but that outside of Germany and outside

25    of that very specific procedural rule, there

CONFIDENTIAL
Graham Wade – March 16, 2022

1    was no basis for thinking that a cum ex

2    transaction in any other jurisdiction would

3    be effective.

4         Q    Okay.  I asked you whether you're

5    aware of any other cum ex transactions in the

6    market other than the transactions you've

7    just described.

8              MR. OXFORD:  If that's the

9         question, I'm going to object to the

10        form of it.  It seems like a statement.

11             Are you asking the question again?

12             MR. PRUDEN:  Yeah, I'll ask it as a

13        question.

14        Q    Are you aware of any other cum ex

15   transactions in the market other than what

16   you've just described?

17             MR. OXFORD:  Objection to the form.

18        A    As I think I've explained, and as I

19   refer to, it's referred to in the ESMA report

20   that I cite in my report.

21             I think any market participant

22   prior to 2012 who was significantly involved

23   in the equity finance market was aware that

24   there were a large number of financial

25   institutions who were involved in cum ex

1    transactions in respect of Germany, but

2    Germany only.

3        Q    Okay.  Can you tell me anything

4    about cum ex transactions that is not

5    otherwise a matter of public record?

6            MR. OXFORD:  Object to form.

7        A    I don't really understand the

8    question you're -- you're asking.

9        Q    Okay.  Can you tell me anything

10   about how cum ex transactions were executed

11   in the market that is not contained in a

12   public record?

13           MR. OXFORD:  Object to the form.

14       A    I genuinely don't know what

15   your -- what you're expecting me to say to

16   that.  I'm saying it's a matter of public

17   record.  I was not personally involved, but

18   it's a matter of public record that Barclays

19   executed certain cum ex transactions.

20           As I'm sure you're aware, there are

21   a number of ongoing investigations and

22   litigations into -- in respect of all those

23   transactions by a wide range of market

24   participants.  What I'm telling you is that,

25   at the time, there were a number of large

CONFIDENTIAL
Graham Wade - March 16, 2022

1    financial institutions, hedge funds, and

2    other counterparties who were executing

3    cum ex transactions.

4            But it is my -- based on my market

5    practice and understanding and my personal

6    knowledge, I was not aware of anyone who

7    either -- prior to my involvement in this

8    case, I was not aware of anyone who,

9    post-2012 outside Germany, thought that a

10    cum ex transaction was effective.

11            That's the substance of my

12    testimony on that point.

13        Q    Okay.  And in all your experience,

14    at any point, was there any aspect of your

15    job in which you were involved in either

16    executing, overseeing, or approving cum ex

17    transactions?

18            MR. OXFORD:  Objection to form.

19        A    To the best of my knowledge, no.

20        Q    Okay.

21            MR. PRUDEN:  Why don't we take that

22        lunch break now and then we can come

23        back in a half-hour or so.

24            MR. OXFORD:  Okay.  Say in half an

25        hour.  Thanks, Greg.

CONFIDENTIAL
Graham Wade - March 16, 2022

1    cum ex seller was long at the time where it

2    entered into the cum ex sale.

3            Is that -- my understanding of your

4    assumption correct?

5        Q    Well, I'm not going to agree that

6    that's different from the facts, but that's

7    the assumption I'm asking you to assume.

8        A    Okay.  Understood.

9            That would not change my ultimate

10   opinion conclusion that the information on

11   the tax vouchers was incorrect.

12       Q    Okay.  And what information on the

13   tax vouchers would have been incorrect in

14   that circumstance?

15           MR. OXFORD:  Object to form.

16       A    All -- all three.  All three of the

17   key items on the tax voucher would still be

18   incorrect.

19           Because the cum ex purchaser did

20   not own the shares on the record date, it did

21   not receive the dividend, and it did not

22   suffer the tax.

23       Q    Okay.  What is the basis for your

24   assertion that in any circumstance, a

25   purchaser must own the shares on the record

CONFIDENTIAL
Graham Wade - March 16, 2022

1    date in order to be entitled to the dividend?

2          MR. OXFORD:  Object to the form.

3      A    The -- there are a range of reasons

4    why I would reach that conclusion, that

5    amongst those is the fact that based on, you

6    know, my extensive market practice of

7    situations like this, what the -- in the

8    assumed facts that you've given, it's still

9    the case that what the cum ex purchaser has

10   been given is a dividend compensation

11   payment.

12         And based on my experience, what

13   would have -- what could have been

14   appropriate is if the cum ex -- a purchaser

15   had been given a voucher which said, "You

16   received a dividend compensation payment."

