**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION OF
THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.: 18-cv-04051;
18-cv-09840; 18-cv-09841; 18-cv-10098;
19-cv-01812; 19-cv-01866; 19-cv-01898.

MASTER DOCKET

18-md-2865 (LAK)

### PLAINTIFF SKATTEFORVALTNINGEN'S SUPPLEMENTAL LOCAL RULE 56.1 STATEMENT IN SUPPORT ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules

of the United States District Courts for the Southern and Eastern Districts of New York, and

Pretrial Order No. 29, Plaintiff Skatteforvaltningen ("SKAT") respectfully states that the

following are additional material facts as to which there is no genuine issue to be tried:

### FACTS AS TO THE SOLO BELLWETHER CASES[1]

## I.    The Purported Trading at the Solo Custodians

---

1.    Per Pretrial Order No. 29, the parties selected the following five cases as Bellwethers in which the pension plan defendant used one or more of the following entities as custodians: Solo Capital Partners LLP ("Solo" or "Solo Capital"), Old Park Lane Capital PLC, Telesto Markets LLP, and West Point Derivatives Ltd (together, the "Solo Custodians"). *See In Re: Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, 18-md-02865 (S.D.N.Y.) Pre-Trial Order No. 29 (ECF 675):

(i)    *Skatteforvaltningen v. RJM Capital Pension Plan & Richard Markowitz*, No. 19-cv-01898;

(ii)    *Skatteforvaltningen v. Basalt Ventures LLC Roth 401(k) Plan, et al.*, No. 19-cv-01866;

(iii)   *Skatteforvaltningen v. Roadcraft Technologies LLC Roth 401(k) Plan, et al.*, No. 19-cv-01812;

(iv)   *Skatteforvaltningen v. The FWC Capital LLC Pension Plan & Roger Lehman*, No. 18-cv-10098; and

(v)    *Skatteforvaltningen v. The Proper Pacific LLC 401K Plan & Doston Bradley*, No. 18-cv-04051.

The Plans named in these complaints will be referred to as the "Solo Bellwether Plans."

1.      The "trading" at the Solo Custodians that formed the basis of the Solo Bellwether Plans' refund applications to SKAT did not include any real money or real shares of Danish stock. The Solo Bellwether Plans never owned any of the shares of Danish stock which they represented to SKAT that they owned.  Instead, the "trading" was a series of sham paper transactions that took the form of circular loops.  These loops are documented in paragraphs 10 through 23 below and in Appendices A through I to this, SKAT's Local Rule 56.1 Statement.

2.      That the Solo Custodians' "trades" were fake has been confirmed by the United Kingdom's Financial Conduct Authority (the "FCA").  In its investigation into two brokers involved in the Solo Custodians' scheme, the FCA "found no evidence of ownership of the shares" by any customers of the Solo Custodians.[2]  Instead, the FCA found that the purported trading was a "circular pattern of extremely high value … equity trading, [involving] back-to-back securities lending arrangements," the purpose of which was to generate the false dividend credit advices submitted to SKAT in the tax refund applications.[3]

3.      Further, to hold Danish shares on behalf of their customers, foreign custodians, such as the U.K.-based Solo Custodians, must do so through a sub-custodian with an account at Denmark's central securities depository VP Securities, or through a chain of sub-custodians, where the ultimate sub-custodian has an account at VP Securities.[4]  In a filing in SKAT's parallel actions in the United Kingdom, Sanjay Shah (who controlled the Solo Custodians)[5] stated under oath that

---

2.      April 29, 2022 Declaration of Marc A. (Weinstein Decl.)) Ex. 75 (FCA, Final Notice to Sunrise Brokers LLP (November 12, 2021)  at 4 (¶ 2.10), *available at* https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf); *see also id.* at 2-4; Weinstein Decl. Ex. 76 (FCA, Final Notice to Sapien Capital at 3-4 (May 6, 2021) *available at* https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf).

3.      Weinstein Decl. Ex. 75 (FCA Final Notice to Sunrise Brokers), at 2 (¶¶ 2.5, 2.9).

4.      Weinstein Decl. Ex. 77 (H. Sorensen Dep., Sept. 21, 2021 (hereinafter "H. Sorensen Dep. Vol. I"), at 49:11-21; Weinstein Decl. Ex. 78 (H. Sorensen Dep., Dec. 7, 2021 (hereinafter "H. Sorensen Dep. Vol. II"), at 51:12-52:2.

5.      Weinstein Decl. Ex. 75 (FCA Final Notice to Sunrise Brokers), at 18 (¶4.19).

Solo Capital had two sub-custodian arrangements: one with JPMorgan Chase ("JPMorgan") from August 2012 through October 2013 and one with Skandinaviska Enskilda Banken AB ("SEB") from July 2013 through April 2014.[6]

4.      Reed Smith, LLP, acting on behalf of the Solo Custodians, represented to the Financial Conduct Authority, the Solo Custodians' regulator in England, in a letter dated March 11, 2016, that "it is believed" that the Zurich Branch of Société Générale SA ("Société Générale") was the only sub-custodian used by the Solo Custodians to sub-custody Danish securities for the period of January 1, 2014 to August 24, 2015.[7]

5.      In this action, SKAT requested from SEB and JPMorgan account statements, stock records, and any other documents showing Danish securities held for the Solo Custodians from January 1, 2012 to December 31, 2015.  *See* ECF No. 253 Ex. 1 at 9-11; ECF No. 569 Exs. 1 at 9-11, 2 at 9-11; ECF No 563 Ex. 1 at 10.  These banks' records show no holdings of any Danish shares by the two banks on behalf of the Solo Custodians during that time.[8]

6.      Further, in response to SKAT's requests, corporate representatives of SEB and JPMorgan provided sworn declarations regarding any record those banks possessed relating to the Solo Custodians' holding of Danish securities.[9]  Both declarations state that the banks have no

---

6.   Weinstein Decl. Ex. 103 (Sanjay Shah Defendants' Response to Claimant's Request Dated 4 June 2019 for Further Information Under CPR 18), at 4-5, 11, 15.  The other three Solo Custodians did not provide custodial services to the Solo Bellwether Plans in 2012 and 2013.  *See* the parties' Joint 56.1 Statement ¶¶ 172-203 (ECF 790) ("Joint 56.1 Statement").

7.   Weinstein Decl. Ex. 113 at SCPADMINISTRATORS_00056788 (March 11, 2016 Ltr. to the FCA from Reed Smith LLP).

8.   Joint 56.1 Statement ¶¶ 222, 226.

9.   *See* Weinstein Decl. Ex. 95 (May 17, 2021 Declaration of Anders Peter Bryde Rasmussen, SEB corporate, representative ("Rasmussen Declaration")); Weinstein Decl. Ex. 96 (December 15, 2021 Declaration of Matthew J. Totman, corporate representative for JPMorgan Chase Bank, N.A. – London Branch and J.P. Morgan Securities plc ("Totman Declaration")).

records that the Solo Custodians held any Danish shares from January 1, 2012 through December 31, 2015.[10]

7.       Pursuant to an April 14, 2021 letter of request to the competent authority of the United Kingdom for documents from the administrators in the Solo Custodians' insolvency proceedings ("Solo Administrators"), SKAT  requested "[t]he statements of the Solo Custodians' accounts holding Danish Securities at any Sub-Custodian, during the Applicable Period" and "[t]he bank account statements of the Solo Custodians into which any Dividend was paid, during the Applicable Period."  ECF No 563 Ex. 1 at 10.  In response to the letter of request, the Solo Administrators produced Société Générale account statements and no other documents.  Bruce Dubinsky, whom SKAT has retained as an expert in forensic accounting, reviewed these account statements and determined that they reflect no holdings of Danish securities on behalf of the Solo Custodians during the relevant time.[11]

8.       There are also no bank records reflecting the receipt of any dividends on behalf of the Solo Bellwether Plans or by the purported sellers of the shares, all of whom used the same Solo Custodians.  Mr. Dubinsky analyzed the Solo Custodians' bank statements for the relevant period, and found no deposits consistent with the receipt of any Danish dividends on or around the relevant payment dates for such dividends.[12]  By contrast, the same Solo Custodians' bank account statements evidenced the receipt of SKAT's payments through the payment agents on or around the relevant dates that such payments were made.[13]

---

10.   Weinstein Decl. Ex. 95 (Rasmussen Declaration) ¶¶ 13, 14; Weinstein Decl. Ex. 96 (Totman Declaration) ¶¶ 8, 9.

11.   Weinstein Decl. Ex. 89 (December 31, 2021 Expert Report of Bruce Dubinsky) ("Dubinsky Report") ¶ 136; *see also* Joint Statement ¶¶ 222.

12.   Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 143; Weinstein Decl. Ex. 90 (February 1, 2020 Rebuttal Report of Bruce G. Dubinsky ("Dubinsky Rebuttal Report")) ¶ 25.

13.   Weinstein Decl. Ex. 90 (Dubinsky Rebuttal Report) ¶ 25.

9.     Mr. Dubinsky also had access to and searched and reviewed the documents of the Solo Custodians and their associated entities (the "Elysium Documents").[14]  Mr. Dubinsky found no evidence that the Solo Bellwether Plans owned any Danish shares or received any dividends on any Danish shares.[15]   In searching the over ten million documents seized from the Elysium companies, Mr. Dubinsky found none of the contemporaneous records one would expect to find if the Solo Custodians did in fact hold the shares or receive the dividends identified in the dividend credit advices at a sub-custodian.[16]   For instance, there were no (i) account statements from any such sub-custodian reflecting Danish equities holdings; (ii) confirmations of shares or money being delivered or received around the relevant dates of the trading or dividend payments; or (iii) email communications between the Solo Custodians and any sub-custodian concerning Danish shares or dividends.[17]   Nor did Mr. Dubinsky find any internal records from the Solo Custodians evidencing the shares or dividends, such as ledgers or spreadsheets tracking the Solo Custodians' shareholdings or dividend receipts at any sub-custodian.[18]   This stands in contrast to records concerning the defendant plans' purported trading and distribution of the money SKAT paid, of which Mr. Dubinsky found plenty.[19]   Mr. Dubinsky reviewed the defendants' productions and

---

14.     Weinstein Decl. Ex. 89 (Dubinsky Report) at ¶ 12, 141.  The Elysium Documents are electronic and hardcopy material seized in SKAT's proceedings in the Dubai International Financial Centre Courts against Elysium Global (Dubai) Limited and Elysium Properties Limited (together, "Elysium"), two entities also controlled by Sanjay Shah.  Weinstein Decl. Ex. 97 (November 26, 2021 Declaration of Rana Shashaa, Deloitte Professional Services (Dubai) Limited); Elysium Global (Dubai) Limited, DIFC Public Register, https://www.difc.ae/public-register/elysium-global-dubai-limited/ (last visited Apr. 28, 2022); *see also* Order Granting SKAT's Consent Mot., ECF No. 286.  The Elysium Documents are Bates-stamped as "ELYSIUM-########".

15.     Weinstein Decl. Ex. 89 (Dubinsky Report) ¶ 142; Mr. Dubinsky also had access the sworn affidavits from representatives of JPMorgan and SEB produced in response to letters rogatory issued by the Court. (Dubinsky Report ¶ 12.).

16.     Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 139-45.

17.     Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 139, 142-43.

18.     Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 140, 142-43.

19.     Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 144.

Solo Custodians' purported trading records and confirmed that all the defendant plans' purported share purchases were part of circular transactions with one of these two structures, depending on whether they were from before or after March 2014.[20]

### A. RJM Capital Pension Plan's Trading Loops

10.     According to the Solo Custodians' documents, the RJM Capital Pension Plan (the "RJM Plan") and other customers of the Solo Custodians engaged in the following trades:

a.     On April 11, 2013, the RJM Plan purchased 10,400 shares of A.P. Møller Mærsk A/S - B, at DKK 43,680.2893 per share, for a notional amount of DKK 454,275,008.72, through the broker FGC Securities LLC, with a settlement date of April 17, 2013.[21]

i.     FGC Securities LLC obtained 10,400 shares of A.P. Møller Mærsk A/S - B at the same price on the same day from the ultimate seller D.D.C. Cayman Limited.[22]

b.     On April 16, 2013, the RJM Plan entered into a stock loan agreement pursuant to which it agreed to loan 10,400 A.P. Møller Mærsk A/S – B shares to Colbrook Limited, in exchange for DKK 454,275,008.72 (DKK 43,680.2893 per share), with a settlement date of April 17, 2013.[23]

---

20.   Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 16, 146-57.

21.   No citation to this trade in which the RJM Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.  As the RJM Plan is the bellwether case for 2012-2013, we have not included here examples of the RJM Plan's trades from 2014.  Those trades were similar in structure to the trades described in this Rule 56.1 Statement for the other four Solo Bellwether Plans.

22.   Appendix A, Trade 7 (ELYSIUM-01552936; ELYSIUM-01744925); Weinstein Decl. Ex. 7.

23.   No citation to this trade in which the RJM Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

i.       Colbrook Limited loaned 10,400 A.P. Møller Mærsk A/S – B shares to D.D.C. Cayman Limited on the same day, in exchange for DKK 454,275,008.72 (DKK 43,680.2893 per share).[24]

c.      D.D.C. Cayman Limited's and Colbrook Limited's account statements show that neither entity held any Danish securities prior to obtaining them through stock loans, never went into the market (*i.e.* outside the Solo Custodian's platform) to obtain the shares, and did not have sufficient capital to acquire the shares.[25]

11.    In addition, in 2013, the RJM Plan and other customers of the Solo Custodians purported to engage in 11 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 10,400 A.P. Møller Mærsk A/S – B shares. All 12 of these series of trade loops are documented in Appendix A[26] to this statement, including the Møller Mærsk loop, which is detailed in line 7 of the Appendix. Documentation for each of the RJM Plan's 12 trade loops is contained in Exhibits 1 through 12 to the Weinstein Declaration.

**B.    Basalt Ventures LLC Roth 401(k) Plan's Trading Loops**

<u>Trade Type #1</u>

12.    According to the Solo Custodians' documents the Basalt Ventures LLC Roth 401(k) Plan (the "<u>Basalt Plan</u>") and other customers of the Solo Custodians engaged in the following trades:

---

24.    Appendix A, Trade 7 (ELYSIUM-01574028); Weinstein Decl. Ex. 7.

25.    Weinstein Decl. Ex. 7 at ELYSIUM-01744925; Weinstein Decl. Ex. 114 (ELYSIUM-01744940).

26.    Appendices A through I do not contain citations to the trades in which the Solo Bellwether Plans purportedly entered, as these were agreed on in the parties' Joint 56.1 Statement.

    a.     On March 26, 2015, the Basalt Plan purchased 178,044 shares of Carlsberg A/S - B, at DKK 571.5 per share, for a notional amount of DKK 101,752,146.00, through the broker Sunrise Brokers, with a settlement date of March 31, 2015.[27]

    i.     Sunrise Brokers obtained 178,044 shares of Carlsberg A/S - B at the same price on the same day from the broker Mako Financial Markets LLP.[28]

    ii.     Mako Financial Markets LLP obtained 178,044 shares of Carlsberg A/S - B at the same price on the same day from the ultimate seller RDKS Consultants.[29]

    b.     On March 30, 2015, the Basalt Plan entered into a stock loan agreement pursuant to which it agreed to loan 178,044 shares of Carlsberg A/S - B shares to Prince Solutions Limited, in exchange for DKK 101,752,146.00 (DKK 571.50 per share), with a settlement date of March 31, 2015.[30]

    i.     Prince Solutions Limited loaned 178,044 Carlsberg A/S - B shares to Relative Value Trading GmbH on the same day, in exchange for DKK 101,752,146.00 (DKK 571.50 per share).[31]

    ii.     Relative Value Trading GmbH loaned 178,044 Carlsberg A/S - B shares to RDKS Consultants on the same day, in exchange for DKK 101,752,146.00 (DKK 571.50 per share).[32]

---

27.    No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

28.    Appendix B, Trade 9 (ELYSIUM-04005495); Weinstein Decl. Ex. 21.

29.    Appendix B, Trade 9 (ELYSIUM-04006834; ELYSIUM-04121850); Weinstein Decl. Ex. 21.

30.    No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

31.    Appendix B, Trade 9 (ELYSIUM-04029621); Weinstein Decl. Ex. 21.

32.    Appendix B, Trade 9 (ELYSIUM-04030318); Weinstein Decl. Ex. 21.

13.     In addition, in 2015, the Basalt Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 178,044 Carlsberg A/S - B shares. All 14 of these series of trade loops are detailed in Appendix B to this statement, including the Carlsberg A/S - B loop, which appears at line 9 of the Appendix. Documentation for each of the Basalt Plan's 14 type 1 trade loops is contained in Exhibits 13 through 26 to the Weinstein Declaration.

