**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.: 18-cv-04051;
18-cv-09840; 18-cv-09841; 18-cv-10098;
19-cv-01812; 19-cv-01866; 19-cv-01898.

MASTER DOCKET

18-md-2865 (LAK)

# PLAINTIFF SKATTEFORVALTNINGEN'S MEMORANDUM
# OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ..................................................................................................4

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................6

I.    The Solo bellwethers................................................................................7

    A.    In 2012, Solo became a purported custodian and began executing a new so-called dividend arbitrage scheme involving Danish shares. ..............................7

    B.    Solo and Sanjay Shah recruited defendants to establish U.S. pension plans for the new purported dividend arbitrage scheme....................................................9

          i.    The Argre Plans, including defendant RJM Capital plan. .............. 9

          ii.    The Post-Argre Kaye Scholer plans, including defendants Basalt Ventures and Roadcraft Technologies plans........................ 9

          iii.    Defendant Lehman's plans, including defendant FWC Capital plan. ................................................................. 11

          iv.    Defendant Bradley's plans, including defendant Proper Pacific plan................................................................. 11

    C.    The defendant plans entered into agreements with the Solo Custodians..............12

    D.    The Solo Custodians would have needed to hold Danish shares through a Danish sub-custodian, either directly or through other sub-custodians.................12

    E.    The Solo Custodians did not hold any Danish shares or receive any dividends on such shares....................................................................13

    F.    According to the Solo Custodians' own records, the defendant plans' purported share purchases were part of a series of fictitious, circular transactions that would not have resulted in any shares or dividends. .................15

    G.    The U.K. Financial Conduct Authority concluded that the defendant plans' purported trading was fictitious, and the Solo Custodians never held any shares or received any dividends on behalf of the plans.......................................18

    H.    The Solo Custodians' legal counsel informed the FCA that the Solo Custodians did not receive any of the dividends identified in the dividend credit advices. ..............................................................................19

II.    The Utah ED&F bellwethers. ..................................................................20

    A.    The defendant plans participated in a purported dividend arbitrage scheme involving Danish shares in which ED&F served as custodian and provided the plans with financing. ..................................................................21

    B.    Defendant Acer served as investment advisor to the defendant plans. .................21

    C.    Under their agreements with ED&F, the plans transferred to ED&F all right, title and interest in shares the plans purchased using financing provided by ED&F. ..................................................................22

    D.    The defendant plans purportedly purchased Danish shares in so called "cum-cum" and "cum-ex" trades. ..................................................................23

    E.    ED&F admitted that the so-called Annex E tax vouchers based on circular cum-ex trades involving ED&F Dubai are false. ..................................................................24

    F.    ED&F's tax vouchers based on the other cum-ex trades are false for the same reasons as the Annex E tax vouchers. ..................................................................28

        i.    The Annex E and other cum-ex trades were structured identically. ..................................................................28

        ii.    The total cost to the defendant plans of their purported trading demonstrates that none of the cum-ex trades resulted in the plans acquiring shares with a right to a dividend. ..................................................................29

        iii.    The volume of shares purportedly purchased in the rest of the cum-ex trades shows that the purported trading was circular. ..................................................................31

    G.    ED&F did not have any shares to settle the defendant plans' cum-ex trades, so it recycled ex-dividend shares. ..................................................................32

III.    In the Solo and ED&F bellwethers, the defendant plans authorized payment agents to submit their dividend withholding tax refund applications to SKAT. ..............34

IV.    The payment agents submitted the defendant plans' false tax refund applications to SKAT. ..................................................................35

V.    SKAT paid the payment agents the money requested in the refund applications and the payment agents, in turn, paid the money to the defendant plans. ..................36

VI.    The money SKAT paid was then distributed to other participants in the schemes. ..........37

LEGAL STANDARD ..................................................................38

ARGUMENT ...................................................................................................................38

I.      SKAT is entitled to summary judgment on certain of its restitution claims.....................39

        A.      In the New York Solo bellwethers, SKAT is entitled to summary judgment
                on its claims for money had and received against certain defendants. .................39

                1.      The FCA's Final Notices are admissible for their truth...........................43

                2.      The Solo Custodians' records are admissible. ...........................................44

                        i.      The Solo Custodians' records are authentic..................................44

                        ii.     The Solo Custodians' records are not subject to the rule
                                against hearsay because SKAT does not offer them for their
                                truth. ...........................................................................................47

                        iii.    The Solo Custodians' records are admissible under the
                                business records exception to the rule against hearsay................48

        B.      In the Florida Solo bellwether, SKAT is entitled to summary judgment on
                its unjust enrichment claims...................................................................................51

        C.      In the Utah ED&F bellwethers, SKAT is entitled to summary judgment on
                its money had and received claims against certain defendants.............................54

                1.      There were no shares or dividends in the cum-ex transactions. ................55

                2.      The defendant plans were not the beneficial owners of any shares
                        or dividends..............................................................................................56

        D.      SKAT is entitled to prejudgment interest on its restitution claims.......................58

                1.      SKAT is entitled to prejudgment interest under New York law...............58

                2.      SKAT is entitled to prejudgment interest under Florida law....................59

                3.      SKAT is entitled to prejudgment interest under Utah law........................60

II.     SKAT is entitled to partial summary judgment on the false statement element of
        its fraud and negligent misrepresentation claims..............................................................61

CONCLUSION.................................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112 (2d Cir. 1984) ...........................................................................................39

*Ace Investors, LLC v. Rubin*, No. 2:08-CV-289 TS, 2009 WL 1684482 (D. Utah Jun. 26, 2009) .......................................................................................53

*Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269 (S.D. Fla. 2013) ...........................52

*Aetna Cas. & Surety Co. v. LFO Constr. Corp.*, 207 A.D.2d 274 (1st Dep't 1994) ....................42

*Allegis Inv. Servs., LLC v. Arthur J. Gallagher & Co.*, 371 F. Supp. 3d 983 (D. Utah 2019) ...................................................................................61

*Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548 (D. Utah Nov. 30, 2007) ...........................................................53

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) .......................................37

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98 (2d Cir. 2012) ....................................38

*Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212 (Fla. 1985) .............................................59

*Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ...........................48

*Baggett v. Electricians Local 915 Credit Union*, 620 So.2d 784 (Fla. Dist. Ct. App. 1993) ..................................................................................61

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) .................................................40, 41

*Barry v. Hialeah Miami Springs Med. Fund*, 184 B.R. 611 (S.D. Fla. 1995) ..............................53

*Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist. v. Rettaliata*, 78 N.Y.2d 128 (1991) ........................................................................................39

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S. Ct. 439 (1988) .........................................43

*Belda v. Doerfler*, No. 14-cv-941 (AJN), 2015 WL 5737320 (S.D.N.Y. Sep. 30, 2015) ........................................................................................40

*Bivens v. Salt Lake City Corp.*, 416 P.3d 338 (Utah 2017) ...........................................................54

*Blecker v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 605 B.R. 570
(S.D.N.Y. 2019) ........................................................................................50

*Casciani v. Nesbitt*, 392 F. App'x 887 (2d Cir. 2010) ....................................55

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ......................48, 49

*Cohen v. Koenig*, 918 F. Supp. 719 (S.D.N.Y. 1996) ....................................62

*Commerce P'ship 8098 Ltd P'ship v. Equity Contracting Co.*, 695 So.2d 383 (Fla.
Dist. Ct. App. 1997) .................................................................................51

*Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777 (2012) ...............................40

*Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*, 781 F.3d 1262 (11th Cir. 2015) ..................46

*In re Customs and Tax Administration of the Kingdom of Denmark (SKAT) Tax
Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2021 WL 2689908 (S.D.N.Y.
Jun. 30, 2021) .......................................................................................41

*D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998) .............................38

*Davis v. Costa-Gavras*, 580 F. Supp. 1082 (S.D.N.Y. 1984) ..........................38

*Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689 (Fla. Dist.
Ct. App. 2018) .......................................................................................51

*Eighteen Holding Corp. v. Drizin*, 268 A.D.2d 371 (1st Dep't 2000) ...................58

*Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074 (10th Cir. 1999) ................56

*Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 210 P.3d 263 (Utah 2009) .............60

*Equilease Corp. v. Hentz*, 634 F.2d 850 (5th Cir. 1981) ...............................52

*Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009) ................60

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611 (2d
Cir. 2010) ...........................................................................................40

*Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325 (2d Cir.
2005) .................................................................................................39

*Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359 (S.D. Fla. 2014) .........................51

*Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966 (Utah 2009) .......................60

*Grabe v. Ziff Davis Publ'g Co.*, No. 91 Civ. 6275 (DLC), 1995 WL 688912
(S.D.N.Y. Nov. 20, 1995) ...........................................................................38

*GRB Enterprises LLC v. JPMorgan Chase Bank, N.A.*, No. 2:11CV833DAK, 2012 WL 845418 (D. Utah Mar. 12, 2012) ............................................................56

*Hall v. Humana Hosp. Daytona Beach*, 686 So.2d 653 (Fla. Dist. Ct. App. 1996) ....................51

*Hann v. Culver*, 73 Hun 109 (1st Dep't 1893) ..............................................................40

*Helper State Bank v. Crus*, 61 P.2d 318 (Utah 1936) .............................................53, 54

*Hudson View II Assocs. v. Gooden*, 222 A.D.2d 163 (1st Dep't 1996) ..........................40

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8 (2d Cir. 2000) ...................61

*Innerlight, Inc. v. Matrix Grp., LLC*, 214 P.3d 854 (Utah 2009) ..................................56

*Isaacs v. Incentive Systems, Inc.*, 52 A.D.2d 550 (1st Dep't 1976) ..............................58

*Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000 (Utah 2015) .....................54

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000) .........................................................40

*Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356 (S.D. Fla. 2010) .......51

*Lance v. Wade*, 457 So.2d 1008 (Fla. 1984) ...............................................................60

*Lefavi v. Bertoch*, 994 P.2d 817 (Utah Ct. App. 2000) ...............................................60

*M.I. Indus. USA Inc. v. Attorneys' Title Ins. Fund, Inc.*, 6 So.3d 627 (Fla. Dist. Ct. App. 2009) .................................................................................................................51

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986) ............................................................................................................37

*McDermott v. City of New York*, 50 N.Y.2d 211 (1980) ..............................................39

*Mfrs. Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113 (1st Dep't 1990) ...........42

*Miller v. Doniger*, 293 A.D.2d 282 (1st Dep't 2002) ..................................................40

*Estate of Miller v. Thrifty Rent-A-Car Sys., Inc.*, 609 F. Supp. 2d 1235 (M.D. Fla. 2009) .....................................................................................................................51

*Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So.2d 180 (Fla. Dist. Ct. App. 2004) ............................................................................................................59

*Moore Handley, Inc. v. Major Realty Corp.*, 340 So.2d 1238 (Fla. Dist. Ct. App. 1976) .....................................................................................................................52

*Mopex, Inc. v. Am. Stock Exchange, LLC*, No. 02 Civ. 1656 (SAS), 2002 WL 342522 (S.D.N.Y. Mar. 5, 2002) ............................................................38

*In re Parmalat Secs. Litig.*, 477 F. Supp. 2d 637 (S.D.N.Y. 2007) ......................................43

*Parsa v. State of New York*, 64 N.Y.2d 143 (1984) ........................................................39

*People v. Duggan*, 30 A.D.2d 736 (3d Dep't 1968) ........................................................42

*In re Refco Inc. Sec. Litig.*, No. 07-md-1902 (JSR), 2013 WL 12191844 (S.D.N.Y. Mar. 25, 2013) ............................................................................61

*Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011 (2d Cir. 1987).....................................48

*Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648 (2d Cir. 1999) ........................................58

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) ..........................................................37

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 592 B.R. 513 (Bankr. S.D.N.Y. 2018) ............................................46

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Sec. LLC (In re Bernard L. Madoff)*, 528 F. Supp. 3d 219 (S.D.N.Y. 2021)............................................48

*Sharp v. Bowling*, 511 So.2d 363 (Fla. Dist. Ct. App. 1987)..........................................53

*Silverman v. Pitterman*, 574 So.2d 275 (Fla. Dist. Ct. App. 1991) ................................62

*Simonds v. Simonds*, 45 N.Y.2d 233 (1978) ..............................................................42

*In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300 (S.D.N.Y. 2019) ............................40

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717 (S.D.N.Y. 2003)..........................................................................38

*U.S. v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ..........................................................44

*U.S. v. Ganias*, 824 F.3d 199 (2d Cir. 2016) ............................................................44

*U.S. Fire Ins. Co. v. Federal Ins. Co.*, 858 F.2d 882 (2d Cir. 1988) ..............................59

*U.S. v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) ............................................................48

*U.S. v. Sliker*, 751 F.2d 477 (2d Cir. 1984)..............................................................47

*Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359 (S.D. Fla. 2015)..........................................................................................52

*Williamson v. Stallone*, 28 Misc.3d 738 (Sup. Ct. N.Y. Cty. 2010) ................................42

**Statutes and Rules**

28 U.S.C. § 1391(b) ...................................................................................................38

28 U.S.C. § 1404(a) ...................................................................................................38

28 U.S.C. § 1961(a) ...................................................................................................60

CPLR § 5001(a) ....................................................................................................58, 59

CPLR § 5001(b) .........................................................................................................58

CPLR § 5004 ..............................................................................................................58

Fed R. Civ. P. 56(a) ...................................................................................................37

Fed. R. Evid. 803(6) ..............................................................................................47, 48

Fed. R. Evid. 803(8)(A)(iii) .......................................................................................43

Fed. R. Evid. 901 .......................................................................................................44

Fed. R. Evid. 901(a) ...................................................................................................44

Fed. R. Evid. 901(b)(4) ..............................................................................................44

Fla Stat. Ann. § 687.01 ..............................................................................................59

Fla Stat. Ann. § 55.03 ................................................................................................59

Utah Stat. Ann. § 15-1-4(3)(a) ...................................................................................60

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in support of its motion for partial summary judgment on (i) its money had and received claims against certain defendants in the New York Solo bellwethers; (ii) its unjust enrichment claims against the defendants in the Florida Solo bellwether; (iii) its money had and received claims against certain defendants in the Utah ED&F bellwethers; and (iv) the material misrepresentation of fact element of its fraud and negligent misrepresentation claims in all the bellwethers.[1]

## PRELIMINARY STATEMENT

The seven bellwether plans sent SKAT applications for tax refunds based on statements from the Solo Custodians or ED&F, representing that the plans were the beneficial owners of Danish shares, had received dividends from which tax had been withheld, and were therefore entitled to be refunded the tax. Almost seven years after the scheme started to unravel and more than four years after SKAT began filing claims in this Court, there is no genuine issue of material fact that the defendant plans had no Danish shares and that their representations were therefore false.

Take the Solo bellwether defendants to start with. If the Solo Custodians had custodied many billions of dollars' worth of shares in large Danish public companies, evidence of these holdings would not be hard to find. Yet, the records of the Solo Custodians contain no evidence

---

1. In its Pretrial Order No. 29, the Court ordered that summary judgment in this multi-district litigation proceed on the basis of seven bellwether cases selected by the parties: (i) five where the defendants used Solo Capital Partners LLP ("Solo"), Telesto Markets LLP ("Telesto"), Old Park Lane Capital PLC ("Old Park Lane"), or West Point Derivatives Ltd. ("West Point Derivatives," and collectively with the others, the "Solo Custodians") as their purported custodian, including one where they used Solo in 2012 or 2013 and four where they used one or more of them in 2014 or 2015; and (ii) two where defendants used ED&F Man Capital Markets Limited ("ED&F") as their purported custodian, including one where the tax refund applications at issue included at least one of the so-called Annex E tax vouchers that ED&F has admitted were false and one where the applications included a non-Annex E tax voucher. (Pretrial Order No. 19, §§ 2.1, 2.2(a)-(d), ECF No. 675 (unless otherwise indicated, citations to the docket are to case no. 18-md-2865).) Of the five Solo custodian bellwether cases the parties selected, four were originally filed in this Court (the "New York Solo bellwethers") and one was transferred to this Court from the Southern District of Florida (the "Florida Solo bellwether," and together with the New York Solo bellwethers, the "Solo bellwethers"). The two ED&F bellwethers the parties chose were both transferred to this Court from the District of Utah (the "Utah ED&F bellwethers").

of Danish shares being custodied.  The Solo Custodians and their owner, Sanjay Shah, would know where they kept these massive, purported holdings.  At one time or another, Shah claimed that the Solo Custodians custodied their Danish shares at JPMorgan Chase or Skandinaviska Enskilda Banken ("SEB").  But both banks have confirmed that the accounts that they maintained for the Solo Custodians did not contain any Danish shares.

Discovery has also revealed that the purported trades orchestrated by the Solo Custodians were merely circular, paper transactions that featured no delivery of Danish shares and no payment of cash to acquire shares.  The plans (which had no shares and no money to buy the shares) purported to buy shares from sellers who purportedly obtained the shares by borrowing them from the plans (which, again, had no shares to start with).  Thus, the U.K. Financial Conduct Authority ("FCA"), which regulated the Solo Custodians, has found "no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group".[2]  The FCA found that the purported trading was a "circular pattern of extremely high value . . . equity trading, back-to-back securities lending arrangements and forward transactions," the purpose of which was to generate the false custodian statements that the plans submitted to SKAT.[3]  Indeed, the FCA noted that the absence of evidence of ownership of shares "coupled with the high volume of shares purported to have been traded, is highly suggestive of sophisticated financial crime."[4]

There is no genuine dispute that the Solo bellwether plans neither owned the shares nor received the dividends that they claimed to own, and that their representations to the contrary

---

2. Declaration of Marc A. Weinstein, dated Apr. 29, 2022 ("Weinstein Decl."), Ex. 76 (FCA Final Notice to Sapien Capital Limited, dated May 6, 2021 ("Sapien Notice")) ¶ 2.10 (explaining why it referred to the Solo trading as "purported" in connection with its imposition of a penalty on Sapien Capital Limited, which acted as a purported broker for certain purported Solo trades).

3. *Id.* ¶¶ 2.5, 2.9.

