**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTERFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:  All cases. | MASTER DOCKET<br><br>18-md-2865 (LAK)<br><br>**Oral Argument Requested** |

**DEFENDANTS' AND THIRD-PARTY DEFENDANT'S MEMORANDUM
IN OPPOSITION TO PLAINTIFF SKATTEFORVALTNINGEN'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

COUNTERSTATEMENT OF FACTS ...............................................................................2

I.    Solo Bellwether Plans' Trading And Applications For Withholding Tax Refunds ..............................................................................................................3

II.   ED&F Bellwether Plans' Trading And Applications For Withholding Tax Refunds ..............................................................................................................5

ARGUMENT .......................................................................................................................6

I.    The Court Cannot Enter Summary Judgment For SKAT Consistent With The Revenue Rule .................................................................................................6

    A.    The Revenue Rule Precludes Summary Judgment Against The Solo Defendants ..................................................................................7

    B.    The Revenue Rule Precludes Summary Judgment Against The ED&F Defendants ..................................................................................9

II.   SKAT Is Not Entitled To Judgment On Its Claims For Money Had And Received ........................................................................................................11

    A.    SKAT Cannot Establish That The Plans Were Not Entitled To Reclaims ...............................................................................................12

    B.    SKAT Cannot Establish That Defendants Received Money Belonging To It ..............................................................................................35

    C.    Several Individual Defendants Did Not Receive Any Funds At All ........................................................................................................37

    D.    Money Had And Received Sounds In Equity So Should Not Be Resolved At This Juncture ...........................................................................42

    E.    SKAT's Motion Also Fails Because Reasonable Fact-Finders Could Find That Equity And Good Conscience Do Not Require Disgorgement ............43

    F.    SKAT's Motion Fails Because It Relies On Inadmissible Evidence ..................50

    G.    SKAT's Claims Are Time-Barred .............................................................56

    H.    SKAT Is Not Entitled To Pre-Judgment Interest ..................................................57

III.  SKAT Is Not Entitled To Judgment On The "False Statement" Element Of Its Claims For Fraud And Negligent Misrepresentation.............................................58

    A.    SKAT Is Not Entitled To Judgment On Statements Defendants Never Made.......................................................................................................59

    B.    SKAT Fails To Support Its Arguments As To The ED&F Bellwethers...............61

IV.  SKAT Seeks An Impermissible Advisory Opinion Vis-à-vis Altbach............................62

CONCLUSION ...................................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*,
    731 F.2d 112 (2d Cir. 1984) ................................................................................................49

*Aceto Corp. v. TherapeuticsMD, Inc.*,
    953 F. Supp. 2d 1269 (S.D. Fla. 2013) ..............................................................................41

*Advanced Recovery Systems, LLC v. American Agencies, LLC*,
    2016 WL 6916539 (D. Utah Sept. 28, 2016) ......................................................................36

*Alvarez v. All Star Boxing, Inc.*,
    258 So. 3d 508 (Fla. Dist. Ct. App. 2018) ..........................................................................41

*American Safety Insurance Service, Inc. v. Griggs*,
    959 So. 2d 322 (Fla. Dist. Ct. App. 2007) ..........................................................................41

*Amsave Credit Corp. v. Security Pacific National Bank*,
    1991 WL 95390 (S.D.N.Y. May 28, 1991) ...................................................................42, 43

*Amusement Industry, Inc. v. Stern*,
    786 F. Supp. 2d 758 (S.D.N.Y. 2011) .................................................................................59

*Angus Partners LLC v. Walder*,
    52 F. Supp. 3d 546 (S.D.N.Y. 2014) ..............................................................................35, 37

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
    268 F.3d 103 (2d Cir. 2001) .................................................................................................9

*Attorney General of Utah v. Pomeroy*,
    73 P.2d 1277 (Utah 1937) ...................................................................................................58

*Banque Worms v. BankAmerica International*,
    77 N.Y.2d 362 (1991) .....................................................................................................47, 48

*Bietola v. McCue*,
    764 N.Y.S.2d 692 (1st Dep't 2003) .................................................................................37, 39

*Boden v. St. Elizabeth Medical Center, Inc.*,
    2018 WL 4855210 (E.D. Ky. Oct. 5, 2018) .........................................................................62

*Bolling v. Gold*,
    2015 WL 6870617 (W.D. Wash. Nov. 9, 2015) ..................................................................59

*Borup v. CJS Solutions Group, LLC*,
  2019 WL 4820732 (D. Minn. Oct. 1, 2019) ...................................................62, 63

*Caldwell v. Compass Entertainment Group LLC*,
  2016 WL 7136181 (M.D. Fla. Feb. 4, 2016) ...........................................................40

*Century Senior Services v. Consumer Health Benefit Association, Inc.*,
  770 F. Supp. 2d 1261 (S.D. Fla. 2011) ...................................................................41

*Chevron Corp. v. Donziger*,
  974 F. Supp. 2d 362 (S.D.N.Y. 2014)..............................................................53, 54

*CIG Exploration, Inc. v. Hill*,
  824 F. Supp. 1532 (D. Utah 1993)..................................................................11, 56

*CIG Exploration, Inc. v. State*,
  24 P.3d 966 (Utah 2001).........................................................................................56

*Cobalt Multifamily Investments I, LLC v. Arden*,
  857 F. Supp. 2d 349 (S.D.N.Y. 2011)....................................................................45

*Cohen v. BMW Investments L.P.*,
  144 F. Supp. 3d 492 (S.D.N.Y. 2015).........................................................12, 45, 48

*Cohn & Berk v. Rothman-Goodman Management Corp.*,
  509 N.Y.S.2d 367 (2d Dep't 1986).........................................................................48

*Cooper v. Anheuser-Busch, LLC*,
  553 F. Supp. 3d 83 (S.D.N.Y. 2021).......................................................................37

*Dumois v. Hill*,
  32 N.Y.S. 164 (Ct. C.P. 1895) ...............................................................................48

*Eighteen Holding Corp. v. Drizin*,
  701 N.Y.S.2d 427 (1st Dep't 2000) ........................................................................57

*Elliot v. Nelson*,
  301 F. Supp. 2d 284 (S.D.N.Y. 2004).....................................................................60

*Estate of Hatch, ex rel. Ruzow v. NYCO Minerals Inc.*,
  704 N.Y.S.2d 340 (3d Dep't 2000).........................................................................45

*European Community v. RJR Nabisco, Inc.*,
  2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ...........................................................35

*European Community v. RJR Nabisco, Inc.*,
  424 F.3d 175 (2d Cir. 2005).....................................................................................9

*F.H. Paschen, S.N. Nielsen & Associates LLC v. B&B Site Development, Inc.*,
   311 So. 3d 39 (Fla. Dist. Ct. App. 2021) ...............................................................58

*Federal Insurance Co. v. Groveland State Bank*,
   37 N.Y.2d 252 (1975) ...............................................................................44, 46

*Fisher v. Davidhizar*,
   263 P.3d 440 (Utah Ct. App. 2011) ....................................................................61

*Fletcher v. Atex, Inc.*,
   68 F.3d 1451 (2d Cir. 1995)...............................................................................38

*Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union
   Bancaire Privee*,
   160 F.3d 146 (2d Cir. 1998)...........................................................................46, 48

*Gameologist Group, LLC v. Science Games International, Inc.*,
   838 F. Supp. 2d 141 (S.D.N.Y. 2011) ...................................................................47

*Georgia Malone & Co. v. Rieder*,
   926 N.Y.S.2d 494 (1st Dep't 2011) .....................................................................49

*Harvey v. Floria Health Sciences Center, Inc.*,
   728 F. App'x 937 (11th Cir. 2018) ......................................................................40

*Holland v. Florida*,
   560 U.S. 631 (2010).......................................................................................44

*In re Allou Distributors, Inc.*,
   446 B.R. 32 (Bankr. E.D.N.Y. 2011).....................................................................39

*In re New Times Securities Services Inc.*,
   371 F.3d 68 (2d Cir. 2003)...............................................................................47

*In re RFC & RESCAP Liquidating Trust Action*,
   2020 WL 504661 (D. Minn. Jan. 31, 2020)..............................................................34

*In re SKAT Tax Refund Scheme Litigation*,
   356 F. Supp. 3d 300 (S.D.N.Y. 2019).............................................................9, 42, 43

*Jewish National Fund, Inc. v. Garland*,
   1985 WL 163 (S.D.N.Y. Jan. 3, 1985) ..................................................................42

*Joseph Rosenbaum, M.D., Inc. v. Hartford Fire Insurance Co.*,
   104 F.3d 258 (9th Cir. 1996) .............................................................................60

*Kind v. B. Gutter & Sons*,
   80 N.Y.S.2d 669 (City Ct. 1947) ........................................................................47

*Kovalivker v. Team Real Estate Management, LLC*,
    2020 WL 3305674 (S.D. Fla. May 4, 2020) ......................................................42

*Litvinoff v. Wright*,
    54 N.Y.S.3d 22 (2d Dep't 2017)...................................................11, 38, 44

*Manufacturers Hanover Trust Co. v. Chemical Bank*,
    559 N.Y.S.2d 704 (1st Dep't 1990) ......................................................48

*Menlo v. Friends of Tzeirei Chabad*,
    2012 WL 137504 (S.D.N.Y. Jan. 17, 2012) ......................................................44

*Mia Shoes, Inc. v. Republic Factors Corp.*,
    1997 WL 525401 (S.D.N.Y. Aug. 21, 1997)......................................................36

*Middle E. Banking Co. v. State Street Bank International*,
    821 F.2d 897 (2d Cir. 1987).......................................................12

*Moss v. Summit County*,
    208 P. 507 (Utah 1922)......................................................44

*Mugavero v. Arms Acres, Inc.*,
    680 F. Supp. 2d 544 (S.D.N.Y. 2010)......................................................38

*Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009) ......................................................60

*Northern Trust Co. v. Chase Manhattan Bank, N.A.*,
    582 F. Supp. 1380 (S.D.N.Y.).......................................................43

*P360 Spaces LLC v. Orlando*,
    76 N.Y.S.3d 114, 116 (1st Dep't 2018) ......................................................44

*People v. Duggan*,
    291 N.Y.S.2d 582 (3d Dep't 1968)...................................................36, 50

*Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*,
    2022 WL 603998 (S.D.N.Y. Mar. 1, 2022) ......................................................37

*Sara Lee Corp. v. Kraft Foods Inc.*,
    276 F.R.D. 500 (N.D. Ill. 2011).......................................................34

*Schwartz v. Tanner*,
    576 P.2d 873 (Utah 1978)......................................................61

*SEC v. ITT Educational Services, Inc.*,
    303 F. Supp. 3d 746 (S.D. Ind. 2018) ...................................................58, 63

*SH575 Holdings LLC v. Reliable Abstract Co.*,
    149 N.Y.S.3d 62 (1st Dep't 2021) ..................................................................47

*Southeast Directional Drilling, LLC v. Kern River Gas Transmission Co.*,
    2013 WL 209492 (D. Utah Jan. 17, 2013).....................................................59

*Spaces LLC v. Orlando*,
    76 N.Y.S.3d 114 (1st Dep't 2018) ..................................................................44

*State Farm Mutual Automobile Insurance Co. v. Stokos*,
    317 N.Y.S.2d 706 (Civ. Ct. 1970) ..................................................................49

*Staudinger+Franke GMBH v. Casey*,
    2015 WL 3561409 (S.D.N.Y. June 8, 2015) ..................................................37

*Stormo v. State National Insurance Co.*,
    2021 WL 4973835 (D. Mass. Oct. 26, 2021)..................................................62

*Stuck v. Delta Land & Water Co.*,
    227 P. 791 (Utah 1924)...................................................................................61

*Swiss Watch International, Inc. v. Movado Group, Inc.*,
    2001 WL 36270980 (S.D. Fla. June 21, 2001) ..............................................40

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
    2010 WL 3310262 (E.D.N.Y. Aug. 19, 2010).................................................47

*Traffix, Inc. v. Herold*,
    269 F. Supp. 2d 223 (S.D.N.Y. 2003)..................................................35, 36, 42

*Trana Discovery, Inc. v. Southern Research Institute*,
    915 F.3d 249 (4th Cir. 2019) .........................................................................60

*Triebwasser & Katz v. American Telephone & Telegraph Co.*,
    535 F.2d 1356 (2d Cir. 1976)....................................................................42, 43

*Tzfira v. Kadouri International Foods, Inc.*,
    2009 WL 10695620 (S.D.N.Y. June 23, 2009) ..............................................43

*United Republic Insurance Co. v. Chase Manhattan Bank*,
    168 F. Supp. 2d 8 (N.D.N.Y. 2001).................................................................36

*United States v. Fattah*,
    914 F.3d 112 (3d Cir. 2019)............................................................................20

*United States v. Federative Republic of Brazil*,
    748 F.3d 86 (2d Cir. 2014)................................................................................6

*United States v. Ganias*,
   824 F.3d 199 (2d Cir. 2016)..................................................................50

*United States v. Sliker*,
   751 F.2d 477 (2d Cir. 1984)..................................................................53

*Vertex Construction Corp. v. T.F.J. Fitness L.L.C.*,
   2011 WL 5884209 (E.D.N.Y. Nov. 23, 2011)........................................49

*VIIV Healthcare Co. v. Mylan Inc.*,
   2014 WL 2195082 (D. Del. May 23, 2014)............................................34

*Weinberg v. Advanced Data Processing, Inc.*,
   147 F. Supp. 3d 1359 (S.D. Fla. 2015) ..................................................41

*White v. Robinson*,
   130 N.Y.S. 388 (1st Dep't 1911) ...........................................................37

*Williamson v. Stallone*,
   905 N.Y.S.2d 740 (Sup. Ct. 2010) ..........................................36, 49, 50

*Zamor v. L & L Associates Holding Corp.*,
   926 N.Y.S.2d 625 (2d Dep't 2011)........................................................44

**Statutes, Codes, & Regulations**

26 U.S.C. § 871(m)....................................................................................20

Utah Code Ann.
   § 78B-2-307(1)......................................................................................56

N.Y. C.P.L.R.
   § 5001(a) ...............................................................................................57

U.C.C.
   § 8-501 ..................................................................................................20

**Rules**

Fed. R. Civ. P. 30(b)(6)..................................................................31, 33, 34

Fed. R. Civ. P. 56................................................................................58, 59

Fed. R. Evid. 803 ...............................................................................33, 53, 55

S.D.N.Y. Local Rule 56.1.........................................................2, 38, 39, 40, 51, 52

## INTRODUCTION

SKAT's motion for partial summary judgment should be denied.

*First*, the Revenue Rule bars this Court from granting SKAT summary judgment. To resolve SKAT's claims against any of the Defendants, this Court will need to choose between competing views of what beneficial ownership requires under Danish tax law. Siding with SKAT would result in this Court's awarding SKAT a money judgment based on its interpretation of Danish tax law—that is, enforcing Danish tax law. The Revenue Rule bars that undertaking. In addition, as to the ED&F Bellwether Plans, SKAT is in any event estopped from challenging the applicability of the Revenue Rule, because this very issue has already been resolved against SKAT in proceedings in England concerning the very same transactions at issue here.

*Second*, summary judgment on SKAT's claims for money had and received should be denied because SKAT cannot meet its burden to establish multiple elements of its claim. As a matter of law, the defendant plans were entitled to the reclaims SKAT paid them. While SKAT repeats its refrain that there were "no shares" and "no dividends," that assertion is wrong as a matter of fact and irrelevant as a matter of law. The only question that matters to determining whether the defendant pension plans were entitled to reclaims is whether they were the beneficial owners of dividends under Danish tax law. Because they were, SKAT cannot establish that equity and good conscience require the return of any money. Additional reasons also doom SKAT's motion, some common to all Defendants and others specific to certain Defendants.

*Third*, SKAT is not entitled to summary judgment on the "false statement" element of its fraud and negligent misrepresentation claims. Defendants did not make the statements alleged to be false and, even if they did, those statements would have been true.

## COUNTERSTATEMENT OF FACTS

SKAT's 32-page "Statement of Undisputed Material Facts," SKAT Br. 6-38, reads more like a legal argument than a statement of facts, let alone "undisputed" ones. SKAT repeatedly mischaracterizes the actually undisputed material facts and includes "facts" that are either genuinely disputed or contradicted by the record evidence. The deficiencies in SKAT's lengthy "facts" section—only some of which are detailed here—expose the problem with its motion: SKAT cannot win summary judgment on the record before the Court.

Most egregiously, SKAT pervasively mischaracterizes the parties' joint Rule 56.1 statement of undisputed material facts (JSUMF), even though the parties extensively negotiated its 391 paragraphs. To take just one repeated error, SKAT routinely cites the JSUMF to support statements that certain of the Defendants' representations in their reclaim applications were "false." For instance, SKAT writes that the plans "falsely represented that they were the beneficial owners of Danish shares," and "falsely stat[ed]" that they had received net dividends. SKAT Br. 7. In support of those assertions, SKAT cites to paragraphs 172-203, 358-59, and 367-68 of the JSUMF. Those paragraphs do not support SKAT's claim that the plans "falsely" represented anything. Instead, they meticulously detail the contents of every reclaim submission made on behalf of the Solo Bellwether Plans, and note that the Riverside Plan included tax vouchers created by ED&F. These paragraphs provide no support for SKAT's assertion that the plans made "false" representations. SKAT's statement of facts contains numerous iterations of the same issue.[1]

---

[1] *See, e.g.*, SKAT Br. 7 (claiming that the refund applications contained "false representations and documents" and citing JSUMF ¶¶ 204-06, 208-10, 212-20, 376-78, which merely list the total amounts of withholding tax the plans claimed and that SKAT paid); *id.* at 35 (asserting that the RJM Capital Plan's refund applications "falsely represented to SKAT that it was the beneficial owner," and citing JSUMF ¶¶ 172-82, 204-06, which, as described above, simply detail the facts of RJM Capital's reclaim submissions and SKAT's payments); *id.* at 35-36 (insisting that the AIG Plan "falsely represented to SKAT that it was the beneficial owner" in reclaim applications, and citing JSUMF ¶ 376, which sets forth only the total amount that the AIG Plan sought and that SKAT paid).

