## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTERFORVALTNINGEN) TAX
REFUND SCHEME LITIGATION

This document relates to:  All cases.

MASTER DOCKET

18-md-2865 (LAK)

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## SKATTEFORVALTNINGEN'S SUPPLEMENTAL LOCAL RULE 56.1 STATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local

Rules of the United States District Courts for the Southern and Eastern Districts of New York, as

modified by the Court's Orders dated November 16, 2021 (ECF No. 675) and March 24, 2022

(ECF No. 745), Defendants listed in Appendix A to this Response ("Defendants") respectfully

submit this response to Plaintiff Skatteforvaltningen's ("SKAT") Supplemental Local Rule 56.1

Statement (ECF No. ___).  As set forth in more detail below, many of SKAT's assertions are not

facts, are not undisputed, and are not material to the resolution of SKAT's motion.

## I.    SKAT Fails To Comply With Local Rule 56.1

SKAT's approach is flatly inconsistent with Local Rule 56.1.  For instance, "some

paragraphs contain multiple factual assertions, which appears to violate the spirit, if not the explicit

text, of Local Rule 56.1."  *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138

F. Supp. 3d 352, 395 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov,*

*Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).[1]  At times, "Plaintiffs' claims are not supported by the evidence cited," so the Court should "not consider these facts as undisputed."  *Id.* at 396.  Equally problematic, SKAT's statements are "replete with argument" or "opinions to which Plaintiff[] cannot reasonably have expected Defendants to agree."  *Id.*  For example, SKAT refers to the trading as "a series of sham paper transactions" (Paragraph 1), "fake" (Paragraph 2), and "purported" (a word it uses no fewer than *50* times).  The Court should find such facts "clearly in dispute" and "not consider these facts as undisputed."  *Id.*

## II.    SKAT Relies On Inadmissible Rule 30(b)(6) Testimony

Much of SKAT's statements of fact concerning the ED&F Bellwethers—and, indeed, the core of SKAT's motion for partial summary judgment against the ED&F Bellwether defendants— relies on the Rule 30(b)(6) testimony of ED&F's corporate witnesses, Shahab Hashemi and Andrew Wall.  However, Rule 32(a)(3) only allows an "*adverse party*" to use the deposition testimony of a corporate witness.  Fed. R. Civ. P. 32(a)(3); *see also Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907 (5th Cir. 2010) ("Rule 32(a)(3) permits an *adverse* party to use [Rule 30(b)(6)] deposition testimony during trial.") (emphasis in original); *L–3 Commc'n Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144(PAC), 2006 WL 988143, at *2 (S.D.N.Y. Apr.13, 2006) (prohibiting use of Rule 30(b)(6) testimony by non-adverse party).  SKAT is not "adverse" to ED&F, a third-party defendant, in this action.  SKAT is only an adverse party to the Defendants.  Accordingly, SKAT is barred from using the ED&F corporate witness testimony pursuant to Rule 32(a)(3).

---

[1]      As just one example, SKAT's Paragraph 9 includes seven sentences, not including the several sentences associated with its seven footnotes.

Even if SKAT were allowed to introduce any of ED&F's Rule 30(b)(6) testimony in contravention to Rule 32(a)(3), SKAT's reliance on such testimony would still be improper.  On a motion for summary judgment, factual assertions may be supported by deposition testimony only if such testimony is based on personal knowledge.  Fed. R. Civ. P. 56(c)(1)(A) & 56(c)(4); *see also* Fed. R. Evid. 602; Fed. R. Civ. P. Rule 32(a)(1)(B) (limiting any use of deposition testimony as if the deponent were present and testifying at the hearing or trial).  A corporate representative may not testify as to matters outside his or her own personal knowledge "to the extent that information is hearsay not falling within one of the authorized exceptions."  *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907-08 (5th Cir. 2010) (unpublished) (citation and internal quotation marks omitted).   Thus, SKAT may only call ED&F's corporate representative witness at trial to testify as to non-hearsay matters within the witness's personal knowledge.  Fed. R. Evid. 602; Fed. R. Evid. 801; *Union Pump*, 404 F. App'x at 907–08 ("a corporate representative may not testify to matters outside his own personal knowledge 'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'"); *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, No. 216CV00135JNPPMW, 2019 WL 3500896, at *13 (D. Utah Aug. 1, 2019) (applying *Union Pump*); *Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-CV-691-T-24-MAP, 2014 WL 4983912, at *3-4 (M.D. Fla. Oct. 6, 2014) (holding that while Rule 30(b)(6) permits a 30(b)(6) witness' deposition testimony to be based on matters outside his personal knowledge, "Rule 602 limits his trial testimony to matters that are within his personal knowledge."); *VIIV Healthcare Co. v. Mylan Inc.*, No. 12-CV-1065-RGA, 2014 WL 2195082, at *2 (D. Del. May 23, 2014) ("Here, because [corporate] testimony relied at least in part on *another employee's knowledge*, there is a substantial question about the reliability of his testimony."); *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011) (explaining "the purposes

underlying Rule 30(b)(6) must be balanced against the real dangers of admitting testimony based on hearsay.").   In sum, SKAT is prohibited from using the deposition testimony of ED&F's corporate witnesses per Rule 32(a)(3), and even if SKAT could introduce any of that testimony at summary judgment or at trial, such testimony must, as a matter of law, be based on the personal knowledge of the witness.

## III.   SKAT Relies On Inadmissible Hearsay From The English Action

Much of SKAT's Statements of Fact also relies on documents created by ED&F or its counsel after the institution of this litigation for purposes of the English Action[2] filed by SKAT against ED&F.   These statements are clear hearsay and may not be used by SKAT to support its motion for summary judgment.   *See* Fed. R. Civ. P. 56(c)(1)(B); 56(c)(2).   Here, SKAT relies on (i) Annex E, a document filed by ED&F as part of a pleading in the English Action; (ii) draft statements of fact exchanged between SKAT and ED&F in connection with the English Action; and (iii) correspondence and summary charts created by ED&F's counsel in the English Action and provided to SKAT's counsel in the English Action (together, the "English Action Documents").   SKAT relies on these out-of-court statements to prove the truth of the matters asserted therein.

SKAT relies on Annex E to try to prove that ED&F's tax vouchers were false and why they are false; however, SKAT's approach is a violation of the rules of evidence.   Annex E is, on its face, part of a court filing by ED&F in the English Action purporting to describe inaccuracies in the ED&F tax vouchers, apparently based on an analysis performed in 2019 after the creation of the tax vouchers.   Weinstein Decl. Ex. 104 (Re-Amended Defence) at Re-Amended Defence to

---

[2]      The English Action refers to SKAT's suit brought in the High Court of Justice of England and Wales against numerous parties, including ED&F.   *See* JSUMF ¶ 291.

Schedule 5T ¶ 18.7.2.   This is an instance of hearsay within hearsay, rendering Annex E is inadmissible.   Fed. R. Evid. 805; *see Agriculture Ins. Co., Inc. v. Ace Hardware Corp.*, 214 F.Supp.2d 413, 416 (S.D.N.Y.2002) ("Double hearsay is not admissible unless each level of hearsay is covered by an exception to the hearsay rule."); *see also Rodriguez v. Modern Handling Equipment of NJ, Inc.*, 604 F.Supp.2d 612 (S.D.N.Y. 2009) (excluding written report, created 22 days after accident, as it was based on statements of non-parties interviewed by insurance investigator, and investigator had no personal knowledge of the information contained in the report).   The same is true for the other English Action Documents, which purportedly describe other hearsay statements.

Additionally, SKAT cannot produce a witness with personal knowledge of the contents of the English Action Documents.   To be sure, SKAT could have sought testimony from any of the number of former ED&F employees involved in the transactions at issue—and in fact did seek and obtain a number of letters rogatory for deposition of witnesses abroad—but SKAT did not seek to depose a single ED&F employee with personal knowledge of the tax vouchers or the trades that are the subject of this litigation.   SKAT chose, instead, to limit its discovery to Rule 30(b)(6) testimony of ED&F, which SKAT cannot use to help it prove the truth of matters asserted in Annex E.   Fed. R. Civ. P. 32(a)(3); *Union Pump*, 404 F. App'x at 907–08 (limiting corporate testimony to matters within personal knowledge of witness); *see also Deutsche Shell Tanker Gesellschaft mbH v. Placid Refining Co.*, 993 F.2d 466, 473 n. 29 (5th Cir. 1993) (corporate representative is not permitted to repeat "rank hearsay").

Moreover, there is nothing in the record to suggest that the English Action Documents are statements of any of the Defendants or that they have personal knowledge of the contents of those documents.   For instance, Defendant Stacey Kaminer testified that while she understands Annex

E exists, she has no knowledge of the nature of its contents beyond the fact that it purportedly describes errors in certain tax vouchers.  Declaration of John C. Blessington  ("Blessington Decl.") Ex. 1 (Deposition Testimony of Stacey Kaminer ("Kaminer Dep.")) at 292:3–17.  Even Adam Piper—the only ED&F employee who testified in this action in his individual capacity—has no idea what "Annex E" is.  Blessington Decl. Ex. 2 (Deposition Testimony of Adam Piper ("Piper Dep.")) at 103:4–17.

 For those reasons, SKAT's motion should be denied.

## FACTS AS TO THE SOLO BELLWETHER CASES[3]

1.    **The "trading" at the Solo Custodians that formed the basis of the Solo Bellwether Plans' refund applications to SKAT did not include any real money or real shares of Danish stock. The Solo Bellwether Plans never owned any of the shares of Danish stock which they represented to SKAT that they owned. Instead, the "trading" was a series of sham paper transactions that took the form of circular loops. These loops are documented in paragraphs 10 through 23 below and in Appendices A through I to this, SKAT's Local Rule 56.1 Statement.**

Response:  Disputed because the Solo Bellwether Plans purchased shares issued by Danish corporations using money obtained by lending those shares pursuant to industry-standard securities lending agreements, received trade confirmations from regulated brokers reflecting those trades, received statements from custodians further reflecting the electronic book entries associated with those trades, and owned the shares as a matter of Danish tax law.  *See, e.g.*, JSUMF ¶¶ 113-117, 121-122, 124-125 and Dulberg Decl. Exs. 37, 47, 50, 51, 54, 68.   Further disputed because Paragraph 1 lacks citation to any evidence as required by Rule 56(c) and Local Rule 56.1(d).  Further disputed because the Plans never represented to SKAT that they owned shares of Danish stock, only that they were beneficial owners of dividends.  Further disputed because the evidence on which SKAT relies to show the trading was circular is inadmissible as it originates in unauthenticated documents that constitute hearsay and they do not fall within any exception.

2.    **That the Solo Custodians' "trades" were fake has been confirmed by the United Kingdom's Financial Conduct Authority (the "FCA"). In its investigation into two brokers involved in the Solo Custodians' scheme, the FCA "found no evidence of ownership of the shares" by any customers of the Solo Custodians.  April 29, 2022 Declaration of Marc A. Weinstein, Ex. 75 (FCA, Final Notice to Sunrise Brokers LLP (November 12, 2021) at 4 (¶2.10), available at https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf);   see also id. at 2-4; Weinstein Decl. Ex. 76 (FCA, Final Notice to Sapien Capital at 3-4 (May 6, 2021) available at https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf).  Instead, the FCA found that the purported trading was a "circular pattern of extremely high value … equity trading, [involving] back-to-back securities lending arrangements," the purpose of which was to generate the false dividend credit advices submitted to SKAT in the tax refund applications. Weinstein Decl. Ex 75 (FCA Final Notice to Sunrise Brokers), at 2 (¶¶2.5, 2.9).**[4]

Response:  Disputed as to materiality and because the statements are incomplete and misleading.  Specifically, Paragraph 2 fails to note the limited time periods of the FCA Final Notice to Sunrise

---

3     Defendants adopt SKAT's definition of "Solo Bellwether Plans."  SKAT's Supplemental 56.1 Statement n.1.

4     In its Supplemental 56.1 Statement, SKAT cites to evidence in footnotes, rather than in-line with each statement of fact.  To enable the Court to assess both what SKAT said and what evidence SKAT cited, Defendants have copied the text of each footnote into the paragraph text at the location where the footnote call number appears in SKAT's Supplemental 56.1 Statement.

Brokers and the FCA Final Notice to Sapien Capital, which addressed only a nine-month period in 2015.  By contrast, the trading in this case spanned over three years; no conclusion can be drawn from evidence that addresses only a small fraction of that time period.  Further, the cited documents (Weinstein Decl. Exs. 75, 76) do not state that the dividend credit advices were "false," do not state whether the customers of the Solo Custodians owned shares as a matter of Danish tax law, do not describe the trading as "purported," and examined trading by brokers during a time period in which several of the Solo Bellwether Plans did not trade in Danish securities.  Further disputed because Weinstein Decl. Exs. 75 and 76 are inadmissible.  Further Paragraph 2 concerns ownership of shares when the Plans representation to SKAT—and the basis for entitlement to dividends—is *beneficial* ownership of *dividends*.

3.   **Further, to hold Danish shares on behalf of their customers, foreign custodians, such as the U.K.-based Solo Custodians, must do so through a sub-custodian with an account at Denmark's central securities depository VP Securities, or through a chain of sub-custodians, where the ultimate sub-custodian has an account at VP Securities. Weinstein Decl. Ex. 77 (H. Sorensen Dep., Sept. 21, 2021 (hereinafter "<u>H. Sorensen Dep. Vol. I</u>"), at 49:11-21; Weinstein Decl. Ex. 78 (H. Sorensen Dep., Dec. 7, 2021 (hereinafter "<u>H. Sorensen Dep. Vol. II</u>"), at 51:12-52:2.  In a filing in SKAT's parallel actions in the United Kingdom, Sanjay Shah (who controlled the Solo Custodians) Weinstein Decl. Ex. 75 (FCA Final Notice to Sunrise Brokers), at 18 (¶4.19) stated under oath that Solo Capital had two sub-custodian arrangements: one with JPMorgan Chase ("JPMorgan") from August 2012 through October 2013 and one with Skandinaviska Enskilda Banken AB ("SEB") from July 2013 through April 2014.  Weinstein Decl. Ex. 103 (Sanjay Shah Defendants' Response to Claimant's Request Dated 4 June 2019 for Further Information Under CPR 18), at 4-5, 11, 15. The other three Solo Custodians did not provide custodial services to the Solo Bellwether Plans in 2012 and 2013. See the parties' Joint 56.1 Statement ¶¶ 172-203 (ECF 790) ("<u>Joint 56.1 Statement</u>").**

<u>Response</u>:  Disputed as to materiality and to the extent Paragraph 3 relies upon Weinstein Decl. Ex. 103, which is inadmissible.  The statements are also incomplete and misleading.  They are incomplete because SKAT's very next paragraph acknowledges that Solo Capital had other sub-custodial arrangements not mentioned in this paragraph.  And they are misleading to the extent they suggest that a customer's custodian must "hold Danish shares" in order for the customer to own such shares, which is not true as a matter of Danish tax law.  *See* Pilgaard ¶¶ 137, 155-170.

4.   **Reed Smith, LLP, acting on behalf of the Solo Custodians, represented to the Financial Conduct Authority, the Solo Custodians' regulator in England, in a letter dated March 11, 2016, that "it is believed" that the Zurich Branch of Société Générale SA ("Société Générale") was the only sub-custodian used by the Solo Custodians to sub-custody Danish securities for the period of January 1, 2014 to August 24, 2015. Weinstein Decl. Ex. 113 at SCPADMINISTRATORS_00056788 (March 11, 2016 Ltr. to the FCA from Reed Smith LLP).**

<u>Response</u>:  Disputed as to materiality and because Weinstein Decl. Ex. 113 is inadmissible.  The statements are also incomplete and thus misleading because the sentence in the Reed Smith letter immediately following the one relied upon by SKAT reads: "We believe if there were any other

sub-custodians used in connection with the transactions in Danish securities either Omar Arti and/or Martin Ward would have knowledge in that regard." Weinstein Decl. Ex. 113 at SCPADMINISTRATORS_00056788.

5.      **In this action, SKAT requested from SEB and JPMorgan account statements, stock records, and any other documents showing Danish securities held for the Solo Custodians from January 1, 2012 to December 31, 2015. See ECF No. 253 Ex. 1 at 9- 11; ECF No. 569 Exs. 1 at 9-11, 2 at 9-11; ECF No 563 Ex. 1 at 10. These banks' records show no holdings of any Danish shares by the two banks on behalf of the Solo Custodians during that time. Joint 56.1 Statement ¶¶ 222, 226.**

Response: Undisputed as stated, but disputed as to materiality for the reasons stated in Dr. Carr's reports regarding internalized net settlement. Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 109-118; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.i., 57-60, 72-79. Further disputed as to materiality because the Plans representation to SKAT—and the basis for entitlement to dividends—is *beneficial* ownership of *dividends*, not ownership of shares.

6.      **Further, in response to SKAT's requests, corporate representatives of SEB and JPMorgan provided sworn declarations regarding any record those banks possessed relating to the Solo Custodians' holding of Danish securities. See Weinstein Decl. Ex. 95 (May 17, 2021 Declaration of Anders Peter Bryde Rasmussen, SEB corporate, representative ("Rasmussen Declaration")); Weinstein Decl. Ex. 96 (December 15, 2021 Declaration of Matthew J. Totman, corporate representative for JPMorgan Chase Bank, N.A. – London Branch and J.P. Morgan Securities plc ("Totman Declaration")). Both declarations state that the banks have no records that the Solo Custodians held any Danish shares from January 1, 2012 through December 31, 2015. Weinstein Decl. Ex. 95 (Rasmussen Declaration) ¶¶ 13, 14; Weinstein Decl. Ex. 96 (Totman Declaration) ¶¶ 8, 9.**

Response: Undisputed as stated as to J.P. Morgan, but disputed as to materiality for the reasons stated in Dr. Carr's reports regarding internalized net settlement. Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 109-118; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.i., 57-60, 72- 79. Disputed as to SEB because the Rasmussen Declaration states only that SEB did not identify any Solo Custodian as a customer of SEB's custody business during the relevant period. Weinstein Decl. Ex. 95 ¶ 13. Further disputed insofar as the Totman Declaration is not admissible for the truth of the matters stated therein. Further disputed as to materiality because the Plans representation to SKAT—and the basis for entitlement to dividends—is *beneficial* ownership of *dividends*, not ownership of shares.

7.      **Pursuant to an April 14, 2021 letter of request to the competent authority of the United Kingdom for documents from the administrators in the Solo Custodians' insolvency proceedings ("Solo Administrators"), SKAT requested "[t]he statements of the Solo Custodians' accounts holding Danish Securities at any Sub-Custodian, during the Applicable Period" and "[t]he bank account statements of the Solo Custodians into which any Dividend was paid, during the Applicable Period." ECF No 563 Ex. 1 at 10. In response to the letter of request, the Solo Administrators**

**produced Société Générale account statements and no other documents. Bruce Dubinsky, whom SKAT has retained as an expert in forensic accounting, reviewed these account statements and determined that they reflect no holdings of Danish securities on behalf of the Solo Custodians during the relevant time. Weinstein Decl. Ex. 89 (December 31, 2021 Expert Report of Bruce Dubinsky) ("Dubinsky Report") ¶ 136; see also Joint Statement ¶¶ 222.**

Response:  The first sentence is undisputed.  The second and third sentences are disputed as to materiality and because they are incomplete and misleading.  They are incomplete because the Solo Administrators have produced thousands of pages of documents in response to SKAT's requests in this case, including account statements generated by financial institutions other than Société Générale.  *See* Dulberg Decl. Exs. 48, 49.  They are also misleading both because Defendants' expert Emre Carr has explained why Mr. Dubinsky's findings are irrelevant as a matter of market operations (Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 109-118; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.i., 57-60, 72-79) and because a custodian does not need to hold Danish securities in order for a purchaser to beneficially own them as a matter of Danish tax law.  *See* Pilgaard Decl. ¶¶ 137, 155-170.  Further disputed as to materiality because the Plans representation to SKAT—and the basis for entitlement to dividends—is *beneficial* ownership of *dividends*, not ownership of shares.

8.     **There are also no bank records reflecting the receipt of any dividends on behalf of the Solo Bellwether Plans or by the purported sellers of the shares, all of whom used the same Solo Custodians.  Mr. Dubinsky analyzed the Solo Custodians' bank statements for the relevant period, and found no deposits consistent with the receipt of any Danish dividends on or around the relevant payment dates for such dividends. Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 143; Weinstein Decl. Ex. 90 (February 1, 2020 Rebuttal Report of Bruce G. Dubinsky ("Dubinsky Rebuttal Report")) ¶ 25. By contrast, the same Solo Custodians' bank account statements evidenced the receipt of SKAT's payments through the payment agents on or around the relevant dates that such payments were made.  Weinstein Decl. Ex. 90 (Dubinsky Rebuttal Report) ¶ 25.**

Response:  The statements in this paragraph are disputed as to materiality.  The first sentence is also disputed because the Solo Bellwether Plans have produced custodian account records they received from the Solo Custodians that show book entry credits for dividends, JSUMF ¶¶ 124-125, and because it does not cite to any evidence, let alone admissible evidence, including for the proposition that the sellers of the shares were "purported."  The second and third sentences are undisputed insofar as they summarize the content of Mr. Dubinsky's reports, but are disputed for the reasons stated in Dr. Carr's reports, e.g., Bahnsen Decl., Ex. 14 (Carr Reply Report) at ¶¶ 39-42 and n.60.

9.     **Mr. Dubinsky also had access to and searched and reviewed the documents of the Solo Custodians and their associated entities (the "Elysium Documents").  Weinstein Decl. Ex. 89 (Dubinsky Report) at ¶ 12, 141.  The Elysium Documents are electronic and hardcopy material seized in SKAT's proceedings in the Dubai International Financial Centre Courts against Elysium Global (Dubai) Limited and Elysium Properties Limited (together, "Elysium"), two entities also controlled by Sanjay Shah.**

**Weinstein Decl. Ex. 97 (November 26, 2021 Declaration of Rana Shashaa, Deloitte Professional Services (Dubai) Limited); Elysium Global (Dubai) Limited, DIFC Public Register, https://www.difc.ae/public-register/elysium-global-dubai-limited/ (last visited Apr. 28, 2022); *see also* Order Granting SKAT's Consent Mot., ECF No. 286. The Elysium Documents are Bates-stamped as "ELYSIUM-########".  Mr. Dubinsky found no evidence that the Solo Bellwether Plans owned any Danish shares or received any dividends on any Danish shares.  Weinstein Decl. Ex. 89 (Dubinsky Report) ¶ 142.   Mr. Dubinsky also had access the sworn affidavits from representatives of JPMorgan and SEB produced in response to letters rogatory issued by the Court. (Dubinsky Report ¶ 12.).  In searching the over ten million documents seized from the Elysium companies, Mr. Dubinsky found none of the contemporaneous records one would expect to find if the Solo Custodians did in fact hold the shares or receive the dividends identified in the dividend credit advices at a sub-custodian.  Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 139-45.  For instance, there were no (i) account statements from any such sub-custodian reflecting Danish equities holdings; (ii) confirmations of shares or money being delivered or received around the relevant dates of the trading or dividend payments; or (iii) email communications between the Solo Custodians and any sub-custodian concerning Danish shares or dividends.  Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 139, 142-43.  Nor did Mr. Dubinsky find any internal records from the Solo Custodians evidencing the shares or dividends, such as ledgers or spreadsheets tracking the Solo Custodians' shareholdings or dividend receipts at any sub-custodian.  Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 140, 142-43.  This stands in contrast to records concerning the defendant plans' purported trading and distribution of the money SKAT paid, of which Mr. Dubinsky found plenty.  Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 144.  Mr. Dubinsky reviewed the defendants' productions and Solo Custodians' purported trading records and confirmed that all the defendant plans' purported share purchases were part of circular transactions with one of these two structures, depending on whether they were from before or after March 2014.  Weinstein Decl. Ex. 89 (Dubinsky Report), at ¶¶ 16, 146-57.**

Response:  The statements in this paragraph are disputed as to materiality.  With respect to the first sentence, Defendants do not dispute that Mr. Dubinsky reviewed the documents identified in his reports, but dispute the assertion that the Elysium Documents were generated by the Solo Custodians because that statement is unsupported by any citation to admissible evidence.  The second sentence is disputed because the Shashaa Declaration is not admissible for the truth of the matters stated therein.  Even if the Shashaa Declaration could be admitted for its truth, it fails to establish any connection between Elysium and/or Solo or Sanjay Shah.  The remainder of Paragraph 9 is undisputed insofar as it summarizes the content of Mr. Dubinsky's reports, but is disputed for the reasons stated in Dr. Carr's reports, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 109-118; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.i., 57-60, 72-79.  It is also disputed because SKAT has not established that the trading was "purported."  As stated elsewhere, the Solo Bellwether Plans purchased shares issued by Danish corporations using money obtained by lending those shares pursuant to industry-standard securities lending agreements, received trade confirmations from regulated brokers reflecting those trades, received statements from custodians further reflecting the electronic book entries associated with those trades, and owned the shares

and beneficially owned the dividends as a matter of Danish tax law.  *See, e.g.*, JSUMF ¶¶ 113-117, 121-122, 124-125 and Dulberg Decl. Exs. 37, 47, 50, 51, 54, 68.

**10.**     **According to the Solo Custodians' documents, the RJM Capital Pension Plan (the "RJM Plan") and other customers of the Solo Custodians engaged in the following trades:**

> **a.**     **On April 11, 2013, the RJM Plan purchased 10,400 shares of A.P. Møller Mærsk A/S - B, at DKK 43,680.2893 per share, for a notional amount of DKK 454,275,008.72, through the broker FGC Securities LLC, with a settlement date of April 17, 2013.  No citation to this trade in which the RJM Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.  As the RJM Plan is the bellwether case for 2012-2013, we have not included here examples of the RJM Plan's trades from 2014. Those trades were similar in structure to the trades described in this Rule 56.1 Statement for the other four Solo Bellwether Plans.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the RJM Plan did not "purport" to engage in trades.  The final sentence is disputed both because it is immaterial, and because the phrase "similar in structure" is vague and ambiguous and is not a fact.

> > **i.**     **FGC Securities LLC obtained 10,400 shares of A.P. Møller Mærsk A/S - B at the same price on the same day from the ultimate seller D.D.C. Cayman Limited.  Appendix A, Trade 7 (ELYSIUM-01552936; ELYSIUM-01744925); Weinstein Decl. Ex. 7.**

Response:  Disputed as to materiality and because Paragraph 10(a)(i) relies on Appendix A and Weinstein Declaration Exhibit 7, which cite to Elysium Documents[5] that are inadmissible for the truth of the matter asserted therein.

> **b.**     **On April 16, 2013, the RJM Plan entered into a stock loan agreement pursuant to which it agreed to loan 10,400 A.P. Møller Mærsk A/S – B shares to Colbrook Limited, in exchange for DKK 454,275,008.72 (DKK 43,680.2893 per share), with a settlement date of April 17, 2013.  No citation to this trade in which the RJM Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the RJM Plan did not "purport" to engage in trades.

> > **i.**     **Colbrook Limited loaned 10,400 A.P. Møller Mærsk A/S – B shares to D.D.C. Cayman Limited on the same day, in exchange**

---

[5] The Elysium Documents are Bates-stamped "ELYSIUM-########".

for DKK 454,275,008.72 (DKK 43,680.2893 per share). Appendix A, Trade 7 (ELYSIUM-01574028); Weinstein Decl. Ex. 7.

