# Exhibit 1

Message

**From:** Lill Helene Drost [/O=TOLDSKAT/OU=TOLDSKAT/CN=RECIPIENTS/CN=W04400]
**Sent:** 14-09-2015 08:48:14
**To:** Anne Munksgaard [anne.munksgaard@skat.dk]
**CC:** Christian Baden Ekstrand (Christian.Ekstrand@Skat.dk) [christian.ekstrand@skat.dk]
**Subject:** VS: Status kontrol udbyttesager
**Attachments:** Faktaark projekt Reclaim.docx

Hej Anne.

Hermed ny udgave af faktaark med tilføjelse omkring selve kontrolarbejdet.

Mvh
Christian og Lill

**Fra:** Lill Helene Drost
**Sendt:** 14. september 2015 10:02
**Til:** Anne Munksgaard
**Cc:** Christian Baden Ekstrand (Christian.Ekstrand@Skat.dk)
**Emne:** VS: Status kontrol udbyttesager

Hej Anne

Hermed Christians og mit tilrettede bidrag i forhold til et faktaark.

Der er lige lidt med rødt, hvor vi mener, at du skal træffe den endelige beslutning (og rykke Jura)

Mvh
Lill

**Fra:** Christian Baden Ekstrand
**Sendt:** 13. september 2015 19:32
**Til:** Anne Munksgaard; Lill Helene Drost
**Emne:** SV: Status kontrol udbyttesager

Hej Anne

Tak for orienteringen. Vi skal her være opmærksom på en ting; som jeg i øvrigt er enig med Kim Tolstrup i, der kan give lidt udfordringer i henhold til straffesagen. Dette afhænger selvsagt af hvad efterforskningen viser og hvilken dokumentation politiet kan indhente, men bare så vi notere os det.

Se nedenstående med rødt.

1) Er tilbagesøger ejer ?

   Første spørgsmål er det som vi formoder at være kernen i svigssagerne, ejer man reelt en aktie i selskabet. Næste skridt bliver at fastslå om man også skatteretligt er såkaldt retmæssig ejer (beneficial owner) af aktien.

I Danmark defineres ejer i skatteretlig sammenhæng som beneficial owner hvilket afviger fra den civilretlige ejerdefinition og dermed også registrering i diverse registre. Det skyldes, at Ligningsrådet afgørelse jf. TfS1999, 408 LR. For bl.a. at forbedre aktiemarkedets likviditet, forbedre handlen med aktier noteret på flere børser samt øge muligheden for en effektiv afvikling fik Finansrådet, Børsmæglerforeningen og Københavns Fondsbørs i 1999 Ligningsrådet til at godkende, at såkaldt aktieudlån ikke er en afståelse i aktieavancebeskatningslovens forstand. Dette betyder således, at når en aktie i en aktielånsmodel civilretligt overdrages så er den ikke skattemæssigt overdraget og det er dermed også den tidligere ejer (långiver) der kan tilbagesøge udbytte.

I kontrolmæssig sammenhæng giver dette meget betydelige problemer, idet alle registre mv. hos fx pengeinstitutter, værdipapircentral osv. registrerer efter civilretten og ikke skatteretten. Det betyder reelt, at SKAT ikke har nogen mulighed for at kontrollere om tilbagesøger er rette ejer i forhold til aktielåneordninger -- ud over at spørge den tilbagesøgende.

Vh

Christian

---

**Fra:** Anne Munksgaard
**Sendt:** 13. september 2015 14:52
**Til:** Lill Helene Drost; Christian Baden Ekstrand
**Emne:** Fwd: Status kontrol udbyttesager



Sendt fra min iPhone

Start på videresendt besked:

> **Fra:** Kim Tolstrup <kim.tolstrup@skat.dk>
> **Dato:** 13. sep. 2015 kl. 14.32.22 CEST
> **Til:** Hans From <Hans.From@skat.dk>, Anne Munksgaard <Anne.Munksgaard@Skat.dk>
> **Emne: Status kontrol udbyttesager**
>
> Kære begge
>
> Nedenstående overblik/status som jeg agter at tage afsæt i på onsdag når Johnny, Susanne og jeg skal til statusmøde hos Jesper.
>
>
> Med venlig hilsen
>
> Kim Tolstrup
> *Kontorchef*
>
> Store selskaber 1
> Sluseholmen 8 B, 2450 København SV
> E-mail: Kim.Tolstrup@Skat.dk

