# Exhibit 4

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

_____
                                   )
IN RE:                             )
                                   )
CUSTOMS AND TAX ADMINISTRATION OF  )
THE KINGDOM OF DENMARK             )
(SKATTEFORVALTNINGEN) TAX REFUND   )
SCHEME LITIGATION                  )
                                   )
_____)



C O N F I D E N T I A L


REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL
EXAMINATION OF
BRUCE DUBINSKY

DATE: March 29, 2022




REPORTED BY:   MICHAEL FRIEDMAN, CCR

Page 30

 1      Q     You're not an expert in trade
 2   clearing, are you?
 3      A     I wouldn't consider myself an
 4   expert in trade clearing.  I have some
 5   experience in looking at that aside from this
 6   case, but I wouldn't consider myself an
 7   expert in trade clearing.
 8      Q     What about trade settlement?  Do
 9   you consider yourself an expert in trade
10   settlement?
11      A     Again, I have some experience in
12   that area aside from this case, but I
13   wouldn't hold myself out as an expert in
14   that.
15      Q     Have you ever worked at a financial
16   firm that was a member of the New York stock
17   exchange?
18      A     I don't believe so, no.
19      Q     Have you ever worked at a firm that
20   was a member of the London stock exchange?
21      A     No.
22      Q     Have you ever worked at a firm that
23   was regulated by FINRA?
24      A     Yes.
25      Q     What firm was that?

Page 31

 1      A     Several firms.  One was Bridgewater
 2   Financial Associates.  One was called SOL,
 3   S-O-L, Capital, and one was Duff & Phelps.
 4   It was a predecessor to Kroll.
 5      Q     What was the second one you
 6   mentioned?
 7      A     SOL Capital, S-O-L Capital.
 8      Q     What did you do at Bridgewater?
 9      A     I was a registered investment
10   advisor representative for Bridgewater and so
11   I had high net worth clients that I did
12   investment advisory services for, and
13   arranged their portfolios in investments.
14      Q     When did you work at Bridgewater?
15      A     That would have been late '90s,
16   early 2000s, in that time period.
17      Q     What did you do at SOL Capital?
18      A     Same thing.  I had -- this was
19   during the time I had an accounting practice.
20   I have a CPA and I had high net worth
21   individual clients.
22            And I got licensed as an IRA rep
23   and SOL was an investment advisor registered
24   with FINRA, regulated with FINRA, and I did
25   the same thing.  I advised high net worth

Page 32

 1   individual clients and pension plans,
 2   retirement plans on investments.
 3      Q     And at Duff & Phelps, you did this
 4   type of work that you do now.
 5            Is that right?
 6      A     No, I did not.  So when I joined
 7   Duff & Phelps, I let my license lapse at that
 8   point because I was not doing that work
 9   anymore.
10            And just to maintain the
11   registration requirements was too much red
12   tape.  So I let the license lapse at that
13   point.
14      Q     So what did you do at Duff &
15   Phelps?
16      A     I was a managing director at Duff &
17   Phelps in their disputes and investigation
18   practice, and so I handled everything from
19   investigations to commercial disputes, expert
20   witness work.
21            That was my role at Duff & Phelps.
22      Q     Okay.  And in this matter, you were
23   retained to do a forensic accounting of the
24   cash flows of the tax refund payments paid
25   out by SKAT.

Page 33

 1            Is that right?
 2      A     Among other things, yes, that was
 3   part of what I was asked to do.
 4      Q     Okay.  And your forensic accounting
 5   was of the payments that allegedly went to
 6   Solo clients.
 7            Right?
 8      A     That portion of the work was, yes,
 9   looking at the refund claim payments paid by
10   SKAT and the money flow from those payments,
11   where did the money go.
12      Q     You did not do a forensic
13   accounting of SKAT, did you?
14      A     No, I did not.
15      Q     Okay.  You did not do a forensic
16   accounting to assess whether the withholding
17   tax associated with the refund claims in this
18   case was actually paid to SKAT.
19            Right?
20      A     No, I did not.
21      Q     Did you develop a view of whether
22   SKAT collected dividend withholding tax from
23   any of the sellers in the trades associated
24   with this case?
25            MR. WEINSTEIN:  Objection to form.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

19 (Pages 70 to 73)

Page 70

1  the standpoint of in the ultimate
2  determination who had legal title, yes, that
3  would be a legal determination.
4      Q    And that's not a determination that
5  you're qualified to make.
6           Right?
7      A    Again, I'm not a lawyer.  I was
8  doing a forensic accounting investigation to
9  determine whether there was evidence that
10 these shares actually existed, and that's
11 what I was discussing.
12     Q    Okay.  But this doesn't -- this
13 opinion doesn't talk about whether the shares
14 actually existed.
15          It talks about ownership, doesn't
16 it?
17          MR. WEINSTEIN:  Objection to form.
18     A    Well, the heading says what it
19 says.  But as you go through the report, the
20 basis for the opinion is that I saw no
21 evidence to support that the shares actually
22 existed.
23          And therefore, if the shares didn't
24 exist, certainly from a forensic accounting
25 standpoint, the plans couldn't have owned

