# Exhibit 7

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 18-MD-2865 (LAK)

_____
                                    )
IN RE:                              )
                                    )
CUSTOMS AND TAX ADMINISTRATION OF   )
THE KINGDOM OF DENMARK              )
(SKATTEFORVALTNINGEN) TAX REFUND    )
SCHEME LITIGATION                   )
                                    )
This document relates to case nos.  )
19-cv-01783; 19-cv-01788; 19-cv-01794; )
19-cv-01798; 19-cv-01918            )
_____)


REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
ROBERT KLUGMAN
DATE: January 28, 2021


REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 22

1 Q Okay. Did you have your own 401(k)
2 prior to setting up these plans?
3 A What do you moon by my own 401(k)?
4 Q From your career at Credit Suisse
5 and UBS in banking, did you have your own
6 retirement account?
7 A Yes, I did.
8 Q Was that a 401(k)?
9 A I had a couple of different ones,
10 but yes, I had a -- I wasn't employed at
11 Credit Suisse anymore, but I was allowed, as
12 a former employee, to maintain a 401(k).
13 Q Why did you not use any of those
14 plans for any of the Danish trading?
15 A Well, it was only one plan. And in
16 order to -- when you have a plan with a
17 former employer, the choices of investments
18 are limited.
19     And they were -- in this case, it
20 was a Fidelity plan that was limited to maybe
21 five Fidelity funds, so I wasn't able to use
22 that plan for this.
23 Q So in order to do the Danish
24 trading, you needed to set up a new plan?
25 A Or, I would guess, I could

Page 23

1 theoretically have gotten approval from
2 Fidelity to use this, but that would have
3 been very impractical.
4 Q Okay. Why did you set up six
5 plans? Why not just one?
6 A Well, it was -- I was told in order
7 to get an allocation, it needed to be done
8 through multiple plans to get that. There
9 was an allocation per plan, and if I wanted
10 to get a certain allocation, it would have to
11 be in multiple plans.
12 Q And who told you that?
13 A Sanjay Shah.
14 Q And when did he tell you that?
15 A Sometime in the spring of 2014.
16 Q And did he explain why there was a
17 limited allocation per plan?
18 A My recollection is a little fuzzy
19 on this. But, I mean, I think it had to do
20 with size limits per plan based on local law,
21 "local" being non-U.S.
22 Q And did he explain where this local
23 law was, where outside the U.S. it was?
24 A Well, he talked about doing
25 transaction in Belgium and Denmark.

Page 24

1 Q And when he explained size limits,
2 what kind of -- what was he -- what was
3 limited by size?
4 A The number of shares that could be
5 purchased.
6 Q What was the limit on the number of
7 shares?
8 A I don't remember what the limit
9 was.
10 Q Did he give a number?
11 A No.
12 Q Did he explain what the expected
13 profits would be per plan, per allocation?
14 A Sorry? You said the expected
15 profit?
16 Q Yes. So if you set up a plan, and
17 you got an allocation, what the expected
18 profit would be on that?
19 A Yes, he gave an estimate.
20 Q And what was that?
21 A I think he gave an estimate of
22 around, if all the trading worked, around a
23 million dollars per plan.
24     I don't remember exactly.
25 Q And did he explain over what period

Page 25

1 of time that million dollars per plan would
2 be realized?
3 A He did, but I'm -- I'm having
4 trouble remembering because he did give an
5 estimate of which stocks would be traded, and
6 I'm not sure whether that was for all of 2014
7 and '15 or just the next 12 months.
8 Q And was there any limit on the
9 number of plans that could participate?
10 A He gave an allocation for a certain
11 number of plans, and that was -- that was it.
12 We didn't talk about that.
13 Q When you say "a certain number of
14 plans," did he tell you there was a
15 particular number of plans that he had in
16 mind, or was he just saying that there was
17 some limit?
18 A He told me for -- for my
19 allocation, I could invest through six plans.
20 Q And did he give you any
21 understanding as to where that six -- number
22 six came from?
23 A I don't remember if he did or
24 didn't.
25 Q Did you have any discussions as to

Page 226

1  reclaim applications that the plans submitted
2  to SKAT?
3      A    I don't recall whether it was
4  before -- you know, while the transactions
5  were going on or after, in reviewing the
6  documents.  But I have seen them.
7      Q    And what about the dividend credit
8  advices?  Did you see those at the time that
9  the transactions were going on or at the time
10 that the applications were being submitted to
11 SKAT?
12     A    I know -- I'm sorry.  Too much
13 coffee.
14          Yes, I -- well, same answer is that
15 I believe I saw them while it was going on,
16 you know.  But I know that I've seen them
17 since and reviewed them, so it's hard to know
18 when I reviewed them.
19     Q    Okay.  If you could go back to the
20 first binder and take a look at Exhibit 1801?
21         MR. MAGUIRE:  Mark this as 1801.
22         (Whereupon the above mentioned was
23     marked for Identification.)
24     A    Back to the first one?
25          Okay.  I'm here.

