# Exhibit 1

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

Page 1

1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2             MASTER DOCKET 18-MD-2865(LAK)
                 CASE NO. 18-CV-09797
3

4    _____
                                            )
     IN RE:                                 )
5                                           )
     CUSTOMS AND TAX ADMINISTRATION OF      )
6    THE KINGDOM OF DENMARK                 )
     (SKATTEFORVALTNINGEN) TAX REFUND       )
7    SCHEME LITIGATION                      )
                                            )
8    _____)

9

10

11          CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                  DEPOSITION OF
                    STACEY KAMINER
15                    VOLUME 1

16             Monday, April 19, 2021
               8:07 a.m. — 4:46 p.m.
17
                  Remote Location
18               Via Huseby Connect
                 All Parties Remote
19

20

21

22

23

24          Stenographically Reported By:
                  Erica Field, FPR
25

1    someone who was entitled to less than 100 percent of the

2    dividend.  And that stock would be purchased by an entity

3    that was entitled to up to 100 percent of the dividend,

4    but more than the person who was holding the stock

5    originally.

6              They would buy the security, they would

7    hold it long and my experience, they would hedge their

8    market risk with a derivative.  They would be provided

9    financing and leverage in order to conduct this

10   transaction.  And they would further -- as further time

11   went on, they would enter into what's called a derivative

12   financing.

13        Q.    What's derivative financing?

14        A.    Derivative financing, in my experience or

15   the latest formation -- form of it is entering where --

16   where an account sells a LEPO, low exercise price option,

17   and enters into a swap on the same security.  It's

18   usually a -- an index security.  By selling --

19        Q.    What do you mean by -- what do you mean by

20   an "index security"?

21        A.    It would be the equivalent of, like, a

22   security that's listed on the Dow Jones or a

23   corresponding European index.

24        Q.    Okay.  Sorry, I didn't mean to interrupt

25   you.

Page 21

1          A.      You're okay.  I was just going say that the
2     purpose of that would be that the selling of that option
3     would bring in cash premium.
4          Q.      And what use is the cash premium put to?
5          A.      The cash from the premium is put towards
6     the purchase of the equity.
7          Q.      Is -- what's the advantage of derivative
8     financing over traditional forms of financing in
9     leverage?
10         A.      When we are speaking in particular about
11    transactions that I've been involved in, the reason for
12    entering into that actually is based on U.S. rules and
13    regulations about pension plans and debt financing.
14         Q.      What do you understand, generally, to be
15    the U.S. rules and regs on U.S. pension plans and debt
16    financing?
17         A.      If debt financing is involved, it does not,
18    in any way, affect the qualifications of your entity as a
19    pension plan.  But it can mean that that particular item
20    of income made by the pension plan could be subject to
21    unrelated business income tax in the U.S.
22         Q.      Is that a topic on which Acer obtained
23    legal advice before entering into dividend arbitrage
24    transactions?
25         A.      Yes.

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

Page 25

```
1    BY MR. OXFORD:
2          Q.    Some did; some didn't?
3          A.    Correct.
4          Q.    Okay.  I mentioned just at the start of the
5    deposition that -- that you're a plan participant in two
6    of the Acer plans, the Kamco LP Plan and the Moira Plan.
7                Are you a participant in any of the other
8    Acer plans?
9          A.    No.
10         Q.    Have you ever been a participant in any of
11   the other Acer plans?
12         A.    No.
13         Q.    Going back to AIG, the American Investment
14   Group, was Greg Summers associated with the AIG at any
15   point?
16         A.    According to the corporate documents, when
17   they first started it in 1984.
18         Q.    And at some point, did Mr. Summers cease to
19   be associated with AIG?
20         A.    Yes.
21         Q.    Was he still associated with AIG when you
22   started clerking there?
23         A.    No.
24         Q.    You mentioned that AIG ceased to be a
25   broker dealer around 2000?
```

```
 1          A.    Correct.

 2          Q.    Since that time, has AIG conducted any

 3    business?

 4          A.    It still has assets and it invests those

 5    assets.

 6          Q.    So the -- the AIG partnership has assets

 7    and it invests those assets on a proprietary basis,

 8    correct?

 9          A.    Correct.

10          Q.    And who does that investing?

11          A.    Bob Crema.  He has an investment advisor or

12    person.

13          Q.    Who is that?

14          A.    Mark Miller at Morgan Stanley.

15          Q.    Is Mr. Crema an employee of AIG?

16          A.    He's a partner.

17          Q.    Does Acer pay -- make any payments to

18    Mr. Crema in connection with Mr. Crema's role at AIG?

19          A.    No.

20          Q.    Do you know how the AIG -- withdrawn.

21                AIG opened a pension plan around 2002.  Are

22    you familiar with that?

23          A.    Yes.

24          Q.    And at some point, you became a trustee of

25    that plan, correct?
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

Page 55

