# Exhibit 5

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2              Master docket No. 18-MD-2865(LAK)
                     Case Nos. 18-cv-09505
 3     _____
                                      )
 4     IN RE:                         )
                                      )
 5     CUSTOMS AND TAX ADMINISTRATION OF )
       THE KINGDOM OF DENMARK (SKATTEFOR )
 6     VALTNINGEN) TAX REFUND SCHEME  )
       LITIGATION,                    )
 7                                    )
       _____)
 8

 9

10

11

12

13

14       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                      EXAMINATION OF

16                       DAVID SCHULMAN

17                   DATE: October 21, 2020

18

19

20

21

22

23

24

25           REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

David Schulman - October 21, 2020

Page 48

```
 1         Q    And so, that -- was that $200 per
 2   plan?
 3         A    200,000 per plan, yes.
 4         Q    Was that how the plans were
 5   initially funded?
 6         A    Yes.
 7         Q    What consulting work did you do for
 8   Mr. Kaminer?
 9         A    I advised him on risk arbitrage
10   positions.  I backed him up on the drip
11   trading.  I gave an opinion if he had a
12   particular strategy that I thought that he
13   wanted my opinion on.
14              There was one in particular that he
15   had already put on rather substantially and I
16   disliked it.  And then he went away on
17   vacation and I shut the whole position down.
18              In other words, I made the decision
19   for him in his absence that he shouldn't be
20   in that position.  And it turned out that
21   that would have been a very, very expensive
22   mistake outside of general advice.
23              Otherwise, that was it.
24         Q    And so, the $400,000 that he gave
25   to the two plans, was that a repayment of the
```

```
1    had done for him for eight years.
2            I did not specify an amount, and
3    that was the amount that he chose.
4        Q    And you said earlier that Dan
5    Kaminer said that now that you have the
6    pension plans, he could pay you back for the
7    work that you had done.
8            Were these pension plans set up to
9    receive that money from Dan Kaminer?
10           MR. BLESSINGTON:  Objection.  You
11       may answer.
12       A    Not specifically, no.  I mean, I
13   might have had that in mind, but no, not
14   specifically.
15       Q    And you said that the $200,000 per
16   plan was a consulting fee?
17       A    Yes.  Correct.
18       Q    And you said that the plans were
19   set up to put consulting income into.
20           Is that right?
21       A    Correct.
22       Q    Did you receive any other
23   consulting income?
24       A    No.
25       Q    So the plans were set up to receive
```

David Schulman - October 21, 2020

Page 52

1    Q    And this was when the plans
2    were -- I'm sorry, excuse me.
3         And Mr. Kaminer paid the -- this
4    $400,000 when the plans were established.
5         Is that right?
6    A    I don't know the answer to that.  I
7    can't talk to specific dates.
8    Q    Do you have financial records of
9    the plans that would demonstrate when these
10   payments were made?
11   A    No.  The only records I have are
12   the tax returns of the plans.
13   Q    And what years do you have those
14   for?
15   A    Oh, definitely the ones you
16   requested.  I have not gone further back to
17   see if I have others.
18   Q    So how did the $200,000 per plan
19   end up in the pension plan?
20   A    I don't remember.
21   Q    Did Mr. Kaminer pay you, and then
22   you made a contribution to the plan, or did
23   he pay the plan directly?
24   A    Oh, I'm pretty sure he paid me and
25   I put the money in the plans.

