# Exhibit 16

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | MASTER DOCKET |
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | 18-md-2865 (LAK) |
| This document relates to all cases listed in Appendix A. | |

---

## REPLY  EXPERT REPORT OF FELICITY TOUBE QC

---

### Purpose of the Expert Engagement

1.      I have been asked by Counsel for SKAT,[1] the Customs and Tax Administration of the Kingdom of Denmark, to reply to the report of Richard Salter QC dated 1 February 2022 (the "**Salter Report**") which was prepared in response to my report dated 17 December 2021 (the "**Initial Toube Report**").   For purposes of this report, I incorporate the definitions, background, analyses, and opinions detailed in the Initial Toube Report and my rebuttal report dated 1 February 2022, as applicable.

.

---

1.      I have been informed by counsel for the Plaintiff that at the time of the events alleged in the complaint, the Plaintiff was known as "SKAT."  Pursuant to Danish Legal Order 804, entered on June 6, 2018, the Plaintiff changed its legal name to Skatteforvaltningen, effective as at July 1, 2018.

A. **Qualifications and Preparation of the Report.**

2.    My qualifications were detailed in Section A of the Initial Toube Report and my curriculum vitae was also included as Appendix C in the Initial Toube Report. My compensation for preparing this reply is the same as stated in the Initial Toube Report.

3.    I have been requested to provide an expert report on certain issues of English law which are relevant to the above-captioned proceedings (the "**Proceedings**") which are pending before the United States District Court for the Southern District of New York (the "**Court**").  I understand that this report will be placed before the Court, and I understand my duties to the Court.

4.    A complete listing of the materials I reviewed and considered in forming my opinions and conclusions rendered in this report is attached hereto as Appendix B.

5.    In providing this report, I do not intend to, and do not, waive any legal professional privilege belonging to SKAT and SKAT's rights are reserved.

B. **Summary of Opinions**

6.    Mr Salter's only material area of disagreement with my Initial Toube Report is his contention that the transfer of title under clause 10(b)(ii) of the Terms did not take place automatically when the Securities were purchased using funds loaned by ED&F to the Clients, but rather that an English court would read into the Terms an additional, unwritten requirement that ED&F take an affirmative action in order for the title transfer to occur.  For the reasons set out in my Initial Toube Report and supplemented by this report, it remains my opinion that all right, title, and interest to the Securities transferred to ED&F immediately on receipt pursuant to the TTCA in the Terms, and therefore that ED&F owned the Securities at the times to which these proceedings relate. In particular, it is my opinion that:

(1)    First, Mr Salter's preferred construction fails to give proper effect to the clear words of the Terms, specifically clause 10(b)(iii), and does not address the parties' recognition of the application of clause 10(b)(ii) as established in the Variation Letters. Therefore the English courts would be

2

likely to reject Mr Salter's construction on the grounds that it effectively renders the Terms a nullity.

(2)   Secondly, the statutory provisions and regulatory rules cited by Mr Salter establish book-keeping procedures to record evidence of title to a security, and do not override or amend the substantive rights established by the agreements between ED&F and the Pension Plans contained in the Contract Suite.  At most, Mr Salter has demonstrated that ED&F had failed to comply with regulatory rules, a failure from which they would not be permitted to benefit themselves, rather than that the title transfer clause of the Terms was not automatic.

(3)   Thirdly, the additional factual information related to the subsequent conduct of the parties and pre-contractual negotiations relied upon by Mr Salter would not be considered by an English court in interpreting the Contractual Suite.  Moreover, even if this information were considered, it demonstrates that ED&F and the Pension Plans were aware that the pursuant to the Terms, all right, title and interest to the Danish Shares would transfer to ED&F immediately upon receipt, as collateral to secure the Clients' obligations to repay the purchase monies advanced by ED&F.

7.   As to Mr Salter's arguments regarding estoppel and rectification, Mr Salter's assertions are in my opinion not supported by English Law.  It is an established principle of English law that estoppel is only capable of binding the parties to the representation or common assumption on which the estoppel is founded, and therefore even if ED&F were to be estopped from making arguments premised on the TTCA provision of the Terms, that estoppel cannot serve to prevent SKAT from raising arguments that the representations contained in the Tax Voucher were fraudulent.  Similarly, an English Court would employ rectification principles to bar a third party from bringing claims arising from the original, uncorrected, agreement.

3

**Rebuttal**

## C.   Contractual Construction – Applicable English Legal Principles

8.   I generally agree with Mr Salter that the English law as to contractual construction is as he sets out in paragraphs 12 to 32, which I note, Mr Salter recognises is consistent with my Initial Toube Report. *See* Salter Report at ¶ 33.  However, I would add that Mr Salter fails to give proper consideration to the following principles which would also apply.

### i.   The court will give clear words meaning

9.   The context of the document as a whole will not usually override the plain meaning of the words used. Effect is to be given to every word so far as possible and words should not be added which are not there, unless the language that the parties actually used creates an ambiguity which cannot be solved otherwise: <u>Barts and the London NHS Trust v Verma</u> [2013] UKSC 20 at [26].

10.   The proper mode of construing any written instrument is to give effect to every part of it, insofar as possible, and not to strike out or nullify one clause in a deed, unless it is impossible to reconcile it with another and more express clause in the same deed: <u>Morris v Blackpool Borough Council</u> [2014] EWCA Civ 1384 at [27].

11.   The court starts from a presumption that clauses included in a contract are intended to affect the parties' rights and obligations. The presumption applies more forcefully against alternative interpretations of the contract which nullify an entire clause of the agreement: <u>Dwr Cymru Cyfyngedig (Welsh Water) v Corus UK Ltd</u> [2007] EWCA Civ 285 at [13].

### ii.   The relevant factual matrix

12.   Pre-contractual negotiations are not admissible evidence as to the meaning of a contract. As set out by Lord Hoffman in <u>Investors Compensation Scheme v West Bromwich Building Society</u> [1998] 1 W.L.R. 896 (as cited by Mr Salter at paragraph 12 of his report):

> *"The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear."*

13.    One of several justifications for the exclusion was set out by Lord Wilberforce in <u>Prenn v Simmonds</u> [1971] 1 W.L.R. 1381 at [1384] as follows:

> *"The reason for not admitting evidence of these exchanges is not a technical one or even mainly of convenience ... It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter are changing and until the final agreement, though converging, still different. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to."*

14.    Further, Waller LJ set out in <u>The Rio Assu (No.2)</u> [1999] 1 Lloyd's Rep. 115 at [124]:

> *"It is dangerous to make the assumption that one party intended to have something supplied or provided for by the contract, or that the other party intended to have something else supplied or provided by the contract. Contracts are negotiated and ultimately each may think that he has what he wishes, but it is for the Court to interpret the language of the contract. There is no doubt about the correctness of the principle."*

15.    The English courts have been very strongly opposed to attempts to introduce evidence of parties' actions and words in the course of negotiations: c.f. <u>Falkonera Shipping Co v Arcadia Energy Pte</u> Ltd [2012] EWHC 3678 (Comm) at [28]. Claims for rectification and estoppel by convention are not exceptions to the rule but operate outside of it. However, such claims must be specifically pleaded and clearly established: <u>Chartbrook Homes Ltd v Persimmon Homes</u> Ltd [2009] 1 A.C. 1101 at [35], [38], [42] and [47].

16.    The conduct of the parties subsequent to formation of the contract is of no greater probative value in the interpretation of the contract than prior negotiations. Evidence to this effect is not admissible unless it evidences a new agreement or forms the basis of an estoppel: <u>Schuler (L.) AG v Wickman Machine Tool Sales Ltd</u> [1973] 2 W.L.R. 683 at [261]. In particular, the conduct of a party after the making of a contract does not provide

relevant factual context to explicate the meaning with which the parties used the words at the time they made the contract: <u>Sattar v Sattar</u> [2009] EWHC 289 (Ch) at [36].

