# Exhibit 8

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

_____
                                   )
IN RE:                             )
                                   )
CUSTOMS AND TAX ADMINISTRATION OF  )
THE KINGDOM OF DENMARK             )
(SKATTEFORVALTNINGEN) TAX REFUND   )
SCHEME LITIGATION                  )
                                   )
This document relates to case nos. )
19-cv-01783; 19-cv-01788; 19-cv-01794; )
19-cv-01798; 19-cv-01918           )
_____)


C O N F I D E N T I A L
SUBJECT TO THE PROTECTIVE ORDER


REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
RICHARD MARKOWITZ
DATE: April 8, 2021




REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 306

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

_____
                                   )
IN RE:                             )
                                   )
CUSTOMS AND TAX ADMINISTRATION OF  )
THE KINGDOM OF DENMARK             )
(SKATTEFORVALTNINGEN) TAX REFUND   )
SCHEME LITIGATION                  )
                                   )
This document relates to case nos. )
19-cv-01783; 19-cv-01788; 19-cv-01794; )
19-cv-01798; 19-cv-01918           )
_____)


C O N F I D E N T I A L
SUBJECT TO THE PROTECTIVE ORDER


CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER
ORAL EXAMINATION OF
RICHARD MARKOWITZ
VOLUME II
DATE: April 9, 2021




REPORTED BY:  MICHAEL FRIEDMAN, CCR

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

62 (Pages 242 to 245)

Page 242

1     A    Yes.
2     Q    And then, the interest in the
3 partnership were split the same as the
4 initial contribution, right, that Delvian has
5 a 5 percent interest, and Quartet 95 percent?
6     A    Yes.
7     Q    Okay.  And at the time that you
8 signed this agreement, you understood that
9 the Delvian plan would be making reclaim
10 submissions to SKAT.
11     Correct?
12     A    (Witness reviewing.)
13     On the 22nd of May, 2012?
14     Q    Well, at the time that you signed
15 it.
16     Do you know when you signed it?
17     A    I don't recall, as I said.
18     Q    At the time that you signed it,
19 were you aware that the Delvian plan would be
20 making reclaim submissions to foreign tax
21 authorities?
22     A    Yes.
23     Q    And then, whatever profit the
24 Delvian plan was going to make from the
25 reclaim applications, 95 percent of that

Page 243

1 would then go to Quartet Investment Partners
2 as its partner in this agreement.
3     Correct?
4     A    No.
5     Q    So how would it work?
6     MR. BONGIORNO:  Objection.
7     A    The advice we received from our
8 lawyers and the reading of this document is
9 that investments that any of the partners
10 made, earnings from those investments -- not
11 reclaims -- earnings from those investments
12 would be shared 95 to 5 across those two
13 partners.
14     Q    Okay.  So any earnings that the
15 Delvian plan made in connection with the
16 dividend arbitrage strategy, it would keep
17 5 percent of the plan's profits and
18 95 percent would go to Quartet.
19     Is that right?
20     A    If the Delvian's investments in
21 dividend arbitrage strategies were part of
22 this partnership.
23     Q    They were, weren't they?
24     A    They had to be so designated, or
25 they could have been or could not have been.

Page 244

1 It was any investment or investments
2 designated, and if the investments made
3 through Solo as a custodian, or with Solo,
4 were a part of this partnership, then profits
5 on those would be -- would become profits of
6 the partnership to be split among the
7 partners.
8     Q    Okay.  And you said "if they were."
9     The fact is that the Delvian plan's
10 profits that it made from dividend arbitrage
11 trading, the profits did go to the
12 partnership.
13     Correct?
14     A    They were partnership earnings,
15 yes, or attributable -- earnings attributable
16 to the partnership.
17     Q    In order to generate those
18 earnings, whose assets were used to make the
19 investment?
20     A    Repeat the question, please?
21     Q    Sure.  In order to generate the
22 earnings for the partnership, whose assets
23 were used?
24     A    Partnership assets.
25     Q    Okay.  Who contributed the assets

