# Exhibit 11

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO.   18-MD-2865 (LAK)

_____

                                     )

IN RE:                               )

                                     )

CUSTOMS AND TAX ADMINISTRATION OF )

THE KINGDOM OF DENMARK               )

(SKATTEFORVALTNINGEN) TAX REFUND  )

SCHEME LITIGATION                    )

_____)

C O N F I D E N T I A L

REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

EXAMINATION OF

GRAHAM WADE

DATE: March 16, 2022

REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 62

1    A    I'm happy to answer questions on
2  specific ones.
3    Q    Well, I'm just asking you a general
4  question on one of the topics that you said
5  that you analyzed here.
6    I'm asking you what forms the basis
7  for your opinions that payments received by
8  entities were not dividends?
9    A    And we -- just to be clear --
10    MR. OXFORD:  Objection to form.
11    A    -- are we talking about the Solo
12  transactions, or the ED&F transactions, or
13  both?
14    Q    Let's start with ED&F transactions.
15    A    Okay.  Well, in the case of the
16  ED&F transactions, my conclusions are based
17  on a number of factors, but the fundamental
18  one being that the shares that were used to
19  settle the cum ex transactions were the same
20  shares that separately dividends were
21  received on and used to support other tax
22  vouchers.
23    And so it's my conclusion, as laid
24  out in my report and subject to all of the
25  other points I make in my report, that there

Page 63

1  were no dividends received on the other -- on
2  the cum ex transactions.
3    Q    Okay.  And I'm asking you what you
4  consider your expertise to be that allows to
5  you draw that conclusion?
6    A    My expertise?  Well, it's, you
7  know, the -- I've spent a significant portion
8  of my career involved in structured financial
9  transactions, and I am able to -- you know, I
10  have reviewed the trades that were done, how
11  they were arranged, and all the details as
12  laid out in my report, and I -- I think I've
13  given the reasons why I reached those
14  conclusions as a result of that experience in
15  my report.
16    Q    Okay.  Again, if it's not a legal
17  opinion, would you agree that whether
18  financial transactions executed by the
19  various defendants would entitle an entity or
20  individual to a dividend is informed by legal
21  principles?
22    MR. OXFORD:  Objection to form.
23    A    No, not really, no.  I think, as
24  I've said, my opinions lead me to conclude
25  that as a matter of fact, there were no

Page 64

1  shares, and so there were no dividends.
2    And so I think that's a fairly
3  straightforward conclusion to draw from my
4  study of these transactions.
5    Q    Okay.  Other than for the trades
6  that you say were used for more than one tax
7  voucher -- withdrawn.  Let me re-ask that
8  question.
9    Other than trades for which you say
10  shares were used to support more than one tax
11  voucher, is there any other basis for
12  concluding that any of the ED&F transactions
13  did not entitle the pension plans to
14  dividends?
15    MR. OXFORD:  Objection.
16    A    There are a number of -- as I said,
17  all of the bases for my opinions are included
18  in my reports and they should be taken as a
19  whole.  So if you have a question on a
20  specific one, I'm very happy to answer it.
21    But it's a combination of all the
22  factors that I've covered in my report taken
23  together.
24    Q    Okay.  Can you tell me what those
25  factors are?  Can you summarize them for me?

Page 65

1    MR. OXFORD:  Objection to form.
2    A    Okay.  Well, apart from
3  the -- apart from the absence of shares, the
4  other most fundamental reason, although, as
5  I've said, there are others in my report, is
6  that the nature of the way the cum ex
7  transactions were structured is that even if
8  there had been shares, it would still not
9  have been the receipt of the dividend.  It
10  would have been a receipt of a dividend
11  compensation payment.
12    Q    Okay.  And whether something is a
13  dividend or a dividend compensation payment,
14  that's informed by legal principles.
15    Right?
16    MR. OXFORD:  Objection to form.
17    A    I think it's formed by an
18  understanding of the market practice that
19  relates to security financing and equity
20  finance transactions.
21    Q    Okay.  So it's your testimony that
22  whether something is a manufactured dividend
23  or a real dividend or a dividend compensation
24  payment is not informed by any legal
25  principles?

Page 90

1  transaction that was done is influenced by my
2  understanding of market regulation.  But it
3  is all the facts and circumstances taken
4  together as a whole that leads me to my
5  opinion that in the cum ex transactions that
6  I've reviewed, the pension plans did not
7  receive the dividend.
8      Q    Okay.  I'm asking you a different
9  question.  I want you to focus only on the
10 securities contract between the parties.
11          Are you aware of any regulation
12 relevant to whether or not a securities
13 contract, standing alone, would or would not
14 have intended to confer a dividend rate on
15 the buyer?
16     MR. OXFORD:  Objection to form.
17     A    My response to that is that in
18 order to understand the nature of the
19 contract between parties, one needs to
20 understand the full facts and circumstances
21 of the case.  And that is, in part,
22 influenced by my understanding of securities
23 market regulation, which would have
24 influenced the terms on which the parties
25 were able to arrange and execute those

Page 91

1  transactions.
2          And it's for all the reasons given
3  in my report.
4      Q    Okay.  The transactions that you
5  analyzed in your report, are you aware of any
6  regulations that impact, in the securities
7  contract, whether the securities contract did
8  or did not intend to confer a dividend right
9  on the buyer?
10     MR. OXFORD:  Objection to form.
11     A    Well, I think the -- the reasons,
12 I've given a number of reasons in my report
13 as to why I concluded that the nature of the
14 transactions between the parties were not
15 intended to deliver a dividend to the pension
16 plan, the overriding one of which is there
17 weren't shares to support the dividend and
18 that the pricing clearly indicated that the
19 seller did not receive a dividend.  And so
20 the seller could not have entered into a
21 transaction intending to sell a dividend that
22 it didn't actually have.
23          But there are a range of other
24 factors that I've taken into account in
25 arriving at those conclusions.  And again,

Page 92

1  it's all the facts and circumstances taken
2  together.
3          And the regulatory status and
4  market conduct rules that apply to these
5  transactions were relevant in understanding
6  the facts and circumstances of what actually
7  happened.
8      Q    Okay.  Which regulations are you
9  referring to at the end of that last answer?
10     A    Well, if you --
11     MR. OXFORD:  Object to form.
12     A    If you -- you know, if you want me
13 to go back through my report and identify all
14 the regulations that I've considered in
15 arriving at my conclusions, I'm happy to do
16 that.  But I've -- you know, at various
17 points I've discussed, you know, market
18 conduct regulations, transaction reporting
19 regulations, you know, short-selling
20 regulations, Prudential capital regulations.
21          There's a wide range -- because you
22 have to understand the nature of the, you
23 know, what the counterparties could and
24 couldn't have done, and how sophisticated
25 financial institutions transact with each

Page 93

1  other.
2          So all of those are relevant in
3  terms of understanding what the nature of the
4  securities transactions between the cum ex
5  seller and ED&F Man was.
6      Q    Mr. Wade, respectfully, I'm asking
7  you specifically about the securities
8  contract.
9          Can you identify for me one example
10 of a regulation that you're aware of that
11 dictates whether or not a securities contract
12 intends or does not intend to confer a right
13 to a dividend on a buyer?
14     MR. OXFORD:  Objection, asked and
15     answered.
16     A    And I'm respectfully telling you
17 that your question is misplaced.  Because in
18 order to understand the nature of the
19 transaction between the two counterparties,
20 one needs to understand all the facts and
21 circumstances and what's the regulatory
22 status, what the market conduct rules were.
23          And for all the reasons I have
24 given in my report, it is clear to me that
25 the transactions were not intended to deliver

Page 94

1  a real dividend to the pension plan because
2  there were no shares and there were
3  no — there were no real dividends to pass
4  on.
5          So — but that requires a full
6  understanding of all the facts and
7  circumstances, which includes all the
8  regulations I've cited to in my report.
9      Q    Okay.  And so you've outlined a
10 number of ED&F Man transactions in the
11 context of your report.
12          For any of those ED&F transactions,
13 can you identify any regulation that is
14 relevant to whether the terms of the
15 securities contract between ED&F and its
16 counterparty did or did not intend to confer
17 the right to a dividend?
18         MR. OXFORD:  Object to the form.
19     A    As I've said, my job is to
20 understand all the facts and circumstances
21 around each of the transactions that I've
22 looked at, and understand the nature of how
23 they executed those transactions, how they
24 hedged them, how they priced them, what the
25 relevant regulations that applied to the

Page 95

1  counterparties were, and for all the reasons
2  I have given in my report.
3          It is clear to me that the nature
4  of those transactions were that they
5  were — that they did not deliver dividends
6  to the pension plans.
7      Q    So the answer to my question is
8  "no?"
9          MR. OXFORD:  Object to the form.
10     A    I don't actually remember what your
11 previous question was, but I don't think my
12 answer was "no."
13          But maybe you can remind me what
14 the previous question was.
15     Q    I asked you, given that you've
16 outlined a number of ED&F Man transactions in
17 the context of your report, whether, for any
18 of those transactions, you can identify any
19 single regulation that is relevant to whether
20 the terms of the securities contract between
21 ED&F and its counterparty did or did not
22 intend to confer a right to a dividend?
23         MR. OXFORD:  Objection, asked and
24         answered.
25     A    And my response to that is that in

Page 96

1  order to arrive at my conclusion about what
2  the nature of the transactions were between
3  the cum ex sellers and the pension plans, I
4  need to understand the full facts and
5  circumstances.  And that includes the
6  regulatory rules that applied to the various
7  counterparties and market conduct
8  regulations.
9          And that is all as detailed in my
10 report.
11     Q    And that's your complete answer to
12 the question that I asked?
13         MR. OXFORD:  Object to the form.
14     A    Yeah, I think I've been clear on
15 what my answer to the question is.
16     Q    All right.  If ED&F were to take
17 the position in this litigation that "a share
18 is acquired or disposed of at the time when a
19 final and binding agreement exists on the
20 acquisition or disposal of the share," would
21 you agree with that?
22         MR. OXFORD:  Objection to the form.
23     A    Sorry?  If ED&F Man were to take
24 what position?
25     Q    The position in this litigation

Page 97

1  that "a share is acquired or disposed of at
2  the time when a final and binding agreement
3  exists on the acquisition or disposal of the
4  share," would you agree with that?
5          MR. OXFORD:  Object to the form.
6      A    And for what?  In what context?
7      Q    I'm asking you, as a general
8  principle of securities trading, whether or
9  not you would agree with the principle that
10 "a share is acquired or disposed of at the
11 time when a final and binding agreement
12 exists on the acquisition or disposal of the
13 share?"
14         MR. OXFORD:  Objection to the form.
15     A    Well, there's a number of terms in
16 that question that would need to be a bit
17 more precisely defined.  For example, for
18 what purpose do you mean "disposed" and what
19 do you mean by "disposed?"
20          So I — I don't think I'm able to
21 agree with that or necessarily disagree with
22 it.
23     Q    Okay.  Would you agree or disagree
24 with the principle that "the ownership right
25 in the share is transferred at the time that

