```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                  CASE NO.  18-MD-2865 (LAK)

 3       _____
                                                 )
 4       IN RE:                                  )
                                                 )
 5       CUSTOMS AND TAX ADMINISTRATION OF       )
         THE KINGDOM OF DENMARK                  )
 6       (SKATTEFORVALTNINGEN) TAX REFUND        )
         SCHEME LITIGATION                       )
 7                                               )
         This document relates to case nos.      )
 8       19-cv-01783; 19-cv-01788; 19-cv-01794; )
         19-cv-01798; 19-cv-01918                )
 9       _____)

10

11

12                  C O N F I D E N T I A L

13            SUBJECT TO THE PROTECTIVE ORDER

14

15

16       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                     EXAMINATION OF

18                   RICHARD MARKOWITZ

19                 DATE: April 8, 2021

20

21

22

23

24

25           REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential – Subject to The Protective Order
Richard Markowitz – April 8, 2021

Page 13

```
1      R I C H A R D   M A R K O W I T Z,

2              called as a witness, having been first

3      duly sworn according to law, testifies as follows:

4

5

6

7      EXAMINATION BY MR. WEINSTEIN:

8          Q    Good morning, Mr. Markowitz.

25         Q    Mr. Markowitz, my name is Marc
```

1     advisor.

2          Q    Was he based in Europe or the

3     United States?

4               MR. BONGIORNO:  Object to the form.

5          Q    Where was he based?

6          A    He lived in and worked from Canada.

7          Q    Who were the principals of Argre

8     Management?

9          A    Myself, Matthew Stein, Jerome

10    Lhote, and John Van Merkensteijn.

11         Q    Did the four of you have equal

12    interests in the company?

13         A    Can you clarify that as to time

14    frame?

15         Q    When Argre was founded, were each

16    of you principals in the company?

17         A    I'm sorry, did you say, were each

18    of us principals in the company at the time

19    of its founding?

20         Q    Yes.

21         A    Yes, we were.

22         Q    And did you each have a 25 percent

23    interest?

24         A    Not at its founding.

25         Q    What was the split at its founding?

1          And ultimately they didn't find you

2    another leverage provider?

3          MR. BONGIORNO:  Objection.

4      A    I disagree with the premise of your

5    question.

6      Q    Okay.  Ultimately, were they able

7    to provide -- to find another leverage

8    provider?

9      A    No.

10     Q    Can you turn, please, to

11   Exhibit 2116?

12         MR. WEINSTEIN:  Mark this as 2116.

13         (Whereupon the above mentioned was

14     marked for Identification.)

15         MR. BONGIORNO:  Marc, maybe after

16     you finish with this one, we can take

17     our next break?

18         MR. WEINSTEIN:  Yeah.

19     Q    So Mr. Shah sends you an e-mail in

20   April of 2012 asking if you have a pension

21   fund in the U.S. that can be used for trading

22   equities and derivatives.

23         Do you recall receiving that from

24   him?

25     A    Yes.

```
 1          Q     At the time that you got it, did
 2    you have a pension fund in the U.S. that
 3    could be used for trading equities and
 4    derivatives?
 5          A     I don't recall.
 6          Q     Okay.  Did you understand that this
 7    question was in the context of dividend —
 8    the dividend arbitrage strategy?
 9          A     Yes.
10          Q     Do you recall what your response
11    was to Mr. Shah?
12          A     No.
13          Q     Did you end up setting up a pension
14    fund in the U.S. to be used for trading
15    equities or derivatives as part of a dividend
16    arbitrage strategy?
17          A     Yes.
18          Q     Okay.  And what pension plans did
19    you set up to be used for that purpose?
20          A     RJM Capital Pension Plan, among
21    others.
22          Q     When was RJM Capital Pension Plan
23    established?
24          A     Sometime in 2013.
25          Q     Okay.  Did — along with your
```

Page 139

```
 1    fellow principals at Argre, did you establish

 2    a pension plan in response to Mr. Shah's

 3    question of whether you had one to trade

 4    equities and derivatives?

 5                MR. BONGIORNO:  Objection.

 6        A    Yes.

 7        Q    Was that the Michelle Pension Plan?

 8        A    Yes.

 9        Q    Do you recall when that was

10    established?

11        A    Sometime in 2012.

12        Q    Okay.  It's shortly after -- well,

13    withdrawn.

14                Did you and the Argre principals

15    establish any other pension plans in 2012 for

16    the same purpose?

17        A    Yes.

18        Q    Which pension plans did you

19    establish?

