```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3   _____
                                            )
 4   IN RE:                                 )
                                            )
 5   CUSTOMS AND TAX ADMINISTRATION OF      )
     THE KINGDOM OF DENMARK                 )
 6   (SKATTEFORVALTNINGEN) TAX REFUND       )
     SCHEME LITIGATION                      )
 7                                          )
     This document relates to case nos.     )
 8   19-cv-01783; 19-cv-01788; 19-cv-01794; )
     19-cv-01798; 19-cv-01918               )
 9   _____)

10

11

12

13

14

15      REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                      EXAMINATION OF

17                      ROBERT CREMA

18                 DATE: February 9, 2021

19

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

Robert Crema - February 9, 2021

Page 12

```
1     R O B E R T  C R E M A,
2             called as a witness, having been first
3     duly sworn according to law, testifies as follows:
4
5
6
7     EXAMINATION BY MR. OXFORD:
8         Q    Good morning, Mr. Crema.  My name
9     is Neil Oxford.  I work at a firm called
10    Hughes, Hubbard & Reed.  We represent the
11    plaintiff SKAT in this case.  It's nice to
12    meet you.
13             How are you doing today?
14        A    I'm doing fine, thank you.
15        Q    Great.  And where am I talking to
16    you this morning?  You're in Florida, I
17    understand?
18        A    That is correct.
19        Q    Where in Florida are you located?
20        A    Naples, Florida.
21        Q    Lovely.  And how long -- withdrawn.
22             Are you a resident of Naples?
23        A    Yes.
24        Q    How long have you been a resident
25    of Naples?
```

Robert Crema - February 9, 2021

Page 13

| | | |
|---|---|---|
| 1 | A | About thirteen years. |
| 2 | Q | Thirteen years.  Okay. |
| 3 | | Between the years 2012 and 2015, do you consider yourself to be a citizen of Florida? |
| 6 | A | 2012, wow.  Let me think.  I actually became a Florida resident, I believe, about five years ago.  I can't be certain, but around five years, six years. |
| 10 | Q | And prior to that, you were a resident of which state, sir? |
| 12 | A | New Jersey. |
| 13 | Q | New Jersey.  Okay. |
| | | And were you a resident of New Jersey -- since when? |
| 16 | A | Since when?  Okay.  I would say 19 -- 1997. |
| 18 | Q | Okay.  Great.  So between 1997 and until that five years ago or six years ago, you were a resident of New Jersey, and then you changed your residence to Florida. |
| 22 | | Is that correct? |
| 23 | A | Correct. |
| 24 | Q | Okay.  Great. |
| 25 | | I realized I dived into the |

Robert Crema - February 9, 2021

Page 18

```
 1        A    Well, I remember we had an issue
 2   with AIG, the insurance company.  Our
 3   brokerage firm was originally American
 4   Investment Group of New York and we used the
 5   AIG logo.
 6             And at that time, AIG was prepared
 7   to sue us, because the state that we
 8   incorporated under made a mistake and they
 9   issued approval for us to use that name,
10   okay?  So we decided to change it from AIG to
11   Acer and be able to keep our logo.
12        Q    I see.  So when Acer was founded in
13   or around 2000, it took over the business of
14   what was previously known as AIG?
15        A    Uh-huh.
16        Q    Is that correct?
17             MR. BLESSINGTON:  You have to
18        answer "yes" or "no."
19        A    Would you repeat that, please?
20        Q    Did -- when Acer was founded in
21   around 2000, it essentially took over the
22   business of a company called AIG?
23        A    Yes.
24        Q    Okay.  And what was the -- what
25   kind of business was AIG, and then Acer, in
```

1      compensated there?
2           A    Acer was compensated -- well, they
3      were calling that, I believe, a finder fee as
4      well, which is after analyzation, going
5      through an audit with the Chicago stock
6      exchange, that's what they said it was.
7               So that's how we reported it.
8           Q    Okay.  So Acer's compensation for
9      dividend arbitrage trading using U.S. pension
10     plans was called a dividend finder's fee
11     because -- on the advice of the Chicago
12     exchange.
13              Is that testimony accurate?
14          A    Correct, yes.
15          Q    Separate and apart from what Acer
16     might have been told by the Chicago exchange,
17     do you consider Acer's compensation to be a
18     finder's fee?
19          A    Yes.
20          Q    Okay.  And in what sense?
21          A    Well, we -- we presented the
22     pension fund to do the trading, and pretty
23     much that's -- that's the sense.  That was
24     the fee that we got for the transaction.
25          Q    I see.  So another way to think

1    about Acer's compensation, it's really a
2    pension plan finder's fee?
3             MR. BLESSINGTON:  Object as to
4        form.  You may answer.
5        A    Repeat it, please.
6        Q    Sure.
7             Is another way to characterize
8    Acer's compensation for the pension plan
9    dividend arbitrage trading to consider that
10   to be a pension plan finder's fee?
11            MR. BLESSINGTON:  Same objection.
12       A    Yes.
13       Q    And would that be a fair
14   characterization?
15            MR. BLESSINGTON:  Same objection.
16       A    Yes.
17       Q    And it would be fair because one of
18   the services that Acer is bringing to the
19   party is they've identified a pension plan
20   that has a particular tax status that is
21   willing to participate in this trade.
22            Correct?
23       A    Correct.
24       Q    It's willing, in effect, to lend
25   its name and its tax status to the

Robert Crema - February 9, 2021

Page 84

