David Schulman - October 21, 2020

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2           Master docket No. 18-MD-2865(LAK)
                  Case Nos. 18-cv-09505
 3   _____
                                             )
 4   IN RE:                                  )
                                             )
 5   CUSTOMS AND TAX ADMINISTRATION OF       )
     THE KINGDOM OF DENMARK (SKATTEFOR       )
 6   VALTNINGEN) TAX REFUND SCHEME           )
     LITIGATION,                             )
 7                                           )
     _____)
 8

 9

10

11

12

13

14       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                      EXAMINATION OF

16                       DAVID SCHULMAN

17                  DATE: October 21, 2020

18

19

20

21

22

23

24

25           REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

David Schulman - October 21, 2020

Page 12

1    D A V I D  S C H U L M A N,
2         called as a witness, having been first
3    duly sworn according to law, testifies as follows:
4
5
6
7    EXAMINATION BY MS. CAHAN:
8         Q    Great.  So good morning,
9    Mr. Schulman.  My name is Valerie Cahan, an
10   attorney at Hughes, Hubbard & Reed.  We
11   represent the plaintiff in this case,
12   Skatteforvaltningen, I'm going to refer to
13   them as "SKAT."
14             Thank you for agreeing to do this
15   and agreeing to do it remotely.  I hope we
16   will not have too many technical issues.
17             Have you ever been deposed before?
18        A    Yes.
19        Q    And when was that?
20        A    That was about 1986.
21        Q    Okay.  So it's been a while.
22        A    Yes.
23        Q    I'm going to just go over some
24   ground rules for the deposition to help this
25   move smoothly.

David Schulman - October 21, 2020

Page 142

| | | |
|---|---|---|
| 1 | A | It looks like it. |
| 2 | Q | Do you know what the purpose of |
| 3 | this document is? | |
| 4 | A | Only what I've gotten from reading |
| 5 | the cover page. And I have to admit I don't | |
| 6 | know what any of these terms mean. "Security | |
| 7 | and set off deed," I have no idea. | |
| 8 | Q | Did somebody tell you that you |
| 9 | needed to sign this document? | |
| 10 | A | I don't recall. |
| 11 | Q | Did you read this before signing? |
| 12 | A | No. |
| 13 | Q | Why not? |
| 14 | A | Again, I am sure that Stacey sent |
| 15 | it to me with a yellow tab, it said "Sign | |
| 16 | Here," and I signed. | |
| 17 | Q | Please turn to Exhibit 822? |
| 18 | | MS. CAHAN: Mark this as 822. |
| 19 | | (Whereupon the above mentioned was |
| 20 | marked for Identification.) | |
| 21 | A | Okay. |
| 22 | Q | Are you familiar with this |
| 23 | document? | |
| 24 | A | No. |
| 25 | Q | Is that your signature on the last |

David Schulman - October 21, 2020

Page 143

1    page?
2       A   Yes.
3       Q   Did you review this document before
4    signing it?
5       A   You know, I probably looked at it.
6    When it said "custody agreement." I just
7    signed by the tab.
8       Q   Why didn't you review this
9    agreement before you signed it?
10      A   I think custody documents are
11   boilerplate. I didn't see any reason to
12   review it.
13      Q   How -- in what way are custody
14   agreements boilerplate?
15      A   I think it just says the same
16   thing, that a broker dealer will keep custody
17   of your securities. It wasn't like they were
18   going to mail me stock certificates.
19        I don't know, but that's my limited
20   understanding of it. I never read this
21   document.
22      Q   Did anybody tell you that you
23   needed to sign this document?
24      A   I don't know, but I believe that it
25   was sent to me with a tab, "Sign Here."

David Schulman - October 21, 2020

Page 144

```
1        Q    Sent to you by whom?
2        A    I don't know the answer to that,
3   but since all documents like this went to
4   Stacey at Lillehammer Road, or whatever it
5   is, and they were forwarded to me, I would
6   assume it was Stacey or her assistant, but
7   certainly at Stacey's direction.
8        Q    Can you please turn to Exhibit 824?
9             MS. CAHAN:  Mark this as 824.
10            (Whereupon the above mentioned was
11       marked for Identification.)
12       A    Okay.
13       Q    Are you familiar with this
14  document?
15       A    (Witness reviewing.)
16            No.
17       Q    Is that your signature on the last
18  page?
19       A    Yes.
20       Q    On the first page, it says that you
21  categorize -- that "the Riverside Associates
22  Defined Benefit Plan will be categorized as
23  an elective professional client."
24            Do you know what that means?
25       A    No idea.
```

David Schulman - October 21, 2020

Page 150

```
 1      document?
 2           A    No.
 3           Q    Did you sign it?
 4           A    Yes.
 5           Q    Did you read this before you signed
 6      it?
 7           A    No.
 8           Q    Why not?
 9           A    I was instructed to sign it by
10      Stacey, and there was a sticker next to where
11      my name is.
12           Q    Do you see Paragraph 1, the letter
13      starts, first paragraph, "We refer to our
14      Terms and Conditions of Business," right?
15                And then, Paragraph 2, it says that
16      "any non-cash assets we hold for you as
17      collateral will be dealt with in accordance
18      with Clause 10-B-2, Assets Transferred, and
19      will be treated on an absolute title transfer
20      basis."
21           A    Yeah, I see it.
22           Q    So did you agree to -- to various
23      terms and conditions as this letter lays out?
24                MR. BLESSINGTON:  Objection to
25           form.
```