Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2              MASTER DOCKET 18-MD-2865(LAK)
                  CASE NO. 18-CV-09797
3

4    _____
                                              )
     IN RE:                                   )
5                                             )
     CUSTOMS AND TAX ADMINISTRATION OF        )
6    THE KINGDOM OF DENMARK                   )
     (SKATTEFORVALTNINGEN) TAX REFUND         )
7    SCHEME LITIGATION                        )
                                              )
8    _____)

9

10

11           CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                   DEPOSITION OF
                     STACEY KAMINER
15                     VOLUME 1

16               Monday, April 19, 2021
                 8:07 a.m. — 4:46 p.m.
17
                    Remote Location
18                 Via Huseby Connect
                  All Parties Remote
19

20

21

22

23

24           Stenographically Reported By:
                  Erica Field, FPR
25

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

```
 1          Markets, Ltd.
 2               MR. BLESSINGTON:  I should've also made it
 3          clear that Brandon Dillman is also on from K&L
 4          Gates representing Stacey Kaminer.
 5     Whereupon,
 6                    STACEY KAMINER,
 7     having been first duly sworn or affirmed, was examined
 8     and testified as follows:
 9               THE WITNESS:  Yes.
10               MR. OXFORD:  Just before we start, John,
11          did you want to put a statement on the record
12          about the protective order.
13               MR. BLESSINGTON:  I just want to make sure
14          that everybody who is actually listening in is
15          subject to the protective order that's in this
16          case.  Because when we are doing it remotely —— I
17          mean, actually, now that that person has dropped,
18          we can see everybody's name.
19               But obviously, we are going to be
20          discussing some confidential information and we
21          want to make sure it's subject to the protective
22          order.
23               MR. KAPLAN:  This is Marty Kaplan speaking.
24          For the record, Scott Goldstein may join this and
25          he obviously is a defendant and subject to the
```

1          Q.     Are you conducting any business through any

2    legal entities today, Ms. Kaminer?

3          A.     The same as the ones we have already

4    discussed.

5          Q.     Just remind me.

6          A.     Kamco LP, as an example.  I have my own

7    entities that I conduct business in.

8          Q.     Are any of those entities involved in

9    dividend arbitrage trading?

10         A.     No.

11         Q.     Let's go back to Acer.

12                What's the ownership interest in Acer

13   today?

14         A.     There's Class A shares that are —— or

15   members, I should say, that is 50/50 Bob Crema and

16   Stacey Kaminer.  And there's Class B shares that's

17   100 percent Pact Investors, Inc.

18         Q.     Okay.  We'll get to Pact in a —— in a

19   moment.

20                Can you describe for us, please, your role

21   at Acer in the time period, 2012 through 2015?

22         A.     I was one of the managing members during

23   that time.  My role would have been —— sorry.

24         Q.     Sorry.  On you go.

25         A.     My role would have been to handle the ——

```
 1    the administrative stuff, the business with -- as an
 2    example, ED&F.  It was basically many paths, from talking
 3    with attorneys, talking -- getting tax advice, regulatory
 4    advice.  Extensive in terms of the different things I
 5    would do, but not necessarily the only person making
 6    decisions.
 7              Q.    I forgot to ask you a question a few
 8    moments ago about Acer's broker dealer registration.
 9              Why did you consider that Acer needed to be
10    registered as a broker dealer prior to 2017?
11              A.    It had a lot to do with legal advice that
12    we had gotten and the type of finder business that we
13    were doing and what was going on with the -- what we
14    deemed, generally speaking, clients, the pension plans,
15    the charities.
16              Q.    Okay.  So without seeking to invade upon
17    the attorney-client privilege, is there anything you can
18    tell me about -- further than that about the -- the
19    reason why Acer considered it needed to be registered as
20    a broker dealer?
21              MR. BLESSINGTON:  Object as to form.
22              And I just caution you not to disclose
23              any -- the substance of any conversations you had
24              with your lawyers.
25              A.    Sorry, I'm scrolling through the
```

```
1      conversations to try and pick out an answer for you that
2      does not involve conversations with -- confidential
3      conversation with our lawyers.  And I -- I think the
4      answer I gave, generally, would be the one I would give
5      again because that would not impact the confidential
6      conversations I had.
7      BY MR. OXFORD:
8              Q.    Back to Acer and your role in 2012 through
9      2015.
10             Did you have any role in the -- the trading
11     side of Acer's business?
12             A.    I was the head trader at Acer.
13             Q.    That's clear.  What was your role as a head
14     trader?
15             A.    If Acer did any proprietary trading, I was
16     in charge of effecting that trading.
17             Q.    And did Acer do any proprietary trading in
18     2012 through 2015?
19             A.    I'm not sure if by then we did any
20     proprietary trading.  Probably toward -- in the beginning
21     of 2012.
22             Q.    Okay.  And separate from the -- withdrawn.
23             What proprietary trading did Acer do in
24     2012?  Would that be the -- the DRIPs trading that
25     Mr. Crema told us about?
```

