UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 18-MD-2865 (LAK)

IN RE:

CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION

This document relates to case nos. 19-cv-01866, et al.

C O N F I D E N T I A L

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

ANDREW WALL

DATE: February 23, 2022

REPORTED BY: MICHAEL FRIEDMAN, CCR

A N D R E W W A L L,

called as a witness, having been first duly sworn according to law, testifies as follows:

EXAMINATION BY MR. OXFORD:

Q I think you can put your hand down, now, Mr. Wall.

A I'm not too sure whether Mike heard me or not. I was waiting for him to ask me to resubmit.

Q Okay. Mr. Wall, we have an echo.

MR. OXFORD: Does anybody else hear that? Okay it's gone.

Q Mr. Wall, good morning and good afternoon. Again, my name is Neil Oxford. I represent the plaintiff SKAT in this case. I will be asking you some questions today.

Just so we have a clear record, I'm going to give you a couple of instructions to make it easier for Mike to take it all down.

If you would please let me finish my question before you start to answer, that will make it easier for Mike to take it down. And similarly, I will try to let you finish

have Exhibit 4393 in front of you, sir?

A Could I just check with you, Mr. Oxford? This is a letter from Rosenblatt dated the 11th of January, 2021.

Q Yes, exactly. Appreciate your confirmation.

And Rosenblatt are the ED&F lawyers that you've been meeting with in preparation for the deposition today.

Correct?

A That's correct, yeah.

Q Have you -- this document is dated 11th of January, 2021.

Do you see that?

A I do, yeah.

Q Have you seen this document before?

A (Witness reviewing.)

I have seen a lot of documents in preparation for my deposition. I don't remember seeing this document.

Q Okay. I turn your attention to the series of numbered paragraphs halfway down the page, starting with Number 1, "Who made the payments?"

Do you see that?

A I do.

Q The letter states, beginning on the second line of that paragraph, "With respect to every trade underlying Number 1, Schedule 1 of Annex E tax vouchers, and Number 2, the incorrect information in Schedule 2 of the Annex E tax vouchers, the payments to the pension plans were made by ED&F Man Proprietary Trading Dubai Limited, MPT Dubai, the ultimate counterparty from whom the pension plans had acquired the right to the relevant Danish shares."

Do you see that?

A I do, yeah.

Q Is that an accurate statement?

A (Witness reviewing.)

I believe there is a slight inaccuracy in that the payments were made from ED&F Man Limited. Payment was taken from MPT Dubai, but the payments to the pension plan was made by ED&F Man.

Q Do you mean to say that the payments referenced in Paragraph 1 were made to the pension plans by ED&F Man Capital Markets and then charged by ED&F Man to

MPT Dubai?

A That's correct. As I understand it, ED&F Man Capital Markets was MPT Dubai's clearing broker and had access to their account.

Q And with that one clarification, is Paragraph 1 accurate?

A (Witness reviewing.)

I would also draw your attention to the fifth line there where it mentions ED&F Man Proprietary Trading Dubai Limited, in brackets, "MPT Dubai," I would say that was a wrong reference to a company name.

The company name was MPT Dubai.

Q Okay. Other than those two clarifications, is Paragraph 1 accurate?

A Other than those two, yeah.

Q You don't have to read it out loud, but could you please read to yourself Paragraph 2, which begins, "Why the Payments Were Made," and let me know when you're done?

A (Witness reviewing.)

I've read that one, Mr. Oxford.

Q Okay. Great. So just taking each sentence one by one, the first sentence is,

"Having acquired the right to the relevant Danish shares on a trade date prior to the reference date, the pension plans had a contractual right to dividends in respect of such shares."

Do you see that?

A Yeah.

Q Is that an accurate statement?

A That is an accurate statement, yes.

Q What does "reference date" mean?

A That is the ex date when, to receive a dividend, purchaser needs to own the shares in that company by. Before, actually, just to clarify.

Q Okay. So let's just try again so we have a clear record.

What is the "reference date" mentioned in this sentence?

MR. BINDER: Objection, asked and answered.

A The reference date is also known as the dividend ex date. This is the date by which, to receive a dividend in the share purchased, the purchasing company has to -- or the purchasing clients needs to own

the share before that date.

Q The sentence references a "contractual right to dividends."

