CONFIDENTIAL PURSUANT TO RULE 26(c) PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to all cases listed in Appendix A. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**EXPERT REPORT OF FELICITY TOUBE QC**

**Purpose of the Expert Engagement**

1.   Counsel for SKAT,[1] which is the Customs and Tax Administration of the Kingdom of Denmark, has requested my expert opinion on whether, as a matter of the construction of certain English law documents (the Contract Suite documents - as defined in paragraph 13 below), ED&F Man Capital Markets Limited (**"ED&F"**) held all right, title and interest to certain Danish securities (the **"Securities"**) and related dividends (**"Dividends"**) which it held as collateral to secure obligations owed by the pension plan clients (the "**Pension Plans**") to ED&F when Dividends were declared in respect of those Securities, or whether it held the Securities as bare trustee (the "**Issue**").

**A.   Qualifications**

2.   I am a barrister practicing at the Bar of England and Wales from Chambers known as South Square, which is located at 3-4 South Square, Gray's Inn, London WC1R 5HP. I have an Upper Second Class Honours Bachelors Degree in Law and a First Class Honours Masters Degree in Law from Oxford University (BCL) (both from Magdalen College, Oxford). I am currently engaged in a part-time DPhil (PhD) at the University of Oxford,

---

1.   I have been informed by counsel for the Plaintiff that at the time of the events alleged in the complaint, the Plaintiff was known as "SKAT." Pursuant to Danish Legal Order 804, entered on June 6, 2018, the Plaintiff changed its legal name to Skatteforvaltningen, effective as at July 1, 2018.

in issues of cross border insolvency. I was called to the Bar in 1995. I was appointed as Queen's Counsel in 2011.

3. I was appointed as a Mediator by ADR in 2014 and am Co-Chair of the INSOL ADR Colloquium. I am a Vice President of the International Insolvency Institute ('**III**'), and am regularly asked to speak at, and Chair, conferences in the UK and internationally (including by INSOL, III, and GRR).

4. My CV is attached as Appendix C. As that CV shows I am a specialist in corporate and individual insolvency law (and in particular cross-border insolvency) and my practice at the Bar encompasses a wide range of business law, including questions of construction of commercial agreements and issues of title. I have appeared in numerous reported cases involving financial and commercial law, including acting for the liquidators and office-holders of numerous banks and financial institutions, including Bank of Credit and Commerce International (BCCI), Lehman Brothers, MF Global, and the Icelandic banks. I have also authored or co-authored a large number of publications relating to insolvency and commercial law, including as editor of "International Asset Tracing in Insolvency" published by the Oxford University Press in 2010, Moss, Fletcher and Isaacs on the EC Regulation, Halsbury's Laws, and (until the last edition) Dicey on Conflict of Laws.

**B.**   **Preparation of the Report**

5. I have been requested to provide an expert report on certain issues of English law which are relevant to the above-captioned proceedings (the "**Proceedings**") which are pending before the United States District Court for the Southern District of New York (the "**Court**"). I understand that this report will be placed before the Court and I understand my duties to the Court.

6. I am being paid an hourly fee of £850 for my services in this engagement.  My fee is not contingent on the outcome of this action or the conclusions expressed in this report.  In preparing this report, I have received assistance from a junior barrister also practising from South Square.

7.   A complete listing of the materials I reviewed and considered in forming my opinions and conclusions rendered in this report is attached hereto as Appendix B.

8.   In providing this report, I do not intend to, and do not, waive any legal professional privilege belonging to SKAT and SKAT's rights are reserved.

## C.   **Summary of Opinions**

9.   As a matter of English Law, it is my opinion that on the proper construction of the relevant documents:

(1)   The Terms are the general provisions that govern the relationships between ED&F and the Pension Plans in relation to the holding of collateral, and provide for collateral to be held subject to the title transfer collateral agreement (**"TTCA"**) in the Terms;

(2)   As a result, all right, title, and interest in the Securities and any Dividends, which were purchased using funds loaned by ED&F to the Pension Plans, would have automatically passed to ED&F.

10.   In addition, it is my opinion that as a matter of English law, and the proper construction of the relevant documents:

(1)   The Custody Agreement is only applicable to the extent that any Pension Plan had custody assets (*i.e.* assets that were acquired without financing from ED&F).

(2)   It was those assets (and those assets alone) that would belong beneficially to the clients and would be held by ED&F as bare trustee under the Custody Agreement.

(3)   The Custody Agreement was intended to ensure that ED&F complied with its obligations pursuant to the FCA Rules, in circumstances where it may have been holding custody assets (*i.e.* assets that were acquired without financing from ED&F) belonging to the Pension Plans in the course of its business dealings with clients.

11.  Further, it is my opinion that as a matter of English law:

    (1)  The Terms continued to apply to the relationship between ED&F and its clients in relation to the Securities; and

    (2)  The Terms were not subordinated to the other Contract Suite documents but ought to be interpreted consistently with those documents (and would be so interpreted by an English court).

## D.  **Factual background**

12.  The following is my understanding (from the various documents with which I have been provided) of the relevant facts and matters by way of factual background for my analysis set out below:

    (1)  SKAT has initiated legal Proceedings against the Pension Plans and related entities and individuals in the United States.[2]

---

2.  *See* Amended Complaint against American Investment Group Plan, No. 18-cv-09841, ECF No. 89 (S.D.N.Y. April 22, 2020); Amended Complaint against DW Construction Plan, No. 18-cv-09797, ECF No. 131 (S.D.N.Y. April 22, 2020); Amended Complaint against Goldstein Law Group Plan, No. 18-cv-02865, ECF No. 155 (S.D.N.Y. April 22, 2020); Amended Complaint against Kamco Investments, Inc. Plan, No. 18-cv-09836, ECF No. 87 (S.D.N.Y. April 22, 2020); Amended Complaint against Kamco LP Plan, No. 18-cv-09837, ECF No. 87 (S.D.N.Y. April 22, 2020); Amended Complaint against Newsong Fellowship Church Plan, No. 18-cv-10100, ECF No. 126 (S.D.N.Y. April 20, 2020); Amended Complaint against Linden Associates Plan, No. 18-cv-09838, ECF No. 82 (S.D.N.Y. April 22, 2020); Amended Complaint against Riverside Associates Plan, No. 18-cv-09840, ECF No. 88 (S.D.N.Y. April 22, 2020); Amended Complaint against Moira Associates Plan, No. 18-cv-09839, ECF No. 88 (S.D.N.Y. April 22, 2020); Amended Complaint against Autoparts Group Trust, No. 18-cv-09549, ECF No. 73 (S.D.N.Y. April 24, 2020); Amended Complaint against Bluegrass Retirement Group Trust, No. 18-cv-09511, ECF No. 74 (S.D.N.Y. April 24, 2020); Amended Complaint against Casting Pensions Group Trust, No. 18-cv-09498, ECF No. 72 (S.D.N.Y. April 24, 2020); Amended Complaint against Central Technologies Group Trust, No. 18-cv-09507, ECF No. 73 (S.D.N.Y. April 24, 2020); Amended Complaint against Industrial Pensions Group Trust, No. 18-cv-09497, ECF No. 71 (S.D.N.Y. April 24, 2020); Amended Complaint against MSJJ Retirement Group Trust, No. 18-cv-09552, ECF No. 82 (S.D.N.Y. April 24, 2020); Amended Complaint against JSH Farms Plan, No. 18-cv-09489, ECF No. 84 (S.D.N.Y. April 24, 2020); Amended Complaint against KRH Farms Plan, No. 18-cv-09491, ECF No. 84 (S.D.N.Y. April 24, 2020); Amended Complaint against MGH Farms Plan, No. 18-cv-09439, ECF No. 86 (S.D.N.Y. April 24, 2020); Amended Complaint against SRH Farms Plan, No. 18-cv-09434, ECF No. 85 (S.D.N.Y. April 24, 2020); Amended Complaint against Triton Farms Plan, No. 18-cv-09490, ECF No. 84 (S.D.N.Y. April 24, 2020); Amended Complaint against Del Mar Asset Management Plan, No. 18-cv-05374, ECF No. 110 (S.D.N.Y. April 24, 2020); Amended Complaint against Federated Logistics Plan, No. 18-cv-08655, ECF No. 95 (S.D.N.Y. April 22, 2020); Amended Complaint against Acorn Capital Strategies Plan, No. 18-cv-10088, ECF No. 62 (S.D.N.Y. April 22, 2020); Amended Complaint against Sterling Alpha Plan, No. 18-cv-04894, ECF No. 77 (S.D.N.Y. April 22, 2020); Amended Complaint against Cambridge Way Plan, No. 18-cv-10090, ECF No.

(2)    The Pension Plans, acting through their agents and representatives, applied to SKAT claiming repayments of tax withheld on Dividends that they purported to have earned on shares of Danish companies.[3]

(3)    SKAT alleges that these applications were fraudulent because the Pension Plans did not own the shares that they claimed to own, did not earn the Dividends they claimed to have earned, did not suffer any withheld tax and so were not entitled to the tax refunds they claimed.  SKAT also alleges that these applications were fraudulent because the Pension Plans did not meet the requirements to be an exempt entity pursuant to the double taxation treaty between the U.S. and Denmark.[4]

(4)    ED&F acted as a custodian for several of these Pension Plans and generated "tax voucher" documents for the Pension Plans' applications claiming that the respective Pension Plan held a specific Danish security over the dividend date. [5]

(5)    The Pension Plans traded on margin provided by ED&F, using ED&F funding to purchase the Securities at issue.[6] As such, at all material times there were sums owed by the Pension Plans to ED&F.

13.  ED&F maintained a number of agreements with the Pension Plans concerning the Pension Plan accounts and custody of the assets therein.  Below are the relevant agreements between ED&F and the Pension Plans with which I have been provided (collectively, the "**Contract Suite**"):[7]

---

59 (S.D.N.Y. April 22, 2020); Amended Complaint against KK Law Firm Plan, No. 18-cv-10127, ECF No. 77 (S.D.N.Y. April 22, 2020).

3.   *Id.* ¶ 4.

4.   *Id.* ¶ 4.

