Rebuttal Report of Emre Carr, Ph.D., CFA

GRAHAM WADE

**EXHIBIT 5101**

03 - 16 - 2022

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND SCHEME LITIGATION

MASTER DOCKET

18-md-2865 (LAK)

## <u>REBUTTAL REPORT OF EMRE CARR, PH.D., CFA</u>

Emre Carr, Ph.D., CFA

February 1, 2022

**CONFIDENTIAL**

Rebuttal Report of Emre Carr, Ph.D., CFA

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 3

    A.    Assignment and Scope........................................................................................ 3
    B.    Information Relied Upon .................................................................................... 3
    C.    Summary of Opinions ........................................................................................ 4

II.    THE PENSION PLAN STRATEGY WAS A STRUCTURED TRANSACTION
    THAT REQUIRED SUCCESSFUL EXECUTION OF ALL OF THE STOCK,
    STOCK LOAN, AND HEDGING TRANSACTIONS ............................................... 9

III.    THE SKAT EXPERTS MISLEADINGLY STATE THAT THE STRUCTURED
    NATURE OF PENSION PLAN TRADES IS EVIDENCE THAT THEY ARE
    FICTITIOUS.............................................................................................................. 12

IV.    THE ANALYZED TRANSACTIONS FOLLOWED NUMEROUS ACCEPTED
    MARKET PRACTICES AND ARE NOT FAKE SIMPLY BECAUSE OF THE
    USE OF ANY NON-STANDARD TERMS ............................................................ 16

    A.    Both Stock and Flex Futures Trading Followed Accepted Market Practices
        and IDBs Earned Commission On Their Trades .......................................... 17
    B.    Securities Lending ........................................................................................... 30

V.    BOTH MR. DUBINSKY AND MR. WADE CONSIDER INFORMATION NOT
    AVAILABLE TO THE PENSION PLANS ............................................................. 34

VI.    CUM-CUM AND CUM-EX TRANSACTIONS LEAD TO THE SAME
    ECONOMIC EXPOSURE FOR A PENSION PLAN; SUBSTITUTE DIVIDEND
    PAYMENTS DO NOT MEAN THAT A TRANSACTION IS FABRICATED...... 36

VII.    SKAT EXPERTS' REPEATED ASSERTIONS OF PURPORTEDLY "CIRCULAR"
    TRANSACTIONS DO NOT DEMONSTRATE THAT THE PENSION PLAN
    TRANSACTIONS WERE "FAKE"......................................................................... 42

VIII.    GIVEN THE OFFSETTING TRADES BY SOLO'S CLIENTS, THE NET SHARE
    HOLDINGS IN SOLO'S SUB-CUSTODIAN ACCOUNT DO NOT
    DEMONSTRATE THAT THE PENSION PLANS DID NOT EXECUTE TRADES
    IN DANISH STOCKS............................................................................................. 46

IX.    CONCLUSION......................................................................................................... 50

**Rebuttal Report of Emre Carr, Ph.D., CFA**

### List of Exhibits to This Report

Exhibit 1………………………………………………………………….Materials Relied Upon

Exhibit 2………..Mr. Dubinsky Misrepresents the Trade Approval Issued under the Give-up Agreement to be the Trade Confirmation

Exhibit 3…………………….…Contrary to Mr. Wade's Assertion, Futures Contracts Expiring in September have Different Prices from the Futures Contracts Expiring in December

### List of Figures

Figure 1………………...….The RJM Plan 2013 Transactions Related To MAERSKB Stock

Figure 2……………………..……Trade Confirmation from FGC Securities to the RJM Plan

Figure 3………………..…….Solo's Acknowledgement of Transaction sent to the RJM Plan

Figure 4………………………..……….Solo's Approval of Transaction sent to the RJM Plan

Figure 5…………… Flex Futures Trade Confirmation from FGC Securities to the RJM Plan

Figure 6…………………………………Dividend Credit Advice from Solo to the RJM Plan

Figure 7…..Replication of Dubinsky Report Figure 15 (Bernina Pension Plan Transaction in Carlsberg Stock)

Figure 8…...…..Replication of Dubinsky Report Figure 15 with Additional Borrowing Party

Figure 9…..Replication of Dubinsky Report Figure 15 with Additional Borrowing Party and Additional Lending Party

Rebuttal Report of Emre Carr, Ph.D., CFA

## I.    INTRODUCTION

### A.    Assignment and Scope

1.    I have been retained by counsel to certain Defendants to review trades in Danish securities and associated instruments conducted by certain U.S.-based pension plans in connection with the above-captioned multidistrict litigation, *In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, 18-md-02865 (LAK).

2.    Counsel has asked me to review two reports submitted by experts ("SKAT Experts") retained on behalf of Skatteforvaltningen ("SKAT").  The two reports are:

    a.    Expert Report of Bruce G. Dubinsky dated December 31, 2021 ("Dubinsky Report")

    b.    Expert Report of Graham Wade dated December 31, 2021 ("Wade Report")

3.    I have been asked to review the analyses in the two reports that relate to those pension plan trades that used one of the following four custodians: Solo Capital ("Solo"), Telesto Markets LLP ("Telesto"), Old Park Lane Capital PLC ("Old Park Lane"), and West Point Derivatives Limited ("West Point").  Mr. Dubinsky refers to these four custodians as "Solo Custodians" and, for the Court's convenience, I adopt the same terminology.[1]

### B.    Information Relied Upon

4.    In performing my analyses and in forming my opinions and conclusions, I have relied upon data and information from various sources, all of which are reasonably relied upon by experts in my field.  In addition to the materials I considered in connection with my opening report, additional materials I have considered in preparing this Rebuttal Report are set forth in **Exhibit 1**.  Additionally, I considered the materials cited in both the Dubinsky and Wade Reports.  I have also relied upon

---

[1] Dubinsky Report ¶19.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

my professional experience and expertise obtained over many years as a professional economist. I am prepared to amend and expand my analyses if I consider it necessary after receiving further information regarding this action.

5.    Regarding any anticipated trial testimony in this action, I may use various documents produced in this litigation that refer to or relate to the matters discussed in this report. Although I may cite to a particular page or pages of documents in this report, such pinpoint cites are provided for clarification purposes only, and other portions of the documents and depositions cited may be relevant for my analyses in this matter. In addition, citations to a document or documents are intended to be illustrative and are not exhaustive. Further, I may create or assist in the creation of certain demonstrative schedules to assist me in testifying. To date, I have yet to create such demonstratives.

### C.    Summary of Opinions

6.    The SKAT Experts repeatedly characterize the pension plans' various transactions as "fake"[2] or "fictitious."[3] By way of example, the SKAT Experts make sweeping characterizations of "massive WHT fraud orchestrated by Solo Capital,"[4] "thousands of fictitious stock transactions,"[5] "the entire trading loop was fictitious,"[6] the "Solo trades were fake,"[7] and "The Purported Trades were Completely Fake."[8] But importantly, the SKAT Experts' analyses fail to demonstrate that the transactions were, indeed, not real.

---

[2] *See, e.g.*, Dubinsky Report ¶203; Wade Report ¶16.

[3] *See, e.g.*, Dubinsky Report ¶122; Wade Report ¶225.

[4] *Id.* at ¶122.

[5] *Id.*

[6] *Id.* at ¶197.

[7] *Id.* at ¶203.

[8] Wade Report, p. 96.

7.  A pension plan's economic exposure to a stock (including a claim to dividend[9]) started as soon as the trade was executed, and the pension plans received confirmations informing them that their stock purchases were executed.  The confirmations were issued by regulated inter-dealer brokers ("IDBs).  Further, almost all securities in Denmark are dematerialized and security holdings and transfers are tracked through book entries at the client account level that are reflected in their statements.[10]  The pension plan account statements showed that the trades settled and the shares were held by the custodian in the plan's account.  In their analyses, the SKAT Experts assert, without basis, that the trade confirmations issued by the IDBs, were "simply camouflage"[11] and that IDBs such as "FGC Securities LLC has no apparent business purpose other than to create an air of legitimacy to the trade."[12]  Additionally, the SKAT Experts ignore the account statements issued by the Solo Custodians that show the pension plans' transactions and holdings.

8.  As discussed in more detail throughout this report, my opinions include the following:[13]

    a.  The Pension Plan Strategy[14] was a structured transaction with the potential to generate significant profits with mitigated risks.  Structured transactions are commonly used, particularly for multi-legged transactions and for purposes of engaging in arbitrage, such as the dividend arbitrage strategy used by the

---

[9] As used herein, the term "dividend" refers to the per-share amount declared by the issuer.  The term encompasses both what the SKAT Experts label a "real dividend"—*i.e.*, where the payment originates from the issuer of the securities and flows through a chain of custody to one or more custodians—and "substitute" dividend payments where the payment is made to compensate investors that did not receive a dividend through the chain of custody despite being entitled to it.

[10] Expert Report of Emre Carr, Ph.D., CFA, dated December 31, 2021 (hereinafter "Initial Carr Report") ¶¶28-29.

[11] Wade Report p. 45.

[12] Dubinsky Report ¶162.

[13] Several of the SKAT Experts' statements are irrelevant to the question of whether the pension plan trades were real.  The fact that I do not address a particular statement should not be understood to mean that I agree with that statement.

[14] I use "Pension Plan Strategy" as I did in my opening report to describe the tax-advantaged trading strategy that aimed to generate profits from market participants' tax differentials on dividends while managing the price risk of the underlying shares.  *See* Initial Carr Report, Section II.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

pension plans.  Starting in approximately early 2015, an automated system that was developed by Solo was used to facilitate the execution of certain trades.  The use of structured transactions facilitated by an automated system does not indicate that the trades executed by the pension plans were "fictitious."

b.  The Pension Plan Strategy trades were in large volumes and executed over-the-counter ("OTC") rather than on an exchange.  Trading OTC is a widely-accepted market practice, particularly for large trades, and is not suspicious or inherently fraudulent.  In Europe, OTC trades of trillions of euros are reported every year.[15]

c.  The Analyzed Transactions followed numerous other accepted market practices, as evidenced by the use of industry-standard templates underlying various agreements, trade acknowledgments, approvals, and confirmations.  The pension plans used an industry-standard template for give-up agreements related to the trade executions and the industry-standard Global Master Securities Lending Agreement ("GMSLA") template for their stock lending transactions.  The pension plans paid commissions to the IDBs and custodians.

d.  Mr. Wade repeatedly claims that the transactions had "unusual" or "irregular" terms and they were not the "market standard."[16]  First of all, these claims do not speak to the legitimacy of the trades because a purportedly "unusual" transaction term does not make a transaction fake.  Second, Mr. Wade implicitly asserts that standards from the marketplaces for standardized transactions apply to the OTC markets.  As Mr. Wade acknowledges, the OTC transactions are "bespoke" transactions.[17]  Given the

---

[15] ESMA, "EU Securities Markets: ESMA Annual Statistical Report," November 2020, p. 6, *available at* https://www.esma.europa.eu/sites/default/files/library/esma50-165-1355_mifid_asr.pdf (last accessed on January 17, 2022).

[16] *See, e.g.*, Wade Report ¶¶ 16 and 241.

[17] *Id.* at ¶90.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

"bespoke" nature of the transactions, there is no reason that the transactions should, much less must, conform to Mr. Wade's view of purported standard market practices.

e.  An investor's receipt of substitute dividend payments does not provide support for the SKAT Experts' assertions that the pension plan transactions were fabricated. From an economic perspective, a tax-exempt investor like a pension plan buying shares prior to an ex-dividend date has a claim to the same amount irrespective of whether the amount is labeled as a "real" or "substitute" dividend. Further, even the payment sourced from an issuer may be labeled "real" or "substitute." For example, a purchaser in a Cum-Cum trade that fails to settle on time and settles after the dividend record date will receive the same amount that the purchaser would have received had the trade settlement not been delayed. The only difference is that the amount received when a trade settles after the record date will be labeled a "substitute dividend" instead of a "real dividend" (as would have been the case without a settlement delay). Mr. Wade conflates an analysis of whether dividends are real versus substitute with an analysis of whether the underlying transactions are real or are fictitious. The treatment of dividends in a transaction depends on its terms and operational details, such as the one discussed above for the Cum-Cum trade and do not constitute a basis in determining whether the transactions are real or fictitious.

f.  The SKAT Experts ignore that an investor's economic exposure to a stock starts when the trade is confirmed and is not impacted by how the custodian settled the trades or the identities of counterparties to those trades.

g.  The SKAT Experts' repeated assertions of purportedly "circular" transactions do not demonstrate that the pension plan transactions were fake. In fact, the SKAT Experts do not define what they mean by circular. Often they just present figures showing a series of transactions, some of which are between parties outside this litigation, that they connect with arrows purportedly

**Rebuttal Report of Emre Carr, Ph.D., CFA**

completing a circle.   Relatedly, the SKAT Experts also assert that "the very same shares" were used in the various legs of the purported circular transactions.[18]  As shares are dematerialized, it does not make sense to talk about the "very same shares" without examining what other transactions the entities involved in those transactions might have undertaken.  Furthermore, the SKAT Experts do not provide any evidence demonstrating that the pension plans were aware of the transactions to which they were not a party or the identity of the counterparties in those transactions.  The pension plans' trade confirmations from IDBs and account statements from Solo did not provide information about the other side of their stock and futures trades.

h.   Mr. Wade repeatedly asserts that some transactions were not arm's-length. Mr. Wade has not defined what he means by arm's-length.  Simply because a transaction is not arm's-length –something not established here -- does not mean that it is a fake transaction.[19]  For example, almost all transactions between a company and its subsidiary are related party transactions that may or may not have arm's-length terms.

i.   Mr. Dubinsky's failure to locate Danish shares at the Solo sub-custodians is not sufficient to demonstrate that the pension plan trades were fake.  Because shares in Danish companies are dematerialized, the quantities of shares held in a given stock across all transactions would be reflected in the pension plans' accounts as electronic book entries, and the entries for offsetting transactions involving the same number of shares would net to zero.  Mr. Dubinsky fails to show that these electronic book entries are "fictitious."

