brokers), who was obtaining the same shares from the "buyer" itself (via intermediate "stock lenders"). These transactions offset each other such that they neither required nor involved any transfer of shares.[14]

18.3    As illustrated in Schedule 3A to the RRAPOC, many of the North Channel Bank and Indigo Credit Advice Notes in 2014 related to the same number of shares in the same Danish companies at the same time but for different US pension plans.[15]

18.4    As illustrated in Schedule 3B to the RRAPOC, Mr Bains signed a number of Credit Advice Notes in 2013 on behalf of SCP on the same date for the same number of shares in the same Danish company for different US pension plans.[16]

18.5    As illustrated in Schedule 4 to the RRAPOC, Credit Advice Notes were produced by Custodians for different US pension plans on the same day in respect of the same Danish company for similar volumes of shares (often increasing by regular intervals).[17]

19.    The Sanjay Shah Defendants allege that "*Danish tax law recognises fiscal ownership based on contractual arrangements*".[18] If that is an allegation that a final and binding agreement has the effect of conveying ownership of shares even in circumstances where the seller did not own the shares,[19] that is denied for the reasons set out in paragraph 15.4 above.

**The WHT Applicants did not receive dividends**

20.    As explained in paragraph 13 above, a "*dividend*" for the purposes of section 69 B(1) of the WHT Act is a distribution by a company to its current shareholders or members.

21.    Section 16 A of the Danish Tax Assessment Act defines "*dividends*" as:

---

[14] RRAPOC, paragraph 24(e1)(i)(C).
[15] RRAPOC, paragraph 24(f).
[16] RRAPOC, paragraph 24(f).
[17] RRAPOC, paragraph 24(g).
[18] Sanjay Shah Defendants' Defence, paragraph 57.8.8.4.
[19] See Sanjay Shah Defendants' Defence, paragraphs 56.1.7, 56.1.8, 57.8.5.

7

"*Anything that the company distributes to its current shareholders or members...*".[20]

22.    Only the person who owns a share at the time that the dividend is declared receives a dividend. As already noted, that person is therefore the only person liable to taxation in respect of any dividend.

23.    The person who receives the dividend is the person who owns the share at the time the dividend is declared. This is reflected in section 19(1) of the Danish Sale of Goods Act (*købeloven*), which provides that a contract for the acquisition of a share includes any dividend that has not fallen due for payment at the time of the conclusion of the contract.

24.    A listed company may discharge its obligation to pay a declared dividend by paying it to VP Securities, which is in turn obliged to pay on the dividend amounts to the company's shareholders. At all relevant times, section 71(2) of the Danish Securities Trading Act (*værdipapirhandelsloven*) provided that VP Securities was discharged from this obligation if it paid the amount of the dividend in good faith to the person registered with VP Securities even if that was not the person who had the right to receive the dividend.[21] In such circumstances, the dividend was received by the person identified in the VP Securities register on behalf of the legal owner of the shares. It was therefore the legal owner who receives the dividend, who was liable to taxation on the dividend and who suffered WHT on the dividend.

25.    As a matter of Danish law, if an owner of shares has agreed (by a contract intended to have legal effect) to sell shares prior to the date that the dividend is distributed, that person will no longer own the relevant shares and will no longer be a shareholder on the date the dividend is distributed. Accordingly, that person will not be treated as having received a dividend, even if they remain the person named in the VP securities register on the date that the dividend is declared such that the dividend sum is paid to them.

---

[20] Section 16A continues, "...*see however, subsection (3) and compensation covered by section 16 B(1). (...)*". Those provisions are not relevant to this case.

[21] Subject to the possibility of the recipient having procured his or her entry in the register by forgery or duress under threats of violence.

26.    Conversely, a person who enters into a contract to purchase shares (prior to the date on which the dividend is declared) from a seller who does not in fact own the shares does not receive a dividend, even if the seller acquires shares after the date on which the dividend is declared and pays the purchaser an amount equal to the amount of the declared dividend by way of "manufactured dividend".

27.    For the reasons set out in paragraphs 14 to 19 above, the WHT Applicants did not own shares in Danish companies. It follows that they did not "*receive dividends*" within the meaning of section 69 B(1).

