Claim Nos.: CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N:**



SHAHAB HASHEMI

EXHIBIT 4430

10 - 08 - 2021

**(The Danish Customs and Tax Administration)**

**Claimant**

**- and -**

**ED&F MAN CAPITAL MARKETS LIMITED AND OTHERS**

**Defendant**

**[DRAFT] SCHEDULE OF AGREED FACTS ("SAF")[1]**

[The Schedule of Agreed Facts (SAF) identifies facts and matters that are common ground between SKAT and ED&F Man for the purpose of the Validity Trial ordered pursuant to paragraph 6 of the July 2020 CMC Order. The Schedule of Agreed Facts adopts the definitions and abbreviations used in the statements of case. Documents Schedules 1 and 2 identify the supporting documents for these Agreed Facts. References "DS1/X/RX" are to the columns and/or rows (R) in Document Schedule 1. References "DS2/TRAD[2] or FIN or FEE/DX/X" are to the Documents and Sample Trades in Document Schedule 2. Appendices 1 and 2 (as also attached with this Schedule and footnoted where appropriate) contain additional relevant information]

**(A) PARTIES**

1.    Until at least July 2018 SKAT was a function of the Danish Government charged with the assessment and collection of Danish taxes[3].

2.    ED&F Man Capital Markets Limited ("**ED&F Man**") is authorised and regulated by the FCA and part of a global financial brokerage business.

---

[1] Prepared pursuant to paragraph 7(e)(iii) of the July 2020 CMC Order.
[2] Where "TRAD" are trading documents; "FIN" are financial documents; and "FEE" are fee related documents.
[3] List of Common Ground/1.

**(B) RELATIONSHIP BETWEEN ED&F MAN AND PENSION PLANS**

3.      From 2012 to 2015, ED&F Man provided services to the 36 pension plans (PPs) identified in Document Schedule 1.[4]

**B1.  Identity of ED&F Man's clients**

4.      The 36 PPs comprised (1) 33 United States PPs (the "**USPPs**") and (2) three Canadian PPs (the "**Canadian PPs**").

5.      Four of the USPPs were members of two Gibraltarian Partnerships ("**GPs**") as follows:

     5.1.      Hamlyn LP ("**Hamlyn**"), in which Del Mar (the "**Hamlyn PP**") was a member; and

     5.2.      Cubix Manager Limited LLP ("**Cubix**"), in which (1) 5T Advisory Services (2) KK Law and (3) Uplands Consulting (the "**Cubix PPs**") were members.

6.      ED&F Man's clients therefore comprised (1) 32 PPs (the "**32 PPs**") and (2) two GPs.

**B2.  Pension plans: establishment and status**

7.      The PPs were established between 1 January 1995 and 1 January 2014 pursuant to written agreements on the dates set out in Document Schedule 1[5] (the "**PP Formation Agreements**").

8.      The (1) beneficiaries (2) trustees and (3) controlling individuals of the PPs were identified in (a) the PP Formation Agreements[6] and/or (b) the application forms made by the 32 PPs and the 2 GPs to ED&F Man between 8 February 2012 and 24 February 2014, as set out in Document Schedule 1[7] (the "**PP Application Forms**").

---

[4] DS1/A.
[5] DS1/B.
[6] DS1/B.
[7] DS1/D; K.

9.      Each of the 33 USPPs was certified by the Internal Revenue Service ("**IRS**") for one or more tax years as a resident of the United States[8] which was:

    9.1.      a trust (1) forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the US Internal Revenue Code ("**IRC**") and (2) exempt from US taxation under section 501(a) US IRC Code and (3); alternatively

    9.2.      a group trust arrangement (as described in Revenue Ruling 81-100).

10.     The status of each of the three Canadian PPs as pension plans was certified by Form W-8BEN[9].

11.     ED&F Man and its employees were not (1) involved in the establishment of any of the PPs or (2) a trustee, beneficiary or controlling individual of any of the PPs[10].

**B3. Pension plans' investment managers**

12.     In their dealings with ED&F Man, the 36 PPs were represented by eight different investment managers as set out in Documents Schedule 1[11] (the "**PP Investment Managers**") and in the table below:

| No | Investment Manager | No of PPs |
|----|--------------------|-----------|
| 1 | Arunvill Capital UK Limited ("**Arunvill**") | 15 (the "**Arunvill PPs**") |
| 2 | Acer Investment Group LLC ("**Acer**") | 9 (the "**Acer PPs**") |
| 3 | Ballance Advisors UK Limited ("**Ballance**") | 3 (the "**Ballance PPs**") |
| 4 | Zeta Financial Partners Limited ("**Zeta**") | 3 (the "**Zeta PPs**") |
| 5 | Duet Asset Management Limited ("**Duet**") | 2 (the "**Duet PPs**") |
| 6 | GSFS Asset Management B.V. ("**GSFS**") | 2 (the "**GSFS PPs**") |
| 7 | AlphaSource | 1 (the "**Alphasource PP**") |
| 8 | MOA Trading ("**MOA**") | 1 (the "**MOA PP**") |

13.     The relationship between (1) the PPs and (2) the PP Investment Managers was governed by:

---

8 DS1/C/R4-R61; R66-R108; R109-R138; R144-R203.
9 DS1/C/R62-65; R109-R113; R139-142.
10 DS1/B/R4-R202; DS1/D/R4-R203; DS1/K/R4-R203.
11 DS1/F.

13.1.   an investment management agreement in respect of (1) the Arunvill PPs[12] (the "**Arunvill IMA**") (2) the Duet PPs[13] (the "**Duet IMA**") (3) the GSFS PPs[14] (the "**GSFS IMA**") and (4) the Alphasource PP[15] (the "**Alphasource IMA**") (together, the "**IMAs**"); and

13.2.   a power of attorney in respect of (1) the Acer PPs[16] (the "**Acer POA**") (2) the Zeta PPs[17] (the "**Zeta POA**") and (3) the MOA PP[18] (the "**MOA POA**") (together, the "**POAs**").

14.   Pursuant to the IMAs (1) the PP appointed the PP Investment Manager to provide the PP with discretionary portfolio management services in respect of the PP's assets in accordance with the investment objectives and on the terms set out therein[19]; and (2) the PP Investment Manager was authorised to give (inter alia) instructions on behalf of the PP to ED&F Man (as custodian and/or broker)[20].

15.   Pursuant to the POAs:

15.1.   <u>Acer and MOA POAs</u>: Acer and MOA, respectively, accepted appointment as attorneys in respect of the accounts of (1) the Acer PPs and (2) the MOA PP with ED&F Man, with full power and authority to invest and trade the cash, assets, and investments in the relevant PP account in accordance with the terms of the agreement entered into between that PP and ED&F Man[21];

15.2.   <u>Zeta POA</u>: the Zeta PPs appointed Zeta to act as their attorney in connection with the execution and management of specific contracts (including (1) establishing appropriate custody, clearing and cash/deposit accounts and (2) instructing ED&F Man to take the actions set out therein[22]).

**B4. Genesis of PPs' relationship with ED&F Man**

---

[12] Arunvill PPs: DS/F/R10-R25; R33-R48; R66-R87; R109-R113; R119-R123; R129-R133; R151-R155; R161-R182.
[13] Duet PPs:  DS1/F/R56-R61; R202.
[14] GSFS PPs:  DS1/F/R62-R65; R139-R143.
[15] Alphasource PPs: DS1/F/R196-R201.
[16] Acer PPs: DS1/F/R5-R9; R51-R55; R88-R101; R114-R118; R124-R128; R134-R138; R144-R150; R184-R189.
[17] Zeta PPs: DS1/F/R4; R27-R32; R156-R160.
[18] MOA PP: DS1/F/R102-R108.
[19] Arunvill IMA Clause 4.1; Duet IMA Clause 4.1; GSFS IMA Clause 2(a)(i); Alphasource IMA Clause 1.1.
[20] Arunvill IMA Clause 4.3; Duet IMA Clause 4.4; Alphasource IMA Clause 1.1.
[21] Acer POA Clause 1.2; MOA POA Clause 1.2.
[22] Zeta POA Clauses 1-6.

