# TERMS AND CONDITIONS OF BUSINESS

## INTRODUCTION

E D & F Man Capital Markets Limited ("MCM") is authorised and regulated by the Financial Services Authority, FSA Register No. 194296. Our registered office is Cotton's Centre, Hay's Lane, London SE1 2QE. The main business of MCM is the provision of investment and custody services.

Further information may be obtained from the FSA Register by visiting the FSA website www.fsa.gov.uk/register, by telephoning 0845 606 1234 or by writing to the FSA at 25, The North Colonnade, Canary Wharf, London E14 5HS.

Please read these Terms and Conditions carefully. It is important that you retain these Terms and Conditions as your rights are governed by them.

We have internal procedures for handling complaints fairly and promptly. You may send a complaint to us by letter, telephone, email or in person to the Compliance Department. Complaints made in writing should be made for the attention of the "Complaints Officer". Please contact us if you would like further details about our complaints procedure. As a Professional Client or Eligible Counterparty, you will have no right of complaint to the Financial Ombudsman Service. We participate in the Financial Services Compensation Scheme which, for those clients that are covered ("Eligible Claimants"), pays compensation in the event of the inability of an FSA-regulated firm to pay monies due, or satisfy obligations owed, for designated business (including obligations to return client money) up to a maximum compensation limit of £50,000 for investments per Eligible Claimant.

## DEFINITIONS AND INTERPRETATION

In these Terms and Conditions, the following words and expressions have the meanings set out below (unless the context otherwise requires):

"**Affiliate**" means any affiliated company that is an undertaking in the same group as us, a representative whom we or an undertaking in the same group as us appoint, or any other person with whom we have a relationship that might reasonably be expected to give rise to a community of interest between us and them;

"**Applicable Law**" means all applicable laws and regulations of the UK;

"**Authorised Person**" means, where the account is in the name of:

- an individual: that individual;

- joint account holders: in respect of payment instructions, any of the joint account holders; and, in respect of other instructions, <u>any</u> of the joint account holders nominated in the account opening form;

- a trust: any of the trustees;

- a company: any of those officers, employees or agents whose names have been notified to us by you in writing; and

- in relation to any of the above: an agent acting on that person's behalf whose name has been notified to us by you in writing.

CONFIDENTIAL                                                                                                         ACER_00011097

"**Base Currency**" means the lawful currency of the United Kingdom;

"**Business Day**" means any day on which banks are open for general commercial business in London;

"**Disclosure Booklet**" means the booklet of regulatory and other disclosures that we may send to you from time to time;

"**Exchange Contract**" means in respect of a Transaction made between us, a matching Transaction identical in its terms to your Transaction with us, except as to the parties, which we shall have made (or arranged to have made through an intermediate broker who may be an Affiliate) on a principal-to-principal basis on an Exchange or shall have accepted the allocation of any such Transaction;

"**FSA**" means the Financial Services Authority, currently of 25 The North Colonnade, Canary Wharf, London E14 5HS, including any replacement regulatory authority;

"**FSA Rules**" means the rules and guidance of the FSA (as amended from time to time);

"**FSMA**" means the Financial Services and Markets Act 2000 (as amended from time to time);

"**LME**" means the London Metals Exchange, currently of 56 Leadenhall Street, London EC3A 2 DX;

"**LME Select**" has the meaning in the rules of the LME;

"**Market**" means any regulated market, or multilateral trading facility (as such terms are defined in the FSA Rules);

"**MCM**", "**we**" or "**us**" means E D & F Man Capital Markets Limited;

"**Relevant Rules**" means any applicable exchange or clearing house rules (as amended from time to time);

"**Ring**" each has the meaning in the rules of the LME; and

"**Transaction**" means any Transaction subject to these Terms and Conditions, and includes:

(a) a contract made on a Market or Exchange or pursuant to the Relevant Rules of a Market or an Exchange;

(b) a contract that is subject to the Relevant Rules of a Market or an Exchange;

(c) a contract which would (but for its term to maturity only) be a contract made on, or subject to the Relevant Rules of a Market or Exchange and which, at the appropriate time, is to be submitted for clearing as a contract made on, or subject to the Relevant Rules of a Market;

(d) a contract made with any other party which contract is not subject to the Relevant Rules of any Market or Exchange (an 'over the counter' contract) and in any of cases (a) to (d) being a future, option, contract for differences, spot or forward contract of any kind in

CONFIDENTIAL

relation to any commodity, financial instrument (including any security), currency, interest rate, index or any combination thereof;

(e) an Exchange Contract;

(f) a contract to buy or sell a commodity;

(g) a contract to buy or sell a security; or

(h) any other Transaction as agreed by us and you.

