# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| In re | |
|---|---|
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET 18-md-2865 (LAK) |

### PLAINTIFF SKATTEFORVALTNINGEN'S RESPONSES TO DEFENDANTS' SUPPLEMENTAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT & STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, as modified by the Court's Orders dated November 16, 2021 (ECF No. 675) and March 24, 2022 (ECF No. 745), Plaintiff Skatteforvaltningen ("SKAT") responds and objects to Defendants' Supplemental Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment as follows:

## I.    **The Plaintiff**

1.    In the event of a shortfall in the collection of tax receipts for any reason, SKAT does not suffer any financial loss. Rule 44.1 Decl. of Kasper Bech Pilgaard ("Pilgaard Decl.") ¶ 54.

**SKAT's Response:** Disputed. Dividend withholding tax refunds are paid by SKAT out of bank accounts in SKAT's name. These refunds come out of the funds SKAT collects. SKAT ultimately pays such funds into an account belonging to the Kingdom of Denmark. Joint 56.1 ¶¶ 6, 8-9. SKAT is part of the government of the Kingdom of Denmark. Joint Rule 56.1 Statement of Undisputed Material Facts in Support of Motions for Summary Judgment ("Joint 56.1," ECF No. 790) ¶ 2. SKAT is not a separate legal entity apart from the Kingdom of Denmark. Bahnsen Decl. Ex. 42 (Brøchner Dep., Apr. 20, 2021) at 29:5-12.

102860210_10

2.       SKAT is able to file claims in Denmark seeking the recovery of dividend

withholding tax previously paid out to foreign shareholders. Pilgaard Decl. ¶¶ 83-85, 91.

**SKAT's Response:** Disputed in part and disputed as to its materiality. This case does not
involve the recovery of dividend withholding tax previously paid out to foreign shareholders.
Rather, this case is about the recovery of monetary payments SKAT made to pension plans that
purported to be, but were not in fact, foreign holders of Danish securities, and that purported to
be, but were not in fact, entitled to refunds of dividend withholding tax suffered on dividends
received.

## II.      SKAT's Administration Of Dividend Withholding Tax Refunds

3.       A dedicated portion of SKAT's current website describes "five refund

requirements" with which a shareholder must comply in order to obtain a refund of Danish

dividend tax.  Declaration of Nicholas S. Bahnsen, dated April 29, 2022 ("Bahnsen Decl."), Exs.

20, 39 (Ekstrand Tr. 138:3-22).

**SKAT's Response:**  This proposed fact is not material to any issue before the court, as it cites to
a recent snapshot of SKAT's website which is not relevant to the time period of the litigation.
Further, Bahnsen Decl. Ex. 20 is not admissible.

4.       SKAT's website explains that the buyer of shares from a borrower is the

beneficial owner of the dividends and can be entitled to a refund. Bahnsen Decl. Ex. 20.

**SKAT's Response:**  This proposed fact is not material to any issue before the court. It cites to a
recent snapshot of SKAT's website which is not relevant to the time period of the litigation.
SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of
their reclaim applications was based on a series of fictitious circular trades, in which no party
ever owned the relevant Danish shares, received dividends or suffered tax on such shares.
Further, Bahnsen Decl. Ex. 20 is not admissible.

5.       SKAT's website does not provide any guidance relating to the timing of a

securities lending transaction relative to the sale of borrowed shares. *Id.*

**SKAT's Response:** This proposed fact is not material to any issue before the court. It cites to a
recent snapshot of SKAT's website which is not relevant to the time period of the litigation.
None of the defendants in the case claim to have obtained Danish securities via stock lending.
The defendants have denied knowledge that the alleged sellers from which they purportedly
purchased Danish securities were short sellers.  SKAT's case is that the defendants' claim to
ownership of the dividends that were the subject of their reclaim applications was based on a
series of fictitious circular trades, in which no party ever owned the relevant Danish shares,

2

received dividends or suffered tax on such shares. Further, Bahnsen Decl. Ex. 20 is not admissible.

6.      SKAT does not require applicants seeking refunds of dividend withholding tax to determine if SKAT collected dividend withholding tax from the company issuing the dividend.

*See id.*

**SKAT's Response:** This proposed fact is not material to any issue before the court, in part because it cites to a recent snapshot of SKAT's website which is not relevant to the time period of the litigation.  There is no evidence that SKAT did not collect withholding tax from the dividend paying companies. Further, Bahnsen Decl. Ex. 20 is not admissible.

7.      SKAT does not inform applicants seeking refunds of dividend withholding tax whether dividend withholding tax was collected by SKAT.

**SKAT's Response:** This proposed fact is not material to any issue before the court. In addition, there is no evidence that SKAT did not collect withholding tax from the dividend paying companies.

8.      SKAT does not publicly disclose the amount of dividend withholding tax SKAT collects from each dividend paying company.

**SKAT's Response:** This proposed fact is not material to any issue before the court.

9.      U.S. pension plans could not obtain reclaims of withholding tax—or gross dividends—directly from the issuers of Danish securities. *See* Bahnsen Decl. Ex. 39 (Ekstrand Tr. 72:16-18, 75:3-11).

**SKAT's Response:** This proposed fact is not material to any issue before the court.

10.      The Danish Central Securities Depository—VP Securities—is not able to pay shareholders a refund of dividend withholding tax. Bahnsen Decl. Ex. 39 (Ekstrand Tr. 73:18-22).

**SKAT's Response:** This proposed fact is not material to any issue before the court and is otherwise disputed. Certain categories of shareholders could choose to participate in the "VP-scheme" whereby VP Securities ensures that the dividends are taxed at the correct percentage at distribution so that the recipient does not have to apply for a refund. Second Weinstein Decl. Ex.

3

303 (Ministry of Taxation's Internal Audit Office (SIR) Report, dated May 30, 2013 ("2013 SIR Report")) at 5.

11.    SKAT's Form 06.003 ("Claim to Relief from Danish Dividend Tax") at all relevant times expressly required refund applicants to identify the "beneficial owner." Declaration of Andrew S. Dulberg, dated April 29, 2022 ("Dulberg Decl."), Ex. 4; Declaration of Brandon Dillman ("Dillman Decl.") Ex. 93 (Ekstrand Dep. Ex. 3016).

**SKAT's Response:** Disputed.  Form 06.003 includes a box to indicate whether the submission is made by the beneficial owner or on behalf of the beneficial owner.  Joint 56.1 ¶ 25.

12.    The purpose of SKAT's tax refund application process was to confirm that the claimant seeking the refund was the "beneficial owner." Bahnsen Decl. Ex. 39, (Ekstrand Dep. 254:4-12, 136:19-25 ("[Y]ou have to be the beneficial owner in order to claim a refund.")); *id.* Ex. 44 (Jeppesen Dep. 86:2-20, 94:18-25 ("The essential question is whether the person applying for the refund is in fact the beneficial owner."), 132:2-133:3, 139:19-140:4 ("Whether they were the beneficial owner or not is the question.")); *see also id.* Ex. 42 (Brøchner Dep. 85:4-9); *id.* Ex. 40 (Rømer Dep. 81:3-13).

**SKAT's Response:** Disputed. The statement omits key context. SKAT's tax refund application process was to confirm that the claimant seeking the refunds was entitled to a refund as set out in Joint 56.1 ¶¶ 23-25, 29-33.

13.    It is SKAT's stated position that the question of beneficial ownership is what this case is "all about." Ekstrand Dep. 232:1-14 ("But fundamentally, this is a case that is all about whether or not you are the beneficial owner of the shares where you are attempting to claim a refund . . . .").

**SKAT's Response:** Disputed. SKAT's allegations and claims are set out in its complaints.  (*See, e.g.,* Am. Compl., *SKAT v. Proper Pacific Plan*, 18-cv-04051 (SDNY), ECF No. 77.)

14.    SKAT's "operational definition" of "beneficial ownership" conformed at all times with the definition of the term under the OECD Model Treaty and its Commentaries, as reflected

in SKAT's legal guidelines. *See* Response to Interrogatory No. 11 (citing SKAT's Legal Guide on Danish Tax Matters and in the Double Taxation Treaty); *see also* Dulberg Decl. Ex. 105 (Ekstrand Dep. 50:13-21 (referring to SKAT's "legal guidelines" for a statement of what SKAT "considered to be the beneficial owner"), 76:8-77:8 , 78:1-7, 233:17-234:14); Bahnsen Decl. Ex. 44 (Jeppesen Dep. 98:16-99:15 ("[I]nformation about who the beneficial owner was and determination thereof was already in our legal guidelines.")).

**SKAT's Response:** This proposed fact is not material to any issue before the court to the extent it addresses a time period outside of the scope of the litigation. Additionally, the cited evidence does not support the statement.

15.     The "beneficial owner" of a security is not necessarily the registered owner of the security. *See* Bahnsen Decl. Ex. 47 (Sørensen Dep. 44:8-12, 49:10-51:2, 42:16-43:7 (the term "beneficial owner" does not "mean anything" to VP Securities), 58:7-12 (VP Securities does not use the term "beneficial owner"), 132:16-23, 141:13-142:7); *see also id.* Ex. 44 (Jeppesen Dep. 123:20-126:6).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Further, disputed, to the extent that beneficial ownership requires an entity to actually own shares.

## III.    SKAT Knew It Was Paying Out Refunds Blindly[1]

16.     Lisbeth Rømer was, from 2002 through her retirement in December 2013, the head of SKAT's unit responsible for the administration of dividend withholding tax reclaims. Bahnsen Decl. Ex. 40 (Rømer Tr. 28:5 – 32:9).

**SKAT's Response:** This proposed fact is not material to any issue before the court.

---

1.    SKAT disputes the defendants' characterization in this heading that SKAT knew it was paying out refunds blindly. Because it is not a proposed "statement of material fact", SKAT does not otherwise respond to the section heading.

102860210_10

17.     During the approximately 11 years Rømer was in charge of dividend tax administration, she made multiple attempts to alert senior SKAT management of problems she had identified with SKAT's process for issuing refunds of withheld dividend tax. Bahnsen Decl. Exs. 40 (Rømer Tr. 30:8-31:12, 31:24-32:2, 32:25-33:18), 41 (Daugaard Tr. 72:22-73:8 (noting his concern upon learning that Rømer's warnings had not been taken seriously)).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. Ms. Rømer testified that most of the issues she identified with SKAT's processes were either ultimately addressed or outside of SKAT's control. Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications. Weinstein Decl. Ex. 212 (Rømer Dep., June 3, 2021) at 225:5-8; 230:13-238:13.

18.     In a memo dated November 15, 2004, Rømer warned that there was no check performed by SKAT to determine whether a refund of dividend tax was made twice. Bahnsen Decl. Exs. 21, 40 (Rømer Tr. 106:6-9).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The facts predate the relevant time period of the case. Disputed. The potential issue of whether a dividend withholding tax refund payment was made twice on the same shares was based on a concern that the system permitted a shareholder to seek a refund through two different methods—the form scheme, which is the method by which all of the defendant plans submitted reclaim applications, and the bank scheme, through which none of the defendant plans submitted reclaim applications. Bahnsen Decl. Ex. 40 (Rømer Dep.), at 106:10-13, 107:16-108:10. As a result, the bank scheme is not relevant to this case and the concern expressed by Ms. Rømer in 2004 has no bearing on any issues in this case. Moreover, Ms. Rømer also confirmed that, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's regulated custodian. Further, Bahnsen Decl. Ex. 21 is not admissible.

19.     In a memo dated March 16, 2005, Rømer warned that it was not possible to confirm whether the refund claimant was the recipient of the dividend. Bahnsen Decl. Exs. 22, 40 (Rømer Tr. 122:17-23).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The memo predates the relevant time period of the case. Disputed. The statement omits key context. In addition, Ms. Rømer explained that the concern raised was due to the timing of certain events in the dividend tax administration processes, a concern which was ultimately addressed through legislation. Rømer Dep. Tr. 152:11-154:22; 236:6-24. Moreover, Ms. Rømer also confirmed

102860210_10

that, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian. Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 34:11-20, 79:9-16, 196:10-24. Further, Bahnsen Decl. Ex. 22 is not admissible.

20.    SIR is SKAT's internal audit division, sometimes known as "internal review."

Bahnsen Decl. Exs. 39 (Ekstrand Tr. 66:25–67:5), 41 (Daugaard Tr. 24: - 25:3), 42 (Brøchner Tr.

35:13-18). In 2006, SIR issued a report warning that SKAT did not satisfactorily control the

administration of dividend withholding tax refunds. Bahnsen Decl. Exs. 23, 39 (Ekstrand Tr.

239:10-21), 40 (Rømer Tr. 144:13-146:17).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The facts predate the relevant time period of the case. Disputed. The statement omits key context. The 2006 SIR report was superseded by a May 30, 2013 report, in which SIR did not have any criticisms of the controls SKAT had in place for the form scheme, stated that the administration was done in a satisfactory manner and concluded that, for example, "the planned business procedures and internal controls ensure the correct accounting registration of the refunded dividend tax to foreigners." 2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen Dep., Oct. 15, 2021) at 32:17-20, 81:7-82:3. Further, Bahnsen Decl. Ex. 23 is not admissible.

21.    In 2006, Lisbeth Rømer and others prepared a document entitled

"Problemkatalog" that identified various deficiencies within the administration of dividend

withholding tax refunds and proposed solutions to those problems. Bahnsen Decl. Exs. 24, 40

(Rømer Tr. 146:18-147:21; 152:11-153:5; 155:2-15; 159:17-160:9).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The document predates the relevant time period of the case. Ms. Rømer testified that most of the issues she identified with SKAT's processes were either ultimately addressed or outside of SKAT's control. Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications. Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 225:5-8, 230:13-238:13. Further, Bahnsen Decl. Ex. 24 is not admissible.

22.    The Problemkatalog identified both the existence of nominee (omnibus) accounts

and the practice of stock lending as potentially resulting in loss of tax revenue. Bahnsen Decl.

Ex. 43 (Zester Tr. 95:10-16).

102860210_10

**SKAT's Response:** This proposed fact is not material to any issue before the court. The facts predate the relevant time period of the case.  None of the defendants in the case claim to have obtained Danish securities via stock lending.  Disputed. The statement omits key context. Ms. Rømer testified that at no time during her employment did she believe that SKAT received fraudulent refund applications. Second Weinstein Decl. Ex. 212 (Rømer Dep.) at at 225:5-8. No one brought to the attention of Rømer any fraudulent refund applications in 2012 and 2013. *Id*. at 225:9-14.

23.    The Problemkatalog proposed that SKAT enact stricter documentation requirements for reclaim applicants to demonstrate eligibility to reclaims. Bahnsen Decl. Exs. 24, 39 (Ekstrand Tr. 246:16–248:20), 40 (Rømer Tr. 159:17-160:9).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact predates the relevant time period of the case.  Disputed.  The document did not propose SKAT enact anything.  The statement omits key context. Ms. Rømer testified that for foreign shareholders with shares in an omnibus account there was no information source within or outside of SKAT from which SKAT could have obtained information about the identities of shareholders within an omnibus account.  Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 238:17-240:14. In addition, in its 2013 Report "SIR notes that SKAT, together with other OECD countries, is working on a common net settlement of dividends to foreign shareholders and that a viable model is ready. However, SKAT is dependent on the participation of foreign banks as well as major countries joining the model. In SIR's opinion, SKAT has made a satisfactory effort in relation to introducing a joint net settlement of dividends to foreign shareholders."  2013 SIR Report at 14.  Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications.  Second Weinstein Decl. Ex. 212 (Rømer Dep.) at at 225:5-8.  Further, Bahnsen Decl. Ex. 24 is not admissible.

24.    At no time before August 2015 did SKAT change the documentation requirements associated with dividend withholding tax reclaim applications. Bahnsen Decl. Exs. 39 (Ekstrand Tr. 248:11-25), 40 (Rømer Tr. 162:9–12), 42 (Brøchner Tr. 143:16–144:5).

**SKAT's Response:.** This proposed fact is not material to any issue before the court.

25.    In 2007, SKAT's chief internal legal officer, Leif Normann Jeppesen, drafted a memorandum warning that stock lending and short sales created the risk of multiple claims to ownership of the same dividend, and that SKAT's documentation requirements in support of reclaim applications did not allow SKAT to establish the beneficial owner before paying a reclaim. Bahnsen Decl. Exs. 25, 44 (Jeppesen Tr. 123:20-125:21, 132:2-16, 133:14–23).

102860210_10

**SKAT's Response:** This proposed fact is not material to any issue before the court. The facts predate the relevant time period of the case. Disputed. None of the defendants in the case claim to have obtained Danish securities via stock lending.   SKAT does not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares submitting reclaims for the same shares.  SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such shares.  Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian. Joint 56.1Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 34:11-20, 79:9-16, 196:10-24.  Additionally, the documents cited do not support the contention. Further, Bahnsen Decl. Ex. 25 is not admissible.

26.     At the time Jeppesen drafted the warning, SKAT had not clarified who, as

between the owner who lends shares and a buyer who subsequently buys those shares from the

borrower without knowledge they are borrowed, is the beneficial owner of the dividend

associated with the shares. Bahnsen Decl. Ex. 44 (Jeppesen Tr. 123:20-25, 125:15-126:6, 132:24

– 133:3, 133:1423).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The facts predate the relevant time period of the case. Disputed.  None of the defendants in the case claim to have obtained Danish securities via stock lending.  SKAT does not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares submitting reclaims for the same shares. SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such shares and that the defendants otherwise lacked ownership of the shares and dividends. Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.

27.     In 2007, Jeppesen suggested that SKAT request information on whether the

shares subject to a reclaim application had been lent. Bahnsen Decl. Ex. 25.

**SKAT's Response:** This proposed fact is not material to any issue before the court. The facts predate the relevant time period of the case. Disputed. Mr. Jeppesen's suggestion is specific to a reclaim request made in 2006 by an applicant unrelated to the defendants.   SKAT does not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to

102860210_10

ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares submitting reclaims for the same shares. SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such dividends and that the defendants otherwise lacked ownership of the shares and dividends.  Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.  Further, Bahnsen Decl. Ex. 25 is not admissible.

28.    At no time before August 2015 was SKAT's legal guide updated to include

guidance resolving the question of who, as between the owner who lends shares and a buyer who

subsequently buys those shares from the borrower without knowledge they are borrowed, is the

beneficial owner of the dividend associated with the shares. *See* Bahnsen Decl. Ex. 50 at pp. 145

– 177 (containing relevant sections of SKAT's legal guide during the relevant period); SKAT

Response to Request for Admission No. 95.

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. None of the defendants in the case claim to have obtained Danish securities via stock lending. SKAT does not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares submitting reclaims for the same shares.  SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such dividends. Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.  Further, Bahnsen Decl. Ex. 50 is not admissible.

29.    Prior to August 2015, the SKAT website describing the requirements for a

dividend withholding tax reclaim included no statement that a claim must state whether the

shares were borrowed from or lent to others at the time when the dividend distribution was

approved. *See* Bahnsen Decl. Ex. 50 at pp. 125-127 (containing printouts of SKAT webpages).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. None of the defendants in the case claim to have obtained Danish securities via stock lending. SKAT's case is not that the defendant plans loaned the securities that were the subject of their

102860210_10

reclaim applications, but rather that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such dividends.   Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.  Further, Bahnsen Decl. Ex. 50 is not admissible.

30.    As of May 2021, SKAT's website describing the requirements for a dividend

withholding tax reclaim included a statement that a claim must state whether the shares were

borrowed from or lent to others at the time when the dividend distribution was approved.

Bahnsen Decl. Exs. 20, 39 (Ekstrand. Tr. 138:9 – 139:21).

**SKAT's Response:** This proposed fact is not material to any issue before the court. It cites to a recent snapshot of SKAT's website, which is not relevant to the time period of the litigation. Disputed. None of the defendants in the case claim to have obtained Danish securities via stock lending.  SKAT's case is not that the defendant plans loaned the securities that were the subject of their reclaim applications, but rather that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such dividends.   Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.  Further, Bahnsen Decl. Ex. 20 is not admissible.

31.    Rømer understood beneficial ownership of a dividend to require only ownership

of the shares at the time the company declares a dividend. Bahnsen Decl. Ex. 40 (Rømer Tr.

94:1922).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. For example, Ms. Rømer explained her understanding that in order to be the beneficial owner of shares in Denmark it was also necessary to be registered as an owner. Bahnsen Decl. Ex. 40 (Rømer Dep.), at 94:8-14.

32.    Dorthe Pannerup Madsen, who supervised the dividend withholding tax

administration from Rømer's retirement at the end of 2013 through August 2015, never thought

about the issue of beneficial ownership. Bahnsen Decl. Ex. 45 (Madsen Tr. 142:3-7).

102860210_10

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. Pannerup had no responsibilities for dividend withholding tax until March 2014. Second Weinstein Decl. Ex. 210 (Madsen Dep., Sept. 30, 2021) at 16:18-17:1. The statement omits key context. Ms. Pannerup stated that her job was not to delve into the subject matter from a technical standpoint but to move the team from one part of Denmark to another. She explained that from March 2014 until August 2015, she supervised Sven Nielsen who was responsible for reviewing dividend refund applications, had years of experience, and was professionally the best person to do that job. She further explained that Mr. Nielsen had a good understanding of the controls that SKAT applied before paying out a dividend withholding tax refund application and applied those controls on every withholding tax refund application he processed. *Id*. at 143:19-144:7, 147:7-24, 158:16-21.

33.    According to Jeppesen, the risk was that both the owner who lends shares and a

buyer who subsequently buys those shares from the borrower without knowledge they are

borrowed might be able to claim in good faith that each is the owner of the dividend entitled to a

reclaim. Bahnsen Decl. Ex. 44 (Jeppesen Tr. 124:2-13, 125:1-126:6).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. None of the defendants in the case claim to have obtained Danish securities via stock lending. SKAT does not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares submitting reclaims for the same shares. SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such dividends. Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian. Joint 56.1 ¶ 31, Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.

34.    Both the Ministry of Taxation and SKAT have concluded that a purchaser of

shares from a borrower of those shares is the beneficial owner of any dividends associated with

those shares. Bahnsen Decl. Exs. 20, 39 (Ekstrand Tr. 137:7-19).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. SKAT does not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares submitting reclaims for the same shares. SKAT's case is that the defendants' claim to ownership of the dividends that were the subject of their reclaim applications was based on a series of fictitious circular trades, in which no party ever owned the relevant Danish shares, received dividends or suffered tax on such dividends. Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the

102860210_10

submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31, Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.   Further, Bahnsen Decl. Ex. 20 is not admissible.

35.    In a memo dated 11 August 2008, Rømer warned that SKAT's inability to

identify foreign shareholders of Danish securities (and, therefore, the beneficial owner of shares)

persisted. Bahnsen Decl. Exs. 26, 40 (Rømer Tr. 170:17-171:13).

**SKAT's Response:**   This proposed fact is not material to any issue before the court.  The facts predate the relevant time period of the case. Disputed.  The statement omits key context, including the conclusions of SIR in its 2013 Report that "SIR notes that SKAT, together with other OECD countries, is working on a common net settlement of dividends to foreign shareholders and that a viable model is ready. However, SKAT is dependent on the participation of foreign banks as well as major countries joining the model. In SIR's opinion, SKAT has made a satisfactory effort in relation to introducing a joint net settlement of dividends to foreign shareholders." 2013 SIR Report at 14. Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications. Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 225:5-8.  Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24. Ms. Rømer further testified that for foreign shareholders with shares in an omnibus account there was no information source within or outside of SKAT from which SKAT could have obtained information about the identities of shareholders within an omnibus account. Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 238:17-240:14.  Further, Bahnsen Decl. Ex. 26 is not admissible.

36.    In a memo dated 2 December 2009 and submitted to SIR in connection with an

audit of the dividend tax administration, Rømer warned that it was not possible to ensure the

accuracy of dividend reclaims paid to foreign shareholders. Bahnsen Decl. Ex. 27.

**SKAT's Response:** This proposed fact is not material to any issue before the court.  The facts predate the relevant time period of the case. Disputed.  The statement omits key context. Ms. Rømer testified that for foreign shareholders with shares in an omnibus account there was no information source within or outside of SKAT from which SKAT could have obtained information about the identities of shareholders within an omnibus account.  Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 238:17-240:14. In addition, in its 2013 Report "SIR notes that SKAT, together with other OECD countries, is working on a common net settlement of dividends to foreign shareholders and that a viable model is ready. However, SKAT is dependent on the participation of foreign banks as well as major countries joining the model. In SIR's opinion, SKAT has made a satisfactory effort in relation to introducing a joint net settlement of dividends to foreign shareholders." 2013 SIR Report at 14. Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications.

102860210_10

Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 225:5-8.  Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31, Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24.   Further, Bahnsen Decl. Ex. 27 is not admissible.

37.     In connection with the same audit, Rømer explained to SIR that SKAT had, for

years, been paying a great deal of money in the form of dividend tax reclaims without any real

possibility of checking that the correct amounts are paid, and that she feared "a huge gap in

dividend taxation." Bahnsen Decl. Exs. 28, 40 (Rømer Tr. 186:17–187:18).

**SKAT's Response:** This proposed fact is not material to any issue before the court.  The facts predate the relevant time period of the case. Disputed.  The statement omits key context. Ms. Rømer testified that for foreign shareholders with shares in an omnibus account there was no information source within or outside of SKAT from which SKAT could have obtained information about the identities of shareholders within an omnibus account.  Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 238:17-240:14.  In addition, in its 2013 Report "SIR notes that SKAT, together with other OECD countries, is working on a common net settlement of dividends to foreign shareholders and that a viable model is ready. However, SKAT is dependent on the participation of foreign banks as well as major countries joining the model. In SIR's opinion, SKAT has made a satisfactory effort in relation to introducing a joint net settlement of dividends to foreign shareholders."  2013 SIR Report at 14.  Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications. Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 225:5-8.  Moreover, for each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31, Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24. Further, Bahnsen Decl. Ex. 28 is not admissible.

38.     In May 2010, SIR issued another report highlighting deficiencies in SKAT's

administration of dividend withholding tax refunds. Bahnsen Decl. Ex. 30.

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact predates the relevant time period of the case. Disputed.  The statement omits key context. The 2010 SIR report was superseded by a May 30, 2013 report, in which SIR did not have any criticisms of the controls SKAT had in place for the form scheme, stated that the administration was done in a satisfactory manner and concluded that, for example, "the planned business procedures and internal controls ensure the correct accounting registration of the refunded dividend tax to foreigners."  2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen Dep.) at 32:17-20, 81:7-82:3. Further, Bahnsen Decl. Ex. 30 is not admissible.

102860210_10

39.    The 2010 SIR report followed a request by the then-head of the Department of the

Ministry of Taxation, Peter Loft, that SIR investigate whether SKAT had refunded more

dividend tax to foreign shareholders than was paid to SKAT. Bahnsen Decl. Exs. 29 (at ¶ 66), 40

(Rømer Tr. 176:7-21, 178:6-14), 41 (Daugaard Tr. 54:3-55:13).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact
predates the relevant time period of the case. Disputed.  The statement omits key context. The
2010 SIR report was superseded by a May 30, 2013 report, in which SIR did not have any
criticisms of the controls SKAT had in place for the form scheme, stated that the administration
was done in a satisfactory manner and concluded that, for example, "the planned business
procedures and internal controls ensure the correct accounting registration of the refunded
dividend tax to foreigners."  2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen
Dep.) at 32:17-20, 81:7-82:3.  Ms. Rømer also testified that at no time during her employment
did she believe that SKAT received fraudulent refund applications. Bahnsen Decl. Ex. 40
(Rømer Dep.), at 225:5-8. Further, Bahnsen Decl. Ex. 29 is not admissible.

40.    The 2010 SIR report identified the risk that SKAT might be refunding dividend

taxes more than once per dividend on account of its inability to identify the correct beneficial

owner of the dividend. Bahnsen Decl. Exs. 30, 40 (Rømer Tr. 198:18–199:10), 41 (Daugaard Tr.

107:19-25, 116:7-117:1, 122:10-13, 123:16-21, 188:10-25).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact
predates the relevant time period of the case. Disputed. The statement omits key context. The
2010 SIR report was superseded by a May 30, 2013 report, in which SIR did not have any
criticisms of the controls SKAT had in place for the form scheme, stated that the administration
was done in a satisfactory manner and concluded that, for example, "the planned business
procedures and internal controls ensure the correct accounting registration of the refunded
dividend tax to foreigners." 2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen
Dep.) at 32:17-20, 81:7-82:3.  Ms. Rømer also testified that at no time during her employment
did she believe that SKAT received fraudulent refund applications. Bahnsen Decl. Ex. 40
(Rømer Dep.), at 225:5-8. SKAT does not allege, nor do any defendants claim, that SKAT paid
refunds based on multiple claims to ownership of the same dividend due to a stock lender and an
ultimate buyer of borrowed shares submitting reclaims for the same shares.  Further, Bahnsen
Decl. Ex. 30 is not admissible.

41.    The author of that 2010 SIR report characterized it as a flashing red light warning

to SKAT. Bahnsen Decl. Ex. 41 (Daugaard Tr. 148:4 – 16).

102860210_10

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact predates the relevant time period of the case. Disputed. The statement omits key context. The 2010 SIR report was superseded by a May 30, 2013 report, in which SIR did not have any criticisms of the controls SKAT had in place for the form scheme, stated that the administration was done in a satisfactory manner and concluded that, for example, "the planned business procedures and internal controls ensure the correct accounting registration of the refunded dividend tax to foreigners." 2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen Dep.) at 32:17-20, 81:7-82:3.

