**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF<br>THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX REFUND<br>SCHEME LITIGATION<br><br>This document relates to: 19-cv-1781, 19-cv-1783,<br>19-cv-1785, 19-cv-1788, 19-cv-1791, 19-cv-1792,<br>19-cv-1794, 19-cv-1798, 19-cv-1800, 19-cv-1801,<br>19-cv-1803, 19-cv-1806, 19-cv-1808, 19-cv-1809,<br>19-cv-1810, 19-cv-1812, 19-cv-1813, 19-cv-1815,<br>19-cv-1818, 19-cv-1865, 19-cv-1866, 19-cv-1867,<br>19-cv-1868, 19-cv-1869, 19-cv-1870, 19-cv-1871,<br>19-cv-1873, 19-cv-1893, 19-cv-1894, 19-cv-1895,<br>19-cv-1896, 19-cv-1898, 19-cv-1904, 19-cv-1906,<br>19-cv-1911, 19-cv-1918, 19-cv-1922, 19-cv-1924,<br>19-cv-1926, 19-cv-1928, 19-cv-1929, 19-cv-1930,<br>19-cv-1931. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**Declaration Regarding Danish Law**
**By**
**Mads Bryde Andersen,**
Professor of Law
Center for Market and Economic Law
University of Copenhagen

Copenhagen, Denmark
July 12, 2019

Mads Bryde Andersen, professor of law, declares and says:

## I. QUALIFICATIONS

1. Since 1991 I have served as a professor of private law at the University of Copenhagen, Denmark, from which university I graduated with a *candidatus juris* degree (LL.M.) in 1981. During the years 1981-1986 I worked as a lawyer for a mid-size Copenhagen law firm. I was admitted to the High Courts of Denmark in 1984. I joined the University of Copenhagen Law Faculty in 1987 where I took the doctor juris degree in 1989 with a dissertation on contract and tort liability for computer malfunctions.

2. For further information on my background, I refer to the enclosed CV (attached as Appendix A).

3. I have written this legal Declaration at the request of Plaintiff, Customs and Tax Administration of The Kingdom of Denmark (Skatteforvaltningen), in the following referred to as "**SKAT**".

4. SKAT is compensating me for my work in preparing this Declaration on a per-hour basis.

## II. DOCUMENTATION REVIEWED

5. For the purpose of giving this Declaration, I have reviewed three examples of Complaints filed on 27 February 2019 by SKAT against the defendants who have filed motions to dismiss this litigation for SKAT's lack of standing. The said defendants are:

   a. Avanix Management LLC,

   b. Hadron Industries LLC, and

   c. Cavus Systems LLC.

6.      I have also reviewed the declaration of Foreign Law of *Kasper Bech Pilgaard* in support of Defendants' Motion to Dismiss the Complaints Pursuant to Federal Rule of Civil Procedure 12(b)(1), dated 11 June 2019 (in the following referred to as "**the Pilgaard Declaration**"), with Exhibits.

7.      Furthermore, I have reviewed Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaints Pursuant to Federal Rule of Civil Procedure 12(b)(1), dated 12 June 2019 (in the following referred to as "**Defendants' Memorandum**").

8.      Counsel for SKAT has invited me to consider whether the allegation presented in Defendants Memorandum and – to the extent these allegations rely on conclusions presented herein – in the Pilgaard Statement, are correct, based upon my understanding of Danish law.

9.      First and in particular, I have been invited to consider whether SKAT– as it is alleged in the Defendants' Memorandum – is, according to Danish law, a *separate legal entity* in its own right, or alternatively whether SKAT is an integral *part of The Danish State* ("The Kingdom of Denmark"). This issue is addressed below at III.A.

10.     Secondly, I have been invited to comment upon how Danish ministries and ministerial branches appear before Danish courts of law. This issue is addressed below at III.B.

11.     True and correct copies of the Danish authorities that I have cited herein are attached as Appendices to this Declaration, with accompanying English translations.

## III.     DISCUSSION

### A.     First Issue: Is SKAT a legal entity in its own right?

12.     The legal argumentation presented in Defendants' Memorandum assumes that *SKAT* and *the Danish treasury* (in the following referred to as **the Ministry of Finance**, in Danish: "Finansministeriet") each are two separate legal entities. This assumption leads the

3

Defendants to conclude that claims for compensation or restitution should be brought forward and litigated by the Ministry of Finance, being the injured party, and therefore not by SKAT.

13.     In my opinion this understanding is undoubtedly flawed. As I will explain in the following, both SKAT and the Ministry of Finance are ministries within the Danish government administration each of which are integral parts of one and the same legal entity, namely The Kingdom of Denmark.

14.     The Kingdom of Denmark bears the basic characteristics of any other separate legal entity: Whereas a *corporation* has its by-laws defining its legal personality and executive functions, The Kingdom of Denmark has its *constitution* (presented as <u>Exhibit A</u> of the Pilgaard Declaration) which, among other things, defines the *executive powers* at the supreme level. And likewise: Just like the by-laws of an association or corporation indicate how its *capital* is provided, the Danish constitution and additional regulations set forth the conditions by which Danish government finances are made available and spent.

15.     The Pilgaard Declaration offers a quite accurate description of a number of these characteristics of the Danish constitution and additional regulations. It also refers to some – however, as we shall see, not all relevant – of these constitutional roles and responsibilities that are necessary to understand the legal personality of The Kingdom of Denmark.

16.     In particular, I agree with the statements made in paragraphs 7 to 20 of the Pilgaard Declaration describing the rules of funding applicable to the Danish government.

17.     I also agree with the statements in paragraphs 21 to 27 in which Mr. Pilgaard underlines the central role played by the Danish Ministry of Finance in *administering* the Danish government budget.

18.     It should, however, be underlined that statutory and constitutional rules on how the government income of whatever origin should be *administered* and how this task is *distributed* between various government agencies *do not* affect the right of a Danish government agency to raise claims against private individuals or undertakings. Whether there is such a right, depends on the distribution of responsibilities, as decided by the government. I will revert to that issue below.

19.     It is also true and accurate, as indicated in paragraphs 28 to 46 of the Pilgaard Declaration, that SKAT is mandated with the competence to collect taxes. SKAT performs its duties and responsibilities with respect to the administration of Denmark's tax laws as the Kingdom of the Denmark. To perform its duties and responsibilities, SKAT has established bank accounts in its own name to hold tax revenues. I have reviewed an example of an account statement from a bank account in the name of SKAT Nordsjælland, which is attached as Exhibit B to the Declaration of Gry Ahlefeld-Engel dated July 12, 2019. When the account is in SKAT's name, it means that SKAT, and in effect the Kingdom of Denmark, holds ownership and legal title to said bank account. Since SKAT holds these accounts as the competent Agency within The Kingdom of Denmark, it is understood that these amounts will transferred to other accounts in accordance with applicable rules.

20.     Summing up, *none* of the observations made by Mr. Pilgaard on the Danish constitution may in any reasonable way lead to the conclusion that SKAT is a legal entity in its own right, separated from the Kingdom of Denmark.

21.     For my own part, I have not heard of any reported case law where allegations regarding the internal "bookkeepings" or internal control of Danish government funds have been

alleged as an argument for lack of legal standing by public entities. And for the reasons I will come revert to, it should surprise me if such case law existed.

22.     The rules that Mr. Pilgaard discusses in these paragraphs all serve the purpose of making sure that government income is subject to necessary control mechanisms. They do not affect the right of third parties who are subject to the legal liabilities that create the obligation to pay taxes or other monetary amounts to the public, or the right to claim monetary or other benefits from the government.

23.     The Pilgaard Declaration fails to address an important provision of the Danish constitution relevant for the question raised, namely Section 14 which in its entirety reads as follows:

> *"Section 14.*
>
> *The King shall appoint and dismiss the Prime Minister and the other Ministers. He shall decide upon the number of Ministers and upon the distribution of the duties of government among them. The signature of the King to resolutions relating to legislation and government shall make such resolutions valid, provided that the signature of the King is accompanied by the signature or signatures of one or more Ministers. A Minister who has signed a resolution shall be responsible for the resolution."*

24.     The important part of this provision appears from the last part of the *second sentence* according to which "the King" (which for all practical purposes, and as also agreed by Mr. Pilgaard, should be understood as ultimately the *Prime Minister*) "*... shall decide upon the number of Ministers and upon the distribution of the duties of government among them*" [italics inserted by me].

25.     This part of Section 14 does not give the Prime Minister the power to change the *substance* of the said "responsibilities" of the various government branches, i.e. the legal powers

provided by legislation and assumed in Section 13 of the constitution, as discussed in paragraph 5 of the Pilgaard Declaration.

26.     It does however make clear that regardless of any statutory act, the Prime Minister is by *government decree* empowered to decide *which branch* of the Danish government (and notably, which minister and ministry) should be in charge of any of the responsibilities as set forth by statute. In doing so Section 14 assumes that a minister (and a ministry) in the Kingdom of Denmark, is not a separate legal entity but merely a part of one and the same government administration and one legal entity: The Kingdom of Denmark.

27.     In accordance with the division of government tasks, decided by the Prime Minister, each *ministry* or other *administrative branch* or *agency* acts under the responsibility and supervision of a *minister* who is in turn appointed by the Prime Minister according to the Danish constitution. A ministry is therefore in itself not its own separate legal entity. It undertakes its tasks in the interest of the state (i.e. The Kingdom of Denmark) and in correspondence with the relevant rules and regulation.

28.     Accordingly, SKAT (being a part of the ministry of taxation) is like any other ministry an integral part of the Kingdom of Denmark.

29.     As rightfully stated by Mr. Pilgaard in paragraph 5, Article 13, 2 of the Danish constitution provides that "The ministers shall be responsible for the conduct of government; their responsibility shall be defined by statute." However, read in conjunction with Article 14, this provision does not indicate that a minister or a ministry is a separate legal entity. According to well-established legal principles, it merely indicates that the powers and tasks allocated to government should be defined by statute, not by government decree.

Case 1:18-md-02865-LAK   Document 159   Filed 07/03/19   Page 8 of 24

30.     It is also important to note that the responsibility for the conduct of government is not a delegated or assigned responsibility but an original and primary responsibility.

31.     Accordingly, the relevant ministry or governmental body will act as party in a) contracts, b) lawsuits and c) the general conduct of government.

32.     It follows as a consequence hereof, that any minister assigned with this task may also prosecute claims, e.g. for damages, either by negotiation or by way of litigation.

