CERTIFIED TRANSLATION

**U.2000.365/2H**

*The seller of profit company, the seller's attorney and auditor as well as the buyer's bank liable in damages for the tax authorities' loss as a result of asset stripping – Distribution of liability between the parties.*

*General topics 21.9 – Damages in tort 111.1, 111.4, 3.3, 43.1, 5, 61.1 and 62.2 – Money matters etc. 2 and 5.7 – Administration of justice 12.3 – Company law 1.2 – Taxes 7.1.*

♦ In 1991, S sold the shares in the private limited company O to K for approximately DKK 8.5 million. The purchase price corresponded to O's equity plus DKK 1 million, and as instructed by K, K's bank B deducted the purchase price from the buyer company's account and transferred it to S's bank on the condition that the latter transferred O's cash to B on the same day, effecting a set-off. After O went bankrupt, the estate filed claims against S and B for the tax authorities' loss on the sale. Section 88 (2) of the Danish Private Limited Companies Act (*anpartsselskabsloven*) was deemed to have been violated, and B, who was aware of the individual transactions, was deemed to have contributed in a manner that incurred liability to this unlawful self-funding. Furthermore, S and S's attorney A and auditor R

**366**

were liable in damages. It was undisputed that both A and A's law firm and R and R's audit firm were jointly and severally liable for what A and R might be ordered to pay. The mutual distribution of liability was found to be effected in accordance with section 25 (1) of the Danish Liability in Damages Act (*erstatningsansvarsloven*) based on e.g. enrichment views. [1]

**H.D. 24 November 1999 in cases II 526/1998 and II 605/1998**

BG Bank A/S (Attorney J. Korsø Jensen, Copenhagen)
vs.
ApS af 1.9.1991 nr. 6 in bankruptcy (Kammeradvokaten, the Legal Adviser to the Danish Government represented by Attorney Sune Fugleholm, Copenhagen), Else Thrane (Attorney Lars Grøngaard, Aarhus), Attorney Flemming Johnsen (Attorney Klaus Søgaard, Copenhagen)
and
Else Thrane (Attorney Lars Grøngaard, Aarhus)
vs.
ApS af 1.9.1991 nr. 6 in bankruptcy (Kammeradvokaten, the Legal Adviser to the Danish Government represented by Attorney Sune Fugleholm, Copenhagen), BG Bank A/S (Attorney J. Korsø Jensen, Copenhagen), Attorney Flemming Johnsen (Attorney Klaus Søgaard, Copenhagen), Inter-Lex Advokater Odense A/S (Attorney Klaus Søgaard, Copenhagen), Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS (Attorney Erik Flink, Aarhus) and Registered Public Accountant John Dreymann Hansen (Attorney Erik Flink, Aarhus).

**Eastern High Court of Denmark**

*Judgment of the Eastern High Court on 6 November 1998 (17th division)*

(Brydensholt, Kroman, Charlotte Arndt (acting)).

The case brought on 20 September 1996 concerns liability in damages for the tax authorities' loss on the sale of a profit company. The case relates to the question of liability for the seller and for the buyer's bank and also the question of liability for the seller's auditor and attorney in connection with the advice provided and the distribution of any liability between them.

The plaintiff in the case B-2412-96, ApS af 1.9.1991 nr. 6 in bankruptcy (the "company"), is the sold company's bankruptcy estate, defendant 1, Else Thrane, is the seller of the company, and defendant 2, BG Bank A/S (at the time of the transaction Sparekassen Bikuben) is the buyer's bank.

During the case, BG Bank A/S has issued third-party notice against Else Thrane and her adviser, Attorney Flemming Johnsen.

Else Thrane has also issued third-party notice against Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S, the law firm co-owned by Flemming Johnsen.

Finally, Else Thrane has brought a contribution action against Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen, who is the auditor in the firm that has advised Mrs. Thrane.

The parties have registered the following final claims:
*The company's (the bankruptcy estate's) claim:*

---

**1** U 1988.858 H, U 1997.256 H, U 1997.364 H, U 1997.842 H, U 1999.1185 H, U 2000.23 H, TfS 1998.398 H, TfS 1998.455, TfS 1998.470 V, TfS 1998.789 Ø, TfS 1998.732 Ø, TfS 1999.122 Ø, TfS 1999.133 Ø, TfS 1999.200 V, TfS 1999.230 V, TfS 1999.228 Ø, TfS 1999.264 Ø, TfS 1999.304, TfS 1999.379 Ø, TfS 1999.530 V, TfS 1999.542 Ø, TfS 1999.618 V, TfS 1999.617 Ø, TfS 1999.615 Ø, TfS 1999.729 Ø, Ole Bjørn and others in SR Skat, 1999 (no. 3) pp. 140-143 and 145, Bo von Eyben and others: Lærebog i erstatningsret, 3rd ed., p. 60, Kurt Gimsing i SR Skat, 1993 (no. 2) pp. 99-103, same in Revision & Regnskabsvæsen, 1997 (no. 8), pp. 9-21, same in Advokaten, 1993 (no. 5), p. 117 ff, and same in SR Skat, 1993 (no. 5), pp. 275-278, Gomard: Aktieselskaber og anpartsselskaber, 3rd ed. (1996), pp. 417-418, same: Obligationsret 3rd part, 1st ed. (1993), pp. 222-229, same i Revision & Regnskabsvæsen, 1997 (no. 3) pp. 9-16, and same in Festskrift til Ole Lando (1997), p. 165 ff, Bjørn Groth-Andersen in TfS 1999.760, Mogens Holm and others: God Advokatskik (1996), pp. 106-108, Allan Højbak i TfS 1999.741, Christen Boye Jacobsen and others: Bank- og sparekasseloven - med komm. (1996), pp. 61-62, 71 and 74, Jørgen B. Jepsen and others in Revision & Regnskabsvæsen, 1997 (no. 8), pp. 9-13, Greve and others: Komm. straffelov, alm. del, 6th ed. (1997), p. 200, A. Vinding Kruse and others: Advokatansvar, 6th ed. (1990), pp. 129-134, A. Vinding Kruse: Erstatningsretten, 5th ed. (1989), pp. 52-56, 87-89, 92, 307-308, 342-343, Jesper Lett and others i TfS 1998.537, Jens Møller and others: Erstatningsansvarsloven med komm., 3rd ed. (1996), pp. 358-367, Jørgen Nørgaard: Selskabsformerne, 3rd ed. (1997), pp. 191-193, Torben Byskov Petersen in TfS 1999.754, Søren Rasmussen in Lov og ret, 1991 (no. 3), pp. 7-8, Søren Rasmussen and others in SR Skat, 1990 (no. 4), pp. 214-217, Skatteministeriets notater vedrørende selskabstømning in TfS 1997.841 and 844, Jakob T. Sørensen and others in TfS 1999.761, Temanummer om selskabstømning, TfS 1999 (no. 19, Jørn Ankær Thomsen in Revision & Regnskabsvæsen, 1997 (no. 2) pp. 40-42, Henry Ussing: Erstatningsret, new reprint (1946), p. 172, and same: Obligationsret, 4th ed. (1961), p. 445, Erik Werlauff in TfS 1997.114 and same: Selskabsret, 3rd ed. (1997), p. 287, 401-403, 427-429 and 875-880, Knud Waaben: Strafferettens alm. del, I. Ansvarslæren, 4th ed., pp. 212-214 and 222, and Kjeld Søgaard and Morten Samuelsen in Advokaten, 1999, p. 235 f.

---

Copyright © 2021 Karnov Group Denmark A/S

Else Thrane and BG Bank A/S are ordered to jointly and severally pay the company DKK 1,860,916 plus the usual statutory interest from the time the case is brought and until payment is made.

The claim which relates to unpaid corporation tax comprises:

| Tax year | | |
|---|---|---|
| 1990/91 | DKK 85,100 | |
| as above | 1991/92 | DKK 0 |
| as above | 1992/93 | DKK 1,775,816 |
| Total | DKK 1,860,916 | |

**367**

*Else Thrane's claims:*

*Against the plaintiff (the company):*

Primary claim: Dismissal of claim.

Alternative claim: Dismissal of claim against payment of a small amount determined in accordance with the High Court's detailed estimate.

*Against defendant 2 – BG Bank A/S:*

Primary claim: BG Bank A/S is ordered to indemnify Else Thrane for any amount incl. interest and costs that Else Thrane may be ordered to pay to the company.

Alternative claim: BG Bank A/S is ordered to indemnify Else Thrane for the loss that Else Thrane may suffer if Else Thrane were to be convicted in the case brought by the company.

*Against the claim asserted against the principal, BG Bank A/S:*

Primary claim: Dismissal of claim.

Alternative claim: Dismissal of claim against payment of an amount equal to BG Bank A/S indemnifying Else Thrane for the loss suffered by Else Thrane, if Else Thrane were to be convicted in the case brought by the company.

*Against the co-third party, Attorney Flemming Johnsen:*

Attorney Flemming Johnsen is ordered to indemnify Else Thrane for any amount incl. interest and costs that Else Thrane may be ordered to pay to the BG Bank A/S in this third-party case.

*In the two cases B-2412-96 and B-3000-96, Else Thrane has asserted the following claim against Attorney Flemming Johnsen, Inter-Lex Advokater Odense A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen:*

Everyone is ordered, primarily jointly and severally and in the alternative alternatively to fully or partly indemnify Else Thrane for the loss that Else Thrane may suffer if Else Thrane were to be convicted in the case brought by the company.

*BG Bank A/S' claims:*

*Against the company (the bankruptcy estate):*

Dismissal of claim.

*Against the individual claim for indemnification asserted by defendant 1, Else Thrane:*

Dismissal of claim.

*Against the third parties, Else Thrane and Attorney Flemming Johnsen:*

Else Thrane and Attorney Flemming Johnsen are ordered to jointly and severally indemnify BG Bank A/S for any amount that BG Bank A/S may be ordered to pay to the plaintiff in the main case, the company vs.

1) Else Thrane and 2) BG Bank A/S, including the amount claimed of DKK 1,860,916.00 plus statutory interest from the case is brought and until payment is made.

*Attorney Flemming Johnsen's and Inter-Lex Advokater Odense A/S' claims:*

*Against Else Thrane:*

1. Dismissal of claim, in the alternative dismissal against payment of a small amount.

2. Else Thrane is ordered to indemnify Attorney Flemming Johnsen for any amount that he may be ordered to pay to BG Bank A/S, including interest and costs.

*Against BG Bank A/S:*

Dismissal of claim, in the alternative dismissal against payment of a small amount. *Against Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen:*

1. Dismissal of claim, in the alternative dismissal against payment of a small amount.

2. The audit firm Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen are primarily ordered one for all and all for one, in the alternative one or more of these, to indemnify Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S for any amount that they may be ordered to pay to Else Thrane, including interest and costs, in the alternative a smaller amount.

*Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS' and Registered Public Accountant John Dreymann Hansen's claims:*

*Against Else Thrane:*

Primary claim: Dismissal of claim.

Alternative claim: Dismissal against payment of a small amount determined by the High Court.

*Against Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S:*

Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S are ordered primarily jointly and severally, in the alternative alternatively to indemnify Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen for any amount incl. interest and costs that Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen may be ordered to pay to Else Thrane.

*Against the claim for indemnification from Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S against Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen:*

Dismissal of claim.

The claims in the case can then be summarised as follows: The company (the bankruptcy estate) claims that the tax claim is covered by the seller, Mrs. Thrane, and the buyer's bank, BG Bank, jointly and severally. Mrs. Thrane has involved both the attorney and the law firm and the auditor and the audit firm, while BG Bank has only involved the attorney. However, as the claims have been registered, this limitation is of no consequence since, to the extent that the company (the bankruptcy estate) is proven right, it must also be

**368**

determined, how liability is to be distributed among the other involved parties.

*Facts of the case:*

In a sales contract of April 1991, the company (then K.L. Thranes Rogeost, Else Rasmussen Odense ApS) represented by Else Thrane transferred the business producing and selling smoked cheese to Thranes Rogeost I/S represented by Kent Thrane and Henrik Lysbjerg.

Under section 1 of the contract, the business was to be taken over on 5 April 1991, and in sections 4 and 9, the following had been agreed:

"4.

The buyer does not take over any obligations or debts of the seller, and the buyer does not take over the seller's outstanding claims, receivables etc. The buyer undertakes to collect and receive the seller's outstanding claims free of charge and pay all received amounts to the seller, but the buyer assumes no responsibility for the receipt of the amounts.

. . .

9.

The seller and Else Thrane undertake not to run or be interested in any business competing with the transferred business.

Furthermore, the seller undertakes to change its name as soon as possible after the transfer so that the name "Thranes Røgeost" is not used.

During the summer of 1991, the received claims were finally settled with the company, and according to Auditor John Dreymann Hansen's statement before the High Court, he contacted the law firm Fischer represented by Attorney Poul Fischer, Korsør, Denmark, in this period with a view to selling the company.

In a fax dated 19 June 1991, the law firm Fischer Law Firm submitted a share transfer agreement in blank to the audit firm W. Hansen ApS, att. John Hansen, as agreed in a telephone conversation.

Apart from the names and figures inserted later, the agreement was identical to the agreement subsequently concluded between Attorney Poul Fischer or order and the company.

The company's tax return concerning the tax year 1991/92 signed by Else Thrane and received by the tax authorities in Odense, Denmark, on 24 June 1991, showed that the financial year was from 1 July 1989 to 30

June 1990. The taxable income was set at DKK 1,007,651.

In a letter of 25 June 1991 to the Danish Customs and Tax Region Odense, Auditor John Dreymann Hansen, at the request of Poul Fischer, requested that the company's financial year be changed to 1/1 – 31/12, so that the financial year for 1990/91 covered an 18-month period running from 1/7 1990 – 31/12 1991. Customs and Tax Region Odense granted the request by letter of 8 July 1991 to the company.

On 13 August 1991, an extraordinary general meeting was held in the company, during which the financial year was changed, and Revisionsfirmaet Verner Hansen ApS was authorised to make the necessary changes to the Danish Commerce and Companies Agency. The minutes were signed by Else Thrane and John Dreymann Hansen as chairman of the meeting.

Auditor John Dreymann Hansen reported the change to the Danish Commerce and Companies Agency and on 5 September 1991 wrote the following to Attorney Flemming Johnsen:

*"Re Else Thrane – sale of shares*

*Expected balance sheet for K. L. Thranes Røgeost, Else Rasmussen ApS, ApS. nr. 8100*

| | |
|---|---|
| Cash at bank . . . . . | DKK 10,937,000 |
| Total assets . . . . . | DKK 10,937,000 |
| Share capital . . . . . | DKK 80,000 |
| Reserves . . . . . | DKK 8,440,000 |
| Equity . . . . . | DKK 8,520,000 |
| Tax, previous years . . . . | DKK 581,000 |
| Deferred tax . . . . . | DKK 1,518,000 |
| Tax on current year's income . . . . . | DKK 318,000 |
| | DKK 2,417,000 |
| Equity and debt . . . . . | DKK 10,937,000" |

By letter of 6 September 1991, Attorney Flemming Johnsen forwarded this provisional balance sheet to Attorney Poul Fischer, requesting information about the price that could be offered for the company. A copy was sent to Auditor John Dreymann Hansen.

On 9 September 1991, Attorney Poul Fischer sent a signed offer to Attorney Flemming Johnsen. On 13 September 1991, Flemming Johnsen forwarded the offer which took the form of a share transfer agreement, to Auditor John Dreymann Hansen, requesting any comments and stating that he had also sent the offer to Else Thrane.

On 21 September 1991, Else Thrane signed the share transfer agreement which states, i.a.:

"SHARE TRANSFER AGREEMENT

The undersigned shareholder(s) in K. L. THRANES RØGEOST, ELSE RASMUSSEN ApS,

the "Seller"), and Attorney Poul Fischer or order

the "Buyer") have entered into the following agreement on the transfer of the nominal share capital of DKK 80,000.00 in K. L. Thranes Røgeost, Else Rasmussen ApS.

1.  *Date of completion.*
    1.1  The transfer will take place as at the date of completion on 1/10 1991 on the basis of a balance sheet prepared by the Seller's auditor as at the date of completion.

**369**

2.  *Determination of the purchase price*
    2.1  The purchase price is determined in accordance with the prepared balance sheet and the following principles:

2.2  Before the transfer date, the company transfers all activities. The purchase price will be paid in cash. This implies that the assets of the company in the balance sheet prepared by the auditor consist exclusively of bank deposits. The liabilities side includes both equity and all current and deferred taxes. Deferred taxes are provided at 38%.

2.3  Calculated taxes on the current year's profits are expected to be provided at DKK 318,000.00, and deferred taxes are expected to be provided at DKK 1,518,000.00.

2.4  The purchase price is then set at the company's equity value plus a fixed amount of DKK 1,000,000.00, which is determined taking into account the estimated tax amounts provided in item 2.3.

The purchase price can then be approximately calculated as follows:

| | |
|---|---|
| Equity value as at the date of completion, approx. | DKK 8,520,000 |
| Addition | DKK 1,000,000 |
| TOTAL | DKK 9,520,000 |

2.5  The purchase price is definitively determined as at the date of completion with an adjustment for accrued interest and any costs incurred. The Seller's auditor provides the balance sheet and the profit and loss account with an audit report.

3.  *Payment of the purchase price.*

3.1  The purchase price is paid on the basis of the balance sheet prepared by the auditor no later than at 11 a.m. on the date of completion in a bank transfer via the Danish central bank, Nationalbanken, to an account specified by the Seller.

4. *Delivery of the company's protocols etc.*
. . .

4.4  As soon as the Buyer has received the company's protocols, an extraordinary general meeting is held with the following agenda:

a. Re-election of the executive board.

b. Re-election of the auditor elected by the general meeting.

c. Change of name according to the Buyer's request.

d. Change of registered office.

4.5  The Buyer also undertakes, in connection with the general meeting to make the necessary notification of changes to the tax authorities. The Seller will deregister the company with the customs authorities.

4.6  The Buyer has been made aware that the company's financial year expires on 31/12 1991 so that the Buyer prepares the financial statements and submits the tax return for the financial year. The adopted financial statements and vouchers to the tax return for the financial year 1990 are enclosed.
. . .

5. *The company's bank*

5.1  The Seller ensures that the company's funds are deposited as cash in the bank account of a recognised financial institution no later than on the date of completion.

5.2  After the transfer of the purchase price to the account specified by the Seller, the Buyer represented by Attorney Poul Fischer

Review of the books and preparation of VAT returns for the period 1/10 1990 – 1/10 1991. Wage reconciliation as at 31/12 1990 and as at 1/10 1991.

Completion of insurance forms and statistics. Deregistration of VAT and CIR. Participation in various meetings and negotiations. Audit and preparation of internal and external financial statement for the period 1/7 1990 – 1/10 1991 with related tax specifications, preparation of various minutes, review of financial statements, transcription, photocopying and submission

|  |  |
|---|---|
| | DKK 110,450.00 |
| + 22% VAT . . . . . | DKK 24,299.00 |
| | DKK 134,749.00" |

In the company's internal financial statements for the period 1 July 1990 – 1 October 1991, the profit for the year is stated at DKK 4,865,515. According to the balance sheet

is legitimated to dispose of the company's accounts in accordance with the balance sheet prepared by the auditor. . . ."

In a letter of 23 September 1991, sent cc. to Auditor John Dreymann Hansen, Attorney Flemming Johnsen returned the share transfer agreement signed by Else Thrane to Attorney Poul Fischer. The letter states, among other things:

". . .

Please contact me on 1 October this year regarding the transfer of the purchase price.

The auditor states that it is possible that the final balance sheet will not be available on 1 October this year. In such case, I propose that the purchase price is transferred but so that an amount of DKK 500,000 is deposited with me until the final balance sheet is available.
. . ."

In a letter of 26 September 1991 with a copy to Else Thrane, Attorney Flemming Johnsen stated as follows to Auditor John Dreymann Hansen:

"Attorney Poul Fischer announced yesterday that he wishes to pay the purchase price when the final balance sheet has been prepared.

I would therefore ask you to ensure that the final balance sheet is prepared immediately.
. . ."

On 30 September 1991, the audit firm Revisionsfirmaet Verner Hansen ApS invoiced the company for the following:

". . .

as at 1 October 1991, the company's assets consisted exclusively of current assets:

**370**

"RECEIVABLES:

|  |  |
|---|---|
| Interest accrual . . . . . | 5,982 |
| TOTAL RECEIVABLES . . . . . | 5,982 |
| CASH AND CASH EQUIVALENTS . . . . . | 10,871,107 |
| TOTAL CASH AND CASH EQUIVALENTS . . . . . | 10,871,107 |
| TOTAL CURRENT ASSETS . . . . . | 10,877,089 |
| TOTAL ASSETS . . . . . | 10,877,089" |

Equity and debt were stated as follows:

| "EQUITY |  |
|---|---|
| Share capital . . . | 80,000 |

| 13 | Revaluation reserve | 0 |
| | *RESERVES* | |
| 14 | OTHER RESERVES . . . . . | 8,565,993 |
| | TOTAL EQUITY . . . . . | 8,645,993 |
| | *PROVISIONS* | |
| 15 | Deferred tax . . . . . | 1,375,334 |
| 16 | TOTAL PROVISIONS . . . . . | 1,375,334 |
| | *LONG-TERM DEBT:* | |
| 17 | Corporation tax (1991/92 tax year) | 456,722 |
| | TOTAL LONG-TERM DEBT . . . . . | 456,722 |
| | *SHORT-TERM DEBT:* | |
| | Corporation tax (1991/92 tax year) | 399,040 |
| | TOTAL SHORT-TERM DEBT . . . . . | 399,040 |
| | TOTAL DEBT . . . . . | 399,040 |
| | EQUITY AND DEBT | 10,877,089" |

Note 15 to the financial statements states:
*"DEFERRED TAX:*                                    *The amount comprises:*

| | |
|---|---|
| Reversed amortisation and depreciation | 1,506,397 |
| transferred to investment fund | 148,000 |
| Accelerated tax depreciation of operating equipment . . . . . | 1,952,685 |
| Accelerated tax depreciation of passenger car . . . . | 12,221 |
| | 3,619,303 |
| Deferred tax 38% . . . . . | 1,375,334" |

The audit report of 7 October 1991 from Revisionsfirmaet Verner Hansen ApS represented by Auditor John Dreymann Hansen was unqualified. On 8 October 1991, Attorney Flemming Johnsen wrote as follows to Attorney Poul Fischer, cc. Auditor John Dreymann Hansen:

"With reference to the share transfer agreement of 9 September and 21 September 1991, I enclose the internal financial statements prepared by the auditor for the period 1/7 – 1/10 1991.

With reference to section 2.4 of the transfer agreement, the purchase price is DKK 8,565,993.00 plus DKK 1,000,000.00, or a total of DKK 9,565,993.00. Please transfer the amount to Den Danske Bank, Rugårdsvej 244, 5210 Odense NV, Denmark, att. John Seitzberg."

According to a handwritten note of 9 October 1991 on the letter, the typed figures were changed to 8,645,993 and 9,645,993, respectively. The parties in the case agree that the reason for the change was that the share capital of DKK 80,000 was not included in the letter by mistake.

On the same day, 8 October 1991, and also with a copy to Auditor John Dreymann Hansen, Attorney Flemming Johnsen wrote to Den Danske Bank, att. Mr. John Seitzberg:

*"Re K. L. Thranes Røgeost, Else Rasmussen Aps.*

Please find enclosed a copy of the letter from today to Attorney Poul Fischer.

Also, please find enclosed a copy of the transfer agreement for information. As mentioned by telephone, the transfer will take place on a day before 11 a.m., after which the buyer expects the companies' accounts to be transferred to ham on the same day.

Attorney Fischer will give further instructions."

In a letter of 9 October 1991, Attorney Poul Fischer instructed Sparekassen Bikuben (now: BG Bank A/S) in Skælskør, Denmark, att. Helle Obling, as follows:

"Re            Centrum Rengøring Sea Service ApS' (name change to PPOU
              nr. 37 ApS) purchase of K. L. Thranes Røgeost, Else
              Rasmussen, Odense ApS (name change to PPOU nr. 44 ApS).

The transaction concerning the above company will be carried out as soon as possible on the terms set out in the enclosed copy of the transfer agreement and addendum.

I therefore ask you to contact John Seitzberg, Den Danske Bank A/S, Rugårdsvej 244, 5210 Odense NV, if applicable, in order to complete the transaction.

A copy of the minutes of the general meeting and notification to the Danish Commerce and Companies Agency is attached for your use.

I request that a new account be opened for the purchased company, *SE no.52 82 51 13.*

After this, please transfer DKK 9,645,993.00 to Den Danske Bank A/S provided that we receive the company's funds DKK 10,877,089.00 incl. any investment fund.

Finally, please send a cheque of DKK 900.00 issued to the Danish Commerce and Companies Agency, also withdrawn from the new account.

Upon the completion of the above transactions, please transfer to PPOU nr. 37 ApS' account DKK 10,500,000.

If you have any questions regarding the information submitted, please contact me."

The next day, on 10 October 1991, an extraordinary general meeting was held with Attorney Fischer. The minutes state, among other things:

"The agenda for the general meeting was as follows:

**371**

1. Election of chairman of the meeting.
2. Change in the company's name, registered office and object.
3. Change to the company's articles of association.
4. Election of executive board
5. Election of auditor.

*Re item 1 on the agenda.*

Attorney Poul Fischer was elected as chairman of the meeting. . .

*Re item 2 on the agenda.*

It was unanimously decided that the name of the company be changed to PPOU nr. 44 ApS, that its registered office address in the future be Fægangen 6, 4220 Korsør, Denmark, and that the object be changed in accordance with the presented Articles of Association.

*Re item 3 on the agenda.*

A new draft of the company's articles of association was presented and approved unanimously.

*Re item 4 on the agenda.*

The previous executive board resigned, Attorney Poul Fischer was employed as a new CEO. . .

*Re item 5 on the agenda.*

The previous auditor resigned, Registered Public Accountant ... was elected as the new auditor of the company. . .

The general meeting authorised Attorney Poul Fischer to make the changes or additions that may be required by the Danish Commerce and Companies Agency in connection with the registration.

. ."

The notification to the Danish Commerce and Companies Agency which, according to the information available, was never submitted, is also signed by Poul Fischer on 10 October 1991.

On 10 October 1991, in accordance with the instructions, Sparekassen Bikuben in Skælskør wrote to Den Danske Bank, att. John Seitzberg:

"*Centrum Rengøring Sea Service ApS' purchase of K. L. Thranes Røgeost, Else Rasmussen, Odense ApS.*

We hereby inform you that today, we transfer DKK 9,645,993.00 as credit for account no. 3581-093314 reg. no. 3581 concerning the above via Nationalbanken.

The amount is transferred provided that we receive a deposit in K. L. Thranes Røgeost, Else Rasmussen, Odense ApS' account no. 10,815,791.81 via Nationalbanken's transfer, immediately after you have received the purchase price of DKK 9,645,993.00.

Please confirm the above on our fax number . . Bikuben's account in Nationalbanken is 1500-8.

Kind regards,

Jørgen Thomsen Helle Obling"

By endorsement on the same day – 10 October 1991 – Den Danske Bank confirmed the above by two signatures, one of which is John Seitzberg's.

The transfer of funds then took place on 10 October 1991. On this day, Bikuben represented by Helle Obling and Jørgen Thomsen thus told PPOU nr. 37 ApS represented by Poul Fischer, that from this company's account no. 581.56.30183 in connection with the purchase of K.L. Thranes Røgeost, Else Rasmussen Odense ApS, now new name PPOU nr. 44 ApS (account no. 581.56.31465), via Nationalbanken, an amount of DKK 9,645,993.00 had been transferred.

By receipt dated 10 October 1991 to Else Thrane, Den Danske Bank confirmed that the amount of DKK 9,645,993.00 had been transferred from Bikuben via Nationalbanken to Den Danske Bank.

On the same day, an amount of DKK 10,815,791.81 was withdrawn from the company's account in Den Danske Bank, as evidenced by a bank statement from Den Danske Bank to the company of 10 September 1991, which also states that the amount had been transferred via Nationalbanken at the request of Centrum Rengøring's purchase of Thranes Røgeost, value date: 10.10 via Danmarks Nationalbank to account with Sparekassen Bikuben A/S.

In a letter of 10 October 1991 to PPOU nr. 44 ApS represented by Poul Fischer, Bikuben confirmed that the amount had been received by Bikuben, and it was also stated that the amount had been deposited in that company's account no. 581.56.31465. It was furthermore stated that investment fund accounts would be transferred at a later date.

The entries in PPOU nr. 44 ApS' account no. 581.56.31465 are shown in a statement of account dated 15 October 1991 from Bikuben:

| "Entered | Text | Value | |
|---|---|---|---|
| 10.10 | from the last statement | | 0.00 |
| 10.10 | ACCORDING TO NOTE 10,815,791.81 | 10.10 | |
| 10.10 | 5815630183 | 10.10 | 10,815,791.81 |
| | 10,500,000.00- | | 315,791.81 |
| 10.10 | FEE PPOU 44 APS 9,645.99- | 10.10 | 306,145.82 |
| 11.10 | CHEQUE COMMERCE AND COMPANIES 900.00- | 11.10 | 305,245.82 |
| | NET INTEREST 146.44 | | 305,392.26 |
| 15.10 | Payment 305,392.26- | 15.10 | 0.00" |

The amount of DKK 10,500,000 withdrawn on 10 October 1991, as seen in this statement of account, was, according to a receipt from Bikuben, also of 10 October 1991, to PPOU nr. 44 ApS represented by Poul Fischer transferred to PPOU nr. 37 ApS. The receipt had the following text:

"Transferred to PPOU nr. 37 ApS in connection with the purchase of the above-mentioned company, account no. 581.56.30183."

Also on 10 October 1991, Bikuben notified PPOU nr. 37 ApS represented by Poul Fischer that the bank had withdrawn DKK 9,645.99 as a fee in connection with the purchase of the company.

The entries that took place during the period

**372**

in PPOU nr. 37 ApS' account no. 581.56.30183 are shown in company's statement of account dated 15 October 1991 from Bikuben.

| "Entered into account | Text | Value date | |
|---|---|---|---|
| 04.10 | 5815631252 SIK | 03.10 | |
| | 62,700.00- | | 1,203,984.53 |
| 10.10 | ACCORDING TO NOTE | 10.10 | |
| | 9,645,993.00 | | 8,442,008.47 |
| 10.10 | 5815631465 | 10.10 | |
| | 10,500,000.00 | | 2,057,991.53 |
| 15.10 | OPG. PPOU NR. 40 A/S | 16.10 | |
| | 313,437.75 | | 2,371,429.28 |
| 15.10 | OPG. PPOU NR. 41 ApS | 16.10 | |
| | 14,509.68 | | 2,385,938.96 |
| 15.10 | OPG. PPOU NR. 44 ApS | 16.10 | |
| | 305,392.26 | | 2,691,331.22 |
| 15.10 | NET INTEREST | | |
| | 2,920.99 | | 2,694,252.21 |
| 15.10 | Payment | 15.10 | |
| | 2,694,242.21- | | 0.00" |

As regards the company's investment fund funds, Bikuben, in a letter of 10 October 1991, asked Den Danske Bank represented by Jens Seitzberg to cancel the accounts, stated at approximately DKK 77,000, and transfer these to Bikuben without a specific account no. According to that letter, the request was submitted by Poul Fischer, who confirmed it by signature of 11 October 1991.

By cheque issued on 10 October 1991, Den Danske Bank submitted the investment fund amount, a total of DKK 80,486.89, incl. interest, to Bikuben, where the amount was deposited on an investment fund account for PPOU nr. 44 ApS in Bikuben – account no. 381.37.02918.

