transaction reached an amount equal to the previous gain without the dividend tax. The pension plan would then still reach a zero result if Danish Tax Agency did not have to pay the reimbursement. This is therefore also the reason why the gain realized on the transactions is equal to the amount of the dividend tax. However, the reimbursement of the dividend tax is only a reimbursement of the profit lost by the pension plan, as the pension plan had bought the stock the day before the ex-date for a price including gross profit, but only received a net profit from the Danish company during the settlement of the market claim process.

**2.4.2.2.3 Business justification of the pension plan and the forward buyer for the sale/purchase of the forward**

The business rationale for entering into a forward is essentially to hedge a risk position: if you have a stock position, you can hedge the risk of price fluctuations by selling a forward contract. This is an agreement to sell the stocks at a certain time in the future at a certain price.

The buyer of the forward contract also hedges against price fluctuations by buying the stocks under a forward contract: He knows at what price he can buy the stocks in the future. This can be an important argument for a short seller or for a stockholder who sells his stocks before the dividend date to avoid the dividend tax.

As it had no direct contact with the counterparties to the forward contracts, the financial plan cannot comment on their specific motivation. There was always an intermediary between the pension plan itself and the ultimate forward counterparty.

The ultimate counterparty to a forward hedge may have had numerous reasons for entering into an agreement with the pension plan.

Thus, the ultimate buyer of a forward can hope that the stock price will rise again quickly after the date on which the stock is no longer traded with dividend rights (ex-dividend date). Empirical studies thus show that the stock price on the ex-dividend date does not always fall by exactly the same amount as the gross dividend, and that the stock price rises faster than usual after the ex-dividend date.

The ultimate counterparty to a forward may also be a foreigner who sells his stock before the dividend date in order not to lose the dividend tax for which he is not entitled to a reimbursement. He may wish to secure the right to repurchase an equivalent amount of stocks in the company from the market at a specified price. He may give the arbitrageur an incentive to buy the stocks in-between the dividend date and sell stocks after the dividend date by pricing the forwarder high. The counterparty to the forwarder can thereby bring the price of the forwarder out of equilibrium with the spot market.

**2.4.2.3 Stock lending and financing of stock purchases**

**2.4.2.3.1 The procedure for stock lending**

The pension plan finances the purchase of the stocks by lending the stocks and paying the stock seller with the cash collateral received from the stock borrower.

The ex-dividend date, which is the first day on which the stocks are traded without entitlement to dividends, occurs between the trade date and the lending date and settlement date. Thus, even if the value of the stocks is lower on the lending date than on the trading date, the stock borrower provides cash collateral equal to the purchase price on the trading date. This is normal market practice, as the stock

lender normally always pledges more collateral for the stock loan than the current market value of the stocks, see § 8.1 of this document. This is precisely what distinguishes a stock loan from a loan against a pledge of stocks. Here, it is the value of the stocks that exceeds the value of the loan.

In the case of stock loans, however, it is the stock lender who is protected against the risk that the stock borrower (who in many cases is a short seller) cannot return the stocks borrowed. Therefore, the cash collateral exceeds the current market value of the stocks.

As stated above, prior to the purchase of the stocks in question, the pension plan had already concluded a GMSLA framework agreement with the stock lending intermediary, which contains the general terms and conditions for the stock lending. The pension plan and the stock lending intermediary then agree on the specific terms as to which stocks, the number of stocks, the loan fee, the interest rate, etc. These agreements are concluded by e-mail. Once the stock loan intermediary and pension plan agree on the loan terms, the stock loan is communicated to the clearing agent and custodian. They check that the stock lending message received from the stock lender corresponds to the message received from the stock lending intermediary. If this is the case, the stock lending is confirmed.

As the pension plan uses the cash collateral from the stock borrower to pay the purchase price of the stocks, the stock lending must be settled on the same day with the clearing agent and custodian as the stock purchase itself. Without payment of the purchase price, the stocks are not delivered to the pension plan's custodial account with the custodian.

The settlement of the stock purchase will take place in parallel with the settlement of the stock lending. The stocks are thus registered three or four days after the purchase of the stocks, first in the pension plan securities account and then in the stock-borrower securities account. This registration in the pension plan's account is crucial for the correct settlement of the pension plan's market claim and for the pension plan's receipt of the proceeds that were initially wrongly sent by VP Securities to the seller's account.

Even if all the conditions are agreed by e-mail when the stock loan itself is concluded, this does not mean that the conditions for the stock loan are fixed. As the stock loans did not have a fixed term (see: "*term: open*"), they were open to constant renegotiation, i.e. the pension plan could demand a different fee at any time and the stock borrower could demand a different interest rate at any time by threatening to terminate the loan immediately. If the pension scheme had an interest in continuing the stock loan, it would accept the changed conditions. The same was true for the stock borrower.

As an example of these e-mails, by which the stock loan terms were continuously modified, is provided Appendix 79.

The formula stated by the Danish Tax Agency in the summary submission of August 09, 2019 in the lead cases, Paragraph 4.5, page 28, is therefore quite correct, but it cannot be used to arrive at the exact amount that the total Stock Lending Fee constituted. Without knowing the exact interest rate applicable on each day at any given time, it is not possible to calculate backwards, as the Danish Tax Agency attempts to do on page 29.

Since the Danish Tax Agency applies the wrong interest rate to all calculations of all stock loans for all pension plans, the Agency naturally also arrives at the same "calculation error" in all cases. When the Agency reaches the conclusion that there is an error in all the cases, the Agency should instead come to the conclusion that there must be an error in the Agency's approach and take into account variable interest rates for the different days.

The fact that the Danish Tax Agency cannot make its own calculations add up is not a sign of fraud, but a sign that the Agency does not know how the stock lending industry works in reality.

**2.4.2.3.2 Business justification for stock lending by the pension plan and the stock borrower**

The pension plan needs cash to pay for the stocks purchased. These are obtained by lending the stocks and receiving a cash collateral for the stocks equal to the purchase price. The financial services industry refers to these as "cash-neutral transactions."

The stock borrower may have many reasons for wanting to borrow the stocks.

It is therefore incorrect for the Danish Tax Agency to claim that the sole purpose of the stock borrower was short selling.

The stock borrower may thus need the borrowed stocks for hedging purposes. The stock borrower may also be a bank wishing to dispose of large cash balances in order to have a different, more valuable asset on its balance sheet than cash. A stock borrower may also be an investment firm that needs to respect a certain asset allocation (risk diversification) and therefore needs more stocks in its portfolio at the accounting date.

The European Central Bank also explicitly refers on its website (https://www.ecb.eu- ropa.eu/explai-ners/tell-me-more/html/securities_lending.de.html) to the existence of many years to borrow a stock: If you only need a stock temporarily for a day or a few weeks, it is often cheaper, quicker and less risky to borrow the stocks rather than buy them. Many different strategies used in the financial markets rely on stock lending. The borrowed stocks can be used for trading (taking a risk to realize a gain), arbitrage (realizing a risk-free gain from price differences) or hedging purposes (reducing risk). If, for whatever reason, stocks are delivered late, stock lending may be an option to obtain the missing stocks on time.

It should be noted in this context that the world's largest national banks themselves act as borrowers of securities as a means of realizing their monetary policy. This allows national banks to pump additional liquidity into the market in order to increase the money supply and thereby raise inflation.
Thus, it is also common knowledge that the Swiss and Japanese national banks are registered as the world's largest owners of listed stocks - whether these are bought or borrowed.

The size of the global equity lending industry is USD 10 trillion, so it is obviously impossible to account for all the possible motivations that an equity borrower might have.

The stock borrower will therefore not necessarily have the expectation that the stock price will fall, as claimed by the Danish Tax Agency in the submission.

The stock borrower and the pension plan have conflicting interests: while the pension plan has stocks and needs cash, the stock borrower (who has cash) needs the stocks. Both parties in a stock loan charge for their services: the stock borrower charges interest on the cash collateral he has to provide, and the pension plan charges a fee for lending the stocks. Who thereby realizes a loss and who realizes a gain depends on current market conditions and the bargaining skills of the parties involved.

**2.4.2.3.3 Other comments on the financing of stock purchases**

Pension plans that do not have enough equity to pay for the stocks themselves trade under what is known as "margin trading" or leverage. This allows a huge number of stocks (or other assets) to be traded without using equity. All the investor needs is a prime broker to provide the investor with the necessary capital.

Arbitrage transactions (not just those made around the dividend date) can be financed without equity when the gain from buying a stock on the spot market and simultaneously selling the derivative on the forward market can be determined immediately. As a rule, the price difference between the spot and forward markets is minimal. It therefore takes a huge volume of trading to generate enough profit for the strategy to pay for all the services involved.

Prime brokers, who in the present cases were custodians, and clearing agents do not necessarily have to directly fund the investor themselves in the form of a credit.
The prime broker can also simply act as a guarantor that payment for the stocks will be made. If the pension plan obtains the necessary financial means to pay for the stocks by lending them against a constant collateral, the role of the prime broker is limited to that of guarantor.

**2.4.2.4 Settlement of transactions (settlement)**

The actual settlement of the stock purchases was carried out four days until 2015 and three days after the stock purchases and forward sales from 2015. The stock purchases were settled by clearing and settlement (settlement). It was the clearing agent's task to calculate the total amount of money going from the buyer's custodian to the broker (and from there on to the ultimate seller), and the total number of stocks going from the custodian's securities account to the pension plan's securities account.

These settlements may be on a gross or net basis. This means that each trade can either be accounted for separately and each number of stocks transferred separately to the pension plan custodian (gross settlement). Alternatively, all purchases and sales to be settled between the broker's (= seller's) custodian and the buyer's custodian can be netted against each other, and all acquisitions and sales of stocks are netted (offset) so that only one net sum of money is transferred and only one net total of stocks is transferred between the buyer's and seller's custodians (net settlement after netting).

If netting is used during the clearing and settlement procedure, a stock can never be traced from the ultimate seller to the pension plan that bought the stock. After netting all purchases and sales, the pension plan will most likely not receive a stock that was at one time in the custody of the broker or the ultimate seller, but a stock that was previously in the custody of another client of the same custodian. This is precisely the purpose of netting: Fewer stocks are transferred between different custodians.

If, on the day of settlement of the trade, the pension plan has not yet received the cash collateral for the stock lending, the clearing agent is liable to the broker (seller) for the payment of the purchase price. Once the buy and sell orders have been matched, the settlement of the trade can no longer be stopped.
The clearing agent is obliged to pay for the stocks himself if the buyer does not have sufficient funds.

It should be noted that in none of the transactions carried out by the pension plan did the clearing agent have to pay the purchase price until a stock loan was in place.

The pension plan settled the stock purchase, the forward and the stock lending on the same day. The pension plan was thereby registered as the owner of the stocks four and three days respectively after the purchase. The pension plan was thus the owner of the stocks for a period of four and three days respectively, without this being registered with the custodian. Registration with the custodian only occurred when the pension plan paid for the stocks and had them delivered to its custodial account. This meant that for the first four or three days after the conclusion of the purchase agreement, the original owner was still registered as the owner of the stocks, even though he was no longer the legal owner of the stocks.

After the pension plan had been the legal owner of the stocks for several days, the pension plan lent the stocks so that the purchase price could be paid. The stock borrower was then registered as the new civil law owner.

However, registration of ownership of the stocks is not a prerequisite for acquiring ownership under Danish law. Registration is only declaratory and serves to secure the rights as owner against third parties. In this respect, Danish law differs fundamentally from German law. It is therefore fatal for the Danish Tax Agency to base its entire reasoning in the case on German case law.

The tax authorities attribute to the registration of ownership with the custodian a significance for ownership which the custodian does not have. The ownership of the pension plan does not start with the registration of the purchase with the custodian, which is why there is no "review ownership" of the stocks for a few minutes when the pension plan is first registered as the owner and the stock borrower is then immediately registered as the civil law owner during the stock lending. The pension plan was the owner of the stocks already from the matching of the purchase order.

**2.4.2.5 Maturity of transactions**

As stated above, the stocks purchased were never delivered under the forward hedge as the pension plan always settled the difference with the forward counterparties.

The pension plan never held the stocks for the exact same period as the forward contract term. On average, 90 days elapsed between the purchase and sale of the stocks by the pension plan. This maturity was achieved either by (1) extending the forward contracts (so-called "roll-over"), (2) purchasing another forward from the market with the same settlement date as the originally sold forward contract or (3) by an earlier difference settlement of the sold forward contract. That the maturity of the forward was generally not respected is proof that the transactions are genuine, since they are subject to market movements.

Thus, the Danish Tax Agency's claim that the pension plan traded the stocks in such quick succession that it was not possible to identify the beneficial owner is clearly incorrect. When 90 days elapse between the purchase and sale of the stocks, it makes no sense to talk about 'looping' the stocks.

The claim of "looping" put forward by the Danish Tax Agency seems to be a claim uncritically taken over from the German "cum ex cases." This, despite the fact that the Danish Tax Agency and the Ministry of Taxation are both of the opinion that (1) cum ex-trading is not possible in Denmark and that (2) none of the pension plans should allegedly have bought any Danish stocks at all. If the Danish Tax Agency really wants to rely on the German argumentation, the Danish Tax Agency must first admit that (1) this is a cum ex case and (2) all the pension plans really bought and sold Danish stocks. The Germans, in all the years they have fought to change the law to prevent cum ex-trading, have never claimed that no trading took place at all. The Germans also admit that there existed a flawed legal framework.

The pension plan was able to pass 90 days before selling the stocks again because the financing was secured by a stock loan. As long as the pension plan realized a positive result from the stock lending (i.e. as long as the stock lending fee exceeded the interest on the cash collateral), or at least the pension plan did not realize a loss exceeding the arbitrage gain, the pension plan could hold on to the stocks and let the stock loan run its course.

Where the stock lending fee exceeded the interest payable by the pension plan on the cash collateral, and the pension plan thus realized a gain on maintaining the stock lending, either the receipt of the merger or the evolution of prices on the stock markets caused the pension plan to close all positions. As the forward contract was sold at a price out of balance with the current stock market, the normal price development of both the stock market and the forward market could cause the pension plan to realize the gains made so far and not to run any further risks.

The calculated gain to be realized by the pension plans was at the same level as the dividend tax, and when it was reached, the targeted gain was realized and the positions closed.

**2.4.2.6    The positions are closed**

Like all pension plans, a solo 401K pension plan aims to generate a profit, and in any case avoid realizing losses.

Dividend arbitrage is an obvious form of investment here, as by closely monitoring the investment, the trader can close positions in time to avoid realizing a loss.

The pension plan knows, at the moment the stocks are purchased and the forward contract is sold, what gain can be realized (purchase and sale prices are both known). The only uncertainties associated with the transaction are (1) whether and when the reimbursement is paid and (2) the cost of the stock lending and hence of financing the stock purchase.

The pension plan knows that the sale price of the forwarder is below the purchase price of the stocks. This is also normal as the dividend is due between the purchase date of the stocks and the expiry date of the forward contract. If the selling price of the forward plus the gross dividend is above the purchase price of the stocks (on the spot market), the pension plan expect to realize a gain. From this gain, the pension plan only has to deduct the cost of the stock lending.

The terms of the stock loan (= the interest on the cash collateral and the stock loan fee) are constantly subject to renegotiation, as both the stock lender and the stock borrower can terminate the stock loan at any time. This means in practice that the current market conditions for stock lending constantly have a direct impact on the cost of the transaction. If the cost of the stock lending increases to the point where the pension plan can no longer realize a profit if the reimbursement is not received, the pension plan has to close all positions: terminate the stock loan, sell the stocks and buy a forward.

The stock loan can be cancelled at one day's notice.

The forward contract can either be bought back or the pension plan can enter into a similar forward contract to buy the same number of stocks it has previously sold, with the same settlement date as the original sale.

The sale of the stocks will follow exactly the same procedure as the purchase of the stocks described above. Now the pension plan is just the seller not the buyer.

**2.4.2.7    Profits realized**

The pension plan starts the whole transaction with a liquidity loss: the pension plan has bought the stocks for their full value - including the gross dividend - and the next day (on the ex-date) the stocks are traded at a lower value. Theoretically, this lower value should be equal to the gross dividend. However, the markets react differently from theory. Sometimes the stock price falls more, sometimes less than the gross dividend.

The fact is, however, that the market price of the stocks bought by the pension plan already falls the day after the purchase. This "loss" is offset by two payments: the net dividend and the reimbursement. This means that the loss on the highly liquid stock value is replaced by two less liquid asset items: the net

dividend claim and the reimbursement claim. While the net dividend is usually received a few days after the stock purchase, it takes several months before the reimbursement is received.

From an accounting point of view, the pension plan did not realize a loss the day after the purchase either, despite the fact that the market price of the stocks fell, because the pension plan sold a forward at the same time. The sum of the value of the forward, the net proceeds and the dividend distribution was always at least equal to the purchase price of the stocks. The purpose of a forward hedge is precisely to offset the loss in the value of the stocks by a corresponding increase in the value of the hedge.

Thus, the gain realized by the pension plan does not derive from the reimbursement. The reimbursement only covers the loss in stock value. Instead, the gain arises either from a profit realized on the stock lending (if the stock lending fee exceeded the interest payable on the cash collateral), from the sale of the stocks or from the settlement of the forward contract.

The reason why the accounting gives the impression that the benefit of the pension plan was the reimbursement (see the Danish Tax Agency's summary submission in the August 09, 2019, § 4.2, page 24), is that the pension plan in principle closed its positions when the gain that the pension plan could realize under the stock lending, stock sale and/or forward contract was equal to the value of the reimbursement. If the pension plan would let the investment run its course, the pension plan could risk realizing a loss: namely, in the event that the reimbursement would not be paid out.

**2.4.2.8 Summary of the business model and transactions**

In the present case, the pension plan purchased the Danish stocks before the ex-dividend date, i.e. before the dividend was deducted from the stock. It became the owner of the stocks and the dividend on the basis of a final and binding agreement to purchase the stocks.

