CERTIFIED TRANSLATION

U.2001.634/2H

*Seller of profit company and buyer's bank liable in damages for the
Danish tax authorities' loss following asset stripping, seller pursuant to
section 115 (5) of the Danish Public Limited Companies Act
(aktieselskabsloven). Distribution of the burden of liability.*

*Damages in tort 111.4, 3.3, 61.1 and 62.1 –
Money matters etc. 2 – Company law 1.2 and 1.3.*

♦ In September 1990, S sold a profit company – a public limited
company in the process of being converted into a private limited
company – to K for a purchase price of approx. DKK 15.9 million,
corresponding to the value of equity plus approx. DKK 2.1 million.
Taxes due and deferred taxes were not paid, and after the company
had been declared bankrupt, the estate raised a principal claim
against S for

**635**

payment pursuant to section 115 (5) of the Danish Public Limited
Companies Act  of the tax authorities' loss of approx. DKK 5.4
million, interest pursuant to the Danish Corporation Tax Act
(*selskabsskatteloven*) of approx. DKK 2.9 million and costs of the
bankruptcy and the administration of the estate. The estate raised a
claim against K's bank B for payment of the loss of approx. DKK
5.4 million with the addition of statutory interest. The transaction
was settled by the transfer of the purchase price to S's bank in
exchange for the company's cash and cash equivalents, approx. DKK
18 million, being transferred to B at the same time – without any
indication of the account holder. Following prior instructions from
K, B deposited the amount in K's account from which the purchase
price had been withdrawn. In the circumstances, it was found that S
must have known that, as a shareholder in the company being sold,
he was making the company's assets available to K in connection
with K's acquisition of the company's shares, thereby infringing
section 115 (2) of the Danish Public Limited Companies Act. S was
therefore liable for the company's loss pursuant to section 115 (5),
and the estate's principal claim against S was thus upheld (dissenting
opinion – as acknowledged to the Danish Supreme Court – with
regard to only considering S as liable in damages under the general
rule on damages in Danish law for the loss of approx. DKK 5.4
million plus statutory interest). It had to be assumed that B knew or
should have known that the bank was contributing to the acquisition
of the company using the company's own resources. In doing so, B
had recklessly disregarded the interests of the tax authorities, and the
estate's claim against B was upheld. Accordingly, S and B were
jointly and severally liable for the loss of approx. DKK 5.4 million
with the addition of statutory interest. Since the joint and several
liability could not be extended to cover the company's further loss,
and as B had not acted as an adviser to S, it could not bring a claim
against B for the additional liability relating to interest under the tax
law and estate costs. The distribution of the joint burden of liability
of approx. DKK 5.4 million had to be based on the principles laid
down in U 2000.365 H. In addition to the additional capital gain in
cash obtained from the sale and interest thereon until the
commencement of the case, S was required to bear an amount in
advance corresponding to the additional taxation on the funds of the
investment fund that would have resulted from the liquidation of the
company. The judgment considers several other issues relating to the
calculation of the amount to be borne by S in advance. The
remaining amount of approx. DKK 2 million was to be divided
equally between S and B.[1]

---

**H.D. 29 December 2000 in cases I75/1999 and I77/1999**

*Amagerbanken A/S (Attorney Torben Steffensen, Copenhagen)*
vs.
*1. Staco Teknik ApS in bankruptcy (Kammeradvokaten, the Legal
Adviser to the Danish Government, represented by Attorney Sune
Fugleholm)*
and
*2. Holger Hentze Andersen (Attorney Morten Samuelson, Copenhagen)
and Holger Hentze Andersen (Attorney Morten Samuelson,
Copenhagen).* vs.
*1. Staco Teknik ApS in bankruptcy (Kammeradvokaten, the Legal
Adviser to the Danish Government, represented by Attorney Sune
Fugleholm)*
and
*2. Amagerbanken A/S (Attorney Torben Steffensen, Copenhagen)
Intervener: Attorney Jørn Friis (Attorney Søren Bagger, Copenhagen).*

**Danish Eastern High Court**

*Judgment of the Danish Eastern High Court on 3 February 1999 (16th
division)*
(Kroman, Karsten Bo Knudsen, Lars Holm (acting)).
In this case, brought on 14 September 1995, the plaintiff, Staco Teknik ApS
in bankruptcy, has raised the following claims:
Principal claim:
1.   The defendants are ordered to jointly and severally pay the plaintiff
DKK 8,245,483, however such that defendant 2, Amagerbanken A/S, is to
pay a maximum of DKK 5,444,709 with the addition of usual statutory
interest from the commencement of the case and until such time as payment
is made.
2.   Defendant 1, Holger Hentze Andersen, is ordered to acknowledge that he
is further liable to bear the plaintiff's costs of the bankruptcy and the
administration of the estate, cf. section 93 (1) and (2) of the Danish
Bankruptcy Act (*konkursloven*), as well as court fees, cf. section 94 (4) of the
Danish Bankruptcy Act.
Alternative claim:
The defendants are ordered to jointly and severally pay the plaintiff DKK
5,444,709 with the addition of usual statutory interest from the
commencement of the case and until such time as payment is made.
*Defendant 1*, Holger Hentze Andersen, has moved for dismissal of the
plaintiff's claims, alternatively against payment of a lesser amount, and has
made a claim against defendant 2 that defendant 2, Amagerbanken A/S, be
ordered to indemnify defendant 1 for any amount, including interest and
costs, which defendant 1 may be ordered to pay to the plaintiff, but not more
than DKK 5,444,709 plus usual statutory interest from the commencement of
the case and until such time as payment is made.
*Defendant 2*, Amagerbanken A/S, has made a claim against the plaintiff for
dismissal of its claims, alternatively against payment of a lesser amount, and
has made a claim against defendant 1 that defendant 1, Holger Hentze
Andersen, be ordered to indemnify defendant 2 for any amount,

**636**

including interest and costs, which defendant 2 may be ordered to pay to the
plaintiff.
*Statement of claim:*
In 1969, Holger Hentze Andersen and his colleague founded a company that
produced safety equipment for monitoring gas burners together. In 1974, the
company moved to Rødkærsbro, and in the same year, it was converted into a
public limited company named Mita Teknik A/S. In 1990, Holger Hentze
Andersen bought his partner out of the company and became the sole owner
of the company. In that same year, the company started exporting security
equipment

---

[1] U 1997.364 H, U 1998.1119 H, U 1998.1172 H, U 2000.364 H, U 2000.1926 H, U 2000.2003 H, TfS 2000.900 H, TfS 1999.512 V, TfS 2000.233 Ø, TfS
2000.249 V, TfS 2000.273 V, TfS 2000.446 V, TfS 2000.496 V, TfS 2000.660 V, Lett in TfS 1998.537, Byskov Petersen in TfS 2000.617 and Marianne
Stigborg in Advokaten 2000 p. 234 et seq.

Copyright © 2021 Karnov Group Denmark A/S

for wind turbines. In the years prior to that, the company had experienced a significant drop in revenue. Several employees had been made redundant, and the company had been rationalised and modernised to such an extent that there was no need for additional investment despite considerable funds in the company's investment fund accounts.

In 1990, Holger Hentze Andersen wanted to start a generational handover to his two sons. In this connection, it was considered whether the generational handover should be implemented through the liquidation of the public limited company. In the summer of 1990, his accountant, Registered

| | DKK '000 | |
|---|---|---|
| Equity – tied-up . . . . . . | | 6,093 |
| Equity – free . . . . . . . . . . . | - | 9,101 |
| Tax – investment fund . . . . . | DKK '000 2,739 | |
| Tax – current income . . . | - 496 | 3,235 |
| Total cash and cash equivalents . . . | DKK '000 | 18,429 |

Briefly put, the offer for the company looks as follows:

| | DKK '000 | |
|---|---|---|
| Equity – tied-up, price 100 . . . | | 6,093 |
| Equity – free, price 107 . . . . . . . . | - | 9,738 |
| Total taxes – 50% 3,235 . . . . . . . . . . | - | 1,618 |
| Sales price . . . . . . . . . . . . . . . . . . . . . | DKK '000 | 17,449 |

We have been informed that the financial statements were closed on 30 September 1990. Financial statements as at 31 August 1990 are being prepared, so there may be minor changes in the abovementioned amounts.

However, no changes will be made within plus/minus DKK 25,000. From the buyer's side, the offer is valid until Thursday 6 September 1990 at 3:00 p.m. If it is not possible to obtain the seller's acceptance before then, please state when it can be obtained, and I will try to have the deadline extended."

On the same day, Holger Hentze Andersen's attorney, Attorney Jørn Friis, from Dahl Advokatfirma in Viborg, sent a fax to Virksomhedsformidlerne I/S stating, among other things:

"I accept on behalf of the company your offer made on 6 September 1990 to Auditor Hjalmar Andersen regarding the acquisition of a profit company.

I have taken steps to transform the company into a private limited company. I assume that I can obtain proof that the purchase price can be paid on the acquisition day, which I expect to be next Friday.

I am contacting you to ask you to aid in the rapid registration of the company change."

On 10 September 1990, Attorney Ole Ellern faxed a draft purchase agreement and transport for the sale of Mita-Teknik,

"Balance sheet as at 14 September 1990

. . . ASSETS:

. . .

| | |
|---|---|
| Total non-current assets . . . . . . . . . | 0 |

. . .

Receivables:

. . .

| | |
|---|---|
| Other interest receivable inv. fund accounts . . . . . . | 155,596 |

. . .

Cash and cash equivalents:

| | |
|---|---|
| Bank accounts of investment fund . . . | 3,412,426 |

Auditor Hjalmar Andersen, suggested that they instead transfer the company to another company, which was loss-making, while at the same time selling the original company's investment fund accounts and cash as a "profit company".

On 6 September 1990, Auditor Hjalmar Andersen received a fax from Virksomhedsformidlerne I/S stating the following:

*"Re Profit company.*

At your request, we have obtained an offer for a profit company subject to the following conditions:

Holger Andersen A/S, which is being converted to B.A. 67.622 ApS, to Attorney Jørn Friis. CEO Kenn Staugaard or order, Eggersvej 17, DK-2900 Hellerup, was named as the buyer, and Holger Hentze Andersen as the seller.

On 13 September 1990, Attorney Ole Ellern faxed a revised draft purchase agreement to Attorney Jørn Friis. Now, ASX 11.235 A/S, Eggersvej 17, DK-2900 Hellerup, was identified as the buyer. The accompanying basic information from the Danish Commerce and Companies Agency concerning ASX 11.235 A/S showed, among other things, that Kenn Staugaard was both the CEO and a member of the board of directors of the company, that its equity for the financial year 1 July 1988 to 30 June 1989 was DKK 305,000 and that a qualified audit report had been issued. It was also indicated that compulsory dissolution of the company had been instituted on 24 July 1989 "due to its financial statements", and that the compulsory dissolution had been revoked on 7 June 1990.

On the same day, Holger Hentze Andersen acquired an "empty-shell company" with 13 September 1990 as the acquisition and cut-off date. On 14 September 1990, the profit company BA 67.622 ApS sold the company to the empty-shell company, which was now under name change to Mita-Teknik, Holger Andersen A/S, on specified terms. Interim financial statements for BA 67.622 ApS prepared on the same day shows, among other things:

. . .

**637**

| | |
|---|---|
| Deposit bank . . . . . . | |
| . . . | 14,457,154 |
| TOTAL ASSETS . . . . . . | 18,025,176 |

. . .

EQUITY AND LIABILITIES:

Equity:

| | |
|---|---|
| Share capital . . . . . . | 4,875,000 |
| Reserves: | |
| Statutory reserve fund . . . . . . | 0 |
| Additional reserve fund . . . . . . | 8,872,756 |
| | 8,872,756 |
| Total equity . . . . . . | 13,747,756 |
| Provisions: | |
| Deferred tax . . . . . . | |
| | 2,729,920 |
| Payables: | |
| Long-term debt: | |
| mortgage debt . . . . . . | 0 |
| Short-term debt: | |
| Income tax previous years . . . . . . | 1,285,300 |
| Income tax on the profit for the period . . . . . . | 262,200 |
| | 1,547,500 |
| Total payables . . . . . . | 1,547,500 |
| TOTAL EQUITY AND LIABILITIES | 18,025,176 |

. . ."

A note states, among other things:

"Deferred tax of DKK 2,729,920, covering the tax liability on investment fund transfers, is entered under provisions.

Under short-term debt is the tax of DKK 1,285,300 that is expected to be levied on last year's calculated taxable income, as well as the tax calculated on the period's taxable income of DKK 262,200."

On 14 September 1990, Holger Hentze Andersen also signed a share transfer agreement, which states, among other things:

"The undersigned shareholders in

BA 67.622 ApS

Håndværkervej 1,

8840 Rødkærsbro

("the seller")

and

ASX 11235 A/S

Eggersvej 17,

2900 Hellerup,

("the buyer")

have entered into the following agreement on the transfer of the nominal share capital of

DKK 4,875,000.00
in
BA 67.622 ApS.

*1. Acquisition date*

1.1.

The transfer takes place with acquisition as of 14 September 1990, on the basis of a balance sheet drawn up by the seller's auditor as at 14 September 1990.

*2. Calculation of the purchase price*

2.1.

The purchase price will be calculated based on the balance sheet in accordance with the following principles:

2.2.

Prior to the acquisition date, the company will transfer all activities. The purchase price for this must be paid in cash. This implies that the assets of the company in the balance sheet drawn up by the auditor comprise only bank deposits as well as calculated interest on investment fund accounts. On the liability side, in addition to equity, all current and deferred taxes are provided for.

Deferred taxes are provided for at 40%.

2.3.

Calculated taxes on the current year's profit are expected to be provided for at DKK 262,200.00 and deferred taxes are expected to be provided for at DKK 2,729,920.00. Tax on previous years' income amounts to DKK 1,285,300.00

. . .

2.5.

The purchase price is then determined at the company's equity value plus a fixed amount of DKK 2,117,153.00, which is determined taking into account the tax amounts provided for in clause 2.3.

The purchase price can then be calculated as follows:

| | | |
|---|---|---|
| Equity – tied-up – 4,875,000.00, price 100 | | DKK 4,875,000.00 |
| Equity – free – 8,872,756.00, price 107 | | - 9,493,849.00 |
| Tax on investment fund 2,729,920 | | |
| Current skat 1990 | | |
| (current income) | 262,200 | |
| | 2,992,120 | |
| total tax of which 50% | | - 1,496,060.00 |
| Purchase price | | DKK 15,864,909.00 |
| The purchase price must be paid as follows: | | |
| Buyer's bank Inter Bank A/S, Ny Adelgade 4, DK-1104 Copenhagen K, pays the purchase price to UNIBANK A/S, DK-8840 Rødkærsbro | | DKK 15,864,909.00 |
| Buyer's bank transfers to Selskabs- og Virksomhedsformidlerne I/S repr. by Attorney Ole Ellern, Kildegårdsvej 41, DK-2900 Hellerup, commission agreed with seller of 1% of the purchase price | | DKK 158,650.00 |
| The balance | | DKK 15,706,259.00 |
| is transferred to seller's bank, UNIBANK A/S, DK.-8840 Rødkærsbro, against settlement of the company's cash and cash equivalents, including: | | |
| **638** | | DKK 14,457,154.00 |
| Bank deposit | | |
| Deposit in investment accounts | | - 3,412,426.00 |
| Calculated interest thereon | | - 155,596.00 |
| Total assets | | DKK 18,025,176.00 |

*3. Payment of the purchase price*

3.1.

The purchase price must be paid on the basis of the balance sheet prepared by the auditor no later than on 14 September 1990 at 2:00 p.m. by bank transfer via Danmarks Nationalbank to the account designated by the seller in UNIBANK A/S.

. . .

*4. Delivery of the company's minute books, etc.*

. . .

4.3.

The company's minute books will be sent to the buyer immediately after the purchase price has been paid.

4.4.

Immediately after the buyer's receipt of the company's minute books, an extraordinary general meeting will be held with the following agenda:

a. New election of executive board.

b. New election of auditor elected by the general meeting.

c. Change of name according to the buyer's wishes, as the buyer undertakes to accept that the company's secondary name is transferred to a company designated by the seller.

d. Change of registered office.

. . .

*5. The company's bank.*

5.1.

The seller ensures that the company's funds are held as cash deposits in the bank account in UNIBANK A/S no later than 14 September 1990.

5.2.

After the transfer of the purchase price to the account designated by the seller, the buyer will be entitled to make use of the company's accounts in accordance with the balance sheet prepared by the auditor.

. . .

*7. Seller's warranty*

. . .

7.8.

The buyer is in all respects responsible for transactions of any kind made after the acquisition date.

. . .

*10. Costs*

. . .

10.3.

To the best of the parties' knowledge and belief, the present transfer is not subject to share transfer tax. If, contrary to expectations, this turns out to be the case, the share transfer tax will be paid by the buyer."

The agreement is signed by Kenn Staugaard for the buyer.

It turned out that the transaction was not to be settled through Inter Bank for the buyer, but instead through Amagerbanken's Løjtegård branch. On 14 September 1990, that branch had two powers of attorney dated the same date and signed by Kenn Staugaard. One power of attorney is handwritten and reads as follows:

"Amagerbanken A/S Løjtegård branch is hereby authorised to withdraw DKK 15,864,909.00 from my account no. 200 590-0 in connection with the draw made by Unibank A/S Rødkærsbro branch."

The power of attorney is also provided with the branch's then Deputy Head Ole Gemynthe's handwritten initials.

The other power of attorney is typewritten and reads as follows:

"The undersigned B A 67.622 ApS under name change to STACO-TEKNIK ApS hereby gives CEO Kenn Staugaard, Eggersvej 17, DK-2900 full disposal of the amount received from UNI-Bank A/S – reg. no. 9274 in Amagerbanken A/S – Løjtegård branch, reg. no. 5208, on 14 September 1990."

On 14 September 1990, at 4.06 p.m., Amagerbanken, Løjtegård branch, sent a fax to Unibank, Rødkærsbro branch, with the following content:

*"Re B A 67.622 ApS.*

We hereby accept that you will today draw up a withdrawal order ("*trækseddel*") drawn on reg. no. 5208 for an amount of

*DKK 15,864,909.00*

say *fifteen million eight hundred sixty-four thousand nine hundred nine Danish kroner*, provided that we are at the same time authorised to draw up a corresponding withdrawal order drawn on reg. no. 9274 for an amount of

*DKK 18,025,176.00*

say *eighteen million twenty-five thousand one hundred seventy-six Danish kroner*. Please find enclosed for your information a copy of the transcript of the minute book and a copy of the notification relating to the release of amounts deposited in the investment fund account. The original version of the latter will be sent to you by post today. We await your agreement before the above transactions are carried out."

