CERTIFIED TRANSLATION

**U.2005.2397H**

***The basis of equal distribution of liability in damages between those liable on the seller side in an asset stripping case not deviated from.***

*Damages in tort 111.4, 3.3 and 5 − Administration of justice 36.2 - Company law 1.2.*

♦ In a Supreme Court judgment, the sellers of a profit sale, S, were ordered to pay damages for the loss suffered by the tax authorities and others as a result of the company having been stripped of assets after the transfer. In a subsequent case against the advisers, S claimed contribution from i.a. Attorney A. The latter admitted being liable in damages and paid damages to S during the case for their additional loss as a result of the fact that it was an interlocutory case. S claimed further damages, but neither the High Court nor the Supreme Court found grounds for deviating from the starting point that in the contribution case in an interlocutory case there must be an equal distribution between those liable on the seller side in accordance with the principles of the Supreme Court's judgment in U 2000.365/2, and found for A.[1] In its judgment, the High Court added DKK 75,000 in legal costs for A. The Supreme Court set the costs for both courts at DKK 200,000.

**H.D. 11 May 2005 in case 14/2004 (2nd division)**

*John Bjerregaard Pedersen, Per Bjerregaard Pedersen and Marie Poulsen (Attorney Claus Madsen, Aarhus)*
vs.
*Attorney Jeppe L. Jepsen (Attorney Søren Bagger, Copenhagen).*

**Danish Western High Court**

***Judgment of the Western High Court on 1 December 2003 (6th division)***

(Kristian Petersen, Würtzen, Rasmus Damm (acting)).

The cases were brought on 4 April 2002 and are so-called asset stripping cases which concern the extent to which the plaintiffs, John Bjerregaard Pedersen, Per Bjerregaard Pedersen and Marie Poulsen, can claim contribution from the buyer's bank, VB Finans A/S in bankruptcy, and from their advisers, Attorney Jeppe L. Jepsen and the audit firm PricewaterhouseCoopers, for the amount of damages that the plaintiffs as sellers of a profit company have been ordered to pay.

The plaintiffs have registered the following claims:

The defendants Attorney Jeppe L. Jepsen ("Attorney Jepsen") and the audit firm PricewaterhouseCoopers ("PricewaterhouseCoopers") are ordered to pay, jointly and severally, DKK 4,918,400, in the alternative a smaller amount determined by the Court, all with the addition of statutory interest from 25 May 2001, in the alternative from 22 September 2001, in the second alternative from the case was brought.

Attorney Jepsen and PricewaterhouseCoopers are also ordered to admit that they are obliged to pay interest on the previously paid shares of the claim for damages of DKK 1,313,473 and DKK 1,294,473, respectively, from 25 May 2001, in the alternative from 22 September 2001, until the dates when the payments are made.

The defendant VB Finans A/S in bankruptcy ("VB Finans") is ordered to pay DKK 327,122 plus interest from 6 November 1996 and until payment is made, in the alternative from a later date.

VB Finans is also ordered to pay interest on DKK 741,340 from 6 November 1996 to 3 May 2001, in the alternative from 3 April 2001 to 3 May 2001.

Attorney Jepsen has claimed dismissal, in the alternative indemnification against payment – jointly and severally with PricewaterhouseCoopers – of an amount smaller than DKK 4,918,400.

PricewaterhouseCoopers has claimed dismissal, in the alternative dismissal against payment – jointly and severally with Attorney Jepsen – of an amount smaller than DKK 4,918,400 plus statutory interest from 4 April 2002, in the alternative from an earlier date.

VB Finans has claimed dismissal, in the alternative dismissal against payment of an amount smaller than DKK 327,122 plus statutory interest from 3 April 2001.

The specifics of the case are as follows:

In the Supreme Court's judgment of 10 May 2001, the plaintiffs as sellers of the profit company Rose Brand Poultry A/S (II) (later Handelsselskabet Vejle 3 af 1993 ApS) were ordered to pay DKK 13,858,430 plus specified interest to Handelsselskabet Vejle 3 af 1993 ApS in bankruptcy for the loss suffered by the tax authorities and any other creditors as a result of the company being stripped of assets after the transfer. The judgment, which is published in Ugeskrift for Retsvæsen 2001, page 1730, in the following the "main case", states:
". . .

**The Supreme Court's observations.**

In the sales contract of 7 November 1991 for the transfer of the entire capital of the profit company, the appellants undertook to make the company's assets in the form of cash available to the buyer company at the same time as the payment of the purchase price.

After payment of the purchase price on 7 November 1991, the profit company's funds were transferred in three stages – on 7, 8 and 14 November 1991 – to account no. 7705 182636-0 in Varde Bank. The transfers were carried out with the appellants' authorisation and on their behalf by the appellants' attorney, Jeppe L. Jepsen, who, in the fax letter of 7 November 1991 had been informed by the buyer company's CEO, Aino Polk Krogh, that this was

**2398**

the buyer company's account. Subsequently, and in accordance with the information on bookkeeping in the buyer company, the Supreme Court finds that the transfer of funds was made directly to the buyer company. This means that the appellants, as shareholders in the profit company, made its funds available to the buyer in connection with the latter's acquisition of the entire share capital in the company and in doing so violated section 115 (2) of the Danish Public Limited Companies Act (*aktieselskabsloven*).

The appellants have not established that a transfer back to the profit company was made after the transfer of the funds. Any back-transfer of the funds is now excluded, and the Supreme Court agrees that the appellants are therefore liable for the company's loss, cf. section 115 (5) of the Danish Public Limited Companies Act .

The Supreme Court subsequently allows the main claims of the bankruptcy estate.

***On these grounds the Court rules that:***

The appellants, Marie Poulsen, John Bjerregaard Pedersen and Per Bjerregaard Pedersen, must jointly and severally, to the respondent, Handelsselskabet Vejle af 1993 ApS in bankruptcy, pay DKK 13,858,430 plus interest of 0.6% per month or fraction thereof of DKK 8,575,914 from December 1999 and admit that they are jointly and severally obliged to cover the costs of the bankruptcy

---

**1** U 2000.365/2 H, U 2001.634/2 H, TfS 2001.570 Ø, TfS 2001.860 V, TfS 2003.308 V and TfS 2004.451 Ø.

and the administration of the estate, cf. section 93 (1) and (2) of the Danish Bankruptcy Act (*konkursloven*) and court fees, cf. section 94 (4).

The High Court's decision on legal costs is affirmed.

The appellants must jointly and severally pay DKK 400,000 to the respondent in legal costs before the Supreme Court.

. . ."

It is noted that the High Court had ordered the plaintiffs to jointly and severally pay DKK 500,000 in legal costs to the bankruptcy estate.

The imposed amount corresponds to taxes due in respect of the tax years 1989/90, 1990/91, 1991/92 and 1992/93 of DKK 8,575,914 and a statutory addition of DKK 5,000. To this is added accrued interest of DKK 5,277,516 under section 30 of the Danish Corporation Tax Act (*selskabsskatteloven*) up to and including November 1999. The interest imposed corresponds to an additional current interest on the tax claim under section 30 of the Danish Corporation Tax Act of 0.6% per month or fraction thereof until payment is made.

In this case, the plaintiffs have brought a claim for contribution from the defendants. The defendants have admitted that under the general rules on damages and jointly and severally with the plaintiffs, they are liable in damages for the tax authorities' loss and that in this connection they are liable to pay contribution to the plaintiffs so that VB Finans must finally bear half the loss, and Attorney Jepsen and PricewaterhouseCoopers ¼ each. Attorney Jepsen and PricewaterhouseCoopers have also admitted that they are liable in damages to the plaintiffs for each ⅓ of the plaintiffs' additional loss, as the latter have, pursuant to section 115 (2) of the Danish Public Limited Companies Act, paid costs to the estate, statutory addition and interest under the Danish Corporation Tax Act to the profit company's bankruptcy estate, the so-called additional liability. During the case, the defendants have paid the amounts plus interest to the plaintiffs that the defendants have been able to admit but has also disputed the plaintiffs' calculation of loss.

In order to calculate the primary claim against Attorney Jepsen and PricewaterhouseCoopers, the plaintiffs have prepared a supporting Exhibit II, which shows, i.a., the following calculations:

". . .

A . . .

| | | | |
|---|---|---|---|
| 1. | The plaintiffs' payment to the bankruptcy estate excluding legal costs | | DKK 14,845,169.00 |
| 2. | The sellers' enrichment . . | | DKK ÷6,438,990.00 |
| 3. | The buyer banks' share of the actual tax amount plus interest from 6/11 to 25/5-01 | | |
| | . . . | | DKK ÷1,487,165.00 |
| | The seller's loss before legal costs | | DKK 6,919,014.00 |

B . . .                                                                          1) . . .

| | | |
|---|---|---|
| Of this, the sellers must themselves bear DKK 356,154.00 . . . corresponding to ⅓ of the seller side's share of the gross claim | DKK | 356,154.00 |
| The advisers must pay the balance | DKK | 6,562,860.00 |

or DKK 3,281,430.00 each plus interest from 25 May 2001.

. . .

C . . .

The legal costs paid by the sellers to the bankruptcy estate of DKK 900,000.00 and the part of own legal costs previously included of DKK 900,000.00 is distributed as follows:

In *situation B 1*, each of the advisers must pay DKK 442,175.00, which amount is calculated as follows:

DKK 3,281,430.00: DKK 13,358,004.00 (DKK 14,845,169.00 ÷ DKK 1,487,165.00) × DKK 1,800,000.00.

. . .

*Total calculation*

. . .

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Attorney | DKK | 3,281,430.00 | + | DKK | 442,175.00 | = | DKK 3,723,605.00 |
| Auditor | DKK | 3,281,430.00 | + | DKK | 442,175.00 | = | DKK 3,723,605.00 |

. . .

**2399**

If, contrary to expectations, the bank must pay statutory interest from the case is brought and until payment is made, the advisers must each pay an additional ⅓ of the interest of DKK 418,703.00 which is included in the above calculations. This corresponds to DKK 139,568.00 for each of the advisers." The plaintiffs' primary claim against Attorney Jepsen and PricewaterhouseCoopers according to the plaintiffs' particulars of claim of 29 August 2003 is thus calculated as follows:

". . .

| | | |
|---|---|---|
| 1. According to the plaintiffs' supporting Exhibit II-B1, defendants I and II must together pay damages of | DKK | 7,447,210.00 |
| 2, The defendants must also together pay an additional | DKK | 279,130.00 |
| if VB Finans A/S in bankruptcy must not pay interest until the notification in the estate is made. | | |
| 3. Total claim | DKK | 7,726,340.00 |
| 4. Previously paid by defendant I | ÷ DKK | 1,313,473.00 |
| 5. Previously paid by defendant II | ÷ DKK | 1,294,473.00 |

| 6. Previously paid legal costs from defendants I and II | ÷ DKK | 200,000.00 |
|---|---|---|
| Total | DKK | 4,918,400.00 |

. . ." The plaintiffs' claim against VB Finans is calculated as follows:

| VB Finans' share of the tax claim (tax saved on investment fund funds not included in the plaintiffs' enrichment) | DKK | 1,068,462.00 |
|---|---|---|
| VB Finans' payment in January-February 2003 of (saved tax on investment fund funds included in the plaintiffs' enrichment) | DKK | 741,340.00 |
| Total | DKK | 327,122.00 |

The size of the calculation is not disputed by VB Finans. Attorney Jepsen has prepared a calculation of 23 September 2002 called calculation II of the sellers' enrichment and loss and its distribution. The calculation shows, i.a., as follows:

". . .

*I Premium*

. . .

| Debt according to transfer balance sheet | | 7,921,670.00 |
|---|---|---|
| Corporation taxes | | 7,921,670.00 |
| . . . | | |
| Premium | | 5,501,172.00 |

*II The sellers' enrichment*

| Premium, cf. above net liquidity benefit (interest 4.125%): | | 5,501,172 |
|---|---|---|
| . . . | | |
| Too little provision for taxes in transfer balance sheet | 8,575,914 | 937,818 |
| Enrichment as at 06.11.96 | ÷ 7,921,670 | 654,244 |
| | | 7,093,234 |

*III Sellers' loss*

| Tax claim excluding interest | 8,575,914 |
|---|---|
| Sellers' enrichment Sellers' loss as at 06.11.96 | 7,093,234 |
| | 1,482,680 |

*IV  Distribution of the tax claim including statutory interest for the period 06.11.96- 25.05.01, i.e. as a gross case.*

| | Share | Interest | Total |
|---|---|---|---|
| Sellers enrichment 7,093,234 ¾ of loss 247,114 | 7,340,348 | 2,876,499 | 10,216,847 |
| VB Finans A/S u/k 3/6 of loss | 741,340 | 290,513 | 1,031,853 |
| Attorney Jeppe L. Jepsen ¼ of loss | 247,113 | 96,837 | 343,950 |
| State-Authorised Public Accountant Jan Lütje Hansen ¼ of loss | 247,113 | 96,837 | 343,950 |
| | 8,575,914 | 3,360,686 | 11,936,600 |

*V   Distribution of the tax claim including statutory addition, corporation tax interest and bankruptcy costs as at 25.05.2001, i.e. as interlocutory case and in accordance with the Supreme Court's judgment.*

| | | |
|---|---|---|
| Tax claim | 8,575,914 | |
| Statutory addition | 5,000 | 8,580,914 |
| Corporation tax interest | | 6,204,255 |
| Bankruptcy estate costs | | 60,000 |
| | | 14,845,169 |
| Tax claim incl. statutory interest as at 25.05.01 | | 11,936,600 |
| Additional loss due to the interlocutory nature of the case | | 2,908,569 |
| Said additional loss is borne by the sellers, Attorney Jeppe L. Jepsen and State-Authorised Public Accountant Jan Lütje Hansen, each by ⅓, i.e.. 3 x 969,523 | | 2,908,569 |
| The final distribution of the bankruptcy estate's claim as at 25.05.01 of DKK 14,845,169 is then as follows: | | |
| The sellers, cf. IV | 10,216,847 | |
| + ⅓ of the additional loss | | 11,186,370 |
| | 969,523  **2400** | |
| VB Finans A/S u/k, cf. IV | | 1,031,853 |
| Attorney Jeppe L. Jepsen, cf. IV | 343,950 | |
| + ⅓ of the additional loss | 969,523 | 1,313,473 |
| State-Authorised Public Accountant Jan Lütje Hansen, cf. IV | 343,953 | |
| + ⅓ of the additional loss | 969,523 | 1,313,473 |
| | | 14,845,169 |

In addition, VB Finans A/S u/k, Attorney Jeppe L. Jepsen and State-Authorised Public Accountant Jan Lütje Hansen pay statutory interest to the sellers of their calculated share of the tax claim, cf. section IV, for the period 26.06.01 and until payment is made. [The parties agree that the correct date is 26.05.01]

*VI Distribution of the legal costs imposed on the sellers of DKK 900,000.*

The stated cost amount is paid in proportion to the parties' share of the calculated amount as at 25.05.01 of DKK 14,845,169, which means the following (rounded) proportions:

| | |
|---|---|
| Sellers | 75% |
| VB Finans A/S in bankruptcy | 7% |
| Attorney Jeppe L. Jepsen | 9% |
| State-Authorised Public Accountant Jan Lütje Hansen | 9% |
| | 100% |

It is noted that Attorney Jeppe L. Jepsen and State-Authorised Public Accountant Jan Lütje Hansen have each previously paid DKK 100,000.00 to cover legal costs and thus each DKK 19,000.00 more than the above distribution shows."

