# LIONBRIDGE

STATE OF NEW YORK     )
                      )
                      ) ss
                      )
COUNTY OF NEW YORK    )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Danish into English of the attached document U.1939.296H. I affirm that the linguist responsible for producing this translation is fluent in both the Danish and English languages.

_____
Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me
this 6th day of June, 2022.

_____

LAURA E MUSICH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MU6386791
Qualified in Queens County
My Commission Expires 01-28-2023

259 W 30th Street, 11th Floor  New York, NY 10001  +1.212.631.7432

**U.1939.296H**

*Danish government bonds, which according to their terms were to be paid in gold in the U.S., were considered subject to U.S. law, which later prohibited payment in gold. Notwithstanding that the Ministry of Finance issued a confirmation of redemption in the Netherlands, the bonds remained subject to US law.*

*Money system etc. 1, Money system etc. 7 and Money system etc. 5.2")*

- **Currency - Foreign Law.** The Danish State (D) received in 1925, through an American Company A, a loan of 30 million Dollars and later in 1928 a new loan of 55 million dollars. In view of the terms of the bonds contained within the loan contracts, and in particular the provisions that payment be made only at the New York head office of the paying agent, and only in United States gold currency, D's obligations in relation to the bonds were assumed to be subject to US law, such that a resolution of June 5, 1933, prohibiting payment in gold should also apply, something which public policy was not assumed to preclude.[1] That D, due to A having transferred a small part of the loan to Dutch banks, in order that the Bonds might be listed on the Dutch Stock Exchange, had made declarations to the Board of the Stock Exchange for the Redemption and Payment of Interest, etc., in Amsterdam (Rotterdam), did not make the obligations under the bonds independent of the law of the United States, and an exclusion of certain bonds specially connected to Holland was moreover impossible.

**Supreme Court Ruling of January 30, 1939, in case 150/1938\***

*Vereeniging voor den Effectenhandel te Amsterdam*
*(Attorney Jacob Winther)*
against
*Ministry of Finance (Advocate General).*

**The Eastern High Court**
**Eastern High Court Ruling of April 11, 1938 (Department I).**

By Act No. 209 of July 22, 1925, on the Acquisition of State Loans Abroad, the respondent, the Minister of Finance, was authorized to acquire a state loan abroad and to issue for the same 1½% interest-bearing government bonds in an aggregate principal amount not exceeding 30 million North American Dollars (Gold).

In this connection the respondent, who had sought an offer of such a loan only from a number of major groups in the American financial world, without making any inquiries in other countries, accepted an offer from the Guaranty Trust Company of New York for the issue of a loan of 30 million dollars on August 1, 1925, at a rate of 97.27%, and a contract was executed between the said company and the respondent for this on July 27, 1925, whereby the respondent would issue Gold Dollar Bonds in the aggregate principal amount of $30 million. The contract provided, inter alia, that the bonds should be denominated "Kingdom of Denmark Thirty Year 5½% External Loan Gold Bonds", issued to the holder in amounts of 1000 and 500 Dollars and provided with coupons. Principal and interest and all other sums in dollars referred to in the contract are to be paid in United States gold coin of the standard of weight and denomination existing on August 1, 1925, at the principal office of the Guaranty Trust Company in New York, which is designated as the paying agent for the loan. The respondent shall, prior to each interest payment

**297**

date, pay to this office the amount necessary to cover the interest and also, from the time the amortization of the loan is to commence, certain half-yearly amounts into an amortization fund, to be used, with the free decision of the respondent, for the purchase of Bonds, but otherwise to be used for the redemption of bonds by drawing down (something the respondent shall publish a notice about in two New York newspapers, in accordance with regulations); upon such notice the bonds therein specified shall become payable on the stated redemption date at the place in New York specified in the notice. The bonds purchased or redeemed in pursuance thereof were to be immediately surrendered.

The respondent was to sell and deliver to the company within a certain time the Bonds issued under the contract, to be framed in conformity with the requirements of the New York Stock Exchange for registration, as set forth in an appendix attached to the contract, and the company was to purchase all such bonds at a price of 97.27% of their aggregate principal amount, subject to the approval of the company's legal counsel as to their form and validity. Provision was made for the signature of the bonds and coupons on behalf of the respondent, and it was stipulated that the bonds should also have an attestation from the Treasurer's office in New York, and should not be valid without such attestation. The respondent was to pay for the printing of the bonds, etc., and also for any more specific work of the Treasurer's Office. And the company, in case of doubt as to its own or the bondholders' claims under the contract, shall have the right, at the expense of the respondent, to consult with a legal adviser chosen by the company, with binding effect on the borrower.

The Kingdom of Denmark undertook to pay to the holder a specified amount of dollars on the bonds, together with interest thereon at the rate of 5½ per cent per annum. Thereafter it was declared that both principal and interest shall be payable at the principal office of the Guaranty Trust Company, New York, which is the cashier for the loan, in gold coin of the United States of America of or equal to the present standard of weight and denomination. Reference was made to certain provisions in the contract, an extract from which was printed on the reverse of the bonds, the text concluding with a statement that the bond was not valid until authorized by the signature of the treasurer's office at New York on a certificate printed on the bond.

The coupons contained an undertaking to pay to the holder the specified amount of interest at the head office of the Guaranty Trust in New York in United States gold coin of the standard at the date of the bond.

By letter dated July 31, 1925, the firm of Lippmann, Rosenthal & Co, Amsterdam, notified the respondent that it had, together with certain other banking firms, taken over bonds to the amount of 2 million dollars of the loan and offered them for subscription in the Netherlands by a prospectus dated July 29, 1925, a copy of which was attached. This stated that the principal and interest were payable in New York at the Guaranty Trust Company in United States gold coin by its then

---

[1] Cf. U. f. R. 1933 A p. 703 and 1935 A p. 82 with Notes (H. D. D.) as well as 1937 B p. 181-86 and T. f. R. 1937 p. 158 ff. and 1938 p. 46 and 265 ff.

\*        H. R. T. 1938 p. 678.

**298**

weight and denomination, and that in Amsterdam the principal and interest were payable at the New York rate by the issuers of the loan, as this was to be fixed at some time in the future, which information was said to be derived from telegraphic communications from New York. The respondent took note of this.

On November 5, 1925, the said firm wrote to the respondent that it was certainly aware that the firm, in conjunction with the Guaranty Trust Company, had in July, 1925, offered $2,000,000 of the loan in question, and that the firm had applied to the Stock Exchange Committee for the admission of the loan to the Amsterdam and Rotterdam official price lists, which was, of course, quite important, and that the Guaranty Trust Company had already forwarded various documents for use in this connection, but that the Stock Exchange Committee required a declaration signed by the respondent's Ministry, as under its statutes such a declaration was required from the borrower. The company therefore sent an English translation of such a declaration and stated that it would be much obliged to the respondent if he could see his way to returning the declaration signed in duplicate for use in the two towns. The company expressed their confidence that the respondent would have no objection to undertake this, the company pointing out, on the one hand, that the payment of coupons and bonds drawn in Holland was in practice entrusted to the company by the Guaranty Trust Company against the dollars to be received there by the company from Denmark, and, secondly, that the arrangement would mean that all handling and settlement of the bonds would take place in Amsterdam and Rotterdam in the same manner as in New York, which would obviously be of the greatest importance to the loans as an international investment, as it would facilitate future transactions.

