CERTIFIED TRANSLATION

**U.2006.1492H**

***Sale of shares to companies owned by the seller's spouse and the seller, respectively, considered taxable grant due to the value of the shares. The deadline for increasing the companies' taxable income has not been exceeded.***
***The tax claim not barred by limitation under the 1908 Act.***

*Money matters etc. 58.3 – Taxes 311.1 – 72.3.*

♦ In June 1989, H acquired the shares in a holding company, F, which was a shell company with a share capital of GBP 100. In the same year, F had an income of DKK 15 million, which

**1493**

had been obtained by the sale of an option to purchase the right of use to an area in Gibraltar. F's financial statements for 1990 showed income of approximately DKK 340,000 and costs of approximately DKK 72,000 and equity of just over DKK 10 million. In October 1989, H sold the shares in F at par to, i.e., the company D, which was owned by her husband, and a company, E, which she owned herself. After the tax assessment authorities, O, at a meeting with the Danish State Prosecutor for Serious Economic Crime (SØK) on 1 October 1997 had become aware of the share transactions and of subsequent transactions in D and E, O increased D's and E's taxable income for the income years 1990 and 1991 on the grounds that a taxable contribution had been provided in the transactions. D and E brought the cases before the High Court which found for the Danish Ministry of Taxation. The Supreme Court affirmed the judgment. The High Court and the Supreme Court found that the value of the shares in F at the time of the transfer had significantly exceeded the nominal value of the shares of GBP 100 and thus the purchase price that H obtained when she sold the shares at par. It was considered that in 1989 there was no market for the sale of shares in companies with an activity such as F's, and that the transaction had taken place between parties with a special sense of community and insight into F's activity and possibility of earnings. O's assessment of the taxable subsidies based on an equity value of just over DKK 8 million did not have any shortcomings that could justify a breach and when O had only become aware of the circumstances of the transactions, the deadline under section 35 (1) of the then applicable Danish Tax Agency Act (*skattestyrelsesloven*)

*Tax year 1991/92*

|  |  |
|---|---|
| Loans considered liquidation distribution from F with | DKK 425,000 |
| Unapproved interest deduction | DKK 15,200 |

*Tax year 1992/93:*

|  |  |
|---|---|
| Loans considered liquidation distribution from F with | DKK 1,900,000 |
| Unapproved interest deduction | DKK 50,810 |

The case has been heard with the company's attorney.
The appeal relates to the fact that declared loans are considered to be advance liquidation distribution from the company F, and that declared interest costs have consequently not been approved.

for assessing D's and E's incomes had not been exceeded.[1] For the same reason, the tax claims were not barred by limitation under the 1908 Act.[2]

**H.D. 16 February 2006 in case 66/2003 (1st division)**

*D and E (Attorney Peter Krarup, Copenhagen.)*
vs.
*The Danish Ministry of Taxation (Kammeradvokaten, the Legal Adviser to the Danish Government, represented by Attorney Steffen Sværke, Copenhagen).*

**Eastern High Court of Denmark**

***Judgment of the Eastern High Court on 20 December 2002 (2nd division)***

(Ulla Staal, Ebbe Christensen, Lone Kerrm-Jespersen (acting)). In these cases, which have both been brought on 28 December 2000 and heard together, D has submitted the following final claims:
Primary claim:
The plaintiff's taxable income for the tax year 1991/92 (income year 1990) is reduced by DKK 2,003,584.
Alternative claim:
The defendant, the Ministry of Taxation, is ordered to admit that the tax claim relating to the tax year 1991/92 (income year 1990) is barred by limitation. Second alternative claim:
The defendant, the Ministry of Taxation, is ordered to admit that any tax claim above DKK 176,080 relating to the tax year 1991/92 (income year 1990) is barred by limitation.
Third alternative claim:
The plaintiff's taxable income for the tax year 1991/92 (income year 1990) is reduced by a smaller amount than DKK 2,003,584 as estimated by the Court.
E has submitted identical final claims, however, the amount in the second alternative claim is DKK 107,200.
The defendant, the Ministry of Taxation, has claimed, in accordance with its final claim, that the claims of both plaintiffs be dismissed, in the alternative that the assessment of the plaintiffs' taxable income for the tax year 1991/92 be remitted for reconsideration by the assessment authorities.
*Facts of the case: The Danish National Tax Tribunal's rulings:*
On 28 November 2000, the National Tax Tribunal delivered the following ruling concerning D:
"The appeal relates to the statements of income on the following points:

It appears from the information in the case that the appealing company ("the company") was formed on 12 April 1989 and was owned by State-Authorised Public Accountant G. G's spouse, H, owned the shares in the company E, which was also formed on 12 April 1989.

---

**1** U 1998.1110/2 H, TfS 1992.19 Ø, TfS 1998.444, TfS 2004.449, TfS 2004.846, Engholm Jakobsen and others: Skatteretten III, 3rd ed., (2000), p. 641, Bent Christensen: Forvaltningsret. Prøvelse 2nd ed. (1994), p. 71, Jens Garde and others: Forvaltningsret. Almindelige emner, 4th ed. (2004), p. 225 and 456, Poul Bostrup and others: Skattestyrelsesloven med kommentarer (2000), p. 472, and Jan Pedersen and others: Skatteretten I, 4th ed. (2004), p. 435.
**2** U 1989.1046 H, U 1998.1485 H, bet. 1339/1997, pp. 17 and 26, bet. 1426/2003, p. 78, Poul Bostrup and others: Skattestyrelsesloven med kommentarer (2000), p. 476, and Engholm Jakobsen and others: Skatteretten III, 3 udg. (2000), p. 549.

H, a former bank manager of - - -, resigned at the end of May 1989 and then in the summer of 1989 established an independent financial

**1494**

advisory business in the company I, in which the company and E each owned 50%.

On 12 June 1989, H acquired the shares in a shell company, the company F ("the subsidiary"), which had a share capital of GBP 100. On 2 October 1989, she sold the shares in the subsidiary to the company, E, and J, respectively, at par. The company and E each acquired 25% of the share capital, whereas J acquired the remaining 50%.

On 16 June 1989, the subsidiary acquired an option from Crown Lands Department Gibraltar for some plots of land in Gibraltar.

Around 12 July 1989, the subsidiary entered into an agreement ("the F agreement") with JPC Gibraltar Ltd. The agreement states, i.a., that JPC exercises the option on two plots of land by payment of DKK 15 million per plot of land. At the same time, the subsidiary undertook to pay DKK 12 million to JPC as a subordinated loan upon receipt of the payment of DKK 15 million for one of the options. The loan could, i.a., be terminated with immediate effect if JPC Gibraltar Ltd. entered into an agreement with a co-investor on the completion of the construction project.

In a report to SØK of 7 April 1993, H and G stated, i.a., that the Rex agreement was a sales agreement (mandate agreement), under which the subsidiary undertook an obligation to sell the built-up areas on the plots of land in question. The payment for this consisted of an upfront payment of DKK 3 million and a success fee depending on the selling prices. If the selling prices turned out as expected, the success fee would amount to DKK 12 million. The reason why the agreement was referred to as concerning transfer of an option and subordinated loan capital was tax considerations, as the subsidiary was a so-called resident company which under Gibraltarian tax rules is fully taxable with 35% tax on its income except for capital gains, including payment for an option.

On 4 August 1989, JPC Gibraltar Ltd. acquired the right of use to the plots of land in question from The Land Crown Gibraltar. By invoice no. 90001 of 18 September 1989 to JPC Gibraltar Ltd., the subsidiary requested payment of DKK 15 million under the Rex agreement. At the same time, the subsidiary confirmed that DKK 12 million of this amount was to be held as subordinated loan capital in JPC Gibraltar Ltd. and requested the transfer of DKK 3 million to the subsidiary's account in ABG-Bank, Gibraltar.

According to the agreement of 20 December 1989, the company borrowed DKK 425,000 from the subsidiary which carried an interest of 10% p.a. and was repayable on 1 March 1993. On 21 December 1989, DKK 425,000 was transferred from the subsidiary's bank account to the company's bank account. The subsidiary granted similar loans to the other shareholders in proportion to their shares in the subsidiary. In the autumn of 1990, JPC Gibraltar Ltd started cooperating with others on the construction project, and as a consequence, the subsidiary requested JPC Gibraltar Ltd. to repay the subordinated loan capital of DKK 12 million, which was effected on 15 November 1990.

Pursuant to a new loan agreement of 20 November 1990, the subsidiary transferred DKK 1.9 million to the company on 21 November 1990. According to the agreement, the loan carried an interest of 10% p.a. and was not repayable until 1 March 1993. The subsidiary granted similar loans to the other shareholders in proportion to their shares in the subsidiary.

On 2 October 1992, G contacted the audit firm Ernst & Young with a view to liquidating the subsidiary and the company was finally wound up on 16 January 1995. The

total liquidation proceeds amounted to DKK 9,576,396, of which the company's share amounted to DKK 2,394,099. According to the set-off confirmation of 16 January 1995 from the shareholders, the set-off of the above loan against the liquidation proceeds of the subsidiary was accepted and there was no actual repayment of the loans. The remaining proceeds for the company amounted to DKK 3,089 which was paid to the company on 25 January 1995.

It appears from the company's financial statements for 1989/90, the statement of the company's liabilities as at 30 April 1990, that the company had a debt to an associated company of DKK 440,200. It also appears that the company's assets totalled DKK 7,052,839. The company's financial statements for 1990/91, the statement of the company's liabilities as at 30 April 1991, show, i.a., that debts to the associated company amounted to DKK 2,468,664. The financial statements also show that the company's assets totalled DKK 13,656,952.

Draft financial statements of F for 1989 have been submitted which show, i.a., that the equity as at 31.12.1989 amounted to DKK 2,014,338 and that this company had an outstanding amount with JPC (Gibraltar) Ltd. of DKK 12 million under the Rex agreement. In the financial statements, the subordinated contributed capital for that year was written down to 0, as its value depended, i.a., on the subsequent sale of the construction project.

Furthermore, draft financial statements of F for 1990 have been submitted, showing, i.a., that the equity as at 31.12.1990 amounted to DKK 9,706,694, and that the subordinated contributed capital in JPC (Gibraltar) Ltd. had been repaid in that year. The financial statements also show that the company had incurred advisory fees costs of DKK 4,600,000 in that year.

G, among others, was indicted for fraud under section 279 of the Danish Criminal Code (*straffeloven*), in the alternative for wilful mismanagement under section 280 of the Danish Criminal Code, for having unlawfully induced, reinforced or exploited, in the summer of 1989 in Gibraltar, the mistake with JPC (International) Ltd. that the company

**1495**

F held an option with the right to exercise and develop two areas, whereby JPC (Gibraltar) Ltd. was ordered to pay, first, on 6.10.1989, DKK 3 million and then on 12.11.1989 [correctly: 1990] DKK 12 million to F, which payments were irrelevant to the construction project. By judgment of 5 February 1995 of the District Court of Ballerup, Denmark, the two majority shareholders were acquitted of this charge, as the District Court noted, i.a., that the Rex agreement was allegedly for tax reasons designed as the transfer of an option on the two areas and the establishment of a subordinated loan of DKK 12 million to JPC, and based on the evidence in the case, it had to be presumed that this structure with an option was consistent with reality. Following the evidence, particularly the concurring statements made, the Court nevertheless found that there was no sufficient basis for setting aside the defence attorneys' argument that the agreement was in fact a sales and marketing agreement and that the fee under the agreement was paid by JPC. Hence, it had not been established with the certainty necessary for conviction that the defendants had done wrong as described in the indictment.

In a ruling of 29 September 2000, the National Tax Tribunal has made an advance decision on the attorney's primary claim for invalidity, as the Tribunal did not find that the appealed decision had a material defect that could lead to the invalidity of the decision and further that the assessment had not been made after the expiry of the deadline in the then applicable section 35 (1) of the Danish Tax Agency Act, as this deadline had been suspended, cf. the then applicable section 34 (4) of the Danish Tax Agency Act.

In the appealed assessments, the Region has found that the company's taxable income for the tax years 1991/92 and 1992/93 must be increased by DKK 440,200 and DKK 1,950,810, respectively, relating to

liquidation distributions from and unapproved interest costs to the subsidiary.

In that regard, it has been taken into account that the payments received in 1989 and 1990, declared as shareholder loans from the subsidiary, are regarded as advance distributions of liquidation proceeds and therefore, no deductions have been approved for interest on shareholder loans.

It has furthermore been taken into account, i.a., that there does not seem to have been any actual commercial activity in the subsidiary and that the activity appears to be centred solely on a number of transactions related to the Rex agreement and the agreement with Scott Marketing Ltd. The level of activity can be divided into two stages. The first stage, i.e. the first part of the Rex agreement, consists of the payment of DKK 3 million to the subsidiary from JPC, which becomes a reality when JPC acquires the plots/the right of use to the plots of land on 4 August 1989. The cost of approximately DKK 1 million to Scott Marketing can, based on the material, already be considered a reality at the time when the subsidiary acquires the option from the Gibraltar government without payment. The parties, in particular H, must be aware of this due to her negotiations with Scott Marketing Ltd. The agreement was signed on 14 June 1989.

The second stage, i.e. the second part of the Rex agreement consists of the repayment of the subordinated loan of DKK 12 million to the subsidiary from JPC and becomes a reality in the autumn of 1990 with the formation of U, which had already been announced in December 1989. In the Region's view, the subsidiary was in fact ready for liquidation at that time. It is stated in a note of 9 October 1992 that when it was announced in December 1989 that Baltica considered entering into an agreement with JPC (Gibraltar) Ltd. to develop area C, the subsidiary no longer expected to need immediate liquidity. No plans or completion of subsequent activity are seen.

The parties knew, which is stated in various proposals for building corporate structures in Gibraltar, the tax rules in Denmark with regard to the liquidation of foreign subsidiaries. Since in December 1989 the capital of the subsidiary had only been held for a few months, it was not possible to liquidate the subsidiary until 2 October 1992 without this having any tax consequences. Since the company law rules in Gibraltar allowed for the possibility of shareholder loans, the shareholders opted instead for this option in order to withdraw the funds back to Denmark.

Subsequently, the shareholders of the subsidiary agreed to set off the shareholder loans against the total liquidation proceeds which could already be calculated with a high degree of certainty at the end of 1989. The fact that this is an advance distribution of liquidation proceeds is also supported by the fact that the funds transferred to the subsidiary have been distributed as far as possible to the shareholders as a direct continuation of the payments in the same proportion as their shareholdings, which is presumed to have been effected by decision of the shareholders of the subsidiary.

In conclusion, the Region thus finds that the shareholders were aware or should be aware that the payment of the shareholder loans was in fact an advance payment of liquidation proceeds to be taxed in Denmark. The region furthermore finds that the dividend cannot be repatriated as tax-free dividend under section 13 (3) of the Danish Corporation Tax Act, as this requires that the dividend originates from a company that is taxed according to rules that do not significantly differ from the rules in this country. For the income year 1990 for the subsidiary, cf. the financial statements for the income year 1990, there was no taxation of the part of

*Tax year 1991/92:*

**1496**

the company's income that derives from its activity in Gibraltar.

As regards non-approved interest costs, the Region has, i.a., taken into account that since the transfers are not recognised as loans for tax purposes, there is no right to deduct interest costs. It is noted that the interest was not paid but was attributable to the shareholder loans shown in the financial statements.

The company's attorney has claimed that the appealed assessments be reduced to 0, submitting that it is not possible at this stage to tax any contribution in connection with the transfer of the shares because of limitation.

**The National Tax Tribunal states:**

At the time of the subsidiary's granting of the loans in question, the subsidiary was not in liquidation and was not insolvent at that time, so there is no reason to believe that the loans were manifestly irrecoverable at the time when the loan agreements were concluded. Taking this into account, i.a., the Tribunal finds no basis for disregarding the financial statements, which showed that they were loans, and the appealed assessments will therefore be reduced by DKK 425,000 and DKK 1,900,000, respectively, plus interest on the loans by DKK 15,200 and DKK 50,810.

However, the Tribunal finds that the company received a taxable contribution from the majority shareholder's spouse in connection with the company's acquisition of the shares in F on 2.10.1989 for a purchase price of GBP 25. It has been taken into account that the subsidiary's equity as of 31.12.1989 had been calculated at DKK 2,014,338, to which should be added that the subsidiary, at the time of the transfer, had a deposit of DKK 12 million in JPC (Gibraltar) Ltd., which, at the time of the calculation of the equity as at 31.12.1989, had been written down to DKK 0. Against this background, the Tribunal finds that the company paid a significant discount on the acquisition of the shares in the subsidiary and that this discount can only be justified by the common interest of the parties. As regards the calculation of the taxable contribution, the Tribunal finds that the subsidiary's equity as at 31.12.1989 according to the financial statements must be taken into account and the Tribunal furthermore finds that the fee of an additional DKK 12 million from JPC (Gibraltar) Ltd. must be included, as the subsidiary had already at that time acquired the right to this additional fee. However, the Tribunal finds that based solely on an estimate, the fee must be included by 50% or DKK 6,000,000, taking into account that at the time of the transfer there was some uncertainty regarding the time of the final payment and the size of the costs associated with the acquisition of the fee. The value of the transferred shares in the subsidiary must thus be calculated on the basis of an equity value of the subsidiary of a total of DKK 8,014,338, so that the company is considered to have received a taxable contribution of 25% or a total of DKK 2,003,584 at the time of the income assessment for the tax year 1991/92.

The Tribunal does not find that the rules on deadlines for the increase of the assessments in the then applicable section 35 (1) of the Danish Tax Agency Act preclude such an assessment, as these deadlines, once an assessment has been appealed, do not apply to increases concerning the appealed matter, cf. the then applicable section 35 (4) of the Danish Tax Agency Act. In that regard, it is noted that the Customs and Tax Region's assessment was made on the basis of an overall assessment of the agreements concluded between the company, the subsidiary and the other parties.

*The following is determined:*

Copyright © 2021 Karnov Group Denmark A/S

| | |
|---|---|
| Loan considered liquidation distribution from F with DKK 425,000 is reduced to | DKK 0 |
| Interest deduction is approved with | DKK 15,200 |
| Increase with taxable contribution in connection with the purchase of shares at a discount | DKK 2,003,584 |

*Tax year 1992/93:*

| | |
|---|---|
| Loans considered liquidation distribution from F with DKK 1,900,000 is reduced to | DKK 0 |
| Interest deduction is approved with | DKK 50,810" |

The National Tax Tribunal's ruling of 29 September 2000 concerning D and relating to the exceeding of the deadline for assessments states as follows:

". . .

As regards the question of the suspension of the limitation deadline, the Region has, i.a., considered that the entire set of agreements rested on a fictitious basis without the tax authorities being able to see through the situation.

The company's representative has before the National Tax Tribunal primarily claimed that the appealed assessments are invalid.

. . .

It is furthermore submitted that the possibility of amending the tax assessment is barred by limitation under section 35 (1) of the Danish Tax Agency Act, as neither the companies nor anyone on their behalf have intentionally or grossly negligently caused the tax authorities to make the assessments for the years in question on an incorrect or incomplete basis. It is a fact that the assessment was made long after the expiry of the assessment deadline, and it is a condition for the suspension of the deadline partly that the taxpayer's conduct has been grossly negligent, partly that there is a causal link between the taxpayer's conduct and the incorrect tax assessment. The companies' financial statements contain information on participating interests in associated companies and

**1497**

on debt to associated companies, but not information on exactly which associated company is involved. It has been submitted that there were good reasons for these omissions and that the omissions were insignificant in relation to the main consideration in the Danish Financial Statements Act (*årsregnskabsloven*) on the true and fair view, and therefore, it must be considered highly doubtful whether the Danish Financial Statements Act has been violated. Furthermore, there is no causal link between these omissions and the assessment made. The information provided in the financial statements has been fully sufficient to ensure that the similar authorities have had the necessary basis to obtain – if requested – the missing formal information on name, registered office and share in the associated company and on this basis make assessments for the appealing company. The conditions for suspension are therefore not met and the assessments must be deemed to be barred by limitation.

At the hearing, the Customs and Tax Region recommended, on behalf of the Danish Tax Agency, that the assessments should not be considered invalid, referring, i.a., to the District Court's judgment of 2 February 1995, which did not come to the attention of the tax authorities until at a meeting with the SØK on 1 October 1997. The judgment contains a large number of statements regarding the agreements entered into, including that fictitious option and loan agreements had been concluded for tax reasons.

. . . Reference has also been made to the SØK report on the questioning of the auditor of the companies, which states that there have been in-depth discussions between the auditor and G on what information should be included in or omitted from the financial statements. Hence, the tax authorities have been in unpredictable ignorance

about the context of the case, until they came into possession of SØK's material in October 1997. With regard to suspension, an overall assessment must be made, taking into account the fact that the majority shareholders of the two companies deliberately entered into fictitious agreements and were well aware that difficulties could arise if the companies' financial statements revealed too much about the underlying facts and taking into account that the full information only came to light in connection with the criminal case where the majority shareholders had to come into the open to avoid conviction for fraud.

**The National Tax Tribunal states:**

. . .

As regards the declaration of invalidity by reason of limitation as stated by the representative, the Tribunal states that section 35 (4) of the Danish Tax Agency Act states that if the taxpayer or any person acting on their behalf has intentionally or through gross negligence caused the tax authorities to make an assessment on an incorrect or incomplete basis, the deadline in para 1 is calculated from the time when the tax authorities obtained sufficient information to make a correct assessment.

As regards the financial statements for 1989/90, the Tribunal states *that* the company in the notes to the financial statements has disclosed name, registered office, ownership share, dividend and purchase price in respect of I and *that*, on the other hand, the same information concerning the subsidiary has not been disclosed, and its exclusion has not been mentioned. As regards the financial statements for 1990/91, the Tribunal states *that* the company in the notes to the financial statements have not disclosed name, registered office, ownership share and the profit or loss of the subsidiary, *that* the exclusion of this information has not been mentioned and *that* the purchase price as of 1/5 1990 for the subsidiary is stated as DKK 478,675.

