# LIONBRIDGE

STATE OF NEW YORK    )
                     )
                     )  ss
                     )
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Danish into English of the attached document U.1997.1546V. I affirm that the linguist responsible for producing this translation is fluent in both the Danish and English languages.

_____

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me
this 6th day of June, 2022.

_____

LAURA E MUSICH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MU6386791
Qualified in Queens County
My Commission Expires 01-28-2023

U.1997.1546V

*Compensation for missing and incorrect reports for the purpose of calculating royalties for the use of protected works.*

*Commercial law 2.9 - Intellectual property law 1.4 - Monetary system etc. 58.3.*

♦ The F association protects the mechanical rights of Danish and foreign composers by concluding agreements with phonogram producers, who pay the F remuneration on the basis of their sales prices to retail outlets. The basis for the calculation of the remuneration is the information received by F from the phonogram producers. A company A (later A A/S) reported over a long period lower production numbers than it actually produced and sold, and both the day-to-day manager and the director, who was also the sole shareholder and a member of the board as well as being involved in daily

**1547**

operations, were liable for F's losses. The calculation of F's loss was based on the general rules of tort law, supplemented by § 56 of the current Copyright Act, and no part of the claim was time-barred. The compensation included, in addition to lost remuneration, compensation for the costs of investigation and research, but not compensation for non-pecuniary damage.

**Western High Court Ruling of September 18, 1997, in appeal 6. B-2582-91**
(Jochimsen, Fabrin, Michael Lynge Jensen (judge)).

*Nordic Copyright Bureau (attorney Marianne Bruhn Andersen, Copenhagen)*
against
*M and S (attorney Ole Wagner, Aalborg).*

**The Western High Court**
In the present action, brought on December 23, 1991, the plaintiff, Nordisk Copyright Bureau, claims that the defendants, M and S, should be ordered jointly and severally to pay the plaintiff, in its principal submission, the sum of DKK 3,163,040.12, in the alternative submission DKK 2,997,593.06, together with interest calculated from the date on which the action was brought until payment is made.

 Defendant M seeks, in its principal submission, a declaration of non-liability against payment of DKK 626,675.93, and alternatively an amount greater than that but less than that claimed by the plaintiff in his secondary submission, all with interest as claimed by the plaintiff.

 The defendant, S, submits that the court should dismiss the action or, in the alternative, order to pay a lesser sum than DKK 2,997,593.06.

 The application states that the plaintiff is an association which protects the mechanical rights of Danish and foreign composers, lyricists and music publishers, i.e. the right to use protected works in connection with the production of gramophone records, cassette tapes and compact discs (CDs) etc. (hereinafter collectively referred to as phonograms). The composers, lyricists and music publishers referred to are hereinafter referred to collectively as rightsholders.

 Under agreements with the Nordic copyright societies (KODA, STEF, STIM, TEOSTO, and TONO) and with rights holders directly and under cooperation agreements with affiliates abroad, the plaintiff manages, as far as the Nordic countries are concerned, the mechanical rights to virtually all protected music in the world. The rightsholder has the exclusive right to record protected works on phonograms, to produce copies of phonograms of protected music and to distribute such phonograms to the public.

 The plaintiff administers the mechanical rights of rightsholders on the basis that the plaintiff concludes agreements with phonogram producers on behalf of the rightsholders for the exploitation of the mechanical rights. In return for their right, the producers pay a remuneration calculated on the basis of the phonogram producers' retail selling prices (Published Price to Dealers), hereinafter 'PPD prices'. The average amount of the remuneration per phonogram is approximately DKK 5. The remuneration to be paid to the plaintiff is called the "NCB" (Nordisk Copyright Bureau) remuneration.

 The plaintiff's licensing agreements with producers are structured differently, depending on whether there is a single production license, where a producer is only entitled to produce a specified number of copies of a particular phonogram, or whether there is a standard producer agreement, where the producer is allowed to exploit the plaintiff's entire repertoire with the obligation to make a regular reporting of the works exploited in the production, without the need for the producer to apply for the plaintiff's license in each case. Regardless of whether a phonogram producer has one form of agreement or the other, the essential basis for the calculation of the NCB remuneration by the plaintiff is the information and reports which the plaintiff receives from the phonogram producers.

 From 1980 until September 14, 1990, A, through the defendant S and later A A/S, had access to the plaintiff's repertoire under various agreements, without at any time having concluded a standard producer agreement.

 A letter dated July 29, 1980, from the plaintiff to A, on whose behalf the contents of the letter were endorsed by the defendant S by a note dated September 23, 1980, states, inter alia:
"...
We refer to telephone conversations which have taken place between your Mr. M and our I, during which the possibility of finding a more flexible form of cooperation between NCB and A than the one used to date has been discussed.
NCB may suggest the following approach:
1. A provides a financial guarantee of DKK 10,000.00. ...
2. A undertakes to place orders for the production of records and tapes only with press and copying firms approved by NCB.
3. Every Friday, A shall send to NCB a statement of the number of records and tapes delivered to A during the preceding week. The statement shall be accompanied by copies of invoices or delivery notes and by a deposit of the number of copies delivered x the minimum remuneration.
4. A informs NCB of the countries for which the various numbers of records and tapes are intended and undertakes to inform NCB of the selling prices obtained. A also undertakes to pay any difference between the minimum remuneration paid and the remuneration requirement calculated by NCB for each production.
..."
From an agreement signed on September 01, 1984

**1548**

by the defendant S on behalf of A by M and on September 4, 1984, by representatives of the plaintiff, appears inter alia:
"...
2. Prior to signing the contract, the producer shall provide a financial guarantee in the form of a bank guarantee, which shall remain deposited with the NCB for the entire duration of the contract and which shall amount to *DKK 50,000.*
3. The producer shall - prior to any production of phonograms - submit to the NCB complete information on the content of the phonograms which the producer has produced.

4. *Every Friday, the* producer sends the NCB by letter or telex a notification of the number of copies of his own productions made during the week and the countries in which the copies are to be sold.

5. NCB shall send an invoice on the *following Monday* for the amount of remuneration due for the quantities declared. Invoices shall be issued at the rate applicable on the Friday of the week in which the phonograms are produced.

6. The manufacturer sends the amount invoiced by NCB *on Friday of the same week*.

..."

In November 1984, A A/S was formed, continuing A's activities with defendant S as director and member of the board and with, among others, defendant M as member of the board. In 1985 and July 1986 the September 1984 agreement was extended until December 31, 1986. On behalf of A A/S this was done in both cases by the signature of the defendant S. Notwithstanding the fact that the validity of this agreement was not formally extended thereafter, it is agreed that the agreement remained in force after December 31, 1986.

It is further stated that in the course of a general market investigation in the autumn of 1988, the plaintiff became aware of certain irregularities in the reports received from A and A A/S. As a result, it was decided that the plaintiff's control department should carry out a further investigation in particular into the reporting of NCB remuneration.

A letter dated March 1, 1989, from the plaintiff to A A/S states, inter alia:

"...

*Re: Relations between A A/S and NCB*

The cooperation between A A/S and NCB has so far been based on a special agreement (signed on September 1 and 4, 1984) which allowed A A/S to exploit NCB's repertoire in the production of phonograms under specified conditions.

The agreement was last extended until December 31, 1986, and thus formally expired at the end of 1986.

In practice, however, cooperation has taken the form of an agreement that is still valid.

This is an unsustainable situation for the NCB, not least because A A/S has for some time had difficulty in complying with the guidelines laid down by the NCB to the satisfaction of the NCB.

In consequence of the above, you are therefore informed that NCB will consider the *contractual relationship with A A/S as terminated 14 days after the date on which you receive this letter.*

The abolition of the previous form of cooperation will mean for A A/S that

a separate application for authorization must be submitted to the NCB for each production, including reprints, to be made - before the order is placed,

NCB invoices for individual authorization applications must be paid before the order is placed.

It should be clarified that the NCB will only be able to authorize new productions/reprints of old productions once all outstanding issues concerning A A/S's past activities as a producer have been resolved.

..."

On November 10, 1989, an agreement was concluded between the plaintiff and A A/S, stating, inter alia:

"Between signed Nordic

Copyright Bureau

...

hereinafter called NCB,

... on the one hand and

A A/S

- - -

Hereinafter referred to as the producer, assigned individual producer number - - -

the following has been concluded with effect from June 01, 1989

*Agreement*

1. *Purpose*

Subject to the conditions set out below, NCB manufacturer grants the right to the following marks:

- - -

to produce phonograms (gramophone records, cassette tapes, compact discs) of the NCB repertoire for sale for private use.

To the extent that no exceptions have been agreed below, the provisions of the "PHONO-LICENSING CONDITIONS/Private Sale" (attached as Appendix 1) shall apply. These licensing conditions form an integral part of the present agreement.

...

4. *Notification of new production*

The producer shall (prior to any production of phonograms) submit to the NCB complete information on the content of the phonograms which the producer has produced.

The notification must be in writing and may be in the form of a label copy or insert card, provided that all relevant information is included.

In principle, the notification must contain the information set out on the back of the NCB application form - see Appendix 3.

**1549**

5. *Reporting of quantities produced*

The producer shall notify the NCB in writing before the 10th of a month:

– the total number of copies *produced* - new production as well as reprints - in the previous month, by catalogue title,

– price per copy (retail price and/or consumer price is requested),

– country of sale,

– other relevant information.

The monthly report must be received by NCB no later than the 10th by morning post or by fax at the same time.

In principle, the report should contain the information shown on the front page of the NCB application form - see Appendix 3.

If reporting is not done in time, NCB is entitled to charge damages equal to the 25% of the invoiced fee for the numbers reported late on the first occasion, and in case of repeated defaults up to 100% of the invoiced fee.

If prices are not reported for each production, remuneration is invoiced based on the normal full price for the phonogram category concerned. Proof of the reported prices must be available upon request.

6. *Invoicing of remuneration*

On the first Friday following receipt of the monthly report, the NCB shall send an invoice for the amount of the fee due for the numbers declared.

The remuneration is calculated by NCB according to the applicable tariffs for individual production.

At present, the NCB remuneration for records and cassettes is 9.504% and for CDs 7.92% of the manufacturer's official retail list price (the so-called PPD = "Published Price to Dealers").

