```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2               CASE NO.  18-MD-2865 (LAK)

 3   _____
                                            )
 4   IN RE:                                 )
                                            )
 5   CUSTOMS AND TAX ADMINISTRATION OF      )
     THE KINGDOM OF DENMARK                 )
 6   (SKATTEFORVALTNINGEN) TAX REFUND       )
     SCHEME LITIGATION                      )
 7                                          )
     This document relates to case nos.     )
 8   19-cv-01783; 19-cv-01788; 19-cv-01794; )
     19-cv-01798; 19-cv-01918               )
 9   _____)

10

11

12

13

14

15     REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                    EXAMINATION OF

17                     ROBERT CREMA

18                 DATE: February 9, 2021

19

20

21

22

23

24

25         REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

Robert Crema - February 9, 2021

Page 12

```
1    R O B E R T  C R E M A,
2         called as a witness, having been first
3    duly sworn according to law, testifies as follows:
4
5
6
7    EXAMINATION BY MR. OXFORD:
8         Q    Good morning, Mr. Crema.  My name
9    is Neil Oxford.  I work at a firm called
10   Hughes, Hubbard & Reed.  We represent the
11   plaintiff SKAT in this case.  It's nice to
12   meet you.
13             How are you doing today?
14        A    I'm doing fine, thank you.
15        Q    Great.  And where am I talking to
16   you this morning?  You're in Florida, I
17   understand?
18        A    That is correct.
19        Q    Where in Florida are you located?
20        A    Naples, Florida.
21        Q    Lovely.  And how long -- withdrawn.
22             Are you a resident of Naples?
23        A    Yes.
24        Q    How long have you been a resident
25   of Naples?
```

Robert Crema - February 9, 2021

Page 26

```
 1     trading as well?
 2          A    No.
 3          Q    Did Acer have specialists in
 4     dividend arbitrage trading?
 5          A    Well, we were a small firm.  It was
 6     always usually one person that traded.
 7          Q    And who was that one person?
 8          A    What specific year?
 9          Q    That's a good question.  Let's do
10     2012 through 2014.
11          A    It would be Stacey Kaminer.
12          Q    Okay.  And prior to that, was
13     someone else responsible for the trading
14     aspects of the dividend arbitrage?
15          A    Yes.  Daniel Kaminer.
16          Q    Okay.  And did Stacey Kaminer take
17     over after Mr. Kaminer passed away?
18          A    That is correct.
19          Q    Okay.  And when was that?  Sometime
20     around 2003?
21          A    Yeah, yes.
22          Q    Okay.  Were you managing partner of
23     Acer at some point?
24          A    Managing partner?  Managing
25     partner?
```

Robert Crema - February 9, 2021

Page 52

 1        Q    Did you take notes of that call or
 2   do you know if Stacey did?
 3        A    Take notes?  I don't recall.
 4        Q    Had you or Ms. Kaminer worked with
 5   Victoria Foster at her previous employer?
 6        A    Yes.
 7        Q    And her previous employer was who?
 8        A    I believe it was MF Global.
 9        Q    So did Ms. Foster move from
10   MF Global, when that went bankrupt, to
11   ED&F Man?
12        A    Yes.  To my knowledge, yes.
13             Excuse me.
14        Q    And in fact, it's true, is it not,
15   that it wasn't just Ms. Foster, it was the
16   whole desk --
17        A    That correct.
18        Q    The whole desk moved from ED&F --
19   from MF Global to ED&F Man?
20             MR. BLESSINGTON:  I just caution
21        you again.  Let Neil finish the
22        question, please.
23             THE WITNESS:  Yeah.
24             MR. OXFORD:  Thanks, John.
25        A    What was the question?

Robert Crema - February 9, 2021

Page 53

