1              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK
2           MASTER DOCKET 18-MD-2865(LAK)
              CASE NO. 18-CV-09797
3

           _____
4                                                )
      IN RE:                                      )
5                                                )
      CUSTOMS AND TAX ADMINISTRATION OF           )
6     THE KINGDOM OF DENMARK                      )
      (SKATTEFORVALTNINGEN) TAX REFUND            )
7     SCHEME LITIGATION                           )
                                                 )
8     _____)

9

10

11          CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                  DEPOSITION OF
                   STACEY KAMINER
15                    VOLUME 1

16             Monday, April 19, 2021
               8:07 a.m. — 4:46 p.m.
17
                  Remote Location
18               Via Huseby Connect
                 All Parties Remote
19

20

21

22

23

24          Stenographically Reported By:
                 Erica Field, FPR
25

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

Page 6

```
 1          Markets, Ltd.
 2               MR. BLESSINGTON:  I should've also made it
 3          clear that Brandon Dillman is also on from K&L
 4          Gates representing Stacey Kaminer.
 5     Whereupon,
 6                    STACEY KAMINER,
 7     having been first duly sworn or affirmed, was examined
 8     and testified as follows:
 9               THE WITNESS:  Yes.
10               MR. OXFORD:  Just before we start, John,
11          did you want to put a statement on the record
12          about the protective order.
13               MR. BLESSINGTON:  I just want to make sure
14          that everybody who is actually listening in is
15          subject to the protective order that's in this
16          case.  Because when we are doing it remotely -- I
17          mean, actually, now that that person has dropped,
18          we can see everybody's name.
19               But obviously, we are going to be
20          discussing some confidential information and we
21          want to make sure it's subject to the protective
22          order.
23               MR. KAPLAN:  This is Marty Kaplan speaking.
24          For the record, Scott Goldstein may join this and
25          he obviously is a defendant and subject to the
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

Page 57

```
1    it.
2          Q.    Was Acer being compensated for introducing
3    the pension plans to ED&F?
4          A.    We didn't get -- I wouldn't characterize it
5    that way, no.  Acer didn't actually have to introduce the
6    pension plans to ED&F, per se, because the people that
7    worked on that desk came from MF Global, which had
8    relationships with the pension plans already.
9          Q.    Each of the nine Acer plans had a
10   preexisting relationship with the former MF Global team
11   that went to ED&F?
12         A.    Yes.
13         Q.    Let's take a look at Exhibit 2420, please.
14               (Exhibit 2420 was marked for
15                identification.)
16         A.    Okay.
17   BY MR. OXFORD:
18         Q.    It's an e-mail from Alan Goldman on which
19   you are copied, from July of 2015.  Mr. Goldman is having
20   an e-mail exchange about Acer invoices with
21   Joseph Sipkin, S-I-P-K-I-N, from Lerner Sipkin, correct?
22         A.    Correct.
23         Q.    And Lerner Sipkin were Acer's accountants,
24   correct?
25         A.    Lerner Sipkin was only responsible for the
```

```
 1                MR. BLESSINGTON:  Objection.
 2                You may answer.
 3        A.    Yes.
 4  BY MR. OXFORD:
 5        Q.    And what -- how -- how is that fee
 6  negotiated?
 7                MR. BINDER:  Objection to form.
 8        A.    I would say my -- more understanding is
 9  that the fee itself in the next column is more what is
10  negotiated and, thereby, the rate is negotiated because
11  they are a mathematical calculation.  I -- I wouldn't
12  necessarily -- when I look at it, I don't separate one
13  from the other.  I think it's a distinction without a
14  difference whether or not we agreed on 116,870 or agreed
15  on the same number, as expressed as a percentage of the
16  dividend times the shares.
17  BY MR. OXFORD:
18        Q.    Okay.  So it's your -- it's your testimony
19  that what was negotiated as a fee for Acer between Acer
20  and ED&F is the dollar, or in this case, the Danish krone
21  figure, rather than a percentage?
22        A.    Yes.
23        Q.    Okay.  And who negotiated that fee for Acer
24  and ED&F -- withdrawn.
25                Who at Acer and ED&F negotiated that fee,
```

```
 1    the -- the dollar or the -- the currency amount?
 2              MR. BINDER:  Objection to form.
 3         A.    That would have been a conversation that
 4    we -- that either -- well, I would have been involved in,
 5    Bob Crema may have been involved in, that would have
 6    happened with Victoria, Mark Whitehead.  They would have
 7    been involved in one of -- at least one of them and
 8    potentially, also, they might have involved others from
 9    the desk, such as Sara Mina.
10    BY MR. OXFORD:
11         Q.    Okay.  And -- and how did -- how did --
12    withdrawn.
13              So were you involved in negotiating that
14    fee?
15         A.    Yes.
16         Q.    Okay.  Because you -- you omitted
17    yourself -- withdrawn.
18              You'd -- how -- you were involved.  So what
19    factors went into arriving at the -- the currency fee
20    here?  So for the Christian Hansen 800,000 shares of
21    Christian Hansen, each of those ED&F fee of 116,870
22    Danish krone, how was that fee arrived at?
23              MR. BINDER:  Objection to form.
24         A.    That fee would have been based on the
25    transaction that ED&F enters into or facilitates for
```

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

