Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                CASE NO.  18-MD-2865 (LAK)

 3      _____
                                               )
 4      IN RE:                                 )
                                               )
 5      CUSTOMS AND TAX ADMINISTRATION OF      )
        THE KINGDOM OF DENMARK                 )
 6      (SKATTEFORVALTNINGEN) TAX REFUND       )
        SCHEME LITIGATION                      )
 7                                             )
        This document relates to case nos.    )
 8      19-cv-01783; 19-cv-01788; 19-cv-01794; )
        19-cv-01798; 19-cv-01918              )
 9      _____)

10

11

12              C O N F I D E N T I A L

13         SUBJECT TO THE PROTECTIVE ORDER

14

15

16      REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                   EXAMINATION OF

18                RICHARD MARKOWITZ

19              DATE: April 8, 2021

20

21

22

23

24

25      REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

```
 1     R I C H A R D   M A R K O W I T Z,

 2              called as a witness, having been first

 3     duly sworn according to law, testifies as follows:

 4

 5

 6

 7     EXAMINATION BY MR. WEINSTEIN:

 8         Q    Good morning, Mr. Markowitz.
```

25         Q    Mr. Markowitz, my name is Marc

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 137

```
 1              And ultimately they didn't find you
 2    another leverage provider?
 3              MR. BONGIORNO:  Objection.
 4         A    I disagree with the premise of your
 5    question.
 6         Q    Okay.  Ultimately, were they able
 7    to provide -- to find another leverage
 8    provider?
 9         A    No.
10         Q    Can you turn, please, to
11    Exhibit 2116?
12              MR. WEINSTEIN:  Mark this as 2116.
13              (Whereupon the above mentioned was
14         marked for Identification.)
15              MR. BONGIORNO:  Marc, maybe after
16         you finish with this one, we can take
17         our next break?
18              MR. WEINSTEIN:  Yeah.
19         Q    So Mr. Shah sends you an e-mail in
20    April of 2012 asking if you have a pension
21    fund in the U.S. that can be used for trading
22    equities and derivatives.
23              Do you recall receiving that from
24    him?
25         A    Yes.
```

```
 1          Q    At the time that you got it, did
 2     you have a pension fund in the U.S. that
 3     could be used for trading equities and
 4     derivatives?
 5          A    I don't recall.
 6          Q    Okay.  Did you understand that this
 7     question was in the context of dividend --
 8     the dividend arbitrage strategy?
 9          A    Yes.
10          Q    Do you recall what your response
11     was to Mr. Shah?
12          A    No.
13          Q    Did you end up setting up a pension
14     fund in the U.S. to be used for trading
15     equities or derivatives as part of a dividend
16     arbitrage strategy?
17          A    Yes.
18          Q    Okay.  And what pension plans did
19     you set up to be used for that purpose?
20          A    RJM Capital Pension Plan, among
21     others.
22          Q    When was RJM Capital Pension Plan
23     established?
24          A    Sometime in 2013.
25          Q    Okay.  Did -- along with your
```

Confidential – Subject to The Protective Order
Richard Markowitz – April 8, 2021

Page 290

```
 1    been on a phone call.  But either our
 2    attorneys dealt with them directly or
 3    Mr. LaRosa had the primary contact with the
 4    reclaim agents.
 5        Q    Okay.  Do you know if Acupay had
 6    any arrangements with Solo Capital, any sort
 7    of deals on doing -- withdrawn.
 8            Do you know if Acupay had any deals
 9    with Solo Capital to be the payment agent for
10    the pension plans in this strategy?
11        A    Can you clarify what you mean by
12    "deal?"
13        Q    Well, for each plan that used a
14    payment agent such as Acupay, the pension
15    plan had to enter into an agreement with
16    Acupay.
17            Correct?
18        A    Yes.
19        Q    All right.  And it paid Acupay some
20    fee which was based on a percentage of the
21    reclaim.
22            Is that right?
23        A    Sometimes it was a fixed amount or
24    a capped amount, but yes.
25        Q    Okay.  And that's the same for
```

