```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2                CASE NO.  18-MD-2865 (LAK)

3   _____
                                            )
4   IN RE:                                  )
                                            )
5   CUSTOMS AND TAX ADMINISTRATION OF       )
    THE KINGDOM OF DENMARK                  )
6   (SKATTEFORVALTNINGEN) TAX REFUND        )
    SCHEME LITIGATION                       )
7                                           )
    This document relates to case nos.      )
8   19-cv-01783; 19-cv-01788; 19-cv-01794;  )
    19-cv-01798; 19-cv-01918                )
9   _____)

10

11

12              C O N F I D E N T I A L

13

14

15    REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                   EXAMINATION OF

17                JOHN VAN MERKENSTEIJN

18                DATE: April 19, 2021

19

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
John Van Merkensteijn - April 19, 2021

Page 13

```
1    J O H N   V A N   M E R K E N S T E I J N,
2         called as a witness, having been first
3    duly sworn according to law, testifies as follows:
4
5
6    EXAMINATION BY MR. WEINSTEIN:
7         Q    Okay.  Sir, my name the Marc
8    Weinstein.  I'm with the firm of Hughes,
9    Hubbard & Reed, LLP.  We represent the
10   plaintiff SKAT in this deposition.  I will be
11   asking you the questions throughout the day.
12             Can you start by just telling us
13   how you pronounce your last name?
14        A    Van Merkensteijn.
15        Q    Okay.  Well, I now have no excuses
16   if I get it wrong.
17        A    Okay.
18        Q    Okay.  Mr. Van Merkensteijn, during
19   the day, as you can tell, we have a court
20   reporter --
21        A    I'm hearing a lot of echo or static
22   or something.
23             THE VIDEOGRAPHER:  Stand by.  The
24        time is 10:34 a.m. and we're going off
25        the record.
```

