*Amended Further Particulars Regarding the Validity of WHT Refund Applications pursuant to the Order of The Honourable Mr Justice Andrew Baker dated 11 May 2022*

**CL-2018-000297, CL-2018-000404 & CL-2018-000590**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN:**

**SKATTEFORVALTNINGEN**
**(the Danish Customs and Tax Administration)**

**Claimant**

**-and-**

**SOLO CAPITAL PARTNERS LLP (in special administration) & OTHERS**

**Defendants**

_____

**CLAIMANT'S AMENDED FURTHER PARTICULARS REGARDING**
**THE VALIDITY OF WHT REFUND APPLICATIONS**

_____

*Capitalised terms herein have the meanings assigned to them in the 5ᵗʰ ~~Re-Re~~ Amended Particulars of Claim ("~~RRA~~POC")*

**A.     INTRODUCTION**

1.      These are SKAT's further particulars pursuant to paragraph 4(b) of Mr Justice Andrew Baker's Case Management Directions Order dated 16 January 2020. In this document, SKAT identifies the requirements under Danish law for a valid application for the refund of dividend withholding tax ("**WHT**") and sets out the reasons why the WHT Applicants ~~and ED&F Man Applicants~~ (~~together,~~ "**WHT Refund Applicants**") did not satisfy those requirements.

1

2.      SKAT's allegations in this document are supplementary to its case as set out in the ~~RRA~~POC, the Schedules thereto, SKAT's Replies to Defences and its responses to Requests for Further Information. These further particulars should be read in conjunction with those statements of SKAT's case.

3.      In summary, in order to be entitled to a refund of WHT from SKAT, an applicant must have received dividends from a Danish company, tax must have been withheld by a Danish company in respect of those dividends and the tax withheld must exceed the WHT refund applicant's tax liability pursuant to an applicable double tax treaty. The WHT Refund Applicants did not satisfy these requirements.

   3.1      The WHT Applicants never owned shares in the relevant Danish companies ~~(beneficially or otherwise)~~ and did not receive any dividends in respect of such shares ~~(beneficially or otherwise)~~. Further or alternatively, no tax had been withheld in respect of payments that the WHT Applicants purportedly received. For the same reasons~~In any event~~, the WHT Applicants did not qualify for relief under the applicable double tax treaties.

   3.2      ~~Pending disclosure, SKAT alleges that the ED&F Man Applicants did not receive dividends (beneficially or otherwise) at least in respect of some transactions. Insofar as they received dividends, the ED&F Man Applicants were not entitled to relief under the applicable double tax treaties.~~

**B.      REQUIREMENTS FOR A VALID WHT REFUND APPLICATION**

4.      By the Tax Relief Form filed as part of the WHT Applications ~~and ED&F Man Applications~~, the WHT Applicants ~~and the ED&F Man Applicants~~ made a "*claim…for a refund of Danish dividend tax*".

5.      Section 65 of the Danish Withholding Tax Act (*kildeskatteloven*) (enacted by Consolidated Act no. 1403 of 7 December 2010) (the "**WHT Act**") requires Danish companies to withhold 27% of dividends declared as WHT and only pay to the

shareholder the dividend net of WHT.[1] The withheld amount is paid by the company to SKAT.[2]

6.    WHT refund applications are governed by section 69 B(1) of the WHT Act (enacted by by Act no. 591 of 18 June 2012), which provides (insofar as is relevant) that:

> "*If a person who is liable to taxation pursuant to section 2 hereof or section 2 of the Corporation Tax Act (selskabsskatteloven) has received dividends... of which withholding tax has been withheld pursuant to sections 65-65 D which exceeds the final tax under a double taxation treaty... the amount must be repaid within six months from the receipt by [SKAT] of a claim for repayment.*"

7.    Section 69 B(1) sets out four requirements that a WHT refund application must satisfy:

    7.1    the applicant must be a person who is liable to taxation pursuant to section 2 of the WHT Act or section 2 of the Danish Corporation Tax Act;

    7.2    the applicant must have received dividends;

    7.3    tax must have been withheld in respect of ~~from~~ the dividends received by the applicant pursuant to sections 65-65 D of the WHT Act; and

    7.4    the tax withheld must exceed the tax due under an applicable double tax treaty.

8.    For the reasons set out below, the WHT Refund Applicants did not satisfy these requirements in relation to the WHT Refund Applications.

## C.    THE WHT REFUND APPLICANTS WERE NOT PERSONS LIABLE TO TAXATION

9.    In order for a person to be eligible to make an application for a refund of WHT, the applicant must be, "*a person who is liable to taxation pursuant to section 2 hereof* [i.e. the WHT Act] *or section 2 of the Corporation Tax Act*".

10.    In this respect and insofar as is relevant, section 2 of the WHT Act and section 2 of the Danish Corporation Tax Act only apply to individuals or legal persons who receive

---

[1] Other rates of WHT apply in some circumstances and there are exceptions to this obligation. However, those variations and exceptions are not relevant in this case.

[2] ~~RRA~~POC, paragraph 7.

dividends that are subject to section 16 A(1) and (2) of the Danish Tax Assessment Act (*ligningsloven*).

