**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CUSTOMS AND TAX ADMINISTRATION O0F THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**EXPERT REPLY REPORT OF MARCIA S. WAGNER**
**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

{14353/A0684102.1}

to be a link between the sponsor's intent to set up a permanent retirement program and the availability of a single investment opportunity. It was not infeasible for the plan to continue operating with alternative investment opportunities. There is also the more practical point that the Plans in this case appear to have been incidental to the Solo transaction and do not appear to have been established with the intent to provide retirement benefits but to facilitate the transaction. In my opinion, Mr. Reish's tortured logic regarding plan permanence is unsupported.

30. A constant refrain in the Reish Rebuttal is that a prospective plan sponsor's subjective intent to establish a permanent retirement plan supersedes all questioning of whether the plan was, in fact, a permanent retirement program.[63] However, when it comes to plan permanence, the IRS views ascertainment of an employer's true intention to be impossible and instructs its examiners to review objective factors, such as employer earnings records, to determine the employer's ability to make future payments to the plan. The permanence rule relates back to the ultimate question of whether the Defendant Plans were bona fide retirement programs for the exclusive benefit of employees. The various objective factors I have cited as to why the Defendant Plans were impermanent arrangements established for purposes other than providing retirement benefits should be instructive and determinative in this regard.[64] While I do not believe that it is an expert's role to opine on a defendant's intent, if asked, and based on the totality of circumstances here, I would advise that there is no reason to believe that the Defendants intended to establish permanent plans, and that the objective factors I have reviewed point decidedly to the contrary. I further believe that the IRS would come to the same conclusion if provided all the relevant evidence.

G.   IRS NO CHANGE LETTER

31. The Reish Rebuttal notes that the IRS requested and reviewed substantial information relating to the RJM Plan going back several years in a nearly two-year audit that concluded on February 3, 2020 with the issuance of a "no change" letter accepting the RJM

---

63. See id.

64. See ¶¶16, 100-102, 135, 148, 158 Wagner Expert Report.

{14353/A0684102.1}                               17

Plan's 2016 Form 5500-EZ filing as previously filed.[65] Mr. Reish implies that this was tantamount to an IRS determination that the RJM Plan continued to be a qualified plan as to its form and operation, or at least indicating that the IRS did not find any disqualifying defects in the form or operation of the Plan.[66] However, the no change letter said no such thing and only referred to the government's acceptance of the Form as filed.[67] In my experience, the IRS is precise in its taxpayer communications and would never take the expansive interpretation adopted by Mr. Reish. The scope of an IRS audit examination rarely covers all the conditions for tax qualification and IRS determinations are correspondingly narrowed.[68]

32. The IRS's initial letter announcing the audit stated that the RJM Plan was either randomly selected or part of a special project.[69] The initial questions related to eligibility to participate as reflected in payroll records, the vesting and distribution of benefits, compliance with deduction limits, discrimination in favor of highly compensated employees, trustee records as reflected in ledgers and journals and controlled group issues, meaning the RJM Plan's relationship with other employers controlled by Markowitz.[70] Thus, the focus of the audit was not on investments of the RJM Plan.

33. Mr. Reish notes that the IRS requested and received, "all monthly bank and broker statements" for 2012 - 2016 for the RJM Plan, along with significant additional information, including documents with information about the "plan account at Solo Capital Partners" and significant tax and financial information concerning Solo and other investment partnerships.[71] In light of these gaps and revisions in the information provided to the IRS, it is

---

65. ¶¶101-114 Reish Rebuttal.

66. See ¶ 116 Reish Rebuttal.

67. WH_MDL_00358606.

68. The information on Form 5500-EZ is largely restricted to the number of plan participants and the amount of its assets and contributions from participants and employers. The RJM Plan's filing for 2016, the year being audited, reported one participant, no employer or participant contributions and assets of $4,594,115 and $4,994,409 at the beginning and end of the year, respectively. This information conveys almost nothing about the RJM Plan's operations and whether they met the conditions for tax qualification.

69. IRS Letter to Markowitz, dated March 21, 2018. WH_MDL_00356183.

70. Id. at WH_MDL_00356185 – 00356187.

71. ¶106 Reish Rebuttal.

difficult to see how its examiner could have discovered a diversion of Plan assets leading to the conclusion that the Plan had violated the exclusive benefit rule. Thus, any attempt to extrapolate the audit's favorable conclusion to mean that the IRS somehow sanctioned the Plan's involvement in the Solo transaction must, in my opinion, fail.

