*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

# Rosenblatt Investigation into Danish trading activity of ED&F Man Professional Trading (Dubai) Ltd ("MPT Dubai")

**Produced in response to the FCA's requests for information investigation under S.171 of the Financial Services and Markets Act 2000 ("FSMA")**

**FCA Ref: ENF WS00377**

**21 June 2019**

1

ED&F-00609800

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

*In providing the information set out in this document, MCM does not waive any legal professional privilege or litigation privilege.*

### Executive Summary

1.  Rosenblatt has been instructed by ED&F Man Capital Markets Ltd ("MCM") to investigate the Danish trading of MCM's client, MPT Dubai, and its impact on WHT reclaims made by MCM's US pension plan clients (the "Pension Plans") to the Danish tax authority ("SKAT") in 2014 and 2015 ("the MPT Investigation").

2.  The MPT Investigation has been conducted in three stages, the first two of which have been completed, namely:

    a.  An investigation in response to Mr Andrew Redwood's enquiries of May 2019 into MPT Dubai's trading of Danske Bank A/S ("Danske") and Novo Nordisk A/S-B ("Nordisk") shares for the the March 2014 dividend event;

    b.  A subsequent review of all other MPT Dubai's Danish trades in 2013, 2014 and 2015 and their impact on the preparation of tax vouchers by MCM on behalf of the Pension Plans ("the Tax Vouchers");

    c.  A broad and ongoing investigation into how and why errors arose in the production of the Tax Vouchers (the "Broad MPT Investigation").

3.  ***Danske/Nordisk Trades -*** Having reviewed the trade data in light of the FCA's May 2019 enquiries (including the data which MCM provided to the FCA in March 2018), Rosenblatt's conclusions are:

    a.  MPT Dubai short-sold (via inter-dealer brokers) Danske and Nordisk shares to the Pension Plans on a cum-dividend basis, but delivered ex-dividend shares to the Pension Plans together with a DKK compensation payment, less 27%, which was equivalent to the dividend net of Danish WHT which would have been due to the Pension Plans on the shares had they been cum-dividend;

    b.  MCM's Operations Desk produced 24 Tax Vouchers in respect of these trades, which mistakenly referred to the 27% deduction withheld as "*WHT Suffered*";

    c.  Full details of Rosenblatt's investigation into these trades is at Appendix 1 to this paper. The aggregate amount of WHT paid out by SKAT attributable to these trades was DKK 70,670,475.

4.  ***Rosenblatt Review into all other Danish trades involving MPT Dubai***

    a.  Following Rosenblatt informing MCM of the above, MCM became concerned that the above mistakes made in relation to MPT Dubai's Danske and Nordisk trades were not isolated events. Accordingly, MCM immediately instructed

CONFIDENTIAL

ED&F-00609801

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

Rosenblatt to carry out a further investigation in relation to all other Danish trading carried out by MPT Dubai that resulted in a Pension Plan seeking a tax reclaim.

b. Rosenblatt have concluded that in every case where MPT Dubai acted as a counterparty, selling Danish shares to MCM's pension plan clients on a cum dividend basis, MPT Dubai adopted the same practice as above, short-selling cum dividend shares and then delivering ex-dividend shares to the Pension Plans together with compensation payments from which was deducted 27%.

c. MCM's Operations Desk produced a further 56 tax vouchers in respect of these trades, which mistakenly referred to the 27% deduction as "*WHT Suffered*".

d. Full details of Rosenblatt's findings are set out Appendix 2.  The aggregate amount of WHT paid out by SKAT attributable to these Danish trades was DKK113,231,925.

## 5.    *The Broad MPT Investigation*

Given the above errors in 80 of the Tax Vouchers, MCM instructed Rosenblatt to conduct an immediate and in-depth investigation in order to establish how and why these errors occurred and, in particular, to determine:

- whether MCM's Operations Desk or Equity Finance Desk were aware of errors in the production of Tax Vouchers at the time; and

- whether MCM's Board, MPT Dubai's Board and/or MCM's parent, ED&F Man Holdings Ltd knew or should have known of these errors at the time, including what they knew or should have known of MPT Dubai's business, its practice of short-selling cum-dividend shares but delivering ex-dividend shares, and the potential for MPT Dubai's short-selling to result in SKAT paying out WHT reclaims.

Full details of the Broad MPT Investigation are set out below. Rosenblatt's initial conclusion is that MCM's errors in the production of tax vouchers relating to MPT's Danish trades was neither deliberate on MCM's part, nor conscious, but instead arose due to:

a. process errors and mistakes in law on the part of the Operations Desk and Equity Finance Desk; and

b. the relevant board members of MCM and MPT Dubai and Messrs Phil Howell and Laurie Foulds (as board members of ED&F Man Holdings Ltd the parent company of MCM), having been informed that all transactions were being conducted in accordance with legal opinions, not understanding how MCM's dividend arbitrage trading  was being affected by MPT Dubai's practice of short-selling.

