# EPTF Report

## 15th May 2017

**Disclaimer**

This document is a document prepared by the informal expert group "EPTF" set up by the European Commission and it does not prejudge the final policy choices and decisions that the European Commission may take.

The views reflected in this Report are the views of the experts. They do not constitute the views of the Commission or its services, nor any indication as to the approach that the European Commission may take in the future.

**European Post Trade Forum Report**

# European Post Trade Forum Report

## *1. Introduction*

In early 2016 the European Commission set up an informal expert group on post-trading, including the areas of collateral markets and derivatives, the European Post Trade Forum (EPTF)[1].

The objective of EPTF in the context the Commission's Capital Markets Union (CMU) project is "to support the work of the Commission to review the developments in post-trading, including collateral management services, in line with the CMU, in order to promote more efficient and resilient market infrastructures in the EU"[2].

In executing its mandate, the EPTF, comprised of representatives of the relevant industry constituencies, analysed the current European Post Trade Landscape in detail with the support of experts that are not members of the EPTF. This analysis that is published as an Annex to this Report, served as a source of evidence for the EPTF to assess the state of removal of the Giovannini Barriers[3] and the identification of new barriers and bottlenecks to efficient and resilient cross-border post-trading in the EU, considering the global nature of capital markets.

The objective of this Report is to list those Giovannini Barriers that have not yet been dismantled as well as new barriers and bottlenecks and to try and establish priorities in addressing these perceived obstacles on the way to a true CMU.

The reader will need to bear in mind that at the time the two Giovannini Reports were written, derivative markets, securities finance activities, collateral management and post-trade reporting were not as developed as they are today. As a result, the focus was put on the standardisation of messages in the cash securities markets, and more precisely on the settlement layer, as the role of CCPs was still in its infancy, not to mention the awareness of their importance. This has changed. The size and complexity of derivative markets, securities finance activities and collateral management can easily be compared with cash securities markets and CCPs have become critical market infrastructures. In addition, new products, and unfortunately their corollaries new barriers, have also appeared since the Giovannini Reports.

All of this also explains why a mere "semantic transposition" of the Giovannini Barriers into the current market environment was not possible: for example, it became obvious that the scope of some (still not dismantled) former Giovannini Barriers had changed or that some of them needed to be redefined or even put together into a new barrier. Hence the decision was taken to adopt a new terminology: the EPTF Barriers (but, in so far as possible and where relevant, a reference to the Giovannini Barriers is provided).

---

[1] http://ec.europa.eu/transparency/regexpert/index.cfm?do=groupDetail.groupDetail&groupID=3394
[2] European Commission's "Action Plan on Building a Capital Markets Union", 30/09/2015.
http://ec.europa.eu/finance/capital-markets-union/docs/building-cmu-action-plan_en.pdf
[3] An expert group, set up by the Commission and chaired by Alberto Giovannini, diagnosed 15 operational, legal and tax barriers to integrated financial markets in Europe in the clearing and settlement space. The Giovannini Group published their analysis and proposals in two reports in 2001 and 2003:
http://ec.europa.eu/internal_market/financial-markets/docs/clearing/first_giovannini_report_en.pdf;
http://ec.europa.eu/internal_market/financial-markets/docs/clearing/second_giovannini_report_en.pdf

**European Post Trade Forum Report**

1. Introduction

This Report is structured as follows: The Executive Summary in Chapter 2 includes a brief overview of the current state of post trade reform, regulatory initiatives in the post trade space and a high-level assessment of the dismantling of the Giovannini Barriers, and focuses on the EPTF Barriers that are accredited the highest priority for required solution in the context of CMU.

Chapter 3 comprises an abstract of the detailed analysis of the current European post trade landscape.

The subsequent chapters of the Report (Chapters 4 to 7) describe the individual barriers in the operational, structural, legal and tax space, their consequences and impact as well as the proposed solutions. Chapter 8, a "watchlist", deals with issues and bottlenecks that require ongoing monitoring. The final Chapter 9 provides brief explanations of the rationale of considering some of the Giovannini Barriers as fully dismantled or as not requiring further actions.


The following annexes are included at the end of this Report:

Annex 1: List of EPTF Members

Annex 2: List of acronyms

Annex 3: Detailed analysis of the European Post Trade Landscape[4]

---

[4] Annex 3 is available as a separate document here:
http://ec.europa.eu/info/files/170515-eptf-report-annex-3_en

# 1.1. Table of Contents

**European Post Trade Forum Report** .............................................................................................**3**

**1. Introduction** ............................................................................................................. 3

**1.1. Table of Contents** ................................................................................................. 5

**1.2. List of Figures** ...................................................................................................... 9

**2. Executive Summary** ..............................................................................................**11**

**2.1. Brief Overview of Current State of Post Trade Reform** ...............................**11**

2.1.1. Regulatory Initiatives ......................................................................................... 11

2.1.2. Current State of Dismantling the Giovannini Barriers ................................... 11

**2.2. Major Unresolved Issues** ...................................................................................**12**

**3. Abstract of the Detailed Analysis of the Current Post Trade Landscape** ................**15**

**3.1. Definition of Post Trade and its Role in the Financial Sector** ...................**15**

**3.2. Brief Description of Post Trade Services** ........................................................**16**

3.2.1. CCP Clearing ......................................................................................................... 16

3.2.2. Settlement ............................................................................................................. 16

3.2.3. Asset Servicing ..................................................................................................... 16

3.2.4. Post Trade Reporting ........................................................................................... 16

**3.3. High level outline of post trade service providers and market structures** ................**17**

3.3.1. Financial market infrastructures ....................................................................... 17

3.3.2. Banks and custodians ......................................................................................... 18

**3.4. Impact of Fintech / Distributed Ledger Technology** ...................................**19**

**Synthetic View of Barriers** .....................................................................................**21**

**Comparative listing of "Giovannini Barriers" vs "EPTF Barriers"** ...........................**22**

**List of "EPTF Barriers"** ............................................................................................**24**

**4. Operational Barriers** ...........................................................................................**27**

**Introduction** ............................................................................................................**27**

**EPTF BARRIER 1: Fragmented corporate actions and general meeting processes** ..........**28**

1. Description of the Barrier .......................................................................................... 28

2. Consequences of the Barrier ..................................................................................... 29

3. Proposed way forward ............................................................................................... 32

**EPTF BARRIER 2: Lack of convergence and harmonisation in information messaging standards** .............................................................................................................**34**

1. Description of the Barrier .......................................................................................... 34

2. Consequences of the Barrier ..................................................................................... 37

3. Proposed way forward ............................................................................................... 39

**EPTF BARRIER 3: Lack of harmonisation and standardisation of ETF processes** ............**43**

1. Description of the Barrier ...................................................................................................... 43

2. Consequences of the Barrier .................................................................................................. 44

3. Proposed way forward ........................................................................................................... 44

## *5. Structural Barriers* .................................................................................... **45**

**Introduction** ..........................................................................................................**45**

**EPTF BARRIER 4: Inconsistent application of asset segregation rules for securities accounts**..................................................................................................................**46**

1. Description of the Barrier ...................................................................................................... 46

2. Consequences of the Barrier .................................................................................................. 49

3. Proposed way forward ........................................................................................................... 49

4. Diverging view ....................................................................................................................... 51

**EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes** ........................................................................................................**52**

1. Description of the Barrier ...................................................................................................... 52

2. Consequences of the Barrier .................................................................................................. 56

3. Proposed way forward ........................................................................................................... 56

4. Diverging view ....................................................................................................................... 58

**EPTF BARRIER 6: Complexity of post-trade reporting structure** ...........................................**60**

1. Description of the Barrier ...................................................................................................... 60

2. Consequences of the Barrier .................................................................................................. 63

3. Proposed way forward ........................................................................................................... 64

**EPTF BARRIER 7: Unresolved issues regarding reference data and standardised identifiers** ...............................................................................................................................................**67**

1. Description of the Barrier ...................................................................................................... 67

2. Consequences of the Barrier .................................................................................................. 68

3. Proposed way forward ........................................................................................................... 68

## *6. Legal Barriers* ....................................................................................... **71**

**Introduction** ..........................................................................................................**71**

**EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures** ...........................................**72**

1. Description of the Barrier ...................................................................................................... 72

2. Consequences of the Barrier .................................................................................................. 79

3. Proposed way forward ........................................................................................................... 79

4. Diverging view ....................................................................................................................... 82

**EPTF BARRIER 9: Deficiencies in the protection of client assets as a result of the fragmented EU legal framework for book entry securities**..................................................**84**

1. Description of the Barrier ...................................................................................................... 84

2. Consequences of the Barrier .................................................................................................. 87

3 .Proposed way forward ........................................................................................................... 87

**EPTF BARRIER 10: Shortcomings of EU rules on finality**........................................................**90**

1. Description of the Barrier .................................................................................................. 90

2. Consequences of the Barrier ............................................................................................ 93

3. Proposed way forward ..................................................................................................... 94

**EPTF BARRIER 11: Legal uncertainty as to ownershiprights in book entry securities and third party effects of assignment of claims** ........................................................................ 95

1. Description of the Barrier .................................................................................................. 95

2. Consequences of the Barrier ............................................................................................ 97

3. Proposed way forward ..................................................................................................... 98

*7. Tax Barrier* .................................................................................................................... **101**

**Introduction** .................................................................................................................... **101**

**EPTF BARRIER 12: Inefficient withholding tax collection procedures** ........................... **102**

1. Description of the Barrier .................................................................................................102

2. Consequences of the Barrier ...........................................................................................102

3. Proposed way forward ....................................................................................................105

*8. Barriers on Watchlist* .................................................................................................... **111**

**Introduction** .................................................................................................................... **111**

**EPTF BARRIER WL1: National restrictions on the activity of primary dealers and market makers** ............................................................................................................................. **112**

1. Description of the Barrier .................................................................................................112

2. Consequences of the Barrier ...........................................................................................113

3. Proposed way forward ....................................................................................................114

**EPTF BARRIER WL2: Obstacles to DvP settlement in foreign currencies at CSDs** ......... **115**

1. Description of the Barrier .................................................................................................115

2. Consequences of the Barrier ...........................................................................................117

3. Proposed way forward ....................................................................................................117

**EPTF BARRIER WL3: Issues regarding intraday credit to support settlement** ............... **118**

1. Description of the Barrier .................................................................................................118

2. Consequences of the Barrier ...........................................................................................119

3. Proposed way forward ....................................................................................................120

**EPTF BARRIER WL4: Insufficient collateral mobility** .................................................... **122**

1. Description of the Barrier .................................................................................................122

2. Consequences of the Barrier ...........................................................................................125

3. Proposed way forward ....................................................................................................125

**EPTF BARRIER WL5: Non-harmonised procedures to collect transaction taxes** ........... **126**

1. Description of the Barrier .................................................................................................126

2. Consequences of the Barrier ...........................................................................................126

3. Proposed way forward ....................................................................................................127

*9. Dismantled Barriers* ...................................................................................................... **129**

**Introduction** .................................................................................................................... **129**

**BARRIER GB 2 and 5: Need for multiple infrastructure memberships** ........................... **130**

European Post Trade Forum Report

1.1. Table of Contents

1. Description of the Barrier .......................................................................................................130

2. Developments since the Giovannini Reports ...........................................................................130

3. Present status of the Barrier ...................................................................................................131

**BARRIER GB 4: absence of intraday settlement finality**.................................................. **133**

1. Description of the Barrier .......................................................................................................133

2. Developments since the Giovannini Reports ...........................................................................134

3. Present status of the Barrier ...................................................................................................134

**BARRIER GB 6: Differences in settlement periods – remaining issues at global level.** **136**

1. Description of the Barrier .......................................................................................................136

2. Developments since the Giovannini Reports ...........................................................................136

3. Present status of the Barrier ...................................................................................................137

**BARRIER GB 7: Operating hours and settlement deadlines** ............................................. **139**

1. Description of the Barrier .......................................................................................................139

2. Developments since the Giovannini Reports ...........................................................................139

3. Present status of the Barrier ...................................................................................................139

***Annexes*** *.........................................................................................................................* ***141***

**List of annexes**............................................................................................................. **141**

**Annex 1: List of EPTF Members**................................................................................ **143**

**Annex 2: List of acronyms** .......................................................................................... **145**

**Annex 3: Detailed analysis of the European Post Trade Landscape**................................... **149**

## *1.2. List of Figures*

Figure 1: Financial industry value chain ................................................................................................................15

Figure 2: CCP's "default waterfall" ........................................................................................................................17

Figure 3: Market Standards for Corporate Actions Processing.........................................................................30

Figure 4 Statistical compliance of T2S markets with the T2S corporate actions standards.......................31

Figure 5: Cost of reference data ...............................................................................................................................38

Figure 6: ESMA guidance on EMIR reporting (TR questions)..........................................................................62

15th May 2017

**European Post Trade Forum Report**

1.2. List of Figures

# 2. Executive Summary

## *2.1. Brief Overview of Current State of Post Trade Reform*

### 2.1.1. Regulatory Initiatives

In addition to earlier EU post trade legislation such as the Settlement Finality Directive of 1998 and the Financial Collateral Directive of 2002, the following are the **most important pieces of legislation**, introduced subsequent to the financial crisis of 2007/2008, focusing on the **core post trade functionalities** of clearing and settlement and respective financial market infrastructure:

- **EMIR:** The Regulation (EU No 648/2012) introduces mandatory clearing through CCPs of standardised OTC derivatives and reporting to Trade Repositories (TRs) of all derivatives. It establishes a unified European regulatory framework for CCPs and TRs, including organisational, conduct of business and prudential requirements. It also establishes rules for protection of clients in the event of failure of a CCP participant.

- **CSDR**: The Regulation (EU No 909/2014) aims at (i) increasing the safety of settlement, in particular for cross-border transactions, by introducing a settlement discipline regime (ii) increasing the efficiency of settlements by introducing a true internal market for the operations of CSDs and (iii) increasing the safety of CSDs by applying high prudential requirements in line with international standards.

- **SFTR:** The Regulation (EU 2015/2365) is set to improve the transparency of certain financial transactions and help supervisors and investors better understand risks. It enhances transparency in three ways:

  o It introduces the reporting of all Securities Financing Transactions (SFTs), except those concluded with central banks, to TRs;

  o Investment funds have to disclose information on the use of SFTs and total return swaps to investors;

  o SFTR introduces minimum transparency conditions on the reuse of collateral.

### 2.1.2. Current State of Dismantling the Giovannini Barriers

The following Giovannini Barriers (GB) have been dismantled:

- GB 2 & 5: Practical impediments to access to national clearing and settlement systems

- GB 4: Absence of intra-day settlement finality in CSDs

- GB 6: National differences in settlement periods

- GB 7: National differences in operating hours/settlement deadlines.

Chapter 9 describes the reasons for the EPTF's assessment that these barriers are dismantled or not in need of further action.

## *2.2. Major Unresolved Issues*

This Report covers major unresolved issues measured in the context of CMU against the objective of an integrated, safe and efficient post trade system in Europe that originate from non-dismantled Giovannini Barriers, Giovannini Barriers that changed their nature and new barriers and bottlenecks.

The following EPTF Barriers should obtain, in the view of EPTF members, the highest priority to be resolved and dismantled.

---

**EPTF Barrier 12: Inefficient withholding tax collection procedures**

**– a barrier to efficient cross-border investments**

Inefficient withholding tax recovery procedures, including the lack of a relief-at-source system, where applicable, are a major barrier to efficient cross-border investments.

Solutions have been developed at international and at EU level; they need to be implemented by Member States with guidance of the European Commission as one of the highest priorities of a CMU Action Plan.

The dismantling of this barrier will have positive synergy effects to the EPTF Barriers 4 and 5 (Asset Segregation, Registration).

---

**EPTF Barriers 8, 9, 10, 11: Legal inconsistencies and uncertainties**

**– a barrier to a successful capital market union**

A strong legal framework which operates consistently across the EU is an essential requirement for a successful capital markets union.

The EPTF's operationally driven approach defines the following legal areas as highest priorities for regulatory initiatives of the European Commission:

- Risk protection to provide more robust netting, collateral and default-management arrangements.

- Investor protection to ensure investors' ownership rights in a dematerialised environment through the custody chain.

- Amended rules of settlement finality to reduce risks for infrastructures and their users.

- Conflict of laws rules to create legal certainty.

The proposed solutions are closely linked to EPTF Barriers 1 (Corporate Actions), 4 (Asset Segregation) and 5 (Registration).

---

---

**EPTF Barrier 1: Fragmented corporate actions and general meeting processes**

**– a risk that successful barrier dismantling work is jeopardised by renewed fragmentation**

One of the most complex areas of post trade services is related to the processing of corporate action events and general meetings. This area is in an advanced state of being harmonised and standardised through industry and Target2-Securities (T2S) efforts.

To preserve and support this industry initiative it is vital that in the context of the amended Shareholder Rights Directive the implementing acts of the European Commission and the transposition into national laws by Member States avoid any fragmentation resurfacing.

The dismantling of EPTF Barrier 9 (client asset protection) will have a positive spill-over effect on the determination of investors' entitlements, both of a monetary and participation nature.

---

**EPTF Barrier 4: Inconsistent application of asset segregation rules**

**– providing for safety and efficiency through harmonisation**

Different segregation requirements create inconsistencies and increased costs and risks without increased investor protection in the absence of harmonised insolvency laws.

Amendments should be made to EU and Member States legislation to conform with the principles (i) client assets to be segregated from proprietary assets in an insolvency proof manner and (ii) account structures to be open to investor choice.

The dismantling of EPTF Barrier 9 (client asset protection) will positively correlate to investors' ownership rights irrespective of the account structure.

---

**EPTF 5: Lack of harmonisation in registration and investor identification rules and processes**

**– an obstacle to cross-border securities investment and issuance**

Registration regimes and shareholder transparency practices vary widely from country to country; at cross-border level this translates into increased complexity and cost.

Operational registration procedures and shareholder identification procedures should be harmonised and standardised.

---

**EPTF 6: Complexity of post-trade reporting structure**

**– an obstacle to making the EU an attractive investment destination**

The lack of harmonisation across multiple post trade reporting requirements increases the cost of reporting and the complexity of data analysis.

The European Commission should develop a harmonised and simplified reporting 'package' for post trade relevant EU regulations and rules.

**2. Executive Summary**
2.2. Major Unresolved Issues

# 3. Abstract of the Detailed Analysis of the Current Post Trade Landscape

## *3.1. Definition of Post Trade and its Role in the Financial Sector*

Post trade processes that are in scope of the work of the European Post Trade Forum (EPTF) comprise the services that are performed subsequent to the execution of a trade in the cash securities markets and in the derivatives markets. These services, provided in support to primary and secondary markets, broadly include:

- Clearing

- Settlement

- Asset servicing

- Post-trade reporting.

Post trade processes also include support to investment funds, securities financing (i.e. securities lending and repo transactions), collateral management services and support to issuers of securities.

Post trade services are an **integral part of the financial industry value chain** as the graph below demonstrates. Thus, proceeds of the issuance of financial instruments will only be credited to the issuer's account upon related post trade services having come into play, as will trading counterparties' agreement to buy or sell only be executed, resulting in a change of ownership, as a result of the delivery of post-trade services.

**Figure 1: Financial industry value chain**



Source: EPTF.

Yet, the post-trade landscape in Europe is still characterised by **diversities and fragmentation** that cause **inefficiency and risks.** Operational, fiscal and legal **harmonisation and standardisation** as proposed in the Giovannini Reports are means to increase efficiency and to reduce risks.

Safe, integrated, harmonised and efficient post trading systems are an enabling element in the **context of the key principles of the CMU Action Plan**[5], creating more opportunities for investors, connecting financing to the real economy, fostering a stronger and more resilient financial system, deepening financial integration and increasing competition.

---

[5] *See* CMU Action Plan: http://ec.europa.eu/finance/capital-markets-union/docs/building-cmu-action-plan_en.pdf

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 16 of 150
3. Abstract of the Detailed Analysis of the Current Post Trade Landscape
3.2. Brief Description of Post Trade Services

## *3.2. Brief Description of Post Trade Services*

### 3.2.1. CCP Clearing

CCP clearing is a post trade service performed by CCPs (see description in 3.3.1.1. below) that guarantees reciprocal counterparty performance and is used for derivatives, equities and fixed income instruments. CCPs also clear repo and securities lending transactions.

### 3.2.2. Settlement

The European Central Securities Depositories Regulation, CSDR, defines settlement as "the completion of a securities transaction where it is concluded with the aim of discharging the obligations of the parties to that transaction through the transfer of cash or securities or both".

In relation to **securities settlement**, the buyer receives the purchased securities and the seller receives the corresponding cash in exchange for those securities. The exchange of cash and securities is usually carried out in a Securities Settlement System (SSS) operated by a Central Securities Depository, CSD (see description in 3.3.1.2. below), using a procedure known as Delivery versus Payment (DvP), a settlement mechanism which links the securities transfer and a funds transfer in such a way as to ensure that one transfer occurs if, and only if, the other transfer occurs.

**Investment fund units** may either be CSD-eligible and settle as described above, or settle with a Transfer Agent (TA).

**Exchange Traded Derivatives** (ETD) may be settled in cash or physically. ETDs are usually settled in cash, whereby the settlement amount results from the difference between the entry price and the settlement price. In the case of physically settled ETDs, settlement will take place though delivery or receipt of the underlying asset.

Over-the-counter (OTC) Derivatives are mostly settled in cash.

### 3.2.3. Asset Servicing

The term "asset servicing" relates to the processing of **events during the life of a security**. From the point of view of an investor, the terms relate to the process whereby an investor is able to **benefit from rights or exercise rights** relating to the holding of a securities position. Asset services include custody services and related corporate action processing, tax processes, registration processes, shareholder identification processes and general meeting processes, as well as value added and ancillary services.

Corporate actions may also have an impact on derivatives, repos and securities lending transactions.

### 3.2.4. Post Trade Reporting

In the aftermath of the 2008 crisis, enhanced, or in some cases new, mandatory post-trade reporting regulations and rules have been implemented in the majority of key global jurisdictions requiring the reporting of individual transactions and/or positions of nominated participants. Complementary to reporting requirements at national level, within the EU, the regulations include but are not limited to MiFIR, EMIR, SFTR and REMIT.

Case 1:18-md-02865-LAK     Document 836-31     Filed 06/27/22     Page 17 of 150

3. **Abstract of the Detailed Analysis of the Current Post Trade Landscape**
3.3. High level outline of post trade service providers and market structures

Post trade reporting is typically performed by intermediaries, i.e. financial market infrastructures and banks / custodians through Trade Repositories (see description in 3.3.1.3. below).

## *3.3. High level outline of post trade service providers and market structures*

### 3.3.1. Financial market infrastructures

#### 3.3.1.1. Central Counterparties, CCPs

A CCP interposes itself between the two trading parties becoming the buyer to every seller and the seller to every buyer – the CCP takes on the liability for settlement. The main function of a CCP is therefore to guarantee the reciprocal performance of obligations between buyers and sellers (i.e. the counterparties) of financial instruments (e.g. shares, bonds and derivatives) negotiated on trading venues (e.g. a stock exchange) or bilaterally between trading parties (Over-The-Counter, OTC) through a process called clearing.

A **CCP's resources to manage the risks assumed** from taking on the liability for settlement are shown in the graph below.

Figure 2: CCP's "default waterfall"



Source: EACH, EPTF.

For events **unrelated to the default of a clearing member** (e.g. cyber-attack, fraud), EMIR defines a set of capital requirements that CCPs should maintain to address any losses caused by such an event. These resources should at all times be sufficient to ensure recovery from such risks or, where necessary, an orderly winding-down or restructuring of the activities over an appropriate time span.

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 18 of 150
3. Abstract of the Detailed Analysis of the Current Post Trade Landscape
3.3. High level outline of post trade service providers and market structures

Risk mitigation is the primary function of a CCP. A CCP independently and continuously manages the risk of counterparties and ensures there are sufficient resources available to deal with extreme but plausible market events.

Another useful function that a CCP can provide is "netting". If a counterparty buys and sells the same financial instruments in a day, these transactions can also be netted, reducing the total number of financial instruments to be received or delivered, thus reducing its exposure.

The European **market structure** in the clearing space is currently characterised by 17 EU CCPs that are authorised by the national competent authorities of their home Member States and 28 third country CCPs recognised by ESMA under EMIR and their direct and indirect clearing members, as well as their clients (typically the trading parties).

In the cash securities space, a number of interoperability links have been established, and allow clearing members belonging to different CCPs to clear trades with each other. Interoperability in the derivatives space is currently not a prevalent feature of the post-trade landscape.

### 3.3.1.2. Central Securities Depositories, CSDs

Historically, CSDs across Europe have been established along national lines (on the basis of legal statutes or as a specialised financial institution) to provide a local **venue for the settlement of securities** at the level of a national exchange. The listing practices and needs of local investors, as well as national legal and regulatory concepts and traditions, have driven the development of domestic services.

Following the support received from almost all euro area CSDs as well as from the European Parliament and Council, the Governing Council of the ECB launched the **Target2-Securities** (T2S) project in July 2008. The goal was to integrate and harmonise Europe's securities settlement landscape. This would be achieved by means of a single technical platform for settlement in central bank money. T2S was launched in July 2015 and its final migration wave is planned for September 2017. It already settles close to 90% of all securities transactions in central bank money in euro.

The main actors of the **market structure** in regard of settlement are CSDs[6], Central Banks and CSD participants. One of the overriding objectives of T2S is to foster competition between CSDs and contribute to financial integration. Other factors that make the CSD landscape increasingly competitive are CSDR provisions on issuer choice and the passporting of CSD services, access considerations in MiFID and MiFIR and settlement internalisation by CSD participants.

### 3.3.1.3. Trade Repositories

Trade Repositories, TRs, centrally collect and maintain the records of derivatives (based on EMIR) and securities financing transactions (based on SFTR). They play a central role in enhancing the transparency of derivative markets securities financing markets and reducing risks to financial stability.

### 3.3.2. Banks and custodians

Banks and custodians play a critical role as intermediaries with respect to trading and post-trading services. Given the reality of large numbers of financial market infrastructures both in Europe and

---

[6] Across 37 European countries there are 41 national and international CSDs.

globally, individual market participants are often unable to access all these infrastructures directly. In order to be able to access these infrastructures, and thus to participate in the markets which these infrastructures serve, market participants need to be able to use intermediaries.

Banks and custodians as intermediaries offer to differing degrees inter alia the following services:

- providing the post trading services to new and existing issues, and to their issuers;

- offering clearing and settlement services to end investors;

- acting as Global Custodian or Sub-Custodians connecting issuers and end investors in the custody chain and offering asset servicing services;

- performing the role of GCMs of CCPs and participants of CSDs;

- providing specialised services in the area of securities financing and collateral management.

These post-trade services can be provided in relation to cash securities (including investment funds), securities financing (repo and securities lending) and derivatives.

### *3.4. Impact of Fintech / Distributed Ledger Technology*

The digital transformation of society will need to be taken into account when considering the way financial entities relate with their customers: from ensuring electronic access to providing more targeted financial advice through data analytics. Digitisation will also bring opportunities to develop sounder markets and increase efficiency. A thorough fitness check by the EU of the existing regulatory framework is necessary to ensure the current framework is up to date, future-proof and does not impede innovation and competitiveness in the Digital Single Market for financial services. At the same time, financial innovation should not introduce new risks.

In particular, the EPTF takes the view[7] that developments in the Fintech / Distributed Ledger Technology (DLT) domain could have a significant impact on post trade services, related operational processes and regulatory requirements. However, at this stage an assessment of such impact appears difficult if not impossible.

As the proposed actions target to a large extent harmonisation and standardisation, in order to increase efficiency and safety of European post trade, the EPTF considers them useful in a Fintech / DLT environment too.

With this in mind and given uncertainties in regard of scope and time, as well as the safety and efficiency of DLT solutions, the EPTF, when developing proposed solutions to identified barriers, has not relied on Fintech / DLT applications, but considers that they might in the future contribute possible solutions to certain of the diagnosed issues.

---

[7] See also Chapter 8 of Annex 3.

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 20 of 150

**3. Abstract of the Detailed Analysis of the Current Post Trade Landscape**
3.4. Impact of Fintech / Distributed Ledger Technology

# Synthetic View of Barriers

The following tables provide a synthetic view of the current status of the Barriers:

- Comparative listing of "Giovannini Barriers" vs "EPTF Barriers"

- List of "EPTF Barriers"

15th May 2017

**Synthetic View of Barriers**
Comparative listing of "Giovannini Barriers" vs "EPTF Barriers"

## Comparative listing of "Giovannini Barriers" vs "EPTF Barriers"

| GB Barrier nr. | GB Barrier Title | Responsible entity (1) | EPTF Barrier nr. | EPTF Barrier Title | Notes |
|---|---|---|---|---|---|
| I. Barriers related to technical requirements/market practice. | | | | | |
| GB 1 | National differences in information technology and interfaces | Private Sector (SWIFT) | EPTF 2 | Lack of convergence and harmonisation in information messaging standards | |
| GB 2 | National clearing and settlement restrictions that require the use of multiple systems. | National governments | XX | | Barrier dismantled |
| GB 3 | Differences in national rules relating to corporate actions, beneficial ownership and custody | Private Sector (ECSA, ECSDA) | EPTF 1 | Fragmented corporate actions and general meeting processes | |
| GB 4 | Absence of intra-day settlement finality | Private Sector (ECSDA) | XX | | Barrier dismantled |
| GB 5 | Practical impediments to remote access to national clearing and settlement systems | National governments | XX | | Barrier dismantled |
| GB 6 | National differences in settlement periods | Private Sector | XX | | Barrier dismantled |
| GB 7 | National differences in operating hours/settlement deadlines | Private Sector (ECSDA) | XX | | Barrier dismantled in T2S markets |
| GB 8 | National differences in securities issuance practice | Private Sector (IPMA, ANNA) | EPTF 7 | Unresolved issues regarding reference data and standardised identifiers | Merged with GB 9 |
| GB 9 | National restrictions on the location of securities | National governments | | | Merged with GB 8 |
| GB 10 | National restrictions on the activity of primary dealers and market makers | National governments | EPTF WL1 | National restrictions on the activity of primary dealers and market makers | |
| II. Barriers related to taxation | | | | | |
| GB 11 | Domestic withholding tax regulations serving to disadvantage foreign intermediaries | National governments | EPTF 12 | Inefficient withholding tax collection procedures | |

**Synthetic View of Barriers**

Comparative listing of "Giovannini Barriers" vs "EPTF Barriers"

15th May 2017

| GB Barrier nr. | GB Barrier Title | Responsible entity (1) | EPTF Barrier nr. | EPTF Barrier Title | Notes |
|---|---|---|---|---|---|
| GB 12 | Transaction taxes collected through a functionality integrated into a local settlement system | National governments | EPTF WL5 | Non-harmonised procedures to collect transaction taxes | |
| III. Barriers relating to legal certainty | | | | | |
| GB 13 | The absence of an EU-wide framework for the treatment of interests in securities | National governments | EPTF 9 | Deficiencies in the protection of client assets as a result of the fragmented EU legal framework for book entry securities | |
| GB 14 | National differences in the legal treatment of bilateral netting for financial transactions | National governments | EPTF 8 | Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures | |
| GB 15 | Uneven application of national conflict of law rules | National governments | EPTF 11 | Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims | |

(1) "Responsibility", as indicated in the 2nd Giovannini Report 2003

**Synthetic View of Barriers**
List of "EPTF Barriers"

*List of "EPTF Barriers"*

| EPTF Barrier nr. | EPTF Barrier Title | Priority (2) | Responsible entity (2) | Chapter | Synergies and dependencies | GB Barrier nr. |
|---|---|---|---|---|---|---|
| | I. Operational Barriers | | | | | |
| EPTF 1 | Fragmented corporate actions and general meeting processes | High | Private sector (all relevant parties), EU and national policy makers | Operational Barriers | EPTF 2 (messaging standards), EPTF 5 (shareholder registration), EPTF 9 (client asset protection) and EPTF 11 (ownership rights) | GB 3 |
| EPTF 2 | Lack of convergence and harmonisation in information messaging standards | High | Market participants and regulators | Operational Barriers | | GB 1 |
| EPTF 3 | Lack of harmonisation and standardisation of ETF processes | Medium | Private sector, EU Commission | Operational Barriers | | New |
| | II. Structural Barriers | | | | | |
| EPTF 4 | Inconsistent application of asset segregation rules for securities accounts | High | EU Commission and Member States | Structural Barriers | EPTF 9 (client asset protection) and EPTF 11 (ownership rights) | New |
| EPTF 5 | Lack of harmonisation of registration and investor identification rules and processes | High | Private sector, EU Commission and Member States | Structural Barriers | EPTF 2 (messaging standards) | New |
| EPTF 6 | Complexity of post-trade reporting structure | High | EU Commission | Structural Barriers | EPTF 2 (messaging standards) | New |
| EPTF 7 | Unresolved issues regarding reference data and standardised identifiers | Medium | EU Commission | Structural Barriers | | GB 8 & 9 redefined and combined |
| | III. Legal Barriers | | | | | |
| EPTF 8 | Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures | High | EU Commission | Legal Barriers | EPTF 11 (ownership rights) | GB 14 |

**Synthetic View of Barriers**
List of "EPTF Barriers"

| EPTF Barrier nr. | EPTF Barrier Title | Priority (2) | Responsible entity (2) | Chapter | Synergies and dependencies | GB Barrier nr. |
|---|---|---|---|---|---|---|
| EPTF 9 | Deficiencies in the protection of client assets as a result of the fragmented EU legal framework for book entry securities | High | EU Commission | Legal Barriers | EPTF 4 (asset segregation) and EPTF 11 (ownership rights) | GB 13 |
| EPTF 10 | Shortcomings of EU rules on finality | High | EU Commission | Legal Barriers | EPTF 8 (risk mitigation) | New |
| EPTF 11 | Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims | High | EU Commission | Legal Barriers | EPTF 9 (client asset protection) | GB 15 |
| IV. Tax Barriers | | | | | | |
| EPTF 12 | Inefficient withholding tax collection procedures | High | EU Commission and Member States | Tax Barriers | EPTF 4 (asset segregation) and EPTF 5 (shareholder registration) | GB 11 |
| V. Barriers on Watchlist | | | | | | |
| EPTF WL1 | National restrictions on the activity of primary dealers and market makers | Watchlist | | Watchlist | | GB 10 |
| EPTF WL2 | Obstacles to DvP settlement in foreign currencies at CSDs | Watchlist | | Watchlist | | New |
| EPTF WL3 | Issues regarding intraday credit to support settlement | Watchlist | | Watchlist | | New |
| EPTF WL4 | Insufficient collateral mobility | Watchlist | | Watchlist | | New |
| EPTF WL5 | Non-harmonised procedures to collect transaction taxes | Watchlist | | Watchlist | | GB 12 |

(2) "Priority" and "Responsibility", as indicated in the EPTF Report.

15th May 2017

25

**Synthetic View of Barriers**
List of "EPTF Barriers"

# 4. Operational Barriers

## *Introduction*

The First Giovannini (2001) Report identified six so-called "industry barriers"[8] :

- Giovannini Barrier 1: Diversity of IT platforms

- Giovannini Barrier 3: Corporate actions

- Giovannini Barrier 4: Absence of intra-day settlement finality

- Giovannini Barrier 6: Differences in standard settlement periods

- Giovannini Barrier 7: Different operating hours / settlement deadlines

- Giovannini Barrier 8: Differences in securities issuance

The CESAME group report concluded in 2008 that "While [Giovannini] Barrier 8 (…) has been dismantled, more work needs to be done on the other [industry] barriers"[9]. The EPTF discussions in 2016 / 2017 led to the conclusion that Giovannini Barriers 4, 6 and 7 had been removed as well since 2008, under the double beneficial impact of the CSD Regulation and the launch of T2S.

Giovannini Barriers 1 and 3, already identified at the time of the Giovannini Reports and of the CESAME Group as the most complex ones, are still unanimously considered today as not being (to various degrees) removed and, as such, they are still deemed serious obstacles to a smooth functioning of an integrated European financial market. These are the two remaining Giovannini Barriers addressed in this chapter. A new operational barrier will also be addressed in this chapter, namely the EPTF Barrier 3 on Exchange Traded Funds (ETFs).

