

# AFME Post Trade Division: Client Asset Protection Task Force

## AFME Principles on Asset Segregation Due Diligence and Collateral Management

September 2016



# Contents

Contents..............................................................................................................................2

1   Introduction.....................................................................................................................3

2   Executive summary and principles....................................................................................4
   2.1   Asset segregation principles.......................................................................................4
   2.2   Due diligence principles............................................................................................5

3   Background context.........................................................................................................6
   3.1   A note on the holding of cash....................................................................................6
   3.2   Client asset protection regulation in context...............................................................6

4   Account segregation........................................................................................................7
   4.1   What is meant by account segregation?.......................................................................7
   4.2   Figure 1: account structures.......................................................................................8
   4.3   Account segregation as a feature of customer protection................................................8
   4.4   Current models of account segregation in Europe.........................................................9
   4.5   Current status of regulations....................................................................................10
   4.6   Practical considerations of external account segregation.............................................11

5   Segregation principles...................................................................................................13

6   Collateral management..................................................................................................14

7   Due diligence................................................................................................................17
   7.1   Due diligence: definition and importance..................................................................17
   7.2   Due diligence process..............................................................................................17
   7.3   The current regulatory environment.........................................................................18
   7.4   Custody due diligence.............................................................................................19
   7.5   Central counterparty due diligence...........................................................................20

8   Due Diligence Principles................................................................................................20

9   Glossary.......................................................................................................................22

10  Contributors to this report.............................................................................................23

11  Annex..........................................................................................................................23
   11.1  Annex 1: Summary of current status of regulation.....................................................23
   11.2  Annex 2: Regulatory Framework Matrix...................................................................25
   11.3  Annex 3: CCP Due Diligence..................................................................................31

## 1    Introduction

Segregation of client assets and related account structures is a topic deemed of high relevance by policymakers at international level (e.g. by IOSCO's Principles regarding the Custody of Collective Investment Schemes' Assets), at EU level (e.g. AIFMD, EMIR, CSDR, UCITS V, MiFID/MiFIR) and at national levels.

Yet such regulatory focus in Europe lacks a comprehensive and holistic approach in terms of the nature of obligations, scope of financial instruments and entities and requirements for collateral treatment.

It is against this background that AFME has engaged in a two-stage project:

- to comprehensively **analyse** existing and proposed regulation that impacts client asset protection, focusing primarily on Europe but with consideration of the broader global context given the nature of the markets in question, and

- to develop, based on the conclusions of this analysis and focusing primarily on securities accounts, **principles on segregation of client assets and client account holding structures** from a holistic and integrated operational, legal and compliance perspective that simultaneously ensure adequate safety of client assets while minimising operational complexity and cost.

These principles deal with **asset segregation as a means of client asset protection in the absence of harmonised insolvency laws.** They are primarily targeted at European policymakers and all financial institutions which provide safekeeping of securities on behalf of clients.

This study is structured as follows: in the Executive Summary (Section 2) the main parts of all segregation and due diligence principles are outlined. Section 3 sets out the context to the topic of asset segregation. We analyse in Section 4 the various account structures used in the market and proposed by regulation, as well as the consequences of those account structures on the market. In Section 5 we present a set of principles of account structures taking into consideration the practical consequences of the various structures, including relevant aspects of collateral management. Section 6 is dedicated to collateral as an unquestionable component to the current landscape and the consequences of differing account structures on it. We discuss in Section 7 the importance of due diligence for the proper protection of client assets. Section 8 sets out the principles regarding due diligence requirements.

## 2    Executive summary and principles

Account segregation is one mechanism by which regulators, legislators and authorities seek to achieve client asset protection. The meaning of "account segregation" differs across regulations and the use of the term within the industry – segregation can be both an internal book keeping concept, and an external account concept. The concept of account segregation is considered in more detail on page 7. In addition, segregation can be required to different levels – between securities account holder and securities account provider assets[1], between the assets of particular types of securities account holders[2], or between the assets of each individual securities account holder[3].

---

*We focus in this paper on the appropriate level of segregation in respect of external accounts.*

---

In our view, external account segregation beyond securities account holder vs securities account provider assets does not necessarily provide additional asset protection – the impact of such further levels of segregation depends principally on the insolvency regime of the jurisdiction in which the securities account provider is located, which is not harmonised across Europe.  This view aligns with the findings within the European Central Securities Depositories Association's October 2015 publication, entitled 'Account Segregation Practices at European CSDs'.

In order to allow for a flexible approach which ensures a high standard of securities account holder asset protection whilst also acknowledging the consequences of the differing insolvency regimes, we consider the following principles to be appropriate.

As will be seen from the principles, knowledge by the securities account holder of the regime in which the assets are held is essential, and so we further consider a set of principles which ought to apply to due diligence processes conducted by securities account holders.

### 2.1    Asset segregation principles

- Internal accounts should be fully segregated and identify the immediate client for whom the assets are being held.

- External accounts should be segregated between proprietary assets and securities account holder assets unless local legislation allows other measures that achieve the same level of protection. The accounts should identify on their face that they hold proprietary or security account holder assets (as relevant).

- Securities account providers should acknowledge that assets held by them for client A who is in turn holding those assets for client B are not assets belonging to client A (if so requested by client A).

- Further to the due diligence conducted by the securities account provider at each level of the custody chain, to the extent that the principles set out above are not sufficient to adequately protect clients' assets on insolvency of the sub-custodian, the securities account provider should be required to take such further steps as are reasonably possible to mitigate the risks identified by the due diligence. To the extent that such risks cannot be mitigated, this should be clearly disclosed to the securities account holder.

---

[1] As required by MiFID
[2] As proposed in ESMA's consultation report – AIFMD Asset Segregation
[3] As required by the ISA offering under EMIR and CSDR

- Any greater levels of external account segregation desired by the securities account holder beyond those required by the principles set out above should be a matter for commercial negotiation between the securities account holder and the securities account provider, subject to following principle:

  - the securities account provider should, to the extent it chooses to offer the alternative account segregation model, disclose to the securities account holder the risks and costs of the segregation options in order to enable the securities account holder to make an informed decision.

- Securities account providers should retain responsibility for shortfalls in custody accounts where such shortfall is due to their own negligence, wilful default or fraud. Where the securities account provider is not liable for the shortfall, it should be required to take all reasonable steps to assist in the resolution of the situation without undue delay.
- The account structure should allow for efficient management of collateral and address the risks arising during the life cycle of the collateral in a timely manner.

Knowledge by the securities account holder of the regime in which the assets are held is essential, and so we further consider a set of principles which ought to apply to due diligence processes conducted by each securities account provider in the custody chain.

## 2.2   Due diligence principles

- A securities account provider should obtain legal advice detailing, in particular, the insolvency regime applicable to assets held in custody in each market offered for custody services.

- A securities account provider should conduct appropriate market due diligence prior to offering services to clients, and periodically thereafter.

- A securities account provider should consider, taking a risk-based approach, whether is it appropriate to conduct due diligence visits to the locations in which it offers custody services.

- Any entity entering into a contractual arrangement for the provision of custody services should exercise all due skill, care and diligence in the selection and appointment and ongoing monitoring of the account provider.

## 3    Background context

Protection of client assets in the event of the insolvency of a securities account provider is of utmost importance. Across the industry, owners of securities frequently do not have their own custody function or links to Central Securities Depositories. In order to be active in the financial markets they require the services of a securities account provider. We specifically consider within this paper the holding of securities as opposed to cash due to differing considerations that apply, as explained further below. Further, we do not consider the holding of chattels such as fine art and wine. With regard to the use of securities, perhaps the most important area to focus on is the use of securities as collateral, which drives risk mitigation and financial stability across the market. The use of securities as collateral is an area which the European Commission and the G20 is increasingly focused on in order to reduce risk in the markets[4]. We therefore set out below a summary of the legal mechanisms by which assets can be used to collateralise obligations.

### 3.1    A note on the holding of cash

In this publication we have focused on non-cash assets only. It is worth noting that in the context of asset segregation cash requires separate consideration to non-cash assets. Absent any statutory regime, on insolvency cash is ordinarily considered as part of the insolvent regime of the cash holder, and so would not be ring-fenced for the "owners" of the cash. Securities on the other hand can be ring-fenced for their owners provided a trust or deposit arrangement (or the equivalent across various regimes) can be evidenced. The Markets in Financial Instruments Directive (MiFID) has sought to mitigate the risk of holding cash with a financial institution by specifying the locations in which such cash should be retained. Banks are permitted under the provisions of MiFID to hold cash received from clients on deposit with themselves. The implementation of the Deposit Guarantee Scheme Directive (DGSD) also mitigates this risk in relation to entities who may not be in the position to purchase credit protection against the risk of loss.