17         That -- that -- but that's not what

18   the tax vouchers state that they are.

19     Q    And what in your extensive market

20   practice experience leads you to believe that

21   the payment that's made by a seller to a

22   buyer in the hypothetical I just described

23   would not be considered a dividend?

24         MR. OXFORD:  Objection to form.

25     A    Well, because it is definitionally

1    a manufactured payment.  And you know,

2    amongst other things, I cited to the HMRC

3    rules on manufactured dividends.

4            And as I've said in my report, that

5    distinction was well understood by market

6    participants and it made an important

7    difference in a number of different

8    situations, not least obligations on filing

9    manufactured overseas dividends returns,

10   which, in the relevant period, I assume that

11   ED&F Man must have had to do because it was

12   subject to those rules.

13       Q    Okay.  And so it's your testimony

14   you know -- withdrawn.

15           On my hypothetical, do you have an

16   opinion on whether the pension plans would

17   have had an entitlement to a tax reclaim?

18           MR. OXFORD:  Object to the form.

19       A    And I assume you mean a tax reclaim

20   in Denmark?

21       Q    Yes, a tax reclaim in Denmark.

22           MR. OXFORD:  Same objection.

23       A    On -- on the facts that you've

24   asked me to assume, it's my opinion that what

25   the pension plan received was a dividend

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 174

1    compensation payment.

2              If -- and I express no opinion on

3    this because I'm not expressing opinions on

4    Danish tax -- if the pension plan were able

5    to take a receipt for a dividend compensation

6    payment to the Danish tax authorities and

7    make a reclaim, if you -- you know, if that's

8    something that were possible, it would be

9    highly surprising to me, based on market

10   practice and, you know, my involvement in the

11   European securities market, including

12   understanding, you know, quite a lot about

13   different tax regimes in that market, it

14   would be very surprising.

15             But if it was the case that a

16   receipt for a dividend compensation payment

17   entitled you to a tax reclaim in Denmark,

18   that's not something I've offered an opinion

19   on.

20      Q    Okay.  But you would agree that

21   whether or not what you described as a

22   "dividend compensation payment" would entitle

23   you to a tax reclaim in Denmark is a matter

24   of Danish law.

25             Right?

```
 1    one.

 2          A    Okay.  Sorry.

 3          Q    Settlement date is record date plus

 4    one.

 5          A    Yeah.  Okay.  And what was the

 6    other --

 7          Q    The seller is long, has a long

 8    position in the share as of the day before

 9    the ex date, the trade date.

10          A    Yeah.

11          Q    Clear?  And the price of the

12    transaction is sold at a cum dividend price.

13               Clear?

14          A    Okay.

15          Q    The seller makes a payment to the

16    buyer equal to the amount that the seller

17    received from the issuer as a dividend.

18               Is that clear?

19               MR. OXFORD:  Object to the form.

20          A    Well, I think you've -- you said

21    the seller makes a payment as a dividend.  I

22    think the only entity that can make a payment

23    as a dividend is the issuer.

24               So are you saying that the

25    seller -- are you saying that the seller has
```

```
 1    agreed, as some kind of trustee relationship,

 2    to pass on the dividend?

 3             I don't understand what that final

 4    piece is.

 5       Q    No.  Okay.  Let's take it in two

 6    steps.

 7             The seller first receives a

 8    dividend from the issuer.

 9             Okay?

10       A    Yeah.

11             MR. OXFORD:  Objection.

12       Q    Okay.  And then the seller makes a

13    payment to the buyer equal to the amount of

14    the dividend that they received.

15             Clear?

16             MR. OXFORD:  Objection to the form.

17       A    I think I'm clear on the payments

18    that are made, yeah.

19       Q    Okay.  In those circumstances, is

20    the payment that the seller made to the buyer

21    a dividend or a dividend compensation

22    payment?

23             MR. OXFORD:  Object to form.  Asked

24         and answered.

25       A    Well, I think you've, you
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1      Q    Okay.  And is a "market claim" a
2   dividend compensation payment or a dividend?
3          MR. OXFORD:  Object to the form.
4      A    It does depend on the specific
5   facts and circumstances of the position.  But
6   in general, the more common uses of "market
7   claim" is when a transaction has failed, and
8   so the person who thought they were buying a
9   dividend does not get that dividend as a
10  result of a fail, and then a payment is
11  passed along to them.
12         That's -- that's my understanding,
13  and I think it's the market definition of a
14  market claim.  But ultimately, market claim
15  says it's to the person who's contractually
16  entitled.
17         So you have to understand the
18  nature of the securities transaction to work
19  out whether there should be a market claim,
20  and if so, what the nature of that market
21  claim is.
22     Q    Okay.  And you mentioned T2S.
23         As far as T2S is concerned, are you
24  aware of whether there's a general consensus
25  in T2S about what happens when the trade date

CONFIDENTIAL
Graham Wade - March 16, 2022