### Trade Type #2

14.     According to the Solo Custodians' documents, the Basalt Plan and other customers of the Solo Custodians engaged in the following trades:

a.     On August 7, 2014, the Basalt Plan purchased 2,876,867 shares of TDC A/S at DKK 51.35 per share, for a notional amount of DKK 147,727,120.45, through the broker Bastion Capital London Ltd, with a settlement date of August 13, 2014.[33]

i.     Bastion Capital acquired those shares by purchasing, in the aggregate, 148,093,767 shares of TDC A/S from the broker Ballygate Capital Ltd,[34] from which Bastion Capital London Ltd allocated 2,876,867 to the Basalt Plan, and the remaining shares to 45 other pension plans, in the following amounts[35]:

| | Plan | Number of Shares |
|---|---|---|
| 1 | Bareroot Capital Investments LLC 401(K) Plan | 3,714,107 |
| 2 | Cedar Hill Capital Investments LLC Roth 401(K) Plan | 3,689,164 |
| 3 | Cantata Industries LLC Roth 401(K) Plan | 2,888,576 |
| 4 | Dicot Technologies LLC Roth 401(K) Plan | 2,869,709 |
| 5 | Fulcrum Productions LLC Roth 401(K) Plan | 3,419,036 |

---

33.    No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

34.    Appendix C, Trade 1 (ELYSIUM-03294580); Weinstein Decl. Ex. 27.

35.    Appendix C, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 27.

|    | Plan | Number of Shares |
|----|------|------------------|
| 6  | Green Scale Management LLC Roth 401(K) Plan | 3,023,900 |
| 7  | Keystone Technologies LLC Roth 401(K) Plan | 3,389,801 |
| 8  | Starfish Capital Management LLC Roth 401(K) Plan | 3,547,235 |
| 9  | The Stor Capital Consulting LLC 401(K) Plan | 3,196,193 |
| 10 | Tumba Systems LLC Roth 401(K) Plan | 3,097,117 |
| 11 | Voojo Productions LLC Roth 401(K) Plan | 3,663,418 |
| 12 | Aerovane Logistics LLC Roth 401(K) Plan | 3,533,815 |
| 13 | Aston Advisors LLC 401(K) Plan | 3,618,584 |
| 14 | Avanix Management LLC Roth 401(K) | 2,805,836 |
| 15 | Battu Holdings LLC Roth 401(K) Plan | 3,081,898 |
| 16 | Cavus Systems LLC Roth 401(K) Plan | 3,691,977 |
| 17 | Crucible Ventures LLC Roth 401(K) Plan | 3,219,605 |
| 18 | Eclouge Industry LLC Roth 401(K) Plan | 3,269,796 |
| 19 | Edgepoint Capital LLC Roth 401(K) Plan | 3,190,351 |
| 20 | First Ascent Worldwide LLC Roth 401(K) Plan | 2,848,717 |
| 21 | Hadron Industries LLC Roth 401(K) Plan | 3,097,958 |
| 22 | Headsail Manufacturing LLC Roth 401(K) Plan | 3,117,881 |
| 23 | Interactive Investments LLC 401(K) Plan | 2,987,462 |
| 24 | Limelight Global Productions LLC Roth 401(K) Plan | 3,415,873 |
| 25 | Loggerhead Services LLC Roth 401(K) Plan | 3,365,526 |
| 26 | PAB Facilities Global LLC Roth 401(K) Plan | 3,669,877 |
| 27 | Plumrose Industries LLC Roth 401(K) Plan | 3,169,872 |
| 28 | Roadcraft Technologies LLC Roth 401(K) Plan | 2,803,027 |
| 29 | Sanford Villa Pension Plan | 2,763,564 |
| 30 | The ADG Asset Management Pension Plan | 3,366,381 |
| 31 | The Desbrosses Trading LLC 401(K) Plan | 2,827,842 |
| 32 | The JML Capital LLC 401(K) Plan | 3,052,229 |
| 33 | The Natoli Management Pension Plan | 3,096,662 |
| 34 | The Nova Fonta Trading LLC 401(K) Plan | 3,150,749 |
| 35 | The Omineca Pension Plan | 2,838,100 |
| 36 | The Random Holdings 401(K) Plan | 2,935,383 |
| 37 | The Routt Capital Pension Plan | 2,832,945 |
| 38 | The SNK Management Pension Plan | 3,578,474 |
| 39 | The SPKK LLC 401(K) Plan | 3,649,778 |
| 40 | The TENS Services LLC 401(K) Plan | 3,343,725 |
| 41 | The Towerlands Pension Plan | 2,888,703 |
| 42 | The Upton Investments LLC 401(K) Plan | 3,664,280 |
| 43 | Trailing Edge Productions LLC Roth 401(K) Plan Trust | 3,632,498 |

|    | Plan | Number of Shares |
|----|------|------------------|
| 44 | True Wind Investments LLC Roth 401(K) Plan | 3,219,090 |
| 45 | Vanderlee Technologies Pension Plan | 2,990,186 |
|    | **Total** | **148,093,767** |

      ii.       Ballygate Capital Limited obtained 39,375,123 shares of TDC

A/S at the same price on the same day from the ultimate seller Aronex Partners Ltd.[36]  These

shares were ultimately sold (through Bastion Capital London Ltd) to the following 12 pension

plans in the following amounts, including 2,876,86 amount of shares to Basalt:

|    | Plan | Number of Shares |
|----|------|------------------|
| 1  | Bareroot Capital Investments LLC 401(K) Plan | 3,714,107 |
| 2  | Basalt Ventures LLC Roth 401(K) Plan | 2,876,867 |
| 3  | Cantata Industries LLC Roth 401(K) Plan | 2,888,576 |
| 4  | Cedar Hill Capital Investments LLC Roth 401(K) Plan | 3,689,164 |
| 5  | Dicot Technologies LLC Roth 401(K) Plan | 2,869,709 |
| 6  | Fulcrum Productions LLC Roth 401(K) Plan | 3,419,036 |
| 7  | Green Scale Management LLC Roth 401(K) Plan | 3,023,900 |
| 8  | Keystone Technologies LLC Roth 401(K) Plan | 3,389,801 |
| 9  | Starfish Capital Management LLC Roth 401(K) Plan | 3,547,235 |
| 10 | The Stor Capital Consulting LLC 401(K) Plan | 3,196,193 |
| 11 | Tumba Systems LLC Roth 401(K) Plan | 3,097,117 |
| 12 | Voojo Productions LLC Roth 401(K) Plan | 3,663,418 |
|    | **Total** | **39,375,123** |

      b.       On August 12, 2014, the Basalt Plan entered into a stock loan agreement

pursuant to which it agreed to loan 2,876,867 TDC A/S shares to Gnosis Capital Ltd., in

exchange for DKK 147,727,120.45 (DKK 51.35 per share), with a settlement date of August

13, 2014.[37]

---

36.    Appendix C, Trade 1 (ELYSIUM-03294559; ELYSIUM-04646523); Weinstein Decl. Ex. 27.

37.    No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the
parties' Joint 56.1 Statement.

      i.      Gnosis Capital Ltd. loaned 2,876,867 TDC A/S shares to Esengi Ltd. on the same day, in exchange for DKK 147,727,120.45 (DKK 51.35 per share).[38]

      ii.      Esengi Ltd. loaned 2,876,867 TDC A/S shares to Aronex Partners Ltd on the same day, in exchange for DKK 147,727,120.45 (DKK 51.35 per share).[39]

      c.      This trade loop is further detailed in Appendix C to this statement. Documentation for this trade loop is contained in Exhibit 27 to the Weinstein Declaration.

### C.    The Roadcraft Technologies LLC Roth 401(k) Plan's Trading Loops

<u>Trade Type # 1</u>

15.    According to the Solo Custodians' documents, the Roadcraft Technologies LLC Roth 401(k) Plan (the "<u>Roadcraft Plan</u>") and other customers of the Solo Custodians engaged in the following trades:

      a.      On March 26, 2015, the Roadcraft Plan purchased 887,986 shares of Carlsberg A/S - B at DKK 571.50 per share for a notional amount of DKK 507,483,999.00, through the broker The TJM Partnership, with a settlement date of March 31, 2015.[40]

      i.      The TJM Partnership obtained 887,986 shares of Carlsberg A/S - B at the same price on the same day from the broker Arian Financial.[41]

      ii.      Arian Financial obtained 887,986 shares of Carlsberg A/S - B at the same price on the same day from the ultimate seller D.D.C. (Cayman).[42]

---

38.    Appendix C, Trade 1 (ELYSIUM-03308429); Weinstein Decl. Ex. 27.

39.    Appendix C, Trade 1 (ELYSIUM-03308581); Weinstein Decl. Ex. 27.

40.    No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

41.    Appendix D, Trade 10 (ELYSIUM-04004403); Weinstein Decl. Ex. 37.

42.    Appendix D, Trade 10 (ELYSIUM-04004175; ELYSIUM-09138288); Weinstein Decl. Ex. 37.

b.     On March 30, 2015, the Roadcraft Plan entered into a stock loan agreement pursuant to which it agreed to loan 887,986 shares of Carlsberg A/S - B shares to Colbrook Limited, in exchange for DKK 507,483,999.00 (DKK 571.50 per share), with a settlement date of March 31, 2015.[43]

i.     Colbrook Limited loaned 887,986 Carlsberg A/S - B shares to CEKA Invest GmbH on the same day, in exchange for DKK 507,483,999.00 (DKK 571.50 per share).[44]

ii.     CEKA Invest GmbH loaned 887,986 Carlsberg A/S - B shares to D.D.C. (Cayman) on the same day, in exchange for DKK 507,483,999.00 (DKK 571.50 per share).[45]

16.     In addition, in 2015, the Roadcraft Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities.  The series of trades in each loop used the same or similar steps as outlined above for the 887,986 Carlsberg A/S - B shares.  All 14 of these series of trade loops are detailed in Appendix D to this statement, including the Carlsberg A/S - B loop, which appears at line 10 of the Appendix. Documentation for each of the Roadcraft Plan's 14 type 1 trade loops is contained in Exhibits 28 through 41 the Weinstein Declaration.

<u>Trade Type # 2</u>

17.     According to the Solo Custodians' documents, the Roadcraft Plan and other customers of the Solo Custodians engaged in the following trades:

---

43.   No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

44.   Appendix D, Trade 10 (ELYSIUM-04033405); Weinstein Decl. Ex. 37.

45.   Appendix D, Trade 10 (ELYSIUM-04031990); Weinstein Decl. Ex. 37.

a. On August 7, 2014, the Roadcraft Plan purchased 2,803,027 shares of TDC A/S at DKK 51.35 per share, for a notional amount of DKK 143,935,436.45, through the broker Bastion Capital London Ltd, with a settlement date of August 13, 2014.[46]

i. Bastion Capital acquired those shares by purchasing, in the aggregate, 148,093,767 shares of TDC A/S from the broker Ballygate Capital Ltd,[47] from which Bastion Capital London Ltd allocated 2,803,027 to the Roadcraft Plan, and the remaining shares to 45 other pension plans, as described in paragraph 14 above.[48]

ii. Ballygate Capital Limited obtained 29,394,791 shares of TDC A/S at the same price on the same day from the ultimate seller Miralty International Limited.[49] These shares were ultimately sold (through Bastion Capital London Ltd) to the following nine pension plans in the following amounts, including 2,803,027 shares to the Roadcraft Plan:

|   | Plan | Number of Shares |
|---|------|------------------|
| 1 | Crucible Ventures LLC Roth 401(K) Plan | 3,219,605 |
| 2 | Eclouge Industry LLC Roth 401(K) Plan | 3,269,796 |
| 3 | First Ascent Worldwide LLC Roth 401(K) Plan | 2,848,717 |
| 4 | Limelight Global Productions LLC Roth 401(K) Plan | 3,415,873 |
| 5 | Loggerhead Services LLC Roth 401(K) Plan | 3,365,526 |
| 6 | PAB Facilities Global LLC Roth 401(K) Plan | 3,669,877 |
| 7 | Plumrose Industries LLC Roth 401(K) Plan | 3,169,872 |
| 8 | Roadcraft Technologies LLC Roth 401(K) Plan | 2,803,027 |
| 9 | Trailing Edge Productions LLC Roth 401(K) Plan Trust | 3,632,498 |
|   | **Total** | **29,394,791** |

b. On August 12, 2014, the Roadcraft Plan entered into a stock loan agreement pursuant to which it agreed to loan 2,803,027 TDC A/S shares to Gnosis Capital

---

46.   No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

47.   Appendix E, Trade 1 (ELYSIUM-03294580); Weinstein Decl. Ex. 42.

48.   Appendix E, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 42.

49.   Appendix E, Trade 1 (ELYSIUM-03294561; ELYSIUM-04646756); Weinstein Decl. Ex. 42.

Ltd., in exchange for DKK 143,935,436.45 (DKK 51.35 per share), with a settlement date of August 13, 2014.[50]

   i.  Gnosis Capital Ltd. loaned 2,803,027 TDC A/S shares to Esengi Ltd. on the same day, in exchange for DKK 143,935,436.45 (DKK 51.35 per share).[51]

   ii.  Esengi Ltd. loaned 2,803,027 TDC A/S shares to Miralty International Ltd on the same day, in exchange for DKK 143,935,436.45 (DKK 51.35 per share).[52]

   c.  This trade loop is further detailed in Appendix E to this statement. Documentation for this trade loop is contained in Exhibit 42 to the Weinstein Declaration.