4. *Id.* ¶ 2.10.

were therefore false.  On this record, SKAT seeks partial summary judgment to recover the money that defendants received from SKAT—money that in equity and good conscience belongs to Denmark and to which defendants have no entitlement.  In addition, to narrow the issues for trial to those in genuine dispute, SKAT also seeks summary judgment on one element—the false statement of material fact—of its fraud and negligent misrepresentation claims.

The record in the Utah ED&F bellwethers is also clear that the defendant plans in those cases were not the beneficial owners of any of the Danish shares or dividends identified in their refund applications.  Much like the fictitious Solo trades, the Utah ED&F bellwether defendant plans' trades were by value mostly cum-ex trades, a strategy where the settlement date is deliberately delayed and that the European Securities Market Association has concluded was designed to obtain multiple issuances of tax certificates and the consequent multiple refunds of taxes to multiple persons.  Most of the cum-ex trades are so-called "Annex E" trades, where ED&F concedes that the "seller" of supposedly cum dividend shares to the plans, ED&F's Dubai affiliate, never owned any dividends that it could convey to the plans, and so the tax vouchers are false.  Just as in the Solo loops, the ED&F-affiliated "seller" entered into short sales, which it purported to cover by purchasing the shares back from the plans.  The only difference between the Annex E cum-ex trades and the remaining ED&F cum-ex trades is that the "seller" was unaffiliated with ED&F: the structure of the trades, the volume of shares the plans supposedly purchased and the pricing of the trades was in essence identical to the Annex E trades, and no more conveyed a dividend to the defendant plans than the Annex E cum-ex trades did.  As if that were not sufficient, ED&F admits that it did not have enough shares to actually settle the cum-ex trades, so it recycled shares on which it had already issued tax vouchers to give the false impression that the trades were legitimate and the plans owned the shares reflected in the tax

3

vouchers.  As a result, ED&F never held any shares or received any dividends on the defendant

plans' behalf, and the plans' representations in the refund applications and ED&F's tax vouchers

stating otherwise were false.

Further, even assuming for purposes of this motion that the ED&F bellwether plans'

cum-ex trades and the smaller cum-cum trades did result in the plans receiving such shares and

actual dividends, there is no genuine dispute that the plans did not own them.  Under the terms of

the plans' agreements with ED&F, the plans agreed to cover their obligations to ED&F with

respect to its financing of their purported share purchases by transferring to ED&F upon receipt

all "right, title and interest" in any such shares or dividends.  Accordingly, contrary to the

representations in the refund applications and ED&F's tax vouchers, the plans had no ownership

interest in any such shares or dividends, and their statements to SKAT were false.

Accordingly, defendants' retention of the SKAT payments to which they have no

entitlement should not in equity and good conscience continue, and the money should be

returned to SKAT.  Finally, to the extent the Court grants SKAT partial summary judgment on

its restitution claims, SKAT is entitled to prejudgment interest on such amounts running from the

date it made each payment until the Court enters judgment.

## **BACKGROUND**

From 2018 to 2021, SKAT filed 177 actions in 11 federal district courts that are currently

consolidated before the Court for pretrial purposes in this multidistrict litigation, arising from

fraudulent dividend withholding tax refund applications that the defendant U.S. pension plans

and associated entities and individuals submitted to SKAT, the part of the Danish government

responsible for assessing and collecting taxes.

In accordance with the Court's Pretrial Order No. 29 directing that summary judgment in this multi-district litigation be based on bellwether cases, the parties selected the following seven bellwethers:

(i) *Skatteforvaltningen v. RJM Capital Pension Plan & Richard Markowitz*, No. 19-cv-01898, a case where defendants used Solo as purported custodian in 2013;

(ii) *Skatteforvaltningen v. Basalt Ventures LLC Roth 401(k) Plan, John van Merkensteijn, & Michael Ben-Jacob*, No. 19-cv-01866, a case where defendants used Old Park Lane as purported custodian in 2014 and Telesto in 2015;

(iii) *Skatteforvaltningen v. Roadcraft Technologies LLC Roth 401(k) Plan, Ronald Altbach, Michael Ben-Jacob, Robert Klugman, Richard Markowitz, RAK Investment Trust, & Routt Capital Trust*, No. 19-cv-01812, a case where defendants used Old Park Lane as purported custodian in 2014 and Solo in 2015;

(iv) *Skatteforvaltningen v. The FWC Capital LLC Pension Plan & Roger Lehman*, No. 18-cv-10098, a case where defendants used both Solo and Old Park Lane as purported custodians in 2015;

(v) *Skatteforvaltningen v. The Proper Pacific LLC 401K Plan & Doston Bradley*, No. 18-cv-04051, a case where defendants used both Old Park Lane and Telesto as purported custodians in 2015;

(vi) *Skatteforvaltningen v. American Investment Group of New York, L.P. Pension Plan, Robert Crema, Stacey Kaminer, & Acer Investment Group, LLC*, No. 18-cv-09841, a case where defendants used ED&F as purported custodian and the refund applications included at least one Annex E and one non-Annex E tax voucher; and

(vii) *Skatteforvaltningen v. Riverside Associates Defined Benefit Plan, David Schulman & Acer Investment Group, LLC*, No. 18-cv-09840, also a case where defendants used ED&F as purported custodian and the refund applications included at least one Annex E and one non-Annex E tax voucher.[5]

---

5. The New York Solo bellwethers comprise SKAT's actions involving the RJM Capital, Basalt Ventures, Roadcraft Technologies and Proper Pacific plans. The Florida Solo bellwether is SKAT's action involving the FWC Capital plan. And the two Utah ED&F bellwethers are SKAT's actions involving the American Investment Group of New York ("AIG") and Riverside Associates plans.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[6]

SKAT is the part of the Kingdom of Denmark responsible for collecting and assessing taxes, including issuing refunds to Danish taxpayers when due.  (Joint 56.1 ¶¶ 1-2, 34-36.)  In Denmark, when Danish companies issue dividends to their shareholders, 27 percent of the dividend is withheld and paid to SKAT.  (*Id.* ¶¶ 18-19.)  If a taxpayer is entitled to pay a lower tax rate or no tax at all on dividend income, such as under a tax treaty with another country, the taxpayer may apply to SKAT for a refund of the withheld tax.  (*Id.* ¶¶ 22-23.)  Such a tax treaty existed between the United States and Denmark during the relevant time, under which U.S. "pension funds," as described in the treaty, may be entitled to a full refund of tax withheld on Danish dividend income.[7]

During the relevant period from 2012 to 2015, Danish taxpayers could apply to SKAT for refunds of over-withheld tax on dividend income using SKAT's "Claim to Relief from Danish Dividend Tax" form.  (Joint 56.1 ¶ 23.)  Among other things, the claim form required a representation that the refund was being requested by, or on behalf of, the "beneficial owner" of the dividend and underlying Danish shares.  (*Id.* ¶ 25.)  SKAT also required that the claim form be accompanied by, among other things, documents from a third-party financial institution evidencing that the claimant owned the shares and received the dividend, net of the claimed withholding tax.  (*Id.* ¶ 31.)

---

6.   Pursuant to section 2.5 of Pretrial Order No. 29, on April 22, 2022, the parties filed their Joint Rule 56.1 Statement of Undisputed Material Facts in Support of Motions for Summary Judgment ("Joint 56.1," ECF No. 790.)  As the parties were not able to agree to all the undisputed facts material to its motion, pursuant to section 2.5 of Pretrial Order No. 29, SKAT, contemporaneously herewith, files its Supplemental Rule 56.1 Statement of Undisputed Material Facts ("SKAT's 56.1").

7.   Protocol Amending Tax Convention with Denmark, U.S.-Den., art. 10, ¶ 3(c), May 2, 2006, S. Treaty Doc. No. 109-19 (amending Convention and Protocol Between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, S. Treaty Doc. No. 106-12).

The U.S. pension plan defendants in the seven bellwethers each submitted to SKAT, through authorized agents, tax refund applications using SKAT's claim form that falsely represented that they were the beneficial owners of Danish shares, on which they received dividends, net of withholding tax, and that were accompanied by documents falsely stating as much, issued by one of the Solo Custodians or ED&F.  (*Id.* ¶¶ 172-203, 358-59, 367-68.)  Based on the false representations and documents in the refund applications, SKAT paid the defendant pension plans' authorized agents the amounts claimed, believing at the time that the defendant plans owned Danish shares and had received dividends on their shares, net of withholding tax, and so were entitled to a full refund of the supposedly withheld tax under the U.S.-Denmark tax treaty.  (*Id.* ¶¶ 204-06, 208-10, 212-14, 215-20, 376-78.)

## I.   The Solo bellwethers

In the five Solo bellwethers, all the defendants' tax refund applications included so-called "dividend credit advices" issued by one of the Solo Custodians stating that the defendant pension plan owned shares of stock in a publicly traded Danish company, on which it received a dividend, net of withholding tax.  (*Id.* ¶¶ 172-203.)[8]  At the times the Solo Custodians issued the dividend credit advices, each was controlled by the same person, Sanjay Shah.  (SKAT's 56.1 ¶ 3.)  There was no apparent reason to utilize four seemingly separate custodians other than to disguise the scheme by spreading the dividend credit advices among four different entities.

### A.   In 2012, Solo became a purported custodian and began executing a new so-called dividend arbitrage scheme involving Danish shares.

In 2012, Solo ostensibly became a custodian and began executing a new purported dividend arbitrage scheme involving Danish shares.  (*Id.* ¶ 34.)  In the financial industry, a

---

8.   Solo called these documents "dividend credit advices," while Old Park Lane and Telesto called them "income advices" and "credit advices," respectively.  For simplicity's sake, SKAT, as the parties do in the Joint 56.1, will refer to each as a "dividend credit advice," regardless of which Solo Custodian issued them, as the substance of each is the same and their name is immaterial to SKAT's motion.  (*See, e.g.*, *id.* ¶¶ 172, 183-84.)

custodian "is an institution (such as a bank) that holds securities, for safekeeping and clearing, on behalf of its customers," and "also arranges for the settlement and deliveries of any securities transactions and administers the collection of dividends."[9]

As part of the new dividend arbitrage scheme, U.S. pension plans opened securities trading accounts at Solo.  (Joint 56.1 ¶ 107.)  After a Danish company announced it would pay a dividend to its shareholders, on the day before the ex-dividend date, the plans purportedly purchased large amounts of shares in the Danish company from a broker identified by Solo in an over-the-counter trade.  (*Id.* ¶¶ 111-15; SKAT's 56.1 ¶ 35.)[10]  Solo did not require the pension plans to pay any money to buy the shares.  (Joint 56.1 ¶ 121-23.)  Instead, on the day before the payments were due, Solo purportedly arranged stock loan transactions that would provide the plans all the money to pay for the supposed shares.  (*Id*; SKAT's 56.1 ¶ 35.)[11]  Solo then issued the plans dividend credit advices stating that they owned the shares and received the dividends, net of withholding tax, and the plans provided that advice in their tax refund applications to SKAT.  (Joint 56.1 ¶¶ 126-27.)  The plans' transactions were later "unwound" through offsetting transactions.  (*Id.* ¶ 128.)

---

9.   Weinstein Decl. Ex. 89 (Expert Report of Bruce G. Dubinsky, dated Dec. 31, 2021 ("Dubinsky Report")) ¶ 132.

10.  The "ex-dividend date" is "the first day that a stock trades without a dividend right," *i.e.*, to receive the dividend, the share purchaser must, among other things, purchase before the ex-dividend date.  (Dubinsky Report ¶ 117.)

11.  Solo also arranged for the plans to enter into futures (for trades in 2012) or forward sale contracts (for trades after 2012) purportedly to hedge the risk of price fluctuations in the shares.  (Joint 56.1 ¶¶ 118-19.)  Because these hedging transactions do not bear on the issue of the plans' purported ownership of the equities at issue, or the receipt of any dividends net of withholding tax, SKAT does not otherwise address the circumstances of these transactions in its motion.

B.     **Solo and Sanjay Shah recruited defendants to establish U.S. pension plans for the new purported dividend arbitrage scheme.**

After Solo became a custodian, its owner Sanjay Shah and others recruited U.S. citizens, including defendants, to establish U.S. pension plans to participate in Solo's new purported dividend arbitrage scheme.

i.     *The Argre Plans, including defendant RJM Capital plan.*

In April 2012, Shah emailed defendant Richard Markowitz to ask if he had a U.S. pension plan that could be used for the new dividend arbitrage scheme.  (SKAT's 56.1 ¶ 32.) Subsequently, Markowitz and the three other principals in Argre Management LLC[12] established pension plans to participate in the strategy, including bellwether defendant RJM Capital plan, which Markowitz established on February 1, 2013.  (*Id.* ¶ 33; Joint 56.1 ¶ 79.)[13]  For these plans, Solo and the Argre principals agreed that for any refunds SKAT paid, Solo would get 66 percent and the Argre principals' plan would get 34 percent.  (SKAT's 56.1 ¶ 36.)

ii.     *The Post-Argre Kaye Scholer plans, including defendants Basalt Ventures and Roadcraft Technologies plans.*

By 2014, a dispute had arisen between the Argre principals.  (*Id.* ¶ 38.)  The split involved defendants Markowitz and van Merkensteijn, on one side, and the other two Argre principals Stein and Lhote, on the other.  (*Id.*)  Stein and Lhote used a German bank they had acquired to replace Solo as the purported custodian, while Markowitz and van Merkensteijn stuck with Sanjay Shah and Solo.  (*Id.*)

In addition, while defendant Robert Klugman had not participated directly in the Argre plans, in Spring 2014, Shah estimated that Klugman could make a million dollars per plan if he

---

12.   The four principals of Argre were defendants Markowitz and John van Merkensteijn and non-parties Mathew Stein and Jerome Lhote.  (*Id.* ¶ 31.)

13.   Markowitz was the sole participant in the RJM Capital plan.  (Joint 56.1 ¶ 79.)  RJM Capital plan's sponsor, RJM Capital LLC, was formed in 2007.  (*Id.*)

opened his own pension plans to participate in the scheme. (*Id.* ¶ 42.) Beginning in June and July 2014, and with the assistance of defendant Michael Ben-Jacob and others at Kaye Scholer LLP in establishing the majority of them, Markowitz, van Merkensteijn and Klugman collectively used 40 pension plans, most of them (including bellwether defendants Basalt Ventures and Roadcraft Technologies plans) newly formed, for the purpose of participating in the scheme. (*Id.* ¶ 39; Joint 56.1 ¶¶ 80-81.)[14] For some of the new plans, such as the Basalt Ventures plan, one of Markowitz, van Merkensteijn, or Klugman was the sole participant in the plan. (SKAT's 56.1 ¶ 40.)[15] For others, such as the Roadcraft Technologies plan, a family member or friend of Markowitz or van Merkensteijn, such as van Merkensteijn's friend defendant Ronald Altbach, was the sole participant in the plan. (SKAT's 56.1 ¶ 40.)[16]

With respect to the plans in which Markowitz or van Merkensteijn's family and friends were the beneficiaries, the plans entered into partnership agreements with trusts established by Markowitz, van Merkensteijn and Klugman, such as defendants RAK Investment Trust (Klugman's) and Routt Capital Trust (Markowitz's). (SKAT's 56.1 ¶ 40; Joint 56.1 ¶¶ 82-83.)[17] After paying Solo 75 percent of the refunds, the partnership arrangements provided that the remaining 25 percent would be split with 95 percent to be distributed to the Markowitz, van Merkensteijn and Klugman trusts, and only 5 percent (of the 25 percent) left for the plan.

---

14. For this new phase, Shah increased Solo's share of any refunds SKAT paid from 66 to 75 percent, leaving 25 percent for the plans. (SKAT's 56.1 ¶ 41.)

15. Defendant van Merkensteijn established the Basalt Ventures plan in July 2014, with himself as the sole participant in the plan. (Joint 56.1 ¶ 80.) Defendant van Merkensteijn formed the Basalt plan's sponsor, Basalt Ventures LLC, the month before in June 2014. (*Id.*)

16. Defendant Roadcraft Technologies plan was established in July 2014, with Altbach the sole participant in the plan. (Joint 56.1 ¶ 81.) The Roadcraft plan's sponsor, Roadcraft Technologies LLC, was formed the month before in June 2014. (*Id.*)

17. Defendant Routt Capital Trust was formed to hold the assets of non-bellwether defendant Routt Capital LLC Solo 401k Plan, in which Markowitz was the sole participant. (Joint 56.1 ¶ 82.) And defendant RAK Investment Trust was formed to hold the assets of non-bellwether defendant STOR Capital Consulting LLC 401K Plan, in which Klugman was the sole participant. (*Id.* ¶ 83.)

(SKAT's 56.1 ¶ 40.)  For instance, Roadcraft Technologies plan, RAK Investment Trust and Routt Capital Trust entered into such a partnership agreement under which the plan's share of the refunds were distributed 70 percent to Routt Trust (Markowitz), 25 percent to RAK Investment Trust (Klugman) and 5 percent to the Roadcraft Technologies plan (Altbach).  (Joint 56.1 ¶¶ 84-85.)

### iii.    Defendant Lehman's plans, including defendant FWC Capital plan.

Initially, defendant Roger Lehman's role in the scheme was to assist Solo clients, including acting as the authorized trader for other people's pension plans, *i.e.*, to coordinate on behalf of the plans the purported share purchases and the stock loans that supposedly financed them.  (SKAT's 56.1 ¶ 43.)  In 2013, Lehman established his own pension plan to participate directly in the scheme.  (*Id.* ¶ 44.)  According to Lehman, Sanjay Shah agreed to pay him $1 million for "introducing" the plan to Solo.  (*Id.* ¶ 45.)  The next year, in 2014, Lehman established four more pension plans, including bellwether defendant FWC Capital plan.  (*Id.* ¶ 46; Joint 56.1 ¶ 89.)[18]  According to Lehman, Sanjay Shah agreed to pay him $700,000 or $800,000 for each plan he "introduced" in 2014.  (SKAT's 56.1 ¶ 47.)