Besides improperly relying on the JSUMF to support its assertions of falsity, SKAT also regularly characterizes undisputed facts that it does not like as "purported" facts.  For example, SKAT writes that "Solo was the only Solo Custodian providing purported custody services to the plans in 2012 and 2013 and was the purported custodian for RJM Capital plan's purported 2014 trading."  SKAT Br. 12.  In support of that sentence—which uses the adjective "purported" three times—SKAT cites only paragraph 107 of the JSUMF.  That paragraph explains that the Solo Bellwether Plans used certain Solo Custodians "to provide custodial services," and it sets forth which Solo Custodian(s) each Solo Bellwether Plan used "as its custodian" and when.  There is nothing in the paragraph to support SKAT's repeated use of "purported."  By characterizing Solo as a "purported custodian," SKAT contradicts the truly undisputed material facts to which it previously agreed.  The parties agree that, at all relevant times, the Solo Custodians were FCA-regulated custodians.  *See* JSUMF ¶ 108; Dulberg Decl. (ECF No. 803) Ex. 40 (Solo Capital).

On SKAT's own telling, then, the Court would have to disregard stipulated undisputed facts and instead rely on mischaracterizations of the record in order to find for SKAT.  As a result, SKAT certainly is not entitled to summary judgment.

## I.     Solo Bellwether Plans' Trading And Applications For Withholding Tax Refunds

The Solo Bellwether Plans include five U.S. single-participant retirement savings plans.  JSUMF ¶¶ 79-81, 89-90.  In its motion, SKAT challenges 68 trades those plans placed from 2012 through 2015.  SKAT App'x A, B, D, F, H.  Under the Double Taxation Treaty between the United States and Denmark, such plans were entitled to seek refunds of tax withheld by the Danish government on dividend payments.  To realize that benefit, the Solo Bellwether Plans engaged in trades arranged by Solo Capital Partners ("Solo Capital"), a London-based custodian, to purchase shares of real Danish companies, like the shipping giant Maersk, on a date prior to the "ex-dividend date."  *See, e.g.*, JSUMF ¶¶ 107, 113.  That timing meant that the plans bought the shares when

the market price was a "cum-dividend" (meaning "with dividend") price and thus reflected the purchaser's entitlement to receive the forthcoming dividend payment from the company. *Id.* ¶ 113; Bahnsen Decl. (ECF No. 808) Ex. 12 (Carr Report) ¶¶ 23, 127.  The shares were purchased through brokers like FGC Securities in New York that were independent of Solo Capital.  JSUMF ¶ 132.  The brokers issued trade confirmations setting forth the pertinent details of each transaction. *Id.* ¶ 132.  Solo Capital then cleared and settled the trades, and issued account statements reflecting the purchases.  *Id.* ¶¶ 133, 144.  The parties agree that the Solo Bellwether Plans received those trade confirmations and account statements showing the purchase of Danish securities, and that the account statements also showed credits for dividends in amounts that reflect the withholding tax.  *Id.* ¶¶ 144-45.

All that is needed to establish ownership under Danish tax law is "a final and binding agreement" to buy shares.  Pilgaard Decl. (ECF No. 801) ¶ 156.  The transaction does not need to settle for ownership to transfer.  *Id.* ¶¶ 155-57.  And because Danish tax law says that a binding agreement to buy cum-dividend shares includes the right to receive a dividend payment, the buyer is thus recognized by Danish tax law to be the "beneficial owner of any dividends associated with those shares." *Id.* ¶ 188.  Because the Solo Bellwether Plans were beneficial owners of dividends associated with Danish companies, and because they were entitled as U.S. pension plans to recover the withheld taxes (a fact the IRS has repeatedly confirmed), they submitted applications to SKAT for refunds.  *See, e.g.*, JSUMF ¶¶ 93, 102, 177.  In doing so, each plan represented that it was a "beneficial owner"—a true statement—and submitted an IRS Form 6166 confirming the plan's U.S. residence and Dividend Credit Advice from each Solo Custodian confirming the plan's receipt of dividends net of withholding tax.  *Id.* ¶ 177.  SKAT then paid the refund.  *Id.* ¶¶ 228-29.

## II.     ED&F Bellwether Plans' Trading And Applications For Withholding Tax Refunds

The cases involving the ED&F Bellwether Plans concern 22 tax reclaim applications based on 25 underlying trades, which SKAT subdivides into 13 "cum-cum" trades and 12 "cum-ex" trades.  In SKAT's parlance, a "cum-cum" trade occurs before the ex-date and settles on or before the record date,[2] while a "cum-ex" trade occurs before the ex-date and settles after the record date.

SKAT acknowledges that the ED&F Bellwether Plans acquired dividend-bearing shares through each of the 13 "cum-cum" trades, resulting in the payment of a dividend from which tax was withheld.  For each of these transactions, the ED&F Bellwether Plans made a request to ED&F to purchase shares in a Danish company with an upcoming dividend event.  Counterstatement of Material Facts (CSMF) ¶ 1.  ED&F executed and confirmed each trade request before the ex-dividend date.  *Id.* ¶ 2.  These transactions settled, as confirmed by SWIFT messages from the relevant sub-custodian bank showing delivery of the shares.  *Id.* ¶ 3.  All of these transactions settled on or before the record date.  *Id.* ¶ 4.  Each of these transactions yielded a dividend payment directly from the relevant Danish issuer, equal to 73% of the dividend rate multiplied by the number of shares, confirmed by a SWIFT message from the sub-custodian.  *Id.* ¶ 5.

ED&F provided documentation of each transaction to the ED&F Bellwether Plans.  Account statements show that the ED&F Bellwether Plans owned the shares as of the ex-dividend date.  CSMF ¶ 16.  Cash account statements show that ED&F credited the full amount of the dividends to the ED&F Bellwether Plans.  *Id.* ¶ 17.  ED&F tax vouchers prepared for the plans state that the dividends had been paid net of withholding tax, *id.* ¶ 18, and were included in tax reclaim applications submitted to SKAT on behalf of the ED&F Bellwether Plans.  *Id.* ¶ 19.

---

[2]     The "ex-dividend date" or "ex-date" is the "first date on which a purchased share does not carry the right to a declared dividend," and the "record date" is the "date on which the issuer checks its share register to determine to whom it will pay a dividend."  *See* Hayden Report ¶ 19.

The remaining 12 trades followed the same general pattern.  For these so-called "cum-ex" trades, the ED&F Bellwether Plans made trade requests to ED&F, which ED&F executed and confirmed.  CSMF ¶ 6.  SWIFT messages confirmed the settlement of each such transaction.  *Id.* ¶ 7.  Because the "cum-ex" transactions settled after the record date, *id.* ¶ 9, dividend payments in the expected amount were received indirectly through the seller of the shares.  *Id.* ¶¶ 12-14, 17. ED&F prepared tax vouchers for the plans, which were included in tax reclaim application packages submitted to SKAT on behalf of the ED&F Bellwether Plans.  *Id.* ¶¶ 18-19.

SKAT further divides the 12 "cum-ex" trades into two distinct subgroups.  SKAT identifies 10 "cum-ex" trades as to which MPT Dubai—a brokerage client of ED&F—was the ultimate counterparty from whom shares were acquired and dividend payments received.  CSMF ¶¶ 14-15. These transactions were listed on "Annex E" of a pleading ED&F filed in England, which stated that the tax vouchers associated with these trades were inaccurate as to the dividend amounts received and withholding tax suffered.  The remaining 2 "cum-ex" trades (the "Non-Annex E Cum-Ex Trades") are not included in Annex E and did not involve MPT Dubai.  The plans received dividend payments for both trades from the counterparties who sold the shares—Lutetia Capital and Mitsubishi UFJ Financial Group—who confirmed the payments in writing.  *Id.* ¶¶ 12-13, 17.

## ARGUMENT

## I.    The Court Cannot Enter Summary Judgment For SKAT Consistent With The Revenue Rule

The Revenue Rule prohibits this Court from directly or indirectly enforcing foreign tax law.  *See United States v. Federative Republic of Brazil*, 748 F.3d 86, 93 n.7 (2d Cir. 2014).  Any finding for SKAT on its claims for money had and received and the false statement element of its fraud and negligent misrepresentation claims would result in this Court's enforcement of Danish

tax law because this Court must necessarily interpret the term "beneficial ownership" under Danish tax law to decide the questions SKAT has put to the Court on summary judgment.

SKAT's motion for summary judgment rests on the premise that the challenged tax refund applications falsely represented that the plans were the "beneficial owners of Danish shares, had received dividends from which tax had been withheld, and were therefore entitled to be refunded the tax." SKAT Br. 1. Any evaluation of that purported representation will require this Court not only to interpret, but also to enforce, Danish tax law. Whether the plans were "beneficial owners" for purpose of the tax reclaims can *only* be decided under Danish tax law. *See* Defs.' Br. 17-20. The plans have explained why they are beneficial owners under Danish tax law: They entered final, binding, unconditional agreements to buy shares of Danish companies before the ex-dividend dates. *See id.* at 21-25. Those transactions are documented by legitimate trade confirmations, book entries, and account statements. SKAT may take a different position, but this Court cannot resolve the parties' competing interpretations of beneficial ownership as a matter of another sovereign's tax laws. Under the Revenue Rule, that is not a task for a U.S. court to undertake.

## A.   The Revenue Rule Precludes Summary Judgment Against The Solo Defendants

With respect to SKAT's claims for money had and received, this Court necessarily will have to examine whether the Solo Bellwether Plans were entitled to the refunds. That question, in turn, depends entirely on whether the Solo Bellwether Plans were beneficial owners of dividends under Danish tax law. SKAT argues that because Solo held "no shares" in its sub-custodian accounts, the Solo Bellwether Plans were not entitled to the refunds. Because entitlement to the refunds depends only on beneficial ownership, *see* Pilgaard Decl. Ex. 40 (2006 Protocol) art. 10(3)(c), SKAT's argument assumes that "no shares" means "no beneficial ownership." But whether an investor's custodian needs to hold shares in order for the investor to beneficially own

dividends for tax purposes is a question that must be answered by reference to Danish tax law. Put that way, it becomes clear that SKAT merely sets forth a competing view of beneficial ownership under Danish tax law. Indeed, as described below, the record shows that SKAT has previously engaged in a version of this debate with Denmark's Ministry of Taxation.

Thus, to evaluate SKAT's claims for money had and received, this Court will need to resolve the parties' differing interpretations of beneficial ownership under Danish tax law, to apply that interpretation to the facts here, and then (if it rules for SKAT) to enforce Danish tax law by awarding SKAT a money judgment. As Defendants explained in their motion, *see* Defs.' Br. 22-23, this exercise is barred by the Revenue Rule. That outcome is especially appropriate here, where Denmark's Ministry of Taxation—of which SKAT is one part (JSUMF ¶ 3)—has essentially endorsed the Defendants' position in this case and rejected requests from within SKAT to change Danish law relating to beneficial ownership. In 2015, multiple divisions of SKAT issued "warnings" to the Ministry, stating that "there is a high risk of errors" associated with SKAT's administration of dividend withholding tax and recommending that SKAT "abandon the beneficial owner concept." Schoenfeld Decl. Ex. 16 at 9. The Ministry recognized that "tax and civil law" in Denmark provide different answers regarding who owns securities, but concluded that "[i]f SKAT has [trouble with controls to ensure] compliance with the rules," it should "analyse the applicable rules" rather than engage in "legislative initiatives." *Id.*

A similar analysis applies to SKAT's motion for summary judgment on the false statement element of its fraud and negligent misrepresentation claims. *See* SKAT Br. 61. SKAT says that it is entitled to summary judgment because the Solo Bellwether Plans falsely represented that they "owned shares of Danish stock, on which they received dividends, net of withholding tax." *Id.* at 62. But no reclaim application even includes that tripartite assertion. If the Solo Bellwether Plans

8

represented anything at all, it was that they were the beneficial owners of *dividends*. As discussed above, determining the meaning of "beneficial ownership" in this context will necessarily require the Court to interpret—and, should the Court find in SKAT's favor, enforce—the tax laws of the Kingdom of Denmark, exactly the sort of exercise that is proscribed under the Revenue Rule.

### B.      The Revenue Rule Precludes Summary Judgment Against The ED&F Defendants

#### 1.      SKAT Is Collaterally Estopped From Disputing Application Of The Revenue Rule

As set out in Defendants' brief, it has been conclusively determined against SKAT in England that SKAT's claims with respect to the very transactions at issue in this case are barred by the Revenue Rule. *See* Defs.' Br. 38-44. Having litigated that issue to an unsuccessful conclusion in England, SKAT is collaterally estopped from re-litigating the same issue here. *See id*. As discussed in Defendants' brief, the issues are manifestly the same, and as if to drive that point home, the arguments SKAT makes in its summary judgment motion closely track its arguments before the English Court. There, as here, SKAT alleged that the tax vouchers produced by ED&F for the ED&F Bellwether Plans were inaccurate, including because of the admissions made by ED&F in Annex E, and that ED&F (and not the ED&F Bellwether Plans) was the "beneficial owner" under Danish tax law of any dividends received. *See* JSUMF ¶ 292; CSMF ¶ 25. In other words, the instant action involves the same legal theories, regarding the same transactions, that were rejected by the English High Court as barred by the Revenue Rule and not appealed by SKAT, and SKAT is collaterally estopped from arguing otherwise.[3]

---

[3]      Nor is it of any moment that SKAT brings causes of action for fraud and negligent misrepresentation here, despite asserting only a claim of negligent misrepresentation against ED&F in England. As this Court has recognized, the determination of whether a claim is barred by the Revenue Rule depends on its substance, and not its form. *See In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 311 (S.D.N.Y. 2019); *see also Eur. Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 182 (2d Cir. 2005). Even the assertion of a RICO claim cannot pull an otherwise barred cause of action outside of the Revenue Rule where the facts and circumstances implicate the direct or indirect enforcement of tax laws. *See Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001).

## 2. SKAT's Arguments Rest On The Concept Of Beneficial Ownership Under Danish Tax Law And Thus Implicate The Revenue Rule

In ruling on the Defendants' motion to dismiss, this Court concluded that SKAT did not appear to be seeking direct enforcement of any foreign tax laws, because its pleadings, as written, rested on allegations of "fraud, pure and simple," untethered to any actual securities transactions. *See* Memorandum Opinion, ECF No. 62 at 11-12. The Court similarly found that SKAT's pleadings did not necessarily implicate indirect enforcement of foreign tax laws, because there was at that time no evidence before the Court of any ownership interest of any sort—whether legal or beneficial—in any Danish shares. *Id.* at 15-16.

In any event, SKAT's position with respect to the ED&F Bellwether Plans has shifted considerably in the interim. With respect to most of the trades at issue, SKAT jettisoned its "no shares, no dividends" argument in the face of clear evidence that dividend-bearing shares were purchased and dividends were received. Rather than abandon its claims, however, SKAT has seized upon a different theory. As to those trades which SKAT concedes returned dividends, SKAT now maintains, incorrectly, that it is ED&F—and not the pension plan clients on whose behalf ED&F acted—that was the "beneficial owner" for Danish tax purposes. SKAT's argument thus places squarely before the Court the task of determining who—as between the ED&F Bellwether Plans and ED&F itself—was the "beneficial owner" as a matter of Danish tax law and determining the tax due. The Revenue Rule forecloses that inquiry.

With respect to the remaining trades executed on behalf of the ED&F Bellwether Plans, SKAT continues to claim that there were no shares or dividends. *See* SKAT Br. 55-56. However, the undisputed evidence makes clear that the securities transactions did in fact occur, and SKAT's

---

Because SKAT's claims for fraud and negligent misrepresentation turn on a common nucleus of operative fact, and because SKAT had every opportunity to bring a fraud claim against ED&F in England (as it did against nearly every other defendant), it cannot argue that the determination made by the Court in England is not on the same issue.

argument thus turns ultimately on the question of whether those transactions entitled the ED&F Bellwether Plans to apply for withholding tax refunds as a matter of Danish tax law. *Id.* Here again, the question is ultimately one of "beneficial ownership" under the tax law of a foreign sovereign. Moreover, for all of the remaining transactions, SKAT makes the alternative argument that even were shares transferred and dividends received, it is ED&F, and not the ED&F Bellwether Plans, which is the beneficial owner. Accordingly, even if the English Court had not already conclusively determined the issue, the outcome would be the same: SKAT's claims against the ED&F Bellwether Plans are barred under the Revenue Rule.

## II.   SKAT Is Not Entitled To Judgment On Its Claims For Money Had And Received

To succeed on a claim for money had and received, a plaintiff must prove that "(1) the defendant received money belonging to the plaintiff, (2) the defendant benefitted from the receipt of the money, and (3) under principles of equity and good conscience"—informed by "broad considerations of right, justice, and morality"—"the defendant should not be permitted to keep the money." *Litvinoff v. Wright*, 54 N.Y.S.3d 22, 25 (2d Dep't 2017).[4]

For several reasons, SKAT cannot meet its burden to show it is entitled to summary judgment on its causes of action for money had and received. *First*, SKAT cannot prove as a matter of law that any Defendant received funds to which it was not entitled. *Second*, SKAT cannot prove that any Defendant received funds belonging to SKAT, because the refunds at issue were paid with money belonging not to SKAT, but to the Kingdom of Denmark. *Third*, several individual defendants received no money at all from SKAT. *Fourth*, SKAT's claims should not be resolved unless SKAT demonstrates there is no adequate remedy at law (which it has not done).

---

[4]       *See also CIG Expl., Inc. v. Hill*, 824 F. Supp. 1532, 1546 (D. Utah 1993) (claim for money had and received "based on the theory that one has money in hand belonging to another which, in equity and with good conscience, should be paid over"), *aff'd sub nom. CIG Expl., Inc. v. Tenneco Oil Co.*, 83 F.3d 431 (10th Cir. 1996).

*Fifth*, reasonable fact-finders could find that the equities favor Defendants.  *Sixth*, SKAT relies on evidence not properly before the Court.  *Seventh*, the claims are time-barred.  And, *eighth*, even if this Court disagrees with the preceding reasons, SKAT is not entitled to prejudgment interest.

### A.        **SKAT Cannot Establish That The Plans Were Not Entitled To Reclaims**[5]

As a matter of law, where a defendant receives money to which it is entitled—even if that money belonged to the plaintiff and even if the defendant benefitted from it—equity and good conscience do not require the return of the money.  *See, e.g.*, *Cohen v. BMW Invs. L.P.*, 144 F. Supp. 3d 492, 502 (S.D.N.Y. 2015) (affirming dismissal of money had and received claim where defendant "indisputably had the right" to the money), *aff'd*, 668 F. App'x 373 (2d Cir. 2016); *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 906 (2d Cir. 1987).  The Bellwether Plans were entitled to receive refunds of withholding tax from SKAT because undisputed record evidence confirms that they were beneficial owners of the dividends under Danish tax law.