Response:  Disputed as to materiality and because Paragraph 10(b)(i) relies on Appendix A and Weinstein Declaration Exhibit 7, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

       c.    **D.D.C. Cayman Limited's and Colbrook Limited's account statements show that neither entity held any Danish securities prior to obtaining them through stock loans, never went into the market (i.e. outside the Solo Custodian's platform) to obtain the shares, and did not have sufficient capital to acquire the shares.  Weinstein Decl. Ex. 7 at ELYSIUM-01744925; Weinstein Decl. Ex. 114 (ELYSIUM-01744940).**

Response:  Disputed as to materiality and because Paragraph 10(c) relies on Weinstein Declaration Exhibits 7 and 114, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

11.    **In addition, in 2013, the RJM Plan and other customers of the Solo Custodians purported to engage in 11 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 10,400 A.P. Møller Mærsk A/S – B shares. All 12 of these series of trade loops are documented in Appendix A.  Appendices A through I do not contain citations to the trades in which the Solo Bellwether Plans purportedly entered, as these were agreed on in the parties' Joint 56.1 Statement to this statement, including the Møller Mærsk loop, which is detailed in line 7 of the Appendix. Documentation for each of the RJM Plan's 12 trade loops is contained in Exhibits 1 through 12 to the Weinstein Declaration.**

Response:  Disputed because the RJM Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops."  The RJM Plan engaged in the equity purchase transactions and stock loan transactions identified in Appendix A, but otherwise disputes Paragraph 11 because it relies on Elysium Documents that are inadmissible for the truth of the matter asserted.

12.    **According to the Solo Custodians' documents the Basalt Ventures LLC Roth 401(k) Plan (the "Basalt Plan") and other customers of the Solo Custodians engaged in the following trades:**

       a.    **On March 26, 2015, the Basalt Plan purchased 178,044 shares of Carlsberg A/S - B, at DKK 571.5 per share, for a notional amount of DKK 101,752,146.00, through the broker Sunrise Brokers, with a settlement date of March 31, 2015.  No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Basalt Plan did not "purport" to engage in trades..

      **i.**      **Sunrise Brokers obtained 178,044 shares of Carlsberg A/S - B at the same price on the same day from the broker Mako Financial Markets LLP.  Appendix B, Trade 9 (ELYSIUM-04005495); Weinstein Decl. Ex. 21.**

Response:  Disputed as to materiality and because Paragraph 12(a)(i) relies on Appendix B and Weinstein Declaration Exhibit 21, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

      **ii.**      **Mako Financial Markets LLP obtained 178,044 shares of Carlsberg A/S - B at the same price on the same day from the ultimate seller RDKS Consultants.  Appendix B, Trade 9 (ELYSIUM-04006834; ELYSIUM-04121850); Weinstein Decl. Ex. 21.**

Response:  Disputed as to materiality and because Paragraph 12(a)(ii) relies on Appendix B and Weinstein Declaration Exhibit 21, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

      **b.**      **On March 30, 2015, the Basalt Plan entered into a stock loan agreement pursuant to which it agreed to loan 178,044 shares of Carlsberg A/S - B shares to Prince Solutions Limited, in exchange for DKK 101,752,146.00 (DKK 571.50 per share), with a settlement date of March 31, 2015.  No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Basalt Plan did not "purport" to engage in trades.

      **i.**      **Prince Solutions Limited loaned 178,044 Carlsberg A/S - B shares to Relative Value Trading GmbH on the same day, in exchange for DKK 101,752,146.00 (DKK 571.50 per share). Appendix B, Trade 9 (ELYSIUM-04029621); Weinstein Decl. Ex. 21.**

Response:  Disputed as to materiality and because Paragraph 12(b)(i) relies on Appendix B and Weinstein Declaration Exhibit 21, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

      **ii.**      **Relative Value Trading GmbH loaned 178,044 Carlsberg A/S - B shares to RDKS Consultants on the same day, in exchange for DKK 101,752,146.00 (DKK 571.50 per share).  Appendix B, Trade 9 (ELYSIUM-04030318); Weinstein Decl. Ex. 21.**

Response:  Disputed as to materiality and because Paragraph 12(b)(ii) relies on Appendix B and Weinstein Declaration Exhibit 21, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

13.     **In addition, in 2015, the Basalt Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 178,044 Carlsberg A/S - B shares. All 14 of these series of trade loops are detailed in Appendix B to this statement, including the Carlsberg A/S - B loop, which appears at line 9 of the Appendix. Documentation for each of the Basalt Plan's 14 type 1 trade loops is contained in Exhibits 13 through 26 to the Weinstein Declaration.**

Response:  Disputed because the Basalt Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops." The Basalt Plan engaged in the equity purchase transactions and stock loan transactions identified in Appendix B, but otherwise disputes Paragraph 13 because it relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein.

14.     **According to the Solo Custodians' documents, the Basalt Plan and other customers of the Solo Custodians engaged in the following trades:**

      a.     **On August 7, 2014, the Basalt Plan purchased 2,876,867 shares of TDC A/S at DKK 51.35 per share, for a notional amount of DKK 147,727,120.45, through the broker Bastion Capital London Ltd, with a settlement date of August 13, 2014.  No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Basalt Plan did not "purport" to engage in trades.

           i.     **Bastion Capital acquired those shares by purchasing, in the aggregate, 148,093,767 shares of TDC A/S from the broker Ballygate Capital Ltd, Appendix C, Trade 1 (ELYSIUM-03294580); Weinstein Decl. Ex. 27 from which Bastion Capital London Ltd allocated 2,876,867 to the Basalt Plan, and the remaining shares to 45 other pension plans, in the following amounts: [table omitted]. Appendix C, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 27:**

Response:   Disputed because Paragraph 14(a)(i) relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.

> **ii.** **Ballygate Capital Limited obtained 39,375,123 shares of TDC A/S at the same price on the same day from the ultimate seller Aronex Partners Ltd. Appendix C, Trade 1 (ELYSIUM-03294559; ELYSIUM-04646523); Weinstein Decl. Ex. 27. These shares were ultimately sold (through Bastion Capital London Ltd) to the following 12 pension plans in the following amounts, including 2,876,86 amount of shares to Basalt:**

**[table omitted]**

<u>Response</u>: Disputed because Paragraph 14(i) relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests. *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.

> **b.** **On August 12, 2014, the Basalt Plan entered into a stock loan agreement pursuant to which it agreed to loan 2,876,867 TDC A/S shares to Gnosis Capital Ltd., in exchange for DKK 147,727,120.45 (DKK 51.35 per share), with a settlement date of August 13, 2014. No citation to this trade in which the Basalt Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

<u>Response</u>: The first sentence is undisputed. The second sentence is disputed because the Basalt Plan did not "purport" to engage in trades.

> **i.** **Gnosis Capital Ltd. loaned 2,876,867 TDC A/S shares to Esengi Ltd. on the same day, in exchange for DKK 147,727,120.45 (DKK 51.35 per share). Appendix C, Trade 1 (ELYSIUM-03308429); Weinstein Decl. Ex. 27.**

<u>Response</u>: Disputed as to materiality and because Paragraph 14(b)(i) relies on Appendix C and Weinstein Declaration Exhibit 27, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **ii.** **Esengi Ltd. loaned 2,876,867 TDC A/S shares to Aronex Partners Ltd on the same day, in exchange for DKK 147,727,120.45 (DKK 51.35 per share). Appendix C, Trade 1 (ELYSIUM-03308581); Weinstein Decl. Ex. 27.**

<u>Response</u>: Disputed as to materiality and because Paragraph 14(b)(ii) relies on Appendix C and Weinstein Declaration Exhibit 27, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **c.** **This trade loop is further detailed in Appendix C to this statement. Documentation for this trade loop is contained in Exhibit 27 to the Weinstein Declaration.**

Response:  This is not a statement of fact and does not require a response.  To the extent it requires any response, it is disputed because it relies on Elysium Documents, which are inadmissible for the truth of the matter asserted therein.

15.     **According to the Solo Custodians' documents, the Roadcraft Technologies LLC Roth 401(k) Plan (the "Roadcraft Plan") and other customers of the Solo Custodians engaged in the following trades:**

    a.     **On March 26, 2015, the Roadcraft Plan purchased 887,986 shares of Carlsberg A/S - B at DKK 571.50 per share for a notional amount of DKK 507,483,999.00, through the broker The TJM Partnership, with a settlement date of March 31, 2015.  No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Roadcraft Plan did not "purport" to engage in trades.

        i.     **The TJM Partnership obtained 887,986 shares of Carlsberg A/S - B at the same price on the same day from the broker Arian Financial.   Appendix D, Trade 10 (ELYSIUM-04004403); Weinstein Decl. Ex. 37.**

Response:  Disputed as to materiality and because Paragraph 15(a)(i) relies on Appendix D and Weinstein Declaration Exhibit 37, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

        ii.     **Arian Financial obtained 887,986 shares of Carlsberg A/S - B at the same price on the same day from the ultimate seller D.D.C. (Cayman).   Appendix D, Trade 10 (ELYSIUM-04004175; ELYSIUM-09138288); Weinstein Decl. Ex. 37.**

Response:  Disputed as to materiality and because Paragraph 15(a)(ii) relies on Appendix D and Weinstein Declaration Exhibit 37, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

    b.     **On March 30, 2015, the Roadcraft Plan entered into a stock loan agreement pursuant to which it agreed to loan 887,986 shares of Carlsberg A/S - B shares to Colbrook Limited, in exchange for DKK 507,483,999.00 (DKK 571.50 per share), with a settlement date of March 31, 2015.  No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Roadcraft Plan did not "purport" to engage in trades.

> **i.    Colbrook Limited loaned 887,986 Carlsberg A/S - B shares to CEKA Invest GmbH on the same day, in exchange for DKK 507,483,999.00 (DKK 571.50 per share).  Appendix D, Trade 10 (ELYSIUM-04033405); Weinstein Decl. Ex. 37.**

Response:  Disputed as to materiality and because Paragraph 15(b)(i) relies on Appendix D and Weinstein Declaration Exhibit 37, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **ii.   CEKA Invest GmbH loaned 887,986 Carlsberg A/S - B shares to D.D.C. (Cayman) on the same day, in exchange for DKK 507,483,999.00 (DKK 571.50 per share).  Appendix D, Trade 10 (ELYSIUM-04031990); Weinstein Decl. Ex. 37.**

Response:  Disputed as to materiality and because Paragraph 15(b)(ii) relies on Appendix D and Weinstein Declaration Exhibit 37, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

**16.    In addition, in 2015, the Roadcraft Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 887,986 Carlsberg A/S - B shares. All 14 of these series of trade loops are detailed in Appendix D to this statement, including the Carlsberg A/S - B loop, which appears at line 10 of the Appendix. Documentation for each of the Roadcraft Plan's 14 type 1 trade loops is contained in Exhibits 28 through 41 the Weinstein Declaration.**

Response:  Disputed because the Roadcraft Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops."  The Roadcraft Plan engaged in the equity purchase transactions and stock loan transactions identified in Appendix D, but otherwise disputes Paragraph 16 because it relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein.

**17.    According to the Solo Custodians' documents, the Roadcraft Plan and other customers of the Solo Custodians engaged in the following trades:**

> **a.    On August 7, 2014, the Roadcraft Plan purchased 2,803,027 shares of TDC A/S at DKK 51.35 per share, for a notional amount of DKK 143,935,436.45, through the broker Bastion Capital London Ltd, with a settlement date of August 13, 2014.  No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Roadcraft Plan did not "purport" to engage in trades.

> **i.    Bastion Capital acquired those shares by purchasing, in the**

aggregate, 148,093,767 shares of TDC A/S from the broker Ballygate Capital Ltd,  Appendix E, Trade 1 (ELYSIUM-03294580); Weinstein Decl. Ex. 42  from which Bastion Capital London Ltd allocated 2,803,027 to the Roadcraft Plan, and the remaining shares to 45 other pension plans, as described in paragraph 14 above.  Appendix E, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 42.

Response:  Disputed as to materiality and because Paragraph 17(a)(i) relies on Appendix E and Weinstein Declaration Exhibit 42, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111..
.

ii.    **Ballygate Capital Limited obtained 29,394,791 shares of TDC A/S at the same price on the same day from the ultimate seller Miralty International Limited.  Appendix E, Trade 1 (ELYSIUM-03294561; ELYSIUM-04646756); Weinstein Decl. Ex. 42.  These shares were ultimately sold (through Bastion Capital London Ltd) to the following nine pension plans in the following amounts, including 2,803,027 shares to the Roadcraft Plan:**

[table omitted]

Response:  Disputed as to materiality and because Paragraph 17(a)(ii) relies on Appendix E and Weinstein Declaration Exhibit 42, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.
.

b.    **On August 12, 2014, the Roadcraft Plan entered into a stock loan agreement pursuant to which it agreed to loan 2,803,027 TDC A/S shares to Gnosis Capital Ltd., in exchange for DKK 143,935,436.45 (DKK 51.35 per share), with a settlement date of August 13, 2014.  No citation to this trade in which the Roadcraft Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Roadcraft Plan did not "purport" to engage in trades.

i.    **Gnosis Capital Ltd. loaned 2,803,027 TDC A/S shares to Esengi Ltd. on the same day, in exchange for DKK 143,935,436.45 (DKK 51.35 per share).  Appendix E, Trade 1 (ELYSIUM-03308489); Weinstein Decl. Ex. 42.**

Response:  Disputed as to materiality and because Paragraph 17(b)(i) relies on Appendix E and Weinstein Declaration Exhibit 42, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> ii.    **Esengi Ltd. loaned 2,803,027 TDC A/S shares to Miralty International Ltd on the same day, in exchange for DKK 143,935,436.45 (DKK 51.35 per share).  Appendix E, Trade 1 (ELYSIUM-03308490); Weinstein Decl. Ex. 42.**

Response:  Disputed as to materiality and because Paragraph 17(b)(ii) relies on Appendix E and Weinstein Declaration Exhibit 42, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> c.    **This trade loop is further detailed in Appendix E to this statement.  Documentation for this trade loop is contained in Exhibit 42 to the Weinstein Declaration.**

Response:  This is not a statement of fact and does not require a response.  To the extent it requires any response, it is disputed because it relies on Elysium Documents, which are inadmissible for the truth of the matter asserted therein.

18.    **According to the Solo Custodians' documents, the FWC Capital Plan LLC Pension Plan (the "FWC Plan"), and other customers of the Solo Custodians, engaged in the following trades:**

> a.    **On March 26, 2015, the FWC Plan purchased 903,635 shares of Carlsberg A/S – B at DKK 571.50 per share, for a total notional amount of DKK 516,427,402.50, through the broker The TJM Partnership PLC, with a settlement date of March 31, 2015.  No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the FWC Plan did not "purport" to engage in trades.

> i.    **The TJM Partnership PLC obtained 903,635 shares of Carlsberg A/S – B at the same price on the same day from the broker Arian Financial.  Appendix F, Trade 9 (ELYSIUM-04004398); Weinstein Decl. Ex. 51.**

Response:  Disputed as to materiality and because Paragraph 18(a)(i) relies on Appendix F and Weinstein Declaration Exhibit 51, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> ii.    **Arian Financial obtained 903,635 shares of Carlsberg A/S – B at the same price on the same day from the ultimate seller JCJC International Limited.  Appendix F, Trade 9 (ELYSIUM-**

04004172; ELYSIUM-04124065); Weinstein Decl. Ex. 51.

Response:  Disputed as to materiality and because Paragraph 18(a)(ii) relies on Appendix F and Weinstein Declaration Exhibit 51, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **b.    On March 30, 2015, the FWC Plan entered into a stock loan agreement pursuant to which it agreed to loan 903,635 Carlsberg A/S – B shares to Diverse Vision Limited, in exchange for DKK 516,427,402.50 (DKK 571.50 per share), with a settlement date of March 31, 2015.  No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the FWC Plan did not "purport" to engage in trades.

> **i.    Diverse Vision Limited loaned 903,635 Carlsberg A/S – B shares to CEKA Invest GmbH on the same day and with the same settlement date, in exchange for DKK 516,427,402.50.  Appendix F, Trade 9 (ELYSIUM-04034597); Weinstein Decl. Ex. 51.**

Response:  Disputed as to materiality and because Paragraph 18(b)(i) relies on Appendix F and Weinstein Declaration Exhibit 51, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **ii.    CEKA Invest GmbH loaned 903,635 Carlsberg A/S – B shares to JCJC International Limited on the same day and with the same settlement date, in exchange for DKK 516,427,402.50. Appendix F, Trade 9 (ELYSIUM-04031953); Weinstein Decl. Ex. 51.**

Response:  Disputed as to materiality and because Paragraph 18(b)(ii) relies on Appendix F and Weinstein Declaration Exhibit 51, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

**19.    In addition, in 2015, the FWC Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 903,635 Carlsberg A/S - B shares. All 14 of these series of trade loops are detailed in Appendix F to this statement, including the Carlsberg A/S - B loop, which appears at line 9 of the Appendix.**

Response:  Disputed because the FWC Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops."  The FWC Plan engaged in the equity purchase transactions and stock loan transactions identified in Appendix F, but otherwise disputes Paragraph 19 because it relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein.

20.     **According to the Solo Custodians' documents, the FWC Plan and other customers of the Solo Custodians engaged in the following trades:**

a.      **On November 27, 2014, the FWC Plan purchased 846,864 shares of Chr. Hansen Holding A/S, at DKK 258.9 per share, for a total notional amount of DKK 219,253,089.60, through the broker Bastion Capital London Ltd, with a settlement date of December 2, 2014.  No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the FWC Plan did not "purport" to engage in trades.

i.      **Bastion Capital acquired those shares by purchasing, in the aggregate, 20,892,979 shares of Chr. Hansen Holding A/S from Ballygate Capital Limited, Appendix G, Trade 1 (ELYSIUM-03572340); Weinstein Decl. Ex. 57 from which Bastion Capital London Ltd allocated 846,864 shares to the FWC Plan, and the remaining shares to 23 other defendant pension plans, in the following amounts:  Appendix G, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 57.  [Table omitted]**

Response:   Disputed because Paragraph 20(a)(i) relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.

ii.      **Ballygate Capital Limited obtained 5,234,119 shares of Chr. Hansen Holding A/S at the same price on the same day from the ultimate seller Miralty International Limited.  Appendix G, Trade 1 (ELYSIUM-03572745; ELYSIUM-04657181); Weinstein Decl. Ex. 57.  846,864 of these were ultimately sold to the FWC Plan (through Bastion Capital London Ltd). These shares were ultimately sold (through Bastion Capital London Ltd) to the following six pension plans in the following amounts, including 846,864 shares to the FWC Plan. [Table omitted]**

Response:   Disputed because Paragraph 20(a)(ii) relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.

b.      **On December 1, 2014, the FWC Plan entered into a stock loan agreement pursuant to which it agreed to loan 846,864 Chr. Hansen**

> **shares to Gnosis Capital Ltd, in exchange for DKK 219,253,089.60, with a settlement date of December 2, 2014.  No citation to this trade in which the FWC Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the FWC Plan did not "purport" to engage in trades.

> **i.  Gnosis Capital Ltd loaned 846,864 Chr. Hansen shares to Esengi Ltd on the same day and with the same settlement date, in exchange for DKK 219,253,089.60.   Appendix G, Trade 1 (ELYSIUM-03582192); Weinstein Decl. Ex. 57.**

Response:  Disputed as to materiality and because Paragraph 20(b)(i) relies on Appendix G and Weinstein Declaration Exhibit 57, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **ii.  Esengi Ltd loaned 846,864 Chr. Hansen shares to Miralty International Limited on the same day and with the same settlement date, in exchange for DKK 219,253,089.60.  Appendix G, Trade 1 (ELYSIUM-03582225); Weinstein Decl. Ex. 57.**

Response:  Disputed as to materiality and because Paragraph 20(b)(i) relies on Appendix G and Weinstein Declaration Exhibit 57, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **c.  In addition, in 2014, the FWC Plan and other customers of the Solo Custodians purported to engage in one additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 846,864 Chr. Hansen shares. Both of these series of trade loops are detailed in Appendix G to this statement. Documentation for both trade loops is contained in Exhibits 57 and 58 to the Weinstein Declaration.**

Response:  Disputed because the FWC Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops."  Further disputed as to materiality and because Paragraph 20(c) relies on Appendix G and Weinstein Declaration Exhibits 57 and 58, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

**21.  According to the Solo Custodians' documents, The Proper Pacific LLC 401(k) Plan (the "Proper Pacific Plan") and other customers of the Solo Custodians engaged in the following trades:**

> **a.  On March 26, 2015, the Proper Pacific Plan purchased 180,313 shares of Carlsberg A/S – B, at DKK 571.5 per share, for a notional amount of DKK 103,048,879.50, through the broker Sunrise Brokers, with a**

> **settlement date of March 31, 2015.  No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Proper Pacific Plan did not "purport" to engage in trades.

> **i.    Sunrise Brokers obtained 180,313 shares of Carlsberg A/S – B at the same price on the same day from the broker Mako Financial Markets LLP.  Appendix H, Trade 10 (ELYSIUM-04005472); Weinstein Decl. Ex. 68.**

Response:  Disputed as to materiality and because Paragraph 21(a)(i) relies on Appendix H and Weinstein Declaration Exhibit 68, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **ii.   Mako Financial Markets LLP obtained 180,313 shares of Carlsberg A/S – B at the same price on the same day from the ultimate seller Opal Capital.   Appendix H, Trade 10 (ELYSIUM-04006870; ELYSIUM-04121825); Weinstein Decl. Ex. 68.**

Response:  Disputed as to materiality and because Paragraph 21(a)(ii) relies on Appendix H and Weinstein Declaration Exhibit 68, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **b.    On March 30, 2015, the Proper Pacific Plan entered into a stock loan agreement pursuant to which it agreed to loan 180,313 Carlsberg A/S – B shares to Treehurst Limited, in exchange for DKK 103,048,879.50 (DKK 571.50 per share), with a settlement date of March 31, 2015.  No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Proper Pacific Plan did not "purport" to engage in trades.

> **i.    Treehurst Limited loaned 180,313 Carlsberg A/S – B shares to Relative Value Trading GmbH on the same day and with the same settlement date, in exchange for DKK 103,048,879.50 (DKK 571.50 per share).  Appendix H, Trade 10 (ELYSIUM-04028842); Weinstein Decl. Ex. 68.**

Response:  Disputed as to materiality and because Paragraph 21(b)(i) relies on Appendix H and Weinstein Declaration Exhibit 68, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

ii.     **Relative Value Trading GmbH loaned 180,313 Carlsberg A/S – B shares to Opal Capital on the same day and with the same settlement date, in exchange for DKK 103,048,879.50 (DKK 571.50 per share).   Appendix H, Trade 10 (ELYSIUM-04030302); Weinstein Decl. Ex. 68.**

Response:  Disputed as to materiality and because Paragraph 21(b)(ii) relies on Appendix H and Weinstein Declaration Exhibit 68, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

22.     **In addition, in 2015, the Proper Pacific Plan and other customers of the Solo Custodians purported to engage in 13 additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 180,313 Carlsberg A/S - B shares. All 14 of these series of trade loops are detailed in Appendix H to this statement, including the Carlsberg A/S - B loop, which appears at line 10 of the Appendix.  Documentation for each of the Proper Pacific Plan's 14 type 1 trade loops is contained in Exhibits 59 through 72 to the Weinstein Declaration.**

Response:  Disputed because the Proper Pacific Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops."  The Proper Pacific Plan engaged in the equity purchase transactions and stock loan transactions identified in Appendix H, but otherwise disputes Paragraph 22 because it relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein.

23.     **According to the Solo Custodians' documents, the Proper Pacific Plan and other customers of the Solo Custodians engaged in the following trades:**

a.     **On November 27, 2014, the Proper Pacific Plan purchased 839,500 shares of Chr. Hansen Holding A/S at DKK 258.9 per share, for a total notional amount of DKK 217,346,550, through the broker Bastion Capital London Ltd, with a settlement date of December 2, 2014.  No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

Response:  The first sentence is undisputed.  The second sentence is disputed because the Proper Pacific Plan did not "purport" to engage in trades.

i.     **Bastion Capital acquired those shares by purchasing, in the aggregate, 20,892,979 shares of Chr. Hansen Holding A/S from Ballygate Capital Limited, Appendix I, Trade 1 (ELYSIUM-03572340); Weinstein Decl. Ex. 73  from which Bastion Capital London Ltd allocated 839,500 to the Proper Pacific Plan, and the remaining shares to 23 other defendant pension plans, as described in paragraph 20 above.  Appendix I, Trade 1 (Trade A Plans); Weinstein Decl. Ex. 73.**

<u>Response</u>:   Disputed because Paragraph 23(a)(i) relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.

> **ii.      Ballygate Capital Limited obtained 5,162,627 shares of Chr. Hansen Holding A/S at the same price on the same day from the ultimate seller Aronex Partners Ltd. Appendix I, Trade 1 (ELYSIUM-04657154); Weinstein Decl. Ex. 73.  These shares were ultimately sold (through Bastion Capital London Ltd) to the following six pension plans in the following amounts, including 839,500 shares to the Proper Pacific Plan.**

<u>Response</u>:   Disputed because Paragraph 23(a)(ii) relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein, and because all shares are dematerialized and fungible so that it is not possible to trace shares in the manner SKAT suggests.  *E.g.*, Bahnsen Decl. Ex. 13 (Carr Rebuttal Report) at ¶¶ 8.g., 80; Bahnsen Decl. Ex. 14 (Carr Reply Report) at ¶¶ 11.xi., 111.

> **b.      On December 1, 2014, the Proper Pacific Plan entered into a stock loan agreement pursuant to which it agreed to loan 839,500 Chr. Hansen shares to Gnosis Capital Ltd, in exchange for DKK 217,346,550 (DKK 51.35 per share), with a settlement date of December 2, 2014.  No citation to this trade in which the Proper Pacific Plan purportedly entered is provided, as it was agreed on in the parties' Joint 56.1 Statement.**

<u>Response</u>:  The first sentence is undisputed.  The second sentence is disputed because the Proper Pacific Plan did not "purport" to engage in trades.

> **i.      Gnosis Capital Ltd loaned 839,500 Chr. Hansen shares to Esengi Ltd on the same day and with the same settlement date, in exchange for DKK 217,346,550 (DKK 51.35 per share). Appendix I, Trade 1 (ELYSIUM-03582197); Weinstein Decl. Ex. 73.**

<u>Response</u>:  Disputed as to materiality and because Paragraph 23(b)(i) relies on Appendix I and Weinstein Declaration Exhibit 73, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **ii.      Esengi Ltd loaned 839,500 Chr. Hansen shares to Aronex Partners Ltd on the same day and with the same settlement date, in exchange for DKK 217,346,550 (DKK 51.35 per share). Appendix I, Trade 1 (ELYSIUM-03582228); Weinstein Decl. Ex. 73.**

Response:  Disputed as to materiality and because Paragraph 23(b)(ii) relies on Appendix I and Weinstein Declaration Exhibit 73, which cite to Elysium Documents that are inadmissible for the truth of the matter asserted therein.

> **c.  In addition, in 2014, the Proper Pacific Plan and other customers of the Solo Custodians purported to engage in one additional series of circular trading loops of Danish securities. The series of trades in each loop used the same or similar steps as outlined above for the 839,500 Chr. Hansen shares. Both of these series of trade loops are detailed in Appendix I to this statement. Documentation for both trade loops is contained in Exhibits 73 and 74 to the Weinstein Declaration.**

Response:  Disputed because the Proper Pacific Plan did not "purport" to engage in trades, nor does admissible evidence establish that it engaged in "circular trading loops."  The Proper Pacific Plan engaged in the equity purchase transactions and stock loan transactions identified in Appendix I, but otherwise disputes Paragraph 23(c) because it relies on Elysium Documents that are inadmissible for the truth of the matter asserted therein.