Confidential Pursuant to Protective Order                                       SKAT_MDL_001_00463952

Telefon: (+45) 72 38 96 57

-------------------------

Kontrolgruppens opgave er overordnet set, at foretage kontrol af de indkomne tilbagesøgninger der er stoppet som en udløber af svigsagen, at foretage kontrol af de sager der løbende modtages indtil en ny proces er på plads, samt ud fra de risici og fejl som evt. konstateres, at give input til den nye proces.

Da opgaven blev igangsat var der samlet set ca. 18.000 sager – et tal der nu er vokset til mere end 20.000 sager.

### Modtagelse af ansøgninger og SKATs datagrundlag til brug ved kontrol

Når anmodninger modtages i SKAT kan det overordnet set ske på to måder:

1) Manuelt enten direkte fra ansøgeren eller via en såkaldt re-claim agent. I begge tilfælde modtages en tilbagesøgningsblanket bilagt en udbyttenota, skatteattest vedrørende tilbagesøgers skatteforhold. Når det er via en re-claim agent skal tillige indsendes en fuldmagt.

2) Regnearksmodellen hvor en af de tre banker indsender et regneark med en linje med data pr. kunde de tilbagesøger for. Her vedlægges ikke yderligere dokumentation og banken er ikke nødvendigvis selv i besiddelse af dette idet de ofte selv blot har modtaget et regneark fra deres (bank)kunder bagud i kæden. De indsendte regneark er ikke ens i deres opbygning og formater.

I begge tilfælde sker der manuel tastning af tilbagesøgningen hos Betaling og Regnskab. De manuelle direkte i 3S og regnearkene som et sum tal pr. regneark i sap38 hvorefter der sker overførsel til tilbagesøger.

De 20.000 sager fordeler sig med ca. 75% på regnearksmodellen og 25% manuelle.

Selve materialet/dokumenterne opbevares i manuelle bundter hos Betaling & Regnskab.

### Kontrolprocessen

Der eksisterer ikke i dag en fuldstændig sikker model til at afstemme tilbagesøgningerne op i mod SKATs egne registre fx vedrørende indeholdt udbytteskat og evt. andre data.

Med den store mængde af ansøgninger vurderes det hensigtsmæssigt at tilgå opgaven ud fra risiko og væsentlighed. Ud fra denne tilgang er data søgt konverteret til et format hvor der kan arbejdes med IT revisionsværktøjer som ACL, Excel mv. Alternativt skal hver eneste sag gennemgås manuelt hvorved en struktureret og ensartet tilgang til risici og væsentlighed fortabes.

Sammen med Indsatsanalyse arbejdes derfor med at skabe et udsøgningsdesign på samme niveau som når vi arbejder med compliance og skattegab. Hensigten er, at vi uden at gennemgå hver eneste sag manuelt kan sige noget om risiko og væsentlighed, også i den del der ikke udtages til kontrol. Der arbejdes således med, at vi målrettet udsøger på bestemte risici og på væsentlige beløb og med stikprøver i resten. Denne proces skulle også tilgodese et mål om hurtigst muligt, at frigive de tilbagesøgninger som ikke er hverken risikofyldte eller væsentlige.

Kvaliteten af data er dog særligt i forhold til regnearksmodellen en betydelig udfordring bl.a. på grund af forskellige formater og der arbejdes aktuelt på at sikre datagrundlaget således, at validiteten heraf er høj.

Aktuelt arbejder Betaling og Regnskab med at få tastet de ca. 4.500 manuelle sager i 3S således, at der kan ske udsøgning i disse i henhold til udsøgningsdesignet. Dette har så aktuelt den udfordring at det kræver opdatering af BO univers hvilket p.t. er forsinket.