Page 71

1  them.
2      Q    You say if the shares didn't exist,
3  the plan -- the plans couldn't have owned
4  them.
5           Is -- again, I ask you:  Is that a
6  legal opinion?
7      A    No, I think that's a forensic
8  accounting opinion, I think the genesis
9  being, after doing a forensic investigation
10 and looking for evidence of the actual shares
11 existing at either -- ultimately at a
12 custodian that Solo used as a sub-custodian,
13 and the fact that those shares didn't exist,
14 I concluded that therefore, the plans could
15 not have owned them.  And I think that's a
16 forensic accounting conclusion.
17          Ultimately, the judge or jury --
18 well, the judge would have to make a
19 determination from a legal standpoint if
20 there's something different than that, if
21 there was legal ownership or not.
22          I'm not issuing a legal opinion.
23     Q    So the forensic -- so a forensic
24 accountant is qualified to determine
25 ownership?

Page 72

1           Is that your testimony?
2           MR. WEINSTEIN:  Objection to form.
3      A    I think certainly from the
4  standpoint of looking at the substance of a
5  transaction and trying to determine if the
6  substance was, were there shares, did the
7  plans actually own those, yes, I think I'm
8  qualified and it is within the purview of a
9  forensic accounting investigation.
10          I think the judge will make a
11 determination -- if there's a different legal
12 meaning, then that would be up to the judge
13 to make.
14     Q    So is that ownership under U.S.
15 principles of ownership?
16          MR. WEINSTEIN:  Objection to form.
17     A    Again, I'm not issuing a legal
18 opinion or not, or I'm not issuing a legal
19 opinion.
20          What I'm saying is I'm looking from
21 an accounting perspective, what do I see.  Do
22 the plans -- and they're U.S. based pension
23 plans -- did they own the shares, did the
24 shares exist.
25          And I concluded the shares did

Page 73

1  not -- there was no evidence that the shares
2  existed.  And therefore, the dividends
3  weren't -- couldn't have existed, weren't
4  paid, and that was my conclusion.
5      Q    I'm asking you regarding your
6  statement regarding ownership, sir.  And I'm
7  asking you whether it was under U.S.
8  principles of ownership.
9           What is your answer to that
10 question?
11     A    Again, I think you're asking for a
12 legal conclusion and I'm not here to give you
13 a legal opinion on -- I'm here to tell you
14 what I did and under what basis that I
15 opined.
16     Q    So the concept of ownership in your
17 Opinion Number 1, you're not willing to tell
18 me under what principle you're giving that
19 opinion, whether it's U.S., EU, Danish, or
20 whatever?
21          MR. WEINSTEIN:  Objection to form,
22     asked and answered.
23     A    Again, I'm not here to issue a
24 legal opinion.  I think that would call for a
25 legal opinion.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

22 (Pages 82 to 85)

Page 82

1  to sell those same shares.  I can sell those
2  shares even though the trade hasn't settled
3  yet.
4          Right?
5          MR. WEINSTEIN:  Objection.
6      A   Again, my understanding is you
7  could place a trade to sell them, but you
8  have to go through the first settlement
9  before you can settle on the sale.  So you'd
10 need to have the settlement on the buy side,
11 and then go to settlement on the sell side.
12         You can't just do it in thin air.
13     Q   Oh, so you're saying that I can't
14 buy and sell Apple on the same day?
15         MR. WEINSTEIN:  Objection,
16     misstates his testimony.
17     A   That's not what I said.
18     Q   It was a question.
19         MR. WEINSTEIN:  The question was --
20     Q   Can you buy and sell Apple on the
21 same day?
22     A   You could place a trade for a buy
23 order and a sell order on the same day, yes.
24     Q   And when you buy the shares, are
25 you the owner of the shares?