Page 227

1      Q    Okay.  If you take a look at that,
2  I think you'll see that's the reclaim by the
3  Aerovane plan for that early August 2014
4  trade in TDC.
5      A    Yes.
6      Q    Then, if you turn to the third
7  page, you'll see the income advice from
8  Old Park Lane?
9      A    Yes.
10     Q    It's signed by Michael Partus.
11          Did you ever have any dealings with
12 Michael Partus?
13     A    Not that I recall, no.
14     Q    So the income advice describes the
15 ticker in the box at the center of the page.
16          Do you see that?
17     A    Yes.
18     Q    And it describes the ex-dividend
19 date, which was August 8, the record date,
20 which was August 12, and the payment date of
21 August 13.
22          You understand those are all with
23 respect to the dividend, right?  The shares
24 of TDC became ex-dividend on August 8.
25          Right?

Page 228

1      A    Yes.
2      Q    And the dividend was actually paid
3  on August 13.
4          Right?
5      A    I believe TDC paid a dividend on
6  August 8th.  That was their -- sorry, on
7  August 13th.
8          That's their payment date, yes.
9      Q    And so the plan purchased all of
10 the shares on August 7.
11          Do you remember that?
12     A    Yes.  That was the purchase that
13 was made.
14     Q    Right.  And then, just below the
15 dividend are the payments details, and it has
16 the dividend per share.
17          Do you see that's 1 kroner, 50?
18     A    Yes.
19     Q    And it does the math for us, for
20 the 3,533,850 shares, and it gives us the
21 gross amount of the dividend, the tax, and
22 the net amount of the dividend.
23          Right?
24     A    Yes.
25     Q    And I haven't done the calculation,

Page 229

1  but I think we all understand that the tax is
2  27 percent of the gross?
3      A    That seems right.
4      Q    And then, the remaining 73 percent
5  is the net amount of the dividend.
6          Right?
7      A    Yes.
8      Q    And then, this reclaim is for the
9  tax portion of the dividend?
10     A    Yes.
11     Q    So, under this application, it's
12 telling SKAT that that 27 percent of the
13 dividend was withheld in tax and should be
14 repaid.
15          Right?
16     A    It is telling us that for the
17 purpose of the reclaim, we are entitled to
18 reclaim that tax amount.
19     Q    Right.  And that's because, on the
20 appropriate date, the -- Aerovane was the
21 owner of the shares and was entitled to
22 receive and did receive the dividend less the
23 tax that was withheld?
24     A    I'm not sure I would put it that
25 way.

Page 230

1  Q  How would you put it?
2  A  I would say based on the trading
3  that was done and the tax advice given, that
4  we are, as a matter of fact, entitled -- when
5  I say "we," I'm using the plan
6  again -- entitled to reclaim that
7  1.4 million, et cetera kroner amount.
8  Q  Okay. So did Aerovane, the plan,
9  ever receive the dividend from TDC that was
10 paid out by the company on the 13th of
11 August?
12 A  So did TDC send that $5.3 million
13 to the plan? So did -- did it get the money
14 from TDC?
15 Q  Did the company make that payment,
16 and did the plan receive its share of that
17 payment?
18 A  I don't know.
19 Q  Well, if the plan received the
20 dividend, you would expect that to show up in
21 the plan records.
22    Right?
23 A  If the plan -- if the plan received
24 a dividend payment, it could -- yes, it could
25 show up in the records of the plan.

Page 231

1  Q  It could or it would?
2  A  Well, it depends on how the records
3  are prepared. I don't know what -- you know.
4  Q  Well, any records that show cash
5  payments received, then the dividend should
6  show up.
7     Right?
8  A  It should show up, yes, unless
9  there's a netting arrangement where they
10 don't actually receive the cash.
11 Q  And what kind of netting
12 arrangement would that be?
13 A  Any netting arrangement. If one
14 party owes the other money, and the other
15 party owes money back, you can just say,
16 "okay, no flows." I'm using a simplified
17 example.
18    But yeah, it doesn't necessarily
19 have to have cash flow to be entitled to a
20 cash payment. There's netting in financial
21 markets.
22 Q  Right. But we're talking about
23 plans now.
24    What offsetting payment was due
25 from any plan that would cause the net