```
1    BY MR. OXFORD:
2            Q.    So just -- just so we are on the same page
3    here, it's your testimony that the dividend finders' fees
4    that are reflected in these accounts are fees that Acer
5    charged ED&F for locating securities that ED&F could
6    borrow in connection with dividend arbitrage trading by
7    the Acer plans?
8            MR. BLESSINGTON:   Object as to form.
9            You may answer.
10           A.    I think that's a narrow definition of
11   dividend finders' fees.   Too narrow.
12   BY MR. OXFORD:
13           Q.    Okay.   And how would you -- well, first of
14   all, insofar as it's narrow, is it correct?
15           A.    That is a component of them, yes.
16           Q.    Okay.   And what are the other components?
17           A.    Some of the other components and some of
18   the other value that we provided to ED&F would be -- also
19   we were the relationship whereby they were able to
20   establish relationships with the pensions and the
21   charities as customers.
22           We were also helpful in making sure that
23   all of their -- sort of that single point of contact so
24   that all of their needs and servicing their customers was
25   consolidated into one place that made everything --
```

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

Page 56

1    facilitating anything much easier than it would have been

2    if they were trying to coordinate amongst many more

3    entities than just one.

4            The definition of dividend finders' fees

5    also talks about advising institutions about

6    opportunities.  And I really think of it as not one

7    jurisdictional relationship with ED&F, that the value of

8    us was based on the relationship as a whole.  It's not

9    that we had a different fee structure or service, you

10   know, invoicing structure dependent on whether it was

11   Denmark or whether it was somewhere else or some other

12   revenue stream.

13           So it's hard when I understand that the

14   point of these conversations is Denmark, but I don't

15   pigeonhole our relationship with ED&F and the value we

16   provided to just that one jurisdiction.

17       Q.    The account statements we just looked at in

18   reference to service provider -- provider relationships,

19   is that what you consider you had -- Acer had with ED&F?

20       A.    I would say that's probably the best

21   terminology, that I didn't come up with that.  But for

22   all I know, that's maybe some sort of standardized

23   accounting term on an audit.  But I -- we were providing

24   a service and we were getting a service, in that we had

25   an account there.  So I don't know.  I -- I didn't choose

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 19, 2021

Page 57

```
 1     it.
 2          Q.    Was Acer being compensated for introducing
 3     the pension plans to ED&F?
 4          A.    We didn't get -- I wouldn't characterize it
 5     that way, no.  Acer didn't actually have to introduce the
 6     pension plans to ED&F, per se, because the people that
 7     worked on that desk came from MF Global, which had
 8     relationships with the pension plans already.
 9          Q.    Each of the nine Acer plans had a
10     preexisting relationship with the former MF Global team
11     that went to ED&F?
12          A.    Yes.
13          Q.    Let's take a look at Exhibit 2420, please.
14                (Exhibit 2420 was marked for
15                identification.)
16          A.    Okay.
17     BY MR. OXFORD:
18          Q.    It's an e-mail from Alan Goldman on which
19     you are copied, from July of 2015.  Mr. Goldman is having
20     an e-mail exchange about Acer invoices with
21     Joseph Sipkin, S-I-P-K-I-N, from Lerner Sipkin, correct?
22          A.    Correct.
23          Q.    And Lerner Sipkin were Acer's accountants,
24     correct?
25          A.    Lerner Sipkin was only responsible for the
```

1    been over your Danish list.

2                    What does that mean?

3          A.    It means she would have sent me a list of

4    securities that they felt they could provide funding for

5    and, potentially, provide liquidity for.

6          Q.    And what did you and Mr. Crema discuss

7    about that list?

8          A.    I don't recall the exact conversation we

9    had about that list.

10         Q.    Okay.  And generally, your process would be

11   what?

12         A.    In general, we would've discussed what was

13   the dividend on those securities, what was the general

14   market on those securities, what did we think the profit

15   was going to be that the plan would make, stuff akin to

16   that.

17         Q.    Okay.  Let's pause there.

18                    How did you calculate what profit the plan

19   would make?

20         A.    It was partially based on, like I said,

21   what the -- so when I say something like, the market,

22   what I'm referring to in this instance is the fact that

23   just even just entering into the transaction at all,

24   buying the security and selling the hedge, has a market

25   cost.  It's usually expressed as an all-in or a