1    Q    And this was -- so he paid you the
2    $200,000 in the consulting fees, and you
3    contributed that money to the plan?
4    A    Correct.
5    Q    Did you report this consulting
6    income on your tax returns?
7    A    I'm sure I did if it's -- if it was
8    legally required, I'm sure I did.
9    Q    And did you pay taxes on that
10   $200,000?
11   A    No.  That was the purpose, was to
12   defer paying taxes on that money.
13   Q    And what about the other pension
14   plan, Joan Schulman -- the Joan Schulman
15   Pension Plan?
16   A    Right.
17   Q    Dan Kaminer contributed $200,000 to
18   that plan as well?
19   A    Yes.
20   Q    Did Joan also provide consulting
21   services to Dan Kaminer?
22   A    Some small services, but
23   she -- when he had to prepare to make
24   presentations, she worked -- I mean, she's a
25   professional editor and teacher, so not a

David Schulman - October 21, 2020

Page 126

```
1     active with Invest Tech at the same time as
2     ED&F Man, and I don't know if there were
3     other parties involved.
4          Q    Did you ask Stacey any questions
5     about the move?
6          A    No.
7          Q    Did she explain anything about why
8     the plans were moving the accounts to
9     ED&F Man?
10              MR. BLESSINGTON:  Object as to
11         form.
12         A    No.
13         Q    Did Stacey enter into any
14    agreements with ED&F Man on behalf of the
15    plans?
16         A    Not that I know of.
17         Q    So when she said that she had an
18    agreement with them for funding, who was that
19    funding being provided to?
20              MR. BLESSINGTON:  Object as to
21         form.
22              MR. BINDER:  Object to form,
23         misstates prior testimony.
24              MR. BLESSINGTON:  You can answer.
25              THE WITNESS:  I don't know what the
```

David Schulman - October 21, 2020

Page 142

```
 1         A    It looks like it.
 2         Q    Do you know what the purpose of
 3    this document is?
 4         A    Only what I've gotten from reading
 5    the cover page.  And I have to admit I don't
 6    know what any of these terms mean.  "Security
 7    and set off deed," I have no idea.
 8         Q    Did somebody tell you that you
 9    needed to sign this document?
10         A    I don't recall.
11         Q    Did you read this before signing?
12         A    No.
13         Q    Why not?
14         A    Again, I am sure that Stacey sent
15    it to me with a yellow tab, it said "Sign
16    Here," and I signed.
17         Q    Please turn to Exhibit 822?
18              MS. CAHAN:  Mark this as 822.
19              (Whereupon the above mentioned was
20         marked for Identification.)
21         A    Okay.
22         Q    Are you familiar with this
23    document?
24         A    No.
25         Q    Is that your signature on the last
```

David Schulman - October 21, 2020

Page 143

```
 1     page?
 2        A    Yes.
 3        Q    Did you review this document before
 4     signing it?
 5        A    You know, I probably looked at it.
 6     When it said "custody agreement."  I just
 7     signed by the tab.
 8        Q    Why didn't you review this
 9     agreement before you signed it?
10        A    I think custody documents are
11     boilerplate.  I didn't see any reason to
12     review it.
13        Q    How -- in what way are custody
14     agreements boilerplate?
15        A    I think it just says the same
16     thing, that a broker dealer will keep custody
17     of your securities.  It wasn't like they were
18     going to mail me stock certificates.
19             I don't know, but that's my limited
20     understanding of it.  I never read this
21     document.
22        Q    Did anybody tell you that you
23     needed to sign this document?
24        A    I don't know, but I believe that it
25     was sent to me with a tab, "Sign Here."
```

1      Q   Sent to you by whom?
2      A   I don't know the answer to that,
3  but since all documents like this went to
4  Stacey at Lillehammer Road, or whatever it
5  is, and they were forwarded to me, I would
6  assume it was Stacey or her assistant, but
7  certainly at Stacey's direction.
8      Q   Can you please turn to Exhibit 824?
9          MS. CAHAN:  Mark this as 824.
10         (Whereupon the above mentioned was
11     marked for Identification.)
12     A   Okay.
13     Q   Are you familiar with this
14  document?
15     A   (Witness reviewing.)
16         No.
17     Q   Is that your signature on the last
18  page?
19     A   Yes.
20     Q   On the first page, it says that you
21  categorize -- that "the Riverside Associates
22  Defined Benefit Plan will be categorized as
23  an elective professional client."
24         Do you know what that means?
25     A   No idea.