### iii.   Admissible evidence to show the genesis and aim of the transaction

17.   I generally agree with Mr Salter's statement of the law, as set out at paragraphs 29 to 32 of his report, as to the admission of pre-contractual documents to show the genesis and aim of a contract.

18.   However, as set out above (and further below) the English courts <u>will not</u> accept evidence of pre-contractual negotiations to elucidate detailed points of interpretation of a contract, and the English courts will be very cautious about accepting such material as admissible evidence as to the aim of the transaction. That this is the case is a fact that Mr Salter recognizes (Salter Report ¶¶ 31-32).  As Arden LJ (as she then was) set out in <u>Scottish Widows Fund and Life Assurance Society v BGC International</u> [2012] EWCA Civ 607 at [33]-[35]:

> *"Pre-contractual negotiations rarely descend into detail on every point; the negotiations are unlikely to throw any light on the detailed points of interpretation that generally arise after execution.*
>
> *However this does not necessarily mean that the pre-contractual negotiations should be accepted as evidence even as to the general object of the transaction. Statements made in the course of negotiations are often no more than statements of a negotiating stance at that point in time, thus shedding more heat than light on issues as to interpretation of the final deal…*
> *…*
> *<u>[J]udges should exercise considerable caution before treating as admissible communications in the course of pre-contractual negotiations relied on as evidencing the parties' objective aim in completing the transaction.</u>"* (emphasis added)

19.   Further, to the extent that pre-contractual material is admissible at all, it is restricted to identifying the general aim of the transaction, rather than to draw inferences about what the contract means: <u>Gwynt Y Mor Ofto Plc v Gwynt Y Mor Offshore Wind Farm Ltd</u> [2020] EWHC 850 (Comm) at [65].

20.   In relation to the question of the genesis or aim of the contract, the court will consider pre-contractual material as an aid to determining the genesis or aim of the contract not in

a subjective sense, but rather in the objective sense of what reasonable persons would have considered the genesis or aim of the contract to have been in the situation of the parties: Reardon-Smith Line Ltd v Hansen-Tangen [1976] 1 W.L.R. 989 at [996].

**D.   Application of the Contract Suite to the Purported Securities Transactions**

> **i.   The Terms governed right, title and interest to the Securities if and to the extent that ED&F advanced funds to the Clients to purchase the Securities**

21.   I disagree with Mr Salter's statement (at paragraph 110 of his report) that my characterisation of the operation of the Contract Suite begs the question of the correct interpretation of the parties' contractual arrangement. I note that in fact Mr Salter and I appear to be in agreement as to the interrelationship between the Contract Suite agreements, but that Mr Salter disagrees with me as to when the Securities were governed by the Terms. In essence, Mr Salter takes the view that title to the Securities would only be governed by the Terms when ED&F had undertaken some act of exercise of its right to take title under clause 10(b)(ii) (as set out, for example, in paragraphs 84 and 88 of his report). I do not agree. As set out in my Initial Toube Report, the Custody Agreement governed where ED&F held the Securities as custodian for the Client, while the Terms governed where ED&F had advanced funds to the Client to purchase the Securities and the Security Deed supplemented the security granted to ED&F pursuant to the Terms.

22.   In my opinion, the flaw with Mr Salter's preferred construction is that it fails to give proper effect to the clear words of the Terms, and that therefore the English courts would be likely to reject Mr Salter's construction on the grounds that it effectively renders the Terms a nullity.

23.   I agree with Mr Salter's statement of the law in paragraph 108.1 as to arguments based on surplusage, where the relevant terms are unnecessary and can be omitted without disadvantaging any party (as to which, for example, see the extract from Merthyr (South Wales) Limited v. Merthyr Tydfil County Borough Council [2019] EWCA Civ 526 at [39] which is cited in footnote 110 of Mr Salter's report).  However, the English Courts' hesitancy to give weight to surplusage or redundancy arguments is only applicable when the allegedly surplus provision at issue is redundant or insignificant.  As clause 10(b)(ii)

of the Terms is not redundant or insignificant, but instead goes to the heart of the collateral protections provided to ED&F, Mr Salter's argument in respect of surplusage is misplaced.

24.    I therefore disagree with Mr Salter's characterisation (at paragraph 93.1 of his report) of the principle that the Terms ought to be given effect insofar as possible as *"simply a pointer"* which *"may or may not be useful as an aid to interpretation"*. The proper mode of construing any written instrument is in fact to give effect to every part of it insofar as possible. When construing an agreement the court will start from the presumption that clauses in that agreement are intended to affect the parties' rights and obligations. This presumption applies even more forcefully where, as here, one proposed construction effectively renders an entire clause (clause 10(b)(ii)) a nullity. Mr Salter suggests at paragraph 108.2 of his report that clause 10(b)(ii) would still have effect *"as regards surplus cash"*, however he fails to explain what would be considered "surplus cash" in this context, and it falls to be inferred that, on his construction, clause 10(b)(ii) would have no legal effect.

25.    I agree with Mr Salter's suggestion (insofar as one is made) that the principles set out in paragraphs 23 to 25 of my Initial Toube Report would not be useful as an aid to interpretation in some circumstances. For example, as I set out in paragraph 25(3) of the Initial Toube Report, those principles may be disapplied where a construction of an agreement which nullifies that agreement is clearly preferable to one which does not. However, in my opinion, such circumstances do not arise here for the following reasons:

   (1)    As set out in paragraph 28 of my Initial Toube Report, in the First and Second Variation Letters the parties expressly recognised that the Terms applied and affected their rights and obligations. These letters reiterated that the Securities would be held by ED&F as collateral on an absolute title transfer basis under the TTCA, to the extent that the Client had not requested that those Securities be segregated in the period between the First and Second Variation Letter.

   (2)    There was therefore not only one, but two, reaffirmations of the existence of the title transfer after the contract was entered into. In my opinion, this

8

strongly supports the construction of the documents which I have already put forward, namely that the Terms governed the relationship between the parties and had legal effect to transfer title to the Securities to ED&F.

(3)    It is my opinion that any construction which nullifies the Terms contradicts the express acknowledgment of the parties in the First and Second Variation Letters that the Terms applied to their relationship and were effective to govern their rights.

(4)    I note that Mr Salter does not refer to these letters in his report, aside from to acknowledge in paragraph 108 that those letters contemplate clause 10(b)(ii) of the Terms having legal effect.

(5)    In the light of all the documents, including the First and Second Variation Letters it is my view that the English court would be highly unlikely to conclude that a construction which nullifies the Terms is *"clearly preferable"* to an interpretation which gives effect to all of the Contract Suite Agreements.

(6)    Accordingly, the English court would be entitled to (and, in my opinion, likely to) prefer the construction of the Contract Suite agreements set out in my Initial Toube Report (which preserves rather than destroys the Terms) to the construction proposed by Mr Salter (which would effectively render the Terms a nullity).

### ii.   <u>Pursuant to the Terms, all right, title and interest to the Securities transferred to ED&F immediately upon receipt</u>

26.   I agree with Mr Salter's statement in paragraph 88 of his report that the only material issue in dispute between us is whether transfer of title under clause 10(b)(ii) of the Terms took place automatically when the Securities were purchased using funds loaned by ED&F to the Clients, or whether the transfer of title was dependent on ED&F exercising its rights to treat the Securities as collateral.

27.   For the reasons set out in my Initial Toube Report and for the reasons set out below, I remain of the opinion set out in my Initial Toube Report that pursuant to the Terms Agreements all right, title, and interest to the Securities was <u>immediately</u> transferred to ED&F when financing to purchase the Securities was provided to the Pension Plans. ED&F was not required to take any further steps for title to the Securities to be transferred, including, but not limited to, making book entries recording that title to the Securities had transferred.

28.   I note that Mr Salter's reasons for disagreeing with my opinion on this point at paragraph 103.1 of his report are not put very high. He states that he *"is not sure"* that right, title and interest to the Securities is correct *"simply as a statement of English law"* and that it *"seems to [him] to be probable that"* such a transfer requires the making of some accounting entry.