Page 245

1 to the partnership that were ultimately used
2 to generate the earnings from the dividend
3 arbitrage trading?
4     A    Partners contributed money to the
5 partnership.
6     Q    Okay.  Which ones contributed what?
7     A    I don't recall.
8     Q    Okay.  Other than the hundred
9 dollars that appears as the initial capital
10 contributions, are you aware of any capital
11 or other assets that Quartet provided as a
12 partner to this partnership that were used to
13 generate dividend arbitrage profits?
14     A    I don't recall.
15     Q    Was there a negotiation between
16 Quartet and the Delvian plan regarding the
17 95/5 split?
18     A    Yes.
19     Q    Okay.  How -- who was -- who was on
20 the other side for Delvian negotiating that
21 split?
22     A    I assume the trustee of the plan.
23     Q    Okay.  Do you recall who that is?
24     A    Yes.
25     Q    Who is that?

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

11 (Pages 343 to 346)

Page 343

1  A   It incurred costs, both direct
2  transactional costs, legal costs, custody
3  account costs. It made investments in
4  shares. They were hedged as perfectly as
5  possible.
6       But then the financial risk would
7  include counterparty risk, vis-a-vis the
8  futures exchange or forward counterparties.
9  Q   What is "counterparty risk?"
10 A   You enter into a contract with
11 someone and they don't perform.
12 Q   Okay. You also mentioned earlier
13 "execution risk."
14      What did you mean by that?
15 A   In order to buy shares, you had to
16 deal with a broker. The broker could make a
17 mistake, the broker could be away from their
18 desk, not able to execute your orders.
19      And the custodian was responsible
20 for clearing and settling the trades, and had
21 a lot of responsibilities, as we saw in the
22 custodial account agreement you walked us
23 through yesterday.
24 Q   You mentioned tax risk. You
25 mentioned tax risk --

Page 344

1       MR. BONGIORNO: Can you start over,
2  Marc? Can you start over?
3       MR. WEINSTEIN: Yes.
4  Q   You mentioned tax risk.
5       What was the tax risk to the plan?
6  A   Pursuant to the laws of Denmark and
7  the double taxation treaty between the U.S.
8  and Denmark, the pension plans needed to be
9  the beneficial owner of the shares on or
10 before the date of the annual general
11 meeting. And that notion of "beneficial
12 ownership" is defined under Danish tax law.
13      The plans reviewed legal opinions
14 on that matter. The plans had to also comply
15 with U.S. tax requirements, whether the IRS
16 or pension plan rules with the Department of
17 Labor that are tax-related as well.
18      And on all those points, both U.S.
19 and foreign, we sought legal advice and
20 received legal advice and reviewed with our
21 lawyers all aspects of the trait, whether it
22 be legal risk, tax risk, to ensure, as we
23 believed at all times and continue to believe
24 to this day, that the pension plans were the
25 beneficial owners of the shares, entitled to

Page 345

1  the dividends, and duly paid by the Danish
2  government for withholding tax refunds.
3  Q   Are you familiar with an entity
4  called Indigo Securities?
5  A   Yes.
6  Q   What is Indigo Securities?
7  A   They may have been a broker and, at
8  a subsequent time, similar to what we talked
9  about with West Point, became a custodian.
10 Q   Was that a custodian affiliated
11 with Solo Capital?
12 A   No.
13 Q   Did any of the pension plans start
14 using Indigo as a custodian for the strategy?
15 A   Yes.
16 Q   Why did the pension plans take that
17 business to Indigo?
18 A   It is a pension plan that never had
19 business with Solo Capital, so it didn't take
20 its business anywhere. It established a new
21 relationship.
22 Q   Which pension plan?
23 A   Routt Capital.
24 Q   Was that your pension plan?
25 A   Yes.