Page 98

1  a final and binding agreement exists on the
2  acquisition or sale of the share?"
3      MR. OXFORD: Object to the form.
4      A    No, I wouldn't. Again, I wouldn't
5  agree with that one because I don't think
6  that's right in terms of when ownership
7  rights associated with shares do change
8  hands.
9      But I would also ask you to be a
10  bit more precise in defining what you mean by
11  "ownership rights."
12      Q    Would you agree with the principle
13  that "a buyer of a share owns the share at
14  the time when a final and binding agreement
15  exists on the acquisition of the share?"
16      MR. OXFORD: Object to the form.
17      A    No.
18      Q    Would you agree with that statement
19  if I told you that that principle is being
20  advanced by me in the context of Danish tax
21  law?
22      MR. OXFORD: Object to the form.
23      A    I think, as I've stated earlier,
24  I'm not expressing opinions as to Danish tax
25  law. So I would -- I would not have an

Page 99

1  opinion on that question as it relates to
2  Danish tax law.
3      Q    Okay. Would you agree that when a
4  final and binding agreement to acquire a
5  share exists, that the buyer is therefore the
6  only person liable to taxation in respect to
7  any dividend that's received?
8      MR. OXFORD: Object to the form.
9      A    Well, firstly, the -- you need to
10  define the circumstances that relate to that,
11  what tax jurisdiction you're talking about,
12  what the circumstances of the trade are.
13      And so, on its face, I can't really
14  answer that.
15      Q    Okay. If I specify Denmark as a
16  jurisdiction, would that help you?
17      MR. OXFORD: Object to the form.
18      A    Well, then, I'm not here to
19  express, and I don't believe I've expressed
20  any opinions in my reports as to Danish tax
21  law and how that would apply to any
22  particular transaction.
23      Q    How about on securities
24  transactions in Denmark? Do you consider
25  yourself to be expressing an opinion on

Page 100

1  securities transactions in Denmark?
2      MR. OXFORD: Object to the form.
3      A    I considered myself to be
4  expressing all the opinions that are
5  contained in my report on the terms in which
6  they're expressed on my report and based on
7  the bases included in my report.
8      Q    Do you consider any of those
9  opinions in your report to be regarding
10  securities transactions in Denmark?
11      MR. OXFORD: Object to the form.
12      A    I -- the -- obviously, the shares
13  in the transaction are Danish shares. But
14  the opinions that I have expressed relate to
15  the facts and circumstances and are given on
16  the terms in which they're given in my report
17  taken as a whole.
18      Q    And so you're not expressing any
19  opinions on your report on securities
20  transactions in Denmark?
21      MR. OXFORD: Object to the form.
22      A    That's not what I said.
23      Q    So I'm asking you, then, why it
24  matters whether or not jurisdiction -- what
25  jurisdiction you're in affects when a final

Page 101

1  and binding agreement exists to buy a share,
2  whether the only person liable to tax is the
3  buyer?
4      MR. OXFORD: Object to the form.
5      A    Well, your question earlier was
6  whether I have an opinion on the tax
7  treatment of a contract in an entirely
8  hypothetical situation. And my answer was
9  that on that hypothetical situation, I'm not
10  expressing an opinion as to Danish tax law.
11      Q    Okay. Would you agree that
12  VP Securities, as Denmark's CSD, has an
13  obligation to pay a dividend to shareholders
14  in Denmark?
15      A    I understand that for listed
16  companies in Denmark whose shares are
17  registered with VP Securities, that
18  VP Securities is involved in the process of
19  passing dividends to the relevant recipient.
20      Q    Sorry. One second.
21      Do you understand anything about
22  what VP Securities' involvement in paying a
23  dividend to holders of Danish shares that are
24  listed on Danish exchanges is?
25      MR. OXFORD: Objection to form.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 102

1     A    I'm sorry -- sorry to do this, but
2  right at the end of your question, it broke
3  up, so I didn't hear the end of the question.
4           Can you repeat it again?
5     Q    No problem.  If you ever need me to
6  repeat a question, I'm happy to do that.
7           Do you understand anything about
8  what VP Securities' involvement in paying a
9  dividend to holders of Danish shares that are
10 listed on Danish exchanges is?
11          MR. OXFORD:  Object to the form.
12    A    Well, as I've said, it is my
13 understanding that VP Securities maintains
14 the ultimate share register.  And so, at the
15 point in time, i.e. the record date, it is
16 VP Securities who ultimately confirms the
17 underlying record holders and will therefore
18 be involved in directing the payment from the
19 issuing company to those record holders.
20          Obviously, in many cases, those
21 record holders will be a custodian or
22 sub-custodian.  So VP Securities is not the
23 only person involved in that process, but
24 they do have an important role in there.
25    Q    Okay.  And do you understand that

Page 103

1  VP Securities satisfied its role to direct
2  the dividends to the proper party if it paid
3  the amount of the dividends to the person on
4  the register?
5           MR. OXFORD:  Object to the form.
6     A    I understand that from the issues
7  perspective, it pays the dividend to the
8  holders of record as determined by
9  VP Securities.  But that may not necessarily
10 be the end of the process, because, as I
11 said, there's other -- they'd most likely be
12 custodians, sub-custodians, and a number of
13 other things involved in the overall process.
14    Q    Okay.  And you would agree with the
15 fact that the person on the register is not
16 necessarily the person who ultimately had the
17 right to receive the dividend?
18          MR. OXFORD:  Object to the form.
19    A    Yeah, I'd agree with that, yeah.
20    Q    Okay.  And would you agree with the
21 fact that where the person on the register
22 was not the one who ultimately had the right
23 to receive the dividend, that the person to
24 whom VP Securities paid the dividend would
25 have received it on behalf of the actual

Page 104

1  legal owner of the shares?
2           MR. OXFORD:  Object to the form.
3     A    That requires making a series of
4  assumptions about who the holder on
5  the -- who the holder of record actually was,
6  and what their -- what are all the
7  circumstances surrounding that particular
8  holder of record.
9           But as I've said, in general, it
10 would typically be a custodian or
11 sub-custodian who was the holder of record at
12 the level of VP Securities.  And so one would
13 need to fully understand in what capacity the
14 custodian is holding those shares in order to
15 determine what happens once the payment gets
16 to that custodian.
17    Q    Okay.  Would you agree with the
18 principle that the legal owner of the shares
19 is the one who ultimately receives the
20 dividends, who's liable to taxation on the
21 dividend, and who's suffered WHT?
22          MR. OXFORD:  Object to the form.
23    A    There's such a wide-ranging number
24 of terms in that.  And it's so general that,
25 no, I would not agree as a general --

Page 105

1  that -- on the grounds that I don't really
2  know what the question is.
3     Q    Okay.  Let me break it down so it's
4  a little more clear.
5           Would you agree that it's the legal
6  owner in Denmark who's considered to have
7  received the dividend?
8           MR. OXFORD:  Objection to form.
9     A    Again, you need to be more precise.
10 I don't know what "legal owner" means.  I
11 don't know what -- received for what purpose.
12          There are a number of terms in
13 there that you'll need to be more precise on.
14    Q    What's your understanding of what
15 the "legal owner" of a security means?
16          MR. OXFORD:  Object to the form.
17    A    Again, legal owner for what
18 purpose?
19    Q    Legal owner for the purposes of
20 owning Danish shares.
21          MR. OXFORD:  Object to form.
22    A    I -- I'm not trying to be difficult
23 but I don't understand that question.
24          You can have tax legal owner, you
25 can have nominee legal owner, you can

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 106

1  have -- you know, there are a whole range of
2  different forms of legal ownership.
3        So I need you to be a bit more
4  precise.
5        Q    Okay.  Is it your understanding
6  that what it means to own a share depends on
7  the legal circumstances in which you're
8  asking that question?
9        MR. OXFORD:  Objection to form.
10       A    Again, the question of what
11 ownership means for the particular purposes
12 in which that question's asked, I need to
13 know what purposes it's asked, and all the
14 facts and circumstances that surround that
15 particular share.
16       So if you give me a specific
17 example, I can give you my thoughts.
18       Q    Is it your testimony that you're
19 unable to tell me, as a general principle,
20 what it means to be a legal owner of a share
21 in Denmark?
22       MR. OXFORD:  Objection.
23       A    What I'm saying is that over the
24 course of my career I spent a long time and I
25 understand that the question you're asking me

Page 107

1  can be a much more complex question than it
2  appears because it requires understanding the
3  exact facts and circumstances, for what
4  purpose, i.e., you know, is it tax, is it
5  accounting, is it regulation, is it, you
6  know, record holder from the issuer's
7  perspective?
8        There's a range of different ways
9  in which one can think about who the owner of
10 a share is.  And without the full facts and
11 circumstances and the specifics and for what
12 purpose the question is being asked, I -- I
13 can't answer it.
14       Q    Is it your understanding that the
15 legal owner of a share can be a different
16 person in different circumstances?
17       MR. OXFORD:  Object to the form.
18       A    It would be highly unusual if a
19 given share for the same -- going back to my
20 point about there are different
21 purposes -- if we're talking about a specific
22 definition of "ownership," in my experience,
23 it would be highly unusual if two people can
24 be the same owner of the share for the same
25 purpose.

Page 108

1        Q    What about whether two people can
2  be the same owner of the share for different
3  purposes?
4        MR. OXFORD:  Sorry.  Just let me --
5  let me get my objection in, please,
6  Mr. Wade.
7        So can you just repeat that
8  question, Greg?
9        MR. PRUDEN:  Yeah.  There was an
10 error in my question anyway, so let me
11 re-ask it.
12       Q    What about whether two people can
13 be the owner of the same share for different
14 purposes?
15       MR. OXFORD:  Object to the form.
16       A    That's possible, yeah.
17       Q    Okay.  What's your understanding
18 that the owner can be a different person in
19 different circumstances based on?
20       MR. OXFORD:  Object to the form.
21       A    My -- over the course of my career,
22 you know, as I said, you've got accounting
23 regulation, you've got nominee ownership.  It
24 is possible and I've seen instances over the
25 course of my career where the owner for one

Page 109

1  of those can be different from another owner.
2        Q    Can you give me an example?
3        A    Yeah.  So for accounting purposes,
4  you know, I mean, in most cases, the nominee
5  owner is the custodian taking Danish
6  securities.  The custodian registered with
7  VP Securities would be the nominee owner for
8  accounting purposes.
9        It's quite unlikely that that
10 person is the accounting owner of the shares.
11 It's possible they are, but it's unlikely.
12       Q    Okay.  You use the word "owner" a
13 lot, but you didn't really refer to a legal
14 owner.  Just let me re-ask the question.
15       Is it your testimony that the
16 accounting owner of a share is equivalent to
17 being a legal owner of a share?
18       MR. OXFORD:  Object to the form.
19       A    It depends -- again, it depends for
20 what purpose and what your definition of
21 "legal owner" of a share is, which I don't
22 know what you mean.
23       So I can't really answer that
24 question.
25       Q    Okay.  Would you agree with the

Page 122

1    **Q**    I will ask you a slightly different
2  question.
3         Can you tell me when the legal
4  ownership in a share transfers from the
5  seller to the buyer in a normal securities
6  transaction?
7         MR. OXFORD:  Object to the form.
8    **A**    And what -- again, what do you mean
9  by "legal ownership" and what do you mean by
10 "normal securities transaction?"
11   **Q**    Can you tell me -- I will ask
12 again -- when legal ownership transfers from
13 the seller to the buyer in any securities
14 transaction?
15        MR. OXFORD:  Did you say in any
16    securities transaction?
17        MR. PRUDEN:  Any securities
18    transaction.
19        MR. OXFORD:  Okay.  Object to form.
20   **A**    And again, what do you mean by
21 "legal ownership?"
22   **Q**    So, am I understanding you to be
23 saying here that you don't understand what it
24 means to legally own a security?
25        MR. OXFORD:  Object to the form.