20        A    Xiphias Pension Plan.

21        Q    Any others?

22        A    Remece Pension Plan or Remece

23    Investments Pension Plan.

24        Q    Any others?

25        A    Could you clarify what time frame
```

```
 1          A    Back in April of 2012, following

 2    the e-mail you mentioned, we had a call with

 3    Solo in which we learned that they were

 4    becoming a custodian, and terms of trades and

 5    liquidity in the market and pricing in the

 6    market was explained to us at that time.

 7               And that included a share between

 8    the seller and the buyer.

 9          Q    Okay.  Were you part of that

10    discussion that you just described happened

11    with Mr. Shah?

12          A    Yes.

13          Q    Where did that take place?

14          A    A telephone discussion.

15          Q    Okay.  Who was a participant?

16          A    I was on the call, one or more of

17    my partners may have been on the call, and

18    representatives of Solo Capital were on the

19    call.

20          Q    Okay.  And during that call, the

21    Solo people said that they were becoming a

22    custodian?

23          A    That they had become a custodian.

24          Q    Okay.  And so we saw a bunch of

25    e-mails earlier where they were trying to get
```

```
 1    other financial institutions to serve as
 2    custodian.
 3              Did they not get any that would
 4    serve in that role?
 5        A    I don't know.
 6        Q    Okay.  But it turned out that when
 7    the dividend arbitrage trading began with
 8    Denmark, it was going to be Solo Capital who
 9    was the custodian for the trading?
10        A    The discussions we had with Solo
11    initially were that the trading would be in
12    Belgium and those were the trades we did
13    initially.
14        Q    Okay.  And for the Belgian trades
15    initially, Solo Capital was going to be the
16    custodian?
17        A    Yes.
18        Q    And then, as we see in August of
19    2012, this plan started trading in Denmark.
20              Was Solo Capital --
21        A    Yes.
22        Q    Was Solo Capital the custodian as
23    well?
24        A    Yes.
25        Q    Okay.  So tell me,
```

```
 1    what -- withdrawn.
 2              What did the Solo folks tell you on
 3    that phone call about how the trading would
 4    work and the counterparties?
 5         A    They said that Solo had worked to
 6    get approvals from the British regulators to
 7    become a custodian, that they had hired legal
 8    and compliance staff, securities finance
 9    people, and that with customers who became
10    clients of Solo as a custodian, they would be
11    able to purchase shares from -- through
12    brokers, from the market, for other sellers
13    of the shares, and hedge those transactions
14    through their accounts at Solo for futures
15    contracts and, if needed, lend shares to a
16    borrower who would post collateral pursuant
17    to a standard stock lending agreement.
18         Q    Okay.  You mentioned earlier
19    that -- something about that there would be
20    negotiations with the sellers of the shares
21    about terms such as price and settlement
22    date.
23              What did they tell you on that
24    phone call about that?
25         A    That the pricing -- market pricing
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 173

```
 1    brokers were going to go find the liquidity

 2    for these trades in the marketplace?

 3         A    From sellers of shares.

 4         Q    Okay.  Where did you expect they

 5    were going to find these sellers?

 6         A    In all the dividend arbitrage

 7    strategies we had looked at and participated

 8    in, that was up to the brokers to find that

 9    liquidity, given the economics of the trade

10    and the advantage of dividend arbitrage.

11              As I said, profitability could be

12    shared.  The sellers could have been other

13    investors who were not entitled to the tax

14    benefits.  They could have been short

15    sellers, long sellers.

16              So the source of the stock was up

17    to the brokers and the sellers to obtain

18    based on market liquidity.

19         Q    Okay.  And was it your

20    understanding that the sellers in each case

21    would be executing on the Solo platform?

22         A    We were informed by Solo that other

23    counterparty to the trade would likely be

24    customers of Solo as well.

25         Q    Okay.  And is that -- that's true
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

1      for the sellers of the shares?

2           A    Yes.

3           Q    Okay.  And so was it your

4      understanding that the sellers of the shares

5      were going to be customers of Solo?

6           A    Yes.

7           Q    Was that also true for the forward

8      or future counterparties?

9           A    Yes and no.

10          Q    Yeah, let me withdraw that.

11               Was that going to be true with

12     respect to the forward counterparties?

13          A    Yes.

14          Q    Okay.  Was that also going to be

15     true with respect to the stock lending

16     counterparties?

17          A    Yes.

18          Q    Okay.  And so, when you say the

19     brokers were going to go out into the market,

20     the market that they were going to go into

21     was the Solo customer list.

22               Correct?

23          A    Again, they could have gone to the

24     Solo customers or other customers if they

25     wanted to.  There was no limit placed.

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 189

```
 1            MR. BONGIORNO:  Thank you.

 2      Q    Who brought Aquila (Cayman) to the

 3  table here?

 4      A    Solo Capital.

 5      Q    And do you have any idea how

 6  Aquila (Cayman) came up with 333 million

 7  kroner to give to the fund in exchange for

 8  borrowing the shares?