```
 1      any knowledge of?
 2           A    No.
 3           Q    Okay.  I think we've covered most
 4      of this before.  I just wanted to run through
 5      the other employees of Acer in the 2012-2015
 6      time frame.
 7           A    Uh-huh.
 8           Q    So Ms. Kaminer was in charge of
 9      trading at that time?
10           A    Correct.
11           Q    And that would include trading done
12      for the Acer plans in Danish securities?
13           A    Right.  Correct.
14           Q    Was she also the chief operating
15      officer?
16           A    I'm not sure of her title.
17           Q    Okay.  Did she have any other
18      roles, to your knowledge, in the 2012, 2015
19      time frame?
20           A    No.
21           Q    Okay.  Mr. Alan Goldman, he was
22      compliance officer and chief financial
23      officer in that period?
24           A    Correct.
25           Q    Did he have any other roles?
```

1    you not, sir?
2         A    Yes.
3         Q    Okay.  The first time you sign is
4    for American Investment Group of New York
5    Limited Partnership.
6              Correct?
7         A    Right.
8         Q    And that's the sponsoring entity
9    that's sponsoring this plan.
10             Correct?
11        A    Right.
12        Q    And then, you and your wife both
13   sign as trustees of the plan.
14             Is that correct?
15        A    That's correct.
16        Q    Okay.  Now, by 2002, AIG had been
17   established for some number of years, a
18   couple of decades.
19             Correct?
20        A    Correct.
21        Q    But also by 2002, it had
22   essentially ceased trading, had it not?
23        A    Again, on or about that year.
24   Can't be exact.
25        Q    Uh-huh.  So whenever Acer was

```
1      formed, it's your understanding that AIG of
2      New York LP, the limited partnership, ceased
3      doing any business?
4           A    Well, is this the pension plan
5      we're talking about or AIG the company?
6           Q    AIG the company.
7           A    Yeah.  I would say we stopped doing
8      business.
9           Q    Okay.  So can you tell me why,
10     having stopped doing business, AIG, the
11     company, is now sponsoring a pension plan in
12     October of 2002?
13              MR. BLESSINGTON:  Object as to
14          form.  You can answer.
15          A    Could you repeat that?  I don't
16     know if I understand the question.
17          Q    Sure.  You told me that at the time
18     this agreement was signed, AIG, the company,
19     the limited partnership, had ceased doing
20     business.
21          A    AIG, the company, ceased doing
22     business that it was doing as a unregulated
23     broker dealer?
24          Q    Well, let me ask you this way --
25          A    There's differences, you know.
```

Robert Crema - February 9, 2021

Page 168

| | | |
|---|---|---|
| 1 | Q | This is an onboarding document for |
| 2 | your AIG plan at ED&F Man. | |
| 3 | A | Okay. |
| 4 | Q | And just to orient you, there's a |
| 5 | signature on the last page. | |
| 6 | A | Hold on.  Yes. |
| 7 | Q | Is that your signature, sir? |
| 8 | A | Yes, it is. |
| 9 | Q | And do you understand the purpose |
| 10 | of this document? | |
| 11 | A | Well, I didn't read it.  But again, |
| 12 | this was something that Stacey would come to | |
| 13 | me and that had to be done -- | |
| 14 | Q | Okay. |
| 15 | A | -- to do business. |
| 16 | Q | Beyond that description, do you |
| 17 | have any understanding about the purpose for | |
| 18 | which this document was prepared? | |
| 19 | A | No. |
| 20 | Q | Did you -- was it your practice to |
| 21 | review documents like this -- | |
| 22 | A | Yes.  Sorry. |
| 23 | Q | And was it your practice to, after |
| 24 | reviewing it, discuss the documents with | |
| 25 | Ms. Kaminer? | |

```
1         A    (Witness reviewing.)
2         Q    If you turn to page 16, sir, it's
3    the penultimate page of the document, you'll
4    see that it's signed by --
5         A    The signature page?
6         Q    Yes.  It's signed by Robert Crema?
7         A    Hold on.  Yes.
8         Q    Okay.  And that's your signature,
9    sir?
10        A    That is correct.
11        Q    And did you follow the same
12   practice as you did with the previous exhibit
13   we looked at whereby you would have reviewed
14   it and discussed it with Ms. Kaminer, but had
15   no current recollection of the purpose of the
16   document?
17        A    That's correct.
18        Q    Okay.  Would that be true of any
19   document signed by you, or on behalf of your
20   plan, setting up your plan with accounts at
21   ED&F Man?
22        A    Yes.
23        Q    Do you have any information about
24   whether your plan's account at ED&F Man was
25   funded by you or your plan in any way?
```