Page 39

```
1          A.    Yes.

2          Q.    Anything else?

3          A.    There might have been, but not to my

4    recollection, as I'm sitting here right now.

5          Q.    Focusing on the Danish dividend arbitrage

6    trading that was conducted by the Acer plans, what was

7    your role in connection with that trading?

8          A.    I would definitely be the person that ED&F

9    reached out to regarding the trading or someone that I

10   designated, but I was still monitoring all of the

11   transactions.

12         Q.    And as head trader, were you involved in

13   designing the trades that the Acer plans entered into?

14               MR. BLESSINGTON:  Object as to form.

15               You may answer.

16         A.    Could you be more specific?  Is there a

17   particular jurisdiction you're asking about?

18   BY MR. OXFORD:

19         Q.    Okay.  Denmark.

20         A.    No.

21         Q.    Who was involved in designing the trades

22   that the Acer plans conducted in Denmark?

23         A.    Those trades didn't really differ from what

24   had been used in other jurisdictions in the past.  So I

25   don't know that I would characterize anybody as having
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

1    designed the specific Danish structure.

2         Q.    To -- is it fair to say that you took the

3    dividend arbitrage structures used in other countries and

4    applied that to Denmark, generally?

5              MR. BLESSINGTON:  Object as to form.

6              You may answer.

7         A.    Yes.

8    BY MR. OXFORD:

9         Q.    Were you involved as head trader in picking

10   the securities -- the Danish securities that the Acer

11   plans would trade in?

12        A.    I was involved in the process of making --

13   of helping figure out -- doing the due diligence on that,

14   I think is the best way to say.

15        Q.    Okay.  Can you describe the due diligence?

16        A.    For us, it -- it would have to do with what

17   was the dividend, what would the yield be, what kind of

18   corporate information did Bloomberg have, what was the

19   security identifier and the like?

20        Q.    Who else was involved in this due

21   diligence?

22        A.    Are you asking on the Acer side?

23        Q.    Just generally, Acer, anybody else.

24        A.    I couldn't --

25             MR. BINDER:  Objection to form.

1    been over your Danish list.

2                What does that mean?

3          A.    It means she would have sent me a list of

4    securities that they felt they could provide funding for

5    and, potentially, provide liquidity for.

6          Q.    And what did you and Mr. Crema discuss

7    about that list?

8          A.    I don't recall the exact conversation we

9    had about that list.

10         Q.    Okay.  And generally, your process would be

11   what?

12         A.    In general, we would've discussed what was

13   the dividend on those securities, what was the general

14   market on those securities, what did we think the profit

15   was going to be that the plan would make, stuff akin to

16   that.

17         Q.    Okay.  Let's pause there.

18               How did you calculate what profit the plan

19   would make?

20         A.    It was partially based on, like I said,

21   what the -- so when I say something like, the market,

22   what I'm referring to in this instance is the fact that

23   just even just entering into the transaction at all,

24   buying the security and selling the hedge, has a market

25   cost.  It's usually expressed as an all-in or a

1    percentage of the dividend.

2              So whereas in Denmark, 73 percent is the

3    underlying dividend entitlement.  The market for

4    something might be 80, 84, 92.  And, therefore, you know

5    that once you pay that away to the market, then there are

6    certain other knowable costs, such as the execution costs

7    of even doing this transaction, and that the financing

8    costs that would be associated with getting the leverage

9    or funding.

10             And when you then add in all those costs,

11   you arrive at the gross profit that the pension would

12   make.

13        Q.   And would Acer get a percentage of that

14   gross profit?

15        A.   ED&F would charge their fee.  After that

16   gross profit, Acer would charge ED&F a fee.

17        Q.   Were those fees based on a percentage of

18   that gross profit you just described?

19        A.   As we discussed earlier, they were based on

20   other factors, but expressed as a percentage -- ED&F's

21   fee was expressed as a percentage.

22        Q.   And generally, what was ED&F's fee as a

23   percentage of the gross profit you've just described?

24             MR. BINDER:  Objection to form.

25             MR. BLESSINGTON:  Objection.

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