What is the basis of ED&F's belief that the pension plans had a contractual right to the shares?

MR. BINDER: Objection to form.

A (Witness reviewing.)

The contractual right is more of a legal term that would be structured and I can't answer that fully.

Q Can you answer it in any respect?

A In context of this paragraph, the contractual right would be referring to the fact that the pension plans had purchased the shares before the dividend dates, or the reference date as mentioned here, and would be entitled to receive a dividend on the shares.

Q The next statement -- the next sentence, rather, reads, "However, the counterparty, MPT Dubai, was unable to pay the pension plans' dividends in satisfaction of such rights because it did not have a right to the relevant Danish shares on the

trade date, and thus did not receive the dividends from the underlying Danish company."

Do you see that?

A I do.

Q Is that also an accurate statement?

A (Witness reviewing.)

That statement is accurate. Yes, it is, Mr. Oxford.

Q What does it mean, that MPT Dubai did not have a right to the relevant Danish shares on the trade date?

MR. BINDER: Objection to form.

A At the time the trade was executed by MPT Dubai by either selling of the shares to the pension plan, MPT Dubai did not own the shares to sell at -- on that date.

Q Would it be accurate to say that MPT Dubai sold Danish shares short to the defendant plans that didn't cover the short sales as of the trade date?

A (Witness reviewing.)

It would be accurate to say, as of the trade date, MPT Dubai short sold the shares. But they may well possibly have had

other orders in place to buy the shares at the same time.

Q And if they did have such orders, would they have had a right to the relevant Danish shares, and therefore would have received dividends from the underlying Danish company?

MR. BINDER: Objection to form. Beyond the scope of the 30(b)(6).

A (Witness reviewing.)

I would like to withdraw my previous statement about MPT Dubai having orders elsewhere. At the time of the trade when MPT Dubai entered into a short sale, they did not have the right to the dividend, no.

Q Okay. So using -- going back to my original question, would it be accurate to say that MPT Dubai sold Danish shares short to the defendant plans, but MPT Dubai did not cover the short sales as of the trade date of the sale to the pension plans?

A That would be an accurate.

Q And because of this, MPT Dubai could not convey to the defendant plans

shares that came with them an entitlement to a dividend?

A That is correct, yeah.

Q Just so we have a clear record, when I asked you the question, "Would it be accurate to say that MPT Dubai sold Danish shares short to the defendant plans, but MPT Dubai did not cover the short sales as of the trade date of the sale to the plans," did you say that would be accurate or inaccurate?

A Apologies if you misunderstood. I said that would be accurate.

Q Thank you. It was just a transcription that I want to make sure I -- I don't think there's a misunderstanding. I just want to make sure we have a clear record. Thank you for clarifying that.

So is it correct that in order for a counterparty such as MPT Dubai to be able to transfer a right to a dividend to the pension plans, it must have had the right to the relevant Danish shares on the date the pension plan entered into the applicable purchase transaction?

MR. BINDER: Objection to form.

earlier -- actually, can I just withdraw that -- my previous comment of "subsequent investigation," actually?

ED&F Man, as MPT Dubai's clearing broker, were aware that MPT Dubai had short sold the position to the pension plans and did not have the shares at the time of the trade.

Q And ED&F Man was MPT Dubai's clearing broker at the time of the trades in 2013, '14 and '15.

Correct?

A That's correct.

Q So ED&F Man, as MPT Dubai's clearing broker at the time of the trades, was aware that MPT Dubai had sold short to the pension plans and did not have the shares at the time of that trade?

MR. BINDER: Objection, objection to form. Again, this was the subject of prior testimony as to when ED&F had knowledge.

Q You can answer.

A ED&F, as MPT Dubai's clearing broker, would have had the information in

hand showing MPT Dubai's position in various Danish securities. How they chose to use that information, I cannot testify to, as members of the desk were not able or willing to discuss.

Q But the information that led ED&F to conclude in 2021 that MPT Dubai had sold short to the pension plans and didn't have the shares at the time of the trade was available to ED&F Man at the time of those trades.

Correct? We can agree to that?

MR. BINDER: Objection to form, lacks foundation.

A The information mentioned in this letter here of 2021, as you say, would have been available at the time. How ED&F Man at the time chose to use that information, I cannot comment on.