5.   *See e.g.* ED&F's Memorandum of Law in Opposition to Motions to Dismiss Amended Counterclaims at 7, Case No. 1:18-md-02865, ECF No. 357 (June 9, 2020); *see also* Deposition Tr. of Shahab Hashemi at 403:20 – 404:4.

6.   *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

7.   Deposition Tr. of Shahab Hashemi at 329:4 -330:8 (confirming that each Pension Plans executed a Custody Agreement, Security Deed, ISDA, 'fee agreement letter' and Terms with ED&F, and that some plans executed a GMSLA).

(1)    New Account/Elective Categorization Letter;

(2)    ED&F Terms and Conditions of Business (the "**Terms**");

(3)    First Variation Letter from ED&F to Pension Plan (the "**First Variation Letter**");

(4)    Second Variation Letter from ED&F to Pension Plan (the "**Second Variation Letter**");

(5)    ED&F Custody Agreement (the "**Custody Agreement**");

(6)    ED&F Security & Set-Off Deed (the "**Security Deed**");

(7)    International Swaps and Derivatives Association Master Agreement (ISDA); and

(8)    Global Master Securities Lending Agreement (GMSLA), as applicable.

14.    The relationship between ED&F and the Pension Plans was governed by the terms of the Contract Suite.[8]  All of the Pension Plans executed substantially identical versions of the Agreement comprising the Contract Suite.[9] For ease of reference, documents from the Contract Suite referenced within this report are those executed by American Investment Group of New York, L.P. Pension Plan, but the analysis contained in this report is equally applicable to the other Pension Plans.

15.    In addition to the Contract Suite, ED&F also had a Client Money and Assets Policy ("**CMA Policy**")[10] that set forth ED&F's policies regarding the manner in which it held and controlled client money and non-cash assets as either collateral or in custody agreements.

16.    All the agreements in the Contract Suite are governed by English Law.

17.    The Terms set out contractual terms governing the relationship between ED&F and the Pension Plans, subject, where relevant, to any transaction-specific documentation.[11]

---

8.   *See e.g.* Amended Counterclaims of Third-Party Defendant ED&F Man at ¶ 1, 26, Case No. 1:18-md-02865-LAK, ECF No. 325 (April 20, 2020); Deposition Tr. of Shahab Hashemi at 329:4 -330:8 (confirming that each Pension Plan executed a Custody Agreement, Security Deed, ISDA, 'fee agreement letter' and Terms with ED&F, and that some plans executed a GMSLA).

9.   Deposition Tr. of Shahab Hashemi at 329:4 -330:8.

10.  ED&F 00050166.

11.  *See e.g.,* Amended Counterclaims of Third-Party Defendant ED&F Man at ¶ 26, Case No. 1:18-md-02865-LAK, ECF No. 325 (April 20, 2020).

18. From the documents with which I have been provided, the following appears to be common ground:

(1)   The Pension Plans lacked sufficient funds to purchase the Securities at issue in the Proceedings.[12]

(2)   ED&F extended financing to the Pension Plans for the purchase of the Securities.[13] ED&F charged the Pension Plans interest on this financing.[14]

(3)   At the direction of the Pension Plans' Investment Managers ED&F executed transactions in the Securities[15] utilizing the financing extended by ED&F. The Securities purportedly purchased on behalf of the Pension Plan formed the basis for the Pension Plan's respective withholding tax ("**WHT**") reclaim applications submitted to SKAT.[16]

(4)   ED&F has asserted that any rehypothecation of the Securities did not occur until after the ex-date, which is the date on which the Securities began trading without a right to the Dividend.[17]

(5)   The amounts SKAT paid pursuant to a Pension Plan's WHT refund applications were paid into the Pension Plan's ED&F account.[18]   After the WHT refund was

---

12.   ED&F Re-Amended Defence to Schedule 5T ¶ 5.4 and ¶ 4.2.4.4. Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487, ECF No. 364-1 (June 12, 2020); *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

13.   *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

14.   *See e.g.* Deposition Tr. of Shahab Hashemi at 85:2 – 23 (noting that ED&F would charge to the Pension Plans interest on financing received from ED&F).

15.   ED&F Re-Amended Defence ¶ 10.4.1., Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487, ECF No. 364-1 (June 12, 2020).

16.   *See e.g.* ED&F's Memorandum of Law in Opposition to Motions to Dismiss Amended Counterclaims at 7-8, Case No. 1:18-md-02865, ECF No. 357 (June 9, 2020).

17.   *See e.g.* Letter from N. Binder to N. Oxford, dated July 13, 2020, at 6 (noting that "the exercise of ED&F's right of rehypothecation in respect of such shares, the shares were (1) (before the ex-date) returned to and held by the PP, as indicated in the Trade Packs, and (2) were not sold, lent or disposed of by the PP until after the ex-date.")

18.   *See e.g.* Deposition Tr. of Shahab Hashemi at 332:1 – 25.

deposited into the Pension Plan's account, ED&F recouped any costs related to financing the Pension Plan's trading, along with charging additional fees to the Pension Plan's account.[19]

**Analysis**

**A.**   **Contractual Construction – Applicable English Legal Principles**

19.   Where parties enter into a number of agreements at the same time, the courts will consider the overall legal effects of the agreements as if they are, in substance, component parts of a single transaction: Re Walden, ex parte Odell (1878) 10 Ch.D. 76; Smith v Chadwick (1882) 20 Ch. D. 27 at [6263].

20.   Alternatively, where two contracts are linked, the law will try to read them consistently with each other: Durham v BAI (Run Off) Ltd [2012] UKSC 14 at [69].

21.   When interpreting contracts, the ultimate aim is to ascertain what a reasonable person, with all the background knowledge available to the parties in the situation they were in at the time of the contract, would have understood the parties to have meant: Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896 at [912]; Rainy Sky v Kookmin Bank [2011] UKSC 50 at [14]; Wood v Capita Insurance Services Limited [2017] UKSC at [10].

22.   Where there are two possible interpretations of a contract, the court is entitled to prefer the interpretation which is most consistent with business common sense: Rainy Sky v Kookmin Bank at [21]; Wood v Capita Insurance Services at [11].

23.   The court will also take into account that the parties are unlikely to have intended to agree to something that is legally ineffective: Bank of Credit and Commerce International SA v Ali [2002] 1 A.C. 251 at [39]. Agreements should be interpreted in such a way that they are effective rather than ineffective, even if they are defective in part: Middlegreen LP v Dominion Developments (2005) Ltd [2011] EWCA Civ 646 at [55].

---

19.   *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

24. Where one mode of reading an agreement destroys the agreement and the other preserves it, the court should lean towards that construction which preserves rather than that which destroys. This principle applies equally where preserving the agreement requires the court to adopt a more liberal meaning than the literal meaning of the words, and supply words to make the agreement mean what the court concludes the parties intended it to mean: Langston v Langston 5 E.R. 167 at [217].

25. As to when the foregoing principles can be applied:

    (1) The court is entitled to prefer the interpretation which preserves rather than destroys the agreement where the rival constructions are evenly balanced: Re Baden's Deed Trusts [1969] 2 Ch. 388 at [400].

    (2) The principle can be invoked where its application means that the contract exists, rather than effectively being something close to a nullity which is worthless from the moment that it was executed: Tecnicas Reunidas Saudia for Services and Contracting Co Ltd v Korea Development Bank [2020] EWHC 968 (TCC) at [30] and [40].

    (3) However, if the court concludes that one construction is clearly preferable to the other, the principle will not apply: IRC v Williams [1969] 1 W.L.R. 1197 at [1201].

**B.   Application of the Contract Suite to the Purported Securities Transactions**

**a.   Pursuant to the Terms, all right, title and interest to the Securities Transferred to ED&F when financing was provided to the Pension Plans.**

26. The material provisions of the Terms are as follows:

    (1) The third recital provides that: "*It is important that you retain these Terms and Conditions as your rights are governed by them.*"

    (2) Clause 1 provides that "*The services to be provided are set out in these Terms and Conditions.*"

(3) Clause 10(b) provides:

> "i. *Requests for segregation*
>
> You may instruct us to hold some or all of your assets in accordance with the FSA Rules on client money (in the case of cash) or in custody accounts segregated from our own assets (in the case of financial instruments). If you give us such an instruction then we will send you a written notification identifying (by account number) which of your accounts are accounts that benefit from client money protection/segregation to enable you to identify those assets in relation to which client money protection/safe custody segregation will apply and, with effect from your receipt of that notification, the relevant provisions of clauses 14 and 15 shall apply in substitution for the applicable provisions of this clause 10 in relation to those assets, but subject in each such case to the charge described in clause 11.
>
> ii. *Absolute title transfer*
>
> Except in relation to assets in respect of which you have received a notification of the type described in paragraph (a) above, all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us. Upon such transfer we will become obliged, subject to the following provisions, to re-transfer to you assets equivalent, but not necessarily identical, to the assets so transferred to us. Our obligation will be reduced to the extent that such assets are applied, in accordance with the margin and collateral arrangements in place between us, in discharge of your obligations to us. We will re-transfer assets to you either: (i) at our absolute discretion; or (ii) at your request, but only if and when we determine in our absolute discretion that you have no present or future, actual, contingent or prospective obligations to us or to the extent that we determine in our absolute discretion that such liability is adequately covered by collateral or margin remaining held by us."

(4) Clause 10(c) provides:

> "The effects of absolute title transfer under paragraph (b)(ii) above are as follows:
>
> i. the relevant assets cease to be your assets and you will no longer have a proprietary claim over them. They will not be held subject to the rules of the FSA in safe custody (where they are financial instruments) or subject to client money protection (where they are cash). The assets become our assets and we can deal with them in our own right;

*ii. you will have (subject to the limitations described in paragraph (b)(ii) above) an unsecured contractual claim against us for re-transfer of equivalent assets; and*

*iii. as a result, the assets will not be subject to a trust or otherwise isolated in our insolvency and in such event, you may not receive back everything so transferred to us and you will only rank as a general creditor."*

(5) Clause 11 provides:

*"As a continuing security for the payment and discharge of all obligations owing to us by you (whether present or future, actual or contingent) you hereby charge to us with full title guarantee by way of fixed and floating charge:*

*(a) all your beneficial interests in and to all derivatives contracts carried on your account;*

*(b) all your assets transferred to us under clause 10 and all your rights against us with respect to the cash accounts referred to in clause 10(e) above."*

27. The Terms therefore provide a TTCA, pursuant to which all right, title and interest in and to Securities held as collateral would automatically be transferred to ED&F.