---

[18] *See, e.g.*, Dubinsky Report ¶17, and Wade Report ¶128.

[19] I assume that Mr. Wade is referring to a transaction conducted between a willing buyer and a willing seller, acting independently and pursuing their own best interests.

Rebuttal Report of Emre Carr, Ph.D., CFA

## II.    THE PENSION PLAN STRATEGY WAS A STRUCTURED TRANSACTION THAT REQUIRED SUCCESSFUL EXECUTION OF ALL OF THE STOCK, STOCK LOAN, AND HEDGING TRANSACTIONS

9.    As I explained in the Initial Carr Report, the Pension Plan Strategy involved numerous transactions by the pension plans and is an example of a structured finance transaction.  Structured transactions, especially complex ones, are facilitated by financial intermediaries.[20]  A 2007 interagency statement from the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, Office of Thrift Supervision, and U.S. Securities and Exchange Commission describes complex structured finance activities as follows:

> *When a financial institution participates in a complex structured finance transaction ("CSFT"), it **bears the usual market, credit, and operational risks** associated with the transaction.  In some circumstances, a financial institution also may face **heightened legal or reputational risks** due to its involvement in a CSFT. ... The documentation that financial institutions use to support CSFTs is often **highly customized for individual transactions and negotiated with the customer.***[21]

10.    The pension plans engaged in a hedged dividend capture strategy, a type of dividend arbitrage strategy commonly pursued by tax-advantaged investors.[22]  Academic research finds that investors have commonly employed dividend arbitrage strategies

---

[20] I note that it is not unusual for a broker to be active in facilitating investors' trades even when they are not complex.  For example, when companies offer shares in initial public offerings or secondary offerings, brokers establish the allocations of those shares to various investors before the offering is closed.

[21] U.S. Securities and Exchange Commission, "Interagency Statement on Sound Practices Concerning Elevated Risk Complex Structured Finance Activities," effective January 11, 2007, *available at* https://www.sec.gov/rules/policy/2007/34-55043.pdf (last accessed on January 31, 2022) (emphasis added). The original policy statement issued in 2004 seeking public comment stated that complex structured finance transactions "typically result in a **final product that is often non-standard**" and "often involve professionals from multiple disciplines within the financial institution and may **have significant fees** or high returns in relation to the market and credit risks associated with the transaction."  U.S. Securities and Exchange Commission, "Policy Statement: Interagency Statement on Sound Practices Concerning Complex Structured Finance Activities," section titled ""II. DEFINITION AND KEY RISKS OF COMPLEX STRUCTURED FINANCE TRANSACTIONS," *available at* https://www.sec.gov/rules/policy/34-49695.htm (last accessed on January 23, 2022) (emphasis added).

[22] *See* Initial Carr Report, Section II.

for decades in numerous countries such as the United States, Australia, Japan, Italy, Finland, and Taiwan.[23]

11.  As examples of the Pension Plan Strategy, the Analyzed Transactions I described in the Initial Carr Report involved numerous transactions serving different purposes, namely, (i) the pension plan's initial purchase of shares prior to the ex-dividend date to gain claim to an amount equal to the forthcoming dividend; (ii) stock loans to finance the purchase of those shares; (iii) execution of flex futures or forward contracts that gave the pension plan the right to sell the shares at a specified price in the future to hedge the price risk; and (iv) a later unwind of the purchase of shares, the stock loan, and the hedging contracts.

12.  For example, see **Figure 1** below, taken from the Initial Carr Report.[24]  This figure illustrates various transactions related to the RJM Plan's hedged dividend capture of MAERSKB stock.  As shown below, in April 2013, the RJM Plan purchased shares in MAERSKB and sold flex futures contracts on a cum-dividend date, which was one day before the ex-dividend date.[25]  One day after the dividend record date, the equity purchase settled, and the RJM Plan loaned its purchased shares, executing the stock lending transaction on the same day that the equity purchase settled.  The RJM Plan unwound the transaction in June 2013 by recalling the loaned shares, selling those recalled shares, and then purchasing flex futures with the same expiration as the contracts that were previously sold.

---

[23] Initial Carr Report Section VII.

[24] *Id.* at Figure 2.

[25] *Id.* at n. 13 ("The ex-dividend date is the date as of which purchasers of stock do not have a claim to the forthcoming dividend declared at the issuer's most recent Annual General Meeting.").  The date at which a company eventually issues the payment is called "Dividend Pay Date."

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 1: The RJM Plan 2013 Transactions Related To MAERSKB Stock**[26]



13.  In practice, to pursue the Pension Plan Strategy, pension plans faced several risks, including price risk, liquidity risk and financing risk.  A significant stock price decline over the holding period due to reasons unrelated to dividend preferences can more than offset an investor's profits from the dividend capture.  The inability to find liquidity for stock purchases or hedging contracts can adversely impact a structured transaction and its profitability.[27]  And here, a failure to find a counterparty willing to enter into the stock lending transaction would have caused the Pension Plan Strategy to fall apart due to lack of financing.

14.  Not surprisingly, pension plans like the RJM Plan and Proper Pacific Plan used their custodians, Solo and Old Park Lane, to successfully implement the Pension Plan Strategy.

---

[26] Dividend dates from Bloomberg, L.P., as shown in Initial Carr Report, Exhibit 14.  Transaction dates from trading documents, as described in the Initial Carr Report ¶¶154-162.

[27] Because the volume of trades is large (as was the case for the pension plan trades), trading OTC allows an investor to minimize the potential price impact of the trades.  However, successful execution in the OTC market is not guaranteed.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

15. As discussed in the Initial Carr Report, Solo and Old Park Lane were both registered with the U.K. regulator, the Financial Conduct Authority ("FCA"), at the time of the Analyzed Transactions, and as such were subject to its handbook of rules and guidance, particularly as it applied to broker-dealers and custodians.[28]  The IDBs that executed the Analyzed Transactions were also registered with the relevant regulators.[29]

16. In short, the various transactions related to the Pension Plan Strategy together formed a complex structured transaction that met the financial objective of the pension plans, and, therefore, it is not surprising that the pension plans took steps to minimize the execution risk of its hedged dividend capture transactions for various stocks.

### III.    THE SKAT EXPERTS MISLEADINGLY STATE THAT THE STRUCTURED NATURE OF PENSION PLAN TRADES IS EVIDENCE THAT THEY ARE FICTITIOUS

17. The SKAT Experts assert that the structured nature of the pension plan trades and the involvement of the Solo Custodians in arranging the trades are evidence that the trades were fake.[30]

18. At the outset, I note that the SKAT Experts' dismissive statements about the structured nature of the transactions do not address, one way or another, whether the Plans owned any shares in Danish companies.  If the Solo Custodians' role in locating liquidity for trades in the market is evidence that those trades are fake, then

---

[28] Initial Carr Report n.49 (citing FCA, "The Financial Services Register," available at https://register.fca.org.uk/s/firm?id=001b000000NMaqQAAT and https://register.fca.org.uk/s/firm?id=001b000000MgBgIAAV) (last accessed December 29, 2021).

[29] Financial Industry Regulatory Authority, Inc., "FGC Securities, LLC," *available at* https://brokercheck.finra.org/firm/summary/158399 (last accessed on February 1, 2022); Financial Conduct Authority, "Bastion Capital London Ltd," *available at* https://register.fca.org.uk/s/firm?id=001b000000MfPpoAAF (last accessed on February 1, 2022).

[30] *See, e.g.*, Dubinsky Report ¶16; Wade Report p.89, Opinion 5.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

the vast majority, if not all, of the trillions of euros of OTC trades reported every year[31] would be fake, according to the SKAT Experts.

19.   Mr. Wade also asserts that the trades were highly irregular and purportedly not arm's-length due to the assistance from the Solo Custodians.[32]  Similarly, Mr. Dubinsky asserts that "Solo Capital pre-arranged the entire structure of the transactions," and that "the Plans had no ability to negotiate the financial terms of the arrangement."[33]

20.   Simply because an intermediary facilitates a transaction does not mean that the transaction is not an arm's-length transaction.  For example,  numerous real estate transactions are facilitated by the same broker representing both the buyer and seller.  It would be incorrect to call these transactions not arm's-length because they are intermediated by a broker.  Even if  these real estate transactions could be called not arm's length, it will be incorrect to call them fake.  Mr. Dubinsky's assertion about the plans not having an ability to negotiate the financial terms is also nothing more than his *ipse dixit* since he provides no evidence (*e.g.*, documentation of negotiations between Solo and the pension plans) to support his assertion.

21.   As Mr. Wade notes, Solo developed "Brokermesh," a custom platform that facilitated order routing and matched counterparties offering or seeking liquidity,

---

[31]  ESMA, "EU Securities Markets: ESMA Annual Statistical Report," November 2020, p. 6, *available at* https://www.esma.europa.eu/sites/default/files/library/esma50-165-1355_mifid_asr.pdf (last accessed on January 17, 2022).

[32]  *See, e.g.*, Wade Report ¶241 ("With the Solo trades, purported traders working for the Solo Pension Plans would receive instructions from Solo with directions on which shares each Plan was to trade, trade volumes, and trade counterparties.  This is highly irregular and means that the purported trades were not at arm's-length.")

[33]  Dubinsky Report, p.79.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

and made the system available to certain clients and broker firms in approximately early 2015.[34]

22.    Mr. Wade asserts that the use of Brokermesh is "highly irregular and further evidence that these transactions were fake."[35]  Automation is a common tool and automation of order entry or routing is not evidence that the trades were fake.[36]  Given numerous structured transactions by the pension plans and potentially by its other customers, it seems reasonable that Solo took steps to automate the process.[37]

23.    Mr. Wade asserts that "[i]t is inconceivable to me that these IDBs (*i.e.*, those using Brokermesh) were genuinely able to provide **instant access** to liquidity equal to more than the ADTV of the shares in question."[38]  Contrary to Mr. Wade's assertion,

---

[34] Wade Report ¶242.  *See also* Financial Conduct Authority, Final Notice to Sapien Capital Limited, May 6, 2021, *available at* https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf (last accessed on January 17, 2022) ¶4.114 ("Brokermesh was an electronic platform, developed by an entity associated with the Solo Group, which generated trade orders from clients which were transmitted to brokers, including to Sapien. The purported trading on the platform was conducted via an automated process whereby once an order appeared on the system, a broker would seek liquidity from the Solo Clients available on the system. Then, once the liquidity was established, the order would be matched subject to trade authorisation from the relevant custodian.").

[35] *Id.* at ¶16.

[36] *See, e.g.*, Wade Report ¶242 ("It is not uncommon for some hedge funds to build sophisticated trade automation systems and many high-frequency hedge funds delegate trading entirely to algorithms.").

[37] Mr. Wade says that "[t]he Brokermesh system appears to have generated emails purporting to be from one firm to another firm or from Solo to various firms offering trades and then confirming them." Wade Report ¶242.  But simply because the record keeping in the automated platform that the pension plans used is not "regular" in Mr. Wade's view is not evidence that the pension plan trades were fake.