28.    In any event, the Principal WHT Scheme (alternatively the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme, and/or the Klar WHT Scheme) did not envisage that the WHT Applicants would receive dividends. For example, as described in paragraph 18.1 above, the transactions in respect of which North Channel Bank acted as Custodian constituted a loop that did not involve the actual transfer of any net dividend.[22] Similarly, the Solo Model did not envisage any real dividend payments entering the loop.[23] In these circumstances, SKAT infers that the WHT Applications were based on fictitious records of transactions that never occurred or circular transactions that cancelled each other out and in respect of which the WHT Applicants never received the relevant dividends.[24]

29.    Anupe Dhorajiwala, Graham Horn and Rajen Shah allege in their respective Defences that the WHT Applicants "*received a sum equal to the net dividend amount (by way of a credit on their account with their custodian)*".[25] However, since the WHT Applicants did not own any shares in Danish companies when the dividends were declared by those companies, even if they did receive any such credit (which is not admitted), it did not constitute a "*dividend*" within the meaning of section 69 B(1) of the WHT Act.

30.    The Sanjay Shah Defendants' Defence suggests that the Solo Model may have involved "*dividend compensation payments which were credited to the 'buyer' in 'the*

---

[22] RRAPOC, paragraph 24(e)(iv).
[23] RRAPOC, paragraph 24(e1)(ii).
[24] RRAPOC, paragraph 24(i)(i).
[25] Mr Dhorajiwala's Defence, paragraph 14.10; Mr Horn's Defence, paragraph 26.10; Mr Rajen Shah's Defence, paragraph 20.10.

*first leg*".[26] SKAT understands the words "*dividend compensation payment*" to describe a payment made by the "seller" to the WHT Applicant to compensate the WHT Applicant for the value of the dividend on a share that was agreed to be transferred cum-dividend, but was in fact transferred ex-dividend. Even if the WHT Applicants received such payments (which is not admitted), those payments were not "*dividends*" within the meaning of section 69 B(1) of the WHT Act:

30.1    The WHT Applicants did not own any shares in any Danish companies at the time any relevant dividends were declared and so did not receive a dividend.

30.2    Any money that the WHT Applicants did receive did not represent an on-payment of a dividend that had been paid by a Danish company.

**ED&F Man Applicants did not receive dividends in respect of some transactions**

31.     In respect of the ED&F Man Applicants whose applications for WHT refund were supported by the Tax Vouchers identified in Annex E to ED&F Man's Amended Defence ("**Annex E ED&F Man Applicants**"):

31.1    ED&F Man admits that the Annex E ED&F Man Applicants had not received the dividends in respect of which they made refund applications.

31.2    The ED&F Man Applicants whose applications were supported by the 64 Tax Vouchers identified in Schedule 1 had not received any dividend.

31.3    The ED&F Man Applicants whose applications were supported by the 16 Tax Vouchers identified in Schedule 2 to Annex E had not received the dividend in respect of which WHT refund applications were made on their behalf.

31.4    On this basis, and on ED&F Man's own case, SKAT overpaid DKK 183,902,400 (around £20.8 million) in response to ED&F Man Applications as a result of inaccuracies in ED&F Man's Tax Vouchers.

---

[26] Sanjay Shah Defendants' Defence, paragraphs 53 and 57.8.7.

10

E.   NO TAX WITHHELD FROM ANY "DIVIDENDS" RECEIVED BY WHT APPLICANTS OR ANNEX E ED&F MAN APPLICANTS

32.   In order for there to be a valid claim for WHT refund, section 69 B(1) requires a WHT refund applicant to show that "*withholding tax has been withheld pursuant to sections 65-65 D*" from the dividends received by the WHT refund applicant. No refund can be sought in respect of tax that was never paid in the first place.

33.   As explained above,[27] section 65 requires Danish companies to withhold 27% of any dividend declared as WHT and pay it to SKAT.

**The WHT Applicants did not receive dividends from which tax was withheld**

34.   The circular and/or fictitious transactions did not involve any real shares or any dividends and no tax was therefore withheld by the relevant Danish companies and paid to SKAT.

**The Annex E ED&F Man Applicants did not receive dividends from which tax was withheld**

35.   It follows from what was said in paragraph 31 above that:

35.1   No tax had been withheld on behalf of the Annex E ED&F Man Applicants whose applications were supported by the 64 Tax Vouchers identified in Schedule 1 to Annex E; and

35.2   The tax withheld from the dividends received by the Annex E ED&F Man Applicants whose applications were supported by the 16 Tax Vouchers identified in Schedule 2 to Annex E was lower (by the amounts identified in Column H of Schedule 2) than the amounts paid out by SKAT in response to applications on their behalf.

---

[27] See paragraph 5 above.

11