16.     Between approximately 9 February 2012 and 26 February 2014 the PP Investment Managers requested ED&F Man to open accounts at ED&F Man in the names of (1) 32 of the PPs; (2) Cubix (on behalf of the Cubix PPs); and (3) Hamlyn (on behalf of the Hamlyn PP) for the purpose of the PPs trading shares (including Danish shares) in different global markets[23].

17.     At or about the same time as submitting such requests, the PP Investment Managers provided to ED&F Man (1) the PP Application Forms (as completed and/or signed by the 32 PPs and the two GPs[24]); and (2) proposed trading plans and/or strategies in respect of the PPs for which they acted[25].

18.     ED&F Man submitted the PPs and GPs to know your client and money laundering checks[26].

19.     Upon the retention of the PPs and the GPs as ED&F Man's clients:

   19.1.   ED&F Man classified the PPs and the GPs as elective professional clients under the relevant FSA rules in force at the time pursuant to letters written to the PPs and the GPs (the "**FSA Classification Letters**")[27]; and

   19.2.   ED&F Man opened records for each of the PPs  custody accounts[28] (comprising (1) cash account statements (the "**PP Cash Account**"), which provided a detailed running ledger of cash and share transactions carried out on behalf of the PPs and the GPs over time by reference to (inter alia) (a) date (b) journal type (c) description (buy/sell specified shares)  (d) amount and (f) running balance (in credit/overdrawn); and (2) equity account statements (the "**PP Equity Account**")[29] which showed the daily position of the PP's shares (including Danish shares) holdings at ED&F Man (together the "**PP Custody Accounts**")).

20.     ED&F Man did not solicit or recruit the PPs as their clients[30].

---

[23] The emails making such requests are identified by date and document reference number in DS1/P.
[24] The PP Application Forms are identified by date and document reference number in DS1/D.
[25] See documents identified in DS1/P
[26] Client file documents disclosed on 3 August 2020.
[27] The FSA Classification Letters are identified by date and document reference number in DS1/M.
[28] In accordance with 2(b) of the Custody Agreements.
[29] See (1) Equity Account Statements and (2) Cash Account Statements disclosed by ED&F Man.
[30] The emails evidencing the introduction of the PPs by the PP Investment Manager to ED&F Man are set out in DS1/J.

**B5. Contractual documentation**

21.   In relation to the services provided by ED&F Man, (1) ED&F Man and (2) each PP and/or GP
      executed and/or agreed to the terms of the following documents[31]:

    21.1.   a custody agreement (the "**Custody Agreement**");

    21.2.   a security and set-off deed (the "**Security and Set-Off Deed**");

    21.3.   an ISDA Master Agreement (the "**ISDA Agreement**");

    21.4.   a fee agreement letter (the "**Fee Agreement Letter**"); and

    21.5.   ED&F Man's terms of business (the "**ED&F Man Terms**").

22.   Some but not all PPs executed a Global Master Securities Lending Agreement with ED&F Man
      (the "**GMSLA**")[32].

**B6. Services provided by ED&F Man to the PPs**

23.   The services provided by ED&F Man included: (1) securities, lending and financing services;
      (2) execution, clearing and settlement services for equities and derivatives; and (3) custodian
      services for on-exchange and over-the-counter ("**OTC**") transactions ("**the ED&F Man
      Services**"). These services were provided pursuant to the terms of: (a) the Custody Agreement;
      and/or (b) the Security and Set-Off Deed; and/or (c) the ISDA Agreement; and/or (d) the Fee
      Agreement Letter; and/or (f) the ED&F Man Terms.

24.   In relation to the holding of Danish shares on behalf of the PPs, ED&F Man set up accounts
      with its sub-custodians[33] BNP Paribas S.A. ("**BNP**") and Skandinaviska Enskilda Banken AB
      (Denmark) ("**SEB**") for the purpose of holding client shares and client cash (in DKK) which:
      (1) (between August 2012 and April 2013) were held in segregated client accounts at BNP in

---

[31] The contractual documents are identified by date and document reference number in DS1/L.
[32] See the contractual documents identified in DS1/L.
[33] As defined in clause 2.2 of the Custody Agreement.

the name of each PP[34]; and (2) (after April 2013) were held in single pooled Danish share and DKK omnibus accounts at BNP and SEB[35] (the "**Share Omnibus Account**" and the "**Cash Omnibus Account**" [36]).

### B7. Fees charged by ED&F Man

25.    Fees were charged by ED&F Man to the PPs in relation to the ED&F Man Services pursuant to (1) the Fee Agreement Letters; and (2) transaction specific fee agreement letters and emails[37], with such fees debited from the PP Cash Accounts[38].

### (C) ED&F MAN APPLICATIONS

26.    ED&F Man prepared 340 Tax Vouchers on behalf of the PPs[39], of which 320 remain the subject of SKAT's claim. They comprised (1) 307 vouchers on behalf of the 32 PPs and (2) 13 vouchers on behalf of the 2 GPs (the "**Disputed Tax Vouchers**").

27.    On the instruction of the PP[40], ED&F Man (on behalf of the PP) prepared the Disputed Tax Voucher which contained information in the following categories in relation to shares held by the PP[41].

|   | Information category | Information supplied |
|---|---|---|
| 1 | Security Description | Name of Danish Listed Company |
| 2 | ISIN | Identification of International Securities Identification Number |
| 3 | SEDOL | Identification of Stock Exchange Daily Official List number |
| 4 | Ex Date | Date supplied |
| 5 | Record Date | Date supplied |
| 6 | Pay Date | Date supplied |
| 7 | Quantity | Specification of number of Danish shares |

---

[34] See documents identified in relation to the opening of segregated accounts on 6 August 2012 in DS1/N; and the accounts as identified at Appendix 2/5.

[35] See documents identified in relation to the opening of the omnibus accounts on 5 April 2013 in DS1/O; and the accounts as identified at Appendix 2/6 & 7.

[36] The Share Omnibus Account is account number: BNP:**778523F** and SEB: **05295142806**; the Cash Omnibus Account is account number: BNP:**724864B** and SEB: **5295-001-7004263**.

[37] See Fee Document in DS2/FEE/D2 and D3 Nos. 1-10.

[38] All PPs' Cash Account Statements were disclosed on 16 September 2020, see examples at DS2/FEE/D4 Nos. 1-10.

[39] The 80 Annex E Tax Vouchers are not the subject of the Validity Trial: see July 2020 CMC Order paragraph 6 (Annex B paragraph 9) and December 2020 CMC Order Annex A paragraph 7.

[40] See DS2/TRAD/D15: Tax Voucher Requests.

[41] ED&F Man Re-Amended Defence/11.1; SKAT Reply/6.

| 8 | Gross Div Rate | Dividend rate applicable per share |
| 9 | Amount Received | Amount received by way of dividend |
| 10 | WHT Suffered | Amount withheld by way of withholding tax |
| 11 | WHT % | Percentage rate (27%) of withholding tax applied |

28.  On completion of the Disputed Tax Voucher, ED&F Man sent it to: (1) the tax reclaim agent acting on behalf of the PP[42] (as identified in Document Schedule 1[43]) and/or (2) the PP Investment Manager[44].

29.  The tax reclaim agent (on behalf of the PP) submitted WHT applications to SKAT (comprising (1) a Tax Relief Form completed by the tax reclaim agent; (2) the completed Disputed Tax Voucher; and (3) other supporting documents).

30.  WHT applications including Disputed Tax Vouchers were made in relation to shareholdings in 17 Danish Companies[45].

31.  The Disputed Tax Vouchers confirmed: (1) the totality of shares (identified in entries 1, 2, 3 and 7); (2) held "*over the dividend date*"; (3) by the PP; (4) in Danish Companies[46], by reason of one or more transactions in respect of such shares.