"**you**" and "**your**" means a person who engages with us as a client and is thereby subject to these Terms and Conditions.

References to a 'clause' mean a clause of these Terms and Conditions. References to legislation, regulations, orders or rules shall mean such legislation, regulations, orders or rules, as amended from time to time or any re-enactment or replacement legislation, regulations, orders or rules, from time to time. Clause headings are for convenience only and do not affect the interpretation of these Terms and Conditions.

## OUR SERVICES

### 1 Scope

The services to be provided are set out in these Terms and Conditions. We may provide such additional services as may be agreed between us and you in writing.

### 2 Communications with Us

(a) **Placing of instructions**

You must give us instructions:

- for Transactions: by telephone or any other means we agree with you; and

- for any other purpose: in writing (including fax, email or any other electronic means).

(b) **Authority**

We will accept instructions from any Authorised Person. If we receive conflicting instructions, we reserve the right to act on one instruction or none at all, and we will use reasonable endeavours to inform all relevant persons of this.

We shall rely on the continuing authority of an Authorised Person to act on your behalf, whether alone or with others, until we receive from you a written notice to the contrary.

We may act upon instructions given or purported to be given by an Authorised Person without enquiry as to the genuineness, authority or identity of such person.

(c) **Amendment of instructions**

CONFIDENTIAL

ACER_00011099

Once given, instructions may be withdrawn or amended only with our consent and provided that we have not acted upon them.

(d) **Execution of instructions**

We will execute Transactions in accordance with our Execution Policy, which is available on request. The Execution Policy is subject to this clause 2 and, in addition, we reserve the right to:

- refuse to accept instructions;

- not be able to enter into transactions as a result of Exchange action;

- impose conditions on carrying out an instruction;

- require you to limit the number of open positions which you may have with us;

- in our sole discretion close out any one or more Transactions in order to ensure that such position limits are maintained; and/or

- subject to the FSA Rules, aggregate transactions in respect of your portfolio with those of our own or of other clients, without asking you first. Such transactions will be allocated on a fair and reasonable basis in accordance with the FSA Rules. This process, described as "aggregation", may on occasion operate to your disadvantage, in which case we will disclose to you such disadvantage.

In the event that we refuse to accept instructions, we will use reasonable endeavours to notify and explain the reasons for this to you. We will not be liable for any expense, loss or damage incurred by you if we fail to notify you of such refusal of instructions unless this is a result of our gross negligence, bad faith, wilful default or fraud. We will further not be liable for any consequential or special damage.

Your placing of a limit order in respect of shares traded on a regulated market will be taken to be an express instruction that if the order is not immediately executed we are not required to make the order public so as to be accessible to other market participants.

(e) **Performance and settlement**

Pursuant to any Relevant Rules, you must promptly deliver all instructions, money, documents or assets as required for any Transaction, thus enabling us to perform our obligations in a timely manner (and as modified by any instruction given by us).

I. You must promptly pay such sums of money as we may require at any time in or towards the clearance of any debit balance on any of your accounts held with us.

II. If you instruct us to purchase an investment for you, and you fail to ensure that we are holding sufficient cleared funds on your behalf on the appropriate settlement date to pay in full for the investment on that date for any reason other than as a result of our negligence, wilful default or fraud, we may (in our discretion but subject to any Relevant Rules) take one or more of the following actions:

- if practicable, not execute the Transaction;

- settle the Transaction on your behalf at our expense;

CONFIDENTIAL

- sell, at the prevailing market price, sufficient of the investments for which settlement is outstanding to recover the amount of any shortfall; or

- sell, at the prevailing market price, sufficient of your other assets to recover the amount of any shortfall.

Where reasonably practicable, we will attempt to notify you before we take such action.

III. If you instruct us to sell an investment for you and we are unable to complete settlement of the Transaction on the appropriate settlement date for any reason other than our negligence, wilful default or fraud, we may, at our discretion and without prior reference to you, buy sufficient investments, at your expense, at the prevailing market price, to enable us to complete settlement of the Transaction. Where reasonably practicable, we will attempt to notify you before we take such action.

IV. In the event that we take any steps under paragraphs II or III of this clause, we will notify you of the action we have taken, together with the details of any amounts that you are required to pay as a result.

V. We will, subject to your compliance with your obligations, pay or deliver any sums or assets to you by crediting your account with us.