42.    By December 21, 2010, SKAT had not formed a working group to address the issues identified in the 2010 SIR report. Bahnsen Decl. Ex. 41 (Daugaard Tr. 131:20-132:1).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact predates the relevant time period of the case. Disputed. The statement omits key context. The 2010 SIR report was superseded by a May 30, 2013 report, in which SIR did not have any criticisms of the controls SKAT had in place for the form scheme, stated that the administration was done in a satisfactory manner and concluded that, for example, "the planned business procedures and internal controls ensure the correct accounting registration of the refunded dividend tax to foreigners." 2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen Dep.) at 32:17-20, 81:7-82:3.

43.    In an October 4, 2011 written warning, Rømer warned of the possibility of dividend withholding tax refund fraud flowing from SKAT's inability to identify the foreign recipient of dividends. Bahnsen Decl. Exs. 31, 39 (Ekstrand Tr. 261:3-22).

**SKAT's Response:** This proposed fact is not material to any issue before the court. The fact predates the relevant time period of the case.  Disputed.  The statement omits key context. Ms. Rømer testified that for foreign shareholders with shares in an omnibus account there was no information source within or outside of SKAT from which SKAT could have obtained information about the identities of shareholders within an omnibus account.  Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 238:17-240:14.  Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications.  Bahnsen Decl. Ex. 40 (Rømer Dep.) at 225:5-8. Further, Bahnsen Decl. Ex. 31 is not admissible.

44.    In 2013, SIR issued a further report identifying deficiencies with SKAT's administration of dividend withholding taxes. Bahnsen Decl. Exs. 32, 40 (Rømer Tr. 212:1-5 (noting the same problems as identified in 2010 SIR report were still pending in 2013)).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed.  In the May 30, 2013 report, SIR did not have any criticisms of the controls SKAT had in place for the form scheme, stated that the administration was done in a satisfactory manner and concluded

102860210_10

that, for example, "the planned business procedures and internal controls ensure the correct accounting registration of the refunded dividend tax to foreigners." 2013 SIR Report at 6; Second Weinstein Decl. Ex. 214 (J. Sørensen Dep.) at 32:17-20, 81:7-82:3. The deficiencies identified in the 2013 SIR report relate not to the form scheme, which is the method by which the defendant plans submitted their fraudulent reclaim applications to SKAT, but to the bank scheme, which was a different methodology for submission of reclaim applications to SKAT, not used by defendants.  Second Weinstein Decl. Ex. 203 (Brøchner Dep., April 29, 2021) at 126:10-127:9.  Further, Bahnsen Decl. Ex. 32 is not admissible.

45.    The 2013 SIR Report was not received by the Ministry of Taxation's permanent secretary and chief administrative officer, Jens Brochner, as a result of "a regrettable mistake of procedures in the department." Bahnsen Decl. Ex. 42 (Brøchner Tr. 119:24–120:4, 136:16–18).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. The statement omits key context. Jens Brøchner testified that the 2013 SIR Report was sent according to the normal procedures to the responsible management in SKAT and to the National Audit Office, and that Brøchner would not have taken separate or specific steps in response to the report, as the report did not raise particular criticism. Bahnsen Decl. Ex. 42 (Brøchner Dep.), at 136:16-137:12.

46.    SKAT used a computer system to verify the amount of taxes, including dividend withholding taxes, that companies owed to SKAT. Bahnsen Decl. Ex. 39 (Ekstrand Tr. 105:19-106:3).

**SKAT's Response:** This proposed fact is not material to any issue before the court. There is no evidence that SKAT did not collect withholding tax from the issuing companies.

47.    Within the system, SKAT maintained data purportedly reflecting the total value of dividends paid in a given year. Bahnsen Decl. Ex. 39 (Ekstrand Tr. 113:14-17).

**SKAT's Response:** This proposed fact is not material to any issue before the court. There is no evidence that SKAT did not collect withholding tax from the issuing companies.

48.    According to the information in SKAT's system, Novo Nordisk issued dividends worth slightly more than 10 billion kroner. Bahnsen Decl. Ex. 39 (Ekstrand Tr. 110:23-111:1).

**SKAT's Response:** This proposed fact is not material to any issue before the court, and does not identify any time period against which to assess it. The information cited to does not clarify whether it refers to one or more of Novo Nordisk A-shares, B-shares, and/or ADRs.

102860210_10

49.     According to Novo Nordisk's annual report, it issued dividends worth more than

12.9 million kroner in 2014. Bahnsen Decl. Ex. 34.

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed.
The report says that Novo Nordisk issued 11.9 billion kroner in dividends in 2014. Bahnsen
Decl. Ex. 34 at 61. Further, Bahnsen Decl. Ex. 34 is not admissible.

50.     According to Novo Nordisk's annual report, 30% of its shareholders resided in

North America. Bahnsen Decl. Exs. 34, 39 (Ekstrand Tr. 117:9-12).

**SKAT's Response:** This proposed fact is not material to any issue before the court, and does not
identify any time period against which to assess it. Further, Bahnsen Decl. Ex. 34 is not
admissible, and it is unknown how the purported calculation was performed.

51.     To the extent SKAT purported to apply controls and procedures to its

administration of dividend withholding tax, those efforts did not include any analysis of

beneficial ownership, whether the purchaser bought borrowed shares, whether the shareholder

had loaned the shares, or whether anyone else had previously sought a refund for the shares in

question. Bahnsen Decl. Ex. 45 (Madsen Tr. 150:1-13, 162:22-163:20); Dulberg Decl. Ex. 11.

**SKAT's Response:** This proposed fact is not material to any issue before the court. SKAT does
not allege, nor do any defendants claim, that SKAT paid refunds based on multiple claims to
ownership of the same dividend due to a stock lender and an ultimate buyer of borrowed shares
submitting reclaims for the same shares.  SKAT's case is that the defendants' claim to ownership
of the dividends that were the subject of their reclaim applications was based on a series of
fictitious circular trades, in which no party ever owned the relevant Danish shares, received
dividends or suffered tax on such dividends and that the defendants otherwise lacked ownership
of the shares and dividends.  Moreover, for each reclaim application received, SKAT required
confirmation of the claimant's entitlement to a refund through the submission of a dividend
credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212
(Rømer Dep.) at 34:11-20, 79:9-16, 196:10-24. Further, Dulberg Decl. Ex. 11 is not admissible.

52.     Denmark's State Prosecutor for Serious Economic and International Crime

(SØIK) provided information to SKAT related to the alleged dividend withholding tax fraud.

Dulberg Decl. Ex. 102 (Ahlefeld-Engel Tr. 59:1-60:10).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed.
Ms. Ahlefeld-Engel testified that SØIK provided very limited information to SKAT, such as the

102860210_10

status of freezing of certain assets.  Dulberg Decl. Ex. 102 (Ahlefeld-Engel Dep., Sept. 24, 2021) at 59:1-13.)

53.    In September 2015, following an August 29, 2015 request that SIR investigate "presumed fraud" in connection with dividend withholding tax refunds, SIR issued another report. Bahnsen Decl. Ex. 37; Dulberg Decl. Ex. 2 (Response to Request for Admission No. 86).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Further, Bahnsen Decl. Ex. 37 is not admissible.

54.    The 2015 SIR report concluded that SKAT had not yet implemented a number of important recommendations that allow for SKAT to make sure that dividend tax is not wrongfully refunded. Bahnsen Decl. Ex. 37; Dulberg Decl. Ex. 2 (Response to Request for Admission No. 86).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. Ms. Rømer testified that most of the issues she identified with SKAT's processes were either ultimately addressed or outside of SKAT's control.  Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications. Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 225:5-8, 230:13-238:13.  Further, Bahnsen Decl. Ex. 37 is not admissible.

55.    The 2015 SIR report concluded that SKAT does not check whether the recipient of the dividend held the shares when the distribution was made. Bahnsen Decl. Ex. 37; Dulberg Decl. Ex. 2 (Response to Request for Admission No. 86).

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed. For each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian. Joint 56.1 ¶ 31, Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 34:11-20, 79:9-16, 196:10-24. Ms. Rømer also testified that at no time during her employment did she believe that SKAT received fraudulent refund applications.  Second Weinstein Decl. Ex. 212 (Rømer Dep.), at 225:5-8; 230:13-238:13. Further, Bahnsen Decl. Ex. 37 is not admissible.

56.    The 2015 SIR report concluded that limitations on the information reported to SKAT about stocks held in omnibus accounts meant that in the majority of cases, SKAT does not have information about the individual dividend recipient to allow for a control of the veracity

102860210_10

of the reclaim application. Bahnsen Decl. Ex. 37; Dulberg Decl. Ex. 2 (Response to Request for

Admission No. 86).

**SKAT's Response:** Disputed. The statement omits key context. Ms. Rømer testified that for
foreign shareholders with shares in an omnibus account there was no information source within
or outside of SKAT from which SKAT could have obtained information about the identities of
shareholders within an omnibus account. Second Weinstein Decl. Ex. 212 (Rømer Dep.), at
238:17-240:14. However, for each reclaim application received, SKAT required confirmation of
the claimant's entitlement to a refund through the submission of a dividend credit advice from
the claimant's custodian. Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at
34:11-20, 79:9-16, 196:10-24. Ms. Rømer also testified that at no time during her employment
did she believe that SKAT received fraudulent refund applications. Second Weinstein Decl. Ex.
212 (Rømer Dep.) at 225:5-8; 230:13-238:13. Further, Bahnsen Decl. Ex. 37 is not admissible.

57.    The Danish National Audit Office (*Rigsrevisionen*) issued a report in 2016

concluding that the 2010 SIR report clearly warned about problems with reimbursement of

dividend tax. Bahnsen Decl. Exs. 29 (at ¶ 69), 41 (Daugaard Tr. 139:15-23; 140:2-4 (agreeing

with the National Audit Office's conclusion)).

**SKAT's Response:** Disputed. The 2010 SIR report was superseded by a May 30, 2013 report, in
which SIR did not have any criticisms of the controls SKAT had in place for the form scheme,
stated that the administration was done in a satisfactory manner and concluded that, for example,
"the planned business procedures and internal controls ensure the correct accounting registration
of the refunded dividend tax to foreigners." 2013 SIR Report at 6; Second Weinstein Decl. Ex.
214 (J. Sørensen Dep.) at 32:17-20, 81:7-82:3. The National Audit Office report was issued after
the fraud was detected. Brøchner testified that the Danish National Audit Office did not read it as
a report with serious criticism, that it does not say anything about fraud in the report, and that the
conclusion was a rationalization in hindsight. Second Weinstein Decl. Ex. 203 (Brøchner Dep.)
at 129:2-5, 133:11-21. Further, Bahnsen Decl. Ex. 29 is not admissible.

58.    The Rigsrevisionen report noted that the Ministry of Taxation's awareness of the

inability to identify the foreign owners of shares held in omnibus accounts was among the

reasons that the Ministry, in February 2010, decided to participate in the OECD TRACE project.

Bahnsen Decl. Ex. 29 at ¶ 67.

**SKAT's Response:** This proposed fact is not material to any issue before the court. Further,
Bahnsen Decl. Ex. 29 is not admissible.

102860210_10

59.    The Rigsrevisionen report concluded that the Ministry of Taxation implemented

no compensating controls to address the inability to identify foreign owners of shares held in

omnibus accounts during the period that SKAT pursued the OECD TRACE project. *Id.* at ¶ 68.

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed.
Ms. Rømer testified that most of the issues she identified with SKAT's processes were either
ultimately addressed or outside of SKAT's control.  Ms. Rømer also testified that for foreign
shareholders with shares in an omnibus account there was no information source within or
outside of SKAT from which SKAT could have obtained information about the identities of
shareholders within an omnibus account.  Second Weinstein Decl. Ex. 212 (Rømer Dep.), at
238:17-240:14.  For each reclaim application received, however, SKAT required confirmation of
the claimant's entitlement to a refund through the submission of a dividend credit advice from
the claimant's custodian. Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.), at
34:11-20, 79:9-16, 196:10-24. Ms. Rømer also testified that at no time during her employment
did she believe that SKAT received fraudulent refund applications.  Second Weinstein Decl. Ex.
212 (Rømer Dep.) at 225:5-8; 230:13-238:13.  The National Audit Office report was issued after
the fraud was detected. Brøchner testified that the Danish National Audit Office did not read the
SIR 2013 report as serious criticism, that it does not say anything about fraud in the report, and
that the conclusion was a rationalization in hindsight. Second Weinstein Decl. Ex. 203 (Brøchner
Dep.), at 129:2-5, 133:11-21. Further, Bahnsen Decl. Ex. 29 is not admissible.

60.    The Rigsrevisionen report concluded that the 2013 SIR Report pointed to a

general need for SKAT to protect itself better from wrongful reimbursement of dividend tax. *Id.*

at ¶ 45.

**SKAT's Response:** This proposed fact is not material to any issue before the court. Disputed.
The criticisms in the 2013 SIR report concern the bank scheme, which was not used by the
defendant pension plans. Second Weinstein Decl. Ex. 203 (Brøchner Dep.) at 136:1-9. In the
May 30, 2013 report, SIR did not have any criticisms of the controls SKAT had in place for the
form scheme, stated that the administration was done in a satisfactory manner and concluded
that, for example, "the planned business procedures and internal controls ensure the correct
accounting registration of the refunded dividend tax to foreigners."  2013 SIR Report at 6;
Second Weinstein Decl. Ex. 214 (J. Sørensen Dep.) at 32:17-20, 81:7-82:3.  Further, Bahnsen
Decl. Ex. 29 is not admissible.

61.    Jette Zester, one of the authors of the Problemkatalog, was not surprised to learn

of alleged dividend tax reclaim fraud because she had identified that SKAT did not always know

the beneficial owner of a dividend while at SKAT and raised that issue in the Problemkatalog.

Bahnsen Decl. Ex. 43 (Zester Tr. 123:3-23).

102860210_10

**SKAT's Response:** Disputed. Jette Zester explained that the issue with the unidentical deadlines for reporting dividend recipients and declaring dividend and dividend tax was solved in 2013. The issue with identifying foreign shareholders in omnibus accounts was a global issue that SKAT could not fix on its own.  Second Weinstein Decl. Ex. 222 (Zester Dep., Sept. 22, 2021) at 124:18-125:2; 133:3-11.  For each reclaim application received, SKAT required confirmation of the claimant's entitlement to a refund through the submission of a dividend credit advice from the claimant's custodian.  Joint 56.1 ¶ 31; Second Weinstein Decl. Ex. 212 (Rømer Dep.) at 34:11-20, 79:9-16, 196:10-24.

## IV.    The Solo Pension Plans

62.    The RJM Plan's trust provides that: "The assets purchased, acquired and retained

by the Trustee for investment may include . . . every kind of property . . . including . . .

government obligations, corporation obligations of every kind, preferred and common stocks . . .

buy and sell call and put options, and limited partnership interests . . . ." Bahnsen Decl. Ex. 51.

**SKAT's Response:** Disputed in so far as it misrepresents the full provisions of the RJM Plan's trust agreement.  In full, the section quoted above states that the trustee has the power to:

> To invest and re-invest Trust assets and to purchase or acquire and retain for the account of the Trust such properties *as people of prudence, discretion and intelligence purchase for their own account, in accordance with the standards set forth in Article XII of this Agreement*. The assets purchased, acquired and retained by the Trustee for investment may include, but not by way of limitation, every kind of property, real, personal and mixed and interests therein, specifically including, but not by way of limitation, government obligations, corporate obligations of every kind, preferred and common stocks (including the stock of a corporate Trustee), buy and sell call and put options, and limited partnership interests, *all in a manner conforming with the then existing law*.

Bahnsen Decl. Ex. 51 at Bates ending -356 (emphasis added).  Further, Section XII of the trust agreement states:

> The Trustee shall have the power to pay out of the Trust assets *all reasonable expenses* of administration including, without limitation, fees paid to accountants, actuaries, appraisers and attorneys.

Bahnsen Decl. Ex. 51 at Bates ending -362 (emphasis added).

63.    The Basalt Plan's trust provisions authorize the trustee to "Invest and reinvest . . .

in any property . . . . whether or not productive of income . . . including, without limitation,

common and preferred stock, bonds, notes . . . without being limited to the classes of property in

102860210_10

which trustees are authorized by law or any rule of court to invest trust funds and without regard

to the proportion any such property may bear to the entire amount of the Trust Fund." Dulberg

Decl. Ex. 18 (JHVM_0009979 – JHVM_0009980).

**SKAT's Response:** Disputed. First, the cited plan formation document became effective in 2016, *i.e.* after each of the Basalt Plan's submissions to SKAT and payments by SKAT to the plan. Second, the quotation misrepresents the full provisions of the Basalt Plan's plan formation document. Section 10.01(c) of the plan formation document effective from 2014 through 2015, in relevant part, states:

> The Trustee shall discharge its assigned duties and responsibilities under this Article and the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Second Weinstein Decl. Ex. 269 (JHVM_0003265 at -3320).

64.    The Roadcraft Plan's trust provisions authorize the trustee to "Invest and reinvest

. . . in any property . . . . whether or not productive of income . . . including, without limitation,

common and preferred stock, bonds, notes . . . without being limited to the classes of property in

which trustees are authorized by law or any rule of court to invest trust funds and without regard

to the proportion any such property may bear to the entire amount of the Trust Fund." Dulberg

Decl. Ex. 20 at WH_MDL_00139411-12; *see also* Bahnsen Decl. Ex. 52 (purpose of LLC is to

"invest in property of any kind, domestic or foreign . . . by any method . . . .").

**SKAT's Response:** Disputed. First, the cited plan formation document became effective in 2016, after each of the Roadcraft Plan's submissions to SKAT and payments by SKAT to the plan. Second, the quotation misrepresents the full provisions of the Roadcraft Plan's plan formation document. Section 10.01(c) of the plan formation document effective from 2014 through 2015, in relevant part, states:

> The Trustee shall discharge its assigned duties and responsibilities under this Article and the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Second Weinstein Decl. Ex. 275 (MBJ_0028887 at -8942).  Further, the citation to the Roadcraft Technologies LLC's operating agreement (Bahnsen Decl. Ex. 52) is irrelevant because the

102860210_10

purported purpose of the LLC cannot rectify acts by a pension plan that render the plan disqualified.

65.     The IRS is the federal agency with the primary authority to determine a retirement

plan's tax qualified status. Bahnsen Decl. Ex. 87 (Wagner Rebuttal ¶ 7).

**SKAT's Response:** This is a conclusion of law, which is not permitted in a Rule 56.1 statement. Further, the statement misrepresents the law as presented in Ms. Wagner's report:  The cited section of the report makes clear that "The IRS is not the sole party that can determine the tax-qualified status of a [pension] plan;" that "a plan can cease to be tax-qualified in the absence of an IRS determination to that effect"; and that Federal courts can also determine whether a plan is tax qualified under the Internal Revenue Code ("IRC").  Bahnsen Decl. Ex. 87 (Wagner Rebuttal) ¶ 7 and the section heading prior to ¶ 7.

66.     To be qualified as tax-exempt, a U.S. pension plan must be formed and operated

in accord with specific, objective requirements set out in section 401(a) of the Internal Revenue

Code. There are no other requirements for qualification. Bahnsen Decl. Ex. 10 at ¶ 9.

**SKAT's Response:** Disputed. This is a conclusion of law, which is not permitted in a Rule 56.1 statement.  The statement is also wrong as a matter of law.  To be tax qualified plans must comply with numerous provisions of the IRC, including, *inter alia*, section 401(d), which reads:

> A trust forming part of a pension or profit-sharing plan which provides contributions or benefits for employees some or all of whom are owner-employees shall constitute a qualified trust under this section only if, *in addition to meeting the requirements of subsection (a),* the plan provides that contributions on behalf of any owner-employee may be made only with respect to the earned income of such owner-employee which is derived from the trade or business with respect to which such plan is established.

26 U.S.C. § 401(d) (emphasis added).  Plans must also comply, *inter alia*, with any binding rulings by Federal courts and the IRC and the Code of Federal Regulations, including, for example, Treasury Regulation section 1.401-1(b)(2), which states in part:

> To be a profit-sharing plan, there must be recurring and substantial contributions out of profits for the employees.

26 C.F.R. § 1.401-1(b)(2).

67.     The issuance of a formal determination or opinion letter establishes that the IRS

considers a plan to be tax-qualified in its form. Bahnsen Decl. ex. 87 (Wagner Rebuttal ¶ 7); *id.*

Ex. 10 at ¶ 11.

24

**SKAT's Response:** This is a conclusion of law, which is not permitted in a Rule 56.1 statement. Further, this statement is inapplicable to the Solo Bellwether Plans, all of which were so-called volume submitter plans. Providers of volume submitter plans

> seek and receive approval from the IRS that their protype or volume submitter plan formation documents meet the requirements of the [Internal Revenue] Code. This approval is provided in opinion letters from the IRS. The providers can then use the prototype plan as a template to assist customers in forming their own solo 401(k) or other pension plans. The plan providers will often provide the relevant IRS opinion letters to their customers along with the plan formation documents. These letters state that the plan sponsors may rely on such documents as to their form but routinely include a caveat as to the plan's operation.

Second Weinstein Decl. Ex. 228 (Expert Report of Marcia S. Wagner, dated Dec. 31, 2021 ("Wagner Report") ¶ 120 (citation omitted).

68.     It is not impermissible for a plan to invest in a partnership and receive its

allocable share of partnership profits. Bahnsen Decl. Ex. 87 (Wagner Rebuttal ¶ 20).

**SKAT's Response:** This is a conclusion of law, which is not permitted in a Rule 56.1 statement. Further, the statement is too broad to be relevant the present case, and the statement is untrue as to the partnership involving the Roadcraft Plan.  Under the Roadcraft Plan's partnership agreement, the three partners were required to make only *de minimus* capital contribution: $70 for the Routt Capital Trust, $25 for the RAK Investment Trust, and $5 for the Roadcraft Plan. Second Weinstein Decl. Ex. 291 (Roadcraft Partnership Agreement) at §2.  Moreover, there is no evidence that either the Routt Capital Trust or the RAK Investment Trust ever made these nominal capital contributions.  *See* Second Weinstein Decl. Ex. 287.  Instead, the only contribution to the Roadcraft Plan's partnership was a $100 deposit made by Ronald Altbach ("Altbach") in his individual capacity."  *Id*. at RC00000059; Second Weinstein Decl. Ex. 201 (Altbach Dep., Oct. 30, 2020) at 148:23 – 149:4.

69.     It is permissible under the Internal Revenue Code for sponsors to establish

multiple pension plans. Bahnsen Decl. Ex. 87 (Wagner Rebuttal ¶ 27).

**SKAT's Response:** This is a conclusion of law, which is not permitted in a Rule 56.1 statement. Further, the statement misrepresents the law and Ms. Wagner's report: While there is technically no prohibition on the number of plans an individual can sponsor, there is little reason to have multiple plans because the cap on an individual's yearly contributions are aggregated across all the plans in which that individual is a participant.  Wagner Report ¶ 99.  That the plan participants here created multiple plans because Sanjay Shah directed them to do so to take part in the scheme, *see, e.g.*, Weinstein Decl. Ex. 82 (Klugman Dep.), at 23:4-13, further suggests that the Solo Bellwether Plans were not created or operated in accordance with the conditions set forth by the IRS for tax exempt status.  Second Weinstein Decl. Ex. 227 (Expert Reply Report of Marcia Wagner, dated February 28, 2022 ("Wagner Reply")) ¶ 55.

102860210_10

70.     Engaging in a prohibited transaction is not grounds for the IRS to disqualify a

plan. Bahnsen Decl. Ex. 88 (Wagner Report ¶¶ 105, 113); *id*. Ex. 87 (Wagner Rebuttal ¶ 16).

**SKAT's Response:** This is a conclusion of law, which is not permitted in a Rule 56.1 statement. Further, the statement misrepresents the law as presented in Ms. Wagner's report, which makes clear that "the fact that a plan has engaged in a prohibited transaction is no bar to its disqualification based on the same set of facts that gave rise to the prohibited transaction." Wagner Reply ¶ 52; *see also* Second Weinstein Decl. Ex. 220 (Wagner Dep., April 14, 2022.), at 131:23 – 133:1. Ms. Wagner is also clear that the Bellwether Plans were disqualified because they paid out the majority of the refunds to others in the scheme. Wagner Report ¶¶ 125 – 127. These acts constitute both prohibited transactions and disqualifying violations of the exclusive benefit rule (IRC section 401(a)). Wagner Reply ¶ 52, 220 (Wagner Dep.) at 131:23 – 133:1.

71.     The RJM audit lasted almost two years. *Compare* Dulberg Decl. Ex. 16 at

WH_MDL_00356182 *with id.* Ex. 50 at WH_MDL_00358607.

**SKAT's Response:** Disputed and unsupported by the citations. The IRS conducted an audit of the RJM Plan's filing of its Form 5500-EZ for the year 2016.[2] The IRS notified the RJM Plan about the audit on March 21, 2018. Dulberg Decl. Ex. 16 at WH_MDL_00356182. The RJM Plan made its last submission to the IRS on April 9, 2019. Second Weinstein Decl. Ex. 299. On February 3, 2020, the IRS issued a "no change" letter informing the RJM Plan that no changes were necessary to its Form 5500-EZ for the year of 2016. Dulberg Decl. Ex. 32 (WH_MDL_00358606 at -607).

72.     In the course of the audit, the IRS received information relating to Avanix

Management LLC Roth 401(k) Plan, Batavia Capital Pension Plan, Battu Holdings LLC Roth

401(k) Plan, Calypso Investments LLC Pension Plan, Cavus Systems LLC Roth 401(k) Plan,

Crucible Ventures LLC Roth 401(k) Plan, Hadron Industries LLC Roth 401(k) Plan, Limelight

Global Productions LLC Roth 401(k) Plan, Michelle Investments LLC Pension Plan, Monomer

Industries LLC Roth 401(k) Plan, Plumrose Industries LLC Roth 401(k) Plan, Remece

Investments LLC Pension Plan, Routt Capital LLC Solo 401(k) Plan, f/k/a Routt Capital Pension

---

2.   The Form 5500-EZ is the annual returns filing of one participant (owners and their spouses) retirement plans. *See* IRS, *About Form 5500-EZ*, available at https://www.irs.gov/forms-pubs/about-form-5500-ez (last visited May 21, 2022).

102860210_10

Plan and Trust, True Wind Investments LLC Roth 401(k) Plan, and Xiphias LLC Pension Plan.

Bahnsen Decl. Ex. 9 at ¶ 42 (citing Bahnsen Decl. Exs. 53-55).

**SKAT's Response:** Disputed to the extent the statement suggests the IRS received substantive information as to all the listed plans or that the IRS separately inquired into those plans apart from the inquiry into whether the RJM Plan's 2016 Form 5500-EZ was accurate.

73.    The IRS did not choose to initiate separate audits of any of the non-RJM plans

about which it received documents in the course of the RJM Audit.

**SKAT's Response:** This statement is not supported by a required citation to evidence in the record, and SKAT does not have information sufficient to determine the accuracy of this statement.

74.    The IRS has not set aside or revoked the qualification of any pension plan

defendant.

**SKAT's Response:** This statement is not supported by a required citation to evidence in the record.

75.    The RJM Plan, Roadcraft Plan, and Basalt Plan funded their accounts at Solo

Custodians with cash. Bahnsen Decl. Exs. 77-78, 85-86.

**SKAT's Response:** Disputed. The RJM Plan did not transfer any funds to its account at Solo Capital before it purported to purchase tens of millions of dollars of Danish stock.  Dulberg Decl. Ex. 51 (RJM Plan Solo Capital Statement, dated Dec. 31, 2013); Second Weinstein Decl. Ex. 281 (RJM Plan Solo Capital Statement dated Dec. 10, 2013), Ex. 277 (RJM Plan First Republic Statements).  Any cash that was deposited in the RJM Plan's Solo Capital account was not used to fund any purported purchase of Danish shares. *See, e.g.*, Joint 56.1 ¶¶ 121, 123; Weinstein Decl. 89 (Dubinsky Report) ¶¶ 164 – 166; Second Weinstein Decl. Ex. 218 (Van Merkensteijn Dep., April 19-20, 2021), at 77:6-20.

On August 6, 2014, approximately $40,000 was deposited in the Basalt Plan's account at Old Park Lane.  Second Weinstein Decl. Ex. 266.  On August 7, 2014, the Basalt Plan purported to purchase 147,727,120.45 DKK (approximately $26,455,429.00 USD)[3] of TDC A/S stock.  SKAT Supplemental 56.1 ¶ 14.  The $40,000 was not used to fund the purchase of the TDC A/S stock. *See, e.g.*, Joint 56.1 ¶¶ 121, 123; Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 164 – 166; Second Weinstein Decl. Ex. 218 (Van Merkensteijn Dep.), at 77:6-20.  Beginning in February 2015, the Basalt Plan purported to purchase tens of millions of dollars of shares of Danish stock at its account at Telesto Markets.  Weinstein Decl. Ex. 182 (GUNDERSON 00009434).  No

---

3.    This amount is based on a conversion rate of $1 USD to 5.584 DKK, the exchange rate on August 7, 2014.

102860210_10

money was deposited into this account prior to when the Basalt Plan began this purported trading.  Weinstein Decl. Ex. 182 (GUNDERSON 00009434).