33.     My above reading of the said provision is supported by numerous statements in scholarly literature of which I limit myself to the following two quotations:

34.     In his 2018 book on Administrative Law ("Forvaltningsret"), on page 133, Professor, and today High Court Justice *Niels Fenger* states as follows:

> *"Under section 14 of the Danish Constitution, the Government (in practice the Prime Minister) may by Royal Decree transfer one duty established by law from one minister to another (from one ministerial department to another). The powers transferred in this manner are comparable to powers originally granted and, hence, in terms of administrative law, are not delegated powers.*
>
> *The distribution of duties can also occur purely administratively. ..."*

35.     A photocopy of the relevant page and of the title page of the Professor Fenger's book is attached to this statement as <u>Appendix B</u>.

36.     Furthermore, in his 1993 book "Administrative Law, Tasks, Authority, Organisation" (in Danish: "Forvaltningsret Opgaver Hjemmel Organisation"), on page 310, professor *Bent Christensen* makes the following statement:

> *"Section 14 of the Danish Constitution is a royal prerogative or a government prerogative exercised by the Prime Minister. The fact that it is a prerogative means that the Legislature cannot deprive the Prime Minister of these organizational powers.*
>
> *What this means is clear insofar as the number of ministers.*

*If a law, including an appropriation law, specifies a number of ministers, the Prime Minister is not required to abide by the number specified. He may appoint additional ministers. Also, the additional ministers can demand payment even if their salary is not specified in the appropriation law. Their demands are thus considered equivalent to salary demands based upon guarantees, judgments etc. that do not require parliamentary appropriation.*

*This is not to imply, of course, that the legislature acts "unlawfully" in any sense by granting pay to a fixed number of ministers. To establish a budget, a fixed number of ministers must necessarily be established. However, the number specified is not binding, nor as a prerequisite for the budget.*

*Regarding the allocation of tasks between the ministers, or in the terminology of this book: the distribution of duties between the ministerial departments, the meaning of section 14 is not as clear.*

*It is well established that the legislature cannot remove or transfer the organizational powers vested in the Prime Minister under section 14.*

*It is also well established that the numerous designations in laws and decrees assigning specific duties to certain ministers or ministries do not prevent the Prime Minister from transferring such duties to another minister by Royal Decree without the involvement of the legislature. The referral to a specific minister in the law or decree is thus considered to be a depiction of the distribution of duties between different ministerial areas that existed at the time the law was passed. This is in line with the practice relating to consolidated laws. If a law, after having been amended in part by a new law, is reprinted in a consolidated version with the amended content of the law, there is an opportunity that can be used to revise the ministerial designation even if it was not affected by the legal amendment, if the duties have since been transferred another minister by an intervening Royal Decree."*

37.     A photocopy of the relevant page and of the title page of the Professor Christensen's book is attached to this statement as <u>Appendix C</u>.

38.     As indicated in the last paragraph of this quotation, the power rested with the Prime Minister by Section 14 even gives the Prime Minister the right to *change the wording* of statutory legislation in order to "rename" public authorities into the names that the Prime Minister may decide in consequence of a decision to distribute government responsibilities. Such renaming of government branches takes place every time a new administration takes over – as it happened in Denmark in June 2019, following the recent election.

39. Before leaving this issue I would like to make a final observation that confirms the conclusion above that the Kingdom of Denmark is in effect *one* legal entity, and not several legal entities. This observation pertains to the offset of claims between various government agencies within the Danish government administration.

40. If, for example, government branch "D" is a debtor for a particular claim towards a particular *citizen*, and government "C" is a creditor in relation to a completely different claim towards that same citizen, then "D" may use "C"'s claim towards the citizen as a counterclaim to compensate or counterbalance its debt towards the citizen.

41. This principle has been established for generations in Danish case-law since the first landmark decision from the Danish Supreme Court, reported in the Weekly Law Report ("Ugeskrift for Retsvæsen"), 1955 at page 13 and subsequent. The said practice has subsequently been upheld by the Supreme Court as reported in the Weekly Law Report and in various High Court decisions, including the one reported in the Weekly Law Report 2002, at page 2396.

42. Summing up: The present dispute is not about whether the government budget should be set up in one way or the other. Consequently, the rules and contracts relied on by Mr. Pilgaard have no bearing on SKAT's standing to sue the defendants in the present litigation. The many rules and provisions referred to in the Pilgaard Declaration describe how decisions are taken on the supreme political level in the Kingdom of Denmark, and how the Danish government's budget is organized. These questions have nothing to do with how a Danish government entity should appear in the role of plaintiff in a case in which compensation or restitution is claimed towards parties who have allegedly deceived the Kingdom of Denmark into paying out major amounts of allegedly withheld dividend tax.

Case 1:18-md-02865-LAK Document 835 Filed 06/27/22 Page 11 of 14

43.     The present litigation has caused substantial political concern in Denmark because of the magnitude of the amounts allegedly lost by the Kingdom of Denmark. Therefore, it is certain that the Ministry of Finance has already taken a profound interest in SKAT's claims in this case. Since, however, no decision has been taken to remove the responsibility to collect these amounts from SKAT to the Ministry of Finance, or any other government entity, it is clear that SKAT – as the deceived party and the party from whose bank account the funds were paid – has the responsibility to raise the claims presented in the present litigation.

**B.     Second Issue: How do Danish ministries and ministerial branches appear before Danish courts of law?**

44.     Section 240 of the Danish Administration of Justice Act ("Retsplejeloven") reads as follows:

> *(1) The home court of the State is the court for the judicial district in which the office of the authority being sued on behalf of the State is located.*

> *(2) Subject to Section 245, proceedings concerning judicial review of decisions made by a central government authority must be instituted in the plaintiff's home court if the plaintiff's home court is in Denmark.*

45.     By making reference to "the authority being sued on behalf of the State", the first sub-paragraph of this Section confirms the conclusions presented above, that the Kingdom of Denmark ("the State") may be sued by plaintiffs bringing action against the relevant "authority". However, the provision does not define *towards which* among several possible authorities proceedings should be instituted.

46.     The Law Report (no. 1082, published in 1985) that lead to the present wording of Section 240 offers on page 75 the following comment to this issue:

> *The question about which authority can be sued on behalf of the state must, as to date, be decided on the basis of general principles of administrative law. A lawsuit can, in general, be brought against the administrative authority that*

*has the capacity and competence on its own to reach a decision or ruling in the particular case.*

47.     A photocopy of the relevant page and of the said Law Report is attached to this statement as <u>Appendix D</u>.

48.     In accordance with the conclusions presented above, it is generally recognized in Danish law that public agencies act in their own name in cases where their decisions are being questioned. Accordingly, in Danish legal practice you will not find cases of such nature with "The Kingdom of Denmark" appearing on the government side, either as plaintiff or defendant.

49.     This conclusion is maintained on page 904 of Professor Niels Fengers aforementioned 2018 book on Administrative Law in which he states:

> *In most cases, it is self-evident who shall appear as litigating party on the administration's side, namely the authority that issued the disputed administrative decision …*
>
> *Additionally, the case must be brought against the authority responsible for the decision that is to be tried.*

50.     A photocopy of the relevant page and of the title page of the Professor Fenger's book is attached to this statement as <u>Appendix E</u>.

51.     In accordance with the conclusions above, I have reviewed examples of relevant case law, which all without exception show that cases against the Danish government have been brought against different branches and agencies of the Danish government administration. Although all of the reviewed cases involve amounts subject to government bookkeeping regulations, none of these cases have been brought against the Ministry of Finance.

Case 1:18-md-02865-LAK Document 835-2 Filed 09/27/22 Page 13 of 14

## IV. CONCLUSION

52. The analyses presented above lead me to conclude that SKAT as the deceived and injured party has standing to raise claims brought forward in the complaints subject to the present litigation and evidenced by the three complaints referred to above in paragraph 8.

53. I therefore strongly disagree on the conclusion drawn in the Preliminary Statement of the Defendant's Memorandum, that SKAT does not have legal standing to raise these claims.

54. In particular, I disagree with the assumption that the legal standing of SKAT to raise the present litigation has anything to do with the fact that SKAT and the Danish Ministry of Finance are two parts of the Danish government administration, or on the fact that the amounts of which SKAT was allegedly deceived did not "belong" to SKAT directly.

55. I do not see that the above conclusions may be subject to any doubt.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 12, 2019

_____

Mads Bryde Andersen

# Appendix A

**MADS BRYDE ANDERSEN**
PROFESSOR, DR.JUR.

UNIVERSITY OF COPENHAGEN
FACULTY OF LAW
KAREN BLIXENS PLADS 16 (6A-3-26)
2300 COPENHAGEN S
DENMARK

HOME ADDRESS:
GARDES ALLE 25
2900 HELLERUP
DENMARK

Office Phone +45 3532 3133
Mobile Phone +45 4058 0925

E-mail mads@jur.ku.dk

July 2019

**CV for Mads Bryde Andersen, professor of law**

Professor Mads Bryde Andersen (b. 1958) **graduated** from the University of Copenhagen in 1981with a candidatus juris degree (LL.M.). After military service he worked for a mid-size Copenhagen law firm and was admitted to the High Courts of Denmark in 1984. He joined the University of Copenhagen Law Faculty in 1987 where he took the **doctor juris** degree in 1989 with a dissertation on contract and tort liability for computer malfunctions. In 1991 he was appointed professor of private law at the University of Copenhagen.

Mads Bryde Andersen is the author, or editor, of several books and articles in his field of expertise which is the law of contracts and obligations, intellectual property law and computer and high technology law. His **authorship** includes "Lærebog i Obligationsret I" (*The law of Obligations, I*, with J. Lookofsky, 4th edition, 2015), "Dansk Pensionsret" (*Danish Pension Law*, 2nd edition, 2017), "Grundlæggende aftaleret" (*Basic Contract Law*, 4th edition, 2013), "Enkelte transaktioner" (*Commercial Transactions,* 4th edition 2016), "Praktisk aftaleret" (*Contract Law in Practice*, 4th edition 2015), "Advokatretten" (*The law of Advocates*, 2005), "IT-retten" (*The law of IT,* 2nd edition, 2005) "Ret og metode" (*Legal Method,* 2002), "Lærebog i edb-ret" (*Computer Law Textbook*, 1991), "Bio-teknologi og patentret" (*Biotechnology and Patent Law*, with M. Koktvedgaard, 1990), "Edb og ansvar" (*Computer Systems and Liability Law* - doctoral dissertation, 1989), and "Arbejdsmarkedspension" (*Labor Market Pension Law*, with Jens Kristiansen, 2009). He has published numerous academic articles and has, among other works, co-edited "Aftaleloven 100 år" (*The 100 Year Anniversary of the Nordic Contract Act*) together with Johan Bärlund, Boel Flodgren & Johan Giertsen and "The CISG Convention and Domestic Contract Law – Harmony, Cross-Inspiration, or Discord?" (with J. Lookofsky, 2014). Since 2003 he has been the editor-in-chief of the most prestigious Danish legal periodical Ugeskrift for Retsvæsen, section B (*The Weekly Law Report*).