On 15 October 1991, as stated in the above statement of account concerning PPOU nr. 44 ApS, the company's account was made up, and the balance of DKK 305,392.26 was transferred to the buyer company's account. This was confirmed by Bikuben by receipt of 15 October 1991 to PPOU nr. 37 ApS represented by Poul Fischer.

On the same day, according to a sale/purchase note signed by Poul Fischer, the buyer company was sold to ApS af 1.9.1991 nr. 1 at a price of DKK 175,000.

According to the transcript of the company's minutes, an extraordinary general meeting was held on 15 October 1991, at which it was decided, among other things, to change the name of the company to ApS af 1.9.1991 nr. 6. At the same time, the company's address was changed, and changes were made to the executive board and the auditor. Carsten Bruun Jespersen was elected as the new CEO. The minutes were signed by Poul Fischer as chairman of the meeting. The change was notified and registered with the Danish Commerce and Companies Agency.

According to a sale/purchase note of 21 October 1991, the company was once again traded, which was also notified to the Agency.

According to the transcript of the company's minutes, an extraordinary general meeting was held on 21 October 1991, at which Jan Preben Kristiansen was elected as the new CEO.

On 21 October 1991, Attorney Poul Fischer wrote as follows to Bikuben, att. Helle Obling:

"We hereby inform you that the shares in the above company have been resold.

Therefore, could you please change the holder of account no. 581-37-02918 (investment fund) to "ApS af 1.9.1991 nr. 6", cf. the enclosed copy of notification to the Danish Commerce and Companies Agency.

Carsten Bruun Jespersen is authorised to sign for the company.

. . .

P.S. Bikuben has "PPOU nr. 44 ApS" as an account holder, but due to the rapid sale of the shares, the notification was never submitted to the Danish Commerce and Companies Agency and therefore, the name was never "used"."

According to the usual notification of the acquisition of assets in connection with withdrawals on the investment fund account signed on 21 October 1991 by Jan Preben Kristiansen, the company's investment fund account with Bikuben was made up, and the amount of DKK 80,803.25 incl. interest was withdrawn on 8 November 1991. The notification stated that computer and communication equipment were to be procured to be delivered/put into service on 21 October 1991, and that the purchase price amounted to DKK 200,000. At the same time as the notification, the following statement was signed:

"As regards operating equipment which can be used both commercially and privately, I declare that the acquired operating equipment will be used only for commercial purposes.

All information is provided under criminal liability in accordance with section 11 (1) of the Danish Investment Fund Act (*lov om investeringsfond*).

In connection with police investigations into Jan Preben Kristiansen's circumstances, Bikuben stated that the investment fund amount was transferred to an account belonging to another company represented by Jan Kristiansen.

According to the Danish Customs and Tax Administration (*Told og Skat*), the amount was withdrawn unlawfully, and DKK 85,100 included in the claim amount is supplementary taxation of investment fund funds.

Copyright © 2021 Karnov Group Denmark A/S

On 24 October 1991, Attorney Flemming Johnsen submitted a statement of DKK 12,000 to Mrs. Thrane for legal assistance in connection with the transfer of the shares.

In a letter of 12 November 1991 to Attorney Poul Fischer, Attorney Flemming Johnsen submitted the company's tax statement of 2 October 1991 for the tax year 91/92 – with a copy to the company's auditor – with a giro inpayment form of DKK 403,040. The last timely deposit date was 20 November 1991. The tax was not paid in a timely manner. Attorney Poul Fischer wrote as follows to Auditor John Dreymann Hansen on 20 January 1992:

**373**

*"Re K. L. Thranes Røgeost, Else Ramussen Odense Aps.*

As per agreement, I enclose a cheque of DKK 28,640.00 to cover VAT receivable made out to the new owners of the company directly from the customs authorities on 26.11.1991.

I deeply regret the proceedings and will do everything in my power to ensure that the corporation tax due is paid shortly."

In a statement of 11 February 1992, signed by Carsten Bruun Jespersen, Mr. Jespersen guaranteed for the payment of the tax due.

"The undersigned Carsten Bruun Jespersen, . . . hereby personally guarantees payment of the corporation tax for 1991/92 concerning K. L. Thranes Røgeost, Else Rasmussen ApS of DKK 403,040 incl. default interest and fees etc., provided that Finansieringsselskabet af 1.7.1980 ApS in liquidation refunds the previously paid purchase price of DKK 140,000.00 less a VAT amount refunded directly to the customs authorities to the company of DKK 28,137.00.

The amount of DKK 111,863.00 will be payable upon the signing of this statement."

In a letter of 12 February 1992 to Carsten Bruun Jespersen, Attorney Poul Fischer submitted the required amount less various costs and the tax of DKK 403,040 was then paid by Carsten Bruun Jespersen on 18 February 1992.

The company has since been sold several times.

On 1 July 1992, the company should have filed a tax return for the tax year 92/93. As this did not happen, the Municipality of Kolding's tax administration made an estimate of the company's taxable income at DKK 1,000,000. which was notified to the company by letter of 30 September 1992. The tax was not paid when it fell due on 20 October 1992, and the Danish Customs and Tax Administration therefore, on 12 March 1993 and 7 April 1993, sent a notice of enforcement to the company and the company's CEO Lene Bløes. On 11 September 1992, the Danish Commerce and Companies Agency informed the company that it would be compulsorily dissolved, unless the financial statements for the period 1 July 1990 – 31 December 1991 were submitted within four weeks. The financial statements were not submitted and therefore, in a letter of 23 March 1993, the Danish Commerce and Companies Agency requested the bankruptcy court to compulsorily dissolve the company. On 11 August 1993, liquidation proceedings were commenced against the company by the bankruptcy department of the Danish Maritime and Commercial High Court, and at the liquidator's request, bankruptcy proceedings were commenced against the company in liquidation on 29 June 1994.

In letters of 19 April 1994 and 30 November 1994, respectively, the tax authorities contacted Else Thrane and requested her to submit various documents relating to the sale of the company for the purposes of the tax assessment of the company and Else Thrane personally.

After a search at Poul Fischer's address in May/June 1994, the police and the Danish Customs and Tax Administration prepared some forms with various information about the sale, including the purchase price and the premium paid. The forms were later submitted to Poul Fischer, who signed them on 27 June 1994.

In a letter of 4 September 1996, the Ministry of Taxation brought a claim for damages for the tax authorities' losses against Else Thrane.

On 23 March 1998, at the request of another trustee in respect of another estate, an auxiliary examination of witnesses was held before

the bankruptcy court in Korsør, Denmark, by, among others, Helle Obling and Jan Milvertz. The court record states:

"The witness Helle Obling has . . . duly admonished, stated that she was employed by BG Bank, then Bikuben, in 1987 in its Korsør branch. From September 1989 and until 1 January 1998, when she resigned, the witness was employed in the Skælskør branch. The witness was employed as an assistant/customer adviser. The witness is bank trained. In relation to . . . , the witness stated the company became a customer of BG Bank and that the witness was aware that Poul Fischer and Orla Rasmussen were involved in the company. The witness first heard about the company in the early 1990s. The witness has facilitated money transfers for the company. The procedure was that the bank received a letter from Poul Fischer requesting a money transfer. Due to their size, some amounts had to be approved at the head office in Copenhagen. As regards account no. . . . , the witness has stated that it is a special cheque account, and this means that the deposit rate was out of the ordinary. No credit facilities were attached to this account. The witness does not believe that the company had other accounts in BG Bank, the Skælskør branch. Hence, the witness does not believe that the company had an overdraft facility. The company could overdraw on this account. There were individual agreements about this, and the account was operated like a regular account. The witness could not herself grant overdrafts exceeding DKK 150,000. Confronted with the fact that the account balance was at times negative by several million kroner, the witness has stated that the witness could not approve this. In general, the Skælskør branch could only allow grants of initially DKK 2 million, which amount was later reduced to DKK 1 million. The credit manager or the bank manager could allow such grants. At first, Niels Brandt Jakobsen was the bank manager and Jan Milvertz was the deputy manager. Later, Troels H. Nielsen was the bank manager, and Søren Andersen was the deputy manager. Confronted with the fact that the above-mentioned account had a debit balance of several million kroner, the witness has stated that this had to be approved centrally. The procedure was that Poul Fischer, as stated above, sent a request for transfer, and the letter from Poul Fischer or a similar letter from the Skælskør branch could then be faxed or sent to

**374**

the head office with a request for approval. With regard to the question of the bank's risk, the witness has stated that at that time it was perceived to be merely an exchange of money, as the money came back almost immediately. The witness had the practical contact with Poul Fischer and his secretary Yvonne Ejlertsen. The commitment ran by itself by phone and letter and with a few meetings annually. On a few occasions, the witness has spoken to Orla Rasmussen, but the witness does not remember whether it was concerning the company of 18/3 1992. For the most part, the witness only had contact with Yvonne. Each request for transfer from Poul Fischer was accompanied by a document detailing the names and signatures of persons authorised to sign for the company and the minutes of the general meeting so that the bank had an authorisation for Poul Fischer to enter into commitments. This was a set procedure. Presented with a letter of 27 January 1993 and minutes of the general meeting of 5 February 1993, the witness has stated that she did not note that the date of the minutes of the general meeting was after Poul Fischer's request. As regards investment fund accounts, the witness has stated that the bank always received a notification of the acquisition of assets from Poul Fischer. With regard to the bank's fees, the witness has stated that these were a fixed percentage of the amount transferred. The percentage was per thousand. Confronted with the commotion around Poul Fischer in the autumn of 1992 or the spring of 1993, the witness has stated that she remembers a meeting but that she does not remember exactly when. It was probably Easter 1993. Søren Andersen called

the head office's credit department to find out how the Skælskør branch should act. After that, the company no longer received a credit. The actual procedure remained unchanged. The commitment with the company ceased in 1993.

Jan Milvertz was presented as a witness . . . and was required to give a statement under oath. The witness has then duly stated that he resigned as a deputy manager of BG Bank, the Skælskør branch, at the end of 1991. At that time, Niels Brandt Jakobsen was the bank manager. The witness remembers dealing with Poul Fischer's companies. However, the witness does not recall the first contact with Poul Fischer. Originally, Poul Fischer was a customer of Den Danske Bank, Korsør, Denmark. The witness probably had meetings with Poul Fischer in the beginning, but does not remember. The witness remembers that Poul Fischer had bought a company with bad debtors. Confronted with a transfer request from Poul Fischer, the witness has stated that the witness received written instructions from Poul Fischer about the individual transaction. The witness has participated in meetings with Poul Fischer, but not with Orla Rasmussen. The witness does not recall when the meetings took place. The witness does not recall whether he received written material from Poul Fischer at the beginning of the commitment. The witness believes that financial statements etc. were handed out in connection with the individual transactions. The witness remembers a name of a company, PPOU. As regards the special checking account referred to by the two previous witnesses, the witness has stated that the transactions with companies were approved by the credit department if the price for the company exceeded DKK 1.5 million. It was about transactions of payments. The witness imagines that in respect of the individual transactions, financial statements were received which were submitted to the credit department. However, the witness does not remember the details. It was mostly the witness who had contact with Poul Fischer. Helle Obling was in charge of the practicalities. The branch manager knew what was going on. The witness was responsible for the commitment with Poul Fischer. The witness did not know Poul Fischer in advance, but had met him in Korsør. The witness does not recall, but it is likely that the witness set up the checking account. The witness does not recall whether he made recommendations to the credit department, since the witness may have delegated the authority to do so. The witness most likely had meetings with Poul Fischer, but he does not remember. At the time, the witness did not consider whether the commitment was legal. Only Poul Fischer gave the bank instructions. The witness has met Orla Rasmussen at some point, but does not remember when. Orla Rasmussen must have participated in meetings at the bank. As regards a company named . . ., the witness has stated that this was Orla Rasmussen's company. The witness does not recall further about this company. With regard to fixed routines concerning supporting documents such as minutes, financial statements and transfer agreements, the witness has stated that Poul Fischer had prior experience with these set routines, and it is possible that the witness had the routines approved at the head office. Niels Brandt Jakobsen did not participate in meetings with Poul Fischer, but was notified of the commitment. The witness has clarified his statement so that he now remembers that when the commitment with the company at issue in this case was established, financial statements were submitted to the credit department. For individual transactions with companies, recommendations could be submitted to the credit department. The witness does not believe that these recommendations were accompanied by financial statements for the relevant companies."

*Statements:*

During the case, Else Thrane, John Dreymann Hansen, Flemming Johnsen, Helle Obling and John Seitzberg have given statements.

*Else Thrane* has stated that the number of employees in the business fluctuated with the season. In the busy season, they had 35-40 employees. With the help of the former auditor of the business, she learned how to keep the books of the business. Her husband took care of

everything regarding the production. At the time of his death in 1989, their son Kent and an employee handled the financial statements, already well integrated into the business. They were to

**375**

take over the business, but only when she found the time convenient. This was in April 1991. As April and the following few months are the busy season in the business, she ensured that the new owners would get a good start by choosing this time for the takeover. Auditor John Dreymann Hansen told her that the shares which she, after the business was sold, had believed were worthless, could be sold. The auditor would find a buyer. After a few months, she received a call from Attorney Johnsen, who had discussed the matter with the auditor, and he stated that a buyer, Attorney Poul Fischer, Korsør, had been found. Johnsen said: "I do not know if I'm an idiot or anyone else is, but you can get DKK 1 million for the shares". She was not involved in the subsequent practical solution of the case. She trusted her advisers. She does not recall the reason for the change of the financial year. She followed the advice given by the auditor. She had used both Attorney Johnsen and auditor Dreymann for many years and had unconditional confidence in their recommendations.

*John Dreymann Hansen* has stated that he has been an accountant for 32 years. He became Else Thrane's auditor at the end of the 1980s.

The original plan was to liquidate the company as solvent. In the Danish paper Erhvervsbladet, he saw an advertisement from Attorney Poul Fischer, who wanted to buy profit companies. At the time, he had not previously disposed of profit companies. He contacted Poul Fischer and was informed that they would pay a premium for the tax. Poul Fischer would purchase depreciable operating equipment and lease them to neutralise the tax. He was not told what Poul Fischer wanted to invest in. He presented the information to Else Thrane and at the same time contacted Attorney Johnsen. Else Thrane said that if it was legal, she would naturally like to get more out of it. He also explained to her that one could save liquidation costs. Else Thrane trusted him and Attorney Johnsen blindly.

He believed that Poul Fischer's project sounded reasonable and that the attorney – whom he trusted – could legally exploit the profit company in a reasonable way. Attorney Johnsen was surprised when he told him about the possibilities and apparently, he had not heard of this possibility before.

Poul Fischer said that the financial statements had to be changed so that he had time to make the necessary investments. Fischer asked him to take care of it. He did not discuss this issue with Attorney Johnsen. The change was approved without comments from the tax authorities. Attorney Johnsen took over the case when he received the blank transfer agreement from Fischer.

At Attorney Johnsen's request, he prepared a preliminary statement of the company's assets on 5 September 1991. On 7 October 1991, at Attorney Johnsen's request, he prepared interim financial statements which showed the final assets at the time of the sale.

The tax for 1991/92, DKK 399,040, had already been assessed and could not be neutralised. It was therefore not included in the calculation of the premium. The DKK 456,722 relating to tax on the operating year 1990-1991 and the deferred tax of DKK 1,375,334 could possibly be neutralised by investments.

He may have seen the share transfer agreement before it was finally concluded, but he had no comment on the agreement. He has not in any way been involved in the money transfers that subsequently took place.

He did not hear about the case again until January 1992 in connection with a VAT amount of DKK 28,640 which Else Thrane was to receive from Poul Fischer. When the business was transferred to the son

U.2000.365/2H

and his co-owner, the company had a VAT receivable, and Else Thrane had agreed to leave a similar amount in the business, provided that this amount would accrue to her when it was paid. However, the Danish Customs and Tax Administration had paid the amount to Poul Fischer. He called Fischer and understood from the conversation that the company had been resold. At the time, he did not wonder that the problems with the VAT amount showed that no name change had been made to the company. He received the amount of DKK 28,640 with Fischer's letter of 20 January 1992. He contacted Poul Fischer again when the tax authorities reminded Else Thrane of the tax amount of DKK 399,040. He then told Fischer that if it was not fixed immediately, he would bring Fischer before the General Council of the Danish Bar and Law Society. He was starting to get a little worried, and Else Thrane was very upset because of the reminder. However, the matters were put right.

He then did not hear about the case until the tax authorities began to take an interest in it at the end of 1994.

His statement of fees to the company dated 30 September 1991 also includes regular quarterly visits to the business to prepare VAT accounts as well as work on the generational change. The work in connection with the sale of shares and the discussion with Else Thrane about this is not included in the invoice. This work was quite modest and should have been paid by Else Thrane herself. One of his employees, Dorthe Svendsen, pointed out that the share capital of DKK 80,000 was missing from the calculation of the purchase price in the contract sent to him by Attorney Johnsen.

He was usually in charge of the general meetings. He had previously discussed shareholder loans with Else Thrane, as there had been a few cases of illegal loans in the company. The reason why the business and not the shares was transferred to the two new owners was to enable them to depreciate investments

**376**

and deduct interest on loans that they had taken out in connection with the acquisition of the business. They also had investment fund accounts of their own that needed to be utilised.

A solvent liquidation would have placed Else Thrane in the same tax position as the transaction made. Verner Hansen ApS, where he is employed, has participated in a total of three sales of profit companies of which he has been in charge of two.

*Flemming Johnsen* has stated that he has been the Thranes' attorney since the mid-1970s. After K.L. Thrane's death in 1989, it became clear that Else Thrane's son would take over the business with a co-stakeholder who was employed by the business. The purchase had to be made in cash to protect Else Thrane. The assets were transferred to a partnership because the buyers had to be ensured the opportunity to depreciate the assets and thus facilitate the refund of the money they borrowed for the purchase of the business. As a shareholder, Else Thrane could not get unemployment benefit from DANA. The idea of the sale of the shares possibly arose as a result of this.

In June 1991, he was informed that Attorney Poul Fischer possibly wanted to buy the company. Later in the month, he was contacted by Poul Fischer by telephone and noted, during the conversation, "tax provisions - 50%". On 13 August 1991, his secretary informed him that the auditor had called about a change of the financial year and that the auditor would take the necessary action himself. The secretary also noted that an attorney in Korsør would pay the most.

The auditor received a copy of Poul Fisher's offer of 9 September 1991 and had no comments. The agreement was then signed by Else Thrane and forwarded to Poul Fischer. There were no negotiations on the content of the agreement which looked completely normal. He did not find clause 5.2 in the transfer agreement conspicuous. It was a company with large funds and

it could be that they wanted to obtain return benefits by better placement of the funds. He was aware of the self-funding ban, and clause 5.2 gave no reason to suspect this. He did not discuss with Poul Fischer how he would use the company. He did not have meetings in this regard with Else Thrane, the auditor or Den Danske Bank. He knew who Poul Fischer was from his time as an assistant attorney in Odense, Denmark, and had not heard anything unfavourably about him.

The present case is the first of its kind in which he has been involved. He has also participated in three sales of profit companies, including one with Poul Fischer as buyer. He had no doubt that Poul Fischer bought the company with a view to resale.

He has taught tax law at Aarhus and Odense Universities and at the accountant and assistant attorney programme.

The premium on the tax due did not surprise him. At the time, the then applicable tax credit rules were used legally by many companies who had an interest in acquiring profit companies. He was also aware of the possibility of deferral or elimination of tax by means of investments in depreciable goods that could subsequently be leased using double taxation agreements.

He did not see Poul Fischer's instructions of 9 October 1991 to Bikuben until the trustee contacted him in 1995. He was not in contact with Bikuben in connection with the money transfers, and he had nothing to do with the subsequent general meeting. He did not check whether the changes were recorded as he assumed that an attorney arranged the matters properly.

For his part, the case ended with the transaction on 12 November 1991 of the tax payment of DKK 403,040 which was completely routine.

Else Thrane has trusted her advisers one hundred percent and had to rely on his advice to complete the transaction with Poul Fischer. Personally, he did not at any time have any idea that he was dealing with people who would perform irregularities.

He was only interested in how the seller got their money and he did not investigate how Poul Fischer financed the purchase. *Helle Obling* has stated that the she is a customer advisor at BG Bank in Slagelse, Denmark. She joined Bikuben's Skælskør branch in September 1989. From 1990 she was the first person in the branch to handle the practical transactions in connection with Poul Fischer's corporate transactions. Later on, other employees worked with this as well. Fischer had that kind of business on a weekly basis. The letter of 9 October 1991 from Poul Fischer is characteristic of a large number of similar letters from him. She contacted the purchased company's previous bank and then set up a new account for the company. This was done regularly in the form of budget accounts because the bank had agreed on a higher interest rate than the usual one with Poul Fischer, and this agreement could be performed very simply be using the budget account form. The letter of 10 October 1991 to Den Danske Bank was a follow-up on the instructions given by Poul Fischer in the letter of 9 October 1991. Prior to that, she had been in telephone contact with John Seitzberg, Den Danske Bank. The documentation in this case concerning the further course of events is fully consistent with the usual practice of these transactions. The fee was specifically agreed with Poul Fischer.

These transactions were usually followed by a transfer of investment fund funds. In Bikuben, the account was set up on the same terms as in the previous bank, as the funds were

**377**

bound. The release of the funds was conditional upon receipt of the special notification form and verification that is was correctly

Copyright © 2021 Karnov Group Denmark A/S

completed. The bank is not obliged to verify that the investments have actually been made.

The witness was not aware of the company law rules on shareholder loans and self-funding at the time. She has always taken it for granted that the material and instructions from Poul Fischer, who was an attorney, were correct and legal. The statement of account of 15 October 1991 relates to a newly created account. No credit facilities were attached to this account. Poul Fischer had a general grant of DKK 10 million in Skælskør and DKK 10 million in Aarhus, Denmark, which gave him a total grant of DKK 20 million. She does not recall whether that grant had been given at the time when the present case was being processed. Nevertheless, the vast majority of Fischer's transactions were submitted to the head office for approval before they were executed. The presentation was always made by the management or the deputy manager, never by herself. She only made the practical arrangements. She does not know whether Poul Fischer had provided security for his commitments. Nor does she know why the DKK 10.5 million were transferred to PPOU 37. She has not been involved in discussing internally whether it was a question of credit granting or money transfers. The text of the transfer notice of 10 October 1991 concerning the DKK 10.5 million was a standard text.

The witness has not spoken to anyone on the seller's side other than the seller's bank. She does not know why Poul Fischer used the Skælskør branch. Korsør also had a Bikuben branch.

The witness only saw the transactions as money transfers. She has not considered whether it might not be possible to simply transfer the differential amounts. The witness has not advised any customers to make similar transactions and she has not received any specific instructions or guidance on such transactions from the head office, including Preben Berthelsen.

Presented with the notification form on investment fund funds and the company's account, the witness states that she has not considered whether, at the time of the release of the investment fund funds, the company had any operating funds.

During her employment, neither the tax authorities nor the police have contacted the Skælskør branch regarding Poul Fischer. When Poul Fischer's cases were considered, the branch manager and deputy manager were always present. The management would contact the head office if necessary. The response was sent to her managers who would then instruct her to continue working on the case.

*John Seitzberg* has stated that he is a senior bank clerk in Den Danske Bank in Odense, where he has been employed for 19 years. He was Else Thrane's personal bank contact, whereas the manager took care of the company's affairs.

Prior to the receipt of Attorney Johnsen's letter of 8 October 1991, Else Thrane had explained that the company was to be sold. The details were not discussed. There were no meetings or discussions on the matter with Attorney Johnsen or Else Thrane. He had a telephone discussion with Helle Obling from Bikuben. Den Danske Bank would initially receive the money for Else Thrane. Subsequently, the company's deposit account was settled and transferred to Bikuben via Nationalbanken. For technical reasons, it was necessary to create a new deposit account for the company on 10 October 1991. After the completion of the transactions, he was no longer involved with the company.

Else Thrane has always consulted with bank, attorney and auditor in connection with slightly larger transactions.

This case is the only one of its kind that he has encountered.

*Procedure:*

*The company,* ApS af 1.9.1991 nr. 6 in bankruptcy, has essentially argued in accordance with its

main claims in the particulars of claim of 6 October 1998, which state, i.a.:

"In accordance with the general rule of Danish law, the defendants are liable for the loss suffered by the tax authorities – and in their place the plaintiff estate in bankruptcy – by the company being unable to pay its taxes.

*Against defendant 1:*

Defendant 1 recklessly set aside the interests of the tax authorities when selling the company.

For the reasons for this, reference is made to the Danish Supreme Court's judgment in the Satair case and the Eastern High Court's judgment of 25 June 1998 in the Klercke case. In the light of the circumstances of the present case, it should be pointed out that:

Liability must be assessed in accordance with the general rule on damages under Danish law, cf. section 110 of the Danish Private Limited Companies Act. As defendant 1 was the CEO, defendant 1's liability is directly covered by section 110, but the general rule on damages under Danish law also follows from the fact that defendant 1 exercised the actual management of the company.

Defendant 1 is also liable for the errors of their advisers,

The irresponsible situation consists in the fact that defendant 1 simultaneously exchanged the company's very substantial cash for the purchase price of the company without carrying out any kind of investigation into the buyer's affairs or what the buyer would use the profit company for. In doing so, defendant 1 breached the special duty of care which defendant 1, because of the risk of self-funding, was already subject to vis-à-vis the company's creditors and in particular the tax authorities who were forced to provide substantial sums of money and who were thus exposed to a significant risk of loss (self-funding aspect).

**378**

In any event, defendant 1 disregarded the special duty of care towards the tax authorities due to – in comparison with the above – the fact *that* the sale of the company – whose business activity had been withdrawn from the company before the sale and whose only asset was cash – was not a formal business operation *and that* defendant 1 obtained a significant premium of DKK 1,000,000 compared to what would be paid in the event of a liquidation of the company (the broader liability aspect).

The premium could not be justified on the basis of saved costs for the buyer. Defendant 1 did not do anything to avert the tax authorities' risk.

The tax authorities' loss is caused by the fact that the company, which had ample resources to pay taxes due and deferred taxes before the transfer, was stripped of assets after the transfer and was therefore unable to pay the tax due.

*Against defendant 2:*

The transfer of the amount of DKK 10,500,000 from the company to the buyer occurred in connection with the company transaction and was a violation of the prohibition in section 84 (2) of the Danish Private Limited Companies Act.

Defendant 2 knew or should have known *that* the bank was involved in the purchase of a company, *that* the bank helped the buyer finance the purchase price of the company, *and that* the amount which the bank received from the seller's bank at the same time as it paid the purchase price was the company's funds.

Against this background, defendant 2 realised or should have realised that the bank was involved in the violation of the self-funding ban in section 84 (2) of the Danish Private Limited Companies Act. In doing so, defendant 2 breached the bank's general obligation to the company's creditors – including the tax authorities – to ensure that it did not contribute to the violation of the self-funding ban. At the same time, defendant 2 also violated the general clause in section 1 (6) of the Danish Bank Act (*bank- og sparekasseloven*).

Defendant 2 had no reason to believe that the payment of the company's funds to the buyer was anything other than what it appeared to be; namely a breach of the self-funding ban. In such case, the burden of proving that this was the case lies with defendant 2.

The tax authorities' loss is caused by the fact that the company – which had ample resources to pay taxes due and deferred taxes before the violation of the self-funding ban – by illegally paying the company's funds to the buyer, was unable to pay the company's tax due.

*Against both defendants:*

The loss is made up of the taxes that accrue to the stripped profit company of a total of DKK 1,860,916. In principle, these taxes correspond to those provided for in the financial statements of 1 October 1991. Hence a tax due for the 1992/93 tax year of DKK 1,775,816 and a supplementary taxation of investment fund reserves for the 1990/91 tax year of DKK 85,100.

The entire loss – including the loss relating to the supplementary taxation of the investment fund reserves – is a foreseeable consequence of the defendants' conduct giving rise to liability.

It this case, it cannot be ascertained whether the supplementary taxation of the investment fund reserves has taken place correctly, cf. section 31 (1) of the Danish Tax Agency Act (*skattestyrelsesloven*), cf. sections 23-24. The question of the company's tax liability must be settled in the course of the case between the bankruptcy estate and the tax authorities. Ex tuto, it is submitted that the supplementary taxation of the investment fund reserves was correct.

The defendants are jointly and severally liable for the loss.

It is disputed that any part of the claim should have been forfeited by inaction or because the duty of mitigation has not been fulfilled." As regards the question whether the claim for damages should be reduced by reason of the fact that Else Thrane may be entitled to an adjustment of the capital gains tax, the company has submitted that this requires *that* Else Thrane first submits a notification, *that* the tax authorities decide to examine the case and *that* Else Thrane is in fact entitled to a reduction. Thus, it is currently not possible to offset. If Else Thrane cannot pay the damages, BG Bank A/S cannot offset for the same reasons, and it is disputed that BG Bank A/S can assume any claims of Else Thrane's claims.

*Else Thrane* has in essence argued in accordance with her main claims in the particulars of claim of 6 October 1998, which state, i.a.:

"*Against the defendant:*

. . .

Defendant 1 – Else Thrane – has not acted culpably in connection with the transfer of the company.

In connection with this claim, the following should, in particular, be pointed out:

- The transfer of the shares in the company took place in September 1991. At that time, trading in profit companies was common. The daily press and trade journals, including Ugeskrift for Retsvæsen, announced a number of different buyers of profit companies. In connection with the liquidation of public and private limited companies, public announcements must be issued and in connection with the issue of the announcement, the liquidator often received inquiries from buyers of profit companies.

- In September 1991, it was not known that certain buyers of profit companies were causing damage to the companies,

**379**

acted in violation of company law and in certain cases appropriated the company's funds in an improper and criminal manner.

- Under the tax rules in force in 1991, a buyer of a profit company could legitimately carry out transactions which either deferred or completely eliminated the presumed tax payment in the profit company.

- Defendant 1's sale of the company constituted a normal commercial transaction, as the sale was a normal consequence of the fact that the company had previously had and as part of a generational change sold its business. In particular, it is noted that the sale of the company was not intended to avoid payment of the company's taxes as was the case in the Satair case.

- In the sale, defendant 1 obtained a "premium" of DKK 1,000,000, corresponding to 44.8% of the taxes due and calculated at the time of the transfer. Compared to the company's taxed equity of DKK 8,645,993, the premium amounted to 11.6%.

The premium determined by the transaction was thus so low that the premium did not give or should not have given defendant 1 or her advisers grounds for suspicion as to the buyer's financial capacity or possibilities of doing a sustainable business with the acquisition of the company.

Here too, the case is substantially different from the Satair case, in which the additional capital gains (premium) amounted to 80% of the tax debt.

- In those circumstances, defendant 1 did not, as in the Satair case, in connection with the sale have "special grounds" for being aware of disregarding the tax authorities' interests.

- Defendant 1 or her advisers had no knowledge of the buyer's financing of the purchase price, but the defendant was able to establish, at the time of the transfer, that the purchase price was paid in cash and there was nothing in the course of the case that gave any particular reason to investigate the matter.

Nor did subsequent circumstances give rise to any suspicion. In particular, it is noted that the buyer paid the corporation tax due for the 1991/92 tax year (income year 1 July 1989 – 30 June 1991) of DKK 403,040.

- Thus, defendant 1 or her advisers have not irresponsibly disregarded the tax authorities' interests, and defendant 1 is consequently not liable for the tax authorities' losses.

- Defendant 1 and her adviser acted in a way that, at the time of the transfer in September 1991, must be regarded as being customary and sufficient from the seller's point of view in connection with a sale of a company such as the one at issue, cf. the paragraphs of the Eastern High Court's judgment in the Haaning case (judgment of 10 March 1997, 9th division no. B-2252-95).