This agreement was reached by electronically matching the pension plan's purchase order with a sales order from a broker. The pension plan paid 100 percent of the current market price before the dividend was deducted from the value of the stock. The purchase price thus included 100 percent of the gross dividend.

Since the pension plan had access to a double tax treaty entitling it to a dividend tax reimbursement, the stocks also had this value for the pension plan, even though it only received the net dividend on its account with its custodian on a first-name basis.

The stocks were paid three and four days after purchase by lending the stocks after the dividend date and thereby receiving a cash collateral equal to the purchase price of the stocks. The individual stock loans were drawn under the GMSLA, which was concluded prior to the stock deal as a framework agreement. The terms of each stock loan were determined by e-mail correspondence. The e-mail correspondence is attached as <u>Appendix 80</u>.

The economic risk associated with the transaction was managed using a forward hedge (in 2012 futures were used for the same purpose). On the same day as the stocks were purchased, a forward hedge was entered into on the sale of the stocks at a later date at a fixed price. However, in neither case were the stocks delivered under the forward hedge. The forward hedge was always offset. This eliminated the risk of losing ownership of the stocks when the hedge was entered into.

To illustrate the progress of the transactions in the dividend arbitrage carried out by the pension plan, please refer to the timeline below. The timeline further illustrates that the pension plan could not possibly have sold the "same" stocks under a forward contract that they had just purchased that day, even ignoring

the fact that the forward was generally settled by difference settlement and that stocks were never delivered under the forward contract.



It was the difference between the price of the stock on the spot market and the price of the stock on the forward market that prompted the pension plan to buy the stocks immediately before the dividend payment. The trader of the pension plan could see that the selling price on the forward market was not as far below the spot market price as the gross dividend would mathematically be. This may be due, among other things, to the fact that sellers who wish to buy back the stocks after the dividend date are offering more than normal for the stocks, as the dividend on their stocks is taxed at 27 %, and these sellers may therefore offer a higher price for the forward than other buyers. The reason for this is an increased demand from the market to buy stocks after the dividend date (e.g. from those who have sold the stocks before the dividend date).

By buying the stock, receiving the net dividend and a reimbursement of the withheld dividend tax, and selling the stock again at a lower price (the stock price falls after the dividend payment), the pension plan could realize a gain. It was this gain that was the purpose of the whole transaction - and what created the financial profit. The purpose of the transactions was thus not simply to obtain a reimbursement of dividend tax from the Danish tax authorities, as claimed by the Danish Tax Agency. On the contrary, the subsequent reimbursement of withheld dividend tax merely ensured that the transaction was tax neutral for the pension plan.

Dividend arbitrage is thus nothing more than a normal arbitrage transaction. The only special feature of dividend arbitrage is that it is carried out around the date of the distribution of the dividend. It is precisely the fact that the company intends to pay a dividend that upsets the markets (spot and forward).

Foreign investors who are not eligible for dividend distribution seek to sell their stocks before the dividend is distributed in order to buy them back from the markets after the distribution. (Danish) stockholders who would rather realize a profit that is taxable under the rules of capital gains tax than receive a stock dividend also seek to sell their stocks to the market before the distribution of the dividend. These stockholders may also buy back stocks from the market after the dividend date. And finally, there are pure speculators who believe that the stock price will not fall by the very amount paid in dividends which bring stocks to the

market just before the dividend date. All these groups of investors cause movements in the market just around the dividend date. These movements are not identical in the spot and forward markets. The spot market price for the same stock may move differently from the forward market price. This creates the possibility of an arbitrage trade.

The only reason that dividend arbitrage is called dividend arbitrage is that this arbitrage is undertaken precisely when the distribution of dividends brings particularly large movements into the market.

Similar arbitrage trades are made throughout the year, as the spot and futures markets do not only diverge around the dividend date.

However, the tax authorities are only interested in dividend arbitrage because it is carried out around the date of distribution of the dividend and thereby triggers dividend income for the arbitrageur with a resulting right to a reimbursement of withheld dividend tax under the applicable rules.

After the pension plan had already described the dividend arbitrage in detail to the Danish Tax Agency in its 2nd submission, it was the Danish Tax Agency itself that, in its 2nd submission of 18 January 2019, for the first time described dividend arbitrage as a "money machine." This concept is not that of pension plans, as the Danish Tax Agency again claims in the Agency's summary submission in the preliminary proceedings of August 08, 2019, § 8.1.

Incredibly, the Danish Tax Agency continues to deny the existence of profit arbitrage throughout its submissions (most recently in the summary submission in the Lead Cases of August 09, 2019, § 4.3, page 26). This, despite the much publicity this investment strategy has received under the term "cum ex" not only in the Danish but also in the international press, and the thorough study conducted by ESMA at the request of the European Parliament, see the European Parliament's proposal for a resolution on a common solution of November 2018, presented here as Appendix 81. When the Danish Tax Appeals Agency submitted its summary submission in the lead cases on August 09, 2019, ESMA's report on dividend arbitrage was already available. It therefore does not help the Danish Tax Agency's case to deny the facts.

It is also naïve to think that it is only the pension plans that realize a profit from the dividend contributions. However, it is only visible to the pension plans what profit they themselves realized from the business. After all, it is their business. Pension plans cannot possibly account for the business models and profits of independent third parties.

Of course, pension plans do not have to stock their gains with the counterparties to the stock loan and the forwarder. That would have meant illegal cooperation between these independent market participants. The stock lender and the forward counterparty have commercial interests which are the opposite of those of the pension plans. They obviously do not co-operate and do not stock profits.

After so many pages of descriptions of dividend arbitrage throughout the previous posts, it is also unfathomable that the Treasury still cannot or will not understand the role of pension plans. In its submission of August 09, 2019, § 4.3, page 27, the Danish Tax Agency lists the various actors without understanding the role of the pension plan.

Thus, the partners are listed as follows:

| Party | Service |
|-------|---------|
| Seller | Supplies the stocks |
| Pension plan | ? |
| Buyer | Receives the stocks |
| Stock borrower | Supply financing |
| Forward purchase/sale | Hedges exchange rate risks |
| Custodian | Guarantees the solvency and completion of the transaction. |

The Tax Agency notes:

> *"As can be seen, each party - apart from the pension plan - is reportedly offering whatever is necessary for the transactions to be carried out with the desired result. It goes without saying, therefore, that all parties must have a share in the benefit before it makes sense for them to engage in arbitration. Otherwise, there is no business rationale for them to participate in this arrangement, which of course entails a number of risks, such as default by co-contractors and insolvency of co-contractors."*

What the tax authorities refuse to accept is that the pension plan is the buyer of the stocks. There is no reason for the question mark next to the pension plan. The pension plan is the buyer of the stocks, since the pension plan has a favorable tax status which it uses to realize its gain.

The other parties' business is not profit arbitrage. There is therefore no reason why they should share in the profit-sharing gains of the pension plan. It makes absolutely no sense that the buyer and seller of stocks or the buyer and seller of a forward contract should stock the gain realized on the transactions. Buyers and sellers never do.

### 2.4.2.9 Examples of transactions at dividend arbitrage

To illustrate the economics of the dividend arbitrage transactions undertaken by the pension plan, the following is a transaction undertaken by the pension plan. It concerns the purchase of an item of stocks in TDC A/S in 2015).

A review of all pension plan transactions would show that the pension plan sometimes realizes a gain on the purchase and sale of the stocks, as in any other speculative investment.
Sometimes, however, the gain was realized on the forward hedge. Here, the hedge worked precisely as intended: to offset the losses on the equity transaction itself. The fact that the gain occurred in such different ways is evidence of the reality of the transactions and that they were in no way centrally organized or controlled.

Appendix 1 also shows a summary of all stock transactions carried out by the pension plan. It shows how it varies where the gain is realized: on the stock trade or the forward hedge. This is typical for dividend arbitrage transactions.

A dividend arbitrage transaction can be divided into three transactions: a stock trade, a forward contract and a stock lending.

Purchase/sale of stocks and the forward contract:

On March 05, 2015, the pension plan issued a purchase order for 2,358,808 TDC A/S stocks at a price of DKK 54.00 per stock, totaling DKK 127,375,632.00. Payment, delivery of stocks and registration were scheduled to take place on March 10, 2015. As the purchase is concluded on the same date as the dividend distribution is decided, the trade is marked in the clearing system as a so-called "cum ex trade." This indicates to the custodians involved that a market claim will be realized after the settlement of the stock trade. This ensures that there are not two persons who both receive the dividend, receive a DCA and can thereby request reimbursement.

Also on March 05, 2015, the pension plan entered into a forward contract (a financial contract) for the sale of 2,358,808 TDC A/S stocks at a price of DKK 53.00 per stock for settlement on June 19, 2015.

On June 02, 2015, the pension plan entered into a new forward contract with the same settlement date, namely
June 19, 2015 regarding the purchase of 2,358,808 TDC A/S stocks at a price of DKK 49.68 per stock. It therefore closed the open position and had a total gain on the forward of DKK 3.56 per stock.

On June 02, 2015, the pension plan sold the stocks with a value date of June 04, 2015 at a price of DKK 49.69 per stock, totaling DKK 117,209,169.52. The pension plan thus had a net loss of DKK -4.31 per stock, totaling DKK -10,166,462.48.

The stock traders and the forward contracts together resulted in a total loss of DKK 1.5 billion. 0.75 per stock, for a total loss of DKK 1,774,059.50.

Stock Lending

On March 09, 2015, the pension plan issued an order for settlement on March 10, 2015 to lend 2,358,808 TDC A/S stocks against cash collateral of DKK 54.00 per stock, totaling DKK 127,375,632.00. The pension plan thus received DKK 127,375,632.00 as security for the return of the stocks.

The stock loan was terminated on June 02, 2015 with an effective date of June 04, 2015. This had the consequence that the stocks had to be returned. The stocks then had a market value of DKK 49.69 per stock, totaling DKK 117,209,169.52.

This amount, plus the total amount of the current valuation adjustment, MTM, which amounted to DKK -10,166,462.48, had to be repaid to the stock borrower, totaling DKK 127,375,632.00.

The stock borrower was thus guaranteed to receive the full amount of the cash collateral he had provided for the stock loan.

In addition, the pension plan had to pay interest on the stock loan of DKK -213,000.36 and receive a fee for the stock loan of DKK 265,130.02, in total paying a net amount of DKK 52,129.66.

Dividend and reimbursement payment

The interim dividend had been adopted on March 05, 2015.

The stocks were traded without dividend from March 06, 2015 (ex-date).

Pay day, i.e. the day on which the dividend is paid, was March 10, 2015.

The pension plan received the net proceeds in the form of a market claim, as the seller of the stocks was still registered as the owner of the stocks on the record date. The pension plans were not yet registered as owners of the stocks on the record date (March 09, 2015), as the settlement of the purchase did not take place until March 10, 2015.

Record day is in Denmark the day before pay day. VP Securities therefore immediately paid the dividend to the former owner, who was still registered as owner of the stock with VP Securities, on March 09, 2015. In accordance with the so-called "market claim process," the seller's custodian is obliged to debit the dividend from the seller and credit the dividend to the buyer (or forward the dividend to the buyer's custodian so that he can credit the buyer's account). It is therefore the buyer of the stocks who receives the dividend and is entitled to a reimbursement.

The gross dividend paid by TDC A/S was DKK 1.00, in total DKK 2,358,808.00 for the pension plan stocks. The net dividend amounted to DKK 1,721,929.84 and the dividend tax to DKK 636,878.16.

The payment of these two amounts to the pension plan merely offset the loss incurred by the pension plan on the ex-date, as the stocks lost the corresponding amount in value on that date. The reimbursement was therefore not the driving force behind the investments in the Danish stocks. The reason for investing in the Danish stocks was the price difference on the spot and forward markets triggered by the distribution of a dividend.

**3 THE PENSION PLAN BECAME THE LEGAL AND TAXABLE OWNER OF THE STOCKS**

**3.1 The pension plan became the civil law owner of the stocks**

In principle, tax law is governed by civil law. This also applies to the question of acquiring ownership of stocks.

It is a fundamental principle of the law of obligations in Danish law that ownership of a given asset is acquired when a final and binding agreement has been concluded between the parties, which is legally valid. This principle also applies to the acquisition of stocks.

Ownership is acquired regardless of whether the buyer defaults on the obligation to pay the purchase price. For the same reason, there are rules allowing the seller to rescind the sale afterwards if the agreed purchase price is not paid, unless only an insignificant amount remains to be paid. These rules on subsequent rescission of a sale if the buyer does not pay the purchase price illustrate very clearly that payment of the purchase price is not a precondition for the transfer of ownership. If this were the case, there would be no need for rules on subsequent rescission in cases where the buyer does not pay the agreed purchase price.

As the payment of the purchase price is not a condition for acquiring ownership, stocks are delivered (in the settlement process called settlement) only when the payment is made (according to the principle of "Payment versus Delivery" - DvP).

The consequence is that:

- Settlement of a stock trade, which takes place with the clearing and settlement agent, is not a prerequisite for acquiring ownership of a stock.
- Evidence of a flow of funds from buyer to seller is not evidence that a buyer has acquired ownership of a Danish stock.
- Evidence of a transfer of a stock from the seller's to the buyer's securities account is not evidence that a buyer has acquired ownership of a Danish stock.
- The buyer of a stock is already the owner before the stock is registered in his deposit.

- If a stock is sold so shortly before the dividend date that the stock is not yet registered in the buyer's securities account, the dividend will be paid to the wrong party via VP Securities and the underlying sub custodians. It is against this background that Article 19(1) of the Danish Sale of Goods Act declares the buyer of a stock entitled to receive the dividend (and thus to a reimbursement).

Accordingly, the comments on § 23 of the Danish Capital Gains Tax Act (L78 of 16 November 2005, see Appendix 12) also maintain this position:

> *"The decisive factor for determining the time of disposal is when there is a final and binding agreement on the disposal. For stocks traded on the stock exchange, the date of the stock exchange note (trade date) will be taken as the basis.*
>
> *In addition, the determination of the acquisition date may have an impact, e.g. in the context of new legislation. Here too, the decisive factor is when there is a final and binding agreement on the acquisition. For stocks traded on the stock exchange, the date of the stock exchange note (the trade date) will be taken as the basis."*

The same is stated in the Legal Guide, § C.B.2.1.6.1.

The trading date of a listed stock is thus the time at which buy and sell orders are "matched." This matching of buy and sell orders - which is done by an automated "handshake" on modern automated trading facilities - is referred to as the "execution of the trade."

Also, the National Tax Agency leaves no doubt that the civil law ownership is acquired on the trade date, which is precisely not the settlement date, since in the decision of March 20, 2007 (SKM2008.831.SR) it was established that the trade date is after the placing of an order for the purchase of stocks, but before the settlement of the transaction:

> *"An order cannot be equated with a purchase [...]*
>
> *[...] it is the trading date that must be taken into account when determining the time of purchase or sale of stocks. The date of exchange is therefore not decisive. [...] This is true even if the value date is only 1/4/2006 and even if the stocks were therefore not in the claimant's portfolio on 12/31/2005)."*

It is therefore clear, on the one hand, that a purchase order is not enough to become the owner of a stock. On the other hand, it is equally clear that the purchase need not yet be settled by entry in the purchaser's securities account. Payment for the stocks is therefore also not necessary in order to become the owner of the stocks, since the purchase price for the stocks must first be paid upon delivery (delivery versus payment) in accordance with § 72 of the Danish Securities Trading Act/§ 188 of the Capital Markets Act, i.e. upon entry of the stocks in the buyer's securities account.

In the present case, the pension plan issued a purchase order to its brokers for the purchase of stocks. These orders were matched with sell orders received from other brokers. This matching is the purchase agreement itself, which is final and binding. The payment and registration of the stocks, confirming that the agreement was final and binding, took place three to four days later.

It can thus be assumed in the decision that the pension plan was the civil law owner of the stocks at issue in this case.

This civil ownership also gives rise to tax ownership, unless one of the exceptions developed by case law applies.

In particular, in the context of stock loans, case law has held that the stock borrower becomes the civil law owner of the stock, but not the tax law owner of the stock. The stock lender continues to be the tax lawful owner of the stock until the stock is sold by the stock borrower to a third party.

At the date of the dividend, the pension plan had not lent the stocks. The lending did not take place until three to four days later. Whether the stock borrower subsequently lent the stocks, kept them or sold them on to a third party, the pension plan cannot know. The pension plan therefore remained the legal owner of the stocks for tax purposes, even though a stock lending followed three or four days later.

Similarly, the fact that the forward contract was entered into on the same day as the stocks were purchased does not mean that the pension plan lost its tax ownership of the stocks.

**3.2 Trading large stocks - short selling**

The Danish Tax Agency considers in the summary submission to the lead cases of August 9, 2019, § 4.1, pages 22-24, that unrealistically large stockholdings have been traded and that the pension plans cannot possibly have been the owners of the stocks in question for that reason. The Agency considers that it should be impossible to acquire such holdings in a single day. As an example, the Agency cites a sale of stocks worth DKK 3.9 billion that was sold through accelerated book building - not on the open market.

Thus, the Agency correctly notes that large stockholdings are precisely not traded on the stock exchange. Alternative OTC markets are sought for large caps.

If the tax authorities were to carry out a similar analysis of all trades made by, for example, Danske Bank, Deutsche Bank, Citibank or Blackrock, the tax authorities would arrive at similarly large trades in stocks. Unimaginably large amounts of stocks are traded every day by all major players in the market.

Since it can indeed be difficult to obtain large holdings of stocks, it is evident that among the stocks bought by pension plans there must logically have been a number of stocks sold by short sellers. Which and how many stocks came from long owners or short sellers is impossible to say. But this is true for any buyer of stocks. No one can know from whom he buys a stock. Neither by exchange trades nor by OTC trades.