The fax was signed by Branch Director Søren Bagge-Petersen and the above-mentioned Deputy Head Ole Gemynthe. The transcript of the minute book for BA 67.622 ApS mentioned in the fax set out the following:

"In the year 1990, on 14 September, an extraordinary general meeting was held in the company's offices.

The reason for the extraordinary general meeting was that binding agreements for the transfer of all the company's shares had been made in accordance with the documents available.

Present were State-Authorised Public Accountant Werner Jespersen, Secretary Jeanni Jørgensen, Editor Anne Staugaard and CEO Kenn Staugaard, who was elected chairman of the meeting and who

**639**

announced that the meeting had been duly convened and formed a quorum. The general meeting had been convened without complying with the notice provided for in the articles of association, but all shareholders entitled to vote accepted that the general meeting formed a quorum by waiving service and notice.

The following proposals for amendment of the company's articles of association had been received:

1. The company's name is changed to: Staco Teknik ApS. The company's registered office is changed to: the Municipality of Gentofte, Denmark.

2. The object of the company is changed to carrying on business in trade, craft, manufacturing, investment, financing and administration. The following proposals for change of the company's management and auditors had been received:

The following was proposed as the new board of directors:
Contractor Flemming Jørgensen,
Editor Anne Staugaard,
CEO Editor Kenn Staugaard
The following was proposed as new CEO:
CEO Kenn Staugaard
The following was proposed as new auditor:
State-Authorised Public Accountant Werner Jespersen

". . .

Land with buildings . . . . . .

. . .

The proposed changes of the company's management and auditors and the articles of association were adopted unanimously and by all votes.

The general meeting unanimously and with all votes authorised Kenn Staugaard to make such amendments to the articles of association and the notification as may be required or recommended by the Danish Commerce and Companies Agency.

The general meeting adjourned.

Chairman of the meeting

Kenn Staugaard"

The notification referred to in the fax in connection with the release of amounts deposited in the investment fund account showed that BA 67.622 ApS wanted the funds to be used for advance depreciation of

"An undivided share of one-fifth of 6,165 sq.m. of let workshop in the property with title no. 44 ø m.fl. Helsingør overdrev"

The date of delivery/commissioning was stated as 15 September 1990, the purchase price was DKK 7,000,000, and the amount withdrawn was DKK 3,412,426. The High Court was informed that Unibank, Rødkærsbro branch, received the original form by post on 17 September 1990, and that it had been signed on behalf of the company by Kenn Staugaard on 14 September 1990.

Unibank, Rødkærsbro branch, replied to the fax of 14 September 1990 on the same day as follows:

*"Re B A 67.622, ApS.*

With reference to the fax received today at 4:06 p.m., you are hereby authorised to withdraw from reg. no. 9274 an amount of

*DKK 18,025,176.00*

on the condition that our withdrawal order is accepted.

We hereby consider the transaction to have been completed."

The fax was signed by Lars Eybye and Poul Hansen.

From bank statements regarding Kenn Staugaard's overdraft facility account no. 200590-0 with Amagerbanken, Løjtegård branch, it appears that the overdraft facility had a limit of DKK 212,000. This limit had been exceeded over an extended period of time, so that the balance as at 14 September 1990 was DKK -443,359.11. On the same day, DKK 18,025,176.00 was deposited, and DKK 15,864,909.00 was withdrawn. The credit and debit documents of the same date, both bearing Ole Gemynthe's handwritten initials, that have been produced are worded as follows:

"Deposited amount from Uni-Bank A/S reg. 9274

18,025,176.00

. . ."

"Transferred according to your power of attorney to Uni-Bank A/S reg. no. 9274

15,864,909.00

. . ."

The bank statements also show that the balance again became negative on 18 September 1990.

From the bank statement from Unibank, Rødkærsbro branch, it appears that DKK 15,864,909.00 was paid into Holger Hentze Andersen's personal account with 14 September 1990 as the book and value date. From Mita-Teknik A/S's account DKK 18,025,176 was paid with 17 September 1990 as the book date and 14 September 1990 as the value date, while a total of DKK 3,568,021.46 was deposited with corresponding dates from the closed investment fund accounts. On 20 September 1990, the Danish Commerce and Companies Agency received notice of the changes in the profit company's board of directors, the name change to Staco Teknik ApS, amendments to the articles of association, etc. According to a balance sheet as of 30 September 1990 prepared by (now former) State-Authorised Public Accountant Werner Jespersen, Staco Teknik ApS had the following assets:

7,000,000

| | |
|---|---|
| Other interest receivable on investment fund accounts . . . . . . | 155,596 |
| . . . | |
| Bank accounts of investment fund . . . . . . | 3,412,426 |
| . . . | |
| Deposit bank . . . . . . | 14.457.154 |
| . . . | |
| TOTAL ASSETS: | 25.025.176 |
| . . ." | |

According to the information provided to the High Court, it has not been possible to establish the ownership or existence of any of these assets. From the material produced, it appears that Staco Teknik ApS has been resold a few times. On 8 December 1994, insolvency proceedings were

**640**

instituted against the company. On 15 July 1997, insolvency proceedings were instituted against Kenn Staugaard (Hansen)'s estate, and on 5 August 1998, the same was done for ASX 11.235 (now ApS).

Finally, the evidence produced to the High Court shows that, in the years 1993 and 1994, the tax authorities, in particular the tax administration of the Municipality of Bjerringbro, and Holger Hentze Andersen, represented by Auditor Hjalmar Andersen and Attorney Jørn Friis, corresponded about defendant 1's tax assessment for 1990 and the payment of the share transfer tax in connection with the sale of the profit company. This correspondence does not refer to the matters covered by the present case.

*Determination of the plaintiff's claim:*

The amounts claimed from the defendants correspond to the taxes due and payable by the profit company, where, however, defendant 1, Holger Hentze Andersen, according to the principal claim, is required to pay an amount corresponding to the taxes due, plus interest according to the Danish Corporation Tax Act and estate costs, while defendant 2, Amagerbanken A/S, is only to compensate the taxes due.

The taxes due, on the basis of which the amounts claimed were calculated, correspond in principle to the taxes provided for in the interim financial statements for the profit company as at 14 September 1990. It is therefore partly a matter of tax due on the annual results for the 1988/89 financial year and partly a matter of additional taxation on investment fund transfers. The fact that the total amount of tax due is higher than the amount of tax provided for in the interim financial statements is solely due to differences in calculation.

The amount that defendant 1, Holger Hentze Andersen, is liable to pay according to the first indent of the principal claim thus corresponds to the tax claim of DKK 5,444,709.00 that the tax authorities made against the plaintiff plus interest according to the Danish Corporation Tax Act up to and including September 1998, in total DKK 8,245,483.00.

The amount that defendant 1, Holger Hentze Andersen, is liable to pay according to the alternative claim, and which defendant 2, Amagerbanken A/S, is liable to pay according to both the principal and the alternative claim, corresponds to the tax claim made excluding interest according to the Danish Corporation Tax Act.

The defendants did not comment on the tax calculations.

In the proceedings, the parties agree that, at the time of the transfer, the profit company was still a public limited company, and that the then applicable Danish Public Limited Companies Act applies in this case.

*Statements:*

During the proceedings, Holger Hentze Andersen made a statement as the defendant, and Knud Kristensen, Jørn Friis,

Hjalmar Andersen, Lars Eybye, Poul Hansen, Ole Gemynthe and Werner Jespersen made witness statements.

*Holger Hentze Andersen* has explained that he is a trained electrical engineer. Since 1969, he has produced electronic components for the monitoring of gas burners, and later, he continued to produce them with a partner and his wife. In 1974, the company moved to Rødkærsbro, and in the same year, it was converted into a public limited company. In the mid-80s there were 20 employees, and as the company now also exported components for wind turbines to the US, the company reached 100 employees in 1986. Between 1987 and 1989, the company lost 90% of its revenue and was reduced to 25 employees. In 1990, the company began exporting worldwide. Since 1993, exports to the German market have been very successful, and it now has 45 employees. He bought his partner's share of the company in 1990 and continued as the manager and owner of the company. As he does not have any accounting or legal training, he has always been assisted by his auditor and his attorney when making important decisions. His wife took care of the company's day-to-day financial affairs, while he was in charge of operations. They had chosen not to be listed on the stock exchange, and since 1985, he and Auditor Hjalmar Andersen had therefore regularly discussed issues concerning the generational handover, as he wanted his two sons to run the company after him. All his savings were invested in the company, and the company was very dependent on him personally after he had bought out his partner. Around 1989, a voluntary winding-up of the company was discussed as a possible solution to the generational handover. He does not recall whether the amount of the winding-up costs was also discussed. At one point, Hjalmar Andersen mentioned some advertisements from people who were looking to buy companies. It was also Hjalmar Andersen who had the idea to acquire the empty-shell company. The intention was to save taxes and distribute 49% of the shares to the children. In the summer of 1990, the idea of a possible sale of the company became more concrete. After having seen some advertisements, Hjalmar Andersen proposed to sell the company, explaining that it was possible to sell the company and continue the business in a new company without affecting the position of the creditors. It was important to him that the creditors were not affected, and that there would be capital for the continued operation after the sale. He had several meetings with Hjalmar Andersen, and they discussed, among other things, the tax rules for shareholdings. During the process, they contacted Attorney Jørgen Friis, who was given the address of the buyer of the company for the purpose of drawing up the agreement. When presented with the purchase offer of 6 September 1990 from Virksomhedsformidlerne I/S, Attorney Jørgen Friis' reply to this and Attorney Ole Ellern's letter of 10 September 1990, he does not remember these, and

**641**

he has never seen Kenn Staugaard's letter of 12 September 1990 or Attorney Ole Ellern's fax of 13 September 1990. The purchase agreement was signed on Friday 14 September 1990 at the office of Attorney Jørgen Friis. The defendant has not seen the powers of attorney

Copyright © 2021 Karnov Group Denmark A/S

to Amagerbanken signed by Kenn Staugaard. When they had signed the agreement, they sat in the office of Attorney Jørgen Friis waiting for a message from Amagerbanken that the purchase price was available. Jørgen Friis explained to him that if the money did not come, "the documents would not be worth the paper they were written on". There was a lot of "calling back and forth" with Amagerbanken, and he remembers that another bank was mentioned by the buyer, but he does not recall if it was Interbank. Then he and Auditor Hjalmar Andersen drove out to Unibank's branch in Rødkærsbro. They arrived just around closing time. Branch Director Poul Hansen and Lars Eybye were present. The defendant and Hjalmar Andersen informed Lars Eybye about the deal and explained that they were waiting for a money transfer. During the meeting, Amagerbanken confirmed that the purchase price would be paid, and the confirmation was approved by Hjalmar Andersen and Lars Eybye. He was on the phone with Amagerbanken, but he does not remember if a document was returned to Amagerbanken. Attorney Jørgen Friis had said that he was no longer the CEO of the company after receiving confirmation that the purchase price had been transferred. He does not know who gave the order to transfer the purchase price. He did not ask Lars Eybye to withdraw money from the investment fund accounts, nor did he subsequently ask Lars Eybye to act on behalf of the company. The buyer had not made it conditional on the release of the investment funds prior to the purchase. He was not surprised that the buyer was ready to pay a price of 50 for the tax claim, as he could have used the investment fund accounts himself if he had invested in real estate in Germany, for example. He does not recall whether they negotiated the amount of the purchase price.

*Knud Kristensen* explained that he is the CEO of Amagerbanken. In 1990, Amagerbanken's corporate customers accounted for about 75% of its total balance sheet. The bank has made a statement to the Danish Financial Supervisory Authority about which business in the bank could relate to asset stripping. Among other things, it was examined whether Amagerbanken had issued any guarantees for transactions relating to asset stripping. It subsequently emerged that, between 1990 and 1993, Amagerbanken was involved in four related cases of asset stripping, and that it was summoned in approx. 40 cases. In the period 1990-93, Amagerbanken was not aware of any trading with profit companies, and this was not one of its business areas. The bank has not provided any bridge financing for profit companies and has not advised any clients on this. The bank has not deliberately breached the Danish Public Limited Companies Act, and does not take on banking business against payment of a higher fee to counter greater risk. However, in one related case, the bank agreed higher fees than usual for international transfers, but the agreement was reached without it having any knowledge of the amounts to be transferred. The present case concerning Kenn Staugaard has not been discussed by the executive board, and the witness' only knowledge of it comes from the list sent to the Danish Financial Supervisory Authority in connection with the bank's statement on possible asset stripping transactions. The Løjtegård branch had a corporate section, because it had many corporate transactions.

*Jørn Friis* explained that he has been a lawyer for 25 years and that, in addition to actions for damages and insurance cases, he deals with a few other case types for local business clients. He has known Holger Andersen privately and professionally for 20 years. According to a note produced in the case, the witness had a conversation with Auditor Hjalmar Andersen on 31 August 1990, but he does not recall what they talked about. After that time, the witness received a fax on 3 September 1990 regarding a share sale and continuation of the company Mita-Teknik. Hjalmar Andersen had stated that the company should be continued either as a shell company or via a sale as a profit company, and it had been calculated that it would

involve taxes of a total of DKK 4,028,000 million [sic]. The plan was to transfer the assets in Mita-Teknik to a new company to be owned by Holger Andersen, his wife and three children. Prior to receiving the fax, the witness had not had any knowledge of the sale of Mita-Teknik or its financial statements. He later became aware that there was no reason to invest further in Mita-Teknik, which meant that the funds of the investment fund could not be used. He had understood from Hjalmar Andersen that the tax on the funds of the investment fund would fall due, unless they were used to purchase property in Germany. At a meeting on 4 September 1990, which the witness and Hjalmar Andersen attended, Holger Andersen decided to sell the company when the operating activities had been transferred to a new company. It was a condition of the transaction that Holger Andersen retained the right to the name Mita-Teknik, and they then bought an empty-shell company to exploit it for tax purposes for the continued operation. The witness did not attach any significance to the fact that the acquiring company only had a share capital of approx. DKK 300,000, because the purchase could be financed. A meeting was held at the witness' office on 14 September 1990. He had prepared a draft purchase agreement. The witness was to ensure that Holger Andersen only transferred the profit company if he received the purchase price. Holger Andersen had no interest in knowing what the buyer was going to use the company for. After the meeting, Holger Andersen and Hjalmar Andersen went to Unibank to see whether the money was transferred. On 17 September 1990,

**642**

the witness received a letter from Auditor Hjalmar Andersen, including a copy of Amagerbanken's fax of 14 September 1990. Before receiving the purchase price, the buyer could not appoint a new management or acquire real estate in the name of the company, just as Holger Andersen was prevented from acting on behalf of the company after that time. The witness has not spoken to Kenn Staugaard, and he has only spoken to Attorney Ole Ellern once. On 17 June 1994, the witness contacted Attorney Ole Ellern concerning Kenn Staugaard's failure to pay the share transfer tax. At that time, he did not consider whether the company's taxes had been paid, and he first became aware of the tax authorities' claims when Kammeradvokaten, the Legal Adviser to the Danish Government, contacted Holger Andersen.

*Hjalmar Andersen* explained that he is Holger Andersen's auditor, and was therefore aware of his problems regarding the imminent generational handover as well as the company's considerable funds in investment fund accounts. After a meeting with Jørn Friis and Holger Andersen, he contacted Virksomhedsformidlerne I/S. He then received an offer which he forwarded to Attorney Jørn Friis. The witness attended the meeting on 14 September 1990, at which Holger Andersen signed the purchase agreement. He believes that Jørn Friis during the meeting spoke with Kenn Staugaard, and that it was agreed to use Amagerbanken instead of InterBank. They were happy with this change, but "focused" mostly on the receipt of the purchase price. After the meeting, the witness and Holger Andersen went to Unibank to obtain documentation that the purchase price had been paid. On arrival, they met Lars Eybye, who they informed about the purchase agreement and that they were awaiting payment of the purchase price. The witness was not aware whether the buyer already wanted to buy real estate at that time or whether the buyer wanted to use the investment fund accounts. The witness has not instructed Unibank to disburse DKK 18,025,176 from the company's account, and he has not given any instructions on the entries that were made in the bank on 17 September 1990. Prior to the witness' statement to the Municipality of Bjerringbro's tax department, he had been summoned to a meeting.

*Lars Eybye* explained that he is a branch director at Unibank, and that at the time he was deputy head at Unibank in Rødkærsbro. Holger Andersen had used the bank for several years, and the witness

had also previously met Hjalmar Andersen. He was contacted on 14 September 1990 in the morning about a meeting in the afternoon. He was only informed at the meeting that it was about the sale of a company, and he then did what he was asked to do. During the meeting, he received the fax from Amagerbanken, and he spoke with Ole Gemynthe. The witness cannot remember what the conversation was about. He recalls that they received the documents mentioned in Amagerbanken's fax. The bank was entitled to disburse the funds of the investment fund on receipt of the completed cancellation form. The purchase price was received that same afternoon, but he did not process the transfer of the company's funds to the buyer until Monday, 17 September 1990. The transfer of the company's funds was made according to the original of the withdrawal order which he received on Monday, 17 September 1990. He had no doubt that Holger Andersen and Hjalmar Andersen had instructed him to transfer the money, as he, as explained earlier, only did what he was asked to do. He had no knowledge of Kenn Staugaard or of the company BA 67.622 ApS. The witness did not know that the company's funds were to be used for, nor did he give it any thought.

*Poul Hansen* explained that he was employed at Unibank's branch in Rødkærsbro in 1990. He knew Holger Andersen and Hjalmar Andersen and remembers meeting them at the bank on a Friday afternoon. The meeting took place after closing time, but the witness did not attend. He believes that Lars Eybye asked him to sign a letter, but he was not told what it was about.