During the case, the parties have agreed that this calculation can be applied if the High Court, in relation to item II, finds that, in connection with the calculation of the plaintiffs' enrichment, tax of investment fund reserves must be added, if the High Court, in relation to item IV finds that the plaintiffs' enrichment must be subject to statutory interest for the period from 6 November 1996 to 25 May 2001, and if the High Court, in relation to item V finds that the additional liability must be borne by the plaintiffs, Attorney Jepsen and PricewaterhouseCoopers by 1/3 each.

The plaintiffs have made a calculation of legal costs paid in connection with the main case, which shows, i.a., that court fees have been paid at DKK 501,400 and attorney fees at DKK 486,556.

At the time of the sale, Rose Brand Poultry A/S II had outstanding investment fund funds and during the case, the parties agreed that such funds in the event of liquidation of the company would have triggered a tax of DKK 654,244.

The case concerns the following main questions:

1. Whether the plaintiffs, when calculating the enrichment that the plaintiffs must waive in the contribution claim, must include statutory interest on the enrichment from the main case is brought on 6 November 1996 and until payment is made on 25 May 2001.

2. Whether the plaintiffs when calculating the enrichment must include the supplementary tax on investment fund reserves that would have been triggered if the company had been liquidated instead of being sold.

3. Whether the part of the loss resulting from the fact that the case is an interlocutory case and not a gross case ("additional liability") must be paid by Attorney Jepsen and PricewaterhouseCoopers alone with each half, or whether the plaintiffs must participate in the payment thereof with one third each on an equal footing with the advisers.

4. The distribution of legal costs in the main case, including the plaintiffs' own costs of attorney and court fees, between the plaintiffs and the defendants.

5. Whether the plaintiffs are entitled to interest on their claims for damages in relation to the additional liability against Attorney Jepsen and PricewaterhouseCoopers from 25 May 2001, when the plaintiffs made a payment to the plaintiff in the main case, in the alternative from 22 September 2001 in accordance with the interest claim of 22 August 2001.

6. Whether the plaintiffs are entitled to interest on their claims for damages against VB Finans from the date when the main case was brought, on 6 November 1996, to 3 May 2001, in the alternative from the notification to VB Finans on 3 April 2001 to 3 May 2001.

In connection with the appeal of the main case to the Supreme Court, it was agreed that Attorney Jepsen's liability insurance company, Codan Forsikring A/S, and PricewaterhouseCoopers would each pay DKK 100,000 to the plaintiffs' then attorney, Klaus Berning, to partially

cover the court fees before the Supreme Court. In a letter of 22 February 2000 to Codan Forsikring A/S, Attorney Berning stated, i.a., as follows:

"Further to my letter of the 10th of this month and our telephone conversations on Tuesday 15 February this year, on the basis of the letter, I have, as stated on the 15th of this month, brought the Western High Court's judgment of the 2nd of this month before the Supreme Court. . .

During one of our telephone conversations on the 15th of this month, you said that the appellants have paid court fees of DKK 416,330, Codan will pay an amount of DKK 100,000 of the said amount. At the same time, I confirm that there is no admission of any liability in this for Attorney Jeppe L. Jepsen, but that Codan's acceptance of paying the said amount merely expresses that Codan Forsikring A/S also considers it appropriate that the decision of the Western High Court be tried by the Supreme Court."

On the same day, Attorney Berning wrote to PricewaterhouseCoopers' attorney, Attorney Jesper Lett, i.a., as follows:

"With reference to your fax letter to me of the 16th of this month concerning the above case, I enclose,

**2401**

for your information, a copy of the letter of today to Codan Forsikring A/S.

. . .

I take the liberty of asking whether the audit firm is prepared to participate in the payment of a part of the court fees in the same way as Codan Forsikring A/S, considering the exorbitant size of such costs. I take the liberty of suggesting that PricewaterhouseCoopers pay an amount of DKK 100,000 without this being an admission of any liability in damages for PricewaterhouseCoopers, but merely an indication that the audit firm considers it appropriate that the Supreme Court consider the High Court's decision of the 2nd of this month."

A letter dated 3 August 2000 from Attorney Lett to Attorney Berning states as follows:

"On behalf of Coopers & Lybrand, I enclose a cheque in the amount of DKK 100,000.00 as part of the court fee costs in the above case on appeal to the Supreme Court. The cheque is submitted without any admission of any liability on the part of PriceWaterhouseCoopers. The amount is submitted subject to the following conditions:

If the Court finds for the seller, the amount must be refunded to Coopers & Lybrand. Also, payment is made on the condition that no claims will be asserted against PriceWaterhouseCoopers in the future for continued accrued interest. Hence, the seller must thus pay the interest-bearing part of the tax claim or bear additional accrued interest themselves."

In a letter of 3 April 2001, Attorney Berning notified the trustee in VB Finans, Attorney Jørgen Holst, of the plaintiffs' claim for contribution. The letter states, i.a.:

"I enclose a copy of the Western High Court's judgment of 2 February 2000 and make the following claim for contribution on behalf of Marie Poulsen, John Bjerregaard Pedersen and Per Bjerregaard Pedersen:

V.B. Finans is ordered to indemnify Marie Poulsen, John Bjerregaard Pedersen and Per Bjerregaard Pedersen for the amount that they have been ordered to pay in the judgment of 2 February 2000, delivered by the Western High Court, to Handelsselskabet Vejle 3 af 1993 ApS in bankruptcy represented by trustee Attorney Bjarne L. Petersen. The claim represents DKK 13,858,430 plus interest of 0.6% per month or fraction thereof of 8,580,914 from December 1999 and until payment is made, and an obligation to cover all finally approved creditor claims in the plaintiff bankruptcy estate, cf. sections 93-98 of the Danish Bankruptcy Act, which are not covered by the said amount. In addition, the claim covers legal costs of DKK 500,000

For your information, the Western High Court's judgment of 2 February 2000 has been appealed to the Supreme Court, where the case will be heard on 1 and 2 May 2001. Consequently, I reserve the right to change the claim for contribution in accordance with the Supreme Court's judgment.

. . ."

Following the Supreme Court's judgment of 10 May 2001, the plaintiffs complied with the judgment of 25 May 2001 by paying DKK 15,684,628, of which the principal was DKK 13,858,430, interest DKK 926,198 and legal costs DKK 900,000. The plaintiffs later paid the bankruptcy costs of DKK 60,000.

A letter dated 22 August 2001 from the plaintiffs' new attorney, Attorney Claus Madsen, to Attorney Jesper Lett states as follows:

"I refer to your letter of 15 August 2001 and inform you that I have forwarded this to my client. My clients have taken note of the Supreme Court's judgment and in that regard have, of course, complied with it. My clients' cash resources have therefore been quite "stretched". For this reason, I would kindly ask you to submit your proposal as soon as possible.

As I am currently not in possession of all documents that the law firm Klaus Berning may have sent in the present case, I am also not aware whether interest claims have previously been submitted. For the sake of good order, I will merely state that it is my opinion that the settlement must be based on an interest calculation and payment in accordance with what may be imposed on my clients and naturally interest after the time when my clients have paid the claims according to the judgment. In the absence of a prior interest claim, this letter must be regarded as a formal interest claim according to the rules of the Danish Interest Act (*renteloven*).

In March and April 2002, there was some correspondence on a possible settlement of the dispute between the plaintiffs on the one side and Attorney Jepsen and PricewaterhouseCoopers on the other side. A letter of 6 March 2002 from Attorney Jepsen's attorney, Attorney Søren Bagger, to Attorney Claus Madsen and Attorney Jesper Lett represented by Attorney Mikkel Falkenberg states, i.a., the following:

". . .

In my clients' view, the case must be settled in accordance with the practice in the asset stripping cases, which means that enrichment and losses must be calculated in accordance with the principles of the Thrane judgment, that the sellers must bear the enrichment obtained by them in advance, that the loss calculated according to the "gross principle" must be finally distributed by half to the buyer side, i.e. Varde Bank's bankruptcy estate, whereas the seller side's loss must be distributed with 1/3 to the sellers, State-Authorised Public Accountant Jan Lütje Hansen and Attorney Jeppe L. Jepsen, respectively, as is also the case with regard to the loss resulting from the seller's liability under section 115 (5) of the Danish Public Limited Companies Act.

I have accordingly prepared the enclosed calculation of the sellers' enrichment and loss and

**2402**

the distribution thereof. In connection with the preparation of the calculation, I have assumed that Attorney Claus C. Madsen's clients have complied with the Supreme Court's judgment of 10 May 2001 on 25 May 2001, at least as regards the tax claim itself, incl. corporation tax interest and imposed legal costs before the High Court and the Supreme Court. The exhibits that I have received do not, however, include material indicating whether or not my assumption is correct. I kindly ask Attorney Madsen to send me documentation of the amounts that your clients have paid to comply with the Supreme Court's judgment.

. . .

Please inform me of your client's position on the enclosed calculation which is to be considered in its entirety as my clients' proposal for a settlement of the case.

. . ."

A letter of 20 March 2002 from Attorney Claus Madsen to Attorney Søren Bagger states, i.a. as follows:

". . .

The advisers' proposal, most recently a letter of the 6th of this month from you, has been submitted to my clients who cannot accept settlements on the basis of the stated amounts that the advisers can admit.

My clients have therefore asked me as soon as possible and before Wednesday the 27th of this month to lodge a writ against the advisers for an amount significantly greater than the approximately DKK 3.2 million stated in the last proposal.

On this basis, I must therefore call on the advisers to pay the amount that they are willing to admit – which I know to be practice in other similar cases – so that the forthcoming court case is limited to the part on which the parties disagree.

. . ."

A letter of 21 March 2002 from Attorney Søren Bagger to Attorney Claus Madsen states, i.a. as follows:

". . .

If you lodge a writ as announced, you must expect that it will be argued that the case has been inflated in terms of amounts because of your clients' circumstances.

I hereby state that Attorney Jeppe L. Jepsen admits the contribution obligation in respect of the amount of DKK 1,298,660.00 stated in said calculation plus statutory interest of DKK 250,839.00 from 25 May 2001, which provides that your clients' enrichment and losses can be calculated as stated in the calculation. If these basic amounts need to be corrected, Attorney Jeppe L. Jepsen will admit to being obliged to indemnify your clients on the basis of the corrected amounts and according to the same guidelines as stated in said calculation.

Attorney Jeppe L. Jepsen also admits being obliged to indemnify your clients for 1/3 of the bankruptcy estate costs etc. which, according to the Supreme Court's judgment, your clients are obliged to pay to Handelsselskabet Vejle 3 af 1993 ApS in bankruptcy.

. . ."

A letter of 2 April 2002 from Attorney Mikkel Falkenberg to Attorney Claus Madsen states, i.a. as follows:

"On behalf of PricewaterhouseCoopers, I submit the enclosed calculation of today, item F of which contains an indication of the amount for which PricewaterhouseCoopers may admit a contribution obligation, DKK 1,323,566. The amount has been transferred per giro to my client account and will be forwarded to you in the next few days.

. . ."

A letter dated 29 April 2002 from Attorney Falkenberg to Attorney Madsen states as follows:

". . .

The reason why I have not yet made payment as stated in my letter of 2 April 2002 and the accompanying calculation is, as stated by telephone, that the loss calculations in the case so far appear to contain an incorrect statement of the premium.

. . ."

With the letter, Attorney Falkenberg submitted an instalment of DKK 1 million, and on 13 November 2002, Attorney Falkenberg submitted an additional DKK 334,863.23 to meet the remaining part of the plaintiffs' claim, for which PricewaterhouseCoopers was able to admit its contribution obligation.

On 15 May 2002, Attorney Søren Bagger has paid DKK 1 million, and on 23 September 2002 an additional DKK 354,167.18 to meet the plaintiffs' claim for contribution against Attorney Jepsen, which was admitted by the latter.

In January/February 2003, VB Finans has paid DKK 741,340 plus statutory interest from 3 May 2001 to satisfy the admitted part of the plaintiffs' claim against VB Finans.

During the case and until the hearing, the parties have disagreed about the calculation of the plaintiffs' claim for contribution, including the basis on which their enrichment is calculated, in particular the amount of the premium and the plaintiffs' cash benefit. In a letter of 28 July 2003, the plaintiffs' attorney at the time, Attorney Claus Madsen, asked the tax department of the Municipality of Vinderup, Denmark, to state which amounts and instalments of capital gains tax the plaintiffs have each paid in respect of the transfer of Rose Brand Poultry A/S (II).

*John Bjerregaard Pedersen* has accepted his statement before the High Court in the main case and has further stated that he is a poultry farmer and farmer. He has also been chairman of the board of Vinderup Fjerkræslagteri A/S and a member of the board of Rose Brand Poultry A/S (II). The latter company was a trading company which handled the sales activities for Vinderup Fjerkræslagteri A/S. He

### 2403

had nothing to do with the financial transactions in connected with the sale of Rose Brand Poultry A/S (II). They were handled by Auditor Jan Lütje Hansen and Attorney Jeppe L. Jepsen. He knew nothing about the self-funding ban in the Danish Public Limited Companies Act. Up to the sale of Rose Brand Poultry A/S (II), there had been no discussion of liquidating the company. If the company had not been sold, the investment fund funds would have been used for investments, as Vinderup Fjerkræslagteri A/S was, i.a., facing major investments. The investment fund funds of the group's companies had always been used. There would have been no discussion of liquidating Rose Brand Poultry A/S (II), i.a. because liquidation would have drained the group's cash resources for tax payments. A former company, Rose Brand Poultry A/S (I), which had the same ownership as Rose Brand Poultry A/S (II), had been liquidated because at that time a number of years had elapsed, and the taxation of capital gains on shares was reduced and he and his brother, Per Bjerregaard Pedersen, needed money from the company to buy some of the mother's shares. The board of directors of Vinderup Fjerkræslagteri included, in addition to himself, his brother Per Bjerregaard Pedersen, his mother Marie Poulsen and former State-Authorised Public Accountant Erik Nielsen. At one point, he heard about the possibility of selling Rose Brand Poultry A/S (II) as a profit company at a favourable price and presented this to, among others, Erik Nielsen and the company's auditor, Jan Lütje Hansen. Erik Nielsen was sceptical from the start, but investigated it further with the auditor. He had been informed by Michael Matzen that in connection with the sale of the company, they could simply pay the purchase price using the funds in the company, but Erik Nielsen and Auditor Lütje Hansen said that the payment should be made in cash. Auditor Lütje Hansen had not proposed to liquidate Rose Brand Poultry A/S (II). When he, Per Bjerregaard Pedersen and Marie Poulsen were sued by Handelsselskabet Vejle 3 af 1993 ApS in bankruptcy, they held a meeting with Attorney Jeppe L. Jepsen and Auditor Jan Lütje Hansen, where they agreed with the attorney and the auditor to conduct the case together and to suspend the limitation period in relation to a possible liability in damages for the attorney and the auditor. He, his brother and their mother have paid approximately DKK 500,000 in fees to Attorney Hans Peter Jespersen and Attorney Klaus Berning in connection with this court case. Add to this court fees.