On November 11, 1925, the respondent signed the two declarations in English. In these, addressed to the Committees of the Stock Exchange in Amsterdam and Rotterdam respectively, the respondents declared that, with a view to the inclusion of the loan in question in the official price list, they undertook, in particular, to make payable in Amsterdam and Rotterdam at the rate of the day the coupons and bonds of the loan, and to publish in Amsterdam and Rotterdam all notices to the bondholders, and to draw up regularly a list of drawings-down and bonds drawn but not yet issued, and to make in Amsterdam the delivery, if any, of new Bonds and such redemption as may take place of the older ones. These statements were sent by the respondent to the said firm by a letter dated November 18, 1925, in which the respondent stated in particular that it was incumbent upon the firm, on behalf of the Guaranty Trust Company, to make payment in Holland of the coupons and drawn bonds, which transactions the firm was to settle directly with New York, with the Guaranty Trust Company covering the amounts made available by the respondent for that purpose; the respondent drew attention to the fact that, under the terms of the respondent's contract with the said company, there would be no mention in either the bonds or the coupons

**299**

of payment in the Netherlands, and that, moreover, as printing had already commenced, it would hardly be possible to change anything on this point; and with regard to the notices in Holland, the respondent only authorized the company to insert them in one of the leading newspapers in Amsterdam and Rotterdam respectively, and observed that the respondent did not consider it necessary to insert half-yearly notices for the payment of coupons. By letter of November 21, 1925, the company thanked the respondent for the prompt transmission the company's statements and agreed with them.

On November 24, 1925, the Guaranty Trust Company notified the respondent of the offering of the Bonds in the amount of 2 million dollars in Holland and announced that the company, at the request of the Amsterdam Stock Exchange and for the convenience of bond purchasers in Holland, had made arrangements to make coupons and bonds drawn redeemable (collectable) in Amsterdam and Rotterdam at the current rate against reimbursement from the amounts paid by the respondent to the company, which, of course, was not contrary to the contract, as it was a pure banking agreement between the company and the firm above mentioned, but the said firm had notified that its stock exchange, in accordance with the current statutes, wanted a declaration from the respondent on the payment of coupons and bonds drawn and notices to that effect for bondholders in Holland; the company, understanding that the company had made an inquiry of the respondent in this respect, therefore requested the respondent to do all that was possible for the relief of the bondholders in Holland, the company explaining its agreement with the company, that the bondholders might collect the Interest and Principal from the company and its co-contractors, who had promised to purchase at the current rate the coupons and bonds, which were of course in effect payable in New York in United States dollars according to the terms of the bonds and the contract. The company noted that the respondent was of course at liberty as to the notices, as the contract only referred to notices in New York, but the company recommended that the company's wish be acceded to, adding that its agreement with the company was so late that it could not have brought this matter up during the negotiations for the loan for its possible mention in the contract. The respondent replied on December 10, 1925, stating what had already been done, and the company, in a letter dated December 24, 1925, expressed its thanks.

Pursuant to the undertaking thus given by the respondent, the respondent caused the notices published in the New York newspapers to be printed in the Dutch newspapers. In these notices it was stated that the Bonds drawn would be paid by the Trust Department of Guaranty Trust Company of New York, 140 Broadway, New York. The Dutch notices added that, for the convenience of the bondholders, the bonds and coupons drawn will also be redeemed (collected) by the offices of the said company and its counterparties at the rate of purchase of dollar bills at New York on the day on which the Bonds or Coupons are presented for redemption.

By Act No. 112 of April 4, 1928, on the Admission of a State Loan Abroad, the respondent was authorized to admit a state loan abroad and to issue for the same 4½% interest-bearing State Bonds at an

**300**

aggregate amount not exceeding 55 million dollars or the equivalent thereof in pounds sterling.

In consequence, the respondent accepted an offer from the Guaranty Trust Company for the payment of a loan of $55 million on April 15, 1928, at a rate of 93.037%, and a contract for this was executed on April 4, 1928, of similar tenor to the contract of July 27, 1925.

On April 18, 1928, De Twentsche Bank in Amsterdam, which had taken over from the Guaranty Trust Company bonds of this loan amounting to 5 million dollars, wrote to the company's office in London that a number of specified documents, including declarations on the attached form signed by the Kingdom of Denmark, were required for the loan's admission to the Rotterdam and Amsterdam official price lists, and that the board of the Amsterdam Stock Exchange had laid down a

number of conditions as to the text and form of the bonds, including that the legal maturity of coupons and loans should be printed on the bonds. The London office of the company sent the respondent a copy of this letter on May 4, 1928, noting that the required documents were to be obtained from the company's head office in New York, with the exception of the declarations annexed (as well as a declaration of no consequence in this connection), the London office further observed that the conditions established as to the bonds' text and form appeared to be satisfied, except for the requirement of the legal period of prescription; the office stated that this period of prescription must be printed on the bonds, and offered to make the necessary arrangements with the English firm who were to do the printing.

On May 10, 1928, the respondents signed the aforesaid declarations in English, addressed to the boards of the stock exchanges of the two cities. In these the respondent, with reference to the present loan agreed

1) to make interest and redemption payable in Amsterdam (Rotterdam) and this, in the case of their denomination in foreign currency, at a fixed conversion rate or at the daily rate,

2) to issue new coupon sheets, to open admission at Amsterdam (Rotterdam) for the free deposit of counterfoils and the free delivery of coupon sheets, and to publish there all notices to bondholders and periodically a list of bonds drawn and annually a list of bonds drawn but not yet presented for redemption,

3) to give access at Amsterdam (Rotterdam) to the exchange of interim bonds for definitive bonds and the delivery of new bonds in place of lost bonds and the payment, if any, on old bonds, as well as all dealings with respect to bonds,

4) to make it possible to obtain in Amsterdam, free of charge, duplicates of all securities which the board of the respondent has rejected on the ground of what it considers inadequate quality of paper and printing. These declarations were sent by the respondent to the

**301**

London office of the Guaranty Trust with a letter dated May 11, 1928, stating that the respondent had ordered the printer to indicate the legal period of prescription in the text of the bonds in a specified manner. The respondent further noted that, under its contract with the company, the respondent was not obliged to pay the costs which might arise from the obligations contained in the declarations and therefore reserved the right to recover these from the company, with which the company agreed in a letter dated May 15, 1928.

In consequence, a statement was inserted in the text of the bonds to the effect that, in accordance with Danish law, the bond would be void if not presented for payment within 20 years after the date on which its principal was due; and the coupons stated that the coupon was void 20 years after maturity.

On June 5, 1933, the President of the United States confirmed a resolution adopted jointly by the Senate of the United States and the House of Representatives, which provided, inter alia:

Any provision contained in or drawn upon any obligation which purports to entitle the creditor to require payment in gold or in any particular coin or paper money of the United States, or in any amount of currency of the United States measured by the same standard, is declared to be contrary to the public good; and no such provision shall be contained in or drawn upon with respect to any obligation hereafter incurred. Every indebtedness heretofore or hereafter contracted shall, whether it contains such a provision or not, shall be satisfied by payment dollar for dollar in any coin or paper money of any kind which at the time of payment is legal tender for public and private debts.

The Guaranty Trust Company and the respondents have agreed that this provision applies to the loan traded here and have maintained this in the face of protests from Dutch bondholders. In the present case, the Vereeniging voor den Effectenhandel te Amsterdam - being the Stock Exchange of Amsterdam - as owner of Coupons Nos. 22 and 23 for August 1936 and February 1937 for Bond No. 27,952 of the Loan from 1925 and Nos. 12-17 for April 1934-October 1936 for Bonds Nos. 52,508-52,510 of the Loan from 1928, order the respondent to pay the petitioner upon delivery of these coupons at specified banks or banking houses in Amsterdam and Rotterdam, or others of the respondent's choice, either for a sum in Dutch guilders equal to an amount in U.S. dollars, representing the market value of the gold contained in the U.S. gold coin specified in the said coupons, so that the U.S. dollars shall be converted into Dutch guilders at the rate of the day fixed by the said banks and banking houses, or the denominations of the coupons in U.S. gold coin of weight and purity as of August 1, 1925, and April 15, 1928, or in bullion of equivalent weight and purity.