The Tribunal furthermore notes *that* when questioned in November 1993, State-Authorised Public Accountant K informed the Danish National Police (*Rigspolitiet*), i.a., that the financial statements of the subsidiary had given rise to in-depth discussions as to what information should be included in the company's financial statements and that G did not want the name REX to appear from the company's financial statements and *that* G is a State-Authorised Public Accountant and must be assumed to be familiar with section 43 of the Danish Financial Statements Act.

The Tribunal finds that the company has omitted information concerning the subsidiary which according to section 43 (1) of the Danish Financial Statements Act are generally required by law and that it is not information of negligible interest according to section 43 (1), last sentence, of the Act.

The Tribunal also finds that the information was deliberately omitted to, i.a., conceal the acquisition of the shares in the subsidiary from H, the ownership of those shares, the entire structure with a foreign company as the recipient of the income received under the Rex agreement and the repatriation of the income after three years' ownership as a tax-free liquidation distribution. This information was only provided in the course of the criminal case.

In those circumstances, the Tribunal finds that the authorities have not had a sufficient basis for making correct assessments for the company as a whole, notwithstanding the fact that the loans in question are shown in the financial statements as "debt to associated company", but that the authorities did not have sufficient information to make an assessment on a full basis until they obtained the reports from SØK and the District Court's judgment of 2 February 1995. The Tribunal thus finds that the deadline in section 35 (1) in the Danish Tax Agency Act was rightly considered to be suspended, although it must be noted that this does not mean that the Tribunal has considered the merits of the case. . . ." The National Tax Tribunal delivered similar rulings with regard to E on the same days.

*Supplementary statement of facts*

According to the statement of facts in the District Court of Ballerup's judgment of 2 February 1995, an agreement was made between F and Scott Marketing Ltd., according to which Scott Marketing undertook to examine and use its

**1498**

contacts in connection with F's efforts to obtain an option on the areas C and A. The following parts of the agreement are quoted in the judgment:

"Payment of fees to Scott are subject to the condition that F obtains an option on areas C and A and subject to the exercise of the options resulting in proceeds to F.

Scott must bear all its own costs and not share any costs incurred by F.

F must pay Scott 1/3 of the total amount obtained by the above options.

Hence, the fees paid to Scott are payment partly for participation in the examination and partly as a share of the fee for good performance in the exercise of the options.

Scott is entitled to invoice their fee to F at the same time as F receives payments."

The agreement between F and JPC (Gibraltar) Ltd. dated 12 July 1989 ("the Rex agreement") states (from the Danish translation):

". . .

### 1. GENERAL

According to a letter of 16 June 1989, F obtained an option for the areas A and C for 5,207 m² and 5,562 m², respectively. Reference is made to enclosed notes of 28 July 1989.

It has been agreed between F and JPC that JPC will exercise the option to purchase the use of the areas against payment to F of DKK 15 million for the option on area C and DKK 15 million for the use of the option on area A.

The payment for the option on area C will be made immediately after payment to the government for the purchase of the right of use and no later than 30 September 1989.

Payment for the option on area A will not be made until JPC decides to exercise/sell the option to develop area A. According to the forecast, this is expected to be in August 1991.

### 2. SUBORDINATED LOAN AREA C:

Upon receipt of the payment of DKK 15 million for the option on area C, F undertakes to pay DKK 12 million as a subordinated loan to JPC.

### 3. REPAYMENT AREA C:

The subordinated loan does not bear interest.

Repayment of the subordinated loan of DKK 12 million depends on the selling price of the project on area C.

The aim is to sell the project at the highest possible market price. According to the notes of 28 July 1989, the estimated selling price for area C is DKK 287 million, which selling price will result in proceeds of DKK 61 million, as the cost, incl. the contractor's mark-up, will be set at DKK 226 million. The subordinated loan is deposited until the sale has raised DKK 226 million. Immediately thereafter, 20% of the part of the selling price that exceeds DKK 226 million will be repaid. Said payment will be considered to be a full and final payment of the subordinated loan.

The repayment will thus amount to more than DKK 12 million, if the selling price exceeds DKK 287 million.

If the selling price is less than DKK 226 million, F cannot demand any repayment of the subordinated loan.

. . .

### 6. TERMINATION:

If JPC enters into an agreement with a co-investor to construct the building(s), F is entitled to terminate the subordinated loan for immediate repayment at par. This applies to both area C and area A at the start of the individual projects.

If such an agreement is concluded, payment for area C falls due at the time of conclusion of the agreement and for area A at the time of commencement of the construction work.

. . .

### 7. CONSULTANCY SERVICES:

F will, at its own expense, provide advice to JPC in connection with company-related and tax-related structures in Gibraltar and in Denmark concerning the above-mentioned areas C and A.

. . ."

The statement of facts in the District Court of Ballerup's judgment of 2 February 1995 furthermore states that the audit firm R had made some calculations, i.a. of 28 July 1989, regarding the development of areas A and C. These calculations are reproduced in the judgment as follows:

". . .

*DEVELOPMENT OF AREA C*

| | |
|---|---|
| Acquisition of areas C and A | DKK 46 million |
| Start-up costs, etc. | DKK 15 million |
| Various authorisations etc. | DKK 9 million |
| Construction price incl. architect's fees etc. – area C | DKK 151 million |
| Construction loan interest until 1/8 1991 | DKK 20 million |
| Marketing (for A and C DKK 10 million) | DKK 5 million |
| Fees, advisory services | DKK 3 million |
| Total financing requirements for area C (incl. acquisition of area A) and incl. fees to N for construction management and quality assurance | DKK 249 million |

. . .

Reservations have been made for selling costs, discounts etc. of 20% of the proceeds.

The estimated selling price for area C (Euro Towers) was DKK 287 million, and the estimated purchase price was DKK 226 million. (DKK 249 million

less acquisition price for A DKK 23 million) and the proceeds DKK 61 million."

The judgment also states that N A/S in a letter of 29 December 1989 confirmed to JPC Entreprise A/S

**1499**

that they participated in the development of areas A and C "in accordance with the budgets drawn up on 28 July 1989 covering the total sum of the construction works, incl. purchase of land and costs." On 6 July 1990, JPC Developer (Gibraltar) Ltd., Baltica Consulting A – C 2 (Gibraltar) Ltd. and KW Development (Gibraltar) Ltd. entered into a partnership contract and formed I/S GIB C – Property, the purpose of which was to "construct, own and/or sell residential housing on rented land" on area C.

On 17 October 1995, Customs and Tax Region Elsinore requested D to submit further information and documentation concerning the item "debt to associated company" in the company' financial statements as at 30 April for the years 1990-1994. The company replied to the enquiry with a statement of 26 October 1995 together with a number of appendices. The appendices included the official financial statements of F, all of which had been prepared by the audit firm Ernst & Young, Gibraltar, in October 1992. The first concerned the period from 16 October 1989, when it was specified that the company had commenced its business, to 31 December 1990. The Rex agreement of 12 July 1989 was not enclosed. The reply gave rise to further questions from the Region, to which the company replied by letter of 21 November 1995.

On 1 October 1997, a meeting was held between Customs and Tax Region Nærum, which had taken over the case, and the Danish State Prosecutor for Serious Economic Crime. At the meeting, the Region was made aware of material provided by the Prosecutor for the purposes of the criminal case, and on the basis of this material prepared an internal note of 30 October 1997.

On 24 April 1998, the Region submitted notifications to D and E, respectively, citing the increases ordered by the National Tax Tribunal's rulings of 28 November 2000. The companies objected but after further correspondence, the Region made its decision on 24 September 1998 in accordance with the notifications.

On 26 January 1999, the companies applied for an extension of the payment of the corporation taxes assessed as a consequence of the Region's decision, which was granted by letter of 25 February 1999 from the Municipality of Fredensborg-Humlebæk, Denmark. After the Nation Tax Tribunal had ruled in the cases, the companies once again, on 26 March 2001, applied for a further extension on the grounds that the cases had been brought before the High Court. In a letter of 29 May 2001, the Municipality granted the requested extension.

*Statements:*

H and G have given statements during the case. Furthermore, parts of the statements during the criminal case as reproduced in the District Court of Ballerup's judgment of 2 February 1995, have been documented.

*Statements given before the High Court::*

*H* has stated that from her previous employment in - - - and - - - she had good contacts with institutional investors in several countries. She joined the project in Gibraltar following a request from M, who was the property manager in N. At the time, N was involved in the construction of an office building, Europort, in Gibraltar and was interested in the construction of additional housing etc. on adjacent areas. In order to conduct business in Gibraltar, she acquired three shell companies from a local attorney, including F. She understood from M, that Scott Marketing Ltd. had such a local position that she needed to enter into an agreement with that company in order to obtain an option on the area from the government, and F therefore entered into the agreement of 14 June 1989 with Scott Marketing. She did not pay anything to the authorities for the option, which gave her

eight weeks to get a project in place. The construction company JPC was supposed to be in charge of the construction work, and she would take care of the marketing and sale of the project. This could be done either by getting some institutional investors into the project or by selling the apartments in the building individually, i.a. to people from Hong Kong who at the time showed interest in moving to Gibraltar. The agreement of 12 July 1989 between F and JPC (Gibraltar) Ltd. ("the Rex agreement") was thus an agreement to perform some work tasks against payment of a fee which consisted of a fixed advance payment of DKK 3 million as well as a success fee. The reason for wording the agreement as payment for the sale of an option was tax considerations and was done on the advice of her attorney in Gibraltar. In practice, the work tasks were to be carried out by her company I, which would then invoice F for the work. At the time, the only employees in I were her and a secretary. F was not intended to remain her personally owned company and therefore, on 2 October 1989, she sold the company to her own holding company E, G's holding company, D, and J. J's husband, L, was a colleague of her husband, and it was originally agreed that he would give up his position in the audit firm R in order to join I. This came to nothing, but both she, her husband and L were interested in L being involved in the project, also in order to take advantage of L's special knowledge of the situation, including the tax situation in Gibraltar. At the time, she did not attribute any major economic value to F and the price was not discussed. When Scott had received their share, DKK 2 million was left of the DKK 3 million fee, and the cost of marketing the project could easily amount to this sum or maybe even more. The size and time of the success fee was uncertain. Therefore, in her view, the company had no current value but must be regarded as a business opportunity that could be sensible, but

**1500**

also difficult to implement. She was aware of the calculations made by the audit firm R of 28 July 1989. In the autumn of 1989, she brought this project on her travels to visit various institutional investors and present the other projects that she marketed under I. In December 1989, she heard for the first time that N was interested in taking part in the project. They were rumours coming out of a birthday party. The shareholder loans from F of 20 December 1989 were prompted by the fact that there was no reason to leave the money in F. The costs of marketing the project were provisionally borne by I and the money could always be repaid to F when this company needed it. In the absence of any written confirmation that N would join the project, she continued her efforts in the spring of 1990 to market the project to the institutional investors with whom she had relations.

*G* has stated that he had resigned as manager and partner in the audit firm R at the end of September 1989 in order to join I. His colleague L, who had worked, in the audit firm, on N's projects in Gibraltar, would also resign in order to join I, but he regretted and chose to remain in the audit firm. Against this background, they chose to maintain an agreement that the family - - - would own half of F. He considered the value of F to be purely theoretical. It would take a significant amount of work for F to get anything out of the agreement with JPC, and as new construction projects in Gibraltar had been at a standstill for about 30 years, the size of the construction costs was uncertain. At the time, I had about 20-25 other mandate agreements, and the Rex agreement was considered one of the most cumbersome and least valuable. The shareholder loans were fully legal under the Gibraltar rules and were due to the fact that F's deposits in Gibraltar only bore interest of ½% p.a. and that the company did not

Copyright © 2021 Karnov Group Denmark A/S

immediately need the money. As the shareholders were well consolidated, it would not be a problem for them to repay the loans, when the company needed liquidity. In Gibraltar, F was not required to prepare financial statements, but he did prepare unofficial financial statements for F as at 31 December 1989 to serve for the auditor's preparation of financial statements for D and E. The equity stated in the financial statements of F is included in the equity of D and E. The writing down of the loan of DKK 12 million to DKK 0 was due to the fact that the success fee according to the Rex agreement did not represent a value in itself, but required that someone was able to successfully market the construction project. The main task of D was to be a shareholder of I, which is therefore mentioned in the financial statements of D. F is not mentioned because the investment in this company had to be considered immaterial in relation to D's overall balance sheet. The reason was also that, at the request of I's customers, it was consistently refused that I or the companies behind I would invest in the projects marketed by I. Therefore, they did not want the financial statements to show that investments had nonetheless been made in another company. The official financial statements of F, dated 2 October 1992, were prepared by the audit firm Ernst & Young in accordance with the rules of Gibraltar. He is aware of the financial statements, but has not participated in their preparation. The date of 16 October 1989, chosen as the starting date for the company, may have been the date of the first cash movement in the company. *Statements according to the District Court of Ballerup's judgment of 2 February 1995:*

*Lars Christiansen*, who was the CEO of the JPC Group in Denmark, has stated as follows about a meeting on 9 June 1989:

". . .

H introduced herself with a view to managing the sale and marketing of the project. The JPC Group did not have much international experience in the sale of projects, and it was therefore a clear precondition that an agreement should be concluded with someone who could manage the sale internationally. . . ."

Lars Christiansen has stated as follows about the "Rex agreement";

". . . As JPC had faced very harsh agreement requirements in connection with another construction project, it had since been JPC's policy that it was OK for an agent to make good money if only JPC did so too. When JPC subsequently entered into contracts with agents/sellers, it was therefore always for a fixed fee combined with a "carrot". Based on this practice, it was agreed with H that she would have a ground fee of DKK 3 million. This amount had to be paid immediately. The payment of the remaining amount of DKK 12 million depended on the selling price of the project. Of the DKK 3 million, H would bear all the costs of sales and marketing as opposed to what is customary in an agency agreement At the same time, this limited JPC's risk to DKK 3 million, should it fail to sell the construction project at a profit. He did not participate in the drafting of the agreement but approved that H would draw it up in the most favourable way for tax purposes, as long as the essence of the agreement was as agreed. He had thus accepted that the agreement with F was drawn up as a transfer of option and subordinated loan. For him, it did not matter whether there was an option.

At H. C. Hansen's 40th birthday (December 1989), which was held in N, he learned that N and Kay Wilhelmsen would join the project with one third each. H. C. Hansen or Alexander Schaumann told him this. He was pleased, as it meant that the risk to the client was reduced to a third without affecting the contractor profit. As a consequence, Kay Wilhelmsen also joined the contractor side.

After the formation of U in the summer of 1990, the DKK 12 million under the Rex agreement fell due for payment. If

**1501**

they would have wanted H to continue to be in charge of sales and marketing after this, they would have had to negotiate a new contract. Both the DKK 3 million and the DKK 12 million have been paid by JPC Construction Ltd., which was the contracting company. . . ."

*Per Høpfner*, CEO of JPC, has stated:

". . .

He had no knowledge of sales and marketing internationally and therefore left it to Lars Christiansen and H. He was not aware that F had an option on areas A and C and did not become aware of it in connection with the conclusion of the lease contract on 4 August 1989. He knew that H was to be paid a ground fee of DKK 3 million, which amount would cover the sales and marketing costs and, in the event of a successful sale, a success fee that would amount to DKK 12 million if the sale was made at the expected selling price. In the event of worst case, this meant that JPC's risk was limited to DKK 3 million. JPC's reason to prefer a sale agreement with a success fee was previous bad experiences regarding a construction project in which JPC had to pay DKK 5 million to an agent without the latter having taken any action.

. . ."

*M*, who was the property manager in N, has stated:

". . .

On behalf of the investors in Europort, N was interested in the construction of housing to be used by the offices, and N was also interested in obtaining fees for construction management, quality assurance and legal assistance. N did not want to financially or morally front another project in Gibraltar but was looking for investors/developers, and the defendant was asked to contribute to this. At this time, Kieler Architects had, at its own expense and on its own initiative, made some sketch proposals concerning the surplus areas. Based on these, the real estate division's technical department prepared experience data that are known to be very close to reality. The material was handed over to R, who prepared some presentations on this basis. At that time – May/June 1989 – no one had acquired the right to the surplus areas. At the end of May/beginning of June 1989, the defendant contacted H whom he knew came from a position as manager in - - - and who had recently formed I. The contact with her was due to the desire to find a person who could perform the total construction task, e.g. find investor/developer or both or offer an investment package for a developer who could not provide financing, and who could also market the construction project internationally. . . ."

*L*, who was a state-authorised public accountant and partner in the audit firm R, has stated:

". . . He was aware that H was working on/negotiating an agreement with JPC on the marketing and sale of a project in Gibraltar and that it concerned areas A and C, but he was not aware of the details. During his stay in Gibraltar, he met Lars Christiansen and Per Høpfner from JPC for the first time. He did not learn about the Rex agreement until mid-August 1989, when G, H and himself negotiated a future cooperation in the company I where each would have a third. In connection with the establishment of the cooperation in I, H's already existing activities in the company had to be considered. During the discussions, the defendant negotiated that he should have half of the shares in F. In his view, this activity was not worth much at the time, but it could be – albeit not without financial and work efforts, which in the case of H consisted of an obligation to market and sell the project and for the defendant of giving tax advice in connection with the project. The defendant did not participate in the preparation of the Rex agreement, the wording of which, according to H,

had been for tax purposes. The cooperation did not materialise, but due to the circumstances of his withdrawal from the cooperation agreement it was agreed that he would retain his shareholding in F, which was the only activity under I that was in a separate company. The shareholding was a purely passive investment. His wife J took over the formal ownership of the shares. The share capital of F was distributed on 2 October 1989. The remaining share capital of 50% was divided between H's and G's holding companies – each by 25%. He has never been actively involved in relation to F. The Rex agreement had nothing to do with N, and he therefore saw no conflict as regards his tasks for N. The first payment from JPC to F of DKK 3 million, which was invoiced on 18 September and paid on 18 October 1989, was paid to get marketing and sales activities under way. The physical work was to be carried out in I, which would then invoice F for the work. From the first payment he received DKK 7-800,000 – it may have been DKK 900,000, which amount was repatriated as legal shareholder loans in two instalments – approximately DKK 500,000 at the end of December 1989 and the balance once at the beginning of 1990. His wife's share of the balance (DKK 12 million) under the Rex agreement – DKK 3,750,000 – which fell due upon the formation of U, was also repatriated as a shareholder loan. Both the shareholding and the repatriated shareholder loans were included in his wife's tax return. He was aware of the agreement between F and Scott Marketing of which H had informed him in August 1989, and that Scott Marketing was to receive the amount because it had helped obtain the option. Other than that, he did not take any interest in the agreement with Scott Marketing.

**1502**

. . ."

State-Authorised Public Accountant K, who was the auditor of I, D and E, has stated:

"that in August 1989 he was elected as auditor of the company I and the two holding companies – D and E. The main assets of the holding companies were the shares in I and the Gibraltar company F. He had previously had discussions with the management of the companies and had been told that F was a material activity in Gibraltar which at the same time gave I significant earnings opportunities, although earnings at that time were uncertain. It was his impression that for H, the task would involve significant efforts to carry out the task, but he is not familiar with the details. He is familiar, though, with the fact that a profit was earned later. There were no problems related to his audit duties. He received the information he asked for. However, he did not receive audited financial statements for F on time."

*Procedure*:

In support of their primary claim, the *plaintiffs* have submitted that the value of the shares in F at the time of the transfer on 2 October 1989 did not exceed par and that, therefore, no taxable contribution was paid from H to the companies. According to the "Rex agreement", F had received DKK 3 million from JPC at that time, but DKK 1 million of this was to be paid to Scott Marketing. According to the statements, it must be applied that the Rex agreement was in fact a work contract which was formulated only as the sale of an option to adapt the agreement to the tax conditions in Gibraltar. The cost of the work tasks for F, according to the actual content of the agreement, would easily exceed the DKK 2 million that remained after the payment to Scott Marketing. F was not entitled to the additional fee of DKK 12 million until the partnership contract of 6 July 1990, and at least until December 1989, when N's interest in joining the project for the first was mentioned, it was highly uncertain whether this amount would ever be paid in full or in part. In addition, one third of any amount would have to be paid to Scott Marketing and the cost of

the sales and marketing tasks undertaken by F in the "Rex agreement" would possibly exceed DKK 2 million. The fact that the value of the shares did not exceed par value is supported by the fact that the shares were sold to J at that price and that she cannot be regarded as related to the companies, as the relationship with her and her husband was purely commercial. The decision of the National Tax Tribunal therefore rests on an incorrect basis and is manifestly unreasonable.

In support of their primary claim, the plaintiffs have also submitted that the assessment deadline under the then applicable section 35 (1) of the Danish Tax Agency Act expired at the end of 1993 and had thus expired when the National Tax Tribunal made its decision on 28 November 2000. The assessment deadline has not been suspended, as neither the plaintiffs nor persons acting on their behalf have intentionally nor through gross negligence caused the tax authorities to make the assessment on an incorrect or incomplete basis. The tax authorities have always had the necessary information to carry out the assessment, and the plaintiffs have not tried to conceal anything. However, assuming that the original information was incomplete and that the assessment period was suspended, such suspension ended on receipt of the plaintiffs' statement of 26 October 1995, which provided additional information and additional appendices were submitted. The provision of the then applicable section 35 (4) of the Danish Tax Agency Act to which the National Tax Tribunal refers, cannot be applied, as there is no increase regarding the appealed matter. The assessment appealed to the National Tax Tribunal concerned the change of shareholder loans to advance liquidation distribution and its interest consequences and concerned two tax years. The National Tax Tribunal upheld the plaintiffs' claim but at the same time made an increase for the first tax year because the Tribunal found that there was a taxable contribution in the acquisition of the shares which must be regarded as a completely new assessment.