The minimum remuneration in force will automatically apply if the remuneration calculation results in an amount lower than the minimum rates - see Appendix 4.

11. *Duration of the agreement*
The Agreement shall enter into force on June 1, 1989, and shall terminate without notice on December 31, 1989.
...”

The agreement was signed on behalf of A A/S by the defendant M.

The PHONO-LICENSING CONDITIONS referred to in point 1 of the Agreement, version 1989.1, contains, inter alia, the following:
“...

§ 7 POTENTIAL SANCTIONS

The manufacturer guarantees the accuracy of the information provided in the application for authorization. In the event of incorrect information, the NCB may withdraw the authorization granted on the basis of the incorrect information. In such a case, the manufacturer undertakes to withdraw the unsold copies from the market and, in respect of any copies already sold, to pay double remuneration and to reimburse the NCB for any expenses incurred in this connection.”

No further agreements have since been concluded between the plaintiff and A A/S.

Extracts from a document entitled "standardkontrakt fonogram 1985" ["standard contract phonogram 1985"]

Among other things, this states:
“...

(3) No remuneration shall be paid for phonograms destroyed as a result of technical faults. The destruction shall be evidenced by a statement from the producer's accountant, the country's customs authorities or other documentation agreed with the NCB.
...”

The plaintiff's further investigation into the reporting of NCB remuneration by A A/S revealed that production figures had been repeatedly and over a number of years lower than the number actually produced and sold.

The facts found are detailed in a report dated January 28, 1990, which was submitted during the proceedings. The nature of the facts was such that on January 29, 1990, the plaintiff lodged a police complaint against, among others, the defendants.

As a result of the police report, a police investigation was opened on May 15, 1990.

On June 25, 1990, the plaintiff received from A A/S an undated letter signed by the then chairman of the company's board, lawyer X, stating, inter alia:

"Re: *Miscellaneous issues*

In connection with the receipt of new minima on July 1, 1990, I should like to ask a few questions on behalf of A A/S:

*1. Entry into force*

A A/S has as at date ordered, not delivered, CDs in a number of approximately 165,000, originating from orders with our supplier in - - - of approximately 125,000 and - - - Discs approximately 40,000. Will these be settled at the new or old rate?
...”

On September 14, 1990, the plaintiff sent a letter to A A/S, att. S, with the following wording:

"*Contract termination*

As a consequence of the police report filed against you on suspicion of illegal production and distribution of phonograms of protected musical works, NCB has decided to terminate the contractual relationship between NCB and A A/S with immediate effect (see point 11 of the agreement).

1550

The termination of the contractual relationship will have the following effect:

1. You will not be permitted to make/cause to be made phonograms of the NCB repertoire, including reprints of previous productions, without prior authorization from the NCB.

2. You will not be permitted to sell phonograms of the NCB repertoire for which no remuneration has been paid without prior authorization from the NCB.

3. All remuneration for previous production is due for immediate payment.

Information on the termination of the contractual relationship will be sent out from NCB Monday September 17, 1990.
...”

In a letter dated November 5, 1990, from the law firms Berning, Schlüter, Hald & Andersen and O. Bondo Svane on behalf of, inter alia, the plaintiff and addressed to both A A/S and the defendants personally, it is stated, among other things:
“...

As you know, the police are currently investigating the case and we will of course await the outcome.

As far as the civil part of the case is concerned, we would like to inform you that our clients believe that they have a major claim for damages against you personally as well as against your company. The exact amount of the claim will be determined once the exact extent of your illegal activities has been uncovered.
...”

As part of the police investigation, a search was carried out at the premises of A A/S and others in September 1990. The investigation resulted in the defendant M being charged by indictment of - - - 1992 and fined DKK 150,000 for infringement of the Copyright Act by - - - judgment of - - - 1994, which was substantially upheld by the Court of Appeal of - - - 1996. The Court found that the defendant had, without notification or payment, resold in their entirety and, in part, manufactured a total of approximately 310,000 to 320,000 cassette tapes, approximately 70,000 to 180,000 of which from April 26, 1984, to July 14, 1987, and approximately 140,000 from July 27, 1987, to September 15, 1989. The charges in the criminal proceedings related solely to what is hereinafter referred to as the "Y relationship".

On - - - 1993, A A/S was declared bankrupt. The administration was completed on - - - 1995, without any dividend being paid to the ordinary creditors. A A/S was originally a co-defendant in this case, but due to the outcome of the administration proceedings, the plaintiff has withdrawn the case against the bankrupt A A/S.

It is apparent, inter alia, from a list of the plaintiff's minimum rates for cassette tapes submitted to the Court that, from January 01, 1984 to June 30, 1985, those rates were DKK 2.05 per unit, from July 1, 1985, to June 30, 1986, DKK 2.45 per unit and from July 1, 1986, to June 30, 1990, DKK 2.55 each.

During the period from April 26, 1984, to September 15, 1989, A, later A A/S, had at least 186,829 cassette tapes manufactured at a factory at - - - belonging to Y (hereinafter referred to as the Y relationship) without reporting and paying the plaintiff. A A/S also had at least 164,497 CDs manufactured at a factory in - - - called G/- - - (hereinafter referred to as the G relationship) between September 13, 1989, and August 31, 1990, without reporting to and settling with the plaintiff. Finally, the plaintiff alleges that, during the period from the beginning of 1986 until the end of 1990, A A/S paid lower NCB remuneration for a large number of phonograms than it was obliged to, alleging that the phonograms were sold at PPD prices which triggered higher NCB remuneration than the minimum remuneration paid to the plaintiff (hereinafter referred to as the low reported sales prices).

The plaintiff's submissions, as set out in the statement of claim and in conjunction with other appendices, are detailed:

*The principal submission*

*The Y Relationship*

4/26/1984-7/14/1987
| | | | |
|---|---|---|---|
| Produced | | 300,130 tapes | |
| Settled | 19,000 | | |
| Unidentifiable | 84,303 | 100,303 tapes | |
| Remainder | | 196,827 tapes | |

which, as per details relating to the degree of protection of the works and multiplied by the applicant's minimum tariff of DKK 2.55, is calculated to correspond to a shortfall in remuneration of DKK 1.00.       477,131.05

07/27/1987 – 09/15/1989
Produced                                    140,350 tapes
**1551**
The proportion of these claimed to be unpaid is estimated to be the same as in the previous period, i.e., 196,827: 300,130 = 65.58% of 140,350 tapes = 92,041 tapes,
which, if determined according to the degree of protection as in the previous period, corresponds to a remuneration of 92,041 X 477,131.05 : 196,827 = DKK       223,110.25

*The G Relationship*
| | | | |
|---|---|---|---|
| CDs delivered | | 222,297 CDs. | |
| of which paid for | 42,500 | | |
| Paid for by others | 14,700 | 57,200 CDs. | |
| Remainder | | 165,097 CDs. | |
| Deductions | | 600 CDs. | |
| | | 164,497 CDs, of which | |

| | | |
|---|---|---|
| 79,000 before 07/01/1990 at 3.20 = DKK | 252,800.- | |
| 85,497 after 07/01/1990 at 3.65 = DKK | 312,064.05 | 564,864.05 |

*Underreporting of sales prices*
From a specification based on the 10 half-years of 1986-1990 inclusive and after the specification has been cleaned of interest originally calculated and of calculation error, it appears that       316.414,71

Total DKK                                                                                                   1,581,520.06
plus 100 % to cover the applicant's costs of the investigation, market disruption and compensation for non-material damage      1,581,520.06

*Principal claim*                   DKK                                         3,163,040.12

*Secondary submission*

*The Y Relationship*
04/26/1984 - 07/14/1987
The production lists show
| | | |
|---|---|---|
| May 1984 - June 1987 | 106,211 tapes @ DKK 2.05 | 217,732.55 |
| July 1985 - May 1986 | 68,666 tapes @ DKK 2.45 | 168,231.70 |
| August 1986 to July 1987 | 40,950 tapes @ DKK 2.55 | 104,422.50 |
| In total, DKK | | 490,386.75 |
| Deduction for 19,000 tapes paid for at a weighted average price of DKK 2.27 | 43,130.00 | |
| Remainder, DKK | 447,256.75 | |
| which, with a weighted protection rate of 95.06%, corresponds to DKK | | 425,162.27 |

7/27/1987–9/15/1989

Copyright © 2021 Karnov Group Denmark A/S                                                                               page 4

| | | |
|---|---:|---:|
| Calculated as in the principal submission (but here without rounding) DKK | | 223,110.15 |
| Total in claim document for DKK | | 648,372.42 |
| *G-Relationship* | | |
| 164,497 CDs divided into three lists as follows: | | |
| List 1, DKK | 137,752.80 | |
| List 2, DKK | 389,436.40 | |
| List 3, DKK | 6,820.00 | |
| Total DKK | 534,009.40 | 534,009.40 |
| *Underreporting of sales prices* | | |
| Adjusted as in the principal submission | | 316,414.71 |
| to *a total of DKK* | | 1,498,796.53 |
|   with the addition of 100 % as in the main claim | | 1,498,796.53 |
| *The alternative claim*    DKK | | 2,997,593.06 |
| It should be noted that due to two adding errors in the submission, the alternative claim should rightly be reduced by DKK 200.40 | | |
| To: | | 2.997.392,66 |

**1552**

The defendant S has contested the liability for damages in its entirety.

| | |
|---|---:|
| In terms of volume, for the first period of the Y Relationship, the Defendants have acknowledged that 186,829 tapes have not been settled, which, calculated using the methodology applied in the Plaintiff's alternative claim, is proportionately equivalent to | DKK 425,162.27 |
| X 186,829 : 196.827 = | DKK 403,565.78 |
| and accepted the plaintiff's statement in respect of the second period of the Y relationship | DKK 223,110.15 |
| total | DKK 626,675.93 |

corresponding to defendant M's principal claim.

The defendants have disputed that the 9,998 tapes, which constitute the difference between the number alleged by the plaintiff and the number acknowledged by the defendants, were published by A A/S.

The defendants also dispute that A A/S had any obligation to pay for the CDs in the G relationship and that sales prices were underreported. If it were to be held that the sales prices were understated, it is submitted that this is in part time-barred.

Finally, the defendants contest the existence of a basis for calculating a 100% supplement as claimed by the plaintiff. A large number of documents and extracts from them were produced in the course of the proceedings, in particular lists of cassettes and CDs released.