```
1          Q    The question was whether the whole
2     desk moved from MF Global to ED&F Man.
3          A    Yes, to my knowledge, the whole
4     desk moved with her.
5          Q    Okay.  So once Ms. Foster got her
6     feet under the desk at ED&F Man, she reached
7     out to you and Ms. Kaminer.
8               Correct?
9          A    Yes.
10         Q    Okay.  Did they ever send you some
11    sort of written materials or presentation or
12    a pitch book?
13         A    Not that I recall.
14         Q    Okay.  So can you tell me
15    everything you can about that initial
16    approach by Ms. Foster?
17         A    Well, I guess, bottom line, it was
18    a generic call at first.  We -- we cared for
19    her very much.  We enjoyed doing business
20    with her at MF Global.
21              And there wasn't much to add, other
22    than she took her whole show, if you will,
23    and all her desk, to perform the same
24    functions that she had at MF Global.  In
25    other words, she had access to their capital.
```

1           They wanted to engage in all this
2    type of business that MF Global was doing.
3    So there wasn't really that much to discuss
4    with her other than the opportunity to do
5    business direct with us.  In other words,
6    introduce our pension funds, any proprietary
7    trading that we might have engaged in.
8           It was all on the table.  But it
9    wasn't like a new -- brand new type of
10   business.
11        Q    I see.  So had the Acer plans,
12   those nine plans, conducted dividend
13   arbitrage trading through MF Global?
14        A    I don't know if they all did.
15        Q    But some of them did?
16        A    Yeah, yeah.
17        Q    And that was facilitated through
18   Acer?
19        A    Yes.
20        Q    Okay.  So is it fair to say what
21   Ms. Foster was proposing to you and
22   Ms. Kaminer was that now that the desk has
23   moved from MF Global to ED&F Man, the same
24   relationship and the same type of trading
25   continue?

```
 1              MR. BLESSINGTON:  Object to the
 2         form.  You can answer.
 3         A    Correct.
 4              THE WITNESS:  I'm sorry.
 5              MR. BLESSINGTON:  That's all right.
 6         A    Yes, yes.
 7         Q    Okay.
 8         A    Just wanted to move the whole show
 9    over to the new firm.
10         Q    Okay.
11         A    Not reinvent the wheel or anything.
12    Same business.
13         Q    Right.  If it ain't broke, why fix
14    it?
15         A    Yeah, exactly.
16         Q    So you mentioned earlier that ED&F
17    had the "sellers."
18              What did you mean by that?
19         A    Had the -- well, again, to my
20    knowledge, and I would defer to Stacey
21    Kaminer on this, because again, I didn't do
22    the trading.
23              But obviously there was -- they're
24    clearing the trade, so we had to buy the
25    stock from somebody.  And I'm assuming that
```

1          It actually depended on the
2    financing that they could provide.  Sometimes
3    they had financing, sometimes they didn't.
4          When they didn't, we didn't do any
5    business.
6       Q    Okay.  And by "they," you mean
7    ED&F?
8       A    I'm sorry.  Yes, yes.
9       Q    So that actually -- that
10   anticipates what was going to be my next
11   question.
12          The size of positions that the Acer
13   plans ultimately took in Danish securities
14   were quite substantial, in the tens,
15   sometimes hundreds of millions of dollars.
16          Correct?
17      A    Uh-huh.
18      Q    Is that a "yes?"
19      A    Yes.
20      Q    And the pension plans themselves,
21   the Acer plans, didn't have enough money to
22   buy those stocks outright.
23          Correct?
24      A    Correct.
25      Q    Some of those plans might have been

1     a few hundred thousand dollars in their
2     accounts, some of them might have a few
3     million, but they certainly didn't have
4     enough money to purchase those Danish
5     security positions they ultimately did.
6            Correct?
7        A   Correct.
8        Q   And was it your understanding of
9     the scheme that ED&F would facilitate the
10    purchase, by the Acer plans, of the Danish
11    plans by providing financing?
12           MR. BLESSINGTON:  Object as to
13        form.  You may answer.
14       A   Well, again, I wasn't involved in
15    the trades, so there's a lot of different
16    ways to finance.
17       Q   Yeah.  My question isn't how they
18    did it.  My question is whether they did it.
19           MR. BLESSINGTON:  Object as to
20        form.
21       A   Whether they did financing?
22       Q   Let me just ask it again so we have
23    a clean record.
24       A   Yeah, I'm not clear.
25       Q   Was it your understanding -- and I

Robert Crema - February 9, 2021

Page 59