```
 1                    So I do think that it gives a full picture.
 2      BY MR. OXFORD:
 3           Q.    Okay.   Isn't a real answer to the question
 4      from Acer's accountants that -- the one you gave me a few
 5      moments ago -- that the invoice was developed by giving
 6      Acer approximately 50 percent of ED&F's fees that they
 7      earned on the trades with the ED&F plan -- with the Acer
 8      plans?
 9                    MR. BLESSINGTON:  Objection to form.
10                    MR. BINDER:  Objection.
11                    You may answer.
12           A.    I think the real answer is the one I gave
13      you.
14      BY MR. OXFORD:
15           Q.    So let -- let's just back up for a second.
16                    It's your testimony that Acer billed ED&F
17      based on a percentage of ED&F's profits on the Danish
18      trading that ED&F did with the Acer plans, correct?
19                    MR. BINDER:  Objection to form.
20                    MR. BLESSINGTON:  Objection.
21                    You may answer.
22           A.    Yes.
23      BY MR. OXFORD:
24           Q.    And Acer's bill is based on a mathematical
25      formula related to ED&F profits on the Danish trading
```

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

1    that ED&F did with the Acer plans, correct?

2                    MR. BINDER:  Objection to form.

3          A.    Yes.

4    BY MR. OXFORD:

5          Q.    And that mathematical formula is that Acer

6    gets about 50 percent of ED&F's profits, correct?

7                    MR. BINDER:  Objection to form.

8          A.    Yes.

9    BY MR. OXFORD:

10          Q.    And what's happening here, Ms. Kaminer, is

11    that Acer's invoices are reverse engineered so that the

12    invoices appear to be calculated by a negotiated rate,

13    applied to the number of shares borrowed and the dividend

14    per share, correct?

15                    MR. BLESSINGTON:  Object as to form.

16          A.    I object to the characterization.  It

17    sounds -- where I'm saying that everything about dividend

18    arbitrage is expressed as a percentage of the dividend,

19    they are not reverse engineered, they are using the

20    prototypical calculation that's involved in that strategy

21    to begin with.

22                    You're supposing that ED&F's fee was not in

23    and of itself, therefore expressed as a percentage of the

24    dividend, times the number of shares or calculated that

25    way.

```
 1          A.     Okay.  So that's actually me e-mailing her.

 2          Q.     Oh, you're quite right.  Thank you for the

 3   correction.  That makes my follow-up question easier.

 4                 What do you mean by "the Ballance boys"?

 5          A.     So Simon and actually, his business

 6   partner, Joe Penna, were originally -- when they

 7   originally introduced themselves to us in 2010, the

 8   company that they were doing business under was called

 9   Ballance, the main company and it just stuck.

10          Q.     I see.  So when you refer to Ballance boys,

11   you're referring to Mr. Penna and Mr. Pearson, who are

12   now associated with Kingham?

13          A.     Correct.

14          Q.     Okay.  You go on to say:  I think the goal

15   of the call is just to make sure no toes are stepped on

16   and we are all making money.

17                 Do you see that?

18          A.     Yes.

19          Q.     What do you mean by that?

20          A.     I mean, because of the fact that Simon had

21   a very longstanding relationship with Mark Whitehead, who

22   was at MF Global, heading the desk and moved over and was

23   heading the desk at ED&F, I did -- and also, because I

24   felt like we had developed an independent, good

25   relationship with the desks, such as Victoria at ED&F,
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

1    that I didn't want anyone to feel like Simon -- I didn't

2    want anyone to feel like they were taking ownership of

3    the relationship with us.  Like, that we felt Simon's

4    relationship to us was more important than we felt our

5    relationship to ED&F was.

6        Q.    And did you subsequently have the telephone

7    call that's mentioned in this e-mail?

8        A.    I wouldn't see any reason why not.  But as

9    I'm sitting here today, I can't recall this specific

10    phone conversation.

11        Q.    Okay.  And what was the ultimate outcome of

12    the -- the discussions that are reflected in this e-mail?