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                   CASE NO.  18-MD-2865 (LAK)

 3        _____
                                                 )
 4        IN RE:                                 )
                                                 )
 5        CUSTOMS AND TAX ADMINISTRATION OF      )
          THE KINGDOM OF DENMARK                 )
 6        (SKATTEFORVALTNINGEN) TAX REFUND       )
          SCHEME LITIGATION                      )
 7                                               )
          This document relates to case nos.     )
 8        19-cv-01783; 19-cv-01788; 19-cv-01794; )
          19-cv-01798; 19-cv-01918               )
 9        _____)

10

11

12                  C O N F I D E N T I A L

13             SUBJECT TO THE PROTECTIVE ORDER

14

15

16      CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

17                  ORAL EXAMINATION OF

18                   RICHARD MARKOWITZ

19                      VOLUME II

20                 DATE: April 9, 2021

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

```
 1    R I C H A R D   M A R K O W I T Z,

 2            called as a witness, having been first

 3    duly sworn according to law, testifies as follows:

 4

      CONTINUED EXAMINATION BY MR. WEINSTEIN:

 5

 6        Q    Mr. Markowitz, if you can turn to

 7    Exhibit 2133, please?

 8            Did each of the partnerships listed

 9    in this exhibit earn profits from the Danish

10    dividend arbitrage strategy?

11        A    (Witness reviewing.)

12            MR. BONGIORNO:  Objection.

13        A    I don't recall.

14        Q    Did the partnerships earn profits

15    from any other investing activity other than

16    the Danish dividend arbitrage strategy?

17        A    Yes.

18        Q    What other investment strategies

19    did these partnerships earn money from?

20        A    Dividend arbitrage investments.

21        Q    So their profits were generated

22    entirely by dividend arbitrage strategies?

23        A    Yes.

24        Q    Did those strategies involve

25    Denmark and Belgium?
```

```
 1        break now?
 2             MR. BONGIORNO:  Sure.  Marc, my
 3        thought is when we come back, maybe
 4        we'll do a shorter session and then do a
 5        lunch break so that we're not waiting
 6        too long.  But it seems a little too
 7        early for lunch right now.
 8             MR. WEINSTEIN:  Yeah, that's a good
 9        plan.
10             THE VIDEOGRAPHER:  Stand by.  The
11        time is 12:05 p.m. and we're going off
12        the record.
13             (Brief recess taken.)
14             THE VIDEOGRAPHER:  Stand by.  The
15        time is 12:14 p.m. and we're back on
16        record.
17        Q    Mr. Markowitz, did you tell Joseph
18   Herman that he did not have to provide any
19   money in order to participate in this
20   investment strategy?
21        A    I don't recall.
22        Q    Can you please turn to
23   Exhibit 1777?
24        A    Can you try to help us find what
25   book that's in?
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 409