```
 1      A    Well, I assume so.
 2      Q    Yeah.  6,250,000 shares?
 3      A    Before I say yes, let me look.
 4           (Witness reviewing.)
 5           Okay.  Yes.
 6      Q    Did you have any understanding as
 7   to how stock loan transactions were a part of
 8   the strategy?
 9      A    It would have been a method of
10   borrowing money to pay for the shares.
11      Q    Okay.  So earlier, when you
12   referred to borrowing money, it's through
13   this kind of transaction?
14      A    However they wanted to do it.  But
15   this is one way to borrow against the stock.
16      Q    Right.  And were you aware that in
17   each case in which one of the pension plans
18   purchased stock, it made a stock lending
19   transaction for the same amount?
20      A    I mean, more or less, yeah.
21      Q    The counterparty in the trade is
22   Aquila (Cayman)?
23      A    Where -- oh, yeah.  Okay.
24           I see that.
25      Q    Are you familiar with an entity
```

1    for got rejected because somebody else had
2    the name.  So I finally ran out of steam.
3         You know, I used to look at a map
4    and pick counties in England for names and
5    stuff like that.
6         Q    Okay.  And so that explains why you
7    wanted the adjective.
8         Did you have an understanding as to
9    why, when you were selecting an adjective, he
10   suggested not to make them all financial
11   sounding, but to make some sound like
12   manufacturing, productions, and technology?
13        A    I don't -- I didn't -- I don't
14   remember anything specific about the
15   relevance of that, other than it's just more
16   adjectives.
17        Q    Okay.  Can you turn, please, to
18   Exhibit 2188?
19        A    Okay.
20        Q    And if you turn to the last page,
21   the first e-mail in this chain is from you to
22   Amy Gregory.
23        A    (Witness reviewing.)
24             Okay.
25        Q    Who was Amy Gregory?

1       A    She was one of the either
2   paralegals or associates working for
3   Kaye Scholer.
4       Q    Okay.  And you write, "I think we
5   left you with the task of coming up with 30
6   dissimilar random names for LLC and plans."
7            Did you have any separate
8   conversation with her, or was that just
9   a -- it's trailing from the last e-mail
10  chain?
11      A    I would -- yeah, I'm sure I spoke
12  to her and tasked Kaye Scholer with the job
13  of coming up with names.  Because I was out
14  of steam on coming up with names.
15      Q    Okay.  In the next e-mail, on the
16  prior page, from Mr. Wells, he says to you,
17  "As discussed, here is our stab at 30 names
18  for the LLCs."
19      A    Right.
20      Q    There's a list of 30.
21           Prior to that, Mr. Wells sending
22  these names, did you and anyone at
23  Kaye Scholer have any discussions about what
24  each of the LLCs businesses would be?
25      A    No.  Not that I can recall.

1      Q    All right.  As far as you know, did
2   Kaye Scholer know what those businesses were
3   going to be used for?
4      A    No.  We were going to form the LLCs
5   and figure it out later.
6      Q    Okay.  What was known was that each
7   LLC would then open up a pension plan in
8   order to participate in the dividend
9   arbitrage trading?
10     A    Yes.
11     Q    All right.  At this point in time,
12  as far as you know, did Mr. Wells know on
13  whose behalf each of these entities was being
14  named?
15     A    At some point, we -- either he or
16  we assigned names to particular individuals.
17     Q    Okay.  All right.
18          So if you go backwards two pages,
19  there's an e-mail from Mr. Wells on June 18th
20  at 4:36 p.m.
21          Do you see that one?
22     A    No.  I'm sorry.
23          On which page?
24     Q    It's at the bottom.  The Bates
25  stamp is 7267.

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 250

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2                CASE NO.  18-MD-2865 (LAK)

3    _____
                                              )
4    IN RE:                                   )
                                              )
5    CUSTOMS AND TAX ADMINISTRATION OF        )
     THE KINGDOM OF DENMARK                   )
6    (SKATTEFORVALTNINGEN) TAX REFUND         )
     SCHEME LITIGATION                        )
7                                             )
     This document relates to case nos.       )
8    19-cv-01783; 19-cv-01788; 19-cv-01794;   )
     19-cv-01798; 19-cv-01918                 )
9    _____)

10

11

12              C O N F I D E N T I A L

13            SUBJECT TO THE PROTECTIVE ORDER

14

15    CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

16                 ORAL EXAMINATION OF

17               JOHN VAN MERKENSTEIJN

18                      VOLUME II

19                DATE: April 20, 2021

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 262

1  JOHN VAN MERKENSTEIJN,
2      called as a witness, having been first
3  duly sworn according to law, testifies as follows:
4
5      MS. MCCARTHY:  Marc, before we
6   start, can I just add something to the
7   record.  I failed yesterday to designate
8   the transcript from yesterday as
9   Confidential pursuant to the protective
10  order, and ask that it be so designated
11  now.
12      MR. WEINSTEIN:  Okay.
13      MS. MCCARTHY:  Thank you.
14
15  CONTINUED EXAMINATION BY MR. WEINSTEIN:
16      Q    Good morning, Mr. Van Merkensteijn?
17      A    Good morning.
18      Q    Can we start by having you look at
19  Exhibit 2307?
20      MR. WEINSTEIN:  Mark this as 2307.
21      (Whereupon the above mentioned was
22   marked for Identification.)
23      A    Okay.
24      Q    Exhibit 2307 is an invoice from
25  Ganymede Cayman, Limited to you and it names

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 280

```
 1        A    I'm the sole beneficiary, yes.
 2        Q    Was that plan involved in the
 3   dividend arbitrage strategy in Denmark?
 4        A    No, it was not.
 5        Q    For what purpose did you transfer
 6   money from the Omineca plan's account to the
 7   Rossi plan's account?
 8        A    I was trying to aggregate as much
 9   cash as I could.  Because in that entity, I
10   was seeking to do an acquisition.
11        Q    In the Rossi entity?
12        A    In the Rossi entity.
13        Q    Okay.  To the extent there are
14   additional payments from the Omineca plan
15   account to the Rossi plan account in
16   subsequent periods, would it be for the same
17   purpose?
18        A    Generally, yes.  I was trying to
19   consolidate as much as I could because I
20   needed to have a significant equity to be
21   able to do this transaction.
22        Q    If you turn to Exhibit 2311?
23             MR. WEINSTEIN:  Mark this as 2311.
24             (Whereupon the above mentioned was
25        marked for Identification.)
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 281

```
 1        A    Okay.
 2        Q    And this is an e-mail from
 3   Stephanie Furr to you on September 22, 2015?
 4        A    Right.
 5        Q    Was Ms. Furr your assistant?
 6        A    She was my assistant, right.
 7        Q    She attaches some handwritten
 8   notes.
 9             Do you see that?
10        A    I see that.
11        Q    Are -- is that your handwriting?
12        A    The dark part is my handwriting,
13   yes.
14        Q    All right.  Do you know who the
15   light part is?
16        A    I think that's her note taking.
17        Q    Okay.  So on the top portion of the
18   note, it says, "Client," and lists some LLCs,
19   and then "Bill To," and it lists some other
20   entities.
21        A    Right.
22        Q    For example, the first row, it
23   says, "Client, Omineca LLC.  Bill to
24   RJM Capital LLC, $25,000."
25        A    Yes.
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 282