11.   The WHT Applicants did not own any shares in Danish companies (as explained in paragraphs 14 to 19 below) and did not receive any dividends (as explained in paragraphs 20 to 30 below). The WHT Applicants were therefore not "*persons liable to taxation*" for these purposes.

12.   ~~The ED&F Man Applicants also did not receive dividends in respect of (at least) some transactions (as explained in paragraph 31 below). The ED&F Man Applicants were therefore not "*persons liable to taxation*" for these purposes.~~

## D.    THE WHT REFUND APPLICANTS DID NOT RECEIVE DIVIDENDS

13.   For the purposes of section 69 B(1), "*dividend*" means a distribution by a company to its current shareholders or members.[3] In order to have "*received dividends*" within the meaning of section 69 B(1), therefore, a WHT refund applicant must have:

13.1    owned shares in a Danish company when the company declared a dividend; and

13.2    received dividend payments from/traceable to the company.

**The WHT Applicants did not own shares in a Danish company**

14.   SKAT will rely on the following principles of Danish law in relation to the ownership of shares in Danish companies:

14.1    Under Danish law, a "share" denotes a distinct share in the ownership of a company. At any given time, each share in a Danish company has one owner (or joint owners). At no point can there be more shares in circulation than the number of shares issued by the company.[4]

14.2    As a result of the dematerialisation of shares, physical share certificates were replaced by a central securities depository ("**VP Securities**") that maintains a register of the ownership of shares in Danish companies. Dematerialisation did

---

[3] Section 16 A of the Danish Tax Assessment Act.
[4] SKAT's Amended Reply to the Sanjay Shah Defendants' Defence, paragraph 30(c).

not require, or involve, a departure from the principles set out in paragraph 14.1 above.

14.3    It is possible for the owner of shares in a Danish company to be different from the person identified in the VP Securities register (for example, as the result of a nominee scheme). It is also possible for the owner of shares in a Danish company to be linked to the VP Securities register through a chain of custodians. Neither of these propositions detract from the principles set out in paragraph 14.1 above. Whether or not the owner of a share is the person named in the VP Securities register, under Danish law, there cannot be two independent owners for the same share.

15.    SKAT will rely on the following principles of Danish law concerning the transfer of ownership in shares:

15.1    Danish law recognises the principle *nemo dat quod non habet*.[5] A "seller" of shares cannot therefore transfer ownership to a "purchaser" of property that the "seller" does not own.[6]

15.2    If a "seller" purports to sell property that the seller does not own, Danish law provides the transferee with a contractual claim against the transferor. However, the transferee does not acquire ownership of the property.

15.3    For the purposes of Danish tax laws (including in relation to the liability to pay withholding tax and the eligibility for a refund of withholding tax), a share is acquired or disposed of at the time when a final and binding agreement exists on the acquisition or disposal.[7]

15.4    However, the rule that a share is acquired or disposed of at the time when there is a final or binding agreement is not an exception to the principle set out in paragraph 15.1 above. That is to say, a person who contracts to buy shares does <u>not</u> become the owner of the shares by entering into a final and binding

---

[5] There are exceptions to this principle in limited circumstances but they do not arise in this case.
[6] SKAT's Amended Reply to the Sanjay Shah Defendants' Defence, paragraph 27(b).
[7] See section C.B.2.1.6.1 of SKAT's legal guidance.

agreement to purchase shares unless the seller owned the shares at the time of conclusion of the agreement.[8]

15.5    In order to determine whether a transaction had the effect of transferring ownership in shares, Danish Courts will consider whether the parties intended the transaction to have legal effect.[9] If the parties did not intend to perform the agreement, the transaction will not be effective to convey ownership of property.

16.    The "sellers" in the Principal WHT Scheme (alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme) did not own any shares in Danish companies. They could not therefore transfer the ownership of shares to the WHT Applicants.

17.    The WHT Applications were based on fictitious records of transactions that never occurred or circular transactions that cancelled each other out.[10]  Accordingly:

17.1    The "seller" from whom the WHT Applicants purported to buy shares did not own shares.

17.2    The transactions did not therefore convey ownership of shares to the WHT Applicants.

17.3    The parties did not intend to perform the sale and purchase agreement and so on the principle set out in paragraph 15.5 above, the transaction would not have been effective to transfer ownership.[11]

18.    Pending disclosure, SKAT relies on the following facts and matters in support of this allegation:

18.1    The transactions in respect of which North Channel Bank acted as the Custodian involved the "buyer" agreeing to buy shares from the broker, who agreed to buy them from the "seller", who agreed to borrow them from the "share lender", who agreed to borrow them from the "buyer".[12] The net result was that these

---

[8] SKAT's Amended Reply to the Sanjay Shah Defendants' Defence, paragraph 29.
[9] SKAT's Amended Reply to the Sanjay Shah Defendants' Defence, paragraph 27(a).
[10] ~~RRA~~POC, paragraph 24(i)(i)-(ii).
[11] ~~RRA~~POC, paragraph 24(g)(iii).
[12] ~~RRA~~POC, paragraph 24(e)(ii)(A).

transactions offset each other and there were never any shares held in the North Channel Bank custody accounts.[13]