34. The Reish Rebuttal states that, in Mr. Reish's opinion, the IRS examiner had access to sufficient information to enable her to determine whether the RJM Plan should have been formally disqualified, and the fact that the IRS did not take this step at the conclusion of the audit signifies its judgment that the RJM Plan was then and is now qualified.[72] Mr. Reish attempts to substantiate this tendentious claim by citing three classes of materials he asserts were received by the IRS: (i) all the RJM Plan's "monthly bank and broker statements" for 2012 – 2016; (ii) information about the RJM Plan account at Solo and (iii) significant tax and financial information concerning Solo and other investment partnerships.[73] The Reish Rebuttal does not identify any specific information included in these materials except that they showed that the RJM Plan was formed in 2013.[74] The Reish Rebuttal appears to suggest that the IRS examiner was aware of certain anomalous aspects of the RJM Plan's investment activity.[75]

35. Given this background, there are two problems with Mr. Reish's conclusion that the IRS did not object to the RJM Plan's participation in the Solo transaction. First, it rests on pure speculation as to the specific facts the IRS knew.[76] For instance, there is no indication in the record that the RJM Plan disclosed to the IRS that it had entered an agreement with Ganymede—a Solo affiliate—to pay over 66% of the refunds received from SKAT, nor that Solo was acting not only as custodian, but also essentially dictating the purported trades in which the Plans engaged. Nor is there any indication that the IRS would have been aware that the partnerships in which the RJM Plan held an interest were designed so that the 5% minority partner Plan literally gave away 95% of the

---

72. ¶¶104, 107 Reish Rebuttal.

73. ¶106 Reish Rebuttal.

74. ¶106 Reish Rebuttal.

75. ¶¶104-110 Reish Rebuttal.

76. Solo Capital's Open Position Statements gave little clue as to the excessive nature of its fees given that these statements listed clearing charges and brokerage, custody and equity fees as zero. WD_MDL_00524103; WD_MDL_00524112.

dividend tax refund to the majority partners. Mr. Reish's conclusion also makes unwarranted assumptions about the scope of the audit and what the IRS was looking for. The audit purported to be about the accuracy of the RJM Plan's 5500-EZs. Certain inaccuracies were identified and corrected and certain transfers into and out of the RJM Plan from and to other Markowitz retirement vehicles were explained. This may have been sufficient to satisfy the IRS's limited objectives without straining its finite resources.[77]

36. In addition, it is doubtful that the information furnished to the IRS disclosed the reciprocal billing arrangement between the Markowitz and van Merkensteijn families which either inflated or completely invented trade or business income for many of their LLCs.[78] Markowitz's response to the IRS regarding the business activities for each of his family's LLCs was generic and failed to indicate which businesses were associated with each LLC.[79] In light of the fact that the income of the various LLCs was reported on the joint tax returns of Markowitz and his spouse, the IRS apparently chose not to pursue the question of whether the income was properly allocated to each Plan. How much of the LLC income was attributable to years before the RJM Plan was established in 2013 and how much related to planning, advice, and recordkeeping to other participants in the Solo transaction cannot be determined. Even if the RJM LLC engaged in <u>bona fide</u> business activity, this has no bearing on whether the other sponsoring LLCs formed on the eve of participation in the Solo transaction met the trade or business requirement. As pointed out in my Rebuttal Report, the RJM LLC's unique circumstances do not apply to other sponsoring LLCs,[80] and the particular facts and circumstances surrounding each LLC and Plan, as well as

---

77. There is no indication that any of the IRS's information requests pertained to the indicators of fraud listed in its Internal Revenue Manual, see Internal Revenue Manual § 25.1.2.3, or that it had instituted internal procedures for investigating fraud, id. § 25.1.9.5.1.

78. ¶11 n.12 Wagner Rebuttal Report. I understand that on November 3, 2021, SKAT served interrogatories on the Markowitz defendants, seeking a information about the specific business of the LLCs sponsoring the RJM and other Plans, but that the Markowitz defendants have to date not provided that information.

79. Markowitz's response to the IRS's question regarding business activities "for each" LLC was as follows: "The business activities conducted by Mr. Markowitz through these companies consist of (1) consulting and advisory services regarding private investments, financings, mergers and acquisitions, and business strategy, (2) advisory, administrative and recordkeeping services provided to third-party investment vehicles, (3) assistance with raising capital for third-party companies, and (4) investment in e-Learning companies, private equity transactions, hedge funds, and early-stage financial services companies." WH_MDL_00356586 at -587.