ED&F-00609802

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

6. **The Ongoing MPT Investigation**

 As outlined above, Rosenblatt's focus has now to turned to determining:

a. whether the issues uncovered in relation to MPT Dubai short-selling Danish trades were replicated in other markets; and

b. whether MPT Dubai (in particular Mr Mark Whitehead) acted deliberately and in collusion with MCM's clients/investment managers and others (in particular Ms Victoria Foster) to deliberately generate illegitimate WHT reclaims.

The proposed next steps in this Ongoing MPT Investigation are outlined at Appendix 4.

CONFIDENTIAL                                                                                           ED&F-00609803

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

### Rosenblatt's Broad MPT Investigation

#### Introduction

As of the date of this paper, the Broad MPT Investigation has involved:

1. A review of MCM's email accounts from February 2012 to April 2015. These email accounts and the keyword searches applied to them are set out Appendix 3; and

2. Interviews conducted on 28 May 2019 with Mr Michael Meade (an employee of MCM from September 2013 to date; promoted from being a member of the Security Operations team to Head of Security Operations in July 2018) and Ms Victoria Foster (an employee of MCM from Feb 2012 to date; promoted from Managing Director of the Equity Finance Desk to Head of Desk in February 2016); and on 11 June 2019 with Mr Stephen Hawksworth (CEO of MCM and former Director of MPT Dubai).

Rosenblatt's findings are as follows:

#### How the errors in the tax vouchers arose

1. MCM's error in the production of Tax Vouchers for Pension Plans who had been short-sold Danish Shares by MPT Dubai was to indicate in these vouchers that Danish WHT had been "*suffered*" by a Pension Plan at 27% in circumstances where the DKK received by the Pension Plan from MPT Dubai was a compensation payment or 'market reclaim' equivalent to the amount of the dividend less 27%, rather than an actual dividend net of Danish WHT which MPT Dubai had received and passed on from the relevant Danish company.

2. All of those Tax Vouchers referred to in Appendices 1 and 2 were prepared by MCM's Operations Desk, the division of MCM responsible for clearing and reconciling its customers' trades. From 23 September 2013 onwards these vouchers were prepared by Mr Michael Meade, currently head of MCM's Operations Desk, but at the time working under the supervision of Ms Christina McKinnon. The process Mr Meade adopted was as follows:

   a. Mr Meade would prepare (using trading data held on Shadow, MCM's internal system) a Dividend Reconciliation spreadsheet identifying, as of ex-date minus one, the Pension Plans' share and dividend entitlements and calculate the dividend payable on these shares as per the amount of the dividend declared by the relevant Danish company (information for which would be on Bloomberg);

   b. In the majority of cases, the Dividend Reconciliation would confirm the dividends which MCM's custodian, BNP Paribas, had received by SWIFT. However, where the Pension Plans were considered to be due a dividend on shares purchased from MPT Dubai, as a client of MCM, rather than due a SWIFT from an external source, Mr Meade would routinely debit MPT Dubai's

*Strictly Private and Confidential*

**This report is to be treated as confidential information pursuant to section 348 of FSMA**

cash account with a compensation payment or 'market reclaim' equivalent to the amount of the dividend due to the Pension Plan and credit this sum to the Pension Plan's cash account. Mr Meade would credit these 'market reclaims' to the Pension Plans net of WHT (i.e. less 27%).

c. Mr Meade has confirmed that no one instructed him to credit/debit market reclaims in this way, rather he understood this to be standard market practice. Mr Meade referred in this regard to the following wording on "MyEuroclear Knowledge base": "*If you transfer securities cum-distribution that you purchase ex-distribution, you will generate a short in tax entitlement. In such case, a market reclaim will be created on the cum-distribution sale. We will credit the market reclaim to the recipient of the securities with the dividend net of tax*";

d. Having produced the Dividend Reconciliation spreadsheet, Mr Meade would then provide this to Ms Victoria Foster, Head of the Equity Finance Desk, who would sign off and send it to be counter-signed by Mr Meade's manager, Ms McKinnon. Mr Meade would then copy and paste information from the Dividend Reconciliation spreadsheet into the relevant fields of a draft tax voucher using a template. Next to the wording "*Amount Received*" he would copy and paste the amount each Pension Plan had received in DKK by SWIFT or market reclaim, and next to "*WHT Suffered*" he would copy and paste his calculation of the 27% deduction.

e. Rosenblatt have identified that the generic template tax voucher used by Mr Meade was a MS Word document produced by Simmons & Simmons in April 2012. The template included the wording "*WHT Suffered*", words which had been drafted by Simmons & Simmons.

f. Having produced the Tax Vouchers, Mr Meade would then provide them to Ms McKinnon who would sign them off and then provide them to the Equity Finance Desk. Mr Marcus Howard of the Equity Finance Desk would then send them out to the Pension Plans' investment managers.

g. MCM would have no part in any subsequent reclaim applications made by the Pension Plans.