This chapter therefore includes the following EPTF Barriers:

- <u>EPTF Barrier 1:</u> Fragmented corporate actions and general meeting processes (formerly Giovannini Barrier 3);

- <u>EPTF Barrier 2:</u> Lack of convergence and harmonisation in information messaging standards (formerly Giovannini Barrier 1);

- <u>EPTF Barrier 3:</u> Lack of harmonisation and standardisation of ETF processes.

---

[8] As opposed to the so-called "public sector-related" Giovannini Barriers.
[9] CESAME Report – 28 November 2008 – page 11.

## *EPTF BARRIER 1: Fragmented corporate actions and general meeting processes*

Former Giovannini Barrier 3

**Description of the issue:** this barrier relates to one of the most complex areas of post trade, the exercise of investors' rights in relation to corporate actions and general meetings. National differences in the rules governing corporate actions processing and general meetings-related operational processes increase costs and operational risks, particularly in a cross-border environment where the ability to exercise the rights flowing from securities may be jeopardised.

All relevant constituencies (i.e. issuers, financial market infrastructures, intermediating custodians and investors) have already agreed and endorsed market standards (both for Corporate Actions Processing and for General Meetings) and the process of implementing the Market Standards for Corporate Actions Processing in major markets is well advanced. But full implementation is still to be completed.

In addition, the endorsement and monitoring of the T2S Corporate Actions Standards by the T2S Advisory Group, has contributed greatly to the harmonisation of corporate action rules and procedures, at least in the 21 T2S markets.

**Priority:** High.

**Summary of proposed action:** continuation and finalisation of the process of implementing the two sets of market standards. The amended Shareholder Rights Directive will provide a meaningful boost to the process of implementing the Market Standards for General Meetings. A re-surfacing of fragmentation at national level for corporate actions and general meetings processes should be avoided by consistent level 2 regulation.

**Responsibility:**

• Industry to finalise the process of implementing the two sets of market standards.

• Policy makers at European and at national level to consider the two sets of market standards to the highest possible extent when adopting the implementing acts and transposing Articles 3b and 3c of the amended Shareholders Rights Directive[10] respectively.

### 1. Description of the Barrier

As outlined in the Giovannini Reports, this barrier relates to national differences in the rules governing corporate actions processing and general meetings related operational processes. This barrier covers a broad range of topics including operational and legal issues[11].

The fact that the standard setting industry working groups have developed and agreed more than 120 standards for corporate actions processing and more than 30 standards for general meetings is proof of the divergences that required harmonisation and standardisation. In addition, the T2S

---

[10] The revised Shareholders Rights Directive (SRD2) was agreed by the European Parliament and the Council in March 2017 but at the time of issue of this Report had not been published in the Official Journal of the EU. The text which the EPTF has used to compile this Report is document number PE-CONS 2/17 dated 23 March 2017.
[11] For a more detailed description of issues see Annex 3, chapter 3.6. Asset Servicing, in particular sections 3.6.3.1., 3.6.3.2., 3.6.3.7., 3.6.3.8..

community of stakeholders has developed another set of 59 standards for the processing of corporate actions on flows, i.e. pending transactions, in T2S, which are based on the market corporate action standards.

The change of laws made by Member States, e.g. France and Germany, to become compliant with market standards demonstrates the degree of fragmentation that existed prior to the change of laws.

In relation to the regulatory framework, articles 3b and 3c of the agreed amended Shareholders Rights Directive[12] regulate the transmission of information and the facilitation of the exercise of shareholder rights both for corporate actions and the right to participate and vote in general meetings.

## 2. Consequences of the Barrier

This barrier relates to one of the most complex areas of post trade, the exercise of shareholders' rights in relation to corporate actions and general meetings. The lack of harmonisation and standardisation of operational processes increases costs and operational risks, particularly in a cross-border environment where the ability to exercise the rights flowing from securities, in particular rights related to general meetings, may be jeopardised. The elimination of these shortcomings and inefficiencies is a key element of successful European post trade reform and at the same time a major post trade contribution to a single European capital market.

Therefore, industry has made a significant effort to develop standards for corporate actions[13] processing and for general meetings[14] and their implementation in all European markets:

- All relevant constituencies, i.e. issuers, financial market infrastructures (including connectivity channels and reference data providers), intermediating custodians and investors have agreed and endorsed some 120 Market Standards for Corporate Actions Processing in 2009 and 31 Market Standards for General Meetings in 2010.

- National Market Implementation Groups are tasked with implementing the Market Standards for Corporate Actions Processing in their respective markets; their representatives participate in semi-annual / annual workshops of the European Market Implementation Group (E-MIG), the remit of which is to monitor the state of implementation by means of standardised progress reports. National legislators have supported the implementation process by changes of law, where required (e.g. Germany and France).

The process of implementing the Market Standards for Corporate Actions Processing in major markets is well advanced as the figure below indicates. For the state of implementation of the standards in all markets see all progress reports on Section 3.6.3.3.3. of Annex 3.

---

[12] The revised Shareholders Rights Directive (SRD2) was agreed by the European Parliament and the Council in March 2017 but at the time of issue of this Report had not been published in the Official Journal of the EU. The text of SRD2 which the EPTF has used to compile this Report is document number PE-CONS 2/17 dated 23 March 2017 located at http://data.consilium.europa.eu/doc/document/PE-2-2017-INIT/en/pdf, and the article numbers referred to in this Report are taken from that version.
[13] http://www.afme.eu/globalassets/downloads/briefing-notes/afme-cajwg-standards-revised-version-2012-updated-2015.pdf
[14] http://www.ebf-fbe.eu/uploads/Market%20Standards%20for%20General%20Meetings.pdf

**4. Operational Barriers**
EPTF BARRIER 1: Fragmented corporate actions and general meeting processes

Figure 3: Market Standards for Corporate Actions Processing





Source: Documentation E-MIG workshop, November 2016 in Madrid.

- The conclusions of the E-MIG workshop held in Madrid in November 2016 showed that most major markets are expected to be fully compliant with the Market Standards for Corporate Actions Processing in 2017/18, while other markets, in particular central and eastern European markets make significant efforts to this end.

- The amended Shareholder Rights Directive will provide a meaningful boost to the process of implementing the Market Standards for General Meetings.

With the aim of supporting the implementation of the market standards as well as fostering settlement efficiency in T2S, the T2S Advisory Group (AG)[15] has defined and endorsed the T2S corporate action standards on flows[16], i.e. pending transactions. These standards are based on and aligned to, the market standards and provide a detailed single rule book for the settlement of corporate actions for the 21 T2S markets covering 23 CSDs.

It should be mentioned that although the AG is directly monitoring the T2S corporate action Standards, it also assesses the results of the EMIG monitoring on the market standards. This has

---

[15] The T2S Advisory Group (AG) represents the T2S community of stakeholders, i.e. NCBs, CSDs and their users. http://www.ecb.europa.eu/paym/t2s/governance/ag/html/index.en.html. The newly established Advisory Group on Market Infrastructures for Securities and Collateral ("AMI-SeCo") replaces the T2S Advisory Group.

[16] https://www.ecb.europa.eu/paym/t2s/governance/ag/html/subcorpact/index.en.html

worked as a catalyst for the T2S markets also to comply with the market standards as in many cases compliance with these standards is a prerequisite to comply with the T2S standards.

The latest results on the T2S markets compliance with the T2S as well as the market corporate action standards can be found in the Seventh T2S harmonisation progress report published by the AG on 31 January 2017[17].

**Figure 4 Statistical compliance of T2S markets with the T2S corporate actions standards**



Source: October 2016 CASG[18] gap analysis report[19].

A separate issue which is not addressed by the market standards mentioned above relates specifically to the processing of corporate actions in the case of securities financing transactions (SFTs[20]). In the case of SFTs, the Seller/Lender of securities has a contractual right to receive any proceeds from corporate actions, in particular coupon and dividend payments, although these will be paid to the Buyer/Borrower, as legal owner of the security. In the case of coupon or dividend payments this is typically achieved through a contractual compensatory payment from the Buyer/Borrower to the Seller/Lender. Unlike in the US, in Europe this process is however still very manual, as custodians and CSDs are in most cases not able to distinguish SFTs from cash trades and thus not able to automate the income collection process for SFTs. This means that firms have to process a claim for each payable on an SFT, which can significantly delay the payment/receipt process, result in call backs for the instructions and generally amount to a significant barrier for firms' efficient liquidity management. Implementing a more automated process would require repos and other SFTs to be systematically identified at the level of custodians and market infrastructures. The industry needs to get together to address this problem and upcoming

---

[17] http://www.ecb.europa.eu/paym/t2s/progress/pdf/ag/2017-01-31_7th_T2S_Harmonisation_Progress_Report.pdf?a088b1c2367e7f3ea1bb0448e303002b

[18] http://www.ecb.europa.eu/paym/t2s/governance/ag/html/subcorpact/index.en.html

[19] http://www.ecb.europa.eu/paym/t2s/progress/pdf/subcorpact/20161117_final_consolidated_end_2016_casg_gap_analysis_report.pdf

[20] As defined in Regulation (EU) 2015/2365 (SFTR) http://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32015R2365&rid=1

**4. Operational Barriers**

EPTF BARRIER 1: Fragmented corporate actions and general meeting processes

regulations, such as CSDR and SFTR are expected to provide a further rationale for doing so. However, T2S also has a potentially important role to play in this context, as the platform currently does not allow for a distinction between cash trades and SFTs. Adding such functionality could be a good way forward towards a more automated and more efficient process. In some cases, achieving such a more automated and more efficient process may depend on how national tax rules treat SFTs.

### 3. Proposed way forward

**3.1.     Who should act to address the Barrier**

- **All relevant parties, including issuers, trading venues, CSDs, and intermediaries** should continue and finalise the process of implementing the two sets of market standards, in the case of corporate actions by 2017/2018 for the 8 major markets (France, Germany, Italy, The Netherlands, Spain, Sweden, Switzerland, UK/Ireland)[21].

- The coming into force of the amended Shareholder Rights Directive will strongly support the successful implementation of the general meeting market standards in all European markets as the provisions that cover end-to-end communication between issuers and shareholders and the facilitation of the exercise of rights flowing from securities are essential elements of the two sets of market standards.

- The industry, including intermediaries and market infrastructures, in collaboration with T2S should consider implementing solutions for the identification and processing of SFTs at the level of custodians and infrastructures in order to facilitate the automation of corporate action processing for SFTs. Where necessary, this may involve liaison with national tax authorities.

- **Policy makers at European and at national level** should consider the two sets of market standards to the highest possible extent when adopting the implementing acts and transposing Articles 3b and 3c of the amended Shareholders Rights Directive respectively, to avoid the risk of re-surfacing fragmentation.

### 3.2. By when should that action be taken

- Major European markets should be fully compliant with the standards by 2018.

- Public sector authorities should provide for alignment as described above in the course of SRD level 2 regulation and transposition into national law respectively.

### 3.3. Priority of the Barrier

Proposed priority: high, as

- achieving the complete removal of this barrier is a key element of post trade reform and a major contribution to the CMU project, because it will significantly facilitate cross-border investments;

---

[21] The regular process of monitoring the state of implementing the Market Standards for Corporate Actions Processing covers all European markets. However, in view of the fact that the 8 major markets account for the overwhelming proportion of corporate action events, special attention in the monitoring process is given to them. Details of the state on implementation in all markets are included in Annex 3.

- maintaining the momentum of industry efforts in implementing the two sets of markets standards is essential;

- avoiding any discrepancies between the market standards and the implementing regulations based on the amended Shareholder Rights Directive at EU and at Member States level is of paramount importance to prevent fragmentation in corporate action and general meeting processes.

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 34 of 150
4. Operational Barriers
EPTF BARRIER 2: Lack of convergence and harmonisation in information messaging standards

## *EPTF BARRIER 2: Lack of convergence and harmonisation in information messaging standards*

Former Giovannini Barrier 1

---

**Description of the issue:** national differences particularly in non-T2S markets remain in information technology and interfaces used by post-trade clearing and settlement providers in the cash securities space. Derivatives markets and securities finance transactions are usually not covered by the protocols and standards used in the cash securities markets. Despite standardisation efforts by the industry there remain large differences in information messaging standards, and some market participants primarily active at domestic level are reluctant to fully migrate to the latest international standards. The overall consequences for all markets are a higher processing cost as well as a higher risk of errors due to a greater level of manual processing.

**Priority:** High.

**Summary of proposed action:** digitisation (in order to improve STP), harmonisation (or interoperability when full harmonisation is not possible) and standardisation (common identifiers should be a common basis) should be the guiding principles. As far as cash markets are concerned it is even suggested that the EU authorities could create a compelling event that would accelerate the migration to ISO 20022 message standards or to future globally accepted standards.

**Responsibility:** market participants / regulators.

---

### 1. Description of the Barrier

Barrier 1 was described in the Giovannini Reports as the national differences in information technology (IT) and interfaces used by post-clearing and settlement providers in the cash securities space. The proposed solution was a standardised protocol for communication, including harmonised connections and messaging protocols based on ISO standards (ISO 15022) to be proposed by SWIFT and with contribution from ECSDA. The barrier solution had four main elements: 1. Definition of the Protocol; 2. Message Standards Gap Analysis; 3. Standards availability; and 4. Implementation. The standards setting should cover settlement & reconciliation, corporate actions, collateral management, cash management, clearing and other business processes (e.g. proxy voting, reference data).

Despite multiple efforts to define message standards and progressively implement them, this barrier still exists today in particularly for non-T2S cash securities markets and for derivatives markets/collateral management. EPTF analysis has split the analysis of the barrier in three different domains:

1) Message standards in the cash securities markets;

2) Message standards in derivatives markets and collateral management;

3) Regulatory reporting.

### 1.1. Message standards in the cash securities markets

ISO standards for messaging used in transactions between financial institutions (including market infrastructures) have evolved overtime in line with the development of the financial industry. A first standard (ISO 7775) was issued in 1985. It was followed by a second standard (ISO 15022)

issued in 1995. The third standard (ISO 20022) was issued in 2004. Each standard cover a broader range of activities, data fields and data formats. The objective of each standard is to facilitate secure communications on automated channels between two parties with the goal to achieve straight through processing (STP). Full STP is achieved when the computer of the sending institution sends a message in an agreed standard format, it is received and read by the computer of the receiving institution and it leads to correct processing without the need of re-keying or human intervention; alternatively, if the correct expected processing cannot be completed, an operational flag is raised to request human intervention.

It is to be noted that the specificity of the ISO 20022 standards is not to be a single whole standard but a modelling methodology to capture in a syntax-independent way financial business areas, business transactions and associated message flows and a central dictionary of business items used in financial communications. It means that two organisations using ISO 20022 but with different versions or a subset of messages could not be necessarily able to communicate together under a full STP mode.

Despite the challenges for the migration to a newer standard, there are currently some 200 initiatives around the world. The majority of those are driven by market infrastructures, related primarily to payments and securities, which require their participants to communicate with them using exclusively the ISO 20022 standard. Europe leads the field in adoption of ISO 20022 thanks to SEPA and T2S.

One of the issues raised by the publication of new standards is that industry players do not all migrate together at the same time to the new standard. Each player decides when it will start receiving or sending messages in the newer standard format. Some players, for example market infrastructures, may decide that they will only agree to receive and to send messages in the newer format. A good example of this is the T2S platform, developed by the ECB, which only sends and receives messages formatted in line with the ISO 20022 standard.

The coexistence of different standards forces industry players, and in particular intermediaries, to make a translation/conversion of messages from one format to another. Such translation/conversion could be the source of errors or delays in the processing of a transaction (for example when some mandatory information is missing in the received message – formatted in the old standard – and required in the message sent – formatted in the new standard). As a result, straight through processing levels are impacted, and operational risk and processing costs are increased.

Experience has shown that financial organisations often only implement change when there is a compelling event or an overriding commercial or economic interest.

The level of competition plays an important role here. An institution will be reluctant to impose on its clients the migration to a newer format, even if this new format will increase efficiency and level of STP, if competitors do not impose the same. Indeed such imposition may induce clients to switch to a competitor. There is a clear correlation between the level of competition and the speed at which an industry migrates to more efficient standards. The level of competition among financial intermediaries is high while it is typically lower among some infrastructures. When this is observed, intervention by the public authorities may be needed to create the compelling event that will trigger the migration of the entire industry and bring it to a higher level of efficiency.

For most of the past decade or so, since ISO 20022 was first launched, no such compelling event occurred. The SEPA (Single European Payments Area) Regulation[22] , details, among other things, the use of the ISO 20022 message standards. This was the first such event as it imposed an end-date

---

[22] Regulation (EU) No 260/2012, adopted in February 2012.

**4. Operational Barriers**

EPTF BARRIER 2: Lack of convergence and harmonisation in information messaging standards

for compliance with the provisions of the Regulation and, even then, many market actors waited until the very last moment before implementing the required ISO 20022 message standards. With many payment infrastructures migrating to ISO 20022 and real-time payments largely also implementing it, the payment industry has certainly reached a tipping point. In the securities industry, the major compelling event was the launch of T2S. In the case of T2S, the central securities depositories (CSDs), clients of T2S, and the directly connected participants (DCPs) exchange messages with the T2S platform exclusively in ISO 20022 standard formats. However, CSDs' clients or DCPs' clients often continue to send their messages in ISO 15022 standard formats, forcing CSDs and DCPs to translate them in ISO 20022 format in order to convey these messages to T2S.

Prior to the SEPA Regulation, the payment industry had been slow in migrating to adopt ISO 20022 because there was no compelling event and because market players could not find compelling economic interest to make the required technology investment to migrate to the new standard. With the SEPA Regulation, the EU authorities did recognise the benefits of migrating the entire EU payment industry to common message standards for payments in euro and decided to create the required compelling event that triggered the move by imposing a date by when all payment messages for payments in euro in the EU payment area would follow the ISO 20022 message standards.

### 1.2. Message standards in the derivatives markets and collateral management

At the time the two Giovannini Reports were written, derivative markets, securities finance activities and collateral management were not as developed as they are today. As a result, the focus was put on the standardisation of messages in the cash securities markets. This has changed. The size of derivative markets, securities finance activities and collateral management are comparable with cash securities markets albeit with different levels of complexity.

Because of their specificities, derivative markets and securities financing transactions (repo, securities lending) are not always covered by the protocols and standards used in the cash securities markets neither in terms of data content nor of message requirements. Despite standardisation efforts by the industry, (e.g. ISDA FpML), there remain large differences in information messaging standards used by derivative trading, clearing, and settlement providers. Non-harmonised messaging standards are also considered an important barrier to a further automation of the collateral management process[23]. One additional element to be taken into account is that derivative markets are more global.

Following issues with data content quality in messaging and lack of comparability of data resulting therefrom, the European regulatory authorities are increasingly engaged in the standardisation of certain data (e.g. Identifiers ISIN, LEI) and reporting messages (e.g. ISO 20022 messages for MiFID2/MiFIR and EMIR Reporting). Provided such standards are appropriate for the desired outcome, and provided that there is no other existing standard fit for purpose and already in place, this regulatory "nudging" towards use of ISO-based standards may help the industry to standardise other flows of other reference and market data, the exchange of which is currently often inhibited

---

[23] In this context, it is worth noting that the ECB's contact group for euro securities infrastructures (COGESI) has worked on collateral related messaging. This work was part of the broader COGESI work on the harmonisation of collateral management activities. More concretely, the relevant work stream on collateral messaging analysed the current collateral messaging 'ecosystem' and suggested ways towards a more consistent and harmonised (global) messaging standards which can drive efficiency in collateral management processing. Following the recent restructuring of the ECB's advisory group structure in relation to financial markets infrastructures, this important work has now been taken up by the newly established Advisory Group on Market Infrastructure for Securities and Collateral (AMI-SeCo).

by proprietary standards and licence requirements. However, where this applies to global markets (e.g. OTC derivatives) it is important that any European initiatives are harmonised at a global level. In the area of OTC derivatives CPMI and IOSCO are coordinating work on the international level. Furthermore, it is imperative that the design and development of any such standards is done in close collaboration with the relevant industry participants to ensure that the standards are appropriate for the full suite of use cases for which they may be applicable, avoiding a proliferation of essentially duplicative standards.

### 1.3. Regulatory reporting

Since the financial crisis of 2008, guided by the direction set by the G20, authorities have significantly increased the requirements of financial transactions reporting either to central repositories, or to central banks or to NCAs. With regard to the lack of standardisation in the field of regulatory reporting, EPTF has identified a specific barrier (EPTF Barrier 6) to address it. As a result, this section does not cover these specific issues.

It is worth noting here that large scale, near-time reporting of transaction-level data is currently required (OTC derivatives under EMIR, securities under MiFID) or under development (on Securities Financing Transactions). For effective reporting under EMIR, experience shows that the very large data flows demand stringent data standardisation. In practice, it would be helpful if data standards used for reporting could be the same as those used for other industry processes, which have a higher degree of automation, yielding lower costs of reporting, better quality of reported data, and higher effectiveness of the public sector missions served by such reporting. That logic would strongly demonstrate alignment of interests between industry and the public sector.

A further example, although not commonly considered to be "regulatory" reporting, is FATCA reporting. The US Tax authorities, with FATCA, are imposing to the entire world an extraterritorial reporting obligation. Under FATCA, all fund managers in the world must report to the US IRS information related to US investors who have invested in non-US funds. Fiscal authorities in many countries, and in Europe in particular, have signed an agreement with the US Tax authorities (namely the IRS) to collect the information locally and to send it to the IRS. Fund managers send the information to their local authorities who collect them, aggregate them and send them to IRS. The format to be used to report to the IRS is standardized. However, local fiscal authorities collect the data locally in different formats. This inconsistent situation imposes additional costs on fund managers and intermediaries, if they are active in more than one country. A large EU fund manager, active in several EU countries, must provide FATCA information for French funds to French authorities in a format defined by French Tax authorities, for their Luxembourg funds to Luxembourg authorities in a format defined by the Luxembourg authorities, etc.

In sum, the post trade sector has collectively created a developed market financial system over many decades that has too much latency, too many hand-offs, too many players moving data back and forth, too many reconciliations being processed. It is important that the industry remakes or transforms itself to take the latency and delays out of all these processes.

### 2. Consequences of the Barrier

The use of non-standard identifiers and associated reference data in issuance, trading, clearing, settlement, asset servicing and reporting of financial instruments and contracts upsets automated

**4. Operational Barriers**

EPTF BARRIER 2: Lack of convergence and harmonisation in information messaging standards

processes, since transactions cannot be processed in a straight through manner without prior harmonisation and mapping of various identifiers and associated reference data. Accenture[24] estimates that for each dollar spent on reference data input, another two dollars are spent in cleansing, reconciliation and IT. In other words, the real cost of reference data is roughly three times the banks' cost of acquisition, and the situation is getting worse. Accenture gives the overall cost of procurement and of harmonising and mapping of reference data to globally amount to over USD 6 billion as the same data needs to be checked, reviewed, scrubbed and mapped at each financial services firm again and again.

**Figure 5: Cost of reference data**



Source: Accenture Research Burton-Taylor International Consulting LLC.

In addition to the issue of data standardisation described above, the issue of harmonisation of messaging format remains. The two issues are connected but not identical. Similar to the securities space, the prevalence of proprietary systems and standards in the derivatives, securities finance and EU regulatory reporting space imposes substantial front-, middle- and back-office costs on investors/intermediaries and reporting entities who have to link to different systems. Entities which need to link to multiple regulatory and private proprietary systems face higher cost in terms of investment required to link to and maintain these interfaces[25], when compared with the cost of

---

[24] https://www.accenture.com/t20151202T165846__w__/us-en/_acnmedia/Accenture/next-gen/top-ten-challenges/challenge3/pdfs/Accenture-2016-Top-10-Challenges-03-Reference-Data.pdf - See also: "Feedback from the market suggests there are many elements of data management costs. Visible costs, such as licence-fees, increase in line with use and are normally predictable. But rising external data licensing costs have often diverted attention from the escalating internal challenge of getting data fit for purpose to suit specific business processes, such as portfolio management, risk management or performance measurement. Across the industry and within all firms, many more people perform data management tasks than those in data management teams. Often, heavy costs begin to accrue once the data is on board. This is especially true for specialist data types, such as index data and benchmarks that are complex and difficult to manage. Such costs relate as much to governance and management of the data as to data validation and quality assurance and can add up to a multiple of the visible data costs. The above costs are confirmed by an independent study (Cutter Associates, The True Cost of Market Data: Operational Impacts, June 2014) -
http://www.internationalfinancemagazine.com/article/Real-cost-of-data-management.html
[25] Historically, client accounts, trades capture and market data was stored in different databases. The new EU reporting requirements will require all this data to be merged and reported together – forcing a rethink of the infrastructure that holds this data. What's more, the pulling together of all this data presents a risk in itself – data being fed from different systems and locations could increase the risk of system outages. Firms will have to ensure that their systems are robust enough to avoid any seismic failures. The arrival of more and more regulation means that firms will have to invest in data quality to ensure that all regulatory requirements are met. The regulators have already made it clear that firms are responsible for the quality of their own data and

using standardised communication mechanisms. In many cases they are also faced with a greater level of manual processing and conversion of information, which lead to a higher risk of errors[26]. Such differences also make straight through processing more difficult or even unattainable across systems. This is also true in the regulatory reporting space where, because of the lack of granular standards, securities transaction reporting under MiFID[27] and derivatives transaction reporting under EMIR cannot be easily aggregated and analysed by a single NCA or ESA.

### 3. Proposed way forward

**3.1. Basic principles for elimination of the Barrier**

The objective is that when information enters the post-trade world, it should enter digitally in order to feed back standardised data to users faster, at best in real-time. Going forward, the industry should be able to take only a standardised digital record and pass it through the system where it should come out the other side of the process without human touch. The effect will be lower cost, lower risk and, perhaps most importantly, reduction of information gaps. If the post trade sector makes the information available in real-time to users it will enable better investment management and risk management processes on their side and it will improve their ability to generate returns. Moreover, improved standardisation could improve returns further by reducing the burden caused by granular, near-time regulatory reporting as report generation could be automated, straight from the operational system.

To enable "Big Data", blockchain[28], data analytics, data quality, data ownership and core data (and lineage) need to be more defined than today. Also, given the divergent data landscape in post-trade ranging from regulatory mandates, to proprietary and open standards, in areas where it is not possible to get all post trade ecosystems to work in the same way only ("full harmonisation") the focus needs naturally to allow the different ecosystems to work together ("interoperability").

As a common basis, identifiers of the building blocks of a transaction should be standardised, or at least harmonised, across sectors. The EPTF supports the use of appropriate ISO standards such as CFI[29], ISIN[30] and LEI[31] or accepted industry standards. The use of non-standard identifiers (and associated reference data) as the basis of trading, clearing, settlement, and reporting of financial

---

must make sure that any reporting is both complete and accurate. Failure to comply will lead to even more misreporting and ultimately, more fines. http://axiscorporate.com/uk/cleaning-reference-data-make-usable/

[26] In 2011, data costs accounted for about USD 333 billion, roughly 83% of the USD 400 billion spent on technology globally by the sector. Using inaccurate reference data leads to failed trades and can cost firms millions of dollars in lost revenue and financial liabilities. It can also lead to misrepresented corporate actions, high reconciliation costs, reduced efficiency, adverse effects on pre-transaction risk assessment and increased costs of repairing failed trades. https://www.cognizant.com/InsightsWhitepapers/Reference-Data-Management-The-Case-for-a-Utility-Model.pdf

[27] Under the proposed technical standards under MIFID 2, the level of granularity will be reinforced.

[28] Even for initiatives like blockchain, it is key that common standards are defined. Re-use of ISO 20022 methodology for defining such standards would be ideal.

[29] Classification of financial instrument (CFI) Code is used to define and describe financial instruments as a uniform set of codes for all market participants.

[30] The International Securities Identification Number (ISIN) is the globally recognised, ISO-developed standard for instrument identification. Designed to uniquely identify financial instruments by key characteristics, the standard covers equities, debt, derivatives and other commonly issued and traded instruments.

[31] The Global Legal Entity Identifier (LEI) System is designed to uniquely and unambiguously identify participants in financial transactions.
https://www.gleif.org/en/lei-system/gleif-management-of-the-global-lei-system

instruments and contracts should be avoided as much as possible. Regulatory nudging like requiring use of LEI in all EU regulatory reporting to NCAs and central banks may, in the medium term, help the industry to reach the point of using the standard for all business processes requiring identification of legal entities. Likewise, the use of ISINs (or another globally consistent standard product identifier) and CFI (and UPI/UTI for derivatives), standardised identification of financial instruments and contracts, and well-defined reference data can be pushed forward in all business applications across the value chain. In the very long term the G20-supported Legal Entity Identifier could morph into a Financial Object Identifier with all associated reference data, covering entities and their relationships, all financial instruments and contracts, described in standards-based representation and language.

Market participants and regulators (e.g. by expanding existing EU, ECB and ESMA data standard initiatives) need to work together to make the financial service industry and regulators alike change their data culture, shifting it to the kind of more machine-driven data practices that enable other industries to make full use of technology for productivity and risk control. Important initiatives, such as the T2S AMI-SeCo work in relation to collateral management-related messaging, have already been established and should be supported.

### 3.1.1. Cash securities transactions

ISO 20022 has a modelling methodology to capture in an independent way financial business areas, transactions and associated message flows and a central dictionary of business items used in financial communications. This flexible framework allows communities of users and message development organisations to define message sets according to an internationally agreed approach. The standard seems to be able to support under one umbrella various data dialects and standards such as FIX protocol or FPML.

As described above, moving messaging in cash securities markets from ISO 15022 to ISO 20022 messages depends either on a compelling event or overriding commercial or economic interests. The EU authorities should create a compelling event that will accelerate the migration to ISO 20022 message standards. In implementing this recommendation, due regard should be had to the different interests of (and relevant incentives for) different classes of market participant. The SEPA experience shows that the attractiveness of migration to ISO 20022 could be very low for the client/buy-side/investor and small-intermediary constituencies. Accordingly, the legislative instrument requiring a switch-over to ISO 20022 should consider carefully all of the following factors in respect of **each affected community** (infrastructures, their participants, other intermediaries, their clients, and end-investors): the **timing** of migration for the community, the **cost-benefit equation** of the switch, the **incentives available**, and the positive impact of a possible **network effect** as momentum builds when many market users have already implemented the change.

### 3.1.2. Derivatives

In the short term, the pre-trade availability of a globally agreed standardised set of reference data attached to appropriate identifiers[32] would be a huge step forward for the (OTC) derivative markets. This would enable automation of regulatory reporting (under MiFIR) and could also provide the necessary reference data to drive efficiency in trading, clearing, settlement and

---

[32] Such as the (OTC) ISIN provided by the new ANNA Derivative Service Bureau (DSB).

collateral management[33]. This move to automation based on a widely-accepted international identifier and associated reference data should be without any usage restrictions arising out of intellectual property rights (as is the case with other identifiers).

It is the responsibility of the industry to decide which standard should be used in the derivative space, and to ensure alternatives are considered or rejected on merit and suitability for the suite of potential use cases, particularly in light of rapidly evolving industry and technology.

Moving transaction and settlement messaging in OTC derivatives to a single standard, e.g. FpML, depends essentially either on a compelling event or overriding commercial or economic interests. OTC derivative markets are global, so EU authorities alone are not in a position to impose harmonisation for the whole world. EU authorities can, however, play an active role in supporting a move to automation of (OTC) derivatives based on standards by supporting definition and use of common standardised data sets for trading, settlement, and transaction reporting. This should include an objective assessment of the suitability of the work currently being undertaken by the ANNA ISIN DSB and the CPMI/IOSCO as well as work on UPI, UTI and "other derivative data" efforts. Re-use and innovation of already existing formats and standards should be the guiding principle.

### 3.1.3. Reporting

Wherever EU regulatory transaction reporting requirements mandate the use of ISO identifiers (CFI, ISIN, LEI) or message standards (ISO 20022[34]) as described above, the detailed definition of reporting protocols and market practices should be a joint effort between industry and regulators. Based on the successful example of the Securities Market Practice Group (SMPG) for the development and documentation of best practices relating to ISO 20022 data and message standards, a (Regulatory) Reporting Market Practice Group (RMPG) should be established involving all market participants and regulators in the trade/transaction reporting cycle of securities (MiFID), derivatives (EMIR) and securities finance transactions (SFTR) based primarily on ISO standards for data and messaging. The RMPG would facilitate the establishment of reporting market practice within the limits set by applicable regulation. Such a group should closely align itself with any appropriate global initiative such as those promulgated by CPMI and IOSCO.

For the first issue (**lack of standardised format**), the trade repositories in Europe should work together to establish EU formats for trade reporting. ESMA could play a role here because they approve trade repositories. They could monitor the convergence to EU formats for trade reporting once this is established and/or could add the adoption of the EU format for trade reporting as one of the conditions to approve a trade repository.

---

[33] ISO 15022 and ISO 20022, do currently not address the full message and automation needs of OTC derivatives. The fully established and more granular FpML taxonomy could therefore be used as the basis of an expanded ISIN reference data model. ISO and ANNA should work closely with ISDA to align FpML taxonomy with the CFI and ISO 20022 dictionary and data model. This may help to ease the implementation burden for all players, independent of their size, going forward and will also insure that larger industry player's investment in FpML implementation can be leveraged going forward.
[34] The use of the ISO 20022 methodology and central repository is a step in the right direction to increase standardisation. Enforcing the use of a particular syntax such as the ISO 20022 XML for regulatory reporting - when this syntax still needs to be developed and other syntaxes are available and tested in the market-place - will not create the hoped for benefits.

15th May 2017

**4. Operational Barriers**

EPTF BARRIER 2: Lack of convergence and harmonisation in information messaging standards

Similarly, EU regulators should work together to establish EU standards for regulatory reporting as opposed to the current situation where each domestic regulator works in isolation and creates its own format.

This standardisation will have massive benefits for the entire finance industry.

For the second issue (**inconsistent use of data standards for data fields**), the Commission and/or ESMA could play an important role in making sure that internationally recognised standards are mandated when a standard exists (ISIN, LEI, CFI, etc.), or facilitating the creation of new standards where they do not exist.

### 3.2. Who should act to address the Barrier?

All ESAs and Member State regulators, in supporting and embracing the new approach to a data culture, standardisation and the establishment of a RMPG.

The European Commission, in respect of the regulatory approach to adoption of ISO 20022 in relation to securities transactions, and assessing international work on data automation in relation to OTC derivatives.

The industry, in respect of all other recommendations described above.

### 3.3. By when that action should be taken?

All steps outlined above should be taken as soon as possible.

The programme for *implementation* of a regulatory approach to adopting ISO 20022 should reflect the specificities of the various interested groups, as explained above.

### 3.4. Priority of the Barrier

High.

## *EPTF BARRIER 3: Lack of harmonisation and standardisation of ETF processes*

New Barrier

> **Description of the issue:** growth rate of Exchange Traded Funds (ETFs) / Products (ETPs) is restrained by legal obstacles and a high degree of fragmentation, in particular in the post trade space, within Europe.
>
> **Priority:** Medium.
>
> **Summary of proposed action:** implementation of best market practices, standards and recommendations. Where relevant, domestic legal obstacles to fluid cross-border movements of ETFs / ETPs should be removed.
>
> **Responsibility:** private sector (industry to implement best market practices) / public sector (European Commission to take the lead for the removal of specific domestic legal hurdles).

### 1. Description of the Barrier

Exchange Traded Fund (ETFs) and more generally Exchange Traded Products (ETPs) are globally among the fastest growing investment instruments. Yet their growth rate in Europe is restrained by legal obstacles and by a high degree of fragmentation, in particular in the post trade space[35].

The main observed problem is a legal issue related to the settlement of Irish ETFs in Germany, though this example shows that ETFs are poorly-integrated into the present EU legal framework for securities settlement.