### 3.2    Client asset protection regulation in context

Account segregation is merely one mechanism by which regulation seeks to achieve client asset protection. Although we have focused in this publication solely on that mechanism, it is worth setting out the other mechanisms adopted across various European regulations.  These include:

- liability levels mandated by regulation (e.g. AIFMD and UCITS V);
- due diligence requirements (e.g. MiFID, AIFMD, UCITS V);
- risk disclosures (e.g. MiFID, AIFMD, EMIR, CSDR, UCITS V and SFTR);
- reconciliation between internal and external accounts (MiFID and CSDR);
- prohibitions / restrictions on the right of re-use (MiFID II, UCITS V and AIFMD);
- daily reporting requirements (AIFMD, UCITS V and CSDR); and
- depositor protection in the case of cash (DGSD).

---

[4] See for example the risk mitigation rules under EMIR and the treatment of collateral within CRR.

## 4    Account segregation

Account segregation has become a major topic of debate in recent years. It is important at the outset to determine the rationales for such account segregation. The first rationale is **client asset protection**, i.e. the theory that increased levels of segregation result in greater protection for a securities account holder's assets upon the insolvency of the securities account provider, which we challenge below. The second rationale, which is evident for example in the clearing requirements under EMIR, is **financial stability**, i.e. the concept that particular segregation and portability arrangements increase the likelihood that upon the insolvency of a Clearing Member, the market can continue to operate without substantial disruption.  For the sake of completeness, we should also note that there is a third reason for account segregation in certain jurisdictions, which is **transparency** for tax, shareholder participation and financial crime purposes, although we do not intend to deal with such issues here.[5]

The account segregation requirements in Article 39 of EMIR in relation to cleared transactions can be set apart from other such requirements by reason of their underlying rationale[6]. A second feature that sets those requirements apart from others described in this section is that they provide for account segregation in respect of assets that the securities account holder may have passed on a title transfer collateral basis, i.e. where the securities account holder has transferred all ownership rights in the assets. The EMIR rules effectively give securities account holders rights in respect of their collateral held at EU CCPs in preference to other unsecured creditors of the clearing member on its insolvency. Use of account segregation structures for financial stability purposes should therefore be weighed carefully against creditor protection principles in the wider sense given the inherent conflict that exists.

An important focus of the European Commission currently is the creation of more efficient capital markets in which investors have the confidence to invest across borders, as set out in the European Commission's Green Paper on Building a Capital Markets Union. A significant focus of this project is the elimination of the remaining barriers to cross-border clearing and settlement set out in the two Giovannini Reports[7].  TARGET2-Securities (T2S) was developed to address some of those barriers, through the introduction of efficiencies in settlement of securities across Europe.  T2S went live in June 2015, and is now operational for a number of CSDs. In its end-stage it will create a pan-European settlement platform which enables efficient and simple cross-CSD settlement of securities.

### 4.1    What is meant by account segregation?

Before going into the detail of omnibus and individually segregated account structures, it is necessary first to determine exactly what is meant by "segregation". In the context of book-entry securities, asset segregation is typically achieved by separate accounts. Throughout European regulation (and beyond) the requirements regarding segregation are framed by reference to various concepts of "books and records", "records and accounts"[8]  etc. "Accounts" in this context can mean one of two things from the perspective of a securities account provider: (a) "internal" accounts, i.e. accounts opened on the books of the securities account provider to reflect the holdings its clients have with it and (b) "external" accounts, i.e. accounts opened by the securities account provider at a third party securities account provider, to hold client assets (Figure 1).[9] The distinction between the two types of account is vital in determining the operational requirements of the regulations, since the obligations in respect of the two types of accounts may well be different, and give rise to different analyses from an insolvency perspective.

[5] We note in this regard the ISSA publication dated 27 August 2015 entitled "Financial Crime Compliance Principles for Securities Custody and Settlement", which considers the financial crime rationale for account segregation in detail.
[6] We note that there are additional segregation requirements required pursuant to EMIR in the context of initial margin for uncleared derivatives.
[7] https://www.ecb.europa.eu/paym/t2s/about/html/giovannini.en.html
[8] Eg Article 16(1) of MiFID and article 99(1)(a) of AIFMD
[9] We note that the terminology applied to these accounts differs across industry and regulator papers. Some refer to "internal" accounts as "account provision", "client-facing accounts", "downstream" accounts or "upstream" accounts, with "external" accounts being referred to as "external account holding", "upstream accounts" or "downstream accounts". **We have chosen to reference "internal" and "external" accounts in this paper so as to avoid any confusion between the various terminology used across the industry.**

### 4.2    Figure 1: account structures



Another distinction worth clarifying is the use of Individual Segregated Client Accounts ("ISA") and Omnibus Segregated Accounts ("OSA") in both EMIR and CSDR. At a very high level, an OSA means that a single account will contain assets of a number of clients of the CSD or CCP participant at the relevant CSD or CCP. An ISA, on the other hand, will contain the assets of just one client of the participant at the relevant CSD or CCP opened under the name of the participant. It is important to note, however, that the use of these concepts in CSDR and in EMIR are vitally different – in CSDR the ISA and OSA both hold assets that belong legally to the client, whereas the ISA and OSA within EMIR, depending upon the structure adopted by the particular CCP, may hold assets that belong legally to the CCP participant itself, as opposed to its client. It is worth noting that, although these concepts have been specifically referenced in recent regulation, they are not the only possible segregation scenarios, and so they have not been relied upon in this paper as exhaustive options.

### 4.3    Account segregation as a feature of customer protection

In order to determine to what extent account segregation achieves the desired outcome it is necessary to consider the insolvency regime that will apply in the event of the insolvency of the securities account provider.

As a general point, insolvency regimes seek to restitute property to their owners. The essential requirement of any segregation model should therefore be to achieve such restitution, considering (a) certainty of the pool of assets to be restituted; and (b) speed of return of such assets.

Although to an extent insolvency regimes across Europe are being harmonised, for example through the BRRD, it remains the case that to a large extent insolvency law is a matter of national legislation[10] (and this is clearly exacerbated outside Europe), and so assumptions cannot be made within asset protection regulations as to the consequences upon insolvency of different levels of account segregation.[11] MiFID specifically recognizes the fact that certain insolvency regimes may not recognize certain segregation models.[12] Further, although we recognize further segregation may provide increased transparency on insolvency it does not necessarily shorten the time to restitute clients' assets, which is dependent on the relevant insolvency regime together with the specific nuances of each case. We do not intend here to go into the details of insolvency regimes, but note that such analysis is done as a matter of practice by financial institutions through their due diligence

---

[10] Potential Economic Gains from Reforming Insolvency Law in Europe, AFME 22 February 2016. We note also the European Commission's recent consultation of an effective insolvency framework.
[11] This is exemplified in the ECSDA report on account segregation practices at CSDs, published 13 October 2015.
[12] See in particular MiFID article 16(2) and (3)




processes, and so any mandated account segregation should give regard to the huge wealth of information that currently exists within financial institutions in this respect.[13]

Due in particular to the potential increased external account segregation requirements under AIFMD, the sell-side of the industry has been in discussions with the buy-side in order to gain an understanding of their preferred approach. We note for example that AIMA's[14] response to the consultation favours omnibus account segregation, as did the AFME response[15]. Importantly, subject to account structures always providing sufficient asset protection, regulation should not impede the ability of securities account holders to make risk and cost decisions on the basis of subjective commercial parameters, provided the essential protection of custody assets on insolvency is maintained.

> The underlying aim of customer protection in the context of asset custody is to ensure that assets do not form part of the estate of the securities account provider in the event of its insolvency.

## 4.4   Current models of account segregation in Europe

As at the date of writing, the account segregation model in relation to securities across the industry is broadly as follows:

- internal accounts (this will always be an individual segregation model):

  - there will always be at least a single internal account per client held by a securities account provider, which will identify the securities account holder on the face of the account.
  - in addition, the internal accounts will, on instruction of the securities account holder, also identify whether the assets held within that securities account holder's account belong to the securities account holder or whether that it is holding them in turn as custodian for its clients. This level of visibility is mandated by MiFID[16] and CSDR.

- External accounts: the holding of assets in external accounts is to a large extent market-dependent:

  - in the vast majority of markets[17], the securities account provider will segregate between its proprietary and customer assets, such that (at least) two external accounts (both in the name of the financial institution) will be opened, making clear in respect of the client account that it contains only assets of clients of the securities account provider (i.e. the omnibus segregation model also called OSA for CSDR purpose).
  - the majority of European markets allow for the use of omnibus accounts, such that the assets of a financial institution's clients can be consolidated into a single external account.
  - some markets require identification of the ultimate beneficial owner of the assets of the account (so called "direct-holding markets"), in which case a separate external account will be opened for each client of the securities account provider.
  - due to the implementation of various laws, and differences in their interpretation and implementation in member states, further levels of segregation are being implemented by the industry, including:

    - optional omnibus or individual segregation models at CCPs;
    - optional omnibus or individual segregation models at CSDs; and
    - in certain European jurisdictions, concentrated omnibus account models for AIF and potentially UCITS assets.