```
1    is prior to the ex date, the intended
2    settlement date is after the record date, and
3    the settlement instruction is also matched
4    after the record date and the payment date
5    for the security?
6            Is a market claim
7    considered -- going back, does that
8    circumstance give rise to a market claim?
9            MR. OXFORD:  Object to the form.
10       A   So we have a cum ex sale -- we have
11   a cum ex sale or a regular way sale?
12       Q   We have a situation where the trade
13   date is prior to the record date and the
14   intended settlement date is after -- sorry.
15   Withdrawn.
16           We have a situation where the trade
17   date is prior to the ex date and intended
18   settlement date is after the record date.
19       A   Okay.  I think, as I've explained
20   in my report, that -- and it settles as
21   expected -- am I allowed to assume that?
22       Q   Yes, you can.  Yes.
23       A   Okay.  In that case, no, I don't
24   think that would meet the definition of a
25   market claim.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

```
1     "liable" means, who's -- who's the person

2     receiving the dividend, what -- what country

3     are they in, you know, are they a Danish tax

4     resident, are they a non-Danish tax resident.

5     There are a number of factors.

6             But if your question is if I -- if

7     I received directly a real dividend and

8     27 percent tax is withheld on it, is that tax

9     that I have suffered, yeah, my understanding

10    is that yes, I have suffered that tax.

11       Q    Okay.  And if you have special tax

12    status, you can reclaim that tax from the

13    Danish government.

14            Right?

15            MR. OXFORD:  Object to the form.

16       A    That all depends on the facts and

17    circumstances around the transaction.

18       Q    Okay.  Well, assuming that the

19    person who receives -- withdrawn.

20            Assuming that the person who

21    applies for the tax refund is the beneficial

22    owner of the dividend, they can receive a

23    reclaim from the Danish government if they

24    are entitled to some kind of special tax

25    status.
```

1           Right?

2           MR. OXFORD:  Object to the form.

3      A    So, as I think we've discussed

4    earlier, it's -- it's not my place here and

5    today to express an opinion on the Danish tax

6    law and exactly what a given holder of

7    dividend is entitled to physically via the

8    Danish tax authorities.

9           So, in general terms, no other

10   arrangements or unusual circumstances, that

11   would be one of the starting point conditions

12   I understand are making a reclaim.  But I'm

13   not expressing a view on the exact

14   requirements of any Danish tax process.

15     Q    Okay.  And second, would you be

16   able to determine whether particular

17   individuals are subject to certain tax status

18   within Denmark?

19          MR. OXFORD:  Object to the form.

20     A    In my -- in my -- my reports have

21   been focused on the transactions and whether,

22   amongst other things, the tax vouchers

23   produced were accurate, what the consequence

24   is, and how those tax vouchers could be used,

25   and what rights of any given person may have

1    or may not have vis-a-vis the Danish tax

2    authorities is not something I've given an

3    opinion.

4          Q    Because you're not an expert on

5    what tax status individuals have with respect

6    to tax reclaim applications to the Danish

7    government.

8              Right?

9              MR. OXFORD:  Object to the form.

10         A    I think that's a slightly different

11   formulation.  I'd say that based on my market

12   practice and experience, you know, I -- I

13   have some understanding of some of the basic

14   requirements for these kind of situations.

15             But on the specific point of, you

16   know, if you tell me that in a situation

17   where the person didn't receive -- didn't

18   actually have the shares, didn't receive a

19   dividend, didn't actually suffer tax, that

20   nevertheless it is possible under Danish tax

21   law to make a reclaim, I find that very

22   surprising.

23             But that is not an opinion on which

24   I've -- you know, I'm not expressing an

25   opinion on that final point.

1    general that there are some shareholders of

2    Danish shares who are entitled only to

3    73 percent of the gross dividend paid under

4    Danish law.

5             Correct?

6             MR. OXFORD:  Object to the form.

7        A    Generally in the whole world are

8    there any shareholders who, on receiving a

9    Danish dividend, suffer 27 percent

10   withholding and cannot recover it?  I would

11   agree that in general that -- yeah, I would

12   be very surprised if that wasn't the case.

13       Q    Okay.  In those circumstances, for

14   that party, it would be rational for that

15   party to sell its dividend right to a party

16   with entitlement to either the tax at the

17   zero percent or 15 percent tax rate as long

18   as they sold the dividend for greater than

19   73 percent of the gross dividend amount.