### D. The FWC Capital LLC Pension Plan's Trading Loops

<u>Trade Type #1</u>

  18. According to the Solo Custodians' documents, the FWC Capital Plan LLC Pension Plan (the "<u>FWC Plan</u>"), and other customers of the Solo Custodians, engaged in the following trades:

   a.  On March 26, 2015, the FWC Plan purchased 903,635 shares of Carlsberg A/S – B at DKK 571.50 per share, for a total notional amount of DKK 516,427,402.50, through the broker The TJM Partnership PLC, with a settlement date of March 31, 2015.[53]

---

50. No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

51. Appendix E, Trade 1 (ELYSIUM-03308489); Weinstein Decl. Ex. 42.

52. Appendix E, Trade 1 (ELYSIUM-03308490); Weinstein Decl. Ex. 42.

53. No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

i.      The TJM Partnership PLC obtained 903,635 shares of Carlsberg A/S – B at the same price on the same day from the broker Arian Financial.[54]

ii.      Arian Financial obtained 903,635 shares of Carlsberg A/S – B at the same price on the same day from the ultimate seller JCJC International Limited.[55]

b.      On March 30, 2015, the FWC Plan entered into a stock loan agreement pursuant to which it agreed to loan 903,635 Carlsberg A/S – B shares to Diverse Vision Limited, in exchange for DKK 516,427,402.50 (DKK 571.50 per share), with a settlement date of March 31, 2015.[56]

i.      Diverse Vision Limited loaned 903,635 Carlsberg A/S – B shares to CEKA Invest GmbH on the same day and with the same settlement date, in exchange for DKK 516,427,402.50.[57]

ii.      CEKA Invest GmbH loaned 903,635 Carlsberg A/S – B shares to JCJC International Limited on the same day and with the same settlement date, in exchange for DKK 516,427,402.50.[58]

19.      In addition, in 2015, the FWC Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 903,635 Carlsberg A/S - B shares. All 14 of these series of trade loops are detailed in Appendix F to this statement, including the Carlsberg A/S - B loop, which appears at line 9 of the Appendix.

---

54.    Appendix F, Trade 9 (ELYSIUM-04004398); Weinstein Decl. Ex. 51.

55.    Appendix F, Trade 9 (ELYSIUM-04004172; ELYSIUM-04124065); Weinstein Decl. Ex. 51.

56.    No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

57.    Appendix F, Trade 9 (ELYSIUM-04034597); Weinstein Decl. Ex. 51.

58.    Appendix F, Trade 9 (ELYSIUM-04031953); Weinstein Decl. Ex. 51.

Documentation for each of the FWC Plan's 14 type 1 trade loops is contained in Exhibits 43 through 56 to the Weinstein Declaration.

Trade Type #2

20. According to the Solo Custodians' documents, the FWC Plan and other customers of the Solo Custodians engaged in the following trades:

    a. On November 27, 2014, the FWC Plan purchased 846,864 shares of Chr. Hansen Holding A/S, at DKK 258.9 per share, for a total notional amount of DKK 219,253,089.60, through the broker Bastion Capital London Ltd, with a settlement date of December 2, 2014.[59]

        i. Bastion Capital acquired those shares by purchasing, in the aggregate, 20,892,979 shares of Chr. Hansen Holding A/S from Ballygate Capital Limited,[60] from which Bastion Capital London Ltd allocated 846,864 shares to the FWC Plan, and the remaining shares to 23 other defendant pension plans, in the following amounts:[61]

|    | Pension Plan | Shares |
|----|--------------|--------|
| 1  | The Aston Advisors LLC 401(K) Plan | 835,831 |
| 2  | The RDL Consulting Group LLC Pension Plan | 808,508 |
| 3  | The Sanford Villa Pension Plan | 898,209 |
| 4  | The Sea Bright Advisors LLC 401(K) Plan | 917,284 |
| 5  | The Zen Training LLC 401(K) Plan | 927,423 |
| 6  | Snow Hill Pension Plan | 866,679 |
| 7  | The Bradley London Pension Plan | 853,647 |
| 8  | The Chambers Property Management LLC 401(K) Plan | 962,606 |
| 9  | The CSCC Capital Pension Plan | 863,201 |
| 10 | The Diamond Scott Capital Pension Plan | 840,249 |
| 11 | The DMR Pension Plan | 822,957 |
| 12 | The Everything Clean LLC 401(K) Plan | 799,986 |
| 13 | The Hoboken Advisors LLC 401(K) Plan | 926,808 |
| 14 | The Houston Rocco LLC 401(K) Plan | 957,048 |

---

59. No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

60. Appendix G, Trade 1 (ELYSIUM-03572340); Weinstein Decl. Ex. 57.

61. Appendix G, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 57.

|    | Pension Plan | Shares |
|----|--------------|--------|
| 15 | The JT Health Consulting LLC 401(K) Plan | 819,647 |
| 16 | The Jump Group LLC 401(K) Plan | 917,594 |
| 17 | The LBR Capital Pension Plan | 797,188 |
| 18 | The Mountain Air LLC 401(K) Plan | 861,468 |
| 19 | The Proper Pacific LLC 401(K) Plan | 839,500 |
| 20 | The Shapiro Blue Management LLC 401(K) Plan | 863,656 |
| 21 | The SKSL LLC Pension Plan | 873,444 |
| 22 | The Tag Realty Advisors LLC 401(K) Plan | 892,287 |
| 23 | The Wave Maven LLC 401(K) Plan | 900,895 |
|    | **Total** | **20,892,979** |

    ii.   Ballygate Capital Limited obtained 5,234,119 shares of Chr. Hansen Holding A/S at the same price on the same day from the ultimate seller Miralty International Limited.[62]   846,864 of these were ultimately sold to the FWC Plan (through Bastion Capital London Ltd).   These shares were ultimately sold (through Bastion Capital London Ltd) to the following six pension plans in the following amounts, including 846,864 shares to the FWC Plan.

|    | Plan | Number of Shares |
|----|------|------------------|
| 1 | Sanford Villa Pension Plan | 898,209 |
| 2 | The Aston Advisors LLC 401(K) Plan | 835,831 |
| 3 | The FWC Capital LLC Pension Plan | 846,864 |
| 4 | The RDL Consulting Group LLC Pension Plan | 808,508 |
| 5 | The Sea Bright Advisors LLC 401(K) Plan | 917,284 |
| 6 | The Zen Training LLC 401(K) Plan | 927,423 |
|    | **Total** | **5,234,119** |

    b.   On December 1, 2014, the FWC Plan entered into a stock loan agreement pursuant to which it agreed to loan 846,864 Chr. Hansen shares to Gnosis Capital Ltd, in exchange for DKK 219,253,089.60, with a settlement date of December 2, 2014.[63]

---

62.  Appendix G, Trade 1 (ELYSIUM-03572745; ELYSIUM-04657181); Weinstein Decl. Ex. 57.

63.  No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

i.      Gnosis Capital Ltd loaned 846,864 Chr. Hansen shares to Esengi Ltd on the same day and with the same settlement date, in exchange for DKK 219,253,089.60.[64]

ii.      Esengi Ltd loaned 846,864 Chr. Hansen shares to Miralty International Limited on the same day and with the same settlement date, in exchange for DKK 219,253,089.60.[65]

c.      In addition, in 2014, the FWC Plan and other customers of the Solo Custodians purported to engage in one additional series of circular trading loops of Danish securities.  The series of trades in each loop used the same or similar steps as outlined above for the 846,864 Chr. Hansen shares.  Both of these series of trade loops are detailed in Appendix G to this statement.  Documentation for both trade loops is contained in Exhibits 57 and 58 to the Weinstein Declaration.

**E.      The Proper Pacific LLC Pension Plan's Trading Loops**

Trade Type #1

21.      According to the Solo Custodians' documents, The Proper Pacific LLC 401(k) Plan (the "Proper Pacific Plan") and other customers of the Solo Custodians engaged in the following trades:

a.      On March 26, 2015, the Proper Pacific Plan purchased 180,313 shares of Carlsberg A/S – B, at DKK 571.5 per share, for a notional amount of DKK 103,048,879.50, through the broker Sunrise Brokers, with a settlement date of March 31, 2015.[66]

---

64.    Appendix G, Trade 1 (ELYSIUM-03582192); Weinstein Decl. Ex. 57.

65.    Appendix G, Trade 1 (ELYSIUM-03582225); Weinstein Decl. Ex. 57.

66.    No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

i.      Sunrise Brokers obtained 180,313 shares of Carlsberg A/S – B at the same price on the same day from the broker Mako Financial Markets LLP.[67]

ii.     Mako Financial Markets LLP obtained 180,313 shares of Carlsberg A/S – B at the same price on the same day from the ultimate seller Opal Capital.[68]

b.      On March 30, 2015, the Proper Pacific Plan entered into a stock loan agreement pursuant to which it agreed to loan 180,313 Carlsberg A/S – B shares to Treehurst Limited, in exchange for DKK 103,048,879.50 (DKK 571.50 per share), with a settlement date of March 31, 2015.[69]

i.      Treehurst Limited loaned 180,313 Carlsberg A/S – B shares to Relative Value Trading GmbH on the same day and with the same settlement date, in exchange for DKK 103,048,879.50 (DKK 571.50 per share).[70]

ii.     Relative Value Trading GmbH loaned 180,313 Carlsberg A/S – B shares to Opal Capital on the same day and with the same settlement date, in exchange for DKK 103,048,879.50 (DKK 571.50 per share).[71]

22.     In addition, in 2015, the Proper Pacific Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities.  The series of trades in each loop used the same or similar steps as outlined above for the 180,313 Carlsberg A/S - B shares.  All 14 of these series of trade loops are detailed in Appendix H to this statement, including the Carlsberg A/S - B loop, which appears at line 10 of the Appendix.

---

67.   Appendix H, Trade 10 (ELYSIUM-04005472); Weinstein Decl. Ex. 68.

68.   Appendix H, Trade 10 (ELYSIUM-04006870; ELYSIUM-04121825); Weinstein Decl. Ex. 68.

69.   No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

70.   Appendix H, Trade 10 (ELYSIUM-04028842); Weinstein Decl. Ex. 68.

71.   Appendix H, Trade 10 (ELYSIUM-04030302); Weinstein Decl. Ex. 68.

Documentation for each of the Proper Pacific Plan's 14 type 1 trade loops is contained in Exhibits 59 through 72 to the Weinstein Declaration.

Trade Type #2

23.     According to the Solo Custodians' documents, the Proper Pacific Plan and other customers of the Solo Custodians engaged in the following trades:

   a.     On November 27, 2014, the Proper Pacific Plan purchased 839,500 shares of Chr. Hansen Holding A/S at DKK 258.9 per share, for a total notional amount of DKK 217,346,550, through the broker Bastion Capital London Ltd, with a settlement date of December 2, 2014.[72]

    i.     Bastion Capital acquired those shares by purchasing, in the aggregate, 20,892,979 shares of Chr. Hansen Holding A/S from Ballygate Capital Limited,[73] from which Bastion Capital London Ltd allocated 839,500 to the Proper Pacific Plan, and the remaining shares to 23 other defendant pension plans, as described in paragraph 20 above.[74]

    ii.     Ballygate Capital Limited obtained 5,162,627 shares of Chr. Hansen Holding A/S at the same price on the same day from the ultimate seller Aronex Partners Ltd.[75]   These shares were ultimately sold (through Bastion Capital London Ltd) to the following six pension plans in the following amounts, including 839,500 shares to the Proper Pacific Plan.

|   | Pension Plan | Shares |
|---|--------------|--------|
| 1 | The Bradley London Pension Plan | 853,647 |
| 2 | The DMR Pension Plan | 822,957 |

---

72.   No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

73.   Appendix I, Trade 1 (ELYSIUM-03572340); Weinstein Decl. Ex. 73.

74.   Appendix I, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 73.

75.   Appendix I, Trade 1 (ELYSIUM-04657154); Weinstein Decl. Ex. 73.

| 3 | The Houston Rocco LLC 401(K) Plan | 957,048 |
| 4 | The LBR Capital Pension Plan | 797,188 |
| 5 | The Proper Pacific LLC 401(K) Plan | 839,500 |
| 6 | The Tag Realty Advisors LLC 401k Plan | 892,287 |
|   | **Total** | **5,162,627** |

b.      On December 1, 2014, the Proper Pacific Plan entered into a stock loan agreement pursuant to which it agreed to loan 839,500 Chr. Hansen shares to Gnosis Capital Ltd, in exchange for DKK 217,346,550 (DKK 51.35 per share), with a settlement date of December 2, 2014.[76]

i.      Gnosis Capital Ltd loaned 839,500 Chr. Hansen shares to Esengi Ltd on the same day and with the same settlement date, in exchange for DKK 217,346,550 (DKK 51.35 per share).[77]

ii.      Esengi Ltd loaned 839,500 Chr. Hansen shares to Aronex Partners Ltd on the same day and with the same settlement date, in exchange for DKK 217,346,550 (DKK 51.35 per share).[78]

c.      In addition, in 2014, the Proper Pacific Plan and other customers of the Solo Custodians purported to engage in one additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 839,500 Chr. Hansen shares. Both of these series of trade loops are detailed in Appendix I to this statement. Documentation for both trade loops is contained in Exhibits 73 and 74 to the Weinstein Declaration.

## II.      <u>Amounts Received by the Solo Bellwether Plans and Their Participants.</u>

---

76.      No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.

77.      Appendix I, Trade 1 (ELYSIUM-03582197); Weinstein Decl. Ex. 73.

78.      Appendix I, Trade 1 (ELYSIUM-03582228); Weinstein Decl. Ex. 73.

### A.    The RJM Plan

24.    The RJM Plan and Ganymede Cayman Limited ("Ganymede"), an entity controlled by Sanjay Shah,[79] split the refunds paid to the RJM Plan by SKAT, net of the payment agent's minimal fee, with Ganymede receiving approximately 66% and the RJM Plan receiving approximately 34%, or DKK 20,225,699.55.[80]

### B.    The Basalt Plan

25.    The Basalt Plan and Ganymede split the refunds paid to the Basalt Plan by SKAT, with Ganymede receiving approximately 75% and the Basalt Plan receiving approximately 25%, or DKK 6,963,382.23.[81]

### C.    The Roadcraft Plan

26.    The Roadcraft Plan and Ganymede split the refunds paid to the Roadcraft Plan by SKAT, with Ganymede receiving approximately 75% and the Roadcraft Plan receiving approximately 25%, or DKK 16,992,759.43.[82]

### D.    The FWC Bellwether

27.    Each time the FWC Plan received refunds payments from SKAT, the FWC Plan paid approximately 95% of the refund to Ganymede.[83]

28.    Defendant Lehman agreed with Sanjay Shah that, for "introducing" his own pension plans to the Solo Custodians, Shah would arrange to pay Lehman at least $700,000 or $800,000 per plan.[84]   From the amount paid to Ganymede, Sanjay Shah subsequently paid

---

79.    Weinstein Decl. Ex. 79 (R. Markowitz Dep., April 8-9, 2021), at 200:24-201:3.

80.    Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18; Weinstein Decl. Ex. 115 (MPSKAT00000351); Weinstein Decl. Ex. 116 (MPSKAT00101953); Joint 56.1 Statement ¶¶ 204-206.

81.    Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18.

82.    Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18.