### iv.    Defendant Bradley's plans, including defendant Proper Pacific plan.

Defendant Doston Bradley first met Sanjay Shah in August 2013, when a work colleague invited him and some of their other colleagues to attend a presentation Shah made on Solo's purported dividend arbitrage scheme.  (*Id.* ¶ 48.)  By the fall 2013, Bradley established five pension plans, one for himself and one for his wife, sister, mother, and father.  (*Id.* ¶ 49.)  In 2014 and 2015, Bradley established fifteen more pension plans, five for himself, including bellwether defendant Proper Pacific plan, and five more for each of his wife and sister.  (*Id.*

---

18.  Defendant Lehman established defendant FWC Capital plan on October 22, 2014, with himself as the sole participant in the plan.  (Joint 56.1 ¶ 89.)  Lehman formed the FWC Capital plan's sponsoring company, FWC Capital LLC, the same month in October 2014.  (*Id.*)

¶ 50.)[19]  According to Bradley, he would be paid $100,000 per plan for "introducing" his five

plans to the Solo Custodians, and $500,000 per plan for "introducing" his wife and sister's ten

plans.  (SKAT's 56.1 ¶ 51.)

> C.    **The defendant plans entered into agreements with the Solo Custodians.**

To participate in the scheme, the defendant plans opened securities trading accounts with

at least one of the Solo Custodians.  (Joint 56.1 ¶¶ 107, 111-12, 124, 127-28.)  The Solo

Custodian ostensibly would provide securities clearing and custody services to the plan.  (*Id.*

¶ 112.)  Solo was the only Solo Custodian providing purported custody services to the plans in

2012 and 2013 and was the purported custodian for RJM Capital plan's purported 2014 trading.

(*Id.* ¶ 107.)  In 2014 and 2015, Sanjay Shah introduced the three other Solo Custodians, Old Park

Lane, Telesto, and West Point Derivatives, into the scheme, and FWC Capital and Roadcraft

Technologies plans used both Solo and Old Park Lane as purported custodians, and Proper

Pacific and Basalt Ventures plans used both Old Park Lane and Telesto.  (*Id.*)

> D.    **The Solo Custodians would have needed to hold Danish shares through a
> Danish sub-custodian, either directly or through other sub-custodians.**

In Denmark, VP Securities A/S is the central repository for all publicly traded shares of

Danish companies.  (SKAT's 56.1 ¶ 53.)  To hold Danish shares on behalf of their customers,

foreign custodians, such as the U.K.-based Solo Custodians, must do so through a sub-custodian

with an account at VP Securities, or a chain of sub-custodians, with the ultimate sub-custodian

having such an account.  (*Id.* ¶ 54.)  When a publicly traded Danish company issues a dividend

to its shareholders, VP Securities distributes the dividend (minus applicable withholding tax) to

its account holders who hold shares of the relevant stock.  (*Id.* ¶ 55.)  Where the VP Securities

---

19.  Defendant Bradley established defendant Proper Pacific plan in September 2014, with himself as the sole
participant in the plan.  (Joint 56.1 ¶ 90.)  Bradley formed defendant Proper Pacific plan's sponsoring company,
Pacific India LLC, the same month in September 2014.  (*Id.*)

account holder is acting as a sub-custodian, it distributes the dividend payment to the custodian that holds the shares on behalf of the investor, or the dividend is distributed to that custodian through the chain of sub-custodians.  (*Id.* ¶ 56.)

### E.    The Solo Custodians did not hold any Danish shares or receive any dividends on such shares.

While the Solo Custodians issued dividend credit advices and account statements and the brokers issued trade confirmations[20] to the defendant plans purporting to show that the plans bought the shares and received the dividends identified in their refund applications, the undisputed evidence shows that the Solo Custodians never held any such shares or received any such dividends.  To determine whether any such shares or dividends existed, SKAT retained Bruce Dubinsky, an expert in the areas of forensic accounting and fraud investigations, to examine the Solo Custodians' records and other materials produced in discovery.[21]

Mr. Dubinsky's examination revealed no evidence whatsoever that the Solo Custodians held any Danish shares or received any dividends at any sub-custodian.  (SKAT's 56.1 ¶¶ 7-9.) In SKAT's English action against Solo, Sanjay Shah stated, and verified in a "Statement of Truth," that Solo had a sub-custodian arrangement with JPMorgan Chase from August 2012 to October 2013, and with SEB from July 2013 to April 2014.  (*Id.* ¶ 3.)  In addition, in response to a letter rogatory issued by this Court, the Solo Custodians' insolvency administrators produced a

---

20. While brokers in the market can perform executing, clearing, and/or settlement services, the role of the brokers in this scheme was limited to "executing" the trade, which means merely that the broker purportedly matched a buyer and a seller (in reality, Solo performed that role as well).  (Joint 56.1 ¶ 112; SKAT's 56.1 ¶ 35.)  Thus, although the brokers issued "trade confirmations", the brokers had no role in clearing or settling any of the purported trades, and thus the broker "trade confirmations" are not evidence that any shares were ever delivered to any defendant plan.

21. To conduct his review, in addition to the Solo Custodian account statements and other purported trading records produced by defendants, Mr. Dubinsky had access to over ten million documents seized, pursuant to an order issued by the Dubai International Financial Centre court, from Elysium Global (Dubai) Limited and Elysium Properties Limited, two entities also controlled by Shah, which were produced in this litigation.  (*Id.* ¶ 9; *see also* Order Granting SKAT's Consent Mot., ECF No. 286.)  Mr. Dubinsky also had access to statements for Solo's account at the Zurich Branch of Société Générale S.A. and sworn affidavits from representatives of JPMorgan Chase and SEB produced in response to letters rogatory issued by the Court.  (SKAT's 56.1 ¶ 7.)

March 2016 letter from Solo's legal counsel Reed Smith LLP to the U.K. FCA stating that the Zurich Branch of Société Générale was the only sub-custodian that the Solo Custodians used for Danish shares from January 2014 to August 2015.  (*Id.* ¶ 4.)

None of JPMorgan Chase, SEB, or Société Générale held any such shares.  (Joint 56.1 ¶¶ 221-26; SKAT's 56.1 ¶¶ 5-7.)  Mr. Dubinsky reviewed the full set of statements for Solo's account at the Zurich Branch of Société Générale and concluded that they showed no Danish stock holdings.  (SKAT's 56.1 ¶ 7.)  And JPMorgan and SEB both provided sworn affidavits attesting that they reviewed their account records and found no evidence that they held any Danish shares on behalf of any of the Solo Custodians.  (*Id.* ¶ 6.)[22]

Further, in searching the over ten million documents seized from the Elysium companies, Mr. Dubinsky found none of the contemporaneous records one would expect to find if the Solo Custodians did in fact hold the shares or receive the dividends identified in the dividend credit advices at a sub-custodian.  (SKAT's 56.1 ¶ 9.)  For instance, there were no (i) account statements from any such sub-custodian reflecting Danish equities holdings; (ii) confirmations of shares or money being delivered or received around the relevant dates of the trading or dividend payments; or (iii) email communications between the Solo Custodians and any sub-custodian concerning Danish shares or dividends.  (*Id.*)  Nor did Mr. Dubinsky find any internal records from the Solo Custodians evidencing the shares or dividends, such as ledgers or spreadsheets tracking the Solo Custodians' shareholdings or dividend receipts at any sub-custodian.  (*Id.*)[23]

---

22. Neither the Solo bellwether defendants nor their experts have identified any other sub-custodian where the Solo Custodians supposedly held Danish shares or received Danish dividends.  Nor does defendants' expert Dr. Emre Carr, who defendants retained to rebut Mr. Dubinsky, contest Mr. Dubinsky's conclusion that none of the three identified sub-custodians held any Danish shares or received any dividends on such shares on behalf of the Solo Custodians.  (Weinstein Decl. Ex. 105 (Rebuttal Report of Emre Carr, dated Feb. 1, 2022 ("Carr Rebuttal Report")), ¶¶ 109-14.)

23. This stands in contrast to records concerning the defendant plans' purported trading and distribution of the money SKAT paid, of which Mr. Dubinsky found plenty.  (*Id.*)

14

F.      **According to the Solo Custodians' own records, the defendant plans' purported share purchases were part of a series of fictitious, circular transactions that would not have resulted in any shares or dividends.**

According to the Solo Custodians' own records, the defendant plans' purported trading in Danish shares were part of a series of fictitious, circular transactions that would not have resulted in the Solo Custodians holding any shares or receiving any dividends on the plans' behalf.  In particular, the Solo Custodians' records show that, in every instance, the plans purportedly bought the Danish shares from an ultimate "seller" that did not have the shares and obtained them only by borrowing the same shares from the pension plan itself, with brokers and supposed stock lenders interspersed in between, all of which were customers of the same Solo Custodian.  (SKAT's 56.1 ¶¶ 10-23, Appendices A-I.)

According to Solo's records, from August 2012 to December 2013, the circular transactions all involved the same four steps, in which shares and money moved in opposite directions around a circle among the pension plan, broker, seller and stock lender, none of whom had any shares or money in the first place, and none of whom went into the open market (*i.e.*, outside the Solo bubble) to obtain actual shares.  (*Id.* ¶¶ 10-11, Appendix A.)  First, on the day before the relevant ex-dividend date, the defendant pension plan agreed to buy from a broker introduced by Solo shares of stock in a Danish company that had announced that it would issue a dividend.  (*See, e.g.*, SKAT's 56.1 ¶ 10; Joint 56.1 ¶¶ 111-17.)  Second, on the same day, the "seller" agreed to sell the same shares, in the same quantity, at the same price and with the same settlement date, to the same broker.  (*See, e.g.*, SKAT's 56.1 ¶ 10.)  Third, as the seller did not have the shares it agreed to sell the broker, it entered into an agreement with a "stock lender," with the same settlement date as the trades in the first two steps, to borrow the shares and post as collateral the money it stood to receive from its sale to the broker.  (*See, e.g.*, *id.* ¶ 10.)  Finally, as the defendant pension plan did not have the money to purchase the shares, it also entered into

an agreement with the same stock lender, with the same settlement date, to lend the shares it

agreed to buy from the broker in exchange for the amount it agreed to pay the broker for the

shares.  (*See, e.g.*, *id.* ¶ 10; Joint 56.1 ¶¶ 121-23.)

The Solo Custodians issued documents, including emails and invoices, approving and

confirming the plans' purported purchases and the short-sellers' purported sale of the same

shares to the intermediary broker, issued stock loan confirmations to the stock loan

counterparties, entered these purported transactions in its books, as reflected in account

statements and spreadsheets of the purported trading, and issued the plans a dividend credit

advice stating that the plans received dividend payments on the shares, net of withholding tax,

even though Solo did not hold any shares or receive any dividends on the plans' behalf.  (Joint

56.1 ¶¶ 111, 121, 124-28; SKAT's 56.1 ¶¶ 10-23, Appendices A-I.)

To illustrate one such circular trade in the name of defendant RJM Capital plan,

according to Solo's records and broker trade confirmations:

> (i) on April 11, 2013, the RJM Capital plan purchased 10,400 shares of Møller-Maersk A/S-B at DKK 43,680.2893 per share, for a total purchase price of DKK 454,275,008.72, through the broker FGC Securities LLC, with a settlement date of April 17, 2013;

> (ii) on the same day, FGC, as broker, purchased 10,400 Møller-Maersk shares at the same price and with the same settlement date from D.D.C. Cayman Limited, the ultimate "seller;"

> (iii) since D.D.C. Cayman did not have the shares it agreed to sell the broker, on April 16, 2013, it agreed to borrow the 10,400 Møller-Maersk shares from supposed stock lender Colbrook Limited, with an April 17, 2013 settlement date, in exchange for the DKK 454,275,008.72 it was due to receive from its sale to the broker; and

> (iv) to fund its purported share purchase, also on April 16, 2013, the RJM Capital plan agreed with Colbrook to loan the 10,400 Møller-Maersk shares on the same settlement date in exchange for the DKK 454,275,008.72 purchase price of its trade through FGC.

(*Id.* ¶ 10.)  The below graphic shows the circularity of these purported trades:



MAERSKB Trades in April 2013

Solo's records make plain that D.D.C. Cayman, the purported seller, itself never owned shares in Møller-Maersk to sell and did not go out into the market to obtain any shares. (*Id.* ¶ 10.) Nevertheless, Solo issued its dividend credit advice falsely stating that the RJM Capital plan received a DKK 9,110,400 dividend, net of withholding tax, on 10,400 Møller Maersk shares even though Solo did not hold any such shares or receive any such dividend on the RJM Capital plan's behalf (or, for that matter, on the purported seller's behalf at any time prior to the purported settlement of this trade), and the RJM Capital plan never suffered any withholding tax. (Joint 56.1 ¶ 177.)

Beginning in March 2014, an extra broker and stock lender were added for no apparent purpose other than to increase complexity. (SKAT's 56.1 ¶¶ 11-23, Appendices B-I.)[24]  The

---

[24.] Mr. Dubinsky reviewed the defendants' productions and Solo Custodians' purported trading records and confirmed that all the defendant plans' purported share purchases were part of circular transactions with one of these two structures, depending on whether they were from before or after March 2014. (*Id.* ¶ 9.)

more complex structure followed the same form, except with an additional broker and stock lender interposed between the defendant pension plan buyer and the seller, but still did not result in the Solo Custodian holding any shares or receiving any dividends on the plans' behalf.  (*Id.* ¶¶ 9, 11-23, Appendices B-I.)

> ### G.  The U.K. Financial Conduct Authority concluded that the defendant plans' purported trading was fictitious, and the Solo Custodians never held any shares or received any dividends on behalf of the plans.

In Final Notices issued on May 6 and November 12, 2021, respectively, the FCA imposed monetary fines on Sapien Capital Limited and Sunrise Brokers LLP, two of the brokers involved in the Solo trading loops, for their participation in circular trading in 2015.  (SKAT's 56.1 ¶ 2; *see generally* Sapien Notice; Weinstein Decl. Ex. 75 (Final Notice to Sunrise Brokers LLP, dated Nov. 12, 2021 ("Sunrise Notice")).)[25]  The FCA's "investigation[s] and conclusions" set forth in the Final Notices were "based on a range of information including, in part, analysis of transaction reporting data, material received from Sapien [or Sunrise], the Solo Group, and five other Broker Firms that participated in the Solo Trading."  (Sapien Notice ¶ 2.7; *see also* Sunrise Notice ¶ 2.7.)[26]

In the course of its investigations, the FCA "found no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group."  (Sapien Notice ¶ 2.10; *see also* Sunrise Notice ¶ 2.10.)  Thus, throughout the Final Notices, the FCA "refer[red] to the trading as 'purported.'"  (*Id.*)  In particular, the FCA found,

---

25.  Sapien was a broker for one set of circular trades involving defendant Basalt Ventures plan, and Sunrise was a broker for 25 sets of circular trades involving one of defendants Basalt Ventures, Roadcraft Technologies, FWC Capital or Proper Pacific plans.  (*See, e.g.*, SKAT's 56.1 Appendix B (rows 1 & 14).)

26.  The FCA's Final Notices defined the "Solo Group" as the Solo Custodians, *i.e.* "the four authorised firms owned by Sanjay Shah:" Solo, West Point Derivatives, Old Park Lane and Telesto.  (Sapien Notice ¶¶ 3.1, 4.3; Sunrise Notice ¶¶ 3.1, 4.3.)  And the Notices define the "Solo Trading" as the "purported Cum-Dividend Trading and the purported Unwind Trading executed for Solo Clients during the Relevant Period," defined as February 10, 2015 to November 10, 2015.  (Sapien Notice ¶ 3.1; Sunrise Notice ¶ 3.1.)

the "Solo Trading was characterised by a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions, involving EU equities," including Danish shares, "on or around the last day of cum-dividend."  (Sapien Notice ¶ 2.5; *see also* Sunrise Notice ¶ 2.5.)  The FCA "considered" the "combined volume" of the purported Danish trading, representing "between 15%-61% of the shares outstanding in the Danish stocks," "implausible."  (Sapien Notice ¶ 2.7; *see also* Sunrise Notice ¶ 2.7.)  "The purpose of the purported trading," the FCA concluded, "was so the Solo Group could arrange for Dividend Credit Advice Slips ('DCAs') to be created, which purported to show that the Solo Clients held the relevant shares on the record date of the dividend."  (Sapien Notice ¶ 2.9; *see also* Sunrise Notice ¶ 2.9.)  The stock loans and forwards, the FCA found, were "likely" just "used to obfuscate and/or give apparent legitimacy to the overall scheme."  (Sapien Notice ¶ 2.8; *see also* Sunrise Notice ¶ 2.8.)[27]

### H. The Solo Custodians' legal counsel informed the FCA that the Solo Custodians did not receive any of the dividends identified in the dividend credit advices.

All of the purported dividends identified in the dividend credit advices that the Solo Custodians issued the defendant plans were cash dividends, payable in Danish Kroner.  (Joint 56.1 ¶¶ 172-203.)  In a March 11, 2016 letter in reference to "FCA INVESTIGATION – Solo Capital Partners LLP ('Solo'), West Point Derivatives Ltd., Old Park Lane Capital Ltd, Telesto Markets LLP ('Firms')," the Solo Custodians' legal counsel Reed Smith LLP informed the FCA that the Solo Custodians received no such cash dividends on Danish shares.  (SKAT's 56.1 ¶ 4; Weinstein Decl. Ex. 113 at 3.)  Reed Smith's letter, among other things, provided the FCA "[c]larification as to whether or not the Firms receive[d] dividends paid on securities in

---

27.  The Solo Custodians themselves were placed in insolvency proceedings in England in 2016.  (Sapien Notice ¶ 4.4; *see also* Sunrise Notice ¶ 4.4.)

connection with the clearing and settlement services they perform[ed]." (Weinstein Decl. Ex.113 at 3.) As the letter recounted, the Solo Custodians' dividend credit advices purportedly "confirm that a dividend entitlement has been credited to the clients account," but "do not state that cash has been received." (*Id.*) The reason for this, Reed Smith explained, "is that the Firms did not receive dividends on Danish securities in cash." (*Id.*)

Reed Smith's statements to the FCA are consistent with Mr. Dubinsky's findings for the entire relevant period. Mr. Dubinsky analyzed the Solo Custodians' bank statements for the relevant period and found no deposits consistent with the receipt of any Danish dividends on or around the relevant payment dates for such dividends. (SKAT's 56.1 ¶ 8.) By contrast, the same Solo Custodians' bank account statements evidenced the receipt of SKAT's payments through the payment agents on or around the relevant dates that such payments were made. (*Id.*)

## II.    The Utah ED&F bellwethers.

In the two Utah ED&F bellwethers, defendants AIG and Riverside plans' tax refund applications included so-called "tax vouchers" issued by ED&F stating that the defendant pension plan owned shares of stock in a publicly traded Danish company over the relevant "dividend date," received the dividend, net of withholding tax, and that ED&F had "no beneficial interest in the [defendant plan's] holding" described therein. (Joint 56.1 ¶¶ 323-45, 356-59, 367-68.)[28] Defendant Robert Crema was the sole participant in the AIG plan, for which defendants Crema and Stacey Kaminer served as co-trustees. (Joint 56.1 ¶¶ 251, 254-55.) Defendant David Schulman was the sole participant in, and trustee of, the Riverside plan. (*Id.* ¶¶ 262, 265.)