### 1.        **The Bellwether Plans Were Entitled To Refunds Of Withholding Tax**

As SKAT recognizes, the U.S.-Denmark Tax Treaty entitles certain U.S. pension funds to full refunds of tax withheld on Danish dividend income.  SKAT Br. 6.  The Treaty provides that a foreign pension fund that is a "beneficial owner" is entitled to a complete refund of tax withheld on Danish dividend income.  2006 Protocol art. 10(3)(c).  Because "beneficial owner" is undefined in the Treaty, the meaning of the term is to be drawn from Danish tax law.  *See* Pilgaard Decl. Ex. 39 (Treaty) art. 3(2) (undefined terms take their meaning from "the law of that State for the purposes of the taxes to which the Convention applies"); *see also* JSUMF ¶¶ 26-27.  Thus, the essential question in this case is whether the plans were "beneficial owners" under Danish tax law.

---

[5]        As explained above and in the Defendants' motion for summary judgment, this Court should not even consider whether equity and good conscience require return of the money.  That consideration will require this Court to resolve the parties' competing interpretations of the requirements of beneficial ownership under Danish tax law and then to enforce that interpretation.  That exercise is barred by the Revenue Rule.

In their motion for summary judgment, Defendants explained why they were.  Defs.' Br. 16-25.

The evidence is straightforward.  Under Danish tax law, ownership of a security is transferred at the time that the final and binding agreement—demonstrated here by the trade confirmation—is executed.  Pilgaard Decl. ¶¶ 155, 169; CSMF ¶ 20 ("For the purposes of Danish tax laws (including in relation to … the eligibility for a refund of withholding tax), a share is acquired … at the time when a final and binding agreement exists on the acquisition[.]").  The Bellwether Plans entered into binding agreements to purchase shares of Danish companies before the issuer's ex-dividend date.  *See, e.g.*, JSUMF ¶¶ 113, 129, 132, 147-48.  Those agreements were evidenced by trade confirmations issued by regulated brokers.  *See id.*; Bahnsen Decl. Ex. 13 (Carr Rebuttal) ¶ 7.  Thus, the plans all owned the shares as a matter of Danish tax law, and because the purchases occurred before the ex-dividend date (and at cum-dividend prices) the plans were entitled to the expected dividends.  Pilgaard Decl. ¶ 188; Carr Report ¶¶ 23, 145.  Under Danish law, a contract to acquire a share includes the right to receive a dividend; accordingly, "[a]t the time of the book entry reflecting the purchase of shares," the buyer of a share becomes, "for purposes of Danish tax law," the "beneficial owner of any dividends associated with those shares." Pilgaard Decl. ¶ 188.

With respect to the dividends, SKAT agrees that the plans' account statements from the Solo Custodians reflect credits for dividends in amounts net of withholding tax, JSUMF ¶ 125 ("The account statements generated by the Solo Custodians reflect credits for net dividends to the [Solo Bellwether Plans]"), and the same is true of the account statements generated by ED&F, CSMF ¶ 17.  And they had every right to use and enjoy them: "Where the recipient of a dividend does have the right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass on the payment received to another person, the recipient is the 'beneficial owner' of that

dividend." Pilgaard Decl. ¶ 184.[6]  Because money is fungible, it is impossible to conclude that the plans did not, in fact, use and enjoy the dividends credited to their accounts.[7]

In sum, the record confirms that the plans engaged in bona-fide, contracted for trades, for shares of real Danish companies, executed at prevailing market prices with legitimate and regulated brokers.  JSUMF ¶ 110; Carr Rebuttal ¶ 7; Bahnsen Decl. Ex. 14 (Carr Reply) ¶¶ 10(v), 35.  All of the documentation received by the plans was genuine, and every trade was settled in accordance with standard market practices.  Carr Reply ¶¶ 57-85.

Even SKAT's account of the Solo trading reinforces the conclusion that the Solo Bellwether Plans were the beneficial owners of the dividends.  According to SKAT, the Solo Bellwether Plans purchased the shares from short sellers who borrowed them.  SKAT Br. 15-16.  SKAT's own website describes this scenario precisely and explains the implications under Danish tax law: "If the borrower resells the shares to a third party … the third party becomes the temporary beneficial owner of the dividends … is taxed on the dividends and the third party is also entitled to receive a possible refund of dividend tax if too much dividend tax has been withheld."  Pilgaard Decl. ¶ 201 & Ex. 84.  Although the Defendants had no visibility into who sold them the shares, if SKAT is correct that the sellers were stock borrowers, the result under Danish tax law is that the plans were beneficial owners of the dividends and were entitled to the reclaims.[8]

---

[6]    The fact that the plans paid service fees to Ganymede does not change the analysis; the plans retained 100% of the net dividend payments credited to their accounts.

[7]    To take just one example, the RJM Plan's custodial account shows book entry credits for Danish dividends (Dulberg Decl. Ex. 51 at MPSKAT00135581, 135649), book entry debits to pay various fees (MPSKAT00135649), and transfers of funds to different accounts (MPSKAT00135650, showing "transfer" and "payment").

[8]    This is entirely consistent with the position of the Danish Ministry of Taxation, which stated in a reply to an "Early Warning" the following:  "[W]ith the acquisition of the shares by third parties from the borrower, third parties become the beneficial owner of the shares and thus also of the dividends….  It is therefore also a third party who is entitled to receive any refund of withholding tax."  Schoenfeld Decl. Ex. 16 at 7.

In short, the plans were the owners of Danish securities, were the beneficial owners of dividends, and were entitled to receive withholding tax refunds. As a matter of Danish tax law, the plans were entitled to the money they received from SKAT.

### 2. SKAT Fails To Establish That The Defendants Were Not Beneficial Owners

SKAT's motion rests on the premise that the Bellwether Plans falsely represented themselves to be the "beneficial owners of Danish shares." SKAT Br. 1. The concept of "beneficial ownership" is thus central to SKAT's argument, but SKAT never discusses the requirements for beneficial ownership under Danish tax law, nor does SKAT even attempt to show that the Bellwether Plans failed to meet those requirements.

### a. SKAT Fails To Establish That The Solo Bellwether Plans Were Not Beneficial Owners

Rather than address the central issue of ownership under Danish tax law, SKAT hardly mentions it. Instead, as to the defendants who traded through Solo Custodians, SKAT simply contends that there were "no shares," by which it means that it has not "found" certain records "one would expect" if the custodians and certain sub-custodians had held shares of Danish companies. *See* SKAT Br. 13-14.[9] Based on that proposition alone, SKAT asserts that the plans were not entitled under the Treaty to the refunds. But SKAT never connects the dots between holding shares and beneficial ownership, nor can it. SKAT's argument simply assumes that if there were "no shares" held by a custodian or sub-custodian, the plans could not have been beneficial owners and thus could not have been entitled to the refunds. *See, e.g.*, *id.* at 1 (claiming that the plans "represent[ed] that [they] were the beneficial owners of Danish shares," but "the defendant plans had no Danish shares and [so] their representations were therefore false").

---

[9] Of course, shares of listed Danish companies have been dematerialized for decades, meaning that they only exist as electronic book entries. Pilgaard Decl. ¶¶ 148-49. A search for physical share certificates would be misguided.

Compounding its error, rather than relying on any shred of evidence produced by any party in this action, SKAT leans heavily on regulatory actions the FCA has taken against two brokers in the UK.  But as SKAT acknowledges (SKAT Br. 18 n.25), one of those brokers—Sapien Capital—played a role in just one of the 68 trades SKAT challenges.  And although SKAT acknowledges that the FCA examined trading between February and November 2015 (SKAT Br. 18 n.26), it ignores the fact that every trade SKAT challenges with respect to the RJM Plan (App'x A) occurred in 2013.  SKAT also misleads the Court when it says that the FCA fined these brokers "for their participation in circular trading"; the fines related to the brokers' compliance with risk management and anti-money laundering policies and procedures.  Apr. 29, 2022 Declaration of Marc A. Weinstein (Weinstein Decl.) Exs. 75, 76.  But most important, whatever the FCA said about "ownership of the shares," it reached no conclusion at all about whether any US pension plan was a beneficial owner of a share or a dividend, let alone under Danish tax law.

### (i) Beneficial Ownership Of Dividends Does Not Require Custody Of Danish Shares

Remarkably, SKAT's entire case is based on the premise that shares must be held by a financial institution (such as a custodian) in order for that firm's clients to be considered beneficial owners of dividends associated with those shares.  That premise is false, and SKAT nowhere identifies the basis for its assumption.

Not only is it possible to be a beneficial owner of dividends without a custodian holding shares, but it is consistent with tax and commercial laws of Denmark and the U.S., in addition to the well-established practices of regulated securities markets around the world.  With respect to Danish tax law, an investor is the owner of a security for tax purposes upon entering a final and binding agreement to purchase the security.  Pilgaard Decl. ¶¶ 155-56.  Danish case law makes clear that the presence or absence of shares has no significance:  in one case, an investor was

deemed to own securities from the moment he agreed to buy them even though he did not receive the shares until a year later. *Id.* ¶ 163. SKAT's forensic expert would have concluded that there were "no shares" during that year, and yet the investor was the owner under Danish tax law. Had that investor sold the shares at any time prior to the end of the year, it would have been taxed on any gain or loss even though its custodian would never have held the shares. SKAT would deem the investor to be the owner from the moment of the agreement to purchase. *Id.* ¶¶ 155-56.[10]

Additional examples confirm that one may be the owner of Danish securities without the investor's custodian holding the shares. Under Danish law,

> Delivery of the share as part of the transaction settlement process is not required for the transfer of ownership. For example, an investor who purchases shares in the morning and sells them in the afternoon is deemed to be the owner (including the beneficial owner) of those shares in the period of time between the transactions and will be liable to SKAT for any tax owed on a gain resulting from the sale, even though the transactions will not have settled until several days later.

Pilgaard Decl. ¶ 157. The securities lending paradigm provides another example. SKAT has published guidance relating to the question of who owns a share when it has been borrowed. *Id.* ¶ 201. According to SKAT, the lender—who has parted with its shares—"remains the beneficial owner of dividends and the actual shareholder even after he has lent the shares." *Id.* Neither the beneficial owner (the lender) nor its custodian has any shares.

SKAT never states the consequences under Danish tax law of the fact pattern in which a purchaser buys shares but his custodian does not possess them, nor does it cite Danish legislation or judicial decisions requiring an investor's custodian or sub-custodian to hold shares in order for the investor to be the beneficial owner. *See* SKAT Br. 12 & PSMF ¶ 54. There is no such

---

[10]   Testimony of SKAT's 30(b)(6) witness is in accord. Schoenfeld Decl. Ex. 20 (Ekstrand Tr. 145:8-16) ("Q. So if the shares are purchased on or before the date of the annual general meeting, the purchaser's entitled to the dividend declared at that meeting. Is that right? A. As long as a legal, binding agreement has been made on the purchase and payment, then yes."); *id.* (Ekstrand Tr. 143:5-144:15) (admitting that even "the seller of the shares" does "[n]ot necessarily" need to "have the shares on the trade date").

requirement.   The fact is that beneficial or economic ownership is distinct from legal or civil ownership under Danish tax law, and does not turn on the holdings of one's custodian.   Nor does beneficial ownership require the registration of shares, directly or indirectly, in the name of an investor's custodian.   *See, e.g.*, Pilgaard Decl. ¶¶ 153, 189 ("Registration is not a precondition to ownership"; "One need not be registered as the owner of the share to be entitled to the dividend").

SKAT asserts—without citation to any statute, regulation, or judicial decision—that the Solo Custodians "would have needed to hold Danish shares through a Danish sub-custodian … with an account at VP Securities." SKAT Br. 12.   As a factual matter, the standard market practices of netting and internalization (described below) demonstrate why it would be unnecessary for the Solo Custodians to hold Danish shares in this case.   But as a legal matter, SKAT seems to be describing *registered* ownership rather than *beneficial* ownership.   Thus, SKAT relies on an expert report signed by a British investment banker who stated that "to own shares" means that the shareholder is "the registered owner of the shares in the shareholder register." PSMF ¶ 75 n.148.

That proposition is flatly wrong as a matter of Danish tax law, and these cases have nothing to do with share registration.   As an internal email among SKAT employees explained, "In Denmark, the owner is defined in tax law terms as beneficial owner which differs from the civil law definition and thus also registration in various registers." Schoenfeld Decl. Ex. 1.   The registered owner of shares is not necessarily the beneficial owner.   A product manager from VP Securities, the Danish central securities depository, confirmed as much.   *Id.* Ex. 2 (Sorensen Tr.) Vol 2, 44:8-12 ("Q.   [A] beneficial owner of Danish securities may not be the registered owner with VP Securities, correct?  A.  That is correct.").   She agreed that "there is a difference between the owners that VP Securities understands are the registered owners and the beneficial owners that SKAT thinks about for tax purposes." *Id.* at 49:10-19.   The Danish Ministry of Taxation itself has

18

stated that "in the event of a share loan, the *borrower* is registered as the owner," but "[a] *lender* is considered the beneficial owner of the shares for tax purposes." *Id.* Ex. 16 at 1. Of course, the only type of ownership relevant to the plans' entitlement to the refunds is *beneficial* ownership, and SKAT nowhere explains why a custodian would need to hold Danish shares for the buyer of shares to be the beneficial owner of those shares, let alone of the dividends associated with those shares. In fact, black letter Danish law provides that one need not be registered as the owner of shares to be entitled to the dividends. Pilgaard Decl. ¶ 189 (citing the Danish Companies Act).[11]

Not only is the presence of shares at the custodial level irrelevant to the question of who owns them, but Danish tax law also establishes that one need not receive a dividend to be liable for dividend withholding tax (or entitled to a refund). In March 2020, the Danish Supreme Court ruled that certain shareholders were responsible for paying dividend withholding tax even though they never received dividends. Pilgaard Decl. Ex. 83. In that case, a father sold his shares in a company to his daughters on condition that his daughters allow him to receive a dividend distribution of more than 48 million Danish kroner. Next, the company approved a dividend, paid withholding tax to SKAT, and paid the dividend directly to the father. When the father requested a refund of the withheld tax, SKAT approved his request. More than one year later, SKAT changed its mind. Reasoning that the dividends belonged to the shareholder daughters—even though they never received them—SKAT demanded repayment of the refund. The Supreme Court sided with SKAT, holding that even though the daughters had transferred their entitlement to the dividends to their father, they still were liable for withholding tax because they owned the shares as a matter

---

[11]     Relatedly, financial markets allow investors to economically own more shares of a company's stock than the actual number of shares outstanding or registered, and could therefore receive dividend compensation payments that exceed the dividends declared and paid by a company. *See* Carr Report ¶ 107 (explaining that, in the GameStop stock episode in late 2020 and early 2021, "long positions reflected in investor accounts and related statements exceeded the share float and shares outstanding due to short interest").

of Danish tax law.  *Id.*  In sum, under Danish tax law, a shareholder can be liable for dividend withholding tax even if she never receives the dividends.

Nor is it a radical proposition that one can beneficially own a dividend even if the custodian does not hold the underlying shares.[12]  Under U.S. law, "a person acquires a security entitlement if a securities intermediary … indicates by book entry that a financial asset has been credited to the person's securities account … [in which case] a person has a security entitlement *even though the securities intermediary does not itself hold the financial asset*."  U.C.C. § 8-501(b)-(c).[13]  U.S. tax law additionally provides that foreign investors who enter into derivative transactions—in other words, who do not have any shares—are subject to withholding tax on payments representing the economic equivalent of a dividend and can be eligible for refunds of any excess withholding tax.  *See* 26 U.S.C. § 871(m).  SKAT's own expert, Graham Wade, acknowledged that even if the Solo custodians did not "actually [have] any shares," the plans had "what is, in effect, a derivative position," Weinstein Decl. Ex. 93 (Wade Reply) ¶ 240(2), that is, "an asset which derives its value from the price of a share" rather than a share itself, Schoenfeld Decl. Ex. 11 (Wade Tr.) 274:19-275:24.[14]  How Danish tax laws, and SKAT as the enforcer of those laws, would treat a derivative

---

[12]    In fact, the OECD's Commentary to the Model Tax Convention itself recognizes that an investor need not even be the owner of shares to be the beneficial owner of the dividends associated with those shares.  Pilgaard Decl. ¶ 184 (quoting Paragraph 12.4 of Commentary for proposition that "Article 10 refers to the beneficial owner of a dividend as opposed to the owner of the shares, which may be different in some cases").

[13]    Although a different paradigm, the concept of fractional reserve banking provides a useful analogy.  In accordance with government regulations, banks are required to retain only a fraction of the deposits their customers provide.  Indeed, "it is the very nature of modern banking that financial institutions do not hold cash reserves equal to the full amount of their liabilities."  *United States v. Fattah*, 914 F.3d 112, 184 (3d Cir. 2019).  The fact that the banks do not hold all of the cash recorded on their customers' account statements does not mean that their customers do not own every cent listed in their account statements.  To extend the analogy, if SKAT were to conduct a forensic search for all of the dollars the banks told their customers they owned, the search would reveal that most of the money was "missing."  That conclusion would be just as meaningless as Dubinsky's opinions regarding securities.

[14]    Wade states, citing no support, that "there is no basis to claim receipt of a dividend (or any tax reclaim rights which derive from such dividends) on … a derivative position."  Wade Reply ¶ 240(2).  Wade admits that he is not an expert in Danish tax law or "the Danish tax administration system," Wade Tr. 271:6-13, and his conclusion in this regard is not entitled to any weight.

asset tied to the price of a share, and whether any refund of withheld tax could issue, is a question of Danish tax law that SKAT has, curiously, chosen not to address in its papers.

### (ii)   Prevailing Market Practices Did Not Require The Solo Custodians To Have Custody Of Danish Shares

In addition to eliding the question of beneficial ownership, SKAT ignores the fact that, due to the standard settlement operations of netting and internalization, the Solo Custodians would not have needed to hold shares of Danish securities to settle their clients' transactions. In other words, the very fact that SKAT says entitles it to judgment is, in reality, the unremarkable result of the lawful execution of the transactions at issue: if the Solo Custodians did not custody Danish shares, it was because they did not need to custody Danish shares. As Defendants' expert Dr. Emre Carr explained, because the trades involved "settlement of offsetting trades" where the "trades netted to zero," the Solo Custodians did not need to "sourc[e] shares externally" from the market. Carr Rebuttal ¶ 111. And because the "trades involve the same number of shares"—*i.e.*, they fully offset—"the custodian's holdings will not change after these offsetting trades," and the custodian can simply "net all the trades." *Id.* ¶ 113.