**24.  The RJM Plan and Ganymede Cayman Limited ("Ganymede"), an entity controlled by Sanjay Shah, Weinstein Decl. Ex. 79 (R. Markowitz Dep., April 8-9, 2021), at 200:24-201:3, split the refunds paid to the RJM Plan by SKAT, net of the payment agent's minimal fee, with Ganymede receiving approximately 66% and the RJM Plan receiving approximately 34%, or DKK 20,225,699.55.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18; Weinstein Decl. Ex. 115 (MPSKAT00000351); Weinstein Decl. Ex. 116 (MPSKAT00101953); Joint 56.1 Statement ¶¶ 204-206.**

Response:  Disputed.  The facts stated in this paragraph are not supported by the evidence cited. Markowitz testified only to his belief that Ganymede was "owned by Sanjay Shah," Weinstein Decl. Ex. 79 (Markowitz Dep. 201:2-3), but the record does not support the assertion that Shah "controlled" Ganymede.  Nor does the record support the characterization that the RJM Plan and Ganymede "split the refunds."  The RJM Plan and others agreed to pay 66.67% of any reclaims as fees in exchange for tax reclaim advisory services, in addition to initial fees of up to €100,000 to be paid in installments.  *See, e.g.*, Schoenfeld Decl. Ex. 12 (Tax Reclaim Advisory Services Agreement Between Ganymede Cayman Limited and Michelle Investments Pension Plan Trust); *id*. Ex. 13 (Ganymede invoice to RJM Plan).  Moreover, the cited portions of Markowitz's deposition also describe his understanding that the fees reflected the pricing structure of the transaction whereby Ganymede was responsible for facilitating the distribution of payments to other counterparties to the transaction, including the sellers of shares, via a fee invoice structure. *Id*. at 200:1-11; 201:17-23. The Solo Capital account statements and the Ganymede invoice cited by SKAT are consistent with that arrangement, but do not suggest any agreement between the RJM Plan and Ganymede whereby Ganymede retained 66% of any reclaim.  Defendants also dispute SKAT's assertion that the RJM Plan received DKK 20,225,699.55.  SKAT appears to have taken 34% of the total amount paid by SKAT in response to the RJM Plan's reclaim applications. *See* JSUMF ¶ 204 (SKAT paid total reclaims of DKK 59,487,351.62; 34% of that is DKK 20,225,669.55).  But SKAT acknowledges directly in Paragraph 24 that the plans received payments net of the payment agent's fee. *See also* JSUMF ¶ 206 (describing the payment agent's

fee structure).  Thus, the payment agent remitted to the RJM Plan some amount *less than* DKK 59,487,351.62, from which Ganymede's fee was paid.

**25.     The Basalt Plan and Ganymede split the refunds paid to the Basalt Plan by SKAT, with Ganymede receiving approximately 75% and the Basalt Plan receiving approximately 25%, or DKK 6,963,382.23.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18.**

Response:  Disputed.  For substantially the same reasons explained in response to Paragraph 24, the facts stated in Paragraph 25 are not supported by the evidence cited.  Here, SKAT does not even cite to evidence providing a basis for the DKK 6,963,382.23 amount.  *See* JSUMF ¶ 208.

**26.     The Roadcraft Plan and Ganymede split the refunds paid to the Roadcraft Plan by SKAT, with Ganymede receiving approximately 75% and the Roadcraft Plan receiving approximately 25%, or DKK 16,992,759.43.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18.**

Response:  Disputed.  For substantially the same reasons explained in response to Paragraph 24, the facts stated in Paragraph 26 are not supported by the evidence cited.  Again, SKAT does not even cite to evidence providing a basis for the DKK 16,992,759.43 amount.  *See* JSUMF ¶ 212.

**27.     Each time the FWC Plan received refunds payments from SKAT, the FWC Plan paid approximately 95% of the refund to Ganymede.  Weinstein Decl. Ex. 117 at FWCCAP00000225-26, FWCCAP00000409, and FWCCAP00000410.**

Response:  Disputed.  The materiality of this purported statement of fact is disputed insofar as it does not support any of Plaintiff's legal theories against the FWC Plan or Lehman because its use is mischaracterized or otherwise misapplied within Plaintiff Skatteforvaltningen's Memorandum of Law in Support of its Motion for Partial Summary Judgment ("SKAT's Brief").  Within SKAT's Brief, this statement of fact is cited to for the distinct assertion that "[t]he FWC Capital plan paid 95 percent of the DKK 70,930,260.73 it received to Ganymede *and retained the rest itself*."  *See* SKAT's Brief at p. 37 (emphasis added).  But, according to Plaintiff's own forensic accounting expert, Bruce G. Dubinsky, "[n]o money from the refunds was paid to Lehman's Plans.  *See* Schoenfeld Decl. Ex. 19 (Dubinsky Report) at ¶ 245; *id.* at p. 96, Table 4 (depicting the FWC Plan received 0.0% of refund).  Indeed, the documents cited by SKAT to support Paragraph 27 do not support the proposition that the FWC Plan "retained" any tax reclaim monies.  Rather, Exhibit 117 (FWCCAP00000194-227), which is the FWC Plan's "Statement Summary" for 2015, demonstrates that the FWC Plan's "Opening Cash Balance" was DKK 0.00 (FWCCAP00000194) and its "Closing Balance" remained at 0.00 (FWCCAP00000226). *See* Weinstein Decl., Ex. 117.

**28.     Defendant Lehman agreed with Sanjay Shah that, for "introducing" his own pension plans to the Solo Custodians, Shah would arrange to pay Lehman at least $700,000 or $800,000 per plan.  Weinstein Decl. Ex. 80 (Lehman Dep., August 9 – 10, 2021), at 396:7-25.  From the amount paid to Ganymede, Sanjay Shah subsequently paid defendant Lehman, via his entity First Alton, Inc., the amounts that Lehman and Shah had agreed upon.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 463:9-.468:1; Weinstein Decl. Ex. 118 (Dep. Ex. 4029) at ELYSIUM-00008355, ELYSIUM-**

**00008475, ELYSIUM-07777714, and ELYSIUM-00008359; Weinstein Decl. Ex. 119 (Dep. Ex. 4027) at ELYSIUM-03847468, ELYSIUM-07558218, ELYSIUM-04265008, ELYSIUM-04465959, and ELYSIUM-04586675.  According to defendant Lehman, he spent the money transferred to First Alton on personal spending, investments, and to pay taxes, and he transferred any remaining funds to his own bank accounts. Weinstein Decl. Ex. 80 (Lehman Dep.), at 473:1-474:19.**

Response:  Disputed.  *First*, this purported statement of fact is disputed to the extent that it cites to inadmissible "ELYSIUM" hearsay documents which also have never been properly authenticated. *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). *Second*, the materiality of this purported statement of fact is disputed. Lehman's admissible testimony can only establish that First Alton, Inc., and not the FWC Plan, received payments from Ganymede. *See* Weinstein Decl., Ex. 80 (Lehman Dep. at 464:8-12) ("instead of my LLCs [such as the FWC Plan's sponsoring entity] receiving the introducing broker fees," First Alton, Inc. received them). First Alton, Inc., is an entirely separate "S Corporation that [Lehman] owned and operated," *see id.* (Lehman Dep. at 463:9-14), and is not a defendant in this action or *any* action within the MDL. Moreover, Mr. Lehman testified "I do not know what Ganymede did with the money after they received it," and that he does not "know how Ganymede obtained the money that it used to pay" him. *See id.* (Lehman Dep. at 463:2-8).

29.   **Each time the Proper Pacific Plan received refunds payments from SKAT, the Proper Pacific Plan paid approximately 95% of the refund to Ganymede.  Weinstein Decl. Ex. 120 at PROPPACIF00000142 – 44, PROPPACIF00000319 and PROPPACIF00000320.**

Response:  Disputed.  The materiality of this purported statement of fact is disputed insofar as it does not support any of Plaintiff's legal theories against the Proper Pacific Plan or Bradley because its use is mischaracterized or otherwise misapplied within SKAT's Brief. Within SKAT's Brief, this statement of fact is cited to for the distinct assertion that "[o]f the DKK 29,035,894.47 Proper Pacific plan received 95 percent to Ganymede *and retained the rest for itself*. *See* SKAT's Brief at p. 37 (emphasis added). But, according to Plaintiff's own forensic accounting expert, Bruce G. Dubinsky, "[n]one of these [tax reclaim] funds were paid to Bradley's Plans or associated LLCs." *See* Schoenfeld Decl. Ex. 19 (Dubinsky Report) at ¶ 251; *id*. at p. 96, Table 4 (depicting the Proper Pacific Plan received 0.0% of refund). Indeed, the documents cited by SKAT to support Paragraph 29 do not support the proposition that the Proper Pacific Plan "retained" any tax reclaim monies. Rather, Exhibit 120 (PROPPACIF00000113-146), which is the Proper Pacific Plan's "Statement Summary" for 2015, demonstrates that the Proper Pacific Plan's "Opening Cash Balance" was DKK 0.00 (PROPPACIF00000113) and its "Closing Balance" remained at 0.00 (PROPPACIF00000145-146). *See* Weinstein Decl., Ex. 120.

30.   **Danny Fletcher ("Fletcher"), a colleague of Bradley's, Weinstein Decl. Ex. 81 (Bradley Dep., Oct. 14, 2020), at 306:14-20; 307:14-308:4 subsequently paid defendant Bradley at least the $100,000 fee he was promised for establishing a plan. Weinstein Decl. Ex. 81 (Bradley Dep.), at 305:11-306:20.**

Response:  Disputed.  The materiality of this purported statement of fact is disputed.  Bradley's testimony does not establish that Fletcher paid Bradley with Danish tax reclaim monies.  *See* Weinstein Decl., Ex. 81 (Bradley Dep. at 305:16-21) ("Q. Okay. Why did Mr. Fletcher pay you? A. We had like an introducing broker agreement, consulting type agreement …").

31.     **The four principals of Argre Management LLC were defendants Markowitz and John van Merkensteijn and non-parties Mathew Stein and Jerome Lhote.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 24:7-10.**

Response:  Undisputed, but the statement is not material.

32.     **In April 2012, Shah emailed defendant Richard Markowitz to ask if he had a U.S. pension plan that could be used for the new dividend arbitrage scheme.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 137:19-138:9; ELYSIUM-00389317.**

Response:  Disputed.  The cited testimony states that in April 2012, Shah emailed Markowitz to ask if he had a pension fund "that can be used for trading equities and derivatives," which he asked "in the context of . . . the dividend arbitrage strategy."  Weinstein Decl. Ex. 79.  The statement is also immaterial.

33.     **Subsequently, Markowitz and the three other principals in Argre Management LLC established pension plans to participate in the strategy, including bellwether defendant RJM Plan.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 138:13-139:23.**

Response:  Undisputed.

34.     **In 2012, Solo ostensibly became a custodian and began executing a new purported dividend arbitrate scheme involving Danish shares.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 158:1-159:24.**

Response:  Disputed.  The cited testimony states that Mr. Markowitz learned that Solo became a custodian in April 2012, and that Solo served as a custodian for dividend arbitrage trades in Denmark in August 2012.  Weinstein Decl. Ex. 79.  SKAT's characterizations—"ostensibly," "purported," and "scheme"—are also disputed, including because SKAT has agreed in the parties' Joint Statement of Undisputed Material Facts that "[c]ertain US pension plan defendants used Solo Capital … to provide custodial services," and that "[t]he Solo Custodians were registered with the U.K. regulator, the Financial Conduct Authority ('FCA'), and were subject to its FCA regulation." JSUMF ¶¶ 107-08.

35.     **After a Danish company announced it would pay a dividend to its shareholders, on the day before the ex-dividend date, the plans purportedly purchased large amounts of shares in the Danish company from a broker identified by Solo in an over-the counter trade.  Solo did not require the pension plans to pay any money to buy the shares.  Instead, on the day before the payment was due, Solo purportedly arranged a stock loan transaction that would provide the plan all of the money to pay for the supposed shares.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 160:2-17; 173:19-**

**174:17;   189:2-4;   268:15-16;   269:21-23;   274:8-16;   274:22-275:19;   433:14-23; Weinstein Decl. Ex. 80 (Lehman Dep.), at 250:4-17.**

Response:  Disputed.  The plans did not "purport" to purchase Danish shares, but did purchase Danish shares.  *See, e.g.*, JSUMF ¶¶ 113-117, 121-122, 124-125 and Dulberg Decl. Exs. 37, 47, 50, 51, 54, 68.  Moreover, Solo did require the plans to pay money to buy the shares; the plans' Client Custody Agreements provided that "clearing and settlement services under this Agreement shall be subject to the Custodian … receiving all necessary … funds … and normally on the basis of 'cash against delivery.'"  Schoenfeld Decl. Ex. 14, § 7.2; *see also* Weinstein Decl. Ex. 91 (Wade Report) ¶¶ 51-52 (explaining delivery versus payment process), ¶ 238 (conceding "theoretical ability to net settle offsetting DVP transactions").  The plans paid money to buy the shares by lending the stock purchased (using industry-standard master securities lending agreements) in exchange for collateral equal to the purchase price of the shares, and using those collateral proceeds to settle (i.e. pay for) the original purchase transaction.  JSUMF ¶¶ 121-123, 136-137, 148 and Dulberg Decl. Exs. 57-59, 69.

36.   **For these plans, Solo and the Argre principals agreed that for any refunds SKAT paid, Solo would get 66 percent and the Argre principals' plan would get 34 percent. Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 200:12-202:18, 211:4-17.**

Response:  Disputed.  SKAT has not identified "these plans," and has not cited to evidence to support a statement applying generally to all bellwether plans.  To the extent Paragraph 36 applies to the Solo Bellwether Plans, including the RJM Plan, it is duplicative of Paragraph 24 and defendants incorporate by reference their response to Paragraph 24.

37.   **The only Solo Custodian providing the Solo Bellwether Plans custody services in 2013 was Solo Capital.  See Appendices A through I. Solo Capital also provided custody services to defendant plans in 2012. See, e.g., Weinstein Decl. Ex. 121 (JHVM_0005618).  By 2015, however, all four Solo Custodians were providing custodial services to Solo Bellwether Plans and/or other defendant plans.  See Appendices A through I; Weinstein Decl. Ex. 122 (78YORK00000060); Weinstein Decl. Ex. 123 (BUSBLK00000104).**

Response:  Disputed as to materiality.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Defendants otherwise agree with the facts stated in this paragraph but note that West Point Derivatives did not provide custodial services to any Solo Bellwether Plan.

38.   **By 2014, a dispute had arisen between the Argre principals.  The split involved defendants Markowitz and van Merkensteijn, on one side, and the other two Argre principals Stein and Lohte, on the other.  Stein and Lhote used a German bank they had acquired to replace Solo as the purported custodian, while Markowitz and van Merkensteijn stuck with Sanjay Shah and Solo.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 346:4-24; 350:5-351:8.**

Response:  These statements are not material.  Defendants dispute the use of the word "purported" because the Solo Bellwether Defendants did, in fact, use Solo as a custodian.  *See, e.g.*, Dulberg Decl. Exs. 37, 47, 50, 51, 54, 68.

**39.  Beginning in June and July 2014, and with the assistance of defendant Michael Ben-Jacob and others at Kaye Scholer LLP in establishing the majority of them, Markowitz, van Merkensteijn and Klugman collectively used 40 pension plans, most of them (including bellwether defendants Basalt and Roadcraft Plans) newly formed, for the purpose of participating in the scheme.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 354:9-17; 369:17-21; 379:5-8.**

Response:       Disputed.  Defendants agree with the following facts: 1) Beginning in or around June and July 2014, Markowitz, van Merkensteijn and Klugman formed a number of pension plans; 2) Kaye Scholer LLP assisted with the establishment of the majority of these plans, including the Basalt Plan and Roadcraft Plan; 3) as many as 40 pension plans, including the Basalt Plan and Roadcraft Plan, participated in the dividend arbitrage strategy; 4) the Basalt Plan and the Roadcraft Plan were formed in June 2014.  JSUMF ¶¶ 80, 81.  Any other statement of a fact in paragraph 39 is not supported by the evidence SKAT cites and should be disregarded.

**40.  For some of the new plans, such as defendant Basalt Plan, one of Markowitz, van Merkensteijn, or Klugman would be the sole participant in the pension plan. Weinstein Decl. Ex. 82 (Klugman Dep., Jan. 21, 2021), at 236:25-237:19.  For many of these 40 plans, such as defendant Roadcraft Plan, a family member or friend of Markowitz and van Merkensteijn, such, as van Merkensteijn's friend defendant Ronald Altbach, would be the sole participant in the plan.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 356:12-357:4; Weinstein Decl. Ex. 179 (October 30, 2020 Altbach Dep.), at 27:19-22.   With respect to the plans in which Markowitz or van Merkensteijn's family and friends were the beneficiaries, the plans entered into partnership agreements with trusts established by Markowitz, van Merkensteijn and Klugman, such as defendants RAK Investment Trust (Klugman's) and Routt Capital Trust (Markowitz's).  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 356:16-357:4. After paying Solo 75 percent of the refunds, the partnership arrangements provided that the remaining 25 percent would be split with 95 percent to be distributed to the Markowitz, van Merkensteijn and Klugman trusts, and only 5 percent (of the 25 percent) left for the plan.  Weinstein Decl. Ex. 82 (Klugman Dep.), at 65:16-21.**

Response:  Disputed.  Defendants agree with the following facts: 1) van Merkensteijn was the sole participant in the Basalt Plan; 2) Ronald Altbach is a friend of van Merkensteijn and the sole participant in the Roadcraft Plan; 3) the Roadcraft Plan entered into a partnership with the RAK Investment Trust and the Routt Capital Trust; 4) the partnership agreement between these three parties called for a profit split of 70% to Routt Capital Trust, 25% to the RAK Investment Trust, and 5% to the Roadcraft Plan, in accordance with each partner's interest in the partnership. Partnership profit was not determined on the basis of individual reclaim payments, but instead, upon the complete balance of earnings from investments by the individual partners.  Schoenfeld Decl. Ex. 8 (Markowitz Tr. 242:23-244:16) (explaining the calculation of earnings attributable to partnerships).

41.     **For this new phase, Shah increased Solo's share of any refunds SKAT paid, net of the payment agent's minimal fee, from 66 to 75 percent, leaving 25 percent for the plans. Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 451:18-453:18.**

<u>Response</u>:  Disputed because the statement is not supported by the evidence cited.  For largely the same reasons explained in response to Paragraph 24, Markowitz did not testify that Solo shared in any refunds or got to keep 75% of the reclaim payments received.  Markowitz's testimony was that Solo then had to share some portion with the Seller.

42.     **In Spring 2014, Shah estimated that Klugman could make a million dollars per plan if he opened his own pension plans to participate in the scheme.  Weinstein Decl. Ex. 82 (Klugman Dep.), at 23:6-15, 24:16-23.**

<u>Response</u>:     Disputed because the statement does not accurately reflect the evidence cited.  Klugman repeatedly qualified his testimony as lacking recollection (*e.g.,* Klugman Tr. 23:18-19 ("My recollection is a little fuzzy on this."); 24:8-9 ("I don't remember what the limit was."); 24:21-24 ("I think he gave an estimate of around, if all the trading worked, around a million dollars per plan. I don't remember exactly.")).  Klugman also testified that these discussions with Shah, including the estimated profits, pertained to transactions in Belgium and Denmark.  Schoenfeld Decl. Ex. 7 (Klugman Tr. 23:24-25). Klugman did not testify that his discussion with Shah was about "participate[ing] in the scheme."  Klugman's testimony was that he and Shah discussed establishing pension plans to engage in trading Danish and Belgium securities.  *Id*. (Klugman Tr. 22:23-23:3; 23:24-24:11; 25:3-7).

43.     **Initially, defendant Roger Lehman's role in the scheme was to assist Solo clients in the reclaim application process, including acting as the authorized trader for other people's pension plans, i.e., to execute on behalf of the plans the purported share purchases and stock loans that supposedly financed them.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 81:13-82:5.**

<u>Response</u>:  Disputed.  Roger Lehman did not have a "role" in any "scheme."  Mr. Lehman never had any concerns about whether the "trading program" in Denmark "was a legitimate trading program."  In fact, SØIK, Denmark's State Prosecutor for Serious Economic and International Crime, gave Mr. Lehman a letter reasoning that "they do not believe [Lehman] could possibly be found guilty of fraud."  *See* Schoenfeld Decl. Ex. 17 (Lehman Dep. at 312:18-313:6).

44.     **In 2013, however, Lehman established his own pension plan to participate in the scheme.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 154:23-155:17.**

<u>Response</u>:  Disputed.  Roger Lehman did not "participate" in any "scheme."  Mr. Lehman never had any concerns about whether the "trading program" in Denmark "was a legitimate trading program."  In fact, SØIK, Denmark's State Prosecutor for Serious Economic and International Crime, gave Mr. Lehman a letter reasoning that "they do not believe [Lehman] could possibly be found guilty of fraud."  *See* Schoenfeld Decl. Ex. 17 (Lehman Dep. at 312:18-313:6).

45.     **According to Lehman, Sanjay Shah agreed to pay him $1 million for "introducing" the plan to Solo.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 134:12-25.**

Response:  Disputed as stated.  Lehman "was told [he] would be paid an introducing broker fee." *See* Lehman Dep. at 134:16-18.  The concept of an "introducing broker" is legitimately recognized in the securities industry.  *See U.S. Commodity Futures Trading Commission v. eFloorTrade, LLC*, 16 Civ. 7544 (PGG), 2020 WL 1673313, at *1 n. 3 (S.D.N.Y. Apr. 3, 2020) (quoting the definition of an "introducing broker" from the Code of Federal Regulations).

**46.    The next year, in 2014, Lehman established four more pension plans, including bellwether defendant FWC Plan.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 393:5-394:2.**

Response:  Undisputed.

**47.    According to Lehman, Sanjay Shah agreed to pay him $700,000 or $800,000 for the four plans Lehman established in 2014, which included the FWC Plan.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 396:4-25.**

Response:  Disputed as stated.  Lehman "was aware that [he] would make introducing broker fees for every plan [he] introduced to the Solo Capital platform."  *See* Weinstein Decl. Ex. 80 (Lehman Dep. at 396:7-9).  The concept of an "introducing broker" is legitimately recognized in the securities industry. *See U.S. Commodity Futures Trading Commission v. eFloorTrade, LLC*, 16 Civ. 7544 (PGG), 2020 WL 1673313, at *1 n. 3 (S.D.N.Y. Apr. 3, 2020) (quoting the definition of an "introducing broker" from the Code of Federal Regulations).

**48.    Defendant Bradley first met Sanjay Shah in August 2013, when Bradley's then colleague, Fletcher, invited him and some of their other colleagues at the broker where they worked to attend a presentation Shah made in New York on Solo's purported dividend arbitrage scheme. Weinstein Decl. Ex. 81 (Bradley Dep.), at 52:13-57:13.**

Response:  Disputed.  There was no "presentation" by Shah about a "purported dividend arbitrage scheme."  "[A] term 'DIV-ARB' may have been said" during a meeting with Shah but "[n]o one presented any information about it.  They just said that word, sir."  *See* Schoenfeld Decl. Ex. 18 (Bradley Dep. at 57:10-18).

**49.    By the fall 2013, Bradley established five pension plans, one for himself and one for his wife, sister, mother, and father.  Weinstein Decl. Ex. 81 (Bradley Dep.), at 87:17-88:16.**

Response:  Undisputed.

**50.    In 2014 and 2015, Bradley established fifteen more pension plans, five for himself, including defendant Proper Pacific plan, and five more for each of his wife and sister.  Weinstein Decl. Ex. 81 (Bradley Dep.), at 305:11-309:4.**

Response:  Undisputed.

51.     According to defendant Bradley, Fletcher agreed to pay him $100,000 per plan for 'introducing" these five plans to the Solo Custodians, and Sanjay Shah agreed to pay him $500,000 per plan for "introducing" his wife and sister's ten plans. **Weinstein Decl. Ex. 81 (Bradley Dep.), at 306:14 – 309:13.**

Response:  Disputed as stated.  Bradley had an "introducing broker agreement, consulting type agreement, which is a broker introducing agreement," each with Fletcher and Shah.  *See* Schoenfeld Decl. Ex. 18 (Bradley Dep. at 305:16-21; 307:12-13).  The concept of an "introducing broker" is legitimately recognized in the securities industry.  *See U.S. Commodity Futures Trading Commission v. eFloorTrade, LLC*, 16 Civ. 7544 (PGG), 2020 WL 1673313, at *1 n. 3 (S.D.N.Y. Apr. 3, 2020) (quoting the definition of an "introducing broker" from the Code of Federal Regulations).

52.     **Bradley received at least $5 million in total from Sanjay Shah, and at least $5.8 million from the scheme.  Weinstein Decl. Ex. 81 (Bradley Dep.), at 276:19-277:10; 306:14-20; 307:14-309:4.  Despite having established numerous pension plans for his sister, father and mother, Bradley did not provide any of the funds he received to his sister, father or mother, or their respective pension plans.  Weinstein Decl. Ex. 81 (Bradley Dep.), at 353:23-354:11.**

Response:  Disputed.  This purported statement of fact is immaterial to this specific bellwether action.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion. SKAT is not, and cannot, contend that Bradley "received at least $5 million in total from Sanjay Shah, and at least $5.8 million from" The Proper Pacific Plan's tax reclaim activities in Denmark.  Moreover, Bradley was not involved in a "scheme."  He believed all of the reclaim submissions were legitimate because he "had confirmations that [he] bought shares … [f]rom brokers who executed those transactions."  *See* Schoenfeld Decl. Ex. 18 (Bradley Dep. at 15:13-16:1).  Shah told Bradley that "[w]e traded. We held shares.  Everything was legitimate to the best of my recollection, sir."  *See id*. (Bradley Dep. at 323:15-19).  Moreover, Bradley "received money from introducing broker fees … [which he] believe[s] in the industry it's customary, if you introduce customers to plans or organizations, they will -- you can be or they will pay you introducing fees for introducing those customers, sir."  *See id.* (Bradley Dep. at 276:9-18).  The concept of an "introducing broker" is legitimately recognized in the securities industry.  *See U.S. Commodity Futures Trading Commission v. eFloorTrade, LLC*, 16 Civ. 7544 (PGG), 2020 WL 1673313, at *1 n. 3 (S.D.N.Y. Apr. 3, 2020) (quoting the definition of an "introducing broker" from the Code of Federal Regulations).  Finally, the fact that "Bradley did not provide any of the funds he received to his sister, father or mother, or their respective pension plans" is immaterial.  *See* Local Civil Rule 56.1(a) (requiring identification of undisputed "material facts").  Notwithstanding, Bradley's family members received no monies because none of the pension plans Bradley established received monies.  *See* Schoenfeld Decl. Ex. 19 (Dubinsky Report) at ¶ 251; *id.* at p. 96, Table 4 (depicting the Proper Pacific Plan received 0.0% of refund).

53.     **In Denmark, VP Securities A/S is the central repository for all publicly traded shares of Danish companies.  Weinstein Decl. Ex. 77 (H. Sorensen Dep. Vol I), at 34:8-35:9.**

Response:  Undisputed.