Det er i puljen med de manuelle tilbagesøgninger, at sagerne omfattet af svigkomplekset er fundet. Fællesnævneren er, at der er sket tilbagesøgning de gennem såkaldte re-claim agents som er firmaer der har specialiseret sig i, at levere serviceydelser bestående i assistance med tilbagesøgning. Der foreligger ikke p.t. oplysninger om, at disse skulle være en del af svigkomplekset. I puljen med manuelle tilbagesøgninger er imidlertid p.t. ca 150 sager med tilbagesøgningsanmodninger fra sådanne agenter og disse sager kontrolleres alle fuldstændigt. Selve kontrolsagsbehandlingen heraf igangsættes mandag den 14. september 2015.

I løbet af uge 38 forventes data fra regnearksmodellen at være på plads således der konkret kan igangsættes udsøgning i populationen ud fra tre risikoprofiler (Høj, mellem og lav) og hver profil indeholder forskellige parametre fx beløbsstørrelse, sammenfald i beløb, tilbagesøgningssats, samme ejer mv. Undersøgelsesdesignet er gjort dynamisk således, at der kan justeres for risici der måtte blive identificeret undervejs i kontrollen.

Nye tilbagesøgninger der modtages indtil ny proces er på plads og implementeret vil blive kørt igennem samme udsøgningsdesign.

Det er på nuværende tidspunkt ikke muligt at sige noget om antallet af sager der vil falde for de forskellige kriterier, idet data fortsat er under klargøring. Det forventes det at være i løbet af de næste 8-14 dage.

Der er kontrolmedarbejdere med rette kompetencer klar til at gå i gang med kontrollen i takt med udsøgningerne foretages.
Der er ligeledes udfærdiget kontrolinstruks til kontrolmedarbejderne til brug for kontrollen ligesom der er udfærdiget standardbreve til brug for indkaldelse af dokumentation m.v. Begge er dele er sket i samarbejde med Jura.

Kontrolprocessen forventes som omtalt ovenfor startet op med sagerne hvor der er re-claim agenter i uge 38, ligesom der forventes igangsat kontroller på regnearksmodellen i uge 38/39. Udsøgninger blandt de manuelle igangsættes så snart BO universitet er opdateret hvilket forventes, at ske i uge 38 hvis nuværende tekniske udfordringer er løst. Kontrolsagerne vil således blive igangsat successivt, ligesom nye indkomne anmodningerne løbende vil blive kørt igennem udsøgningsdesignet. Samtidig forventes der løbende, at kunne frigøres sager uden risiko til Betaling & Regnskab til udbetaling. Ressourcemæssigt er der to medarbejdere der hele tiden styrer det samlede antal sager, udsøgninger, frigivelser og opsamling af viden og videregivelse heraf til gruppen der arbejder med ny proces mv. og som ikke deltager i kontrolopgaven. Disse er ligeledes løbende i dialog med Indsatsanalyse så samme høje niveau i tilgangen som ses i skattegabsanalyser mv. også er til stede her, hvilket skulle sikre et høj grad af sikkerhed i den endelige afrapportering på kontrollen.

Kontrolgruppens plan for kontrollens gennemførelse har været forelagt Intern Revision (SIR) som har tilkendegivet, at de finder tilgangen god og samtidig har bedt om løbende at blive orienteret om udviklingen i kontrollen og dens resultater. Denne opgave er ligeledes forankret hos de to omtalte medarbejdere ovenfor.

I forhold til kontrollens gennemførelse skal der ligeledes gøres opmærksom på, at en meget væsentlig del af den dokumentation der skal indkaldes til brug for vurderingen befinder sig i udlandet hvilket betyder en længere sagsbehandlingstid end hvis dette umiddelbart kunne tilgås inden for landets grænser. Der må ifølge den største af bankerne på regnearksordningen påregnes nogle ugers leveringstid fra vi beder om noget til det kan forventes modtaget.

### Kontrolopgaven

Kontrolopgaven tager et væsentlig bredere sigte en svigkontrollen og der har løbende i pressen været talt og skrevet om såvel cum/ex set uppet i Tyskland og spørgsmålet om aktielåneordninger.