Page 83

1          MR. WEINSTEIN:  Objection, calls
2      for a legal conclusion, vague.  Again,
3      you know, I think you're --
4          MR. BONGIORNO:  I think you could
5      just object without giving a speech,
6      please.
7          MR. WEINSTEIN:  Did you hear the
8      objections of your side the other day?
9      Lengthy speeches and bases.  But when
10     you call for a legal conclusion, I'm
11     going to make that objection.
12     A   Again, I think you're asking me for
13 a legal conclusion on who owned -- who owns
14 the shares.  But assuming a trade is placed
15 and settlement is to occur and the stock is
16 actually delivered -- cleared, delivered, and
17 settled, then you would own the stock, the
18 stock is there.  You own it.
19     Q   But if you buy and sell on the same
20 day, it doesn't -- the buy doesn't clear,
21 does it?
22         MR. WEINSTEIN:  Objection, form.
23     A   Again, the buy -- you can place the
24 orders on the same day, but there has to be a
25 settlement and clearance process for the two

Page 84

1  legs of that trade.
2      Q   But they can net settle, can't
3  they?
4          MR. WEINSTEIN:  Objection to form.
5      A   In what scenario?
6      Q   In the scenario I just gave where I
7  buy a hundred shares of Apple today, and then
8  I sell later today?
9          MR. WEINSTEIN:  Objection to form.
10     A   If the -- if you're trading
11 through -- my understanding is if you're
12 trading through the same sub-custodian and
13 both the buyer and seller or custodian or
14 sub-custodian and both the buyer and seller
15 have accounts there when the settlement
16 occurs, there could be a net settlement
17 because the stock is already at the
18 custodian.  The stock exists.
19         So in that hypothetical, I would
20 agree that type of net settlement could
21 occur.
22     Q   So your testimony is, if I buy and
23 later sell a hundred shares of Apple on the
24 same day through my broker, they can't net
25 settle unless the broker is long those

Page 85

1  shares?
2          Is that your testimony?
3          MR. WEINSTEIN:  Objection to form.
4      A   No.  I'm saying that the
5  shares -- either the broker has a market in
6  those shares and has an inventory.  But you
7  posed if you bought and sold, and the -- and
8  the broker is acting as an agent for that
9  sale, not a principal, then, in that
10 hypothetical, I believe they can net settle
11 if both the buyer and seller were at the same
12 institution and the shares were already
13 either at the custodian at the institution or
14 the sub-custodian.
15         That's my understanding.
16     Q   So your view is if the shares are
17 not already at the custodian or
18 sub-custodian, and I buy and sell on the same
19 day, that the custodian has to go out and
20 find those shares even though I bought and
21 sold them the same day?
22     A   My -- it's -- again, I'm not -- I
23 think there's other people dealing with
24 trading, trading experts in this case.
25 That's not, you know, my area or my opinion.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

23 (Pages 86 to 89)

Page 86

1     But my general understanding is,
2 yes, to net settle, you would have to have
3 the shares at the same custodian or the
4 shares were being borrowed and brought into
5 that custodian and already sourced.
6     But that's my general
7 understanding.  I'm not an expert on net
8 settlement.
9     Q   Okay.  Let's look at Tab 5225 of
10 your binder.
11     MR. BONGIORNO:  We'll mark this as
12     Exhibit 5225.
13     (Whereupon the above mentioned was
14     marked for Identification.)
15     Q   It's a document entitled "SEC
16 Investor Publications, Day Trading:  Your
17 Dollars at Risk."
18     Do you have that?
19     A   It doesn't say "SEC."  Mine just
20 says "Investor Publications, Day Trading:
21 Your Dollars at Risk."
22     Q   Okay.  We're looking at the same
23 document, and we're at tab -- Exhibit 5225.
24     At the top of the page, I want to
25 read to you the first sentence.

Page 87

1     "Day traders rapidly buy and sell
2 stocks throughout the day in the hope that
3 their stocks will continue climbing or
4 falling in value for the seconds to minutes
5 they own the stock, allowing them to lock in
6 quick profits."
7     Did I read that correctly?
8     A   Yes.
9     Q   And does this document suggest to
10 you that traders can both buy and sell the
11 same stock on the same trading day?
12     A   Yes, that's what it says.
13     Q   And it says the traders can do this
14 rapidly throughout the day.
15     Correct?
16     A   Correct.
17     Q   And if the traders buy and sell
18 rapidly, they nonetheless own a stock on the
19 trade, even if for seconds to minutes.
20     Right?
21     MR. WEINSTEIN:  Objection to form.
22     A   Well, again, I haven't read this
23 whole document and I don't -- I mean, it
24 says -- it says what it says.
25     I don't know what they mean by "own

Page 88

1 the stock" in regards to this.  I haven't
2 read this whole document.
3     I assume --
4     Q   But it doesn't say?
5     A   Well, I assume they mean the trades
6 settle.  I assume they mean they're going to
7 settle.  You can't have a trade that doesn't
8 settle.
9     But it doesn't -- let me just see
10 if it says anything else about that here.
11     (Witness reviewing.)
12     Q   Okay.
13     A   (Witness reviewing.)
14     Yeah, it doesn't get into much
15 detail.
16     Q   It doesn't say anything about
17 settlement.
18     Right?
19     A   No.  It's a two-page document from
20 2005.  It doesn't really get into the
21 mechanics of the trade.
22     Q   The document doesn't say that a day
23 trader must confirm that its broker or
24 custodian holds the shares that the investor
25 is purchasing.