Page 232

1  dividend to be zeroed out?
2  A  I don't know. It could be a
3  mark-to-market payment. I don't know.
4     I don't know the answer.
5  Q  It could be a mark-to-market
6  payment?
7  A  Yeah.
8  Q  A mark-to-market payment is an
9  adjustment in value based on a fluctuation in
10 market price.
11    Right?
12 A  That's right.
13 Q  So it would be an extraordinary
14 coincidence if that adjustment of market
15 price happened to equal and exactly offset
16 3,869,527 kroner and 42 cents?
17 A  Not necessarily.
18    THE VIDEOGRAPHER: The time is
19    4:57 p.m. and we're going off the
20    record.
21    (Whereupon a discussion was held
22    off the record.)
23    THE VIDEOGRAPHER: Stand by. The
24    time is 4:59 p.m. and we're back on
25    record.

Page 233

1  Q  So, sir, we were just discussing
2  what circumstances would cause the net amount
3  of the dividend to be zeroed out on the
4  plan's records so that the entire and exact
5  amount of the dividend would not show up.
6     And I think you had mentioned --
7  was it mark-to-market?
8  A  Yeah. Well, basically, you have a
9  transaction that's perfectly hedged.
10    So, in a perfectly hedged
11 transaction, you shouldn't be receiving free
12 cash flow of a dividend. It has to go
13 somewhere else.
14    If not, then you're just -- the
15 arbitrage is even bigger. You can't just --
16 you know, there has to be an offset in value
17 to the dividend.
18 Q  So can you explain where is that
19 "somewhere else?" What is that offset?
20 A  Well, I'm -- I'm having trouble,
21 but if you look at the three legs of the
22 transaction, you have a stock purchase, a
23 forward, and a forward sale. And the forward
24 sale price, ignoring -- this is just, in
25 general, how forwards are priced when you

Page 298

1  retirement plans and it can be somewhat of a
2  legal minefield.
3           There's people who are specialists
4  in that area.  I'm certainly far from one of
5  them.
6           And this was -- this memo was
7  making sure that -- that well, in this case,
8  the people who it was addressed to didn't run
9  afoul of those regulations.
10     Q    Let's look at just the first
11 paragraph of the section.  It says, "A
12 transaction between a retirement plan subject
13 to 4957 of the code and a disqualified person
14 described in Appendix A that is prohibited
15 under Section 4975 of the code described in
16 Appendix A will be subject to the tax under
17 Section 4975 of the code described below
18 unless it meets the requirements of a
19 prohibited transaction exception under
20 Section 4975."
21     A    Yes.
22     Q    And finally, I would like you to go
23 down to page 14?
24     A    Page 14?  Yes.
25     Q    And the final sentence of this

Page 299

1  memorandum reads, "This memorandum does not
2  address other issues other than those
3  specifically addressed herein."
4       A    Yes.
5       Q    So do you have any reason to think
6  that this memorandum addressed any legal
7  issues other than those related to
8  transactions with disqualified persons under
9  the Internal Revenue Code?
10      A    Let me -- may I just read the
11 memorandum?
12      Q    You may, yes.
13      A    (Witness reviewing.)
14           And my computer's a little slow, so
15 this might take a tiny bit.  Hold on.
16           (Witness reviewing.)
17           Yeah, it looks like a very thorough
18 discussion of what was headlined in
19 Roman Numeral 2.
20      Q    Okay.  And that would be the issue
21 of transactions with disqualified persons
22 under the U.S. Internal Revenue Code?
23      A    Yes, that's what it looks like
24 everything under that is related to.
25      Q    I'm sorry.  And it could have been

Page 300

1  me at this point, but I didn't catch the last
2  part of your answer there.
3       A    Well, yes, that looks like that's
4  what it's related to.  It's -- I will be
5  honest, some of the language is beyond me,
6  particularly that sentence you read.
7            But it does look like it's related
8  to everything in that Roman Numeral 2.
9       Q    Okay.  Turning away from the memo,
10 Kaye Scholer did not receive any proceeds
11 from the transactions.
12           Is that right?
13      A    Other than -- other than legal
14 fees?  No.
15      Q    Other than legal fees --
16      A    I should add, not that I know of
17 from me, other than legal fees.
18      Q    Okay.  And by "legal fees," you
19 mean the hourly billing of lawyers' time and
20 support staff time, those sorts of legal
21 fees?
22      A    Yes.
23      Q    And you didn't understand
24 Kaye Scholer to be providing legal advice
25 with respect to Danish law, did you?