```
 1    percentage of the dividend.

 2              So whereas in Denmark, 73 percent is the

 3    underlying dividend entitlement.  The market for

 4    something might be 80, 84, 92.  And, therefore, you know

 5    that once you pay that away to the market, then there are

 6    certain other knowable costs, such as the execution costs

 7    of even doing this transaction, and that the financing

 8    costs that would be associated with getting the leverage

 9    or funding.

10              And when you then add in all those costs,

11    you arrive at the gross profit that the pension would

12    make.

13         Q.   And would Acer get a percentage of that

14    gross profit?

15         A.   ED&F would charge their fee.  After that

16    gross profit, Acer would charge ED&F a fee.

17         Q.   Were those fees based on a percentage of

18    that gross profit you just described?

19         A.   As we discussed earlier, they were based on

20    other factors, but expressed as a percentage -- ED&F's

21    fee was expressed as a percentage.

22         Q.   And generally, what was ED&F's fee as a

23    percentage of the gross profit you've just described?

24              MR. BINDER:  Objection to form.

25              MR. BLESSINGTON:  Objection.
```

1          Q.     Yeah.   And do you have, off the top of your

2     head, a sense of the value of the Danish securities that

3     the Acer plans collectively purchased?

4          A.     No.

5          Q.     Was it in the billions of U.S. dollars?

6                 MR. BLESSINGTON:  Objection.

7                 You -- you can answer.

8          A.     I don't have that number, off the top of my

9     head.

10    BY MR. OXFORD:

11         Q.     In the ballpark, does that sound right?

12         A.     I wouldn't want to confirm that.

13         Q.     We can certainly agree that the Acer plans

14    didn't have enough money to go out and purchase using

15    their own money, the securities that they ultimately

16    claimed to dividend refund on, correct?

17         A.     I'm going to need you to rephrase that.

18         Q.     Okay.   Well, let -- let's say that

19    Mr. Mitchell's Newsong Plan, if it made a claim for

20    refund on shares that had a market value of $100 million,

21    Mr. Mitchell's Plan didn't have $100 million to go and

22    purchase those securities, correct?

23         A.     Correct.

24         Q.     So how did the plan -- the Acer plans go

25    about -- actually, how did they afford to buy the Danish

1    shares that were the subject of the reclaim applications

2    to Denmark?

3           A.    They used derivative financing and market

4    hedging.

5           Q.    Okay.

6           A.    They were provided leverage.

7           Q.    Okay.   Can you explain to me how the

8    derivative financing worked in the context of the Acer

9    plans purchasing Danish shares?

10          A.    Derivative financing in our circumstance

11   meant that the plans were to sell low equity price

12   options, LEPO, and take in a substantial premium as a

13   result of those sales and simultaneously enter into a

14   total return swap on those securities, these would not

15   have been Danish securities.

16                Total return swap would have been a

17   contract, but not something that had a payment, positive

18   or negative, associated with it.   And in turn, the plans

19   would use the premiums, the profit they made, the cash

20   that was credited to their account to effect the Danish

21   transactions.

22          Q.    And was the premium on the LEPO trade

23   sufficient to cover 100 percent of the purchase price of

24   the Danish securities?

25          A.    As I said, they also used hedges, market

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 19, 2021

1    hedges, and a combination of those things, plus the cash

2    capital that they had in their accounts was what they

3    used to purchase the Danish securities.

4    Q.    Okay.  Did -- did the hedges generate a

5    cash -- positive cash balance for the plans?

6    A.    Depending on exactly which type of hedge

7    they used, yes, when they sold one, it effectively

8    created a cash balance or receivable for the plans.

9    Q.    And by hedges, is that the total return

10    swap you were talking about?

11    A.    No.

12    Q.    What hedges developed --

13    A.    Sometimes it would be --

14    Q.    -- a cash balance?

15    A.    Sometimes it would be a single stock

16    future.  Sometimes it would be a price return swap.  And

17    as I said, it would either be a cash balance or a good

18    receivable.

19    Q.    Okay.  And is it your testimony that a

20    combination of the LEPO and a single swap future --

21    single stock futures would provide sufficient cash for

22    the pension plan to purchase 100 percent of the market

23    value of the -- in my example, $100 million worth of

24    Danish securities?

25    MR. BINDER:  Objection to form.