29.   It appears that Mr Salter's disagreement is based on the following points:

   (1)   Firstly, that it is *"well-arguable"* that a transfer of Securities held as collateral requires accounting entries to be made in the records of the relevant intermediary in order to be effective, as a matter of the applicable regulations and CASS Rules (as set out in paragraph 65 of Mr Salter's report).

   (2)   Secondly, that the court, upon taking into account the wider context of the parties' relationship, would be likely to conclude that right, title and interest to the Securities did not pass to ED&F immediately on receipt as ED&F treated the Securities as safe custody assets, held in a segregated client account.

   (3)   Thirdly, that some further step was required to transfer title to the Securities to ED&F as a matter of the plain language of the Terms.

30.   I note that Mr Salter's conclusions are somewhat tentatively advanced in paragraph 103.1, where he asserts that he is "*not sure*" that I would be correct in relation to transfers of book entry interests in intermediated securities. He also reaches a conclusion that it is "*probable*" that the transfer requires the making of "*some sort of accounting entry*".

31.   For the reasons set out in my Initial Toube Report, and supplemented by this report, I do not agree with Mr Salter's conclusions.

<u>No further steps were required for title to the Securities to transfer</u>

32.   I generally agree that Mr Salter accurately describes the common practice in respect of Intermediated Securities at paragraphs 55 to 58 of his report, and generally agree with the manner in which he describes the general practice of segregating and pooling client money or assets in paragraphs 59 to 64 of his report. However, the common practice in either respect is not relevant to the question of the ownership of the Securities in the present case, as that it is a matter which falls to be determined by the agreement governing those ownership rights (*i.e.* the Terms). In particular, for the reasons set out in paragraphs 33 to 44 below, the beneficial ownership of assets held by an intermediary falls to be determined by reference to the relevant agreement governing ownership of those assets, and not the manner in which those assets are later held by the intermediary. If the Terms require the assets to be treated in a certain way, but they are not in fact treated in that way, that would be a breach of the Terms, and not a means for reinterpreting what the Terms required. In other words, even if the facts are as asserted by ED&F, as to which I express no concluded opinion, that is evidence (at best) that there was a breach of the Terms, but provides no proper guidance as to the proper interpretation of the Contact Suite.

33.   In particular, as set out in my Initial Toube Report, Clause 10(b)(ii) provides, materially, that *"all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us"*. In my opinion, the English courts are likely to interpret the clear words of clause 10(b)(ii) as effective to transfer all right, title and interest to the Securities to ED&F immediately upon receipt. In particular, clause 10(b)(ii) is in absolute terms, and the title transfer is not expressed to be conditional on any further step. Importantly, clause 10(b)(ii) also

does not specify what hypothetical further step would be required in order for title to the Securities to transfer to ED&F, which strongly indicates that no such further step was required.

34. This interpretation also accords with business common sense. It would be impractical for ED&F to have to calculate the balance of each Client's obligations at the time of receipt of the Securities, in order to assess whether it required further collateral to secure those obligations, and then to have to take some further step to make it clear if and when it had chosen to accept those Securities as collateral. Further, clause 10(b)(ii) does not set out how ED&F would exercise its choice to treat the assets as collateral, and it is highly unlikely that sophisticated commercial parties would have intended to leave such a significant gap in the Terms. It is highly unlikely that where ED&F lent funds to the Clients to purchase the Securities, that it would have agreed that the Clients' obligations to repay those funds would be secured by collateral but only if and to the extent that ED&F elected to exercise its right to such security, dependent on some ambiguous and unstated method of exercise.

35. Mr Salter sets out in paragraph 65 of his report that it is *"well-arguable"* that a transfer of title in Securities, even in the case of a financial collateral arrangement, requires accounting entries to be made in the records of the relevant intermediary in order to be effective. In my opinion, to the extent that an intermediary is required to make accounting entries to record the transfer of title to assets held as financial collateral, that is not, as Mr Salter suggests, a requirement for the transfer of those assets to be effective, but merely evidences that the intermediary has in fact done so.

36. I generally agree that the relevant regulations, definitions and features of a TTCA and Security FCA are as set out by Mr Salter in paragraphs 66 to 70 and paragraphs 72 to 73 of his report, and that the CASS Rules set out in paragraph 75 are accurate. I also agree with his statement in paragraph 71 that the existence of a right to rehypothecate collateral is not necessarily conclusive that an arrangement is a TTCA as opposed to a Security FCA. The existence of rehypothecation is neutral in this regard.

37. However, I disagree that the statutory provisions and regulatory rules cited by Mr Salter support the contention that book entries are required for a transfer to be effective. Rather,

the statutory provisions and regulatory rules are general procedural book-keeping rules. These provision and rules do not determine, let alone override, the substantive rights between a collateral provider and a collateral taker, which would be set out in the relevant contracts between the parties (here, the Terms). In particular:

(1) Article 1(g) of the FCD provides that title to financial collateral consisting of financial instruments *"is evidenced by entries in a register or account maintained by or on behalf of an intermediary"*. It does not provide that title to financial collateral is <u>effected by</u> book entries.

(2) Article 1.5 sets out the requirements for *"[t]he evidencing of the provision of financial collateral"* which *"must allow for the <u>identification</u> of the financial collateral"* and goes on to state that it is sufficient for this purpose to prove that the book entry securities collateral has been credited to the relevant account. Again, it does not provide that title to financial collateral is <u>effected</u> by book entries, but rather that book entries are sufficient to <u>prove</u> the provision of financial collateral and <u>identify</u> that collateral.

(3) The definition of "relevant account" set out in the FCARs provides that it refers to *"the register or account, which <u>may</u> be maintained by the collateral-taker"*. Accordingly, it is not imperative for a collateral-taker to maintain a register or account. It follows that it is not necessary that a book entry <u>must</u> be made in the register or account in order for the collateral-taker to obtain title to the collateral.

38. I agree with Mr Salter that ED&F would have been obliged to comply with the CASS Rules cited in paragraph 75 of his report, and that those rules form part of the admissible background in aid of interpretation. However, in my opinion, failure to comply with those regulatory requirements does not amount to a failure to transfer title to the Securities to ED&F, for the following reasons:

(1) The breach of the regulatory requirements by a firm does not mean that the regulatory requirements are without any force. In particular, mere failure to segregate client money or client assets does not defeat the regulatory provisions.

(2)     One particular example of this point is exemplified in  Re Lehman Brothers International (Europe) (In Administration) [2012] UKSC 6 ("**LBIE**"), in which the Supreme Court held at [62] that the statutory trust imposed on Client Money under CASS Rule 7 arose upon receipt of the Client Money by a firm and remained of effect throughout the time in which such Client Money remained held, even if the firm failed to comply with its obligations to segregate the Client Money. It follows that the English courts will not permit a firm to rely on its own failure to comply with the CASS Rules in order to retain assets to which it should not have had title if it had properly complied with its CASS obligations.

(3)     The court made it clear at [2] that procedural steps, such as segregating money into separate bank accounts, are not sufficient to establish a proprietary interest in those funds in anyone other than the account holder, and a declaration of trust would be required to protect those funds in the event of the firm's insolvency. Accordingly, procedural steps, such as segregation or book entries, are not sufficient to establish parties' proprietary interests in the relevant assets (but may be sufficient to evidence those interests).

(4)     In my opinion, the English courts are highly likely to adopt the same approach in the present situation and apply the same reasoning. Accordingly, if ED&F failed to keep adequate records to distinguish between its own assets and safe custody assets, that does not mean that those assets will be deemed to be safe custody assets.  Rather, under English law, ownership falls to be determined by the relevant agreements governing those ownership rights.

(5)     Further, compliance (or non-compliance) with the procedural steps required by CASS Rules is not sufficient to establish that ED&F did not own the relevant Securities at the relevant times.