Page 346

1  Q   Was anyone else a participant in
2  that plan?
3  A   My wife.
4  Q   What prompted you to open a
5  custodial account with Indigo for the Routt
6  Capital plan?
7  A   The opportunity was offered to me
8  by my former -- by my then to be former
9  partners, Mr. Stein and Mr. Lhote. And it
10 was at a time when there was a business
11 dispute between ourselves and potentially
12 Solo Capital.
13 Q   What was that business dispute?
14 A   My partners, Mr. Stein and
15 Mr. Lhote, informed me and Mr. Van
16 Merkensteijn in late 2013 or early 2014 that
17 they no longer wanted to work with us as a
18 group or on group investments and projects,
19 and that they had made an investment in a
20 bank in Europe, and that that bank would
21 become a custodian for, among other things,
22 dividend arbitrage strategies, and that they
23 had worked with former Solo employees to
24 establish that platform.
25 Q   Was that North Channel Bank?

Page 443

1   the total shares outstanding.
2           That's what I understand the 40
3   basis points to reflect.
4       Q   And were you -- did you have a
5   threshold in mind for the group of plans as
6   to how much market share it would purchase?
7       A   The goal was to always ensure that
8   no plan would own shares above a certain
9   threshold; 3 percent, 5 percent.
10          Depending on the jurisdiction of
11  the research we received, the legal advice we
12  received from different jurisdictions would
13  have told us what those percentages were for
14  reporting requirements, as well as we asked
15  lawyers in Denmark to make sure that they
16  wouldn't necessarily aggregate across pension
17  plans that might have had common ownership or
18  even across these 34 different plans.
19          So it was -- the legal advice we
20  received from lawyers in Denmark and the U.S.
21  to just put a cap on it. But other than
22  that, it was based on the market liquidity
23  that was able to be sourced through the
24  participants in the transactions.
25      Q   Was the cap that you placed on it

Page 444

1   per plan intended so that the group of plans
2   in the aggregate wouldn't meet a certain
3   level?
4       A   No.
5       Q   Okay. You mentioned that -- the
6   use of a computer algorithm for the trading.
7           Do you remember that?
8       A   Yes.
9       Q   Okay. Was a computer algorithm
10  being used as of the time of this e-mail?
11      A   No.
12      Q   Okay. Did the computer algorithm
13  ultimately replace Cooper and Reibeisen?
14      A   Yes.
15      Q   And so what was the computer
16  algorithm?
17      A   It was a software that the plans
18  were able to license that allowed the plans
19  to input certain trading jurisdictions,
20  capacity constraints, interest in shares,
21  dividend paying versus non-dividend paying.
22          After filling out forms, it would
23  assist on an automated basis the placing of
24  orders for both share purchases and hedging
25  and, if needed, stock lending for those plans

Page 445

1   on dividend paying shares.
2       Q   Okay. And where was this computer
3   algorithm housed? You know, was it yours or
4   was it -- withdrawn.
5           The plan --
6       A   The plans licensed it from a third
7   party.
8       Q   Okay.
9           MR. BONGIORNO: Let him finish
10      before you jump in.
11      Q   And would the computer algorithm
12  itself place the orders that Mr. Cooper and
13  Mr. Reibeisen used to send by e-mail?
14      A   I don't know how that computer
15  software worked, but it was able to generate
16  orders and trading information, whether that
17  generated the orders to brokers, or e-mail
18  exchanges with brokers, or that was a
19  secondary computer program within the
20  custodians.
21          But it was a one-source assistance
22  for the plans.
23      Q   Who brought this computer algorithm
24  to the plan's attention?
25      A   I don't recall if it was Solo

Page 446

1   Capital itself or affiliates of Solo Capital.
2       Q   Okay. But it was one or the other?
3   It was either Solo Capital or an affiliate of
4   Solo Capital?
5       A   Yes.
6       Q   So when -- before using the
7   computer algorithm, as we see in this
8   exhibit, 1785, Solo Capital would inform the
9   plans which brokers and which counterparties
10  were going to be used.
11          Correct?
12      A   Yes.
13      Q   How did it work once there was a
14  computer algorithm? Who selected, for
15  example, the stock lending counterparty?
16      A   It was part of the software. And I
17  assume, in working with the custodians and
18  counterparties, that it became a part of that
19  software process, but not something that we
20  would be able to look under the hood or see
21  how that software worked.
22      Q   So the pension plans didn't need to
23  reach out to the stock lending counterparties
24  once the computer algorithm was in place?
25      A   No.