Page 123

1         Asked and answered.
2    **A**    I'm saying, and I think it's been
3  my consistent response, that "legal
4  ownership" can mean a number of different
5  things in a number of different contexts, and
6  that without the context or precision on
7  exactly for what purpose you're asking it, I
8  can't answer that.
9         So if you want to give me a very
10 specific example of a trade, and then a very
11 specific definition of what you mean by
12 "legal ownership," I will do my best to
13 answer it.
14   **Q**    In the transactions that you
15 analyzed in this case, when did the buyer of
16 the shares become the owner of the shares?
17        MR. OXFORD:  Object to the form.
18   **A**    It's the same point.  For what
19 purpose do -- what do you mean by "owner?"
20        Do you mean nominee owner?  Do you
21 mean tax owner?  Do you mean accounting
22 owner?
23        There are lots of different
24 definitions.
25   **Q**    Is it your testimony you can't tell

Page 124

1  me what it means to be an owner of a share?
2         MR. OXFORD:  Objection, asked and
3    answered.
4    **A**    It is my testimony that in order to
5  answer that question, I need to understand
6  the context in which you're asking that
7  question, and all the facts and circumstances
8  surrounding that particular transaction.
9    **Q**    Okay.  And so you have no general
10 definition available to you of what it means
11 to be the owner of a share?
12        MR. OXFORD:  Objection to form.
13   **A**    My position is, as I've explained
14 earlier, that over the course of my career
15 working in structured finance, I'm well aware
16 that what it means to be the owner of a
17 security can take a number of different
18 meanings, and that precision is required.
19        And like I said, if you give me a
20 precise set of facts and a precise definition
21 of what you mean by the particular type of
22 ownership, I will do my best to answer it.
23   **Q**    Okay.  For the purposes of making a
24 tax application in Denmark, in the
25 transactions that you analyzed in this case,

Page 125

1  when did the buyer of the shares become the
2  legal owner of the shares?
3    **A**    I'm really sorry, that -- sorry.  I
4  just didn't catch that question.
5         The sound has been a bit worse
6  since we've restarted again.  I don't know if
7  that's -- that's the only change.
8         Sorry, but could you repeat the
9  question?
10   **Q**    Yes.  For the purposes of making a
11 tax reclaim application in Denmark, in the
12 transactions that you analyzed in this case,
13 when did the buyer of the shares become the
14 owner of those shares?
15        MR. OXFORD:  Object to the form.
16   **A**    I don't believe I've given an
17 opinion as to the requirements for when or
18 what exactly is required to make a tax
19 reclaim.
20        My opinions relate to the fact that
21 if we go back to the tax vouchers, there are
22 three key facts in the tax vouchers.
23 Number 1, that the pension plans held shares;
24 Number 2, that they received dividends; and
25 Number 3, that they suffered tax.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 126

1    And my opinions are fundamentally
2  that those three statements are false.  But I
3  have offered no opinion as to, you know, what
4  the Danish tax consequences of -- as a result
5  of that are.
6    Q    Okay.  Well, you said that -- you
7  told me in response to a question that I
8  asked you, Mr. Wade, whether and in what
9  context I was using the term "ownership"
10  would inform your answer to my question.
11    I'm not asking you about opinions
12  that you provided or not.  What I'm asking
13  you right now is whether you understand that
14  for the purpose of making a tax reclaim in
15  Denmark, when, in a securities transaction,
16  the ownership would transfer from the seller
17  to the buyer?
18    MR. OXFORD:  Object to the form.
19    A    And my response is that given the
20  opinions that I gave and the fact that I am
21  not giving opinions on Danish tax law, I have
22  not given an opinion on the question of what
23  the precise conditions required to obtain
24  a Danish tax reclaim.
25    But it's my opinion that the three

Page 127

1  key pieces of information on the tax voucher,
2  which I understand to have formed a very
3  important part of that tax group claim, in my
4  opinion, and based on my review, and for all
5  the reasons given in my report, that
6  information is false.  So it seems highly
7  unlikely to me that that would mean that the
8  person is the owner for Danish tax purposes.
9    But that is not something I've
10  expressed an opinion on.
11    Q    Okay.  For the purposes of
12  determining whether a payment made from a
13  seller to a buyer in reference to a dividend
14  is a dividend or a manufactured dividend,
15  when do you understand that legal ownership
16  transfers in a securities transaction from
17  the seller to the buyer?
18    MR. OXFORD:  Object to the form.
19    A    I just don't think that's a
20  question that makes sense on its own terms.
21  A -- as I think I defined in my report, a
22  dividend compensation payment is a
23  contractual payment that arises under a
24  transfer -- a contract for the transfer of
25  securities.

Page 128

1    So I -- I don't think that your
2  question makes sense on its own terms.
3    Q    Okay.  Well, that's your
4  understanding of the definition of
5  "manufactured dividends?"
6    A    Amongst other things, and, as laid
7  out in my reports, extensive experience over
8  the course of my career in understanding
9  equity finance transactions.
10    Q    What is the definition of
11  "manufactured dividends?"
12    A    I think -- I think I just gave a
13  definition which is, I believe, the one I
14  used in my report, which is it's a
15  contractual payment representative of a
16  dividend that arises under a contract for the
17  transfer of securities.
18    That, I think, is the generally
19  accepted definition based on my market
20  practice.
21    Q    And what determines whether a
22  payment that's representative of a dividend
23  is, itself, a dividend or a manufactured
24  dividend?
25    MR. OXFORD:  Object to form.

Page 129

1    A    Well, I think -- I don't -- I don't
2  really understand that question because my --
3  under my definition, which I think is the --
4  well, I know, based on my market practice, is
5  the accepted market definition of a dividend
6  compensation payment -- a dividend
7  compensation payment is a contractual payment
8  made under the contract for transfer of
9  securities.
10    So it's definitionally not a
11  dividend.
12    Q    Okay.  So your testimony is that a
13  payment that's made from the seller to a
14  buyer of securities can never represent a
15  real dividend?
16    MR. OXFORD:  Object to the form,
17    misstates his testimony.
18    A    That's -- that's not what I said.
19    Q    Okay.  Is it your testimony that a
20  contractual payment that represents a
21  dividend from the seller to a buyer of shares
22  is always a manufactured dividend?
23    MR. OXFORD:  Object to the form.
24    A    I don't think I said that.  I
25  defined -- I gave my definition, which is the

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 130

1  generally accepted market definition, that a
2  dividend compensation payment -- or a
3  manufactured dividend, if you prefer that --
4  is a contractual payment made under contract
5  for the transfer of securities.
6      Q    Okay.  And can that ever be
7  considered a real dividend?
8          MR. OXFORD:  Object to the form.
9      A    For what purpose?
10     Q    For the purposes of determining
11 whether the payment received is a dividend?
12         MR. OXFORD:  Object to the form.
13     A    Well, my understanding of the term
14 "dividend" is a dividend is a payment from an
15 issuing company made to a shareholder in
16 respect of that person's being the owner of
17 shares in a company.
18         So, in that sense, a dividend and a
19 manufactured dividend, as I've previously
20 just defined them and are included in my
21 report, cannot be the same thing under
22 those -- as defined for those purposes.
23     Q    Okay.  Well, how do you determine
24 whether somebody is the owner of shares in a
25 company?

Page 131

1          MR. OXFORD:  Object to the form.
2      A    Again, I'm going to ask you to
3  define for what purpose.
4      Q    Mr. Wade, I'm using your words.
5  You told me a second ago that your
6  understanding of the term "dividend" is "a
7  dividend is a payment from an issuing company
8  made to a shareholder in respect of that
9  person being an owner of shares in a
10 company."
11         What do you mean when you say that
12 the person is the "owner of shares in a
13 company" in that context?
14     A    Okay.  In that particular context,
15 I mean that the person is the -- in whatever
16 format that particular -- depending on the
17 articles of association of that company and
18 whatever form the register is held, that that
19 person is, at the time when the dividend
20 right accrues, i.e., the record date, that
21 person is the record holder on the company's
22 share register, and that the issuing company
23 pays the dividend to.
24     Q    Okay.  So if you are not on the
25 share register, you are not the owner of the

Page 132

1  shares.
2          Is that your testimony?
3          MR. OXFORD:  Object to the form.
4      A    No, that's a -- that's completely
5  different because you've expanded my -- I
6  said for the purposes of knowing -- in
7  defining "dividend," I have defined
8  "shareholder" in the way I just defined it.
9          I didn't say anything about who the
10 owner of the shares is, because that could
11 mean -- depending on what the context is and
12 what circumstances are, "owner" is a very
13 broad term that can mean all kinds of things.
14     Q    Okay.  And so, for the purposes of
15 determining who receives a dividend, the
16 owner is synonymous with the person on the
17 share register.
18         Is that your testimony?
19         MR. OXFORD:  Object to the form,
20     asked and answered.
21     A    You asked me to define "dividend."
22 I defined it as being -- in the way that I
23 did.
24         And then that requires -- the
25 dividend is paid by the issuing company to

Page 133

1  the shareholder of record on the record date,
2  and the shareholder of record is the person
3  who, in whatever format the shareholder
4  registry is maintained, is the person who is
5  on the record at that time.
6          That was the purpose -- that is a
7  definition in which I've defined "dividend,"
8  and for those purposes, that's what I mean by
9  "shareholder."
10     Q    I asked you about the definition of
11 "owner."  I'm asking you whether the
12 definition of "owner," for the purposes of
13 determining whether you received a dividend,
14 is synonymous with the person on the share
15 register?
16         MR. OXFORD:  Objection.
17     A    And I did not give a general
18 definition of "owner."  You asked me for a
19 definition of "dividend" which I gave.
20         And for those purposes, the owner
21 of the shares is the person who's on the
22 register, but only for those purposes.  Maybe
23 for other purposes as well, but I'm just
24 being very precise on -- as I said, you know,
25 across the course of my career, I have

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 134

1  learned that it's very important that the
2  definition of "owner," "legal owner," all
3  these kind of terms can have a number of
4  different meanings in different contexts.
5          So I'm just trying to be very
6  precise.
7      Q    Okay.  So your definition of who
8  receives a dividend is the person on the
9  share register?
10         Full and final answer?
11     MR. OXFORD:  Object to the form.
12     A    I think I actually defined
13  "dividend" as being a payment by the issuer
14  company.  That was -- that was what I was
15  defining.
16         And the issuer company pays it to
17  the person who is on the shareholder register
18  at the date of record that the company
19  determines the dividend will be paid.
20     Q    Okay.  I'm asking you, for the
21  purposes of determining who is deemed to have
22  received a dividend, what determines who is
23  the owner of the share on which the dividend
24  is paid?
25     MR. OXFORD:  Object to form.