 9      A    I don't know how they funded their

10  business one way or the other.

11      Q    Any idea what their capital was at

12  Aquila (Cayman)?

13      A    No.

14            MR. WEINSTEIN:  All right.  Why

15       don't we take the break?

16            THE VIDEOGRAPHER:  Stand by.  The

17       time is 3:13 p.m. and we're going off

18       the record.

19            (Brief recess taken.)

20            THE VIDEOGRAPHER:  Stand by.  The

21       time is 3:22 p.m. and we're back on

22       record.

23      Q    Mr. Markowitz, with respect to the

24  Danish trading and the filing of reclaims

25  with Denmark, did you participate in the
```

1    plan get the seller his or her 50 percent

2    profit on the deal?

3         A    Again, the plan didn't pay the

4    money to the seller.  The plan paid the money

5    or a fee, as was previously negotiated, to a

6    company called Ganymede Investments, I

7    believe, and would have received an invoice

8    for that.

9              And it was up to Ganymede to

10   distribute those funds, if needed, to other

11   counterparties.

12        Q    What was Ganymede?

13        A    A company.

14        Q    Okay.  Was it a company that you

15   had ever heard of prior to starting this

16   dividend arbitrage trading strategy with Solo

17   Capital?

18        A    No.

19        Q    Okay.  Did you do any due diligence

20   on Ganymede prior to doing any transactions

21   with it?

22        A    Patriot Act, AML, and basic

23   information on the owners of the company.

24        Q    Okay.  What information did you

25   obtain on the owners of the company,

```
 1    Ganymede?

 2         A    I believe it was owned by Sanjay

 3    Shah.

 4         Q    Okay.  And so Mr. Shah told you

 5    that?

 6         A    We might have received corporate

 7    documents that -- from wherever the company

 8    was incorporated that showed that.

 9         Q    Okay.  Do you know if you actually

10    did that, or did you just hear from Mr. Shah

11    that he owned it?

12         A    I don't recall which one it was at

13    this point.

14         Q    Okay.  What -- did Ganymede provide

15    services to any of the pension plans that you

16    were affiliated with?

17         A    The services would have been

18    assistance in the overall transaction, I

19    think, from our perspective, as I explained,

20    the amount of sharing of profit from the

21    trades and fees to Solo, similar to the

22    Merrill Lynch trade.  Those would be paid to

23    an entity designated by Solo.

24              And they designated Ganymede, and

25    it was up to that entity and Solo to decide
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 202

```
 1    how those fees would be parceled out.  But it
 2    was part of the overall construction of the
 3    trade.
 4         Q    Okay.  Other than facilitating
 5    getting the money to the right places, did
 6    Ganymede, the entity, provide services to the
 7    pension plans?
 8         A    I viewed Ganymede and Solo and
 9    Sanjay Shah as one entity.  So yes, in my
10    belief, there were significant services
11    provided in developing and becoming a
12    custodian at Solo Capital, and hiring all the
13    staff necessary to allow the custodian to
14    function, and to allow our pension plans or
15    other pension plans to execute these trades.
16         Q    Okay.  So you viewed Solo Capital
17    and Ganymede as interchangeable?
18         A    Yes.
19         Q    Okay.  And do you -- did you have
20    an understanding as to why you got an
21    instruction from Mr. Shah to use the Ganymede
22    entity on certain occasions as opposed to the
23    Solo Capital entity?
24         A    No.
25         Q    Okay.  Solo Capital had operations
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 211

1     to this agreement, you were agreeing to pay

2     Ganymede 66.67 percent -- I'm not even sure I

3     said that right.

4            Pursuant to this agreement, you

5     were agreeing to pay Ganymede 66.67 percent

6     of that refund amount that's in the schedule,

7     but minus the Acupay fee.

8            Correct?

9        A    My understanding was that the

10    pension plan was entitled to 50 percent, the

11    other 50 to the seller, and we would pay to

12    Solo or its designee a 34 percent fee similar

13    to the arrangements we had at Broadgate.

14           The net result to the pension plan

15    is to retain approximately 34 percent of the

16    reclaim.  That's our understanding of any

17    fees that were paid.

18           It starts with a 50/50 split with

19    the seller.

20       Q    Okay.  I'm just asking what -- what

21    this agreement says.  And the agreement that

22    you signed with Ganymede was that the plan

23    would pay Ganymede 66.67 percent of that

24    refund amount in schedule -- in the schedule,

25    except that deducted from that refund amount

Page 268