```
1                  You may answer.
2            A.    90 to 95 percent.
3     BY MR. OXFORD:
4            Q.    And what percentage of that 90 to
5     95 percent would go to Acer?
6            A.    50 percent, approximately.
7            Q.    And that leaves the plan with what?
8            A.    5 to 10 percent.
9            Q.    So your intimate group of friend -- friends
10    and family who have these plans get 5 to 10 percent of
11    the profit, and Acer and ED&F Man split 90 to 95 percent
12    of the profit; is that right?
13                 MR. BINDER:  Objection to form.
14           A.    Yes.  Actually, I would add onto that.  By
15    virtue of their ownership in Acer, those plans end up
16    making part of what Acer makes.
17    BY MR. OXFORD:
18           Q.    Through the Pact Agreement?
19           A.    Correct.
20           Q.    Right.  We'll come back to that.
21                 Okay.  So you and Mr. Crema identify from
22    Ms. Foster's list, the shares that you would like to
23    trade in sort of round numbers; is that fair?
24           A.    Can you say it again?  I apologize.
25           Q.    Withdrawn.  I -- I apologize.  I'll -- I'll
```

```
 1          A.    No.
 2                MR. BLESSINGTON:  Objection.
 3                You may answer.
 4          A.    No.  I actually did not say that that
 5    involved the Acer plans at all.
 6    BY MR. OXFORD:
 7          Q.    I see.  Maybe I misunderstood your
 8    testimony.  Okay.  So let's try and do this in a clean
 9    way.
10                Is the agreement reflected in your
11    March 4th e-mail to Ms. -- to Ms. Foster that ED&F's
12    profit on the Acer plans Danish trading would be split
13    50/50 between Acer and ED&F Man?
14          A.    Yes.
15          Q.    And you told us earlier, did you not, that
16    ED&F Man's profit on the Acer plan dividends trading in
17    Denmark were almost 95 percent of the profit after the
18    fees had been taken off?
19                MR. BINDER:  Objection to form.
20                MR. BLESSINGTON:  Object as to form.
21                You may answer.
22          A.    I think I specifically said that ED&F's fee
23    that they charged equated to 90 to 95 percent.
24    BY MR. OXFORD:
25          Q.    90 to 95 percent of the profit on the
```

```
 1    BY MR. OXFORD:

 2          Q.    From a capital allocation perspective, does

 3    it matter which country the securities are issued in?

 4          A.    I couldn't attest to whether that mattered

 5    on ED&F's side or not.

 6          Q.    Okay.  Did ED&F need to allocate capital in

 7    order to facilitate the Acer plans Danish securities

 8    purchases?

 9                MR. BINDER:  Objection to form.

10          A.    They would have needed to arrange funding,

11    yes.

12    BY MR. OXFORD:

13          Q.    Okay.  There's a reference here to

14    Ms. Foster saying:  You were going to send over a

15    trade -- a trade diagram.

16                Do you see that?

17          A.    Yes.

18          Q.    Why is Ms. Foster asking you for a trade

19    diagram?