Q You told me a few moments ago that members of the desk "were not willing or able to discuss."

What did you mean by that?

A In the course of the preparation for my deposition, my counsel had informed me

Q As part of your getting up to speed, did you come to learn at any point why the information that ED&F Man had about MPT's failure to cover the shorts was not utilized?

MR. BINDER: Objection to form.

A No. Unfortunately, Mr. Oxford, no, I don't understand. I -- my -- as you mentioned, coming up to speed, I have no understanding as to why the information wasn't used.

Q Okay. As a corporate representative of ED&F Man today, what is ED&F Man's position as to why this information wasn't utilized by ED&F at the time?

MR. BINDER: Objection to form.

A As a representative of ED&F today, I have -- again, I have no knowledge as to why this information was not used at the time.

Q Okay. Directing your attention, if I could, sir, back to the Rosenblatt letter, Exhibit 4393, sticking with numbered Paragraph 2, the last sentence reads, "Accordingly, MPT Dubai satisfied its

contractual obligations to the purchasing pension plans by paying sums equivalent in value to these dividends net of 27 percent WHT."

Do you see that?

A I do, sir, yeah.

Q And is that an accurate statement, sir?

A (Witness reviewing.)

MPT Dubai did pay some equivalent to the value of the dividends net of 27 percent withholding tax, yes. That's -- I'm unsure as to the statement where it says that they've satisfied their contractual obligations, and so I'm not a legal expert.

But yes, I can confirm that payment was made equivalent to the dividend that would have been received by the pension plan. I'm unsure as to whether that satisfies any contractual obligation.

Q And you would agree, sir, that making a contractual payment such as the ones referenced in Paragraph 2, that's not the same thing as transferring a real dividend?

MR. BINDER: Objection to form.

A Yeah. So I would agree, Mr. Oxford, that the pension plans had a right to receive a dividend. And MPT Dubai have paid by the clearer, ED&F Man and others, an equivalent amount to the amount they would have received had they been paid a dividend.

Q And that equivalent amount, such as the ones that were made on the Annex E claims, we can agree cannot serve as the proper basis for a tax voucher?

A That is not a dividend. So, as you say, that cannot serve as a proper basis for a tax voucher.

Q And can we agree that the right to receive a dividend is insufficient for ED&F to have issued a tax voucher?

MR. BINDER: Objection to form.

A (Witness reviewing.)

The client in the pension plans, in executing the trades with MPT Dubai, understood that they were buying the shares before the ex date, and understood they would be entitled to a dividend payment. As such,

there would be an expectation that there would be a tax voucher being received by them.

Q But that understanding or expectation alone would not be sufficient to permit ED&F to issue a tax voucher unless MPT Dubai actually transmitted to the pension plans a real dividend.

Correct?

MR. BINDER: Objection to form.

A As I mentioned earlier, the information was available to ED&F Man at the time. How they chose to use it, I can't comment on, so.

Q Yeah, I think you may have misunderstood my question, Mr. Wall. I'm not asking about what ED&F Man did with the information in its possession about MPT's trades in 2013 or 2014. I'm asking a different question.

Is the expectation of the pension plans that they would receive a dividend in a situation where MPT Dubai did not convey to them a real dividend sufficient for ED&F Man to issue a tax voucher?

MR. BINDER: Objection to form.

A (Witness reviewing.)

Expectation by the pension plans that they would receive a dividend is not enough for ED&F Man to have issued a tax voucher.

Q Thank you.

Turning your attention to Paragraph 3, it begins, "Why the Annex E tax vouchers treated the payments as dividends."

Do you see that?

A Yes, I do.

Q Is goes on to say, "When completing the Annex E tax vouchers, which were in a standard form template, Michael Meade, M-E-A-D-E, of ED&F Man's operations desk, took into account the relevant pension plans' entitlement as of the trade date. He did not understand at the time when the payments received by the pension plans could not constitute dividends net of WHT (i.e., although equivalent in value, they were not dividends which had been paid by the underlying Danish company)."

Do you see that?

Danish company?

MR. BINDER: Objection to form.

A As we mentioned earlier in the deposition, Annex E is made up of two schedules; Schedule 1 and Schedule 2. Schedule 2, the trades are executed, some of them by MPT Dubai, some with other underlying clients.