28. The Terms are also expressly referred to in two separate Variation Letters sent by ED&F to the Pension Plans:

(1)    The Variation Letters state that the Terms (and in particular the TTCA contained therein) apply in relation to both non-cash and cash assets.

(2)    The First Variation Letter is dated 26 March 2012.

(a) It states that: "*Any cash received in respect of OTC products or to cover DVP transactions and any non-cash assets we hold for you as collateral will be dealt with in accordance with clause 10(b)(ii) ('Assets Transferred') and will be treated on an Absolute Title Transfer basis.*"

(b) The letter also states that: "*At the start of business on the following Business Day, our operations staff will review your positions to determine the total*

*amount of your outstanding liabilities to MCM relating to the above specified business and transfer any surplus cash in excess of €1,000 to a segregated cash account also held in your name in accordance with clause 10(b)(i). ('Assets Transferred')"*

(c) Accordingly, the parties expressly recognised that the Terms applied at the time of the First Variation Letter as the Client had made an election for excess cash to be segregated pursuant to clause 10(b)(i), and non-cash collateral was expressly held on a title transfer basis pursuant to clause 10(b)(ii).

(3)   The Second Variation Letter is dated 17 May 2013.

(a)  It states: "*We refer to [the First Variation Letter] which set out a procedure pursuant to which E D & F Capital Markets ('MCM') agreed on a daily basis to transfer surplus cash in excess of €1000 in your trading account into a segregated cash account. Upon a review of the operation of this procedure, we have concluded that such cash transfers created undue complexity, operational risk and potential uncertainty as to the reconciliation of your balances, in particular in relation to liabilities on your trading account (such as margin, commissions, fees and interest) arising on a continuous, not a daily basis. However please note that if you wish for any surplus finds to be held on a segregated basis, then you will need to instruct us accordingly. We would therefore like to revert to our former procedure of dealing with any cash received in respect of OTC products or to cover DVP transactions and any non-cash collateral assets we hold for you in accordance with Clause 10(b)(ii) ('Assets Transferred') of [the Terms] and to treat such cash and assets on an Absolute Title Transfer basis*".

(b) Accordingly, the parties reaffirmed their recognition that the Terms applied and that non-cash collateral was expressly held on an absolute title transfer basis pursuant to clause 10(b)(ii).

29.   The Terms were also referred to in the undated client categorisation letter (the "**Client Categorisation Letter**") with which the Pension Plans were provided, and to which a copy of the Terms was attached. The Client Categorisation Letter provides that:

(a)   "*The [Terms] set out the contractual terms that govern [the parties'] relationship but are subject to, where relevant, any transaction-specific documentation (e.g. ISDA and GMRA) as entered into between [the Pension Plans and ED&F] from time to time and as the case may be.*"

(b)   "*Any assets, including cash, held or received by us from you or in respect of your account will be dealt with in accordance with clause 10(b) ('Assets Transferred') of [the Terms]."*

(c)   The Letter also sets out that: *"In respect of certain products [ED&F] may be able to offer you a segregated account"*, which in my opinion also emphasises that ED&F may be able to segregate assets, but only at the Pension Plan's election and not as a default.

(d)   There is a separate signature line for the Pension Plan expressly to acknowledge that it understands its accounts with ED&F *"will be treated as ATT [Absolute Title Transfer]"* and that ED&F "*does not provide segregation where [the client] has been granted a credit facility*".

30.   I further note that the ED&F Client Money and Asset Policy with which I have been provided sets out as follows:

(1)   Section II, paragraph 6.2 provides that: "*Clients classified as Professional … may be offered the option of having their money held as collateral on an absolute title transfer ('ATT') basis where suitable. Under a title transfer collateral arrangement ATTT, MCM is not required to treat money received as client money."* [20]

---

20.  The Pension Plans elected to be treated as professional clients. *See, e.g.,* Client Categorization Letter, AIG_00000624.

(2)     Section III paragraph 2.1 provides that ED&F will "*accept non-cash assets from non-Retail Clients under the Title Transfer Collateral Provisions (TTCA) of CASS 6.1.6 and CASS 7.2.3 (respectively) which it uses to secure obligations from those clients ('Collateral')*". Paragraphs 2.2 and 2.3 make it clear that the "*non-cash assets held by MCM shall be transferred into the firm's name upon receipt with only an obligation to return equivalent assets to the client concerned upon satisfaction of a client's obligations to the firm*" and that "*MCM will maintain records to ensure that collateral held is identifiable and clients are able to distinguish those assets held as collateral and those assets held in safe custody in the periodic statements sent to them.*"

31.  It is my opinion that the Terms are the general provisions that govern the relationships between ED&F and the Pension Plans in relation to the holding of collateral, and provide for collateral to be held subject to the TTCA in the Terms for the following reasons:

(1)     The Terms should, if possible, be interpreted in a manner that they have some application to some part of the relationship between the Pension Plan and ED&F.

(2)     The First Variation Letter provides that the Terms apply to the holding of collateral, except in relation to surplus cash.

(3)     The Second Variation Letter removed the exception in relation to surplus cash and reiterated that the Terms applied. I note that the Second Variation Letter was written after the parties had entered into the Security Deed to which I refer below, and in my opinion amounts to an express recognition that the parties intended for the Terms to continue be effective (including where the Security Deed also applied to govern their relationship).

(4)     The ED&F Client Money and Asset Policy envisaged that the TTCA (which was provided for by the Terms) applied to collateral.

32.  Under the facts presented in these Proceedings, the Terms apply, and the Securities will be subject to the TTCA, and therefore all right, title and interest to the Securities (and Dividends) would have passed to ED&F Man.

**b.** **The Custody Agreement Is Not Applicable When ED&F Provided Financing For The Purchase Of The Danish Shares.**

33. ED&F contends that the Custody Agreement applies to the holding of the Securities, and that they were held under that agreement by ED&F as bare trustee for the Client.[21] I set out below why in my opinion that contention is misconceived as a matter of construction of the relevant documents.

34. In summary, ED&F contends (as set out in the letter from Rosenblatt to Pinsent Masons dated 13 July 2020) that:

(1)     *"The relevant securities (the Danish shares) acquired on behalf of the pension plans and on their instructions were held at all material times in the Omnibus Account at ED&F Man's sub-custodian (BNP) in an account which was used for the settlement of customer trades;*

(2)     *dividends in relation to such securities were received into the DKK Omnibus Account at BNP in an account which was used to hold customer cash receipts;*

(3)     *The pension plans' Custody Accounts (Equity and Cash Account Statements) recorded the shares and dividends as being held to the pension plans' account (no transfer of rights in such shares and dividends having been made to our client as a matter of fact);*

(4)     *the Tax Vouchers (prepared for Pension Plan customers at their request) made clear that ED&F Man held no beneficial interest in the shares or dividends (because it held the relevant shares and dividends solely in its capacity as custodian and trustee); and*

---

21. *See* Letter from Rosenblatt to Pinsent Masons dated July 13, 2020.

(5)   *the economic interest in the dividends was held at all times by the pension plans (the income from the dividends being (a) received by the pension plans and (b) used by the pension plans to pay transaction costs…"*

35.   I should record that I have not seen a copy of the statements on the custody accounts or the tax vouchers. However, I do not regard such ex post facto statements as being relevant to (or detracting from) the question of the transfer of title pursuant to the Terms, as the transfer of all right, title and interest would have occurred automatically at the moment of any Securities (or other assets) were delivered to ED&F and been governed by the contractual agreements between the parties.

36.   The material terms of the Custody Agreement are as follows:

(1)   Clause 2(a) provides:

*"The Client hereby appoints the Custodian to act as bare trustee for the purposes of safekeeping the Client Property upon the terms of this Agreement and the Custodian agrees to act as such upon the terms and conditions set out in this Agreement."*

(2)   Clause 2(e) provides:

*"The Client Securities shall be held, recorded, registered and segregated in accordance with the FSA Rules or, where held outside the United Kingdom, the equivalent of the FSA Rules relating solely to these matters, provided that the Custodian shall not be required to comply with any equivalent of the FSA Rules which require any consent to be obtained or notification to be given by the Custodian"*

(3)   Clause 5(b) provides that:

*"The Custodian will identify in the Custodian's books that the Client Securities are beneficially owned by the Client. The Custodian will require Sub-Custodians to identify in their books that the Client Securities are held to the order of the Custodian."*

(4)   Clause 5(c) provides that:

*"The Custodian may pool the Client Securities with securities held by the Custodian for other clients. The Client Securities may be held by the Custodian or by any Sub-Custodian in a fungible account in which case the Custodian will identify in its books*

*that such Client Securities belong to the Client. The Custodian may use the Client Securities for the account of another customer and vice versa."*

(5)    Clause 5(d) provides that:

*"The Custodian may hold any document of title or document evidencing title to the Client Securities:*
      *i.   in the Custodian's physical possession;*
      *ii.   with a Sub-Custodian; or*
      *iii.   otherwise, with the prior consent of the Client."*

(6)    Clause 5(e) provides that:

*"Notwithstanding any other provision of this Agreement, but without prejudice to the Client's proprietary right, the Client Securities will be deemed to be fungible for the purposes of this Agreement. Accordingly, the Customer's redelivery rights in respect of the Client Securities are not in respect of the Securities actually deposited with the Custodian from time to time but rather in respect of Securities of the same number, class, denomination and issue as those Securities originally deposited with the Custodian from time to time. A reference in this Agreement to 'Client Securities' (and similar expressions) shall be construed accordingly."*

(7)    Clause 6(b) provides that:

*"The Client acknowledges that where Client Securities are registered in the name of the Custodian, the Client Securities may not be segregated from other securities held by the Custodian and the Client Securities and may not be identifiable by separate certificates or other physical documents of title. Consequently, should the Custodian become insolvent, the Client securities may not be protected from claims made on behalf of the general creditors of the Custodian."*

(8)    'Client Securities' are defined in Clause 1.1 as:

*"any securities (including evidence thereof, evidence of title thereto and all rights in respect thereof) deposited or transferred by the Client or on the Client's behalf to the Custodian or Sub-Custodian or collected by the Custodian or a Sub-Custodian for the Client's account".*

37. The regulatory background to the Custody Agreement can be found in the fact that Financial Conduct Authority ("**FCA**") (previously the Financial Services Authority – "**FSA**") imposes certain obligations on firms which:

(1)    Handle safe custody assets belonging to clients. Safe custody assets are defined as follows:

(a) In relation to a MiFID business,[22] which is defined as a business which carries on investment services and activities including reception and transmission of orders in relation to financial instruments and execution of orders on behalf of clients, the definition of a safe custody asset includes transferable securities.