[38] Wade Report ¶243 (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

Sunrise Brokers, one of the IDBs, "said that they would **not** get responses **instantaneously** on Brokermesh."[39]

24. He also ignores that the brokers were sometimes unable to find liquidity for the plan trades despite automation. For example, one of the FCA notices that Mr. Wade cites notes that Sunrise "accepted all [Solo] trade orders on Brokermesh but **liquidity was not always found and some orders were not matched**."[40]

25. Even before the automation, it seems that liquidity was not always found. For example, the executing broker could not find liquidity for a March 8, 2013, request by the Mill River Capital Management Pension Plan for Coloplast A/S stock trades.[41]

26. While discussing what he describes as "the pre-arranged bulk nature of the Solo Trades," Mr. Dubinsky also asserts that "the transactions were not custom tailored to

---

[39] Financial Conduct Authority, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶4.125, *available at* https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf (last accessed on January 17, 2022) (emphasis added). Relatedly, I note that Mr. Wade reports Average Daily Trading Volume ("ADTV") and maximum daily trading volume ("max DTV") for various Danish securities in Appendix D to his report. Mr. Wade's ADTV calculations fail to incorporate any volume of OTC trading and thus understate the ADTV and maximum DTV. There is a large amount of OTC trading volume in Europe, including the UK. For example, off-book, off-exchange (*i.e.*, OTC trades that are reported) average trading volume in December 2013 for Cboe Europe APA (UK) was 1,074,187,297. *See* Cboe, European Equities Market Share by Market, as of December 31, 2013, *available at* https://www.cboe.com/europe/equities/market_share/market/off-book/2013-12-31/#dm=tbnnav&dr=mtd&mt=1&ms=0&hc=1&f=0&ID=515770de6ebe755a2fe7&V=88e178cff5ed72b217b0 (last accessed on January 26, 2022). Cboe Europe APA accounts for the majority of European OTC trading. Cboe Europe describes itself as "the largest truly pan-European equities exchange by market share and value traded, offering trading in securities from 18 markets" and explains that "[t]hrough our exchanges in the Netherlands (Cboe NL) and the UK (Cboe UK) we operate a range of equity trading mechanisms to allow our clients to trade in a way that suits them. We operate Europe's largest Approved Publication Arrangement (APA) for the reporting of OTC equity trades … [O]ur Approved Publication Arrangement (APA) handles around 75% to 80% of all equity APA reports …." Cboe, "Our Vision for EU Equity Market Structure Reform," 2021, *available at* https://cdn.cboe.com/resources/participant_resources/KeyMiFIDIIViews_0521.pdf (last accessed on January 26, 2022).

[40] Financial Conduct Authority, Final Notice to Sunrise Brokers LLP, November 12, 2021, ¶4.125 (emphasis added), *available at* https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf (last accessed on January 17, 2022). Mr. Wade seems to be aware of this fact. *See* Wade Report n. 197 (citing FCA Sunrise Notice ¶4.125).

[41] MPSKAT00072484.

Rebuttal Report of Emre Carr, Ph.D., CFA

each Plan based upon their own risk profile, investment strategy or time horizon."[42] Mr. Dubinsky does not explain how the absence of "custom tailoring" to each plan's risk profile, investment strategy, or time horizon is evidence of the trade being fake. His observation about the risk profile is nothing more than his *ipse dixit* because he does not explain how the use of the Pension Plan Strategy in a particular stock tailored to a plan's risk profile would have been different from the transaction that any plan actually did. Furthermore, Mr. Dubinsky does not cite any sources that indicate what the pension plans' risk tolerances were or that the trades were not tailored to meet them.

27.  In short, the structured nature of the U.S. pension plan trades facilitated by the Solo Custodians is consistent with the arbitrage strategy that the plans pursued and, contrary to the SKAT Experts' assertions, the structured nature of the pension plans trades or automated trading does not support the assertion that the trades were fake.

## IV.   THE ANALYZED TRANSACTIONS FOLLOWED NUMEROUS ACCEPTED MARKET PRACTICES AND ARE NOT FAKE SIMPLY BECAUSE OF THE USE OF ANY NON-STANDARD TERMS

28.  Below, I provide a brief overview of several practices that the Analyzed Transactions followed. The Analyzed Transactions involve the initiation and unwind of three types of transactions: 1) stock trading, 2) hedging of the long stock positions via flex futures and forward contracts, and 3) securities lending.[43]

29.  I discuss each of the three transactions below and address several of the SKAT Experts' analyses of purported irregularities in the transactions. I find the SKAT Experts' analyses to be flawed and that they fail to demonstrate that the pension plan trades were fake.

---

[42] Dubinsky Report ¶207.

[43] *See* Initial Carr Report, Sections III-V for a detailed discussion of stock trading, hedging stock positions, and securities lending.

Rebuttal Report of Emre Carr, Ph.D., CFA

A. **Both Stock and Flex Futures Trading Followed Accepted Market Practices and IDBs Earned Commission On Their Trades**

i. **Stock Trading**

30.    With respect to stock trading, when an investor purchases or sells shares of a stock, it involves 1) trade execution, 2) clearance, and 3) settlement.[44]

31.    As I explained in the Initial Carr Report, an investor places an order to buy (or sell) shares of an issuer through an executing broker, with trade execution occurring when a seller agrees to sell, and a buyer agrees to buy a security in a specified quantity at a specified price.  The trades can be executed on a stock exchange or through bilateral trading via broker-dealers in the OTC market.  Economic risk is assumed by the buyer of shares as soon as the trade is executed.  The Analyzed Transactions were executed OTC by an executing broker and then given up to a Solo Custodian for clearing and settlement.[45]

32.    It is normal market practice for an investor to receive a trade confirmation from the executing broker when a stock trade is executed.[46]  As shown in **Figure 2** below, the RJM Plan received a trade confirmation from FGC Securities LLC for its purchase of MAERSKB shares.  As noted in the Initial Carr Report, a trade confirmation is evidence that the trade was executed and of the terms of execution.[47]

33.    Mr. Dubinsky ignores the common market practice of give-up arrangements and misrepresents the Solo Capital's trade approval issued under the give-up agreement to be the trade confirmation.[48]  I present a comparison of the emails that Mr.

---

[44] *See id.* at Section III for a detailed discussion of stock trading.

[45] *Id.* at ¶¶38-39.

[46] *Id.* at ¶35.

[47] *Id.  See also* Association for Financial Markets in Europe, "Post Trade Explained -The Role of Post-Trade Services in the Financial Sector," February 2015, Appendix 2 – Trade Confirmation; *see also* U.S. Securities and Exchange Commission, "Investor Bulletin: How to Read Confirmation Statements" (September 27, 2012), *available at*  https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-62 (last accessed on December 28, 2021) (explaining "What is a Confirmation Statement?").

[48] Dubinsky Report Figures 9 and 10.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

Dubinsky represents as the trade confirmations in Figure 10 of his report and the corresponding actual trade confirmations issued by FGC Securities in **Exhibit 2**.

**Figure 2: Trade Confirmation from FGC Securities to the RJM Plan**[49]

FGC

FGC SECURITIES LLC
12 Desbrosses Street
New York, NY 10013
e: execution@fgcsecurities.com

CLIENT: RJM CAPITAL PENSION PLAN
REF #: FUTL-20130411-0007-A
DATE: April 11, 2013

**CASH EQUITY CONFIRMATION**

Client and FGC Securities agree that this confirms the terms and conditions of the following Cash Equity Transaction:

| | |
|---|---|
| Transaction Type Type: | CASH EQUITY (STOCK) |
| Listed / OTC | LISTED |
| Trade Date: | April 11, 2013 |
| Client: | RJM CAPITAL PENSION PLAN |
| Email: | adam@rjmcapitalp.com |
| Buy / Sell: | BUY |
| Stock Description: | MAERSKB DC \| AP MOELLER-MAERSK A/S-B \| 4253048 |
| Exchange: | Copenhagen |
| Share Quantity: | 10,400 |
| Trade Currency: | DKK |
| Trade Price: | 43,680.2893 |
| Trade Notional: | 454,275,008.72 |

| | | |
|---|---|---|
| Commission: | 11,356.88 | DKK |
| USD FX: | 5.69 | |
| **Commission** | **1,995.94** | **USD** |

**To be invoiced montly*

*We thank you for the opportunity to have been of service to you and trust that the above correctly represents your understanding of the transaction in question. Failure to object in writing to the transaction confirmed above by the earlier of 24 hours after your receipt of this confirmation or prior to 9 a.m. local market time on the settlement date shall be deemed your agreement to the correctness of this confirmation. Please note we have acted only as agent in this transaction and are not responsible for the financial viability of any counterparties we have matched you with nor are we responsible for the performance of this or any other transaction we have arranged. You*

Regards,
**FGC Securities**

Highly Confidential MPSKAT00077419



Rebuttal Report of Emre Carr, Ph.D., CFA

34.  As the trade confirmation shows, the IDB earned a commission of $1,995.94 on the trade.  If the trade was fictitious, there would be no reason for the pension plans to pay commissions to brokers for execution.

35.  As part of executing stock trades, the use of executing brokers and clearing brokers by a customer such as a pension plan through a give-up agreement is a common industry practice and accepted arrangement.[50]

36.  The pension plans used an industry-standard template as part of their give-up arrangements.[51]  **Figures 3** and **4** below show acknowledgment and approval of equity transactions by the clearing broker (Solo, which also served as the custodian) sent to the RJM Plan, in accordance with the standard industry give-up agreement.[52]

---

[49] MPSKAT00077418-9 at MPSKAT00077419.  Note that this is an accurate example of a trade confirmation that the plans received from their brokers.  Mr. Dubinsky's report often cites to trade approval emails, *e.g.*, Dubinsky Report, Fig. 12, rather than the formal trade confirmation.

[50] Initial Carr Report ¶¶40-41.

[51] *See id.* at ¶¶39-43 for general discussion of give-up agreements and as it pertains to the RJM Plan transaction. *See also* Initial Carr Report, Exhibit 9 that compares and demonstrates that there are no significant differences between the give-up agreement used by the RJM Plan and the standard industry template called the International Uniform Brokerage Execution Services ("Give-Up") Agreement (Trader Version 2008).

[52] Once a stock trade is executed, the trade is subsequently cleared and settled.  The clearing process involves confirming transactions details (*e.g.*, security identifier, side of each party (buy or sell), trade price, trade quantity, and settlement date) between the buyer and the seller.  After the trade is cleared, the trade is settled. Settlement refers to the delivery of securities from the seller to the buyer, and the delivery of cash due, if any, on the transaction from the buyer to the seller.  I discuss the clearing and settlement of the trades later in §VIII of this report.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

### Figure 3: Solo's Acknowledgement of Transaction sent to the RJM Plan[53]

| From: | solotradeapprovals@solo.com |
|---|---|
| Sent: | Thursday, April 11, 2013 7:40 AM |
| To: | adam@RJMCapitalp.com; solotradeapprovals@solo.com |
| Subject: | Account (RJM01) - Request for Trade Approval |

Dear Client,

Solo Capital Partners LLP acknowledges receipt of the requested trade below (**Trade**). The Trade will only be accepted for "give-up" to Solo Capital Partners LLP once the Trade is approved by Solo Capital Partners LLP. The Trade will not be accepted if Solo Capital Partners LLP does not provide its approval.

Details of Trade:

| | |
|---|---|
| **Trade Type** | Buy |
| **Ticker** | MAERSKB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 43,680.2893 |
| **Quantity/Contracts** | 10,400 |
| **Notional** | 454,275,008.7200 |
| **Trade Date** | 11/04/2013 |
| **Settlement Date** | 17/04/2013 |
| **Broker** | FGC Securities LLC |

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Highly Confidential                    MPSKAT00077090

---

[53] MPSKAT00077090.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

### Figure 4: Solo's Approval of Transaction sent to the RJM Plan[54]

| | |
|---|---|
| **From:** | solotradeapprovals@solo.com |
| **Sent:** | Thursday, April 11, 2013 8:57 AM |
| **To:** | adam@RJMCapitalp.com |
| **Cc:** | execution@fgcsecurities.com; operations@fgcsecurities.com; solotradeapprovals@solo.com |
| **Subject:** | Account (RJM01) - Trade Approved |

Dear Client,

In relation to the trade referred to below (**Trade**), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| | |
|---|---|
| **Trade Type** | Buy |
| **Ticker** | MAERSKB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 43,680.2893 |
| **Quantity/Contracts** | 10,400 |
| **Shapes** | **Shape 1** 10,400 |
| **Notional** | 454,275,008.7200 |
| **Trade Date** | 11/04/2013 |
| **Settlement Date** | 17/04/2013 |
| **Broker** | FGC Securities LLC |

Highly Confidential                                                MPSKAT00077295

**Rebuttal Report of Emre Carr, Ph.D., CFA**

37.  The settlement term for the Analyzed Transactions used a T+4 settlement prior to October 6, 2014, and a T+3 settlement subsequent to October 6, 2014, as opposed to the T+3 and T+2 settlements, respectively, typically seen for trades executed on exchange.[55]  The Analyzed Transactions were executed OTC, and "[p]arties that trade stock OTC (or brokers acting on their behalf) may choose their settlement date, and can choose to settle before, on, or after the settlement date applicable to trades executed on an exchange."[56]

38.  As I noted in the Initial Carr Report, there is nothing wrong with a plan using a longer settlement period for stock purchases.  VP Securities, the Denmark central securities depository ("CSD"), explicitly allows for a longer settlement period.[57]  As I stated in the Initial Carr Report: "In Denmark, a trade can settle the day it is made or up to 365 days post-trade."[58]

39.  Relatedly, I observe that even Mr. Wade does not assert that the plans violated any market standard by using a longer settlement period; he merely notes that "[a]greeing to deliberately settle the trades with a settlement period longer than the market standard settlement cycle (*i.e.*, a T+4 basis instead when the market standard was T+3), … indicates that the contracts were bespoke [OTC] transactions."[59]  There is nothing wrong with trading OTC.