**(D) THE TRADES**

**D1. Identity of trades: general**

32.  The transactions underlying the Disputed Tax Vouchers involved the PP's acquisition of shares pursuant to trades (the "**Trades**") which involved:

32.1.  the PP purchasing shares from ED&F Man's Equity Finance Desk ("**the EF Desk**"), which the EF Desk had acquired from the market ("**the Purchase Trades**"); or

32.2.  the PP exercising its right to request ED&F Man, pursuant to Clause 10(b)(ii) of the ED&F Man Terms, to re-transfer assets previously purchased equivalent to shares transferred to ED&F Man under the same clause ("**the Recall Trades**")[47].

---

[42] See DS2/TRAD/D16: Tax Voucher Emails.
[43] DS1/G.
[44] See DS2/TRAD/D16: Tax Voucher Emails.
[45] SKAT Schedule 1B of Fourth Amended Particulars of Claim
[46] ED&F Man Re-Amended Defence/11.2, 21; SKAT Reply/6, 8.
[47] These took the form of A or B Recall Trades as explained below.

33.     The Purchase Trades and Recall Trades are described more fully at paragraphs 50 to 79 below with footnoted references to Document Schedule 2 and the documents contained in the trade packs[48] ("**the Trade Pack Documents**") relating to 10 proposed sample trades ("**the Sample Trades**"). Appendix 1 identifies, in respect of each of the 320 Disputed Tax Vouchers, the type of Trade which underlie each Tax Voucher.

**D2. ED&F Man records**

34.     The Purchase and Recall Trades are evidenced by the following categories of trading records held by ED&F Man (the "**ED&F Man Records**")[49] (1) as set out in Document Schedule 2 (**DS2**); and (2) described more fully in paragraphs 35 to 49 below)[50]:

34.1.    (1) an order to purchase shares; or (2) an instruction to recall shares (the "**Share Instruction**") (sometimes together with an email seeking approval in respect of the same);

34.2.    an email from the inter-dealer broker ("**IDB**") confirming the purchase of the shares (the "**IDB Share Purchase Confirmation**");

34.3.    a confirmation in relation to a Share Instruction (the "**Share Confirmation**");

34.4.    an entry or entries in ED&F Man's settlement system (Shadow) recording the Trade (the "**Shadow Entry**");

34.5.    an entry or entries on Trade Date in the PP Equity Account recording the purchase (the "**Purchase Entry**");

34.6.    (where the shares are recalled) an entry or entries made in the "B-loan account" in Shadow recording the PP's recall of the shares (the "**Recall Entry**");

34.7.    an order to enter into a transaction to hedge the risk of market movements in the value of the shares (the "**Hedge Order**");

---

[48] As disclosed by ED&F Man to SKAT on 16 September 2020.
[49] ED&F Man Re-Amended Defence to Schedule 5T/18.7.3.
[50] Certain additional ED&F Man Records that relate to borrowed Securities and to Recall Trades are identified in sections D3 and D4 below.

34.8.   a confirmation in relation to a Hedge Order (the "**Hedge Confirmation**");

34.9.   an automated SWIFT message confirming delivery of the shares to ED&F Man's sub-custodian (the "**Share Delivery SWIFT**");

34.10.  a debit entry in the PP Cash Account in respect of the PP's purchase of the shares (in the amount of the purchase price of the shares) (the "**PP Purchase Payment Entry**");

34.11.  ED&F Man's internal record showing the calculation of the dividend(s) due to ED&F Man's clients (including one or more PPs) (the "**Dividend Reconciliation Sheet**");

34.12.  a record of dividend payment (the "**Dividend Payment Record**");

34.13.  a credit entry in the PP Cash Account in respect of the PP's receipt of the dividend (in the amount of the dividend) (the "**PP Dividend Receipt Entry**"); and

34.14.  a credit entry in the PP Cash Account in respect of the PP's receipt of withholding tax (in the amount of the withholding tax) (the "**PP WHT Receipt Record**").

(1) Share Instruction

35.   The Share Instruction is an email from the PP Investment Manager to (1) the EF Desk; or (2) an IDB[51] instructing:

35.1.   the purchase of shares (usually identifying (1) the purchasing PP(s); (2) the Danish Listed Company in which shares are to be purchased; (3) the trade date; (4) the quantity and price of the shares; and (5) the settlement date); alternatively

35.2.   the recall of shares from ED&F Man of shares previously acquired by the PP(s) (identifying (1) the recalling PP(s); (2) the Danish Listed Company in which the shares are held; and (3) the quantity of shares so held).

---

[51] A list of the IDBs used by the EF Desk for Security acquisitions and their settlement agents is at Appendix 2/8-11.

36.    Sometimes this Share Instruction was accompanied by a request for approval of the trade. Provided that the trade was within the EF Desk's budget and risk limits, a trader on the EF Desk would send an email confirming that a trade could be made.

## (2) IDB Share Purchase Confirmation

37.    The IDB Share Purchase Confirmation is an email from the IDB to the EF Desk confirming the purchase of the shares by ED&F Man for onward sale to the PP on the terms set in the Share Instruction.

## (3) Share Confirmation

38.    The Share Confirmation is an email to the PP Investment Manager from (1) the EF Desk or (2) an IDB, confirming the PP's acquisition of the shares pursuant to a Purchase Trade on the terms set out in the Share Instruction.

## (4) Shadow Entry

39.    The Shadow Entry is an entry or entries in ED&F Man's settlement system (Shadow) recording the Trade (including information as to (1) date of Trade(s); (2) settlement date(s); (3) trade account; (4) product type (equity); (5) trade currency (DKK); (6) trade transaction (buy/sell); (7) quantity of shares; (8) trade proceeds; and (9) final price) which identifies ED&F Man (a) buying the shares from the IDB; and (b) selling the shares to the PP.

## (5) Purchase Entry

40.    The Purchase Entry is an entry or entries in the PP Equity Account recording the PP's purchase of the shares on Trade Date on the terms set out in the Share Confirmation identifying (inter alia) the PP's up-to-date trading and cash position (including in respect of trades in Danish shares) by reference to:

40.1.    the "*Trade Date Positions (Equity)*" which described the totality of shares held by the PP at the date of production of the PP Equity Account in respect of trades (including settled trades and unsettled trades) entered into by close of business that date by reference to (1) asset/description (shares in the Danish Listed Company); (2) position

11

(total quantity of shares purchased); (3); trade price; (4) market price; (5) original value; (6) market value (7); unrealised G/L (the gain/loss on the transaction) and (8) currency (DKK);

40.2.  the "*Pending Trades*" which described trades which had not yet settled at the close of business on the date of production of the PP Equity Account by reference to (1) trade date; (2) settlement date; (3) transaction (buy/sell); (4) trade price; (5) proceeds; and (6) currency)).

(6) Recall Entry

41.  The Recall Entry is an entry made by ED&F Man in the *"B-loan account"* relating to the PP in ED&F Man's trading records. The entry arose in the context of (1) ED&F Man having exercised its right (in accordance with Clause 10 (b) (ii) of the ED&F Man Terms) to transfer to itself assets purchased by the PP (the Danish shares) in order to cover debts owed by the PP to ED&F Man; and (2) the PP having exercised its right (in accordance with the same Clause 10(b)(ii)) to request the re-transfer of equivalent assets to the Danish shares. The Recall Entry then records a commensurate reduction in the Danish shares previously transferred to and held by ED&F Man.

(7) Hedge Order

42.  The Hedge Order is an instruction from the Investment Manager (on behalf of (1) the PP or (2) a fund which is owned and managed by the Investment Manager and which is also a client of the EF Desk (an "**IM Fund**"[52])) to the EF Desk requiring a hedging transaction in respect of movements in the market price of the shares using one of the following products:

42.1.  a single stock future: a futures contract executed on an exchange by (1) the buyer (a market counterparty) and (2) the seller (the PP or an IM Fund) in relation to shares in the Danish Listed Company pursuant to which (a) the buyer agrees to pay an agreed price for a specified number of shares in that company on an agreed future date; and (b) the seller is obliged to deliver cash or equivalent shares in that amount on that date; or

---

[52] Please see Section H below for more details on the IM Funds.

42.2. a price swap: derivative contracts executed on ISDA terms comprising a contract between (1) ED&F Man and (2) the PP pursuant to which the parties exchange the price performance of a specified number of Danish shares by (a) fixing a reference price for the shares (the "**Fixed Price**") and (b) calculating the return as the difference (on an agreed valuation date) between (i) the Fixed Price of the shares and (ii) the market value of the shares.