VI. If in any Transaction we deliver securities to you when your obligations to us have not been fully satisfied, then you will hold them on trust for us until your obligations to us are satisfied.

VII. With FX Transactions:

(i) each party will pay to the other all outstanding amounts owing by it on the date specified in the confirmation, although we will not pay if you fail, within two Business Days of our reasonable request, to give us assurance that you will be able to perform your obligations in respect of FX Transactions on that date; and

(ii) payments will be made in the same day (or be immediately available) and be freely transferable funds to a bank account notified by the relevant party to the other at least five Business Days before payment is due.

VIII. You must pay, on a full indemnity basis, any costs, claims, liabilities, expenses, fines, penalties or losses from time to time suffered or incurred by us by reason of any steps we take pursuant to this clause; any breach of these Terms and Conditions; any failure by you to duly perform your obligations in relation to any Transaction or Exchange Contract; or of us taking steps following an Event of Default.

(f) **Derivatives**

- When we enter into a Transaction on an Exchange as an intermediate broker, we will automatically be deemed to have entered into with you a matching transaction on a principal-to-principal basis on identical terms except as to the parties and price.

5

CONFIDENTIAL

ACER_00011101

- Unless we agree otherwise by way of confirmation and in the absence of earlier instructions from you to close out, each Transaction will be closed out before its expiry and settled in cash. If we do so agree:

    (i) you undertake to deliver all underlying property with full title guarantee and free of all third party rights;

    (ii) title will pass at the time the warrant/commodity is delivered except that, where we are the seller, title will remain with us until we have received full payment;

    (iii) risk will pass to you on delivery (where a commodity is in your possession before title has passed to you, you will preserve its condition and make good or fully compensate us for any damage or deterioration);

    (iv) any commodity delivered will be of satisfactory quality pursuant to any Relevant Rules;

    (v) where you intend to take physical delivery, you will notify us of this decision two Business Days in advance of the delivery date;

    (vi) costs incurred by us in effecting physical delivery will be borne by you;

    (vii) any commodity required to be delivered physically will be delivered to such location as is reasonably specified by the receiving party and in accordance with its reasonable instructions; and

    (vii) with bullion:
    - it will be held on an unallocated basis;
    - delivery will occur upon confirmation of receipt;
    - delivery to an unallocated account excludes all warranties as to title; and
    - if we become liable for any VAT on delivery, you will pay an equivalent amount to us.

- Any instruction to exercise options must be received by us before the expiration time notified to you by us (which may be on or before the expiration time established by the relevant Exchange). If you fail to so instruct us, the option may expire worthless.

- We will notify you of any profit or loss that results from closing out any transaction amounts due to us or any broker, exchange or clearing house will be due and payable upon such notification.

- Where there has been an error in the execution of your instruction, the relevant exchange may allow us to enter into an Exchange Contract in order to satisfy your instruction. In such circumstances, we will try where possible to secure and offer a price that is better than that at which the error transaction was executed.

- Where we have bought or sold in accordance with your instruction, except that we have traded the wrong delivery/expiry month or wrong exercise price of the relevant contract, then we may in accordance with any Relevant Rules offset any loss arising from that trade against any improvement achieved for you in the course of correctly satisfying your instruction, thus offering you only a net improvement, if any.

- You acknowledge and accept that:

6

(i) the relevant intermediate broker, exchange or clearing house may alter a contract's terms or liquidate it; and

(ii) the exchange or clearing house may instruct us to take an action with regard to a Transaction,

and, in either case, the Transaction between us will be automatically amended to match the relevant Exchange Contract.

- If we execute (but do not clear) Transactions, then:

   (i) the give-up will be subject to a give-up agreement entered into by you, us and your clearing broker, and this paragraph (f) will be read accordingly; and

   (ii) if your clearing broker does not accept the Transaction for clearing then the provisions of these Terms and Conditions with regard to clearing and settlement will apply.

(g) **Securities**

- We may enter into Transactions which:

   (i) will result in your having a short position, that is, a further Transaction will be necessary to fulfil your outstanding obligations to the market; or

   (ii) may be for a settlement date beyond the normal market settlement date and, accordingly, you may find yourself committed to buying or selling securities at a price which is higher or lower than the market price for other transactions entered into on the same date but for the normal market settlement date.

   In either case we may ask you to provide us with a deposit or security to cover your future obligations and may call margin or collateral of any amount at anytime under clause 10 below.

- Transactions on a delivery-versus-payment basis will be settled accordingly.