On August 6, 2014, approximately $40,000 was deposited in the Roadcraft Plan's account at Old Park Lane.  Second Weinstein Decl. Ex. 278.  This $40,000 was a loan from the Routt Capital Trust, an entity controlled by Richard Markowitz.  Second Weinstein Decl. Ex. 270; Joint 56.1 ¶ 82.  On August 7, 2014, the Roadcraft Plan purported to purchase 143,935,436.45 DKK (approximately $25,776,403.00 USD)[4] of TDC A/S stock.  SKAT Supplemental 56.1 ¶ 17.  The $40,000 was not used to fund the purchase of the TDC A/S stock.  *See, e.g.*, Joint 56.1 ¶¶ 121, 123; Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 164 – 166; Second Weinstein Decl. Ex. 218 (Van Merkensteijn Dep.), at 77:6-20.  Beginning in February 2015, the Roadcraft Plan purported to purchase tens of millions of dollars of shares of Danish stock at its account at Solo Capital.  Second Weinstein Decl. Ex. 279.  No money was deposited into this account prior to when the Roadcraft Plan purportedly began trading.  Second Weinstein Decl. Ex. 279.

## V.     The Solo Trades

76.     In the case of the RJM Plan, the decision of whether or not to purchase shares of

Danish securities was made by the U.S. pension plan. *See, e.g.*, Bahnsen Decl. Ex. 46

(Markowitz Tr. 440:24-441:10).

**SKAT's Response:** Disputed. To begin, SKAT disputes the statement to the extent it suggests there were ever any real trades.  Further, the entire structure of the purported trading was generated by Solo.  Solo provided each plan with, *inter alia*, (1) which shares to trade; (2) how many shares to trade; (3) the dates on which the trades were to be executed and settled; (4) the price of each trade; and (5) the counterparties of to each trade.  Second Weinstein Decl. Ex. 211 (Markowitz Dep.), at 408:22- 428:9; Weinstein Decl. Ex. 178 (Klugman Dep. Exhibit 1777).

77.     The pension plan defendants did not know the identity of the seller of the Danish

securities. *See, e.g.*, *id.* (Markowitz Tr. 338:18-339:2).

**SKAT's Response:** Disputed.  The cited testimony does not support the statement as to the FWC Plan and the Proper Pacific Plan.  SKAT also disputes the statement to the extent it suggests that any shares were actually sold.  The statement is also not relevant in so far as it suggests the plans needed to know the exact names of the purported sellers of the shares.  Further, there is copious evidence of communications about the scheme with Solo Capital by Markowitz, van Merkensteijn, Klugman, Lehman, and Bradley.  This provides circumstantial evidence that Solo Capital's employees told the individual defendants the identity (or at least general facts) about the purported sellers.

---

4.   This amount is based on a conversion rate of $1 USD to 5.584 DKK, the exchange rate on August 7, 2014.

102860210_10

78.    A trade confirmation is a final and binding agreement to exchange money for

shares. *See, e.g.*, Bahnsen Decl. Exs. 13 (at ¶ 32), 56-58.

**SKAT's Response:** This is a conclusion of law, which is not permitted in a Rule 56.1 statement. Further, the statement is too broad to make any conclusive statement as to its truth. Finally, the statement is not true as to the Solo Bellwether Plans. As there were no cash and no shares, the trade confirmations could not be binding agreements to "exchange money for shares." *See generally* SKAT's Supplemental 56.1 Statement at ¶¶ 1 through 23 and Appendices A through I.

## VI.    Specific Solo Bellwether Trades

79.    The RJM Plan paid total fees of DKK 179,471.22 in connection with the

transactions described in paragraphs 129 to 146 of the JSUMF. Bahnsen Decl. Ex. 12 at ¶ 161.

**SKAT's Response:** Disputed. First, the RJM Plan paid approximately 66% percent of the dividend withholding tax refunds paid to it by SKAT to Ganymede Cayman Limited, an entity controlled by Sanjay Shah and affiliated with the Solo Custodians.[5] *See, e.g.*, Second Weinstein Decl. Ex. 283, Ex. (Markowitz Dep.), at 290:19-22, 540:14-17, 541:10-17. While the Ganymede invoices to the RJM Plan describe these payments as "fees," SKAT disputes any claim that the payments to Ganymede constituted legitimate "fees" for services. The defendants oftentimes created invoices purporting to be for "fees" in order to justify and create a paper trail for the movement of fraud proceeds. *See, e.g.*, Second Weinstein Decl. Ex. 280 & Ex. 283.

Second, even excluding the payment to Ganymede, the statement is false. As shown in plaintiff's expert report of Graham Wade, the stock loan fees and interest in the RJM Plan's Solo Capital account statement for the year 2013 were retroactively manipulated. *See* Weinstein Decl. Ex. 92 (Wade Rebuttal Report) ¶¶ 89 – 94; Weinstein Decl. Ex. 91 (Wade Report) ¶¶ 259 – 266. Without this manipulation the total fees paid by the RJM Plan would be significantly different. *See* Weinstein Decl. Ex. 92 (Wade Rebuttal Report) ¶¶ 89 – 94. The alteration of the RJM Plan's account statement made it so that the purported trading netted to zero (excluding the near *de minimus* fees to brokers and custodians). Weinstein Decl. Ex. 92 (Wade Rebuttal Report) ¶ 93. As Mr. Wade writes, this is far outside the norms of market practice and a major indication that the "trading" was non-existent. Weinstein Decl. Ex. 92 (Wade Rebuttal Report) ¶ 94; Weinstein Decl. Ex. 91 (Wade Report) ¶ 266.

---

5.    Sanjay Shah was the shareholder of Ganymede from September 2011 until he transferred the share to Elysium Global Limited, another entity he controlled, in July 2014. Second Weinstein Decl. Ex. 241; Second Weinstein Decl. Ex. 262. Shah also acted as a director of Ganymede. Second Weinstein Decl. Ex. 242 (CAYMAN_00003294 at 3369).

## VII.    Defendant Altbach Did Not Communicate With SKAT Or Know About Communications With SKAT[6]

80.    Defendant Ronald Altbach was introduced to the pension plan opportunity by John van Merkensteijn in or about June 2014. Bahnsen Decl. Ex. 73 (Altbach Tr. 27:13-22); Declaration of Ronald Altbach, dated April 29, 2022 ("Altbach Decl.") at ¶ 2. Based on the description from van Merkensteijn, Altbach understood the opportunity involved transactions that involved pension plans. Bahnsen Decl. Ex. 73 (Altbach Tr. 28:1-7); Altbach Decl. ¶ 2.

**SKAT's Response:** Disputed to the extent that the second sentence misstates the scope of Altbach's knowledge.  First, at his deposition, Altbach testified that he understood the scheme involved trading in Danish securities and "tax treaties."  Second Weinstein Decl. Ex. 201 (Altbach Dep.), at 48:12 – 50:23.  Further, in January 2015, Altbach participated in a telephone call about the scheme with (among others) Markowitz and van Merkensteijn.  Second Weinstein Decl. Ex. 285, Ex. 201 (Altbach Dep.), at 126:2 – 136:23.  This call was prompted by an article in the Wall Street Journal about European government actions regarding dividend withholding tax refunds.  Second Weinstein Decl. Ex. 293, Ex. 304 (Van Merkenseijn Dep. Ex. 2305), Ex. 201 (Altbach Dep.), at 134:1-9.  Second, Altbach executed a power of attorney that appointed Michael Ben-Jacob ("Ben-Jacob") as his agent.  Bahnsen Decl. Ex. 79 (MBJ_0005107).  Ben-Jacob understood the scheme involved the submission of reclaim applications to SKAT, and this knowledge is attributable to Altbach as Ben-Jacob was his agent. *See, e.g.*, Mullen Decl. Ex. 1 (Ben-Jacob Dep., October 11-12, 2021),. at 23:22 – 24:2.  Third, the Roadcraft Plan was aware of its own submissions to SKAT, and Altbach was the Roadcraft Plan's alter ego because, *inter alia*, Altbach was the sole participant and trustee of plan.  Joint 56.1 ¶ 81; Second Weinstein Decl. Ex. 290.  Fourth, the Roadcraft Plan entered into a partnership agreement with the Routt Capital Trust (controlled by Markowitz) and the RAK Investment Trust (controlled by Klugman) and the acts of these partners are attributable to Altbach.  Fifth, the Roadcraft Plan partnership agreement appointed defendant van Merkensteijn as the partnership's "manager."  Van Merkensteijn was therefore an agent of the partnership, and his knowledge is attributable to the partners in the partnership, and thus to Altbach as the Roadcraft Plan's *alter ego*.  Second Weinstein Decl. Ex. 291 at § 4.

81.    In June or July 2014, van Merkensteijn introduced Altbach to the attorneys at Kaye Scholer LLP ("KS"). Bahnsen Decl. Ex. 73 (Altbach Tr. 56:18-57:7); Altbach Decl. ¶ 3.

---

6.    The fact statements in this section apply with equal force to David Zelman, Perry Lerner, Robin Jones, Joseph Herman, and Edwin Miller.

   **SKAT's Response:**  Disputed.  The statement is unsupported by a citation to any evidence in the record. Further, as shown in SKAT's responses in this section, the statement is disputed.

102860210_10

**SKAT's Response:** Undisputed.

82.    Altbach understood that KS attorneys would be responsible for tasks including

forming entities and Roth 401(k) plans for such entities, opening bank accounts, preparing

agreements and otherwise documenting the pension plan opportunity. Altbach Decl. ¶ 3;

Bahnsen Decl. Ex. 73 (Altbach Tr. 83:5 – 84:5).

**SKAT's Response:** Disputed to the extent that it understates the scope of Altbach's acts in the
scheme.  Altbach (in his own name) signed a power of attorney appointing defendant Michael
Ben-Jacob ("Ben-Jacob") as his agent, and which specifically authorized Ben-Jacob to execute
"tax reclaim agreements."  Bahnsen Decl. Ex. 79 (MBJ_0005107).  These acts are attributable to
Altbach as Ben-Jacob was Altbach's agent.  Bahnsen Decl. Ex. 79 (MBJ_0005107).  Further, the
Roadcraft Plan entered into a partnership agreement with the Routt Capital Trust (controlled by
Markowitz) and the RAK Investment Trust (controlled by Klugman) and the acts of these
partners are attributable to Altbach.  Joint 56.1 ¶¶ 82 – 84.  Roadcraft Plan partnership agreement
appointed defendant van Merkensteijn as the partnership's "manager."  Van Merkensteijn was
therefore an agent of the partnership, and his acts are attributable to the partners in the
partnership, and thus to Altbach as the Roadcraft Plan's *alter ego*.  Second Weinstein Decl. Ex.
291 at § 4.

83.    Altbach attended a meeting with KS to discuss the opportunity at which time

Altbach was asked by KS to sign "a bunch of signature pages." Bahnsen Decl. Ex. 73 (Altbach

Tr. 56:18-58:23, 59:17-60:4; 63:13-68.1; 77:23 - 78:5); Altbach Decl. ¶ 3.

**SKAT's Response:** Undisputed.

84.    The Roadcraft Technologies LLC (the "Roadcraft LLC") was formed by KS.

Bahnsen Decl. Ex. 73 (Altbach Tr. 62:5-9; 91:14-19; 92:16-22); Altbach Decl. ¶ 4.

**SKAT's Response:** Undisputed.

85.    Altbach was instructed to open a bank account for the Roadcraft LLC and to fund

the bank account in a nominal amount. Bahnsen Decl. Ex. 73 (Altbach Tr. 141:25-143:11);

Altbach Decl. ¶ 4.

**SKAT's Response:** Undisputed.

102860210_10

86.     After the Roadcraft LLC was established, in July 2014 it sponsored a pension plan, the Roadcraft Technologies LLC Roth 401(k) Plan (the "Roadcraft Plan"). JSUMF ¶ 81; Bahnsen Decl. Exs. 73 (Altbach Tr. 76:11-14), 74. Altbach was not involved in the establishment of the Roadcraft Plan other than executing various signature pages. Altbach Decl. ¶ 5; Bahnsen Decl. Ex. 73 (Altbach Tr. 43:15-24). Altbach is the trustee for the Roadcraft Plan. Bahnsen Decl. Ex. 73 (Altbach Tr. 145:10 – 12); Altbach Decl. ¶ 5. Altbach is the sole beneficiary of the Roadcraft Plan. JSUMF ¶ 81.

**SKAT's Response:** Disputed to the extent that the statement claims "Altbach was not involved in the establishment of the Roadcraft Plan other than executing various signature pages." As Altbach's agent, Ben-Jacob's and his subordinates' acts relating to the establishment of the Roadcraft Plan are attributable to Altbach. Bahnsen Decl. Ex. 79 (MBJ_0005107). These acts include assisting in the formation of the Roadcraft Plan's sponsoring entity, the Roadcraft Technologies LLC; establishing the Roadcraft Plan; and assisting in the establishment of the Roadcraft Plan's bank account. *See, e.g.*, Second Weinstein Decl. Ex. 265, Ex. 295 (WH_MDL_00297399 ("one name from rocks one from fish")), Ex. 274, Ex. 300. Further, the Roadcraft Plan entered into a partnership agreement with the Routt Capital Trust (controlled by Markowitz) and the RAK Investment Trust (controlled by Klugman) and the acts of these partners are attributable to Altbach. Joint 56.1 ¶¶ 82 – 84. The Roadcraft Plan partnership agreement appointed defendant van Merkensteijn as the partnership's "manager." Van Merkensteijn was therefore an agent of the partnership, and his acts are attributable to the partners in the partnership, and thus to Altbach as the Roadcraft Plan's *alter ego*. Second Weinstein Decl. Ex. 291 at § 4.

87.     In or about July 23, 2014, Altbach was asked by KS to execute a Limited Power of Attorney (the "Limited POA") which gave Michael Ben-Jacob ("MBJ") authority to act on behalf of "entities beneficially owned by [Altbach] or established by [Altbach]" including the Roadcraft Plan. Bahnsen Decl. Exs. 73 (Altbach Tr. 77:16 – 78:5), 79. At no point did Altbach agree that MBJ would serve as an agent for him personally. Altbach Decl. ¶ 7.

**SKAT's Response:** Disputed. The power of attorney identifies Altbach as the principal and Ben-Jacob as his agent, and states "by this Power of Attorney made effective as of the 30th day of June 2014, the Principal hereby appoints the Agent with full power and authority for him and in his name and on his behalf. . . ." Bahnsen Decl. Ex. 79 (MBJ_0005107).

88.     The Limited POA provided MBJ would serve as the Roadcraft Plan's agent in connection with establishing the LLC and pension plan, trading transactions and the opening of custody accounts. Bahnsen Decl. Ex. 79; Altbach Decl. ¶ 6. It also provided that MBJ had the authority to "execute...tax reclaim agreements" for the Roadcraft Plan. *Id*. There is no provision in the Limited POA expressly permitting the delegation of the agent's duties. *Id*. The Limited POA was executed in New York and is governed by New York law. *Id*.

**SKAT's Response:** Disputed to the extent that the third sentence states "There is no provision in the Limited POA expressly permitting the delegation of the agent's duties." The limited power of attorney states "by this Power of Attorney made effective as of the 30th day of June 2014,the Principal hereby appoints the Agent with full power and authority for him and in his name and on his behalf…" Bahnsen Decl. Ex. 79 (MBJ_0005107). Further, the power of attorney grants Ben-Jacob the power to "execute...tax reclaim agreements"; to "appoint an authorized trader"; and to "[e]xecute, or cause to be executed, any and all documentation related to the foregoing or reasonably necessary to implement the foregoing." *Id*. These are express statements that contemplate the appointment of agents to implement the "Transactions," as defined in the power of attorney, which include the submissions of the reclaims to SKAT.

89.     In August 2014, MBJ, in his capacity as the "attorney-in-fact" for the Roadcraft Plan, executed an agreement between the Roadcraft Plan and Goal Taxback Limited ("Goal") pursuant to which Goal was to provide tax reclamation outsourcing services to the Roadcraft Plan. Bahnsen Decl. Ex. 80.

**SKAT's Response:** Disputed to the extent it purports to describe how Ben-Jacob signed the document. The limited power of attorney is signed by Ben-Jacob as "attorney-in-fact" for the "Trustee" of the Roadcraft Plan, and Altbach is the Trustee. Bahnsen Decl. Ex. 81 (SKAT _MDL_001_0056868 at -56869); Bahnsen Decl. Ex. 82 (SKAT _MDL_001_0056852 at -56880); Second Weinstein Decl. Ex. 292.

90.     Altbach did not have knowledge of, or communicate with, Goal. Altbach Decl. ¶ 9. Altbach did not execute an agreement with Goal or have knowledge of its contents. Bahnsen Decl. Ex. 80; Altbach Decl. ¶ 9. MBJ did not discuss the agreement with Altbach or provide him with a copy. Altbach Decl. ¶ 9.

**SKAT's Response:** Disputed as to the statements that "Altbach did not have knowledge of, or communicate with, Goal" and "Altbach did not execute an agreement with Goal or have

knowledge of its contents." Ben-Jacob communicated and had knowledge of Goal and executed the agreement on behalf of Altbach. Bahnsen Decl. Ex. 82 (Goal Agreement). These acts and knowledge are attributable to Altbach because Ben-Jacob was Altbach's agent and the signing of the tax reclaim agreement was within the scope of Ben-Jacob's authority. Bahnsen Decl. Ex. 79 (MBJ_0005107). Further, the Roadcraft Plan entered into a partnership agreement with the Routt Capital Trust (controlled by Markowitz) and the RAK Investment Trust (controlled by Klugman) and the acts of these partners are attributable to Altbach. Joint 56.1 ¶¶ 82 – 84. The Roadcraft Plan partnership agreement appointed defendant van Merkensteijn as the partnership's "manager." And van Merkensteijn was therefore an agent of the partnership, and his acts are attributable to the partners in the partnership, and thus to Altbach as the Roadcraft Plan's *alter ego*. Second Weinstein Decl. Ex. 291 at § 4.

91.     On or about August 22, 2014, MBJ, in his capacity as "attorney-in-fact" for the

Roadcraft Plan, executed a power of attorney appointing Goal (the "Goal POA"). Bahnsen Decl.

Ex. 81; Altbach Decl. ¶ 10. The Goal POA identified "Roadcraft Technologies LLC Roth

401(K)" as the principal. *Id*. The Goal POA authorized Goal to serve as the Roadcraft Plan's

agent in connection with the tax reclaim application submissions to SKAT. *Id*. The Goal POA

permitted Goal to delegate its authority to "nominees or agents or delegates." *Id*.

**SKAT's Response:** Disputed to the extent that the first sentence states that Ben-Jacob was acting as "attorney-in-fact" for the Roadcraft Plan. The limited power of attorney is signed by Ben-Jacob as "attorney-in-fact" for the "Trustee" of the Roadcraft Plan, and Altbach is the Trustee. Bahnsen Decl. Ex. 81 (SKAT _MDL_001_00056868 at -56869); Bahnsen Decl. Ex. 82 (SKAT _MDL_001_00056852 at -56880); Second Weinstein Decl. Ex. 292. SKAT does not dispute the accuracy of the last sentence, but disputes its materiality.

92.     Altbach did not execute the Goal POA. *Id*. Altbach did not have knowledge of the

existence of the power of attorney authorizing Payment Agent Goal to communicate with SKAT

in connection with the submission of reclaim applications on behalf of the Roadcraft Plan.

Altbach Decl. ¶ 10. Altbach did not have any conversations with MBJ concerning the

appointment of any other agent for the Roadcraft Plan, whether pursuant to the Limited POA or

otherwise, or the delegation of MBJ's duties to another agent. Altbach was not informed that the

Roadcraft Plan had an agent or agents other than MBJ. Altbach Decl. ¶ 11.

**SKAT's Response:** Disputed. SKAT disputes the first sentence: because Ben-Jacob was Altbach's agent, Ben-Jacob's knowledge of the Goal power of attorney is attributable to Altbach.

34

Bahnsen Decl. Ex. 79 (MBJ_0005107).  Further, the Roadcraft Plan entered into a partnership agreement with the Routt Capital Trust (controlled by Markowitz) and the RAK Investment Trust (controlled by Klugman) and the acts of these partners are attributable to Altbach.  Joint 56.1 ¶¶ 82 – 84.  The Roadcraft Plan partnership agreement appointed defendant van Merkensteijn as the partnership's "manager.".  Van Merkensteijn was therefore an agent of the partnership, and his acts are attributable to the partners in the partnership, and thus to Altbach as the Roadcraft Plan's *alter ego*.  Second Weinstein Decl. Ex. 291 at § 4.

93.    Altbach did not see and was not aware of the reclaim applications submitted on

behalf of the Roadcraft Plan and the documents and forms contained therein. Bahnsen Decl. Ex.

73 (Altbach Tr. 138:12-140:21); Altbach Decl. ¶¶ 12. Altbach has never communicated with

SKAT regarding the reclaim applications or any other matter. Altbach Decl. ¶ 13.

**SKAT's Response:** Disputed.   First, at his deposition, Altbach testified that he understood the scheme involved trading in Danish securities and "tax treaties."  Second Weinstein Decl. Ex. 201 (Altbach Dep.), at 48:12 – 50:23.  Further, in January 2015, after Altbach's plans had submitted five reclaim applications to SKAT, and had received five payments from SKAT as a result of those reclaim applications, Altbach participated in a telephone call about whether Altbach and other defendants should go forward with the scheme.  Second Weinstein Decl. Ex. 285 at PL00000503, PL00000506 & Ex. 201 (Altbach Dep.), at 128:12 – 131:8.  Record evidence suggests that the call was prompted by a Wall Street Journal article, which discussed government investigations into cum/ex trades.  Second Weinstein Decl. Ex. 293, Ex. 304 (van Merkensteijn Dep. Ex. 2305). If any shares had existed in the Solo trades, the trades would have been "cum/ex" because the trades were purportedly executed prior to the ex-date (*i.e.* cum dividend), but purportedly settled after the record date (*i.e.* ex-dividend).  (Weinstein Decl. Ex. 91 (Wade Report) ¶¶ 79-81, 229.)  The article described these trades as ones in which investment firms "claim[ed] rebates on withholding-tax payments despite not having actually paid such taxes in the first place."  Second Weinstein Decl. Ex. 293, Ex. 304 (van Merkensteijn Dep. Ex. 2305).  In addition, the article stated that the German government considered these trades "illegal" and that the U.S. Federal Reserve was concerned with the "legal and reputational harm" of the trades. Second Weinstein Decl. Ex. 304 (van Merkensteijn Dep. Ex. 2305).  Altbach's testimony suggests he read the article.  Second Weinstein Decl. Ex. 201 (Altbach Dep.), at 133:23 – 135:8. Second, Altbach executed a power of attorney that appointed Ben-Jacob as his agent.  Bahnsen Decl. Ex. 79 (MBJ_0005107).  Ben-Jacob understood the scheme involved the submission of reclaim applications to SKAT and signed the power of attorney authorizing Goal to submit the reclaim applications to SKAT.  As Altbach's agent, Ben-Jacob's knowledge and acts are attributable to Altbach.  *See, e.g.*, Mullen Decl. Ex. 1 (Ben-Jacob Dep.), at 23:22 – 24:2.  Third, the Roadcraft Plan was aware of its own submissions to SKAT, and Altbach was the Roadcraft Plan's alter ego because, *inter alia*, Altbach was the sole participant and trustee of plan.  Joint 56.1 ¶ 81; Second Weinstein Decl. Ex. 290.  Fourth, the Roadcraft Plan entered into a partnership agreement with the Routt Capital Trust (controlled by Markowitz) and the RAK Investment Trust (controlled by Klugman) and the acts and knowledge of these partners are attributable to Altbach.  Joint 56.1 ¶¶ 82 – 84.  The Roadcraft Plan partnership agreement appointed defendant van Merkensteijn as the partnership's "manager."     And van Merkensteijn

35

was therefore an agent of the partnership, and his acts are attributable to the partners in the partnership, and thus to Altbach as the Roadcraft Plan's *alter ego*. Second Weinstein Decl. Ex. 291 at § 4.

94.     Goal prepared and submitted reclaim applications on November 27, 2014, April 29, 2015 and May 15, 2015 to SKAT on behalf of the Roadcraft Plan. JSUMF ¶¶ 190 - 192. The reclaim applications Goal submitted included a cover letter, a standard tax-refund form entitled "Claim to Relief from Danish Dividend Tax," a "credit advice" from the broker custodian, the Goal POA by which MBJ authorized Goal to act on behalf of the Roadcraft Plan, and a statement from the United States Internal Revenue Service (the "IRS") confirming that the Roadcraft Plan was a qualified pension plan under section 401(a) of the Internal Revenue Code. JSUMF ¶¶190 – 192.

**SKAT's Response:** Disputed. The second sentence misrepresents the parties' Joint 56.1.  The POA was executed by Ben-Jacob "in the name of Ronald Altbach" in Altbach's capacity as trustee of the Roadcraft Plan.  Bahnsen Decl. Ex. 81 (SKAT _MDL_001_0056868 at -56869); Bahnsen Decl. Ex. 82 (SKAT _MDL_001_0056852 at -56880).  SKAT also disputes the second sentence's statement that the IRS "confirm[ed] that the Roadcraft Plan was a qualified pension plan under section 401(a) of the Internal Revenue Code."  This IRS Form 6166, which was part of the reclaim application, states the IRS:

> certify[ies] that, *to the best of our knowledge*, the [Roadcraft Plan], is a trust forming a part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for the purposes of U.S. taxation.

Bahnsen Decl. Ex. 82 (SKAT _MDL_001_0056852 at –56873, 56878) (emphasis added).

To receive a Form 6166 from the IRS, a pension plan must submit an IRS Form 8802.  *See* IRS, *Instructions for Form 8802*, *available at* https://www.irs.gov/pub/irs-pdf/i8802.pdf.  The individual who signs a Form 8802 for a 401(k) plan represents to the IRS "under penalty of perjury" that the plan was tax-qualified under the IRC.  *See, e.g.*, Second Weinstein Decl. Ex. 264 (Basalt Plan Form 8802).  Thus, while the IRS did not certify that the plans were tax-qualified, the plans themselves did.  Further, the IRS could not have known the myriad of ways in which the plans' rendered them not tax-exempt under the IRC.

95.     The reclaim applications submitted on behalf of the Roadcraft Plan included the Goal POA executed by MBJ on behalf of the Roadcraft Plan. Bahnsen Decl. Ex. 81. The reclaim

applications did not include a copy of the Limited POA executed by Altbach appointing MBJ as

the agent of the Roadcraft Plan. Bahnsen Decl. Ex. 82.

**SKAT's Response:** Disputed to extent that the first sentence states that the POA was executed
by Ben-Jacob on behalf of the Roadcraft Plan. The POA was executed by Ben-Jacob "in the
name of Ronald Altbach." Bahnsen Decl. Ex. 81 (SKAT _MDL_001_0056868 at -56869);
Bahnsen Decl. Ex. 82 (SKAT _MDL_001_0056852 at -56880). SKAT does not dispute the
statement in the second sentence but disputes its materiality.

96.    No reclaim applications were submitted to SKAT on behalf of Altbach

individually. Altbach Decl. ¶ 13.

**SKAT's Response:** SKAT does not dispute this statement but disputes its materiality.

97.    No trading was conducted, nor dividends received, on behalf of Altbach

individually. Altbach Decl. ¶ 8.

**SKAT's Response:** SKAT disputes this statement to the extent it implies that trading was
conducted and dividends were received by Altbach's pension plans, and otherwise disputes its
materiality.

98.    SKAT does not allege that Altbach or other individual defendants had actual

knowledge of the reclaim applications, the powers of attorney authorizing the Payment Agents or

the contents of or statements in such documents. Bahnsen Decl. Exs. 3 (at ¶¶ 41-44), 83.

**SKAT's Response:** This is a characterization of SKAT's amended complaints in this litigation,
and thus cannot be included in a Rule 56.1 statement. Further, the statement mischaracterizes
SKAT's complaints, which state in part that the "Defendants [*i.e.* Markowitz, Klugman, and
Altbach] did know or should have known that the[] false representations [in the reclaim
applications] would cause SKAT to make payments to which the Defendants were not entitled."
Bahnsen Decl. Ex. 3 ¶ 10.

SKAT also disputes the statement's characterization of SKAT's interrogatory responses
(Bahnsen Ex. 81). SKAT is clear that the "Individual Plan Participants"—which included
Altbach—knew about the reclaim applications, the powers of attorney signed with the payment
agents; and the content thereof. Bahnsen Ex. 83 at pp. 6-18. Second Weinstein Decl. Ex. 229
(Defendants First Set of Contention Interrogatories ¶ 21 (defining individual defendants)). The
responses also make clear that Ben-Jacob, Markowitz, van Merkensteijn all had actual
knowledge of these facts. Bahnsen Ex. 83 at pp. 7-10.

102860210_10

99.    SKAT does not allege that Payment Agent Goal had knowledge of the purported falsity of the statements in the reclaim applications or formed the intent to commit fraud in connection with the reclaim applications it submitted on behalf of the Roadcraft Plan. Bahnsen Decl. Ex. 3 (at ¶¶ 31-37, 72-76).

**SKAT's Response:**  This is a characterization of SKAT's amended complaints in this litigation, and thus cannot be included in a Rule 56.1 statement.