Among other positions of trust, Professor Andersen is the **chairman** the Copenhagen Law Society (Juridisk Forening i København, established in 1881). He is also a **board member** of the Danish Society for Insurance Law (*Det Danske Selskab for Forsikringsret*, a.k.a. AIDA Denmark), Statistics Denmark (*Danmarks Statistik*) and chair of a several private foundations.

Professor Andersen has previously served as chairman of the board of the Danish Financial Supervisory Authority (*Finanstilsynet*, 2014-2016), the Danish Radio and Television Council (*Radio- og tv-nævnet*, 2011-2016) and of the Danish Government IT Security Council (*IT-sikkerhedsrådet*, 1995-2002). He has also served as a member of the Danish Government Commercial Complaints Board (*Erhvervsankenævnet*, 1995-2014).

Since 1992, Professor Andersen has been the Danish **delegation** to *UNCITRAL*, the United Nations Commission on International Trade Law. From 1997 to 1998 he **chaired** the UNCITRAL working group on Electronic Commerce. He has been involved in a number of working groups within the *OECD* dealing with security and consumer issues of the information society and was the head of the Danish delegation during the OECD talks on encryption policy (1995-1996). From 2003 to 2012 he was co-chairman and later chairman of the Danish Guarantee Fund for Depositors and Investors.

Professor Andersen is a frequently used arbitrator in domestic and international **arbitration** matters and has been involved in more than 100 arbitration cases, either as chairman or co-arbitrator. He represents Denmark in the *ICC Commission of Arbitration* and has given several courses on international arbitration. He has an extended network within domestic and international arbitration. In the years 2006-2008 he was the president of the Danish Arbitration Institute (*Voldgiftsinstituttet*, www.denarbitra.dk) and in the years 2004-2008 he was on the board of the Danish Arbitration Society (*Dansk Forening for Voldgift*), the last year as vice-chairman.

Professor Mads Bryde Andersen has received various **marks of honour** and awards for his work. In 2005 he was awarded the *doctor juris honoris causae* from the University of Oslo. In 2017 he received *Knut och Alice Wallenbergs Stiftelses pris för rättsvetenskapliga insatser* (the Wallenberg award for jurisprudential contributions) – a 1 million Swedish Croner prize awarded every three years to an outstanding legal scholar from one of the five Nordic countries. In 2011 he was appointed honorary member of *the Finnish Law Society*. In 2018, on the occasion of his 60 years birthday, 39 colleagues published a 797 pages long "Festskrift for Mads Bryde Andersen" in his honor on Djoef Publishing.

# Appendix B

Niels Fenger (Editor)

# Administrative Law



Danish Union of Jurists and Economists Press
2018

Case 1:18-md-02865-LAK   Document 834-2   Filed 06/27/22   Page 20 of 51
Case 1:18-md-02865-LAK   Document 453-2   Filed 07/19/19   Page 3 of 51

2

*2. Who is the competent authority, and how is that determined?*

ges til grund, at et organ, herunder et privat organ, er blevet tildelt originær kompetence til at træffe afgørelser mv. på et givent område. I sidstnævnte tilfælde vil det efter omstændigheder ne være tilstrækkeligt, at det private organs kompetence er forudsat i den relevante lovgivning, jf. U 1999.190 0 og U 2007.3009 H.

En privat, der f'ar delegeret kompetencen til at agere på en offentlig myndigheds vegne, er forpligtet til at leve op til de samme offentligret lige forpligtigelser, som den offentlige myndighed selv ville skulle have efterlevet i den forbindelse. Derfor kunne man også :fa den tanke, at en privat, der udførte en tilsvarende opgave blot baseret på en originær kompetence, tillige skal efterleve de samme regler. Helt så simpelt er det imidlertid ikke, jf. herom kapitel 3, afsnit 2.7.10.

Under section 14 of the Danish Constitution, the Government (in practice the Prime Minister) may by Royal Decree transfer one duty established by law from one minister to another (from one ministe rial department to another). The powers transferred in this manner are comparable to powers originally granted and, hence, in terms of administrative law, are not delegated powers.

The distribution of duties can also occur purely administrative ly. Opgaven vil i så fald blive tildelt ved ekstern delegation, jf. herom afsnit 3 nedenfor, eller ved intern delegation, jf. herom afsnit 4 nedenfor.

## 2.2.  Principper for opgavefordelingen i øvrigt

2.2.1.  Saglig kompetencefordeling

En fordeling efter opgavens art (sagens indhold) er helt sædvanlig. En sådan saglig kompetencefordeling bygger bl.a. på forudsætninger om, at visse myndigheder i kraft af deres sammensætning, særlige sagkundskab og erfaring er særligt velegnede til at tage sig af bestemte forvaltningsopga ver, herunder at træffe bestemte typer af afgørelser.

Opgavefordelingen i centraladministrationen - mellem ministerie rne ogderes departementer, mellem de centrale direktorater og styrelser indbyrdes samt mellem forskellige råd og nævn mv. og resten af centraladministrationen - er i alt væsentligt udtryk for en saglig kompetencefordeling. Også ved fordelingen af opgaver på forskellige myndighedsniveauer - centralt/regionalt eller regionalt/lokalt niveau - er der ofte tale om en saglig kompetencefordeling. Som eksempler herpå kan nævnes fordelingen af kompetencen til at tage stilling til tiltalerejsningsspørgsmålet mellem statsadvokaterne og politidirektørerne efter retsplejelovens § 719 og fordelingen af ansvaret for driften af sociale institutioner mellem regioner og kommunerne efter bl.a. lov om social service kapitel 2 og § 51. Sidstnævnte er i øvrigt et eksempel på en saglig kompetencefordeling mellem myndigheder, som ikke indgår i et admi-

133

Niels Fenger (red.)

# Forvaltningsret



Jurist- og Økonomforbundets Forlag
2018

*2. Hvem er den kompetente myndighed, og hvordan afgøres det?*

ges til grund, at et organ, herunder et privat organ, er blevet tildelt originær kompetence til at træffe afgørelser mv. på et givent område. I sidstnævnte tilfælde vil det efter omstændighederne være tilstrækkeligt, at det private organs kompetence er forudsat i den relevante lovgivning, jf. U 1999.190 Ø og U 2007.3009 H.

En privat, der får delegeret kompetencen til at agere på en offentlig myndigheds vegne, er forpligtet til at leve op til de samme offentligretlige forpligtigelser, som den offentlige myndighed selv ville skulle have efterlevet i den forbindelse. Derfor kunne man også få den tanke, at en privat, der udførte en tilsvarende opgave blot baseret på en originær kompetence, tillige skal efterleve de samme regler. Helt så simpelt er det imidlertid ikke, jf. herom kapitel 3, afsnit 2.7.10.

Efter grundlovens § 14 kan regeringen (i praksis statsministeren) ved kongelig anordning flytte en opgave, der er fastlagt ved lov, fra en minister til en anden (fra et ministerområde til et andet). Den kompetence, der er blevet tildelt på denne måde, må sidestilles med at blive tillagt en originær kompetence, og der er dermed ikke i forvaltningsretlig forstand tale om delegation.

Opgavefordelingen kan også ske rent administrativt. Opgaven vil i så fald blive tildelt ved ekstern delegation, jf. herom afsnit 3 nedenfor, eller ved intern delegation, jf. herom afsnit 4 nedenfor.

## 2.2. Principper for opgavefordelingen i øvrigt

### 2.2.1. Saglig kompetencefordeling

En fordeling efter opgavens art (sagens indhold) er helt sædvanlig. En sådan saglig kompetencefordeling bygger bl.a. på forudsætninger om, at visse myndigheder i kraft af deres sammensætning, særlige sagkundskab og erfaring er særligt velegnede til at tage sig af bestemte forvaltningsopgaver, herunder at træffe bestemte typer af afgørelser.

Opgavefordelingen i centraladministrationen – mellem ministerierne og deres departementer, mellem de centrale direktorater og styrelser indbyrdes samt mellem forskellige råd og nævn mv. og resten af centraladministrationen – er i alt væsentligt udtryk for en saglig kompetencefordeling. Også ved fordelingen af opgaver på forskellige myndighedsniveauer – centralt/regionalt eller regionalt/lokalt niveau – er der ofte tale om en saglig kompetencefordeling. Som eksempler herpå kan nævnes fordelingen af kompetencen til at tage stilling til tiltalerejsningsspørgsmålet mellem statsadvokaterne og politidirektørerne efter retsplejelovens § 719 og fordelingen af ansvaret for driften af sociale institutioner mellem regioner og kommunerne efter bl.a. lov om social service kapitel 2 og § 51. Sidstnævnte er i øvrigt et eksempel på en saglig kompetencefordeling mellem myndigheder, som ikke indgår i et admi-

# Appendix C

BENT CHRISTENSEN

# Administrative Law

Tasks
Authority
Organisation

THE DANISH UNION OF JURISTS AND ECONOMISTS PRESS

Forvaltningsret. Opgaver. Hjemmel. Organisation
© 1991 By Jurist- og Økonomforbundets Forlag
Alle rettigheder forbeholdes.
Mekanjsk, [otografisk eller aodeo gengivelse eller
mangfoldiggørelse af denne bog eUer dele heraf
er uden forlagets skriftlige samtykke ikke tilladt
ifølge gældende dam.sk lov om ophavsret
Sat bos Viborg Maskinsærieri
Tryk: Naraya.na Press, Gylling
Indbinding: Damm's Bogbinderi, Randei:,;
Printed in Denmark 1991
ISBN 87-574-5183-4

Kap. XX. 2.

tisk betydning. Tendensen gar i retning af at lægge flere og flere opgaver til kommunerne.

Grl. § 24 hindrer, at de retsakter, der bestar i benadning og amnesti, tildeles andre forvaltningsorganer end justitsministeren[32]). Bestemmelsens omrade er sa snrevert, at heller ikke den har st0rre praktisk betydning.

Det har derimod grl. § 14, nar den foreskriver, at kongen bestemmer ministrenes antal og forretningernes fordeling mellem dem[33]).