- The plaintiff has not established that there is any causal link between defendant 1's transfer of the company and the fact that the company was subsequently unable to pay corporation tax.

- The defendant did not participate in the process in which the purchase price for the shares was obtained using the company's own funds in violation of section 84 (2) of the Danish Private Limited Companies Act, just as the defendant did not realise or should have realised that this was the case.

Any liability for defendant 1 – Else Thrane – should lapse as a consequence of the plaintiff's inaction. Hence, the tax authorities were aware, no later than at the beginning of 1994, of the circumstances surrounding defendant 1's transfer of the company. In that regard, it is also submitted that identity must be established between the tax authorities and the plaintiff.

Any liability for defendant 1 – Else Thrane – should be reduced or lapse in accordance with section 113 of the Danish Private Limited Companies Act or section 24 of the Danish Liability in Damages Act.

The plaintiff has not demonstrated that the company has suffered a loss equal to the claimed amount. Defendant 1 contests the tax liability, both formally and in terms of the amount.

Any claim for damages against defendant 1 – Else Thrane – should be reduced by the calculated supplementary taxation, including percentage addition of investment fund funds, totalling DKK 85,100. The plaintiff has failed to document that the subsequent termination of the investment fund account deposit was unjustified. In the event that this can be documented, it is submitted that defendant 1 is not liable for an unjustified termination of the investment fund account."

Else Thrane has further stated that regarding the investment fund account, the Court should find for the defendant, at least as regards the percentage addition of DKK 11,100, as this must be equated with an addition under the Danish Tax Control Act (*skattekontrolloven*).

"The plaintiff has not demonstrated that the acquiring company or its parent company was unable to finance the purchase price. Defendant 1 has requested the plaintiff to document the cash resources of these companies as at the date of the transfer.

. . .

*To defendant 2 – BG Bank A/S:*

. . .

As Attorney Poul Fischer's bank, defendant 2 was aware of all the transactions which took place in connection with the transfer of the shares in the company.

Defendant 2 – unlike defendant 1 – realised or should have realised

**380**

that Attorney Poul Fischer intended to cause losses to the company or its creditors.

Defendant 2 – unlike defendant 1 – participated in the process in which the purchase price for the shares was obtained using the company's own funds in violation of section 84 (2) of the Danish Private Limited Companies Act, just as defendant 2 – unlike defendant 1 – realised or should have realised that this was the case. In this connection, it is of particular importance that defendant 2 acted as a bank for Poul Fischer in connection with his purchase of a very large number of "profit companies" and that defendant 2 in connection with these many transactions allowed repeated overdrafts of up to DKK 20,000,000. Defendant 2 has acted in violation of good banking practice, cf. section 1 (6) of the Danish Bank Act. In this regard, reference is made to the Danish Financial Supervisory Authority's report on the participation of Danish banks in "asset stripping".

Under section 25 (2), 1st sentence, of the Danish Liability in Damages Act, cf. section 19 (1), defendant 2, who is presumed to be insured against third-party risks, shall bear the burden of damages in the mutual relationship between defendants 1 and 2. Secondly, it is submitted that defendant 2 in the mutual relationship between the defendants is closest to bearing the burden of damages, cf. the principle laid down in section 25 (1) of the Danish Liability in Damages Act. Hence, defendant 2 should at least be required to participate in the burden of damages with an amount corresponding to the loss suffered by defendant 1, provided that the full amount of the claim is paid by defendant 1.

. . .

*Against the principal BG Bank A/S:*

The same claims as to BG Bank A/S in the main case are submitted, cf. above.

*Against the co-third party Attorney Flemming Johnsen:*

. . .

As Else Thrane's adviser, Attorney Flemming Johnsen has given inadequate and erroneous advice to the extent that Else Thrane is subject to liability towards the principal.

In the mutual relationship between the third parties, Attorney Flemming Johnsen is the closest to bearing the final loss.

Under section 25 (2), 1st sentence, of the Danish Liability in Damages Act, cf. section 19 (1), Attorney Flemming Johnsen, who is insured against third-party liability, must bear the burden of damages in the mutual relationship with Else Thrane.

Secondly, it is submitted that Attorney Flemming Johnsen in the mutual relationship with Else Thrane is closest to bearing the burden of damages, cf. the principle laid down in section 25 (1) of the Danish Liability in Damages Act. Hence, Attorney Flemming Johnsen should at least be required to participate in the burden of damages with an amount corresponding to the loss suffered by Else Thrane, provided that the full amount of the claim is paid by Else Thrane.

*Against the third parties Attorney Flemming Johnsen, Inter-Lex Advokater Odense A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen:*

Against the third parties, it is generally submitted

*that* the third parties as advisers to the principal gave inadequate and erroneous advice to the extent that the principal is liable in the main case brought by the bankruptcy estate. The third parties have thereby incurred liability towards the principal for the principal's losses.

*that* the principal's – Else Thrane's – loss should be determined in accordance with the principles set out above concerning the mutual relationship between Else Thrane and BG Bank A/S in the main case.

Against the third parties Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S it is submitted in particular:

*that* the third party Attorney Flemming Johnsen "vouched for the sale" and overall acted as an advisor in the process leading up to the sale,

*that* the third party Inter-Lex Advokater Odense A/S is jointly and severally liable with the third party Attorney Flemming Johnsen under the general rules of Danish law on damages and the principle laid down in section 143 (2) of the Danish Public Limited Companies Act (*aktieselskabsloven*).

*that* the third parties realised or should have realised that the principal's sale of the shares to Attorney Poul Fischer could involve a risk, including a possible risk for the company's creditors,

*that* the third parties should have doubted the intentions of Attorney Poul Fischer, including whether Attorney Poul Fischer was allowed to disregard the self-funding ban in section 84 (2) of the then applicable Danish Private Limited Companies Act in connection with the purchase of the shares,

*that* the third parties at the time of the sale should have advised the principal not to carry out the sale of the shares to Attorney Poul Fischer,

*that* there is the necessary causal link and foreseeability between the third parties' assistance to the principal and the fact that the company is now in bankruptcy.

Against the third parties Registered Public Accountant John Dreymann Hansen and Revisionsfirmaet Verner Hansen, Registrerede Revisorer ApS, it is submitted, in particular:

*that* the third party, Revisionsfirmaet Verner Hansen, Registrerede Revisorer ApS, is jointly and severally liable with the third party, Registered Public Accountant John Dreymann Hansen, under the general rules of Danish law on damages and the principle laid down in section 143 (2) of the former Danish Private Limited Companies Act).

*that* the third parties have committed errors or negligence or have otherwise engaged in conduct giving rise to liability vis-à-vis the principal,

*that* the third parties were or should have been aware that the relevant transfer of shares would result in the alleged asset stripping of the company,

*that* the third parties realised or should have realised that the transfer would otherwise entail a risk that Attorney Fischer or those to whom he further transferred the company, would cause loss to the company thus sold or to the company's creditors,

**381**

*that* the third parties realised or should have realised that Attorney Fischer or the persons to whom he transferred the company intended to strip the company's assets or contribute to such assets stripping,

*that* the third parties knew or should have known how Attorney Fischer financed the payment of the purchase of the shares,

*that* the third parties were or should have been aware that the company's shares were acquired using own funds,

*that* the third parties' liability does not lapse as a result of the principal's own fault,

*that* the principal has suffered a loss eligible for damages,

*that* the claim against the third parties has not lapsed as a result of limitation or inaction,

*that* there is a causal link between the acts or omissions of the third parties and the company's bankruptcy."

As regards the question of the determination of her loss, Else Thrane has submitted that account should be taken, where appropriate, of statutory interest and the resulting tax benefit, capital gains tax paid on the premium, costs of advising on the sale of the company, saved liquidation costs and any liquidation benefit of the premium. However, her claim for contribution will not be limited by the amount that may, if necessary, be refunded to her of the capital gains tax paid in accordance with TSS circular 1997-19. In that regard, Else Thrane has stated that it follows from the general rules of damages that she is obliged to limit her loss and to refrain from any enrichment. Amounts paid to her in accordance with TSS circular 1997-17 must therefore be paid to the debtors if they have paid the claim for contribution.

*BG Bank A/S* has in essence argued in accordance with its main claims in the particulars of claim of 2 October 1998, which state, in relation to the company, i.a.:

"The assessment of liability

*that* there has been no self-funding in violation of section 115 (2) of the Danish Public Limited Companies Act/section 84 (2) of the Danish Private Limited Companies Act and that the bank can therefore not be held liable for the loss of the estate/tax authorities,

*that* the defendant, BG Bank A/S, is not subject to the refund obligation pursuant to section 115 (4) of the Danish Public Limited Companies Act/section 84 (4) of the Danish Private Limited Companies Act or the liability pursuant to section 115 (5) of the Danish Public Limited Companies Act/section 84 (5) of the Danish Private Limited Companies Act,

*that* the assessment of any liability for the defendant, BG Bank A/S, can thus only be made in accordance with the general rules of Danish law on damages in tort,

*that* the above provisions of the Danish Companies Acts cannot be extended/circumvented by using the same rules as a parameter for a culpa assessment for parties who are not covered by the provisions, *that* the defendant, BG Bank A/S is not subject to a special vigilance or investigation obligation in relation to section 115 (2) of the Danish Public Limited Companies Act/section 84 (2) of the Danish Private Limited Companies Act, as the defendant, BG Bank A/S and other banks are not subject to such special vigilance or investigation obligation, *that* the defendant, BG Bank A/S, as a new bank for the sold company has not had the opportunity to refuse to implement instructions on payment transactions submitted by the persons authorised to sign for the company,

*that* the defendant, BG Bank A, has only complied with instructions from persons authorised to sign for the company and has thus not acted independently,

*that* BG Bank A/S neither realised nor should have realised that the company transactions were financed using the companies' own funds,

*that* the fact that the defendant, BG Bank A/S, has received a fee of 1 ‰ for the transactions, does not in itself establish liability,

*that* the fact that the defendant, BG Bank A/S, may have been assumed to have provided credit facilities to the buyers, cannot in itself justify liability for the bank,

*that* the loss has been incurred as a result of unlawful acts carried out by the buyers of the companies after the exchange of services, including failure to submit financial statements and tax returns, change of financial periods, purchase of depreciable assets that were not carried out or were carried out pro forma, all resulted in the unlawful withdrawal of the traded companies' cash funds, and

*that* the defendant, BG Bank A/S, has therefore not acted in a way that incurred liability.

. . .

*Causality and foreseeability.*

*that* the risk of loss was not increased as a result of the bank's actions and omissions, as the bank was obliged to comply with the instructions given by the persons entitled to sign for the company,

*that* the defendant, BG Bank A/S could not, at the time, have expected that the company's provisions and deferred taxes would not be paid simply because the company's cash funds were transferred to the parent company,

*that* the fact that the company's due taxes were not paid was not foreseeable for the defendant, BG Bank A/S. However, it is also the case that on 20 November 1991, the buyer of the sold company paid the corporation tax for the 1991/92 tax year in the amount of DKK 403,040.00. . . .

*that* there is no reason to believe that the defendant, BG Bank A/S, was, could or should have been aware that the funds in the company that were to be used for the payment of taxes and which were withdrawn by the persons authorised to sign for the company, would not be

**382**

returned to the company for the payment of taxes due and payable, and

*that* the defendant, BG Bank A/S, cannot be assumed to have been or should have been aware of the buyers' further intentions with the company or its funds, and

*that* the part of the claim raised that may relate to the supplementary taxation of investment fund reserves can neither foreseeably nor causally be attributed to the bank.

. . .

*The plaintiff's inaction.*

*that* any claim by the plaintiff must be deemed to have lapsed as a result of inaction, and

*that* in the assessment of this, there must be identity between the plaintiff and the Danish Tax Agency and its customs and tax regions.

. . .

*Joint and several liability with the seller.*

*that* the defendant, BG Bank A/S has assumed a subordinate role in relation to the effectively acting parties, including the seller and the seller' advisers, as the defendant, BG Bank A/S, has only complied with external instructions and has thus in no way acted independently,

*that* the defendant, BG Bank A/S, has not obtained any financial benefit from the transfers other than the fees which were, moreover, much like other transfers of funds, calculated by default as 1 ‰ of the transferred amount,

*that* the seller, on the other hand, has received a premium equivalent to approximately 450 ‰,

*that* the remaining 549 ‰ has been made available to the buyers and any intermediaries, and

*that* the seller and the buyers in the case bear the main liability for the loss suffered by the sold company and thus the Danish Tax Agency,

as these persons and companies have organised, carried out and received the financial result of the transactions in violation of section 115 (2) of the Danish Public Limited Companies Act/section 84 (2) of the Danish Private Limited Companies Act,

*that* when calculating any losses incurred by the seller, the premium received by the seller plus a return on the amount plus market interest and saved liquidation costs will be deducted.

. . .

*Statement of loss.*

*that* the claim raised by the plaintiff must be reduced, as a minimum, by the following items:

i)  The supplementary taxation of investment fund reserves by DKK 85,100 charged to the plaintiff plus interest,

ii)  Primarily the capital gains tax paid by the seller to the customs and tax authorities, in the alternative an amount corresponding to the capital gains tax that the sellers would be able to recover under circular no. 19/1997 on the resumption of tax assessments in connection with the payment of damages after asset stripping, as the Danish Tax Agency would otherwise obtain an unjustified enrichment. That amount will be subject to interest before any deduction is made."

*As regards Else Thrane, the following, i.a. is stated:*

"*that* third party 1's liability to the principal as the sole shareholder in the company must be assessed according to the general rules of Danish law on damages in tort,

*that* the sale of the company was apparently intended to avoid payment of the company's due and deferred taxes, meaning that the sale did not constitute a normal commercial transaction,

*that* third party 1 had to realise that there was a not insignificant risk that the buyer would not be able to legally postpone or eliminate the taxes incumbent on the company,

*that* third party 1 or its advisers apparently did nothing to avert the tax authorities' risk of loss,

*that* third party 1 is closest to bearing any liability, as third party 1 has:

i) entered into a transfer agreement with the buyer of the company, including the right to dispose of the company's funds at the same time as the transfer of the purchase price, even though the purchaser could not at that time be considered as being authorised to sign for the company,

ii) carried out the transactions in question and

iii)  received the capital gains from the sale, including the addition of DKK 1,000,000.00, corresponding to approximately 45% of the provided taxes.

*that* the defendant, BG Bank A/S has assumed a subordinate role in relation to the effectively acting parties, including the sellers, as the defendant, BG Bank A/S, has only complied with external instructions and has thus in no way acted independently.

*that* the defendant, BG Bank A/S, has not obtained any financial benefit from the transfers other than the fees which have, moreover, much like other transfers of funds, calculated by default as 1 ‰ of the transferred amount.

The sellers, on the other hand, have received a premium equivalent to approximately 450 ‰, and the remaining 549 ‰ has been paid to the buyers and any intermediaries, and

*that* the sellers and buyers in the case bear the main liability for the loss suffered by the sold company and thus the Danish Tax Agency, as these persons and companies have organised, carried out and received the financial result of the transactions in violation of section 115 (2) of the Danish Public Limited Companies Act/section 84 (2) of the Danish Private Limited Companies Act, and

*that* the seller, third party 1, must otherwise be identified with her advisers, for whom she is liable."

*As regards Attorney Flemming Johnsen, the following, i.a. is stated:*

"*that* the liability of the sellers' advisers, who are independent of a contractual relationship with BG Bank A/S, must

**383**

be assessed in accordance with the rules on damages in tort. The following is therefore essential:

i) the advisers' professional and expert knowledge,

ii) the advisers' initiative, including contact with the buyer of the company,

iii) the advisers' advice to the seller, including any invitation to sell, review of the transfer agreement etc.,

iv) the advisers' activities in order to carry out the transactions and

v) the advisers' investigations prior to the conclusion of the contract or the absence of such investigations,

*that* the above third party 2, Flemming Johnsen, therefore to a much greater extent than BG Bank A/S is closer to bearing the liability resulting from the actual events of the case, as the principal BG Bank A/S has only played a subordinate role in implementing payment instructions which the principal, BG Bank A/S, was otherwise obliged to comply with."

*Registered Public Accountant John Dreymann Hansen and Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS* have in essence argued in accordance with their main claims in the particulars of claim of 22 September 1998, which state, i.a.:

"*In support of the primary claim, it is submitted:*

*that* third parties 1 and 2 [the audit firm and Auditor John Dreymann Hansen] have not committed errors or omissions or have not otherwise acted in a manner that could involve liability to pay damages to the principal,

*that* third parties 1 and 2 were not or should not have been aware that the relevant transfer of shares would result in the alleged asset stripping of the company. Therefore, third party 2 has not had any reason to advise on such a risk and therefore, failure to do so does not incur liability on his part,

*that* third parties 1 and 2 did not realise or should not have realised that the transfer would otherwise entail a risk that Attorney Fischer or those to whom he transferred the company, would cause a loss to the company thus sold and to the company's creditors,

*that* third parties 1 and 2 did not realise or should not have realised that Attorney Fischer or the persons to whom he transferred the company, intended to strip the company's assets or contribute to such assets stripping,

*that* third parties 1 and 2 did not participate in the actual settlement on the sale of the company

*that* third parties 1 and 2 did not know or should not have known how Attorney Fischer financed the payment of the purchase price of the shares,

*that* third parties 1 and 2 did not – or should not have been – aware that the company's shares were acquired using own funds as claimed by the plaintiff in the main case,

*that* any claim for contribution in the event of limitation or inaction has lapsed, *that* there is no causal link between the actions or omissions from third parties 1 and 2 and the company's bankruptcy

*that* in 1991 it was possible to obtain a tax credit under section 17a of the Danish Corporation Tax Act (*selskabsskatteloven*) which justifies a buyer's willingness to pay extra for the corporation tax due from a commercial point of view,

*that* the principal has not shown any loss eligible for damages and *that* the principal, through their own reckless conduct or acceptance of risk, must themselves bear any liability in damages.

. . ."

Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and John Dreymann Hansen have essentially agreed with the principles for calculating the loss invoked by Else Thrane and BG Bank A/S.

In support of the *claim for dismissal against Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S*, it is stated:

"*that* third party 4 – Attorney Flemming Johnsen – and third party 5 – Inter-Lex Advokater Odense A/S – are the closest to bear a loss, as third party 4 – Attorney Flemming Johnsen – was in charge of the final execution of the transaction, and as third party 4 – Attorney Flemming Johnsen – was in charge of the execution of the financial transactions that took place in connection with the transfer of the share capital of the current Anpartsselskabet af 1.9.1991 nr. 6 in bankruptcy."

*Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S* have in essence argued in accordance with their main claims in the particulars of claim of 6 October 1998, which state, i.a.:

"In support of the claims made, it is submitted that Attorney Flemming Johnsen and Inter-Lex Advokater Odense A/S have not committed errors, shown negligence or otherwise shown conduct giving rise to liability to pay damages to Else Thrane, BG Bank A/S, Revisionsfirmaet Verner Hansen Registered Auditors ApS and/or Registered Public Accountant John Dreymann Hansen in connection with the assistance that Attorney Flemming Johnsen gave Else Thrane in connection with her sale of the shares in the company.

The following is also submitted with regard to Inter-Lex Advokater Odense A/S.

*Against Else Thrane:*

In the light of the foregoing, it is disputed that Attorney Flemming Johnsen gave Else Thrane inadequate and erroneous advice in connection

**384**

with Else Thrane's sale of the shares in the company. Therefore, if the High Court finds that Attorney Flemming Johnsen is liable in damages vis-à-vis BG Bank A/S, it is also submitted that Else Thrane is closest to bearing the loss and therefore, Else Thrane should indemnify Attorney Flemming for such loss. In support of the claims, it is generally submitted:

*that* Attorney Flemming Johnsen under the circumstances presented did not realise and should not have realised that Else G. Thrane's sale of the shares to Poul Fischer could involve a risk, including a possible risk for the company's creditors,

*that* Attorney Flemming Johnsen did not doubt or should not have doubted the intentions of Attorney Poul Fischer, including whether Poul Fischer was allowed to disregard the self-funding ban in the then applicable section 84 (2) of the Danish Private Limited Companies Act (now section 49 (2) of the Danish Private Limited Companies Act) in connection with the purchase of the shares in the company,

*that* at the time of the transfer of the shares, no legislation, case law or legal theory had established or referred to an obligation on a seller of shares to ensure that the tax authorities' interests would not subsequently be disregarded due to acts or omissions on the part of a buyer,

*that* Attorney Flemming Johnsen should not, at the time, have advised Else Thrane not to carry out the sale of the shares to Attorney Poul Fischer,

*that* there is not the necessary causal link and foreseeability between Attorney Flemming Johnsen's assistance to Else Thrane and the fact that the company is now bankrupt and – as far as can be seen – with the tax authorities as sole creditor.

. . ."

These defendants, too, have essentially agreed with the principles for calculating the loss invoked by Else Thrane and BG Bank A/S, and they have accepted Else Thrane's statement on the tax treatment of the investment fund.

*Against BG Bank A/S:*

"If the High Court finds that there has been a violation of the self-funding ban in connection with the transfers on 10 October 1991, BG Bank A/S is closer to being liable in damages for this than Attorney Flemming Johnsen.

In particular, it is submitted that if BG Bank A/S is convicted in the main case, this would indicate that BG Bank A/S bears an independent liability in damages to the plaintiff due to the buyer's violation of the self-funding ban in the then applicable section 84 (2), now section 49 (2) of the Danish Private Limited Companies Act.

It is furthermore submitted:

*that* there is not the necessary causal link and foreseeability between Attorney Flemming Johnsen's assistance to Else Thrane and the fact that the company is now bankrupt, and – as far as can be seen – with the tax authorities as sole creditor, and

*that* BG Bank A/S has not suffered any loss that entitles to damages. If Attorney Flemming Johnsen were to be held liable in damages to BG Bank A/S, it is submitted: *that* BG Bank A/S' claim for damages must lapse as a result of inaction and

*that* BG Bank A/S' claim for damages must otherwise lapse or be reduced as a result of its own fault and/or acceptance of risk and with reference to section 25 of the Danish Liability in Damages Act.

*Against Revisionsfirmaet Verner Hansen, Registrerede Revisorer ApS and Registered Public Accountant John Dreymann Hansen:*

If the High Court applies that Attorney Flemming Johnsen and Registered Public Accountant John Dreymann are liable in damages to Else Thrane, it is submitted that Registered Public Accountant John Dreymann Hansen in their mutual relationship is closer to bearing a loss than Attorney Flemming Johnsen.

The above also applies to Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS."

**The High Court's comments:**

In the Court's decision, in accordance with the statements provided and the documents produced, it is submitted that the business activities performed in K.L. Thrane's Røgeost, Else Rasmussen Odense ApS in connection with a normal generational change were sold by the sole shareholder Else Thrane with takeover on 5 April 1991. The documents in connection with the transfer of the business were processed by the company's and Else Thrane's attorney, Flemming Johnsen. The intention was for the private limited company to be liquidated, but the company's and Else Thrane's auditor, John Dreymann Hansen, took the initiative to obtain an offer from Attorney Poul Fischer to buy the company for a price that exceeded the equity by DKK 1 million.

Auditor John Dreymann Hansen has not previously been involved in the sale of a "profit company" but had seen that Poul Fischer, among others, advertised for them. Attorney Poul Fischer's offer was sent to Attorney Johnsen who was also aware that such companies were acquired but had not previously participated in any transactions himself. Johnsen knew that Poul Fischer had been an assistant attorney in Odense and had never heard anything negative about him.

Both Johnsen and Hansen were aware that the premium was motivated by the tax debt chargeable to the company. They both had some knowledge that

**385**

it could be possible under the current tax rules for a buyer to defer and possibly eliminate the tax debt through a tax credit scheme or the purchase and leasing of depreciable assets in connection with the use of double taxation agreements. During an initial telephone conversation with Poul Fischer, Hansen was informed that the intention was to acquire depreciable assets. Both Johnsen and Hansen assumed that the change of the financial year which Hansen carried out in accordance with Fischer's instructions, was motivated by the desire to have time during the transfer year to make the necessary acquisitions. Both advisers were aware, on the basis of the share transfer agreement, of the buyer's demand that the company's capital be transferred to an account with the buyer's bank on the same day as the purchase price was paid and that the capital would be immediately available to the buyer. None of them initiated an investigation into the buyer's affairs.

Else Thrane, who had no knowledge of the tax situation herself, had to perceive the situation in such a way that both the attorney and the auditor, whose professional advice she had full confidence in, approved the legality of the transaction and advised her to go through with it.

At the time of the transfer, the private liability company's assets consisted solely of an ordinary bank deposit of DKK 10,815,791.81, an investment account of DKK 80,486.89, and the only debt was a tax claim consisting of:

- Already charged corporation tax for the 1991/92 tax year which was due on 20 November 1991.

- Calculated corporation tax 1992/93 DKK 456,722.

- Deferred tax (reversed depreciation and amortisation) DKK 1,375,334.

As regards the transfers of funds via Bikuben, it appears that these were carried out in accordance with Fischer's instructions, so that Bikuben, on the same day, 10 October 1991, transferred the purchase price to the seller's bank through an overdraft on the buyer company's account which only contained a previous deposit of approximately DKK 1.2 million, and via a newly created account in Bikuben received almost all the funds of the acquired company back into the buyer company's account in the bank, so that the overdraft was immediately covered, and a positive account of just over DKK 2 million emerged. The buyer company's account was emptied on 15 October 1991.

On 10 October 1991, a separate cheque transfer was made from the seller's bank to Bikuben with an investment deposit of DKK 80,486.89. In Bikuben, the amount was deposited in a special investment fund account on 14 October 1991 which belonged to the acquired private limited company represented by Poul Fischer.

The company in question was immediately resold in several stages. On 8 November 1991, the deposit in the investment account was paid by Bikuben to Jan Preben Kristiansen who now appeared as CEO and had drawn up a standard form for the purchase of depreciable equipment justifying a payment.

The practical arrangements for these monetary transactions were carried out by a subordinate employee in Bikuben but always with the approval of the local management, and the local management in turn usually obtained approval from Bikuben's head office. There are statements in the case that the management in Bikuben should have given a general approval to the bank's branches in Skælskør and Aarhus to grant credit in connection with Fischer's business and a similar business operating in Aarhus. The credit in both branches was apparently limited at DKK 10 million but so that to the extent that the credit was not utilised in one branch, the credit in the other branch could be increased. Even though the branches concerned could thus expect that the individual transactions of the kind at issue here would

be approved by the head office, the individual cases typically had to be submitted. No documentation has been provided in relation to this credit commitment.

It is therefore clear that the acquisition of the private limited company was financed using the company's own funds and that employees at Bikuben had full knowledge of how the purchase price was obtained. On the seller side, it must be assumed that Attorney Flemming Johnsen and Auditor John Dreyman Hansen, after the preparation of the sales contract and the instructions given accordingly by Johnsen to the seller's bank regarding transfer of the company's funds – of which Auditor Hansen received a copy – should have noticed that the purchase was financed from the company's own funds.

The seller achieved a premium of DKK 1 million. The seller and the seller's advisers assumed that this premium was paid by the buyer in order to exploit the opportunities to avoid or defer the payment of the company's deferred taxes. The premium clearly exceeded the costs that could be justified in saved costs for the buyer. Hence, the sale did not constitute a normal commercial transaction.

The seller, who is also liable in cases where a harmful act is caused by the recommendation of an adviser, should realise that a sale of the profit company through self-funding entailed a risk that the tax due would not be paid. The seller or the seller's advisers effectively did nothing to avert this risk. The seller and the seller's advisers have thereby recklessly disregarded the tax authorities' interests and thereby incurred liability.

In this case, such liability cannot be extended to the investment fund funds. It is emphasised that these funds were not part of the self-funding, that they were correctly deposited in a special

**386**

account in Bikuben and that these funds were only disbursed when a false declaration was made to the bank by a person authorised to sign for the company concerning the purchase of depreciable assets.

Bikuben was aware of the self-funding and that the company's surplus funds were put at the disposal of Attorney Fischer but did nothing to avert the resulting risk of non-payment of the tax debt. In doing so, Bikuben also, jointly and severally with the seller and to the same extent, incurred liability vis-à-vis the tax authorities.

In accordance with the foregoing, and as the plaintiff is not found to have forfeited their right by inaction, the Court will find for the plaintiff, ApS af 1.9.1991 nr. 6 in bankruptcy, as regards the claimed amount less the part of the claim that consists of supplementary taxation of the investment fund reserves or DKK 1,775,816.

As regards the mutual relationship between the defendant Else Thrane and BG Bank A/S, the calculation should be made in such a way that Else Thrane will disclaim the capital gains that she obtained, taken into account *the* premium she has received, *the* interest benefit she obtained from the premium paid and *the* refund of overpaid capital gains tax that she must be expected to obtain, cf. circular no. 19 of 25 July 1997. On the other hand, there is such uncertainty as to the extent to which saved liquidation costs exceed the costs incurred in connection with the sale of the private limited company that it cannot be taken into account.

It is clear that the premium, taking into account the later paid capital gains tax of the premium, amounted to DKK 750,000. The interest benefit can, taking into account the information on the average interest rate and the tax that has been triggered for the seller by the interest benefit obtained, be determined at DKK 165,000. Refund of the capital gains tax

will amount to approximately DKK 585,000, including interest. The total capital gains can thus be set at DKK 1.5 million.

In the mutual relationship between Else Thrane and Bikuben, Else Thrane is found to cover an amount corresponding to the capital gains of DKK 1,500,000, while Bikuben must cover the rest, DKK 275,816.

In view of the degree of negligence shown, there is no basis for giving BG Bank A/S access to obtain cover for any part of this amount from Attorney Johnsen. The rules of the Danish Liability in Damages Act, including section 25 (2), 1st sentence, cf. section 19 (1), cannot lead to any other result.

In the relationship between Else Thrane and her advisers, there is, as the amount payable in damages by Else Thrane has been calculated, no basis for requiring any part of it to be paid by the advisers or the companies to which they are affiliated.

The Court has considered whether Attorney Johnsen and Auditor Hansen, in view of the liability established above for them as well, should be ordered to pay Else Thrane the costs that she is ordered to pay to the plaintiff, but has not found sufficient cause to do so, having regard to the benefit that Else Thrane had sought to obtain.

### On these grounds the Court rules that:

Else Thrane and BG Bank A/S must jointly and severally to ApS af 1.9.1991 nr. 6 in bankruptcy pay DKK 1,775,816 with the usual statutory interest from 20 September 1996.

In their mutual relationship, Mrs. Else Thrane bears DKK 1,500,000, and BG Bank A/S DKK 275,816 with the statutory interest as stated.

Flemming Johnsen, Inter-Lex Advokater Odense A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS and John Dreymann Hansen are dismissed from the claims against them.

Else Thrane and BG Bank A/S must jointly and severally to ApS af 1.9.1991 nr. 6 in bankruptcy pay DKK 110,000 in legal costs. In their mutual relationship, each of the sentenced persons must each pay half of this amount.

In the cases brought against Flemming Johnsen and Inter-Lex Advokater Odense A/S and John Dreymann Hansen and Registrerede Revisorer ApS, each party must bear their own costs.

### Supreme Court of Denmark

**The Supreme Court's judgment.**

In a previous instance, the Danish Eastern High Court, 17th division, gave its ruling on 6 November 1998.

Seven judges ruled in the case: Hornslet, Marie-Louise Andreasen, Melchior, Asbjørn Jensen, Børge Dahl, Engholm Jacobsen and Henrik Zahle.

The parties have registered the following claims:

*BG Bank A/S:*

Against ApS af 1.9.1991 nr. 6 in bankruptcy (the bankruptcy estate): Dismissal of the claim.