**3.2.1 Introduction to short selling**

Short selling is not regulated in Denmark, with the exception of rules prohibiting uncovered short selling and some flagging rules.

According to a note dated April 10, 2018, from the Danish Financial Supervisory Authority regarding short selling in Denmark, which is presented as Appendix 82, short selling, according to the Danish Financial Supervisory Authority's own definition, means the sale of a stock that the seller does not own at the time of sale, as opposed to a regular securities trade, where the seller owns the security being sold.

It is internationally recognized that a short seller is considered covered if he only has a framework stock loan agreement in place at the time he sells the stocks he does not own. Such a framework agreement is a GMSLA. A person who wishes to sell stocks which he does not own simply has to ensure that he can deliver the stocks at the time of delivery. In the short selling industry, this is also known as a "localization agreement": the short seller must be able to locate the stocks covering his sale so that he can deliver at the time of settlement. In the words of the FSA, see Appendix 82, page 2, a short seller must

> *"that is, before the sale, have been in a position to borrow the paper or have secured in some other way a transfer of ownership of the paper."*

"Being able" to borrow is not the same as already having borrowed. This is why the Financial Services Authority talks about the short seller simply having to ensure that he can transfer ownership.

In other words, the short seller does not have to enter into a **specific** agreement to borrow a certain number of stocks before the sale is made, as postulated by the Danish Tax Agency in its submission of August 9, 2019, as such an agreement would make the short seller the civil law owner of the stock. He would thus no longer be a short seller at all, but a "long owner seller." Short selling can therefore (legally) only occur in the form of sales under stock loan framework agreements (unless short selling is carried out by so-called "market makers" - banks authorized to engage in uncovered short selling).

Since a short seller only needs to be covered by the conclusion of a framework agreement for stock lending, short selling has the consequence that a short seller increases the number of stocks traded and thus the number of stocks for which final and binding agreements to purchase are concluded. All the buyers of these stocks become, under the general rules of the law of obligations, the owners of the stocks acquired.

Thus, the FSA also highlights in Appendix 82, page 6:

> *"Similarly, short selling allows market makers to offer their clients (retail as well as institutional clients) to buy a security even if the **<u>market maker cannot obtain the security</u>** from its own inventory or through the market **<u>at the time of the client's order</u>**."* (our emphasis)

Short sellers can, in effect, sell an unlimited number of stocks as long as they have stock loan localization agreements (GMSLAs) that allow them to deliver the stocks sold. Thus, at the beginning of 2018, the value of short positions in Danish listed stocks was approximately DKK 25 billion, equivalent to about 1 percent of the total value of the Danish listed stock market. And these figures only include short positions, each of which was reportable. If the ultimate sellers of the stocks sold to the pension plans were in part short sellers, they do not necessarily need to appear in these statistics if each short seller's net position did not exceed 0.2 percent of the stock capital issued by the company.

**Figure 3: The value of net short positions in Danish listed shares has increased sixfold since 2103**



Note: The figure shows the market value in Danish kroner of net outstanding short positions above 0.2% of the issued share capital in Danish listed shares broken down by sector of the issuing company and the relative size compared to the total number of shares in the issuing company as against the total market. The sector breakdown is determined on the basis of GICS codes.
Source: FSA (Finanstilsynet)

No one can distinguish between stocks sold by a short seller and stocks sold by a real stockholder (long owner). The number of stocks available for trading thus increases (temporarily) in the case of short selling to a number exceeding 100 percent of the issued stocks. It is only at the settlement of the stock trades that this excess number of stocks traded is brought back to the actual number of stocks issued by the company. The total quantity of dematerialized stocks will always be correct at the time of settlement, when the short seller has to deliver the stocks sold, by drawing stocks under the stock loan or making a covering purchase on the market.

It is thus possible that more Danish stocks are traded on the market than the number originally issued by the companies. Short selling has precisely the typical - and also **often desired by central banks and financial supervisors (cf. the Financial Supervisory Authority's report on short selling, see Appendix 82, pages 5-6)** - consequence that there are more stocks available on the market than originally issued.

Under Danish law, the transfer of *ownership* is completely separate from the settlement of a stock deal. Moreover, it is irrelevant for the question of ownership whether (1) a stock trade is settled physically (by a "de-registration" of the seller and a "registration" of the buyer with VP Securities or another custodian) or whether the trade (2) is settled using netting (with the consequence that a net report may not be sent to VP Securities at all - if the net result is 0).

### 3.2.2 Short selling creates more stocks until the trades are settled (settlement)

When a short seller sells stocks under a Master Stock Lending Agreement (GMSLA), he either creates more stocks than the company has issued, or expressed differently, double ownership of one and the same stock arises: the stock lender who has not yet lent the stock under a specific stock lending agreement (but has only entered into a Master Agreement for a potential lending) is still the civil law owner of the stock. At the same time, the buyer acquires civil law ownership of a stock by the final and binding agreement with the short seller.

It is only at the settlement of the trades (which usually takes place two days after the trade has been concluded by a final and binding agreement) that the number of owners is brought back to the number of stocks issued by the company, as no more than one owner of the same stock can be registered. It is this fact that we have tried to outline with the following illustration.

The illustration shows an artificial world in which a company issues only a single stock. Thus, the owner can only sell a single stock.

However, the illustration shows 3 short sellers bringing the total number of stocks in circulation up to 4 stocks, even though only one stock can be delivered. The trade is still 4 stocks.

In the situation illustrated here, several stocks become the subject of a final and binding stock purchase agreement, and there are thus four buyers who become owners of the stocks even though only one can have the stock delivered. There is thus a temporary "inflation" of stocks, as Unidroit puts it, on the trade date which disappears again on the settlement date.



Thus, it is only until the liquidation of the stock dealers that there are more owners of Danish stocks than the number of stocks issued by the companies. Since no more stocks can be "physically" delivered than the company has issued, the double temporary ownership created by the short seller must cease when the stocks are to be delivered by electronic book-keeping (entries/registrations) with the custodian(s) involved. Whether settlement using netting can lead to an extension of the dual ownership beyond the time of settlement does not need to be discussed here, as the pension plan lent the stocks at the time the stock purchases had to be settled in order to pay the purchase price. The pension plan's civil ownership therefore also ceased with the settlement of the stock purchase, pursuant to the stock lending agreement they entered into by email. However, on the date of the dividend, the pension plan had civil law ownership of the stocks and was therefore also the proper recipient of the dividend, with the consequence that it was entitled to receive a reimbursement of the withheld dividend tax under the current rules on this subject.

Which stocks have more than one civil law owner cannot be identified, as short sellers act under one or more stock lending framework agreements. GMSLAs are often concluded between (long owner) stockholders and stock loan intermediaries on the one hand and short sellers and stock loan intermediaries on the other hand. The stockholder who lends his/her stock does therefore not necessarily know the short seller. The stock lender who makes his stock available for a potential or actual loan also does not know the ultimate stock borrower and his motivation, much less whether the ultimate borrower is a short seller at all.

The short seller only relies on the master agreement (GMSLA) - often only by e-mails that maintain the concrete terms of the specific stock loan - *if* and *when* he has to deliver the stocks during the clearing and settlement process. If the short seller buys stocks from the market again before he has to deliver the stocks he originally sold and he agrees a shorter delivery time for the stock purchase than for the stock sale

(in the case of OTC orders, the delivery period can be freely agreed), the short seller never has to withdraw any stocks under the GMSLA. He has nevertheless transferred ownership of the stocks to a buyer.

Thus, on the day of delivery, the short seller offsets the excess number of stocks over the number of stocks issued (free float is brought back to normal) by making a covering purchase so that no one "discovers" that the short seller has sold stocks he did not own. If the short seller did not succeed in making such a covering purchase, it would be obvious that there had been more owners of stocks than the number issued. He must therefore draw on the GMSLA, bringing the stock lender's ownership to an end. However, this does not alter the fact that there *have legally been two owners for a period of time*. Who continues to be the owner will be decided according to the rules of substantive law, including the rules on observance of security deeds and vindication/extinction. It is precisely in *this* context that the delivery of the stock plays a role under Danish law. The person who has the stock registered in his deposit has a secured legal position as owner. Until delivery, the ownership acquired by the buyer is not protected against extinction. The buyer has nevertheless acquired ownership of the stock.

In other words, during the period between the sale of the stocks he did not own and the cover purchase (or the loan of the stocks under a specific loan agreement), the short seller transferred ownership of the stocks by a simple purchase contract to a buyer who cannot know that the seller is a short seller. In doing so, the short seller de facto creates more owners of Danish stocks than the company has issued. This can only be prevented if the actual transfer of ownership of stocks requires delivery of the stocks.

However, such a requirement does not exist in Danish law. In Danish law, the delivery of the stocks, which takes place during the settlement process and which leads to the registration of the ownership with the custodian of the buyer, is merely declaratory.

In this respect, Danish legislation differs significantly from, for example, German legislation. Under German law, the delivery of the stock from the seller's depository to the buyer's depository is necessary for the buyer to become the owner. As this is not necessary under Danish law, Denmark - also according to German Prof. Dr. Christoph Spengel from the University of Mannheim - has made it extremely easy for short sellers to create more stocks than the number of Danish stocks issued by the companies.

The professor believes that Denmark is suffering from a legal problem that legislation and legal practice have created.

It is quite obvious that the tax authorities are trying to rely on German rules and case law on the acquisition of stocks to solve the problems arising from short selling. The tax authorities are trying to do this without any legal basis. There are no rules in Denmark requiring the delivery of stocks in order to acquire ownership, quite the contrary.

### 3.2.2.1 The Tax Agency's views on the "short buyer"

In its summary submission of August 09, 2019, the Danish Tax Agency presents in § 8.3, page 69, a chain that would reproduce short selling:

*Owner/stock lender à Stock borrower/short seller à "Short buyer"*

This chain correctly represents how a stock is delivered. However, it does not represent how ownership is transferred.

In presenting this chain, the tax authorities seem to want to introduce the (new and fictitious) figure "short buyer." In reality, there is no such thing as a 'short buyer'. The introduction of dematerialized stocks and the anonymous way in which these are traded has made it impossible to follow a particular stock from a particular seller to a particular buyer. Stocks exist only as numbers in computers, and when these numbers can be netted against each other during the settlement process (called "netting"), so that each financial firm transfers only the net sum of all purchases and sales made by its customers to the next financial firm, it is impossible to follow a particular stock from seller to buyer. There is no "short buyer" equivalent to a short seller.

A short seller is only a short seller if he is <u>not</u> the civil owner of the stock. The civil owner of the stock is the long seller. At the moment the short seller enters into a <u>concrete stock loan</u> with the owner of the stock, the stock borrower becomes the civil law owner of the stock. In other words, the short seller is only "short" as long as he is either (1) uncovered (which is allowed for a so-called "market maker"), or (2) "only" covered by a GMSLA, but has not yet drawn (= borrowed) a concrete number of stocks under a GMSLA. When the stocks are drawn by a specific stock loan under the GMSLA, the short seller becomes the long owner. Short selling is therefore only possible as long as there is "only" a GMSLA under which no stocks have yet been drawn. When a short seller draws stocks under a GMSLA, he draws stocks that the company has issued. The existence of the GMSLA covers the short seller and makes his sale legal (since he is not "uncovered"), but at the same time this short selling results in more stocks being traded than have been issued by the company. There are more stocks on the market to trade than issued by the company.

If the Danish Tax Agency were correct in its argumentation, short selling would exist exclusively in the form of extended short selling (by market makers).

The reason why the short seller can transfer ownership of something he does not own (civil and legal ownership) is that the short seller can **legitimize** the transfer of ownership of the stocks by being able to exclude the risk of a "fail" of the trade, i.e. that the trade does not settle. The short seller can exclude a failure by (1) having a GMSLA that allows him to borrow stocks for delivery, and (2) have a clearing agent and custodian who - in case of emergency - is obliged to guarantee the delivery of the stocks during the settlement of the trade. The short seller's lack of title to the stocks still held by the stock lender at the time of the sale does not result in the buyer, acting in good faith on the seller's ownership, not acquiring ownership. Rather, ownership of the stocks by the stock lender is acquired by the purchaser acting in good faith. This exclusion is justified by the fact that the stock lender has exposed itself to the risk that the stock borrower disposes of the stocks by entering into a GMSLA.

How the buyer acts in good faith on the short seller's right to assign legitimate- right ownership to assets he only borrows later can be illustrated as follows:



The correct chain to illustrate the transfer of ownership should therefore look as follows:

*Owner/lender à Bona fide purchaser*

If a non-owner seller could not transfer ownership, the rules on acquisition of ownership in good faith (vindication/extinction) would not exist at all. Since the dual ownership of the stocks ceases - or to put it another way: the number of stocks owned is brought back to the number of stocks issued by the company - when the stocks are delivered and registered in the buyer's securities account, short selling does not lead to problems of extinction. When the short seller enters into an agreement to borrow a **specified number of stocks** under a GMSLA, he becomes the owner of those stocks and delivers them to his purchaser of the stocks.

Increasing the number of stocks traded by short selling is precisely one of the effects of short selling desired by the FSA. Reference can therefore be made to both the FSA publication on short selling (see Appendix 82) and the ESMA report on dividend arbitrage (see Appendix 83). ESMA makes it quite clear that a legal claim for reimbursement should depend on the receipt of a net dividend and not on the ownership of a stock, as short selling has precisely the consequence that more stocks are traded than issued by the sellers. When the trade itself is sufficient to acquire ownership, short selling has fatal consequences for the tax system. ESMA makes no secret of the fact that a DCA (dividend credit advice) is the correct document with which to prove a legal claim for reimbursement, but that this DCA should not depend on the ownership of the stock, but on the receipt of the dividend.

The Danish Tax Agency seems to base its entire theory that there should be no "reality" in the stock transactions carried out on the fact that the stock transactions should have been carried out as short selling. In so doing, the Danish Tax Agency overlooks the fact that short sales are also real stock transactions and that the supply chain is not identical with the chain of transfer of ownership, as the supply chain only takes place several days after ownership is transferred. The tax authorities consistently overlook the fact that an unlimited number of stocks can be traded and that only the number of stocks that can be delivered is limited by the number of stocks issued by the companies

**3.2.2.2 Consequence of multiple stocks as a result of short selling (until settlement)**

The fact that short sellers may create more owners of stocks than the number of issued stocks in the period between the purchase agreement and the delivery of stocks only leads to problems if and when short selling occurs around the dividend date. The purchase contract then makes a person entitled to dividends even if he is not yet registered as an owner, cf. § 19(1) of the Danish Sale of Goods Act: the purchase of stocks includes the dividends which were not due at the time the purchase was concluded.

This has the consequence that the purchaser must be credited with the net dividend on the dividend payment date, irrespective of when the registration of the stocks takes place on his deposit. If the payment date is earlier than the registration date of the stock with the custodian, the seller of the stock must pay the net dividend to the buyer (the short seller pays a compensation payment during the "market claim process" to the buyer). This compensation payment is not subject to withholding tax under Danish tax law, even though it is in fact the payment of a dividend to the civil law owner of the stock. Since the buyer of the stock is the owner on the dividend date and receives the net dividend on the payment date, he is also entitled to a reimbursement.

If the payment date of the dividend is after the record date of the stock sale by a short seller, the stock lender is entitled to the compensation payment under the GMSLA. In this case, the stock buyer receives the dividend directly from the company (where dividend tax is also paid), but the stock lender receives the compensation payment from the short seller, on which Denmark does not levy withholding tax, despite the fact that it is considered a dividend for economic and tax purposes.

However, the temporary dual ownership of the stock between the sale and the delivery of the stock only has consequences for the payment of dividends and their taxation.

As cumulative legal ownership ends when the stocks are to be delivered, only one stockholder per stock will always be entitled to vote at the general meeting, the right to vote requiring that the registration of the stock be evidenced by a statement from the respective custodian.

The Danish Tax Agency's assertion in its summary submission in the drivers' cases of August 9, 2019, that

> *"If there could be multiple owners of the same stock, it would also mean that more than 100% stockholders could attend and vote at the company's AGM."*

is obviously not correct.

**3.2.2.2.1 Lack of withholding tax on compensation payment**

The Ministry of Taxation and the Danish Tax Agency have clearly identified short selling as one of the main problems in the dividend tax cases, as stated in the Early Warning issued in 2015.

As long as no dividend tax is levied on the compensation payment that a short seller has to pay to the person who buys the stock on the record date (the date on which the dividend is legally acquired and thus entitled to a reimbursement), but who only becomes registered as owner after the record date, there will be no dividend tax payment. Since the buyer of the stock (or any other person) cannot tell the difference between a stock bought by a short seller and a stock bought by a long owner, the short seller, who sells on

the date of the general meeting, will have to pay a compensation payment into the chain of custodians and finally down to the buyer equal to the net proceeds of the stocks. All purchasers of stocks, including those who purchase the excess number of stocks outstanding, receive a net dividend and a DCA and are eligible for reimbursement as owners of the stocks and recipients of a net dividend.

Since no one other than the short seller itself and its immediate custodian knows, can see or can recognize that a payment in fact does not come from the company itself, but from a short seller, it is necessary to tax the compensation payment. Already at the first sub-custodian in the chain of custodians, all net proceeds from the company itself are irrevocably mixed with the compensation payments from short sellers. No one in the chain of custodians is able to confirm to the buyer of the stock whether the amount credited to his account (the net proceeds) actually originates from a short seller or from the company.

This is also reflected in the fact that neither the buyer of a stock - nor any other human being - can tell whether the stock he has bought and is being delivered originates from a short seller or from a long owner. It is quite possible that the very "stock" that the buyer gets registered in his securities account due to netting in the settlement process was previously registered with a completely different customer as the same custodian. The buyer does not receive the specific stock sold to him by "his" seller, but any stock from the same company, as stocks are commodities.