*Ole Gemynthe* explained that he joined Amagerbanken in 1964. After having worked somewhere else for some time, he returned to Amagerbanken in 1984. In 1988 he was employed as deputy manager in Amagerbanken's Løjtegaard branch, where he worked with corporate clients. He has worked with Kenn Staugaard at Henriques Bank, and after it closed, the witness saw Kenn Staugaard at annual meetings for former employees. On 12 February 1990, the witness had a meeting with Kenn Staugaard, who was then given a bank overdraft at Amagerbanken. This was a normal operating credit with full security. On 14 September 1990, Kenn Staugaard contacted the witness and asked if he would help allow Unibank to withdraw an amount from Amagerbanken, in exchange for Amagerbanken withdrawing a larger amount from Unibank. It was important, and the transaction had to take place on the same day. It was a deal made or brokered by Kenn Staugaard. He was willing to transfer the amount of approx. DKK 15 million, provided that Amagerbanken received the approx. DKK 18 million. He wondered why they could not just receive the difference, but as it was not possible, he carried out the transaction as an ordinary transfer. The witness was shown the necessary powers of attorney and documentation by Kenn Staugaard. In connection with this, he read transcripts of the minute books for BA 67.622 ApS and was thus able to ascertain that a company transfer had taken place, and that Kenn Staugaard was involved in it. The witness did not give any further consideration to why funds were to be withdrawn from

**643**

investment fund accounts. In agreement with Kenn Staugaard, the witness spoke to Lars Eybye several times, but he does not remember if it was the witness who contacted Lars Eybye. Unibank had made the transaction conditional on the use of withdrawal orders, and that they received the original transfer request from Amagerbanken on Monday, 17 September 1990. Amagerbanken received a fee of DKK 1,000 for the transfer. Amagerbanken did not grant Kenn Staugaard a credit of approx. DKK 15 million in connection with the transaction, as the approx. DKK 18 million had previously been deposited in his account. It was agreed with Kenn Staugaard that Amagerbanken would transfer the

amount received to a higher-interest account on Monday. The account relationship with Kenn Staugaard was terminated around the turn of the year 1990-91. The witness had no knowledge of the self-funding ban in 1990.

*Werner Jespersen* explained that he was elected auditor of Staco Teknik in 1990, and that he has audited most of Kenn Staugaard's financial statements. He does not recall the basis on which he prepared the financial statements as at 30 September 1990, but considers that he had a signed contract of sale for Kenn Staugaard's purchase of real estate. He reckoned that the transaction had been concluded shortly beforehand and that it had not yet been registered in the land registry. He does not recall whether he requested a land registration certificate in connection with the preparation of the income statement in September 1991. As regards the size of the investment fund accounts, the witness explained that he must have had bank statements relating to them.

*The parties' closing statements:*

In respect of *Holger Hentze Andersen,* the *plaintiff* has submitted that all the profit company's funds were made available to the buyer's representative, Kenn Staugaard, and thus to the buyer in connection with the transfer of the profit company by defendant 1. In doing so, it infringed section 115 (2) of the Danish Public Limited Companies Act. The instruction to the profit company's bank to make the company's funds available to the buyer at the buyer's bank was given by Holger Hentze Andersen. It is hereby submitted that he is liable for his advisers' acts in the same way as if they had been performed by himself.

Repayment of the profit company's funds from Kenn Staugaard and/or the buyer, cf. section 115 (4) of the Danish Public Limited Companies Act, is excluded. As the person who made the unlawful transaction, Holger Hentze Andersen is, thus, liable for the company's loss, cf. section 115 (5) of the Danish Public Limited Companies Act, which is a provision on strict liability.

If Holger Hentze Andersen were not to be covered by the liability under section 115 (5), the plaintiff must, however, be successful in the alternative claim, as the defendant in the sale of the company recklessly disregarded the interests of the tax authorities. In this case, the liability must therefore be assessed in accordance with the general rule on damages in Danish law, cf. in this regard section 140 of the Danish Public Limited Companies Act. Since Holger Hentze Andersen was member of the management board, his liability is directly covered by section 140, but the liability under the general rule on damages in Danish law also follows from the fact that he exercised the actual management of the company. The defendant is also liable for errors made by his advisers.

The reckless conduct consists in Holger Hentze Andersen simultaneously exchanging the company's very considerable cash funds with the purchase price of the company without taking any interest in where the company's funds were transferred to, and without undertaking any investigation into either the buyer's or Kenn Staugaard's relationship or what the buyer would be using the profit company for. Further investigation was even particularly relevant considering the buyer's hurry to have the company's investment fund accounts disbursed. In doing so, the defendant breached the special duty of care which, owing to the risk of self-funding, was already incumbent on it vis-à-vis the company's creditors and, in particular, the tax authorities, which were forced creditors for substantial sums of money and which were, thus, exposed to a significant risk of loss.

In any event, Holger Hentze Andersen disregarded the special duty of care towards the tax authorities, which – read with the above – resulted from the fact *that* the sale of the company – whose business activities the defendant had extracted from the company before the sale, and whose only asset was cash funds – was not a normal business transaction, *and that* the defendant obtained a significant additional price of DKK 1,496,060.00 determined as 50% of the latent tax liability.

Copyright © 2021 Karnov Group Denmark A/S

The tax authorities' risk was not averted by the buyer submitting a notification on the acquisition of real estate for the purpose of cancelling the company's investment fund transfers, even before the purchase price was paid. The notification was not and could not be anything other than a customary declaration of intent by the buyer to postpone and either pay or completely eliminate the latent tax liability of the profit company. Furthermore, the entire tax loss, including the liability to the additional taxation on investment fund transfers, was a foreseeable consequence of the defendant's reckless handover of the company to the buyer.

*In respect of Amagerbanken A/S,* the plaintiff submits that the bank knew, or should have known, *that* the bank was involved in the purchase of a company, *that* it was the purchase price of the company that it helped the buyer finance, *and that* the amount received by the bank at the same time as the payment of the purchase price from the seller's bank and deposited into Kenn Staugaard's account was the company's funds.

Against this background, Amagerbanken knew or should have known that it was involved in the violation of the self-funding ban in section 115 (2) of the Danish Public Limited Companies Act. In doing so, it disregarded the bank's general

**644**

obligation to the company's creditors – including the tax authorities – to ensure that they did not contribute to the violation of the self-funding ban. At the same time, the bank also breached the general clause in section 1 (6) of the Danish Commercial Bank and Savings Bank Act (*bank- og sparekasseloven*).

The bank had no reason to believe that the disbursement of the company's funds to the buyer was anything other than what it appeared to be: a breach of the self-funding ban. Where relevant, the burden of proving that this was the case lies with the bank.

The tax authorities' loss is caused by the fact that the company – which, prior to the violation of the self-funding ban, had ample resources to pay taxes due and deferred taxes – by illegally paying all the company's funds to Kenn Staugaard was unable to pay the company's tax due. The loss is a foreseeable consequence of the breach of the self-funding ban.

*In respect of both defendants,* the plaintiff has claimed that, irrespective of the fact that the defendants are liable on different grounds, they are jointly and severally liable to the plaintiff for its losses. It is disputed that any part of the plaintiff's claim has lapsed by reason of limitation, inaction or contributory negligence, including that the claim for damages has been waived at any time in connection with the Municipality of Bjerringbro's approval of Holger Andersen's tax assessment for 1990.

*Defendant 1, Holger Hentze Andersen,* contests that he – or his advisers – infringed section 115 (2) of the Danish Public Limited Companies Act . Furthermore, it is disputed that he – or his advisers – instructed Unibank, Rødkærsbro branch, to withdraw the company's funds. In this respect, it is argued that the withdrawal of the company's funds was made by the company's new management and new owners.

In addition, it is disputed that Holger Hentze Andersen – or his advisers – knew or should have known that, after the transfer to Amagerbanken, the company's money would be deposited in a bank account which did not belong to the company. It is, thus, disputed that infringement of section 115 (2) of the Danish Public Limited Companies Act can be imputed to the defendant – or the defendant's advisers. Although section 115 (2) may have been breached by an adviser or other person employed by the defendant, it is disputed that such infringement can be imputed to the defendant on the basis of imputed negligence.

As regards the question of liability under the principle of fault, Holger Hentze Andersen disputes that he or his advisers recklessly disregarded the interests of the tax authorities. It is disputed that the defendant is liable for any errors made by its advisers, just as it

is disputed that he should be held to the same standard as his advisers in respect of the question of fault.

Current tax liabilities were transferred to a relatively smaller extent. The tax liabilities were essentially linked to investment fund transfers, and the taxes were essentially secured by deposits in investment fund accounts. Funds may only be withdrawn from investment fund accounts if the procedure laid down by the legislator and the tax authorities is followed, and it cannot be imputed to the defendant that in the present case this procedure has not prevented fraud committed by the company's new management and a state-authorised public accountant.

The timing of the transaction (September 1990) means that, as a result of the opportunities offered by the tax credit model, there was a commercial incentive for the buyer to pay an additional consideration over and above equity. The timing of the transaction must also be taken into account when determining the general standard of recklessness, as it is submitted that the transfers in 1990 should be made subject to a more lenient assessment.

Holger Hentze Andersen further submitted that the claim is time-barred, referring to the fact that the transaction was entered into with binding effect on 6 September 1990. The case was brought on 14 September 1995. Effective suspension is disputed.

The investigations carried out by the Municipality of Bjerringbro and the Central Customs and Tax Administration in 1993, in which all relevant documents were available with the authorities indicated, must mean that the defendant had grounds to assume that all outstanding claims with the authorities had thereby been settled. It is argued, therefore, that the statements made by the authorities at the time imply that they waived their claims. In that regard, it is noted that, in the present case, the plaintiff must be considered to rank alongside the authorities, since the case was brought for the public authorities and in the public interest. In addition, it is submitted that the authorities after the events described must be precluded from making any claim, at least on the grounds of inaction.

As regards the amount of the claim, it has been submitted that Holger Hentze Andersen's potential liability in damages cannot be extended to a greater amount than that at which the tax liabilities were calculated in the transfer balance sheet (DKK 2,729,920.00 in deferred tax and DKK 1,547,500.00 in current taxes), and that the claim must be reduced by the amount that was deposited in investment fund accounts. The withdrawals from these accounts are not imputable to the defendant, since he cannot guard against false notifications concerning the acquisition of capital goods. In the present case, therefore, the defendant should be treated as if those deposits were intact.

It is submitted that the claim should be reduced by the revenue from the share transfer tax that accrued to the public authorities. That revenue would not have been obtained by the public authorities if the defendant had not performed the transaction. The amount totals DKK 158,649.00. In any event, it is disputed that the claim may include the subsequent additional charge

**645**

of 1,167,269.00, relating to investment fund transfers. This additional charge does not relate to the actual transfer as a profit company. It is a subsequent penalty payment imposed because the buyer made unauthorised withdrawals – a fact which is not imputable to the defendant. Practice shows that additional charges and fees such as fees for failure to file a tax return, interest under the Danish Corporation Tax Act, etc. cannot be included in the claim for damages. It is submitted that this additional charge is entirely comparable to these.

In relation to the co-defendant, Holger Hentze Andersen submits that Amagerbanken A/S has incurred liability for the loss that Holger Hentze Andersen may suffer in case of

Copyright © 2021 Karnov Group Denmark A/S

conviction to the plaintiff. It should be noted in this regard that the bank's employees – in particular Ole Gemynthe – helped Kenn Staugaard mislead Holger Hentze Andersen and his advisers into believing that Kenn Staugaard had genuine intentions for the company, and that he or his company had the money for the purchase price, even though the bank's employees knew or should have known that this was not the case.

Without the intervention of Amagerbanken, the company would never have been handed over to the buyer since the condition of payment of the purchase price would then not have been fulfilled. The bank's actions were therefore the decisive cause of Holger Hentze Andersen's loss.

It is disputed that Holger Hentze Andersen has incurred liability in damages to Amagerbanken. If the bank is convicted in this case, it is due to actions for which only this defendant is responsible, and according to section 25 of the Danish Liability for Damages Act, the bank is closest to bearing the loss.

*Defendant 2, Amagerbanken A/S,* claims in relation to the plaintiff that the bank did not know or should have known that the bank was involved in a corporate transaction, what the contractual relationship was between the seller and the buyer, that the amount transferred by the bank to the buyer's bank was the purchase price for the company, and that the amount received by Amagerbanken from the seller's bank was the company's funds. It is disputed that Amagerbanken has contributed to anyone's violation of the self-funding ban, in addition to the fact that the bank could not act differently without incurring liability to its customer, the buyer. There is therefore no basis of liability for Amagerbanken.

Furthermore, it has been submitted that there is no causal link between the bank's possible contribution to self-funding and the loss incurred by the tax authorities, and thus there is not a foreseeable consequence of the bank's actions.

Amagerbanken is not jointly and severally liable with Holger Hentze Andersen due to its subordinate role in relation to the seller of the company.

In relation to Holger Hentze Andersen, Amagerbanken has submitted that it is Holger Hentze Andersen who is liable to the plaintiff.

Regardless of whether it is Holger Hentze Andersen, his advisers or his bank that made mistakes, or whether the mistake on his part was made due to a combination of acts carried out by him and his assignees, Holger Hentze Andersen must indemnify Amagerbanken. When apportioning the burden of liability in accordance with section 25 of the Danish Liability for Damages Act, Holger Hentze Andersen is closest to bearing the loss and must bear the full loss.

If the issue of recourse is to be settled, Holger Hentze Andersen must in advance disclaim the amount of the preference in respect of the premium received and the winding-up costs saved, and it must be taken into account that he can apply for a refund of the capital gains tax.

**The High Court's observations:**

In connection with the preparation of the sale of the profit company to ASX 11.235 A/S, Holger Hentze Andersen's attorney, Jørn Friis, was made aware of extracts of the register of the Danish Commerce and Companies Agency regarding the buyer company on 13 September 1990. The extract for the financial year 1 July 1988 to 30 June 1989 showed, among other things, that Kenn Staugaard was the CEO, that the equity amounted to DKK 305,000, that there was a qualified audit report, that a petition for compulsory dissolution of the company had been filed on 24 July 1989 due to absence of financial statements, and that the petition for compulsory dissolution was withdrawn on 7 June 1990.

During their meeting in Unibank, Rødkærsbro branch, on 14 September 1990, Holger Hentze Andersen and Auditor

Hjalmar Andersen received a fax from Amagerbanken. This showed that Amagerbanken accepted that Unibank issued a withdrawal order on Amagerbanken of DKK 15,864,909, provided that Amagerbanken was at the same time authorised to issue a withdrawal order on Unibank of DKK 18,025,176. At the same time, Amagerbanken submitted a transcript of the minute book for the profit company dated 14 September 1990, which showed, among other things, that a new board of directors and new auditors had been elected and that the name had been changed. The minute book did not state whether ASX 11.235 A/S was represented, but Kenn Staugaard was present and elected CEO. In addition, Amagerbanken submitted a notification form on the acquisition of assets in connection with a withdrawal from the investment fund account, stating a total purchase price of DKK 7 million and an amount withdrawn of DKK 3,412,426. On receipt of Amagerbanken's fax and enclosures, on that same day, Unibank sent a fax

**646**

to Amagerbanken giving it authority to withdraw the DKK 18,025,176 from Unibank, which at the same time withdrew this amount from the profit company's account with the bank. It must be assumed that Unibank thereby acted on the order of Holger Hentze Andersen.

In the circumstances, Holger Hentze Andersen, as the company's owner and CEO, is found to have transferred the company's funds to the buyer. He thereby made the company's assets available to the buyer in connection with its acquisition of the shares in the company, thereby infringing section 115 (2) of the then applicable Danish Public Limited Companies Act.

Repayment from the buyer of the disbursed company funds, cf. section 115 (4), is excluded. As the person who made the unlawful transaction, Holger Hentze Andersen is, thus, liable for the company's loss, cf. section 115 (5) of the Act, which must be interpreted as a provision on strict liability.

It appears from Kenn Staugaard's overdraft account with Amagerbanken that on 14 September 1990, prior to the transactions in connection with the acquisition of the company, he had an overdraft limit of DKK 212,000 and that the account had a debit balance of approximately DKK 443,000. According to the wording of Amagerbanken's fax of 14 September 1990 to Unibank and its enclosures concerning, among other things, the "transfer of all the company's shares" and the release of investment funds, the power of attorney signed by Kenn Staugaard under which the company gave him full control of the amount received from Unibank, Amagerbanken's authorisation to withdraw DKK 15,864,909 from Kenn Staugaard's account, Unibank's fax of 14 September 1990 to Amagerbanken and the deposit of the amount received from Unibank in Kenn Staugaard's account, it must be considered that Amagerbanken knew or should have known that it was contributing to the acquisition of the company using its own funds.

It must also be considered that Amagerbanken knew or should have known that this created a significant risk that the company's creditors, including the tax authorities, would suffer losses, and that the bank did nothing to avert this risk. Against this background, Amagerbanken is found to have recklessly neglected the interests of the tax authorities and is therefore liable for the loss suffered by the tax authorities.

The defendants' liability cannot be considered to be time-barred, and the tax authorities have not acted in any way that could lead to the lapse or reduction of the claims against the defendants. In the statement of loss, the withdrawals made by the buyer from investment fund accounts should also be included, since the fact that the withdrawals proved to be unjustified must be regarded as foreseeable for the defendants.

The plaintiff's principal claims are therefore upheld.

In the mutual relationship between the defendants, Holger Hentze Andersen and Amagerbanken A/S, it is considered that the statement of loss should be such that Holger Hentze Andersen will disclaim the gain he obtained, taking into account the premium he received, the interest advantage he had on the premium paid, and the repayment of overpaid capital gains tax he must be expected to receive. On the other hand, the extent to which the saved winding-up costs exceed the costs incurred in the sale of the company is so uncertain that they cannot be taken into account.

The parties have not produced any information allowing the High Court to accurately calculate Holger Hentze Andersen's gain. His gain is estimated at DKK 2.5 million.

In the mutual relationship between Holger Hentze Andersen and Amagerbanken A/S, Holger Hentze Andersen is found to have to cover an amount corresponding to the gain of DKK 2.5 million, while Amagerbanken A/S is to cover the rest, DKK 2,944,709.

— — —

With regard to legal costs, Holger Hentze Andersen and Amagerbanken A/S are ordered to jointly and severally pay Staco Teknik ApS in bankruptcy DKK 250,000. Each of the liable parties must pay half of this amount.

In the relationship between the defendants, Holger Hentze Andersen and Amagerbanken A/S, each party must bear its own costs.

**Supreme Court of Denmark**

**The Supreme Court's judgment.**

Judgment was previously delivered in the case by the 16th Division of the Eastern High Court on 3 February 1999.

Seven judges ruled in the case: Pontoppidan, Hermann, Wendler Pedersen, Peter Blok, Asbjørn Jensen, Børge Dahl and Engholm Jacobsen.

*Amagerbanken A/S* (the bank) has reiterated its claims.