*Per Bjerregaard Pedersen* has accepted his statement before the High Court in the main case and further explained that he was co-CEO in Vinderup Fjerkræslagteri A/S and Rose Brand Poultry A/S (II) and worked with production activities. He was a member of the board of directors of both companies. When John Bjerregaard Pedersen said that Rose Brand Poultry A/S (II) could be sold as a profit company,

Copyright © 2021 Karnov Group Denmark A/S

he did not believe it at first. They asked Erik Nielsen and Auditor Jan Lütje Hansen to investigate it, and they said that a sale could not be settled net. The sale was then completed, and their advisers handled the financial transactions. A liquidation of the company was not an issue, as their cash resources could not have covered the tax payment of approximately DKK 8 million that this would have triggered. Furthermore, they needed the investment fund funds in the company for investments in machinery etc. The group made investments of approximately DKK 10-20 million a year. The group's annual turnover was DKK 350-400 million. He was not involved in the issue of adviser liability, including suspension of the limitation period, but he did participate in a meeting with Attorney Hans Peter Jespersen, where they agreed with Attorney Jepsen and Attorney Lütje Hansen to conduct the case. He believes that the chairman of the board of Rose Brand Poultry (II) was the mother's husband, Poul Poulsen, The shareholders of the company and Erik Nielsen discussed intensely how it was possible to "use" the tax in the company. The shareholders asked Erik Nielsen to investigate it thoroughly, and Erik Nielsen, together with Auditor Lütje Hansen, has made written notes about it, but he has not seen them himself. Even though they sold Rose Brand Poultry A/S (II), they were able to finance new investments in Vinderup Fjerkræslagteri A/S with the funds they received from the sale.

*Attorney Jeppe L. Jepsen* has accepted his statement before the High Court in the main case and further explained that he has been an attorney for Marie Poulsen for a number of years and became so for the group in connection with the sale of Rose Brand Poultry A/S (II). The three shareholders had been discussing the sale for a long time when he came into the picture. He had nothing to do with the liquidation of Rose Brand Poultry A/S (I). Auditor Jan Lütje Hansen was originally an "understudy" with Erik Nielsen when the latter worked as a state-authorised public accountant, and they had been the group's auditors for many years. Even after Erik Nielsen's retirement, Erik Nielsen had a big say on the auditor side. Only after careful consideration did Erik Nielsen recommend the company sale, i.a. on the basis of a consideration that it would incur liability if they did not. Everything was agreed with the shareholders after thorough discussions. Erik Nielsen had made a note about cash flows etc. He cannot comment on whether the shareholders have discussed the possibility of a liquidation of the company, but it is likely as liquidity was needed. In connection with the sale, he was aware of the self-funding ban, but he had not foreseen that the courts would reach the conclusion that this situation involved self-funding. Both the shareholders and the advisers thought that they had covered themselves. The investments that were to be made in the company would be made in the operating company, Vinderup

**2404**

Fjerkræslagteri A/S, and not in Rose Brand Poultry A/S (II). *The plaintiffs* have, in support of their claims against Attorney Jepsen and PricewaterhouseCoopers, submitted that it follows from the Western High Court's judgment of 29 August 2001 (Tidsskrift for Skatter og Afgifter 2001, no. 860) and from the Western High Court's judgment of 5 February 2003 (Tidsskrift for Skatter og Afgifter 2003, no. 308), that statutory interest on the plaintiffs' enrichment must not be included in the calculation of such enrichment but the interest must be included as part of the loss to be distributed among the parties during the case. The Eastern High Court's judgment of 7 June 2001 (Tidsskrift for Skatter og Afgifter 2001, no. 570) states that it is true that the calculation of the sellers' enrichment included statutory interest on the enrichment, but this was because the sellers had not disputed this.

Liquidating the company had never been discussed, and there was a great need for investment in the group. Therefore, the investment fund reserves could easily have been used in the group. The judgments in the asset stripping cases where the sellers, in

the contribution case, had to waive the tax on the investment fund reserves in the company, are specifically reasoned, often by the fact that there were actually plans to liquidate the companies in question. As this is not the case here, the plaintiffs must not, when calculating the enrichment, include the supplementary tax of DKK 654,244 which would have been triggered if the company had been liquidated instead of being sold.

The plaintiffs did not have the necessary qualifications to assess the extent of the self-funding ban in section 115 of the Danish Public Limited Companies Act, and it was the advisers, in particular Attorney Jepsen, who conducted the transactions in connection with the sale and agreed to the method of sale. Therefore, there is no basis for ordering the plaintiffs to pay any part of the additional liability which was a consequence of the fact that the case, because of the unlawful self-funding, became an interlocutory case and not a gross case. Erik Nielsen was an independent adviser and there is therefore no identification between the plaintiffs and Erik Nielsen in relation to his possible knowledge.

The main case was conducted in two instances with the consent of the defendants and also in their interests. As a consequence, Attorney Jepsen and PricewaterhouseCoopers must, in addition to indemnifying the plaintiffs for a proportionate part of the legal costs in the main case, also indemnify them for the legal costs incurred by the plaintiffs to their own attorney and court fees which amounted to not less than DKK 900,000. Attorney Jepsen and PricewaterhouseCoopers have by voluntarily paying DKK 100,000 each to partially cover the court fees before the Supreme Court accepted this.

The plaintiffs are entitled to interest on their entire claim against Attorney Jepsen and PricewaterhouseCoopers from 25 May 2001, when the plaintiffs made payment to the plaintiff in the main case. This also applies to the part of the claim which covers statutory addition and bankruptcy estate costs as well as corporation tax interest until 25 May 2001, which part Attorney Jepsen and PricewaterhouseCoopers have not admitted any obligation to pay interest on from that date. In the alternative, the plaintiffs are entitled to interest on this part of the claim from 22 September 2001, cf. section 3 (2) of the Danish Interest Act, as Attorney Claus Madsen's letter of 22 August 2001 contained a valid interest claim.

If VB Finans were to succeed in its claim that the plaintiffs are not entitled to interest on their claim for damages against VB Finans from 6 November 1996 to 3 May 2001, which is, i.a., assumed in Attorney Jepsen's calculation II of 23 September 2002, the plaintiffs' loss will increase by an amount equal to the missing interest amount. This additional loss must be borne by the plaintiffs themselves with 1/3 and by Attorney Jepsen and PricewaterhouseCoopers with 2/3.

In support of their claim for payment of DKK 327,122, the plaintiffs have submitted to VB Finans that too little taxes provided for invest fund reserves should not be included in the calculation of the plaintiffs' enrichment. The plaintiffs have also referred to the submission in this respect against the other defendants.

In support of their claim for interest against VB Finans, the plaintiffs have submitted that the claim asserted when the case was brought, some of which has been paid in the course of the case, is a claim for indemnification intended to cover all the loss suffered by the plaintiffs, including interest. This is, i.a., supported by the Western High Court's judgement of 21 December 2001 (Skat – Aktuel Information 2002, no. 120).

In support of his claim for dismissal, *Attorney Jepsen* has submitted that the Supreme Court, i.a. in its judgment of 29 December 2000 (Ugeskrift for Retsvæsen 2001, page 634) has determined that in interlocutory cases such as the present, the liability must be distributed into a part that relates to the loss under the general rules on damages under Danish law

which is caused by the actual sale (the gross case part) and a part that relates to the further loss resulting from violation of the self-funding ban (the interlocutory part). It must therefore be calculated what should have been paid and by whom, if the case had been a gross case, cf. Attorney Jepsen's calculation II of 23 September 2002, item IV. In that regard, the plaintiffs are obliged to bear the enrichment obtained by them plus statutory interest in advance for the period from 6 November 1996 to 25 May 2001. The difference between the gross part of the case and the amount of damages actually paid by the plaintiffs is the additional liability which

**2405**

must then be distributed between the plaintiffs and Attorney Jepsen and PricewaterhouseCoopers. If the plaintiffs' claim that, when calculating the enrichment, statutory interest must only be added from the time when the main case is brought in the case of a gross case, but not in the case of an interlocutory case as here, was correct, it would entail that a seller, who in connection with the sale to an asset stripping party also violates the self-funding ban, would have to pay less in damages than if he had been convicted for the sale alone. Such an outcome would be manifestly unreasonable and contrary to the intentions of the Supreme Court.

In this type of case, there is a presumption that the alternative to a sale of the company was a liquidation which would have triggered taxation of the company's investment fund reserves. The plaintiffs have not met their burden of proving that other options to continue the company would have been more favourable than a liquidation. There is no reason to treat the question of taxation of investment fund reserves differently from the question of the triggering of the other deferred taxes which the plaintiffs are ordered to pay in the main case.

The Supreme Court's judgment of 24 November 1999 (Ugeskrift for Retsvæsen 2000, page 365 – the "Thrane judgment") shows that the basis of the distribution of the additional liability due to the case being an interlocutory case is an equal distribution among all the liable participants on the seller side. In this case, the plaintiffs were very active in connection with the sale of the company, and through Erik Nielsen they had full knowledge of what was going on. Therefore, there is no basis for departing from the principle of equal distribution in this case.

Attorney Jepsen has admitted to pay a proportionate part of the legal costs in the main case, and the payment of DKK 100,000 to partially cover the court fees before the Supreme Court has covered his legal costs in the main case. Attorney Jepsen has not hereby agreed to pay part of the plaintiffs' own legal costs and the fact that the plaintiffs should not have submitted a claim for dismissal before the Supreme Court must lead to the fact that Attorney Jepsen cannot be obliged to do so.

Attorney Jepsen has admitted that the part of the plaintiffs' claim for damages that relates to the gross case will bear interest from 25 May 2001. The part that relates to the interlocutory part consists of corporation tax interest, statutory addition and estate costs which are not in themselves interest-bearing. There is no claim for payment of interest, and it is noted that Attorney Claus Madsen's letter of 22 August 2001 is addressed solely to Attorney Jesper Lett. Consequently, interest only accrues from the case is brought. The defendant Jepsen has paid interest on the amounts paid during the case accordingly and the plaintiffs are therefore not entitled to any further interest.

If the plaintiffs are not successful in their claim for interest against VB Finans, any increased loss cannot be passed on to the other defendants, as the plaintiffs in such case have shown their own guilt by not filing the claim in time with VB Finans.

Prior to the case, Attorney Jepsen has admitted his indemnification obligation and it is solely based on the plaintiffs' refusal to relate to the draft loss calculations and provide the necessary information that defendant Jepsen did not pay the amount due until 15 May 2002 and 23 September 2002, respectively. If the claim against Attorney Jepsen is dismissed, he should therefore be awarded legal costs.

In support of their claim for dismissal, *PricewaterhouseCoopers* has submitted that a number of principles can be inferred from Supreme Court case law on contribution cases in asset stripping cases, including *that* the seller must give up their enrichment in advance, *that* the seller in interlocutory cases must not be put in a more favourable situation than in gross cases, in particular if the seller is jointly liable for the violation of the self-funding ban, *that*, as a rule, the loss is equally distributed between the liable participants on the seller side and *that* the legal costs imposed are distributed proportionately between the liable parties. It also follows from Supreme Court case law, including the Thrane judgment and the Supreme Court's judgment of 29 December 2000 (Ugeskrift for Retsvæsen 2001, page 634), that the sellers must bear the enrichment and their part of the loss plus statutory interest.

A liquidation that would undisputedly have triggered taxation of the investment fund reserves was the most realistic alternative to a sale as in this case. Hence, the plaintiffs had once previously liquidated a company, Rose Brand Poultry A/S (I), after a period of ownership which gave them the opportunity to get money out of the company with a lenient taxation. This option was closed by a change in legislation in 1993. Therefore, it is presumed that Rose Brand Poultry A/S (II) would have been liquidated by the beginning of 1993 at the latest. The plaintiffs have not shown that the operation of the company would have continued or that the investment fund funds could have been lawfully used. Thus, to avoid taxation, the plaintiffs should have purchased assets in the company and retained them for a long time. There is no basis for departing from the principle in the Thrane judgment of equal distribution of the loss on the seller side. The plaintiffs were well informed about the self-funding issue, and Erik Nielsen had, i.a., prepared a written note to that effect. According to the case law, the fact that the seller has general experience in carrying on a commercial activity already means that the loss on the seller side must be distributed equally.

It follows from the Thrane judgment that the legal costs imposed must, generally, be distributed

**2406**

proportionately between those liable. VB Finans' share of the costs must therefore be included in the distribution of the legal costs between the defendants, even though the plaintiffs have not submitted a claim to this effect against VB Finans. There is no legal basis for the claim by agreement or by any other legal basis to claim that their own legal costs be covered by the defendants.

PricewaterhouseCoopers was not able, before the case was brought, to calculate the size of the plaintiffs' claim, in particular as regards the determination of the premium and the cash benefit for the plaintiffs. Therefore, Attorney Claus Madsen's letter of 22 August 2001 in which a claim for interest was submitted, cannot be attributed importance, cf. section 3 (3) of the Danish Interest Act. Therefore, interest does not accrue before the case is brought.

No further claim can be brought against the other defendants on the grounds that the plaintiffs were unsuccessful in their claim against VB Finans, as the plaintiffs in such case, by not having previously submitted the claim against VB Finans, have breached their duty to limit losses.

In support of its claim for dismissal relating to the claim for payment of DKK 327,122, *VB Finans* has submitted that the calculation of the plaintiffs' enrichment must include supplementary tax on the investment fund reserves in the company and has also referred to the other defendants' statements in that regard.