The respondent has pleaded not liable.

In support of its contention, the petitioner submits that the said laws provide for the establishment of a state branch abroad without

**302**

limitation, just as the loans on the bonds are designated as "external loan." It is true that the contracts concluded, as well as the text of the bonds, are specially drawn up with the conditions of the United States in mind, but it is nowhere agreed that the law there should be applied to the conditions of the loan. And these conditions are entirely modified by the declarations of the respondent dated November 11, 1925, and May 10, 1928. The issuance of these was in no way inconsistent with the assumptions made during the negotiations; on the contrary, the remark in the respondent's letter of November 18, 1925, that the fact that printing of the bonds had begun made amendments impossible shows that there were no obstacles in principle to amendments, and the addition of the redemption period in the 1928 bonds also shows the agreement to seek the sale of the bonds in the Netherlands. The Vereeniging voor den Effectenhandel te Amsterdam operates in accordance with its Articles of Association, which have been approved by the King. The Association for the Exchange of Bonds is authorized by the statutes of the association to protect the interests of the bondholders and must comply with the regulations laid down for that purpose, including the promise that, when applying for the government bonds to be included in the price list, a written declaration must be made by the borrower regarding payment in Holland and the conversion of foreign currency; if the respondent has made such a declaration on special request, it must therefore be regarded as an official undertaking to all bond purchasers. The declarations are therefore a change in the obligation of the respondent under the bonds, making them multi-denominated bonds by the undertaking of a conversion rate, and bringing them to the Dutch interest by making them payable in Holland. It is therefore unwarranted, at least from this time, to consider the law of the United States as applicable to the bonds converted under these declarations. The petitioner sees that there may be some doubt as to the extent to which this may be true, but in order to remove any doubt in this case it has proved that the bonds dealt in here, although traded in the Netherlands after the date of the said resolution, June 5, 1933, were owned by Dutch companies before that date and still are. These bonds have been paid in the Netherlands; they cannot therefore be

be governed by the laws of the United States, which are based solely on and construed in accordance with the conditions existing in those States. Dutch law must govern the obligations of the respondent under the bonds, and it does not permit the application of such a rule of law as that contained in the American resolution to bonds such as these, as is shown, inter alia, by the fact that the Dutch Gold Clauses Act of 24 May 1937 expressly exempts from the provisions of the Act, in its § 4, the bonds listed on the Amsterdam Stock Exchange in the price list of the "Vereeniging voor den Effectenhandel". Even if the situation is assessed under Danish law, the result must be the same, since Act No. 254 of November 27, 1936 on gold clauses applies only to obligations in Danish currency.

The respondent, on the other hand, contends that all the circumstances of the admission of the two loans show that they have been and are intended to be dealt with exclusively in accordance with the conditions and laws of the United States, such as the wording of the bonds, their authorization in New York, their payment in dollars there. Even if one

**303**

of these points, e.g. the place of payment, is not considered decisive, there can be no doubt, on the whole, that the obligations of the respondent must be assessed according to the law of the United States, and therefore also on the basis of the resolution of June 5, 1933, which the Guaranty Trust Company has also not disputed. The declarations made by the petitioners cannot alter this. Under the contracts, the Guaranty Trust Company purchased all the bonds and then had full power of disposition over them. Shortly before the negotiations for the termination of the contract of July 27, 1925, the present representative of the company mentioned that the company was negotiating with some banking firms in Holland for the purchase of a part of the bonds, and recommended the respondent to give assistance in this matter if necessary. The respondent was therefore aware of the outer framework of the scheme, partly due to this and partly due to the letter of the firm Lippmann, Rosenthal & Co. ("the firm") of July 31, 1925, by the time the firm's letter of 5 November 1925 was received. It was then clear that the company and the firm had, in fact, made arrangements for payment in Holland, and that only for the purposes of the Stock Exchange Regulations was a statement to that effect required from the respondent. The actual relationship between the company and the firm was not a matter for the respondent, who was unaware, for example, of the purchase price of the bonds sold and of possible agreements for the cancellation of redeemed coupons and bonds. The respondent therefore regarded the request on this point as a mere formality and therefore signed the declaration of payment; the respondent, on the other hand, had some misgivings about requiring payment of the cost of notices, but did so as a matter of goodwill, subject to the limitations set out in the letter of November 18, 1925. The statement of May 10, 1928 contains, for the purposes of the present case, a reproduction of the relevant provision of the Stock Exchange Rules and is therefore also considered to be purely formal; it thus refers to payment in foreign currency at a fixed conversion rate or at the current rate without deciding between these alternatives. Nor can any greater significance have been attached to the declaration from any other point of view, since no question was raised as to the inclusion of a provision to that effect in the bonds, as opposed to what was the case with the Prescription Rule. There was never any desire to do so, and the remark in the respondent's letter of November 18, 1925 that the commencement of printing of the bonds made such inclusion impossible was only a remark intended to prevent any plans to that effect. The declarations were not made public and for that reason alone cannot give the purchasers of the bonds, either before or after June 5, 1933, any grounds to expect that the obligations arising from the bonds would have changed, in which connection the respondent has referred to the fact that under the applicable regulations, the boards of the stock exchanges may waive, inter alia, the provision at issue here. The respondent also pointed out that the annual notices on Danish State loans, which are published in several languages and of which the petitioner must be aware, still only indicate the place of payment of those loans: New York: Guaranty Trust Company. Finally, the respondent submits that, even if the declarations are regarded as

**304**

legal for the bondholders, they do not alter the obligations of the respondents under the bonds, which still amount to payment in dollars only, and must therefore still be judged by the resolution of June 5, 1933, which must be applicable to all indebtedness arising under the laws of the United States, whether payment be made within or outside the States.

In view of the circumstances of the admission of the two loans, in particular the provisions relating to the registration of the bonds in New York as a condition of their validity, to New York being the only authorized place of payment and to the exclusive indication of the amount of the debt in dollars by the bonds and coupons, it is considered that the said resolution of June 5, 1933, with regard to the prohibition of payment in gold or at the value of gold, must be applicable to the respondents under the obligations imposed by the Bonds.

The firm Lippmann, Rosenthal &. Co. is not seen in its letter of November 5, 1925, to the respondent (nor De Twentsche Bank in its letter of April 18, 1928, to the London office of Guaranty Trust Company) to have requested that any change be made in the terms of the loan itself, with particular reference to the place and manner of payment, which the respondent probably could not have effected by himself.

As the company had already settled the matter with the company itself, and did not otherwise specify the details of the arrangement, the letter of November 5, 1925 must naturally be understood as a request to the respondent to make the declaration requested purely for reasons of propriety. As to the contents of the respondent's letter of reply of November 18, 1925, it can only be seen that the letter merely expresses the position taken by the respondent in the present case, that the payment scheme is based on the company's agreements with the Guaranty Trust Company and not on any change in the loan relationship. The making of the declarations of November 11, 1925, and May 10, 1928, were thus carried out solely for the purpose of obtaining a listing of the bonds on the Amsterdam and Rotterdam Stock Exchanges. In view of this, and since the contents of the bonds remained unchanged, the petitioners, as holders of coupons, are not considered to have acquired, by the access created by the declarations for payment in the Netherlands, a legal position different from that which the contract itself conferred, and the respondent must therefore be found not liable, and the petitioner must reimburse the respondent for the costs of the proceedings, amounting to 1500 DKK.