In support of their alternative claim, the plaintiffs have submitted that the tax claim relating to the increase in the 1990 income year was due on 1 November 1991 and was therefore barred by limitation under the Danish Limitation Act (*forældelsesloven*) of 1908 on 1 November 1996. The limitation deadline has not been suspended, as the tax authorities were not in unpredictable ignorance about their claims. Assuming that the limitation deadline was suspended because of unpredictable ignorance on the part of the authorities, the suspension ceased upon receipt of the statement of 26 October 1995 and the claim thus lapsed on 27 October 2000. The request for suspension of 26 January 1999 did not interrupt the limitation deadline, as the request concerned the tax claim arising from the tax region's decision and thus a different tax claim from the one at issue. Hence, the tax claim is barred by limitation as the limitation period was not interrupted until the cases were brought or at the earliest when the National Tax Tribunal made the new assessment in the ruling of 28 November 2000. In support or the second alternative claim, the plaintiffs have stated that a request for suspension only interrupts the limitation period in respect of the amount for which suspension has been requested.

In support of the third alternative claim, the plaintiffs have submitted that the discretionary assessment of the National Tax Tribunal, according to which 50% of the remaining fee of DKK 12

**1503**

million must be included in the taxable contribution, is incorrect, as the Tribunal has not taken sufficient account of the costs that may incur and in particular has not taken into account that F had to pay a third of the amount or DKK 4 million to Scott Marketing.

In support of the claim for dismissal, the *defendant* has submitted that the National Tax Tribunal has rightfully determined that the plaintiffs received

a taxable contribution in connection with the acquisition of the shares in F. This company had already at the time of the acquisition entered into the so-called Rex agreement with JPC which would immediately result in an income of DKK 3 million and later the possibility of an additional significant amount, in the agreement estimated at DKK 12 million. The plaintiffs have not established that the Rex agreement, contrary to its wording about relating to the sale of an option, was a work agreement, and the plaintiffs have also failed to establish that F was to bear any significant costs relating to the payments from JPC in addition to the agreed payment to Scott Marketing. The value of the company at the time of sale therefore far exceeded the purchase price. Due to L's close connection with the project, it is immaterial that it was sold to his wife J at the same price as to the plaintiffs. The National Tax Tribunal has estimated the value of the company and thus the amount of the taxable contribution, and this estimate can only be set aside if it has been made on an incorrect basis or is manifestly unreasonable, which is not the case.

The defendant has furthermore submitted that the assessment deadline in the then applicable section 35 (1) of the Danish Tax Agency Act was suspended on the ground that the plaintiffs or persons acting on their behalf in any event acted grossly negligently. It was not possible for the tax authorities to see, on the basis of tax returns and financial statements, that the shares were acquired at a price far below their real value. The information received by the authorities in their statement of 26 October 1995 did not make this clear either. On the other hand, the companies were fully aware of this fact. Furthermore, the National Tax Tribunal has rightly referred to the then applicable section 35 (4) of the Danish Tax Agency Act, as the increase relates to the matter under appeal, since the facts of the case are the same, but the National Tax Tribunal has merely judicially qualified them differently from the tax region.

In response to the plaintiffs' alternative claim and second alternative claim, the defendant has disputed that the tax claim is barred by limitation, as the limitation deadline has been suspended for the same reasons as are stated concerning suspension of the assessment deadline and was also interrupted by the application for extension.

In support of its alternative claim and in relation to the plaintiffs' third alternative claim, the defendant has stated that the case should be remitted to the tax authorities for re-assessment if the High Court finds grounds for setting aside the estimate of the National Tax Tribunal.

**The High Court states:**

According to the agreement of 12 July 1989 between F and JPC (Gibraltar) Ltd. (the "Rex agreement'), JPC was required to pay DKK 15 million to F for the option on area C by 30 September 1989 at the latest, but F was also required to pay JPC DKK 12 million as a subordinated interest-free loan. The repayment of the loan was dependent on the selling price of the project on area C and, in the event that the estimated selling price of DKK 287 million was obtained, would constitute the full loan amount, whereas no part of the loan would have to be repaid if the selling price was lower than DKK 226 million. If JPC entered into an agreement with a co-investor, F would be entitled to terminate the subordinated loan for immediate repayment at par.

On 18 September 1989 – and thus before the transfer of the shares in F to the plaintiffs and J on 2 October 1989 – F requested JPC to transfer DKK 3 million under the Rex agreement. Of that amount, according to the agreement with Scott Marketing Ltd., F was obliged to pass on DKK 1 million to that company. In draft financial statements prepared by G on 31 December 1989 for F, the company's equity was calculated at DKK 2,014,338, regardless of the fact that the subordinated loan capital of DKK 12 million was written down to DKK 0 for accounting purposes.

It is thus established that the value of the shares in F at the time of the transfer significantly exceeded the nominal value of the shares and thus the purchase price and that the plaintiffs therefore received a taxable contribution with the acquisition of the shares. The National Tax Tribunal has based its estimate of the size of the contribution on the above draft financial statements of F as at 31 December 1989 and to the equity capital calculated therein added an estimated 50% of the deposit in JPC, bearing in mind that at the time of the transfer there was some uncertainty as to the date of payment of the deposit and the amount of expenses associated with it. The High Court finds that it has not been established that the National Tax Tribunal's estimate of F's equity value of DKK 8,014,338 was made on an erroneous basis or is manifestly unreasonable.

It is not apparent from the plaintiffs' tax returns that they received a taxable contribution, nor can this be inferred from the plaintiffs' financial statements. According to G's statement, F was deliberately omitted from mentioning in the financial statements, and information on its acquisition did not appear until the calculation of 26 October 1995. However, the calculation was not satisfactory, as the actual Rex agreement was not enclosed, but only the official financial statements of F, according to which activity in the company did not commence until 16 October 1989 and thus after the transfer of the shares to the plaintiffs. The High Court finds that the owners of the plaintiff companies, who were both business experts, must

**1504**

have known that the shares in F were acquired at a price that was significantly below the real value of the shares, and that the plaintiffs thus received a taxable contribution, and they must be deemed to have acted grossly negligently by not disclosing such information. Subsequently, the High Court finds that the assessment period under the then applicable section 35 (1) of the Danish Tax Agency Act has been suspended under section 35 (3) of the same Act and that this suspension has lasted at least until the end of 1995, as the tax authorities had to have a certain reasonable period of time to process and complete the incomplete and partly misleading information received with the calculation of 26 October 1995. The assessment deadline had therefore not expired when the Customs and Tax Region made its decision on 24 September 1998. The National Tax Tribunal's ruling of 28 November 2000 is based on the same facts on which the Customs and Tax Region's appealed decision is based, and the changed result is solely due to a changed legal assessment of those facts. Therefore, the deadline rule in the then applicable section 35 (1) of the Danish Tax Agency Act did not preclude the increase in the plaintiffs' income made by the National Tax Tribunal, cf. the then applicable section 35 (4) of the Danish Tax Agency Act. The limitation of the tax claim under the 1908 Act is found to be suspended under section 3 of the Act due to the tax authorities' unpredictable ignorance for the same reasons which lead to the suspension of the assessment deadline and in the same period of time, and the tax claim was therefore not barred by limitation when this case was brought on 28 December 2000.

The defendant's claim for dismissal is therefore upheld.

- - -

D must pay legal costs to the defendant of DKK 40,000, and E must pay DKK 40,000 to the defendant.

**Supreme Court of Denmark**

**The Supreme Court's judgment.**

In a previous instance, the Eastern High Court, 2nd division, gave its ruling on 20 December 2002.

Five judges ruled in the case: Wendler Pedersen, Per Walsøe, Børge Dahl, Thomas Rørdam and Jens Peter Christensen.

*Claims:*

The appellants, D and E, have reiterated their claims, but have waived the second alternative claim before the High Court.

The respondent, the Danish Ministry of Taxation, has claimed affirmation, in the alternative that the appellants' taxable income for the tax year 1991/92 be remitted for reconsideration by the tax authorities.

*Supplementary statement of facts*

A draft agreement prepared by H in June 1989 states, i.a.:

"KW & JPC on the one side

(the "Developer")

and on the other side

S represented by H or a company controlled by her

(the "Adviser")

as a consequence of the Developer's intention to tender the project referred to in the enclosed appendix (A, B and C) to investors, have concluded the following Agreement:

1

The Adviser must, in relation to this Agreement, initiate and conduct an investigation and assessment of the value of A, B and C, respectively, with the aim of determining a realistic net selling price.

2

The Adviser must, on a "best effort basis", conduct the negotiations with potential investors and has the right, without the Developer's prior approval, to sell the project A, B and C at a price that gives the Developer minimum proceeds before fee to the Adviser of . . million . million and . million, respectively, cf. the enclosed calculation.

The Client is, respectively, obliged to help carry out such a sale.

3

The Client must not without the written approval of the Adviser contact investors or buyers, regardless of whether they are private investors/buyers, institutional investors or financial institutions, with a view to the completion or sale of this project. All contact must always be through the Advisor.

4

If the Adviser's negotiations with investors/buyers result in A, B or C being sold in whole or in part with minimum proceeds or proportionate minimum proceeds to the Developer as stated in Clause 2, the Adviser will calculate a fee of . . % of such minimum proceeds or any proceeds exceeding this. The fee is settled in accordance with the binding agreement between the Developer and the investor or buyer regarding the transfers.

In any case, the Adviser is entitled to a fee of at least DKK 4 million which falls due on the termination of the Agreement.

5

The Developer bears the Adviser's marketing costs within a maximum amount of DKK 5 million. The Adviser will be able to bear maximum costs of DKK 10 million in connection with the marketing of C and maximum costs of DKK 5 million in connection with the marketing of B. Marketing costs

PROFIT AND LOSS ACCOUNT FOR 1989

includes brochures, sales prospectuses, PR activities, external consultants, advertising, travel and representation.

The costs are settled on an ongoing basis and paid by B on demand from the Adviser.

**1505**

6

If A, B or C is disposed of in whole or in part without the involvement of the Adviser, the Adviser receives the full fee and coverage of costs for as long as this Agreement is in force.

7

If A, B or C is disposed of in whole or in part after the expiry of this Agreement, the Adviser receives the full fee if the transfer is made to a connection with whom the Adviser has been in contact. Upon the expiry of the Agreement, the Adviser provides the Developer with a list of the potential buyers with whom the Adviser has been in contact.

8

If it is appropriate to use gearing for all or parts of A, B or C, the Adviser conducts negotiations with any lenders. The Adviser's costs in this connection are contained in the amounts stated in Clauses 4 and 5.

9

If it is appropriate to let all or parts of A, B or C, the Adviser conducts negotiations with any agents. The Adviser's costs in this connection are also contained in the amounts stated in Clauses 4 and 5.

10

If the conditions for the completion of this project are changed to such an extent that one of the parties wishes to amend or possibly terminate this Agreement, the other party is obliged to enter into negotiations to that effect.

11

This Agreement may be terminated at the earliest six months after the last section of either A, B or C has been completed or the Developer has decided not to complete the construction of A, B and/or C and in such case giving six months' written notice to expire on the first day of a month."

It has been stated that the draft financial statements of F for 1989 – prepared by G – were handed over to the tax authorities by the Danish State Prosecutor for Serious Economic Crime (SØK) at the meeting on 1 October 1997. These financial statements state, i.a.:

"F, Gibraltar has in July 1989 entered into an agreement with JPC (Gibraltar), Ltd., according to which JPC (Gibraltar), Ltd exercises the option to purchase the right of use to the areas covered by the option agreement concluded between the government in Gibraltar and F on 16 June 1989. JPC (Gibraltar), Ltd. has decided to exercise the option right to one of the areas. The payment for this amounts to DKK 15 million, of which DKK 3 million is paid in cash and DKK 12 million is deposited as subordinated contributed capital in JPC (Gibraltar), Ltd, in accordance with the agreement. In the financial statements for 1989, the subordinated contributed capital is written down to 0 as its value depended, i.a., on the subsequent sale of the construction project.

The financial statements show a profit of DKK 2,013,188 and equity of DKK 2,014,338.

. . .

| | | |
|---|---|---:|
| Sale of option right | | 15,000,000 |
| Write-down of subordinated loan capital | | 12,000,000 |
| | | 3,000,000 |
| Costs | | 1,012,112 |
| Gross profit | | 1,987,888 |

| | |
|---|---:|
| Financing income | 25,300 |
| PROFIT | 2,013,188 |

**BALANCE AS AT 31. DECEMBER 1989**

**ASSETS**

| | |
|---|---:|
| Loan debtors | 1,353,108 |
| ABG Bank, 344.20.010 | 670,025 |
| TOTAL ASSETS | 2,023,133 |

**LIABILITIES**

| | |
|---|---:|
| Share capital, GBP 100 | 1,150 |
| Retained earnings | 2,013,188 |
| EQUITY | 2,014,338 |

**DEBT**

| | |
|---|---:|
| Payables | 8,795 |
| DEBT | 8,795 |
| TOTAL LIABILITIES | 2,023,133 |

**NOTES**

*COSTS*

| | |
|---|---:|
| Adviser fee | 1,000,000 |
| Bank costs | 2,166 |
| Attorney costs (GBP 450) | 4,946 |
| Miscellaneous | 5,000 |
| | 1,012,112 |

. . .

*LOAN DEBTORS*

| | |
|---|---:|
| J | 500,548 |
| D | 426,280 |
| E | 426,280 |
| | 1,353,108 |

. . ."

F's financial statements for 1990 ("financial statements period ended 31st December 1990"), audited by Ernst & Young, state, i.a.:

»*REPORT OF THE AUDITORS TO THE MEMBERS OF F*

We have examined the attached balance sheet and have obtained all the information and explanations we have required.

**1506**

In our opinion the balance sheet is properly drawn up so as to give a true and fair view of the state of affairs of the company as at 31st December 1990 according to the best of our information and the explanations given to us and as shown by the books of the company.

. . .

*F's*
*PROFIT AND LOSS ACCOUNT FOR THE PERIOD FROM*
*COMMENCEMENT OF TRADING ON*
*16th OCTOBER 1989 TO 31st DECEMBER 1990*

| | Notes | DKK | DKK |
|---|:---:|:---:|:---:|
| INCOME | | | |
| Loan interest | 4 | | 265.904 |
| Bank interest | | | 74.154 |
| | | | 340.058 |
| EXPENSES | | | |

| | | |
|---|---|---|
| Administration fees | 42,000 | |
| Audit and accountancy fees | 14.000 | |
| Legal fees | 8.770 | |
| Bank charges | 5.545 | |
| Sundries | 2.588 | |
| | | 72.903 |
| PROFIT FOR THE PERIOD BEFORE | | 267.155 |

. . .

F's

**BALANCE SHEET AS AT 31st DECEMBER 1990**

| | Notes | DKK | DKK |
|---|---|---|---|
| CURRENT ASSETS | | | |
| Cash at bank | | | 4,757,251 |
| Loans | 2 | | 9,566,904 |
| | | | 14,324,155 |
| CURRENT LIABILITIES | | | |
| Taxation | | 54.813 | |
| Creditors | | 4,056,000 | |
| | | | 4,110,813 |
| | | | 10,213,342 |
| Represented by: - | | | |
| CAPITAL ACCOUNT | | | |
| Share capital | | | 1.000 |
| Capital reserve | 3 | | 10,000,000 |
| Profit and loss account | | | 212.342 |
| | | | 10,213,342 |

. . .

F's

*NOTES TO THE ACCOUNTS FOR THE PERIODE ENDED 31st DECEMBER 1990*

. . .

2. Loans

The loans outstanding at 31stDecember 1990 are made up as follows: -

| | DKK |
|---|---|
| E | 2,391,010 |
| D | 2,391,010 |
| J | 4,784,884 |
| | 9,566,904 |

3. CAPITAL RESERVE

Movements on Capital reserve are as follows: -

| | DKK |
|---|---|
| Proceeds of disposal of capital asset | 15,000,000 |
| Less: expenses relating to disposal | 5,000,000 |
| | 10,000,000 |

. . ."

In this case, the Ministry of Taxation filed a defence with the High Court claiming dismissal on 14 February 2001.

In an expert opinion of 30 September 2004, State-Authorised Public Accountant Jesper Meto has answered a number of questions from the parties as follows:

*"2. Answers to the expert questions*

*2.1 Answer to question 1*

Question 1:

*"The expert is requested to state the market value of the shares in F as of the date of transfer on 02.10.1989, and the expert is asked to take into account*

• *that F's gross receivable of DKK 0-12 million was conditional on JPC for a project on the area obtaining a certain selling price or on JPC entering into an agreement with a co-investor for 50% or more*

• *that Scott Marketing Ltd. under the agreement of 14.06.1989 was entitled to 1/3 of the gross fee obtained by F in accordance with the agreement with JPC of 12.07.1989*

• *that at the time of the transfer there were no specific offers for the purchase or co-financing of the project and*

• *that there were no activities in F other than those mentioned above."*

The share transaction is carried out as of 02.10.1989, and no interim financial statements or similar material

concerning the company's situation have been prepared as at this date. No transactions are made in the period 02.10.1989 – 31.12.1989 which materially affect the company's equity. Thus, the calculated equity of approximately DKK 2 million as at 31.12.1989 was also present on 02.10.1989, as F as at 30.09.1989 requested payment from JPC of DKK 15 million in accordance with the agreement of 12.07.1989.

In the period up to 31.12.1989, F receives settlement of the DKK 15 million and at the same time establishes the subordinated loan to JPC of DKK 12 million. In the same period, DKK 1 million is paid to Scott Marketing Ltd., so that the company as at

**1507**

31.12.1989 has approximately DKK 2 million in cash, corresponding to the equity. The company then has an opportunity to obtain repayment of the DKK 12 million, depending on the selling price of the overall project. However, out of the gross fee, F must pay Scott Marketing Ltd. 1/3 of the amounts received. On the other side is the obligation to provide advisory assistance under Clause 7 of the agreement which is worded as follows:

"F undertakes, free of charge, to provide consultancy to JPC regarding company-related and tax-related constructions in Gibraltar and in Denmark regarding the above mentioned areas C and A."

The assessment of the value of the shares as at 02.10.1989 can thus be based on the company having a book equity of approximately DKK 2 million and at the same time a subordinated loan of DKK 12 million, the value of which depends on the total selling price of the project. However, the company will receive a maximum of DKK 8 million after settlement with Scott Marketing Ltd. This will cover the costs possibly incurred in connection with the performance of the contract on advice in corporate and tax matters.

The expert finds that the following factors may have a positive impact on the assessment:

• If the project is realised at an amount between DKK 226-287 million, F will obtain 20% of the part of the selling price that exceeds DKK 226 million. At a selling price of DKK 287 million, F will receive DKK 12 million, of which 1/3, corresponding to DKK 4 million, must be paid to Scott Marketing Ltd. Hence, the maximum possible proceeds for F regarding the subordinated loan will be DKK 8 million net.

• To the extent that area A may be developed, F has an additional opportunity to obtain a new commission of DKK 15 million. The conditions of this commission correspond to what applies to area C. This means that F will receive DKK 3 million cash upon the utilisation of the area and receive 20% of the selling price that exceeds DKK 213 million and receive the full amount of DKK 12 million if the total selling price of the project exceeds DKK 273 million. 1/3 is payable to Scott Marketing Ltd.

• If JPC enters into an agreement with a co-investor to take over more than 50% of the construction project, F must receive full repayment of the subordinated loan(s). If a co-investor is accepted for less than 50%, there will be a proportional repayment of the subordinated loan.

• In 1989, this was a new market in Gibraltar, characterised as being a highly speculative market at the time. Brian Francis stated as follows on this:

»There was a highly speculative market at that time in 1989 for such projects but such a market had not yet developed and consequently there was al very high development risk fuelled to a large degree by market hype.«

Factors that may have a negative impact on the assessment include:

• Costs must be incurred to perform the advisory agreement, and the agreement does not provide for any maximum amount in this respect.

• It was a speculative market at that time in 1989 which may affect the price both positively and negatively.

• The selling value of the project is uncertain at this time. Calculations are available showing a cost of the project of DKK 226 million and an estimated selling price of DKK 287 million. According to Brian Francis, the housing market in Gibraltar has up to this point been dominated by rental housing and not owner-occupied housing.

According to information received from Brian Francis, it is estimated that there was not a high probability of obtaining the stipulated selling price of DKK 287 million, which would trigger the full repayment of the subordinated loan.

»There was a very little likelihood that the potential sales price of the Eurotowers project at the relevant time in mid-1989 would have been in the range of DKK 287 million.

If the opinion expressed was in respect of the apartments alone it would even be more unlikely. However with the shops and offices included as part of the project the value would have been more realistic but still in our view not achievable given that the market for shops and offices in that area was even worse than for the residential accommodation.«

In the assessment of the value of the share as at 02.10.1989, the following has been emphasised as regards the above:

• It will be difficult to obtain a repayment of the full amount of DKK 12 million in subordinated loan capital to JPC, as there was uncertainty about the value of the overall project, and as it is not deemed to be realistic to be able to obtain the full DKK 287 million in selling price.

• The company has the opportunity to obtain additional return on the agreement with JPC if area A was to be developed later. The company may also receive full repayment of the subordinated loan if JPC was to accept an investor for more than half the construction project, even though it is stated in the assumptions that it must be taken into account that at the time of the transaction there were no specific offers for the purchase or co-financing of the project.

• The company is obliged to bear advisory costs of an unknown size. These costs may be higher or lower, depending on the type of sale. The advisory services are limited to legal and tax aspects concerning Gibraltar and Denmark,

**1508**

In this respect, it has been applied that the advisory services would naturally consist of providing information on legal and tax aspects of the preparation of a prospectus, so that the prospectus would include information on the legal and tax consequences of different forms of establishment.

At the same time, it should be noted that it is within the competence of the investors to provide part of the advice on their own. However, this will require recruitment of the relevant persons or payment on consultancy basis, and it must also be expected that legal assistance will have to be procured.

At the same time, it is applied that there will be no individual advice to individual investors, who must be expected to examine the legal and tax consequences of various structures themselves. It is therefore considered that this will only be a matter of advisory services in relation to the preparation of prospectuses.

• It is also emphasised that within a relatively short period of time before the share transaction, F and JPC have entered into an agreement regarding the project on the basis of calculations partially reproduced in the submitted material and showing a cost for the mentioned DKK 226 million and a stipulated selling price of DKK 287 million. This material is also known to the parties involved in the transaction, and JPC has deemed this to be a worthwhile project.