Statements were given by the defendants and by witnesses H, I, and W.

- - -

Mr. W, now employed elsewhere, explained that he was employed as a monitoring officer in the plaintiff's monitoring department from 1979 to 1995. Initially there were 3 employees in the department. When he left, there were 4 staff working exclusively on monitoring. The main function of the monitoring department is to monitor phonogram producers who use protected works in production. Monitoring is exercised partly through the monitoring of sales by wholesalers to retail outlets and partly through reports from factories producing phonograms. There is also cooperation with the IFPI. When A A/S had cassettes made in the Y family factory and CDs made in the G family factory, the plaintiff had no knowledge of the existence of these factories. It therefore had no way of knowing about, let alone monitoring the production carried out by the factories for A A/S. A A/S typically combined small-scale production of a plant at a known factory with a "side production" of a much larger scale at Y or G. Only the copies produced at the factory known to the plaintiff were reported, while the copies produced at the "side production" were not reported. As examples of works produced by such "side production," he can mention "- - -" and "- - -." In particular, with regard to the 9,998 cassette tapes on the basis of which the defendants have claimed that A A/S is not liable for remuneration, he recalls that the titles of these releases are close to those of other A A/S releases. During a search of the Y factory, covers relating to the - - - series were found bearing the A A/S label, which in his view strongly suggests that A A/S is also liable to pay royalties in respect of these releases. The production of CDs is based on high technology and the possibility of errors in production is, in his view, small. The CDs are made using a 'glass master', which costs upwards of DKK 5,000, and only if there are errors in this, do errors occur in the finished CDs. He is not aware of any report having been received from Attorney O's office concerning A A/S for the purpose of calculating the NCB remuneration due in respect of the G relationship. It is he who has made the calculations concerning claims for back-payment in respect of under-reported sales prices. The calculations were made by comparing the prices reported in the sales catalogues of A A/S with the PPD prices reported to him by wholesalers who resold A A/S cassettes to retail outlets. In some of the catalogues, the sales prices are indicated in the column marked "kode" ["code"].

Copyright © 2021 Karnov Group Denmark A/S

The prices quoted will in many cases be identical to the prices charged to wholesalers, and the PPD prices will therefore normally be even higher. However, his calculations are also based on the catalogue prices in these cases. A A/S sold a number of phonograms of children's and classical music. He considers, however, that sales of this type of phonograms accounted for a maximum of 10% of turnover. A A/S's activities distorted the market in several ways. Producers who complied with the rules were unable to compete on price with A A/S, which resulted in a fall in the plaintiff's income from those producers, since those producers, as a result of the unequal competition, had falling sales figures and falling prices. For approximately six years he spent much of his working time investigating the case against A A/S and the defendants. It has been very difficult to document the amounts for which the plaintiff has been deprived of NCB compensation. In his view, the amounts covered by the claims in this case represent only a small part of the total amounts withheld from the plaintiff. The plaintiff's assertion that at least an additional 3,400 hours and 250,000 DKK have been expended, not taking account of legal services, is very conservative. He has visited everything from record stores to supermarkets to flea markets in investigating the case. His report of January 28, 1990, contains a number of points relating to this case. It was the release of cassette tapes by A A/S containing - - - which triggered the whole case. He cannot say exactly how long the report took to prepare. The plaintiff has not charged the police any amount for assistance in the investigation of the criminal case.

In support of its claims, the plaintiff submits that both defendants, through A A/S, have infringed the plaintiff's rights under § 2 of the current Copyright Act by failing to pay to the plaintiff royalties to the extent to which the plaintiff is entitled. The plaintiff is therefore entitled to damages under § 56 of that law and under the general rules of tort law, which require only that the defendants have been guilty of simple negligence. Defendant M has already been convicted of a breach of copyright law for his conduct in relation to the Y relationship. He must therefore make good the loss suffered by the plaintiff as a result of his criminal acts. Furthermore, no remuneration has been paid for the CDs in the G relationship. M acted in the same way for A A/S in the Y relationship and in the G relationship, and his liability must therefore be assessed in the same way in those circumstances. Furthermore, he has full knowledge of the copyright rules through many years of experience in the industry, including among other things, as the day-to-day manager of A A/S, and therefore cannot have been unaware that A A/S was paying NCB remuneration in relation to understated PPD prices. This means that he is also liable to compensate the plaintiff for the loss suffered as a result. The defendant S was a director, sole shareholder and member of the board of A A/S. In addition, through her daily work, she made reports to the plaintiff concerning NCB remuneration and also participated in negotiations with the plaintiff's representatives. As she was the sole shareholder of A A/S, the income from the company's illegal activities accrued to her. In view of this, her diligence and supervision to ensure that A A/S's duties towards the plaintiff were respected must be strictly required. She has failed to meet those requirements and has therefore shown such negligence as to render her liable to the same extent as the co-defendants. In assessing the damages, account must be taken of the plaintiff's calculation, which forms part of the principal claim. Where, as in the present case, the plaintiff has suffered serious infringements of his copyright, he must be awarded damages corresponding to the loss which he is likely to have suffered. The plaintiff has, to the best of his resources adequately documented the magnitude of the loss. In this respect, the testimony given by W must be given great weight.

The plaintiff has shown great restraint in exercising the discretion which must necessarily be included in the calculation of the loss. It must also be borne in mind that the defendants did not substantially object to the calculations made by W for the purposes of calculating the loss in the three circumstances. It must be assumed, following W's explanation, that A A/S and thus the defendants were also liable to pay NCB compensation for the 9,998 disputed cassette tapes in the Y relationship. The defendants' statement that there were substantial defects in the cassette tapes manufactured at the Y plant and the CDs from the G plant must be disregarded, as no evidence is given to substantiate, let alone prove, this. The defendants were in the best position to secure such proof. It is disputed that any part of the plaintiff's claim for back payment in respect of understated selling prices is time-barred, the plaintiff having been in excusable ignorance of the existence of the claim. Thus, the plaintiff was not in a position to raise the claim until the catalogues in question were found during a search in the autumn of 1990. It is also disputed that the plaintiff tacitly accepted the payment of a commission in respect of underpricing. The plaintiff must also be entitled, pursuant to § 56, Paragraph 1, of the Copyright Act currently in force, to compensation for the very considerable expenses incurred in investigating the case and to compensation for non-material damage. The compensation and the reimbursement thereof must be awarded on a discretionary basis and on the basis of the information available concerning the extent of the costs incurred by the plaintiff. Account must also be taken of the scale and seriousness of the infringements to which the plaintiff has been subjected, the significant disruption to the market and the fact that the rules on the settlement of NCB remuneration are based on trust. It is both difficult and costly to verify the accuracy of the reports. On the basis of an overall assessment, this part of the compensation and the compensation for non-pecuniary damage should be set at the same level as the total amounts deducted, taking into account the case-law.

Defendant M has admitted liability for the loss suffered by the plaintiff as a result of the failure to report in the Y relationship in accordance with his principal submission. However, the plaintiff's statement of losses is contested. He denies having infringed copyright law in the G relationship and thus being liable for damages in that relationship. It was not the defendant's intention not to pay the NCB remuneration due. The failure to inform the claimant of the deliveries of the CDs was due to the problems that had arisen with the quality of the CDs. The defendant intended to notify the plaintiff once it was clear how many could be sold. However, this was never done, as the police carried out a search in the light of the plaintiff's notification. No NCB reimbursement was paid in respect of underpriced PPD. Only in exceptional cases did A A/S sell phonograms at PPD prices causing the NCB remuneration to exceed the minimum remuneration, and in these cases proper reporting and settlement took place. The plaintiff's claim for damages is contested. In particular, as regards the Y relationship, the plaintiff submits that it has not discharged the burden of proving that it was incumbent on A A/S to pay the NCB remuneration for the 9,998

**1553**

cassette tapes. Nor is it proven that either the cassettes from Y's factory or the CDs from G's factory were sold at PPD prices justifying NCB remuneration higher than the minimum. On the basis of the table of minimum remuneration submitted by the plaintiff, it is disputed that the plaintiff is entitled to make the calculation as set out in the principal submission concerning the Y

relationship on the basis of a minimum remuneration of DKK 2,55 per cassette tape for the entire period from April 26, 1984, to July 14, 1987. The numerical calculation of the loss arising from the alleged failure to state the amount of the PPD remuneration or the understatement of that amount is not contested, but the assumptions underlying the calculations are contested. Furthermore, claims in respect of possible understatement of the PPD prices for sales made in 1986 are time-barred, and it must be assumed that A A/S had an implied agreement with the plaintiff that, irrespective of the amount of the PPD prices, it could settle for the minimum remuneration. Finally, it is disputed that the plaintiff has established that it is entitled to compensation for the costs of investigating the case. The report of January 28, 1990, includes a number of facts which are irrelevant to the present case. The time spent by Mr. W. on these matters, which are irrelevant to the present case, should not affect the calculation of the compensation to which the plaintiff may be entitled from the defendants. There is no basis for awarding standard damages equal to the total amount of NCB compensation deducted, although it is acceptable that there should be some small increase in damages to cover other losses. Finally, given the nature of the copyright infringements, there is no basis for awarding the plaintiff compensation for non-pecuniary damage.

The defendant S, who also puts forward the same pleas in law as the defendant M in relation to the assessment of the plaintiff's claims, submits in particular, in support of her claim of non-liability, that she was not at fault. Although she was the director, member of the board and sole shareholder of A A/S, and although during the period from 1980 to 1984 A was operated in her name, the co-defendant was throughout that period the day-to-day manager. She did not participate in the actual management of A A/S and her position must be assessed on a par with the other office staff in the company.

**The High Court pronounces:**

Defendant M was the day-to-day manager of A, both while the company was operated in the name of defendant S and while it was a limited company. He was responsible, inter alia, for the reporting and settlement of royalties due in accordance with the agreements entered into in that regard, read in conjunction with the Copyright Act. On that basis, he is personally liable to the plaintiff to the extent that information was omitted or misrepresented by A through S and by A A/S for the purpose of calculating the NCB remuneration in all three circumstances.