```
 1      know that you were not involved in
 2      implementing the trading, but you -- you had
 3      some meetings with Victoria Foster and her
 4      team.
 5           A     Right.
 6           Q     And you were aware that Acer had
 7      done similar trading through MF Global.
 8                 Based on your understanding, did
 9      you believe that the way -- the only way that
10      Acer could afford to buy these substantial
11      positions in Danish securities was that
12      ED&F Man agreed to facilitate that by
13      providing financing?
14           A     Yes, that was my understanding.
15           Q     Okay.  And do you know how that
16      financing operated?
17           A     No.
18           Q     Okay.  Was Acer, to your knowledge,
19      ever involved in identifying or locating
20      securities that would ultimately be purchased
21      by the Acer plans?
22           A     Repeat it, please?
23           Q     To your knowledge, was Acer ever
24      involved in identifying the Danish securities
25      that were ultimately to be purchased by the
```

1     Q    Okay.  And was the purpose of this
2     power of attorney, and the others like it
3     signed by the other Acer plans to permit
4     Acer, on behalf of the plans, to pursue a
5     dividend arbitrage strategy and submit
6     reclaims for withheld tax to the Danish
7     government?
8              MR. BLESSINGTON:  Object as to
9         form.  You may answer.
10    A    Yes.
11    Q    So, under this power of attorney,
12    and the others like it, Acer was authorized
13    to decide and to give advice on which
14    securities your AIG plan and the other Acer
15    plans would purchase.
16             Correct?
17             MR. BLESSINGTON:  Object as to
18        form.  You can answer.
19    A    Yes.
20    Q    And this power of attorney
21    authorized Acer to place orders for those
22    same securities on behalf of Acer plans.
23             Correct?
24    A    Correct.
25    Q    And those decisions as to which

```
 1      securities to trade, and any ancillary
 2      financial instruments to enter into, were
 3      made with respect to the Danish trading by
 4      Ms. Kaminer and not by, for example, in this
 5      case, you as the beneficiary or trustee of
 6      the plan?
 7           A    It was strictly Ms. Kaminer.
 8           Q    Did Ms. Kaminer make the trading
 9      investment decisions in Danish securities for
10      all of the nine Acer plans?
11           A    I believe so.
12           Q    And to your knowledge, was anybody
13      else at Acer involved in making those
14      decision?
15           A    On an individual basis is the
16      question?  Or overall as a --
17           Q    Just sort of generally, was anybody
18      else involved in making the trading decisions
19      in Danish securities on behalf of the nine
20      Acer plans, other than Ms. Kaminer?
21           A    No.  She was the only one.
22           Q    And presumably, if we want to learn
23      about the factors that went into the trading
24      decisions, which stocks to buy, when to buy
25      them, on whose behalf, those are questions
```

Robert Crema - February 9, 2021

Page 163

```
 1        A    My guess would be -- well, I don't
 2   want to guess.  I'm not an attorney, so I
 3   can't answer that question.
 4        Q    Yeah, I'm not, you know, trying to
 5   be tricky.  I'm not asking you a legal
 6   question, sir.
 7             But you were, in fact, the trustee
 8   of this pension plan.
 9             Correct?
10        A    Right.
11        Q    Okay.  And you understand, just as
12   a general matter, that a trustee comes with
13   certain responsibilities?
14        A    And I would carry out those
15   responsibilities as trustee.
16        Q    Okay.  And what were those
17   responsibilities?
18        A    If you're asking me what the
19   responsibilities are, I don't know.
20        Q    Exactly?
21        A    I'm sorry.  Yeah.
22             That, I don't know.
23        Q    Do you know whether, as of 2002 or
24   any time subsequently, AIG, the company that
25   sponsors the plan, has had any employees?
```