13        A.    The ultimate outcome was that, I think,

14    everybody understood that Ballance -- see, I just did

15    it -- Kingham was wanting to take advantage of their

16    funding line to its fullest.  And when they didn't feel

17    like they could do that with their existing -- I don't

18    want to say customers for them because I don't think

19    Kingham was set up to have customers.

20            So maybe in the same general client, they

21    had other pension plans they transacted with that -- that

22    they would want it to be a situation where they could

23    still use that funding, but use Acer plans still involve

24    ED&F, still get all the services from ED&F, which

25    included the funding, but just use the Acer plans, as

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

1      A.    I don't know who Chris Smith is.  I'd
2  assume he is an ED&F folk.  And Stephen Hawksworth, I
3  never had any interactions with him, but I've seen his
4  name on ED&F documents, and Verrona's name likewise.
5  BY MR. OXFORD:
6      Q.    And I thought you mentioned Mr. Hawksworth
7  earlier and you knew him and his involvement in dividend
8  arbitrage trading at MF Global and ED&F Man.
9            Am I misremembering?
10      A.    I mentioned Mark Whitehead.
11      Q.    Mark Whitehead, okay.  Sorry, you're quite
12  right.  Thank you for that clarification.
13            So this is -- purports to be a meeting or a
14  report of a call between you and Mr. Crema on behalf of
15  Acer and three ED&F Man employees, Victoria Foster,
16  Mark Whitehead, and Chris Henstock.
17            Do you see that?
18      A.    Yes.
19      Q.    And the date is March 13, 2012.
20            Do you recall such a meeting or a call?
21      A.    I don't recall that specific call, no.
22      Q.    Did you have a number of calls with ED&F
23  Man around this time?
24      A.    Yes.
25      Q.    It says:  Stacey and Bob are keen to

```
 1    on-board similar funds to those we have worked with
 2    previously.
 3              Just pausing there, is that a reference to
 4    the prior employment of Ms. Foster and others as MF
 5    Global?
 6              MR. BINDER:  Objection to form.  Lacks
 7         foundation.
 8         A.    Yes.
 9    BY MR. OXFORD:
10         Q.    Are you aware or are you not that
11    Ms. Foster and Mr. Whitehead worked at MF Global prior to
12    coming to ED&F Man?
13         A.    I am aware.
14         Q.    And you are aware that because the Acer
15    plans transacted with those individuals -- withdrawn.
16              You're aware that because the Acer plans
17    used ED&F and MF Global as broker dealer prior to its
18    collapse, correct?
19              MR. BINDER:  Objection to form.  Compound.
20              MR. BLESSINGTON:  Objection.
21         You may answer.
22         A.    I am aware because the plans were customers
23    of MF Global.
24    BY MR. OXFORD:
25         Q.    Ms. Foster goes on to say:  Some trades
```

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 19, 2021

```
 1    BY MR. OXFORD:
 2         Q.    Ms. Kaminer, just want to make sure we're
 3    on the same page about a couple of terms, industry terms
 4    before we go into the next line of questioning.
 5               Can you tell me what the record date is in
 6    the context -- these questions are all in the context of
 7    dividend arbitrage trading.
 8         A.    Record date is a date set by the company,
 9    that they will say that is the date on which anybody who
10    is an owner of record is entitled to the dividend or
11    corporate action, generally speaking.
12         Q.    So -- so differently, it's the date in
13    Denmark at least, on which a shareholder has to be
14    registered with VP securities in order to get paid a
15    dividend by the company?
16               MR. BLESSINGTON:  Object as to form.
17               You may answer.
18         A.    Actually, I think Denmark works a little
19    bit differently.  I'm not sure you would have to be
20    registered with VP securities.  And they don't always go
21    off record dates.  A lot of Denmark centered around X
22    dates, record dates and that's it, sorry.
23    BY MR. OXFORD:
24         Q.    Okay.  So you don't know what the relevance
25    of the record date is for Danish securities trading?
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

1          A.     I just know that it's actually different

2     from what -- what a lot of the rest of the market does

3     to -- Denmark is a trade date market and not a settlement

4     date market.

5          Q.     Okay.  But you -- you don't know what, if

6     any, significance the record date has with respect to

7     Danish securities trading in dividend arbitrage?

8          A.     I would still think it held -- for me, it

9     held similar significance.

10         Q.     Similar to?

11         A.     What my understanding was elsewhere.

12         Q.     Which is what?

13         A.     That it is that date on which the company

14    would look to in order to determine entitlement to a

15    dividend.

16         Q.     And you're making a distinction between

17    entitlement and paying?

18         A.     Not -- I'm not sure of your distinction,

19    actually.

20         Q.     Okay.  Would you agree with the following

21    statement that the record date is the date on which the

22    shareholder needs to be registered in order to receive a

23    dividend from the company that issued the shares?

24         A.     Generally speaking, yes.

25         Q.     What's the pay date?

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

Page 166

```
1              A.     Pay date would be the day that the dividend
2       funds were actually paid to the shareholders.
3              Q.     What's the X date?
4              A.     The X date would be the day on which before
5       the stock trades with the dividend entitlement.  And it's
6       the cutoff date, whereby if you buy the security after
7       the X date, you're not entitled to a dividend or a
8       corporate action.
9              Q.     What is cum-dividend mean?
10             A.     Generally, thought to mean with -- with the
11      dividend.
12             Q.     So to use your example, if I place a trade
13      before the X date to purchase shares, I'm entitled to the
14      divined on those shares, and that would be a cum-dividend
15      purchase?
16             A.     Yes.
17             Q.     And what is a cum/cum trade?
18             A.     It's not terminology that I usually use.
19             Q.     Okay.  You don't know what a cum/cum trade
20      is in the context of dividend arbitrage trading?
21             A.     It's more of a European terminology and it
22      doesn't have as much significance for me.  It's not part
23      of my vernacular.
24             Q.     You don't -- okay.
25                    You don't know what it means in the context
```

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

1    of trading in Danish securities?

2           A.    As I said, cum-dividend, to me, means

3    buying with the dividend.

4           Q.    Do you know what a cum-ex trade is?

5           A.    What it means to me is buying with the

6    dividend and selling without the dividend entitlement.

7           Q.    Do you understand that a cum-ex trade

8    means, in the context of Danish securities, that the -- a

9    trade is made before the X date, but a settlement is

10   after the record date?

11          MR. BLESSINGTON:  I'm sorry, Neil.  Could

12          you repeat that?  I apologize.

13          MR. OXFORD:  Sure.

14   BY MR. OXFORD:

15          Q.    Do you understand that a -- that a cum-ex

16   trade means that the trade date is before the X date, but

17   the settlement date is after the record date?

18          A.    No.  I wouldn't of -- I -- I don't use that

19   cum-ex terminology and honestly, I know it's taking on a

20   life of its own, and so I don't feel like I am the person

21   to ask about that.

22          Q.    Okay.  What you do is -- let's just try it

23   a slightly different way.

24          The -- the trades that the Acer plans did

25   in Danish securities, were they all placed before the

```
 1    X date?