```
 1         Q    It would be at the front of a book.
 2    I don't know which book.
 3              MR. BONGIORNO:  I think it's the
 4         first book.  Yeah.  It's Day 1,
 5         Volume 1.
 6         Q    So this is an e-mail from
 7    Mr. Klugman to a number of people, including
 8    you.  "Arbitrage Instructions and Questions."
 9              Who are —— who is Matthew Cooper?
10         A    An individual introduced to me by
11    Robert Klugman.
12         Q    What role, if any, did Mr. Cooper
13    have in connection with the dividend
14    arbitrage strategy?
15         A    He assisted the pension plans in
16    executing trades.
17         Q    And who is Ira Reibeisen?
18         A    An individual introduced to me by
19    Robert Klugman.
20         Q    Did he have the same role as
21    Mr. Cooper?
22         A    Yes.
23         Q    Do you recall being part of any
24    discussions about trading instructions for
25    this dividend arbitrage trading?
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 410

```
 1          A    I just remember this e-mail.  I
 2    don't recall being on a -- having a
 3    conversation about arbitrage instructions.
 4          Q    Okay.  And is the attachment to the
 5    e-mail meant to provide guidance for how
 6    Mr. Cooper and Mr. Reibeisen would do the
 7    trading for the pension plans?
 8          A    How they would execute trading
 9    instructions on behalf of the plans, yes.
10          Q    Okay.  At the bottom of Page 1,
11    there are three questions that Mr. Cooper
12    raises.  And the second one is, "How do we
13    reach POGO?"
14               Do you know who POGO is?
15          A    Yes.
16          Q    Who is that?
17          A    An employee of Solo Capital.
18          Q    Do you know his name?
19          A    I believe it's Mark Anderson,
20    something like that.  I don't have an exact
21    recollection.
22          Q    Okay.  Does Mark Paterson ring a
23    bell?
24          A    Yes.
25          Q    Okay.
```

```
 1        A    Better bell.

 2        Q    Okay.  Do you think that's who

 3   "POGO" is?

 4        A    I believe so.

 5        Q    All right.  If you turn to the next

 6   page, step one in the trading day is around

 7   7:00 a.m. to request liquidity using 34

 8   e-mails.

 9             And is the 34 -- the 34 e-mails are

10   for the 34 pension plans that were

11   participating prior to adding six more?

12        A    Yes.  One request for each client.

13        Q    Okay.  Who was the request for

14   liquidity supposed to be sent to?

15        A    A broker.

16        Q    Okay.  How would Mr. Cooper or

17   Mr. Reibeisen know which broker to reach out

18   to for liquidity, or was that left to their

19   discretion?

20        A    Can you rephrase the question,

21   please?

22        Q    How did Mr. Cooper and

23   Mr. Reibeisen know what broker to reach out

24   to for liquidity?

25        A    They would have received
```

```
 1     information along with the allocations of the

 2     market liquidity we received.  We would have

 3     received information from Solo regarding

 4     which brokers could source that liquidity.

 5          Q    Okay.  So Solo -- what information

 6     would Solo provide to Cooper and Reibeisen in

 7     the morning?

 8          A    Allocation of shares and

 9     information on broker or other counterparties

10     for the hedging transactions to send the

11     e-mails to and trade with.

12          Q    Okay.  So would Solo select the

13     security or the issuer that was going to be

14     traded in?

15          A    I don't understand your question.

16          Q    Well, in order to seek liquidity,

17     you have to be seeking it in a particular

18     stock.

19               Right?

20          A    Yes.

21          Q    Okay.  Would Solo select the stock

22     for which Cooper would send the liquidity

23     e-mail?

24          A    The stock was common knowledge.  It

25     was a limited number of publicly traded
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 413