```
1      Q     And what is that referring to?
2      A     Telling her to prepare the invoice
3  from Omineca to RJM.
4      Q     Omineca was your LLC?
5      A     Omineca was one of my LLCs, right.
6      Q     Was RJM Capital an LLC of Richard
7  Markowitz?
8      A     I believe so, yes.
9      Q     What services did Omineca LLC
10 render for Mr. Markowitz's LLC?
11     A     Well, as I've said, I think from
12 time to time through -- you know, throughout
13 the whole period, we each advised each other,
14 helped each other look at transactions we
15 might do, that we might be able to invest in,
16 that we might be able to put into a pension
17 plan.
18           And around this time, there were
19 maybe three or four transactions where Rich
20 was responsible for investigating it, doing
21 due diligence, deciding whether we should
22 invest or not.  There were three or four
23 larger ones that I took responsibility for
24 really investigating.
25           And since we were rendering
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 283

```
 1    services, we agreed that we would invoice for
 2    that.
 3         Q    All right.  And so, the next row is
 4    Basalt Ventures billing to RJM Capital for
 5    27,500.
 6              Is that also one of your LLCs
 7    billing for services --
 8         A    Yes.
 9         Q    -- to Mr. Markowitz?
10         A    Yes, it is.
11         Q    How did you decide the different
12    amounts for each of these services rendered?
13         A    Well, I don't recall specifically.
14    I mean, generally, they're all in the same
15    amounts because we wanted to balance the
16    books.
17              And like I said, you know, one of
18    the principles that I learned early on is
19    always keep the numbers a little bit
20    different so you can figure out which one is
21    which.  Otherwise you end up with a bank
22    statement with a number, you don't know what
23    it is.
24         Q    I think you are referring to your
25    testimony from earlier that you wanted to
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 284

1    keep the names of the LLCs different for that
2    purpose.
3         Is that right?
4    A    Yeah.  But it's generally you keep
5    things different so you can figure it out
6    later.  If you just have a bunch of payments
7    for the same amount, then you never know
8    which one's for what.
9    Q    And so, in total, on the top here,
10   you're billing for $100,000 worth of services
11   to Mr. Markowitz?
12   A    Yes, I am.
13   Q    Through four entities?
14   A    Right.
15   Q    All right.  And so each one could
16   have been split equally for $25,000?
17   A    Sure.
18   Q    But you wanted to make the numbers
19   appear dissimilar for -- so that you could
20   figure out which payment was for what,
21   ultimately?
22   A    Exactly.
23   Q    And what would be the confusion if
24   Omineca is billing for some services and
25   Basalt is billing for others?  Why would the

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 285

```
 1    same amount cause confusion as to what the
 2    payments were for?
 3         A    I don't -- I don't know.  We just
 4    decided to make them a little bit different,
 5    that's all.
 6         Q    So Starfish Capital, that was also
 7    your entity?
 8         A    Yes, it was.
 9         Q    Do you know whose entity
10    Calypso LLC was?
11         A    It's one of Rich's.
12         Q    Are you aware that that was his
13    wife's entity?
14         A    No.
15         Q    Did you know that you were
16    providing services to Jocelyn Markowitz's
17    entity?
18         A    I don't know.  You know, I don't
19    know how we decided which entity would be the
20    recipient of the fee, or the payor of the
21    fee.
22         Q    Sorry.  And then, the last item on
23    the top half is Voojo, which is your entity,
24    billing Calypso for 17,500.
25              Is that right?
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 286

```
 1        A    Correct.
 2        Q    All right.  Then, underneath the
 3   line on the bottom half, there are bills from
 4   Bernina -- well, starting with Bernina LLC.
 5             Well, withdrawn.
 6        A    Yes.
 7        Q    I'm sorry.  I will withdraw that.
 8             On the bottom half, the first item,
 9   it says that Bernina LLC is going to pay
10   Avanix Management LLC.
11             Is that right?
12        A    Right.
13        Q    All right.  And Bernina was your
14   entity?
15        A    Bernina was mine, right.
16        Q    Avanix was Mr. Markowitz's?
17        A    Yes.
18        Q    And so in this -- for this, it's
19   saying that Avanix provided $30,000 worth of
20   services to Bernina?
21        A    That's what we invoiced for, right.
22        Q    Okay.  He also invoiced Bernina
23   from his Cavus Systems equity for 25,000?
24        A    Yes.
25        Q    And then, are those two other
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 287