18.2    Similarly, the net effect of the first two legs of the Solo Model was that the "buyer" was purportedly buying shares from a "seller" (via intermediate brokers), who was obtaining the same shares from the "buyer" itself (via intermediate "stock lenders"). These transactions offset each other such that they neither required nor involved any transfer of shares.[14]

18.3    As illustrated in Schedule 3A to the ~~RRA~~POC, many of the North Channel Bank and Indigo Credit Advice Notes in 2014 related to the same number of shares in the same Danish companies at the same time but for different US pension plans.[15]

18.4    As illustrated in Schedule 3B to the ~~RRA~~POC, Mr Bains signed a number of Credit Advice Notes in 2013 on behalf of SCP on the same date for the same number of shares in the same Danish company for different US pension plans.[16]

18.5    As illustrated in Schedule 4 to the ~~RRA~~POC, Credit Advice Notes were produced by Custodians for different US pension plans on the same day in respect of the same Danish company for similar volumes of shares (often increasing by regular intervals).[17]

19.    The Sanjay Shah Defendants allege that "*Danish tax law recognises fiscal ownership based on contractual arrangements*".[18] If that is an allegation that a final and binding agreement has the effect of conveying ownership of shares even in circumstances where the seller did not own the shares,[19] that is denied for the reasons set out in paragraph 15.4 above.

---

[13] ~~RRA~~POC, paragraph 24(e)(ii)(C).
[14] ~~RRA~~POC, paragraph 24(e1)(i)(C).
[15] ~~RRA~~POC, paragraph 24(f).
[16] ~~RRA~~POC, paragraph 24(f).
[17] ~~RRA~~POC, paragraph 24(g).
[18] Sanjay Shah Defendants' Defence, paragraph 57.8.8.4.
[19] See Sanjay Shah Defendants' Defence, paragraphs 56.1.7, 56.1.8, 57.8.5.

**The WHT Applicants did not receive dividends**

20.     As explained in paragraph 13 above, a "*dividend*" for the purposes of section 69 B(1) of the WHT Act is a distribution by a company to its current shareholders or members.

21.     Section 16 A of the Danish Tax Assessment Act defines "*dividends*" as:

>      "*Anything that the company distributes to its current shareholders or members…*".[20]

22.     Only the person who owns a share at the time that the dividend is declared receives a dividend.  As already noted, that person is therefore the only person liable to taxation in respect of any dividend.

23.     The person who receives the dividend is the person who owns the share at the time the dividend is declared. This is reflected in section 19(1) of the Danish Sale of Goods Act (*købeloven*), which provides that a contract for the acquisition of a share includes any dividend that has not fallen due for payment at the time of the conclusion of the contract.

24.     A listed company may discharge its obligation to pay a declared dividend by paying it to VP Securities, which is in turn obliged to pay on the dividend amounts to the company's shareholders.  At all relevant times, section 71(2) of the Danish Securities Trading Act (*værdipapirhandelsloven*) provided that VP Securities was discharged from this obligation if it paid the amount of the dividend in good faith to the person registered with VP Securities even if that was not the person who had the right to receive the dividend.[21]  In such circumstances, the dividend was received by the person identified in the VP Securities register on behalf of the legal owner of the shares.  It was therefore the legal owner who receives the dividend, who was liable to taxation on the dividend and who suffered WHT on the dividend.

25.     As a matter of Danish law, if an owner of shares has agreed (by a contract intended to have legal effect) to sell shares prior to the date that the dividend is distributed, that person will no longer own the relevant shares and will no longer be a shareholder on the date the dividend is distributed.  Accordingly, that person will not be treated as

---

[20] Section 16A continues, "…*see however, subsection (3) and compensation covered by section 16 B(1). (…)*". Those provisions are not relevant to this case.
[21] Subject to the possibility of the recipient having procured his or her entry in the register by forgery or duress under threats of violence.

having received a dividend, even if they remain the person named in the VP securities register on the date that the dividend is declared such that the dividend sum is paid to them.

26.    Conversely, a person who enters into a contract to purchase shares (prior to the date on which the dividend is declared) from a seller who does not in fact own the shares does not receive a dividend, even if the seller acquires shares after the date on which the dividend is declared and pays the purchaser an amount equal to the amount of the declared dividend by way of "manufactured dividend".

27.    For the reasons set out in paragraphs 14 to 19 above, the WHT Applicants did not own shares in Danish companies. It follows that they did not "*receive dividends*" within the meaning of section 69 B(1).

28.    In any event, the Principal WHT Scheme (alternatively the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme, and/or the Klar WHT Scheme) did not envisage that the WHT Applicants would receive dividends. For example, as described in paragraph 18.1 above, the transactions in respect of which North Channel Bank acted as Custodian constituted a loop that did not involve the actual transfer of any net dividend.[22] Similarly, the Solo Model did not envisage any real dividend payments entering the loop.[23] In these circumstances, SKAT infers that the WHT Applications were based on fictitious records of transactions that never occurred or circular transactions that cancelled each other out and in respect of which the WHT Applicants never received the relevant dividends.[24]

29.    Anupe Dhorajiwala, Graham Horn and Rajen Shah allege in their respective Defences that the WHT Applicants "*received a sum equal to the net dividend amount (by way of a credit on their account with their custodian)*".[25] However, since the WHT Applicants did not own any shares in Danish companies when the dividends were declared by those companies, even if they did receive any such credit (which is not admitted), it did not constitute a "*dividend*" within the meaning of section 69 B(1) of the WHT Act.