80. ¶¶10-12 Wagner Rebuttal Report.

how the Plans were used together, must be considered in determining whether the conditions for tax-qualification were met.[81]

37. Mr. Reish maintains that he has not seen any evidence that Defendant Plans other than the RJM Plan should or would have been disqualified by the IRS and, using his word, "presumes" the IRS would have taken action against these other plans if it had any reason to suspect that their operation failed to meet tax-law requirements.[82] The limited scope of Mr. Reish's review of the Plans and the transaction in which they engaged would seem to make this an unreliable presumption, but in any event, the observation is made even more untrustworthy by the fact that the RJM Plan was something of a one-off compared to the general run of Plans.

38. Other LLCs and Plans were handled in a more egregious manner than the Markowitz Plans. For example, five LLCs and five Plans were formed by Kaye Scholer on behalf of Defendant Perry Lerner, who was recruited by Argre principal, van Merkensteijn. The five LLCs were (1) Loggerhead Services LLC, (2) Eclouge Industry LLC, (3) First Ascent Worldwide LLC, (4) PAB Facilities Global LLC and (5) Trailing Edge Productions LLC. In each case, Mr. Lerner testified that the names were assigned to him in order to participate in the Solo transaction and that: (i) he never intended to use these entities to conduct business activities, (ii) he never actually conducted any business through the LLCs, and (iii) the LLCs never generated any business income.[83] Mr. Lerner even testified that he participated only as a favor to his friend van Merkensteijn.[84] This was clearly a case in which the self-employed owner of the LLCs not only failed to meet the trade or business requirement but where the Plans were simply a vessel for the Solo transaction with no relationship to the purpose of providing retirement benefits. Further, while the RJM Plan only paid Solo 66% of the refunds from SKAT, Mr. Lerner's five Plans paid Solo 75% and then (after fees) 95% of the remainder to the Routt Capital Trust (controlled by Markowitz), the Omineca Trust (controlled by van Merkensteijn), and/or the RAK Investment Trust (controlled by Klugman). The RJM Plan was left with 33% of the refunds, but Mr. Lerner's Plans were left with at most 1.25% (.25 x .05), an even more

---

81. ¶¶4, 28 Wagner Rebuttal Report.

82. ¶116 Reish Rebuttal.

83. P. Lerner Tr. at 85:10-20, 86:8-16, 88:10-11, 90:15-22, 92:10-25 and 93:1-16.

84. P. Lerner Tr. at 43:20 – 45:15.

partnership) be then held in the trust."[115]  However, this scenario can be distinguished from Solo Capital's arrangement, under which Plan assets held in cash by the custodian were comingled with the assets of other Plans as well as assets of non-plan Solo customers instead of being held in segregated trust accounts.  Mr. Reish states that the custodian's holding of "stocks and bonds, shares of a mutual fund or otherwise, does not mean that plan assets have been impermissibly diverted or 'commingled.'"  But this ignores the fact that Solo Capital's custodial agreement failed to include any of the separate accounting provisions, or prohibitions on assignments by plans adopting the arrangement of any part of their interest in the group trust, such as the IRS requires to be included in group trust instruments.

K.   APPLICABILITY OF PROHIBITED TRANSACTION RULES

52. The Reish Rebuttal takes the position that prohibited transactions under ERISA *and* under the Code, such as excessive fee arrangements with plan providers and the plan custodian's involving the Plans in putative stock loan transactions with the custodian's affiliates, cannot result in plan disqualification under section 401(a) of the Code.[116]  As noted in my Rebuttal Report, in many cases there is an overlap between the two sets of rules, and the fact that a plan has engaged in a prohibited transaction is no bar to its disqualification based on the same set of facts that gave rise to the prohibited transaction.[117]  The Tax Court in the *Wingers Department Store* case provides the appropriate analysis for the situation in the present case.[118]  As in the *Wingers* case, the fact that the Plans' pervasive operational transgressions are described under Code section 4975 (relating to prohibited transactions) is no reason why those same transgressions do not also disqualify the plan under the exclusive benefit rule.

L.   PATTERN OF DISREGARDING RECORDS REQUIREMENTS

53.   The Reish Rebuttal concedes that all retirement plan sponsors should undertake the measures my Expert Report cites as common to <u>bona fide</u> retirement plans, such as

---

115.  ¶121 Reish Rebuttal.

116.  ¶¶162-65 Reish Rebuttal.

117.  ¶16 Wagner Rebuttal Report.

118.  We are not here dealing with an isolated prohibited transaction described in Section 4975. Rather, our decision that the petitioner's trust did not operate for the exclusive benefit of employees is based on the totality of the transgressions that occurred and pervaded the entire operation of the Trust. The fact that some of these transactions are described specifically in Section 4975 and subject to an excise tax are merely fortuitous."