**Knowledge of MCM's Operations Desk and/or Equity Finance Desk**

*Securities Operations Desk*

1. Mr Meade confirmed to Rosenblatt that he was aware at the time:

a. that MPT Dubai was short-selling Danish cum-dividend shares to the Pension Plans and that it was short over the dividend date, such that MPT Dubai did not receive a dividend from the underlying Danish company in respect of these shares; and

CONFIDENTIAL

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

   b.  the dividends which he credited to the Pension Plans on the shares they had acquired from MPT Dubai were not dividends which had been paid to MPT Dubai by the underlying Danish companies net of WHT; they were instead sums which were equivalent to the amount of the dividends.

2.  Mr Meade maintained that:

   a.  he had been entirely open with the FCA about the above at his interview;

   b.  when filling in a tax voucher template, he was solely concerned with accurately representing the DKK which the relevant Pension Plan had received. He gave no consideration as to whether Danish WHT had been received by SKAT;

   c.  he did not understand why Danish WHT reclaims would not be due to the Pension Plans in such circumstances; his understanding at the time was that the legality of the Pension Plans' trades and of their reclaim strategy had been confirmed in legal opinions obtained by Mr Mark Whitehead (MCM's Global Head of Structured Equities and a director and principal operating mind behind MPT Dubai);

   d.  Mr Meade had never seen these legal opinions.

3.  Rosenblatt have yet to interview Mr Meade's manager at the time, Ms Christina McKinnon since she is no longer an employee of MCM.

**Equity Finance Desk**

4.  Ms Foster confirmed to Rosenblatt that she was aware at the time that:

   a.  MPT Dubai was the counterparty to those cum-dividend trades referred to in Appendices 1 and 2;

   b.  MPT Dubai was short-selling Danish cum-dividend shares to the Pension Plans and that it was short over the dividend date;

   c.  she knew this because MPT Dubai was a client of the Equity Finance Desk. Mr Chris Henstock, the sole trader at MPT Dubai who worked under Mr Whitehead, would email her (and others on the desk) prior to MPT Dubai acquiring the Danish shares to ensure he had sufficient credit, and would then email one of her team to instruct them to effect the purchase. All of these purchases were made after the ex-date and, therefore, were purchases of ex-dividend shares such that MPT Dubai would not receive a dividend from the underlying Danish company in respect of these shares;

   d.  accordingly, the dividends which MCM credited to the Pension Plans on the shares they had acquired from MPT Dubai were not dividends which had been paid to MPT Dubai by the underlying Danish companies net of WHT; they were instead 'market reclaims', sums which were equivalent to the

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

amount of the dividends (she knew this because she signed off the Dividend Reconciliations);

e. the Pension Plans would then apply for refunds of WHT in respect of these market reclaims.

5. Ms Foster maintained that:

a. she did not consider at the time that in such circumstances Danish WHT reclaims would not be due to the Pension Plans or that it was in any way improper for the Pension Plans to be making WHT reclaim applications;

b. her understanding at the time was that the legality of the Pension Plans' trades and of their reclaim strategy had been confirmed in legal opinions obtained by Mr Whitehead;

e. Ms Foster also had never seen these legal opinions.

### *Rosenblatt initial conclusions*

6. Systems and controls should have been in place to prevent uncovered short-selling between customers of shares over dividend dates where it was known that the purchasing customers would be issuing WHT reclaim applications;

7. The Operations Desk's processes were flawed – it should not have credited market reclaims to a purchasing customer net of tax in circumstances where no tax had been paid on such reclaims;

8. The Operations Desk was further mistaken in providing tax vouchers in such circumstances;

9. The Operations Desk and Equity Finance Desk were mistaken in law as to their belief that WHT would be payable in the above circumstances;

10. The existence of legal opinions would not alter the above; and

11. No such legal opinions have however been found. Accordingly, further investigation is required as to Mr Whitehead's role and his reported reliance on such opinions.

### **Knowledge of the Boards of MCM, MPT Dubai and MCM Holdings Limited**

Rosenblatt's findings as regards the knowledge of the respective Boards of MCM, MPT Dubai and ED&F Man Holdings Ltd are based upon the review of contemporaneous documentation and the explanation of Mr Hawksworth (director of MCM and former director of MPT Dubai). Rosenblatt have not met with relevant directors of ED&F Holdings Ltd (Messrs Phil Howell and Laurie Foulds), nor have they met with Messrs Whitehead and Henstock (the active directors of MPT Dubai).