The specific problem regarding Irish ETFs is rooted in different substantive securities legal provisions on securities in the EU Member States. If a German investor, who uses Clearstream Banking Frankfurt (CBF) as Investor CSD to hold foreign investments, wishes to invest in an Irish ETF, the following difficulty arises:

- ETFs domiciled in Ireland are settled in Euroclear UK & Ireland (EUI), which is the CSD serving both Ireland and the UK. However, EUI does not perform a 'notary function' for the ETFs as this function is performed by the ETF registrars.
- For the purposes of the German Safe Custody Act (Depotgesetz[36]), a security recognised for settlement in CBF must be issued into a CSD which does perform the notary function.

Therefore Irish ETFs are not directly admitted for settlement in CBF because they cannot be recognised as securities under German law. To overcome this difficulty, ETFs issued into EUI that need to reach CBF as Investor CSD are "re-certified" under a German vehicle that carries a German ISIN. This "re-certification" provides that the German investors benefit from the Collective Safe Custody regime under the Depotgesetz. This leads to a situation where the same ETF carries different ISINs (IE and DE) depending on the market where it is traded or settled.

An industry study gives more detail on the problem[37].

---

[35] For a more detailed description of issues see Annex 3, Section 4, chapter 4.2.5. ETF.

[36] Gesetz über die Verwahrung und Anschaffung von Wertpapieren

[37] http://www.afme.eu/globalassets/downloads/consultation-responses/afme-ptd-etf-document-9-november-2016.pdf; see especially pages 10 onwards.

**4. Operational Barriers**
EPTF BARRIER 3: Lack of harmonisation and standardisation of ETF processes

## 2. Consequences of the Barrier

In the **primary market,** variances in issuance structure and the fragmentation of the European post trade environment place dampen the ETF market within Europe and act as an impediment to delivering an efficient and liquid market.

In the **secondary market,** fragmentation of the European ETF industry in respect of products cross-listed across various European markets arises because market participants are required to deal with settlement rules that differ significantly across markets. Identical ETFs ought to be treated as fungible, but in practice fungibility is impaired because of differing national approaches. Market participants have to manage ETFs inventory on a line by line basis and process dozens of realignments between CSDs despite the financial product being the same. This process is expensive, operationally complex and lengthy as in certain cases it might take up to three days to move ETF shares between two European CSDs. T2S will bring improved efficiency in some cases, but not all European markets are part of T2S. Therefore, it is expected that market participants will continue to experience delays in moving shares between European CSDs.

The CSDR is intended to create a harmonised EU regime for settlement. Unfortunately ETFs fit poorly into the CSDR structure. Further work is needed to ensure that ETFs benefit from equivalent improvements to those enjoyed by other types of financial instrument under the CSDR, in order to realise fully the benefits of ETFs in a Capital Markets Union.

## 3. Proposed way forward

The European Commission should ensure that ETFs are appropriately integrated into the CSDR framework for cross-border (and cross-infrastructure) settlement, taking account of the product specificities of ETFs, the importance of investor protection, the notary function and the need for regulation of persons carrying out the notary function in relation to ETFs.

Industry should implement the best market practices, standards, and recommendations developed and agreed by the Joint Working Group ETF Processing[38].

As regards the specific problem of Irish ETFs and German investors, either or both of the following steps would resolve the issue:

- The Depotgesetz in Germany should be modified to allow Collective Safe Custody status to ETFs held through CSD links, even though the 'notary function' is not carried out by the Issuer CSD itself, but by the ETF Registrar.

- Euroclear UK & Ireland (EUI) should consider the inclusion of the notary function in their services.

---

[38] http://www.afme.eu/globalassets/downloads/consultation-responses/afme-ptd-etf-document-9-november-2016.pdf;
http://www.afme.eu/globalassets/downloads/consultation-responses/afme-ptd-market-standards-for-corporate-actions-processing-for-etfs-2016.pdf

# 5. Structural Barriers

## *Introduction*

While the preceding chapter focuses on operational barriers in regard of clearly defined individual post trade services such as the processing of corporate actions, this chapter deals with structural issues of a cross functional nature in post trade.

In the context of the EPTF's mission to support more efficient and resilient post-trade systems, the mandate of the EPTF not only includes the assessment of the extent to which the Giovannini Barriers have been removed or remain in the EU, but also the determination of new barriers and proposals for solutions.

With the exception of EPTF Barrier 7, which comprises the redefined Giovannini Barriers 8 and 9 on practical impediments to cross-border issuance and national restrictions on the location of securities, all structural barriers in this chapter are new barriers:

- <u>EPTF Barrier 4:</u> Inconsistent application of asset segregation rules for securities accounts;

- <u>EPTF Barrier 5:</u> Lack of harmonisation of registration rules and shareholder identification processes;

- <u>EPTF Barrier 6:</u> Complexity of post-trade reporting structure;

- <u>EPTF Barrier 7:</u> Unresolved ISIN issues (formerly Giovannini Barriers 8 & 9, redefined and combined).

15th May 2017

5. Structural Barriers
EPTF BARRIER 4: Inconsistent application of asset segregation rules for securities accounts

## *EPTF BARRIER 4: Inconsistent application of asset segregation rules for securities accounts*

New Barrier

---

**Description of the issue:** Different regulatory requirements regarding segregation (by type of client and by type of instrument) across Members States and between different EU regulations create inconsistencies and unnecessary costs and increased risks, without corresponding benefits to investors in terms of providing additional protection in the absence of harmonised insolvency laws.

**Priority:** High.

**Summary of proposed action:** The approach to asset segregation should be made consistent across all EU legislation, for all markets and asset classes, so as to implement two principles:

- Client assets held by an intermediary should be segregated from proprietary assets in an insolvency-proof manner.

- Account structures should be open to investor choice. Use of asset segregation to achieve a policy objective should generally be optional, and only required if it is demonstrated that it will achieve the objective and no better alternative is available.

Amendments should be made to EU and Member State legislation, as necessary, to conform to these principles.

**Responsibility:** European Commission, Member States.

---

### 1. Description of the Barrier

In the aftermath of the financial crisis, and in particular as a result of the root-cause analyses following the Madoff[39] and Lehman[40] affairs, a number of regulatory and legislative initiatives were targeted at asset segregation to effect investor protection, specifically to identify assets in the case of the insolvency of a service provider in the intermediated chain of custody.

***Wide range of legislative approaches***

EU Member states generally ensure investor protection by segregation of proprietary assets from client assets or equivalent measures ensuring a comparable level of protection both under national laws. Various EU laws are directed at the same end, such as MiFID Implementing Directive[41], EMIR[42] and CSDR[43].

However, there are differences of approach between EU legal acts. On the one hand:

---

[39] http://ec.europa.eu/smart-regulation/impact/ia_carried_out/docs/ia_2012/swd_2012_0386_en.pdf, p. 11 "The Madoff fraud has demonstrated that investors' claims for compensation for assets lost in custody are not addressed in consistent ways in different Member States."
[40] http://ec.europa.eu/finance/consultations/2010/mifid/docs/consultation_paper_en.pdf, p. 70 "Recent cases where ownership of assets has been in dispute as a result of poor rules or practices underline the importance to have strong requirements in this area. [for instance the Lehman Brothers case]"
[41] Commission Directive 2006/73/EC, art 16.
[42] Article 39.
[43] Article 38.

- MiFID 2[44] requires that an investment firm, when holding financial instruments belonging to clients, makes adequate arrangements in order to safeguard the clients' ownership rights, especially in the event of the investment firm's insolvency, and to prevent the use of a client's financial instruments on own account without the client's express consent (Article 16(8))[45].

By contrast, other EU legal acts mandate supplementary degrees of segregation for some categories of end investor:

- With regard to alternative investment funds, the AIFMD[46] requires the fund depositary to hold an AIF's assets in a segregated account (Article 21(8)(a)(ii)). The segregation requirement applies not only to the depositary but also to its "delegates" in the custody chain (Article 21(11)(d)(iii)) [47].

- UCITS V[48] has similar segregation requirements to AIFMD. Article 22a(3)(e) UCITS V requires that a depositary should hold the UCITS' assets in a segregated account. The segregation requirement applies not only to the depositary but also to its "delegates" in the custody chain. Article 22(8) UCITS V requires Member States to ensure that in the event of insolvency of the depositary and/or of any delegate or sub-delegate, the assets of a UCITS held in custody are unavailable for distribution among, or realisation for the benefit of, creditors of such a depositary and/or such a third party. Therefore, UCITS V requires Member States to modify their insolvency laws in order to ensure the protection of the UCITS assets[49].

A further development, specifically in relation to AIFMD and UCITS V, is a forthcoming clarification by ESMA following its recent "Call for Evidence on Asset Segregation and Custody Service" on this topic[50]. Open issues exist, in particular, around securities held in Investor CSDs, and whether this constitutes a delegation of custody functions by depositaries under AIFMD and UCITS V.

Finally, it may be noted that EMIR (Art. 39 – Segregation and Portability) and CSDR (Art. 38 - Protection of securities of participants and those of their clients) require market infrastructures and service providers to offer omnibus- and individually-segregated accounts to their respective clients; but in both cases, it is a matter for investor choice which type of segregation is selected, based upon information which must be provided about cost and risk.

### Use of omnibus accounts

Today's market practice generally allows for a choice between omnibus and segregated securities account structures, while obliging intermediaries to ensure effective separation of clients' assets from proprietary assets. Omnibus account structures are used by Investor CSDs to accommodate CSDR objectives of efficient cross-CSD settlement and efficient T2S cross-CSD settlement[51]. They

---

[44] Directive 2014/65/EU.
[45] See also Commission Delegated Directive of 7.4.2016, supplementing MiFID 2 with regard to safeguarding of financial instruments and funds belonging to clients, product governance obligations and the rules applicable to the provision or reception of fees, commissions or any monetary or non-monetary benefits, C(2016) 2031 final, art 2.
[46] Directive 2011/61/EU.
[47] See also Commission Delegated Regulation 231/2013.
[48] Directive 2009/65/EC.
[49] See also article 16(1)(a) of the Commission Delegated Regulation (EU) 2016/438.
[50] https://www.esma.europa.eu/press-news/consultations/call-evidence-asset-segregation
[51] "The TFAX recommended that account segregation is minimised, in particular at the higher levels of the settlement chain (e.g. at issuer CSD level). Account segregation that needs to be propagated through the settlement chain should be avoided. If account segregation is required, this should be implemented at the

**5. Structural Barriers**

EPTF BARRIER 4: Inconsistent application of asset segregation rules for securities accounts

are required to facilitate (third party) collateral arrangements, as well as repo and securities lending programmes. Furthermore, they are required to enable investments in certain non-EU markets which do not allow segregation at all levels in the value chain (e.g. DTCC Membership in the USA[52], or Hong Kong[53]). Omnibus accounts reduce the number of accounts: it is estimated that millions of additional accounts, and millions of additional settlement operations, would be required in a fully segregated market environment[54].

In some Nordic markets, omnibus accounts are not typically used. A legal requirement for individually segregated investor accounts at CSD level only exists in the EEA in Finland and Norway. However, in these countries omnibus accounts are allowed for foreign custodians and CSDs in order that foreign investors may have access to the local market. In Sweden and Denmark there is extensive use of individually-segregated accounts, but investors can freely choose between individually-segregated and omnibus accounts.

Notwithstanding the advantages of omnibus account arrangements, the trend in legislative and regulatory developments has been in favour of increasing the use of individually-segregated accounts throughout the custody chain. A number of grounds for such a policy can be identified:

- The first is the potential for increased investor protection, i.e. increased asset safety and decreased potential for loss of securities, combined with facilitation of the prompt return of securities in case of losses (such as the Madoff fraud). These grounds have been challenged in surveys performed by various trade associations, e.g. studies by AFME[55] and ECSDA[56], which have highlighted that in the majority of cases no higher protection is provided by account segregation in an insolvency situation (so long as client assets are segregated from proprietary assets). There is still insufficient evidence that these grounds are sound, and this area would benefit from further study. This has created uncertainty among regulators as to the approach to take, and whether further asset segregation should be mandated throughout the intermediary chain, across borders and across different regulations.

---

lowest possible level of the settlement chain." Quoted from p. 7 of T2S CSD Account Segregation Rules https://www.ecb.europa.eu/paym/t2s/progress/pdf/hsg/mtg9/20130521_CSD_account_segregation_rules.pdf

[52] DTC rules by-laws Rule 2&3 http://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf

[53] See AGC response to ESMA's Call for Evidence, p. 55

[54] Data on the number of securities accounts maintained at CSD level can be found in the ECSDA database at http://ecsda.eu/facts/2015 database. For example, ATHEXCSD in Greece maintains more than 1.6 million accounts, Euroclear Sweden and VP Securities in Denmark each maintain respectively more than 3 million accounts. In addition, the Turkish market may be quoted as an example for a fully segregated environment: in 2015 more than 45 million accounts have been operated by the Turkish CSD in comparison to about 10 000 accounts in the German CSD. These fully segregated accounts would need to be maintained throughout the chain of custody (with the concomitant number of standard settlement instructions, which must be kept up to date); there are similar effects in relation to the number of settlements required between accounts at all levels throughout the chain of custody, including CSDs (example: Turkey 172 million transactions with an average value of EUR 14 150 vs. Germany 66 million transactions with an average value of EUR 1.3 million), and the subsequent potential increase in the number of settlement fails.

[55] http://www.afme.eu/globalassets/downloads/publications/afme-position-and-proposed-principles-on-asset-segregation-07.09.16.pdf, p. 8 ("Further, although we recognize further segregation may provide increased transparency on insolvency it does not necessarily shorten the time to restitute clients' assets, which is dependent on the relevant insolvency regime together with the specific nuances of each case.")

[56] In the vast majority of EU markets, the use of segregated accounts at CSD level does not affect the legal nature of investor rights on the securities. In only 7 out of 28 Member States does the use of segregated accounts at CSD level grant different or additional rights to investors (e.g. ownership rights over the securities). These markets are Bulgaria, Finland, Greece, Denmark, Estonia, Sweden and the UK. See pages 19 and 20 of the ECSDA report on "Account segregation practices at CSDs" of October 2015: http://ecsda.eu/wp-content/uploads/2015_10_13_ECSDA_Segregation_Report.pdf

- Various other grounds can also make individual segregation along the whole custody chain appear attractive. These include account segregation as a tool to process tax-related information; the potential to obtain information for up-to-date lists of shareholders from the same source; and possible solutions for various issues around ownership and registration. Whether asset segregation is the appropriate solution for these questions is considered below under the Proposed Way Forward.

### *The Barrier*

In summary, the current EU legal and regulatory landscape on asset segregation is inconsistent between different sectors and different markets. It is difficult to understand and engenders problems of interpretation and application.

### 2. Consequences of the Barrier

The absence of a common European approach to asset segregation increases operational complexities, risks and related costs for market users and end-investors.

Different rules and operational approaches can apply at different levels in the chain of custody. Segregation requirements differ according to the type of client and type of instrument, between Member States[57], and between different EU regulations. All these differences create inconsistencies and give rise to unnecessary costs and increased risks. It is unclear whether those disadvantages are compensated by corresponding benefits to investors in terms of providing additional protection.

### 3. Proposed way forward

### 3.1 Possible solutions

As a fundamental principle, the way forward on asset segregation needs to accommodate business needs and the respective legal environment; a degree of flexibility will be required until a future harmonisation of European resolution and insolvency laws (as well as a certain substantive law harmonisation) allows more standardisation across Member States.

In the meantime, EU laws and regulatory practices should conform to the following principles (and where necessary, be changed accordingly):

1. **Account structures should be open to investor choice.** Use of the individually-segregated account asset segregation tool should be optional; use should only be mandatory if certain conditions are met, e.g. that the tool is effective in achieving the objectives and that no other better alternative is available.

2. **The proprietary assets of the intermediary should always be segregated from the assets of the intermediary's clients in a form that is insolvency proof**. Segregation[58] should occur at the level where the intermediary holds assets: in other words, the intermediary must ensure that the CSD (or other person with whom the intermediary holds

---

[57] See the four main approaches to segregation described by ECSDA in page 3 of its report of October 2015: http://ecsda.eu/wp-content/uploads/2015_10_13_ECSDA_Segregation_Report.pdf

[58] The intermediary should also keep accurate records on its own books to show exactly what it holds for each client. That is essential but it will not constitute 'segregation'.

assets) records the intermediary's proprietary assets in a different account from the intermediary's clients' assets. Furthermore, the legal effect of that distinction between accounts must be that the assets booked to the intermediary's client-assets account(s) are not available to the intermediary's creditors, in particular in the event of insolvency. If investors require individual-account segregation or segregation further along the chain of custody, this should be an option, but there should be a clear disclosure and understanding of the different risks and additional costs that will result from such segregation; European regulation, e.g. EMIR Art 39 (7) and CSDR Art 38(6), already foresees that the level of protection and the costs associated with different levels of segregation be disclosed to account holders.

***Possible solutions for related issues where asset segregation has been seen as a potential solution***

It was observed above that asset segregation can be seen as a solution to problems other than investor protection. These problems could, however, also be addressed in other ways.

All issues around **securities ownership** topics, and the lack of universal acknowledgement across Member States of property rights of end investors in securities should be addressed via the proposed solutions to the legal barriers (see EPTF Barriers 9 and 11).

The provision of **tax-related information** should be contained within the Commission's separate work-stream on withholding tax procedures, as assessed by the "Expert Group on barriers to free movement of capital"[59] and harmonised across Member States as part of that initiative, and may also be covered within EPTF Barrier 12 (GB11). The implementation of the automated exchange of information on fiscal matters will substitute account segregation as a means to gather tax-related information.

**Shareholder identification** and **shareholder registration**: Shareholder information will be addressed via the SRD Chapter 1A[60]. Registration issues and the passing of registration information should be addressed within the context of the work being done to address EPTF Barrier 5.

### 3.2 Who should act to address the Barrier?

European Commission, ESMA, Member States

### 3.3. By when should that action be taken?

ESMA is expected to finalise its approach to asset segregation in the AIFMD and UCITS space on the basis of its recent market consultation in the second half of 2017.

A review of consistency in accordance with the proposed approach to asset segregation should be started in the context of the CMU Action Plan.

---

[59] See the specific section of the Report of the group dedicated to withholding tax procedures at: http://ec.europa.eu/info/files/report-commission-accelerating-capital-markets-union-addressing-national-barriers-capital-flows_en
[60] The revised Shareholders Rights Directive (SRD2) was agreed by the European Parliament and the Council in March 2017 but at the time of issue of this Report had not been published in the Official Journal of the EU. The text of SRD2 which the EPTF has used to compile this Report is document number PE-CONS 2/17 dated 23 March 2017 located at http://data.consilium.europa.eu/doc/document/PE-2-2017-INIT/en/pdf.

Amendments to EU and Member States legislation should be made in the context of regular reviews of relevant legislation.

**3.4. Priority of the Barrier:** High.

## 4. Diverging view

CSDR Art. 38 gives investors the choice to ask for segregation and European Issuers believe this choice should be mirrored in the custody chain. Asset segregation should be the end investor's choice only and that choice should be respected by all intermediaries in the whole custody chain especially to avoid the risk of wrong attribution of assets to intermediaries instead of to the specific end investor. This choice is of utmost importance as long as uncertainty about ownership of securities and the treatment of securities in insolvency situations or priority rights of certain intermediaries like CCPs exist.

In general, direct holding systems are considerably more reliable and safer for end investors and the maintaining of the relationship between issuers and end investors and can avoid most of the issues described above. Blockchain technology (or distributed ledger technology) is understood by end investors and issuers to be able to eliminate all of the issues described above. The European Union should concentrate on the fast development of this technology and concept.

**5. Structural Barriers**
EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes

## *EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes*

New Barrier

---

**Description of the issue:** Registration regimes vary widely from country to country as outlined in several fact-finding reports including those of the T2S Taskforce on shareholder transparency and of ECSDA. This diversity is not an issue at domestic level, but is a serious issue at cross-border level as it translates into increased complexity and cost where registration processes go beyond communication between issuers and investors.

Shareholder transparency practices also vary widely from country to country as outlined in the shareholder transparency report of the T2S AG and are also a serious issue at cross-border level.

**Priority:** High.

**Summary of proposed action:** Investor transparency procedures (data fields, data content, messaging standards) should be harmonised and standardised.

Where applicable, operational registration procedures should be harmonised and standardised along the harmonised framework defined for shareholder transparency and should also accommodate the specific requirements of the investment fund industry.

**Responsibility:** Industry (investors, issuers, intermediaries including financial market infrastructures). The basis of a technical standard has already been defined by the industry, which could be adopted in the level 2 measures of the revised SRD (Shareholder Rights Directive) as a means to enforce the implementation of the shareholder transparency standard.

The agreed harmonised and standardised operational registration procedures should be adopted by Member States in their registration regimes; Member States should also review and where appropriate amend registration requirements which go beyond necessary requirements for communication between issuers and investors in matters which affect investors' rights.

**Responsibility:** Industry, European Commission and Member States.

---

### 1. Description of the Barrier

**A) Registration**

In most Member States of the EU, it is a requirement of national law that, in the case of registered securities, investors (shareholders and also sometimes bond holders) have to forward their data to the issuer, in most cases when they acquire or sell securities, sometimes on special occasions. The issuers are required to maintain or update a register, which contains the names and other details relating to the persons who own the shares or debt; depending on the Member State these owners refer to either legal owners (for example nominees) or the end investors/beneficial owners[61].

The registration process described above was designed to achieve several objectives:

    a)  To record the transfer of securities between buyers and sellers.

---

[61] Member States should adopt a single approach to who is a 'shareholder', based on the principle that a person who paid for a share is the shareholder (with two caveats for the avoidance of doubt: funds belong to shareholders (not their own investors) and intermediaries are not shareholders).

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 53 of 150

5. Structural Barriers
EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes

b) To allow companies issuing shares to have access to complete and accurate information on who their shareholders (and sometimes bond holders) are.

c) In some instance, to allow companies to have a meaningful relationship with their investors. As an example, companies may entice shareholders to be on their register by inviting them to events where the company products and strategy is explained.

d) To allow companies to control their shareholder base, by being able to refuse registration of shares acquired by certain purchasers.

e) To allow companies to attribute bonus rights to certain shareholders based on the length of time the shares have been held.

The EPTF understands and acknowledges these objectives of shareholder registration. The barrier observed relates to the rules and processes which are in place to achieve registration, which differ between Member States and cause friction in a cross-border investment scenario.

Noteworthy market developments concerning these areas are as follows.

As described in Annex 3, the financial industry has evolved. Securities are more and more immobilised or dematerialised and commonly recorded on the books of central securities depositories (CSDs) (and reconciled with the register of the issuer in those countries where this is applicable). Securities transactions among the parties to trades settle by book-entry transfers on the books of CSDs. Transactions settling in CSDs and confirmed by them are considered as final and irrevocable. While access to securities settlement systems operated by the CSDs is now largely free from nationally imposed obstacles, achieving settlement may (but in some Member States need not) involve a process of updating the shareholders' register. However, this update process is no longer a precondition to achieve finality of transfers (i.e. securities and cash) on the books of the CSD.

Regulation and market practices regarding registration vary widely from country to country. There are efficient local/national solutions for local investor registration and also investor identification in most markets of Europe, but cross-border registration of securities holders is typically more challenging. Indeed, what information is required to be recorded in the register, and how and when the register must be updated, differs between Member States. ECSDA studied technical aspects of registration requirements for securities holders in Europe, and issued a fact-finding report in July 2016[62].

Various reasons for the differences in the processes for maintaining a register may be cited: different corporate laws in EU Member States, different civil laws, different data protection laws, different decisions by the owners of companies on which information is helpful or needed in order to have a meaningful relationship between the owners themselves and with the company, in particular because the company wishes to know who its owners are (e.g. for corporate actions, and effective exercise of governance and voting rights), the need for the end investors to have a definitive legal record of their ownership, legal requirements and regulatory purposes such as proof of nationality in case of air carriers. However, the challenge posed by national specificities concerning registration relates to the format and content of data, which must flow to the issuer (and its registrar, where separate) from the end investor, often through the chain of intermediaries.

**Registration requirements that go beyond investor identification**

---

[62] See ECSDA report on the registration of securities holders (2016): http://ecsda.eu/archives/5091

**5. Structural Barriers**

EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes

As described in the T2S and the ECSDA reports, in several Member States the registration requirements go beyond investor identification.

The EPTF has discussed the national specificities of registration regimes in various Member States, highlighting that they create impediments to cross-border investments, even though the regime works satisfactorily at a domestic level. It was agreed that specific issues arise, causing operational complexity and cost for cross-border investment, such as in Spain and France.

**Specificities of the investment fund industry**

The actor that calculates and pays commissions needs to be provided with the information needed to make the payment and advise the distributor accordingly in a timely fashion. Funds need confirmed distributor holdings and transaction information to pay (recurring) commissions correctly to intermediaries in the custody chain. EFAMA has made recommendations[63] on both positions as well as transaction based reporting, e.g. in France "earmarking" of transactions. The agreed amended Shareholder Rights Directive does not resolve the commission payment data issue.

**B) Shareholder Identification**

In order reduce their investment risks, investors more and more invest outside their country of residence. Cross-border investment is a very important evolution, which is expected to continue to increase with the removal of barriers to cross-border investments. Important initiatives, such as T2S, are further contributing to the removal of barriers and making the settlement of cross-border transactions similar to the settlement of a domestic transaction. The growth of cross-border investment is raising concerns on the issuer's side as regards shareholder identification. The process to identify who their shareholders are, when the shareholders are outside of the country of the issuer, is often complex and difficult. The T2S Advisory Group (AG) decided in December 2009 to establish a task force on shareholder transparency. In March 2011, the task force issued its final report[64] with proposals to the AG for possible further action. In addition to proposing two possible technical solutions to improve the provision of shareholder information to issuers in a cross-border context, the task force identified three obstacles for the two solutions to work:

1. The lack of standardised and machine-readable formats for sending disclosure requests and receiving disclosure responses were a serious hindrance to the efficient operation of the decentralised model;

2. The lack of harmonised market practices between the various players in the holding chain obstructed the smooth operation of the disclosure process; and

3. Legal uncertainty among intermediaries as to whether they can share their clients' holding data is a significant obstacle; the revised Shareholders Right Directive (SRD2) has removed most of this uncertainty.

---

[63] EFAMA report on Standardisation of Fund Processing in Europe (March 2011)
http://www.efama.org/Publications/Public/Fund_Processing_Passport/110324_EFAMA%20FPSG%20Report%20(Final%20March%202011).pdf
Chapter 6, p. 18 & ff, addresses holding reporting and transaction reporting. Chapter 7, p. 20 & ff, addresses commissions reporting.
[64] T2S task force on shareholder transparency – final report to the T2S Advisory group.
https://www.ecb.europa.eu/paym/t2s/progress/pdf/subtrans/st_final_report_110307.pdf?dc403716f023aedd5fd597fcb7d24ab2

The task force has also finalised a comprehensive market survey of shareholder transparency regimes in Europe.

The European Post Trade Group (EPTG) continued the work on this topic and a Working Group on Shareholder Identification and Registration wrote a report[65] which, starting from the findings in the report of the T2S Taskforce, focused on how all technical questions of shareholder identification, registration and the exercise of shareholder rights by the end investor could be resolved. The technical aspects of a solution comprise the contents of messages, the format of messages, the format of interfaces and open system concepts and cost questions.

The Working Group recommended that a solution to address shareholder identification and registration questions in the context of disclosure of end investors, maintaining a shareholder register and the exercise of shareholder rights should take into account:

a) The data necessary and sufficient to address shareholder identification and shareholder registration are very similar if not identical.

b) The necessary data of end investors is usually stored within the systems of at least one financial intermediary, but which intermediary holds the data depends on the structure and the market practice of the domestic market. Most commonly, for example, it is the custody bank that provides the securities account directly to the end investor. It may also be another designated financial institution or a broker.

c) The solution would be to define an EU wide harmonised set of data, limited to what is really necessary. Once this has been defined, the next step is the definition of message formats to allow automated communication of the agreed data among the players.

In relation to the flow of information from investors to companies, it should be noted that the revisions to the Shareholders Rights Directive will introduce a right for companies to obtain information from intermediaries on their "shareholders"[66]. This may help set up standards for end investor data and data formats, which could help to facilitate compliance with registration procedures. However, the revised Shareholders Rights Directive does not in itself purport to harmonise registration procedures and practices across the EU. In particular, following transposition of the revised directive, the following issues are likely to remain:

• Being a directive, there will be the danger of differential implementation between Member States.

• A further particular danger resides at Level 2 if the implementing acts expected from the Commission are not established as an EU Regulation in order to ensure uniform application of article 3 of the revised SRD[67]. If the implementing acts were established in the form of a Directive, the risk is that Member States may adopt different mechanisms (format and content rules) for the transmission of the information. If this were to come about in reality,

---

[65] EPTG Working Group on Shareholder Identification report:
http://www.europeanissuers.eu/positions/files/view/591da562f05ba-en
[66] The revised Shareholder Rights Directive does not define who a shareholder is; it would be desirable that the term would have the meaning of an end investor as defined in the two sets of market standards for corporate actions and general meeting (see EPTF Barrier 1).
[67] http://www.europarl.europa.eu/sides/getDoc.do?pubRef=-//EP//TEXT+TA+P8-TA-2015-0257+0+DOC+XML+V0//EN&language=EN

15th May 2017

**5. Structural Barriers**

EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes

the present barrier would not only be confirmed but might become higher as what is now just national practice becomes embedded as legally binding obligation.

- Some national specificities relating to registration procedures (such as those described in the ECSDA report and the T2S Shareholder Transparency report) which do not relate to the information flow between issuer and shareholder may remain in place if the level 2 measures envisaged by the Shareholders Rights Directive do not address those aspects. The scope of the level 1 Directive is limited to shares listed on a regulated market within the EU, so that registration procedure issues, if any, concerning other types of listed and unlisted transferable securities will persist.

This barrier is closely connected to progress on EPTF Barriers 1, 12, 11 and 4, which could have an influence on the progress in dismantling this barrier.

### C) Bondholder Identification

The identification of bondholders raises issues quite similar to the identification of shareholders. In the case of bearer securities in particular, market participants in the settlement chain often do not pass on information to facilitate the identification of bearer bondholders, e.g. for the purpose of convening bondholder meetings.

As the issues are broadly identical with the barrier of identifying shareholders, the solutions to the latter barrier should also be able to address the issues of identification of bondholders.

### 2. Consequences of the Barrier

The differences in national procedural requirements for registration of securities holdings and in investor identification requirements could give rise to complexity in a cross-border context, because investors and their intermediaries have to comply with the differing data fields and data format requirements, which may lead to additional costs and operational risk. Greater uniformity regarding data fields and data formats would help to reduce the complexity thus experienced.

Moreover, the persistence of different national requirements for registration where securities are held indirectly may be seen by CSDs as an obstacle to issuer choice, as described in article 49 of the CSDR. Indeed, in practice, CSDs find it complex and costly) to compete for issuer services where registration rules in the target market are fundamentally different from those in the home market(s) of the CSD. From an issuer´s perspective, this may not be seen as a barrier since the conditions for offering a service which complies with applicable national law are the same for all service providers in Europe. If a CSD wishes to offer a service to create or enter competition, they should be able to offer the same service as their competitors. Issuers choose their CSDs by considering whether they are equipped to comply with applicable company law and its registration requirements.

### 3. Proposed way forward

**3.1. Possible solutions for the elimination of the Barrier**

The EPTF believes that the following steps should be taken:

1. A task force of relevant market participants (investors, issuers, registrars, intermediaries, infrastructures whether acting as central register or intermediary) should be established to

Case 1:18-md-02865-LAK     Document 836-31     Filed 06/27/22     Page 57 of 150

5. Structural Barriers
EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and
processes

analyse registration procedures and shareholder identification procedures; to harmonise, where possible, data fields, contents and formats; and to identify and define practical issues related to the technical, operational and cost aspects of registration and investor identification rules and processes. This work should be based on existing work and reports, such as the T2S Task Force and the EPTG Working Group. The proposed solution should be drafted and assessed not only within the framework of the Level 2 SRD legislation but also with a view that Member States are encouraged to follow a single EU-wide approach and avoid unnecessary diversity in transposition in areas not covered by SRD and Level 2 implementing measures.

2. The relevant constituencies (investors, issuers, registrars, intermediaries, financial market infrastructures) should agree and endorse the proposed solution.

3. Member States should (with encouragement from the Commission in the context of the Level 2 legislation) adopt industry standards as per point 2, but also review and where appropriate amend registration requirements which go beyond necessary requirements for shareholder information.

4. The EPTF also supports the inclusion in bond prospectuses of information concerning the appointment of a representative for bond holders. This is of particular importance in cases of collective engagement, such as in times of restructuring, where bond owners have difficulties in acting collectively.

5. EU Authorities will need to monitor the progress made by Member States in the review/adaptation described above.

6. EU authorities could consider establishing a unique EU identifier for investors, similar to what has been done with the LEI to identify legal entities, the ISIN for securities and the IBAN for bank account number.

7. To address the specific issue described above in the investment fund business, market players supporting investment funds should move quickly to adopt a recommended standard content, format and transmission methodology for the transmission of information as set forth in chapter 7 of the EFAMA report[68].

Registration requirements are defined either in national law or in local rules and regulations. These laws, rules or regulations will need to be observed in the proposed harmonised framework (data fields, content, messages).

### 3.2. Who should act to address the Barrier?

The relevant constituencies (investors, issuers, registrars, intermediaries – including infrastructures whether acting as central register or intermediary), should work together to analyse registration procedures; where possible, data fields, contents and formats should be harmonised, to identify and define practical issues related to the technical aspects of registration procedures and their differences as well as the additional operational issues and cost they may cause.

---

[68] EFAMA report on Standardisation of Fund Processing in Europe (March 2011)
http://www.efama.org/Publications/Public/Fund_Processing_Passport/110324_EFAMA%20FPSG%20Report%20(Final%20March%202011).pdf

**5. Structural Barriers**

EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes

The relevant constituencies should adopt recommended standard content, format and transmission methodology for the transmission of information as set forth in the revised SRD. This should be based on existing work and reports. This should be drafted and assessed not only within the framework of the Level 2 SRD legislation but also with a view that Member States are encouraged to follow a single EU-wide approach and avoid unnecessary diversity in transposition in areas not covered by SRD and Level 2 implementing measures.

**Responsibility**: Industry.

Member States should (with encouragement from the Commission in the context of the Level 2 legislation) adopt industry standards as per above, but also to review and where appropriate amend registration requirements which go beyond necessary requirements for shareholder information[69].

**Responsibility**: Member States, European Commission.

To address the specific issue described above in the investment fund business, market players supporting investment funds should move quickly to adopt a recommended standard content, format and transmission methodology for the transmission of information as set forth in chapter 7 of the EFAMA report Standardisation of Fund Processing in Europe (March 2011).

**Responsibility**: Investment fund industry.

**3.3. By when should the actions be taken?**

All solutions should be implemented at the time of SRD level 2 / transposition into national law coming into force.

**3.4. Priority of the Barrier:** High.

**4. Diverging view**

European Issuers note the following areas of disagreement with the text above.

- It should not be argued that registration itself is a barrier, only different procedures how to execute registration may cause different operational necessities. Further harmonisation should focus on the processes and procedures for transmission of shareholder information; in particular, it is neither proven that there is a need for, nor accepted that there should be harmonisation of the content of registers.

- It is not proven and should thus be investigated that operational risk arises as a result of the divergence of registration arrangements; further work should be done to substantiate the suggestion.

---

[69] Where registration is mandatory for taxable shareholders, EPTF barrier 10 on registration should be considered in conjunction with EPTF barrier 5 on withholding taxes.

EPTF BARRIER 5: Lack of harmonisation of registration and investor identification rules and processes

- The work already accomplished by T2S Taskforce on Shareholder Identification and the Working Group of the EPTG on shareholder identification and registration is sufficient to achieve the desirable harmonisation.

## *EPTF BARRIER 6: Complexity of post-trade reporting structure*

New Barrier

---

**Description of the issue:** The lack of harmonisation across multiple post trade reporting requirements increases the cost of reporting and the complexity of data analysis.