---

[13] Detailed analysis on the impact of increased external account segregation on a UK and US insolvency has been conducted by the industry in the context of AIFMD, as to which see [link to joint advocacy paper.]
[14] https://www.esma.europa.eu/press-news/consultations/consultation-guidelines-asset-segregation-under-aifmd
[15] https://www.esma.europa.eu/press-news/consultations/consultation-guidelines-asset-segregation-under-aifmd
[16] Art. 16(1)(d) of Directive 2006/73/EC
[17] Unless local legislation provides equivalent protection by alternative means.



### 4.5    Current status of regulations

The regulations as at the date of writing currently create a fragmented approach to account segregation, which hinders the aims of the rationales set out above, particularly in the context of the intentions of the Capital Markets Union project. In brief, the regulations provide as follows:

MiFID I: In relation to securities, MiFID requires internal accounts to identify the securities account holder to whom the securities belong. With respect to external securities accounts, the omnibus model is permitted, requiring external account segregation between securities account holder and proprietary assets of the securities account provider, or other equivalent measures, and requiring identification (normally on the face of the relevant account) that the relevant securities account contains only assets belonging to the securities account holder. Importantly, MiFID also requires regular reconciliations to be conducted between the internal accounts and external accounts of the securities account provider. With respect to cash, MiFID requires investment firms to segregate cash away from its own funds (on an omnibus basis) with third party banks (including central banks) or in qualifying money market funds. However, this obligation does not apply to banks in relation to deposits held by them. Finally, MIFID requires Member States to prescribe requirements having an equivalent effect in terms of safeguarding clients' rights where local laws of the relevant Member State do not satisfy MIFID segregation requirements. This framework is expected to be maintained under MIFID II, with an additional ban (except in specific cases) on security interests, liens or rights of set-off over securities account holder assets.

AIFMD: ESMA is currently considering its guidelines on the segregation requirements under AIFMD[18], which apply to the holding of assets in custody by custodians for AIFs. There is debate among regulators as to whether the segregation obligations under AIFMD refer to internal accounts or external accounts, and the various options being considered can be found in ESMA's consultation paper issued in December 2014[19]. Here ESMA outlined some options and asked the industry for feedback. In particular, ESMA suggested the following options:

- AIF and non-AIF assets should not be mixed in the same account and there should be separate accounts for AIF assets of each depositary when a delegate is holding assets for multiple depositary clients.

- the separation of AIF and non-AIF assets should be required, but it would be possible to combine AIF assets of multiple depositaries into a single account at sub-custodian level.

- AIF and non-AIF assets could be commingled in the account in which the AIF's assets are to be kept at the level of the delegate. However, the delegate could not commingle in this account assets coming from different depositaries.

- AIF and non-AIF assets could be commingled in the account in which the AIF's assets are to be kept at the level of the delegate.

- AIF assets should be segregated on an AIF-by-AIF basis at the level of each delegate.

If ESMA issues guidelines in line with either of Options 1 or 2 set out in its consultation paper, the market will be required to create omnibus accounts for smaller subsets of clients ("concentrated omnibus accounts"), either divided between AIF and non-AIF clients, or further between the AIF clients of one depositary and the AIF clients of another depositary, depending upon the option mandated. Under this regulation CSDs operating as securities settlement systems are not considered "delegates" and so are not required to comply with the segregation obligations as described above.[20] AFME's response papers to these proposals can be found on AFME's website[21].

UCITS V: This regulation is some months behind AIFMD in terms of drafting and implementation, but the segregation requirements are expected to be largely consistent with those to be implemented under AIFMD.[22]

---

[18] In relation to which it has issued a Call for Evidence seeking further views on the consequences of different levels of segregation. Due to the timing of publication, this publication has not taken into account the contents of that document.
[19] http://www.esma.europa.eu/system/files/2014-1326_cp_-
[20] Note the guidance provided by ESMA on this point in Q&A dated 1 October 2015.
[21] http://www.afme.eu/
[22] One potential difference between the approach taken in UCITS V and in AIFMD is the treatment of CSDs. Recital 21 of UCITS V provides that entrusting the custody of securities to a CSD should be considered a delegation of custody functions for the purposes of the Directive. This is currently a point of discussion within the industry and with regulators.

The delegated regulations supplementing UCITS V published by European Commission further clarify the rules provided to segregation of UCITS assets. There are different views as to how these draft rules should be interpreted and complied with. In particular, there is no common view as to whether at certain levels of intermediaries that are involved in holding UCITS assets, such assets should be held in *segregated omnibus accounts,* or *concentrated omnibus accounts* divided between UCITS and non-UCITS clients. Unlike AIFMD, there is currently uncertainty as to which circumstances CSDs may be considered to be delegates under UCITS V, which creates further uncertainty about rules of segregation of UCITS assets which are to be complied with by the industry.

EMIR: There are two aspects of account segregation contained in this Regulation. The first relates to collateral provided in relation to cleared transactions, at article 39. This provision requires that a clearing member (and the CCP) offers its securities account holders at least the option between an ISA and an OSA at the CCP (ie external accounts), setting out the costs and level of protection associated with each option[23]. The second relates to initial margin provided in relation to uncleared derivative transactions, which is currently in draft Regulatory Technical Standards. The final draft RTS require that initial margin be segregated such that it is protected from the default or insolvency of the collecting counterparty[24].

CSDR: This regulation requires CSDs and their participants to offer their clients at least the choice between an OSA and an ISA (ie external accounts at the CSD), and to inform them of the costs and risks associated with each option.

The table at Annex 1 summarises the distinctions between these various segregation obligations.

## 4.6   Practical considerations of external account segregation

We are of the view that asset protection must be a central tenet of any securities account provider arrangement. The choice of any particular account structure will depend on (a) asset protection in a given structure in the context of an insolvency of the securities account provider; (b) the operational risks to which the structure gives rise; and (c) any increased costs related to the structure, which may ultimately be borne by the end investors. It is therefore vital to understand the operational consequences of an increased level of external account segregation, which we set out below.

- **Increased number of external accounts gives rise to increased number of settlement instructions, thereby increasing the likelihood of operational and human error**. By way of example, a fund manager managing 10 funds holding assets in 20 jurisdictions currently has to deal with 20 SSIs. If each fund were required to have its own external account with a sub-custodian, the manager would need to contend with 200 SSIs, thereby increasing the risk of error, which in turn increases the risk of settlement fails. It is worth noting that an aim of CSDR is expressly to reduce the frequency of settlement fails through use of the penalties and buy-in process. Settlement fails are particularly undesirable in the event of the insolvency of the custodian, due to the added complexities that would need to be resolved before assets are returned to clients.

- **Increased number of accounts requires more time and manpower for their creation and maintenance and increased reconciliation management.** The creation and maintenance of accounts incurs costs, such that the more accounts are required the higher the cost is to the securities account holder. Such costs include the day-one set up costs as well as the ongoing maintenance and reconciliation costs. These costs are recognised in both EMIR and CSDR, hence the requirement for firms to disclose the risks and costs of the various account structures, giving the securities account holder greater information when opting for increased segregation. The increased maintenance requirements may also have a detrimental impact on speed of return of assets in an insolvency, due to the increased quantity of reconciliations that will need to be performed prior to such distribution. We note, on the other hand, that reconciliations of segregated accounts, whilst increasing the quantity of reconciliations to be conducted, should also be simpler on a per account basis, than reconciliations of omnibus accounts due to the 1:1 mapping.

---

[23] In both cases the accounts will be opened in the name of the clearing member, rather than directly in the name of the client, due to the principal to principal model used in Europe for clearing.
[24] Article 33(1). At the time of writing, the final draft RTS remain subject to further scrutiny by the European Commission.

- **Increased segregation between external accounts will reduce settlement efficiencies.** Securities account holders currently seek to reduce settlement costs by settling transactions in blocks (ie settling a single transaction for a number of their underlying securities account holders) such that there is only a single asset movement to pay for. This would be prevented if each underlying client of the securities account holder is required to have its own external account with the sub-custodian. In addition, the use of omnibus external accounts currently enables settlement internalisation at custodian level, which allows for increased efficiency and reduces time delays involved in externalised settlements. This capability will be removed if each client were required to have an individually segregated external account.

- **Accounts segregated at CSD level is a means to mitigate the risk that a securities account provider such as a custodian settles client A's sale with client B's assets.** External individual segregation is a tool for a custodian to avoid any unintended use of assets as well as all ex ante controls on the provision or any borrowing of assets.