20            Right?

21            MR. OXFORD:  Object to form.

22       A    No.  Obviously, it depends on who

23   the shareholder is and what their

24   circumstances are.

25            But if they were a sophisticated

1    financial institution who was active in the

2    equity finance markets, and the market level

3    for dividend compensation payments at that

4    particular point in time was 90 percent of

5    the gross dividend, it would be an irrational

6    transaction for them to sell at any number

7    above 73.  It would be irrational for them to

8    sell at any level below 90 if, on my

9    assumption, the prevailing market level is

10   90.

11       Q    And is your assertion that the

12   market level is 90 based on anything other

13   than the price that you observed for the

14   cum cum transactions?

15          MR. OXFORD:  Object to the form.

16       A    Yes.  It's, you know, the -- in the

17   course of my experience, particular markets

18   in Europe at particular points in time tend

19   to have a general level around which they

20   trade.

21          And based on my experience,

22   90 percent, give or take, tends to be the

23   ballpark for a number of -- a number of

24   markets.

25       Q    What markets in Europe form the

CONFIDENTIAL
Graham Wade - March 16, 2022

1    basis for your experience?

2        A    Sorry?

3        Q    Which markets in Europe form the

4    basis for your experience?

5        A    Well, I can't remember the full

6    list of markets.  But, you know, in my time

7    at Barclays, Barclays traded positions across

8    nearly all the active main indices in Europe,

9    so that certainly includes Denmark.

10       Q    Are you relying on any other

11   experience beyond Barclays or any other

12   sources besides experience for that

13   90 percent figure you cite?

14           MR. OXFORD:  Objection to form.

15       A    The first thing that I just want to

16   be clear on is that the 90 percent is not a

17   hard and fast number.  And as I said, it can

18   vary across market and it can vary across a

19   particular dividend event, and I think I've

20   made that point clear in my report.

21           But at the relevant time, I was

22   working at Barclays and had responsibility

23   for Barclays' equity finance activity, or at

24   least a large portion of it.  And based on

25   that experience, it's my understanding that,

CONFIDENTIAL
Graham Wade - March 16, 2022

1    at that time, the market level in Denmark was

2    somewhere around 90 percent.

3         Q    Are you aware of any other entities

4    besides pension plans who would have an

5    economically rational basis to acquire a

6    dividend at 90 percent of the gross dividend

7    rate in Denmark?

8              MR. OXFORD:  Object to the form.

9         A    Yes.

10        Q    Who else besides pension plans?

11        A    Well, any range of financial

12   institutions might want to acquire dividends

13   at that level.  Danske Bank, for example, was

14   active in the European equity finance market.

15             I don't know the exact position of

16   Danske Bank, but I would think that the

17   dividend would almost be certainly worth at

18   least 90, if not a hundred to them.  Both

19   European and U.S. financial institutions

20   would almost certainly have been able to

21   obtain value for 85.

22             In many cases, they were -- they

23   also may well have been able to achieve a

24   hundred, not necessarily through a tax

25   reclaim, but through other mechanisms

1      involving foreign tax credit relief.

2              So I would think there would be a

3      wide -- the reason the market was around 90

4      is because there are some tax disadvantaged

5      people and some tax advantaged people, and

6      the tax disadvantaged people are going to

7      want to earn as much as they can for selling

8      their dividends, and the tax advantaged

9      people are going to want to pay as little as

10     they can to acquire dividends.

11             And the market is a reflection of

12     the aggregate supply and demand at any given

13     time.  And that's what sets the level.

14        Q    Okay.  And the level depends on the

15     number of people who are tax advantaged and

16     non-tax advantaged.

17             Right?

18             MR. OXFORD:  Object to the form.

19        A    In general terms, that's -- yeah,

20     that's one of the factors, yeah.

21        Q    Okay.  And can you explain to me

22     the process by which a non-pension plan could

23     recover a hundred percent by use of foreign

24     tax credit relief?

25        A    Well --

1          A    It's actually — and I can tell

2    this from the — the legend at the top, it's

3    actually a copy of that memo that was

4    submitted on a voluntary basis to HMRC.

5          Q    Okay.  Have you seen this before?

6          A    Yes, I believe I have.

7          Q    And I just want to represent to you

8    that this was a document taken off the

9    Internet and the green highlighting was there

10   when it was taken off.  So that is not

11   something that we highlighted on purpose.