83.    Weinstein Decl. Ex. 117 at FWCCAP00000225-26, FWCCAP00000409, and FWCCAP00000410.

84.    Weinstein Decl. Ex. 80 (Lehman Dep., August 9 – 10, 2021), at 396:7-25.

defendant Lehman, via his entity First Alton Inc., the amounts that Lehman and Shah had agreed

upon.[85] According to defendant Lehman, he spent the money transferred to First Alton on personal

spending, investments, and to pay taxes, and he transferred any remaining funds to his own bank

accounts.[86]

###### E.    The Proper Pacific Bellwether

29.    Each time the Proper Pacific Plan received refunds payments from SKAT, the

Proper Pacific Plan paid approximately 95% of the refund to Ganymede.[87]

30.    Danny Fletcher ("Fletcher"), a colleague of Bradley's,[88] subsequently paid

defendant Bradley at least the $100,000 fee he was promised for establishing a plan.[89]

## III.    Other Facts Related to the Solo Bellwether Cases

31.    The four principals of Argre Management LLC were defendants Markowitz and

John van Merkensteijn and non-parties Mathew Stein and Jerome Lhote.[90]

32.    In April 2012, Shah emailed defendant Richard Markowitz to ask if he had a U.S.

pension plan that could be used for the new dividend arbitrage scheme.[91]

33.    Subsequently, Markowitz and the three other principals in Argre Management LLC

established pension plans to participate in the strategy, including bellwether defendant RJM Plan.[92]

---

85.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 463:9-.468:1; Weinstein Decl. Ex. 118 (Dep. Ex. 4029) at
       ELYSIUM-00008355, ELYSIUM-00008475, ELYSIUM-07777714, and ELYSIUM-00008359; Weinstein
       Decl. Ex. 119 (Dep. Ex. 4027) at ELYSIUM-03847468, ELYSIUM-07558218, ELYSIUM-04265008,
       ELYSIUM-04465959, and ELYSIUM-04586675.

86.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 473:1-474:19.

87.   Weinstein Decl. Ex. 120 at PROPPACIF00000142 – 44, PROPPACIF00000319 and PROPPACIF00000320.

88.   Weinstein Decl. Ex. 81 (Bradley Dep., Oct. 14, 2020), at 306:14-20; 307:14-308:4.

89.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 305:11-306:20.

90.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 24:7-10.

91.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 137:19-138:9; ELYSIUM-00389317.

92.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 138:13-139:23.

34.     In 2012, Solo ostensibly became a custodian and began executing a new purported dividend arbitrage scheme involving Danish shares.[93]

35.     After a Danish company announced it would pay a dividend to its shareholders, on the day before the ex-dividend date, the plans purportedly purchased large amounts of shares in the Danish company from a broker identified by Solo in an over-the counter trade.  Solo did not require the pension plans to pay any money to buy the shares.  Instead, on the day before the payment was due, Solo purportedly arranged a stock loan transaction that would provide the plan all of the money to pay for the supposed shares.[94]

36.     For these plans, Solo and the Argre principals agreed that for any refunds SKAT paid, Solo would get 66 percent and the Argre principals' plan would get 34 percent.[95]

37.     The only Solo Custodian providing the Solo Bellwether Plans custody services in 2013 was Solo Capital.[96]  By 2015, however, all four Solo Custodians were providing custodial services to Solo Bellwether Plans and/or other defendant plans.[97]

38.     By 2014, a dispute had arisen between the Argre principals.  The split involved defendants Markowitz and van Merkensteijn, on one side, and the other two Argre principals Stein and Lhote, on the other.  Stein and Lhote used a German bank they had acquired to replace Solo

---

93.    Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 158:1-159:24.

94.    Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 160:2-17; 173:19-174:17; 189:2-4; 268:15-16; 269:21-23; 274:8-16; 274:22-275:19; 433:14-23; Weinstein Decl. Ex. 80 (Lehman Dep.), at 250:4-17.

95.    Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 200:12-202:18, 211:4-17.

96.    *See* Appendices A through I.  Solo Capital also provided custody services to defendant plans in 2012.  *See, e.g.*, Weinstein Decl. Ex. 121 (JHVM_0005618).

97.    *See* Appendices A through I; Weinstein Decl. Ex. 122 (78YORK00000060); Weinstein Decl. Ex. 123 (BUSBLK00000104).

as the purported custodian, while Markowitz and van Merkensteijn stuck with Sanjay Shah and Solo.[98]

39.     Beginning in June and July 2014, and with the assistance of defendant Michael Ben-Jacob and others at Kaye Scholer LLP in establishing the majority of them, Markowitz, van Merkensteijn and Klugman collectively used 40 pension plans, most of them (including bellwether defendants Basalt and Roadcraft Plans) newly formed, for the purpose of participating in the scheme.[99]

40.     For some of the new plans, such as defendant Basalt Plan, one of Markowitz, van Merkensteijn, or Klugman would be the sole participant in the pension plan.[100]  For many of these 40 plans, such as defendant Roadcraft Plan, a family member or friend of Markowitz and van Merkensteijn, such, as van Merkensteijn's friend defendant Ronald Altbach, would be the sole participant in the plan.[101]  With respect to the plans in which Markowitz or van Merkensteijn's family and friends were the beneficiaries, the plans entered into partnership agreements with trusts established by Markowitz, van Merkensteijn and Klugman, such as defendants RAK Investment Trust (Klugman's) and Routt Capital Trust (Markowitz's).[102]  After paying Solo 75 percent of the refunds, the partnership arrangements provided that the remaining 25 percent would be split with 95 percent to be distributed to the Markowitz, van Merkensteijn and Klugman trusts, and only 5 percent (of the 25 percent) left for the plan.[103]

---

98.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 346:4-24; 350:5-351:8.

99.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 354:9-17; 369:17-21; 379:5-8.

100.   Weinstein Decl. Ex. 82 (Klugman Dep., Jan. 21, 2021), at 236:25-237:19.

101.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 356:12-357:4; Weinstein Decl. Ex. 179 (October 30, 2020 Altbach Dep.), at 27:19-22.

102.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 356:16-357:4.

103.   Weinstein Decl. Ex. 82 (Klugman Dep.), at 65:16-21.

41.     For this new phase, Shah increased Solo's share of any refunds SKAT paid, net of the payment agent's minimal fee, from 66 to 75 percent, leaving 25 percent for the plans.[104]

42.     In Spring 2014, Shah estimated that Klugman could make a million dollars per plan if he opened his own pension plans to participate in the scheme.[105]

43.     Initially, defendant Roger Lehman's role in the scheme was to assist Solo clients in the reclaim application process, including acting as the authorized trader for other people's pension plans, *i.e.*, to execute on behalf of the plans the purported share purchases and stock loans that supposedly financed them.[106]

44.     In 2013, however, Lehman established his own pension plan to participate in the scheme.[107]

45.     According to Lehman, Sanjay Shah agreed to pay him $1 million for "introducing" the plan to Solo.[108]

46.     The next year, in 2014, Lehman established four more pension plans, including bellwether defendant FWC Plan.[109]

47.     According to Lehman, Sanjay Shah agreed to pay him $700,000 or $800,000 for the four plans Lehman established in 2014, which included the FWC Plan.[110]

---

104.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18.

105.   Weinstein Decl. Ex. 82 (Klugman Dep.), at 23:6-15, 24:16-23.

106.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 81:13-82:5.

107.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 154:23-155:17.

108.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 134:12-25.

109.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 393:5-394:2.

110.   Weinstein Decl. Ex. 80 (Lehman Dep.), at 396:4-25.

48.     Defendant Bradley first met Sanjay Shah in August 2013, when Bradley's then colleague, Fletcher, invited him and some of their other colleagues at the broker where they worked to attend a presentation Shah made in New York on Solo's purported dividend arbitrage scheme.[111]

49.     By the fall 2013, Bradley established five pension plans, one for himself and one for his wife, sister, mother, and father.[112]

50.     In 2014 and 2015, Bradley established fifteen more pension plans, five for himself, including defendant Proper Pacific plan, and five more for each of his wife and sister.[113]

51.     According to defendant Bradley, Fletcher agreed to pay him $100,000 per plan for "introducing" these five plans to the Solo Custodians, and Sanjay Shah agreed to pay him $500,000 per plan for "introducing" his wife and sister's ten plans.[114]

52.     Bradley received at least $5 million in total from Sanjay Shah, and at least $5.8 million from the scheme.[115]   Despite having established numerous pension plans for his sister, father and mother, Bradley did not provide any of the funds he received to his sister, father or mother, or their respective pension plans.[116]

53.     In Denmark, VP Securities A/S is the central repository for all publicly traded shares of Danish companies.[117]

---

111.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 52:13-57:13.

112.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 87:17-88:16.

113.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 305:11-309:4.

114.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 306:14 – 309:13.

115.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 276:19-277:10; 306:14-20; 307:14-309:4.

116.   Weinstein Decl. Ex. 81 (Bradley Dep.), at 353:23-354:11.

117.   Weinstein Decl. Ex. 77 (H. Sorensen Dep. Vol. I), at 34:8-35:9.

54.     To hold Danish shares on behalf of their customers, foreign custodians, such as the U.K.-based Solo Custodians, must do so through a sub-custodian with an account at VP Securities, or a chain of sub-custodians, with the ultimate sub-custodian having an account at VP Securities.[118]

55.     When a publicly traded Danish company issues a dividend to its shareholders, VP Securities distributes the dividend (minus applicable withholding tax) to its account holders who hold shares of the relevant stock.[119]

56.     Where the VP Securities account holder is acting as a sub-custodian, it distributes the dividend payment to the custodian that holds the shares on behalf of the investor, or the dividend is distributed to that custodian through the chain of sub-custodians.[120]

## FACTS AS TO THE ED&F BELLWETHER CASES

### I.     ED&F Plan Formation & Funding

57.     American Investment Group of New York, L.P. ceased doing business in 2000.[121]

58.     Defendant David Schulman ("Schulman") made a single contribution of $200,000 to the Riverside Associates Defined Benefit Plan ("Riverside Plan") in 1995.[122]

59.     Schulman's contribution was $200,000 received from Daniel Kaminer.[123]

### II.     Custody Relationship, Powers of Attorney

---

118.   Weinstein Decl. Ex. 77 (H. Sorensen Dep. Vol. I), at 49:11-21.

119.   Weinstein Decl. Ex. 78 (H. Sorensen Dep.. Vol. II), at 51:12-52:2.

120.   Weinstein Decl. Ex. 78 (H. Sorensen Dep. Vol. II), at 51:12-52:2.

121.   Weinstein Decl. Ex. 83 (Crema Dep., Feb. 9, 2021), at 18:12-23, 159:25-160:8; Weinstein Decl. Ex. 124 (AIG_00000367).

122.   Weinstein Decl. Ex. 102 (Riverside Plan Resp. to SKAT's First Req. for Admis. (hereinafter "Riverside Plan RFA")) at Req. No. 1.

123.   Weinstein Decl. Ex. 102 (Riverside Plan RFA) at Req. No. 2.

60.     The Riverside Plan entered into the Agreements[124] at the direction of Defendant Stacey Kaminer ("Kaminer").[125]

61.     The American Investment Group of New York, L.P. Pension Plan ("AIG Plan") entered into the Agreements at Kaminer's direction.[126]

## III.     Acer Investment Group, LLC

62.     Acer Investment Group LLC ("Acer") served as agent for seven other pension plans in connection with the plans' trading in Danish securities conducted at ED&F Man (together with the AIG Plan and Riverside Plan, the "Acer Plans").[127]

63.     In her dealings with ED&F, Kaminer acted in her capacity as principal of Acer.[128]

64.     Kaminer operated Acer from Utah.[129]

## IV.     The English Litigation

65.     On June 11, 2020, ED&F filed a Re-Amended Defence in the English Action[130] (the "Re-Amended Defence").[131]

---

124.   *See* Joint 56.1 Statement ¶ 276 (defining "Agreements").

125.   Weinstein Decl. Ex. 84 (D. Schulman Dep., Oct. 21, 2020) at 150:9-11 (First Variation Letter), 143:22-144:7 (Custody Agreement), 142:14-16 (Security & Set Off Deed).

126.   Weinstein Decl. Ex. 83 (Crema Dep.), at 168:1-19 (ED&F Account Application), 170:2-22 (Security & Set Off Deed, and any other ED&F account opening document).

127.   Acer Third Party Complaint against ED&F Man at 2, 1:18-md-02865, Jan. 29, 2021 (ECF No. 527) ("Acer served as the Plans' authorized agent in connection with the  Plans' investments in Danish securities through ED&F between 2013 and 2015," and defining "Plans" as the DW Construction, Inc. Retirement Plan; The Goldstein Law Group PC 401(k) Profit Sharing Pension Plan; Kamco Investments, Inc. Pension Plan; Kamco LP Profit Sharing Pension Plan; Linden Associates Defined Benefit Plan; Moira Associates 401(K) LLC Plan; Riverside Associates Defined Benefit Plan; American Investment Group of New York, L.P. Pension Plan and Newsong Fellowship Church 401(k) Plan).

128.   AIG Plan Answer to SKAT's Amended Complaint ¶ 19, 1:18-md-02865, July 2, 2020 (ECF No. 391-7); *see also* Weinstein Decl. Ex. 85 (Kaminer Dep., Apr. 19 – 20, 2021) at 36:20 – 37:6, 38:8 – 40:14.

129.   *Id.*

130.   *See* Joint 56.1 Statement ¶ 291 (defining "English Action").

131.   Weinstein Decl. Ex. 104 (Re-Amended Defence).

a.     The Re-Amended Defence included a Defence to Re-Amended Schedule 5T and Annex E.[132]

b.     Annex E described inaccuracies in 80 of 420 tax vouchers prepared by ED&F, including certain tax vouchers prepared on behalf of the AIG Plan and the Riverside Plan (the "Annex E Tax Vouchers").[133]

c.     According to the Re-Amended Defence, the 80 tax vouchers identified in Annex E were inaccurate because the pension plans identified in those tax vouchers "had not 'received' the amount set out therein by way of dividend from the Danish Listed Company; and had not 'suffered' withholding tax in the amount set out therein in relation to such dividend at the stated (27%) or any rate."[134]

d.     Four of the Annex E Tax Vouchers were prepared on behalf of the AIG Plan.[135]

e.     Six of the Annex E Tax Vouchers were prepared on behalf of the Riverside Plan.[136]

66.     SKAT's allegations contained in the Re-Amended Schedule 5T[137] were expressly based on (a) the admissions made in respect of the Annex E applications; and (b) an allegation that the applicants did not hold and were not the beneficial owners of the relevant shares and did not receive any dividend as beneficial owner net of withholding tax.  SKAT further alleged that ED&F

---

132.   *Id*.

133.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at ¶¶ 4.2, 27A, Re-Amended Defence to Schedule 5T ¶¶ 18.7.2, 19.1, and Annex E.

134.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 2.

135.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedules 1-11, 1-64, 2-2, and 2-15.

136.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedule 1-8, 1-25, 1-26, 1-39, 1-51, and 1-60.

137.   *See* Joint 56.1 Statement ¶ 292.

Man was the true principal of the applications.  SKAT did not allege before the English Court that the alleged securities transactions executed or purportedly executed by ED&F involved no shares, even in the case of the transactions that were the basis of the 80 Annex E Tax Vouchers.  In relation to the transactions which were the basis of the remaining 340 tax vouchers, SKAT alleged that the tax refunds were not due because ED&F, and not the relevant refund applicant, was the beneficial owner of the relevant shares and dividends.[138]

67.     In its Further Particulars Regarding the Validity of Withholding Tax Refund Applications (hereinafter "Further Particulars"),[139] SKAT alleged that, under Danish law, the concept of "beneficial owner" arose under the double tax treaties between Denmark and certain other states.[140]

## V.     **Trades**

68.     The date on which two counterparties agree to transact is referred to as the "Trade Date."[141]

69.     "Settlement" refers to the delivery of securities from the buyer to the seller and the payment of the purchase price from the buyer to the seller.  The date that settlement occurs is referred to as the "Settlement Date."[142]

---

138.   Weinstein Decl. Ex. 107 (Re-Amended Schedule 5T) at ¶ 18(e).

139.   *See* Joint 56.1 ¶ 292.