---

28. Cover letters for the defendant plans' tax refund applications characterized these tax vouchers as purported "evidence of payment and tax deduction paid on the [plan's] securities." (SKAT's 56.1 ¶¶ 124(a), 128(a).)

A. **The defendant plans participated in a purported dividend arbitrage scheme involving Danish shares in which ED&F served as custodian and provided the plans with financing.**

Both defendant AIG and Riverside plans ostensibly purchased large amounts of Danish shares through securities trading accounts they held at ED&F, which provided clearing and custody services to the plans for the purpose of the supposed dividend arbitrage scheme, and simultaneously entered into futures sales or other hedge transactions of the shares they supposedly purchased. (*Id.* ¶¶ 270-75, 317-19.) The defendant plans did not have the money to buy the Danish shares, and in fact often had negative balances in their accounts at ED&F. (*Id.* ¶¶ 348-49; SKAT's 56.1 ¶ 119.) Instead, the plans purportedly paid for them using financing made available by ED&F. (Joint 56.1 ¶¶ 348-49.) In exchange for facilitating the plans' purported dividend arbitrage scheme, the plans also agreed to pay ED&F a "transaction" fee for each set of trades, contingent on SKAT's payment of the purported refund, which was generally 90 to 95 percent of the net profit on the transaction. (Joint 56.1 ¶¶ 383-85; SKAT's 56.1 ¶ 130.)

B. **Defendant Acer served as investment advisor to the defendant plans.**

Defendant Acer Investment Group, LLC, a U.S. registered broker-dealer the two principals of which were defendants Kaminer and Crema, served as investment advisor for the AIG and Riverside plans. (Joint 56.1 ¶¶ 283, 285-290; SKAT's 56.1 ¶ 63.) Through powers of attorney, the defendant plans granted Acer authority to act as the plans' representative and agent with respect to ED&F. (Joint 56.1 ¶¶ 286-290.) Pursuant to these powers of attorney, Acer coordinated the plans' purported trading in Danish shares with ED&F. (*Id.* ¶¶ 318-22.) In exchange, Acer and ED&F agreed that from ED&F's "transaction fee," Acer would receive 4 to 38 percent of any purported tax refunds paid by SKAT, supposedly as a "dividend finder's fee," even though Acer did not "find" any of the dividends the plans purportedly received. (SKAT's 56.1 ¶ 134.) Rather, defendant Crema admitted that the payments to Acer were really "pension

21

plan finder fees" for identifying US pension plans willing to lend their tax status and name to the

transactions.  (*Id.* ¶ 135.)

> **C.**     **Under their agreements with ED&F, the plans transferred to ED&F all right, title and interest in shares the plans purchased using financing provided by ED&F.**

Defendant AIG and Riverside plans' rights and interests in any Danish shareholdings and

money held in their ED&F securities accounts were governed by a series of agreements between

the plans and ED&F, including ED&F's "Terms and Conditions of Business."  (Joint 56.1

¶¶ 276-78.)  Under those agreements, the plans transferred to ED&F all right, title and interest in

any purported Danish shares (and any purported dividends supposedly issued thereon) the plans

bought with ED&F's financing.  In particular, the "absolute title transfer" provision in section

10(b)(ii) of the Terms and Conditions of Business provided that:

> "all assets, whether cash or financial instruments, received by [ED&F] either from [the plan] or in respect of [its] account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to [ED&F], and all right, title and interest in and to such assets will pass to [ED&F] outright and absolutely for the purposes of covering [the plan's] obligations to [ED&F]."

(Weinstein Decl. Ex. 171 (Terms and Conditions of Business) at 18.)  Further, section

10(c) provided that:

> "[t]he effects of absolute title transfer under paragraph (b)(ii) above are as follows: i. the relevant assets cease to be [the plans'] assets and [the plan] will no longer have a proprietary claim over them.  They will not be held subject to the rules of the FSA in safe custody (where they are financial instruments) or subject to client money protection (where they are cash).  The assets become [ED&F's] assets and [ED&F] can deal with them in [its] own right; ii. [the plan] will have (subject to the limitations described in paragraph (b)(ii) above) an unsecured contractual claim against [ED&F] for re-transfer of equivalent assets; and iii. as a result, the assets will not be subject to a trust or otherwise isolated in [ED&F's] insolvency and in such event, [the plan] may not receive back everything so transferred to [ED&F] and [the plan] will only rank as a general creditor."

(*Id.* at 18-19.)

**D.** **The defendant plans purportedly purchased Danish shares in so called "cum-cum" and "cum-ex" trades.**

As part of the dividend arbitrage scheme, the AIG and Riverside plans purportedly purchased Danish shares from brokers identified by, and in many cases affiliated with, ED&F in a series of off-exchange, over-the-counter trades shortly after the Danish company announced a dividend, some of which were so-called "cum-cum" trades, but the majority of which, by value, were so-called "cum-ex" trades executed on non-standard terms.  (Joint 56.1 ¶ 317; SKAT's 56.1 ¶¶ 87-88.)  In the cum-cum trades, the timing of both the trade date and settlement date entitled the defendant plan to receive the dividend from the issuer of the shares, *i.e.*, both were "cum" or "with" dividend in that the trade date was before the ex-dividend date and the settlement date was on or before the record date for the dividend.  (SKAT's 56.1 ¶¶ 75-77, Appendix J.)[29]  In the cum-ex trades, however, while the trade date was before the ex-dividend date, *i.e.*, "cum" dividend, the defendant plan and broker agreed to a non-standard, extended settlement date that was after the record date, *i.e.*, "ex" dividend.  (*Id.* ¶ 78, 85(d), 85(f), Appendices K-L.)  This meant that the defendant plans did not receive a dividend from the issuer.  As the European Securities Market Association has concluded, in cum-ex trading the settlement date is

---

29.  The ex-dividend date is the date before which a purchaser must purchase shares to be entitled to an upcoming dividend payment, and the record date is the date on which the issuing company determines its shareholders to whom the dividend is owed.  (*Id.* ¶ 76.)  The ex-dividend and record dates for a dividend are generally set such that if a share purchase settles on standard market terms, trades executed before the ex-dividend date will settle before the record date.  (European Securities and Markets Authority, Final Report On Cum/Ex, Cum/Cum and withholding tax reclaim schemes, Sept. 23, 2020, available at esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf (europa.eu), at 30-33.)  Before October 2014, the standard settlement date for trades in Danish shares was three business days after the trade date, or "T + 3."  (*Id.* ¶ 70.)  In October 2014, the standard settlement period was shortened by one business day to "T + 2."  (*Id.*)

deliberately delayed in order to obtain, improperly, the issuance of multiple tax certificates and consequent multiple refunds of taxes to different entities.[30]

For the cum-cum trades, ED&F's sub-custodians, BNP Paribas and SEB, received the dividends, net of withholding tax, from the issuers of the shares because ED&F held the Danish shares in its BNP and SEB accounts over the record date.  (SKAT's 56.1 ¶ 111.)  For the cum-ex trades, however, ED&F did not hold the Danish shares over the record date, so its sub-custodian did not receive the dividend from the issuer.  (*Id.* ¶ 92-93, 105.)  Rather, ED&F received a purported "dividend compensation payment" from the purported seller of the shares, which supposedly received the dividend payment from the issuer.  (*Id.* ¶ 99, 105(a).)  The payment was in the amount of the net dividend the purported seller would have received from the issuer, accounting for withholding tax, if it had received such a dividend, *i.e.*, 73 percent of the gross dividend payment.  (*Id.* ¶ 99, 105(a).)

### E.    ED&F admitted that the so-called Annex E tax vouchers based on circular cum-ex trades involving ED&F Dubai are false.

ED&F has admitted that 80 of the Danish tax vouchers it issued, the so-called Annex E tax vouchers, 22 of which ED&F issued to the Utah bellwether plans, were completely or partly false because the defendant plan did not receive some or any of the dividends identified therein. (*Id.* ¶ 65(b)-(e), 89-102.)[31]  Very similar to the Solo custodians' dividend credit advices, ED&F's admittedly false Annex E vouchers were based, in whole or in part, on series of circular

---

30.  (European Securities and Markets Authority, Final Report On Cum/Ex, Cum/Cum and withholding tax reclaim schemes, Sept. 23, 2020, available at esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf (europa.eu).)

31.  The parties call these vouchers the "Annex E tax vouchers" because ED&F first identified them, and admitted they were false, in Annex E to the September 6, 2019 Amended Defence it filed in SKAT's English action against ED&F.  Annex E included two schedules, the first identifying tax vouchers that ED&F admits were completely false because the defendant plan did not receive any of the Danish dividend income identified therein, and the second identifying vouchers that ED&F admits were partly false in that the defendant plan admittedly did not receive all the Danish dividend income identified therein.  *See* Ltr. Addressed to Judge Lewis A. Kaplan from Brian S. Fraser dated Sep. 27, 2019 re: Amended Defence, Ex. A ¶ 4.2 & Annex E, ECF No. 202.

transactions in which the defendant plans purportedly purchased Danish shares from an ultimate short seller, ED&F's affiliate ED&F Man Proprietary Trading (Dubai) Limited ("ED&F Dubai"), that did not have the shares and obtained them only by buying the shares, via a broker and ED&F, from the defendant plans, which did not have any Danish shares to sell on the trade date in the first place.  (SKAT's 56.1 ¶¶ 85(d)-(e), 89-102, Appendix K.)

In every instance, the purported trading underlying the admittedly false Annex E vouchers followed the same four steps.  First, on the day before the ex-dividend date, the defendant plan agreed to buy Danish shares from a broker, often affiliated with ED&F, in a cum-ex trade due to settle the day after the record date.  (*Id.* ¶ 85(d), Appendix K.)  Second, on the same day, the broker matched and executed this order with ED&F Dubai, which agreed to sell the same amount of the same Danish shares at the same price in a cum-ex trade also due to settle the day after the record date.  (*Id.* ¶ 85(d)(i).)  Third, since ED&F Dubai did not have the Danish shares it agreed to sell to the defendant plan via the broker, or any right to such shares, the next day (which was the ex-dividend date), ED&F Dubai entered into another trade with a second broker, this time agreeing to buy the same amount of Danish shares, with the key difference being that this trade was done on standard market terms so that the trade was also due to settle the day after the record date.  (*Id.* ¶ 85(e)(i).)  Additionally, the price for this transaction was an ex-dividend price because the shares were now trading ex-dividend.  (*Id.* ¶ 85(e), Appendix K.)[32] Finally, also on the ex-dividend date, ED&F entered into a short sale of the shares to the second broker at the ex-dividend price also due to settle the day after the record date, which it planned to cover by rehypothecating the shares from the defendant plans when they were delivered on the settlement date.  (*Id.* ¶ 85(e), 85(e)(ii).)

---

32.  The market price of a stock generally drops on the ex-dividend date to reflect that the buyer is not entitled to the upcoming dividend payment.  (Weinstein Decl. Ex. 91 (Expert Report of Graham Wade, dated Dec. 31, 2021 ("Initial Wade Report")) ¶ 78.)

At the same time, the defendant plans and ED&F Dubai hedged their exposure to the price risk on the shares by entering into equal and offsetting futures executed through an ED&F-affiliated broker.  (*Id.* ¶ 85(d)(iv); Weinstein Decl Ex. 91 (Initial Wade Report) at Appendix E, ¶¶ 5, 7.)  ED&F Dubai made a profit on the price difference between the cum-ex sale and the future, which was matched by a corresponding pre-tax refund loss by the defendant plan.  (*See* Weinstein Decl. Ex. 91 (Initial Wade Report) at ¶¶ 110-111 (chart showing "MPT Dubai Profit and Loss (DKK Per Share)".)  This profit for ED&F Dubai and loss for the defendant plan was equal to approximately 80 percent of the gross dividend expected on the referenced Danish share.  (*Id.* ¶ 85(d)(vi), Appendix K; Weinstein Decl. Ex. 91 (Initial Wade Report) at Appendix C.)  Since ED&F Dubai did not have the Danish shares, or the right to such shares, on the ex-dividend date, ED&F Dubai did not receive a dividend payment from the issuer.  (SKAT 56.1 ¶¶ 94(a), 98.)  From its paper "profit" on the transactions, however, ED&F Dubai "paid" ED&F, on behalf of the defendant plan, a "dividend compensation payment" in the amount ED&F Dubai would have received from the issuer, net of withholding tax, had there been any shares, *i.e.*, 73 percent of the gross dividend.  (*Id.* ¶ 99.)[33]

As set forth in SKAT's 56.1, all the purported trading underlying ED&F's admittedly false Annex E vouchers followed the same pattern.  (*Id.* ¶¶ 87-88, Appendix K.)  To illustrate with one example: (i) on March 6, 2014, the day before the relevant ex-dividend date, defendants AIG and Riverside plans (along with certain non-bellwether defendant pension plans) collectively purchased 22,300,000 shares of TDC A/S from the ED&F-affiliated broker Volcafe at 52.4 DKK per share, in a cum-ex trade due to settle on March 12, 2014, the day after the record date; (ii) on the same day, ED&F Dubai sold 22,300,000 TDC shares to Volcafe at the

---

33.  The combined effect of the Annex E transactions, future and dividend compensation payment resulted in a transfer of a share of the eventual payment from SKAT (approximately 7 percent) from the defendant plans to ED&F Dubai.

same price of 52.4 DKK per share in a cum-ex trade also due to settle on March 12, 2014; (iii) on

the March 7, 2014 ex-dividend date, ED&F Dubai agreed to buy from broker Link Asset &

Securities Co. 22,300,000 TDC shares for 50.65 DKK per share in a trade also due to settle on

March 12, 2014; and (iv) on the same day, ED&F rehypothecated the 22,300,000 TDC shares

from the plans' accounts and sold them to Link for 50.65 DKK per share in another trade due to

settle on March 12, 2014.  (*Id.* ¶¶ 85(d)-(g), 87-88, Appendix K.)  On March 13, 2014, ED&F

Dubai paid ED&F, on the plans' behalf, a dividend compensation payment of DKK 103,265,800,

representing the gross dividend ED&F Dubai would have received from the issuer had there been

any shares and accounting for the 27 percent of the dividend that would have been withheld as

tax.  (*Id.* ¶ 99(a)-(b).)  And, on March 24, 2014, since the defendant plans purportedly purchased

the Danish shares before the ex-dividend date and received market compensation payments from

ED&F Dubai, ED&F issued tax vouchers falsely stating that the AIG and Riverside plans

received net dividends in the amounts of DKK 8,030,000 and DKK 3,452,900, respectively,

from which DKK 2,970,000 and DKK 1,277,100 had been withheld as tax.  (Joint 56.1 ¶¶ 324,

336.)  The below graphic shows the circularity of these purported trades:



TDC Trades in March 2014

**F.     ED&F's tax vouchers based on the other cum-ex trades are false for the same reasons as the Annex E tax vouchers.**

While admitting that the tax vouchers it issued based on defendant plans' cum-ex trades involving ED&F Dubai are false, ED&F still contends that the tax vouchers it issued based on the defendant plans' other cum-ex trades, where the ultimate seller was not an ED&F-affiliate, are accurate.  But the record demonstrates that those vouchers are false for the same reasons the Annex E vouchers are false: the defendant plans purported cum-ex trades were parts of series of circular trades that did not result in the plans receiving any Danish shares or dividends from which tax was withheld.

> *i.      The Annex E and other cum-ex trades were structured identically.*

As set forth in SKAT's 56.1, the defendant plans' other cum-ex trades followed the same circular pattern as the trading involving ED&F Dubai that ED&F admits did not result in the defendant plan receiving a dividend, from which tax was withheld; the only difference being that the ultimate seller of the Danish shares was a third-party not affiliated with ED&F.  (*See id.* at

28

Appendices K and L.)  For these transactions, on the day before the ex-dividend date, the defendant plan agreed to purchase shares in the Danish company from a broker affiliated with ED&F in a cum-ex trade due to settle the day after the record date.  (SKAT's 56.1 ¶ 85(f), Appendix L.)  On the same day, a third-party seller agreed to sell the same amount of the same shares at the same price to the same broker in another cum-ex trade due to settle the day after the record date.  (*Id.* ¶ 85(f)(iv), Appendix L.)  ED&F also entered into short sales of the shares to a broker at the ex-dividend price also due to settle the day after the record date, which it planned to cover by rehypothecating the shares from the defendant plans when they were delivered on the settlement date.  (*Id.* ¶ 85(g), Appendix L.)  Further, the record evidence indicates that the third-party seller obtained the shares from the same broker or brokers to which ED&F sold the shares from the plan's account.  (Weinstein Decl. Ex. 93 (Reply Expert Report of Graham Wade, dated February 28, 2022 ("Wade Reply Report")) ¶¶ 156(2), 189, 198, 203.)[34]

> **ii.**   *The total cost to the defendant plans of their purported trading demonstrates that none of the cum-ex trades resulted in the plans acquiring shares with a right to a dividend.*

The total cost to the defendant plan of its trading shows that the plan received no dividends, and suffered no tax, in its cum-ex trades.  In particular, each of the defendant plans' purported share purchases, whether by way of a cum-cum or cum-ex trade, formed part of a structured transaction, in which the defendant plan also entered into a futures contract or other hedge transaction under which it agreed to sell the Danish shares at a future date to the ultimate

---

34.  Neither ED&F nor the defendant plans have any evidence that the third-party sellers in these cum-ex trades sold the plans shares other than the same ones ED&F rehypothecated from the plans' accounts.  In fact, ED&F's sub-custodians BNP and SEB refused to issue tax vouchers to ED&F or its clients for cum-ex trades where the seller paid ED&F a dividend compensation payment.  (*Id.* ¶ 112(a), 112(b).)  And after SKAT sued ED&F in England, ED&F conducted a detailed review of all the tax vouchers it issued to the defendant plans, during which ED&F did nothing to determine whether the tax vouchers it issued based on cum-ex trades involving third-party sellers were false for the same reasons as the ones it issued based on the cum-ex trades involving ED&F Dubai.  (*Id.* ¶ 107-108.)

seller of the shares and that was priced to provide the seller extra compensation, above the market price, for the shares.  (*Id.* ¶¶ 139-54.)  For each such structured transaction, Acer calculated an "all-in cost," also called a "dividend sourcing cost," which represented the total cost to the defendant plan of "buying the security and selling the hedge," expressed as a percentage of the gross dividend.  (*Id.* ¶ 82.)