Netting and internalized settlement are "quite common" in modern financial markets, and EU Regulations issued in July 2014 "specifically recognize internalized settlement." Carr Rebuttal ¶ 116. A representative of the Danish central securities depository testified that "net settlement is used in Denmark and also in the rest of the market and specifically around Europe." Sorensen Tr., Vol. 1, 15:17-16:5; *see also* Carr Rebuttal ¶ 115.[15] And a 2020 report from the European Securities and Markets Authority revealed that recent "equity trades worth trillions of Euros were settled

---

[15]   As the representative of VP Securities explained, "In order to save cost on settlement, [net settlement] is used so that all of the participants in the settlement process can net all of the base settlement instructions into one large bulk settlement instruction[.]" Sorensen Tr., Vol. 1, 15:17-16:5.

through internalized settlement." Carr Rebuttal ¶ 116. SKAT itself engages in netting with respect to the tax obligations and credits of Danish taxpayers. DSMF ¶ 386.

It is hardly surprising that a financial intermediary need not hold shares if its clients buy and sell the same number of shares. A 2019 policy statement from the Bank of England describes the practice as follows:

> If a PB [Prime Broker] has two clients that are taking opposite positions on the same asset (one long, the other short), the PB may internally net these amounts to avoid having to fund the positions elsewhere: a client short position is therefore funding a client long position. Liquidity risk arises if one client wishes to withdraw from their transaction: the PB will either need to find additional funding or will need to purchase or borrow the asset to match the remaining transaction.

Carr Rebuttal ¶ 117 (quoting Bank of England Prudential Regulation Authority, "Statement of Policy, Pillar 2 Liquidity," June 2019). In other words, a custodian engaging in internalized settlement would source external shares only when a "client wishes to withdraw from their transaction"; otherwise, there would be no need "to purchase or borrow the asset" from the market. *See id.* This, again, is consistent with the testimony of a manager from the Danish central securities depository, who agreed that "if A buys and B sells one hundred shares and at the start of the day there are no shares at the custodial bank," then "the sum at the end of the day would be zero." Sorensen Tr., Vol. 2, 60:4-18. Solo's clients, including the Solo Bellwether Plans, had no restrictions on selling shares they owned or transferring their accounts (including any assets) to another custodian, independent of what other clients may have done. If the plans had done so, the Solo Custodians would have been required to acquire the shares from the market.

Based on SKAT's own characterization of the transactions (SKAT Br. 15-17), the Solo Custodians settled transactions among their clients that were entirely offsetting purchases and sales, such that the Solo Custodians' position in the relevant Danish securities at the end of the day netted to zero and carried no obligation to fund the plans' long positions externally. The

custodian's net zero position does not mean the customer of the custodian owns nothing; to the contrary, its customers would be the beneficial owners under Danish tax law.  And since the trades could settle without the requirement of sourcing the shares externally, SKAT's refrain of "no shares" proves nothing.  It certainly does not prove that the plans were not the beneficial owners of the shares and the dividends, particularly where Danish tax law confers ownership at the time of a trade and does not require delivery of shares as part of a settlement process to validate that ownership, Pilgaard Decl. ¶ 157, which is evidenced by electronic book entries (*id.* ¶ 151).

### (iii)    Dubinsky's Analysis Does Not Carry SKAT's Burden

Rather than address head-on the impact of netting and internal settlement, SKAT rests on the work of its expert, Bruce Dubinsky, who repeatedly admits that he is not an expert in trade settlement.   Schoenfeld Decl. Ex. 4 (Dubinsky Tr.) 30:8-14, 85:16-86:8, 165:8-17.   Instead, Dubinsky performed "a forensic accounting investigation to determine whether there was evidence that these shares actually existed."   *Id.* at 70:7-10.   As explained above, the findings of that "investigation" are meaningless because (1) beneficial ownership under Danish tax law does not require the holding of shares by a custodian, and (2) the permissible practices of netting and internalized settlement can result in an absence of shares held by a custodian.   As Dr. Carr explained, "examining the Danish holdings on behalf of the Solo Custodians at the sub-custodians is irrelevant for assessing the validity of the purchases that the [Solo Bellwethers] made" where "the settlement of the trades involved the settlement of offsetting trades on the same date."   Carr Rebuttal ¶ 111.   Thus, even accepting Dubinsky's conclusions at face value does not establish that the plans did not own Danish shares and were not beneficial owners of dividends.

Even setting aside that fundamental flaw, there are other reasons why SKAT's reliance on Dubinsky is misplaced.   SKAT claims that Dubinsky "search[ed] over ten million documents seized" from an entity called Elysium and "found none of the contemporaneous records one would

expect to find if the Solo Custodians did in fact hold the shares or receive the dividends identified in the dividend credit advices at a sub-custodian."[16]   SKAT Br. 14.   This was a meaningless exercise because the Solo Custodians did not need to hold any shares (as explained above) and their sub-custodians did not need to receive any dividends (as explained below).[17]   But SKAT declines to tell the Court that Dubinsky conceded that the Solo Bellwethers' futures trades—used to hedge the price risk associated with the purchase of Danish equities—"were real" and are reflected in records from "Solo Capital's account at JP Morgan Chase."   Schoenfeld Decl. Ex. 3 (Dubinsky Reply) ¶ 47.   Though Dubinsky dismisses these futures trades as "window dressing," neither he nor SKAT ever explains why the Solo Bellwethers would enter into real hedging transactions with real economic consequences if the underlying trades were fake.[18]   Since the futures contracts obligated the RJM Plan to sell Danish securities at a fixed price, its economic risk to such "real" transaction was unlimited.   Carr Reply ¶ 79.   The plan could only have mitigated its exposure by having a genuine economic interest in the underlying Danish securities.   *Id.*

Dubinsky's conclusion that the Solo Custodians did not seem to receive cash dividends is also beside the point.   Danish tax law does not require a shareholder's custodian to receive a dividend in cash, or even receive it directly or indirectly from the company that issued the dividend.

---

[16]   Dubinsky admits that SKAT possesses a "hard drive potentially containing Solo Capital and/or related entities documents" that "is encrypted and cannot be accessed."   Weinstein Decl. Ex. 89 (Dubinsky Report) ¶ 12 n.5. Given SKAT's emphasis on its certainty that the Solo Custodians "never held any … shares or received any … dividends," SKAT Br. 13, the possibility that SKAT has left a stone unturned in its search leaves a supposedly critical question unanswered.

[17]   The absence of shares is simply irrelevant; even in a situation where there is "settlement failure," and the "seller fails to deliver … shares," the buyer still retains the "economic claims to dividend payments and the right to sell the stock."   Carr Reply ¶ 106.

[18]   Indeed, the plans experienced actual gains and losses on the real futures trades.   For example, on March 21, 2013, the Bernina Pension Plan sold 6,000 single stock futures contracts of the Danish company Carlsberg at a price of DKK 583.4300 per contract.   Schoenfeld Decl. Ex. 5 (MPSKAT00075372).   On August 21, 2013, Bernina bought the same number of futures contracts at a price of DKK 561.4700 per contract.   *Id.* Ex. 6 (MPSKAT00088402).   Thus, Bernina made a profit of DKK 21.96 per contract.   Nor could the futures trades be settled internally:   in order to settle those transactions, a firm needed to be a member of the LIFFE exchange.   *See id.* Ex. 21 (SCPADMINISTRATORS_000048547 at 48575-77).   JP Morgan was, and the Solo Custodians were not.

As the Danish Supreme Court has recognized, a beneficial owner of shares can be liable for dividend withholding tax even when she did not receive a dividend at all.  Pilgaard Decl. Ex. 83. Dr. Carr explained that whether the plans received what SKAT calls "'real' dividends or substitute dividends made no difference to the economics of the trade."  Carr Rebuttal ¶ 95.  Moreover, Danish case law also treats dividend compensation payments "the same way as dividends paid directly by a company."  Pilgaard Decl. ¶ 202.  That conclusion, supported by a body of Danish case law (Pilgaard Decl. ¶¶ 195-200), is critical in this case, where SKAT maintains that the plans received "dividend compensation payments" from the sellers of shares.

Dubinsky's analysis of sub-custodial accounts is flawed for another reason.  SKAT makes much of Solo's representations about the banks where it had sub-custodian accounts, including a letter submitted by Reed Smith, counsel to Solo Capital, to the U.K. FCA.  SKAT Br. 13-14; DSMF ¶ 4.  SKAT characterizes that letter as definitively stating that "the Zurich Branch of Société Générale was the only sub-custodian that the Solo Custodians used for Danish shares from January 2014 to August 2015."  SKAT Br. 14.  In fact, Reed Smith told the FCA that "[i]t is *believed* that during the Relevant Period Societe Generale SA, Zurich Branch was the only sub-custodian used by the Firms" and that "if there were any other sub-custodians used in connection with transactions in Danish Securities either Omar Arti and/or Martin Ward would have knowledge in that regard." Weinstein Decl. Ex. 113 at 2.  SKAT does not make any showing that it has answered the question posed by the Reed Smith letter.  Given the importance that SKAT itself has placed on its quest to find evidence of the Solo Bellwethers' shareholdings, that omission is glaring.

**b.**   **SKAT Fails To Establish That The ED&F Bellwether Plans Were Not Beneficial Owners**

**(i)**   **The "Cum-Cum" Trades Undisputedly Resulted In Dividends, And Disputed Issues Of Fact Remain As To Whether The ED&F Bellwether Plans Or ED&F Owned Those Dividends**

There is no dispute that the 13 "cum-cum" transactions—the majority of the trades at issue in the ED&F Bellwether cases—involved purchases of Danish shares, resulting in the receipt of dividends from Danish issuers.  SKAT seeks to gloss over these trades, dismissively remarking that they were "smaller" than the others "by value."  *See* SKAT Br. 3-4.  But as SKAT acknowledges, each of these 13 trades yielded a dividend payment, net of tax, paid by the Danish issuer.  *See* Weinstein Decl. Ex. 91 (Wade Report) ¶ 162, Defs.' Br. 55-56.  With respect to these trades, there is no dispute that shares were purchased, dividends received, and tax withheld.

Nor is there any dispute that *someone* was entitled to a withholding tax refund from SKAT on the dividends.  But according to SKAT, that someone was *ED&F*.  Relying on an isolated contractual provision contained in one of several agreements between ED&F and the ED&F Bellwether Plans, SKAT now contends that the ED&F Bellwether Plans were divested of all title to and interest in the shares, and that ED&F became the "beneficial owner" for Danish tax purposes.  As discussed below, SKAT's argument misreads the plain language of the contract, makes nonsense of the arrangement between ED&F and the ED&F Bellwether Plans, and ignores the fact that, under English law (which governs the contract), construction depends on a holistic view of the overall context and commercial purpose of the transaction.

First, the text of the relevant contract is inconsistent with the reading that SKAT advocates.  According to SKAT, all title to shares purchased with ED&F financing (and all title to any corresponding dividends) "passed immediately to ED&F upon receipt."  *See* SKAT Br. 57.[19]  However, Clause 10(b)(ii) of the Terms and Conditions of Business (the "Terms"), on which

---

[19]    In arguing that title passes to ED&F upon receipt of the shares, SKAT appears to mean that title is transferred on the settlement date.  *See* Wade Report ¶ 28.  However, under Danish law, a buyer acquires ownership interest on the trade date, *see* CSMF ¶ 20, and the owner of shares as of the beginning of the ex-date is entitled to a dividend, *see* Pilgaard Decl. ¶ 188.  Thus, even if SKAT's interpretation of the contractual language were correct, and it is not, the plans, and not ED&F, would have remained the beneficial owners of the dividends notwithstanding any later transfer of title to the shares upon settlement.

SKAT relies, provides that "all assets … received by us … in respect of your account will be *actually or potentially* in respect of margin or collateral."  Blessington Decl. Ex. 13 (emphasis added).  The contract thus provides ED&F with the option of either (1) holding the securities it acquires on behalf of its client as collateral, or (2) holding the securities in custody as *potential* collateral until it exercises its right to use the asset as collateral.  *See* Salter Decl. ¶ 93.4.  ED&F acted consistently with such an interpretation and recorded any use of client assets as collateral through entries to a "B-Loan Account."  CSMF ¶ 22.  When it did so, ED&F became obligated, pursuant to Clause 10(b)(ii), to "re-transfer" equivalent assets to its client.  As Salter explains, such action by ED&F is also consistent with U.K. CASS regulations and ED&F's own Client Money & Assets policy, contrary to the position taken by Toube.  Salter Decl. ¶¶ 56, 93.2, 103-05.[20]  Such an interpretation is also supported by ED&F's tax vouchers, each of which stated that ED&F had "no beneficial interest in the holding and will not be reclaiming the tax,"[21] and by the fact that ED&F charged the plans a "Custody Fee."  *See* JSUMF ¶ 383.

Moreover, a court construing a contract under English law would take into account "all the relevant surrounding circumstances," including the "overall commercial purpose" of the agreement, in order to ascertain what "a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant."  Salter Decl. ¶¶ 12, 25, 27. Toube admits the relevance of the commercial purpose of the contracting parties, adding that

---

[20]    SKAT's expert, Felicity Toube, acknowledged that the CASS rules "form part of the admissible background in aid of interpretation" of the contract.  Toube Reply ¶ 38.

[21]    ED&F did not in fact make any tax reclaims with respect to any of the transactions at issue, and SKAT does not allege otherwise.  However, if SKAT were correct that ED&F was the proper party to be submitting tax refund applications with respect to the dividends received on the "cum-cum" trades, then ED&F would have been entitled to a tax refund in the amount of 12% under the double taxation treaty between England and Denmark.  CSMF ¶ 23. SKAT cannot very well claim to be entitled, in "equity and good conscience," to the full amount of the withholding tax refunds paid, when by its own account it owed at least a 12% refund to ED&F.

outside evidence may "be admissible to show the commercial purpose or aim of the transactions." Blessington Decl. Ex. 16 (Toube Reply) ¶ 49(4)-(5).  Toube's analysis nevertheless wholly ignored the commercial purpose of the contractual relationship between ED&F and the ED&F Bellwether Plans.  *See* Salter Decl. ¶¶ 95-105.  The dividend arbitrage transactions undertaken by the ED&F Bellwether Plans make no commercial sense unless the ED&F Bellwether Plans could make tax reclaim applications to SKAT, as SKAT itself has stated.  *See* CSMF ¶ 24 (transactions were "intended to enable a [pension plan] to make a withholding tax application" and "had no other purpose").  Accordingly, to the extent the meaning of the contract between ED&F and the ED&F Bellwether Plans may be resolved at this stage, it must be resolved in favor of the plans.

Finally, even if the contractual provision referenced by SKAT did, as Toube suggests, defeat the intended purpose of the arrangement between ED&F and the ED&F Bellwether Plans, additional issues of disputed, material fact would remain as to whether the contractual provision could, under English common-law principles of rectification and estoppel, be conformed to effect the contracting parties' intended purpose.  The acknowledged goal of the dividend arbitrage transactions was to enable the ED&F Bellwether Plans to submit tax reclaim applications, and the only party seeking to disrupt that core purpose is a stranger to the contract:  SKAT.  As Salter explains, this is precisely the kind of scenario in which an English court may exercise its equitable discretion to rectify the contractual language to effect its purpose.  *See* Salter Decl. ¶¶ 73-88. Similarly, although SKAT is not a party to the agreements it seeks to interpret here, principles of estoppel suggest that SKAT should not be permitted to advance an interpretation of the agreement that would not have been available to the contracting parties themselves.  *See id.* ¶ 88.

> **(ii)     SKAT's Arguments Regarding The "Non-Annex E Cum-Ex Trades" Rely On Misrepresentations Of Fact, Mischaracterized Deposition Testimony, and Disputed Expert Opinion**

With respect to the "Non-Annex E Cum-Ex Trades," SKAT contends that the trading was "circular" and involved neither shares nor dividends.  SKAT Br. 55.  The argument is based on faulty inferences, a distorted reading of deposition testimony, and the controverted analysis of SKAT's expert Graham Wade.

*First*, SKAT argues that the pricing of the "cum-ex" transactions suggests that the selling parties could not have had any right to a dividend when the shares were sold.  *See* SKAT Br. 55. Relying on Wade's analysis, SKAT maintains that the "prevailing market price" for the "transfer [of] dividends in cum-cum transactions" was "approximately 90 percent of the gross dividend." *See id*. at 30, 55.  By contrast, the "dividend acquisition cost" of the "non-Annex E cum-ex trades" was, according to Wade, "approximately 82 percent."  *See id*. at 30-31.  SKAT maintains that this pricing differential can mean only one thing, that the "Non-Annex E Cum-Ex Trades" involved non-dividend-bearing shares.  As explained in the ED&F Bellwether Defendants' brief in support of the exclusion of Wade's opinions and testimony, SKAT's reasoning is fundamentally flawed. Wade's "approximately 90 percent" figure was not derived from a survey of the Danish securities market but was instead computed on the basis of just 53 "cum-cum" transactions executed by ED&F on behalf of pension plan defendants in this action.  Wade offers no sound reason for supposing that these 53 transactions constitute a representative sample from which a "prevailing market price" can be reliably extrapolated, particularly given that several trades were exceptions to the rule Wade describes.  *See* Blessington Decl. Ex. 15 (Hayden Report) ¶ 50(d).  Even if "approximately 90%" really were the average "prevailing market price" during the relevant time period, Wade offers no basis for assuming that would-be sellers would always be able to find buyers at that price, or that it would always be "economically irrational" to sell for less, particularly given that Danish shares, according to Wade himself, traded in an "illiquid market."  *See* SKAT

29

Br. 55; Wade Report ¶ 68(i).  As the ED&F Plans' expert, Max Hayden, points out, it would have been perfectly rational for any Danish shareholder—or any non-tax-advantaged foreign shareholder of Danish securities seeking to achieve "uplift" on dividend entitlements—to sell its dividend entitlement for any amount over 73% of the gross dividend value, as such a shareholder would otherwise be subject to withholding tax at the full 27% rate.  *See* Hayden Report ¶ 50(a).[22]

SKAT further argues that the volume of ED&F's "cum-ex" trading was so "implausibly high" that the trading must have been "circular."  SKAT Br. 31-32, 56.  SKAT's argument rests on analysis by Wade that is, again, flawed and disputed.  *See* SKAT Br. 31 & Wade Report; *see also* ED&F Bellwether Defendants' brief in support of the exclusion of Wade's opinions and testimony.  Wade purports to compare the average daily trading volume ("ADTV") for various Danish securities—computed over the 15 days before and after the record date—with the "claimed ownership" of such shares by ED&F.  This is an apples-to-oranges comparison on its face, and is further undermined by Wade's use of a period of thirty-one trading days—over six weeks of trading—even though the trading at issue generally occurred within just a few days of the record date, when trading volume is known to spike.[23]  SKAT appears to have abandoned Wade's overall analysis to argue that a single transaction involved an "implausibly high 251 percent of the daily average."  SKAT Br. 31.  But again, SKAT's daily average was computed over a thirty-one-trading-day period, whereas the transaction at issue was initiated and concluded over the course of

---

[22]     SKAT's unsupported conjecture, based solely on Wade's Reply Report, that "tax advantaged sellers, such as MUFG, by virtue of doing no trade at all, would have been able to receive 85 percent of the dividend payment," SKAT Br. 55, cannot be credited.  As Hayden pointed out as his deposition, MUFG "specialized in access to [the] Southeast Asian Far East client base," and operated a "brokerage business" on behalf of those clients.  Blessington Decl. Ex. 7 (Hayden Tr.) 239:22-240:22.  Accordingly, to the extent MUFG traded with ED&F in its capacity as a broker for other clients, and not on its own behalf, the relevant tax status would have been that of MUFG's clients, not MUFG itself.