54. **To hold Danish shares on behalf of their customers, foreign custodians, such as the U.K.-based Solo Custodians, must do so through a sub-custodian with an account at VP Securities or a chain of sub-custodians, with the ultimate sub-custodian having an account at VP Securities. Weinstein Decl. Ex. 77 (H. Sorensen Dep. Vol. I), at 49:11-21.**

Response: Disputed to the extent that Paragraph 54 suggests an affirmative legal obligation or describes the conditions for ownership of shares under Danish law, because it states an incorrect legal conclusion. Defendants agree with the factual statement that foreign custodians who do not otherwise have accounts directly with VP Securities and who must access the custody chain for Danish securities must do so via a sub-custodian with an account at VP Securities (or a series of sub-custodial relationships that ultimately lead to a sub-custodian with an account at VP Securities).

55. **When a publicly traded Danish company issues a dividend to its shareholders, VP Securities distributes the dividend (minus applicable withholding tax) to its account holders who hold shares of the relevant stock. Weinstein Decl. Ex. 78 (H. Sorensen Dep.. Vol. II), at 51:12-52:2.**

Response: Undisputed.

56. **Where the VP Securities account holder is acting as a sub-custodian, it distributes the dividend payment to the custodian that holds the shares on behalf of the investor, or the dividend is distributed to that custodian through the chain of sub-custodians. Weinstein Decl. Ex. 78 (H. Sorensen Dep. Vol. II), at 51:12-52:2.**

Response: Defendants agree with the fact stated in Paragraph 56 insofar as it suggests that the dividend is distributed down the custody chain to the custodian for the investor, which custodian then distributes to the investor. Defendants do not agree that VP Securities ever distributes a dividend directly to anyone other than the VP Securities account holder.

## FACTS AS TO THE ED&F BELLWETHER CASES

**57.     American Investment Group of New York, L.P. ceased doing business in 2000. Weinstein Decl. Ex. 83 (Crema Dep., Feb. 9, 2021), at 18:12-23, 159:25-160:8; Weinstein Decl. Ex. 124 (AIG_00000367).**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, while it is undisputed that American Investment Group of New York, L.P. ceased doing business *as a broker dealer* in 2000, it has continued to operate in the securities and financial markets since 2000, investing its own assets on a proprietary basis.  Blessington Decl. Ex. 3 (Deposition Testimony of Robert Crema ("Crema Dep.")) at 161:1–17; Blessington Decl. Ex. 1 (Kaminer Dep.) at 25:24–26:16 ("Q: Since that time, has AIG conducted any business? A: It still has assets and it invests those assets.  Q. So the — the AIG partnership has assets and it invests those assets on a proprietary basis correct? A. Correct."); Weinstein Decl. Ex. 124 AIG_00000367 (stating American Investment Group of New York, L.P. ceased to be a regulated broker-dealer but would continue to "engage in business in the securities industry."); Blessington Decl. Ex. 4 AIG Plan's Interrogatory Response No. 9 to SKAT's First Set of Interrogatories to Acer Plan Defendants.

**58.     Defendant David Schulman ("Schulman") made a single contribution of $200,000 to the Riverside Associates Defined Benefit Plan ("Riverside Plan") in 1995.  Weinstein Decl. Ex. 102 (Riverside Plan Resp. to SKAT's First Req. for Admis. (hereinafter "Riverside Plan RFA")) at Req. No. 1.**

Response:  Disputed as to materiality.  The statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Otherwise, undisputed.  *See* JSUMF ¶ 267.

**59.     Schulman's contribution was $200,000 received from Daniel Kaminer.  Weinstein Decl. Ex. 102 (Riverside Plan RFA) at Req. No. 2.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.   Second, SKAT mischaracterizes the evidence and Schulman's contribution to the Riverside Plan.  The payment of $200,000 to Schulman in 1995 was for consulting services provided by Schulman to Daniel Kaminer.  Weinstein Decl. Ex. 102 Riverside Plan RFA at Req. No. 2 ("Defendant admits that one contribution made to the plan was $200,000 in consulting income paid by Dan Kaminer."); Blessington Decl. Ex. 5 (Deposition Testimony of David Schulman ("Schulman Dep.")) at 48:7–23; 50:15–21; 52:18–53:4.

**60.     The Riverside Plan entered into the Agreements124  See Joint 56.1 Statement ¶ 276 (defining "Agreements")  at the direction of Defendant Stacey Kaminer ("Kaminer").  Weinstein Decl. Ex. 84 (D. Schulman Dep., Oct. 21, 2020) at 150:9-11 (First Variation Letter), 143:22-144:7 (Custody Agreement), 142:14-16 (Security & Set Off Deed).**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, SKAT mischaracterizes the cited testimony.  The cited testimony relates to only three of the "Agreements," and with respect to at least two of these three, Schulman testified merely that the documents bore "Sign Here" tabs and had been sent to him by or at the direction of Stacey Kaminer.  Blessington Decl. Ex. 5 (Schulman Dep.) at 142:14-16, 143:22-144:7.  Schulman further testified that he was unaware of Stacey Kaminer entering into any agreements with ED&F on behalf of the Riverside Plan.  *Id.* at 126:13–16.  Finally, SKAT cannot cite to any evidence to suggest that Stacey Kaminer is a trustee or participant of the Riverside Plan.

**61.    The American Investment Group of New York, L.P. Pension Plan ("AIG Plan") entered into the Agreements at Kaminer's direction.  Weinstein Decl. Ex. 83 (Crema Dep.), at 168:1-19 (ED&F Account Application), 170:2-22 (Security & Set Off Deed, and any other ED&F account opening document).**

Response:  Disputed.  SKAT mischaracterizes the cited testimony, which indicates only that Crema, as trustee of the AIG Plan, would have reviewed any document signed by him (or on behalf of the AIG Plan) in connection with the setting up of ED&F accounts for the AIG Plan,  and that he would have discussed any such document with Stacy Kaminer.  Blessington Decl. Ex. 3 (Crema Dep.) at 154:8–24; 168:1-19; 170:2–22; Dillman Decl. Ex. 94, at AIG_00000434 (identifying Crema as trustee of the AIG Plan).  In addition, the "ED&F Account Application"—the subject of some of the testimony cited by SKAT (Weinstein Decl. Ex. 83 (Crema Dep.), at 168:1-19)—is not among the "Agreements."  Notwithstanding SKAT's mischaracterization of Crema's testimony, Stacey Kaminer was a trustee of the AIG Plan at the time the AIG Plan entered into the Agreements.  Blessington Decl. Ex. 6 (Minutes of Meeting of Partners in American Investment Group of New York, L.P.) at AIG_00000508.

**62.    Acer Investment Group LLC ("Acer") served as agent for seven other pension plans in connection with the plans' trading in Danish securities conducted at ED&F Man (together with the AIG Plan and Riverside Plan, the "Acer Plans").  Acer Third Party Complaint against ED&F Man at 2, 1:18-md-02865, Jan. 29, 2021 (ECF No. 527) ("Acer served as the Plans' authorized agent in connection with the Plans' investments in Danish securities through ED&F between 2013 and 2015," and defining "Plans" as the DW Construction, Inc. Retirement Plan; The Goldstein Law Group PC 401(k) Profit Sharing Pension Plan; Kamco Investments, Inc. Pension Plan; Kamco LP Profit Sharing Pension Plan; Linden Associates Defined Benefit Plan; Moira Associates 401(K) LLC Plan; Riverside Associates Defined Benefit Plan; American Investment Group of New York, L.P. Pension Plan and Newsong Fellowship Church 401(k) Plan).**

Response:  Disputed as to materiality.  The statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Otherwise, undisputed.

**63.    In her dealings with ED&F, Kaminer acted in her capacity as principal of Acer.  AIG Plan Answer to SKAT's Amended Complaint ¶ 19, 1:18-md-02865, July 2, 2020 (ECF**

No. 391-7); *see also* Weinstein Decl. Ex. 85 (Kaminer Dep., Apr. 19 – 20, 2021) at 36:20 – 37:6, 38:8 – 40:14.

Response:  Undisputed.

**64.    Kaminer operated Acer from Utah.  Id.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, during the relevant time period, Acer's principal place of business was in New Jersey before moving to Florida, where it also has operations. *See, e.g.*, Blessington Decl. Ex. 1 (Kaminer Dep.) at 385:13–22.   It is undisputed that Stacey Kaminer resides in Utah and that she has worked for Acer from Utah.

**65.    On June 11, 2020, ED&F filed a Re-Amended Defence in the English Action130  See Joint 56.1 Statement ¶ 291 (defining "English Action") (the "Re-Amended Defence").  Weinstein Decl. Ex. 104 (Re-Amended Defence).**

Response:  Undisputed.

> **a.    The Re-Amended Defence included a Defence to Re-Amended Schedule 5T and Annex E.  Id.**

Response:  Undisputed.

> **b.    Annex E described inaccuracies in 80 of 420 tax vouchers prepared by ED&F, including certain tax vouchers prepared on behalf of the AIG Plan and the Riverside Plan (the "Annex E Tax Vouchers").  Weinstein Decl. Ex. 104 (Re-Amended Defence) at ¶¶ 4.2, 27A, Re-Amended Defence to Schedule 5T ¶¶ 18.7.2, 19.1, and Annex E.**

Response:  Disputed.   The documents cited in support of SKAT's statement are inadmissible hearsay. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  Defendants further object to the defined term "Annex E Tax Vouchers" as vague and ambiguous, inasmuch as the "certain tax vouchers prepared on behalf of the AIG Plan and the Riverside Plan" are not specified in the definition.

> **c.    According to the Re-Amended Defence, the 80 tax vouchers identified in Annex E were inaccurate because the pension plans identified in those tax vouchers "had not 'received' the amount set out therein by way of dividend from the Danish Listed Company; and had not 'suffered' withholding tax in the amount set out therein in relation to such dividend at the stated (27%) or any rate."  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 2.**

<u>Response</u>:  Disputed.  The documents cited in support of SKAT's statement are inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  In addition, the cited document has been misquoted:  In the cited document, the term "WHT," rather than "withholding tax," is used.

> **d.**  **Four of the Annex E Tax Vouchers were prepared on behalf of the AIG Plan.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedules 1-11, 1-64, 2-2, and 2-15.**

<u>Response</u>:  Disputed.  The documents cited in support of SKAT's statement are inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

> **e.**  **Six of the Annex E Tax Vouchers were prepared on behalf of the Riverside Plan.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedule 1-8, 1-25, 1-26, 1-39, 1-51, and 1-60.**

<u>Response</u>:  Disputed.  The documents cited in support of SKAT's statement are inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

**66.**  **SKAT's allegations contained in the Re-Amended Schedule 5T 137 See Joint 56.1 Statement ¶ 292  were expressly based on (a) the admissions made in respect of the Annex E applications; and (b) an allegation that the applicants did not hold and were not the beneficial owners of the relevant shares and did not receive any dividend as beneficial owner net of withholding tax. SKAT further alleged that ED&F Man was the true principal of the applications. SKAT did not allege before the English Court that the alleged securities transactions executed or purportedly executed by ED&F involved no shares, even in the case of the transactions that were the basis of the 80 Annex E Tax Vouchers. In relation to the transactions which were the basis of the remaining 340 tax vouchers, SKAT alleged that the tax refunds were not due because ED&F, and not the relevant refund applicant, was the beneficial owner of the relevant shares and dividends.  Weinstein Decl. Ex. 107 (Re-Amended Schedule 5T) at ¶ 18(e).**

<u>Response</u>: Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, SKAT's characterization of the allegations made in Re-Amended Schedule 5T is not a "material fact," *see* Local Rule 56.1(a); the document speaks for itself.

67.    **In its Further Particulars Regarding the Validity of Withholding Tax Refund Applications (hereinafter "Further Particulars"), See Joint 56.1 ¶ 292 SKAT alleged that, under Danish law, the concept of "beneficial owner" arose under the double tax treaties between Denmark and certain other states.  Weinstein Decl. Ex. 108 (Further Particulars) ¶¶ 5-7, 39, 49.**

Response:  Undisputed.

68.    **The date on which two counterparties agree to transact is referred to as the "Trade Date."  Weinstein Decl. Ex. 91 (Expert Report of Graham Wade, dated December 31, 2021 (hereinafter "Initial Wade Report")) at ¶ 27 ("[Trade Date] is the date two counterparties agree to transact. In a purchase transaction, the trade date is the date on which the buyer agrees to purchase shares, typically through a call, email, or Bloomberg Chat message, followed shortly thereafter by the buyer's receipt of a trade confirmation."**

Response:  Disputed.  To the extent this purported definition suggests that a security is not purchased on the trade date, it is inaccurate.  The trade date is the date that securities are actually bought and sold.  *See* https://www.nasdaq.com/glossary/t/trade-date ("Also, the day on which a security or a commodity future trade actually takes place."); Blessington Decl. Ex. 7 (Deposition Testimony of Max Hayden ("Hayden Dep.")) at 18:16-19:3 (testifying that the trade date "is when the trade is struck and . . . would be reflective on the contracts to sign to that end.").  Defendants further object to this statement as SKAT cites inadmissible hearsay. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Graham Wade is an expert proffered by SKAT in this case.  SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See Crawford-Brunt v. Kruskall*, 489 F. Supp. 3d 1, 4 (D. Mass. 2020) (excluding plaintiff's expert reports as hearsay); *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96 CIV.7874(RWS), 2002 WL 826956, at *7 (S.D.N.Y. May 1, 2002) (excluding expert reports as inadmissible hearsay); *Ake v. General Motors Corp.*, 942 F.Supp. 869, 877-78 (W.D.N.Y. 1996) (excluding plaintiff's expert report as hearsay when offered by plaintiff to prove the truth of the matter in the report); *see also* Fed. R. Evid. 702 (permitting experts to "testify in the form of an opinion").  In addition, Mr. Wade's testimony is inadmissible for the reasons as set forth in the ED&F Bellwether Plans' Motion to Exclude.

69.    **"Settlement" refers to the delivery of securities from the buyer to the seller and the payment of the purchase price from the buyer to the seller. The date that settlement occurs is referred to as the "Settlement Date."  Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 28 ("[Settlement Date is] the date the transfer of securities occurs between the buyer and seller. On this date, the buyer makes a payment to the seller to settle the share transaction and the seller delivers the shares to the buyer.").**

Response:  Disputed.  The buyer of securities does not deliver securities to the seller to settle a securities transaction.  Defendants further object to this statement as SKAT cites inadmissible hearsay. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See* Response to SKAT SOF 68.  Mr. Wade's testimony is also unreliable and should be excluded for the additional reasons set forth in the Motion In Limine To Exclude The Expert Report And Testimony Of Graham Wade.  It is

undisputed that, as part of the settlement of a securities transaction, cash is delivered from the buyer to the seller and securities are delivered from the seller to the buyer as set forth in the trade executed on the trade date.

70.     **Until October 2014, the standard settlement cycles for Danish equity transactions occurred on the third business day after the Trade Date ("T+3"), after which it was shortened to the second business day after the Trade Date ("T+2").  Weinstein Decl. Ex. 78 (Sorensen Dep. Vol. II), at 31:14-19, 32:16-19.**

Response:  Disputed.  SKAT's statement that "the standard settlement cycles for Danish equity transactions occurred on the third business day after the Trade Date" is vague and unclear.  It is undisputed that under standard settlement cycles for the Danish securities market, equity transactions would settle on the third business day after the Trade Date ("T+3") prior to October 2014, and would settle on the second business day after the Trade Date ("T+2") thereafter.  *See* Weinstein Decl. Ex. 78 31:14-19, 32:16-19.  Defendants further object to the use of the term "Trade Date."  *See* Response to SKAT SOF 68.

71.     **There are multiple "settlement cycles" in a single day in which trades in Danish shares may settle.  Weinstein Decl. Ex. 125 (ED&F-00203860 – 64).**

Response:  Disputed.  SKAT's use of the term "settlement cycles" is confusing in that it appears to attach a different meaning than SKAT's reference to "settlement cycles" in SOF 70 above.  It is undisputed that, according to the chart included in the cited email, there appear to be several "settlement batches" within a "24-hour settlement period" in Denmark.  *See* Weinstein Ex 125 at ED&F-00203862.  However, none of the parties to the email appears to have personal knowledge of the accuracy of the chart, and instead appear to be discussing guidance from an unidentified "settlement team" at BNP Paribas.  *See* Weinstein Ex 125 at ED&F-00203860.  The cited document is therefore inadmissible hearsay regarding the truth of the matters asserted therein.  *See* Fed. R. Evid. 801, 802.

72.     **At all relevant times, ED&F claims to have held shares for its pension plan clients, including the AIG Plan and Riverside Plan, in accounts 778523F at BNP Paribas Security Services ("BNP") and account 05295142806 at SEB (the "Client Omnibus Account").  Weinstein Decl. Ex. 109 (Dep. Ex. 4430 (Draft Statement of Agreed Facts)) ¶ 24, n.36; Weinstein Decl. Ex. 86 (Hashemi Dep., Oct. 7 – 8, 2021), at 327:14 – 328:10 (adopting Weinstein Decl. Ex. 109 as "ED&F Man's position"); see also Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); Weinstein Decl. Ex. 127 (SEB_00000092 (SEB settlement record)); Weinstein Decl. Ex. 128 (SEB_0000093 (SEB settlement record)).**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, although it is undisputed that ED&F held shares for one or more of its pension plan clients in account 778523F at BNP Paribas Security Services and account 05295142806 at SEB, it is disputed that ED&F held shares only in those accounts.  For example, ED&F held shares of TDC attributable to a pension plan client in August 2014 in an SEB account with account number 05295142814.  *See* Dillman Decl. Ex. 122 (ED&F-00042261)

at ED&F-00042328.  Moreover, SKAT's statement depends largely upon inadmissible evidence.  SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, Exhibit 109, which states on its face that it is a *draft* statement of facts created purportedly agreed to between SKAT and ED&F (*i.e.*, not involving any of the Defendants) in the English Action, is inadmissible hearsay and cannot be used to prove the truth of the matters therein.  Defendants further object to the ambiguous definition of two separate accounts as a "Client Omnibus Account."

73.     **ED&F claims to have used BNP account 778523F as the Client Omnibus Account until the end of 2014, and SEB account 05295142806 as the Client Omnibus Account in 2015.  Id.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, the cited documents do not support the assertion that "ED&F claims to have used BNP account 778523F as the Client Omnibus Account until the end of 2014, and SEB account 05295142806 as the Client Omnibus Account in 2015."  The cited portion of Weinstein Declaration Exhibit 109, for example, states that ED&F used "single pooled Danish share and DKK omnibus accounts"—as opposed to "segregated client accounts"—after April 2013 to hold Danish securities.  Defendants additionally object to the ambiguous use of the term "Client Omnibus Account," which SKAT has defined to include two separate accounts and which does not include all accounts used to house Danish securities on behalf of clients.  Moreover, SKAT's statement depends largely upon inadmissible evidence.  SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, Exhibit 109, which is a *draft* statement of facts created in the English Action, is inadmissible hearsay and cannot be used to prove the truth of the matters therein.

74.     **ED&F exclusively used the Client Omnibus Account to settle its clients' transactions in Danish securities.  Weinstein Decl. Ex. 87 (Wall Dep., Feb. 23, 2022), at 237:7-23.**

Response:  Disputed.  SKAT mischaracterizes the cited testimony, which does not support the assertion that ED&F "exclusively" used any given account to "settle its clients' transactions in Danish securities."  Rather, the testimony states only that the shapes used by ED&F for certain transactions—in particular the Annex E transactions—were able to be settled with the shares present in the relevant ED&F depot account.  Defendants additionally object to the ambiguous use of the term "Client Omnibus Account," which SKAT has defined to include two separate accounts and which, as discussed above, does not include all accounts used by ED&F.  Moreover, SKAT's statement is not supported by admissible evidence.  Defendants further object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because

SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

75.    **"Record Date" refers to the date by which a shareholder is required to own shares (meaning that the shareholder is the registered owner of the shares in the shareholder register) to be entitled to receive a dividend directly from the issuer of the securities. Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 29 ("[Record Date] refers to the date by which a shareholder is required to own shares (meaning that the shareholder is the registered owner of the shares in the shareholder register) to be entitled to receive a dividend.").**

Response:  Disputed.  The record date is the date on which "a company will view the share register and use that record to pay dividend amounts to the names that are registered on that record." Blessington Decl. Ex. 7 (Hayden Dep.) at 20:15-25.  Moreover, SKAT's statement cites only inadmissible evidence.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802. SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See* Response to SKAT SOF 85(d).  Mr. Wade's testimony is also unreliable and should be excluded for the additional reasons set forth in the Motion In Limine To Exclude The Expert Report And Testimony Of Graham Wade.

76.    **"Ex-Date" refers to the first trading date on which the buyer of a share is not entitled to receive the most recently announced dividend.  Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 30 ("[Ex-Date] refers to the first trading date on which the buyer of a share is not entitled to the receive the most recently announced dividend because any purchase transactions entered into after this date will not settle prior to the Record Date.").  This date is generally the day following the date a company's dividend is ratified at the general meeting of shareholders.**

Response:  Disputed.  The "Ex-Date" is a date "set by exchanges . . . to have default rules where a purchase on that day does not carry the right to a dividend."  Blessington Decl. Ex. 7 (Hayden Dep.) 21:8-18.  In addition, the second sentence of the statement lacks any supporting citation to materials in the record.  Fed. R. Civ. P. 56(c)(1).  Moreover, SKAT's statement cites only inadmissible evidence.  Defendants further object to this statement as SKAT cites inadmissible hearsay. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See* Response to SKAT SOF 85(d). Mr. Wade's testimony is also unreliable and should be excluded for the additional reasons set forth in the Motion In Limine To Exclude The Expert Report And Testimony Of Graham Wade.

77.    **A trade with a Trade Date before the Ex-Date and settles on or before the Record Date is referred to as a "Cum-Cum" trade.  Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 162 ("Separately, I have reviewed various other contemporaneous transactions undertaken by ED&F Man that involved the transfer of shares which settled prior to the Record Date . . . I will refer to these transactions as 'Cum-Cum' transactions.").**

Response:  Disputed.  In the cited document, Graham Wade wrote that *he* would refer to the transactions as "Cum-Cum transactions."  The cited document does not support the implication that the term "'Cum-Cum' trade" is standard usage.  When asked whether "a cum-cum trade is understood in the industry as a trade that is placed prior to the ex date and settles on or before the record date," Max Hayden, an expert retained by the ED&F Bellwether Plans, responded, "Well, I don't want to use generalities because there's lots of reasons why that may not happen." Blessington Decl. Ex. 7 (Hayden Dep.) at 23:6-24:2.  Moreover, SKAT's statement cites only inadmissible evidence.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802. SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See* Response to SKAT SOF 85(d).  Mr. Wade's testimony is also unreliable and should be excluded for the additional reasons set forth in the Motion In Limine To Exclude The Expert Report And Testimony Of Graham Wade.  Defendants further object to the use of the terms "Trade Date," "Record Date," and "Ex-Date."  *See* Response to SKAT SOF 68, 75-76.

**78.   A trade with a Trade Date before the Ex-Date and settles after the Record Date is referred to as a "Cum-Ex" trade.  Weinstein Decl. Ex. 91 (Initial Wade Report), at ¶ 79 ("A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date. This means the transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex.").**

Response:  Disputed.  When confronted with this statement, Mr. Hayden responded that "there isn't a precise definition [for a cum-ex trade], it can mean a number of things." Blessington Decl. Ex. 7 (Hayden Testimony) at 24:3-21.  Moreover, SKAT's statement cites only inadmissible evidence.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See* Response to SKAT SOF 85(d).  Mr. Wade's testimony is also unreliable and should be excluded for the additional reasons set forth in the Motion In Limine To Exclude The Expert Report And Testimony Of Graham Wade.  Defendants further object to the use of the terms "Trade Date," "Record Date," and "Ex-Date."  *See* Response to SKAT SOF 68, 75-76.

**79.   ED&F used shares in the Client Omnibus Account that had been acquired for Cum-Cum trades to settle Cum-Ex trades in the same security.  Weinstein Decl. Ex. 87 (Wall Dep.), at 237:7-239:19.**

Response:  Disputed.  SKAT mischaracterizes and misuses the cited testimony, which was addressed narrowly to the transactions underlying the Annex E tax vouchers and which did not characterize any of the trades in question as "Cum-Cum" or "Cum-Ex" trades.  The cited testimony related exclusively to the trades reflected on Annex E.  Mr. Wall testified pursuant to a court order, *see* ECF No. 726, which compelled ED&F to produce an additional 30(b)(6) witness to provide supplemental testimony on three specific topics: (1) the tax vouchers listed on Annex A of ED&F's Amended Defence and the underlying trading, (2) the tax vouchers listed on Annex E of ED&F's Amended Defence and the underlying trading, and (3) the investigation of the Financial Conduct Authority ("FCA") into ED&F.  Because his testimony was to be confined to these three topics, Mr. Wall (who had no personal knowledge whatsoever with respect to the transactions at issue) "only looked at the trades in Annex E and Annex A" in preparing for his deposition.  Wall Tr. 58:14-24.  Moreover, the specific line of questioning to which SKAT cites was expressly elicited

as a "follow up" to an answer given previously by Mr. Wall with respect to the "splitting" of trades where MPT Dubai was the counterparty.  See Wall Tr. 212:20-214:11 (explaining why MPT Dubai would "split" a transaction into subparts), 236:8-237:1 (eliciting "follow up" testimony on "splits").  Because Annex E trades are the only trades at issue in which MPT Dubai was the counterparty, the testimony relied upon by SKAT was necessarily addressed to Annex E trades and to Annex E trades alone.  Defendants additionally object to the ambiguous use of the term "Client Omnibus Account," which SKAT has defined to include two separate accounts.  Defendants further object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to the use of the terms "Cum-Cum trades" and "Cum-Ex trades."  *See* Response to SKAT SOF 77, 78.

80.     **ED&F did not hold in its Client Omnibus Account the full quantity of shares identified on the Tax Vouchers it issued on Annex E Cum-Ex Trades and the non-Annex E Cum-Ex Trades. Rather, it held a smaller number of shares, broke those positions up into even smaller parcels ("shapes" or "splits"), and then re-used those shapes multiple times in one day until the aggregation of those actions equaled the full amount reflected on the Tax Vouchers.  Id.**

Response:  Disputed.  SKAT mischaracterizes the cited testimony, which was addressed narrowly to the transactions underlying the Annex E tax vouchers and which did not characterize any of the trades in question as "Cum-Cum" or "Cum-Ex" trades.  *See* Response to SKAT SOF 79.  In addition, the cited testimony makes no reference to any "Tax Vouchers," or to the quantities or amounts reflected on any "Tax Vouchers," and thus does not in any way support the assertion that ED&F did not hold the "full quantity of shares identified on the Tax Vouchers it issued on Annex E Cum-Ex Trades and the non-Annex E Cum-Ex Trades" or that ED&F "re-used . . . shapes . . . until the aggregation of those actions equaled the full amount reflected on the Tax Vouchers."  Defendants additionally object to the ambiguous use of the term "Client Omnibus Account," which SKAT has defined to include two separate accounts.  Defendants further object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to the use of the term "Cum-Ex Trades."  *See* Response to SKAT SOF 78.

81.     **Settlement shapes are listed on the trade confirmations provided to transacting parties on the Trade Date.  See, e.g., Weinstein Decl. Ex. 130 at ED&F-00040949, ED&F-00113799; Weinstein Decl. Ex. 131 at ED&F-00045814 – 17, ED&F-000458 54.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, the cited documents do not support the implication that including settlement shapes on trade confirmations is routine or standard practice.  Indeed, on

the settlement confirmation provided to the AIG Plan cited by SKAT (Weinstein Decl. Ex. 131 at ED&F-00045814-17), there is no indication of shapes.