Sat på spidsen er der to ting der skal kontrolleres i sager om tilbagesøgning af udbytter fra selskaber i Danmark:

1) Er tilbagesøger ejer ?

    Første spørgsmål er det som vi formoder at være kernen i svigssagerne, ejer man reelt en aktie i selskabet. Næste skridt bliver at fastslå om man også skatteretligt er såkaldt retmæssig ejer (beneficial owner) af aktien.

    I Danmark defineres ejer i skatteretlig sammnehæng som beneficial owner hvilket afviger fra den civilretlige ejerdefinition og dermed også registrering i diverse registre. Det skyldes, at Ligningsrådet afgørelse jf. TfS1999, 408 LR. For bl.a. at forbedre aktiemarkedets likviditet, forbedre handlen med aktier noteret på flere børser samt øge muligheden for en effektiv afvikling fik Finansrådet, Børsmæglerforeningen og Københavns Fondsbørs i 1999 Ligningsrådet til at godkende, at såkaldt aktieudlån ikke er en afståelse i aktieavancebeskatningslovens forstand. Dette betyder således, at når en aktie i en aktielånsmodel civilretligt overdrages så er den ikke skattemæssigt overdraget og det er dermed også den tidligere ejer (långiver) der kan tilbagesøge udbytte.

    I kontrolmæssig sammenhæng giver dette meget betydelige problemer, idet alle registre mv. hos fx pengeinstitutter, værdipapircentral osv. registrerer efter civilretten og ikke skatteretten. Det betyder reelt, at SKAT ikke har nogen mulighed for at kontrollere om tilbagesøger er rette ejer i forhold til aktielåneordninger – ud over at spørge den tilbagesøgende.

2) Er det rette beløb/skatteprocent der tilbagesøges. Afhængigt af tilbagesøgers domicilland kan DBO, direktiver mv. betyde, at den indeholdte udbytteskat kan tilbagesøges helt eller delvist. Denne må også ses i sammenhæng med spørgsmålet under 1 om ejer, idet man ikke kan opnå tilbagesøgning af større beløb end det ejer defineret som beneficial owner er berettiget til ved fx at skyde et mellemselskab ind i et bedre DBO land (som muliggør tilbagesøgning af fx hele udbytteskatten i stedet for kun noget af denne) mellem beneficial owner og udbytteudloddende selskab.

Der er dialog i gang med Jura og departement omkring disse problemstillinger.

For så vidt angår det omtalt CUm/Ex set up fra Tyskland har vi netop modtaget materiale fra Tyskland som Jura p.t. er ved at se nærmere på . Den foreløbige vurdering er dog, at den specifikke model, nemlig udbyttekompensation omkring udlodningstidspunktet – ikke har noget at gøre med danske forhold, da vi ikke betragter kompensationerne som udbytte hvorfor der ikke er mulighed for at søge refusion.  Endelig konklusion afventer dog Juras vurdering. Dersom der er en risiko vil den indgå i udsøgningsdesignet som omtalte ovenfor.

Confidential Pursuant to Protective Order

SKAT har iht Kildeskattelovens § 69B 6 måneder til, at kontrollere og bede om fornøden dokumentation uden, at der skal betales rentegodtgørelsen til den tilbagesøgende part. Hvis de 6 måneder overskrides (regnet fra modtagelse af anmodningen) skal der betales renter, medmindre overskridelsen skyldes vægring i udlevering af oplysninger/dokumentation fra den tilbagesøgende parts side. Det betyder, at der i udsøgning og tildeling af sager arbejdes med et FIFO princip og arbejdes med opfølgning/advis proces for at undgå SKAT kommer til, at skulle betale renter i denne sammenhæng. Erfaringen tilsiger, at der vil komme sager hvor sagsbehandlingen vil overskride 6 måneder, men erfaringen viser også det skyldes manglende dokumentation mv. fra tilbagesøgende part. Der ligger dog en usikkerhed om hvor meget/lidt der skal til for, at der er tale om vægring. Der er dialog med Jura om fortolkning og SKATs linje på dette område.