Page 89

1     Right?
2     A   It doesn't -- well, let me -- let's
3 just see.
4     (Witness reviewing.)
5     No, it's just -- it's just saying
6 that day trading firms must register with the
7 SEC in the states.  No, it doesn't -- it
8 doesn't say specifically anything about
9 confirming with the broker.
10     Q   But it does use the word "own."
11     Right?
12     A   Yes.
13     Q   The same word you used in one of
14 your opinions that we looked at earlier?
15     A   Yes.
16     Q   And you'd agree with me that short
17 selling is very common.
18     Right?
19     A   I would agree that short selling
20 happens in the market.
21     Q   You wouldn't agree with me that
22 it's common, though?
23     A   Well, in relative to what, short
24 sell?  I will agree that short selling occurs
25 and it happens.

CONFIDENTIAL
Bruce Dubinsky - March 29, 2022

42 (Pages 162 to 165)

Page 162

1  millions of documents in this case.
2          And sitting here today, I can't
3  recall each specific one, but nothing is
4  coming top of mind that there would have been
5  an external account statement for Colbrook
6  showing any stock owned.
7      Q   If such documents existed, is that
8  something you would have wanted to see?
9      A   If there were documents that showed
10 Colbrook actually had a position in Carlsberg
11 at 600,000 shares and they put those into the
12 Solo transaction, yes, I would have -- that
13 would have been a document that I would like
14 to see.
15     Q   What if they had 600,000 shares but
16 didn't, as you say, put it into the Solo
17 transaction?  Is that something that you
18 would want to see?
19     A   It would -- it certainly would be
20 interesting if those shares existed
21 somewhere.  I haven't seen any evidence to
22 suggest that they existed.
23     Q   The document -- let's go back to
24 Figure 14, Page 55 of your report.
25         That document is, again, a document

Page 163

1  from the Elysium documents.
2          Right?
3      A   Yes.
4      Q   And there's nothing on the face of
5  this document that you have shown here in
6  Figure 14 that reflects that it was sent to
7  any U.S. pension plan.
8          Right?
9      A   The only reason I'm hesitating to
10 answer your question, something in the back
11 of my mind, I thought Martin Smith actually
12 owned some pension plans.  But I'd have to go
13 back and check.
14         But this was sent to Martin Smith
15 at Colbrook.  I know there's crossover
16 between some of the people involved at the
17 counterparties and some of the people that
18 also had pension plans.
19         I'd need to go back and
20 cross-reference that.
21     Q   But it didn't go to -- to the
22 extent it went to somebody named Martin
23 Smith, it went to a Colbrook Limited address,
24 not a U.S. pension plan address.
25         Right?

Page 164

1      A   Yes, but that wasn't the question
2  you asked.  So just to clarify, yes, this is
3  going to a Colbrook e-mail address.
4          You asked me, in your earlier
5  question, do I know if this e-mail went to
6  anybody at a U.S. pension plan, I think was
7  your question, and that's what I wanted to
8  clarify.
9      Q   But these documents reflected in
10 Figures 9 and 14, neither one of them went to
11 a U.S. pension plan.
12         Right?
13     A   Well, let me just go back and look
14 at what 9 was.
15         MR. WEINSTEIN:  Objection, asked
16     and answered.
17     A   (Witness reviewing.)
18     Q   Let me ask you a different
19 question.
20         Neither of the documents reflected
21 in your Figures 9 and 14 went to Bernina, did
22 they?
23     A   I don't see anything that
24 would -- on the face of it that would
25 indicate whether they did or not.  I don't

Page 165

1  know one way or another where these documents
2  went, so I can't say.
3      Q   And in order to determine what you
4  called the "closed loop," you needed to see
5  these documents, didn't you?
6      A   Correct.  These were the steps of
7  the purported transaction.
8      Q   Mr. Dubinsky, you're not an expert
9  in trade settlement operations.
10         Right?
11     A   That is correct.  I wouldn't
12 consider myself an expert in trade
13 settlement.
14         I do have some experience with it,
15 but I'm not being proffered here and I
16 understand somebody else is dealing with
17 trades and settlement issues.
18     Q   Do you understand what "net
19 settlement" is?
20     A   As a general concept, yes.
21     Q   It's a -- two or more transactions
22 that offset each other in settlement.
23         Is that right?
24     A   Well, I think that's a very general
25 description.  You know, it's a -- very