Page 301

1       A    With respect to Danish law?  No.
2       Q    Okay.
3            MR. MULLEN:  I have no other
4  questions.
5            MR. ALLISON:  Bill, do you mind?
6  Give me two minutes to get my notes?
7            MR. MAGUIRE:  Of course.
8            THE VIDEOGRAPHER:  The time is
9  6:52 p.m. and we're going off the
10 record.
11           (Brief recess taken.)
12           THE VIDEOGRAPHER:  Stand by.  The
13 time is 6:58 p.m. and we're back on
14 record.
15           MR. ALLISON:  Thank you.  We have
16 no questions for Mr. Klugman.
17           MR. MAGUIRE:  I have one or two
18 last questions.
19
   CONTINUED EXAMINATION BY MR. MAGUIRE:
20
21      Q    You were asked some questions about
22 Kaye Scholer and its role.
23           How would you describe
24 Kaye Scholer's role with respect to the time
25 when you were involved in the Danish trading

Page 302

1  scheme?
2  A   I'm not sure how I would describe
3  it, but it wasn't -- it was in line with the
4  role of lawyers that I've worked with, you
5  know, throughout my entire career from big
6  law firms.
7      It was just, generally speaking,
8  making sure everything was done correctly.
9  Q   And how did Kaye Scholer know how
10 you were doing in the Danish trades?
11 A   Well, they were -- again, in
12 general, involved in every aspect.  And this
13 is before I got there, so I assume there was,
14 you know, two-plus years of learning because
15 I was -- I was definitely behind the curve.
16     But from what I saw, it was -- you
17 know, kind of from -- to use an overused
18 expression, "from womb to tomb," they helped
19 us in setting up the entities, they helped in
20 getting us to be approved clients of the
21 entities.  They knew what trades were going
22 on.
23     They helped us with tax issues,
24 securities law issues, reporting issues,
25 yeah, just in line with how I've worked with

Page 303

1  other law firms my whole career.
2  Q   And how did Kaye Scholer know how
3  you were doing the Danish trades?
4  A   Well, I mean, they knew all the
5  agreements we were entering into.  They
6  obviously knew how the trade worked.  They
7  wrote it in their memorandum.
8      The trade wasn't that much
9  different, as we went through, i.e. -- I
10 mean, I -- they must have seen the confirms.
11 I don't know if they did or didn't, but they
12 knew the agreements under which the confirms
13 were being entered -- were -- you know, were
14 for, for the stock loan purchase and forward
15 contracts, you know.
16     And there was a lot of back and
17 forth on -- as I saw in this memo, about
18 securities limitations under securities law
19 in Denmark, which they helped us work
20 through.  I know there were a lot of issues
21 back and forth with Treasury on how to report
22 this.  There were obviously tax issues as we
23 saw from the memorandum.
24     So they couldn't have possibly
25 answered those questions without knowing

Page 304

1  everything that be we were doing.
2  Q   And were you open in disclosing
3  what you were doing to Kaye Scholer?
4  A   Absolutely.
5  Q   Did you withhold any information
6  from Kaye Scholer?
7  A   No.
8      MR. MAGUIRE:  That's all.  Thank
9  you, sir.
10     THE WITNESS:  Thank you.
11     MR. MULLEN:  I do have a few
12 follow-up questions.
13
CONTINUED EXAMINATION BY MR. MULLEN:
14
15 Q   I apologize, Mr. Klugman.  I bet
16 you thought you were getting out of here.
17 A   No, don't apologize.  I understand.
18     Are you Canadian?
19 Q   I'm not Canadian, no.
20 A   Okay.  I apologize for asking.  Go
21 ahead.  I like to know.
22 Q   Fine.  Just a few follow-up
23 questions.
24     First, is it correct you don't know
25 whether or not Kaye Scholer saw the trade

Page 305

1  confirms?  Is that right?
2  A   I don't know for sure that
3  they -- they saw the trade confirms.
4  Q   Okay.  And yet you referenced
5  advice regarding securities limitations on
6  what -- let me make sure I get the exact
7  phrasing right, hold on just a
8  moment -- yeah, you said they discussed in
9  the memo "securities limitations under
10 securities law in Denmark."
11     What were you referring to when you
12 said that?
13 A   Well, that was -- what was in that
14 e-mail that we talked about earlier, before
15 one of the breaks, there was a long e-mail
16 discussing Danish securities law and getting
17 an opinion.  And I think there was a -- there
18 was a contact from the London office of
19 Kaye Scholer with a securities lawyer.  I
20 don't remember exactly.
21     But if we went back to the
22 document, which I don't think I remember the
23 number, either --
24 Q   It was Exhibit 1852, and I think we
25 should go back to that document.