```
 1              A.     I believe I said --
 2                     MR. BLESSINGTON:  Objection.
 3                     You may answer.
 4              A.     I believe I said that it was the
 5      combination of those, plus capital they -- they had on
 6      deposit in their accounts.  And I didn't use the term
 7      "cash" for all of that.  I said cash or a good
 8      receivable.
 9      BY MR. OXFORD:
10              Q.     Okay.  And what does a good receivable
11      mean?
12              A.     It's an accounting term, which means such
13      as -- a dividend is considered a good receivable and
14      therefore, an asset.
15              Q.     You also mentioned that when I asked you
16      first how the plans afforded to buy the shares, they used
17      leverage.
18                     Can you explain what you meant?
19              A.     What I meant was the fact that if they had
20      a good receivable, but not the cash yet, then ED&F would
21      provide leverage or multiple of their assets, right, in
22      order to affect the trade they would -- some of the
23      transaction on behalf of their customer.
24              Q.     So ED&F would provide financing backed by a
25      receivable to -- in order to permit the Acer plans to
```

```
 1            A.    It was a component of the fees they
 2     charged.
 3     BY MR. OXFORD:
 4            Q.    Sure.  I understand they charge other fees,
 5     but ED&F definitely -- let's be very clear about it --
 6     charged the Acer plans fees, financing fees for extending
 7     credit to help the Acer plans purchase the Danish
 8     securities that are subject of the reclaims, correct?
 9                  MR. BINDER:  Objection to form.
10            A.    Yes.
11     BY MR. OXFORD:
12            Q.    What -- what type of margin are we talking
13     about, the size of the multiple, 10 times, 20 times
14     the -- the assets that the plans had?
15            A.    Since I just said that a good receivable is
16     an asset, I wouldn't be able to calculate that in my
17     head.
18            Q.    Who are the counterparties to -- let's take
19     each of the these instruments one by one -- on the -- the
20     LEPO instrument you told me about.
21                  Who are -- who are the counterparties on
22     the -- the LEPO instruments that the Acer plans entered
23     into?
24            A.    ED&F.
25            Q.    Was it always ED&F?
```