39.   As to the specific rules relied on by Mr Salter, the purpose of CASS 6.5 is to ensure that regulated firms maintain adequate records, accounts, and reconciliations as a matter of good practice. In my opinion, it is plain that CASS 6.5 does not affect the substantive rights of the parties as to safe custody assets or the firm's own applicable assets. Otherwise, it would lead to the result (and one that would be contrary to the conclusion in <u>LBIE</u>) that a firm's failure to comply with its regulatory obligations, including maintaining adequate records, would mean that it could rely on its own wrongdoing to obtain title to assets or money which would have belonged to its clients if it had complied with those obligations.

40.   Further, I disagree with Mr Salter's statement (in paragraph 75.2 of his report) that CASS 3.1.7. assumes that a firm will exercise its rights under a TTCA by identifying the assets in its own books and records. The remainder of the relevant sentence, as cited in footnote 90 of Mr Salter's report, provides that: *"The firm <u>may</u> exercise its right to treat the asset as its own by, <u>for example</u>, clearly so identifying the asset in its own books and records"*. Accordingly, in my opinion, it is not inconsistent with CASS 3.1.7 that ED&F did not in fact need to exercise its right by identifying the assets in its books and records to treat the Securities as its own. Its right to do so under the TTCA arose immediately on receipt of those Securities.

41.   I agree that CASS 3.2.3. indicates that unless and until a firm exercises its rights to treat assets as its own the CASS custody rules will still apply. However, it is not inconsistent with this provision that ED&F did not have to take additional hypothetical steps to exercise its rights under the TTCA in order to treat the Securities as its own (or to have right, title, and interest to those Securities), and therefore that the custody rules ceased to apply immediately on receipt of the Securities by ED&F.

42.   Further, I agree with Mr Salter's statement of ED&F and the Acer Defendants' pleaded case in paragraph 84 of his report. However, the statements made by those parties that clause 10(b)(ii) required ED&F to exercise or assert its rights to the Securities are just assertions. They are not relevant to the proper interpretation of the Terms.

43.   In summary, I disagree with Mr Salter's conclusion in paragraph 83 of his report that an English court would be likely to hold that ED&F was required to take additional

hypothetical steps to exercise its right under the TTCA before title in the Securities would pass from the Acer Defendant to ED&F for the following reasons:

(1)   In my opinion, the fact that book entries can be relied upon to provide sufficient evidence of title to Securities held as financial collateral does not mean that those book entries were necessary for ED&F to have title to those Securities.

(2)   Failure to comply with the CASS Rules, or other regulatory obligations, is not determinative of the parties' substantive rights. If ED&F failed to record the transfers of title to the Securities in its books, that does not mean that it did not obtain such title. Title falls to be determined by reference to the provisions and operation of the Terms, which are the relevant agreement governing the parties' ownership rights.

(3)   Finally, it is not inconsistent with the CASS Rules that title to the Securities would transfer to ED&F immediately. Those rules do not specify any particular method of exercising rights to treat assets as collateral. They simply provide that recording a transfer in the firm's books is one example of how such rights could be exercised.

<u>Proper factual matrix to interpret the Contract Suite</u>

44.   I disagree with Mr Salter's statements at paragraph 90 that the information with which I have been provided has been limited to that necessary to support the interpretation for which I argue, and the further contention at paragraph 93.2 of his report that my Initial Report *"ignores crucial aspects of the wider documentary, factual and commercial context"*.

45.   The information with which I had been provided was limited to that which would be properly admissible before the English courts as a guide to interpreting the Contract Suite agreements. In contrast, Mr Salter's report impermissibly relies on the subsequent conduct of the parties and pre-contractual negotiations as an aid to construing the Contract Suite agreements.

46. I deal below with each of the categories of additional documents relied upon in Mr Salter's report.

47. First, at paragraphs 94.4 and 98.2 of his report Mr Salter cites examples of the conduct of the ED&F and the Acer Defendants, and certain account statements sent by ED&F to the Acer Defendants after formation of the Contract Suite Agreements.

    (1) I disagree with Mr Salter's conclusion at paragraph 103.2.3. that such conduct and documents would *"make most English judges at least pause before deciding that the true interpretation of the document was so very different",* his statement at paragraph 113 of his report that such conduct and the relevant documents *"would be regarded by an English judge as providing the best guide to the true meaning of those agreements"* and his statement at paragraph 109 that subsequent conduct can be looked at if *"its relevance is that it is the operation by the parties of the machinery laid down in the Contract Suite".*

    (2) As set out in paragraph 16 above, pursuant to established principles of English law, courts are not entitled in most circumstances to rely on the subsequent conduct of the parties as an aid to interpreting the agreements. In my opinion, the decision of any judge who relied on the materials in the manner suggested by Mr Salter would be liable to being overturned on appeal on that basis.

48. Secondly, although I agree with Mr Salter's further statement in paragraph 103.2.3. of his report that if an English court would be apprised of the facts cited in his report in the context of an alternative claim for rectification or on the basis of estoppel, the court would not be entitled to rely on those facts as an aid to interpretation.

    (1) Claims for rectification and/or estoppel assume that the proper interpretation of the documents requires some amendment.

    (2) The English court would be careful to ensure that it considered the separate claims in isolation by reference to the proper factual matrix for each and would therefore exclude any evidence as to the subsequent conduct or pre-

contractual negotiations when interpreting the meaning of the Contract Suite agreements.

49.    Thirdly, Mr Salter also refers to various correspondence in paragraph 115 of his report which was exchanged between the parties prior to Custody Agreement being entered into on 21 June 2012 and therefore amounts to pre-contractual negotiations. As to this:

(1)    The copy of the Terms with which I have been provided is not dated. However, I have been provided with copies of the Application documentation completed by the Pension Plans when opening accounts with ED&F Man.[2] The classification letter provided by ED&F to the Pension Plans set out that the Terms were attached to that letter. The Pension Plans signed the attached "Acknowledgement of ATT Status", by which they represented that *"I have read and understood the relevant sections of the MCM Terms and Conditions"*. It follows that the Application documentation was completed prior to the Terms being agreed, as the Pension Plans were required to verify the provisions of the Terms in that documentation.

(2)    However, if the Terms were entered into in after the correspondence referred by Mr Salter in paragraph 115 of his report was exchanged, those would be pre-contractual negotiations which are generally not relevant to questions of construction.

(3)    More particularly, as I have already set out above, pre-contractual negotiations are not generally relevant or admissible as evidence regarding the proper interpretation of the Contract Suite agreements, as such negotiations comprise evidence of the parties' subjective beliefs as to the meaning of the agreements, which subverts the objective nature of the exercise of interpretation undertaken by the court, to determine what a reasonable person would have understood the parties to have meant.

---

2.      ED&F-00018041.

(4) I agree that <u>some</u> of the evidence as to the parties' subsequent conduct or pre-contractual negotiations on which Mr Salter relies may be admissible to show the commercial purpose or aim of the transactions. However, contrary to Mr Salter's conclusion in paragraph 113 of his report, the court will be very cautious about admitting such evidence. In my opinion, the English court is highly unlikely to admit evidence of the parties' pre-contractual negotiations in the manner suggested by Mr Salter.

(5) That is because, as I have already set out above, evidence of pre-contractual negotiations can go no further than to establish the objective commercial purpose or aim of the arrangements. They cannot be relied on to establish detailed points of interpretation.

(6) The evidence referred to by Mr Salter in paragraph 115 of his report is relied on by him to establish detailed points of interpretation of the relevant agreements, regarding the operation of specific clauses in the Custody Agreement and the Terms, including his assertion that the Terms required some act of exercise on the part of ED&F before title would pass to ED&F (paragraph 116). In my opinion such evidence would not be admitted by the English courts for the purpose of establishing such points of interpretation.