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

66 (Pages 563 to 566)

Page 563

1  purposes.
2       Right?
3     A   My understanding is that "in the
4  name of the plan" means that, for foreign tax
5  purposes, it is the plan.  You're reading the
6  word "for" differently than I do.
7     Q   I'm reading the word "foreign"
8  differently?
9     A   No.  For, F-O-R.
10    Q   Okay.  Tell me, what do you expect
11 would have happened with your dividend
12 arbitrage strategy if the Delvian partnership
13 opened an account at Solo in its name and all
14 the trading was done under the name of the
15 Delvian partnership?
16    A   We did such transactions in which
17 partnerships were the clients of Solo as a
18 custodian, and ownership -- beneficial
19 ownership was in the name of one of the
20 partners.  And we received legal advice that
21 that was acceptable for foreign tax purposes.
22        And so we had that experience where
23 a partnership was the account holder and a
24 tax-preferred partner was deemed by the
25 foreign government, and for lawyers who

Page 564

1  reviewed it, as the owner for foreign tax
2  purposes.
3     Q   Did that happen in connection with
4  the trading in Danish shares?
5     A   No.
6     Q   So when did that happen?
7     A   2012.
8     Q   And what partnership had an account
9  at Solo?
10    A   Pension and Retirement LP 1, I
11 believe the name was, and "Free Street
12 Partners LP, Roman Numeral 1."
13    Q   And how did anyone come up with the
14 name "Free street" in connection with the
15 dividend arbitrage strategy?  I will withdraw
16 that.
17        And so, with respect to the
18 accounts opened by Free Street Partners and I
19 think you said "P&R 1," something like that,
20 what kind of trading was done using Solo's
21 custodial account?
22    A   Dividend arbitrage trading.
23    Q   And were reclaims submitted to any
24 foreign tax authorities?
25    A   Yes.

Page 565

1     Q   To which foreign tax authorities?
2     A   The tax authorities in Belgium.
3     Q   Any other countries?
4     A   No.
5     Q   Did that strategy work?
6     A   Yes.
7     Q   Okay.  And why was that strategy
8  not pursued for Denmark?
9     A   I don't know.
10    Q   Well, were you -- did you have an
11 interest in those investments?
12    A   Yes.
13    Q   Okay.  Did you have any role in
14 considering whether to repeat it for Denmark?
15    A   Those other transactions involved
16 our lawyers at Kaye Scholer.  They assisted
17 us in establishing those partnerships, in
18 establishing the custodial accounts and other
19 documents needed to effect the trades.
20        And when it came time to use
21 pension plans, I don't recall what the reason
22 was or wasn't or what was considered by us as
23 principals or businessmen or our lawyers.
24 But for me, it gets back to this debate or
25 discussion we were having that regardless of

Page 566

1  whether the partnership was -- the plan was
2  acting as the nominee or the plan was the
3  account holder or the partnership was the
4  account holder, for foreign tax purposes, the
5  plan was the entity and was the beneficial
6  owner of the shares, the recipient of
7  dividends, and under Danish tax law, entitled
8  to a full reclaim under the terms of Danish
9  tax law and the U.S. Danish double taxation
10 treaty.
11        And all the advice we received from
12 Kaye Scholer and foreign law firms indicated
13 that that was the case.  And no one ever
14 advised us otherwise.
15    Q   Okay.  And so, when you're going
16 through this process that we're talking about
17 here, for example, in this memo, and trying
18 to figure out how to structure the
19 partnership with the pension plans, why go
20 through all the trouble?
21        If you just had a partnership, why
22 not just have the partnership open the
23 account, and not worry about the pension plan
24 aspect?
25    A   Because the pension plans were