Page 135

1      A    I'm sorry, but you just introduced
2  the word "deemed" there, so deemed for what
3  purpose?  What's the context?  What's the
4  transaction?
5          I just -- my experience over many
6  years involved in structured finance
7  transactions is that precision is required.
8  And so, if you give me precision, I will do
9  my best to answer.
10     Q    Okay.  I want to go back to what
11  you told me again, and that's that "the
12  dividend is a payment from an issuing company
13  made to a shareholder in respect to that
14  person being an owner of shares in a
15  company."
16         I'm asking you whether being an
17  owner of shares in a company in that context
18  is synonymous with being on the share
19  register?
20     MR. OXFORD:  Object to the form.
21     A    For the purpose -- in the way I
22  defined what a dividend is, the dividend is a
23  payment made by the issuing company to the
24  person -- we can call them the owner for
25  these purposes -- who is on the shareholder

Page 136

1  register on the record date.
2          So, for these purposes, "owner"
3  means the person on the shareholder register.
4  But "owner" in any other context may well
5  have a completely different meaning.
6      Q    Okay.  And for these purposes, when
7  does the person who is considered to be the
8  owner -- using your definition
9  again -- become the owner?
10     MR. OXFORD:  Object to the form.
11     A    It would depend on the full details
12  of the article of association of the company
13  and exactly how it works.  But in simple
14  terms, it would be when whoever the registrar
15  for the company is puts that person onto the
16  shareholder register as being the current
17  owner of that share.
18     Q    Do you reference the details of the
19  articles of association of any of the Danish
20  issuers whose transactions you analyzed in
21  this case?
22     MR. OXFORD:  Object to the form.
23     A    No, but that's not necessary in the
24  context of understanding these particular
25  transactions because, first of all, the

Page 137

1  specific definition that we've been talking
2  about I don't think is actually relevant to
3  any of my opinions.
4          And secondly, it's my
5  understanding, based on a combination of
6  market practice and the documents I've
7  reviewed in this case, that the nominee
8  holder of a share on the record date is
9  determined by VP Securities and what register
10  they maintain, which is the ultimate and only
11  record of who the nominee holder of the share
12  is, but purely for the purposes of defining
13  who the issuing company pays a dividend to.
14     Q    Okay.  Have you reviewed any
15  documents in this case that would indicate to
16  you who was the owner of a share?
17     MR. OXFORD:  Object to the form.
18     A    I'm sorry, but you're just using
19  the phrase "owner," and I think I've been
20  clear that unless you're precise about what
21  you mean by ownership, I can't give an answer
22  to that.
23     Q    Okay.  As a matter of general
24  English, have any documents you've reviewed
25  in this case offered you any opinion on who

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 146

1  this deposition?
2        MR. OXFORD:  Object to the form.
3        A    Yeah.  So amongst the other
4  reasons, and the full reasons are given in my
5  report, the pricing clearly indicates that
6  the cum ex sellers were not transferring a
7  real dividend.
8        And it's further my view that on
9  all the facts and circumstances that are
10  relevant to me reaching my decision, there
11  are no -- there are no particularly
12  meaningful differences between the non-annex
13  E cum ex transactions and the annex E cum ex
14  transactions other than in the case of the
15  annex E cum ex transactions, MPT Dubai, it
16  was an internal IDB, and in the non-annex E
17  cum ex transactions, it was an external IDB.
18        That -- and that's the -- you know,
19  there are other -- there are other facts and
20  circumstances that I have taken into account,
21  but that's the essence of why I don't think
22  there's any meaningful difference between the
23  two types of transaction, in addition to the
24  share recycling.
25        Q    Okay.  So is it your -- withdrawn.

Page 147

1  Okay.
2        So you've given what are the
3  reasons why you believe that dividends were
4  not received, the pricing of the shares that
5  ED&F acquired, your belief that the shares
6  were recycled in the annex E transactions,
7  and that the annex E and the non-annex E
8  transactions had similar characteristics.
9        Is that correct?
10        MR. OXFORD:  Object to the form.
11        A    I think what I said is that they
12  were amongst the reasons that I had reached
13  the opinions I reached in my report.  But the
14  full work that I did and the reason I reached
15  my opinions are as laid out in my report.
16        I'm happy -- if you want to discuss
17  other aspects, I'm happy to.
18        Q    Are there any other reasons that
19  you can tell me as you sit here today?
20        MR. OXFORD:  Object to the form.
21        A    Well, at some level, my entire
22  report and all the work I've done is what led
23  me to arrive in my overall opinions that, A,
24  the annex E and non-annex E are fundamentally
25  the same in all relevant aspects, and B, that

Page 148

1  the tax vouchers were issued, were issued in
2  respect of shares which were not held because
3  they were recycled, and dividends were not
4  received, and no tax was suffered.
5        So -- but it's the cumulative
6  volume of work that was contained in my
7  report and the documents that I've used that
8  allow me to arrive at those opinions.
9        Q    And you can't tell me more
10  specifically, in any more detail, what
11  allowed you to arrive at those opinions?
12        MR. OXFORD:  Object to the form.
13        A    I'm very happy to go through any of
14  the particular bases of opinion that are laid
15  out in my reports, but it is the culmination
16  of all of those taken together that has led
17  me to arrive at my opinions.
18        Q    Okay.  And that's -- go ahead.
19        MR. OXFORD:  Sorry, Mr. Wade.  Were
20        you finished with your answer?
21        A    Sorry.  I was just going to say if
22  there's a specific basis or anything in the
23  opinion that you'd like me to focus on, I'm
24  happy to talk about it.
25        Q    Okay.  That's your complete answer

Page 149

1  to my question, "Are there any other reasons
2  that you can tell me as you sit here today?"
3        MR. OXFORD:  Object to the form,
4        asked and answered.
5        A    Yeah.  My answer to that question
6  is that all the reasons are contained across
7  my three reports, and that if you want to
8  discuss any of those specific reasons, I'm
9  very happy to.
10        Q    Okay.  But I would have to direct
11  you to the portion of the report to do that?
12        MR. OXFORD:  Object to the form.
13        A    Well, I think I've already given
14  you some of the key reasons.  But all the
15  reasons are contained in my report.
16        Q    Okay.  And it's your opinion that a
17  share has to settle by the record date in
18  order for the buyer of the share to be
19  entitled to a dividend.
20        Right?
21        MR. OXFORD:  Objection.  Objection
22        to the form.
23        A    Sorry.  Can you repeat that
24  question?
25        Q    Sure.

CONFIDENTIAL
Graham Wade - March 16, 2022

39 (Pages 150 to 153)

Page 150

1        It's your opinion that a share has
2   to settle by the record date in order for the
3   buyer to be entitled to a dividend.
4        Right?
5        MR. OXFORD:  Same objection.
6   A    My answer to that is:  It depends.
7   Q    What does it depend on?
8   A    It depends on all the facts and
9   circumstances of the case, who the buyer and
10  seller are, what the nature of the
11  transaction is, how it's settled.
12       All the facts and circumstances.
13  Q    Why does it depend on who the buyer
14  and the seller are?
15  A    Well, because without knowing that,
16  you may not know the nature of the
17  arrangement between the counterparties, where
18  do the shares come from, for what purpose was
19  the buy transaction done, and --
20       (Whereupon a discussion was held
21  off the record.)
22       MR. OXFORD:  Mr. Wade, do you know
23       where you were in your answer?
24  A    I didn't know I was in an answer,
25  actually, so sorry.

Page 151

1        MR. OXFORD:  Mike, would you mind
2        reading back the question and what
3        Mr. Wade got through of his answer
4        before call-in user Number 3 decided to
5        make his or her presence felt?
6        (Whereupon the record was read back
7        by the reporter.)
8   A    I think I'd just add "and all the
9   other facts and circumstances."
10  Q    Okay.  Is it your view that in the
11  transactions you analyzed in this case that
12  the transaction date and agreed price terms
13  of the trades that were executed typically
14  indicated that the buyer of securities will
15  receive a dividend?
16       MR. OXFORD:  Objection to the form.
17  A    Which -- which transactions are we
18  talking about?  Because in each transaction
19  there are buys and sells.
20       So if you give me a specific
21  transaction, I'm happy to -- I'm happy to
22  discuss it.
23  Q    I'm asking you whether it's your
24  view, for cum ex transactions that you
25  analyzed in this case, that the transaction

Page 152

1   date and agreed price terms typically
2   indicate that the buyer of securities will
3   receive a dividend?
4        MR. OXFORD:  Object to the form.
5   A    It's -- it's my position based on
6   market practice and understanding how the
7   equity finance markets work that the -- and I
8   think I've laid this out quite extensively in
9   my report -- that in a cum ex transaction,
10  the whole point of a cum ex transaction is
11  that a -- the seller is not selling the real
12  dividend because they don't have it.
13       So -- but we'd have to get into a
14  very specific cum ex transaction and go
15  through the details of that if you'd like me
16  to give you a more precise answer.
17  Q    Okay.  So, as a general matter,
18  it's not accurate that the transaction date
19  and the agreed price terms for the cum ex
20  transactions you analyzed typically indicate
21  that the buyer of the securities will receive
22  a dividend?
23       That's my question.
24       MR. OXFORD:  Object to the form.
25  A    In the specific cum ex transactions

Page 153

1   that I have reviewed, it is my opinion that
2   it is clear that there was no intention to
3   sell a dividend from the cum ex seller to the
4   cum ex buyer, not least of which because the
5   cum ex seller did not, itself, have a
6   dividend to sell.
7        And that's fairly obvious from all
8   the facts and circumstances surrounding the
9   trades, the way they were settled, the way
10  they were priced, and my experience over many
11  years of looking at structured financial
12  transactions.
13  Q    Okay.  If the seller in the cum ex
14  transaction did have the right to a dividend,
15  is it the case that the transaction date and
16  the agreed price terms typically indicate
17  that the buyer of the securities would
18  receive the dividend?
19       MR. OXFORD:  Object to the form.
20  A    Sorry.  What transaction are we
21  talking about?  Are we talking about a cum ex
22  transaction?
23  Q    Yes.  In the cum ex transactions,
24  if the buyer -- sorry -- if the seller of the
25  shares did have the right to a dividend when

Page 154

1  it sold the shares, would it be the case that
2  the transaction date and agreed price terms
3  would typically indicate that the buyer of
4  securities will receive the dividend?
5      MR. OXFORD:  Objection to form.
6   A   No.
7   Q   It's not?
8   A   Sorry?
9   Q   I just want to confirm -- I tried
10 to confirm that you said it's not the case
11 that the transaction date and the agreed
12 price terms would typically indicate that the
13 buyer would receive a dividend?
14  A   That's correct.  Because the -- the
15 very nature of a cum ex transaction is that
16 what the seller is agreeing to do is to
17 deliver ex-dividend shares, using the
18 definition of cum ex in my report.
19      So what the -- what the arrangement
20 is is an arrangement to deliver ex-dividend
21 shares, which, by that point, will not have a
22 right to a dividend attached to them anymore.
23  Q   Okay.  Would it surprise you that
24 someone wrote in your report that you signed
25 that in a cum ex transaction, "the

Page 155

1  transaction date and agreed price terms
2  typically indicate that the buyer of the
3  securities will receive the dividend?"
4      MR. OXFORD:  Objection, object to
5  the form.  You can answer.
6   A   Can you -- can you direct me to
7  where in my report it says that?
8   Q   Yeah, Paragraph 25.
9      MR. OXFORD:  This is Exhibit 5001,
10 Greg?
11     MR. PRUDEN:  Yeah.  It's the same
12 exhibit we've been on the whole time.
13     MR. OXFORD:  Oh, I didn't realize
14 we were on an exhibit the whole time.
15  A   Well, I think if I -- if I read
16 back the whole sentence, it says, "As
17 described more fully below, in a cum ex
18 transaction, the transaction date and agreed
19 price terms typically indicate that the buyer
20 of the securities will receive the dividend,
21 but the settlement cycle is extended, so the
22 buyer of the securities does not receive the
23 shares until after the record date, and so
24 the buyer does not actually receive the
25 dividend."