```
 1        A    Yes.
 2        Q    Do you recall which brokers were
 3   used for Danish trading?
 4        A    One was the e-mail we were
 5   previously looking at, FGC Securities.
 6        Q    Okay.
 7        A    I recall another name, Novus
 8   Capital, and there were probably one, two, or
 9   three more that I don't recall their names at
10   this point.
11        Q    Okay.  Were you familiar with Novus
12   Capital prior to doing trading with Solo
13   Capital?
14        A    No.
15        Q    Who introduced Novus as a broker?
16        A    Solo.
17        Q    Did you perform any due diligence
18   on Novus other than to obtain DML or Patriot
19   Act certificates?
20        A    No.  It wouldn't have been our --
21   it wouldn't have been something we would have
22   done to deal with a broker that was
23   intermediating trades for us.
24        Q    Prior to using any brokers for the
25   purposes of this Danish trading, were you
```

1    familiar with any of them that acted in that

2    role?

3        A    Yes.

4        Q    Which ones were you familiar with

5    prior to dealing with Solo?

6        A    We had met one or two when we made

7    our first due diligence trip to London in

8    2010.  In addition to meeting Merrill Lynch

9    and Acupay, we met one or more institutional

10   dealer — institutional brokers.

11           And the names I don't recall at

12   this point, but we met at least two of them

13   at that trip.

14       Q    Did you end up using those one or

15   two institutional brokers as part of the

16   Danish trading?

17       A    I don't recall.

18       Q    Okay.  Had you been familiar with

19   FGC Securities before dealing with Solo?

20       A    No.

21       Q    Who introduced FGC Securities as a

22   broker?

23       A    Solo.

24       Q    Can you turn, please, to Exhibit

25   2143?

Page 274

1    reports that Solo asked him "to onboard with

2    three new brokers yesterday," and then he

3    identifies those three.

4            Do you have any understanding why

5    Solo asked to have the plans onboarded with

6    three new brokers?

7        A    No.

8        Q    Had you ever heard of Bastion

9    Capital, Mako Financial or the TJM

10   Partnership prior to Mr. LaRosa introducing

11   them through this e-mail?

12       A    No.

13       Q    As far as you understood, was it

14   Solo that introduced those brokers into the

15   mix?

16       A    Solo asked Mr. LaRosa to onboard

17   with those three new brokers.

18       Q    Okay.  Do you know if the plans

19   ever used any of these three brokers in

20   connection with trading of Danish securities?

21       A    I think so, yes.

22       Q    Okay.  Whose job was it on behalf

23   of the plans to decide which broker to go to

24   to seek liquidity for any particular trade?

25       A    It's part of the allocation process

```
 1      that we received from Solo in terms of the
 2      liquidity and shares.  We'd also be given
 3      information as to which of those brokers
 4      would source that liquidity or had access to
 5      that liquidity.
 6              So Solo would provide us a number
 7      of shares that they saw in the marketplace or
 8      could arrange in the marketplace, and also
 9      the identity of the brokers who would be able
10      to handle the trades on behalf of the pension
11      plans.
12         Q    So prior to the plans entering into
13      the purchase of the securities, the plan
14      would receive information from Solo about
15      which brokers to reach out to to fill
16      certain, you know, liquidity for any
17      particular stock.
18              Is that right?
19         A    Yes.
20         Q    If you look at the Michelle plan's
21      purchase of TDC shares in August of 2012, did
22      the various plans that were set up in 2012
23      trade in other Danish stocks in 2012?
24         A    Yes.
25         Q    And did the trades follow the same
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 306

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2                   CASE NO.  18-MD-2865 (LAK)

 3        _____
                                                  )
 4        IN RE:                                  )
                                                  )
 5        CUSTOMS AND TAX ADMINISTRATION OF       )
          THE KINGDOM OF DENMARK                  )
 6        (SKATTEFORVALTNINGEN) TAX REFUND        )
          SCHEME LITIGATION                       )
 7                                                )
          This document relates to case nos.      )
 8        19-cv-01783; 19-cv-01788; 19-cv-01794;  )
          19-cv-01798; 19-cv-01918                )
 9        _____)