20          A.    We just looked at the one I sent them.

21          Q.    Okay.  I understand.

22                Did you put together an indicative trade

23    schedule as requested by Ms. Foster?

24          A.    I can't tell from this e-mail, but I don't

25    see why I wouldn't have.
```

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 19, 2021

1          Q.    Okay.  That's all I have for this document,
2     thanks.
3                Can you open up please 2489?
4          A.    We have it open.
5          Q.    So this goes back to the original
6     discussions with ED&F in 2012.  Can you turn to Page 2 of
7     the e-mails, and to the bottom of the second page, the
8     18 July 2012 e-mail from Ms. Foster to you.
9                Do you have it?
10         A.    Yes.
11         Q.    Okay.  She says in the second paragraph:
12    I'm not sure if we've been through funding cost with you.
13               And then she explains what the funding
14    costs would be.  And she says:  We need 72 hours to get
15    funding in place from our group treasury and once we have
16    committed to that, we are charges.  It's at EURIBOR plus
17    4.75.
18               Do you see that?
19         A.    Yes.
20         Q.    And is -- is that the charge that the
21    internal desk at ED&F Man is charged for funding the
22    trading on behalf of the Acer plans?
23               MR. BINDER:  Objection to form.  Lacks
24          foundation.
25               MR. BLESSINGTON:  Objection.

1          A.    I take that to mean that that is what they

2     get charged by their treasury.

3     BY MR. OXFORD:

4          Q.    And they passed that charge on to the Acer

5     plans, correct?

6               MR. BINDER:  Objection to form.

7          A.    Yes.

8     BY MR. OXFORD:

9          Q.    And they go in to say:  Marcus can walk you

10    through any custodian fees.

11               Did Marcus walk you through any custodian

12    fees?

13         A.    I can't recall specific a conversation

14    about it.  But I would think if she said he was going to,

15    that that happened.

16         Q.    She goes on to say:  We would propose you

17    fund the account with some money, i.e., any capital risk

18    plus some to cover the percentage of the initial margin.

19               Do you see that?

20         A.    Yes.

21         Q.    Why was only some of the initial margin

22    being funded by the plans?

23               MR. BINDER:  Objection to form.

24         A.    I would put this in context of them talking

25    about, as they did above futures.  And with regards to

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
2        MASTER DOCKET 18-MD-2865(LAK)
            CASE NO. 18-CV-09797
3

4    _____
                                            )
     IN RE:                                 )
5                                           )
     CUSTOMS AND TAX ADMINISTRATION OF      )
6    THE KINGDOM OF DENMARK                 )
     (SKATTEFORVALTNINGEN) TAX REFUND       )
7    SCHEME LITIGATION                      )
                                            )
8    _____)

9

10

11            CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                 DEPOSITION OF
                   STACEY KAMINER
15                    VOLUME 2

16             Tuesday, April 20, 2021
                8:08 a.m. — 2:35 p.m.
17
                 Remote Location
18               Via Huseby Connect
                 All Parties Remote
19

20

21

22

23

24          Stenographically Reported By:
                 Erica Field, FPR
25

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 20, 2021

Page 249

```
 1    Thereupon,

 2    the following proceedings began at 8:08 a.m.:

 3                   THE VIDEOGRAPHER:  We are back on the

 4             record.  This begins Day 2, Volume II of the video

 5             deposition of Stacey Kaminer.  The time is

 6             8:08 a.m., April 20, 2021.

 7                   Will the court reporter please administer

 8             the oath.

 9    Whereupon,

10                   STACEY KAMINER,

11    having been first duly sworn or affirmed, was examined

12    and testified as follows:

13                   THE WITNESS:  I do.

14                   MR. BINDER:  Before you begin your

15             questioning, I just wanted to follow up on a

16             statement I made on the record yesterday.

17                   During your questioning of Ms. Kaminer, you

18             stated that, quote, ED&F's counsel had represent

19             ed to us that there was no recording that they

20             have of your placing an order orally for the

21             shares prior to the 20th of November, closed

22             quote.