When a dividend was paid, ED&F contacted the underlying clients, clearers, and the dividends were paid.

Q What do you mean, "when a dividend was paid, ED&F contacted the underlying clients, clearers, and the dividends were paid?"

A As you know, in Annex E, the -- the trades -- the trades executed against MPT Dubai, MPT Dubai did not own those shares and did not have -- were unable to provide shares with dividends.

In Schedule 2 of Annex E, other clients were involved in selling shares to the pension plans. These, as we are -- as far as -- as far as we are aware, the other clients held shares in these Danish

securities and were able to forward on the dividend to the pension plans.

Q Okay. Tell me, please, what steps ED&F took to confirm the other clients held Danish shares in these securities, in these companies, and were able to forward the dividend to the pension plans.

MR. BINDER: Objection to form.

A ED&F did not take any steps any differently in any of the trading in Annex E. There was no checks made with the other clients outside of MPT Dubai to understand -- to check whether they held the shares before they sold them to the pension plans.

Q As ED&F's corporate representative, can you tell me whether ED&F's process for issuing tax vouchers was different with respect to the Annex E vouchers and to any other vouchers that it issued to the defendant plans concerning Danish securities?

A It's my understanding that the issuance of tax vouchers was no different, you know, as we've said. It's been identified that the tax vouchers in Annex E contained incorrect information.

entitled to a dividend on the second trade in this strategy, which is the buy leg.

Q Thank you.

The next paragraph goes on to say, "The transactions were executed by Chris Henstock of MPT. And as will be noted from the copy orders and instructions previously provided by MCM, Chris would check with the MCM finance desk that they had a sufficient credit line available to settle a particular transaction."

Do you see that?

A I see that, yeah.

Q Why would Mr. Henstock need to check with the MCM finance desk prior to entering a transaction?

MR. BINDER: Objection to form, lacks foundation.

A ED&F Man Capital Markets Limited were MPT Dubai's clearer. So before executing a trade, MPT Dubai would need to -- would need to find out whether they had sufficient credit line to settle this -- to settle any particular transaction that they wanted to enter into.

As I mentioned, the reason they would do this is because MCM or ED&F Man Capital Markets were MPT Dubai's clearing broker.

Q Right. So Mr. Henstock would check with MCM finance desk prior to entering into any of those transactions that are described in this memo at Exhibit 4168?

A That they would check to see whether they had sufficient credit line available to settle a particular transaction.

Q And in order to be able to do that, Mr. Henstock would need to disclose the nature of the transactions that he was intending to complete.

Correct?

MR. BINDER: Objection to form.

A Mr. Henstock would need to disclose the intended trade to check if he had sufficient credit line available.

Q And that disclosure would include the particular shares that are involved, the volume, pricing data, and the dates on which the trades were entered and would settle.

Correct?

A "split" is a split trade. You will note that the amounts there will add up to 22.3 million shares.

Q Okay. So what's a "split?"

A A trade that's been split into smaller parts.

Q I see. So we have three splits of 2 million, one split of 2.2 million, two splits of 2.15 million, one split of 3.3 million, one split of 4 million, and one split of 2.5 million?

A As per the confirmation, yes.

Q And what is the reason that MPT would split a transaction into smaller parts?

MR. BINDER: Objection to form and beyond his scope as a corporate representative of ED&F.

MR. OXFORD: I'm just asking for the witness' understanding from ED&F's perspective.

A The trade would be split into smaller parcels or lot size, if you like. Smaller trades are easier to settle.

Q Why are they easier to settle?

A You need less shares to settle

smaller trades than you do to settle one big trade.

Q Can you explain what you mean by that? Feel free to use an example if that's easier.

A ED&F were a clearing broker of MPT Dubai. ED&F held a depot account with certain amounts of Danish securities in it.

Smaller parcels of shares would be used to settle these smaller splits of trades.

Q In the context of the memo to the FCA, Exhibit 4168, is it correct that this trade confirm that we've just been looking at is Trade 1?

MR. BINDER: Objection to form, lacks foundation.

A (Witness reviewing.)

In the context of the document we've been looking at, sir, Mr. Oxford, yes, this would be Trade 1 as per the diagram.

Q Okay. Then, in the same exhibit, can I direct you 11 pages earlier to the document ending in Bates number 938?