(b) In relation to a safeguarding and administering investments business that is not a MiFID business, which safeguards and administers assets consisting of and including any security belonging to another, where security includes shares pursuant to Article 76 of the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 (SI 2001/544) (the "**Regulated Activities Order**"), a safe custody asset is defined as any Specified Investment under the Regulated Activities Order.

(2)   Handle client money. Client money is defined as money of any currency (a) that a firm receives or holds or on behalf of a client in the course of or in connection with its MiFID business or (b) that the firm holds for a client in the course of carrying on designated investment business that is not MiFID business.

38.   In my opinion, when dealing with the clients, ED&F was either conducting a MiFID business, as it appears to have purportedly received, transmitted and executed orders of transferable securities on behalf of clients, or alternatively was conducting a safeguarding and administering investments business, as it was purportedly safeguarding and administering securities belonging to clients. Further, ED&F could have (at least in theory) handled client money in the course of its business.

39.   Accordingly, ED&F would have been under an obligation to comply with the following FCA rules (amongst others) when holding assets belonging to clients (as opposed to assets belonging to the firm):

(1)   CASS 6.2.1R: A firm must, when holding safe custody assets belonging to clients, make adequate arrangements so as to safeguard clients' ownership rights, especially

---

22.  MiFID is the Markets in Financial Instruments Directive (2004/39/EC). *See also* CASS 6.1.1R.

in the event of the firm's insolvency, and to prevent the use of safe custody assets belonging to a client on the firm's own account except with the client's express consent.

(2)    CASS 6.2.2R: A firm must introduce adequate organisational arrangements to minimise the risk of the loss or diminution of clients' safe custody assets, or the rights in connection with those safe custody assets, as a result of the misuse of the safe custody assets, fraud, poor administration, inadequate record-keeping or negligence.

40.    In my opinion, the Custody Agreement was intended to ensure that ED&F complied with its obligations pursuant to the FCA Rules, in circumstance where it may have been holding safe custody assets belonging to the Pension Plans. In such cases, the Pension Plans' ownership rights would have needed to be adequately safeguarded, and ED&F would have needed to put in place adequate organisational arrangements in place to minimise the risk of loss or diminution of those assets.  This position is supported by:

(1)    Clause 2(a), which provides that such securities would be held by ED&F as bare trustee *"for the purposes of safekeeping the Client Property"*.

(2)    Clause 2(e), which provides that these securities "*shall be held, recorded, registered and segregated in accordance with the FSA Rules or, where held outside the United Kingdom, the equivalent of the FSA Rules relating solely to these matters…"*.

(3)    Clause 2(f) which provides that:  *"The Custodian shall only accept custody under this Agreement of Client Property."*

(4)    Clause 5(b) of the Custody Agreement, which provides that the Custodian will identify in the Custodian's books that the securities "*are beneficially owned by the Client"*.

(5)    Clause 5(e) which provides that the Client Securities will be deemed to be fungible but *"without prejudice to the Client's proprietary rights"*.

(6)     Clause 6(b) which provides that the Pension Plan acknowledges that where Client Securities are registered in the name of the Custodian, the Client Securities *"may not be segregated from other securities held by the Custodian"* in which case they may not be protected if ED&F becomes insolvent. The Custody Agreement therefore seeks express consent from the Pension Plan to dilute the safeguarding provisions in certain circumstances, in accordance with CASS 6.1.1R.

41.   Accordingly, in my opinion, the Custody Agreement governed title to the Securities which ED&F held as custodian. In other words, it applied where (and only where) safe custody assets belonging to clients were held by ED&F (as opposed to where assets were held as collateral). This would occur where the Pension Plan had advanced their own funds to ED&F to purchase securities or where the Pension Plan had repaid the funds loaned by ED&F to purchase securities. This opinion is also supported by the references to the parties as *"Client"* and *"Custodian"* throughout.

42.   However, it is also my opinion that the Custody Agreement supports the contention that ED&F *always* acted as a custodian when it is holding Pension Plan assets. In the alternative to holding assets which belonged to clients on a segregated basis, ED&F could (and did) hold the assets as collateral – in circumstances where title was not held by the Pensions Plan but instead was held by the firm.  As identified above, in that case, the issue of title was addressed by the Terms and governed by a title transfer agreement, in which case ED&F would not need to comply with the FCA Rules on segregation as the assets would no longer be safe custody assets that belonged to the Pension Plans (as opposed to belonged to the firm) or client money.

43.   My opinion is further supported by the following provisions which indicate that collateral and custody arrangements were treated by ED&F as separate and distinct from each other:

(1)   Section III Clause 1.1 of the CMA Policy sets out that ED&F holds and controls non-cash assets on behalf of clients *"either as collateral or in custody arrangements."*

(2)   Section III Clause 2.3 of the CMA Policy which provides that ED&F will maintain records to ensure that clients are able to distinguish those assets *"held as collateral and those assets held in safe custody"*.

### c.  Title to the Securities Transferred to ED&F

44. The Securities which were purchased using funds loaned by ED&F to the Pension Plans which had not been repaid would not be held as safe custody assets pursuant to the Custody Agreement and would instead be governed by the Terms (and by virtue of the TTCA, all right, title and interest to those Securities would have passed to ED&F). Such Securities would in particular not be governed by the Custody Agreement as they cannot properly be said to *"belong"* to the Pension Plan.

45. As a result, in relation to the Securities in the present case, it is my opinion that they were collateral, were governed by the Terms and were therefore subject to a TTCA by which all right, title, and interest passed to ED&F.

46. It therefore follows that in my opinion the Securities were not, as a matter of English law, governed by the Custody Agreement, which applied to custody assets (*i.e.* assets that were acquired without financing from ED&F). It was those assets (and those assets alone) that would belong beneficially to the clients and would be held by ED&F as bare trustee under the Custody Agreement.

47. Moreover I note that if the position were that *all* non-cash assets in relation to which ED&F claims to have held "custody" in the omnibus custody account were governed by the Custody Agreement, then it would follow that the relevant provisions of the Terms (and the Variation Letters) would have had no application as between the Pension Plan and ED&F. As I set out above, it is a general principle of English law that meaning and effect should be given to all contractual documents insofar as possible. It therefore follows that it is inherently unlikely that the Terms and the Variation Letters were of no effect, simply because ED&F had "custody" of all client assets (in the sense that it held them).

48. I reach this conclusion even if the position were factually that all Securities were held by ED&F in its omnibus custody accounts, regardless of whether they were assets that were held as collateral subject to a title transfer or were truly held as subject to custody arrangements. As a matter of English law, the proper legal construction cannot be undone

by an inconsistent course of operation by a party following the entry into the agreement and remains as I set out above, namely that:

(1) Securities (and Dividends) which had been purchased using funds loaned by ED&F to the Pension Plans which had not been repaid were collateral and were subject to the Terms and all right, title and interest to these Securities and Dividends would have transferred to ED&F; and

(2) Where the Pension Plan had advanced its own funds to ED&F to purchase Securities or where the Pension Plan had repaid the funds loaned by ED&F to purchase Securities, those assets would have been held in custody by ED&F and would have been subject to the Custody Agreement.

**d.   The Security Deed Supplemented and Did not Supersede the Terms**

49. Having reached the conclusion that the Securities were non-cash assets held as collateral and were held on the basis of the Terms and not the Custody Agreement, I also consider the relevance of the Security Deed.

50. The material terms of the Security Deed are as follows:

(1) Clause 5 provides that the Pension Plan charges all of its rights, title, interest and benefit, present and future, in and to/under (a) the Investments, (b) the Custody Accounts and (c) the Custody Agreement to the Chargee (*i.e.* ED&F) by way of fixed legal mortgage and floating charge.

(2) Clause 14(a) provides:

*"The Chargee may, at any time, apply the Charged Property, or any of it, to satisfy any obligations of the Chargor to the Chargee under any Transaction Document."*

(3) Clause 17.5 of the Security Deed provides:

*"To the extent that any of the Charged Property constitutes 'financial collateral' and this Deed and the obligations of the Chargor hereunder constitute a 'security financial collateral arrangement' (in each case for the purposes of the Financial Collateral Arrangements (No.2) Regulations (SI 2003/3226)) the Chargee shall*

22

*have the right to appropriate all or any part of such financial collateral in or towards discharge of the Secured Liabilities".*

51. In my opinion, the Security Deed was intended to add to and complement the Terms rather than supersede them, which opinion is supported by the following terms of the Security Deed:

(1) Clause 8 provides:

*"The security created by this Deed and the rights of the Chargee under this Deed shall be in addition to, and not prejudiced by, any other security or guarantee or any other right which the Chargee has in respect of or in connection with any or all of the Secured Liabilities. All such rights may be exercised from time to time as often as the Chargee may deem expedient."*

(2) Clause 14(b) grants ED&F as Chargee the right to set off any obligation of the Pension Plan as Chargor to make a payment to ED&F and provides that *"[t]his right is in addition to the Chargee's rights under any Terms of Business, the ISDA Master Agreement"*.

52. The Security Deed and the Terms are linked documents, and as a matter of English law governing questions of construction (as set out above) the court will read them consistently, insofar as possible.

53. In my opinion, the Security Deed and the Terms can be read consistently as to the treatment of the Securities, as follows:

(1) The Terms governed the title of the Securities when ED&F purchased the Securities using funds it had loaned to the Pension Plan. Any such Securities were held pursuant to Clause 10(b)(ii) of the Terms as non-cash collateral.

(2) When the Pension Plan discharged its obligations to ED&F (in the present case, where it repaid the purchase monies), ED&F was under an obligation to transfer title to the underlying Securities to the Pension Plan.