---

[54] MPSKAT00077295.

[55] Initial Carr Report ¶48.

[56] *Id.* ¶49.

[57] *Id.* n. 56 (discussing that "VP Securities ('VP'), the Denmark CSD, allows for settlement periods up to 365 days").

[58] *Id.* at ¶50.

[59] Wade Report ¶90.

**CONFIDENTIAL**

Rebuttal Report of Emre Carr, Ph.D., CFA

ii.    **Flex Futures Contracts**

40.    As I explained in the Initial Carr Report, the pension plans entered into either flex futures or forward contracts in the Analyzed Transactions to hedge the economic risk associated with price fluctuations in purchased shares.[60]

41.    I noted further that BClear was used to facilitate the flex futures transaction for the RJM Plan, as shown in the trade confirmation for the RJM Plan's flex future unwind transaction related to MAERSKB stock (see **Figure 5** below). As the trade confirmation shows, the IDB earned a commission of $1,895.39 on the trade.

42.    BClear was, as of June 2014, the largest provider of flex futures products in Europe.[61] Neither Mr. Wade nor Mr. Dubinsky states that BClear did anything improper or had any connection to Solo or Sanjay Shah.

---

[60] *See* Initial Carr Report, Section IV for a detailed discussion of hedging stock positions via flex futures and forward contracts.

[61] ISDA, "Central Clearing in the Equity Derivatives Market – An ISDA Study," June 2014, p. 7, *available at* https://www.isda.org/a/6PDDE/central-clearing-in-the-eqd-market-final.pdf (last accessed on December 17, 2021).

**Figure 5: Flex Futures Trade Confirmation from FGC Securities to the RJM Plan**[62]

FGC

FGC SECURITIES LLC
12 Desbrosses Street
New York, NY 10013
e: execution@fgcsecurities.com

CLIENT: RJM CAPITAL PENSION PLAN
REF #: RJMC_MAERS_20130613_0003_A1
DATE: June 13, 2013

**EQUITY FUTURES CONFIRMATION**

Client and FGC Securities agree that this confirms the terms and conditions of the following Equity Futures Transaction:

| | |
|---|---|
| Transaction Type Type: | **SINGLE STOCK FUTURES** |
| Listed / OTC | **LISTED** |
| Futures Trade Date: | **June 13, 2013** |
| Client | **RJM CAPITAL PENSION PLAN** |
| Buy / Sell: | **BUY** |
| Futures Contract: | **MAY (MAERSKB DC) JUN13 Bclear Flex Futures** |
| Exchange: | **BCLEAR** |
| Futures Quantity: | **104** |
| Futures Price: | **40,750.9400** |
| Futures Expiry Date: | **June 21, 2013** |
| Futures Notional: | **423,809,776.00** |
| Settlement Type: | **CASH** |
| Underlying Reference: | **MAERSKB DC \| AP MOELLER-MAERSK A/S-B \| 4253048** |
| Reference Units: | **10,400** |
| Trade Currency: | **DKK** |
| Reference Price: | **40,750.2863** |
| Reference Notional: | **423,802,977.52** |
| Delta: | **100.00** |
| Multiplier: | **100.00** |

| | | |
|---|---|---|
| Commission: | [illegible] | DKK |
| USD FX: | 5.59 | |
| **Commission** | **1,895.39** | **USD** |

**To be invoiced montly*

*We thank you for the opportunity to have been of service to you and trust that the above correctly represents your understanding of the transaction in question. Failure to object in writing to the transaction confirmed above by the earlier of 24 hours after your receipt of this confirmation or prior to 9 a.m. local market time on the settlement date shall be deemed your agreement to the correctness of this confirmation. Please note we have acted only as agent in this transaction and are not responsible for the financial viability of any counterparties we have matched you with nor are we responsible for the performance of this or any other transaction we have arranged. You agree that FGC shall have no liability to any party if any party is for any reason restricted from entering into or fails to perform obligations within this transaction*

Regards,
**FGC Securities**

Highly Confidential MPSKAT00085291

[62] MPSKAT00085291.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

43. As I explained in Initial Carr Report, "Solo Capital accessed BClear through JP Morgan Chase because '[f]irms wishing to access the [BClear] system either have to be a member firm of LIFFE (Euronext Liffe London) or to have a clearing agreement in place with a member firm.'"[63]

44. While Mr. Dubinsky asserts that the absence of Danish shares in the Solo sub-custodian accounts that he identified and reviewed shows that the pension plans never held Danish shares,[64] he failed to address whether there were transactions in flex futures contracts present in those sub-custodian accounts. Instead, Mr. Dubinsky states that he "**purposely omitted** a detailed discussion on the use of forward contracts and futures contracts that were present."[65] In contrast, Mr. Wade acknowledges that the futures were present in sub-custodian accounts.[66] Thus, according to Mr. Dubinsky's logic, the presence of flex futures in Solo's sub-custodian accounts is evidence that the plans' flex futures contracts were not fake.

45. Mr. Wade, in turn, asserts that Solo "booked fictious (*sic*) open [flex futures] positions in its clients' account statements" even though, as he is aware, these positions are shown in statements issued by JP Morgan.[67] In other words, without any basis, Mr. Wade seems to assert that the JP Morgan statements he cites are fake.

46. Mr. Wade only cites partial communication between JP Morgan and Solo Capital. Specifically, he only reports Solo Capital's response explaining that the "commercial rational behind the business is to charge clients a premium for a facility to clear through a Global Bank," and asserts that he does "not accept this

---

[63] Initial Carr Report ¶83.

[64] Mr. Dubinsky claims that he searched for "additional evidence of any other custodians or sub-custodians" that may have had custody of Danish shares on behalf of the Solo Custodians and was "unable to find any such evidence." Dubinsky Report ¶135. However, he cannot be sure that he has searched thoroughly as it is unclear what the relevant sub-custodians are absent confirmation from Solo Capital, which is not a party to this litigation. For example, Mr. Dubinsky did not mention reviewing any records from the National Bank of Abu Dhabi, which was a sub-custodian for Solo Capital. SCPADMINISTRATORS_00013560-13917.

[65] Dubinsky Report, n. 7 (emphasis added).

[66] Wade Report ¶256.

[67] *Id.*

response."[68]  He fails to report that, on getting Solo Capital's response, JP Morgan further inquired, "For the transactions identified, can you please confirm that each trade had different buyers and sellers (i.e. different beneficial owners)?"[69]  Thus, JP Morgan's real concern was that trades should be for different buyers and sellers, and Mr. Wade has not provided any evidence that they were not.

47.   Mr. Wade also appears to take exception with the fact that Solo also provided custodian services for another client that engaged in the offsetting flex futures trades observing that "Solo itself never held an open futures position in its sub-custodian omnibus accounts."[70]  Naturally, if two of Solo's customers engaged in equal but offsetting flex futures trades, Solo would not have an open position.  The relevant analysis is whether both the positions appeared in Solo's omnibus account (with JP Morgan) used to access BClear because Solo could not directly access BClear.  As Mr. Wade acknowledges, both the offsetting positions do appear in JP Morgan's statement for Solo's omnibus account.[71]

48.   Mr. Wade further comments that Solo's futures "trading patterns are highly irregular" and that "it is not clear what purpose any of the IDBs serve in the Solo Transactions, but it is clear that they are complete pass-through entities which take no risk and have no opportunity for profit."[72]

49.   First of all, there is no reason why an IDB must take a risk while finding liquidity for investors.  For example, an IDB can facilitate the transaction on a matched principal basis wherein:

> *the facilitator interposes itself between the buyer and the seller to the transaction in such a way that it is never itself exposed to market risk throughout the execution of the transaction, with both sides executed*

---

[68] *Id. at* ¶257.

[69] ELYSIUM-01746161.

[70] *Id.*

[71] *Id.*  ("Because the Solo Pension Plans and the short sellers, such as Delvian and Gulf Management Group, took offsetting futures positions, Solo's position in its sub-custodians' futures omnibus accounts would net to zero.")

[72] *Id.* at ¶257.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

> *simultaneously, and where the transaction is concluded at a price*
> **where the facilitator makes no profit or loss, other than a previously**
> **disclosed commission, fee or charge for the transaction**.[73]

50. In this regard, Mr. Wade's assertion that the entities have no opportunity for profit ignores that the IDBs earned a commission on their transactions. For example, as **Figure 5** above shows, FGC Securities earned a commission of $1,895.39 when the RJM Plan unwound the flex futures transaction.[74]

51. Further, Mr. Wade opines "that the IDBs were used **to create the impression** that Delvian and Roadcraft were engaging with real external IDBs and were transacting on 'market' terms" because the IDBs were "complete pass-through entities which [took] no risk."[75] As explained above, Delvian and Roadcraft did, indeed, engage with real external IDBs. Mr. Wade implicitly acknowledges that Delvian and Roadcraft's transactions with those real external IDBs were on market terms.[76]

52. Mr. Wade claims that the pricing of the futures was "a further indication that none of the transactions were done at arm's-length."[77] Mr. Wade discusses several factors that can affect the pricing of futures contracts.[78] However, this discussion appears to be related to exchange-traded instruments and therefore irrelevant here.

---

[73] Financial Conduct Authority, "Matched Principal Trading," *available at* https://www.handbook.fca.org.uk/handbook/glossary/G3544m.html (last accessed on January 17, 2022) (emphasis added).

[74] Wade Report at p. 104 ("the Bid-Ask Spread Were Ignored by Solo"). Bid-ask spread is an alternative way of earning commission by the IDBs. Under the bid-ask spread system, an IDB would pay a lower price ("bid") for buying an asset from an investor and charge a higher price ("ask") for selling the same asset to another investor. Because IDBs such as FGC Securities for the RJM Plan charged a commission, contrary to Mr. Wade's assertion, they did not need to execute orders using a bid-ask spread. See MPSKAT00066947-51 at MPSKAT00066951, stating: "This letter is to confirm the brokerage rates for FGC Securities, LLC. …

- We charge ¼ of a basis point on notional of any stock transactions
- We charge ¼ of a basis point on notional of any future transactions"

[75] Wade Report ¶257 (emphasis added).

[76] *See id*.

[77] *Id.* at ¶253.

[78] *Id*. at ¶¶254-255.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

53. Additionally, Mr. Wade claims that the IDBs involved in the Solo Custodians' transactions included futures contracts at different expirations trading at the same prices, and, in support, asserts that pricing of several flex futures transactions related to Novo Nordisk A/S had the same prices despite different expirations.[79] I have reviewed the custodian's statement and found Mr. Wade's assertion to be wrong. The statement shows the trades on March 20, 2013, of contracts in Novo Nordisk A/S with September 20, 2013, expiry at prices ranging from DKK 956.01 to DKK 956.08 and with December 20, 2013, expiry at prices ranging from DKK 958.05 to DKK 958.08.[80] See **Exhibit 3** for a listing of these trades and prices. To the extent that Mr. Wade's assessment of the trading pattern in futures as "highly irregular" is predicated on this evidence, it is without basis.

54. Mr. Wade claims that "[i]n my experience, in transactions where futures are used as hedging instruments in **equity finance transactions**, it is **not market standard** for the gains and losses on the component elements of trade to net perfectly to zero. Netting to zero, in this instance, refers to a zero gain or loss for Delvian after combining the equity purchase, future sale, equity sale, future purchase, net dividend, stock loan interest, and fees."[81]

55. Mr. Wade's claim is incorrect for at least the following reasons.

56. First, so far as I am aware, there is no "market standard" regarding the profit (or loss) a transaction should have.

57. Second, Mr. Wade seems to misunderstand the Pension Plan Strategy. He incorrectly characterizes the entire transaction as an equity finance transaction and ignores dividend reclaim and transaction costs in his net profit calculations.