(8) Hedge Confirmation

43. The Hedge Confirmation is an email from the EF Desk to the Investment Manager confirming the execution of the Hedge in accordance with the terms of the Hedge Order.

(9) Share Delivery SWIFT

44. The Share Delivery SWIFT is an automated message sent by ED&F Man's sub-custodian bank to ED&F Man confirming (1) the delivery of shares on a specified date (the settlement date[53]) and (2) the receipt of the shares in the Share Omnibus Account[54] (a) free of payment in the case of a Recall Trade; or (b) for payment in the case of a Purchase Trade.

(10) PP Purchase Payment Entry

45. The PP Purchase Payment Entry is a debit entry made to the PP Cash Account by ED&F Man which recorded the PP's purchase of the shares in the amount debited.

(11) Dividend Reconciliation Sheet

46. The Dividend Reconciliation Sheet is a spreadsheet created by ED&F Man to calculate the dividend due to each PP on specified Danish shares which identified (inter alia):

46.1. the Danish Listed Company in which the shares were held (by reference to (1) ISIN[55] number; (2) the SEDOL[56] number; (3) country; (4) ex-date; (5) record date; and (6) pay date);

---

[53] ED&F Man Re-Amended Defence/10.4.5.
[54] ED&F Man Re-Amended Defence/10.5.
[55] ISIN: Identification of Stock Exchange Daily Official List number
[56] SEDOL: Identification of Stock Exchange Daily Official List number

46.2.   the shares held by the PP (by reference to (1) the relevant PP client account; (2) the name of the PP; and (3) the number of shares); and

46.3.   the dividend due (by reference to (1) the relevant rate of WHT (27%); and (b) the gross dividend rate).

(12) PP Dividend Payment Record

47.    The PP Dividend Payment Record identifies the payment of the net dividend on the shares at 73% of the gross dividend rate and comprised (depending on the source of the payment):

47.1.   (where the payment is made by the sub-custodian): an MT566 SWIFT message; or

47.2.   (where the payment is made by (1) an IDB or (2) a counterparty to ED&F Man) an email from the IDB/counterparty confirming payment.

(13) PP Dividend Receipt Entry

48.    The PP Dividend Receipt Entry is a credit entry made to the PP Cash Account by ED&F Man which recorded the PP's receipt of 100% of the dividend (net of WHT).

(14) PP WHT Receipt Entry

49.    The PP WHT Receipt Entry is a credit entry made to the PP Cash Account by ED&F Man which recorded the PP's receipt of 100% of the WHT (less agent fees).

**D3.  Purchase Trades**

50.    Purchase Trades involved the PP purchasing Securities from ED&F Man which ED&F Man acquired from the market. As identified in Appendix 1 Purchase Trades are the most common Trades, and 9 of the 10 Sample Trades make reference to at least some Securities that had been purchased by means of Purchase Trades. Sample Trades 1, 5 to 8 and 10 in Documents Schedule 2 (**DS2**) were exclusively Purchase Trades. Purchase Trades proceeded as follows (with footnoted references to DS2 and the relevant Trade Pack Documents relating to the Sample Trades):

<u>(1) Share Instructions</u>

51.     On the Trade Date and prior to the Reference Date, the Investment Manager on behalf of the PP instructed the EF Desk to purchase the Security (see **Share Instructions**[57]**)**.

<u>(2) IDB Share Purchase Confirmations & (3) Share Confirmations</u>

52.     Pursuant to the Share Instructions, the EF Desk: (1) purchased the Security from an IDB on a principal to principal basis who confirmed the purchase (see **IDB Share Purchase Confirmations**[58]); and (2) sold the Security to the PP on Trade Date, confirming the same to the Investment Manager (see **Share Confirmations**[59]). The IDB acquired the Security by either:

52.1.     purchasing the Security from a selling counterparty in the market; or

52.2.     purchasing the Security from the EF Desk after the EF Desk borrowed the Security from a financial institution within the market[60] pursuant to a GMSLA (a "**Borrow**") (see **Borrow Confirmations**[61] and **Borrow Delivery SWIFTs**[62]). The Borrow was made by the EF Desk:

52.2.1.     on behalf of ED&F Man's client facilitation account (known simply as "Client Hedges" and with account number 1-020-010)[63] ("**Client Hedges**"). In this case the EF Desk would then purchase the Security from Client Hedges via the IDB and sell it to the PP on Trade Date[64]  (for an example see Sample Trade No 9: Riverside); or

52.2.2.     on behalf of an IM Fund[65]. In this case the EF Desk would then purchase the Security from the IM Fund via the IDB and sell it to the PP on Trade Date (see

---

[57] DS2/TRAD/D1: Share Instructions.
[58] DS2/TRAD/D2: IDB Share Purchase Confirmations.
[59] DS2/TRAD/D3. Share Confirmations.
[60] A list of all the financial institutions used for Borrows and their settlement agents is at Appendix 2.
[61] DS2/TRAD/D18: Borrow Confirmations.
[62] DS2/TRAD/D19: Borrow Delivery SWIFTs.
[63] DS2/TRAD/D4: Shadow Entries, No. 9 Riverside (page 15).
[64] DS2/TRAD/D21: IDB Share Sale Confirmations, No. 9 Riverside (page 10).
[65] DS 2/TRAD/D4: Shadow Entries, No. 2 Autoparts (page 40).

**Funds Sale Orders and Confirmations**[66] and **IDB Share Sale Confirmations**[67]) (for an example of such trades see Sample Trade No. 2: Autoparts).

### (4) Shadow Entries & (5) Purchase Entries

53.     On Trade Date, the EF Desk recorded the PP's purchase of the Security in its internal settlement system (see **Shadow Entries**[68]); and recorded in the PP Equity Account the Security as an asset with a corresponding debit for the purchase price (see **Purchase Entries**[69]).

### (7) Hedge Orders

54.     Also on Trade Date, the Investment Manager instructed the EF Desk to protect against the market risk of price movements in the Security by (1) selling a single stock future, either on behalf of the PP[70] or on behalf of the IM Fund[71]; or (2) entering an OTC swap agreement[72] between ED&F Man and the PP (see **Hedge Orders**).

### (8) Hedge Confirmations

55.     Pursuant to a Hedge Order, and on the Trade Date, the EF Desk: (1) sold on an exchange a single stock future on behalf of the PP or on behalf the IM Fund; or (2) entered into a price swap agreement with the PP, and confirmed the same to the Investment Manager (see **Hedge Confirmations**[73]). The EF Desk would then offset its risk by entering into an identical price return swap with another ED&F Man client.

### (9) Share Delivery SWIFTs & (10) PP Purchase Payment Entries

---

[66] DS 2/TRAD/D20: Funds Sale Orders and Confirmations.
[67] DS 2/TRAD/D21: IDB Share Sale Confirmations.
[68] DS2/TRAD/D4: Shadow Entries.
[69] DS2/TRAD/D5: Purchase Entries.
[70] DS2/TRAD/ D7: Hedge Orders: Nos. 1, 5, 6, 8, 9 and 10.
[71] DS2/TRAD/D7: Hedge Orders: Nos. 2, 3, 4 and 7.
[72] A more detailed explanation of the Hedges and the IM's role is at section E below.
[73] DS2/TRAD/D8: Hedge Confirmations.

56.    On Settlement Date, the Security was delivered by the IDB's settlement agent to the Share Omnibus Account in return for payment by the EF Desk to the IDB's settlement agent (see **Share Delivery SWIFTs**[74]) with such settlement paid from funds in the Cash Omnibus Account[75] and the EF Desk recording a debit for  such payment in the PP's Cash Account (see **PP Purchase Payment Entries**[76]).

### (12) PP Dividend Payment Records & (13) PP Dividend Receipt Entries

57.    On the dividend's Payment Date or shortly thereafter, 100% of the net dividend on the purchased Security was received into the Cash Omnibus Account (see **PP Dividend Payment Entries**[77]). The EF Desk recorded receipt of the dividend as a credit in the PP's Cash Account (see **PP Dividend Receipt Entries**[78]).