## 3 Advisory Services

MCM does not give investment advice or recommendations or provide an advisory service.

(a) **General**

All Transactions undertaken by us on your behalf are on an execution-only basis. Where you are categorised as a Professional Client and where required by the FSA Rules, we will, solely on the basis of information supplied by you (which we shall assume is accurate) assess, before it is provided, whether a proposed service is appropriate for you and, having assessed that it is, continue to make that service available to you, subject to these Terms and Conditions, unless and until you draw to our attention in writing information which reasonably indicates that such assessment ought to be changed.

We do not under any circumstances provide:

CONFIDENTIAL

ACER_00011103

- advice on the merits of a Transaction;
- a recommendation that a Transaction is suitable for you; or
- tax advice.

Views expressed to you orally or in writing concerning investments, investment strategies, markets, opportunities, situations or other matters are to be construed in all cases to constitute generic information and/or personal views and should not be construed as regulated financial services advice or recommendations.

(b) **Updating information**

On an annual basis you should update us, in writing, with any changes to the information which you have previously supplied to us, particularly if such information is likely to affect your regulatory status or client categorisation pursuant to the FSA Rules.

(c) **Research**

We or our Affiliates may from time to time provide research reports to you (but are under no obligation to do so or to send any such reports to all our customers). Where they do so, they need not see that any information they give is given either before or at the same time as it is made available to other Affiliates or to our or their employees, officers or directors. Further, you may not receive them at the same time as our other customers.

We or our Affiliates and our and their employees, officers and directors may receive, have knowledge of, act upon or use such research reports (or any conclusions expressed thereon or research or analysis upon which they are based) prior to publication or after they have been published but before they are received by our customers (e.g. because of postal delays).

*No obligation to take account of research.* We are under no obligation to take account of any reports published to our customers when we deal with you or on your behalf. Further, we are not required to ensure that our dealings with you or on your behalf take account of any such research which has been carried out for us, our Affiliates, market makers or otherwise with a view to assisting our or their own activities.

4 **Electronic Services**

(a) "**Electronic Service**" means a service provided by us for your use upon which you may view information and enter into Transactions via our and/or a third party's electronic order routing/trading system.

(b) **Our services**

At our absolute discretion we may provide you with direct access to an exchange or a closed user electronic communication network ("**ECN**") using our own computer equipment (the "**Equipment**") or otherwise. Where appropriate we may supply to you the software (the "**Software**") necessary to enable your system to interconnect with our server, the Equipment, a designated link (a "**Designated Link**") and access to our online settlement data service ("**Online Settlement Data Service**").

8

CONFIDENTIAL

ACER_00011104

We will issue a username and password to you and each person nominated by you in writing (the "**Authorised User**").

We may make such modifications, improvements or additions to the Equipment, electronic service or any part of it as we deem fit.

(c) **Your Obligations**

- As applicable to you and the type of service we provide to you, you will:

    i. comply with all of our relevant policies concerning use of the facilities outlined in clause 4(a) and (b);

    ii. take reasonable care of the Equipment and Software and not (i) interfere or tamper with, alter, amend or modify the Equipment; (ii) copy any Software; (iii) reverse compile or disassemble any Software; (iv) move the Equipment; and

        - not create or allow to be created any encumbrance over the Equipment; do or permit to be done any act which might prejudice our rights, or those of our suppliers, in the Equipment or result in it being taken from your possession;

        - maintain the accommodation, environment and facilities for the Equipment as reasonably specified by us, and use the Equipment only in accordance with the manufacturer's recommendations;

        - maintain all necessary support services;

        - run such tests and provide such information to us as we shall reasonably consider necessary;

        - only implement Transactions in accordance with Applicable Law;

        - accept any updates or modifications to Software and install and use a state-of-the-art virus detection/scanning program (in the event that you become aware of a material defect, malfunction or virus you will immediately notify us and cease to use all such electronic services until you have received permission from us);

        - use the services solely for the purpose supplied and not on behalf of any third parties without our prior written consent;

        - not sell, lease, store, re-transmit, redistribute or provide, directly or indirectly, the electronic services and Software or any component thereof to any third party;

        - provide all equipment and network services necessary;

        - ensure that your system is compatible with our Software;

        - since between us all information provided via the electronic service or incorporated Software is our exclusive and proprietary property, you agree to protect our proprietary rights in it.

9

CONFIDENTIAL

ACER_00011105

- We will assume that all Transactions entered into and communications made with your password were entered into or made by you.