## VIII.    Defendants Roger Lehman and Doston Bradley And Their Respective Plans Did Not Receive Any Monies Directly From SKAT

100.    Defendant Roger Lehman did not receive any monies directly from SKAT. *See* Expert Report of Bruce G. Dubinsky (Dec. 31, 2021) at ¶¶ 244-245.

**SKAT's Response:**  Undisputed.  SKAT paid tax refunds to payment agents acting on behalf of defendants' plans.  Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 218, 225.  After taking their fee (which was typically less than 1% of the refund), the payment agents typically transferred the rest of the funds to the Solo Custodians, which credited the funds to the plans' accounts.  *Id.* ¶ 225. Lehman participated in Solo's purported dividend arbitrage scheme with Sanjay Shah.  SKAT's Motion for Partial Summary Judgment § I.B.iii.  Shah agreed to pay Lehman $700,000 or $800,000 for introducing the FWC Plan to Solo.  *Id.*; Weinstein Decl. Ex. 80 (Lehman Dep.), at 396:4-25.

Approximately 95% of the refund payments the FWC Plan received from SKAT, through the payment agent Syntax into its Solo account, went to Ganymede, which was controlled by Shah. Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 200:24-201:3; Weinstein Decl. Ex. 117 at FWCCAP00000225-26, FWCCAP00000409, and FWCCAP00000410.  The FWC Plan was credited refunds from only Denmark in its Solo account.  Weinstein Decl. Ex. 117 at FWCCAP00000225-26.  From the amount paid to Ganymede, Shah paid Lehman at least $700,000 or $800,000 for introducing the FWC Plan to the Solo Custodians.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 396:7-25, 463:9-468:1.  The money went to Lehman's entity First Alton Inc. and he subsequently spent it on personal spending, investments, and to pay taxes, and transferred any remaining funds to his own bank accounts.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 473:1-474:19.

Lehman signed invoices, dated February, May, June, and July 2015, on behalf of First Alton Inc. to Ganymede in order to get paid.  Weinstein Decl. Ex. 80 (Lehman Dep.), at 464:23-468:1; Weinstein Decl. Ex. 119 (Dep. Ex. 4027).  Lehman also signed invoices, dated July and August 2015, on behalf of First Alton Inc. to four other entities in order to get paid.  Shah or an affiliate asked him to invoice these four entities—Acai Investments Limited, Fire Capital One Limited, Parla Global Investments Limited, and Philo Holdings Limited—instead of Ganymede.  Weinstein Decl. Ex. 118 (Dep. Ex. 4029); Second Weinstein Decl. Ex. 209 (Lehman Dep.), at 472:13-25, 480:9-483:6.  Shah's wife, Usha Shah, was the shareholder and director of these entities at this time.  Second Weinstein Decl. Ex. 240, Ex. 209 (Lehman Dep.), at 476:24-477:4.  In 2015, First

102860210_10

Alton Inc. received payments in March, May, and June from Ganymede and in July and September from Solo Capital Partners LLP into the accounts listed on the invoices. Second Weinstein Decl. Ex. 272 at JPM00003490, 3498, 3503 (Ganymede), JPM00003507 (Solo), Ex. 289 at WELLSFARGO_00008440, WELLSFARGO_0008447 (Solo).

First Alton Inc., Acai Investments Limited, Fire Capital One Limited, Parla Global Investments Limited, and Philo Holdings Limited were established shortly before Lehman issued the invoices: First Alton on February 10, 2015 and Acai, Fire, Parla, and Philo in May or July of 2015. First Alton Inc. was dissolved on October 26, 2017. Second Weinstein Decl. Ex. 240 & Ex. 302 (Florida Electronic Articles of Incorporation for First Alton Inc., February 10, 2015; Florida Division of Corporations, First Alton Inc.).

101.    Moreover, according to SKAT's own forensic accounting expert, Bruce Dubinsky, "[n]o money from the refunds was paid to Lehman's Plans." *Id.* at ¶ 245; *see also* Dubinsky Report Table 4 ("Amount Paid to Plan" for The FWC Capital LLC Pension Plan equals "$ -" and "0.0%" "% of Refund").

**SKAT's Response:** Disputed. The quotation omits key context. SKAT paid tax refunds to payment agents acting on behalf of defendants' plans. Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 218, 225. After taking their fee (which was typically less than 1% of the refund), the payment agents typically transferred the rest of the funds to the Solo Custodians, which credited the funds to the plans' accounts. *Id.* ¶ 225. As a result, money was paid into the plans' custodial accounts. However, unlike certain other defendant plans, the Lehman Plans did not direct the Solo Custodians to transfer money from their custodial accounts into the bank accounts that Lehman established for those plans in the United States. Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 260-264; *see also* Second Weinstein Decl. Ex. 209 (Lehman Dep.), at 453:24-454:10.

102.    Defendant Doston Bradley also did not receive any monies directly from SKAT.

*See* Dubinsky Report at ¶¶ 251-254.

**SKAT's Response:** Undisputed. SKAT paid tax refunds to payment agents acting on behalf of defendants' plans. Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 218, 225. After taking their fee (which was typically less than 1% of the refund), the payment agents typically transferred the rest of the funds to the Solo Custodians, which credited the funds to the plans' accounts. *Id.* ¶ 225. Bradley participated in Solo's purported dividend arbitrage scheme with Sanjay Shah. SKAT's Motion for Partial Summary Judgment § I.B.iv. According to Bradley, he was to be paid $100,000 per plan for "introducing" the five Plans he set up for himself in 2014 to the Solo Custodians, one of which was the Proper Pacific Plan, and $500,000 per plan for "introducing" ten plans he set up for his wife and sister. *Id.*; Weinstein Decl. Ex. 81 (Bradley Dep.), at 305:11-309:13.

102860210_10

Approximately 95% of the refund payments the Proper Pacific Plan received from SKAT, through a payment agent into its Solo Custodian account, went to Ganymede, which was controlled by Shah. Weinstein Decl. Ex. 79 (R. Markowitz Dep.), at 200:24-201:3. Ex. 120 at PROPPACIF00000142-44, PROPPACIF00000319 and PROPPACIF00000320. The Proper Pacific Plan was credited refunds from only Denmark in its Solo Custodian account. Weinstein Decl. Ex. 120 at PROPPACIF00000142-45. Danny Fletcher paid Bradley at least $100,000 for introducing the Proper Pacific Plan to the Solo Custodians. Weinstein Decl. Ex. 81 (Bradley Dep.), at 305:14-308:4.

Fletcher was connected to Solo and Shah. Fletcher, who was employed at a broker with Bradley, was the person who initially introduced Bradley and some of their other colleagues to the scheme. Weinstein Decl. Ex. 81 (Bradley Dep.), at 52:13-57:13. Fletcher acted as a "go-between" between the participants and Solo and as a "point man" in charge of distributing payments from the scheme, which came from the refund money that SKAT sent to Solo. Second Weinstein Decl. Ex. 205 (Driscoll Dep.) at 145:18-147:2, 150:11-14 & Ex. 219 (Vergari Dep.), at 117:13-118:3; 134:1-135:2.

Bradley acted as the sole owner of India Atlantic, Inc, incorporated on May 12, 2015. Second Weinstein Decl. Ex. 202 (Bradley Dep.) at 351:5-11 & Ex. 301 (Electronic Articles of Incorporation for India Atlantic, Inc, May 12, 2015). India Atlantic received payments from Fletcher's entities. Fletcher acted as a director of SBD TT Limited, incorporated on December 5, 2014, and Patek PA Limited, incorporated on July 17, 2015.[7] The dates of incorporation of these entities were shortly before the transfers of money: India Atlantic, Inc received payments from SBD TT Limited on June 25, July 2, and August 13, 2015 and from Patek PA Limited September 28, 2015. Second Weinstein Decl. Ex 272 at JPM00000847, 0854, 0862, 0868.

In 2016, Shah loaned $2 million to one of Bradley's companies, Blackrain Inc., that Bradley has not repaid. Second Weinstein Decl. Ex 202 (Bradley Dep.) at 324:16 – 327:19. The payments came from Elysium Global (Dubai) Limited. Second Weinstein Decl. Ex. 272 at JPM00000370, 0381. Matthew Tucci, a colleague of Bradley's who joined the scheme through Fletcher as well, also received a $2 million loan from Shah at around the same time as Bradley, that he has also not repaid. According to Tucci, he and Bradley were shorted by Fletcher and these loans from Shah were make-up payments for what they were owed. Second Weinstein Decl. Ex. 217 (Tucci Dep.), at 170:11-174:25; 175:22-176:14; 178:20-179:22; 233:9-14.

103.    Mr. Dubinsky also confirmed, as he did with regard to Lehman, that no "funds

were paid to Bradley's Plans or associated LLCs." *Id.* at ¶ 251; *see also* Dubinsky Report Table

---

7.    *Daniel John Fletcher*, Companies House, https://find-and-update.company-information.service.gov.uk/officers/9EUypgRpStKgqaemZqmz1jRfjxU/appointments; *SBD TT Limited*, Companies House, https://find-and-update.company-information.service.gov.uk/company/09342372; *Patek PA Limited*, Companies House, https://find-and-update.company-information.service.gov.uk/company/09692298.

4 ("Amount Paid to Plan" for The Proper Pacific LLC 401(k) Plan equals "$ -" and "0.0%" "% of Refund").

**SKAT's Response:** Disputed.  The quotation omits key context.  SKAT paid tax refunds to payment agents acting on behalf of defendants' plans.  Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 218, 225.  After taking their fee (which was typically less than 1% of the refund), the payment agents typically transferred the rest of the funds to the Solo Custodians, which credited the funds to the plans' accounts.  *Id.* ¶ 225.  As a result, money was paid into the plans' custodial accounts.  However, unlike certain other defendant plans, the Lehman Plans did not direct the Solo Custodians to transfer money from their custodial accounts into the bank accounts that Lehman established for those plans in the United States.  Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 260-264; *see also* Second Weinstein Decl. Ex. 202 (Bradley Dep.), at 349:7-19.

104.    Solo Capital and its related entities' tax reclaim activities were not limited to Denmark. Solo also generated funds from tax reclaims filed in other European countries such as Belgium and Austria. *See* Lehman Tr., Vol. 1 at 60:18-24, 77:5-13, 257:5-8; Bradley Tr. 230:19-231:2; *see*, *e.g.*, FWCCAP00000141-155; FWCCAP00000228-256; PROPPACIF00000098-108; PROPPACIF00000109-112; PROPPACIF00000147-175.

**SKAT's Response:**  Disputed as to substance and materiality.  First, Solo Capital's purported tax reclaim activities in jurisdictions other than Denmark with respect to claimants other than the bellwether plans are not relevant to the issues before the Court for the bellwether plans.  The plans at issue—the FWC Plan and the Proper Pacific Plan—did not receive refunds from Belgium.  Weinstein Decl. Ex. 117 at FWCCAP00000223-27; Weinstein Decl. Ex. 120 at PROPPACIF00000142-46.  Further, the Solo Custodian statements defendants cite do not reflect purported trades in Austria or any countries other than Denmark and Belgium, nor the receipt of refunds from any such countries.

## IX.    ED&F Bellwether Plan Formation & Funding

105.    The AIG Plan is a U.S. resident under the Convention and Protocol Between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, S. Treaty Doc. No. 106-12, as amended by the Protocol Amending Tax Convention with Denmark, U.S.-Den., May 2, 2006, S. Treaty Doc. No. 109-19 (the "Treaty"). Dillman Decl., Ex. 90, SKAT's Response to Defendants' Request for Admission No. 113.

**SKAT's Response:**  This proposed fact is not material to any issue before the court.

106.    The AIG Plan was "organized under the laws of" the United States, as provided in Article 22.2e of the Treaty. Dillman Decl. Ex. 90, SKAT's Response to Defendants' Request for Admission No. 115.

**SKAT's Response:**  This proposed fact is not material to any issue before the court.

107.    The AIG Plan's trust provisions authorize the trustee to "invest assets in any form of property, including common and preferred stocks . . . or in any other property, real or personal, foreign or domestic, having a ready market . . . ." Dillman Decl. Ex. 94, at AIG_00000411; Dillman Decl. Ex. 95, at AIG_00000494.

**SKAT's Response:**  Disputed. The statement omits key context that the language of a trust agreement cannot override applicable fundamental plan standards.  Second Weinstein Decl. Ex. 226 (Rebuttal Expert Report of Marcia S. Wagner, dated February 1, 2022 at ¶ 17.)

108.    The Riverside Plan is a U.S. resident under the Convention and Protocol Between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, S. Treaty Doc. No. 106-12, as amended by the Protocol Amending Tax Convention with Denmark, U.S.-Den., May 2, 2006, S. Treaty Doc. No. 109-19 (the "Treaty"). Dillman Decl. Ex. 90, SKAT's Response to Defendants' Request for Admission No. 113.

**SKAT's Response:**  This proposed fact is not material to any issue before the court.

109.    The Riverside Plan was "organized under the laws of" the United States, as provided in Article 22.2e of the Treaty. Dillman Decl. Ex. 90, SKAT's Response to Defendants' Request for Admission No. 115.

**SKAT's Response:**  This proposed fact is not material to any issue before the court.

110.    There is no record evidence that the IRS has disqualified the AIG Plan.

**SKAT's Response:** This proposed fact is not material to any issue before the court.

111.    There is no record evidence that the IRS has disqualified the Riverside Plan.

**SKAT's Response:** This proposed fact is not material to any issue before the court.

**X.    ED&F Custody Relationship, Powers of Attorney, Acer**

112.    Schulman never had any direct communications with ED&F. Dillman Decl. Ex.

97, Deposition of David Schulman ("Schulman Dep.") 135:8-24, 152:25-153:8; Ex. 142,

RIVER_00000285.

**SKAT's Response:** This proposed fact is not material to any issue before the court.  Further, disputed as Schulman communicated with ED&F through his agent, Acer.  Joint 56.1 ¶ 289, 321; Dillman Decl. Ex. 96 (Kaminer Decl.) ¶ 8; Dillman Decl. Ex. 97 (Schulman Dep.) at 76:14-77:6.

113.    The Riverside Plan never had direct communications with ED&F concerning the

Riverside Plan's trading in Danish securities, except through Acer. Schulman Dep. 135:8-24,

152:25-153:8); Dillman Decl. Ex. 142, RIVER_00000285.

**SKAT's Response:** This proposed fact is not material to any issue before the court.  Further, disputed as the Riverside Plan communicated with ED&F through its agent, Acer.  Joint 56.1 ¶ 289, 321; Dillman Decl. Ex. 96 (Kaminer Decl.) ¶ 8; Dillman Decl. Ex. 97 (Schulman Dep.) at 76:14-77:6.

114.    Schulman never placed an order to trade in Danish securities through ED&F

individually. Schulman Dep. 135:8-24, 152:25-153:8; Dillman Decl. Ex. 142,

RIVER_00000285.

**SKAT's Response:** This proposed fact is not material to any issue before the court.  Further, disputed as Schulman communicated with ED&F through his agent, Acer.  Joint 56.1 ¶ 289, 321; Dillman Decl. Ex. 96 (Kaminer Decl.) ¶ 8; Dillman Decl. Ex. 97 (Schulman Dep.) at 76:14-77:6.

115.    The AIG Plan never had direct communications with ED&F concerning the AIG

Plan's trading in Danish securities, except through Acer. Dillman Decl. Ex. 98, Deposition of

Robert Crema ("Crema Dep.") 26:3–14; 55:16–22; Ex. 143, AIG_00000669.

**SKAT's Response:** This proposed fact is not material to any issue before the court.  Further, disputed as the AIG Plan's trustee and participant, Crema, participated in calls with ED&F

102860210_10

concerning trades in Danish securities and the financing of those trades with ED&F.  Second
Weinstein Decl. Ex. 245 & Ex. 204 (Crema Dep.) at 185:21-186:14.  The AIG Plan also placed
orders to trade in Danish securities with ED&F through its agent, Acer.  Joint 56.1 ¶ 288, 321;
Dillman Decl. Ex. 96 (Kaminer Decl.) ¶ 8.

116.    Crema never placed an order to trade in Danish securities through ED&F

individually. Crema Dep. 26:3–14; 55:16–22; Dillman Decl. Ex. AIG_00000669.

**SKAT's Response:**  This proposed fact is not material to any issue before the court.  Further,
disputed as Crema participated in calls with ED&F concerning trades in Danish securities and
the financing of those trades with ED&F, and negotiated Acer's share of the Plans' profits with
ED&F.  Second Weinstein Decl. Ex. 245; Ex. 234, Ex. 237, 232, Ex. 204 (Crema Dep.) at
185:21-186:14; Ex. 208 (Kaminer Dep.) at 63:18-64:15.  The AIG Plan also placed orders to
trade in Danish securities with ED&F through its agent, Acer.  Joint 56.1 ¶ 288, 321; Dillman
Decl. Ex. 96 (Kaminer Decl.) ¶ 8.

117.    At no time prior to 2020 had Schulman ever seen a tax voucher prepared by

ED&F. Schulman Dep. 198:16-202:4.

**SKAT's Response:**  This proposed fact is not material to any issue before the court.  Further,
disputed as Schulman's agent received and reviewed tax vouchers prepared by ED&F, and
directed that they be sent to Goal Taxback Limited ("Goal") for the purpose of submitting them
to SKAT.  Joint 56.1 ¶¶ 323(a)-(c); Dillman Decl. Ex. 96 (Kaminer Decl.) ¶ 8.

118.    Stacey Kaminer is a member of Acer Investment Group, LLC ("Acer"). Dillman

Decl. Ex. 96, Declaration of Stacey Kaminer ("Kaminer Decl.") ¶ 1.

**SKAT's Response:**  Undisputed.

119.    From 2013 through 2015, Kaminer, who held the role of head trader at Acer, was

the representative of Acer who dealt with ED&F regarding Danish securities trading for the AIG

and Riverside Plans. Kaminer Decl. ¶¶ 4, 7-8; Dillman Decl. Ex. 144, Deposition of Stacey

Kaminer ("Kaminer Dep.") 38:8–39:11.

**SKAT's Response:**  Undisputed.

120.    In Kaminer's role with Acer as agent for the AIG and Riverside Plans, she would

receive, review, and analyze trading information, trade confirmations, account statements, and

tax vouchers, among other things, sent by ED&F. She would also communicate with ED&F with respect to the AIG and Riverside Plans' trading, including by instructing ED&F on behalf of the Pension Plans. Kaminer Decl. ¶ 8.

**SKAT's Response:** Disputed. This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading. Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; selecting the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; negotiating financing; and in executing those trades with ED&F. Second Weinstein Decl. Ex. 235 (Dep. Ex. 2480), Ex. 234, Ex. 233, Ex. 204 (Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 182:3-185:13, 192:2-202:23. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c). Kaminer also negotiated Acer's share of the Plans' profits with ED&F, which paid those profits to Acer in the guise of "dividend finders fees," but was in reality a payment for providing access to U.S. pension plans willing to lend their tax status and name to the transactions." SKAT's 56.1 at ¶¶ 130-136; Second Weinstein Decl. Ex. 208 (Kaminer Dep.) at 63:18-64:15, 269:10-19.

121.    Kaminer communicated with ED&F by phone prior to any transaction in Danish securities to confirm the details of the transactions, including the pricing of the securities, the number of shares available, and the proposed settlement periods. Through communications with ED&F, Kaminer would be advised about the liquidity and financing availability in relation to Danish securities transactions. Kaminer Decl. ¶¶ 10, 11; Kaminer Dep. 98:25–99:5, 291:13–292:1, 374:5–20.

**SKAT's Response:** Undisputed.

## XI.    **The English Litigation**

122.    In 2018, SKAT brought suit in the High Court of Justice (the "English Action"), alleging that it had issued millions of dollars in dividend withholding tax refunds on the basis of purportedly false or fraudulent statements contained in refund applications received between August 2012 and July 2015. *See, e.g.*, Dillman Decl. Ex. 134, Particulars of Claim ¶¶ 3(a)-(b),

13; Ex. 135, Fifth Amended Particulars of Claim ("5APC") ¶¶ 3(a)-(b), 13, 52; Ex. 137, Re-Re-

Amended Particulars of Claim ¶¶ 3(a)-(b), 13, 52.

**SKAT's Response:**  This is a characterization of SKAT's pleadings in the English Action,
which speak for themselves.  Further, the statement mischaracterizes SKAT's pleadings in the
English Action, in which SKAT did not allege fraud against ED&F Man, which is a non-fraud
defendant in the English Action.  Further, the document at Dillman Declaration Exhibit 135 was
not filed as a pleading in the English Action; SKAT's Fifth Amended Particulars of Claim was
filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

123.    According to SKAT, the disputed tax refund applications had been made by a

handful of tax reclaim agents generally purporting to act on behalf of various United States

pension plans, Canadian pension plans, and/or "entities in Malaysia, UK or Luxembourg." 5APC

¶¶ 3(b), 5(a), 14, 14A; Dillman Decl. Ex. 137, Re-Re-Amended Particulars of Claim ¶¶ 3(b),

5(a), 14, 14A.

**SKAT's Response:**  This is a characterization of SKAT's pleadings in the English Action,
which speak for themselves.  Further, the document defined as 5APC (Dillman Declaration Ex.
135) was not filed as a pleading in the English Action; SKAT's Fifth Amended Particulars of
Claim was filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

124.    On September 12, 2018, SKAT filed its Particulars of Claim in England against

69 defendants, including ED&F. *See* Dillman Decl. Ex. 134, Particulars of Claim ¶¶ 2(c), 5(b).

**SKAT's Response:**  Undisputed.

125.    SKAT's claims in the English Action were directed at multiple categories of

defendants, including the "Alleged Fraud Defendants" and the "Non-Fraud Defendants." 5APC

¶¶ 2(b)-(c); Re-Re-Amended Particulars of Claim ¶¶ 2(b)-(c).

**SKAT's Response:**  Undisputed.  However, the document defined as 5APC (Dillman
Declaration Ex. 135) was not filed as a pleading in the English Action; SKAT's Fifth Amended
Particulars of Claim was filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

126.    ED&F was named among the "Non-Fraud Defendants" in the English Action. *See*

5APC ¶¶ 2(c), 3(k); Re-Re-Amended Particulars of Claim ¶¶ 2(c), 3(k).

102860210_10

**SKAT's Response:**  Undisputed.  However, the document defined as 5APC (Dillman Declaration Ex. 135) was not filed as a pleading in the English Action; SKAT's Fifth Amended Particulars of Claim was filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

127.    SKAT alleged unjust enrichment and negligent misrepresentation in connection with the production of "tax vouchers" by ED&F and the other Non-Fraud Defendants. *See* Dillman Dec. Ex. 136, Re-Amended Schedule 5T ¶¶ 3-25.

**SKAT's Response:**  Undisputed.

128.    At all relevant times while SKAT's claims against ED&F in England were pending, ED&F remained a "Non-Fraud Defendant." *See* 5APC ¶¶ 2(c), 3(k).

**SKAT's Response:**  Undisputed.  However, the document defined as 5APC (Dillman Declaration Ex. 135) was not filed as a pleading in the English Action; SKAT's Fifth Amended Particulars of Claim was filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

129.    In the English Action, SKAT maintained that withholding tax refund applications were governed by the Danish Withholding Tax Act. *See* Dillman Decl. Ex. 138, Claimant's Further Particulars Regarding the Validity of WHT Refund Applications, at ¶¶ 5-7, 32-33, 39, 45, 48-49.

**SKAT's Response:**  Disputed.  This statement mischaracterizes SKAT's pleadings in the English Action, which speak for themselves.  In particular, SKAT maintains that "Section 69B(1) sets out four requirements that a WHT refund application must satisfy[.]"  Dillman Decl. Ex. 138 (Claimant's Further Particulars Regarding the Validity of WHT Refund Applications) at ¶ 7.  Furthermore, paragraphs 39, 45, and 48-49 were removed from SKAT's Amended Further Particulars Regarding the Validity of WHT Refund Applications, filed May 17, 2022.  Second Weinstein Decl. Ex. 224 (Claimant's Amended Further Particulars Regarding the Validity of WHT Refund Applications) at ¶¶ 39, 45, 48-49.

130.    In the English Action, SKAT indicated that it understood the "beneficial owner" to be the "entity that actually benefits from the interest economically and has the power freely to determine the use to which it is put, as opposed to an intermediary or nominee that is bound to pay the amounts it receives to another person." Dillman Decl. Ex. 136, Re-Amended Schedule 5T ¶ 14.

102860210_10

**SKAT's Response:**  Disputed.  The quotation omits context from SKAT's pleadings in the English Actions.  *See also* Dillman Decl. Ex. 138 (Claimant's Further Particulars Regarding the Validity of WHT Refund Applications) at ¶ 41-47.

131.    SKAT has amended its Particulars of Claim five times, most recently in August 2020.  *See* 5APC.

**SKAT's Response:**  Disputed.  The document defined as 5APC (Dillman Declaration Ex. 135) was not filed as a pleading in the English Action.  SKAT's most recent amendment to its Particulars of Claims in the English Action was filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

132.    In the English Action, SKAT did not allege that the Danish securities transactions executed by ED&F were anything other than actual trades involving actual shares. *See* 5APC.

**SKAT's Response:**  Disputed.  This statement mischaracterizes SKAT's pleadings in the English Action, which speak for themselves.  *See*, *e.g.*, Second Weinstein Decl. Ex. 225 (Claimant's Reply to the Validity Defences, Nov. 6, 2020) at ¶¶ 113.1-113.3.  Further, the document defined as 5APC (Dillman Declaration Ex. 135) was not filed as a pleading in the English Action; SKAT's Fifth Amended Particulars of Claim was filed May 17, 2022.  Second Weinstein Decl. Ex. 223.

133.    The English High Court of Justice ultimately determined that SKAT's claims should be tried in three stages. *See* Dillman Decl. Ex. 139, July 2020 CMC Order ¶¶ 2-10; Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Capital Partners LLP*, [2021] EWHC 974 (Comm) at ¶ 4.

**SKAT's Response:**  Undisputed.

134.    The first stage, designated the "Revenue Rule Trial," was to address a single, threshold question: Whether any of SKAT's claims fell within a rule of English law known as "Dicey Rule 3." *See* Dillman Decl. Ex. 139, July 2020 CMC Order ¶ 2, Annex B ¶ 1; Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Capital Partners LLP*, [2021] EWHC 974 (Comm) at ¶ 4.

**SKAT's Response:**  Disputed.  This statement mischaracterizes the CMC Order, which described the issue for the Revenue Rule Trial as "Are any of SKAT's claims, as alleged,

102860210_10

inadmissible in this court under the rule of law stated, e.g., as *Dicey Rule 3* (*Dicey, Morris & Collins on the Conflict of Laws*, 15th Ed., para 15R-019). If so, which claims are inadmissible and why?"  Dillman Decl. Ex. 139 (July 2020 CMC Order) at ¶ 2, Annex B ¶ 1.

135.    The Revenue Rule Trial was conducted over the course of several days in late

March 2021. Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Capital Partners LLP*, [2021]

EWHC 974 (Comm) (caption).

**SKAT's Response:**  Undisputed.

136.    Justice Baker concluded that all of SKAT's claims were foreclosed under Dicey

Rule 3, mandating dismissal in full. Dillman Decl. Ex. 140, *Skatteforvaltningen v. Solo Capital*

*Partners LLP*, [2021] EWHC 974 (Comm) at ¶¶ 118-20, 177 ("[B]y the application of Dicey

Rule 3 in these proceedings, all of SKAT's claims fall to be dismissed."); *see also* Dillman Decl.

Ex. 141, *Skatteforvaltningen v. Solo Capital Partners LLP*, [2022] EWCA Civ 234 at ¶ 9 ("In a

closely-reasoned and comprehensive judgment, the judge concluded that all SKAT's claims were

inadmissible as a consequence of Dicey Rule 3.").

**SKAT's Response:**  Undisputed.

137.    SKAT chose not to pursue an appeal of Justice Baker's decision with respect to

the applicability of Dicey Rule 3 to SKAT's claims against ED&F. *See* Dillman Decl. Ex. 141,

*Skatteforvaltningen v. Solo Capital Partners LLP*, [2022] EWCA Civ 234 at ¶¶ 7, 27, 145.

**SKAT's Response:**  Undisputed.

138.    According to SKAT's counsel, the decision not to pursue an appeal of Justice

Baker's decision with respect to the applicability of Dicey Rule 3 to SKAT's claims against

ED&F was made for "pragmatic reasons." Dillman Decl. Ex. 141, *Skatteforvaltningen v. Solo*

*Capital Partners LLP*, [2022] EWCA Civ 234 at ¶ 27.

**SKAT's Response:**  Undisputed.

139.    The English Court of Appeal found that SKAT was bound by the lower court's

holding and that SKAT's action against ED&F was, by necessary implication, a "revenue

matter." *See* Dillman Decl. Ex. 141, *Skatteforvaltningen v. Solo Capital Partners LLP*, [2022]

EWCA Civ 234 at ¶¶ 150, 153-54.

**SKAT's Response:**  Disputed. This statement mischaracterizes the English High Court's
decision, which states "whatever the reason for SKAT not having pursued Ground 1 against
ED&F Man (and although it was said that it was done for reasons of pragmatism, as I have
already said, there does seem to be an inconsistency of approach) SKAT is fixed with the judge's
conclusion that, so far as ED&F Man are concerned, Dicey Rule 3 makes the claim
inadmissible."  Dillman Decl. Ex. 141 (*Skatteforvaltningen v. Solo Capital Partners LLP*, [2022]
EWCA Civ 234) at ¶ 150.