Section 14 of the Danish Constitution is a royal prerogative or a government prerogative exercised by the Prime Minister. The fact that it is a prerogative means that the Legislature cannot deprive the Prime Minister of these organisational powers.
What this means is clear insofar as the number of ministers.

If a law, including an appropriation law, specifies a number of ministers, the Prime Minister is not required to abide by the number specified. He may appoint additional ministers. Also, the additional ministers can demand payment even if their salary is not specified in the appropriation law. Their demands are thus considered equivalent to salary demands based upon guarantees, judgments etc. that do not require parliamentary appropriation.[34]

This is not to imply, of course, that the legislature acts "unlawfully" in any sense by granting pay to a fixed number of ministers. To establish a budget, a fixed number of ministers must necessarily be established. However, the number specified is not binding, nor as a prerequisite for the budget.
Regarding the allocation of tasks between the ministers, or in the terminology of this book: the distribution of duties between the ministerial departments, the meaning of section 14 is not as clear.

It is well established that the legislature cannot remove or transfer the organisational powers vested in the Prime Minister under section 14.

It is also well established that the numerous designations in laws and decrees assigning specific duties to certain ministers or ministries do not prevent the Prime Minister from transferring such duties to another minister by Royal Decree without the involvement of the legislature. The referral to a specific minister in

---

32) *Ross* 420-21, *Zahle* 2.40-41.

33) *Ross* 418 jvf. 236, *Max Sørensen* 126-27, *Zahle* 2.36 Jørgen Albæk Jensen Parlamentarismens statsretlige betydning 1989.lll, *Germer* I 33, *Poul Andersen:* Statsret 163-64 and *Niels Petersen* Bet. 320/1962 appendix 137.

34) Budget guidelines (*Budgetvejledning*), 1989.61, 23-24.

Grl. § 14

the law or decree is thus considered to be a depiction of the distribution of duties between different ministerial areas that existed at the time the law was passed. This is in line with the practice relating to consolidated laws. If a law, after having been amended in part by a new law, is reprinted in a consolidated version with the amended content of the law, there is an opportunity that can be used to revise the ministerial designation even if it was not affected by the legal amendment, if the duties have since been transferred another minister by an intervening Royal Decree.[35]

Tvivl opstar, hvis der foreligger srerlige holdepunkter for, at lovgivningsmagten eller et folketingsflertal har lagt eller lregger srerlig vregt pa, at netop denne opgave ud0ves inden for netop dette ministeromrade. Holdepunkterne kan fremga af en lovs forarbejder eller ligefrem vrere udtalt i en folketingsbeslutning36). Hvilken betydning har sadanne tilkendegivelser for statsministerens ud0velse af sin organisationsmagt?

At tilkendegivelserne kan have faktisk eller politisk betydning og endda kan fore til et rnistillidsvotum, er en selvf0lge.

Lovgivningsmagten kan naturligvis ogsa g0re statsministerens organisationsmagt genstandsl0s ved at afskaffe opgaven, og den kan via l0n- og personalerammer pr0ve at udsulte en bestemt minister.

Sp0rgsmalet er, om tilkendegivelserne i no gen rimeligt handfast forstand kan siges retligt at begrrense statsrninisterens organisationsmagt. I sidste instans afhrenger svaret vist af, hvordan man i det hele vil betragte en mindretalsregerings forfatningsretlige stilling over for Folketinget. Folketinget har irnidlertid pa lige netop dette omrade for ganske nylig lagt til grund, at Folketingets tilkendegivelser ikke retligt begrrenser statsministerens organisationsmagt37). Denne l0sning har den store fordel, at den er klar.

Grl. § 14 omfatter kun forretningernes fordeling mellem ministrene - med den sprogbrug, som anvendes i denne bog: opgavernes fordeling pa ministeromrader. Helt op i begyndelsen af dette arhundrede findes – ganske vist uklare - spar af en opfattelse, hvorefter § 14 ogsa' omfattede opgavefordelingen inden for det enkelte rninisteromrade, altsa centralad-

35) N. Eilschou, Basic Law Book I (*Juridisk Grundbog I*) 1975, 109.

36) Således folketingsbeslutning af 22/S 1986, hvori folketinget opfozdrer statsministeren til i folketingssamlingen 1985-86 at overløre oorninistrationen af lov om jagt og vildtforvalming Wllt og dertil hørende institutioner til Miljøministeriet, Ff 1985-86 A 1125, B 1701 ogC 813.

37) Ff 1982-83. 1219'} ff. især 122l6, Ff 1935-86. 2835 ff. ogl!S72 og Ff 1986187.13310.

BENT CHRISTENSEN

# Forvaltningsret

Opgaver
Hjemmel
Organisation

JURIST- OG ØKONOMFORBUNDETS FORLAG

Forvaltningsret. Opgaver. Hjemmel. Organisation
© 1991 By Jurist- og Økonomforbundets Forlag
Alle rettigheder forbeholdes.
Mekanisk, fotografisk eller anden gengivelse eller
mangfoldiggørelse af denne bog eller dele heraf
er uden forlagets skriftlige samtykke ikke tilladt
ifølge gældende dansk lov om ophavsret.

Sat hos Viborg Maskinsætteri
Tryk: Narayana Press, Gylling
Indbinding: Damm's Bogbinderi, Randers
Printed in Denmark 1991
ISBN 87-574-5183-4

Kap. XX. 2.

tisk betydning. Tendensen går i retning af at lægge flere og flere opgaver til kommunerne.

Grl. § 24 hindrer, at de retsakter, der består i benådning og amnesti, tildeles andre forvaltningsorganer end justitsministeren[32]). Bestemmelsens område er så snævert, at heller ikke den har større praktisk betydning.

Det har derimod grl. § 14, når den foreskriver, at kongen bestemmer ministrenes antal og forretningernes fordeling mellem dem[33]).

Grl. § 14 er et kongeligt prærogativ eller et regeringsprærogativ, der udøves af statsministeren. At der er tale om et prærogativ, betyder, at lovgivningsmagten ikke kan fratage statsministeren denne organisationsbeføjelse.

Hvad der nærmere ligger heri, er utvivlsomt for så vidt angår antallet af ministre.

Hvis en lov, herunder en bevillingslov, fastsætter antallet af ministre, behøver statsministeren ikke at respektere antalsangivelsen. Han kan udnævne yderligere. Og de yderligere ministre, hvis løn ikke er optaget på finansloven, har alligevel krav på løn. Deres krav sidestilles altså med de krav, der bygger på indfrielse af garantier, dom m.v., og som ikke behøver finanslovhevilling.[34])

Heri ligger naturligvis ikke, at lovgivningsmagten handler i nogen forstand »retsstridigt« ved at bevilge løn til et bestemt antal ministre. For at kunne opstille et budget må man nødvendigvis bygge på et bestemt antal ministre. Men antalsangivelsen er altså ikke bindende, heller ikke som bevillingsforudsætning.

For så vidt angår forretningernes fordeling mellem ministrene – eller med den sprogbrug, der anvendes i denne bog: opgavefordelingen mellem ministerområder – er § 14's betydning ikke helt så utvivlsom.

Det står fast, at lovgivningsmagten ikke kan fjerne eller flytte den organisationsmagt, som statsministeren har efter § 14.

Der er ligeledes fast praksis for, at de talrige bestemmelser i love og anordninger, der henlægger bestemte opgaver til bestemte ministre eller ministerier, ikke hindrer statsministeren i ved kongelig resolution og uden lovgivningsmagtens medvirken at flytte opgaverne til en anden minister.

32) *Ross* 420-21, *Zahle* 2.40-41.

33) *Ross* 418 jvf. 236, *Max Sørensen* 126-27, *Zahle* 2.36 *Jørgen Albæk Jensen* Parlamentarismens statsretlige betydning 1989.111, *Germer* I 33, *Poul Andersen:* Statsret 163-64 og *Niels Petersen* Bet. 320/1962 bilag 137.

34) Budgetvejledning 1989.61. 23-24.

Lovens eller anordningens henvisning til en bestemt minister betragtes således som en beskrivelse af den fordeling af opgaverne mellem ministerområder, der var gældende på det tidspunkt, hvor loven blev vedtaget. Hermed stemmer praksis vedrørende lovbekendtgørelser. Hvis en lov i anledning af, at den er blevet delvis ændret ved en ny lov, optrykkes samlet med det indhold, loven har efter ændringerne, kan man benytte lejligheden til at ændre ministerbetegnelsen selv i de paragraffer, der ikke er berørt af ændringsloven, hvis en mellemkommende kongelig resolution har flyttet opgaverne til en anden minister[35]).

Tvivl opstår, hvis der foreligger særlige holdepunkter for, at lovgivningsmagten eller et folketingsflertal har lagt eller lægger særlig vægt på, at netop denne opgave udøves inden for netop dette ministerområde. Holdepunkterne kan fremgå af en lovs forarbejder eller ligefrem være udtalt i en folketingsbeslutning[36]). Hvilken betydning har sådanne tilkendegivelser for statsministerens udøvelse af sin organisationsmagt?

At tilkendegivelserne kan have faktisk eller politisk betydning og endda kan føre til et mistillidsvotum, er en selvfølge.

Lovgivningsmagten kan naturligvis også gøre statsministerens organisationsmagt genstandsløs ved at afskaffe opgaven, og den kan via løn- og personalerammer prøve at udsulte en bestemt minister.

Spørgsmålet er, om tilkendegivelserne i nogen rimeligt håndfast forstand kan siges retligt at begrænse statsministerens organisationsmagt. I sidste instans afhænger svaret vist af, hvordan man i det hele vil betragte en mindretalsregerings forfatningsretlige stilling over for Folketinget. Folketinget har imidlertid på lige netop dette område for ganske nylig lagt til grund, at Folketingets tilkendegivelser *ikke* retligt begrænser statsministerens organisationsmagt[37]). Denne løsning har den store fordel, at den er klar.

Grl. § 14 omfatter kun forretningernes fordeling mellem ministrene – med den sprogbrug, som anvendes i denne bog: opgavernes fordeling på ministerområder. Helt op i begyndelsen af dette århundrede findes – ganske vist uklare – spor af en opfattelse, hvorefter § 14 også omfattede opgavefordelingen inden for det enkelte ministerområde, altså centralad-

---

35) *N. Eilschou Holm* i Juridisk Grundbog I 1975, 109.
36) Således folketingsbeslutning af 22/5 1986, hvori folketinget opfordrer statsministeren til i folketingssamlingen 1985-86 at overføre administrationen af lov om jagt og vildtforvaltning samt de dertil hørende institutioner til Miljøministeriet, FT 1985-86 A 1125, B 1701 og C 813.
37) FT 1982-83. 12199 ff. især 12206, FT 1985-86. 2835 ff. og 11572 og FT 1986/87.13310.