Against Else Thrane: Dismissal of the claim and that Else Thrane, jointly and severally with Attorney Flemming Johnsen must indemnify BG Bank A/S (the bank) for any amount that the bank may be ordered to pay to the bankruptcy estate.

Against Attorney Flemming Johnsen: Attorney Flemming Johnsen must, jointly and severally with Else Thrane, indemnify the bank for any amount that the bank may be ordered to pay to the bankruptcy estate.

*The bankruptcy estate:*

Against the bank and Else Thrane: The bank and Else Thrane must, jointly and severally, pay DKK 1,860,916 to the bankruptcy estate with the addition of

statutory interest from the case was brought on 20 September 1996, in the alternative affirmation.

*Else Thrane:*

Against the bankruptcy estate: Dismissal of the claim.

Against the bank: Dismissal of the claim and the bank must

**387**

indemnify Else Thrane for any amount incl. interest and costs that she may be ordered to pay to the bankruptcy estate.

Against Attorney Flemming Johnsen in the case brought by the bank: Attorney Flemming Johnsen must indemnify Else Thrane for any amount incl. interest and costs that she may be ordered to pay to the bank.

Against Attorney Flemming Johnsen, Inter-Lex Advokater Odense A/S (the law firm), Registered Public Accountant John Dreymann Hansen and Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS (the audit firm): Attorney Flemming Johnsen, the law firm, Auditor Dreymann Hansen and the audit firm must primarily jointly and severally and in the alternative alternatively, fully or partly indemnify Else Thrane for any loss that she may suffer if she is convicted in accordance with the bankruptcy estate's claim.

*Attorney Flemming Johnsen and the law firm:*

Against the bank: Affirmation.

Against Else Thrane: Affirmation, in the alternative that Else Thrane must indemnify Attorney Flemming Johnsen for any amount that he may be ordered to pay to the bank, including interest and costs.

Against auditor Dreymann Hansen and the audit firm: Affirmation, in the alternative that Auditor Dreymann Hansen and the audit firm primarily jointly and severally, in the alternative one or more of these, must indemnify Attorney Flemming Johnsen and the law firm for any amount that Attorney Flemming Johnsen and the law firm may be ordered to pay to Else Thrane, including interest and costs.

*Auditor Dreymann Hansen and the audit firm:*

Against Else Thrane: Affirmation, in the alternative dismissal against payment of a small amount.

Against Attorney Flemming Johnsen and the law firm: Affirmation, in the alternative that Attorney Flemming Johnsen and the law firm primarily jointly and severally, in the alternative alternatively must indemnify Auditor Dreymann Hansen and the audit firm for any amount, including interest and costs, that Auditor Dreymann Hansen and the audit firm may the ordered to pay to Else Thrane. Auditor Dreymann Hansen and the audit firm have waived the claim that any claim for contribution has lapsed because of inaction or limitation. It is not disputed that Auditor Dreymann Hansen and the audit firm are jointly and severally liable for what he or the audit firm may be ordered to pay to one of the other parties in the cases.

Attorney Flemming Johnsen and the law firm do not dispute that they are jointly and severally liable for what he or the law firm may be ordered to pay to one of the other parties in the cases.

Additional information has been provided for the Supreme Court. Those of the parties which may become parties in a distribution of any liability in damages for asset stripping have submitted calculations of the seller Else Thrane's enrichment. They are presented according to the same model and contain different ways of calculating the seller's enrichment, calculated as the difference between, on the one hand, her capital gains on the transaction made and, on the other hand, the capital gains if a solvent liquidation had been carried out. The bank has calculated Else Thrane's enrichment as follows:

| | "Gross interest rate | Net interest rate |
|---|---|---|
| The net interest corresponds to a tax of 50% of the gross interest | 8.250 % | 4.125 % |

| | | |
|---|---|---|
| 1. Seller's premium. | 1,000,000 | 1,000,000 |
| 2. Less the amount of capital gains tax paid on the seller's premium 25% of DKK 1 million . . . . . . | -250,000 | -250,000 |
| Seller's net premium. | 750,000 | 750,000 |

3. With the addition of the cash benefit/return on the premium after deduction of the capital gains tax and at the interest rate stated above until the writ is issued.

The capital gains tax is . . . settled in three instalments on 1/11 1992 and on 1/1 and 1/2 1993 by DKK 83,333 per instalment.

| | | |
|---|---|---|
| 10/10-1991-1/11-1992=381 days of DKK 1,000,000 | 87,313 | 43,656 |
| 1/11-1992-1/1-1993=60 days of DKK 916,667 | 12,604 | 6,302 |
| 1/1-1993-1/2-1993=30 days of DKK 833,334 | 5,729 | 2,865 |
| 1/2-1993-20/9-1996=1309 days of DKK 750,000 | 224,984 | 112,492 |
| | [330,630] | [165,315] |
| Seller's net premium plus the cash benefit. | | 915,315 |
| | 1,080,630 | **388** |

| | | |
|---|---|---|
| 4. Saved liquidation costs less selling costs (estimated) | 25,000 | 25,000 |

5. Supplementary taxation of investment fund funds incl. percentage addition.

| | | |
|---|---|---|
| Included regardless of whether the seller is required to pay supplementary taxation of the investment fund funds. | 28,860 | 28,860 |
| Seller's enrichment before the refund of capital gains tax pursuant to circular no. 19/1997. | 1,134,490 | 969,175 |

6. Refund of capital gains tax pursuant to circular no. 19/1997.

The refund amounts to 25% of the seller's share of any judgment amount in the main case plus ordered and own legal costs, which together for the two cases are estimated at: 250,000

As the seller's share is not finally known, the enrichment before refund calculated above is used as a basis.

As the calculated refund will be included in the final calculation of any refund for overpaid tax, the final refund for overpaid tax can be calculated by dividing by 0.75 (75%)

| | | |
|---|---|---|
| 7. Interest on item 6. | 162,378 | 71,495 |

The interest rate is the statutory interest, cf. section 62E of the Danish Withholding Tax Act (*kildeskatteloven*), and interest is calculated from the commencement of the case

20/9-1996-20/11-1999=38 months.

Copyright © 2021 Karnov Group Denmark A/S

| | | |
|---|---:|---:|
| The interest amount must also be divided by 75% | | |
| Seller's enrichment in relation to liquidation: | 1,758,365 | 1,447,062" |

Else Thrane has presented three calculations of her enrichment. The most favourable one for her contains the following:

| | |
|---|---:|
| "1. Seller's premium. | 1,000,000 |
| 2. Less the capital gains tax paid on the seller's premium 25% of DKK 1 million. | -250,000 |
| Seller's net premium. | 750,000 |
| . . . | |
| Seller's enrichment before the refund of capital gains tax pursuant to circular no. 19/1997 | 750,000 |
| 6. Refund of capital gains tax pursuant to circular no. 19/1997. | 250,000 |
| The refund is 25% of the seller's share of any judgment amount in the main case. | |
| . . . | |
| Seller's enrichment in relation to liquidation | 1,000,000" |

**The Supreme Court's observations.**

Initially, it is considered whether there has been self-funding:

In accordance with Poul Fischer's instructions of 9 October 1991, the purchase price of the profit company was deducted by the buyer's bank on 10 October 1991 from the buyer company's account and transferred via Nationalbanken to the seller's bank. This transfer was conditional on the seller's bank transferring the profit company's money to the bank on the same day via Nationalbanken. Upon receipt of this money and its deposit in an account in the name of the profit company, the withdrawal on the buyer company's account for the payment of the purchase price – as stated in Poul Fischer's instructions – was offset on the same day by a transfer from the profit company's account. The Supreme Court then agrees that the purchase of the company was financed by its own funds and that the self-funding ban in the then applicable section 84(2) (now section 49 (2)) of the Danish Private Limited Companies Act was thereby violated.

The question then is whether anyone – and if so who – has incurred liability in damages to the bankruptcy estate:

With regard to the buyer's bank, it must be applied that the bank was aware that the individual transactions were interrelated – which was crucial for the bank's risk assessment – and that the transactions overall formed the basis for Poul Fischer's payment of a profit company which only had assets in the form of bank deposits and liabilities in the form of a tax burden. The bank consequently contributed recklessly to the unlawful self-funding, and the Supreme Court agrees that the bank, which did nothing to avert the consequent risk of disregarding the tax authorities' interests, is liable in damages for the tax authorities' loss.

As regards the assessment of Else Thrane's liability, it is undisputed that she must be identified with her advisers, Attorney Flemming Johnsen and Auditor Dreymann Hansen, and that they recommended the sale and were in charge of performing it.

For the reasons set out by the High Court, the Supreme Court agrees that the sale of the profit company did not

**389**

constitute a normal commercial transaction. As regards the payment upon the liquidation of the company, considering the prepared balance sheet, Else Thrane earned

additional capital gains of DKK 1 million on the sale, corresponding to 55% of the deferred tax burden. Under these circumstances, Else Thrane and her advisers had a particular reason to be aware of the risk of disregarding the taxation authorities' interests in connection with the sale.

Else Thrane and her advisers had to realise *that* the sale of the profit company comprised a not insignificant risk that the deferred tax burden could not be postponed or eliminated and *that* the risk of this and of a loss for the tax authorities would be especially great if the price of the profit company was paid with its own funds. For Else Thrane and her advisers, it must already as a result of the agreed transfer from Nationalbanken of the purchase price and the company's funds on the same day appear to be an obvious possibility that the sale would involve self-funding. However, Else Thrane and her advisers did not really do anything to avert the tax authorities' risk.

Against this background, the Supreme Court agrees that Else Thrane, Attorney Flemming Johnsen and Auditor Dreymann Hansen in connection with the sale of the profit company recklessly disregarded the tax authorities' interests, and that they are therefore also liable in damages for the tax authorities' loss.

The question is then what loss can be covered by a claim for damages: In the circumstances set out above, there is no basis for considering the loss relating to the investment fund reserve to be unforeseeable. Therefore, the loss for which the tax authorities – and in their place the bankruptcy estate – can claim damages also includes supplementary taxation of the investment fund funds, including the percentage addition.

Nor is there any basis for considering – as claimed by the bank – when calculating the tax authorities' loss that Else Thrane has paid capital gains tax on the additional capital gains.

No claim has been forfeited by inaction and there is also no basis for – as claimed by Else Thrane – relaxing her liability.

Else Thrane, Attorney Flemming Johnsen, Auditor Dreymann Hansen and the bank are thus all liable in damages for DKK 1,860,916. The Supreme Court therefore upholds the bankruptcy estate's primary claim against Else Thrane and the bank.

As regards the distribution of liability between the parties:

Since both the bank and Else Thrane and her advisers are liable in damages for the tax authorities' loss, the cases must

be determined in accordance with section 25 (1) of the Danish Liability in Damages Act, according to which the distribution of the burden of damages between several jointly and severally liable parties must be carried out in accordance with "what must be considered reasonable, taking into account the nature of the liability and the circumstances as such."

As regards the mutual distribution of liability, the Supreme Court finds that it must be sought to ensure, on the one hand, that the seller will in advance give up their enrichment and, on the other hand, that the distribution of liability in an asset stripping case such as the present one – a so-called "gross case" – is carried out according to generally applicable principles.

As regards Else Thrane, a consequence of the liability that she incurred – in addition to the tax authorities' recoverable loss – was that she obtained additional capital gains from the sale in relation to what a liquidation would have realised. The Supreme Court finds that in the mutual relationship, she must in any case pay an amount equal to the additional capital gains in advance. It is undisputed that the additional capital gains include the amount of DKK 1 million paid by the buyer for the company's tax burden and that a liquidation would have triggered a supplementary taxation of investment fund funds including a percentage addition of DKK 28,860 in addition to what was set aside for this in the balance sheet. Since the saved liquidation costs in this case do not exceed with certainty the cost of the sale, they cannot be taken into account in the calculation of the additional capital gains.

It applies to all those liable that the lack of care for the company's tax burden has been demonstrated in connection with profit-making activities that are subject to independent taxation. For some of those liable, there may be access to deduct, for tax purposes as an operating expense, the cost of their damages. Particularly for Else Thrane as the seller of the profit company it is stated that in respect of a seller's share of the total burden of damages – and only such burden – the capital gains tax triggered by the seller's capital gains on the sale of the company may be adjusted in accordance with the Danish Tax Agency's circular no. 19 of 25 July 1997. The Supreme Court finds that there is no basis for taking these tax consequences into account when distributing the burden of the damages.

However, the Supreme Court finds that when distributing the burden of damages, the enrichment associated with the fact that Else Thrane received the additional capital gains from the sale in cash must be taken into account. Else Thrane should therefore – in addition to the additional capital gains – in advance bear an amount equal to the financial value that is generally deemed to be linked to the disposal of the additional capital gains. This value must be determined on the basis of a normal return on passive capital investment. In the present case, the addition is set at the net interest gain of DKK 165,135 calculated by the parties on the basis of an average bond yield. This addition covers

**390**

the period from Else Thrane's receipt of the additional capital gains in cash and until the case was brought.

Of the full amount of damages of DKK 1,860,916, Else Thrane must then, in relation to the other parties in advance bear DKK 1,194,175.

When distributing the balance of DKK 666,741, the Supreme Court finds that the starting point should be an equal distribution between the seller and the buyer's bank. In doing so, the Supreme Court attaches importance to the fact that the circumstances justifying the liability of a contributing seller and of a seller (and the seller's advisers, if any) must as a starting point be regarded as equally significant in terms of the law of damages. Notwithstanding the fact that the information about BG Bank's special insight into Poul Fischer's approach in this type of case could speak in favour of imposing a larger share of the burden of damages on the bank in the present case, the Supreme Court finds that there is no sufficient basis for departing from the starting point.

In the mutual relationship between the bank and Else Thrane, Else Thrane must then pay DKK 1,527,545.50 and the bank DKK 333,370.50. In the mutual relationship between the seller and the seller's advisers, the Supreme Court finds that the starting point should be an equal distribution between all liable participants on the seller side. In the present case, according to the information provided, Else Thrane was without any special qualifications for assessing the soundness of the transaction recommended unconditionally to her by her attorney and auditor. Against this background, such special circumstances are found to exist that Attorney Flemming Johnsen and Auditor Dreymann Hansen in relation to Else Thrane should jointly and severally bear the seller side's full share of the said balance, i.e. DKK 333,370.50. In the mutual relationship between the attorney and the auditor, each must bear half, i.e. DKK 166,685.25.

With regard to the bank's claim against Attorney Flemming Johnsen, the following is noted:

In the relationship between, on the one hand, the bank and, on the other hand, the seller's advisers, the starting point must be that the bank is liable for half of the total claim for damages and that the seller's advisers are jointly and severally – and in their mutual relationship equally – liable for half of the total claim for damages. No special circumstances in the present case form the basis of departing from that starting point. In the mutual relationship between Attorney Flemming Johnsen and the bank, both Attorney Flemming Johnsen and the bank must therefore be liable for DKK 930,458.

**On these grounds the Court rules that:**

*Else Thrane and BG Bank A/S must within 14 days of the passing of this Supreme Court judgment jointly and severally to ApS af 1.9.1991 nr. 6 in bankruptcy pay DKK 1,860,916 with statutory interest from 20 September 1996. In their mutual relationship, Else Thrane bears DKK 1,527,545.50 of this amount, and BG Bank A/S DKK 333,370.50, both amounts with statutory interest from 20 September 1996.*

*In legal costs before the High Court and the Supreme Court, BG Bank A/S and Else Thrane must within 14 days of this Supreme Court judgment jointly and severally pay DKK 250,000 to ApS af 1.9.1991 nr. 6 in bankruptcy. In the mutual relationship, Else Thrane must bear DKK 200,000, and BG Bank A/S DKK 50,000.*

*Neither party must pay legal costs to any other party.*

*Attorney Flemming Johnsen, Inter-Lex Advokater Odense A/S, Registered Public Accountant John Dreymann Hansen and Verner Hansen Registrerede Revisorer ApS must jointly and severally indemnify Else Thrane for the part of the judgment amount of damages of DKK 1,860,916 that she pays to ApS af 1.9.1991 nr. 6 in bankruptcy that exceeds DKK 1,194,175 with statutory interest from 20 September 1996. They must also jointly and severally indemnify Else Thrane for the part of the judgment amount of legal costs of DKK 250,000 that she pays to ApS af 1.9.1991 nr. 6 in bankruptcy that exceeds DKK 100,000. In their mutual relationship, Attorney Flemming Johnsen and Registered Public Accountant John Dreymann Hansen are each liable for half. Inter-Lex Advokater Odense A/S is jointly and severally liable with Attorney Flemming Johnsen. Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS is jointly and severally liable with Registered Public Accountant John Dreymann Hansen.*

*Attorney Flemming Johnsen must indemnify BG Bank A/S for the part of the judgment amount of damages of DKK 1,860,916 that BG Bank A/S pays to ApS af 1.9.1991 nr. 6 in bankruptcy that exceeds DKK 930,458 with statutory interest from 20 September 1996. Else Thrane must indemnify Attorney Flemming Johnsen for the amount that he subsequently pays to BG Bank A/S that exceeds DKK 333,370.50 with statutory interest from 20 September 1996.*

# THIS IS TO CERTIFY

that the foregoing

**"Judgment"**

is a true and faithful translation of the
attached document
in the Danish language produced to me.

This translation consists of 22 (twenty-two) pages, including this page.

In witness whereof I have hereunto set
my hand and affixed my seal of office
this 19th day of May 2022.



Certified Translator at Aarhus, Denmark

Lea Mathiasen

**U.2000.365/2H**

***Sælger af overskudsselskab, sælgers advokat og revisor samt købers bank erstatningsansvarlige over for skattevæsenet for dettes tab ved selskabstømning. - Ansvarets fordeling mellem de ansvarlige.***

*Almindelige emner 21.9 - Erstatning uden for kontraktforhold 111.1, 111.4, 3.3, 43.1, 5, 61.1 og 62.2 - Pengevæsen m.v. 2 og 5.7 - Retspleje 12.3 - Selskabsret 1.2 - Skatter 7.1.*

♦ I 1991 solgte S for ca. 8,5 mio. kr. anparterne i anpartsselskabet O til K. Købesummen svarede til O's egenkapital med tillæg af 1 mio. kr., og efter K's instruks blev købesummen af K's bank B trukket på køberselskabets konto og overført til S's pengeinstitut betinget af, at dette samme dag overførte O's pengebeholdning til B og udvirkede en udligning. Efter at O var gået konkurs, rejste boet krav mod S og B for skattevæsenets tab ved salget. Anpartsselskabslovens § 88, stk. 2, ansås for overtrådt, og B, der var bekendt med de enkelte transaktioner, ansås at have medvirket på erstatningspådragende vis til denne ulovlige selvfinansiering. Endvidere var S og dennes advokat A og revisor R

**366**

erstatningsansvarlige. Det var ubestridt, at såvel A og dennes advokatfirma som R og dennes revisionsfirma hæftede solidarisk for, hvad henholdsvis A og R måtte blive dømt til at betale. Den indbyrdes ansvarsfordeling fandtes at skulle ske i overensstemmelse med erstatningsansvarslovens § 25, stk. 1, ud fra bl.a. berigelsessynspunkter. [1]

**H.D. 24. november 1999 i sagerne II 526/1998 og II 605/1998**

BG Bank A/S (adv. J. Korsø Jensen, Kbh.)
mod
ApS af 1.9.1991 nr. 6 under konkurs (Km.adv. v/adv. Sune Fugleholm, Kbh.), Else Thrane (adv. Lars Grøngaard, Århus), advokat Flemming Johnsen (adv. Klaus Søgaard, Kbh.)
og
Else Thrane (adv. Lars Grøngaard, Århus)
mod
ApS af 1.9.1991 nr. 6 under konkurs (Km.adv. v/adv. Sune Fugleholm, Kbh.), BG Bank A/S (adv. J. Korsø Jensen, Kbh.), advokat Flemming Johnsen (adv. Klaus Søgaard, Kbh.), Inter-Lex Advokater Odense A/S (adv. Klaus Søgaard, Kbh.), Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS (adv. Erik Flink, Århus) og registreret revisor John Dreymann Hansen (adv. Erik Flink, Århus).

## Østre Landsret

### Østre Landsrets dom 6. november 1998 (17. afd.)

(Brydensholt, Kroman, Charlotte Arndt (kst.)).

Sagen, der er anlagt den 20. september 1996, drejer sig om erstatningsansvar for skattevæsenets tab ved salg af et overskudsselskab. Sagen omhandler spørgsmålet om et eventuelt ansvar for sælgeren og for købers bank og tillige spørgsmålet om ansvar for sælgerens revisor og advokat i forbindelse med den ydede rådgivning samt om den indbyrdes fordeling af et eventuelt ansvar.

Sagsøger i sagen B-2412-96, ApS af 1.9.1991 nr. 6 under konkurs (i det følgende kaldet selskabet), er det solgte selskabs konkursbo, sagsøgte 1, Else Thrane, er sælger af selskabet, og sagsøgte 2, BG Bank A/S (på handelstidspunktet Sparekassen Bikuben), er købers bankforbindelse.

BG Bank A/S har under sagen adciteret Else Thrane og dennes rådgiver, advokat Flemming Johnsen.

Else Thrane har ligeledes adciteret advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S, som er det advokatfirma, Flemming Johnsen er medindehaver af.

Endelig har Else Thrane anlagt regressag mod Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen, der er den revisor i firmaet, der har rådgivet fru Thrane.

Parterne har nedlagt følgende endelige påstande:
*Selskabets (konkursboets) påstand:*

---

[1] U 1988.858 H, U 1997.256 H, U 1997.364 H, U 1997.842 H, U 1999.1185 H, U 2000.23 H, TfS 1998.398 H, TfS 1998.455, TfS 1998.470 V, TfS 1998.789 Ø, TfS 1998.732 Ø, TfS 1999.122 Ø, TfS 1999.133 Ø, TfS 1999.200 V, TfS 1999.230 V, TfS 1999.228 Ø, TfS 1999.264 Ø, TfS 1999.304, TfS 1999.379 Ø, TfS 1999.530 V, TfS 1999.542 Ø, TfS 1999.618 V, TfS 1999.617 Ø, TfS 1999.615 Ø, TfS 1999.729 Ø, Ole Bjørn m.fl. i SR Skat, 1999 (nr. 3) s. 140-143 og 145, Bo von Eyben m.fl.: Lærebog i erstatningsret, 3. udg., s. 60, Kurt Gimsing i SR Skat, 1993 (nr. 2) s. 99-103, samme i Revision & Regnskabsvæsen, 1994 (nr. 8), s. 9-21, samme i Advokaten, 1993 (nr. 5) s. 117 ff, og samme i SR Skat, 1993 (nr. 5), s. 275-278, Gomard: Aktieselskaber og anpartsselskaber, 3. udg. (1996), s. 417-418, samme: Obligationsret 3. bd., 1. udg. (1993), s. 222-229, samme i Revision & Regnskabsvæsen, 1997 (nr. 3) s. 9-16, og samme i Festskrift til Ole Lando (1997), s. 165 ff, Bjørn Groth-Andersen i TfS 1999.760, Mogens Holm m.fl.: God Advokatskik (1996), s. 106-108, Allan Højbak i TfS 1999.741, Christen Boye Jacobsen m.fl.: Bank- og sparekasseloven - med komm. (1996), s. 61-62, 71 og 74, Jørgen B. Jepsen m.fl. i Revision & Regnskabsvæsen, 1997 (nr. 8), s. 9-13, Greve m.fl.: Komm. straffelov, alm. del, 6. udg. (1997), s. 200, A. Vinding Kruse m.fl.: Advokatansvar, 6. udg. (1990), s. 129-134, A. Vinding Kruse: Erstatningsretten, 5. udg. (1989), s. 52-56, 87-89, 92, 307-308, 342-343, Jesper Lett m.fl. i TfS 1998.347, Jesper Lett i TfS 1998.537, Jens Møller m.fl.: Erstatningsansvarsloven med komm., 3. udg. (1996), s. 358-367, Jørgen Nørgaard: Selskabsformerne, 3. udg. (1997), s. 191-193, Torben Byskov Petersen i TfS 1999.754, Søren Rasmussen i Lov og ret, 1991 (nr. 3), s. 7-8, Søren Rasmussen m.fl. i SR Skat, 1990 (nr. 4), s. 214-217, Skatteministeriets notater vedrørende selskabstømning i TfS 1997.841 og 844, Jakob T. Sørensen m.fl. i TfS 1999.761, Temanummer om selskabstømning, TfS 1999 (nr. 19, Jørn Ankær Thomsen i Revision & Regnskabsvæsen, 1990 (nr. 2) s. 40-42, Henry Ussing: Erstatningsret, nyt optryk (1946), s. 172, og samme: Obligationsret, 4. udg. (1961), s. 445, Erik Werlauff i TfS 1997.114 og samme: Selskabsret, 3. udg. (1997), s. 287, 401-403, 427-429 og 875-880, Knud Waaben: Strafferettens alm. del, I. Ansvarslæren, 4. udg., s. 212-214 og 222, og Kjeld Søgaard og Morten Samuelsen i Advokaten, 1999, s. 235 f.

Else Thrane og BG Bank A/S tilpligtes til selskabet in solidum at betale 1.860.916 kr. med tillæg af sædvanlig procesrente fra sagens anlæg, til betaling sker.

Påstanden, der vedrører ikke betalt selskabsskat, er sammensat således:

| Skatteåret | 1990/91 | 85.100 kr. |
| do | 1991/92 | 0 kr. |
| do | 1992/93 | 1.775.816 kr. |
| I alt | | 1.860.916 kr. |

**367**

*Else Thranes påstande:*

*Over for sagsøgeren (selskabet):*

Principalt: Frifindelse.

Subsidiært: Frifindelse mod betaling af et mindre beløb fastsat efter landsrettens nærmere skøn.

*Over for sagsøgte 2 - BG Bank A/S:*

Principalt: BG Bank A/S tilpligtes at friholde Else Thrane for ethvert beløb inkl. renter og omkostninger, som Else Thrane måtte blive tilpligtet at betale selskabet.

Subsidiært: BG Bank A/S tilpligtes at friholde Else Thrane for det tab, Else Thrane måtte lide, såfremt Else Thrane måtte blive dømt i den af selskabet anlagte sag.

*Over for den af adcitanten, BG Bank A/S, nedlagte påstand:*

Principalt: Frifindelse.

Subsidiært: Frifindelse mod betaling af et beløb svarende til, at BG Bank A/S friholder Else Thrane for det tab, Else Thrane måtte lide, såfremt Else Thrane måtte blive dømt i den af selskabet anlagte sag.

*Over for medadciterede, advokat Flemming Johnsen:*

Advokat Flemming Johnsen tilpligtes at frihold Else Thrane for ethvert beløb inkl. renter og omkostninger, som Else Thrane måtte blive tilpligtet at betale til BG Bank A/S i nærværende adcitationssag.

*Over for advokat Flemming Johnsen, Inter-Lex Advokater Odense A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen har Else Thrane i de to sager B-2412-96 og B-3000-96 påstået:*

Alle tilpligtes principalt solidarisk, subsidiært alternativt, helt eller delvist at frihold Else Thrane for det tab, Else Thrane måtte lide, såfremt Else Thrane måtte blive dømt i den af selskabet anlagte sag.

*BG Bank A/S' påstande:*

*Over for selskabet (konkursboet):*

Frifindelse.

*Over for den af sagsøgte 1, Else Thrane, nedlagte selvstændige friholdelsespåstand:*

Frifindelse.

*Over for de adciterede, Else Thrane og advokat Flemming Johnsen:*

Else Thrane og advokat Flemming Johnsen tilpligtes in solidum at frihold BG Bank A/S for ethvert beløb, som BG Bank A/S måtte blive tilpligtet at betale til sagsøgeren i hovedsagen, selskabet ctr. 1) Else Thrane og 2) BG Bank A/S, herunder det påstævnte beløb kr. 1.860.916,00 med tillæg af procesrente fra sagens anlæg, til betaling sker.

*Advokat Flemming Johnsens og Inter-Lex Advokater Odense A/S' påstande:*

*Over for Else Thrane:*

1. Frifindelse, subsidiært frifindelse mod betaling af et mindre beløb.

2. Else Thrane dømmes til at skadesløsholde advokat Flemming Johnsen for ethvert beløb, som denne måtte blive pålagt at betale til BG Bank A/S, herunder renter og omkostninger.

*Over for BG Bank A/S:*

Frifindelse, subsidiært frifindelse mod betaling af et mindre beløb.

*Over for Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen:*

1. Frifindelse, subsidiært frifindelse mod betaling af et mindre beløb.

2. Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen dømmes principalt en for alle og alle for en, subsidiært en eller flere af disse, til at skadesløsholde advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S for ethvert beløb, som disse måtte blive pålagt at betale til Else Thrane, herunder renter og omkostninger, subsidiært et mindre beløb.

*Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS' og registreret revisor John Dreymann Hansens påstande:*

*Over for Else Thrane:*

Principalt: Frifindelse.

Subsidiært: Frifindelse mod betaling af et af landsretten fastsat mindre beløb.

*Over for advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S:*

Advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S tilpligtes principalt solidarisk, subsidiært alternativt, at frihold Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen for ethvert beløb inkl. renter og omkostninger, som Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen måtte blive tilpligtet at betale til Else Thrane.

*Over for friholdelsespåstanden fra advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S over for Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen:*

Frifindelse.

Sagens påstande kan herefter sammenfattes således, at selskabet (konkursboet) kræver skattekravet dækket af sælgeren, fru Thrane, og køberens bank, BG Bank, in solidum. Fru Thrane har medinddraget såvel advokaten og advokatselskabet som revisor og revisionsselskabet, medens BG Bank alene har medinddraget advokaten. Således som påstandene i øvrigt er nedlagt, får denne begrænsning dog ingen betydning, idet det, i det omfang der gives selskabet (konkursboet) ret, tillige skal

**368**

afgøres, hvorledes ansvaret skal fordeles mellem de i øvrigt implicerede.

*Sagens omstændigheder:*

Ved købekontrakt af april 1991 overdrog selskabet (da K.L. Thranes Røgeost, Else Rasmussen Odense ApS) ved Else Thrane den selskabet tilhørende virksomhed med produktion og salg af rygeost til Thranes Røgeost I/S ved Kent Thrane og Henrik Lysbjerg.

Ifølge kontraktens § 1 skulle virksomheden overtages den 5. april 1991, og i §§ 4 og 9 var følgende aftalt:

»§ 4.

Køber overtager ingen forpligtelser eller gæld sælgeren vedrørende og køberen overtager ikke sælgerens udestående fordringer, tilgodehavender m.m. Køberen påtager sig vederlagsfrit at opkræve og modtage sælgerens udestående fordringer og afregne alle indgåede beløb til sælgeren, men køberen påtager sig ingen indeståelse for beløbenes indgang.

. . .

Copyright © 2021 Karnov Group Denmark A/S

### § 9.

Sælger samt Else Thrane forpligter sig til ikke at drive virksomhed eller være interesseret i nogen virksomhed, der konkurrerer med den overdragne virksomhed.

Endvidere forpligter sælger sig til snarest efter overdragelsen at ændre navn, således at navnet »Thranes Røgeost« ikke anvendes.«

I løbet af sommeren 1991 blev de indkomne fordringer endeligt afregnet, med selskabet og ifølge revisor John Dreymann Hansens forklaring for landsretten tog denne i nævnte periode kontakt til Advokatfirmaet Fischer v/advokat Poul Fischer, Korsør, med henblik på salg af selskabet.

Ved telefax af 19. juni 1991 fremsendte Advokatfirmaet Fischer iht. en telefonsamtale en anpartsoverdragelsesaftale in blanco til Revisionsfirmaet W. Hansen ApS, att. John Hansen.