At the office meeting, the following sketch was presented, showing this problem in graphic form:



The sketch shows that both stocks and also the dividend payment from the company itself (shown with black arrows) are mixed with stocks/compensation payments originating from a short seller (shown with red arrows). While the short seller can only fulfil its obligation to deliver stocks with stocks issued by the company, the "dividend" received by the buyer can just as well be a compensation payment from a short seller. Since the requirement to pay the dividend already arises with the purchase of the stocks, the short seller has to create a "dividend" - over and above what the company has paid. This dividend from the short seller is called the compensation payment.

Germany recognized the problems of compensation payments already in 1999 (by a BFH ruling) and introduced a withholding tax on compensation payments in 2007. In 2012, the withholding tax rules were changed again as it became clear that the debtor obliged to withhold and report withholding tax on dividends also had to be changed. To date, however, Denmark has done nothing to remedy this shortcoming. In Denmark, the withholding tax law (§ 65) is still in force, according to which it is the distributing company which is obliged to withhold and report the dividend tax, and the compensation payment from the short seller is not taxed at all.

### 3.2.2.3 Tax ownership of stock lending - double ownership in addition to settlement

In addition to the problems created by the fact that a purchaser acting in good faith may acquire ownership of stocks still held by a stock lender, the practical handling of stock lending and the case law on stock lending and beneficial ownership give rise to further problems concerning the identification of the beneficial owner for tax purposes and thus a risk of double reimbursement, as reimbursement may be paid to a stock lender who is no longer to be considered as the beneficial owner of the stocks for tax purposes.

### 3.2.2.3.1 Case law on beneficial ownership for tax purposes in stock lending

In the case of stock lending, the stock borrower is registered with VP Securities as the new owner of the stock. However, this civil law categorization of the stock loan, as expressed by VP Securities, does not correspond to the *tax law* categorizations of stock loans.

From a tax point of view, ownership of stock loans is *not* transferred from the lender to the borrower (cf. SKM2010.266.SR). Thus, there is *no* assignment in the case of stock loans concluded under the Danish standardized stock loan scheme, Morgan Stanley & Co International Limited - Overseas Securities Lender's Agreement or Overseas Securities Lenders Association, Global Master Securities Lending Agreement (GMSLA).

The lender retains all its rights, etc. arising from the stocks. However, the borrower has certain powers of disposal over the stocks, since the loan agreement generally requires only the return of the stocks at a certain time in the future. Until that time, the borrower may dispose of the stocks in full, including transferring them to third parties. However, the borrower must pay the lender an amount equal to the dividends paid by the company during the term of the stock loan (compensation payment). At the end of the loan period, the borrower must return stocks of the same quantity and type. The lender is thus placed in the same position as if the stocks had been in his possession throughout the period of the loan. He is therefore regarded, from an overall view of the stock loan arrangement, as the *owner of* the stocks *for tax purposes*. This result is reached by Danish Tax Agency, tax experts and the Danish National Tax Tribunal.

Since the stock lender does not lose the tax ownership of the stocks upon lending and, accordingly, he is also entitled to receive the dividend under the GMSLA, the stock lender is also entitled to the dividend reimbursement.

Since the sale of dematerialized stocks takes place anonymously (via brokers) and all the service providers involved in a transfer transaction mix all the stocks transferred between all their customers, a buyer of a stock cannot know whether he is *buying and receiving* a stock from a long owner (who has the stock in his securities account) or whether he is buying the stock from a short seller who has only been able to borrow the stock.

This is in itself for 364 days a year also not relevant. It is only at the moment when the company pays out a dividend that it becomes a problem, when the tax authorities, case law and literature consider the stock lender to be the tax owner of the stock.

When the buyer cannot know whether the seller is a short seller who is only borrowing the stock, the buyer must necessarily become not only the civil owner of the stock but also the tax owner upon purchase of the stock. Since the buyer of the stock will be registered with VP Securities or any other sub custodian, the buyer will also receive a net dividend and be eligible for a reimbursement.

Next to the stock lender, who has received a compensation payment from the stock borrower and is taxable as if he had received the dividend directly, there is the new owner of the stock, who also receives a dividend, is taxable and is entitled to a reimbursement.

The case law on stock loans has thus created two tax owners of the same stock at the time of distribution.



Since short selling must be covered by a stock loan, all the problems recognized by case law, tax experts (Katja Dyppel Joo, see Appendix 2c) and Danish Tax Agency Law and Large Companies (see Early Warning 2015 presented as Appendix 4a) lead to the problems mentioned in connection with short selling.

**3.2.2.3.2 Danish Tax Agency on tax ownership of stock lending**

As Danish Tax Agency Large Companies wrote to Danish Tax Agency Law in Early Warning on March 27, 2015, VP Securities registers the legal owner as a rule. In the case of stock loans, the borrower is registered as the owner, whereby the lender is no longer registered as the owner. Subsequently, it is stated that in the case of stock loans, the legal owner/beneficial owner must be determined for tax purposes, cf. SKM2010.266.SR. The ruling states that an *agreement to lend stocks cannot be qualified as a disposal for tax purposes*. A lender is considered the beneficial owner of the stocks for tax purposes. Dividends distributed during the loan period are deemed to accrue to the lender and are therefore taxable.

In the context of short selling, this has the consequence that the stock lender is still considered to receive a dividend, he is taxed on it, and consequently he must be eligible for reimbursement if he otherwise meets the conditions.

At the same time, a purchaser acting in good faith, and not knowing that he is buying from a short seller, acquires ownership of the stocks, receives the dividend and is taxable thereon, with the consequence that he is also entitled to a reimbursement of withheld dividend tax under the applicable rules in this respect.

Danish Tax Agency Jura's Early Warning of July 7, 2015, to the Ministry of Taxation is based on the Early Warning from Danish Tax Agency Large Companies. Danish Tax Agency Jura's Early Warning also states at the outset that the borrower is registered as the owner of the borrowed stocks under civil law, but that the stocks are not deemed to have been transferred in accordance with TfS 1999, 408. Thus, for tax purposes, the lender continues to be considered the owner of the loaned stocks. In SKM2010.266.SR, the National Tax Board agreed with Danish Tax Agency's recommendation that it is the lender who, according to the double taxation agreements concluded, is the beneficial owner of the dividends on the borrowed stocks *when these are not sold* by the borrower.

The problem that arises is that, in principle, the stock lender cannot know why the borrower is taking out a stock loan, much less whether the borrower is reselling the stock. The stock lender must therefore assume, on the basis of SKM2010.266.SR, that despite the lending of the stocks he remains the rightful recipient of the dividend, liable to tax and entitled to reimbursement. At the same time, the buyer of the stocks becomes the legal owner of the stocks, the dividend therefrom and thus also entitled to a reimbursement.

From a tax perspective, SKM2010.266.SR thus results in a double tax ownership of the same stocks. This, of course, only as long as the stock loan exists.

Danish Tax Agency Law rightly states in the Early Warning that the tax treatment of stock loans in Denmark differs from the tax treatment of stock loans in the rest of the world. This difference gives rise to problems when Danish lenders or borrowers enter into stock loans with foreign lenders or borrowers.

### 3.2.2.3.3 Ministry of Taxation on tax ownership of stock lending

In its response to the Early Warning in relation to stock loans of 23 September 2015, the Ministry of Taxation distinguishes between two different situations when it comes to stock loans: (1) stock loans without resale to third parties and (2) stock loans with resale to third parties.

**3.2.2.3.3.1** Stock lending without resale to third parties The Ministry of Taxation describes this as follows:

> *"In a stock loan agreement between lender and borrower, notwithstanding the lending of the stocks to the borrower, the lender will still be the beneficial owner of the stocks for tax purposes and therefore also of the dividends"*

The Ministry of Taxation relies on SKM2010.266.SR, according to which dividends on loaned stocks are taxable to the lender. In the case of a foreign lender, the latter will also be entitled to seek a reimbursement of the excess dividend tax (see Appendix 4a, memorandum of September 23, 2015, page 6).

When the Ministry of Taxation writes in the same memorandum that "*Danish tax law does not provide for the possibility of crediting or reimbursing withheld taxes on dividends to parties other than the party considered for tax purposes as the recipient of the money from a company under Danish law*," this should be seen in the context that this only concerns cases of stock loans without resale to third parties.

The Ministry of Taxation leaves no doubt as to the applicable law when the loaned stocks are not sold to third parties:

*"It is the borrower who receives the dividend on the stocks. The borrower will usually compensate the lender for the dividend in the form of a so-called dividend compensation. If the gross dividend is transferred from the borrower to the lender as dividend compensation, the dividend compensation will generally have such a direct link to the dividends paid that the dividend compensation is taxed as dividends of the lender (cf. SKM2009.65.SR). Similarly, the borrower is not liable to tax on the dividends, as the borrower de facto merely receives the dividends on behalf of the lender. The distribution of the dividend thus has, as a rule, no tax consequences for the borrower."*

What the Treasury overlooks here is the fact that the borrower does not receive any gross proceeds at all, which he can pass on to the lender. Since the borrower only receives a net profit, it can also only be this amount that the borrower has to pass on to the lender. The reimbursement of the dividend tax must be claimed by the lender from the tax authorities on the basis of its tax ownership of the stocks. Such ownership is relatively difficult to prove as there is no register of stock loans. Only the borrower can prove his civil law ownership with a statement from his custodian.

**3.2.2.3.3.3** Stock lending with resale to third parties

*"In the event of resale by the borrower to a third party, the stocks shall not be deemed to have been disposed of by the lender for the purposes of determining the amount of the advance. This has to be seen in the context that the loan agreement between the lender and the borrower agrees that the borrower shall sell back the stocks, as the loan remains in force. However, as the stocks are a non-cash item, the sale is, so to speak, irrelevant for the lender in terms of profit. There is therefore no transfer tax on the lender.*

*With the acquisition of the stocks by the third party from the borrower, the third party becomes the legal owner of the stocks and thus also of the dividend (see SKM2010.266.SR). The dividend is then taxed in the hands of the third party. It is thus the third party who is entitled to receive any reimbursement of dividend tax withheld.*

*In cases where the borrower still has to compensate the lender for dividends that the borrower has not received due to the sale to a third party, the cost of the compensation for the dividends qualifies as a loss covered by the State Tax Act."*

As a result of the sale of the stocks by the borrower to a third party, the Treasury is of the opinion that the lender is no longer considered a current stockholder, that the compensation payment no longer qualifies as a dividend and that the stock borrower is no longer eligible for reimbursement. The third party that acquired the stocks from the stock borrower is entitled to reimbursement.

**3.2.2.3.3.3** Comments on the Treasury's view

The Treasury overlooks two fundamental aspects:

1      The stock lender cannot know if and when a stock borrower sells the stocks, as they do not necessarily have any immediate contact with each other. Stock loans are intermediated by so-called stock loan intermediaries.

2      The stock lender receives only the net proceeds from the stock borrower (this is fully in line with the GMSLA).

Making the legal position of the stock lender depend on circumstances of which he has no knowledge and no influence would result in legal uncertainty that would destroy the Danish market for stock lending. When a stock lender can in practice neither know whether a stock borrower sells the stocks (and if so, when), or

whether the amount he receives entitles him to reimbursement or not, even if he receives only a payment equal to the net proceeds, his legal position cannot possibly be altered by the unilateral dispositions of the stock-borrower. This would be contrary to every principle of the rule of law.

The position of the Ministry of Taxation is not legally tenable in case of resale of the stocks to a third party. When the case law under SKM2010.266.SR holds that the stock lender remains the tax owner of the stock, this must necessarily apply regardless of whether the stock borrower resells the stocks to a third party or not.

The inter-ministerial working group set up in 2015 under the Ministry of Taxation also seems to recognize the problem, stating both in the publication "Danish Tax Agency out of the crisis," see Appendix 4b, and also in the progress note of 26 June 2016, page 6, see Appendix 5a, that there is no set of rules *in Denmark* that ensures that it is possible to identify the beneficial owners for tax purposes.

### 3.2.2.3.4 Literature on tax ownership of stock lending

In the academic literature, Katja Joo Dyppel in particular has dealt with the consequences of stock lending, see Appendix 2a, in her article *"Taxation of stock loans and repos"* from 2013.

She maintains that stocks transferred by way of a stock loan are generally not considered to have been disposed of for tax purposes and that the loan of stocks does not therefore give rise to a disposal tax.

She also correctly notes that companies pay the dividend to the borrower of the stocks if the stocks are transferred to the borrower's securities account, or to a third party if the stocks are transferred to the borrower's securities account. However, under the standard loan agreements, the stock lender is entitled to any dividends distributed during the loan period and the borrower must compensate the lender for the dividends.

In order for a payment to be considered a dividend for tax purposes, it is a condition that the payment qualifies as a distribution and that the recipient is a stockholder of the company making the distribution. This follows from § 16A of the Tax Assessment Act, which defines dividends as *'anything distributed by the company to current stockholders'*. The decisive factor is therefore whether the lender or the borrower is a stockholder at the time of the distribution.

Katja Joo Dyppel then makes a thorough analysis of the case law, which looks as follows:

In TfS 2001, 146, the National Tax Assessment Council took a position on the tax qualification of dividends paid under a stock loan. Accordingly, the compensated dividend was to be taxed as ordinary income of the lender, regardless of whether the borrower continued to hold the stocks or had disposed of them. To the extent that the borrower received dividends from the company, these dividends were subject to dividend tax. If it is assumed for tax purposes that the stocks lent have not been transferred to the borrower and the lender's stockholder position has therefore not ceased, this **decision** is **difficult to explain**. Under § 16A of the Tax Assessment Act, the taxation of dividends presupposes the existence of a stockholder position, and the same applies in relation to § 4E of the State Tax Act. It seems reasonable to assume that a stockholder within the meaning of the Danish Capital Gains Tax Act is also a stockholder within the meaning of § 16A of the Income Tax Act, and since there is no disposal/acquisition under the Danish Capital Gains Tax Act, the practice seems difficult to justify.

The consequences of the National Tax Assessment Council's decision published in TfS 2001, 146 are set out in TfS 2001, 760, which considers whether compensated dividends from a stock loan are included in investment trusts' mini-major distributions. For investment funds which lend stocks, the lent stocks are still included in the investment fund's stockholding, but according to the National Tax Assessment Council,

reimbursements of dividends received other remuneration shall not be included in the minimum distribution. The argument was that the minimum distribution only includes interest, dividends earned under § 16A of the Danish Income Tax Act and gains on financial contracts under §§ 29-33 of the Danish Capital Gains Tax Act, cf. § 16A of the Danish Income Tax Act. Since the dividends transferred from the loan to the lender were taxable as ordinary income, the National Tax Assessment Council did not consider this amount to be covered by the minimum distribution in § 16 C of the Tax Assessment Act.

Later, in TfS 2002, 755, the National Tax Assessment Council took a position on the tax treatment of the borrower's right to deduct the payment of remuneration for the loan and compensatory dividends to the lender. With reference to Tfs 2001, 146, according to which remuneration and compensation for dividends are qualified in the case of the lender, irrespective of whether or not the stocks are sold on by the borrower, it is stated that similar considerations apply to the borrower. In this context, the National Tax Assessment Council notes that the **possible sale of** the stocks **is therefore irrelevant** for the borrower's ability to deduct the remuneration and compensation for dividends from taxable income.

In relation to the tax treatment of dividends and compensatory dividends on the loaned stocks, the Danish National Tax Tribunal amended the answer given by the National Tax Assessment Council in TfS 2002, 755 in an order published in TfS 2004, 152. According to the Danish National Tax Tribunal, the tax treatment depends on how the borrower disposes of the borrowed stocks during the loan period, and is addressed in three scenarios:

1    The borrower has resold the stocks and does not receive dividends, but must compensate the lender for dividends. The current consideration and the amount paid to the lender as compensation for the dividend are so directly related to the stock loan agreement that the expense must be included in the determination of the borrower's gain or loss on sale and purchase under the rules of § 4(f) of the State Tax Act.
2    The borrower does not resell the stocks and does not receive dividends and therefore has no gain recognized, but still has to pay a fee for borrowing the stocks. The cost of the consideration is therefore his loss on the agreement and this loss is not deductible under § 4F of the National Tax Act in determining taxable income, but only in any other gains on similar agreements in the same year.
3    The borrower has not resold the stocks but has received dividends for which he must compensate the lender. As the borrower has not become the owner of the stocks by virtue of the loan agreement or otherwise, he is not liable to pay tax on the dividends accruing to the lender under the GMSLA.

It can be inferred from the Danish National Tax Tribunal's ruling that the tax treatment of the **borrower's** expenditure on remuneration and compensatory dividends depends on how **the borrower** disposes of the stocks during the period. It follows that, to the extent that the borrower compensates the lender only for the dividends received by the borrower, the borrower is not taxed on the dividends received, so that the distribution has no tax consequences for the borrower. The argument is that the borrower has not become the owner of the stocks and is receiving the dividends solely on behalf of the lender.

In cases where the borrower has to compensate for dividends which he has not received, whether the stocks have been resold or not, the expenditure qualifies as a loss covered by the betting provision in § 4 F of the State Tax Act.

In TfS 2009, 283, a position is taken on how the **lender** is taxed on compensatory dividends. With reference to the National Tax Tribunal's ruling, the National Tax Agency states that **payments received for deficient dividends** on loaned stocks are taxable as **dividends** for the lender, provided that the dividends accrue to the lender.

However, for the compensatory dividend to be taxed as a dividend by the lender, it must be a condition that a distributed dividend is actually compensated. Thus, if no dividend is distributed, but the borrower has to pay a consideration, this can hardly be qualified as a dividend, since the consideration is not the claim

that a distribution has been made in accordance with § 16 A of the Tax Assessment Act has not been satisfied. In such a case, the income is presumably taxable under § 4 of the State Tax Act.

The decision of the National Tax Board in TfS 2009, 283 refers to situation 3 in the Danish National Tax Tribunal's order, which concerns the case where the borrower has not resold the stocks but has received dividends for which the lender must be compensated. Thus, the taxation of the **lender is** not addressed in the situation where the borrower has sold the borrowed stocks and is still obliged to compensate the lender for the lack of dividends.