In respect of Staco Teknik ApS in bankruptcy (the bankruptcy estate), *Holger Hentze Andersen* has moved for dismissal against payment of DKK 5,444,709 plus statutory interest, and in respect of the bank, he has moved for indemnification from any amount in excess of DKK 2,286,088, which he may be held liable to pay to the bankruptcy estate. Hentze Andersen has moved for dismissal of the bank's claim for indemnification. *Staco Teknik ApS in bankruptcy* has claimed affirmation of the judgment, with the amount to be paid by Hentze Andersen to the bankruptcy estate, however, being increased to DKK 8,365,267.

Additional information has been produced to the Supreme Court.

**The Supreme Court's observations.**

Six judges – Pontoppidan, Hermann, Wendler Pedersen, Asbjørn Jensen, Børge Dahl and Engholm Jacobsen – rule:

Hentze Andersen – the seller of the profit company – has acknowledged that in the sale of the company he recklessly disregarded the interests of the tax authorities and is therefore liable for the tax authorities' loss of DKK 5,444,709.

The agreement on the transfer of the company was not in the nature of a normal commercial transaction. It was concluded with ASX 11.235 A/S, which was unknown to Hentze Andersen before then,

The bank has submitted to the Supreme Court that the amount that Hentze Andersen must disclaim in advance in the event of any apportioning of the burden of liability must be calculated as follows:

**647**

1) the additional capital gain in cash of DKK 1,958,503,

2) the amount of DKK 1,167,289 that, in the event of winding-up, would have been charged in case of additional taxation of the funds of the investment fund in addition to the provision made,

3) the cash benefit – the net interest gain – on item 1 from 14 September 1990 and until the legal proceedings were instituted on 14 September 1995 (DKK 327,585 if the case is considered to be a gross case ("*bruttosag*"), DKK 403,941 if the case is considered to be an interlocutory case" ("*mellemformsag*"), cf. the symmetric interest principle in section 62 E, third sentence, of the Danish Withholding Tax Act (*kildeskatteloven*)) and on item 2 from 21 November 1991, when the additional tax became due, and until the commencement of the case,

4) the cash benefit – the net interest gain – on items 1 and 2 from the commencement of the case and until 21 December 1998, when Hentze Andersen paid DKK 5,444,709 to the bankruptcy estate.

The bank and Hentze Andersen agree that Hentze Andersen's additional cash capital gains amount to DKK 1,958,503. They further agree to apply a net interest rate of 4.125% per annum, and that the interest on the additional capital gains for the period from 14 September 1990 and until the commencement of the case are then DKK 327,585 calculated in accordance with the principles set out in the Supreme Court's judgment of 24 November 1999 (UfR 2000 p. 365).

The bank has contested being liable to Hentze Andersen for any part of any liability under section 115 (5) of the Danish Public Limited Companies Act, over and above DKK 5,444,709.

Hentze Andersen acknowledges to the Supreme Court that he is liable to the bankruptcy estate under the general rule on damages in Danish law, and does not claim to the Supreme Court that the bankruptcy estate's claims have lapsed by reason of inaction or limitation. He further submits that the bank in relation to him must also bear the additional damages in excess of DKK 5,444,709, which he may be ordered to pay to the bankruptcy estate if he is liable under section 115 (5) of the Danish Public Limited Companies Act.

Hentze Andersen has stated that the amount he is to pay in advance in the mutual relationship is DKK 2,286,088, which is the sum of the additional capital gain in cash of DKK 1,958,503 and the interest on this from 14 September 1990 and until the commencement of the case.

The amount of the bankruptcy estate's claim is calculated as follows:

| | |
|---|---|
| Notified corporate taxes including additional taxation relating to investment fund transfers | DKK 5,444,709 |
| Interest under the Danish Corporation Tax Act up to and including December 1998 | DKK 2,920,558 |
| total | DKK 8,365,267 |

and which was represented by Kenn Staugaard. Only the information referred to in the judgment was available in respect of that company, in particular regarding the qualified audit report and a previous petition for compulsory dissolution on the grounds of absence of financial statements. According to the agreement, the purchase price of approx. DKK 16 million was to be transferred to the seller's bank "against settlement of the company's cash and cash equivalents", which had been calculated at approx. DKK 18 million. The transaction was settled by the seller accepting, at a time when he was the only one in control of the company's funds, the request from Amagerbanken as the buyer's representative to receive the purchase price in exchange for a simultaneous transfer of the company's funds to the bank – without the account holder being indicated. We consider that, in the circumstances described, the seller must have known that he, as

Copyright © 2021 Karnov Group Denmark A/S

as a shareholder in the company being sold, was making the company's assets available to the buyer in connection with the buyer's acquisition of the company's shares, thereby infringing section 115 (2) of the Danish Public Limited Companies Act. In connection with the transfer, the company's funds were deposited in Kenn Staugaard's account, and repayment from him, cf. section 115 (4) of the Act, is excluded. On these grounds, we agree that Hentze Andersen is liable for the acquisition in accordance with section 115 (5), and therefore the estate must pay DKK 8,365,267 as well as bankruptcy costs as claimed before the High Court.

Judge Peter Blok's statement on the relationship between the bankruptcy estate and Hentze Andersen:

If the self-funding ban laid down in section 115 (2) of the Danish Public Limited Companies Act has been infringed, and if the buyer is not able to repay the company funds disbursed, "the persons who have made or maintained the transactions according to subsections . . . (2) above shall be held liable for the company's losses", cf. section 115 (5). That provision must, in my view, be understood as covering only shareholders, members of the board of directors or the management board of the company who, at the time when the transactions at issue was made or maintained, were aware of the facts which had the effect of rendering the transaction contrary to the ban in subsection (2). If, in connection with the sale of a profit company, the self-funding ban has been breached because the company's funds in the

**648**

settlement of the transaction were transferred to an account belonging to the buyer, the seller may then only be held liable under subsection (5) if it can be considered, according to the terms of the transfer agreement or otherwise, that the seller knew that the transfer was being made to an account belonging to the buyer. Negligence on the part of the seller is thus not sufficient to impose this liability under subsection (5).

In the present case, clause 5.2 of the transfer agreement provided that, after the transfer of the purchase price to the seller, the buyer was entitled to make use of the company's accounts. This provision can only be interpreted as meaning that the buyer was authorised to act as a new sole shareholder and not as a provision requiring the transfer of the company's funds to the buyer. The fax dated 14 September 1990 from the buyer's bank, Amagerbanken, to Hentze Andersen's bank Unibank stated only that the transfer of the purchase price to Unibank was conditional on the transfer of the company's funds to Amagerbanken. Thus, it did not specify that the company's funds would be transferred to an account belonging to the buyer. Nor are there any other circumstances which would indicate that Hentze Andersen knew this. In view of the foregoing, I consider that no claim may be brought against Hentze Andersen under section 115 (5) of the Danish Public Limited Companies Act.

Before the Supreme Court, Hentze Andersen has, as mentioned, acknowledged to be liable to the bankruptcy estate according to the general rule on damages in Danish law. I therefore vote to uphold his claim for dismissal against payment of DKK 5,444,709, plus usual statutory interest from the commencement of the case.

As far as the relationship between the bankruptcy estate and Hentze Andersen is concerned, judgment is given in accordance with the majority of votes.

All judges hereby rule:

For the reasons stated by the High Court, the Supreme Court agrees that Amagerbanken is liable for the tax authorities' loss and must therefore pay DKK 5,444,709 to the bankruptcy estate.

Accordingly, the Supreme Court upholds the bankruptcy estate's claim.

Both Hentze Andersen and the bank have recklessly contributed to the unlawful self-funding. The joint and several liability for this includes the tax authorities' loss of DKK 5,444,709. In addition, additional liability is incumbent on Hentze Andersen

in respect of interest due under tax law and the costs of its bankruptcy by virtue of his liability for the loss suffered by the company as a result of the unlawful payment to Kenn Staugaard which Kenn Staugaard has not repaid to the company.

The joint and several liability for the tax authorities' loss cannot, according to the specific nature of the company – a profit company without a protectable corporate interest other than the tax authorities' creditor interest – be extended to cover the company's further loss. Against this background – and since Amagerbanken was not an adviser to Hentze Andersen in respect of the act that gave rise to liability under section 115 (5) of the Danish Public Limited Companies Act – Hentze Andersen cannot bring a claim against Amagerbanken in connection with the aforementioned additional liability.

The mutual distribution of the joint burden of liability of DKK 5,444,709 between the bank and Hentze Andersen, in a case of asset stripping such as the present case – a so-called "interlocutory case" – must be based on the principles laid down in the Supreme Court's judgment of 24 November 1999 (UfR 2000, p. 365). Of the amount of DKK 5,444,709, Hentze Andersen must, thus, in advance bear the additional capital gain in cash of DKK 1,958,503. Based on the information produced in the case, it must be considered that the alternative to the sale was winding-up of the company, which would have given rise to additional taxation on the funds of the investment fund of DKK 1,167,289 over and above what had been provided for in the financial statements. Hentze Andersen must therefore also bear this amount in advance. In addition, an amount must be included to compensate for the economic value for Hentze Andersen of the disposal of the additional capital gain in cash of DKK 1,958,503 in the period from the payment on 14 September 1990 and until the commencement of the case. The parties agree that this benefit calculated in accordance with the principles of the above-mentioned Supreme Court judgment can be calculated at DKK 327,585. There is no reason to depart from these principles because Hentze Andersen is also liable under section 115 (5) of the Danish Public Limited Companies Act. Nor does the Supreme Court find any basis for charging interest on the amount of DKK 1,167,289 in additional taxation of the funds of the investment fund or for charging interest for the time after the commencement of the case. The part of the joint burden of liability of DKK 5,444,709 that Hentze Andersen must bear in advance in the relationship between the parties amounts to a total of DKK 3,453,377.

When allocating the remaining amount of DKK 1,991,322, there is no reason to depart from the principles applied in the above-mentioned judgment. The amount must therefore be divided equally between Hentze Andersen and Amagerbanken.

Accordingly, in the mutual relationship, Hentze Andersen must pay DKK 4,449,043 and Amagerbanken DKK 995,666.

**On these grounds the Court rules that:**

*Holger Hentze Andersen and Amagerbanken A/S are ordered to jointly and severally pay Staco Teknik ApS in bankruptcy DKK 8,365,267, however such that Amagerbanken A/S is to pay a maximum of DKK 5,444,709, plus statutory interest from 14 September 1995. Holger Hentze Andersen must acknowledge that he is further liable to bear*

**649**

*the costs of Staco Teknik ApS in bankruptcy for the bankruptcy and the administration of the estate, cf. section 93 (1) and (2) of the Danish Bankruptcy Act, and court fees, cf. section 94 (4) of the Danish Bankruptcy Act.*

*In the mutual relationship, Holger Hentze Andersen is ordered to pay DKK 4,449,043 and Amagerbanken A/S DKK 995,666 of the amount for which they are jointly and severally liable, all with statutory interest from 14 September 1995.*

*With regard to legal costs before the Supreme Court, Holger Hentze Andersen and Amagerbanken A/S are ordered to jointly and severally pay Staco Teknik ApS in*

bankruptcy DKK 350,000. In the mutual relationship, Holger Hentze Andersen is ordered to pay DKK 175,000 of this amount, and Amagerbanken A/S DKK 175,000.

In the relationship between Holger Hentze Andersen and Amagerbanken A/S, each party must pay its own legal costs before the Supreme Court.

The High Court's orders on legal costs are affirmed.

The imposed amounts must be paid within 14 days of the present judgment of the Supreme Court.



T: (+45) 33 12 13 18
Sværtegade 3             www.ad-astra.dk
DK-1118 København K      info@ad-astra.dk

I, the undersigned Benjamin Holst Kjeldsen, Danish certified translator and interpreter of the English language, hereby certify the preceding text to be a true and faithful translation of the attached Judgment in the Danish language.

In Witness Whereof I have hereunto set my hand and affixed my Seal this 31st day of May 2022

**Benjamin Holst Kjeldsen**
**Certified Translator and Interpreter**

*Registration no. 76 with the Danish Association of Certified Translators and Interpreters*

**U.2001.634/2H**

***Sælger af overskudsselskab og købers bank erstatningsansvarlige for skattevæsenets tab ved selskabstømning, sælger efter aktieselskabslovens § 115, stk. 5. Fordeling af erstatningsbyrden.***

*Erstatning uden for kontraktforhold 111.4, 3.3, 61.1 og 62.1 - Pengevæsen m.v. 2 - Selskabsret 1.2 og 1.3.*

♦ S solgte i september 1990 et overskudsselskab - et aktieselskab under omdannelse til anpartsselskab - til K for en købesum på ca. 15,9 mio. kr. svarende til egenkapitalen med et tillæg på ca. 2,1 mio. kr. De skyldige og latente skatter blev ikke betalt, og efter at selskabet var gået konkurs, rejste boet over for S principalt krav om

**635**

betaling i medfør af aktieselskabslovens § 115, stk. 5, af skattevæsenets tab på ca. 5,4 mio. kr., renter i henhold til selskabsskatteloven på ca. 2,9 mio. kr. samt omkostninger ved konkursens indtræden og boets behandling. Over for K's bank B rejste boet krav om betaling af tabet på ca. 5,4 mio. kr. med tillæg af procesrente. Handelen blev afviklet ved, at købesummen blev overført til S' bank mod, at selskabets likvide midler, ca. 18 mio. kr., samtidig blev overført til B - uden angivelse af kontohaver. Efter forudgående instruks fra K indsatte B beløbet på K's konto, hvorfra købesummen var blevet hævet. S fandtes under de foreliggende omstændigheder at måtte have indset, at han som aktionær i det solgte selskab stillede dettes midler til rådighed for K i forbindelse med dennes erhvervelse af aktierne i selskabet, og at han dermed overtrådte aktieselskabslovens § 115, stk. 2. S hæftede derfor for selskabets tab i medfør af § 115, stk. 5, og boets principale påstand over for S blev herefter taget til følge (dissens for alene - som erkendt for Højesteret - at anse S for erstatningsansvarlig efter dansk rets almindelige erstatningsregel for tabet på ca. 5,4 mio. kr. med procesrente). Det måtte lægges til grund, at B indså eller burde have indset, at banken medvirkede til en erhvervelse af selskabet under anvendelse af dets egne midler. B havde herved på uforsvarlig måde tilsidesat skattevæsenets interesser, og boets påstand over for B blev taget til følge. S og B var herefter solidarisk ansvarlige for tabet på ca. 5,4 mio. kr. med procesrente. Da det solidariske ansvar ikke kunne udstrækkes til at omfatte selskabets videregående tab, og da B ikke havde været rådgiver for S, kunne denne ikke rejse krav mod B i anledning af merforpligtelsen vedrørende renter efter skattelovgivningen og boomkostninger. Ved den indbyrdes fordeling af den fælles erstatningsbyrde på ca. 5,4 mio. kr. måtte der tages udgangspunkt i de principper, der var fastlagt i U 2000.365 H. Ud over det ved salget opnåede kontante merprovenu og rente heraf indtil sagsanlæg skulle S forlods bære et beløb svarende til den efterbeskatning af investeringsfondsmidler, som en likvidation af selskabet ville have udløst. Dommen tager stilling til flere andre spørgsmål vedrørende opgørelsen af det beløb, S forlods skulle bære. Det resterende beløb på ca. 2 mio. kr. skulle deles lige mellem S og B.[1]

**H.D. 29. december 2000 i sagerne I 75/1999 og I 77/1999**

*Amagerbanken A/S (adv. Torben Steffensen, Kbh.)*
mod
*1. Staco Teknik ApS under konkurs (Km.adv. v/adv. Sune Fugleholm)*
og
*2. Holger Hentze Andersen (adv. Morten Samuelson, Kbh.)*
samt *Holger Hentze Andersen (adv. Morten Samuelson, Kbh.)*
mod
*1. Staco Teknik ApS under konkurs (Km.adv. v/adv. Sune Fugleholm)*
og
*2. Amagerbanken A/S (adv. Torben Steffensen, Kbh.)*
*Biintervenient: advokat Jørn Friis (adv. Søren Bagger, Kbh.).*

## Østre Landsret

### Østre Landsrets dom 3. februar 1999 (16. afd.)

(Kroman, Karsten Bo Knudsen, Lars Holm (kst.)).

Under denne sag, der er anlagt den 14. september 1995 har sagsøgeren, Staco Teknik ApS under konkurs, nedlagt følgende påstande:

Principalt:

1. De sagsøgte tilpligtes til sagsøgeren in solidum at betale 8.245.483 kr., dog således at sagsøgte 2, Amagerbanken A/S, højst skal betale 5.444.709 kr. med tillæg af sædvanlig procesrente fra sagens anlæg til betaling sker.

2. Sagsøgte 1, Holger Hentze Andersen, tilpligtes at anerkende, at han yderligere er forpligtet til at erstatte sagsøgeren omkostningerne ved konkursens indtræden og boets behandling, jf. konkurslovens § 93, nr. 1 og 2, samt retsafgift, jf. konkurslovens § 94, nr. 4.

Subsidiært:

De sagsøgte tilpligtes til sagsøgeren in solidum at betale 5.444.709 kr. med tillæg af sædvanlig procesrente fra sagens anlæg, til betaling sker.

Sagsøgte 1, Holger Hentze Andersen, har over for sagsøgerens påstande, påstået frifindelse, subsidiært mod betaling af et mindre beløb, og over for sagsøgte 2 nedlagt påstand om, at sagsøgte 2, Amagerbanken A/S, tilpligtes at frihold sagsøgte 1 for ethvert beløb, herunder renter og omkostninger, som sagsøgte 1 måtte blive tilpligtet at betale til sagsøgeren, dog højst 5.444.709 kr. med tillæg af sædvanlig procesrente fra sagens anlæg, til betaling sker.

Sagsøgte 2, Amagerbanken A/S, har over for sagsøgeren nedlagt påstand om frifindelse, subsidiært mod betaling af et mindre beløb og over for sagsøgte 1 nedlagt påstand om, at sagsøgte 1, Holger Hentze Andersen, tilpligtes at frihold sagsøgte 2 for ethvert beløb,

**636**

herunder renter og omkostninger, som sagsøgte 2 måtte blive tilpligtet at betale til sagsøgeren.