UfR ONLINE

U.2005.2397H

VB Finans has further submitted that the plaintiffs are not entitled to interest until 3 April 2001, when the claim was notified to the trustee in VB Finans. Notification must in this connection be equated with prosecution, cf. section 3 (4) of the Danish Interest Act. VB Finans has not been involved in the main case and could, had they been involved earlier, paid the amount they were believed to owe and thus avoid addition of interest. Therefore, it must be to the detriment of the plaintiffs that VB Finans was not involved in the case earlier.

**The justification and conclusion of the High Court:**

Following the statements, it is applied that there was an opportunity to utilise the investment fund reserves in the group if the company had not been sold. Notwithstanding this, the High Court is not satisfied by the evidence that the plaintiffs, who actually chose to realise the company and not to use the investment fund reserves, in the event that the company had not been sold, would have used the investment fund reserves so that no taxation had been triggered. As part of their enrichment, the plaintiffs must therefore waive the tax amount of DKK 654,244 which would have been triggered in the event of a solvent liquidation.

It has been agreed between the parties that, in the event that the Supreme Court has assessed the main case as a so-called gross case with the consequence that the plaintiffs, according to the alternative claim before the Supreme Court, had been found liable in damages according to the general rules of damages under Danish law, the plaintiffs should have paid statutory interest on the damages amount from 6 November 1996 to 25 May 2001. On that basis, and as the case has been presented with the division into the gross and the interlocutory part, the High Court finds that the enrichment which the plaintiffs must waive in advance in the case between the parties must also include the statutory interest of this from the main case is brought and until payment was made. It has been agreed between the parties that the plaintiffs' enrichment in this situation can be calculated as set out in Attorney Jepsen's calculation of 23 September 2002, item IV. The additional liability, arising from the fact that it is an interlocutory case and not a gross case, therefore constitutes the difference between the damages that should have been paid if the case was a gross case, and the damages that were actually paid, as this was an interlocutory case. It has been agreed between the parties that if the High Court reached the stated conclusion, the calculation of damages must be made on the basis of Attorney Jepsen's calculation II of 23 September 2003, items II and IV.

The distribution of the liability in damages for the additional liability between the plaintiffs and their advisers must, in accordance with section 25 (1) of the Danish Liability in Damages Act (*erstatningsansvarsloven*) be based on the guidelines in the Supreme Court's judgment in the Thrane case. The plaintiffs participated in the management of the company and were given advice in connection with the decisions on the form of sale etc. from both the board member, former State-Authorised Public Accountant Erik Nielsen and from external advisers. In these circumstances, there is no reason to depart from the premise that the liability in damages must be distributed equally between the liable participants on the seller side. The distribution of the liability in damages for the additional liability must therefore be done as stated in Attorney Jepsen's calculation II of 23 September, item V.

The plaintiffs have not submitted a claim against VB Finans for contribution for their share of the legal costs imposed in the main case. Consequently, the plaintiffs must bear the part of the legal costs themselves and there is no reason to charge the other defendants with that amount. On the evidence, no agreement has been concluded between Attorney Jepsen and PricewaterhouseCoopers and the plaintiffs that the defendants must pay a part of

the plaintiffs' own costs of attorney and court fees, and the defendants' payments of DKK 100,000 each to partially cover the court fees for the Supreme Court cannot be considered an implied acceptance of this. Accordingly, and since the parties agree on the calculation of these defendants' share of the legal costs imposed, there is

**2407**

no basis for ordering them to pay additional legal costs to the plaintiffs.

The part of the claims admitted and paid by Attorney Jepsen and PricewaterhouseCoopers in the course of the case which involves the additional liability, relates to estate costs, statutory addition and interest under the Danish Corporation Tax Act until 25 May 2001. As regards interest on this claim for damages, the following is noted: According to the evidence, in 2001, the plaintiffs on the one side and Attorney Jepsen and PricewaterhouseCoopers on the other side discussed the size of the plaintiffs' claim for contribution, and in a letter of 22 August 2001, the plaintiffs submitted a "formal interest claim under the provisions of the Danish Interest Act" against PricewaterhouseCoopers. However, it has been sufficiently demonstrated that PricewaterhouseCoopers was not able to obtain the detailed information that was necessary to assess the merits and the amount of the claim, cf. section 3 (3) of the Danish Interest Act, until the case had been brought. For this reason, PricewaterhouseCoopers will not have to pay any statutory interest on the claim until it was brought on 4 April 2002, cf. section 3 (4) of the Danish Interest Act. The same applies to Attorney Jepsen, against whom no interest claim has been made prior to the case. Attorney Jepsen's and PricewaterhouseCoopers' interest payments, the amount of which has not been disputed, have therefore been correctly calculated and the plaintiffs claim for additional interest is consequently not allowed.

As stated above, the plaintiffs must, as part of their enrichment waive the tax amount of DKK 654,244 which would have been triggered in the event of a solvent liquidation. The plaintiffs' claim against VB Finans for payment of DKK 327,122 is therefore not allowed.

VB Finans must then bear DKK 741,340 of the tax authorities' losses. The following is noted on the interest on this amount:

After the plaintiffs have complied with the judgment in the main case on 25 May 2001, including interest imposed, their claim for contribution as regards the tax authorities' loss against VB Finans, taking into account the need to achieve financial equality between these jointly and severally liable parties, is found to include interest from the case was brought on 6 November 1996, notwithstanding that the plaintiffs did not bring a case against VB Finans for the claim for contribution until their letter of 3 April 2001. Nor can it lead to any other conclusion that VB Finans, according to the evidence, had not been informed before then that the plaintiffs would claim contribution. The High Court therefore allowed the plaintiffs' claim for interest from 6 November 1996.

When determining the costs of the case, it has been attributed importance that the defendants have not paid the admitted amounts until during the case. It has also been attributed importance that Attorney Jepsen and PricewaterhouseCoopers had admitted the obligation to pay damages before the case was brought and suggested that the damages be calculated according to a model similar to the one used in the decision of the case.

**On these grounds the Court rules that:**

The Court finds for the defendants Attorney Jeppe L. Jepsen and the audit firm PricewaterhouseCoopers.

The defendant VB Finans A/S in bankruptcy must pay to the plaintiffs, John Bjerregaard Pedersen, Per Bjerregaard Pedersen and Marie Poulsen, interest of DKK 741,340 from 6 November 1996 to 3 May 2001.

Copyright © 2021 Karnov Group Denmark A/S

The plaintiffs must pay legal costs to each of the defendants' Attorney Jeppe L. Jepsen and the audit firm PricewaterhouseCoopers in the amount of DKK 75,000.

The defendant VB Finans A/S in bankruptcy must pay legal costs to the plaintiffs in the amount of DKK 30,000.

This amount must be paid within 14 days.

**Supreme Court of Denmark**

**The Supreme Court's judgment.**

In a previous instance, the Western High Court, 6th division, gave its ruling on 1 December 2003.

Five judges ruled in the case: Marie-Louise Andreasen, Lene Pagter Kristensen, Jytte Scharling, Marianne Højgaard Pedersen and Jon Stokholm.

*Claims*

The appellants, John Bjerregaard Pedersen, Per Bjerregaard Pedersen and Marie Poulsen, have finally claimed that the respondent, Attorney Jeppe L. Jepsen, must pay DKK 969,523, in the alternative a smaller amount, all with statutory interest from the case is brought. Attorney Jeppe L. Jepsen has claimed affirmation, however so that the appellants must pay legal costs before the High Court in an amount greater than DKK 75,000.

Before the Supreme Court, the case only concerns whether Attorney Jeppe L. Jepsen must indemnify the appellants for their additional loss due to the fact that it is an interlocutory case and not a gross case (the additional liability) and the size of the legal costs before the High Court.

*Supplementary statement of facts*

The amount that Attorney Jeppe L. Jepsen, prior to the bringing of the case, had admitted to pay, was not included in the amount for which the writ was issued.

**The justification and conclusion of the Supreme Court**

For the reasons stated by the High Court, the Supreme Court agrees that there is no reason to depart from the basis that, in the contribution case, there must be an equal distribution between those liable on the seller side in accordance with the principles of the Supreme Court's judgment of 24 November 1999 (UfR 2000 p. 365/2). The Supreme Court therefore affirms the judgment.

**2408**

Considering the value of the case for the High Court and the Supreme Court, respectively, and the outcome of the case, the appellants must pay DKK 200,000 in legal costs before both courts.

**On these grounds the Court rules that:**

*The High Court's judgment is affirmed.*

*In legal costs before the High Court and the Supreme Court, John Bjerregaard Pedersen, Per Bjerregaard Pedersen and Marie Poulsen must, within 14 days of the delivery of this Supreme Court judgment, jointly and severally pay DKK 200,000 to Attorney Jeppe L. Jepsen.*

Copyright © 2021 Karnov Group Denmark A/S

# THIS IS TO CERTIFY

that the foregoing

**"Judgment"**

is a true and faithful translation of the
attached document
in the Danish language produced to me.

This translation consists of 11 (eleven) pages, including this page.

In witness whereof I have hereunto set
my hand and affixed my seal of office
this 23rd day of May 2022.



Certified Translator at Aarhus, Denmark

Lea Mathiasen

**U.2005.2397H**

***Udgangspunktet om ligedeling af erstatningsansvaret mellem de ansvarlige på sælgersiden i en selskabstømmersag ikke fraveget.***

*Erstatning uden for kontraktforhold 111.4, 3.3 og 5 - Retspleje 36.2 - Selskabsret 1.2.*

♦ Ved en højesteretsdom blev sælgerne af et overskudssalg, S, dømt til at betale erstatning for det tab, skattevæsenet m.fl. havde lidt som følge af, at selskabet efter overdragelsen var blevet tømt for midler. Under en efterfølgende sag mod rådgiverne gjorde S regres gældende over for bl.a. advokat A. Denne anerkendte at være erstatningsansvarlig og betalte under sagen erstatning til S for deres mertab som følge af, at der var tale om en mellemformssag. S krævede yderligere erstatning, men hverken landsretten eller Højesteret fandt grundlag for at fravige udgangspunktet om, at der ved regresopgøret i en mellemformssag skal ske ligedeling mellem de ansvarlige på sælgersiden i overensstemmelse med principperne i Højesterets dom i U 2000.365/2, og frifandt A.[1] Ved landsrettens dom havde A fået tillagt 75.000 kr. i sagsomkostninger. Højesteret fastsatte sagsomkostningerne for begge retter til 200.000 kr.

**H.D. 11. maj 2005 i sag 14/2004 (2. afd.)**

*John Bjerregaard Pedersen, Per Bjerregaard Pedersen og Marie Poulsen (adv. Claus Madsen, Århus)*
mod
*Advokat Jeppe L. Jepsen (adv. Søren Bagger, Kbh.).*

## Vestre Landsret

### Vestre Landsrets dom 1. december 2003 (6. afd.)

(Kristian Petersen, Würtzen, Rasmus Damm (kst.)).

Sagerne, der er anlagt den 4. april 2002, er såkaldte selskabstømmersager, der drejer sig om, i hvilket omfang sagsøgerne, John Bjerregaard Pedersen, Per Bjerregaard Pedersen og Marie Poulsen, kan gøre regres over for købers bank, VB Finans A/S under konkurs, og over for deres rådgivere, advokat Jeppe L. Jepsen og revisionsfirmaet PricewaterhouseCoopers, for det erstatningsbeløb, sagsøgerne som sælgere af et overskudsselskab er blevet dømt til at betale.

Sagsøgerne har nedlagt følgende påstande:

De søgsøgte advokat Jeppe L. Jepsen (herefter kaldet »advokat Jepsen«) og revisionsfirmaet PricewaterhouseCoopers (herefter kaldet »PricewaterhouseCoopers«) tilpligtes solidarisk at betale 4.918.400 kr., subsidiært at et retten fastsat mindre beløb, alt med tillæg af procesrente fra den 25. maj 2001, subsidiært fra den 22. september 2001, mest subsidiært fra sagens anlæg.

Advokat Jepsen og PricewaterhouseCoopers tilpligtes endvidere at anerkende at være forpligtede til at forrente de tidligere indbetalte andele af erstatningskravet på henholdsvis 1.313.473 kr. og 1.294.431 kr. fra den 25. maj 2001, subsidiært fra den 22. september 2001, til tidspunkterne for betalingernes foretagelse.

Sagsøgte VB Finans A/S under konkurs (herefter kaldet »VB Finans«) tilpligtes at betale 327.122 kr. med tillæg af renter fra den 6. november 1996, til betaling sker, subsidiært fra et senere tidspunkt.

VB Finans tilpligtes endvidere at betale renter af 741.340 kr. fra den 6. november 1996 til den 3. maj 2001, subsidiært fra den 3. april 2001 til den 3. maj 2001.

Advokat Jepsen har påstået frifindelse, subsidiært frifindelse mod betaling - solidarisk med PricewaterhouseCoopers - af et mindre beløb end 4.918.400 kr.

PricewaterhouseCoopers har påstået frifindelse, subsidiært frifindelse mod betaling - solidarisk med advokat Jepsen - af et mindre beløb end 4.918.400 kr. med tillæg af procesrente fra den 4. april 2002, subsidiært fra et tidligere tidspunkt.

VB Finans har påstået frifindelse, subsidiært frifindelse mod betaling af et mindre beløb end 327.122 kr. med tillæg af procesrente fra den 3. april 2001.

Sagens nærmere omstændigheder er følgende:

Ved Højesterets dom af 10. maj 2001 blev sagsøgerne som sælgere af overskudsselskabet Rose Brand Poultry A/S (II) (senere Handelsselskabet Vejle 3 af 1993 ApS) dømt til at betale 13.858.430 kr. med nærmere angivne renter til Handelsselskabet Vejle 3 af 1993 ApS under konkurs i erstatning for det tab, som skattevæsenet og eventuelle andre kreditorer led, som følge af at selskabet efter overdragelsen blev tømt for midler. I dommen, der er trykt i Ugeskrift for Retsvæsen 2001, side 1730, herefter benævnt »hovedsagen«, hedder det:

». . .

**Højesterets bemærkninger.**

Ved købekontrakten af 7. november 1991 om overdragelse af hele kapitalen i overskudsselskabet forpligtede appellanterne sig til at stille selskabets aktiver i form af en kontant beholdning til rådighed for køberselskabet samtidig med erlæggelsen af købesummen.

Efter erlæggelse af købesummen den 7. november 1991 blev overskudsselskabets midler ad tre gange - den 7., 8. og 14. november 1991 - overført til konto nr. 7705 182636-0 i Varde Bank. Overførslerne blev med appellanternes bemyndigelse og på deres vegne foretaget af appellanternes advokat, Jeppe L. Jepsen, der ved faxbrevet af 7. november 1991 havde fået oplyst at køberselskabets direktør, Aino Polk Krogh, at det var

**2398**

køberselskabets konto. Herefter og i overensstemmelse med oplysningerne om bogføringen i køberselskabet finder Højesteret, at overførslen af midlerne skete direkte til køberselskabet. Appellanterne stillede herved som aktionærer i overskudsselskabet dettes midler til rådighed for køberen i forbindelse med dennes erhvervelse af hele aktiekapitalen i selskabet og overtrådte dermed aktieselskabslovens § 115, stk. 2.