- - -

**Supreme Court**

**Judgment of the Supreme Court.**

The judgment under appeal was delivered by the Eastern High Court. Nine judges participated in the judgment.

From the conditions of the bonds issued in accordance with the two loan contracts, and in particular from the provisions as to their being payable only at the head office of the paying agent in New York, and only in United States gold coin, it must be assumed that

the obligations of the Danish State under the bonds were subject to the laws in force in the United States, as well as to the provisions of

**305**

the joint resolution of June 5, 1933, applied to the bonds.

In the light of the foregoing, and since the so-called public interest cannot be invoked to exclude the provisions of the Resolution in the present case, the only question is whether the legal position has changed as a result of the negotiations on payments etc. on the Dutch stock exchanges and the declarations of December 11, 1925, and May 10, 1928, issued by the Ministry of Finance to the stock exchanges in Amsterdam and Rotterdam in connection therewith.

In this respect the following is noted:

No independent expression is here given that the Danish State has undertaken any obligation to pay according to the value of the gold; the declarations do not give any basis for any other understanding than that the amounts due under the bonds and coupons will be settled in Holland at the rate of the dollar, so that the obligation there is also dependent on the American currency law, and room is thereby left for the effect of changes in that law.

Finally, it is to be noted that, in so far as the claim in the present case is raised only in respect of certain Bonds specifically connected with the Netherlands, all the bonds and coupons relating to the two State loans are very uniform, such that there is no possibility of distinguishing between parts of the loans.

In the light of all the foregoing, the judgment as delivered by the respondent is to be confirmed.

The costs of the proceedings before both courts are found to be payable by the appellant to the respondent in the sum of DKK 600.

***The order of the court:***

*The judgment of the high court should stand. The appellants, Vereeniging voor den Effectenhandel te Amsterdam, shall pay to the respondent, the Ministry of Finance, the costs of the proceedings before both courts in the sum of DKK 6000 within 15 days of the date of the judgment of this Supreme Court.*

Copyright © 2021 Karnov Group Denmark A/S

**U.1939.296H**

*Danske statsobligationer, der ifølge indholdet skulle betales i guld i U.S.A., ansås undergivet amerikansk lovgivning, der senere forbød betaling i guld. Uanset at finansministeriet afgav erklæring om indfrielse i Holland, var obligationerne fortsat undergivet amerikansk lovgivning.*

*Pengevæsen m.v. 1, Pengevæsen m.v. 7 og Pengevæsen m.v. 5.2*

♦ **Mønt - Fremmed Ret.** Den danske Stat (D) optog i 1925 gennem et amerikansk Selskab A et Laan paa 30 Mill. Dollars og senere i 1928 et nyt Laan paa 55 Mill. Dollars. Efter Indholdet af de i Ovsst. m. Laanekontrakterne udstedte Obligationer, navnlig Bestemmelserne om Betalbarhed alene paa Betalingsagentens Hovedkontor i New York og alene i U. S. A.s Guldmønt, antoges D's Forpligtelser efter Obligationerne at være undergivet U. S. A.s Lovgivning, saaledes at ogsaa en Resolution af 5. Juni 1933, hvorefter Betaling i Guld blev forbudt, maatte komme til Anvendelse, hvilket ordre public Hensynet ikke antoges at være til Hinder for.[1] At D i Anledning af, at A havde overdraget en mindre Del af Laanet til hollandske Banker, havde - for at Obligationerne kunne noteres paa hollandsk Børs - afgivet Erklæringer overfor Fondsbørsbestyrelserne om Indfrielse og Udbetaling af Renter m. v. i Amsterdam (Rotterdam), medførte ikke, at Forpligtelsen efter Obligationerne blev uafhængig af U. S. A.s Lovgivning, og en Udsondring af visse særlig til Holland knyttede Obligationer var iøvrigt umuligt.

**H. D. 30. Januar 1939 i sag 150/1938**[*]

*Vereeniging voor den Effectenhandel te Amsterdam (Overretssagfører Jacob Winther)*
mod
*Finansministeriet (Kammeradvokaten).*

### Østre Landsret
#### Østre Landsrets Dom 11. April 1938 (I Afd.).

Ved Lov Nr. 209 af 22. Juli 1925 om Optagelse af Statslaan i Udlandet bemyndigedes Sagsøgte, Finansministeren, til at optage et Statslaan i Udlandet og for samme at udstede 1 ½ pCt. Rente bærende Statsobligationer til et samlet Paalydende Beløb af indtil 30 Millioner nordamerikanske Dollars (Guld).

I Henhold hertil accepterede Sagsøgte, der uden at have foretaget Henvendelser til andre Lande kun havde søgt Tilbud paa et saadant Laan blandt en Række større Grupper indenfor Amerikas Finansverden, et Tilbud fra Guaranty Trust Company of New York om Ydelsen af et Laan paa 30 Millioner Dollars pr. 1. August 1925 til en Kurs af 97,27 pCt., og der oprettedes under 27. Juli 1925 en Kontrakt mellem det nævnte Kompagni og Sagsøgte derom, hvorefter Sagsøgte vilde udstede en Emission af Guld-Dollar-Obligationer til et samlet Kapitalbeløb af 30 Millioner Dollars. I Kontrakten bestemtes bl. a., at Obligationerne skulle betegnes »Kingdom of Denmark Thirty Year 5 ½ pCt. External Loan Gold Bonds«, udstedes til Ihændehaveren i Beløb paa 1000 og 500 Dollars og forsynes med Rentekupons. Hovedstol og Renter og alle andre i Kontrakten omhandlede Beløb i Dollars skulde betales (are to be payables) i De forenede Staters Guldmønt af den Vægt- og Lødighedsstandard, som fandtes den 1. August 1925, paa Guaranty Trust Companys Hovedkontor i New York, som bestemtes til at være Kassererkontor (paying agent) for Laanet. Sagsøgte skulde forud for hver

**297**

Rentetermin til dette Kontor indbetale det nødvendige Beløb til Udredelse af Renten og endvidere fra det Tidspunkt, Laanets Amortisation skulde begynde, bestemte halvaarlige Beløb til et Amortisationsfond, der efter Sagsøgtes Ønske kunde anvendes til Indkøb af Obligationer, men ellers skulde benyttes til Indløsning af Obligationer ved Udtrækning, hvorom Sagsøgte skulde indrykke Bekendtgørelse i to Dagblade i New York efter nærmere Regler; ved saadan Bekendtgørelse forfaldt de deri angivne Obligationer til Betaling paa den opgivne Indløsningsdag paa det Sted i New York, som blev opgivet i Bekendtgørelsen. De i Henhold hertil indkøbte eller indløste Obligationer skulde straks kasseres.

Sagsøgte skulde inden en vis Frist sælge og overlevere til Kompagniet de i Henhold til Kontrakten udstedte Obligationer, der skulde formuleres i Overensstemmelse med de Krav, New York Stock Exchange stillede for Indregistrering, og som var anført i et Kontrakten vedføjet Bilag, og Kompagniet skulde købe samtlige disse Obligationer til en Pris af 97,27 pCt. af deres samlede Paalydende, dog med Forbehold af Kompagniets juridiske Konsulents Godkendelse af deres Form og Gyldighed. Der var fastsat Bestemmelser om, hvorledes Underskrift paa Obligationer og Kuponer skulde ske paa Sagsøgtes Vegne, og det udtaltes, at Obligationerne ogsaa skulde have en Attestationspaategning fra Kassererkontoret i New York og ikke være gyldige uden saadan Paategning. Sagsøgte skulde betale Obligationernes Trykning m. v. og ligeledes Kassererkontorets Arbejde paa nærmere bestemt Maade. Og Kompagniet skulde ved opstaaet Tvivl om dets egen eller Obligationsejernes Krav efter Kontrakten paa Sagsøgtes Bekostning have Ret til med bindende Virkning for Laantageren at raadføre sig med en af Kompagniet valgt juridisk Konsulent.