The assessment of the company F's value as at 02.10.1989 has been based on a book equity of approximately DKK 2 million on the date of transaction. The company has the opportunity to realise an upside

Copyright © 2021 Karnov Group Denmark A/S

on the subordinated loan and maybe a construction project on the other area, but must pay costs in connection with tax and legal advice. On the basis of the market assessment, it is deemed to be unlikely that the subordinated loan will be repaid in full, unless JPC takes up a co-investor. The value of the subordinated loan from F to JPC is therefore assessed at a maximum value of DKK 2-3 million. At the same time, reserves must be made for advisory costs which are estimated to amount to no more than DKK 1 million.

*Considering the above and the uncertainties associated with the various elements that affect the value, it is therefore estimated that the total value of the shares in F as of 02.10.1989 amounts to around DKK 3-4 million.*

*2.2 Answer to question 2*

Question 2:

*"The expert is requested to state the market value of the shares in F on the day of the transfer on 02.10.1989, if it is further applied that F had an obligation – in addition to providing tax and legal advice – to market the project at its own expense and seek investors for this."*

The cost of the project includes marketing costs of DKK 5 million per area. In connection with the sale of such a project, it is estimated that costs will be incurred for the following:

• Preparation of sales prospectus and other sales material.

• Advertising and distribution of promotional material.

• Outreach work, meetings and discussions with potential buyers.

• Viewings, primarily when the construction work has begun.

• Possible closure of sales with sale contracts.

When assessing the costs to be incurred for the sale and marketing of the project, it is assessed that a level as stated in the project costs of DKK 5 million is not unrealistic. An inquiry with Brian Francis confirms that marketing costs at a level of 2% of the gross selling value are not unrealistic. This corresponds to a level of DKK 5 million.

The answer to question 2 is therefore divided into two, as it is not clear from the material whether the costs to be borne by F are the total costs, i.e. the level of DKK 5 million, or whether only costs that exceed DKK 5 million are included in the project calculation.

If F must only bear costs that exceed the DKK 5 million, it is estimated that these will not exceed an additional DKK 1 million based on the indications that the selling and marketing costs of such projects are usually around 2% of the total selling price.

*Assuming this, it is estimated that the value of the shares as of 02.10.1989 will be around DKK 2-3 million.*

Alternatively, assuming that the DKK 5 million included in the project must be paid by F, this will have a different effect on the value of the shares as at 02.10.1989.

Generally, costs incurred at a level of DKK 5 million in F will require a net payment of the subordinated loan of DKK 4 million in order for F to be able to cover the costs. This means that F must receive a payment of DKK 6 million on the subordinated loan, as DKK 2 million DKK must be paid to Scott Marketing Ltd., leaving F with a capital of DKK 6 million (equity of DKK 2 million and DKK 4 million in net payment from JPC). This corresponds to the marketing costs of DKK 5 million and DKK 1 million in costs for advisory services relating to legal and tax aspects.

This requires a selling price for the project of DKK 257 million, which F will not be certain to achieve on the basis of the estimated market situation in 1989. This may

**1509**

immediately indicate a value of the shares as of 02.10.1989 of DKK 0. F will probably try, if the sales efforts show that due to market conditions, it will be difficult to obtain a payment on the subordinated loan that is sufficient to cover the costs, to adapt the efforts made in connection with the sale. There is apparently no actual written agreements on specific commitments in relation to marketing, sales efforts etc., and there is no commitment to this in the agreement of 12.07.1989 between F and JPC.

It must also be taken into account that there are some possible upsides in the agreement entered into by F that may result in a higher repayment on the subordinated loan in connection with either a good sale, that a co-investor is accepted or that area A is utilised. A value of DKK 0 is therefore not deemed to be reasonable, as there are some possibilities, albeit uncertain, of obtaining a gain on the subordinated loan. Nor is it likely that the shareholders in F will sell shares to an independent third party at DKK 0 without retaining a regulation option.

*Assuming this, it is therefore estimated that the value of the share as at 02.10.1989 will be around DKK 1-1½ million.*

*2.3 Answer to question 3*

Question 3:

*"In relation to question 1, the expert is requested to give a precise description and state the elements and assumptions included in the assessment of the market price."*

These aspects have been described in the answers to both questions 1 and 2.

*2.4 Answer to question 4*

Question 4:

*"Further to question 3, the expert is requested to give a precise description of the commitments, marketing and investor search efforts he has assumed that F had on 02.10.1989 and to estimate the cost of this partly in terms of direct costs and partly in terms of internal working hours."*

In this regard, reference is also made to the answers to questions 1 and 2. As regards the distribution of external costs and internal working hours, the expert is not in a position to answer this question. This is partly because F does not have employees and because the material in some places shows that the resources available in the rest of the part of the group which F is a part of are expected to be used. This may indicate that everything is external costs, but the group could also choose to have people employed in F when it comes to carrying out the market efforts, which makes it impossible to estimate the distribution, as there is no information about the competences that the group may possess.

*2.5 Answer to question 5*

Question 5:

*"The expert is requested to state whether there was a general market in October 1989 for trading in shares in companies with a similar activity – including in Gibraltar – as that in F."*

The opening and use of the waterfront in Gibraltar had just begun in 1989 and the Government of Gibraltar had fixed selling prices for the land to be used at this point in time, corresponding to GBP 350 per square metre with a subsequent rent. Asked whether he was aware of the existence of a market for the trading of rights or of projects for the use of the waterfront areas, Brian Francis stated that in his view, this was not the case.

*2.6 Answer to question 6*

Question 6:

*"The expert is requested to state what experience he has had with regard to the establishment of construction projects in Gibraltar in the period 1980 to date."*

The expert has no experience in specific construction projects in Gibraltar during the period in question,

*3. Final remarks*

The expert states that the above answers to questions 1-6 have been made on the basis of the available material and to the best of his ability based on job experience as a state-authorised public accountant and previously performed assessment jobs as well as with the use of input from Brian Francis, including also telephone discussions on the conditions in Gibraltar during the period. Since these are estimates and weightings of circumstances that are not precisely known, it cannot be excluded that others will, on the basis of the same material, make another weighting and thus a different assessment.

The expert's answers to the questions have been prepared for use in the present case and cannot be used in full or in part in another context without the expert's consent."

### The justification and conclusion of the Supreme Court

According to the draft financial statements of F for 1989, the company, after H had acquired it as a shell company with a share capital of GBP 100 on 12 June 1989, had an income of DKK 15 million. This income had been obtained by the sale of the option on the right of use to area C. Of the DKK 15 million, the DKK 12 million was to remain in JPC as subordinated loan capital – with the possibility of payment as stated in the agreement of 12 July 1989 with JPC. In F's financial statements, the amount of DKK 12 million was written down to 0. In 1989, F's costs were – in addition to consultancy fees of DKK 1 million to Scott Marketing – DKK 12,112.

**1510**

According to F's financial statements for 1990, the period from 16 October 1989 to 31 December 1990 saw income of DKK 340,058 and costs of DKK 72,903. Equity amounted to just over DKK 10 million with assets worth just over DKK 14 million and a debt of approximately DKK 4 million.

Against this background and on the evidence, the Supreme Court does not find any basis for assuming that F had costly obligations which are not mentioned in the agreement of 12 July 1989 with JPC.

With these remarks and for the reasons set out by the High Court, the Supreme Court accepts that the value of the shares in F at the time of the transfer on 2 October 1989 exceeded substantially the nominal value of the shares of GBP 100 and thus the purchase price received by H when she sold the shares at par to, i.a., D, which was owned by her husband, G, and E, which she owned herself.

The Supreme Court also accepts that the tax authorities have therefore been entitled to estimate the value of the taxable contribution obtained by the holding companies from these share transactions.

As stated by the expert, in October 1989 there was no market for the sale of shares in companies with an activity such as F's, and on the evidence, it can be applied that the transaction had taken place between parties with a special community of interest and insight into the company's activity and possibility of earnings. The Supreme Court accepts that it has not been established that the National Tax Tribunal's assessment of the taxable contribution based on equity value of just over DKK 8 million suffers from deficiencies that may justify a breach.

The tax authorities only became aware of the draft financial statements of F for 1989 and the judgment of the District Court of Ballerup of 2 February 1995 at the meeting with SØK on 1 October 1997. With reference to this and further to the High Court's statements, the Supreme Court finds that the assessment period under the then applicable section 35 (1), cf. (3), of the Danish Tax Agency Act

must be deemed to have been suspended until 1 October 1997 and therefore had not expired when the Customs and Tax Region made its decision on 24 September 1998.

For the reasons set out by the High Court and following the link between the information used as a basis for the decisions by the Tax Region and the National Tax Tribunal, respectively, the Supreme Court accepts that the deadline rule does not prevent the National Tax Tribunal's decision of 28 November 2000 which must be regarded as an increase concerning the matter under appeal, cf. the then applicable section 35 (4) of the Danish Tax Agency Act.

Since the tax authorities did not have sufficient information to be able to make a correct tax calculation until 1 October, which cannot be blamed on the tax authorities, the Supreme Court accepts that no limitation period has occurred under the 1908 Act.

The Supreme Court therefore affirms the judgment.

### On these grounds the Court rules that:

*The High Court's judgment is affirmed.*

*As legal costs before the Supreme Court, D and E must, within 14 days of the delivery of this Supreme Court judgment, each pay DKK 50,000 to the Ministry of Taxation. The amounts bear interest according to section 8a of the Danish Interest Act (renteloven).*

# THIS IS TO CERTIFY

that the foregoing

**"Judgment"**

is a true and faithful translation of the
attached document
in the Danish language produced to me.

This translation consists of 16 (sixteen) pages, including this page.

In witness whereof I have hereunto set
my hand and affixed my seal of office
this 24th day of May 2022.



Certified Translator at Aarhus, Denmark

Lea Mathiasen

**U.2006.1492H**

***Salg af aktier til selskaber, der ejedes af henholdsvis sælgerens ægtefælle og sælger selv, anset for skattepligtigt tilskud på grund af aktiernes værdi. Fristen for forhøjelse af selskabernes skattepligtige indtægt ikke overskredet. Skattekravet ikke forældet efter 1908-loven.***

*Pengevæsen m.v. 58.3 - Skatter 311.1 - 72.3.*

♦ I juni 1989 erhvervede H aktierne i et holdingselskab, F, der var et skuffeselskab med en aktiekapital på 100 GBP. Samme år havde F en indtægt af 15 mio. kr., der

**1493**

var opnået ved salg af en option på køb af brugsretten til et areal i Gibraltar. Det fremgik af F's regnskab for 1990, at der havde været indtægter på ca. 340.000 kr. og udgifter på ca. 72.000 kr., og at egenkapitalen udgjorde godt 10 mio. kr. I oktober 1989 solgte H aktierne i F til parikurs til bl.a. selskabet D, der var ejet af hendes mand, og et selskab, E, som hun selv ejede. Efter at ligningsmyndighederne, O, på et møde med SØK den 1. oktober 1997 var blevet bekendt med aktiedispositionerne og med senere dispositioner i D og E, forhøjede O D's og E's skattepligtige indkomster for indkomstårene 1990 og 1991, under henvisning til at der var ydet et skattepligtigt tilskud ved dispositionerne. D og E indbragte sagerne for landsretten, der frifandt Skatteministeriet. Højesteret stadfæstede dommen. Landsretten og Højesteret fandt, at værdien af aktierne i F på overdragelsestidspunktet væsentligt havde oversteget aktiernes pålydende på 100 GBP og dermed den købesum, som H fik, da hun solgte aktierne til kurs pari. Det blev lagt til grund, at der ikke i 1989 var et marked for omsætning af aktier i selskaber med en aktivitet som F's, og at der havde været tale om handel mellem parter med et særligt fællesskab om og en særlig indsigt i F's aktivitet og mulighed for indtjening. O's ansættelse af de skattepligtige tilskud ud fra en reel værdi på godt 8 mio. kr. led ikke af mangel, som kunne begrunde en tilsidesættelse, og da O først i oktober 1997 var blevet bekendt med de nærmere omstændigheder ved dispositionerne, var fristen efter den dagældende skattestyrelseslovs § 35, stk. 1, for at ændre

*Skatteåret 1991/92:*

| | | |
|---|---|---|
| Lån anset for likvidationsudlodning fra F med | | 425.000 kr. |
| Ikke godkendt rentefradrag | | 15.200 kr. |

*Skatteåret 1992/93:*

| | | |
|---|---|---|
| Lån anset for likvidationsudlodning fra F med | | 1.900.000 kr. |
| Ikke godkendt rentefradrag | | 50.810 kr. |

Sagen har været forhandlet med selskabets advokat.

Klagen vedrører det forhold, at selvangivne lån er anset for forlods likvidationsudlodning fra selskabet F, og at selvangivne renteudgifter som følge heraf ikke er godkendt.

ansættelsen af D's og E's indkomster ikke overskredet.[1] Af samme grund var skattekravene ikke forældet efter 1908-loven.[2]

**H.D. 16. februar 2006 i sag 66/2003 (1. afd.)**

*D og E (adv. Peter Krarup, Kbh.)*
mod
*Skatteministeriet (Km.adv. v/adv. Steffen Sværke, Kbh.).*

## Østre Landsret

### Østre Landsrets dom 20. december 2002 (2. afd.)

(Ulla Staal, Ebbe Christensen, Lone Kerrn-Jespersen (kst.)).

Under disse sager, der begge er anlagt den 28. december 2000, og som er domsforhandlet sammen, har D nedlagt følgende endelige påstande:

Principalt:

Sagsøgers skattepligtige indkomst for skatteåret 1991/92 (indkomståret 1990) nedsættes med 2.003.584 kr.

Subsidiært:

Sagsøgte, Skatteministeriet, tilpligtes at anerkende, at skattekravet vedrørende skatteåret 1991/92 (indkomståret 1990) er forældet.

Mere subsidiært:

Sagsøgte, Skatteministeriet, tilpligtes at anerkende, at ethvert skattekrav ud over 176.080 kr. vedrørende skatteåret 1991/92 (indkomståret 1990) er forældet.

Mest subsidiært:

Sagsøgers skattepligtige indkomst for skatteåret 1991/92 (indkomståret 1990) nedsættes med et mindre beløb end 2.003.584 kr. efter rettens skøn.

E har nedlagt enslydende endelige påstande, dog er beløbet i den mere subsidiære påstand 107.200 kr.

Sagsøgte, Skatteministeriet, har over for begge sagsøgere efter sin endelige påstand påstået frifindelse, subsidiært at ansættelsen af sagsøgernes skattepligtige indkomst for skatteåret 1991/92 hjemvises til fornyet behandling ved ligningsmyndighederne.

*Sagens omstændigheder:*

*Landsskatterettens kendelser:*

Landsskatteretten afsagde den 28. november 2000 sålydende kendelse vedrørende D:

»Klagen vedrører opgørelserne af indkomst på følgende punkter:

Det fremgår af sagens oplysninger, at det klagende selskab (herefter benævnt selskabet) blev stiftet den 12. april 1989 og var ejet af statsautoriseret revisor G. G's ægtefælle, H, ejede aktierne i selskabet E, som tillige var stiftet den 12. april 1989.

**1** U 1998.1110/2 H, TfS 1992.19 Ø, TfS 1998.444, TfS 2004.449, TfS 2004.846, Engholm Jakobsen m.fl.: Skatteretten III, 3 udg., (2000), s. 641, Bent Christensen: Forvaltningsret. Prøvelse 2. udg. (1994), s. 71, Jens Garde m.fl.: Forvaltningsret. Almindelige emner, 4. udg. (2004), s. 225 og 456, Poul Bostrup m.fl.: Skattestyrelsesloven med kommentarer (2000), s. 472, og Jan Pedersen m.fl.: Skatteretten I, 4. udg. (2004), s. 435.
**2** U 1989.1046 H, U 1998.1485 H, bet. 1339/1997, s. 17 og 26, bet. 1426/2003, s. 78, Poul Bostrup m.fl.: Skattestyrelsesloven med kommentarer (2000), s. 476, og Engholm Jakobsen m.fl.: Skatteretten III, 3 udg. (2000), s. 549.

H, som er tidligere bankdirektør i - - -, fratrådte ultimo maj 1989 sin stilling og etablerede herefter i sommeren 1989 selvstændig finansiel

**1494**

rådgivningsvirksomhed i selskabet I, som var ejet med 50 % til hver af selskabet og E.

H erhvervede den 12. juni 1989 aktierne i et skuffeselskab, selskabet F (herefter benævnt datterselskabet), hvis aktiekapital udgjorde 100 GBP. Den 2. oktober 1989 solgte hun aktierne i datterselskabet til henholdsvis selskabet, E og J til kurs pari. Selskabet og E erhvervede hver 25 % af aktiekapitalen, mens J erhvervede de resterende 50 %.

Datterselskabet erhvervede den 16. juni 1989 en option fra Crown Lands Department Gibraltar på nogle grundstykker i Gibraltar.

Omkring den 12. juli 1989 indgik datterselskabet en aftale (herefter benævnt F-aftalen) med JPC Gibraltar Ltd. Af aftalen fremgår det bl.a., at JPC udnytter optionen på to grundstykker ved betaling af 15 mio. kr. pr. grundstykke. Samtidig hermed forpligtede datterselskabet sig til at betale 12 mio. kr. til JPC som ansvarligt lån ved modtagelsen af betalingen på 15 mio. kr. for den ene option. Lånet kunne bl.a. opsiges med øjeblikkelig virkning, hvis JPC Gibraltar Ltd. indgik aftale med en medinvestor om gennemførelse af byggerierne.

H og G har i en rapport til SØK af 7/4-93 bl.a. oplyst, at Rex-aftalen var en salgsaftale (mandataftale), i henhold til hvilken datterselskabet påtog sig en forpligtelse til at sælge bebyggelserne på de omhandlede grundstykker. Betalingen herfor bestod af en upfront på 3 mio. kr. og en success-fee afhængig af salgssummerne. Hvis salgssummerne blev som forventet, ville success-fee'en andrage 12 mio. kr. Baggrunden for, at aftalen blev benævnt som vedrørende overdragelse af en option og ansvarlig lånekapital var skattemæssige overvejelser, idet datterselskabet var et såkaldt resident selskab, som efter gibraltarianske skatteregler er fuldt skattepligtig med 35 % skat af sine indtægter bortset fra kapitalgevinster, herunder betaling for en option.

Den 4. august 1989 erhvervede JPC Gibraltar Ltd. brugsretten til de omhandlede grundstykker fra The Land Crown Gibraltar. Ved faktura nr. 90001 af 18. september 1989 til JPC Gibraltar Ltd. anmodede datterselskabet om betaling af 15 mio. kr. i henhold til Rex-aftalen. Samtidig hermed bekræftede datterselskabet, at 12 mio. kr. heraf skulle indestå som ansvarlig lånekapital i JPC Gibraltar Ltd., og anmodede om overførsel af 3 mio. kr. til datterselskabets konto i ABG-Bank, Gibraltar.

I følge aftale af 20. december 1989 lånte selskabet 425.000 kr. af datterselskabet, som skulle forrentes med 10 % p.a. og var tilbagebetalingspligtigt pr. 1. marts 1993. Den 21. december 1989 blev der overført 425.000 kr. fra datterselskabet bankkonto til selskabets bankkonto. Datterselskabet ydede tilsvarende lån til de øvrige aktionærer i forhold til deres kapitalandele i datterselskabet.

Som følge af, at JPC Gibraltar Ltd. i efteråret 1990 indgik i et samarbejde med andre om byggeprojektet, anmodede datterselskabet JPC Gibraltar Ltd. om tilbagebetaling af den ansvarlige lånekapital på 12 mio. kr., hvilket skete den 15. november 1990.

I henhold til en ny låneaftale af 20. november 1990 overførte datterselskabet den 21. november 1990 1,9 mio. kr. til selskabet. I følge aftalen blev lånet forrentet med 10 % p.a. og var først tilbagebetalingspligtigt den 1. marts 1993. Datterselskabet ydede tilsvarende lån til de øvrige aktionærer i forhold til deres kapitalandele i datterselskabet.

Den 2. oktober 1992 tog G kontakt til revisorfirmaet Ernst & Young med henblik på at tage datterselskabet under likvidation, og selskabet blev endeligt likvideret den 16. januar 1995. Det samlede likvidationsprovenu udgjorde 9.576.396 kr., hvoraf selskabets andel udgjorde 2.394.099 kr. I følge modregningsbekræftelse af 16. januar 1995 fra aktionærerne accepterede man modregning af ovennævnte lån i likvidationsprovenuet fra datterselskabet, og der skete ikke en egentlig tilbagebetaling af lånene. Restprovenuet for selskabet udgjorde 3.089 kr., som blev udbetalt til selskabet den 25. januar 1995.

Det fremgår af selskabets årsregnskab for 1989/90 under opgørelsen af selskabets passiver pr. 30. april 1990, at selskabet havde en gæld til et associeret selskab på 440.200 kr. Det fremgår videre, at selskabets aktiver i alt udgjorde 7.052.839 kr. Af selskabets årsregnskab for 1990/91 under opgørelsen af selskabets passiver pr. 30. april 1991 fremgår det bl.a., at gæld til associeret selskab udgjorde 2.468.664 kr. Det fremgår videre af regnskabet, at selskabets aktiver i alt udgjorde 13.656.952 kr.

Der er fremlagt et udkast til årsregnskab for F for 1989, hvoraf bl.a. fremgår, at egenkapitalen pr. 31.12.1989 var opgjort til 2.014.338 kr., og at dette selskab havde et indestående i JPC (Gibraltar) Ltd. på 12 mio.kr. i henhold til Rex-aftalen. Den ansvarlige indskudskapital var i regnskabet for dette år nedskrevet til 0, da værdien heraf bl.a. var afhængig af det senere salg af byggeriet.