The defendant S was the proprietor of A when the company was operated under personal management from 1980 to 1984. When the company was converted into a limited company in 1984, she became a director, member of the board and sole shareholder. She also took part in the day-to-day running of the company, in particular the administrative work, including the preparation of reports for the plaintiff. It must be held that, as a result, she was responsible, in the same way as the co-defendant, for ensuring that the plaintiff was paid the amount of the remuneration due. To the extent that, both while the company was being run in her name and while it was being run as a limited company, A failed to provide, or provided incorrect, information for the purposes of calculating the NCB remuneration, she is therefore held liable, like the co-defendant, for the loss thereby caused to the plaintiff.

The calculation of the plaintiff's claim for damages against the defendants must be based on the general rules of tort law, supplemented by § 56 of the current Copyright Act.

It is therefore for the plaintiff to prove that, as a result of the defendants' negligent acts, damage has been suffered. In assessing the requirements for the requisite proof, among other things, account must be taken of the nature of the defendants' negligent conduct, the plaintiff's ability to assess the loss, the defendants' ability to counter the assessment of the loss and the plaintiff's ability to control and thereby mitigate the loss. In that regard, considerable weight must be attached to the fact that the relationship between the parties is based, inter alia, on the fact that the manufacturer has undertaken, by contract, to provide specified, accurate and regular reports.

In calculating the plaintiff's principal claim, account was taken, inter alia, of a minimum remuneration of DKK 2.55 per cassette tape for the entire period from April 26, 1984, to July 14, 1987. That is not in accordance with the table produced by the plaintiff showing the amount of the minimum remuneration, which was not increased to DKK 2.55 per cassette tape until July 1, 1986. In the light of the foregoing, there is no basis for making the calculation of the loss in respect of the NCB remuneration, as was done in the calculation of the plaintiff's main claim in respect of the first period of the Y relationship. Furthermore, it has not been sufficiently established that a loss was suffered in the G relationship to the extent indicated in the plaintiff's statement of the main claim.

On the points on which the statement on which the plaintiff relies in the alternative is disputed, the defendants had occasion, both during the contractual period and subsequently, to seek to prove or to make plausible facts capable of calling into question the accuracy of that statement. This applies both to the disputed 9,998 tapes in the first period of the Y relationship, the entire G relationship in

**1554**

which the defendants were in the best position to secure evidence that the products claimed by them were defective or were to be settled by others, as in the case of the underreported sales prices. No such evidence or plausibility has been established. In particular, in the light of W's witness statement, it is considered that the plaintiff's calculation of lost remuneration under its alternative claim should be upheld.

Furthermore, there is no basis for assuming that any part of the claim should be time-barred, as the plaintiff must be considered to have been in excusable ignorance of its claim for the underreported sales prices until immediately before the filing of the police report on January 29, 1990, cf. § 3 of the 1908 Statute of Limitations Act. Furthermore, particularly in the light of the content of the witness statements by Mr. H and Mr. I, there is no basis for assuming that the plaintiff at any time accepted, even tacitly, that only the minimum remuneration was charged.

In assessing whether the plaintiff is entitled to additional compensation and compensation for non-material damage, considerable weight must be given to the fact that the entire procedure for collecting the NCB remuneration is dependent on the correct and complete reporting by the persons liable to pay the remuneration and that the plaintiff is able to monitor the compliance of the persons liable to pay the remuneration with their obligations only with difficulty and using considerable resources. Consequently, the plaintiff must also be compensated for the costs incurred in investigations and inquiries in the present case, where settlement was not effected as required. Such compensation must essentially be assessed on a discretionary basis, and there is no basis (particularly in the light of the statement made by witness W) for setting aside the discretion exercised by the plaintiff in determining that part of the claim. Having regard to that and to the content of Item 5, Paragraph 4, of the agreement of November 10, 1989, read in conjunction with § 7 of the *Phono-Licensing Conditions*, which, according to the statements of witnesses H and I, were consistent with the content of the earlier agreements between the plaintiff and

A, the Court upholds the plaintiff's claim for damages at the rate of 100%. There are no grounds for awarding the plaintiff compensation for non-material damage but, in the light of the foregoing, there are no grounds for making a deduction from the 100% supplement.

The plaintiff's alternative claim is therefore upheld, with the deduction of the amount resulting from the aggregation errors in the calculation of the loss in the Y relationship.

**The order of the Court:**

The defendants, M and S, are jointly and severally liable to pay the plaintiff, Nordisk Copyright Bureau, DKK 2,997,392.66, with interest calculated from the date the proceedings were instituted until payment is made. - - -

**U.1997.1546V**

*Erstatning for manglende og forkerte indberetninger til brug for beregning af vederlag for udnyttelse af beskyttede værker.*

*Erhvervsret 2.9 - Immaterialret 1.4 - Pengevæsen m.v. 58.3.*

♦ Foreningen F varetager bl.a. danske og udenlandske komponisters mekaniske rettigheder ved indgåelse af aftaler med fonogramproducenter, der til F betaler vederlag på grundlag af deres salgspriser til detailforretninger. Grundlaget for beregning af vederlaget er de oplysninger, som F modtager fra fonogramproducenterne. Et firma A – senere A A/S – indberettede over en længere periode lavere produktionsantal end det faktisk producerede og solgte, og såvel den daglige leder som direktøren, der tillige var eneaktionær og medlem af bestyrelsen og

**1547**

deltog i den daglige drift, var erstatningsansvarlige for F's tab. Der blev ved opgørelsen af F's tab taget udgangspunkt i de almindelige erstatningsretlige regler suppleret af den dagældende ophavsretslovs § 56, og ingen del af kravet var forældet. Erstatningen omfattede foruden mistet vederlag erstatning for udgifter til efterforskning og undersøgelse, men ikke godtgørelse for ikke-økonomisk skade.

**V.L.D. 18. september 1997 i anke 6. afd. B-2582-91**
(Jochimsen, Fabrin, Michael Lynge Jensen (kst.)).

*Nordisk Copyright Bureau (adv. Marianne Bruhn Andersen, København)*
mod
*M og S (adv. Ole Wagner, Aalborg).*

## Vestre Landsret

Under denne sag, der er anlagt den 23. december 1991, har sagsøgeren, Nordisk Copyright Bureau, nedlagt påstand om, at de sagsøgte, M og S, in solidum tilpligtes til sagsøgeren at betale principalt 3.163.040,12 kr., subsidiært 2.997.593,06 kr. med procesrente fra sagens anlæg, til betaling sker.

Sagsøgte M har nedlagt påstand om frifindelse mod betaling af principalt 626.675,93 kr., subsidiært et beløb større end dette, men mindre end det af sagsøgeren subsidiært påståede, alt med procesrente som påstået af sagsøgeren.

Sagsøgte S har nedlagt påstand om frifindelse, subsidiært mod betaling af et mindre beløb end 2.997.593,06 kr.

Det er i stævningen oplyst, at sagsøgeren er en forening, der varetager danske og udenlandske komponisters, tekstforfatteres og musikforlags mekaniske rettigheder, d.v.s. retten til at benytte beskyttede værker i forbindelse med fremstilling af grammofonplader, kassettebånd og compact discs (CD'ere) m.v. (herefter samlet betegnet fonogrammer). De nævnte komponister, tekstforfattere og musikforlag betegnes i det følgende under ét som rettighedshavere.

I henhold til aftaler indgået med de nordiske ophavsretsselskaber (KODA, STEF, STIM, TEOSTO og TONO) og med rettighedshavere direkte samt i henhold til samarbejdsaftaler med søsterselskaber i udlandet forvalter sagsøgeren for så vidt angår de nordiske lande de mekaniske rettigheder til stort set al beskyttet musik, der findes i verden. Rettighedshaveren har eneret til at lydfæste beskyttede værker på fonogrammer, til at fremstille eksemplarer af fonogrammer med beskyttet musik samt til at sprede sådanne fonogrammer til almenheden.

Sagsøgeren forvalter rettighedshavernes mekaniske rettigheder på grundlag af, at sagsøgeren på rettighedshavernes vegne indgår aftaler med fonogramproducenter om udnyttelse af de mekaniske rettigheder. Til gengæld for deres ret hertil betaler producenterne et vederlag, der beregnes på grundlag af fonogramproducenternes salgspriser til detailforretningerne, i det følgende kaldet ppd-priser. Vederlaget udgør i gennemsnit pr. fonogram ca. 5 kr. Det vederlag, der skal betales til sagsøgeren, kaldes n c b-vederlaget.

Sagsøgerens licensaftaler med producenterne er udformet forskelligt, afhængigt af om der er tale om en enkeltproduktionstilladelse, hvor en producent kun får ret til at producere et nærmere angivet antal eksemplarer af et bestemt fonogram, eller om der foreligger en standardproducentaftale, hvor producenten får adgang til at udnytte hele sagsøgerens repertoire med pligt til at foretage en løbende indrapportering af de værker, der udnyttes i produktionen, uden at det er nødvendigt for producenten i hvert enkelt tilfælde at ansøge om sagsøgerens tilladelse. Uanset om en fonogramproducent har den ene eller anden form for aftale, er det helt væsentlige grundlag for sagsøgerens beregning af n c b-vederlaget de oplysninger og indrapporteringer, som sagsøgeren modtager fra fonogramproducenterne.

A ved sagsøgte S og senere A A/S havde fra 1980 til den 14. september 1990 adgang til at udnytte sagsøgerens repertoire i henhold til forskellige aftaler, dog uden på noget tidspunkt at have indgået en standardproducentaftale.

Af en skrivelse af 29. juli 1980 fra sagsøgeren til A, på hvis vegne skrivelsens indhold er tiltrådt af sagsøgte S ved en påtegning af 23. september 1980, fremgår blandt andet:

»...

Vi refererer til stedfundne telefonsamtaler mellem Deres hr. M og vor I, hvorunder muligheden for at finde en smidigere samarbejdsform mellem n c b og A end den til nu anvendte har være drøftet.

n c b kan foreslå følgende fremgangsmåde:

1. A stiller en økonomisk sikkerhed på kr. 10.000,00. ...

2. A forpligter sig til kun at placere ordrer på fremstilling af plader og bånd hos presse- og kopieringsvirksomheder, som er godkendt af n c b.

3. A indsender til n c b hver fredag en opstilling over det antal plader og bånd, der i den forløbne uge er blevet leveret til A. Opstillingen skal være ledsaget af kopi af fakturaer eller følgesedler samt af en indbetaling af leverede antal x minimumvederlag.