```
 1      A     Subsequent to 2002?
 2      Q     Yeah.
 3      A     Yeah, we had employees.
 4      Q     Who were those employees?
 5      A     Oh, boy.  I don't recall.
 6      Q     Okay.
 7      A     I don't recall the staff.
 8      Q     What were those employees doing
 9   after 2002?
10      A     Securities lending, general
11   accounting, supporting the office, trading,
12   trading assistance, prior to 2002.
13      Q     Okay.  And after 2002?
14      A     After -- after Mr. Kaminer passed
15   on, we were -- ran very thin with people.
16   There was only four or five of us after that.
17      Q     Okay.  So I just want to make sure
18   I have your testimony as best you recall.
19            After October of 2002, did AIG, the
20   company, have any employees?
21            MR. BLESSINGTON:  Object as to
22      form.
23      A     AIG, the company?  Well, AIG, the
24   company, I'm going to answer that in this
25   way.
```

Robert Crema - February 9, 2021

Page 165

1              After Acer came into being, Acer
2     had the employees, if any.  AIG had none.
3         Q    Okay.  And -- thank you.  That's a
4     helpful answer.
5              And is it also, following that, any
6     business that was conducted by one of the two
7     companies was conducted by Acer and not AIG?
8              MR. BLESSINGTON:  Object as to
9         form.  You can answer.
10        A    That was done by Acer, not AIG, and
11    conducted by Acer?
12             Yes.  I would say yes to that.
13        Q    Okay.  Are you familiar with a
14    company called Moira Associates LLC?
15        A    Yes.
16        Q    What is that company?
17        A    It's an investment company.
18        Q    What kind of investment company?
19        A    Any and all opportunities.
20        Q    Can you give me -- can we go off
21    for one second?
22             THE VIDEOGRAPHER:  Stand by.  The
23        time is 2:13 p.m. and we're going off
24        the record.
25             (Brief recess taken.)

```
 1    thing.  No, no.
 2            That's my recollection.
 3       Q    Okay.  But it's your testimony that
 4    a trade diagram could have meant that Acer
 5    was going to provide the buy transaction and
 6    the amount.
 7            Is that right?
 8       A    Yes.  They call it a "diagram."
 9    It's a big rift between countries, the
10    English language.  A diagram to them is
11    totally different than to us.
12            A diagram could simply mean what
13    you just said; the buy, pricing, and how much
14    do you want to do.  That's the beginning and
15    the end of the diagram.
16            In the states, we would take that
17    to be a little bit more encompassing and
18    involved.  But not necessarily in the U.K.
19       Q    Okay.  And then --
20       A    I understand the question.
21       Q    Okay.  And then, the top e-mail
22    that says, "I need assistance with this," am
23    I hearing you correctly that your
24    interpretation of that e-mail is that Stacey
25    is asking you to help her make decisions on
```

Robert Crema - February 9, 2021

Page 186

1     which names the Acer plans would buy?
2            MR. BLESSINGTON:  Objection.  You
3        may answer.
4        A    Yes, she could be asking me that.
5     So basically, it would be participation in
6     the -- in the entire conversation.  And a lot
7     of times, she would do this to be sure that a
8     total of four ears on our side would hear.
9            We used to do that often.  Let us
10    both hear what is being said, and it made us
11    feel more comfortable.
12           So when she says "I need assistance
13    with this," it could have been just for that
14    reason.
15       Q    Okay.  But Ms. Kaminer would have
16    been the person that was primarily
17    responsible for determining which
18    transactions to engage in?
19           MR. BLESSINGTON:  Object as to
20       form, but you may answer.
21       A    Well, we would synthesize together
22    which trades we would like to do, that we
23    would be interested in doing, and how big,
24    what kind of size.  But then she would take
25    over.  She's the trader, she would take it