 2           A.    Yes.

 3           Q.    And did they settle before or after the

 4    record date, or was it a mix?

 5           A.    I'd have to look at the confirms to answer

 6    that accurately.

 7           Q.    Sitting here today, you have no idea?

 8           A.    Sitting here today, I couldn't answer that

 9    for every transaction.  They, generally.

10           Q.    Okay.  So -- so generally, did -- did you

11    consider the -- the Acer plans Danish trades to be --

12    once it settled before or after the record date or was it

13    a mix?

14           A.    I just don't want to speculate on that.  I

15    cannot recall.

16           Q.    Okay.  Was it a matter of importance to you

17    when the trades settled before or after the record date?

18           A.    Since in Denmark, the importance was the

19    trade date, it wasn't of significance to me as much as

20    the settlement date.

21           Q.    In the -- the Acer plans Danish dividend

22    arbitrage trading, did ED&F borrow the securities --

23                 (Reporter clarification.)

24           Q.    -- to sell to the plans?

25                 MR. BINDER:  Objection to form.
```

```
 1              A.    I know there were instances that they did.
 2     BY MR. OXFORD:
 3              Q.    And it's known as short-selling, isn't it,
 4     where you make a sale that you don't -- of securities you
 5     don't own?
 6                    MR. BINDER:  Objection to form.
 7                    MR. BLESSINGTON:  Objection.
 8              A.    Yes.
 9     BY MR. OXFORD:
10              Q.    And sometimes the -- and ED&F would borrow
11     those shares in order to cover their short sale?
12                    MR. BINDER:  Objection to form.
13                    MR. BLESSINGTON:  Objection.
14              A.    ED&F would have been required like a broker
15     dealer here in the U.S., to locate to securities before
16     being able to enter into a short sale and yes, they would
17     have been required to borrow the securities in order to
18     effectuate the sale, complete.
19     BY MR. OXFORD:
20              Q.    Okay.  Was it -- was it relevant to you
21     when ED&F actually borrowed the shares that they were
22     selling to the Acer plans?
23                    MR. BINDER:  Objection to form.
24              A.    The relevance would be did -- were they
25     able to settle the purchase.
```

```
 1     BY MR. OXFORD:
 2            Q.    Didn't matter to you when they borrowed the
 3     shares, it was whether they could settle the agreed
 4     purchase with the Acer plans; is that your view?
 5            MR. BINDER:  Objection to form.
 6            A.    Yeah.
 7     BY MR. OXFORD:
 8            Q.    How did the -- withdrawn.
 9            So the -- the Acer plans had assets of
10     between, what, 500,000 and $1 million maybe, before they
11     started do Danish dividend arbitrage trading; is that
12     about a fair range?
13            A.    No.
14            Q.    What's a fair range?
15            A.    A fair range would be up to multiples of
16     $1 million.
17            Q.    Which plans had multiples of millions of
18     dollars?
19            A.    American Investment Group, Kamco LP, that's
20     off the top of my head.
21            Q.    Okay.  And some of the plans, I think you
22     mentioned maybe Mr. Mitchell's plan, had a little less?
23            A.    I don't think I characterized how much he
24     had in relation to the numbers you just said.  I just
25     said he had less than the others.
```

1    were contemplating and trying to enter into contracts to

2    do business with them, and it has a Canadian name on it.

3         Q.    Does this -- you testified this morning

4    that the structure of Danish dividend arbitrage was not

5    materially different from the dividend arbitrage trades

6    you and Acer have done in other jurisdictions.

7              Do you remember telling me that?

8         A.    Yes.

9         Q.    Is -- would it be fair to characterize the

10   spreadsheet attached to Exhibit 2480 as a generic trade

11   structure for dividend arbitrage?

12        A.    No.

13        Q.    Why not?

14        A.    It was something that I only recall using

15   actually in Canada, and it wasn't something we used with

16   ED&F at all.  It was a starting point for a conversation.

17        Q.    Did you ever provide a trade schedule like

18   this to ED&F?

19        A.    I don't see this as a trade schedule,

20   sorry.

21        Q.    Okay.

22        A.    What do you mean by that?

23        Q.    Trade structure.  Would -- would you agree

24   with me that this is a trade structure?

25        A.    Yes.

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