```
 1     European stocks who were going to be
 2     declaring dividends.
 3            So all parties, including anyone
 4     looking at a Bloomberg terminal would know
 5     when a company was getting ready to pay a
 6     dividend.  And we would receive information
 7     about allocations of that particular security
 8     from Solo.
 9       Q    Okay.  So if TDC's dividend date
10     was coming up, how would Mr. Cooper know that
11     the plans wanted to trade in TDC securities?
12       A    The plans would have given them
13     advice or instructions that they were
14     interested in trading dividend-paying stocks
15     in Denmark and other countries.  And there's
16     a list of -- a limited list of publicly
17     traded companies that pay dividends.
18       Q    Okay.  And then, in order for Solo
19     to know that it needs to provide to Cooper,
20     the liquidity provider, how would Solo know
21     what stocks the plans wanted to trade in that
22     day?
23       A    I don't agree with the premise of
24     your question.
25       Q    Was it Solo -- the first thing that
```

1    would happen that day was that Solo would

2    provide Mr. Cooper the liquidity and

3    allocation and broker for the trading?

4         A    Yes.

5         Q    Okay.  How would Solo know which

6    stocks to provide that information for?

7         A    All participants across the

8    financial markets around the world who

9    participate in dividend arbitrage have the

10   same list.

11        Q    Okay.  But the pension plans

12   didn't -- but the pension plans didn't trade

13   in every dividend issuing company in the

14   world.

15             Right?

16        A    So it's even a shorter list.

17        Q    So, basically, Solo understood that

18   if any one of a number of Danish securities

19   had a dividend date coming up, he's going to

20   send -- Solo is going to send this liquidity

21   e-mail to Cooper?

22        A    Subject to the pension plan having

23   information that it was a profitable

24   opportunity, looking at the dividend yield of

25   the company, and for its own investment.

1          But the list was less than 20 names

2     in Belgium —— in Denmark, and similar in

3     other jurisdictions where these opportunities

4     existed.  And every financial participant

5     would have the same list, the same dividend

6     amount, the same payment dates.

7          And anyone participating would be

8     looking for liquidity in the marketplace.

9        Q    Okay.  So Solo would inform Cooper

10    or Reibeisen which brokers to shoot these

11    liquidity e-mails out to for a particular

12    stock?

13       A    Which brokers to ——

14       Q    Send e-mails to for a particular

15    stock?

16       A    They would receive an allocation of

17    the liquidity that Solo saw in the

18    marketplace, and that sellers could source,

19    and which brokers would be able to arrange

20    purchases on behalf of our pension plans.

21       Q    Okay.  And that —— the allocation

22    that was provided, was that provided in the

23    aggregate for the 34 pension plans or was it

24    allocated by Solo across the 34 pension

25    plans?

```
 1        A    Yes.

 2        Q    So both?

 3             MR. BONGIORNO:  Objection.

 4        A    Repeat your question?

 5        Q    Yeah.  You said that Solo would

 6   determine the liquidity that was available,

 7   and would make an allocation.

 8             Correct?

 9        A    Yes.

10        Q    Okay.  And would Solo allocate an

11   aggregate number of shares for all of the

12   pension plans together, or would he allocate

13   it to each plan?

14             MR. BONGIORNO:  Objection.

15        A    Yes.

16        Q    And so he did both?

17             MR. BONGIORNO:  Well, objection.

18        It's a compound question, Marc.  Maybe

19        if you break it down, it would be

20        easier.

21             MR. WEINSTEIN:  When you ask a

22        large question, it's not compound.

23        Q    Did Solo --

24        A    I'm sorry.  I didn't hear your

25   question.  I'm sorry.  I didn't hear your
```

```
 1    question.

 2         Q    When -- did Solo allocate an

 3    aggregate number of shares in a particular

 4    stock for the 34 pension plans combined?

 5         A    Yes.

 6         Q    Okay.  And from there, who decided

 7    how many shares each plan would get?

 8         A    Solo would provide information for

 9    each customer on their custodial or related

10    custodial platform.

11         Q    Okay.  So if you look at Step

12    Number 2 on that page, after Cooper or

13    Reibeisen send out the liquidity e-mails,

14    Step 2 is that the broker responds back,

15    saying they will seek that liquidity.

16              Right?

17         A    Yes.

18         Q    But in fact, everyone knew at the

19    time that the broker had already -- that that

20    liquidity was there, because Solo had

21    determined that.