```
1        entities of Mr. Markowitz's which billed the
2        Azalea LLC for two different amounts?
3              A     Right.
4              Q     The Azalea LLC, that's not yours.
5                    Is that right?
6              A     That's my wife's.
7              Q     What services was Mr. Markowitz
8        providing through Hadron and Routt to your
9        wife's LLC?
10             A     Well, the same services.  It's
11       fungible.  It didn't matter whether it was my
12       wife or me, and we were looking at making
13       these investments or not.
14             Q     Why spread it out amongst different
15       entities, including your wife's entity?
16             A     I don't know.  Maybe it had the
17       cash at the moment to pay the fee.
18                   I don't know.
19             Q     Do you know when the services were
20       rendered for which these amounts are
21       pertaining to?
22             A     There's no specific dates, but
23       these are ongoing projects that, you know,
24       came across our horizon.  We had to
25       investigate them, we had to look at them, we
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 288

```
 1    had to meet the people, decide whether it was
 2    worth investing in.
 3            In some cases we did, in some cases
 4    I did.  In some cases he did, but I didn't.
 5        Q   Is the effect of the transaction
 6    listed on this page that your entities were
 7    billing Mr. Markowitz and his wife's entities
 8    for $100,000 worth of services, and
 9    Mr. Markowitz's entities were billing your
10    entities and your wife's entities also for
11    $100,000?
12        A   Yes.
13        Q   So the two ultimately net out.
14            Is that right?
15        A   Yeah.  We wanted to keep the cash
16    flow even.
17        Q   In your testimony yesterday, you
18    mentioned that you couldn't recall for which
19    clients your LLCs provided services.
20            Is this -- are these the clients
21    for which your LLCs provided services?
22        A   No.  There were other clients that
23    I provided services for.  Nothing
24    related -- not related to any of this.
25        Q   As you sit here today, do you
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 289

```
1    recall any of those clients?
2         A    Sure.
3         Q    Which ones did any of these
4    entities perform services for?
5         A    Well, again, there were invoices
6    every year.  I mean, apart from this, there
7    were invoices every year to various parties.
8              One was a private equity investor
9    for which I had introduced some significant
10   investors, and they owed fees for that.  And
11   we invoiced from various LLCs to them every
12   period.
13             I think it was every quarter for
14   quite a few years.
15        Q    Okay.
16        A    And the other one was principally a
17   similar kind of thing, and it was -- I had
18   organized a financing for somebody.  They
19   owed fees to me for that.
20             I split it up among my LLCs so they
21   would each have some income.  And I think
22   those were paid annually.
23             I would have to check.
24        Q    Okay.  The date of this e-mail is
25   September 22, 2015.
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 290

```
 1              Was that after Denmark announced
 2   that it was no longer going to pay reclaims?
 3       A    I don't know the timing sequence.
 4       Q    Is the point of this e-mail that
 5   invoices need to be issued consistent with
 6   the notes on the second page?
 7       A    Yeah.  You should have an invoice
 8   for every transaction that is a fee.
 9            So the communication with Stephanie
10   is do the invoices.
11       Q    Do you know what prompted the
12   timing of this e-mail to do the invoices at
13   this point?
14       A    No.  I don't think it had anything
15   to do with anything.
16       Q    On the top half of the note, next
17   to each of your LLCs, it looks like there's a
18   handwritten date.
19            Do you see that?
20       A    Yes.
21       Q    Do you know what the dates refer
22   to?
23       A    No, I don't.  I don't know what she
24   was writing.
25       Q    All right.  Underneath each of your
```