---

[22] ~~RRA~~POC, paragraph 24(e)(iv).
[23] ~~RRA~~POC, paragraph 24(e1)(ii).
[24] ~~RRA~~POC, paragraph 24(i)(i).
[25] Mr Dhorajiwala's Defence, paragraph 14.10; Mr Horn's Defence, paragraph 26.10; Mr Rajen Shah's Defence, paragraph 20.10.

30.    The Sanjay Shah Defendants' Defence suggests that the Solo Model may have involved "*dividend compensation payments which were credited to the 'buyer' in 'the first leg'*".[26] SKAT understands the words "*dividend compensation payment*" to describe a payment made by the "seller" to the WHT Applicant to compensate the WHT Applicant for the value of the dividend on a share that was agreed to be transferred cum-dividend, but was in fact transferred ex-dividend.  Even if the WHT Applicants received such payments (which is not admitted), those payments were not "*dividends*" within the meaning of section 69 B(1) of the WHT Act:

30.1    The WHT Applicants did not own any shares in any Danish companies at the time any relevant dividends were declared and so did not receive a dividend.

30.2    Any money that the WHT Applicants did receive did not represent an on-payment of a dividend that had been paid by a Danish company.

~~ED&F Man Applicants did not receive dividends in respect of some transactions~~

~~31.    In respect of the ED&F Man Applicants whose applications for WHT refund were supported by the Tax Vouchers identified in Annex E to ED&F Man's Amended Defence ("**Annex E ED&F Man Applicants**"):~~

~~31.1    ED&F Man admits that the Annex E ED&F Man Applicants had not received the dividends in respect of which they made refund applications.~~

~~31.2    The ED&F Man Applicants whose applications were supported by the 64 Tax Vouchers identified in Schedule 1 had not received any dividend.~~

~~31.3    The ED&F Man Applicants whose applications were supported by the 16 Tax Vouchers identified in Schedule 2 to Annex E had not received the dividend in respect of which WHT refund applications were made on their behalf.~~

~~31.4    On this basis, and on ED&F Man's own case, SKAT overpaid DKK 183,902,400 (around £20.8 million) in response to ED&F Man Applications as a result of inaccuracies in ED&F Man's Tax Vouchers.~~

---

[26] Sanjay Shah Defendants' Defence, paragraphs 53 and 57.8.7.

10

E.     **NO TAX WITHHELD FROM ANY "DIVIDENDS" RECEIVED BY WHT APPLICANTS** ~~OR ANNEX E ED&F MAN APPLICANTS~~

32.     In order for there to be a valid claim for WHT refund, section 69 B(1) requires ~~a WHT refund applicant to show~~ that "*withholding tax has been withheld pursuant to sections 65-65 D*" in respect of ~~from~~ the dividends received by the WHT refund applicant. No refund can be sought in respect of tax that was never withheld ~~paid~~ in the first place.

33.     As explained above,[27] section 65 requires Danish companies to withhold 27% of any dividend declared as WHT and pay it to SKAT.

**The WHT Applicants did not receive dividends** ~~in respect of~~ ~~from~~ **which tax was withheld**

34.     The circular and/or fictitious transactions did not involve any real shares or any dividends and no tax was therefore withheld by the relevant Danish companies and paid to SKAT.

~~The Annex E ED&F Man Applicants did not receive dividends from which tax was withheld~~

~~35.     It follows from what was said in paragraph 31 above that:~~

~~35.1     No tax had been withheld on behalf of the Annex E ED&F Man Applicants whose applications were supported by the 64 Tax Vouchers identified in Schedule 1 to Annex E; and~~

~~35.2     The tax withheld from the dividends received by the Annex E ED&F Man Applicants whose applications were supported by the 16 Tax Vouchers identified in Schedule 2 to Annex E was lower (by the amounts identified in Column H of Schedule 2) than the amounts paid out by SKAT in response to applications on their behalf.~~

---

[27] See paragraph 5 above.

11

**F.    THE WHT REFUND APPLICANTS DID NOT SUFFER TAX THAT EXCEEDED THE FINAL TAX DUE UNDER A DOUBLE TAXATION TREATY**

36.    As explained in paragraphs 6 and 7 above, section 69 B(1) of the WHT Act requires a WHT refund applicant to show that the tax withheld ~~in respect of~~ ~~from~~ the dividends received by it "*exceeds the final tax due under a double taxation treaty*".

37.    For the reasons set out above, the WHT Applicants did not own any shares in Danish companies, did not receive any dividends and no tax was withheld by any Danish company on their behalf. Accordingly, no tax was suffered by the WHT Applicants which might be said to exceed the final tax due under any double taxation treaty.

38.    ~~For the same reasons,~~ ~~In any case,~~ the WHT Applicants were not ~~entitled to any different treatment as a result of any double taxation treaty because they were not~~ eligible for relief under any double taxation treaty set out in paragraph 9 of the ~~RRAPOC~~ (the "**Double Tax Treaties**").