{14353/A0684102.1}                                                28

maintaining records reflective of plan operations, filing government reports where required[119] and reporting plan distributions on IRS Form 1099-R.[120] But he then argues that the 193 Defendant Plans associated with Solo Capital that violated or neglected to comply with most of these requirements should be viewed in the same way as compliant plans. This is not to say that all the Defendant plans were guilty of each and every qualified plan violation I have cited or that each of them disregarded every industry standard discussed.[121] But the fact that all the Plans' failed in multiple ways to observe rules, regulations and standards, along with their specific violations of qualified plan rules, indicates that they were merely tools for the profit of Solo, the Argre principals, and a few others, and that the Plan sponsors were generally indifferent to satisfying the conditions for tax-qualification or meeting their participants' retirement needs.

54.  As to TIC and FBAR reporting, Mr. Reish reports his "understand[ing]" that the Defendant Plans associated with Argre consistently filed the applicable forms.[122] The Reish Rebuttal then suggests that all the other Defendant Plans made similar filings.[123] Mr. Reish also states that these putative filings are an indicia of the tax-qualified status of the Plans on behalf of which they were made.[124] As made clear in my initial report, the record indicates that it was the Lehman (and not the Argre or Kaye Scholer plans) that consistently and egregiously failed to file the appropriate regulatory filings, which as stated is another indicia that the Plans were not designed as legitimate entities.

M.   RELEVANCE OF RETIREMENT INDUSTRY STANDARDS

55.  The Reish Rebuttal criticizes my Report's use of noncompliance with retirement industry standards by the Defendant Plans as an analytical tool to evaluate their status as tax-

---

119. E.g., Form 5500 to the IRS, Treasury International System (TIC) forms to the Federal Reserve Bank and Foreign Bank and Financial Assets (FBAR) submissions to the Financial Crimes Enforcement Network (FinCEN).

120. ¶¶168-75 Reish Rebuttal.

121. Indeed, my report makes clear that my criticisms based upon the records requirement are limited to certain of the Plans.

122. ¶174 Reish Rebuttal.

123. ¶174 Reish Rebuttal.

124. ¶174 Reish Rebuttal.

qualified plans.[125] Any one of a list of transgressions—such as the diversion of plan assets in violation of the exclusive benefit rule, failure to maintain a permanent plan, improper funding of plans benefitting only owner-employees and the pooling of Plan assets in the control of a foreign custodian—would, on its own, justify disqualification. The point about the Plans' departures from industry standards is that, when viewed holistically, nothing else about the operation of these Plans looked right: the recruitment process in which individual Plan sponsors saw only the signature pages of the LLCs, Plans and partnerships that were being formed, the redundant multiple Plans, the unique naming process for LLCs and Plans, the failure of most LLCs to conduct business activity, the meager bookkeeping by many Plans, the failure to resolve regulatory issues, the misleading responses to government regulators, and the extraordinary returns achieved with no commitment of Plan funds, all spoke to the likelihood that the Plans were not established for retirement purposes, as required by the conditions the IRS has set forth for tax-qualification.

N.  CONCLUSION

56.  The Reish Rebuttal's presentation of qualified plan rules is unreliable, as exemplified by its failure to accurately state the Code's funding requirements for solo 401(k) plans, such as the Defendant Plans. But in my view, its greater defect is the failure to apply these rules to the facts of this case. The Reish Rebuttal's approach is to set forth Mr. Reish' selective version of a rule in isolation from any other rule and then, without considering facts (but in some cases relying on an "understanding" not derived from the record), to conclude that he has never seen or never heard of the IRS disqualifying a plan under the rule in question in the circumstances of this case. This approach does not assist a reader in understanding how the abstract principles of the Code and regulations apply to new and unique factual patterns, such as the steps taken in implementing the Solo transactions. As I have previously stated, making sense of this case requires a comprehensive view of the gestation, execution, and results of these transactions. Finally, the Reish Rebuttal relies too heavily on unwarranted inferences. In theory and in practice, an IRS "no change" letter with respect to the filing of a plan report does not signify its sanction of the plan's qualified status or prevent the IRS from subsequently taking action to retroactively disqualify the Plan.

---

125.  ¶¶176-80 Reish Rebuttal.

\* \* \* \* \* \* \* \*

This Reply Report is executed this 28th day of February 2022 at Boston, Massachusetts.

*[signature]*

Marcia S. Wagner