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

### Knowledge of MCM's Dividend Arbitrage business

1. MCM's involvement in Dividend Arbitrage was a niche business exclusively run by the Equity Finance Desk in London, with a small group of traders under the direction of Mr Whitehead.

2. Mr Whitehead joined MCM with Ms Foster from MF Global in February 2012, Mr Whitehead as Global Head of Structured Equities and Ms Foster as Managing Director, Equity Finance. They assembled their own team (Mr Oliver Bottomley (a graduated trainee, Mr Marcus Howard and Chris Henstock, all from MF Global, and Ms Sara Mina), and brought with them their own clients, (none of whom were known to Mr Hawksworth) and years of experience of dividend arbitrage trading in Germany, which Mr Hawksworth understood had been recently curtailed due to regulatory changes.

3. Mr Hawksworth was Mr Whitehead's immediate superior in London. Mr Hawksworth did not have any personal experience of dividend arbitrage. While Mr Hawksworth understood the nature of the trading strategy in its broadest terms – that tax exempt clients were entitled to WHT reclaim on dividends – he knew nothing of the detailed trading strategies adopted by Mr Whitehead and his clients.

4. Mr Hawksworth has confirmed to Rosenblatt that his focus in 2012-2015 was on growing the entirety of MCM's London business and that while he was kept informed of the Equity Finance Desk's financial performance, he had no direct involvement with the Desk's day to day trading. It was not until May 2014 that he had indications of any problems (███████████████████████████████), but that even then he had the comfort that the Equity Finance Desk was monitored by MCM's in-house counsel and its Risk and Compliance departments.

### Knowledge of MPT Dubai's business

5. Shortly after his arrival at MCM, Mr Whitehead indicated that he wanted to replicate the successful proprietary business he had run at MF Global. Because MCM could not do this itself for regulatory reasons - it was seeking to change its licence from "Full Scope" to "Limited Activity" - Mr Whitehead proposed to Mr Hawksworth the creation of a new and unregulated proprietary trading business.

6. On 25 July 2012, Mr Whitehead and Mr Bottomley prepared a business plan for MPT Dubai, which proposed:

   a. The creation of an unregulated proprietary trading company based in Dubai, whose business would be to engage in structured equity finance transactions (equities, options, futures and hedging products), on a "delta neutral" basis, Its equity trades being described as being transacted *"against dividend entitlements obtained through stock loan trades, equity swaps and yield enhancement trades"*;

   b. The company should be a wholly owned subsidiary of ED&F Man Holdings BV (which was itself owned by ED&F Holdings Ltd) and a client of MCM, with

CONFIDENTIAL

ED&F-00609808

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

MCM providing it with clearing, custody and back office services and managing its credit limits in accordance with a Model B Clearing Agreement;

c.  It would have just one equity finance trader, Mr Chris Henstock, who had also worked for Mr Whitehead at MF Global, who would be based in Dubai and who would report directly to him.

7.  As Mr Whitehead's superior in the London office, Mr Hawksworth agreed to sponsor the proposal with ED&F Man Holdings Ltd and the proposal was approved.

8.  29 October 2012 – MPT Dubai secured its Dubai licence and began operations. Documents seen by Rosenblatt suggest that MPT Dubai was run solely by Mr Whitehead and Mr Henstock.

9.  Mr Hawksworth's understanding was that MPT Dubai was to be engaged solely in proprietary trading. He was aware that MPT Dubai was profitably engaged in dividend arbitrage trading on its own account, but so far as he was concerned, there was no original intention for MPT Dubai to be involved in trading with other MCM clients, or engaged in short selling to them, or for it to otherwise be involved with the dividend aribtrage business of the Equity Finance Desk in London.

10. It was not until May 2014 that Mr Hawksworth, MCM's Board and board members of ED&F Man Holdings Ltd became aware of MPT Dubai's involvement with short selling to other MCM clients.

**Knowledge of MPT Dubai's short selling**

11. ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████

12. ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████

13. █████████████████████████████████████████████████. Mr Hawksworth confirmed:

a.  that this was the first time he became aware that MPT Dubai had been engaged in short-selling shares to other MCM customers;

CONFIDENTIAL                                    ED&F-00609809

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

b.  that upon discovering this, he instructed Mr Whitehead that the practice must stop; and

c.  that he confirmed to Messrs Howell and Foulds that he would ensure MPT Dubai's short selling of shares to MCM customers would cease.

14. ███████████████████████████████████████████████████

████████, Mr Hawksworth confirmed:

a.  ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████;

b.  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ █████████████████████████

████████████████████████████████████████████████

████████████████████████

c.  that MCM did not then conduct an investigation into whether similar problems were occurring in other juridictions, such as Denmark; and

d.  that MCM's Board and the Board of the ED&F Man Holdings Ltd did not fully understand how MCM's dividend arbitrage business was being affected by MPT Dubai's uncovered short-selling.