**Priority:** High.

**Summary of proposed action:** A harmonised and simplified reporting 'package' should be developed, which can be referenced by all EU regulations and rules that require post trade transaction reporting.

**Responsibility:** European Commission.

---

### 1. Description of the Barrier

There are two principal issues that contribute to the high level of complexity associated with the existing EU post-trade reporting regime:

a) The lack of a harmonised structure to the various post-trade reporting requirements as defined in the relevant legislation/regulation and rules.

b) The mechanism by which the application of post-trade reporting regulations are maintained on a day-to-day basis.

Each of these is dealt with separately below.

### a)      Lack of a harmonised structure for the various post-trade reporting requirements as defined in the relevant legislation/regulation and rules

In the aftermath of the 2008 crisis, enhanced, or in some cases new, mandatory post-trade reporting regulations and rules have been implemented in the majority of key global jurisdictions requiring the reporting of individual transactions and/or positions of nominated participants.

Within the EU, the regulations include but are not limited to MiFIR, EMIR, SFTR and REMIT and local rules include but are not limited to ECB's MMSR and Bank of England's SMMDC. (A detailed list of reporting obligations is contained in Annex 3, Table P, at section 7.2.3.)*.*

However, the requirements for transaction-level reporting identified under the various rules and regulatory instruments display differences in a number of key dimensions:

1. Data elements to be reported e.g. EMIR requires the reporting of up to 85 individual data elements, approximately 23 of which are also reportable under MiFID2/MiFIR.

2. The intermediary channels by which the data is to be reported e.g.

    a. EMIR – both parties report to an EMIR authorised Trade Repository (TR);

    b. MiFIR – both parties report either directly to the National Competent Authority (NCA) or to the NCA via an Approved Reporting Mechanism (ARM);

    c. SFTR – both sides have to report to an SFTR-authorised TR.

3. The mechanism of reporting, e.g. data is pushed to the regulator (MiFID/MiFIR) or is pulled by the regulator (EMIR, SFTR).

An additional complication has been the slow adoption of data standards for individual data elements and the reporting formats to be used by regulators and market participants. For example, the ISO LEI standard was published in 2012 but in the initial technical standards under the EMIR legislation, a counterparty identifier could be input as either LEI 'if available' or in the event of no LEI, a BIC or client code. Regulatory support for a standard will clearly encourage its acceptance and adoption as shown by the accelerated use of LEI following its mandatory inclusion in multiple regulations published since 2014 and in the recent revision of the technical standards under EMIR when the Global Legal Entity Identifier Foundation (GLEIF) process was introduced globally formalising LEI production and access.

**b)      The mechanism by which the application of post-trade reporting regulations are maintained on a day-to-day basis**

There are occasions on which particular reporting regulations may lack the clarity or granularity necessary for accurate and co-ordinated implementation by all reporting entities and reporting infrastructures such as TRs.

If clarification of a regulation is required post-implementation, it is typically addressed via mechanisms such as the Q&A process. However, such processes lack a structured approach in two regards:

1.  *Procedures*: There is no formal consultation period on the definition of such clarifications. In some but not all circumstances, market opinion is sought but there is no formal feedback mechanism that allows understanding of the decisions made.

2.  *Timing*: Guidance is issued on an ad hoc basis (see chart below). Where clarifications of ambiguous regulatory obligations require market participants and/or infrastructures to make system changes, there should be tolerance to allow sufficient time to implement the changes. Consideration should be given to the bona fide efforts already made to comply with the regulations and the effort required to respond to the clarifications. It should also be noted that the ad hoc nature of the issuance of Q&As, for example, makes it problematic to plan the effective use of IT resources.

15th May 2017

**5. Structural Barriers**

EPTF BARRIER 6: Complexity of post-trade reporting structure

Figure 6: ESMA guidance on EMIR reporting (TR questions)

| | | | | |
|---|---|---|---|---|
| | 1 | Classification of financial instruments | 1 of EMIR | 5 August 2013 |
| | 2 | TR registration | 56 of EMIR | 20 March 2013 |
| | 3a | Reporting of collateral | 9 of EMIR | 23 June 2014 |
| | 3b | Reporting of valuations | 9 of EMIR | 23 June 2014 |
| | 4 | Reporting of outstanding positions following the entry into force of EMIR (Backloading) | 5 of the ITS on reporting to TR | 3 April 2017 |
| | 5 | Exchange traded derivatives | 9 of EMIR | 4 June 2013 |
| | 6 | Reporting to TRs: Cleared trades | 9 of EMIR | 20 March 2013 |
| | 7 | Reporting to TRs: Avoidance of duplication | 9 of EMIR | 4 June 2013 |
| | 8 | Reporting to TRs: delegation | 9 of EMIR | 4 June 2013 |
| | 9 | Reporting to TRs: Table of fields | 9 of EMIR | 20 December 2013 |
| | 10 | Codes | 9 of EMIR | 24 October 2014 |
| | 11 | Frequency of reports | 9 of EMIR | 5 August 2013 |
| TR Questions | 12 | Field "Maturity" | 9 of EMIR | 27 April 2015 |
| | 13 | Intragroup transactions | 9 of EMIR | 5 August 2013 |
| | 14 | Transactions within the same legal entity | 9 of EMIR | 5 August 2013 |
| | 15 | Subsidiaries of non-EU entities | 9 of EMIR | 5 August 2013 |
| | 16 | Collateral portfolio code | 9 of EMIR | 20 December 2013 |
| | 17 | Position level reporting | 9 of EMIR | 20 December 2013 |
| | 18 | Reporting to TRs: UTI construction | 9 of EMIR | 11 February 2014 |
| | 19 | Reporting to TRs: UTI generation | 9 of EMIR | 24 October 2014 |
| | 20a | Reporting to TRs: Empty fields | 9 of EMIR | 27 April 2015 |
| | 20b | Reporting to TRs: Validations of EMIR reports | 9 of EMIR | 27 April 2015 |
| | 21 | Reporting to TRs: UPI taxonomy | 9 of EMIR | 11 February 2014 |
| | 22 | Reporting to TRs: Venues with AII codes | 9 of EMIR | 11 February 2014 |
| | 23 | Reporting to TRs: AII code | 9 of EMIR | 11 February 2014 |
| | 24 | Reporting to TRs: Buy/Sell indicator for swaps | 9 of EMIR | 24 October 2014 |
| | 25 | Reporting to TRs: Decimal values in fields 15 and 16 | 9 of EMIR | 11 February 2014 |

| | | | | |
|---|---|---|---|---|
| | 26 | Reporting to TRs: Complex Contracts | 9 of EMIR | 11 February 2014 |
| | 27 | Reporting to TRs: 'Leg 1' and 'Leg 2' fields | 9 of EMIR | 11 February 2014 |
| | 28 | Reporting to TRs: Underlying field | 9 of EMIR | 20 March 2014 |
| | 29 | Reporting to TRs: Field 15 for NFC | 9 of EMIR | 20 March 2014 |
| | 30 | Reporting to TRs: MIC codes | 9 of EMIR | 20 March 2014 |
| | 31 | Reporting to TRs: Exchange rate | 9 of EMIR | 20 March 2014 |
| | 32 | Reporting valuations of swaps on structured products | 9 of EMIR | 23 June 2014 |
| | 33 | Collateralisation field | 9 of EMIR | 23 June 2014 |
| | 34 | Contracts with no maturity date | 9 of EMIR | 23 June 2014 |
| | 35 | Notional Amount field | 9 of EMIR | 23 June 2014 |
| | 36 | OTC Derivatives Novations | 9 of EMIR | 23 June 2014 |
| | 37 | Access to Data by the authorities | 81 of EMIR | 4 February 2016 |
| | 38 | Trades terminated before reporting deadline | 9 of EMIR | 24 October 2014 |
| | 39 | Block trades and allocations | 9 of EMIR | 24 October 2014 |
| | 40 | LEI changes due to mergers and acquisitions. Update of identification code to LEI | 9 of EMIR | 1 October 2015 |
| | 41 | Reporting of notional in position reports | 9 of EMIR | 4 February 2016 |
| | 42 | Population of the field Clearing Obligation | 9 of EMIR | 4 April 2016 |
| | 43 | Trades cleared by clearing house which is not a CCP | 9 of EMIR | 26 July 2016 |
| | 44 | Transition to the new EMIR TS on reporting | 9 of EMIR | 2 February 2017 |

Source: ESMA[70].

---

[70] Questions and Answers, Implementation of the Regulation (EU) No 648/2012 on OTC derivatives, central counterparties and trade repositories (EMIR), dated 3 April 2017
https://www.esma.europa.eu/sites/default/files/library/esma70-1861941480-52_qa_on_emir_implementation.pdf

## 2. Consequences of the Barrier

**a.  Increases the cost of reporting:**

> o   For Reporting entities
>
> o   For Reporting infrastructures

***For reporting entities***:  Entities that have multiple reporting obligations may have to build multiple reporting channels. As an example, there is no reuse of data between the MiFID and EMIR intermediary channels or reporting frameworks as defined earlier in Section 1a. Whilst the use of a TR is mandatory for both EMIR and SFTR, TRs must be authorised separately. Thus, if a reporting entity's EMIR TR is not SFTR registered, then either a link to a second TR will be required or the portfolio will need to be transferred to an appropriately dual-registered TR. All of these complexities ultimately increase the cost to the participant. It should be noted, however, that a simplified procedure is foreseen in SFTR to allow for the registration of TRs already registered under EMIR. Technical standards currently under preparation will also introduce such a simplified registration into EMIR for SFTR-registered TRs.

Additionally, the possibility of needing to rework reporting solutions in the light of post-implementation clarifications adds to the cost with the ad hoc nature of the clarifications, inhibiting planning for optimal use of resources. These increased costs apply both to reporting entities and authorised intermediaries such as TRs but are ultimately borne by the reporting entities.

The consequences of increased cost of reporting are effectively an increase in cost of investing in European markets. Whilst other jurisdictions competing for this investment also have reporting obligations to satisfy, the complexity, lack of harmonisation between reporting regulations in the EU, and the resulting sub-optimal use of IT resources means that the incremental post trade costs for reporting in the EU tend to be higher than in a jurisdiction with harmonised or single reporting obligations. This risks being a negative factor in relation to any investment decision.

***For reporting infrastructures:*** Specifically in the case of EMIR, the initial absence of mandated data standards and formats to make data available to the authorities has led to a situation where it is difficult to aggregate data made available by the individual TRs. This directly led to the creation of the TRACE regulator portal project to provide the required harmonisation of data and formats to be made available to authorities. The costs to the industry of implementing this project (estimated by some TRs to be as much as EUR 1m per TR plus a percentage of the disclosed ESMA TRACE budget of EUR 700 000 given that EU regulators' funding is derived at least in part from industry funding through fees) have been significant. Additionally, where different reporting regulations/rules require reporting of the same data fields, the duplicate data will potentially increase the cost of data storage. The recent adoption of revised EMIR technical standards should help to alleviate this problem.


**b.  Increases the complexity of data analysis**

The twin complexities of the absence of harmonised data formats together with the lack of standardisation of data elements inevitably has a negative impact on the ability of any entity to analyse the data without prior 'cleansing' and/or normalisation. Typically, but not exclusively, this will negatively impact the regulatory authorities in carrying out their role in an effective and efficient manner. This complexity manifests itself in two ways:

5. **Structural Barriers**

EPTF BARRIER 6: Complexity of post-trade reporting structure

***Data quality***: In the absence of mandated standards, as defined earlier for counterparty identifiers, participants and intermediaries invariably settle on the standards best suited for their own operation. This means that in the absence of a mandated standard, it is highly unlikely that all participants will implement the same solution, leading to a degradation in the level of harmonisation and consistency of the data.

***Data aggregation***: If the reports received by the regulators or other users (e.g. usage of publicly reported data) vary in terms of the formats used by the reporting entity, then the aggregation of data (as required for systemic risk analysis, for example) becomes subject to a data normalisation process. In the case of EMIR, this is achieved, at a cost, via the TRACE portal. The recently adopted revised technical standards should, however, go some way towards alleviating this problem.

### 3. Proposed way forward

#### 3.1. Possible solutions

a) *Harmonised structure*: There are a number of ways in which this barrier can be addressed. Taking each of the issues in the sequence they have been highlighted:

1. *Data elements to be reported*: Where duplicate data is being reported to the same point by the same reporting entity, e.g. the 23 duplicate fields between MiFIR and EMIR, the reporting obligations should ensure that such duplication is eliminated where possible.

2. *Intermediary channels for reporting*: At present, the variety of reporting channels possible under the various EU regulations means that a reporting entity with obligations across multiple Member States may, in a most complex case, need discrete connections to all relevant EU NCAs for MiFID direct NCA reporting, an EMIR TR and an SFTR TR, as well as separate linkages to the ECB, BoE, etc. If the reporting regulations can offer the option of consolidating multiple channels to use a single type of authorised intermediary, for example by reusing existing reporting infrastructure, more cost effective reporting solutions could be built, should reporting entities determine this to be the most appropriate solution and subject to a case-by-case analysis of its overall efficiency for each type of reporting.

3. *Mechanism for reporting*: Standardisation of the push vs pull reporting requirement should be achieved, i.e. all data should either be pushed or pulled. It is also important to note that whilst timing is currently not an issue with all regulatory reporting being mandated no later than T+1, this particular standardisation should be maintained in a review of all reporting mechanisms (for example, it should be noted that ECB MMSR reporting is due on T+0). Similarly, harmonised reporting exemption criteria should be maintained.

4. *Data standards*: Where there is broad industry agreement on the use of a standard, it should be mandated and promoted as part of a regulation/rule. For example, guidelines exist for UTI[71] and regulatory support for one of these will give impetus to early adoption. Note that a key part of the implementation of any standard includes the process by which the data is created, e.g. an issue surrounding the implementation of UTI is its availability in time to be used in the reporting process and this should also be addressed in any regulatory support.

---

[71] e.g. for ISDA guidelines, see multiple references at  http://www2.isda.org/functional-areas/technology-infrastructure/data-and-reporting/identifiers/uti-usi/
for BIS guidance, see https://www.bis.org/cpmi/publ/d131.pdf

5. *Reporting formats*: A set of reporting templates, utilising internationally agreed standards as referenced above, should be agreed and implemented by all reporting entities (direct or intermediary).

6. *Common communication protocol*: usage of standard ISO 20022 protocol should be recommended (please also refer to EPTF Barrier 2).

b) *Maintenance mechanisms:* The continued relevance of the available legislative tools should be regularly assessed and if its continued use is appropriate, the issue of regulations lacking clarity and/or granularity should be addressed with a view to ensuring maximum clarity and lack of ambiguity. This will require continued consultation with industry bodies, but ultimately, it will require regulation to be drafted in a form which is clear and unambiguous and, as far as possible, recommending or requiring the use of specific standards.

To address the ongoing maintenance issue, the regulatory process followed by ESMA to elaborate and issue Q&As[72] in the areas which are within its remit should be revised to add the following steps:

1. Publication by ESMA of the proposed clarifications with explanation as to why proposed alternative solutions were not recommended.

2. Where technical implementation is required, definition of a formal post-publication implementation period which allows for industry compliance to be achieved.

3. Identification of a regular maintenance cycle to move away from the current ad hoc process, again referencing specifically those clarifications requiring technical implementation. This would allow implementation of industry best practice around IT release planning and resource usage. The maintenance should be done either quarterly or half yearly.

### 3.2. Who should act to address the Barrier?

a) In consultation with the industry, with other EU regulatory and/or supervisory authorities such as ESMA, ACER, the ECB and the BoE, and with reference to global recommendations from authorities such as the FSB, CPMI, and IOSCO, the European Commission should work to create a harmonised and simplified reporting 'package' which can be referenced by all EU regulations and rules that require post-trade transaction reporting.

This package should, at a minimum, address the standardisation of data elements to be reported as already defined in various regulations and rules, standardise the use of reporting intermediaries, standardise the mechanisms for reporting, and identify relevant data standards as mentioned above.

b) The European Commission should revise the maintenance process for reporting required by regulation:

- Ensure that the initial (and, where required, supporting) legislation is unambiguous.

- Redesign the existing maintenance process to address the deficiencies identified above.

### 3.3. By when that action should be taken?

---

[72] See https://www.esma.europa.eu/questions-and-answers

**5. Structural Barriers**

EPTF BARRIER 6: Complexity of post-trade reporting structure

By the end of 2017 the Commission should launch an industry consultation to identify the key components of a common standardised reporting 'package', as defined in section 3.1 a) *Harmonised structure*, for inclusion in all EU regulatory mandates that require post trade reporting. Following such consultation the Commission and the ESAs should jointly work at addressing the issues raised, by means of delegated acts, technical standards, guidelines and Q&As according to the legislative imperative.

**3.4. Priority of the Barrier:** High.

## *EPTF BARRIER 7: Unresolved issues regarding reference data and standardised identifiers*

Former Giovannini Barriers 8 & 9, redefined and combined

---

**Description of the issue:** Financial reference data, e.g. International Securities Identification Number (ISIN), Legal Entity Identification (LEI), should be available to all market participants for free or at cost, free of licence fees, copyright or similar restrictions.

A legal dispute with US service providers that treat the provision of reference data as a commercial business is unresolved to date.

**Priority:** Medium.

**Summary of proposed action:** In the medium term an international agreement should be achieved whereas all reference data identifiers that are necessary to ensure efficiency should be available to users for free or at cost, for internal and external use, and not restricted by commercial interest such as licence contracts or consumption reporting requirements.

**Responsibility:** European Commission.

---

### 1. Description of the Barrier

A financial instrument can be traded electronically only if it and its counterparties are properly "identified" by their own unique standardised identifiers. Global regulatory efforts support the use of essentially four identifiers: International Securities Identification Number, ISIN (instruments), Legal Entity Identifier, LEI (counterparties), Unique Product Identifier, UPI (derivative instrument classification), and Unique Transaction Identifier, UTI (transactions). The possibility to use these identifiers and associated reference data without licence agreements and/or the payment of usage fees removes barriers to the uptake of agreed identifiers, fosters their acceptance in the market place, and enables automation (of data reporting and processing) on the basis of standardisation.

Globally tradable securities are identified by the **ISIN**, which is based on the ISO 6166 standard and issued and distributed within a short time frame by all EU national numbering agencies. The timely issuance and distribution of ISINs for cash securities was the first Giovannini Barrier (GB 8) to be (partially) dismantled.

However, the CESAME 2 report mentioned that the issue of licensing fees for the use of US ISINs remains unresolved[73]. The EC issued a Commitments Decision on 15 November 2011[74]. The decision allows European data customers to exercise their unconditional right to early termination of their existing Standard & Poor's (S&P) licensing agreements and to receive US ISIN records via a market data vendor free of charge under a new US ISIN End-user Agreement. S&P announced in August 2014 voluntary modifications for the US ISIN Service, including a direct contract between

---

[73] For details , please see: Solving the industry Giovannini Barriers to post-trading  within the EU, CSAME Report, 28 November 2008, at p.48.
[74] http://ec.europa.eu/competition/antitrust/cases/dec_docs/39592/39592_2152_5.pdf

**5. Structural Barriers**

EPTF BARRIER 7: Unresolved issues regarding reference data and standardised identifiers

the user and the numbering agency[75]. The EC Commitments Decision expires after 5 years, i.e. after 17 April 2017. S&P declared its readiness to extend the voluntary measures beyond this date[76].

When it comes to the use of agreed identifiers for the processing (including collateral management) and (regulatory) reporting of other financial instruments and positions, such as credit claims or derivative instruments, the first CESAME report of 28 November 2008[77] acknowledged this need but cautioned that "any standard identifier for such other instruments should be carefully developed to avoid any issues on intellectual property rights, such as copyright". This is a real danger[78]. The EU has adopted ISIN as the instrument identifier of liquid OTC derivatives traded on platforms in the context of MiFID and transaction reporting to ESMA under EMIR. However, the necessary OTC-ISIN identifiers and associated reference data are not produced by S&P but by the Association of National Numbering Agencies[79] from 2018 onwards under a cost recovery principle and their use is expected to be licence-fee free[80].

The **identification of legal entities** acting as issuers or counterparties to financial instruments and contracts are under risk of being subject to licence and fee issues too. However, following a G20 recommendation, legal entity identification has been internationally standardised by the **Legal Entity Identifier (LEI)** under ISO 17442. EU legislation requires the use of the LEI mainly for reporting purposes in almost all areas of financial services. LEIs are issued and distributed by the Global Legal Entity Identifier Foundation and its associated network of local operating units under strict governance principles set by the Financial Stability Board (FSB), including the licence-free distribution and use of the identifier and associated reference data.

### 2. Consequences of the Barrier

Carrying out post-trade steps in real time (in contrast to simple file transfers) is very sensitive to risk-management, clearing and settlement issues as it affects straight through processing. The blocking of ISIN could lead to interruptions in electronic securities trading, and is therefore a potentially very significant interference in financial markets, which can have vast economic effects and shake the systemic stability of financial markets worldwide. According to recent research 50% of buyside firms said that problems with securities identification lead up to 10% of trade failures[81].

### 3. Proposed way forward

#### 3.1. Proposed solution

The concept of licence-free distribution of the identifiers and associated reference data should be extended to the identification of all financial instruments and counterparties. Reference data as well

---

[75] http://www.cusip.com/pdf/CUSIPImprovesAccessibilityofUSISINBasicServiceAugust2014_FINAL.pdf
[76] http://pages.marketintelligence.spglobal.com/rs/565-BDO-100/images/CGS-Other-Voluntarily%20Extends%20Offering-170317.pdf
[77] Cf. p.49.
[78] For example, the so-called MarkIT Redcode is used widely within in the global derivative industry to identify credit default swaps. However, it is linked to CUSIP, an identifier that is not licence free
[79] Following a joint ISO/ISDA study group ("ISO SG2") for the definition of allocation rules for such "OTC-ISINs" the Association of National Numbering Agencies (ANNA) has set up a Derivatives Service Bureau (DSB) to issue and distribute OTC derivative ISINs.
[80] For details, please see: http://www.anna-web.org/home/derivatives-service-bureau/
[81] http://www.thetradenews.com/Buy-side/Buy-side-blame-securities-identification-for-trade-failures/

as instrument or entity identifiers should be a common good, available for free or at cost to ensure efficiency within the financial markets, and should not be restricted by commercial interests.

Furthermore, to avoid licence and fee issues going forward, the CPMI/IOSCO work on standardisation of a Unique Trade Identifier (UTI)[82] and a Unique Product Identifier (UPI)[83] should follow the LEI governance principles.

### 3.2. Who should act to address the Barrier?

The European Commission should initiate an international agreement whereas the use of publicly mandated identifiers, such as LEI, ISIN, UPI, UTI, and associated reference data should follow strict governance principles as set by the Financial Stability Board in case of LEI, including the licence-free distribution and use of the identifiers and associated reference data.

All (other) reference data that are necessary to ensure efficiency should be available at cost and not restricted by commercial interests. In particular, unrestricted blocking of data delivery by data vendors in the chain should not be allowed. Interruptions of STP flows in financial markets because of disruption of data flows need to be prevented to be able to maintain financial market stability.

### 3.3. By when that action should be taken?

Medium term.

### 3.4. Priority of the Barrier

Medium.

---

[82] For details on UTI please see: http://www.fsb.org/2017/03/proposed-governance-arrangements-for-the-unique-transaction-identifier-uti/
[83] For details please see: http://www.fsb.org/2014/09/r_140919/

15th May 2017

**5. Structural Barriers**

EPTF BARRIER 7: Unresolved issues regarding reference data and standardised identifiers

# 6. Legal Barriers

## *Introduction*

A strong legal framework which operates consistently across the EU is an essential requirement for a successful capital markets union. However, in several ways, there are legal issues that remain a barrier to a truly integrated capital market in the EU.

The Giovannini Reports in 2001 and 2003 identified three legal barriers in the post-trade area. First, it was noted that the absence of an EU-wide framework for the treatment of interests in securities causes legal uncertainty and inhibits cross-border transactions. It was also noted that similar legal uncertainty arises because there is no broad-ranging rule for establishing which country's legal system applies when a legal question about ownership rights in securities arises (a "conflict of laws rule"). Finally, differences across jurisdiction in the treatment of bilateral netting were identified as a barrier. Despite repeated efforts to introduce legal reform along the lines of the Giovannini recommendations (FCD, WUD, Proposal for a draft Securities Law Directive etc.), progress in removing the barriers has remained limited and the rationale for such reforms is unchanged.

Furthermore, the collapse of Lehman Brothers in 2008 highlighted several additional shortcomings in legal and regulatory systems, many of which have been addressed through legislation introduced in the intervening years. Nevertheless, a number of key issues relating to risk management and investor protection have not yet been covered by corresponding EU legislative developments. It is also observed that new legal uncertainties have arisen in light of post-crisis market developments, notably the increased prominence of central clearing and new arrangements relating to securities settlement.

A central piece of the current legislative framework relevant to these subjects is the Settlement Finality Directive (SFD). The SFD was enacted in 1998 and market participants argue that it has not kept pace with the market developments. As a result, it might give rise to several legal challenges, in particular, as regards the insolvency remoteness of CCPs' risk mitigation procedures under EMIR in the post-trade area and the appropriate treatment of DvP (securities).

The following analysis focuses on four aspects of the current post-trade legal framework, which are seen to affect efficient cross-border clearing and settlement:

- <u>EPTF Barrier 8:</u> Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures  (formerly Giovannini Barrier 14);

- <u>EPTF Barrier 9:</u> Deficiencies in the protection of client assets as a result of the fragmented EU legal framework for book entry securities  (formerly Giovannini Barrier 13);

- <u>EPTF Barrier 10:</u> Shortcomings of EU rules on finality; and

- <u>EPTF Barrier 11:</u> Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims  (formerly Giovannini Barrier 15).

## *EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures*

Former Giovannini Barrier 14

---

**Description of the issue:**

1. Risk mitigation actions taken by intermediaries providing post-trade services should be legally protected. In this respect, specifically the Financial Collateral Directive (FCD):

- does not sufficiently protect close-out netting agreements in cross-border settings. Under the current regime, parties need to carry out due diligence in order to ascertain whether a close-out netting agreement is enforceable in case of insolvency of the other party. In addition, the recently adopted Bank Recovery and Resolution Directive (BRRD) introduces new uncertainties as to whether close-out netting agreement is enforceable in accordance with its terms in the context of a bank resolution.

- does not sufficiently protect collateral takers, such as settlement agents guaranteeing the execution of transactions, e.g. when providing credit to support liquidity of trading. Legal uncertainty as to the valid creation and scope of protection of collateral arrangements might inhibit cross-border use of collateral flows, which are needed to collateralise credit transactions.

2. Default management procedures of CCPs might be challenged under relevant applicable insolvency laws.

**Priority:** High.

**Summary of proposed action:**

1. Risk mitigation actions taken by intermediaries

- Legal certainty as to the enforcement of close-out netting agreements in cross-border settings has to be enhanced. In addition, guidance should be issued urgently to the Member States on the issues arising under the BRRD which threaten the enforceability of close-out netting arrangements in the context of a bank resolution regime.

- The Financial Collateral Directive (FCD) should be amended so as to establish higher legal certainty as to the acquisition and disposition of collateral and improve the enforceability of collateral arrangements.

**Responsibility**: European Commission.

2. CCPs' default management procedures

EMIR should be amended in order to safeguard the insolvency remoteness of CCP default management procedures upon default of a CCP participant.

**Responsibility:** European Commission.

---

### 1. Description of the Barrier

It is generally accepted that providers of post-trade services (infrastructures and intermediaries) must manage the risks they assume in providing those services.

## 1.1. Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries

Intermediaries and their clients frequently manage their counterparty credit risk through close-out netting and collateral arrangements. Weaknesses in the current legal framework have the result that neither such risk mitigants may be as reliable as they need to be.

### Close-out netting arrangements

Having effective bilateral close-out netting[84] between the parties of a transaction is important because it is an essential piece of defence against counterparty credit risk, in particular in a case of insolvency. With the growth in long-term financial products[85] and collateralisation requirements, the ability to close out and achieve certainty quickly following a default has grown in importance. The wide-spread use of close-out netting arrangements and their importance for risk management led to the recognition of bilateral close-out netting for reduction of capital requirements under the CRR.[86] Under the roll-out of mandatory clearing requirements through EMIR[87], bilateral close-out netting is an important risk management consideration for clearing members. All these reasons indicate that the rationale for clear and effective rules about effectiveness of bilateral netting continues.

The Financial Collateral Directive (Article 7 FCD) obliges Member States to recognise that a close-out netting arrangement concluded by eligible parties and relating to eligible assets[88] can take effect in accordance with its terms, notwithstanding the commencement or continuation of winding-up proceedings or reorganisation measures in respect of the collateral provider or the collateral taker[89]. There is, however, considerable variation between Member States on the scope of protected close-out netting arrangements. In addition, the FCD provisions concerning the protection of netting arrangements are limited to netting agreements in connection with collateral arrangements, and only address very basic concepts thereby leaving room for considerable uncertainty over their interpretation and application. Moreover, there are diverging national insolvency 'avoidance rules' which might affect netting arrangements. Annex 3 [90] identifies that the EU lacks a fully harmonised close-out netting regime which is consistent with the international

---

[84] In this note, the term 'bilateral netting' (i.e. between two market participants) is addressed, rather than 'multilateral netting', which occurs within infrastructures such as CCPs and securities settlement systems. It is not correct to draw the distinction between 'cleared' and 'uncleared' transactions, since bilateral netting is also relevant to cleared transactions, since some clearing relationships (e.g. client-clearing member) are bilateral in nature even though the wider picture includes a CCP. It should be understood further that this note is concerned with 'close-out netting' as opposed to other species of netting such as 'payment netting' or 'netting by novation', which are important in particular fields, but are not the focus of this analysis.

[85] Cf BIS studies on growth in derivatives volumes, available at:
http://www.bis.org/statistics/about_derivatives_stats.htm

[86] Article 195 ff. CRR.

[87] Article 4 ff. and level 2 legislation.

[88] As determined by the national implementing rules of the Financial Collateral Directive, due to the opt-out provisions of Article 1(3) and 1(4)(b) FCD.

[89] The FCD limits the range of eligible party types and also gives Member States considerable flexibility over coverage, which contributes to diversity.

[90] Sections 7.3.1, 7.4.1.

15th May 2017

**6. Legal Barriers**

EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures

standard set in the UNIDROIT Principles on Close-out Netting[91], even though the UNIDROIT Principles were largely inspired by the European regime. (It may be argued that further harmonisation would not remove the requirement to undertake a legal review of the enforceability/validity of netting arrangements, because these arise under regulatory requirements (in particular CRR, EMIR); however, the fact that legal analysis would be in any case necessary does not justify a status quo where the legal analysis is complicated and, thus, entails higher uncertainties).

In addition, the BRRD[92] and the Commission's proposal for a Regulation on the Recovery and Resolution of CCPs (CRRR)[93], introduce a new framework for ailing financial institutions, including, *inter alia,* pre-insolvency measures such as moratoria and (extended) stay of termination rights under a close-out arrangement. As regards the BRRD, the main issues appear to be:

- The introduction of a new mandatory two-business-day stay for non-exempted institutions[94] (Article 71(1) BRRD) precludes close-out netting during the implementation of resolution of a failing institution. This rule does not create legal uncertainty, but affects directly the effectiveness of netting agreements as risk mitigation instruments since any extended stay will necessarily increase the potential risk exposure for the affected counterparty and may affect the quantitative assessment of collateral requirements. However, these are calculations to which financial institutions can adapt.

- The interplay of bail-in with close-out netting. Under Article 49(2) BRRD, the general principle is that netting should take place first, and bail-in in relation to a liability arising from a derivative should be applied to the net sum emerging from the netting process. However, a resolution authority is not obliged to close-out the derivative contract before applying bail-in tools, where a derivative liability has been excluded from the application of the bail-in tool under Article 44(3) BRRD[95]. The resolution authorities also have discretion to split up assets (rights or liabilities) covered by the same netting agreement in 'partial property transfers'. Although Articles 76 and 77(1) BRRD state that netting sets ought in principle to be protected[96], Member States may approach implementation in different ways, and may give resolution authorities a discretion. This results in a further risk of inconsistency as to what must (as opposed to *may*) be kept in a set. Where there is lack of clarity as to whether bail-in or netting prevails, netting may no longer be a reliable risk-mitigant. Such differences in scope and the application of exemptions make the picture harder to assess.

**1.2. Shortcomings in the legal framework for financial collateral arrangements**

---

[91] http://www.unidroit.org/instruments/capital-markets/netting

[92] Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directive 82/891/EEC, and Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC, 2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) No 1093/2010 and (EU) No 648/2012, of the European Parliament and of the Council Text with EEA relevance.

[93] Brussels, 28.11.2016 COM(2016) 856 final 2016/0365 (COD).

[94] Such stays do not apply to CCPs, central banks and systems or operators of systems designated for the purposes of Directive 98/26/EC, by virtue of article 71(3) of BRRD.

[95] A derivative contract is excluded from bail-in under Article 44(2), if it is fully collateralised. The same applies to liabilities that arise by virtue of the holding of client assets or client money including client assets or client money held on behalf of UCITS.

[96] See also Commission Delegated Regulation of 18 March 2016.

EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures

The Financial Collateral Directive addresses a number of issues concerning collateral arrangements[97]. It disapplies formalities in relation to the creation, validity, perfection, enforceability or admissibility in evidence of collateral arrangements (Article 3 FCD). In addition, FCD establishes the right to enforce a financial collateral arrangement by sale or appropriation and by set-off (Article 4(1) FCD). Article 5 FCD recognises the right of use of collateral under security financial collateral arrangements, while requiring the collateral taker to transfer equivalent collateral, in order to replace the original collateral, at the latest on the due date for performance. Furthermore, FCD recognises title transfer collateral arrangements (TTCAs, Article 6 FCD). In addition, collateral arrangements are afforded protection in case of insolvency of one of the parties, since certain national insolvency provisions are disapplied (Article 8 FCD). In particular, enforcement of a collateral arrangement is, in principle, not delayed by a stay or moratorium in the event of insolvency proceedings affecting the collateral provider.

However, several key legal aspects of collateral arrangements remain fully subject to national laws. Cross-border collateral flows are affected by lack of harmonised rules on the acquisition and disposition of collateral, including the good faith acquisition. In addition, despite the conflict of laws rule of Article 9 FCD, there is still legal uncertainty as to the applicable law to collateral arrangements in certain situations.

In the following, we identify several shortcomings of the current collateral framework, which are illustrated by the example of the custody pledges and repos, two widely-used collateral arrangements.

### 1.2.1 "Custody pledges" (security interests)

In providing securities settlement services, banks and other service providers can provide credit in relation to the trading activity of their clients. A bank or settlement agent may agree with the client to provide the necessary funds for settlement, and to receive a contractual security interest over the incoming purchased securities as a risk-mitigant. In this way, the bank or settlement agent can be protected with security over an asset of approximately equal value to the price which it has agreed to lend. This type of arrangement is referred to in this Report as a "custody pledge".

As a vital component of the post-trade market, the FCD ought in principle to give clear support to custody pledges and other protected financial collateral arrangements. Despite this, in cross-border settings several shortcomings can be identified:

- Lack of clarity as to the "possession" or "control" test: Article 1(5) FCD states that the Directive applies to financial collateral, once "it has been provided". However, FCD lacks rules on the "provision" of collateral. Recital 9 of the FCD merely provides that "the only perfection requirement which national law may impose in respect of financial collateral should be that the financial collateral is delivered, transferred, held, registered or otherwise designated so as to be *in the possession or under the control* [emphasis added] of the collateral taker [...]". Therefore, the FCD seems to rely on a "possession" or "control" test for the perfection of financial collateral arrangements. However, it does not specify what is involved in taking 'possession' of financial collateral (is it sufficient for the collateral to be in the collateral-taker's account at the CSD? Is it sufficient to be

---

[97] It is observed that the market in financial collateral is inhibited by regulatory restrictions not considered in this section. For example, certain investors such as UCITS funds are limited in their ability to create security interests; retail investors are not permitted by MiFID2 to enter into title transfer collateral arrangements.