- **The segregated account model currently disadvantages securities account holders with respect to corporate actions / asset servicing, in particular cross-border, as it increases costs, takes longer (particularly in the case of elective corporate action events) and potentially reduces investors' financial benefits of a corporate action event with fractions.** In the case of elective corporate actions, e.g. cash vs. stock dividend or rights issues, custodians collate elections and then send a single instruction per option onwards in the custody chain and ultimately to the issuer (or issuer agent). This significantly reduces costs, is more efficient and less time consuming when custodians perform their checks against the account held at the next level and ultimately at the CSD. In the case of payments, the lesser the number of accounts with the CSD and subsequent parts of the custody chain, the quicker and simpler the process becomes. Increasing the number of accounts within the CSD / custodians may result in a delay in crediting the outturn – cash and/or stock – from the corporate action. There is also a potentially negative impact to the end investor from a fractional entitlement perspective as the issuer will retain any fractional shares and thus the end investor will not be cash compensated. One of the reasons for all of the above is that currently corporate actions are not standardised across Europe and manual processing still plays a key role within the entire front to back process. In the long term should each corporate action be processed the same way in each European market and with greater levels of automation, this position may change.

- **TARGET2-Securities and CSD links in general are designed for an omnibus account structure, allowing for cross-border deliveries.** While some solutions have been created to accommodate the greater segregation levels associated with direct holding markets, any future regulation must account for the limitations of relevant infrastructures.

- **For consequences for collateral models** see Section 6 below.

## 5    Segregation principles

Taking into account the operational consequences of account segregation noted in section 4 above, together with the need to overlay differing national insolvency regimes onto any account structure, we consider the following to be a set of principles in relation to asset holding account structures which provide investor protection whilst at the same time allowing sufficient flexibility to take account of differing insolvency regimes and to promote efficiency in the markets.

- **Internal accounts should be fully segregated and identify the immediate client for whom the assets are being held.** This is necessary in order to ensure that, on the insolvency of a securities account provider, the insolvency practitioner is able to identify to whom the assets belong and to return them accordingly. This obligation must apply throughout the chain of intermediaries (each in respect of their immediate securities account holder), in order that, through a process of reconciliation of internal and external accounts throughout the chain of intermediaries, the insolvency practitioner is able to trace the assets through to the issuer CSD.

- **External accounts must be segregated between proprietary assets and securities account holder assets unless local legislation achieves the same objective through equivalent measures. The accounts should identify on their face that they hold proprietary or security account holder assets (as relevant).** This again is necessary in order to ensure an appropriate treatment of securities account holder assets on the insolvency of the securities account provider, and is required throughout the holding chain. By ensuring that proprietary assets are segregated from securities account holder assets throughout the chain of intermediaries, the securities account holder assets should not form part of the insolvent estate of the insolvent securities account provider.

- **Securities account providers should acknowledge that assets held by it for client A who is in turn holding those assets for client B are not assets belonging to client A (if so advised by client A).** The legal validity of such acknowledgement should be enforced by law. This requirement would prevent the risk that, in the event of client A's insolvency, the securities account provider would seek to take ownership, or otherwise prevent the return of those assets, in order to make good client A's outstanding obligations to the securities account provider. We note that the acknowledgement is dependent upon full and accurate information being given by client A.

- **Further to the due diligence conducted by the securities account provider at each level of the chain, to the extent that the principles set out above are not sufficient to adequately protect the client's assets on insolvency of the sub-custodian, the securities account provider should be required to take such further steps as are reasonably possible to mitigate the risks identified by the due diligence.** To the extent that such risks cannot be mitigated, this must be clearly disclosed to the securities account holder.

- **Unless bound by regulatory requirements, any greater levels of external account segregation desired by the securities account holder beyond those required by the principles set out above should be a matter for commercial negotiation between the securities account holder and securities account provider,** subject to the following principle**:**

  - the securities account provider should, to the extent it chooses to offer the alternative account segregation model, disclose to the securities account holder the risks and costs of the segregation options in order to enable the securities account holder to make an informed decision.

This principle would enable the market to determine the utility of additional levels of segregation for purposes other than protection on insolvency, and as such additional account structures could be driven by market demand.

- **Securities account providers should retain responsibility for shortfalls in custody accounts where such shortfall is due to their own negligence, willful default or fraud. Where the securities account provider is not liable for the shortfall, it should be required to take all reasonable steps to assist in the resolution of the situation without undue delay.** This requirement may be applied by different means across jurisdictions, but the principle should remain consistent so as to mitigate the risk of loss of securities account holder assets throughout the custody chain.
- **The account structure should allow efficient management of collateral and address the risks arising during the life cycle of the collateral in a timely manner**.

## 6   Collateral management

**The chapter on segregation principles includes a principle stating that an account structure should allow for an efficient management of collateral, and should address the risks arising during the life cycle of the collateral in a timely manner.**

This chapter discusses this principle in more detail.

### Introduction

Collateral management has become an increasingly important subject because of recent regulatory changes that encourage or mandate the use of collateral by potentially all market participants.

Collateral management is an operationally complex process, and thus is particularly affected by account segregation requirements.

Likewise, the efficacy[25] of security interest collateral arrangements established over pools of securities issued in multiple jurisdictions, which are held in a single client account by a custodian, would be particularly affected by individual client account segregation requirements at a CSD or local market custodian level.

### Definition

Collateral is an asset (cash or securities) that is used by one party to secure an obligation vis-à-vis another party. In other words, collateral management is a tool to protect against counterparty risk. For the purposes of this discussion, only securities collateral is in scope.

### Regulatory Context

The topic of collateral has gained increased prominence in recent years, as a result of the regulatory reform agenda that followed the financial crisis of 2007-2008.

Regulators see obligations placed on markets participants to provide collateral to each other as a powerful micro-prudential tool to mitigate counterparty risk. Regulators also see such obligations as a powerful macro-prudential tool to prevent the build-up of excessive leverage in the financial system.

In consequence, many of the recent regulatory reform measures (such as CSDR, CRD4 and EMIR) encourage or mandate that market participants use collateral.[26]

As a result, a wide range of market participants now need the capability either to provide collateral to their counterparties, or to receive collateral from their counterparties. If they did not have such a capability, then they would in effect be excluded from some markets.

---

[25] The efficacy of security interest collateral arrangements relies on robust legal opinions, which in turn rely on certainty as to the jurisdiction of enforcement of rights relating to the securities (the so-called "PRIMA" approach) and the parties entitled to a claim in respect of those securities. The use of segregated accounts through the chain of custody identifying the end beneficial owner casts doubt on these legal opinions at the level of the collateral taker, potentially resulting in the need to obtain multiple legal opinions (and multiple security interests) across the locations in which the collateral resides locally.

[26] For example, the requirement for uncleared OTC derivative contracts to be collateralised on a daily basis by the transfer of variation margin on a full title transfer basis and the pledging of initial margin by both parties on a security interest basis.

### How is collateral held?

The Financial Collateral Directive recognises two financial collateral arrangements:

- the title transfer financial collateral arrangement (TTCA)

  TTCA means an arrangement under which a collateral giver transfers full ownership of collateral to a collateral taker for the purpose of securing or otherwise covering the performance of relevant financial obligations. Being the property of the collateral taker these assets used as collateral will be protected and segregated externally in the same way as any other assets belonging to the collateral taker.

- the security interest collateral arrangement (SCA)

  Under a SCA, the collateral giver retains ownership rights in the securities position while establishing a security right for the collateral taker. This approach provides for asset protection for the collateral giver as the securities position is still held in the name of the collateral giver but is established under control rights for the collateral taker.[27]

### Examples of use of collateral

A market where collateral is traditionally used is the securities finance market[28] where market participants use collateral to collateralise repurchase transactions or securities lending transactions.

Beyond repurchase[29] and securities lending[30] transactions, market participants may use collateral to secure any other form of loan, credit or trading exposure against their counterparty. Market participants use collateral for the margining of fixed income, equities or derivatives trade exposures.

### Collateral management services and models

Collateral management is a complex process. The fundamental objective of the collateral management process is to minimise counterparty risk for the two trading parties. This requires in particular that the collateral assets be protected in the custody chain, that the collateral allocation between the two parties be determined (i.e. that neither party be over- or under-collateralised), and that in the event of an insolvency of one of the two parties the collateral be delivered to or liquidated by the right party depending on the applicable circumstances.

Many trading parties use the services of intermediaries, and other third parties, to help them manage their collateral. These services may range from valuation services to a full outsourcing of the collateral management function.

The two main operational models for the provision of collateral are:

- traditional bi-lateral collateral posting

- tri-party structures where a third party acts as agent on behalf of both the collateral giver and the collateral taker.

### Protection for collateral assets in the custody chain

All collateral assets, whether delivered under a TTCA or a SCA, are at any point in time in a custody chain.

The principles that apply for the protection of collateral assets in the custody chain are the same as the principles that apply for the protection of other assets in the custody chain.

---

[27] Security interest collateral arrangements are found in OTC Derivatives Credit Support Deed under English law, and the Credit Support Agreement under New York law (subject to rehypothecation rights) and the NY law MSLA (subject to rehypothecation rights).

[28] Note that SFTR includes within the definition of securities financing transactions margin lending, which is intended primarily to capture the collateralisation of financial instruments in the context of prime brokerage activities.