12   That's how it came out.

13              So are you familiar, then,

14   Mr. Wade, with the contents of this document?

15         A    I'm not fully familiar with all the

16   details of it.  But the reason I recognize

17   this document is, as I said, it was submitted

18   to the U.K. tax authorities and the German

19   tax authorities, and then it was subject of a

20   leak, and I — I recall because at the time

21   of that leak, I was, I believe, the global

22   head of SCM.

23              So I have seen this memo before in

24   that context.

25         Q    Okay.  And you are familiar with

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 245

```
 1    the fact that Barclays engaged in cum ex
 2    trading in Germany.
 3            Correct?
 4            MR. OXFORD:  Object to the form.
 5       A    I think I've already said it's a
 6    matter of public record that yes, Barclays
 7    undertook cum ex transactions in Germany --
 8            MR. OXFORD:  Hold on, Sharon.  He
 9        wasn't finished with his answer.
10            Please continue, Mr. Wade.
11       A    Undertook transactions in Germany
12    prior to 2012.
13       Q    Okay.  And are you aware that in
14    connection with that, Barclays was a short
15    seller?
16            MR. OXFORD:  Object to form.
17       A    If I can just --
18            MR. OXFORD:  Yeah, take a moment to
19        review the memo if you need it to answer
20        the questions, Mr. Wade.
21       A    (Witness reviewing.)
22            MR. OXFORD:  Sharon, there's a lot
23        of background noise where you are.  We
24        didn't have the problem with the other
25        examiners.
```

**ERRATA SHEET**

Case Name:          In Re: Customs and Tax Administration of The Kingdom of
                                Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation
Case Number:     18-md-2865
Deponent:         Graham Wade
Deposition Date:   March 16, 2022

| PAGE | LINE | ORIGINAL TEXT | CORRECTED TEXT | REASON FOR CHANGE |
|------|------|---------------|----------------|-------------------|
| 24 | 12 | obtain review | obtain and review | Transcription error |
| 40 | 12-13 | corporate finance manual | Corporate Finance Manual | Clarification |
| 42 | 8 | Unfortunately | Fortunately | Transcription Error |
| 77 | 10 | party | parties | Transcription Error |
| 103 | 6 | issues | issuer's | Transcription Error |
| 117 | 11 | the date | the trade date | Clarification |
| 120 | 24 | completed until on trade date | completed on the trade date | Transcription Error |
| 127 | 3 | tax group claim | tax reclaim | Transcription Error |
| 163-164 | 22-1 | it's a matter of public record that Barclays has executed cum ex transactions, but limited to -- as I say in my report, the nature of cum ex transactions changed significantly, so not in 2012. | it is a matter of public record that Barclays executed cum ex transactions but limited to the period before 2012 when the rules relating to German transactions changed significantly. | Transcription Error/Clarification |
| 171 | 10 | opinion conclusion | opinion and conclusion | Clarification |
| 177 | 23 | working group tax | working with group tax | Clarification |

| PAGE | LINE | ORIGINAL TEXT | CORRECTED TEXT | REASON FOR CHANGE |
|---|---|---|---|---|
| 209 | 2, 5, 17 | Cult | Colt | Transcription Error |
| 211 | 1 | Renaissance phrase | Renaissance transactions | Transcription Error |
| 211 | 25 | Cult | Colt | Transcription Error |
| 214 | 7 | Cult | Colt | Transcription Error |
| 218 | 25 | Nason Square and Flowana | Renaissance Technologies | Transcription Error |
| 219 | 25 | "SCMUS Prudence Committee" | "SCM US Approvals Committee" | Transcription Error |
| 220 | 22 | Cult | Colt | Transcription Error |
| 221 | 7 | LaRosa | LaRocca | Clarification |
| 224 | 11 | Cult | Colt | Transcription Error |
| 225 | 25 | referenced | represented to us | Transcription Error |
| 226 | 12 | Cult | Colt | Transcription Error |
| 226 | 25 | Pact | pack | Transcription Error |
| 237 | 24 | would be simply a trade receiver | would simply be a trade taker | Transcription Error/Clarification |
| 240 | 7 | Bluebird | Bloomberg | Transcription Error |
| 254 | 23-24 | rule, in title straight requires to issue | rule, entitled/required to issue | Transcription Error |
| 258 | 13 | say | see | Clarification |

I declare under penalty of perjury under the laws of the United States of America that I have read the entire transcript of my deposition taking in the above captioned matter and the same is true and accurate, save and except for the changes and/or corrections as indicated by me on the deposition errata sheet hereof, with the understanding that I offer these changes as if still under oath.

Executed this 18th day of April, 2022

_____
Graham Wade