140.   Weinstein Decl. Ex. 108 (Further Particulars) ¶¶ 5-7, 39, 49.

141.   Weinstein Decl. Ex. 91 (Expert Report of Graham Wade, dated December 31, 2021 (hereinafter "Initial Wade Report")) at ¶ 27 ("[Trade Date] is the date two counterparties agree to transact.  In a purchase transaction, the trade date is the date on which the buyer agrees to purchase shares, typically through a call, email, or Bloomberg Chat message, followed shortly thereafter by the buyer's receipt of a trade confirmation.").

142.   Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 28 ("[Settlement Date is] the date the transfer of securities occurs between the buyer and seller. On this date, the buyer makes a payment to the seller to settle the share transaction and the seller delivers the shares to the buyer.").

70.     Until October 2014, the standard settlement cycles for Danish equity transactions occurred on the third business day after the Trade Date ("T+3"), after which it was shortened to the second business day after the Trade Date ("T+2").[143]

71.     There are multiple "settlement cycles" in a single day in which trades in Danish shares may settle.[144]

72.     At all relevant times, ED&F claims to have held shares for its pension plan clients, including the AIG Plan and Riverside Plan, in accounts ███523F at BNP Paribas Security Services ("BNP") and account ███2806 at SEB (the "Client Omnibus Account").[145]

73.     ED&F claims to have used BNP account ███523F as the Client Omnibus Account until the end of 2014, and SEB account ███2806 as the Client Omnibus Account in 2015.[146]

74.     ED&F exclusively used the Client Omnibus Account to settle its clients' transactions in Danish securities.[147]

75.     "Record Date" refers to the date by which a shareholder is required to own shares (meaning that the shareholder is the registered owner of the shares in the shareholder register) to be entitled to receive a dividend directly from the issuer of the securities.[148]

---

143.    Weinstein Decl. Ex. 78 (Sorensen Dep. Vol. II), at 31:14-19, 32:16-19.

144.    Weinstein Decl. Ex. 125 (ED&F-00203860 – 64).

145.    Weinstein Decl. Ex. 109 (Dep. Ex. 4430 (Draft Statement of Agreed Facts)) ¶ 24, n.36; Weinstein Decl. Ex. 86 (Hashemi Dep., Oct. 7 – 8, 2021), at 327:14 – 328:10 (adopting Weinstein Decl. Ex. 109 as "ED&F Man's position"); *see also* Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); Weinstein Decl. Ex. 127 (SEB_00000092 (SEB settlement record)); Weinstein Decl. Ex. 128 (SEB_0000093 (SEB settlement record)).

146.    *Id.*

147.    Weinstein Decl. Ex. 87 (Wall Dep., Feb. 23, 2022), at 237:7-23.

148.    Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 29 ("[Record Date] refers to the date by which a shareholder is required to own shares (meaning that the shareholder is the registered owner of the shares in the shareholder register) to be entitled to receive a dividend.").

76.     "Ex-Date" refers to the first trading date on which the buyer of a share is not entitled to receive the most recently announced dividend.[149]  This date is generally the day following the date a company's dividend is ratified at the general meeting of shareholders.

77.     A trade with a Trade Date before the Ex-Date and settles on or before the Record Date is referred to as a "Cum-Cum" trade.[150]

78.     A trade with a Trade Date before the Ex-Date and settles after the Record Date is referred to as a "Cum-Ex" trade.[151]

79.     ED&F used shares in the Client Omnibus Account that had been acquired for Cum-Cum trades to settle Cum-Ex trades in the same security.[152]

80.     ED&F did not hold in its Client Omnibus Account the full quantity of shares identified on the Tax Vouchers it issued on Annex E Cum-Ex Trades and the non-Annex E Cum-Ex Trades.  Rather, it held a smaller number of shares, broke those positions up into even smaller parcels ("shapes" or "splits"), and then re-used those shapes multiple times in one day until the aggregation of those actions equaled the full amount reflected on the Tax Vouchers.[153]

---

149.   Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 30 ("[Ex-Date] refers to the first trading date on which the buyer of a share is not entitled to the receive the most recently announced dividend because any purchase transactions entered into after this date will not settle prior to the Record Date.").

150.   Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 162 ("Separately, I have reviewed various other contemporaneous transactions undertaken by ED&F Man that involved the transfer of shares which settled prior to the Record Date . . . I will refer to these transactions as 'Cum-Cum' transactions.").

151.   Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 79 ("A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date. This means the transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex.").

152.   Weinstein Decl. Ex. 87 (Wall Dep.), at 237:7-239:19.

153.   *Id.*

81.     Settlement shapes are listed on the trade confirmations provided to transacting parties on the Trade Date.[154]

82.     The cost of acquiring shares in a structured transaction is referred to as the "All-In Cost" or "Dividend Sourcing Cost," which is calculated as the cost of "buying the security and selling the hedge," expressed as a percentage of the gross dividend expected from holding those securities and receiving the most recently announced dividend.[155]

83.     In some circumstances, entities (including financial institutions) domiciled in countries with tax treaties with Denmark, including those domiciled in England, could receive 85% of the gross dividend, rather than 73%, via the U.K./Denmark Double Taxation Convention.[156]

84.     Under Danish law, entities (including financial institutions) resident in European Union member states, including France, that have incorporated Council Directive 2011/16/EU of 15 February 2011 on administrative cooperation in the field of taxation and repealing Directive 77/799/EEC can receive 85% of the gross dividend, rather than 73%.[157]

85.     According to ED&F's documents, its customers and counterparties engaged in the following types of transactions, illustrated by the examples that follow:

<u>Trade Type #1 ("Cum-Cum Trade")</u>

---

154.   *See*, *e.g.*, Weinstein Decl. Ex. 130 at ED&F-00040949, ED&F-00113799; Weinstein Decl. Ex. 131 at ED&F-00045814 – 17, ED&F-000458 54.

155.   Weinstein Decl. Ex. 85 (Kaminer Dep.), at 99:21-100:5, 326:1-4.

156.   *See* Article 10(2) of the U.K./Denmark Double Taxation Convention, signed November 11, 1980 (as amended by protocols signed July 1, 1991, and October 15, 1996).

157.   Danish Corporate Tax Act) § 2(8), ¶ 2, 4.

a.      On March 5, 2014, Acer, acting as agent for the Acer Plans, instructed ED&F to purchase 2,000,000 shares of TDC A/S ("TDC"), a public issuer of securities in Denmark.[158]

b.      On March 5, 2014, ED&F purchased 2,000,000 TDC shares from Volcafe Limited ("Volcafe") at 52.9 DKK per share, with a settlement date of March 10, 2014.[159]

i.      Volcafe was an interdealer broker[160] and subsidiary of ED&F's ultimate parent company, ED&F Man Holdings Limited, during the relevant period.[161]

ii.     On the same day, Volcafe purchased 2,000,000 TDC shares at the same price and with the same settlement date from Morgan Stanley Equity Derivative Services (Luxembourg) S.a r.l.[162]

iii.    ED&F credited 1,000,000 of the 2,000,000 TDC shares to the AIG Plan, and the remaining shares to another Acer Plan.[163]

c.      On March 10, 2014, ED&F settled the above transactions in two shapes of 1,000,000 shares each.[164]

<u>Trade Type #2A ("Annex E Cum-Ex Trade")</u>

---

158.   Weinstein Decl. Ex. 130 at ED&F-00040921; *see* Appendix J, Columns "Issuer," "Quantity," and "Trade Date."

159.   Weinstein Decl. Ex. 130 at ED&F-00040922; *see* Appendix J, Columns "Issuer," "Quantity," "Trade Date," "Settle Date," and "Share Price (DKK per share)."

160.   Weinstein Decl. Ex. 86 (Hashemi Dep.), at 62:15-17.

161.   Weinstein Decl. Ex. 86 (Hashemi Dep.), at 31:12-20.

162.   Weinstein Decl. Ex. 130 at ED&F-00040935.

163.   Weinstein Decl. Ex. 130 at ED&F-00040920–25; *see* Appendix J, Columns "Issuer," "Quantity," and "Shares Credited to Plan."

164.   Weinstein Decl. Ex. 130 at ED&F-00040920–27; *see* Appendix J, Column "Settle Date."; ED&F-00604196.

d.      On March 6, 2014, Acer, acting as agent for the Acer Plans, instructed ED&F to purchase 22,300,000 TDC shares, with a T+4 settlement date of March 12, 2014; and sell 223,000 TDC futures.[165]

i.      On March 6, 2014, ED&F purchased 22,300,000 TDC shares from Volcafe at 52.4 DKK per share, with a settlement date of March 12, 2014.[166]

1.      On the same day, Volcafe purchased 22,300,000 TDC shares of at the same price from ED&F Man Professional Trading (Dubai) Limited ("ED&F Dubai"), with a settlement date of March 12, 2014.[167]

2.      ED&F Dubai was a subsidiary of ED&F's ultimate parent company, ED&F Man Holdings Limited, during the relevant period.[168]

3.      At the time it entered into the transaction, ED&F Dubai's sale of 22,300,000 TDC shares on March 6, 2014 was an uncovered short sale.[169]

4.      As of March 6, 2014, ED&F Dubai did not hold any TDC shares to sell to Volcafe, did not have any rights to any TDC shares, and did not have a right to a dividend on any TDC shares.[170]

---

165.  Weinstein Decl. Ex. 130 at ED&F-00040938; *see* Appendix K, "Plan Purchase" Columns "Trade Date," "Settle Date" and "Quantity."

166.  Weinstein Decl. Ex. 130 at ED&F-00040939 – 47; *see* Appendix K, "Plan Purchase" Columns "Trade Date," "Settle Date" "Quantity," "Share Price (DKK per share)," and "Equity Broker."

167.  Weinstein Decl. Ex. 130 at ED&F-00040949; *see* Appendix K, "Plan Purchase" Columns "Trade Date," "Settle Date" "Quantity," "Share Price (DKK per share)," "Equity Broker," and "Seller."

168.  Weinstein Decl. Ex. 86 (Hashemi Dep.), at 29:20-30:1.

169.  Weinstein Decl. Ex. 87 (Wall Dep.), at 56:15-57:10; *see also* Weinstein Decl. Ex. 147 (ED&F-00443853).

170.  Weinstein Decl. Ex. 87 (Wall Dep.), at 56:15-57:10; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).

5.      ED&F was the clearing firm for all of ED&F Dubai's transactions in Danish securities.[171]

6.      At the time of ED&F Dubai's transactions, ED&F was in possession of the following facts:

a.      ED&F Dubai did not hold any TDC shares.

b.      ED&F Dubai did not have any rights to TDC shares.

c.      ED&F Dubai did not have a right to a dividend on any TDC shares.[172]

d.      ED&F Dubai did not receive a dividend from the Danish issuer for any TDC shares.[173]

ii.      ED&F credited 22,300,000 TDC shares to the Acer Plans as follows:[174]

| Plan | Number of Shares |
|------|------------------|
| AIG Plan | 2,000,000 |
| Riverside Plan | 2,150,000 |
| DW Construction, Inc. Retirement Plan | 3,300,000 |
| Goldstein Law Group PC 401(K) Profit Sharing Plan | 2,200,000 |
| Kamco Investments, Inc. Pension Plan | 2,000,000 |
| Kamco LP Profit Sharing Pension Plan | 2,000,000 |
| Linden Associates Defined Benefit Plan | 2,150,000 |
| Moira Associates LLC 401 (K) Plan | 4,000,000 |
| Newsong Fellowship Church 401 (K) Plan | 2,500,000 |

---

171.  Weinstein Decl. Ex. 87 (Wall Dep.), at  202:19-203:4.

172.  Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15; *see also*, *e.g.*, Weinstein Decl. Ex. 148 (ED&F-00251535).

173.  *See* Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).

174.  Weinstein Decl. Ex. 130 at ED&F-00040938 – 47; see Appendix K, Column "Shares Credited to Plan.".

iii.     On March 12, 2014, ED&F settled the above transactions in nine shapes:  2,000,000; 2,000,000; 2,000,000; 2,200,000; 2,150,000; 2,150,000; 2,500,000; 3,300,000; and 4,000,000.[175]

iv.     On March 6, 2014, ED&F sold 223,000 March expiry TDC futures, which corresponds to 22,300,000 TDC shares, at 50.64 DKK per share.[176]

v.     On March 6, 2014, TDC declared a dividend in the amount of 2.2 DKK per share, with a Record Date of March 11, 2014.[177]

vi.     The All-In Cost for the plans' equity purchase of 22,300,000 TDC shares and corresponding futures sale was 80%.[178]

e.     On March 7, 2014, ED&F entered a short sale of 22,300,000 TDC shares to Link Asset & Securities Co.  ("Link") for 50.65 DKK per share, with a settlement date of March 12, 2014, which it intended to cover with shares it would rehypothecate from the Acer Plans.[179]

i.     On the same day, Link sold 22,300,000 TDC shares to ED&F Dubai at the same price and with the same settlement date.[180]

---

175.   Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); Weinstein Decl. Ex. 130 at ED&F-00040939 – 47; *see* Appendix K, "Plan Purchase" Columns "Settle Date," and "Settlement Shapes."

176.   Weinstein Decl. Ex. 130 at ED&F-00040948; *see* Appendix K, "Plan Purchase" Column "Hedge Price (DKK Per Share)."

177.   Joint 56.1 ¶ 309; *see also* Appendix K, "Share Information" Columns.

178.   Share price of 52.4 DKK less futures price of 50.64 DKK, expressed as a percentage of a gross dividend of 2.2 DKK; *see* Appendix K, "Dividend Sourcing Cost" Columns.

179.   Weinstein Decl. Ex. 130 at ED&F-00190794 - 97 (rehypothecation and sale to Link); *see* Appendix K, "ED&F Rehypothecation/Plan Sale" Columns.

180.   Weinstein Decl. Ex. 130 at ED&F-00113798-99; *see* Appendix K, "ED&F Dubai Acquisition" Columns.

    ii. Link bought and sold the shares for the same price, 50.65 DKK per share, on the same Trade Date and with the same Settlement Date, and charged a total brokerage fee of 16,000 DKK, or around 0.1 basis points, on both transactions.[181]

    iii. On March 12, 2014, ED&F settled the above equities transactions in nine shapes: 2,000,000; 2,000,000; 2,000,000; 2,200,000; 2,150,000; 2,150,000; 2,500,000; 3,300,000; and 4,000,000.[182]

<u>Trade Type #2B ("Non-Annex E Cum-Ex Trade")</u>

    f. On March 6, 2014, Acer, acting as agent for the Acer Plans, instructed ED&F to purchase 6,000,000 TDC shares at 52.55 DKK per share, with a T+4 settlement date of March 12, 2014; and sell 60,000 TDC futures at 50.736 DKK.[183]

    i. Kaminer specified that the purchase was "T+4," and also specified a purchase price of DKK 52.55 on the equity and 50.736 on the futures.[184]

    ii. Kaminer further wrote that "I have heard that Marianna might have liquidity on the futures."[185]

    iii. On the same day, ED&F purchased these shares from its internal Interdealer Broker ("<u>ED&F IDB</u>") at the same price and with the same Settlement Date.[186]

---

181. Weinstein Decl. Ex. 130 at ED&F-001137999, ED&F-00 ED&F-00190797.

182. Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); Weinstein Decl. Ex. 130 at ED&F-00040939-47; *see* Appendix K, "ED&F Rehypothecation/Plan Sale" Columns "Settlement Date" and "Settlement Shapes," and "ED&F Dubai Acquisition" Columns "Settlement Date" and "Settlement Shapes."