For the structured transactions involving cum-cum share purchases, the all-in cost averaged approximately 90 percent of the gross dividend, meaning that for selling the shares, the seller received 90 percent of the gross amount of the upcoming dividend payment through the share sale and forward transaction.  (Weinstein Decl. Ex. 91 (Initial Wade Report) at Appendix F.)  This all-in cost represented the prevailing market price at which willing buyers and sellers were prepared to transfer dividends in cum-cum transactions.  (*Id.* at Appendix F, n.2; Weinstein Decl. Ex. 93 (Wade Reply Report) at n.52.)  The market price was a function of the fact that there are a range of counterparties in the market, including the third-party cum-ex sellers, who were able to earn more than 73 percent of the gross dividend on Danish shares held over the record date.  (Weinstein Decl. Ex. 91 (Initial Wade Report) at Appendix F, n.2; SKAT's 56.1 ¶ 83-83.)  For example, entities (including financial institutions) domiciled in countries with tax treaties with Denmark, including those domiciled in England, could receive 85 percent of the gross dividend, rather than 73 percent, via the U.K.-Denmark Double Taxation Convention.  (SKAT's 56.1 ¶ 83.)  The "dividend acquisition cost" for the Annex E cum-ex trades, which ED&F concedes did not give rise to a dividend because the "sellers" had no dividend to convey, averaged approximately 80 percent.  (*Id.* ¶ 85(d)(vi), Appendix K; Weinstein Decl. Ex. 91 (Initial Wade Report) at Appendix C.)  The "dividend acquisition cost" for the non-Annex E

cum-ex trades was almost identical, averaging approximately 82 percent.  (SKAT's 56.1
¶ 85(f)(vii), Appendix L; Weinstein Decl. Ex. 91 (Initial Wade Report) at Appendix C.)

> iii.  *The volume of shares purportedly purchased in the rest of the cum-ex trades shows that the purported trading was circular.*

The volume of shares involved in the defendant plans' cum-ex trades, combined with the
fact that the third-party sellers did not have the shares on the day before the ex-dividend date
when they purportedly sold them to the plan, demonstrate that, just like ED&F Dubai in the
Annex E trades, the third-party seller ultimately sold the defendant plan the same shares that
ED&F rehypothecated from the defendant plan's account.  As such, the defendant plan did not
receive any dividends, net of withholding tax, from these cum-ex trades either.

For instance, on March 6, 2014, the day before the relevant ex-dividend date, defendant
plans, including the AIG plan, agreed to buy six million shares of TDC A/S from ED&F's
internal interdealer broker in cum-ex trades due to settle on March 12, 2014, the day after the
record date.  (*Id.* ¶ 85(f).)  And on the same day, ED&F's internal interdealer broker agreed to
buy the same amount of TDC shares from third-party seller Lutetia in a cum-ex trade also due to
settle on March 12, 2014.  (*Id.* ¶¶ 85(f)(iv).)

Email correspondence indicates that Lutetia was a short seller to a number of pension
plans that obtained tax vouchers from ED&F.  (*Id.* ¶ 85(f)(iv)(1).)  In order to cover a short
position, within four days, Lutetia would need to find six million shares of TDC in the market.
(Weinstein Decl. Ex. 91 (Wade Initial Report) ¶ 151-159.)  But for the 30 days around the March
11, 2014 record date for the TDC dividend, the on-exchange average daily trading volume of
TDC shares was just 2,393,898 shares, meaning the 6 million TDC shares Lutetia needed to find
in the market represented an implausibly high 251 percent of the daily average.  (*Id.* ¶ 86.)  On
the March 12, 2014 settlement date, however, ED&F rehypothecated the 6 million TDC shares

from the plans' accounts and sold and delivered 2 million each to brokers Link, ICAP and GFI. (*Id.* ¶ 85(g).)  The only plausible market source for Lutetia to acquire the 6 million TDC shares was from Link, ICAP and GFI, which were the same six million shares ED&F rehypothecated from the defendant plans' accounts.  (Weinstein Decl. Ex. 91 (Initial Wade Report) ¶¶ 143-145, 151-159.)[35]

### G.    ED&F did not have any shares to settle the defendant plans' cum-ex trades, so it recycled ex-dividend shares.

ED&F did not have sufficient Danish shares on the settlement dates to settle any of the defendant plans' cum-ex trades, Annex E or otherwise.  (SKAT's 56.1. ¶¶ 74, 114-116.)  Instead, according to ED&F, where ED&F had on hand shares from the defendant plans' cum-cum trades (and for which ED&F already had issued the defendant plans' tax vouchers), it used those to settle the cum-ex trades too, thereby issuing multiple tax vouchers for multiple tax refund claims on the same underlying Danish shares.  (*Id.* ¶ 74, 79-80, 113-118.)  And where ED&F did not have any of the relevant shares on hand from prior cum-cum transactions (or not enough of them), it otherwise acquired ex-dividend shares to use to settle the cum-ex trades.  (*Id.* ¶ 114(a).)[36]

But the cum-ex trades were for larger amounts than the cum-cum trades, so ED&F still did not have sufficient shares to settle the defendant plans' cum-ex trades all at once.  (*Id.* ¶ 74, 79-80, 113-118.)  Thus, ED&F broke the cum-ex trades down into smaller "shapes" for settlement purposes.  For instance, if ED&F had only 20 shares in inventory on the settlement date from cum-cum trades but needed to settle a cum-ex trade for, say, 100 shares, it would break

---

35.  Further, due the lack of any bid-offer spread and regulatory and hedging requirements, it is not plausible that Link, ICAP and GFI would have sold the shares to anyone other than Lutetia.  (Weinstein Decl. Ex. 93 (Reply Wade Report) ¶¶ 201-206.)

36.  ED&F acquired the other ex-dividend shares through transactions executed after the ex-dividend date for the upcoming dividend, meaning the shares ED&F acquired carried no right to a dividend.  (SKAT's 56.1 ¶¶ 76, 114.)

that cum-ex trade into five shapes of 20 shares, and settle each shape individually reusing the same 20 shares five times.  (*Id.*)  ED&F was able to do so because there are multiple "settlement cycles" in a single day in which trades in Danish shares may settle.  (*Id.* ¶ 71.)  And since the trades were circular in that the seller sold the defendant plan the same shares ED&F rehypothecated from the plan and sold to the seller, at the end of each settlement cycle the shares always ended up back at ED&F, available to be used in the next cycle.  (*Id.* at ¶¶ 74, 79-80, 113-118, Appendix K and L; Weinstein Decl. Ex. 91 (Wade Initial Report) at Figure 8; Weinstein Decl. Ex. 93 (Reply Wade Report) ¶¶ 16, 182-184, 188, 201-206.).)

By reusing the same shares again and again to settle the cum-ex trades, ED&F issued multiple tax vouchers based on the same underlying shares.  (SKAT's 56.1 ¶ 113-118.)  With respect to the Danish shares from the plans' cum-cum trades, ED&F issued one tax voucher to the defendant plan purchaser in the cum-cum trade, and then another to a defendant plan cum-ex purchaser each time it reused the same shares to settle another shape.  (*Id.*)  Likewise, with respect to the ex-dividend shares, on which no dividend was due to the plans in the first place, ED&F issued a separate tax voucher on the same underlying shares each time it used them to settle a shape.  (*Id.*)

For instance, defendant plans, including defendants AIG and Riverside plans and non-bellwether defendant plans, collectively purchased 73,300,000 shares in the Danish company TDC A/S in cum-ex trades due to settle on March 12, 2014.  (*Id.* ¶ 115(b)-(c).)  On March 12, 2014, however, ED&F held only 24,845,000 TDC shares in accounts at its sub-custodians.  (*Id.* ¶ 113(a), 115(a).)  As such, ED&F settled the defendant plans TDC cum-ex trades in multiple shapes using the shares on hand.  (*Id.* ¶ 74, 79-80, 113-118.)  In one settlement cycle, it settled the first tranche of the shapes by sending that number of TDC shares around the circle, via the

brokers, from ED&F to the seller and then back to ED&F.  (*Id.* ¶¶ 74, 79-80, 113-118; Weinstein Decl. Ex. 91 (Initial Wade Report) ¶¶ 141, 143; Weinstein Decl. Ex. 93 (Reply Wade Report) ¶¶ 16, 182-184, 188, 201-206.)  Once those trades settled, it reused the same shares in the next settlement cycle and repeated the process until it settled the full 74,300,000 in TDC trades.  (SKAT's 56.1 ¶¶ 74, 79-80, 113-118; Weinstein Decl. Ex. 91 (Wade Initial Report) at Figure 8; Weinstein Decl. Ex. 93 (Reply Wade Report) ¶¶ 16, 182-184, 188, 201-206.)

Despite that ED&F held only 24,845,000 TDC shares on March 14, 2014, which it used to settle the defendant plans' cum-cum trades and for which it had issued separate tax vouchers, ED&F used those same shares to settle the defendant plans' cum-ex trades.  Thus, ED&F issued the defendant plans, collectively, tax vouchers stating that the plans owned 99,145,000 TDC shares, on which they received dividends, net of withholding tax, even though ED&F and the defendant plans held only 24,845,000 TDC shares.  (SKAT's 56.1. ¶ 113-115; Weinstein Decl. Ex. 93 (Wade Reply Report) ¶¶ 185-186.)

### III.     In the Solo and ED&F bellwethers, the defendant plans authorized payment agents to submit their dividend withholding tax refund applications to SKAT.

In both the Solo and ED&F bellwethers, the defendant pension plans authorized "payment agents" to submit dividend withholding tax refund applications on their behalf to SKAT.  (Joint 56.1 ¶¶ 172-203, 350-57.)  By powers of attorney, Solo bellwether defendants RJM Capital, Basalt Ventures, Roadcraft Technologies and Proper Pacific plans, and ED&F bellwether defendants AIG and Riverside plans, each appointed non-party Goal TaxBack Limited to submit tax refund applications on the plan's behalf, and defendant FWC Capital plan appointed non-party Syntax GIS Ltd for the same purpose.  (*See e.g.*, *id.* ¶¶ 172, 183, 190, 193, 200, 352, 355.)  Under the plans' agreements with the payment agents, the payment agents were

entitled to collect a small fee from the proceeds of any amounts paid by SKAT.  (*Id.* ¶¶ 206, 210, 214, 217, 220, 379.)[37]

## IV.  The payment agents submitted the defendant plans' false tax refund applications to SKAT.

Pursuant to the powers of attorney, the payment agents submitted to SKAT the defendant plans' dividend withholding tax refund applications, which represented that the refunds were being requested on behalf of the "beneficial owner" of the shares and dividends, and included the false dividend credit advices and tax vouchers issued by the Solo Custodians and ED&F, respectively.  For instance, during 2013 and 2014, Goal submitted to SKAT 24 refund applications on behalf of Solo bellwether defendant RJM Capital plan, in which, collectively, the plan falsely represented to SKAT that it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 160,836,170.33, from which DKK 59,487,351.62 was withheld in tax.  (*Id.* ¶¶ 172-82, 204-06.)[38]

In 2014 and 2015, Goal submitted to SKAT nine refund applications on behalf of ED&F bellwether defendant AIG plan, in which, collectively, the plan falsely represented to SKAT that

---

37. Pursuant to its agreements with the respective pension plans, Goal was entitled to (i) 0.85 percent of each refund collected on behalf of the RJM Capital, AIG, and Riverside plans, respectively, up to a cap of 12,000 Euros per refund; (ii) 0.85 percent of each refund collected on behalf the Basalt Ventures plan, up to a cap of 10,000 Euros per refund; (iii) 0.85 percent of each refund collected on behalf of Roadcraft Technologies plan; and (iv) 1 percent of each refund it collected on behalf of Proper Pacific plan.  (*Id.* ¶¶ 206, 210, 214, 220 379.)  Pursuant to its agreement with the FWC plan, Syntax was entitled to 0.75 percent of each refund it collected, up to a cap of 10,000 Euros per refund.  (*Id.* ¶ 217.)

38. During 2014 and 2015, Goal, on behalf of the Basalt Ventures and Roadcraft Technologies plans respectively, submitted to SKAT 15 refund applications, in which, collectively, the Basalt Ventures plan represented to SKAT that it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 75,307,868.95, from which DKK 27,853,528.92 was withheld in tax, and, collectively, the Roadcraft Technologies plan represented to SKAT that it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 183,773,544.13, from which DKK 67,971,037.72 was withheld in tax.  (Joint 56.1 ¶¶ 183-92, 208, 212.)  During 2015, Syntax, on behalf of the FWC plan, submitted to SKAT 16 refund applications, in which, collectively, the plan represented to SKAT that it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 191,774,407, from which DKK 70,930,260.73 was withheld in tax.  (*Id.* ¶¶ 193-99, 215.)  And in 2015, Goal, on behalf of the Proper Pacific plan, submitted to SKAT 16 refund applications, in which, collectively, the plan represented to SKAT that it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 78,504,454, from which DKK 29,035,894.47 was withheld in tax.  (*Id.* ¶¶ 200-03, 218.)

it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 78,000,000, from which DKK 21,060,000 was withheld in tax.  (*Id.* ¶ 376.)  Of the purportedly withheld tax, DKK 10,314,000 was based on tax vouchers issued on cum-cum trades; DKK 8,613,000 was based on tax vouchers ED&F admits were false that involved ED&F Dubai cum-ex trades; and DKK 2,133,000 was based on tax vouchers issued on other cum-ex trades.  (SKAT's 56.1 ¶ 90(a), 122-123, 125.)[39]

## V.   SKAT paid the payment agents the money requested in the refund applications and the payment agents, in turn, paid the money to the defendant plans.

In every instance, SKAT paid the defendant plan's payment agent, as directed in the refund application, the full amount requested.  Specifically, SKAT paid Goal or Syntax

(i) DKK 59,487,351.62 in response to the RJM Capital plan's refund applications;

(ii) DKK 27,853,528.92 in response to the Basalt Ventures plan's refund applications;

(iii) DKK 67,971,037.72 in response to the Roadcraft Technologies plan's refund applications;

(iv) DKK 70,930,260.73 in response to the FWC Capital plan's refund applications;

(v) DKK 29,035,894.47 in response to the Proper Pacific plan's refund applications;

(vi) DKK 21,060,000 in response to the AIG plan's refund applications; and

(vii) DKK 12,724,425 in response to the Riverside plan's refund applications.  (Joint 56.1 ¶¶ 204-06, 208, 212, 215, 218, 376-77.)  Pursuant to their agreements with the defendant plans, the payment agents took their fees and transferred the remainder to the Solo Custodians or ED&F, respectively, on the plans' behalf, or directly to the plans' bank accounts, from where the

---

[39]. During 2014 and 2015, Goal, on behalf of the Riverside plan, submitted to SKAT eight refund applications, in which, collectively, the plan represented to SKAT that it was the beneficial owner of publicly traded Danish securities, on which it received dividends totaling DKK 47,127,500, from which DKK 12,724,425 was withheld in tax.  (Joint 56.1 ¶ 377.)  Of the purportedly withheld tax, DKK 5,308,200 was based on tax vouchers issued on cum-cum trades, and DKK 7,416,225 was based on tax vouchers ED&F admits were false that involved ED&F Dubai cum-ex trades.  (SKAT's 56.1 ¶ 90(b), 126-127, 129, Appendices J and K.)

money was distributed to the other participants in the scheme.  (Joint 56.1 ¶¶ 206, 210, 214, 217, 220, 378-80.)

**VI.**     **The money SKAT paid was then distributed to other participants in the schemes.**

After the payment agents transferred the purported refunds, the money was then distributed pursuant to the parties' agreements.  Thus, of the DKK 59,487,351.62 RJM Capital plan received, it paid 66 percent, to a Cayman Islands entity controlled by Sanjay Shah called Ganymede Cayman Limited and retained the rest, or DKK 20,225,699.55, for itself.  (SKAT's 56.1 ¶ 24.)  Similarly, of the DKK 27,853,528.92 Basalt Ventures plan received, it paid 75 percent to Ganymede, and retained the rest, or DKK 6,963,382.23, for itself.  (*Id.* ¶ 25.)  The DKK 67,971,037.72 Roadcraft Technologies plan received was distributed 75 percent to Ganymede, and the remaining 25 percent, or DKK 16,992,759.43, was divided between the plan (DKK 849,637.97), Routt Capital Trust (DKK 11,894,931.60), and RAK Investment Trust (DKK 4,248,189.86) pursuant to their partnership agreement.  (*Id.* ¶ 26; Joint 56.1 ¶¶ 84-85.)