[23]     As Hayden observes, trading volume spikes significantly in the days immediately surrounding dividend events, *see* Hayden Report ¶ 49(b)(iv) (showing jump from 1.3 million shares of trading volume to 7.6 million shares of trading volume for a sample dividend event in the three days around the ex-dividend date), and Wade's analysis is further skewed by the fact that he excluded over-the-counter transaction volume, *see id.* ¶ 49(b).

just a few days before and after the record date, when trading volume would likely have been at its apex.  SKAT provides no basis for supposing that a daily average calculated over a period of six weeks provides a meaningful benchmark with respect to the specific trading days relevant to this transaction or any of the other "cum-ex" transactions.[24]

SKAT's final argument for the purported circularity of the "cum-ex" trades rests on a willful misreading of the deposition testimony of ED&F's second 30(b)(6) witness, Andrew Wall. According to SKAT, Wall testified that ED&F "recycl[ed] the same cum-cum or other ex-dividend shares through multiple settlement cycles," thus "demonstrat[ing] that the trading was circular." SKAT Br. 56.  SKAT is being dishonest in reading Wall's testimony as a description of ED&F's standard trading practice, when it is beyond dispute that the testimony cited by SKAT was in fact addressed narrowly to the trades underlying the Annex E tax vouchers.

This is clear enough from the nature of the deposition itself:  Wall testified pursuant to a court order, *see* ECF No. 726, which compelled ED&F to produce an additional 30(b)(6) witness to provide supplemental testimony on two specific topics: (1) the tax vouchers listed on Annexes A and E of ED&F's Amended Defence (and the underlying trading), and (2) the investigation of the Financial Conduct Authority ("FCA") into ED&F.  Because his testimony was to be confined to these topics, and because Wall had no personal knowledge whatsoever with respect to the transactions at issue, Wall "only looked at the trades in Annex E and Annex A" in preparing for

---

[24]     The example SKAT provides at pages 31-32 is specifically disputed.  First, when SKAT asked Hayden about email correspondence that it now contends shows that Lutetia Capital was a short seller, Hayden explained that the correspondence at issue supported the position that Lutetia Capital was selling shares that it had already acquired. Hayden Tr. 219:1-226:3.  SKAT cites no record evidence, beyond the disputed average daily trading volume data discussed above, to establish that Lutetia Capital was short selling.  Moreover, Wade's theory of the trading was that it would have only been possible with the "pre-ordained" coordination of all parties to the transaction, *see* Wade Report ¶ 143, and assumed the coordination of five distinct parties for the sale of only two million of the six million shares—ED&F, Lutetia Capital, Link Asset and Securities, Arian Financial, and Mariana Capital.  When considering the entire set of six million shares, the coordination of additional parties was required, including ICAP and GFI Securities.  *See* SKAT Br. 32.  There is no record evidence of any such pre-ordained coordination among at least seven financial institutions, and SKAT cannot satisfy its burden solely by reference to unsupported conjecture.

his deposition.  Blessington Decl. Ex. 8 (Wall Tr.) 58:14-24.  And, to remove all doubt, the specific

line of questioning to which SKAT refers was expressly elicited as a "follow up" to an answer

given with respect to the "splitting" of trades where MPT Dubai was the counterparty.  *See id.* at

212:20-214:11 (explaining why MPT Dubai would "split" a transaction into subparts), 236:20-

237:1 (eliciting "follow up" testimony on "splits").  Because Annex E trades are the only trades at

issue in which MPT Dubai was the counterparty, CSMF ¶ 15, the testimony SKAT relies upon

was necessarily addressed to Annex E trades alone.[25]  Moreover, and as explained below, *see infra*

§ II.A.2.b.iii, Wall's testimony is inadmissible hearsay as to the ED&F Plans.

SKAT is ultimately left only with unsupported innuendo that "cum-ex" transactions are

*per se* improper, a position which Defendants dispute as wholly inconsistent with market practice.

During the relevant period, VP Securities, Denmark's Central Securities Depository, permitted

parties trading in Danish securities to agree on "any settlement date from the trading day, T+0, to

T+365."  *See* CSMF ¶ 8.  Where the terms of a transaction result in settlement after the record

date, a "market claim" may be used to transfer a dividend from the seller who receives it to the

buyer who is entitled to obtain it from the seller.  *See id.* ¶ 10; Hayden Report ¶ 37.  Moreover, a

market claim is just as appropriate in circumstances where the parties intend to settle a transaction

after the record date as in circumstances where the parties intend to settle a transaction date before

the record date but fail to do so.[26]

Consistent with this market practice, ED&F made a market claim to the ultimate

counterparty in cases where the transaction at issue settled after the record date.  In each such

---

[25]     What SKAT describes as "recycling" arose from the fact that, with respect to the Annex E trades, ED&F was
the clearing broker for both the seller and the buyer of the shares, and so the shares were delivered into and out of the
same custodial account.  *See* Wall Tr. 214:3-11, 233:21-234:5, 234:14-18.

[26]     *See* CSMF ¶¶ 10-11.  SKAT's expert, Wade, in contrast provides no support for his assertion that a "market
claim" does not apply to transactions intended to settle after the record date.

instance, ED&F specified that it was "claiming the below dividend due to cum dividend trades settling after the dividend record date," CSMF ¶ 13, and the market counterparty paid and confirmed the relevant market claim. *See id.* ¶ 12.  Contrary to SKAT's assertion that "ED&F studiously avoided inquiring into whether the third-party sellers actually received a dividend from the share issuer," *see* SKAT Br. 56, ED&F made standard market claims in keeping with standard market practice, and such market claims were without exception agreed to and paid by the ultimate counterparty to the transaction.[27]

### (iii) SKAT Fails To Support Its Arguments As To The Annex E Trades With Admissible Evidence

SKAT's arguments regarding the trading underlying the Annex E tax vouchers are premised on hearsay documents and the inadmissible 30(b)(6) testimony of a non-party to the dispute.  SKAT relies on court documents and investigation statements created by ED&F or its outside counsel in the context of litigation and investigations that did not involve the ED&F Bellwether Plans.  ED&F's Amended Defence—which includes Annex E—was a court document prepared specifically for use in litigation; as such, it is clearly not a business record under the meaning of Rule 803(6), for it was not produced "in the course of a regularly conducted activity of a business" and creating such a record was not "a regular practice" of ED&F.  Nor does it qualify under any other exception to the hearsay rule or any enumerated category of nonhearsay.  Similarly inadmissible are the letters from ED&F's counsel to SKAT's counsel in the English Action and

---

[27]    Indeed, there is no evidence in the record that there would have been any way for ED&F to conclusively verify the underlying stockholding of the ultimate selling counterparty, which the pension plans purchased through an inter-dealer broker.  Indeed, to the extent the selling counterparty was acting as a broker for yet *another* counterparty, it is not at all clear from the record whether that *broker* would have had complete information as to the stock position of the party on behalf of whom it was selling.  SKAT's attempt to blame ED&F for failing to investigate rings hollow—and turns its own burden of proof on its head—given that SKAT has sought at least 25 letters rogatory and issued over 50 subpoenas in this case, but has itself decided not to pursue discovery to determine whether the selling counterparty did not deliver cum-dividend shares.

the documents prepared by ED&F for submission to the FCA, all of which were prepared outside the ordinary course of business.

SKAT's reliance on nonparty 30(b)(6) testimony from ED&F's corporate representatives is also impermissible. Although "[f]ew courts have addressed this issue, … the purposes underlying Rule 30(b)(6) must be balanced against the real dangers of admitting testimony based on hearsay." *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011); *see also VIIV Healthcare Co. v. Mylan Inc.*, 2014 WL 2195082, at *2 (D. Del. May 23, 2014). Thus, even those courts that have allowed 30(b)(6) testimony at trial have limited such testimony to "topics that are particularly suitable for Rule 30(b)(6) testimony, … such as corporate policies and procedures," and not for "proving how the parties acted in a given instance." *Sara Lee Corp.*, 276 F.R.D. at 503-04 ("[T]he Court doubts that a Rule 30(b)(6) witness should be allowed to testify about the details of a car accident in lieu of the corporation's truck driver who actually witnessed the event."). SKAT seeks to use the 30(b)(6) testimony *solely* to prove how and why ED&F conducted specific trades at issue in this litigation. *See, e.g.*, SKAT Br. 32 (citing 30(b)(6) testimony to support its assertion that ED&F broke trades down into "shapes" to re-use the same shares). Admission of such testimony is particularly problematic here, where the designated corporate representatives were not desk traders at ED&F and were not even able to speak to the former ED&F employees who were, despite attempts to do so. *See* Wall Tr. 63:20-64:5. In *In re RFC & RESCAP Liquidating Trust Action*, for example, the court precluded a 30(b)(6) representative from testifying "about any evidence solely learned from … counsel when preparing for her deposition," because such knowledge "was not acquired through 'a review of records in the ordinary course of business' or 'perceptions based on industry practice.'" 2020 WL 504661, at *7 (D. Minn. Jan. 31, 2020). SKAT's use of 30(b)(6) testimony obtained from individuals

without personal knowledge to prove specific facts surrounding specific transactions at issue is similarly impermissible.

### B.  SKAT Cannot Establish That Defendants Received Money Belonging To It

To prevail on its claim for money had and received, SKAT must prove that each defendant "received money belonging to" SKAT.  *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 570 (S.D.N.Y. 2014); *accord* SKAT Br. 39.  But the reclaim amounts do not "belong[] to" SKAT.  *See* Defs.' Br. 57-58.  For that reason alone, Defendants, not SKAT, are entitled to summary judgment on the money had and received claims.

The record confirms that SKAT's role as a Danish agency is ministerial—*i.e.*, that SKAT assesses and collects taxes payable to the Kingdom of Denmark, on the Kingdom's behalf and pursuant to the Kingdom's authority.  *See* Defs.' Br. 57-58.  Indeed, SKAT has stipulated that the money it collects "*belongs to the Kingdom of Denmark.*"  JSUMF ¶ 11 (emphasis added).  SKAT cannot keep the tax revenue it collects and has no discretion in handling the funds, which are deposited into a bank account belonging not to SKAT but to the Kingdom.  *See id.* ¶¶ 9-11.  Any tax-revenue shortfall is borne by the Kingdom, not by SKAT, and any monetary judgment obtained in these actions would be remitted to the Kingdom, not to SKAT.  *See* DSMF ¶ 1.

There is no reason why the Kingdom could not have brought suit in this Court on its own behalf.  *See* Pilgaard Decl. ¶ 61; *see also Eur. Cmty. v. RJR Nabisco, Inc.*, 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) (lawsuit brought by coalition of European countries, including Kingdom of Denmark), *vacated*, 764 F.3d 129 (2d Cir. 2014), *rev'd & remanded*, 579 U.S. 325 (2016). Instead, SKAT is the plaintiff.  One consequence of that choice is that SKAT cannot now seek to recover money "belonging to" the Kingdom, rather than to SKAT itself.

*Traffix, Inc. v. Herold*, also involved a plaintiff attempting to recover funds that did not legally belong to it.  269 F. Supp. 2d 223 (S.D.N.Y. 2003).  That plaintiff, Traffix, had agreed to

provide "billing and collection services" to the defendant's company, FTT, under a contract permitting FTT to hold "certain monies collected on Traffix's behalf" in its own accounts for up to twelve months. *Id.* at 225. When FTT later went bankrupt, Traffix allegedly discovered that defendant had "looted" or otherwise "misappropriated" Traffix's reserve accounts before FTT's bankruptcy filing. *Id.* at 225-26. Nonetheless, the court dismissed Traffix's claim for money had and received, holding that the cause of action did not permit Traffix to recover money that Traffix itself had never legally owned, possessed, or controlled. *See id.* at 228-29; *see also United Republic Ins. Co. v. Chase Manhattan Bank*, 168 F. Supp. 2d 8, 20 (N.D.N.Y. 2001) (rejecting as futile money had and received claim because plaintiff had "no possessory interest" in money it had "freely given" as loan), *aff'd*, 40 F. App'x 630 (2d Cir. 2002), *remanded on other grounds*, 315 F.3d 168 (2d Cir. 2003) (per curiam); *Mia Shoes, Inc. v. Republic Factors Corp.*, 1997 WL 525401, at *3 (S.D.N.Y. Aug. 21, 1997) (dismissing money had and received claim because, although plaintiff had contractual right to receive "sums due under the factoring agreement" with defendant, plaintiff did not itself have any "ownership interest" in receivables collected by defendant); *Advanced Recovery Sys., LLC v. Am. Agencies, LLC*, 2016 WL 6916539, at *7 (D. Utah Sept. 28, 2016) (plaintiff itself must have "legal right to the disputed amount").[28]

Here, like the plaintiff in *Traffix*, SKAT hopes to skate past the first element of its claim and to jump ahead to the second and third elements. *See* SKAT Br. 42. The Court should not be fooled. Because the record does not establish that the reclaim amounts "belong[ed] to" SKAT, summary judgment cannot issue in SKAT's favor on its claim for money had and received.

_____

[28]      In contrast, the cases cited by SKAT, *see* SKAT Br. 43 & n.45, involved plaintiffs with a straightforward basis for asserting that the funds in dispute belonged to them. *See Williamson v. Stallone*, 905 N.Y.S.2d 740, 740-43 (Sup. Ct. 2010) (granting summary judgment to court-appointed liquidating trustee, suing on behalf of defunct hedge fund to recover distributions rightfully belonging to fund that had been wrongly paid to former partners); *People v. Duggan*, 291 N.Y.S.2d 582, 583-84 (3d Dep't 1968) (granting summary judgment to State of New York, suing to recover unemployment insurance benefits wrongly paid by State to defendant).

### C.       Several Individual Defendants Did Not Receive Any Funds At All

#### 1.       Altbach, Klugman, Markowitz, and van Merkensteijn Did Not Receive Money From SKAT

With respect to Solo Bellwether defendants Altbach, Klugman, Markowitz, and van Merkensteijn, even if SKAT could show that the reclaim amounts "belong[ed] to" it, SKAT's claim would still fail because SKAT has offered no evidence that any of these four individual defendants "received money" at all.  *Angus Partners*, 52 F. Supp. 3d at 570.

SKAT has offered evidence that the pension-plan defendants received money.  But that evidence does not suffice as proof of the first element of SKAT's claim against the *individual defendants*.  The individual defendants are participants in the plans; SKAT has pointed to no undisputed facts that would permit this Court to conclude that the plans' receipt of reclaims establishes the participants' receipt.  Simply put, because the individual defendants "have not had and did not receive [SKAT's] money, [SKAT] may not recover it from them."  *White v. Robinson*, 130 N.Y.S. 388, 396 (1st Dep't 1911); *see also Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*, 2022 WL 603998, at *11 (S.D.N.Y. Mar. 1, 2022) (dismissing money had and received claim where there was "no allegation that [individual defendants] received money"); *Staudinger+Franke GMBH v. Casey*, 2015 WL 3561409, at *9 (S.D.N.Y. June 8, 2015) (granting summary judgment because "[n]o individual defendant ever received money belonging to the plaintiffs in his or her individual capacity"); *Bietola v. McCue*, 764 N.Y.S.2d 692, 693 (1st Dep't 2003) (rejecting claim for money had and received because defendant "never received the money").

SKAT's assertion that Altbach, Klugman, Markowitz, and van Merkensteijn, were each "enriched" when their respective plans received reclaim amounts—either directly or pursuant to a partnership agreement (SKAT Br. 41-42)—misses the mark.  In contrast to a claim for unjust enrichment—where a plaintiff must prove that "the defendant was enriched," *Cooper v. Anheuser-*

*Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021)—a claim for money had and received requires proof that "the defendant received money belonging to the plaintiff." *Litvinoff*, 54 N.Y.S.3d at 25. Thus, SKAT's citation (at 42) to this Court's ruling regarding the statute of limitations for unjust enrichment claims is beside the point.[29] Because SKAT has failed to present any evidence that Altbach, Klugman, Markowitz, or van Merkensteijn "received money belonging to the plaintiff," the Court must deny SKAT's motion as to those defendants.

### 2.      Bradley And Proper Pacific Did Not Receive Money From SKAT

SKAT's motion for partial summary judgment against Defendants Bradley and the Proper Pacific Plan for money had and received should be denied because SKAT cannot prove (1) the first substantive element of such a claim, *i.e.*, "the defendant received *money belonging to the plaintiff*," *Litvinoff*, 54 N.Y.S.3d at 25 (emphasis added) (cleaned up), or (2) non-speculative and reasonably certain damages caused by either Defendant. *See*, *e.g.*, *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 581 (S.D.N.Y. 2010) ("Under New York law, compensatory damages for all economic injury 'must be established with reasonable certainty' and 'may not be based on pure speculation and conjecture.'").

SKAT's motion against Defendants Bradley and the Proper Pacific Plan for money had and received is based upon the false factual premise that "the Proper Pacific plan received DKK 1,451,794.72 (5 percent)." SKAT Br. 42. But this is squarely contradicted by SKAT's own forensic accounting expert, Dubinsky, who opined that neither Bradley nor the Proper Pacific Plan received tax reclaim monies. *See* DSMF ¶¶ 102-03. Indeed, this factual premise commences in SKAT's supplemental Rule 56.1 Statement as "[e]ach time the Proper Pacific Plan received

---

[29]      To the extent SKAT is citing this case to establish liability against the individual defendants who were participants in the plans under an alter ego theory, the existence of an alter ego relationship is generally a question of fact that cannot be resolved on summary judgment. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995).

refunds payments from SKAT, the Proper Pacific Plan paid approximately 95% of the refund to Ganymede." PSMF ¶ 29. It then surreptitiously morphs in SKAT's brief to: "Of the DKK 29,035,894.47 Proper Pacific plan received[, it paid] 95 percent to Ganymede *and retained the rest for itself*." SKAT Br. 37 (emphasis added).