82. **The cost of acquiring shares in a structured transaction is referred to as the "All-In Cost" or "Dividend Sourcing Cost," which is calculated as the cost of "buying the security and selling the hedge," expressed as a percentage of the gross dividend expected from holding those securities and receiving the most recently announced dividend.  Weinstein Decl. Ex. 85 (Kaminer Dep.), at 99:21-100:5, 326:1-4.**

Response:  Disputed.  SKAT mischaracterizes Stacey Kaminer's testimony.  Ms. Kaminer testified that "buying the security and selling the hedge" had a "market cost" and that such market cost was "*usually* expressed as an all-in or a percentage of the dividend."  Blessington Decl. Ex. 1 (Kaminer Dep.) at 99:20–100:5 (emphasis added).  Ms. Kaminer did not testify regarding the general use of the terms "All-In Cost" or "Dividend Sourcing Cost" and in fact never used the terms "All-In Cost" or "Dividend Sourcing Cost" at any point in her testimony.  Moreover, Ms. Kaminer testified that she was not familiar with the term "dividend sourcing fee."  Blessington Decl. Ex. 1 (Kaminer Dep.) at 186:14–16.  In addition, SKAT misrepresents the "cost of acquiring shares" by focusing only on the "market cost."  Ms. Kaminer testified that the cost of acquiring shares in the types of transactions at issue in this case also included "certain other knowable costs, such as the execution costs of even doing this transaction, and that the financing costs that would be associated with getting the leverage or funding."  *Id.* at 100:4–9.  Defendants further object to the use of the term "Trade Date."  *See* Response to SKAT SOF 68.

83. **In some circumstances, entities (including financial institutions) domiciled in countries with tax treaties with Denmark, including those domiciled in England, could receive 85% of the gross dividend, rather than 73%, via the U.K./Denmark Double Taxation Convention.   See Article 10(2) of the U.K./Denmark Double Taxation Convention, signed November 11, 1980 (as amended by protocols signed July 1, 1991, and October 15, 1996).**

Response:  Undisputed.

84. **Under Danish law, entities (including financial institutions) resident in European Union member states, including France, that have incorporated Council Directive 2011/16/EU of 15 February 2011 on administrative cooperation in the field of taxation and repealing Directive 77/799/EEC can receive 85% of the gross dividend, rather than 73%.  Danish Corporate Tax Act § 2(8), ¶ 2, 4.**

Response:  Disputed.  The statement is irrelevant and immaterial to the legal issues in SKAT's Motion.  It is also a conclusion of law and not a fact suitable for a Local Rule 56.1 Statement.

85. **According to ED&F's documents, its customers and counterparties engaged in the following types of transactions, illustrated by the examples that follow:**

Response:  Disputed.  SKAT does not cite any part of the record in support of this statement.  Fed. R. Civ. P. 56(c)(1).

a.   **On March 5, 2014, Acer, acting as agent for the Acer Plans, instructed ED&F to purchase 2,000,000 shares of TDC A/S ("TDC"), a public issuer of securities in Denmark.  Weinstein Decl. Ex. 130 at ED&F-00040921; see Appendix J, Columns "Issuer," "Quantity," and "Trade Date."**

Response:  Undisputed.  However, in not disputing this fact, Defendants do not agree to the accuracy or admissibility of Appendix J, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

b.   **On March 5, 2014, ED&F purchased 2,000,000 TDC shares from Volcafe Limited ("Volcafe") at 52.9 DKK per share, with a settlement date of March 10, 2014.  Weinstein Decl. Ex. 130 at ED&F-00040922; see Appendix J, Columns "Issuer," "Quantity," "Trade Date," "Settle Date," and "Share Price (DKK per share)."**

Response:  Undisputed.  However, Defendants object to the accuracy and admissibility of Appendix J.  *See* Response to SKAT SOF 85(a).

i.   **Volcafe was an interdealer broker160 Weinstein Decl. Ex. 86 (Hashemi Dep.), at 62:15-17 and subsidiary of ED&F's ultimate parent company, ED&F Man Holdings Limited, during the relevant period. Weinstein Decl. Ex. 86 (Hashemi Dep.), at 31:12-20.**

Response:  Disputed.  SKAT's statement cites solely to inadmissible evidence.  Defendants object to SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

ii.   **On the same day, Volcafe purchased 2,000,000 TDC shares at the same price and with the same settlement date from Morgan Stanley Equity Derivative Services (Luxembourg) S.a.r.l. Weinstein Decl. Ex. 130 at ED&F-00040935.**

Response:  Undisputed.

iii.   **ED&F credited 1,000,000 of the 2,000,000 TDC shares to the AIG Plan, and the remaining shares to another Acer Plan. Weinstein Decl. Ex. 130 at ED&F-00040920–25; see Appendix J, Columns "Issuer," "Quantity," and "Shares Credited to Plan."**

Response:  Undisputed.  However, Defendants object to the accuracy and admissibility of Appendix J.  *See* Response to SKAT SOF 85(a).

      **c.**     **On March 10, 2014, ED&F settled the above transactions in two shapes of 1,000,000 shares each.  Weinstein Decl. Ex. 130 at ED&F-00040920–27; see Appendix J, Column "Settle Date."; ED&F-00604196.**

**Response**:  Disputed.  The cited documents do not support the contention that *ED&F* "settled the . . . transactions," for they are trade confirmations that do not reflect settlement.   However, it is undisputed that the transactions settled on March 10, 2014, as reflected by the SWIFT statements in ED&F's records pertaining to the transaction and in the AIG Plan's account statements.  *See* Dillman Decl. Ex. 116 at ED&F-00040977–79; ED&F-00040981.  Defendants also object to the accuracy and admissibility of Appendix J.  *See* Response to SKAT SOF 85(a).

      **d.**     **On March 6, 2014, Acer, acting as agent for the Acer Plans, instructed ED&F to purchase 22,300,000 TDC shares, with a T+4 settlement date of March 12, 2014; and sell 223,000 TDC futures.  Weinstein Decl. Ex. 130 at ED&F-00040938; see Appendix K, "Plan Purchase" Columns "Trade Date," "Settle Date" and "Quantity."**

**Response**:  Undisputed.  However, in not disputing this fact, Defendants do not agree to the accuracy or admissibility of Appendix K, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

        **i.**     **On March 6, 2014, ED&F purchased 22,300,000 TDC shares from Volcafe at 52.4 DKK per share, with a settlement date of March 12, 2014.  Weinstein Decl. Ex. 130 at ED&F-00040939 – 47; see Appendix K, "Plan Purchase" Columns "Trade Date," "Settle Date" "Quantity," "Share Price (DKK per share)," and "Equity Broker."**

**Response**:  Undisputed.  However, Defendants object to the accuracy and admissibility of Appendix K.  *See* Response to SKAT SOF 85(d).

          **1.**     **On the same day, Volcafe purchased 22,300,000 TDC shares of at the same price from ED&F Man Professional Trading (Dubai) Limited ("ED&F Dubai"), with a settlement date of March 12, 2014.  Weinstein Decl. Ex. 130 at ED&F-00040949; see Appendix K, "Plan Purchase" Columns "Trade Date," "Settle Date" "Quantity," "Share Price (DKK per share)," "Equity Broker," and "Seller."**

**Response**:  Undisputed.  However, Defendants object to the admissibility of Appendix K.  *See* Response to SKAT SOF 85(d).

          **2.**     **ED&F Dubai was a subsidiary of ED&F's ultimate parent company, ED&F Man Holdings Limited, during**

> the relevant period.  Weinstein Decl. Ex. 86 (Hashemi
> Dep.), at 29:20-30:1.

Response:  Disputed.  SKAT's statement cites solely to inadmissible evidence.  Defendants object to SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

> **3.     At the time it entered into the transaction, ED&F Dubai's
> sale of 22,300,000 TDC shares on March 6, 2014 was an
> uncovered short sale.  Weinstein Decl. Ex. 87 (Wall Dep.),
> at 56:15-57:10; see also Weinstein Decl. Ex. 147 (ED&F-
> 00443853).**

Response:  Disputed.  SKAT's statement cites solely to inadmissible evidence.  Defendants object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to SKAT's reliance on an ED&F memorandum prepared in connection with an investigation by U.K. regulators.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Moreover, contrary to SKAT's statement, the document upon which SKAT relies states that "MPT had a covered short position."  *See* Weinstein Decl. Ex. 147 at ED&F-00443854.

> **4.     As of March 6, 2014, ED&F Dubai did not hold any TDC
> shares to sell to Volcafe, did not have any rights to any
> TDC shares, and did not have a right to a dividend on
> any TDC shares.  Weinstein Decl. Ex. 87 (Wall Dep.), at
> 56:15-57:10; Weinstein Decl. Ex. 110 (Letter from
> Rosenblatt to Pinsent Masons (Jan. 11, 2021)).**

Response:  Disputed.  SKAT's statement cites solely to inadmissible evidence.  Defendants object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to SKAT's reliance on a letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K. The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.

> **5.     ED&F was the clearing firm for all of ED&F Dubai's
> transactions in Danish securities.  Weinstein Decl. Ex. 87**

**(Wall Dep.), at 202:19-203:4.**

Response:  Disputed.  SKAT's statement cites solely to inadmissible evidence.  Defendants object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, the testimony SKAT cites, even if admissible, stated only that "ED&F Capital Markets Limited were MPT Dubai's clearing broker."  *See* Weinstein Decl. Ex. 87 (Wall Dep.) 202:19-20.  The cited testimony does not establish that ED&F acted as clearing broker for "all of" MPT Dubai's "transactions in Danish securities."

6. **At the time of ED&F Dubai's transactions, ED&F was in possession of the following facts:**

   a   **ED&F Dubai did not hold any TDC shares.**

   b   **ED&F Dubai did not have any rights to TDC shares.**

   c   **ED&F Dubai did not have a right to a dividend on any TDC shares.  Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15; see also, e.g., Weinstein Decl. Ex. 148 (ED&F-00251535).**

   d   **ED&F Dubai did not receive a dividend from the Danish issuer for any TDC shares.  See Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).**

Response:  Disputed.  SKAT's statement that "ED&F was in possession of the following facts" is vague and confusing, and SKAT mischaracterizes the cited deposition testimony.  Mr. Wall testified that ED&F "would have had the information in hand showing MPT Dubai's position in various Danish securities," but Mr. Wall did not testify that ED&F had inferred or otherwise acquired knowledge, at the time of the transactions, of the purported facts set forth in Paragraph 85.d.i.6.  *See* Wall Dep. 62:23-63:19 ("The information mentioned in this letter here of 2021, as you say, would have been available at the time.  How ED&F Man at the time chose to use that information, I cannot comment on.").  Similarly, the email communication cited by SKAT, Weinstein Decl. Ex. 148, indicates only that "ED&F Dubai were short" with respect to a specified number of TDC shares.  It does not support the assertion that ED&F had knowledge, at the time of the transactions, of the purported facts set forth above.  Defendants further object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  The cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants also object to SKAT's reliance on a

letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Finally, the email communication cited by SKAT, Weinstein Decl. Ex. 148, is inadmissible hearsay and there is no testimony from a witness with personal knowledge of the document to authenticate it or explain its content.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

> **ii.**　　**ED&F credited 22,300,000 TDC shares to the Acer Plans as follows:  Weinstein Decl. Ex. 130 at ED&F-00040938 – 47; see Appendix K, Column "Shares Credited to Plan.".**

**[CHART OMITTED]**

Response:　Undisputed.　However, Defendants object to the accuracy and admissibility of Appendix K.　*See* Response to SKAT SOF 85(d).

> **iii.**　　**On March 12, 2014, ED&F settled the above transactions in nine shapes:  2,000,000;  2,000,000;  2,000,000;  2,200,000;  2,150,000; 2,150,000;  2,500,000;  3,300,000;  and 4,000,000.  Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); Weinstein Decl. Ex. 130 at ED&F-00040939 – 47; see Appendix K, "Plan Purchase" Columns "Settle Date," and "Settlement Shapes."**

Response:　Disputed.　The cited documents do not support the contention that *ED&F* "settled the . . . transactions."　However, it is undisputed that the transactions settled on March 12, 2014, as reflected by the SWIFT statement in ED&F's records pertaining to the transaction.  Dillman Decl. Ex. 116 at ED&F-00040985.  It is further not clear to what the plural "above transactions" refers.  Defendants further object to the accuracy and admissibility of Appendix K.　*See* Response to SKAT SOF 85(d).

> **iv.**　　**On March 6, 2014, ED&F sold 223,000 March expiry TDC futures, which corresponds to 22,300,000 TDC shares, at 50.64 DKK per share.  Weinstein Decl. Ex. 130 at ED&F-00040948; see Appendix K, "Plan Purchase" Column "Hedge Price (DKK Per Share)."**

Response:　Disputed.　The statement is not material to any argument made in SKAT's motion.  It is also not clear what SKAT's statement that the sale of futures "corresponds to 22,300,000 shares" means, but it is undisputed that, according to the document SKAT cites, each lot of the relevant single-stock future is a derivative that tracks the price of 100 underlying stock shares, and it is also undisputed that ED&F sold 223,000 March expiry TDC futures on behalf of its clients at a price of DKK 50.64 per share.  Defendants object to SKAT's reliance on Appendix K, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802. Defendants further state that ED&F sold the futures on behalf of the Acer Plans.  Dillman Decl. Ex. 116 at ED&F-00040938, ED&F-00040957–58, ED&F-00040948.

> **v.** **On March 6, 2014, TDC declared a dividend in the amount of 2.2 DKK per share, with a Record Date of March 11, 2014. Joint 56.1 ¶ 309; see also Appendix K, "Share Information" Columns.**

Response:  Undisputed.  However, Defendants object to the accuracy and admissibility of Appendix K.  *See* Response to SKAT SOF 85(d).  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.

> **vi.** **The All-In Cost for the plans' equity purchase of 22,300,000 TDC shares and corresponding futures sale was 80%.  Share price of 52.4 DKK less futures price of 50.64 DKK, expressed as a percentage of a gross dividend of 2.2 DKK; see Appendix K, "Dividend Sourcing Cost" Columns.**

Response:  Disputed.  SKAT fails to cite any material in the record to support its computation.  Fed. R. Civ. P. 56(c)(1).  Instead, SKAT relies exclusively on Appendix K, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.  Defendant further objects to the use of the ambiguous term, "All-In Cost."  *See* Response to SKAT SOF 82.

> **e.** **On March 7, 2014, ED&F entered a short sale of 22,300,000 TDC shares to Link Asset & Securities Co. ("Link") for 50.65 DKK per share, with a settlement date of March 12, 2014, which it intended to cover with shares it would rehypothecate from the Acer Plans.  Weinstein Decl. Ex. 130 at ED&F-00190794 - 97 (rehypothecation and sale to Link); see Appendix K, "ED&F Rehypothecation/Plan Sale" Columns.**

Response:  Disputed.  The cited documents do not support SKAT's statement that ED&F "entered a short sale of 22,300,000 TDC shares.," Rather, the document states that ED&F re-hypothecated 22,300,000 shares because it "need[ed] to free up the funding" and then sold those shares to Link.  Defendants further object to the accuracy and admissibility of Appendix K.  *See* Response to SKAT SOF 85(d).

> **i.** **On the same day, Link sold 22,300,000 TDC shares to ED&F Dubai at the same price and with the same settlement date.  Weinstein Decl. Ex. 130 at ED&F-00113798-99; see Appendix K, "ED&F Dubai Acquisition" Columns.**

Response:  Undisputed.  However, Defendants object to the accuracy and admissibility of Appendix K.  *See* Response to SKAT SOF 85(d).

> **ii.** **Link bought and sold the shares for the same price, 50.65 DKK per share, on the same Trade Date and with the same Settlement Date, and charged a total brokerage fee of 16,000 DKK, or around 0.1 basis points, on both transactions.  Weinstein Decl.**

**Ex. 130 at ED&F-001137999, ED&F-00 ED&F-00190797.**

Response: Disputed. SKAT's reference to "the shares" implies that the shares are the same shares, which is argument and is not supported by Exhibit 130. The citations supporting SKAT's statement also do not make sense. The statement is further not material to any argument in SKAT's motion. Defendants further object to the use of the term "Trade Date." *See* Response to SKAT SOF 68.

> **iii.    On March 12, 2014, ED&F settled the above equities transactions in nine shapes: 2,000,000; 2,000,000; 2,000,000; 2,200,000; 2,150,000; 2,150,000; 2,500,000; 3,300,000; and 4,000,000. Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); Weinstein Decl. Ex. 130 at ED&F-00040939-47; see Appendix K, "ED&F Rehypothecation/Plan Sale" Columns "Settlement Date" and "Settlement Shapes," and "ED&F Dubai Acquisition" Columns "Settlement Date" and "Settlement Shapes."**

Response: Disputed. The cited documents do not support that ED&F "settled the . . . transactions," nor do they specifically support the settlement of the cited transactions. Indeed, it is not clear what relevance the citation to Weinstein Decl. Ex. 130, which cites to trade confirmations of acquisition of the shares by ED&F's pension plan clients, has to SKAT's statement at all. Defendants further object to the accuracy and admissibility of Appendix K. *See* Response to SKAT SOF 85(d).

> **f.    On March 6, 2014, Acer, acting as agent for the Acer Plans, instructed ED&F to purchase 6,000,000 TDC shares at 52.55 DKK per share, with a T+4 settlement date of March 12, 2014; and sell 60,000 TDC futures at 50.736 DKK. Weinstein Decl. Ex. 130 at ED&F-00040954; Appendix L, "Plan Purchase" Columns "Trade Date," "Settle Date," "Quantity," and "Share Price (DKK per share)."**

Response: Disputed. The cited email exchange indicates that Stacey Kaminer advised ED&F that three of the Acer Plans were "looking to purchase" a total of 6,000,000 shares of TDC, and she asked whether "clearance and liquidity" were available for such a transaction on the indicated terms (although a settlement date of March 12, 2014 was not explicitly specified). Defendants further object to SKAT's reliance on Appendix L, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

> **i.    Kaminer specified that the purchase was "T+4," and also specified a purchase price of DKK 52.55 on the equity and 50.736 on the futures. Id.**

Response: Disputed. Defendants dispute the assertion that Stacey Kaminer "specified" anything. The cited email exchange indicates that Stacey Kaminer advised ED&F that three of the Acer Plans were "looking to purchase" a total of 6,000,000 shares of TDC, and she asked whether

"clearance and liquidity" were available for such a transaction.  Defendants further object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

> **ii.    Kaminer further wrote that "I have heard that Marianna might have liquidity on the futures."  Id.**

Response:  Disputed as to materiality.  Defendants further object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

> **iii.   On the same day, ED&F purchased these shares from its internal Interdealer Broker ("ED&F IDB") at the same price and with the same Settlement Date.  Weinstein Decl. Ex. 130 at ED&F-00040972; Appendix L, "Plan Purchase" Columns "Trade Date," "Settle Date," "Quantity," "Share Price (DKK per share)," and "Equity Broker."**

Response:  Disputed.  The cited materials do not support SKAT's statement; rather, they relate to the sale of 6,000,000 shares to ED&F's internal inter-dealer broker by Lutetia Capital.  It is, however, undisputed that ED&F bought 6,000,000 total shares of TDC from its internal inter-dealer broker desk in shapes of 3 x 2,000,000 on March 6, 2014, for a price of DKK 52.55 and a settlement date of March 12, 2014.  *See* Weinstein Decl. Ex. 130 at ED&F-00040965.  Defendants further object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

> **iv.   On the same day, the ED&F IDB purchased 6,000,000 TDC shares at the same price same and with the same settlement date from Lutetia Patrimoine.  Id.**

Response:  Disputed to the extent it suggests that the ED&F IDB purchased 6,000,000 shares in a single transaction.  It is undisputed, however, that ED&F's internal inter-dealer broker made three purchases of TDC stock from Lutetia Capital on March 6, 2014, each in the amount of 2,000,000 shares, at a price of DKK 52.55 and a settlement date of March 12, 2014.  Defendants further object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

> **1.    ED&F credited 2,000,000 of the 6,000,000 shares to the AIG Plan, and the remaining shares to other Acer Plans.  Weinstein Decl. Ex. 130 at ED&F-00040956; Appendix L, "Shares Credited to Plan" Column.**

Response:  Disputed on the ground that the term "credited" is vague and not directly supported by the cited documents.  It is undisputed that the portion of Weinstein Decl. Ex. 130 that SKAT cites is a trade confirmation for the AIG Plan for 2,000,000 shares of TDC with trade date March 6, 2014 and settlement date March 12, 2014, which was sent to Stacey Kaminer following her instruction to purchase 6,000,000 total shares of TDC, 2,000,000 of which would be for the AIG Plan.  Defendants further object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

> **2.    On at least one occasion, Lutetia sold shares that it did**

> **not have in its account with its sub-custodian on the Record Date.   Weinstein Decl. Ex. 149 (ED&F-00268329).**

Response:  Disputed.  The document cited to support this statement is entirely unclear and no one with knowledge of this document testified.   However, Mr. Hayden testified that from the perspective of settlement personnel, the email read as though Lutetia Capital had previously purchased the shares it then sold to ED&F, and its custodian was waiting for the delivery of such shares so that it could deliver them to ED&F, which delivery it expected on April 9, 2014.  *See* Blessington Decl. Ex. 7 (Hayden Dep.) 218:19-226:3.  Moreover, the cited document refers to a transaction in Tryg DC shares, and there is no evidence in the record of a similar conversation regarding the TDC transaction at issue.  *See* Weinstein Decl. Ex. 149.  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.

> **v.   On March 12, 2014, ED&F settled the above transactions in three shapes of 2,000,000 shares each.   Weinstein Decl. Ex. 130 at ED&F-00040956; Weinstein Decl. Ex. 126 (ED&F-00604196 (BNP settlement record)); see Appendix L, "Settlement Shapes" Column.**

Response:  Disputed. The cited documents do not support the assertion that *ED&F* "settled the . . . transactions," for it is a trade confirmation that reflects a trade, rather than settlement.  However, it is undisputed that the transactions settled on March 12, 2014, as reflected by the SWIFT statements in ED&F's records pertaining to the transaction.  Dillman Decl. Ex. 116, at ED&F-00040977–79; ED&F-00040981.  Defendants further object to SKAT's reliance on Appendix L. *See* Response to SKAT SOF 85(f).

> **vi.   On March 6, 2014, ED&F sold 60,000 TDC futures, which corresponds to 6,000,000 TDC shares, at 50.736 DKK. Weinstein Decl. Ex. 130 at ED&F-0040957 – 58, ED&F-0040960 – 61, ED&F-0040963-64.**

Response:  Disputed.  The statement is not material to any argument made in SKAT's motion.  It is also not clear what SKAT's statement that the sale of futures "corresponds to 6,000,000 TDC shares" means, but it is undisputed based on the cited document that each lot of the relevant single-stock future is a derivative that tracks the price of 100 underlying stock shares, and it is also undisputed that ED&F sold 60,000 TDC futures on behalf of its clients at a price of DKK 50.736 per share.

> **1.   ED&F sold the 60,000 futures via Mariana Capital for a weighted average price of exactly DKK 50.736 per share, the same price and through the same broker as requested by Kaminer.   Weinstein Decl. Ex. 130 at ED&F-00040967; Appendix L, "Hedge Price (DKK per share)" Column.**

Response:  Disputed.  Stacey Kaminer stated only that she "heard Marianna might have liquidity on the futures"; she did not specifically request that the transaction be executed through Mariana Capital.  *See* Weinstein Decl. Ex. 130 at ED&F-00040954.  Additionally, this statement is not material to any argument in SKAT's motion.  Defendants further object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

> **2.      The All-In Cost for the equity purchase of the 6,000,000 TDC shares and corresponding futures sale was 82.3%. Share price of 52.55 DKK less futures price of 50.74 DKK, expressed as a percentage of a gross dividend of 2.2 DKK; Appendix L, "Dividend Sourcing Cost" Columns.**

Response:  Disputed.  SKAT fails to cite any material in the record to support its computation. Fed. R. Civ. P. 56(c)(1).  Instead, SKAT relies exclusively on Appendix L, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.  Defendants further object to SKAT's use of the ambiguous term, "All-In Cost." *See* Response to SKAT SOF 82.

> **g.      On March 12, 2014, ED&F rehypothecated 6,000,000 TDC shares from the AIG Plan and two other Acer Plans and sold them for 48.88 DKK per share, with a settlement date of March 13, 2014.  Weinstein Decl. Ex. 130 at ED&F-00252017; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.**
>
>> **i.      ED&F sold 2,000,000 shares to GFI Securities Limited. Weinstein Decl. Ex. 130 at ED&F-00252019; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.**
>>
>> **ii.      ED&F sold 2,000,000 shares to ICAP.  Weinstein Decl. Ex. 130 at ED&F-00252020; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.**
>>
>> **iii.      ED&F sold 2,000,000 shares to Link.  Weinstein Decl. Ex. 130 at ED&F-00252021; Appendix L, "ED&F Rehypothecation/Plan Sale" Columns.**

Response:  Undisputed; however Defendants object to SKAT's reliance on Appendix L.  *See* Response to SKAT SOF 85(f).

**86.      The on-exchange Average Daily Trading Volume ("ADTV") of TDC shares over the 15 days before March 11, 2014, and the 15 days after March 11, 2014, was approximately 2,400,000 million shares per day.  See Weinstein Decl. Ex. 91 (Initial Wade Report), at Appendix D; see also Appendix M, Column "Average Daily Trading Volume (ADTV)."  The ADTV for each issuer for which ED&F issued a Tax Voucher**

> **or Annex E Tax Voucher based on a Non-Annex E Cum-Ex Trade or Annex E Cum-Ex Trade is listed in Appendix M.**

<u>Response</u>:  Disputed.  The assertion is ambiguous as written, because it is not clear whether the trading volume on March 11, 2014 was included in the analysis, nor is it clear whether the "15 days" include non-trading days.  In addition, the cited documents do not include data to support the "Average Daily Trading Volume" calculation.  It is further disputed that ED&F issued any "Tax Voucher" for any "issuer."  Defendants further object to the statement as irrelevant and immaterial to the legal issues in SKAT's Motion.  Defendants further object to SKAT's reliance on Appendix D of the expert report of Graham Wade, because it is inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  SKAT cannot offer Mr. Wade's report as evidence at trial to prove the asserted facts.  *See* Response to SKAT SOF 85(d).  Mr. Wade's testimony is also unreliable and should be excluded for the additional reasons set forth in the Motion In Limine To Exclude The Expert Report And Testimony Of Graham Wade.  Defendants further object to SKAT's citation to Appendix M's "Average Daily Trading Volume," because Appendix M was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.  Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

87.   **The AIG Plan engaged in a total of 14 relevant trades in Danish securities:  See Joint 56.1, Appendix B eight Cum-Cum Trades, which settled before the Record Date; four Annex E Cum-Ex Trades which settled after the Record Date; and two Non-Annex E Cum-Ex Trades which settled after the Record Date. Each trade follows the same steps outlined above for the relevant type of trade, but in some cases with different counterparties. These 14 trades are identified in Appendices J, K, and L, along with the material terms of each transaction as identified in paragraph.**

<u>Response</u>:  Disputed.  It is undisputed that the AIG Plan "engaged in a total of 14 relevant trades in Danish securities" and that all 14 of these trades settled, eight before the record date and six after the record date; however, the parties dispute the meaning of "Cum-Cum" and "Cum-Ex" as it relates to these trades.  *Compare* Blessington Decl. Ex. 1 (Kaminer Dep.) at 176:4–6 ("Q: Do you know what a cum-ex trade is? A: What it means to me is buying with the dividend and selling without the dividend entitlement.") *with* SKAT SOF 78.  The second and third sentences of Paragraph 87 are disputed in full, as they lack any evidentiary support as required by Fed. R. Civ. P. 56(c)(1).  Defendants dispute that each of the 14 trades "follows the same steps outlined above for the relevant type of trade."  Defendants further dispute that SKAT's Appendixes J, K, and L contain all the "material terms of each transaction;" for instance, the appendices do not reference, among other things: (i) the dividend payments received by the AIG Plan or (ii) the SWIFT statements supporting the AIG Plan's purchase of the relevant Danish securities.  *See generally* Dillman Decl. Ex. 115–126.  Defendants further object to the use of the terms "Cum-Cum Trades" and "Cum-Ex Trades."  *See* Response to SKAT SOF 77-78.  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.