Med venlig hilsen

Kim Tolstrup
*Kontorchef*

Store selskaber 1
Sluseholmen 8 B, 2450 København SV
E-mail: Kim.Tolstrup@Skat.dk
Telefon: (+45) 72 38 96 57

| | |
|---|---|
| **pious:** | Lill Helene Drost |
| **Late hour:** | 09/14/2015 09:48:14am |
| **two:** | Anne Munksgaard <anne.munksgaard@skat.dk> |
| **Cc:** | Christian Baden Ekstrand (Christian.Ekstrand@Skat.dk) <christian.ekstrand@skat.dk> |
| **Subject:** | Vs: Status control dividend cases |
| **Attachments:** | Fact sheet project Reclaim.docx |

Hello Anne.

This is a new edition of fact sheets with an addition to the control work itself.

Mvh
Christian and Lill

**from:** Lill Helene Drost
**sent:** 14. September 10, 2015 - 10:02AM
**towards:** Anne Munksgaard
**Cc:** Christian Baden Ekstrand (Christian.Ekstrand@Skat.dk)
**subject:** Vs: Status control dividend cases

Hello Anne

This means Christians and my corrected contribution in relation to a fact sheet.

There is just a little in red where we think you should make the final decision (and move Jura)

Mvh
Lill


**from:** Christian Baden Ekstrand
**sent:** 13. September 19, 2015 - 7:32PM
**towards:** Anne Munksgaard; Lill Helene Drost
**subject:** Sv: Status control dividend cases

Hello Anne

Thank you for your information. We must pay attention here to one thing; which I also agree with Kim Tolstrup, which can present some challenges under the criminal case. This obviously depends on what the investigation shows and what evidence the police can obtain, but just so we take note of it.

See below in red.

    1)     Is the seeker owner?

        The first question is that, as we assume to be at the heart of the fraud cases, you actually own a share in the company. The next step will be to determine whether you are also the beneficial owner of the stock under tax law.

In Denmark, the owner is defined in tax law terms as beneficial owner which differs from the civil owner definition and thus also registration in various registers. This is because the Equation Council's decision under Article 100a of the Treaty on European Union is not in accordance with the procedure laid down in Article 1 TfS1999, 408 LR. In order, among other things, to ensure that the In 1999, the Danish Securities Association and the Copenhagen Stock Exchange approved the possibility of so-called share lending not a transfer within the meaning of the Danish Securities And Exchange Act. This means that when a share in a share loan model is transferred in civil law, it is not transferred for tax purposes and it is thus also the previous owner (lender) who can recover dividends.

In the control context, this presents very significant problems, since all registers, etc. financial institutions, csDs, etc. register according to civil law and not tax law. This effectively means that SKAT has no way of checking whether the returnee is the right owner in relation to share loan schemes – in addition to asking the returnee.

Vh

Christian

**from:** Anne Munksgaard
**sent:** 13. September 2015 14:52
**towards:** Lill Helene Drost; Christian Baden Ekstrand
**subject:** Fwd: Status control dividend cases


Sent from my iPhone

Start forwarded message:

> **from:** Kim Tolstrup <kim.tolstrup@skat.dk>
> **date:** 13. Sep. 2015 at 10:30 AM 14.32.22 Cest
> **towards:** Hans From <Hans.From@skat.dk>, Anne Munksgaard <Anne.Munksgaard@Skat.dk>
> **subject: Status control dividend cases**
>
> Dear both
>
> The overview/status below which I intend to start on Wednesday when Johnny, Susanne and I are going to a status meeting with Jesper.
>
>
> Yours sincerely
>
> Kim Tolstrup
> *Head of Unit*



**Large corporations 1**
Sluseholmen 8 B, 2450 Copenhagen SV
email: Kim.Tolstrup@Skat.dk
telephone: (+45) 72 38 96 57

----------------------

The task of the control group is, in general, to carry out checks on the recoverys received which have been stopped as an offshoot of the fraud case, to carry out checks on the cases that are received on an ongoing basis until a new process is in place, and on the basis of the risks and errors that may be involved. to provide input to the new process.

When the task was launched, there were a total of approx. 18,000 cases – a figure that has now grown to more than 20,000 cases.