```
 1              Q.    And it would include, for example, if one
 2    wishes to borrow a security for the purposes of dividend
 3    arbitrage, one has to pay an additional fee -- I think
 4    you had call it an all-fee earlier.
 5              Do you remember that testimony?
 6              MR. BINDER:  Objection to form.
 7         A.    Yes.
 8    BY MR. OXFORD:
 9         Q.    So in the --
10         A.    And I believe I did, in relation to also,
11    that that's what would result after the transaction,
12    buying the stock and selling the hedge, not specifically
13    in relation to stock borrowing.
14         Q.    Are you familiar with a term dividend
15    sourcing fee?
16         A.    No.
17         Q.    Are you familiar with stock landing
18    agreements under which a portion of the dividend needs to
19    be repaid to the lender?
20              MR. BINDER:  Objection to form.  Vague.
21         A.    I've never seen a stock lending fee
22    agreement.
23    BY MR. OXFORD:
24         Q.    Can I ask you to turn 2482, please.
25              MR. BLESSINGTON:  2482?
```

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2                   MASTER DOCKET 18-MD-2865(LAK)
                       CASE NO. 18-CV-09797
 3

 4   _____
                                        )
     IN RE:                             )
 5                                      )
     CUSTOMS AND TAX ADMINISTRATION OF  )
 6   THE KINGDOM OF DENMARK             )
     (SKATTEFORVALTNINGEN) TAX REFUND   )
 7   SCHEME LITIGATION                  )
                                        )
 8   _____)

 9

10

11            CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                     DEPOSITION OF
                       STACEY KAMINER
15                        VOLUME 2

16               Tuesday, April 20, 2021
                  8:08 a.m. — 2:35 p.m.
17
                    Remote Location
18                  Via Huseby Connect
                   All Parties Remote
19

20

21

22

23

24            Stenographically Reported By:
                   Erica Field, FPR
25
```

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 20, 2021

```
 1          Q.    The title is:  Dividend Finder Fee Billing
 2    for Danske Bank, Novozymes and Pandora?
 3          A.    Yes.
 4          Q.    And he writes:  Hi, Marcus/Chris, attached
 5    is the Acer group LLC billing for those three shares,
 6    correct?
 7          A.    Yes.
 8          Q.    What was Acer invoicing ED&F for here?
 9          A.    Our fees.
10          Q.    What were your fees based on?
11                What did you do to earn those fees?
12          A.    I believe I stated yesterday that ED&F paid
13    us based on our relationship, based on overall value that
14    we brought to the table, based on the instances when we
15    did locate stock, and that our dividend finder fee didn't
16    just cover locating, sourcing, whatever word you want to
17    use for the term stock, and they did not separate out
18    well, this is Belgium, this is Canada, this is Denmark.
19    They viewed us as a relationship in the whole.
20          Q.    The one thing that we can be sure is, is
21    that Acer services for Denmark did not include finding
22    any dividends.
23                We can agree on that?
24          A.    We can agree that Acer services for Denmark
25    did not include locating stock that ultimately got
```

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 20, 2021

Page 292

```
 1    you received from ED&F?

 2            A.    Yes.

 3            Q.    Are you familiar with a document that's

 4    known in this case as Annex E?

 5            A.    Yes.

 6            Q.    What can you tell me about Annex E?  What

 7    is your understanding?

 8            A.    My understanding is Annex E is a document

 9    that got filed by ED&F that contains tax vouchers that

10    they say have errors on them.

11            Q.    What do you understand to be the nature of

12    those errors?

13            A.    I have no idea what the nature of those

14    errors are.

15            Q.    ED&F never explained to you what the errors

16    were?

17            A.    No.

18            Q.    Have you asked them?

19            A.    Yes.

20            Q.    What did they say?

21                  MR. BLESSINGTON:  Objection.  Have you —

22            A.    You're right.  I apologize.  I have not

23    personally asked ED&F.

24    BY MR. OXFORD:

25            Q.    I take it from Mr. Blessington's objection
```

Page 385

```
 1          A.    Yes.
 2          Q.    And this reflects all of the shares --
 3   withdrawn.
 4                During the time period between 2012 and
 5   2015, there were two members of Acer, correct, you and
 6   Mr. Crema?
 7          A.    We were the two class A members of Acer.
 8          Q.    And there were -- Mr. Goldman was an
 9   employee?
10          A.    Yes.
11          Q.    And Mr. Messina was an employee, correct?
12          A.    Yes.
13          Q.    And, you know, in 2012, at the beginning of
14   2012, Acer's principal place of business was New Jersey,
15   right?
16          A.    Yes.
17          Q.    And at some point, Acer relocated its
18   business to Florida; is that correct?
19          A.    Yes.
20          Q.    And Acer's principal place of business in
21   2015 was Florida, correct?
22          A.    Yes.
23                MR. BLESSINGTON:  Objection.
24                You can answer.
25          A.    Yes.
```