50. In any event, the evidence relied on by Mr Salter in paragraph 115 of his report does not establish that the commercial purpose or aim of the arrangements was that the Acer Defendants should hold beneficial title to the Securities on the Reference Date, or that the Terms required some act of exercise on the part of ED&F to transfer title to the Securities, as expressed by Mr Salter in paragraphs 114 and 116 respectively:

(1) First, while ED&F's Defence to Re-Amended Schedule 5T in the proceedings in the Commercial Court in London is pleaded as Mr Salter describes, the Defence merely expresses ED&F's subjective belief as to the commercial purpose or aim of the transaction and does not demonstrate the objective intention of the parties.

(2)  The email dated 4 May 2012 referred to in paragraph 115.4 of Mr Salter's report in fact supports the interpretation of the operation of the Terms set out in my Initial Toube Report, as it provides that *"all money and assets in the hands of ED&F Man are, in fact not your money and assets at all (but give you only a right of claim as an ordinary creditor), unless your specific instructions say otherwise ... for any such other categories of cash and non-cash you are an unsecured creditor only (ie the standard position applies)".* Importantly, the email does not provide that the Clients' money and assets would be transferred to ED&F if it exercised its right to transfer those assets, but instead states that all assets *"in the hands of ED&F Man" i.e.* any assets received by ED&F, would be held by ED&F on a title transfer basis subject to the Client specifically requesting that those assets be treated differently. Further, this is described as *"the standard position"*, indicating that it is the default position regarding title to the Securities.  This correspondence demonstrates that ED&F did not in fact need to take any additional steps to effectuate the TTCA provisions of the Terms. Instead, it was the Pension Plans who were required to take additional actions to the extent they did not want the TTCA provisions to apply to their assets. Accordingly, this demonstrates the opposite of the construction advanced by Mr Salter in his report.

(7)  The email dated 16 May 2012 referred to in paragraph 115.5 of Mr Salter's report also demonstrates that the parties recognised that the TTCA in clause 10(b)(ii) provides for the Securities to be held on a different basis from the bare trust provision in clause 2(a) of the Custody Agreement.

(8)  The email from Endeavour Advisory referred to in paragraph 115.6 of Mr Salter's report provides that *"the terms of the custody agreement are intended to prevail over the terms and conditions of business in so far as they relate to custody"*.[3]  However, as set out at paragraph 42 of my Initial Toube Report, clause 10(b)(ii) of the Terms does not relate to custody but is a TTCA which concerns the holding of the Securities as collateral.

---

3.      ACER_00022658.

Accordingly, this email does not establish that the Custody Agreement was intended to prevail over the Terms in respect of the TTCA.

(9) Further, the email from Endeavour Advisory is inconsistent with Mr Salter's case, as it provides that absolute transfer of title *"may be inconsistent with <u>certain objectives</u> of the proposed transaction"* (my emphasis):

(a) Mr Salter identifies the purported objective of the arrangements at paragraph 114 of his report as being to ensure that the Acer Defendants were intended to own the Securities beneficially on the Reference Date. If that were correct, the TTCA would be inconsistent with what Mr Salter suggests was the central aim of the arrangements, rather than only potentially inconsistent (*"may be"*) with *"certain objectives"* of the arrangements.

(b) The email does not identify the *"objectives"* of the proposed transaction with which the TTCA *"may be inconsistent"*.

(c) Mr Salter suggests at paragraph 118 of his report that the documents he has seen *"clearly show that both parties were well aware that the application of the TTFCA provision in clause 10(b)(ii) to [the Securities] would defeat the <u>entire commercial purpose</u> of the arrangements which the agreements in the "Contract Suite" were intended to document"* (emphasis added). I do not agree. In my opinion, the highest the email from Endeavour Advisory can be put, is that it shows that Endeavour Advisory acting on behalf of ED&F subjectively believed that the TTCA *"may be inconsistent"* with *"certain objectives"* of the proposed transaction. It does not clearly show that both parties were aware of anything in particular. It does not show that the TTCA provision would defeat the purpose of the arrangements. It does not show that the TTCA would defeat the entire commercial purpose of the arrangements. It is unclear from this document what *"objectives"* there were to the transaction (and in fact suggests that there were additional *"objectives"* other than those relating to title to the Securities).  It therefore, even if

admissible (which it is not), does not establish that the TTCA was not intended to apply to the Securities.

51. Accordingly, I disagree with Mr Salter's conclusion in paragraph 117 that an English judge would be likely to hold that the facts referred to support his interpretation of the agreements. In my opinion, for the reasons set out above, the English courts are highly unlikely to have regard to the materials relied on by Mr Salter when interpreting the agreements at all, as they are inadmissible and being improperly relied on to establish detailed points of interpretation, rather than the broad and objective genesis or aim of the agreements. In any event, the materials relied on do not support any conclusion that contradicts the opinion I have previously expressed, namely that, pursuant to the Terms, all right, title and interest to the Securities would transfer to ED&F immediately upon receipt, as collateral to secure the Clients' obligations to repay the purchase monies.

52. Furthermore, prior to preparation of this Report, I have been provided with a selection of the Account Statements produced by ED&F for the Acer Defendants which are referred to in paragraph 99 of Mr Salter's report. As these statements constitute evidence of the subsequent conduct of the parties, which is not admissible as an aid to interpreting the Contract Suite agreements, they do not alter my opinion as to the correct interpretation of the Terms.

53. In any event, even if the Account Statements were admissible as to the construction of the Contract Suite agreements, I would remain of the same conclusion as to the correct interpretation of the Terms, for the following reasons:

(1) The Account Statements do not have any bearing on the correct interpretation of the Terms. As set out above, book entries in ED&F's account statements are not determinative of ownership of the Securities, although they may provide evidence that a transfer of ownership has taken place. Accordingly, if ED&F did fail to record the transfers of title to the Securities in its books, that does not mean that it did not obtain such title.

(2) In any event, the Account Statements that I have seen in fact support my opinion that book entries and/or records were not necessary for title to the Securities to transfer to ED&F:

(a) Mr Salter appears to accept at paragraph 71 of his report that ED&F had the right to re-hypothecate or otherwise deal with the Securities. Further, in paragraph 10.4 of its Re-Amended Defence in the English Proceedings ED&F pleaded that the acquisition and subsequent sale by the Acer Defendants of the Securities took place by the process set out therein (as set out in part in paragraph 85 of Mr Salter's report), including a step in which the Clients could recall the Securities from ED&F.

(b) The Account Statements with which I have been provided do not distinguish between positions in the accounts which were held by the Clients and those which had been rehypothecated by ED&F. I have also seen no indication in the documents I have reviewed that the Acer Defendants were, at least with any regularity or formality, informed when the Securities were rehypothecated or used by ED&F. Further, I have been informed that there is no supporting documentation which demonstrates that the Acer Defendants recalled Securities from ED&F.

(c) Accordingly, it appears that when the parties exercised their rights to deal with the Securities (including in the manner pleaded by ED&F), no corresponding book entries were made in the Account Statements, and no other record of the dealing was kept by ED&F (at least insofar as that record was shared with the Acer Defendants).

(d) It follows that book entries were not necessary for the parties to exercise their respective rights to deal with the Securities, and therefore that book entries were not necessary for title to the Securities to transfer to ED&F pursuant to the TTCA.

<u>Plain language of the TTCA</u>

54. My opinion as to the immediacy of the transfer of title to the Securities upon receipt is also supported by the plain language of the TTCA. In particular, I disagree with Mr Salter's statement at paragraph 103.3.1. of his report that an English judge would be likely to interpret the wording *"actually or potentially"* in clause 10(b)(ii) of the Terms

23

to mean that, for the purpose of securing the client's obligations, ED&F is to have a choice whether and when to treat such assets as collateral. In my opinion, the English courts are highly unlikely to conclude that this is what a reasonable person, with all the background knowledge available to the parties at the time of the contract, would have understood the parties to have meant.