Page 156

1      So I don't know what -- I think
2  that's entirely consistent with what I said a
3  few minutes ago.
4   Q   And your understanding is that the
5  buyer doesn't receive a dividend because the
6  settlement cycle of the shares is extended so
7  the buyer of the securities does not receive
8  the shares until after the record date.
9      Is that right?
10     MR. OXFORD:  Object to form.
11  A   That's in respect of the overall
12 cum ex transaction.  That's not the only
13 reason why I understand that.
14      But that is -- that is an important
15 element of that understanding, yes.
16  Q   Okay.  Well, is that the only
17 reason to determine that the buyer doesn't
18 receive a dividend in these transactions you
19 analyzed?
20     MR. OXFORD:  I'm sorry, Greg.  The
21 audio was bad on our end.
22     Would you mind repeating the
23 question?
24     MR. PRUDEN:  Sure.
25  Q   I asked:  Is that a sufficient

Page 157

1  reason to determine that the buyer doesn't
2  receive a dividend in the cum ex transactions
3  that you analyzed?  Is that fact, standing
4  alone, a sufficient reason?
5      MR. OXFORD:  Object to the form.
6   A   I think my -- my conclusions as
7  regards the overall transactions in this case
8  are based on the full facts and
9  circumstances.
10      But my point is that the very
11 nature and essence of the design of a cum ex
12 transaction is that it is designed to deliver
13 ex-dividend shares.  That is -- that's the
14 fundamental nature of a cum ex transaction.
15      So it's almost inherent in what the
16 nature of a cum ex transaction is that it is
17 the seller -- if anyone, the seller may not
18 receive the dividend because they may, like
19 in these transactions, be selling short.
20      But it is not the buyer who is
21 going to receive the dividend.  That sort of
22 is the whole point of a cum ex transaction.
23      That's my -- that's my opinions as
24 in this report and it's also based on, you
25 know, market practice.

CONFIDENTIAL
Graham Wade - March 16, 2022

41 (Pages 158 to 161)

Page 158

1    Q    Okay.  And so your opinion in this
2  case is based on the view that all cum ex
3  transactions necessarily involve shares to
4  which there's not a dividend right?
5        MR. OXFORD:  Objection to form.
6    A    Based on the definition of "cum ex"
7  that I've used in my report, that -- yeah.
8    Q    Okay.  And so that your conclusion
9  relies on your own definition of "cum ex"
10  that you've used in your report?
11    A    I don't think it's my -- I don't
12  think it's my own definition.  I think it is
13  an accepted market definition of what a
14  cum ex transaction is.
15    Q    Okay.  And what's your -- what's
16  your basis for your definition in the market
17  of what a cum ex transaction is?
18        MR. OXFORD:  Object to the form.
19    A    Well, I think it's -- you know,
20  based on my experience over the course of my
21  career, the -- it's my understanding that
22  across a wide range of market participants
23  that that is -- if you refer to a cum ex
24  transaction, what people understand that to
25  mean is a transaction where you're going to

Page 159

1  execute a trade before the trade date, but
2  only deliver ex-dividend shares.
3    Q    Okay.  And is your only basis for
4  stating that ex-dividend shares were
5  delivered that the shares were delivered
6  after the record date?
7        MR. OXFORD:  Object to the form.
8    A    No, because -- and again, what
9  does -- what does "delivered" mean?  That's a
10  slightly imprecise term.
11        But in the transactions in this
12  case and for all the reasons given in the
13  report, including the way they were
14  settled -- the pricing, who the
15  counterparties were, the nature of all the
16  arrangements -- it is clear to me that what
17  the parties intended to do was have a
18  contract where the cum ex seller had agreed a
19  trade under which they were going to deliver
20  ex-dividend shares.
21        That's -- that's my opinion.
22    Q    Mr. Wade, I used your term.  You
23  said, "What people understand that to mean is
24  a transaction where you're going to execute a
25  trade before the trade date but only deliver

Page 160

1  ex-dividend shares."  And then I asked you
2  that same question using the same terminology
3  and you said that "delivered" is an imprecise
4  term.
5        Is it your general practice to use
6  imprecise terms for your explanations?
7        MR. OXFORD:  Objection.  Greg, I
8  think you're a little bit better than
9  that.  The question was -- you asked him
10  what his -- if that was his only basis.
11  He gave you the other basis.
12        So do you want to try again?
13    Q    You can answer the question.
14        MR. OXFORD:  Sure.  Is the
15  question, "Is it your general practice
16  to use" -- the transcript reads
17  "imprecise terms for your explanations,"
18  and I object to that question.
19        MR. PRUDEN:  All right.  An
20  objection is sufficient.
21    Q    Mr. Wade, is it your assertion in
22  this case that all of the cum ex transactions
23  involved short sold shares from the seller to
24  ED&F Man?
25        MR. OXFORD:  Object to the form.

Page 161

1    A    I'm sorry.  Can you repeat that
2  question again?
3        Is it my testimony that what?
4    Q    All of the cum ex transactions you
5  analyzed in this case involved short sold
6  shares from the seller to ED&F Man?
7        MR. OXFORD:  Same objection.
8    A    It's my -- it's my opinion in the
9  case of the annex E cum ex transactions, I
10  believe, confirmed beyond doubt by ED&F Man
11  that they were short sold trades.
12        In the case of the non-annex E
13  trades, which I've analyzed in detail, which
14  includes all the bell weather trades, it is
15  my conclusion that there are no meaningful
16  difference between those, and so that, yes,
17  it is my opinion that those transactions were
18  short sale cum ex sales by the counterparty.
19    Q    Okay.  So it's your assertion that
20  "cum ex sale" and "short sale" are
21  equivalent?
22        MR. OXFORD:  Object to the form.
23        Misstates his testimony.
24    A    Yeah.  No, that's not what I said.
25  I think, earlier, you asked --

CONFIDENTIAL
Graham Wade - March 16, 2022

42 (Pages 162 to 165)

Page 162

1    Q    Sorry, I --
2         MR. OXFORD: Hold on. Greg, you
3    asked him the question. Please let him
4    finish.
5    A    Sorry. Can we have the question
6    back again, please?
7    Q    I'll ask another question.
8         Is it your assertion that all
9    cum ex sales are short sales?
10        MR. OXFORD: Objection. You can
11   answer.
12   A    By that question, do you mean
13   generally or in the context of the specific
14   transactions which I've given opinions on?
15   Q    Let's start generally first.
16        Is it your assertion generally that
17   all cum ex sales are short sales?
18        MR. OXFORD: Object to the form.
19   A    I couldn't possibly give an opinion
20   on all cum ex sales that have ever been done,
21   but my point earlier is that, in my
22   experience, it would be somewhat unusual to
23   do a cum ex sale, because the only situation
24   which, in all my market experience I've ever
25   seen a cum ex sale being done, is in order to

Page 163

1    give rise to a tax reclaim on a contract,
2    which is the contract for delivery of
3    ex-dividend shares.
4         And if someone were long
5    immediately before doing a cum ex, so they
6    were doing a cum ex out of a long position,
7    that is not an impossible thing to happen,
8    but it would be a quite unusual thing to be
9    done.
10   Q    And what's the basis for that
11   testimony?
12   A    The basis for that testimony is
13   being responsible and working in the
14   structured finance industry for many years.
15   Q    Have you ever executed cum ex
16   transactions yourself?
17   A    No.
18   Q    Have you, as far as you're aware,
19   worked for an institution that ever entered
20   into cum ex transactions?
21        MR. OXFORD: Object to form.
22   A    I believe it's a matter of public
23   record that Barclays has executed cum ex
24   transactions, but limited to -- as I say in
25   my report, the nature of cum ex transactions

Page 164

1    changed significantly, so not in 2012.
2         In my experience, prior to my
3    involvement in this case, it was only ever my
4    understanding that cum ex transactions were
5    executed in Germany and prior to the various
6    legislative changes that were made in
7    Germany.
8    Q    Okay. So you, prior to this case,
9    had no understanding of cum ex transactions
10   being executed in any context other than in
11   the German market prior to 2012.
12        Is that right?
13        MR. OXFORD: Object to the form,
14   misstates his testimony.
15   A    Yeah. My answer was, I think, that
16   Barclays, to my knowledge, only undertook
17   cum ex transactions prior to the legislative
18   changes in Germany and only ever undertook
19   them in respect of German shares, the reason
20   for that being that based on my market
21   experience and extensive understanding of the
22   European securities, no market participant or
23   advisor who I ever dealt with ever considered
24   the outside of those parameters, that a
25   cum ex transaction was effective.

Page 165

1         So maybe they executed them
2    in -- nobody at Barclays would have executed
3    them. Let's put it that way.
4    Q    Okay. And so is your familiarity
5    with cum ex transactions limited to the
6    manner in which Barclays has executed them?
7         MR. OXFORD: Object to the form.
8    A    No. I -- over the course of my
9    time at Barclays, you are not just aware of
10   transactions that Barclays is executing. You
11   are aware of a wide range of practice going
12   on in the market.
13   Q    Okay. Well, what other executions
14   of cum ex transactions are you aware of in
15   the market?
16        MR. OXFORD: Object to form.
17   A    I think my -- my point is that up
18   until no later than the beginning of 2012,
19   there were a wide range of
20   counterparties -- I think this is a matter of
21   public record -- who were undertaking cum ex
22   transactions in Germany based on their
23   understanding of a very specific procedural
24   rule, but that outside of Germany and outside
25   of that very specific procedural rule, there

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 166

1   was no basis for thinking that a cum ex
2   transaction in any other jurisdiction would
3   be effective.
4        Q    Okay.  I asked you whether you're
5   aware of any other cum ex transactions in the
6   market other than the transactions you've
7   just described.
8        MR. OXFORD:  If that's the
9        question, I'm going to object to the
10       form of it.  It seems like a statement.
11       Are you asking the question again?
12       MR. PRUDEN:  Yeah, I'll ask it as a
13       question.
14       Q    Are you aware of any other cum ex
15   transactions in the market other than what
16   you've just described?
17       MR. OXFORD:  Objection to the form.
18       A    As I think I've explained, and as I
19   refer to, it's referred to in the ESMA report
20   that I cite in my report.
21       I think any market participant
22   prior to 2012 who was significantly involved
23   in the equity finance market was aware that
24   there were a large number of financial
25   institutions who were involved in cum ex

Page 167

1   transactions in respect of Germany, but
2   Germany only.
3        Q    Okay.  Can you tell me anything
4   about cum ex transactions that is not
5   otherwise a matter of public record?
6        MR. OXFORD:  Object to form.
7        A    I don't really understand the
8   question you're -- you're asking.
9        Q    Okay.  Can you tell me anything
10  about how cum ex transactions were executed
11  in the market that is not contained in a
12  public record?
13       MR. OXFORD:  Object to the form.
14       A    I genuinely don't know what
15  your -- what you're expecting me to say to
16  that.  I'm saying it's a matter of public
17  record.  I was not personally involved, but
18  it's a matter of public record that Barclays
19  executed certain cum ex transactions.
20       As I'm sure you're aware, there are
21  a number of ongoing investigations and
22  litigations into -- in respect of all those
23  transactions by a wide range of market
24  participants.  What I'm telling you is that,
25  at the time, there were a number of large

Page 168

1   financial institutions, hedge funds, and
2   other counterparties who were executing
3   cum ex transactions.
4        But it is my -- based on my market
5   practice and understanding and my personal
6   knowledge, I was not aware of anyone who
7   either -- prior to my involvement in this
8   case, I was not aware of anyone who,
9   post-2012 outside Germany, thought that a
10  cum ex transaction was effective.
11       That's the substance of my
12  testimony on that point.
13       Q    Okay.  And in all your experience,
14  at any point, was there any aspect of your
15  job in which you were involved in either
16  executing, overseeing, or approving cum ex
17  transactions?
18       MR. OXFORD:  Objection to form.
19       A    To the best of my knowledge, no.
20       Q    Okay.
21       MR. PRUDEN:  Why don't we take that
22       lunch break now and then we can come
23       back in a half-hour or so.
24       MR. OXFORD:  Okay.  Say in half an
25       hour.  Thanks, Greg.