10

11

12                   C O N F I D E N T I A L

13               SUBJECT TO THE PROTECTIVE ORDER

14

15

16        CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

17                     ORAL EXAMINATION OF

18                     RICHARD MARKOWITZ

19                         VOLUME II

20                    DATE: April 9, 2021

21

22

23

24

25           REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

```
 1      R I C H A R D   M A R K O W I T Z,

 2              called as a witness, having been first

 3      duly sworn according to law, testifies as follows:

 4

        CONTINUED EXAMINATION BY MR. WEINSTEIN:

 5

 6          Q    Mr. Markowitz, if you can turn to

 7      Exhibit 2133, please?

 8              Did each of the partnerships listed

 9      in this exhibit earn profits from the Danish

10      dividend arbitrage strategy?

11          A    (Witness reviewing.)

12              MR. BONGIORNO:  Objection.

13          A    I don't recall.

14          Q    Did the partnerships earn profits

15      from any other investing activity other than

16      the Danish dividend arbitrage strategy?

17          A    Yes.

18          Q    What other investment strategies

19      did these partnerships earn money from?

20          A    Dividend arbitrage investments.

21          Q    So their profits were generated

22      entirely by dividend arbitrage strategies?

23          A    Yes.

24          Q    Did those strategies involve

25      Denmark and Belgium?
```

```
 1          Q     Was anyone else a participant in
 2     that plan?
 3          A     My wife.
 4          Q     What prompted you to open a
 5     custodial account with Indigo for the Routt
 6     Capital plan?
 7          A     The opportunity was offered to me
 8     by my former — by my then to be former
 9     partners, Mr. Stein and Mr. Lhote.  And it
10     was at a time when there was a business
11     dispute between ourselves and potentially
12     Solo Capital.
13          Q     What was that business dispute?
14          A     My partners, Mr. Stein and
15     Mr. Lhote, informed me and Mr. Van
16     Merkensteijn in late 2013 or early 2014 that
17     they no longer wanted to work with us as a
18     group or on group investments and projects,
19     and that they had made an investment in a
20     bank in Europe, and that that bank would
21     become a custodian for, among other things,
22     dividend arbitrage strategies, and that they
23     had worked with former Solo employees to
24     establish that platform.
25          Q     Was that North Channel Bank?
```

```
 1    money from earlier trading in 2015, they've

 2    been dormant, as far as investing goes, since

 3    2014?

 4         A    Yes.

 5         Q    Was -- did you and Mr. Van

 6    Merkensteijn intend to continue with the

 7    dividend arbitrage strategy without the

 8    involvement of your former Argre partners?

 9         A    Our -- my preference, I can't speak

10    for Mr. Van Merkensteijn, my preference would

11    have been to continue the

12    relationship -- professional relationship we

13    had established with Solo Capital and

14    continue to have investment vehicles invest

15    in that strategy or others with Solo Capital

16    acting as a custodian.

17              That would have been my -- that was

18    my preference.

19         Q    Was that done?

20         A    Yes.

21         Q    What vehicles were used to pursue

22    that strategy of dividend arbitrage using

23    Solo Capital?

24              MR. BONGIORNO:  Objection.

25         A    Can you repeat the question,
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 351

```
 1    please?
 2         Q    Yeah.  What vehicles were used to
 3    pursue that strategy with Solo Capital?
 4         A    U.S. pension plans.
 5         Q    Were those new pension plans or the
 6    ones you had been using with Argre?
 7              MR. BONGIORNO:  Objection.
 8         A    Primarily new plans.
 9         Q    Can you turn to Exhibit
10    Number 2265?
11              MR. WEINSTEIN:  Mark this as 2265.
12              (Whereupon the above mentioned was
13         marked for Identification.)
14         Q    That's in the second day's binder.
15    Okay.
16              If you turn to the last page of
17    that e-mail chain, it starts with an e-mail
18    from Peter Wells to you and Mr. Van
19    Merkensteijn.
20              He says, "I wanted to follow up
21    with you both on the status of the additional
22    information regarding the new ex-dividend
23    trades.  As you -- we recall, you were going
24    to provide us with, among other things, a
25    list of who is going to be involved in the
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 354

```
 1     can establish pension plans to participate in
 2     the dividend arbitrage strategy?
 3          A     No.
 4          Q     Okay.  So you had thoughts that you
 5     would do business using the LLCs.
 6                Right?
 7          A     That is certainly one function of
 8     those LLCs.
 9          Q     Okay.  And how many LLCs were you
10     intending to have set up?
11          A     At the time, in discussions with
12     Solo Capital about market liquidity and
13     capacity, and to spread that liquidity in our
14     allocation among our allocation of the market
15     liquidity among clients, I think we were
16     intending somewhere between 30 and 40 pension
17     plans would be established.
18          Q     Okay.  But the number of pension
19     plans and LLCs that would be set up were
20     based on what Sanjay Shah and Solo told you
21     would be a market allocation for the dividend
22     arbitrage strategy?
23          A     No.  The overall allocation would
24     be indicated to us or forecasted.  It was up
25     to us to decide if we wanted to spread that
```

```
 1    obligations that we discussed yesterday, that
 2    allocation from the market liquidity and
 3    market capacity, we could have put into one
 4    entity, but that probably would have required
 5    certain reporting requirements.  We could
 6    have put it into ten entities.
 7              I think we decided and discussed
 8    that it was appropriate to put it into
 9    somewhere between 30 and 40 entities and
10    spread the market capacity that we were being
11    afforded into that number.
12        Q    Okay.  So your decision to open up
13    30 to 40 new LLCs and pension plans was
14    driven by how you thought you would disperse
15    the allocation provided by Solo Capital?
16        A    Yes.  And also, since — as we've
17    discussed with the partnership
18    structure — it involves us working with
19    friends and family.
20              This was an attractive investment
21    opportunity that we had been working on for
22    six years now, learning, studying, working
23    with lawyers, and getting comfortable that
24    everything complied with all legal standards
25    and tax requirements.
```