23                   So at the time I stated that as current

24             counsel for ED&F in this matter, I was unaware of

25             such representation.  So since the end of the
```

Page 269

1          Q.     The title is:  Dividend Finder Fee Billing

2     for Danske Bank, Novozymes and Pandora?

3          A.     Yes.

4          Q.     And he writes:  Hi, Marcus/Chris, attached

5     is the Acer group LLC billing for those three shares,

6     correct?

7          A.     Yes.

8          Q.     What was Acer invoicing ED&F for here?

9          A.     Our fees.

10         Q.     What were your fees based on?

11                What did you do to earn those fees?

12         A.     I believe I stated yesterday that ED&F paid

13    us based on our relationship, based on overall value that

14    we brought to the table, based on the instances when we

15    did locate stock, and that our dividend finder fee didn't

16    just cover locating, sourcing, whatever word you want to

17    use for the term stock, and they did not separate out

18    well, this is Belgium, this is Canada, this is Denmark.

19    They viewed us as a relationship in the whole.

20         Q.     The one thing that we can be sure is, is

21    that Acer services for Denmark did not include finding

22    any dividends.

23                We can agree on that?

24         A.     We can agree that Acer services for Denmark

25    did not include locating stock that ultimately got

```
 1    delivered to ED&F.

 2           Q.    And that's what you described yesterday at

 3    your dividend finder fee business?

 4           A.    No, it isn't.

 5           MR. BLESSINGTON:  Objection.

 6           A.    No, it isn't.  I described that as a

 7    component or part of our dividend finder fee business.

 8    BY MR. OXFORD:

 9           Q.    So tell me, how are those numbers

10    calculated in the invoice?

11           A.    Which number specifically are you referring

12    to, please?

13           Q.    All of the numbers, actually.  Let's look

14    at Pan -- let's look at -- particularly at the Pandora

15    numbers here on the invoice.  So there's 7,950 [sic]

16    shares.

17           MR. BINDER:  Objection.

18    BY MR. OXFORD:

19           Q.    That's the number of shares that were sold

20    to the Acer plans, correct?

21           A.    700,950, correct.

22           Q.    Yep.  And the fee wasn't calculated on

23    any -- any dividends that Acer had sourced, correct?

24           A.    Acer doesn't source a dividend.  They

25    would --
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 20, 2021

```
 1              Q.    Acer doesn't source stock?

 2              THE STENOGRAPHER:  I'm sorry.  The answer

 3         again?

 4              A.    Acer doesn't source dividends.  They would

 5         have sourced or located a stock in --

 6              Q.    But they didn't source or locate the stocks

 7         that is referenced on this e-mail, this Pandora stock,

 8         did they?

 9              A.    No, they did not.

10              Q.    And they didn't actually locate any of the

11         other stocks that are listed on this invoice or any other

12         invoice that Acer sent ED&F in connection with Danish

13         dividend arbitrage trading?

14              A.    That's correct.

15              Q.    And that fee is based on the 50 percent

16         share of ED&F Man's fee as you testified yesterday,

17         correct?

18              A.    Yes.

19              Q.    And the rest of the numbers there are just

20         made up to make it look like there's an actual dividend

21         finders fee calculated based on individual stocks?

22              MR. BLESSINGTON:  Objection.  You can

23         answer.

24              A.    No.

25
```

1    average, the all-in, which we discussed earlier that gets

2    paid out to what I deemed the market, or is sort of the

3    cost initially in buying the stock and entering into the

4    hedge and is in the range of 89 percent all-in.  If we

5    use that number and -- therefore the remainder of the

6    reclaim that gets held as a gross profit by the pensions

7    is equal to approximately 11 percent of the dividend,

8    which would therefore equate to little less than half,

9    maybe 40 percent of the reclaim, reclaim being

10   27 percent, so my math could be off on the percentage.

11           Q.    Either your math is off or mine.  It

12   wouldn't be the first time, at least on my part.