A (Witness reviewing.)

MR. BINDER: Objection, hypothetical and outside the scope of his role as a corporate representative.

A I'm unable to answer that question, Mr. Oxford.

Q Why is that?

A I don't know the answer.

Q Okay. Last topic, you'll be delighted to hear, I just want to follow up on a couple of your answers earlier.

When I was asking you about the reason transactions were split into smaller parts, you told me that smaller trades are easier to settle because you need fewer shares to settle a smaller trade than a large one.

Do you remember telling me that?

A I do remember telling you that, yes.

Q Okay. And then I asked you to give me an example, and you told me that ED&F was a clearing broker for MPT Dubai and ED&F held a depot account with a certain amount of Danish securities in it.

Do you remember telling me that?

A Yes.

Q And you went on to say that smaller parcels of shares would be used to settle the smaller splits.

Correct?

A That's correct.

Q Okay. Is it correct that in the depot account, ED&F held certain amounts of Danish securities, but not enough to settle all of the Danish trades that they were settling in one day?

A There wasn't enough shares held within the depot to settle all of the trades on one day.

Q Okay. And how is it that ED&F then managed to settle all of those trades in one day?

MR. BINDER: Objection to form.

A Trades were, as we've -- as we've covered, were in smaller shapes. The smaller shapes were able to be settled with the shares that were held in the depot account by ED&F Man.

Q Is that what's known in the industry as "intraday settlement?"

MR. BINDER: Objection to form. It looks like we lost our witness.

MR. OXFORD: Let's go off the record while we get him back.

THE VIDEOGRAPHER: Stand by. The time is 4:18 p.m. New York time and we're going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER: Stand by. The time is 4:18 p.m. New York time and we're back on record.

Q Okay. So my question, Mr. Wall, was: Is that what's known in the industry as "intraday settlement?"

MR. BINDER: Objection to form.

A I'm not familiar with the term "intraday settlement," Mr. Oxford, I'm afraid.

Q Okay. So can you explain to me in a little more detail how it is that ED&F used the shares that it did have in the depot to settle all the trades in one day?

MR. BINDER: Objection to form.

A The trades -- the trades in the depot account were of sufficient size to

settle the shapes of trades reviewed individually.

Q Okay. And then, would the same shares be used again on the same day to settle another shape of the same shares?

A Yes, they would. Yes, they would.

I'm sorry if you didn't hear me.

Q Yes. Thank you.

And did the reuse of the shares on the same day happen more than once on the same day when ED&F was settling Danish trades?

MR. BINDER: Objection to form.

A Yes, they did. I'm sorry.

Q The answer was yes, I believe.

And would the shares be reused multiple times until all the shapes were settled?

A Yes, they would.

Q Give me one second, if you could. I think we may be finished. Let me just consult with my colleagues.

(Whereupon a discussion was held off the record.)

MR. OXFORD: Let's go off for just

abbreviated to "CP?"

A No, I have not, no.

Q You have not. Okay. We'll do that another way.

Mr. Binder asked you, other than MPT Dubai, is ED&F aware of any other counterparty short selling without a covered position, and you said no, ED&F Man is not aware of any other counterparty short selling without a covered position.

Do you remember that?

A Yes.

Q Can you tell me, please, what investigation ED&F has done in order to find out whether any other counterparty that was selling shares to the defendant pension plans was selling short without a covered position?

MR. BINDER: Objection, asked and answered.

Q Are you able to answer the question, sir?

A Could you just answer -- ask the question again, please, Mr. Oxford?

Q Can you tell me, please, what investigation ED&F has done in order to find

out whether or not any counterparty that was selling shares to the defendant pension plans was selling short without a covered position?

MR. BINDER: Objection, asked and answered.

A ED&F would have not done any investigation into the counterparties to see whether they were selling short.

Q Thank you.

MR. OXFORD: I have no more questions. Neil, other counsel, do we have any other questions or can we let this gentleman --

MR. BINDER: We are done.

THE VIDEOGRAPHER: Okay. Stand by. The time is 5:41 p.m. New York time and we're going off the record.

THE COURT REPORTER: Recapping orders, Hughes Hubbard, five realtime connections, rough draft, next day final.

Hanamirian, rough draft, regular final.

Wilmer Hale, rough draft, regular final.