(3)   However, if the Pension Plan had at that time outstanding obligations to ED&F, (which were not covered by collateral or margin), ED&F was also entitled to performance of those outstanding obligations. In those circumstances, without any additional provision for security, when the Pension Plan had made the principal repayment or otherwise discharged its obligations (and ED&F's transfer obligation arose) ED&F would not have held any security in respect of the Pension Plan's outstanding obligations (title to the assets having already passed back from ED&F to the Pension Plan by this time).

(4)   In order to cover this "gap" in security, pursuant to Clause 11(b) of the Terms, the Pension Plan granted a fixed and floating charge over all assets transferred to ED&F under Clause 10. Clause 11 therefore provided that those Securities will be subject to a fixed and floating charge securing the Pension Plan's remaining obligations to ED&F.

(5)   The Clause 11 charge could only bite when the assets no longer belonged to ED&F but were subject to an obligation to be transferred from ED&F to the Pension Plan (in other words when the Pension Plan had repaid the purchase monies or discharged any other obligations to ED&F).

(6)   The purpose of the Security Deed is in my opinion to provide the specific terms governing the nature and extent of the fixed and floating charge set out in Clause 11 of the Terms:

  (a) Clause 5.1 of the Security Deed provides that the fixed charge will be by way of first fixed legal mortgage and sets out the specific property which will be charged, namely the Investments, the Custody Accounts and the Chargee's rights under the Custody Agreement. The definition of Investments includes the Securities.

  (b) Clause 5.2 of the Security Deed provides that the floating charge attaches to the same property as the fixed charge in Clause 5.1. It also provides that the floating charge shall rank behind all fixed charges and mortgages created by

Clause 5.1 and sets out the circumstances in which the floating charge will crystallise.

(7)  The foregoing security structure therefore protects ED&F. When the Pension Plan's obligations are outstanding, it will have absolute title to the Securities. However, when the Pension Plan discharges those obligations, and ED&F is under an obligation to re-transfer the Securities, ED&F will retain a fixed and floating charge over the Securities to secure the Pension Plan's remaining obligations (whether or not they are covered by margin or collateral).

(8)  The security structure also protects the Pension Plans, for when the Pension Plan has performed its obligations (save in respect of outstanding sums which were matched by margin or collateral), the effect of Clause 11 of the Terms is that ED&F will no longer have absolute title to the underlying Securities under Clause 10(b) but will instead have the rights of a secured creditor pursuant to the Security Deed, in respect of any outstanding obligations. Accordingly, if the Pension Plan has performed its obligations (or its obligations were fully secured by margin or collateral), it would have a proprietary claim to the Securities in the event of ED&F's insolvency. However, prior to that point, and before the charge under Clause 11 of the Terms and the Security Deed arises, the Pension Plan will only have an unsecured contractual claim in ED&F's insolvency.

54.  I have considered the possible alternative that the Security Deed should instead as a matter of English law be interpreted as a transaction-specific document which supersedes the provisions of the Terms. If that were the case, the Securities might be said to be held by ED&F as bare trustee (under the Custody Agreement), but subject to the charge in the Security Deed. In my opinion, this construction is incorrect for the following reasons:

(1)  As set out above, the Security Deed does not provide that it supersedes or is intended to supersede the Terms. Clauses 8 and 14(b) expressly provide that the rights under the Security Deed are intended to be in addition to ED&F's rights under other agreements (in particular, Clause 14(b) identifies the Terms as containing additional rights).

(2)    It would render the Variation Letters, the second of which was entered into after the Security Deed, otiose as the parties would have been agreeing to the modification and reinstatement of the provision of an Agreement that allegedly was of no effect between the parties (*i.e.* Clause 10(b)(ii) of the Terms);

(3)    The examples of transaction-specific documentation given in the Client Categorisation Letter include the ISDA and GMRA, but <u>not</u> the Security Deed or Custody Agreement.

(4)    Furthermore, if this were the proper construction of the Contract Suite, when ED&F loaned funds to the Pension Plans to purchase the Securities, it would not (and could not) hold any of the Securities as collateral on a title transfer basis, as the Terms would not be effective to transfer all right, title and interest in the Securities. ED&F would have instead held all Securities under the Custody Agreement as a bare trustee subject to the charge under the Security Deed.

(5)    Again, preferring this construction would therefore require the court to conclude that ED&F agreed, by entering into documents which superseded the Terms, to be a secured creditor in the event of the Pension Plan's insolvency rather than the proprietary owner of the Securities, even in circumstances where the Pension Plan had not repaid the purchase monies for those Securities.

55.   In any event, even if the court concluded that the merits of the rival constructions are evenly balanced, the court will take into account that the parties are unlikely to have intended to agree something that is legally ineffective (*i.e.* gives the Terms no meaning or effect) and is likely to prefer the interpretation which preserves the legal effect of the instrument. As the alternative construction does away with the Terms, in my opinion, it is plain that this alternative construction should be rejected.

56.   This construction is also preferable as it fits more clearly with business common sense. Brokers are likely to want to maintain security in respect of any exposure to their clients, but in particular are likely to want to maintain even more inviolable security rights where their exposure is greater, such as where assets have been purchased using funds which the broker has loaned to the client which have not been repaid. Accordingly, it makes

commercial sense that ED&F would itself hold the title to the Securities (on a title transfer basis pursuant to the Terms) until the loan for the purchase monies had been repaid by the Client. It makes much less commercial sense that ED&F would have surrendered those rights to ownership available under the Terms by entering into transaction specific documents which only afforded it the rights of a secured creditor in respect of the Securities.

57.   In summary, my opinion is therefore that the Terms and the Security Deed should be read together as follows:

(1)   When ED&F had loaned the funds to Clients to purchase Securities, it held the underlying Securities pursuant to Clause 10(b)(ii) of the Terms, on an absolute title transfer basis.

(2)   When the Pension Plan repaid the loan, ED&F would have been under an obligation to transfer the underlying Securities to the Pension Plan. However, to ensure ED&F was protected in respect of the Pension Plan's remaining obligations, Clause 11 of the Terms provided that it would obtain a charge over the Securities.

(3)   The Security Deed sets out the nature and extent of the charge granted pursuant to Clause 11 of the Terms.

58.   I therefore remain of the conclusion that the proper construction of the documents is that title to the Securities passed to ED&F under the TTCA in the Terms at the time of the purchase of the Securities.

## C.   <u>Conclusion</u>

59.   In conclusion, my opinion is that the Terms continued to apply to the relationship between ED&F and the Pension Plans in relation to the Securities, and that the Terms were not subordinated to the other Contract Suite documents but ought to be interpreted consistently with those documents.

60.   The proper interpretation of the documents is that ED&F only acted as a bare trustee in respect of the Securities when it acted as custodian of safe custody assets, which role it

did not occupy in respect of the Securities (which were collateral). The Custody Agreement does not govern the Securities in the present case. Clause 10(b)(ii) of the Terms therefore applied to determine ED&F's rights in respect of the collateral Securities and operated to transfer all rights, title and interest to and in the collateral Securities to ED&F.

**FELICITY TOUBE QC**

felicitytoube@southsquare.com

17 December 2021

SIGNED .................... _(signature)_

**FELICITY TOUBE QC**

DATED ... 17 DECEMBER 2021

## APPENDIX A: RELEVANT CASES

| Plan | Plan Participant | Sponsoring Entity | MDL Case No. |
|---|---|---|---|
| Kamco LP Profit Sharing Plan | Stacey Kaminer | Kamco LP | 1:18-cv-09837-LAK |
| Moira Associates LLC 401(k) Plan | Stacey Kaminer | Moira Associates LLC | 1:18-cv-09839-LAK |
| American Investment Group of New York, L.P. Pension Plan | Robert Crema | American Investment Group of New York, L.P. | 1:18-cv-09841-LAK |
| DW Construction, Inc. Retirement Plan | Darren Wittwer | DW Construction, Inc. | 1:18-cv-09797-LAK |
| Goldstein Law Group PC 401(k) Profit Sharing Plan | Sheldon Goldstein Scott Goldstein | Goldstein Law Group PC | 1:18-cv-05053-LAK |
| Kamco Investments, Inc. Pension Plan | Louise Kaminer | Kamco Investments, Inc. | 1:18-cv-09836-LAK |
| Newsong Fellowship Church 401(k) Plan | Alexander Jaime Mitchell III | Newsong Fellowship Church | 1:18-cv-10100-LAK |
| Linden Associates Defined Benefits Plan | Joan Schulman | N/A | 1:18-cv-09838-LAK |
| Riverside Associates Defined Benefits Plan | David Schulman | N/A | 1:18-cv-09840-LAK |
| JSH Farms LLC 401(k) Plan | Jamie Hofmeister | JSH Farms LLC | 1:18-cv-09489-LAK |
| KRH Farms LLC 401(k) Plan | George Hofmeister | KRH Farms LLC | 1:18-cv-09491-LAK |
| MGH Farms LLC 401(k) Plan | Megan Hofmeister | MGH Farms LLC | 1:18-cv-09439-LAK |
| SRH Farms LLC 401(k) Plan | Julie Hofmeister | SRH Farms LLC | 1:18-cv-09434-LAK |
| Triton Farms LLC 401(k) Plan | Scott Hofmeister | Triton Farms LLC | 1:18-cv-09490-LAK |

| Plan | Plan Participant | Sponsoring Entity | MDL Case No. |
|---|---|---|---|
| Autoparts Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Derby City Technology Pensions Group Trust<br>Craig Cohen IRA<br>Michael Cohen IRA<br>Rudolph Schmidt IRA<br>Bay City Industrial Pensions Group Trust<br>Crescent Industrial Pensions Group Trust<br>Derby City Industrial Pensions Group Trust<br>Derby City Technology Pensions Group Trust | N/A | 1:18-cv-09549-LAK |
| Bluegrass Retirement Group Trust | Tew Enterprises, LLC Pension Plan<br>BlueGrass Investment Management, LLC Pension Plan<br>SV Holdings, LLC Pension Plan<br>Tew LP Pension Plan<br>MSJJ Retirement Group Trust<br>Bernard Tew Roth IRA | N/A | 1:18-cv-09511-LAK |
| Casting Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Julia Ryan IRA | N/A | 1:18-cv-09498-LAK |
| Central Technologies Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Michael Cohen IRA<br>Summit Technology Pensions Group Trust<br>Crescent Technology Pensions Group Trust<br>Windy City Industrial Pensions Group Trust<br>Windy City Technology Pensions Group Trust | N/A | 1:18-cv-09507-LAK |
| Industrial Pensions Group Trust | Revstone Casting Fairfield GMP Local 359 Pension Plan<br>Hillsdale Hourly Pension Plan<br>Hillsdale Salaried Pension Plan<br>Fourslides Pension Plan<br>MSJJ Retirement Group Trust<br>Calder Ryan IRA | N/A | 1:18-cv-09497-LAK |
| MSJJ Retirement Group Trust | Highland Farms LLC Roth 401(k)<br>Triton Farms LLC Roth 401(k)<br>KRH Farms LLC Roth 401(k) | N/A | 1:18-cv-09552-LAK |