---

[79] *Id.* at ¶257 and n. 211 ("See for example the trades on 20 March 2013 in the JP Morgan statement (ELYSIUM-01460217). This has 8 trades for the September 20, 2013, expiry single stock future over Novo Nordisk A/S shares and 8 trades of similar sizes over the December 20, 2013, expiry contract which coincidentally match the prices on the September 20, 2013, expiry contracts exactly.")

[80] ELYSIUM-01460217.

[81] Wade Report ¶258. (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

58. It is certainly not market standard to not analyze a trade's profit ignoring payoff from a part of the overall transaction (*i.e.*, dividend reclaim) and transaction costs.

59. Mr. Wade's profit calculations are irrelevant because they are effectively the gross profits (*i.e.*, before transaction costs) for an investor paying taxes at the same rate as the withholding tax, not a tax-exempt entity like Delvian because the calculations ignore a purchaser's tax status.

60. For example, for the Analyzed Transactions in the Initial Carr Report, adding transaction costs to Mr. Wade's profit definition results in a loss for each Analyzed Transaction. See, for example, Table 1 in the Initial Carr Report, when I subtract per share tax reclaim of DKK 324 from the Gross Profit of DKK 340.37 per share, I get Mr. Wade's profit of DKK 16.37 per share (equals DKK 340.37 less DKK 324.00) for the MAERSKB trade by the RJM Plan.[82] From an economic perspective, DKK 16.37 represents the gross profit that an investor with a marginal tax rate of 27% would have made. When I subtract the transaction cost of DKK 17.26 per share shown in Table 1 of the Initial Carr Report, that results in a negative profit because transaction costs of DKK 17.26 exceed the gross profit of DKK 16.37. This result is not surprising and is merely a reflection of the fact that there is no arbitrage opportunity for an investor whose marginal tax rate is the same rate as the withholding tax.

**B.    Securities Lending**

61. To finance the purchase of shares, the pension plans engaged in securities lending. For the Analyzed Transactions, the pension plans lent shares that they purchased on the same day that the stock trades settled and used the cash collateral received in return to pay for the purchased shares.

62. Securities lending transactions are commonly done pursuant to industry-standard agreements like the Global Master Securities Lending Agreement ("GMSLA"), a

---

[82] Initial Carr Report, p. 53, Table 1.

widely used industry standard template issued by the International Securities Lending Association ("ISLA").[83]

63.  For the Analyzed Transactions, the RJM Plan entered into an agreement with Colbrook Ltd., and the Proper Pacific Plan entered into an agreement with Gnosis Capital Ltd.[84]

64.  As I noted in the Initial Carr Report, investors sometimes use security lending transactions to finance stock purchases because, as per acceptable market practices, one can obtain more than 100% of the value of the stocks as cash collateral.  Mr. Dubinsky ignores this when he asserts, "the Plans lacked the liquidity and financial wherewithal necessary to purchase the shares that were supposed to be the subject of the Solo Trades."[85]  Mr. Dubinsky also asserts, "[c]onsistent with this pattern, it appears that the offshore stock loan counterparties such as Neoteric Limited were also thinly capitalized and would not have had capital to use as the cash collateral component of the stock loan."[86]  Mr. Dubinsky provides no analyses or citations in support of his assertion.  Absent an analysis of all the transactions that Neoteric Limited did, Mr. Dubinsky's claim is flawed.

65.  The pension plans entered into securities lending agreements that conformed to the industry-accepted GMSLA template.[87]

---

[83] ISLA, Global Master Securities Lending Agreement, Version: January 2010, *available at* https://www.islaemea.org/wp-content/uploads/2019/03/GMSLA_2010_amendments_July_2012-1.pdf. (last accessed on January 17, 2022).

[84] Global Master Securities Lending Agreement between Colbrook Ltd. and RJM Capital Pension Plan (MPSKAT00068151-92); Global Master Securities Lending Agreement between Gnosis Capital Ltd. and The Proper Pacific LLC 401k Plan (PROPPACIF00001035-78).

[85] Dubinsky Report ¶214.

[86] *Id.* at ¶215.

[87] GMSLA between Colbrook Ltd. and RJM Capital Pension Plan (MPSKAT00068151-92); GMSLA between Gnosis Capital Ltd. and The Proper Pacific LLC 401k Plan (PROPPACIF00001035-78). As demonstrated in Exhibit 11 of the Initial Carr Report, the GMSLA entered between the pension plans and the borrowers in the Analyzed Transactions were substantially similar to the GMSLA master template.  Exhibit 11 compares the GMSLA used by the RJM Plan to the General Master Securities Agreements (Version: January 2010), the standard industry template.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

66. Yet, Mr. Wade asserts that the "The Terms of the Stock Loan Agreements are Highly Irregular for Multiple Reasons."[88]  As discussed below, Mr. Wade's reasons are flawed or without any basis.

67. First, Mr. Wade states that "[i]f Aquila needed the shares then Delvian would demand margin, and if Delvian were in need to (*sic*) funding then Aquila would demand a haircut."[89]

68. Mr. Wade's assertion that Aquila would have demanded a haircut in this context is inconsistent with the fact that Delvian had executed the transaction as a stock lending transaction, in which the stock lender generally charges margin, not a repurchase agreement (repo) in which the cash lender requires a haircut typically.

69. It is not clear what Mr. Wade means by "[i]f Aquila needed the shares then Delvian would demand margin" because Delvian did demand collateral.[90]  If by margin he is referring to a collateral in excess of 100% of the value of the lent securities,  there is no such requirement.  As I explained in the Initial Carr Report, cash collateral varies from transaction to transaction and is negotiated between the parties:

> *In practice, the cash collateral is often negotiated between parties and depends on firm-specific and collateral-specific factors.  A study reports that 'the 90% of securities lending transactions [in the U.S.] take place with collateral margins ranging from 100% to 111%.'"[91]*

70. Second, Mr. Wade also states, "Delvian appears to have not taken any steps to finance its purchase of DKK 351.9M of CARLB shares for the 5 days between the Trade Date of its Cum-Ex purchase and the Trade Date of the stock loan it used to

---

[88] Wade Report, p. 98.

[89] *Id.* at ¶248.

[90] *Id.* at ¶248.

[91] Initial Carr Report ¶116. (internal citation omitted).  Mr. Wade also asserts, "Aquila gave funding of DKK 586.4698 per share when the value of the collateral was only worth DKK 573.0000 per share.  Aquila provided Delvian with significant margin when it would have been customary instead for Aquila to demand a haircut from Delvian. This is not something which would have been agreed to between arm's-length counterparties." Wade Report ¶249.  In percentage terms, DKK 586.4698 is 102.4% of the DKK 573.00.  As I explained in the Initial Carr Report, the actual cash collateral in an agreement varies, and Delvian could have obtained cash collateral of 105% as per normal stock lending market practices in Europe.  Initial Carr Report ¶¶115-116.

finance itself. As a thinly capitalized pension fund this is a highly imprudent approach to take if it were not part of the completely pre-ordained set of transactions."[92]

71. The time or steps taken to obtain the financing is irrelevant for determining whether stock purchases were fake. The fact that Delvian did obtain the financing and used that to pay for the shares does not support the conclusion that the trades were fake.[93]

72. Third, Mr. Wade asserts, "I have seen no evidence that any of the counterparties to Delvian were at all concerned about such a large unfunded position or had taken any steps to address what would happen if Delvian's funding stock loan had been declined. There is simply no way that arm's-length counterparties would have dealt with each other on this basis."[94]

73. Without any basis, Mr. Wade seems to assume that the parties to the stock trade knew each other and had visibility into each other's finances. Again, whether a pension plan's counterparty to a stock trade was concerned or not is irrelevant for determining whether stock purchases were fake. The fact that Delvian did obtain the financing and used that to pay for the shares does not support the conclusion that the trades were fake.

74. Fourth, Mr. Wade questions the terms of the stock loan that provided for payments of dividends among the parties, which specify that "Aquila, the borrower, would pay 100% of dividends back to the lender, Delvian"[95] and observes that "this provision

---

[92] Wade Report ¶250.

[93] Mr. Wade also asserts that "[i]n effect, Aquila is providing a thinly capitalized pension fund with complete financing for its 'trading' position and so is effectively at risk of any losses that arise. In my experience, no stock borrower would agree to such terms as it would require the party to ignore all counterparty and market risk inherent in any stock loan transaction." Wade Report ¶247. Without any basis, Mr. Wade seems to assume that Aquila knew that the pension plan was thinly capitalized. If indeed Aquila knew that then it is also likely that Aquila knew that the pension plan had fully hedged its stock purchase and had no market risk. Similarly, Aquila might not have been concerned about the counterparty risk as both Aquila and Delvian were using the same custodian, or because Aquila intended to do another transaction that offset the risk.

[94] *Id.*

[95] *Id.* at ¶246 (citation omitted).

Rebuttal Report of Emre Carr, Ph.D., CFA

appears to be meaningless because there was no need for any manufactured payments during the life of the stock loan."[96]

75. He himself provides an example of a special dividend where the provision would be applicable.

76. He also asserts that the dividend terms in the stock lending agreement prove "that the terms of the stock loan transaction were unmoored from the realities of the actual market or any economic considerations."[97] Mr. Wade ignores that sometimes a company can declare special dividends or that the security lending could extend to the next dividend date. Therefore, the industry-accepted GMSLA template includes the dividend terms and, as demonstrated in Initial Carr Report, the stock lending done by the pension plans conformed to the GMSLA template.[98]

77. Finally, Mr. Wade speculates that the stock loan "would have only been undertaken to create the illusion of a dividend to support a reclaim application by Delvian."[99] He fails to provide any reclaim application that used a stock lending agreement in support of the tax reclaim, and I am aware of none that did.

## V.    BOTH MR. DUBINSKY AND MR. WADE CONSIDER INFORMATION NOT AVAILABLE TO THE PENSION PLANS

78. Both Mr. Dubinsky's and Mr. Wade's analyses consider information that was not available to the pension plans. For example, both of these experts rely on:

---

[96] *Id.*

[97] *Id.* at ¶246.

[98] Initial Carr Report Exhibit 11. Mr. Wade also asserts that "Aquila would have lost 27% of any such dividend paid as it would not be able to recover any withholding tax and would have had to pay the gross amount." *Id.* at ¶246, citation omitted. It seems to me that Mr. Wade is offering an opinion that is based on his interpretation of the tax related clauses in the GMSLA template. I am not a tax law expert. However, it seems to me that Mr. Wade's interpretation might be incorrect as he ignores the fact that, under the GMSLA, payment could be net of withholding tax depending on the Applicable Law. In support of his assertion, Mr. Wade highlights Aquila's residency without explaining its relevance to the question of whether dividend payments made pursuant to the GMSLA would have taxes withheld in the first instance.

[99] *Id.* at ¶246.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

    a.    Solo account statements at Société Générale, a sub-custodian, and sworn affidavits from two other sub-custodians, JP Morgan Chase and Skandinaviska Enskilda Banken AB,[100]

    b.    Various transactions by the counterparties to the pension plans that did not involve the pension plans.[101]

79.    Mr. Dubinsky suggests that the pension plans received the "very same shares" that the plans lent because the pension plans' lent those shares to a stock loan intermediary that loaned those shares to the party that had sold those shares to the pension plans in the first place.[102]

80.    First, as discussed in the Initial Carr Report, Danish shares are dematerialized, meaning that there are no physical paper certificates of shares, and that the shares exist "only" as electronic book entries that track ownership.[103]  Further, the shares are fungible.  As a result, the concept of the "same shares" being transferred through multiple holders does not make sense.

81.    Second, Mr. Dubinsky does not suggest that he has examined all the transactions (*e.g.*, other trades and borrowing or lending) done by the stock borrowers in these transactions.  For example, the stock borrowers may have also sold or lent shares to other parties and/or borrowed additional shares in addition to the specific trades that Mr. Dubinsky identifies.  Absent such an examination of other transactions, it is incorrect to conclude, as Mr. Dubinsky does, that the stock trade counterparty had no other shares, or that "the same shares" came back to the pension plans.  In particular, due to the prevalence of dividend arbitrage strategies, share trading volumes are high around ex-dividend dates – whether due to Cum-Cum or Cum-Ex trading or any

---

[100] Dubinsky Report ¶¶134-137; Wade Report ¶234-235.