### (15) Tax Voucher Emails

58.    Shortly after the Payment Date: (a) ED&F Man provided the PP's Investment Manager or Reclaim Agent with a tax voucher (see **Tax Voucher Emails**[79]); (b) the Reclaim Agent issued a WHT Application; (c) SKAT determined whether WHT was due in respect of a WHT Application; and (d) in the event that SKAT determined that WHT was due, SKAT either (i) paid the WHT to a Reclaim Agent who then paid it to ED&F Man; or (ii) made direct payment of the WHT to ED&F Man.

### (14) PP WHT Receipt Entries

59.    ED&F Man received the WHT into its Cash Omnibus Account. The EF Desk recorded receipt of 100% of WHT net of Reclaim Agent fees in the PP's Cash Account (see **PP WHT Receipt Entries**[80]).

---

[74] DS2/TRAD/D9: Share Delivery SWIFTs.
[75] An explanation of ED&F Man's provision of such funding is at Section F.
[76] DS2/TRAD/D10: PP Purchase Payment Entries.
[77] DS2/TRAD/D12: PP Dividend Payment Entries.
[78] DS2/TRAD/D13: PP Dividend Receipt Entries.
[79] DS2/TRAD/D16: Tax Voucher Emails.
[80] DS2/TRAD/D14: PP WHT Receipt Entries.

(16) Pension Plans Sale Orders and Confirmations

60.     On or after Reference Date, the EF Desk either:

60.1.    sold the Security, on instruction from the PP's Investment Manager, to an IDB (see **PP Sale Orders and Confirmations**[81]) and upon settlement, credited the sale price to the PP's Cash Account (See **PP Sale Payment Entries**[82]); or

60.2.    exercised its right to transfer title to the Security to itself pursuant to Clause 10(b)(ii) of the ED&F Man Terms; and recorded this as a "*borrow*" in the PP's B-loan account (with the PP retaining its right, also pursuant to Clause 10 (b) (ii) of the ED&F Man Terms, to a retransfer of equivalent assets to the Security upon request).

61.     On the same day that the Security was sold, the Hedge was unwound pursuant to an instruction from the Investment Manager, with the EF desk (a) purchasing an equivalent single stock future on behalf of the PP or the IM Fund or (b) terminating the SWAP (see **PP Sale Orders and Confirmations**[83])

**D4. Recall Trades**

62.     Recall Trades involved: (1) the PP recalling a Security which the PPs had previously purchased and received pursuant to a Purchase Trade ("**A Recall Trades**"); or alternatively (2) the PP recalling a Security to which the PP had a contractual right pursuant to a prior related trade ("**B Recall Trades**"). Appendix 1 identifies those Disputed Tax Vouchers which reference Securities acquired by one or more A and/or B Recall Trades.

**(1) The A Recall Trades**

63.     An A Recall Trade[84]involved the PP effecting a Purchase Trade before the previous Reference Date (with the EF Desk purchasing the Security from the market via an IDB), followed by (a) the transfer of the Security after that Reference Date to ED&F Man pursuant to Clause 10(b)(ii) of the ED&F Man Terms ("**the Transfer**"); (b) the PP's recall of assets equivalent to this

---

[81] DS2/TRAD/D17: PP Sale Orders and Confirmations.
[82] DS2/FIN/D5: PP Sale Payment Entries.
[83] DS2/TRAD/D17: PP Sale Orders and Confirmations.
[84] See Sample Trades No. 3: Bluegrass IMT and No. 4: Central.

Security prior to the Reference Date pursuant to the same Clause 10 (b)(ii) (**"the Recall"**); and (c) the settlement of the Security.

(a) The Transfer

64.    After effecting a Purchase Trade for the PP, and after its Reference Date, the EF Desk exercised its right to transfer title to the Security to itself pursuant to Clause 10(b)(ii) of the ED&F Man Terms. This transfer was recorded by the EF Desk as a borrow (**"BOR"**) in the PP's B-loan account (see **Recall Entries**[85]).

65.    The EF Desk continued to record the Security as an asset of the PP in the PP's Equity Account because (pursuant to Clauses 10(b)(ii) and 10(c)(ii) of the ED&F Terms) the PP retained a contractual claim against ED&F Man for the re-transfer of equivalent assets (see **Purchase Entries**[86]).

(b) The Recall

66.    Prior to the Reference Date for the Security's next dividend event, the Investment Manager, on behalf of the PP, instructed the EF Desk to recall the Security (see **Share Instructions**[87]).

67.    The Security was then sourced and returned to the PP by the EF Desk either by:

67.1.    borrowing equivalent Danish shares from a financial institution within the market pursuant to a GMSLA (see **Borrow Confirmations**[88]); or

67.2.    (a) exercising its right under Clause 10(b)(ii) of the ED&F Man Terms to transfer to itself equivalent Danish shares from an IM Fund (which had purchased the Security, prior to Reference Date, by means of a Purchase Trade (see **Funds Purchase Orders and Confirmations**[89])  and (b) recording that transfer as a borrow (**"BOR"**) in the IM Fund's B Loan Statement.

(c) The Settlement

68.    On Settlement Date:

---

[85] DS2/TRAD/D6: Recall Entries, No 3: Bluegrass IMT (page 13) and No. 4: Central (page 35).
[86] DS2/TRAD/D5: Purchase Entries, No. 3: Bluegrass IMT (page 16) and No 4: Central (page 48).
[87] DS2/TRAD/D1: Share Instructions, No. 3: Bluegrass IMT (page 9) and No 4: Central (pages 27-28).
[88] DS2/TRAD/D22: Borrow Confirmations.
[89] DS2/TRAD/D23: Funds Purchase Orders and Confirmations.

68.1.    in the event of a borrow, the equivalent Danish shares were delivered by the relevant financial institution to the Share Omnibus Account (see **Share Delivery SWIFTs**[90]); or

68.2.    in the event of an IM Fund's share purchase, the shares were delivered from the relevant IDB's settlement agent to the Share Omnibus Account in return for payment (see **Share Delivery SWIFTs**[91]).

69.    In either event, the EF Desk recorded the Security as having been recalled by the PP by reversing or reducing a borrow ("**BOR**") on the PP's B-loan account to reflect the quantity of shares recalled by the PP (see **Recall Entries**[92]).

**(2) The B Recall Trades**

70.    The B Recall Trades[93] involved: (1) a prior related trade whereby, in advance of the Reference Date, the PP acquired a contractual right against ED&F Man to recall Danish shares equivalent to the Security later referred to in the relevant Disputed Tax Voucher ("the **Prior Related Trade**" or "**PRT**"); and (2) the PP's Recall of the same.

(a) The Prior Related Trade

71.    Before the relevant Trade Date and Reference Date, an IM Fund instructed the EF Desk to borrow Danish shares from the market on its behalf. In accordance with that instruction, the EF Desk borrowed the shares from a financial institution pursuant to a GMSLA (the "**PRT Borrowed Shares**") and lent the same to the IM Fund (see **PRT Borrow Confirmations**[94]**and PRT Shadow Entries**[95]).

72.    On the settlement date of the borrow, the PRT Borrowed Shares were delivered by the relevant financial institution's settlement agent to the Share Omnibus Account and held to the IM Fund's account ready for onward sale (see **PRT Borrow Settlement SWIFTs**[96] **and PRT Shadow Entries**[97]).

73.    On the PRT's trade date:

---

[90] DS2/TRAD/D9: Share Delivery SWIFTs, No. 3: Bluegrass (pages 14 and 15).
[91] DS2/TRAD/D9: Share Delivery SWIFTs, No 4: Central (pages 36-47).
[92] DS2/TRAD/D6: Recall Entries, No. 3: Bluegrass (page 13) and No. 4: Central (page 35).
[93] See Sample Trade No 4: Central.
[94] DS2/TRAD/D24: PRT Borrow Confirmations.
[95] DS2/TRAD/D30: PRT Shadow Entries.
[96] DS2/TRAD/D25: PRT Borrow Settlement SWIFTs.
[97] DS2/TRAD/D30: PRT Shadow Entries.