- You must ensure that your password is not disclosed to any other person, and is sufficiently complex to prevent it being guessed by another person.

(d) **Withdrawal of an Electronic Service**

We may suspend or withdraw temporarily or permanently any Electronic Service.

(e) **Right Of Access**

We may, on reasonable notice, enter your premises and inspect your system and trading practices to ensure that you are carrying out electronic trading in accordance with these Terms and Conditions.

(f) **Setting Limits and Controls**

We may set limits or other controls on your ability to use electronic trading access including but not limited to: (i) the maximum order/trade amount; (ii) our total exposure to you; (iii) our overall exposure to third parties; (iv) the price of orders; and (v) as necessary or desirable to comply with Applicable Law.

(g) **Offer and Acceptance**

i. The price displayed is merely an invitation to you to make an offer.

ii. An offer is made by you clicking on the designated box within any permitted time displayed.

iii. Acceptance with a CFD (as defined in clause 7(a) below) is when we have established a hedge in the market.

(h) **Orders**

i. We shall only be responsible for the execution of orders in the circumstances where you have received a notification of receipt generated by the relevant systems and you will bear the risk of inaccuracy, loss or delay in transmission.

ii. Our electronic records and paper copies of such electronic records will be conclusive, although taped conversations will prevail.

iii. In respect of orders submitted incorrectly or erroneously, we will only accept instructions to amend or delete orders submitted by an Authorised User and only to the extent that such order has not already been executed.

iv. If such order has already been executed, you will be bound by it. In our discretion and for our protection, or for reasons of market integrity/counterparty risk, we may reverse the executed trade and you agree to co-operate in that regard and to indemnify us fully for any and all costs and losses arising therefrom.

(i) **Security**

i. We may from time to time notify you of the security procedures for accessing an Electronic Service and you agree to follow the procedures, not disclose them to any third party and maintain appropriate security arrangements for this purpose. From

10

CONFIDENTIAL

ACER_00011106

      time to time we may require you to describe and, if appropriate, adapt your arrangements in this regard.

  ii. If for any reason you suspect that such security information has been discovered by any third party, you must notify us immediately and cease to use it.

  iii. You will ensure that only Authorised Users access and use Electronic Services and you will notify us of the identity of all Authorised Users and will ensure that all Authorised Users have been given suitable training. We are under no obligation to provide training or assistance and if we do, it is at your sole risk.

(j) **Record Keeping**

Both parties will keep records in accordance with Applicable Law to demonstrate the nature of orders submitted and the time at which such orders are submitted.

(k) **Information Available through our Trading System or our Web Site**

- The display of any price quotation, volume or other information does not constitute:

  i. an offer to buy or sell; or

  ii. any guarantee that your orders will be executed at the price or market level displayed or at the level specified in your order.

- We accept no responsibility for the accuracy or completeness of any information displayed.

- We make no representations or warranties concerning the content of sites which can be accessed through our website.

- Our marketing material may be sent to you through our trading system or our web site.

(l) **Open Networks**

Although we take reasonable steps to avoid information being intercepted and read by third parties, we draw your attention to the fact that the provision of an Electronic Service over an open network, the internet, which is accessible to anybody, may result in someone other than us gaining access to information about you and your dealings with us.

**5   Our capacity**

(a) Derivatives and margined transactions: we act as your principal.

(b) Securities: other than in respect of Transactions on the London Stock Exchange, where we act as matched principal, and unless otherwise indicated in these Terms and Conditions, or agreed in writing, we act as your agent.

**6   Your capacity**

(a) General

CONFIDENTIAL

ACER_00011107

You will deal with us as a principal unless you have indicated otherwise in your application form.

(b) **Joint Accounts**

All investments will be registered jointly in the name of all account holders.

We may send communication to the primary account holder in the account opening form.

Each joint account holder will be jointly and severally liable under these Terms and Conditions.

If you selected in the account opening form to hold the account as tenants in common:

- your joint account holders' interests will be equal, unless you stated otherwise; and

- if one of you dies, the deceased's interest will vest in their estate.

Otherwise, you will hold as joint tenants and, if one of you dies, the entire interest will vest in the surviving joint tenant(s).

If one of you becomes bankrupt, we:

- will act on the instructions of the trustee in bankruptcy and other joint account holders; and

- may establish a new account in the name of the remaining non-bankrupt joint accountholder(s) and transfer their interest into the new account.

(c) **Trust accounts**

If you act as trustee of more than one trust, these Terms and Conditions will apply to you in each such capacity.