140.    The Court of Appeal additionally held that the application of Dicey Rule 3 as

against SKAT's claims against ED&F was not inconsistent with the Brussels Recast Regulation.

Dillman Decl. Ex. 141, *Skatteforvaltningen v. Solo Capital Partners LLP*, [2022] EWCA Civ

234 at ¶¶ 147-54.

**SKAT's Response:**  Undisputed.

**XII.    The AIG Plan and Riverside Plan's Trades in Danish Securities**

141.    According to SKAT, "[f]or the purposes of Danish tax laws (including in relation

to the liability to pay withholding tax and the eligibility for a refund of withholding tax), a share

is acquired or disposed of at the time when a final and binding agreement exists on the

acquisition or disposal." Dillman Decl. Ex. 138, Claimant's Further Particulars Regarding the

Validity of WHT Refund Applications, at ¶ 15.3.

**SKAT's Response:**  Disputed.  The statement omits context from SKAT's pleadings in the
English Actions that "the rule that a share is acquired or disposed of at the time when there is a
final or binding agreement is not an exception to the principle [of *nemo dat quod non habet*].
That is to say, a person who contracts to buy shares does <u>not</u> become the owner of the shares by
entering into a final and binding agreement to purchase shares unless the seller owned the shares
at the time of conclusion of the agreement."  Dillman Decl. Ex. 138 (Claimant's Further
Particulars Regarding the Validity of WHT Refund Applications) at ¶ 15.4 (emphasis in
original).

*Riverside – TDC A/S March 2014*

142.    On March 6, 2014, Stacey Kaminer provided ED&F with a trade instruction to

purchase 2,150,000 shares of TDC DC stock on behalf of the Riverside Plan with trade date

March 6, 2014 and settlement date March 12, 2014. *See* Dillman Decl. Ex. 100, ED&F-

00041310 at ED&F-00041311.

**SKAT's Response:** Disputed.  Kaminer instructed that the trade should settle T+4, but did not
specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 100, ED&F-
00041310 at ED&F-00041311.

143.    On March 6, 2014, ED&F on behalf of the Riverside Plan purchased 2,150,000

shares of TDC DC with trade date March 6, 2014 and settlement date March 12, 2014 from

Volcafe. The total number of TDC DC shares ED&F purchased from Volcafe for pension plans

using Acer as their representative and agent was 22,300,000. ED&F provided confirmation of

this trade to Stacey Kaminer. *Id.* at ED&F-00041311, ED&F-00041320.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the Riverside Plan
because the counterparty it purported to purchase them from, ED&F Dubai, did not have TDC
shares to sell and the transaction was not properly settled to effectuate a purchase.  Second
Weinstein Decl. Ex. 247 (ED&F-00408963 (ED&F Dubai Account Statement dated March 7,
2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 130 at ED&F-00040949; Weinstein
Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-00443853);
Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second
Weinstein Decl. Ex. 261 (ED&F-00609825 ("Sept. 2019 FCA Report")) at ED&F-00609827-28.

144.    ED&F's purchase from Volcafe was confirmed by a MT545 SWIFT message

showing delivery of 2,150,000 TDC DC shares by Volcafe to ED&F's depot account at BNP

Paribas S.A. ("BNP"). *Id.* at ED&F-00041328.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

145.    Also on March 6, 2014, Volcafe purchased 2,150,000 shares of TDC DC with

trade date March 6, 2014 and settlement date March 12, 2014. Volcafe purchased 2,150,000

102860210_10

shares from ED&F Man Professional Trading Dubai ("MPT Dubai"). The total number TDC DC shares sold by MPT Dubai to Volcafe was 22,300,000. *Id.* at ED&F-00041322-24.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have TDC shares to sell and the transaction was not properly settled to effectuate a purchase.  Second Weinstein Decl. Ex. 247 (ED&F-00408963 (ED&F Dubai Account Statement dated March 7, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 130 at ED&F-00040949; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

146.    As of March 7, 2014, the Riverside Plan's Account Equity Statement at ED&F reflects ownership of 2,150,000 shares of TDC DC stock credited to the Riverside Plan. There was no sale, transfer, or rehypothecation of these shares until on or after March 7, 2014. *Id.* at ED&F-00041329.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 7, 2014 reflects a pending purchase of 2,150,000 shares of TDC DC stock and an account value of negative $1,369,715.34.  Dillman Decl. Ex. 100 at ED&F-00041329.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

147.    ED&F's dividend reconciliation sheet for TDC DC stock shows that the Riverside Plan held a long position of 2,150,000 shares not settled by record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the Riverside Plan of DKK 3,452,900.00 at the gross dividend rate of DKK 2.20 per share and net dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00041332-33.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the Riverside Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

102860210_10

148.    The dividend reconciliation sheet shows the net dividend amount payable to the

Riverside Plan can be traced back to MPT Dubai, which held a net short position in TDC, via

Volcafe. *Id*.

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the Riverside Plan.  Instead, ED&F Dubai made a contractual payment to the Riverside Plan, through Volcafe and ED&F.  Weinstein Decl. Ex. 148 (ED&F-00251535); Second Weinstein Decl. Ex. 251 (ED&F-00409258 (ED&F Dubai General Ledger) at 60); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

149.    ED&F's ShadowSuite system shows that DKK 3,452,900.00 was booked to the

Riverside Plan's account at ED&F with description "CASH DIV - TDC DC." *Id.* at ED&F-

00041334.

**SKAT's Response:** Disputed.  Disputed to the extent this notation purports to reflect receipt of a dividend.  Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

150.    The Riverside Plan's account statement for the month of March 2014 provided by

ED&F showed the crediting to the Riverside Plan of DKK 3,452,900.00, with a notation of

"CASH DIV - TDC DC - PD 12/03/14." Dillman Decl. Ex. 111, at RIVER_00000086.

**SKAT's Response:** Disputed.  Disputed to the extent this notation purports to reflect receipt of a dividend.  Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

### *Riverside – Danske A/S March 2014*

151.    On March 17, 2014, Stacey Kaminer provided ED&F with a trade instruction to

purchase 2,000,000 shares of DANSKE DC stock on behalf of the Riverside Plan with trade date

March 18, 2014 and settlement date March 24, 2014. *See* Dillman Decl. Ex. 101, ED&F-

00046709 at ED&F-00046710-11.

**SKAT's Response:** Disputed.  Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares.  .  *See* Dillman Decl. Ex. 101, ED&F-00046709 at ED&F-00046710-11.

102860210_10

152. On March 18, 2014, ED&F on behalf of the Riverside Plan purchased 2,000,000 shares of DANSKE DC with trade date March 18, 2014 and settlement date March 24, 2014 from Volcafe. The total number of DANSKE DC shares ED&F purchased from Volcafe for pension plans using Acer as their representative and agent was 26,125,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00046710-11, ED&F-00046740, ED&F-00046746-48.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have DANKSE DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 248 (ED&F-00409148 (ED&F Dubai Account Statement dated March 18, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 131 at ED&F-00045852; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

153. ED&F's purchase from Volcafe was confirmed by a MT545 SWIFT message showing delivery of 2,000,000 DANSKE DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00046755.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of shares. SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

154. Also on March 18, 2014, Volcafe purchased 2,000,000 shares of DANSKE DC from MPT Dubai with trade date March 18, 2014 and settlement date March 24, 2014. The total number DANSKE DC shares sold by MPT Dubai to Volcafe was 26,125,000. *Id.* at ED&F-00046750-52.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have DANSKE DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 248 (ED&F-00409148 (ED&F Dubai Account Statement dated March 18, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 131 at ED&F-00045852; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-

00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

155.    As of March 19, 2014, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 2,000,000 shares of DANSKE DC stock credited to the Riverside Plan.

There was no sale, transfer, or rehypothecation of these shares until on or after March 19, 2014.

*Id.* at ED&F-00046756.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 19, 2014 reflects a pending purchase of 2,000,000 shares of DANSKE DC stock and an account value of negative $5,591,760.23.  Dillman Decl. Ex. 101 at ED&F-00046756 - 58.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

156.    ED&F's dividend reconciliation sheet for DANSKE DC stock shows that the

Riverside Plan held a long position of 2,000,000 shares not settled by record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK 2,920,000.00 at the gross dividend rate of DKK 2.00 per share and net

dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00046759-60.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the Riverside Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

157.    The dividend reconciliation sheet shows the net dividend amount payable to the

Riverside Plan can be traced back to MPT Dubai, which held a net short position in Danske, via

Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the Riverside Plan.  Instead ED&F Dubai made a contractual payment to the Riverside Plan, through Volcafe and ED&F.  Second Weinstein Decl. Ex. 250 (ED&F-00409244); Second Weinstein Decl. Ex. 251 (ED&F-00409258 (ED&F Dubai General Ledger) at 62); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

102860210_10

158.    ED&F's ShadowSuite system shows that DKK 2,920,000.00 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - DANSKE DC." *Id.* at ED&F-00046761.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. =Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

159.    The Riverside Plan's account statement for the month of March 2014 provided by

ED&F showed the crediting to the Riverside Plan of DKK 2,920,000.00, with a notation of

"CASH DIV - DANSKE DC - PD 24/03/14." Dillman Decl. Ex. 111, at RIVER_00000086.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

### *Riverside – Novo Nordisk A/S-B March 2014*

160.    On March 20, 2014, Stacey Kaminer provided ED&F with a trade instruction to

purchase 2,000,000 shares of NOVOB DC stock on behalf of the Riverside Plan with trade date

March 20, 2014 and settlement date March 26, 2014. *See* Dillman Decl. Ex. 102, ED&F-

00049490 at ED&F-00049491-92.

**SKAT's Response:**  Disputed.  Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 102, ED&F-00049490 at ED&F-00049491-92.

161.    On March 20, 2014, ED&F DC on behalf of the Riverside Plan purchased

2,000,000 shares of NOVOB with trade date March 20, 2014 and settlement date March 26,

2014. The total number of NOVOB DC shares ED&F purchased for pension plans using Acer as

their representative and agent was 22,000,000: 10,000,000 shares of NOVOB DC were

purchased from ED&F's internal inter-dealer broker ("IDB") and 12,000,000 shares of NOVOB

DC were purchased from Volcafe. ED&F provided confirmation of this trade to Stacey Kaminer.

*Id.* at ED&F-00049491, ED&F-00049497, ED&F-00049510-13.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have NOVOB shares to sell and the transaction was not properly settled to effectuate a purchase.

Second Weinstein Decl. Ex. 249 (ED&F-00409224 (ED&F Dubai Account Statement dated March 21, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 132 at ED&F-00048754; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

162.    ED&F's purchases were confirmed by MT545 SWIFT messages showing

delivery of 10,000,000 NOVOB DC shares by ED&F's internal IDB and 12,000,000 NOVOB

DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00049521-35.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of shares. SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

163.    Also on March 20, 2014, ED&F's internal IDB purchased 10,000,000 shares of

NOVOB from MPT Dubai with trade date March 20, 2014 and settlement date March 26, 2014

and Volcafe purchased 12,000,000 shares of NOVOB DC from MPT Dubai with trade date

March 20, 2014 and settlement date March 26, 2014. *Id.* at ED&F-00049516-19.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have NOVOB shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 249 (ED&F-00409224 (ED&F Dubai Account Statement dated March 21, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 132 at ED&F-00048754; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

164.    As of March 21, 2014, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 2,000,000 shares of NOVOB DC stock credited to the Riverside Plan.

There was no sale, transfer, or rehypothecation of these shares until on or after March 21, 2014.

*Id.* at ED&F-00049536.

**SKAT's Response:** Disputed. The Riverside Plan's Account Equity Statement dated March 21, 2014 reflects a pending purchase of 2,000,000 shares of NOVOB DC stock and an account value of negative $13,031,924. Dillman Decl. Ex. 102 at ED&F-00049536 - 38. Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right,

102860210_10

title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

165.    ED&F's dividend reconciliation sheet for NOVOB DC stock shows that the

Riverside Plan held a long position of 2,000,000 shares not settled by record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK 6,570,000.00 at the gross dividend rate of DKK 4.50 per share and net

dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00049539-40.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the Riverside Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

166.    The dividend reconciliation sheet shows the net dividend amount payable to the

Riverside Plan can be traced back to MPT Dubai, which held a net short position in NOVOB

DC, via Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the Riverside Plan.  Instead ED&F Dubai made a contractual payment to the Riverside Plan, through Volcafe and ED&F.  Second Weinstein Decl. Ex. 260 (ED&F-00444941); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

167.    ED&F's ShadowSuite system shows that DKK 6,570,000.00 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - NOVOB DC." *Id.* at ED&F-00049541.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

168.    The Riverside Plan's account statement for the month of March 2014 provided by

ED&F showed the crediting to the Riverside Plan of DKK 6,570,000.00, with a notation of

"CASH DIV - NOVOB DC - PD 26/03/14." Dillman Decl. Ex. 111, at RIVER_00000086.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

102860210_10

*Riverside – Tryg A/S April 2014*

169. On April 2, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 175,000 shares of TRYG DC stock on behalf of the Riverside Plan with trade date April 3, 2014 and settlement date April 9, 2014. *See* Dillman Decl. Ex. 103, ED&F-00044891 at ED&F-00044892.

**SKAT's Response:** Disputed. Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares. *See* Dillman Decl. Ex. 103, ED&F-00044891 at ED&F-00044892.

170. On April 3, 2014, ED&F on behalf of the Riverside Plan purchased 175,000 shares of TRYG DC with trade date April 3, 2014 and settlement date April 9, 2014 from Volcafe. The total number of TRYG DC shares ED&F purchased from Volcafe for pension plans using Acer as their representative and agent was 800,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00044892, ED&F-00044895-98.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have TRYG DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 246 (ED&F-00210889 (ED&F Dubai Account Statement dated April 2, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 134 at ED&F-00044899; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

171. ED&F's purchase from Volcafe was confirmed by MT545 SWIFT messages showing delivery of 800,000 TRYG DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00044905-06.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of shares. SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

102860210_10

172.    Also on April 3, 2014, Volcafe purchased 800,000 shares of TRYG DC from

MPT Dubai with trade date April 3, 2014 and settlement date April 9, 2014. *Id.* at ED&F-

00044899-901.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the Riverside Plan
because the counterparty it purported to purchase them from, ED&F Dubai, did not have TRYG
DC shares to sell and the transaction was not properly settled to effectuate a purchase.  Second
Weinstein Decl. Ex. 246 (ED&F-00210889 (ED&F Dubai Account Statement dated April 2,
2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 134 at ED&F-00044899; Weinstein
Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853);
Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second
Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

173.    As of April 4, 2014, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 175,000 shares of TRYG DC stock credited to the Riverside Plan. There

was no sale, transfer, or rehypothecation of these shares until on or after April 4, 2014. *Id.* at

ED&F-00044907.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated April 4,
2014 reflects a pending purchase of 175,000 shares of TRYG DC stock and an account value of
negative $13,024,823.33.  Dillman Decl. Ex. 103 at ED&F-00044907-09.  Because these shares
were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right,
title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.
Weinstein Decl. Ex. 171 at 18.

174.    ED&F's dividend reconciliation sheet for TRYG DC stock shows that the

Riverside Plan held a long position of 175,000 shares not settled by record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK 3,449,250.00 at the gross dividend rate of DKK 27.00 per share and net

dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00044910-11.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments
from ED&F Dubai to the Riverside Plan and do not show "payable dividend amounts," and (ii)
an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares
subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept.
2019 FCA Report) at ED&F-00609833–35.

102860210_10

175.    The dividend reconciliation sheet shows the net dividend amount payable to the Riverside Plan can be traced back to MPT Dubai, which held a net short position in Tryg, via Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the Riverside Plan.  Instead ED&F Dubai made a contractual payment to the Riverside Plan, through Volcafe and ED&F.  Second Weinstein Decl. Ex. 252 (ED&F-00409315); Second Weinstein Decl. Ex. 253 (ED&F-00409331 (ED&F Dubai General Ledger)); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

176.    ED&F's ShadowSuite system shows that DKK 3,449,250.00 was booked to the Riverside Plan's account at ED&F as "CASH DIV – TRYG DC." *Id.* at ED&F-00044912.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

177.    The Riverside Plan's account statement for the month of April 2014 provided by ED&F showed the crediting to the Riverside Plan of DKK 3,449,250.00, with a notation of "CASH DIV - TRYG DC - PD 09/04/14." Dillman Decl. Ex. 112, at RIVER_00000096.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

### *Riverside – DS Norden A/S April 2014*

178.    On April 23, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 322,500 shares of DNORD DC stock on behalf of the Riverside Plan with trade date April 23, 2014 and settlement date April 29, 2014. *See* Dillman Decl. Ex. 104, ED&F-00076758 at ED&F-00076759-60.

**SKAT's Response:**  Disputed.  Kaminer did not specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 104, ED&F-00076758 at ED&F-00076759-60.

179.    On April 23, 2014, ED&F on behalf of the Riverside Plan purchased 322,500 shares of DNORD DC with trade date April 23, 2014 and settlement date April 29, 2014 from Volcafe. The total number of DNORD DC shares ED&F purchased from Volcafe for pension

plans using Acer as their representative and agent was 860,000. ED&F provided confirmation of

this trade to Stacey Kaminer. *Id.* at ED&F-00076759, ED&F-00076763 ED&F-00076767-69.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the Riverside Plan
because the counterparty it purported to purchase them from, ED&F Dubai, did not have
DNORD DC shares to sell and the transaction was not properly settled to effectuate a purchase.
Second Weinstein Decl. Ex. 254 (ED&F-00409354 (ED&F Dubai Account Statement dated
April 22, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 135 at ED&F-00076770;
Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-
00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021);
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

       180.    ED&F's purchase from Volcafe was confirmed by MT545 SWIFT messages

showing delivery of 860,000 DNORD DC shares by Volcafe to ED&F's depot account at BNP.

*Id.* at ED&F-00076775-76

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

       181.    Also on April 23, 2014, Volcafe purchased 860,000 shares of DNORD DC from

MPT Dubai with trade date April 23, 2014 and settlement date April 29, 2014. *Id.* at ED&F-

00076770-72.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the Riverside Plan
because the counterparty it purported to purchase them from, ED&F Dubai, did not have
DNORD DC shares to sell and the transaction was not properly settled to effectuate a purchase.
Second Weinstein Decl. Ex. 254 (ED&F-00409354 (ED&F Dubai Account Statement dated
April 22, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 135 at ED&F-00076770;
Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-
00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021);
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

       182.    As of April 24, 2014, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 322,500 shares of DNORD DC stock credited to the Riverside Plan. There

was no sale, transfer, or rehypothecation of these shares until on or after April 24, 2014. *Id.* at

ED&F-00076777.

102860210_10

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated April 24, 2014 reflects a pending purchase of 322,500 shares of DNORD DC stock and an account value of negative $552,004.75.  Dillman Decl. Ex. 104 at ED&F-0007677 - 79.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

183.    ED&F's dividend reconciliation sheet for DNORD DC stock shows that the

Riverside Plan held a long position of 322,500 shares not settled by record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK1,177,125.00 at the gross dividend rate of DKK 5.00 per share and net

dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00076780.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the Riverside Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

184.    The dividend reconciliation sheet shows the net dividend amount payable to the

Riverside Plan can be traced back to MPT Dubai, which held a net short position in DS Norden,

via Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the Riverside Plan.  Instead ED&F Dubai made a contractual payment to the Riverside Plan, through Volcafe and ED&F.  Weinstein Decl. Ex. 255 (ED&F-00409387); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

185.    ED&F's ShadowSuite system shows that DKK 1,177,125.00 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - DNORD DC." *Id.* at ED&F-00076781.

**SKAT's Response:** Disputed.  Disputed to the extent this notation purports to reflect receipt of a dividend.  Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

186.    The Riverside Plan's account statement for the month of May 2014 provided by ED&F showed the crediting to the Riverside Plan of DKK 1,177,125.00, with a notation of "CASH DIV - DNORD DC - PD 29/04/14." Dillman Decl. Ex. 112, at RIVER_00000105.

**SKAT's Response:** Disputed.  Disputed to the extent this notation purports to reflect receipt of a dividend.  Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

### Riverside – Coloplast A/S May 2014

187.    On May 8, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 1,100,000 shares of COLOB DC stock on behalf of the Riverside Plan with trade date May 8, 2014 and settlement date May 14, 2014. *See* Dillman Decl. Ex. 105, ED&F-00045466 at ED&F-00045467-68.

**SKAT's Response:**  Disputed.  Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares.   *See* Dillman Decl. Ex. 105, ED&F-00045466 at ED&F-00045467-68.

188.    On May 8, 2014, ED&F on behalf of the Riverside Plan purchased 850,000 shares of COLOB DC with trade date May 8, 2014 and settlement date May 14, 2014 from Sunrise Brokers ("Sunrise"). The total number of COLOB DC shares ED&F purchased from Sunrise for pension plans using Acer as their representative and agent was 4,300,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00045467-68, ED&F-00045484-86, ED&F-00045489.

**SKAT's Response:** Disputed.  Sunrise was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have COLOB DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 256 (ED&F-00409433 (ED&F Dubai Account Statement dated May 7, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 136 at ED&F-000409469; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.  Further, ED&F provided purported confirmation of a purchase of 1,100,000 shares by the Riverside Plan. Dillman Decl. Ex. 105, ED&F-00045466 at ED&F-00045484-86.

189.    ED&F's purchase from Sunrise was confirmed by MT545 SWIFT messages

showing delivery of 4,300,000 COLOB DC shares by Sunrise to ED&F's depot account at BNP.

*Id.* at ED&F-00045496-501.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

190.    Also on May 8, 2014, Sunrise purchased 4,300,000 shares of COLOB DC from

MPT Dubai with trade date May 8, 2014 and settlement date May 14, 2014. *Id.* at ED&F-

00045490.

**SKAT's Response:** Disputed.  Sunrise was unable to convey shares to the Riverside Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have COLOB DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 256 (ED&F-00409433 (ED&F Dubai Account Statement dated May 7, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 136 at ED&F-000409469; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

191.    As of May 9, 2014, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 850,000 shares of COLOB DC stock credited to the Riverside Plan. There

was no sale, transfer, or rehypothecation of these shares until on or after May 9, 2014. *Id.* at

ED&F-00045502.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated May 9, 2014 reflects a pending purchase of 850,000 shares of COLOB DC stock and an account value of negative $1,820,385.28.  Dillman Decl. Ex. 105 at ED&F-00045502 - 04.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

192.    ED&F's dividend reconciliation sheet for COLOB DC stock shows that the

Riverside Plan held a long position of 850,000 shares not settled by record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK2,482,000.00 at the gross dividend rate of DKK 4.00 per share and net

dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00045506-07.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments
from ED&F Dubai to the Riverside Plan and do not show "payable dividend amounts," and (ii)
an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares
subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept.
2019 FCA Report) at ED&F-00609833–35.

193.    The dividend reconciliation sheet shows the net dividend amount payable to the

Riverside Plan can be traced back to MPT Dubai, which held a net short position in Coloplast,

via Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend
payments to the Riverside Plan.  Instead ED&F Dubai made a contractual payment to the
Riverside Plan, through Volcafe and ED&F.  Second Weinstein Decl. Ex. 257 (ED&F-
00409557); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35;
SKAT's 56.1 ¶¶ 94(a), 96 – 99.

194.    ED&F's ShadowSuite system shows that DKK 2,482,000.00 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - COLOB DC." *Id.* at ED&F-00045508.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend.
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

195.    The Riverside Plan's account statement for the month of May 2014 provided by

ED&F showed the crediting to the Riverside Plan of DKK 2,482,000.00, with a notation of

"CASH DIV - COLOB DC - PD 14/05/14." Dillman Decl. Ex. 113, at RIVER_00000105.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend.
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

*Riverside– TDC A/S March 2015*

196.    On March 4, 2015, Stacey Kaminer provided ED&F with a trade instruction to

purchase 2,000,000 shares of TDC DC stock on behalf of the Riverside Plan with trade date

March 4, 2015 and settlement date March 6, 2015.  *See* Dillman Decl. Ex. 106, ED&F-00043382

102860210_10

at ED&F-00043383-84; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 166(a).

**SKAT's Response:** Undisputed.

197.    On March 4, 2015, ED&F on behalf of the Riverside Plan purchased 2,000,000 shares of TDC DC with trade date March 4, 2015 and settlement date March 6, 2015 through its internal inter-dealer broker. ED&F provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex. 106 at ED&F-00043383, ED&F-00043385, ED&F-00043389; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 166(b).

**SKAT's Response:** Disputed.  The statement does not accurately describe the nature of the purported purchase.

198.    ED&F's purchase from the internal IDB were confirmed by two MT545 SWIFT messages showing delivery of 2,000,000 TDC DC shares by the internal IDB desk to ED&F's depot account at Skandinaviska Enskilda Banken ("SEB"). Dillman Decl. Ex. 106 at ED&F-00043397-98.

**SKAT's Response:**  Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

199.    Also on March 4, 2015, ED&F's internal IDB purchased from ED&F's client facilitation account 2,000,000 shares of TDC DC with trade date March 4, 2015 and settlement date March 6, 2015. ED&F's client facilitation account had, on February 12, 2015, borrowed, pursuant to a GMSLA, 2,000,000 TDC DC shares from Macquarie Bank Limited. Dillman Decl. Ex. 106 at ED&F-00043391, ED&F-00043395.

**SKAT's Response:** Disputed.  The statement does not accurately describe the nature of the purported purchase or purported stock borrow, and is not supported by admissible evidence.

200.    As of March 6, 2015, the Riverside Plan's Account Equity Statement at ED&F reflects ownership of 2,000,000 shares of TDC DC stock credited to the Riverside Plan. There

102860210_10

was no sale, transfer, or rehypothecation of these shares until on or after March 6, 2015. *Id.* at

ED&F-00043399.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 6, 2014 reflects a pending purchase of 2,000,000 shares of TDC stock and an account value of negative $6,552,675.43.  Dillman Decl. Ex. 106 at ED&F-00043399-401.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the AIG Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

201.    ED&F's dividend reconciliation sheet for TDC DC stock shows that the Riverside

Plan held a long position of 1,400,000 shares of the 31,515,200 shares housed in ED&F Man's

depot account at SEB, account number 05295142806, as of record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK 1,460,000.00 at the gross dividend rate of DKK 1.00 per share and net

dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of

DKK 23,006,096.00 for all shares housed in the depot account. *Id.* at ED&F-00043402.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 1,460,000 described only as "payable," to the Riverside Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

202.    ED&F received an MT566 SWIFT message showing a cash dividend payment on

account of 31,515,200 shares of stock of "TDC" in account number 05295142806. The MT566

SWIFT states that DKK 23,006,096.00 was the posted net dividend amount, net of DKK

8,509,104.00 in tax. *Id.* at ED&F-00043403.

**SKAT's Response:** Undisputed.

203.    ED&F's ShadowSuite system shows that DKK 1,460,000 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - TDC DC." *Id.* at ED&F-00043404.

**SKAT's Response:** Undisputed.

204.    The Riverside Plan's account statement for the month of March 2015 provided by ED&F showed the crediting to the Riverside Plan of DKK 1,460,000.00, with a notation of "CASH DIV - TDC DC - PD 10/03/15." Dillman Decl. Ex. 114, at RIVER_00000164.

**SKAT's Response:** Undisputed.

*Riverside – DSV A/S March 2015*

205.    On March 11, 2015, Stacey Kaminer provided ED&F with a trade instruction to purchase 850,000 shares of DSV DC stock on behalf of the Riverside Plan with trade date March 11, 2015 and settlement date March 13, 2015. *See* Dillman Decl. Ex. 107, ED&F-00038285 at ED&F-00038286-87; Dillman Decl. Ex. 91, Response to ED&F Request for Admission No. 108(a); Kaminer Decl. at ¶ 12; Kaminer Decl., Ex. A.

**SKAT's Response:** Undisputed.

206.    On March 11, 2015, ED&F on behalf of the Riverside Plan purchased 1,700,000 shares of DSV DC with trade date March 11, 2015 and settlement date March 13, 2015 through its internal inter-dealer broker; 850,000 of these DSV DC shares were purchased on behalf of the Riverside Plan. ED&F provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex. 107 at ED&F-00038286-87 and ED&F-00038289; Dillman Decl. Ex. 91, Response to ED&F Request for Admission No. 108(b). Kaminer Decl. at ¶ 14; Kaminer Decl., Ex. A.

**SKAT's Response:** Undisputed.

207.    Stacey Kaminer understood from her written trade instructions sent to ED&F and her receipt of the trade confirmation for 1,700,000 shares of DSV DC with trade date March 11, 2015 and settlement date March 13, 2015, that 850,000 of these DSV DC shares were purchased on behalf of the Riverside Plan on March 11, 2015. Kaminer Decl. at ¶ 14.

**SKAT's Response:** Disputed. This statement omits key context.  Kaminer had detailed knowledge of the scheme and how it was carried out, including but not limited to her knowledge of the terms of the Riverside Plan's trades and that those trades were financed by ED&F.