# Appendix D

Case 1:18-md-02865-LAK Document 452-4 Filed 07/19/23 Page 23 of

[Handbook Shelf 2]

# Considerations
# on the Court's Territorial
# Jurisdiction in Civil Cases, etc.

# (EC-Convention on Judgments)

Published by the Justice Council (*retsplejerådet*)



CONSIDERATION NO. 1052

COPENHAGEN 1985

75

Til § 239.

Bestemmelsen træder i stedet  for reglen om kommuners  værneting
i nugældende§ 238. I lighed med reglen i lovudkastets § 238
foreslås det, at der ved fastlæggelsen af kommuners værneting
skal lægges vægt på,  hvor kommunens hovedkontor er    beliggende.

Til § 240.

Reglen i lovudkastets § 240 om statens værneting svarer med
nogle ændringer af redaktionel karakter til den nugældende re-
gel i retsplejelovens § 239. The question about which
authority can be sued on behalf of the state must, as to date,
be decided on the basis of general principles of
administrative law. A lawsuit can, in general, be brought
against the administrative authority that has the capacity and
competence on its own to reach a decision or ruling in the
particular case.

Særlovgivningen indeholder som omtalt i kapitel 2, afsnit 1.2.
i vidt omfang regler om andet værneting.

Efter skattestyrelseslovens § 31 anlægges sager om skattespørgs-
mål ved den landsret, i hvis kreds den skattepligtige har hjem-
ting ved sagens anlæg.

Søgsmål om ekspropriation anlægges efter  ekspropriationslovens
§ 26, stk. 1, ved den landsret, under hvilken vedkommende ejen-
dom er beliggende. Tilsvarende regler gælder efter lov om of-
fentlige veje, § 65, stk. 1, by- og landszonelovens§ 16 og
naturfredningslovens§ 30,  stk.  6.

Efter lov nr. 93 af 29. marts 1937 om skibsregistrering § 53
indbringes skibsregistrets afgørelse for (køres til) landsret-
ten, i hvis kreds det pågældende skibsrederi er  hjemmehørende.

Retsplejerådet har overvejet,  hvorvidt der burde gennemføres
en regel, der generelt lader sagsøgerens hjemting være afgø-
rende ved sager mod staten, således som det har været  foreslået

76

af Sv. B. Muller i Juristen 1959, s. 427 ff og af Frost i
Juristen 1969, s. 265. En sådan regel kunne umiddelbart fore-
komme nærliggende på baggrund af det af rådet stillede forslag
om gennemførelse af en særlig værnetingsregel om forbrugersa-
ger, der i visse tilfælde giver forbrugeren adgang til at an-
lægge sag ved sit eget hjemting (lovudkastets § 244). En regel,
der giver adgang til i alle sager at anlægge sag mod staten
ved eget hjemting, ville imidlertid være meget vidtgående. Reg-
len i lovudkastets § 244 har endvidere sammenhæng med, at de
pågældende sager, som er omfattet af denne bestemmelse, ved-
rører aftaler, som den erhvervsdrivende typisk har taget ini-
tiativ til. Det samme gør sig ikke gældende i sager, hvor sta-
ten er modpart. En adgang til sagsanlæg mod statsmyndigheder
ved eget hjemting ville undertiden være uhensigtsmæssig. Sager
mod decentrale statsmyndigheder vil typisk have deres udspring
i begivenheder i det lokalområde, hvor myndigheden har hjemting,
og det er derfor naturligt, at de også behandles der. Hertil
kommer, at der som foran nævnt, hvor der har vist sig et sær-
ligt behov herfor, i særlovgivningen er foretaget en fravigel-
se af retsplejelovens almindelige værnetingsbestemmelse. På
den baggrund finder retsplejerådet det rigtigst at opretholde
den nugældende regel om statens værneting.

Til § 241.

Lovudkastets § 241 om værnetinget for sager om fast ejendom
svarer med sproglige ændringer til nugældende § 240, stk. 1.

Der henvises herom til kapitel 2, afsnit 1.1.2.

Efter nugældende § 240, stk. 2, kan sagsøgeren benytte den fas-
te ejendoms værneting i sager, hvor han indtaler fordringer,
som er sikret ved pant i ejendommen, eller enkelte forfaldne
grundbyrdeydelser. Retsplejerådet foreslår, at denne bestem-
melse ophæves. Efter retsplejerådets opfattelse er der ikke
noget større behov for en sådan regel. Dette skyldes bl.a.,
at udlæg kan foretages direkte på grundlag af pantebreve, jfr.
retsplejelovens § 478, stk. 1, nr. 6. Retsplejeloven indehol-
der i § 487, stk. 1, nr. 3, en særlig værnetingsregel, hvor-

*Håndbogsreol 2*

# Betænkning
# om retternes stedlige kompetence
# i borgerlige sager m.v.

## (EF-domskonventionen)

*Afgivet af retsplejerådet*



*ex. 2*

BETÆNKNING NR. 1052
KØBENHAVN 1985

75

Til § 239.

Bestemmelsen træder i stedet for reglen om kommuners værneting
i nugældende § 238. I lighed med reglen i lovudkastets § 238
foreslås det, at der ved fastlæggelsen af kommuners værneting
skal lægges vægt på, hvor kommunens hovedkontor er beliggende.

Til § 240.

Reglen i lovudkastets § 240 om statens værneting svarer med
nogle ændringer af redaktionel karakter til den nugældende re-
gel i retsplejelovens § 239. Spørgsmålet om, hvilken myndig-
hed der kan sagsøges på statens vegne, må som hidtil afgøres
ud fra almindelige forvaltningsretlige principper. En retssag
kan i almindelighed anlægges mod den forvaltningsmyndighed,
som har habilitet og kompetence til selv at træffe afgørelse
eller beslutning i det anliggende, sagen angår.

Særlovgivningen indeholder som omtalt i kapitel 2, afsnit 1.2.
i vidt omfang regler om andet værneting.

Efter skattestyrelseslovens § 31 anlægges sager om skattespørgs-
mål ved den landsret, i hvis kreds den skattepligtige har hjem-
ting ved sagens anlæg.

Søgsmål om ekspropriation anlægges efter ekspropriationslovens
§ 26, stk. 1, ved den landsret, under hvilken vedkommende ejen-
dom er beliggende. Tilsvarende regler gælder efter lov om of-
fentlige veje, § 65, stk. 1, by- og landszonelovens § 16 og
naturfredningslovens § 30, stk. 6.

Efter lov nr. 93 af 29. marts 1937 om skibsregistrering § 53
indbringes skibsregistrets afgørelse for (kæres til) landsret-
ten, i hvis kreds det pågældende skibsrederi er hjemmehørende.

Retsplejerådet har overvejet, hvorvidt der burde gennemføres
en regel, der generelt lader sagsøgerens hjemting være afgø-
rende ved sager mod staten, således som det har været foreslået

Case 1:18-md-02865-LAK   Document 153-4   Filed 07/19/19   Page 38 of 51

76

af Sv. B. Müller i Juristen 1959, s. 427 ff og af Frost i
Juristen 1969, s. 265. En sådan regel kunne umiddelbart fore-
komme nærliggende på baggrund af det af rådet stillede forslag
om gennemførelse af en særlig værnetingsregel om forbrugersa-
ger, der i visse tilfælde giver forbrugeren adgang til at an-
lægge sag ved sit eget hjemting (lovudkastets § 244). En regel,
der giver adgang til i alle sager at anlægge sag mod staten
ved eget hjemting, ville imidlertid være meget vidtgående. Reg-
len i lovudkastets § 244 har endvidere sammenhæng med, at de
pågældende sager, som er omfattet af denne bestemmelse, ved-
rører aftaler, som den erhvervsdrivende typisk har taget ini-
tiativ til. Det samme gør sig ikke gældende i sager, hvor sta-
ten er modpart. En adgang til sagsanlæg mod statsmyndigheder
ved eget hjemting ville undertiden være uhensigtsmæssig. Sager
mod decentrale statsmyndigheder vil typisk have deres udspring
i begivenheder i det lokalområde, hvor myndigheden har hjemting,
og det er derfor naturligt, at de også behandles der. Hertil
kommer, at der som foran nævnt, hvor der har vist sig et sær-
ligt behov herfor, i særlovgivningen er foretaget en fravigel-
se af retsplejelovens almindelige værnetingsbestemmelse. På
den baggrund finder retsplejerådet det rigtigst at opretholde
den nugældende regel om statens værneting.

Til § 241.

Lovudkastets § 241 om værnetinget for sager om fast ejendom
svarer med sproglige ændringer til nugældende § 240, stk. 1.

Der henvises herom til kapitel 2, afsnit 1.1.2.

Efter nugældende § 240, stk. 2, kan sagsøgeren benytte den fas-
te ejendoms værneting i sager, hvor han indtaler fordringer,
som er sikret ved pant i ejendommen, eller enkelte forfaldne
grundbyrdeydelser. Retsplejerådet foreslår, at denne bestem-
melse ophæves. Efter retsplejerådets opfattelse er der ikke
noget større behov for en sådan regel. Dette skyldes bl.a.,
at udlæg kan foretages direkte på grundlag af pantebreve, jfr.
retsplejelovens § 478, stk. 1, nr. 6. Retsplejeloven indehol-
der i § 487, stk. 1, nr. 3, en særlig værnetingsregel, hvor-

Case 1:18-md-02865-LAK   Document 835-5   Filed 07/15/22   Page 1 of 95

# Appendix E

Administrative  Law

*Chapter 20. Court Proceedings*

betydning i erstatningsretlig henseende. Højesteret udtalte, at uanset at manden havde fået en tidsbegrænset humanitær opholdstilladelse, var der ikke grundlag for at fastslå, at han savnede retlig interesse i at få prøvet lovligheden af ministeriets afgørelser.