Aftalen var, bortset fra de senere indføjede navne og tal, identisk med den aftale, der efterfølgende blev indgået mellem advokat Poul Fischer eller ordre og selskabet.

På selskabets selvangivelse vedrørende skatteåret 1991/92, der er underskrevet af Else Thrane og modtaget af Odense Skattevæsen den 24. juni 1991, var regnskabsåret fra den 1. juli 1989 til den 30.

juni 1990. Den skattepligtige indkomst var angivet til 1.007.651 kr.

Ved skrivelse af 25. juni 1991 til Told- og Skatteregion Odense anmodede revisor John Dreymann Hansen på Poul Fischers foranledning om ændring af selskabets regnskabsår til 1/1 - 31/12, således at regnskabsåret for 1990/91 omfattede en 18-måneders-periode fra 1/7 1990 - 31/12 1991. Told- og Skatteregion Odense imødekom anmodningen ved skrivelse af 8. juli 1991 til selskabet.

Den 13. august 1991 afholdtes ekstraordinær generalforsamling i selskabet, hvor regnskabsåret blev vedtægtsmæssigt omlagt og Revisionsfirmaet Verner Hansen ApS bemyndiget til at foretage de nødvendige ændringer over for Erhvervs- og Selskabsstyrelsen. Referatet blev underskrevet af Else Thrane og John Dreymann Hansen som dirigent.

Revisor John Dreymann Hansen anmeldte ændringen til Erhvervs- og Selskabsstyrelsen og skrev den 5. september 1991 følgende til advokat Flemming Johnsen:

*»Vedr. Else Thrane - salg af anparter*

*Forventet status for K. L. Thranes Røgeost, Else Rasmussen ApS, ApS. nr. 8100*

| | |
|---|---|
| Indestående i bank . . . . . . | kr. 10.937.000 |
| Aktiver ialt . . . . . . | kr. 10.937.000 |
| Anpartskapital . . . . . . | kr. 80.000 |
| Reserver . . . . . . | kr. 8.440.000 |
| Egenkapital . . . . . . | kr. 8.520.000 |
| Skat tidligere år . . . . . . | kr. 581.000 |
| Udskudt skat . . . . . . | kr. 1.518.000 |
| Skat på indeværende års indkomst . . . . . . | kr. 318.000 |
| | kr. 2.417.000 |
| Egenkapital og gæld . . . . . . | kr. 10.937.000« |

Denne foreløbige status videresendte advokat Flemming Johnsen til advokat Poul Fischer ved skrivelse af 6. september 1991 med anmodning om at få oplyst, hvilken pris der ville kunne tilbydes for selskabet. Kopi heraf blev sendt til revisor John Dreymann Hansen.

Den 9. september 1991 sendte advokat Poul Fischer et underskrevet købstilbud til advokat Flemming Johnsen. Købstilbuddet, der var udformet som en anpartsoverdragelsesaftale, videresendte Flemming Johnsen til revisor John Dreymann Hansen den 13. september 1991 med anmodning om eventuelle bemærkninger, ligesom han oplyste, at han også havde sendt tilbuddet til Else Thrane.

Den 21. september 1991 underskrev Else Thrane anpartsoverdragelsesaftalen, hvori det blandt andet hedder:

*»ANPARTSOVERDRAGELSESAFTALE*

Mellem undertegnede anpartshaver(e) i K. L. THRANES RØGEOST, ELSE RASMUSSEN ApS, (i det følgende kaldet »sælger«), og advokat Poul Fischer eller ordre (i det følgende kaldet »køber«), er indgået følgende aftale om overdragelse af den nominelle anpartskapital stor kr. 80.000,00 i K. L. Thranes Røgeost, Else Rasmussen ApS.

1.  *Overtagelsesdag.*
    1.1  Overdragelsen finder sted med overtagelsesdag pr. 1/10 1991 på grundlag af en af sælgers revisor udfærdiget balance pr. overtagelsesdagen.

**369**

2.  *Købesummens fastsættelse.*
    2.1  Købesummen fastsættes i overensstemmelse med den udfærdigede balance efter følgende principper:

2.2  Forinden overtagelsesdagen overdrager selskabet samtlige aktiviteter. Købesummen herfor berigtiges kontant. Dette indebærer, at aktiverne i selskabet i den af revisor udfærdigede balance alene består af bankindeståender. På passivsiden afsættes udover egenkapitalen alle aktuelle og udskudte skatter. Udskudte skatter afsættes med 38%.

2.3  Beregnede skatter af det løbende års overskud forventes at blive afsat med kr. 318.000,00, og udskudte skatter forventes afsat med kr. 1.518.000,00.

2.4  Købesummen fastsættes herefter til selskabets indre værdi med tillæg af et fast beløb stort kr. 1.000.000,00, der er fastsat under hensyn til punkt 2.3 skønnede afsatte skattebeløb.

Købesummen kan herefter tilnærmelsesvis beregnes således:

| Egenkapital (indre værdi) | |
|---|---|
| pr. overtagelsesdagen, ca. | kr. 8.520.000 |
| Tillæg | kr. 1.000.000 |
| IALT | kr. 9.520.000 |

2.5  Købesummen fastlægges endeligt pr. overtagelsesdagen, idet der reguleres for indvundne renter og eventuelt afholdte omkostninger. Sælgers revisor forsyner balance og driftsregnskab med revisionspåtegning.

3.  *Købesummens berigtigelse.*

Copyright © 2021 Karnov Group Denmark A/S                                          side 3

3.1  Købesummen berigtiges på grundlag af den af revisor udarbejdede balance senest overtagelsesdagen kl. 11.00, ved bankoverførsel over Nationalbanken til en af sælger anvist konto.

4.  *Levering af selskabets protokoller m.v.*
    . . .
    4.4  Straks køber har modtaget selskabets protokoller afholdes ekstraordinær generalforsamling med følgende dagsorden:
    a. Nyvalg af direktion.
    b. Nyvalg af generalforsamlingsvalgt revisor.
    c. Ændring af navn efter købers ønske.
    d. Ændring af hjemsted.
    4.5  Køber forpligter sig endvidere til i tilknytning til den afholdte generalforsamling at foretage den fornødne ændringsanmeldelse til skattevæsenet. Sælger sørger for at afmelde selskabet overfor toldvæsenet.
    4.6  Køber er gjort bekendt med, at selskabets regnskabsår udløber den 31/12 1991, således at køber udfærdiger årsregnskab og indgiver selvangivelse for regnskabsåret. For regnskabsåret 1990 medfølger godkendt regnskab samt bilag til selvangivelsen.
    . . .

5.  *Selskabets pengeinstitut.*
    5.1  Sælger sørger for, at selskabets midler senest pr. overtagelsesdagen indestår som kontant indestående på bankkonto i anerkendt pengeinstitut.
    5.2  Efter overførslen af købesummen til den af sælger anviste konto er køber v/advokat Poul Fischer legitimeret til at disponere over de selskabet tilhørende konti i overensstemmelse med den af revisor udfærdigede balance.
    . . .«

Ved skrivelse af 23. september 1991, der i kopi sendtes til revisor John Dreymann Hansen, returnerede advokat Flemming Johnsen den af Else Thrane underskrevne anpartsoverdragelsesaftale til advokat Poul Fischer. Af skrivelsen fremgår blandt andet:
». . .
Jeg beder Dem kontakte mig den 1. oktober d.å. med henblik på købesummens overførsel.
Revisor oplyser, at det er muligt, at endelig status ikke kan foreligge den 1. oktober d.å. Er dette tilfældet, foreslår jeg, at købesummen overføres, men således at der deponeres kr. 500.000,- hos mig, indtil endelig status foreligger.
. . .«

Advokat Flemming Johnsen anførte i skrivelse af 26. september 1991 med kopi til Else Thrane følgende til revisor John Dreymann Hansen:
»Advokat Poul Fischer har i går meddelt, at han først ønsker at afregne købesummen, når den endelige status er udarbejdet.
Jeg beder Dem derfor foranledige, at endelig status udarbejdes omgående.
. . .«

Den 30. september 1991 fakturerede Revisionsfirmaet Verner Hansen ApS selskabet for følgende:
». . .

Gennemgang af bogholderiet samt udarbejdelse af momstilsvar for perioden 1/10 1990 - 1/10 1991. Lønafstemning pr. 31/12 1990 samt pr. 1/10 1991. Udfyldelse af forsikringsskemaer og statistikker. Afmeldelse af moms og CIR. Deltagelse i diverse møder og forhandlinger.

Revision og udarbejdelse af internt - og eksternt årsregnskab for perioden 1/7 1990 - 1/10 1991 med tilhørende skattemæssige specifikationer, udarbejdelse af diverse protokollater, gennemgang af regnskab, renskrivning, fotokopiering samt fremsendelse

| | |
|---|---|
| . . . . . | kr. 110.450,00 |
| + 22% moms . . . . . . | kr. 24.299,00 |
| | kr. 134.749,00« |

I selskabets interne regnskab for perioden 1. juli 1990 - 1. oktober 1991 er årets resultat angivet til 4.865.515 kr. I henhold til balancen pr. 1. oktober 1991 bestod selskabets aktiver udelukkende af omsætningsaktiver:

**370**

| »TILGODEHAVENDER: | |
|---|---|
| Renteperiodisering . . . . . . | 5.982 |
| TILGODEHAVENDER IALT . . . . . . | 5.982 |
| LIKVIDE BEHOLDNINGER . . . . . . | 10.871.107 |
| LIKVIDE BEHOLDNINGER IALT . . . . . . | 10.871.107 |
| OMSÆTNINGSAKTIVER IALT . . . . . . | 10.877.089 |
| AKTIVER IALT . . . . . . | 10.877.089« |

Egenkapital og gæld var opført således:

| »EGENKAPITAL: | |
|---|---|
| Anpartskapital . . . . . . | 80.000 |

| 13 | Opskrivningshenlæggelser | 0 |
| | RESERVER: | |
| 14 | Andre reserver . . . . . . | 8.565.993 |
| | EGENKAPITAL IALT . . . . . . | 8.645.993 |
| | HENSÆTTELSER: | |
| 15 | Udskudt skat . . . . . . | 1.375.334 |
| | HENSÆTTELSER IALT . . . . . . | 1.375.334 |
| | LANGFRISTET GÆLD: | |
| | Selskabsskat (skatteåret 1991/92) | 456.722 |
| | LANGFRISTET GÆLD IALT . . . . . . | 456.722 |
| | KORTFRISTET GÆLD: | |
| | Selskabsskat (skatteåret 1991/92) | 399.040 |
| | KORTFRISTET GÆLD IALT . . . . . . | 399.040 |
| | GÆLD IALT . . . . . . | 399.040 |
| | EGENKAPITAL OG GÆLD | 10.877.089« |

Af note 15 til regnskabet fremgår:                         . . .

»UDSKUDT SKAT:                              Beløbet sammensætter sig således:

| Gevundne afskrivninger ejendom | 1.506.397 |
| Henlagt til investeringsfond | 148.000 |
| Skattemæssige merafskrivninger driftsmidler . . . . . . | 1.952.685 |
| Skattemæssige merafskrivninger personvogne . . . . . | 12.221 |
| | 3.619.303 |
| Udskudt skat 38% . . . . . . | 1.375.334« |

Revisionspåtegningen af 7. oktober 1991 fra Revisionsfirmaet Verner Hansen ApS v/revisor John Dreymann Hansen var blank.

Med kopi til revisor John Dreymann Hansen skrev advokat Flemming Johnsen den 8. oktober 1991 således til advokat Poul Fischer:

»Under henvisning til anpartsoverdragelsesaftale af 9. september og 21. september 1991 fremsendes hoslagt intern revisorudfærdiget regnskab for perioden 1/7 - 1/10 1991.«

Under henvisning til overdragelsesaftalen § 2.4. andrager købesummen kr. 8.565.993,00 med tillæg af kr. 1.000.000,00, eller ialt kr. 9.565.993,00. Beløbet bedes overført til Den Danske Bank, Rugårdsvej 244, 5210 Odense NV, att. John Seitzberg.«

De maskinskrevne tal er ifølge et håndskrevet notat af 9. oktober 1991 på skrivelsen ændret til henholdsvis 8.645.993 og 9.645.993. Parterne i sagen er enige om, at ændringen skyldtes, at

anpartskapitalen på 80.000 kr. fejlagtigt ikke var medregnet i skrivelsen.

Samme dag, den 8. oktober 1991, og ligeledes med kopi til revisor John Dreymann Hansen, skrev advokat Flemming Johnsen til Den Danske Bank, att. hr. John Seitzberg:

»Vedr. K. L. Thranes Røgeost, Else Rasmussen Aps.

Hoslagt fremsendes kopi af skrivelse af d.d. til advokat Poul Fischer.

Endvidere vedlægges til orientering kopi af overdragelsesaftale.

Som nævnt telefonisk vil overførslen ske en dag inden kl. 11.00, hvorefter køber forventer, at selskabernes konti overføres til ham samme dag.

Advokat Fischer vil instruere nærmere herom.«

Ved skrivelse af 9. oktober 1991 instruerede advokat Poul Fischer Sparekassen Bikuben (nu: BG Bank A/S) i Skælskør, att. Helle Obling, som følger:

»Vedr.     Centrum Rengøring Sea Service ApS's (u/navneændring til PPOU nr. 37 ApS) køb af K. L. Thranes Røgeost, Else Rasmussen, Odense ApS (u/navneændring til PPOU nr. 44 ApS).

Handlen vedrørende ovennævnte selskab skal på vilkår som i vedlagte kopi af overdragelsesaftale med tillæg gennemføres snarest.

Jeg skal derfor anmode Dem om eventuelt at kontakte John Seitzberg, Den Danske Bank A/S, Rugårdsvej 244, 5210 Odense NV med henblik på gennemførsel af handlen.

Til Deres brug vedlægges kopi af generalforsamlingsprotokollat samt anmeldelse til Erhvervs- og Selskabsstyrelsen.

Jeg skal herefter anmode om, at der oprettes ny konto på det købte selskab, SE nr. 52 82 51 13.

Herefter bedes overført kr. 9.645.993,00 til Den Danske Bank A/S på betingelse af, at vi modtager selskabets midler kr. 10.877.089,00 incl. eventuel investeringsfond.

Endelig skal jeg anmode om at få fremsendt check kr. 900,00 udstedt til Erhvervs- og Selskabsstyrelsen, ligeledes trukket på den nye konto.

Copyright © 2021 Karnov Group Denmark A/S                                        side 5

Når ovenstående transaktioner er gennemført, bedes overført til PPOU nr. 37 ApS's konto kr. 10.500.000.

Er der spørgsmål vedrørende det fremsendte, kontakt mig venligst.«

Dagen efter, den 10. oktober 1991, afholdtes ekstraordinær generalforsamling hos advokat Fischer. Af forhandlingsprotokollen fremgår blandt andet:

»Dagsordenen for generalforsamlingen var følgende:

**371**

1. Valg af dirigent.
2. Ændring af selskabets navn, hjemsted og formål.
3. Ændring af selskabets vedtægter.
4. Valg af direktion.
5. Valg af revisor.

*Ad dagsordenens punkt 1.*

Som dirigent valgtes advokat Poul Fischer . . .

*Ad dagsordenens punkt 2.*

Det besluttedes enstemmigt, at selskabets navn ændres til PPOU nr. 44 ApS, at dets hjemstedsadresse fremtidigt er Fægangen 6, 4220 Korsør, og at formålet ændres i h.t. fremlagte vedtægter.

*Ad dagsordenens punkt 3.*

Nyt udkast til selskabets vedtægter fremlagdes og godkendtes eenstemmigt.

*Ad dagsordenens punkt 4.*

Den hidtidige direktion fratrådte. Som ny direktør ansattes advokat Poul Fischer . . .

*Ad dagsordenens punkt 5.*

Den hidtidige revisor fratrådte. Som selskabets ny revisor valgtes reg. revisor . . .

Generalforsamlingen bemyndigede advokat Poul Fischer til at foretage de ændringer eller tilføjelser, der måtte kræves af Erhvervs- og Selskabsstyrelsen i forbindelse med registreringen . . .«

Anmeldelsen til Erhvervs- og Selskabsstyrelsen, der ifølge det oplyste aldrig blev indsendt, er ligeledes underskrevet af Poul Fischer den 10. oktober 1991.

I overensstemmelse med instruksen skrev Sparekassen Bikuben i Skælskør den 10. oktober 1991 til Den Danske Bank, att. John Seitzbjerg:

»*Centrum Rengøring Sea Service ApS's køb af K. L. Thranes Røgeost, Else Rasmussen, Odense ApS.*

Vi skal hermed meddele Dem, at vi dags dato via Nationalbanken overfører kr. 9.645.993,00 til kredit for konto nr. 3581-093314 reg.nr. 3581 vedrørende ovennævnte.

Beløbet overføres under forudsætning af, at vi modtager indestående på K. L. Thranes Røgeost, Else Rasmussen, Odense ApS's konto kr. 10.815.791,81 via Nationalbankoverførsel, straks efter at De har modtaget købesummen på kr. 9.645.993,00.

De bedes bekræfte ovenstående på vort fax-nr. . . .

Bikubens konto i Nationalbanken er 1500-8.

Med venlig hilsen

Jørgen Thomsen Helle Obling«

Ved påtegning af samme dag - 10. oktober 1991 - bekræftede Den Danske Bank ovennævnte ved 2 underskrifter, hvoraf den ene er John Seitzbergs.

Pengeoverførslerne skete herefter den 10. oktober 1991. Denne dag meddelte Bikuben v/Helle Obling og Jørgen Thomsen således til PPOU nr. 37 ApS v. Poul Fischer, at der fra dette selskabs konto nr. 581.56.30183 i forbindelse med køb af K.L. Thranes Røgeost, Else Rasmussen Odense ApS, nu nyt navn PPOU nr. 44 ApS (konto nr. 581.56.31465), via Nationalbanken var overført 9.645.993,00 kr.

At beløbet 9.645.993,00 kr. var overført fra Bikuben via Nationalbanken til Den Danske Bank, bekræftede Den Danske Bank ved kvittering af 10. oktober 1991 til Else Thrane.

Samme dag blev der hævet 10.815.791,81 kr. fra selskabets konto i Den Danske Bank, hvilket fremgår af en kontoudskrift fra Den Danske Bank vedrørende selskabet og af en kvittering fra Den Danske Bank til selskabet af den 10. september 1991, hvor det tillige meddeltes, at beløbet var overført via Nationalbanken på foranledning af Centrum Rengørings køb af Thranes Røgeost, valør: 10.10 via Danmarks Nationalbank til konto hos Sparekassen Bikuben A/S.

At beløbet var indgået hos Bikuben bekræftede Bikuben ved skrivelse af 10. oktober 1991 til PPOU nr. 44 ApS v. Poul Fischer, ligesom det meddeltes, at beløbet var indsat på dette selskabs konto nr. 581.56.31465. Endvidere oplystes, at investeringsfondskonti ville blive overført senere.

De posteringer, der fandt sted på PPOU nr. 44 ApS' konto nr. 581.56.31465, fremgår af en kontoudskrift af 15. oktober 1991 fra Bikuben:

| »Bogført | Tekst | Valør | |
|---|---|---|---|
| 10.10 | fra sidste udskrift | | 0,00 |
| 10.10 | IFØLGE NOTA | 10.10 | |
| | 10.815.791,81 | | 10.815.791,81 |
| 10.10 | 5815630183 | 10.10 | |
| | 10.500.000,00- | | 315.791,81 |
| 10.10 | GEBYR PPOU 44 APS | 10.10 | |
| | 9.645,99- | | 306.145,82 |
| 11.10 | CHECK ERHVERVS-SEL | 11.10 | |
| | 900,00- | | 305.245,82 |
| 15.10 | NETTORENTE | 15.10 | |
| | 146,44 | | 305.392,26 |
| 15.10 | Udbetaling | 15.10 | |
| | 305.392,26- | | 0,00« |

De 10.500.000 kr., der ifølge denne kontoudskrift blev hævet den 10. oktober 1991, blev ifølge en kvittering fra Bikuben også af den

10. oktober 1991 til PPOU nr. 44 ApS v. Poul Fischer overført til PPOU nr. 37 ApS. Kvitteringen havde følgende tekst:

»Overført til PPOU nr. 37 ApS i forbindelse med køb af ovennævnte selskab, konto nr. 581.56.30183.«

Ligeledes den 10. oktober 1991 meddelte Bikuben PPOU nr. 37 ApS v. Poul Fischer, at banken havde hævet 9.645,99 kr. som gebyr i forbindelse med køb af selskabet.

De posteringer, der fandt sted i omhandlede periode,

**372**

på PPOU nr. 37 ApS' konto nr. 581.56.30183 fremgår af selskabets første kontoudskrift af 15. oktober 1991 fra Bikuben.

| »Bogført | Tekst | | Valør | |
|---|---|---|---|---|
| 04.10 | 5815631252 SIK | | 03.10 | |
| | 62.700,00- | | | 1.203.984,53 |
| 10.10 | IFØLGE NOTA | | 10.10 | |
| | 9.645.993,00 | | | 8.442.008,47 |
| 10.10 | 5815631465 | | 10.10 | |
| | 10.500.000,00 | | | 2.057.991,53 |
| 15.10 | OPG. PPOU NR. 40 A/S | | 16.10 | |
| | 313.437,75 | | | 2.371.429,28 |
| 15.10 | OPG. PPOU NR. 41 ApS | | 16.10 | |
| | 14.509,68 | | | 2.385.938,96 |
| 15.10 | OPG. PPOU NR. 44 ApS | | 16.10 | |
| | 305.392,26 | | | 2.691.331,22 |
| 15.10 | NETTORENTE | | | |
| | 2.920,99 | | | 2.694.252,21 |
| 15.10 | Udbetaling | | 15.10 | |
| | 2.694.242,21- | | | 0,00« |

Vedrørende selskabets investeringsfondsmidler anmodede Bikuben ved skrivelse af 10. oktober 1991 Den Danske Bank v. Jens Seitzberg om at ophæve kontiene, anført til ca. 77.000 kr., og overføre disse til Bikuben uden særskilt kontoangivelse. Ifølge skrivelsen er anmodningen indleveret to Poul Fischer, der ved underskrift af 11. oktober 1991 har bekræftet denne.

Ved check udstedt den 10. oktober 1991 sendte Den Danske Bank investeringsfondsbeløbet, i alt 80.486,89 kr. inkl. renter, til Bikuben, og beløbet indsattes her på en investeringsfondskonto for PPOU nr. 44 ApS i Bikuben - kontonr. 381.37.02918.

Den 15. oktober 1991 opgjordes, som det fremgår af ovennævnte kontoudskrift vedrørende PPOU nr. 44 ApS, selskabets konto, og restbeløbet 305.392,26 kr. overførtes til køberselskabets konto. Dette bekræftede Bikuben ved kvittering af den 15. oktober 1991 til PPOU nr. 37 ApS ved Poul Fischer.

Samme dag blev køberselskabet ifølge en fondsnota underskrevet af Poul Fischer solgt til ApS af 1.9.1991 nr. 1 til en pris af 175.000 kr.

Ifølge udskrift af forhandlingsprotokollen for selskabet afholdtes der den 15. oktober 1991 ekstraordinær generalforsamling, hvor det blandt andet besluttedes at ændre selskabets navn til ApS af 1.9.1991 nr. 6. Samtidig ændredes selskabets adresse, og der foretoges ændringer af direktion og revision. Som ny direktør valgtes Carsten Bruun Jespersen. Protokollatet er underskrevet af Poul Fischer som dirigent. Ændringen blev anmeldt og registreret hos Erhvervs- og Selskabsstyrelsen.

Ved en fondsnota af 21. oktober 1991 blev selskabet på ny handlet, hvilket også blev anmeldt til styrelsen.

Ifølge udskrift af forhandlingsprotokollen for selskabet afholdtes der ekstraordinær generalforsamling den 21. oktober 1991, hvor Jan Preben Kristiansen blev valgt som ny direktør.

Den 21. oktober 1991 skrev advokat Poul Fischer følgende til Bikuben, att. Helle Obling:

»Herved skal vi meddele, at anparterne i ovennævnte selskab er videresolgt.

I den anledning bedes kontohaver på konto 581-37-02918 (investeringsfond) ændret til »ApS af 1.9.1991 nr. 6« jfr. vedlagte kopi af anmeldelse til Erhvervs- og Selskabsstyrelsen.

Selskabet tegnes af Carsten Bruun Jespersen.

. . .

P.S. Bikuben har »PPOU nr. 44 ApS« som kontohaver, men p.g.a. hurtig omsætning af anparterne, blev anmeldelsen aldrig indsendt til Erhvervs- og Selskabsstyrelsen, hvorfor navnet ikke blev »brugt«.«

I henhold til sædvanlig anmeldelse om anskaffelse af aktiver i forbindelse med hævning på investeringsfondskonto underskrevet den 21. oktober 1991 af Jan Preben Kristiansen blev selskabets investeringsfondskonto hos Bikuben opgjort og beløbet kr. 80.803,25 inkl. renter hævet den 8. november 1991. Af anmeldelsen fremgik, at der skulle anskaffes edb og kommunikationsudstyr, der skulle leveres/ibrugtages den 21. oktober 1991, og at anskaffelsessummen udgjorde 200.000 kr. Samtidig med anmeldelsen blev sålydende erklæring underskrevet:

»For så vidt angår driftsmidler, der kan benyttes både erhvervsmæssigt og privat, erklærer jeg, at det/de anskaffede driftsmidler alene vil blive benyttet erhvervsmæssigt.

Samtlige oplysninger afgives under strafansvar efter lov om investeringsfond § 11, stk. 1.«

I forbindelse med politimæssige undersøgelser af Jan Preben Kristiansens forhold oplyste Bikuben, at investeringsfondsbeløbet blev overført til en konto tilhørende et andet selskab v. Jan Kristiansen.

Beløbet er ifølge Told og Skat hævet uberettiget, og 85.100 kr., der er indeholdt i påstandsbeløbet, er efterbeskatning af investeringsfondsmidler.

Den 24. oktober 1991 sendte advokat Flemming Johnsen en opgørelse på 12.000 kr. til fru Thrane for juridisk assistance i forbindelse med overdragelse af anparterne.

Ved skrivelse af 12. november 1991 til advokat Poul Fischer videresendte advokat Flemming Johnsen selskabets skatteopgørelse af 2. oktober 1991 for skatteåret 91/92 - med kopi til selskabets revisor - med giroindbetalingskort stort 403.040 kr. Sidste rettidige indbetalingsdato var den 20. november 1991. Skatten blev ikke betalt rettidigt. Advokat Poul Fischer skrev således den 20. januar 1992 til revisor John Dreymann Hansen.

### 373

»*Vedr. K. L. Thranes Røgeost, Else Ramussen Odense Aps.*

Vedlagt fremsendes efter aftale i check kr. 28.640,00 til dækning af momstilgodehavende, der er tilstillet de nye ejere af selskabet direkte fra toldvæsenet pr. 26.11.1991.

Jeg beklager dybt det passerede, og vil gøre alt, hvad der står i min magt til at få betalt den skyldige selskabsskat snarest.«

Ved erklæring af 11. februar 1992, underskrevet af Carsten Bruun Jespersen, indestod denne for betaling af den skyldige skat.

»Undertegnede Carsten Bruun Jespersen, . . . indestår herved personligt for betaling af selskabsskatten 1991/92 vedrørende K. L. Thranes Røgeost, Else Rasmussen ApS kr. 403.040 incl. morarenter og gebyrer m.v. mod at Finansieringsselskabet af 1.7.1980 ApS i likv. refunderer af tidligere erlagt købesum kr. 140.000,00 med fradrag af et direkte fra Toldvæsenet til selskabet tilbagebetalt momsbeløb kr. 28.137,00.

Beløbet kr. 111.863,00 vil være at betale, når nærværende erklæring foreligger i underskrevet stand.«

Ved skrivelse af 12. februar 1992 til Carsten Bruun Jespersen fremsendte advokat Poul Fischer det krævede beløb med fradrag af diverse omkostninger, og skatten kr. 403.040 blev herefter betalt af Carsten Bruun Jespersen den 18. februar 1992.

Senere er selskabet solgt flere gange.

Den 1. juli 1992 skulle selskabet have indleveret selvangivelse vedrørende skatteåret 92/93. Da dette ikke skete, foretog Kolding Kommunes skatteforvaltning en skønsmæssig ansættelse af selskabets skattepligtige indkomst til 1.000.000 kr., hvilket meddeltes selskabet ved skrivelse af 30. september 1992. Skatten blev heller ikke betalt til forfaldstid den 20. oktober 1992, hvorfor Told og Skat den 12. marts 1993 og 7. april 1993 sendte en udlægstilsigelse til hhv. selskabet og selskabets direktør Lene Bløes.

Den 11. september 1992 meddelte Erhvervs- og Selskabsstyrelsen selskabet, at dette ville blive tvangsopløst, medmindre årsregnskabet for perioden 1. juli 1990 - 31.december 1991 indsendtes inden 4 uger. Regnskabet indgik ikke, hvorfor Erhvervs- og Selskabsstyrelsen ved skrivelse af 23. marts 1993 anmodede skifteretten om at tvangsopløse selskabet. Den 11. august 1993 blev selskabet taget under likvidation af Sø- og Handelsrettens skifteafdeling, og efter likvidators begæring blev selskabet i likvidation taget under konkursbehandling den 29. juni 1994.

Ved skrivelse af hhv. 19. april 1994 og 30. november 1994 rettede skattemyndighederne henvendelse til Else Thrane og anmodede om til brug for ligningen af selskabet og Else Thrane personlig at få tilsendt diverse dokumenter vedrørende salget af selskabet.

Efter en ransagning hos Poul Fischer i maj/juni 1994 udarbejdede politiet og Told og Skat nogle skemaer med forskellige oplysninger om salget, herunder købesummen og den betalte overkurs. Skemaerne blev senere forelagt Poul Fischer, der underskrev dem den 27. juni 1994.

Ved skrivelse af 4. september 1996 rejste Skatteministeriet erstatningskrav for skattevæsenets tab over for Else Thrane.