Katja Joo Dyppel illustrates the situation as follows:

*Figure 4. Payment stream for compensatory dividend on resale*



What is different from the case where the borrower does not sell the borrowed stocks is that a third party (also) becomes the owner of the stocks, **which is why there is dual ownership** if the sale of the stocks by the borrower does not result in the lender being deemed to have given up its stockholder position.

The consequence of the lender continuing to be considered a stockholder may be that the lender continues to be taxed under § 16A of the Tax Assessment Act on compensatory dividends received by the borrower, notwithstanding that the borrower compensates the lender for dividends distributed without the borrower having received them. At the same time, a third party will also be taxed on the distributed dividends it receives from the distributing company, pursuant to § 16 A of the Danish Tax Assessment Act. This **dual ownership** may thus result in the undesirable consequence of a situation where a **larger amount is taxed on dividends than is actually distributed**.

Katja Joo Dyppel argues in her 2013 article that, alternatively, even if the lender is not considered to have disposed of its stocks at the time of the stock loan, the sale of the borrower results in the lender no longer being the current stockholder of specific stocks, but only having the right to receive in the future the same amount of stocks issued by the same company and with the same rights as those lent. This results in the **lender** no longer being considered a current stockholder and thus no longer eligible to receive dividends under § 16A of the Danish Tax Assessment Act, and the dividends are instead taxed under § 4 of the Danish State Tax Act**. However, she believes that this may be correct, as it seems difficult to see how the lender can still be considered to be the actual stockholder under § 16 A of the Danish Tax Assessment Act when the stocks have been sold to a third party.

Katja Joo Dyppel's alternative argumentation has the following consequence: if the borrower (of the stocks) has to compensate the lender for dividends distributed during the lending period, the tax treatment depends on whether the borrower has (re)sold the stocks to a third party or not. If the stocks have not been sold to a third party, the lender is deemed to be the current stockholder and is thus taxed on the dividends in accordance with § 16 A of the Danish Tax Assessment Act, without the distribution having any tax

consequences for the borrower. However, if the stocks are sold to a third party, the lender can, in Katja Joo Dyppel's opinion, presumably not be considered a current stockholder, which is why the compensatory dividend is taxed under § 4 of the State Tax Act, while the borrower has a deduction for the compensatory dividend only under the betting provision in § 4(f) of the State Tax Act.

In this alternative argument, Katja Joo Dyppel overlooks the fact that in **practice** the lender cannot know what the borrower does with the stocks. Most stock loans are intermediated by stock loan intermediaries, who prevent any direct contact between the original stock lender and the final borrower. The stock loan intermediary is the contractual counterparty of the stock lender, and the stock loan intermediary can either lend the stock directly to another client or lend the stock to another stock loan intermediary. Whether and when a stock is sold on to a third party is in practice completely unclear to the original stock lender. In practice, the alternative model presented by Katja Joo Dyppel therefore does not work.

The practical consequences for a stock lender would be that he can never know whether he is still the tax owner of the stocks or not, how he should be taxed on the compensation payment and whether he is eligible for reimbursement. The risk for the stock lender is so significant that in practice he would never be prepared to lend his stocks, as he would constantly be at risk of breaching tax law because of the actions of a stock borrower with whom he is not familiar.

In a small national market where stock lender and borrower know each other, Katja Joo Dyppel's universal consideration model might work. In international stock markets, this model is doomed to fail.

### 3.2.2.4 Conclusion: short selling has no impact on the tax beneficial ownership of the pension plan

It is irrelevant to the pension plan's right to reimbursement whether a person who borrowed the stocks from the stock loan intermediary to whom the pension plan loaned their stocks resold the stocks, since the pension plan did not lend the stocks until after the vesting date of the dividend. Therefore, the tax lawful ownership of the pension plan cannot be affected by a resale to a third party.

The point in time at which the dividend is acquired and thus the right to claim reimbursement is the point in time at which the dividend is declared, cf. the Legal Guide, § C.B.3.1 (The concept of dividends for tax purposes). The declaration of dividends will usually take place at the company's ordinary or extraordinary general meeting. For tax purposes, dividends are thus understood to be anything distributed by a company to current stockholders (cf. § 16 A(2)(1) of the Danish Income Tax Act).

The pension plan purchased the Danish stocks at the latest on the day of the Annual General Meeting. It became the civil law and therefore also the tax owner of the stocks on the same day, since the stock purchase agreement is necessary for the transfer of ownership.

The dividend was paid by the company (VP Securities) to the former owner of the stocks, who was still registered as owner of the stocks on the so-called record day. The company may pay the dividend to the person registered as the owner on the record day (cf. the Danish Securities Trading Act, Article 71(2)), even if that person is not (any longer) the rightful recipient of the dividend, with discharging effect vis-à-vis the current civil and tax law owner of a stock.

The proceeds paid to the seller shall be debited from the seller's account and credited to the pension plan account. This is done through the custodians involved, who must settle this "market claim," as the buyer's claim to the transfer of the dividend is called. The seller has no influence on this forwarding of the dividend to the beneficiary (the buyer).

If the pension plan purchased the stock from a long owner seller, that seller is charged the dividend he received by virtue of his registration on record day from the company. The amount is credited to the pension plan's account as soon as it is registered as the new owner of the stock by its custodian. It is only at that point that it becomes apparent in the chain of custodians who the true beneficiary of the dividend was: the pension plan, which was the owner of the stock on the dividend date, despite the fact that it was still not registered as such.

However, if the pension plan purchased the stock from a short seller (which the pension plan cannot know) the short seller must compensate the pension plan for the dividend accruing to the pension plan as the legal owner of the stock on the dividend date. The actual dividend is paid by the company via VP Securities to the stockholder with whom the short seller covers its sale after the dividend date on the settlement date. The compensation payment from the short seller is in practice indistinguishable from the dividend itself, which originally came from the company, as both are mixed together in the cash flow passing through the various custodians. In practice, the buyer of a stock does not know who the seller is - even in OTC trading. The buyer therefore has no way of knowing whether the "market claim" credited to his account when the stock purchase is settled and the stocks are registered in his securities account with his custodian actually originates from a long owner seller or a short seller.

If the pension plan purchased from a short seller, the stockholder who <u>later</u> loaned the stock to the short seller to settle the trade was still the legal owner of the stock at the time of the dividend. At the same time, the pension plan became the owner of the stock by the purchase contract with the short seller.

The legal ownership of the stock acquired on the dividend date and thus the claim to payment of the dividend and reimbursement is lost by the pension plan under civil law only when the stock is lent to a third party. This loan is made between the date of the general meeting and the date of settlement of the stock purchase. Whether the pension plan also lost tax ownership of the stock and thus the claim to the dividend when the stocks were lent is irrelevant for the pension plan's right to the dividend and reimbursement that arose before the stock was lent.

The pension plan was the owner of the Danish stocks at the decisive moment, the day of the general meeting, which is the vesting date. This, despite the fact that the pension plan was not yet registered as owner with its custodian and therefore could not participate in the general meeting itself.

Since only registered owners of stocks can participate in the general meeting, the civil law dual ownership of a stock that exists between the purchase of a stock from a short seller and the settlement of the stock purchase also does not lead to more votes being cast at a general meeting than stocks issued.

**4 LEGAL MATTERS RELATING TO DIVIDEND TAX**

In the following, we will explain the reasons for the payment of the dividend tax reimbursement at issue in the case.

In the present case, the basis for the reimbursement is the withholding tax law and the corresponding withholding tax order, as well as the relevant double taxation agreement between Denmark and the United States.

**4.1 Dividend tax is withheld according to the rules of the withholding tax law.**

According to § 65(1) of the Danish Withholding Tax Act, dividend tax at a rate of 27 percent must be withheld from any decision to distribute dividends from companies based in Denmark.

According to § 65(6) of the Danish Withholding Tax Act, the dividend tax has been reduced to 22 percent for dividend distributions to companies and foundations that are taxable in Denmark under § 1 of the Danish Corporate Income Tax Act or the Danish Corporate Income Tax Act, with effect from the 2014 income year. Prior to that, the dividend tax rate for these companies and foundations was reduced to 25 percent, corresponding to the current corporate tax rate under § 17(1) of the Corporate Tax Act.

Article 66(1) of the Withholding Tax Act stipulates that companies subject to withholding tax must pay the withholding tax to Danish Tax Agency in the month following the dividend distribution, at the latest at the same time as the deadline for payment of the company's withholding tax and social security contributions.

§ 65(4) (until January 1, 2013, § 65(5)) of the Withholding Tax Act provides that no withholding tax shall be withheld from dividends if the recipient of the dividend is resident abroad and is not subject to limited tax liability under § 2(1)(c) of the Corporate Tax Act.

The starting point of § 2(1)(c) of the Corporate Tax Act is that foreign recipients of dividends from Denmark are subject to limited tax liability. However, this does not apply in particular to recipients of dividends on subsidiary stocks (i.e. ownership of at least 10 percent of the company making the distribution) or group stocks (i.e. where the foreign owner is jointly taxed with the Danish company paying the dividend or can be jointly taxed with it under § 31A of the Danish Corporate Tax Act), provided that the foreign recipient can rely on a double taxation convention or the EU Parent/Subsidiary Directive (Directive 2011/96/EU).

**4.2 Rules of the Withholding Tax Order on exemption from the withholding obligation**

Pursuant to § 65(3) (until January 1, 2013 § 65(4)) of the Withholding Tax Act, the Minister for Taxation may lay down rules on exemption from the obligation to withhold tax on dividends that are not taxable for the recipient. This option is used in Chapter 9 of the Withholding Tax Order, which deals with dividend and royalty taxes.

§ 31 of the Withholding Tax Statutory Order provides that, inter alia, no dividend tax shall be withheld when the recipient can receive the dividend tax-free under the rules on tax exemption for subsidiary/group company stocks in § 4 A or § 4 B of the Danish Capital Gains Tax Act, § 2(1) of the Act on Corporate Income Tax and § 4(2) of the Act on Corporate Income Tax. 1, c, § 13(1)(2) of the Corporate Tax Act or § 10(1) of the Fund Tax Act, unless the company making the distribution is an investment company exempt from Danish tax under § 13(1)(19) of the Corporate Tax Act.

**4.3 Limited tax liability of dividends**

Under § 2(1)(c) of the Danish Corporate Tax Act, foreign recipients of dividends from Denmark are generally subject to limited tax liability in Denmark on the dividends. The tax rate for the limited tax liability is 27%, corresponding to the dividend tax withheld according to § 65(1) of the Danish Withholding Tax Act when the dividend is paid to the foreign stockholder.

**4.4 Determining the correct percentage**

Thus, the same rate of dividend tax does not have to be withheld from all stockholders. If the tax status of the stockholder is not known, the highest tax rate (27%) is withheld. However, this does not necessarily mean that the Danish Tax Agency is on the safe side as regards collecting the same amount of dividend tax for which it is later entitled to a reimbursement. Trades made on the dividend date that have still not been settled on the record day will entail a risk of reimbursement claims from stock buyers who cannot know

how much they will have to pay. Their reimbursement claim would therefore always be against the 27% dividend tax, even if the ultimate seller had not been deducted for dividend tax.

**4.5 Compensation payments**

It must be assumed that dividend tax has been withheld in the dividends distributed by the Danish companies.

There is no provision for withholding tax on the compensation payments paid into the custody chain of short sellers and not in any way distinguishable in the chain from the dividends paid by the Danish companies. The rule introduced in Germany in 2006 to tax the dividend compensation payment from the short seller is missing in Denmark to date.

**4.6 Reimbursement of dividend tax**

§ 69B(1) of the Withholding Tax Act provides, inter alia, that *if a person* liable to tax under § 2 of the Withholding Tax Act or § 2 of the Corporate Tax Act has *received dividends*, royalties or interest which, under §§ 65 to 65D, *have deducted at source withholding tax in* excess of the final tax under a double taxation agreement, *the amount shall be repaid* within six months of receipt of the request for repayment by the Customs and the Danish Tax Agency.

The US-Denmark Double Tax Convention provides in Article 10(3)(c) that dividends from a company resident in Denmark are not taxable in Denmark if the *beneficial owner is a pension fund*, as defined in Article 22(2)(e), resident in the US. It is a condition that such profits do not arise from the carrying on of business by the pension fund or by any associated enterprise.

Article 22(2)(e) of the DTC provides that a person resident in a Contracting State shall be entitled to all the benefits of this Convention only if that person is a legal person, whether exempt from taxation or not, organized under the laws of a Contracting State for the purpose of providing retirement or similar benefits under a defined benefit scheme to employed persons, including self-employed persons. It shall be a condition that more than 50 percent of the beneficiaries, members or participants of such person are natural persons resident in one of the Contracting States.

Neither the Danish Tax Agency nor the Danish Tax Appeals Agency denied that the applicant for reimbursement was an American 401K pension plan organized under the laws of the United States for the purpose of providing pensions under a defined benefit plan to employees, including the self-employed.

Since, as stated above, it must be assumed that the pension plan in question was the owner of the stocks and dividends in question under both civil and tax law, it must therefore be assumed that the pension plan satisfies the conditions for reimbursement under the withholding tax law and the corresponding ordinance. As stated above, there are no grounds for refusing reimbursement on the grounds of inadequate withholding of dividend tax.

**5 EVIDENCE OF LEGAL OWNERSHIP FOR TAX PURPOSES**

There is no clear evidence of beneficial ownership for tax purposes. This has also been confirmed by the interministerial working group (see note of June 27, 2016, page 2, Appendix 5a):

> *"A survey of the civil law rules in force has revealed, among other things, that there
> are no rules ensuring that it is possible to identify the specific owners of securities."*

This is because tax ownership is not recorded anywhere. All that is recorded is civil ownership - and this is done by each investor-custodian under the EU CSD Directive and the Finality Directive.

The evidence available for civil law ownership will therefore be reviewed below.

**5.1 The practical evidence of beneficial ownership for tax purposes**

**5.1.1 Broker confirmations (trade notes)**

The final and binding agreement between the buyer and the seller of a stock, which results in the buyer becoming the immediate owner of the stock, is, for dematerialized stocks, concluded electronically through a broker.

Under the Capital Markets Act and the underlying EU legislation, listed stocks cannot be traded without the involvement of (authorized and controlled) fund brokerage firms. By brokers, buy and sell orders are brought together by an electronic transaction called "matching." In owner matching trades, the broker acts as the seller of the stock to his own client. The broker buys the stock from another client or another broker.

As the actual conclusion of the contract transferring the ownership of the stock to the buyer is a purely electronic process, the documentation of this can only be done by (1) examination of the computer where the buy and sell order were merged, or by (2) indirect evidence such as the trading note (= broker confirmations) which is subsequently issued as physical evidence that an electronic contract has been concluded.

It should be noted that the commercial paper itself is *not* the contract that transfers ownership of the stocks. Any human error (such as the use of the wrong template referring to a purchase ("BUY") instead of a sale ("SALE"), or wrong dates, amounts or similar typographical errors in a broker confirmation are of no relevance to the validity of the actual purchase contract concluded by the electronic matching. Indeed, official statistics from the U.S. show that approximately 10% of all broker confirmations are incorrect, see presentation from U.S. conference, see presentation from ACA Spring 2015 Compliance Conference, provided as <u>Appendix 84</u>.

The contract itself for the purchase of the dematerialized stocks is a pure electronic merger of purchase and sale order. Under EU law (Regulation 910/2015), such an electronic contract has the same legal effect and evidential value as a physical contract drawn up on paper.

MIFID II, implemented in Denmark by the Capital Markets Act, has introduced rules for a market structure that ensures that trading takes place on regulated marketplaces. In order to achieve a better protection of investors, MIFID II has imposed a trading obligation on all stocks and other financial instruments on "regulated trading facilities" ("trade obligation," Article 23 of MIFID). This means that any order for the purchase of stocks placed by a client with a stockbroker - who must have access to a regulated trading facility - must lead to a matching, i.e. the conclusion of a final and binding agreement for the purchase of stocks. Stockbrokers are subject to a non-discretionary obligation to execute orders for stocks through a randomized, <u>computerized "matching procedure.</u>"

Since both the stocks themselves and the contract transferring ownership of the stocks exist only in electronic form, the documentation for both is available only in electronic form. Physical evidence of the existence of the stocks and of the transfer of ownership is no more than documents subsequently issued for evidential purposes.

The commercial document is thus a piece of paper representing the fact that an electronic purchase contract has been concluded.

The trade note must not (as the Danish Tax Agency does in its summary submission of August 9, 2019) be confused with the electronic instruction from the trading platform (where matching has occurred) to the clearing agent and custodian to settle the trade.

The trade note is issued only after instructions have been given by the broker to the clearing agent to settle the final and binding purchase contract. These instructions initiate a settlement which cannot be stopped again. For this very reason, the clearing agent is liable for the payment and delivery of the stocks.

The individual steps involved in the purchase of a stock can be outlined as follows:



**5.1.2 Custody statements and DCA**

Despite the fact that clearing and settlement of a stock trade, leading to the registration of the stock in the buyer's securities account with its custodian, is not necessary to become the owner of a Danish stock, the pension plan's stock trades were cleared and settled and the stocks registered in its securities account with the custodian.

This is documented by the custody statements provided. The custody statement documents that a stock trade has been cleared and the stock transfer settled and that the dematerialized stock is in the securities account of the buyer.

There is no obligation to hold Danish securities in a securities account with VP Securities or in a Danish bank. The absence of a securities account statement from such an institution is therefore no indication that the investor does not own a Danish stock.

No stockholder shall be entitled to be informed by his custodian of the location of his sub-securities accounts. Sanjay Shah did not even disclose to the High Court in London (see his pleadings submitted as Appendix 85, Paragraphs 56.1.4 and 56.1.5) in which banks the Solo group had its sub-accounts. The lack of presentation of a chain of sub custodians from the stockholder's own securities account to a securities account with VP Securities cannot therefore be an indication that the stockholder is not the owner of a Danish stock.