*Sagsfremstilling:*

I 1969 grundlagde Holger Hentze Andersen sammen med en kollega en virksomhed, som producerede sikkerhedsudstyr til overvågning af gasbrændere. I 1974 flyttede virksomheden til Rødkærsbro, og samme år blev den omdannet til et aktieselskab med navnet Mita Teknik A/S. I 1990 købte Holger Hentze Andersen sin kompagnon ud af selskabet og var herefter eneejer af virksomheden. Samme år begyndte man at eksportere sikringsudstyr

---

**1** U 1997.364 H, U 1998.1119 H, U 1998.1172 H, U 2000.364 H, U 2000.1926 H, U 2000.2003 H, TfS 2000.900 H, TfS 1999.512 V, TfS 2000.233 Ø, TfS 2000.249 V, TfS 2000.273 V, TfS 2000.446 V, TfS 2000.496 V, TfS 2000.660 V, Lett i TfS 1998.537, Byskov Petersen i TfS 2000.617 samt Marianne Stigborg i Advokaten 2000 s. 234 ff.

til vindmøller. I årene forinden havde virksomheden haft en betydelig nedgang i omsætningen. Adskillige medarbejdere var blevet afskediget, og virksomheden var blevet rationaliseret og moderniseret i et sådant omfang, at man ikke havde yderligere investeringsbehov trods betydelige beløb på selskabets investeringsfondskonti.

Holger Hentze Andersen ønskede i 1990 at påbegynde et generationsskifte med sine to sønner. I forbindelse hermed blev det overvejet at gennemføre generationsskiftet via en likvidation af aktieselskabet. I sommeren 1990 foreslog hans revisor, registreret

|  |  | |
|---|---|---|
| Egenkapital - bunden. . . . . . | tkr. | 6.093 |
| Egenkapital - fri. . . . . . . . . . | - | 9.101 |
| Skat -investeringsfond. . . . . | tkr. 2.739 | |
| Skat - løbende indkomst . . . | - 496 | 3.235 |
| Likvide midler i alt. . . . . . . . | tkr. | 18.429 |

Tilbuddet på selskabet ser - kort fortalt - således ud:

|  |  | |
|---|---|---|
| Egenkapital - bunden, kurs 100. . . | tkr. | 6.093 |
| Egenkapital - fri, kurs 107. . . . . . . . | - | 9.738 |
| Skatter i alt - 50% 3.235. . . . . . . . . | - | 1.618 |
| Salgspris. . . . . . . . . . . . . . . . . . . . . | tkr. | 17.449 |

Der er gjort opmærksom på, at der er regnskabsafslutning pr. 30. september 1990. Regnskab pr. 31. august 1990 er under udarbejdelse, hvorfor der kan ske mindre ændringer i ovenstående beløbsstørrelser.

Der foretages dog ikke ændringer indenfor plus/minus tkr. 25.

Fra købers side er tilbuddet gældende til torsdag den 6. september 1990 kl. 15.00. Er det ikke muligt at få sælgers accept inden da, oplys da venligst hvornår den kan foreligge, da jeg så vil forsøge at få tilbudsfristen forlænget.«

Samme dag sendte Holger Hentze Andersens advokat, advokat Jørn Friis, advokatfirmaet Dahl i Viborg, en telefax til Virksomhedsformidlerne I/S, hvori der blandt andet stod:

»Deres tilbud, fremsat den 6. september 1990 overfor revisor Hjalmar Andersen vedrørende køb af overskudsselskab, accepterer jeg på selskabets vegne.

Jeg har taget skridt til at omdanne selskabet til anpartsselskab.

Jeg går ud fra, at jeg kan få dokumentation for, at købesummen kan erlægges pr. overtagelsesdagen, som jeg forventer er næste fredag.

Jeg kontakter Dem med henblik på at Deres medvirken til en hurtig registrering af ændringer af selskabet.«

Den 10. september 1990 fremsendte advokat Ole Ellern via telefax et udkast til købsaftale og transport vedrørende salg af Mita-Teknik,

revisor Hjalmar Andersen, at man i stedet flyttede virksomheden over i et andet selskab, som havde underskud, samtidig med at man solgte det oprindelige selskabs investeringsfondskonti og kontante midler som et »overskudsselskab«.

Den 6. september 1990 modtog revisor Hjalmar Andersen en telefax fra Virksomhedsformidlerne I/S med følgende indhold:

»Vedr.: Overskudsselskab.

Vi har på Deres foranledning opnået et tilbud på et overskudsselskab under følgende forudsætninger:

Holger Andersen A/S, under omdannelse til B.A. 67.622 ApS, til advokat Jørn Friis. Som køber var anført direktør Kenn Staugaard eller ordre, Eggersvej 17, 2900 Hellerup, og Holger Hentze Andersen som sælger.

Den 13. september 1990 telefaxede advokat Ole Ellern et revideret udkast til købsaftale til advokat Jørn Friis. Som køber var nu anført ASX 11.235 A/S, Eggersvej 17, 2900 Hellerup. Af de medfølgende basisoplysninger fra Erhvervs- og Selskabsstyrelsen vedrørende ASX 11.235 A/S fremgik blandt andet, at Kenn Staugaard var såvel direktør som bestyrelsesmedlem i selskabet, at der for regnskabsåret 1. juli 1988 til 30. juni 1989 var en egenkapital på 305.000 kr., og at der forelå revision med forbehold. Det fremgik endvidere, at selskabet den 24. juli 1989 var sat under tvangsopløsning »på grund af regnskab«, og at tvangsopløsningen var tilbagekaldt den 7. juni 1990.

Med overtagelses- og skæringsdag den 13. september 1990 købte Holger Hentze Andersen samme dag et »underskudsselskab«. Den 14. september 1990 solgte overskudsselskabet BA 67.622 ApS virksomheden til underskudsselskabet, der nu var under navneændring til Mita-Teknik, Holger Andersen A/S, på nærmere fastsatte vilkår. Af et samme dag udfærdiget perioderegnskab for BA 67.622 ApS fremgår blandt andet:

»Balance pr 14. september 1990

. . .

AKTIVER:

. . .

|  |  |
|---|---|
| Anlægsaktiver ialt . . . . . . . . . | 0 |

. . .

Tilgodehavender:

. . .

|  |  |
|---|---|
| Andre tilgodehavender renter inv. fondskonti . . . . . . | 155.596 |

. . .

Likvide beholdninger:

|  |  |
|---|---|
| Bankkonti for investeringsfond . . . | 3.412.426 |

. . .

| | |
|---|---|
| **637** | 14.457.154 |
| Indlån bank . . . . . . | |

. . .

| | |
|---|---|
| AKTIVER IALT . . . . . . | 18.025.176 |

. . .

PASSIVER:

Egenkapital:

| | |
|---|---|
| Anpartskapital . . . . . . | 4.875.000 |
| Reserver: | |
| Lovpligtig reservefond . . . . . . | 0 |
| Ekstra reservefond . . . . . . | 8.872.756 |
| | 8.872.756 |
| Egenkapital i alt . . . . . . | 13.747.756 |
| Hensættelser: | |
| Eventualskat . . . . . . | 2.729.920 |
| Gæld: | |
| Langfristet gæld: | |
| prioritetsgæld . . . . . . | 0 |
| Kortfristet gæld: | |
| Selskabsskat tidligere år . . . . . . | 1.285.300 |
| Selskabsskat af periodens resultat . . . . . . | 262.200 |
| | 1.547.500 |
| Gæld ialt . . . . . . | 1.547.500 |
| PASSIVER IALT | 18.025.176 |

. . .«

Af en note fremgår blandt andet:

»Under hensættelser er opført eventualskat kr. 2.729.920 der dækker skatteforpligtelsen af investeringsfondshenlæggelser.

Under kortfristet gæld er den skat kr. 1.285.300, der forventes at blive pålignet sidste års beregnede skattepligtige indkomst, samt den skat, der er beregnet af periodens skattepligtige indkomst kr. 262.200.«

Den 14. september 1990 underskrev Holger Hentze Andersen tillige en anpartsoverdragelsesaftale, hvori det blandt andet er anført:

»Mellem undertegnede anpartshavere i

BA 67.622 ApS

Håndværkervej 1,

8840 Rødkærsbro

( i det følgende kaldet sælger)

og

ASX 11235 A/S

Eggersvej 17,

2900 Hellerup,

( i det følgende kaldet køber)

er indgået følgende aftale om overdragelse af den nominelle anpartskapital

Kr. 4.875.000,00

i

BA 67.622 ApS.

*1. Overtagelsesdag*

1.1.

Overdragelsen finder sted med overtagelse pr. 14. september 1990, på grundlag af en af sælgers revisor udfærdiget balance pr. 14/9 1990.

*2. Købesummens fastsættelse*

2.1.

Købesummen fastsættes i overensstemmelse med den udfærdigede balance efter følgende principper:

2.2.

Forinden overtagelsesdagen overdrager selskabet samtlige aktiviteter. Købesummen herfor berigtiges kontant. Dette indebærer, at aktiverne i selskabet i den af revisor udfærdigede balance alene består af bankindestående samt beregnede renter på investeringsfondskonti. På passivsiden afsættes udover egenkapitalen alle aktuelle og udskudte skatter.

Udskudte skatter afsættes med 40%.

2.3.

Beregnede skatter af det løbende års overskud forventes at blive afsat med kr. 262.200,00 og udskudte skatter forventes afsat med kr. 2.729.920,00. Skat af tidligere års indkomst udgør kr. 1.285.300,00

. . .

2. 5.

Købesummen fastsættes herefter til selskabets indre værdi med tillæg af et fast beløb stort kr. 2.117.153,00, der er fastsat under hensyn til de i pkt. 2.3. afsatte skattebeløb.

Købesummen kan herefter beregnes således:

| | | |
|---|---|---|
| Egenkapital bunden - 4.875.000,00, kurs 100 | | kr. 4.875.000,00 |
| Egenkapital fri 8.872.756,00 kurs 107 | | - 9.493.849,00 |
| Skat af investeringsfond 2.729.920 | | |
| Aktuel skat 1990 | | |
| (løbende indkomst) | 262.200 | |
| | 2.992.120 | |
| ialt skat heraf 50% | | - 1.496.060,00 |
| Købesum | | kr. 15.864.909,00 |
| Købesummen berigtiges således: | | |
| Købers pengeinstitut Inter Bank A/S, Ny Adelgade 4, 1104 København K, betaler købesummen til UNIBANK A/S, 8840 Rødkærsbro | | kr. 15.864.909,00 |
| Købers pengeinstitut overfører til Selskabs- og Virksomhedsformidlerne I/S v/adv. Ole Ellern, Kildegårdsvej 41, 2900 Hellerup, med sælger aftalt kommission 1% af købesummen | | kr. 158.650,00 |
| Restbeløbet | | kr. 15.706.259,00 |
| overføres til sælgers pengeinstitut, UNIBANK A/S, 8840 Rødkærsbro, mod afregning af selskabets likvide midler, nemlig: | | |
| **638** | | kr. 14.457.154,00 |
| Bankindestående | | |
| Indestående på investeringskonti | | - 3.412.426,00 |
| Beregnede renter heraf | | - 155.596,00 |
| Aktiver ialt | | kr. 18.025.176,00 |

*3. Købesummens berigtigelse.*

3.1.

Købesummen berigtiges på grundlag af den af revisor udarbejdede balance senest den 14. september 1990 kl. 14,00 ved bankoverførsel over Nationalbanken til den af sælger anviste konto i UNIBANK A/S.

. . .

*4. Levering af selskabets protokoller m.v.*

. . .

4.3.

Selskabets protokoller tilsendes køber straks efter købesummens erlæggelse.

4.4.

Straks køber har modtaget selskabets protokoller afholdes ekstraordinær generalforsamling med følgende dagsorden:

a. Nyvalg af direktion.

b. Nyvalg af generalforsamlingsvalgt revisor.

c. Ændring af navn efter købers ønske, idet køber, forpligter sig til at tåle, at selskabets binavn overgår til et af sælger anvist selskab.

d. Ændring af hjemsted.

. . .

*5. Selskabets pengeinstitut.*

5.1.

Sælger sørger for, at selskabets midler senest pr. den 14/9 1990 indestår som kontant indestående på bankkonto i UNIBANK A/S.

5.2.

Efter overførslen af købesummen til den af sælger anviste konto er køber legitimeret til at disponere over de selskabet tilhørende konti i overensstemmelse med den af revisor udfærdigede balance.

. . .

*7. Sælgers garanti*

. . .

7.8.

Køber er i enhver henseende ansvarlig for dispositioner af enhver art, der foretages efter overtagelsesdagen.

. . .

*10. Omkostninger*

. . .

10.3.

Det er parternes bedste antagelse, at nærværende overdragelse ikke er belagt med aktieafgift. Hvis dette mod forventning skulle vise sig at være tilfældet, betales aktieafgiften af køber.«

Aftalen er på købers vegne underskrevet af Kenn Staugaard.

Det viste sig, at handelen fra købers side ikke skulle berigtiges gennem Inter Bank, men i stedet gennem Amagerbankens Løjtegård afdeling. Denne afdeling var den 14. september 1990 i besiddelse af to fuldmagter dateret samme dato og underskrevet af Kenn Staugaard. Den ene fuldmagt er håndskrevet og lyder således:

»Amagerbanken A/S Løjtegård afd. bemyndiges herved til at hæve kr. 15.864.909,- på min konto nr 200 590-0 i forbindelse med træk foretaget af Unibank A/S Rødkærsbro afd.«

Fuldmagten er tillige forsynet med afdelingens daværende souschef Ole Gemynthes håndskrevne initialer.

Den anden fuldmagt er maskinskrevet og lyder således:

»Undertegnede B A 67.622 ApS under navneændring til STACO-TEKNIK ApS. giver herved direktør Kenn Staugaard, Eggersvej 17 2900 fuld rådighed over det fra UNI-Bank A/S - reg.nr. 9274 modtagende beløb i Amagerbanken A/S - Løjtegård afdeling, reg. 5208 den 14. september 1990.«

Den 14. september 1990 kl. 16.06 sendte Amagerbanken, Løjtegård afdeling en telefax til Unibank, Rødkærsbro afdeling med følgende indhold:

*»Vedr: B A 67.622 ApS.*

Vi skal herved acceptere, at De dags dato udfærdiger en trækseddel trukket på reg. nr. 5208 på et beløb af

*kr. 15.864.909,00*

*skriver femtenmillionerottehundredesekstifiretusinde-nihundredeni 00/100* under forudsætning af, at vi samtidig bemyndiges til at udfærdige en tilsvarende trækseddel trukket på reg. nr. 9274 på et beløb af

*kr. 18.025.176,00*

*skriver attenmillionerogtotifemtusindeethundredesyvtiseks 00/100.* Til Deres orientering vedlægges kopi af udskrift af forhandlingsprotokollen samt kopi af anmeldelse i forbindelse med frigivelse af beløb indestående på investeringsfondskonto. Sidstnævnte tilstiles Dem i original med almindelig post dags dato.

Vi imødeser Deres accept før ovennævnte transaktioner gennemføres.«

Telefaxen er underskrevet af filialdirektør Søren Bagge-Petersen og ovennævnte souschef Ole Gemynthe. Den i telefaxen nævnte udskrift af forhandlingsprotokollen for BA 67.622 ApS havde følgende ordlyd:

»År, 1990 den 14. september afholdes ekstraordinær generalforsamling på selskabets kontor.

Årsagen til den ekstraordinære generalforsamlings afholdelse var, at bindende aftaler om overdragelse af samtlige selskabets anparter havde fundet sted i henhold til foreliggende dokumenter.

Tilstede var statsaut. revisor Werner Jespersen, sekretær Jeanni Jørgensen, redaktør Anne Staugaard og direktør Kenn Staugaard der valgtes til dirigent, og som

**639**

konstaterede at generalforsamlingen var lovlig og beslutningsdygtig.

Generalforsamlingen var indkaldt uden hensyntagen til det i vedtægterne fastsatte varsel, men samtlige stemmeberettigede aktionærer godkendte generalforsamlingens beslutningsdygtighed ved frafald af kald og varsel.

Der forelå følgende forslag til ændring af selskabets vedtægter:

§ 1. Selskabets navn ændres til: Staco Teknik ApS. Selskabets hjemsted ændres til: Gentofte kommune.

§ 2. Selskabets formål ændres til at udøve virksomhed ved handel, håndværk, fabrikation, investering, finansiering og administration.

Der forelå følgende forslag til ændring af selskabets ledelse og revision:

Som ny bestyrelse foreslås:

Entreprenør Flemming Jørgensen

Redaktør Anne Staugaard

Direktør Kenn Staugaard

Som ny direktør foreslås:

Direktør Kenn Staugaard

Som ny revisor foreslåes:

Statsaut. revisor Werner Jespersen

». . .

Grunde med bygninger. . . . . .                                              7.000.000

. . .

De foreslåede ændringer i selskabets ledelse og revision samt vedtægterne vedtoges eenstemmigt og med alle stemmer.

Generalforsamlingen bemyndigede eenstemmigt og med alle stemmer Kenn Staugaard til at foretage de ændringer i vedtægterne og anmeldelsen som Erhvervs- og Selskabsstyrelsen måtte kræve eller henstille foretaget.

Generalforsamlingen hævet.

Som dirigent

Kenn Staugaard«

Af den i telefaxen omtalte anmeldelse i forbindelse med frigivelse af beløb indestående på investeringsfondskonto fremgik, at BA 67.622 ApS ønskede midlerne anvendt til forlods afskrivninger på

»En ideel 1/5 af 6165 m² udlejede værkstedslokaler i ejendommen matr. nr. 44 o m.fl. Helsingør overdrev«

Dato for levering/ibrugtagning var angivet som 15. september 1990, anskaffelsessummen var 7.000.000 kr., og det hævede beløb udgjorde 3.412.426 kr. Det er for landsretten oplyst, at Unibank, Rødkærsbro afdeling, den 17. september 1990 modtog den originale blanket pr. post, og at det deraf fremgik, at den på selskabets vegne var underskrevet af Kenn Staugaard den 14. september 1990.

Unibank, Rødkærsbro afdeling, besvarede telefaxen af 14. september 1990 samme dag således:

*»Vedr: B A 67.622, ApS.*

Under henvisning til modtaget fax d.d. kl. 16.06 bemyndiges De til at trække på reg. nr. 9274 et beløb stort

*kr. 18.025.176,00*

under forudsætning af at vores trækseddel accepteres.

Vi betragter hermed handlen som gennemført.«

Telefaxen er underskrevet af Lars Eybye og Poul Hansen.

Af kontoudtog vedrørende Kenn Staugaards kassekredit konto nr. 200590-0 med Amagerbanken, Løjtegård afdeling, fremgår, at kassekreditten havde et maksimum på 212.000 kr. Dette maksimum var overskredet gennem en længere periode, således at saldoen pr. 14. september 1990 var -443.359,11 kr. Samme dag indsattes 18.025.176,00 kr., ligesom der blev hævet 15.864.909,00 kr. De fremlagte kredit- og debetbilag af samme dato, der begge bærer Ole Gemynthes håndskrevne initialer, har følgende ordlyd:

»Indsat modtaget fra Uni-Bank A/S reg. 9274

18.025.176,00

. . .«

»Overført ifølge Deres fuldmagt til Uni-Bank A/S reg. nr. 9274

15.864.909,00

. . .«

Af kontoudtogene fremgår endvidere, at saldoen påny blev negativ den 18. september 1990.