Appellanterne har ikke godtgjort, at der efter overførslen af midlerne er sket tilbageførsel til overskudsselskabet. Tilbageførsel af midlerne er nu udelukket, og Højesteret tiltræder, at appellanterne derfor indestår for selskabets tab, jf. aktieselskabslovens § 115, stk. 5.

Højesteret tager herefter konkursboets principale påstande til følge.

### Thi kendes for ret:

Appellanterne, Marie Poulsen, John Bjerregaard Pedersen og Per Bjerregaard Pedersen, skal in solidum til indstævnte, Handelsselskabet Vejle af 1993 ApS under konkurs, betale 13.858.430 kr. med tillæg af rente 0,6% pr. påbegyndt måned af 8.575.914 kr. fra december 1999 samt anerkende, at de in solidum er forpligtet til at dække omkostningerne ved konkursens indtræden

---

1  U 2000.365/2 H, U 2001.634/2 H, TfS 2001.570 Ø, TfS 2001.860 V, TfS 2003.308 V og TfS 2004.451 Ø.

Copyright © 2021 Karnov Group Denmark A/S

og boets behandling, jf. konkurslovens § 93, nr. 1 og 2, samt retsafgift, jf. § 94, nr. 4.

Landsrettens afgørelse om sagsomkostninger stadfæstes.

I sagsomkostninger for Højesteret skal appellanterne in solidum betale 400.000 kr. til indstævnte.

. . .«

Det bemærkes, at landsretten havde dømt sagsøgerne til in solidum at betale 500.000 kr. i sagsomkostninger til konkursboet.

Det idømte beløb svarer til skyldige skatter vedrørende skatteårene 1989/90, 1990/91, 1991/92 og 1992/93 på 8.575.914 kr. samt kontrollovtillæg på 5.000 kr. Hertil kommer påløbne renter på 5.277.516 kr. efter selskabsskattelovens § 30 til og med november 1999. Den idømte forrentning svarer til yderligere løbende forrentning af skattekravet efter selskabsskattelovens § 30 med 0,6% pr. påbegyndt måned, til betaling sker.

Sagsøgerne har under denne sag gjort regreskrav gældende over for de sagsøgte. De sagsøgte har anerkendt, at de efter de almindelige erstatningsregler og solidarisk med sagsøgerne er erstatningsansvarlige for skattevæsenets tab, og at de i den forbindelse har regrespligt over for sagsøgerne således, at VB Finans endeligt skal bære halvdelen af tabet og advokat Jepsen og PricewaterhouseCoopers hver ⅙ heraf. Advokat Jepsen og PricewaterhouseCoopers har desuden anerkendt at være erstatningspligtige over for sagsøgerne for hver ⅓ af sagsøgernes yderligere tab, i forbindelse med at disse i medfør af aktieselskabslovens § 115, stk. 2, har betalt boomkostninger, kontrollovtillæg og renter i henhold til selskabsskattelovgivningen til overskudsselskabets konkursbo, den såkaldte merforpligtelse. De sagsøgte har under sagen betalt de beløb med tillæg af renter til sagsøgerne, som de sagsøgte har kunnet anerkende, men har i øvrigt bestridt sagsøgernes tabsopgørelse.

Sagsøgerne har til brug for opgørelsen af den principale påstand over for advokat Jepsen og PricewaterhouseCoopers udarbejdet et støttebilag II, hvoraf bl.a. følgende beregninger fremgår:

». . .

A . . .

| | | |
|---|---|---|
| 1. | Sagsøgernes betaling til konkursbo excl. sagsomkostninger | kr. 14.845.169,00 |
| 2. | Sælgernes berigelse . . . | kr. ÷6.438.990,00 |
| 3. | Køberbankens andel af selve skattebeløbet med tillæg af renter fra 6/11 til 25/5-01 | |
| | . . . | kr. ÷1.487.165,00 |
| | Sælgernes tab før sagsomkostninger | kr. 6.919.014,00 |

B . . .

1) . . .

| | | |
|---|---|---|
| Af nævnte skal sælgerne selv bære kr. 356.154,00 . . . svarende til ⅓ af sælgersidens andel af bruttokravet | kr. | 356.154,00 |
| Rådgiverne skal betale resten | kr. | 6.562.860,00 |

eller kr. 3.281.430,00 hver med tillæg af renter fra den 25. maj 2001.

. . .

C . . .

De sagsomkostninger som sælgerne har betalt til konkursboet på kr. 900.000,00 og den del af egne sagsomkostninger som tidligere er medtaget på kr. 900.000,00 skal fordeles således:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Advokat | kr. | 3.281.430,00 | + | kr. | 442.175,00 | = | kr. 3.723.605,00 |
| Revisor | kr. | 3.281.430,00 | + | kr. | 442.175,00 | = | kr. 3.723.605,00 |

. . .

**2399**

Såfremt banken mod forventning først skal betale procesrente fra sagens anlæg og til betaling sker, skal rådgiverne hver yderligere

I situation B 1 skal hver af rådgiverne betale kr. 442.175,00, som fremkommer således:

Kr. 3.281.430,00: kr. 13.358.004,00 (kr. 14.845.169,00 ÷ kr. 1.487.165,00) × kr. 1.800.000,00.

. . .

*Samlet opgørelse:*

. . .

betale ⅓ af renter på kr. 418.703,00 som indgår i ovennævnte opgørelser. Dette svarer til kr. 139.568,00 for hver af rådgiverne.«

Sagsøgernes principale påstand over for advokat Jepsen og PricewaterhouseCoopers fremkommer herefter ifølge sagsøgernes påstandsdokument af 29. august 2003 således:

». . .

| | | |
|---|---|---|
| 1. Sagsøgte I og II skal i henhold til sagsøgernes støttebilag II-B1 tilsammen betale erstatning på | kr. | 7.447.210,00 |
| 2. De sagsøgte skal endvidere tilsammen yderligere betale | kr. | 279.130,00 |
| såfremt VB Finans A/S under konkurs først skal betale rente fra anmeldelsen i boet | | |
| 3. Samlet krav | kr. | 7.726.340,00 |
| 4. Tidligere indbetalt af sagsøgte I | ÷kr. | 1.313.473,00 |
| 5. Tidligere indbetalt af sagsøgte II | ÷kr. | 1.294.473,00 |

| | | | |
|---|---|---|---|
| 6. Tidligere indbetalt sagsomkostninger fra sagsøgte I og II | ÷kr. | 200.000,00 | |
| I alt | kr. | 4.918.400,00 | |

. . .«                                        Sagsøgernes påstand over for VB Finans fremkommer således:

| | | |
|---|---|---|
| VB Finans' andel af skattekravet (sparet skat af investeringsfondsmidler ikke medregnet i sagsøgernes berigelse) | kr. | 1.068.462,00 |
| VB Finans' indbetaling i januar-februar 2003 af | kr. | 741.340,00 |
| (sparet skat af investeringsfondsmidler medregnet i sagsøgernes berigelse) | | |
| I alt | kr. | 327.122,00 |

Opgørelsen er ikke størrelsesmæssigt bestridt af VB Finans.

Advokat Jepsen har udarbejdet en opgørelse af 23. september 2002 benævnt opgørelse II over sælgernes berigelse og tab samt fordeling heraf. Af opgørelsen fremgår bl.a. følgende:

». . .

*I Overkurs*

. . .

Gæld ifølge overdragelsesbalance

| | |
|---|---|
| Selskabsskatter | 7.921.670,00 |
| . . . | |
| Overkurs | 5.501.172,00 |

*II Sælgernes berigelse*

| | | |
|---|---|---|
| Overkurs, jf. ovenfor | | 5.501.172 |
| Nettolikviditetsfordel (rente 4,125 %): | | |
| . . . | | 937.818 |
| For lidt afsatte skatter i overdragelsesbalance | 8.575.914 | |
| | ÷ 7.921.670 | 654.244 |
| Berigelse pr. 06.11.96 | | 7.093.234 |

*III Sælgernes tab*

| | |
|---|---|
| Skattekravet excl. renter | 8.575.914 |
| Sælgernes berigelse | 7.093.234 |
| Sælgernes tab pr. 06.11.96 | 1.482.680 |

*IV Fordeling af skattekravet incl. procesrenter f.t. 06.11.96-25.05.01, d.v.s. som bruttosag.*

| | Andel | Renter | I alt |
|---|---|---|---|
| Sælgerne berigelsen 7.093.234 | | | |
| ⅛ af tab 247.114 | 7.340.348 | 2.876.499 | 10.216.847 |
| VB Finans A/S u/k | | | |
| 3/6 af tab | 741.340 | 290.513 | 1.031.853 |
| Advokat Jeppe L. Jepsen | | | |
| ⅛ af tab | 247.113 | 96.837 | 343.950 |
| Statsaut. revisor Jan Lütje Hansen | | | |
| ⅛ af tab | 247.113 | 96.837 | 343.950 |
| | 8.575.914 | 3.360.686 | 11.936.600 |

*V Fordeling af skattekravet incl. kontrollovstillæg, selskabsskatterenter og konkursomkostninger pr. 25.05.2001, d.v.s. som mellemformssag og overensstemmende med Højesterets dom.*

| | | |
|---|---:|---:|
| Skattekravet | 8.575.914 | |
| Kontrollovstillæg | 5.000 | 8.580.914 |
| Selskabsskatterenter | | 6.204.255 |
| Konkursboomkostninger | | 60.000 |
| | | 14.845.169 |
| Skattekravet incl. procesrenter pr. 25.05.01 | | 11.936.600 |
| Mertab som følge af sagens karakter af en mellemformssag | | 2.908.569 |
| Nævnte mertab bæres af sælgerne, advokat Jeppe L. Jepsen og statsaut. revisor Jan Lütje Hansen, hver med ⅓, d.v.s. 3 x 969.523 | | 2.908.569 |
| Den endelige fordeling af konkursboets krav Pr. 25.05.01 på kr. 14.845.169 er herefter følgende: | | |
| Sælgerne, jf. IV | 10.216.847 | |
| + ⅓ af mertabet | | 11.186.370 |
| | 969.523 **2400** | |
| VB Finans A/S u/k, jfr. IV | | 1.031.853 |
| Advokat Jeppe L. Jepsen, jfr. IV | 343.950 | |
| + ⅓ af mertabet | 969.523 | 1.313.473 |
| Statsaut. Revisor Jan Lütje Hansen, jfr. IV | 343.953 | |
| + ⅓ af mertabet | 969.523 | 1.313.473 |
| | | 14.845.169 |

VB Finans A/S u/k, advokat Jeppe L. Jepsen og statsaut. revisor Jan Lütje Hansen betaler herudover til sælgerne procesrenter af deres opgjorte andele vedrørende skattekravet, jfr. afsnit IV, f.t. 26.06.01 og til betaling sker. [Parterne er enige om, at der rettelig skulle stå 26.05.01]

*VI Fordeling af de sælgerne pålagte sagsomkostninger på kr. 900.000.*

Nævnte omkostningsbeløb udredes i forhold til parternes andele af det pr. 25.05.01 opgjorte beløb på kr. 14.845.169, hvilket vil sige i følgende (afrundede) forhold:

| | |
|---|---:|
| Sælgerne | 75% |
| VB Finans A/S u/konkurs | 7% |
| Advokat Jeppe L. Jepsen | 9% |
| Statsaut. revisor Jan Lütje Hansen | 9% |
| | 100% |

Det bemærkes, at advokat Jeppe L. Jepsen og stats. aut. revisor Jan Lütje Hansen hver tidligere til dækning af sagsomkostninger har betalt kr. 100.000,00 og således hver kr. 19.000,00 mere end ovennævnte fordelingsopgørelse udviser.«

Der har under sagen været enighed mellem parterne om, at denne opgørelse kan lægges til grund, hvis landsretten for så vidt angår punkt II når frem til, at der ved beregningen af sagsøgernes berigelse skal tillægges skat af investeringsfondshenlæggelser, hvis landsretten for så vidt angår punkt IV når frem til, at sagsøgernes berigelse skal tillægges procesrente for tiden 6. november 1996 til 25. maj 2001, og hvis landsretten for så vidt angår punkt V når frem til, at merforpligtelsen skal bæres af sagsøgerne, advokat Jepsen og PricewaterhouseCoopers med hver 1/3.

Sagsøgerne har foretaget en opgørelse over afholdte sagsomkostninger i forbindelse med hovedsagen, hvoraf bl.a. fremgår, at der er betalt retsafgifter med 501.400 kr. og advokatudgifter med 486.556 kr.

I Rose Brand Poultry A/S II var der på salgstidspunktet indestående investeringsfondsmidler, og der har under sagen været enighed mellem parterne om, at disse i tilfælde af en likvidation af selskabet ville have udløst en skat på 654.244 kr.

Sagen vedrører følgende hovedspørgsmål:

1. Om sagsøgerne ved beregningen af den berigelse, som sagsøgerne ved regresopgøret skal fralægge sig, skal medregne procesrenterne af berigelsen fra sagsanlægget i hovedsagen, den 6. november 1996, til betaling skete den 25. maj 2001.

2. Om sagsøgerne ved beregning af berigelsen skal medregne den merskat af investeringsfondshenlæggelserne, der ville være blevet udløst, hvis selskabet i stedet for at blive solgt var blevet likvideret.

3. Om den del af tabet, der skyldes, at der er tale om en mellemformssag og ikke en bruttosag (merforpligtelsen), skal afholdes af advokat Jepsen og PricewaterhouseCoopers alene med hver halvdelen, eller om sagsøgerne på lige fod med rådgiverne skal deltage i betalingen heraf med 1/3.

4. Fordelingen af sagsomkostningerne i hovedsagen, herunder sagsøgernes egne omkostninger til advokat og retsafgifter, mellem sagsøgerne og de sagsøgte.

5. Om sagsøgerne har krav på renter af deres erstatningskrav, for så vidt angår merforpligtelsen, mod advokat Jepsen og PricewaterhouseCoopers fra den 25. maj 2001, da sagsøgerne foretog betaling over for sagsøgeren i hovedsagen, subsidiært fra den 22. september 2001 i henhold til rentepåkrav af 22. august 2001.

6. Om sagsøgerne har krav på renter af deres erstatningskrav mod VB Finans fra tidspunktet for sagsanlægget i hovedsagen, den 6. november 1996, til den 3. maj 2001, subsidiært fra anmeldelsen over for VB Finans den 3. april 2001 til den 3. maj 2001.