I Obligationerne forpligtede Kongeriget Danmark sig til at betale Ihændehaveren et nærmere angivet Dollarbeløb med Rente deraf 5 ½ pCt. aarlig. Derefter udtaltes, at baade Hovedstol og Renter betaltes af (are payable at) Guaranty Trust Companys Hovedkontor i New York, der er Kassererkontor for Laanet, i De forenede Staters Guldmønt (gold coin of the Unites States of America) af eller lig med den nuværende Standard for Vægt og Lødighed. Der henvistes til visse Bestemmelser i Kontrakten, hvoraf et Uddrag blev trykt paa Obligationernes Bagside, og Teksten sluttede med en Udtalelse om, at Obligationen ikke var gyldig, før den blev autoriseret ved Underskrift af Kassererkontoret i New York paa en paa Obligationen trykt Attestation.

Rentekuponerne indeholdt et Tilsagn om at betale Ihændehaveren det angivne Rentebeløb ved Guaranty Trusts Hovedkontor i New York i De forenede Staters Guldmønt af den Standard, den havde paa Obligationens Dato.

I Skrivelse af 31. Juli 1925 meddelte Firmaet Lippmann, Rosenthal & Co., Amsterdam, Sagsøgte, at Firmaet sammen med nogle andre Bankier-Firmaer havde overtaget Obligationer til Paalydende 2 Millioner Dollars af Laanet og udbudt disse til Tegning i Holland ved et den 29. Juli 1925 dateret Prospekt, hvoraf Eksemplar vedlagdes. I dette oplystes, at Hovedstol og Renter var betalbar i New York hos Guaranty Trust Company i De forenede Staters Guldmønt af dennes daværende

---

[1]  Jfr. U. f. R. 1933 A p. 703 og 1935 A p. 82 med Noter (H. D. D.) samt 1937 B p. 181-86 og T. f. R. 1937 p. 158 ff. og 1938 p. 46 og 265 ff.
[*]  H. R. T. 1938 p. 678.

**298**

Vægt og Lødighed, og at i Amsterdam Hovedstol og Renter var betalbar hos Laanets Emittenter til New Yorks Kurs, saaledes som denne hver Gang fremtidig skulde blive fastsat, hvilke Oplysninger sagdes at stamme fra telegrafiske Opgivelser fra New York. Sagsøgte tog dette til Efterretning.

Den 5. November 1925 tilskrev det nævnte Firma Sagsøgte, at det sikkert var denne bekendt, at Firmaet i Samarbejde med Guaranty Trust Company i Juli 1925 havde udbudt 2 Millioner Dollars af det heromhandlede Laan, og at Firmaet havde ansøgt Fondsbørskomitéen om Laanets Optagelse paa Kurslisterne i Amsterdam og Rotterdam, hvilket naturligvis var ret vigtigt, samt at Guaranty Trust Company allerede havde fremsendt diverse Dokumenter til Brug i dette Øjemed, men at Fondsbørskomitéen krævede en Erklæring underskrevet af Sagsøgtes Ministerium, da der ifølge dens Vedtægter skulde foreligge en saadan fra Laantageren. Firmaet sendte derfor en engelsk Oversættelse af en saadan Erklæring og udtalte, at det vilde være Sagsøgte meget forbunden, hvis han kunde se Udvej for at tilbagesende Erklæringen underskrevet i to Eksemplarer til Brug i de to Byer. Firmaet udtalte sin Tillid til, at Sagsøgte ikke vilde have nogen Indvending mod at paatage sig dette, idet Firmaet henviste til, dels at Betalingen af Kuponer og udtrukne Obligationer i Holland praktisk talt var overdraget Firmaet af Guaranty Trust Company imod de Dollarbeløb, Kompagniet skulde modtage dertil fra Danmark, og dels, at Ordningen vilde betyde, at enhver Behandling og Bekendtgørelse vedrørende Obligationerne vilde ske i Amsterdam og Rotterdam paa samme Maade som i New York, hvilket selvforstaaeligt vilde være af største Betydning for Laanene som international Kapitalanbringelse, da det vilde lette fremtidige Forretninger.

Sagsøgte underskrev den 11. November 1925 de to omtalte paa Engelsk affattede Erklæringer. I disse, der var stilet til »The Commitee of the Stock Exchange« henholdsvis i Amsterdam og Rotterdam, erklærede Sagsøgte med Henblik paa det heromhandlede Laans Optagelse paa den officielle Kursliste at forpligte sig til bl. a. at gøre Kuponer og udtrukne Obligationer af Laanet betalbare (make payable) i Amsterdam og Rotterdam til Dagskurs (at the rate of the day) og at bekendtgøre i Amsterdam og Rotterdam alle Meddelelser til Obligationsejerne og regelmæssigt at udfærdige en Fortegnelse over Udtrækninger og udtrukne, men endnu ikke fremkomne Obligationer samt i Amsterdam at foretage den eventuelle Udlevering af nye Obligationer og saadan Afbetaling, som maatte finde Sted paa de ældre. Disse Erklæringer sendte Sagsøgte til det nævnte Firma med en Skrivelse af 18. November 1925, hvori sagsøgte bl. a. konstaterede, at det paahvilede Firmaet paa Guaranty Trust Companys Vegne at foretage Betalingen i Holland af Kupons og udtrukne Obligationer, hvilke Forretninger Firmaet skulde afregne direkte med New York med Dækning fra Guaranty Trust Company af de af Sagsøgte dertil til Raadighed stillede Beløb; Sagsøgte henledte Opmærksomheden paa den Kendsgerning, at der efter Vilkaarene i sagsøgtes Kontrakt med det nævnte Kompagni hverken i Obligationerne eller Kuponerne vilde blive nævnt noget om Betalingen i

**299**

Holland, og at det desuden, da Trykningen allerede var begyndt, næppe vilde være muligt at ændre noget paa dette Punkt; og med Hensyn til Bekendtgørelserne i Holland bemyndigede Sagsøgte kun Firmaet til at indrykke disse i een af de ledende Aviser henholdsvis i Amsterdam og Rotterdam og bemærkede, at Sagsøgte ikke fandt det nødvendigt at indrykke halvaarlige Bekendtgørelser om Betalingen af Kuponer. Firmaet takkede i Skrivelse af 21. November 1925 for Sagsøgtes hurtige Fremsendelse af Erklæringerne og erklærede sig enig i sagsøgtes Udtalelser.