Der er videre fremlagt et udkast til årsregnskab for F for 1990, hvoraf bl.a. fremgår, at egenkapitalen pr. 31.12.1990 var opgjort til 9.706.694 kr., idet den ansvarlige indskudskapital i JPC (Gibraltar) Ltd. var tilbagebetalt i dette år. Det fremgår videre af regnskabet bl.a., at selskabet havde afholdt udgifter til rådgivningshonorar på 4.600.000 kr. i dette år.

Der blev rejst tiltale mod bl.a. G for bedrageri efter straffelovens § 279, subsidiært for mandatsvig efter straffelovens § 280, ved i sommeren 1989 på Gibraltar retsstridigt at have fremkaldt, bestyrket eller udnyttet den vildfarelse hos JPC (International) Ltd., at selskabet

**1495**

F bestod en option med eneret til at udnytte og bebygge to arealer, hvorved JPC (Gibraltar) Ltd. bestemtes til at udbetale først den 6.10.1989 3 mio. kr. og siden den 12.11.1989 [rettelig: 1990] 12 mio. kr. til F, hvilke betalinger var byggeprojektet uvedkommende. Ved dom af 5. februar 1995 fra byretten i Ballerup blev de to hovedaktionærer frifundet for denne tiltale, idet byretten bl.a. bemærkede, at Rex-aftalen angiveligt af skattemæssige grunde var udformet som overdragelse af en option på de to arealer og etablering af et ansvarligt lån på 12 mio. kr. til JPC, og det måtte efter det, der i øvrigt forelå i sagen, umiddelbart have formodningen for sig, at denne konstruktion med hensyn til option stemte med virkeligheden. Efter bevisførelsen, særligt de afgivne forklaringer, der herom var samstemmende, fandt retten desuagtet ikke tilstrækkeligt grundlag for at tilsidesætte forsvarernes anbringende om, at aftalen faktisk var en salgs- og markedsføringsaftale, og at honoraret i henhold til aftalen var afholdt af JPC. Det var således ikke med den til domfældelse fornødne sikkerhed godtgjort, at de tiltalte havde forset sig som beskrevet i anklageskriftet.

Landsskatteretten har ved kendelse af 29. september 2000 taget forlods stilling til advokatens principale påstand om ugyldighed, idet retten ikke fandt, at den påklagede afgørelse var behæftet med en væsentlig mangel, der kunne medføre afgørelsens ugyldighed, og videre, at ansættelsen ikke var foretaget efter udløbet af fristen i skattestyrelseslovens dagældende § 35, stk. 1, da denne frist var suspenderet, jf. skattestyrelseslovens dagældende § 34, stk. 4.

Regionen har ved de påklagede ansættelser fundet, at selskabets skattepligtige indkomst for skatteårene 1991/92 og 1992/93 skal forhøjes med henholdsvis 440.200 kr. og 1.950.810 kr. vedrørende

likvidationsudlodninger fra og ikke godkendte renteudgifter til datterselskabet.

Man har herved bl.a. henset til, at de i 1989 og 1990 modtagne betalinger, selvangivet som aktionærlån fra datterselskabet, er anset som forlods udlodning af likvidationsprovenu, hvorfor der ej heller er godkendt fradrag for renter af aktionærlån.

Man har ydermere bl.a. henset til, at der ikke ses at have været nogen reel erhvervsmæssig aktivitet i datterselskabet, og at aktiviteten alene ses at være centreret om en række transaktioner med relation til Rex-aftalen og aftalen med Scott Marketing Ltd. Aktivitetsniveauet kan opdeles i to faser. Den første fase, dvs., første del af Rex-aftalen består af betaling af 3 mio. kr. til datterselskabet fra JPC, som bliver en realitet, da JPC erhverver grundstykkerne/retten til at benytte grundstykkerne den 4. august 1989. Udgifterne på ca. 1 mio. kr. til Scott Marketing kan på grundlag af materialet allerede anses for en realitet på det tidspunkt, hvor datterselskabet erhverver optionen fra Gibraltar-regeringen uden betaling. Parterne, herunder specielt H, må være bekendt hermed qua hendes forhandlinger med Scott Marketing Ltd. Aftalen er underskrevet den 14. juni 1989.

Den anden fase, dvs., anden del af Rex-aftalen består af tilbagebetaling af ansvarligt lån på 12 mio. kr. til datterselskabet fra JPC, og bliver en realitet i efteråret 1990 ved dannelse af U, hvilket allerede var tilkendegivet i december 1989. Datterselskabet var efter regionens opfattelse på dette tidspunkt i realiteten likvidationsmodent. Det er oplyst i notat af 9. oktober 1992, at da det i december 1989 meddeltes, at Baltica overvejede at indgå aftale med JPC (Gibraltar) Ltd. om bebyggelse af areal C, forventedes der ikke længere i datterselskabet at være behov for likviditet til umiddelbar rådighed. Der ses intetsteds at være planer eller gennemførelse af efterfølgende aktivitet.

Parterne vidste, hvilket fremgår af diverse oplæg til opbygning af selskabsstruktur på Gibraltar, hvorledes de skattemæssige regler var i Danmark med hensyn til likvidation af udenlandske datterselskaber. Da man i december 1989 kun havde ejet kapitalen i datterselskabet i få måneder var det ikke muligt at likvidere datterselskabet førend den 2. oktober 1992, uden at dette ville få skattemæssige konsekvenser. Da der på grundlag af de selskabsretlige regler på Gibraltar var mulighed for at foretage aktionærlån, valgte selskabsdeltagerne i stedet at benytte sig af dette for at trække midlerne hjem til Danmark.

Efterfølgende aftalte aktionærerne i datterselskabet at modregne aktionærlånene i det samlede likvidationsprovenu, som allerede ved udgangen af 1989 kunne beregnes med stor sikkerhed. At der er tale om forlods udlodning af likvidationsprovenu understøttes endvidere af, at udbetaling af de til datterselskabet tilflydte midler er sket i størst muligt omfang til aktionærerne i umiddelbar forlængelse af indbetalingerne i samme forhold som disses aktionærandele, hvilket forudsættes sket efter beslutning af de pågældende aktionærer i datterselskabet.

Sammenfattende er det således regionens opfattelse, at selskabsdeltagerne var klar over eller burde være klar over, at der ved udbetaling af aktionærlånene reelt var tale om forlods udbetaling af likvidationsprovenu, der skulle beskattes i Danmark. Det er videre regionens opfattelse, at udbyttet ikke kan hjemtages som skattefrit udbytte efter selskabsskattelovens § 13, stk. 3, idet det er en forudsætning herfor, at udbyttet hidrører fra et selskab, der beskattes efter regler, der ikke i væsentlig grad afviger fra reglerne her i landet. Der er for indkomståret 1990 for datterselskabet, jf. regnskabet for indkomståret 1990, ikke sket beskatning af den del af

*Skatteåret 1991/92:*

**1496**

selskabets indkomst, der stammer fra selskabets aktivitet på Gibraltar.

Vedrørende ikke godkendte renteudgifter har regionen bl.a. henset til, at da overførslerne i skattemæssig henseende er anerkendt som lån, er der ikke fradragsret for renteudgifter. Det bemærkes, at renterne ikke har været betalt, men alene tilskrevet de i regnskaberne opførte aktionærlån.

Selskabets advokat har nedlagt påstand om nedsættelse af de påklagede ansættelser til 0, idet hun til støtte herfor har gjort gældende, at det ikke på nuværende tidspunkt er muligt at beskatte et eventuelt tilskud i forbindelse med overdragelsen af aktierne på grund af forældelse.

### Landsskatteretten skal udtale:

På tidspunktet for datterselskabets ydelse af de omhandlede lån var datterselskabet ikke i likvidation, og selskabet var ikke på dette tidspunkt insolvent, således at der ikke er grundlag for at antage, at lånene allerede på tidspunktet for indgåelsen af låneaftalerne var åbenlyst uerholdelige. Under hensyn bl.a. hertil finder retten ikke grundlag for at tilsidesætte regnskabernes udvisende, hvorefter der var tale om lån, og de påklagede ansættelser vil derfor være at nedsætte med hhv. 425.000 kr. og 1.900.000 kr. samt renteudgifterne på lånene med hhv. 15.200 kr. og 50.810 kr.

Retten finder derimod, at selskabet modtog et skattepligtigt tilskud fra hovedanpartshaverens ægtefælle i forbindelse med aktiernes erhvervelse af aktierne i F den 2.10.1989 for en købesum på 25 GBP. Der er herved henset til, at datterselskabets egenkapital pr. 31.12.1989 var opgjort til 2.014.338 kr., hvortil kommer, at datterselskabet på tidspunktet for overdragelsen havde et indestående på 12 mio. kr. i JPC (Gibraltar) Ltd., som ved opgørelsen af egenkapitalen pr. 31.12.1989 var nedskrevet til 0 kr. Retten finder på denne baggrund, at selskabet betalte en betydelig underkurs ved erhvervelsen af aktierne i datterselskabet, og at denne underkurs alene kan være begrundet i parternes interessefællesskab.

Ved beregningen af det skattepligtige tilskud finder retten, at der må tages udgangspunkt i datterselskabets egenkapital pr. 31.12.1989 ifølge regnskabet, og retten finder videre, at honoraret på yderligere 12 mio. kr. fra JPC (Gibraltar) Ltd. skal medregnes, idet datterselskabet allerede på dette tidspunkt havde erhvervet ret til dette yderligere honorar. Retten finder dog, at honoraret ud fra en skønsmæssig vurdering alene skal medregnes med 50 % eller 6.000.000 kr. henset til, at der på overdragelsestidspunktet var en vis usikkerhed forbundet med tidspunktet for den endelige udbetaling samt størrelsen af udgifter forbundet med erhvervelsen af honoraret. Værdien af de overdragne aktier i datterselskabet skal således beregnes ud fra en indre værdi af datterselskabet på i alt 8.014.338 kr., således at selskabet anses at have modtaget et skattepligtigt tilskud på 25 % eller i alt 2.003.584 kr. ved indkomstansættelsen for skatteåret 1991/92.

Retten finder ikke, at reglerne om frist for forhøjelse af ansættelserne i dagældende skattestyrelseslovs § 35, stk. 1, er til hinder for at foretage en sådan ansættelse, idet disse frister, når en ansættelse er påklaget, ikke gælder for forhøjelser vedrørende det påklagede forhold, jf. skattestyrelseslovens dagældende § 35, stk. 4. Det bemærkes herved, at told- og skatteregionens ansættelse er foretaget ud fra en samlet bedømmelse af de indgåede aftaler mellem selskabet, datterselskabet og de øvrige parter.

### Herefter bestemmes:

| | |
|---|---|
| Lån anset for likvidationsudlodning fra F med 425.000 kr., nedsættes til | 0 kr. |
| Rentefradrag godkendes med | 15.200 kr. |
| Forhøjelse med skattepligtigt tilskud ved køb af aktier til underpris | 2.003.584 kr. |

*Skatteåret 1992/93:*

| | |
|---|---|
| Lån anset for likvidationsudlodning fra F med 1.900.000 kr., nedsættes til | 0 kr. |
| Rentefradrag godkendes med | 50.810 kr.« |

I Landsskatterettens kendelse af 29. september 2000 vedrørende D om overskridelse af ansættelsesfristen anført:

».. .

Vedrørende spørgsmålet om suspension af forældelsesfristen har regionen bl.a. henset til, at hele aftalekomplekset hvilede på et fiktivt grundlag, uden at skattemyndighederne havde mulighed for at kunne gennemskue forholdet.

Selskabets repræsentant har over for Landsskatteretten principalt nedlagt påstand om, at de påklagede ansættelser er ugyldige.

. . .

Det er ydermere bl.a. gjort gældende, at muligheden for ændringer af skatteansættelsen er forældet i henhold til skattestyrelseslovens § 35, stk. 1, idet hverken selskaberne eller nogen på disses vegne forsætligt eller groft uagtsomt har bevirket, at skattemyndighederne har foretaget ansættelserne for de pågældende år på et urigtigt eller ufuldstændigt grundlag. Det er en kendsgerning, at ansættelsen er foretaget lang tid efter udløbet af ligningsfristen, og det er en betingelse for suspension af fristen, dels at skatteyderens adfærd har været groft uagtsom, dels at der er årsagssammenhæng mellem skatteyderens adfærd og den forkerte skatteansættelse. Selskabernes årsregnskaber indeholder oplysninger om kapitalinteresser i associerede selskaber og

**1497**

om gæld til associerede selskaber, men ikke oplysninger om præcist hvilket associeret selskab, der er tale om. Det er gjort gældende, at der var gode grunde til disse undladelser, og at undladelserne var ubetydelige i forhold til hovedhensynet i årsregnskabsloven om det retvisende billede, således at det må anses for særdeles tvivlsomt om der er sket nogen overtrædelse af årsregnskabsloven. Videre er der ingen årsagssammenhæng mellem disse undladelser og den foretagne ansættelse. De oplysninger, der er fremgået af regnskaberne, har været fuldt tilstrækkelige til, at de lignende myndigheder har haft det fornødne grundlag til - om ønsket - at indhente de manglende oplysninger om navn, hjemsted og andel i associeret virksomhed og på grundlag heraf at foretage ansættelser for det klagende selskab. Betingelserne for suspension er således ikke opfyldt, og ansættelserne må derfor anses for forældede.

Told- og skatteregionen har under retsmødet på vegne Told- og Skattestyrelsen indstillet, at ansættelserne ikke anses for ugyldigt foretaget, idet der bl.a. er henvist til byrettens dom af 2. februar 1995, som først kom til skattemyndighedernes kendskab ved et møde med SØK den 1. oktober 1997. Dommen indeholder en lang række forklaringer vedrørende de indgåede aftaler, herunder at der var indgået fiktive options- og låneaftaler af skattemæssige årsager. . . . Der er yderligere henvist til SØK's rapport vedrørende afhøringen af selskabernes revisor, hvoraf fremgår, at der har været indgående diskussioner mellem revisoren og G om hvilke oplysninger, der skulle medtages i eller udelades af regnskaberne. Skattemyndighederne har således været i utilregnelig uvidenhed

om sagens rette sammenhæng, indtil de kom i besiddelse af SØK's materiale i oktober 1997. Der må vedrørende suspension anlægges en samlet vurdering, hvor der skal tages hensyn til, at hovedaktionærerne i de to selskaber med vilje indgik fiktive aftaler og var ganske klar over, at der kunne komme vanskeligheder, hvis der fremgik for meget om de underliggende forhold af selskabernes regnskaber, samt til at de fulde oplysninger først kom frem i forbindelse med straffesagen, hvor hovedaktionærerne var nødt til at tone rent flag for at undgå domfældelse for bedrageri.

**Landsskatteretten skal udtale:**

. . .

Vedrørende det af repræsentanten anførte om ugyldighed som følge af forældelse bemærker retten, at det af skattestyrelseslovens § 35, stk. 4, fremgår, at hvis den skattepligtige eller nogen på dennes vegne forsætligt eller groft uagtsomt har bevirket, at skattemyndighederne har foretaget en ansættelse på et urigtigt eller ufuldstændigt grundlag, regnes fristen i stk. 1 fra det tidspunkt, hvor skattemyndighederne kom i besiddelse af tilstrækkelige oplysninger til at foretage en korrekt ansættelse.

Vedrørende årsregnskabet for 1989/90 bemærker retten, *at* selskabet i noterne til regnskabet har oplyst om navn, hjemsted, ejerandel, resultat, udbytte samt anskaffelsessum vedrørende I, og *at* samme oplysninger vedrørende datterselskabet derimod ikke er oplyst, ligesom udelukkelsen heraf ikke er nævnt. Vedrørende årsregnskabet for 1990/91 bemærker retten, *at* selskabet i noterne til regnskabet ikke har oplyst om navn, hjemsted, ejerandel og resultat for datterselskabet, *at* udelukkelsen heraf ikke er nævnt, og *at* anskaffelsessum pr. 1/5 1990 for datterselskabet er angivet til 478.675 kr.

Retten bemærker videre, *at* statsautoriseret revisor K overfor Rigspolitiet ved afhøring i november 1993 bl.a. oplyste, at regnskaberne for datterselskabet havde givet anledning til indgående diskussioner om, hvilke oplysninger der skulle anføres i selskabets regnskaber, og at G ikke ønskede, at navnet REX skulle fremgå af selskabets regnskaber, samt *at* G er statsautoriseret revisor og må forudsættes bekendt med årsregnskabslovens § 43.

Retten finder, at selskabet har udeladt oplysninger vedrørende datterselskabet, som i henhold til årsregnskabslovens § 43, stk. 1, som udgangspunkt er lovpligtige, og at der ikke er tale om oplysninger af ubetydelig interesse i henhold til lovens § 43, stk. 1, sidste pkt.

Retten finder videre, at oplysningerne bevidst er udeladt for bl.a. at tilsløre anskaffelsen af aktierne i datterselskabet fra H, ejerskabet af disse aktier, hele konstruktionen med et udenlandsk selskab som modtager af de i forbindelse med Rex-aftalen oppebårne indtægter, samt tillige hjemtagelsen af indtægterne efter tre års ejertid som skattefri likvidationsudlodning. Disse oplysninger blev først fremlagt i forbindelse med straffesagen.

Under disse omstændigheder finder retten, at myndighederne ikke har haft et tilstrækkeligt grundlag for at foretage korrekte ansættelser for selskabet som helhed, uanset de omhandlede lån fremgår af regnskaberne som »gæld til associeret selskab«, men at myndighederne først fik tilstrækkelige oplysninger til at foretage en ansættelse på et fuldstændigt grundlag, da man kom i besiddelse af rapporterne fra SØK og byrettens dom af 2. februar 1995. Retten finder således, at det er med rette, at fristen i skattestyrelseslovens § 35, stk. 1, anses for suspenderet, idet det dog bemærkes, at retten ikke herved har taget stilling til sagens realitet. . . .«

Landsskatteretten afsagde de samme dage tilsvarende kendelser vedrørende E.

*Supplerende sagsfremstilling:*

Det fremgår af sagsfremstillingen i Ballerup Rets dom af 2. februar 1995, at der den 14. juni 1989 blev indgået en aftale mellem F og Scott Marketing Ltd., hvorefter Scott Marketing påtog sig at undersøge og benytte sine

**1498**

kontakter i forbindelse med F's bestræbelser på at få en option på arealerne C og A. Følgende dele af aftalen er citeret i dommen:

»Betaling af honorarer til Scott er med forbehold af, at F får en option på arealerne C og A og med forbehold af udnyttelse af optionerne, der resulterer i en fortjeneste til F.

Scott skal afholde alle egne udgifter og deler ikke udgifter, som F har pådraget sig.

F skal betale Scott 1/3 af det samlede beløb, der opnås ved hjælp af ovennævnte optioner.

Honorarerne til Scott er således betaling dels for deltagelse i undersøgelsen og dels som en andel i et honorar for godt resultat ved udnyttelse af optionerne.

Scott har ret til at fakturere sit honorar til F samtidig med at F modtager betalinger.«

I aftalen mellem F og JPC (Gibraltar) Ltd. dateret 12. juli 1989 (»Rex-aftalen«) hedder det (i dansk oversættelse):

». . .

1. GENERELT

Ifølge skrivelse af 16. juni 1989 har F opnået option på arealerne A og C på henholdsvis 5.207 m² og 5.562 m². Der henvises til vedlagte notater af 28. juli 1989.

Der er mellem F og JPC indgået aftale om, at JPC udnytter optionen til at købe brugen af arealerne mod betaling til F af DKK 15 millioner for optionen på areal C og DKK 15 millioner for brugen af optionen på areal A.

Betaling for optionen på areal C sker straks efter betaling til regeringen for købet af brugsretten og ikke senere end 30. september 1989.

Betaling for optionen på areal A sker, førend JPC beslutter at udnytte/sælge muligheden for at bebygge, areal A. Ifølge prognosen forventes dette at ske i august 1991.

2. ANSVARLIGT LÅN AREAL C:

Samtidig med modtagelse af betalingen af DKK 15 millioner for optionen på areal C forpligter F sig at betale DKK 12 millioner som et ansvarligt lån til JPC.

3. TILBAGEBETALING AREAL C:

Det ansvarlige lån forrentes ikke.

Tilbagebetaling af det ansvarlige lån på DKK 12 millioner afhænger af salgsprisen på projektet på areal C.

Det tilstræbes at sælge projektet til højst mulige markedspris.

Ifølge notaterne af 28. juli 1989 er den anslåede [»estimated«] salgspris på areal C DKK 287 millioner, hvilken salgspris vil resultere i en avance på DKK 61 millioner, eftersom kostprisen, incl. entreprenørens avance, vil blive fastsat til DKK 226 millioner.

Det ansvarlige lån deponeres, indtil salget har indbragt DKK 226 millioner. Umiddelbart herefter tilbagebetales 20 % af den del af salgsprisen, der overstiger DKK 226 millioner. Nævnte betaling betragtes som fuld og endelig betaling af det ansvarlige lån.

Tilbagebetalingen vil således beløbe sig til mere end DKK 12 millioner, såfremt salgsprisen overstiger DKK 287 millioner.

Såfremt salgsprisen er mindre end DKK 226 millioner, kan F ikke kræve nogen form for tilbagebetaling af det ansvarlige lån.

. . .

6. OPSIGELSE:

Såfremt JPC indgår aftale med en medinvestor om udførelsen af bygningen/bygningerne, er F berettiget til at opsige det ansvarlige lån til omgående indfrielse til kurs 100. Dette gælder for såvel areal C som areal A ved påbegyndelsen af de respektive projekter.

Hvis en sådan aftale indgås, er betaling forfalden, for så vidt angår areal C på det tidspunkt, hvor aftalen indgås, og for så vidt angår areal A på det tidspunkt, hvor byggeriet påbegyndes.

. . .

7. RÅDGIVNING:

F stiller for egen regning rådgivning til rådighed for JPC i forbindelse med selskabsrelaterede og skatterelaterede konstruktioner i Gibraltar og i Danmark vedrørende de oven for nævnte arealer C og A.

. . .«

Af sagsfremstillingen i Ballerup Rets dom af 2. februar 1995 fremgår endvidere, at revisionsfirmaet R havde udført nogle beregninger bl.a. af 28. juli 1989 vedrørende bebyggelse af areal A og areal C. Disse beregninger er i dommen gengivet således:

». . .