4. A meddeler n c b hvilke lande de forskellige antal plader og bånd er bestemt for, ligesom A forpligter sig til at oplyse n c b om de opnåede salgspriser. A forpligter sig endvidere til at betale eventuel difference mellem det indbetalte minimumvederlag og det af n c b udregnede vederlagskrav for hver enkelt produktion.

...«

Af en aftale, der er underskrevet den 1. september 1984

**1548**

af sagsøgte S på vegne af A ved M og den 4. september 1984 af repræsentanter for sagsøgeren, fremgår blandt andet:

»...

2. Producenten stiller forud for aftalens underskrift en økonomisk sikkerhed i form af en bankgaranti, som skal forblive deponeret hos n c b i hele kontraktens løbetid, og som andrager *kr. 50.000,-*

3. Producenten indsender – forud for enhver produktion af fonogrammer – fuldstændige oplysninger til n c b om indholdet på de fonogrammer, producenten lader fremstille.

4. Producenten indsender *hver fredag* til n c b pr. brev eller telex meddelelse om det i ugens løb fremstillede antal eksemplarer af egne produktioner, samt i hvilke lande eksemplarerne skal sælges.

5. n c b fremsender den *følgende mandag* faktura over det beløb, der skal erlægges i vederlag for de oplyste antal. Der faktureres efter gældende kurs fredag i den uge, hvor fonogrammerne er fremstillet.

6. Producenten afsender *fredag i samme uge* det af n c b fakturerede beløb.

...«

I november 1984 dannedes A A/S, der fortsatte A's aktiviteter med sagsøgte S som direktør og bestyrelsesmedlem og med blandt andre sagsøgte M som bestyrelsesmedlem. I 1985 og i juli 1986 blev aftalen af september 1984 forlænget til udløb den 31. december 1986. På A A/S's vegne skete dette i begge tilfælde ved sagsøgte S's underskrift. Uanset at denne aftales gyldighedsperiode ikke herefter formelt blev forlænget, er der enighed om, at aftalen var gældende også efter den 31. december 1986.

Det er videre oplyst, at sagsøgeren i forbindelse med en generel markedsundersøgelse i efteråret 1988 blev opmærksom på visse uregelmæssigheder i de indberetninger, man havde modtaget fra A og A A/S. Dette medførte, at det blev besluttet, at sagsøgerens kontrolafdeling skulle foretage en nærmere efterforskning særligt vedrørende indberetning af n c b-vederlag.

I en skrivelse af 1. marts 1989 fra sagsøgeren til A A/S hedder det blandt andet:

»...

*Vedr.: Relationerne mellem A A/S og n c b*

Samarbejdet mellem A A/S og n c b har hidtil været baseret på en særaftale (underskrevet den 1./4. september 1984), som på nærmere angivne vilkår gav A A/S tilladelse til at udnytte n c b's repertoire ved fremstilling af fonogrammer.

Aftalen er senest forlænget til den 31. december 1986 og er således formelt set ophørt med udgangen af 1986.

I praksis har samarbejdet imidlertid formet sig, som om aftalen stadig var gyldig.

Dette er for n c b en uholdbar situation, ikke mindst fordi A A/S gennem længere tid har haft vanskeligt ved at overholde de af n c b udstukne retningslinier til n c b's tilfredshed.

Som konsekvens af ovenstående skal det derfor meddeles Dem, at n c b vil betragte *aftaleforholdet med A A/S som ophørt 14 dage efter det tidspunkt, hvor De modtager nærværende skrivelse.*

Ophævelsen af den hidtidige samarbejdsform vil for A A/S betyde, at

der til n c b skal indsendes særskilt autorisationsansøgning for hver produktion, inkl. genoptryk, der ønskes foretaget – før ordre afgives,

n c b's fakturaer for de enkelte autorisationsansøgninger skal betales, før ordre afgives.

Det skal for en ordens skyld præciseres, at n c b først vil kunne autorisere nye produktioner/genoptryk af gamle produktioner, når alle åbentstående spørgsmål vedrørende A A/S's hidtidige virksomhed som producent er løst.

...«

Den 10. november 1989 blev der mellem sagsøgeren og A A/S indgået en aftale, hvori det blandt andet er anført:

»Mellem underskrevne

Nordisk Copyright Bureau

...

nedenfor kaldet n c b, ...

på den ene side og

A A/S

– – –

nedenfor kaldet producenten, som har fået tildelt enkeltproducentnr. – – –

er der med virkning pr. 1. juni 1989 indgået følgende

*Aftale*

1. *Formål*

På nedenstående vilkår indrømmer n c b producenten ret til på følgende mærker:

– – –

at fremstille fonogrammer (grammofonplader, kassettebånd, compact discs) med n c b's repertoire med henblik på salg til privat brug.

I det omfang der ikke er aftalt fravigelser nedenfor, gælder i øvrigt det, der er anført i n c b's »FONO-LICENSVILKÅR/Salg til private« – vedlagt som bilag 1. Disse licensvilkår udgør en integreret del af nærværende aftale.

...

4. *Anmeldelse af nyproduktion*

Producenten indsender – forud for enhver produktion af fonogrammer – fuldstændige oplysninger til n c b om indholdet på de fonogrammer, producenten lader fremstille.

Anmeldelsen skal være skriftlig og kan evt. ske i form af indsendelse af etiketmanus (label copy) eller indlægskort, såfremt alle relevante oplysninger fremgår heraf.

I princippet skal anmeldelsen indeholde de oplysninger, som fremgår af bagsiden af n c b's ansøgningsskema – jf. bilag 3.

**1549**

5. *Rapportering af fremstillede antal*

Producenten indsender inden den 10. i en måned meddelelse til n c b i skriftlig form om:

– det totale antal eksemplarer, der er *fremstillet* – nyproduktion såvel som genoptryk – i den foregående måned angivet pr. katalogbetegnelse,

– pris pr. eksemplar (der ønskes oplyst pris til detailhandel og/eller pris til forbruger),

– salgsland,

– øvrige relevante oplysninger.

Den månedlige rapportering skal være n c b i hænde senest den 10. med morgenposten eller pr. telefax samme tidspunkt.

I princippet skal rapporteringen indeholde de oplysninger, som fremgår af forsiden af n c b's ansøgningsskema – jf. bilag 3.

Dersom rapportering ikke sker rettidigt, er n c b berettiget til at opkræve skadeserstatning svarende til 1. gang 25 % af det udfakturerede vederlag for de antal, der rapporteres for sent, og ved gentagne misligholdelser op til 100 % af det udfakturerede vederlag.

Rapporteres der ikke priser for hver produktion, faktureres vederlag baseret på normal fuldpris for den pågældende fonogramkategori. Dokumentation for de opgivne priser må på forlangende kunne fremlægges.

6. *Fakturering af vederlag*

Førstkommende fredag efter modtagelsen af den månedlige rapportering fremsender n c b faktura over det beløb, der skal erlægges i vederlag for de oplyste antal.

Vederlaget beregnes af n c b efter gældende tariffer for enkeltproduktion.

P.t. udgør n c b-vederlaget for grammofonplader og kassettebånd 9,504 % og for CD 7,92 % af producentens officielle prislistepris til detailhandelen (den såkaldte PPD = »Published Price to Dealers«).

Gældende minimumvederlag træder automatisk i kraft, hvis vederlagsberegningen giver et beløb, der er mindre end minimumsatserne – jf. bilag 4.

...

11. *Aftalens løbetid*

Aftalen træder i kraft den 1. juni 1989 og ophører uden varsel den 31. december 1989.

...«

Aftalen blev på A A/S's vegne underskrevet af sagsøgte M.

De i aftalens punkt 1 omtalte FONOLICENSVILKÅR indeholder i version 1989.1 blandt andet følgende:

»...

§ 7-SANKTIONSMULIGHEDER

Producenten indestår for, at de oplysninger, som afgives i forbindelse med ansøgning om autorisation, er korrekte. I tilfælde af ukorrekte oplysninger kan n c b trække den autorisation tilbage, der er givet på basis af de ukorrekte oplysninger. Producenten forpligter sig i et sådant tilfælde til at tilbagekalde de usolgte eksemplarer fra handelen og for eventuelt allerede solgte eksemplarer at betale dobbelt vederlag samt godtgøre n c b eventuelle udgifter i denne forbindelse.«

Der er ikke siden indgået yderligere aftaler mellem sagsøgeren og A A/S.

Der er fremlagt uddrag af et dokument benævnt

»standardkontrakt

fonogram

1985«

Heri hedder det blandt andet:

»...

(3) Vederlag betales ikke for fonogrammer, der destrueres som følge af tekniske fejl. Som dokumentation for destruktion tjener erklæring fra producentens statsautoriserede registrerede revisor, landets toldmyndigheder eller anden med n c b aftalt dokumentation.

...«

Ved sagsøgerens nærmere efterforskning af A A/S's forhold vedrørende indberetning af n c b-vederlag blev det konstateret, at der gentagne gange og over en længere årrække var blevet indberettet lavere produktionstal end det antal, der faktisk var blevet produceret og solgt.

De forhold, der blev konstateret, er nærmere beskrevet i en rapport af 28. januar 1990, der er fremlagt under sagen. Forholdene var af en sådan karakter, at sagsøgeren den 29. januar 1990 indgav politianmeldelse mod blandt andre de sagsøgte.

Som følge af politianmeldelsen blev der den 15. maj 1990 indledt politimæssig efterforskning.

Den 25. juni 1990 modtog sagsøgeren fra A A/S en udateret skrivelse underskrevet af selskabets daværende bestyrelsesformand, advokat X, hvori det blandt andet er anført:

» Vedr.: *Diverse spørgsmål*

I forbindelse med modtagelsen af nye minima pr. 1. juli 1990, skal jeg på vegne A A/S tillade mig at stille et par spørgsmål:

*1. Ikrafttræden*

A A/S har pr. dato bestilte, ikke leverede, CD'er i et antal af ca. 165.000, hidrørende fra bestillinger hos vor leverandør i – – – på ca. 125.000 og – – – Disc på ca. 40.000. Vil disse blive afregnet efter ny eller gammel sats?