```
 1          Q.    Okay.  Did you ever provide -- provide a
 2   trade structure for dividend arbitrage in Danish
 3   securities, did you ever provide that to ED&F?
 4          A.    No.
 5          Q.    Did you ever create such a trade for any
 6   purpose?
 7          A.    You're going to need to clarify the
 8   question.
 9          Q.    Sure.
10                So you see that attached to 2480 is a -- is
11   a trade structure for a Canadian security?
12          A.    Correct.
13          Q.    And it's done in the context of a dividend
14   arbitrage trade, correct?
15          A.    Correct.
16          Q.    Okay.  Did you ever create a similar
17   document relating to Danish dividend arbitrage?
18          A.    No.
19          Q.    Why not?
20          A.    They were already doing Danish dividend
21   arbitrage when they approached me and --
22          Q.    Who is they?
23          A.    They, ED&F.
24          Q.    Who approached you?
25          A.    Victoria Foster.
```

1          Q.    So it's your testimony that your -- Acer

2    followed ED&F's previously used structure for Danish

3    dividend arbitrage trading?

4                MR. BLESSINGTON:   Objection.

5                You can answer.

6          A.    With one caveat.

7    BY MR. OXFORD:

8          Q.    What's the caveat?

9          A.    We liked holding the securities longer

10   term.

11         Q.    And did ED&F ever provide you with a trade

12   structure for Danish dividend arbitrage?

13         A.    We would have discussed it verbally.

14         Q.    But nothing in writing?

15         A.    No.

16         Q.    Any particular reason -- any reason why

17   not?

18         A.    I don't recall them ever providing us a

19   trade structure in writing on anything.

20         Q.    Just taking a quick look at Exhibit 2480,

21   can you point out the material differences between the

22   structure reflected there and the structure ultimately,

23   you used for the Danish dividend arbitrage trading

24   through ED&F?

25         A.    To begin with, the client would not have

1    included a 501C3 for Denmark.  There were not cash --

2    cash-settled calls involved in the Danish transaction.

3    There was no attached due bill.  The trades did settle a

4    regular way.

5            Since there were no calls, ED&F didn't

6    exercise anything.  Since there were no due bills, there

7    wasn't any delivery.  Since Denmark had a reclaim

8    procedure, they would not have received 100 percent of

9    the dividend on payable date.

10            You can see that Canada had a reclaim at

11   source, DTC would not have been involved.  Again, ED&F

12   did not charge the client a dividend equivalent.  That's

13   what I see, just as I look at it here.

14        Q.   Okay.  I'm just going back to Stock Landing

15   for a moment.

16            Did you have insight into how the Stock

17   Landing agreements that ED&F entered into with

18   counterparties to supply Danish shares to Acer plans were

19   structured?

20            MR. BLESSINGTON:  Objection.

21        A.   No.

22   BY MR. OXFORD:

23        Q.   Do you know from, your experience in the

24   market, how stock landing generally works?

25        A.   Yes.

```
 1          A.    Yes.

 2          Q.    And what -- what is this you're sending to

 3    Mr. Crema?

 4          A.    And we're just scrolling to the actual

 5    spreadsheet.  This is a list of stocks that may have

 6    involved Simon.

 7          Q.    Simon is Simon Pearson of Kingham?

 8          A.    Yes.

 9          Q.    Who put this spreadsheet together?

10          THE WITNESS:  Can you scroll down to the

11    second?

12          MR. BLESSINGTON:  That one?

13          THE WITNESS:  Yes.

14          A.    Without seeing the metadata, I don't know.

15    BY MR. OXFORD:

16          Q.    Okay.  You actually anticipated by next

17    representation very cleverly, which is that the metadata

18    indicates it was created in -- created by SK.

19          A.     It's not completely on my spreadsheet.  I

20    can tell because my spreadsheets didn't have lots of

21    those columns.  But they would have had -- and -- and I

22    was in some ways responsible for the capitalizations, but

23    some of those columns were edited someone else because

24    that's not the sign of my spreadsheets.

25          Q.    Who -- who's the someone else here?
```

```
 1          A.    I'm going to assume someone at Kingham, if
 2    it's a sign-in related spreadsheet or a copied and pasted
 3    from something I got sent.
 4          Q.    So it's your testimony you -- this document
 5    was not created by Acer?
 6          A.    Correct.
 7          Q.    Even though the metadata has your initials
 8    in it?
 9          A.    As I said, it could've been something I
10    copied and pasted into an excel spreadsheet.
11          Q.    Someone would have to e-mail it for you for
12    you to copy and paste it, right?
13          A.    Yes.
14          Q.    Again, I will represent we have nothing in
15    production from your counsel that suggests this was sent
16    to you from Mr. Pearson or anybody else?
17          A.    Now that you're sort of expanding on that,
18    someone could have faxed me the spreadsheet, and I could
19    have created the Excel to manipulate the cells more
20    effectively and just retyped what was in the facts.
21          Q.    And is that your practice when you're
22    creating long Excels, you usually look to someone to fax
23    you some information, then you manually type it in?
24          MR. BLESSINGTON:  Objection.
25          You may answer.
```

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 19, 2021