22              Right?

23         A    It was our expectation that the

24    liquidity would be there.  We had no

25    assurances or guarantees.
```

```
 1          Q     Okay.  And then, Number 3 is in
 2    response.   The pension plan's representative
 3    will send back saying, "Okay, we'll seek
 4    custodial approval in the meantime."
 5                Right?
 6          A     Yes.
 7          Q     And the custodian was either Solo
 8    or Old Park Lane?
 9                MR. BONGIORNO:  Objection.
10          A     At this time, it was Old Park Lane.
11          Q     Okay.  And the pension plans knew
12    that that approval was going to happen.
13                Correct?
14          A     No.
15          Q     Okay.  Were there times where Old
16    Park Lane refused to accommodate one of these
17    requests?
18          A     I don't recall.  This -- we had
19    never traded with Old Park Lane as a
20    custodian before.  So, at this time, it was
21    our expectation that our trades would be
22    approved if they complied with the terms of
23    our custodial agreement.
24                But the approval process was not
25    anything we had control over.
```

 1        Q    Okay.  Did -- once you started

 2    trading using Old Park Lane, did they ever

 3    deny one of these requests?

 4        A    I don't recall.

 5        Q    Number 7 says, "At market close,

 6    get SKYPE message from POGO on accurate

 7    closing price and forward price and confirm

 8    the pricing."

 9             Do you know how that forward price

10    was generated?

11        A    My understanding just goes to

12    forward pricing models that I've had some

13    experience with, that the forward price

14    reflects the value of the shares expected to

15    be in the future.  Because it's a forward,

16    there's an element of interest rate.

17             So it reflects an expected future

18    value plus an interest rate or time value of

19    money component.

20        Q    Okay.  And as part of the future

21    value, it would have to take into account

22    that there would be no dividend attached at

23    that point.

24             Right?

25        A    Assuming the future security was

```
 1      being -- or the forward contract was being

 2      executed prior to the ex-dividend date, yes.

 3          Q    And it was in each case.

 4          Correct?

 5          A    Yes.

 6          Q    Okay.  Number 9 says, "Take the

 7      forward price and put it into a pre-made

 8      e-mail to be sent to the forward

 9      counterparty."

10              Were these -- were the forward

11      counterparty transactions all prearranged?

12          A    No.

13          Q    Okay.  Was it your understanding

14      that once the purchases were made, that the

15      brokers would then have to just go into the

16      market and find sufficient forward

17      counterparties?

18          A    No.

19          Q    Was it your understanding that that

20      had been determined prior to the

21      purchase -- well, withdrawn.

22              Was it your understanding that the

23      forward counterparty trades had been arranged

24      prior to the actual purchase of the

25      securities?
```

```
 1        A    No.
 2        Q    Okay.  So what was your
 3   understanding of how the brokers went out and
 4   got the forward counterparties?
 5        A    I can't answer that because I don't
 6   agree with the premise of the question.
 7        Q    How did -- was it the brokers who
 8   went into the market -- well, withdrawn.
 9             Was it the brokers who found the
10   forward counterparty liquidity?
11        A    No.
12        Q    Who did that?
13        A    The pension plans or their
14   authorized representatives.
15        Q    How did the pension plans go about
16   finding forward counterparties?
17        A    Each of the plans established
18   master relationships with forward
19   counterparties before trading even began.
20   And one or more of those forward
21   counterparties would transact with the
22   pension plans on a security-by-security basis
23   the day of the trades.
24        Q    How did the pension plans -- well,
25   withdrawn.
```

1          Who, on behalf of the pension

2    plans, communicated with the forward

3    counterparties?

4        A    The authorized trader or

5    representative of the pension plan would

6    either solicit or receive information from

7    the forward counterparty.  I don't recall.

8          It's probably in these instructions

9    as to whether a forward counterparty came to

10   the plan or vice versa.  But it was a

11   relationship between those two parties to

12   transact.

13       Q    Okay.  And on each occasion that

14   the pension plans required the forward, was

15   its liquidity met based on the requests sent

16   out by the authorized trader?

17       A    I'm going to ask you to repeat that

18   one.  It got me a little confused.

19       Q    Sure.  So I think what you're

20   saying is that on each occasion, the

21   authorized trader -- and that would be Cooper

22   or Reibeisen?

23       A    Yes.

24       Q    Okay.  They would send out a

25   communication to a potential forward

```
 1    counterparty asking if they will transact.