39.    ~~The applicable double tax treaties are set out in paragraph 9 of the RRAPOC (the "**Double Tax Treaties**"). In order to be eligible for relief under them, each of the Double Tax Treaties required WHT refund applications to satisfy three requirements:~~

39.1    ~~they were resident in a Contracting State;~~

39.2    ~~they were the "*beneficial owner*" of dividends paid by a resident of another Contracting State;[28]~~

39.3    ~~the transactions giving rise to an application for a WHT refund were not created for the sole or main purpose of securing favourable tax treatment under the double tax treaty; and~~

39.4    ~~if the WHT refund applicant is a US pension fund, the pension fund satisfied the requirements under the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the~~

---

[28] Although the Agreement between the Government of Malaysia and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and Prevention of Fiscal Evasion with Respect to Taxes on Income (the "**Denmark-Malaysia Treaty**") does not expressly set out the requirement of beneficial ownership, it was an implicit requirement under Article 10 of the Denmark-Malaysia Treaty.

~~Avoidance of Double Taxation and Prevention of Fiscal Evasion with respect to Taxes on Income (the **Denmark-US Treaty**).~~

~~40.    The WHT Refund Applicants did not satisfy these requirements for the reasons set out below.~~

~~**The WHT Applicants were not owners "*beneficial owners*" of a dividend**~~

41.    The meaning of the term "*dividend*" in each of the Double Tax Treaties is similar to that under Danish law.[29] As the Commentary on the OECD Model Tax Convention on Income and Capital (2014)[30] ("**OECD Commentary**") explains at page 191 (paragraph 24), "*dividends*" are distributions of profits by companies the title to which is constituted by shares.

42.    ~~As set out above, t~~he WHT Applicants did not receive any "*dividends*':

    42.1    The WHT Applicants did not own any shares in the relevant Danish companies.

    42.2    Any amounts received by the WHT Applicants were not income from shares.

    42.3    Any amounts received by the WHT Applicants were not paid by Danish companies, either directly or through a chain of custody.

    42.4    Any amounts received by the WHT Applicants were not the distribution of profits of Danish companies.

~~43.    Further or alternatively, for the reasons set out below, the WHT Applicants were not the "*beneficial owners*" of the dividends they claimed to have received.~~

~~44.    The concept of "*beneficial owner*" in the Double Tax Treaties derives from the OECD Model Convention, as explained in the commentary thereto,[31] to which a Danish Court would have regard in determining whether a WHT refund applicant was the beneficial owner of dividends received based on all relevant facts and circumstances of the case.~~

---

[29] ~~See paragraph 13 above.~~
[30] ~~Each of the Danish Double Tax Treaties are based on the OECD Articles of the Model Convention with Respect to Taxes on Income and on Capital (the "**OECD Model Convention**").~~
~~31 A Danish Court will take into account versions of the commentary that are issued after the date of any particular WHT Application.~~

B/47.1/13

45.    In accordance with the OECD Model Convention and the commentary thereto, a Danish Court would consider the following non-exhaustive factors relevant to determine whether a WHT refund applicant was the beneficial owner of a dividend:

45.1    whether the WHT refund applicant had the power freely to decide how to dispose of the income said to constitute a dividend;

45.2    whether the WHT refund applicant's power to use and enjoy the dividend was constrained by an obligation — either legal or economic — to pass on the economic benefit of the amount received to another person;

45.3    whether the WHT refund applicant was an agent or nominee or conduit for passing the benefit of the dividend (or a very substantial portion thereof) to a third party;

45.4    whether the WHT refund applicant received the dividend as part of a transaction between related parties that was not at arm's length;

45.5    whether the WHT refund applicant was an entity of commercial substance (for example, by reference to whether it had its own business, staff, employees or offices);

45.6    whether a holding company (or other affiliated entity or individual) exercised a level of control over the WHT refund applicant that was beyond the control and management that one would normally expect;

45.7    whether the WHT refund applicant was set up for the sole or main purpose of obtaining the benefit(s) of a double tax treaty.

46.    Pending disclosure, SKAT will rely on the following facts and matters in support of the allegation that the WHT Applicants were not beneficial owners of dividends:[32]

46.1    The WHT Applicants did not have the power freely to dispose of the dividends.[33]

46.2    The WHT Applicants did not retain the economic benefit of the amounts that they received which purportedly constituted dividends. The economic benefit

---

[32] Even if they did receive any dividend, which is denied for the reasons set out in paragraphs 13 to 31 above.

[33] RRAPOC, paragraph 24(g)(iv).

14

(or the very large majority thereof) was in all cases passed on to another party in the relevant chain of transactions pursuant to a legal or economic obligation.

46.3    The WHT Applicants acted as nominee for or conduit passing the benefit of the dividend (or a very substantial portion thereof) to third parties.