15. Rosenblatt have conducted searches of MCM's documents to identify whether the potential WHT tax consequences of the above were ever raised internally at MCM, either at the level of the Operations and Equity Finance Desks, or at Board level, or with MCM's parent company, ED&F Man Holdings Ltd. No documents or communications to this effect have been identified to date. ████ █████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.

*Rosenblatt's initial conclusions*

Following its intial investigation, Rosenblatt conclude that the board of MCM did not appreciate the exact operations of the trading undertaken by the Equity Finance Desk or the effects of MPT Dubai's short-selling.

Further investigation into operational matters is required. Therefore, Rosenblatt has been instructed to investigate in further detail the relationship between MCM, MPT and ED&F Man Holdings Ltd during the relevant time and, in particular, the role of Mark Whitehead/Victoria Foster.

**Rosenblatt**

**21 June 2019**

CONFIDENTIAL ED&F-00609810

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

<u>**Appendix 1**</u>

**Danske Findings**

- On 18 March 2014, 48,015,000 Danske shares were purchased by MCM on behalf of a number of its pension plan clients with a settlement date of 24 March 2014.

- The pension plans' trades were before ex-date, being 19 March 2014, and therefore cum-dividend, entitling the pension plans to a dividend on the shares.

- The 48,015,000 shares were purchased through an inter-dealer broker, Volcafe Ltd, another entity in the ED&F Man Group. The counterparty to the pension plans' trade was MPT Dubai.

- MCM's dividend reconciliation, which its Operations Desk prepared from an ex-date - 1 perspective (being the relevant date in which an entity must have purchased shares by under Danish law) shows the pension plans holding 48,015,000 shares and MPT Dubai short of 48,015,000 shares. MPT Dubai did not however hold any Danske shares on 18 March 2014.

- On 19 March 2014 MPT Dubai, through MCM, purchased 48,015,000 Danske shares through a number of different inter-dealer brokers including The Link Assets and Securities Co Ltd, ICAP Securities Limited, BGC Brokers LP and GFI Securities. These trades also settled on 24 March 2014. These trades were ex-dividend and the shares did not come with any dividend entitlement. It was these shares which MPT Dubai then transferred to the pension plans on the settlement date of 24 March 2014.

- Having settled its sale of cum-dividend shares with ex-dividend shares, MPT Dubai made a compensation payment to the pension plans in lieu of the dividend. 27% was deducted from that payment (a sum equivalent to Danish WHT).

- MCM's Operations Desk produced 12 tax vouchers in respect of these trades, each of which mistakenly included the phrase "*WHT suffered*" next to a DKK figure representing the 27% which had been deducted from the payments received by the pension plans. Because these were compensation payments paid by MPT Dubai to the pension plans in lieu of dividends, rather than the payment of dividends MPT Dubai had received from Danske, no WHT would have been withheld in respect of these payments. Accordingly, SKAT should not have issued the pension plans with a WHT reclaim in respect of these Danske shares.

- the total amount of WHT paid out by SKAT in respect of these trades was DKK25,928,100.

**Nordisk findings**

- 26,825,000 Nordisk shares were purchased by MCM on behalf of a number of its pension plan clients on 20 March 2014 through Volcafe Ltd. These trades settled on 26 March 2014.

CONFIDENTIAL

ED&F-00609811

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

- An additional 10,000,000 Nordisk shares were purchased by MCM on behalf of a number of its pension plans clients through MCM's London inter-dealer broker desk on 20 March 2014. These trades also settled on 26 March 2014.

- The ex-date for Nordisk was 21 March 2014 making the above trades cum-dividend, which entitled the pension plans to a dividend on a total of 36,825,000 Nordisk shares.

- The counterparty to both of the pension plans' trades was MPT Dubai. MPT Dubai sold 26,825,000 Novob shares into Volcafe Ltd and 10,000,000 into MCM's London inter-dealer broker desk on 20 March 2014 with a settlement date of 26 March 2014.

- As with the Danske shares, MPT Dubai were short 36,825,000 shares over ex-date: 36,825,000 Nordisk shares were purchased by MPT Dubai, through MCM, from BGC Brokers LP, GFI Securities and MCM's London inter-dealer broker desk on 21 March 2014 with a settlement date of 26 March 2014. These trades took place after ex-date and the Nordisk shares were therefore ex-dividend and did not come with any dividend entitlement. MPT Dubai made a compensation payment to the pension plans in lieu of the dividend, with 27% deducted from that payment (a sum equivalent to Danish WHT).