"earmarked" in the collateral provider's account?) or "control" (is it sufficient that the collateral-taker has a legal right to refuse a request from the collateral-taker to withdraw collateral?). The CJEU ruling in the case *Private Equity Insurance Group v Swedbank*[98] does not provide sufficient clarity as regards the "possession" or "control" test under the FCD.

- Ambiguity in insolvency laws as to whether collateral provided after the opening of insolvency proceedings is covered by FCD protections: Article 8(2) FCD requires Member States to safeguard financial collateral that has been provided on the day of, but after the moment of the commencement of insolvency or reorganisation proceedings, is enforceable and binding on third parties if the collateral taker proves that he was not aware, nor should have been aware, of the commencement of such proceedings[99]. However, it is not clear which steps and events are protected by Article 8(2) FCD: Is it sufficient that the collateral taker was unaware of the opening of insolvency proceedings at the time the collateral agreement is concluded (transaction)? Or must he be unaware of the opening of the proceedings at the moment of the delivery, transfer, holding, registering etc. of financial collateral so as to be in the "possession" or under the "control" of the collateral-taker?

- Legal uncertainty as to the applicable law to book entry security collateral. The conflict of laws rule of Article 9(1) FCD points to the law of the place of the "relevant account". A fundamental problem is that an account itself, strictly speaking, has no location; their location is to be determined with reference to other factors. In any case, the connecting factor of Article 9(1) FCD is unclear and has not been interpreted uniformly across Member States. This can result in legal uncertainty in an important case, commonly encountered in post-trade collateral arrangements: where a financial intermediary, such as a clearing member or a custodian providing settlement services, receives securities from its client into an account provided by the intermediary. Depending on the jurisdiction, the question of the identification of the relevant account can lead to different possible answers: (i) the accounts of the collateral taker on the intermediary's books; (ii) the account where the intermediary's entitlement to the securities is recorded (such as the next intermediary in a custody chain or the CSD or another set of books) or (iii) the account of the collateral provider[100]. The end investor needs to agree either in individual case or in generalised manner with the custodian as to the conditions under which the assets may be used as collateral.

### 1.2.2 Repos

A repo is (for the purposes of the FCD) a type of title transfer financial collateral arrangement, under which a collateral provider transfers full ownership of financial collateral to a collateral taker

---

[98] Judgment of 10 November 2016, *Private Equity Insurance Group v Swedbank*, C-156/15, ECLI:EU:C:2016:851, paragraph 38-44. In the UK, courts had to rule in two cases whether financial collateral in the sense of the Financial Collateral Regulations, which implemented the FCD in the UK, has been "provided" (Gray and others v G-T-P Group Limited: Re F2G Realisations Limited (in liquidation) [2010] EWCH 1772 (Ch) and Lehman Brothers International (Europe) (In Administration) [2012] EWHC 2997 (Ch)).
[99] The CJEU reiterated the provision of Article 8(2) FCD in its Judgment of 10 November 2016, *Private Equity Insurance Group v Swedbank*, C-156/15, ECLI:EU:C:2016:851, paragraph 46.
[100] Cf Member States' divergence on renvoi issues: see *Conflict of laws issues in T2S Markets: A fact finding exercise*, p. 6 ff. http://www.ecb.europa.eu/paym/t2s/progress/pdf/ag/mtg29/item_4_20151116.pdf

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 77 of 150

6. Legal Barriers
EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by
intermediaries and of CCPs' default management procedures

for the purpose of securing the performance of relevant financial obligations (Article 1(b) FCD). Under a repo agreement, a good faith collateral taker expects, in principle, to obtain clean title over the securities. However, the lack of harmonised rules on the acquisition and disposition of book entry collateral/securities at EU level, including rules on good faith acquisition, might undermine the legitimate expectations of a good faith acquirer. This is because the conditions for good faith acquisition differ across Member States. As a result, the collateral taker has to determine the applicable law and examine its substantive rules so it is important to know which system of law will govern the question when a purchaser's entitlement is challenged.

As explained above, Article 9(1) FCD points to the place of the "relevant account". However, it is unclear which the relevant account in a case is, where the buyer uses an intermediary to hold its securities: as with the previous example, it could be either the custody account or the account where the intermediary's client account is provided[101]. This might result in legal uncertainty in cross-border transactions.

### 1.3. Shortcomings in legal protection of CCPs' default management procedures[102]

Following the G20 agenda in the wake of the financial crisis, CCPs authorised in the EU have been obliged to call and collect margins to limit their credit exposures (Article 41 EMIR) and maintain a pre-funded default fund to cover losses that exceed the losses to be covered by margin requirements (Article 42 EMIR).

In addition, CCPs rules must set out in detail the procedures to be followed upon the default of a clearing member and safeguard that such procedures are enforceable (Article 48(1) and (4) EMIR). In that context, a CCP might take the following actions in order to contain losses and liquidity pressures and avoid disruption of the CCP operations (Article 48(2) and (5) EMIR):

- close out transactions;

- place a value on positions and collateral;

- set off credit and debit balances;

- transfer/porting of client's positions to a consenting non-defaulting participant upon request of the clients, without the consent of the defaulting clearing member;

- transfer assets or surplus on a client account to a client of the defaulting clearing member.

EMIR does not explicitly protect the default management procedures of CCPs, which must deal with defaults of clearing members, against challenges under the applicable national insolvency laws (which are not harmonised at EU level)[103]. Under other legislation, CCPs' close-out netting arrangements are given insolvency protection under Article 7 FCD, subject to the avoidance rules of

---

[101] See the Case Study in section 7.4.1. of Annex 3.
[102] It should be noted that the European Commission has issued a proposal for a Regulation on recovery and resolution of CCPs, , 28.11.2016 COM(2016) 856 final 2016/0365 (COD). That proposal deals with protection of the market and the roles of stakeholders in the event that the CCP has insufficient pre-funded financial resources to cope with the consequences of a member default. The barrier which is identified here is different: the barrier is concerned with legal protection granted to CCPs, as contrasted with the financial position of CCPs. Until the legislative proposal for recovery and resolution is finalised and has had a chance to bed in, it is inappropriate to comment on the financial position of CCPs in Europe.
[103] The possible default or failure of a CCP itself is not considered here, as it is the subject of specific legislative proposal (COM(2016) 856 final 2016/0365 (COD)).

6. Legal Barriers

EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures

the insolvency proceedings. Given that CCPs qualify as SFD-designated systems[104], the SFD in its present form should afford insolvency protection to margin collateral and default fund contributions (Article 7 SFD; and see also Article 8 FCD).

**The specific problem of transfers of client positions and assets**

- However, the SFD does not protect other actions taken by CCPs upon the default of a direct clearing member, in particular the transfer/porting of a client's positions to another consenting non-defaulting direct clearing member, and the transfer of assets to a client of the defaulting clearing member.

As a result, the insolvency authority of a defaulting direct clearing member might argue that such actions contravene the entitlements of the insolvent entity. The shortcomings of the EU legal framework for the insolvency protection of CCPs' default management procedures can undermine the role that CCPs have assumed with regard to risk management and financial stability, unless Member States introduce such legislation on their own initiative.

Furthermore, the SFD, like EMIR, does not provide CCPs with comprehensive protection against property law challenges to actions taken as part of default management processes. This was a particular issue in a claim by the bankruptcy trustee of MF Global US, which asserted that it owned property rights in proprietary account margin that had been transferred to various CCPs to cover proprietary account positions of its affiliated clearing member, MF Global UK, and that CCPs had acted contrary to its property law rights in applying the margin against proprietary account liabilities or porting.

Property law-related issues concern (in particular) the obligations of CCPs to attempt to the positions and collateral relating to a client's positions to a non-defaulting member, and to make a direct payment of surplus amounts remaining after close-out of a client account directly to the client[105]. These actions may be challenged:

- It can be said that the clearing member dealt with the CCP as principal, so even though the client positions and collateral ought not to be 'proprietary' entitlements of the clearing member, they should be dealt with under the insolvency proceedings applicable to the defaulter. Such an analysis would put the transfer or direct-payment duties of the CCP in conflict with the insolvency objectives.

- Transfer of positions and collateral to a replacement clearing member is sometimes done using a security interest, granted over the client account at the CCP in favour of the client as security for the performance of the clearing member. However, the 'asset' comprising the client account, positions and collateral is not a species of 'financial collateral' for the purposes of the FCD, thus making it potentially vulnerable to challenge.

Finally, in order to ensure an effective default management mechanism by CCPs and therefore avoid an increase in systemic risk and contagion effect to other markets, it may also be appropriate to consider an exemption for liabilities that arise from CCP-cleared derivatives from the bail-in tool in BRRD.

---

[104] Article 17(4) EMIR.
[105] Articles 48(5), (6) and (7).

**2. Consequences of the Barrier**

## 2.1. Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries

**Netting arrangements**

The differences in personal and material scope of protection of netting agreements due to the opt-out provisions of Article 1(3) and 1 (2)(e) FCD result in great complexity across the EU. The position in the interbank market is clearer, since netting arrangements between financial institutions fall within the protective regime of the FCD but are still subject to the non-harmonised insolvency avoidance rules of the Member States (recital 15 FCD). Outside the interbank market, the scope of protection of close-out netting is more difficult to assess. The legal uncertainty as to the scope of protection of close-out agreements could either lead the counterparty to refuse to trade or, potentially, to seek another solution such as collateralising the gross value at risk or demanding a premium for the transaction. Outside the wholesale market, the legal uncertainty as to the enforceability of close-out netting agreements can adversely affect provision of credit (and financing conditions) for investments and job creation, which are principal goals of the CMU.

**Financial collateral arrangements**

Uncertainty as regards the legal soundness of collateral arrangements in the post-trade sector has negative consequences for the capital market in Europe.

In the first place, difficulty in obtaining secure (valid and insolvency remote) collateral arrangements tends to disincentivise credit provision and reduce the available credit. This is liable to adversely affect liquidity in the marketplace.

Secondly, legal risk can materialise as actual loss, which is likely to depress further the willingness to provide credit.

Thirdly, legal uncertainty as regards the protection of collateral arrangements may have an adverse impact on the activities of settlement agents or other banks presently offering settlement services that include credit facilities. The consequences might include (a) the settlement agents' withdrawal from the marketplace, which is likely to result in further consolidation and reduction of competition; (b) an agent bank failure, which can lead to cross-border transfer of risk and systemic contagion and have an impact on the ability of survivors to liquidate collateral. An attempt to mitigate systemic risk is being implemented through the resolution and recovery regime for larger banks.

## 2.2. Shortcomings in legal protection of CCPs' default management procedures

Adequate protection of CCP policies and procedures to handle clearing member defaults is part of the international principles for financial market infrastructures[106]. A shortcoming in EU legal framework regarding the protection of CCPs' default management procedures for transfer/porting may affect the stability of CCPs.

**3. Proposed way forward**

### 3.1 Risk mitigation techniques used by intermediaries

### 3.1.1 Netting Agreements

---

[106] CPMI/IOSCO Principles for Financial Market Infrastructures, principle 13.

**6. Legal Barriers**

EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures

**Action**: Adoption of UNIDROIT Principles on close-out netting (and revision of BRRD).

The legal patchwork on the insolvency protection (eligible transactions and counterparties) for close-out netting across Member States goes back to the debate on the appropriateness of the so called "safe harbours", which favour the counterparty over other creditors of the failed firm. In order to address the current legal uncertainty as to the insolvency remoteness of close-out netting provisions, either existing EU legal acts (FCD and WUD) should be amended to accommodate the UNIDROIT Principles on close-out netting, which seem to favour a rather balanced approach, or alternatively, new netting legislation (which does not depend on a collateral arrangement being in place) should be adopted to replace (and extend) the relevant rules of the FCD and WUD.

The Commission should ensure that BRRD's effect on close-out netting is kept under close observation, bearing in mind the statutory review of BRRD due by 1 June 2018. The statutory review of the BRRD should examine the extent to which netting protections have been put at risk by the BRRD and whether any modification to the BRRD (such as the introduction of safeguards) is desirable. If by the time of the statutory review of BRRD, i.e. 1 June 2018, the desired results regarding the elimination of uncertainty of enforceability are not achieved, either an amendment to BRRD (e.g. in the form of a Level 2 Regulation) or a new EU legal regime should be proposed by the Commission.

The barrier is of high priority because of the substantially adverse consequences which flow from inadequacy in the legal framework for close-out netting. The need for legal certainty in this area is already well understood and accepted by policy-makers.

**Responsibility**: European Commission.

**Timeframe**: By 1 June 2018 (i.e. timeline for statutory review of BRRD).

### 3.1.2 Collateral arrangements

**Action**: Revision of the Financial Collateral Directive.

The following amendments to the FCD are desirable in order to make collateral arrangements work effectively in the post-trade space; the amendments will not interfere with legitimate rights of any other interested persons such as infrastructures or issuers.

- Article 9(1) FCD should be revised so as to clarify which is the "relevant account" in a case where the collateral-taker is also the custodian of the collateral. It is appropriate in this situation that the account provided by the custodian  be the only "relevant account".

- The FCD should be revised in order to clarify the "possession" or "control" test for the provision of collateral. With regard to 'custody pledges' in favour of settlement agents, it should be confirmed that a settlement agent has "possession" of securities once the securities have been transferred to the settlement agent's account.

- Article 8(2) FCD should provide additional clarification as to the insolvency protection of collateral provided after the opening of insolvency proceedings, where the collateral-taker is not aware of such opening. It should be specified that it is necessary that the collateral-taker was not aware of the opening of the insolvency proceedings at the moment the collateral arrangement came into existence (rather than the moment that the collateral was delivered). It is understood that a financial collateral provided after the opening of

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 81 of 150

6. Legal Barriers

EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures

insolvency proceedings must be protected, at a minimum where the insolvency proceedings were opened between the date of the conclusion of the collateral agreement (transaction) and the intended date of delivery of the collateral (settlement).

In implementing this recommendation, the following principles should be observed:

- The need to differentiate between security interests and transfer of ownership in a security. Transfer of ownership should be evidenced by booking of a security in an account when the principle "no credit without credit" and "no credit without debit" on all levels of the custody chain are observed[107].

- In relation to the 'relevant account' issue[108], the need to ensure consistency with the approach to conflict of laws (see EPTF Barrier 11).

**Responsibility**: European Commission.

**Timeframe**: Without delay.

### 3.2. Protection for CCPs' default management procedures

**Action**: Revision of EMIR.

The SFD was not specifically designed to protect a CCP against challenges to its default management processes in the context of clearing[109]. Where specific protections have been introduced, this has been on an individual Member State basis. There is therefore a need for ensuring clarity and harmonisation on an EU-wide basis in the legal protection of the default-management actions enshrined in EMIR.

The EU should revise EMIR so as to expressly protect, in the event of the insolvency of a clearing member, certain default activities of CCPs which are contemplated by EMIR, from both insolvency law and property law challenges, namely porting of client margin and positions and direct payment to clients.

The revision could potentially also consider an exemption for liabilities that arise from CCP-cleared derivatives from the bail-in tool in BRRD.

In implementing the EPTF's recommendation, the following concerns of market participants should be considered:

- Legal protections given to protect default action by CCPs against challenge should carefully balance the interests represented by CCPs and other stakeholders, and be justified in terms of client protection and/or financial stability.

---

[107] Cf. recommendations under Barrier EPTF 9.
[108] Opinions differ as to the appropriateness of the custodian's account as the 'relevant account' for all purposes. This issue is a question of conflict of laws, which is addressed under Barrier EPTF 11.
[109] Clearing precedes, and is distinct from, settlement; the attempt to cover both processes in the same directive has caused some confusion. CCPs are not ordinarily engaged in settlement of transactions.

15th May 2017

**6. Legal Barriers**

EPTF BARRIER 8: Uncertainty as to the legal soundness of risk mitigation techniques used by intermediaries and of CCPs' default management procedures

- Rules of CCPs which could affect ownership rights or rights of non-participants[110] (in particular, those of clients) should be subject to the oversight of supervisory authorities.

**Responsibility**: European Commission.

**Timeframe**: Without delay.

### 4. Diverging view

European Issuers disagree with both the analysis of the situation and the description of perceived problems and with several of the above proposals. These proposals seem to argue in favour of:

- Putting the business interest of certain intermediaries above the interest of end investors but also of other intermediaries.

- Giving priority to internal rules of CCPs and other intermediaries over applicable laws, over the basic principle of protection of end investors and over the interests of other third parties not being a party to a contractual arrangement with CCPs or other intermediaries.

- Giving CCPs and parties to a collateral arrangement not being the first collateral provider priority over third party rights. A simple "balancing" with other "stakeholders interests" is not sufficient.

European Issuers are of the opinion that:

- no intermediary incl. CCPs should be given priority of their own rules of procedure over the rights of other parties in the capital markets, esp. not over the creation laws of securities, over the rights of end investors and over other applicable laws.

- It is an effect of doing business in any given market, and esp. doing business cross-border that one should carefully consider the legal basis for doing business. This is not a barrier in the single market but a mere cost of entering a market and offering a service.

- It is not proven that there are real problems for the functioning of the capital markets if intermediaries are obliged to investigate whether they actually legally obtain a position they want to obtain and whether that position is acknowledged in the insolvency of a contract partner besides the instrument of "transfer" (or "porting").

- Contractual arrangements and rules of procedure set by market participants themselves should only be binding and have legal effect for the contract partners and the direct participants of any CCP or other market system which have knowingly consented to being bound but cannot bind third parties esp. not end investors not being a party to the contract or a direct participant in that system.

- Consequences of differing rules of procedures of different CCPs should be avoided.

---

[110] Clearing members are bound by the CCP's rules but third parties may have no (or only limited) contractual relationships with the CCP.

European Issuers do not agree with the claim that BRRD, FCD and EMIR have serious shortfalls and need a revision. Before any action is proposed or taken a fact finding should be done to determine where problems are perceived and by whom as well as how they, if any exist, can be addressed by improving operational procedures before regulations or directives are changed. This especially concerns:

- The relevant account should always be the account of the end investor who owns (or at least should own) the security and not the account of an intermediary or "collateral taker" since the latter creates additional risk and uncertainty esp. in cases where intermediaries may move the "account" by a simple internal operational decision or the rules of procedure of a CCP. This could deprive end investors of their vested rights in a security they have paid for.

- The introduction of a new mandatory two-business-day stay (Article 71(1) BRRD) precluding close-out netting does not create legal uncertainty, but only leads to the need for calculations to which financial institutions can adapt as stated above.

- Article 49(2) BRRD states correctly and in favour of certain market participants, that netting should take place first, and bail-in in relation to a liability arising from a derivative should be applied to the net sum emerging from the netting process. Although Articles 76 and 77(1) BRRD state that netting set offs ought in principle to be protected, Article 77(2) BRRD allows resolution authorities to split up "where necessary". This does not result in legal uncertainty since after the decision of the resolution authority the legal consequences are clear.

6. Legal Barriers
EPTF BARRIER 9: Deficiencies in the protection of client assets110F as a result of the fragmented
EU legal framework for book entry securities

## *EPTF BARRIER 9: Deficiencies in the protection of client assets[111] as a result of the fragmented EU legal framework for book entry securities*

Former Giovannini Barrier 13

> **Description of the issue:** EU law does not comprehensively ensure legal certainty as to clients' ownership rights over securities held through intermediaries. As a result, the failure of an intermediary may result in legal uncertainty as to the clients' ownership rights and delays in returning the securities.
>
> **Priority:** High.
>
> **Summary of proposed action:** EU legislation should be introduced to:
>
> - ensure that an end investor enjoys ownership rights[112] over all securities credited to an account intended to confer ownership, and that the end investor obtains ownership rights when the end investor's account-provider credits his account subject to the principles of "no credit without credit" and "no credit without debit" throughout the custody chain.
>
> - clarify that securities credited to a client account do not belong to the account-provider, regardless of whether the account is an omnibus account or an individually segregated account.
>
> - enable prompt return of the securities in the intermediary's insolvency by establishing common processes for the return of assets.
>
> - specify how losses should be attributed in cases of shortfalls arising in the intermediary's insolvency.
>
> **Responsibility:** European Commission.

## 1. Description of the Barrier

The EU rules on protection of client assets suffer from potential shortcomings, which become relevant in the intermediary failure (insolvency or resolution): (i) legal uncertainty as to the clients' (and end investors) ownership rights due to the fragmented EU legal framework for ownership rights in book entry securities; and (ii) insufficient protection of client assets in the intermediary's failure, due to the absence of harmonised rules on the treatment of shortfalls and common processes enabling the prompt return of client assets.

---

[111] The term "client assets" refers to "assets (or an analogous term) in respect of which the intermediary has an obligation (either contractual or regulatory) to safeguard for its securities or derivatives clients, including, to the extent appropriate, client positions, client securities and money (including margin money) held by an intermediary for or on behalf of a client", see 2014 IOSCO Recommendations Regarding the Protection of Client Assets (Glossary, p.9). The current analysis focuses on securities held through intermediaries.
[112] "Ownership" rights include the right to sell, right to receive dividends, right to vote, right to receive other shareholder benefits, right to be recognised as a "shareholder". "Ownership rights" are *'in rem'* rights binding on third parties (not just the investor and his account provider)") even when the asset like a security has been dematerialised and may only exist in the form of book entries.

EPTF BARRIER 9: Deficiencies in the protection of client assets110F as a result of the fragmented EU legal framework for book entry securities

Analysis reveals that the 2014 IOSCO Recommendations Regarding the Protection of Client Assets[113] and the FSB Key Attributes of Effective Resolution Regimes for Financial Institutions (Client Asset Protection in Resolution)[114] have only partly been transposed into EU legislation, though some Member States may already have, or may have added, national laws in keeping with it.

### 1.1 Legal uncertainty as to the clients' ownership rights in book entry securities and the end investor's legal position

The current EU legal framework fails to establish legal certainty with regards to ownership rights of end investors in securities held through an intermediary.

In addition, there are no harmonised EU rules on the legal position of the end investor in book entry securities[115]. Across the EU, Member States have developed legal mechanisms which are intended to ensure that an end investor enjoys in rem "ownership" of securities, notwithstanding that a chain of intermediaries may separate the end investor from the issuer. These mechanisms work reasonably well within each Member State. But the mechanisms differ from each other, and can come into conflict if the chain of intermediaries crosses borders[116]. The lack of harmonised rules on the end investors' legal position in cross-border settings constitutes a barrier to the CMU.

The barrier can be illustrated by the following example, which includes an issuer in one Member State, the end investor in a second Member State and a cross-border custody chain involving an intermediary in a third Member state. It may occur that the account agreement between the end investor and its bank is governed by French law which confers a right in rem on the end investor but the account agreement between the bank of the end investor and another bank acting as custody bank in the UK is governed by English law which may consider the person registered in the issuer's register to be the "legal owner" of the security. If the intermediary's Member State considers that the requirements under local law for recognition of end investors have not been satisfied, and treats the intermediary as the "owner" of a security in the insolvency of the intermediary, the outcome would be unjust and contrary to the expectations of all parties.

### 1.2 Insufficient protection of client assets in the event of intermediary failure

Two situations of concern to clients have been observed in cases where their intermediary has become insolvent[117]. These are (a) where there is a shortfall of client assets – which, by reason of

---

[113] International Organization of Securities Commissions, Recommendations Regarding the Protection of Client Assets – Final Report (FR 1/14, January 2014), available at:
http://www.iosco.org/library/pubdocs/pdf/IOSCOPD436.pdf
[114] Key Attributes of Effective Resolution Regimes for Financial Institutions (October 2014), Client Asset Protection in Resolution, II-Annex 3, available at: http://www.fsb.org/wp-content/uploads/II-Annex-3-Protection-of-Client-Assets-in-Resolution.pdf
[115] The expression "end investor" refers to the buyer of securities – often at the end of the holding chain- who is buying for his/her own account. It also includes an investor such as a fund or a company who may have its own investors, but does not include the investors in the fund or company. This concept of the end investor is well-understood across the EU.
[116] The variety of concepts and the difficulties caused in a cross-border context are summarised in several papers, e.g. a paper by Thiebald Cremers, "Reflexion on intermediated securities" in the Geneva Securities Convention", European Banking and Finance Law Journal, 1 (2010-1) pp. 93; another paper by Philipp Paech, *Market Needs as Paradigm: Breaking Up the Thinking on EU Securities Law*, SSRN ID 2150156, LSE Legal Studies Working Paper No. 11/2012
[117] See, for example, Four Private Investment Funds v Lomas [2008] All ER (D) 237 and Lomas v RAB Market Cycles (Master) Fund Ltd and Hong Leong Berhad [2009] EWHC 2545 (Ch).

**6. Legal Barriers**

EPTF BARRIER 9: Deficiencies in the protection of client assets110F as a result of the fragmented EU legal framework for book entry securities

the intermediary's insolvency, cannot be corrected; and (b) where client assets cannot be extricated from the insolvency in a timely manner.

### 1.3 Shortfalls

A major concern which relates to holdings of securities with an intermediary is the possibility of shortfalls. (A shortfall arises when the intermediary of the relevant account holder holds or has available fewer securities than the amount credited to the accounts of all account holders.) While the risk of a shortfall may be considerably reduced through the principles of "no credit without credit" and "no credit without debit", as outlined below, and by establishing segregated accounts (to the extent possible), they cannot be excluded. In the same vein, shortfalls cannot be excluded through the general legal obligation of intermediaries to rectify reconciliation errors or the daily reconciliation requirements under CSDR. Despite existing systems and controls, it is possible that there will be losses, e.g. if client assets have been improperly used.

Where a shortfall arises, the law needs to determine how and by whom the costs should be borne. Various different solutions are adopted in Member States[118], but there are no uniform rules at EU level[119]. A wide variety of outcomes may be possible. In a cross-border context where several intermediaries may be involved, shortfalls may arise at more than one level in the chain – especially if the intermediaries are affiliated. If that were to occur, different outcomes could be prescribed and uncertainty would exist. This is unsatisfactory for clients of intermediaries and end investors.

### 1.4 Obstacles to timely return of client assets

A further concern for clients holding assets with intermediaries is delay in obtaining access to their securities in the event of failure of the intermediary. Complications and delays in the return of client securities held through intermediaries can be attributed to:

- Lack of legal certainty as to ownership rights in book entry securities (see also EPTF Barrier 11)[120]. This problem is exacerbated where the client has granted the intermediary a "right of use", in particular if this is not precisely defined[121]. It may not be clear to the client, or to the insolvency authority which assets have been subject to a right of use and which remain in the ownership of the investor. As a result, insolvency authorities have to conduct legal due diligence, in order to determine whether the securities held through the insolvent intermediary belong to the clients or other third parties.

---

[118] Losses may be borne pro rata by the clients. Alternatively, under a 'trust' analysis, whether a client is entitled depends on a first-in, first-out approach, which is expensive and uncertain to apply in practice.

[119] Some losses may be covered by the Investor Compensation Schemes Directive (97/9/EC). Under specific legislation, losses arising from intermediary default are allocated to another intermediary. The prime example of this is AIFMD and UCITS which allocate losses to be borne by the relevant depositary.

[120] The common understanding that the intermediary holds investors' assets on a fiduciary basis, and that those assets should not legally be part of the intermediary's insolvency estate, which is available to creditors, does not accelerate the return of assets (securities), since the insolvency authority needs to carry out due diligence in order to assert the legal owner of the assets held through the intermediary.

[121] The legal problem is not so much between client and intermediary (where regulation may limit the degree to which a right of use can be obtained) but for a third party, such as a later recipient of the securities, whose ability to receive clean ownership may be in doubt.

EPTF BARRIER 9: Deficiencies in the protection of client assets110F as a result of the fragmented
EU legal framework for book entry securities

- End-of the day processing and poor bookkeeping[122]. Failed firms may be found to have inadequate book-keeping. Accordingly, it might be in practice difficult for the insolvency authority to identify what is held for whom. In any given case, it will be time-consuming to get clarity on "who owns what", in particular if there has been fraud.

The collapse of Lehman Brothers shone a spotlight on cases where assets were locked up in the insolvency and, for a variety of reasons, could not be extricated for a long time.

### 2. Consequences of the Barrier

The lack of clarity as to the ownership rights of clients over securities held through an intermediary and the position of the end investor results in significant uncertainty, in the event of failure of an intermediary, increasing complexity and cost. In particular, the following problems arise:

- Who should be considered as "owner" of a security by third parties and by the issuer?

- How should securities held in an omnibus account be treated in the failure of the intermediary?

- Who has the right to exercise rights flowing from the security that an end investor has acquired?

- Who can claim the security in case of insolvency of an intermediary from the insolvency authority of that intermediary?

- Who can attach book-entry securities?

The lack of harmonised rules on the clients' ownership rights and the position of end investors has led policy-makers and regulatory authorities to reach for other tools, which may have unintended consequences and create themselves additional barriers. For instance, the segregation requirements introduced at EU level in the wake of the 2008 crisis create additional operational burdens, while failing to establish legal certainty as to the ownership rights in securities held through intermediaries and adequately protect client assets (see discussion under EPTF Barrier 11).

### 3 .Proposed way forward

**Action**: Introduction of harmonised rules relating to client asset protection

In order to improve protection of client assets, in particular in the failure of an intermediary, EU legislation should recognise the clients' ownership rights in securities held through an intermediary[123] and clarify the legal position of end investors[124]. In particular, legislation should be introduced which implements the following principles into EU law:

---

[122] In theory, this can be addressed by banking and securities supervisors. However, the law needs to cater for when things go wrong, i.e. when despite all supervisory efforts, the failed institution has not complied with the regulatory standards.

[123] The Geneva Securities Convention (GSC) proposes a system under which  a credit of securities to an account gives the investor all rights inherent in the securities and provides that no further steps are needed to perfect the investor's rights against insolvency authorities (in particular in the event of insolvency of the account-provider), but not the issuer or fellow shareholders.

**6. Legal Barriers**

EPTF BARRIER 9: Deficiencies in the protection of client assets110F as a result of the fragmented EU legal framework for book entry securities

- securities held through an intermediary (in omnibus or individually segregated accounts) should be legally recognised as *not* being owned by the intermediary providing a securities account.

- securities held through an intermediary can be attached[125] only by the end investor's (client's) creditors (prohibition of upper-tier attachment).

- an end investor obtains ownership rights in securities in accordance with the applicable law, when the end investor's account-provider (intermediary) credits the securities to the end investor's account, provided that there is an uninterrupted chain of corresponding credits in the custody chain including the CSD.

- end investors should be able to exercise all ownership rights relating to securities held in an intermediated chain.

In order to avoid the risk of 'inflation' of securities, the following principles should apply:

1. "No credit without credit". Under this principle, an intermediary should not make a credit to its client's account, where that credit is intended to constitute ownership rights, unless the intermediary has itself received a credit, with finality, to its own account at the next-tier intermediary. This principle should apply at all levels of the custody chain starting with the Issuer CSD.

2. "No credit without debit". Under this principle, an intermediary should not make a credit to its client's account, where that credit is intended to constitute ownership rights, unless the intermediary has simultaneously made an equivalent debit entry on its books. This principle would apply in particular to cases where securities are transferred between a client account and a proprietary account.

In implementing such principles as part of EU law or regulatory practice, appropriate regard should be given to their compatibility with legal requirements, accounting and financial reporting standards and operational practice, and to agree any appropriate refinements and exceptions.

In addition, EU legislation needs to enhance the protection of client assets in the event of failure of an intermediary. In particular, there is a need for:

- Harmonised rules on loss attribution in case of shortfalls[126].

- Common processes to ensure the prompt return of assets, in line with the FSB Key attributes of effective resolution regimes for financial institutions relating to client asset protection in resolution (point 10). The legal uncertainty (see also EPTF Barrier 11) as to ownership rights in intermediated securities, which affect the timely return of client assets, could be mitigated, if EU legislation obliges intermediaries to maintain information systems

---

[124] The Geneva Securities Convention (GSC) acknowledges that the relationship between issuer and "account-holders" is subject to the applicable corporate law (Article 8) and cannot be changed or modified by the Convention. The Convention has not met unanimous agreement and has been criticised for not providing proper protection especially for failing to address the question of the relationship of a booking to the benefit of an end investor.

[125] In this context the word "attached" refers to the consequence of court or equivalent action, whereby assets are appropriated or seized to satisfy a creditor.

[126] As recognised by the Legal Certainty Group (Second Advice of the Legal Certainty Group, Solutions to Legal Barriers related to Post-Trading within the EU August 2008, p. 69), the principle "no credit without debit", as a mechanism to prevent shortfalls, "is applied in a number of Member States. However, as it is closely linked to the underlying legal concept of securities holding and settlement, it would not work in other jurisdictions".

**6. Legal Barriers**

EPTF BARRIER 9: Deficiencies in the protection of client assets110F as a result of the fragmented
EU legal framework for book entry securities

and controls that can promptly produce, in a format understandable by a resolution authority, information on the amount, nature and ownership status of client assets held by the intermediary and the identity of the clients. Additional records on the clients' ownership rights and any potential limitations to those rights (including the existence and exercise of any rehypothecation or rights of use by the intermediary), the location of the client assets and the sub-custodians involved, the type of segregation and the applicable client asset protections, in particular where client assets are held in a foreign jurisdiction, could significantly accelerate the return of client assets.

**Responsibility**: European Commission.

**Timeframe**: Without delay.

15th May 2017

## *EPTF BARRIER 10: Shortcomings of EU rules on finality*

New barrier

---

**Description of the issue:** The EU legal framework for settlement finality only caters for a limited number of scenarios: it does not address the actual finality of a transfer or delivery vs payment mechanisms, and should better take into account central clearing.

**Priority:** High.

**Summary of proposed action:** The SFD should be amended to consolidate an EU-wide understanding of the actual moment of finality of transfers, and to protect DvP.

**Responsibility:** European Commission.

---

### 1. Description of the Barrier

#### 1.1 The legal framework for settlement finality in the SFD

The Settlement Finality Directive (SFD)[127] was Europe's response to the risks spelled out in the 1993 CPSS Report on central bank payment and settlement services with respect to cross-border and multi-currency transactions[128]. It was designed to reduce systemic risks for payment and securities settlement systems and ensure the smooth settlement of such systems in case of insolvency of one of the participants to the system, contributing thus to the stability of the capital markets infrastructure and, consequently, to the stability of the financial system as a whole. The SFD was later amended to also cover clearing systems such as CCPs[129].

Together with the protection of "collateral security" provided in connection with participation in an SFD-designated system (e.g. CCPs[130] or securities settlement systems operated by a CSD[131]), the objective of the SFD is to assure the finality of 'transfer orders' and netting of transfer orders among the parties of a trade, not only in a business as usual scenario but also in the event of insolvency of the operator of the system or of any of its participants.

The SFD provides protection to "transfer orders", which are defined as "instructions" by a participant in a designated system to transfer title to a security or place money at the disposal of a recipient (Article 2(i) SFD). In particular, it provides that transfer orders are legally enforceable and even in the event of insolvency proceedings against a participant, binding against third parties, once they are entered in a "designated" system (Article 3(1)). A participant in a SFD-designated

---

[127] Directive 98/26/EC of the European Parliament and of the Council of 19 May 1998 on settlement finality in payment and securities settlement systems, as amended by Directive 2009/44/EC of the European Parliament and of the Council of 6 May 2009 amending Directive 98/26/EC on settlement finality in payment and securities settlement systems and Directive 2002/47/EC on financial collateral arrangements as regards linked systems and credit claims, OJ 10.6.2009, L 146, p. 37.

[128] http://www.bis.org/cpmi/publ/d07.pdf

[129] Article 1(5) of Directive 2009/44/EC of the European Parliament and of the Council of 6 May 2009 amending Directive 98/26/EC on settlement finality in payment and securities settlement systems and Directive 2002/47/EC on financial collateral arrangements as regards linked systems and credit claims, OJ 10.6.2009, L 146, p. 37, amending Article 2(1) SFD.

[130] Under Article 17(4) EMIR, EU-based CCPs must become SFD-designated systems in order to be 'authorised' to act as CCPs.

[131] Article 39(1) CSDR.

system or a third party may not revoke a transfer order from the moment defined by the rules of that system (Article 5).