[29] A repurchase transaction (repo) is a sale of an asset(s) versus cash payment with the legal obligation to repurchase the fungible asset(s) from the second party at a different price at a future date or (in case of an open repo) on demand. If the seller defaults during the life of the repo, the buyer can sell the asset(s) to a third party to offset his loss. The asset therefore in effect acts as collateral and mitigates the credit risk that the buyer has to the seller.

[30] Securities Lending is, in effect, a temporary exchange of securities for acceptable collateral between a lender and an approved borrower. The transaction is often facilitated by a lending agent.



**Implications of the segregation requirements through the custody chain**

Regulatory requirements for segregation through the custody chain (beyond the standard requirements to segregate between proprietary and client assets) have the potential to cause particular problems for collateral management without offering additional protection.

Both the underlying trading activity, and the specific collateral management processing activity, can be very diverse, so that the specific impacts of segregation requirements may vary considerably.

Although in general segregation requirements may have less impact for bilateral collateral posting, there are certainly serious impacts for some types of bilateral collateral management activity. For example, segregation through the custody chain creates an extra burden for securities lending activity; the positions that make up a securities loan may have to be segregated through the custody chain, and so may need to be gathered together before delivery to a borrower; similarly, the collateral that a securities borrower delivers on a bilateral basis to secure its obligation may need to be split up into multiple separate positions up the custody chain.

Segregation requirements have the biggest impacts for triparty collateral management. Under this model, an agent provides securities accounts to both collateral giver and collateral taker, and on an intra-day basis transfers collateral between the accounts of the collateral giver and taker in the books of the agent, so that at any point in time the collateral amounts are optimised (so that there is, for example, no over- or under-collateralisation, and that collateral givers can rapidly recall assets in order to satisfy delivery obligations arising out of a sale of securities).

Requirements to segregate client assets through the custody chain mean that a triparty agent has to move securities between the accounts of the collateral giver and the collateral taker not only in its own books, but also in the books of all relevant parties through the custody chain. This creates extra cost, complexities and delays, and thus is an impediment for the use of triparty agents.


**Conclusions**

Mandatory segregation requirements through the custody chain cause operational and legal problems for bilateral and triparty collateral management activities, as well as more generally for other securities financing activities. These operational problems have the effect of preventing certain types of activity from taking place; in consequence, there is potentially a knock-on impact on broader market liquidity and settlement efficiency.

Given the wide variety of collateral management activities, it is important that no unnecessary mandatory segregation requirements be imposed through the custody chain.

## 7    Due diligence

**Principle 4 of the segregation principles provides that:**

Further to the due diligence conducted by the securities account provider at each level of the custody chain, to the extent that the [prior principles] are not sufficient to adequately protect clients' assets on insolvency of the sub-custodian, the securities account provider should be required to take such further steps as are reasonably possible to mitigate the risks identified by the due diligence. To the extent that such risks cannot be mitigated, this must be clearly disclosed to the securities account holder.

*We therefore set out below some background on current regulation and processes regarding due diligence, together with a set of proposed principles to be applied across the industry.*

### 7.1    Due diligence: definition and importance

For the purposes of this section, 'securities account holder' refers to an entity entering into contractual arrangement with a global custodian, and/or a general clearing member such as an investment fund vehicle or investment manager.  It does not refer to the underlying end-investor of an investment fund vehicle.

Due diligence processes of all entities to whom a securities account holder has potential exposure or risk by virtue of the holding of assets by those entities is essential. Due diligence processes are necessary not only at securities account holder level, but also at all stages of the holding chain of assets, including for example a global custodian bank assessing the suitability of its sub-custodian network or CSD, or a CCP evaluating its general clearing members. It is worth noting that the nature of the due diligence will differ depending upon the manner in which the assets are being held by the securities account provider. In the case of a custodian, assets are held on a custody basis, whereas a CCP, for example, may hold assets received as collateral on a title transfer basis, meaning that the type of exposure that the client bears to the entity is fundamentally different.

The due diligence processes for each entity ultimately have two common purposes: to ensure (i) that assets are accurately reflected on the records of the account provider; and (ii) the safety of those assets.

### 7.2    Due diligence process

A securities account holder should ensure that appropriate steps are taken to monitor each entity holding its own or its clients' assets.  The securities account holder should have in place a formal due diligence framework that forms part of its overall risk management structure. Where securities account holders are not sufficiently sophisticated to take on this task themselves, they have the option of appointing third party advisors to assess the relevant risks on their behalf.

A global custodian will have in place an internal framework of senior individuals whose responsibility it is to approve the selection of sub-custodians and to ensure the appropriate ongoing monitoring of all agents in its network.

The global custodian's network management function is responsible for ensuring the ongoing testing of the intermediary chain. The network management due diligence should be comprehensive and documented thoroughly. The evaluation process requires reviews of each provider as well as the provision of clearly documented (albeit non-legally binding) service level agreements. Regardless of which entity is performing due diligence, a risk based approach should be applied to the due diligence process (including the decision as to whether an on-site visit is necessary) in order to ensure appropriate levels of focus and frequency are applied to the various evaluated components.

## 7.3    The current regulatory environment

AFME members acknowledge and welcome the efforts regulators have made in enhancing the supervisory frameworks around the due diligence process. With the development of multiple regulations, the industry would further benefit from a consistent approach in relation to the due diligence process.

For example, under AIFMD, while a depositary may delegate responsibility for its safekeeping functions to third parties, it cannot delegate its oversight and due diligence responsibilities. The depositary must exercise due skill, care and diligence in the selection, appointment and ongoing review and monitoring of its delegates and must ensure that the delegate meets, at all times during the performance of the delegated tasks, certain specified standards.

Key articles of the Directive set out the duties and functions that are expected of the depositary bank and these will require the bank to be increasingly aware of global events and the potential impacts on AIF assets within their custody. Increased vigilance around the safekeeping of such assets, the account structures, and naming conventions employed for accounts, and reconciliation frequencies need to be carefully and regularly monitored. Due diligence visits or on-site operational reviews are now performed with increased structure and regularity.

MiFID I also addresses this topic of due diligence in a broad sense. For example, investment firms must conduct on a regular basis reconciliations between their internal accounts and records and those of any third parties by whom those assets are held. As in AIFMD, investment firms shall also exercise all due skill, care and diligence in the selection, appointment and periodic review of the third party where clients' assets are held.

MIFID II will strengthen these obligations: security interests, liens or right of set-off over client financial instruments will not be permitted except where required by local law; also, some requirements will be extended to cases where a third party used has delegated the functions to another third party.

### 7.3.1 The need for a harmonised approach

The global custodian's due diligence process has evolved due to increased regulation.  As mentioned above, under AIFMD and UCITS V or MIFID it is incumbent upon the global custodian/depositary to clearly demonstrate that it has exercised due skill, care and diligence in the functions that it performs including the selection and ongoing monitoring of its sub-custodian network. However, a uniform due diligence standard for firms providing services to securities account holders together with common standards for intermediaries remains absent.  This is demonstrated when looking at the required frequency of the due diligence process under different regulations.  For example, while AIFMD states the due diligence procedures are to be reviewed annually, other regulations, such as MiFID simply state that periodic reviews are required.

Another example of an area that would benefit from a common approach is the treatment of reconciliations through the intermediary chain.  CSDR requires a CSD to conduct reconciliations on at least a daily basis. The requirement under MiFID, UCITS V and AIFMD is for investment firms to carry out regular reconciliations between their internal accounts and those records of any third party where client assets are held. Ultimately, this creates different obligations depending on entity type.

The manner in which the due diligence process itself is carried out could also be harmonised to create efficiencies for the industry while ensuring a minimum standard of due diligence questions are used. Currently, multiple actors in the post trade chain submit detailed questionnaires to each other with the vast majority of questions posed being the same in nature, but presented in different formats and structures.  There is an opportunity to create a single framework and standard for common due diligence questions that can be agreed within the industry.  This will create efficiencies in relation to the issuance and completion of the due diligence process itself, while ensuring a minimum standard for due diligence questions is applied.[31]

---

[31] The AFME Due Diligence Harmonisation Task Force has created a framework for the standardisation of the subcustodian due diligence process

## 7.4   Custody due diligence

Although sometimes outsourced to a third party consultant with appropriate expertise, it is incumbent upon the securities account holder to evaluate suitability of its global custodian, prior to its appointment and then on an ongoing basis. This is in addition to the oversight of regulators and public authorities that oversee global custodians to ensure appropriate management frameworks are in place together with the monitoring of capital adequacy, risk weighting of assets and liquidity in accordance with the functions they perform.  The global custodian itself must assess the risks in connection with the appointment and ongoing monitoring of its sub-custodians.