183. Weinstein Decl. Ex. 130 at ED&F-00040954; Appendix L, "Plan Purchase" Columns "Trade Date," "Settle Date," "Quantity," and "Share Price (DKK per share)."

184. *Id.*

185. *Id.*

186. Weinstein Decl. Ex. 130 at ED&F-00040972; Appendix L, "Plan Purchase" Columns "Trade Date," "Settle Date," "Quantity," "Share Price (DKK per share)," and "Equity Broker."

iv.     On the same day, the ED&F IDB purchased 6,000,000 TDC shares at the same price same and with the same settlement date from Lutetia Patrimoine.[187]

1.     ED&F credited 2,000,000 of the 6,000,000 shares to the AIG Plan, and the remaining shares to other Acer Plans.[188]

2.     On at least one occasion, Lutetia sold shares that it did not have in its account with its sub-custodian on the Record Date.[189]

v.     On March 12, 2014, ED&F settled the above transactions in three shapes of 2,000,000 shares each.[190]

vi.     On March 6, 2014, ED&F sold 60,000 TDC futures, which corresponds to 6,000,000 TDC shares, at 50.736 DKK.[191]

1.     ED&F sold the 60,000 futures via Mariana Capital for a weighted average price of exactly DKK 50.736 per share, the same price and through the same broker as requested by Kaminer.[192]

2.     The All-In Cost for the equity purchase of the 6,000,000 TDC shares and corresponding futures sale was 82.3%.[193]

---

187.   *Id.*

188.   Weinstein Decl. Ex. 130 at ED&F-00040956; Appendix L, "Shares Credited to Plan" Column.

189.   Weinstein Decl. Ex. 149 (ED&F-00268329).

190.   Weinstein Decl. Ex. 130 at ED&F-00040956; Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); *see* Appendix L, "Settlement Shapes" Column.

191.   Weinstein Decl. Ex. 130 at ED&F-0040957 – 58, ED&F-0040960 – 61, ED&F-0040963-64.

192.   Weinstein Decl. Ex. 130 at ED&F-00040967; Appendix L, "Hedge Price (DKK per share)" Column.

193.   Share price of 52.55 DKK less futures price of 50.74 DKK, expressed as a percentage of a gross dividend of 2.2 DKK; Appendix L, "Dividend Sourcing Cost" Columns.

g.　　On March 12, 2014, ED&F rehypothecated 6,000,000 TDC shares from the AIG Plan and two other Acer Plans and sold them for 48.88 DKK per share, with a settlement date of March 13, 2014.[194]

　　　　i.　　ED&F sold 2,000,000 shares to GFI Securities Limited.[195]

　　　　ii.　　ED&F sold 2,000,000 shares to ICAP.[196]

　　　　iii.　　ED&F sold 2,000,000 shares to Link.[197]

86.　　The on-exchange Average Daily Trading Volume ("ADTV") of TDC shares over the 15 days before March 11, 2014, and the 15 days after March 11, 2014, was approximately 2,400,000 million shares per day.[198]  The ADTV for each issuer for which ED&F issued a Tax Voucher or Annex E Tax Voucher based on a Non-Annex E Cum-Ex Trade or Annex E Cum-Ex Trade is listed in Appendix M.

87.　　The AIG Plan engaged in a total of 14 relevant trades in Danish securities:[199] eight Cum-Cum Trades, which settled before the Record Date; four Annex E Cum-Ex Trades which settled after the Record Date; and two Non-Annex E Cum-Ex Trades which settled after the Record Date.  Each trade follows the same steps outlined above for the relevant type of trade, but in some cases with different counterparties.  These 14 trades are identified in Appendices J, K, and L, along with the material terms of each transaction as identified in paragraph 85.

---

194.　Weinstein Decl. Ex. 130 at ED&F-00252017; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.

195.　Weinstein Decl. Ex. 130 at ED&F-00252019; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.

196.　Weinstein Decl. Ex. 130 at ED&F-00252020; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.

197.　Weinstein Decl. Ex. 130 at ED&F-00252021; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.

198.　*See* Weinstein Decl. Ex. 91 (Initial Wade Report), at Appendix D; *see also* Appendix M, Column "Average Daily Trading Volume (ADTV)."

199.　*See* Joint 56.1, Appendix B.

88.     The Riverside Plan engaged in a total of 11 relevant trades in Danish securities:[200] six Annex E Cum-Ex Trades and five Cum-Cum Trades.  Each trade follows the same steps outlined above for the relevant type of trade, but in some cases with different counterparties. These 11 trades are identified in Appendices J and K, along with the material terms of each transaction as summarized in paragraph 85.

89.     ED&F issued 80 incorrect Annex E Tax Vouchers to its clients, including the AIG Plan and the Riverside Plan, which were submitted to SKAT.[201]

        a.     ED&F issued an Annex E Tax Voucher to the AIG Plan and the Riverside Plan based on each of the Annex E Cum-Ex Trades listed in Appendix K.[202]

                i.     For example, on March 24, 2014, ED&F issued Tax Vouchers to the AIG Plan and Riverside Plan stating that each held TDC shares over the Record Date of March 11, 2014.[203]

        b.     Through their agent Goal Taxback Limited ("Goal"), the AIG and Riverside Plans submitted Annex E Tax Vouchers to SKAT.[204]

90.     According to ED&F, SKAT overpaid dividend withholding tax refunds to its clients, including the AIG Plan and the Riverside Plan, pursuant to each of the Annex E Tax Vouchers issued by ED&F.[205]

---

200.   *See* Joint 56.1, Appendix B.

201.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1.

202.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1.

203.   Weinstein Decl. Ex. 150 (ACER_00001028 - 38).

204.   Joint 56.1 ¶¶ 356 – 359, 367 – 368.

205.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedules 1 and 2.

      a.      According to ED&F, SKAT overpaid dividend withholding tax refunds to the AIG Plan pursuant to Annex E Tax Vouchers in the amount of DKK 8,613,000.[206]

      b.      According to ED&F, SKAT overpaid dividend withholding tax refunds to the Riverside Plan pursuant to Annex E Tax Vouchers in the amount of DKK 7,416,225.[207]

91.      SKAT relied, inter alia, on the Annex E Tax Vouchers when issuing the refunds of dividend withholding tax listed therein.[208]

92.      The Annex E Tax Vouchers were inaccurate because the pension plans listed in the vouchers, including the AIG Plan and the Riverside Plan, did not receive a dividend from the Danish issuer for the portion of the voucher supported by an Annex E Cum-Ex Trade.[209]

93.      The Annex E Tax Vouchers were inaccurate because the pension plans listed in the vouchers, including in that the AIG Plan and the Riverside Plan, did not suffer withholding tax on dividends from the Danish issuer for the portion of the voucher supported by an Annex E Cum-Ex Trade.[210]

94.      In each Annex E Cum-Ex Trade, the AIG Plan and the Riverside Plan did not acquire shares in respect of which a dividend was paid by the issuer of the Danish securities.[211]

---

206.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedules 1 and 2.

207.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedule 1.

208.   Weinstein Decl. Ex. 88 (Ekstrand Dep.), at 122:3-21, 123:11-18.

209.   Weinstein Decl. Ex. 87 (Wall Dep.), at 50:1 – 52:17 (adopting paragraph 1, "Who made the payments) and 52:18 – 55:9, 65:21 – 66:21 (adopting paragraph 2, "Why the payments were made"); Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).

210.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1.

211.   Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)) ("[T]he Pension Plans had a contractual right to dividends in respect of such shares. However, the counterparty MPT Dubai was unable to pay the Pension Plans' dividends in satisfaction of such rights because it did not have a right to the relevant Danish Shares on the Trade Date and thus did not receive the dividends from the underlying Danish company.").

a.      In each Annex E Cum-Ex Trade, ED&F Dubai did not receive a dividend from the Danish issuer of the securities it purportedly sold.[212]

95.     In each of the Annex E Cum-Ex Trades, ED&F Dubai was the ultimate seller of shares.[213]

96.     In each Annex E Cum-Ex Trade, ED&F Dubai's sale was an uncovered short sale.[214]

97.     In each Annex E Cum-Ex Trade, as of the Trade Date of ED&F Dubai's sale to the Plans, ED&F Dubai did not hold the Danish shares to sell and did not have any rights to the Danish shares.[215]

98.     For each Annex E Cum-Ex Trade, ED&F Dubai did not have the right to a dividend on the Danish shares it sold and did not receive a dividend on those shares from the Danish issuer.[216]

99.     For each Annex E Cum-Ex Trade, the payment that ED&F Dubai made to the AIG Plan and the Riverside Plan was a contractual payment.[217]  This contractual payment was in the amount of the net dividend the purported seller would have received from the issuer, accounting for withholding tax, if it had received such a dividend.[218]

---

212.   Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).

213.   *See* Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)) ("[MPT Dubai] the ultimate counterparty from whom the Pension Plans had acquired the right to the relevant Danish shares"); *see* Appendix K, "Plan Purchase" Column "Seller".

214.   Weinstein Decl. Ex. 87 (Wall Dep.), at 56:15-57:10; Weinstein Decl. Ex. 147 (ED&F-00443853).

215.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)); Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15.

216.   Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15; Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).

217.   Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)) ("MPT Dubai satisfied its contractual obligations to the purchasing Pension Plans by paying sums equivalent in value to these dividends net of 27% [withholding tax.").

218.   Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).

a. For example, on March 13, 2014, ED&F debited ED&F Dubai's account DKK 103,265,800 as "CASH DIV – TDC – PD 12/03/14" because it held a total short position of 64,300,000 TDC shares on the Ex-Date.[219]

b. On the same date, ED&F credited DKK 3,212,000 to the AIG Plan as "CASH DIV – TDC – PD 12/03/14"[220] and DKK 3,452,900 to the Riverside Plan as "CASH DIV - TDC DC - PD 12/03/14."[221]

100. At the time of each Annex E Cum-Ex Trade, ED&F was in possession of the following facts: [222]

a. ED&F Dubai did not hold any Danish shares;

b. ED&F Dubai did not have any rights to Danish shares; and

c. ED&F Dubai did not have a right to a dividend on any Danish shares.

101. In each Annex E Cum-Ex Trade, ED&F Dubai did not have the shares it was selling in its custodial account as of the Trade Date and did not obtain the relevant shares until on or after the Ex-Date.

a. The transactions by which ED&F Dubai purported to acquire shares to settle the Annex E Cum-Ex Trades are identified in Appendix K, along with the material terms of each transaction as identified in paragraph 85.[223]

102. ED&F admits that it should not have produced and issued Tax Vouchers for the Annex E Cum-Ex Trades.[224]

---

219. Weinstein Decl. Ex. 148 (ED&F-00251535); Weinstein Decl. Ex. 151 (ED&F-00409126 – 47) at 28.

220. Weinstein Decl. Ex. 152 (ED&F-00039750 – 85 (AIG Plan ED&F Account Transactions)) at 50.

221. Weinstein Decl. Ex. 153 (ED&F-00040756 – 78 (Riverside Plan ED&F Account Transactions)) at 56.

222. Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15.

223. Appendix K, "ED&F Dubai Acquisition."

224. Weinstein Decl. Ex. 86 (Hashemi Dep.), at 252:5-18.

103.    ED&F admits that a customer's expectation that it would receive a dividend is not sufficient for it to issue a Tax Voucher.[225]

104.    A dividend credit on an account statement is not a sufficient basis for ED&F to issue a Tax Voucher.[226]

105.    In each Non-Annex E Cum-Ex Trade, neither the AIG Plan nor ED&F received a dividend from the issuer of the Danish securities.[227]

        a.      For each Non-Annex E Cum-Ex Trade, the AIG Plan received a contractual payment from the purported seller of the shares.[228]  This contractual payment was in the amount of the net dividend the purported seller would have received from the issuer, accounting for withholding tax, if it had received such a dividend.[229]

106.    Before issuing Tax Vouchers based on the Non-Annex E Cum-Ex Trades, ED&F made no checks with the sellers to verify whether the sellers held shares before they sold them to the Plans or whether the sellers received a dividend from the issuer of the Danish securities and were able to forward the dividends to the Plans.[230]

107.    Following SKAT's claims against it in the High Court of Justice of England and Wales, ED&F conducted a detailed review of all 420 Tax Vouchers it issued for shares of Danish securities.[231]

---

225.    Weinstein Decl. Ex. 87 (Wall Dep.), at 68:21-69:6.

226.    Weinstein Decl. Ex. 87 (Wall Dep.), at 67:1-69:6.

227.    Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast); Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC).

228.    Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast); Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC).

229.    Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast); Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC).

230.    Weinstein Decl. Ex. 87 (Wall Dep.), at 120:16-121:25.

231.    Weinstein Decl. Ex. 104 (Re-Amended Defence) at Re-Amended Defence to Schedule 5T ¶ 18.7.2.

108.     As part of its detailed review, ED&F did not inquire about whether counterparties to the Non-Annex E Cum-Ex trades were short sellers.[232]

109.     Acer received no assurances from ED&F that the securities it purchased for the AIG Plan and Riverside Plan were not short sales.[233]

     a.     Acer did not ask ED&F whether it was acquiring Danish shares for the Plans from short sellers.[234]

     b.     Acer did not request that ED&F not acquire Danish shares for the Plans from short sellers.[235]

110.     The AIG Plan and the Riverside Plan took no steps to ensure that they received a dividend from the Danish issuer prior to submitting their respective reclaim applications to SKAT.[236]

## VI.     Issuance of Tax Vouchers

111.     ED&F's sub-custodians, BNP Paribas and SEB, received dividends net of withholding tax from the share issuer for each of the AIG Plan and Riverside Plans' Cum-Cum Trades.[237]

---

232.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Re-Amended Defence to Schedule 5T ¶ 18.7.2; Weinstein Decl. Ex. 87 (Wall Dep.), at 261:24-262:8.

233.  Weinstein Decl. Ex. 98 (Acer's Resp. to SKAT's First Set of Interrog. (hereinafter "Acer Interrog. Resp.")) at Resp. No. 18; Weinstein Decl. Ex. 99 (AIG Plan's Resp. to SKAT's First Set of Interrog. (hereinafter "AIG Interrog. Resp.")) at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100 (Riverside Plan's Resp. to SKAT's First Set of Interrog. (hereinafter "Riverside Interrog. Resp.")) at Resp. Nos. 20, 21.

234.  Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 17.

235.  Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 17.

236.  Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 16; Weinstein Decl. Ex. 99 (AIG Interrog. Resp.) at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100 (Riverside Interrog. Resp.) at Resp. Nos. 20, 21.