The FWC Capital plan paid 95 percent of the DKK 70,930,260.73 it received to Ganymede and retained the rest itself.  (SKAT's 56.1 ¶ 27.)  From the amount paid to Ganymede, Shah subsequently paid defendant Lehman, via his entity First Alton Inc., at least the $700,000 or $800,000 fee he was promised.  (*Id.* ¶ 28.)  According to defendant Lehman, he spent the money transferred to First Alton on personal spending, investments, and to pay taxes, and transferred any remaining funds to his own bank accounts.  (*Id.*)

Of the DKK 29,035,894.47 Proper Pacific plan received 95 percent to Ganymede and retained the rest for itself.  (*Id.* ¶ 29.)  Defendant Bradley was then paid at least the $100,000 fee he was promised.  (*Id.* ¶ 30.)

And with respect to the DKK 21,060,000 and DKK 12,724,425 the AIG and Riverside plans received, respectively, DKK 17,246,218 (DKK 11,307,555 from AIG's refunds and DKK

37

5,938,663 from Riverside's refunds) was transferred to ED&F, with the remaining DKK

9,752,445 and DKK 6,785,761 left for the respective plan.  (Joint 56.1 ¶¶ 384-385.)  From the

amounts transferred to ED&F, DKK 5,616,189 (DKK 3,308,314 from AIG's refunds and DKK

2,307,875 from Riverside's refunds) was then transferred to Acer.  (SKAT's 56.1. ¶ 136.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court must "grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  A party may, as SKAT does here,

move for partial summary judgment, *i.e.*, with respect to some of its claims, but not others, or

with respect to part, but not the whole of, a claim.  *See id.*

Material facts are those "that might affect the outcome of the suit under the governing

law," and disputes about them are genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S. Ct. 2505, 2510 (1986).  Once the movant satisfies its initial burden to show there are no

material facts in genuine dispute, "its opponent must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986), and "may not rely on conclusory

allegations or unsubstantiated speculation" to do so.  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d

Cir. 1998).  Rather, the non-moving party "must offer some hard evidence showing that its

version of the events is not wholly fanciful."  *D'Amico v. City of New York*, 132 F.3d 145, 149

(2d Cir. 1998).

## ARGUMENT

In this multi-district litigation founded in the Court's diversity jurisdiction, the Court

applies New York law to the four bellwethers commenced in this Court, Florida law to the

bellwether transferred from the Southern District of Florida, and Utah law to the two transferred

from the District of Utah, including each jurisdiction's respective choice of law rules.  *See, e.g.*,

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 112 (2d Cir. 2012) ("choice-of-law

rules from the transferor forum" apply in multi-district litigation "to determine which state law

controls"); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 257 F. Supp. 2d 717, 723

(S.D.N.Y. 2003) ("district court sitting in diversity applies the law of the forum state," which in

"an MDL proceeding . . . is the district court where the action was originally filed" (internal

citation and quotation omitted)).[40]

## I.   **SKAT is entitled to summary judgment on certain of its restitution claims.**

### A.   **In the New York Solo bellwethers, SKAT is entitled to summary judgment on its claims for money had and received against certain defendants.[41]**

Under New York law, the "essential elements" of a claim for money had and received are

that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the

---

40. The AIG plan bellwether was originally filed in the District of New Jersey and then transferred under 28 U.S.C. § 1404(a) to the District of Utah before being consolidated in this multi-district litigation.  *See* Order Granting Parties' Joint Motion to Transfer Venue, *SKAT v. Am. Inv. Grp. of N.Y., L.P. Pension Plan et al.*, No. 3:18-CV-08876-FLW-LHG (D.N.J.), ECF No. 14.  Generally, "when a case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court must apply the choice-of-law rules that the transferor court would have applied," but where, as here, the action "could not have been maintained in the transferor court, the applicable law, including choice of law rules, is the state law of the transferee court."  *Mopex, Inc. v. Am. Stock Exchange, LLC*, No. 02 Civ. 1656 (SAS), 2002 WL 342522, at *4 (S.D.N.Y. Mar. 5, 2002).  Under 28 U.S.C. § 1391(b), the District of New Jersey was not a proper venue for SKAT's action because defendants Crema and the AIG plan did not both reside in New Jersey when the action was commenced, none of the events giving rise to SKAT's claims occurred there, and there is another district where venue is proper—the District of Utah where "a substantial part of the events . . . giving rise to the claim[s] occurred."  28 U.S.C. § 1391(b)(2); *see* Weinstein Decl. Ex. 83 (Crema Dep. Tr.), at 13:2-9, 84:3-13.  Thus, SKAT's action could not have been maintained there and Utah law applies in the AIG bellwether.  *See Grabe v. Ziff Davis Publ'g Co.*, No. 91 Civ. 6275 (DLC), 1995 WL 688912, at *5 (S.D.N.Y. Nov. 20, 1995) (transferee forum's law applied because "venue would have been improper" in the transferor forum).  Further, neither of the Utah nor New Jersey courts determined whether the District of New Jersey was a proper venue for SKAT's action before it was consolidated in this multi-district litigation, so this Court may decide the issue.  *See Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1086 (S.D.N.Y. 1984) ("when a transferor court has not ruled on the propriety of venue . . . the transferee court must determine whether venue . . . would have been proper in the transferor court in order to decide which forum state's law will apply").

41. SKAT seeks summary judgment on its money had and received claims against all defendants in the New York Solo bellwethers, except with respect to defendant Ben-Jacob in the Roadcraft Technologies and Basalt Ventures bellwethers.

receipt of money; and (3) under principles of equity and good conscience, defendant should not

be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l

Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984).[42] "A cause of action for money had and received is one

of quasi-contract or of contract implied in law," *Bd. of Educ. of Cold Spring Harbor Cent. Sch.

Dist. v. Rettaliata*, 78 N.Y.2d 128, 138 (1991), "a form adopted by common-law courts to

incorporate the equitable principles of unjust enrichment." *McDermott v. City of New York*, 50

N.Y.2d 211, 217 n.2 (1980).

While money had and received "is recognized as an action in implied contract, the name

is something of a misnomer because it is not an action founded on a contract at all; it is an

obligation which the law creates in the absence of agreement when one party possesses money

that in equity and good conscience he ought not to retain and that belongs to another." *Parsa v.

State of New York*, 64 N.Y.2d 143, 148 (1984). "The action depends upon equitable principles in

the sense that broad considerations of right, justice and morality apply to it, but it has long been

considered an action at law." *Id.*[43]

---

42. There is no need for a choice of law analysis and New York law governs SKAT's money had and received
   claims in the New York bellwethers because there is no "actual conflict" between New York law and the law of
   another relevant jurisdiction, *e.g.*, Denmark, in that the law of the other jurisdiction "provides different
   substantive rules" that would "have a significant possible effect on the outcome." *Fin. One Public Co. Ltd. v.
   Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (internal quotation and citation omitted).

43. SKAT also asserted claims for unjust enrichment in the New York bellwethers, to prevail on which SKAT
   "must establish 1) that the defendant[s] benefitted; 2) at [SKAT's] expense; and 3) that 'equity and good
   conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). Under New York law,
   the causes of action unjust enrichment and money had and received are "essentially identical," *Belda v.
   Doerfler*, No. 14-cv-941 (AJN), 2015 WL 5737320, at *4 n.4 (S.D.N.Y. Sep. 30, 2015), except that money had
   and received is a claim at law and, at least in certain circumstances, unjust enrichment is considered a claim in
   equity. *See In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 326 (S.D.N.Y. 2019) (internal
   quotation omitted) ("money had and received and unjust enrichment are not duplicative of each other even
   when they rest on the same facts on the grounds that money had and received is a claim that has been
   considered an action at law even though it rests on equitable principles"). Were SKAT's unjust enrichment
   claims considered actions in equity, they would be available only should SKAT not succeed on its tort claims
   against the defendants. *See Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012) (unjust enrichment
   "is available only in unusual situations when, though the defendant has not breached a contract nor committed a
   recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff"); *Fed.
   Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) ("Unjust
   enrichment is an equitable claim that is unavailable where an adequate remedy at law exists."). New York

The undisputed facts in the New York Solo bellwethers fall squarely within New York's "long recognized" rule, "applied" in actions "for money had and received," that "if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery." *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 366 (1991) (internal quotation omitted).  In each bellwether, SKAT paid the defendant plans' payment agents the money requested in the tax refund applications under the mistaken belief, based on the false representations in the applications and accompanying documents, that the defendant plans owned shares of Danish stock and received dividends on such shares, net of withholding tax, and so Denmark owed the defendant plans refunds of the purportedly withheld tax.  But the record—including the (i) account statements and affidavits from the Solo Custodians' sub-custodians, (ii) defendants, Solo Custodians and brokers' own records (and the absence of necessary records for share ownership and dividend receipt), (iii) factual findings from the FCA's legally authorized investigation, and (iv) Reed Smith's March 2016 letter to the FCA—shows that the Solo Custodians held no such Danish shares and so received no dividends, from which tax was withheld, on the defendant plans' behalf.  (*Supra* pgs. 13-20.)

From the purported refunds SKAT paid, the RJM Capital plan received DKK 20,225,699.55 (34 percent of the refunds); the Basalt Ventures plan received

---

authority is divided, however, on whether unjust enrichment claims, such as SKAT's, that seek monetary damages only, as opposed to equitable relief, are properly considered actions at law or in equity.  *Compare id. with Miller v. Doniger*, 293 A.D.2d 282, 282 (1st Dep't 2002) ("claims for unjust enrichment where award of money would fairly compensate the party bringing the claim" are "legal in nature") *and Hudson View II Assocs. v. Gooden*, 222 A.D.2d 163, 168 (1st Dep't 1996) ("Generally, the determinant as to whether a claim is at law or at equity is the nature of the relief which, under the facts alleged, could fairly compensate the party bringing the claim.  If money damages alone could achieve that end, the action is generally at law. . . .  [I]f defendants had sought the restitution of specific property, their causes would properly be characterized as at equity.").  But, as noted in the Restatement (Third) of Restitution and Unjust Enrichment, the requirement that there be no available legal remedy is generally of no practical significance since, as is the case here, "a modern claim in restitution or unjust enrichment is so often the equivalent of a cause of action that was available at law."  Restatement (Third) of Restitution and Unjust Enrichment § 4, comment e; *see also Hann v. Culver*, 73 Hun 109, at *881 (1st Dep't 1893) ("while the remedy can be pursued on the equity side of the court, a court of law has jurisdiction to give relief in the form of an action for money had and received").

DKK 6,963,382.23 (25 percent of the refunds); the Roadcraft Technologies plan received

DKK 849,637.97 (5 percent of the partnership's 25 percent); and the Proper Pacific plan received

DKK 1,451,794.72 (5 percent).  (*Supra* pgs. 36-37.)  "As the sole participant[s] in the[se]

plan[s]," defendants Markowitz, van Merkensteijn, Altbach and Bradley likewise were "enriched

by the[ir] plan's enrichment" in the same amount.  *In re Customs and Tax Administration of the*

*Kingdom of Denmark (SKAT) Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2021 WL

2689908, at *5 n.47 (S.D.N.Y. Jun. 30, 2021).

Further, from the refunds in the Roadcraft Technologies bellwether, defendants

Markowitz and Klugman received an additional DKK 11,894,931.60 and DKK 4,248,189.86,

respectively, through defendants Routt Capital Trust and RAK Investment Trust, of which trusts

Markowitz and Klugman, respectively, were the sole beneficiaries, pursuant to the partnership

agreement their entities entered into with the Roadcraft Technologies plan.  (*Supra* pg. 36.)  And

in the Proper Pacific plan bellwether, defendant Bradley received an additional $100,000 for

"introducing" the plan to the Solo custodians.  (*Supra* pg. 37.)

There is no doubt that the defendants benefitted from receiving this money to which they

had no entitlement and that "principles of equity and good conscience" should require them to

return it.  *See Banque Worms*, 77 N.Y.2d at 366 ("Since A was mistaken in the assumption that

he was indebted to B, the latter is not entitled to retain the money acquired by the mistake of the

former." (internal quotation omitted)).[44]  The undisputed facts demonstrating that defendants

---

44.  It is of no consequence if defendants contend—contrary to the facts—that SKAT was negligent in making the
payments because "[t]he principle that a party who pays money, under a mistake of fact, to one who is not
entitled to it should, in equity and good conscience, be permitted to recover it back . . . applies even if the
mistake is due to the negligence of the payor."  *Mfrs. Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113,
117 (1st Dep't 1990).  Nor does it matter if defendants argue that they themselves did nothing wrong, *Simonds
v. Simonds*, 45 N.Y.2d 233, 242 (1978) ("Unjust enrichment . . . does not require the performance of any
wrongful act by the one enriched."), or even if any particular defendant played no role in obtaining the money.
*Aetna Cas. & Surety Co. v. LFO Constr. Corp.*, 207 A.D.2d 274, 277 (1st Dep't 1994) (unjust enrichment "does
not require that the party enriched take an active role in obtaining the benefit").

received and benefitted from money that SKAT paid under the mistaken belief that the defendant plans received Danish dividends, from which tax was withheld, entitle SKAT to summary judgment. *See, e.g.*, *Williamson v. Stallone*, 28 Misc.3d 738, 750 (Sup. Ct. N.Y. Cty. 2010) (granting summary judgment on money had and received claim where "undisputed evidence" demonstrated that partnership's "net asset value was overvalued when defendants withdrew and that defendants received inflated disbursements from the partnership").[45]

Rather than produce any evidence that the defendant plans owned Danish shares, received Danish dividends, and suffered any withholding tax, defendants contend that some of the evidence on which SKAT relies to show that the plans' purported trading was fictitious is inadmissible, and refused to include that evidence in the parties' Joint 56.1 statement. As demonstrated below, the FCA Final Notices evidencing that the defendant plans' purported trading was fake are admissible for their truth (*infra*, I.A.1), and the Solo Custodians' records that SKAT relies on are likewise admissible. (*Infra*, I.A.2.)[46]

### 1.    The FCA's Final Notices are admissible for their truth.

As an initial matter, the fact that the defendant plans' purported trading in Danish shares was fake is evidenced by the FCA's Final Notices, which found that the purported trading at the Solo Custodians in 2015 consisted of circular transactions and that the Solo Custodians did not hold any Danish shares on the defendant plans' behalf. (*Supra* pgs. 18-19.) The Final Notices are admissible for their truth under the hearsay exception for "record[s] or statement[s] of a

---

45. *See also People v. Duggan*, 30 A.D.2d 736, 736 (3d Dep't 1968) (granting summary judgment on New York State's money had and received claim to recover "unemployment insurance benefits . . . received by respondent by willful misrepresentation").

46. The March 11, 2016 Reed Smith letter to the FCA, produced by the Solo Custodians' insolvency administrators from the Solo Custodians' files in response to a letter rogatory issued by this Court, is admissible under the business records exception, including on the basis of foundational testimony SKAT intends to obtain from a representative witness of the Solo Custodians' administrators, pursuant to the Court's letter rogatory, demonstrating as much.

public office" setting forth "factual findings from a legally authorized investigation," Fed. R.

Evid. 803(8)(A)(iii), which is "available to reports of foreign public offices and agencies," such

as the FCA, "that otherwise come within its terms."  *In re Parmalat Secs. Litig.*, 477 F. Supp. 2d

637, 640 (S.D.N.Y. 2007).  Further, "the scope" of the exception is not limited to specific

findings of fact, but rather broadly encompasses "factually based conclusions or opinions," such

as the FCA's conclusion that the Solo Custodians held no Danish shares.  *Beech Aircraft Corp. v.*

*Rainey*, 488 U.S. 153, 162, 109 S. Ct. 439, 446 (1988).

## 2.   The Solo Custodians' records are admissible.

The records, including trade approvals, confirmations, invoices, account statements and

spreadsheets of trade data, from the Solo Custodians on which SKAT relies to show that the

defendant plans' purported trading was fictitious, are likewise admissible.  First, there is no

genuine dispute as to the authenticity of such documents.  (*Infra*, I.A.2.i.)  Second, SKAT does

not offer them for the truth of the statements therein, *i.e.*, that any of the purported trading

actually happened, so the records are not inadmissible hearsay.  (*Infra*, I.A.2.ii.)  And, finally,

even if SKAT were offering them for their truth, the records would nonetheless be admissible

under the business records exception to the rule against hearsay.  (*Infra*, I.A.2.iii.)

### i.   The Solo Custodians' records are authentic.

Under Federal Rule of Evidence 901, authenticating evidence requires only that the

proponent "produce evidence sufficient to support a finding that the item is what the proponent

claims it is," which may include "[t]he appearance, contents, substance, internal patterns, or

other distinctive characteristics of the item, taken together with all the circumstances."  Fed. R.

Evid. 901(a) & (b)(4).  "[T]he bar for authentication of evidence is not particularly high, and

proof of authentication may be direct or circumstantial."  *U.S. v. Al-Moayad*, 545 F.3d 139, 172

(2d Cir. 2008) (internal quotation and citation omitted).  It is not necessary that the proponent

"rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *U.S. v. Ganias*, 824 F.3d 199, 215 n.33 (2d Cir. 2016) (internal quotation omitted). The "standard," rather, "is one of reasonable likelihood." *Id.* (internal quotation omitted).

There is no genuine dispute that the "appearance, contents, substance, internal patterns, or other distinctive characteristics" of the Solo Custodians' documents on which SKAT relies, "taken together with all the circumstances," establish their authenticity. (*See, e.g.*, Weinstein Decl. Ex. 21 at ELYSIUM-04005495 & ELYSIUM-04029621; Ex. 57 (Equities Transactions Trade 3) at ELYSIUM-04657181; Ex. 7 at ELYSIUM-01744925; Ex. 13 at ELYSIUM-09140791.) As an initial matter, all these records were found among the documents seized, pursuant to court order, from Sanjay Shah's Elysium companies. (Weinstein Decl. Ex. 97.)