Yet, the documents relied upon to support SKAT's supplemental Rule 56.1 statement do not support the proposition that the Proper Pacific Plan "retained" any tax reclaim monies. Rather, Exhibit 120—the Proper Pacific Plan's "Statement Summary" for 2015—demonstrates that the Proper Pacific Plan's "Opening Cash Balance" was DKK 0.00 (PROPPACIF00000113) and its "Closing Balance" remained at 0.00 (PROPPACIF00000145-146). *See* Weinstein Decl. Ex. 120. That is clearly not evidence that the Proper Pacific Plan *retained* any monies. *See*, *e.g.*, *Bietola*, 764 N.Y.S.2d at 693 ("Equally specious is plaintiff's effort to convert this action against defendant Towe into one for money had and received. *Towe never received the money*; it had disappeared into the hands of his unscrupulous former attorney-in-fact *long before he was even aware that the money had fleetingly passed through his account*." (emphases added)).

SKAT's motion for summary judgment fails to competently trace the tax reclaim payments it paid on behalf of the Proper Pacific Plan, *but not to the Proper Pacific Plan*, to the nonparty payments ultimately made to Bradley. Without being able to competently trace the specific monies Bradley received from the various nonparty payors to SKAT's tax reclaim monies, SKAT can neither establish reasonably certain, non-speculative damages against Bradley or the Proper Pacific Plan nor the first substantive element of SKAT's money had and received cause of action against either Defendant. *See In re Allou Distribs., Inc.*, 446 B.R. 32, 77 (Bankr. E.D.N.Y. 2011) ("A plaintiff cannot state a claim for money had and received if the defendant did not receive the plaintiff's money.").

### 3.   Lehman And The FWC Plan Did Not Receive Money From SKAT

SKAT moved for summary judgment against the FWC Plan and Roger Lehman on its unjust enrichment claims under Florida law.  *See* SKAT Br. 51-53.  That claim fails because it is undisputed that SKAT cannot specifically trace any of its tax reclaim payments from itself directly to the benefit of Lehman, himself.  In other words, to the extent Lehman was "enriched" as part of this dividend arbitrage strategy, the "enrichment" was paid by non-party entities whom SKAT has not been able prove obtained their monies solely from SKAT's tax reclaim payments.

SKAT concedes that neither Lehman nor the FWC Plan were paid directly by SKAT.  *See* SKAT Br. 52 ("It matters not that SKAT did not pay Lehman or the FWC plan directly[.]").  But the record is even more damaging:  SKAT's own forensic accounting expert opined that neither Lehman nor the FWC Plan received *any* SKAT tax refund monies.  *See* DSMF ¶¶ 100-01.[30]  Once this critical factual distinction is made, the irrelevant Florida caselaw cited by SKAT becomes utterly unavailing on its motion.

As relevant here, to state an unjust enrichment claim under Florida law, "[t]he plaintiff must allege that it directly conferred a benefit on defendant; an indirect benefit is insufficient." *Swiss Watch Int'l, Inc. v. Movado Grp., Inc.*, 2001 WL 36270980, at *5 (S.D. Fla. June 21, 2001); *Harvey v. Fla. Health Scis. Ctr., Inc.*, 728 F. App'x 937, 946 (11th Cir. 2018).  "It is not enough to show that the defendant obtained a benefit and that the plaintiff was in some roundabout way damaged."  *Caldwell v. Compass Ent. Grp. LLC*, 2016 WL 7136181, at *2 (M.D. Fla. Feb. 4,

---

[30]     Again, SKAT's factual assertions are dubious.  SKAT's supplemental Rule 56.1 Statement asserts that "[e]ach time the FWC Plan received refunds payments from SKAT, the FWC Plan paid approximately 95% of the refund to Ganymede."  PSMF ¶ 27.  This statement then surreptitiously morphs into the distinct statement in SKAT's legal memo that "[t]he FWC Capital plan paid 95 percent of the DKK 70,930,260.73 it received to Ganymede *and retained the rest itself*."  SKAT Br. 37 (emphasis added).  Yet, the documents relied upon to support SKAT's supplemental Rule 56.1 statement do not support the proposition that the FWC Plan "retained" any tax reclaim monies.  Rather, Exhibit 117, which is the FWC Plan's "Statement Summary" for 2015, demonstrates that the FWC Plan's "Opening Cash Balance" was DKK 0.00 (FWCCAP00000194) and its "Closing Balance" remained at 0.00 (FWCCAP00000226).  *See* Weinstein Decl. Ex. 117.

2016).  "A benefit that a defendant gains that does not come directly from the plaintiff does not give rise to a claim for unjust enrichment." *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011).  Damages under unjust enrichment "'cannot be awarded upon the singular determination that the requesting party is deserving.'" *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331 (Fla. Dist. Ct. App. 2007).

SKAT relies upon *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013) and *Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1368 (S.D. Fla. 2015) for the uncontroversial proposition that "direct benefit" does not mean "direct contact." SKAT Br. 52-53.  But SKAT's argument that "the 'direct benefit' element of an unjust enrichment claim may be satisfied where a benefit is conferred through an intermediary," *Weinberg*, 147 F. Supp. 3d at 1368, misses the point entirely.

The dispositive factual issue is not that Lehman *could have* been unjustly enriched by an intermediary nonparty if the intermediary nonparty paid Lehman with SKAT's tax reclaim monies. Rather, the dispositive factual issue is whether SKAT can prove the monies the intermediary nonparties paid Lehman *actually came* from SKAT's tax reclaim monies in the first instance.  And SKAT cannot prove this fact because, as its own forensic accounting expert unequivocally opines, "'[n]o money from the refunds was paid to Lehman's Plans.'"  DSMF ¶ 101.  Indeed, Solo and its affiliated entities were deriving monies from tax reclaim activities in other European countries, not just Denmark.  *Id.* ¶ 104.  Lehman's payments could have come from any of Solo's activities, not just its Danish tax reclaim activities.  SKAT has not, and presumably cannot, specifically and directly trace the monies received by Lehman to SKAT's tax reclaim monies.  *See, e.g.*, *Alvarez v. All Star Boxing, Inc.*, 258 So. 3d 508, 512 (Fla. Dist. Ct. App. 2018) ("Because unjust enrichment damages are economic damages, the amount of damages must be measurable and quantifiable:

'[i]t has long been accepted in Florida that a party claiming economic losses must produce evidence justifying a definite amount.'"). This destroys the "direct benefit" element of Florida's unjust enrichment cause of action and, moreover, renders it impossible for SKAT to prove its unjust enrichment damages within a reasonable degree of certainty.[31]

### 4. Crema, Schulman, and Acer Did Not Receive Money From SKAT

SKAT does not seek summary judgment against Stacey Kaminer on its claim for money had and received, *see* SKAT Br. 54 n.54, and SKAT does not even argue, much less adduce undisputed facts to show, that Robert Crema, David Schulman, or Acer received any funds from SKAT. Indeed, as SKAT admits, the ED&F Bellwethers were credited with the "full amount of the refunds" paid by SKAT. JSUMF ¶¶ 381-82. SKAT's motion should accordingly be denied.

### D. Money Had And Received Sounds In Equity So Should Not Be Resolved At This Juncture

Even setting aside these deficiencies in SKAT's money had and received claim, summary judgment is inappropriate because SKAT has not demonstrated that it lacks an "adequate remedy at law," a necessary prerequisite for invoking the Court's equitable power. *Triebwasser & Katz v. Am. Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976).

Although money had and received "is a claim that 'has been considered an action at law,'" *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 326 (S.D.N.Y. 2019), courts have described it as an "equitable cause of action," *Amsave Credit Corp. v. Sec. Pac. Nat'l Bank*, 1991 WL 95390, at *3 (S.D.N.Y. May 28, 1991), as an "equitable doctrine," *Jewish Nat'l Fund, Inc. v. Garland*, 1985 WL 163, at *1 (S.D.N.Y. Jan. 3, 1985), or as an "equitable remedy," *Traffix*, 269 F. Supp. 2d at 229. SKAT itself quotes Florida law for the proposition that an action for money

---

[31] To be sure, if the Court determines that there is a factual dispute as to whether SKAT conferred a "direct benefit" upon Lehman, summary judgment to SKAT should be precluded. *See Kovalivker v. Team Real Estate Mgmt., LLC*, 2020 WL 3305674, at *8 (S.D. Fla. May 4, 2020).

had and received "is an equitable remedy" that warrants "intervention by a court of equity."  SKAT

Br. 52 n.53.  At a minimum, there can be no dispute that the cause of action "rests on equitable

principles," *SKAT*, 356 F. Supp. 3d at 326, and is "ruled by broad considerations of equity and

justice," *Tzfira v. Kadouri Int'l Foods, Inc.*, 2009 WL 10695620, at *2 (S.D.N.Y. June 23, 2009),

*aff'd*, 365 F. App'x 235 (2d Cir. 2010).  One element of the claim is whether "principles of equity

and good conscience" require the defendant to return money to the plaintiff, and that determination

necessarily "requires a weighing of the equities."  *Amsave Credit*, 1991 WL 95390, at *3.

By seeking summary judgment on its money had and received claim, SKAT is asking the

Court to decide before trial "[o]n which side … the equities lie."  *N. Tr. Co. v. Chase Manhattan

Bank, N.A.*, 582 F. Supp. 1380, 1384 (S.D.N.Y.), *aff'd*, 748 F.2d 803 (2d Cir. 1984).  Regardless

of whether money had and received should formally be categorized as an "action at law," SKAT

is invoking the Court's equitable powers in asking the Court to fashion a remedy by "weighing …

the equities."  *Amsave Credit*, 1991 WL 95390, at *3.  But SKAT cannot ask the Court to resort to

equitable remedies unless and until SKAT has demonstrated that no adequate remedy at law exists.

*See Triebwasser*, 535 F.2d at 1359.[32]  Because SKAT does not seek summary judgment on its

legal claims—fraud and negligent misrepresentation—and because claims sounding in equity can

only be addressed where legal remedies are unavailable, the money had and received claim cannot

be resolved in SKAT's favor now, before a decision on SKAT's legal claims at trial.

### E.   SKAT's Motion Also Fails Because Reasonable Fact-Finders Could Find That Equity And Good Conscience Do Not Require Disgorgement

To grant SKAT summary judgment, this Court would have to hold that every reasonable

---

[32]   SKAT's brief seems to concede as much.  SKAT Br. 40 n.43 (acknowledging that if SKAT's unjust enrichment claims were "considered actions in equity, they would be available only should SKAT not succeed on its tort claims"), 54 n.56 (acknowledging Utah Supreme Court case holding that "plaintiff is first required to exhaust legal remedies" before proceeding on unjust enrichment claims).

fact-finder would necessarily conclude that principles of "equity and good conscience"—informed by "broad considerations of right, justice, and morality"—dictate that Defendants ought not be permitted to keep the withholding tax refunds that SKAT voluntarily paid out. *Litvinoff*, 54 N.Y.S.3d at 25 (cleaned up); *see also Moss v. Summit Cnty.*, 208 P. 507, 511 (Utah 1922). The Court cannot reach that holding because the opposite is true: Equity and good conscience dictate that Defendants should be permitted to keep the money. At the least, there is a triable question regarding the balance of the equities. In similar circumstances, courts routinely deny summary judgment on claims for money had and received or unjust enrichment. *See, e.g.*, *Menlo v. Friends of Tzeirei Chabad*, 2012 WL 137504, at *3 (S.D.N.Y. Jan. 17, 2012) (denying summary judgment where "a reasonable fact-finder could determine that Plaintiff has not shown that equity and good conscience require Defendant's repayment at present").[33]

The New York Court of Appeals has said that a claim for money had and received "is the most favorable way in which a defendant can be sued" because "[i]n such an action the defendant 'may defend himself by everything which shows the plaintiff [e]x aequo et bono is not entitled to the whole of his demand or any part of it.'" *Fed. Ins. Co. v. Groveland State Bank*, 37 N.Y.2d 252, 258 (1975). That equitable inquiry is intentionally broad, flexible, and case-specific. *See Holland v. Florida*, 560 U.S. 631, 650 (2010). Here, it requires judgment to enter for the Defendants, or at the very least, SKAT's motion to be denied.

SKAT claims that equity and good conscience require Defendants to return the refunds

---

[33]     *See also, e.g.*, *P360 Spaces LLC v. Orlando*, 76 N.Y.S.3d 114, 116 (1st Dep't 2018) (affirming denial of summary judgment on plaintiff's unjust enrichment claim because there "were issues of fact as to whether it was 'against equity and good conscience' to permit defendants to retain the monies and benefits" they gained by using basement where they were under the "mistaken belief that they had the right to use the space"); *Zamor v. L & L Assocs. Holding Corp.*, 926 N.Y.S.2d 625, 628 (2d Dep't 2011) (reversing grant of summary judgment on plaintiff's unjust enrichment claim where non-moving party had "raised a triable issue of fact as to whether it would be against equity and good conscience to permit [movant] to retain a benefit conferred on [movant] under mistake of fact or law").

because SKAT paid the money on its "mistaken belief" that the plans "owned shares" and "received dividends," and so the plans actually "had no entitlement" to the refunds.  SKAT Br. 41-43.  SKAT's argument is deficient for several reasons.  First, SKAT has not explained how it was "mistaken":  SKAT was in fact fully "aware that [its] understanding of a legal obligation may be erroneous," so its decisions to pay the refunds "can hardly be characterized as truly *mistaken* when [it] intentionally proceeds without further investigation of [its] rights."  *Estate of Hatch, ex rel. Ruzow v. NYCO Minerals Inc.*, 704 N.Y.S.2d 340, 341 (3d Dep't 2000); *see* Defs.' Br. 75-79 (making same point with respect to SKAT's payment by mistake claims).  Second, even if SKAT had been mistaken in its belief that the plans "owned shares" and "received dividends"—it was not—that would not mean that the plans were not entitled to the refunds.  As Defendants have explained, the only qualification for entitlement to refunds is beneficial ownership of the dividends (as defined under the Treaty and Danish tax law), and the plan defendants were, in fact, the beneficial owners of the dividends.  *See* Defs.' Br. 21-25; *supra* § II.A.  As a result, the plans were entitled to the withholding tax refunds that SKAT seeks to recover.  That entitlement—which a reasonable fact-finder could find—means that equity and good conscience do not warrant the entry of judgment for SKAT.  *See Cohen*, 144 F. Supp. 3d at 502.

Even if the Court were to disagree with that conclusion, reasonable fact-finders still could conclude that equity and good conscience do not require Defendants to return any money to SKAT. They might determine that SKAT was more culpable than Defendants.  *See Cobalt Multifamily Invs. I, LLC v. Arden*, 857 F. Supp. 2d 349, 361 (S.D.N.Y. 2011) ("In considering whether to order restitution, a court may take into account not only the culpability of the defendant but also that of the plaintiff.").  Beneficial ownership under Danish tax law—which formed the basis for the plans' entitlement—presented a complex question of law, and Defendants' interpretation was at least

45

objectively reasonable.  *See* Defs.' Br. 46-53.  Meanwhile, the record reflects that SKAT paid out refunds "blindly," with full knowledge that multiple people could, in good faith, claim to be the beneficial owner of "the same" dividends.  *See id.* at 58-69.

SKAT alone was responsible for structuring and administering the withholding tax reclaim process.  It established the requirements for documentation, and the plans complied with all of them.  SKAT did not require tax reclaim applicants to disclose whether a custodian held the shares that were the subject of the application directly or through a sub-custodian.  Pilgaard Decl. ¶ 137. Nor did it require such applicants to disclose whether they had purchased shares that had been borrowed (*id.*)—the very fact pattern it recognized would enable the submission of multiple requests for reclaims for the same shares.  Schoenfeld Decl. Ex. 16.  And, to the extent SKAT's claim relates to its own failure to collect dividend withholding tax from sellers of borrowed shares, that is the result of the design of its system rather than the fault of any Defendant in this litigation. At any rate, Danish law did not require that dividend withholding taxes had actually been paid to SKAT to entitle a claimant to a refund.  Pilgaard Decl. ¶ 136.

SKAT's (at best) negligent actions could lead reasonable fact-finders to conclude that the equities favor Defendants.  *See, e.g.*, *Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146, 148 (2d Cir. 1998) (affirming summary judgment for defendant on money had and received claim because "the [plaintiff's] negligence would preclude its recovery" and approving district court's conclusion that "it could not be against good conscience to allow a holder in due course, as opposed to a party whose negligence substantially contributed to the forgery, to keep the disputed money"); *Groveland State Bank*, 37 N.Y.2d at 258 (stating that "a depositor's negligence in examining his monthly bank statement will bar a recovery for money had and received," and denying summary judgment because "reasonable and prudent

action by [bank] would have revealed the defalcation and prevented further losses").

Relatedly, reasonable fact-finders could conclude that the Plan Defendants received the refunds in good faith, and so equity and good conscience do not require that the plans forfeit that money.  Many of the individual defendants received direct and indirect advice of counsel that these transactions were lawful.  *See, e.g.*, Schoenfeld Decl. Exs. 7-10 (Markowitz Tr. 344:4-345:2, 565:13-566:14;  van Merkensteijn Tr. 391:18-393:2;  Klugman Tr. 229:11-230:7;  Ex. 2235.) And—although it does not matter because SKAT has not shown how it is relevant to the question of beneficial ownership—there is no evidence that any Bellwether Defendant knew the identity of the sellers of Danish securities, let alone that the trading was purportedly accomplished in a "circular" manner.  *Cf., e.g.*, *In re New Times Sec. Servs. Inc.*, 371 F.3d 68, 87 (2d Cir. 2003) (adopting SEC's position that "[w]hen a customer has been sent confirmations and account statements reflecting his securities purchases and showing that he holds the securities in his account," customer is entitled to SIPC protection).  In similar circumstances, courts have held that disgorgement would be inappropriate.  *See, e.g.*, *SH575 Holdings LLC v. Reliable Abstract Co.*, 149 N.Y.S.3d 62, 64 (1st Dep't 2021) (if defendants "received their funds in good faith, it would not be 'against equity and good conscience' to permit them to retain them").[34]

SKAT's arguments to the contrary are weak and rely on inapposite cases.  For instance, SKAT twice cites *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 366 (1991), for the proposition that "if A pays money to B upon the erroneous assumption of the former that he is

---

[34]     *See also, e.g.*, *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 3310262, at *3, *6 (E.D.N.Y. Aug. 19, 2010) (denying motion to dismiss interpleader complaint and noting that recipient of money would be able to "keep the money, free of any claim by" allegedly defrauded party, "if it can show that it acted in good faith," among other things); *Kind v. B. Gutter & Sons*, 80 N.Y.S.2d 669, 671 (City Ct. 1947) (dismissing claims for unjust enrichment and money had and received against defendant pawnbroker when allowing the claims "would be imputing lack of good faith to defendants"); *cf. Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 163 (S.D.N.Y. 2011) (granting defendant summary judgment on plaintiff's trademark infringement claim where defendants acted in "good faith" based on "defendants' action in seeking and relying on the advice of counsel"), *aff'd*, 508 F. App'x 31 (2d Cir. 2013).

indebted to the latter, an action may be maintained for its recovery."  SKAT Br. 41-42.  But the court in *Banque Worms* allowed the recipient to keep the money it had been paid, and the case is easily distinguishable, as it involved a "concededly [] mistaken" wire transfer.  *Banque Worms*, 77 N.Y.2d at 366.  In contrast, this case does not involve any conceded "mistake," but a disputed interpretation of beneficial ownership under Danish tax law.