88.   **The Riverside Plan engaged in a total of 11 relevant trades in Danish securities:  See Joint 56.1, Appendix B six Annex E Cum-Ex Trades and five Cum-Cum Trades. Each trade follows the same steps outlined above for the relevant type of trade, but in some**

**cases with different counterparties. These 11 trades are identified in Appendices J and K, along with the material terms of each transaction as summarized in paragraph.**

Response:  Disputed.  It is undisputed that the Riverside Plan "engaged in a total of 11 relevant trades in Danish securities" and that all 11 of these trades settled; however, the parties dispute the meaning of "Cum-Cum" and "Cum-Ex" as it relates to these trades.  *Compare* Blessington Decl. Ex. 1 (Kaminer Dep.) at 176:4–6 ("Q: Do you know what a cum-ex trade is?  A: What it means to me is buying with the dividend and selling without the dividend entitlement.") *with* SKAT SOF 78.  The second and third sentences of Paragraph 88 are disputed in full, as they lack any evidentiary support as required by Fed. R. Civ. P. 56(c)(1).  Defendants dispute that each of the 11 trades "follows the same steps outlined above for the relevant type of trade."  Defendants further dispute that SKAT's Appendixes J, K, and L contain the "material terms of each transaction"; for instance, the appendices do not reference, among other things: (i) the dividend payments received by the Riverside Plan or (ii) the SWIFT statements supporting the Riverside Plan's purchase of the relevant Danish securities.  *See generally* Dillman Decl. Ex. 100–110.  Defendants further object to the use of the terms "Cum-Cum Trades" and "Cum-Ex Trades."  *See* Response to SKAT SOF 77-78.

89.    **ED&F issued 80 incorrect Annex E Tax Vouchers to its clients, including the AIG Plan and the Riverside Plan, which were submitted to SKAT.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1.**

Response:  Disputed.  The cited document does not support the assertion that ED&F "issued" tax vouchers to its clients or that any such tax vouchers were submitted to SKAT.  It is, however, undisputed that ED&F prepared tax vouchers on behalf of the AIG Plan and the Riverside Plan.  Joint 56.1 ¶¶ 323-45.  Defendants further object to Paragraph 89 as irrelevant and immaterial, inasmuch as the total number of "incorrect" tax vouchers is of no relevance to SKAT's partial motion for summary judgment with respect to the AIG Plan and Riverside Plan.  Defendants further object to SKAT's reliance on Annex E of the Re-Amended Defence, which is inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

a.    **ED&F issued an Annex E Tax Voucher to the AIG Plan and the Riverside Plan based on each of the Annex E Cum-Ex Trades listed in Appendix K.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1.**

Response:  Disputed.  The cited document does not support the assertion that ED&F "issued" tax vouchers to the AIG Plan or the Riverside Plan.  It is, however, undisputed that ED&F prepared tax vouchers on behalf of the AIG Plan and the Riverside Plan.  Joint 56.1 ¶¶ 323-45.  Defendants further object to SKAT's reliance on Annex E of the Re-Amended Defence, because it is inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against

the Defendants for the truth of the matter asserted therein.   Defendants further object to SKAT's reference to Appendix K.  *See* Response to SKAT SOF 85(d).  Defendants further object to the use of the term "Cum-Ex Trades."  *See* Response to SKAT SOF 78.

> **i.      For example, on March 24, 2014, ED&F issued Tax Vouchers to the AIG Plan and Riverside Plan stating that each held TDC shares over the Record Date of March 11, 2014.  Weinstein Decl. Ex. 150 (ACER_00001028 - 38).**

Response:  Disputed.  The cited document indicates that tax vouchers were emailed on March 24, 2014 by Marcus Howard to one or more individuals affiliated with the "Goal Group of Companies," with copies to Alan Goldman and Stacey Kaminer (and to Marcus Howard himself). Each of the attached tax vouchers states that the relevant pension plan "was holding the below security over the *dividend* date," not "over the Record Date of March 11, 2014."  Weinstein Decl. Ex. 150 (ACER_00001030 - 38) (emphasis added).  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.

> **b.      Through their agent Goal Taxback Limited ("Goal"), the AIG and Riverside Plans submitted Annex E Tax Vouchers to SKAT.  Joint 56.1 ¶¶ 356 – 359, 367 – 368.**

Response:  Disputed.  The cited document makes no reference to "Annex E" or to "Annex E Tax Vouchers," and the term "Annex E Tax Vouchers" is in any event vague and ambiguous.  It is undisputed that Goal, as agent for the AIG and Riverside Plans, submitted dividend withholding tax refund applications to SKAT that included one or more tax vouchers created by ED&F.

**90.      According to ED&F, SKAT overpaid dividend withholding tax refunds to its clients, including the AIG Plan and the Riverside Plan, pursuant to each of the Annex E Tax Vouchers issued by ED&F.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedules 1 and 2.**

Response:  Disputed.  Defendants dispute that ED&F represented that SKAT overpaid dividend withholding tax refunds "pursuant" to any tax vouchers.  SKAT has not cited any admissible evidence that it paid any refunds "pursuant" to any tax vouchers.   The tax vouchers created by ED&F were only one of the documents included in the dividend withholding tax refund application packages submitted on behalf of the AIG and Riverside Plans.  Those tax vouchers were not themselves requests for payment of a dividend withholding tax refund to the pension plan identified therein. It was SKAT's "practice" to pay withholding tax refunds so long as SKAT received a certain set of documentation, including SKAT Form 06.003 and supporting documentation from third-party financial institutions and foreign tax authorities.  *See* JSUMF ¶¶ 23, 31; Bahnsen Decl. Ex. 6, at ¶ 33 ("It was SKAT's practice to pay claims that included the required supporting documentation.").  Defendants further object to Paragraph 90 inasmuch as the term "Annex E Tax Vouchers" is vague and ambiguous.  Defendants further object to SKAT's reliance on Annex of the Re-Amended Defence, because it is inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements

in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

        **a.**      **According to ED&F, SKAT overpaid dividend withholding tax refunds to the AIG Plan pursuant to Annex E Tax Vouchers in the amount of DKK 8,613,000.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedules 1 and 2.**

<u>Response</u>:  Disputed.  Defendants dispute that ED&F represented that SKAT overpaid dividend withholding tax refunds "pursuant" to any tax vouchers.  SKAT has not cited any admissible evidence that it paid any refunds "pursuant" to any tax vouchers.  The tax vouchers created by ED&F were only one of the documents included in the dividend withholding tax refund application packages submitted on behalf of the AIG and Riverside Plans.  Those tax vouchers were not themselves requests for payment of a dividend withholding tax refund to the pension plan identified therein.  It was SKAT's "practice" to pay withholding tax refunds so long as SKAT received a certain set of documentation, including SKAT Form 06.003 and supporting documentation from third-party financial institutions and foreign tax authorities.  *See* JSMUF ¶¶ 23, 31; Bahnsen Decl. Ex. 6, at ¶ 33 ("It was SKAT's practice to pay claims that included the required supporting documentation.").  Defendants further object to Paragraph 90(a) inasmuch as the term "Annex E Tax Vouchers" is vague and ambiguous.  Defendants further object to SKAT's reliance on Annex of the Re-Amended Defence, because it is inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

        **b.**      **According to ED&F, SKAT overpaid dividend withholding tax refunds to the Riverside Plan pursuant to Annex E Tax Vouchers in the amount of DKK 7,416,225.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E, Schedule 1.**

<u>Response</u>:  Disputed.  Defendants dispute that ED&F represented that SKAT overpaid dividend withholding tax refunds "pursuant" to any tax vouchers.  SKAT has not cited any admissible evidence that it paid any refunds "pursuant" to any tax vouchers.  The tax vouchers created by ED&F were only one of the documents included in the dividend withholding tax refund application packages submitted on behalf of the AIG and Riverside Plans.  Those tax vouchers were not themselves requests for payment of a dividend withholding tax refund to the pension plan identified therein.  It was SKAT's "practice" to pay withholding tax refunds so long as SKAT received a certain set of documentation, including SKAT Form 06.003 and supporting documentation from third-party financial institutions and foreign tax authorities.  *See* JSMUF ¶¶ 23, 31; Bahnsen Decl. Ex. 6, at ¶ 33 ("It was SKAT's practice to pay claims that included the required supporting documentation.").  Defendants further object to Paragraph 90(b) inasmuch as the term "Annex E Tax Vouchers" is vague and ambiguous.  Defendants further object to SKAT's reliance on Annex E of the Re-Amended Defence, because it is inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements

in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

91.  **SKAT relied, inter alia, on the Annex E Tax Vouchers when issuing the refunds of dividend withholding tax listed therein.  Weinstein Decl. Ex. 88 (Ekstrand Dep.), at 122:3-21, 123:11-18.**

Response:  Disputed.  The cited deposition testimony does not support the assertion that SKAT relied on any tax vouchers, let alone "Annex E Tax Vouchers," when issuing "refunds of dividend withholding tax."  *See* Ekstrand Dep. 122:1-123:18.  Furthermore, it was SKAT's "practice" to pay withholding tax refunds so long as SKAT received a certain set of documentation, including SKAT Form 06.003 and supporting documentation from third-party financial institutions and foreign tax authorities.  *See* JSMUF ¶¶ 23, 31; Bahnsen Decl. Ex. 6, at ¶ 33 ("It was SKAT's practice to pay claims that included the required supporting documentation.").

92.  **The Annex E Tax Vouchers were inaccurate because the pension plans listed in the vouchers, including the AIG Plan and the Riverside Plan, did not receive a dividend from the Danish issuer for the portion of the voucher supported by an Annex E Cum-Ex Trade.  Weinstein Decl. Ex. 87 (Wall Dep.), at 50:1 – 52:17 (adopting paragraph 1, "Who made the payments) and 52:18 – 55:9, 65:21 – 66:21 (adopting paragraph 2, "Why the payments were made"); Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).**

Response:  Disputed.  The testimony and documents cited by SKAT—taken separately or together—do not support the assertion that the tax vouchers identified on Annex E of the Re-Amended Defence were inaccurate because the relevant pension plans "did not receive a dividend from the Danish issuer for the portion of the voucher supported by an Annex E Cum-Ex Trade."  Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.  Defendants further object to this statement as SKAT cites inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Furthermore, Defendants object to SKAT's reliance on a letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.

93.  **The Annex E Tax Vouchers were inaccurate because the pension plans listed in the vouchers, including in that the AIG Plan and the Riverside Plan, did not suffer withholding tax on dividends from the Danish issuer for the portion of the voucher**

**supported by an Annex E Cum-Ex Trade.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1.**

Response:  Disputed.  The cited document does not support the assertion that the tax vouchers identified on Annex E of the Re-Amended Defence were inaccurate because the relevant pension plans "did not suffer withholding tax on dividends from the Danish issuer for the portion of the voucher supported by an Annex E Cum-Ex Trade."  Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.  Defendants further object to this statement as SKAT cites inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

94.  **In each Annex E Cum-Ex Trade, the AIG Plan and the Riverside Plan did not acquire shares in respect of which a dividend was paid by the issuer of the Danish securities. Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)) ("[T]he Pension Plans had a contractual right to dividends in respect of such shares. However, the counterparty MPT Dubai was unable to pay the Pension Plans' dividends in satisfaction of such rights because it did not have a right to the relevant Danish Shares on the Trade Date and thus did not receive the dividends from the underlying Danish company.").**

Response:  Disputed.  SKAT's statement is not supported by any admissible evidence.  SKAT relies on a letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Moreover, SKAT's statement that the AIG Plan and the Riverside Plan "did not acquire shares in respect of which a dividend was paid by the issuer of the Danish securities" is vague.  Both the AIG Plan and the Riverside Plan were parties to settled transactions in the correct security with a trade date prior to the ex-dividend date for a dividend event, *see* Counterstatement of Facts ¶¶ 6-7, and both received a dividend payment through ED&F, *id.* ¶¶ 14, 17.  Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 68.  Defendants further object to the use of the term "Trade Date."  *See* Response to SKAT SOF 68.

a.  **In each Annex E Cum-Ex Trade, ED&F Dubai did not receive a dividend from the Danish issuer of the securities it purportedly sold. Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).**

Response:  Disputed.  The cited document does not support the assertion that the relevant shares were "purportedly sold."  Defendants further object to this statement as SKAT relies on a letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

95.    **In each of the Annex E Cum-Ex Trades, ED&F Dubai was the ultimate seller of shares.  See Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)) ("[MPT Dubai] the ultimate counterparty from whom the Pension Plans had acquired the right to the relevant Danish shares"); see Appendix K, "Plan Purchase" Column "Seller".**

Response:  Disputed.  SKAT's statement is not supported by any admissible evidence. SKAT relies on a letter by the Rosenblatt law firm, ED&F's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Defendants further object to SKAT's reliance on Appendix K, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.  Defendants further object to the use of the term "Cum-Ex Trade." *See* Response to SKAT SOF 78.

96.    **In each Annex E Cum-Ex Trade, ED&F Dubai's sale was an uncovered short sale. Weinstein Decl. Ex. 87 (Wall Dep.), at 56:15-57:10; Weinstein Decl. Ex. 147 (ED&F-00443853).**

Response:  Disputed.  SKAT's statement is not supported by any admissible evidence.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to SKAT's reliance on an ED&F memorandum prepared in connection with an investigation by U.K. regulators.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802. Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

97.    **In each Annex E Cum-Ex Trade, as of the Trade Date of ED&F Dubai's sale to the Plans, ED&F Dubai did not hold the Danish shares to sell and did not have any rights to the Danish shares.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)); Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15.**

Response:  Disputed.  SKAT's statement is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3). Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Furthermore, Defendants object to this statement as SKAT relies on a letter by

the Rosenblatt law firm, ED&F's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Defendants further object to the terms "Trade Date" and "Cum-Ex Trade."  *See* Response to SKAT SOF 68; Response to SKAT SOF 78.

**98.    For each Annex E Cum-Ex Trade, ED&F Dubai did not have the right to a dividend on the Danish shares it sold and did not receive a dividend on those shares from the Danish issuer.  Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15; Weinstein Decl. Ex. 104 (Re-Amended Defence) at Annex E ¶ 1; Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).**

Response:  Disputed.  SKAT's statement is not supported by any admissible evidence.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence and Annex E are documents filed by ED&F in the English Action.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Furthermore, Defendants object to this statement as SKAT relies on a letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Defendants further object to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

**99.    For each Annex E Cum-Ex Trade, the payment that ED&F Dubai made to the AIG Plan and the Riverside Plan was a contractual payment.  Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)) ("MPT Dubai satisfied its contractual obligations to the purchasing Pension Plans by paying sums equivalent in value to these dividends net of 27% [withholding tax.").  This contractual payment was in the amount of the net dividend the purported seller would have received from the issuer, accounting for withholding tax, if it had received such a dividend.  Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021)).**

Response:  Disputed.  SKAT's statement that the payment made by "ED&F Dubai" was a "contractual payment" is a legal conclusion and not a statement of fact.  SKAT's statement is also not supported by any admissible evidence.  SKAT relies on a letter from ED&F's counsel in the U.K. to SKAT's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56I(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Defendants further object to the reference to the "purported seller" and to the use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

> a.    **For example, on March 13, 2014, ED&F debited ED&F Dubai's account DKK 103,265,800 as "CASH DIV – TDC – PD 12/03/14" because it held a total short position of 64,300,000 TDC shares on the Ex-Date.  Weinstein Decl. Ex. 148 (ED&F-00251535); Weinstein Decl.**

Ex. 151 (ED&F-00409126 – 47) at 28.

Response: Disputed. The cited documents do not support the statement that MPT Dubai had a "total short position of 64,300,000 TDC shares on the Ex-Date." Rather, the cited email shows that MPT Dubai had sold a total of 64,300,000 shares "as per Ex Date reconciliation," which refers to the fact that the transactions had not settled by record date. *See* Weinstein Decl. Ex. 148. The cited documents do not purport to show MPT Dubai's "total short position." Defendants additionally object to this statement as SKAT relies on Weinstein Declaration Ex. 148. The document is inadmissible hearsay and, moreover, there is no testimony from a witness with personal knowledge of the document to authenticate it or explain its content. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802. Defendants further object to the use of the term "Ex-Date." *See* Response to SKAT SOF 76.

> **b.** **On the same date, ED&F credited DKK 3,212,000 to the AIG Plan as "CASH DIV – TDC – PD 12/03/14 220 Weinstein Decl. Ex. 152 (ED&F-00039750 – 85 (AIG Plan ED&F Account Transactions)) at 50 and DKK 3,452,900 to the Riverside Plan as "CASH DIV - TDC DC - PD 12/03/14." Weinstein Decl. Ex. 153 (ED&F-00040756 – 78 (Riverside Plan ED&F Account Transactions)) at 56.**

Response: Undisputed.

**100. At the time of each Annex E Cum-Ex Trade, ED&F was in possession of the following facts: Weinstein Decl. Ex. 87 (Wall Dep.), at 62:1-63:15.**

> **a.** **ED&F Dubai did not hold any Danish shares;**

> **b.** **ED&F Dubai did not have any rights to Danish shares; and**

> **c.** **ED&F Dubai did not have a right to a dividend on any Danish shares.**

Response: Disputed. SKAT's statement that "ED&F was in possession of the following facts" is vague and confusing, and is not supported by the cited deposition testimony. Mr. Wall testified that ED&F "would have had the information in hand showing MPT Dubai's position in various Danish securities," but Mr. Wall did not testify that ED&F had inferred or otherwise acquired knowledge, at the time of the transactions, of the purported facts set forth in Paragraph 100. *See* Wall Dep. 62:23-63:19 ("The information mentioned in this letter here of 2021, as you say, would have been available at the time. How ED&F Man at the time chose to use that information, I cannot comment on."). Defendants further object to the use of the term "Cum-Ex Trade." *See* Response to SKAT SOF 78. Defendants further object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F. Fed. R. Civ. P. 32(a)(3). Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

101.   **In each Annex E Cum-Ex Trade, ED&F Dubai did not have the shares it was selling in its custodial account as of the Trade Date and did not obtain the relevant shares until on or after the Ex-Date.**

Response:  Disputed.  SKAT fails to cite any material in the record to support this statement.  Fed. R. Civ. P. 56(c)(1).  Defendants further object to the terms "Trade Date," "Ex-Date" and "Cum-Ex Trade."  *See* Response to SKAT SOF 68; Response to SKAT SOF 76; Response to SKAT SOF 78.

      a.   **The transactions by which ED&F Dubai purported to acquire shares to settle the Annex E Cum-Ex Trades are identified in Appendix K, along with the material terms of each transaction as identified in paragraph 85.  Appendix K, "ED&F Dubai Acquisition."**

Response:   Disputed.   Defendants dispute the characterization of the share acquisitions as "purported," and Defendants further dispute that SKAT's Appendix K contains the "material terms of each transaction."   Appendix K does not reference, among other things: (i) the dividend payments received by the AIG and Riverside Plans or (ii) the SWIFT statements supporting the purchase of the relevant Danish securities.  *See generally* Dillman Decl. Exs.100–110, 115–126. Defendants further object to use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78. Defendants further object to SKAT's reliance on Appendix K, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

102.   **ED&F admits that it should not have produced and issued Tax Vouchers for the Annex E Cum-Ex Trades.  Weinstein Decl. Ex. 86 (Hashemi Dep.), at 252:5-18.**

Response:   Disputed.   SKAT mischaracterizes the cited testimony, which refers only to the production, not the issuance, of tax vouchers.  Hashemi Dep. at 252:5-18.  Defendants further object to use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.  Defendants further object to SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

103.   **ED&F admits that a customer's expectation that it would receive a dividend is not sufficient for it to issue a Tax Voucher.  Weinstein Decl. Ex. 87 (Wall Dep.), at 68:21-69:6.**

Response:  Disputed.  ED&F's admissions are not material to any argument in SKAT's motion, which is not made against ED&F.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  SKAT's statement is also not supported by any admissible evidence.  Defendants object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F. Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is

insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

**104.   A dividend credit on an account statement is not a sufficient basis for ED&F to issue a Tax Voucher.  Weinstein Decl. Ex. 87 (Wall Dep.), at 67:1-69:6.**

Response:  Disputed.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  SKAT mischaracterizes the cited testimony, which makes no reference to a "dividend credit on an account statement."  Hashemi Dep. at 252:5-18.  Defendants further object to SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.

**105.   In each Non-Annex E Cum-Ex Trade, neither the AIG Plan nor ED&F received a dividend from the issuer of the Danish securities.  Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast); Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC).**

Response:  Disputed.  Defendants do not dispute that the dividend was not received from the issuer directly (that is, without passing through intermediaries).   However, the record establishes that ED&F was "claiming the . . . the dividend due to cum dividend trades settling after the dividend record date," and that counterparty was s forwarding the dividend that the counterparty had been paid.  Defendants further object to use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

> **a.     For each Non-Annex E Cum-Ex Trade, the AIG Plan received a contractual payment from the purported seller of the shares.228 Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast); Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC). This contractual payment was in the amount of the net dividend the purported seller would have received from the issuer, accounting for withholding tax, if it had received such a dividend.  Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast); Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC).**

Response:  Disputed.  The cited documents do not establish receipt of any payment of any kind from any "purported seller of the shares."  SKAT's statement that the payment received was a "contractual payment" is, moreover, a legal conclusion and not a fact.  Defendants dispute the characterization of the seller of the shares as a "purported seller."  Defendants further object to use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.  The record establishes that ED&F was "claiming . . . the dividend due to cum dividend trades settling after the dividend record date," and that counterparty was s forwarding the dividend that the counterparty had been paid. *See, e.g.*, ED&F-00044985 at ED&F-00044997.

**106.   Before issuing Tax Vouchers based on the Non-Annex E Cum-Ex Trades, ED&F made no checks with the sellers to verify whether the sellers held shares before they**

**sold them to the Plans or whether the sellers received a dividend from the issuer of the Danish securities and were able to forward the dividends to the Plans.  Weinstein Decl. Ex. 87 (Wall Dep.), at 120:16-121:25.**

Response:  Disputed.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified.  Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to use of the term "Cum-Ex Trade."  *See* Response to SKAT SOF 78.

107.    **Following SKAT's claims against it in the High Court of Justice of England and Wales, ED&F conducted a detailed review of all 420 Tax Vouchers it issued for shares of Danish securities.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Re-Amended Defence to Schedule 5T ¶ 18.7.2.**

Response:  Disputed.  ED&F's 2019 conduct is not material to any argument in SKAT's motion.  Defendants further object to this statement as SKAT cites inadmissible hearsay.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence was filed by ED&F in the English Action, and thus is not a business record, nor does it fall into any other hearsay exception or category of nonhearsay.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.

108.    **As part of its detailed review, ED&F did not inquire about whether counterparties to the Non-Annex E Cum-Ex trades were short sellers.  Weinstein Decl. Ex. 104 (Re-Amended Defence) at Re-Amended Defence to Schedule 5T ¶ 18.7.2; Weinstein Decl. Ex. 87 (Wall Dep.), at 261:24-262:8.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  Second, Mr. Wall was not testifying about "Non-Annex E" trades other than those listed on Annex A.  *See* Blessington Decl. Ex. 8 (Wall Dep.) 58:3-24 ("In preparation for this deposition, I've only looked at trades in Annex E and Annex A."); *see also* ECF No. 726 (ordering ED&F to produce additional witness only on the topics of Annex A, Annex E, and the FCA's investigation into ED&F).  Furthermore, the statement is not supported by admissible evidence.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  As discussed above, the Re-Amended Defence was filed by ED&F in the English Action, and thus is not a business record, nor does it fall into any other hearsay exception or category of nonhearsay.  As such, the statements in those documents cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is similarly inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, the statement as written is not material to any argument in SKAT's

motion.  SKAT cites this statement in its memorandum in support of its motion for the proposition that ED&F "studiously avoided inquiring into whether the third-party sellers actually received a dividend from the share issuer." *See* SKAT Br. at 56.  But SKAT provides no support in the record to equate being a short seller, as SKAT states here, with not having received a dividend from the share issuer, *i.e.* that short sellers may not themselves acquire dividend rights to meet their obligation to settle a cum-dividend sale with cum-dividend shares.  Further, there is nothing whatsoever to support the assertion that ED&F "studiously avoided" obtaining information.  To the contrary, the testimony on which SKAT relies states that—unlike the trades listed on Annex E, where ED&F had access to counterparty information because the counterparty was a client of ED&F—ED&F did not have access to similar information for the trades not listed on Annex E.  Defendants further object to the use of the term "Cum-Ex Trades."  *See* Response to SKAT SOF 78.

**109.    Acer received no assurances from ED&F that the securities it purchased for the AIG Plan and Riverside Plan were not short sales.  Weinstein Decl. Ex. 98 (Acer's Resp. to SKAT's First Set of Interrog. (hereinafter "<u>Acer Interrog. Resp.</u>")) at Resp. No. 18; Weinstein Decl. Ex. 99 (AIG Plan's Resp. to SKAT's First Set of Interrog. (hereinafter "<u>AIG Interrog. Resp.</u>")) at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100 (Riverside Plan's Resp. to SKAT's First Set of Interrog. (hereinafter "<u>Riverside Interrog. Resp.</u>")) at Resp. Nos. 20, 21.**

<u>Response</u>:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, the cited material does not support SKAT's statement.  Acer, the AIG Plan, and the Riverside Plan each assert in the cited material that the Plans purchased securities through a FCA-regulated entity, ED&F, and that they understood that the regulated broker-dealers would comply with all relevant U.K. laws, rules, and regulations concerning short sales.  Weinstein Decl. Ex. 98, Acer Interrog. Resp. at Resp. No. 18; Weinstein Decl. Ex. 99, AIG Interrog. Resp. at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100, at Riverside Interrog. Resp. at Resp. Nos. 20, 21.

> **a.    Acer did not ask ED&F whether it was acquiring Danish shares for the Plans from short sellers.  Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 17.**

<u>Response</u>:  Disputed as to materiality.  The statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Moreover, Acer, the AIG Plan, and the Riverside Plan each assert in the cited material that the Plans purchased securities through an FCA-regulated entity, ED&F, and that they understood that the regulated broker-dealers would comply with all relevant U.K. laws, rules, and regulations concerning short sales.  Weinstein Decl. Ex. 98, Acer Interrog. Resp. at Resp. No. 18; Weinstein Decl. Ex. 99, AIG Interrog. Resp. at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100, at Riverside Interrog. Resp. at Resp. Nos. 20, 21.  Moreover, Acer states in the cited document that the Plans had no visibility into or opportunity to learn the identity of the sellers of the securities.  Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 17.