**Receipt of applications and THE DATA BASE of THE SHAFT for control purposes**

When requests are received in SKAT, there are two main ways to do this:

1) Manually either directly from the applicant or via a so-called re-claim agent. In both cases, a recovery form attached to a dividend note, tax certificate relating to the applicant's tax affairs, is received. When it is through a re-claim agent must also be submitted a power of attorney.

2) The spreadsheet model in which one of the three banks submits a spreadsheet with a line of data per month. customer they are recovering for. No further documentation is attached here and the bank does not necessarily have this in its own possession, as they have often simply received a spreadsheet from their (bank) customers behind the chain. The submitted worksheets are not the same in their structure and formats.

In both cases, there is a manual entry of the recovery from Betaling og Regnskab. The manual directly in 3S and the worksheets as a sum of numbers per spreadsheet in sap38, after which there is a transfer to the crawler.

The 20,000 cases are divided into about 100,000 cases. 75% on the spreadsheet model and 25% manual.

The material(s) themselves are stored in manual bundles at Betaling &Regnskab.

**The verification process**

Confidential Pursuant to Protective Order                                    SKAT_MDL_001_00463951_T

There is currently no completely safe model for reconciling the recoverys against SKAT's own registers, e.g. on withholding dividend tax and possibly on dividend tax. other data.

With the large volume of applications, it is considered appropriate to access the task on the based on risk and materiality. Based on this approach, data is sought converted to a format where IT audit tools such as ACL, Excel, etc. can be worked on. Alternatively, each case must be manually reviewed, thereby forfeiting a structured and consistent approach to risks and materiality.

Together with Effort Analysis, we are therefore working to create a search design at the same level as when we work with compliance and tax gaps. The intention is that without going through every case we can say something manually about risk and materiality, even in the part that is not taken for control. Thus, work is being done to target certain risks and on significant amounts and with random checks in the rest. This process should also take into account the objective of releasing as soon as possible those recoveries which are neither risky nor significant.

However, the quality of data is a significant challenge, especially in relation to the spreadsheet model, partly because of the high quality of the data. due to different formats and work is currently under way to ensure the data base so that its validity is high.

Currently, Payment and Accounting work with the approx. 4,500 manual cases in 3S so that they can be searched according to the search design. This currently has the challenge that it requires updating the BO universe which at the moment. is delayed.

It is in the pot of manual recoverys that the cases covered by the fraud complex have been found. The common denominator is that there has been recovery through so-called re-claim agents who are companies that specialize in providing services consisting of assistance with recovery. There is currently no such time. information that these were to be part of the fraud complex. However, in the manual recovery pool is currently. approximately 150 cases involving recovery requests from such agents and these cases are all completely controlled. The actual investigation will begin on Monday, 14 March 2009. September 2015.

During week 38, data from the spreadsheet model is expected to be in place so that actual search in the population can be initiated based on three risk profiles (High, medium and low) and each profile contains different parameters e.g. amount size, decrease in amount, recovery rate, same owner, etc. The study design has been made dynamic so that it can be adjusted for risks that may be identified during the check.

New searches received until a new process is in place and implemented will be run through the same search design.

At this stage, it is not possible to say anything about the number of cases that will fall for the different criteria, as data is still being prepared. It is expected to be over the next 8-14 days.

There are control officers with the right skills ready to start the checks as the searches are made.
Control instructions have also been drawn up for the control officers for the purposes of the checks and standard letters have been drawn up for the purposes of a call for documentation, etc. Both have been done in collaboration with Jura.

As mentioned above, the verification process is expected to start with the cases where there are re-claim agents in week 38, and checks on the spreadsheet model are expected to be initiated in week 38/39. Searches among the manual are initiated as soon as bo university is updated which is expected to happen in week 38 if current technical challenges are solved. The control cases will thus be initiated successively, and new requests will be continuously run through the search design. At the same time, it is expected that cases can be released without risk to Payment & Accounts for payment. In terms of resources, there are two employees who constantly manage the total number of cases, searches, releases and collection of knowledge and their disclosure to the group working with new process, etc. who do not participate in the control task. These are also ongoing in dialogue with Effort Analysis as the same high level of approach as seen in tax gap analyses, etc. here, which should ensure a high level of assurance in the final reporting of the checks.