55.   As I set out in paragraph 53 of my Initial Toube Report, when ED&F loaned funds to Clients to purchase the Securities, it would be exposed to the Clients until the purchase monies had been repaid. The purpose of the TTCA is to protect ED&F from such exposure to the Clients, including in respect of future, actual, contingent or prospective obligations, by transferring absolute title to the Securities to ED&F upon receipt of those Securities. It follows that assets would be held *"actually"* in respect of margin or collateral for the purpose of securing the Client's present and actual obligations and would be held *"potentially"* as collateral in respect of margin or collateral for the purpose of securing the Client's future, contingent or prospective obligations which may be incurred from time to time. The potentiality expressed in clause 10(b)(ii) does not relate to ED&F's choice as to whether to treat the Securities as collateral, but rather the nature of the obligation which the collateral is meant to secure.

56.   I also disagree with Mr Salter's statement at paragraph 103.3.2. of his report that an English judge would be likely to interpret the words *"will be…transferred"* and *"upon such transfer"* in clause 10(b)(ii) of the Terms as indicating that some separate act of transfer is to take place after receipt of the Securities by ED&F.  Clause 10(b)(ii) provides that the Securities *"will be absolutely transferred"* and that all right, title and interest in and to the Securities *"will pass to us outright and absolutely"*. In my opinion, the mandatory and absolute terms of clause 10(b)(ii) support the interpretation that title to the Securities transferred to ED&F immediately upon receipt. This view is also supported by the absence in the Terms of any mechanism exercisable by ED&F to effect such a transfer which, as set out in paragraph 33 above, strongly indicates that title transferred immediately.

57.   Further, the re-transfer obligation in clause 10(b)(ii) is not inconsistent with title to the Securities having transferred to ED&F immediately upon receipt. Clause 10(b)(ii) sets out that ED&F *"will re-transfer assets"* and the re-transfer obligation is not expressed

to be conditional on ED&F's right to accept the Securities as collateral being exercised. Accordingly, in my opinion, the re-transfer obligation also arises immediately upon receipt of the Securities, which indicates that the Securities were immediately transferred to ED&F in the first place, rather than transfer being subject to some ambiguous method by which ED&F could exercise its right to take the Securities as collateral.

<u>The CMA Policy</u>

58.   I agree with Mr Salter's statements at paragraphs 89.4 and 93.3 of his report that if ED&F and the Acer Defendants did not both have knowledge of or access to the CMA Policy at the time of formation of the Contract Suite then it is not relevant or admissible as an aid to interpretation. However, whether it was a document available to both parties is a matter of fact on which I do not express an opinion.

59.   As I have set out in paragraph 43 of my Initial Toube Report, if the CMA Policy is admissible, I remain of the view that it would support the preferable interpretation of the Contract Suite that I have set out therein for the following reasons.

> (1)   As correctly pointed out by Mr Salter at paragraph 103.2 of his report, the CMA Policy implemented the relevant regulatory provisions. As set out in paragraph 39 above, a firm's failure to comply with its procedural regulatory obligations does not affect the substantive rights of the parties to the relevant assets.

> (2)   Accordingly, in my opinion, it did not affect ED&F's title to the Securities even if ED&F did not transfer the Securities into its own name or into a non-segregated account upon receipt. The CMA Policy sets out the effect of the regulatory CASS Rules, breach of which rules is not determinative of the parties' ownership rights to the Securities.

60.   I note that even if the CMA Policy is not relevant or admissible as an aid to interpretation, I remain of the opinion that the English court would be likely to conclude that the Terms governed title to the Securities on the basis of the material that was available to the contracting parties at the relevant time.

## E.   ALTERNATIVE ARGUMENTS BASED ON RECTIFICATION AND ESTOPPEL

### i.   Estoppel and Rectification - Applicable Legal Principles

Estoppel

61.   I generally agree with Mr Salter's statement of the law on estoppel as set out in paragraphs 48 to 54 of his report. However, contrary to Mr Salter's suggestion in paragraph 54, it is an established principle of English law that estoppel is only capable of binding the parties to the representation or common assumption on which the estoppel is founded.

62.   The position in respect of estoppel by representation is summarised in Halsbury's Laws of England, Vol.23 at [308][4]:

> *"Where a person has by words or conduct made an unequivocal representation of fact or law to another, either knowing of its falsehood or with the intention that it should be acted upon, or having conducted himself so that another would, as a reasonable person, understand that it was intended to be acted upon, and the other person has acted upon such representation and thereby detrimentally altered his position, an estoppel arises against the party who made the representation, and he is not allowed to state that the fact is otherwise than he represented it to be."* (emphasis added)

63.   The fact that two parties so conduct themselves as to give rise to a representation by one that the facts (or the law) are X and a detrimental reliance by the other that the facts (or the law) are X does not *make* the facts (or the law) X. All it does is to estop the parties to that agreement from asserting as against each other that the facts (or the law) are anything other than X.

---

4.      This summary was approved by the court in Laroche v Spirit of Adventure (UK) Limited [2008] EWHC 788 (QB).

64. Estoppel therefore only binds the parties to the deed containing the representation relied upon and does not affect the rights of strangers to the deed: <u>Mowatt v Castle Steel and Iron Works Co</u> (1886) 34 ChD 58 at [63]. Every estoppel has to be reciprocal in order to bind both parties, and that is the reason that a stranger shall neither take advantage nor be bound by the estoppel: <u>Gaunt v Wainman</u> (1836) 3 Bing NC 69 at [336].

65. Estoppel by convention also binds the parties to their shared, although mistaken, understanding or assumption of the law or facts on which their rights are to be determined, rather than providing a cause of action: <u>Dixon v Blindley Heath Investments Ltd</u> [2015] EWCA Civ 1023 at [73]. (It is a shield and not a sword.)

66. As a result, whatever the position that ED&F and its counterparty (the Clients) take, that does not bind third parties. I note that Mr Salter does not cite any case where an estoppel asserted between two parties binds a third party, and that in paragraph 54 of his report he just states that he is not aware of a case where a third party has contended that the agreement between the parties to a contract does not bind him. That is, no doubt, because estoppels bind the parties *inter se*, and therefore it would be inconsistent with the doctrine of estoppel for it to be contended that they bind a third party.

<u>Rectification</u>

67. I generally agree that Mr Salter accurately states the law of rectification at paragraphs 42 to 45 of his report. I would add that the following principles also apply.

    (1)    Whether or not a particular instrument should be rectified is a question of fact, rather than a matter of law: <u>Snell's Equity</u>, 34th Edition at [16-011].

    (2)    The burden of proving that the concluded instrument does not represent the common intention of the parties is particularly onerous where the contract has been entered into between sophisticated commercial parties: c.f. <u>Phillips Petroleum Co UK Ltd v Snamprogetti Ltd</u> [2001] EWCA Civ 889 at [34]-[36].

(3)   Further, rectification may be refused if the party claiming rectification has affirmed the instrument with knowledge of the error contained therein: <u>Goff & Jones on The Law of Unjust Enrichment</u>, 9th Edition at [40-39]

**ii.   <u>Claims of estoppel and/or rectification would be highly unlikely to succeed</u>**

68.   Mr Salter concludes at paragraph 122 of his report that *"it must be highly likely that a claim for rectification and/or a claim based upon estoppel would succeed"*.  However, I note that the language he uses elsewhere in relation to these claims is much more equivocal.

(1)   He states in paragraph 44 that if ED&F and/or the Acer Defendants could show that they had a common intention which was mistakenly not accurately recorded in the documents *"then they <u>could in principle</u> be entitled to rectification of the documents"*.

(2)   He states in paragraph 46 that that *"[t]wo kinds of estoppel <u>could perhaps be relevant</u> in the present case"*.

(3)   He states in paragraph 48 that account statements "*may sometimes found an estoppel in favour of the client"*.

(4)   He asserts in paragraph 49 that account statements "*can…amount to a representation of fact which, if relied upon by the client represented to that client's detriment, could found an estoppel…"*.