Page 169

1        MR. PRUDEN:  Thanks, guys.
2        THE VIDEOGRAPHER:  Stand by.  The
3   time is 11:04 a.m. New York time and
4   we're going off the record.
5        (Lunch recess taken.)
6        THE VIDEOGRAPHER:  Stand by.  The
7   time is 11:55 a.m. New York time and
8   we're back on record.
9        Q    Okay.  Mr. Wade, I want to start by
10  going over a series of assumptions with you.
11  And then, based on those assumptions, I'd
12  like you to answer a question.
13       Is that clear?
14       MR. OXFORD:  Objection to form.
15       A    That's -- yeah, I'll do my best.
16       Q    Okay.  So I want to start by
17  analyzing this hypothetical through the lens
18  of the non-annex E cum ex transactions.
19       Does that make sense?
20       A    Okay.  So we're talking about
21  non-annex E trades.
22       Q    Correct.  Okay.
23       I want you to assume for those
24  trades that the shares that were delivered to
25  ED&F were never recycled.

Page 170

1        Okay?
2        MR. OXFORD:  Object to the form.
3    A    Okay.  That's counterfactual, but
4 go on.
5    Q    Okay.  And I want you to assume
6 that the seller of those shares had a long
7 position in the securities that they sold on
8 the trade date, which is the day before the
9 ex date.
10        Is that clear?
11        MR. OXFORD:  Objection to form.
12    A    That's clear.
13    Q    Okay.  And then the transaction has
14 an intended settlement date and an actual
15 settlement date of the day after the record
16 date.
17        Okay?
18    A    Understood.
19    Q    Okay.  Assuming those facts, would
20 that change your opinion on whether the buyer
21 of the shares would be entitled to a
22 dividend?
23        MR. OXFORD:  Object to the form.
24    A    So the only -- so the change versus
25 the facts as I understand them is that the

Page 171

1 cum ex seller was long at the time where it
2 entered into the cum ex sale.
3        Is that -- my understanding of your
4 assumption correct?
5    Q    Well, I'm not going to agree that
6 that's different from the facts, but that's
7 the assumption I'm asking you to assume.
8    A    Okay.  Understood.
9        That would not change my ultimate
10 opinion conclusion that the information on
11 the tax vouchers was incorrect.
12    Q    Okay.  And what information on the
13 tax vouchers would have been incorrect in
14 that circumstance?
15        MR. OXFORD:  Object to form.
16    A    All -- all three.  All three of the
17 key items on the tax voucher would still be
18 incorrect.
19        Because the cum ex purchaser did
20 not own the shares on the record date, it did
21 not receive the dividend, and it did not
22 suffer the tax.
23    Q    Okay.  What is the basis for your
24 assertion that in any circumstance, a
25 purchaser must own the shares on the record

Page 172

1 date in order to be entitled to the dividend?
2        MR. OXFORD:  Object to the form.
3    A    The -- there are a range of reasons
4 why I would reach that conclusion, that
5 amongst those is the fact that based on, you
6 know, my extensive market practice of
7 situations like this, what the -- in the
8 assumed facts that you've given, it's still
9 the case that what the cum ex purchaser has
10 been given is a dividend compensation
11 payment.
12        And based on my experience, what
13 would have -- what could have been
14 appropriate is if the cum ex -- a purchaser
15 had been given a voucher which said, "You
16 received a dividend compensation payment."
17        That -- that -- but that's not what
18 the tax vouchers state that they are.
19    Q    And what in your extensive market
20 practice experience leads you to believe that
21 the payment that's made by a seller to a
22 buyer in the hypothetical I just described
23 would not be considered a dividend?
24        MR. OXFORD:  Objection to form.
25    A    Well, because it is definitionally

Page 173

1 a manufactured payment.  And you know,
2 amongst other things, I cited to the HMRC
3 rules on manufactured dividends.
4        And as I've said in my report, that
5 distinction was well understood by market
6 participants and it made an important
7 difference in a number of different
8 situations, not least obligations on filing
9 manufactured overseas dividends returns,
10 which, in the relevant period, I assume that
11 ED&F Man must have had to do because it was
12 subject to those rules.
13    Q    Okay.  And so it's your testimony
14 you know -- withdrawn.
15        On my hypothetical, do you have an
16 opinion on whether the pension plans would
17 have had an entitlement to a tax reclaim?
18        MR. OXFORD:  Object to the form.
19    A    And I assume you mean a tax reclaim
20 in Denmark?
21    Q    Yes, a tax reclaim in Denmark.
22        MR. OXFORD:  Same objection.
23    A    On -- on the facts that you've
24 asked me to assume, it's my opinion that what
25 the pension plan received was a dividend

CONFIDENTIAL
Graham Wade – March 16, 2022

Page 174

1  compensation payment.
2          If -- and I express no opinion on
3  this because I'm not expressing opinions on
4  Danish tax -- if the pension plan were able
5  to take a receipt for a dividend compensation
6  payment to the Danish tax authorities and
7  make a reclaim, if you -- you know, if that's
8  something that were possible, it would be
9  highly surprising to me, based on market
10  practice and, you know, my involvement in the
11  European securities market, including
12  understanding, you know, quite a lot about
13  different tax regimes in that market, it
14  would be very surprising.
15          But if it was the case that a
16  receipt for a dividend compensation payment
17  entitled you to a tax reclaim in Denmark,
18  that's not something I've offered an opinion
19  on.
20      Q    Okay.  But you would agree that
21  whether or not what you described as a
22  "dividend compensation payment" would entitle
23  you to a tax reclaim in Denmark is a matter
24  of Danish law.
25          Right?

Page 175

1          MR. OXFORD:  Object to the form.
2      A    My opinion is that the contractual
3  payment received in the facts that you asked
4  me to assume would be a dividend compensation
5  payment, and I expressed no opinion as to if,
6  in those assumed facts, I had a voucher
7  saying I received a dividend compensation
8  payment.
9          I express no opinion as to what
10  that would entitle me to do vis-a-vis the
11  Danish tax authorities.
12      Q    Okay.  And so, your report, if I'm
13  understanding correctly, expresses no opinion
14  on whether or not the facts described in my
15  hypothetical would lead to a valid tax
16  reclaim application to Denmark.
17          Is that right?
18          MR. OXFORD:  Object to the form.
19      A    No, I don't think that's right.  I
20  mean, firstly, I don't think anything
21  connected with your assumed facts is actually
22  covered in my opinions or reports, so I think
23  it's a gating issue.
24          I've expressed no opinion on your
25  assumed facts in my report.

Page 176

1      Q    So your report expresses no opinion
2  on that topic.
3          Right?
4          MR. OXFORD:  Object to form.
5      A    No.  What I just said is that I
6  expressed no opinions in my report on your
7  assumed hypothetical because my report is on
8  the actual transactions which I reviewed.
9      Q    And are you otherwise able to offer
10  an opinion based on my hypothetical,
11  other -- even if you didn't do so in your
12  report?
13          MR. OXFORD:  Object to the form.
14      A    An opinion as to what?
15      Q    Are you otherwise able to offer an
16  opinion about whether the facts of my
17  hypothetical would lead to a valid reclaim
18  for a pension plan even if you did not do so
19  in your expert report?
20          MR. OXFORD:  Object to the form.
21      A    At the risk of restating my answer,
22  I think I -- it is my opinion that on your
23  assumed facts, what the pension plan would
24  have received would have been a dividend
25  compensation payment, and that if, having

Page 177

1  received a voucher which made it clear that
2  that was a dividend compensation payment and
3  not a real dividend, the pension plan was
4  able to take that voucher to the Danish tax
5  authorities and make a Danish tax reclaim,
6  that would be a highly surprising outcome to
7  me based on my market practice and
8  experience.
9          But I am not expressing -- I'm not
10  here to express an opinion on the Danish tax
11  reclaim process.
12      Q    Have you ever prepared tax
13  vouchers?
14          MR. OXFORD:  Object to the form.
15      A    Yes.
16      Q    In what context?
17      A    I started my career at Deloitte.
18  I've worked in financial services tax
19  department.  Tax vouchers were fairly common
20  there.
21          At Barclays, at various points in
22  my career, I was responsible for -- from a
23  front office perspective, of working group
24  tax and ensuring that the manufactured
25  overseas dividends returns that we made were

CONFIDENTIAL
Graham Wade - March 16, 2022

47 (Pages 182 to 185)

Page 182

1  not sure I fully understand the full terms of
2  the transaction, but -- and it doesn't sound
3  like something that would be very normal.
4        But ultimately, my opinion is that
5  you have to understand the terms of the
6  transaction that was done between the
7  counterparties, taking into account all the
8  full facts of the transaction, and then make
9  a determination as to who owns what at what
10  point in time.
11        So if you're effectively saying to
12  me, "Please assume that the terms of the
13  contract are that the dividend has been sold
14  to the buyer, do you agree that the dividend
15  has been sold to the buyer," then yes, I
16  would agree, based on that assumption, that
17  the dividend is owned by the buyer.
18     Q    And I'm asking you if the parties
19  to a transaction agree the day before the
20  ex date to sell and buy shares at a cum
21  dividend price, and agree to settle the day
22  after the record date, and the seller at that
23  time has a long position in the security that
24  is being sold, is a payment equal to the
25  dividend amount that the seller receives from

Page 183

1  the issuer made to the buyer a dividend
2  compensation payment or a dividend?
3        MR. OXFORD:  Object to the form.
4  Asked and answered.
5     A    Sorry.  Can I just go through this
6  slowly, step by step?
7        So the buyer agrees to buy -- the
8  contract, whatever the terms of this contract
9  are, are agreed the day before the
10  ex-dividend date.
11        Is that correct?  I just want to be
12  clear that I know exact facts on being asked
13  about this.
14     Q    Yeah.  The trade date is the day
15  before the record -- sorry.  The trade date
16  is the date before the ex date.
17     A    Okay.  And then the settlement date
18  is what date?
19     Q    And the settlement date is the day
20  after the record date.
21     A    Okay.  So the trade date is record
22  date minus one, and the settlement date is
23  record date plus one.
24        Is that correct?
25     Q    No.  Trade date is ex date minus

Page 184

1  one.
2     A    Okay.  Sorry.
3     Q    Settlement date is record date plus
4  one.
5     A    Yeah.  Okay.  And what was the
6  other --
7     Q    The seller is long, has a long
8  position in the share as of the day before
9  the ex date, the trade date.
10     A    Yeah.
11     Q    Clear?  And the price of the
12  transaction is sold at a cum dividend price.
13        Clear?
14     A    Okay.
15     Q    The seller makes a payment to the
16  buyer equal to the amount that the seller
17  received from the issuer as a dividend.
18        Is that clear?
19        MR. OXFORD:  Object to the form.
20     A    Well, I think you've -- you said
21  the seller makes a payment as a dividend.  I
22  think the only entity that can make a payment
23  as a dividend is the issuer.
24        So are you saying that the
25  seller -- are you saying that the seller has