Page 357

```
 1              We wanted to include friends and
 2      family as an opportunity to earn some
 3      retirement income through pension plan
 4      investing.
 5         Q    During this period of time when you
 6      were establishing new LLCs and pension plans,
 7      did you discuss with Mr. Shah what you could
 8      expect to earn from the dividend arbitrage
 9      strategy using these new set of plans?
10         A    I don't recall any such
11      conversations.
12         Q    All right.  Did he provide you any
13      figures that you could expect to earn on a
14      per plan basis?  Like a million dollars, for
15      example?
16         A    Any figures I would have had would
17      have been based on our experience from
18      previous trading.  But I don't recall
19      Mr. Shah saying, one way or the other, one
20      million, a half million, 10 million.
21              I don't recall any such
22      conversations.
23         Q    Okay.  If you turn to the first
24      page of the document --
25              MR. BONGIORNO:  Marc, it's -- when
```

```
 1      opportunity to two additional individuals.
 2          Q    Okay.  And those are Ms. Jones and
 3      Mr. Herman?
 4          A    Yes.
 5          Q    Okay.  And they are related to you?
 6               MR. BONGIORNO:  Objection.
 7          A    Yes.
 8          Q    So after Mr. -- after Solo Capital
 9      informed you that there was additional
10      capacity for the trading, LLCs and pension
11      plans were set up for Ms. Jones and
12      Mr. Herman?
13          A    Yes.
14          Q    And did they each have three LLCs
15      and pension plans set up?
16          A    Yes.
17          Q    Okay.  So, ultimately, there was a
18      group of 40 plans that were trading using
19      this strategy.
20               Is that right?
21          A    Yes.
22          Q    Were -- three of the new plans that
23      were set up were set up on your behalf.
24               Is that right?
25          A    Yes.
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 379

1    that role?

2        A    I don't recall.

3        Q    Well, did Mr. Ben-Jacob -- well,

4    withdrawn.

5            Did Kaye Scholer assist with the

6    establishment of the new LLCs and pension

7    plans?

8        A    Yes.

9        Q    Okay.  And was that true for all 40

10   of the new LLCs and pension plans?

11       A    No.

12       Q    And not all of them were new.

13           Is that correct?

14       A    Yes.

15       Q    Okay.  So, of the 40 LLCs and

16   pension plans, for those that were newly

17   established in 2014, did Kaye Scholer assist

18   in establishing them?

19       A    Yes.

20       Q    Was it your understanding that each

21   of the plan participants for those new

22   pension plans signed a similar limited power

23   of attorney granting Mr. Ben-Jacob the power

24   to do the same things?

25       A    I don't recall.

```
 1        Q    It would be at the front of a book.
 2   I don't know which book.
 3             MR. BONGIORNO:  I think it's the
 4        first book.  Yeah.  It's Day 1,
 5        Volume 1.
 6        Q    So this is an e-mail from
 7   Mr. Klugman to a number of people, including
 8   you.  "Arbitrage Instructions and Questions."
 9             Who are -- who is Matthew Cooper?
10        A    An individual introduced to me by
11   Robert Klugman.
12        Q    What role, if any, did Mr. Cooper
13   have in connection with the dividend
14   arbitrage strategy?
15        A    He assisted the pension plans in
16   executing trades.
17        Q    And who is Ira Reibeisen?
18        A    An individual introduced to me by
19   Robert Klugman.
20        Q    Did he have the same role as
21   Mr. Cooper?
22        A    Yes.
23        Q    Do you recall being part of any
24   discussions about trading instructions for
25   this dividend arbitrage trading?
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 410

1          A    I just remember this e-mail.  I

2    don't recall being on a -- having a

3    conversation about arbitrage instructions.

4          Q    Okay.  And is the attachment to the

5    e-mail meant to provide guidance for how

6    Mr. Cooper and Mr. Reibeisen would do the

7    trading for the pension plans?

8          A    How they would execute trading

9    instructions on behalf of the plans, yes.

10          Q    Okay.  At the bottom of Page 1,

11    there are three questions that Mr. Cooper

12    raises.  And the second one is, "How do we

13    reach POGO?"