13                 Are you suggesting that the plans -- the

14   Acer plans retained about 40 percent of the reclaim that

15   Denmark paid to the Acer plans, 40 percent of the 18

16   million?

17           A.    On a gross profit basis, yes.  If I

18   interpreted the question incorrectly, I apologize.

19           Q.    Well, let me ask it a different way.

20                 How much in terms of dollars and cents at

21   the end of the day, of the 18 million, was actually

22   retained by the Acer plans after ED&F had been paid their

23   fees, after Acer had been paid their fees, after all the

24   other expenses that we've talked about at length?

25           A.    Acer did not get paid fees by the pension

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 20, 2021

1    every trade, there wasn't a detailed reconciliation

2    informed and ultimately agreed between Mr. Goldman on

3    behalf of Acer and so the Acer plans and ED&F?

4         A.    No.

5         Q.    Your testimony is that such a detailed

6    reconciliation did not happen on each occasion?

7         A.    You asked me -- you said -- I maybe

8    misinterpreted.  I thought you said in your question that

9    it was my testimony that it did not happen in every case

10   and I am saying no, that's not my testimony.

11        Q.    Okay.  Let me try to clean it up.

12             Do we agree that Acer and ED&F Man

13   conducted a detailed reconciliation on all of the costs,

14   including the financing costs, on each trade involving

15   Danish securities?

16             MR. BINDER:  Objection to form.

17        A.    Yes.  But that not all of the same

18   information was necessary in every reconciliation.

19   BY MR. OXFORD:

20        Q.    So, for example, Acer would need to know

21   the dates on which shares were borrowed by ED&F Man in

22   order to ensure -- withdrawn.

23             So in the case where ED&F Man covers its

24   short sale to the plan by borrowing shares, Acer -- in

25   order to do the reconciliation that you have just agreed

1    happened on every occasion, Acer would need detailed

2    information about the stock lending transactions

3    including the number of days over which the interest

4    should be charged, and with that comes the day ED&F

5    borrowed the stock and day that ED&F unwound the stock?

6                MR. BINDER:  Objection to form.

7          A.    So there wouldn't be an instance that --

8    actually, it doesn't matter.

9                If there was an instance where we were

10   trying to track the financing with regard to money laid

11   out for three days, whether it was for a borrow or not,

12   we would need to know the amount of money and the rate.

13   But we generally knew the rate in advance, as in there

14   was an e-mail that we had gotten and if that changed,

15   then we were apprised of it, of what the rate of funding

16   was that they charged and it was pegged to the Euribor

17   and we could look that up.

18               If when we calculated that out, let's say

19   we were in our reconciliation within a hundred dollars --

20   not saying this was what happened but by way of

21   example -- a hundred dollars of what they were saying,

22   would there be a need for Alan to pursue really in-depth

23   more detailed figures from ED&F, no.

24               If we -- if the -- if the optics we put

25   together matched what they were saying, then if they

```
 1    didn't, then yes.
 2    BY MR. OXFORD:
 3         Q.    Can you pull up Exhibit 2492?  I think we
 4    looked at this yesterday.
 5              MR. BLESSINGTON:  Do you want the
 6         spreadsheet, Neil, or just the e-mail?
 7              MR. OXFORD:  Just the attachment, actually.
 8         Just the cover e-mail actually, John.
 9         A.    We have it open.
10    BY MR. OXFORD:
11         Q.    We looked at this yesterday, didn't we?
12         A.    Yes.
13         Q.    I know it's been a long day or so.
14              This is an example, is it not, of
15    Mr. Goldman going over financing costs that ED&F is
16    charging to the Acer plans with a fine-tooth comb and
17    finding some that are larger than expected?
18         A.    This would be an example of Alan being -- I
19    don't think he was ever not thorough, and it's just there
20    wasn't always reason to dive deeper.
21         Q.    Okay.  Just back to the stock lending
22    example.  If Alan is being thorough, and the Acer plans
23    are being charged daily interest rates for facilitating
24    stock lending transactions, whether to purchase or unwind
25    the purchase of Danish shares, then he would need to know
```