| Plan | Plan Participant | Sponsoring Entity | MDL Case No. |
|---|---|---|---|
| | MGH Farms LLC Roth 401(k)<br>JSH Farms LLC Roth 401(k)<br>SRH Farms LLC Roth 401(k)<br>Bluegrass Retirement Group Trust<br>Bernard Tew Roth IRA<br>Andrea Tew Roth IRA<br>Stephanie Tew Roth IRA<br>Vincent Tew Roth IRA<br>Catherine Tew Roth IRA | | |
| Acorn Capital Strategies LLC Employee Pension Profit Sharing Plan & Trust | Gregory Summers | Acorn Capital Strategies LLC | 1:18-cv-10088-LAK |
| Sterling Alpha LLC 401(K) Profit Sharing Plan | John Doscas | Sterling Alpha LLC | 1:18-cv-04894-LAK |
| Federated Logistics LLC 401(k) Plan | Tatjana Vanjak<br>David Freelove | Federated Logistics LLC | 1:18-cv-08655-LAK |
| Del Mar Asset Management Saving & Retirement Plan | David Freelove | Del Mar Asset Management LP | 1:18-cv-05374-LAK |
| KK Law Firm Retirement Plan Trust | Kevin Kenning | The Law Offices of Kevin Kenning | 1:18-cv-10127-LAK |
| Cambridge Way LLC 401k Profit Sharing Plan | Shreepal Shah | Cambridge Way LLC | 1:18-cv-10090-LAK |

## APPENDIX B: MATERIALS CONSIDERED

### I.    Bates Stamped Documents

- Undated ED&F Man Terms and Conditions of Business.  NEW_00000904.

- March 26, 2012 First Variation Letter from ED&F Man to Pension Plan. ED&F Man00001026.

- April 17, 2012 New Account/Elective Categorization Letter. AIG_00000624.

- June 13, 2012 Letter from Robert Crema to ED&F Man.  ACER_00015864.

- June 21, 2012 ED&F Man Custody Agreement. AIG_00000605.

- June 21, 2012 ED&F Man Security & Set-Off Deed. AIG_00000674.

- June 21, 2012 International Swaps and Derivatives Association Master Agreement (ISDA). AIG_00000627.

- 2013, ED&F Man Client Money & Asset Policy.  ED&F-00050166.

- May 17, 2013 Second Variation Letter from ED&F Man to Pension Plan. ED&F Man00001025.

- March 12, 2014 Global Master Securities Lending Agreement (GMSLA). ED&F-00221829.

### II.    Correspondence

- July 6, 2020, Letter from Pinsent Masons to Rosenblatt

- July 13, 2020, Letter from Rosenblatt to Pinsent Masons

- July 13, 2020 Letter from N. Binder to N. Oxford

- August 3, 2020 Letter from N. Oxford to N. Binder

- August 14, 2020 Letter from N. Binder to N. Oxford

### III.    Deposition Transcripts

- Deposition Transcript of Shahab Hashemi, dated October 7-8, 2021.

- Deposition Transcript of Robert Crema, dated February 9, 2021.

### IV.    Legal Documents

- 69th Defendant's Response to Claimant's Request Dated 1 March 2019 For Further Information Under CPR Part 18, Claim No. CL-2018-000297 (April 8, 2019).

- Amended Counterclaims of Third-Party Defendant ED&F Man, Case No. 1:18-md-02865, ECF No. 325 (April 20, 2020).

- Amended Complaint and Demand for Jury Trial, Case No. 18-cv-09841, ECF No. 89 (April 22, 2020).

- Memorandum of Law in Opposition to Motions to Dismiss Amended Counterclaims, Case No. 1:18-md-02865, ECF No. 357 (June 9, 2020).

- ED&F Man Re-Amended Defence, Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487, ECF No. 364-1 (June 12, 2020).

- ED&F Man's Response to Claimant's Request Dated 2 March 2021 For Further Information Under Part 18, Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487; CL-2020-000369 (March 16, 2021).

**V.    Legal Opinions**

- Bank of Credit and Commerce International SA v Ali [2002] 1 A.C. 251

- Durham v BAI (Run Off) Ltd [2012] UKSC 14

- Gray v G-T-P Group Ltd [2010] EWHC 1772

- In Re Baden's Deed Trusts [1969] 2 Ch. 388

- In Re Walden, ex parte Odell (1878) 10 Ch.D. 76

- Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896

- IRC v Williams [1969] 1 W.L.R. 1197

- Langston v Langston 5 E.R. 167

- Middlegreen LP v Dominion Developments (2005) Ltd [2011] EWCA Civ 646

- Rainy Sky v Kookmin Bank [2011] UKSC 50

- Smith v Chadwick (1882) 20 Ch. D. 27

- Tecnicas Reunidas Saudia for Services and Contracting Co Ltd v Korea Development Bank [2020] EWHC 968 (TCC)

- Wood v Capita Insurance Services Limited [2017] UKSC

**VI.    Statutes & Rules**

- Financial Conduct Authority CASS 6

- Financial Conduct Authority CASS 6.1.1R

- Financial Conduct Authority CASS 6.2.1R

- Financial Conduct Authority CASS 6.2.2R

- Financial Conduct Authority CASS 7.2.3

- Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 (SI 2001/544)

**APPENDIX C**

# Felicity Toube QC

QC 2011, Called to the Bar 1995

+44 (0)20 7696 9900
felicitytoube@southsquare.com




Felicity Toube QC specialises in domestic and cross-border insolvency and restructuring, banking and financial services, commercial litigation, civil fraud, and company law. Felicity appears in the Cayman Islands on a regular basis. She also acts as an expert in international proceedings in English law, as well as the law of other common law jurisdictions. She is asked to speak regularly at conferences, including at INSOL and Offshore Alert.

Felicity has acted in relation to most of the recent major corporate restructurings or insolvencies and related litigation including most recently in *NMC, GateGroup, Codere, Saad, Madoff, Lehman, Stanford, Rastogi, Nortel, SPhinX, Sigma, Landsbanki, MF Global,* and *Rafidain Bank.*

Felicity is widely recognised in all the legal directories as an expert in several fields. She won Chambers and Partners Insolvency/Company Silk of the Year 2020 and is ranked as a Leading Silk both nationally and internationally by Chambers & Partners in Insolvency/Restructuring, Commercial Dispute Resolution, Company Law, and Commercial/Chancery Litigation .

Chambers UK Bar 2019 refers to her as *"at the top of her game – very bright, supremely user-friendly and great with clients."* Other comments include:

*"Felicity is quick-witted and extremely responsive. She's redoubtable and very highly regarded, yet eminently approachable."*

*"She is extremely user-friendly and provides clear, thoughtful and pragmatic advice quickly and in a very helpful format."*

*"Felicity is an intelligent and empathetic silk who quickly gets to the heart of the matter."*

*"Very much a strong leader, with strong submissions of her own style."*

She is ranked by Legal 500 2020 as a Leading Silk for Insolvency, Banking and Finance, Civil Fraud, Commercial Litigation, and Offshore: with comments including: "*Her written opinions should stand as an example of precisely what clients and instructing attorneys want to see – clear, concise and reliable.*"

Felicity is also ranked in Who's Who in Insolvency and Asset Tracing, and also as a Thought Leader in Insolvency.

Felicity also publishes widely across all her fields of experience, including as editor and contributor to Toube on "International Asset Tracing in Insolvency" (OUP) and as Editor of *Insolvency Intelligence.*

Felicity is an ADR Group Accredited Civil & Commercial Mediator, an accredited Arbitrator by CiArb, and is Co-Chair of the INSOL Mediation Colloquium.

**APPENDIX C**

## Insolvency and Restructuring

Instructed in all varieties of administrations and liquidations, including in respect of financial institutions (*NMC, GateGroup, Codere, Saad, Madoff, Lehman, Stanford, Nortel, SPhinX, Sigma, Landesbanki, MF Global, Debenhams, BHS,* and *Rafidain Bank*).