[101] Dubinsky Report, Figures 9, 14, 15, 19, 20, 25, 26, 27, and 28; *see also* Wade Report, Figure 11.

[102] Dubinsky Report ¶17.

[103] Initial Carr Report ¶29, *also see* Regulation (EU) No 909/2014 Of The European Parliament And Of The Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) No 236/2012, Art. 2.1(4)  ("dematerialised form' means the fact that financial instruments exist **only** as book entry records") (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

other form of dividend strategies.  The party to whom the pension plans lent shares could have traded with many other parties on those dates.

82.  Therefore, the purported evidence that Mr. Dubinsky proffers regarding the Solo Custodians' conduct is incomplete for evaluating the pension plan trades.  I refer to the evidence as purported because the Solo Custodians are not parties in this matter and, therefore, cannot respond to Mr. Dubinsky's claims.

83.  Further, both of the SKAT Experts fail to demonstrate that the pension plans knew that "Solo never held any actual Danish securities."[104]

84.  The SKAT Experts also do not provide any evidence demonstrating that the pension plans knew of all transactions (and identities of parties in those transactions), including transactions that did not involve the pension plans.

## VI.    CUM-CUM AND CUM-EX TRANSACTIONS LEAD TO THE SAME ECONOMIC EXPOSURE FOR A PENSION PLAN; SUBSTITUTE DIVIDEND PAYMENTS DO NOT MEAN THAT A TRANSACTION IS FABRICATED

85.  Mr. Wade categorizes dividend arbitrage transactions of the type pursued as part of the Pension Plan Strategy into two categories: (i) "Cum-Cum," and (ii) "Cum-Ex."[105]

86.  Mr. Wade considers the Cum-Cum trades as "legitimate," noting that in those trades, the custodian or one of its clients "did in fact obtain a **real** dividend."[106]  Mr. Wade,

---

[104] Wade Report ¶225. As discussed in §VIII, given the offsetting trades by Solo's clients, the net shareholdings in Solo's sub-custodian account do not demonstrate that the pension plan trades were fake.

[105] *Id.* at ¶162 ("Separately, I have reviewed various other contemporaneous transactions undertaken by ED&F Man that involved the transfer of shares which settled prior to the Record Date… I will refer to these transactions as 'Cum-Cum' transactions."); *id.* at ¶79 ("A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date.").  I note that in Cum-Ex transactions the settlement terms are not "modified" but are selected and agreed upon by the parties.

[106] As per Mr. Wade, "A real dividend involves the direct payment of a dividend from a share issuer, and results from being a shareholder of record on the dividend Record Date." *Id.* at ¶70 Mr. Dubinsky calls the dividend sourced from an issuer an "actual dividend."  Dubinsky Report ¶16.  I note that these definitions are imprecise since, as discussed in the Initial Carr Report, dividends received by the holders of record are not received directly from the stock issuer, but from the custodians and flow from a chain of custody that began at the issuer.  *See* Initial Carr Report ¶125.

*See also*, Wade Report ¶162 (explaining Cum-Cum transactions "**are transactions under which ED&F Man or one of its clients did in fact obtain a real dividend**.) (emphasis added).

**Rebuttal Report of Emre Carr, Ph.D., CFA**

however, considers Cum-Ex transactions through the Solo Custodians as "fabricated" because, among other things, the "The Solo Pension Plans' counterparties and other parties to the transactions **did not receive a real dividend**."[107]

87. As discussed below, a transaction is not "fabricated" simply because the investor received an amount labeled a substitute, rather than "real" dividend payment, as Mr. Wade asserts.[108]

88. Mr. Wade does not describe the Cum-Cum transactions he analyzed in detail. His report suggests that, like the Pension Plan Strategy, an investor engaging in a Cum-Cum transaction bought shares at cum-dividend prices (*i.e.*, before the ex-dividend date) and, thereby, obtained claim to an amount equal to the forthcoming dividend paid by the underlying stock.[109] Concurrently, the investor hedged price risk through a derivative, *e.g.*, a future or forward contract.[110]

89. As I explained in the Initial Carr Report, an investor obtains economic exposure to a stock when the purchase occurs and not when the trade settles. Both in a Cum-Cum and a Cum-Ex trade, an investor buys a stock at the cum-dividend price before the ex-dividend date, and, thereby, obtains immediate economic exposure to changes in the stock price and a claim to an amount equal to the forthcoming dividend. Clearing and settlement are post-trade operations that do not alter the investor's economic exposure.[111]

---

[107] *Id.* at ¶16 (emphasis added).

[108] *Id.* at ¶16.

[109] Mr. Wade implicitly acknowledges that, typically, the seller in the Cum-Cum Transactions was a short seller as he explains that "the pricing of these [Cum-Cum] transactions necessarily involves the economic compensation of a third-party financial institution from which the shares were obtained, **most often through a stock loan that settled prior to the Record Date**." *Id.*at ¶162 (emphasis added).

[110] *Id.* at Appendix F.

[111] Initial Carr Report ¶47 ("Together, clearing and settlement form a process that ensures that sellers get payment for the sold securities and buyers get delivery of the purchased securities.") An investor's economic exposure is only impacted if a custodian fails to settle the purchased securities. I discuss the trade settlement in Section VIII.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

90.    Cum-Cum and Cum-Ex trades differ in the sense that stock purchases in a Cum-Cum transaction settle **before** the record date, whereas the stock purchases settle **after** the record date in a Cum-Ex trade.[112]

91.    As a matter of economics, an investor's purchase of shares at cum-dividend prices reflects the purchaser's entitlement to receive an amount equal to the dividend payment (net of withholding tax, if any).  As discussed in my opening report, the Plan accounts received dividend payments (net of withholding taxes) from their custodians.[113]  **Figure 6** below shows the "Dividend Credit Advice" that the RJM Plan received from Solo for its April 2013 trade in MAERSKB stock.

---

[112] Wade Report ¶79, stating that a Cum-Ex "transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex."  I use the term Cum-Ex as used by Mr. Wade in his report.

[113] Initial Carr Report ¶128.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 6: Dividend Credit Advice from Solo to the RJM Plan**[114]

Solo Capital

4 Throgmorton Avenue
London EC2N 2DL

**DIVIDEND CREDIT ADVICE**
Issue Date: 17th April 2013, Issue No: 285

**RJM Capital Pension Plan**
1010 Fifth Avenue
Apt 1D
New York
NY 10028
United States of America

**Date: 17th April 2013**

Dear Sirs,

Please be advised that we have credited your account RJM01, for the value date of 17th April 2013. This payment represents the dividend as shown below:

| | |
|---|---|
| **Security Name:** | AP MOELLER-MAERSK A/S - B SHARES |
| **Sedol:** | 4253048 |
| **ISIN:** | DK0010244508 |
| **Pay Date:** | 17th April 2013 |
| **No of Shares:** | 10,400 |
| **Gross Dividend:** | DKK 12,480,000.00 |
| **Tax:** | DKK 3,369,600.00 |
| **Net Dividend:** | DKK 9,110,400.00 |

Name: Jas Bains
**Solo Capital Partners LLP**

Solo Capital Partners LLP is authorised and regulated by the Financial Conduct Authority of the United Kingdom
[FCA Registration Number 566435, Company Number 07287979, VAT Registration Number 123 4462 46]

CONFIDENTIAL                                                                     WH_MDL_00268445

---

[114] WH_MDL_00268445.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

92.   Contrary to Mr. Wade's assertion, there is nothing wrong *per se* with a Cum-Ex transaction and the Cum-Ex nature of the trade does not make the transaction fictitious simply because the dividends received in the transaction are substitute dividend payments.  For example, as noted earlier, a Cum-Cum transaction can become a Cum-Ex transaction when there is a settlement failure and thus the trade does not settle on or before record date.  As Mr. Wade acknowledges, "[a]cross equity and other financial markets numerous settlements fail daily" and "failed trades are simply reattempted the next day and generally settle a maximum of one or two days later."[115]  Mr. Wade acknowledges that a Cum-Cum trade will become a Cum-Ex trade when there is a settlement failure.[116]

93.   According to Mr. Wade, there is no problem if a "legitimate" Cum-Cum trade has a settlement failure and becomes a Cum-Ex trade.  I agree.  And further, if a Cum-Ex trade is legitimate when it happens as a result of a settlement failure, it is equally legitimate when it happens by design.  Relatedly, irrespective of whether a payment is called a substitute dividend or real dividend, an investor receives the same amount.

94.   Similarly, if the seller in a Cum-Ex transaction is a short seller that borrowed shares before the record date, the buyer will still receive substitute dividend payments.  The short seller will also have to pay substitute dividends to the security lender as well.  In other words, for the same shares, two investors will receive substitute dividends.  It will be incorrect to say that the stock trade or loan is fake or that either of these substitute dividend payments is fake even though the company paid dividends only once for the shares.

95.   Mr. Wade also states that "[t]here was no economic requirement for the contracts to be priced on a cum-dividend basis when they in fact were ex-dividend purchase

---

[115] Wade Report ¶82 ("Settlement failure can occur because banks or custodians make errors which need to be corrected or because counterparties default. … In nearly all circumstances, failed trades are simply reattempted the next day and generally settle a maximum of one or two days later.").

[116] *Id.* at p. 33 discussing "Origins of "Cum-Ex" Transactions Which Resulted from Settlement Fails." *See also id.* at ¶83 ("It is my understanding that the earliest examples of Cum-Ex transactions arose as a result of accidents due to settlement failures.").

**Rebuttal Report of Emre Carr, Ph.D., CFA**

contracts."[117]  However, the pension plans purchased shares at cum-dividend prices and, thus, they were entitled to receive the dividends.  Whether those were "real" dividends or substitute dividends made no difference to the economics of the trades. As discussed above, even a Cum-Cum trade can become a Cum-Ex trade under some circumstances.[118]

96.    Mr. Wade also states that "market participants were highly skeptical of situations that appeared to suggest that a dividend compensation payment was the same as a real dividend."[119]  Even if this statement without any citation were true, skepticism does not mean that investors do not engage in such transactions or that there is anything "fake" about them.  Furthermore, I note that any dividend payments made in securities lending transactions, from the borrower to the lender, are by default substitute dividend payments.  Securities lending transactions involving such substitute dividend payments are quite common, despite any "skepticism" of such payments that Mr. Wade asserts.  There are trillions of euros of securities lent each year,[120] and, in fact, as discussed in the Initial Carr Report, securities lending increases around dividend record dates.[121]

97.    Citing to the U.K. Manufactured Overseas Dividend (tax) rules, Mr. Wade asserts that "it was well understood by market participants that there was a significant difference between receiving a real dividend and receiving a dividend compensation

---

[117] *Id*. at ¶90.

[118] Mr. Wade also asserts that "the Cum-Ex transactions were priced on average at a significantly lower rate compared to the Cum-Cum transactions which required market-level compensation payments because the shares were lent over Record Dates."  *Id*. at ¶163.  I am unable to verify Mr. Wade's claims about "All-In" Dividend Sourcing Cost presented in Appendix F because, unlike his Appendix C, he does not provide the underlying data or a specific source that would allow me to replicate his Appendix F.  I understand from counsel that, despite my request, SKAT has refused to provide the data, and therefore, in my opinion, Mr. Wade's evidence in Appendix F is nothing more than his *ipse dixit*.

[119] *Id*. at ¶76.

[120] *See, e.g.*, ISLA, "Securities Lending Market Report," March 2021, p. 13, *available at* https://www.islaemea.org/assets/smart-pdfs/isla-securities-lending-market-report-march-2021/ (last accessed January 31, 2022)

[121] *See* Initial Carr Report ¶108.

payment."[122]  First of all, Mr. Wade does not explain why the U.K. Manufactured Overseas Dividend (tax) rules are relevant when the securities at issue are Danish ones.  Second, he does not explain to what the "significant difference" refers, and why it demonstrates that the pension plans trades were allegedly fake.  To the extent Mr. Wade is referring to the different tax treatment, the impact would depend on the tax status of the investor and Mr. Wade does not explain why that would be relevant for a tax exempt investor like pension plan.