73.1.   the Investment Manager, on behalf of the IM Fund, instructed the EF Desk to sell a specified number of Danish shares (see **PRT Sale Orders**[98]). Pursuant to this instruction, the EF Desk (a) purchased Danish Shares from the IM Fund; and (b) sold them to an IDB on a principal to principal basis, confirming the same to the investment manager (see **PRT Sale Confirmations**[99]); and

73.2.   the Investment Manager, on behalf of the PP, instructed the EF Desk to purchase the same number of Danish shares (see **PRT Buy Order**[100]). Pursuant to this instruction, the EF Desk (a) purchased Danish shares on a principal to principal basis from the same IDB; and (b) sold the same to the PP, confirming the same to the Investment Manager (see **PRT Buy Confirmations**[101]).

74.   The PRT Sale and Buy Orders specified an overall quantity of shares apportioned between various identified PPs. The PRT Sale and Buy Confirmations identified the "shapes" (batches of shares) in which the Shares would be sold and bought.

75.   On the PRT's settlement date, the PRT Borrowed shares were:

75.1.   delivered by the IDB's settlement agent to the Share Omnibus Account against payment from the Cash Omnibus Account (and the EF Desk then debited the Security's purchase price from the PP's Cash Account ) (see **PRT Purchase Payment Entries**[102] **& PRT Share Delivery SWIFTs**[103]); and

75.2.   used to settle each "*shape*" of the PRT Sale and Buy Confirmations (ED&F Man immediately exercising its right (following the settlement of each sale and purchase) to transfer to itself title to the PRT Borrowed Shares pursuant to Clause 10(b)(ii) of the ED&F Terms).

76.   Upon completion of the trade, and pursuant to Clauses 10(b)(ii) and 10(c)(ii) of the ED&F Terms, the PP retained a contractual right to recall equivalent Danish shares from ED&F Man. Accordingly: (a) the PP's Equity Statement recorded the Danish shares as an asset of the PP (see **PRT Purchase Entries**[104]); and (b) ED&F Man's Shadow software (see **PRT Shadow**

---

[98] DS2/TRAD/D26: PRT Sale Orders, No. 4: Central (pages 15 & 16).
[99] DS2/TRAD/D28: PRT Sale Confirmations, No. 4: Central (pages 15 & 16).
[100] DS2/TRAD/D27: PRT Buy Orders; No. 4: Central (pages 12 & 13).

[101] DS2/TRAD/D29: PRT Buy Confirmations, No. 4: Central (pages 12 & 14).
[102] DS2/TRAD/D34: PRT Purchase Payment Entries; No 4: Central (page 17).
[103] DS2/TRAD/D33: PRT Share Delivery SWIFTs; No. 4: Central (pages 49,50 and 51).
[104] DS2/TRAD/D31: PRT Purchase Entries; No 4: Central (pages 57-60).

**Entries**[105]) and the PP's B-Loan account recorded the shares transferred to ED&F Man as a borrow ("**BOR**") (see **PRT Recall Entries**[106]).

(b) The Recall

77.    As with the "A" Recall Trades:

77.1.    on a Trade Date prior to the Reference Date, the Investment Manager on behalf of the PP instructed the EF Desk to recall shares which were equivalent to the Danish shares recorded as assets in the PP's Equity Account; and

77.2.    prior to the Reference Date, the EF Desk acquired shares for the PP's Recall either by (a) borrowing them from the market prior to the Reference Date, or (b) by exercising its right to transfer to itself shares which had been purchased by an IM Fund Prior to the Reference Date.

For the avoidance of doubt, the Security recalled and held by the PP and referred to in the Disputed Tax Vouchers was limited to those Danish shares which the EF Desk had been able to acquire before the Reference Date.

**(E) HEDGES**

78.    All Purchase Trades were hedged on Trade Date removing the risk of the purchased Security's value changing due to price movements in the market.

79.    The Purchase Trades were hedged by either (1) a single stock future; or (2) a price return swap[107].

**E1. Single Stock Future**

80.    A single stock future ("**SSF**") is a standardised forward derivatives contract traded on an exchange. Parties to an SSF agree between themselves on the future price of shares, with (1) the buyer required to pay the agreed price on the expiry of the contract (whether or not the price of the underlying  shares has moved in the buyer's favour); and (2) the seller required to deliver the shares. An SSF can also be "cash settled" where, rather than delivering the asset, one party pays the other the difference between the contract value of the shares and their actual value at the expiry date. An SSF does not convey any title, voting or dividends rights in the underlying

---

[105] DS2/TRAD/D30: PRT Shadow Entries; No 4: Central (page 42).
[106] DS2/TRAD/D32: PRT Recall Entries; No 4: Central (page 43).
[107] DS2/TRAD/D7: Hedge Orders; and D8: Hedge Confirmations.

shares: rather it enables an entity who purchases/owns shares and sells an SSF in respect of such shares to remove the price risk of their subsequent sale by fixing the sale price.

81.    In all cases where an SSF was sold by the EF Desk to hedge a Purchase Trade it was sold (1) upon the instruction of (and on the terms instructed by) the Investment Manager either (i) on the PP's behalf, or (ii) on behalf of an IM Fund; (2) on an exchange; (3) on the Trade Date; and (4) at a price which was very close to the Security's purchase price.

82.    In all cases where an SSF was sold on behalf of an IM Fund and not the PP, the IM Fund would in turn assume the PP's risk by means of Performance Guarantee Agreements or Guarantee Agreements, as described at paragraphs 122 to 128 below.

**E2. Price Return Swap**

83.    A Price Return Swap ("**PRS**") is a principal derivative contract whose parties swap between themselves the price performance of a specific number of referenced shares, with one party guaranteeing a Fixed Price of shares held by another party over a specified period. As with an SSF, a PRS does not convey any title, voting or dividend rights in the referenced shares: it was only used by the PP to prevent the value of a Security moving during the period over which the PP held the Security and was terminated upon the Security's sale.

84.    In all cases where a PRS was used by a PP to hedge a Trade, it was executed (1) pursuant to the PP's ISDA Agreement with ED&F Man[108] (with ED&F Man entering into a mirroring PRS on identical terms with another client); (2) on the instruction of the PP's Investment Manager and (3) on terms which prescribed a Fixed Price very close to the Security's purchase price.

**(F) FUNDING OF TRADES**

**F1. Transaction Costs**

85.    When onboarded as clients, the PPs were required to make an initial cash deposit into their PP Cash Accounts to cover the transaction costs of trades brokered by ED&F Man[109], with such moneys paid into ED&F Man's London commercial account with JP Morgan.

86.    The Trades involved all or some of the following third-party transaction costs (together the "**Transaction Costs**"):

---

[108] All PPs executed ISDA with ED&F Man see DS1/CL.
[109] See DS2/FIN/D1: PP Opening Balance Transfers

86.1.    IDB fees (fees charged by IDBs on equities or futures);

86.2.    futures fees (fees charged by the relevant futures exchange);

86.3.    ED&F Man's fees (Section G);

86.4.    funding fees (paragraphs 90.2.1 and 95 below).

87.    All such transaction costs were passed to the PPs and debited from their Cash Accounts[110].

### F2. Settlement Costs

88.    All Purchase Trades were settled with funds provided by ED&F Man, ED&F Man having the power to settle its clients' transactions  pursuant to Clause 9(a) of the Custody Agreement and Clause 2(e) of the ED&F Terms.

89.    The EF Desk settled all relevant Purchase Trades with funds paid from the Cash Omnibus Account at either BNP or SEB. Funds required for such settlement of all client trades would be paid into the Cash Omnibus Account on a regular basis and according to anticipated client settlement needs. Such funds would be paid from ED&F Man's London commercial account with JP Morgan (account number 0035823201) after being drawn down in to that account and on the EF Desk's request[111] from the US JP Morgan account of ED&F Man Treasury Management Plc, ("**Group Treasury**"), the corporate entity which held the central funds for the entire ED&F Man Group.