You warrant to us on the date of these Terms and Conditions and as of the date of each Transaction that:

- your account is for the benefit of the relevant trust;

- you have the right to be fully indemnified out of trust assets for obligations incurred under these Terms and Conditions; and

- you comply with clause 20(a) of these Terms and Conditions.

You will notify us in writing as soon as there are any changes in the trustee(s).

After each change of trustee(s), you will procure by way of a deed of novation that the continuing and/or incoming trustee(s) expressly adopt these Terms and Conditions and all Transactions entered into before the change.

(d) **Agents**

You may, in a form acceptable to us, appoint another person to act on your behalf.

CONFIDENTIAL

We may follow the agent's instructions and you will be liable for anything that the agent does or does not do.

You must notify us in writing as soon as you cancel or revoke an agent's authority.

(e) **FSA Classification**

We shall classify you as defined in our cover letter to you for the purposes of the FSA Rules. However and notwithstanding the absence of applicable FSA Rules, we will endeavour to provide a service that is overall effective and commercially reasonable.

7   **Equity Contracts for Differences**

(a) **Our Services**

i. We may make available an indicative price quotation for an Equity Contract for Differences ("**CFD**") and enter into such CFD with you at our absolute discretion.

ii. Where we choose to do so, the CFD will be deemed to be executed at the contract security price (where such price is the current price of the underlying reference security as determined by us from time to time) at the time a hedge/contract is matched in whole or in part by any counterparty (which may include us). The day of execution will be the first day of the term of the CFD.

iii. We will calculate the contract value of each CFD on each business day. The contract value is the contract security price multiplied by the number of underlying securities to which the CFD relates and for the purposes of this clause 7, "Business Day" means each day on which the exchange on which the CFD underlying security is principally traded is open for trading.

(b) **Payment of Differences**

i. If, on any Business Day during the term of the CFD, the current contract value is:

- higher than the previous Business Day's contract value, then the short party will pay the long party the difference; or
- lower than the previous Business Day's contract value, then the long party will pay the short party the difference, where the long party is the party who has notionally bought a CFD and the short party is the party who has notionally sold a CFD.

ii. We will debit and credit amounts owing between us to your account.

iii. All Contracts will be cash settled.

(c) **Interest**

Interest will be payable as follows:

i. The long party will pay a funding charge payable on a percentage of the contract value of each CFD; the applicable interest rates will be notified to you in the rate schedule or by a separate letter; and

13

    ii.    The charge will be calculated and accrued daily and be credited or debited from your account. The interest will be calculated on the day count basis that we deem to be appropriate in the relevant market.

(d) **Dividends/Interest**

We will make appropriate debits and/or credits to your account in respect of dividends/interest on the relevant contract security.

(e) **Closing a Contract**

    i.    If on any Business Day you wish to close any CFD (whether in whole or in part), then before the close of business on that day you must give notice of that fact to us specifying the CFD underlying security and (if only part of the CFD is to be closed) the proportion that you wish to close.

    ii.    We will use reasonable endeavours to calculate and notify to you an indicative closing price and you will immediately notify us whether or not you are willing to accept such indicative closing price. Acceptance will constitute a binding closing of the CFD on that day. If you do not immediately accept our closing price the CFD will remain in full force and effect.

(f) **Adjustments**

    i.    If we determine that any CFD underlying security has become subject to possible adjustment as a result of any event to be reasonably determined by us and which would include (but not be limited to) a merger, takeover, nationalisation, insolvency, an exchange suspension or delisting, we will determine the appropriate adjustment, if any, to be made to the contract value of that underlying equity and/or the related quantity of such equities to preserve the economic equivalent of the rights and obligations of the parties under the relevant CFD immediately prior to that event, to be effective as of the date determined by us. In the event of an exchange suspension we may at our absolute discretion close out the CFD with you at a price to be determined by us.

    ii.    We will give notice of any adjustment to you as soon as reasonably practicable after the determination thereof and such notice will be conclusive and binding in the absence of manifest error.

(g) **Rate Schedule**

We may amend the rate schedule at any time.

**8    LME Contracts**

(a) We act as broker and market maker on the London Metal Exchange ("LME"). Accordingly, when we enter into an LME contract with you, we may choose a basis of trading, including:

- entering into a back-to-back transaction on a principal-to-principal basis across the Ring or via LME Select, in which case the client contract and the back-to-back Exchange Contract will be identical or substantially similar in its terms except as to parties and price;

14

CONFIDENTIAL

ACER_00011110