102860210_10

Kaminer was also aware of ED&F's Terms & Conditions, which stated that "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

208.    ED&F's purchase from the internal IDB was confirmed by two MT545 SWIFT messages showing delivery of 850,000 DSV DC shares by the internal IDB desk to ED&F's depot account at SEB. Dillman Decl. Ex. 107 at ED&F-00038293-94.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶¶ 79, 114, 117Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

209.    Also on March 11, 2015, ED&F's internal IDB purchased a total of 1,700,000 shares of DSV DC from Morgan Stanley with trade date March 11, 2015 and settlement date March 13, 2015. *Id.* at ED&F-00038291.

**SKAT's Response:** Undisputed.

210.    As of March 12, 2015, the Riverside Plan's Account Equity Statement at ED&F reflects the purchase of 850,000 shares of DSV DC stock credited to the Riverside Plan. There was no sale, transfer, or rehypothecation of these shares until on or after March 12, 2015. *Id.* at ED&F-00038295.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 13, 2015 reflects a pending sale of 850,000 shares of DSV stock and an account value of negative $8,035,948.87.  Dillman Decl. Ex. 107 at ED&F-00038295-97.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

211.    Stacey Kaminer understood from receipt of the Riverside Plans' Account Equity Statement provided to Acer by ED&F in March 2015 that the Riverside Plan had purchased 850,000 shares of DSV DC on March 11, 2015, that ED&F was holding the Riverside Plan's right to these shares for the Riverside Plan as of March 11, 2015, and that the trade settled on March 13, 2015. Kaminer Decl. at ¶ 15; Kaminer Decl., Ex. B.

102860210_10

**SKAT's Response:** Disputed.  This statement omits key context.  Kaminer had detailed knowledge of the scheme and how it was carried out, including but not limited to her knowledge of the terms of the Riverside Plan's trades and that those trades were financed by ED&F. Kaminer was also aware of ED&F's Terms & Conditions, which stated that "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

212.    ED&F's dividend reconciliation sheet for DSV DC stock shows that the Riverside Plan held a long position of 850,000 shares of the 1,700,000 shares housed in ED&F Man's depot account at SEB, account number 05295142806, as of record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the Riverside Plan of DKK 992,800.00 at the gross dividend rate of DKK 1.60 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 1,985,600.00 for all shares housed in the depot account. Dillman Decl. Ex. 107 at ED&F-00038298.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 992,800.00 described only as "payable," to the Riverside Plan. The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

213.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 1,700,000 shares of stock of "DSV B" in account number 05295142806. The MT566 SWIFT states that DKK 1,985,600.00 was the posted net dividend amount, net of DKK 734,400.00 in tax. *Id.* at ED&F-00038299.

**SKAT's Response:** Undisputed.

214.    ED&F's ShadowSuite system shows that DKK 992,800.00 was booked to the Riverside Plan's account at ED&F as "CASH DIV - DSV DC." *Id.* at ED&F-00038300.

**SKAT's Response:** Undisputed.

102860210_10

215.    The Riverside Plan's account statement for the month of March 2015 provided by

ED&F showed the crediting to the Riverside Plan of DKK 992,800.00, with a notation of

"CASH DIV - DSV DC - PD 17/03/15." Dillman Decl. Ex., at RIVER_00000164.

**SKAT's Response:** Undisputed.

216.    Stacey Kaminer understood the entry of a "CASH DIV - DSV DC - PD 17/03/15"

to mean that the Riverside Plan had received a dividend net of any withholding taxes in relation

to its holding over the ex-date of 850,000 shares of DSV DC and that ED&F was holding that

dividend for the Riverside Plan in the Riverside Plan's account at ED&F. Kaminer Decl. at ¶ 16;

Kaminer Decl., Ex. B

**SKAT's Response:**  Disputed.  This statement omits key context.  Kaminer had detailed
knowledge of the scheme and how it was carried out, including but not limited to her knowledge
of the terms of the Riverside Plan's trades and that those trades were financed by ED&F.
Kaminer was also aware of ED&F's Terms & Conditions, which stated that "all right, title, and
interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein
Decl. Ex. 171 at 18.

217.    Stacey Kaminer understood that the tax vouchers provided by ED&F were

ED&F's confirmation that the Riverside Plan had received a dividend in relation to its holding of

850,000 shares of DSV DC and that the Riverside Plan had suffered withholding taxes. Kaminer

Decl. ¶ 17; Kaminer Decl., Ex. C.

**SKAT's Response:**  Disputed.  This statement omits key context.  Kaminer had detailed
knowledge of the scheme and how it was carried out, including but not limited to her knowledge
of the terms of the Riverside Plan's trades and that those trades were financed by ED&F.
Kaminer was also aware of ED&F's Terms & Conditions, which stated that "all right, title, and
interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein
Decl. Ex. 171 at 18.

***Riverside – Pandora A/S March 2015***

218.    On March 17, 2015, Stacey Kaminer provided ED&F with a trade instruction to

purchase 300,000 shares of PNDORA DC stock on behalf of the Riverside Plan with trade date

102860210_10

March 17, 2015 and settlement date March 19, 2015. *See* Dillman Decl. Ex. 108, ED&F-

00043997 at ED&F-00043998-99; Response to ED&F's Request for Admission No. 177(a).

**SKAT's Response:** Undisputed.

219.    On March 17, 2015, ED&F on behalf of the Riverside Plan purchased 300,000

shares of PNDORA DC with trade date March 17, 2015 and settlement date March 19, 2015

through its internal inter-dealer broker in three shapes: one lot of 150,000 shares and two lots of

75,000 shares. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-

00043998, ED&F-00044001; Dillman Decl. Ex. 91, Response to ED&F's Request for

Admission No. 177(b).

**SKAT's Response:** Undisputed.

220.    ED&F's purchases from the internal IDB were confirmed by three MT545

SWIFT messages showing delivery of 300,000 PNDORA DC shares by the Internal IDB desk to

ED&F's depot account at Skandinaviska Enskilda Banken ("SEB"). Dillman Decl. Ex. 108 at

ED&F-00044006-08.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT 56.1 ¶¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

221.    Also on March 17, 2015, ED&F's internal IDB purchased a total of 300,000

shares of PNDORA DC with trade date March 17, 2015 and settlement date March 19, 2015.

The internal IDB purchased one lot of 150,000 shares from Merrill Lynch, and two lots of

75,000 shares from UBS London. *Id.* at ED&F-00044003-04.

**SKAT's Response:** Undisputed.

222.    As of March 19, 2015, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 300,000 shares of PNDORA DC stock credited to the Riverside Plan.

102860210_10

There was no sale, transfer, or rehypothecation of these shares until on or after March 19, 2015.

*Id.* at ED&F-00044009.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 19, 2015 reflects a pending sale of 300,000 shares of PNDORA DC stock and an account value of negative $3,558,914.18.  Dillman Decl. Ex. 108 at ED&F-00044009 - 11. Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

223.    ED&F's dividend reconciliation sheet for PNDORA DC stock shows that the

Riverside Plan held a long position of 300,000 shares of the 700,950 shares housed in ED&F

Man's depot account at SEB, account number 05295142806. The dividend reconciliation sheet

states that these shares would create a payable dividend amount to the Riverside Plan of DKK

1,971,000 at the gross dividend rate of DKK 9.00 per share and net dividend rate equal to 73% of

the gross dividend amount, out of a total dividend entitlement of DKK 4,605,241.50 for all

shares housed in the depot account. *Id.* at ED&F-00044012.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 1,971,000.00 described only as "payable," to the Riverside Plan. The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

224.    ED&F received an MT566 SWIFT message showing a cash dividend payment on

account of 700,950 shares of stock of "PANDORA HOLDING" in account number

05295142806. The MT566 SWIFT states that DKK 4,605,241.50 was the posted net dividend

amount, net of DKK 1,703,308.50 in tax. *Id.* at ED&F-00044013.

**SKAT's Response:** Undisputed.

225.    ED&F's ShadowSuite system shows that DKK 1,971,000 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - PNDORA DC." *Id.* at ED&F-00044014.

**SKAT's Response:** Undisputed.

226.    The Riverside Plan's account statement for the month of March 2015 provided by ED&F showed the crediting to the Riverside Plan of DKK 1,971,000.00, described as a "CASH DIV - PNDORA DC - PD 23/03/15." Dillman Decl. Ex. 114, at RIVER_00000164.

**SKAT's Response:** Undisputed.

*Riverside – Danske A/S March 2015*

227.    On March 13, 2015, Stacey Kaminer provided ED&F with a trade instruction to purchase 1,200,000 shares of DANSKE DC stock on behalf of the Riverside Plan with trade date March 13, 2015 and settlement date March 17, 2015. *See* Dillman Decl. Ex. 109, ED&F-00047364 at ED&F-00047365-66; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 227(a).

**SKAT's Response:** Undisputed.

228.    On March 13, 2015, ED&F on behalf of the Riverside Plan purchased 4,5000,000 shares of DANSKE DC with trade date March 13, 2015 and settlement date March 17, 2015 through its internal inter-dealer broker, 1,200,000 DANSKE DC shares were purchased on behalf of the Riverside Plan. ED&F provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex. 109, at ED&F-00047365, ED&F-00047371, ED&F-00047377; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 227(b).

**SKAT's Response:** Undisputed.

229.    ED&F's purchase from the internal IDB was confirmed by MT545 SWIFT messages showing delivery of 4,500,00 DANSKE DC shares by the internal IDB desk to ED&F's depot account at SEB. Dillman Decl. Ex. 109 at ED&F-00047387-89.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

102860210_10

230.    Also on March 13, 2015, ED&F's internal IDB purchased a total of 4,500,000 shares of DANSKE DC with trade date March 13, 2015 and settlement date March 17, 2015. The internal IDB purchased 3,500,000 shares from Citi Group Global Market Limited, and 1,000,000 shares from Merrill Lynch. *Id.* at ED&F-00047378-79.

**SKAT's Response:** Undisputed.

231.    As of March 19, 2015, the Riverside Plan's Account Equity Statement at ED&F reflects ownership of 1,200,000 shares of DANSKE DC stock credited to the Riverside Plan. There was no sale, transfer, or rehypothecation of these shares until on or after March 19, 2015. *Id.* at ED&F-00047390.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 19, 2015 reflects a pending sale of 1,200,000 shares of DANSKE DC stock and an account value of negative $3,558,914.18.  Dillman Decl. Ex. 109 at ED&F-00047390 - 92. Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

232.    ED&F's dividend reconciliation sheet for DANSKE DC stock shows that the Riverside Plan held a long position of 1,200,000 shares of the 24,805,000 shares housed in ED&F Man's depot account at SEB, account number 05295142806, as of record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the Riverside Plan of DKK 4,818,000.0 at the gross dividend rate of DKK 5.50 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 99,592,075.00 for all shares housed in the depot account. *Id.* at ED&F-00047393.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 4,818,000.00 described only as "payable," to the Riverside Plan. The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

102860210_10

233.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 24,805,000 shares of stock of "DANSKE BANK A?S" in account number 05295142806. The MT566 SWIFT states that DKK 99,592,075.00 was the posted net dividend amount, net of DKK 36,835,425 in tax. *Id.* at ED&F-00047394.

**SKAT's Response:** Undisputed.

234.    ED&F's ShadowSuite system shows that DKK 4,818,000 was booked to the Riverside Plan's account at ED&F as "CASH DIV - DANSKE DC." *Id.* at ED&F-00047395.

**SKAT's Response:** Undisputed.

235.    The Riverside Plan's account statement for the month of March 2015 provided by ED&F showed the crediting to the Riverside Plan of DKK 4,818,000.00, with a notation of "CASH DIV - DANSKE DC - PD 23/03/15." Dillman Decl. Ex. 114, at RIVER_00000164.

**SKAT's Response:** Undisputed.

### *Riverside – Novo Nordisk A/S March 2015*

236.    On March 13, 2015, Stacey Kaminer provided ED&F with a trade instruction to purchase 1,400,000 shares of NOVOB DC stock on behalf of the Riverside Plan with trade date March 13, 2015 and settlement date March 17, 2015. *See* Dillman Decl. Ex. 110, ED&F-00049905 at ED&F-00049906-07; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 261(g).

**SKAT's Response:** Undisputed.

237.    On March 13, 2015, ED&F on behalf of the Riverside Plan purchased 4,000,000 shares of NOVOB DC with trade date March 13, 2015 and settlement date March 17, 2015 through its internal inter-dealer, 1,400,000 DANSKE DC shares were purchased on behalf of the Riverside Plan. ED&F provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex.

102860210_10

110 at ED&F-00049906, ED&F-00049910, ED&F-00049914; Dillman Decl. Ex. 91, Response

to ED&F's Request for Admission No. 261(b).

**SKAT's Response:** Undisputed.

238.    ED&F's purchase from the internal IDB were confirmed by MT545 SWIFT

messages showing delivery of 4,000,000 NOVOB DC shares by the internal IDB desk to

ED&F's depot account at SEB. Dillman Decl. Ex. 91 at ED&F-00049930-33.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

239.    Also on March 13, 2015, ED&F's internal IDB purchased a total of 4,000,000

shares of NOVOB DC with trade date March 13, 2015 and settlement date March 17, 2015. The

internal IDB purchased 3,000,000 shares from Citi Group Global Market Limited, and 1,000,000

shares from Merrill Lynch. *Id.* at ED&F-00049915-16.

**SKAT's Response:** Undisputed.

240.    As of March 19, 2015, the Riverside Plan's Account Equity Statement at ED&F

reflects ownership of 1,400,000 shares of NOVOB DC stock credited to the Riverside Plan.

There was no sale, transfer, or rehypothecation of these shares until on or after March 19, 2015.

*Id.* ED&F-00047390.

**SKAT's Response:** Disputed.  The Riverside Plan's Account Equity Statement dated March 20,
2015 reflects a pending sale of 1,400,000 shares of NOVOB DC stock and an account value of
negative $2,550,514.37.  Dillman Decl. Ex. 110 at ED&F-00049934 - 36.  Because these shares
were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right,
title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.
Weinstein Decl. Ex. 171 at 18.

241.    ED&F's dividend reconciliation sheet for NOVOB DC stock shows that the

Riverside Plan held a long position of 1,400,000 shares of the 5,600,000 shares housed in ED&F

Man's depot account at SEB, account number 05295142806, as of record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the

Riverside Plan of DKK 5,110,000.00 at the gross dividend rate of DKK 5.00 per share and net

dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of

DKK 20,440,000.00 for all shares housed in the depot account. *Id.* at ED&F-00049937.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend
reconciliation sheet lists DKK 5,110,000 described only as "payable," to the Riverside Plan.  The
cited supporting documentation does not support the characterization of "net dividend rate" or
"dividend entitlement."

242.    ED&F received an MT566 SWIFT message showing a cash dividend payment on

account of 5,600,000 shares of stock of "NOVO NORDISK" in account number 05295142806.

The MT566 SWIFT states that DKK 20,440,000 was the posted net dividend amount, net of

DKK 7,560,000 in tax. *Id.* at ED&F-00049938.

**SKAT's Response:** Undisputed.

243.    ED&F's ShadowSuite system shows that DKK 5,110,000 was booked to the

Riverside Plan's account at ED&F as "CASH DIV - NOVOB DC." *Id.* at ED&F-00049939.

**SKAT's Response:** Undisputed.

244.    The Riverside Plan's account statement for the month of March 2015 provided by

ED&F showed the crediting to the Riverside Plan of DKK 5,110,000.00, with a notation of

"CASH DIV - NOVOB DC - PD 24/03/15." Dillman Decl. Ex. 114, at RIVER_00000164.

**SKAT's Response:** Undisputed.

***AIG – Coloplast A/S December 2013***

245.    On December 5, 2013, Stacey Kaminer provided ED&F with a trade instruction to

purchase 500,000 shares of COLOB DC stock on behalf of the AIG Plan with trade date

December 5, 2013and settlement date December 11, 2013.  *See* Dillman Decl. Ex. 115, ED&F-

102860210_10

00044985 at ED&F-00044986; Dillman Decl. Ex. 91, Response to ED&F's Request for

Admission No. 197(a).

**SKAT's Response:** Disputed. Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares. *See* Dillman Decl. Ex. 115, ED&F-00044985 at ED&F-00044986.

246.    On December 5, 2013, ED&F on behalf of the AIG Plan purchased 500,000

shares of COLOB DC with trade date December 5, 2013 and settlement date December 11, 2013

from its internal inter-dealer broker. ED&F provided confirmation of this trade to Stacey

Kaminer. Dillman Decl. Ex. 115 at ED&F-00044986, ED&F-00044988; Dillman Decl. Ex. 91,

Response to ED&F's Request for Admission No. 197(b).

**SKAT's Response:** Disputed. ED&F internal IDB was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from did not have COLOB DC shares to sell and the transaction was not properly settled to effectuate a purchase of shares or convey a dividend. Weinstein Decl. Ex. 87 (Wall Dep.), at 67:2-69:6, 120:16-121:25; Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast).

247.    ED&F's purchase from the internal IDB was confirmed by a MT545 SWIFT

message showing delivery of 500,000 COLOB DC shares by the internal IDB desk to ED&F's

depot account at BNP. Dillman Decl. Ex. 115 at ED&F-000449911.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of shares. SKAT's 56.1 ¶ 79, 114, 115(b), 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

248.    Also on December 5, 2013, ED&F's internal IDB purchased a total 2,000,000

shares of COLOB DC from Mitsubishi UFJ Securities ("Mitsubishi") with trade date December

5, 2013 and settlement date December 11, 2013. *Id.* at ED&F-00044989.

**SKAT's Response:** Disputed. ED&F internal IDB was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from did not have COLOB DC shares to sell and the transaction was not properly settled to effectuate a purchase of shares or convey a dividend. Weinstein Decl. Ex. 87 (Wall Dep.), at 67:2-69:6, 120:16-121:25; Weinstein Decl. Ex. 129 at ED&F-00044997 (Coloplast).

102860210_10

249.    As of December 6, 2013, the AIG Plan's Account Equity Statement at ED&F reflects ownership of 500,000 shares of COLOB DC stock credited to the AIG Plan. There was no sale, transfer, or rehypothecation of these shares until on or after December 6, 2013. *Id.* at ED&F-00044992.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated December 6, 2013, reflects a pending purchases of 500,000 shares of COLOB DC stock and an account value of negative $327,061.88.  Dillman Decl. Ex. 115 at ED&F-00044992 - 94.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the AIG Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

250.    ED&F's dividend reconciliation sheet for COLOB DC stock shows that the AIG Plan held a long position of 500,000 shares not settled by record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 2,555,000 at the gross dividend rate of DKK 7.00 per share and net dividend rate equal to 73% of the gross dividend amount. The dividend reconciliation sheets show the net dividend amount payable from ED&F's internal IDV. *Id.* at ED&F-00044995-96.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments to the AIG Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax. SKAT's 56.1 ¶ 105(a).

251.    ED&F received confirmation from Mitsubishi of payment of a market claim dividend on 4,800,000 COLOB DC shares, 500,000 belonging to the AIG Plan, in the amount DKK 24,528,000.00. *Id.* at ED&F-00044997- ED&F-00045000.

**SKAT's Response:** Disputed.  This statement omits key context.  The AIG Plan received no dividend from the share issuer for the 500,000 shares purportedly purchased from Mitsubishi; Mitsubishi made a contractual payment to the AIG Plan through ED&F; and this payment is not traceable to the issuer of securities. SKAT's 56.1 ¶¶ 105-106, 108.

252.    ED&F's ShadowSuite system shows that DKK 2,555,000 was booked to the AIG Plan's account at ED&F as "CASH DIV – COLOB DC." *Id.* at ED&F-00045001.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

253.    The AIG Plan's account statement for the month of December 2013 provided by ED&F showed the crediting to the AIG Plan of DKK 2,555,000.00, with a notation of "CASH DIV - COLOB DC - PD 11-12-2013." Dillman Decl. Ex. 127, at AIG_00000151.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

### *AIG – TDC A/S March 2014*

254.    On March 5, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 1,000,000 shares of TDC DC stock on behalf of the AIG Plan with trade date March 4, 2014 and settlement date March 10, 2014. *See* Dillman Decl. Ex. 116, ED&F-00040919 at ED&F-00040920-21.

**SKAT's Response:**  Disputed.  The trade date was March 5.  Joint 56.1 App'x B (listing Mar. 5, 2014 as the "Trade Date" for AIG Plan's purchase of 1,000,000 TDC shares from Morgan Stanley Equity Derivative Services).  Kaminer did not specify a trade date or settlement date for the shares.  Dillman Decl. Ex. 116, ED&F-00040919 at ED&F-00040920-21.

255.    On March 5, 2014, ED&F on behalf of the AIG Plan purchased 1,000,000 shares of TDC DC with trade date March 5, 2014 and settlement date March 10, 2014 from Volcafe. The total number of TDC DC shares ED&F purchased for pension plans using Acer as their representative and agent was 2,000,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00040920, ED&F-00040922-24, ED&F-00040931-33.

**SKAT's Response:** Undisputed.

256.    ED&F's purchase from Volcafe was confirmed by a MT545 SWIFT message showing delivery of 1,000,000 TDC DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00040977.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

257.    Also on March 6, 2014, Volcafe purchased two lots of 1,000,000 shares of TDC DC from Morgan Stanley with trade date March 5, 2014 and settlement date March 10, 2014. *Id.* at ED&F-00040935-37.

**SKAT's Response:** Undisputed.

258.    ED&F's dividend reconciliation sheet for TDC DC stock shows that the AIG Plan held a long position of 1,000,000 shares of the 24,845,000 shares housed in ED&F Man's depot account at BNP, account number 778523F. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 1,606,000.00 at the gross dividend rate of DKK 2.20 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 39,901,070.00 for all shares housed in the depot account. *Id.* at ED&F-00040983-40984.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 1,606,000.00 described only as "payable," to the AIG Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

259.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 24,845,000 shares of stock of "TDC SHS" in account number 778523F. The MT566 SWIFT states that DKK 39,901,070.00 was the posted net dividend amount, net of DKK 14,757,930 in tax. *Id.* at ED&F-00040985.

**SKAT's Response:** Undisputed.

260.    On March 6, 2014, Stacey Kaminer provided ED&F with a second trade instruction to purchase 2,000,000 shares of TDC DC stock on behalf of the the AIG Plan with trade date March 6, 2014 and settlement date March 12, 2014. *Id.* at ED&F-00040938.

102860210_10

**SKAT's Response:** Disputed. Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares. Dillman Decl. Ex. 116, ED&F-00040919 at ED&F-00040938.

261.    On March 6, 2014, ED&F on behalf of the AIG Plan purchased 2,000,000 shares of TDC DC with trade date March 6, 2014 and settlement date March 12, 2014 from Volcafe. The total number of TDC DC shares ED&F purchased from Volcafe for pension plans using Acer as their representative and agent was 22,300,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00040938, ED&F-00040939.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have TDC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 247 (ED&F-00408963 (ED&F Dubai Account Statement dated March 7, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 130 at ED&F-00040949; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

262.    ED&F's purchase from Volcafe was confirmed by a MT545 SWIFT message showing delivery of 2,000,000 TDC DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00040978.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of shares. SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

263.    Also on March 6, 2014, Volcafe purchased 2,000,000 shares of TDC DC from ED&F Man Professional Trading Dubai ("MPT Dubai) with trade date March 6, 2014 and settlement date March 12, 2014. The total number TDC DC shares sold by MPT Dubai to Volcafe was 22,300,000. *Id.* at ED&F-00040949-51.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have TDC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 247 (ED&F-00408963 (ED&F Dubai Account Statement dated March 7, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 130 at ED&F-00040949; Weinstein Decl. Ex. 87

(Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

264.    ED&F's dividend reconciliation sheet for TDC DC stock shows that the AIG Plan held a long position of 2,000,000 shares, which shares had not yet settled into an ED&F depot account as of the record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 3,212,000.00 at the gross dividend rate of DKK 2.30 per share and net dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00046759-60.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the AIG Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

265.    The dividend reconciliation sheet shows the net dividend amount payable to the AIG Plan can be traced back to MPT Dubai, which held a net short position in TDC, via Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the AIG Plan.  Instead ED&F Dubai made a contractual payment to the AIG Plan, through Volcafe and ED&F.  Weinstein Decl. Ex. 148 (ED&F-00251535); Second Weinstein Decl. Ex. 251 (ED&F-00409258 (ED&F Dubai General Ledger) at 60); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

266.    On March 6, 2014, Stacey Kaminer provided ED&F with a third trade instruction to purchase 2,000,000 shares of TDC DC stock on behalf of the AIG Plan with trade date March 6, 2014 and settlement date March 12, 2014. *Id.* at ED&F-00040954.

**SKAT's Response:** Disputed.  Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares.  Dillman Decl. Ex. 116, ED&F-00040919 at ED&F-00040954.

102860210_10

267.    On March 6, 2014, ED&F on behalf of the AIG Plan purchased 2,000,000 shares of TDC DC with trade date March 6, 2014 and settlement date March 12, 2014 from ED&F's internal IDB. The total number of TDC DC shares ED&F purchased the internal IDC for pension plans using Acer as their representative and agent was 6,000,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00040954, ED&F-00040956, ED&F-00040965.

**SKAT's Response:** Disputed. ED&F internal IDB was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from did not have TDC shares to sell and the transaction was not properly settled to effectuate a purchase of shares or convey a dividend. Weinstein Decl. Ex. 87 (Wall Dep.), at 67:2-69:6, 120:16-121:25; Weinstein Decl. Ex. 130 at ED&F-00040986 – 87 (TDC).

268.    ED&F's purchase from the internal IDB was confirmed by a MT545 SWIFT message showing delivery of 2,000,000 TDC DC shares by the internal IDB to ED&F's depot account at BNP. *Id.* at ED&F-00040979.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of shares. SKAT's 56.1 ¶ 79, 114, 115(b), 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

269.    Also on March 6, 2014, ED&F's internal IDB purchased 3 x 2,000,000 shares of TDC DC from Lutetia Capital with trade date March 6, 2014 and settlement date March 12, 2014. *Id.* at ED&F-00040972-75.

**SKAT's Response:** Disputed. ED&F internal IDB was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from did not have TDC shares to sell and the transaction was not properly settled to effectuate a purchase of shares or convey a dividend. Weinstein Decl. Ex. 87 (Wall Dep.), at 67:2-69:6, 120:16-121:25; Weinstein Decl. Ex. 130 at ED&F-00040986 – 87.

270.    ED&F's dividend reconciliation sheet for TDC DC stock shows that the AIG Plan held a long position of 2,000,000 shares not settled by record date from this. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 3,212,000.00 at the gross dividend rate of DKK 2.30 per share and net dividend

rate equal to 73% of the gross dividend amount. This dividend cannot be traced back to MPT

Dubai, and the dividend reconciliation sheet contains a "YES" in the "CLAIM?" column. *Id.* at

ED&F-00040983-84.

**SKAT's Response:** Disputed. The dividend reconciliation sheets list (i) contractual payments to
the AIG Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by
ED&F to replicate the dividend that would be paid on actual shares subject to Danish
withholding tax. SKAT's 56.1 ¶ 105(a).

271. ED&F then made an outside market claim for the dividend from Lutetia Capital,

received confirmation from Lutetia Capital of payment of the dividend on 6,000,000 TDC DC

shares, 2,000,000 belonging to the AIG Plan, in the amount DKK 9,636,000.00. *Id.* at ED&F-

00040986-87.

**SKAT's Response:** Disputed. This statement omits key context. The AIG Plan received no
dividend from the share issuer for the 2,000,000 shares purportedly purchased from Lutetia
Capital; Lutetia Capital made a contractual payment to the AIG Plan through ED&F; and this
payment is not traceable to the issuer of securities. SKAT's 56.1 ¶¶ 85(f)(iv), 105-106, 108.

272. As of March 7, 2014, the AIG Plan's Account Equity Statement at ED&F reflects

ownership of 5,000,000 shares of TDC DC stock credited to the AIG Plan. There was no sale,

transfer, or rehypothecation of these shares until on or after March 7, 2014. *Id.* at ED&F-

00040980.

**SKAT's Response:** Disputed. The AIG Plan's Account Equity Statement dated March 7, 2014
reflects purchases of 5,000,000 shares of TDC stock and an account value of negative
$3,851,438.73. Dillman Decl. Ex. 116 at ED&F-00040980-82. Because these shares were held in
an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and
interest" in the AIG Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl.
Ex. 171 at 18.

273. ED&F's ShadowSuite system shows that a total DKK 8,030,000.00 was booked

to the AIG Plan's account at ED&F as "CASH DIV - TDC DC." *Id.* at ED&F-00040988-90.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend.
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

274.    The AIG Plan's account statement for the month of March 2014 provided by

ED&F showed the crediting to the AIG Plan of a total of DKK 8,030,000.00, with a notation of

"CASH DIV - TDC DC - PD 12/03/14." Dillman Decl. Ex. 128, at AIG_00000172.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend.
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

*AIG – Danske A/S March 2014*

275.    On March 17, 2014, Stacey Kaminer provided ED&F with a trade instruction to

purchase 3,000,000 shares of DANSKE DC stock on behalf of the AIG Plan with trade date

March 17, 2014 and settlement date March 20, 2014. *See* Dillman Decl. Ex. 117, ED&F-

00045804 at ED&F-00045805.

**SKAT's Response:** Disputed.  Kaminer instructed that the trade should settle T+3, but did not
specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 117, ED&F-
00045804 at ED&F-00045805.