I U 2004.3051 H havde en bygherre opfordret rådgivere til at anmode om prækvalifikation i forbindelse med udbud af rådgivning vedrørende en tilbygning. Praktiserende Arkitekters Råd, PAR, indbragte sagen for Klagenævnet for Udbud med påstand om, at bygherren på 6 punkter havde handlet i strid med udbudsreglerne. Klagenævnet gav PAR medhold vedrørende 2 af punkterne, mens bygherren fik medhold vedrørende de resterende 4. Derefter anlagde PAR sag ved landsretten vedrørende de 4 punkter. Under domstolsprøvelsen kom det frem, at bygherren endeligt havde opgivet det byggeprojekt, som sagen vedrørte, og udbetalt tilbudsvederlag til alle de deltagende firmaer. En afgørelse af PARs påstande ville derfor ikke have betydning for bygherrens, de deltagende firmaers eller PARs retsstilling. Der forelå desuden ikke oplysninger om, at en afgørelse ville have betydning for andre. PAR havde herefter ikke længere fornøden interesse i en prøvelse af, om bygherren havde handlet i strid med udbudsreglerne. Hverken hensynet til effektiv kontrol med forvaltningen eller PARs klageadgang i medfør af udbudsreglerne kunne føre til et andet resultat. Søgsmålet blev herefter afvist.

Kravene til tvistens fortsatte aktualitet synes større, hvis modparten ikke er forvaltningsmyndigheden, men en privat part, uanset om sagen indirekte rejser spørgsmål om berettigelsen af en myndigheds dispositioner, jf. U 2008.1897 H og U 2009.1758 H. Det samme er tilfældet, hvis prøvelsen ikke angår, om en bestemt persons rettigheder er blevet krænket, idet søgsmålet har karakter af abstrakt normkontrol med en forening som sagsøger.

I U 1987.923 H påstod Foreningen af Arbejdsledere i Danmark Direktoratet for Arbejdsløshedsforsikringen tilpligtet at anerkende, at et af direktoratet udstedt cirkulære var i strid med lov om arbejdsformidling og arbejdsløshedsforsikring. Højesteret fandt, at foreningen havde en aktuel, saglig interesse i at få afklaret, om cirkulæret var lovstridigt, og at de nødvendige oplysninger til afgørelse af dette spørgsmål kunne tilvejebringes under retssagen. Alligevel blev søgsmålet afvist, da cirkulæret efter sagens anlæg var blevet ophævet, og foreningen herefter ikke længere havde fornøden interesse i en prøvelse af spørgsmålet om lovmedholdeligheden af cirkulæret.

*2.4.7.   Særligt om myndigheder som sagsøgere*
*2.4.7.1.   Mod en anden forvaltningsmyndighed*
En offentlig myndighed kan være adressat for en forvaltningsafgørelse på samme måde som et privat organ eller i øvrigt have en væsentlig, konkret og aktuel interesse i sagens udfald på samme måde som private retssubjekter. I sådanne tilfælde vil den offentlige myndighed kunne anlægge søgsmål mod andre offentlige organer, herunder for at få prøvet disse andre myndigheders afgørelser, jf. U 1977.651 H, U 1996.1183/2 H, U 1997.1693 H, U 1998.1344 H og U 2007.464 H. På samme måde som bl.a. organisationer kan

902

Case 1:18-md-02865-LAK   Document 835-25   Filed 06/13/22   Page 4 of 95

*2. Procedural questions in broad overview*

offentlige myndigheder endvidere gennem at være tillagt klageret i den admi-
nistrative rekurs :fa søgsmålsret ved domstolene, jf. U 2003.64 H og U
2004.904 V.

Underordnede myndigheder er normalt ikke berettigede til at klage over
overordnede myndigheders afgørelser til højere administrative myndigheder,
jf. kapitel 2, afsnit 4.4.7. På tilsvarende måde er udgangspunktet, at en under-
ordnet myndighed ikke har søgsmålsret i forhold til rekursinstansen i den si-
tuation, hvor den underordnede myndighed har truffet en afgørelse, der efter-
følgende er blevet omgjort af rekursorganet, jf. U 1997.1304 0, U 1998.672
0, U 2002.1472 H og U 2004.1513 H. Dette vil dog kunne være tilfældet,
hvis den underordnede myndighed - f.eks. en kommune - har en økonomisk,
planlægningsmæssig eller anden relevant interesse i sagens udfald, jf. U
2007.1074 H og U 2007.1078/1 H. Domstolene påser ikke ex officio, om der
i sådanne sager foreligger søgsmålskompetence.

Efter fast praksis anses kommunalbestyrelser at have søgsmålskompetence
i forhold til de kommunale tilsynsmyndigheders afgørelser efter kommune-
styrelseslovens tilsynsbestemmelser, jf. f.eks. U 1981.637 H, U 1990.601 H,
U 1992.699 H og U 2006.3200/2 H og se herom nærmere kapitel 19, hvor der
i afsnittene 9.3.7, 10.2.1.4 og 10.2.2.4 også redegøres for, at de kommunale
tilsynsmyndigheder ved lov er tillagt kompetence til at anlægge anerkendel-
sessøgsmål til håndhævelse af deres udtalelser.

Spørgsmål om en myndigheds søgsmålskompetence kan også opstå i til-
fælde, hvor et ressortministerium er uenigt i afgørelser truffet at et uafhæn-
gigt ankenævn. På den ene side vil sådanne afgørelser - bl.a. på grund af de-
res praksisskabende virkning - efter omstændighederne kunne have betydeli-
ge økonomiske og praktiske virkninger for ministeriet. På den anden side er
formålet med at henlægge afgørelseskompetencen til et uafhængigt nævn of-
te, at ministeren ikke skal have beføjelser over for nævnets konkrete afgørel-
ser, men alene kunne styre nævnet gennem (forslag til) ny lovgivning og ud-
stedelse af generelle administrative forskrifter.

I U 2009.58 Ø havde Beskæftigelsesministeriet ikke retlig interesse i at anlægge sag mod
Arbejdsmarkedets Ankenævn for at fa en konkret afgørelse om ret til at få udbetalt ferie-
penge under efterløn underkendt som ugyldig. Sml. skatteforvaltningslovens § 49, hvoref-
ter Skatteministeriet kan indbringe de skatteretlige ankenævns afgørelser for domstolene.

Spørgsmål, der direkte har interesse for private, bliver i visse tilfælde afgjort un-
der retssager, der føres mellem offentlige myndigheder, jf. f.eks. U 1981.637 H,
U 1995.952 0, U 1996.583 0 og U 2000.2088  V og se afsnit 2.5.2 nedenfor
om de problemer, som den manglende inddragelse af vedkommende private
kan give anledning til.

*Chapter 20. Court Proceedings*

*2.4.7.2.   Med en privat part som sagsøgt*

Også i forhold til tvister med private parter **kan** en myndighed naturligvis have søgsmålsinteresse på samme måde, som hvis myndigheden var et privat organ. I visse tilfælde har offentlige myndigheder endvidere sagsøgt private parter for at få parten dømt til at anerkende rigtigheden af myndighedens retsopfattelse, jf. U 1977.514 H, U 2001.2493 H og U 2007.2012 Ø.

En række lovbestemmelser pålægger en myndighed at indbringe sin egen afgørelse for domstolene. Der kan både være tale om automatisk indbringelse og domstolsprøvelse, der alene sker, hvis parten anmoder derom. Se for eksempler domstolsprøvelse af administrativ frihedsberøvelse i henhold til retsplejelovens kapitel 43 a og domstolsprøvelse i henhold til en række lovbestemmelser vedrørende forvaltningsafgørelser, der forbyder eller begrænser virksomhed, hvortil der kræves offentlig autorisation, jf. bl.a. revisorlovens § 52, lov om vagtvirksomhed § 15, godskørselslovens § 13, luftfartslovens § 146 b, retsplejelovens §§ 121, stk. 4, 139, stk. 3, og 147 e, lov om autorisation af virksomheder på el-, vvs- og kloakinstallationsområdet § 23, lov o m formidling af fast ejendom mv. § 64 og lov om autorisation af sundhedspersoner §§ 11 og 36. Beslægtede bestemmelser findes i udlændingelovens § 52, produktsikkerhedslovens § 34 og lov om dyrkning mv. af genetisk modificerede afgrøder § 16, stk. 3.

Sådanne regler er vedtaget for at gøre det lettere for borgerne at få forvaltningsakter prøvet og afskærer normalt ikke den private fra selv at anlægge sag ved domstolene. De indebærer i de fleste tilfælde, at sagen skal anlægges i den civile retsplejes former med en påstand fra myndighedens side om, at parten (sagsøgte) skal anerkende, at forvaltningsakten er gyldig. Der vil normalt være fastsat en frist for partens adgang til at fremsætte anmodning om, at myndigheden indbringer sagen for domstolene.

## 2.5.   Who should be sued as part of the process on the administration's side?

### 2.5.1.   General administrative cases

In most cases, it is self-evident who shall appear as litigating party on the administration's side, namely the authority that issued the disputed administrative decision. Tvivl kan dog opstå i tilfælde, hvor flere myndigheder har truffet afgørelse i sagen. På visse områder er det lovreguleret eller fastlagt i retspraksis, hvilken myndighed der sagsøges. I skattesager er Skattemini ste- riet procespart i sager, der er afgjort af Landsskatteretten, jf. U 2011.781 H. I sager, der i sidste instans er afgjort af Konkurrenceankenævnet, er Konkur- rencerådet rette sagsøgte.

Additionally, the case must be brought against the authority responsible for the decision that is to be tried. Er en afgørelse tru:ffet af en underordnet in-

904

*2. Procedural questions in broad overview*

stans, hvis afgørelse kan påklages til en højere administrativ myndighed uden at være blevet det, er underinstansen rette sagsøgte. Det samme gælder, hvis afgørelsen har været påklaget, men rekursorganet afviser at realitetsbehandle klagen, og påstanden ikke går på, at rekursorganet burde have behandlet sagen.

Har ankeinstansen realitetsbehandlet sagen, er ankeinstansen normalt rette sagsøgte, eventuelt sammen med underinstansen. Derimod er det uden betydning, om ankeinstansen har ændret eller stadfæstet afgørelsen. I begge tilfælde er den retskraftige afgørelse ankeinstansens, og dermed er denne rette procespart, jf. U 1997.1411 V, U 2000.179 H, U 2005.2809 H og U 2007.2404 H. Om underinstansen skal inddrages, beror på, i hvilken udstrækning ankeinstansen har taget stilling til underinstansens afgørelse, sammenholdt med det klagepunkt, sagsøgeren har mod sagens administrative behandling, jf. U 1992.227 H og U 2002.757 H. Ønsker parten at nedlægge påstande, der ikke dækkes af ankeinstansens kompetence, må parten - evt. tillige - rette søgsmålet mod den underordnede instans, jf. U 2010.818 H.