Den 23. marts 1998 blev der på en anden kurators begæring vedrørende et andet bo afholdt subsidiær vidneafhøring ved skifteretten i Korsør af blandt andre Helle Obling og Jan Milvertz. Af retsbogen fremgår:

»Vidnet Helle Obling har . . . behørigt formanet forklaret, at hun blev ansat i BG Bank, der dengang hed Bikuben, i 1987 i Korsørafdelingen. Fra september 1989 og indtil den 1. januar 1998, hvor hun fratrådte, var vidnet ansat i Skælskør-afdelingen. Vidnet var ansat som assistent/kunderådgiver. Vidnet er bankuddannet. Vedrørende . . . har vidnet forklaret, at selskabet blev kunde i BG Bank, og at vidnet var bekendt med, at Poul Fischer og Orla Rasmussen havde med selskabet at gøre. Vidnet hørte første gang om selskabet i begyndelsen af 1990'erne. Vidnet har formidlet pengeoverførsler for selskabet. Ekspeditionsgangen var den, at banken fik brev fra Poul Fischer med anmodning om pengeoverførsel. Nogle bevillinger skulle på grund af størrelsen godkendes i hovedkontoret i København. Med hensyn til kontonr. . . . har vidnet forklaret, at der er tale om en særlig checkkonto, og dette er ensbetydende med, at der var en indlånskonto udover det sædvanlige. Der var ikke knyttet kreditfaciliteter til denne konto. Vidnet mener ikke, at selskabet havde andre konti i BG Bank, Skælskør-afdelingen. Vidnet mener således ikke, at selskabet havde en kassekredit. På den nævnte konto kunne selskabet overtrække. Der var tale om individuelle aftaler herom, og kontoen kørte som en almindelig konto. Vidnet kunne ikke selv bevillige overtræk større end 150.000,- kr. i engagement. Foreholdt, at på kontoen var en saldo, der til tider var negativ med flere mio. kr., har vidnet forklaret, at vidnet ikke kunne godkende denne debitering. Skælskør-afdelingen kunne i det hele taget kun give bevillinger på fra starten 2 mio. kr., og dette blev senere sat ned til 1 mio. kr. Det var kreditchefen eller direktøren, som kunne give sådanne bevillinger. I starten var Niels Brandt Jakobsen direktør og Jan Milvertz var souschef. Senere blev Troels H. Nielsen direktør og Søren Andersen souschef. Foreholdt, at den ovenfor nævnte konto havde en debetsaldo på flere mio. kr., har vidnet forklaret, at dette skulle godkendes centralt. Ekspeditionsgangen var den, at Poul Fischer som ovenfor forklaret sendte en anmodning om overførsel, og brevet fra Poul Fischer eller et tilsvarende brev fra Skælskørafdelingen kunne derefter faxes eller sendes til

### 374

hovedkontoret med anmodning om godkendelse. Med hensyn til spørgsmålet om bankens risiko har vidnet forklaret, at man dengang opfattede det således, at der blot var tale om en udveksling af penge, idet pengene nom til igen næsten med det samme. Vidnet havde den praktiske kontakt med Poul Fischer og dennes sekretær Yvonne Ejlertsen. Engagementet kørte af sig selv pr. telefon og breve og med et par møder årligt. Enkelte gange har vidnet talt med Orla Rasmussen, men vidnet husker ikke, om det var vedrørende selskabet af 18/3 1992. For det meste havde vidnet kun kontakt med Yvonne. Sammen med hver enkelt anmodning om overførsel fra Poul Fischer fulgte tegningsudskrift og generalforsamlingsprotokollat, således at der for banken forelå en bemyndigelse for Poul Fischer til at disponere. Dette var en fast procedure. Forevist et brev af 27. januar 1993 og et generalforsamlingsprotokollat af 5. februar 1993 har vidnet forklaret, at hun ikke har hæftet sig ved, at datoen for generalforsamlingsprotokollatet lå efter anmodningen fra Poul Fischer. Med hensyn til investeringsfondskonti har vidnet forklaret, at banken altid fik en anmeldelse om anskaffelse af aktiver fra Poul Fischer. Med hensyn til bankens gebyrer har vidnet forklaret, at der var tale om en fast procentsats af det overførte beløb. Procentsatsen var i promille. Foreholdt, at der i løbet af efteråret 1992 eller foråret 1993 blev rørt omkring Poul Fischer, har vidnet forklaret, at hun husker et møde, men at hun ikke husker præcist hvornår. Der var nok tale om påsken 1993. Søren Andersen ringede

til hovedkontorets kreditafdeling for at høre, hvordan Skælskør-afdelingen skulle forholde sig. Derefter blev der ikke længere bevilget kredit til selskabet. Selve ekspeditionsgangen forblev uændret. Engagementet med selskabet ophørte i løbet af 1993.

Som vidne fremstod Jan Milvertz, . . ., der blev pålagt at afgive forklaring under vidneansvar. Vidnet har herefter behørigt formanet forklaret, at han fratrådte som souschef i BG Bank, Skælskør-afdelingen, i slutningen af 1991. På det tidspunkt var Niels Brandt Jakobsen direktør. Vidnet husker at have haft med Poul Fischers selskaber at gøre. Vidnet husker imidlertid ikke den første kontakt med Poul Fischer. Oprindelig var Poul Fischer kunde i Den Danske Bank, Korsør. Vidnet havde nok møder med Poul Fischer i starten, men husker det ikke. Vidnet husker, at Poul Fischer havde opkøbt et selskab med dårlige debitorer. Foreholdt en overførselsanmodning fra Poul Fischer har vidnet forklaret, at vidnet fik skriftlig instruktioner fra Poul Fischer om den enkelte transaktion. Vidnet har deltaget i møder med Poul Fischer, men ikke med Orla Rasmussen. Vidnet husker ikke, hvornår møderne fandt sted. Vidnet husker ikke, om han ved starten af engagementet fik skriftligt materiale fra Poul Fischer. Vidnet vil tro, at man ved de enkelte transaktioner fik udleveret regnskaber m.v. Vidnet huskere at var på et selskab PPOU. Med hensyn til den særlige checkkonto, der er omtalt af de forrige vidner, har vidnet forklaret, at handlerne med selskaber blev godkendt af kreditafdelingen, hvis prisen for selskabet var over 1,5 mio. kr. Der var tale om betalingsformidling. Vidnet forestiller sig, at man vedrørende de enkelte handler fik regnskaber, som blev indsendt til kreditafdelingen. Vidnet husker det imidlertid ikke nøjere. Det var mest vidnet, som havde kontakt med Poul Fischer. Helle Obling stod for det praktiske. Direktøren i afdelingen vidste, hvad der foregik. Det var vidnet, som var ansvarlig for engagementet med Poul Fischer. Vidnet kendte ikke Poul Fischer i forvejen, men havde mødt ham i Korsør. Vidnet husker det ikke, men det er sandsynligt, at vidnet oprettede checkkontoen. Vidnet husker ikke, om han har lavet indstillinger til kreditafdelingen, idet vidnet kan have uddelegeret kompetencen hertil. Det er højst sandsynligt, at vidnet har haft møder med Poul Fischer, men han husker det ikke. Vidnet overvejede dengang ikke, om engagementet var lovligt. Det var kun Poul Fischer, som gav banken instruktioner. Vidnet har på et tidspunkt mødt Orla Rasmussen, men husker ikke hvornår. Orla Rasmussen må have været med til møder i banken. Med hensyn til et selskab ved navn . . . har vidnet forklaret, at det var Orla Rasmussens selskab. Vidnet husker ikke nærmere om dette selskab. Med hensyn til faste rutiner vedrørende bilagsmateriale, der kunne være referater, regnskaber og overdragelsesaftaler, har vidnet forklaret, at Poul Fischer på forhånd havde erfaringer med disse faste rutiner, og det er muligt, at vidnet fik rutinerne godkendt i hovedkontoret. Niels Brandt Jakobsen var ikke med til møder med Poul Fischer, men blev orienteret om engagementet. Vidnet har præciseret sin forklaring, således at han nu husker, at der ved oprettelsen af engagementet med det selskab, der er omhandlet under sagen, blev indsendt regnskaber til kreditafdelingen. Ved de enkelte handler med selskaber kunne indstillinger indsendes til kreditafdelingen. Med disse indstillinger mener vidnet ikke, at der fulgte regnskaber for de pågældende selskaber.«

*Forklaringer:*

Der er under sagen afgivet forklaringer af Else Thrane, John Dreymann Hansen, Flemming Johnsen, Helle Obling og John Seitzberg.

*Else Thrane* har forklaret, at antallet af ansatte i virksomheden svingede med årstiden. I højsæsonen om sommeren var der 35-40 ansatte. Hun lærte ved hjælp af virksomhedens tidligere revisor at bogføre virksomhedens regnskaber. Hendes mand tog sig af alt vedrørende produktionen. Ved hans død i 1989 var deres søn Kent og en medarbejder, der tog sig af regnskaberne, allerede velintegreret i virksomheden. De skulle

**375**

overtage virksomheden, men først når hun fandt tidspunktet belejligt. Det blev april måned 1991. Da april og de følgende par måneder er virksomhedens højsæson, sikrede hun ved at vælge dette overtagelsestidspunkt de nye ejere en god start. Revisor John Dreymann Hansen gjorde hende opmærksom på, at anparterne, som hun, efter at virksomheden var solgt, havde ment var værdiløse, kunne sælges. Revisoren ville finde en køber. Efter nogle måneder blev hun ringet op af advokat Johnsen, der havde drøftet sagen med revisoren, og han oplyste, at man havde fundet en køber, advokat Poul Fischer, Korsør. Johnsen sagde, »jeg ved ikke, om jeg er idiot, eller nogen andre er det, men du kan få 1 mio. kr. for anparterne«. Hun beskæftigede sig ikke med den efterfølgende praktiske løsning af sagen. Hun stolede på sine rådgivere. Hun husker ikke årsagen til omlægninger af regnskabsåret. Hun fulgte de råd, revisoren gav. Såvel advokat Johnsen som revisor Dreymann havde hun benyttet i mange år og havde ubetinget tillid til deres anbefalinger.

*John Dreymann Hansen* har forklaret, at han har været revisor i 32 år. Han blev revisor for Else Thrane i slutningen af 1980'erne. Det var oprindeligt planen at likvidere selskabet solvent. Han så i Erhvervsbladet en annonce fra advokat Poul Fischer, der ønskede at købe overskudsselskaber. Han havde ikke da tidligere afhændet overskudsselskaber. Han kontaktede Poul Fischer og fik oplyst, at man ville betale en overkurs for skatten. Fischer ville købe afskrivningsberettigede driftsmidler og udlease disse og således neutralisere skatten. Han fik ikke nærmere oplyst, hvad der var, Poul Fischer ville investere i. Han forelagde oplysningerne for Else Thrane og tog samtidig kontakt til advokat Johnsen. Else Thrane sagde, at hvis det var lovligt, ville hun da gerne have mere ud af det. Han forklarede hende også, at man kunne spare likvidationsomkostninger. Else Thrane stolede blindt på ham og advokat Johnsen.

Han mente, at Poul Fischers projekt lød rimeligt, og at advokaten - som han stolede på - legalt kunne udnytte overskudsselskabet fornuftigt. Advokat Johnsen blev overrasket, da han fortalte ham om mulighederne, og han havde åbenbart ikke hørt om noget sådant tidligere.

Poul Fischer sagde, at regnskabet skulle omlægges, således at han kunne nå at foretage de nødvendige investeringer. Fischer bad ham sørge for det. Han drøftede ikke dette spørgsmål med advokat Johnsen. Tilladelsen til omlægning blev givet uden bemærkninger fra skattevæsenet. Advokat Johnsen overtog sagen, da han fra Fischer modtog den blanke overdragelseskontrakt.

På advokat Johnsens anmodning udarbejdede han den 5. september 1991 en foreløbig opgørelse af selskabets værdier. Den 7. oktober 1991 udarbejdede han på advokat Johnsens anmodning perioderegnskab, der udviste de endelige værdier på salgstidspunktet.

Skatten 1991/92, 399.040 kr., var allerede pålignet og kunne ikke neutraliseres. Den indgik derfor ikke ved beregningen af overkursen. De 456.722 kr. vedrørende skat af driftsåret 1990-1991 og den udskudte skat 1.375.334 kr. kunne eventuelt neutraliseres ved investeringer.

Han har muligt set anpartsoverdragelsesaftalen, før denne blev endeligt indgået, men han havde ingen bemærkninger til aftalen. Han har ikke på nogen måde været involveret i de pengeoverførsler, der herefter fandt sted.

Han hørte først til sagen på ny i januar 1992 i forbindelse med et momsbeløb på 28.640 kr., som Else Thrane skulle have fra Poul Fischer. Selskabet havde ved andragelse af virksomheden til sønnen

og dennes medejer et momstilgodehavende, og Else Thrane havde accepteret at lade et tilsvarende beløb stå i virksomheden, mod at beløbet skulle tilfalde hende, når det blev udbetalt. Beløbet blev imidlertid fra Told og Skat udbetalt til Poul Fischer. Han ringede til Fischer og forstod på samtalen, at selskabet var blevet videresolgt. Han spekulerede ikke da over, at problemerne med momsbeløbet viste, at der ikke var foretaget navneændring af selskabet. Beløbet på 28.640 kr. modtog han med Fischers brev af 20. januar 1992. Han kontaktede da ny Poul Fischer, da Else Thrane af skattevæsenet blev rykket for skattebeløbet på 399.040 kr. Han sagde da til Fischer, at hvis det ikke blev ordnet omgående, ville han indklage Fischer for Advokatrådet. Han var da begyndt at blive lidt urolig, og Else Thrane var helt ude af den på grund af rykkeren. De omhandlede forhold blev imidlertid bragt i orden.

Han hørte herefter først til sagen, da skattevæsenet begyndte at interessere sig for den i slutningen af 1994.

Hans honoraropgørelse til selskabet dateret 30. september 1991 omfatter også løbende kvartalsvise besøg på virksomheden til opgørelse af momsregnskaber samt arbejdet med generationsskiftet. Arbejdet i forbindelse med anpartssalget og drøftelsen med Else Thrane herom er ikke med på fakturaen. Det var et arbejde, der skulle være betalt af fru Else Thrane selv, men som var af beskeden omfang. Det var en af hans medarbejdere, Dorthe Svendsen, der gjorde opmærksom på, at anpartskapitalen på 80.000 kr. manglede ved opgørelsen af købesummen i den kontrakt, advokat Johnsen havde sendt ham.

Det var normalt ham, der forestod generalforsamlingerne. Han havde tidligere drøftet anpartshaverlån med Else Thrane, idet der havde været enkelte tilfælde af ulovlige lån i selskabet. Når man overdrog virksomheden og ikke anparterne til de to nye ejere, var det for at muliggøre, at de kunne få afskrivning på investeringer

**376**

og fradrag for renter på lån, de havde optaget i forbindelse med erhvervelsen af virksomheden. De havde også selv investeringsfondskonti, der skulle udnyttes.

En solvent likvidation ville skattemæssigt have stillet Else Thrane på samme måde som den foretagne disposition. Verner Hansen ApS, hvor han er ansat, har i alt medvirket ved tre salg af overskudsselskaber, hvoraf han har forestået de to.

*Flemming Johnsen* har forklaret, at han har været familien Thranes advokat siden midten af 1970'erne. Efter K.L. Thranes død i 1989 blev det klart, at Else Thranes søn skulle overtage virksomheden sammen med en medinteressent, der var ansat i virksomheden. Købet skulle ske kontant for at sikre Else Thrane. Aktiverne blev overdraget til interessentskab, fordi køberne skulle sikres mulighed for at afskrive på aktiverne og hermed lette tilbagebetalingen af de penge, de lånte til køb af virksomheden. Else Thrane kunne ikke som anpartsejer få arbejdsløshedsdagpenge fra DANA. Tanken om salg af anparterne opstod muligt som følge heraf.

I juni 1991 fik han oplyst, at advokat Poul Fischer muligt ville købe virksomheden. Senere på måneden blev han telefonisk kontaktet af Poul Fischer og noterede under samtalen »skattehensættelser – 50%«. Han blev den 13. august 1991 via sin sekretær orienteret om, at revisoren havde ringet om en omlægning af regnskabsåret, og at revisoren selv ville foretage det fornødne. Sekretæren havde endvidere noteret, at det vist var en advokat i Korsør, der ville give mest.

Revisoren modtog kopi af Poul Fishers tilbud af 9. september 1991 og havde ingen bemærkninger hertil. Herefter blev aftalen underskrevet af Else Thrane og videreekspederet til Poul Fischer. Der var ingen forhandlinger om indholdet af aftalen, der i øvrigt så helt normal ud. Han fandt ikke § 5.2 i overdragelsesaftalen påfaldende. Der var tale om et selskab med store midler, og der

kunne være tale om, at man ville opnå forretningsfordele ved bedre placering af midlerne. Han var bekendt med forbudet mod selvfinansiering, og § 5.2 gav ingen anledning til mistanke herom. Han drøftede ikke med Poul Fischer, hvorledes denne ville anvende selskabet. Han havde ikke i sagens anledning møder med Else Thrane, revisor eller Den Danske Bank. Han vidste, hvem Poul Fischer var fra dennes tid som advokatfuldmægtig i Odense, og havde altid et helt ordentligt indtryk af ham.

Nærværende sag er den første af sin art, han har været involveret i. Han har yderligere medvirket ved tre salg af overskudsvirksomheder, herunder et med Poul Fischer som køber. Han var ikke i tvivl om, at Poul Fischer købte selskabet med henblik på videresalg.

Han har undervist i skatteret på Aarhus og Odense Universiteter og på revisor- og advokatfuldmægtiguddannelsen.

Overkursen på den skyldige skat overraskede ham ikke. De dagældende skattegodtgørelsesregler blev dengang udnyttet lovligt af mange selskaber, der derfor havde interesse i at erhverve overskudsselskaber. Han var også bekendt med mulighederne for udskydelse eller eliminering af skat ved hjælp af investeringer i afskrivningsberettigede goder, der derefter kunne udleases under udnyttelse af dobbeltbeskatningsoverenskomster.

Poul Fischers instruks af 9. oktober 1991 til Bikuben så han først, da kurator rettede henvendelse til ham i 1995. Han var ikke i kontakt med Bikuben i forbindelse med pengeoverførslerne, og han havde ikke noget at gøre med den efterfølgende generalforsamling. Han kontrollerede ikke, om ændringerne blev registreret, idet han gik ud fra, at en advokat ordnede forholdene behørigt.

Sagen sluttede for hans vedkommende med ekspeditionen den 12. november 1991 af skattebetalingen af 403.040 kr., der var helt rutinemæssig.

Else Thrane har stolet et hundrede procent på sine rådgivere og måtte forlade sig på, at han anbefalede hende accepteringen af den købsaftale, han med Poul Fischer. Personligt har han på intet tidspunkt anet, at han handlede med personer, der ville foretage uregelmæssigheder.

Han har alene interesseret sig for, hvorledes sælger fik sine penge, og han undersøgte ikke, hvorledes Poul Fischer finansierede købet.

*Helle Obling* har forklaret, at hun er kunderådgiver i BG Bank i Slagelse. Hun blev ansat i Bikubens Skælskør-afdeling september 1989. Hun var fra 1990 den første i afdelingen, der forestod de praktiske transaktioner i forbindelse med Poul Fischers selskabshandler. Der var senere også andre ansatte, der arbejdede hermed. Det var ugentligt, Fischer havde den form for forretninger. Brevet af 9. oktober 1991 fra Poul Fischer er karakteristisk for en lang række lignende skrivelser fra ham. Hun kontaktede det købte selskabs hidtidige bank og oprettede derefter ny konto for selskabet. Det skete regelmæssigt i form af budgetkonti, fordi man med Poul Fischer havde aftalt en højere rente end den sædvanlige, og denne aftale på en enkel måde kunne opfyldes ved at bruge budgetkontoformen. Brevet af 10. oktober 1991 til Den Danske Bank var en opfølgning af den instruks, Poul Fischer gav i brevet af 9. oktober 1991. Forinden havde hun været i telefonisk kontakt med John Seitzberg, Den Danske Bank. Dokumentationen i denne sag vedrørende det videre forløb er helt i overensstemmelse med sædvanlig praksis for disse ekspeditioner. Gebyret var særligt aftalt med Poul Fischer.

Det var i disse handler sædvanligt, at der efterfølgende skete overførsel af investeringsfondsmidler. Kontoen blev i Bikuben oprettet på samme vilkår, som de havde været i den tidligere bank, da der jo var tale om bundne

**377**

midler. Frigivelsen af midlerne forudsatte, at man modtog den særlige anmeldelsesblanket og kontrollerede, at denne var korrekt

udfyldt. Banken har ikke pligt til at kontrollere, at investeringerne faktisk er foretaget.

Vidnet kendte ikke dengang til selskabslovgivningens regler om aktionærlån og selvfinansiering. Hun har altid taget for givet, at materialet og instruktionerne fra Poul Fischer, der jo var advokat, var korrekte og lovlige. Kontoudskriften af 15. oktober 1991 vedrører en nyoprettet konto. Der var ikke knyttet kreditfaciliteter til denne. Poul Fischer havde en generel bevilling på 10 mio. kr. i Skælskør og på 10 mio. i Århus, der gav ham en samlet bevilling på 20 mio. kr. Hun husker ikke, om der på det tidspunkt, hvor nærværende sag blev behandlet, var givet den nævnte bevilling. Men det var alligevel således, at langt de fleste af Fischers transaktioner, inden de blev effektueret, blev forelagt hovedsædet til godkendelse. Forelæggelsen blev altid foretaget af direktionen eller souschefen, aldrig af hende selv. Hun foretog kun de praktiske foranstaltninger. Hun ved ikke, om Poul Fischer havde stillet sikkerhed for sine engagementer. Hun ved heller ikke, hvorfor de 10,5 mio. kr. blev overført til PPOU 37. Hun har ikke været med til at drøfte internt, om der var tale om kreditgivning eller pengeoverførsler. Teksten på overførselsmeddelelsen af 10. oktober 1991 vedrørende de 10,5 mio. kr. var en standardtekst.

Vidnet har ikke talt med andre på sælgers side end sælgers bank. Hun ved ikke, hvorfor Poul Fischer benyttede Skælskør-afdelingen. Der var også en Bikuben-afdeling i Korsør.

Vidnet betragtede det, der foregik, alene som pengeoverførsler. Hun har ikke tænkt over, om man ikke i stedet blot kunne overføre differencebeløbene. Vidnet har ikke rådgivet nogen kunder om at foretage lignende handler, og hun har ikke fra hovedsædet, herunder Preben Berthelsen, modtaget nogen særlig instruks eller vejledning om disse transaktioner.

Foreholdt anmeldelsesblanketten om investeringsfondsmidler og selskabets konto forklarer vidnet, at hun ikke har overvejet, om der på tidspunktet for frigivelsen af investeringsfondsmidlerne var midler i selskabet til drift.

Hverken skattevæsenet eller politiet har i hendes ansættelsestid rettet henvendelse til Skælskør-afdelingen vedrørende Poul Fischer.

Ved behandling af Poul Fischers sager var afdelingens direktør og souschef altid med. Det var ledelsen, der om nødvendigt kontaktede hovedsædet. Svaret blev sendt til hendes chefer, der derefter gav hende besked om at arbejde videre med sagen.

John Seitzberg har forklaret, at han er fuldmægtig i Den Danske Bank i Odense, hvor han har været ansat i 19 år. Han var Else Thranes personlige bankkontakt, mens det var bestyreren, der tog sig af selskabets forhold.

Forud for modtagelsen af advokat Johnsens brev af 8. oktober 1991 havde Else Thrane forklaret, at selskabet skulle sælges. De nærmere vilkår blev ikke drøftet. Der var ikke i sagens anledning møder eller drøftelser med advokat Johnsen eller Else Thrane. Han havde en telefonisk drøftelse med Helle Obling fra Bikuben. Den Danske Bank skulle i første omgang modtage pengene til Else Thrane. Derefter blev selskabets indlånskonto opgjort og overført til Bikuben via Nationalbanken. Af tekniske grunde var det nødvendigt at oprette en ny indlånskonto for selskabet den 10. oktober 1991. Efter gennemførelsen af transaktionerne havde han ikke mere med selskabet at gøre.

Else Thrane har altid i forbindelse med lidt større transaktioner rådført sig med både bank, advokat og revisor.

Det foreliggende tilfælde er det eneste af sin art, han har været ude for.

*Procedure:*

*Selskabet,* ApS af 1.9.1991 nr. 6 under konkurs, har i det væsentlige procederet i overensstemmelse med sine

hovedanbringender i påstandsdokument af 6. oktober 1998, hvori det blandt andet hedder:

»De sagsøgte er efter dansk rets almindelige erstatningsregel ansvarlige for det tab, som skattevæsenet - og i dettes sted det sagsøgende konkursbo - har lidt ved, at selskabet ikke kan betale sine skatter.

*Overfor sagsøgte 1:*

Sagsøgte 1 tilsidesatte ved salget af selskabet på uforsvarlig måde skattevæsenets interesser.

Om begrundelsen herfor henvises til Højesterets dom i Satairsagen og Østre Landsrets dom af 25. juni 1998 i Klercke-sagen. Med henblik på de i nærværende sag foreliggende omstændigheder fremhæves:

Ansvaret skal bedømmes efter dansk rets almindelige erstatningsregel, jf. herved anpartsselskabslovens § 110. Da sagsøgte 1 var direktør, er dennes ansvar for så vidt direkte omfattet af § 110, men hæftelsen efter dansk rets almindelige erstatningsregel følger i øvrigt også af, at sagsøgte 1 udøvede den faktiske ledelse af selskabet.

Sagsøgte 1 hæfter tillige for sine rådgiveres fejl.

Det uforsvarlige forhold består i, at sagsøgte 1 foretog samtidig udveksling af selskabets meget betydelige pengebeholdning med købesummen for selskabet uden at foretage nogen form for undersøgelse af købers forhold eller af, hvad køber ville benytte overskudsselskabet til. Herved tilsidesatte sagsøgte 1 den særlige omsorgspligt, som allerede som følge af risikoen for selvfinansiering påhvilede denne overfor selskabets kreditorer og ganske særligt overfor skattevæsenet, som var tvangskreditor for betydelige beløb, og som herved blev udsat for betydelig risiko for tab (selvfinansieringssynspunktet).

## 378

I hvert fald tilsidesatte sagsøgte 1 den særlige omsorgspligt overfor skattevæsenet, som - sammenholdt med ovenstående - fulgte af, *at* forretningsmæssig aktivitet var trukket ud af selskabet inden salget og hvis eneste aktiv var en pengebeholdning - ikke var nogen normal forretningsmæssig disposition, *og at* sagsøgte 1 opnåede en betydelig merpris på kr. 1.000.000,- i forhold til, hvad der ville komme til udbetaling ved en likvidation af selskabet (det bredere ansvarssynspunkt).

Merprisen kunne ikke være begrundet i sparede omkostninger for køberen. Sagsøgte 1 gjorde ikke noget reelt for at afværge skattevæsenets risiko.

Skattevæsenets tab er forårsaget ved, at selskabet, som før overdragelsen havde rigelige midler til betaling af skyldige og latente skatter, efter overdragelsen var tømt for midler og dermed ude af stand til at betale det skyldige skattetilsvar.

*Overfor sagsøgte 2:*

Overførslen af beløbet på kr. 10.500.000,- fra selskabet til køberen skete i forbindelse med selskabshandlen, og var en overtrædelse af forbuddet i anpartsselskabslovens § 84, stk. 2.

Sagsøgte 2 vidste eller burde have vidst, *at* banken medvirkede ved køb af et selskab, *at* det var købesummen for selskabet, som banken bistod køber med at finansiere, *og at* det beløb, som banken samtidig med betaling af købesummen modtog fra sælgers bank var selskabets midler.

Sagsøgte 2 indså eller burde på denne baggrund have indset, at banken medvirkede til overtrædelse af selvfinansieringsforbudet i anpartsselskabslovens § 84, stk. 2. Herved tilsidesatte sagsøgte 2 bankens almindelige forpligtelse overfor selskabets kreditorer - herunder skattevæsenet - til at sikre, at man ikke medvirkede til overtrædelse af selvfinansieringsforbudet. Samtidig overtrådte sagsøgte 2 endvidere generalklausulen i bank- og sparekasselovens § 1, stk. 6.

Sagsøgte 2 havde ikke noget grundlag for at mene, at udbetalingen af selskabets midler til køber var andet end det den fremtrådte som; nemlig en overtrædelse af selvfinansieringsforbudet. Bevisbyrden for, at dette måtte have været tilfældet, påhviler i givet fald sagsøgte 2.

Skattevæsenets tab er forårsaget af, at selskabet - der før overtrædelsen af selvfinansieringsforbudet havde rigelige midler til betaling af skyldige og latente skatter - ved den ulovlige udbetaling af selskabets midler til køberen blev ude af stand til at betale selskabets skyldige skatter.

*Overfor begge de sagsøgte:*

Tabet udgøres af de skatter, som påhviler det tømte overskudsselskab i alt kr. 1.860.916, -. Skatterne svarer i princippet til de skatter, som var afsat i regnskabet pr. 1. oktober 1991. Der er således tale dels om skyldig skat for skatteåret 1992/93 på kr. 1.775.816,-, dels om efterbeskatning af investeringsfondshenlæggelser for skatteåret 1990/91 på kr. 85.100,-.

Hele tabet - herunder også tabet vedrørende efterbeskatning af investeringsfondshenlæggelserne - er en adækvat følge af de sagsøgtes ansvarspådragende adfærd.

Det kan ikke under denne sag prøves, om efterbeskatningen af investeringsfondshenlæggelserne er sket med rette, jf. skattestyrelseslovens § 31, stk. 1, jf. §§ 23-24. Spørgsmålet om selskabets skyldige skat må afklares under sagen mellem konkursboet og skattemyndighederne. Ex tuto gøres det gældende, at der med rette er sket efterbeskatning af investeringsfondshenlæggelserne.

De sagsøgte hæfter solidarisk for tabet.

Det bestrides, at nogen del af det indtalte krav skulle være fortabt ved passivitet eller fordi kravsbegrænsningspligten ikke er opfyldt.«

For så vidt angår spørgsmålet, om erstatningskravet bør reduceres som følge af, at Else Thrane muligt har krav på regulering af avanceskatten, har selskabet anført, at dette forudsætter, *at* Else Thrane først indgiver anmeldelse herom, *at* sagen af skattemyndighederne tages under behandling, og *at* Else Thrane faktisk får krav på reduktion. Der er således ikke for tiden modregningsadgang. Såfremt Else Thrane ikke måtte kunne betale erstatningen, kan BG Bank A/S af de samme grunde heller ikke modregne, og det bestrides, at BG Bank A/S kan indtræde i Else Thranes eventuelle krav.

*Else Thrane* har i det væsentlige procederet i overensstemmelse med sine hovedanbringender i påstandsdokument af 6. oktober 1998, hvori det blandt andet hedder:

»*Overfor sagsøgeren:*

. . .

Sagsøgte 1 - Else Thrane - har ikke handlet culpøst i forbindelse med overdragelsen af Selskabet.

I forbindelse med det anbringende skal særligt fremhæves:

- Overdragelsen af aktierne i Selskabet skete i september 1991. På dette tidspunkt var handel med overskudsselskaber almindeligt forekommende. I dagspressen og i fagbladene, herunder Ugeskrift for Retsvæsen, annoncerede en række forskellige opkøbere af overskudsselskaber. I forbindelse med likvidation af aktie- og anpartsselskaber skal der indrykkes proklama, og i forbindelse med proklamaets offentliggørelse modtog likvidator ofte henvendelser fra køber af overskudsselskaber.

- I september 1991 var det ikke kendt, at visse købere af overskudsselskaber forvoldte selskaberne skade,

**379**

handlede i strid med selskabslovene og i visse tilfælde på uretmæssig og strafbar vis tilegnede sig Selskabets midler.

- Med de i 1991 gældende skatteregler kunne en køber af et overskudsselskab på lovlig vis foretage dispositioner, som enten udskød eller helt eliminerede den forudsatte skattebetaling i overskudsselskabet.

- Sagsøgte 1's salg af Selskabet havde karakter af en normal forretningsmæssig disposition, idet salget var en normal følge af det forhold, at Selskabet forinden og som led i et generationsskifte havde afhændet sin virksomhed. Særligt bemærkes det, at salget af Selskabet ikke havde til formål at undgå betaling af Selskabets skatter, således som det var tilfældet i Satair-sagen.

- Sagsøgte 1 opnåede ved salget en »overkurs« på kr. 1.000.000, svarende til 44,8 % af de skyldige og beregnede skatter på overdragelsestidspunktet. Set i forhold til Selskabets beskattede egenkapital på kr. 8.645.993 androg overkursen 11,6%.

Den ved handlen fastsatte overkurs var hermed så lav, at overkursen ikke gav eller burde have givet sagsøgte 1 eller hendes rådgivere grund til mistanke med hensyn til købers finansielle formåen eller muligheder for at gøre en bæredygtig forretning med købet af Selskabet.