In addition to a custody statement, the owner of a stock also receives the Dividend Credit Advice (DCA) initially requested by Danish Tax Agency. This is issued by the custodian once the stock trade has been settled and the dividend received.

The custody statements and the DCA thus document that the pension plan not only entered into a final and binding agreement to purchase stocks, but that these agreements were also "implemented" - as the Danish Tax Agency likes to put it in layman's terms. Correctly, the Danish Tax Agency would speak of the trades having been settled or settled.

Whether the trade in the stocks was settled (cleared and settled) by a "physical" delivery of the stocks by a "de-registration" by the seller and a "registration" by the buyer and a corresponding transfer of stocks between the seller's and the buyer's custodian, or whether the trade was settled by the use of netting (with the consequence that a net report may not be sent to VP Securities at all - if the net result is 0), is irrelevant in this context.

**5.2 Documentation of the tax ownership of the pension plan**

Documentation of each step in the execution of a complete dividend arbitrage transaction has been provided to the extent it is still available. The 12 individual steps can be summarized as follows:

1       Orders to purchase stocks are placed by e-mail to the broker, which is presented here as Appendix 86. At the same time, the clearing agent is informed that this order has been placed and the pension plan asks for a commitment to settle the purchase if it matches.
2       The clearing agent gives a commitment to the purchase of the stocks (which indirectly means a guarantee for the settlement and valuation of the stocks in the clearing agent's own prime broker position) - this commitment is itself given electronically and therefore cannot be provided in the form of a paper document, but it is also confirmed by e-mail, see Appendix 80.
3       The electronic matching of the purchase order and thereby the conclusion of a binding agreement on the purchase of the stocks is confirmed by the broker by e-mail. The matching itself is an electronic process, which cannot be documented per se, however the broker confirms the deal by e-mail, which is provided as Appendix 86. Later, the broker sends the trade note, which is presented as Appendix 11.
4       Invoice from the broker is received by e-mail. Presented as Appendix 11.

5     A broker confirmation (trade note) is received by e-mail, see Appendix 11.

6     Orders to sell stocks through a forward contract are placed by e-mail, see Appendix 86.

7     Confirmation of the forward contract will be received by e-mail, see Appendix 80.

8     Orders for stock lending are placed by e-mail, see Appendix 86.

9     Confirmation of stock lending is received by e-mail, example provided as per <u>Appendix 80</u>.

10     The individual steps to sell the stocks again are similar to those described under points 1-5 in connection with the purchase of the stocks.

11     The open forward contract is closed by placing an order to buy a forward contract (see points 6 and 7).

12     The stock lending will be recalled by e-mail, which was also confirmed by e-mail (see points 8 and 9).

As the actual agreement to transfer ownership of a stock is concluded purely electronically (by matching buy and sell orders in the computer systems), the broker confirmation issued after the trade is concluded is simply a confirmation of what has happened electronically. Therefore, clerical errors in a broker confirmation have <u>no</u> impact on the existence of a final and binding contract.

The clearing and settlement of stock trades is also done electronically on computer systems to which the clients (the pension plan) do not have access. The pension plan has access only to the e-mails it has sent and received and to the documentation issued as evidence after the trade: a broker confirmation (trading note), a DCA (Dividend Credit Advice) and a custody statement. The pension plan may not hold any other documents as proof of ownership.

The pension plan has provided the following documentation to demonstrate the purchase and ownership of the stocks, the financing of the stock purchases and the receipt of the dividends:

1     Orders to buy and sell stocks (e-mails). When such e-mails are matched, the contract to buy or sell stocks is concluded

2     Broker confirmations = trade notes showing that an electronic contract for the purchase or sale of stocks has been concluded

3     Dividend Credit Advice: shows not only ownership of stocks, but also receipt of a net dividend

4     Custody statements showing equity holdings, equity lending and forward hedging.

5     E-mails relating to the clearing and settlement of transactions

6     GMSLA framework agreements and e-mails specifying in each case the conditions of the individual stock lending. The pension plan has hereby produced "all correspondence concerning stock loans." The tax authority's statement on page 17 is incorrect. The Danish Tax Agency's request in the Agency's 3rd submission to provide all correspondence has been answered.

In addition, the pension plan has provided the documentation related to the account opening procedure with the various financial institutions involved in the stock transactions.

It is therefore incorrect for the Danish Tax Agency to claim that none of the pension plans has provided

> *"any physical or electronic evidence of their previous stockholdings (which*
> *formed the basis of their reimbursement applications)"* (submission of May 09,
> 2019, point 1)

On the one hand, the Danish Tax Agency demands that the Danish National Tax Tribunal's decision disregard the very documents which, on the other hand, the Danish Tax Agency claims do not exist. The documents in the possession of the pension plan and the additional documentation which it has produced, since the Danish Tax Appeals Agency was apparently not satisfied with the documentation already produced, have been submitted to the Danish Tax Appeals Agency.

In an attempt to discredit the documentation provided, the Danish Tax Agency alleges that the companies issuing the documentation were dishonest and issued false documentation. In so doing, the Danish Tax Agency completely ignores the fact that neither of the independent companies involved, nor the to date, any of the documents relied on in the case have been alleged or proved to be false.

Considering that electronic documents have general evidential value and the purchase contracts that immediately led to the pension plans becoming owners of the Danish stocks were concluded *electronically* with the fund brokers, it is this electronic matching that must be proven in this case. This electronic matching is not in the possession of the pension plan, as it takes place with the fund brokers, i.e. on the trading platform where the brokers act.

After the electronic matching, which constitutes the purchase contract itself, various documents are issued in physical form. These may contain typographical errors, which do not affect the validity of the contract, which was already concluded electronically.

Immediately after the electronic matching of the buy and sell order, instructions are passed on for clearing and settlement. The clearing and settlement of the trade is further evidence that a purchase contract had previously been concluded. However, the pension scheme cannot provide this additional proof as the Solo group's computers have been seized.

**CONCLUSION OF THE FIRST PART**

The pension plan became the beneficial owner of the stocks for tax purposes and received dividends from the Danish companies, since the compensation payment from a short seller must also be considered as dividends under Article 10 of the Danish-American Double Taxation Convention, since no owner of a stock can distinguish between stocks purchased by short sellers and stocks purchased by long owners.

If the compensation payment is not equated with a genuine dividend from the company itself, this would - in addition to the purely factual problems that arise when no one can distinguish between the compensation payment and the exploitation in the chain of custodians - also mean that the recipient of the compensation payment would not be liable to tax on it, since it would not then be covered by § 4 of the State Tax Act.

The pension plan's ownership of the stocks is also evidenced by all the documents of ownership required by EU law. No further documentation can be provided as proof of beneficial ownership for tax purposes.

**PART 2: THE TAX ADMINISTRATION'S VIEWS ARE BASED ON AN UNFOUNDED AND ERRONEOUS BASIS - NO GROUNDS FOR REVOCATION**

**6 LACK OF INFORMATION BY THE TAX AUTHORITIES**

In particular, the Danish Tax Agency - in line with all other authorities - had the responsibility to provide sufficient information before the Danish Tax Agency took a decision on the case.

This is a fundamental principle of Danish administrative law. The principle - known as the official principle or official maxim - is not enshrined in law, but is the expression of something so fundamental that in theory it can be taken to be the expression of a general principle of law.

The purpose of the principle of legality is to support the taking of decisions that are materially legal and correct.

The principle of officiality belongs to the so-called guarantee rules, and if a case is insufficiently informed, this may mean that the decision must be set aside as invalid. It may also mean that the case has to be reopened so that the missing investigations can be carried out.

In the present case, the Danish Tax Agency has largely failed to comply with the official principle. This is particularly objectionable in view of the extraordinarily large subject-matter and the very serious nature of the protection, and the consequent major impact on the pension plans and their owners.

In this context, the missing report of June 19, 2018, from Deloitte, which was prepared at the request of the Government Lawyer Boris Frederiksen, should be highlighted. The Deloitte report followed the complete flow of funds to the Solo Capital group's capital account at Barclays Bank, but the Danish Tax Agency did not, however, produce this report in the case.

In addition, the Danish Tax Agency has not received a copy from SØIK of the information relevant to the case, including in particular the information relevant to the documentation of the disputed stock transactions and the receipt of dividends, etc.

The tax administration has also failed to obtain relevant information from the many professional foreign operators and foreign control and supervisory authorities.

The Danish Tax Agency has apparently not even informed VP Securities about how the securities settlement takes place in practice, including what happens to the dividend when a stock purchase has not yet been settled on record day. This is particularly critical in view of the central importance of the settlement of the market claim process in the present case.

The failure to obtain relevant information must be seen in the light of the fact that Danish Tax Agency, through its powers of control, has a real possibility to obtain the information requested by Danish Tax Agency.

In the present case, however, Danish Tax Agency has based its view on undocumented assumptions about the non-ownership and lending of the stocks in question by the pension plans. Thus, Danish Tax Agency has not provided any real evidence to support its claim of lack of ownership, etc., and the claim is therefore entirely unfounded.

In deciding the present case, it is very important to bear in mind that a lack of adequate information cannot be detrimental to the pension plans. This is particularly the case when the Danish Tax Agency, which, as stated above, has a number of special tools for providing information on the case, is the closest to clarifying a number of the facts of the case.

The lack of information must therefore in all respects be prejudicial to the tax authorities.

**7 SUBMITTED AND MISSING DOCUMENTATION**

**7.1 The Tax Agency's unsubstantiated claim of false documentation**

While the Danish Tax Agency acknowledges that the documents submitted (agreements, e-mails, custody statements, DCNs) together prove that the pension plan was the owner of the stocks, received the net proceeds and was entitled to a reimbursement, the Danish Tax Agency tries to convince the Danish National Tax Tribunal's decision to disregard this documentation, claiming that it is allegedly "false."

The tax authorities are still reluctant to explicitly invoke forgery. This, probably against the background that none of the independent companies involved issued these documents, has not been charged with document fraud by the responsible auditors, financial supervisors or prosecutors. Not even the voluminous evidence presented by the hundreds of individuals sued in courts around the world, where the Treasury has launched an onslaught of civil suits, has produced any evidence of document fraud.

The Danish Tax Agency attempts to refute the probative value of the documentation provided and deny the reality of the transactions by highlighting typographical errors and other deficiencies in the documents provided. The Danish Tax Agency considers that these errors should be treated as suspicious.

It should be noted at the outset that this is not a case of typographical errors in various documents. It is a case about how to become the owner of a Danish stock and whether the pension plans have received a net dividend from their stocks.

An examination of the errors and shortcomings referred to shows that they are all human typing errors. These errors reflect the reality of the transaction and its documentation. Had the sole task and purpose of the brokers and the Solo group been to produce false documents (and not, as was in fact the case, to match buy and sell orders (the real task of the brokers) and to clear and settle real stock transactions (the real task of the Solo group)) it must be assumed that so many companies with so many employees would at least have been able to produce correct "false" documents without typographical errors or other defects. However, as the Solo group concentrated on clearing, settling and storing stocks, the traders concentrated on placing buy and sell orders and raising finance by finding borrowers for their stocks, and the fund brokers concentrated on matching buy and sell orders on the alternative marketplace, no one noticed the human typographical errors in the documentation, which are insignificant for the transactions themselves and which merely prove what the real world actors have done. Real people who make real transactions and have to document them make real mistakes. These are the errors identified by the Danish Tax Agency in the course of a major investigation. Perfect documentation without the errors that are normal in all stock trading would, on the other hand, indicate that the material was produced for the purpose and could not document real stock transactions.

### 7.1.1 Errors in documentation from brokers

The tax authorities seem to confuse human error - which occurs entirely without or, rather, against the will of the persons involved - and fraud, which requires intent. If the tax authorities are seriously of the opinion that a clerical error in the documentation of a stock deal renders the deal itself invalid or even fraudulent, then 10% of all deals worldwide are invalid or fraudulent. A position that the tax authorities cannot take seriously.

The documentation is not the transaction itself, but the Danish Tax Agency still does not seem to be able or willing to understand this, even in the summary of the preliminary proceedings of August 9, 2019, § 8.6, page 70. Clerical errors can and do happen de facto every day, also in the field of stock trading. However, the stock traders themselves are not affected by these clerical errors. Stock trading takes place properly and, being tied into such a strictly regulated system, there can be no fraud in stock trading. The EU has ensured this most recently with MIFID and MIFIR.

If the Danish Tax Agency is seriously of the opinion that human clerical errors cause the document containing a clerical error to be fictitious, fraudulent or non-existent, then the pension plans must concede that the Danish Tax Agency itself must face the fact that in that case the Danish Tax Agency has not sued anyone at all in the civil proceedings, since in those proceedings the Danish Tax Agency has consistently misidentified the appellant as "Danish Tax Agency." This error was challenged in the High Court in London by Pinsent Masons, the UK solicitor for the Inland Revenue.

**7.1.1.1 Different trade dates on broker confirmations and custody statements**

The Tax Agency highlights in its summary submission, § 5.4.3, page 36, that there should be

> *"several cases where the trade notes (Appendix 11) do not tally with the information provided in the custody statements (Appendix 10) and credit advices (Appendix Q)."*

It rightly follows that custody statements - which in fact document settlement - do not tally with the commercial notes in Appendix 11. However, the custody statements are consistent with the clearing statements submitted as Appendix 80.

Appendix 11 was an erroneous trade note attached to the invoice from the broker Sunrise, which was received long after the transactions.

The Danish Tax Agency further highlights that the pension plans have not provided any evidence as to how the settlement would have been done correctly, despite the fact that the trade notes were (allegedly) incorrectly endorsed.

It should be noted that settlement is not based on commercial invoices. Settlement takes place on the basis of the electronic **clearing and settlement instructions** which go from the trading venue, where the buy and sell orders are matched, to the clearing agent and custodian. Such electronic settlement instructions going from one computer to another cannot be provided by pension plans without access to these computers.

Only SØIK can provide this documentation as they are in possession of the computer systems.

The trade note is only issued by the broker (several weeks) after the settlement instructions have been given.

Having noted inconsistencies between the commercial notes - which show human typing errors - and the custody statements, the Danish Tax Agency analyses in § 5.4.3.1, page 37, the dates indicated as commercial date and as settlement date in the various appendices, and comes itself to the very correct conclusion that

> *"There are several factors that could indicate that the discrepancy between the custody statement and the commercial invoice is due to an error made by the broker"*

However, these clerical errors in a broker confirmation do not invalidate the actual stock trading that takes place through the electronic entry of buy and sell orders.

The significance that the pension plans refer to the commercial notes as evidence in the case is not a significance invented by the pension plans, as the Danish Tax Agency suggests. The legislator, unlike the Danish Tax Agency, has understood that when settlement of a trade - which in Danish usage is referred to as "settlement" or "afregning" - is not necessary to become the owner of a stock, the documentation one can find for the trade must be found elsewhere. The documentation must be found for the purchase contract, which is concluded electronically by matching the purchase and sale order.

One such document is the commercial invoice. However, if such a commercial document contains errors, this does not mean that the transaction has not taken place. The commercial document is merely an electronic record of what has happened.

When independent, authorized and supervised stockbrokers have issued these trade notes, it is an indication that they have executed a trade under their professional responsibility.

It should be noted that a trade is already completed when the buy and sell orders are matched. The Danish National Tax Tribunal's decision is wrong in the Agency's assertion that the pension plans have not documented that an agreement to purchase stocks has been consummated. Since ownership changes to the buyer when the contract is concluded, the conclusion of the contract itself also constitutes completion.

A broker confirmation is simply proof that an electronic agreement has been concluded. It is not the agreement itself. Where the substance of the agreement manifests itself is the recording of the number of stocks purchased in the securities account with the custodian. This appears in the custody statements.

Custody statements contain the correct dates and these are confirmed and supported by the trading emails provided in the cases. The trade was concluded by matching the orders evidenced by the emails.

The trade date in the emails provided matches the trade date in the custody statements and in the DCA. Only the broker made an error in the preparation of the documentation attached to his invoices.

**7.1.1.2 Commercial invoices confuse buying and selling**

The reference by the Danish Tax Agency to a purchase of stocks, while the custody statements show a sale, is also an expression of human error. The pension plan, which clearly concentrated on carrying out the stock transactions and verifying that the stocks ordered or sold were properly registered in the pension plan's securities account, did not notice this clerical error in the trading notes received from the pension plan's broker. The pension plan's order was consistent with the registration in the pension plan's securities account. Often, the pension plan also did not receive the trade notes until several weeks after a stock transaction had been executed.

The pension scheme has been in contact with the broker following the Danish Tax Agency's letter and can therefore inform you that it was clearly a human error on the part of the employee who had to issue the commercial invoice. The employee used the wrong template, which by default read "BUY," and not the template with "SALE."

**7.1.1.3 Commercial note indicates price as "#####"**

Also, the example of a trading note from the broker Bastion Capital London Ltd. where the price of the sale of 7,884 Mærsk stocks is indicated as *"#########"* (Appendix AA, page 57) is clearly a computer error.

As noted above, the Pension Plan has not previously noticed this typographical error either, as a broker confirmation is not received until long after the actual stock transaction has been completed.

The error has also been confirmed by the broker Bastion Capital London Ltd, as documented by emails dated January 7 and May 16, 2019, from Bastion Capital London Ltd, submitted as Appendices 88 and 89, stating that the field did not contain a number, but only *"####,"* as the size of the field was set with too few characters to reflect the correct amount. Bastion Capital London Ltd has subsequently issued a corrected broker confirmation. There is nothing "mysterious" about this, although the Inland Revenue would like to see mystery in everything that goes on in this case. The facts of the case have simply been explained and documented, as the Danish Tax Agency has requested.

Naturally, the representatives of the pension plans have asked the broker to issue a correct broker confirmation, now that the error has been discovered by the Danish Tax Agency's detective work.