Af kontoudtog fra Unibank, Rødkærsbro afdeling, fremgår, at der med bogførings- og valørdato den 14. september 1990 blev indbetalt 15.864.909,00 kr. på Holger Hentze Andersens personlige konto. Fra Mita-Teknik A/S' konto blev der med bogføringsdato 17. september 1990 og valørdato 14. september 1990 udbetalt 18.025.176,00 kr., og med tilsvarende datoer blev der indsat i alt 3.568.021,46 kr. hidrørende fra opgjorte investeringsfondskonti.

Den 20. september 1990 modtog Erhvervs- og Selskabsstyrelsen meddelelse om de skete ændringer i overskudsselskabets bestyrelse, navneændring til Staco Teknik ApS, vedtægtsændringer m.v.

Ifølge en status pr. 30 september 1990 udarbejdet af (nu tidligere) statsautoriseret revisor Werner Jespersen havde Staco Teknik ApS følgende aktiver:

Andre tilgodehavende renter af investeringsfondskonti.

. . . . .                                                                    155.596

. . .

Bankkonti for investeringsfond. . . . . .                                    3.412.426

. . .

Indlån bank. . . . . .                                                       14.457.154

. . .

<u>AKTIVER IALT:</u>                                                         <u>25.025.176</u>

. . .«

Efter det for landsretten oplyste har det ikke været muligt at konstatere ejerskabet til eller eksistensen af nogen af disse aktiver. Af det fremlagte materiale fremgår, at Staco Teknik ApS er blevet videresolgt nogle gange. Den 8. december 1994 blev selskabet taget under

**640**

konkursbehandling. Den 15. juli 1997 blev Kenn Staugaard (Hansen)'s bo taget under konkursbehandling, og den 5. august 1998 skete det tilsvarende for ASX 11.235 (nu ApS).

Af det for landsretten fremlagte materiale fremgår endelig, at der i årene 1993 og 1994 blev korresponderet mellem skattemyndighederne, navnlig Bjerringbro Kommunes skatteforvaltning, og Holger Hentze Andersen ved revisor Hjalmar Andersen og advokat Jørn Friis, vedrørende sagsøgte 1's skatteansættelse for 1990 og betaling af aktieafgift i forbindelse med salget af overskudsselskabet. Denne korrespondance omtaler ikke de spørgsmål, som er omfattet af nærværende sag.

*Opgørelsen af sagsøgerens krav:*

De beløb, som de sagsøgte afkræves, svarer til overskudsselskabets skyldige og forfaldne skatter, idet sagsøgte 1, Holger Hentze Andersen, dog efter den principale påstand afkræves et beløb, som svarer til de skyldige skatter med tillæg af renter efter selskabsskatteloven og boomkostninger, medens sagsøgte 2, Amagerbanken A/S, alene skal erstatte de skyldige skatter.

De skyldige skatter, som danner grundlag for opgørelsen af påstandsbeløbene, svarer i princippet til de skatter, som var afsat i perioderegnskabet for overskudsselskabet pr. 14. september 1990. Der er således tale dels om skyldig skat af årsresultatet for regnskabsåret 1988/89, dels om efterbeskatning af investeringsfondshenlæggelser. Når der samlede skyldige skattebeløb er højere end det afsatte skattebeløb i perioderegnskabet, skyldes det alene beregningsmæssige forskelle.

Det beløb, som sagsøgte 1, Holger Hentze Andersen, skal betale efter den principale påstands første led, svarer således til det af skattemyndighederne hos sagsøgeren anmeldte skyldige skattekrav på kr. 5.444.709,- med tillæg af renter efter selskabsskatteloven frem til og med september 1998, i alt kr. 8.245.483,-.

Det beløb, som sagsøgte 1, Holger Hentze Andersen, skal betale efter den subsidiære påstand, og som sagsøgte 2, Amagerbanken A/S, skal betale såvel efter den principale som subsidiære påstand, svarer til det anmeldte skattekrav eksklusive renter efter selskabsskatteloven.

De sagsøgte har ikke haft bemærkninger til de skattemæssige beregninger.

Parterne er under sagen enige om, at overskudsselskabet på overdragelsestidspunktet stadig var et aktieselskab, og at den dagældende aktieselskabslov finder anvendelse under denne sag.

*Forklaringer:*

Under sagen er der afgivet partsforklaring af Holger Hentze Andersen og vidneforklaringer af Knud Kristensen, Jørn Friis,

Hjalmar Andersen, Lars Eybye, Poul Hansen, Ole Gemynthe og Werner Jespersen.

*Holger Hentze Andersen* har forklaret, at han er uddannet elektromekaniker. Han har siden 1969 produceret elektroniske komponenter til overvågning af gasbrændere, og fortsatte senere sammen med en kompagnon og sin hustru produktionen heraf. I 1974 flyttede virksomheden til Rødkærsbro, og samme år blev det omdannet til aktieselskab. I midten af 80'erne var der 20 ansatte, og som følge af at virksomheden nu også eksporterede komponenter til vindmøller til USA, nåede virksomheden i 1986 op på 100 ansatte. I perioden fra 1987-89 faldt 90% af virksomhedens omsætning væk, og virksomheden reduceredes til 25 ansatte. I 1990 begyndte virksomheden at eksportere til hele verden. Siden 1993 har man haft stor succes med eksport til det tyske marked, og der er nu 45 ansatte. Han købte sin kompagnons andel af firmaet i 1990, og var herefter chef for og ejer af virksomheden. Da han ikke har regnskabsmæssig eller juridisk uddannelse, har han altid været bistået af sin revisor og sin advokat, når vigtige beslutninger skulle træffes. Hustruen tog sig af virksomhedens daglige økonomiske forhold og han af driften. De havde valgt ikke at blive noteret på børsen, og han og revisor Hjalmar Andersen havde derfor siden 1985 løbende drøftet generationsskifteproblemer, idet han ønskede, at hans to sønner skulle fortsætte virksomheden efter ham. Al opsparing var anbragt i selskabet, og virksomheden var meget afhængig af ham personligt, efter at han havde købt sin kompagnon ud. Omkring 1989 drøftedes en frivillig likvidation af selskabet som mulig løsning af generationsskiftet. Han husker ikke, om man herunder drøftede likvidationsomkostningernes størrelse. På et tidspunkt omtalte Hjalmar Andersen nogle annoncer fra personer, der ønskede at købe selskaber. Det var også Hjalmar Andersen, der fik ideen til købet af underskudsselskabet. Meningen var at spare skat og udlodde 49% af aktierne til børnene. I sommeren 1990 blev tanken om et eventuelt salg af selskabet mere konkret. Hjalmar Andersen foreslog på baggrund af nogle annoncer at sælge selskabet, idet han oplyste, at det var muligt at sælge selskabet og fortsætte virksomheden i et nyt selskab, uden at kreditorernes stilling blev berørt. Det var vigtigt for ham, at kreditorerne ikke blev berørt, og at der efter salget var kapital til den fortsatte drift. Han havde flere møder med Hjalmar Andersen, og de drøftede herunder blandt andet af de skattemæssige regler for aktiebesiddelser. Under forløbet henvendte de sig til advokat Jørgen Friis, der fik udleveret en adresse på køberen af selskabet til brug for udfærdigelsen af kontrakten. Forevist købstilbud af 6. september 1990 fra Virksomhedsformidlerne I/S, advokat Jørgen Friis' svar herpå samt advokat Ole Ellerns brev af 10. september 1990 kan han ikke huske disse, og

**641**

han har aldrig set Kenn Staugaards brev af 12. september 1990 eller advokat Ole Ellerns telefax af 13. september 1990. Købsaftalen blev underskrevet fredag den 14. september 1990 på advokat Jørgen Friis' kontor. Afhørte har ikke set de af Kenn Staugaard

underskrevne fuldmagter til Amagerbanken. Da aftalen var underskrevet, sad de på advokat Jørgen Friis' kontor og ventede på en meddelelse fra Amagerbanken om, at købesummen var til stede. Jørgen Friis forklarede ham, at hvis pengene ikke kom, var »papirerne lige til at smide ud«. Der var en del »ringeri« med Amagerbanken, og han kan huske, at der blev nævnt en anden bank af køberen, men han husker ikke, om det var Interbank. Herefter kørte han og revisor Hjalmar Andersen ud til Unibanks afdeling i Rødkærsbro. De ankom lige omkring lukketid. Til stede var filialdirektør Poul Hansen og Lars Eybye. Afhørte og Hjalmar Andersen underrettede Lars Eybye om handlen og om, at de ventede på en pengeoverførsel. Under mødet bekræftede Amagerbanken, at købesummen ville blive betalt, og bekræftelsen blev godkendt af Hjalmar Andersen og Lars Eybye. Der blev talt i telefon med Amagerbanken, men han husker ikke, om der blev returneret et dokument til Amagerbanken. Advokat Jørgen Friis havde sagt, at han ikke længere var direktør i selskabet efter modtagelsen af bekræftelsen på, at købesummen var overført. Han ved ikke, hvem der gav ordre til at overføre købesummen. Han har ikke bedt Lars Eybye om at hæve penge på investeringsfondskontiene, og han har heller ikke efterfølgende bedt Lars Eybye om at foretage dispositioner over selskabet. Køber havde ikke betinget sig, at investeringsfondene blev frigivet inden købet. Det undrede ham ikke, at køberen ville betale kurs 50 for skattekravet, idet han selv kunne have udnyttet investeringsfondskontiene, hvis han for eksempel havde investeret i ejendomme i Tyskland. Han husker ikke, om de forhandlede om købesummens størrelse.

*Knud Kristensen* har forklaret, at han er administrerende direktør for Amagerbanken. I 1990 udgjorde Amagerbankens erhvervskunder ca. 75% af bankens samlede balance. Banken har udfærdiget en redegørelse til Finanstilsynet om, hvilke forretninger i banken der kunne vedrøre selskabstømning. Det blev blandt andet undersøgt, om Amagerbanken havde udstedt indeståelser for handler vedrørende selskabstømning. Det har efterfølgende vist sig, at Amagerbanken i perioden fra 1990 til 1993 var involveret i fire komplekse vedrørende selskabstømning, og banken har modtaget stævning i ca. 40 sager. Amagerbanken var i perioden fra 1990-93 ikke bekendt med, at der foregik handel med overskudsselskaber, og det var ikke et af bankens forretningsområder. Banken har ikke mellemfinansieret købesummer vedrørende overskudsselskaber, og der er ikke ydet rådgivning herom. Banken har ikke bevidst overtrådt aktieselskabslovgivningen, og man accepterer ikke bankforretninger mod et højere gebyr til imødegåelse af større risici. Banken har dog i et kompleks aftalt højere gebyrer end normalt for overførsler til udlandet, men aftalen herom blev indgået uden kendskab til størrelsen af de beløb, der skulle overføres. Nærværende sag vedrørende Kenn Staugaard er ikke blevet drøftet i direktionen, og vidnets kendskab hertil stammer alene fra den liste, der blev sendt til Finanstilsynet i forbindelse med bankens redegørelse om mulige selskabstømmerhandler. Løjtegaard afdelingen havde en tilknyttet erhvervsdel, fordi den havde mange erhvervshandler.

*Jørn Friis* har forklaret, at han har været advokat i 25 år, og at han ud over erstatnings- og forsikringssager beskæftiger sig med enkelte andre sagstyper for lokale erhvervsklienter. Han har kendt Holger Andersen privat og erhvervsmæssigt gennem 20 år. Det fremgår af et notat på sagen, at vidnet den 31. august 1990 havde en samtale med revisor Hjalmar Andersen, men han husker ikke, hvad de talte om. Herefter modtog vidnet en telefax den 3. september 1990 vedrørende aktiesalg og videreførsel af virksomheden Mita-Teknik. Hjalmar Andersen havde anført, at videreførslen enten skulle ske gennem et skuffeselskab eller via salg som overskudsselskab, og der var en beregning over udløste

skatter på i alt 4.028.000 mio. kr. Tanken var at overdrage aktiverne i Mita-Teknik til et nyt selskab, der skulle ejes af Holger Andersen, dennes hustru og tre børn. Forinden modtagelsen af telefaxen kendte vidnet intet til salget af Mita-Teknik eller dets regnskaber. Han blev senere klar over, at der ikke var anledning til at foretage yderligere investeringer i Mita-Teknik, hvorfor investeringsfondsmidlerne ikke kunne udnyttes. Han havde forstået på Hjalmar Andersen, at skatterne på investeringsfondsmidlerne ville forfalde, medmindre de blev anvendt til køb af ejendomme i Tyskland. På et møde den 4. september 1990, hvor vidnet og Hjalmar Andersen deltog, besluttede Holger Andersen sig til at sælge selskabet, når driftsaktiviteterne var overført til et nyt selskab. Det var en betingelse for handlen, at Holger Andersen beholdt retten til navnet Mita-Teknik, og man købte herefter et underskudsselskab for at udnytte det skattemæssigt til den fortsatte drift. Vidnet tillagde det ikke betydning, at det købende selskab alene havde en aktiekapital på ca. 300.000 kr., fordi købet kunne være finansieret. Den 14. september 1990 holdtes et møde på vidnets kontor. Han havde lavet et udkast til købsaftalen. Vidnet skulle sikre, at Holger Andersen kun overdrog overskudsselskabet, hvis han modtog købesummen. Holger Andersen interesserede sig ikke for, hvad køberen skulle bruge selskabet til. Efter mødet kørte Holger Andersen og Hjalmar Andersen til Unibank for at se, om pengene blev overført. Den 17. september 1990

**642**

modtog vidnet et brev fra revisor Hjalmar Andersen, og herunder modtog han også en kopi af Amagerbankens telefax af 14. september 1990. Forinden købesummens modtagelse kunne køber ikke vælge ny ledelse eller erhverve fast ejendom i selskabets navn, ligesom Holger Andersen efter modtagelsen var afskåret fra at disponere over selskabet. Vidnet har ikke talt med Kenn Staugaard, og han har kun i et enkelt tilfælde talt med advokat Ole Ellern. Vidnet rettede den 17. juni 1994 henvendelse til advokat Ole Ellern vedrørende Kenn Staugaards manglende betaling af aktieafgiften. På det tidspunkt tænkte han ikke på, om selskabets skatter var betalt, og han blev først bekendt med skattevæsenets krav i forbindelse med Kammeradvokatens henvendelse til Holger Andersen.

*Hjalmar Andersen* har forklaret, at han er Holger Andersens revisor, og var som følge heraf bekendt med dennes problemer vedrørende et forestående generationsskifte samt virksomhedens betydelige midler vedrørende midler på investeringsfondskonti. Efter et møde med Jørn Friis og Holger Andersen tog han kontakt til Virksomhedsformidlerne I/S. Han modtog herefter et tilbud, som han videresendte til advokat Jørn Friis. Vidnet deltog i mødet den 14. september 1990, hvor Holger Andersen underskrev købsaftalen. Han mener, at Jørn Friis under mødet talte med Kenn Staugaard, og at det blev aftalt at anvende Amagerbanken i stedet for InterBank. De var tilfredse med denne ændring, men »fokuserede« mest på købesummens modtagelse. Efter mødet tog vidnet og Holger Andersen til Unibank for at få dokumentation for, at købesummen blev erlagt. Ved ankomsten traf de Lars Eybye, som de underrettede om købekontrakten og om, at de afventede købesummens erlæggelse. Vidnet var ikke bekendt med, om køberen allerede på det tidspunkt ville købe fast ejendom, eller om køberen ville disponere over investeringsfondskontiene. Vidnet har ikke instrueret Unibank om at udbetale 18.025.176 kr. fra selskabets konto, og han har ikke givet instruktion om de bogføringer, der skete i banken den 17. september 1990. Forud for vidnets redegørelse til Bjerringbro Kommunes skatteafdeling havde han været indkaldt til et møde.

*Lars Eybye* har forklaret, at han er filialdirektør i Unibank, og han på daværende tidspunkt var souschef i Unibank i Rødkærsbro. Holger Andersen havde anvendt banken gennem flere år, og vidnet

havde også tidligere truffet Hjalmar Andersen. Han blev kontaktet den 14. september 1990 om formiddagen vedrørende et møde om eftermiddagen. Han fik først under mødet oplyst, at det drejede sig om salg af et selskab, og han foretog herefter de ekspeditioner, han blev bedt om. Under mødet modtog han telefaxen fra Amagerbanken, og han talte med Ole Gemynthe. Vidnet kan ikke huske, hvad samtalen drejede sig om. Han kan huske, at de modtog de dokumenter, der var nævnt i Amagerbankens telefax. Banken var berettiget til at udbetale investeringsfondsmidlerne efter modtagelsen af den udfyldte blanket om ophævelse. Købesummen blev modtaget samme eftermiddag, men han ekspederede først overførslen af selskabets midler til køberen mandag den 17. september 1990. Selve overførslen af selskabets midler skete ifølge den trækseddel, som han modtog i original mandag den 17. september 1990. Han var ikke i tvivl om, at Holger Andersen og Hjalmar Andersen havde instrueret ham om at overføre pengene, idet han som sagt kun foretog de ekspeditioner, han blev bedt om. Han havde intet kendskab til Kenn Staugaard eller til selskabet BA 67.622 ApS. Vidnet vidste ikke, hvad selskabets midler skulle bruges til, og gjorde sig heller ingen tanker herom.

*Poul Hansen* har forklaret, at han i 1990 var ansat i Unibanks filial i Rødkærsbro. Han kendte Holger Andersen og Hjalmar Andersen og kan huske, at de var til møde i banken en fredag eftermiddag. Mødet fandt sted efter lukketid, men vidnet deltog ikke heri. Han mener, at Lars Eybye bad ham underskrive et brev, men han fik ikke nærmere at vide, hvad det drejede sig om.