I forbindelse med anken af hovedsagen til Højesteret blev det aftalt, at advokat Jepsens ansvarsforsikringsselskab, Codan Forsikring A/S, og PricewaterhouseCoopers hver betalte 100.000 kr. til sagsøgernes daværende advokat, Klaus Berning, til delvis

dækning af retsafgiften for Højesteret. Advokat Berning anførte i et brev af 22. februar 2000 til Codan Forsikring A/S bl.a. følgende:

»I fortsættelse af min skrivelse af 10. ds. og vore telefonsamtaler tirsdag den 15.02. d.å. med baggrund i skrivelsen har jeg, som jeg meddelte den 15. ds., indbragt Vestre Landsrets dom af 2. ds. For Højesteret . . .

De meddelte under en af vores telefonsamtaler den 15. ds., at under hensyn til, at appellanterne har betalt en retsafgift stor kr. 416.330,-, vil Codan betale et beløb stort kr. 100.000,- af nævnte beløb. Jeg bekræfter samtidig, at der ikke herved ligger nogen anerkendelse af noget erstatningsansvar for advokat Jeppe L. Jepsen, men at Codans accept af at betale nævnte beløb alene udtrykker, at også Codan Forsikring A/S anser det for hensigtsmæssigt, at Vestre Landsrets afgørelse bliver prøvet ved Højesteret.«

Samme dag skrev advokat Berning til PricewaterhouseCoopers' advokat, advokat Jesper Lett, bl.a. følgende:

»Under henvisning til Deres telefax-skrivelse til mig af 16. ds. vedrørende ovennævnte sag vedlægger jeg til

**2401**

Deres orientering kopi af skrivelse af d.d. til Codan Forsikring A/S.

. . .

Jeg tillader mig at forespørge, om revisionsfirmaet på samme måde som Codan Forsikring A/S er indstillet på at deltage i betalingen af en del af udgifterne til erlæggelse af retsafgift henset til den eksorbitante størrelse af samme. Jeg tillader mig at foreslå, at PricewaterhouseCoopers betaler et beløb stort kr. 100.000,-, uden at der heri ligger nogen anerkendelse af noget erstatningsansvar for PriceWaterhouseCoopers, men alene en tilkendegivelse om, at revisionsfirmaet anser det for hensigtsmæssigt, at Højesteret tager stilling til landsrettens afgørelse af 2. ds.«

Af et brev af 3. august 2000 fra advokat Lett til advokat Berning fremgår følgende:

»På vegne af Coopers & Lybrand fremsendes vedlagt i check kr. 100.000,00 som en del af udgifterne til retsafgiften i ovennævnte sag ved anke til Højesteret. Fremsendelsen sker, uden at der heri ligger nogen anerkendelse af noget erstatningsansvar fra PricewaterhouseCoopers. Fremsendelsen af beløbet sker med følgende forbehold:

Såfremt sælger frifindes, skal beløbet tilbagebetales til Coopers & Lybrand. Dernæst sker betalingen med det forbehold, at der ikke over for PriceWaterhouseCoopers senere vil blive gjort noget krav gældende vedrørende fortsat påløbende renter. Sælger må således indbetale den rentebærende del af skattekravet eller selv bære yderligere påløbende renter.«

Ved brev af 3. april 2001 anmeldte advokat Berning sagsøgernes regreskrav over for kurator i VB Finans, advokat Jørgen Holst. I brevet hedder det bl.a.:

»Idet jeg vedlægger kopi af dom afsagt af Vestre Landsret den 2. februar 2000 fremsætter jeg herved på vegne Marie Poulsen, John Bjerregaard Pedersen og Per Bjerregaard Pedersen følgende regreskrav:

V.B. Finans tilpligtes at friholde Marie Poulsen, John Bjerregaard Pedersen og Per Bjerregaard Pedersen for det beløb, som de i henhold til dom af 2. februar 2000, afsagt af Vestre Landsret, er dømt til at betale til Handelsselskabet Vejle 3 af 1993 ApS u/konkurs v/kurator advokat Bjarne L. Petersen. Kravet udgør kr. 13.858.430 med tillæg af rente 0,6% pr. påbegyndt måned af 8.580.914 fra december 1999, til betaling sker, samt forpligtelse til at dække samtlige endeligt godkendte kreditorkrav i det sagsøgende konkursbo, jf. Konkurslovens §§ 93-98, som ikke dækkes af det nævnte beløb. Herudover udgør kravet sagsomkostninger, kr. 500.000

Jeg kan oplyse, at Vestre Landsrets dom af 2. februar 2000 er anket til Højesteret, hvor sagen domsforhandles den 1. og 2. maj 2001. Der tages følgelig forbehold for at ændre det fremsatte regreskrav i overensstemmelse med Højesterets dom.

. . .«

Efter afsigelsen af højesteretsdommen den 10. maj 2001 opfyldte sagsøgerne dommen den 25. maj 2001 ved betaling af 15.684.628 kr., hvoraf hovedstolen udgjorde 13.858.430 kr., renter 926.198 kr. og sagsomkostninger 900.000 kr. Sagsøgerne indbetalte senere de idømte konkursboomkostninger med 60.000 kr.

Af et brev af 22. august 2001 fra sagsøgernes nye advokat, advokat Claus Madsen, til advokat Jesper Lett fremgår følgende:

»Idet jeg henviser til Deres skrivelse af 15. august 2001, kan jeg oplyse, at jeg har videresendt denne til min klient. Mine klienter har noteret sig Højesterets dom og har i den forbindelse naturligvis også opfyldt den, hvorfor mine klienter føler sig »hårdt spændt for«. Af den grund skal jeg venligst anmode Dem om snarest muligt at vende tilbage med Deres oplæg.

Da jeg ikke p.t. er i besiddelse af alle dokumenter, som Advokatfirmaet Klaus Berning måtte have sendt i nærværende sag, er jeg heller ikke klar over, om der tidligere er afgivet rentepåkrav. For god ordens skyld skal jeg blot oplyse, at det er min opfattelse, at forliget skal tage udgangspunkt i en renteberegning og betaling i overensstemmelse med det, der måtte være pålagt mine klienter, samt naturligvis også renter efter det tidspunkt, hvor mine klienter har betalt kravene i henhold til dommen. Såfremt der ikke tidligere er afgivet rentepåkrav, skal denne skrivelse hermed betragtes som et formelt rentepåkrav efter rentelovens regler.«

I marts og april 2002 udspandt der sig en korrespondance om en mulig forligsmæssig løsning på mellemværendet mellem sagsøgerne på den ene side og advokat Jepsen og PricewaterhouseCoopers på den anden side. I et brev af 6. marts 2002 fra advokat Jepsens advokat, advokat Søren Bagger, til advokat Claus Madsen og advokat Jesper Lett ved advokat Mikkel Falkenberg er bl.a. anført følgende:

». . .

Det er mine klienters standpunkt, at sagen må afgøres overensstemmende med praksis inden for selskabstømmersagerne, hvilket indebærer, at berigelse og tab skal opgøres overensstemmende med Thrane-dommens principper, at sælgerne forlods må bære den del af den opnåede berigelse, at tabet opgjort efter »brutto-prinsippet« endeligt fordeles med halvdelen til købersiden, d.v.s. til Varde Banks konkursbo, medens sælgersidens tab fordeles med 1/3 til henholdsvis sælgerne, statsaut. revisor Jan Lütje Hansen og advokat Jeppe L. Jepsen, hvilket ligeledes gælder, for så vidt angår mertabet, der er en følge af det sælgerne pålagte hæftelsesansvar efter aktieselskabslovens § 115, stk. 5.

Jeg har i overensstemmelse hermed udfærdiget vedlagte opgørelse over sælgernes berigelse og tab samt

**2402**

fordeling heraf. Jeg har ved opgørelsens udarbejdelse antaget, at advokat Claus C. Madsens klienter har opfyldt Højesterets dom af 10. maj 2001 og 25. maj 2001, i hvert fald for så vidt angår selve skattekravet incl. selskabsskatterenter og idømte sagsomkostninger for landsret og Højesteret. I det bilagsmateriale, jeg har fået overgivet, findes dog ikke materiale, der viser, om min antagelse er korrekt. Jeg beder venligst advokat Madsen sende mig dokumentation for, hvilke beløb Deres klienter har betalt i forbindelse med opfyldelsen af Højesterets dom.

. . .

De bedes venligst meddele mig Deres klienters stillingtagen til min vedlagte opgørelse, der i det hele bedes betragtet som mine klienters forslag til sagens forligsmæssige afgørelse.

Copyright © 2021 Karnov Group Denmark A/S

...«

I et brev af 20. marts 2002 fra advokat Claus Madsen til advokat Søren Bagger er bl.a. anført følgende:

». . .

Rådgivernes oplæg, senest brev af 6. ds. fra Dem, har været forelagt mine klienter, som ikke kan acceptere forligsdrøftelser ud fra de angivne beløb, som rådgiverne kan anerkende.

Mine klienter har derfor bedt mig snarest og inden onsdag den 27. ds. at indlevere stævning mod rådgiverne på et beløb væsentligt større end ca. 3,2 mio. kr., som fremgår af sidste oplæg.

På dette grundlag må jeg derfor opfordre rådgiverne til at indbetale det beløb, som de mener at kunne anerkende - hvilket jeg ved er praksis i andre lignende sager - således at den kommende retssag i givet fald begrænses til den del parterne er uenige om.

. . .«

I et brev af 21. marts 2002 fra advokat Søren Bagger til advokat Claus Madsen er bl.a. anført følgende:

». . .

Måtte De indgive stævning som bebudet, må De påregne, at det vil blive gjort gældende, at det beror på Deres klienters forhold, at sagen beløbsmæssigt er pustet op.

Jeg skal herved anføre, at advokat Jeppe L. Jepsen kan anerkende regrespligt, for så vidt angår det i min nævnte opgørelse anførte beløb på kr. 1.298.660,00 tillige med procesrenter af kr. 250.839.00 fra den 25. maj 2001, hvorved er forudsat at Deres klienters berigelse og tab kan opgøres som anført i opgørelsen. Såfremt disse basisbeløb må korrigeres, kan advokat Jeppe L. Jepsen anerkende at være pligtig at friholde Deres klienter med udgangspunkt i de korrigerede beløb og efter samme retningslinier som anført i min nævnte opgørelse.

Advokat Jeppe L. Jepsen kan herudover anerkende at være pligtig at friholde Deres klienter for 1/3 af de konkursboomkostninger m.v., som Deres klienter ifølge Højesterets dom er pligtige at betale til Handelsselskabet Vejle 3 af 1993 ApS under konkurs.

. . .«

I et brev af 2. april 2002 fra advokat Mikkel Falkenberg til advokat Claus Madsen er bl.a. anført følgende:

»På vegne af PricewaterhouseCoopers sender jeg vedlagt opgørelse af i dag, sem i pkt. F indeholder en angivelse af det beløb, som PricewaterhouseCoopers kan anerkende regrespligt for, 1.323.566 kr. Beløbet er overført pr. giro til min klientkonto og vil blive videresendt til Dem en af de nærmeste dage.

. . .«

Af et brev af 29. april 2002 fra advokat Falkenberg til advokat Madsen fremgår bl.a. følgende:

». . .

Baggrunden for, at jeg endnu ikke har foretaget betaling som angivet i mit brev af 2. april 2002 med tilhørende opgørelse er som oplyst telefonisk, at de i sagen hidtil foreliggende tabsopgørelser tilsyneladende indeholder en forkert angivelse af overkursbeløbet . . .«

Med brevet fremsendte advokat Falkenberg et acontobeløb på 1 mio. kr., og den 13. november 2002 fremsendte advokat Falkenberg yderligere 338.863,23 kr. til opfyldelse af den resterende del af sagsøgernes krav, som PricewaterhouseCoopers kunne anerkende regrespligt for.

Advokat Søren Bagger har den 15. maj 2002 betalt 1 mio. kr. og den 23. september 2002 yderligere 354.167,18 kr. til opfyldelse af den del af sagsøgernes regreskrav mod advokat Jepsen, som denne kunne anerkende.

VB Finans har i januar/februar 2003 betalt 741.340 kr. med tillæg af procesrente fra den 3. maj 2001 til opfyldelse af den anerkendte del af sagsøgernes krav mod VB Finans.

Under sagen har der indtil domsforhandlingen været uenighed mellem parterne om opgørelsen af sagsøgernes regreskrav, herunder om grundlaget for beregningen af deres berigelse, navnlig størrelsen af overkursen og sagsøgernes likviditetsfordel. I en skrivelse af 28. juli 2003 bad sagsøgernes daværende advokat, advokat Claus Madsen, i den forbindelse Vinderup Kommunes skatteafdeling om at oplyse, hvilke beløb og i hvilke rater sagsøgerne hver for sig har betalt avanceskat vedrørende overdragelsen af Rose Brand Poultry A/S (II).

*John Bjerregaard Pedersen* har vedstået sin forklaring for landsretten i hovedsagen og suppleret forklaret, at han er fjerkræavler og landmand. Han har endvidere været bestyrelsesformand i Vinderup Fjerkræslagteri A/S og medlem af bestyrelsen for Rose Brand Poultry A/S (II). Sidstnævnte selskab var et handelsselskab, som varetog salget for Vinderup Fjerkræslagteri A/S. Han

**2403**

havde ikke noget at gøre med de økonomiske transaktioner i forbindelse med salget af Rose Brand Poultry A/S (II). De blev varetaget af revisor Jan Lütje Hansen og advokat Jeppe L. Jepsen. Han vidste ikke noget til selvfinansieringsforbudet i aktieselskabsloven. Der havde ikke op til salget af Rose Brand Poultry A/S (II) været tale om at likvidere selskabet. Hvis der ikke var sket et salg af selskabet, ville man have udnyttet investeringsfondsmidlerne til investeringer, idet man bl.a. stod over for store investeringer i Vinderup Fjerkræslagteri A/S. Man havde altid udnyttet investeringsfondsmidlerne i koncernens selskaber. Det ville ikke have været på tale at likvidere Rose Brand Poultry A/S (II), bl.a. fordi en likvidation ville have drænet koncernen for en masse penge til betaling af skat. Et tidligere selskab, Rose Brand Poultry A/S (I,) som havde samme ejerkreds som Rose Brand Poultry A/S (II), var blevet likvideret, fordi der på daværende tidspunkt var forløbet et antal år, således at aktieavancebeskatningen blev lempelig, og fordi han og broderen, Per Bjerregaard Pedersen, skulle have penge ud af selskabet for at kunne købe nogle af moderens aktier. I bestyrelsen for Vinderup Fjerkræslagteri sad foruden han selv broderen Per Bjerregaard Pedersen, moderen Marie Poulsen og tidligere statsautoriseret revisor Erik Nielsen. Han hørte på et tidspunkt om muligheden for at sælge Rose Brand Poultry A/S (II) som overskudsselskab til en favorabel kurs og foreslagde dette for bl.a. Erik Nielsen og selskabets revisor, Jan Lütje Hansen. Erik Nielsen var fra starten skeptisk, men undersøgte det nærmere sammen med revisoren. Han havde af Michael Matzen fået at vide, at man i forbindelse med salg af selskabet bare kunne nettoafregne købesummen med de i selskabet stående midler, men Erik Nielsen og revisor Lütje Hansen sagde, at der skulle foreligge en kontant udbetaling. Revisor Lütje Hansen havde ikke stillet noget forslag om at likvidere Rose Brand Poultry A/S (II). Da han, Per Bjerregaard Pedersen og Marie Poulsen blev sagsøgt af Handelsselskabet Vejle 3 af 1993 ApS under konkurs, holdt de et møde med advokat Jeppe L. Jepsen og revisor Jan Lütje Hansen, hvor de blev enige med advokaten og revisoren om at føre retssagen sammen og om at suspendere forældelsesfristen i relation til et eventuelt erstatningsansvar for advokaten og revisoren. Han, hans bror og deres mor har betalt ca. 500.000 kr. i honorar til advokat Hans Peter Jespersen og advokat Klaus Berning i forbindelse med denne retssag. Hertil kommer retsafgifter.