Den 24. November 1925 tilskrev Guaranty Trust Company Sagsøgte om Udbydelsen af Obligationerne til Beløb 2 Millioner Dollars i Holland og meddelte, at Kompagniet efter Ønske fra Amsterdams Fondsbørs og til Lettelse for Obligationskøbere i Holland havde truffet Foranstaltninger til at gøre Kuponer og udtrukne Obligationer indløselige (collectable) i Amsterdam og Rotterdam til Dagskurs mod Refusion fra de af Sagsøgte til Kompagniet betalte Beløb, hvilket selvfølgelig ikke stred mod Kontrakten, da det var en ren Bankaftale mellem Kompagniet og det foran nævnte Firma, men at dette Firma havde meddelt, at dets Fondsbørs efter gældende Vedtægter ønskede en Erklæring fra Sagsøgte om Betalingen af Kuponer og udtrukne Obligationer og Bekendtgørelser herom for Obligationsejere i Holland; Kompagniet, som havde forstaaet, at Firmaet havde rettet Henvendelse herom til Sagsøgte, anmodede derfor Sagsøgte om at gøre alt, hvad der var muligt til Lettelse for Obligationsejere i Holland, idet Kompagniet gjorde Rede for sin Aftale med Firmaet om, at Obligationsejerne kunde faa indløst (collect) Renter og Hovedstol hos Firmaet og dets Medkontrahenter, som havde lovet at købe til Dagskurs Kuponerne og Obligationerne, der selvfølgelig i Realiteten var betalbare (payable) i New York i De forenede Staters Dollars efter Obligationernes og Kontraktens Vilkaar. Kompagniet bemærkede, at Sagsøgte selvfølgelig stod frit med Hensyn til Bekendtgørelserne, da Kontrakten kun talte om Bekendtgørelser i New York, men Kompagniet anbefalede at imødekomme Firmaets Ønske, idet det tilføjede, at dets Aftale med Firmaet blev truffet saa sent, at det ikke kunde naas at fremdrage dette Spørgsmaal under Forhandlingerne om Laanet til mulig Omtale i Kontrakten. Sagsøgte besvarede den 10. December 1925 denne Henvendelse med at meddele, hvad der allerede var sket, og Kompagniet takkede i Skrivelse af 24. December 1925 derfor.

I Henhold til det af Sagsøgte saaledes givne Tilsagn har Sagsøgte ladet de i Aviserne i New York indrykkede Bekendtgørelser aftrykke i hollandske Aviser. I disse Bekendtgørelser udtaltes, at de udtrukne Obligationer vilde blive betalt af the Trust Department of Guaranty Trust Company of New York, 140 Broadway, New York. I de hollandske Bekendtgørelser er tilføjet, at til Lettelse for Obligationsejerne vil de udtrukne Obligationer og Kuponer ogsaa blive indløst (collected) af det nævnte Firmas og dets Medkontrahenters Kontorer til den gældende Kurs for Køb af Dollarveksler paa New York paa den Dag, da Obligationerne eller Kuponer præsenteres til Indløsning.

Ved Lov Nr. 112 af 4. April 1928 om Optagelse af et Statslaan i Udlandet bemyndigedes Sagsøgte til at optage et Statslaan i Udlandet og for samme at udstede 4 ½ pCt. Rente bærende Statsobligationer til et

**300**

samlet Paalydende Beløb af indtil 55 Millioner Dollars eller et dertil svarende Beløb i Pund Sterling.

I Henhold hertil accepterede Sagsøgte et Tilbud fra Guaranty Trust Company om Ydelsen af et Laan paa 55 Millioner Dollars pr. 15. April 1928 til en Kurs af 93,037 pCt., og der oprettedes under 4. April 1928 en Kontrakt herom af tilsvarende Indhold som Kontrakten af 27. Juli 1925.

Den 18. April 1928 tilskrev De Twentsche Bank i Amsterdam, der fra Guaranty Trust Company havde overtaget Obligationer af dette Laan til Paalydende 5 Millioner Dollars, Kompagniets Kontor i London, at der for Laanets Optagelse paa Kurslisterne i Rotterdam og Amsterdam krævedes en Række nærmere angivne Dokumenter, deriblandt Erklæringer efter vedlagt Formular, underskrevet af Kongeriget Danmark, og at Bestyrelsen for Amsterdams Fondsbørs

havde fastsat en Række Betingelser angaaende Obligationernes Tekst og Form, deriblandt at den retlige Præskriptionstid for Kuponer og udtrukne Obligationer skulde trykkes paa Obligationerne. Kompagniets Londonkontor sendte den 4. Maj 1928 Sagsøgte en Afskrift af denne Skrivelse og bemærkede, at de krævede Dokumenter skulde fremskaffes fra Kompagniets Hovedkontor i New York med Undtagelse af de omtalte Erklæringer, der vedlagdes, - samt en Erklæring, der er uden Betydning i denne Forbindelse -; Londonkontoret bemærkede videre, at de stillede Betingelser angaaende Obligationernes Tekst og Form syntes opfyldt med Undtagelse af Kravet om den retlige Præskriptionstid; Kontoret udtalte, at denne Præskriptionstid maatte trykkes paa Obligationerne, og tilbød at ordne det fornødne herom med det engelske Firma, som skulde foretage Trykningen.

Den 10. Maj 1928 underskrev Sagsøgte de omtalte, paa Engelsk affattede Erklæringer, der var stilede til Bestyrelserne for Fondsbørs-Organisationerne i de to Byer. I disse tilsiger Sagsøgte med Hensyn til dette Laan

1) at gøre Renter og Indfrielse betalbar (Payable) i Amsterdam (Rotterdam) og dette, i Tilfælde af disses Angivelse i fremmed Mønt, til en fastsat Omregningskurs eller til Dagskurs,

2) naar nye Kuponark udfærdiges, at aabne Adgang i Amsterdam (Rotterdam) til gratis Indlevering af Taloner og gratis Udlevering af Kuponsark, samt bekendtgøre der alle Meddelelser til Obligationsejere og regelmæssigt en Fortegnelse over udtrukne Obligationer og aarligt en Liste over udtrukne, men endnu ikke til Indfrielse fremkomne Obligationer,

3) at give Adgang i Amsterdam (Rotterdam) til Ombytning af Interimsbeviser med endelige Obligationer samt Udlevering af nye Obligationer i Stedet for bortkomne Obligationer og Udbetaling, hvis saadan sker paa gamle Obligationer, saavel som al Behandling med Hensyn til Obligationer,

4) at gøre det muligt i Amsterdam gratis at faa Duplikater af alle Værdipapirer, som Sagsøgtes Bestyrelse har afvist paa Grund af efter dennes Mening ufyldestgørende Papirkvalitet og Tryk.

Disse Erklæringer sendte Sagsøgte Guaranty Trusts Londonkontor

**301**

med en Skrivelse af 11. Maj 1928, hvori oplystes, at Sagsøgte havde givet Trykkeriet Ordre til at anføre den retlige Præskriptionstid i Obligationernes Tekst paa nærmere angiven Maade. Sagsøgte bemærkede derhos, at Sagsøgte efter sin Kontrakt med Kompagniet ikke var forpligtet til at betale de Udgifter, som maatte følge af de i Erklæringerne indeholdte Forpligtelser, og derfor forbeholdt sig at faa disse refunderet af Kompagniet, hvori Kompagniet i Skrivelse af 15. Maj 1928 erklærede sig enig.

Som Følge heraf blev der i Obligationernes Tekst optaget en Udtalelse om, at Obligationen i Overensstemmelse med dansk Lov vilde være ugyldig, hvis den ikke præsenteredes til Betaling inden 20 Aar efter den Dato, paa hvilken dens Hovedstol skulde betales; og paa Kuponerne anførtes, at Kuponen var ugyldig 20 Aar efter Forfaldstid.

Under 5. Juni 1933 stadfæstede Præsidenten for De forenede Stater en af Staternes Senat og Repræsentanternes Hus i Forening vedtaget Resolution, hvori det bl. a. bestemtes:

Alle Bestemmelser, som indeholdes i eller trænes vedrørende enhver Obligation, og som gaar ud paa at give Kreditor Ret til at kræve Betaling i Guld eller i en af De forenede Staters særlige Møntsorter eller Papirpenge eller i et Beløb af De forenede Staters Valuta, som maales efter samme Maalestok, erklæres for at være stridende mod det almene Vel; og ingen saadan Bestemmelse skal indeholdes i eller trænes med Hensyn til nogen Gældsforpligtelse, der herefter indgaas. Enhver Gældsforpligtelse, der hidtil er og fremtidig vil blive indgaaet, skal, enten den indeholder en saadan Bestemmelse, eller der er truffet Aftale i saa Henseende eller ej, opfyldes ved Betaling Dollar for Dollar i enhver Møntsort eller enhver Art Papirpenge, som paa Betalingstidspunktet er lovligt Betalingsmiddel for offentlig og privat Gæld.