*BEBYGGELSE AF AREAL C*

| | |
|---|---|
| Erhvervelse af arealerne C og A | 46 mio kr. |
| Opstartomkostninger m.v. | 15 mio kr. |
| Diverse tilladelser m.v. | 9 mio kr. |
| Byggesum incl. arkitekthonorarer m.v. - areal C | 151 mio kr. |
| Byggelånsrenter frem til 1/8 1991 | 20 mio kr. |
| Markedsføring (for A og C 10 mio kr.) | 5 mio kr. |
| Honorarer, rådgivning | 3 mio kr. |
| Samlet finansieringsbehov vedrørende areal C (incl. erhvervelse af areal A) og incl. honorar til N for byggestyring og kvalitetssikring | 249 mio kr. |

. . .

Der er reservation til salgsomkostninger, rabatter m.v. på 20 % af avancen.

Den skønnede salgspris for areal C (Euro Towers) var 287 mio. kr., og den skønnede anskaffelsessum var 226 mio. kr. (249 mio

Copyright © 2021 Karnov Group Denmark A/S

kr. minus anskaffelsessum for A 23 mio. kr.) og avancen 61 mio. kr.«

Det fremgår yderligere af dommen, at N A/S ved skrivelse af 29. december 1989 over for JPC Entreprise A/S

**1499**

bekræftede, at man deltog i byggelsen på arealerne A og C »i henhold til de af 28. juli 1989 udarbejdede budgetter omfattende den totale opførelsessum incl. grundkøb og omkostninger.« Den 6. juli 1990 indgik JPC Developer (Gibraltar) Ltd., Baltica Consulting A - C 2 (Gibraltar) Ltd. og KW Development (Gibraltar) Ltd. en interessentskabskontrakt og stiftede hermed I/S GIB C-Property, hvis formål var at »opføre, eje og/eller afhænde en boligbebyggelse på lejet grund« på areal C.

Den 17. oktober 1995 anmodede Told- og Skatteregion Helsingør D om nærmere oplysninger og dokumentation vedrørende posten »gæld til associeret selskab« i selskabets årsregnskaber pr. 30. april i årene 1990-1994. Selskabet besvarede henvendelsen med en redegørelse af 26. oktober 1995 vedlagt en række bilag. Blandt bilagene var de officielle regnskaber for F, alle udarbejdet af revisionsfirmaet Ernst & Young, Gibraltar, i oktober 1992. Det første regnskab vedrørte perioden fra 16. oktober 1989, hvor selskabets virksomhed angaves at være påbegyndt, til 31. december 1990. »Rex-aftalen« af 12. juli 1989 var ikke vedlagt. Svaret gav anledning til yderligere spørgsmål fra regionen, der blev besvaret af selskabet ved skrivelse af 21. november 1995.

Den 1. oktober 1997 blev der afholdt et møde mellem Told- og Skatteregion Nærum, som havde overtaget sagen, og Statsadvokaten for Særlig Økonomisk Kriminalitet. På mødet blev regionen gjort bekendt med materiale, som anklagemyndigheden havde fremskaffet til brug for straffesagen, og udarbejdede på grundlag heraf et internt notat af 30. oktober 1997.

Den 24. april 1998 sendte regionen agterskrivelser til henholdsvis D og E, indeholdende de forhøjelser, som blev påkendt ved Landsskatterettens kendelser af 28. november 2000. Selskaberne gjorde indsigelse, men efter yderligere brevveksling traf regionen den 24. september 1998 afgørelse i overensstemmelse med agterskrivelserne.

Selskaberne ansøgte den 26. januar 1999 om henstand med betaling af de selskabsskatter, der var pålignet som følge af regionens afgørelse, hvilket blev bevilget ved skrivelse af 25. februar 1999 fra Fredensborg-Humlebæk Kommune. Efter at Landsskatteretten havde truffet afgørelse i sagerne, ansøgte selskaberne på ny den 26. marts 2001 om yderligere henstand, under henvisning til at sagerne var indbragt for landsretten. Ved skrivelse af 29. maj 2001 gav kommunen den ansøgte henstand.

*Forklaringer:*

Der er under sagen afgivet forklaring af H og G. Endvidere er dele af forklaringerne under straffesagen, som gengivet i Ballerup Rets dom af 2. februar 1995, dokumenteret.

*Forklaringer afgivet for landsretten:*

*H* har forklaret, at hun fra sine tidligere ansættelser i - - - og - - - havde gode kontakter til institutionelle investorer i flere lande. Hun kom ind i projektet på Gibraltar efter en henvendelse fra M, der var ejendomschef i N. N var på det tidspunkt involveret i opførelsen af et kontorhus, Europort, på Gibraltar og var interesseret i, at der på tilstødende arealer blev opført supplerende byggeri i form af boliger m.v. For at kunne udføre forretning på Gibraltar erhvervede hun tre skuffeselskaber hos en lokal advokat, herunder F. Hun forstod på M, at Scott Marketing Ltd. havde en skattemæssig gunstig position på stedet, at hun var nødt til at indgå en aftale med dette selskab for at opnå en option på arealerne fra regeringen, og F indgik derfor aftalen af 14. juni 1989 med Scott Marketing. Hun betalte ikke noget til myndighederne for optionen, som gav hende

8 uger til at få et projekt på plads. Det var meningen, at entreprenørfirmaet JPC skulle stå for opførelsen af bebyggelsen, og at hun skulle tage sig af markedsføring og salg af projektet. Dette kunne enten ske ved, at hun fik nogle institutionelle investorer til at gå ind i projektet, eller ved at lejlighederne i bebyggelsen blev solgt enkeltvis, f.eks. til personer fra Hongkong, der på daværende tidspunkt viste interesse for at flytte til Gibraltar. Aftalen af 12. juli 1989 mellem F og JPC (Gibraltar) Ltd. (»Rex-aftalen«) var således en aftale om at udføre nogle arbejdsopgaver mod betaling af et honorar, der bestod af en fast forlods betaling på 3 mio. kr. og en succesafhængig betaling herudover. Når aftalen blev formuleret som vederlag for salg af en option, skyldtes det skattemæssige hensyn og skete efter råd fra hendes advokat på Gibraltar. Arbejdsopgaverne skulle i praksis udføres af hendes firma I, der herefter skulle fakturere F for arbejdet. På det tidspunkt var kun hun selv og en sekretær ansat i I. Det var ikke meningen, at F skulle forblive hendes personligt ejede selskab, og hun solgte derfor den 2. oktober 1989 selskabet til sit eget holdingselskab, E, G's holdingselskab, D, og J. J's mand, L, var kollega til hendes mand, og det var oprindelig aftalt, at han skulle opgive sin stilling i revisionsfirmaet R for at indtræde i I. Dette blev ikke til noget, men både hun, hendes mand og L var interesseret i, at L var involveret i projektet, også for herved at udnytte L's særlige kendskab til forholdene, herunder skatteforholdene, på Gibraltar. Hun tillagde ikke på dette tidspunkt F nogen større økonomisk værdi, og prisen blev ikke drøftet. Når Scott havde fået sin andel, var der 2 mio. kr. tilbage af honoraret på 3 mio. kr., og omkostningerne ved at markedsføre projektet kunne let beløbe sig til denne sum eller måske endog mere. Størrelsen af og tidspunktet for den succesafhængige betaling var usikker. Selskabet havde derfor efter hendes opfattelse ikke nogen aktuel værdi, men måtte anses for en forretningsmulighed, der kunne være fornuftig, men

**1500**

også vanskelig at gennemføre. Hun var bekendt med revisionsfirmaet R's beregninger af 28. juli 1989. I efteråret 1989 havde hun dette projekt med, når hun rejste rundt for at besøge forskellige institutionelle investorer og præsentere de projekter, hun i øvrigt markedsførte i I's regi. I december 1989 hørte hun for første gang, at N var interesseret i at gå ind i projektet. Det var nogle rygter, som stammede fra et fødselsdagsselskab. Aktionærlånene fra F af 20. december 1989 var foranlediget af, at der ikke var nogen grund til, at pengene blev stående i F. Udgifterne til markedsføringen af projektet blev foreløbig afholdt af I, og pengene kunne altid tilbagebetales til F, når dette selskab fik brug for dem. Da der ikke forelå nogen skriftlig bekræftelse på, at N ville gå ind i projektet, fortsatte hun i foråret 1990 sine bestræbelser på at markedsføre projektet over for de institutionelle investorer, hun havde forbindelse med.

*G* har forklaret, at han opsagde sin stilling som direktør og partner i revisionsfirmaet R pr. ultimo september 1989 for at indtræde i I. Hans kollega L, der i revisionsfirmaet havde beskæftiget sig med N's projekter på Gibraltar, ville ligeledes fratræde for at gå ind i I, men han fortrød og valgte at blive i revisionsfirmaet. På den baggrund valgte man at fastholde en aftale om, at familien - - - skulle eje halvdelen af F. Han anså værdien af F for at være rent teoretisk. Der skulle et betydeligt arbejde til, for at F kunne få noget ud af aftalen med JCP, og da nybyggeriet på Gibraltar havde ligget stille i omkring 30 år, var størrelsen af byggeomkostningerne usikker. I havde på det tidspunkt omkring 20-25 andre mandataftaler, og Rex-aftalen blev anset for en af de mest besværlige og mindst værdifulde. Aktionærlånene var fuldt lovlige efter reglerne på Gibraltar og skyldtes, at F's indeståender på Gibraltar kun blev forrentet med ½ % p.a., og at selskabet ikke

havde noget umiddelbart behov for pengene. Da aktionærerne var velkonsoliderede, ville det ikke være et problem for dem at tilbagebetale lånene, når selskabet fik brug for likviditet. Der var ikke på Gibraltar krav om, at F skulle aflægge årsregnskab, men han lavede et uofficielt regnskab for F pr. 31. december 1989 til brug for revisors udarbejdelse af regnskaber for D og E. Den egenkapital, som fremgår af regnskabet for F, indgår i egenkapitalen i D og E. Når lånet på 12 mio. kr. blev nedskrevet til 0 kr., skyldtes det, at det succesafhængige honorar ifølge Rex-aftalen ikke repræsenterede en værdi i sig selv, men forudsatte, at nogen var i stand til succesfuldt at markedsføre byggeprojektet. Den væsentligste opgave for D var at være aktionær i I, der derfor er omtalt i regnskaberne for D. Når F ikke er nævnt, skyldtes det, at investeringen i dette selskab måtte anses for uvæsentlig i forhold til D's samlede balance. Årsagen var endvidere, at man på forespørgsel fra I's kunder konsekvent afviste, at I eller selskaberne bag I selv ville investere i de projekter, som I markedsførte. Man ønskede derfor ikke i regnskaberne at vise, at man alligevel havde investeret i et andet selskab. De officielle regnskaber for F, dateret 2. oktober 1992, er udarbejdet at revisionsfirmaet Ernst & Young efter reglerne på Gibraltar. Han er bekendt med regnskaberne, men har ikke deltaget i udfærdigelsen heraf. Datoen 16. oktober 1989, der er valgt som begyndelsesdato for selskabet, kan have været datoen for den første kontante bevægelse i selskabet.

*Forklaringer ifølge Ballerup Rets dom af 2. februar 1995:*

*Lars Christiansen*, der var administrerende direktør i JPC-koncernen i Danmark, har om et møde den 9. juni 1989 forklaret:

».. .

H præsenterede sig med henblik på varetagelse af salg og markedsføring af projektet. JPC-koncernen havde ikke megen international erfaring vedrørende salg af projekter, og det var derfor en klar forudsætning, at der skulle indgås aftale med én, der kunne forestå salg på internationalt plan. .. .«

Om »Rex-aftalen« har Lars Christiansen forklaret:

».. . Da JPC i forbindelse med et andet byggeri havde været ude for meget grove mæglerkrav, havde det siden været JPC's politik, at det ikke gjorde noget, at en mægler tjente godt, hvis JPC også gjorde det. Når JPC sidenhen indgik kontrakter med mæglere/sælgere, var det derfor altid til et fast honorar kombineret med en »gulerod«. På baggrund af denne praksis blev det med H aftalt, at hun skulle have et grund-fee på 3 mio. kr. Dette beløb skulle betales straks. Betalingen af det resterende beløb på 12 mio. kr. afhang af salgsprisen for projektet. Ud af de 3 mio. kr. skulle H afholde samtlige udgifter til salg og markedsføring i modsætning til, hvad der er sædvanligt ved en mægleraftale. Herved var JPC's risiko samtidig begrænset til 3 mio. kr., såfremt det ikke lykkedes at sælge byggeriet med fortjeneste. Han deltog ikke i udformningen af aftalen, men godkendte, at H udfærdigede den på den skattemæssigt mest gunstige måde, blot essensen af aftalen var som aftalt. Han havde således accepteret, at aftalen med F blev udfærdiget som overdragelse af option og ansvarligt lån. For ham var det uden betydning, om der forelå en option.

Ved H. C. Hansens 40-års fødselsdag (december 1989), der blev holdt i N, fik han at vide, at N og Kay Wilhelmsen ville træde ind i projektet hver med en tredjedel. Det var H. C. Hansen eller Alexander Schaumann, der fortalte dette. Det var han glad for, da det betød, at bygherrerisikoen blev reduceret til en tredjedel og uden, at det generede entreprenørfortjenesten. Resultatet blev, at Kay Wilhelmsen tillige kom med på entreprenørsiden.

Efter stiftelsen af U i sommeren 1990 forfaldt de 12 mio. kr. i henhold til Rex-aftalen til betaling. Havde

**1501**

man efter dette fortsat ønsket, at H skulle forestå salg og markedsføring, måtte man have forhandlet sig frem til en ny kontrakt. Såvel de 3 mio. kr. som de 12 mio. kr. er betalt af JPC Construction Ltd., der var entreprenørselskabet. .. .«

*Per Høpfner*, der var administrerende direktør i JPC, har forklaret: ».. .

Han havde ikke viden om salg og markedsføring internationalt og overlod det derfor til Lars Christiansen og H. Han var ikke bekendt med, at F havde option på areal A og C og blev det heller ikke i forbindelse med indgåelse af leasekontrakten den 4. august 1989. Han var vidende om, at H skulle have 3 mio. kr. i grund-fee, hvilket beløb skulle dække salgs- og markedsføringsomkostningerne samt, hvis salget skete med succes, et succes-fee, der ville udgøre 12 mio. kr., såfremt salget skete til den forventede salgspris. Dette indebar i tilfælde af »worst case«, at JPC's risiko var begrænset til 3 mio. kr. Når JPC foretrak en salgsaftale, hvor honoraret var succesbestemt, skyldtes det tidligere dårlige erfaringer vedrørende et byggeri, hvor JPC måtte betale 5 mio. kr. til en mægler, uden at denne havde foretaget sig noget.

.. .«

*M*, der var ejendomschef i N, har forklaret :

».. .

N var på vegne af investorerne i Europort interesseret i, at der blev bygget boliger til brug for kontorbyggeriet, ligesom N var interesseret i at opnå honorar for byggestyring, kvalitetssikring og juridisk assistance. N ville ikke selv hverken økonomisk eller moralsk fronte et yderligere projekt på Gibraltar, men var på udkig efter investorer/bygherrer, og tiltalte blev bedt om at medvirke hertil. På dette tidspunkt havde Kieler Architects for egen regning og på eget initiativ lavet nogle skitseforslag vedrørende de overskydende arealer. På basis af disse udarbejdede ejendomsdivisionens tekniske afdeling erfaringstal, som man ved ligger meget tæt på virkeligheden. Materialet blev overgivet til R, der på dette grundlag udfærdigede nogle oplæg. Ingen havde på dette tidspunkt - maj/juni 1989 - opnået ret til de overskydende arealer. I slutningen af maj/begyndelsen af juni 1989 kontaktede tiltalte H, som han vidste kom fra en stilling som direktør i - - -, og som netop havde stiftet I. Kontakten til hende skyldtes ønsket om at finde en person, der kunne løse den totale opgave vedrørende byggeriet, f.eks. finde investor/bygherre eller begge dele eller tilbyde en investeringspakke for en bygherre, der ikke selv kunne finansiere, og som endvidere kunne markedsføre byggeriet internationalt. .. .«

*L*, der var statsautoriseret revisor og partner i revisionsfirmaet R, har forklaret:

».. . Han var bekendt med, at H arbejdede på/forhandlede om en aftale med JPC om markedsføring og salg af et projekt på Gibraltar, og at det drejede sig om arealerne A og C, men han var ikke bekendt med detaljerne. Under opholdet på Gibraltar traf han for første gang Lars Christiansen og Per Høpfner fra JPC. Han fik først kendskab til Rex-aftalen i midten af august 1989, da G, H og han selv førte forhandlinger omkring et fremtidigt samarbejde i selskabet I, hvor hver skulle have en tredjepart. I forbindelse med etableringen af samarbejdet i I, skulle der tages stilling til H's allerede igangværende aktiviteter i selskabet. Under drøftelserne herom forhandlede tiltalte sig frem til, at han skulle have halvdelen af aktierne i F. Efter hans opfattelse var denne aktivitet ikke på dette tidspunkt meget værd, men den kunne muligt blive det - dog ikke uden en økonomisk og arbejdsmæssig indsats, der for H's vedkommende bestod en forpligtelse til at markedsføre og sælge projektet, og for tiltaltes vedkommende i at yde skattemæssig rådgivning i forbindelse hermed. Tiltalte var ikke med i udformningen af Rex-aftalen, som H havde oplyst var formuleret

som sket af skattemæssige grunde. Samarbejdet blev ikke til noget, men på grund af omstændighederne ved hans udtræden af samarbejdsaftalen, aftaltes det, at han beholdt sin aktiepost i F, der var den eneste aktivitet i I-regi, der lå i et separat selskab. Aktiebesiddelsen var en ren passiv investering. Hans hustru J overtog det formelle ejerskab af aktierne. Aktiekapitalen i F fordeltes den 2. oktober 1989. Den resterende aktiekapital på 50% fordeltes mellem H's og G's holdingselskaber - hver med 25%. Han har på intet tidspunkt været aktivt involveret vedrørende F. Rex-aftalen havde intet med N at gøre, og han så derfor ingen konflikt i forhold til sine opgaver for N. Den første udbetaling fra JPC til F på 3 mio. kr., der var faktureret den 18. september og betalt den 18. oktober 1989, blev betalt for at få gang i markedsførings- og salgsaktiviteterne. Det fysiske arbejde skulle udføres i I, der herefter skulle fakturere F for arbejdet. Af den første betaling fik han 7-800.000 kr. - muligt var det 900.000 kr., der blev hjemtaget som lovligt aktionærlån ad to omgange - cirka 500.000 kr. i slutningen af december 1989 og restbeløbet en gang i begyndelsen af 1990.

Hans hustrus andel i det resterende beløb (12 mio. kr.) i henhold til Rex-aftalen - 3.750.000 kr. - der forfaldt ved stiftelsen af U, blev tillige hjemtaget som aktionærlån. Såvel aktiebesiddelsen som de hjemtagne aktionærlån var medtaget på hans hustrus selvangivelse.

Han var bekendt med aftalen mellem F og Scott Marketing, som H havde orienteret ham om i august 1989, og at Scott Marketing skulle have beløbet, fordi man havde været behjælpelig med at skaffe optionen. I øvrigt interesserede han sig ikke nærmere for aftalen med Scott Marketing.

**1502**

. . .«

Statsautoriseret revisor K, der var revisor for I, D og E, har forklaret:

»at han i august 1989 blev valgt som revisor for selskabet I og de to holdingselskaber - D og E. De vigtigste aktiver i holdingselskaberne var aktierne i I og Gibraltarselskabet F. Han havde forud haft drøftelser med ledelsen i selskaberne og havde fået at vide, at der i F lå en væsentlig aktivitet på Gibraltar, der samtidig gav I, der skulle udføre arbejdet, betydelige indtjeningsmuligheder, dog var indtjeningen på dette tidspunkt usikker. Det var hans indtryk, at det for H's vedkommende ville medføre en større arbejdsindsats at gennemføre opgaven, men han er ikke bekendt med detaljerne. Han er derimod bekendt med, at de senere kom en indtjening. Der var ikke problemer i relation til hans revisionsopgaver. Han fik de oplysninger, som han bad om. Dog fik han ikke et revideret regnskab vedrørende F til tiden.«

*Procedure:*

*Sagsøgerne* har til støtte for deres principale påstand gjort gældende, at værdien af aktierne i F ved overdragelsen den 2. oktober 1989 ikke oversteg pari, og at der derfor ikke er ydet skattepligtigt tilskud fra H til selskaberne. F havde på dette tidspunkt i henhold til »Rex-aftalen« modtaget 3 mio. kr. fra JPC, men 1 mio. kr. heraf skulle betales videre til Scott Marketing. Efter forklaringerne må det lægges til grund, at Rex-aftalen i realiteten var en arbejdsaftale, der kun var formuleret som salg af en option for at tilpasse aftalen til skatteforholdene på Gibraltar. Omkostningerne ved de arbejdsopgaver, der efter aftalens reelle indhold påhvilede F, ville let kunne overstige de 2 mio. kr., der var tilbage efter betalingen til Scott Marketing. F opnåede først ret til det yderligere honorar på 12 mio. kr. ved interessentskabskontrakten af 6. juli 1990, og det var i hvert fald indtil december 1989, hvor N's interesse for at indtræde i projektet for første gang blev omtalt, aldeles usikkert, om dette beløb nogensinde ville komme helt eller delvis til udbetaling. Hertil kommer, at en tredjedel af et eventuelt beløb skulle betales til Scott Marketing, og at omkostningerne til

de salgs- og markedsføringsopgaver, som F havde påtaget sig ved »Rex-aftalen«, muligvis ville overstige 2 mio. kr. At værdien af aktierne ikke oversteg kurs pari, underbygges af, at aktierne blev solgt til J til denne kurs, og at hun ikke kan betragtes som nærtstående til eller interesseforbundet med selskaberne, idet forbindelsen til hende og hendes mand var rent forretningsmæssig. Landsskatterettens afgørelse hviler derfor på et urigtigt grundlag og er åbenbart urimelig.