...«

Den 14. september 1990 sendte sagsøgeren en skrivelse til A A/S, att. S, med følgende ordlyd:

»*Kontraktopsigelse*

Som en konsekvens af at der er blevet indgivet politianmeldelse mod Dem på grund af mistanke om ulovlig fremstilling og distribution af fonogrammer med beskyttede musikværker har n c b besluttet at bringe kontraktforholdet mellem n c b og A A/S til ophør med øjeblikkelig virkning (jf. aftalens punkt 11.).

**1550**

Kontraktforholdets bortfald vil have følgende virkning:

1. Det vil ikke være Dem tilladt at foretage/lade foretage fremstilling af fonogrammer med n c b's repertoire, herunder genoptryk af tidligere produktioner, uden forudgående autorisation fra n c b.

2. Det vil ikke være Dem tilladt at sælge fonogrammer med n c b's repertoire, for hvilke vederlag ikke er betalt, uden forudgående autorisation fra n c b.

3. Samtlige vederlagsbeløb for tidligere produktion forfalder til omgående betaling.

Information om kontraktforholdets bortfald vil blive udsendt fra n c b mandag den 17. september 1990.

...«

I en skrivelse af 5. november 1990 fra advokatfirmaerne Berning, Schlüter, Hald & Andersen og O. Bondo Svane på vegne af blandt andre sagsøgeren og stilet til såvel A A/S som til de sagsøgte personligt er anført blandt andet:

»...

Som bekendt pågår politiets efterforskning af sagen for tiden, og vi vil naturligvis afvente resultatet af denne.

For så vidt angår den civilretlige del af sagen, skal vi oplyse, at vore klienter mener at have et større erstatningskrav mod såvel Dem personligt som Deres selskab. Det præcise erstatningskrav vil blive opgjort, når det eksakte omfang af Deres ulovlige virksomhed er afdækket.

...«

Som led i den politimæssige efterforskning blev der – – – september 1990 foretaget ransagning hos blandt andre A A/S. Efterforskningen resulterede i, at der ved anklageskrift af – – – 1992 blev rejst tiltale mod sagsøgte M, der ved – – – dom af – – – 1994, som i det væsentlige blev stadfæstet ved Vestre Landsrets ankedom af – – – 1996, blev idømt en bøde på 150.000 kr. for overtrædelse af ophavsretsloven. Det blev af landsretten lagt til grund, at tiltalte uden anmeldelse eller afregning havde i det hele videresolgt og heraf til dels fremstillet i alt ca. 310.000 – 320.000 kassettebånd, heraf ca. 70.000–180.000 fra den 26. april 1984 til den 14. juli 1987 og ca. 140.000 fra den 27. juli 1987 til den 15. september 1989. Tiltalen i straffesagen angik alene det forhold, der i det følgende er benævnt »Y-forholdet«.

Den – – – 1993 blev A A/S erklæret konkurs. Bobehandlingen blev afsluttet den – – – 1995, uden at der fremkom dividende til simple kreditorer. A A/S var oprindelig medsagsøgt i denne sag, men på grund af bobehandlingens resultat har sagsøgeren hævet sagen mod Konkursboet A A/S.

Af en fremlagt oversigt over sagsøgerens minimumstariffer for kassettebånd fremgår blandt andet, at denne fra den 1. januar 1984 til den 30. juni 1985 udgjorde 2,05 kr. pr. stk., fra den 1. juli 1985 til den 30. juni 1986 2,45 kr. pr. stk. og fra den 1. juli 1986 til den 30. juni 1990 2,55 kr. pr. stk.

A, senere A A/S, fik i perioden fra den 26. april 1984 til den 15. september 1989 uden indberetning og afregning til sagsøgeren fremstillet mindst 186.829 kassettebånd på en fabrik på – – – tilhørende Y (i det følgende kaldet Y-forholdet). A A/S fik endvidere i perioden fra den 13. september 1989 til den 31. august 1990 uden indberetning og afregning til sagsøgeren fremstillet mindst 164.497 stk. CD'er på en fabrik i – – – ved navn G/– – – (i det følgende kaldet G-forholdet). Endelig hævder sagsøgeren, at A A/S i perioden fra begyndelsen af 1986 til udgangen af 1990 har afregnet lavere n c b-vederlag for et stort antal fonogrammer, end selskabet var forpligtet til, idet det gøres gældende, at fonogrammerne blev solgt til ppd-priser, der udløste højere n c b-vederlag end det minimumsvederlag, der blev indbetalt til sagsøgeren (i det følgende kaldes dette forhold for lavt indberettede salgspriser).

Sagsøgerens påstande er i henhold til påstandsdokument og sammenholdt med øvrige bilag opgjort således:

*Principal påstand*

*Y-forholdet*

26/4 1984–14/7 1987

| | | | |
|---|---|---|---|
| Fremstillet | | 300.130 bånd | |
| Afregnet | 19.000 | | |
| Uidentificerbare | 84.303 | 100.303 bånd | |
| Resten | | 196.827 bånd, | |

der i henhold til en nærmere specifikation efter værkernes beskyttelsesgrad og multipliceret med sagsøgerens minimumstarif på 2,55 kr. er udregnet til at svare til et manglende vederlag på kr.    477.131,05

27/7 1987–15/9 1989

Fremstillet    140.350 bånd

**1551**

Andelen heraf, der gøres gældende at være uafregnede, er anslået at være den samme som i foregående periode, d.v.s. 196.827 : 300.130 = 65,58 % af 140.350 bånd = 92.041 bånd, der ved en sammensætning efter beskyttelsesgrad som i foregående periode svarer til et vederlag på 92.041 X 477.131,05 : 196.827 = kr.    223.110,25

*G-forholdet*

| | | | |
|---|---|---|---|
| Leverede CD'ere | | 222.297 stk. | |
| Heraf afregnet | 42.500 | | |
| Afregnet af andre | 14.700 | 57.200 stk. | |
| Rest | | 165.097 stk. | |
| Fradrag | | 600 stk. | |
| | | 164.497 stk., heraf | |
| 79.000 før 1/7 1990 à 3,20 = kr. | | 252.800,– | |
| 85.497 efter 1/7 1990 à 3,65 = kr. | | 312.064,05 | 564.864,05 |

*For lavt indberettede salgspriser*

Af en specifikation ud fra de 10 halvår i 1986– 1990 inkl. og efter at specifikationen er renset for oprindeligt beregnede renter samt for en regnefejl fremgår    316.414,71

*I alt kr.*    1.581.520,06

med tillæg af 100 % til dækning af sagsøgerens omkostninger ved sagens efterforskning, markedsforstyrrelser samt godtgørelse for ikke-økonomisk skade    1.581.520,06

*Principalt påstandsbeløb*    kr.    3.163.040,12

*Subsidiær påstand*

*Y-forholdet*

26/4 1984–14/7 1987

Af fremlagte lister over produktionen fremkommer

| | | |
|---|---|---|
| Maj 1984–juni 1985 | 106.211 bånd à 2,05 kr. | 217.732,55 |
| Juli 1985–maj 1986 | 68.666 bånd à 2,45 kr. | 168.231,70 |
| August 1986–juli 1987 | 40.950 bånd à 2,55 kr. | 104.422,50 |
| I alt kr. | | 490.386,75 |
| Fradrag for 19.000 afregnede bånd til et vægtet prisgennemsnit på 2,27 kr. = | | 43.130,00 |
| Resten kr. | | 447.256,75, |

der med en vægtet beskyttelsesgrad på 95,06 % svarer til kr.    425.162,27

27/7 1987–15/9 1989

|  |  |  |
|---|---|---|
| Opgjort som i den principale påstand (dog her uden øreafrunding) kr. |  | 223.110,15 |
| Sammentalt i påstandsdokument til kr. |  | 648.372,42 |
| *G-forholdet* |  |  |
| 164.497 CD'ere fordelt på tre lister således: |  |  |
| Liste 1, kr. | 137.752,80 |  |
| Liste 2, kr. | 389.436,40 |  |
| Liste 3, kr. | 6.820,00 |  |
| Sammentalt til kr. | 534.009,40 | 534.009,40 |
| *For lavt indberettede salgspriser* |  |  |
| Opgjort som i den principale påstand til |  | 316.414,71 |
| *I alt kr.* |  | 1.498.796,53 |
| med tillæg af 100 % som i den principale påstand |  | 1.498.796,53 |
| *Subsidiært påstandsbeløb* | kr. | 2.997.593,06 |
| Det bemærkes, at på grund af to sammentællingsfejl i påstandsdokumentet burde det subsidiære påstandsbeløb rettelig reduceres med 200,40 kr. |  |  |
| til |  | 2.997.392,66 |

**1552**

Sagsøgte S har i det hele bestridt at være erstatningspligtig.

|  |  |
|---|---|
| Størrelsesmæssigt har de sagsøgte for så vidt angår Y-forholdets første periode anerkendt, at der ikke er afregnet for 186.829 bånd, som udregnet efter den metode, der er anvendt under sagsøgerens subsidiære påstand forholdsmæssigt svarer til | 425.162,27 kr. |
| X 186.829 : 196.827 = | kr. 403.565,78 |
| samt har anerkendt sagsøgerens opgørelse for så vidt angår Y-forholdets anden periode | kr. 223.110,15 |
| i alt | kr. 626.675,93 |

svarende til sagsøgte M's principale påstand.

De sagsøgte har bestridt, at de 9.998 bånd, der udgør differencen mellem det af sagsøgeren påståede og det af de sagsøgte anerkendte antal, er udgivet af A A/S.

De sagsøgte har endvidere bestridt, at der for A A/S har foreligget nogen afregningspligt for CD'erne i G-forholdet, og at der er indberettet for lave salgspriser. Hvis det måtte blive lagt til grund, at der er indberettet for lave salgspriser, gøres det gældende, at der til dels er indtrådt forældelse i dette forhold.

Endelig har de sagsøgte bestridt, at der foreligger grundlag for, at der kan beregnes et tillæg på 100 % som påstået af sagsøgeren.

Der er under sagen dokumenteret en lang række bilag og uddrag heraf, herunder især lister over udgivne kassettebånd og CD'ere.

Der er afgivet forklaring af de sagsøgte samt af vidnerne H, I og W.