```
 1          A.    When it came to Simon, he was notorious for
 2    faxing me information.  I don't know why.
 3    BY MR. OXFORD:
 4          Q.    Okay.  So -- so you don't know -- which
 5    information in this spreadsheet did not come from you?
 6          A.    I can't say just looking at it what
 7    information wasn't generated by me specifically.  I can
 8    say I would have been somebody who organized the stock, X
 9    date, record date, pay date.  I certainly would have
10    organized the number of outstanding shares and that type
11    of information in this instance, when Simon was involved.
12          Q.    Okay.  What -- what does Column I mean,
13    cum/cum all in?  You mentioned an all-in number in your
14    testimony earlier today?
15          A.    I see Column I as saying shares.  Am I on
16    the wrong sheet?
17          Q.    I don't think so.  To the --
18                MR. BLESSINGTON:  Sheet 1 or Sheet 2, Neil?
19                MR. OXFORD:  Sheet 1.
20    BY MR. OXFORD:
21          Q.    So just to the left of shares, there's a
22    column called cum/cum all in.
23                Do you see that?
24          A.    Hold on.
25                MR. BLESSINGTON:  On Sheet 1.
```

```
 1              A.    Yeah, there definitely -- there's a window
 2      pain because it goes D to L.
 3                    Okay.  Now, we're on the one that says I.
 4      It would have meant to me that potentially, the all-in of
 5      those shares.
 6              Q.    And what does all-in of those shares mean
 7      to you?
 8              A.    A percentage of the dividend, what the
 9      pension would have to -- the cost of acquiring those
10      shares.
11              Q.    And that's a percentage of the close
12      dividend, correct?
13              A.    Correct.
14              Q.    So just to use your example, let's look at,
15      say, the 4th row, the TDC shares.
16              A.    Yes.
17              Q.    The cum/cum all-in rate is 91 percent.
18      Actually, it's -- it's not 91 for all of them, but it's
19      91 for -- for TDC.
20                    In this situation, the pension plan would
21      be acquiring the shares of TDC and it would receive a
22      dividend, which is net of tax, i.e., 73 percent of the
23      dividend, but would have to pay out 91 percent as the
24      cost of acquiring the share.
25              A.    Yes.
```

```
 1              Q.     So just bear this number in mind, that the
 2     cost of cum/cum, the cum/cum all-in range for Danish
 3     shares is, we can agree, 85 to 91 percent there -- 88.5
 4     to 91 percent?
 5              A.     On this spreadsheet, yes.
 6              Q.     Yeah.  And is that your understanding of
 7     the ranges within the normal market range?
 8              A.     I don't recall now what the normal market
 9     range was for Denmark.
10              Q.     Okay.  And just for the record, I think the
11     way it's being printed on my exhibit, I have Column I,
12     but the cum/cum all-in is Column H?
13              A.     You were correct on Sheet 1, cum/cum all-in
14     is Column I.  It's on Sheet 2 that it's H.
15              Q.     Okay.  So just turning to -- so what's the
16     gross dividend amount Column H in Sheet 1?
17              A.     Can you highlight one of those for me?
18     It's the number of shares times the dividend.
19              Q.     Okay.  Turning to Sheet 2, if we could.
20     Can I direct your attention to Column K.
21              A.     I'm there.
22              Q.     That's entitled:  Negative Dividend.
23                     Do you see that?
24              A.     Yes.
25              Q.     What does that term mean to you in the
```

```
1     context of this spreadsheet?

2          A.    That means the 100 percent of the

3     dividend -- well, no.  It means the all-in number, less

4     the 73 percent of the dividend times the number of

5     shares.

6          Q.    And you see in Column L, it's entitled:

7     Cum-Ex All-in?

8          A.    Yes.

9          Q.    You see there's -- there's a percentage

10    muck like in the cum -- cum all-in column?

11         A.    Yes.

12         Q.    And you see that the -- for the same

13    securities, the cum-ex all-in percentage is lower than

14    the cum/cum all-in percentage?

15         A.    Yes.

16         Q.    So we have a range for the Danish shares of

17    84.5 to 87 percent for cum-ex all-in.

18                Do you see that?

19         A.    That 87 percent, if you're looking at 18

20    and 19, that's a Belgium share.

21         Q.    You're quite right.  Thank you for

22    correcting my error.

23                So the cum-ex all-in price is 85 --

24    84.5 percent for all of the Danish shares here?