 2          Correct?

 3     A    No.  I said that I don't recall if

 4    inquiries were incoming from forward

 5    counterparties offering to participate in the

 6    forward contract, or outgoing.  But I think

 7    it was between the forward counterparty and

 8    the pension plan, not involving the brokers,

 9    and I just don't recall whether -- which way

10    the inquiry came from or to.

11     Q    Okay.  So for the forward contract,

12    the pension plan needed the forward to

13    involve the same amount of shares as the

14    purchase.

15          Correct?

16     A    If you wanted to fully hedge your

17    shared position, yes, you'd have to get an

18    equal number of shares.

19     Q    But you keep saying "if."

20          Isn't that what actually happened?

21     A    Is it what?  What actually

22    happened?

23     Q    That the pension plan, each time it

24    purchased securities, got a forward contract

25    for the same amount of securities?
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 424

```
 1          A    Yes.

 2          Q    Okay.  And how would the forward

 3     counterparty know to come to you for that

 4     amount of securities that the pension plan

 5     had purchased?

 6          A    I don't know.

 7          Q    And then, on the next page, there's

 8     the stock borrow.

 9          A    Yes.

10          Q    And do you see, it says, "Prepare

11     loan document 34 times.  Cash collateral is

12     price times shares."

13               Do you see that?

14          A    (Witness reviewing.)

15               Yes.

16          Q    And that's supposed to be done on

17     "T plus 2," meaning two business days after

18     the trade?

19          A    Yes.

20          Q    Okay.  The price that was supposed

21     to be used for the cash collateral, was that

22     supposed to be the price on "T plus 2" or the

23     price on "T?"

24               MR. BONGIORNO:  Objection.

25          A    I believe it's the price that the
```

```
 1    pension plan purchased the shares for.

 2         Q    On the trade date of the purchase?

 3         A    Yes.

 4         Q    Okay.  So on this one, it says, "On

 5    T plus 3, look for EML for stock borrow."

 6              And does that mean that Cooper and

 7    Reibeisen were to expect the stock lending

 8    counterparty to send an e-mail seeing if

 9    there's interest?

10         A    Yes.

11         Q    Okay.  And how did the stock

12    lending counterparties know in each occasion

13    to reach out to the pension plans to see if

14    there was interest for a stock loan?

15         A    I don't know.

16         Q    But in each occasion, there was

17    interest.

18              Correct?

19         A    Yes.

20         Q    But you just don't know how it

21    would come about that the stock lending

22    counterparties would know each time to seek

23    these pension plans out for these

24    transactions?

25         A    I don't know.
```

Page 426

```
 1        Q    Okay.  Did you have an

 2   understanding of what the stock lending

 3   counterparties were doing with the borrowed

 4   shares?

 5        A    No.

 6        Q    Okay.  Do you know how the stock

 7   lending counterparty made money?

 8        A    Through its stock lending business.

 9        Q    Okay.

10        A    I'm sorry.  Can you repeat the

11   question?

12        Q    Yeah.  The question was:  How was

13   the stock lending counterparty making money

14   by borrowing the shares from your plans?

15        A    In the -- in any stock lending

16   transaction, there is an interest rate that

17   is paid on cash collateral that is posted, or

18   any collateral that might be posted.  And

19   there are other fees involved.

20             And so, if the interest rate earned

21   by the stock borrower on collateral posted is

22   greater than the fees, they earn money that

23   way.

24             And they can also have shares in

25   which they can do with that collateral how
```

1    they see fit, if they're a securities finance

2    or stock lending firm.

3            But I don't know the business of

4    these stock lending firms beyond the

5    transactions that these pension plans

6    participated in.

7        Q    Okay.  In the transactions that the

8    plans participated in, was there a

9    mark-to-market adjustment each day based on

10   the -- that day's value of the shares?

11       A    Not for purposes of posting or

12   returning collateral.