46.4    The WHT Applicants took no price risk in relation to the shares that they purportedly owned.[34]

46.5    Although the Principal WHT Scheme (alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme) ostensibly involved a number of independent parties, each of the "buyers", "sellers", "stock lenders" and "forward counterparties" were in reality owned, controlled or in league with the core conspirators identified in the RRAPOC, the Schedules thereto and SKAT's Replies to Defences. The brokers were interposed to give the transactions the false appearance of being at arm's length between unrelated parties; all the "trades" were centrally arranged as part of a closed loop without the brokers performing a normal broking function of buying and selling in the market.[35] In particular:

(a)    All other participants in the Solo WHT Scheme were owned or controlled by or in league with Mr Shah and the Solo and Elysium Group Companies. The identity of the majority of counterparties in the Solo Model are set out in Schedule 7 to the RRAPOC;

(b)    The Donaldson/LaRosa WHT Scheme involved at least Messrs Donaldson and LaRosa (who owned and/or controlled the US pension plans that were WHT Applicants), Messrs Stein and Lhote (who owned North Channel Bank), Mr Teraiya (who owned Indigo), Mr Klar (who owned and/or controlled the stock lenders, Sherwood Enterprises Ltd and Potala Trading Ltd), and Messrs Horn, Rajen Shah, Dhorajiwala, Price (who owned and/or controlled and/or procured the participation in the scheme of the "sellers", "forward contract counterparties");

---

[34] RRAPOC, paragraph 24(e)(v).
[35] RRAPOC, paragraphs 24(e), (e1), 50, 50A, 50AA, Schedule 6A-B, Schedule 7.

(c)     The Klar WHT Scheme involved at least Mr Klar (who owned and controlled each of Salgado Capital, Europa and Khajuraho).

46.6    The WHT Applicants were recently incorporated pension plans or companies and/or one or two person pension plans and/or had limited to no assets. They were set up by and/or represented by a small number of individuals.[36] The WHT Applicants were not financially capable (or creditworthy) of making the very substantial investments in the Danish companies, which would have been required for the WHT Applicants to have become entitled to receive the dividends in respect of which the WHT Applications were based.[37]

46.7    In relation to transactions that formed part of the Principal WHT Scheme (alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme), the core conspirators identified in the RRAPOC (and Schedules thereto and SKAT's Replies to Defences) exercised an unusual level of control over the WHT Applicants and the other entities that formed part of these transactions. In particular:

(a)     the WHT Applicants were established (at the direction of at least some of the Alleged Fraud Defendants);[38] controlled; and (in some cases) owned by a small number of persons (such as the US authorised representatives identified in paragraph 50(b) of the RRAPOC with respect to the Solo WHT Scheme, Messrs Donaldson and LaRosa with respect to the Donaldson/LaRosa WHT Scheme and Mr Klar with respect to the Klar Scheme);

(b)     all "trade instructions" in respect of all counterparties to the purported trading were provided and executed centrally (for example, by SCP/Hydra/Octave with respect to the Solo WHT Scheme);[39]

---

[36] RRAPOC, paragraphs 24(b)(ii), 50(b).

[37] RRAPOC, paragraph 24(b) and Schedule 1A to the RRAPOC setting out the implied acquisition value of the shareholdings necessary to make the WHT Applications.

[38] Including Mr Shah and Alleged Fraud Defendants owned and controlled by him, including Mr Godson, Mr Fletcher, Mr Jain, Mr Preston and Mr Klar.

[39] RRAPOC, paragraph 24(e1)(iii).

(c)      the proceeds of the WHT Applications were shared out centrally (for example, by Ganymede/Acai/Fire/Parla/Philo with respect to the counterparties in the Solo WHT Scheme).[40]

46.8    The Principal WHT Scheme (alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme) was created for the sole purpose of manufacturing a claim to a WHT refund including by identifying, procuring or assisting in the formation of seemingly eligible applicants for WHT refunds.[41] There was no other commercial rationale for the Principal WHT Scheme (alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme) and it did not result in any other material profits for any of the parties.[42]

46.9    The ultimate economic beneficiaries of all or the majority of the WHT refunds obtained by the WHT Applicants were the Alleged Fraud Defendants,[43] the other parties identified in Schedule 7 to the RRAPOC and certain other conspirators to be identified following disclosure and evidence.

**The ED&F Man Applicants were not "*beneficial owners*" of a dividend**

47.     Pending disclosure, SKAT will rely on the following facts and matters in support of the allegation that, insofar as the ED&F Man Applicants received dividends, they were not the beneficial owners of such dividends:

47.1    To the extent that any shares were acquired, the ED&F Man Applicants' acquisition of shares were funded by ED&F Man. The ED&F Man Applicants made limited or no contribution towards the acquisition of shares.

47.2    The ED&F Man Applicants did not bear any or any substantial economic risk in respect of their acquisition of the shares, including by reason of the hedging transactions which were entered with or through ED&F Man.

---

[40] RRAPOC, paragraph 50, 50A, 50AA.
[41] RRAPOC, paragraphs 24(i)(ii)(b) and 24(i)(iii)(A).
[42] RRAPOC, paragraph 24(e)(v).
[43] RRAPOC, paragraphs 24(g)(iv), 24(i)(ii)(e) and 24(i)(iii)(F)(4).