- MCM's Operations Desk produced 12 tax vouchers in respect of these trades, each of which mistakenly included the phrase "WHT suffered" next to a DKK figure representing this 27% deduction. Because these were compensation payments paid by MPT in lieu of dividends, it is apparent that no WHT had been withheld from these payments. Accordingly, SKAT should not have issued the pension plans with a WHT reclaim in respect of these shares.

- the total amount of WHT paid out by SKAT attributable to these trades was DKK 44,742,375.

CONFIDENTIAL

ED&F-00609812

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

### Appendix 2

**In relation to Coloplast A/S B shares for the December 2013 dividend event:**

i.   1,000,000 shares were purchased by MCM on behalf of pension plan clients on 5 December 2013 through Volcafe Ltd. These trades settled on 11 December 2013 and MPT Dubai was the counterparty to these trades.

ii.  MPT Dubai was short of these shares over ex–date, 6 December 2013.

iii. 1,000,000 shares were purchased by MCM on behalf of MPT Dubai through MCM's London IDB on 6 December 2013 and settled on 11 December 2013.

iv.  MPT Dubai matched these trades and corresponding positions.

v.   2 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK1,890,000.

**In relation to Novozymes A/S- B shares for the February 2014 dividend event:**

i.   14,450,000 shares were purchased by MCM on behalf of pension plan clients on 26 February 2014 through Volcafe Ltd. These trades settled on 4 March 2014 and MPT Dubai was the counterparty to these trades.

ii.  MPT Dubai was short of these shares over ex–date, 27 February 2014.

iii. 14,450,000 shares were purchased by MCM on behalf of MPT Dubai through The Link Assets and Securities Co Ltd and ICAP Securities Limited on 27 February and settled on 4 March 2014.

iv.  MPT Dubai matched these trades and corresponding positions.

v.   2 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK 9,753,750.

**In relation to TDC A/S- shares for the March 2014 dividend event:**

i.   64,300,000 shares were purchased by MCM on behalf of pension plan clients on 6 March 2014 through Volcafe Ltd. These trades settled on 12 March 2014 and MPT Dubai was the counterparty to these trades.

ii.  MPT Dubai was short of these shares over ex–date, 7 March 2014.

iii. 64,300,000 shares were purchased by MCM on behalf of MPT Dubai through The Link Assets and Securities Co Ltd, ICAP Securities Limited, Cantor Fitzgerald Europe and MCM's London IDB on 7 March and settled on 4 March 2014.

iv.  MPT Dubai matched these trades and corresponding positions.

v.   21 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK 38,194,200.

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

**In relation to Mærsk A/S - B shares for the April 2014 dividend event:**

i.   85,800 shares were purchased by MCM on behalf of pension plan clients on 31 March 2014 through Volcafe Ltd. These trades settled on 4 April 2014 2013 and MPT Dubai was the counterparty to these trades.

ii.  MPT Dubai was short of these shares over ex–date, 1 April 2014.

iii. 85,800 shares were purchased by MCM on behalf of MPT Dubai through ICAP Securities Limited, Marex Financials Limited and MCM's London IDB on 1 April 2014 and settled on 4 April 2014.

iv.  MPT Dubai matched these trades and corresponding positions.

v.   8 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK32,342,400.

**In relation to Tryg A/S shares for the April 2014 dividend event:**

i.   2,126,500 shares were purchased by MCM on behalf of pension plan clients on 3 April 2014 through Volcafe Ltd. These trades settled on 9 April 2014 and MPT Dubai was the counterparty to these trades.

ii.  MPT Dubai was short of these shares over ex–date, 4 April 2014.

iii. 2,126,500 were shares purchased by MCM on behalf of MPT Dubai through ICAP Securities Limited, Marex Financials Limited and MCM's London IDB on 4 April 2014 and setted on 9 April 2014.

iv.  MPT Dubai matched these trades and corresponding positions.

v.   8 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK15,764,625.

**In relation to Dampskibsselskabet Norden A/S shares for the April 2014 dividend event:**

i.   1,525,000 shares were purchased by MCM on behalf of pension plan clients on 23 April 2014 through Volcafe Ltd. These trades settled on 29 April 2014 2013 and MPT Dubai was the counterparty to these trades.

ii.  MPT Dubai was short of these shares over ex–date, 24 April 2014.

iii. 1,525,000 shares were purchased by MCM on behalf of MPT Dubai through MCM's London IDB and ICAP Securities Limited on 24 April 2014 and settled on 29 April 2014.

iv.  MPT Dubai matched these trades and corresponding positions.

v.   5 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK2,058,750.