The process leading to a final settlement in the system can be broken into a number of operational stages, which need to be distinguished in order to understand the source of legal uncertainty.

1) A system participant submits instructions to the system.

2) The system validates the instructions.

3) The system matches the instructions with instructions presented by the counterparty.

4) Under the rules of the system, a participant is usually no longer permitted to revoke 'transfer orders' unilaterally after matching.

5) Credit and debit entries are made within the system.

6) A transfer of title legally occurs.

It is of course possible that some of these events may be simultaneous.

The SFD does not provide a comprehensive answer to a number of questions:

- Article 3(1) of the SFD provides that transfer orders are legally enforceable and binding against third parties in case of insolvency, once entered in an SFD-designated system. However, it does not define the moment of entry of transfer orders in a system[132], but leaves it to the rules of the system or the national legislation[133]. Some systems define the moment of entry with reference to the receipt of the instruction, whereas others rely on the time of validation or matching of the instruction[134]. This divergence about the moment of entry – it could be any of the steps numbered 1) to 3) in the above list – leads to inconsistency and legal uncertainty and different treatment of participants across different systems.

- Furthermore, the SFD looks at a transfer order/instruction in isolation, whereas typically, securities transactions involve *matching* instructions from both the transferor and the transferee. The matching process is not recognised under the SFD.

- Article 5(1) of SFD leaves it to the rules of the system to determine the moment of irrevocability of transfer orders[135]. The circumstances and extent of such irrevocability differs. Some systems/legal systems prohibit any form of revocation, others prohibit unilateral revocations, whilst still permitting bilateral revocation, whereas others permit unilateral revocation in some circumstances. Thus there is inconsistency in implementation[136].

---

[132] Settlement Finality 1 - SF1.

[133] The 2006 Evaluation report on the Settlement Finality Directive from the Commission (http://ec.europa.eu/smart-regulation/evaluation/search/download.do?documentId=2418) reveals that EU Member States have not enacted any legislation in this respect.

[134] CSDs using the T2S Platform have agreed to an identical moment of entry of transfer orders into their respective systems (SF1). This is the moment when the validation process is positively performed according to the T2S validation criteria, i.e. when the transfer orders have been declared compliant with the technical rules of T2S.

[135] Settlement Finality 2 - SF2.

[136] CSDs using the T2S Platform have agreed to an identical moment of irrevocability of transfer orders into their respective systems (SF2). This is the moment when the transaction has been given the status "matched" on the T2S Platform.

15th May 2017

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 92 of 150
6. Legal Barriers
EPTF BARRIER 10: Shortcomings of EU rules on finality

- A further source of legal uncertainty is that SFD does not determine the moment of irrevocability and enforceability of settlement[137]. By focusing on "transfer orders" the SFD leaves it to national law to define the moment of final settlement[138].

Further, the SFD does not fully reflect the evolution of the post-trade environment since it was first enacted in 1998, such as the crucial role of DvP as well as the increasing relevance of central clearing with regard to risk management and financial stability in the aftermath of the 2008 financial crisis and has only been revised by narrowly targeted amendments.

### 1.2 Delivery versus payment (DvP)

Delivery versus payment (DvP) is a securities settlement mechanism which links a securities transfer and a cash transfer in such a way as to ensure that delivery occurs if – and only if – the corresponding payment occurs[139].

The question of the moment of finality is particularly relevant in a DvP environment[140]. The SFD treats each leg of a DvP settlement (cash payment, and securities transfer) as separate "transfer orders" even though in a modern settlement environment they are linked and should be conditional upon each other although market practice would usually regard DvP transactions as a single instruction (transfer order) with two legs. However, where a transaction is intended to settle on a DvP basis across separate securities settlement and payment systems which are not operationally integrated, although connected technically[141], the risk arises that one leg of a DvP transaction would settle with finality when the other leg is still potentially reversible within its system. This is unsatisfactory and creates legal uncertainties if the parties intended the transaction to settle on a DvP basis (both legs settle, or neither): if one party were to enter an insolvency proceeding when only one leg is final, that would expose the other party to the so called "principal risk", i.e. the risk that the seller of securities will deliver, but not receive payment, or the risk that the buyer will pay, but not receive its securities. The principal risk is systemically dangerous[142] as well as falling short of accepted standards of investor protection[143].

Given that, under the current EU regime outside T2S markets, final settlement could be attained in one system but not (at least simultaneously) in the other, uncertainties about the effectiveness of DvP, which create a barrier to safe and efficient post trade market infrastructures in Europe, need to be addressed.

### 1.3 Clearing instructions in CCPs

---

[137] Settlement Finality 3 - SF3.

[138] In T2S markets, CSDs using the T2S Platform are bound to ensure the unconditionality, irrevocability and enforceability of the settlement processed on the T2S Platform (SF3 – Article 21(4) T2S Framework Agreement).

[139] See European Central Bank, Glossary of terms related to payment, clearing and settlement systems (December 2009).

[140] Article 39(7) CSDR requires DvP settlement but does not provide legal certainty as regards the methodology adopted by the relevant systems to achieve it.

[141] This is sometimes described as an 'interfaced' model.

[142] Bank for International Settlements, *Delivery versus Payment in Securities Settlement Systems* (September 1992), p. 1.

[143] Where a transaction settles within T2S, or any non-T2S platform where the cash and securities settlement platforms are operationally integrated, this risk does not arise thanks to the design of the underlying operational and technical processes within their settlement engines.

SFD provisions on settlement finality were not tailored for the specificities of CCPs, since the SFD was drafted with "transfer orders" in mind and its application to clearing of transactions, which occurs prior to settlement, is somewhat ambiguous. Clearing systems, including CCPs, were included within the scope of the SFD, without providing further clarifications as regards the application of settlement related provisions to the somewhat different clearing processes. This is leading to a number of ambiguities.

First, it is unclear whether the clearing instructions given by CCP participants to CCPs benefit from the finality regime of the SFD applicable to transfer orders, i.e. whether they are irrevocable among the parties of a transaction from the moment of the entry in CCP, as determined by its rules. Even if this question is to be answered in the affirmative and we assume that CCPs are subject to the finality regime of the SFD, the finality of margin or collateral transfers to a CCP from its participants will still be a matter of the applicable national law. This question may become relevant in the insolvency or resolution of a CCP participant for netting as performed by the CCP.

Second, the definition of transfer orders under the SFD, which covers cash and securities, may not be appropriate for clearing instructions referring to physical delivery of a commodity (e.g. metal or oil).

Further, a revision of the SFD might also consider the status of settlement instructions issued by CCPs as a necessary part of their default management procedures. In the event of insolvency of a clearing member of the CCP, CCPs may issue new settlement instructions that need to be processed by the CCP or by another settlement or payment system (for instance, cancellation of previously issued settlement instructions or new settlement instructions required within the close-out netting procedure in the CCP). The possibility to accept and process new transfer orders after the commencement of an insolvency proceeding (not necessarily on the same business day) against a participant of a system, in the context of CCP default management procedures, could be protected by the SFD.


## 2. Consequences of the Barrier

### 2.1 Impact on the settlement layer

The aforementioned non-harmonised aspects of the rules on settlement finality, in particular in non-T2S markets, leave an unfortunate patchwork of approaches to the key questions as to whether and when a transfer order in a securities settlement or payment system is irrevocable or when a transfer of securities or cash cannot be undone. This legal uncertainty is likely to affect the position of parties involved in the settlement process in particular in the context of CSD link arrangements outside T2S. CSD participants (or their clients) should be able to determine without difficulties, whether a securities or cash transfer order can still be revoked and when a transfer has legally taken place. The lack of harmonisation requires, instead, complex and costly enquiry and due diligence, in order to determine whether the account entry can be relied on.

### 2.2 Impact on the clearing layer

Stability of CCPs' clearing processes, particularly in the circumstances of market disruption following a clearing member default, is acknowledged to be a desirable policy objective, as it contributes to the financial stability as a whole.

The lack of certainty as to the status of clearing instructions entered into CCPs may become relevant in the insolvency or resolution of a CCP participant, in particular for the effectiveness of netting as performed by the CCP and could also adversely affect risk management in case of CCP interoperability.

15th May 2017

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 94 of 150
6. Legal Barriers
EPTF BARRIER 10: Shortcomings of EU rules on finality

### 3. Proposed way forward

**Action**: Revision of the Settlement Finality Directive

The SFD should be revised in order to:

- address precisely the legal duty for designated systems to specify the moment of the entry into the system, the moment of irrevocability of transfer orders and the moment where settlement is enforceable and irrevocable.

- revise the definition of "transfer order" with the aim of accommodating the specificities of clearing instructions in CCPs.

- ensure that the moment of settlement finality is identical in relation to both cash and securities transfer legs of a transaction which the parties intend to settle on a DvP basis. Linked payment and securities settlement systems may be required to define in their rules a moment at which the respective settlement occurs with finality, which may entail conditionality upon finality occurring in respect of the opposite leg in the corresponding system[144].

- update and clarify provisions in the directive which have given rise to misinterpretations, namely the system definition (Article 2(a) SFD) referring to multilateral agreements rather than system rules and the definition of participants (Article 2(f) SFD) in view of the different types of systems covered by the SFD. This may also include a clarification of whether the range of participants within a SFD eligible system is a minimum or full harmonisation rule, to avoid questions on the cross-border recognition of the SFD status.

- potentially permit that, in the context of default management by a CCP, CCPs can issue new settlement instructions (protected by the SFD) that need to be processed by the CCP or in another settlement or payment system.


It could be considered to convert the SFD into a regulation to avoid the current differences in national implementations in the future.

In implementing the revised SFD, infrastructures' rules should always comply with the principles of ownership described in relation to Barrier EPTF 8; and in particular such rules should not result in investors not receiving securities they have paid for, or the price of securities they have disposed of.


**Responsibility**: European Commission.


**Timeframe**: Without delay.

---

[144] The actual finality of transfers is a matter left to national substantive law. A solution may require a harmonisation of substantive law or additional requirements on the settlement process (e.g. in the CSDR).

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 95 of 150

6. Legal Barriers
EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims

## *EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims*

Former Giovannini Barrier 15

---

**Description of the issue:**

The fragmented EU legal framework for ownership rights in book entry securities, creates cost and uncertainty, inhibiting the growth of a single capital market.

The EU lacks harmonised rules on third party effects of assignment of claims. This might result in the confinement of securitisations into national silos due to increased legal risk and affect the liquidity of securitisation markets.

**Priority:** High.

**Summary of proposed action:**

- Introduction of a single conflict of laws rule for ownership rights in book entry securities.

- Introduction of a conflict of laws rule on third party effects of assignment of claims.

**Responsibility:** European Commission.

---

### 1. Description of the Barrier

**1.1. Ownership rights in book entry securities**

In 2001, the First Giovannini Report identified the absence of an EU-wide framework for the treatment of interests in securities (GB 13) and the uneven application of national conflict of laws rules (GB 15) as legal barriers for the efficient cross-border clearing and settlement. The Second Giovannini Report (2003) addressed the issue as to what action should be undertaken to eliminate the problems identified in the first Report. In that second Report, the Giovannini Group proposed an "EU Securities Account Certainty project" in order to establish legal certainty as to the treatment of interests in securities (GB13). As to GB 15, the Group pointed out that the conflict of laws rule of Article 9 of the Financial Collateral Directive was a "huge step" towards the removal that barrier but "did not go all the way".

**1.1.1 Legal uncertainty as to the applicable law to certain ownership aspects of dealings in securities[145]**

The EU lacks a single conflict of laws rule for ownership rights in book entry securities. Several EU legal acts (Settlement Finality Directive[146], Financial Collateral Directive (FCD)[147] and the Banks

---

[145] This barrier is not concerned with legal questions relating to the creation of securities, only their transfer.
[146] Directive 98/26/EC of the European Parliament and of the Council of 19 May 1998 on settlement finality in payment and securities settlement systems, OJ L 166, 11.6.1998, p. 45.
[147] Directive 2002/47/EC of the European Parliament and of the Council of 6 June 2002 on financial collateral arrangements, OJ 27.6.2002, L 168, p. 43, as amended by Directive 2009/44/EC of the European Parliament and of the Council of 6 May 2009 amending Directive 98/26/EC on settlement finality in payment and securities settlement systems and Directive 2002/47/EC on financial collateral arrangements as regards linked systems and credit claims, OJ 10.6.2009, L 146, p. 37.

**6. Legal Barriers**

EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims

Winding Up Directive[148]) already contain conflict of laws rules on ownership rights in securities referring, essentially, to the place of the relevant account/register. However, the formulation of the conflict of laws provisions of the aforementioned directives is not identical and might create confusion as to the notion of the relevant account. As a result, the law of the relevant account concept itself is not always clear in its application (see below)[149]. In addition, the scope of these conflict of laws rules is limited respective approach only in line with the scope of these directives. For out-of-scope cases Member States retain their different rules for identifying which legal system applies, such as *lex cartae* (law of the place where the security is deposited in material form or issued in immaterial form), the place of the shareholder register, and so forth.

### 1.1.2 Absence of harmonisation on key aspects of dealings in book entry securities

The EU lacks comprehensive substantive rules on the treatment of ownership and on certain aspects of acquiring or disposing of rights over book entry securities[150]. The FCD regulates a limited number of issues concerning collateral arrangements. However, several key legal aspects of collateral arrangements and other dealings in book entry securities are left to national laws.

In order to address the absence of harmonised rules in relation to dealings in book entry securities, the Legal Certainty Group reported in August 2008 on "Solutions to Legal Barriers related to Post-Trading within the EU". The Group made 15 recommendations on the legal effects of book-entries (GB 13), the corporate action processing (GB 3) and the location of securities (GB 9). Noticeable are the recommendations on the role of account providers, the minimum rights conferred to account holders by book-entries, the acquisition and disposition of book entry securities and interests therein (including its effectiveness and reversal as well as good faith acquisition), the priority of rights in the same book entry securities, the integrity of the issue, the attachment of book entry securities and the introduction of a comprehensive conflict of laws rules for ownership rights in book entry securities. The UNIDROIT (Geneva) Convention on substantive rules for intermediated securities was agreed in October 2009. However, neither of these instruments has been adopted as EU legislation.

It seems to be difficult to achieve a broad-ranging legal reform which delivers these desired objectives in a comprehensive manner (so called "securities law reform"). The reasons for lack of progress are diverse, and, for the sake of briefness, should not be addressed in context of this Report. However, EPTF Members agree that the issues identified in the recommendations of the legal certainty group constitute major post-trade barriers and have also been explained under Legal Barriers 1 (good faith acquisition in TTCAs/repos) and 2 (clients' ownership rights and allocation of shortfalls).

### 1.2. Effectiveness of assignment of claims against third parties

The assignment of claims is a legal mechanism used *inter alia* in the field of securitisation and mobilisation of credit claims as collateral. Parties involved in such transactions are particularly

---

[148] Directive 2001/24/EC of the European Parliament and of the Council of 4 April 2001 on the reorganisation and winding up of credit institutions, OJ L 125, 5.5.2001, p.15.
[149] Cf Conflict of laws issues in T2S markets - A fact finding exercise, available at: http://www.ecb.europa.eu/paym/t2s/progress/pdf/ag/mtg29/item_4_20151116.pdf.
[150] The relationship between an issuer and its shareholders, incl. special rules and requirements for its full establishment, are a matter of applicable company law and outside the scope of this report.

Case 1:18-md-02865-LAK     Document 836-31     Filed 06/27/22     Page 97 of 150

6. Legal Barriers
EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party
effects of assignment of claims

interested in the legal soundness of the assignment of claims, including its effectiveness against third parties.

However, the current EU legal framework does not provide a harmonised rule on third party effects of assignments of claims which are transferable under applicable law or agreement. As regards, the applicable law, Article 14 of the Rome I Regulation[151] does not address the question of the effectiveness of an assignment of a claim against third parties and the priority of the assigned claim over a right of another person.

In 2012, the Commission's DG Justice commissioned a study on the transfer of debt claims[152], which highlighted the diversity of approaches in the EU, but no legal proposal has been put forward for harmonisation. In order to fulfil its obligation under Article 27(2) Rome I Regulation, the Commission released in 2016 a Report on the question of the effectiveness of an assignment or subrogation of a claim against third parties and the priority of the assigned or subrogated claim over the right of another person[153], which puts forward three possible solutions (connecting factors), based on the findings of the aforementioned study.

The lack of a conflict of laws rule results in significant legal uncertainty for the mobilisation of credit claims as collateral as well as the securitisation market, since national requirements for the effective transfer of claims (debts) vary significantly. The Commission's report on the appropriateness of Article 3(1) of the FCD reveals that the laws of the Member States differ in relation to the steps required to perfect a collateral arrangement involving credit claims[154]. Some jurisdictions require for the perfection or priority of collateral rights the notification of the third-party debtor or public registration (with constitutive or declaratory effect) for credit claims which have been pledged or assigned. The rules which apply to credit claims typically also apply more broadly to other types of debt claim, which are assigned or transferred by way of security in a securitisation structure.


## 2. Consequences of the Barrier

In relation to securities, the legal gaps described above impose friction in the capital market, with the following specific consequences.

- Transactions may be carried out on a single-state basis, or gravitate to Member States where the legal framework is perceived to be clearer.

- The cost of cross-border transactions is raised, because investors considering a potential transaction (and their intermediaries) find that due diligence is harder, the risk of litigation higher, and the search for certainty elusive. Therefore, the execution of cross-border security transactions often requires costly and extensive legal opinions.

---

[151] Regulation (EC) No 593/2008 of the European Parliament and of the Council of 17 June 2008 on the law applicable to contractual obligations (Rome I) (OJ L 177, 4.7.2008, p.6).
[152] http://ec.europa.eu/justice/civil/files/report_assignment_en.pdf
[153] Brussels, 29.9.2016, COM(2016) 626 final.
[154] Report from the Commission to the Council and the European Parliament on the appropriateness 0f Article 3(1) of Directive 2002/47/EC on Financial Collateral Arrangements, Brussels, 29.6.2016 COM(2016) 430 final.

15th May 2017

**6. Legal Barriers**

EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims

- Investors and intermediaries could be disincentivised from developing certain cross-border economic activity. This may have the effect (which is almost impossible to measure) that deals are not done which would otherwise be feasible[155].

- Where legal uncertainty exists, parties will typically take the more cautious approach in order to ensure that the legal opinions required for capital adequacy purposes can be obtained. This may lead to a reduction of credit, restructuring the transaction, or requiring additional security.

- Disputes are frequently settled out of court, e.g. via bilateral negotiation or via arbitrage, in view of the legal uncertainty.

In relation to debt claims, the absence of a comprehensive EU conflict-of-laws regime for third party effects of assignment of claims has several effects:

- Confinement of securitisations into national silos. Evidence appears to indicate that securitisations are structured along national lines, in part as a result of the complexity of including a multinational portfolio of claims within a single structure. So, for example, a collection of trade receivables (such as a stream of rental payment obligations deriving from hire contracts for machinery) would require an additional legal analysis for the country of each participating debtor, even if those claims are generally transferable and the type of machinery and type of receivable is identical in every country.

- Negative impact on the liquidity of cross-border securitisation markets.

- Legal risks and higher costs. As a result, the parties involved may need to carry out enhanced due diligence, in order to determine whether the mobilisation of credit claims/securitisation structure is effective against third parties.

### 3. Proposed way forward

**Action**: Introduction of conflict of laws rule on ownership aspects of dealings in book entry securities and third effects of assignment of claims.

### 3.1. Ownership in book entry securities

Notwithstanding the differences of views in particular on the desirability or feasibility of a comprehensive securities law reform, the majority of participants in the EPTF consider that a comprehensive conflict of laws solution for ownership in book entry securities could be an ideal outcome.

The conflict of laws regime for ownership rights in book entry securities should be improved. In particular, the following considerations should be noted:

**Single comprehensive conflict of laws rule**: in principle it is desirable to introduce a single conflict of laws rule for the holding and transferring of book entry securities and the provision of ownership therein. This means going further than the above-mentioned sectoral legislation (such as SFD and FCD) and introducing a general rule applicable to all securities held through securities

---

[155] http://www.ecb.europa.eu/paym/t2s/progress/pdf/ag/mtg29/item_4_20151116.pdf, p. 3.

6. Legal Barriers
EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party
effects of assignment of claims

accounts (noting that specific carve-outs may still be necessary, for example, as regards direct holding systems or SFD-designated systems). To achieve this, the new rule could be enacted as a separate legal act or as part of an existing legal act.

**Establishment of a clear connecting factor**: building on the approach currently enshrined in EU sectoral legislation, further clarifications may be added to specify which law governs the ownership aspects of securities held with an intermediary. In this respect, a variety of options exists, which should be assessed as to their clarity and appropriateness. It is clear nevertheless that the connecting factor should sufficiently describe how the applicable law is determined, as the securities account may not physically exist and its 'location' would need to be determined with reference to some specific factors.

Given that the European Commission has launched, on 7 April 2017, a consultation on conflict of laws rules for third party effects of transactions in securities and claims[156], the EPTF has not expressed views on the further detail of its recommendation.


### 3.2. Third party effects of assignment of claims

The FCD has brought about a great improvement in legal certainty by simplifying the legal analysis of financial collateral arrangements involving securities. A similar simplification in relation to transfers (and creation of security interests) in respect of debt claims may be helpful.

Article 14 of the Rome I Regulation should be amended or complemented by another legal act in order to specify a single legal system for third party effects of the assignment of transferable claims.


**Responsibility**: European Commission.


**Timeframe**: Without delay.

---

[156] https://ec.europa.eu/info/sites/info/files/2017-securities-and-claims-consultation-document_en.pdf

15th May 2017

**6. Legal Barriers**

EPTF BARRIER 11: Legal uncertainty as to ownership rights in book entry securities and third party effects of assignment of claims

# 7. Tax Barrier

## *Introduction*

Another important area of quite burdensome practical impediments to an efficient flow of capital across the European financial markets covers a broad range of operational issues in the processing of tax payments and tax-related information flows.

These inefficiencies give rise to a relative unattractiveness of cross-border investments because foreign investors are forced to seek higher investment returns in order to compensate for the additional costs incurred in relation to the complex and inefficient operational processes related to fiscal requirements.

The prevailing withholding tax regimes, that are currently characterised by various shortcomings, such as lack of tax exemption at source, non-harmonised reclaim procedures and in certain Member States unduly long repayment periods, are in direct contradiction to the CMU objective of increased cross-border investments.

It is important to note that tax regimes (i.e. tax liabilities and exemptions) are themselves not in question (nor in scope of the EPTF work), as these matters are indisputably issues of national sovereignty in regard of substantive tax laws. With a pragmatic approach, the EPTF wishes to invite the relevant public authorities to address specific issues around the purely operational processes that are required for the collection and payment of applicable taxes, and for obtaining access to all eligible tax treaty benefits. Solutions developed at European level (FISCO, T-BAG Report[157]) and at international level (OECD TRACE Implementation Package[158]) are at hand and should be the basis of further immediate action by the relevant public authorities, with coordination by the European Commission.

This section focuses on a tax barrier, already noted in the Giovannini Reports[159]:

- <u>EPTF Barrier 12:</u> Inefficient withholding tax procedures (formerly Giovannini Barrier 11).

---

[157] The Tax Barriers Business Advisory Group report, 2013
http://ec.europa.eu/internal_market/financial-markets/docs/clearing/tbag/130524_tbag-report-2013_en.pdf
[158] OECD TRACE Implementation Package,
http://www.oecd.org/ctp/exchange-of-tax-information/TRACE_Implementation_Package_Website.pdf
[159] Giovannini report 2001, Executive summary: "... there remains a convincing argument in favour of harmonising the procedures for securities taxation as a further means to facilitate the integration of EU financial markets".

## *EPTF BARRIER 12: Inefficient withholding tax collection procedures*

Former Giovannini Barrier 11

> **Description of the issue:** Inefficiencies in withholding tax procedures, related to the operational activities of collecting the taxes and applying for any eligible rebates, have been identified as a barrier to efficient cross-border investment and securities.
>
> **Priority:** High.
>
> **Summary of proposed action:** Public authorities are requested to adopt a common harmonised process for WHT collection and reliefs, based on standard rules and forms, in application of the relevant Double Taxation Treaties. For such harmonisation, the European Commission should foster a coordinated approach among Member States, in order to establish a common set of procedures and enhance communication tools.
>
> **Responsibility:** European Commission and all Member States.

### 1. Description of the Barrier

This barrier (already identified in the 2001 Giovannini Report) is related to inefficiencies in withholding tax procedures, mainly in the area of operational activities for collecting the taxes and applying for any eligible tax rebates. This barrier has been identified as a burdensome impediment to efficient cross-border investment and securities. This barrier covers a wide range of issues including operational and fiscal issues.

Capital market investors and Member States have repeatedly identified withholding tax (WHT) relief procedures as a major deterrent to cross-border investment. As pointed out by the ECOFIN Council of November 2015 in support of CMU initiatives, there is a need for "pragmatic solutions to longstanding tax obstacles such as double taxation linked to current withholding tax arrangements".

### 2. Consequences of the Barrier

The withholding tax barrier represents a significant issue in the post-trading system and an obstacle to the development of cross-border capital markets. Both financial institutions (asset owners, pension funds, collective investment funds, individuals and custodians) and their clients are affected by WHT recovery and relief issues. Financial institutions' clients experience delays in recovery and the smaller ones struggle with the complexity and variance in documentation.

Investors also experience different and often changing tax forms, face increasing costs due to lack of standards and consistency, which result in onerous refund procedures and different refund collection timelines in Europe. There is also a different tax relief structure in each market, with the role of withholding tax agent being covered by an issuing company, an intermediary, a CSD or an ICSD.

As such, operating with approximately 90 different types of forms and supporting documentation, different languages, processing requirements of the source country, and facing frequently changing and uncertain procedures and timelines, make the withholding tax processes overall very complex and problematic to handle. Consequently this situation makes it more difficult to efficiently contribute to the development of cross-border capital markets.

Collective investment funds (CIVs) are arguably amongst the most affected. By their pooling of funds from investors, CIVs rely on economies of scale to manage costs and provide returns to their investors. The cumbersome and uncertain WHT procedures are particularly complex for funds (with specific eligibility criteria, documentation requirements, etc.), leading to either loss of reinvestment opportunity, foregone relief, competition issues, and negative impact on investment returns. The main difficulty is that CIVs (UCITS as well as Alternative Investment Funds (AIFs)) are widely distributed and generally held through distributors or CSDs. All the information with respect to the end investors lies with the distributors (e.g. account holder banks or Fund Administrators) which – mostly for commercial and legal reasons – often are not willing or able to share the information with the issuer, i.e. the management company. Therefore, the management company would only have information about those distributors, if any, but not of their "end" investors. Tax treaties, however, often foresee rules on limitation on benefits ("LoB-rules") in order for the funds to obtain treaty entitlement. LoB-rules require the funds to prove their "end" investor base (nationality/residence). In addition, compared to domestic funds, European investment funds distributed cross-border were for a long time treated differently with respect to WHT and have challenged this at the European Court of Justice and national courts. Significant progress has been made, but not all discriminatory treatment has yet been eliminated.

Those operational burdens to claiming tax entitlements make it extremely difficult to complete the reclaim process in a systematic manner. Source countries that continue to operate such procedures to claim tax entitlements make it impossible to complete the reclaim process in a systematic manner. The ability to adapt systems to react to the ongoing uncertainties will over time affect any move toward simplification. Whilst some source countries have taken intermediate steps to amend their existing procedures this is merely exacerbating the above-mentioned issues for all actors in the process chains, ultimately affecting the end investor, and in some cases transferring the withholding tax cost to the investor's country. Additionally, investors are likely to limit exposure to certain investments due to those impediments. Therefore, market segmentation is likely to occur, as providers will restrain their services to specific markets or asset types due to difficulties in obtaining relief, generating a loss of revenue for future investment activities.

The operational burdens on the intermediaries that support investors in trying to help them obtain the correct withholding tax rate on distributions are far from insignificant. Surveys conducted among the custodian community at the beginning of the millennium have indicated that between 18 and 25% of the staff in the post-trade divisions of these intermediaries are dedicated to tax processing. Moreover, there are a series of complications specifically linked to the post-trading environment with regard to WHT that could be identified, as follows:

- Different structure for withholding tax relief in each market: the role of withholding agent can be performed by an issuing company, an intermediary, a CSD, or an ICSD.

- The fiscal treatment of market claims: difficulties in managing multiple, different, complex mechanisms for the fiscal treatment of market claims.

- Mandatory use of local tax advisory firms in tax relief procedures.

- The persistence of national rules that reserve tax withholding responsibilities for local intermediaries, thus forcing foreign intermediaries to use local fiscal agents.

- The fact that the requirements set by tax administrations may become more severe retrospectively, increasing compliance costs to ensure the refund is effectively granted.

- The requirement for asset segregation throughout the custody chain in order to evidence the rights to obtaining tax relief.

- Varied and non-standard documentation.

**7. Tax Barrier**

EPTF BARRIER 12: Inefficient withholding tax collection procedures

- Use by source countries of aged or outdated systems for relief filing and their insistence on requesting documentation filed in original (i.e. lack of e-filing/inability and unwillingness of source countries to accept documentation in electronic form), resulting in burdensome, time consuming paperwork. Tax reclaim forms are sent to clients for signatures (or, if allowed, signed under a Power of Attorney by the custodian), then to the local tax authority of the client for a Certificate of Residence. Power of Attorney's and credit advices will be attached; then the whole package goes, through the sub-custodian or directly, to the tax authority of the issuing company.

- Different regional custodians adopting differing procedures.

- Lack of clear guidance from source country tax authorities regarding basic operational requirements (entitlement eligibility, filing procedures, etc.).

- As for the payment of the refund, it is sometimes requested that the client must sign a further Power of Attorney to collect the refund. Or a cheque is issued by the fiscal authorities and must be collected at a local bank.

- In certain cases, additional information will be requested about the fiscal identity or structure of the Beneficial Owners (BO), or how holdings are built up. In such cases there may be little clear guidance from source country tax authorities. These questions normally delay the time frame for refund by around 2/3 months. If the additional information is not submitted in time, the BO might lose the right for refund, as a second request will not be honoured.

- In certain countries, a plain certificate of residence issued by the fiscal authorities is not accepted. Sometimes only original paper certificates are accepted and further notarisation and legalisation is required, which is also a time-consuming aspect. The validity time of tax residence certification is also different across countries.

- Certain countries may request tax vouchers instead of the credit advice, and these vouchers need to be issued by the custodian/sub-custodian who also charges a fee. There are costs relating to collecting refund cheques.

- In certain countries the reclaim requests are submitted to a central portal of the fiscal authorities, and from there the requests will be divided to the relevant departments. When requesting an update, it is not always clear who to contact. Fiscal tax authorities hardly ever provide updates about reclaim requests.

- Only a few double taxation treaties (DTT) allow expressly pension funds to reclaim WHT.


More recently, at the beginning of 2016 the T2S Advisory Group conducted a Survey with the T2S Community on the impact of withholding tax relief procedures. The key findings from the Survey were the following:

1. **The rules for tax refund or tax reclaim differ between Member States**. T2S markets follow different rules in terms of which assets and actors are subject to the withholding tax procedures.

2. **Most financial instruments and classes of investors, including retail ones, seem to be affected by cumbersome withholding tax procedures**. In most markets, the issuer or its appointed agent is responsible for managing the withholding tax procedure. Non-domestic institutions are usually excluded from offering the service.

3. **Back office functions and asset servicing are mainly impacted** by the withholding tax procedures since they are usually responsible for tax processing within intermediaries.

4. **The mostly manual procedures can take anywhere between 90 days to 4 years in some markets**. Often, physical tax reclaim forms have to be signed and stamped by all relevant actors in the chain (investors, local tax authorities, paying/fiscal agents), translation services are required and foreign intermediaries are excluded from offering the withholding tax relief.

5. **This non-harmonised EU environment, in particular in the context of increased cross-border connectivity (see T2S), may lead to regulatory/tax arbitrage among EU countries**. Some markets may find themselves at a disadvantage due to their complex tax reclamation procedures if investors decide to move their activities to other, more efficient, ones.

6. **It appears that recent EU regulatory initiatives may result in unintended and contradicting outcomes**. Although EU public initiatives on facilitating tax relief (T-BAG) are welcomed by the T2S stakeholders, recent initiatives to potentially restrict tax benefits in treaties may have the opposite effect and fortify, rather than remove, cross-border barriers.

7. **Non-harmonised initiatives across T2S markets**. The responses provide evidence to various national measures adopted recently in order to address withholding tax relief issues. However, the responses also provide evidence that there is a lack of harmonisation, standardisation and coordination among these initiatives.

### 3. Proposed way forward

#### 3.1. Possible solutions

Regarding post-trading, the 2013 Tax Barriers Business Advisory Group (T-BAG) report, on "Workable solutions for efficient and simplified compliance procedures related to post-trading within the EU", highlighted that *"many of the current administrative and efficiency problems can be resolved by eliminating the need to pass on detailed information on beneficial owners through the custody chain up to the local withholding agents. This can be best achieved by allowing any intermediary in the chain to either assume full withholding responsibilities or to take responsibility for granting withholding tax relief by sending pooled withholding rate information to the upstream intermediary"*[160].

Simplifying and harmonising tax relief and recovery procedures are crucial elements to the European single market in order to improve post-trade activities, in particular in facilitating the clearing and settlement of securities across EU Member States.

In this regard, several aspects should be considered:

- Governments should take steps to implement a standardised and harmonised system for tax relief at source and simplified tax refund procedures.

- Two or three Member States should volunteer to conduct a pilot test.

- The most advanced work in this area has been the development by the OECD of the Trace Implementation Package[161]. The following elements should be considered in order to improve the current system:

  o Standardised investor documentation;

---

[160] The Tax Barriers Business Advisory Group (T-BAG) report, 2013
http://ec.europa.eu/internal_market/financial-markets/docs/clearing/tbag/130524_tbag-report-2013_en.pdf
[161] TRACE = Treaty Relief and Compliance Enhancement.

- o Standardised tax reclaim forms;

- o Safeguards to protect governments from inappropriate tax relief claims;

- o Agreement on the liability standards applicable to end investors and financial intermediaries;

- o Removal of national tax rules reserving tax withholding responsibilities for local intermediaries and thus obliging foreign intermediaries to use local fiscal agents;

- o Ensure the system remains voluntary and financial intermediaries are free to choose whether or not to provide relief at source services.

▪ Member States should consider harmonisation of the fiscal status of market claims across the EU so that all market claims on dividend payments are treated as indemnities, and not as taxable dividends[162].

▪ Standardised communication forms, possibly machine readable.

▪ Electronic communication with tax authorities to submit reclaims.

The impact of withholding tax on asset servicing, varies from country to country. In most countries, there is the need to advance the list of the holders some days / weeks before the record date in order to guarantee the most favourable tax rate. A common standard in order to allow for a tax rate adjustment during a "window" of 2-3 weeks applicable to withholding agents would be a positive starting point.

In order to solve specific issues for CIVs, two aspects should be considered:

(1) In order for the fund to obtain treaty benefits, the fund itself should be regarded as the beneficial owner (or a qualified person) and should qualify for double tax treaties without further requirements (no LoB-requirement). This solution, which is in part supported by the 2010 OECD CIV report[163], should be applied at least to all widely held open ended funds. The EU should encourage in this respect Member States to take a harmonised position in negotiating revisions to double tax treaties.

(2) The easiest solution to solve complex legal and practical WHT problems in Europe would be the abolition of WHT on transferable securities for payments made to CIVs within the EU or to impose an EU wide limit on the WHT rate equal to the rate foreseen in most double tax treaties, which is 15 percent.

The latter is a less radical proposal than it may at first appear. First, generally abolishing WHT or limiting applicable WHT rates on cross-border dividend payments were possible options presented by the Commission in its 2011 consultation on cross-border portfolio dividends[164]. Furthermore, some Member States have already decided to abolish, under certain circumstances, WHT for certain types of foreign CIVs (France; Spain; Poland) or limited the WHT rate to 15 percent (e.g.