Once the decision is made to enter a market, the global custodian must select a sub-custodian. The sub-custodian may be an affiliate of the global custodian, but more often it is a local bank. Alternatively, the global custodian may utilise its local branch, though such a structure would not amount to a sub-custody arrangement. A bank or banking group may act as a regional custodian, providing local custody services in several countries within a geographical region. It is the responsibility of the management of the global custodian to ensure that an effective sub-custodian selection and monitoring process is in place. The due diligence process required during the selection and monitoring of sub-custodians should cover the following risk areas.

### 7.4.1 Operational risk

Operational risk is apparent across the securities lifecycle of trading, settlement and subsequent post trade activities.  These risks are managed by global custodians via their internal controls together with appropriate monitoring of their sub-custodian networks.  A global custodian must be able to demonstrate appropriate operational controls, continuity of business arrangements and a proven error resistant track record which benchmarks favourably against the market.

Global custodians manage the impact of an operational risk event at the sub-custodian level by employing vigilant selection and ongoing risk assessments of their sub-custodians.  There may be certain markets in which a securities account holder wishes to hold securities where the choice of sub-custodian providers is limited.  In markets such as this the risk of holding such assets can be borne by the securities account holder provided sufficient disclosure of this is made.

### 7.4.2 Credit/counterparty risk

Credit risk is the risk that a counterparty will fail to deliver or pay in full on the due date.   The global custodian will maintain ongoing monitoring of the creditworthiness of its sub-custodians. This is particularly important in the relation to the holding of cash, where it is likely that the sub-custodian will hold any cash as banker on deposit.

### 7.4.3 Legal risk

Legal risk occurs where a contractual party is unable to enforce rights under a law, contract or other arrangement. The main legal risk for clients of global custodians is the risk of loss of title to assets. This area remains un-harmonised given that insolvency, collateral and settlement finality rules remain local. This risk is increased because it is very likely that the governing law of the contract between global custodians and their clients would be the local law of the global custodian as opposed to the local law of the securities account holder. This is an area which could benefit from harmonisation at an industry level, by utilising industry-standard legal opinions.



### 7.4.4 Compliance risk

Compliance risk is the risk arising from violations of, or non-conformance with, laws, rules, and regulations, together with prescribed practices, internal policies and procedures.

### 7.4.5 Strategic risk

Strategic risk includes the improper implementation of key decisions, or lack of responsiveness to the evolving industry environment that has an adverse effect on capital and earnings.

### 7.4.6 Reputational risk

Reputational risk is any risk to an organisation's reputation that is likely to negatively impact shareholder value. In the context of a global custodian, it is important that the global custodian not only manages the reputational risk of its own institution, but also monitors the activities of its appointed sub-custodians in order that contagion does not occur.

### 7.4.7 Political risk

Political risk occurs where the contract party is unable to perform its contractual obligations as a result of political changes or instability in the pertinent country.

## 7.5    Central counterparty due diligence

The need for appropriate CCP due diligence is increasingly under the spotlight. Whilst not directly the subject of this paper, we include in Annex 5 our view on the requirements for CCP due diligence.

## 8    Due Diligence Principles

**A securities account provider should obtain legal advice detailing the insolvency regime applicable to assets held in custody in each market offered for custody services.**

The legal advice should cover the market's holding structures through to the Central Securities Depository together with the insolvency rules applicable to clients' assets in order to ensure adequate protection[32] is applied. The legal opinions for each market should be reviewed annually and updated where required.

**A securities account provider should conduct appropriate market due diligence prior to offering services to clients, and periodically thereafter.**

Factors to take into account include:

- the settlement environment, the central securities depository, local payment systems;
- country risk, including the political, social, and economic environment;
- the regulatory environment and quality of supervision, existence of bankruptcy laws, and the enforceability of laws and regulations; and
- any market restrictions on foreign investment, ability to repatriate capital, and currency controls

---

[32] See Account Segregation, Principle 4

**A securities account provider should consider, taking a risk-based approach, whether is it appropriate to conduct due diligence visits to the locations in which it offers custody services.**

When local market visits are conducted they should include visits to the global custodian's primary sub-custodian and where appropriate, any alternative sub-custody providers, CSD, and central bank (if acting as CSD for government debt). Visits should also be made to the stock exchange and central counterparty where appropriate.

Any entity entering into a contractual arrangement for the provision of custody services should exercise all due skill, care and diligence in the selection and appointment and ongoing monitoring of the securities account provider.

Factors to take into account include:

- the expertise and market reputation of the account provider;
- business continuity provisions;
- any local legal or market practices related to the holding of the safe custody assets that could affect clients' rights;
- the account provider's arrangements for holding and safeguarding the assets;
- its performance of its services measured against its contractual obligations;
- its capital or financial resources and credit rating;
- any other activities undertaken by the account provider and, if relevant, its affiliated parties

## 9    Glossary

**AIFMD –** Alternative Investment Fund Managers Directive

**CCP –** Central Counterparty (clearing house)

**CM –** Clearing Member

**CRD –** Capital Requirements Directive

**CSD –** Central Securities Depository

**CSDR –** Central Securities Depositories Regulation

**Custody –** the safekeeping and record-keeping of securities in an account maintained by a securities account provider

**DGSD –** Deposit Guarantee Scheme Directive

**EC / EU –** European Community / Union

**EEA –** European Economic Area

**ECSDA –** European Central Securities Depositories Association

**EMIR –** European Market Infrastructure Regulation

**ESMA –** European Securities and Markets Authority

**FCA –** Financial Conduct Authority

**GCM –** General Clearing Member

**IOSCO –** International Organisation of Securities Commissions

**ISSA –** International Securities Services Association

**MiFID/R –** Markets in Financial Instruments Directive / Regulation

**NCM –** Non Clearing Member

**OTC –** Over the Counter

**Securities Account Holder –** Any entity that enters into a securities account holding agreement with a third party securities account provider

**Securities Account Provider –** Any entity that provides a securities account for either a securities owner or an intermediary of a securities owner

**T2S – TARGET2-Securities –** ECB securities settlement platform

**UCITS –** Undertakings for Collective Investment in Transferable Securities

**UCITS V** – The Undertakings for Collective Investment in Transferable Securities Directive

**Global Custodian –** a financial institution that holds customers' securities for safekeeping across multiple jurisdictions

**Sub-Custodian –** An institution providing custody services, usually with respect to securities traded in a particular market or jurisdiction, to a global custodian

## 10    Contributors to this report

Michael Buzza, Northern Trust Corporation (chair)

Alison Debattista, Barclays Bank PLC (co-chair)

Laura Bates, Citi

Gesa Benda, BNY Mellon

Sylvie Bonduelle, Société Générale Corporate & Investment Banking

Simon Copsey, Citi

Thiebald Cremers, BNP Paribas

James Cunningham, Bank of New York Mellon

Polina Evstifeeva, Deutsche Bank AG

Oonagh Harrison, Allen & Overy LLP

Deborah Hutton, Citi

Nick Jenkins, BNP Paribas

Janne Palvalin, Nordea Bank

Henry Raschen, HSBC

Damon Shipe, J.P. Morgan Europe Limited

Sarah Woodland, Goldman Sachs International

## 11    Annex

### 11.1  Annex 1: Summary of current status of regulation

| | MiFID - securities | MiFID - cash | EMIR - cleared | EMIR - uncleared | AIFMD | UCITS V | CSDR |
|---|---|---|---|---|---|---|---|
| **Applies to cash?** | No | Yes | Yes | Yes | No | No | No |
| **Segregation applies to TTCA assets?** | No | No | Yes | Varies by implementation | No | No | No |
| **Level of segregation** | Omnibus | Omnibus – unless holder is a bank | Individual / omnibus | Omnibus | Potentially Concentrated omnibus | Potentially Concentrated omnibus | Individual / omnibus |
| **Required throughout chain of intermediaries** | Yes | N/A – cash will be held with a bank | No | No, with individual segregation at option of client if IA is held by or on behalf of the collecting counterparty. | Yes | Yes | No |
| **Clients impacted** | All | All | Direct and indirect clients of clearing members of EU CCPs | All counterparties posting IM | AIFs | UCITS | CSD participants of EU CSDs, and their clients |

| **At the option of the client?** | No | No | Yes | Omnibus segregation is mandatory; individual segregation is at option of client where IA is held by or on behalf of the collecting counterparty. | No | No | Yes |
|---|---|---|---|---|---|---|---|