237.  Weinstein Decl. Ex. 154 (ED&F-00603586 (BNP dividend record); Weinstein Decl. Ex. 155 (SEB_00000094 (SEB dividend record for account ██████2822)); Weinstein Decl. Ex. 156 (SEB_00000095 (SEB dividend record for account ██████2806)); Weinstein Decl. Ex. 157 (SEB_00000096 (SEB dividend record for account ██████2814)).

112.    For some dividend events, BNP and SEB issued tax vouchers to ED&F.[238]

a.    BNP declined to issue tax vouchers to ED&F on Cum-Ex trades, and provided tax vouchers to ED&F only for the shares held in the Client Omnibus Account on the record date.[239]

b.    SEB issued tax vouchers only on the shares that ED&F held in the Client Omnibus Account on the Record Date.[240]

113.    For each dividend event in which ED&F held shares in the Client Omnibus Account on the Record Date, ED&F used the shares in the Client Omnibus Account to support Tax Vouchers based on its clients' Cum-Cum Trades, and issued Tax Vouchers to its clients based on those Cum-Cum Trades.[241]   Details of each dividend event for which ED&F issued a Tax Voucher to the AIG Plan or Riverside Plan, including the total number of shares for which ED&F issued a Tax Voucher and the number of shares held in the Client Omnibus Account, are identified in Appendix M.

a.    For example, ED&F held 24,845,000 TDC shares in the Client Omnibus Account at the end of the Record Date of March 11, 2014, which were acquired through its clients' Cum-Cum Trades, including the AIG Plan's Cum-Cum Trades.[242]

---

238.   Weinstein Decl. Ex. 158 (ED&F-00255315 – 16 (BNP Tax Vouchers – Coloplast) and ED&F-00257149 – 60 (BNP Tax Vouchers – Novo Nordisk)); Weinstein Decl. Ex. 159 (ED&F-00315766 (SEB Tax Voucher for Chr. Hansen, Coloplast), ED&F-00318721 (SEB Tax Voucher – A.P. Møller Mærsk A/S - B), ED&F-00385070 (SEB Tax Voucher for Novozymes, TDC, DSV, Danske Bank, Pandora, and Novo Nordisk), and ED&F-00436486 (SEB Tax Voucher – TDC)).

239.   Weinstein Decl. Ex. 158 (ED&F-00255315 – 16 (BNP Tax Vouchers – Coloplast) and ED&F-00257149 – 60 (BNP Tax Vouchers – Novo Nordisk)); Weinstein Decl. Ex. 160 (ED&F-00112487 – 93).

240.   *See* Weinstein Decl. Ex. 159 (ED&F-00315766 (SEB Tax Voucher for Chr. Hansen, Coloplast), ED&F-00318721 (SEB Tax Voucher – A.P. Møller Mærsk A/S - B), ED&F-00385070 (SEB Tax Voucher for Novozymes, TDC, DSV, Danske Bank, Pandora, and Novo Nordisk), and ED&F-00436486 (SEB Tax Voucher – TDC)).

241.   Weinstein Decl. Ex. 87 (Wall Dep.), at 213:21 – 214:11, 236:20 – 239:19.

242.   Weinstein Decl. Ex. 130 at ED&F-00446138 (Dividend Reconciliation Sheet, "BNP Paribas Depot 778523F").

b.      ED&F issued Tax Vouchers to its clients, including the AIG Plan, based on the TDC shares in the Client Omnibus Account on the Record Date and acquired in those TDC Cum-Cum Trades.[243]

114.    ED&F used the shares in the Client Omnibus Account that were acquired for the Cum-Cum Trades, and other ex-dividend shares, to settle its clients' Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades, and issued Tax Vouchers to its clients based on those Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades.[244]

a.      Where ED&F did not have any of the relevant shares on hand (or not enough of them), it otherwise acquired ex-dividend shares to use to settle the cum-ex trades.[245]

115.    Details of each dividend event for which ED&F issued a Tax Voucher to the AIG Plan or Riverside Plan, including the total number of shares for which ED&F issued a Tax Voucher and the number of shares held in the Client Omnibus Account, are identified in Appendix M.

a.      For example, ED&F held 24,845,000 TDC shares in the Client Omnibus Account over the Record Date of March 11, 2014[246], and issued Tax Vouchers collectively stating that its clients owned 99,145,000 TDC shares.[247]

---

243.    Weinstein Decl. Ex. 130 at ED&F-00040919, ED&F-00041108, ED&F-00041180, ED&F-00222877, ED&F-00041335, ED&F-00041655, ED&F-00041554, ED&F-00041352, ED&F-00041756, ED&F-00041857, ED&F-00041958, ED&F-00042059, ED&F-00042160, and ED&F-00446140 (identifying the total number of shares identified as held in the BNP Paribas Depot 778523F).

244.    Weinstein Decl. Ex. 87 (Wall Dep.), at 238:19-239:19; *see, e.g.*, Weinstein Decl. Ex. 136 at ED&F-00409468 – 69; Weinstein Decl. Ex. 161 (ED&F-00409462 – 3).

245     *See, e.g.*, Weinstein Decl. Ex. 136 at ED&F-00409468 – 69; Weinstein Decl. Ex. 161 (ED&F-00409462 – 3).

246     Weinstein Decl. Ex. 130 at ED&F-00446138 (Dividend Reconciliation Sheet, "BNP Paribas Depot 778523F").

247.    Weinstein Decl. Ex. 87 (Wall Dep.), at 238:19-239:19; Weinstein Decl. Ex. 130 at ED&F-00222877 – 79, ED&F-00040919, ED&F-00041352, ED&F-00041453, ED&F-00041554, ED&F-00040991, ED&F-00041655, ED&F-00041756, ED&F-00041059, ED&F-00041009, ED&F-00041034, ED&F-00041857, ED&F-00041083, ED&F-00041108, ED&F-00041180, ED&F-00041211, ED&F-00041236, ED&F-00041285, ED&F-00041310, ED&F-00041958, ED&F-00042059, ED&F-00042160, ED&F-00041335, and ED&F-00446140 (identifying the total number of shares identified as held in the BNP Paribas Depot 778523F).

b.      ED&F used the TDC shares that were acquired in the Cum-Cum Trades to settle its clients' Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades in TDC, totaling 74,300,000 shares.[248]

c.      ED&F issued Tax Vouchers to its clients, including the AIG Plan and Riverside Plan, based on those Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades in TDC, totaling 74,300,000 shares.[249]

i.      64,300,000 of those 74,300,000 TDC shares were purportedly acquired from ED&F Dubai.  The number of shares purportedly acquired from ED&F Dubai for all ED&F clients for each dividend event for which ED&F issued a Tax Voucher to the AIG Plan or Riverside Plan is identified in Appendix M.

116.    ED&F settled the Annex E Cum-Ex Trades and the Non-Annex E Cum-Ex Trades by reusing the same shares multiple times until all shapes of the trade settled.[250]

117.    ED&F issued multiple Tax Vouchers to its clients, including the AIG Plan and the Riverside Plan, based on the same Cum-Cum shares held in the Client Omnibus Accounts on the Record Date.[251]

---

248.  Weinstein Decl. Ex. 87 (Wall Dep.), at 238:19-239:19; Weinstein Decl. Ex. 130 at ED&F-00446138 (Dividend Reconciliation Sheet, "BNP Paribas Depot 778523F").

249.  Weinstein Decl. Ex. 130 at ED&F-00041059, ED&F-00041009, ED&F-00041083, ED&F-00041211, ED&F-00041285, ED&F-00040991, ED&F-00041034, ED&F-00040919, ED&F-00041108, ED&F-00041236, ED&F-00041335, ED&F-00041655, ED&F-00041554, ED&F-00041352, ED&F-00041756, ED&F-00041857, ED&F-00041958, ED&F-00042059, ED&F-00042160, and ED&F-00040983 – 84 (identifying the total number of shares not identified as held in the BNP Paribas Depot 778523F, excluding Volcafe "long holdings").

250.  Weinstein Decl. Ex. 87 (Wall Dep.), at 213:13-214:11, 238:12-239:19.

251.  Weinstein Decl. Ex. 87 (Wall Dep.), at 213:13-214:11, 238:12-239:19.

118.    ED&F issued multiple Tax Vouchers to its clients, including the AIG Plan and the Riverside Plan, based on the same ex-dividend shares held in the Client Omnibus Accounts on the day after the Record Date.[252]

## VII.    Trades – Funding

119.    The AIG Plan and Riverside Plan often had negative balances in their accounts at ED&F.[253]

120.    Before engaging in trades on behalf of the AIG Plan and the Riverside Plan, Acer and ED&F coordinated, in part to ensure that ED&F had sufficient capital available to pay for the Plans' trades in Danish securities.[254]

121.    ED&F charged the AIG Plan and the Riverside Plan interest at a rate pegged to Euribor on the funds it advanced for the Plans' trades in Danish securities.[255]

## VIII.    Reclaim Submissions to SKAT

122.    Through its agent Goal, the AIG Plan submitted the following applications for refunds of dividend withholding tax to SKAT (the "AIG Plan Applications").[256]

a.    On March 5, 2014, the AIG Plan claimed that it was the beneficial owner of:

---

252.    Weinstein Decl. Ex. 87 (Wall Dep.), at 213:13-214:11, 238:12-239:19.

253.    *See*, *e.g.*, Weinstein Decl. Ex. 130 at ED&F-00040982 (AIG Plan); Weinstein Decl. Ex. 142 at ED&F-00038297 (Riverside).

254.    Weinstein Decl. Ex. 85 (Kaminer Dep.), at 99:3-5, 188:6-11.

255.    Weinstein Decl. Ex. 85 (Kaminer Dep.), at 212:20-213:7, 337:13-17; Weinstein Decl. Ex. 162 (ACER_00024721 – 23) at ACER_00024722.

256.    Weinstein Decl. Ex. 101 (AIG Plan Resp. to SKAT's First Req. for Admis. (hereinafter "AIG Plan RFA")) at Req. Nos. 23, 37 - 39.

     i.  500,000 B shares of Coloplast A/S ("Coloplast") for which it received a dividend net of withholding tax in the amount of DKK 2,555,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 945,000.[257]

    b.  On March 26, 2014,the AIG Plan claimed that it was the beneficial owner of:

     i.  5,000,000 shares of TDC for which it received a dividend net of withholding tax in the amount of DKK 8,030,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 2,970,000.[258]

    c.  On April 4, 2014, the AIG Plan claimed that it was the beneficial owner of:

     i.  7,750,000 shares of Danske Bank A/S ("Danske Bank") for which it received a dividend net of withholding tax in the amount of DKK 11,315,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 4,185,000.[259]

     ii.  3,500,000 shares of Novo Nordisk A/S ("Novo Nordisk") for which it received a dividend net of withholding tax in the amount of DKK 11,497,500 and was entitled to a refund for dividend withholding tax in the amount of DKK 4,252,500.[260]

    d.  On April 16, 2014, the AIG Plan claimed that it was the beneficial owner of:

---

257. Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 84 – 90.

258. *Id.* at 91 – 96.

259. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 21 – 27.

260. *Id.*

i.      1,000 shares of A.P. Møller Mærsk A/S – B ("Mærsk") for which it received a dividend net of withholding tax in the amount of DKK 1,022,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 378,000.[261]

ii.     50,000 shares of Tryg A/S ("Tryg") for which it received a dividend net of withholding tax in the amount of DKK 985,500 and was entitled to a refund for dividend withholding tax in the amount of DKK 364,500.[262]

e.      On August 14, 2014, the AIG Plan claimed that it was the beneficial owner of:

i.      3,400,000 shares of TDC for which it received a dividend net of withholding tax in the amount of DKK 3,723,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,377,000.[263]

f.      On December 3, 2014, the AIG Plan claimed that it was the beneficial owner of:

i.      800,000 shares of Chr. Hansen Holding A/S, for which it received a dividend net of withholding tax in the amount of DKK 2,201,680 and was entitled to a refund for dividend withholding tax in the amount of DKK 814,320.[264]

g.      On December 10, 2014, the AIG Plan claimed that it was the beneficial owner of:

---

261.   *Id.* at 28 – 34.

262.   *Id.*

263.   *Id.* at 35 – 40.

264.   *Id.* at 41 – 46.

i.      1,500,000 B shares of Coloplast, for which it received a dividend net of withholding tax in the amount of DKK 8,212,500 and was entitled to a refund for dividend withholding tax in the amount of 3,037,500 DKK.[265]

h.      On March 4, 2015, the AIG Plan claimed that it was the beneficial owner of:

i.      750,000 B shares of Novozymes A/S ("Novozymes"), for which it received a dividend net of withholding tax in the amount of DKK 1,642,500 and was entitled to a refund for dividend withholding tax in the amount of 607,500 DKK.[266]

i.      On April 8, 2015, the AIG Plan claimed that it was the beneficial owner of:

i.      4,000 B shares of Mærsk for which it received a dividend net of withholding tax in the amount of DKK 5,755,320 and was entitled to a refund for dividend withholding tax in the amount of 2,128,680 DKK.[267]

123.    In total, the AIG Plan, through its agent Goal, claimed dividend withholding tax refunds for the AIG Plan in the amount of DKK 21,060,000 and, subsequently, SKAT made payments to Goal in the amount of DKK 21,060,000.  After taking its fee, Goal transferred the remainder of the funds from the refund payments to ED&F, which credited the Plans' custodial accounts with those amounts.  The AIG Plan received the full amount of the refunds paid by SKAT following SKAT's receipt of the AIG Plan's withholding tax reclaim applications, minus the fee deducted by Goal.[268]

124.    The AIG Plan Applications each included:

---

265.   *Id.* at 47 – 52.

266.   *Id.* at 53 – 58.

267.   *Id.* at 59 – 65.

268.   Joint 56.1 ¶ 376, 378 – 81.

a.      A cover letter on Goal's letterhead, describing the enclosed Tax Voucher as "evidence of payment and tax deduction paid on the [plan's] securities";[269]

b.      A "Claim to Relief from Danish Dividend Tax" (Form 06.003);[270]

c.      One or more Tax Vouchers from ED&F;[271]

d.      A Power of Attorney;[272] and

a.      An IRS Form 6166.[273]

125.    According to the defendants, each of the AIG Plan's trades identified in Appendices J, K, and L was the basis for its claims that it was the beneficial owner of shares in the AIG Plan Applications.

126.    Through its agent Goal, the Riverside Plan submitted the following applications for refunds of dividend withholding tax to SKAT (the "Riverside Plan Applications"):[274]

a.      On March 26, 2014, the Riverside Plan claimed that it was the beneficial owner of:

i.      2,150,000 shares of TDC for which it received a dividend net of withholding tax in the amount of DKK 3,452,900 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,277,100 .[275]

b.      On April 4, 2014, the Riverside Plan claimed that it was the beneficial owner of:

---

269.  *See*, *e.g.*, Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 84.

270.  *See*, *e.g.*, Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 86.

271.  Joint 56.1 ¶ 359; *see*, *e.g.*, Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 87.

272.  *See*, *e.g.*, Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 89 – 90.