With respect to the trade approvals, confirmations, account statements and invoices, defendants themselves received the same types of documents from the Solo Custodians and produced them in this litigation (and presumably intend to rely on them to show that the plans' purported trading was real). The documents on which SKAT relies are identical in substance and appearance to those defendants produced, the authenticity of which are not in question (and the facts of which, to the extent the defendant plans were parties to the purported transactions, have been admitted in the Joint 56.1 statement), except that the Solo Custodians issued them not just to the defendant plans, but also to the purported sellers and stock loan counterparties for the additional transactions in each circular trading loop, so they include purported trading to which the defendant plans were not party. For instance, defendant FWC Capital plan produced a "Quarter 4 -2014" invoice issued by Old Park Lane listing the plans' purported Danish trading during the quarter. (Weinstein Decl. Ex. 179.) And to show the FWC Capital plans' purported

trading was fictitious, SKAT relies on a "Quarter 4 – 2014" invoice, identical in form and substance, that Old Park Lane issued to Miralty International Limited, the purported seller in some of FWC Capital plans' circular trades, listing the Danish trading to which it supposedly was a party.  (Weinstein Decl. Ex. 57, Equities Transactions Trade 3, at ELYSIUM-04657181.)[47]

Further, with respect to the invoices, account statements and spreadsheets of trades, their authenticity is shown by the fact that they are corroborated by the broker confirms, which according to the defendants are independent third-party documents, and defendants' own Solo Custodian-issued trade approvals, confirmations and account statements, on which defendants rely to show that they actually purchased and loaned shares.  The documents on which SKAT relies identify the same purported trades as are shown on the broker confirms, account statements, trade approvals and stock loan confirmations produced by the defendants.  For example, the February-March 2015 spreadsheet of Telesto's customer trades on which SKAT relies includes the Basalt Ventures plan's purported March 27, 2015 purchase of Carlsberg shares identified in the email trade confirmation Sunrise Brokers sent the Basalt Ventures plan on that date that was produced by defendant van Merkensteijn.  (*Compare* Weinstein Decl. Ex. 187 *with* Ex. 181.)  Indeed, the February-March 2015 Telesto spreadsheet includes the Basalt Ventures plan's purported Danish trading during that period identified on the plan's Telesto-issued 2015 yearly account statement.  (*Compare* Weinstein Decl. Ex. 187 *with* Ex. 182.)[48]

---

47. Likewise, the March 30, 2015 stock loan email confirmation from "tradeapprovals@telesto.com" that defendants produced supposedly confirming the Basalt Ventures plan's loan of Carlsberg shares to Prince Solutions Limited is identical in form and substance to the stock loan email confirmations from the Solo Custodians' records on which SKAT relies to show the purported trading was circular, including the March 30, 2015 email confirmations from "tradeapprovals@telesto.com" to (i) Prince supposedly confirming its loan of the same Carlsberg shares to Relative Value Trading GmbH, and (ii) Relative Value Trading, supposedly confirming its further loan of the same shares to the ultimate "seller" in the loop RDKS Consultants. (Weinstein Decl. Exs. 180, 21 at ELYSIUM-04029621 & ELYSIUM-04030318.)

48. The spreadsheet thus also includes the Basalt Ventures plan's purported loan of the Carlsberg shares to Prince Solutions Limited.  (*Compare* Weinstein Decl. Ex. 187 *with* Ex. 180.)

Moreover, the cash payments to the defendant plans reflected on the Solo Custodians' account statements match deposits in bank records produced either by the defendants or their respective banking institutions at which they maintain bank accounts. *See Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*, 781 F.3d 1262, 1267 (11th Cir. 2015) (affirming finding of authenticity where "documents were found at [company's] offices and . . . the information in those documents substantially matched the records kept by the financial institutions and clients with which [company] had transacted"); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 592 B.R. 513, 526 (Bankr. S.D.N.Y. 2018) (records of customers' cash withdrawals were sufficiently authenticated in part because they were corroborated by "bank records"). For example, defendant Basalt Ventures plans' June 16, 2015 $775,000 "Cash Withdrawal" reflected on its Telesto statement is corroborated by the plans' Wells Fargo bank account records reflecting a credit in that same amount (minus a wire transfer fee) on the same date. (*Compare* Weinstein Decl. Ex. 183 at 3 *with* Ex. 184 at 17.)[49]

> ii. *The Solo Custodians' records are not subject to the rule against hearsay because SKAT does not offer them for their truth.*

SKAT does not offer the Solo custodian records on which it relies for the truth of any matters asserted therein, *e.g.*, that the purported trades listed therein occurred. To the contrary, SKAT contends that the trades were fictitious, and offers the records solely to show that even on the Solo Custodians' own account of what occurred, the defendant plans' purported share purchases still would not have resulted in any shareholdings because the purported trading was entirely circular. As such, the rule against hearsay does not bar admission of the challenged Solo Custodian records. *See, e.g.*, *U.S. v. Sliker*, 751 F.2d 477, 489 (2d Cir. 1984) (hearsay objection

---

49. In addition, the accuracy of the Solo Custodians' records, which demonstrate the circular nature of the defendant plans' purported trades, is corroborated by the FCA's Final Notices' finding that the "Solo Trading was characterised by a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions." (*See, e.g.*, Sapien Notice ¶ 2.5.)

was "meritless" because documents "were admitted not to establish the truth of the matters asserted but rather to prove the sham nature of the bank and to link the defendants to it").

        *iii.*    *The Solo Custodians' records are admissible under the business records exception to the rule against hearsay.*

Further, even if SKAT did seek to offer the Solo Custodian records for the truth of any matter asserted therein—which it does not—the records would be admissible under the "business records" exception to the rule against hearsay.  Under Federal Rule of Evidence 803(6), a "record of an act [or] event" is not excluded by the rule against hearsay "if (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;" "(B) the record was kept in the course of a regularly conducted activity of a business;" and "(C) making the record was a regular practice of that activity."  Fed. R. Evid. 803(6).

Courts in this Circuit construe the business records exception "generously in favor of admissibility, due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases."  *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421 (S.D.N.Y. 2011).  Thus, "Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all."  *U.S. v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (internal quotation omitted).  "The principal precondition to admission of documents as business records . . . is that the records have sufficient indicia of trustworthiness to be considered reliable."  *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).

"[N]either a qualified witness nor a certification is necessary to provide the foundation" for the business records exception "in all instances."  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 691 (S.D.N.Y. 2014).  "Instead, the requirements for qualification as a business record can be met by documentary evidence, affidavits, or admissions of the parties, *i.e.*, by circumstantial evidence, or by a combination of direct and circumstantial evidence."  *Id.* (internal

quotation omitted).  Further, the fact that the Solo Custodians were engaged in fraud does not

preclude the records from qualifying for the exception, as "business records of entities engaged

in fraud are commonly admitted into evidence."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff*

*Sec. LLC (In re Bernard L. Madoff)*, 528 F. Supp. 3d 219, 232 (S.D.N.Y. 2021).

First, the documents themselves reflect that that they were "made at or near the time" of

the act or event "by—or from information transmitted by—someone with knowledge."  *See Saks*

*Int'l*, 817 F.2d at 1013 ("there is no requirement that the person whose first-hand knowledge was

the basis for the entry be identified").  For instance, the stock loan email confirmations were sent

from email addresses called "tradeapprovals@[Solo Custodian]" to the purported stock lender on

the same date of the purported stock loan, and on the same date (usually within minutes) of the

stock lending transactions purportedly entered into by the defendant plans, and appear identical

to those relied upon by the defendants other than the names of the counterparties involved.  (*See,*

*e.g.*, Weinstein Decl. Exs. 180, 21 at ELYSIUM-04029621 & ELYSIUM-04030318.)[50]  The

invoices were created on the Solo Custodians' letterhead and were dated shortly after the period

covered by the invoice ended, and again appear identical to those sent to the defendant plans.

(Weinstein Decl. Ex. 57 (Equities Transactions Trade 3) at ELYSIUM-04657181.)  And the

metadata for the account statements, which, again, are identical to the statements issued to

defendants, shows they were also created shortly after the covered period.  (*See, e.g.*, Weinstein

Decl. Ex. 185.)  Similarly, the metadata from the spreadsheets of purported trades indicates that

---

50.  Indeed, beginning in 2014, Solo or one of its affiliates introduced the plans to software that the plans then
     licensed from a third-party that automated the purported trading and automatically generated at least the plans'
     trading emails based on the data inputted into the program.  (SKAT's 56.1 ¶ 137.)  Before it licensed the
     software, Markowitz, van Merkensteijn and Klugman hired two traders to manually send or respond to emails
     from the Solo Custodians, brokers and purported stock loan counterparties to purportedly execute the plans'
     trading.  (*Id*.)  As part of those trading instructions, the traders were told to expect trade approval and
     confirmation emails from the Solo Custodians, brokers and purported lenders shortly after it executed or
     requested approval to execute a trade.  (*Id*.)

the documents were created shortly after the period covered by the spreadsheet.  (*See, e.g.*, Weinstein Decl. Ex. 187.)

Second, with respect to the account statements, trade approval emails, invoices and stock loan confirmations, defendants regularly received similar documents contemporaneously.  (*See, e.g.*, Joint 56.1 ¶¶ 121, 124-25, 128.)  Further, the Court can take judicial notice that custodians regularly prepare these types of documents and maintain them in the regular course of business. *See Chevron Corp.*, 974 F. Supp. 2d at 691 (taking "judicial notice that banks routinely produce periodic statements for their customers and that those periodic statements reflect any and all deposits, withdrawals, debits and credits during stated periods of time").  And, with respect to the spreadsheets, the fact that the Elysium documents included these spreadsheets covering almost the entire period when the purported trading supposedly occurred demonstrates that the Solo Custodians created and maintained them as part of its regularly conducted activities.  (*See, e.g.*, Weinstein Decl. Ex. 187 (excerpt from Solo customer trade spreadsheet covering period 2012 up to 2015).)[51]

Finally, the Solo Custodians' documents are sufficiently trustworthy as contemporaneous business records to be admitted.  As discussed above, the spreadsheets, account statements, and invoices are corroborated by the defendants' own documents reflecting the same supposed trades included therein.  *See Blecker v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 605 B.R. 570, 585-86 (S.D.N.Y. 2019) (affirming admission of payment records under business records where they "reconcile[d]" to "bank records chronicling payments").  And there is no reason to question the trustworthiness of the trade approvals and stock loan confirmations as transactions purportedly executed at the time by the Solo Custodians' customers, which are in the same form

---

51.  Because this spreadsheet is voluminous, SKAT includes just an excerpt therefrom as an exhibit.

and contain the same substance, albeit with respect to different trades and stock loans, as the trade approvals and stock loan confirmations the Solo Custodians sent defendants.

### B.    In the Florida Solo bellwether, SKAT is entitled to summary judgment on its unjust enrichment claims.

SKAT is entitled to summary judgment on its unjust enrichment claims against defendants Lehman and the FWC Capital plan in the Florida bellwether for much the same reasons it is entitled to summary judgment in the New York Solo bellwethers on its money had and received claims.  Under Florida law, the elements of an unjust enrichment claim are that "(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693 (Fla. Dist. Ct. App. 2018) (internal quotation and citation omitted).[52]

Like New York's money had and received cause of action, Florida's cause of action for unjust enrichment is grounded in "contract implied in law, or quasi contract," *i.e.*, a "legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct . . . adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." *Commerce P'ship 8098 Ltd P'ship v. Equity Contracting Co.*, 695 So.2d 383, 386 (Fla. Dist. Ct. App. 1997).  In Florida, unjust enrichment claims that seek money damages only, as SKAT's do, are considered claims at law, not equity, as "implied contract

---

52. No Florida choice of law analysis is required because there is no potentially outcome determinative difference between Florida unjust enrichment law and the law of another relevant jurisdiction.  *See Estate of Miller v. Thrifty Rent-A-Car Sys., Inc.*, 609 F. Supp. 2d 1235, 1244 (M.D. Fla. 2009) ("a true conflict exists when two or more states have a legitimate interest in a particular set of facts in the litigation and the laws of those states differ or would produce a different result").

actions were part of the action of assumpsit, which was an action at law under the common law."
*Id.* at 389-90; *accord M.I. Indus. USA Inc. v. Attorneys' Title Ins. Fund, Inc.*, 6 So.3d 627, 629
(Fla. Dist. Ct. App. 2009) ("this court has squarely held that an action for unjust enrichment is an
action at law").  "Although some Florida courts have described quasi contracts as being
'equitable in nature,' the term has been used in the sense of 'fairness,' to describe that quality
which makes an enrichment unjust, and not as a reference to the equity side of the court."
*Commerce P'ship*, 695 So.2d at 390.[53]

First, the record conclusively establishes that SKAT conferred a direct benefit on Lehman
and the FWC plan when SKAT paid the plan's payment agent the amounts sought in the plan's
refund applications, which the payment agent, in turn, transferred to the Solo Custodians, and of
which, pursuant to agreement, Shah paid a fixed amount to Lehman.  (*Supra* pg. 36.)  It matters
not that SKAT did not pay Lehman or the FWC plan directly as an "unjust enrichment claim"
may "stand where the benefit is conferred through an intermediary" because "direct *contact*, or
privity, is not the equivalent of conferring a direct *benefit*."  *Aceto Corp. v. TherapeuticsMD,
Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013); *accord Weinberg v. Advanced Data
Processing, Inc.*, 147 F. Supp. 3d 1359, 1368 (S.D. Fla. 2015) (plaintiff stated claim for unjust

---

53.  SKAT also asserted money had and received claims against defendants Lehman and FWC plan.  Under Florida
law, "a claim for money had and received is treated the same (and requires the same showing) as a claim for
unjust enrichment or restitution."  *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1391 (S.D. Fla. 2014); *accord
Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1384 (S.D. Fla. 2010) ("In Florida, the
elements of both causes of action [for money had and received and unjust enrichment] are the same.").  Courts
have characterized them as two names for the same cause of action.  *See Hall v. Humana Hosp. Daytona Beach*,
686 So.2d 653, 656 (Fla. Dist. Ct. App. 1996) ("An action for money had and received, or the more modern
action for unjust enrichment, is an equitable remedy requiring proof that money had been paid due to fraud,
misrepresentation, imposition, duress, undue influence, mistake, or as a result of some other grounds
appropriate for intervention by a court of equity."); *Moore Handley, Inc. v. Major Realty Corp.*, 340 So.2d
1238, 1239 (Fla. Dist. Ct. App. 1976) (holding plaintiff stated cause of action, "whether one labels it with the
terminology of the old common count 'for money had and received' (indebitatus assumpsit) or the more current
'restitution' to prevent 'unjust enrichment'); *Equilease Corp. v. Hentz*, 634 F.2d 850, 853 (5th Cir. 1981) (cause
of action under Florida law to "recover money paid by mistake of fact to a defendant," where "in equity and
good conscience, the defendant should not be allowed to keep the money" is "alternatively referred to as one for
restitution, unjust enrichment, quasi-contract, or an action for money had and received").

enrichment by alleging "he paid EMS for his ambulance trip and, as a result of the direct relationship between EMS and Defendants, a portion of his payment was transferred to Defendants").

Second, the facts are clear that Lehman had knowledge of the benefit SKAT conferred, *i.e.*, the money the FWC plan received and that Shah paid him via First Alton, and that he voluntarily accepted and retained it.  (*Supra* pg. 11.)

Finally, it would be inequitable for the FWC plan and Lehman to retain the benefit, where SKAT paid the amounts sought in the FWC plan's refund applications to the plan's payment agent under the mistaken belief, based on the false representations in the applications and accompanying documents, that the plan had received Danish dividends, from which tax was withheld.  "In Florida, where a recipient of money by mistake cannot show legal or equitable ground for retaining the money, it can be recovered."  *Barry v. Hialeah Miami Springs Med. Fund*, 184 B.R. 611, 612 (S.D. Fla. 1995).

For instance, in *Sharp v. Bowling*, the Florida District Court of Appeals directed that judgment be entered in favor of the plaintiff employer on its unjust enrichment claim seeking to recover amounts it reimbursed the Internal Revenue Service for a tax refund paid based on a W-2 plaintiff issued that overstated the amount of tax withheld from the defendant employee's wages. 511 So.2d 363, 364 (Fla. Dist. Ct. App. 1987).  The court reversed the trial court's judgment denying the claim in part because defendant had already spent the money, holding that in "equity and good conscience" defendant "should be required to reimburse" plaintiff for money "to which in equity and law she was not entitled."  *Id.* at 365.  So too here.  Defendants should be required to reimburse SKAT for money they received and to which they had no entitlement.

### C.     In the Utah ED&F bellwethers, SKAT is entitled to summary judgment on its money had and received claims against certain defendants.[54]

To prevail on its Utah law money had and received claims, SKAT must "establish that the defendants have received money belonging to [SKAT] or to which [it] is in equity and good conscience entitled." *Ace Investors, LLC v. Rubin*, No. 2:08-CV-289 TS, 2009 WL 1684482, at *2 (D. Utah Jun. 26, 2009); *accord Helper State Bank v. Crus*, 61 P.2d 318, 319 (Utah 1936) ("to sustain a cause for money had and received it is only necessary to show that defendant obtained money from plaintiff, under such circumstances that in equity and good conscience it should be returned").[55]  In Utah, an action for money had and received is considered an action at law.  *See Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1013 (Utah 2015) ("At the time of the signing of the Utah Constitution, it was understood that a contract implied in law's predecessor claims (including assumpsit and an action for money had and received) were claims at law, not in equity.").[56]  The undisputed facts show that defendants have received money belonging to SKAT or to which it is in equity and good conscience entitled.

---

54. SKAT seeks summary judgment on its money had and received claims against all defendants in the Utah ED&F bellwethers, except with respect to defendant Kaminer in the AIG plan bellwether.

55. Under Utah choice of law rules, no analysis is necessary because there is no other relevant jurisdiction the application of whose laws would result in a different outcome on SKAT's money had and received claims.  *See Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *11 (D. Utah Nov. 30, 2007) ("A conflict exists if the outcome would differ depending on which state's law is applied or if the forum state does not recognize the cause of action.").