SKAT cites another wire transfer case—*Manufacturers Hanover Trust Co. v. Chemical Bank*, 559 N.Y.S.2d 704 (1st Dep't 1990)—for the proposition that it is "of no consequence" if "SKAT was negligent in making the payments."  SKAT Br. 42 n.44.  But other courts in analogous circumstances *have* held that a plaintiff's negligence can provide a basis to deny the plaintiff's claim for money had and received—*see, e.g.*, *Fundacion Museo de Arte Contemporaneo de Caracas*, 160 F.3d at 148—and it is beyond dispute that this Court may consider the actions of both plaintiff and defendant in balancing the equities.  *See Dumois v. Hill*, 32 N.Y.S. 164, 165 (Ct. C.P. 1895) ("The action for money had and received, proceeding upon equitable principles, is defeated by an equal equity in the defendant, and he is never held to return what he may keep with a good conscience."), *aff'd*, 37 N.Y.S. 1093 (1st Dep't 1896), *aff'd*, 157 N.Y. 718 (1899); *cf. Cohn & Berk v. Rothman-Goodman Mgmt. Corp.*, 509 N.Y.S.2d 367, 368 (2d Dep't 1986) (affirming summary judgment against claim for unjust enrichment because plaintiff had acted wrongfully).

Along the same lines, SKAT argues that it does not matter if Defendants (1) "did nothing wrong," or if (2) "any particular defendant played no role in obtaining the money."  SKAT Br. 42 n.44.  Those assertions are simply incorrect.  Regarding (1), if Defendants were entitled to the refunds as beneficial owners under Danish tax law (they were)—*i.e.*, if they did nothing wrong— then equity and good conscience cannot demand disgorgement.  *See Cohen*, 144 F. Supp. 3d at 502.  Furthermore, courts regularly bar claims for money had and received when both plaintiff and

48

defendant are innocent.  *See, e.g.*, *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d

112, 126 (2d Cir. 1984) ("[W]here the loss must be borne by one of two innocent parties, such loss

must be borne by the party whose conduct brought about the situation that caused the loss."); *State

Farm Mut. Auto. Ins. Co. v. Stokos*, 317 N.Y.S.2d 706, 707 (Civ. Ct. 1970).

Regarding (2), it is far from certain that a plaintiff may maintain an unjust enrichment claim

under New York law against a defendant who "played no role in obtaining the money."  Numerous

New York courts—contrary to SKAT's view—have held that a plaintiff may not.  *See, e.g.*,

*Georgia Malone & Co. v. Rieder*, 926 N.Y.S.2d 494, 499 (1st Dep't 2011) (affirming dismissal of

quantum meruit claim against individual defendants where "there is no allegation that the services

performed by [plaintiff] were requested by [that individual defendant] or performed on his

individual behalf"), *aff'd*, 19 N.Y.3d 511 (2012); *Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.*,

2011 WL 5884209, at *5 (E.D.N.Y. Nov. 23, 2011) (describing disagreement on subject and

dismissing unjust enrichment claim when defendant had not "requested, approved, supervised,

agreed to pay for, or assumed any other obligation with respect to" plaintiff's work).  In any event,

even if SKAT were correct that it is not *required* that a defendant take an active role in obtaining

the money to succeed on an unjust enrichment claim, the Court certainly can (and should) consider

the Defendants' limited role when balancing the equities.

SKAT cites two more cases in its favor, but both miss the mark.  In *Williamson v. Stallone*

(SKAT Br. 43), the court granted summary judgment on plaintiff's claim for money had and

received where "undisputed evidence" demonstrated that the defendants had received "inflated

disbursements from the partnership."  905 N.Y.S.2d 740, 750 (Sup. Ct. 2010); *see also id.* at 749

(defendants did not "raise any specific objections or provide evidence disputing the accuracy or

validity" of evidence establishing that assets were overvalued).  Similarly, in the one-paragraph

decision *People v. Duggan* (SKAT Br. 43 n.45), the court remarked that the State was entitled to summary judgment on its claim for money had and received because the defendant received unemployment benefits "by willful misrepresentation." 291 N.Y.S.2d 582, 583 (3d Dep't 1968).[35] Thus, in both *Williamson* and *Duggan*, the relevant basis for recovery was undisputed:  In *Williamson*, the assets were overvalued, and in *Duggan*, the unemployment benefits were obtained by willful misrepresentation.  Here, by contrast, the Defendants were entitled to the money at issue—and at the least, there is a genuine dispute about whether they were based on the parties' differing interpretations of the requirements of beneficial ownership under Danish tax law.

### F.      SKAT's Motion Fails Because It Relies On Inadmissible Evidence

SKAT's prebuttal defending the admissibility of the Elysium Documents is telling, but ultimately meritless.[36]  SKAT cannot offer the Court anything other than these unauthenticated, unreliable documents themselves because SKAT procured no evidence from any representative of a Solo Custodian to establish the basic evidentiary foundation for its motion.

#### 1.      SKAT Has Not Authenticated The Elysium Documents As "Solo Custodian Documents"

SKAT offers the Elysium Documents as the "Solo Custodians' records."  But SKAT does not support the conclusion that the Elysium Documents—seized from an office in Dubai—are, in fact, business records of the Solo Custodians, whose offices were in the United Kingdom.  The bar for authentication may not be particularly high, but SKAT must still offer proof sufficient "for a reasonable juror to find in favor of authenticity or identification."  *United States v. Ganias*, 824

---

[35]      In fact, *Duggan* is inapposite for the additional reason that the case was actually about whether the claim at issue was subject to a three-year or six-year statute of limitations.  The *Duggan* Court held that the claim was one for money had and received and so was subject to a six-year statute of limitations.  291 N.Y.S.2d at 583.  Applying the longer statute of limitations rendered the claim timely, and the *Duggan* Court then granted summary judgment to the State (without any analysis) because there was "no cogent reason" not to do so.  *See id.*

[36]      The Elysium Documents are Bates-stamped as ELYSIUM-######.

F.3d 199, 215 n.33 (2d Cir. 2016) (cleaned up).  SKAT fails to clear even this low hurdle because it offers *no* basis to conclude that Elysium and Solo are interchangeable.  What SKAT *does* provide only raises questions about the relationship between the entities, and the Court, on summary judgment, should not resolve those questions in SKAT's favor.

The only evidence SKAT introduces to explain the Elysium Documents is the Declaration of Rana Shashaa.[37]  *See* PSMF ¶ 9 n.14 and Weinstein Decl. Ex. 97 (Shashaa Decl.).  According to Shashaa, an employee of Deloitte Professional Services (Dubai) Limited, Deloitte assisted with the execution of a Dubai International Financial Courts (DIFC) search order issued against Elysium Global (Dubai) Limited and Elysium Properties Limited.  Shashaa Decl. ¶ 5.  The documents collected by Deloitte and subsequently produced to Defendants in this MDL are the Elysium Documents.  *Id*. at 2, 40.  Absent from the Shashaa Declaration, however, is any description of the connection between the Elysium entities and the Solo Custodians.  Indeed, the Shashaa Declaration does not mention any Solo Custodian by name even once.[38]

SKAT's attempts to patch over the lack of evidence by alleging a connection between Elysium and Solo via Sanjay Shah fall short.  SKAT asserts that Sanjay Shah "controlled" both Elysium and the Solo Custodians.  *See* SKAT Br. 7 (citing PSMF ¶ 3); *id*. at 13 n.21 (citing PSMF ¶ 9).  Neither of the citations supports the claim.  Paragraph 3 of SKAT's 56.1 misstates the language of the FCA Final Notice, which states only that the Solo Custodians "were *owned by* Sanjay Shah."  FCA Final Notice (Weinstein Decl. Ex. 75) at ¶ 4.19 (emphasis added).  At no

---

[37]     The Shashaa Declaration, although dated November 26, 2021, was produced to Defendants for the first time when SKAT served its motion for summary judgment on April 29, 2022.  At no time before the close of discovery on December 3, 2021, nor at any time in the intervening five months did SKAT disclose to Defendants either Shashaa's identity or Deloitte's role in the collection of the Elysium Documents.  SKAT's claim to a lack of any genuine dispute as to authenticity is disingenuous and flouts its disclosure obligations under the Rules.

[38]     Nor does the Shashaa Declaration provide any basis for concluding that Shashaa is qualified to testify as to the relationship between Elysium and Solo or the circumstances surrounding the creation of any document collected from Elysium by Deloitte.

point does the FCA Final Notice state that Shah *controlled* the Solo Custodians. Paragraph 9 (footnote 14) of SKAT's 56.1, in turn, cites the Shashaa Declaration as support that Shah controlled the Elysium entities. Shashaa makes no such claim, and for the reasons previously discussed, would not be qualified to do so anyway. And the DIFC Public Register cited by SKAT, although not admissible, similarly states only that Shah was a "director" of Elysium. *See* https://www.difc.ae/public-register/elysium-global-dubai-limited. Even if SKAT had presented plausible evidence of common control by Shah, it has offered nothing to support its leap of logic that the Elysium Documents should be equated with Solo Custodian documents. In short, SKAT has given a potential juror *no basis* to find, reasonably or otherwise, the authenticity of the Elysium Documents. The documents should be excluded.

### 2. The Elysium Documents Are Not Admissible To Prove "Circular Trading Loops" Under The Business Records Exception

SKAT's suggestion that the Elysium Documents are not offered for their truth is nonsensical. According to SKAT, the Elysium Documents are only offered to prove the alleged "circular" shape of the trading. SKAT Br. 47. But there is no way to trace the so-called trading loops without relying on the truth of the Elysium Documents, nor does SKAT even try. For example, in support of the proposition that the Basalt Plan's shares of Carlsberg A/S were ultimately sourced from an entity called RDKS Consultants, SKAT cites Elysium Documents to set out the intervening trades involving Sunrise Brokers, Mako Financial Markets LLC, and RDKS. *See* PSMF ¶ 12.a.i and ii. Those dots only connect if one assumes the truth of the trading reflected in the records. By offering the Elysium Documents to show any sort of pattern in the

trading, SKAT necessarily offers them for the truth of the matter asserted.[39]   Accordingly, the documents would only be admissible via an exception to the rule against hearsay.

SKAT fails to demonstrate that the Elysium Documents may be admitted under the business records exception.  SKAT has not produced testimony of the custodian or other qualified witness, nor a certification, establishing the exception's three qualifying conditions as required by Rule 803(6)(D).  Fed. R. Evid. 803(6)(D).[40]  Instead, SKAT stretches this Court's prior suggestion in *Chevron Corp. v. Donziger* of some flexibility on the issue well beyond the facts of that case to claim it should be generally permitted to rely exclusively on the face of the documents themselves.

In *Chevron*, the plaintiff offered bank statements as proof of various payments.  974 F. Supp. 2d 362, 690 (S.D.N.Y. 2014).  The documents were corroborated by testimony from the account holder that the statements reflected accurate copies of what he received from the bank.  *Id.* at 691.  The issuing bank was not alleged to have participated in a fraud, nor were the account statements alleged to have played any role in the perpetration of a fraud.  *Id*. at 689-90.  Under these circumstances, and finding no reason to believe the statements—issued in the normal course of a bank's regular business—were untrustworthy, the Court sensibly admitted the statements under Rule 803(6) without a records custodian declaration.  *Id*. at 690-91.[41]

---

[39]      SKAT's reliance on *United States v. Sliker* is misplaced.  There, the court reasoned that the probative value of the evidence lay in its "mere existence … rather than the meaning."  751 F.2d 477, 489 (2d Cir. 1984) (cleaned up). As explained above, the meaning of the Elysium Documents is the very basis for their purported relevance.

[40]      The Shashaa Declaration establishes *none* of the qualifications for admitting the Elysium Documents under Rule 803(6)(A)-(C), nor does SKAT suggest otherwise.  As previously noted, Shashaa is plainly unqualified to offer the required foundation.

[41]      In arriving at this conclusion, the Court took judicial notice that banks routinely produce statements reflecting deposits, withdrawals, debits, and credits of the type reflected on the statements admitted.  974 F. Supp. 2d at 692. Notwithstanding SKAT's explicit invitation, SKAT Br. 50, whether courts may take judicial notice of the regularity in form of documents evidencing the full range of equity and derivative trades and stock lending transactions at issue in this matter is another question entirely.  The parties' submission of multiple expert reports on the trading powerfully suggests that this Court reject SKAT's offer.

SKAT turns *Chevron* on its head to suggest that the documents alone are sufficient to provide the foundation for their admissibility.  That is not what *Chevron* held, and SKAT cannot point to any testimony corroborating the creation, existence, or form of *any* Solo Custodian document.[42]  SKAT's fundamental dispute with the trading activity, and its deliberate decision not to depose Sanjay Shah or any other representative of a Solo Custodian, is also totally inconsistent with Chevron's reliance on the bank statements.  *E.g.*, SKAT Br. 2, 4, 8, 44 (calling the trading "purported" or "fictitious").  While Chevron relied on bank statements to prove the payments reflected therein, SKAT's whole aim in offering the Elysium Documents is to prove that Solo actually did *none* of the things its records reflect.[43]

In any event, SKAT's own experts have pointed out a lack of trustworthiness in the Elysium Documents, precluding any inference of admissibility.  In his opening expert report, Graham Wade claims that Solo "retroactively adjusted interest and fees on the original stock loan agreement" for an example trade.  Wade Report ¶ 260.  Thus, Wade explains, the Elysium Documents (which he characterizes as Solo's internal documents) reflect the trade yielding a modest gain for the plan, while the plan's documents (non-Elysium Documents) show the trade effectively netting to zero.  *Id.* ¶¶ 263-64.[44]  Wade's comments go to the very core of the documents' evidentiary value.  If the veracity of a particular trade fact cannot be accepted on its face because other documents would

---

[42]    In *Chevron*, the Court explicitly acknowledged the corroborating testimony of the account holder on at least two occasions as part of its basis for admitting the bank statements.  974 F. Supp. 2d at 691-92.

[43]    This exposes the absurdity of relying on the business record exception.  SKAT both seeks to offer the Elysium records for the truth of the matter in some instances—the ones purportedly showing circularity of trading—and to dispute the accuracy of the information in others—*inter alia*, the ones showing the defendant plans' purchases of the shares and the crediting to their accounts of the dividends.

[44]    Wade's observation also critically undercuts SKAT's suggestion that the reliability of the Elysium Documents can generally be inferred from their being "corroborated by the defendants' own documents reflecting the same supposed trades."  SKAT Br. 50.

tend to show a different fact, reliability is in question.  SKAT cannot pick and choose which Elysium Documents are reliable business records and which are not.

SKAT's reliance on no more than the face of the documents to establish their contemporaneous creation by a person with knowledge is also particularly weak.  Pointing to features like an email sender's address or a purported letterhead, SKAT simply assumes the very connection which it is obligated to demonstrate.  Indeed, without testimony by a Solo Custodian representative establishing which Solo Custodian was associated with which email address or letterhead, SKAT cannot even demonstrate that *any* Solo Custodian was responsible for the creation of any example it offers.  There is no baseline against which the reliability of any feature of the documents can be tested, and yet SKAT would ask the Court to extrapolate a facially sufficient showing under Rule 803(6)(A) to the millions of pages of Elysium Documents.  SKAT has not met its burden to demonstrate the Elysium Documents are admissible.

SKAT's further argument that reliability can be inferred from the substantive corroboration by Defendants' own documents is similarly meritless.  First, to whatever extent the Defendants' documents corroborate substance, such corroboration is limited to trades in which Solo Bellwether Plans were parties because the Solo Bellwether Plans never received records beyond those trades.  Thus, the suggestion that SKAT may offer Elysium Documents that go beyond these specific plans' trades because they would "contain the same substance, albeit with respect to different trades and stock loans," SKAT Br. 51, is too clever by half.  The details of those "different trades and stock loans" comprise the very substance for which the documents are offered as evidence and which SKAT, evidently, believes are material to its position.  None of those details are corroborated, and SKAT offers no other evidence of their inherent reliability.

Because SKAT cannot establish the admissibility of the Elysium Documents, the Court should disregard all references to them in assessing the merits of SKAT's motion for summary judgment.  Because SKAT cannot establish the elements of its claims as a matter of law absent these unreliable documents, its motion must fail.

### G.    SKAT's Claims Are Time-Barred

As Defendants explained in their opening brief, all of SKAT's claims are time barred, thus entitling Defendants to judgment and the denial of SKAT's motion.  Defs.' Br. 58-71.  In addition, under Utah law, actions based on a "contract, obligation, or liability not founded upon an instrument in writing" are subject to a four-year statute of limitations, running from the date the "last charge is made or the last payment is received."  U.C.A. § 78B-2-307(1).  Because claims for money had and received are "quasi-contractual claims" that "concern a promise 'implied in law'," they are governed by this four-year statute of limitations.  *See CIG Expl., Inc. v. Hill*, 824 F. Supp. 1532, 1545-48 (D. Utah 1993), *aff'd sub nom CIG Expl., Inc. v. Tenneco Oil Co.*, 83 F.3d 431 (10th Cir. 1996).  The date of discovery of the overpayment is irrelevant; the limitations period is flatly four years.  *See id.* at 1547-48 (Utah had not "transform[ed] the four-year statute [of limitations] into a 'discovery' statute"); *see also CIG Expl., Inc. v. State*, 24 P.3d 966, 971 (Utah 2001) (money had and received claim barred because it had not been filed "within four years after the last payment was made").