      **b.**     **Acer did not request that ED&F not acquire Danish shares for the Plans from short sellers. Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 17.**

<u>Response</u>:  Disputed as to materiality.  The statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Moreover, Acer, the AIG Plan, and the Riverside Plan each assert in the cited material that the Plans purchased securities through an FCA-regulated entity, ED&F, and that they understood that the regulated broker-dealers would comply with all relevant U.K. laws, rules, and regulations concerning short sales.  Weinstein Decl. Ex. 98, Acer Interrog. Resp. at Resp. No. 18; Weinstein Decl. Ex. 99, AIG Interrog. Resp. at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100, at Riverside Interrog. Resp. at Resp. Nos. 20, 21.  Moreover, Acer states in the cited document that the Plans had no visibility into or opportunity to learn the identity of the sellers of the securities.  Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 17.

**110.**    **The AIG Plan and the Riverside Plan took no steps to ensure that they received a dividend from the Danish issuer prior to submitting their respective reclaim applications to SKAT. Weinstein Decl. Ex. 98 (Acer Interrog. Resp.) at Resp. No. 16; Weinstein Decl. Ex. 99 (AIG Interrog. Resp.) at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100 (Riverside Interrog. Resp.) at Resp. Nos. 20, 21.**

<u>Response</u>:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion. SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, the cited material does not support SKAT's statement.  Acer, the AIG Plan, and the Riverside Plan each assert in the cited material that the Plans purchased securities through a FCA-regulated entity, ED&F, and that they understood that the regulated broker-dealers would comply with all relevant U.K. laws, rules, and regulations concerning short sales.  Weinstein Decl. Ex. 98, Acer Interrog. Resp. at Resp. No. 18; Weinstein Decl. Ex. 99, AIG Interrog. Resp. at Resp. Nos. 20, 21; Weinstein Decl. Ex. 100, at Riverside Interrog. Resp. at Resp. Nos. 20, 21.

**111.**    **ED&F's sub-custodians, BNP Paribas and SEB, received dividends net of withholding tax from the share issuer for each of the AIG Plan and Riverside Plans' Cum-Cum Trades. Weinstein Decl. Ex. 154 (ED&F-00603586 (BNP dividend record); Weinstein Decl. Ex. 155 (SEB_00000094 (SEB dividend record for account 05295142822)); Weinstein Decl. Ex. 156 (SEB_00000095 (SEB dividend record for account 05295142806)); Weinstein Decl. Ex. 157 (SEB_00000096 (SEB dividend record for account 05295142814)).**

<u>Response</u>:  Undisputed.  Defendants object to the use of the term "Cum-Cum Trades."  *See* Response to SKAT SOF 77.

**112.**    **For some dividend events, BNP and SEB issued tax vouchers to ED&F. Weinstein Decl. Ex. 158 (ED&F-00255315 – 16 (BNP Tax Vouchers – Coloplast) and ED&F-00257149 – 60 (BNP Tax Vouchers – Novo Nordisk)); Weinstein Decl. Ex. 159 (ED&F-00315766 (SEB Tax Voucher for Chr. Hansen, Coloplast), ED&F-00318721 (SEB Tax**

> **Voucher – A.P. Møller Mærsk A/S - B), ED&F-00385070 (SEB Tax Voucher for Novozymes, TDC, DSV, Danske Bank, Pandora, and Novo Nordisk), and ED&F-00436486 (SEB Tax Voucher – TDC)).**

Response:  Disputed as to materiality.  Moreover, the documents cited are not called "tax vouchers;" rather, they are titled "Dividend Credit Advice."

> **a.   BNP declined to issue tax vouchers to ED&F on Cum-Ex trades, and provided tax vouchers to ED&F only for the shares held in the Client Omnibus Account on the record date.  Weinstein Decl. Ex. 158 (ED&F-00255315 – 16 (BNP Tax Vouchers – Coloplast) and ED&F-00257149 – 60 (BNP Tax Vouchers – Novo Nordisk)); Weinstein Decl. Ex. 160 (ED&F-00112487 – 93).**

Response:  Disputed.  The cited documents  do not support the statement that BNP categorically declined  to  issue  tax  vouchers  for  Cum-Ex  trades.    Rather,  the  email  exchange  concerns transactions for which BNP "claimed [the] counterparty to receive the funds," but the "claims were not accepted by the counterparty."  *See* Weinstein Decl. Ex. 160 at ED&F-00112488-89.  ED&F explained that BNP did not have an accepted claim because BNP was "seeking the wrong ctpy," or counterparty, and "because [ED&F] did it for [BNP], [BNP] cant [sic] provide the tax voucher." *Id.* at ED&F-00112488.  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants further object to the use of the term "Cum-Ex Trades."  *See* Response to SKAT SOF 78.  Defendants further object to the use of the term "record date."  *See* Response to SKAT SOF 75.

> **b.   SEB issued tax vouchers only on the shares that ED&F held in the Client Omnibus Account on the Record Date.  See Weinstein Decl. Ex. 159 (ED&F-00315766 (SEB Tax Voucher for Chr. Hansen, Coloplast), ED&F-00318721 (SEB Tax Voucher – A.P. Møller Mærsk A/S - B), ED&F-00385070 (SEB Tax Voucher for Novozymes, TDC, DSV, Danske Bank, Pandora, and Novo Nordisk), and ED&F-00436486 (SEB Tax Voucher – TDC)).**

Response:  Disputed as to materiality.  As a matter of policy, SEB also did not issue tax vouchers for so-called "Cum-Cum" transaction shares that were accidentally delivered to a different client, such as occurred as part of ED&F's trading in TDC shares in August 2014.  *See* Blessington Decl. Ex. 9 (ED&F-00315846); Blessington Decl. Ex. 10 (ED&F-00273945); Weinstein Decl. Ex. 91, Wade Report App'x F.  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.

**113.   For each dividend event in which ED&F held shares in the Client Omnibus Account on the Record Date, ED&F used the shares in the Client Omnibus Account to support Tax Vouchers based on its clients' Cum-Cum Trades, and issued Tax Vouchers to its clients based on those Cum-Cum Trades.  Weinstein Decl. Ex. 87 (Wall Dep.), at 213:21 – 214:11, 236:20 – 239:19.  Details of each dividend event for which ED&F issued a Tax Voucher to the AIG Plan or Riverside Plan, including the total number**

**of shares for which ED&F issued a Tax Voucher and the number of shares held in the Client Omnibus Account, are identified in Appendix M.**

Response:  Disputed.  SKAT's statement is premised solely on inadmissible evidence.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  The second sentence is disputed, as SKAT fails to cite any material in the record to support its statement.  Fed. R. Civ. P. 56(c)(1).  Defendants object to SKAT's reliance on Appendix M, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.  Defendants further object to the use of the term "Cum-Cum Trades."  *See* Response to SKAT SOF 77.

> **a.     For example, ED&F held 24,845,000 TDC shares in the Client Omnibus Account at the end of the Record Date of March 11, 2014, which were acquired through its clients' Cum-Cum Trades, including the AIG Plan's Cum-Cum Trades.  Weinstein Decl. Ex. 130 at ED&F-00446138 (Dividend Reconciliation Sheet, "BNP Paribas Depot 778523F").**

Response:  Disputed.  The cited document does not support the assertion that the shares in ED&F's depot accounts "were acquired through its clients' Cum-Cum Trades."  It is undisputed based on the cited document that ED&F's reconciliation showed that ED&F held 24,845,000 TDC shares in the relevant depot accounts on behalf of its clients as of March 11, 2014.  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.  Defendants further object to the use of the term "Cum-Cum Trades."  *See* Response to SKAT SOF 77.

> **b.     ED&F issued Tax Vouchers to its clients, including the AIG Plan, based on the TDC shares in the Client Omnibus Account on the Record Date and acquired in those TDC Cum-Cum Trades.  Weinstein Decl. Ex. 130 at  ED&F-00040919,  ED&F-00041108,  ED&F-00041180,  ED&F-00222877,  ED&F-00041335,  ED&F-00041655,  ED&F-00041554, ED&F-00041352,  ED&F-00041756,  ED&F-00041857,  ED&F-00041958,  ED&F-00042059,  ED&F-00042160,  and  ED&F-00446140 (identifying the total number of shares identified as held in the BNP Paribas Depot 778523F).**

Response:  Disputed.  The material SKAT cites establishes that ED&F did not issue tax vouchers separately for "Cum-Cum Trades," but rather issued tax vouchers for the entirety of its clients' share position, whether or not as a result of a "Cum-Cum Trade."  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants

further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.  Defendants further object to the use of the term "Cum-Cum Trades."  *See* Response to SKAT SOF 77.

**114.** **ED&F used the shares in the Client Omnibus Account that were acquired for the Cum-Cum Trades, and other ex-dividend shares, to settle its clients' Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades, and issued Tax Vouchers to its clients based on those Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades. Weinstein Decl. Ex. 87 (Wall Dep.), at 238:19-239:19; see, e.g., Weinstein Decl. Ex. 136 at ED&F-00409468 – 69; Weinstein Decl. Ex. 161 (ED&F-00409462 – 3).**

Response:  Disputed.  SKAT's statement is premised solely on inadmissible evidence or on evidence that does not support SKAT's statement.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F. Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Furthermore, the trade confirmations cited by SKAT do not support SKAT's statement.  The trade confirmations demonstrate that a trade was executed, not settled.  Weinstein Decl. Ex. 136 at ED&F-00409468 – 69; Weinstein Decl. Ex. 161 (ED&F-00409462 – 3).  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants further object to the use of the terms "Cum-Cum Trades" and "Cum-Ex Trades."  *See* Response to SKAT SOF 77-78.

    **a.** **Where ED&F did not have any of the relevant shares on hand (or not enough of them), it otherwise acquired ex-dividend shares to use to settle the cum-ex trades.  See, e.g., Weinstein Decl. Ex. 136 at ED&F-00409468 – 69; Weinstein Decl. Ex. 161 (ED&F-00409462 – 3).**

Response:  Disputed.  The trade confirmations cited by SKAT do not support SKAT's statement. The cited documents do not establish what shares were used "to settle the cum-ex trades." Weinstein Decl. Ex. 136 at ED&F-00409468 – 69; Weinstein Decl. Ex. 161 (ED&F-00409462 – 3).  Defendants further object to the use of the term "Cum-Ex Trades."  *See* Response to SKAT SOF 78.

**115.** **Details of each dividend event for which ED&F issued a Tax Voucher to the AIG Plan or Riverside Plan, including the total number of shares for which ED&F issued a Tax Voucher and the number of shares held in the Client Omnibus Account, are identified in Appendix M.**

Response:  Disputed.  SKAT fails to cite any material in the record to support its statement.  Fed. R. Civ. P. 56(c)(1).  Furthermore, this is duplicative of the second sentence of SKAT SOF 113. Defendants further object to SKAT's reliance on Appendix M, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

    **a.** **For example, ED&F held 24,845,000 TDC shares in the Client Omnibus Account over the Record Date of March 11, 2014  Weinstein Decl. Ex.**

> **130 at ED&F-00446138 (Dividend Reconciliation Sheet, "BNP Paribas Depot 778523F") 246, and issued Tax Vouchers collectively stating that its clients owned 99,145,000 TDC shares. Weinstein Decl. Ex. 87 (Wall Dep.), at 238:19-239:19; Weinstein Decl. Ex. 130 at ED&F-00222877 – 79, ED&F-00040919, ED&F-00041352, ED&F-00041453, ED&F-00041554, ED&F-00040991, ED&F-00041655, ED&F-00041756, ED&F-00041059, ED&F-00041009, ED&F-00041034, ED&F-00041857, ED&F-00041083, ED&F-00041108, ED&F-00041180, ED&F-00041211, ED&F-00041236, ED&F-00041285, ED&F-00041310, ED&F-00041958, ED&F-00042059, ED&F-00042160, ED&F-00041335, and ED&F-00446140 (identifying the total number of shares identified as held in the BNP Paribas Depot 778523F).**

Response:  Disputed.  It is not clear from SKAT's statement what it is providing an example to support.  SKAT's statement is further disputed to the extent it implies that there a connection between shares in an omnibus account as of record date, and the total shares listed in a tax voucher, which is not supported by the cited documents.  SKAT's statement is further disputed to the extent it relies on inadmissible evidence.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Defendants further object to the ambiguous definition of "Client Omnibus Account."  *See* Response to SKAT SOF 72.  Defendants further object to the use of the term "Record Date."  *See* Response to SKAT SOF 75.

> **b.     ED&F used the TDC shares that were acquired in the Cum-Cum Trades to settle its clients' Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades in TDC, totaling 74,300,000 shares. Weinstein Decl. Ex. 87 (Wall Dep.), at 238:19-239:19; Weinstein Decl. Ex. 130 at ED&F-00446138 (Dividend Reconciliation Sheet, "BNP Paribas Depot 778523F").**

Response:  Disputed.  SKAT's statement relies on inadmissible evidence.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F. Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, the testimony from Mr. Wall that SKAT cites does not support its statement, because Mr. Wall testified only about the Annex E trades, and not about non-Annex E trades, as SKAT now argues.  Defendants further object to the use of the terms "Cum-Cum Trades" and "Cum-Ex Trades."  *See* Response to SKAT SOF 77-78.

> **c.     ED&F issued Tax Vouchers to its clients, including the AIG Plan and Riverside Plan, based on those Non-Annex E Cum-Ex Trades and Annex E Cum-Ex Trades in TDC, totaling 74,300,000 shares.**

> **Weinstein Decl. Ex. 130 at ED&F-00041059, ED&F-00041009, ED&F-00041083, ED&F-00041211, ED&F-00041285, ED&F-00040991, ED&F-00041034, ED&F-00040919, ED&F-00041108, ED&F-00041236, ED&F-00041335, ED&F-00041655, ED&F-00041554, ED&F-00041352, ED&F-00041756, ED&F-00041857, ED&F-00041958, ED&F-00042059, ED&F-00042160, and ED&F-00040983 – 84 (identifying the total number of shares not identified as held in the BNP Paribas Depot 778523F, excluding Volcafe "long holdings").**

Response:  Disputed.  The material SKAT cites establishes that ED&F did not issue tax vouchers separately for "Cum-Cum Trades" and "Cum-Ex Trades."  ED&F issued tax vouchers for the entirety of its clients' long position at the start of the ex-dividend date for the relevant dividend event, whether or not as a result of a "Cum-Cum Trade" or a "Cum-Ex Trade."  Defendants further object to the use of the terms "Cum-Cum Trades" and "Cum-Ex Trades."  *See* Response to SKAT SOF 77-78.

> i.   **64,300,000 of those 74,300,000 TDC shares were purportedly acquired from ED&F Dubai. The number of shares purportedly acquired from ED&F Dubai for all ED&F clients for each dividend event for which ED&F issued a Tax Voucher to the AIG Plan or Riverside Plan is identified in Appendix M.**

Response:  Disputed.  SKAT fails to cite any material in the record to support its statement.  Fed. R. Civ. P. 56(c)(1).  Defendants object to SKAT's reliance on Appendix M, which was prepared by SKAT and is inadmissible hearsay that cannot be relied on to prove the truth of the matter asserted.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 602, 801, 802.

**116.   ED&F settled the Annex E Cum-Ex Trades and the Non-Annex E Cum-Ex Trades by reusing the same shares multiple times until all shapes of the trade settled.  Weinstein Decl. Ex. 87 (Wall Dep.), at 213:13-214:11, 238:12-239:19.**

Response:  Disputed.  SKAT's statement relies solely on inadmissible evidence.  SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, the testimony of Mr. Wall, even if admissible, does not refer to the "Non-Annex E Cum-Ex Trades," only the trades included on Annex E of ED&F's Amended Defence, which are the only trades that were within the scope of his 30(b)(6) testimony.  Defendants further object to the use of the term "Cum-Ex Trades."  *See* Response to SKAT SOF 78.

**117.   ED&F issued multiple Tax Vouchers to its clients, including the AIG Plan and the Riverside Plan, based on the same Cum-Cum shares held in the Client Omnibus Accounts on the Record Date.  Weinstein Decl. Ex. 87 (Wall Dep.), at 213:13-214:11, 238:12-239:19.**

Response: Disputed. SKAT's statement relies solely on inadmissible evidence. SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F. Fed. R. Civ. P. 32(a)(3). Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802. Defendants further object to the ambiguous definition of "Client Omnibus Account." *See* Response to SKAT SOF 72. Defendants further object to the use of the term "Record Date." *See* Response to SKAT SOF 75. Defendants further object to the use of the term "Cum-Cum shares," which is undefined; to the extent it purports to refer to "Cum-Cum trades," Defendants object for reasons stated above. *See* Response to SKAT SOF 77.

**118.  ED&F issued multiple Tax Vouchers to its clients, including the AIG Plan and the Riverside Plan, based on the same ex-dividend shares held in the Client Omnibus Accounts on the day after the Record Date. Weinstein Decl. Ex. 87 (Wall Dep.), at 213:13-214:11, 238:12-239:19.**

Response: Disputed. SKAT's statement relies solely on inadmissible evidence. SKAT's use of the testimony of Mr. Wall, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F. Fed. R. Civ. P. 32(a)(3). Furthermore, the cited testimony of Mr. Wall is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802. Defendants further object to the ambiguous definition of "Client Omnibus Account." *See* Response to SKAT SOF 72. Defendants further object to the use of the term "Record Date." *See* Response to SKAT SOF 75.

**119.  The AIG Plan and Riverside Plan often had negative balances in their accounts at ED&F. See, e.g., Weinstein Decl. Ex. 130 at ED&F-00040982 (AIG Plan); Weinstein Decl. Ex. 142 at ED&F-00038297 (Riverside).**

Response: Disputed. The documents cited by SKAT are account statements on a single day in 2014 for each of the AIG Plan and the Riverside Plan, and thus cannot support SKAT's statement that the plans "often" had negative balances.

**120.  Before engaging in trades on behalf of the AIG Plan and the Riverside Plan, Acer and ED&F coordinated, in part to ensure that ED&F had sufficient capital available to pay for the Plans' trades in Danish securities. Weinstein Decl. Ex. 85 (Kaminer Dep.), at 99:3-5, 188:6-11.**

Response: Disputed. First, SKAT mischaracterizes the cited testimony. While it is true that ED&F provided capital, that capital was not "for the Plans' trades in Danish securities." Rather, the Plans sold low exercise price options (or "LEPOs") to ED&F on non-Danish securities, earning a substantial cash premium. Blessington Decl. Ex. 1 (Kaminer Dep.), at 20:13–21:6; 171:24–173:3, 176:21–24. That cash premium, in conjunction with the Pension Plans' own cash and various market hedges, could then be used to purchase the Danish securities. *Id.* The sale of the LEPOs would be reflected on the Pension Plans' account statements. *See, e.g.*, Blessington Decl. Ex 11, at ACER_00009465–66; Blessington Decl. Ex. 12, at ACER_00010585–86. It is

undisputed that there was coordination between ED&F and Acer to ensure that financing could be arranged.  *See* Dillman Decl. Ex 96, Kaminer Affidavit ¶¶ 10, 11.  SKAT's statement is also not material to any argument in SKAT's motion.

**121.   ED&F charged the AIG Plan and the Riverside Plan interest at a rate pegged to Euribor on the funds it advanced for the Plans' trades in Danish securities.  Weinstein Decl. Ex. 85 (Kaminer Dep.), at 212:20-213:7, 337:13-17; Weinstein Decl. Ex. 162 (ACER_00024721 – 23) at ACER_00024722.**

Response:  Disputed.  SKAT mischaracterizes the cited testimony and the purpose of the funds provided by ED&F.  While it is true that ED&F provided capital, that capital was not "for the Plans' trades in Danish securities."  *See* Response to SKAT SOF 120.  It is undisputed that ED&F's provision of capital carried interest.

**122.   Through its agent Goal, the AIG Plan submitted the following applications for refunds of dividend withholding tax to SKAT (the "AIG Plan Applications"). Weinstein Decl. Ex. 101 (AIG Plan Resp. to SKAT's First Req. for Admis. (hereinafter "AIG Plan RFA")) at Req. Nos. 23, 37 - 39.**

Response:   Undisputed except as to SKAT's characterizations of each application in the subsequent sub-bullets, which are addressed below.

> **a.   On March 5, 2014, the AIG Plan claimed that it was the beneficial owner of:**
>
> > **i.   500,000 B shares of Coloplast A/S ("Coloplast") for which it received a dividend net of withholding tax in the amount of DKK 2,555,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 945,000.  Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 84 – 90.**

Response: Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 84 – 90.  The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax."  *Id.*

> **b.   On March 26, 2014,the AIG Plan claimed that it was the beneficial owner of:**
>
> > **i.   5,000,000 shares of TDC for which it received a dividend net of withholding tax in the amount of DKK 8,030,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 2,970,000.  Id. at 91 – 96.**

Response:  Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 91 – 96.  The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

      **c.**      **On April 4, 2014, the AIG Plan claimed that it was the beneficial owner of:**

            **i.**      **7,750,000 shares of Danske Bank A/S ("Danske Bank") for which it received a dividend net of withholding tax in the amount of DKK 11,315,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 4,185,000. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 21 – 27.**

            **ii.**     **3,500,000 shares of Novo Nordisk A/S ("Novo Nordisk") for which it received a dividend net of withholding tax in the amount of DKK 11,497,500 and was entitled to a refund for dividend withholding tax in the amount of DKK 4,252,500. Id.**

Response:  Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 21 – 27.  The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

      **d.**      **On April 16, 2014, the AIG Plan claimed that it was the beneficial owner of:**

            **i.**      **1,000 shares of A.P. Møller Mærsk A/S – B ("Mærsk") for which it received a dividend net of withholding tax in the amount of DKK 1,022,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 378,000.  Id. at 28 – 34.**

            **ii.**     **50,000 shares of Tryg A/S ("Tryg") for which it received a dividend net of withholding tax in the amount of DKK 985,500 and was entitled to a refund for dividend withholding tax in the amount of DKK 364,500.  Id.**

Response:  Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 28 – 34.

The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

e.     **August 14, 2014, the AIG Plan claimed that it was the beneficial owner of:**

i.     **3,400,000 shares of TDC for which it received a dividend net of withholding tax in the amount of DKK 3,723,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,377,000.  Id. at 35 – 40.**

Response:  Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 35 – 40. The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

f.     **On December 3, 2014, the AIG Plan claimed that it was the beneficial owner of:**

i.     **800,000 shares of Chr. Hansen Holding A/S, for which it received a dividend net of withholding tax in the amount of DKK 2,201,680 and was entitled to a refund for dividend withholding tax in the amount of DKK 814,320.  Id. at 41 – 46.**

Response:  Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 41 – 46. The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

g.     **On December 10, 2014, the AIG Plan claimed that it was the beneficial owner of:**

i.     **1,500,000 B shares of Coloplast, for which it received a dividend net of withholding tax in the amount of DKK 8,212,500 and was entitled to a refund for dividend withholding tax in the amount of 3,037,500 DKK.  Id. at 47 – 52.**

Response:  Disputed.  The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 47 – 52. The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

    h.    **On March 4, 2015, the AIG Plan claimed that it was the beneficial owner of:**

        i.    **750,000 B shares of Novozymes A/S ("Novozymes"), for which it received a dividend net of withholding tax in the amount of DKK 1,642,500 and was entitled to a refund for dividend withholding tax in the amount of 607,500 DKK. Id. at 53 – 58.**

<u>Response</u>: Disputed. The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities. The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 53 – 58. The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

    i.    **On April 8, 2015, the AIG Plan claimed that it was the beneficial owner of:**

        i.    **4,000 B shares of Mærsk for which it received a dividend net of withholding tax in the amount of DKK 5,755,320 and was entitled to a refund for dividend withholding tax in the amount of 2,128,680 DKK. Id. at 59 – 65.**

<u>Response</u>: Disputed. The documents cited by SKAT do not state that the AIG Plan claimed to be the beneficial owner of Danish securities. The application states "Beneficial Owner: American Investment Group of New York, L.P. Pension Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 164 (SKAT_MDL_001_00081821 - 65) at 59 – 95. The application also does not state that the AIG Plan was "entitled to a refund for dividend withholding tax." *Id.*

123.    **In total, the AIG Plan, through its agent Goal, claimed dividend withholding tax refunds for the AIG Plan in the amount of DKK 21,060,000 and, subsequently, SKAT made payments to Goal in the amount of DKK 21,060,000. After taking its fee, Goal transferred the remainder of the funds from the refund payments to ED&F, which credited the Plans' custodial accounts with those amounts. The AIG Plan received the full amount of the refunds paid by SKAT following SKAT's receipt of the AIG Plan's withholding tax reclaim applications, minus the fee deducted by Goal. Joint 56.1 ¶ 376, 378 – 81.**

<u>Response</u>: Undisputed.

124.    **The AIG Plan Applications each included:**

    a.    **A cover letter on Goal's letterhead, describing the enclosed Tax Voucher as "evidence of payment and tax deduction paid on the [plan's] securities"; See, e.g., Weinstein Decl. Ex. 163**

(SKAT_MDL_001_017584 – 96) at 84.

      **b.**      **A "Claim to Relief from Danish Dividend Tax" (Form 06.003); See, e.g., Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 86.**

      **c.**      **One or more Tax Vouchers from ED&F; Joint 56.1 ¶ 359; see, e.g., Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 87.**

      **d.**      **A Power of Attorney; See, e.g., Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 89 – 90 and**

      **e.**      **An IRS Form 6166.  Joint 56.1 ¶ 360; see, e.g., Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 88.**

Response:  Undisputed except as to subparagraph (a) of the statement.  The cited letter from Goal Taxback "enclosed a tax reclaim, together with evidence of payment and tax deduction paid on the [Plan's] securities."  Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 84.

**125.**      **According to the defendants, each of the AIG Plan's trades identified in Appendices J, K, and L was the basis for its claims that it was the beneficial owner of shares in the AIG Plan Applications.**

Response: Disputed.  SKAT fails to cite any material in the record to support its statement.  Fed. R. Civ. P. 56(c)(1).

**126.**      **Through its agent Goal, the Riverside Plan submitted the following applications for refunds of dividend withholding tax to SKAT (the "Riverside Plan Applications"): Weinstein Decl. Ex. 102 (Riverside Plan RFA) at Req. Nos. 9, 19 – 21.**

Response:  Undisputed except as to SKAT's characterizations of each application in the subsequent sub-bullets, which are addressed below.