The control group's plan for carrying out the checks has been submitted to internal audit (SIR) which has indicated that they consider the approach to be good and at the same time has asked to be kept regularly informed of the progress of the controls and its results. This task is also anchored by the two employees mentioned above.

In relation to the implementation of the checks, it should also be pointed out that a very substantial part of the documentation to be called for use in the assessment is abroad, which means a longer processing time than if this could be readily accessed within the country. According to the largest of the banks on the spreadsheet scheme, a few weeks' delivery time is expected from the time we ask for something until it can be expected to be received.

**The control task**
The task of control is a much broader aim of fraud control and there has been constant talk and writing in the press about both cum/ex set up in Germany and the issue of share loan schemes.

Put on the lead there are two things to be checked in cases concerning the recovery of dividends from companies in Denmark:

1) Is the seeker owner?

   The first question is that, as we assume to be at the heart of the fraud cases, you actually own a share in the company. The next step will be to determine whether you are also the beneficial owner of the stock under tax law.

   In Denmark, the owner is defined in tax law as beneficial owner, which differs from the civil owner definition and thus also registration in various registers.  This is because the Equation Council's decision under Article 100a of the Treaty on European Union is not in accordance with the procedure laid down in Article 1 TfS1999, 408 LR. In order, among other things, to ensure that the In 1999, the Danish Securities Association and the Copenhagen Stock Exchange approved the possibility of so-called share lending not a transfer within the meaning of the Danish Securities And Exchange Act. This means that when a share in a share loan model is transferred in civil law, it is not transferred for tax purposes and it is thus also the previous owner (lender) who can recover dividends.

In the control context, this presents very significant problems, since all registers, etc. financial institutions, csDs, etc. register according to civil law and not tax law. This effectively means that SKAT has no way of checking whether the returnee is the right owner in relation to share loan schemes – in addition to asking the returnee.

2) Is the correct amount/tax rate to be recovered. Depending on the country of residence of the applicant, DBO, directives, etc. may be used to determine the number of applicants. means that the withholding dividend tax can be recovered in whole or in part. This must also be seen in the context of the question under 1 about the owner, since one cannot obtain the recovery of amounts greater than the owner defined as beneficial owner is entitled to by, for example, shooting an intermediary into a better DBO country (which allows the recovery of, for example, the entire dividend tax instead of only some of this) between the owner beneficial and dividend-distributing company.

Dialogue with the Law And Department is under way on these issues.

As far as the mentioned CUm/Ex set up from Germany is concerned, we have just received material from Germany as Jura at the moment. is looking into . However, the preliminary assessment is that the specific model, namely dividend compensation around the time of distribution – has nothing to do with Danish conditions, as we do not consider the compensations to be dividends, so it is not possible to seek reimbursement.  Final conclusion, however, awaits Jura's assessment. If there is a risk, it will be included in the search design as mentioned above.

According to Section 69B of the Withholding Tax Act, SKAT has 6 months to check and ask for the necessary documentation without paying the interest subsidy to the applicant. If the 6 months are exceeded (as from receipt of the request), interest shall be payable, unless the overrun is due to a refusal to provide information/documentation by the requesting party. This means that in the search and assignment of cases, work is done with a FIFO principle and is worked on the follow-up/advising process to avoid SKAT having to pay interest in this context. Experience suggests that there will be cases where the casework will exceed 6 months, but experience also shows this is due to a lack of documentation, etc. from the applicant party. However, there is uncertainty as to how much/little it takes for the refusal to be involved. There is dialogue with the Law On Interpretation and THESKAT's line in this area.

Yours sincerely

Kim Tolstrup
*Head of Unit*



**Large corporations 1**
Sluseholmen 8 B, 2450 Copenhagen SV
email: Kim.Tolstrup@Skat.dk
telephone: (+45) 72 38 96 57

Confidential Pursuant to Protective Order                    SKAT_MDL_001_00463951_T