69.   In any event, I disagree with Mr Salter's conclusion that it would be highly likely that a claim for rectification or estoppel would succeed.

(1)   Whether a claim for rectification and/or estoppel would succeed is a matter of fact which falls to be determined by reference to evidence as to the parties' intentions and/or representations.

(2)    In particular, when considering evidence of the parties' true intentions to support rectification, it has to be shown that one party's representation which the other party relied on to its detriment to support estoppel by representation or alternatively a shared assumption founding estoppel by convention.

(3)    The burden of proof is on the party alleging the estoppel and/or claiming that the agreement should be rectified, and the claims must be specifically pleaded and clearly established.  I understand that neither ED&F or the Acer Defendants have pleaded a claim as to estoppel and/or rectification, having raised them for the first time in this context, at a late stage in the litigation, and therefore the latter requirement is not satisfied.

(4)    I agree with Mr Salter's statement at paragraph 101 of his report that the facts cited in section E3 of his report would be admissible in respect of a claim for rectification and/or estoppel.  However, I disagree that those facts would be *"well-capable"* of supporting claims for rectification or estoppel.

(5)    In my opinion, those facts are insufficient to discharge the burden of proof in respect of any of the relevant claims, as there is no evidence that ED&F and the Acer Defendants in fact mutually intended that the Terms should not apply to transfer the Securities immediately to ED&F (or that one party made a representation to that effect which the other party relied on to its detriment).

(6)    In particular, the evidence is insufficient to discharge the high burden of proof required to rectify agreements which have been negotiated by sophisticated commercial parties.

70.    In my opinion, the Clients would be unlikely to succeed in a claim for estoppel and/or rectification in the manner suggested by Mr Salter. There is no assertion of, or evidence of, any written or oral agreement to the effect that ED&F would not take title to the Securities until after the Reference Date. In particular, I am informed that SKAT has received the following responses to Interrogatories:

(1) In respect of a request to Acer to *"Identify the terms of Your relationships with ED&F and the Plans, including any oral or written agreements to provide services or distribute profit and loss or fees among You, ED&F, the Plans, and any other individual or entity"* Acer referred to (i) the Power of Attorney executed in connection with the Defendant Plans' accounts at ED&F, (ii) the documentation with PACT investors, and (iii) *"Acer's invoices to ED&F"*. The Power of Attorney documents and the Acer invoices do not provide any evidence of an agreement between ED&F and the Pension Plans capable of supporting estoppel and/or rectification. Further, ED&F was not a party to the documentation with PACT investors, and that documentation also does not provide any evidence supporting rectification and/or estoppel; and

(2) In respect of a request to the Pension Plans to *"Identify the terms of the Plan's relationships with Acer and ED&F, including any oral or written agreements to provide services to or distribute profit and loss or fees among the Plan, Acer, ED&F, or any other individual or entity"* the Pension Plans referred to *"[the] Plan's the account documents with ED&F and to the power of attorney executed in connection with the opening of the Plan's accounts at ED&F [sic]"*.

71. I also note that rectification is an equitable remedy which may be refused if the party seeking rectification has affirmed the agreement with knowledge of the error contained therein.

(1) If it were the case that the application of the TTCA to the Securities was an "error", ED&F would be prevented from claiming that the Contract Suite agreements ought to be rectified in order to remove application of the TTCA.

(2) In particular ED&F expressly affirmed the application of the TTCA in the First and Second Variation Letters, which affirmation is in my opinion entirely inconsistent with any claim made by either party for rectification or estoppel.

30

(3)   Further, in my opinion, to the extent that the Acer Defendants did not object to the First and Second Variation Letters, the English courts would be likely to conclude that they had also affirmed the TTCA, and they would also therefore be prevented from claiming rectification on that basis.

72.   In any event, as I set out above, it is my opinion that estoppel (whether by representation, convention or otherwise) will not bind a party which was not a party to the representation or common assumption relied on to found the estoppel. SKAT was not a party to any representation or common assumption that the Securities were held by ED&F on bare trust for the Clients, or alternatively that some further step was required for the Securities to be transferred to ED&F. Accordingly, in my opinion, SKAT would not be bound by any estoppel arising between ED&F and the Acer Defendants.

73.   It is also my opinion that the English courts would be unlikely to prevent SKAT from arguing for ED&F to have greater rights than those reflected in the parties' mutual dealings (to the extent that this is correct). It would not be necessary for SKAT to establish some wrongful conspiracy with the Acer Defendants, as suggested in paragraph 101.1 of Mr Salter's report. The English courts are unlikely to permit ED&F to rely on a self-serving agreement with the Acer Defendants in order to rewrite the express provisions of the Terms.

74.   For the reasons set out above, I disagree with Mr Salter's conclusion in paragraph 101.2 of his report that it is likely than an English court would regard SKAT as being precluded from arguing that ED&F had all right, title and interest to the Securities immediately upon receipt pursuant to the TTCA.

## F.   Conclusion

75.   In conclusion, and for all the reasons set out above, I remain of the view expressed in my Initial Toube Report that the Terms applied to govern ED&F's rights to the Securities when it had advanced funds to the Clients to purchase the Securities. Pursuant to those Terms, all right, title and interest to the Securities would transfer to ED&F immediately upon receipt, and no further step was required for the title transfer to be effective.

76.   Under English law SKAT would not be bound by any estoppel arising between ED&F and the Acer Defendants, as it was not a party to any representation or common assumption capable of founding such an estoppel. It is also my opinion that claims of estoppel and/or rectification brought by ED&F and/or the Acer Defendants would be unlikely to succeed, as I have seen no evidence capable of supporting either claim. Further, ED&F (and the Acer Defendants to the extent they did not object) expressly affirmed the application of the TTCA in the First and Second Variation Letters, and would be likely to be prevented from claiming rectification by the English courts on that basis.

**FELICITY TOUBE QC**

felicitytoube@southsquare.com

25  February 2022

**SIGNED**. _(signature)_

**FELICITY TOUBE QC**

**DATED** 25 FEBRUARY 2022

## APPENDIX A: RELEVANT CASES

| Plan | Plan Participant | Sponsoring Entity | MDL Case No. |
|---|---|---|---|
| Kamco LP Profit Sharing Plan | Stacey Kaminer | Kamco LP | 1:18-cv-09837-LAK |
| Moira Associates LLC 401(k) Plan | Stacey Kaminer | Moira Associates LLC | 1:18-cv-09839-LAK |
| American Investment Group of New York, L.P. Pension Plan | Robert Crema | American Investment Group of New York, L.P. | 1:18-cv-09841-LAK |
| DW Construction, Inc. Retirement Plan | Darren Wittwer | DW Construction, Inc. | 1:18-cv-09797-LAK |
| Goldstein Law Group PC 401(k) Profit Sharing Plan | Sheldon Goldstein Scott Goldstein | Goldstein Law Group PC | 1:18-cv-05053-LAK |
| Kamco Investments, Inc. Pension Plan | Louise Kaminer | Kamco Investments, Inc. | 1:18-cv-09836-LAK |
| Newsong Fellowship Church 401(k) Plan | Alexander Jaime Mitchell III | Newsong Fellowship Church | 1:18-cv-10100-LAK |
| Linden Associates Defined Benefits Plan | Joan Schulman | N/A | 1:18-cv-09838-LAK |
| Riverside Associates Defined Benefits Plan | David Schulman | N/A | 1:18-cv-09840-LAK |
| JSH Farms LLC 401(k) Plan | Jamie Hofmeister | JSH Farms LLC | 1:18-cv-09489-LAK |
| KRH Farms LLC 401(k) Plan | George Hofmeister | KRH Farms LLC | 1:18-cv-09491-LAK |
| MGH Farms LLC 401(k) Plan | Megan Hofmeister | MGH Farms LLC | 1:18-cv-09439-LAK |
| SRH Farms LLC 401(k) Plan | Julie Hofmeister | SRH Farms LLC | 1:18-cv-09434-LAK |
| Triton Farms LLC 401(k) Plan | Scott Hofmeister | Triton Farms LLC | 1:18-cv-09490-LAK |