Page 185

1  agreed, as some kind of trustee relationship,
2  to pass on the dividend?
3        I don't understand what that final
4  piece is.
5     Q    No.  Okay.  Let's take it in two
6  steps.
7        The seller first receives a
8  dividend from the issuer.
9        Okay?
10     A    Yeah.
11        MR. OXFORD:  Objection.
12     Q    Okay.  And then the seller makes a
13  payment to the buyer equal to the amount of
14  the dividend that they received.
15        Clear?
16        MR. OXFORD:  Objection to the form.
17     A    I think I'm clear on the payments
18  that are made, yeah.
19     Q    Okay.  In those circumstances, is
20  the payment that the seller made to the buyer
21  a dividend or a dividend compensation
22  payment?
23        MR. OXFORD:  Object to form.  Asked
24  and answered.
25     A    Well, I think you've, you

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 190

1      Q      Okay.  And is a "market claim" a
2  dividend compensation payment or a dividend?
3          MR. OXFORD:  Object to the form.
4      A      It does depend on the specific
5  facts and circumstances of the position.  But
6  in general, the more common uses of "market
7  claim" is when a transaction has failed, and
8  so the person who thought they were buying a
9  dividend does not get that dividend as a
10  result of a fail, and then a payment is
11  passed along to them.
12          That's -- that's my understanding,
13  and I think it's the market definition of a
14  market claim.  But ultimately, market claim
15  says it's to the person who's contractually
16  entitled.
17          So you have to understand the
18  nature of the securities transaction to work
19  out whether there should be a market claim,
20  and if so, what the nature of that market
21  claim is.
22      Q      Okay.  And you mentioned T2S.
23          As far as T2S is concerned, are you
24  aware of whether there's a general consensus
25  in T2S about what happens when the trade date

Page 191

1  is prior to the ex date, the intended
2  settlement date is after the record date, and
3  the settlement instruction is also matched
4  after the record date and the payment date
5  for the security?
6          Is a market claim
7  considered -- going back, does that
8  circumstance give rise to a market claim?
9          MR. OXFORD:  Object to the form.
10      A      So we have a cum ex sale -- we have
11  a cum ex sale or a regular way sale?
12      Q      We have a situation where the trade
13  date is prior to the record date and the
14  intended settlement date is after -- sorry.
15  Withdrawn.
16          We have a situation where the trade
17  date is prior to the ex date and intended
18  settlement date is after the record date.
19      A      Okay.  I think, as I've explained
20  in my report, that -- and it settles as
21  expected -- am I allowed to assume that?
22      Q      Yes, you can.  Yes.
23      A      Okay.  In that case, no, I don't
24  think that would meet the definition of a
25  market claim.

Page 192

1      Q      Okay.  And that's based on your
2  overall understanding in the market of how
3  that's treated?
4          MR. OXFORD:  Object to the form.
5      A      That's a significant component.
6  There are other -- I mean, in my -- in my
7  reply report, I think it's my reply report, I
8  go through, you know, various, you know,
9  aspects that lead me to -- lead me to that
10  conclusion.
11      Q      Okay.  You're aware that Denmark
12  withholds 27 percent of gross dividend
13  amounts paid at the source as tax.
14          Right?
15          MR. OXFORD:  Object to the form.
16      A      That's my understanding at the
17  relevant time, yeah.
18      Q      Okay.  And you're -- you also
19  understand that unless you're entitled to
20  some kind of special tax status, you are
21  liable for that full 27 percent of the gross
22  dividend.
23          Right?
24          MR. OXFORD:  Object to the form.
25      A      I don't -- in terms of what

Page 193

1  "liable" means, who's -- who's the person
2  receiving the dividend, what -- what country
3  are they in, you know, are they a Danish tax
4  resident, are they a non-Danish tax resident.
5  There are a number of factors.
6          But if your question is if I -- if
7  I received directly a real dividend and
8  27 percent tax is withheld on it, is that tax
9  that I have suffered, yeah, my understanding
10  is that yes, I have suffered that tax.
11      Q      Okay.  And if you have special tax
12  status, you can reclaim that tax from the
13  Danish government.
14          Right?
15          MR. OXFORD:  Object to the form.
16      A      That all depends on the facts and
17  circumstances around the transaction.
18      Q      Okay.  Well, assuming that the
19  person who receives -- withdrawn.
20          Assuming that the person who
21  applies for the tax refund is the beneficial
22  owner of the dividend, they can receive a
23  reclaim from the Danish government if they
24  are entitled to some kind of special tax
25  status.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 194

1          Right?
2          MR. OXFORD:  Object to the form.
3      A    So, as I think we've discussed
4  earlier, it's -- it's not my place here and
5  today to express an opinion on the Danish tax
6  law and exactly what a given holder of
7  dividend is entitled to physically via the
8  Danish tax authorities.
9          So, in general terms, no other
10 arrangements or unusual circumstances, that
11 would be one of the starting point conditions
12 I understand are making a reclaim.  But I'm
13 not expressing a view on the exact
14 requirements of any Danish tax process.
15     Q    Okay.  And second, would you be
16 able to determine whether particular
17 individuals are subject to certain tax status
18 within Denmark?
19         MR. OXFORD:  Object to the form.
20     A    In my -- in my -- my reports have
21 been focused on the transactions and whether,
22 amongst other things, the tax vouchers
23 produced were accurate, what the consequence
24 is, and how those tax vouchers could be used,
25 and what rights of any given person may have

Page 195

1  or may not have vis-a-vis the Danish tax
2  authorities is not something I've given an
3  opinion.
4      Q    Because you're not an expert on
5  what tax status individuals have with respect
6  to tax reclaim applications to the Danish
7  government.
8          Right?
9          MR. OXFORD:  Object to the form.
10     A    I think that's a slightly different
11 formulation.  I'd say that based on my market
12 practice and experience, you know, I -- I
13 have some understanding of some of the basic
14 requirements for these kind of situations.
15         But on the specific point of, you
16 know, if you tell me that in a situation
17 where the person didn't receive -- didn't
18 actually have the shares, didn't receive a
19 dividend, didn't actually suffer tax, that
20 nevertheless it is possible under Danish tax
21 law to make a reclaim, I find that very
22 surprising.
23         But that is not an opinion on which
24 I've -- you know, I'm not expressing an
25 opinion on that final point.

Page 196

1      Q    What's your understanding of the
2  situations in which a foreign shareholder
3  would be subject to tax at 15 percent under a
4  double taxation treaty?
5          MR. OXFORD:  Object to form.
6      A    Sorry.  A Danish?
7          MR. OXFORD:  He said "foreign
8  shareholder."
9      A    Sorry.  Foreign shareholder.
10         MR. OXFORD:  Can you just read your
11 question back, Greg?  Sorry.
12         MR. PRUDEN:  Sure.
13     Q    What is your understanding of the
14 situations in which a foreign shareholder
15 would be subject to tax of 15 percent under a
16 double taxation treaty?
17         MR. OXFORD:  Object to the form.
18     A    Well, I think there's a number of
19 networks of tax treaties around Europe, and
20 many of them are mutual tax treaties.  And
21 there are -- there are wide range of
22 jurisdictions under which different countries
23 have agreed that the maximum withholding tax
24 that can be levied on a dividend is limited
25 to 15 percent.

Page 197

1          So a foreign shareholder that
2  complies with all the conditions of the
3  relevant tax authority, the relevant treaty,
4  and depending on the facts and circumstances,
5  would be entitled to either limit their
6  withholding to 15 percent in the first place
7  or make a recovery if they've been
8  over-withheld to get them back to 15 percent.
9      Q    What are the additions that you
10 understand of the Danish tax authority to
11 recover tax back to 15 percent of the overall
12 amount of the dividend?
13         MR. OXFORD:  Object to the form
14 when you say what are the circumstances
15 in which the Danish authority can
16 recover tax back to 15 percent of the
17 overall dividend amount?
18         Is that the question?
19         MR. PRUDEN:  I think there was some
20 issue with the way that the question is
21 down here.  So let me rephrase.
22         MR. OXFORD:  Okay.  Appreciate it.
23 Thanks.
24     Q    Okay.  What are the conditions that
25 you understand the Danish tax authority to

CONFIDENTIAL
Graham Wade - March 16, 2022

52 (Pages 202 to 205)

Page 202

1  general that there are some shareholders of
2  Danish shares who are entitled only to
3  73 percent of the gross dividend paid under
4  Danish law.
5          Correct?
6          MR. OXFORD:  Object to the form.
7      A    Generally in the whole world are
8  there any shareholders who, on receiving a
9  Danish dividend, suffer 27 percent
10  withholding and cannot recover it?  I would
11  agree that in general that -- yeah, I would
12  be very surprised if that wasn't the case.
13      Q    Okay.  In those circumstances, for
14  that party, it would be rational for that
15  party to sell its dividend right to a party
16  with entitlement to either the tax at the
17  zero percent or 15 percent tax rate as long
18  as they sold the dividend for greater than
19  73 percent of the gross dividend amount.
20          Right?
21          MR. OXFORD:  Object to form.
22      A    No.  Obviously, it depends on who
23  the shareholder is and what their
24  circumstances are.
25          But if they were a sophisticated

Page 203

1  financial institution who was active in the
2  equity finance markets, and the market level
3  for dividend compensation payments at that
4  particular point in time was 90 percent of
5  the gross dividend, it would be an irrational
6  transaction for them to sell at any number
7  above 73.  It would be irrational for them to
8  sell at any level below 90 if, on my
9  assumption, the prevailing market level is
10  90.
11      Q    And is your assertion that the
12  market level is 90 based on anything other
13  than the price that you observed for the
14  cum cum transactions?
15          MR. OXFORD:  Object to the form.
16      A    Yes.  It's, you know, the -- in the
17  course of my experience, particular markets
18  in Europe at particular points in time tend
19  to have a general level around which they
20  trade.
21          And based on my experience,
22  90 percent, give or take, tends to be the
23  ballpark for a number of -- a number of
24  markets.
25      Q    What markets in Europe form the

Page 204

1  basis for your experience?
2      A    Sorry?
3      Q    Which markets in Europe form the
4  basis for your experience?
5      A    Well, I can't remember the full
6  list of markets.  But, you know, in my time
7  at Barclays, Barclays traded positions across
8  nearly all the active main indices in Europe,
9  so that certainly includes Denmark.
10      Q    Are you relying on any other
11  experience beyond Barclays or any other
12  sources besides experience for that
13  90 percent figure you cite?
14          MR. OXFORD:  Objection to form.
15      A    The first thing that I just want to
16  be clear on is that the 90 percent is not a
17  hard and fast number.  And as I said, it can
18  vary across market and it can vary across a
19  particular dividend event, and I think I've
20  made that point clear in my report.
21          But at the relevant time, I was
22  working at Barclays and had responsibility
23  for Barclays' equity finance activity, or at
24  least a large portion of it.  And based on
25  that experience, it's my understanding that,

Page 205

1  at that time, the market level in Denmark was
2  somewhere around 90 percent.
3      Q    Are you aware of any other entities
4  besides pension plans who would have an
5  economically rational basis to acquire a
6  dividend at 90 percent of the gross dividend
7  rate in Denmark?
8          MR. OXFORD:  Object to the form.
9      A    Yes.
10      Q    Who else besides pension plans?
11      A    Well, any range of financial
12  institutions might want to acquire dividends
13  at that level.  Danske Bank, for example, was
14  active in the European equity finance market.
15          I don't know the exact position of
16  Danske Bank, but I would think that the
17  dividend would almost certainly worth at
18  least 90, if not a hundred to them.  Both
19  European and U.S. financial institutions
20  would almost certainly have been able to
21  obtain value for 85.
22          In many cases, they were -- they
23  also may well have been able to achieve a
24  hundred, not necessarily through a tax
25  reclaim, but through other mechanisms