14               Do you know who POGO is?

15          A    Yes.

16          Q    Who is that?

17          A    An employee of Solo Capital.

18          Q    Do you know his name?

19          A    I believe it's Mark Anderson,

20    something like that.  I don't have an exact

21    recollection.

22          Q    Okay.  Does Mark Paterson ring a

23    bell?

24          A    Yes.

25          Q    Okay.

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 417

```
 1   question.
 2        Q    When —— did Solo allocate an
 3   aggregate number of shares in a particular
 4   stock for the 34 pension plans combined?
 5        A    Yes.
 6        Q    Okay.  And from there, who decided
 7   how many shares each plan would get?
 8        A    Solo would provide information for
 9   each customer on their custodial or related
10   custodial platform.
11        Q    Okay.  So if you look at Step
12   Number 2 on that page, after Cooper or
13   Reibeisen send out the liquidity e-mails,
14   Step 2 is that the broker responds back,
15   saying they will seek that liquidity.
16             Right?
17        A    Yes.
18        Q    But in fact, everyone knew at the
19   time that the broker had already —— that that
20   liquidity was there, because Solo had
21   determined that.
22             Right?
23        A    It was our expectation that the
24   liquidity would be there.  We had no
25   assurances or guarantees.
```

```
 1        A    Yes.

 2        Q    Who provided that information?

 3        A    This entire spreadsheet came from

 4   Solo.

 5        Q    All right.  So Solo provided the

 6   forward counterparties and how much each plan

 7   would transact with that forward

 8   counterparty?

 9        A    They provided that identification

10   of the forward counterparties.

11        Q    And the amount.

12             Correct?

13        A    Yes.

14        Q    All right.  And then, the stock

15   lender, there would be a stock lending

16   transaction several days after the purchase

17   date.

18             Correct?

19        A    Yes.

20        Q    And Solo was providing you the name

21   of the stock lender.

22             Right?

23        A    Yes.

24        Q    And he -- for this particular

25   trade, he was telling you that the Gnosis was
```

Page 444

```
 1        per plan intended so that the group of plans

 2        in the aggregate wouldn't meet a certain

 3        level?

 4             A    No.

 5             Q    Okay.  You mentioned that -- the

 6        use of a computer algorithm for the trading.

 7                  Do you remember that?

 8             A    Yes.

 9             Q    Okay.  Was a computer algorithm

10        being used as of the time of this e-mail?

11             A    No.

12             Q    Okay.  Did the computer algorithm

13        ultimately replace Cooper and Reibeisen?

14             A    Yes.

15             Q    And so what was the computer

16        algorithm?

17             A    It was a software that the plans

18        were able to license that allowed the plans

19        to input certain trading jurisdictions,

20        capacity constraints, interest in shares,

21        dividend paying versus non-dividend paying.

22                  After filling out forms, it would

23        assist on an automated basis the placing of

24        orders for both share purchases and hedging

25        and, if needed, stock lending for those plans
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 445

1    on dividend paying shares.

2        Q    Okay.  And where was this computer

3    algorithm housed?  You know, was it yours or

4    was it — withdrawn.

5            The plan —

6        A    The plans licensed it from a third

7    party.

8        Q    Okay.

9            MR. BONGIORNO:  Let him finish

10    before you jump in.

11        Q    And would the computer algorithm

12    itself place the orders that Mr. Cooper and

13    Mr. Reibeisen used to send by e-mail?

14        A    I don't know how that computer

15    software worked, but it was able to generate

16    orders and trading information, whether that

17    generated the orders to brokers, or e-mail

18    exchanges with brokers, or that was a

19    secondary computer program within the

20    custodians.

21            But it was a one-source assistance

22    for the plans.

23        Q    Who brought this computer algorithm

24    to the plan's attention?

25        A    I don't recall if it was Solo

1    Capital itself or affiliates of Solo Capital.

2        Q    Okay.  But it was one or the other?

3    It was either Solo Capital or an affiliate of

4    Solo Capital?

5        A    Yes.

6        Q    So when -- before using the

7    computer algorithm, as we see in this

8    exhibit, 1785, Solo Capital would inform the

9    plans which brokers and which counterparties

10   were going to be used.

11           Correct?

12       A    Yes.

13       Q    How did it work once there was a

14   computer algorithm?  Who selected, for

15   example, the stock lending counterparty?

16       A    It was part of the software.  And I

17   assume, in working with the custodians and

18   counterparties, that it became a part of that

19   software process, but not something that we

20   would be able to look under the hood or see

21   how that software worked.

22       Q    So the pension plans didn't need to

23   reach out to the stock lending counterparties

24   once the computer algorithm was in place?

25       A    No.

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