Recent cases include:

- ***Smile Telecoms*** [2021] EWHC 685 (Ch), [2021] EWHC 933 (Ch) (restructuring plan – sanction – effect of conditions, cross class cram down)
- ***Smile Telecoms*** [2021] EWHC 395 (Ch) (restructuring plan – convening)
- ***GateGroup*** [2021] EWHC 775 (Ch) (restructuring plan – sanction)
- ***GateGroup*** [2021] EWHC 304 (Ch) (restructuring plan – convening – insolvency proceeding)
- ***Swissport Fuelling 2*** [2020] 12 WLUK 171 (scheme of arrangement – sanction)
- ***Swissport Fuelling 2*** [2020] EWHC 3064 (Ch) (scheme of arrangement – convening)
- ***New Look Financing Plc*** [2020] EWHC 3613 (Ch) (scheme of arrangement – sanction)
- ***New Look Financing Plc*** [2020] EWHC 2793 (Ch) (scheme of arrangement – convening)
- ***Pizza Express*** [2020] EWHC 2873 (Ch) (restructuring plan – convening)
- ***Flybe*** (acting for administrators re Flybe administration in multiple disputes)
- ***Hood*** [2020] EWHC 3232 (Ch) (acting for creditor in relation to change of carriage petition in bankruptcy – appeal)
- ***Codere Finance 2 (UK) Ltd*** [2020] EWHC 2441 (Ch) (scheme of arrangement)
- ***Matalan Finance Plc*** [2020] EWHC 2345 (Ch) (scheme of arrangement – sanction)
- ***Matalan Finance Plc*** [2020] EWHC 1953 (Ch) (scheme of arrangement – convening)
- ***Swissport Fuelling*** [2020] EWHC 1773 (Ch) (scheme of arrangement – sanction)
- ***Swissport Fuelling*** [2020] EWHC 1499 (Ch) (scheme of arrangement – convening)
- ***Re A Company*** [2020] EWHC 1406 (Ch) (injunction to restrain presentation of winding-up petition pending CIGA)
- ***Peak Hotels*** [2020] EWHC 1365 (Ch) (costs of valuation of services under section 245 Insolvency Act 1986)
- ***Gertner v. CFL*** [2020] EWHC 1241 (Ch) (successful appeal re good faith in IVAs) and [2021] EWHC 1404 (Ch) (third party costs order)
- ***Carluccio's Limited*** [2020] EWHC 886 (Ch) (adoption of furloughed contracts in administration)
- ***CFL Finance v. Bass*** [2019] EWHC 1837 (Ch) (ability to vote in IVA/bankruptcy petition)
- ***Peak Hotels*** [2019] EWHC 2558 (Ch) (application of test for valuation of services under section 245 Insolvency Act 1986)
- ***Peak Hotels*** [2019] EWCA Civ 345 (test for valuation of services under section 245 Insolvency Act 1986)
- ***Crumpler v Candey Ltd*** [2018] EWCA Civ 2256 (Court of Appeal) (Nature of ownership of monies paid into Court – floating charge)
- ***Re Lehman Brothers Europe Ltd*** [2017] EWHC 2031 (Ch) (Distribution to shareholders in administration by newly appointed director)
- ***Re LB Holdings Intermediate 2 Ltd (In Administration) and others*** [2017] EWHC 2032 (Ch) (Sanction of settlement of Waterfall III litigation)
- ***Chubb v Rafidain Bank*** Chancery Division (Companies Court), 27 July 2017 (unreported)

# APPENDIX C

- (Declaration of meaning of scheme of arrangement)
- **Leeds v Lemos** [2017] EWHC 1825 (Ch) (privilege in bankruptcy does not pass to trustee in bankruptcy even in relation to "assets" documents)
- **PricewaterhouseCoopers v SAAD Investments Co Ltd** (In Official Liquidation) Privy Council (Bermuda), 17 November 2016 [2016] UKPC 33; [2017] 1 W.L.R. 953 (costs of aborted document production exercise not paid by office holders)
- **Lehman Brothers Luxembourg Investments S.A.R.L. v Lehman Brothers UK Holdings Limited (In Administration)** [2016] EWHC 617 (Ch) (Construction of loan document and subordination)
- **Citicorp International Ltd v Castex Technologies Ltd** [2016] EWHC 349 (Comm) (contents of notice for mandatory conversion notice)
- **Indah Kiat International Finance Co BV** [2016] EWHC 246 (Ch); [2016] B.C.C. 418 (adjournment of convening meeting for scheme of arrangement – requirements for convening order)
- **Centaur Litigation SPC (In Liquidation) v Terrill** [2015] EWHC 3420 (Ch) (freezing order – breach of duty by director)
- **MF Global UK Ltd (In Special Administration)** [2015] EWHC 2319 (Ch) [2016] Ch. 325 (denial of section 236 order against foreign respondents)
- **Black Diamond Offshore Ltd v Fomento De Construcciones Y Contratas SA** [2015] EWHC 1035 (Ch) (denial of stay of proceedings pending homologation proceedings in Spain; subsequent relief granted in favour of Black Diamond)
- **Northsea Base Investment Ltd** (and 7 others) [2015] EWHC 121 (Ch) (COMI of 7 Cypriot companies in England)
- **Re Business Environment Fleet St** [2014] EWHC 3540 (Ch) (powers of administrators to sell disputed assets)
- **Pricewaterhouse Coopers v Saad Investments Company Limited** [2014] UKPC 35 (ability of stranger to liquidation to set aside winding-up order)
- **Singularis Holdings Limited v Pricewaterhouse Coopers** [2014] UKPC 36 (extent of common law assistance in cross border insolvencies; existence of common law power to assist investigations as to assets)
- **Re ARM Asset Backed Securities** (EC Regulation and Luxembourg) [2014] EWHC 1097 (Ch)
- **JSC Bank of Moscow and others v Kekhman** (No: 4893 of 2012) [2014]
- **London Scottish Finance** [2013] EWHC 4047 (Ch) Ch D
- **ARM Asset Backed Securities** [2013] EWHC 3351 (Ch)
- **Re Tambrook** [2013]
- **Re Nortel Networks NV; Re Lehman Brothers International (Europe)** [2013] UKSC 52
- **Lehman Brothers Special Financing v Carlton Communications** [2012] EWCA Civ 419
- **Re Nortel Bloom v The Pensions Regulator** [2011] EWCA Civ 1124
- **Lehman Brothers Special Financing v Carlton Communications** [2011] EWHC 718 (Ch)
- **Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo** [2011] EWHC 256 (Comm)
- **Re Nortel Bloom v The Pensions Regulator** [2010] EWHC 3010 (Ch)
- **Madoff Securities International v Financière Meeschaert** [2010] EWHC 133 (Ch)
- **Re Lehman Brothers International (Europe) v CRC** [2010] EWHC 47
- **Re Lehman Brothers International (Europe) v CRC** [2009] EWHC 3228 (Ch); [2009] WLR (D) 371
- **Re Stanford International Bank** [2009] EWHC 1441 (Ch)
- **Re Sigma** [2009] UKSC 2
- **Re Global Trader Europe** [2009] EWHC 602 (Ch)

**APPENDIX C**

## Banking and Finance

Recently instructed in a variety of issues including the client money litigation, as well as cases arising under ISDA Master Agreements, Facility Agreements and other security documents, and issues relating to schemes of arrangement (*Saad, Lehman, Stanford, SPhinX, Sigma, Landesbanki, MF Global, and Rafidain Bank*).

Recent cases include:

- ***ING Bank v. Santander*** [2020] EWHC 3561 (Comm) (jurisdiction question)
- ***BCV*** (acting for receiver in relation to dispute between Maduro and Guaido Central Bank of Venezuela)
- ***Akers v Samba Financial Group*** [2014] EWHC 540 (Ch)
- ***London Scottish Finance*** [2013] EWHC 4047 (Ch)
- ***Lehman Brothers Special Financing v Carlton Communications*** [2012] EWCA Civ 419
- ***Lehman Brothers Special Financing v Carlton Communications*** [2011] EWHC 718 (Ch)
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm)
- ***Madoff Securities International v Financière Meeschaert*** [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC 47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] EWHC 3228 (Ch); [2009] WLR (D) 371
- ***Re Stanford International Bank*** [2009] EWHC 1441 (Ch)
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)
- ***Black Diamond Offshore Ltd v Fomento de Construcciones y Contratas SA*** [2016] EWCA Civ 1141; [2017] 1 B.C.L.C. 196 (construction of bond documentation/insolvency events of default)
- ***Lehman Brothers Luxembourg Investments Sarl v Lehman Brothers UK Holdings Ltd*** Chancery Division (Companies Court), 21 March 2016 [2016] EWHC 617 (Ch); [2017] 1 All E.R. (Comm) 393; [2016] 2 B.C.L.C. 244 (Construction of subordination agreement – solvency issues)
- ***Citicorp International Ltd v Castex Technologies Ltd*** Queen's Bench Division (Commercial Court), 24 February 2016 [2016] EWHC 349 (Comm) (issues of notice requirements in relation to convertible bonds)

## Commercial Litigation and Arbitration

Major commercial litigation, and in particular civil fraud claims. Recent commercial cases and arbitrations include:

- ***Flybe*** (acting for administrators re Flybe administration in multiple disputes)
- ***BCV*** (acting for receiver in relation to dispute between Maduro and Guaido Central Bank of Venezuela)
- ***ING v. Santander*** (jurisdiction challenge re English/Spanish proceedings)
- ***Re Smith*** [2020] EWHC 1280 (Comm) (multi party fraud claim – acting for Jersey Viscount)

**APPENDIX C**

- ***Mohamed v. Breish*** [2020] EWCA Civ 637 (one voice principle)
- ***Mohamed v. Breish*** [2020] EWHC 696 (Comm) – Identity of Chairman of Libyan Investment Authority
- ***Mohamed v. Breish*** [2019] EWHC 1768 (Comm) – one voice principle
- ***Mohamed v. Breish*** [2019] EWHC 306 (Comm) – authority dispute within Libyan Investment Authority
- ***Crumpler v Candey Ltd*** [2018] EWCA Civ 2256 (Court of Appeal) (Nature of ownership of monies paid into Court – floating charge)
- ***Shaw v Breish*** [2017] EWHC 2972 (Comm) (Collateral use of documents; variation of court appointed receivership)
- ***UBS AG, London Branch v Glas Trust Corp Ltd*** [2017] EWHC 1788 (Comm) (powers of Note Trustee)
- ***Black Diamond Offshore Ltd v Fomento de Construcciones y Contratas SA*** [2016] EWCA Civ 1141; [2017] 1 B.C.L.C. 196 (construction of bond documentation/insolvency events of default)
- ***Lehman Brothers Luxembourg Investments Sarl v Lehman Brothers UK Holdings Ltd***
- ***Chancery Division*** (Companies Court), 21 March 2016 [2016] EWHC 617 (Ch); [2017] 1 All E.R. (Comm) 393; [2016] 2 B.C.L.C. 244 (Construction of subordination agreement – solvency issues)
- ***Libyan Investment Authority v Codeis Securities SA*** Queen's Bench Division (Commercial Court), 02 November 2016 [2016] EWHC 2773 (Comm) (powers of court appointed receiver where authority dispute in Libya) ***RBG v Rastogi and others*** [2014] EWHC 2316 (Ch)
- ***Akers v Samba Financial Group*** [2014] EWHC 540 (Ch)
- ***Lehman Brothers Special Financing v Carlton Communications*** [2012] EWCA Civ 419
- ***Lehman Brothers Special Financing v Carlton Communications*** [2011] EWHC 718 (Ch)
- ***Re Nortel Bloom v The Pensions Regulator*** [2010] EWHC 3010 (Ch)
- ***Madoff Securities International v Financière Meeschaert*** [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC 47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] WLR (D) 371
- ***Re Stanford International Bank*** [2009] EWHC 1441 (Ch)
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)
- ***Citicorp International Ltd v Castex Technologies Ltd*** Queen's Bench Division (Commercial Court), 24 February 2016 [2016] EWHC 349 (Comm) (issues of notice requirements in relation to convertible bonds

---

# Company

Recently instructed in a variety of company law cases including in relation to schemes of arrangement and restructuring plans, for company or AHG.