## VII.  SKAT EXPERTS' REPEATED ASSERTIONS OF PURPORTEDLY "CIRCULAR" TRANSACTIONS DO NOT DEMONSTRATE THAT THE PENSION PLAN TRANSACTIONS WERE "FAKE"

98.  Mr. Dubinsky refers to the Solo trades as "closed loop, circular transactions,"[123] while Mr. Wade asserts that "[t]he circular nature of the Solo trades with Delvian means that there was no requirement for shares or cash; the purported trades were completely fake."[124]

99.  Mr. Dubinsky defines the term "loop" as a "circular trading pattern involving (1) ostensibly the purchase of Danish equity securities, (2) the use of purported stock loans to finance the purchases by Plans that otherwise had no money, and (3) purported forward/futures hedging transactions, all related to certain Danish equities structured around their respective dividend payment dates."[125]

100.  This description does not point to a loop but suggests that Mr. Dubinsky disagrees that the pension plans actually executed the stock purchases, futures and forwards hedges, and stock loans.  Mr. Dubinsky inserts "ostensibly" and "purportedly" in his description of these transactions and apparently refers to them as a "loop" based on

---

[122] Wade Report ¶73 (citing to U.K. guidance on manufactured dividend rules from Her Majesty's Revenue and Customs Corporate Finance Manual, published April 16, 2016, updated November 23, 2021).

[123] Dubinsky Report ¶16.

[124] Wade Report ¶16.

[125] Dubinsky Report ¶147.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

his assessment of additional transactions in which other parties (such as the executing broker and lending counterparties) engaged.[126]

101.  Both Mr. Wade and Mr. Dubinsky fail to articulate what they mean by a circular transaction and fail to explain what exactly is circular in the figures present and why the purportedly circular nature of the transactions establishes that the trades were fake.[127]  For example, Figure 15 in the Dubinsky Report shows a Solo trade made by the Bernina Pension Plan, in which it purchases shares of Carlsberg stock from D.D.C. Cayman (through executing broker FGC Securities) and lends shares of Carlsberg stock to Colbrook, Ltd.[128]  Presumably this is a circular trade according to Mr. Dubinsky as he draws arrows connecting parties to various transactions in a way that they form a circle.

102.  The Bernina Pension Plan's transactions of 1) buying shares through FGC Securities and 2) lending shares to Colbrook, Ltd. do not make a "loop."   However, the Dubinsky Report goes on to state that Colbrook, Ltd. loaned shares to D.D.C. Cayman, which is the same counterparty from which the Bernina Pension Plan purchased shares (through FGC Securities).  This, the Dubinsky Report asserts in Figure 15, is a "loop."[129]  **Figure 7** below is a replication of the transactions depicted in the figure.

---

[126] Mr. Dubinsky's assessment is incomplete as it does not consider all the transactions that financial intermediary might have made.

[127] *See, e.g.*, Dubinsky Report, Figure 15, and Wade Report, Figure 2.

[128] Dubinsky Report ¶¶158-175 and Figure 15.

[129] *Id.* at Figure 15.

Rebuttal Report of Emre Carr, Ph.D., CFA

**Figure 7: Replication of Dubinsky Report Figure 15 (Bernina Pension Plan Transaction in Carlsberg Stock)**



103.  The role that Colbrook, Ltd. plays in the figure --borrowing shares from one party and lending shares to another-- is no different from a similar intermediary function performed by the securities lending desks of other broker-dealers.  For example, the Northern Trust security lending desk could have been the stock loan intermediary instead of Colbrook, Ltd.

104.  Further, from an economic perspective, the transaction would result in the same economic exposure for the Bernina Pension Plan whether D.D.C. Cayman owned the shares it sold or borrowed them from a different party.  **Figure 8** below depicts a transaction where D.D.C. Cayman owned, as of trade date, the shares it sold and Colbrook, Ltd. lent shares to a different party.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

**Figure 8: Replication of Dubinsky Report Figure 15 with Additional Borrowing Party**



105. This alternative form of the transaction involves what Mr. Dubinsky might call "actual Carlsberg shares." This transaction is identical to that depicted in Figure 15 to the Dubinsky Report in the sense that, in both transactions, the Bernina Pension Plan purchased shares through FGC Securities and lent shares to Colbrook, Ltd.

106. **Figure 9** below shows another alternative version of the transaction that appears identical from an economic perspective: D.D.C Cayman borrows shares from an additional party.

Rebuttal Report of Emre Carr, Ph.D., CFA

**Figure 9: Replication of Dubinsky Report Figure 15 with Additional Borrowing Party and Additional Lending Party**



107. The Dubinsky Report acknowledged that FGC Securities LLC acted as an executing broker, suggesting that this act created "an air of legitimacy to the trade."[130] Certainly, the pension plans' trading through a broker such as FGC Securities LLC was a customary practice and not anything that would indicate that the trade confirmations from the broker were "fake."

108. In short,  the SKAT Experts' repeated assertions of purportedly "circular" transactions do not demonstrate that the pension plan transactions were "fake."

## VIII. GIVEN THE OFFSETTING TRADES BY SOLO'S CLIENTS, THE NET SHARE HOLDINGS IN SOLO'S SUB-CUSTODIAN ACCOUNT DO NOT DEMONSTRATE THAT THE PENSION PLANS DID NOT EXECUTE TRADES IN DANISH STOCKS

109. Mr. Dubinsky describes his attempts to confirm that Solo had shares of the Danish companies traded in the Pension Plan Strategy[131] and concludes that: "I am unaware

---

[130] *Id.* at ¶162.

[131] *Id.* at ¶¶135-136.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

of any credible explanation for the lack of Danish holdings on behalf of the Solo Custodians at the sub-custodians identified by Shah other than that no such shareholdings ever existed."[132]

110. First of all, I note again that an investor obtains immediate economic exposure when a stock purchase occurs. Because the pension plans bought shares at the cum-dividend prices, they obtained immediate economic exposure to changes in the stock price and a claim to an amount equal to the forthcoming dividend as soon as the trade execution was confirmed by the IDBs. Clearing and settlement are post-trade operations that do not alter the economic exposure of the investor unless a custodian fails to settle the purchased securities. Mr. Dubinsky does not provide any evidence that the Solo Custodians failed to settle the trades.

111. Further, examining the Danish holdings on behalf of the Solo Custodians at the sub-custodians is irrelevant for assessing the validity of purchases that the pension plans made. This is because if the Solo Custodians' settlement of the trades involved the settlement of offsetting trades on the same date then it would not require sourcing shares externally as the trades netted to zero.

112. Consider the transaction described in Figure 15 to the Dubinsky Report, in which the Bernina Pension Plan purchased 600,000 shares of Carlsberg through FGC Securities.[133] The Bernina Pension Plan lent shares to Colbrook Ltd. to finance the transaction, which, according to Mr. Dubinsky, then lent shares to D.D.C. Cayman to cover its sale of shares to the Bernina Pension Plan.[134] Mr. Dubinsky claims that "I have seen no evidence that any of the parties to this transaction loop ever actually owned shares."[135] Mr. Dubinsky does not explain how he arrives at the conclusion

---

[132] *Id.* at ¶137. As discussed above, it is not clear which sub-custodians are relevant and Mr. Dubinsky does not appear to have reviewed records from all sub-custodians.

[133] Dubinsky Report, Figures 10 and 15.

[134] *Id.* at Figures 14 and 15.

[135] *Id.* at ¶173.

**Rebuttal Report of Emre Carr, Ph.D., CFA**

that no one "actually owned" the Carlsberg shares or how he is qualified to make a legal conclusion about what a party did or did not own.

113.  Furthermore, as Mr. Wade acknowledges in his report, a custodian can settle multiple trades simultaneously, and net settle offsetting transactions.[136]  Through application of net settlement, if two or more clients of a Solo Custodian engage in offsetting trades in a Danish stock (*e.g.*, a buy and a sell order) settling on the same day, the custodian can net all the trades.  If the trades involve the same number of shares, the custodian's holdings will not change after these offsetting trades.

114.  Thus, the lack of Danish holdings on behalf of the Solo Custodians at the sub-custodians identified by Mr. Shah cannot demonstrate that Bernina did not purchase Carlsberg shares.

115.  Contrary to Mr. Wade's assertion, "the ability to net settle offsetting" transactions is not theoretical.  Denmark's CSD, VP's settlement model allows for net simultaneous settlement of funds and securities.[137]

116.  In fact, the settlement by a custodian without external sourcing of securities is known as internalized settlement and is quite common.  EU Regulations issued in July 2014 specifically recognize internalized settlement.[138]  A report issued by the European Securities and Markets Authority ("ESMA") notes that "[t]he majority of

---

[136] Wade Report ¶189.i discussing simultaneous settlement.  Mr. Wade also acknowledges that it is possible to settle trades by netting when he notes: "Notwithstanding the theoretical ability to **net settle offsetting DVP transactions**..."  Wade Report ¶238. (emphasis added)

[137] VP uses DvP Model 3 (for its settlement system) that also allows for net simultaneous settlement of funds and securities.  *See, e.g.*, BIS, "Glossary: DvP Model 3," *available at* https://www.bis.org/cpmi/publ/d00b.htm?&selection=125&scope=CPMI&c=a&base=term (last accessed on January 17, 2022) and Banque de France, "Payments and Market Infrastructures in the Digital Era," January 2021, Chapter 13, p. 220, *available at* https://publications.banque-france.fr/en/economic-and-financial-publications/book-payments-and-market-infrastructures-digital-era (last accessed January 17, 2022).

[138] Regulation (EU) No 909/2014 Of The European Parliament And Of The Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) No 236/2012, Chapter IV, "Internalised Settlement."

**Rebuttal Report of Emre Carr, Ph.D., CFA**

internalised settlement instructions (based on their number) concerns equities."[139] The same ESMA report shows that equity trades worth trillions of Euros were settled through internalized settlement.[140]

117. Financial intermediaries use a similar practice called "internalization, in which long and short positions from a dealer's client pool are matched **to reduce net funding requirements**."[141]  Internalization of trades is common: one estimate is that 40% of short positions in the U.S. are covered internally by dealers.[142]  Discussing internalization, a Bank of England Policy Statement notes:

> *4.19 Internalisation: If a PB [Prime Broker] has two clients that are taking opposite positions on the same asset (one long, the other short), the PB may internally net these amounts to avoid having to fund the positions elsewhere: a client short position is therefore funding a client long position.  Liquidity risk arises if one client wishes to withdraw from their transaction: the PB will either need to find additional funding or will need to purchase or borrow the asset to match the remaining transaction.*[143]

118. In other words, the internalization of transactions (*i.e.*, settling the opposite positions on the same asset and using a client's short position for "funding a client long

---

[139] ESMA, "Report to the European Commission: CSDR Internalised Settlement," November 5, 2020, p.23 *available at* https://www.esma.europa.eu/sites/default/files/library/esma70-156-3729_csdr_report_to_ec_-_internalised_settlement.pdf (last accessed on January 31, 2022).

[140] *Id.* at p. 25 reporting that total internalized settlement in equities was, at a minimum, 15.8 trillion euros  per quarter for the period from the second quarter of 2019 through the third quarter of 2020.

[141] Macchiavelli, Marco, and Luke Pettit, "Shining a Light on the Shadows: Dealer Funding and Internalization," Board of Governors of the Federal Reserve System, December 20, 2019, *available at* https://www.federalreserve.gov/econres/notes/feds-notes/dealer-funding-and-internalization-20191220.htm (last accessed on January 31, 2022) (emphasis added).

[142] *Id*.

[143] Bank of England Prudential Regulation Authority, "Statement of Policy, Pillar 2 Liquidity," June 2019 Updating February 2018, p. 10, *available at* https://www.bankofengland.co.uk/-/media/boe/files/prudential-regulation/statement-of-policy/2019/pillar-2-liquidity-sop-update-june-2019.pdf?la=en&hash=78618B0A466B17BCF86952AAD06AC14AEE3E4FDE (last accessed on January 31, 2022)

**Rebuttal Report of Emre Carr, Ph.D., CFA**

position") is a well-recognized and accepted practice as per the Bank of England Policy statement.[144]

119. Relatedly, Mr. Wade asserts that "[i]n my experience, a custodian would only issue tax vouchers which totaled its combined net long position, not the long side of its net flat, or equal and offsetting long and, short positions."[145] Mr. Wade seems to opine on what a custodian is required to do under tax regulations without citing any applicable authority. If there are requirements or practices associated with the issuance of tax vouchers to a client relating to taxes associated with a particular tax jurisdiction, it seems that they would be based on the laws and requirements of that particular jurisdiction.

120. Mr. Dubinsky claims that "[m]ost of the proceeds from the tax reclaim payments went to Solo Capital or affiliated entities."[146] In my opinion, the division of the proceeds post transaction is irrelevant for assessing whether the trades were fake because the parties could agree to split the proceeds in a particular way irrespective of whether the transactions were fake or not.