90.    The EF Desk settled the Purchase Trades with its own funds because:

90.1.    funding the settlement of client trades was one of the ED&F Man Services provided by the EF Desk where such funding requirements were (1) approved and (2) within the EF Desk's agreed Budget and Risk Mandate (as identified and defined below);

90.2.    funding the settlement of the Danish Trades involved minimal commercial risk for ED&F Man in circumstances where:

90.2.1.    the EF Desk passed on to clients any interest payments it had to make on the drawdown of funds required for settlement ("**the Funding Fee**");

90.2.2.    the Trades were protected by near perfect hedges;

---

[110] See DS2/FEE/D4: Fee Debits.
[111] See Appendix 2/15 for an example of an EF Desk's drawdown request.

90.2.3.   the total assets and liabilities on a client's Custody Account (a PP's assets' Net Liquidated Value ("**NLV**")) remained positive;

90.2.4.   ED&F Man held security over a PP's assets under Clause 5 of the Security and Set Off Deed; and

90.2.5.   ED&F Man held a right under Clause 10(b)(ii) of the ED&F Man Terms to transfer a PP's assets to itself and use them pending payment of its liabilities;

90.3.   the PP ultimately paid for the Security[112]; and

90.4.    the EF Desk received fees for the provision of the ED&F Man Services[113].

**F2. EF Desk Budget and Risk Mandate**

91.   The PPs' Investment Managers sought approval from the EF Desk prior to entering a Trade. Trades would be approved if they were within the EF Desk's Budget and Risk Mandates (both as identified below).

**(1) EF Desk's Budget**

92.   The EF Desk settled trades for multiple clients in multiple equities and across multiple jurisdictions over the course of each year. It did so from its agreed annual budget, which was made up of ED&F Man's funds and funds which the EF Desk was entitled to drawdown from Group Treasury. During the material time, the EF Desk's available budget was US$600 million in 2013, US$1.7 billion in 2014, and US$813.4 million in 2015[114] ("**the Budget**").

93.   Settlement of each of the Trades was within ED&F Man's Budget.

**(2) EF Desk's Risk Mandate**

94.   The EF Desk's risk limits were identified in ED&F Man's annual Risk Mandates[115] ("**the Risk Mandates**"). The Risk Mandates prescribed (inter alia) the types of product which could be traded, the maximum settlement date, the maximum value of any trade and the maximum number of shares in any one company which could be bought/sold in a single trade.

**F3. Settlement at no commercial risk to ED&F Man**

**(1) Funding Fee: the drawdown costs passed on to the PP**

---

[112] As explained in paragraph 60 above.
[113] An explanation of the fees charged for the ED&F Man Services is at Section G below.
[114] See Appendix 2/13 for details of the EF Desk's Budget.
[115] See Appendix 2/14 for details of the EF Desk's Risk Mandate.

95.    Where the EF Desk (1) settled Trades with funds drawn down from Group Treasury; and (2) incurred interest on such funds, it passed such cost on to its clients, providing their Investment Managers with drawdown interest statements[116] and debiting the requisite sums from the PPs' Cash Accounts[117].

**(2) Market price movements were hedged**

96.    The Security was always hedged, as explained in E above

**(3) Client default could not cause material loss to ED&F Man**

97.    ED&F Man monitored every PP's NLV to ensure that, in the event of default, the EF Desk could exit all of the PP's positions without loss.

98.    A PP's NLV would be monitored on a daily basis by ED&F Man's risk department ("**the Risk Department**"), a PP's NLV is the overall balance on its account at any given time taking into account its total assets and liabilities, a full breakdown of the how the PPs NLV's were calculated is at Appendix 2/16.

99.    The NLV report was sent out on a daily basis by the Risk Department as part of a package sent to the ED&F Man directors under the heading "*ED&F Man Capital Markets Equity Risk Reports*"[118]. These reports would identify which PP clients with which IMs had a negative NLV, necessitating a margin call.

100.    If a client's NLV had turned negative, ED&F Man would make a margin call for funds to restore it to a positive balance[119]. Margin calls were made to the PP's Investment Manager, with the Investment Manager arranging for the call to be met, and for the requisite sums to be paid.

101.    The NLV Report grouped certain PP client accounts together under the umbrella of their IMs and allowed netting between some accounts (where netting agreements had been entered between the PP and ED&F Man). This netting was for the purpose of margin calls only. Negative balances with no such netting mitigation were called as cash from the clients.

**(4) ED&F Man retained a Fixed and Floating Charge under Security and Set Off Deed**

---

[116] See DS2/FIN/D2: Drawdown Charges.
[117] See DS2/FEE/D4: Fee Debits.
[118] See DS/2/FIN/D3: Trade Date -1 NLV; amd D4: Trade Date NLV for example ED&F Man Equity Risk Reports in relation to the Sample Trades as of Trade Date -1 and Trade Date.
[119] See DS/2/FIN/D3: Trade Date -1 NLV; Nos: 5 and 8 for example ED&F Man Equity Risk Reports where a margin calls was required due to a PP negative NLV.

102.    ED&F Man held a charge (fixed and floating) over the Security pursuant to Clause 5 of the Security and Set off Deed.

103.    ED&F Man had a right to apply the PP's assets to satisfy any of the PP's obligations to ED&F Man pursuant to Clause 14 of the Security and Set off Deed.

**(5) ED&F Man retained a Right of Transfer**

104.    ED&F Man had the right to use all PP assets which it received pursuant to Clause 10(b)(ii) of the ED&F Man Terms. As explained at paragraphs 60.2 and 65, and with respect to the Securities referred to in the Disputed Tax Vouchers, ED&F Man only ever exercised its right of transfer after the relevant Reference Date.

105.    The PP retained (1) the right to recall equivalent security; and (2) the right to a compensation payment equivalent to a dividend where a dividend was paid on shares which had been transferred[120].

**F4. The PP ultimately paid for the Security**

106.    As explained at paragraph 60 above, the price of every Purchase Trade was debited from the PP's Custody Account.. Where there were insufficient funds in the PP's Custody  Account, this debit entry recorded cash owed by the PP to ED&F Man.

107.    The settlement debt was then extinguished on sale of the Security, when the sale price was credited to the Custody Account[121].

**F5. ED&F Man charged fees for the ED&F Man Services.**

108.    Fees paid to ED&F Man are explained at Section G below.

**(G) ED&F MAN FEES**

109.    In accordance with the Fee Agreement Letters referred to at paragraph 21.4 above, ED&F Man was entitled to charge the PPs fees in consideration for those ED&F Man Services which it provided in relation to a transaction and pursuant to the Custody Agreement, ISDA Agreement, Security and Set of Deed and ED&F Man Terms[122].

---

[120] See DS2/TRAD/D11: Dividend Reconciliation Sheet; Nos. 3 and 4; and D13: PP Dividend Receipt Entries; No.3 and No. 4.
[121] See/DS2/FIN/D5: PP Sale Payment Entries.
[122] DS2/FEE/D1: Fee Agreement Letters.

110.    The EF Desk did not operate standard fee rate for all clients when charging fees. Fees for the ED&F Man Services were agreed orally and on a bespoke basis between the EF Desk and the PPs' Investment Managers, with the PPs paying different amounts.

111.    Fees were not agreed for each Trade, nor where they agreed for each of the ED&F Man Services provided in respect of a Trade: rather a composite fee was agreed for all of the Services provided by ED&F Man in respect of all of the Trades in a specific Security and over a specific dividend window ("**a Transaction**").

112.    This agreed fee ("**the Agreed Transaction Fee**") was subsequently documented in: (1) transaction fee letters between ED&F Man and the PPs ("**Fee Letters**"[123]); and/or (2) emails between the EF Desk and the PPs' Investment Managers often including spreadsheets prepared for the PPs by ED&F Man, which itemised the profit and loss of the totality of a Transaction ("**Fee Emails**"[124]).