276.    On March 17, 2014, ED&F purchased 3,000,000 shares of DANSKE DC with

trade date March 18, 2014 and settlement date March 20, 2014 from ED&F's internal IDB.

ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00045805, ED&F-

00045807.

**SKAT's Response:** Undisputed.

277.    ED&F's purchase from ED&F's internal IDB was confirmed by a MT545 SWIFT

message showing delivery of 3,000,000 DANSKE DC shares by ED&F's internal IDB to

ED&F's depot account at BNP. *Id.* at ED&F-00045857.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

278.    Also on March 17, 2014, ED&F's internal IDB purchased 3,000,000 shares of DANSKE DC from HSBC Bank PLC with trade date March 17, 2014 and settlement date March 20, 2014. *Id.* at ED&F-00045809.

**SKAT's Response:** Undisputed.

279.    ED&F's dividend reconciliation sheet for DANSKE DC stock shows the AIG Plan held a long position of 3,000,000 shares of the 23,125,000 shares housed in ED&F Man's depot account at BNP, account number 778523F. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 4,380,000.00 at the gross dividend rate of DKK 2.00 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 33,762,500 for all shares housed in the depot account. *Id.* at ED&F-00045863-64.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 4,380,000.00 described only as "payable," to the AIG Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

280.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 3,000,000 shares of "DANSKE BANK A/S" in account number 778523F. The MT566 SWIFT states that DKK 4,380,000 was the posted net dividend amount, net of DKK 1,620,000 in tax. *Id.* at ED&F-00045865.

**SKAT's Response:** Undisputed.

281.    On March 17, 2014, Stacey Kaminer provided ED&F with a second trade instruction to purchase 4,750,000 shares of DANSKE DC stock on behalf of the the AIG Plan with trade date March 18, 2014 and settlement date March 24, 2014. *Id.* at ED&F-00045812-13.

**SKAT's Response:**  Disputed.  Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 117, ED&F-00045804 at ED&F-00045812-13.

102860210_10

282.    On March 18, 2014, ED&F on behalf of the AIG Plan purchased 4,750,000 shares of DANSKE DC with trade date March 18, 2014 and settlement date March 24, 2014 from Volcafe. The total number of DANSKE DC shares ED&F purchased from Volcafe for pension plans using Acer as their representative and agent was 26,125,000. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00045812, ED&F-00045814, ED&F-00045848-50.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have DANKSE DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 248 (ED&F-00409148 (ED&F Dubai Account Statement dated March 18, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 131 at ED&F-00045852; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

283.    ED&F's purchase from Volcafe was confirmed by two MT545 SWIFT messages showing delivery of 4,750,000 DANSKE DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00045858-59.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

284.    Also on March 18, 2014, Volcafe purchased 4,750,000 shares of DANSKE DC from MPT Dubai with trade date March 18, 2014 and settlement date March 24, 2014. The total number DANSKE DC shares sold by MPT Dubai to Volcafe was 26,125,000. *Id.* at ED&F-00045852-54.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have DANSKE DC shares to sell and the transaction was not properly settled to effectuate a purchase.  Second Weinstein Decl. Ex. 248 (ED&F-00409148 (ED&F Dubai Account Statement dated March 18, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 131 at ED&F-00045852; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

102860210_10

285.    ED&F's dividend reconciliation sheet for DANSKE DC stock shows the AIG

Plan held a long position of 4,750,000 shares of the 48,015,000 shares sold to ED&F by Volcafe,

which can further be traced to a short position of 48,015,000 shares held by MPT Dubai. The

dividend reconciliation sheet states that these 4,750,000 shares would create a payable dividend

amount to the AIG Plan of DKK 6,935,000.00 at the gross dividend rate of DKK 2.00 per share

and net dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00045863-64.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments
from ED&F Dubai to the AIG Plan and do not show "payable dividend amounts," and (ii) an
artificial calculation by ED&F to replicate the dividend that would be paid on actual shares
subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept.
2019 FCA Report) at ED&F-00609833–35.

286.    As of March 19, 2014, the AIG Plan's Account Equity Statement at ED&F

reflects ownership of 7,750,000 shares of TDC DC stock credited to the AIG Plan. There was no

sale, transfer, or rehypothecation of these shares until on or after March 19, 2014. *Id.* at ED&F-

00045860.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated March 19, 2014
reflects purchases of 7,750,000 shares of DANSKE DC stock and an account value of negative
$21,339,205.68.  Dillman Decl. Ex. 117 at ED&F-00045860 - 62.  Because these shares were
held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title,
and interest" in the AIG Plan's assets held at ED&F transferred to ED&F outright.  Weinstein
Decl. Ex. 171 at 18.

287.    ED&F's ShadowSuite system shows that DKK 11,315,000.00 was booked to the

AIG Plan's account at ED&F as "CASH DIV - DANSKE DC." *Id.* at ED&F-00045866-87.

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend.
Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

288.    The AIG Plan's account statement for the month of March 2014 provided by

ED&F showed the crediting to the AIG Plan of a total of DKK 11,315,000.00, with a notation of

"CASH DIV - DANSKE DC - PD 24/03/15." Dillman Decl. Ex. 128, at AIG_00000172.

102860210_10

**SKAT's Response:** Disputed to the extent this notation purports to reflect receipt of a dividend. Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

*AIG – Novo Nordisk A/S-B March 2014*

289.    On March 20, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 3,500,000 shares of NOVOB DC stock on behalf of the AIG Plan with trade date March 20, 2014 and settlement date March 26, 2014. *See* Dillman Decl. Ex. 118, ED&F-00048728 at ED&F-00048729-30.

**SKAT's Response:** Disputed. Kaminer instructed that the trade should settle T+4, but did not specify a trade date or settlement date for the shares. *See* Dillman Decl. Ex. 118, ED&F-00048728 at ED&F-00048729-30.

290.    On March 20, 2014, ED&F on behalf of the AIG Plan purchased 3,500,000 shares of NOVOB DC with trade date March 20, 2014 and settlement date March 26, 2014. The total number of NOVOB DC shares ED&F purchased for pension plans using Acer as their representative and agent was 22,000,000: 10,000,000 shares of NOVOB DC were purchased from ED&F's internal IDB and 12,000,000 shares of NOVOB DC were purchased from Volcafe. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00048729, ED&F-00048747, ED&F-48748-51.

**SKAT's Response:** Disputed. Volcafe was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have NOVOB shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 249 (ED&F-00409224 (ED&F Dubai Account Statement dated March 21, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 132 at ED&F-00048754; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12; Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

291.    ED&F's purchases were confirmed by MT545 SWIFT messages showing delivery of 10,000,000 NOVOB DC shares by ED&F's internal IDB and 12,000,000 NOVOB DC shares by Volcafe to ED&F's depot account at BNP. *Id.* at ED&F-00048759-73.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

292.    Also on March 20, 2014, ED&F's internal IDB purchased 10,000,000 shares of

NOVOB from MPT Dubai with trade date March 20, 2014 and settlement date March 26, 2014

and Volcafe purchased 12,000,000 shares of NOVOB DC from MPT Dubai with trade date

March 20, 2014 and settlement date March 26, 2014. *Id.* at ED&F-00048754-57.

**SKAT's Response:** Disputed.  Volcafe was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have NOVOB shares to sell and the transaction was not properly settled to effectuate a purchase.  Second Weinstein Decl. Ex. 249 (ED&F-00409224 (ED&F Dubai Account Statement dated March 21, 2014)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 132 at ED&F-00048754; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

293.    As of March 21, 2014, the AIG Plan's Account Equity Statement at ED&F

reflects ownership of 3,500,000 shares of NOVOB DC stock credited to the AIG Plan. There was

no sale, transfer, or rehypothecation of these shares until on or after March 21, 2014. *Id.* at

ED&F-00048774.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated March 21, 2014 reflects a pending purchase of 3,500,000 shares of NOVOB DC stock and an account value of negative $34,279,059.17.  Dillman Decl. Ex. 118 at ED&F-00048774 - 76.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the AIG Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

294.    ED&F's dividend reconciliation sheet for NOVOB DC stock shows that the AIG

Plan held a long position of 3,500,000 shares not settled by record date. The dividend

reconciliation sheet states that these shares would create a payable dividend amount to the AIG

Plan of DKK 11,497,500.00 at the gross dividend rate of DKK 4.50 per share and net dividend

rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00048778-79.

**SKAT's Response:** Disputed. The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the AIG Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax. SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

295.    The dividend reconciliation sheet shows the net dividend amount payable to the AIG Plan can be traced back to MPT Dubai, which held a net short position in Novo Nordisk, via Volcafe and ED&F's internal IDB. *Id.*

**SKAT's Response:** Disputed. ED&F Dubai received no dividend and could not make dividend payments to the AIG Plan. Instead ED&F Dubai made a contractual payment to the AIG Plan, through Volcafe and ED&F. Second Weinstein Decl. Ex. 260 (ED&F-00444941); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

296.    ED&F's ShadowSuite system shows that DKK 11,497,500.00 was booked to the AIG Plan's account at ED&F as "CASH DIV - NOVOB DC." *Id.* at ED&F-00048780.

**SKAT's Response:** Undisputed.

297.    The AIG Plan's account statement for the month of March 2014 provided by ED&F showed the crediting to the AIG Plan of DKK 11,497,500.00, with a notation of "CASH DIV - NOVOB DC - PD 26/03/14." Dillman Decl. Ex. 128, at AIG_00000172.

**SKAT's Response:** Undisputed.

***AIG – Novozymes A/S February 2015***

298.    On February 25, 2015, Stacey Kaminer provided ED&F with a trade instruction to purchase 750,000 shares of NZYMB DC stock on behalf of the AIG Plan with trade date February 25, 2015 and settlement date March 2, 2015. *See* Dillman Decl. Ex. 119, ED&F-00076389 at ED&F-00076390.

**SKAT's Response:** Disputed. Kaminer did not specify a trade date or settlement date for the shares. *See* Dillman Decl. Ex. 119, ED&F-00076389 at ED&F-00076390.

299.    On February 25, 2015, ED&F on behalf of the AIG Plan purchased 750,000 shares of NZYMB DC stock with trade date February 25, 2015 and settlement date March 2, 2015 from ED&F's internal IDB. ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00076390, ED&F-00076392.

**SKAT's Response:** Disputed.  ED&F's internal IDB was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have NZYMB DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 259 (ED&F-00409781 (ED&F Dubai Account Statement dated March 3, 2015)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 140 at ED&F-00076394; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

300.    ED&F's purchase from ED&F's internal IDB was confirmed by a MT545 SWIFT message showing delivery of 750,000 NZYMB DC shares by from ED&F's internal IDB to ED&F's depot account at SEB. *Id.* at ED&F-00076398.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

301.    Also on February 25, 2015, ED&F's internal IDB purchased 750,000 shares of NZYMB DC stock from MPT Dubai with trade date February 25, 2015 and settlement date March 2, 2015, 2014. *Id.* at ED&F-00076394-95.

**SKAT's Response:** Disputed.  ED&F's internal IDB was unable to convey shares to the AIG Plan because the counterparty it purported to purchase them from, ED&F Dubai, did not have NZYMB DC shares to sell and the transaction was not properly settled to effectuate a purchase. Second Weinstein Decl. Ex. 259 (ED&F-00409781 (ED&F Dubai Account Statement dated March 3, 2015)); SKAT's 56.1 ¶ 85(d)(i)(3)-(4); Weinstein Decl. Ex. 140 at ED&F-00076394; Weinstein Decl. Ex. 87 (Wall Dep.), at 56:11-57:12;  Weinstein Decl. Ex. 147 (ED&F-00443853); Weinstein Decl. Ex. 110 (Letter from Rosenblatt to Pinsent Masons (Jan. 11, 2021); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609827-28.

302.    As of February 26, 2015, the AIG Plan's Account Equity Statement at ED&F reflects ownership of purchased 750,000 shares of NZYMB DC stock credited to the AIG Plan.

102860210_10

There was no sale, transfer, or rehypothecation of these shares until on or after February 26, 2015. *Id.* at ED&F-00076399.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated February 26, 2015 reflects a pending purchase of 750,000 shares of NZYMB DC stock and an account value of negative $542,319.41.  Dillman Decl. Ex. 119 at ED&F-00076399 - 401.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the AIG Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

303.    ED&F's dividend reconciliation sheet for NZYMB DC stock shows that the AIG Plan held a long position of 750,000 shares not settled by record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 1,642,500 at the gross dividend rate of DKK 3.00 per share and net dividend rate equal to 73% of the gross dividend amount. *Id.* at ED&F-00076402.

**SKAT's Response:** Disputed.  The dividend reconciliation sheets list (i) contractual payments from ED&F Dubai to the AIG Plan and do not show "payable dividend amounts," and (ii) an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

304.    The dividend reconciliation sheet shows the net dividend amount payable to the AIG Plan can be traced back to MPT Dubai, which held a net short position in Novozymes, via Volcafe. *Id.*

**SKAT's Response:** Disputed.  ED&F Dubai received no dividend and could not make dividend payments to the AIG Plan.  Instead ED&F Dubai made a contractual payment to the AIG Plan, through Volcafe and ED&F.  Second Weinstein Decl. Ex. 258 (ED&F-00409778 (ED&F Dubai General Ledger)); Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

305.    ED&F's ShadowSuite system shows that DKK 1,642,500.00 was booked to the AIG Plan's account at ED&F as "CASH DIV – NZYMB DC." *Id.* at ED&F-00076403.

**SKAT's Response:** Undisputed.

306.    The AIG Plan's account statement for the month of March 2015 provided by

ED&F showed the crediting to the AIG Plan of DKK 1,642,500.00, with a notation of "CASH

DIV - NZYMB DC - PD 02/03/15." Dillman Decl. Ex. 129, at AIG_00000261.

**SKAT's Response:** Undisputed.

 *AIG – Tryg A/S April 2014*

307.    On April 2, 2014, Stacey Kaminer provided ED&F with a trade instruction to

purchase 50,000 shares of TRYG DC stock on behalf of the AIG Plan with trade date April 2,

2014 and settlement date April 7, 2014. *See* Dillman Decl. Ex. 120, ED&F-00044535 at ED&F-

00044536; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 188(a).

**SKAT's Response:**  Disputed.  Kaminer instructed that the trade should settle T+3, but did not
specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 120, ED&F-
00044535 at ED&F-00044536.

308.    On April 2, 2014, ED&F on behalf of the AIG Plan purchased 50,000 shares of

TRYG DC with trade date April 2, 2014 and settlement date April 7, 2014 from Link. ED&F

provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex. 120 at ED&F-

00044536, ED&F-00044538, ED&F-00044541-42; Dillman Decl. Ex. 91, Response to ED&F's

Request for Admission No. 188(b).

**SKAT's Response:** Undisputed.

309.    ED&F's purchase from Link was confirmed by a MT545 SWIFT message

showing delivery of 50,000 TRYG DC shares from Link to ED&F's depot account at BNP.

Dillman Decl. Ex. 120 at ED&F-00044546.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

310.    As of April 4, 2014, the AIG Plan's Account Equity Statement at ED&F reflects

ownership of 50,000 shares of TRYG DC stock credited to the AIG Plan. There was no sale,

102860210_10

transfer, or rehypothecation of these shares until on or after April 4, 2014. *Id.* at ED&F-00044547.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated April 4, 2014 reflects a pending sale of 50,000 shares of TRYG DC stock and an account value of negative $31,012,387.42.  Dillman Decl. Ex. 120 at ED&F-00044547 - 49.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

311.    ED&F's dividend reconciliation sheet for TRYG DC stock shows that the AIG Plan held a long position of 50,000 shares of the 73,000 shares housed in ED&F Man's depot account at BNP, account number 778523F, settled by record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 985,500 at the gross dividend rate of DKK 27.00 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 1,438,830.00 for all shares housed in the depot account. *Id.* at ED&F-00044551-52.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 985,500.00 described only as "payable," to the AIG Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

312.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 73,000 shares of stock of "TRYG A/S" in account number 778523F. The MT566 SWIFT states that DKK 1,438,830.00 was the posted net dividend amount, net of DKK 532,170 in tax. *Id.* at ED&F-00044553.

**SKAT's Response:** Undisputed.

313.    ED&F's ShadowSuite system shows that DKK 985,500 was booked to the AIG Plan's account at ED&F as "CASH DIV - TRYG DC." *Id.* at ED&F-00044554.

**SKAT's Response:** Undisputed.

102860210_10

314.    The AIG Plan's account statement for the month of April 2014 provided by

ED&F showed the crediting to the AIG Plan of DKK 985,500.00, with a notation of "CASH

DIV - TRYG DC - PD 09/04/14." Dillman Decl. Ex. 130, at AIG_00000184.

**SKAT's Response:** Undisputed.

*AIG – AP Moeller – Maersk A/S - B April 2014*

315.    On March 28, 2014, Stacey Kaminer provided ED&F with a trade instruction to

purchase 1,000 shares of MAERSKB DC stock on behalf of the AIG Plan with trade date March

28, 2014 and settlement date April 2, 2014. *See* Dillman Decl. Ex. 121, ED&F-00077536 at

ED&F-00077537; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No.

300(a).

**SKAT's Response:**  Disputed.  Kaminer instructed that the trade should settle T+3, but did not
specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 121, ED&F-
00077536 at ED&F-00077537.

316.    On March 28, 2014, ED&F on behalf of the AIG Plan purchased 1,000 shares of

MAERSKB DC with trade date March 28, 2014 and settlement date April 2, 2014 from its

internal inter-dealer broker. ED&F provided confirmation of this trade to Stacey Kaminer.

Dillman Decl. Ex. 121 at ED&F-00077537, ED&F-00077539; Dillman Decl. Ex. 91, Response

to ED&F's Request for Admission No. 300(b).

**SKAT's Response:** Undisputed.

317.    ED&F's purchase from the internal IDB was confirmed by a MT545 SWIFT

messages showing delivery of 1,000 MAERSKB DC by the internal IDB desk to ED&F's depot

account at BNP. Dillman Decl. Ex. 121 at ED&F-00077543.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of
shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

318.    Also on March 28, 2014, ED&F's internal IDB purchased 1,000 shares of

MAERSKB DC from HSBC Bank PLC with trade date March 28, 2014 and settlement date

April 2, 2014. *Id.* at ED&F-00077541.

**SKAT's Response:** Undisputed.

319.    As of April 1, 2014, the AIG Plan's Account Equity Statement at ED&F reflects

ownership of 1,000 shares of MAERSKB DC stock credited to the AIG Plan. There was no sale,

transfer, or rehypothecation of these shares until on or after April 1, 2014. *Id.* at ED&F-

00077544.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated April 1, 2014
reflects a pending sale of 1,000 shares of MAERSKB DC stock and an account value of negative
$30,963,825.80.  Dillman Decl. Ex. 121 at ED&F-0077544 - 46.  Because these shares were held
in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and
interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein
Decl. Ex. 171 at 18.

320.    ED&F's dividend reconciliation sheet for MAERSKB DC stock shows that the

AIG Plan held a long position of 1,000 shares of the 12,500 shares housed in ED&F Man's depot

account at BNP, account number 778523F, settled by record date. The dividend reconciliation

sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK

1,022,000 at the gross dividend rate of DKK 1400.00 per share and net dividend rate equal to

73% of the gross dividend amount, out of a total dividend entitlement of DKK 12,775,000.000

for all shares housed in the depot account. *Id.* at ED&F-00077547-48.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend
reconciliation sheet lists DKK 1,022,000.00 described only as "payable," to the AIG Plan.  The
cited supporting documentation does not support the characterization of "net dividend rate" or
"dividend entitlement."

321.    ED&F received an MT566 SWIFT message showing a cash dividend payment on

account of 12,500 shares of stock of "AP MOELLER MASERK A/S" in account number

102860210_10

778523F. The MT566 SWIFT states that DKK 12,775,000.00 was the posted net dividend amount, net of DKK 4,725,000 in tax. *Id.* at ED&F-00077549.

**SKAT's Response:** Undisputed.

322.    ED&F's ShadowSuite system shows that DKK 1,022,000 was booked to the AIG Plan's account at ED&F as "CASH DIV - MAERSKB DC." *Id.* at ED&F-00077550.

**SKAT's Response:** Undisputed.

323.    The AIG Plan's account statement for the month of April 2014 provided by ED&F showed the crediting to the AIG Plan of DKK 1,022,000.00, with a notation of "CASH DIV - MAERSKB DC - PD 09/04/14." Dillman Decl. Ex. 130, AIG_00000184.

**SKAT's Response:** Undisputed.

*AIG – TDC A/S August 2014*

324.    On August 7, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 3,400,000 shares of TDC, DC stock on behalf of the AIG Plan with trade date August 7, 2014 and settlement date August 11, 2014. *See* Dillman Decl. Ex. 122, ED&F-00042261 at ED&F-00042262-63; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 150(a).

**SKAT's Response:** Disputed.  Kaminer instructed that the trade should settle T+2, but did not specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 122, ED&F-00042261 at ED&F-00042262-63.

325.    On August 7, 2014, ED&F on behalf of the AIG Plan purchased 3,400,000 shares of TDC DC with trade date August 7, 2014 and settlement date August 11, 2014 through its internal inter-dealer broker. The total number of TDC DC shares ED&F purchased from the internal IDB for pension plans using Acer as their representative and agent was 16,601,000. ED&F provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex. 122 at ED&F-

102860210_10

00042262, ED&F-00042266, ED&F-00042274; Dillman Decl. Ex. 91, Response to ED&F's

Request for Admission No. 150(b).

**SKAT's Response:** Disputed. The statement does not accurately describe the nature of the
purported purchase.

326.    ED&F's purchase from the internal IDB was confirmed by a MT545 SWIFT

messages showing delivery of 3,400,000 TDC DC shares by the Internal IDB desk to ED&F's

depot account at SEB. Dillman Decl. Ex. 122 at ED&F-00042324.

**SKAT's Response:** Disputed. The MT545 SWIFT message does not reflect the purchase of
shares. SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report)
at ED&F-00609832.

327.    Also on August 7, 2014, ED&F's internal IDB purchased from ED&F's client

facilitation account 3,400,000 shares of TDC DC with trade date August 7, 2014 and settlement

date August 11, 2014. The total number of shares purchased from ED&F's client facilitation

account was 16,601,000. *Id.* at, ED&F-00042277.

**SKAT's Response:** Disputed. The statement does not accurately describe the nature of the
purported purchase and is not supported by admissible evidence.

328.    Prior to August 7, 2015, ED&F's client facilitation account had borrowed

16,601,000 shares of TDC DC. The 16,601,000 shares were made up of: 2,800,000 from Maple

Securities on 14 July 2014; 2,750,000 from ING Bank on 15 July 2014; 2,245,000 from ING

Bank on 17 July 2014; 500,000 from Jefferies on 18 July 2014; 500,000 from Maple Securities

on 18 July 2014; 161,000 from ING Bank on 15 July 2014; 1,145,000 from Jefferies on 30 July

2014; 1,500,000 from ING Bank on 30 July 2014; and 5,000,000 from Morgan Stanley on 30

July 2014. *Id.* at ED&F-00042280-302.

**SKAT's Response:** Disputed. The statement does not accurately describe the nature of the
purported stock borrow, and is not supported by admissible evidence.

102860210_10

329. MT544 SWIFT messages confirm the stock borrows showing delivery of 16,601,000 from the respective banks to ED&F's depot account at SEB. *Id*. at ED&F-00042309-23.

**SKAT's Response:** Disputed. The MT544 SWIFT messages do not reflect the borrowing of shares or delivery of 16,601,000 TDC shares. SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

330. As of August 8, 2014, the AIG Plan's Account Equity Statement at ED&F reflects ownership of 3,400,000 shares of TDC DC stock credited to the AIG Plan. There was no sale, transfer, or rehypothecation of these shares until on or after August 8, 2014. *Id.* at ED&F-000442325.

**SKAT's Response:** Disputed. The AIG Plan's Account Equity Statement dated August 8, 2014 reflects a pending purchase of 3,400,000 shares of TDC DC stock and an account value of negative $1,899,907.43. Dillman Decl. Ex. 122 at ED&F-00042325 - 27. Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright. Weinstein Decl. Ex. 171 at 18.

331. ED&F's dividend reconciliation sheet for TDC DC stock shows that the AIG Plan held a long position of 3,400,000 shares of the 40,913,000 shares housed in ED&F Man's depot account at SEB, account number 05295142806, settled by record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 3,723,000.00 at the gross dividend rate of DKK 1.50 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 44,799,735.00 for all shares housed in the depot account. *Id.* at ED&F-00042328-29.

**SKAT's Response:** Disputed. This fact is not supported by the cited document. The dividend reconciliation sheet lists DKK 3,723,000 described only as "payable," to the AIG Plan. The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

102860210_10

332.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 40,913,000 shares of TDC in account number 05295142806. The MT566 SWIFT states that DKK 44,799,735.00 was the posted net dividend amount, net of DKK 16,569,765 in tax. *Id.* at ED&F-00042330.

**SKAT's Response:** Undisputed.

333.    ED&F's ShadowSuite system shows that DKK 3,723,000 was booked to the AIG Plan's account at ED&F as "CASH DIV - TDC DC." *Id.* at ED&F-00042333.

**SKAT's Response:** Undisputed.

334.    The AIG Plan's account statement for the month of August 2014 provided by ED&F showed the crediting to the AIG Plan of DKK 3,723,000.00, with a notation of "CASH DIV - TDC DC - PD 13/08/14." Dillman Decl. Ex. 123, ED&F-00177423.

**SKAT's Response:** Undisputed.

335.    ED&F prepared a tax voucher for the AIG Plan confirming that the AIG Plan held 3,400,000 shares of TDCA/S stock over the ex-dividend date of August 8, 2014. The tax voucher states that the AIG Plan received a dividend in the amount of DKK 3,723,000.00 and indicates "WHT Suffered" in the amount of DKK 1,377,000 at a tax rate of 27% of the gross dividend amount. Dillman Decl. Ex. 122, ED&F-00042261.

**SKAT's Response:** Disputed.  The tax voucher prepared by ED&F for the AIG Plan states that the AIG Plan "was holding the below security over the dividend date," but does not define or identify "the dividend date."  Dillman Decl. Ex. 122, ED&F-00042261; Joint 56.1 ¶ 342.

336.    From August 2014 through March 2015, the AIG Plan held 3,400,000 shares of TDC DC stock, which it had acquired in August 2014. Dillman Decl. Ex. 131, AIG_00000262.

**SKAT's Response:** Disputed.  The shares were rehypothecated from the AIG Plan's account and returned to the lenders by August 15, 2014.  Weinstein Decl. Ex. 127 (SEB Settlement Record) at 2 (Tab "Fin 05295142806"), 8-10 (Tab "Fin 05295142814"), and 11 (Tab "Fin

102860210_10

05295142822"); Weinstein Decl. Ex. 128 (SEB Settlement Record) at 3 (Tab "05295142814 EUR").

337.    The AIG Plan's account statement for the month of March 2015 provided by ED&F showed the crediting to the AIG Plan of DKK 3,400,000, with a notation of "STCK LOAN DIV - TDC DC - PD 10/03/14." *Id.* at AIG_00000261.

**SKAT's Response:**  SKAT does not dispute this statement but disputes its materiality.

338.    For the March 2015 dividend event concerning TDC DC, the AIG Plan did not suffer any withholding tax. *Id.* at AIG_00000261.

**SKAT's Response:**  SKAT does not dispute this statement but disputes its materiality.

339.    There is no record evidence that ED&F provided a tax voucher for the AIG Plan in relation to the March 2015 dividend event concerning the AIG Plan's holdings of 3,400,000 shares of TDC DC stock, and no withholding tax refund application was submitted in connection with these holdings.

**SKAT's Response:**  SKAT does not dispute this statement but disputes its materiality.

***AIG – Chr. Hansen Holding A/S November 2014***

340.    On November 28, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase up to 1,000,000 shares of CHR DC stock on behalf of the AIG Plan. The instruction states that November 27, 2014 had been "overlooked as a possible trading day" due to the U.S. Thanksgiving holiday, and asks ED&F if an accommodation could be made. *See* Dillman Decl. Ex. 124, ED&F-00026785 at ED&F-00026786.

**SKAT's Response:** Undisputed.

341.    ED&F on behalf of the AIG Plan purchased 800,000 shares of CHR DC with trade date November 27, 2014 and settlement date December 1, 2014 through its internal IDB.

102860210_10

ED&F provided confirmation of this trade to Stacey Kaminer. *Id.* at ED&F-00026786, ED&F-00026788.

**SKAT's Response:** Disputed.  The statement does not accurately describe the date or nature of the purported purchase.

342.    ED&F's purchase from the internal IDB was confirmed by a MT545 SWIFT messages showing delivery of 800,000 CHR DC shares by the Internal IDB desk to ED&F's depot account at SEB. *Id.* at ED&F-00026799.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

343.    ED&F's internal IDB purchased from ED&F's client facilitation account 800,000 shares of CHR DC with trade date November 27, 2014 and settlement date December 1, 2014. *Id.* at, ED&F-00026791.

**SKAT's Response:** Disputed.  The statement does not accurately describe the nature of the purported purchase.

344.    Prior to November 27, 2014, ED&F's client facilitation account had borrowed 800,000 shares of CHR DC from Morgan Stanley. *Id.* at, ED&F-00026792-97.