I U 2003.1150 H havde et amt givet dispensation til kommunen med henblik på at udføre et skolebyggeri, hvis bygning overskred det byggefelt, der var fastsat i den gældende lokalplan. Herefter indbragte naboen til skolebyggeriet kommunens afgørelse for Naturklagenævnet, der imidlertid ikke gav naboen medhold. Naboen anlagde derefter sag mod amtet og kommunen med påstand bl.a. om, at disse skulle anerkende, at en tilbygning var opført i strid med lokalplanen, og at der skulle ske lovliggørelse ved nedrivning subsidiært ændring af tilbygningen. Mere subsidiært nedlagde naboen tillige en erstatningspåstand. Amtet og kommunen påstod sagen afvist under henvisning til, at fristen for sagsanlæg var overskredet, subsidiært at de ikke var rette sagsøgte. Højesteret fandt, at amtet og kommunen var rette sagsøgte, da sagen bl.a. angik, om kommunen som lokalplanmyndighed og amtet som grundejer og bygherre skulle henholdsvis kræve og gennemføre fysisk lovliggørelse, og subsidiært, om kommunen og amtet skulle betale erstatning for ulemper som følge af tilbygningen. Uanset at krav herom bl.a støttedes på et anbringende om, at kommunen ikke var bemyndiget til at give dispensation for de konkrete forhold, var der herefter ikke grundlag for frifindelse allerede som følge af, at hverken kommunen eller amtet skulle være rette sagsøgte.

Er afgørelsen truffet af et uafhængigt nævn, må søgsmålet rettes mod nævnet og ikke mod det ministerium, der har ressortområdet, jf. U 2000.669 H. Er afgørelsen truffet af et privat organ, hvis afgørelser ikke kan indbringes for en offentlig myndighed, må søgsmålet rettes mod det private organ, jf. U 1998.1552 H, hvor Undervisningsministeriet ikke var rette sagsøgte i sag om en tilskudsordning administreret af en privat organisation, uanset at der var tale om fordeling af offentlige midler, og ministeriet var ressortmyndighed og øverste budgetansvarlige. Går påstanden ud på et pengekrav, må procesparten på forvaltningens side efter budgetrettens regler kunne forpligte den pågæl-

905

*Chapter 20. Court Proceedings*

dende fonnue; kræves der erstatning, må det organ, der hævdes at have begået den erstatningspådragende fejl, sagsøges, se U 2002.1566 H.

Det tilføjes, at domstolene heller ikke i denne sammenhæng exofficio påser, at den indstævnte forvaltningsmyndighed er rette sagsøgte, men alene behandler problemstillingen efter sagsøgtes påstand.

*2.5.2.   Søgsmål mod forvaltningen af betydning for private tredjemænd*
Det hænder ofte, at en sag ved en forvaltningsmyndighed ikke blot involverer en enkelt part, men at forvaltningen træffer en afgørelse, der har betydning for flere, som måske har modstående interesser. Det kan f.eks. være en sag om en tilladelse til at opføre et hus, der vil være til gene for naboer e.lign. Dette forhold ændrer ikke ved, at den, der er utilfreds med forvaltningens afgørelse, må anlægge sag mod forvaltningen.

Ikke sjældent føres prøvelsessager mellem myndigheden og en enkelt af flere private parter, uanset om sagen har betydning for en anden part, og dommens resultat potentielt kan have betydelige negative følger for denne, jf. f.eks. U 1990.106/2 0, U 2000.2412 **H** og U 2003.1628 0.

I U 2000.1380 **H** afgjordes det under en retssag mellem Miljøstyrelsen og en grundejerforening, at Miljøstyrelsens afgørelser om støjgrænser for en virksomhed skulle annulleres og hjemvises til ny behandling. Dette skete, uden at virksomheden var inddraget i sagen.

I U 1999.1 H ophævedes en tilladelse til et supermarked om at holde åbent i weekenden. Tilladelsen var meddelt af Frederikshavn Kommune. Retssagen førtes med kommunen og HK som parter.

I enkelte tilfælde er et søgsmål mod myndigheden af betydning for tredjemand dog blevet afvist.

I U 2006.1717 **H** afviste Højesteret ex officio et søgsmål mod Sundhedsvæsenets Patientklagenævn, hvor der ønskedes dom for, at en læge - i modstrid med nævnets afgørelse - havde overtrådt lægeloven, allerede fordi lægen ikke havde haft mulighed for at varetage sine interesser under retssagen. Se tilsvarende U 2013.3295 **H** omtalt i afsnit 2.4.5 ovenfor samt U 2014.3504 **H** om et forsikringsselskabs påstand over for Ankestyrelsen om, at det fuldt ud havde opfyldt sine forpligtelser til at udbetale erhvervsevnetabserstatning i en sag, hvor skadelidte arbejdstager ikke var part.

Det hænder også, at der i sager mellem private parter sker en præjudiciel prøvelse af forvaltningsafgørelser, uden at den myndighed, der har udstedt afgørelsen, deltager i sagens behandling, jf. U 1988.352 H, U 2000.2047 H og U 2014.760 0. Se også U 2004.4 H.

906

Forvaltningsret

*Kapitel 20. Domstolsprøvelse*

betydning i erstatningsretlig henseende. Højesteret udtalte, at uanset at manden havde fået en tidsbegrænset humanitær opholdstilladelse, var der ikke grundlag for at fastslå, at han savnede retlig interesse i at få prøvet lovligheden af ministeriets afgørelser.

I U 2004.3051 H havde en bygherre opfordret rådgivere til at anmode om prækvalifikation i forbindelse med udbud af rådgivning vedrørende en tilbygning. Praktiserende Arkitekters Råd, PAR, indbragte sagen for Klagenævnet for Udbud med påstand om, at bygherren på 6 punkter havde handlet i strid med udbudsreglerne. Klagenævnet gav PAR medhold vedrørende 2 af punkterne, mens bygherren fik medhold vedrørende de resterende 4. Derefter anlagde PAR sag ved landsretten vedrørende de 4 punkter. Under domstolsprøvelsen kom det frem, at bygherren endeligt havde opgivet det byggeprojekt, som sagen vedrørte, og udbetalt tilbudsvederlag til alle de deltagende firmaer. En afgørelse af PARs påstande ville derfor ikke have betydning for bygherrens, de deltagende firmaer eller PARs retsstilling. Der forelå desuden ikke oplysninger om, at en afgørelse ville have betydning for andre. PAR havde herefter ikke længere fornøden interesse i en prøvelse af, om bygherren havde handlet i strid med udbudsreglerne. Hverken hensynet til effektiv kontrol med forvaltningen eller PARs klageadgang i medfør af udbudsreglerne kunne føre til et andet resultat. Søgsmålet blev herefter afvist.

Kravene til tvistens fortsatte aktualitet synes større, hvis modparten ikke er forvaltningsmyndigheden, men en privat part, uanset om sagen indirekte rejser spørgsmål om berettigelsen af en myndigheds dispositioner, jf. U 2008.1897 H og U 2009.1758 H. Det samme er tilfældet, hvis prøvelsen ikke angår, om en bestemt persons rettigheder er blevet krænket, idet søgsmålet har karakter af abstrakt normkontrol med en forening som sagsøger.

I U 1987.923 H påstod Foreningen af Arbejdsledere i Danmark Direktoratet for Arbejdsløshedsforsikringen tilpligtet at anerkende, at et af direktoratet udstedt cirkulære var i strid med lov om arbejdsformidling og arbejdsløshedsforsikring. Højesteret fandt, at foreningen havde en aktuel, saglig interesse i at få afklaret, om cirkulæret var lovstridigt, og at de nødvendige oplysninger til afgørelse af dette spørgsmål kunne tilvejebringes under retssagen. Alligevel blev søgsmålet afvist, da cirkulæret efter sagens anlæg var blevet ophævet, og foreningen herefter ikke længere havde fornøden interesse i en prøvelse af spørgsmålet om lovmedholdeligheden af cirkulæret.

### 2.4.7. Særligt om myndigheder som sagsøgere
### 2.4.7.1. Mod en anden forvaltningsmyndighed
En offentlig myndighed kan være adressat for en forvaltningsafgørelse på samme måde som et privat organ eller i øvrigt have en væsentlig, konkret og aktuel interesse i sagens udfald på samme måde som private retssubjekter. I sådanne tilfælde vil den offentlige myndighed kunne anlægge søgsmål mod andre offentlige organer, herunder for at få prøvet disse andre myndigheders afgørelser, jf. U 1977.651 H, U 1996.1183/2 H, U 1997.1693 H, U 1998.1344 H og U 2007.464 H. På samme måde som bl.a. organisationer kan

*2. Processuelle spørgsmål i bred forstand*

offentlige myndigheder endvidere gennem at være tillagt klageret i den administrative rekurs få søgsmålsret ved domstolene, jf. U 2003.64 H og U 2004.904 V.

Underordnede myndigheder er normalt ikke berettigede til at klage over overordnede myndigheders afgørelser til højere administrative myndigheder, jf. kapitel 2, afsnit 4.4.7. På tilsvarende måde er udgangspunktet, at en underordnet myndighed ikke har søgsmålsret i forhold til rekursinstansen i den situation, hvor den underordnede myndighed har truffet en afgørelse, der efterfølgende er blevet omgjort af rekursorganet, jf. U 1997.1304 Ø, U 1998.672 Ø, U 2002.1472 H og U 2004.1513 H. Dette vil dog kunne være tilfældet, hvis den underordnede myndighed – f.eks. en kommune – har en økonomisk, planlægningsmæssig eller anden relevant interesse i sagens udfald, jf. U 2007.1074 H og U 2007.1078/1 H. Domstolene påser ikke ex officio, om der i sådanne sager foreligger søgsmålskompetence.

Efter fast praksis anses kommunalbestyrelser at have søgsmålskompetence i forhold til de kommunale tilsynsmyndigheders afgørelser efter kommunestyrelseslovens tilsynsbestemmelser, jf. f.eks. U 1981.637 H, U 1990.601 H, U 1992.699 H og U 2006.3200/2 H og se herom nærmere kapitel 19, hvor der i afsnittene 9.3.7, 10.2.1.4 og 10.2.2.4 også redegøres for, at de kommunale tilsynsmyndigheder ved lov er tillagt kompetence til at anlægge anerkendelsessøgsmål til håndhævelse af deres udtalelser.

Spørgsmål om en myndigheds søgsmålskompetence kan også opstå i tilfælde, hvor et ressortministerium er uenigt i afgørelser truffet at et uafhængigt ankenævn. På den ene side vil sådanne afgørelser – bl.a. på grund af deres praksisskabende virkning – efter omstændighederne kunne have betydelige økonomiske og praktiske virkninger for ministeriet. På den anden side er formålet med at henlægge afgørelseskompetencen til et uafhængigt nævn ofte, at ministeren ikke skal have beføjelser over for nævnets konkrete afgørelser, men alene kunne styre nævnet gennem (forslag til) ny lovgivning og udstedelse af generelle administrative forskrifter.