Også på dette punkt er sagen væsentlig forskellig fra Satair-sagen, hvor merprovenuet (overkursen) androg 80 % af skattegælden.

- Under disse omstændigheder havde sagsøgte 1 ikke, som i Satair-sagen, ved salget »særlig anledning« til at være opmærksom på tilsidesættelse af skattevæsenets interesser.

- Sagsøgte 1 eller hendes rådgivere havde intet kendskab til køberens finansiering af købesummen, men sagsøgte kunne ved overdragelsen konstatere, at købesummen blev betalt kontant, og der var intet i sagsforløbet, der gav nogen særlig anledning til undersøgelse af dette forhold.

Heller ikke efterfølgende omstændigheder gav nogen anledning til mistanke. Særligt bemærkes, at køber betalte den skyldige selskabsskat for skatteåret 1991/92 (indkomståret 1. juli 1989 - 30. juni 1991) på kr. 403.040.

- Sagsøgte 1 eller hendes rådgivere har således i det hele ikke på uforsvarlig måde tilsidesat skattevæsenets interesser, og sagsøgte 1 er følgelig heller ikke erstatningsansvarlig for skattevæsenets tab.

- Sagsøgte 1 og hendes rådgivere foretog, hvad der på overdragelsestidspunktet i september 1991 må anses for sædvanligt og tilstrækkeligt fra sælgerside i forbindelse med et salg af et selskab som det omhandlede, jfr. præmisserne i Østre Landsrets dom i Haaning-sagen (dom af 10. marts 1997, 9. afdeling nr. B-2252-95).

- Sagsøgeren har ikke godtgjort, at der er nogen årsagssammenhæng mellem sagsøgte 1's overdragelse af Selskabet og det forhold, at Selskabet senere ikke var i stand til at betale selskabsskatter.

- Sagsøgte deltog ikke i det forløb, hvorved købesummen for anparterne blev tilvejebragt af Selskabets egne midler i strid med anpartsselskabslovens § 84, stk. 2 ligesom sagsøgte indså eller burde have indset, at dette var tilfældet.

Et eventuelt ansvar for sagsøgte 1 - Else Thrane - bør bortfalde som følge af sagsøgerens passivitet. Skattemyndighederne var således senest i begyndelsen af 1994 bekendt med omstændighederne vedrørende sagsøgte 1's overdragelse af Selskabet. I denne forbindelse gøres det tillige gældende, at der må statueres identitet mellem skattemyndighederne og sagsøgeren.

Et eventuelt ansvar for sagsøgte 1 - Else Thrane - bør nedsættes eller bortfalde efter anpartsselskabslovens § 113 eller erstatningsansvarslovens § 24.

Sagsøgeren har ikke dokumenteret, at Selskabet har lidt et tab svarende til det påstævnte beløb. Sagsøgte 1 bestrider således skattetilsvaret, såvel formelt som beløbsmæssigt.

Et eventuelt erstatningskrav mod sagsøgte 1 - Else Thrane - bør nedsættes med den beregnede efterbeskatning incl. procenttillæg af investeringsfondsmidler, i alt kr. 85.100. Sagsøgeren har ikke dokumenteret, at den senere ophævelse af indeståendet på investeringsfondskontoen skete uberettiget. For det tilfælde, at dette kan dokumenteres, gøres det gældende, at sagsøgte 1 ikke bærer noget ansvar for en uberettiget ophævelse af investeringsfondskontoen.«

Else Thrane har yderligere anført, at der vedrørende investeringsfondskontoen i hvert fald bør ske frifindelse for så vidt angår procenttillægget på 11.100 kr., idet dette må sidestilles med skattekontrollovstillæg.

»Sagsøgeren har ikke godtgjort, at køberselskabet eller dettes moderselskab ikke var i stand til at finansiere købesummen. Sagsøgte 1 har opfordret sagsøgeren til at dokumentere disse selskabers likvide beredskab pr. overdragelsesdagen.

. . .

*Overfor sagsøgte 2 - BG Bank A/S:*

. . .

Sagsøgte 2 havde som pengeinstitut for advokat Poul Fischer kendskab til samtlige transaktioner, som fandt sted i anledning af overdragelsen af anparterne i Selskabet.

Sagsøgte 2 - i modsætning til sagsøgte 1 - indså eller burde have

**380**

indset, at det var advokat Poul Fischers hensigt at forvolde Selskabet eller dettes kreditorer tab.

Sagsøgte 2 - i modsætning til sagsøgte 1 - deltog i det forløb, hvorved købesummen for anparterne blev tilvejebragt af Selskabets egne midler i strid med anpartsselskabslovens § 84, stk. 2, ligesom sagsøgte 2 - i modsætning til sagsøgte 1 - indså eller burde have indset, at dette var tilfældet. I denne forbindelse er det af særlig betydning, at sagsøgte 2 fungerede som pengeinstitut for Poul Fischer i forbindelse med dennes køb af et meget stort antal »overskudsselskaber«, og at sagsøgte 2 i forbindelse med disse mange handler tillod gentagne overtræk på op til kr. 20.000.000.

Sagsøgte 2 har handlet i strid med god pengeinstitutpraksis, jfr. bank- og sparekasselovens § 1, stk. 6. Der henvises i denne forbindelse til Finanstilsynets redegørelse for danske pengeinstitutters deltagelse i »selskabstømninger«.

I henhold til erstatningsansvarslovens § 25, stk. 2, 1. pkt. jfr. § 19, stk. 1 skal sagsøgte 2, som forudsættes ansvarsforsikret, i det indbyrdes forhold mellem sagsøgte 1 og 2 bære erstatningsbyrden.

I anden række gøres det gældende, at sagsøgte 2 i det indbyrdes forhold mellem de sagsøgte er nærmest til at bære erstatningsbyrden, jfr. princippet i erstatningsansvarslovens § 25, stk. 1. Sagsøgte 2 bør således som det mindste tilpligtes at deltage i erstatningsbyrden med et beløb svarende til sagsøgte 1's tab, såfremt det fulde erstatningskrav betales af sagsøgte 1.

. . .

*Overfor adcitanten BG Bank A/S:*

Gøres de samme anbringender gældende som overfor BG Bank A/S i hovedsagen, jfr. ovenfor.

*Overfor medadciterede advokat Flemming Johnsen:*

. . .

Advokat Flemming Johnsen har som rådgiver for Else Thrane ydet en mangelfuld og fejlagtig rådgivning i det omfang Else Thrane pålægges erstatningsansvar overfor adcitanten.

Advokat Flemming Johnsen er i det indbyrdes forhold mellem de adciterede nærmest til at bære det endelige tab.

I henhold til erstatningsansvarslovens § 25, stk. 2, 1. pkt. jfr. § 19, stk. 1 skal advokat Flemming Johnsen, som ansvarsforsikret, i det indbyrdes forhold til Else Thrane bære erstatningsbyrden.

I anden række gøres det gældende, at advokat Flemming Johnsen i det indbyrdes forhold til Else Thrane er nærmest til at bære erstatningsbyrden, jfr. princippet i erstatningsansvarslovens § 25, stk. 1. Advokat Flemming Johnsen bør således som det mindste tilpligtes at deltage i erstatningsbyrden med et beløb svarende til Else Thranes tab, såfremt det fulde erstatningskrav betales af Else Thrane.

*Overfor de adciterede advokat Flemming Johnsen, Inter-Lex Advokater Odense A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og registreret revisor John Dreymann Hansen:*

Overfor de adciterede gøres det overordnet gældende,

*at* de adciterede som rådgivere for adcitanten har ydet en mangelfuld og fejlagtig rådgivning i det omfang adcitanten pålægges erstatningsansvar i den af konkursboet anlagte hovedsag. De adciterede har herved pådraget sig et erstatningsansvar overfor adcitanten for dennes tab.

*at* adcitanten - Else Thranes - tab bør opgøres efter de principper, der er redegjort for ovenfor vedrørende det indbyrdes forhold imellem Else Thrane og BG Bank A/S i hovedsagen.

Overfor de adciterede advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S gøres det særligt gældende:

*at* adciterede advokat Flemming Johnsen sagde »god for salget«, og i det hele virkede som rådgiver i det forløb der førte frem til salget,

*at* adciterede Inter-Lex Advokater Odense A/S hæfter solidarisk med adciterede advokat Flemming Johnsen i henhold til dansk rets almindelige erstatningsregler og princippet i Aktieselskabslovens § 143, stk. 2.

*at* de adciterede indså eller burde have indset, at der med adcitantens salg af anparterne til advokat Poul Fischer kunne være forbundet en risiko, herunder en eventuel risiko for selskabets kreditorer,

*at* de adciterede burde have betvivlet advokat Poul Fischers hensigter, herunder om advokat Poul Fischer måtte tilsidesætte selvfinansieringsforbudet i dagældende anpartsselskablovs § 84, stk. 2, i forbindelse med købet af anparterne i selskabet,

*at* de adciterede på tidspunktet for salget burde have frarådet adcitanten at gennemføre salget af anparterne til advokat Poul Fischer,

*at* der er den fornødne årsagssammenhæng og adækvans imellem de adciteredes bistand til adcitanten og den omstændighed, at selskabet nu er under konkurs.

Overfor de adciterede registreret revisor John Dreymann Hansen og Revisionsfirmaet Verner Hansen, Registrerede Revisorer ApS, gøres det særligt gældende:

*at* adciterede Revisionsfirmaet Verner Hansen, Registrerede Revisorer ApS, hæfter solidarisk med adciterede registreret revisor John Dreymann Hansen i henhold til dansk rets almindelige erstatningsregler og princippet i aktieselskablovens § 143, stk. 2 (og den tidligere anpartsselskablovs § 113, stk. 2).

*at* de adciterede har begået fejl eller udvist forsømmelser eller på anden måde har udvist ansvarspådragende adfærd, der medfører erstatningspligt overfor adcitanten,

*at* de adciterede var eller burde have været vidende om, at den omhandlede anpartsoverdragelse ville medføre den påståede selskabstømning,

*at* de adciterede indså eller burde have indset, at overdragelsen i øvrigt ville medføre risiko for, at advokat Fischer eller dem til hvem han videre overdrog selskabet, ville forvolde det solgte selskab eller selskabets kreditorer tab,

**381**

*at* de aditerede indså eller burde have indset, at advokat Fischer eller dem til hvem han overdrog selskabet, havde til hensigt at tømme selskabet eller medvirke hertil,

 *at* de aditerede vidste eller burde have vidst, hvorledes advokat Fischer finansierede betaling af købesummen for anparterne,

 *at* de aditerede var eller burde have været vidende om, at selskabets anparter blev erhvervet for egne midler,

 *at* de aditeredes ansvar ikke bortfalder som følge af egen skyld hos aditanten,

 *at* aditanten har lidt et erstatningsberettiget tab,

 *at* kravet mod de aditerede ikke er bortfaldet ved forældelse eller passivitet,

 *at* der er årsagsforbindelse mellem handlinger eller undladelser fra de aditerede og selskabets konkurs.«

For så vidt angår spørgsmålet om opgørelsen af sit tab har Else Thrane anført, at der eventuelt bør tages hensyn til procesrente og skattefordelen heraf, betalt avanceskat af overkursen, omkostninger til rådgivere vedrørende selskabssalget, sparede likvidationsomkostninger og eventuel likvidationsfordel af overkurs. Hendes regreskrav skal imidlertid ikke begrænses med det beløb, hun i givet fald kan få tilbagebetalt af den erlagte avanceskat i henhold til TSS-cirkulære 1997-19. Else Thrane har i forbindelse hermed anført, at det følger af almindelige erstatningsretlige regler, at hun er forpligtet til at begrænse sit tab og fralægge sig en eventuel berigelse. Beløb udbetalt til hende i henhold til TSS-cirkulære 1997-17 skal derfor afgives til de regrespligtige, såfremt disse har betalt regreskravet.

*BG-Bank A/S* har i det væsentlige procederet i overensstemmelse med sine hovedanbringender i påstandsdokumenter af 2. oktober 1998, hvori det for så vidt angår selskabet blandt andet hedder:

»*Ansvarsvurderingen.*

 *at* der ikke er sket selvfinansiering i strid med aktieselskabslovens § 115, stk. 2/anpartsselskabslovens § 84, stk. 2, og at banken derfor ikke kan gøres ansvarlig for boets/skattevæsenets tab,

 *at* sagsøgte, BG Bank A/S ikke er omfattet af tilbagebetalingspligten efter aktieselskabslovens § 115, stk. 4/anpartsselskabslovens § 84, stk. 4, eller hæftelsen efter aktieselskabslovens § 115, stk. 5/anpartsselskabslovens § 84, stk. 5,

 *at* bedømmelsen af et eventuelt ansvar for sagsøgte, BG Bank A/S således kun kan ske i henhold til dansk rets almindelige regler om erstatning udenfor kontrakt,

 *at* ovennævnte bestemmelser i selskabslovene ikke kan udvides/omgås ved at anvende samme regler som parameter for en culpavurdering for parter, der ikke er omfattet at bestemmelserne,

 *at* sagsøgte, BG Bank A/S ikke er underlagt en særlig agtpågivenhed eller undersøgelsespligt i relation til aktieselskabslovens § 115, stk. 2/anpartsselskabslovens § 84, stk. 2, idet der ikke er pålagt sagsøgte, BG Bank A/S og andre pengeinstitutter sådan særlig agtpågivenhed eller undersøgelsespligt,

 *at* sagsøgte, BG Bank A/S som nyt pengeinstitut for det solgte selskab ikke har haft anledning til at nægte at gennemføre instruktioner om betalingstransaktioner afgivet af de tegningsberettigede for selskabet,

 *at* sagsøgte, BG Bank A/S alene har efterlevet instrukser fra tegningsberettigede i selskabet og således ikke har handlet selvstændigt,

 *at* BG Bank A/S hverken indså eller burde have indset, at selskabshandlerne blev finansieret af selskabernes egne midler,

 *at* det forhold, at sagsøgte, BG Bank A/S har modtaget en gebyr på 1 ‰ for transaktionerne, ikke i sig selv statuerer ansvarsgrundlag,

 *at* det forhold, at sagsøgte, BG Bank A/S eventuelt kan antages at have stillet kreditfaciliteter til rådighed for køberne ikke i sig selv kan begrunde et ansvar for banken,

 *at* tabet er realiseret som følge af ulovlige forhold, som køberne af selskaberne efter ydelsesudvekslingen har udvist, herunder manglende indlevering af regnskaber og selvangivelser, omlægning af regnskabsperioder, køb af afskrivningsberettigede aktiver, der ikke blev gennemført eller blev gennemført pro forma, alt resulterende i, at de handlede selskabers likvide midler blev hævet uretmæssigt, og

 *at* sagsøgte, BG Bank A/S derfor ikke har handlet ansvarspådragende.

*. . .*

*Årsagssammenhæng og adækvans.*

 *at* risikoen for tab ikke blev forøget som følge af bankens handlinger og undladelser, eftersom banken var forpligtet til at efterkomme de fra de tegningsberettigede afgivne instrukser,

 *at* sagsøgte, BG Bank A/S ikke på daværende tidspunkt har kunnet påregne, at selskabets afsatte og udskudte skatter ikke ville blive betalt, blot fordi selskabets likvide midler blev overført til moderselskabet,

 *at* det forhold, at selskabets skyldige skatter ikke blev betalt ikke var påregneligt for sagsøgte, BG Bank A/S. Det forholder sig imidlertid også sådan, at køberen af det solgte selskab den 20. november 1991 indbetalte selskabsskatten for skatteåret 1991/92 med kr. 403.040,00. . . .

 *at* der ikke er grundlag for at antage, at sagsøgte, BG Bank A/S var, kunne eller burde have været bekendt med, at de i selskabet værende midler, der skulle benyttes til betaling af skatter, og som blev hævet af de tegningsberettigede personer i selskabet, ikke ville blive

**382**

tilbageført selskabet med henblik på betaling af skyldige skatter til forfaldstid, og

 *at* sagsøgte, BG Bank A/S ikke kan antages at have været eller burde have været bekendt med købernes videre hensigter med selskabet eller dettes midler, samt

 *at* den del af det rejste krav, der evt. måtte vedrøre efterbeskatning af investeringsfondshenlæggelser, hverken adækvat eller causalt kan henføres til banken.

*. . .*

*Passivitet hos sagsøgeren.*

 *at* sagsøgerens eventuelle krav må anses for bortfaldet ved passivitet, og

 *at* der ved bedømmelsen heraf må være identitet mellem sagsøgeren og Told- og Skattestyrelsen samt dennes told- og skatteregioner,

*. . .*

*Solidarisk hæftelse med sælger.*

 *at* sagsøgte, BG Bank A/S har indtaget en underordnet rolle i forhold til de reelle agerende parter, herunder sælger og dennes rådgivere, idet sagsøgte, BG Bank A/S alene har efterlevet eksterne instrukser, og således på ingen måde optrådt selvstændigt,

 *at* sagsøgte, BG Bank A/S ikke har opnået nogen økonomisk vinding ved overførslerne udover de gebyrer, der iøvrigt ganske tilsvarende andre pengeoverførsler, blev beregnet standardmæssigt som 1 ‰ af det overførte beløb,

 *at* sælger derimod har modtaget en overkurs svarende til ca. 450 ‰,

 *at* de resterende 549 ‰ er tilgået køberne og eventuelle formidlere, samt

 *at* det er sælger og køberne i sagen, der bærer det principale ansvar for det tab, som det solgte selskab og dermed Told- og

Skattestyrelsen har lidt, idet disse personer og selskaber har tilrettelagt, gennemført og oppebåret det økonomiske resultat af transaktionerne i strid med aktieselskabslovens § 115, stk. 2/anpartsselskabslovens § 84, stk. 2,

*at* der ved opgørelsen af sælgers eventuelle tab skal fradrages den af sælger modtagne overkurs tillagt en forrentning af beløbet med markedsrenten samt sparede likvidationsomkostninger.

. . .

*Tabsopgørelsen.*

*at* det af sagsøger rejste krav som minimum skal reduceres med følgende poster:

i) Efterbeskatning af investeringsfondshenlæggelser med kr. 85.100, som er pålignet sagsøgeren med tillæg af renter,

ii) Principalt den af sælger betalte avanceskat til Told- & Skattemyndighederne, subsidiært et beløb modsvarende den avanceskat, som sælgerne vil kunne opnå tilbagebetalt efter cirkulære nr. 19/1997 om genoptagelse af skatteansættelser i forbindelse med indbetaling af erstatningsbeløb efter selskabstømninger, idet Told- og Skattestyrelsen ellers ville opnå en uberettiget berigelse. Nævnte beløb skal tillægges rente, forinden fradrag sker.«

For så vidt angår Else Thrane hedder det blandt andet:

»*at* adciterede 1's ansvar overfor adcitanten som eneanpartshaver i selskabet skal bedømmes efter dansk rets almindelige regler om erstatning udenfor kontrakt,

*at* salget af selskabet efter alt at dømme alene havde til formål at undgå betaling af selskabets skyldige og latente skatter, hvorfor salget ikke havde karakter af en normal forretningsmæssig disposition,

*at* adciterede 1 måtte indse, at der bestod en ikke ubetydelig risiko for, at køberen ikke lovligt ville kunne udskyde eller eliminere de selskabet påhvilende skatter,

*at* adciterede 1 eller dennes rådgivere tilsyneladende intet gjorde for at afværge skattevæsenets tabsrisiko,

*at* adciterede 1 er nærmest til at bære et eventuelt erstatningsansvar idet adciterede 1 har:

i) indgået overdragelsesaftalen med køberen af selskabet, herunder givet denne dispositionsret til selskabets midler samtidig med overførslen af købesummen uagtet, at køberen ikke på det tidspunkt kunne anses for tegningsberettiget,

ii) gennemført de omhandlede dispositioner og

iii) oppebåret provenuet ved salget, herunder tillægget på kr. 1.000.000,00, svarende til omkring 45% af de afsatte skatter.

*at* sagsøgte, BG Bank A/S har indtaget en underordnet rolle i forhold til de reelle agerende parter, herunder sælgerne, idet sagsøgte, BG Bank A/S alene har efterlevet eksterne instrukser, og således på ingen måde optrådt selvstændigt.

*at* sagsøgte, BG Bank A/S ikke har opnået nogen økonomisk vinding ved overførslerne udover de gebyrer, der i øvrigt ganske tilsvarende andre pengeoverførsler, blev beregnet standardmæssigt som 1 ‰ af overførte beløb.

Sælgerne har derimod modtaget en overkurs svarende til ca. 450 ‰, og de resterende 549 ‰ er tilgået køberen og eventuelle formidlere, samt

*at* det er sælgerne og køberne i sagen, der bærer det principale ansvar for det tab, som det solgte selskab og dermed Told- og Skattestyrelsen har lidt, idet disse personer og selskaber har tilrettelagt, gennemført og oppebåret det økonomiske resultat af transaktionerne i strid med aktieselskabslovens § 115, stk. 2/anpartsselskabslovens § 84, stk. 2, samt

*at* sælger, adciterede 1 i øvrigt må identificeres med sine rådgivere, for hvem hun er ansvarlig.«

For så vidt angår advokat Flemming Johnsen hedder det blandt andet:

»*at* sælgernes rådgiveres ansvar, der er uafhængig af et kontraktmæssigt forhold til BG Bank A/S, skal

**383**

bedømmes efter reglerne om erstatning udenfor kontrakt. Afgørende er således:

i) rådgivernes professionelle og sagkyndige viden,

ii) rådgivernes initiativ, herunder kontakt til køber af selskabet,

iii) rådgivernes rådgivning til sælger, herunder eventuel opfordring til salg, gennemgang af overdragelsesaftalen m.v.,

iv) rådgivernes aktive udfoldelser med henblik på gennemførelse af transaktionerne, samt

v) rådgivernes undersøgelser forud for kontraktsindgåelsen eller mangel på samme,

*at* ovennævnte adciterede 2 Flemming Johnsen derfor i langt højere grad end BG Bank A/S er nærmest til at bære det erstatningsansvar, der følger af sagens faktiske begivenheder, idet adcitanten BG Bank A/S alene har haft en underordnet rolle ved at gennemføre betalingsinstrukser, som adcitanten, BG Bank A/S iøvrigt var forpligtet at efterkomme.«

Registreret revisor John Dreymann Hansen og Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS har i det væsentlige procederet i overensstemmelse med deres hovedanbringender i påstandsdokument af 22. september 1998, hvori det blandt andet hedder:

»*Til støtte for den principale påstand gøres det gældende:*

*at* adciterede 1 og 2 [Revisionsselskabet og revisor John Dreymann Hansen] ikke har begået fejl eller udvist forsømmelser eller på anden måde udvist ansvarspådragende adfærd, der kan medføre erstatningspligt overfor adcitanten,

*at* adciterede 1 var eller burde have været vidende om, at den omhandlede anpartsoverdragelse ville medføre den påståede selskabstømning. Adciterede 2 har derfor ikke haft grund til at rådgive om en sådan risiko, hvorfor undladelse heraf ikke pådrager ham ansvar,

*at* adciterede 1 og 2 ikke indså eller burde have indset, at overdragelsen i øvrigt ville medføre risiko for, at advokat Fischer, eller dem til hvem han videreoverdrog selskabet, ville forvolde det solgte selskab og selskabets kreditorer tab,

*at* adciterede 1 og 2 ikke indså eller burde have indset, at advokat Fischer eller dem til hvem han overdrog selskabet havde til hensigt at tømme selskabet eller medvirke hertil,

*at* adciterede 1 og 2 ikke deltog i selve afregningen ved salget af selskabet,

*at* adciterede 1 og 2 ikke vidste eller burde have vidst, hvorledes advokat Fischer finansierede betalingen af købesummen for anparterne,

*at* adciterede 1 og 2 ikke var - eller burde have været - vidende om, at selskabets anparter som påstået af sagsøger i hovedsagen blev erhvervet for egne midler,

*at* evt. regreskrav er bortfaldet ved forældelse eller passivitet,

*at* der ikke er årsagsforbindelse mellem handlinger eller undladelser fra adciterede 1 og 2 og selskabets konkurs,

*at* der i 1991 var mulighed for at opnå skattegodtgørelse i henhold til selskabsskattelovens § 17 A, hvilket begrunder, at en køber var villig til at betale ekstra for den skyldige selskabsskat ud fra et forretningsmæssigt synspunkt,

*at* adcitanten ikke har påvist noget erstatningsberettiget tab, samt

*at* adcitanten selv ved egen uforsvarlig adfærd eller accept af risiko selv må bære ansvaret for et eventuelt erstatningsansvar.

. . .«

Copyright © 2021 Karnov Group Denmark A/S

Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og John Dreymann Hansen har i det væsentlige tilsluttet sig de principper for opgørelsen af tabet, som Else Thrane og BG Bank A/S har påberåbt sig.

Til støtte for *friholdelsespåstanden over for advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S* hedder det:

»*at* adciterede 4 - advokat Flemming Johnsen - og adciterede 5 - Inter-Lex Advokater Odense A/S - er de nærmeste til at bære et tab, idet adciterede 4 - advokat Flemming Johnsen - forestod den endelige gennemførelse af handlen, ligesom adciterede 4 - advokat Flemming Johnsen - forestod gennemførelsen af de økonomiske transaktioner, der fandt sted i forbindelse med overdragelse af anpartskapitalen i det nuværende Anpartsselskabet af 1.9.1991 nr. 6 under konkurs.«

*Advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S* har i det væsentlige procederet i overensstemmelse med deres hovedanbringender i påstandsdokument af 6. oktober 1998, hvori det blandt andet hedder:

»Til støtte for de nedlagte påstande gøres det gældende, at advokat Flemming Johnsen og Inter-Lex Advokater Odense A/S ikke har begået fejl, udvist forsømmelse eller på anden måde udvist ansvarspådragende adfærd, der kan medføre erstatningspligt over for Else Thrane, BG Bank A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og/eller registreret revisor John Dreymann Hansen i forbindelse med den bistand, advokat Flemming Johnsen ydede Else Thrane ved dennes salg af anparterne i Selskabet.

Det nedenfor anførte gøres tillige gældende for så vidt angår Inter-Lex Advokater Odense A/S.

*Over for Else G. Thrane:*

Under henvisning til ovenstående bestrides det, at advokat Flemming Johnsen skulle have ydet Else Thrane en mangelfuld og fejlagtig rådgivning i forbindelse

**384**

med Else Thranes salg af anparterne i Selskabet. Skulle Landsretten finde advokat Flemming Johnsen erstatningsansvarlig overfor BG Bank A/S, gøres det derfor tillige gældende, at Else Thrane er nærmest til at bære tabet, hvorfor Else Thrane bør friholde advokat Flemming Johnsen herfor. Til støtte for de nedlagte påstande gøres i hovedtræk gældende:

*at* advokat Flemming Johnsen efter de foreliggende omstændigheder ikke havde eller burde have indset, at der ved Else G. Thranes salg af anparterne til Poul Fischer kunne være forbundet en risiko, herunder en eventuel risiko for Selskabets kreditorer,

*at* advokat Flemming Johnsen ikke havde eller burde have betvivlet advokat Poul Fischers hensigter, herunder om Poul Fischer måtte tilsidesætte selvfinansieringsforbudet i den dagældende Anpartsselskabslov § 84, stk. 2 (nu Anpartsselskabslovens § 49, stk. 2) i forbindelse med købet af anparterne i Selskabet,

*at* der på tidspunktet for overdragelsen af anparterne hverken i lovgivning, retspraksis eller juridisk teori var fastslået eller omtalt en forpligtelse for en sælger af anparter til at sikre sig, at skattevæsenets interesser ikke efterfølgende ville blive tilsidesat som følge af handlinger eller undladelser fra en købers side,

*at* advokat Flemming Johnsen ikke på daværende tidspunkt burde have frarådet Else Thrane at gennemføre salget af anparterne til advokat Poul Fischer,

*at* der ikke er den fornødne årsagssammenhæng og adækvans imellem advokat Flemming Johnsens bistand til Else Thrane og den omstændighed, at Selskabet nu er under konkurs og - så vidt ses - med skattemyndighederne som eneste kreditor.

. . .«

Også disse sagsøgte har i det væsentlige tilsluttet sig de principper for opgørelsen af tabet, som Else Thrane og BG Bank A/S har påberåbt sig, ligesom man har tilsluttet sig det af Else Thrane om skatten af investeringsfonden anførte.

*Over for BG Bank A/S:*

»Hvis Landsretten lægger til grund, at der foreligger en overtrædelse af selvfinansieringsforbudet i forbindelse med pengeoverførelserne den 10. oktober 1991, er BG Bank A/S nærmere til at bære et erstatningsansvar herfor end advokat Flemming Johnsen.

Det gøres særligt gældende, at dersom BG Bank A/S bliver dømt i hovedsagen, vil det være udtryk for, at BG Bank A/S bærer et selvstændigt erstatningsansvar overfor sagsøger i anledning af købers overtrædelse af selvfinansieringsforbudet i den dagældende Anpartsselskabslovs § 84, stk. 2, nu § 49, stk. 2.

Det gøres endvidere gældende:

*at* der ikke foreligger den fornødne årsagssammenhæng og adækvans imellem advokat Flemming Johnsens bistand til Else Thrane og den omstændighed, at Selskabet nu er under konkurs, og - så vidt ses - med skattemyndighederne som eneste kreditor, og

*at* BG Bank A/S ikke har lidt noget tab, der berettiger til erstatning. Hvis advokat Flemming Johnsen måtte blive anset erstatningsansvarlig over for BG Bank A/S, gøres det gældende:

*at* BG Bank A/S' erstatningskrav må bortfalde som følge af udvist passivitet, og

*at* BG Bank A/S' erstatningskrav i øvrigt må bortfalde eller nedsættes som følge af egen skyld og/eller accept af risiko samt under henvisning til Erstatningsansvarslovens § 25.

*Over for Revisionsfirmaet Verner Hansen, Registrerede revisorer ApS og registreret revisor John Dreymann Hansen:*

Hvis Landsretten lægger til grund, at advokat Flemming Johnsen og registreret revisor John Dreymann Hansen er erstatningsansvarlige over for Else Thrane, gøres det gældende, at registreret revisor John Dreymann Hansen i det indbyrdes forhold er nærmere til at bære et tab end advokat Flemming Johnsen.

Det ovenfor anførte gøres tillige gældende over for Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS.«

## Landsrettens bemærkninger:

Ved sagens afgørelse lægges det i overensstemmelse med de afgivne forklaringer og fremlagte dokumenter til grund, at de i K.L. Thranes Røgeost, Else Rasmussen Odense ApS drevne erhvervsaktiviteter i forbindelse med et sædvanligt generationsskifte blev solgt af eneanpartshaveren Else Thrane med overtagelse den 5. april 1991. Papirerne i forbindelse med overdragelsen af virksomheden blev ordnet af selskabets og Else Thranes advokat Flemming Johnsen.

Det var tanken, at anpartsselskabet skulle være likvideret, men selskabets og Else Thranes revisor, John Dreymann Hansen, tog initiativet til, at der fra advokat Poul Fischer fremkom et tilbud om køb af selskabet for en pris, der oversteg egenværdien med 1 mio. kr.

Revisor John Dreymann Hansen havde ikke tidligere været involveret i salg af et »overskudsselskab«, men havde set, at blandt andet Poul Fischer averterede efter dem. Advokat Poul Fischers tilbud blev sendt til advokat Johnsen, der ligeledes var bekendt med, at der foregik opkøb af sådanne selskaber, men heller ikke selv tidligere havde medvirket i nogen handel. Johnsen var bekendt med, at Poul Fischer havde været advokatfuldmægtig i Odense, og havde aldrig hørt noget negativt om ham.