The simple explanation for Adrian Mildne issuing the new broker confirmation, even though he no longer works for his brother's company, Bastion Capital London Ltd, is that he still has the form on his computer and it was his fault that the form was set with too few characters. Adrian Mildne was therefore able to confirm, even long after the transactions, that the field was simply set incorrectly, because he still had the original on his computer. The real, original transactions were recorded in his computer. Whether it is Adrian Mildne or his brother, Patrick Mildne, who signs a form which originally - in original - originates from a computer of which Adrian Mildne at least has a copy, is for that matter immaterial. This in no way weakens the credibility of the documentation presented.

### 7.1.1.4 Commercial invoices do not take public holidays into account

The Danish Tax Agency considers that the trading notes should erroneously have not taken into account public holidays and therefore that weekdays should be determined on the basis of the market in the country where the stock is traded. Whether this is true or not, why should an OTC trade conducted by foreigners through foreign brokers and settled by foreign clearing agents and custodians stick to Danish business days?
- is not of decisive importance.

The fact is, as the Danish Tax Agency itself states, that the trade was in fact settled T+3 according to the Danish public holiday calendar. The trading note from Sunrise Brokers was once again, as so often, erroneous, as it showed T+6. However, this typing error does not mean that the agreed terms were not respected. What was agreed was the content of the computer that SØIK seized.

### 7.1.1.5 Errors in other trade notes

The errors highlighted by the tax authorities in commercial notes from other, non-precedent cases, only confirm the pension plans' assertions about how many typographical errors there were in the confirmations of what had happened in reality, which were immaterial to the 'dividend arbitrage' business itself. The final and binding agreement is an electronic transaction and there were no errors in it. This is evidenced by the custody statements provided.

The pension plans were aware that they were engaging in dividend arbitrage and that because of the marginal profit they can realize on each stock they own, they have to acquire huge amounts of stocks. This can of course only be done by using service providers who offer the necessary services as a "manufactured good." As in any other factory, increasing production also means an increasing amount of errors.

Considering how many transactions are carried out by pension plans and how many individual steps are needed for this all to fall into place, what is really remarkable is not that there are errors in the subsequent documentation, but how few there really are.

### 7.1.2 Error in documentation from custodian - custody statement and account statement

The Danish Tax Agency seems to misunderstand the nature of the documentation presented at the office meetings with the Danish Tax Appeals Agency.

The Danish Tax Agency thus writes in its 3rd submission of May 09 2019, point 3.4, that,

> *"The summaries of accounts provided (Appendices 45-49 and PowerPoint presentation, p. 134) are not statements of account, but merely extracts from undated Excel sheets, which have no automatic character and whose origin is not documented."*

It should be noted that the table was prepared by Schaffelhuber Müller & Kollegen S.à r.l. for use in the office meetings to explain the transactions. This was also disclosed to the Danish Tax Appeals Agency at the meetings.

The summaries provided are only a summary of events prepared by Schaffelhuber Müller & Kollegen S.à r.l. on the basis of the trading records available to the pension plans. As the Danish National Tax Tribunal's decision should have noted, nowhere is it indicated that this is an account from the custodian's computer systems. In that case, the statements would have indicated the name of the individual custodian and would have been prepared on the custodian's letterhead.

The charts have been prepared as an aid for the Danish Tax Agency and the Danish National Tax Tribunal/Danish Tax Appeals Agency to understand the individual steps of a complete stock transaction, which consists of so many individual aspects. Thus, they make sense.

The Danish Tax Agency further comments on these summaries:

> *" The statements of accounts (Appendices 45-49 and PowerPoint presentation, p. 134, from the office meetings) do not contain all transactions for the given pension plan for a given period, but only extracts."*

That is quite true. As the Danish Tax Agency rightly points out, this is precisely an extract from the records of transactions. Extract means that not everything is included. For ease of understanding, we have only included transactions relating to a single stock. Otherwise, the overview would become confusing and complicated. The overview was only prepared as an explanation of a single example. The statement is not and should not be a formal statement of account from an account-holding institution.

The Danish Tax Agency does not understand why the receipt of the reimbursement appears in the statements prepared for the Danish Tax Appeals Agency, but not in the custody statements provided. The reason is relatively simple: as explained at the office meetings, some pages of the custody statements show stock purchases and sales. Others show loan transactions, and others show forward transactions. Custody statements therefore show all transactions relating to the equity positions. The dividend reimbursement was of course not booked to the stock accounts, but to a cash account. This cash account could be viewed online by the pension plans. Since the Danish Tax Agency attaches such importance to seeing the movements on the cash account as well, the pension plans have been able, with great effort, to obtain the statements of movements on their cash account as kept by their respective custodians, presented here as <u>Appendix 90</u>.

To date, the pension plans have not considered documentation of receipt of the dividend distribution to be material to the case, as the Danish Tax Agency is well aware of how much dividend distribution Danish Tax Agency has paid to the pension plans' agent on behalf of the pension plans. This is also clear from the Danish Tax Agency's own documents. Nor do any of the pension plans contest the receipt of the dividend payment.

If the Danish Tax Agency believes that the dividend reimbursement should not have gone to the pension plans, then the serious question arises as to why the Danish Tax Agency has sued all the pension plans in the U.S. for back-payment, thereby causing such enormous costs to Danish taxpayers.

The documentation requested by the Danish Tax Agency for payment of the broker, tax agent and custody fee appear on the cash account statements provided here.

The stock lending fee requested by the Treasury and shown in the table covers the total costs and interest associated with the stock lending. This is therefore the total of both items, which appear in the custody agreement as "stock lending fee" and "interest." The fact that the statement uses different terms from the custody statement is simply because the two are not prepared by the same persons. The summary is, as I said, a summary and therefore draws together different items.

Consequently, there are no errors in the custody statements provided. The inconsistencies noted are due to the simplifications made to the statements drawn up by Schaffelhuber Müller & Kollegen S.à r.l. in order to explain the transactions in a simple manner to the Danish Tax Appeals Agency.

Moreover, according to official U.S. statistics, the error rate in custody statements is 9:1, which means that 10% of all documents relating to stock transactions are incorrect. Errors do not mean that Danish stocks were not traded, on the contrary.

### 7.1.3 Compliance with GMSLA

The Danish Tax Agency states in the summary submission of August 9, 2019, in § 3.2.4, page 18, that GMSLAs should not be complied with.

In this respect, it is stated that the GMSLAs had to anticipate a so-called "Marking to Market" ("MTM") revaluation of the value of the stocks, and this corresponded to the cash collateral, in order to ensure that there was neither over- nor under-collateralization.

The question of over- or under-insurance has absolutely nothing to do with the question of whether the pension plans were owners of the Danish stocks and received dividends. The GMSLAs therefore foresee, both in § 5.4.b and in § 5.5.b, that the stock borrower and the stock lender will receive an additional payment of collateral or a repayment of the collateral already provided only upon request. It is therefore not relevant whether 5.4 or 5.5 applies.

However, from the custody statements provided, which are prepared to show all the transactions for the year, the Danish Tax Agency cannot see each entry of the daily MTM. The annual statement shows a summary amount at the end of the year.

Since we do not have access to the computer system "TAS" located on the Solo Group's computers, which performed these daily MTM calculations - see Paragraph 56.8.3, page 23, of Sanjay Shah's pleading - and do not have daily printouts from this system, we have also been unable to include these individual daily entries in the preparation of our supporting document for the clarification of the transactions. Moreover, they would have rendered the overview totally unmanageable, thus defeating the whole purpose of an explanatory supporting document.

As these daily MTM regulations are of no relevance to ownership, no further investigation of the MTM relationship has been undertaken.

### 7.1.4 Stock lending rate

The Danish Tax Agency states in the summary submission of August 09, 2019 in § 3.2.5 that the stock lending rate is set arbitrarily and that the agreed rate is not applied.

The Danish Tax Agency doubts that the terms of the stock loans are negotiated between the partners, simply because (1) the same terms can be seen in the e-mails provided and (2) the agreed interest rate should not be exceeded.

Had the tax authorities looked more closely, they would have seen that no loan period was stipulated (Term: open). This means that the pension plan and the professional intermediary in stock loans could terminate the loan at any time if the counterparty did not agree to changed, new market conditions. The fact that the interest rate was constantly changing between the parties is shown by the fact that one cannot calculate backwards, as the Danish Tax Agency attempts in § 4.5, page 28. As this is a regular exercise, it is often done by telephone. We have provided as Appendix 79 some examples of e-mails sent in connection with the agreement on a 're-rating'.

The interest rate agreed at any time was respected. The interest rate was just not the same all the time.

As regards the fact that at any given time the same interest rate was agreed for all the stock loans, this is a natural consequence of the fact that (1) all the pension plans worked with the same five stock loan intermediaries, who therefore, when concluding the agreements, naturally applied the market interest rate applicable at the time, and (2) that other interest rates were subsequently agreed informally by means of a so-called "re-rating."

As mentioned above, whether pension plans were able to negotiate different interest rates in their ongoing negotiations with the intermediaries in stock lending depended on the current market and the negotiating power of the pension plans.

## 7.2 Lack of documentation

In the following, we will explain the documentation that the Danish Tax Appeals Agency claims is missing in this case.

### 7.2.1 The purchase contract for the stocks

Pension plans cannot directly document the actual contract by which the stocks were purchased, as this contract is electronic. It is concluded when the purchase and stock orders are matched.

### 7.2.2 Cash flow and bank statements

### 7.2.2.1 Money flow

The tax authorities require documentation of a cash flow to the pension plans. Such a cash flow is not required to become an owner of a stock. Ownership is acquired even before the payment of the stock.

However, as the settlement of purchases (and sales) of stocks is on a delivery versus payment basis, the payment flow for the stocks must necessarily be from a cash account with the custodian. Otherwise, the custodian cannot ensure that payment is made at the same time as the stocks are delivered to the buyer's account.

As the payment is to be made from a cash account with the custodian, the cash collateral during the stock lending is also paid into this account with the custodian. This also ensures that the stock borrower receives the stocks at the same time as he pays the cash collateral.

Also, the receipt of the net proceeds can only have occurred in the pension plan's account with its custodian, as the flow of funds from the company down the sub-custody chain can only reach the custodian, not any other bank or financial institution.

Since the pension plans used an online system to view the cash flows to their own accounts, without the computer from their custodian, they cannot document all these cash flows. The only thing the pension plans can show are the cash account statements from their own custodians, which they still kept in paper form, see Appendix 90.

All pension plan funds were held under a TTC clause in Solo Capital's account at one or more commercial banks.

As none of the four custodians in the Solo group had a banking license allowing them to hold cash, all cash was held in Solo Capital's account in a regular commercial bank. According to the pension plans' latest investigations, Solo Capital was thereby acting as sub custodian for its three subsidiaries (the other three custodians) and was thus holding not only its own customers' funds but also the funds of the three subsidiaries and their respective customers. All money transactions between customers within the Solo group could be carried out without any movement on Solo Capital's account at its bank. This was fully in line with the European CSD Directive 909/2014 Chapter IV Article 9 on internalized settlement.

Which commercial bank Solo Capital used, the pension plans do not know for sure. However, from Sanjay Shah's pleading to the High Court in London, it appears that Solo Capital held the pension plans' cash in an account at Barclays.

The pension plans all established an account in the United States at the time of their formation (see, for example, the account statements submitted as Appendix 91 to the appellant's leading cases), yet these accounts were not used to effect the stock transactions and cash flows related thereto. Account statements from other banks showing payments from Solo to the pension plans cannot be produced as they had not yet received their profits from their custodian to another bank when Solo Capital was closed down and put into administration by PwC in the summer of 2015.

The pension plans had no reason to have the gains from the dividend arbitrage transactions paid into another account in the United States, as a payment to the beneficiaries was not imminent. In any event, however, the gains in the lead cases were below an amount that would result in a reporting obligation to the IRS.

The reason why the gain retained by the pension plans was less than USD 250,000 is the high transaction costs described in § 2. Not least, the Solo group invoiced significant amounts to the pension plans (see § 2.3.4.) for their services and for the fact that the Solo group ultimately had to act as guarantor that the stocks would be paid if a stock borrower was not found in time.

**7.2.2.2 Stream of stocks**

Evidence of a flow of stocks (or dividends) through the chain of custodians cannot be provided by the pension plans, as no custodian informed the pension plans who their respective sub custodian is. However, when the settlement of a stock trade is not necessary to be the owner of a Danish stock, and the only at the settlement of a trade that a "flow of stocks" through the chain of custodians may occur (namely if there is no internalized settlement), such a flow of stocks through the custody chain is even without probative value.

Finally, it should be noted that the netting procedures used by all clearing and settlement agents lead to the impossibility of following any stock through the chain of sub custodians.

**7.2.3 TTC clauses**

The tax authorities claim that the pension plans have not documented the TTC clause. As explained at the meetings, the TTC clause was originally a component of the custody agreements. In 2014, this clause was taken out of the custody agreements and put into the general terms and conditions to be accepted online.

For the Pegasus Fox 23 LLC Solo 401K Plan, a custody agreement containing the TTC clause was submitted in the lead cases. In addition, an example of a printout from the terms and conditions was submitted for online approval. The pension plans are unable to provide proof of this approval, as SØIK has obtained the computers from the Solo group. However, the pension plans have provided evidence that the pension plans have decided to approve the general terms and conditions.

**7.2.4 Single account opening documents and transaction documents**

For some of the pension plans, the above-mentioned documentation concerning the transactions and the account opening procedure is missing. This is mainly because the trustees of the respective pension plans no longer have access to the e-mail account through which all transactions were settled. However, it can be assumed that all transactions for all pension plans represented by the TVC Law Firm/Schaffelhuber Müller & Kollegen S.à r.l., which were clients of the Solo Group, were carried out in the same way. The documentation provided by the other pension plans can therefore be used by analogy.

**7.2.5 Documentation in 2014 and 2015**

More documents are available for trades executed in 2014 than for trades executed in 2015. This is simply because trading was automated in 2015 with the introduction of the Octave, and BrokerMesh software systems to handle order (algo trading), trade, clearing and settlement tasks. It is only regrettable that the Danish Tax Agency denies the existence of algo trading. The pension plans refer the Danish Tax Agency to § 3, No 18 and No 20 of the Capital Markets Act, which regulates algo trading.

In fact, the algo trader made the choice of stocks to buy (knowing the dividend schedule and the dividend expected to be paid), as well as the number that each pension plan would buy. This was done on the basis of programmed aspects of the funding possibilities of each pension plan, risk profile and risk diversification, etc.

The Danish Tax Agency's claim with regard to algo trading (see the summary pleading of August 09, 2019, page 44), according to which

> *"If there is an algorithm used by pension plans, it must have been used solely*
> *to disguise the alleged stock traders' lack of reality"*

is completely absurd. It is not at all the purpose of algo trading to obscure stock trades and their reality.

All stock trades, including those cleared by the Solo Group, were duly reported to the London authorities (FCA and Stock Exchange) (daily trade and transaction reports), as documented by the FSA statistics already provided. These reports would be confirmed by the Danish Tax Agency to the SØIK if the Agency would simply request the SØIK to do so. Such confirmation could in no way prejudice any criminal investigations which, after 3½ years, are allegedly still ongoing.

The real purpose of algo trading is to increase trading volume with less risk of error, eliminating human interference as much as possible.

Algo trading cannot disguise stock trading either, as it is reported to the FCA and the LSE in London.

As a result of these reports, the Interministerial Working Group has also noted in its progress note of 27 June 2016:

> "In connection with the work of the inter-ministerial working group, the Committee has received information on trading statistics from the Danish Financial Supervisory Authority for the years 2012-2015, showing stock trades for selected listed Danish companies. This shows that, among other things, there are remarkably large stock trades around the time of dividend distribution. The working group has not at this stage uncovered the reason for this, including whether the trades may be tax-motivated. Danish Tax Agency will investigate this further."

**7.3 Responsibility for missing documentation**

The tax authorities claim that

> "In this context, the pension plans are largely hiding behind the fact that Danish and British authorities have seized material from their custodians"

It should be noted at the outset that there is no question of "hiding" behind the simple fact that the material has indeed been seized. It is unfortunately a fact of the case that the authorities have seized the computer systems which handled the stock trades. The pension plans therefore have no way of verifying all the electronic transactions that took place after the orders to buy the stocks were placed.
Matching of buy and sell orders was done electronically, clearing and settlement was done electronically, and the actual record-keeping and existence of the stocks was electronic. Dematerialized stocks now exist only in electronic form.

Any documentation issued is therefore no more than a physical reflection of what took place electronically. Without access to the electronic transactions, pension plans are limited to presenting paper documentation that does not constitute the acts themselves, but merely reflects the fact that acts have been executed. Of course, when these statements of transactions are issued by humans, they also include the very common human errors such as typing errors in dates or ISIN numbers, the use of wrong templates (showing purchases instead of sales) and fields that are too small to show the many numbers and therefore only print "####."

The computer systems are the main evidence in the case, as the electronic acts were carried out here. These computer systems have been in the possession of SØIK for years, without this leading to any positive evidence that the pension plans did not own the Danish stocks. This must indicate that the SØIK has indeed found electronic evidence of the settlement of the stock trades. Since the settlement took place only after a final agreement on the purchase of the stocks had been concluded, transferring ownership of the stocks to the buyer, the proof that ownership had been transferred by matching purchase and sale orders.

**8 OVERPAYMENT DIVIDEND TAX**

**8.1 Sum of all reimbursements**

In several of its submissions, the Danish Tax Agency presents various statistics which allegedly show that Danish Tax Agency paid out more in reimbursements than it received in dividend tax.

These statistics, produced by Danish Tax Agency itself, contradict the publicly available statistics.

According to the SIR report of September 24, 2015 (Tax Committee 2014-15 2nd session) SAU Alm del), page 16, Danish Tax Agency has not paid out more in reimbursements than received:

Page 16 states:

Graph 7.2 below shows the revenue, reimbursements and number of reimbursement applications for the years 2005 to June 2015.