*Ole Gemynthe* har forklaret, at han blev ansat i Amagerbanken i 1964. Efter at have været ansat uden for banken i en periode kom han i 1984 tilbage til Amagerbanken. I 1988 blev han ansat som souschef i Amagerbankens Løjtegaard afdeling, hvor han var beskæftiget med erhvervskunder. Han har arbejdet sammen med Kenn Staugaard i Henriques Bank, og efter lukningen af banken har vidnet set Kenn Staugaard ved årlige sammenkomster for tidligere ansatte. Den 12. februar 1990 havde vidnet møde med Kenn Staugaard, der herefter fik en kassekredit i Amagerbanken. Der var tale om en almindelig driftskredit med fuld sikkerhed. Den 14. september 1990 kontaktede Kenn Staugaard vidnet og spurgte, om han ville være behjælpelig med at lade Unibank trække et beløb på Amagerbanken, mod at Amagerbanken trak et større beløb på Unibank. Det var vigtigt, og transaktionen skulle foregå samme dag. Det drejede sig om en handel, som Kenn Staugaard havde indgået eller formidlet. Beløbet på ca. 15 mio. kr. var han villig til at overføre under forudsætning af, at Amagerbanken modtog de ca. 18 mio. kr. Han undrede sig over, hvorfor de ikke blot kunne modtage differencebeløbet, men da det ikke kunne lade sig gøre, foretog han transaktionen som en helt almindelig overførsel. Vidnet fik forevist fornødne fuldmagter og bilag af Kenn Staugaard. I forbindelse hermed læste han udskrifter af forhandlingsprotokollen for BA 67.622 ApS og kunne således konstatere, at der havde fundet en selskabsoverdragelse sted, og at Kenn Staugaard var involveret heri. Vidnet gjorde sig ikke nærmere overvejelser med hensyn til, at der skulle hæves midler fra

**643**

investeringsfondskonti. Efter aftale med Kenn Staugaard talte vidnet med Lars Eybye flere gange, men han husker ikke, om det var vidnet, der kontaktede Lars Eybye. Unibank havde betinget sig, at transaktionen foregik via træksedler, og at de modtog den originale anmodning om betalingsoverførsel fra Amagerbanken mandag den 17. september 1990. Amagerbanken fik 1.000 kr. i gebyr for overførslen. Amagerbanken ydede ikke Kenn Staugaard en kredit på ca. 15 mio. kr. i forbindelse med transaktionen, idet man forinden havde indsat de ca. 18 mio. kr. på hans konto. Det var aftalt med Kenn Staugaard, at Amagerbanken om mandagen overførte det modtagne beløb til en konto med højere forrentning. Kontoforholdet med Kenn Staugaard blev afsluttet omkring årsskiftet 1990-91. Vidnet havde intet kendskab til selvfinansieringsforbuddet i 1990.

*Werner Jespersen* har forklaret, at han blev valgt som revisor for Staco Teknik i 1990, og at han har revideret de fleste af Kenn Staugaards regnskaber. Han husker ikke, hvilket grundlag han havde for udarbejdelsen af regnskabet pr. 30. september 1990, men mener, at han har haft en underskrevet slutseddel vedrørende Kenn Staugaards køb af fast ejendom. Han regnede med, at handlen var afsluttet kort forinden, og at den endnu ikke var tinglyst. Han husker ikke, om han rekvirerede en tingbogsattest i forbindelse med udarbejdelsen af resultatopgørelsen i september 1991. Vedrørende størrelsen af investeringsfondskontiene har vidnet forklaret, at han må have haft bankudskrifter vedrørende disse.

*Parternes procedure:*

*Over for Holger Hentze Andersen* har *sagsøgeren* gjort gældende, at alle overskudsselskabets midler blev stillet til rådighed for købers repræsentant, Kenn Staugaard, og dermed for køberen i forbindelse med sagsøgte 1's overdragelse af overskudsselskabet. Herved blev aktieselskabslovens § 115, stk. 2, overtrådt. Instruktionen til overskudsselskabets bank om at stille selskabets midler til rådighed for køber hos købers bank blev afgivet af Holger Hentze Andersen. Det gøres herved gældende, at han hæfter for sine rådgiveres dispositioner på samme måde, som hvis de havde været foretaget af ham selv.

Tilbageførsel af overskudsselskabets midler fra Kenn Staugaard og/eller køber, jf. aktieselskabslovens § 115, stk. 4, er udelukket. Holger Hentze Andersen indestår derfor som den, der traf den ulovlige disposition, for selskabets tab, jf. aktieselskabslovens § 115, stk. 5, der er en regel om hæftelse på objektivt grundlag.

Såfremt Holger Hentze Andersen ikke måtte være omfattet af hæftelsen efter § 115, stk. 5, skal sagsøgeren dog have medhold i den subsidiære påstand, idet sagsøgte ved salget af selskabet på uforsvarlig måde tilsidesatte skattevæsenets interesser. Ansvaret skal i så fald bedømmes efter dansk rets almindelige erstatningsregel, jf. herved aktieselskabslovens § 140. Da Holger Hentze Andersen var direktør, er dennes ansvar for så vidt direkte omfattet af § 140, men hæftelsen efter dansk rets almindelige erstatningsregel følger i øvrigt også af, at han udøvede den faktiske ledelse af selskabet. Sagsøgte hæfter tillige for sine rådgiveres fejl.

Det uforsvarlige forhold består i, at Holger Hentze Andersen foretog samtidig udveksling af selskabets meget betydelige pengebeholdning med købesummen for selskabet uden at interessere sig for, hvortil selskabets midler blev overført, og uden at foretage nogen form for undersøgelse af hverken købers eller Kenn Staugaards forhold eller af, hvad køber ville benytte overskudsselskabet til. Nærmere undersøgelser var endda særlig indiceret af købers hastværk med at få udbetalt selskabets investeringsfondskonti. Herved tilsidesatte sagsøgte den særlige omsorgspligt, som allerede som følge af risikoen for selvfinansiering påhvilede denne over for selskabets kreditorer og ganske særligt over for skattevæsenet, som var tvangskreditor for betydelige beløb, og som herved blev udsat for betydelig risiko for tab.

I hvert fald tilsidesatte Holger Hentze Andersen den særlige omsorgspligt over for skattevæsenet, som - sammenholdt med ovenstående - fulgte af, *at* salget af selskabet - hvis forretningsmæssige aktivitet sagsøgte havde trukket ud af selskabet inden salget, og hvis eneste aktiv var en pengebeholdning - ikke var nogen normal forretningsmæssig disposition, *og at* sagsøgte opnåede en betydelig merpris på kr. 1.496.060,- fastsat som 50% af det latente skattetilsvar.

Skattevæsenets risiko var ikke afværget ved, at køber fremsendte anmeldelse om anskaffelse af fast ejendom med henblik på ophævelse af selskabets investeringsfondshenlæggelser, allerede inden købesummen blev betalt. Anmeldelsen var ikke og kunne ikke være udtryk for andet end en sædvanlig hensigtserklæring fra køber om at ville udskyde og enten betale eller helt eliminere overskudsselskabets latente skattetilsvar. Hele skattevæsenets tab, herunder også tabet vedrørende efterbeskatning af investeringsfondshenlæggelser, var videre en adækvat følge af sagsøgtes uforsvarlige overladelse af selskabet til køber.

*Over for Amagerbanken A/S* har sagsøgeren gjort gældende, at banken vidste eller burde have vidst, *at* banken medvirkede ved køb af et selskab, *at* det var købesummen for selskabet, som banken bistod køber med at finansiere, *og at* det beløb, som banken samtidig med betaling af købesummen modtog fra sælgers bank og indsatte på Kenn Staugaards konto, var selskabets midler.

Amagerbanken indså eller burde have indset, at banken medvirkede til overtrædelse af selvfinansieringsforbudet i aktieselskabslovens § 115, stk. 2. Herved tilsidesattes bankens almindelige

**644**

forpligtelse over for selskabets kreditorer - herunder skattevæsenet - til at sikre, at man ikke medvirkede til overtrædelse af selvfinansieringsforbudet. Samtidig overtrådte banken endvidere generalklausulen i bank- og sparekasselovens § 1, stk. 6.

Banken havde ikke noget grundlag for at mene, at udbetalingen af selskabets midler til køber var andet end det, den fremtrådte som: nemlig en overtrædelse af selvfinansieringsforbudet. Bevisbyrden for, at dette måtte have været tilfældet, påhviler i givet fald banken.

Skattevæsenets tab er forårsaget af, at selskabet - der før overtrædelsen af selvfinansieringsforbudet havde rigelige midler til betaling af skyldige og latente skatter - ved den ulovlige udbetaling af alle selskabets midler til Kenn Staugaard blev ude af stand til at betale selskabets skyldige skatter. Tabet er en adækvat følge af tilsidesættelsen af selvfinansieringsforbudet.

*Over for begge av sagsøgte* har sagsøgeren gjort gældende, at uanset de sagsøgte hæfter på forskelligt grundlag, hæfter de over for sagsøgeren solidarisk for dennes tab. Det bestrides, at nogen del af sagsøgerens krav skulle have været fortabt ved forældelse, passivitet eller egen skyld, herunder at der på noget tidspunkt er givet afkald på at kræve erstatning i forbindelse med Bjerringbro Kommunes godkendelse af Holger Andersens skatteansættelse for 1990.

*Sagsøgte 1, Holger Hentze Andersen,* har bestridt, at han - eller hans rådgivere - har tilsidesat aktieselskabslovens § 115, stk. 2. Endvidere bestrides, at han - eller hans rådgivere har instrueret Unibank, Rødkærsbro afdeling, om at hæve selskabets midler. Det gøres i den forbindelse gældende, at hævningen af selskabets midler er foretaget af selskabets nye ledelse og nye ejer.

Derudover bestrides, at Holger Hentze Andersen - eller hans rådgivere - vidste eller burde vide, at selskabets penge, efter overførslen til Amagerbanken, ville blive indsat på en bankkonto, som ikke tilhørte selskabet. Det bestrides således, at sagsøgte - eller sagsøgtes rådgivere - kan tilregnes en overtrædelse af aktieselskabslovens § 115, stk. 2. Selvom § 115, stk. 2, måtte være tilsidesat af en rådgiver eller andre, som var antaget af sagsøgte, bestrides det, at en sådan overtrædelse kan tilregnes sagsøgte efter identifikationssynspunkter.

For så vidt angår spørgsmålet om ansvar efter culpareglen bestrider Holger Hentze Andersen, at han eller hans rådgivere har tilsidesat skattevæsenets interesser på uforsvarlig måde. Det bestrides, at sagsøgte hæfter for sine rådgiveres eventuelle fejl, ligesom det

bestrides, at han i henseende til culpa skal bedømmes efter den målestok, som gælder for hans rådgivere.

Der blev i forholdsvis mindre omfang overdraget aktuelle skatteforpligtelser. Skatteforpligtelserne var i det væsentlige knyttet til investeringsfondshenlæggelser, og skatterne var i det væsentlige sikret ved indskud på investeringsfondskonti. Investeringsfondskonti kan kun hæves, såfremt der af lovgiverne og skattemyndighederne fastsatte fremgangsmåde følges, og det kan ikke tilregnes sagsøgte som uforsvarligt, at denne fremgangsmåde i det foreliggende tilfælde ikke har sikret mod svig udvist af selskabets nye ledelse og en statsautoriseret revisor.

Tidspunktet for handelen (september 1990) betyder, at der som følge af de muligheder, som skattegodtgørelsesmodellen gav, var et forretningsmæssigt motiv for køberen til at betale et mervederlag ud over egenkapitalen. Tidspunktet for handelen må også tages i betragtning, når den generelle uforsvarlighedsstandard skal fastlægges, idet det gøres gældende, at der ved overdragelsen i 1990 skal anlægges en mildere bedømmelse.

Holger Hentze Andersen har yderlige gjort gældende, at kravet er bortfaldet ved forældelse, og har henvist til, at handelen er bindende indgået den 6. september 1990. Sagen blev anlagt den 14. september 1995. Det bestrides, at der foreligger faktisk suspension.

De undersøgelser, der er foretaget af Bjerringbro Kommune og Told- og Skattestyrelsen i 1993, hvor alle relevante dokumenter var til stede i de anførte myndigheder, må bevirke, at sagsøgte har haft føje til at regne med, at alle udestående med myndighederne hermed var afsluttede. Det gøres således gældende, at de tilkendegivelser, som er kommet fra myndighederne dengang, er ensbetydende med, at der er givet afkald. Det bemærkes herved, at sagsøgeren i denne sag, må sidestilles med myndighederne, da sagen føres for det offentlige og det offentliges interesse. Derudover gøres det gældende, at myndighederne efter det anførte forløb i hvert fald som følge af passivitet må være afskåret fra at rejse noget krav.

For så vidt angår kravets størrelse er det gjort gældende, at Holger Hentze Andersens eventuelle erstatningspligt ikke kan udstrækkes til større beløb end det, som skatteforpligtelserne var opgjort til i overdragelsesbalancen (kr. 2.729.920,00 i latent skat og kr. 1.547.500,00 i aktuelle skatter), og at kravet skal reduceres med det beløb, som indestod på investeringsfondskonti. Hævningerne på disse konti kan ikke tilregnes sagsøgte, idet han ikke kan gardere sig mod urigtige anmeldelser vedrørende anskaffelse af investeringsgoder. Sagsøgte bør derfor under denne sag stilles, som om disse indeståender var fuldt i behold.

Det gøres gældende, at kravet skal reduceres med den indtægt vedrørende skatteafgift, som er tilfaldet det offentlige. Denne indtægt havde det offentlige ikke opnået, såfremt sagsøgte havde afstået fra transaktionen. Beløbet udgør kr. 158.649,00. Det bestrides i alle tilfælde, at kravet kan indbefatte det efterfølgende tillæg

**645**

på 1.167.269,00, som vedrører investeringsfondshenlæggelser. Dette tillæg vedrører ikke selve overdragelsen som overskudsselskab. Det er et efterfølgende straftillæg, som har sammenhæng med den omstændighed, at køberen har foretaget uberettigede hævninger - et forhold, der ikke kan tilregnes sagsøgte. Praksis viser, at tillæg og gebyrer såsom gebyr for undladt selvangivelse, renter efter selskabsskatteloven m.v. ikke kan indbefattes i erstatningskravet. Det gøres gældende, at det her omhandlede tillæg fuldt ud må sidestilles hermed.

I forholdet til medsagsøgte har Holger Hentze Andersen gjort gældende, at Amagerbanken A/S har pådraget sig erstatningsansvar for det tab, som Holger Hentze Andersen måtte lide i tilfælde af

domsfældelse over for sagsøgeren. Der henvises herved til, at bankens medarbejdere - navnlig Ole Gemynthe - har bistået Kenn Staugaard med at forlede Holger Hentze Andersen og hans rådgivere til at tro, at Kenn Staugaard havde reelle hensigter med selskabet, og at han eller hans selskab havde penge til købesummen, selvom bankens medarbejdere vidste eller burde vide, at dette ikke var tilfældet.

Uden Amagerbankens mellemkomst var selskabet aldrig blevet afleveret til køberen, idet betingelsen om betaling af købesummen så var svigtet. Bankens handlinger har derfor været den afgørende årsag til Holger Hentze Andersens tab.

Det bestrides, at Holger Hentze Andersen skulle have pådraget sig erstatningspligt over for Amagerbanken. Hvis banken dømmes i denne sag, skyldes det handlinger, som kun denne sagsøgte bærer ansvaret for, og efter erstatningsansvarslovens § 25 er banken nærmest til at bære tabet.

*Sagsøgte 2, Amagerbanken A/S,* har i forhold til sagsøgeren gjort gældende, at banken ikke vidste eller burde have vidst, at banken medvirkede ved en selskabshandel, hvordan aftaleforholdet var mellem sælger og køber, at det beløb, som overførtes af banken til købers bank, var købesummen for selskabet, og at det beløb, som Amagerbanken modtog fra sælgers bank, var selskabets midler.

Det bestrides, at Amagerbanken har medvirket til nogens overtrædelse af selvfinansieringsforbudet, hvortil kommer, at banken ikke kunne handle anderledes end sket uden at ifalde ansvar over for sin kunde, køberen. Der foreligger således ikke noget ansvarsgrundlag for Amagerbanken.

Det er videre gjort gældende, at der ikke er årsagssammenhæng mellem bankens eventuelle medvirken til selvfinansiering og skattevæsenets tab, og dette tab er ikke en adækvat følge af bankens forhold.

Amagerbanken hæfter ikke solidarisk med Holger Hentze Andersen som følge af sin underordnede rolle i forhold til sælger af selskabet.

I forhold til Holger Hentze Andersen har Amagerbanken gjort gældende, at det er Holger Hentze Andersen, der er ansvarlig over for sagsøgeren.

Uanset om det er Holger Hentze Andersen, dennes rådgivere eller dennes bank, der har begået fejl, eller om fejlen på dennes side er sket ved en kombination af forhold hos ham og hans hvervtagere, skal Holger Hentze Andersen friholde Amagerbanken. Ved fordeling af erstatningsbyrden efter erstatningsansvarslovens § 25 er Holger Hentze Andersen nærmest til at bære tabet og skal bære det fulde tab.

I tilfælde af en eventuel opgørelse af regresmellemværendet skal Holger Hentze Andersen forlods fralægge sig den berigelse, som han har opnået i form af overpris og sparede likvidationsomkostninger, og der skal tages hensyn til, at han kan ansøge om at få tilbagebetalt avanceskat.

## Landsrettens bemærkninger:

I forbindelse med forberedelsen af salget af overskudsselskabet til ASX 11.235 A/S, blev Holger Hentze Andersens advokat, Jørn Friis, den 13. september 1990 gjort bekendt med registerudskrifter fra Erhvervs- og Selskabsstyrelsen vedrørende køberselskabet. Af udskriften for regnskabsåret 1. juli 1988 til 30. juni 1989 fremgik blandt andet, at Kenn Staugaard var direktør, at egenkapitalen udgjorde 305.000 kr., at der var revision med forbehold, at selskabet den 24. juli 1989 var begæret tvangsopløst på grund af manglende regnskab, og at begæringen om tvangsopløsning blev tilbagekaldt den 7. juni 1990.