*Per Bjerregaard Pedersen* har vedstået sin forklaring for landsretten i hovedsagen og suppleret forklaret, at han var meddirektør i Vinderup Fjerkræslagteri A/S og Rose Brand Poultry A/S (II) og havde med produktionen at gøre. Han var medlem af bestyrelsen i begge selskaber. Da John Bjerregaard Pedersen sagde, at Rose Brand Poultry A/S (II) kunne sælges som overskudsselskab,

troede han i første omgang ikke på det. De satte Erik Nielsen og revisor Jan Lütje Hansen til at undersøge det, og disse sagde, at der ved et salg ikke måtte ske nettoafregning. Salget blev herefter gennemført, og deres rådgivere klarede de økonomiske ekspeditioner. En likvidation af selskabet var ikke på tale, da de likviditetsmæssigt ikke kunne have klaret den skattebetaling på ca. 8 mio. kr., der ville være blevet udløst. Desuden skulle de bruge de investeringsfondsmidler, der stod i selskabet, til investeringer i maskiner m.v. Koncernen foretog investeringer for ca. 10-20 mio. kr. årligt. Koncernens årlige omsætning var 350-400 mio. kr. Han var ikke involveret i spørgsmålet om rådgiveransvar, herunder suspension af forældelsesfristen, men han var med til et møde hos advokat Hans Peter Jespersen, hvor de blev enige med advokat Jepsen og revisor Lütje Hansen om, at retssagen skulle føres. Bestyrelsesformand i Rose Brand Poultry A/S (II) var vistnok moderens mand, Poul Poulsen. Aktionærerne i selskabet og Erik Nielsen drøftede intenst, hvordan det kunne lade sig gøre at »bruge« skatten i selskabet. Aktionærerne bad Erik Nielsen undersøge det til bunds, og Erik Nielsen har sammen med revisor Lütje Hansen lavet skriftlige notater om det, men han har ikke selv set dem. Selv om de solgte Rose Brand Poultry A/S (II), kunne de finansiere nye investeringer i Vinderup Fjerkræslagteri A/S med de midler, de fik ved salget.

*Advokat Jeppe L. Jepsen* har vedstået sin forklaring for landsretten i hovedsagen og suppplerende forklaret, at han har været advokat for Marie Poulsen i årrække og blev det for koncernen i forbindelse med salget af Rose Brand Poultry A/S (II). De tre aktionærer havde diskuteret salget længe, da han kom ind i billedet. Han havde ikke haft noget at gøre med likvidationen af Rose Brand Poultry A/S (I). Revisor Jan Lütje Hansen var oprindelig »føl« hos Erik Nielsen, da denne fungerede som statsautoriseret revisor, og de havde været revisorer for koncernen i mange år. Også efter Erik Nielsens pensionering var det Erik Nielsen, der havde det store ord på revisorsiden. Først efter grundige overvejelser anbefalede Erik Nielsen selskabssalget, bl.a. ud fra en overvejelse om, at det ville være ansvarspådragende ikke at anbefale det. Alt blev aftalt med aktionærerne efter grundige drøftelser. Erik Nielsen havde lavet et notat om pengestrømme m.m. Han kan ikke udtale sig om, hvorvidt aktionærerne har drøftet muligheden for en likvidation af selskabet, men det er sandsynligt, da der var brug for likviditet. I forbindelse med salget var han opmærksom på forbuddet mod selvfinansiering, men han havde ikke forudset, at domstolene ville nå frem til, at der var tale om selvfinansiering i denne situation. Såvel aktionærerne som rådgiverne troede, at de havde garderet sig. De investeringer, der skulle ske i virksomheden, skulle ske i driftsselskabet, Vinderup

**2404**

Fjerkræslagteri A/S, og ikke i Rose Brand Poultry A/S (II).

*Sagsøgerne* har til støtte for påstandene over for advokat Jepsen og PricewaterhouseCoopers gjort gældende, at det følger af Vestre Landsrets dom af 29. august 2001 (Tidsskrift for Skatter og Afgifter 2001, nr. 860) og af Vestre Landsrets dom af 5. februar 2003 (Tidsskrift for Skatter og Afgifter 2003, nr. 308), at der ikke ved beregningen af sagsøgernes berigelse skal medregnes procesrenter af berigelsen, men at renterne derimod skal medregnes som en del af det tab, der under sagen skal fordeles mellem parterne. I Østre Landsrets dom af 7. juni 2001 (Tidsskrift for Skatter og Afgifter 2001, nr. 570) blev der ganske vist ved beregningen af sælgernes berigelse medregnet procesrenter af berigelsen, men det skyldtes, at dette ikke var bestridt af sælgerne.

Det havde aldrig været på tale at likvidere selskabet, og der var et stort investeringsbehov i koncernen. Derfor kunne investeringsfondshenlæggelserne nemt have været brugt i koncernen. De domme i selskabstømmersager, hvor sælgerne ved

regnskabsopgøret har måttet fralægge sig skatten af de i selskaberne indestående investeringsfondshenlæggelser, er konkret begrundede, ofte med at der faktisk var planer om at likvidere de pågældende selskaber. Da dette ikke er tilfældet i denne sag, skal sagsøgerne ikke ved beregningen af berigelsen medregne den merskat på 654.244 kr., der ville være blevet udløst, hvis selskabet i stedet for at blive solgt var blevet likvideret.

Sagsøgerne havde ikke de fornødne forudsætninger for at vurdere rækkevidden af selvfinansieringsforbuddet i aktieselskabslovens § 115, og det var rådgiverne, navnlig advokat Jepsen, der forestod ekspeditionerne i forbindelse med salget og sagde god for salgsmetoden. Der er derfor ikke grundlag for at pålægge sagsøgerne at betale nogen del af merforpligtelsen, som var en følge af, at sagen på grund af den ulovlige selvfinansiering blev en mellemformssag og ikke en bruttosag. Erik Nielsen var en selvstændig rådgiver, og der skal derfor ikke ske identifikation mellem sagsøgerne og Erik Nielsen i relation til dennes eventuelle viden.

Hovedsagen blev ført i to instanser med de sagsøgtes indforståelse og tillige i disses interesse. Advokat Jepsen og PricewaterhouseCoopers skal som følge heraf foruden at frihode sagsøgerne for en forholdsmæssig del af de i hovedsagen idømte sagsomkostninger også frihode dem for de sagsomkostninger, sagsøgerne har afholdt til egen advokat og retsafgifter, som udgjorde ikke under 900.000 kr. Advokat Jepsen og PricewaterhouseCoopers har ved frivilligt at indbetale hver 100.000 kr. til delvis dækning af retsafgiften for Højesteret accepteret dette.

Sagsøgerne har krav på renter af hele deres krav mod advokat Jepsen og PricewaterhouseCoopers fra den 25. maj 2001, hvor sagsøgerne foretog betaling over for sagsøgeren i hovedsagen. Dette gælder også den del af kravet, som omfatter kontrollovstillæg og konkursboomkostninger samt selskabsskatterenter indtil den 25. maj 2001, hvilken del advokat Jepsen og PricewaterhouseCoopers ikke har anerkendt nogen pligt til at forrente fra den nævnte dato. Subsidiært har sagsøgerne krav på renter af denne del af kravet fra den 22. september 2001, jf. rentelovens § 3, stk. 2, da advokat Claus Madsens brev af 22. august 2001 indeholdt et gyldigt rentepåkrav.

Hvis VB Finans måtte få medhold i, at sagsøgerne ikke har krav på renter af deres erstatningskrav mod VB Finans fra den 6. november 1996 til den 3. maj 2001, hvilken forrentning bl.a. er forudsat i advokat Jepsens opgørelse II af 23. september 2002, stiger sagsøgernes tab med et beløb svarende til det manglende rentebeløb. Dette yderligere tab skal afholdes af sagsøgerne selv med 1/3 og af advokat Jepsen og PricewaterhouseCoopers med 2/3.

Sagsøgerne har over for VB Finans til støtte for deres påstand om betaling af 327.122 kr. gjort gældende, at for lidt afsatte skatter vedrørende investeringsfondshenlæggelser ikke skal medregnes ved opgørelsen af sagsøgernes berigelse. Sagsøgerne har i øvrigt henvist til det, der er gjort gældende herom over for de øvrige sagsøgte.

Sagsøgerne har til støtte for deres rentepåstand over for VB Finans gjort gældende, at den påstand, der blev nedlagt ved sagens anlæg, hvoraf en del er betalt under sagen, er en friholdelsespåstand, der skal dække hele det tab, sagsøgerne har lidt, herunder også renterne. Dette støttes bl.a. af Vestre Landsrets dom af 21. december 2001 (Skat - Aktuel Information 2002, nr. 120).

*Advokat Jepsen* har til støtte for sin frifindelsespåstand gjort gældende, at Højesteret bl.a. i dom af 29. december 2000 (Ugeskrift for Retsvæsen 2001, side 634) har fastslået, at der i mellemformssagen som den foreliggende må ske en opdeling af ansvaret i en del, der vedrører det tab i henhold til dansk rets

almindelige erstatningsregler, der skyldes selve salget (bruttosagsdelen), og en del, der vedrører det videregående tab, der skyldes overtrædelse af selvfinansieringsforbuddet (mellemformsdelen). Der skal derfor foretages en beregning af, hvad der skulle have været afholdt og af hvem, hvis sagen havde været en bruttosag, jf. advokat Jepsens opgørelse II af 23. september 2002, punkt IV. Sagsøgerne er i den forbindelse pligtige forlods at bære den af dem opnåede berigelse med tillæg af procesrenter for tiden 6. november 1996 til 25. maj 2001. Forskellen mellem bruttosagsdelen og det af sagsøgerne faktisk betalte erstatningsbeløb udgør merforpligtelsen, som

**2405**

herefter skal fordeles mellem sagsøgerne og advokat Jepsen og PricewaterhouseCoopers. Hvis sagsøgerne anbringende om, at der ved beregning af berigelsen alene skal tillægges procesrenter fra hovedsagens anlæg, når der er tale om en bruttosag, men ikke når der som her er tale om en mellemformssag, var korrekt, ville det føre til, at en sælger, der i forbindelse med salg til en selskabstømmer tillige overtræder selvfinansieringsforbuddet, ville skulle betale mindre i erstatning, end hvis han var dømt for salget alene. Et sådant resultat ville være åbenbart urimeligt og i strid med Højesterets intentioner.

Der gælder i denne type sager en forhåndsformodning for, at alternativet til af salg af selskabet var en likvidation, som ville have udløst beskatning af selskabets investeringsfondshenlæggelser. Sagsøgerne har alene løftet deres bevisbyrde for, at andre videreførelsesmuligheder ville have været gunstigere end en likvidation. Der er ingen grund til at behandle spørgsmålet om beskatning af investeringsfondshenlæggelser anderledes end spørgsmålet om udløsning af de øvrige latente skatter, som sagsøgerne er dømt til at erstatte i hovedsagen.

Det fremgår af Højesterets dom af 24. november 1999 (Ugeskrift for Retsvæsen 2000, side 365 - »Thrane-dommen«), at udgangspunktet ved fordelingen af merforpligtelsen, som følge af at der er tale om en mellemformssag, er en ligedeling mellem samtlige ansvarlige deltagere på sælgersiden. Sagsøgerne var i denne sag meget aktive i forbindelse med salget af selskabet, og de havde gennem Erik Nielsen fuld viden om, hvad der foregik. Der er derfor ikke grundlag for at fravige udgangspunktet om ligelig fordeling i denne sag.

Advokat Jepsen har anerkendt at betale en forholdsmæssig del af de i hovedsagen idømte sagsomkostninger, og er med betalingen af 100.000 kr. til delvis dækning af retsafgiften for Højesteret gjort op med hans dækning af sagsomkostninger i hovedsagen. Advokat Jepsen har ikke herved accepteret at betale en del af sagsøgernes egne sagsomkostninger, og allerede det forhold, at sagsøgerne ikke burde have nedlagt en frifindelsespåstand i Højesteret, må føre til, at advokat Jepsen ikke kan være forpligtet hertil.

Advokat Jepsen har anerkendt, at den del af sagsøgernes erstatningskrav, der vedrører bruttosagsdelen, forrentes fra den 25. maj 2001. Den del, der vedrører mellemformsdelen, består af selskabsskatterenter, kontrollovstillæg og boomkostninger, som ikke i sig selv er rentebærende. Der er ikke afgivet rentepåkrav, idet bemærkes, at advokat Claus Madsens brev af 22. august 2001 alene er stilet til advokat Jesper Lett. Renter påløber herefter først fra sagens anlæg. Sagsøgte Jepsen har betalt renter af de under sagen indbetalte beløb i overensstemmelse hermed, og sagsøgerne har derfor ikke krav på yderligere renter.

Hvis sagsøgerne ikke måtte få medhold i deres rentepåstand over for VB Finans, kan et derved forøget tab ikke videreføres til de øvrige sagsøgere, da sagsøgerne i så fald hur udvist egen skyld ved ikke at anmelde kravet tidsnok over for VB Finans.

Advokat Jepsen har forud for sagen anerkendt regrespligt, og det beror alene på sagsøgernes vægring ved at forholde sig til udkast til tabsopgørelser og fremkomne med fornødne oplysninger, at sagsøgte Jepsen først henholdsvis den 15. maj 2002 og 23. september 2002 har betalt det skyldige beløb. Hvis advokat Jepsen frifindes, bør han derfor tillægges sagsomkostninger.