Guaranty Trust Company og Sagsøgte har været enige om, at denne Bestemmelse er gældende for de heromhandlede Laan, og har fastholdt dette overfor Protester fra hollandske Obligationsejere.

Under denne Sag har Vereeniging voor den Effectenhandel te Amsterdam - der er Fondsbørsen i Amsterdam - som Ejer af Kuponerne Nr. 22 og 23 for August 1936 og Februar 1937 til Obligation Nr. 27,952 af Laanet af 1925 og Nr. 12-17 for April 1934-Oktober 1936 til Obligationerne Nr. 52,508-52,510 af Laanet af 1928 paastaaet Sagsøgte tilpligtet at betale Sagsøgeren mod Udlevering af disse Kuponer ved nærmere angivne Banker eller Bankierhuse i Amsterdam og Rotterdam eller andre efter Sagsøgtes Valg enten en Sum i hollandske Gylden, svarende til et Beløb i U. S. A.-Dollars, repræsenterende Markedsværdien af det Guld, der indeholdes i den i de nævnte Kuponer angivne U. S. A.Guldmønt, saaledes at U. S. A.-Dollars omveksles til hollandske Gylden til Dagens Kurs, fastsat af de nævnte Banker og Bankierhuse, eller Kuponernes Paalydende i U. S. A.-Guldmønt af Vægt og Finhed som henholdsvis 1. August 1925 og 15. April 1928 eller i Guldbarrer af tilsvarende Vægt og Finhed.

Sagsøgte har paastaaet sig frifundet.

Til Støtte for sin Paastand har Sagsøgeren anført, at de nævnte Love taler om Optagelse af et Statslaan i Udlandet uden nærmere

**302**

Begrænsning, ligesom Laanene paa Obligationerne betegnes som »External Loan«. Det er vel rigtigt, at de afsluttede Kontrakter saavel som Obligationernes Tekst er udformet særlig med Forholdene i De forenede Stater for Øje, men det er intetsteds aftalt, at Lovgivningen der skal anvendes paa Laaneforholdene. Og disse Forhold ændres ganske ved de af Sagsøgte udstedte Erklæringer af 11. November 1925 og 10. Maj 1928. Udstedelsen af disse var paa ingen Maade i Strid med Forudsætninger under Laaneforhandlingerne; tværtimod viser Bemærkningen i sagsøgtes Skrivelse af 18. November 1925 om, at den Omstændighed, at Obligationernes Trykning var begyndt, umuliggjorde Ændringer, at der ikke var principielle Hindringer for Ændringer, og Tilføjelsen om Præskriptionsfristen i Obligationerne af 1928 viser ligeledes Enigheden om at søge Obligationerne afsat i Holland. Vereeniging voor den Effectenhandel te Amsterdam virker efter kongelig godkendte Statutter bl. a. til Varetagelse af Obligationsejernes Interesser og skal overholde de i den Anledning fastsatte reglementariske Bestemmelser, deriblandt Paabud om, at der ved Ansøgning om Statsobligationernes Optagelse paa Kurslisten skal foreligge en skriftlig Erklæring fra Laantageren om Betaling i Holland og om Omregning af udenlandsk Valuta; naar Sagsøgte paa særlig Henvendelse har afgivet en saadan Erklæring, maa denne derfor anses givet som officielt Tilsagn til alle Obligationskøbere. Erklæringerne er derfor en Ændring i sagsøgtes Pligt efter Obligationerne, som gør disse til flermøntede Obligationer ved Tilsagnet om en Omregningskurs og fører dem ind i den hollandske Interessesfære ved at gøre dem betalbare i Holland. Det er derfor i hvert Fald fra dette Tidspunkt uberettiget at anse De forenede Staters Lovgivning for anvendelig paa de Obligationer, der omsættes i Henhold til disse Erklæringer. Sagsøgeren ser vel, at der kan opstaa Tvivl om, i hvilket Omfang dette kan gælde, men har for i denne Sag at afskære Tvivl dokumenteret, at de heromhandlede Obligationer, om end omsat i Holland efter den nævnte Resolutions Dato, den 5. Juni 1933, har været ejet af hollandske Firmaer før dette Tidspunkt og stadig er dette. Disse Obligationer har faaet Betalingssted i Holland; de kan derfor ikke

behandles efter Lovgivningen i De forenede Stater, som udelukkende begrundes af og udformes efter disse Staters Forhold. Det maa være hollandsk Ret, der skal være afgørende for Sagsøgtes Pligter efter Obligationerne, og denne tillader ikke Anvendelse af en saadan Retsregel som den i den amerikanske Resolution indeholdte paa Obligationer som disse, hvilket bl. a. fremgaar af, at den hollandske Lov af 24. Maj 1937 om Guldklausuler i sin § 4 udtrykkelig undtager de paa Amsterdams Børs i »Vereeniging voor den Effectenhandel«s Prisliste noterede Pengelaan fra Lovens Bestemmelser. Selv om Forholdet bedømmes efter dansk Ret, maa Resultatet blive det samme, da Lov Nr. 254 af 27. November 1936 om Guldklausuler kun gælder Forpligtelser i danske Penge.

Sagsøgte har heroverfor hævdet, at alle Omstændighederne ved Optagelsen af de to Laan viser, at de er behandlet og udelukkende tænkt at skulle behandles efter Forholdene og Retsreglerne i De forenede Stater, saaledes Obligationernes Formulering, deres Autorisation i New York, deres Betaling i Dollars sammesteds. Henvisningen til

**303**

Raadførsel med amerikanske Sagførere m. v. Selv om et enkelt af disse Punkter, f. Eks. Betalingsstedet, ikke betragtes som afgørende, kan der efter Laanenes Forhold som Helhed ikke være Tvivl om, at Sagsøgtes Forpligtelser maa bedømmes efter De forenede Staters Ret og derfor ogsaa paa Grundlag af Resolutionen af 5. Juni 1933, hvad Guaranty Trust Company ikke heller har rejst Tvivl om. De af Sagsøgerne paaberaabte Erklæringer kan intet ændre heri. Ifølge Kontrakterne købte Guaranty Trust Company samtlige Obligationer og havde derefter fuld Dispositionsret over dem. Kort før Forhandlingerne om Afslutningen af Kontrakten af 27. Juli 1925 omtalte Kompagniets herværende Repræsentant, at Kompagniet forhandlede med nogle Bankierfirmaer i Holland om Køb af en Del af Obligationerne, og henstillede til Sagsøgte i paakommende Tilfælde at yde Bistand dertil. Sagsøgte var derfor dels derved, dels ved Firmaet Lippmann, Rosenthal & Co.s Skrivelse af 31. Juli 1925 kendt med den ydre Ramme for Ordningen, da Firmaets Skrivelse af 5. November 1925 modtoges. Det var herefter klart, at Kompagniet og Firmaet faktisk havde truffet Arrangement for Udbetaling i Holland, og at der kun af Hensyn til Børsreglementet krævedes en Erklæring fra Sagsøgte derom. Selve Mellemværendet mellem Kompagniet og Firmaet vedkom ikke Sagsøgte, der f. Eks. var ukendt med Købesummen for de solgte Obligationer og mulige Aftaler om Tilintetgørelse af indløste Kuponer og Obligationer. Sagsøgte opfattede derfor Henvendelsen paa dette Punkt som en ren Formssag og underskrev derfor Erklæringen om Udbetaling; Sagsøgte nærede derimod visse Betænkeligheder ved at tilsige Betaling af Udgifter til Bekendtgørelser, men gjorde af Kulance dette med de i Skrivelsen af 18. November 1925 gjorte Begrænsninger. Erklæringen af 10. Maj 1928 indeholder for den her i Betragtning kommende Dels Vedkommende en Gengivelse af den paagældende Bestemmelse i Børsreglementet og er derfor ogsaa betragtet som rent formel; den taler saaledes om Betaling efter fremmed Mønt til en fastsat Omregningskurs eller til Dagskurs uden at træffe Afgørelse mellem disse Alternativer. Der kan ikke heller fra anden Side være tillagt Erklæringen større Betydning, idet der ikke rejstes Spørgsmaal om Optagelse af en Bestemmelse herom i Obligationerne i Modsætning til, hvad der var Tilfældet med Præskriptionsreglen. Ønske herom har aldrig foreligget, og Bemærkningen i sagsøgtes Skrivelse af 18. November 1925 om, at Paabegyndelsen af Obligationernes Trykning umuliggjorde Optagelsen, var kun en Lejlighedsbemærkning, der skulde afskære Planer herom. Erklæringerne er ikke bragt til Offentlighedens Kundskab og kan allerede af den Grund ikke give Obligationskøberne, hverken før eller efter 5. Juni 1933, nogen Forventning om, at Obligationsforholdet skulde være ændret, i hvilken Forbindelse Sagsøgte har henvist til, at efter det paagældende Reglement kan Fondsbørsernes Bestyrelser dispensere bl. a. fra den heromhandlede Bestemmelse. Sagsøgte har endvidere bemærket, at der i de aarlige Meddelelser om danske Statslaan, som udsendes paa flere Sprog og maa være Sagsøgeren bekendt, stadig kun er angivet som Betalingssted for disse Laan: New York: Guaranty Trust Company. Sagsøgte har endelig anført, at selv om Erklæringerne betragtes som retsstiftende for