Til støtte for den principale påstand har sagsøgerne endvidere gjort gældende, at ansættelsesfristen efter den dagældende skattestyrelseslovs § 35, stk. 1, udløb med udgangen af 1993 og således var udløbet, da Landsskatteretten traf afgørelse den 28. november 2000. Der er ikke sket suspension af ansættelsesfristen, idet hverken sagsøgerne eller personer, som handlede på sagsøgernes vegne, forsætligt eller groft uagtsomt har bevirket, at skattemyndighederne har foretaget ansættelsen på et urigtigt eller ufuldstændigt grundlag. Skattemyndighederne har til stadighed haft de fornødne oplysninger til at foretage ligningen, og sagsøgerne har ikke forsøgt at skjule noget. Hvis det imidlertid antages, at de oprindelige oplysninger har været ufuldstændige, og at ansættelsesfristen har været suspenderet, er suspensionen ophørt ved modtagelsen af sagsøgernes redegørelse af 26. oktober 1995, hvorved der blev givet supplerende oplysninger og fremsendt yderligere bilag. Bestemmelsen i den dagældende skattestyrelseslovs § 35, stk. 4, som Landsskatteretten henviser til, kan ikke anvendes, da der ikke er tale om en forhøjelse vedrørende det påklagede forhold. Den ansættelse, der var påklaget til Landsskatteretten, angik ændring af aktionærlån til forlods likvidationsudlodning og de rentemæssige konsekvenser heraf og vedrørte to skatteår. Landsskatteretten gav sagsøgerne medhold i deres klage, men foretog samtidig en forhøjelse vedrørende det første skatteår, fordi retten fandt, at der forelå et skattepligtigt tilskud ved aktieerhvervelsen, hvilket må betragtes som en helt ny ansættelse.

Til støtte for den subsidiære påstand har sagsøgerne gjort gældende, at skattekravet i anledning af den skete forhøjelse, der vedrører indkomståret 1990, forfaldt den 1. november 1991 og derfor bortfaldt ved forældelse efter forældelsesloven af 1908 den 1. november 1996. Der er ikke sket suspension af forældelsesfristen, idet skattemyndighederne ikke var i utilregnelig uvidenhed om deres krav. Antages det, at forældelsesfristen var suspenderet som følge af utilregnelig uvidenhed hos myndighederne, ophørte suspensionen ved modtagelsen af redegørelsen af 26. oktober 1995, og kravet forældes således den 27. oktober 2000. Anmodningen om henstand af 26. januar 1999 har ikke afbrudt forældelsesfristen, idet anmodningen angik skattekravet i henhold til skatteregionens afgørelse og således et andet skattekrav end det nu omhandlede. Skattekravet er således forældet, idet forældelsesfristen først blev afbrudt ved sagernes anlæg, eller tidligst da Landsskatteretten foretog den nye ansættelse ved kendelsen af 28. november 2000.

Til støtte for den mere subsidiære påstand har sagsøgerne anført, at en ansøgning om henstand kun afbryder forældelsen for så vidt angår det beløb, der er søgt henstand for.

Til støtte for den mest subsidiære påstand har sagsøgerne gjort gældende, at Landsskatterettens skønsmæssige vurdering, hvorefter 50 % af resthonoraret på 12

**1503**

mio. kr. skal medregnes i det skattepligtige tilskud, er forkert, idet retten ikke har taget tilstrækkeligt hensyn til de udgifter, der kunne påløbe, og navnlig ikke har taget hensyn til, at F skulle betale en tredjedel af beløbet, eller i alt 4 mio. kr., til Scott Marketing.

*Sagsøgte* har til støtte for frifindelsespåstanden gjort gældende, at Landsskatteretten med rette har fastslået, at sagsøgerne modtog

et skattepligtigt tilskud i forbindelse med erhvervelse af aktierne i F. Dette selskab havde allerede på tidspunkt for erhvervelsen indgået den såkaldte Rex-aftale med JPC, som umiddelbart ville medføre en indtægt på 3 mio. kr. og senere mulighed for yderligere et betydeligt beløb, der i aftalen blev anslået til 12 mio. kr. Sagsøgerne har ikke godtgjort, at Rex-aftalen i strid med sin ordlyd om at vedrøre salg af en option var en arbejdsaftale, og sagsøgerne har endvidere ikke godtgjort, at F skulle afholde udgifter af betydning i forbindelse med betalingerne fra JPC ud over den aftalte betaling til Scott Marketing. Selskabets værdi på salgstidspunktet oversteg derfor langt købesummen. På grund af L's nære forbindelse til projektet er det uden betydning, at der er solgt til hans hustru J til samme pris som til sagsøgerne. Landsskatteretten har skønsmæssigt fastsat selskabets værdi, og dermed størrelsen af det skattepligtige tilskud, og dette skøn kan kun tilsidesættes, hvis det er udøvet på et urigtigt grundlag eller er åbenbart urimeligt, hvilket ikke er tilfældet.

Sagsøgte har endvidere gjort gældende, at ansættelsesfristen i den dagældende skattestyrelseslov § 35, stk. 1, var suspenderet, som følge af at sagsøgerne eller personer, der handlede på sagsøgernes vegne, i hvert fald handlede groft uagtsomt. Det var ikke muligt for skattemyndighederne på grundlag af selvangivelser og regnskaber at se, at aktierne blev erhvervet til en pris, der var langt under den reelle værdi. Heller ikke de oplysninger, som myndighederne modtog med redegørelsen af 26. oktober 1995, gjorde det muligt at gennemskue dette. Derimod var sagen af selskaberne fuldt ud klar over dette forhold. Endvidere har Landsskatteretten med rette henvist til den dagældende skattestyrelseslovs § 35, stk. 4, idet forhøjelsen vedrører, det påklagede forhold, da der er tale om samme faktiske omstændigheder, som Landsskatteretten blot retligt har kvalificeret anderledes end skatteregionen.

Over for sagsøgernes subsidiære påstand og mere subsidiære påstand har sagsøgte bestridt, at skattekravet er forældet, idet forældelsesfristen har været suspenderet af de samme grunde, som er anført vedrørende suspension af ansættelsesfristen, og i øvrigt blev afbrudt ved ansøgningen om henstand.

Til støtte for sin subsidiære påstand og vedrørende sagsøgernes mest subsidiære påstand har sagsøgte anført, at sagen skal hjemvises til skattemyndighederne til fornyet skatteansættelse, hvis landsretten finder grundlag for at tilsidesætte Landsskatterettens skøn.

## Landsretten udtaler:

Ifølge aftalen af 12. juli 1989 mellem F og JPC (Gibraltar) Ltd. (»Rex-aftalen«) skulle JPC senest den 30. september 1989 betale 15 mio. kr. til F for optionen på areal C, dog skulle F samtidig betale JPC 12 mio. kr. som ansvarligt, rentefrit lån. Tilbagebetalingen af lånet var afhængig af salgsprisen for projektet på areal C og ville i tilfælde af opnåelse af den anslåede salgspris herfor på 287 mio. kr. udgøre det fulde lånebeløb, hvorimod ingen del af lånet skulle tilbagebetales, dersom salgsprisen var mindre end 226 mio. kr. Såfremt JPC indgik aftale med en medinvestor, var F berettiget til at opsige lånet til omgående indfrielse til kurs 100.

Den 18. september 1989 - og således inden overdragelsen af aktierne i F til sagsøgerne og J den 2. oktober 1989 - anmodede F i henhold til Rex-aftalen JPC om overførsel af 3 mio. kr. Af dette beløb skulle F i henhold til aftalen med Scott Marketing Ltd. videregive 1 mio. kr. til dette selskab. I et af G pr. 31. december 1989 udarbejdet udkast til regnskab for F var selskabets egenkapital opgjort til 2.014.338 kr., uanset at den ansvarlige lånekapital på 12 mio. kr. regnskabsmæssigt var nedskrevet til 0 kr.

Det findes herefter godtgjort, at værdien af aktierne i F på overdragelsestidspunktet væsentligt oversteg aktiernes pålydende og dermed købesummen, og at sagsøgerne således med aktieerhvervelsen modtog et skattepligtigt tilskud. Landsskatteretten har ved skønnet over tilskuddets størrelse taget udgangspunkt i ovennævnte udkast til regnskab for F pr. 31. december 1989 og til den heri opgjorte egenkapital skønsmæssigt lagt 50% af indeståendet i JPC, idet der heved er henset til, at der på overdragelsestidspunktet var en vis usikkerhed med hensyn til tidspunktet for udbetalingen af indeståendet samt størrelsen af udgifter forbundet hermed. Landsretten finder der ikke godtgjort, at Landsskatterettens således udøvede skøn over F's indre værdi på i alt 8.014.338 kr. er sket på et fejlagtigt grundlag eller er åbenbart urimeligt.

Det fremgår ikke af sagsøgernes selvangivelser, at de har modtaget et skattepligtigt tilskud, og dette kan heller ikke udledes af sagsøgernes regnskaber. Efter G's forklaring undlod man bevidst i årsregnskaberne at omtale F, og oplysninger om erhvervelsen heraf fremkom først med redegørelsen af 26. oktober 1995. Redegørelsen var dog ikke fyldestgørende, idet selve Rex-aftalen ikke var vedlagt, men alene det officielle regnskab for F, hvorefter aktivitet i selskabet først påbegyndtes den 16. oktober 1989, og således efter overdragelsen af aktierne til sagsøgerne. Landsretten finder, at ejerne af de sagsøgende selskaber, der begge var forretningskyndige, må

**1504**

have været bekendt med, at aktierne i F blev erhvervet til en pris, der lå væsentligt under aktiernes reelle værdi, og at sagsøgerne dermed modtog et skattepligtigt tilskud, og det må tilregnes dem som groft uagtsomt, at de ikke gav nærmere oplysning herom. Herefter finder landsretten, at ansættelsesfristen efter dagældende skattestyrelseslovs § 35, stk. 1, har været suspenderet efter samme lovs § 35, stk. 3, og at denne suspension i hvert fald har varet indtil udgangen af 1995, idet skattemyndighederne måtte have en vis rimelig tid til at bearbejde og komplettere de med redegørelsen af 26. oktober 1995 modtagne, ufuldstændige og til dels misvisende oplysninger. Ansættelsesfristen var derfor ikke udløbet, da told- og skatteregionen traf afgørelse den 24. september 1998. Landsskatterettens kendelse af 28. november 2000 bygger på samme faktiske omstændigheder, som ligger til grund for told- og skatteregionens påklagede afgørelse, og det ændrede resultat skyldes alene en ændret retlig vurdering af disse faktiske omstændigheder. Fristreglen i dagældende skattestyrelseslov § 35, stk. 1, var derfor ikke til hinder for den af Landsskatteretten foretagne forhøjelse af sagsøgerens indkomster, jf. dagældende styrelseslovs § 35, stk. 4.

Forældelsen af skattekravet efter 1908-loven findes efter lovens § 3 suspenderet på grund af utilregnelig uvidenhed hos skattemyndighederne af de samme grunde, som fører til, at ansættelsesfristen var suspenderet, og i samme tidsrum, og skattekravet var derfor ikke forældet, da denne retssag blev anlagt den 28. december 2000.

Sagsøgtes frifindelsespåstand tages herefter til følge.

- - -

I sagsomkostninger skal D betale 40.000 kr. til sagsøgte og E betale 40.000 kr. til sagsøgte.

## Højesteret

## Højesterets dom.

I tidligere instans er afsagt dom af Østre Landsrets 2. afdeling den 20. december 2002.

I pådømmelsen har deltaget fem dommere: Wendler Pedersen, Per Walsøe, Børge Dahl, Thomas Rørdam og Jens Peter Christensen.

Copyright © 2021 Karnov Group Denmark A/S

*Påstande:*

Appellanterne, D og E, har gentaget deres påstande, dog således at den for landsretten mere subsidiære påstand er frafaldet.

Indstævnte, Skatteministeriet, har påstået stadfæstelse, subsidiært at ansættelsen af appellanternes skattepligtige indkomst for skatteåret 1991/92 hjemvises til fornyet behandling ved skattemyndighederne.

*Supplerende sagsfremstilling*

I et fremlagt udkast til aftale udarbejdet af H i juni 1989 hedder det bl.a.:

»Mellem på den ene side

KW & JPC

(i det følgende kaldet bygherren)

og på den anden side

S v/H eller et af hende kontrolleret selskab

(i det følgende kaldet rådgiveren)

er der som følge af, at bygherren agter at udbyde det i vedhæftede bilag omtalte projekt (i det følgende kaldet henholdsvis A, B og C) til investorer indgået følgende aftale:

§ 1

Rådgiveren skal i relation til nærværende aftale iværksætte og forestå en undersøgelse og vurdering af henholdsvis A, B og C's værdi med det formål at fastsætte en realistisk nettosalgspris.

§ 2

Rådgiveren skal på »best effort basis« forestå forhandlingerne med potentielle investorer og har uden forudgående godkendelse af bygherren ret til at sælge projektet A, B og C til en pris, der giver bygherren et minimumsprovenu før fee til rådgiveren på henholdsvis . . . mio, . . . mio og . . . mio, jf. vedhæftede opgørelse.

Bygherren er respektivt forpligtet til at medvirke til at gennemføre et sådant salg.

§ 3

Bygherren må ikke uden skriftlig tilladelse fra rådgiveren rette henvendelse til investorer respektive købere uanset om det drejer sig om private investorer/købere, institutionelle investorer eller pengeinstitutter med henblik på gennemførelse eller salg af nærværende projekt. Enhver kontakt skal stedse foregå gennem rådgiveren.

§ 4

Såfremt rådgivers forhandlinger med investorer/købere medfører, at A, B eller C helt eller delvist sælges med et minimumsprovenu eller forholdsmæssigt minimumsprovenu til bygherren som anført i § 2, vil rådgiveren beregne sig et honorar på . . . % af dette minimumsprovenu eller ethvert provenu, der overstiger dette. Honoraret afregnes i takt med at der foreligger bindende aftale mellem bygherren og investor respektive køber angående overdragelserne.

I alle tilfælde har rådgiver krav på et honorar på minimum kr. 4 mio, der forfalder ved aftalens opsigelse.

§ 5

Bygherren afholder rådgivers markedsføringsomkostninger inden for en beløbsramme på maximalt DKK 5 mio. Rådgiver vil maximalt kunne afholde omkostninger for DKK 10 mio i forbindelse med markedsføring af C og maximalt DKK 5 mio i forbindelse med markedsføring af B. Markedsføringsomkostninger

RESULTATOPGØRELSE FOR 1989

omfatter brochurer, salgsprospekter, PR-virksomhed, externe konsulenter, annoncering, rejser og repræsentation.

Omkostningerne afregnes løbende og betales af B efter påkrav fra rådgiver.

**1505**

§ 6

Bliver A, B eller C afhændet helt eller delvist uden rådgivers medvirken, oppebærer rådgiver fuldt honorar og dækning af omkostninger, så længe nærværende aftale er gældende.

§ 7

Bliver A, B eller C efter udløbet af nærværende kontrakt afhændet helt eller delvist, oppebærer rådgiver fuldt honorar, såfremt overdragelse sker til en forbindelse, som rådgiver har været i kontakt med. Ved udløb af aftalen overgiver rådgiver bygherren en fortegnelse over de potentielle aftagere, som rådgiver har været i kontakt med.

§ 8

Rådgiver forestår, såfremt det er hensigtsmæssig at fremmedfinansiere hele eller dele af A, B eller C, forhandlinger med eventuelle långivere. Rådgivers omkostninger i den forbindelse er indeholdt i de i §§ 4 og 5 nævnte beløb.

§ 9

Rådgiver forestår, såfremt det er hensigtsmæssigt at udleje hele eller dele af A, B eller C, forhandlinger med eventuelle udlejningsagenter. Rådgivers omkostninger i den forbindelse er ligeledes indeholdt i de i §§ 4 og 5 nævnte beløb.

§ 10

Såfremt forudsætningerne for gennemførelse af nærværende projekt ændres i en sådan grad, at en af parterne ønsker nærværende aftale ændret eller eventuelt ophævet, skal den anden part være forpligtet til at optage forhandling herom.

§ 11

Nærværende aftale kan tidligst opsiges 6 måneder efter sidste afsnit af enten A, B eller C er færdigopført eller bygherren har besluttet ikke at gennemføre opførelsen af A, B og/eller C og da med 6 måneders skriftlig varsel til den første i måneden.«

Det er oplyst, at udkastet til F's årsregnskab fra 1989 - udarbejdet af G - blev overgivet til skattemyndighederne af Statsadvokaten for Særlig Økonomisk Kriminalitet (SØK) på mødet den 1. oktober 1997. Det hedder i dette regnskab bl.a.:

»F, Gibraltar har i juli 1989 indgået aftale med JPC (Gibraltar), Ltd hvorefter JPC (Gibraltar, Ltd udnytter optionen til køb af brugsretten for de arealer der er omfattet af optionsaftalen der er indgået mellem Regeringen på Gibraltar og F den 16. juni 1989.

JPC (Gibraltar), Ltd har besluttet at udnytte optionsretten til et af arealerne. Betalingen herfor andrager DKK 15 mill, hvoraf DKK 3 mill betales kontant og DKK 12 mill bliver indestående som ansvarlig indskudskapital i JPC (Gibraltar), Ltd, i henhold til aftalen. Den ansvarlig indskudskapital er i regnskabet for 1989 nedskrevet til nul da værdien heraf bl.a. afhænger af det senere salg af byggeriet.

Årsregnskabet viser et overskud på DKK 2.013.188 og en egenkapital på DKK 2.014.338.

. . .

| | |
|---|---:|
| Salg af optionsrettighed | 15.000.000 |
| Nedskrivning af ansvarlig indskudskapital | 12.000.000 |
| | 3.000.000 |
| Omkostninger | 1.012.112 |
| Bruttofortjeneste | 1.987.888 |

| | |
|---|---|
| Finansieringsindtægter | 25.300 |
| OVERSKUD | 2.013.188 |

**BALANCE PR. 31. DECEMBER 1989**

**AKTIVER**

| | |
|---|---|
| Lånedebitorer | 1.353.108 |
| ABG Bank, 344.20.010 | 670.025 |
| AKTIVER I ALT | 2.023.133 |

**PASSIVER**

| | |
|---|---|
| Aktiekapital, 100 GBP | 1.150 |
| Overført overskud | 2.013.188 |
| EGENKAPITAL | 2.014.338 |

**GÆLD**

| | |
|---|---|
| Skyldige omkostninger | 8.795 |
| GÆLD | 8.795 |
| PASSIVER I ALT | 2.023.133 |

**NOTER**

*OMKOSTNINGER*

| | |
|---|---|
| Rådgiverhonorar | 1.000.000 |
| Bankomkostninger | 2.166 |
| Advokatomkostninger (450GBP) | 4.946 |
| Diverse | 5.000 |
| | 1.012.112 |

. . .

*LÅNEDEBITORER*

| | |
|---|---|
| J | 500.548 |
| D | 426.280 |
| E | 426.280 |
| | 1.353.108 |

. . .«

I F's årsregnskab for 1990 (»financial statements period ended 31st December 1990«), som er revideret af Ernst & Young, hedder det bl.a.:

*»REPORT OF THE AUDITORS TO THE MEMBERS OF F*
We have examined the attached balance sheet and have obtained all the information and explanations we have required.

**1506**

In our opinion the balance sheet is properly drawn up so as to give a true and fair view of the state of affairs of the company as at 31st December 1990 according to the best of our information and the explanations given to us and as shown by the books of the company.

. . .

*F's*
*PROFIT AND LOSS ACCOUNT FOR THE PERIOD FROM*
*COMMENCEMENT OF TRADING ON*
*16th OCTOBER 1989 TO 31st DECEMBER 1990*

| | Notes | DKK | DKK |
|---|---|---|---|
| INCOME | | | |
| Loan interest | 4 | | 265,904 |
| Bank interest | | | 74,154 |
| | | | 340,058 |

EXPENSES

| | | |
|---|---:|---:|
| Administration fees | 42,000 | |
| Audit and accountancy fees | 14,000 | |
| Legal fees | 8,770 | |
| Bank charges | 5,545 | |
| Sundries | 2.588 | |
| | | 72,903 |
| PROFIT FOR THE PERIOD BEFORE | | 267,155 |

. . .

F's

*BALANCE SHEET AS AT 31ST DECEMBER 1990*

| | Notes | DKK | DKK |
|---|---|---:|---:|
| CURRENT ASSETS | | | |
| Cash at bank | | | 4,757,251 |
| Loans | 2 | | 9,566,904 |
| | | | 14,324,155 |
| CURRENT LIABILITIES | | | |
| Taxation | | 54,813 | |
| Creditors | | 4,056,000 | |
| | | | 4,110,813 |
| | | | 10,213,342 |
| Represented by: - | | | |
| CAPITAL ACCOUNT | | | |
| Share capital | | | 1,000 |
| Capital reserve | 3 | | 10,000,000 |
| Profit and loss account | | | 212,342 |
| | | | 10,213,342 |

. . .

F's

*NOTES TO THE ACCOUNTS FOR THE PERIODE ENDED 31ST DECEMBER 1990*

. . .

2. Loans

The loans outstanding at 31StDecember 1990 are made up as follows: -

| | DKK |
|---|---:|
| | |
| E | 2,391,010 |
| D | 2,391,010 |
| J | 4,784,884 |
| | 9,566,904 |

3. CAPITAL RESERVE

Movements on Capital reserve are as follows: -

| | DKK |
|---|---:|
| Proceeds of disposal of capital asset | 15,000,000 |
| Less: expenses relating to disposal | 5,000,000 |
| | 10,000,000 |

. . .«

Skatteministeriet har i sagen indgivet svarskrift til landsretten med påstand om frifindelse den 14. februar 2001.