– – –

W, der nu er ansat andetsteds, har forklaret, at han var ansat som kontrolmedarbejder i sagsøgerens kontrolafdeling fra 1979 til 1995. I begyndelsen var der 3 ansatte i afdelingen. Da han fratrådte, var der 4 ansatte, der udelukkende arbejdede med kontrol. Kontrolafdelingens væsentligste funktion er at kontrollere fonogramproducenter, der benytter beskyttede værker i produktionen. Kontrollen udøves dels gennem kontrol af grossisternes salg til detailforretningerne og dels gennem indberetninger fra fabrikker, der fremstiller fonogrammer. Man har også samarbejde med IFPI. Da A A/S fik fremstillet kassettebånd på familien Y's fabrik og CD'er på G's fabrik, havde sagsøgeren intet kendskab til disse fabrikkers eksistens. Man havde derfor ikke via indberetninger fra fabrikkerne nogen mulighed for at få kendskab til den produktion, som fabrikkerne foretog for A A/S, endsige at føre kontrol med den. A A/S kombinerede typisk en mindre produktion af et værk på en kendt fabrik med en »sideproduktion« af langt større omfang hos Y eller G. Der blev alene foretaget indberetning vedrørende de eksemplarer, der blev fremstillet på den fabrik, som sagsøgeren havde kendskab til, mens der ikke blev foretaget indberetning vedrørende de eksemplarer, der var fremstillet ved »side- produktionen«. Som eksempler på værker, der er blevet fremstillet ved sådan »sideproduktion«, kan han nævne »– – –« og »– – –«. Særligt vedrørende de 9.998 kassettebånd, som de sagsøgte har hævdet, at A A/S ikke ern c b-vederlagspligtig af, kan han huske, at titlerne på disse udgivelser ligger tæt op ad andre udgivelser fra A A/S. Der blev under ransagning på Y-fabrikken fundet covers vedrørende – – –-serien påført A A/S's label, hvilket efter hans opfattelse tyder kraftigt på, at A A/S også er n c bvederlagspligtig vedrørende disse udgivelser. Produktion af CD'er er baseret på højteknologi, og mulighederne for at der kan ske fejl i produktionen, er efter hans opfattelse beskedne. CD'erne laves efter en »glasmaster«, der koster op mod 5.000 kr., og kun hvis der er fejl i denne, opstår der fejl i de færdige CD'er. Han har ikke kendskab til, at der fra advokat O's kontor skal være fremkommet en anmeldelse vedrørende A A/S til brug for udregning af skyldigt n c b-vederlag for G-forholdet. Det er ham, der har foretaget beregningerne vedrørende krav på efterbetaling i anledning af for lavt indberettede salgspriser. Beregningerne er lavet ved at sammenligne de priser, der er oplyst i salgskatalogerne fra A A/S, med de ppd-priser, som han har fået oplyst fra grossister, der har solgt kassettebånd fra A videre til detailbutiker. I nogle af katalogerne er salgspriserne angivet i kolonnen mærket »kode«.

De angivne priser vil i mange tilfælde være identiske med de priser, som grossisterne skal betale, og ppd-priserne vil derfor normalt være endnu højere. Hans beregninger er imidlertid også i disse tilfælde baseret på katalog-priserne. A A/S solgte en del fonogrammer med børnemusik og klassisk musik. Han mener dog, at salget af denne type fonogrammer maksimalt har udgjort 10 % af omsætningen. A A/S's aktiviteter forstyrrede markedet på flere måder. Producenter, der overholdt reglerne, var uden mulighed for at kunne konkurrere prismæssigt med A A/S, hvilket bevirkede faldende indtægter til sagsøgeren fra disse producenter, idet disse producenter som følge af den ulige konkurrence havde faldende salgstal og faldende priser. I ca. 6 år har han brugt meget af sin arbejdstid til at efterforske sagen mod A A/S og de sagsøgte. Det har været meget vanskeligt at dokumentere, hvor store beløb sagsøgeren er unddraget n c b-vederlag for. Det, der er omfattet af påstandene i denne sag, udgør efter hans opfattelse kun en lille del af de samlede beløb, der er unddraget sagsøgeren. Sagsøgerens opgørelse, hvorefter der til undersøgelser i sagen er anvendt mindst 3.400 timer og har været brugt mindst 250.000 kr. iøvrigt, ekskl. advokatbistand, er meget forsigtigt fastsat. Han har besøgt alt fra pladeforretninger over supermarkeder til kræmmermarkeder i forbindelse med undersøgelse af sagen. I den rapport af 28. januar 1990, som han har udfærdiget, er indeholdt en række punkter, der har relation til denne sag. Det var A A/S's udgivelse af kassettebånd med – – –, der udløste hele sagen. Han kan ikke sige nøjagtigt, hvor lang tid, der er anvendt på udarbejdelse af rapporten. Sagsøgeren har ikke debiteret politiet noget beløb for bistand til efterforskningen i forbindelse med straffesagen.

Sagsøgeren har til støtte for sine påstande gjort gældende, at begge de sagsøgte gennem A A/S har krænket sagsøgerens rettigheder i henhold til den dagældende ophavsretslovs § 2, idet der ikke er betalt n c b-vederlag til sagsøgeren i den udstrækning, som sagsøgeren har krav på. Sagsøgeren har derfor krav på erstatning, jf. samme lovs § 56 og almindelige erstatningsretlige regler, og hertil kræves alene, at de sagsøgte har udvist simpel uagtsomhed. Sagsøgte M er allerede straffet for overtrædelse af ophavsretsloven for sin handlemåde i forbindelse med Y-forholdet. Han skal derfor erstatte det tab, som sagsøgeren har lidt som følge af hans strafbare handlinger. Endvidere er der ikke afregnet vederlag for CD'erne i G-forholdet. M har handlet på samme måde for A A/S i Y-forholdet og i G-forholdet, og hans erstatningsansvar må derfor bedømmes ens i disse forhold. Endvidere har han gennem mange års erfaring fra branchen, herunder blandt andet som daglig leder af A A/S, fuldt ud kendskab til de ophavsretlige regler og kan derfor ikke have været uvidende om, at der af A A/S blev afregnet n c b-vederlag i forhold til for lavt angivne ppd-priser. Dette medfører, at han også er pligtig til at erstatte sagsøgeren det tab, som man har lidt herved. Sagsøgte S var direktør, eneaktionær og bestyrelsesmedlem i A A/S. Desuden foretog hun gennem sit daglige arbejde indberetninger til sagsøgeren vedrørende n c b-vederlag og deltog også i forhandlinger med sagsøgerens repræsentanter. Da hun var eneaktionær i A A/S, kom indtægterne fra selskabets ulovlige aktiviteter hende til gode. På baggrund heraf må der stilles strenge krav til hendes agtpågivenhed og tilsyn til sikring af, at A A/S's pligter overfor sagsøgeren blev overholdt. Disse krav har hun ikke opfyldt, og hun har derfor udvist en sådan uagtsomhed, at hun er erstatningsansvarlig i samme omfang som medsagsøgte. Ved udmålingen af erstatningen må sagsøgerens opgørelse, der indgår i den principale påstand lægges til grund. Når sagsøgeren som i den foreliggende sag har været udsat for grove krænkelser af sin ophavsret, må der tilkendes sagsøgeren erstatning svarende til det tab, som sagsøgeren har sandsynliggjort at have lidt. Sagsøgeren har så godt som muligt med brug af meget store ressourcer i tilstrækkelig grad dokumenteret størrelsen af tabet. I relation hertil må vidneforklaringen afgivet af W tillægges stor betydning. Der er udvist stor tilbageholdenhed fra sagsøgerens side ved udøvelsen af det skøn, der nødvendigvis må indgå i opgørelsen af tabet. Der må også lægges vægt på, at de sagsøgte ikke har haft væsentlige indsigelser mod de beregninger, som W har foretaget ved tabsopgørelsen i de tre forhold. Det må efter W's forklaring lægges til grund, at A A/S og dermed de sagsøgte også var pligtige til at betale n c b-vederlag af de 9.998 bestridte kassettebånd i Y-forholdet. De sagsøgtes forklaring om, at der var mangler i væsentligt omfang ved kassettebåndene fremstillet på Y-fabrikken og CD'erne fra G-fabrikken må tilsidesættes, idet der ikke er anført noget, der nærmere sandsynliggør, endsige beviser, dette. De sagsøgte var de nærmeste til at sikre sig et sådant bevis. Det bestrides, at nogen del af sagsøgerens krav på efterbetaling i anledning af for lavt oplyste salgspriser er forældet, idet sagsøgeren har været i undskyldelig uvidenhed om kravets eksistens. Sagsøgeren havde således først mulighed for at rejse kravet, da de pågældende kataloger blev fundet ved en ransagning i efteråret 1990. Det bestrides endvidere, at sagsøgeren stiltiende har accepteret, at der skete afregning af n c b-vederlag i forhold til for lave priser. Sagsøgeren må endvidere i medfør af den dagældende ophavsretslovs § 56, stk. 1, have krav på erstatning for de meget betydelige udgifter, som man har haft til undersøgelse af sagen samt krav på godtgørelse for ikke-økonomisk skade. Erstatningen og godtgørelsen herfor må gives skønsmæssigt og med udgangspunkt i de oplysninger, der foreligger om omfanget af sagsøgerens udgifter. Der må også tages hensyn til omfanget og grovheden af de ophavsretskrænkelser, som sagsøgeren har været udsat for, de betydelige markedsforstyrrelser samt det forhold, at reglerne om afregning af n c b-vederlag hviler på tillid. Det er både vanskeligt og bekosteligt at kontrollere rigtigheden af indberetningerne. Ud fra en samlet vurdering heraf bør denne del af erstatningen og godtgørelsen for ikke-økonomisk skade med støtte i retspraksis fastsættes til et beløb af samme størrelse som de samlede unddragne beløb.