25         A.    Yes.
```

1       Q.    And the cum/cum all-in price is more

2    extensive, it's higher, it's 88.5 to 91 percent in the

3    cum/cum all-in column, correct?

4       A.    Yes.

5       Q.    Which means that cum/cum trade is more

6    specific than a cum-ex trade for a plan to do, correct?

7       A.    On an all-in basis, yes.

8       Q.    Okay.  And we can see that, because if you

9    look across to the gross P&L column for cum/cum, the

10   trade was 7.5 million TDC shares results in a gross P&L

11   of 193,000.

12             Do you see that?

13      A.    Yes.

14      Q.    And the same trade on a cum-ex basis with a

15   lower cum-ex all-in percentage results in a higher P&L of

16   more than 333,000.

17             Do you see that?

18      A.    Can you just go back and see the number of

19   shares?

20      Q.    Yes.  Can you tell me why the cum-ex trades

21   are more profitable than the cum/cum trades?

22      A.    My understanding was that those were being

23   sourced from a seller who was not entitled to put in a

24   reclaim any higher than 73 percent.

25      Q.    Where did you get that understanding from?

1          A.     I can't recall specifically.

2          Q.     So it's your testimony that the difference

3     between the cum/cum trade and the cum-ex trades is the

4     source of the shares?

5          A.     I would say the underlying entitlement of

6     the shares.

7          Q.     And it has nothing to do with your

8     understanding of when the trades actually settle?

9          A.     No.

10         Q.     Do you have an understanding that cum-ex

11    trades are considered to be riskier than cum/cum trades?

12         A.     No.

13         Q.     When you gave your answer a moment ago, the

14    difference between the cum/cum trade and the cum-ex trade

15    is the underlying entitlement to the shares, what did you

16    mean by that?

17         A.     There are treaties and therefore,

18    entitlements between 73 percent and 100, using Denmark as

19    the example.  And to go back to when you were talking

20    about stock loan and an entitlement that sort of travels

21    with the stock loan, by way of example, if the pension

22    plan did loan out it's securities in Danish securities,

23    then, and it loaned them out over the record date, they

24    would still be entitled to the same dividend treatment as

25    if they had never loaned out the shares.

1                    So if the pension plan loans out the shares

2        and it happens to go over a record date, then they too

3        would get a payment under the stock loan umbrella and

4        theirs would be reflective of their entitlement, they

5        would get 100 percent of the dividend.

6                    If the -- and that would be considered the

7        underlying entitlement.

8            Q.    So it's the tax status of the provider of

9        the shares that determines, in your mind, the pricing

10       difference between cum/cum trade and cum-ex transactions?

11           A.    As I am looking at this spreadsheet, yes.

12           Q.    And generally, also, is that your

13       understanding?

14           A.    That's not a straightforward a question

15       because the terminology cum-ex has taken on a life of its

16       own in Europe and come to mean things that it was never

17       my understanding that they meant at the time.

18           Q.    So in order to do -- in order to understand

19       the entitlement to the dividend, as you have just

20       explained, wouldn't you need to know who the counterparty

21       was?

22           A.    No.

23           Q.    You would just need to be their tax status?

24           A.    It's the lender's responsibility to convey

25       to the borrower, such as ED&F might be the borrower, what

1    the underlying dividend entitlement is.

2           Q.    What the underlying dividend entitlement of

3    who?

4           A.    Of -- well, let's say -- let's say

5    Morgan Stanley is lending out shares to ED&F, and they

6    happen to be lending them over a record date, and it's a

7    U.S. security, is that U.S. security ultimately owned by

8    potentially a client of Morgan Stanley and they know that

9    that client who owns it is a U.S. person or a European

10   person?

11           And depending on that, then that would --

12   that was the type of information that they would pass on.

13   This is 100 percent stock, this is 85 percent stock, now

14   maybe Morgan Stanley themselves borrowed that stock that

15   they end up lending to ED&F from Deutsch Bank.  When

16   Deutsch Bank lends to Morgan Stanley, it's their

17   responsibility to say, this is 100 percent stock, this is

18   85 percent stock.

19           At some point at the origination of a loan,

20   whether it's the party that immediately lends it to an

21   ED&F or whether it's two parties away, they know the

22   account that it's being lent out of, and they know their

23   entitlement and they convey it and it follows the stock

24   along the chain.

25           Q.    When you told us a few moments ago that the

1    terminology cum-ex has taken on a life of its own in

2    Europe and come to mean things that it was never your

3    understanding it meant at the time, what do you -- what

4    do you mean by that?

5         A.    I mean, there's lots of news articles about

6    cum-ex transactions in relation to trading in Europe and

7    how it characterizes them is not what my understanding

8    was at the time.

9         Q.    What was your understanding at the time?

10         A.    I feel I explained that in terms of the

11   underlying dividend entitlement.

12         Q.    I see.  Was -- has the -- the press in

13   Europe about cum-ex change your view of what a cum-ex

14   transaction actually is?

15         A.    Just because that's how they want to

16   characterize it or its in the news, I don't feel I should

17   change my opinion necessarily, and it certainly doesn't

18   change what my opinion was at the time doing the

19   transactions.

20         Q.    Have you come to learn that Acer was

21   actually facilitating cum-ex transactions for the Acer

22   plans?

23         A.    No.

24         MR. BLESSINGTON:  Object as to form.

25

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              MASTER DOCKET 18-MD-2865(LAK)
                   CASE NO. 18-CV-09797
 3

 4     _____
                                              )
       IN RE:                                 )
 5                                            )
       CUSTOMS AND TAX ADMINISTRATION OF      )
 6     THE KINGDOM OF DENMARK                 )
       (SKATTEFORVALTNINGEN) TAX REFUND       )
 7     SCHEME LITIGATION                      )
                                              )
 8     _____)

 9

10

11           CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                    DEPOSITION OF
                      STACEY KAMINER
15                      VOLUME 2

16                Tuesday, April 20, 2021
                   8:08 a.m. — 2:35 p.m.
17
                     Remote Location
18                  Via Huseby Connect
                   All Parties Remote
19

20

21

22

23

24           Stenographically Reported By:
                   Erica Field, FPR
25
```

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 20, 2021

Page 249

```
 1    Thereupon,

 2    the following proceedings began at 8:08 a.m.:

 3              THE VIDEOGRAPHER:  We are back on the

 4        record.  This begins Day 2, Volume II of the video

 5        deposition of Stacey Kaminer.  The time is

 6        8:08 a.m., April 20, 2021.

 7              Will the court reporter please administer

 8        the oath.

 9    Whereupon,

10              STACEY KAMINER,

11    having been first duly sworn or affirmed, was examined

12    and testified as follows:

13              THE WITNESS:  I do.

14              MR. BINDER:  Before you begin your

15        questioning, I just wanted to follow up on a

16        statement I made on the record yesterday.

17              During your questioning of Ms. Kaminer, you

18        stated that, quote, ED&F's counsel had represent

19        ed to us that there was no recording that they

20        have of your placing an order orally for the

21        shares prior to the 20th of November, closed

22        quote.

23              So at the time I stated that as current

24        counsel for ED&F in this matter, I was unaware of

25        such representation.  So since the end of the
```

1          Q.     The title is:  Dividend Finder Fee Billing

2     for Danske Bank, Novozymes and Pandora?