13       Q    Is that standard in the industry?

14       A    I don't know what's standard, but

15   it's -- we've been involved in transactions

16   with all types of securities and firms that

17   have done it that way.

18       Q    Okay.

19       A    Especially in a transaction that

20   has a hedge associated with it.

21       Q    And so the stock lending

22   counterparty would post the collateral,

23   meaning the cash, right, at the time of the

24   trade?

25       A    Yes.

1     Q     And then, that collateral, there
2   was no true-up on a day-to-day basis based on
3   the market value of the shares lent.
4           Correct?
5     A     There was no mark-to-market in
6   terms of changing the amount of collateral
7   one way or the other between the stock
8   borrower and the stock lender.  That was the
9   terms of the stock lending agreement.
10    Q     Can you turn to Exhibit 1782?
11    A     (Witness reviewing.)
12    Q     In the e-mail on the first page,
13  you are informing the Kaye Scholer people
14  that each of the 40 plans are going to
15  establish new brokerage relationships.
16          Correct?
17    A     Yes.
18    Q     Okay.  And the names of the brokers
19  are -- one is Lontrad.
20          Is that right?
21    A     (Witness reviewing.)
22          Yes.
23    Q     Okay.  There's an Atanta Capital?
24    A     Yes.
25    Q     And Arian Financial?

```
 1        A    Yes.

 2        Q    Okay.  Were you familiar with any

 3   of those brokering firms prior to this?

 4        A    (Witness reviewing.)

 5             As Lontrad was affiliated with TJM,

 6   we were familiar with TJM.

 7        Q    Okay.  You were familiar with TJM

 8   because you had been using it as a broker for

 9   the dividend arbitrage strategy previously.

10             Correct?

11        A    Yes.

12        Q    But it would -- that entity itself

13   had been introduced to you by Solo?

14        A    Yes.

15        Q    Is that the same for the rest of

16   these new brokering firms?

17        A    I don't recall if Solo introduced

18   us or some of these firms reached out to us

19   independently and inquired about establishing

20   relationships with them.

21        Q    Okay.  Did you do any due diligence

22   on them?

23        A    To the extent that there was

24   publicly available information, we would have

25   done due diligence.
```

```
 1    payment of the additional costs for other
 2    brokers and other service providers used to
 3    effect the purchases and sales discussed
 4    above."
 5              As of this date, was the 25 percent
 6    correct?
 7       A    (Witness reviewing.)
 8              Based on my understanding and
 9    consistent with the earlier memo we looked
10    at, that 25 percent was our understanding,
11    and therefore correct.
12       Q    Okay.  And it says -- it's
13    25 percent -- well, withdrawn.
14              The plan was making a payment to
15    Solo of approximately 66 or 67 percent,
16    correct?  A gross payment?
17       A    Yes.
18       Q    Okay.  And then Solo was paying
19    some folks, and Solo's share ended up being
20    25 percent after paying whatever fees they
21    had to pay.
22              Right?
23       A    Again, the largest fee would be to
24    the seller of the shares, because the trading
25    and pricing level was told to us to be 50/50.
```

1    And so some large chunk of that would go to

2    the sellers, and they may or may not have

3    compensated other parties.

4         And based on our calculations, this

5    was the amount that Solo would be left with.

6         Q    Okay.  And the way they put it here

7    in this memo is that it's 25 percent "after

8    payment of the additional costs for other

9    brokers."  So let's stop there.

10        So this is saying that Solo was

11   going to have to pay some of the brokers

12   fees?

13        A    No, I think it's modifying the term

14   "net profits."  Net profits is after payment

15   of additional costs for other brokers and

16   other service providers, although I could be

17   mistaken.

18        Q    Okay.  But what it's saying is that

19   what Solo is going to have to pay out of the

20   amount that is given to Solo is additional

21   costs for other brokers.  That's one thing.

22        Correct?

23        A    Yes.

24        Q    Okay.  And the brokers is the

25   entity that's just executing the trade as