47.3    Settlement of the ED&F Man Applicants' purchase of the shares was, at least in some cases, back to back with the ED&F Man Applicants' sale of the shares, such sale being used to finance the acquisition;

47.4    The ED&F Man Applicants had no or no substantial control over the disposition of the shares, including by reason of:

(a)    ED&F Man's alleged Re-Hypothecation Rights;[44] and (b) clauses 5.1(c), 13.2, 14, 17.2 and 17.5 of the Security and Set Off Deed ("**Set Off Deed**"). In paragraph 17.2 of ED&F Man's response to SKAT's Request for Further Information dated 1 March 2019, ED&F Man avers that it had the power to use and/or dispose of and/or replace the shares prior to the settlement date (implicitly, without the consent of the ED&F Man Applicants);

(b)    Pursuant to clause 13.2 of the Set Off Deed, until all secured liabilities had been discharged in full, ED&F Man was not obliged to act on any instructions from the WHT Applicants without the consent of the "Chargee" (namely, itself).

47.5    The ED&F Man Applicants did not receive or retain the large majority of the economic benefit of the dividends or WHT refunds received purportedly on their behalf. For example, Goal and Acupay paid the sums received by them from SKAT to ED&F Man after deducting their fees.[45] Similarly, at least until June 2014, ED&F Man received all sums in response to ED&F Man Applications made by Global Equities directly from SKAT.[46]

47.6    The ED&F Man Applications were part of a trading scheme that was created for the sole purpose of manufacturing a claim to a WHT refund including by identifying, procuring or assisting in the formation of seemingly eligible applicants for WHT refunds. There was no other commercial rationale for such trading, which did not result in any other material profits for any of the parties.

---

[44] See paragraph 17.2 of ED&F Man's Response to SKAT's Request for Further Information dated 1 March 2019.

[45] Re-Amended Schedule 5T to RRAPOC, paragraph 8.

[46] Re-Amended Schedule 5T to RRAPOC, paragraph 8.

B/47.1/18

**The Principal WHT Scheme,[47] and the trading scheme on which the ED&F Man Applications were based, were created for the sole purpose of obtaining tax relief**

48.     As explained in paragraph 45.7 above, one of the factors that Danish law will take into account in deciding whether a WHT refund applicant was the beneficial owner of dividend is whether the WHT refund applicant was set up for the sole or main purpose of obtaining the benefit(s) of a double tax treaty.

49.     In addition, Danish law and international tax law recognise a separate, and more general principle, against abusive reliance on double tax treaties. According to this principle, the benefit of double tax treaties is not available to WHT refund applicants if the sole or main purpose of their participation in the relevant transactions (or the sole or main purpose of the transactions) was to secure a favourable tax position. This principle is reflected in the Article 10(6) of the "**Denmark-UK Treaty**",[48] set out in Section CF.8.2.2.1.1 of SKAT's External Legal Guide[49] and recognised in the OECD Commentary at page 72-74 (paragraph 57-65) and page 235 (paragraph 12.5) and in the case law of Danish courts.

50.     As set out in paragraph 46.8 above, the sole purpose of the Principal WHT Scheme (alternatively, the Solo WHT Scheme, alternatively the Donaldson/LaRosa WHT Scheme, alternatively the Klar WHT Scheme) was to manufacture claims for WHT refund.[50] As explained in paragraph 47.6 above, the ED&F Man Applications were based on a trading scheme that was created for the sole purpose of manufacturing a claim to a WHT refund. As such, even if the WHT Refund Applicants had been able to satisfy all the elements required by the text of the Double Tax Treaties, they would not have been entitled to a WHT refund.

---

[47] Alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme.
[48] The Convention between the Kingdom of Denmark and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention Evasion with Respect to Taxes on Income and Capital Gains.
[49] The current version of SKAT's External Legal Guide is dated 31 January 2020.
[50] RRAPOC, paragraphs 24(i)(ii)(b) and 24(i)(iii)(A).

**The WHT Refund Applicants that were US pension plans did not satisfy the requirements of the Denmark-US Treaty**

51.    Pursuant to Article 10(3)(e) of the Denmark-US Treaty, the WHT Refund Applicants that were US pension funds ("**US WHT Applicants**" and "US ED&F Man Applicants"; together, the "**US WHT Refund Applicants**") had to satisfy two additional requirements in order to make a valid WHT refund application:

    51.1    they had to be "*pension funds*" within the meaning of Article 22(2)(e) of the Treaty; and

    51.2    the dividends they received should not have been "*derived from the carrying on of a business*".

52.    The US WHT Refund Applicants did not satisfy these requirements.

**The US WHT Refund Applicants were not "*pension funds*" within the meaning of Article 22(2)(e)**

53.    In order to be a "*pension fund*" within the meaning of Article 22(2)(e) of the Denmark-US Treaty, the US WHT Refund Applicants had to have been "*organized under the laws of a Contracting State to provide a pension or other similar benefits to employees*" i.e. they had to have had tax-exempt status under §401(a) of the US Internal Revenue Code ("**IRC**").

54.    §401(a) of the IRC imposes three (relevant) requirements:

    54.1    the pension fund must be created and organised for the exclusive benefit of an employer's employees;

    54.2    the pension fund must be a permanent, rather than a temporary, program; and

    54.3    the funding of the pension fund must comply with the contribution rules in the IRC.

55.    The US WHT Refund Applicants did not satisfy these requirements for the reasons set out below.

20

56.    The US WHT Applicants were not set up for the exclusive benefit of an employer's employees. Rather:

56.1    They were established by shell corporations that conducted no trade or business and therefore had no legitimate employees.