CONFIDENTIAL

ED&F-00609814

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

**In relation to Coloplast A/S B shares for the May 2014 dividend event:**

i. 11,565,000 shares were purchased by MCM on behalf of pension plan clients on 8 May 2014 through Sunrise Brokers LLP. These trades settled on 14 May 2014 2013 and MPT Dubai was the counterparty to these trades.

ii. MPT Dubai was short of these shares over ex–date, 9 May 2014.

iii. 11,565,000 shares were purchased by MCM on behalf of MPT Dubai through Volcafe Ltd, Cantor Fitzgerald Europe and ICAP Securities Limited on 9 May 2014 and settled on 14 May 2014.

iv. MPT Dubai matched these trades and corresponding positions.

v. 8 tax vouchers were produced. The aggregate amount of WHT attributable to these trades was DKK12,490,200.

**In relation to IC Group A/S shares for the September 2014 dividend event:**

i. 50,000 shares were purchased by MCM on behalf of pension plan clients on 24 September 2014 through MCM's London IDB. These trades settled on 30 September 2014 and MPT Dubai was the counterparty to these trades.

ii. MPT Dubai was short of these shares over ex–date, 25 September 2014.

iii. 50,000 shares were purchased by MCM on behalf of MPT Dubai through GFI Securities on 25 September 2014 and settled on 30 September 2014.

iv. MPT Dubai matched these trades and corresponding positions.

v. 1 tax voucher was produced. The aggregate amount of WHT attributable to these trades was DKK40,500.

**In relation to Novozymes A/S- B shares for the February 2015 dividend event:**

i. 750,000 shares were purchased by MCM on behalf of pension plan clients on 25 February 2015 through MCM's London IDB. These trades settled on 2 March 2015 and MPT Dubai was the counterparty to these trades.

ii. MPT Dubai was short of these shares over ex–date, 26 February 2015.

iii. 750,000 shares were purchased by MCM on behalf of MPT Dubai through BGC Brokers LP on 26 February and settled on 2 March 2015.

iv. MPT Dubai matched these trades and corresponding positions.

v. 1 tax voucher was produced. The aggregate amount of WHT attributable to these trades was DKK607,500.

Following our investigation MCM can confirm that 56 of the tax vouchers were produced in relation to the above trades.

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

The aggregate amount of WHT attributable to these trades was DKK113,231,925 of WHT.

CONFIDENTIAL                                                                                      ED&F-00609816

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

### Appendix 3

### MPT Investigation

### Rosenblatt Search Criteria

Rosenblatt have obtained emails for the period 1 January 2012 to 31 April 2015 from the following custodians:

1. Angela Hayes
2. Alix Holloway
3. Amelia Kounnou
4. Adam Piper
5. Ben Stanley
6. Colin Kettle-Williams
7. Christopher Ramsey
8. Evita Koutsopoulou
9. Freddie Ireland
10. Jurgen Bischof
11. Julian Courtney
12. Jose Jove
13. Jacqueline Kilgour
14. LDN-EQUITYASSETSERVICING-DL
15. LDN-EQUITYFINANCE-TRADS-DL
16. LDN-SECOPS-MB
17. LDN-SECOPS-MB
18. Mike Blackwell
19. Marcus Howard
20. Mark Newson
21. Natalie Campbell
22. Nick Sheppard
23. Oliver Bottomley
24. Paul Fox
25. Richard Goodwin
26. Ross Reason
27. Svetlana Comrie
28. Shahab Hashemi
29. Sharon Heath
30. Shique Ismail
31. Stuart McLaughlan
32. Sara Mina
33. Steve Wadlow
34. Susan Wood
35. Thomas McNamara
36. Victoria Foster
37. Ian Ulliott
38. Chris Scanlan

CONFIDENTIAL

ED&F-00609817

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

39. Michael Gibson
40. Chris Henstock
41. Christina MacKinnon
42. Michael Meade
43. Miguel Senra
44. Ahamed Sagar
45. Ross Liddard
46. Paul Schofield
47. Paul Regan
48. Christopher Smith
49. Steven Hawksworth

The following search terms were used:

"Legal opinion" OR "Legal advice" AND "withholding tax" AND (from) Mark Whitehead OR (from) Chris Henstock

"Legal opinion" OR "Legal advice" AND "WHT" AND (from) Mark Whitehead OR (from) Chris Henstock

"Legal opinion" OR "Legal advice" AND "Dubai" AND (from) Mark Whitehead OR (from) Chris Henstock

"Legal opinion" OR "Legal advice" AND "reclaim" AND (from) Mark Whitehead OR (from) Chris Henstock

"Legal opinion" OR "Legal advice" AND "div arb" OR "dividend arbitrage" AND (from) Mark Whitehead OR (from) Chris Henstock

"Legal opinion" OR "Legal advice" AND (from) Mark Whitehead OR (from) Chris Henstock

"Ernst & young" AND "Legal opinion" OR "legal advice"