---

[162] See T2S AG Discussion note on tax harmonisation of November 2016 here:
http://www.ecb.europa.eu/paym/t2s/progress/pdf/ag/20161130_ag_discussion_note_on_harmonisation_of_tax_processing.pdf
[163] https://www.oecd.org/tax/treaties/45359261.pdf
[164] EC Consultation on taxation problems that arise when dividends are distributed across borders to portfolio and individual investors and possible solutions, 28 January 2011
http://ec.europa.eu/taxation_customs/sites/taxation/files/resources/documents/common/consultations/tax/withholding_taxes/wht_public_consutation_en.pdf

Netherlands, Belgium, Germany from 2018). Other Member States do not levy WHT on certain types of income paid on the basis of their domestic legislation (e.g. UK).

Finally, it should also be noted that a number of decisions of the European Court of Justice (ECJ) are indicating that the current fragmentation of procedures in recovering WHT is inefficient, unsatisfactory and lastly discriminatory[165]. In fact, the ECJ has, over the years, issued a significant number of judgements on possible infringement of EU law due to the great diversity in WHT treatment between resident and non-resident investors/taxpayers in cross-border financial transactions. Starting from the assumption that a foreign investor cannot be subject to a heavier tax burden than a similarly situated domestic investor, such decisions specify that discriminatory treatment concerning the refund of WHT could constitute an infringement of Treaty on the Functioning of the European Union (TFEU)[166]. These rulings of the ECJ give legally binding interpretations and they should be taken into account by national authorities when implementing their procedures "in such a way as to effectively create a simplification through clarification"[167].

### 3.2. Who should act to address the Barrier?

The main objective should be to request public authorities to adopt a common harmonised process for WHT collection and reliefs, based on standard rules and forms, in application of the relevant Double Taxation Treaties (which are themselves not in question, nor in scope of the EPTF work).

EU treaties have established that tax matters are the prerogative of Member States. As a result, any regulation aiming to harmonise tax processes at EU level requires unanimity of all Member States. This is probably one of the main reasons why the topic of tax processes harmonisation is not progressing. Because of this, the Commission has issued recommendations such as the Recommendation 2009 on withholding tax relief procedures[168] to Member States. This Recommendation asked all Member States to implement a well-functioning relief at source system or, where this is not possible, to establish quick and standardised refund procedures. A study accompanying the 2009 Recommendation showed that simplifying WHT relief procedures has positive spill-over effects[169]. However, these recommendations, even if backed by a good monitoring process, are limited by the willingness of Member States to follow the recommendation. One possible approach to address this issue is to make a clear distinction between:

- on one side, what is taxable, who is subject to taxation and the level of taxation, all matters that will remain the prerogative of Member States;

- on the other side the harmonisation of tax processes, in particular when an investor invests outside of its country of domicile. For such harmonisation, the Commission should foster a coordinated approach among Member States in order to achieve such common set of procedures and enhance communication tools.

---

[165] Inter alia: C- 383/10, 6 June 2013; joined cases C-10/14, C-14/14 and C-17/14, 17 September 2015; C-18/15, 13 July 2016, (all in http://curia.europa.eu/).
[166] In particular, the rulings indicate possible infringements of Article 56 (freedom to provide services), and/or Articles 63 and 65 TFEU (free movement of capital), and/or Articles 49 and 54 TFEU (freedom of establishment).
[167] The Tax Barriers Business Advisory Group (T-BAG) report, page 14, 2013
http://ec.europa.eu/internal_market/financial-markets/docs/clearing/tbag/130524_tbag-report-2013_en.pdf
[168] See Commission Recommendation of 19 October 2009: On withholding tax relief procedures (http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32009H0784).
[169] Report from the Commission - Accelerating the capital markets union: addressing national barriers to capital flows: https://ec.europa.eu/info/files/170227-report-capital-barriers_en

15th May 2017

The EU authorities should consider whether such an approach could be adopted, with support by all Member States.

In March 2017, the Commission adopted a report (2017 Report) on national barriers to capital flows[170]. In this report, based on a work of an Expert group (composed mostly of Treasury officials), the Commission has identified, among other barriers, that tackling burdensome WHT refund procedures is all the more urgent as they affect all kinds of financial instruments (bonds, shares and derivatives) and stakeholders.

The 2017 Report also identified nine best practices in WHT procedures (in addition to relief at source). Also, in the 2017 Report the Commission invited the Member States' tax experts to assess and confirm, where appropriate, the relevance of the nine WHT best practices that were listed in a joint roadmap. The Commission believes that this collaborative method of working with Member States on the basis of the mutual evaluation of national requirements, peer reviews and an exchange of best practices, can help in dismantling the barrier.


### 3.3. By when should that action be taken?

Considering the significant impact of this barrier on cross-border investments and the potential benefits in adopting the proposed approach focused on practical and operational steps only, it is recommended that further action along the steps delineated above should be strongly driven by the European Commission within the next 12 months. With cooperation by major Member States and appropriate support by industry experts, a reasonable target date for the go-live of these harmonised operational processes could be the traditionally high-volume dividend season of Q2 2018.

It has to be highlighted that, as foreseen in the Action Plan of the Capital Market Union (CMU) and following a call by the ECOFIN Council of June 2015, the Commission and an expert group of Member States' representatives have been working together, with the European Parliament as observer, to map national barriers to cross-border capital flows and find the best ways of tackling those that are either not justified by public interest considerations or are disproportionate. In connection with this work, the ECOFIN Council pointed out that there is a need for "pragmatic solutions to longstanding tax obstacles such as double taxation linked to current withholding tax arrangements"[171]. The expert group discussed the nature of the problem and existing best practices, taking note of the view that a well-functioning CMU needs to tackle this matter, while acknowledging that any steps beyond mapping relevant barriers and best practices should be taken in the appropriate tax working groups. In the Report from the Commission to the Council and the European Parliament[172] (the Report), it is noted:

> "[W]hile improvements have been made, the general status quo remains unsatisfactory since solutions are well-known, and have been successfully put in place in some Member States."

Based on mapping work carried out by the expert group, the Report sets out a list of nine best practices (in addition to relief at source)[173]. The Report recommends that work be taken forward by relevant tax working groups, while the expert group would be regularly informed of progress

---

[170] https://ec.europa.eu/info/files/170227-report-capital-barriers_en
[171] Capital market investors and Member States repeatedly identified withholding tax (WHT) relief procedures as a major deterrent to cross-border investment.
[172] "Accelerating the capital markets union: addressing national barriers to capital flows", 24th March 2017.
[173] Report, pp. 10-12.

and play a supporting role in view of the importance of the issue for CMU. The Commission indicates that it will also work with national tax experts on a code of conduct on WHT relief principles.

Completion of this work as contemplated in the Report should be prioritised as proposed.

**3.4. Priority of the Barrier:** High.

**7. Tax Barrier**

EPTF BARRIER 12: Inefficient withholding tax collection procedures

# 8. Barriers on Watchlist

## *Introduction*

As part of their mandate to i) review the remaining, or any new, barriers to an integrated post-trade environment in the EU and ii) to provide technical advice to the Commission on follow-up actions, the EPTF members have also discussed possible barriers that are already visible and potentially emerging over the next few years.

The inclusion of these barriers "on the watchlist" is intended as an alert for public authorities about areas where there is no immediate or urgent need for action. In some cases it should be recognised that some action has already been taken to address the root causes of these obstacles and there is only a recommendation for continued monitoring of progress towards full implementation or resolution. However, for the topics included in this section various signs of difficult conditions are emerging, that may evolve into the creation of significant barriers if not adequately monitored or controlled.

This section focuses on five barriers:

- <u>EPTF Barrier WL1:</u> National restrictions on the activity of primary dealers and market makers (formerly Giovannini Barrier 10);

- <u>EPTF Barrier WL2:</u> Obstacles to DvP settlement in foreign currencies at CSDs;

- <u>EPTF Barrier WL3:</u> Issues regarding intraday provision of credit to support the settlement process;

- <u>EPTF Barrier WL4:</u> Insufficient collateral mobility;

- <u>EPTF Barrier WL5:</u> Non-harmonised procedures to collect transaction taxes (formerly Giovannini Barrier 12).

15th May 2017

**8. Barriers on Watchlist**

EPTF BARRIER WL1: National restrictions on the activity of primary dealers and market makers

## *EPTF BARRIER WL1: National restrictions on the activity of primary dealers and market makers*

Former Giovannini Barrier 10

---

**Description of the issue:** restrictions on the activity of primary dealers and market-makers often require the setting-up of local securities operations and the settlement of primary-market transactions in the local settlement system

Priority: Watchlist.

**Summary of proposed action:** EPTF members would like to invite the AMI-SeCo to further assess the issue and propose actions, if or where necessary. Ultimately, the barrier will have to be addressed by national governments.

**Responsibility:** AMI-SeCo, national governments.

---

### 1. Description of the Barrier

Most sovereign issuers in Europe, acting through Debt Management Offices (DMOs), operate in the markets through an appointed group of banks called Primary Dealers (PDs) responsible for buying, promoting and distributing newly issued sovereign bonds. PDs are subject to certain obligations, which differ from country to country, but usually include participating in auctions, placing government securities and maintaining a liquid secondary market by making continuous bid–offer prices in minimum amounts. To reward their efforts, the issuers can in turn provide PDs with certain incentives, such as access to auctions, consideration for syndications, access to a non-competitive bidding facility after an auction, or the possibility to compete for derivatives contracts. A detailed overview of the European system for Primary Dealers is available in the form of the European Primary Dealers Handbook[174] maintained by AFME.

The First Giovannini Report explicitly listed as Barrier 10 restrictions on the activity of primary dealers and market makers, explaining that[175]:

> "Restrictions on the activity of primary dealers and market-makers often require the setting-up of local securities operations and the settlement of primary-market transactions in the local settlement system. Such restrictions prevent primary dealers and market-makers whose activities span several markets from centralising their settlements in fewer systems. The inability to centralise cross-border settlements raises the cost of their operations because they are prevented from using their preferred settlement location (if any) for these market operations and, by implication, they must bear the additional expense of settlement in a remote CSD."

In terms of strategy to remove this barrier, the second Giovannini Report went on to say[176]:

> "While member states should be able to set criteria for qualification for primary dealer status, these should not relate to location or to use of particular infrastructure. Such

---

[174] Available at: [European Primary Dealers Handbook].

[175] First Giovannini Report (2001): http://ec.europa.eu/internal_market/financial-markets/docs/clearing/first_giovannini_report_en.pdf

[176] Second Giovannini Report (2003): http://ec.europa.eu/internal_market/financial-markets/docs/clearing/first_giovannini_report_en.pdf

Case 1:18-md-02865-LAK    Document 836-31    Filed 06/27/22    Page 113 of 150

**8. Barriers on Watchlist**
EPTF BARRIER WL1: National restrictions on the activity of primary dealers and market makers

restrictions inhibit the centralisation of settlements and raise the cost to investors. As with the other restrictions linked to location, these restrictions on primary dealers and market makers limit choice and are inconsistent with the principles underlying the internal market in financial services."

Member states were called upon to take the necessary steps to remove these restrictions, co-ordinating their action via the relevant EU Council.

In 2006, following up on the Giovannini work, the Economic and Financial Committee (EFC) Sub-Committee on EU Sovereign Debt Markets (ESDM) published a report[177] concluding that: *"any restrictions on clearing and settlement activities in the primary or secondary market cannot be removed in isolation, but only in the broader context also considering restrictions related to rules and regulations in securities markets"*. Given these interdependencies, it was thus suggested to collapse the work on Giovannini Barrier 10 (GB10) into Giovannini Barrier 2 (GB2). This was reiterated in the final CESAME report[178], which also expressed the expectation that the Target2-Securities project *"would go a long way towards eliminating this barrier for what concerns the choice of the location of settlement."*

Subsequent discussions in the EPTF have led to the conclusion that the core issues covered under GB 2 can indeed be generally considered as resolved, given the ongoing migration to T2S and further legislative changes in the EU, including on access to and between market infrastructures. While it was thus decided to consider GB 2 as dismantled, members also found that this does not address the issue initially covered under GB 10. Restrictions for primary dealers in relation to the settlement location remain in place in certain markets; as far as the EPTF is aware no further work has been done to resolve this issue, although certain improvements were made at trading level opening the market to more competition between electronic trading platforms. Restrictions for primary dealers on settlement location continue to constitute a barrier to a more harmonised EU market for sovereign bonds that needs to be further assessed.

More specifically, some Member States in the eurozone still require that primary market transactions in government securities of that specific market must settle through accounts opened with the domestic CSD of that country.

### 2. Consequences of the Barrier

The key risk is the proliferation of the restriction currently existing in some Member States. If other EU Member States impose similar restrictions, organisations acting as primary dealers will be forced to maintain separate accounts in all the CSDs of the countries where such restrictions are imposed. This would lead to an unjustified multiplication of accounts, market fragmentation, and, potentially to reduced collateral mobility.

While the logic set out in both Giovannini Reports remains valid, the launch of Target2-Securities makes this barrier rather difficult to justify. One of the key objectives of T2S has been to integrate and harmonise the highly fragmented securities settlement infrastructure in Europe and to move one step closer to a single market for financial services and deeper financial integration in Europe. Importantly, T2S allows participants to optimise their collateral and liquidity management by

---

[177] EFC Report on *Restrictions on the location of clearing and settlement in the EU government bond markets* (2006): http://ec.europa.eu/internal_market/financial-markets/docs/cesame/ec-docs/20060612-barrier-10_en.pdf
[178] Final Report by the CESAME Group (2008): http://ec.europa.eu/internal_market/financial-markets/docs/cesame/cesame_report_en.pdf

**8. Barriers on Watchlist**

EPTF BARRIER WL1: National restrictions on the activity of primary dealers and market makers

creating a single pool of securities replicating what is already the case today for euro cash in TARGET2. This would essentially ensure that collateral is not blocked in local markets but can be moved quickly and efficiently to where it is needed. The restrictions described prevent those primary dealers and market makers whose activities span several markets from centralising their settlements in a single account and thus directly undermine some of the core efficiencies created by T2S, while also conflicting with the objectives of creating a Capital Markets Union in Europe.


**3. Proposed way forward**

The issue could be considered under the auspices of AMI-SeCo to further investigate the issue and suggest actions, as deemed necessary. The work should be undertaken in close collaboration with the relevant industry associations, including ICMA, AFME and ECSDA. The group could also coordinate its work with DMOs, e.g. through the EFC's ESDM Sub-Committee. Ultimately, it will be the relevant national governments that will be responsible for taking the necessary action to remove the barrier.

The proposed Working Group should be established as soon as practical.

# *EPTF BARRIER WL2: Obstacles to DvP settlement in foreign currencies at CSDs*

New Barrier

---

**Description of the issue:** New regulatory restrictions imposed by the CSDR on settlement agents could constitute an obstacle to the provision of cross-border delivery versus payment services in non-domestic currencies by CSDs.

**Priority: Watchlist.**

**Summary of proposed action:** The implementation of the CSDR should be carefully monitored and, if the barrier materialises and no credit institution has applied for the status of DCI within 6 months of the CSDR implementation, amendments to the Level 1 text of the CSDR should be considered (possibly as part of the CSDR review scheduled for September 2019).

**Responsibility:** European Commission.

---

## 1. Description of the Barrier

New regulatory restrictions imposed by the CSDR on settlement agents could constitute an obstacle to the provision of cross-border delivery versus payment services (DvP) in non-domestic currencies by CSDs.

(a)    *Regulatory framework*:

Article 54 of the EU Regulation 909/2014 (the CSD Regulation or CSDR) imposes excessively burdensome restrictions on foreign currency settlement due to the prohibition for commercial banks and for CSDs with a banking licence to provide limited banking services to non-bank CSDs (and in some cases to CCPs servicing the same customers). The CSDR created a status of "designated credit institution" (DCI) which is without precedent and which forces CSD to create a separate legal entity if they wish to provide cash accounts for the settlement of DvP transactions by CSD participants.

(b)    *Description*:

The vast majority of CSDs operating in the European Union settle in central bank money. This means that CSDs only offer securities accounts to their participants and that the settlement of the cash leg of securities transactions occurs on the cash accounts maintained by CSD participants at the local central bank.

If CSD participants nonetheless wish to settle in a different currency than the local currency on a delivery versus payment (DvP) basis, they have a limited number of options:

1)    In some rare cases, a CSD can offer <u>central bank money settlement in another currency</u> than the domestic currency. This is currently the case for SEK settlement in VP, the Danish CSD, and for USD and EUR settlement in Euroclear UK & Ireland[179]. This scenario is rare because it involves several obstacles:

---

[179] For more details on the VP SEK settlement service, see the press release "<u>VP announces service in Swedish Kronor</u>" dated 26 May 2016. In addition to offering GBP central bank money settlement in the UK, Euroclear UK and Ireland also provides central bank money settlement in EUR, through its link with the Central Bank of

**8. Barriers on Watchlist**

EPTF BARRIER WL2: Obstacles to DvP settlement in foreign currencies at CSDs

- CSDs are typically not eligible to open cash accounts at foreign central banks (remote participation is not always allowed by the rules of central banks and most CSDs are not authorised as banks);

- CSD participants themselves may not have an account at the foreign central bank and may not be eligible to obtain one (e.g. a domestic bank wishing to settle foreign currency transactions in its domestic CSD);

- Central banks in the EU and outside the EU may be prevented from establishing agreements with CSDs by their own statutes or regulations, or may not be willing to consider such agreements for a variety of reasons;

- For currencies whose central banks are located outside of the European time zones, the opening hours are an obstacle (e.g. Asia, America). Commercial bank settlement, on the other hand, offers the possibility to settle during European opening hours.

- For all these reasons, in practice, foreign currency settlement typically occurs in commercial bank money.

2) In a few cases, <u>CSDs themselves offer cash accounts</u> to their participants, allowing them to settle in commercial bank money. This is only possible if the CSD is authorised as a credit institution. Today, only 5 out of 40 CSDs in the EEA[180] are able to offer this option to their participants. Given the capital constraints imposed on CSDs with a banking licence, it is highly unlikely that many more CSDs will apply for an authorisation to provide banking type ancillary services in the future.

3) In all other cases, cash accounts in foreign currencies are provided by <u>commercial banks acting as settlement agents</u>. This means that the securities leg of a DvP transaction in a non-domestic currency settles in the CSD while the cash leg settles in the cash account of the CSD participant at the settlement agent. Such arrangements allow CSDs which are not authorised as banks to offer DvP settlement in non-domestic currencies to their participants.

With the entry into force of the CSDR, CSDs which are not authorised to provide limited banking services under the CSDR will only be able to offer foreign currency settlement in commercial bank money if their cash settlement agent obtains an authorisation as DCI under the CSDR[181].

As of end 2016, no credit institution had expressed an intention to apply for DCI status. Banks acting as settlement agents seem to find that the constraints imposed by the CSDR on DCIs are disproportionate and that there is no business case for them to create a separate legal entity, especially given the very limited purpose such an entity would have and the unusual risk profile this would create.

---

Ireland, and in USD, through a special arrangement with the New York Federal Reserve. As of December 2016, the arrangement with the New York Fed was still under negotiation.

[180] These CSDs are Euroclear Bank, Clearstream Banking Luxembourg, Clearstream Banking Frankfurt, OeKB CSD and KELER. The number of 40 CSDs for the EEA includes 32 CSDs which are members of ECSDA as well as VP Lux, NCDCP (Slovakia) and 6 central bank CSDs.

[181] See further section 7.3.3 of Annex 3.

## 2. Consequences of the Barrier

If no credit institution is authorised as DCI under the CSDR, the risk is that non-bank CSDs which offer DvP settlement in foreign currencies to their participants today will no longer be able to provide the services, unless they obtain access to central bank money for the respective currencies.

This will have the following consequences:

- Transactions will have to be processed free of payment (FoP) instead of versus payment, undermining the CSDR's objective of promoting DvP settlement;

- CSDs in multi-currency regions such as the Nordics will suffer more directly from the restrictions given that their current volumes of DvP instructions in non-domestic currencies exceeds the threshold contained in CSDR art.54(5) (1% of the total annual value of DvP instructions, with a max. of EUR 2.5 billion). They will be obliged to restrict their cross-border and currency offerings. This may even affect securities for which the CSD provides the notary service;

- The decrease in foreign currency settlement at non-bank CSDs would constitute a step backwards if it results in the settlement of these transactions outside of the CSD infrastructure.

It is also worth noting that new entrants wishing to offer pan-European CSD services (and thus likely to require commercial bank money settlement facilities) may be discouraged from entering the EU market. The decision of BNY Mellon to stop its CSD project in 2015 can at least in part be attributed to the restrictions imposed on DCIs by CSDR article 54.

## 3. Proposed way forward

The European Commission should carefully monitor the implementation of the CSDR and, if the barrier materialises and no credit institution has applied for the status of DCI within 6 months of the CSDR implementation, it should recommend amendments to the Level 1 text of the CSDR (possibly as part of the CSDR review scheduled for September 2019).

An increase in the threshold under article 54(5) of the CSDR, although it may be helpful for the impacted markets, is not a long-term solution and a re-assessment of the conditions for obtaining DCI status (e.g. obligation to set up a separate legal entity) is likely to be required. Such a re-assessment would aim at lifting barriers to entry in the CSD market by making the DCI status a reality and not just a legal concept.

Action should be undertaken in 2018-2019 if the barrier materialises.

The restrictions are currently impacting a limited number of credit institutions, CSDs, and CSD participants. However, the issue could potentially be exacerbated in the near future as the proportion of cross-border settlement and foreign currency settlement increases in EU CSDs.

## EPTF BARRIER WL3: Issues regarding intraday credit to support settlement

New Barrier

---

**Description of the issue:** The increasing focus on intraday and overnight liquidity, from both regulators and industry participants has created the need to better understand the related drivers and impacts, as a basis to assess whether further action is required to reduce the overall usage of intraday and overnight credit and to flatten current peaks and troughs in exposure.

**Priority: Watchlist**.

**Summary of proposed action:** None identified so far. The implementation of the relevant CSDR provisions and related technical standards should be effected in a coordinated, proportionate and gradual way. Further analysis should be undertaken in the course of 2017.

**Responsibility:** National regulators, with monitoring by the European Commission.

---

## 1. Description of the Barrier

Intraday and overnight credit usage is mainly driven by time gaps in the settlement process, i.e. where a cash payment is funded before the corresponding receipt is due. The extent to which intraday and overnight credit is used during the settlement process depends on many factors, and differs significantly across settlement scenarios. While intraday credit usage is reduced for settlement in central bank money (CeBM), e.g. within T2S, cross-border settlement involving commercial bank money (CoBM) often requires transactions to be pre-funded for an extended period of time and may therefore lead to increased usage of intraday credit.

The issue of intraday and overnight liquidity has already been considered in the past, e.g. in the context of the Giovannini work. However, no tangible conclusions were reached on this issue, as intraday liquidity was abundant and available at no or very low costs. More recently, the topic has received renewed interest, as a result of both increasing regulatory pressures as well as non-standard monetary policy. In terms of regulation, the Basel Committee paper on Monitoring Tools for Intraday Liquidity Management[182] requires treasury departments within banks to monitor their intraday liquidity profile, creating new pressures to actively manage intraday liquidity needs and crystallising new costs for such liquidity. While this is not in itself unduly problematic, there is concern that individual optimisation might lead to outcomes that are sub-optimal for the market as a whole, as it could incentivise firms to delay settlement instructions, thus also putting at risk settlement efficiency.

In addition, the EU CSD Regulation will introduce extensive prudential requirements related to credit and liquidity risk for CSDs with a banking licence which could lead to a further increase in the costs of intraday liquidity. More importantly, if, as a result of these rules, the ICSDs are forced to significantly reduce, over a short timeframe, the amount of credit extended to their participants and to reduce the exposure among themselves, this could have a negative impact on established infrastructure arrangements, particularly the Bridge between the two ICSDs.

---

[182] Basel Committee on Banking Supervision paper 248: http://www.bis.org/publ/bcbs248.htm

## 2. Consequences of the Barrier

The consequences of increased pressures to more actively manage and reduce intraday and overnight liquidity exposures are twofold. The first aspect relates to the settlement behaviour of individual firms, while the second one concerns the impact on current settlement infrastructure.

(a) Firms optimising intraday liquidity management

Although this requires further analysis, there is concern that individual firms optimising their intraday liquidity management could lead to settlement being pushed out to the end of the settlement day. This might not be desirable from a broader market perspective and might require action to achieve a better sequencing of settlement, including potentially appropriate market best practices.

A possible reference point could be the European Interbank Liquidity Management Guidelines developed by the EBF in relation to the settlement of unsecured money market activity. Initially developed in 1999 in response to the breakdown in payment flows which occurred upon the introduction of the euro, the standards aim to enhance market discipline and prevent firms from postponing settlement in order to utilise other firms' liquidity by defining an early deadline for instructions. No similar standards currently exist in relation to securities settlement instructions.

Similarly, while the different functionalities provided by T2S are in principle considered helpful, some of them might require further guidance and market practices to ensure that they are applied appropriately and help overall market efficiency. This is particularly true for the hold and release functionality which has the potential to support early matching if applied appropriately but which might also further delay settlement and undermine settlement efficiency if misused.

(b) The role of market infrastructure

As mentioned above, the extent to which intraday credit is used depends on a complex interplay of factors, some of which relate to individual business models and funding arrangements, others to the underlying settlement infrastructure. Intraday liquidity usage differs across settlement scenarios and is most relevant in the case of cross-border settlements involving commercial bank money.

Settlement in CeBM, in particular within T2S, can probably be considered the optimal route in terms of intraday liquidity, given that T2S potentially provides the conditions for firms to centralise inventory on a single cash/securities account and intraday liquidity needs are minimised through the self- and auto-collateralisation functionality. However, there are constraints that limit the extent to which activity can move into T2S/CeBM. This includes a limited capacity for central banks to accommodate large numbers of additional direct participants and the lack of access to central bank accounts of a wide range of market actors, but also restrictions in relation to settlement in foreign currency. As a result, settlement in CoBM will continue to be an integral part of the overall settlement infrastructure and efficient links between the different settlement environments will remain crucial. Initiatives are under way to support this, such as T2S, improved interoperability between the ICSDs and T2S with the continuing migrations to T2S in waves 4 and 5, and the ICSDs' commitment to phased enhancement of the Bridge as a first step to achieve tri-party settlement interoperability (TSI)[183].

---

[183] See TSI Memorandum of Understanding between the European Repo Council, Eurex Clearing, Clearstream and Euroclear signed on 15 July 2013 under the auspices of the ECB.

**8. Barriers on Watchlist**

EPTF BARRIER WL3: Issues regarding intraday credit to support settlement

Against this background, upcoming prudential requirements related to credit and liquidity risk for CSDs with a banking licence, introduced by the CSDR (in particular article 59(3), further specified by applicable EBA technical standards), may require important changes to the way the Bridge operates today. For Bridge transactions, this is particularly driven by the large exposures between the ICSDs themselves which are created in the current settlement process. While there is no specific target date for the ICSDs in CSDR level 1 to reduce credit risks, there is a desire to appropriately control such risk. However, any premature action by regulators, to limit intraday credit over a short timeframe without giving industry and market infrastructure providers sufficient time to assess ways to optimise the process, could put at risk established critical infrastructure arrangements and could also negatively impact settlement efficiency in Europe.

The starting point to address both aspects of the identified emerging barrier will be to develop a better understanding of the relevant factors that drive intraday credit usage in the settlement process. Based on this analysis, it could be explored whether to address the issue through a more efficient sequencing of settlement, either through appropriate market best practices or further improvements in the settlement infrastructure.

Relevant issues to further analyse in this context include:

- Drivers determining the use of the different settlement channels and the constraints for T2/T2S to onboard additional direct participants.

- Transparency and visibility in relation to the applicable cut-off times.

- Understanding and describing the various factors at play that determine intraday liquidity usage in the different settlement scenarios, including the needs and behaviours of the different actors today in terms of sequencing of settlement (e.g. CCP prepositioning in the night cycle, bond borrowing cycles, inventory prepositioning, FOP, cross-border treasury alignments, bridge batches). This would serve as a basis to assess ways to optimise the process and flatten the peaks and troughs in intraday liquidity exposure.

- Optimal technical design of the settlement process in the different settlement scenarios, including benefits and drawbacks of batch-based processing as opposed to real-time settlement.

### 3. Proposed way forward

No immediate solution identified so far, as further analysis should be undertaken.

The following next steps are proposed:

1) The **relevant industry associations in collaboration with infrastructure providers** need to continue work to better understand the drivers for intraday liquidity and to assess ways to flatten peaks and troughs in intraday and overnight exposures. If deemed necessary, this might include work on relevant market practices.

Timeline: Further analysis should be undertaken in the course of 2017.

2) **National regulators** should implement the relevant CSDR provisions and related technical standards in a coordinated, proportionate and gradual way, carefully considering the implications for the broader settlement environment and taking into account the ongoing industry work to address the issue.

Timeline: As the CSDR rules are being implemented and enforced.

3) The **European Commission** should monitor the implementation of the relevant CSDR provisions and should consider proposing any amendments where this is deemed necessary.

Timeline: Once the relevant CSDR provisions have been implemented.

### *EPTF BARRIER WL4: Insufficient collateral mobility*

New Barrier

---

**Description of the issue:** The ability to move collateral efficiently between counterparties, markets and accounts is paramount for the adequate functioning of financial markets. The lack of collateral mobility is often cited as an industry constraint.

**Priority: Watchlist**.

**Summary of proposed action:** The ECB's AMI-SeCo is expected to consider how to continue the ongoing work on the harmonisation of collateral management activities. Industry participants and the relevant infrastructure providers could consider whether any further work is required to extend the ongoing work to (EU) markets.

**Responsibility:** ECB AMI-SeCo.

---

#### 1. Description of the Barrier

Collateral plays a key role in the fabric of financial markets, and the ability to move collateral efficiently between counterparties, markets and accounts is paramount for the adequate functioning of financial markets. Collateral should be able to move quickly and efficiently across borders/systems via tri-party and bilateral collateral management processes, i.e. to be able to mobilise collateral on demand to where and when it is needed and to meet regulatory requirements. The lack of collateral mobility is often cited as an industry constraint[184].

Important work has been undertaken over the past years in the context of the ECB's Contact Group for Euro Securities Infrastructures (COGESI) to identify and address the relevant barriers to collateral mobility. COGESI conducted some work during 2015 with the aim to identify some key activities for harmonisation of cross-border collateral management arrangements. In line with the COGESI mandate, the scope of the work was limited to the euro area, but can be an important reference point for other markets as well. The newly established Advisory Group on Market Infrastructures for Securities and Collateral (AMI-SeCo) takes over the work of COGESI (as the latter was disbanded at the end of 2016).

The EPTF might offer an opportunity to consider whether aspects of the COGESI/AMI-SeCo work on collateral management are relevant for other EU markets as well and how a better alignment can be achieved.

Collateral mobility issues arise out of the current complex post-trade environment in which there are multiple collateral givers, multiple collateral takers, and multiple locations at which securities used as collateral are held. A collateral giver and a collateral taker may choose to hold the securities that they intend to deliver, or that they intend to receive, at one of several issuer CSDs, or at one of several investor CSDs, or at one of several custodians. A collateral giver may need to give collateral to several different collateral takers, and a collateral taker may need to receive collateral from

---

[184] See e.g. ICMA's report Collateral is the new cash: the systemic risks of inhibiting collateral fluidity (April 2014), http://www.icmagroup.org/assets/documents/Regulatory/Repo/COLLATERAL-IS-THE-NEW-CASH-THE-SYSTEMIC-RISKS-OF-INHIBITING---4-April-2014.pdf
or previous ECB/COGESI publications such as Euro repo market: improvements for Collateral and liquidity management (July 2014),
https://www.ecb.europa.eu/pub/pdf/other/erm201407en.pdf?1c063e7be2bf1440c88528df8ed93c52

several different collateral givers, and each party may choose to hold the securities that are used as collateral in different places.

In general, there is an advantage for securities that are used as collateral to be held with intermediaries (custodians or investor CSDs); this is because a collateral giver or taker can hold in a single location a much wider range of securities (and is not limited in any single location to the securities from just one issuer CSD). However, there are other factors that affect the choice of collateral location; one important factor is the location chosen by the counterparty (as there are frictional difficulties in moving securities from one location to another); another factor is standard settlement processing for cash trades, which may, for example, encourage the use of an issuer CSD to hold securities.

In summary, there is considerable complexity in collateral holding structures, and frequently the need to move securities from one location to another.

Collateral mobility issues could be divided into various categories. One category relates to restrictions on holding patterns. Requirements on holding patterns may be driven by regulatory or market preferences. Restrictions on holding patterns of collateral takers inevitably have a knock-on effect on the holding patterns of collateral givers, so that collateral givers may be forced to hold securities in different places.

A second category of collateral mobility relates more generally to requirements which limit the ability or willingness of participants to be active in the collateral market. This includes balance sheet constraints for banks that increase the costs of moving collateral as well as restrictions (particularly for funds) on assets that could be used to provide eligible collateral through mechanisms commonly referred to as "collateral transformation".

Finally, a third category of collateral mobility issues relates to frictional difficulties in moving securities from one location to another.

This barrier only covers the latter category of frictional collateral mobility issues. Other relevant issues, also considered in the COGESI/AMI-SeCo context, are already covered under EPTF Barrier 4 on asset segregation, which should cover work undertaken on collateral holding and segregation, and EPTF Barrier 2 on information messaging standards, which also explicitly considers collateral-related aspects of the issue.

COGESI assessed recent developments on collateral mobility and possible issues/frictions related to collateral processing (messaging/workflows) and collateral cut-off times. The objective of COGESI was to review how collateral could be moved quickly and efficiently across borders via tri-party and bilateral collateral management processes. In particular, a key aim of the work is to identify and address remaining barriers that prevent a greater level of automation and connectivity between market infrastructures (i.e. CCPs, (I)CSDs/collateral agents) which would help ensure timely delivery of collateral across borders. In this context, analysis has been conducted on national restrictions that impede movement of collateral and related services. The following main issues have been raised by COGESI members.

- Prompt access to collateral:

Prompt access to collateral from different asset inventories in a standardised manner is needed for assets which are managed via bilateral collateral management processes. Especially in view of upcoming regulatory requirements (e.g. margin requirements for cleared/uncleared transactions), market participants will have to make sure that they have access to the right collateral at the right time.

To increase collateral mobility, the opportunities for using the ISO 20022 standards for collateral management messages should be considered where needed. For example, buy-side depositaries

need to provide access to the asset inventory and the buy-side depositaries need to enable external collateral managers to instruct on collateral movements. Currently, asset managers could be using more than 20 different depositaries and process flows and IT-implementations are not synchronised across all of these depositaries. In this context, it should be analysed how standardisation could contribute to automation and efficiency throughout the custody chain. More consistent (and potentially longer) cut-off times in bilateral collateral management processes could be considered (see also next point).

  o  Opportunities of using ISO 20022 for collateral messages in the various layers of the chain are expected to be analysed in the AMI-SeCo context.

- Cross-border transactions:

Cross-border transactions in Commercial Bank Money (CoBM) over the ICSD's interoperable link (Bridge) are subject to different and shorter DvP settlement cut-off times (compared to T2S), which may result in collateral settlement fails. The ICSDs made improvements in 2015 to their operating timeframes, and further improvements are being considered (improved deadlines, quicker turnaround during daytime processing and extended timeline) to facilitate same-day trading and settlement in the European repo market when involving different cross-border and cross-system arrangements.

  o  Improvements on CoBM cross-border transactions are expected to be analysed in the AMI-SeCo context.

- Triparty-related harmonisation

Two aspects should be considered. First, market participants have been analysing the possibility of establishing interoperability for triparty repos arrangements ("triparty settlement interoperability", TSI). Despite previous industry initiatives[185], triparty settlement interoperability is not yet available for CCP cleared SFTs/triparty repo products, which results in collateral being blocked in certain infrastructures (silos).