**Table 1: Current Status of Regulation**

Annex

## 11.2   Annex 2: Regulatory Framework Matrix

| No | Subject | Regulations | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | MiFID | AIFMD | UCITS V | EMIR | CSDR | CASS | Revised CAR | IOSCO | SFTR |
| 1 | Rationale for Regulation | Market & Investor Safety Efficiency Harmonisation Transparency | Market & Investor Safety Harmonisation Transparency | Investor Safety Harmonisation Transparency | Market & Investor Safety Harmonisation Transparency | Market & Investor Safety Harmonisation Transparency Efficiency | Investor Safety Transparency | Investor Safety Transparency | Market & Investor Safety Efficiency Harmonisation Transparency | Market & Investor Safety Transparency |
| 2 | Segregation | | | | | | | | | |
| 2.1 | Method of holding assets (Title Transfer basis or on a Custody Basis) | Custody (Securities & Cash) Transfer of Title | Custody Cash TTCA Art. 21(7) and (8) AIFMD | Custody (Securities & Cash) Transfer of Title | Custody (Securities & Cash) Transfer of Title | Silent | Custody (Securities & Cash) Transfer of Title CASS 7 | Custody (Securities & Cash) Transfer of Title Art 16 | Custody (Securities & Cash) Transfer of Title | Transfer of Title Art 3 |
| | **Segregation levels** | | | | | | | | | |
| | Global Custodian | Segregation at the Lead Custodian (Art 13) Prop Client | Segregation of securities held by the Depositary or Management Company acting on behalf of the AIF) Art 21(8)(a) AIFMD | Segregation of securities held by the Depositary (Art. 22) between Prop Client (Fund/r Management Company acting on behalf of the fund) | Segregation of securities held by the CM (Art. 39) CM's Prop NCMs | Silent | Segregation at the Lead Custodian Prop Client CASS 7.13 | Segregation at the Lead Custodian Prop Client Art 3 | Segregation at the Lead Custodian (Principle 3) Prop Client | Silent |
| | At Sub-Custodian | Segregation at the Sub-Custodian Sub-Custodian's Assets Client's Prop Client's Client | ESMA has not published any guidelines yet on segregation requirements at the Sub-Custodian Art 21(11)(d)(iii) and Art. 99 AIFMR | ESMA has published Level 2 Regulations, but there is no clarity yet on segregation requirements at the Sub-Custodian | Silent | Silent | Segregation at the Sub-Custodian Sub-Custodian's Assets Client's Prop Client's Client CASS 7.13 | Segregation at the Sub-Custodian Sub-Custodian's Assets Client's Prop Client's Client Art 10 and Art 11 | Segregation at the Sub-Custodian Sub-Custodian's Assets Client's Prop Client's Client | Silent |
| 2.2 | At Investor CSD | Silent | Segregation at CSD CSD Participant's CSD Participant's Clients(Art. 21(fi)) | Segregation at CSD ESMA has published Level 2 Regulation, but there is no clarity yet on segregation requirements at the CSDs | Segregation at CSD per CM (Art 47(3)) | Segregation at CSD CSD Participant's CSD Participant's Clients Art 38 | Silent | Segregation at Investor CSD CSD Participant's CSD Participant's Clients Art 10 and Art 11 | Segregation at CSD CSD Participant's CSD Participant's Clients | Silent |

| No | Subject | MiFID | AIFMD | UCITS V | Regulations CSDR | EMIR | CASS | Revised CAR | IOSCO | SFTR |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.2.1 | AI Issuer CSD | Silent | Silent Art. 21(11). | ESMA has published guidelines, but there is no clarity yet on segregation requirements at the CSDs. | Segregation at CSD — Omnibus, Segregated | Segregation at CSD per CM (A47(3)) | Silent | Segregation at Investor CSD — CSD Participant, CSD Participant's Clients | Segregation at CSD — CSD Participant, CSD Participant's Clients | Silent |
| 2.2.2 | AI CCP | Segregation at CCP: Net, Omnibus, Gross, Omnibus | Silent | Silent | Silent Art 38 | Segregation at CCP: Net, Gross, Omnibus, Individual, Segregated Art 39 | Segregation at CCP: Net Omnibus, Gross, Omnibus, Individual, Segregated CASS 7.13.70 | Segregation at CCP: Net Omnibus, Gross, Omnibus, Individual, Segregated Art 10 and Art 11 | Segregation at CCP: Net, Gross, Omnibus, Individual, Segregated | Silent |
|  | Is the level of segregation at the option of the client? | No, Yes for Indirect Clearing | No | No | Yes | Yes | Yes | No | No | No |
|  | Is a definition of segregation provided? | No | No, pending ESMA guidelines. | No | Silent | Yes | No | No | No | Silent |
| 2.2.2 | What is to be segregated? | Silent | Securities held in Custody (Art. 21(11) AIFMD) | Securities held in Custody (Art 22) | Securities | Cash Securities | Cash Securities | Cash Securities | Cash Securities | Silent |
| 2.2.5 | Asset protection | Insolvency | Insolvency (Art. 98(2)(a) AIFMR) Portability (Art.21(11) AIFMD) Loss (Art. 21(13) AIFMD) | Insolvency Loss (Art. 26) | Insolvency | Insolvency Loss Portability | Insolvency Portability | Insolvency Portability | Insolvency Portability | Loss |
| 2.2.9 | Collateral Treatment | Transfers of Collateral — Security Interest, Transfer of Title | Transfers of Collateral — Security Interest, Transfer of Title Art.83(1)(h) AIFMR. Art. 21(11)(iv); Art. 91 AIFMR | Transfers of Collateral — Security Interest, Transfer of Title (Art. 220) Re-Use is permitted where: (a) the reuse is executed for the account of the UCITS; | Silent | Transfers of Collateral from a NCM to CM — Transfer of title, Security Interest | Transfers of Collateral — Security Interest, Transfer of Title CASS 3, CASS 6 and CASS7 | Transfers of Collateral — Security Interest, Transfer of Title Art 16 | Transfers of Collateral — Security Interest, Transfer of Title | Transfer of Collateral, Transfer of title Rehypothecation Art.15 |

Annex

| No | Subject | MiFID | AIFMD | UCITS V | EMIR | CSDR | CASS | Revised CAR | IOSCO | SFTR |
|----|---------|-------|-------|---------|------|------|------|-------------|-------|------|
| | | | | (b) the depositary is carrying out the instructions of the management company on behalf of the UCITS;<br><br>(c) the reuse is for the benefit of the UCITS and in the interest of the unit holders; and<br><br>(d) the transaction is covered by high-quality and liquid collateral received by the UCITS under a title transfer arrangement.<br><br>The market value of the collateral shall, at all times, amount to at least the market value of the reused assets plus a premium. | | | | | | |
| 2.2.10 | **Due Diligence** | | | | | | | | | |
| 2.2.11 | Due Diligence requirements | Client Assets are deposited with a Third Party. The investment firm must exercise all due skill, care and diligence in the selection appointment and periodic review of the third party. Client Assets are not deposited in a Central Bank: An investment firm must exercise all due skill, care and diligence in the selection, appointment and periodic review of the credit institution, bank authorised in a third country or a | Appropriately documented due diligence procedure to be implemented for the selection and-on going monitoring of the delegate. Due diligence should include assessments on the third parties: Regulatory and legal framework, country risk, custody risk, enforceability of the third party's contracts. | Appropriately documented due diligence procedure to be implemented for the selection and on-going monitoring of the delegate. The depositary should ensure that the sub-custodian has: Effective prudential regulation External periodic audit; Clearly identifiably client assets in a segregated account sub-custodian ensures that on insolvency the assets are not available; | Not directly but for the CCP as any participant to a CSD there is a requirement of reconciliation due to the CSDR | For CSD: Regarding the integrity of the issue Regarding CSD links | Safe custody assets: CASS 6.3.1(A) imposes the due diligence obligation in relation to the selection and appointment of a third party. Firms must have regard to expertise and market reputation as well as the legal requirements and any market practice. A firm must record the grounds on which the due diligence has provided comfort and retain the record for 5 | Financial instruments shall be deposited with a third party only where the investment firm has exercised due skill, care and diligence in the selection and appointment of that third party. Art 17(b) | The IOSCO principles include: The intermediary holding client assets in a foreign jurisdiction should ensure compliance with local market regimes where applicable. Due skill, care and diligence in the selection and appointment of third parties (e.g. sub-custodians) is required and equally, this applies | Silent |

| No | Subject | Regulations | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | MiFID | AIFMD | UCITS V | EMIR | CSDR | CASS | Revised CAR | IOSCO | SFTR |
| | | qualifying money market fund where the funds are held. CCPs must identify, monitor and manage any material risks arising from indirect clearing that could affect the resilience of the CCP. CMs must identify, monitor and manage any material risks arising from indirect clearing. Indirect Clearing CCPs must identify, monitor and manage any material risks arising from indirect clearing that could affect the resilience of the CCP. CMs must identify, monitor and manage any material risks arising from indirect clearing. | Procedures and internal controls Financial strength and reputation Operational / technological capabilities. Performance and compliance with the depositary's standards. Ensuring the third party exercises a high standard of care, and in particular that it effectively segregates assets in line with the segregation obligation. Reviewing the custody risks associated with the decision to entrust the assets to the third party. Art. 98 AIFMR | Sub-custodian complies with certain rules which apply to depositary 22(2), 22(5), 22(7) and Article 25. | | | years after the firm ceases to use the third party. Client money: CASS 7.13 imposes similar requirements to the above for client banks but in addition a firm is required to consider the need for diversification of risk in relation to the selection of the client money banks. | | to the safeguarding of client assets. | |
| 2.3 | Frequency of due diligence | Periodic review is required | Procedure to be reviewed regularly, at least annually. During market turmoil or when a risk has been identified, the frequency and scope of the DD should be increased. Art. 98 AIFMR | Reviewed regularly and, at least, once a year | Silent | For CSD: Regarding the integrity of the issue: reconciliation to be made at least daily Regarding CSD links | Safe custody assets: CASS 6.3.1: the firm must carry out a periodic review of the third party and of the arrangements for the holding and safekeeping of the assets. Client money: CASS 7.13.8 and 7.13.10 impose a periodic review requirement. | Six-monthly minimum Art 18 | Silent | Silent |