273.  Joint 56.1 ¶ 360; *see*, *e.g.*, Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 88.

274.  Weinstein Decl. Ex. 102 (Riverside Plan RFA) at Req. Nos. 9, 19 – 21.

275.  Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 179 – 185.

i.    2,000,000 shares of Danske Bank for which it received a dividend net of withholding tax in the amount of DKK 2,920,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,080,000.[276]

ii.    2,000,000 B shares of Novo Nordisk, for which it received a dividend net of withholding tax in the amount of DKK 6,570,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 2,430,000.[277]

c.    On April 16, 2014, the Riverside Plan claimed that it was the beneficial owner of:

i.    175,000 shares of Tryg, for which it received a dividend net of withholding tax in the amount of DKK 3,449,250 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,275,750.[278]

d.    On May 6, 2014, the Riverside Plan claimed that it was the beneficial owner of:

i.    322,500 shares of Dampskibsselskabet Norden A/S, for which it received a dividend net of  withholding tax in the amount of DKK 1,177,125and was entitled to a refund for dividend withholding tax in the amount of DKK 435,375.[279]

e.    On May 28, 2014, the Riverside Plan claimed that it was the beneficial owner of:

---

276.   Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 186 – 192.

277.   *Id.*

278.   Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 193 – 199.

279.   Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240)  at 200 – 205.

i.      850,000 B shares of Coloplast, for which it received a dividend net of withholding tax in the amount of DKK 2,482,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 918,000.[280]

f.      On March 13, 2015, the Riverside Plan claimed that it was the beneficial owner of:

i.      2,000,000 shares of TDC, for which it received a dividend net of withholding tax in the amount of DKK 1,460,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 540,000.[281]

g.      On March 18, 2015, the Riverside Plan claimed that it was the beneficial owner of:

i.      850,000 shares of DSV A/S for which it received a dividend net of withholding tax in the amount of DKK 992,800 and was entitled to a refund for dividend withholding tax in the amount of DKK 367,200.[282]

h.      On March 26, 2015, the Riverside Plan claimed that it was the beneficial owner of:

i.      1,200,000 shares of Danske Bank for which it received a dividend net of withholding tax in the amount of DKK 4,818,000 and was entitled to a refund for dividend withholding tax in the amount of 1,782,000 DKK.[283]

---

280.   *Id.* at 206 – 211.

281.   *Id.* at 212 – 218.

282.   *Id.* at 219 – 225.

283.   *Id.* at 233 – 240.

    ii. 300,000 shares of Pandora A/S for which it received a dividend net of withholding tax in the amount of DKK 1,971,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 729,000.[284]

    iii. 1,400,000 shares of Novo Nordisk which it received a dividend net of withholding tax in the amount of DKK 5,110,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,890,000 DKK.[285]

  127. In total, the Riverside Plan, through its agent Goal, claimed dividend withholding tax refunds for the Riverside Plan in the amount of DKK 12,724,425 and, subsequently, SKAT made payments to Goal in the amount of DKK 12,724,425.  After taking its fee, Goal transferred the remainder of the funds from the refund payments to ED&F, which credited the Riverside Plans' custodial accounts with those amounts.  The Riverside Plan received the full amount of the refunds paid by SKAT following SKAT's receipt of the Riverside Plan's withholding tax reclaim applications, minus the fee deducted by Goal.[286]

  128. The Riverside Plan Applications each included:

    a. A cover letter on Goal's letterhead, describing the enclosed Tax Voucher as "evidence of payment and tax deduction paid on the [plan's] securities";[287]

    b. A "Claim to Relief from Danish Dividend Tax" (Form 06.003);[288]

    c. One or more Tax Vouchers from ED&F;[289]

---

284. *Id.*

285. *Id.* at 226 – 232.

286. Joint 56.1 ¶ 377 – 80, 382.

287. *See*, *e.g.*, Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 79.

288. *See*, *e.g.*, Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 81.

289. Joint 56.1 ¶ 368; *see*, *e.g.*, Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 82.

     d.     A Power of Attorney;[290] and

     e.     An IRS Form 6166.[291]

129.    According to the defendants, each of the Riverside Plan's trades identified in Appendices J, K, and L was the basis for its claims that it was the beneficial owner of shares in the Riverside Plan Applications.

**Fees and Payments to ED&F and Acer**

130.    The Custody and Clearance Fees[292] were calculated based on the net profit and loss of an entire structured transaction, and generally amounted to 90 to 95% of the net profit from each structured transaction.[293]

131.    Acer and ED&F agreed on the amount of the Custody and Clearance Fees charged to the AIG Plan and the Riverside Plan, and ED&F debited the Custody and Clearance Fees from AIG Plan's and Riverside Plan's ED&F accounts.[294]

132.    Acer and ED&F agreed that Acer would receive about half of the net profit on the Acer Plans' Danish trading.[295]

133.    ED&F paid Acer a total of DKK 20,577,685 in connection with the Acer Plans' transactions in Danish shares.

---

290.   *See*, *e.g.*, Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 83 – 84.

291.   Joint 56.1 ¶ 369*; see*, *e.g.*, Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 85.

292.   See Joint Rule 56.1 Statement of Undisputed Material Facts in Support of Motions for Summary Judgment, ¶ 383.

293.   Weinstein Decl. Ex. 85 (Kaminer Dep.), at 99:18 – 101:2.

294.   Weinstein Decl. Ex. 85 (Kaminer Dep.), at 336:11-338:1.

295.   Weinstein Decl. Ex. 85 (Kaminer Dep.), at 121:10 – 14; Weinstein Decl. Ex. 166 (ACER_00025379);.

a.  Acer sent invoices to ED&F for amounts described as "Dividend Finders Fees" totaling DKK 15,122,846.00, which ED&F paid.[296]

b.  According to ED&F, ED&F paid Acer an additional DKK 5,454,839 in relation to the plan transactions in Danish shares.[297]

134.  Kaminer testified that Acer did not locate any Danish stock for ED&F.[298]

135.  Crema testified that the payments to Acer were "pension plan finder fees" for identifying U.S. pension plans willing to lend their tax status and name to the transactions.[299]

136.  ED&F remitted a portion of the Custody and Clearance Fees paid by the Acer Plans to Acer in the guise of "Dividend Finders Fees," as outlined below:[300]

| Pension Plan | Security | Ex Date | Number of Shares | Acer Fee (DKK) |
|---|---|---|---|---|
| AIG Plan | Coloplast A/S - B | 12/6/2013 | 500,000 | 73,500.00 |
| **Subtotal** | | | **500,000** | **73,500.00[301]** |
| AIG Plan | TDC A/S | 3/7/2014 | 5,000,000 | 515,900.00 |
| Riverside Plan | TDC A/S | 3/7/2014 | 2,150,000 | 221,837.00 |
| Other Acer Plans | TDC A/S | 3/7/2014 | 23,150,000 | 2,388,617.00 |
| **Subtotal** | | | **30,300,000** | **3,126,354.00[302]** |
| AIG Plan | Danske Bank A/S | 3/19/2014 | 7,750,000 | 678,900.00 |
| Riverside Plan | Danske Bank A/S | 3/19/2014 | 2,000,000 | 175,200.00 |

---

296.  Weinstein Decl. Ex. 167 (ACER_00002925, ACER_00007675, ACER_00017546 – 55, ACER_00019338, ED&F-00214987, ED&F-00226522, and ED&F-00257314); Acer Third Party Complaint against ED&F Man ¶ 39, 1:18-md-02865, Jan. 29, 2021 (ECF No. 527).

297.  Weinstein Decl. Ex. 111 (ED&F's Response to Claimant's Request Dated May 19, 2020 for Further Information Under Part 18 (June 11, 2020)) at Appendix 1 (hereinafter "Updated Funds Flow Spreadsheet"); *see also* Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

298.  Weinstein Decl. Ex. 85 (Kaminer Dep.), at 269:20-270:1, 270:22-271:14.

299.  Weinstein Decl. Ex. 83 (Crema Dep.), at 31:21 to 32:33.

300.  Weinstein Decl. Ex. 111 (Updated Funds Flow Spreadsheet); see also Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

301.  Weinstein Decl. Ex. 167 at ED&F-00214987 (Acer invoice).

302.  Weinstein Decl. Ex. 167 at ED&F-00226522 (Acer invoice); Weinstein Decl. Ex. 111 (Updated Funds Flow Spreadsheet); *see also* Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

| Pension Plan | Security | Ex Date | Number of Shares | Acer Fee (DKK) |
|---|---|---|---|---|
| Other Acer Plans | Danske Bank A/S | 3/19/2014 | 19,375,000 | 1,697,250.00 |
| **Subtotal** | | | **29,125,000** | **2,551,350.00[303]** |
| AIG Plan | Novo Nordisk A/S - B | 3/21/2014 | 3,500,000 | 855,223.47 |
| Riverside Plan | Novo Nordisk A/S - B | 3/21/2014 | 2,000,000 | 488,699.13 |
| Other Acer Plans | Novo Nordisk A/S - B | 3/21/2014 | 17,400,000 | 4,251,682.40 |
| **Subtotal** | | | **22,900,000** | **5,595,605.00[304]** |
| AIG Plan | A.P. Møller Mærsk A/S - B | 4/11/2014 | 1,000 | 91,241.13 |
| Other Acer Plans | A.P. Møller Mærsk A/S - B | 4/11/2014 | 15,000 | 1,368,616.88 |
| **Subtotal** | | | **16,000** | **1,459,858.00[305]** |
| AIG Plan | Tryg A/S | 4/4/2014 | 50,000 | 89,086.88 |
| Riverside Plan | Tryg A/S | 4/4/2014 | 175,000 | 311,804.09 |
| Other Acer Plans | Tryg A/S | 4/4/2014 | 625,000 | 1,113,586.03 |
| **Subtotal** | | | **850,000** | **1,514,477.00[306]** |
| Riverside Plan | Dampskibsselskabet Norden A/S | 4/24/2014 | 322,500 | 124,951.88 |
| Other Acer Plans | Dampskibsselskabet Norden A/S | 4/24/2014 | 537,500 | 208,253.13 |
| **Subtotal** | | | **860,000** | **333,205.00[307]** |
| Riverside Plan | Coloplast A/S - B | 5/9/2014 | 850,000 | 279,912.91 |
| Other Acer Plans | Coloplast A/S - B | 5/9/2014 | 3,450,000 | 1,136,117.09 |
| **Subtotal** | | | **4,300,000** | **1,416,030.00[308]** |
| AIG Plan | TDC A/S | 8/8/2014 | 3,400,000 | 150,894.05 |
| Other Acer Plans | TDC A/S | 8/8/2014 | 13,077,424 | 580,383.94 |
| **Subtotal** | | | **16,477,424** | **731,277.99[309]** |
| Other Acer Plans | IC Group A/S | 9/25/2014 | 50,000 | 13,752.00 |

303. Weinstein Decl. Ex. 167 at ED&F-00257314 (Acer invoice); Weinstein Decl. Ex. 111 (Updated Funds Flow Spreadsheet); *see also* Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

304. *Id.*

305. Weinstein Decl. Ex. 111 (Updated Funds Flow Spreadsheet); *see also* Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

306. *Id.*

307. *Id.*

308. *Id.*

309. *See* Weinstein Decl. Ex. 168 (ED&F-00335658 ("The total acer fee of 756,885 DKK should go against the Belgian loss.")).

| Pension Plan | Security | Ex Date | Number of Shares | Acer Fee (DKK) |
|---|---|---|---|---|
| **Subtotal** | | | **50,000** | **13,752.00**[310] |
| AIG Plan | Chr. Hansen Holding A/S | 11/28/2014 | 800,000 | 116,870.00 |
| **Subtotal** | | | **800,000** | **116,870.00**[311] |
| AIG Plan | Coloplast A/S - B | 12/5/2014 | 1,500,000 | 326,250.00 |
| Other Acer Plans | Coloplast A/S - B | 12/5/2014 | 2,500,000 | 543,750.00 |
| **Subtotal** | | | **4,000,000** | **870,000.00**[312] |
| AIG Plan | Novozymes A/S - B | 2/26/2015 | 750,000 | 121,500.00 |
| Other Acer Plans | Novozymes A/S - B | 2/26/2015 | 1,115,000 | 180,630.00 |
| **Subtotal** | | | **1,865,000** | **302,130.00**[313] |
| Riverside Plan | TDC A/S | 3/6/2015 | 2,000,000 | 63,000.11 |
| Other Acer Plans | TDC A/S | 3/6/2015 | 1,615,200 | 50,878.89 |
| **Subtotal** | | | **3,615,200** | **113,879.00**[314] |
| Riverside Plan | DSV A/S | 3/13/2015 | 850,000 | 23,460.00 |
| Other Acer Plans | DSV A/S | 3/13/2015 | 850,000 | 23,460.00 |
| **Subtotal** | | | **1,700,000** | **46,920.00**[315] |
| Riverside Plan | Danske Bank A/S | 3/19/2015 | 1,200,000 | 277,200.00 |
| Other Acer Plans | Danske Bank A/S | 3/19/2015 | 2,200,000 | 508,200.00 |
| **Subtotal** | | | **3,400,000** | **785,400.00**[316] |
| Riverside Plan | Pandora A/S | 3/19/2015 | 300,000 | 273,913.97 |
| Other Acer Plans | Pandora A/S | 3/19/2015 | 400,950 | 366,086.03 |
| **Subtotal** | | | **700,950** | **640,000.00**[317] |
| Riverside Plan | Novo Nordisk A/S - B | 3/20/2015 | 1,400,000 | 67,895.80 |
| Other Acer Plans | Novo Nordisk A/S - B | 3/20/2015 | 2,600,000 | 126,092.20 |
| **Subtotal** | | | **4,000,000** | **193,988.00**[318] |
| AIG Plan | A.P. Møller Mærsk A/S - B | 3/31/2015 | 4,000 | 288,948.41 |

---

310.   Weinstein Decl. Ex. 167 at ACER_00002925 (Acer invoice).

311.   Weinstein Decl. Ex. 167 at ACER_00017549 (Acer invoice).

312.   Weinstein Decl. Ex. 167 at ACER_00017549 (Acer invoice); Weinstein Decl. Ex. 111 (Updated Funds Flow Spreadsheet); *see also* Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

313.   Weinstein Decl. Ex. 167 at ACER_00017551 (Acer invoice).

314.   Weinstein Decl Ex. 167 at ACER_00007675 (Acer invoice).

315.   *Id.*

316.   Weinstein Decl. Ex. 167 at ACER_00019338 (Acer invoice).

317.   *Id.*

318.   *Id.*

| Pension Plan | Security | Ex Date | Number of Shares | Acer Fee (DKK) |
|---|---|---|---|---|
| Other Acer Plans | A.P. Møller Mærsk A/S - B | 3/31/2015 | 5,595 | 404,166.59 |
| **Subtotal** | | | **9,595** | **693,115.00[319]** |
| **TOTAL** | | | | **20,577,685.00** |

137.     Beginning in 2014, Solo or one of its affiliates introduced the plans to software that the plans then licensed from a third-party that automated the purported trading and automatically generated at least the plans' trading emails based on the data inputted into the program.[320]  Before it licensed the software, Markowitz, van Merkensteijn, and Klugman hired two traders to manually send or respond to emails from the Solo Custodians, brokers and purported stock loan counterparties to purportedly execute the plans' trading.[321]  As part of those trading instructions, the traders were told to expect trade approval and confirmation emails from the Solo Custodians, brokers and purported lenders shortly after it executed or requested approval to execute a trade.[322]

---

319.   *Id.*

320.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 444:5-448:2.

321.   Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 409:9-410:9.

322.   Weinstein Decl. Ex. 178 (JHVM_0004863); Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 417:2-25.