56. SKAT also asserts unjust enrichment claims against the Utah defendants.  The Utah Supreme Court has issued conflicting guidance on whether unjust enrichment claims, such as SKAT's, that seek money damages only should be considered claims at equity, such that the plaintiff is first required to exhaust legal remedies before they may proceed.  *Compare id.* at 1015 ("Restitution is available as a legal remedy where the plaintiff asks exclusively for monetary relief.") *and id.* at 1016 n.3 ("the *Restatement (Third) of Restitution and Unjust Enrichment* points out the weakness of the application of the exhaustion doctrine to unjust enrichment claims, which have their basis, historically, in law") *with Bivens v. Salt Lake City Corp.*, 416 P.3d 338, 350-51 (Utah 2017) (internal quotations and citation omitted) ("The doctrine of unjust enrichment—like other equitable actions—is designed to provide an equitable remedy where one does not exist at law.  Thus, if remedies for a wrong *do* exist at law, a party invoking equity is generally required to first exhaust the legal remedies available.").

### 1.    There were no shares or dividends in the cum-ex transactions.

As an initial matter, defendants "obtained money" from SKAT, "under such circumstances that in equity and good conscience it should be returned," because with respect to the circular cum-ex trading, the defendant plans did not the own shares or receive the dividends, net of withholding tax, they claimed to have owned and received in their refund applications and identified in ED&F's tax vouchers. *Helper State Bank*, 61 P.2d at 319.  ED&F admits the defendants did not receive any dividends or suffer any withholding tax with respect to the Annex E tax vouchers, or portions thereof, where ED&F Dubai was the ultimate seller of the plans' supposed shares, and there is no record evidence to the contrary.  (*See supra* pgs. 24-27.)

The record likewise demonstrates that the rest of the defendant plans' cum-ex trades also were part of circular trading in which the source of the Danish shares the "seller" supposedly sold the plans were the plans themselves, which did not have any shares to begin with.  (*See supra* pgs. 28-31.)  As an initial matter, the defendant plans' "all-in cost" for the structured transactions of which the cum-ex trades were part show that the seller must have sold the plans shares with no dividend right as selling shares with a dividend right would have been economically irrational in the circumstances.  (*See supra* pgs. 28-29.)  If the non-Annex E "sellers" actually owned rights to a dividend, they would have sold them in cum-cum trades for 90 percent of the gross dividend.  No rational seller who was able to convey a dividend would have sold it for 80-82 percent, when the market price averaged 90 percent.  That is particularly so when tax advantaged sellers, such as MUFG, by virtue of doing no trade at all, would have been able to receive 85 percent of the dividend payment, 73 percent from the issuer plus an additional 12 percent refund from SKAT.  (SKAT's 56.1 ¶¶ 83-84.)[57]

---

57.  Under applicable tax treaties and other agreements, most foreign, non-tax-exempt Danish shareholders are entitled to pay a 15 percent tax rate on Danish dividend income.  (*Id.*)

Further, the amounts of shares the plans purportedly purchased in the cum-ex trades were implausibly high for it to be otherwise.  (*See supra* pgs. 29-30.)  And, finally, ED&F admittedly did not hold anywhere close to the number of shares on which it issued tax vouchers and held no shares supporting the cum-ex transactions.  Even setting aside whether any dividend was due on the shares in the first place, the manner in which ED&F settled the cum-ex trades—by breaking them down into smaller shapes and recycling the same cum-cum or other ex-dividend shares through multiple settlement cycles—demonstrates that the trading was circular, and resulted in ED&F issuing multiple tax vouchers stating that multiple plans received a dividend on the same underlying shares.  (*See supra* pgs. 31-33.)

There is no evidence in the record that would make it reasonable to infer that the supposed "dividend compensation payments" the sellers in the cum-ex trades paid to the plans represented actual dividends from the issuer and from which tax was withheld.  *See Casciani v. Nesbitt*, 392 F. App'x 887, 888 (2d Cir. 2010) (on summary judgment, "the court is not required to draw *all* inferences in the nonmovant's favor, but only all *reasonable* inferences").  Indeed, in conducting its own investigation of the legitimacy of its tax vouchers, ED&F studiously avoided inquiring into whether the third-party sellers actually received a dividend from the share issuer and from which tax was withheld.  (SKAT's 56.1 ¶¶ 107-108.)

## 2.    The defendant plans were not the beneficial owners of any shares or dividends.

Further, even to the extent any of the shares or dividends identified in any of ED&F's tax vouchers existed, the defendant plans were not entitled to any of the money SKAT paid in response to their tax refund applications because, contrary to their representations, ED&F, not the defendant plan, was the beneficial owner of such shares and dividends.  The AIG and Riverside plans' ownership interests in any such shares and dividends were governed by a series

of agreements, including ED&F's Terms and Conditions of Business, to which the defendant

plans agreed when they opened accounts at ED&F.  (Joint 56.1 ¶¶ 275-280.)  All the agreements,

including the Terms and Conditions, provide that they are "governed by," and to "be construed

in accordance with, the laws of England."  (*Id*. at ¶ 180.)[58]

As set forth in the expert report of Felicity Toube QC, construing the operative

agreements in accordance with English law principles of contract interpretation, the Terms and

Conditions governed the plans' ownership rights in the shares and dividends, and under those

Terms, to the extent they existed in the first place, "all right, title, and interest" in the shares and

dividends passed immediately to ED&F upon receipt.  (Weinstein Decl. Ex. 94 (Expert Report of

Felicity Toube QC, dated December 17, 2021) at ¶ 44; Weinstein Decl. 171 at 18.)[59]  In

particular, all the shares the defendant plans supposedly bought through ED&F were paid for

with financing ED&F provided the plan, which amounts the plans did not repay before the

dividends were issued.  (Joint 56.1 ¶¶ 348-49; SKAT's 56.1 ¶¶ 119-121.)  Thus, under the

"absolute title transfer" provision in paragraph 10(b)(ii) of the Terms and Conditions, all such

shares and dividends "received by [ED&F] either from [the plans] or in respect of [their]

---

58.  "Utah courts generally uphold [contractual] choice-of-law provisions based on the intent of the contracting parties and a respect of the parties' right to choose the governing law for a contract."  *GRB Enterprises LLC v. JPMorgan Chase Bank, N.A.*, No. 2:11CV833DAK, 2012 WL 845418, at *3 (D. Utah Mar. 12, 2012); *see also Innerlight, Inc. v. Matrix Grp., LLC*, 214 P.3d 854, 858 (Utah 2009) (enforcing contractual choice of law provision "[b]ased on a plain reading of the language of the Contract").  In particular, Utah follows section 187 of the Restatement (Second) of Conflict of Laws, under which "the law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties['] choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which would be the state of the applicable law in the absence of an effective choice of law by the parties."  *Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1083-84 (10th Cir. 1999) (quoting Restatement (Second) of Conflict of Laws § 187)).  Here, England has a substantial relationship to the parties and their transactions, as one party, ED&F, is located there and the purported transactions governed by the Terms and Conditions were executed there, and English contract law is not at odds with any fundamental Utah policy.

59.  SKAT is not aware of any actual conflict with Utah law in applying the plain terms of the plans' agreements, but for the avoidance of doubt provided notice of its intent to raise the applicability of English law to the agreements governing the plans and ED&F's relationship in its December 3, 2021 Rule 44.1 notice.  (ECF No. 692.)

account[s] [were] actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets . . . pass[ed] to [ED&F] outright and absolutely for the purposes of covering [the plans'] obligation to [ED&F]."  (Weinstein Decl. 171 at 18.)

Further, section 10(c) of the Terms made clear that "absolute title transfer under paragraph (b)(ii)" meant that "the relevant assets," *i.e.*, the shares and dividends, "cease[d] to be [the plans'] assets and [the plans'] . . . no longer ha[d] a proprietary claim over them."  (*Id.*) Rather, the "assets," *i.e.*, the shares and dividends, "bec[a]me [ED&F's] assets," which ED&F could "deal with . . . in [its] own right."  (*Id.*)  Since all right, title and interest in the shares passed to ED&F under the terms of the absolute title transfer provision before any dividends were paid, the representations in the defendant plans' refund applications and ED&F's tax vouchers that the plans were the beneficial owners of the shares and dividends were false, and the plans have no entitlement to the amounts SKAT paid, which in equity and good conscience should be returned to SKAT.

**D.     SKAT is entitled to prejudgment interest on its restitution claims.**

Under New York, Florida, and Utah law, SKAT is entitled to prejudgment interest on its restitution damages awards in each respective jurisdiction.  *See Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999) ("The awarding of prejudgment interest is considered a question of substantive law.").

**1.     SKAT is entitled to prejudgment interest under New York law.**

Under New York law, prejudgment interest is mandatory on "a sum awarded because of a breach of performance of a contract."  CPLR § 5001(a).  Such interest runs from "the earliest ascertainable date the cause of action existed," "at the rate of nine per centum per annum,"

"except that interest upon damages incurred thereafter shall be computed from the date incurred."  CPLR §§ 5001(b), 5004.

Damages awards based on contract implied in law, such as those SKAT seeks based on its money had and received claim, are considered awards "because of a breach of performance of a contract" on which prejudgment interest is mandatory.  *See Isaacs v. Incentive Systems, Inc.*, 52 A.D.2d 550, 551 (1st Dep't 1976) ("The sum awarded below being 'because of a breach of performance of a contract,' albeit a contract implied in law, plaintiff was properly awarded interest on the recover.").  Further, CPLR § 5001(a)'s exception to mandatory prejudgment interest for actions "of an equitable nature" does not apply to SKAT's money had and received claims, which are actions at law.  *See Eighteen Holding Corp. v. Drizin*, 268 A.D.2d 371, 372 (1st Dep't 2000) ("award of pre-judgment interest [on claims for money had and received, unjust enrichment and conversion] pursuant to CPLR 5001 at the statutory rate of nine percent was proper" because it "was an action at law"); *see also U.S. Fire Ins. Co. v. Federal Ins. Co.*, 858 F.2d 882, 889 (2d Cir. 1988) (concluding that "the history of § 5001(a) supports the conclusion a plaintiff who recovers under an implied contract was meant to recover predecision interest as a matter of law").  Thus, should the Court grant SKAT summary judgment on its money had and received claims in the New York Solo bellwethers, SKAT is entitled to nine percent prejudgment interest from the date it paid each of the amounts at issue until judgment is entered on the claims.

## 2.    SKAT is entitled to prejudgment interest under Florida law.

Likewise, in the Florida Solo bellwether, SKAT is entitled to prejudgment interest on its unjust enrichment claims as a matter of law.  *See Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So.2d 180, 199 (Fla. Dist. Ct. App. 2004) (awarding prejudgment interest where "damages for unjust enrichment can be liquidated").  In Florida, once damages have been liquidated as of a certain date, there is no "discretion in the award of prejudgment interest" or

"the rate of that interest," which is set by statute.  *Argonaut Ins. Co. v. May Plumbing Co.*, 474

So.2d 212, 215 (Fla. 1985).  Where, as here, no contract sets forth an applicable rate of interest,

the statutory rate applies, which is currently 4.25 percent.  *See* Fla Stat. Ann. §§ 687.01, 55.03;

Civil Judgment Interest Rates, CLERK OF THE COURT BREVARD COUNTY, FLORIDA,

https://brevardclerk.us/civil-judgment-interest-rates (last visited Apr. 29, 2022).  Accordingly,

since the amounts SKAT seeks on its unjust enrichment claims can be liquidated as of certain

dates, *i.e.*, the dates it paid the amounts at issue, SKAT is entitled to mandatory 4.25 percent

interest running from the date it made each respective payment until judgment is entered on the

claims.

### 3.      SKAT is entitled to prejudgment interest under Utah law.

Under Utah law, an award of prejudgment interest "is proper when the damage is

complete, the loss can be measured by facts and figures, and the amount of loss is fixed as of a

particular time."  *Lefavi v. Bertoch*, 994 P.2d 817, 823 (Utah Ct. App. 2000) (internal quotations

omitted).  Prejudgment interest may be awarded only where the damages are "subject to

calculation," *i.e.*, not those "where the trier of fact is left to assess damages based on a mere

description of the wrongs done or injuries inflicted," "such as in cases of personal injury,

wrongful death, defamation of character, and false imprisonment."  *Encon Utah, LLC v. Fluor

Ames Kraemer, LLC*, 210 P.3d 263, 272-73 (Utah 2009) (internal quotations omitted).  By Utah

statute, where proper, the rate of prejudgment interest is "the federal postjudgment interest rate

as of January 1 of each year, plus 2%," which for 2022, equals 2.4 percent.  Utah Stat. Ann.

§ 15-1-4(3)(a); 28 U.S.C. § 1961(a) (federal postjudgment interest rate is "equal to the weekly

average 1-year constant maturity Treasury yield, as published by the Board of Governors of the

Federal Reserve System, for the calendar week preceding").[60]  Thus, an award of prejudgment interest on SKAT's Utah law money had and received claims is proper as SKAT's damages are fixed and certain as of a particular date, *i.e.*, the date SKAT made each payment, and readily subject to calculation.

## II.     SKAT is entitled to partial summary judgment on the false statement element of its fraud and negligent misrepresentation claims.

Under the respective laws of New York, Florida and Utah, a false statement of material fact is an element of SKAT's fraud claims.  *See, e.g.*, *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) ("elements of a cause of action for fraud require a material misrepresentation of fact"); *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla. 1984) ("elements for actionable fraud" include "a false statement concerning a material fact"); *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 977 n.38 (Utah 2009) ("elements of a fraud claim include . . . (1) a representation; (2) concerning a presently existing material fact; (3) which was false").

The same is true with respect to SKAT's negligent misrepresentation claims under the laws of those jurisdictions.  *See, e.g.*, *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) (elements of New York law negligent misrepresentation claim include that "the defendant made a false representation"); *Baggett v. Electricians Local 915 Credit Union*, 620 So.2d 784, 786 (Fla. Dist. Ct. App. 1993) (negligent misrepresentation claim requires that "there was a misrepresentation of material fact"); *Allegis Inv. Servs., LLC v. Arthur J. Gallagher & Co.*,

---

60.  *See also* Data Download Program, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (select "Treasury Constant Maturities,"
then click "Go to download" button, then click "Change Format" button, then select "Dates" and enter January
1 to January 10, 2022 in date range, then click "View chart," then select "1-year Treasury constant maturity").

371 F. Supp. 3d 983, 1005 (D. Utah 2019) (Utah law negligent misrepresentation claims requires "a false representation").[61]

SKAT demonstrated above that there is no genuine dispute that in all the bellwethers, the defendant plans' tax refund applications included false representations that the plans owned shares of Danish stock, on which they received dividends, net of withholding tax. (*Supra* Section I.) Thus, to narrow the scope of issues at trial, SKAT also moves for partial summary judgment on the false statement element of its fraud and negligent misrepresentation claims. *See In re Refco Inc. Sec. Litig.*, No. 07-md-1902 (JSR), 2013 WL 12191844, at *2 (S.D.N.Y. Mar. 25, 2013) ("The purpose of a partial summary judgment motion is to promote efficiency and narrow the scope of a trial to the issues that are reasonably disputed."). In the Solo bellwethers, there is no genuine dispute that the plans' representations of share ownership and dividend receipt were false because there never were any shares or dividends. (*Supra* Section I.A & B.) Likewise, with respect to the ED&F bellwethers, all the representations were false because even if there were shares, ED&F, not the defendant plan, was the beneficial owner of them. (*Supra* Section I.C.2.) And for the cum-ex trades, no shares or dividends existed. (*Supra* Section I.C.1.)

Nor could there be any genuine dispute that the false representations were material to SKAT's decision to pay the amounts at issue. Material facts are those to which "a reasonable man would attach importance" in making the determination at issue. *Cohen v. Koenig*, 918 F. Supp. 719, 726 (S.D.N.Y. 1996) (internal quotations omitted); *see also Silverman v. Pitterman*, 574 So.2d 275, 276 (Fla. Dist. Ct. App. 1991) ("A material fact is generally defined as one to which a reasonable person would attach importance in determining a choice of action.").

---

61. No choice of law analysis is needed with respect to the false statement element of SKAT's fraud and negligent misrepresentation claims because there is no actual conflict between New York, Florida or Utah law and the law of another potentially relevant jurisdiction on this element of the claims. (*See supra* pgs. 39 n.41, 51 n.51, 53 n.54.)

Whether the defendant plans owned the shares and received the dividends, net of withholding tax, is clearly something "a reasonable" person would consider important in deciding whether to pay the amounts requested in the defendant plans' refund applications.

## **CONCLUSION**

For the reasons set forth above, SKAT respectfully requests that the Court grant its motion for partial summary judgment (i) in the New York Solo bellwethers, on its money had and received claims against defendants Markowitz, van Merkensteijn, Klugman, Altbach Bradley, RJM Capital plan, Basalt Ventures plan, Roadcraft Technologies plan, Proper Pacific plan, RAK Investment Trust and Routt Capital Trust; (ii) in the Florida Solo bellwether, on its unjust enrichment claims against defendants Lehman and FWC Capital plan; (iii) in the Utah ED&F bellwethers, on its money had and received claims against defendants Crema, Schulman, AIG plan, Riverside plan and Acer; and (iv) on the false statement of material fact element of its fraud and negligent misrepresentation claims in all the bellwethers.  Further, should the Court grant SKAT's motion with respect to its money had and received and unjust enrichment claims in the bellwethers, SKAT respectfully requests that the Court award prejudgment interest from the date each payment was made until judgment is entered on the claims.

Dated: New York, New York
      April 29, 2022

                      HUGHES HUBBARD & REED LLP

                      By:    /s/ Marc A. Weinstein
                         William R. Maguire
                         Marc A. Weinstein
                         Neil J. Oxford
                         Gregory C. Farrell
                      One Battery Park Plaza
                      New York, New York 10004-1482
                      Telephone: (212) 837-6000
                      Fax:  (212) 422-4726
                      bill.maguire@hugheshubbard.com
                      marc.weinstein@hugheshubbard.com
                      neil.oxford@hugheshubbard.com
                      gregory.farrell@hugheshubbard.com

                      *Counsel for Plaintiff Skatteforvaltningen*
                      *(Customs and Tax Administration of the*
                      *Kingdom of Denmark)*