The ED&F Bellwether cases concern 22 separate tax reclaim applications made by the ED&F Bellwether Plans between December 2013 and April 2015.  Accordingly, to the extent SKAT did not bring suit against the ED&F Bellwether defendants within four years of the purported overpayment, its claims are untimely.  SKAT moved to add Acer Investment Group, LLC and Robert Crema as defendants in the ED&F Bellwether actions on March 27, 2020.  *See* ECF No. 294.  Because the last alleged overpayment by SKAT occurred in 2015, all of SKAT's

money had and received claims against Acer and Crema are untimely.   Similarly, SKAT's complaints naming the other ED&F Bellwether defendants were filed by SKAT on May 4, 2018 (against the AIG Plan, *see* ECF No. 1, Case No. 1:18-cv-9841-LAK) and June 7, 2018 (against the Riverside Plan, *see* ECF No. 2, Case No. 1:18-cv-9840-LAK).   Accordingly, the four-year statute of limitations bars claims in the AIG Plan action arising out of payments made before May 4, 2014, and bars claims in the Riverside Plan action arising out of payments made before June 7, 2014.

### H.      SKAT Is Not Entitled To Pre-Judgment Interest

The Court should also deny SKAT's request for prejudgment interest on its money had and received claim.   With respect New York law, SKAT concedes that prejudgment interest is appropriate on "a sum awarded because of a breach of performance of a contract."  SKAT Br. 58. But SKAT does not assert claims for breach of contract.   SKAT also concedes that the law does not require prejudgment interest on claims "of an equitable nature," CPLR 5001(a), and cannot seriously assert that money had and received falls beyond that category.   *See, e.g.*, Bahnsen Decl. Ex. 1 ¶ 85 (SKAT complaint for money had and received explaining that "it is against equity and good conscience to permit Defendants to keep these monies"); *see also supra* § II.D.[45]

SKAT's request fares no better under Florida law.   SKAT argues it is entitled to pre-judgment interest against Lehman and the FWC Plan under the erroneous assertion that "since the amounts SKAT seeks on its unjust enrichment claims can be liquidated as of certain dates, *i.e.*, *the dates it paid the amounts at issue*, SKAT is entitled to mandatory 4.25 percent interest running from the date it made each respective payment until judgment is entered on the claims."  SKAT Br. 60 (emphasis added).   *First*, it is undisputed that SKAT did not pay the amounts at issue to

---

[45]      In the lone case SKAT cites as an example of a court awarding prejudgment interest on a claim for money had and received, the court *actually* found for the plaintiff on *all* counts, and its award of prejudgment interest was not specific to the claim for money had and received.  *See Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427 (1st Dep't 2000).

Lehman or the FWC Plan.  *See* DSMF ¶¶ 100-01; SKAT Br. 52 ("It matters not that SKAT did not pay Lehman or the FWC plan directly").  *Second*, "[t]he measure of damages for unjust enrichment is the value of the benefit conferred, not the amount the plaintiff hoped to receive or the cost to the plaintiff."  *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 50 (Fla. Dist. Ct. App. 2021).  Accordingly, based upon the evidentiary record before the Court, an award of prejudgment interest, even if warranted (it is not because SKAT cannot prevail on liability or damages), could not be entered under the grounds advanced by SKAT.  The dates SKAT alleges it made payments on behalf of Lehman and/or the FWC Plan are irrelevant for determining the date the alleged damages could or should be liquidated.

Finally, SKAT's request suffers the same fate in Utah.  Utah requires, as a basis for money had and received, that the defendant not only "collected" the money but also "has had it in his possession."  *Att'y Gen. of Utah v. Pomeroy*, 73 P.2d 1277, 1295 (Utah 1937).  Because, as SKAT recognizes, the "amount of loss [must be] fixed as of a particular time," SKAT Br. 60, and SKAT has not established that the defendants from whom it seeks summary judgment continued to possess the funds it disbursed, *see, e.g.*, Defs.' Response to PSMF ¶¶ 130-36, material disputes of fact remain as to the propriety of prejudgment interest.

### III.    SKAT Is Not Entitled To Judgment On The "False Statement" Element Of Its Claims For Fraud And Negligent Misrepresentation

Although Rule 56(a) allows a party to move for partial summary judgment, the Court also has the discretion to deny such a motion where it will serve no purpose.  10A Wright & Miller, Federal Practice & Procedure: Civil § 2728 (4th ed.).  Moreover, courts uniformly decline to issue Rule 56(g) orders when a party has moved for partial summary judgment on some, but not all, elements of a claim because the limited efficiencies that may result would not outweigh the benefits of conducting a trial on all of the facts and issues.  *See, e.g.*, *SEC v. ITT Educ. Servs., Inc.*,

303 F. Supp. 3d 746, 758 n.3 (S.D. Ind. 2018) ("[M]otions for summary judgment seeking the adjudication of certain elements of a claim are a waste of judicial resources, especially where, as here, other elements of the claims will need to be considered by a jury at trial.").   This is particularly true for fraud claims, which are not well-suited for disposition on partial summary judgment.  *See, e.g.*, *Bolling v. Gold*, 2015 WL 6870617, at *12 n.17 (W.D. Wash. Nov. 9, 2015) (declining to issue Rule 56(g) rulings because "[t]he evidence related to the elements of falsity, scienter, and materiality is so intertwined that the court is not disposed to rule separately on these issues").  SKAT's motion should be denied for this reason alone.

### A.      SKAT Is Not Entitled To Judgment On Statements Defendants Never Made

SKAT's request for partial summary judgment on the "false statement" element of its claims for fraud or negligent misrepresentation is fundamentally flawed.  To state these claims, SKAT must identify a false statement of material fact—with particularity.  *See, e.g., Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 770-71 (S.D.N.Y. 2011); *Se. Directional Drilling, LLC v. Kern River Gas Trans. Co.*, 2013 WL 209492, at *4-5 (D. Utah Jan. 17, 2013).  Instead, SKAT waves its hands at "the defendant plans' tax refund applications," fails to identify any specific portion of any specific application that includes the purportedly false statements, and then suggests that the applications included words that cannot be found within their four corners.

Buried in a single paragraph towards the end of its brief, SKAT asserts that the "defendant plans' tax refund applications" contained "false representations that the plans owned shares of Danish stock, on which they received dividends, net of withholding tax."  SKAT Br. 62.[46]  If

---

[46]      SKAT's formulation of the Bellwether Plans' purported representations changes considerably over the course of SKAT's brief.  SKAT variously claims that the Bellwether Plans represented that they "owned" Danish shares, *see* SKAT Br. 8, 62, that they were the "beneficial owners" of Danish shares, *see id*. at 1, 7, 35 n.38, 36, 36 n.39, and that the Bellwether Plans represented that they had "received dividends," *see id*. at 1, 7, 35, 35 n.38, 36, 36 n.39, 62, or were the "beneficial owners" of the dividends.  *See id*. at 6, 35, 56, 58.

SKAT means to refer to the application package as a whole, SKAT declines to identify which document in the package contains the alleged misrepresentation, and SKAT's reclaim form itself did not require applicants to make that statement. *See, e.g.*, Dulberg Decl. Exs. 4, 23-25. Rather, the applications contain statements made by others—the IRS, the Solo Custodians, or ED&F— and then a fill-in-the-blank form in which SKAT asked the applicants to identify themselves as "Beneficial Owner," without elaboration. *Id.* SKAT's failure to single out any particular document in the application packages at issue—much less any particular misrepresentation in any particular document—is fatal to its summary judgment motion.

Indeed, the representation SKAT contends was made—that the applicant pension plan was the owner of the underlying shares and received dividends—is not what the Treaty requires; the only relevant question under the Treaty is whether the Plans were the beneficial owners of the dividends. Treaty art. 10(2) (limiting tax payable by "beneficial owner of the dividends"). A defendant can be liable only for statements that it actually made, and not a plaintiff's subjective characterization or reinterpretation of the defendant's statements.[47]

SKAT's motion should also be denied because the forms Defendants provided to SKAT are demonstrably accurate. The Defendant Plans were the beneficial owners of the dividends associated with those ownership positions. *See* Defs.' Br. 20-25. And their accounts were credited

---

[47]     *See also, e.g., Trana Discovery, Inc. v. S. Rsch. Inst.*, 915 F.3d 249, 254 (4th Cir. 2019) (affirming summary judgment in defendant's favor on North Carolina-law claims, where defendant's research report "did not say" what plaintiff alleged it said, and "the information in the … report was not false"); *Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 20 (S.D.N.Y. 2009) (dismissing fraud and misrepresentation claims premised on statement that "was not actually untrue" and was misleading only when subjectively mischaracterized by plaintiff), *aff'd*, 382 F. App'x 107 (2d Cir. 2010); *Elliot v. Nelson*, 301 F. Supp. 2d 284, 287-88 (S.D.N.Y. 2004) (granting summary judgment to defendants where alleged misrepresentation that defendants' firm was "close" to raising $40 million "would be actionable," but record revealed that defendants had stated only an intention to raise that sum and "uncontradicted record evidence demonstrate[d] that Defendants did take steps, although ultimately unfruitful, towards raising money"); *Joseph Rosenbaum, M.D., Inc. v. Hartford Fire Ins. Co.*, 104 F.3d 258, 264 (9th Cir. 1996) (affirming summary judgment in defendant's favor on California-law claims, where defendant's policy language "d[id] not say that it cover[ed] anyone who need[ed] to be bonded," as plaintiff alleged, and "[t]hus there was no misrepresentation [on] which a fraud, misrepresentation, or false advertising claim could be based").

with the receipt of net dividend payments.  *See id.* at 21-22; JSUMF ¶¶ 125, 127, 145.

**B.**     **SKAT Fails To Support Its Arguments As To The ED&F Bellwethers**

Genuine issues of material fact remain regarding whether the ED&F Bellwether Plans made any actionable misrepresentation to SKAT.  The tax reclaim applications made by the ED&F Bellwether Plans to SKAT contained only a fillable form, Form 06.003, with a fill-in-the-blank field to indicate the "Beneficial Owner," and documentation prepared by ED&F and the IRS.  *See, e.g.*, Weinstein Decl. Ex. 163.  Under Utah law, fraud and negligent misrepresentation require a misrepresentation of "existing material fact."  *Schwartz v. Tanner*, 576 P.2d 873, 875 (Utah 1978). Whether statements are fact or opinion is generally for the jury, for "'whether a representation is one of opinion or one of fact must be determined not only by the subject matter, but by the form of the statement, the attendant circumstances, and the knowledge of the parties.'"  *Fisher v. Davidhizar*, 263 P.3d 440, 447 (Utah Ct. App. 2011); *see also Stuck v. Delta Land & Water Co.*, 227 P. 791, 797 (Utah 1924).  SKAT fails to identify a false statement of existing material fact made by the ED&F Bellwether Plans, and indeed whether a party is a "beneficial owner" is a legal conclusion of Danish law, not a statement of fact.  *See* Defs.' Br. 46-53.

Moreover, even if the statement that the relevant ED&F Bellwether Plan was a "beneficial owner" could be read as a representation of underlying facts, any such representation was true. The ED&F Bellwether Plans in all cases received account statements from ED&F accurately relaying that the ED&F Bellwether Plans had purchased shares prior to the ex-dividend date for the dividend event, and did not sell those shares until on or after the ex-dividend date.[48]  CSMF ¶ 16.  For each such trade, the ED&F Bellwether Plans were also credited a dividend payment in the amount expected.  *Id.* ¶ 17.  And the ED&F Bellwether Plans received tax vouchers from their

---

[48]     SKAT's own expert contends that the ED&F Bellwether Plans purchased shares trading "cum-dividend" and sold shares trading "ex-dividend."  *See* Wade Report ¶¶ 77-78.

broker further confirming the shares that they purchased and the dividend payment they received. *Id.* ¶ 18.   Accordingly, to the extent the tax reclaim applications' representation that the ED&F Bellwether pension plans were the "beneficial owner" necessarily implied any of these underlying facts, the ED&F Bellwether Plans correctly represented those facts to SKAT.[49]

## IV.    SKAT Seeks An Impermissible Advisory Opinion Vis-à-vis Altbach

SKAT's motion for partial summary judgment also should be denied because it is "a vehicle for obtaining rulings on issues that may never have to be addressed" and an order granting the requested relief "would be tantamount to an advisory opinion." *Stormo v. State Nat'l Ins. Co.*, 2021 WL 4973835, at *2 (D. Mass. Oct. 26, 2021) (cleaned up).   "Indeed, '[t]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'"   *Id.* at *2; *see also Boden v. St. Elizabeth Med. Ctr., Inc.*, 2018 WL 4855210, at *4 (E.D. Ky. Oct. 5, 2018) (denying partial summary judgment as a request for an advisory opinion); *Borup v. CJS Sols. Grp., LLC*, 2019 WL 4820732, at *1 (D. Minn. Oct. 1, 2019) (same).

In his motion seeking summary judgment on the fraud-based claims, Defendant Altbach demonstrated that he did not communicate with SKAT at any time, DSMF ¶ 93, and that there is no record evidence that Altbach authorized, or had any knowledge of, statements in the reclaim applications made by the Payment Agent Goal Taxback Limited ("Goal") on behalf of the Roadcraft Plan, Goal's principal, to SKAT.   *Id.* ¶¶ 90, 92-93.   As to what Goal may have intended, SKAT has not alleged—nor adduced evidence—that Goal knew the statements in the reclaim application were false in any respect or intended to deceive SKAT.   *Id.* ¶ 99.   Thus, even if SKAT

---

[49]      To the extent SKAT argues that the ED&F Bellwether Plans had implicitly represented that the party from whom ED&F acquired the shares had the right to cum-dividend shares to deliver, such argument is not plausible. There is no evidence in the record that the ED&F Bellwether Plans even knew the party from whom ED&F acquired shares on their behalf; they did not.   But even if the ED&F Bellwether Plans could identify the ultimate counterparty to the transaction, they lacked the means to verify that party's underlying shareholding. *See* Hayden Report ¶ 42.

could establish that Altbach was Goal's principal—which it cannot do—there is nothing to impute to Altbach and the fraud-based claims must be dismissed.

SKAT must prove every element of the fraud-based claims to be entitled to summary judgment.  However, to be awarded summary judgment in his favor, Altbach need only establish that SKAT has failed to adduce record evidence supporting any element of the fraud-based claims. Altbach has proven more than that:  SKAT cannot demonstrate, as a matter of law, that the maker of the false statements—the Roadcraft Plan's agent Goal—knew that the statements were (supposedly) false when it made them and intended to deceive SKAT by the submission of the reclaim applications containing those statements.  Accordingly, SKAT's request for partial summary judgment on the single element of falsity not only elides the critical fact that the maker of the supposedly false statements is not Altbach and is not Altbach's agent, it also seeks to resolve an issue that may never need to be resolved, at least vis-à-vis Altbach.  Hence, SKAT seeks an impermissible advisory opinion.  *See, e.g., ITT Educ. Servs.*, 303 F. Supp. 3d at 760 (refusing to determine "purchase or sale of securities" element under section 10(b) because SEC was seeking advisory opinion); *Borup*, 2019 WL 4820732, at *1 (refusing to determine whether plaintiff was entitled to compensation under Fair Labor Standards Act because movant was seeking advisory opinion on non-dispositive issue).  For this reason alone, SKAT's motion for partial summary judgment on the fraud-based claims must be denied as against Altbach.

## CONCLUSION

The Court should deny Plaintiff's motion for partial summary judgment and enter judgment for Defendants.

Dated:  June 6, 2022

Respectfully submitted,

*/s/ Alan Schoenfeld*
Alan Schoenfeld
Julia Pilcer Lichtenstein
Michael Bongiorno
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
julia.lichtenstein@wilmerhale.com
michael.bongiorno@wilmerhale.com


*/s/ Andrew S. Dulberg*
Andrew S. Dulberg
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel. (617) 526-6000
andrew.dulberg@wilmerhale.com


*Attorneys for Bellwether Defendants Richard
Markowitz and RJM Capital Pension Plan*

*/s/ Sharon L. McCarthy*
Sharon L. McCarthy
Nicholas S. Bahnsen
KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Fl.
New York, NY 10007
Tel. (212) 808-8100
Fax: (212) 808-8108
smccarthy@kflaw.com
nbahnsen@kflaw.com

*Attorneys for Bellwether Defendants Basalt
Ventures LLC Roth 401(k) Plan and John van
Merkensteijn*


*/s/ John C. Blessington*

64

John C. Blessington (*pro hac vice*)
Brandon R. Dillman (*pro hac vice*)
Michael R. Creta (*pro hac vice*)
John L. Gavin (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA  02111
Tel. (617) 261 3100
Fax: (617) 261 3175
john.blessington@klgates.com
brandon.dillman@klgates.com
michael.creta@klgates.com
john.gavin@klgates.com

*Attorneys for Bellwether Defendants American Investment Group of New York, L.P. Pension Plan, Riverside Associates Defined Benefit Plan, Robert Crema, David Schulman, Stacey Kaminer, and Acer Investment Group, LLC*


/s/ Michelle Rice
Michelle Rice
Consuelo Mejer
KAPLAN RICE LLP
142 W. 57th Street
Suite 4A
New York, NY 10019
Tel. (212) 333-0227
Fax: (212) 235-0301
mrice@kaplanrice.com
cmejer@kaplanrice.com

*Attorneys for Bellwether Defendants Roadcraft Technologies LLC Roth 401(K) Plan and Ronald Altbach*


/s/ Zhanna A. Ziering
Zhanna A. Ziering
MOORE TAX LAW GROUP LLC
11 Broadway, Ste. 615
New York, NY 10004
Tel. (646) 357-3875
Fax: (312) 549-9991
zhanna.ziering@mooretaxlawgroup.com

*Attorney for Bellwether Defendants RAK Investment Trust and Robert Klugman*

*/s/ Thomas E.L. Dewey*
Thomas E.L. Dewey
Sean K. Mullen
DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue, 37th Fl.
New York, NY 10017
Tel. (212) 943-9000
Fax: (212) 943-4325
tdewey@dpklaw.com
smullen@dpklaw.com

*Attorneys for Bellwether Defendant Michael Ben-Jacob*

*/s/ Joseph LoPiccolo*
Joseph LoPiccolo
John N. Poulos
Daniella DaCunzo Dalia
POULOS LOPICCOLO PC
311 West 43rd Street
11th Floor, Suite 124
New York, NY 10036
Tel. (732) 757-0165
Fax: (732) 358-0180
lopiccolo@pllawfirm.com
poulos@pllawfirm.com
ddalia@pllawfirm.com

*Attorneys for Bellwether Defendants Doston Bradley, The FWC Capital LLC Pension Plan, The Proper Pacific LLC 401K Plan, and Roger Lehman*

*/s/ Neil S. Binder*
Neil S. Binder
BINDER & SCHWARTZ, LLP
366 Madison Avenue, Sixth Floor
New York, NY 10017
Tel. (212) 510-7008
Fax: (212) 510-7299
nbinder@binderschwartz.com

*Attorney for Third-Party Defendant*
*ED&F Man Capital Markets, Ltd.*