      **a.**      **On March 26, 2014, the Riverside Plan claimed that it was the beneficial owner of:**

            **i.**      **2,150,000 shares of TDC for which it received a dividend net of withholding tax in the amount of DKK 3,452,900 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,277,100.  Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 179 – 185.**

Response: Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 179 – 185.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax."  *Id.*

     **b.**     **On April 4, 2014, the Riverside Plan claimed that it was the beneficial owner of:**

          **i.**     **2,000,000 shares of Danske Bank for which it received a dividend net of withholding tax in the amount of DKK 2,920,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,080,000. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 186 – 192.**

          **ii.**     **2,000,000 B shares of Novo Nordisk, for which it received a dividend net of withholding tax in the amount of DKK 6,570,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 2,430,000. Id.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 186 – 192.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

     **c.**     **On April 16, 2014, the Riverside Plan claimed that it was the beneficial owner of:**

          **i.**     **175,000 shares of Tryg, for which it received a dividend net of withholding tax in the amount of DKK 3,449,250 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,275,750. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 193 – 199.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 193 – 199.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

     **d.**     **On May 6, 2014, the Riverside Plan claimed that it was the beneficial owner of:**

          **i.**     **322,500 shares of Dampskibsselskabet Norden A/S, for which it received a dividend net of withholding tax in the amount of DKK 1,177,125and was entitled to a refund for dividend withholding tax in the amount of DKK 435,375. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 200 – 205.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 200 – 205.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

        **e.**      **On May 28, 2014, the Riverside Plan claimed that it was the beneficial owner of:**

            **i.**     **850,000 B shares of Coloplast, for which it received a dividend net of withholding tax in the amount of DKK 2,482,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 918,000.  Id. at 206 – 211.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 206 – 211.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

        **f.**      **On March 13, 2015, the Riverside Plan claimed that it was the beneficial owner of:**

            **i.**     **2,000,000 shares of TDC, for which it received a dividend net of withholding tax in the amount of DKK 1,460,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 540,000.  Id. at 212 – 218.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 212 – 218.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

        **g.**      **On March 18, 2015, the Riverside Plan claimed that it was the beneficial owner of:**

            **i.**     **850,000 shares of DSV A/S for which it received a dividend net of withholding tax in the amount of DKK 992,800 and was entitled to a refund for dividend withholding tax in the amount of DKK 367,200.  Id. at 219 – 225.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner:

Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 219 – 225.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

       **h.**    **On March 26, 2015, the Riverside Plan claimed that it was the beneficial owner of:**

              **i.**    **1,200,000 shares of Danske Bank for which it received a dividend net of withholding tax in the amount of DKK 4,818,000 and was entitled to a refund for dividend withholding tax in the amount of 1,782,000 DKK.  Id. at 233 – 240.**

              **ii.**    **300,000 shares of Pandora A/S for which it received a dividend net of withholding tax in the amount of DKK 1,971,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 729,000.  Id.**

              **iii.**    **1,400,000 shares of Novo Nordisk which it received a dividend net of withholding tax in the amount of DKK 5,110,000 and was entitled to a refund for dividend withholding tax in the amount of DKK 1,890,000 DKK.  Id. at 226 – 232.**

Response:  Disputed.  The documents cited by SKAT do not state that the Riverside Plan claimed to be the beneficial owner of Danish securities.  The application states "Beneficial Owner: Riverside Associates Defined Benefit Plan," but it does not define that beneficial ownership in any way. Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 226–240.  The application also does not state that the Riverside Plan was "entitled to a refund for dividend withholding tax." *Id.*

**127.**    **In total, the Riverside Plan, through its agent Goal, claimed dividend withholding tax refunds for the Riverside Plan in the amount of DKK 12,724,425 and, subsequently, SKAT made payments to Goal in the amount of DKK 12,724,425. After taking its fee, Goal transferred the remainder of the funds from the refund payments to ED&F, which credited the Riverside Plans' custodial accounts with those amounts. The Riverside Plan received the full amount of the refunds paid by SKAT following SKAT's receipt of the Riverside Plan's withholding tax reclaim applications, minus the fee deducted by Goal.  Joint 56.1 ¶ 377 – 80, 382.**

Response:  Undisputed.

**128.**    **The Riverside Plan Applications each included:**

       **a.**    **A cover letter on Goal's letterhead, describing the enclosed Tax Voucher as "evidence of payment and tax deduction paid on the [plan's] securities"; See, e.g., Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 79.**

     **b.**     **A "Claim to Relief from Danish Dividend Tax" (Form 06.003); See, e.g., Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 81.**

     **c.**     **One or more Tax Vouchers from ED&F; Joint 56.1 ¶ 368; see, e.g., Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 82.**

     **d.**     **A Power of Attorney; See, e.g., Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 83 – 84 and**

     **e.**     **An IRS Form 6166. Joint 56.1 ¶ 369; see, e.g., Weinstein Decl. Ex. 165 (SKAT_MDL_001_00082179 – 240) at 85.**

**Response**: Undisputed except as to subparagraph (a) of the statement. The cited letter from Goal Taxback "enclosed a tax reclaim, together with evidence of payment and tax deduction paid on the [Plan's] securities." Weinstein Decl. Ex. 163 (SKAT_MDL_001_017584 – 96) at 84.

**129.**     **According to the defendants, each of the Riverside Plan's trades identified in Appendices J, K, and L was the basis for its claims that it was the beneficial owner of shares in the Riverside Plan Applications.**

**Response**: Disputed. SKAT fails to cite any material in the record to support its statement. Fed. R. Civ. P. 56(c)(1).

**130.**     **The Custody and Clearance Fees292 See Joint Rule 56.1 Statement of Undisputed Material Facts in Support of Motions for Summary Judgment, ¶ 383 were calculated based on the net profit and loss of an entire structured transaction, and generally amounted to 90 to 95% of the net profit from each structured transaction. Weinstein Decl. Ex. 85 (Kaminer Dep.), at 99:18 – 101:2.**

**Response**: Disputed. The term "entire structured transaction" is undefined and vague. The cited documents also do not support SKAT's statement. SKAT states that Custody and Clearance Fees were "calculated based on the net profit and loss of an entire structured transaction." Stacey Kaminer instead testified that the total fees, without any reference to Custody and Clearance Fees, "were based on other factors, but expressed as a percentage." Blessington Decl. Ex. 1, Kaminer Dep. at 100:17-21.

**131.**     **Acer and ED&F agreed on the amount of the Custody and Clearance Fees charged to the AIG Plan and the Riverside Plan, and ED&F debited the Custody and Clearance Fees from AIG Plan's and Riverside Plan's ED&F accounts. Weinstein Decl. Ex. 85 (Kaminer Dep.), at 336:11-338:1.**

**Response**: Disputed. First, the statement is not material to the issues presented in SKAT's motion. SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion. Second, disputed to the extent that SKAT's statement leaves out ED&F's financing costs, which, according to the cited testimony, were included in a detailed reconciliation on all of the costs. Weinstein Decl. Ex. 85 (Kaminer Dep.), at 336:11-338:1. Furthermore, the cited testimony does not support the statement.

132.   **Acer and ED&F agreed that Acer would receive about half of the net profit on the Acer Plans' Danish trading.  Weinstein Decl. Ex. 85 (Kaminer Dep.), at 121:10 – 14; Weinstein Decl. Ex. 166 (ACER_00025379);.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, it is undisputed that the AIG and Riverside Plans received the full amount of the refunds paid by SKAT.  Joint SOF ¶¶ 381, 282.  Second, Stacey Kaminer testified that Acer's fee was charged after "ED&F would charge their fee," and "[a]fter that gross profit, Acer would charge ED&F a fee."  Blessington Decl. Ex. 1 (Kaminer Dep.) at 100:13–16.  Thus, it is disputed that Acer's fee was "half of the net profit on the Acer Plan's Danish trading," when the testimony that SKAT ignores states that Acer's fee was based on ED&F's fee calculation.

133.   **ED&F paid Acer a total of DKK 20,577,685 in connection with the Acer Plans' transactions in Danish shares.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, SKAT fails to cite any material in the record to support its statement.  Fed. R. Civ. P. 56(c)(1).

a.   **Acer sent invoices to ED&F for amounts described as "Dividend Finders Fees" totaling DKK 15,122,846.00, which ED&F paid. Weinstein Decl. Ex. 167 (ACER_00002925, ACER_00007675, ACER_00017546 – 55, ACER_00019338, ED&F-00214987, ED&F-00226522, and ED&F-00257314); Acer Third Party Complaint against ED&F Man ¶ 39, 1:18-md-02865, Jan. 29, 2021 (ECF No. 527).**

Response:  Disputed as to materiality.  The statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.

b.   **According to ED&F, ED&F paid Acer an additional DKK 5,454,839 in relation to the plan transactions in Danish shares.  Weinstein Decl. Ex. 111 (ED&F's Response to Claimant's Request Dated May 19, 2020 for Further Information Under Part 18 (June 11, 2020)) at Appendix 1 (hereinafter "Updated Funds Flow Spreadsheet"); see also Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.**

Response:  Disputed.  First, the statement is not material to the issues presented in SKAT's motion.  SKAT does not cite this statement anywhere in its motion, and as a practical matter, the statement cannot be material to SKAT's motion.  Second, SKAT's reference to "plan transactions in Danish shares" is vague and ambiguous, and SKAT's statement cites solely to inadmissible hearsay.  Fed.

R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Exhibit 111 cited by SKAT appears to be ED&F's response to SKAT's counsel's discovery request in the English Action. As such, the statement in that document cannot be offered by SKAT against the Defendants for the truth of the matter asserted therein.  Third, Defendants object to this statement as SKAT relies on a letter by the Rosenblatt law firm, ED&F's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Fourth, SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, as to Mr. Hashemi's testimony cited by SKAT in this instance: (i) it is not even clear what document Mr. Hashemi is testifying about; (ii) Mr. Hashemi testified that he did not know if he had seen the document that he was looking at before; and (iii) Mr. Hashemi did not testify that he was certain the information in the document was accurate.  Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.

134. **Kaminer testified that Acer did not locate any Danish stock for ED&F.  Weinstein Decl. Ex. 85 (Kaminer Dep.), at 269:20-270:1, 270:22-271:14.**

Response:  Disputed.  Stacey Kaminer testified that Acer did not locate any stock that "ultimately got delivered to ED&F" and that Acer did not locate any of the stock listed on any invoice submitted by Acer to ED&F in connection with Danish dividend arbitrage trading.  Kaminer Dep. 269:20-270:1.

135. **Crema testified that the payments to Acer were "pension plan finder fees" for identifying U.S. pension plans willing to lend their tax status and name to the transactions.  Weinstein Decl. Ex. 83 (Crema Dep.), at 31:21 to 32:33.**

Response:  Disputed.  SKAT's statements are not material to any issue raised in its motion.  Moreover, Mr. Crema testified that he agreed that identifying pension plans for the transaction was "one of the services" that Acer provided.  Weinstein Decl. Ex. 83 (Crema Dep.), at 32:17–23.  This is consistent with testimony from Acer's other principal, Stacey Kaminer.  Ms. Kaminer testified that "ED&F paid [Acer] based on our relationship, based on overall value that we brought to the table, based on the instances when we did locate stock, and that our dividend finder fee didn't just cover locating, sourcing, whatever word you want to use for the term stock, and they did not separate out well, this is Belgium, this is Canada, this is Denmark.  They viewed us as a relationship in the whole."  Blessington Decl. Ex. 1 (Kaminer Dep.) at 269:8–19.  Ms. Kaminer testified that Acer's finder fees were based on "other value that we provided to ED&F… we were the relationship whereby [ED&F] were able to establish relationships with the pension plans and the charities as customers.  We were also helpful in making sure that all of their — sort of that single point of contact so that all of their needs and servicing their customers was consolidated into one place that made everything — facilitating anything much easier than it would have been if they were trying to coordinate amongst many more entities than just one."  *Id.* at 55:16–56:3.  Ms. Kaminer further testified that Acer's relationship and its finders fees were based on more than simply Acer's relationship with ED&F through transactions in Danish securities, but for securities

from other jurisdictions as well. *Id.* at 56:4–16. When asked whether Acer was "being compensated for introducing the pension plans to ED&F," Ms. Kaminer testified that she "wouldn't characterize that way . . . Acer didn't actually have to introduce the pension plans to ED&F, per se, because the people that worked on that desk came from MF Global, which had relationships with the pension plans already." *Id.* at 57:2–8. Finally, Crema testified that Stacey Kaminer would be the person at Acer who would know how the dividend finder's fees were calculated. Blessington Decl. Ex. 3 (Crema Dep.) at 36:19–22. Crema also testified that he did not know what a service provider relationship is in the context of the dividend finder's fee business that Acer conducted. *Id.* at 87:17–22. Thus, the record also demonstrates that Kaminer was the person most knowledgeable as to the basis for Acer's fees.

136. **ED&F remitted a portion of the Custody and Clearance Fees paid by the Acer Plans to Acer in the guise of "Dividend Finders Fees," as outlined below: Weinstein Decl. Ex. 111 (Updated Funds Flow Spreadsheet); *see also* Weinstein Decl. Ex. 112 (Letter from Rosenblatt to Pinsent Masons (Jan. 13, 2020)) (Dep. Ex. 4259); Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.**

[CHART OMITTED]

Response: Disputed. First, SKAT's statements are not material to any issue raised in its motion. Second, it is disputed that "ED&F remitted a portion of the Custody and Clearance Fees to Acer under the guise of 'Dividend Finders Fees.'" Stacey Kaminer testified that Acer's fee was charged after "ED&F would charge their fee," and, after ED&F's "gross profit, Acer would charge ED&F a fee." Blessington Decl. Ex. 1 (Kaminer Dep.) at 100:13–16. Moreover, Ms. Kaminer testified that "ED&F paid [Acer] based on our relationship, based on overall value that we brought to the table, based on the instances when we did locate stock, and that our dividend finder fee didn't just cover locating, sourcing, whatever word you want to use for the term stock, and they did not separate out well, this is Belgium, this is Canada, this is Denmark. They viewed us as a relationship in the whole." Blessington Decl. Ex. 1 (Kaminer Dep.) at 269:8–19. Ms. Kaminer testified that Acer's finder fees were based on "other value that we provided to ED&F… we were the relationship whereby [ED&F] were able to establish relationships with the pension plans and the charities as customers. We were also helpful in making sure that all of their — sort of that single point of contact so that all of their needs and servicing their customers was consolidated into one place that made everything — facilitating anything much easier than it would have been if they were trying to coordinate amongst many more entities than just one." *Id.* at 55:16–56:3. Ms. Kaminer further testified that Acer's relationship and its finders fees was based on more than simply Acer's relationship with ED&F through transactions in Danish securities, but for securities from other jurisdictions as well. *Id.* at 56:4–16. When asked whether Acer was "being compensated for introducing the pension plans to ED&F," Ms. Kaminer testified that she "wouldn't characterize that way . . . Acer didn't actually have to introduce the pension plans to ED&F, per se, because the people that worked on that desk came from MF Global, which had relationships with the pension plans already." *Id.* at 57:2–8. Thus, it is disputed that Acer's fees were "a portion of [ED&F's] Custody and Clearance Fees" that were charged to the plans. Second, when setting forth the amounts above, SKAT extensively relies on inadmissible hearsay. Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802. Exhibit 111 cited by SKAT appears to be ED&F's response to SKAT's counsel's discovery request in the English Action. As such, the statement in that document cannot be offered by SKAT against the Defendants for the truth of

the matter asserted therein.  Furthermore, Defendants object to this statement as SKAT relies on a letter from ED&F's counsel in the U.K.  The document is inadmissible hearsay and is therefore not appropriate to consider on summary judgment.  Fed. R. Civ. P. 56(c)(2); Local Rule 56.1(d); Fed. R. Evid. 801, 802.  Finally, SKAT's use of the testimony of Mr. Hashemi, one of ED&F's Rule 30(b)(6) witnesses, is inappropriate because SKAT is not "adverse" to ED&F.  Fed. R. Civ. P. 32(a)(3).  Furthermore, the cited testimony of Mr. Hashemi is inadmissible hearsay because it was made in his capacity as a Rule 30(b)(6) corporate representative and there is insufficient evidence that he possessed personal knowledge of the facts to which he testified. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 801, 802.  Moreover, as to Mr. Hashemi's testimony cited by SKAT in this instance, it is not even clear what document Mr. Hashemi is testifying about; moreover, Mr. Hashemi testified that he did not know if he had seen the document that he was looking at before, and he did not testify that he was certain the information in the document was accurate.  Weinstein Decl. Ex. 86 (Hashemi Dep.), at 342:24 – 343:10.  However, it is undisputed (though immaterial to SKAT's motion) that Acer's invoices were sent to ED&F and were subsequently paid.  *See supra* Response to SKAT SOF ¶ 133.a.

**137.  Beginning in 2014, Solo or one of its affiliates introduced the plans to software that the plans then licensed from a third-party that automated the purported trading and automatically generated at least the plans' trading emails based on the data inputted into the program.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 444:5-448:2.  Before it licensed the software, Markowitz, van Merkensteijn, and Klugman hired two traders to manually send or respond to emails from the Solo Custodians, brokers and purported stock loan counterparties to purportedly execute the plans' trading.  Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 409:9-410:9.  As part of those trading instructions, the traders were told to expect trade approval and confirmation emails from the Solo Custodians, brokers and purported lenders shortly after it executed or requested approval to execute a trade.  Weinstein Decl. Ex. 178 (JHVM_0004863); Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 417:2-25.**

Response:      Disputed.  The facts set forth in Paragraph 137 are immaterial, but Defendants admit the following facts: 1) Solo or one of its affiliates introduced the Basalt Plan, Roadcraft Plan, FWC Plan, and Proper Pacific Plan to software that partially automated the trading process; 2) Prior to the Basalt Plan and the Roadcraft Plan licensing the software, Markowitz, van Merkensteijn, and Klugman hired two individuals to manually execute trades on behalf of the Basalt Plan and Roadcraft Plan, among others; 3) These two individuals sent or responded to emails from the Solo Custodians, brokers, and stock loan counterparties; and 4) These two individuals were given instructions, which included an instruction to expect trade approval and confirmation emails form the Solo Custodians, brokers, and lenders shortly after executing or requesting approval to execute a trade.

All other factual contentions contained in Paragraph 137 are unsupported by the evidence cited by SKAT, including its characterization—four times—of certain facts as "purported."  Because they lack support via citation to admissible evidence, they are properly disregarded.  SKAT has not limited itself here to a discussion of the specific bellwether cases, nor does it specify the plans to which the various facts apply.  For example, the RJM Plan neither employed the two individuals described by SKAT, nor licensed the trading software described in this paragraph.  *See* Schoenfeld Decl. Ex. 8 (Markowitz Tr. 444:9-14) and *id.* Ex. 15 (Ex. 1785) (confirming that no computer

software was yet in use as of August 4, 2014, and that the RJM Plan was not among those set to trade in August 2014).  The two referenced individuals similarly did not execute trades on behalf of any other bellwether defendant apart from the Basalt Plan and Roadcraft Plan.

## DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS

1.      For each of what SKAT refers to as the 13 "Cum-Cum" transactions executed by ED&F on behalf of the ED&F Bellwether Plans, the relevant ED&F Bellwether Plan made a trade request to ED&F to purchase shares in a Danish company with an upcoming dividend event.  *See* DSMF ¶¶ 196, 205, 218, 227, 236, 254, 275, 307, 315, 324, 340, 350, 359.

2.      For each "Cum-Cum" transaction, ED&F executed a trade with a trade date prior to the ex-dividend date for the relevant dividend event, and provided confirmation of that trade to Stacey Kaminer and/or Acer Investment Group.  *See* DSMF ¶¶ 197, 206, 219, 228, 237, 255, 276, 308, 316, 325, 341, 351, 360.

3.      For each "Cum-Cum" transaction, ED&F received a SWIFT message confirming settlement of the trade from its sub-custodian, which in each case was either BNP Paribas or Skandinaviska Enskilda Banken.  *See* DSMF ¶¶ 198, 208, 220, 229, 238, 256, 277, 309, 317, 326, 342, 352, 361.

4.      Each "Cum-Cum" transaction settled on or before the record date for the relevant dividend event.  *See* DSMF ¶¶ 198, 208, 220, 229, 238, 256, 277, 309, 317, 326, 342, 352, 361.

5.      Following each "Cum-Cum" transaction, ED&F received from its sub-custodian a SWIFT message demonstrating receipt by the sub-custodian of a dividend payment from the relevant Danish issuer, which in each case was equal to 73% of the dividend rate multiplied by the number of shares held.  DSMF ¶¶ 202, 213, 224, 233, 242, 259, 280, 312, 321, 332, 347, 356, 367.

6.      For each of what SKAT refers to as the 12 "Cum-Ex" transactions, the relevant ED&F Bellwether Plan made a trade request to ED&F to purchase shares in a Danish company with an upcoming dividend event.  *See* DSMF ¶¶ 142, 151, 160, 169, 178, 187, 245, 260, 266, 281, 289, 298.

7.      For each "Cum-Ex" transaction, ED&F received a SWIFT message confirming settlement of the trade from its sub-custodian, which in each case was either BNP Paribas or Skandinaviska Enskilda Banken.  DSMF ¶¶ 144, 153, 162, 171, 180, 189, 247, 262, 268, 283, 291, 300.

8.      VP Securities, Denmark's Central Securities Depository, permitted parties trading in Danish securities during the relevant period to agree on "any settlement date from the trading day, T+0, to T+365."  *See* Danmarks Nationalbank, *Assessment of the VP settlement system against the ECSB/CESR Recommendations for Securities Settlement Systems*, at 12, *available at* https://www.nationalbanken.dk/en/publications/Documents/2012/04/Assesment%20of%20the%20VP%20settlement%20system_2012.pdf.

9.      Each "Cum-Ex" transaction settled the day after the record date for the relevant dividend event.  *See* DSOF ¶¶ 143, 152, 161, 170, 179, 188, 246, 261, 267, 282, 290, 299; JSUMF ¶¶ 300-15.

10.     Global securities markets recognize the concept of a "market claim," which may be used to transfer a dividend from the seller of a share to the buyer of the share.  *See, e.g.*, European Central Bank and Target2 Securities, T2S Corporate Actions Standards: Market Claims, at 3 (May 16, 2013), *available at* https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2S MarketClaimStandards.en.pdf.

11.     Securities markets recognize that a market claim is appropriate in circumstances where the parties intend to settle a transaction after the record date and in circumstances where the parties intend to settle a transaction before the record date, but fail to do so.  *See* European Central Bank T2S Corporate Actions Standards Frequently Asked Questions, Questions 1.1, 1.3, 1.5, 1.22

(March 8, 2018), *available at* ecb.targetseccasg180308_T2SCAStandardsFAQsUpdatedMarch2018.en; Corporate Action Joint Working Group, Market Standards for Corporate Actions Processing at 41 (2012), *available at* . https://www.ebf.eu/wp-content/uploads/2017/07/CAJWG-Standards-revised-version-2012-final-clean-_-priorities-marked.pdf ("Market Claims should be created . . . when trade date is before Ex Date and there is a Pending Transaction at close of business of Record Date").

12.     For the two "Cum-Ex" transactions not included on Annex E, the counterparties, Lutetia Capital and Mitsubishi UFJ Financial Group ("MUFG"), confirmed by email that ED&F was due a dividend by virtue of the trading between the parties, and paid their dividend along to ED&F.  DSMF ¶¶ 251, 271.

13.     In seeking the dividend payments from Lutetia Capital and MUFG, ED&F specified that it was "claiming the below dividend due to cum dividend trades settling after the dividend record date." *See, e.g.*, Dillman Decl. Ex. 115 (ED&F-00044985) at ED&F-00044997.

14.     For the ten "Cum-Ex" transactions underlying the tax vouchers listed on Annex E, ED&F's securities operations personnel debited the dividend payment from MPT Dubai and credited the dividend payment to the relevant ED&F Bellwether Plan.  *See, e.g.*, Weinstein Decl. Ex. 150.

15.     MPT Dubai was not the seller of the shares for any transaction at issue other than those underlying the tax vouchers listed on Annex E.  *See* DSMF ¶¶ 145, 154, 163, 172, 181, 190, 263, 284, 292, 301; *see generally* DSMF ¶¶ 142-369.

16.     For both "Cum-Cum" and "Cum-Ex" transactions, account statements provided by ED&F to the relevant ED&F Bellwether Plan show that, as of the ex-dividend date for the relevant dividend event, the relevant ED&F Bellwether Plan owned the shares for which they received

confirmation of acquisition.  DSMF ¶¶ 146, 155, 164, 173, 182, 191, 200, 210, 222, 231, 240, 249, 272, 286, 293, 302, 310, 319, 330, 345, 354, 365.

17.     For both "Cum-Cum" and "Cum-Ex" transactions, ED&F credited the expected amount of the dividend received on account of those shares to the relevant ED&F Bellwether Plan, which was in all cases equal to 73% of the dividend rate multiplied by the number of shares owned. DSMF ¶¶ 140, 149, 158, 167, 176, 185, 194, 205, 216, 225, 234, 243, 264, 278, 287, 296, 304, 313, 324, 339, 348, 359.

18.     For "Cum-Cum" and "Cum-Ex" transactions alike, ED&F prepared tax vouchers stating that the dividend amounts received and credited to the ED&F Bellwether Plan were net of withholding tax.  JSUMF ¶¶ 324-345.

19.     Each tax reclaim application submitted to SKAT on behalf of the relevant ED&F Bellwether Plan included the relevant tax voucher(s) produced by ED&F.  JSUMF ¶¶ 359, 368.

20.     SKAT has stated in a pleading in its action against ED&F in England, and thus has admitted, that "[f]or the purposes of Danish tax laws (including in relation to . . . the eligibility for a refund of withholding tax), a share is acquired or disposed of at the time when a final and binding agreement exists on the acquisition or disposal."  *See* Dillman Decl. Ex. 138 (Claimant's Further Particulars Regarding the Validity of WHT Refund Applications) at ¶ 15.3.

21.     Clause 10(b)(ii) of the ED&F Terms and Conditions of Business states that "all assets . . . received by us . . . in respect of your account will be actually or potentially in respect of margin or collateral." Blessington Decl. Ex. 13 (ED&F Terms and Conditions of Business), at ACER_00011114.

22.     When ED&F exercised its right to use client assets as collateral for financing provided to the ED&F Bellwether Plans, ED&F made a record of entry to a separate "B-Loan

Account."  The B-Loan Account for the AIG Plan was called "CC:AMERIC-BLOAN" and the B-Loan Account for the Riverside Plan was called "CC:RIVERS-BLOAN."  *See, e.g.*, Blessington Decl. Ex. 14 (ACER_00001624) (showing relevant transactions for TDC DC for March 2014 dividend event).

23.      Under the Double Taxation Treaty in place between the United Kingdom and Denmark, ED&F, as a resident of England, would have been entitled to a refund of dividend tax withheld in excess of 15% of the gross dividend amount if it had been "beneficial owner" of the relevant shares and had applied to SKAT for a tax reclaim.  *See* UK/Denmark Double Taxation Convention art. 10(2)(a), signed November 18, 1980.

24.      SKAT alleged in England that the contractual arrangements between ED&F and the ED&F Bellwether Plans were "intended to enable a [pension plan] to make a withholding tax application," and that the "chain of transactions" in fact "had no other purpose."  *See* Dillman Decl. Ex. 136 (SKAT Re-Amended Schedule 5T) at ¶ 5(b).

APPENDIX A

| Bellwether Case No. | Defendants |
| --- | --- |
| 19-cv-1898 | RJM Capital Pension Plan; Richard Markowitz |
| 19-cv-1866 | Basalt Ventures LLC  Roth 401(k) Plan; John van Merkensteijn; Michael Ben-Jacob |
| 19-cv-1812 | Roadcraft Technologies LLC Roth 401(k) Plan; Ronald Altbach; Michael Ben-Jacob; Robert Klugman; Richard Markowitz; RAK Investment Trust; Routt Capital Trust |
| 18-cv-4051 | The Proper Pacific LLC 401K Plan; Doston Bradley |
| 18-cv-10098 | The FWC Capital LLC Plan; Roger Lehman |
| 18-cv-9841 | American Investment Group of New York, L.P. Pension Plan; Stacey Kaminer; Robert Crema; Acer Investment Group, LLC; ED&F Man Capital Markets Ltd. (third-party defendant) |
| 18-cv-9840 | Riverside Associates Defined Benefit Plan; David Schulman; Acer Investment Group, LLC; ED&F Man Capital Markets Ltd. (third-party defendant) |