| Plan | Plan Participant | Sponsoring Entity | MDL Case No. |
|------|------------------|-------------------|--------------|
| Autoparts Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Derby City Technology Pensions Group Trust<br>Craig Cohen IRA<br>Michael Cohen IRA<br>Rudolph Schmidt IRA<br>Bay City Industrial Pensions Group Trust<br>Crescent Industrial Pensions Group Trust<br>Derby City Industrial Pensions Group Trust<br>Derby City Technology Pensions Group Trust | N/A | 1:18-cv-09549-LAK |
| Bluegrass Retirement Group Trust | Tew Enterprises, LLC Pension Plan<br>BlueGrass Investment Management, LLC Pension Plan<br>SV Holdings, LLC Pension Plan<br>Tew LP Pension Plan<br>MSJJ Retirement Group Trust<br>Bernard Tew Roth IRA | N/A | 1:18-cv-09511-LAK |
| Casting Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Julia Ryan IRA | N/A | 1:18-cv-09498-LAK |
| Central Technologies Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Michael Cohen IRA<br>Summit Technology Pensions Group Trust<br>Crescent Technology Pensions Group Trust<br>Windy City Industrial Pensions Group Trust<br>Windy City Technology Pensions Group Trust | N/A | 1:18-cv-09507-LAK |
| Industrial Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Calder Ryan IRA | N/A | 1:18-cv-09497-LAK |
| MSJJ Retirement Group Trust | Highland Farms LLC Roth 401(k)<br>Triton Farms LLC Roth 401(k)<br>KRH Farms LLC Roth 401(k) | N/A | 1:18-cv-09552-LAK |

| Plan | Plan Participant | Sponsoring Entity | MDL Case No. |
|---|---|---|---|
| | MGH Farms LLC Roth 401(k)<br>JSH Farms LLC Roth 401(k)<br>SRH Farms LLC Roth 401(k)<br>Bluegrass Retirement Group Trust<br>Bernard Tew Roth IRA<br>Andrea Tew Roth IRA<br>Stephanie Tew Roth IRA<br>Vincent Tew Roth IRA<br>Catherine Tew Roth IRA | | |
| Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan & Trust | Gregory Summers | Acorn Capital Strategies LLC | 1:18-cv-10088-LAK |
| Sterling Alpha LLC 401(K) Profit Sharing Plan | John Doscas | Sterling Alpha LLC | 1:18-cv-04894-LAK |
| Federated Logistics LLC 401(k) Plan | Tatjana Vanjak<br>David Freelove | Federated Logistics LLC | 1:18-cv-08655-LAK |
| Del Mar Asset Management Saving & Retirement Plan | David Freelove | Del Mar Asset Management LP | 1:18-cv-05374-LAK |
| KK Law Firm Retirement Plan Trust | Kevin Kenning | The Law Offices of Kevin Kenning | 1:18-cv-10127-LAK |
| Cambridge Way LLC 401k Profit Sharing Plan | Shreepal Shah | Cambridge Way LLC | 1:18-cv-10090-LAK |

# APPENDIX B: MATERIALS CONSIDERED

## I.   Bates Stamped Documents[1]

- ACER_00002925
- ACER_00007265
- ACER_00012166
- ACER_00016219
- ACER_00017546
- ACER_00019338
- ACER_00022658
- ACER_00022688
- ACER_00022690
- ACER_00022708
- ACER_00022712
- ACER_00022724
- ACER_00022726
- AIG_00000605
- AIG_00000624
- AIG_00000669
- DWC_00000483
- ED&F-00002363
- ED&F-00002726
- ED&F-00002781
- ED&F-00018041
- ED&F-00039750
- ED&F-00040592
- ED&F-00040756
- ED&F-00136285

---

1.      All references to Bates-stamped documents are inclusive of the documents' family.

- ED&F-00172940
- ED&F-00214566
- ED&F-00214987
- ED&F-00226522
- ED&F-00226629
- ED&F-00233918
- ED&F-00233927
- ED&F-00242091
- ED&F-00243047
- ED&F-00257314
- ED&F-00446422
- ED&F-00446432
- ED&F-00461071
- ED&F-00461083
- ED&F-00461113
- ED&F-00493826
- ED&F-00504191
- ED&F-00504193
- ED&F-00504222
- ED&F-00504930
- ED&F-00504932
- ED&F-00544634
- ED&F-00545230
- ED&F-00545406
- ED&F-00545523
- ED&F-00545714
- ED&F-00545892
- ED&F-00546100
- ED&F-00595465
- ED&F-00595671

- ED&F-00596236

- ED&F-00596320

- ED&F-00596463

- ED&F-00596818

- ED&F-00597145

- EDFMan00000436

- EDFMan00001715

- KAMINV_00000523

- LIND_00000312

- MOIR_00000356

- NEW_00000460

- RIVER_00000240

- RIVER_00000285

## II.   Exhibits

- Exhibit 4152, Appendix to the Draft Statement of Agreed Facts
- Exhibit 4430, Draft Statement of Agreed Facts

## III.   Legal Documents

- ED&F Man Re-Amended Defence, Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487, ECF No. 364-1 (June 12, 2020).

## IV.   Legal Opinions

- Barts and the London NHS Trust v Verma [2013] UKSC 20
- Chartbrook Homes Ltd v Persimmon Homes Ltd [2009] 1 A.C. 1101
- Dixon v Blindley Heath Investments Ltd [2015] EWCA Civ 1023
- Dwr Cymru Cyfyngedig (Welsh Water) v Corus UK Ltd [2007] EWCA Civ 285
- Falkonera Shipping Co v Arcadia Energy Pte Ltd [2012] EWHC 3678
- Gaunt v Wainman (1836) 3 Bing NC 69
- Gwynt Y Mor Ofto Plc v Gwynt Y Mor Offshore Wind Farm Ltd [2020] EWHC 850 (Comm) at [65]

- <u>Investors Compensation Scheme v West Bromwich Building Society</u> [1998] 1 W.L.R. 896
- <u>Laroche v Spirit of Adventure (UK) Limited</u> [2008] EWHC 788 (QB)
- <u>Merthyr (South Wales) Limited v. Merthyr Tydfil County Borough Council</u> [2019] EWCA Civ 526
- <u>Morris v Blackpool Borough Council</u> [2014] EWCA Civ 1384
- <u>Mowatt v Castle Steel and Iron Works Co</u> (1886) 34 ChD 58
- <u>Prenn v Simmonds</u> [1971] 1 W.L.R. 1381
- <u>Re Lehman Brothers International (Europe) (In Administration)</u> [2012] UKSC 6
- <u>Reardon-Smith Line Ltd v Hansen-Tangen</u> [1976] 1 W.L.R. 989
- <u>Sattar v Sattar</u> [2009] EWHC 289 (Ch)
- <u>Schuler (L.) AG v Wickman Machine Tool Sales Ltd</u> [1973] 2 W.L.R. 683
- <u>Scottish Widows Fund and Life Assurance Society v BGC International</u> [2012] EWCA Civ 607
- <u>Phillips Petroleum Co UK Ltd v Snamprogetti Ltd</u> [2001] EWCA Civ 889
- <u>The Rio Assu (No.2)</u> [1999] 1 Lloyd's Rep. 115

## V.   <u>Legal Treatises</u>

- H.S.G. Halsbury & C.J.P.H. Mackay,  <u>Halsbury's Laws of England</u> (Vol. 23).
- Charles Mitchell, et. al., <u>Goff & Jones: The Law of Unjust Enrichment</u> (9th ed., 2016).
- John McGhee, <u>Snell's Equity</u> (34th ed., 2019).

## VI.   <u>Statutes & Rules</u>

- Financial Conduct Authority CASS Rules