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 206

1   involving foreign tax credit relief.
2           So I would think there would be a
3   wide -- the reason the market was around 90
4   is because there are some tax disadvantaged
5   people and some tax advantaged people, and
6   the tax disadvantaged people are going to
7   want to earn as much as they can for selling
8   their dividends, and the tax advantaged
9   people are going to want to pay as little as
10  they can to acquire dividends.
11          And the market is a reflection of
12  the aggregate supply and demand at any given
13  time.  And that's what sets the level.
14      Q   Okay.  And the level depends on the
15  number of people who are tax advantaged and
16  non-tax advantaged.
17          Right?
18      MR. OXFORD:  Object to the form.
19      A   In general terms, that's -- yeah,
20  that's one of the factors, yeah.
21      Q   Okay.  And can you explain to me
22  the process by which a non-pension plan could
23  recover a hundred percent by use of foreign
24  tax credit relief?
25      A   Well --

Page 207

1       MR. OXFORD:  Object to form.  You
2   can answer.
3       A   Okay.  So, in depending on the
4   particular rules and tax position of a
5   particular entity, it may well be that the
6   entity is happy to suffer a foreign tax like
7   Danish tax, because the way -- the way the
8   dividend gets included in its overall tax
9   position.
10          So let's take -- and this was
11  relatively common -- a U.S. financial
12  institution which operates its European
13  broker dealer through a separate subsidiary.
14  They would be taxed both in the U.K. and on a
15  local basis because it's a legal entity based
16  in the U.K., and they'd also be taxed on a
17  global basis, either currently or ultimately
18  on repatriation, and so they would need to
19  understand all those consequences.
20          And it's my understanding that a
21  number of U.S. financial institutions would
22  regularly be happy to acquire dividends and,
23  you know, be quite happy to suffer foreign
24  withholding tax.  Because the impact for them
25  was that it reduced their -- either their

Page 208

1   European tax liability or their U.S. tax
2   liability, and that therefore, the overall
3   after-tax affect of acquiring the dividend
4   would be to receive a hundred percent of the
5   dividend on an after-tax basis.
6       Q   All right.
7       MR. PRUDEN:  Why don't we take a
8   short break?  I'm conscious of the other
9   questioners who might want to ask.  I'll
10  probably have a little more when we come
11  back, but I just want to organize a
12  little bit first to streamline this a
13  bit.
14      MR. OXFORD:  Okay.  Let's take ten
15  minutes.
16      THE VIDEOGRAPHER:  Okay.  Stand by.
17  The time is 12:50 p.m. New York time and
18  we're going off the record.
19      (Brief recess taken.)
20      THE VIDEOGRAPHER:  Stand by.  The
21  time is 1:06 p.m. New York time and
22  we're back on record.
23      Q   I just have a few more minutes of
24  questions.
25          Are you familiar with a set of

Page 209

1   options at Barclays for Renaissance
2   Technologies known as "Cult"?
3       MR. OXFORD:  Object to the form.
4       A   Yes.
5       Q   And what do you understand Cult to
6   be?
7       A   Well, I have to be careful here
8   because, you know, I -- under my contractual
9   position with Barclays, I have to be careful
10  about talking about the specifics of a given
11  transaction.
12          And this was a transaction that
13  Barclays executed for one of its clients, so.
14      Q   Okay.  Let's do it this way.  I'll
15  ask you questions and you tell me if you
16  agree or not.
17          Were Cult options designed to be
18  written for a period of longer than 12 months
19  so that Renaissance could realize long-term
20  capital gains even on short-term trading that
21  they did within the options basket?
22      MR. OXFORD:  Object to the form.
23      A   The -- the transactions as I
24  understand them were originally designed by
25  Renaissance Technologies, so I am unable

CONFIDENTIAL
Graham Wade - March 16, 2022

69 (Pages 270 to 273)

Page 270

1    A    There's -- there's two separate
2  questions.  There's who does the ultimate tax
3  liability fall on, and who is responsible for
4  the withholding of tax.
5        My general understanding is that
6  the -- it's the issuer or its paying agent
7  who is responsible for the withholding of
8  tax.  The withholding in general is not
9  always a final tax.
10        So the taxation of the income on
11  which that withholding relates is a question
12  of who the recipient is and on all the facts
13  and circumstances around how they
14  receive -- in what basis they receive the
15  income to which it relates.
16    Q    So is the process different in the
17  United States than it is in Denmark?
18        MR. OXFORD:  Object to the form.
19    A    Almost certainly there will be a
20  number of differences in how that operates.
21    Q    But when you say "almost
22  certainly," does that mean you're almost
23  certain or what do you mean by that?
24    A    I mean that in my -- in my
25  experience of looking at a number of

Page 271

1  different tax jurisdictions, it is -- it
2  would be almost inconceivable to me that the
3  Danish payment and collection process is
4  exactly the same as the U.S. payment and
5  collection process.
6    Q    But you don't know?
7        MR. OXFORD:  Objection to form.
8    A    I -- no, I'm not giving an opinion
9  on the exact details of either the U.S. tax
10  administration system or the Danish tax
11  administration system.  Hopefully, I've been
12  clear that that's not something I'm here
13  giving an opinion on.
14        But I think you previously asked
15  me, in general terms, what is my
16  understanding of how these processes work,
17  which is what I was trying to answer.
18    Q    Okay.  So you're not giving a
19  specific opinion on the details of the
20  administration of the Danish tax system.
21        Are you giving a general opinion on
22  the administration of the Danish tax system,
23  sir?
24        MR. OXFORD:  Object to the form.
25    A    I am not giving any opinion as

Page 272

1  regards Danish tax law or the administration
2  of the Danish tax system.
3    Q    I'd ask you to turn if you could
4  to --
5        MR. OXFORD:  Oh, sorry, Mike.  The
6    witness is asking to take a break.
7    We've been going a little over an hour.
8    Can we take a five to ten-minute break?
9        MR. BONGIORNO:  Sure.
10        THE VIDEOGRAPHER:  Stand by.  The
11    time is 2:55 p.m. New York time and
12    we're going off the record.
13        (Brief recess taken.)
14        THE VIDEOGRAPHER:  Stand by.  The
15    time is 3:15 p.m. New York time and
16    we're back on record.
17        MR. BONGIORNO:  So just to clarify
18    on the record, we have marked as
19    Exhibit 5100, the opening Carr report;
20    5101, the Carr rebuttal report; and
21    5102, the Carr reply report.
22        (Whereupon the above mentioned was
23    marked for Identification.)
24    Q    Mr. Wade, I would like you to go to
25  your reply report, which I think is

Page 273

1  Exhibit 5003.  You probably have that
2  somewhere nearby.
3    A    Yeah, got it.
4    Q    For some reason I'm not seeing you
5  on the screen, so hopefully -- well, I don't
6  know, hopefully or not, but perhaps you're
7  seeing me, but I'm not seeing you.
8        I don't know what we can do about
9  that.
10    A    I'm seeing you okay.
11    Q    Oh, there we go, there we go.
12  You're back.  Thank you.
13        So you have your reply report in
14  front of you, sir?
15    A    I do.
16    Q    Okay.  Could you go to
17  Paragraph 240, parenthesis "2?"
18        Sorry.  It's not a parentheses.
19  It's just a number "2."  It's on Page 114.
20        MR. OXFORD:  Yeah, I've got that.
21    Q    Do you have that in front of you?
22    A    I do.
23    Q    Okay.  I'd like you to read that
24  paragraph to yourself, and I want to -- and
25  then I'm going to focus you on the last

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 274

1  sentence.
2        Let me know when you've completed
3  reading the paragraph to yourself.
4    A    (Witness reviewing.)
5        I've read it, yeah.
6    Q    I'm going to direct your attention
7  to the last sentence of that paragraph.  I'll
8  read it out loud.  Then I will have a
9  question for you.
10        "In particular, there's no basis to
11  claim receipt of a dividend (or any test
12  reclaim rights which derive from such
13  dividend) on what is, in effect, a derivative
14  position."
15        Do you see that?
16    A    I do see that.
17    Q    Okay.  Did I read that correctly?
18    A    I believe so, yeah.
19    Q    Okay.  What do you mean by "a
20  derivative position?"
21        What does that mean?
22    A    Well.  In the situation that this
23  relates to, based on the facts as I've
24  referenced in my report, if there are in fact
25  no shares, then irrespective of what

Page 275

1  the -- you know, the pension plan statement
2  may show, all they can possibly have is a
3  contractual claim against its prime broker,
4  which, when I use the word "derivative," I'm
5  using that in the market sense to mean if I
6  have a derivative in respect of the share,
7  that means a -- an asset which derives its
8  value from the price of a share, but it is
9  not, itself, the share.
10        That's all I mean by that.
11    Q    So by "derivative" you mean
12  a -- like a contract with -- a contract where
13  there aren't any shares.
14    A    Yeah.  I'm saying that if a -- if a
15  prime broker is somehow -- and this would not
16  be, in my experience, normal practice -- but
17  if somehow a prime broker is representing to
18  its client that he's created a position, but
19  in fact it never settled that position, then
20  if there is any position as between the
21  pension plan and its prime broker, it must be
22  some kind of contractual derivative, being a
23  contract which derives its price from the
24  value of a share.
25    Q    Okay.  I want to direct your

Page 276

1  attention to a different document now.
2        If you could go to that Wilmer Hale
3  notebook that I think you still have
4  somewhere nearby?
5        And if you'd go to the Tab 5105.2?
6        MR. BONGIORNO:  This will be
7  Exhibit Number 5105.
8        (Whereupon the above mentioned was
9  marked for Identification.)
10    A    So I've got 5105.  That's the tab.
11    Q    Is -- do you have something that
12  says 5105.2?
13    A    I don't believe so, no.  It goes
14  from 5105 to 5106.
15    Q    Okay.  So is there a blue sheet in
16  that 5105 in between the pages?
17    A    There is.
18    Q    Okay.  I'd like you to go to the
19  document that's behind the blue sheet.
20        Okay?  Is that a two-sided
21  document?
22    A    It is.
23    Q    Okay.  And does the back side of
24  that document have a Bates number that ends
25  in 5320?

Page 277

1    A    It does.
2    Q    Okay.  So I'd like to mark that
3  document as Exhibit 5105.
4        Okay?
5        (Whereupon a discussion was held
6  off the record.)
7    Q    So you have in front of you the
8  document that ends in Bates number 5320?
9    A    The one that says "Cash Equity
10  Confirmation."
11    Q    Exactly.  And that is Exhibit 5105.
12  So you have that in front of you.
13        Do you know whether or not this is
14  a document that you looked at in connection
15  with the preparation of your reports?
16    A    I don't specifically know whether
17  this is one that I looked at.
18    Q    Okay.  And you can see that this is
19  an e-mail from Execution@FGC Securities to
20  Adam@Delvian Group.
21        Right?
22        MR. OXFORD:  Object to the form.
23    Q    Sorry.  That's not the case, that's
24  the cover e-mail.  Okay.  I'm sorry.
25        The binders have gotten the best of