```
 1        Q    Okay.  Same with the forward
 2   counterparties?
 3        A    The pension plans continued to
 4   reach out to brokers, forward counterparties,
 5   stock lenders.  But the information that was
 6   required to be put into an e-mail was
 7   populated by and through the software
 8   program.
 9        Q    So if you put in information saying
10   you wanted to do a stock lending transaction,
11   would you identify the stock lender or stock
12   lending counterparty that you wanted to
13   transact with, or would the computer figure
14   that out?
15             MR. BONGIORNO:  Objection.
16        A    My understanding is that — and you
17   asked a very astute question — the software
18   replaced the human traders.  So if, as you
19   show in this exhibit, information came from
20   Solo because they arranged parties, sourced
21   liquidity, and were important in working with
22   the other counterparties, the software
23   program would take similar information, to
24   the extent it had it from Solo, and was able
25   to eliminate the need for the human person to
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 448

```
 1    digest that information and interact with an
 2    e-mail server.
 3        Q    Okay.  Can you turn, please, to
 4    Exhibit 2212?
 5            MR. WEINSTEIN:  Mark this as 2212.
 6            (Whereupon the above mentioned was
 7        marked for Identification.)
 8        A    I didn't hear that.
 9            MR. BONGIORNO:  It's 2212.  It's in
10    Day 1, Volume 2.
11        Q    So 2212 is a trading diagram with
12    Solo Capital in the middle.
13            Have you ever seen this before?
14        A    No.
15        Q    Okay.  In the diagram on the right
16    side, there's a circle for "U.S. Pension Fund
17    or Malaysian Trading Company."
18            Do you see that?
19        A    Yes.
20        Q    And on the left side, there's a
21    circle for "BVI/Cayman Trading Company?"
22        A    Yes.
23        Q    Okay.  And according to this
24    diagram, the U.S. pension fund or Malaysian
25    company buys stock through a broker, which
```

```
 1          A    We received advice that explained

 2    the issues surrounding that related to a

 3    different jurisdiction in Denmark, and that

 4    it created additional tax risk for the

 5    pension plans.

 6          Q    Okay.  Can you turn, please, to

 7    Exhibit 1829?

 8              MR. BONGIORNO:  Day 1, Volume 1.

 9          Q    This e-mail from you is about

10    Danish reclaim payments received from Syntax.

11              Is that right?

12          A    Yes.

13          Q    And you say in the e-mail that "the

14    amounts on the spreadsheet were sent to each

15    plan's respective custodian, and then

16    75 percent of the gross reclaim was paid out

17    to Ganymede."

18              And in 2015, why was 75 percent of

19    the gross reclaim paid out to Ganymede?

20          A    In late 2014, after the partners of

21    Argre decided not to work together, we

22    weren't sure we would be able to continue

23    doing business with Solo Capital or its

24    related entities.

25              And as I mentioned, two of my
```

1    former partners, Mr. Stein and Mr. Lhote, had
2    decided to go off and do business on their
3    own.  And they had acquired North Channel
4    Bank, got authorizations to have it act as a
5    custodian, had decided to work with former
6    employees of Solo, and were going to be
7    effectively competing in this dividend
8    arbitrage marketplace.
9           So with respect to Solo Capital,
10   where Mr. Van Merkensteijn and myself, and
11   ultimately Mr. Klugman, preferred to continue
12   our relationship and client business, we had
13   discussions that initially were tense because
14   Mr. Shah thought that Mr. Van Merkensteijn
15   and myself were investors in the bank, aware
16   of the developments, were going to be
17   competing.
18          And we assured them that that was
19   farthest from the truth.  We had no
20   relationship with that, we're not aware of
21   it, or became aware of it at the time that
22   Argre Management effectively dissolved.
23          And Mr. Shah said that he would
24   consider allowing us to participate as
25   customers and clients with different

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 453

```
1    entities, those that were no longer
2    affiliated with or related to Mr. Stein
3    and -- Mr. Stein and Mr. Lhote, and the
4    economics would most likely change because
5    there would be additional competitors in the
6    marketplace, North Channel Bank, the ability
7    to get liquidity in shares would be impacted,
8    and that we would be -- the pension plans
9    would be receiving a lower percentage based
10   on the market pricing and the fees paid to
11   the other counterparties.
12           And that became 66 percent to
13   75 percent that would be paid away by the
14   pension plans because of this market
15   development, and perhaps Mr. Shah being upset
16   and associating Mr. Van Merkensteijn and
17   myself with the actions of my former
18   partners.
19      Q    So, in this particular case, adding
20   competitors into the market actually drove up
21   the fee as opposed to the additional
22   competitors usually driving a fee down?
23      A    No.  Additional competitors in the
24   marketplace drive up the cost of borrowing
25   shares if it's a stock lending transaction,
```