- ***Smile Telecoms*** [2021] EWHC 685 (Ch), [2021] EWHC 933 (Ch) (restructuring plan – sanction – effect of conditions, cross class cram down)
- ***Smile Telecoms*** [2021] EWHC 395 (Ch) (restructuring plan – convening)
- ***GateGroup*** [2021] EWHC 775 (Ch) (restructuring plan – sanction)
- ***GateGroup*** [2021] EWHC 304 (Ch) (restructuring plan – convening – insolvency proceeding)
- ***Swissport Fuelling 2*** [2020] 12 WLUK 171 (scheme of arrangement – sanction)

**APPENDIX C**

- ***Swissport Fuelling 2*** [2020] EWHC 3064 (Ch) (scheme of arrangement – convening)
- ***New Look Financing Plc*** [2020] EWHC 3613 (Ch) (scheme of arrangement – sanction)
- ***New Look Financing Plc*** [2020] EWHC 2793 (Ch) (scheme of arrangement – convening)
- ***Pizza Express*** [2020] EWHC 2873 (Ch) (restructuring plan – convening)
- ***Flybe*** (acting for administrators re Flybe administration in multiple disputes)
- ***Hood*** [2020] EWHC 3232 (Ch) (acting for creditor in relation to change of carriage petition in bankruptcy – appeal)
- ***Codere Finance 2 (UK) Ltd*** [2020] EWHC 2441 (Ch) (scheme of arrangement)
- ***Matalan Finance Plc*** [2020] EWHC 2345 (Ch) (scheme of arrangement – sanction)
- ***Matalan Finance Plc*** [2020] EWHC 1953 (Ch) (scheme of arrangement – convening)
- ***Swissport Fuelling*** [2020] EWHC 1773 (Ch) (scheme of arrangement – sanction)
- ***Swissport Fuelling*** [2020] EWHC 1499 (Ch) (scheme of arrangement – convening)
- ***Swissport Fuelling*** [2020] 11 WLUK 96 (second scheme of arrangement for airline related company)
- Scheme proponent in the ***Sphinx*** case in the Cayman Islands
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm)
- ***Madoff Securities International v Financière*** Meeschaert [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC 47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] WLR (D) 371
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)

---

## Civil Fraud and Asset Recovery

Recent cases include:

- ***Re Smith*** [2020] EWHC 1280 (Comm) (multi party fraud claim – acting for Jersey Viscount)
- ***RBG v Rastogi and others*** [2014] EWHC 2316 (Ch)
- ***Akers v Samba Financial Group*** [2014] EWHC 540 (Ch)
- ***NMC***
- ***Madoff***
- ***Stanford***

---

## Offshore

Felicity has appeared in the following foreign jurisdictions, the Cayman Islands (where she appears on a regular basis in the Grand Court), the BVI (including appearing in the BVI Court), ADCM, Antigua, USA, EU (in particular realising property and unravelling frauds in France and Spain), Jersey, Guernsey and Isle of Man.

Also acts as an expert in international proceedings in English law, as well as the law of other common law jurisdictions. Currently retained in one case by the US Department of Justice as an expert on foreign law.

**APPENDIX C**

Recent cases include:

- ***Pacific Drilling*** (Cayman Islands provisional liquidation in support of Chapter 11 restructuring)
- ***NMC*** (Abu Dhabi administrations of UAE based healthcare group) – multiple ongoing issues
- ***Port Fund*** (Cayman Islands – section 22 proceedings re limited partners' rights to information from Fund)
- ***Peak Hotels*** (BVI proceedings re expense claim in liquidations)
- ***Ardon Maroon*** (Eastern Caribbean Court of Appeal – redemptions between Master and Feeder Fund)
- ***BCV*** (acting for receiver in relation to dispute between Maduro and Guaido Central Bank of Venezuela)
- ***Libyan Investment Authority***: proceedings in the Cayman Islands in relation to Palladyne
- ***Pricewaterhouse Coopers v Saad Investments Company Limited*** [2014] UKPC 35 (ability of stranger to liquidation to set aside winding-up order)
- ***Singularis Holdings Limited v Pricewaterhouse Coopers*** [2014] UKPC 36 (extent of common law assistance in cross border insolvencies; existence of common law power to assist investigations as to assets)
- ***Re Saad*** (Bermuda, Cayman, and Saudi Arabia)
- ***SPhinX*** liquidation (Cayman Islands)
- ***Re ARM*** (EC Regulation and Luxembourg) [2014] EWHC 1097 (Ch)
- ***Tambrook*** (Jersey)
- ***Madoff SIPA Trustee v Harley*** (Cayman Islands)
- ***Stanford International Bank*** (Antigua, Switzerland, and Canada)
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm) (Indonesia)
- ***PricewaterhouseCoopers v SAAD Investments Co Ltd*** (In Official Liquidation) Privy Council (Bermuda), 17 November 2016 [2016] UKPC 33; [2017] 1 W.L.R. 953 (costs of aborted document production exercise not paid by office holders)

---

## Awards and Recommendations

Chambers and Partners

Restructuring/ Insolvency

*"She is able to combine a fierce intellect with a commercial understanding and a commercial approach. She is a go-to for insolvency, schemes of arrangement and CVA work."*

*"Felicity is really technically excellent, easy to work with, turns things round very quickly and has an informal, easy style that translates well with clients."*

*"A powerhouse in international insolvency law. She is incredibly responsive, user-friendly and pragmatic."*

*"She is fantastic, very down to earth and has an encyclopedic knowledge of the law. She's also very*

**APPENDIX C**

*easy to deal with and accessible – the perfect barrister."*

*"She's extremely good and unbelievably responsive. She turns out extremely high-quality work at all times of day and is a really, really good advocate."*

Chancery: Commercial

*"A really good litigator, who's very clever, very personable and completely committed to her clients. She is a real insolvency expert and a very good, tough advocate."*

*"Felicity is superb – really responsive, thoughtful and fantastic with clients. She's an outstanding barrister."*

Commercial Dispute Resolution

*"A very polished and persuasive advocate." "She is incredibly responsive, user-friendly and pragmatic, even when clearly under pressure."*

*"She is very responsive, very clever and very easy to deal with."*

Company

*"Gives thoughtful, rigorous and technically detailed advice, and delivers it in a practical and commercial way."*

*"She's incredibly responsive, user-friendly and pragmatic."*

*"Felicity is excellent: she's pragmatic, user-friendly and brilliant on her feet. She's popular with clients and open and easy to work with."*

Offshore

*"She is incredible and very polished. She has gravitas with the judges and is an encyclopedia on insolvency."*

**Legal 500**

Insolvency

*"'Extremely respected; prodigious work ethic – my go-to QC."*

Banking and Finance

*"A consummate team player, and a very good advocate."*

Offshore

*"Felicity is fiercely intelligent, robust, user-friendly and responsive. She is my go-to Leading Counsel for insolvency work."*

Commercial litigation

*"Highly responsive and practical, really fights the client's corner, and does it all with a sense of*

**APPENDIX C**

*perspective and humour and is great to work with.*"

Company/Insolvency Silk of the Year 2020

Junior Insolvency and Corporate Restructuring Barrister of the Year 2006

---

## Career

| | |
|---|---|
| 2020 | Co-Chair of INSOL Mediation Colloquium |
| 2019 onwards | Teaching on Corporate Insolvency Law course, BCL, University of Oxford |
| 2015 | Appointed to INSOL International Mediation Panel |
| 2015 | ADR group Accredited Civil and Commercial Mediator |
| 2012 | First Called to the Bar of the Cayman Islands (on the cases of SPhinX and Harley) |
| 2011 | Appointed Queen's Counsel |
| 1995 | Called to the Bar of England and Wales |
| 1994-1995 | Taught Restitution with with Prof Peter Birks from All Soul's College, Oxford |

---

## Memberships

Commercial Bar Association

Chancery Bar Association

International Insolvency Institute (Board Member)

---

## Publications

Editor of and contributor to ***International Asset Tracing in Insolvency*** (Toube, OUP 2009)

Editor of ***Insolvency Intelligence***

Contributor to ***Insolvency Intelligence***

**APPENDIX C**

Editor of **Totty & Moss on Insolvency** case summaries

Case editor for **Sweet & Maxwell Complete Insolvency Service** CD Rom

Contributor to **EC Regulation on Insolvency Proceedings** (Moss, Fletcher and Isaacs)
Contributor to **Lightman & Moss on Receivers and Administrators**

Author of chapter in **Rowlatt on Surety**

Contributor to **Halsbury's Laws of England** Volume 3(2) (fourth edition, 2002 reissue)

Co-editor of **Halsbury's Laws of England** Volume 7 (fifth edition, 2013 reissue)

Author of **Restitution for Public Lawyers** [1996] JR 92

Author of **Restitution under Article 85(2) EC Treaty – Can it be Done?** (F Rose)

Author of **Cross-Border Security Enforcement and the Conflict of Laws** (F Rose)

---

## Lectures and Seminars

Speaker and Chair and numerous events on insolvency and asset tracing (in particular cross-border insolvency issues): INSOL, INSOL Europe, R3, ILA, IWIRC, Offshore Alert

---

## Education and Qualifications

2020-        Oxford University, part time DPhil
1993-1994 Magdalen College, Oxford University, BCL, First Class
1990-1993 Magdalen College, Oxford University, BA

---

## Prizes and Scholarships

Princess Royal Scholarship (ICSL)

---

## Interests

Charity work (Chair W11 Children's Opera, Trustee of Magdalen College Development Trust, Legal Friends of the Hebrew University, New West End Synagogue, and various other deaf, homeless, and educational charities)

Cooking, reading, cricket