## IX. CONCLUSION

121. For all of the reasons discussed in this report, I find that the core claim of the SKAT Experts that the trading at issue in this case was "fake" or "fictitious" is not supported by their reports.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[144] *Id.* at 4.16 ("Prime brokerage services allow investors, usually hedge funds, **access to securities lending, leveraged trade executions, and cash management**, among other things. Prime brokers (PB) **act as intermediaries to facilitate investor positions**, but do not generally assume the risk of the transactions. They do this by sourcing funding for the transactions and, where possible, the maturity of this funding will be matched to the maturity of the client transaction.")

[145] Wade Report ¶237.

[146] Dubinsky Report ¶16.

**CONFIDENTIAL**
-50-

Rebuttal Report of Emre Carr, Ph.D., CFA

My work is ongoing and my opinions are subject to revision based on new information, which subsequently may be provided to or obtained by me.

Emre Carr, Ph.D., CFA

February 1, 2022

CONFIDENTIAL

**Exhibit 1**

**Materials Relied Upon**

| Expert Reports |
| --- |
| Expert Report of Bruce G. Dubinsky, MST, CPA, CFE, CVA, CFF, CAMS, MAFF, December 31, 2021, and all materials cited therein |
| Expert Report of Graham Wade, December 31, 2021, and all materials cited therein |
| **Publicly Available Documents** |
| Bank of England Prudential Regulation Authority, "Statement of Policy, Pillar 2 Liquidity," June 2019 Updating February 2018, *available at* https://www.bankofengland.co.uk/-/media/boe/files/prudential-regulation/statement-of-policy/2019/pillar-2-liquidity-sop-update-june-2019.pdf?la=en&hash=78618B0A466B17BCF86952AAD06AC14AEE3E4FDE (last accessed on January 31, 2022) |
| Banque de France, "Payments and Market Infrastructures in the Digital Era," January 2021, Chapter 13, *available at* https://publications.banque-france.fr/en/economic-and-financial-publications/book-payments-and-market-infrastructures-digital-era (last accessed January 17, 2022) |
| BIS, "Glossary: DvP Model 3," *available at* https://www.bis.org/cpmi/publ/d00b.htm?&selection=125&scope=CPMI&c=a&base=term (last accessed on January 17, 2022) |
| Cboe, European Equities Market Share by Market, as of December 31, 2013, *available at* https://www.cboe.com/europe/equities/market_share/market/off-book/2013-12-31/#dm=tbnnav&dr=mtd&mt=1&ms=0&hc=1&f=0&ID=515770de6ebe755a2fe7&V=88e178cff5ed72b217b0 (last accessed on January 26, 2022) |
| Cboe, "Our Vision for EU Equity Market Structure Reform," 2021, *available at* https://cdn.cboe.com/resources/participant_resources/KeyMiFIDIIViews_0521.pdf (last accessed on January 26, 2022) |
| ESMA, "Report to the European Commission: CSDR Internalised Settlement," November 5, 2020, *available at* https://www.esma.europa.eu/sites/default/files/library/esma70-156-3729_csdr_report_to_ec_-_internalised_settlement.pdf (last accessed on January 31, 2022) |
| Financial Conduct Authority, "Bastion Capital London Ltd," *available at* https://register.fca.org.uk/s/firm?id=001b000000MfPpoAAF (last accessed on February 1, 2022) |
| Financial Conduct Authority, "Matched Principal Trading," *available at* https://www.handbook.fca.org.uk/handbook/glossary/G3544m.html (last accessed on January 17, 2022) |
| Financial Industry Regulatory Authority, Inc., "FGC Securities, LLC," *available at* https://brokercheck.finra.org/firm/summary/158399 (last accessed on February 1, 2022) |
| ISLA, "Securities Lending Market Report," March 2021, *available at* https://www.islaemea.org/assets/smart-pdfs/isla-securities-lending-market-report-march-2021/ (last accessed January 31, 2022) |
| Macchiavelli, Marco, and Luke Pettit, "Shining a Light on the Shadows: Dealer Funding and Internalization," Board of Governors of the Federal Reserve System, December 20, 2019, *available at* https://www.federalreserve.gov/econres/notes/feds-notes/dealer-funding-and-internalization-20191220.htm (last accessed on January 31, 2022) |

CONFIDENTIAL

| |
|---|
| U.S. Securities and Exchange Commission, "Interagency Statement on Sound Practices Concerning Elevated Risk Complex Structured Finance Activities," effective January 11, 2007, *available at* https://www.sec.gov/rules/policy/2007/34-55043.pdf (last accessed on January 31, 2022) |
| U.S. Securities and Exchange Commission, "Policy Statement: Interagency Statement on Sound Practices Concerning Complex Structured Finance Activities," *available at* https://www.sec.gov/rules/policy/34-49695.htm (last accessed on January 23, 2022) |

| **Bates-Stamped Documents** |
|---|
| ELYSIUM-02456224 |
| ELYSIUM-02456225 |
| ELYSIUM-03009935 |
| ELYSIUM-03009936 |
| ELYSIUM-03896088 |
| ELYSIUM-03896089 |
| ELYSIUM-04280089 |
| ELYSIUM-04280090 |
| ELYSIUM-04280092 |
| ELYSIUM-04280093 |
| ELYSIUM-04736480 |
| ELYSIUM-04736481 |
| ELYSIUM-07699789 |
| ELYSIUM-07699790 |
| MPSKAT00072484 |
| MPSKAT00072485 |
| MPSKAT00072486 |
| MPSKAT00072495 |
| MPSKAT00072498 |
| MPSKAT00072506 |
| MPSKAT00072509 |
| MPSKAT00072521 |
| MPSKAT00072523 |
| MPSKAT00072553 |
| MPSKAT00072555 |
| MPSKAT00072558 |
| MPSKAT00072560 |
| MPSKAT00072707 |
| MPSKAT00072722 |
| MPSKAT00072723 |
| MPSKAT00072753 |
| MPSKAT00072755 |

CONFIDENTIAL

| |
|---|
| MPSKAT00072757 |
| MPSKAT00072779 |
| SCPADMINISTRATORS_00013560 |

CONFIDENTIAL

**Exhibit 2**
**Mr. Dubinsky Misrepresents the Trade Approval Issued under the Give-up Agreement to be the Trade Confirmation**

Trade Confirmation from Solo Capital to Bernina Plan
as Represented by Mr. Dubinsky [1]

Actual Trade Confirmation from
FGC Securities LLC to Bernina Plan [2]

| From: | solotradeapprovals@solo.com |
|---|---|
| To: | adam@Berninap.com |
| Cc: | execution@fgcsecurities.com, operations@fgcsecurities.com, solotradeapprovals@solo.com |
| Subject: | Account (BER01) - Trade Approved |
| Sent: | Thu, 21 Mar 2013 13:12:20 +0000 |

Dear Client,

In relation to the trade referred to below (*Trade*), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| Trade Type | Buy |
|---|---|
| Ticker | CARLB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 586.3316 |
| **Quantity/Contracts** | 600,000 |
| **Shapes** | **Shape 1** 600,000 |
| **Notional** | 351,798,960.0000 |
| **Trade Date** | 21/03/2013 |
| **Settlement Date** | 27/03/2013 |
| **Broker** | FGC Securities LLC |

Client: The Bernina Plan

Broker: FGC Securities LLC

Trade Type: Buy

Ticker: CARLB DC

Instrument: Equity

Quantity: 600,000 shares

Price: DKK 586.3316

Notional: DKK 351,798,960.00

Trade Date: March 21, 2013

Settlement Date: March 27, 2013

**FGC**

FGC SECURITIES LLC
12 Desbrosses Street
New York, NY 10013
e: execution@fgcsecurities.com

CLIENT: THE BERNINA PENSION PLAN
REF #: FUTL-20130321-0018-A
DATE: March 21, 2013

**CASH EQUITY CONFIRMATION**

Client and FGC Securities agree that this confirms the terms and conditions of the following Cash Equity Transaction:

| Transaction Type Type: | CASH EQUITY (STOCK) |
|---|---|
| Listed / OTC | LISTED |
| Trade Date: | March 21, 2013 |
| Client: | THE BERNINA PENSION PLAN |
| Email: | adam@berninap.com |
| Buy / Sell: | BUY |
| Stock Description: | CARLB DC | CARLSBERG AS-B | 4169219 |
| Exchange: | Copenhagen |
| Share Quantity: | 600,000 |
| Trade Currency: | DKK |
| Trade Price: | 586.3316 |
| Trade Notional: | 351,798,960.00 |

| Commission: | 8,794.97 | DKK |
|---|---|---|
| USD FX: | 5.77 | |

| Commission | 1,524.26 | USD |
|---|---|---|

*To be invoiced monthly

We thank you for the opportunity to have been of service to you and trust that the above correctly represents your understanding of the transaction in question. Failure to object in writing to the transaction confirmed above by the earlier of 24 hours after your receipt of this confirmation or prior to 9 a.m. local market time on the settlement date shall be deemed your agreement to the correctness of this confirmation. Please note we have acted only as agent in this transaction and are not responsible for the financial viability of any counterparties we have matched you with nor are we responsible for the performance of this or any other transaction we have arranged for you.

Regards,
FGC Securities

**Sources:**
[1] Dubinsky Report, Figure 10; ELYSIUM-01463894.
[2] MPSKAT00075373-4 at MPSKAT00075374.

MPSKAT00075374

**Exhibit 3**

**Contrary to Mr. Wade's Assertion, Futures Contracts Expiring in September have Different Prices from the Futures Contracts Expiring in December**

| | Trade Date | Contract Expiration Date | Trade Type | Quantity (# of Contracts) | Trade Price (DKK) |
|---|---|---|---|---|---|
| **Novo Nordisk A/S BClear September 20, 2013 Contract** | | | | | |
| [1] | 3/20/2013 | 9/20/2013 | Buy | 18,500 | 956.01 |
| [2] | 3/20/2013 | 9/20/2013 | Sell | 18,500 | 956.01 |
| [3] | 3/20/2013 | 9/20/2013 | Buy | 30,000 | 956.02 |
| [4] | 3/20/2013 | 9/20/2013 | Sell | 30,000 | 956.02 |
| [5] | 3/20/2013 | 9/20/2013 | Buy | 22,500 | 956.03 |
| [6] | 3/20/2013 | 9/20/2013 | Sell | 22,500 | 956.03 |
| [7] | 3/20/2013 | 9/20/2013 | Buy | 24,000 | 956.04 |
| [8] | 3/20/2013 | 9/20/2013 | Sell | 24,000 | 956.04 |
| [9] | 3/20/2013 | 9/20/2013 | Buy | 29,000 | 956.05 |
| [10] | 3/20/2013 | 9/20/2013 | Sell | 29,000 | 956.05 |
| [11] | 3/20/2013 | 9/20/2013 | Buy | 22,000 | 956.06 |
| [12] | 3/20/2013 | 9/20/2013 | Sell | 22,000 | 956.06 |
| [13] | 3/20/2013 | 9/20/2013 | Buy | 28,500 | 956.07 |
| [14] | 3/20/2013 | 9/20/2013 | Sell | 28,500 | 956.07 |
| [15] | 3/20/2013 | 9/20/2013 | Buy | 22,500 | 956.08 |
| [16] | 3/20/2013 | 9/20/2013 | Sell | 22,500 | 956.08 |
| | | | | 394,000 | |

| | Trade Date | Contract Expiration Date | Trade Type | Quantity (# of Contracts) | Trade Price (DKK) |
|---|---|---|---|---|---|
| **Novo Nordisk A/S BClear December 20, 2013 Contract** | | | | | |
| [1] | 3/20/2013 | 12/20/2013 | Buy | 30,000 | 958.05 |
| [2] | 3/20/2013 | 12/20/2013 | Sell | 30,000 | 958.05 |
| [3] | 3/20/2013 | 12/20/2013 | Buy | 28,500 | 958.06 |
| [4] | 3/20/2013 | 12/20/2013 | Sell | 28,500 | 958.06 |
| [5] | 3/20/2013 | 12/20/2013 | Buy | 27,000 | 958.07 |
| [6] | 3/20/2013 | 12/20/2013 | Sell | 27,000 | 958.07 |
| [7] | 3/20/2013 | 12/20/2013 | Buy | 25,500 | 958.08 |
| [8] | 3/20/2013 | 12/20/2013 | Sell | 25,500 | 958.08 |
| | | | | 222,000 | |

**Source:** ELYSIUM-01460217.

**Notes:**

This exhibit does not directly match the September expiry contracts to December expiry contracts for two reasons:

1 Mr. Wade refers to 8 trades for each expiration date, but the account statement lists 16 trades for September and 8 trades for December, so all trades are included here.

2 Mr. Wade refers to "similar sizes" without identifying which contract sizes are considered "similar" to others.