113.    The Agreed Transaction Fee was referred to (in the above documents) as a "*Custody Fee*", or "*EDF Fee*", and occasionally as a "*Clearance Fee*". It was calculated by reference to: (1) a percentage of the total profit made from the Transaction (100% of the dividend; plus the profit/loss of the Security and hedging; less the Transaction Costs)[125]; or (2) a percentage of the gross dividend received by the PP. The Agreed Transaction Fee varied between 27% to 50% of the Transactions profits, and between 3% and 10% of the net dividend.

114.    The Agreed Transaction Fee was paid either as a single fee at the end of the Transaction (as envisaged in the Fee Agreement Letter) or, more usually, in two tranches:

114.1.    on the Settlement Date or upon the PP's receipt of the net dividend (often referred to as an '*Upfront Fee*'[126]); and

114.2.    on completion of the Transaction, when the PP's total profit could be calculated (often referred to as a '*Behind fee*'[127]).

115.    The Agreed Transaction Fee was debited from the PP's Cash Account[128], but only once agreed by the PP's Investment Manager.

**(H) INTERMEDIARIES**

---

[123] DS2/FEE/D2: Upfront Fee Letters Nos. 2, 3, & 5; D3: Behind Fee Letters: Nos 1 and 10.
[124] DS2/FEE/D2: Upfront Fee Emails: Nos. 4 & 9; D3: Behind Fee Emails: 3 Nos 2, 3, 4, 5, 6, 7, 8, and 9.
[125] See Spreadsheets attached to the Fee Emails at DS2/FEE/D2 Nos.4 & 9; D3 Nos 2, 3, 4, 5, 6, 7,  8 & 9
[126] DS2/FEE/D2: Upfront Fee: Fee Letters and Fee Emails.
[127] DS2/FEE/D3 Behind Fee: Fee Letters and Fee Emails.
[128] DS2/FEE/D4: Fee Debits.

**H1. IM Funds**

116.    IM Funds were used by the PPs' Investment Managers to (1) source a Security from the market; and/or (2) to hedge a Security.

**(1) Sourcing shares from the market**

117.    As explained in Sections **D3 to D4** above, Investment Managers instructed the EF Desk on behalf of an IM Fund, to source a Security from the market prior to the Reference Date by means of a Borrow or Purchase (which a PP would subsequently purchase or recall as per a Purchase or Recall Trade).

118.    Two Investment Managers, Arunvill and GSFS, used IM Funds to source Securities for their PP clients in this manner. In particular:

118.1.   Arunvill used three IM Funds to source Securities for its PP clients: Massey Fund, Pollen Fund Ltd ("**Pollen**") and GSP Ltd ("**GSP**"); and

118.2.   GSFS used one: ETS Malta ("**ETS**").

119.    Further details on each of these IM Funds are set out at Appendix 2/1-4.

**(2) Hedging Securities**

120.    As explained in Section E above, Investment Managers used IM Funds to hedge a Security which had been acquired by a Purchase Trade by selling an SSF or entering into a PRS. Two Investment Managers, Arunvill and Balance, used IM Funds to hedge Securities in this manner: Arunvill used Pollen and GSP; Balance used Apex Capital ltd ("**Apex**") and Balance Overseas Holding Ltd ("**BOHL**")[129].

121.    On every occasion that these IM Funds hedged a Danish Security which had been acquired by means of a Purchase Trade, the IM Fund separately agreed to assume the relevant PP's risks in respect of the Security:

121.1.   Pollen and GSP did so by means of  Performance Guarantee Swap Agreements ("**a PGS Agreement**"), by which Pollen or GSP assumed the risk of a fall in value of the Security (and of other equities and assets) held by the PP; and

---

[129] Further details of Apex and BOHL are at Appendix 2.

121.2.    Apex and BOHL did so by means of a Deed of Guarantee ("**Guarantee**") by which they guaranteed all obligations owed by a PP to ED&F Man.

(a) PGS Agreements

122.    As set out in Appendix 2/2 every Arunvill PP hedged the risk of a fall in value of its ED&F Man held assets by entering into a PGS Agreement with ED&F Man. ED&F Man in turn entered into a back-to-back PGS Agreement on identical terms with either Pollen or GSP[130].

123.    A PGS Agreement did not convey any proprietary title, voting or dividends rights in in respect of equities: it was a principal derivative contract executed under an ISDA Master Agreement[131] pursuant to which the parties swapped over a defined period the financial '*Performance*' of a '*Referenced Asset*'.

124.    The '*Referenced Asset*' in each Arunvill PP's PGS Agreement was the entirety of its Custody Account at ED&F Man. Thus every PP's PGS Agreement hedged the performance of all equities (Danish and non-Danish) in its Equity Account with ED&F Man, and all cash (DKK and non DKK) in its Cash Account with ED&F Man[132].

125.    The '*Performance*' of a PP's Custody Account was a calculation of the value of these assets on a monthly basis during the term of the PGS Agreement, with one party contractually obliged to pay a sum in to the other depending upon whether the total asset value went above or below a defined threshold. If the value of a PP's total assets rose above the threshold, the PP would make a payment to ED&F Man, who would pass on the payment to the IM Fund pursuant to its back-to-back PGS. If the value fell below this threshold, then the IM Fund would make a payment to ED&F Man, who would pass on the payment to the PP (hence the IM Fund protecting itself against this risk by hedging against the price of equities held in a PP's Custody Account).

126.    The PGS Agreement did not fetter a PP's right to add, substitute, or remove equities from its Custody Account.

(b) Guarantees

---

[130] See Appendix 2 for example PGS for each Arunvill PP.
[131] As clients of ED&F Man, all Arunvill PPs and IM Funds executed an ISDA Agreement with ED&F Man.
[132] See page 2 of any example PGS.

127.    The PPs advised by Ballance (the partners to Cubix) protected their risk by means of Guarantees entered into between Cubix and ED&F Man with ED&F Man entering into back-to-back Guarantees on identical terms with BOHL or Apex[133].

128.    The Guarantees did not convey any proprietary title, voting or dividends rights in in respect of equities.  The Guarantees provided that at all material times Apex or BOHL unconditionally guaranteed the performance of all of Cubix's obligations to ED&F Man (including all liabilities).

### H2. Inter-dealer brokers

129.    As explained in **D3 and D4** above, each and every Purchase Trade involved the EF Desk effecting a Share Instruction by purchasing/selling shares from/to an IDB[134].

130.    The EF Desk used:

130.1.  ED&F Man's in-house IDB desk operating out of ED&F Man's London office[135];

130.2.  Volcafe Limited: an IDB based in Switzerland owned by Volcafe Holding Limited (and which shared the same ultimate parent company as ED&F Man, ED&F Man Holdings Limited[136])  ("**Volcafe**"); and

130.3.  various third party IDBs.

131.    All purchases and sales of those Securities referenced in the Disputed Tax Vouchers from/to an IDB involved the delivery of the both the Security and the purchase/sale cash between the IDB's settlement agent and the relevant Omnibus Account at ED&F Man's settlement agent.

### H3. Custodians

132.    VP Securities ("**VP**") was the Central Depository where all Danish Securities were held. At the relevant time only 5 Danish banks held accounts at VP including Nordea Bank Abp ("**Nordea**") and SEB. Therefore a chain of Custodians was used throughout the market to hold the rights to Danish Securities on account of their client.

---

[133] See Appendix 2/3.2 for example Guarantees for the Ballance PP.
[134] DS2/TRAD/D2: IDB Share Purchase Confirmations.
[135] See Appendix 2/8 for the individuals working for the ED&F Man IDB Desk; and Appendix 2/11 for the settlement agent accounts and details.
[136] See Appendix 2/9 for the individuals working for Volcafe; and Appendix 2/11 for the settlement agent accounts and details.

133. Throughout the relevant period the EF Desk used two Sub-Custodians to hold Danish shares and cash for its clients, as follows:

    133.1.  from August 2012 to April 2014, the EF Desk held Danish Cash and Securities accounts at BNP[137]. BNP did not itself have an account at VP Securities and therefore used Nordea as its Danish Custodian; and

    133.2.  from April 2014 the EF Desk held a Danish Cash and Securities account with SEB[138].

---

[137] See Appendix 2/5 and 6 for a list of BNP account numbers held.
[138] See Appendix 2/7 for a list of SEB account numbers held.