**SKAT's Response:** Disputed.  The statement does not accurately describe the nature of the purported stock borrow.

345.    As of November 28, 2014, the AIG Plan's Account Equity Statement at ED&F reflects ownership of 800,000 shares of CHR DC stock credited to the AIG Plan. There was no sale, transfer, or rehypothecation of these shares until on or after November 28, 2014. *Id.* at ED&F-00026800.

**SKAT's Response:** Disputed.  The AIG Plan's Account Equity Statement dated November 28, 2014 reflects a pending sale of 800,000 shares of CHR DC stock and an account value of $468,397.16.  Dillman Decl. Ex. 124 at ED&F-0026800 - 02.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and

102860210_10

interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

346.    ED&F's dividend reconciliation sheet for CHR DC stock shows that the AIG Plan held a long position of 800,000 shares of the 4,080,000 shares housed in ED&F Man's depot account at SEB, account number 05295142806, settled by record date. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 2,210,680.00 at the gross dividend rate of DKK 3.77 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 11,228,568.00 for all shares housed in the depot account. *Id.* at ED&F-00026803.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 2,201,680.00 described only as "payable," to the AIG Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

347.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 4,080,000 shares of stock of "CHR HANSEN HOLDING" in account number 05295142806. The MT566 SWIFT states that DKK 11,228,568.00 was the posted net dividend amount, net of DKK 4,153,031 in tax. *Id.* at ED&F-00026804.

**SKAT's Response:** Undisputed.

348.    ED&F's ShadowSuite system shows that DKK 2,210,680.00 was booked to the AIG Plan's account at ED&F as "CASH DIV - CHR DC." *Id.* at ED&F-00026805.

**SKAT's Response:** Undisputed.

349.    The AIG Plan's account statement for the month of December 2014 provided by ED&F showed the crediting to the AIG Plan of DKK 2,201,680.00, with a notation of "CASH DIV - CHR DC - PD 02/12/14." Dillman Decl. Ex. 131, at AIG_00000241.

**SKAT's Response:** Undisputed.

102860210_10

*AIG – Coloplast A/S December 2014*

350.    On December 3, 2014, Stacey Kaminer provided ED&F with a trade instruction to purchase 1,500,000 shares of COLOB DC stock on behalf of the AIG Plan with trade date December 3, 2014 and settlement date December 5, 2014. *See* Dillman Decl. Ex. 125, ED&F-00045535 at ED&F-00045536-37; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 204(a).

**SKAT's Response:** Disputed.  ED&F specified that the settlement date was T+2, but did not specify a trade date or settlement date for the shares.  *See* Dillman Decl. Ex. 125, ED&F-00045535 at ED&F-00045536-37.

351.    On December 3, 2014, ED&F on behalf of the AIG Plan purchased 1,500,000 shares of COLOB DC with trade date December 3, 2014 and settlement date December 5, 2014 through its internal inter-dealer broker. ED&F provided confirmation of this trade to Stacey Kaminer. Dillman Decl. Ex. 125 at ED&F-00045536, ED&F-00045543; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 204(b).

**SKAT's Response:** Undisputed.

352.    ED&F's purchase from the internal IDB was confirmed by two MT545 SWIFT messages showing delivery by the internal IDB desk to ED&F's depot account at SEB. Dillman Decl. Ex. 125 at ED&F-00045550-51.

**SKAT's Response:** Disputed.  The MT545 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

353.    Also on December 3, 2014, ED&F's internal IDB purchased a total of 1,500,000 shares of COLOB DC from Morgan Stanley with trade date December 3, 2014 and settlement date December 5, 2014. *Id.* at ED&F-00045548.

**SKAT's Response:** Undisputed.

102860210_10

354.    As of on December 5, 2014, the AIG Plan's Account Equity Statement at ED&F reflects ownership of 1,500,000 shares of COLOB DC stock credited to the AIG Plan. There was no sale, transfer, or rehypothecation of these shares until on or after December 5, 2014. *Id.* at ED&F-00045552.

**SKAT's Response:** Disputed. The AIG Plan's Account Equity Statement dated December 5, 2014 reflects a "Trade Date Position" of 1,500,000 shares of COLOB DC stock and an account value of negative $11,059,597.70.  Dillman Decl. Ex. 125 at ED&F-00045552 - 54.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

355.    ED&F's dividend reconciliation sheet for COLOB DC stock shows that the AIG Plan held a long position of 1,500,000 shares of the 4,630,000 shares housed in ED&F Man's depot account at SEB, account number 05295142806. The dividend reconciliation sheet states that these shares would create a payable dividend amount to the AIG Plan of DKK 8,212,500 at the gross dividend rate of DKK 7.50 per share and net dividend rate equal to 73% of the gross dividend amount, out of a total dividend entitlement of DKK 25,349,250.00 for all shares housed in the depot account. *Id.* at ED&F-00045555.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 8,212,500.00 described only as "payable," to the AIG Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

356.    ED&F received an MT566 SWIFT message showing a cash dividend payment on account of 4,630,000 shares of stock of "COLOPLAST B" in account number 05295142806. The MT566 SWIFT states that DKK 25,349,250.00 was the posted net dividend amount, net of DKK 9,375,750.00 in tax. *Id.* at ED&F-00045556.

**SKAT's Response:** Undisputed.

357.    ED&F's ShadowSuite system shows that DKK 8,212,500 was booked to the AIG

Plan's account at ED&F as "CASH DIV - COLOB DC." *Id.* at ED&F-00045557.

**SKAT's Response:** Undisputed.

358.    The AIG Plan's account statement for the month of December 2014 provided by

ED&F showed the crediting to the AIG Plan of DKK 8,212,500.00, with a notation of "CASH

DIV - COLOB DC - PD 09/12/14." Dillman Decl. Ex. 131, at AIG_00000241.

**SKAT's Response:** Undisputed.

*AIG – AP Moeller – Maersk A/S -B March 2015*

359.    On March 30, 2015, Alan Goldman provided ED&F with a trade instruction to

purchase 5,000 shares of MAERSKB DC stock on behalf of the AIG Plan with trade date March

30, 2015. *See* Dillman Decl. Ex. 126, ED&F-00078083 at ED&F-00078084-85; Dillman Decl.

Ex. 91, Response to ED&F's Request for Admission No. 307(a).

**SKAT's Response:**  Disputed.  Goldman did not specify a trade date or settlement period for the shares.  *See* Dillman Decl. Ex. 126, ED&F-00078083 at ED&F-00078084-85.

360.    On March 30, 2015, ED&F on behalf of the AIG Plan purchased 4,000 shares of

MAERSKB DC with trade date March 30, 2015 and settlement date April 1, 2015 through its

internal inter-dealer broker. The total number of MAERSKB DC shares ED&F purchased for

pension plans using Acer as their representative and agent was 9,595, made up of three lots of

4,000, 3,570, and 2,025 shares respectively. ED&F provided confirmation of this trade to Alan

Goldman. Dillman Decl. Ex. 126 at ED&F-00078084, ED&F-00078091, ED&F-00078094;

Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 307(b).

**SKAT's Response:**  Disputed.  This statement does not accurately describe the nature of the purported purchase and is not supported by the cited documents.  *See* Dillman Decl. Ex. 126 at ED&F-00078084, ED&F-00078091, ED&F-00078094; Dillman Decl. Ex. 91, Response to ED&F's Request for Admission No. 307(b).

102860210_10

361.    ED&F's purchase from the internal IDB was confirmed by a MT544 SWIFT message showing delivery of 9,595 MAERSKB DC shares by the internal IDB desk to ED&F's depot account at SEB. Dillman Decl. Ex. 126 at ED&F-00078104-06.

**SKAT's Response:** Disputed.  The MT544 SWIFT message does not reflect the purchase of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832.

362.    Also on March 30, 2015, ED&F's internal IDB purchased from ED&F's client facilitation account 9,595 shares of MAERSKB DC with trade date March 30, 2015 and settlement date April 1, 2015. *Id.* at, ED&F-00078095.

**SKAT's Response:**  Disputed.  The statement does not accurately describe the nature of the purported purchase and is not supported by admissible evidence. .

363.    Prior to March 30, 2015, ED&F's client facilitation account had borrowed 9,595 shares of MAERSKB DC: 4,000 shares were borrowed from Maple Securities (UK) Ltd on March 10, 2015; 3,570 shares were borrowed from Jefferies International on March 11, 2015; and 2,025 shares were borrowed from Jefferies International on March 30, 2015. *Id.* at, ED&F-00078096-99.

**SKAT's Response:**  Disputed.  The statement does not accurately describe the nature of the purported stock borrow and is not supported by admissible evidence.

364.    MT544 SWIFT messages confirm the stock borrows showing delivery of 9,595 from the respective banks to ED&F's depot account at SEB.  *Id.* at ED&F-00078101-03.

**SKAT's Response:**  Disputed.  The MT544 SWIFT message does not reflect the borrowing of shares.  SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832..

365.    As of March 31, 2015, the AIG Plan's Account Equity Statement at ED&F reflects ownership of 4,000 shares of MAERSKB DC stock credited to the AIG Plan. There was

102860210_10

no sale, transfer, or rehypothecation of these shares until on or after March 31, 2015. *Id.* at

ED&F-00078107.

**SKAT's Response:** Disputed. The AIG Plan's Account Equity Statement dated March 31, 2015, reflects a pending sale of 4,000 shares of MAERSKB DC stock and an account value of negative $1,117,657.32.  Dillman Decl. Ex. 126 at ED&F-00078107 - 09.  Because these shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the Riverside Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

366.    ED&F's dividend reconciliation sheet for MAERSKB DC stock shows that the

AIG Plan held a long position of 4,000 shares of the 126,314 shares housed in ED&F Man's

depot account at SEB, account number 05295142806. The dividend reconciliation sheet states

that these shares would create a payable dividend amount to the AIG Plan of DKK 5,755,320.00

at the gross dividend rate of DKK 1971.00 per share and net dividend rate equal to 73% of the

gross dividend amount, out of a total dividend entitlement of DKK 181,744,372.62 for all shares

housed in the depot account. *Id.* at ED&F-00078110.

**SKAT's Response:** Disputed.  This fact is not supported by the cited document.  The dividend reconciliation sheet lists DKK 5,755,320.00 described only as "payable," to the AIG Plan.  The cited supporting documentation does not support the characterization of "net dividend rate" or "dividend entitlement."

367.    ED&F received an MT566 SWIFT message showing a cash dividend payment on

account of 126,314 shares of stock of "MOELLER MAERSK B" in account number

05295142806. The MT566 SWIFT states that DKK 181,744,372.62 was the posted net dividend

amount, net of DKK 67,220,521.38 in tax. *Id.* at ED&F-00078111.

**SKAT's Response:** Undisputed.

368.    ED&F's ShadowSuite system shows that DKK 5,755,320.00 was booked to the

AIG Plan's account at ED&F as "CASH DIV - MAERSKB DC." *Id.* at ED&F-00078112.

**SKAT's Response:** Undisputed.

102860210_10

369.    The AIG Plan's account statement for the month of April 2015 provided by ED&F showed the crediting to the AIG Plan of DKK 5,755,320.00, with a notation of "CASH DIV - MAERSKB DC - PD 07/04/15." Dillman Decl. Ex. 132, at AIG_00000268.

**SKAT's Response:** Undisputed.

370.    The transactions included in Appendix F of the December 31, 2021 Expert Report of Graham Wade are transactions under which ED&F (or one of its clients) did in fact obtain what Mr. Wade describes as a "real dividend," i.e., a dividend paid by the issuer net of withholding tax.  Dillman Decl. Ex. 99, Wade Report ¶¶ 70, 162.

**SKAT's Response:** Undisputed.

371.    There is no record evidence that ED&F made any attempt to reclaim from SKAT any tax withheld on any Danish securities acquired by the AIG Plan.

**SKAT's Response:** This proposed fact is not material to any issue before the court.

372.    There is no record evidence that ED&F made any attempt to reclaim from SKAT any tax withheld on any Danish securities acquired by the Riverside Plan.

**SKAT's Response:** This proposed fact is not material to any issue before the court.

373.    For the AIG and Riverside Plans' trading in Danish securities, Stacey Kaminer was involved in Acer's due diligence process, by which she would determine what the dividend per share was and what the yield would be. She would also review publicly available information about the issuing company. She communicated with ED&F by phone prior to any transaction in Danish securities for the AIG and Riverside Plans to confirm the details of any transaction, including the pricing of the securities, the number of shares available, and the proposed settlement periods. It was her practice to enter into trades on behalf of the AIG and Riverside

102860210_10

Plans over the phone with ED&F and subsequently send confirmatory emails. Kaminer Decl. ¶¶

8–10.

**SKAT's Response:** Disputed.  This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading.  Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and pricing; and in executing those trades with ED&F.  (Second Weinstein Decl. Ex. 235, Ex. 234, Ex. 204 (Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 192:2-202:23, 182:3-185:3 .  Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F.  Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25.  Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT.  Joint 56.1 ¶¶ 323(a)-(c).

374.    For all but one of the Danish securities transactions for the AIG and/or Riverside

Plans, Stacey Kaminer emailed ED&F prior to the ex-date of a dividend event, instructing ED&F

to purchase Danish securities for the AIG and/or Riverside Plans. The instructions would

typically include the price for the securities, the number of shares, and which of the plans would

be trading in the securities. Stacey Kaminer would also, typically, instruct ED&F to hedge the

transaction, typically with the sale of a single stock future. The details of Stacey Kaminer's

instructions to ED&F would have been worked out ahead of time with ED&F to ensure that

ED&F had the liquidity and financing available to it to facilitate the trades. Kaminer Decl. ¶ 11;

Kaminer Dep. 98:25–99:5, 291:13–292:1, 374:5–20.

**SKAT's Response:** Disputed.  Further, this statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading.  In her trade instructions on behalf of the AIG and Riverside Plans, Kaminer included a share price on only five of the twenty-five trade instructions for the AIG and Riverside Plans.  *See* Dillman Decl. Ex. 115, ED&F-00044985 at ED&F-00044986; Dillman Decl. Ex. 116, ED&F-00040919 at ED&F-00040920-21 and ED&F-00040954; Dillman Decl. Ex. 117, ED&F-00045804 at ED&F-00045805; Dillman Decl. Ex. 120, ED&F-00044535 at ED&F-00044536.

Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; selecting the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; negotiating financing; and in executing those trades with ED&F.  (Second Weinstein Decl. Ex. 235, Ex. 234, Ex. 233, Ex. 204

(Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 182:3-185:3, 192:2-202:23. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c).

375.    After Stacey Kaminer communicated trade instructions to ED&F, ED&F provided confirmations of the trade and the relevant hedging transaction. Stacey Kaminer received these confirmations on the same day she sent the written trade instructions. The trade confirmations from ED&F contained information concerning the AIG and/or Riverside Plans' transactions, including the name of the security purchased, the number of shares purchased, the share price, the trade date, and the settlement date. Kaminer Decl. ¶ 13.

**SKAT's Response:** Undisputed.

376.    Stacey Kaminer understood from her written trade instructions sent to ED&F and her receipt of a related trade confirmation that the AIG and/or Riverside Plans identified in the trade confirmations had purchased the identified shares as of or on the trade date identified in the trade confirmation. Kaminer Decl. ¶¶ 13, 14.

**SKAT's Response:** Disputed. This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading. Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; and in executing those trades with ED&F. Second Weinstein Decl. Ex. 235, Ex. 234, Ex. 204 (Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 182:3-185:3, 192:2-202:23. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c).

377.    Stacey Kaminer understood from the Account Equity Statements provided by ED&F, in conjunction with the trade confirmations, that the AIG and/or Riverside Plans had purchased the securities on the trade date and had settled on the relevant settlement date and that

102860210_10

ED&F was holding the relevant pension plan's right to these shares for the relevant pension plan.

Kaminer Decl. ¶ 15.

**SKAT's Response:** Disputed. This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading. Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; and in executing those trades with ED&F. Second Weinstein Decl. Ex. 235, Ex. 234, Ex. 204 (Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 182:3-185:3, 192:2-202:23. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c).

378. Stacey Kaminer understood the entry of a "CASH DIV" on the Account Equity Statements provided by ED&F to mean that the AIG and/or Riverside Plan had received a dividend net of withholding taxes and that ED&F was holding the relevant pension plan's right to these shares for the relevant pension plan. Kaminer Decl. ¶ 16.

**SKAT's Response:** Disputed. This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading. Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; and in executing those trades with ED&F. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c).

379. For each of the Danish securities transactions by the AIG and/or Riverside Plans, ED&F provided a tax voucher. Stacey Kaminer understood that the tax vouchers provided by ED&F were confirmation by ED&F, which she believed was a highly reputable and regulated entity, that the AIG and/or Riverside Plans had received a dividend and had suffered withholding taxes. Kaminer Decl. ¶¶ 5, 17.

102860210_10

**SKAT's Response:** Disputed. This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading. Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; and in executing those trades with ED&F. Second Weinstein Decl. Ex. 235, Ex. 234, Ex. 204 (Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 182:3-185:3, 192:2-202:23. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c).

380.    Stacey Kaminer understood that the AIG and/or Riverside Plans had received a dividend and had suffered withholding taxes and believed that the AIG and/or Riverside Plans were entitled to submit withholding-tax refund applications to SKAT based on (i) her experience in dividend arbitrage and (ii) the information available to her, including (a) the trade confirmations provided by ED&F showing that the relevant trade was executed prior to the relevant ex-date; (b) the AIG and/or Riverside Plans' account statements reflecting receipt and ownership of a dividend designated as a "CASH DIV;" and (c) the subsequent receipt of a tax voucher from ED&F. Kaminer Decl. ¶ 18.

**SKAT's Response:** Disputed. This statement lacks key context and understates Kaminer and Acer's roles in the AIG and Riverside Plans' Danish trading. Together with ED&F, Kaminer was responsible for determining the specific trading structure to be used; the Danish securities in which the AIG and Riverside Plans would trade, including share quantities, settlement periods, and all-in pricing; and in executing those trades with ED&F. Second Weinstein Decl. Ex. 235, Ex. 234, Ex. 204 (Crema Dep.) at 90:11-91:21, Ex. 208 (Kaminer Dep.) at 164:2-170:6, 182:3-185:3, 192:2-202:23. Kaminer also facilitated the AIG and Riverside Plans' opening accounts at ED&F and other institutions, and obtained legal advice on the AIG and Riverside Plans' agreements with ED&F. Joint 56.1 ¶ 279, 281, 282; Second Weinstein Decl. Ex. 213 (Schulman Dep.) at 69:16-25. Finally, Kaminer requested that ED&F send Tax Vouchers to Goal for the purpose of submitting them to SKAT. Joint 56.1 ¶¶ 323(a)-(c).

381.    Robert Crema relied on the information conveyed to him by Kaminer about the AIG Plan's Danish trades and dividends received. Robert Crema Dep. 172:21-176:25.

**SKAT's Response:** Disputed. Crema participated in calls with ED&F about trading by the AIG and Riverside Plans, assisted Kaminer in determining what Danish stocks to trade, and

102860210_10

negotiated Acer's share of the Plans' profits with ED&F.  Second Weinstein Decl. Ex. 245, Ex. 234, Ex. 237, Ex. 232, Ex. 204 (Crema Dep.) at 185:21-186:14; Ex. 208 (Kaminer Dep.) at 63:18-64:15.  Crema also received information from others at Acer about the AIG Plan's Danish trades.  *See*, *e.g.*, Second Weinstein Decl. Ex. 238.  Further, Crema executed a "Confirmation of Election Statement/FSA Client Categorisation" with ED&F, which expressly states that "[a]ny assets, including cash, held or received by us from you or in respect of your account will be dealt with in accordance with clause 10(b) ("Assets Transferred") of our Terms and Conditions," and was aware that ED&F provided financing for the AIG and Riverside Plans' trades, without which the plans could not have made the trades in Danish shares.  Joint 56.1 ¶¶ 277, 278; Second Weinstein Decl. Ex. 239; Second Weinstein Decl. Ex. 204 (Crema Dep.) at 58:8-59:14.

382.    David Schulman relied on Acer to conduct, on behalf of the Riverside Plan, all of the Riverside Plan's trading through ED&F. Schulman Dep. 76:14–77:1-6; 120 13–21; 122:2–123:5; 135:8-24, 137:13–21; 152:25-153:8.

**SKAT's Response:**  Undisputed.

383.    In October 2016, SKAT stated that "[the AIG Plan], as a pension fund—with a single participant and the resulting limited amounts of deposits—did not have the sufficient capital basis to be able to make investments in Danish shares of the amount underlying ... previous requests for payment of withheld dividend tax."    Dillman Decl. Ex. 133, SKAT_MDL_001_008120. SKAT's reference to "previous requests for payment of withheld dividend tax" is a reference to the payments at issue in SKAT's claims in this action against the AIG Plan. *Id.*; Bahnsen Dec. Ex. 6, SKAT's Amended Complaint, Docket Entry # 89 in related action 18-cv-09841.

**SKAT's Response:**  Undisputed.

## XIII.    Market Practices

384.    There is no record evidence that any defendant had any knowledge with respect to the holdings of SKAT's sub-custodians.

**SKAT's Response:** Disputed.  This statement is not supported by the required citation to evidence in the record.  To the extent the statement implies SKAT used a subcustodian to custody shares, the statement is irrelevant: There is no evidence in the record that SKAT would

102860210_10

have used a subcustodian, as there is no contention that SKAT, as opposed to the defendant plans, would have needed a subcustodian.

Even if the statement is meant to read "There is no record evidence that any defendant had any knowledge with respect to the holdings of [the Solo Custodian's]'s sub-custodians," the statement is still untrue.  To begin, as shown in SKAT's Supplemental 56.1 Statement ¶¶ 1 through 9, there were no holdings by the Solo Custodians of Danish shares at any subcustodian. The defendants therefore could not have had "knowledge" of shares that did not exist.

SKAT also disputes the sentence if it is to be interpreted as claiming that the defendants were unaware that subcustodians were being used by Solo Capital.  All the five Solo Bellwether Plans custodian agreements or terms and conditions with the Solo Custodians contained clauses discussing subcustodians.  Second Weinstein Decl. Ex. 282 (RJM Plan Solo Capital Custody Agreement) at §§ 403.2-3, 406.1-406.6, 407.1, 407.5-407.7, 408.1-408.3, 414.5, 416.2-416.3, 417.1, and 419.3, Ex. 268 (Basalt Plan Old Park Lane Custody Agreement) at §§ 3.2-3, 6.1-6, 7.1, 7.5-7, 8.1-3, 14.5, 16.2-3, 17.1, and 19.3, Ex. 298 (Roadcraft Plan Old Park Lane Custody Agreement) at §§ 3.2-3, 6.1-6, 7.1, 7.5-7, 8.1-3, 14.5, 16.2-3, 17.1, and 19.3, & Ex. 263 (FWC Plan Old Park Lane Custody Agreement) at §§ 3.2-3, 6.1-6, 7.1, 7.5-7, 8.1-3, 14.5, 16.2, 16.3, 17.1, and 19.3).  Markowitz, van Merkensteijn and Ben-Jacob specifically discussed the issue of subcustodians as part of a custody agreement with Solo Capital.  Second Weinstein Decl. Ex. 294.

385.    Netting refers to the practice of offsetting credits and debits. *See, e.g.*, Bahnsen Decl. Ex. 13 at ¶ 113 (describing net settlement).

**SKAT's Response:** Disputed.  The statement is too broad for SKAT to meaningfully respond to.

386.    SKAT engages in netting. In particular, as of August 1, 2013, company taxes are paid on a balance principle, in which a company's tax liabilities to SKAT are aggregated and offset by any tax credits/refunds due from SKAT to that company. Bahnsen Decl. Ex. 38. SKAT's collection of dividend withholding tax will consequently depend on other taxes due from and any credits/refunds due to the dividend-issuing company. *Id.* As an example, a company with a 50 million kroner tax credit and 50 million kroner dividend withholding tax liability would make no payment to SKAT. *See* Bahnsen Decl. Ex. 39 (Ekstrand Tr. 99:3-101:13). SKAT does not separately account for its receipt of dividend withholding tax. Bahnsen Decl. Ex. 38.

102860210_10

**SKAT's Response:** Disputed to the extent the first statement suggest SKAT engages in any "netting" related to the purchase, sale, or loan of any security. SKAT otherwise disputes relevance of the statement.

387.    Clearing and settling firms (including custodians) can engage in "net settlement," whereby equal and opposite transactions entered into by clients of the same custodian can be settled on the same day without any change in the custodian's holdings. Bahnsen Decl. Ex. 13 at ¶ 113.

**SKAT's Response:** Disputed to the extent it suggests "net settlement" could occur without the Solo Custodians having the relevant shares at a subcustodian. Net settlement does not mean a custodian can "create positions in a share if it never owns any of the shares itself at any point in time." Weinstein Decl. Ex. 91 (Reply Expert Report of Graham Wade, dated February 28, 2022) at ¶ 240.

388.    Denmark's central securities depositary, VP Securities, allows for net simultaneous settlement of funds and securities. Bahnsen Decl. Exs. 13 (at ¶ 115), 47 (Sørensen Vol. 1 Tr. 15:21-16:9; 82:2-7; Vol. 2 Tr. 16:2-17:9).

**SKAT's Response:** Disputed. The citations to Ms. Sørensen's deposition transcript do not describe net settlement at VP Securities. Instead, Ms. Sørensen testified that VP Securities permits, but does not encourage, clients with accounts at VP Securities to submit trade orders on a net basis. Second Weinstein Decl. Ex. 215 (H. Sørensen Dep. Vol. I) at 15:23 - 16:17, 75:5-23. The netting is therefore done by VP Securities' clients, not VP Securities. SKAT further disputes the materiality of the statement. As Solo held no shares at its purported subcustodians, any acts by VP Securities are irrelevant to whether the Solo Bellwether Plans ever held any Danish shares. SKAT Supplemental 56.1 ¶¶ 1-23 and Appendices A through I.

389.    Financial intermediaries use a practice called "internalization" in which long and short positions from a dealer's client pool are matched to reduce net funding requirements. As a Bank of England Statement of Policy explains, if a prime broker has two clients that are taking opposite positions on the same asset (one long, the other short), the broker may internally net these amounts to avoid having to fund the positions elsewhere, such that a client short position is therefore funding a client long position. Bahnsen Decl. Ex. 13 at ¶ 117 (citing Bahnsen Decl. Ex. 60).

102860210_10

**SKAT's Response:** Disputed. SKAT disputes the first sentence to the extent that it does not support any statement as to practices regarding trading in Danish securities. The breadth of the statement is not supported by the citations relied on in the expert report of Emre Carr.

SKAT further disputes materiality of statement's discussion of the Bank of England Policy Statement. The relevant section of the Policy Statement is only applicable to prime brokers, and there is no evidence in the record suggesting any of the Solo Custodians were prime brokers. Bahnsen Decl. Ex. 13 at ¶ 113; Bahnsen Decl. Ex. 60 at ¶ 4.19.

390.    The European Securities and Markets Authority has reported that equity trades worth trillions of Euros were settled through internalized settlement. Bahnsen Decl. Ex. 13 at ¶ 116.

**SKAT's Response:** SKAT does not dispute the statement, but disputes its materiality.


## PLAINTIFF SKAT'S STATEMENT OF ADDITIONAL DISPUTED MATERIAL FACTS

1.    The Bellwether Plans were not created or operated for the exclusive benefit of the plans or the plan participants, in part because the Bellwether Plans were operated primarily for the benefit of others, including Ganymede Cayman Limited, ED&F Man Capital Markets Limited, and/or Acer Investment Group LLC to which the plans made payments that far exceeded industry norms. Wagner Report ¶ 112.

2.    The Solo Bellwether Plans were vehicles for the fraudulent scheme and were created to participate in the fraud. Second Weinstein Decl. Ex. 273, Ex. 211 (Markowitz Dep.) at 137:19 – 138:21 (RJM Plan), Ex. 218 (van Merkensteijn Dep.) at 172:17 - 174:4 (Basalt and Roadcraft Plans), Ex. 209 (Lehman Dep.) at 393:5-15 (FWC Plan), & Ex. 202 (Bradley Dep.) at 307:10 - 313:8 (Proper Pacific Plan).

102860210_10

3.      The Bellwether Plans did not comply with the funding requirements of the Internal Revenue Code, in part because they conducted no business or because the business they conducted mostly or completely consisted of related-party transactions.  Wagner Report ¶ 81, Second Weinstein DeaDcl. Ex. 267, Ex. 271, Ex. 243 (Altbach LLC Invoices), Ex. 284 at PL00000123, Ex. 218 (J. van Merkensteijn Dep., April 19 – 20, 2021) at 280:22 – 290:15, Ex. 226 (Wagner Rebuttal Report) ¶ 11 n.12; Wagner Reply ¶ 36.

4.      The Solo Bellwether Plans were not created to be permanent programs.  Wagner Report ¶¶ 100-102, 135-137, 148-149.

5.      The only "business" of the Roadcraft Plan's sponsoring LLC (and the sponsoring LLCs of Ronald Altbach's other four pension plans) was providing purported or nonexistent services to an entity controlled by co-defendant John van Merkensteijn.  Second Weinstein Decl. Ex. 243 (Altbach LLC Invoices), Ex. 276 (MBJ_STOR-0002719) at -2725 to -2728, Ex. 284 at PL00000123.

6.      The IRS audit of the RJM Plan does not establish that any of the Solo Bellwether Plans were tax-exempt.  Wagner Reply ¶ 31.