I U 2009.58 Ø havde Beskæftigelsesministeriet ikke retlig interesse i at anlægge sag mod Arbejdsmarkedets Ankenævn for at få en konkret afgørelse om ret til at få udbetalt feriepenge under efterløn underkendt som ugyldig. Sml. skatteforvaltningslovens § 49, hvorefter Skatteministeriet kan indbringe de skatteretlige ankenævns afgørelser for domstolen.

Spørgsmål, der direkte har interesse for private, bliver i visse tilfælde afgjort under retssager, der føres mellem offentlige myndigheder, jf. f.eks. U 1981.637 H, U 1995.952 Ø, U 1996.583 Ø og U 2000.2088 V og se afsnit 2.5.2 nedenfor om de problemer, som den manglende inddragelse af vedkommende private kan give anledning til.

*Kapitel 20. Domstolsprøvelse*

*2.4.7.2.   Med en privat part som sagsøgt*

Også i forhold til tvister med private parter kan en myndighed naturligvis have søgsmålsinteresse på samme måde, som hvis myndigheden var et privat organ. I visse tilfælde har offentlige myndigheder endvidere sagsøgt private parter for at få parten dømt til at anerkende rigtigheden af myndighedens retsopfattelse, jf. U 1977.514 H, U 2001.2493 H og U 2007.2012 Ø.

En række lovbestemmelser pålægger en myndighed at indbringe sin egen afgørelse for domstolene. Der kan både være tale om automatisk indbringelse og domstolsprøvelse, der alene sker, hvis parten anmoder derom. Se for eksempler domstolsprøvelse af administrativ frihedsberøvelse i henhold til retsplejelovens kapitel 43 a og domstolsprøvelse i henhold til en række lovbestemmelser vedrørende forvaltningsafgørelser, der forbyder eller begrænser virksomhed, hvortil der kræves offentlig autorisation, jf. bl.a. revisorlovens § 52, lov om vagtvirksomhed § 15, godskørselslovens § 13, luftfartslovens § 146 b, retsplejelovens §§ 121, stk. 4, 139, stk. 3, og 147 e, lov om autorisation af virksomheder på el-, vvs- og kloakinstallationsområdet § 23, lov om formidling af fast ejendom mv. § 64 og lov om autorisation af sundhedspersoner §§ 11 og 36. Beslægtede bestemmelser findes i udlændingelovens § 52, produktsikkerhedslovens § 34 og lov om dyrkning mv. af genetisk modificerede afgrøder § 16, stk. 3.

Sådanne regler er vedtaget for at gøre det lettere for borgerne at få forvaltningsakter prøvet og afskærer normalt ikke den private fra selv at anlægge sag ved domstolene. De indebærer i de fleste tilfælde, at sagen skal anlægges i den civile retsplejes former med en påstand fra myndighedens side om, at parten (sagsøgte) skal anerkende, at forvaltningsakten er gyldig. Der vil normalt være fastsat en frist for partens adgang til at fremsætte anmodning om, at myndigheden indbringer sagen for domstolene.

## 2.5.   Hvem skal indstævnes som procespart på forvaltningens side?

*2.5.1.   Almindelige forvaltningssager*

I de fleste tilfælde giver det sig selv, hvem der skal optræde som procespart på forvaltningens side, nemlig den myndighed, der har udstedt den anfægtede forvaltningsafgørelse. Tvivl kan dog opstå i tilfælde, hvor flere myndigheder har truffet afgørelse i sagen. På visse områder er det lovreguleret eller fastlagt i retspraksis, hvilken myndighed der sagsøges. I skattesager er Skatteministeriet procespart i sager, der er afgjort af Landsskatteretten, jf. U 2011.781 H. I sager, der i sidste instans er afgjort af Konkurrenceankenævnet, er Konkurrencerådet rette sagsøgte.

I øvrigt må sagen anlægges mod den myndighed, der har ansvaret for den afgørelse, der ønskes påkendt. Er en afgørelse truffet af en underordnet in-

904

*2. Processuelle spørgsmål i bred forstand*

stans, hvis afgørelse kan påklages til en højere administrativ myndighed uden at være blevet det, er underinstansen rette sagsøgte. Det samme gælder, hvis afgørelsen har været påklaget, men rekursorganet afviser at realitetsbehandle klagen, og påstanden ikke går på, at rekursorganet burde have behandlet sagen.

Har ankeinstansen realitetsbehandlet sagen, er ankeinstansen normalt rette sagsøgte, eventuelt sammen med underinstansen. Derimod er det uden betydning, om ankeinstansen har ændret eller stadfæstet afgørelsen. I begge tilfælde er den retskraftige afgørelse ankeinstansens, og dermed er denne rette procespart, jf. U 1997.1411 V, U 2000.179 H, U 2005.2809 H og U 2007.2404 H. Om underinstansen skal inddrages, beror på, i hvilken udstrækning ankeinstansen har taget stilling til underinstansens afgørelse, sammenholdt med det klagepunkt, sagsøgeren har mod sagens administrative behandling, jf. U 1992.227 H og U 2002.757 H. Ønsker parten at nedlægge påstande, der ikke dækkes af ankeinstansens kompetence, må parten – evt. tillige – rette søgsmålet mod den underordnede instans, jf. U 2010.818 H.

I U 2003.1150 H havde et amt givet dispensation til kommunen med henblik på at udføre et skolebyggeri, hvis bygning overskred det byggefelt, der var fastsat i den gældende lokalplan. Herefter indbragte naboen til skolebyggeriet kommunens afgørelse for Naturklagenævnet, der imidlertid ikke gav naboen medhold. Naboen anlagde derefter sag mod amtet og kommunen med påstand bl.a. om, at disse skulle anerkende, at en tilbygning var opført i strid med lokalplanen, og at der skulle ske synliggørelse ved nedrivning subsidiært ændring af tilbygningen. Mere subsidiært nedlagde naboen tillige en erstatningspåstand. Amtet og kommunen påstod sagen afvist under henvisning til, at fristen for sagsanlæg var overskredet, subsidiært at de ikke var rette sagsøgte. Højesteret fandt, at amtet og kommunen var rette sagsøgte, da sagen bl.a. angik, om kommunen som lokalplanmyndighed og amtet som grundejer og bygherre skulle henholdsvis kræve og gennemføre fysisk lovliggørelse, og subsidiært, om kommunen og amtet skulle betale erstatning for ulemper som følge af tilbygningen. Uanset at krav herom bl.a. støttedes på et anbringende om, at kommunen ikke var bemyndiget til at give dispensation for de konkrete forhold, var der herefter ikke grundlag for frifindelse allerede som følge af, at hverken kommunen eller amtet skulle være rette sagsøgte.

Er afgørelsen truffet af et uafhængigt nævn, må søgsmålet rettes mod nævnet og ikke mod det ministerium, der har ressortområdet, jf. U 2000.669 H. Er afgørelsen truffet af et privat organ, hvis afgørelser ikke kan indbringes for en offentlig myndighed, må søgsmålet rettes mod det private organ, jf. U 1998.1552 H, hvor Undervisningsministeriet ikke var rette sagsøgte i sag om en tilskudsordning administreret af en privat organisation, uanset at der var tale om fordeling af offentlige midler, og ministeriet var ressortmyndighed og øverste budgetansvarlige. Går påstanden ud på et pengekrav, må procesparten på forvaltningens side efter budgetrettens regler kunne forpligte den pågæl-

905

*Kapitel 20. Domstolsprøvelse*

dende formue; kræves der erstatning, må det organ, der hævdes at have begå-
et den erstatningspådragende fejl, sagsøges, se U 2002.1566 H.

Det tilføjes, at domstolene heller ikke i denne sammenhæng ex officio på-
ser, at den indstævnte forvaltningsmyndighed er rette sagsøgte, men alene
behandler problemstillingen efter sagsøgtes påstand.

## 2.5.2. Søgsmål mod forvaltningen af betydning for private tredjemænd

Det hænder ofte, at en sag ved en forvaltningsmyndighed ikke blot involverer
en enkelt part, men at forvaltningen træffer en afgørelse, der har betydning
for flere, som måske har modstående interesser. Det kan f.eks. være en sag
om en tilladelse til at opføre et hus, der vil være til gene for naboer e.lign.
Dette forhold ændrer ikke ved, at den, der er utilfreds med forvaltningens af-
gørelse, må anlægge sag mod forvaltningen.

Ikke sjældent føres prøvelsessager mellem myndigheden og en enkelt af
flere private parter, uanset om sagen har betydning for en anden part, og
dommens resultat potentielt kan have betydelige negative følger for denne, jf.
f.eks. U 1990.106/2 Ø, U 2000.2412 H og U 2003.1628 Ø.

I U 2000.1380 H afgjordes det under en retssag mellem Miljøstyrelsen og en grundejerfor-
ening, at Miljøstyrelsens afgørelser om støjgrænser for en virksomhed skulle annulleres og
hjemvises til ny behandling. Dette skete, uden at virksomheden var inddraget i sagen.

I U 1999.1 H ophævedes en tilladelse til et supermarked om at holde åbent i weekenden.
Tilladelsen var meddelt af Frederikshavn Kommune. Retssagen førtes med kommunen og
HK som parter.

I enkelte tilfælde er et søgsmål mod myndigheden af betydning for tredje-
mand dog blevet afvist.

I U 2006.1717 H afviste Højesteret ex officio et søgsmål mod Sundhedsvæsenets Patient-
klagenævn, hvor der ønskedes dom for, at en læge – i modstrid med nævnets afgørelse –
havde overtrådt lægeloven, allerede fordi lægen ikke havde haft mulighed for at varetage
sine interesser under retssagen. Se tilsvarende U 2013.3295 omtalt i afsnit 2.4.5 ovenfor
samt U 2014.3504 H om et forsikringsselskabs påstand over for Ankestyrelsen om, at det
fuldt ud havde opfyldt sine forpligtelser til at udbetale erhvervsevnetabserstatning i en sag,
hvor skadelidte arbejdstager ikke var part.

Det hænder også, at der i sager mellem private parter sker en præjudiciel prø-
velse af forvaltningsafgørelser, uden at den myndighed, der har udstedt afgø-
relsen, deltager i sagens behandling, jf. U 1988.352 H, U 2000.2047 H og U
2014.760 Ø. Se også U 2004.4 H.

906