Såvel Johnsen som Hansen var på det rene med, at overprisen var motiveret af den skattegæld, der påhvilede selskabet. De havde begge en vis viden om, at

Copyright © 2021 Karnov Group Denmark A/S

**385**

det efter de dagældende skatteregler kunne være muligt for en køber at udskyde og eventuelt eliminere skattegælden gennem en skattegodtgørelsesordning eller køb og udleasing af afskrivningsberettigede goder i forbindelse med udnyttelse af dobbeltbeskatningsoverenskomster. Hansen fik under en indledende telefonsamtale med Poul Fischer oplyst, at det netop var tanken at erhverve afskrivningsberettigede goder. Såvel Johnsen som Hansen antog, at den omlægning af regnskabsåret, som Hansen gennemførte efter Fischers anvisning, var motiveret af ønsket om i overdragelsesåret at få tid til at foretage de nødvendige anskaffelser. Begge rådgivere var på grundlag af anpartsoverdragelsesaftalen bekendt med køberens krav om, at selskabets kapital skulle overføres til en konto i køberens pengeinstitut samme dag, som købesummen blev erlagt, og at kapitalen straks ville være til disposition for køberen. Ingen af dem foranstaltede nogen undersøgelse af køberens forhold.

Else Thrane, der ikke selv havde nogen viden om skatteforholdene, måtte opfatte situationen således, at såvel advokaten som revisoren, hvis professionelle råd hun havde fuld tillid til, sagde god for lovligheden af transaktionen og rådede hende til at gennemføre den.

Anpartsselskabets aktiver bestod på overdragelsestidspunktet alene af almindeligt bankindestående på 10.815.791,81 kr., en investeringskonto på 80.486,89 kr., og eneste gæld var skattekrav bestående af:
- Allerede pålignet selskabsskat for skatteåret 1991/92, der forfaldt til betaling den 20. november 1991.
- Beregnet selskabsskat 1992/93 kr. 456.722,-.
- Udskudt skat (genvundne afskrivninger) kr. 1.375.334,-.
For så vidt angår pengeoverførslerne via Bikuben fremgår det, at disse blev udført i overensstemmelse med instruktion fra Fischer, således at Bikuben samme dag, den 10. oktober 1991, gennem overtræk på køberselskabets konto, hvor der forud alene var et indestående på ca. 1,2 mio. kr., overførte købesummen til sælgers bank, og via en nyoprettet konto i Bikuben modtog næsten alle det erhvervede selskabs midler tilbage på køberselskabets konto i banken, således at overtrækket straks herved blev inddækket, og der fremkom en positiv konto på godt 2 mio. kr. Køberselskabets konto blev den 15. oktober 1991 tømt.

Den 10. oktober 1991 skete en særskilt overførsel på check fra sælgers bank til Bikuben af et investeringsindestående på kr. 80.486,89. Beløbet blev i Bikuben indsat på en særlig investeringsfondskonto den 14. oktober 1991 som tilhørende det købte anpartsselskab ved Poul Fischer.

Det omhandlede selskab blev straks solgt videre i flere led. Den 8. november 1991 blev indestående på investeringskontoen af Bikuben udbetalt til Jan Preben Kristiansen, der nu fremtrådte som direktør og havde udfærdiget en sædvanlig blanket om anskaffelse af afskrivningsberettiget udstyr, der begrundede en udbetaling.

De praktiske foranstaltninger vedrørende disse pengetransaktioner blev gennemført af en underordnet medarbejder i Bikuben, men altid med den lokale ledelses godkendelse, og den lokale ledelse indhentede på sin side normalt godkendelse i Bikubens hovedsæde. Der foreligger i sagen forklaringer om, at der af Bikubens ledelse skulle være givet en almindelig bemyndigelse til bankens afdelinger i Skælskør og Århus til at yde kredit i forbindelse med Fischers virksomhed og en tilsvarende virksomhed, der blev drevet i Århus. Kreditten skulle i begge afdelinger være maksimeret til 10 mio. kr., men således at man i det omfang, kreditten ikke var udnyttet i den ene af afdelingerne, kunne forhøje kreditten i den anden afdeling. Selv om de pågældende filialer således måtte forvente, at de enkelte transaktioner af den her omhandlede karakter ville

blive godkendt i hovedsædet, skulle der dog som nævnt typisk ske forelæggelse i de enkelte sager. Der er i øvrigt ikke fremlagt nogen dokumentation vedrørende dette kreditilsagn.

Det ligger herefter klart, at købet af anpartsselskabet er finansieret af selskabets egne midler, og at medarbejdere i Bikuben har haft fuld indsigt i, hvorledes købesummen blev tilvejebragt. På sælgerside må det antages, at også advokat Flemming Johnsen og revisor John Dreymann Hansen efter købekontraktens udformning og den instruktion, Johnsen i overensstemmelse hermed gav sælgerens bank om overførsel af selskabets midler - og hvoraf revisor Hansen modtog kopi - burde have været opmærksom på, at købet blev finansieret af selskabets egne midler.

Sælgeren opnåede en overpris på 1 mio. kr. Sælgeren og dennes rådgivere antog, at denne overpris blev betalt af køberen med henblik på at udnytte muligheder for et undgå eller udskyde betalingen af selskabets latente skatter. Overprisen oversteg klart de udgifter, der kunne være begrundet i sparede omkostninger for køberen. Salget havde således ikke karakter af en normal forretningsmæssig disposition.

Sælgeren, der er ansvarlig også i tilfælde, hvor en skadegørende handling er forårsaget af rådgiveres indstilling, burde indse, at der ved salg af overskudsselskabet gennem selvfinansiering forelå en risiko for, at den skyldige skat ikke ville blive betalt. Sælgeren eller dennes rådgivere gjorde reelt ikke noget for at afværge denne risiko. Sælgeren og dennes rådgivere har herved på uforsvarlig måde tilsidesat skattevæsenets interesser og har herved pådraget sig et erstatningsansvar.

Dette ansvar findes ikke i nærværende sag at kunne udstrækkes til investeringsfondsmidlerne. Der lægges herved vægt på, at disse midler ikke indgik i selvfinansieringen, at de korrekt blev anbragt på en særlig

**386**

konto i Bikuben, og at udbetaling af disse midler først skete, da der over for banken blev afgivet en urigtig erklæring af en tegningsberettiget om køb af afskrivningsberettigede goder.

Bikuben, der var bekendt med selvfinansieringen, og at selskabets overskydende midler blev stillet til advokat Fischers disposition, gjorde intet for at afværge den herved opståede risiko for, at skattegælden ikke blev betalt. Også Bikuben har herved, solidarisk med sælgeren i samme omfang, pådraget sig et erstatningsansvar over for skattevæsenet.

I overensstemmelse med det anførte, og idet sagsøger ikke findes at have forspildt sin ret ved passivitet, vil der være at give sagsøgeren, ApS af 1.9.1991 nr. 6 under konkurs, medhold for så vidt angår det påståvnte beløb med fradrag af den del af kravet, der udgøres af efterbeskatning af investeringsfondshenlæggelserne, eller for 1.775.816 kr.

I det indbyrdes forhold mellem sagsøgte Else Thrane og BG Bank A/S findes opgørelsen at burde ske således, at Else Thrane kommer til at fralægge sig den gevinst, hun opnåede, når hensyn tages til *den* overkurs, hun har oppebåret, *den* rentefordel, hun har haft af den betalte overkurs, og *den* tilbagebetaling af for meget betalt avanceskat, hun må påregnes at opnå, jf. cirkulære nr. 19 af 25. juli 1997. Derimod findes det at være en sådan usikkerhed om, i hvilket omfang sparede likvidationsomkostninger oversteger de omkostninger, der har været forbundet med salget af anpartsselskabet, at der ikke kan tages hensyn hertil.

Det ligger fast, at overkursen, når hensyn tages til den senere betalte avanceskat af overkursen, androg 750.000 kr. Rentefordelen kan under hensyn til det oplyste om den gennemsnitlige rentesats og den skat, der for sælgeren er udløst af den opnåede rentefordel, fastsættes til 165.000 kr. Tilbagebetalingen af avancebeskatningen

vil inkl. renter udgøre omkring 585.000 kr. Den samlede gevinst kan således fastsættes til 1,5 mio. kr.

I det indbyrdes forhold mellem Else Thrane og Bikuben findes Else Thrane at skulle dække et beløb svarende til den opnåede gevinst på 1.500.000 kr., medens Bikuben skal dække resten, 275.816 kr.

Der findes under hensyn til den udviste grad af uagtsomhed ikke grundlag for at give BG Bank A/S adgang til at opnå dækning for nogen del af dette beløb hos advokat Johnsen. Reglerne i erstatningsansvarsloven, herunder dennes § 25, stk. 2, 1. pkt., jf. § 19, stk. 1, kan ikke føre til noget andet resultat.

I forholdet mellem Else Thrane og hendes rådgivere findes der, således som det beløb, Else Thrane skal betale i erstatning, er opgjort, ikke grundlag for at kræve nogen af heraf betalt af rådgiverne eller de selskaber, de er tilknyttet.

Retten har overvejet, om advokat Johnsen og revisor Hansen under hensyn til det ansvar, der ovenfor er statueret også for deres vedkommende, skulle pålægges at erstatte Else Thrane de sagsomkostninger, hun pålægges over for sagsøger, men har dog under hensyn til den fordel, der var tilstræbt opnået for Else Thrane, ikke fundet tilstrækkelig anledning hertil.

### Thi kendes for ret:

Else Thrane og BG Bank A/S skal in solidum til ApS af 1.9.1991 nr. 6 under konkurs betale 1.775.816 kr. med sædvanlig procesrente fra den 20. september 1996.

I deres indbyrdes forhold bærer fru Else Thrane heraf 1.500.000 kr. og BG Bank A/S 275.816 kr. med procesrente som anført.

Flemming Johnsen, Inter-Lex Advokater Odense A/S, Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS og John Dreymann Hansen frifindes for de mod dem rettede krav.

I sagsomkostninger betaler Else Thrane og BG Bank A/S in solidum til ApS af 1.9.1991 nr. 6 under konkurs 110.000 kr. I det indbyrdes forhold betaler hver af de dømte halvdelen heraf.

I de sager, der er rejst mod Flemming Johnsen og Inter-Lex Advokater Odense A/S samt John Dreymann Hansen og Registrerede Revisorer ApS, bærer hver af parterne egne omkostninger.

### Højesteret

### Højesterets dom.

I tidligere instans er afsagt dom af Østre Landsrets 17. afdeling den 6. november 1998.

I pådømmelsen har deltaget syv dommere:Hornslet, Marie-Louise Andreasen, Melchior, Asbjørn Jensen, Børge Dahl, Engholm Jacobsen ogHenrik Zahle.

Parterne har nedlagt følgende påstande:

*BG Bank A/S:*

Over for ApS af 1.9.1991 nr. 6 under konkurs (konkursboet): Frifindelse.

Over for Else Thrane: Frifindelse, samt at Else Thrane solidarisk med advokat Flemming Johnsen skal friholde BG Bank A/S (banken) for ethvert beløb, som banken måtte blive tilpligtet at betale til konkursboet.

Over for advokat Flemming Johnsen: Advokat Flemming Johnsen skal solidarisk med Else Thrane friholde banken for ethvert beløb, som banken måtte blive tilpligtet at betale til konkursboet.

*Konkursboet:*

Over for banken og Else Thrane: Banken og Else Thrane skal solidarisk til konkursboet betale 1.860.916 kr. med tillæg af

procesrente fra sagens anlæg den 20. september 1996, subsidiært stadfæstelse.

*Else Thrane:*

Over for konkursboet: Frifindelse.

Over for banken: Frifindelse, samt at banken skal

**387**

friholde Else Thrane for ethvert beløb inkl. renter og omkostninger, som hun måtte blive tilpligtet at betale til konkursboet.

Over for advokat Flemming Johnsen i den af banken anlagte sag: Advokat Flemming Johnsen skal friholde Else Thrane for ethvert beløb inkl. renter og omkostninger, som hun måtte blive tilpligtet at betale til banken.

Over for advokat Flemming Johnsen, Inter-Lex Advokater Odense A/S (advokatfirmaet), registreret revisor John Dreymann Hansen og Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS (revisionsfirmaet): Advokat Flemming Johnsen, advokatfirmaet, revisor Dreymann Hansen og revisionsfirmaet skal principalt solidarisk, subsidiært alternativt, helt eller delvist friholde Else Thrane for det tab, hun måtte lide, såfremt hun måtte blive dømt i overensstemmelse med konkursboets påstand.

*Advokat Flemming Johnsen og advokatfirmaet:*

Over for banken: Stadfæstelse.

Over for Else Thrane: Stadfæstelse, subsidiært at Else Thrane skal friholde advokat Flemming Johnsen for ethvert beløb, som han måtte blive pålagt at betale til banken, herunder renter og omkostninger.

Over for revisor Dreymann Hansen og revisionsfirmaet: Stadfæstelse, subsidiært at revisor Dreymann Hansen og revisionsfirmaet principalt solidarisk, subsidiært en eller flere af disse, skal friholde advokat Flemming Johnsen og advokatfirmaet for ethvert beløb, som advokat Flemming Johnsen og advokatfirmaet måtte blive pålagt at betale til Else Thrane, herunder renter og omkostninger.

*Revisor Dreymann Hansen og revisionsfirmaet:*

Over for Else Thrane: Stadfæstelse, subsidiært frifindelse mod betaling af et mindre beløb.

Over for advokat Flemming Johnsen og advokatfirmaet: Stadfæstelse, subsidiært at advokat Flemming Johnsen og advokatfirmaet principalt solidarisk, subsidiært alternativt, skal friholde revisor Dreymann Hansen og revisionsfirmaet for ethvert beløb inkl. renter og omkostninger, som revisor Dreymann Hansen og revisionsfirmaet måtte blive tilpligtet at betale til Else Thrane.

Revisor Dreymann Hansen og revisionsfirmaet har frafaldet anbringendet om, at eventuelt regreskrav er bortfaldet på grund af passivitet eller forældelse. Det bestrides ikke, at revisor Dreymann Hansen og revisionsfirmaet hæfter solidarisk for, hvad han eller revisionsfirmaet måtte blive dømt til at betale til en af sagens øvrige parter.

Advokat Flemming Johnsen og advokatfirmaet bestrider ikke, at de hæfter solidarisk for, hvad han eller advokatfirmaet måtte blive dømt til at betale til en af sagernes øvrige parter.

Til brug for Højesteret er der tilvejebragt yderligere oplysninger.

De af parterne, der kan blive deltagere i en indbyrdes fordeling af et eventuelt erstatningsansvar for selskabstømning, har fremlagt opgørelser af sælgeren Else Thranes berigelse. De er opstillet efter samme model og indeholder forskellige muligheder for opgørelse af sælgers berigelse, beregnet som forskellen mellem på den ene side hendes fortjeneste ved den foretagne transaktion og på den anden side fortjenesten, hvis en solvent likvidation var gennemført.

Banken har beregnet Else Thranes berigelse således:

| | *»Bruttorente* | *Nettorente* |
|---|---|---|
| Nettorenten svarer til en beskatning på 50% af bruttorenten | 8,250% | 4,125% |

UfR ONLINE    U.2000.365/2H

| | | |
|---|---:|---:|
| 1. Sælgers overkurs. | 1.000.000 | 1.000.000 |
| 2. Med fradrag af den betalte avanceskat af sælgers overkurs 25% af 1 mio. kr. . . . . . . | <u>-250.000</u> | <u>-250.000</u> |
| Sælgers nettooverkurs. | 750.000 | 750.000 |

3. Med tillæg af likviditetsfordel/forrentning af overkurs efter fradrag af avanceskatten og med den ovenfor anførte rentesats, indtil stævning udtages.

Avanceskatten er . . . afregnet i tre rater den 1/11 1992 samt den 1/1 og 1/2 1993 med kr. 83.333 pr. rate.

| | | |
|---|---:|---:|
| 10/10-1991-1/11-1992=381 dage af kr. 1.000.000 | 87.313 | 43.656 |
| 1/11-1992-1/1-1993=60 dage af kr. 916.667 | 12.604 | 6.302 |
| 1/1-1993-1/2-1993=30 dage af kr. 833.334 | 5.729 | 2.865 |
| 1/2-1993-20/9-1996=1309 dage af kr. 750.000 | <u>224.984</u> | <u>112.492</u> |
| | [330.630] | [165.315] |
| Sælgers nettooverkurs med tillæg af likviditetsfordelen. | | 915.315 |
| | 1.080.630 **388** | |

| | | |
|---|---:|---:|
| 4. Sparede likvidationsomkostninger med fradrag af salgsomkostninger (anslået). | 25.000 | 25.000 |

5. Efterbeskatning af investeringsfondsmidler inkl. procenttillæg.

| | | |
|---|---:|---:|
| Medtages uanset om sælger tilpligtes at betale efterbeskatning af investeringsfondsmidlerne. | <u>28.860</u> | <u>28.860</u> |
| Sælgers berigelse før tilbagebetaling af avanceskat efter cirkulære nr. 19/1997. | 1.134.490 | 969.175 |

6. Tilbagebetaling af avanceskat efter cirkulære nr. 19/1997.

Tilbagebetalingen udgør 25% af sælgers andel af et eventuelt domsbeløb i hovedsagen med tillæg af idømte samt egne sagsomkostninger, der samlet for de to instanser er anslået til: 250.000

Da sælgers andel ikke endeligt kendes, tages udgangspunkt i den ovenfor opgjorte berigelse før tilbagebetaling.

Da den beregnede tilbagebetaling vil indgå i den endelige opgørelse af returskatten, kan den endelige returskat opgøres ved at dividere med 0,75 (75%).

| | | |
|---|---:|---:|
| 7. Rente af pkt. 6. | 162.378 | 71.495 |

Rentesatsen er procesrente, jfr. KSL §62E, og renten beregnes fra sagens anlæg og til betaling sker.

20/9-1996-20/11-1999=38 måneder.

Copyright © 2021 Karnov Group Denmark A/S

|  | | |
|---|---|---|
| Rentebeløbet skal ligeledes divideres med 75% | | |
| Sælgers berigelse i forhold til likvidation: | 1.758.365 | 1.447.062« |

Else Thrane har fremlagt tre beregninger af sin berigelse. Den for hende gunstigste indeholder følgende:

|  | |
|---|---|
| »1. Sælgers overkurs. | 1.000.000 |
| 2. Med fradrag af den betalte avanceskat af sælgers overkurs 25% af 1 mio. kr. | -250.000 |
| Sælgers nettooverkurs. | 750.000 |
| . . . | |
| Sælgers berigelse før tilbagebetaling af avanceskat efter cirkulære nr. 19/1997. | 750.000 |
| 6. Tilbagebetaling af avanceskat efter cirkulære nr. 19/1997. | 250.000 |
| Tilbagebetalingen udgør 25% af sælgers andel af et eventuelt domsbeløb i hovedsagen. | |
| . . . | |
| Sælgers berigelse i forhold til likvidation | 1.000.000« |

**Højesterets bemærkninger.**

Indledningsvis tages stilling til, om der har foreligget selvfinansiering.

I overensstemmelse med Poul Fischers instruks af 9. oktober 1991 blev købesummen for overskudsselskabet af købers bank den 10. oktober 1991 trukket på køberselskabets konto og via Nationalbanken overført til sælgers pengeinstitut. Denne overførsel var betinget af, at sælgers pengeinstitut samme dag via Nationalbanken overførte overskudsselskabets pengebeholdning til banken. Efter modtagelse af denne pengebeholdning og indsættelse heraf på en konto i overskudsselskabets navn blev trækket på køberselskabets konto til betaling af købesummen - som angivet i Poul Fischers instruks - samme dag udlignet ved overførsel fra overskudsselskabets konto. Højesteret tiltræder herefter, at købet af selskabet blev finansieret af dettes egne midler, og at forbudet mod selvfinansiering i den dagældende anpartsselskabslovs § 84, stk. 2 (nu § 49, stk. 2), herved blev overtrådt.

Spørgsmålet er så, om nogen - og i bekræftende fald hvem - har pådraget sig et erstatningsansvar over for konkursboet:

Med hensyn til købers bank må det lægges til grund, at banken var bekendt med, at de enkelte transaktioner var indbyrdes forbundne - hvilket var afgørende for bankens risikovurdering - og at transaktionerne set som en helhed dannede grundlag for Poul Fischers betaling for et overskudsselskab, som alene havde aktiver i form af bankindestående og passiver i form af en skattebyrde. Banken medvirkede herved på uforsvarlig måde til den ulovlige selvfinansiering, og Højesteret tiltræder, at banken, som intet gjorde for at afværge den heraf følgende risiko for tilsidesættelse af skattevæsenets interesser, er erstatningsansvarlig for skattevæsenets tab.

Med hensyn til bedømmelsen af Else Thranes ansvar er det ubestridt, at hun må identificeres med sine rådgivere, advokat Flemming Johnsen og revisor Dreymann Hansen, og at disse anbefalede salget og forestod dets gennemførelse.

Af de grunde, som er anført af landsretten, tiltræder Højesteret, at salget af overskudsselskabet ikke havde

**389**

karakter af en normal forretningsmæssig disposition. I forhold til, hvad der ville komme til udbetaling ved likvidation af selskabet i henhold til den udarbejdede balance, opnåede Else Thrane ved salget et merprovenu på 1 mio. kr. svarende til 55% af den latente skattebyrde. Under disse omstændigheder havde Else Thrane og hendes rådgivere ved salget en særlig anledning til at være opmærksom på risikoen for tilsidesættelse af skattevæsenets interesser.

Else Thrane og hendes rådgivere måtte indse, at der ved salget af overskudsselskabet bestod en ikke ubetydelig risiko for, at den latente skattebyrde ikke ville kunne udskydes eller elimineres, og at risikoen herfor og for tab for skattevæsenet ville være særlig stor, hvis købesummen for overskudsselskabet blev betalt med dettes egne midler. For Else Thrane og hendes rådgivere måtte det allerede som følge af den aftalte nationalbankoverførsel af købesum og selskabets midler samme dag fremstå som en nærliggende mulighed, at der ved det foreliggende salg ville ske selvfinansiering. Else Thrane og hendes rådgivere gjorde imidlertid ikke noget reelt for at afværge skattevæsenets risiko.

På denne baggrund tiltræder Højesteret, at Else Thrane, advokat Flemming Johnsen og revisor Dreymann Hansen ved salget af overskudsselskabet på uforsvarlig måde tilsidesatte skattevæsenets interesser, og at også de derfor er erstatningsansvarlige for skattevæsenets tab.

Herefter er spørgsmålet, hvilket tab der kan kræves erstattet:

Under de ovenfor angivne omstændigheder er der ikke grundlag for at anse tabet vedrørende investeringsfondshenlæggelsen for upåregneligt. Det tab, som skattevæsenet - og i dettes sted konkursboet - kan kræve erstattet, omfatter derfor også efterbeskatning af investeringsfondsmidlerne, herunder procenttillægget.

Der er heller intet grundlag for - som hævdet af banken - ved opgørelsen af skattevæsenets tab at tage hensyn til, at Else Thrane har betalt avanceskat af merprovenuet.

Der er ikke ved passivitet fortabt noget krav, og der er endvidere ikke grundlag for - som hævdet af Else Thrane - at lempe erstatningsansvaret for hende.

Else Thrane, advokat Flemming Johnsen, revisor Dreymann Hansen og banken er herefter alle erstatningsansvarlige for 1.860.916 kr. Højesteret tager derfor konkursboets principale påstand over for Else Thrane og banken til følge.

Om ansvarets fordeling mellem de ansvarlige anføres:

Da såvel banken som Else Thrane og hendes rådgivere er erstatningsansvarlige for skattevæsenets tab, må sagerne i øvrigt

Copyright © 2021 Karnov Group Denmark A/S                                                              side 20

afgøres efter erstatningsansvarslovens § 25, stk. 1, hvorefter den indbyrdes fordeling af erstatningsbyrden mellem flere solidarisk erstatningsansvarlige skal foretages efter, »hvad der under hensyn til ansvarets beskaffenhed og omstændighederne i øvrigt må anses for rimeligt«.

Ved den indbyrdes fordeling af erstatningsansvaret finder Højesteret, at det skal tilstræbes, på den ene side at sælger forlods kommer til at afgive sin berigelse, og på den anden side at ansvarsfordelingen i en sag om selskabstømning som den foreliggende - en såkaldt »bruttosag« - sker efter principper, som er generelt anvendelige.

For så vidt angår Else Thrane var det – ud over skattevæsenets erstatningsberettigede tab - en følge af den ansvarspådragende adfærd, at hun ved salget af selskabet opnåede et merprovenu i forhold til, hvad en likvidation ville have indbragt. Højesteret finder, at hun i det indbyrdes forhold forlods i hvert fald skal betale et beløb svarende til merprovenuet. Det er uomtvistet, at merprovenuet omfatter det beløb på 1 mio. kr., som køber betalte for selskabets skattebyrde, og at der ved likvidation ville være udløst en efterbeskatning af investeringsfondsmidler inklusive procenttillæg på 28.860 kr., ud over hvad der var hensat hertil i balancen. Da de sparede likvidationsomkostninger i denne sag ikke med sikkerhed overstiger omkostningerne ved salget, kan der ved opgørelsen af merprovenuet ikke tages hensyn hertil.

Det gælder for alle de ansvarlige, at den manglende omsorg for selskabets skattebyrde er udvist i forbindelse med fortjenstgivende aktiviteter, som er undergivet selvstændig beskatning. For nogle af de ansvarliges vedkommende er der muligvis adgang til skattemæssigt som en driftsudgift at fratrække, hvad de kommer til at betale i erstatning. For Else Thrane som sælger af overskudsselskabet gælder specielt, at der for så vidt angår en sælgers andel af den samlede erstatningsbyrde - og kun den - efter Told- og Skattestyrelsens cirkulære nr. 19 af 25. juli 1997 kan ske en regulering af den avanceskat, som udløstes af sælgerens fortjeneste ved salget af selskabet. Højesteret finder, at der ikke er grundlag for ved erstatningsbyrdens fordeling at tage hensyn til disse skattemæssige konsekvenser.

Derimod finder Højesteret, at der ved erstatningsbyrdens fordeling skal tages hensyn til den berigelse, som er forbundet med, at Else Thrane ved salget modtog merprovenuet kontant. Else Thrane bør derfor - i tillæg til merprovenuet - forlods bære et beløb svarende til den økonomiske værdi, der generelt må antages at være knyttet til rådigheden over merprovenuet. Denne værdi må i almindelighed fastsættes på grundlag af en normal forrentning ved passiv kapitalanbringelse. I det foreliggende tilfælde fastsættes tillægget til den nettorentegevinst på 165.315 kr., som parterne har opgjort ud fra en gennemsnitlig oplagsrente. Dette tillæg dækker

**390**

perioden fra Else Thranes modtagelse af det kontante merprovenu til sagens anlæg.

Af det fulde erstatningsbeløb på 1.860.916 kr. skal Else Thrane herefter i forhold til de øvrige forlods bære 1.194.175 kr.

Ved fordelingen af det resterende beløb på 666.741 kr. finder Højesteret, at udgangspunktet bør være en ligedeling mellem sælgeren og køberens bank. Højesteret lægger herved vægt på, at de omstændigheder, der begrunder ansvaret henholdsvis for en medvirkende bank og for en sælger (og dennes eventuelle rådgivere), som udgangspunkt må anses for lige tungtvejende i erstatningsretlig henseende. Uanset at oplysningerne om BG Banks særlige indsigt i Poul Fischers fremgangsmåde i denne type sager kunne tale for at pålægge banken en større andel af erstatningsbyrden i det foreliggende tilfælde, finder Højesteret, at der ikke er tilstrækkeligt grundlag for at fravige udgangspunktet.

I det indbyrdes forhold mellem banken og Else Thrane skal Else Thrane herefter betale 1.527.545,50 kr. og banken 333.370,50 kr.

I det indbyrdes forhold mellem sælger og dennes rådgivere finder Højesteret, at udgangspunktet bør være en ligedeling mellem samtlige ansvarlige deltagere på sælgersiden. I den foreliggende sag var Else Thrane efter det oplyste uden særlige forudsætninger for at bedømme forsvarligheden af den disposition, som hendes advokat og revisor uden forbehold anbefalede hende. På denne baggrund findes der at foreligge sådanne særlige omstændigheder, at advokat Flemming Johnsen og revisor Dreymann Hansen i forhold til Else Thrane solidarisk bør bære sælgersidens fulde andel af det nævnte restbeløb, dvs. 333.370,50 kr. I det indbyrdes forhold mellem advokaten og revisoren skal de hver især bære halvdelen, dvs. 166.685,25 kr.

Med henblik på bankens påstand over for advokat Flemming Johnsen bemærkes:

I forholdet mellem på den ene side banken og på den anden side sælgerens rådgivere må udgangspunktet være, at banken hæfter for halvdelen af det samlede erstatningskrav, og at sælgerens rådgivere solidarisk - og indbyrdes lige - hæfter for halvdelen af det samlede erstatningskrav. Der foreligger ikke sådanne særlige omstændigheder i denne sag, at der er grundlag for at fravige dette udgangspunkt. I det indbyrdes forhold mellem advokat Flemming Johnsen og banken skal såvel advokat Flemming Johnsen som banken derfor hæfte for 930.458 kr.

## Thi kendes for ret:

*Else Thrane og BG Bank A/S skal inden 14 dage efter denne højesteretsdoms afsigelse solidarisk til ApS af 1.9.1991 nr. 6 under konkurs betale 1.860.916 kr. med procesrente fra den 20. september 1996. I deres indbyrdes forhold bærer Else Thrane heraf 1.527.545,50 kr. og BG Bank A/S 333.370,50 kr., begge beløb med procesrente fra den 20. september 1996.*

*I sagsomkostninger for landsret og Højesteret skal BG Bank A/S og Else Thrane inden 14 dage fra denne højesteretsdoms afsigelse solidarisk til ApS af 1.9.1991 nr. 6 under konkurs betale 250.000 kr. I det indbyrdes forhold bærer Else Thrane 200.000 kr. heraf og BG Bank A/S 50.000 kr.*

*I øvrigt betaler ingen af parterne sagsomkostninger til nogen anden part.*

*Advokat Flemming Johnsen, Inter-Lex Advokater Odense A/S, registreret revisor John Dreymann Hansen og Verner Hansen Registrerede Revisorer ApS skal solidarisk friholde Else Thrane for, hvad hun af det idømte erstatningsbeløb på 1.860.916 kr. betaler til ApS af 1.9.1991 nr. 6 under konkurs ud over 1.194.175 kr. med procesrente fra den 20. september 1996. De skal desuden solidarisk friholde Else Thrane for, hvad hun af det idømte sagsomkostningsbeløb på 250.000 kr. betaler i sagsomkostninger til ApS af 1.9.1991 nr. 6 under konkurs ud over 100.000 kr. I deres indbyrdes forhold hæfter advokat Flemming Johnsen og registreret revisor John Dreymann Hansen hver for halvdelen. Inter-Lex Advokater Odense A/S hæfter solidarisk med advokat Flemming Johnsen. Revisionsfirmaet Verner Hansen Registrerede Revisorer ApS hæfter solidarisk med registreret revisor John Dreymann Hansen.*

*Advokat Flemming Johnsen skal friholde BG Bank A/S for, hvad BG Bank A/S af det idømte erstatningsbeløb på 1.860.916 kr. betaler til ApS af 1.9.1991 nr. 6 under konkurs ud over 930.458 kr. med procesrente fra den 20. september 1996. Else Thrane skal friholde advokat Flemming Johnsen for, hvad han som følge heraf betaler til BG Bank A/S ud over 333.370,50 kr. med procesrente fra den 20. september 1996.*