Graph 7.2.

This graphical representation is supported by Table 7.1, page 15, of the same SIR report:

Table 7.1 includes revenue (dividend tax), reimbursements and the number of reimbursements per year from 2005 to June 2015.

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 Jan - juni |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue in bil. DKK | 6,69 | 9,36 | 9,94 | 11,1 | 8,06 | 6,36 | 9,65 | 8,71 | 11,69 | 13,2 | 18,51 |
| Reimbursements in bil. DKK | 1,18 | 1,88 | 1,07 | 0,75 | 0,75 | 0,68 | 1,12 | 1,45 | 2,79 | 6,06 | 8,73 |
| Number of Reimbursement | 16.617 | 18.618 | 15.687 | 16.655 | 21.284 | 21.451 | 24.292 | 30.765 | 33.861 | 41.764 | 34.850 |

**Tabel 7.1.**

More recent figures are presented in the report of the Interministerial Working Group 2016/2017. These too show that no more was paid out in reimbursements than was received from the Danish authorities. From this report comes the table below, showing Denmark's net receipts from dividend tax on stocks:

| Table 2.1. Revenue from withholding tax on dividends | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Mia. kr. (current prices) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Gross revenue from dividend tax | 6,7 | 9,4 | 10,0 | 11,1 | 8,1 | 6,4 | 9,7 | 8,7 | 11,7 | 13,2 | 22,2 |
| Offset against corporation tax (1) | -1,2 | -1,6 | -1,8 | -2,1 | -0,8 | -0,6 | -0,9 | -1,1 | -1,6 | -1,7 | -3,6 |
| Reimbursements (2) | -1,2 | -1,9 | -1,1 | -0,8 | -0,8 | -0,7 | -1,1 | -1,5 | -2,8 | -6,1 | -10,9 |
| of which economic crime | 0,0 | 0,0 | 0,0 | 0,0 | 0,0 | 0,0 | 0,0 | -0,1 | -0,7 | -3,8 | -7,8 |
| Net revenue from dividend tax | 4,3 | 5,9 | 7,0 | 8,3 | 6,5 | 5,1 | 7,6 | 6,2 | 7,9 | 9,3 | 15,5 |

It is therefore disputed in principle that Danish Tax Agency should have paid out more in reimbursements than was paid in.

The only thing that can be seen from the statistics provided is that the number of reimbursements has increased considerably. But selling the stocks before the dividend date to a stockholder who is eligible for a reimbursement is also the motivation for the seller of the stocks - and the fact that puts the derivatives market (forwards and futures) out of balance with the spot market. The statistics thus simply show that investors interested in dividend arbitrage turned to the Danish stock market in earnest from 2014 onwards.

The Danish Tax Agency thus also appears in the summary of the preliminary proceedings of August 9, 2019, to abandon this manifestly false allegation of overpayment of dividends, since the argument put forward in all previous submissions is now abandoned.

**8.2 Total reimbursements per distributing company**

The Danish Tax Agency now refers in the summary statement in § 2.1 only to all reimbursements made under TRYG A/S. The Danish Tax Agency wishes to reject the pension plans' claim for reimbursement on the grounds that a total of approximately DKK 151 million has been claimed. TRGY A/S had for the year tax year (2015) only withheld approximately DKK 123 million in dividend tax. Of the DKK 151 million, U.S. pension plans had received DKK 136 million.

In this respect, the Danish Tax Agency notes in § 2.1, page 6, that

> *"far more has been claimed (and paid out) in reimbursements than has been withheld. It goes without saying that there can never be a claim for reimbursement of more than has been withheld."*

However, the Danish Tax Agency is not in a position to document who specifically would not be entitled to a reimbursement. A pension scheme's claim for reimbursement cannot be denied on the grounds that another recipient of reimbursement may not have been entitled to receive it.

By citing this example, the Danish Tax Agency has chosen (voluntarily or accidentally) to demonstrate that the exchange tax system suffers from a systemic malfunction and that there is no fraud. The Tax Agency has no explanation as to why approximately DKK 151 million has been paid out in reimbursements while only approximately DKK 136 million has been paid in by Tryg A/S.

Although the Danish Tax Agency claims that all applications from customers in the Solo group amounting to DKK 136 million were fraudulent, which is clearly disputed, there is still a difference of DKK 15 million that has been overpaid (the difference between DKK 136 million and DKK 151 million). There must therefore clearly be another explanation for the discrepancies. The most obvious is that not too much dividend tax has been paid, but rather too little.

If the beneficial owner of a stock on the dividend date is not correctly identified, the dividend tax payable is also incorrectly calculated.

### 8.3 Malfunctions in the administration of dividend tax

Although it is not the task of the pension plan to analyze the Danish dividend tax system and explain how it can happen that more is paid out in dividend distribution for a certain company than this company has paid in dividend tax, we would nevertheless like to make our offer on the most obvious explanations for this discrepancy:

1       The banking scheme (the spreadsheet solution) has led to dividend payments to banks without any evidence of ownership of the stocks or receipt of dividends. Since the payments to the banks were not registered by Danish Tax Agency's own "3-S" platform - see the Bech-Bruun report, page 92 et seq., and the SIR report of September 24, 2015, point 11.4 - the banks' applications could lead to the same stock being reimbursed several times. One via the bank scheme and another via the form scheme. The banking scheme was stopped in 2015 when the problems became known, but only with the official explanation that there was no legal basis for the solution. The fact was, however, that the banks had received reimbursements of withheld dividend tax without sufficient evidence of legal ownership of the stocks. An investigation into the banking system has therefore now also been launched by the Ministry of Taxation, and rightly so.

2       If, on the dividend date, a stockholder sells his stocks to a buyer with a different tax status and the transaction is settled with a longer deadline than the one used by VP Securities (i.e. now longer than T+3), VP Securities will apply the wrong tax rate when calculating the dividend tax. For example, if the seller is exempt from tax and this is registered with VP Securities, no dividend tax is calculated on the dividend (see the Danish Tax Agency's Appendix AO) which is immediately sent to the seller of the stocks (because he is still registered as the owner on the record day). Since the buyer of the stocks cannot know that the seller is registered as tax exempt with VP Securities, the buyer expects to receive only a net dividend. Only net proceeds are circulated during the market claims process between the various custodians and sub custodians. The purchaser (pension plan) receiving a net dividend is entitled to a reimbursement as he was the legal owner of the stock on the dividend date. However, VP Securities has not calculated the 27% dividend tax. The seller of the stock has run away with them.

3       The dividend tax is calculated on the basis of the registrations with VP Securities. However, VP Securities does not know the beneficial owners of Danish stocks. In the case of stock lending, for example, the beneficial owner may be someone else with a completely different tax status than the registered civil law owner.

4       The errors in the way the tax authorities have administered the reimbursement of withheld dividend tax are even more obvious in the case of short selling. The main problem with short selling, which is triggered by stock lending by banks, asset managers and not least hedge funds, is that it leads to an increase in the free-float of stocks - i.e. stocks available on the market - beyond 100 percent of all stocks issued by a company through VP Securities, and that this allows for more than one legal owner of a single stock.

This is, in our view, the most obvious explanation as to why more could have been paid in dividend tax reimbursements than the amounts received by the Danish tax authorities from the companies, if this claim by the Danish Tax Agency were correct.

The example that the Danish Tax Agency wants to use as evidence to deny the pension plans dividend distribution simply confirms that a dividend tax administration system based on the VP Securities regulations suffers from serious flaws. The beneficial owners entitled to the reimbursement cannot be identified by these records.

As demonstrated above, under the applicable law, the owner of the stocks is entitled to the dividend reimbursement if he is the legal owner of the stocks on the dividend date and has received the net dividend. The beneficial owner of the stocks has no obligation to investigate or document whether other beneficial owners are also claiming reimbursement. This is also quite impossible for an owner of a stock (or for any other person).

As already shown above, there may be more beneficial owners of Danish stocks than the number of stocks issued by a Danish company.

Despite the very clear "Early Warning" of 2015, the Ministry of Taxation has not solved the problem of stock loans and short selling, but at least the Ministry acknowledges in the status note of June 26, 2016, that Denmark simply does not have a system or rules to identify the rightful owner of Danish stocks (page 6).

**9 PENSION PLAN FINANCIAL TRANSACTIONS**

**9.1 Financing of stock purchases**

The Pension Plan has demonstrated, by means of the Master Stock Lending Agreements (GMSLAs) and the e-mails provided, by which the individual stock loans are drawn under the GMSLA, that it had the necessary financial resources to pay for the stocks at the time the loan was made. The pension plan was thus able to pay for the stocks on the date of delivery.

A retention of title which meant that ownership of the stocks first passed to the pension plan (cf. § 188(1) of the Capital Markets Act) had not been asserted by the seller when the purchase contract was concluded. The pension plan thus became the civil law owner of the stocks even before payment for them. This ownership was subsequently secured by registration with his custodian. This act of security meant that the pension scheme could receive the dividend to which it was entitled as the purchaser of the stocks under Article 19(1) of the Danish Sale of Goods Act.

The Danish Tax Agency has raised doubts as to whether a stock borrower would provide an amount as security corresponding to the market value of the stocks on the day before the stock loan, i.e. before the ex-date.

The pension plan has documented that it is normal practice for the stock borrower to provide a larger amount in cash collateral than the market value on the date of the loan by providing documentation of how much Nordnet, for example, requires in collateral.

Help

Stocks that can be shorted

Read more about short selling



Stocks that can be shorted

Currency    DKK ∨

~~Hvis du vil shorte aktier som ikke findes med~~
If you want to short stocks that are not on the list of the day, you can contact
Nordnet's brokers by phone on 70 20 66 85

| Name | Short name | Security requirement |
|---|---|---|
| - Maersk A A/S | | |
| A.P. Møller - Maersk B A/S | MAERSK B | 125o |
| ALK-Abelló B A/S | ALK B | 150o |
| Alm. Brand A/S | ALMB | 140o |
| Ambu A/S | AMBU B | 150o |
| Bavarian Nordic A/S | BAVA | 160o |
| Carlsberg B A/S | CARL B | 115o |
| Chr. Hansen Holding A/S | CHR | 125o |
| Coloplast B A/S | COLO B | 120o |
| DFDS A/S | DFDS | 130o |
| DSV A/S | DSV | 115o |
| Danske Bank A/S | DANSKE | 120o |
| FLSmidth & Co. A/S | FLS | 125o |
| GN Store Nord A/S | GN | 120o |
| Genmab A/S | GEN | 170o |
| H. Lundbeck A/S | LUN | 130o |
| ISS A/S | ISS | 120o |
| Jyske Bank A/S | JYSK | 130o |
| Matas A/S | MATAS | 125o |
| Nordea Bank Abp | NDA DK | 120o |

https://www.nordnet.dk/mux/page/blankningin1.html                                   17.02.2019

In the Agency's summary submission of August 9, 2019, at Paragraph 8.12, page 74, the Da 2.17.2019
attempts to distort the roles in a stock loan by claiming that it is the equity of the stock ler
role in determining the amount of cash collateral required for a stock loan. Of course, it is not. The purpose
of the cash collateral is to secure a possible cover purchase if the borrower does not return the stocks.
In its description of Nordnet, the Danish Tax Agency fails to mention that it is not the bank's capital strength
that determines how much cash security they can demand from their customers.

The fact is that when Nordnet lends stocks to their customers, the bank itself has to borrow the stocks
elsewhere. Nordnet must therefore provide collateral of the same amount as the bank itself requires from
its customers if it wants to operate competitively in the market.

Where the capital strength of the borrower and lender is expressed is in the ongoing negotiations about the interest the pension plan has to pay for the cash collateral and the loan fee the borrower has to pay to borrow the stocks. The stronger the capital strength of the equity borrower relative to the equity lender (the pension plan), the better the equity lender can impose a higher interest rate and a lower equity loan fee. The combined result of the interest rate payable on the cash and the fee payable on the equity loan is referred to in the industry as the "rebate."

As regards the consequences of a possible price drop on the stock market, reference is made to the standard terms under the GMSLA, which already foresee how the parties should deal with this.

**9.2 The possibility of carrying out the financial transactions in question**

The IRS believes it would be like a con game to have all three transactions occur simultaneously, namely (1) find a stock seller willing to sell to the pension plan, (2) find a stock borrower who would need the stock and was willing to put up the purchase price as cash collateral for the stock loan, and (3) find a forward counterparty who could bear any price loss on the stock.

The tax authorities are trying to make it seem impossible. However, this is by no means the case.

Contrary to what the Danish Tax Agency claims, these are not coincidences, but underline normal transactions on international financial markets. Agreements are concluded with brokers to arrange the purchase and sale of stocks and derivatives and framework agreements with intermediaries in stock loan intermediaries long before a single transaction is settled. All individual transactions are thus recorded long before they are executed. The financial industry is different from any other industry in this respect. Everywhere, all the components of what is to be produced (cars, houses, bread or structured financial products like dividend arbitrage) must be planned and coordinated in advance so that everything is present at the right moment in the machinery. If just one ingredient is missing, the final product will not work.

As for the challenge of finding a seller who will sell to a pension plan, the answer is quite simple: The seller to the pension plan was not the previous owner of the stock, but the pension plan's fund broker, who conducted the transactions as an owner-matching trader. In other words, he sold the stocks to the pension plan himself. He obtained the stocks from another fund broker, who himself obtained them from the original stockholder. This is how owner-matching trades take place.

The pension plan's fund broker knew that the pension plan had entered into a master stock lending agreement and that the pension plan therefore had a constant stock loan intermediary whose sole job was to procure stock loans. The intermediary therefore knew that, even before the purchase of the stocks, the pension plan would contact the stock loan intermediary to see if he could arrange a loan against the necessary cash collateral if the pension plan wanted to purchase the stocks.

The fund broker also received acceptance from the pension plan's clearing agent that the trade would re-clear and settle. The clearing agent thereby assumed the risk that payment would be made on the sale of the stock. This risk could be assumed by the clearing agent in its capacity as prime broker, since the clearing agent would itself receive the stocks if the pension plan failed to pay.

Finding a seller is therefore absolutely no challenge in practice, once all business relations have been established.

As can be seen from the e-mails provided as Appendix 78, despite all the preparation, not all pension planners managed to place an order to buy stocks in every single case. This could theoretically be because there was no corresponding supply of stocks on the market or because the clearing agent had not given its commitment to guarantee the settlement of the trade. Which of the two scenarios was actually the case is, in this respect, irrelevant. The fact is, however, that the pension plans did not always "unravel the cabal," as the tax authorities again allege, without any evidence whatsoever.

The same goes for the challenge of finding a forward counterpart. A forward is also brokered by brokers. The ultimate counterparty to the forward contract may have many different reasons for entering into the contract. One of them may be to speculate on how much the stock price will fall when the dividend is paid. Another may be that the forward counterparty wants to secure the price at which he can buy the stocks back from the market after he has originally sold his stocks to the market before the distribution of the dividend. This may be a purely speculative transaction or, as mentioned above, a foreigner who would lose the 27% dividend tax if he owned the stocks on the dividend date.

Finally, there is the equity borrower, whose motivation has already been described in this post. Also, the stock borrower is found through professional stock loan intermediaries. The GMSLA framework agreement concluded in advance ensures that the pension plan can lend the stocks when the need arises. A brief conversation with the intermediary prior to the stock purchase ensures the pension plan that the specific loan can be made in time to pay for the stocks.

Finding all these counterparties is certainly not something that can be done in a short time. That is why the account opening procedure with the various professional operators takes so long. All contracts must be in place before trading can begin.

The best evidence that this is possible in the real world and behaves exactly as described in our post is that all the trade and transaction reports were filed with the respective responsible (regulatory) authorities in London (FCA and LSE). This is further supported by the voluminous documentation of the transactions (custody statements, electronic custody records, trade notes from the fund brokers, audited financial statements of the custodians, etc.).

It is further noted that the following statistics from the Danish Financial Supervisory Authority on the turnover of Danish stocks, which have been presented in the cases, confirm that in reality the situation is as stated:



Figure 2.3. Stock turnover in selected companies - 2015

Note: The dividend date indicated is the first day on which the share is traded without the dividend (the so-called x-day - the day after the day of the General Meeting. The dividend itself is not paid to shareholders until a few days later. The figures are based on Mi-FID data, which aims to investigate market abuse cases. It means that for one transaction there may be 1, 2, 3, 4 or in some cases more MiFID reports. The reported turnover is therefore not necessarily fully accurate. However, whether or not there is a risk of multiple reporting based on the same transaction cannot explain the large around dividend dates. SOURCE: Financial Supervision

The fact that there is a daily trading volume of Danish stocks of more than DKK 100 trillion means that countless investors trade stocks in the same companies at the same time every day. Many investors choose to trade a particular stock just when a dividend payment is about to be made. All this is not a sign of fraud.

Had there been real evidence of fraud in the cases, there would also have to be suspicions on the part of the prosecution of a strength that would lead to the indictment of the pension plans or their trustees. The court in Lyngby has indicated by order of March 18, 2019 that this is not the case for Doston Bradley or any of the pension plans managed by him (including the Pegasus Fox 23 LLC Solo 401K Plan trial). The order is provided as Appendix 92.

In line with this, in November 2019 the English prosecutors also decided to stop their own investigations into the case. They will only provide Denmark with the assistance required under international agreements, cf. the Ministry of Justice's communication to the Folketing's Judicial Committee quoted in the article of November 16, 2019, which is presented here as Appendix 94. Also attached as Appendix 94 is a letter from the UK Crown Prosecution Service stating that they are no longer pursuing investigations against former Solo Group employees on their own initiative.

Despite this, the Danish Tax Agency continues to claim that the pension plans' arbitrage transactions

*"only act as accounting entries without real transactions"*
(summary post of August 09, 2019, page 28)