Under deres ophold i Unibank, Rødkærsbro afdeling, den 14. september 1990 modtog Holger Hentze Andersen og revisor Hjalmar Andersen, en telefax fra Amagerbanken. Af denne fremgik, at Amagerbanken accepterede, at Unibank udfærdigede en trækseddel på Amagerbanken på 15.864.909 kr., under forudsætning af at Amagerbanken samtidig blev bemyndiget til at udfærdige en trækseddel på Unibank på 18.025.176 kr. Amagerbanken fremsendte samtidig udskrift af forhandlingsprotokol for overskudsselskabet dateret den 14. september 1990, hvoraf blandt andet fremgik, at der var valgt ny bestyrelse og revision samt foretaget navneændring. Det fremgik ikke af protokollatet, om ASX 11.235 A/S var repræsenteret, men Kenn Staugaard var til stede og valgtes til direktør. Endvidere fremsendte Amagerbanken en anmeldelsesblanket om anskaffelse af aktiver i forbindelse med bankens nye investeringsfondskonto med angivelse af en samlet anskaffelsessum på 7 mio. kr. og et hævet beløb på 3.412.426 kr. Efter modtagelsen af Amagerbankens telefax med bilag bemyndigede Unibank samme dag pr. telefax

### 646

Amagerbanken til at trække de 18.025.176 kr. på Unibank, der samtidig hævede dette beløb på overskudsselskabets konto i banken. Det må lægges til grund, at Unibank herved handlede efter ordre fra Holger Hentze Andersen.

Under de foreliggende omstændigheder findes Holger Hentze Andersen som selskabets ejer og direktør at have overført selskabets midler til køberen. Han stillede herved selskabets midler til rådighed for køberen i forbindelse med dennes erhvervelse af aktierne i selskabet og overtrådte dermed § 115, stk. 2, i den dagældende aktieselskabslov.

Tilbageførsel fra køber af de udbetalte selskabsmidler, jf. lovens § 115, stk. 4, er udelukket. Holger Hentze Andersen indestår derfor som den, der traf den ulovlige disposition for selskabets tab, jf. lovens § 115, stk. 5, der må forstås som en regel om hæftelse på objektivt grundlag.

Det fremgår af Kenn Staugaards kassekreditkonto i Amagerbanken, at han den 14. september 1990, forud for transaktionerne i forbindelse med købet af selskabet, havde et kassekreditmaksimum på 212.000 kr., og at der på kontoen var en debetsaldo på ca. 443.000 kr. Efter indholdet af Amagerbankens telefax af 14. september 1990 til Unibank med bilag, blandt andet vedrørende »overdragelse af samtlige selskabets anparter« og frigivelse af investeringsfondsmidler, den af Kenn Staugaard underskrevne fuldmagt, hvorefter selskabet gav ham fuld rådighed over det fra Unibank modtagne beløb, Amagerbankens bemyndigelse til at hæve 15.864.909 kr. på Kenn Staugaards konto Unibanks telefax af 14. september 1990 til Amagerbanken samt indsættelsen af det fra Unibank modtagne beløb på Kenn Staugaards konto, må det lægges til grund, at Amagerbanken indså eller burde have indset, at banken medvirkede til en erhvervelse af selskabet under anvendelse af selskabets egne midler.

Det må endvidere lægges til grund, at Amagerbanken indså eller burde have indset, at der herved opstod en betydelig risiko for, at selskabets kreditorer, herunder skattevæsenet, ville lide tab, og at banken intet gjorde for at afværge denne risiko. På denne baggrund findes Amagerbanken på uforsvarlig måde at have tilsidesat skattevæsenets interesser og er derfor erstatningsansvarlig for skattevæsenets tab.

De sagsøgtes erstatningsansvar kan ikke anses for forældet, og der er ikke fra skattemyndighedernes side udvist forhold, som kan medføre bortfald eller nedsættelse af kravene mod de sagsøgte.

Ved tabsopgørelsen bør tillige de af køberen foretagne hævninger på investeringsfondskonti medregnes, idet den omstændighed, at hævningerne viste sig at være uretmæssige, må anses for påregnelig for de sagsøgte.

Herefter tages sagsøgers principale påstande til følge.

I det indbyrdes forhold mellem de sagsøgte, Holger Hentze Andersen og Amagerbanken A/S, findes opgørelsen at burde ske således, at Holger Hentze Andersen kommer til at fralægge sig den gevinst, han opnåede, når hensyn tages til den overkurs, han har oppebåret, den rentefordel, han har haft af den betalte overkurs, og den tilbagebetaling af for meget betalt avanceskat, han måtte påregnes at opnå. Derimod findes det at være en sådan usikkerhed om, i hvilket omfang sparede likvidationsomkostninger oversteger de omkostninger, der har været forbundet med salget af selskabet, at der ikke kan tages hensyn hertil.

Parterne har ikke for landsretten forelagt sådanne oplysninger, at Holger Hentze Andersens gevinst kan opgøres præcist. Gevinsten fastsættes skønsmæssigt til 2,5 mio. kr.

I det indbyrdes forhold mellem Holger Hentze Andersen og Amagerbanken A/S findes Holger Hentze Andersen at skulle dække et beløb svarende til den opnåede gevinst på 2,5 mio. kr., mens Amagerbanken A/S skal dække resten, 2.944.709 kr.

———

I sagsomkostninger betaler Holger Hentze Andersen og Amagerbanken A/S in solidum til Staco Teknik ApS under konkurs 250.000 kr. I det indbyrdes forhold betaler hver af de dømte halvdelen heraf.

I forholdet mellem de sagsøgte, Holger Hentze Andersen og Amagerbanken A/S, bærer hver part sine omkostninger.

## Højesteret

### Højesterets dom.

I tidligere instans er afsagt dom af Østre Landsrets 16. afdeling den 3. februar 1999.

I pådømmelsen har deltaget syv dommere: Pontoppidan, Hermann, Wendler Pedersen, Peter Blok, Asbjørn Jensen, Børge Dahl og Engholm Jacobsen.

*Amagerbanken A/S* (banken) har gentaget sine påstande.

*Holger Hentze Andersen* har over for Staco Teknik ApS under konkurs (konkursboet) påstået frifindelse mod betaling af 5.444.709 kr. med tillæg af procesrente og har over for banken nedlagt påstand om frihold else for ethvert beløb ud over 2.286.088 kr., som han måtte have tilpligtet at betale til konkursboet. Over for bankens påstand om frihold else har Hentze Andersen påstået frifindelse.

*Staco Teknik ApS under konkurs* har påstået stadfæstelse, idet det beløb, som Hentze Andersen skal betale til konkursboet, dog skal forhøjes til 8.365.267 kr.

| | |
|---|---|
| Anmeldte selskabsskatter inklusive efterbeskatning vedrørende investeringsfondshenlæggelser | 5.444.709 kr. |
| Renter i henhold til selskabsskatteloven frem til og med december 1998 | 2.920.558 kr. |
| i alt | 8.365.267 kr. |

Til brug for Højesteret er der tilvejebragt yderligere oplysninger.

### Højesterets bemærkninger.

Seks dommere - Pontoppidan, Hermann, Wendler Pedersen, Asbjørn Jensen, Børge Dahl og Engholm Jacobsen - udtaler:

Hentze Andersen - sælgeren af overskudsselskabet - har erkendt, at han ved salget af selskabet på uforsvarlig måde tilsidesatte skattevæsenets interesser og derfor er erstatningsansvarlig for skattevæsenets tab på 5.444.709 kr.

Aftalen om overdragelse af selskabet havde ikke karakter af en normal forretningsmæssig disposition. Den blev indgået med det for Hentze Andersen på forhånd ukendte ASX 11.235 A/S,

Banken har for Højesteret gjort gældende, at det beløb, som Hentze Andersen ved en eventuel fordeling af erstatningsbyrden forlods skal fralægge sig, skal opgøres således:

**647**

1) det kontante merprovenu på 1.958.503 kr.,

2) det beløb på 1.167.289 kr., der ved likvidation ville være blevet udløst ved efterbeskatning af investeringsfondsmidler ud over det hensatte,

3) likviditetsfordelen - nettorentegevinsten - af post 1 fra den 14. september 1990 til sagsanlægget den 14. september 1995 (327.585 kr. i tilfælde af, at sagen anses for en bruttosag, 403.941 kr. i tilfælde af, at sagen anses for en mellemformsag, jf. symmetriforrentningsprincippet i kildeskattelovens § 62 E, 3. pkt.) og af post 2 fra den 21. november 1991, hvor efterbeskatningen forfaldt til betaling, til sagsanlægget,

4) likviditetsfordelen - nettorentegevinsten - af post 1 og 2 fra sagsanlægget til den 21. december 1998, hvor Hentze Andersen indbetalte 5.444.709 kr. til konkursboet.

Banken og Hentze Andersen er enige om, at Hentze Andersens kontante merprovenu kan opgøres til 1.958.503 kr. De er endvidere enige om at anvende en nettorentesats på 4,125% p.a. og om, at renten af merprovenuet i perioden fra 14. september 1990 til sagsanlægget herefter er 327.585 kr. beregnet efter principperne i Højesterets dom af 24. november 1999 (UfR 2000 s. 365).

Banken har bestridt at være regrespligtig over for Hentze Andersen for nogen del af en eventuel hæftelse efter aktieselskabslovens § 115, stk. 5, ud over 5.444.709 kr.

Hentze Andersen anerkender for Højesteret, at han over for konkursboet er erstatningsansvarlig efter dansk rets almindelige erstatningsregel, og gør ikke for Højesteret gældende, at konkursboets krav er bortfaldet som følge af passivitet eller forældelse. Han gør over for banken yderligere gældende, at denne i forhold til ham skal bære også den yderligere erstatning ud over 5.444.709 kr., som han måtte blive dømt til at betale til konkursboet, hvis han hæfter efter aktieselskabslovens § 115, stk. 5.

Hentze Andersen har anført, at det beløb, han forlods skal betale i det indbyrdes forhold, er 2.286.088 kr., hvilket er summen af det kontante merprovenu på 1.958.503 kr. og forrentningen heraf fra den 14. september 1990 til sagens anlæg.

Beløbet i konkursboets påstand fremkommer således:

repræsenteret ved Kenn Staugaard. Om dette selskab forelå der alene de i dommen nævnte oplysninger, bl.a. om revision med forbehold og om en tidligere begæring om tvangsopløsning på grund af manglende regnskab. Ifølge aftalen skulle købesummen på ca. 16 mio. kr. overføres til sælgers pengeinstitut »mod afregning af selskabets likvide midler«, der var opgjort til ca. 18 mio. kr. Handelen blev afviklet ved, at sælger på et tidspunkt, hvor adgangen til at disponere over selskabets midler alene tilkom ham, accepterede henvendelsen fra Amagerbanken som repræsentant for køber om at modtage købesummen mod samtidig at overføre selskabets midler til banken - uden angivelse af kontohaver. Vi finder, at sælgeren under de angivne omstændigheder må have indset, at han som

aktionær i det solgte selskab stillede dettes midler til rådighed for køberen i forbindelse med dennes erhvervelse af aktierne i selskabet, og at han dermed overtrådte aktieselskabslovens § 115, stk. 2. Ved den gennemførte overførsel blev selskabets midler indsat på Kenn Staugaards konto, og tilbageførsel fra ham, jf. lovens § 115, stk. 4, er udelukket. Vi tiltræder herefter, at Hentze Andersen hæfter for selskabets tab efter § 115, stk. 5, og derfor til boet skal betale 8.365.267 kr. samt konkursomkostninger som påstået for landsretten.

Dommer Peter Blok udtaler vedrørende forholdet mellem konkursboet og Hentze Andersen:

Er forbudet mod selvfinansiering i aktieselskabslovens § 115, stk. 2, blevet tilsidesat, og kan køberen ikke tilbagebetale de udbetalte selskabsmidler, »indestår de, der har truffet eller opretholdt dispositionerne efter stk. . . . 2, for selskabets tab«, jf. § 115, stk. 5. Denne bestemmelse må efter min opfattelse forstås således, at den alene omfatter aktionærer, bestyrelsesmedlemmer eller direktører i selskabet, som på det tidspunkt, da den omhandlede disposition blev truffet eller opretholdt, var vidende om de faktiske omstændigheder, som bevirkede, at dispositionen var i strid med forbudet i stk. 2. Er der i forbindelse med salg af et overskudsselskab sket overtrædelse af selvfinansieringsforbudet derved, at selskabets midler i forbindelse med handelens

**648**

berigtigelse er blevet overført til en konto tilhørende køberen, kan sælgeren herefter kun pålægges hæftelse efter stk. 5, såfremt det efter indholdet af overdragelsesaftalen eller det i øvrigt foreliggende kan anses for godtgjort, at sælgeren var vidende om, at overførslen skete til en konto tilhørende køberen. Uagtsomhed hos sælgeren er således ikke tilstrækkeligt til at pålægge denne hæftelse efter stk. 5.

I den foreliggende sag var det i overdragelsesaftalens pkt. 5.2 bestemt, at køber efter overførselen af købesummen til sælger var legitimeret til at disponere over selskabets konti. Denne bestemmelse kan alene forstås som udtryk for, at køberen var legitimeret til at disponere som ny eneaktionær, og ikke som en bestemmelse om, at selskabets midler skulle overføres til køberen. Af telefaxen af 14. september 1990 fra køberens pengeinstitut, Amagerbanken, til Hentze Andersens pengeinstitut, Unibank, fremgik alene, at overførselen af købesummen til Unibank var betinget af, at selskabets midler overførtes til Amagerbanken. Det fremgik således ikke, at selskabets midler ville blive overført til en konto tilhørende køberen. Der foreligger heller ikke andre omstændigheder, som giver grundlag for at fastslå, at Hentze Andersen var vidende herom. Efter det foran anførte finder jeg herefter, at der ikke kan rejses krav mod Hentze Andersen i medfør af aktieselskabslovens § 115, stk. 5.

For Højesteret har Hentze Andersen som nævnt erkendt at være erstatningsansvarlig over for konkursboet efter dansk rets almindelige erstatningsregel. Jeg stemmer herefter for at tage hans påstand om fritagelse mod betaling af 5.444.709 kr. med tillæg af sædvanlig procesrente fra sagens anlæg til følge.

Der afsiges for så vidt angår forholdet mellem konkursboet og Hentze Andersen dom efter stemmeflertallet.

Samtlige dommere udtaler herefter:

Af de grunde, der er anført af landsretten, tiltræder Højesteret, at Amagerbanken er erstatningsansvarlig for skattevæsenets tab og derfor skal betale 5.444.709 kr. til konkursboet.

Højesteret tager herefter konkursboets påstand til følge.

Både Hentze Andersen og banken har på uforsvarlig måde medvirket til den ulovlige selvfinansiering. Det solidariske erstatningsansvar herfor omfatter skattevæsenets tab på 5.444.709 kr. Herudover påhviler der Hentze Andersen en merforpligtelse

vedrørende renter efter skattelovgivningen og omkostninger ved selskabets konkurs i kraft af hans hæftelse for det tab, som selskabet har lidt som følge af den ulovlige udbetaling til Kenn Staugaard, og som Kenn Staugaard ikke har dækket ind ved tilbagebetaling til selskabet.

Det solidariske ansvar for skattevæsenets tab kan efter selskabets særegne karakter - et overskudsselskab uden anden beskyttelsesværdig selskabsinteresse end skattevæsenets kreditorinteresse - ikke udstrækkes til at omfatte selskabets videregående tab. På denne baggrund - og da Amagerbanken ikke var rådgiver for Hentze Andersen om den disposition, som udløser hans hæftelse efter aktieselskabslovens § 115, stk. 5 - kan Hentze Andersen ikke rejse krav mod Amagerbanken i anledning af den nævnte merforpligtelse.

Ved den indbyrdes fordeling af den fælles erstatningsbyrde på de 5.444.709 kr. mellem banken og Hentze Andersen må der også i en sag om selskabstømning som den foreliggende - en såkaldt »mellemformsag« - tages udgangspunkt i de principper, der er fastlagt i Højesterets dom af 24. november 1999 (UfR 2000 s. 365).

Af beløbet på 5.444.709 kr. skal Hentze Andersen herefter forlods bære det kontante merprovenu på 1.958.503 kr. Det må efter det foreliggende lægges til grund, at alternativet til salget var en likvidation af selskabet, som ville have udløst en efterbeskatning af investeringsfondsmidlerne på 1.167.289 kr. ud over, hvad der var hensat hertil i regnskabet. Hentze Andersen skal derfor også forlods bære dette beløb. Herudover skal medregnes et beløb til kompensation for den økonomiske værdi, der for Hentze Andersen var knyttet til rådigheden over det kontante merprovenu på 1.958.503 kr. i perioden fra udbetalingen den 14. september 1990 til sagsanlægget. Parterne er enige om, at denne fordel beregnet efter principperne i den nævnte højesteretsdom kan opgøres til 327.585 kr. Der er ikke grundlag for at fravige disse principper som følge af, at Hentze Andersen tillige hæfter efter aktieselskabslovens § 115, stk. 5. Højesteret finder heller ikke grundlag for at tillægge renter af beløbet på 1.167.289 kr. i efterbeskatning af investeringsfondsmidler eller for at tillægge renter for tiden efter sagens anlæg. Den del af den fælles erstatningsbyrde på 5.444.709 kr., som Hentze Andersen i det indbyrdes forhold forlods skal bære, udgør herefter i alt 3.453.377 kr.

Der er ved fordelingen af det resterende beløb på 1.991.322 kr. ikke grundlag for at fravige det i ovennævnte dom fastlagte udgangspunkt. Beløbet skal derfor deles lige mellem Hentze Andersen og Amagerbanken.

I det indbyrdes forhold skal Hentze Andersen herefter betale 4.449.043 kr. og Amagerbanken 995.666 kr.

**Thi kendes for ret:**

*Holger Hentze Andersen og Amagerbanken A/S skal til Staco Teknik ApS under konkurs in solidum betale 8.365.267 kr., dog således, at Amagerbanken A/S højst skal betale 5.444.709 kr., med tillæg af procesrente fra den 14. september 1995. Holger Hentze Andersen skal anerkende, at han yderligere er forpligtet til at erstatte*

**649**

*Staco Teknik ApS under konkurs omkostningerne ved konkursens indtræden og boets behandling, jf. konkurslovens § 93, nr. 1 og 2, og retsafgift, jf. konkurslovens § 94, nr. 4.*

*I det indbyrdes forhold skal Holger Hentze Andersen af det beløb, for hvilket der hæftes solidarisk, bære 4.449.043 kr. og Amagerbanken A/S 995.666 kr., alt med procesrente fra den 14. september 1995.*

*I sagsomkostninger for Højesteret skal Holger Hentze Andersen og Amagerbanken A/S in solidum til Staco Teknik ApS under*

konkurs betale 350.000 kr. I det indbyrdes forhold bærer Holger Hentze Andersen 175.000 kr. heraf og Amagerbanken A/S 175.000 kr.

I forholdet mellem Holger Hentze Andersen og Amagerbanken A/S skal hver part betale egne sagsomkostninger for Højesteret.

Landsrettens sagsomkostningsafgørelser stadfæstes.

De idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.