*PricewaterhouseCoopers* har til støtte for sin frifindelsespåstand gjort gældende, at der ud fra retsteretspraksis kan udledes en række principper om regresopgørene i selskabstømmersager, herunder *at* sælgeren forlods må afgive sin berigelse, *at* sælgeren i mellemformssager ikke må stilles bedre end i bruttosager, navnlig hvis sælgeren er medansvarlig for overtrædelse af selvfinansieringsforbuddet, *at* der som udgangspunkt sker en ligedeling af tabet mellem de ansvarlige deltagere på sælgersiden, og *at* idømte sagsomkostninger fordeles forholdsmæssigt på de ansvarlige. Det følger endvidere af højesteretspraksis, herunder af Thrane-dommen og af Højesterets dom af 29. december 2000 (Ugeskrift for Retsvæsen 2001, side 634), at sælgerne skal bære berigelsen og deres del af tabet med tillæg af procesrenter.

En likvidation, der ubestridt ville have udløst beskatning af investeringsfondshenlæggelserne, var det mest realistiske alternativ til et salg som sket. Sagsøgerne havde således en gang tidligere likvideret et selskab, Rose Brand Poultry A/S (I), efter en retssag, som gav mulighed for at få penge ud af selskabet med en lempelig beskatning. Denne mulighed blev lukket ved en lovændring i 1993. Derfor har det formodningen for sig, at Rose Brand Poultry A/S (II) ville være blevet likvideret senest i begyndelsen af 1993. Sagsøgerne har ikke sandsynliggjort, at man ville have fortsat driften af selskabet, eller at man lovligt kunne have udnyttet investeringsfondsmidlerne. Sagsøgerne skulle således for at undgå beskatning have købt aktiver i selskabet og beholdt dem længe.

Der er ikke grundlag for at fravige princippet i Thrane-dommen om en ligedeling af tabet på sælgersiden. Sagsøgerne var velorienterede om selvfinansieringsproblemstillingen, og Erik Nielsen havde bl.a. udarbejdet et skriftligt notat herom. Efter retspraksis fører allerede det forhold, at sælgeren har almindelig erfaring med at drive erhvervsmæssig virksomhed, til, at der skal ske en ligedeling af tabet på sælgersiden.

Det følger af Thrane-dommen, at idømte sagsomkostninger som udgangspunkt skal fordeles

**2406**

forholdsmæssigt mellem de ansvarlige. VB Finans' del af sagsomkostningerne skal derfor indgå i fordelingen af sagsomkostningerne mellem de sagsøgte, selv om sagsøgerne ikke har rejst krav herom over for VB Finans. Der er hverken i kraft af aftale eller på andet grundlag hjemmel for sagsøgerne til at kræve egne sagsomkostninger dækket hos de sagsøgte.

PricewaterhouseCoopers havde ikke før sagens anlæg mulighed for at opgøre størrelsen af sagsøgernes krav, navnlig når det gælder fastsættelsen af overkurs og likviditetsfordelen for sagsøgerne. Advokat Claus Madsens brev af 22. august 2001, hvori fremsattes et rentepåkrav, kan derfor ikke tillægges betydning, jf. rentelovens § 3, stk. 3. Derfor påløber rente ikke før sagens anlæg.

Der kan ikke rejses yderligere krav mod de øvrige sagsøgte, i anledning af at sagsøgerne ikke måtte få medhold i deres rentepåstand over for VB Finans, idet sagsøgerne i så fald ved ikke tidligere at have anmeldt kravet over for VB Finans har tilsidesat deres tabsbegrænsningspligt.

*VB Finans* har til støtte for sin frifindelsespåstand vedrørende påstanden om betaling af 327.122 kr. gjort gældende, at der ved beregning af sagsøgernes berigelse skal tillægges merskat af investeringsfondshenlæggelserne i selskabet og har i øvrigt henvist til det, der er anført af de øvrige sagsøgte herom.

Copyright © 2021 Karnov Group Denmark A/S

VB Finans har endvidere gjort gældende, at sagsøgerne ikke har krav på renter før den 3. april 2001, da kravet blev anmeldt over for kurator i VB Finans. Anmeldelse må i den forbindelse sidestilles med retsforfølgning, jf. rentelovens § 3, stk. 4. VB Finans har ikke været inddraget i hovedsagen og kunne, hvis man havde været inddraget tidligere, have betalt det beløb, man mente at skylde, og herved undgå rentetilskrivning. Det må derfor komme sagsøgerne til skade, at man ikke inddrog VB Finans i sagen tidligere.

### Landsrettens begrundelse og resultat:

Efter forklaringerne lægges det til grund, at der var mulighed for at udnytte investeringsfondshenlæggelserne i koncernen, hvis selskabet ikke var blevet solgt. Uanset dette finder landsretten det ikke ved bevisførelsen godtgjort med tilstrækkelig sikkerhed, at sagsøgerne, der rent faktisk valgte at realisere selskabet og ikke udnytte investeringsfondshenlæggelserne, i tilfælde af at selskabet ikke var blevet solgt, ville have udnyttet investeringsfondshenlæggelserne, således at der ikke var udløst beskatning. Sagsøgerne må derfor som en del af deres berigelse forlods fralægge sig det skattebeløb på 654.244 kr., som ville være blevet udløst i tilfælde af en solvent likvidation.

Der har været enighed mellem parterne om, at sagsøgerne, i tilfælde af at Højesteret havde vurderet hovedsagen som en såkaldt bruttosag med den konsekvens, at sagsøgerne alene i henhold til den subsidiære påstand for Højesteret var blevet idømt erstatningsansvar efter dansk rets almindelige erstatningsregler, skulle have betalt procesrente af erstatningsbeløbet fra den 6. november 1996 til den 25. maj 2001. På dette grundlag, og således som sagen i øvrigt er forelagt med opdelingen i brutto- og mellemformsdel, finder landsretten, at den berigelse, som sagsøgerne i opgøret mellem parterne forlods skal fralægge sig, også må omfatte procesrente heraf fra hovedsagens anlæg, til betaling skete. Der har været enighed mellem parterne om, at sagsøgernes berigelse i denne situation kan beregnes som sket i advokat Jepsens opgørelse II af 23. september 2002, punkt IV.

Merforpligtelsen, som følge af at der er tale om en mellemformsag og ikke en bruttosag, udgør herefter forskellen mellem den erstatning, der skulle have været betalt, hvis der var tale om en bruttosag, og den erstatning, der rent faktisk blev betalt, idet der var tale om en mellemformssag. Der har været enighed mellem parterne om, at erstatningsberegningen, hvis landsretten nåede det anførte resultat, skal ske med udgangspunkt i advokat Jepsens opgørelse II af 23. september 2003, punkt II og IV.

Der må ved fordelingen af erstatningsansvaret for merforpligtelsen mellem sagsøgerne og deres rådgivere i henhold til erstatningsansvarslovens § 25, stk. 1, tages udgangspunkt i retningslinjerne i Højesterets dom i Thrane-sagen. Sagsøgerne deltog i ledelsen af selskabet og fik, i forbindelse med at beslutningerne om salgsform m.v. blev truffet, rådgivning fra såvel bestyrelsesmedlem, tidligere statsautoriseret revisor Erik Nielsen som fra eksterne rådgivere. Under disse omstændigheder er der ikke grundlag for at fravige udgangspunktet om, at der skal ske ligedeling af erstatningsansvaret mellem de ansvarlige deltagere på sælgersiden. Fordelingen af erstatningsansvaret for merforpligtelsen skal derfor ske som anført i advokat Jepsens opgørelse II af 23. september, punkt V.

Sagsøgerne har ikke rejst krav over for VB Finans om regres for dennes andel af de i hovedsagen idømte sagsomkostninger. Sagsøgerne må som følge heraf selv bære denne del af sagsomkostningerne, og der er ikke grundlag for at belaste de øvrige sagsøgte med dette beløb. Der er efter det foreliggende ikke indgået nogen aftale mellem advokat Jepsen og PricewaterhouseCoopers og sagsøgerne om, at de sagsøgte skulle afholde en del af

sagsøgernes egne omkostninger til advokat og retsafgifter, og de sagsøgtes indbetalinger af hver 100.000 kr. til delvis dækning af retsafgiften for Højesteret kan ikke anses for en stiltiende accept heraf. Herefter, og da parterne i øvrigt er enige om opgørelsen af disse sagsøgtes andele af de idømte sagsomkostninger, er der ikke

**2407**

grundlag for at pålægge dem at betale yderligere sagsomkostninger til sagsøgerne.

Den del af de af advokat Jepsen og PricewaterhouseCoopers under sagen anerkendte og betalte krav, der vedrører merforpligtelsen, relaterer sig til boomkostninger, skattekontrollovstillæg og renter i henhold til selskabsskattelovgivningen indtil den 25. maj 2001. Med hensyn til forrentningen af dette erstatningskrav bemærkes:

Efter det oplyste var der i 2001 drøftelse mellem sagsøgerne på den ene side og advokat Jepsen og PricewaterhouseCoopers på den anden side om størrelsen af sagsøgernes regreskrav, og over for PricewaterhouseCoopers fremsatte sagsøgerne i skrivelse af 22. august 2001 et »formelt rentepåkrav efter rentelovens regler«. Det er imidlertid tilstrækkeligt godtgjort, at PricewaterhouseCoopers først under sagen har været i stand til at indhente de nærmere oplysninger, som har været nødvendige for at bedømme kravets berettigelse og størrelse, jf. rentelovens § 3, stk. 3. Allerede af denne grund skal PricewaterhouseCoopers først betale procesrente af kravet fra denne sags anlæg den 4. april 2002, jf. rentelovens § 3, stk. 4. Det samme gælder advokat Jepsen, over for hvem der ikke forud for sagen er fremsat noget rentepåkrav. Advokat Jepsen og PricewaterhouseCoopers' renteindbetalinger, som ikke er beløbsmæssigt bestridt, har derfor været korrekt opgjort, og sagsøgernes krav på yderligere renter tages som følge heraf ikke til følge.

Sagsøgerne må som ovenfor anført som en del af deres berigelse forlods fralægge sig et beløb svarende til det skattebeløb på 654.244 kr., som ville være blevet udløst i tilfælde af en solvent likvidation. Sagsøgernes påstand over for VB Finans om betaling af 327.122 kr. tages derfor ikke til følge.

Af skattevæsenets tab skal VB Finans herefter bære 741.340 kr. Om forrentningen heraf bemærkes:

Efter at sagsøgerne den 25. maj 2001 har opfyldt dommen i hovedsagen, herunder med idømte renter, findes deres regreskrav vedrørende skattevæsenets tab over for VB Finans i betragtning af hensynet til at opnå økonomisk ligestilling mellem disse solidarisk erstatningsansvarlige at måtte omfatte rente fra hovedsagens anlæg den 6. november 1996, uanset sagsøgerne for deres vedkommende først ved skrivelse af 3. april 2001 indledte retsforfølgning over for VB Finans for regreskravet. Det kan heller ikke føre til andet resultat, at VB Finans efter det oplyste ikke under sagen har fået nogen underretning om, at sagsøgerne ville gøre regres. Landsretten tager herefter sagsøgernes påstand om forrentning fra 6. november 1996 til følge.

Ved fastsættelsen af sagens omkostninger er det tillagt betydning, at de sagsøgte først under retssagen har betalt de anerkendte beløb. Det er endvidere tillagt betydning, at advokat Jepsen og PricewaterhouseCoopers inden sagens anlæg havde anerkendt erstatningspligten og foreslået erstatningsbeløbene opgjort efter en model svarende til den, der er benyttet ved sagens afgørelse.

### Thi kendes for ret:

De sagsøgte advokat Jeppe L. Jepsen og Revisionsfirmaet PricewaterhouseCoopers frifindes.

Sagsøgte VB Finans A/S under konkurs skal til sagsøgerne, John Bjerregaard Pedersen, Per Bjerregaard Pedersen og Marie Poulsen, betale renter af 741.340 kr. fra den 6. november 1996 til den 3. maj 2001.

Copyright © 2021 Karnov Group Denmark A/S

Sagsøgerne skal betale sagsomkostninger til hver af de sagsøgte advokat Jeppe L. Jepsen og Revisionsfirmaet PricewaterhouseCoopers med 75.000 kr.

Sagsøgte VB Finans A/S under konkurs skal betale sagsomkostninger til sagsøgerne med 30.000 kr.

Det idømte skal betales inden 14 dage.

## Højesteret

### Højesterets dom.

I tidligere instans er afsagt dom af Vestre Landsrets 6. afdeling den 1. december 2003.

I pådømmelsen har deltaget fem dommere: Marie-Louise Andreasen, Lene Pagter Kristensen, Jytte Scharling, Marianne Højgaard Pedersen og Jon Stokholm.

*Påstande*

Appellanterne, John Bjerregaard Pedersen, Per Bjerregaard Pedersen og Marie Poulsen, har endeligt nedlagt påstand om, at indstævnte, advokat Jeppe L. Jepsen, skal betale 969.523 kr., subsidiært et mindre beløb, alt med procesrente fra sagens anlæg.

Advokat Jeppe L. Jepsen har påstået stadfæstelse, dog således at appellanterne skal betale sagsomkostninger for landsretten med et større beløb end 75.000 kr.

For Højesteret drejer sagen sig alene om, hvorvidt advokat Jeppe L. Jepsen skal friholde appellanterne for deres mertab som følge af, at der er tale om en mellemformssag og ikke en bruttosag (merforpligtelsen), samt om størrelsen af sagsomkostningerne for landsretten.

*Supplerende sagsfremstilling*

Det beløb, som advokat Jeppe L. Jepsen forud for sagens anlæg havde anerkendt at skulle betale, var ikke indeholdt i det beløb, som stævningen blev udtaget for.

### Højesterets begrundelse og resultat

Af de grunde, der er anført af landsretten, tiltræder Højesteret, at der ikke er grundlag for at fravige udgangspunktet om, at der ved regresopgøret skal ske ligedeling mellem de ansvarlige på sælgersiden i overensstemmelse med principperne i Højesterets dom af 24. november 1999 (UfR 2000 s. 365/2). Højesteret stadfæster derfor dommen.

**2408**

Efter sagens værdi for henholdsvis landsretten og Højesteret og sagens resultat skal appellanterne betale 200.000 kr. i sagsomkostninger for begge retter.

### Thi kendes for ret:

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for landsret og Højesteret skal John Bjerregaard Pedersen, Per Bjerregaard Pedersen og Marie Poulsen inden 14 dage efter denne højesteretsdoms afsigelse in solidum betale 200.000 kr. til advokat Jeppe L. Jepsen.*

Copyright © 2021 Karnov Group Denmark A/S