**304**

Obligationsejerne, ændrer de ikke Sagsøgtes Forpligtelser efter Obligationerne, der stadig kun gaar ud paa Betaling i Dollars og derfor stadig maa bedømmes efter Resolutionen af 5. Juni 1933, der maa være gældende for alle under De forenede Staters Lovgivning faldende Gældsforhold uden Hensyn til, om Betalingen sker i eller udenfor Staterne.

Under Hensyn til Forholdene ved de to Laans Optagelse, hvoraf særlig fremhæves Bestemmelserne om Obligationernes Paategning i New York som Betingelse for deres Gyldighed, om New York som det eneste autoriserede Betalingssted og Obligationernes og Kuponernes udelukkende Angivelse af Skyldbeløbet i Dollars, findes det, at den omtalte Resolution af 5. Juni 1933 med Hensyn til Forbudet mod Betaling i Guld eller efter Guldværdi maa være gældende for de Sagsøgte efter Obligationerne paahvilende Forpligtelser.

Firmaet Lippmann, Rosenthal &. Co. ses ikke i sin Skrivelse af 5. November 1925 til Sagsøgte - saa lidt som De Twentsche Bank i sin Skrivelse af 18. April 1928 til Guaranty Trust Companys Londonkontor - at have fremsat Anmodning om, at der maatte ske nogen Ændring i selve Laaneforholdets Vilkaar med særligt Henblik paa Udbetalingssted og -maade, hvad Sagsøgte formentlig ikke heller kunde have foretaget paa egen Haand.

Da Firmaet i Forvejen selv havde ordnet Forholdet med Kompagniet og iøvrigt ikke nærmere omtalte Enkelthederne i Ordningen, maa Skrivelsen af 5. November 1925 naturlig forstaas som en Anmodning til Sagsøgte om af rent børsmæssige Grunde at afgive den ønskede Erklæring. Hvad angaar Indholdet af Sagsøgtes Svarskrivelse af 18. November 1925 ses det ikke rettere end, at Skrivelsen kun giver Udtryk for det af Sagsøgte under nærværende Sag hævdede Standpunkt, at Udbetalingsordningen hviler paa Firmaets Aftaler med Guaranty Trust Company og ikke paa nogen Ændring af Laaneforholdet I den med Sagsøgte førte Korrespondance findes der saaledes ikke Holdepunkter for, at der skulde være sket en Ændring af selve Laaneforholdet. Afgivelsen af Erklæringerne af 11. November 1925 og 10. Maj 1928 har saaledes udelukkende haft til Formaal at opnaa Obligationernes Notering paa Børserne i Amsterdam og Rotterdam. Under Hensyn hertil, og da Obligationernes Indhold forblev uændret, findes Sagsøgerne som Indehavere af Kupons ikke ved den Adgang, der ved Erklæringerne var aabnet for Betaling i Holland, at have erhvervet en anden Retsstilling end den, selve Laaneforholdet hjemlede, og Sagsøgte vil derfor være at frifinde, og Sagsøgeren vil have at godtgøre Sagsøgte Sagens Omkostninger med 1500 Kr.
- - -

## Højesteret

### Højesterets Dom.

Den indankede Dom er afsagt af Østre Landsret.

I Paadømmelsen har ni Dommere deltaget.

Efter Indholdet af de i Overenstemmelse med de to Laanekontrakter udstedte Obligationer, navnlig Bestemmelserne om Betalbarhed alene paa Betalingsagentens Hovedkontor i New York og alene i de forenede Staters Guldmønt maa det antages, at

den danske Stats Forpligtelser efter Obligationerne blev undergivet den i de forenede Stater gældende Lovgivning, og at

**305**

saaledes ogsaa Bestemmelserne i Joint Resolution af 5. Juni 1933 kom til Anvendelse paa Obligationerne.

Herefter og idet Hensynet til saakaldet ordre public ikke findes at kunne paaberaabes til Udelukkelse af Resolutionens Bestemmelser i nærværende Tilfælde, bliver Spørgsmaalet alene, om Retsstillingen er forandret ved de førte Forhandlinger om Udbetalinger m. v. paa de hollandske Pladser og de i Tilslutning dertil af Finansministeriet til Fondsbørserne i Amsterdam og Rotterdam udstedte Deklarationer af 11. December 1925 og 10. Maj 1928.

I denne Henseende bemærkes følgende:

Der ses ikke heri at være givet selvstændigt Udtryk for, at den danske Stat skulde have paataget sig nogen Forpligtelse til Betaling efter Guldværdi; Deklarationerne giver ikke Holdepunkter for anden Forstaaelse end, at de efter Obligationerne og Kuponerne skyldige Beløb til Lettelse for Obligationsejerne vil blive udredet i Holland efter Kursen for Dollars, saaledes at Forpligtelsen ogsaa der er afhængig af den amerikanske Møntlovgivning og Plads derved er aaben for Virkning af Ændringer i denne.

Endelig bemærkes, - forsaavidt Kravet under denne Sag kun rejses med Hensyn til visse særlig til Holland tilknyttede Obligationer, - at samtlige Obligationer og Kuponer vedrørende de to Statslaan foreligger i ganske ensartet Form, saaledes at der savnes Muligheder for en Udsondring af en Del af Laanene.

Efter alt saaledes foreliggende vil Dommen efter Indstævntes Paastand være at stadfæste.

Sagens Omkostninger for begge Retter findes Appellanten at burde betale til Indstævnte med 6000 Kr.

### *Thi kendes for Ret:*

*Landsrettens Dom bør ved Magt at stande. Sagens Omkostninger for begge Retter betaler Appellanten, Vereeniging voor den Effectenhandel te Amsterdam, til Indstævnte, Finansministeriet, med 6000 Kr. inden 15 Dage efter denne Højesteretsdoms Afsigelse.*

Copyright © 2021 Karnov Group Denmark A/S