Statsautoriseret revisor Jesper Meto har i skønserklæring af 30. september 2004 besvaret en række spørgsmål fra parterne således:

»2. Besvarelse af skønsmaets spørgsmål

2.1 Besvarelse af spørgsmål 1

Spørgsmål 1:

»Skønsmanden bedes oplyse handelsværdien af aktierne i F pr. overdragelsesdagen den 02.10.1989, idet skønsmanden ud over det i øvrigt oplyste bedes lægge til grund,

• at F's bruttotilgodehavende på 0-12 mio. kr. var betinget af, at JPC for et projekt på arealet skulle opnå en bestemt salgspris eller af, at JPC indgik en aftale med en medinvestor for 50% eller derover,

• at Scott Marketing Ltd. i henhold til aftalen af 14.06.1989 var berettiget til 1/3 af det af F opnåede bruttohonorar i henhold til aftalen med JPC af 12.07.1989,

• at der ikke på tidspunktet for overdragelsen var konkrete tilbud vedrørende køb eller medfinansiering af projektet, og

• at der ikke var andre aktiviteter i F end de ovenfor nævnte.«

Aktiehandlen gennemføres pr. 02.10.1989, og der er ikke pr. denne dato udarbejdet perioderegnskab eller lignende materiale vedrørende

selskabets situation. Der sker ikke i perioden fra 02.10.1989 -
31.12.1989 transaktioner, som har væsentlig indflydelse på
selskabets egenkapital. Den opgjorte egenkapital på ca. 2 mio.kr.
pr. 31.12.1989 var således også til stede pr. 02.10.1989, idet F pr.
30.09.1989 anmodede JPC om betaling af 15 mio.kr. i henhold til
aftalen af 12.07.1989.

I perioden frem til 31.12.1989 modtager F afregning af de 15
mio.kr. og etablerer samtidig det ansvarlige lån til JPC, stort 12
mio.kr. I samme periode afregnes der 1 mio.kr. til Scott Marketing
Ltd., således at selskabet pr.

**1507**

31.12.1989 har ca. 2 mio.kr. i likvider, svarende til egenkapitalen.

Selskabet har herefter en mulighed for at opnå tilbagebetaling af
de 12 mio.kr., afhængig af salgsprisen for det samlede projekt. Ud
af bruttovederlaget skal F dog betale Scott Marketing Ltd. 1/3 af
de indgåede beløb. Her over for står forpligtelsen til at yde
konsulentassistance i henhold til kontraktens punkt 7, der er
formuleret således:

»F undertakes, free of charge, to provide consultancy to JPC
regarding company-related and tax-related constructions in Gibraltar
and in Denmark regarding the above mentioned areas C and A.«

Vurderingen af aktiernes værdi pr. 02.10.1989 kan således tage
udgangspunkt i, at selskabet har en bogført egenkapital på ca. 2
mio.kr., hvor der samtidig er et ansvarligt lån på 12 mio.kr., hvis
værdi afhænger af projektets samlede salgspris. Dog vil der
maksimalt tilgå selskabet 8 mio. kr. efter afregning med Scott
Marketing Ltd. Herfra går de omkostninger, der måtte løbe på i
forbindelse med opfyldelse af kontrakten omkring rådgivning i
selskabs- og skattespørgsmål.

Der er efter skønsmandens opfattelse følgende forhold, der kan
påvirke positivt ved værdiansættelsen:

• Såfremt projektet realiseres til et beløb mellem 226-287 mio.kr.,
vil F opnå 20% af den del af salgsprisen, der overstiger 226 mio.kr.
Ved en salgspris på 287 mio.kr. vil F modtage 12 mio.kr., hvoraf
1/3, svarende til 4 mio.kr., skal afregnes til Scott Marketing Ltd.
Den maksimale gevinstmulighed for F vedrørende det ansvarlige
lån vil således være 8 mio.kr. netto.

• I det omfang der måtte blive bygget på areal A, har F yderligere
mulighed for at opnå en ny provision på 15 mio.kr. Betingelserne
for denne provision svarer til, hvad der er gældende for areal C.
Det vil sige, at F vil modtage 3 mio.kr. kontant ved udnyttelse af
arealet og modtage 20% af den salgssum, der måtte overstige 213
mio.kr. og modtage det fulde beløb på 12 mio.kr., såfremt projektets
samlede salgspris overstiger 273 mio.kr. Der skal afregnes 1/3 til
Scott Marketing Ltd.

• Såfremt JPC måtte indgå en aftale med en medinvestor om at
overtage mere end 50% af byggeprojektet, skal F modtage fuld
indfrielse af det/de ansvarlige lån. Såfremt der optages en
medinvestor for mindre end 50%, vil der ske en forholdsmæssig
tilbagebetaling af det ansvarlige lån.

• Der var i 1989 tale om et nyt marked på Gibraltar, som var
karakteriseret som værende et meget spekulativt marked på
daværende tidspunkt. Brian Francis udtrykte herom:

»There was a highly speculative market at that time in 1989 for
such projects but such a market had not yet developed and
consequently there was at very high development risk fuelled to a
large degree by market hype.«

Af forhold der kan påvirke værdiansættelsen negativt kan nævnes:

• Der skal afholdes udgifter for at opfylde rådgivningsaftalen, og
der er ikke i kontrakten indsat noget maksimum beløb herfor.

• Der er tale om et spekulativt marked på dette tidspunkt i 1989,
hvilket kan påvirke prisen såvel positivt som negativt.

• Projektets salgsværdi er usikker på dette tidspunkt. Der foreligger
kalkulationer der viser en kostpris for projektet på 226 mio.kr. og
en estimeret salgspris på 287 mio.kr. Boligmarkedet på Gibraltar
har ifølge Brian Francis op til dette tidspunkt været domineret af
lejeboliger og ikke ejerboliger.

I henhold til oplysninger modtaget fra Brian Francis vurderes det,
at der ikke var stor sandsynlighed for at opnå den stipulerede
salgspris på 287 mio.kr., der ville udløse den fulde tilbagebetaling
af det ansvarlige lån.

»There was a very little likelihood that the potential sales price
of the Eurotowers project at the relevant time in mid-1989 would
have been in the range of DKK 287 million.

If the opinion expressed was in respect of the apartments alone it
would even be more unlikely. However with the shops and offices
includede as part of the project the value would have been more
realistic but still in our view not achievable given that the market
for shops and offices in that area was even worse than for the
residential accommodation.«

Ved vurdering af aktiens værdi pr. 02.10.1989 er der i forhold til
ovenstående forhold lagt vægt på følgende:

• Det vil være vanskeligt at opnå en tilbagebetaling af det fulde
beløb på 12 mio.kr. i ansvarlig lånekapital til JPC, idet der var
usikkerhed om værdien af det samlede projekt, og at det ikke
vurderes realistisk at kunne opnå de fulde 287 mio.kr. i salgspris.

• Selskabet har mulighed for at opnå yderligere afkast af aftalen
med JPC, såfremt der senere måtte ske en bebyggelse af areal A.

Selskabet har også er en mulighed for fuld tilbagebetaling af det
ansvarlige lån, såfremt JPC måtte optage en investor for mere end
halvdelen af byggeprojektet, selv om det er oplyst i
forudsætningerne, at der skal lægges til grund, at der på
handelstidspunktet ikke var konkrete tilbud vedrørende køb eller
medfinansiering af projektet.

• Selskabet er forpligtet til at afholde rådgivningsomkostninger
af en ukendt størrelse. Disse omkostninger kan blive større eller
mindre afhængig af, hvilket form for salg der vil være tale om.
Rådgivningen er begrænset til juridiske og skattemæssige forhold
vedrørende Gibraltar og Danmark.

**1508**

I den forbindelse er der lagt til grund, at rådgivningen naturligt
ville bestå i at oplyse om juridiske og skattemæssige forhold i
forbindelse med prospektudarbejdelse, således at der i prospektet
indgår oplysninger om juridiske og skattemæssige konsekvenser
af forskellige etableringsformer.

Det må samtidig bemærkes, at det ligger inden for
investorkredsens kompetenceområde at forestå en del af
rådgivningen på egen hånd. Det vil dog kræve en ansættelse af de
pågældende eller en afregning på konsulentbasis, ligesom det må
forventes, at der skal indkøbes juridisk assistance.

Det lægges samtidig til grund, at der ikke vil være tale om
individuel rådgivning til enkeltinvestorer, der må forventes selv at
undersøg juridiske og skattemæssige konsekvenser af forskellige
konstruktioner. Det er derfor vurderet, at der alene vil være tale
om rådgivning i relation til prospektudarbejdelse.

• Der lægges også vægt på, at der inden for relativ kort tid før
aktiehandlen er indgået en aftale mellem F og JPC omkring
projektet på baggrund af beregninger, der i det fremsendte materiale
er delvis gengivet, og som udviser en kostpris på de omtalte 226
mio.kr. og en stipuleret salgspris på 287 mio.kr. Dette materiale er
også bekendt af de parter, der indgår handlen, ligesom JPC har
vurderet, at dette var et projekt, som var værd at indgå i.

Ved vurderingen af selskabet, F's værdi pr. 02.10.1989 er der taget
udgangspunkt i en bogført egenkapital på ca. 2 mio.kr. pr.
handelsdagen. Selskabet har muligheden for at realisere en upside

på det ansvarlige lån samt eventuelt en bebyggelse på det andet areal, men skal afholde omkostninger i forbindelse med skattemæssig og juridisk rådgivning. På baggrund af markedsvurderingen vurderes det ikke sandsynligt, at der opnås en fuld tilbagebetaling af det ansvarlige lån, medmindre dette sker ved, at JPC optager en medinvestor. Værdien af det ansvarlige lån fra F til JPC vurderes derfor til maks. at kunne værdiansættes til 2-3 mio.kr. Der skal samtidig reserveres til rådgivningsomkostninger, som skønnes ikke at beløbe sig til mere end 1 mio.kr.

*Det skønnes derfor under hensyntagen til ovenstående og de usikkerhedsmomenter der er knyttet til de forskellige elementer der har indflydelse på værdien, at den samlede værdi af aktierne i F pr. 02.10.1989 udgør i niveauet 3-4 mio.kr.*

*2.2 Besvarelse af spørgsmål 2*

Spørgsmål 2:

*»Skønsmanden bedes oplyse handelsværdien af aktierne i F pr. overdragelsesdagen den 02.10.1989, såfremt det yderligere lægges til grund, at F havde forpligtelse til - ud over at skatte- og selskabsmæssig rådgivning - for egen regning at markedsføre projektet og søge investorer hertil.«*

I projektets kostpris indgår der markedsføringsomkostninger for 5 mio.kr. pr. areal. I forbindelse med salget af et sådant projekt vurderes det, at der vil være omkostninger til følgende:
• Udarbejdelse af salgsprospekt og andet salgsmateriale.
• Annoncer og distribution af salgsmateriale.
• Opsøgende arbejde, møder og drøftelser med potentielle købere.
• Fremvisninger primært når byggeriet er påbegyndt.
• Eventuel afslutning af salg med slutsedler.

Ved vurdering af hvilke omkostninger der skal afholdes vedrørende salg og markedsføring af projektet vurderes det, at et niveau, som fremgår af projektomkostningerne på 5 mio.kr., ikke er urealistisk. Ved forespørgsel til Brian Francis er det bekræftet, at markedsføringsomkostninger i et niveau af 2% af bruttosalgsværdien ikke er urealistisk. Dette svarer således til et niveau på 5 mio.kr.

Besvarelsen af spørgsmål 2 er derfor opdelt i 2, da det ikke af materialet fremgår, hvorvidt de omkostninger F skal afholde er de samlede omkostninger, altså niveauet på 5 mio.kr., eller om det kun er omkostninger, der løber ud over de 5 mio.kr., der er indeholdt i projektkalkulationen.

Såfremt det kun er omkostninger ud over de 5 mio.kr. som F skal afholde, skønnes det, at disse ikke vil overstige yderligere 1 mio.kr. ud fra indikationerne om, at salgs- og markedsføringsomkostningerne til sådanne projekter normalt har et niveau på ca. 2% af den samlede salgspris.

*Under den forudsætning skønnes det, at værdien af aktierne pr. 02.10.1989 vil ligge i niveauet 2-3 mio.kr.*

Forudsættes det derimod, at de 5 mio.kr., der indgår i projektet, skal afholdes af F, vil dette få en anden konsekvens for værdien af aktierne pr. 02.10.1989.

Som udgangspunkt vil afholdelse af omkostninger i et niveau på 5 mio.kr. i F stille krav om, at der skal opnås en nettobetaling på det ansvarlige lån på 4 mio.kr. for, at F er i stand til at inddække omkostningerne. Det vil sige, at F skal have en udbetaling på 6 mio.kr. på det ansvarlige lån, idet der skal viderebetales 2 mio.kr. til Scott Marketing Ltd., hvorefter F har en kapital på 6 mio.kr. (egenkapitalen på 2 mio.kr. og 4 mio.kr. i netto betaling fra JPC). Dette modsvarer markedsføringsomkostningerne på 5 mio.kr. samt 1 mio.kr. i omkostninger til rådgivning vedrørende juridiske og skattemæssige forhold.

Dette vil kræve en salgspris for projektet på 257 mio.kr., hvilket F ikke ud fra den vurderede markedssituation i 1989 vil være sikker på at opnå. Dette kan

**1509**

umiddelbart indikere en værdi af aktierne pr. 02.10.1989 på 0 kr.

F vil formentlig, såfremt salgsbestræbelserne viser, at det på grund af markedsforholdene vil være vanskeligt at opnå en betaling på det ansvarlige lån, der er tilstrækkelig til at dække omkostningerne, forsøge at tilpasse indsatsen der gøres i forbindelse med salget. Der er tilsyneladende ikke konkrete skriftlige aftaler om specifikke forpligtelser til markedsføring, salgsindsats mv., og der ses ingen forpligtelse hertil i aftalen af 12.07.1989 mellem F og JPC.

Der må også tages hensyn til, at der er nogle mulige up-sides i den aftale, som F har indgået, som kan medføre, at der sker en højere tilbagebetaling på det ansvarlige lån i forbindelse med enten et godt salg, al der optages en medinvestor, eller at der måtte ske en udnyttelse af areal A. En værdi på 0 kr. skønnes derfor ikke at være rimelig, da der er nogle muligheder om end usikre for at opnå en gevinst på det ansvarlige lån. Det vurderes heller ikke sandsynligt, at aktionærerne i F vil afstå aktier til en uvildig tredjepart til 0 kr. uden samtidig at bibeholde en reguleringsmulighed.

*Under disse forudsætninger vurderes derfor, at aktiens værdi pr. 02.10.1989 vil ligge i niveauet 1-1½ mio.kr.*

*2.3 Besvarelse af spørgsmål 3*

Spørgsmål 3:

*»I tilknytning til spørgsmål 1 bedes skønsmanden præcist beskrive og oplyse de momenter og forudsætninger han har ladet indgå i vurderingen af handelsprisen.«*

Disse forhold er søgt beskrevet under besvarelsen af både spørgsmål 1 og spørgsmål 2.

*2.4 Besvarelse af spørgsmål 4*

Spørgsmål 4:

*»Skønsmanden bedes i forlængelse af spørgsmål 3 præcist beskrive hvilke forpligtelser tiltag til markedsføring og søgning af investorer han har gået ud fra, at F havde pr. 02.10.1989 samt anslå udgifterne hertil dels i direkte omkostninger dels i intern arbejdstid.«*

I den forbindelse henvises ligeledes til besvarelsen af spørgsmål 1 og 2. Med hensyn til fordelingen i eksterne omkostninger og intern arbejdstid ser skønsmanden sig ikke i stand til at besvare dette. Det skyldes blandt andet, at F ikke har ansatte, og at det af materialet nogle steder fremgår, at man forventer at kunne udnytte de ressourcer, der er til rådighed i den øvrige del af koncern F indgår i. Dette kan indikere, at alt er eksterne omkostninger, men koncernen kunne også vælge at lade personer ansætte i F, når det kommer til udførelsen af markedsindsatsen, hvilket gør det umuligt at skønne over fordelingen, idet der heller ikke er oplysninger om de kompetencer, som koncernen måtte besidde.

*2.5 Besvarelse af spørgsmål 5*

Spørgsmål 5:

*»Skønsmanden bedes oplyse, om der i oktober 1989 eksisterede et almindeligt marked for omsætning af aktier i selskaber med en tilsvarende aktivitet - herunder på Gibraltar - som i F.«*

Åbningen og udnyttelsen af havnefronten på Gibraltar var i 1989 lige påbegyndt, og Goverment of Gibraltar havde på dette tidspunkt faste salgspriser på den jord, der skulle udnyttes, svarende til 350 pund pr. m² med en efterfølgende leje. Ved forespørgsel til Brian Francis om hvorvidt han var bekendt med, at der eksisterede et marked vedrørende handel med rettigheder eller projekter vedrørende udnyttelse af arealerne omkring havnefronten er det oplyst, at det efter hans opfattelse ikke var tilfældet.

*2.6 Besvarelse af spørgsmål 6*

Spørgsmål 6:

»Skønsmanden bedes oplyse hvilke erfaringer han har haft med hensyn til etablering af byggeprojekter på Gibraltar i perioden 1980 til dags dato.«

Det kan oplyses, at skønsmanden ikke har erfaring med konkrete byggeprojekter på Gibraltar i den omtalte periode.

3. Afslutning

Skønsmanden kan oplyse, at ovenstående besvarelse af spørgsmål 1-6 er sket med baggrund i det foreliggende materiale og efter bedste evne med baggrund i joberfaring som statsautoriseret revisor og tidligere udførte vurderingsopgaver samt med anvendelse af input fra Brian Francis, herunder også telefoniske drøftelser om forholdene på Gibraltar i perioden. Da der er tale om skøn og vægtninger af forhold, der ikke er præcis viden om kan det ikke udelukkes, at andre på baggrund af det samme materiale vil foretage en anden vægtning og dermed vurdere anderledes.

Skønsmandens besvarelse af skønstemaet er udarbejdet til brug i den verserende sag og kan ikke helt eller delvist anvendes i anden sammenhæng uden skønsmandens tilsagn.«

## Højesterets begrundelse og resultat

Det fremgår af udkast til årsregnskab for F for 1989, at selskabet - efter at H den 12. juni 1989 havde erhvervet det som skuffeselskab med en aktiekapital på 100 GBP - i dette år havde en indtægt på 15 mio. kr. Denne indtægt var opnået ved salg af optionen på køb af brugsretten til areal C. Af de 15 mio. kr. skulle 12 mio. kr. forblive indestående i JPC som ansvarlig lånekapital - med mulighed for udbetaling som angivet i aftalen af 12. juli 1989 med JPC. I F's regnskab var beløbet på 12 mio. kr. nedskrevet til 0. F's omkostninger i 1989 var - ud over rådgivningshonorar på 1 mio. kr. til Scott Marketing - på 12.112 kr.

**1510**

Det fremgår af F's årsregnskab for 1990, at der i perioden fra den 16. oktober 1989 til den 31. december 1990 var indtægter på 340.058 kr. og udgifter på 72.903 kr. Egenkapitalen udgjorde godt 10 mio. kr., idet der var aktiver for godt 14 mio. kr. og en gæld på ca. 4 mio. kr.

På denne baggrund og efter bevisførelsen i øvrigt finder Højesteret ikke grundlag for at antage, at F havde omkostningskrævende pligter, som ikke er nævnt i aftalen af 12. juli 1989 med JPC.

Med disse bemærkninger og i øvrigt af de grunde, der er anført af landsretten, tiltræder Højesteret, at værdien af aktierne i F på overdragelsestidspunktet den 2. oktober 1989 væsentligt oversteg aktiernes pålydende på 100 GBP og dermed den købssum, som H fik, da hun solgte aktierne til kurs pari til bl.a. D, der var ejet af hendes mand, G, og E, som hun selv ejede.

Højesteret tiltræder endvidere, at skattemyndighederne herefter har været berettiget til at skønne over værdien af det skattepligtige tilskud, som holdingselskaberne opnåede ved disse aktiedispositioner.

Som anført af skønsmanden var der ikke i oktober 1989 et marked for omsætning af aktier i selskaber med en aktivitet som F's, og det kan efter bevisførelsen lægges til grund, at der var tale om handel mellem parter, som havde et særligt fællesskab om og særlig indsigt i selskabets aktivitet og mulighed for indtjening. Højesteret tiltræder, at det ikke er godtgjort, at Landsskatterettens ansættelse af det skattepligtige tilskud ud fra en indre værdi på lige godt 8 mio. kr. lider af mangler, som kan begrunde en tilsidesættelse.

Skattemyndighederne blev først på mødet med SØK den 1. oktober 1997 bekendt med udkastet til årsregnskab for F for 1989 og Ballerup Rets dom af 2. februar 1995. Med henvisning hertil og i øvrigt til det, som landsretten har anført, finder Højesteret, at ansættelsesfristen efter den dagældende skattestyrelseslov § 35,

stk. 1, jf. stk. 3, må anses for suspenderet indtil den 1. oktober 1997, og at fristen derfor ikke var udløbet, da told- og skatteregionen traf afgørelse den 24. september 1998.

Af de grunde, der er anført af landsretten, og efter sammenhængen mellem de oplysninger, der er lagt til grund for henholdsvis skatteregionens og Landsskatterettens afgørelse, tiltræder Højesteret, at fristreglen ikke var til hinder for Landsskatterettens afgørelse af 28. november 2000, der må anses som en forhøjelse vedrørende det påklagede forhold, jf. den dagældende skattestyrelseslov § 35, stk. 4.

Da skattemyndighederne først den 1. oktober 1997 kom i besiddelse af tilstrækkelige oplysninger til at kunne foretage en korrekt skatteberegning, hvilket ikke kan bebrejdes skattemyndighederne, tiltræder Højesteret, at der ikke er indtrådt forældelse efter 1908-loven.

Højesteret stadfæster herefter dommen.

## Thi kendes for ret:

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for Højesteret skal D og E inden 14 dage efter denne højesteretsdoms afsigelse hver betale 50.000 kr. til Skatteministeriet. Beløbene forrentes efter rentelovens § 8 a.*

Copyright © 2021 Karnov Group Denmark A/S