Sagsøgte M har erkendt at være erstatningsansvarlig for det tab, som sagsøgeren har lidt som følge af manglende indberetninger i Y-forholdet i overensstemmelse med hans principale påstand. Derimod bestrides sagsøgerens tabsopgørelse. Han bestrider i G-forholdet at have overtrådt ophavsretsloven og dermed at være erstatningsansvarlig i dette forhold. Det var ikke sagsøgtes hensigt at undlade at afregne skyldigt n c b-vederlag. De manglende oplysninger til sagsøgeren om leverancerne af CD'erne skyldtes de problemer, der havde været med CD'ernes kvalitet. Sagsøgte havde tænkt sig at foretage anmeldelse til sagsøgeren, når det var klarlagt, hvor stort et antal der kunne sælges. Dette blev imidlertid aldrig gennemført, idet politiet på baggrund af sagsøgerens anmeldelse foretog ransagning. Der er ikke afregnet n c b-vederlag i forhold til for lave ppd-priser. A A/S solgte kun undtagelsesvis fonogrammer til ppd-priser, der fik n c b-vederlaget til at overstige minimumsvederlaget, og i disse tilfælde er der sket korrekt indberetning og afregning. Sagsøgerens opgørelse af erstatningskravet bestrides. Særligt vedrørende Y-forholdet gøres det gældende, at sagsøgeren ikke har løftet bevisbyrden for, at det påhvilede A A/S at betale n c b-vederlaget for de 9.998

**1553**

kassettebånd. Det er heller ikke bevist, at hverken kassetterne fra Y's fabrik eller CD'erne fra G-fabrikken er solgt til ppd-priser, der berettiger til et n c b-vederlag, der er højere end minimumsvederlaget. På baggrund af den oversigt over minimumsvederlag, som sagsøgeren har fremlagt, bestrides det, at sagsøgeren er berettiget til at foretage opgørelsen som sket i den

Copyright © 2021 Karnov Group Denmark A/S

principale påstand vedrørende Y-forholdet på basis af et minimumsvederlag på 2,55 kr. pr. kassettebånd for hele perioden fra den 26. april 1984 til den 14. juli 1987. Selve den talmæssige opgørelse af tabet i anledning af den påståede manglende eller for lave angivelse af ppd-vederlag bestrides i øvrigt ikke, men forudsætningerne for beregningerne bestrides. Endvidere er krav i anledning af eventuelt for lavt indberettede ppd-priser for salg foretaget i 1986 forældede, ligesom det må lægges til grund, at A A/S havde en stiltiende aftale med sagsøgeren om, uanset ppd-prisernes størrelse, at kunne nøjes med at afregne n c b-minimumsvederlag. Endelig bestrides det, at sagsøgeren har dokumenteret at have krav på erstatning for udgifter til undersøgelse af sagen. I rapporten af 28. januar 1990 indgår en række forhold, der er uden relevans for denne sag. W's tidsforbrug på disse for denne sag irrelevante forhold bør ikke påvirke opgørelsen af den erstatning, som sagsøgeren i givet fald har krav på hos de sagsøgte. Der er ikke grundlag for at udmåle en standarderstatning svarende til størrelsen af de samlede unddragne beløb i n c b-vederlag, omend det kan accepteres, at der sker en vis mindre forhøjelse af erstatningen til dækning af andet tab. Endelig er der ikke efter ophavsretskrænkelsernes karakter grundlag for at tildele sagsøgeren godtgørelse for ikke-økonomisk skade.

Sagsøgte S, der i øvrigt vedrørende opgørelsen af sagsøgerens krav har gjort de samme anbringender gældende som sagsøgte M, har særligt til støtte for sin frifindelsespåstand gjort gældende, at hun ikke har handlet ansvarspådragende. Selv om hun var direktør, bestyrelsesmedlem og eneaktionær i A A/S, og selv om A i perioden fra 1980 til 1984 blev drevet i hendes navn, var medsagsøgte i hele perioden daglig leder. Hun deltog ikke i den reelle ledelse af A A/S, og hendes stilling må bedømmes på linje med de øvrige kontoransatte i firmaet.

### Landsretten udtaler:

Sagsøgte M var daglig leder af A, både mens firmaet blev drevet i sagsøgte S's navn, og mens det var et aktieselskab. Han havde blandt andet ansvaret for, at der skete indberetning og afregning af skyldigt n c b-vederlag i overensstemmelse med de aftaler, der var indgået herom, sammenholdt med ophavsretsloven. På baggrund heraf er han personligt erstatningsansvarlig overfor sagsøgeren i det omfang, der fra A ved S og fra A A/S er undladt at give eller er givet forkerte oplysninger til brug for beregning af n c b-vederlag i alle tre forhold.

Sagsøgte S var indehaver af A, da firmaet fra 1980 til 1984 blev drevet i personligt regi. Da firmaet i 1984 blev omdannet til et aktieselskab, blev hun direktør, medlem af bestyrelsen og eneaktionær. Hun tog endvidere del i den daglige drift af selskabet, herunder særligt det administrative arbejde blandt andet med foretagelse af indberetninger til sagsøgeren. Det må lægges til grund, at hun som følge heraf på samme måde som medsagsøgte havde ansvaret for, at der skete afregning af n c b-vederlag til sagsøgeren i det pligtige omfang. I den udstrækning der fra A, såvel mens firmaet blev drevet i hendes navn, som mens det blev drevet i aktieselskabsform, er undladt at give eller er givet forkerte oplysninger til brug for beregningen af n c b-vederlag, findes hun derfor ligesom medsagsøgte ansvarlig for det tab, som herved er påført sagsøgeren.

Ved opgørelsen af sagsøgerens erstatningskrav mod de sagsøgte må der tages udgangspunkt i almindelige erstatningsretlige regler suppleret af den dagældende ophavsretslovs § 56.

Det er derfor sagsøgeren, der har bevisbyrden for, at der som følge af de sagsøgtes ansvarspådragende handlinger er lidt et tab. Ved bedømmelsen af, hvilke krav der kan stilles, for at det fornødne bevis er ført, må der blandt andet tages hensyn til karakteren af den ansvarspådragende handlemåde, som de sagsøgte har udvist, sagsøgerens muligheder for at opgøre tabet, de sagsøgtes muligheder for at imødegå tabsopgørelsen og sagsøgerens muligheder for at føre kontrol og derigennem foretage tabsbegrænsning. Der må herunder lægges en betydelig vægt på, at forholdet mellem parterne blandt andet bygger på, at producenten ved aftale har forpligtet sig til en nærmere bestemt nøje og regelmæssig indrapportering.

Ved opgørelsen af sagsøgerens principale påstand er der blandt andet taget udgangspunkt i et minimumsvederlag på 2,55 kr. pr. kassettebånd for hele perioden fra den 26. april 1984 til den 14. juli 1987. Dette er ikke i overensstemmelse med den oversigt, som sagsøgeren har fremlagt over størrelsen af minimumsvederlaget, idet dette ifølge oversigten først blev hævet til 2,55 kr. pr. kassettebånd med virkning fra den 1. juli 1986. Der er på baggrund heraf ikke grundlag for at foretage tabsopgørelsen vedrørende n c b-vederlag, som dette er sket ved opgørelsen af sagsøgerens principale påstand vedrørende Y-forholdets første periode. Det er endvidere ikke tilstrækkeligt godtgjort, at der i G-forholdet er lidt et tab i det omfang, der er angivet i sagsøgerens opgørelse af den principale påstand.

På de punkter, hvor den opgørelse, som sagsøgerens subsidiære påstand bygger på, er bestridt, har de sagsøgte haft anledning til, såvel i aftaleperioden som senere, at søge at dokumentere eller at sandsynliggøre forhold, der kunne rejse tvivl om rigtigheden af opgørelsen. Dette gælder såvel de bestridte 9.998 bånd i Y-forholdets første periode, hele G-forholdet, hvor de sagsøgte var de

**1554**

nærmeste til at sikre sig dokumentation for, at produkterne, som af dem hævdet, var defekte eller skulle afregnes af andre, som i forholdet om de for lavt indberettede salgspriser. En sådan dokumentation eller sandsynliggørelse har ikke fundet sted. Navnlig med støtte i W's vidneforklaring findes sagsøgerens opgørelse over mistet vederlag i henhold til dennes subsidiære påstand herefter at burde lægges til grund.

Der er endvidere ikke grundlag for at antage, at nogen del af kravet skulle være forældet, da sagsøgeren må anses for at have været i undskyldelig uvidenhed om sit krav for de for lavt indberettede salgspriser indtil umiddelbart før indgivelsen af politianmeldelsen den 29. januar 1990, jf. 1908-forældelseslovens § 3. Endvidere er der, navnlig efter indholdet af H's og I's vidneforklaringer, ikke grundlag for at antage, at sagsøgeren på noget tidspunkt skulle have accepteret, heller ikke stiltiende, at der alene afregnedes minimumsvederlag.

Ved vurderingen af, om sagsøgeren har krav på yderligere erstatning og godtgørelse for ikke-økonomisk skade, må der lægges betydelig vægt på, at hele fremgangsmåden ved opkrævning af n c b-vederlag er afhængig af, at de vederlagspligtige foretager korrekte og fuldstændige indberetninger, og at sagsøgeren kun vanskeligt og under anvendelse af store ressourcer er i stand til at føre kontrol med, om de vederlagspligtige opfylder deres forpligtelser. Derfor må der også ydes sagsøgeren erstatning for de udgifter, som man har haft til efterforskning og undersøgelser i den foreliggende sag, hvor afregning ikke er sket som påkrævet. En sådan erstatning må i det væsentlige fastsættes skønsmæssigt, og der er ikke – særligt på baggrund af vidnet W's forklaring – grundlag for at tilsidesætte det skøn, som sagsøgeren har udøvet ved opgørelsen af denne del af kravet. Under hensyn hertil og til dels indholdet af punkt 5, stk. 4, i aftalen af 10. november 1989, sammenholdt med § 7 i Fono-licensvilkårene, der ifølge forklaringerne fra vidnerne H og I var i overensstemmelse med indholdet af de tidligere aftaler mellem sagsøgeren og A, tages

sagsøgerens krav om erstatning svarende til et 100 %-tillæg til følge. Der er ikke grundlag for at tilkende sagsøgeren godtgørelse for ikke-økonomisk skade, men efter det foran anførte findes der ikke herved anledning til at foretage fradrag i 100 %-tillægget.

Sagsøgerens subsidiære påstand tages herefter til følge med fradrag af det beløb, der skyldes sammentællingsfejlene i opgørelsen af tabet i Y-forholdet.

**Thi kendes for ret.**

De sagsøgte, M og S, skal in solidum til sagsøgeren, Nordisk Copyright Bureau, betale 2.997.392,66 kr. med procesrente fra sagens anlæg, til betaling sker. – – –

Copyright © 2021 Karnov Group Denmark A/S