3          A.     Yes.

4          Q.     And he writes:  Hi, Marcus/Chris, attached

5     is the Acer group LLC billing for those three shares,

6     correct?

7          A.     Yes.

8          Q.     What was Acer invoicing ED&F for here?

9          A.     Our fees.

10         Q.     What were your fees based on?

11                What did you do to earn those fees?

12         A.     I believe I stated yesterday that ED&F paid

13    us based on our relationship, based on overall value that

14    we brought to the table, based on the instances when we

15    did locate stock, and that our dividend finder fee didn't

16    just cover locating, sourcing, whatever word you want to

17    use for the term stock, and they did not separate out

18    well, this is Belgium, this is Canada, this is Denmark.

19    They viewed us as a relationship in the whole.

20         Q.     The one thing that we can be sure is, is

21    that Acer services for Denmark did not include finding

22    any dividends.

23                We can agree on that?

24         A.     We can agree that Acer services for Denmark

25    did not include locating stock that ultimately got

1    plans so it would be ED&F's fee, and without re-reviewing

2    all of the transactions and looking at account statements

3    and re-creating them, I can't tell you off the top of my

4    head in dollars what they retained.

5        Q.    You don't have a sense of the amount of

6    that 18 million that actually went to the Acer plans and

7    then be kept without paying in some form, whether you

8    call it a fee, whether you call it a profit share, to

9    Acer, to Kingham, to the market and to ED&F?

10       A.    I don't call it a profit share.  I do call

11   it a fee; and no, and the reason I know the other number

12   is because that's what was attached to the lawsuit.

13       Q.    If we wanted to calculate how much of the

14   18 million, to use your round number, how much of that

15   was actually retained after all fees, costs, expenses had

16   been paid by the plans, how would we do that?

17       A.    It would be difficult to use -- try and use

18   a real-life example and it's easier, I find, when

19   explaining something like this to sort of use round

20   numbers.

21       Q.    And I appreciate that.

22       A.    The pension plan, as an example, had a

23   million shares of a stock, and that stock was paying $1.

24   They would be entitled to a million dollars worth of

25   dividend.

Confidential - Attorneys' Eyes Only
Stacey Kaminer - April 20, 2021

1          In a case of Denmark, they would receive

2     73 percent of that $1 million on payable date, so

3     730,000.  And they would have suffered the withholding of

4     the 27 percent which equates to an additional 270,000.

5          When they enter into the transaction, they

6     buy the security and they sell the hedge, there's that,

7     what we have now been discussing as an all-in number that

8     gets paid in that transaction away to the -- that's the

9     cost of obtaining ownership of that security.

10          If we use an example of 90 all-in, that

11     means that 90 percent of the dividend is a cost in

12     establishing that ownership.

13          So if we look at that in terms of the

14     numbers that we have been discussing, that equates to

15     900,000.  Right?  90 percent of that 1 million that we

16     have been talking about.

17          That means that out to the market goes all

18     of that.  It doesn't go to ED&F, it doesn't go to the

19     plan, it doesn't go by way of ED&F to Acer.  It's out to

20     the -- potentially to the -- as we have seen on some of

21     the lending, like to the lender of the security, and

22     where that goes from there, none of us are privy to -- no

23     customer is privy to that information.

24          So now we are dealing with a hundred

25     thousand.  And from there, of that hundred thousand, we

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 20, 2021

Page 329

```
 1    have been discussing that they retain 5 to 10 percent.

 2    Let's -- even for the sake of this argument -- use the

 3    lower number, the 5 percent number.  That's what they

 4    retain.  95 percent of that goes to execution fees,

 5    financing fees, custody fees, ED&F's fees, which include

 6    custody fees.

 7                 And so therefore, of that hundred thousand,

 8    you're talking about ED&F getting in the range of

 9    probably -- let's see, five -- probably 90, maybe as low

10    as 80, and then Acer is invoicing half of that.  And so

11    now you're talking about 40,000 to ED&F as an ending net

12    profit on the trade and 40,000 to Acer and 5,000 to the

13    plan.

14                 I'm hoping that type of example maybe made

15    it easier to --

16          Q.    Yeah.  That was very helpful, actually.

17                 MR. OXFORD:  Let's go off the record.

18                 THE VIDEOGRAPHER:  We are off the record.

19          The time is 10:43 a.m.

20                 (A brief recess was held from 10:43 a.m. to

21    11:07 a.m.)

22                 THE VIDEOGRAPHER:  We are back on the

23          record.  The time is 11:07 a.m.

24    BY MR. OXFORD:

25          Q.    Ms. Kaminer, in the example that we just
```