56.2    They were set up by or on behalf of the persons set out at paragraph 46.7(a) above to enter into purported transactions that would ostensibly generate a claim for WHT refund.[51]

56.3    As explained in paragraphs 46.7 and 46.8 above, the ultimate beneficiaries of the WHT refunds obtained by the US WHT Applicants were the Alleged Fraud Defendants,[52] the other parties identified in Schedule 7 to the RRAPOC and certain other conspirators to be identified following disclosure and evidence.

57.    As to the requirement that the pension fund must be a permanent program, the US WHT Applicants were not set up to be permanent. They were only intended to operate for so long as the Principal WHT Scheme (alternatively, the Solo WHT Scheme, the Donaldson/LaRosa WHT Scheme and/or the Klar WHT Scheme) continued.[53]

58.    As to the funding of those US WHT Applicants and the US ED&F Man Applicants that were 401(k) plans:

58.1    Pursuant to §415(c) of the IRC, contributions to a 401(k) plan are limited to the lesser of $40,000 or 100% of the contributing employee's compensation from the employer.

58.2    Pursuant to §401(a)(1) of the IRC, contributions to a 401(k) plan may only be made by the employers, employees or charitable remainder trusts.

58.3    Pursuant to §415, the maximum permissible contribution by each employee to a 401(k) plan was limited to: (a) $51,000 in 2013; (b) $52,000 in 2014; and (c) $53,000 in 2015.

[51] RRAPOC, paragraph 24(e)(v).
[52] RRAPOC, paragraphs 24(i)(ii)(c) and 24(i)(iii)(F)(4).
[53] Many US WHT Applicants were only set up shortly before they started submitting WHT Applications to SKAT: RRAPOC, paragraph 24(b)(ii).

21

**B/47.1/21**

58.4     The US WHT Refund Applicants claim to have made very substantial investments in Danish companies[54] and owned millions/billions of pounds worth of Danish securities. Pending disclosure, SKAT infers that any 401(k) plans that did hold shares (which is denied) did not comply with the funding rules set out in sub-paragraphs 58.1, 58.2 and 58.3 above.

Dividends received by the US WHT Refund Applicants were derived from the carrying on of business

59.     In order to qualify for relief under Article 10(3)(c) of the Denmark-US Treaty, dividends received by the US WHT Refund Applicants should not have been derived from the carrying on of business.

60.     For the purposes of Article 10(3)(c), income derived from the carrying on of business includes the "*unrelated business taxable income*" of a pension fund.[55]

61.     Income received by the US WHT Refund Applicants from transactions under which they purchased the securities on margin, through securities lending transactions that were not marked to market (or through similar financing arrangements) falls within the purview of "*unrelated business taxable income*".[56] Insofar as the US WHT Refund Applicants used the cash collateral received in this way to fund the purchase of shares in Danish companies, dividends on those shares constitute income derived from the carrying on of business. As such, the US WHT Refund Applicants were not entitled to tax relief under Article 10 of the Denmark-US Treaty in respect of those dividends.

MICHAEL FEALY QC
JAMIE GOLDSMITH
SAM O'LEARY
SOPHIE WEBER

---

[54] RRAPOC, paragraph 24(b).

[55] US Department of Treasury's Technical Explanation of the Convention between the US and the Kingdom of Netherlands for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income (see explanation to Article 35).

[56] Henry E. and Nancy Horton Bartels Tr. ex rel. Cornell Univ. v United States 88 Fed Cl 105, 122 (Fed Cl 2009), affd sub nom. Bartels Tr. for benefit of Cornell Univ. ex rel. Bartels v United States 617 F3d 1357 (Fed Cir 2010).

~~JAMES RUDDELL~~
~~KV KRISHNAPRASAD~~

~~28 February 2020~~


JAMIE GOLDSMITH QC
SAM O'LEARY
ABRA BOMPAS
JAMES RUDDELL
KV KRISHNAPRASAD

17 May 2022

~~STATEMENT OF TRUTH~~

~~The Claimant believes that the facts stated in these further particulars are true and I am~~
~~duly authorised to sign this statement on behalf of the Claimant.~~

~~Signed:~~      ...............................................................

~~Name:~~       ...............................................................

~~Position:~~    ...............................................................

~~Date:~~        ...............................................................

~~Served on 28 February 2020~~
~~by Pinsent Masons LLP of 55 Colmore Row, Birmingham  B3 2FG~~
~~Solicitors for the Claimant (AJH/668205.07000)~~

**Statement of Truth**

The Claimant believes that the facts stated in these Amended Validity Particulars are
true.  I am duly authorised by the Claimant to sign this statement on its behalf. I
understand that proceedings for contempt of court may be brought against anyone
who makes, or causes to be made, a false statement in a document verified by a
statement of truth without an honest belief in its truth.

Signed     _Stur McNill_ .

Name:        Stuart McNeill

Position:     Partner in the firm of Pinsent Masons LLP, solicitors to the Claimant

Date:        17 May 2022

by Pinsent Masons LLP of 30 Crown Place, Earl Street, London EC2A 4ES
Solicitors for the Claimant (AJS/SM/668205.07000)

23

**B/47.1/23**