"Legal opinion" OR "legal advice" AND From Mark Whitehead

"board minutes" – reviewed by year/month

"board minutes" AND (to) Jacqueline Kilgour

"Agenda" AND "Board meeting"

"Board papers" AND "Board meeting"

"Resolution" AND "board meeting"

"Trade Mandate" AND "MPT"

"Trade Mandate" AND "Dubai"

"Risk Mandate" AND "MPT"

"Risk Mandate" AND "Dubai"

"business plan" AND "Dubai" OR "MPT"

19

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

"Shareholder resolutions"

"shareholders" AND "resolutions" AND "MPT" OR "dubai"

"Clyde & Co" AND "Dubai" OR "MPT"

"Clyde & Co" AND "incorporation"

"DICF" AND "Clyde & Co"

"FinCom" AND "Dubai" AND "MPT" OR "Man Professional Trading"

██████████████████

██████████████████

██████████████████

██████████████████

██████████████████

██████████████████

██████████████████

██████████████████

██████████████████

Stephen Hawskworth's and Christopher Smith's emails were searched with the following terms:

"Cum-ex"

"Reclaim"

"Dividend"

"Withholding tax" or "WHT"

"Strategy" AND "Dubai"

"Structure" AND "Dubai"

"Dividend Arbitrage"

"Short-selling" and "Dubai"

"Short" and "Dubai"

"div-arb"

Stephen Hawskworth's and Christopher Smith's emails were reviewed over the following dates:

- 20 May 2014;

20

ED&F-00609819

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

- 21 May 2014;
- 22 May 2014;
- 23 May 2014;
- 26 May 2014;
- 27 May 2014;
- 28 May 2014;
- 29 May 2014; and
- 30 May.

The following correspondence was reviewed:

Emails between Phil Howell AND Stephen Hawksworth Date range March 2015 – June 2015

Emails between Laurie Foulds AND Stephen Hawksworth Date range March 2015 – June 2015

Emails between Phil Howell AND Stephen Hawksworth AND "reclaims"

Emails between Phil Howell AND Mark Whitehead AND "reclaims"

Emails between Stephen Hawksworth and Mark Whitehead AND "reclaims"

Emails between Phil Howell AND Stephen Hawksworth AND "███████"

Emails between Phil Howell AND Mark Whitehead AND "███████"

Emails between Stephen Hawksworth and Mark Whitehead AND "████████"

Emails between Phil Howell AND Stephen Hawksworth AND "████"

Emails between Phil Howell AND Mark Whitehead AND "████"

Emails between Stephen Hawksworth and Mark Whitehead AND "████"

Emails between Phil Howell AND Stephen Hawksworth AND "█████"

Emails between Phil Howell AND Mark Whitehead AND "█████"

Emails between Stephen Hawksworth and Mark Whitehead AND "██████"

CONFIDENTIAL

ED&F-00609820

*Strictly Private and Confidential*

*This report is to be treated as confidential information pursuant to section 348 of FSMA*

## Appendix 4

## Ongoing MPT Investigation

## Closure of Equity Finance Desk and Next Steps

**Closure of the Equity Finance Desk**

On Friday 29 March 2019 the board of MCM resolved to wind down the operations of its equity finance and inter-dealer broker desks. As part of this process:

a.   FTI Consulting Ltd have been instructed by Rosenblatt to conduct a comprehensive harvest of all trading data, client records, legal documentation in place between MCM and its clients and electronic communications sent to and from (i) the staff of the desks and (ii) the operations team that supported the desks' historic trading activities; and

b.   at all times during the wind down process either FTI or Mr Michael Hodnett, MCM's head of compliance, have been in regular contact with Mr Patrick Shone of the FCA to advise him as to progress.

**Next Steps**

1.   ███████████████████████████████████████
     ███████████████████████████████████████
     ███████████████████████████

2.   Verification by FTI and Rosenblatt of the accuracy of the remaining 340 tax vouchers produced for the Pension Plans' Danish trades;

3.   Ongoing Rosenblatt review of MCM documentation;

4.   Rosenblatt review of Chris Henstock MPT Dubai email account; and

5.   Subject to availability, interviews with:

     a.   Sara Mina -  Senior Equity Finance Trader (November 2011 to May 2019);

     b.   Oliver Bottomley - Equity Finance Trader (April 2012 to date);

     c.   Marcus Bacchi-Howard - Equity Finance Trader (February 2012 to date);

     d.   Adam Piper - European Chief Risk Officer (May 2012 – to date);

     e.   Christina MacKinnon - Previous head of Securities Operations (August 2013 - July 2018);

     f.   Julian Courtney - European Head of Compliance & Legal (July 2012 – December 2017); and

     g.   Paul Parness – Head of Tax - ED&F Man Holdings Limited.

CONFIDENTIAL                                                                            ED&F-00609821