Second, differences in triparty collateral management messages/communication flows could also result in different procedures for providing collateral to the Eurosystem via triparty arrangements. The Eurosystem is investigating the launch of a Eurosystem Collateral Management System (ECMS), which would improve its processes for collateral management in Eurosystem credit operations. In this context, analysis is being undertaken on the current use of triparty messages for the Eurosystem credit operations.

  o  Opportunities for common triparty messages for Eurosystem credit operations will be analysed in the AMI-SeCo context with ECMS at the horizon.

- Best practices in collateral management:

Other national-specific obligations may impact collateral users and service providers in related to Eurosystem credit operations, notably differences related to messages for corporate actions and

---

[185] See TSI Memorandum of Understanding between the European Repo Council, Eurex Clearing, Clearstream and Euroclear signed on 15 July 2013 under the auspices of the ECB.

messages used to exchange information required for tax forms processing, might also be an impediment to use of collateral.

- o Opportunities for common messages for corporate actions and tax information processing messages are expected to be analysed in the AMI-SeCo context.

- Effective cross-border connections

Further analysis has focused on requirements for greater integration of post-trade infrastructures on a cross-border basis, involving automated trading, clearing, triparty collateral management services and settlement at (I)CSD level. A distinction could be drawn between bilateral and tri-party perspectives[186]:

(a) From a **bilateral** collateral management perspective, complexity exists on a cross-border basis because of a lack of harmonised processes and, electronic messaging methods; consistent storage of collateral information; the need for management of multiple places of safekeeping and settlement (in non-T2S markets); and remaining differences in cut-off times (non-T2S markets); also CSD link arrangements should be considered in this context, as these are necessary to move collateral cross-border in T2S;

(b) From a **tri-party** collateral management perspective, complexity exists on a cross-border basis for the sourcing/moving collateral to/from triparty agents in view of current triparty models.

- o Opportunities for possible alignment of static data/information and collateral deadlines are expected to be analysed in the AMI-SeCo context.

## 2. Consequences of the Barrier

Traditionally, processes and services around collateral management were managed in a non-automated and decentralised manner. Increasingly, processes have been developed to improve the management of collateral. The COGESI work has been an important facilitator in this context and the AMI-SeCo is expected to consider how to continue the work. Other relevant initiatives which aim to improve the efficiency of using collateral in financial markets include the existing work on T2S harmonisation[187] (standards and activities), which foster the creation of harmonised post-trade processes and contribute to EU financial integration.

## 3. Proposed way forward

As one element in the discussion on collateral mobility, the justification for existing restrictions on holding patterns could be re-analysed.

The AMI-SeCo is expected to consider how to continue the ongoing work on the harmonisation of collateral management activities, and to tackle issues falling into the category of frictional problems. The further harmonisation of collateral management activities is also relevant in the context of the Eurosystem's ongoing review of its arrangements for collateralisation and its analysis on the business case for developing a common Eurosystem collateral management system (ECMS).

---

[186] See relevant COGESI documents for more details.
[187] See T2S harmonisation, https://www.ecb.europa.eu/paym/t2s/harmonisation/html/index.en.html

## *EPTF BARRIER WL5: Non-harmonised procedures to collect transaction taxes*

Former Giovannini Barrier 12

---

**Description of the issue:** Transaction taxes are collected through complex and non-harmonised procedures in various EU markets. Some additional Member States are discussing the possible introduction of a European FTT, with potentially further operational differences.

**Priority:** Watchlist.

**Summary of proposed action:** On-going political discussions around the possibility of introducing a European FTT should address the harmonisation of the tax collection mechanism at the level of the countries that are involved in the political decision. Failure to harmonise the tax collection mechanism would create a new barrier (and keep alive the current one for France and Italy).

**Responsibility:** European Commission, with support by all Member States discussing a European FTT.

---

### 1. Description of the Barrier

Giovannini Barrier 12 is about "Transaction taxes collected through a functionality integrated into a local settlement system". The substance of this barrier has evolved over the last few years.

In the initial Giovannini Report (2001) this barrier was specifically about the UK and Ireland stamp duty mechanisms and the fact that this tax was (and still is) collected through the Crest settlement system.

Since then the scope of this barrier has broadened with the implementation of a Financial Transaction Tax in two countries: France and Italy. The collection mechanisms in France and Italy differ from the UK and Irish stamp duty systems and the French and Italian systems are themselves different from each other.

### 2. Consequences of the Barrier

A general statement is that these mechanisms effectively create an unlevel playing field between CSDs and markets (though it has to be emphasised that these mechanisms do not result in difficulties to access internal markets), as the respective tax collection mechanisms have been designed from the operational characteristics of each of the local CSDs involved in the process:

- UK / Ireland: as said above the stamp duty collection is embedded into the Crest platform settlement mechanism. Specific regimes are foreseen in case of settlement of eligible securities in the books of an investor CSD.

- France: all FFTT declarations (as there is no calculation mechanism in the system) have to be sent to the French CSD by intermediaries and payments made accordingly to the CSD who then retransfers the amounts received to the French Treasury (the same process applies to transactions of eligible French securities done in the books of an investor CSD).

- Italy: IFTT has to be paid monthly and reported annually directly to the tax authority by the taxpayer, or by the investor or its delegate, or by the intermediary receiving the

purchase/sale order from the investor. The Italian CSD and intermediaries acting only as custodian are not involved in this process.

In addition, the respective scope of application of this tax is different from one country to another:

- UK / Ireland: stamp duty is charged on individual trades;

- France / Italy: the Financial Transaction Tax is applied on the net incremental position that is traded each day.

### 3. Proposed way forward

#### 3.1. Possible solutions

Discussions have been under way for some years between ministers of finance of the group of 10 Member States prepared to implement a European FTT. In that respect, the most relevant and indispensable way forward is to call attention to the fact that any political decision to set up a European FTT has absolutely to be designed with a harmonisation of the tax collection mechanism at the level of the countries that are involved in the political decision. Failure to harmonise the tax collection mechanism would create a new barrier (and keep alive the current one for France and Italy).

#### 3.2. Who should act to address the Barrier?

The actions should be taken by the Member States developing a European FTT. The European Commission should also maintain close oversight on any new proposals for a European FTT, to ensure that due care is taken in establishing a fully harmonised tax collection mechanism, including France and Italy.

#### 3.3. By when should that action be taken?

The urgency of action on removal of this barrier depends on whether additional Member States will proceed with the introduction of some form of transactional taxes. In such an event, the urgency would be increased to a higher level, especially when tax collection procedures are not aligned with those already in place in other markets.

#### 3.4. Priority of the Barrier: Watchlist.

**8. Barriers on Watchlist**

EPTF BARRIER WL5: Non-harmonised procedures to collect transaction taxes

# 9. Dismantled Barriers

## *Introduction*

Since the publication of the CESAME Group report[188], work has progressed towards the elimination (totally or partially) of the Giovannini Barriers. The EPTF came to the conclusion that some of the initial Giovannini Barriers can actually be considered as fully dismantled or, for those that are, formally speaking, not fully dismantled, that no further active work is needed.

The following section provides brief explanations of the rationale for considering some of the Giovannini Barriers as dismantled or not requiring further action:

- GB 2 & 5: Practical impediments to access to national clearing and settlement systems;

- GB 4: Absence of intra-day settlement finality in CSDs;

- GB 6: National differences in settlement periods;

- GB 7: National differences in operating hours/settlement deadlines.

---

[188] CESAME Report – 28 November 2008.

15th May 2017

## *BARRIER GB 2 and 5: Need for multiple infrastructure memberships*[189]

### 1. Description of the Barrier

The First Giovannini Report identified two barriers relating to use of infrastructures, relating to (GB2) national restrictions on the location of clearing and settlement, typically requiring investors to use the national system, and (GB5) practical impediments to remote access to national clearing and settlement systems.

In the first Giovannini Report of November 2001 the following statement is made:

> *"National restrictions on the location of clearing and settlement typically require investors to use the national system. Such restrictions constitute a barrier by requiring investors, who engage in cross-border securities transactions on multiple stock exchanges, to use multiple post-trading systems. The need to use multiple systems is often generated by rules that create exclusive links between the different elements of a national securities market infrastructure. In particular, rules can designate that a specific central counterparty and settlement system should be used for a particular trading platform and may impose constraints on the choice of location of settlement by tie-in arrangements and 'silos'. Such restrictions prevent participants, who undertake cross-border transactions, from centralising their clearing and settlement. … Rather than maintaining membership of multiple systems, many institutional investors 'outsource' clearing and settlement functions to agents that offer a standardised service for communication, reporting, asset and cash management, etc."*

### 2. Developments since the Giovannini Reports

Since the publication of the Giovannini Reports, major developments have taken place in relation to the ability of investors and intermediaries to access post-trade infrastructures, either directly or via interoperability arrangements.

**Access**

Since 2001 many legislative steps have been taken which have attempted to provide market users with freedom of choice for clearing and settlement services. In particular:

- MiFID 1 allowed investment firms rights of direct or indirect access to CCPs and settlement systems of their choice, and required regulated markets to allow participants to designate a settlement system of their choice. *(Now Art 37 of MiFID 2).*

- MiFID 1 also allowed MTFs and regulated markets to use foreign CCPs and settlement systems. *(Now Arts 38 and 55 of MiFID 2).*

- MiFIR (upon entering into application) obliges CCPs to accept financial instruments for clearing on a non-discriminatory and transparent basis, and in particular without regard to

---

[189] Name changed from original Giovannini Barrier (initially: "Remaining obstacles and practical impediments to access to national clearing and settlement system") to make it more self-evident what this is about.

the trading venue. *(Art 35)*. Likewise, EMIR obliges CCPs to accept OTC derivatives regardless of the trading venue. *(Art 7)*.

- MiFIR obliges trading venues to provide feeds to CCPs which wish to clear transactions executed on the venue. *(Art 36)*. EMIR obliges venues to provide feeds on OTC derivatives to CCPs. *(Art 8)*.

- The CSDR will oblige venues and CCPs to provide data feeds to CSDs. Further, The CSDR will oblige CSDs to provide access to their settlement systems to CCPs and trading venues. *(Art 53)*.

Despite these changes, it might be observed that post-trade continues to be predominantly national (venue, CCP and CSD all located in the same country). Various reasons can be put forward to explain that observation. However, it would not appear that infrastructure rules, or entry criteria, are the cause.


**Interoperability**

Legislation and market practices have evolved significantly since 2001 in relation to interoperability between infrastructures:

- Interoperability arrangements between cash equities CCPs have been established (and to a more limited extent in relation to futures CCPs). Despite regulatory and commercial barriers, the McCreevy "Code of Conduct" and its associated "Access and Interoperability Guideline" have achieved success.

- Interoperability between Cash Equities CCPs is established on a statutory footing. (EMIR, Title V). Interoperability between CSDs is established on a technical and statutory footing: it is a participation requirement of T2S that a CSD offer accounts to other T2S CSDs. It is requirement of the CSDR that CSDs set up standardised links. (Art 50). The CSDR also provides a mechanism for a non-standard link to be established between CSDs, and it is expressly stated that loss of market share is not an acceptable ground for refusal. *(Art 51)*.

- Operational functionality for true DvP has been created for interoperating CSDs participating in T2S.

Against this, the following counterbalancing factors might be mentioned, which can combine to make interoperability extremely challenging.

- As for derivatives, interoperability between CCPs is outside the scope of EMIR. Interoperability between CCPs constitutes a dilution of risk protection at each participating CCP.

- Interoperability between derivatives CCPs raises significant questions of financial stability.

- Interoperability between CSDs cannot take away the "root-of-title" or "notary" function of the issuer-CSD, and so introduces a layer of intermediation and necessary expense.


### 3. Present status of the Barrier

The review of developments since the publication of the Giovannini Reports shows that many formal obstacles comprising the two Giovannini Barriers under discussion have been partially or completely dismantled. It is no longer perceived that national preferences should be laid at the door of "national restrictions" limiting choice of infrastructure; although some of the infrastructure-related barriers identified by the EPTF (e.g. EPTF Barriers 12, WL2, 10) may, either directly or

**9. Dismantled Barriers**

BARRIER GB 2 and 5: Need for multiple infrastructure memberships188F

indirectly, encourage business to remain within national boundaries. However, it is generally concluded that progress towards dismantling Giovannini Barriers 2 and 5 has been sufficient so that those issues need no longer be regarded as a major barrier to the Capital Markets Union.

## BARRIER GB 4: absence of intraday settlement finality

### 1. Description of the Barrier

Another barrier identified in the First Giovannini Report relates to the problems arising from the absence of intraday settlement finality in securities settlements. This is an issue both at domestic / local level and at cross-border level.

In the first Giovannini Report of November 2001 the following statement is made:

> "Intra-day settlement finality is needed to ensure that pan-EU clearing and settlement can be delivered efficiently, while minimising systemic risk. At present, intra-day settlement finality cannot be guaranteed for all cross-border transactions within the EU. Settlement-cycle timing differences between platforms tend to impede same-day transfer between systems and so increase the likelihood that a transfer will not be finalised within a trading day. If same-day transfer or finality cannot be achieved, there is a requirement for the counterparties to provide extra collateral or incur funding costs.31 Moreover, the implied higher risks of fails in cross-border trades due to the absence of intra-day settlement finality has negative implications for the stability of an increasingly integrated EU financial system. While settlement systems are already required to have intra-day finality for ECB operations, it will be necessary for all settlement systems to take steps to ensure that any links between them provide intra-day settlement finality within a fixed (short) period, If cross-border trading is to be encouraged on an efficient and safe basis."

Intraday settlement finality is a fundamental requirement to ensure that once a settlement is deemed complete, i.e. after the required debit/credit entries of securities and cash[190] are performed in the accounts of the two counterparties in a settlement system, there is nothing that can trigger an unwind of these accounting entries.

At domestic level the absence of intraday settlement finality is seen as a problem to the extent that CSD participants have to wait until the end of the daylight processing to get the assurance that the settlement of their transactions cannot be unwound. This is in particular an obstacle to an efficient use of collateral for domestic operations (including with the central bank).

In a cross-CSD settlement scenario, where for example securities are to be moved from a participant in an issuer CSD (CSD A) to a participant in an investor CSD (CSD B), so that the securities become available for further transactions in CSD B, absence of intraday settlement finality again leads to the risk that all transactions previously settled in CSD A may be unwound. It also means, practically speaking, that a participant in CSD B who has purchased or borrowed securities from a counterparty in CSD A may have to comply with specific procedures in order to dispose or re-use those securities within the same day of receipt, including for collateral purposes, with other participants in CSD B.

There are two main consequences of this barrier:

---

[190] In case of FOP transactions, finality of settlement is achieved with the debit/credit of securities only.

- from an efficiency viewpoint: notwithstanding all the "practical inconveniences" for back-offices, this barrier is an obstacle to an efficient re-use or cross-border movement of securities. In addition, a late identification of any issue related to the settlement of a transaction will materially not leave time for "solutions", hence reducing the overall settlement efficiency;

- from a risk viewpoint: be it at domestic or at international level some market (CSD) participants may decide to overcome this obstacle by taking themselves the risk of crediting (with finality) their own clients before finality is declared by the CSD. This is done for "reliable markets", where there may be a long experience of absence of unwinding, and for selected "reliable" clients, where credit risk may be deemed to be acceptable. Nevertheless this is a risk-taking behaviour and a possible cause for inconsistent behaviours across markets and across CSD participants and participants' clients.

It is important to highlight that these issues are related not only to finality but also to insolvency discussions, so they should also be considered in that context.

### 2. Developments since the Giovannini Reports

At the end of the 1990's / beginning of the 2000's the adoption of system rules to ensure real-time intraday settlement finality was rather the exception than the norm in the vast majority of securities settlement systems in Europe (and globally). Finality was essentially provided at the end of the day (one single batch). The reality now is that intraday finality has become (in Europe) almost the rule (be it provided by RTGS or by multi-batch systems) thanks to technical progress. On top of this T2S is precisely based on strict adherence of settlement finality standards, which means that all participating CSDs will have eliminated this barrier after their migration to T2S.

### 3. Present status of the Barrier

EPTF members believe that there is no need for specific action directly involving this barrier. However, it is important to note two dimensions that still may pose some difficulties:

- Technical dimension: after all T2S CSDs will have eliminated this barrier at the time of their migration into T2S, it would be useful to investigate (e.g. via ECSDA) the extent to which non-euro CSDs have also eliminated this barrier. Nevertheless, no further action seems to be necessary to address the technical dimension of this barrier. Peer pressure should be enough to convince these remaining markets / CSDs to change their modus operandi.

- Legal dimension: there are two aspects of specific legal nature that remain relevant and require action for the full removal of this barrier:

  o First, the SFD does not provide for the concept of DvP (simultaneous transfers of securities against cash) but only unidirectional transfer orders. A revision of the SFD should address this issue (as proposed in EPTF Barrier 10), in particular with a view to completely eliminate any risk that one leg could be final whereas the other leg would not.

  o Secondly, whereas there can be at least a harmonised concept of settlement finality in all (euro-zone) markets and CSDs, it is not clear whether the legal consequences of this finality are the same everywhere. This is particularly true in case of insolvency (or resolution) of a CSD participant. Even further complexity arises in case of insolvency of a client of a CSD participant, where differences in national insolvency

legislations and in the resulting domestic market practices (e.g. in relation to the treatment of pending transactions that are already irrevocably matched but not yet settled) would clearly result in significant uncertainty about the enforceability of SFD protections for the various actors involved. To further secure the settlement finality dimension an assessment is desirable as to whether there is need for revision of the EU insolvency and resolution framework (as per the work currently in progress by the European Commission and EU Member State experts in the revision of EU insolvency legislation[191]) and of related market practices.

---

[191] The September 2016 CMU Communication stressed the negative impact that the differences and inefficiencies in some national insolvency regimes have on cross-border investment and lending. See Commission Communication of 14 September 2016: Capital Markets Union — accelerating reform (http://ec.europa.eu/finance/capital-markets-union/docs/20160913-cmu-accelerating-reform_en.pdf).

## *BARRIER GB 6: Differences in settlement periods – remaining issues at global level*

### 1. Description of the Barrier

Giovannini Barrier 6 relates to national differences in settlement periods for EU equity markets. Resultant mismatches in the settlement of obligations can require funding arrangements with other market participants at additional cost to the investor. This barrier would be removed if settlement periods for all EU equity markets were harmonised.

In the first Giovannini Report of November 2001 the following statement is made:

> *"Cross-border clearing and settlement is complicated by national differences in settlement periods and the need to make adjustments as settlement periods change. Particular difficulty can arise when the international settlement convention differs from that of the local market, e.g. Germany settles on T+2, while the international convention is T+3. Differences in settlement periods arise mainly in the case of equities and create a mismatch in settlement of obligations, which must be addressed by using funding arrangements with other market participants. These funding arrangements can add significantly to the overall cost of executing a cross-border transaction. National differences in settlement periods again reflect the historical preferences of participants in the domestic market, and their removal is contingent on the ability or willingness of local suppliers of settlement services to make the required financial investment to shorten the period. While the international consensus favours a short settlement period recommends to limit credit risk, as a minimum, there should be a harmonised settlement period for the EU as a whole."*

### 2. Developments since the Giovannini Reports

The EU member-states migrated to a T+2 settlement cycle on 6th October 2014, except the Spanish equities market which migrated on 3rd October 2016. Consensus emerged in late 2013 that an implementation of T+2 for equity and fixed income transactions was a pre-requisite for successful launch of Target2-Securities and a live-date date was adopted a few months before wave 1 of T2S in June 2015. The implementation of T+2 was well planned and successfully executed.

The CSDR specifies that transactions executed on trading venues must settle at (a maximum) T+2 cycle. However, two categories of transactions are not covered by this mandate:

- Fixed-income trades

  The majority of trading in fixed-income securities takes place over-the-counter. No trading venue is involved. Therefore the T+2 mandate is technically not applicable to these trades. However, in practice, the majority of fixed-income trades are currently settled on a T+2 basis[192].

- OTC trades between buy-side firms and brokers

---

[192] At the level of internal debt instruments settled in the ICSDs, most fixed income instruments actually settle a on shorter settle cycle than T+2 (T+0/T+1).

The vast majority of trades executed by buy-side firms (institutional investors, pension funds, mutual funds, hedge-funds, etc.) are structured as "riskless principal" transactions. From a legal and technical perspective, this style of trading involves two related – but legally separate – transactions: (i) the buy-side firm trades with the broker/dealer and (ii)the broker/dealer trades – separately – on the exchange/trading venue. The former transaction is regarded as an OTC trade while the latter is clearly on a trading venue. A buy-side firm can therefore choose not to comply with the T+2 standard. The decision to settle on a T+3 (or longer) basis is normally driven by operational issues, often involving cash management. Buy-side firms based in the US may request a T+3 cycle, whilst their home market remains on the T+3 model for the moment. (Note: The US & Canada markets are migrating to a T+2 cycle in September 2017.)

In both these circumstances the counterparties can choose not to settle on a T+2 basis.

There are two primary impacts of disharmonised settlement cycles:

a)  cost and investment flexibility

   •   The process of portfolio management is made more complex by having to cope with a variety of settlement cycles: e.g. when an investment decision is made to sell in the US market and invest in the European market. The fund will need to:

      (i)    cover the 1-day funding cost (normally by way of an overdraft facility or revolving credit facility) of waiting 3 days for receipt of the US funds but having to pay for the European investments in 2 days, or

      (ii)   delay the investment into European stocks by 1 day so that the payment and receipt occur on the same day (meaning that the fund is not invested for a day).

   •   the net impact is therefore increased cost and, potentially, reduced investment performance.

b)  operational complexity[193]

   •   Both scenarios described above introduce additional operational complexity. In scenario (i) operational staff will need to arrange an overdraft or draw funds from an existing facility. In scenario (ii) operational staff will need to closely monitor in-flight transactions to ensure that settlement occurs as intended and no undue costs are incurred.

### 3. Present status of the Barrier

As far as the European markets are concerned, the CSDR has clarified the situation as Article 5 requires a move to T+2 for transactions executed on a trading venue. In addition, implementation of T+2 is a prerequisite for all markets migrating to T2S.

At a more global level, the trend is that equity market trades are heading to almost universal adoption of T+2. This movement is likely to be somewhat accelerated when the US moves to T+2 in Q3 2017.

---

[193] It should be noted that the converse scenario – a fund holds non-invested cash which is received 1 day prior to the outgoing payment obligation – can sometimes benefit the fund. Institutional investors are, by their nature, net long-term buyers of assets. Most investment funds also prefer to be as fully invested as possible and hold minimal levels of cash. The revenues received from holding cash and being paid interest are probably therefore more than outweighed by the costs of not being able to invest whilst waiting for cash to be received. The operational aspects remain the same.

**9. Dismantled Barriers**

BARRIER GB 6: Differences in settlement periods – remaining issues at global level

Global equity and fixed-income markets are gradually coalescing around a 2-day settlement cycle. The US & Canada will adopt T+2 in 2017 and Japan will migrate in 2018/19. At that point the vast majority of the world developed markets will operate on a T+2 cycle. This convergence is beneficial to all segments of the market, because it reduces risk and harmonises and simplifies investment and operational processes. That said, it is important that participants in OTC markets continue to benefit from the flexibility to adopt different settlement cycles based on their specific needs (cf. impact on investment firms who need to manage inventory effectively).

The EPTF would therefore suggest that public authorities should act to further promote harmonised settlement cycles at a global scale. It is appropriate at this time to converge on a T+2 cycle, but consideration should also be given to a future migration to T+1.

The following actions should be considered:

- publication of statistics by CSDs about the number of trades that settle at T+3 or longer;

- requiring investment managers to provide greater transparency of the costs borne by funds in connection with overdraft charges incurred due to an extended settlement cycle.

## BARRIER GB 7: Operating hours and settlement deadlines

### 1. Description of the Barrier

Giovanni Barrier 7 on settlement deadlines was referring to the differences in opening days and settlement deadlines between CSDs as issuer CSDs.

In the first Giovannini Report of November 2001 the following statement is made:

> "Differences in the operating hours of national systems complicate cross-border settlement, if at least one of the systems concerned does not operate real-time settlement or frequent batches. In such circumstances, differences in operating hours can result in the incompatibility of deadlines for matching and delivery in the different systems. This type of problem is aggravated when there are different deadlines for the matching or delivery of same instrument within a settlement system, depending on where it was traded. ... Although European settlement systems are required to conform to the operating hours of TARGET, sufficient differences remain in the hours and deadlines to impede efficient cross-border clearing and settlement. If cross-border activity is to be facilitated, these national differences will need to give way to harmonised opening hours and settlement deadlines for the EU as a whole."

Ten years ago, there were indeed major differences in operating hours and operating days of CSDs and this was making it difficult for market participants to achieve same-day irrevocable deliveries. This is why this barrier has historically been addressed by the CESAME group in conjunction with Giovannini Barrier 4 on intraday settlement.

### 2. Developments since the Giovannini Reports

With the implementation of Target2-Securities, the barrier will be fully dismantled for 20 European markets by September 2017. In the remaining EU markets, CSDs have now largely aligned their operating hours when acting as issuer CSDs.

### 3. Present status of the Barrier

As regards intraday settlement, the vast majority of EU CSDs, and all T2S CSDs, now offer real-time settlement (BIS "model 1" or RTGS for real-time gross settlement). CSD Prague and CDAD in Bulgaria are the only EU CSDs settling exclusively based on BIS "model 2", which means that there are a few "batches" each day allowing for the netting of cash payments. This model is typically adopted in markets without a local CCP.

Today, market participants do not seem to consider that the use of BIS "model 2" by the Bulgarian and Czech markets represent a barrier to efficient post trade processes.

The concerns expressed at the time of the Giovannini Reports have given way to new concerns related to cross-border settlement deadlines. These deadlines depend on the cut-off times of intermediaries and investor CSDs used to "connect" to the issuer CSD.

In particular, cross-border transactions in Commercial Bank Money (CoBM) over the ICSDs' interoperable link (the "Bridge") are subject to different and shorter DvP settlement cut-off times

**9. Dismantled Barriers**

BARRIER GB 7: Operating hours and settlement deadlines

(compared to T2S), which may result in collateral settlement fails. EPTF Barrier WL4 (insufficient collateral mobility) covers this issue and states that improvements to CoBM cross-border transactions are expected to be analysed in the AMI-SeCo context.

## Annexes

### *List of annexes*

Annex 1: List of EPTF Members

Annex 2: List of acronyms

Annex 3: Detailed description of the European Post Trade Landscape

**Annexes**
List of annexes

## *Annex 1: List of EPTF Members*

| Associations, interest groups or other organisations | | Representative |
|---|---|---|
| 1 | AFME – Association for Financial Markets in Europe | Mr Werner Frey |
| 2 | AGC – Association of Global Custodians | Mr Stephen Lomas |
| 3 | DTCC's Derivatives Repository Ltd | Mr Andrew Douglas |
| 4 | EACH – European Association of CCP Clearing House | Mr Rafael Plata |
| 5 | EBF – European Banking Federation | Mr Marcello Topa |
| 6 | ECSDA – European Central Securities Depositories Association | Ms Soraya Belghazi |
| 7 | EFAMA – European Fund and Asset Management Association | Mr Rudolf Siebel |
| 8 | European Issuers | Mr Markus Kaum |
| 9 | FESE – Federation of European Securities Exchanges | Mr Rainer Riess |
| 10 | ICMA – International Capital Market Association[194] | Mr Godfried De Vidts |
| 11 | ISDA – International Swaps and Derivatives Association | Mr George Handjinicolaou |
| 12 | ISLA – International Securities Lending Association[195] | Mr Andrew Dyson |
| **Individuals appointed to represent a common interest** | | |
| 13 | Mr Joël Mérère, representing interests of the T2S community | |
| **Independent experts** | | |
| 14 | Mr Paul Bodart | |
| 15 | Mr Klaus Löber | |
| 16 | Mr Dermot Turing | |
| 17 | Mr Marcus Zickwolff[196] | |
| Observers | | Representative |
| * | ESCB – European System of Central Banks | Mr Helmut Wacket |
| * | ESMA – European Securities and Markets Authority | Ms Karole-Anne Sauvet-Frot |

---

[194] EPTF Member from October 2016 until May 2017.
[195] EPTF Member from October 2016 until May 2017.
[196] EPTF Member from March 2016 until September 2016.

**Annexes**
Annex 1: List of EPTF Members

## Annex 2: List of acronyms

| Acronym | Meaning |
|---------|---------|
| AFME | Association for Financial Markets in Europe |
| AG | Advisory Group |
| AGC | Association of Global Custodians |
| AIA | Authorised Intermediary Agreement |
| AIF | Alternative Investment Fund |
| AIFMD | Alternative Investment Fund Managers Directive |
| AMI-SeCo | Advisory Group on Market Infrastructures for Securities and Collateral |
| AML (AML4) | Anti-Money-Laundering Directive |
| ANNA | Association of National Numbering Agencies |
| AUM | Assets Under Management |
| BCBS | Basel Committee on Banking Supervision |
| BIC | Bank Identifier Code |
| BIS | Bank for International Settlements |
| BO | Beneficial Owner |
| BRRD | Bank Recovery and Resolution Directive |
| CAJWG | Corporate Actions Joint Working Group |
| CASG | ECB's T2S Corporate Actions Sub-Group |
| CASS | UK Client Assets regime |
| CBF | Clearstream Banking Frankfurt |
| CCP | Central Counterparty |
| CeBM | Central Bank Money |
| CESAME, CESAME2 | European Commission's Clearing and Settlement Advisory and Monitoring Experts group |
| CFI | Classification of Financial Instrument |
| CFTC | Commodity Futures Trading Commission |
| CIV | Collective Investment Vehicle |
| CM | Clearing Member |
| CMU | Capital Markets Union |
| CNS | Continuous Net Settlement |
| CoBM | Commercial Bank Money |
| COGESI | Contact Group for Euro Securities Infrastructure |
| CPMI | Committee on Payment and Market Infrastructures |
| CPSS | Committee on Payment and Settlement Systems |
| CRD (CRD IV) | Directive on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms |
| CRR | Capital Requirements Regulation |
| CSC | Collective Safe Custody regime |
| CSD | Central Securities Depository |
| CSDR | CSD Regulation |
| CUSIP | Committee on Uniform Securities Identification Procedures |
| DCI | Designated Credit Institution |
| DCP | Directly Connected Participant |
| DEA | Direct Electronic Access |
| DLT | Distributed Ledger Technology |
| DMO | Debt Management Office |
| DR | Depository Receipts |
| DSB | Derivative Service Bureau |
| DTA | Double Taxation Agreement |
| DTCC | Depository Trust and Clearing Corporation |
| DTT | Double Taxation Treaty |
| DvP | Delivery-versus-Payment |

15th May 2017

**Annexes**
Annex 2: List of acronyms

| Acronym | Meaning |
|---------|---------|
| EBA | European Banking Authority |
| EBF | European Banking Federation |
| ECB | European Central Bank |
| ECMS | Eurosystem Collateral Management System |
| ECSDA | European Central Securities Depositories Association |
| EFAMA | European Fund and Asset Management Association |
| EFC | Economic and Financial Committee |
| E-MIG | European Market Implementation Group |
| EMIR | European Market Infrastructure Regulation |
| EPTF | European Post Trade Forum |
| EPTG | European Post Trade Group |
| ESA | European Supervisory Authority |
| ESCB | European System of Central Banks |
| ESDM | EU Sovereign Debt Markets |
| ESMA | European Securities and Markets Authority |
| ETD | Exchange Traded Derivative |
| ETF | Exchange Traded Funds |
| ETP | Exchange Traded Products |
| EUI | Euroclear UK & Ireland |
| FATCA | Foreign Account Tax Compliance Act |
| FCD | Financial Collateral Directive |
| FCP | Fonds Commun de Placement |
| FESE | Federation of European Securities Exchanges |
| FFTT | French Financial Transaction Tax |
| FI | Financial Institution |
| FISCO | Fiscal Compliance Experts Group |
| FMI | Financial Market Infrastructure |
| FOP | Free-of-payment |
| FpML | Financial products Markup Language |
| FSB | Financial Stability Board |
| FTT | Financial Transaction Tax |
| GB | Giovannini Barrier |
| GCM | General Clearing Members |
| GLEIF | Global Legal Entity Identifier Foundation |
| GM | General Meeting |
| GSC | Geneva Securities Convention |
| HSG | Harmonisation Steering Group |
| ICMA | International Capital Market Association |
| ICP | Indirectly Connected Participant |
| ICSD | International Central Securities Depositary |
| IFTT | Italian Financial Transaction Tax |
| IM | Initial Margin |
| IMF | International Monetary Fund |
| IOSCO | International Organisation of Securities Commissions |
| ISDA | International Swaps and Derivatives Association |
| ISIN | International Securities Identification Number |
| ISLA | International Securities Lenders Association |
| ISO | International Organisation for Standardisation |
| ISSA | International Securities Services Association |
| IT | Information Technology |
| KYC | Know Your Client |
| LEI | Legal Entity Identifier |
| LOB | Limitation on Benefits |
| MAR | Market Abuse Regulation |

| Acronym | Meaning |
|---|---|
| MiFID | Markets in Financial Instruments Directive |
| MiFID 2 | Revised Markets in Financial Instruments Directive (II) |
| MiFIR | Markets in Financial Instruments Regulation |
| MMSR | Money Market Statistical Reporting |
| MTF | Multilateral Trading Facility |
| NAV | Net Asset (Active) Value |
| NCA | National Competent Authority |
| NFI | Non-Financial Institution |
| NMPG | National Market Practice Group |
| NUG | National User Group |
| OECD | Organisation for Economic Co-operation and Development |
| OEIC | Open Ended Investment Company |
| OTC | Over-The-Counter |
| PD | Primary Dealer |
| PFMI | Principles for Financial Market Infrastructures |
| PoA | Power of Attorney |
| RDU | Reference Data Utility |
| REMIT | Regulation on wholesale energy market integrity and transparency |
| RTGS | Real Time Gross Settlement |
| RTS | Regulatory Technical Standards |
| SEPA | Single Euro Payments Area |
| SF | Settlement Finality |
| SFD | Settlement Finality Directive |
| SFT | Securities Financing Transaction |
| SFTR | Securities Financing Transactions Regulation |
| SICAV | Société d'investissement à capital variable |
| SMMDC | Sterling Money Market Data Collection |
| SMPG | Securities Market Practice Group |
| SRD or SHRD | Shareholders Rights Directive |
| SSI | Static Settlement Instruction |
| SSR | Short Selling Regulation |
| SSS | Securities Settlement System |
| STP | Straight-Through-Processing |
| SWIFT | Society for Worldwide Interbank Financial Telecommunication |
| T2S | Target2-Securities |
| TA | Transfer Agent |
| T-BAG | Tax Barriers Business Advisory Group |
| TDN | Trade Date Netting |
| TIN | Taxpayer Identification Number |
| TR | Trade Repository |
| TRACE | Treaty Relief and Compliance Enhancement |
| TSI | Tri-party Settlement Interoperability |
| TTCA | Title Transfer Collateral Arrangement |
| UCITS (UCITS V) | Undertakings for Collective Investment in Transferable Securities |
| UPI | Unique Product Identifier |
| UTI | Unique Transaction Identifier |
| VM | Variation Margin |
| WHT | Withholding Taxes |
| WUD | Winding-up Directive |
| XML | eXtensible Markup Language |

## *Annex 3: Detailed analysis of the European Post Trade Landscape*

This Annex provides a detailed analysis of the European Post Trade Landscape, intended as an overview of all major aspects of the various activities normally included under the broad spectrum of post trade activities and services.

The descriptions in this Annex are provided as reference material in order to facilitate a common understanding of the actors, objectives, roles, responsibilities, services and recent developments in relation to each of the activities herein described.

Significant effort has been made by EPTF members to provide correct and factual information in this Annex. All this information is deemed, to the best of current knowledge, to be correct and valid. However, this is not intended to be an exhaustive and fully comprehensive description of all relevant aspects of post-trade services in Europe.

Given its nature as a reference document about the post trade services industry, the EPTF Report Annex 3 is published as a stand-alone document at the following link:

http://ec.europa.eu/info/files/170515-eptf-report-annex-3_en

15th May 2017

**Annexes**

Annex 3: Detailed analysis of the European Post Trade Landscape