**Annex**

| No | Subject | Regulations | | | | | | | | |
|----|---------|-------|-------|---------|------|------|------|-------------|--------|------|
| | | MiFID | AIFMD | UCITS V | EMIR | CSDR | CASS | Revised CAR | IOSCO | SFTR |
| | Cross-jurisdictional issues | ➢ If applicable law in the jurisdiction where the client assets or client funds are held prevents investment firms from complying with the required levels of segregation outlined above, Member States shall prescribe requirements with equivalent effect, and investment firms must disclose this to clients.<br>➢ Investment firms shall not deposit financial instruments held on behalf of clients with a third party in a third country that does not regulate the holding and safekeeping of financial instruments for the account of another person unless either (i) the nature of the financial instruments or the asset requires them to be deposited with a third party in that third country or (ii) a professional client requests in writing the | ➢ Notification requirements regarding sufficiency of segregation. Art. 98 (2)(a) AIFMR)<br>➢ | ➢ Silent | ➢ Silent | Silent | Safe custody assets:<br>➢ CASS 6.3.4: Restrictions on depositing assets with sub-custodians outside the EEA which do not have a relevant regulatory regime unless the assets must be held in that country. The rules also place disclosure requirements on the firm in relation to the client. | ➢ Revised CAR applies to Irish authorised MiFID investment firms and can therefore apply to non-Irish branches of a MiFID Firm. | ➢ The intermediary holding client assets in a foreign jurisdiction should ensure compliance with local market regimes where applicable. They equally must understand the impact on the asset protection regime in the domestic market.<br>➢ There is also an expectation set on the regulators themselves that they will cooperate cross-jurisdictionally with regards asset protection and insolvency regimes. | ➢ Note extraterritorial impact – art.2 |

| No | Subject | Regulations | | | | | | | | |
|----|---------|-------|-------|---------|------|------|------|-------------|-------|------|
| | | MiFID | AIFMD | UCITS V | EMIR | CSDR | CASS | Revised CAR | IOSCO | SFTR |
| | Reconciliation requirements | firm to hold the assets with a third party in that third country. Investment firms must conduct regular reconciliations between their internal accounts and records and those of any third party where client assets are held. | Where safekeeping has been delegated regular reconciliations should be carried out between the records of the depositary and those of the delegate for safekeeping (Art. 98(1)(c) AIFMR) | To conduct, on a regular basis, reconciliations between the depositary's internal accounts and records and those of the third party to whom it has sub-delegated safekeeping functions | Silent | A CSD shall take appropriate reconciliation measures to verify that the number of securities making up a securities issue or part of a securities issue submitted to the CSD is equal to the sum of securities recorded on the securities accounts of the participants of the securities settlement system operated by the CSD and, where relevant, on owner accounts maintained by the CSD. Such reconciliation measures shall be conducted at least daily | Safe custody assets: Internal and external reconciliations should be conducted as often/regularly as is necessary and the firm must promptly correct any discrepancies. Client money: Reconciliations have to be carried out as often/regularly as necessary. Any approved collateral held in accordance with the rules with the external reconciliation | Reconciliations should be carried out and verified by a person independent of the production and maintenance of the records Daily reconciliation for cash between an investment firm and third parties Monthly reconciliation for fixed term deposits between an investment firm and third parties (carried out within three days of the reconciliation point) Art 5 | The intermediary should have the systems and controls to undertake regular reconciliations regarding client assets with third parties. Under the Collective Investment Scheme Principles, the above stipulation goes further by way of reference to daily reconciliation against sub-custodial records. A CSD should deploy robust accounting and reconciliation practices to ensure the validity of its books and records and protect the interests of securities issuers and holders. Where an Issuer CSD does not act as Registrar, suitable and regular reconciliation processes should be in place with the Registrar's books. | Silent |

**Table 2: Regulatory Framework Matrix**

## 11.3 Annex 3: CCP Due Diligence

The need for appropriate CCP due diligence is increasingly under the spotlight. The mandatory clearing of OTC derivative contracts under regulations such as EMIR and Dodd Frank will substantially increase their use. Regardless of whether a choice of CCP exists for a securities account holder, appropriate due diligence should be performed in order that informed investment decisions are made. This due diligence process should include how the CCP evaluates its general clearing members.

As per previous comments in respect to the role of a CCP as a risk concentration vehicle, the requirement for an appropriate level of CCP due diligence has always existed. However, it is becoming more pertinent with the introduction of, and increase in, mandatory central clearing. So, in the same way that investors will review their global custodian, the global custodian will review the sub-custodian and the sub-custodian review the Central Securities Depository, Clearing Members will look to review the CCP. In addition to this, a vital component of the due diligence process is centred on how the CCP itself controls its clearing member risk.

### 11.3.1 Membership Risk and Requirements

Each CCP will have very clearly defined membership requirements. In agreeing to CCP membership, the clearing member not only acknowledges the requirements, both financial and operational, that it has to meet to obtain membership, but also the risk it is taking on in relation to the CCP and by definition the other clearing members. Exposure to the default of another clearing member of the CCP is one of the main risks of becoming a clearing member, together with how the CCP conducts its default management processes.

### 11.3.2 CCP Financial Resources

One of the firewalls in the default "waterfall" will be the financial resources of the CCP itself in addition to the additional resources to which it has access. The ability to cover the default of a clearing member in "extreme but plausible market conditions" needs to be clear to ensure risk on the CCP itself is understood. In addition, the use of commercial banks vs central banks to keep margin and default fund contributions and associated risk has to be examined.

### 11.3.3 Collateral Risk and Requirements

In theory, a clearing member's risk to the CCP and its other participants is fully collateralised at all times and as such understanding the composition of CCP collateral requirements, together with how it is calculated and maintained, is essential. This should include eligibility criteria, haircut calculations and top up frequency to provide comfort that it is sufficient to cover losses arising from a defaulting clearing member.

### 11.3.4 Default Procedures/Risk Waterfall

Clear and transparent procedures of the CCP to take action and contain losses and liquidity pressures in case of a clearing member default are critical. The structure and timing of the implementation of the CCP risk waterfall are two key factors that allow the clearing member visibility and comfort around where it sits within the risk of Clearing Member default vs that of the CCP itself. Example per below:

- defaulter's margin
- defaulter's default fund contribution
- CCP's contribution
- non-defaulting clearing members' default fund contributions
- non-defaulting clearing members' unfunded assessments
- CCP's equity

11.3.5  Principles for CCP Due Diligence

- **any entity entering into a contractual arrangement with a general clearing member should conduct appropriate due diligence prior to appointment and periodically thereafter.**

  Factors to take into account should include:

  - adequacy of capital/financial resources;
  - sufficiently robust systems and risk controls together with experience in performing third party clearing services;
  - regulatory approval to perform a GCM role where required; and
  - asset safety and operational risks

- **any entity entering into a contractual arrangement with a CCP should conduct appropriate due diligence prior to appointment and periodically thereafter.**

  Factors to take into account should include:

  - the CCP's ability to cover a default of a clearing member in extreme but plausible conditions;
  - ensuring CCP default procedures are clear and transparent and include actions that would be taken to contain losses and liquidity pressures;
  - default risk waterfall provisions; and
  - asset safety and operational risks

- **a CCP should conduct appropriate due diligence on a clearing member prior to its admission to the CCP, and periodically thereafter.**

  As a key component of a CCP's risk is the creditworthiness of its clearing members, a CCP should ensure that it has at least an annual review of its clearing members' financial standing. It should also have procedures in place to review clearing members' financial standing intra-year based on market events and have the ability to reflect its view on a Clearing Member via changing risk parameters, e.g. through increased default fund contributions or more conservative margin parameters.



Finance for Europe

**London Office**
39th Floor
25 Canada Square
London E14 5LQ
United Kingdom

Switchboard:
+44 (0)20 3828 2700

**Brussels Office**
Rue de la Loi, 82
1040 Brussels
Belgium

Switchboard:
+32 (0) 2 788 3971

**AFME**
**Werner Frey**– Managing
Director, Post Trade
**Stephen Burton** –Director
Post Trade
**Thanos Kagiaras** – Manager,
Post Trade and Prime Services

www.afme.eu

AFME is registered on the EU Transparency Register, registration number 65110063986-76