**LIONBRIDGE**

STATE OF NEW YORK      )
                                     )
                                     )    ss
COUNTY OF NEW YORK    )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Danish into English of the attached letter, dated October 02, 2020.

_____

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this __1__ day of _June_ , 20 _22_ .

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023



Advokatfirmaet Poul Schmith, Kammeradvokaten I/S
Vester Farimagsgade 23
1606 Copenhagen V
Denmark
Attention: Steffen Svaerke

**Contact**
Send a mail to the
Danish Tax Appeals Agency

Phone          3376 0909

**Case Worker**
Anja Marie Pedersen
Direct Telephone 33762670

Our Case No.   18-0005368

Your Case No.

October 02, 2020

**Mail from the Danish Tax Appeals Agency**

You hereby receive a copy of a letter from the Danish Tax Appeals Agency.

We ask that you to refer to the case number received by the Danish Tax Appeals Agency, if you need to contact us regarding this letter.

Yours sincerely,

The Danish Tax Appeals Agency

Cvr no. 10 24 28 94
www.skatteankestyrelsen.dk

1 / 1



Skatteankestyrelsen

Riverside Associates Defined Benefit Plan
5532 Lillehammer Lane, Suite 103, Park City
UT 84098 Park City
United States of America

**Contact**
Send a mail to the
Danish Tax Appeals Agency
here

Telephone       3376 0909

**Case Worker**
Anja Marie Pedersen
Direct Telepone 33762670

Our Case No.    18-0005368

October 02, 2020

**Decision**

On behalf of Riverside Associates Defined Benefit Plan, an appeal has been filed against
the decision dated May 04, 2018 that was made by the Danish Tax Agency. The Danish
National Tax Tribunal has now made a decision in the matter, the decision is attached.

**Guidance on litigation**

The decision may be appealed no later than <u>3 months</u> after the date of the decision. The
rules on judicial review are set out in Sections 48-49 of the Danish Tax Administration Act.

The case must be brought before the district court where the taxpayer is domiciled. The summons is
to be served on the Ministry of Taxation, Nicolai Eigtveds Gade 28, 1402 Copenhagen K. The detailed
instructions for bringing a case before the court can be found on www.domstol.dk.

Sincerely,

Janne Rasmussen

Cvr no. 10 24 28 94
www.skatteankestyrelsen.dk

1 / 1

# Decision

### From

# The Danish National Tax Tribunal

# OCT. 2, 2020
### Case No. 18-0005368

| | |
|---|---|
| The following participated in the decision-making: | Susanne Dahl, Bodil Toftemann, and Tine Roed |
| Appellant: | Riverside Associates Defined Benefit Plan |
| Matter being appealed: | The decision made by The Danish Tax Agency dated May 4, 2018 |
| Assigned CVR no.: | 20762 |

**Meeting etc.**
A meeting was held with the representative of the Riverside Associates Defined Benefit Plan.

**Factual Information**
Riverside Associates Defined Benefit Plan (the Pension Plan), incorporated on January 1, 1995, is registered as a pension fund in the United States of America.

In the period March 26, 2014, to March 26, 2015, at the request of the Pension Plan's agent, Goal Taxback Limited, the Danish Tax Agency paid a refund of dividend tax via Goal Taxback Limited's bank account ███ 5159 at NatWest Bank.

On behalf of the Pension Plan, Goal Taxback Limited, has submitted the following requests to the Danish Tax Agency for a refund of withheld dividend tax of a total of DKK 12,724,425 with regard to the following shares:

| Danish Tax Agency's Case no. | Date of the request | Share | Quantity | Ex-date | Dividends in total in DKK | Dividend tax refunded |
|---|---|---|---|---|---|---|
| 19414 | 03/26/2014 | TDC A/S | 2,150,000 | 03/07/2014 | 4,730,000 | 1,277,100 |
| 21814 | 04/04/2014 | Danske Bank A/S | 2,000,000 | 03/19/2014 | 4,000,000 | 1,080,000 |
| 21814 | 04/04/2014 | Novo Nordisk A/S B | 2,000,000 | 03/21/2014 | 9,000,000 | 2,430,000 |
| 27814 | 04/16/2014 | Tryg A/S | 175,000 | 04/04/2014 | 4,725,000 | 1,275,750 |
| 37214 | 05/06/2014 | Dampskibsselskabet Norden | 322,500 | 04/24/2014 | 1,612,500 | 435,375 |
| 37214 | 05/28/2014 | Coloplast A/S - B | 850,000 | 05/09/2014 | 3,400,000 | 918,000 |
| 25015 | 03/13/2015 | TDC A/S | 2,000,000 | 03/06/2015 | 2,000,000 | 540,000 |

| 25015 | 03/18/2015 | DSV A/S | 850,000 | 03/13/2015 | 1,360,000 | 367,200 |
| 31415 | 03/26/2015 | Pandora A/S | 300,000 | 03/19/2015 | 2,700,000 | 729,000 |
| 31415 | 03/26/2015 | Danske Bank A/S | 1,200,000 | 03/19/2015 | 6,600,000 | 1,782,000 |
| 31415 | 03/26/2015 | Novo Nordisk A/S B | 1,400,000 | 03/20/2015 | 7,000,000 | 1,890,000 |
| Total | | | | | 47,127,500 | 12,724,425 |

The requests were accompanied by the following appendices:

1. Form 06.003 ENG - Claim to Relief from Danish Dividend Tax.
2. Tax Vouchers - prepared by the Pension Plan's custodian ED&F Man Capital Markets Limited (ED&F Man).
3. FORM 6166 from Internal Revenue Service (IRS) - Certificate of resident in USA (issued by the American Internal Revenue Service).
4. Power of Attorney.

Reference 1. Form 06.003 declares that the Pension Plan is the legal owner of the shares and is covered by the Double Taxation Convention between Denmark and the United States.

Reference 2. According to Tax Vouchers prepared by custodian ED&F Man, the Pension Plan received net dividend of the shares.

Assuming that the Pension Plan must own the shares at the time of the General Meeting (the day before the ex-date), the acquisition cost of the Pension Plan's purchase of the shares stated in the request is calculated on the basis of the closing price on the last trading day before the ex-date:

| Stock | Price date | Quantity | Price | Estimated acquisition cost in DKK |
|---|---|---|---|---|
| TDC A/S | 03/06/2014 | 2,150,000 | 52.65 | 113,197,500 |
| Danske Bank A/S | 03/18/2014 | 2,000,000 | 145.70 | 291,400,000 |
| Novo Nordisk A/S B | 03/20/2014 | 2,000,000 | 245.80 | 491,600,000 |
| Tryg A/S | 04/03/2014 | 175,000 | 551.50 | 96,512,500 |
| Dampskibsselskabet Norden | 04/23/2014 | 322,500 | 228.00 | 73,530,000 |
| Coloplast A/S - B | 05/08/2014 | 850,000 | 468.10 | 397,885,000 |
| TDC A/S | 03/05/2015 | 2,000,000 | 54.00 | 108,000,000 |
| DSV A/S | 03/12/2015 | 850,000 | 219.20 | 186,320,000 |
| Pandora A/S | 03/18/2015 | 300,000 | 614.50 | 184,350,000 |
| Danske Bank A/S | 03/18/2015 | 1,200,000 | 175.30 | 210,360,000 |
| Novo Nordisk A/S B | 03/19/2015 | 1,400,000 | 341.90 | 478,660,000 |

All shares in Danish listed companies are registered with VP Securities, which is the Danish securities depository. This registration includes a securities account in a Danish bank set up in the name of a shareholder. A securities account contains the shareholder's shareholdings, which may be composed of shares in various Danish listed companies. A securities account and its holdings may also have several owners (referred to as an omnibus account).

A search of information from VP Securities has not revealed any securities account in a Danish bank where the Pension Plan is registered as owner.

The Danish Tax Agency has received information from the IRS in the United States through the competent authority in Denmark and the United States.

In a letter dated August 3rd, 2016, the IRS stated:

- That the IRS has received information from the Pension Plan in FORM 5500-EZ for 2012 and 2013 and FORM 5500 SF (Short Form) for 2014
- That the IRS has not received FORM 5500 for 2015, as the deadline for submissions will expire later.
- The information from the forms received shows that the Pension Plan's assets at year-end and the number of participants in 2012, 2013 and 2014 amount to:

| Calendar year | Assets/wealth in USD according to FORM 5500-EZ/SF | DKK exchange rate at year-end | Equvilant DKK | Number of active participants |
|---|---|---|---|---|
| 2012 | 1,569,191 | 5.6591 | 8,880,209 | 1 |
| 2013 | 1,039,640 | 5.4127 | 5,627,259 | 1 |
| 2014 | 763,315 | 6.1214 | 4,672,556 | 1 |

In a letter dated December 13th, 2016, the IRS attached the Company's FORM 5500 for 2014 and 2015:

| Calendar year | Assets/wealth in USD according to FORM 5500-EZ/SF | DKK exchange rate at year-end | Equvilant DKK | Number of active participants |
|---|---|---|---|---|
| 2013 | 1,039,640 | 5.4127 | 5,627,259 | 1 |
| 2014 | 763,315 | 6.1214 | 4,672,556 | 1 |
| 2015 | 981,917 | 6.83 | 6,706,493 | 1 |

In connection with general questions about pension plans and contributions to them, the IRS has submitted links to the IRS website regarding "Topics for Retirement Plans". The website states, among other things, the following:

- That a One-Participant 401(k) plan covers a business owner with no employees other than the person and his or her related persons.
- That the annual deposit is limited to between USD 12,500 and USD 53,000 depending on the age of the depositor (over or under 50 years).

The IRS has provided the Danish Tax Agency, the Competent Authority, with the following general information:

- That if a tax-exempt retirement plan operates a business (Unrelated Business Income), it must pay taxes on the income from that business and must file Form 990-T with the IRS.
- That if a tax-exempt retirement plan has Dept-Finances income, then tax must be paid on the income therefrom and Form 990-T must be filed with the IRS.
- That if a pension plan distributes funds, this must be reported to the IRS on Form 1099, stating how much was paid out and to whom. The person who received the funds is taxable on the income and must file a tax return.

The Danish Tax Appeals Agency has requested additional information and documentation from the representative for use in the case, including:

- Financial statements for the Pension Plan for the years 2012 - 2014, bank statements for the Pension Plan for the years 2012 - 2014, and bank statements for the Pension Plan from the account at ED&F Man for 2014.
- Agreement between the Pension Plan and ED&F Man on the purchase/sale of shares.
- Account Equity for the purchase of shares and printout from the banks' common SWIFT system.

The representative has not forwarded this information to the Danish Tax Appeals Agency.

Furthermore, Cash Equity Confirmation from Volcafe and emails to and from ED&F Man regarding the purchase and sale of shares have also been provided.

Finally, Account Transactions (General Ledger) relating to the purchase and sale of shares and Account Equity relating to holdings of shares, futures and swaps have also been provided.

**Decision from the Danish Tax Agency**
The Danish Tax Agency has revoked previous decisions on the refund of dividend taxes of a total of DKK 12,724,425 to the Pension Plan, as the Pension Plan has not been entitled to receive the dividend tax.

The Danish Tax Agency has stated the following:

> "Decision - Revocation of previous decisions on refund of dividend tax
>
> The Danish Tax Agency has previously issued dividend tax refund rulings to Riverside Associates Defined Benefit Plan (RIVERSIDE) based on requests from RIVERSIDE's agent GOAL TaxBack Limited (GOAL).
>
> The Danish Tax Agency revokes the previous decisions on refund of dividend taxes totaling DKK 12,724,425, as RIVERSIDE has not been entitled to receive the dividend tax.
>
> The revocation concerns the following decisions:

| | Date | Dividend Tax |
|---|---|---|
| Request for | Match 26, 2014 | 1,277,100 DKK |
| Request for | April 4, 2014 | 3,510,000 DKK |
| Request for | April 16, 2014 | 1,275,750 DKK |
| Request for | May 6, 2014 | 435,375 DKK |
| Request for | May 28th, 2014 | 918,000 DKK |
| Request for | March 13, 2015 | 540,000 DKK |
| Request for | March 18, 2015 | 367,200 DKK |
| Request for | March 26, 2015 | 4,401,000 DKK |
| Total | | 12,724,425 DKK |

According to the assessment from the Danish Tax Agency, RIVERSIDE does not own or have owned the shares listed in the requests and that the dividends relating to the shares listed in the requests have not been accrued to RIVERSIDE.

Furthermore, it is the Danish Tax Agency's assessment that RIVERSIDE did not have the necessary capital to make the investments in Danish shares, which are the basis for the mentioned requests for refund of dividend tax.

According to the submitted Tax Voucher, RIVERSIDE had invested in shares in Danish companies for a significant amount and received dividends therefrom. The information in the case does not provide any basis for such significant investments.

The Danish Tax Agency has put emphasis on the fact:

- That RIVERSIDE only has one participant with the resulting limited deposit amounts.
- That RIVERSIDE has filed FORM 5500 in the U.S., which shows that RIVERSIDE's assets at the end of 2012 through 2015 were:

| Calendar year | USD according to FORM 5500EZ | DKK exchange rate at year-end | Equivalent DKK | Number of active |
|---|---|---|---|---|
| 2012 | 1,569,191 | 5.6591 | 8,880,209 | 1 |
| 2013 | 1,039,640 | 5.4127 | 5,627,259 | 1 |
| 2014 | 763,315 | 6.1214 | 4,672,556 | 1 |
| 2015 | 981,917 | 6.8300 | 6,706,493 | 1 |

As a result of this, based on the information that is now available, it is the assessment of the Danish Tax Agency, that RIVERSIDE did not have the economic means to own shares to the extent indicated in RIVERSIDE's applications for refund of Danish dividend tax. This is shown for example by the fact:

- That on March 18-19, 2015, RIVERSIDE has declared to be the owner of shares in Novo Nordisk A/S, Danske Bank A/S and Pandora A/S respectively for a total value of DKK 873,370,0003.

Therefore, RIVERSIDE does not qualify for a refund of withholding taxes on Danish shares under Article 10 of the Double Taxation Convention between Denmark and the United States.

The Danish Tax Agency has therefore refunded the said dividend taxes to RIVERSIDE on an incorrect basis and the Danish Tax Agency therefore revokes the previous dividend tax refund decisions.

The Danish Tax Agency's decision is in line with the previously submitted proposal, as RIVERSIDE has not provided any evidence for their claims in their Statement of opposition dated April 23, 2018.

On behalf of the Danish Tax Agency, the attorney for the governemnt will raise a claim against RIVERSIDE for repayment and compensation of damages.

It can also be noted that it is the opinion of the Danish Tax Agency that the payments to RIVERSIDE are part of a larger international scheme, which the Danish Tax Agency has reported to the State Prosecutor for Serious Economic and International Crime (SØIK) as suspected fraud against the Danish state. The Danish Tax Agency has reported the scheme as being covered by Section 279 of the Criminal Code for the unjustified recovery of withheld dividend tax, where the applicant pension fund does not own or has not owned the shares referred to in the requests and where the dividends relating to the shares referred to in the requests have not reached the applicant pension fund.

For further justification, please refer to the facts below and the appendices submitted with the Danish Tax Agency's proposal dated March 23, 2018."

**Opinion of the appellant**

The Pension Plan's representative has requested that the Danish Tax Agency's decision from April 26, 2018, be amended so as to confirm the Danish Tax Agency's previous decisions on the refund of dividend taxes to the Pension Plan for a total of DKK 12,724,425.

The Pension Plan was established on January 1, 1995 and is a US pension plan which is exempt from tax under US domestic rules, and which is exempt from the payment of withholding tax on dividend distributions from Denmark under the Double Taxation Convention between Denmark and the US.

The Pension Plan has in 2014 and 2015 invested in Danish equities and received dividends on these equities. In connection with the payment of these dividends, withholding tax has been included on the dividend payment.

The Pension Plan has subsequently applied for payment of these dividend taxes, which the Danish Tax Agency has approved.

The present case concerns the fact that the Danish Tax Agency has now revoked these earlier decisions in the decision under appeal, whereby the Danish Tax Agency recognized the Pension Plan's right to be paid the dividends withholding tax.

The Pension Plan's representative further stated:

"1. The reasoning for the investment
Riverside Associates Defined Benefit Plan (Riverside) was established on January 1, 1995. Riverside has since its inception made numerous investments in both U.S. and foreign (non-U.S.) securities, financial products and contracts, etc.

In 2014 - 21 years after the foundation - the appellant started to inform themselves about investments in Danish shares. After examining the market conditions for equity investments in Danish shares, the appellant decided to add the investments in question to the portfolio of investments that the appellant was already making under the auspices of the brokerage company ED&F Man Capital Markets Limited.

ED&F Man Capital Markets Limited, part of the ED&F Man Group, is a large and reputable global financial brokerage firm, authorized and regulated by the Financial Conduct Authority ("FCA") (194926). The Company has its registered office at 3 London Bridge Street, London, SE1 9SG and is registered in England with a company registration number similar to the Danish Corporate ID No. 1292851.

ED&F Man Group was established in 1783 and today employs around 6,000 people in 60 countries.
In the course of the cooperation between the appellant and ED&F Man Capital Markets Limited, a number of framework agreements were concluded which formed the basis for the cooperation and the investments which the appellant chose to make in the following years.

The appellant does not have - and has never had - any overlapping interests with ED&F Man Capital Market Ltd.

For a better understanding of ED&F Man Capital Markets Ltd.'s general services, please refer to the company's website, which states, among other things:

"We provide fixed income, equity and commodity exchange-traded funds and source liquidity for listed and OTC block trades. We help customers from banks to hedge and real money funds with algorithmic trading strategies and voice, electronic, chat, and FIX staged access."

"We provide equity crossing in pan-European, Asian, US and Canadian equities. With a client base across Europe, North America and Asia-Pacific, we can quickly execute over-the-counter or on-exchange trades. We also offer execution and clearing of ICE and Eurex single stock futures and options."

"We provide clearing and settlement for equities and fixed-income securities. We offer global services for on-exchange securities deals and settlement, and custodian services for on-exchange and over- the-counter transactions. We can provide a full list of markets covered on request."

"We provide specialized securities lending and financing services to hedge funds and proprietary trading firms."

As stated above, ED&F Man Capital Markets Ltd. offers its clients a wide range of different investment opportunities in all types of securities etc.

<u>2. The investments made</u>

As mentioned above, the appellant was founded on January 1, 1995 and has since made financial investments, including with ED&F Man Capital Market Limited.

In 2014, the appellant was advised to invest in Danish equities - partly as a result of the fact that, as a US pension plan, the appellant is entitled to a 100% refund of Danish withholding tax on dividends.

On the basis of this, in 2014 and 2015, the appellant made a total of 11 trades in Danish listed shares, all of which yielded dividends, where the usual withholding tax on the dividend was included, and where the withheld dividend tax was subsequently requested to be refunded by the appellant.

\*\*\*\*\*\*\*\*\*\*

As mentioned above, the appellant has for many years made investments in securities in a number of different countries. In order not to have to familiarize themselves with the recovery procedure in each country, the appellant has for several years used various professional service providers to handle the practical recovery of withheld dividend tax according to the rules that apply to investments in the country in question.

After the appellant began investing through ED&F Man Capital Markets Limited in 2012, the appellant was introduced to Goal TaxBack, with whom ED&F Man Capital Markets Ltd. had a partnership. Goal TaxBack provides the service of reclaiming withheld dividend tax for foreign investors.

As a result of these circumstances, the appellant issued a power of attorney to Goal TaxBack in order for Goal TaxBack to recover the withheld dividend tax. The power of attorney issued for this purpose is attached as **Appendix 2**.

In connection with the recovery of withheld dividend tax, Goal TaxBack, on behalf of the appellant, submitted a request for refund of the withheld dividend tax.

**Appendix 3** presents a form for claiming a refund on dividend tax (Form 06.003 (ENG)) filled out by Goal TaxBack, which contains all the information that the Danish Tax Agency - then and now - requires in order to be able to decide on the refund of the withheld dividend tax. The request from Goal TaxBack thus contained the following documents:

* Purchase note evidencing the purchase of the dividend-paying shares
* A dividend declaration (Tax Voucher) documenting the dividend distribution and the dividend tax withheld.
* A so-called "place of residence statement", which must prove that the person (natural or legal) recovering the dividend tax is resident for tax purposes in the country with which Denmark has concluded a double taxation agreement allowing the recovery of withheld dividend tax.

This "place of residence statement" ("Form 6166") issued by the U.S. Department of the Treasury, is attached as **Appendix 4.** It states that the appellant is a pension plan that for tax purposes is resident in the United States and is exempt from U.S. tax liability. In addition to proving that the appellant is a US tax resident, the declaration also proves that the appellant is a US pension plan and therefore, under Article 10(3) of the Danish-US Double Tax Convention, the appellant is entitled to a refund of the entire dividend tax.

It should be emphasized that this Form 6166 is a standard form used by the U.S. Treasury Department as documentation for the recovery of dividend taxes under all double tax treaties entered into by the United States. It is therefore not a form specifically designed for appeals, or specifically for the recovery of dividend tax from Danish stocks.

On the basis of these documents, Goal TaxBack recovered the withheld dividend tax on the distribution made on the shares owned by the appellant at the time of the distribution.

Following the Danish Tax Agency's review of the above material, the Danish Tax Agency decided to pay the withheld dividend tax, as the appellant was entitled to 100% of the withheld dividend tax according to the US-Denmark Double Taxation Convention.

**********

ALLEGATIONS

In support of the plea, it is generally argued that the appellant was the beneficial owner of the shares in question at the time of the adoption of the dividend distribution.

Under Danish rules, the owner of the shares at 23:59:59 on the day of the General Meeting's adoption of the dividend distribution is deemed to be the rightful owner of the distributed dividend and thus also the person entitled to recover the Danish dividend tax withheld on the shares.

The appellant is a legally established and registered pension plan under the Double Taxation Agreement between the United States and Denmark. There is evidence that the appellant is a US tax resident but is exempt from US tax liability, see Appendix 4.

The appellant has received evidence from ED&F Man Capital Market Limited of having owned and held the shares in question at the time of the adoption of the dividend distribution by the distributing company.

The appellant has further received evidence of having received the dividend itself excluding withheld tax. Thus, the appellant has also received documentation that the Danish withholding tax has actually been included in the current dividend distribution.

As a result of this, the appellant therefore fulfils the conditions for a refund of the withheld dividend tax, according to Article 10 of the Double Taxation Agreement between the United States and Denmark.

The appellant was therefore entitled to a refund of the withheld dividend tax, and it is therefore wrong that the Danish Tax Agency in the contested decision revoked its previously favorable administrative act.

**********

The Danish Tax Agency has stated in the order on page 2, that it is the opinion of the Danish Tax Agency, that the reimbursements to the appellant should be presumed to be a fraudulent act, and it is also stated, that the Danish Tax Agency has reported this -- and apparently other -- cases to (SØIK) the State Prosecutor for Serious Economic and International Crime as a result of a suspicion that the appellant did not own the shares forming the basis for the recoveries, and as a result of a suspicion that the appellant did not receive the dividend distribution itself from the distributing company.

Basically, these allegations seem quite detached from the facts of the case.

Furthermore, these allegations are in contradiction with the documentation received by the appellant from ED&F Man Capital Market Limited and the appellant therefore does not recognize the picture depicted by the Danish Tax Agency in this letter.

The appellant has made customary investments in Danish shares. All these investments -- including the ownership and receipt of the dividend payments - have resulted in customary payments and postings to the appellant's account in a large internationally recognized investment firm, which is subject to supervision by the UK financial authorities.

The documentation provided with the recovery form is and was perfectly usual and also fully sufficient evidence of both ownership and cash flows. The documentation in question is quite similar to the documentation that the Danish Tax Agency still recommends enclosing to request for refund of dividend taxes, and it is quite similar to the documentation that the Danish Tax Agency has required through many years of established practice.

The appellant has at no time had any reason to doubt the validity of the documentation received by the appellant from ED&F Man Capital Market Ltd. and the appellant continues to have no reason to doubt that the entries and records contained in the material provided by ED&F Man Capital Market Ltd. are not accurate."

On June 19, 2019, the appellant further submitted evidence in the form of e-mails to and from ED&F Man regarding the purchase of shares, several Account Equity for trading in Danish stocks, several Account Transactions regarding shares and futures and SWIFT statements regarding share transactions.

In this regard, the Representative has stated, among other things, about the SWIFT statements:

"SWIFT stands for Society for Worldwide Interbank Financial Telecommunication. It is a data network that exchanges payment data between 8,300 financial institutions in 208 countries. It is therefore a data network developed by international banks for the rapid international processing of account transfers between the 8300 international financial institutions.

The following information can be read from the confirmation:

1) that DKK 104,501,320 has been transferred, which corresponds to the purchase price of the shares, see items 35
2) that the amount was transferred with effect from March 12, 2014, see items 36, which corresponds to the payment date in the purchase confirmation, see Appendix 5a
3) that the amount relates to payment for 2,000,000 shares in TDC A/S, see items 17, 13 and 14
4) that there is a reference to the trade date, see item 11, and the settlement date, see item 12
5) that the settlement date indicated corresponds exactly to the date of transfer of the amount.

It can therefore be established that there is objective proof of payment for the shares purchased.

The payment was made through the Society for Worldwide Interbank Financial Telecommunication - SWIFT system, which is managed and controlled by a network of international banks. It can therefore also be concluded that the proof of payment of the purchase price comes from an independent third party and that there is therefore objectively indisputable proof that the purchase price for the shares has been paid.

Taking the existence of such objectively verifiable evidence of payment of the purchase price into consideration, there is, in the opinion of the appellant, no present basis for commenting on the Danish Tax Agency's undocumented allegations of non-payment, nor does there appear to be any basis for addressing the issue of financing when it can be objectively established that the payment for the shares itself has been made."

**The representative also stated in relation to the appendices submitted:**

"Danske Bank A/S - 2,000,000 shares.
Appendix 6 is a Bloomberg printout of the shares in Danske Bank A/S. This appendix has been received by the appellant directly from ED&F and is a document showing information published in connection with the announcement by Danske Bank A/S to the stock market of the dividend proposed to be paid at the forthcoming general meeting of the company.

Presented as Appendix 6a is confirmation from ED&F of the purchase of 2,000,000 shares purchased on March 18, 2014 with payment date of March 24, 2014.

It can thus be assumed that the appellant purchased a total of 2,000,000 shares in Danske Bank A/S in early March 2014 with a payment deadline a few days after the acquisition.

The purchase of the shares was registered with the appellant's custodian, ED&F Man Capital Market Ltd. Appendix 6b contains the Equity Account from ED&F, which shows that the 2,000,000 shares in question were deposited with ED&F Man Capital Market Ltd.  It can therefore be assumed that the purchases made were recorded in the custody of the appellant's custodian.

**********

As proof of payment for the shares, a printout from the banks' joint SWIFT system is provided as Appendix 6c. For the content and understanding of this, please refer to the description above.

**********

For the record, a copy of the confirmation of the sale of the shares in question by the appellant, is attached as Appendix 6d.

Novo-Nordisk A/S - 2,000,000 shares.
Attached as Appendix 7 is a Bloomberg transcript relating to the shares of Novo-Nordisk A/S. This appendix has been received by the appellant directly from ED&F and is a document showing information published in connection with the announcement by Novo-Nordisk A/S to the stock exchange market of the dividend proposed to be paid at the forthcoming general meeting of the company.

As Appendix 7a is presented confirmation from ED&F of the purchase of a total of 2,000,000 shares purchased on March 20, 2014 with payment date March 26, 2014.

It can thus be assumed that the purchases made were recorded in the custody of the appellant's custodian.

**********

For the record, a copy of the confirmation of the sale of the shares in question by the appellant is attached as Appendix 7c.

Coloplast A/S -1,300,000 shares
Attached as Appendix 8 is a Bloomberg printout of the shares in Tryg A/S. This attachment was received by the appellants directly from ED&F and is a document showing information published in connection with the announcement by Tryg A/S to the stock market of the dividend proposed to be paid at the forthcoming general meeting of the company.

As Appendix 8a 2 confirmations from ED&F are presented on the appellant's 2 purchases of a total of 1,300,000 shares purchased on April 3, 2014 with payment date on April 9, 2014.

It can thus be assumed that the appellant purchased 175,000 shares in Tryg A/S on May 8, 2014 with a payment date of May 14, 2014.

**********

The purchase of the shares was registered with the appellant's custodian, ED&F Man Capital Market Ltd.

As Appendix 8b, Account Equity from ED&F is provided, which shows that the 1,300,000 shares in question were deposited with ED&F Man Capital Market Ltd.

It can therefore be assumed that the purchases made were recorded in the custodial account of the appellant's custodian.

**********

A SWIFT statement is provided as Appendix 8c to substantiate the payment for the shares.

\*\*\*\*\*\*\*\*\*\*

A copy of the appellant's sale of the shares in question is attached as Appendix 8d.

It can thus be assumed that the appellant purchased a total of 2,000,000 shares in Novo-Nordisk A/S in March 2014 with a payment deadline a few days after the acquisition.

\*\*\*\*\*\*\*\*\*\*

The purchase of the shares was registered with the appellant's custodian, ED&F Man Capital Market Ltd.

As Appendix 7b, Account Equity from ED&F is provided which shows that the 2,000,000 in question were deposited with ED&F Man Capital Market Ltd.

TDC A/S - 3,500,000 shares.
Appendix 9 contains a Bloomberg printout of the shares in TDC A/S. This appendix has been received by the appellants directly from ED&F and is a document showing information published in connection with the announcement by Dampskibsselskabet TDC A/S to the stock exchange market of the dividend proposed to be paid at the forthcoming general meeting of the company.

As Appendix 9a is presented confirmation from ED&F of the purchase of a total of 3,500,000 shares purchased on August 7, 2014 with payment date of August 11, 2014.

\*\*\*\*\*\*\*\*\*\*

The purchase of the shares was registered with the appellant's custodian, ED&F Man Capital Market Ltd. Attached as Exhibit 9b is Account Equity from ED&F showing that the 175,000 shares in question were placed in custody with ED&F Man Capital Market Ltd.

It can therefore be assumed that the purchases made were recorded in the custody account of the appellant's custodian.

\*\*\*\*\*\*\*\*\*\*

As evidence of the payment for the shares, a printout from the banks' SWIFT system is provided as Appendix 9c, see above.

\*\*\*\*\*\*\*\*\*\*

Finally, confirmation of the subsequent sale of the same shares by the appellant is provided as Appendix 9d.

A.P. Møller Maersk - 5,595 shares

Appendix 10 contains a Bloomberg printout of the shares in A.P. Møller Maersk A/S. This appendix has been received by the appellant directly from ED&F and is a document showing information published in connection with the announcement by A.P. Møller Maersk A/S to the stock exchange market of the dividend proposed to be paid at the forthcoming general meeting of the company.

As 10a, confirmation is provided that the appellant had purchased the shares in question and that the shares in question had been registered and deposited with the appellant's custodian, ED&F Man Capital Market Ltd.

It can therefore be assumed that the purchases made were registered with the appellant's custodian. Evidence of payment of the purchase price for the shares in question is provided in Appendix 10b.

\*\*\*\*\*\*\*\*\*\*

The above documentation shows the transactions carried out by the appellant. The Danish Tax Appeals Agency has requested a full statement of the appellant's account with ED&F. This is attached as Appendix 11.

The transactions described above have all been reflected in Appendix 11."

**The Danish Tax Agency's submission dated August 12, 2019**

The Danish Tax Agency, through the attorney for the government, stated the following in a submission dated August 12, 2019:

"The Riverside Associates Defined Benefit Plans (hereinafter the "Pension Plan") submission dated June 19, 2019, provides the Danish Tax Agency with the following additional comments:

On p.6 in the submission, the Pension Plan argues that the evidence presented "clearly" documents that the pension plan acquired the shares, was the legal owner of the dividends paid and was therefore also entitled to recover the dividend tax withheld on the shares.

The fact is, however, that the Pension Plan has not shown that it owned the alleged shares or that it received the alleged net dividends.

The evidence provided is incomplete. This in itself is discrediting - especially as the material was alleged to document share deals worth hundreds of millions of kroner. The Pension Plan's equity was far from sufficient to make the alleged investments, and the Pension Plan still has not documented how it would have financed the massive stock purchases.

The pension plan has still only partially responded to the Danish Tax Agency's request dated September 27, 2018. In particular, the Pension Plan has not provided financial statements, bank statements and correspondence with its custodian.

(...)

1.   BURDEN OF PROOF

It is the Pension Plan that has requested the refund of withheld dividend tax, and it is thus also the pension plan that has the burden of proving that the conditions for refund of dividend tax are met, see e.g., UfR 2003.2312/3H.

It is irrelevant whether at the time of the application the Pension Plan submitted documents which, if they had been correct, were sufficient documentation according to the Danish Tax Agency's way of conducting things in 2014 - 2015. - However, what is relevant, is whether on the basis of the information provided in this case, the Danish National Tax Tribunal finds that the Pension Plan has proven that it met the conditions for refund of dividend tax.

The pension plan's explanation of the transactions that should have entitled them to dividend distribution is implausible, see below, and the burden of proof is therefore even more important, see e.g., UfR 1998.898 H.

The pension plan, on the other hand, argues that the burden of proof has shifted so that the Danish Tax Agency is closer to the events, and therefore must bear the burden of proof (submission of June 11, 2019, p. 14).

The Danish Tax Agency disputes that the burden of proof can be reversed in this way, even taking into account the nature of the cases.

Between March 2014 and April 2015, the pension plan requested refunds on the basis of very large, alleged shareholdings. According to the Pension Plan, it has made investments of more than DKK 4 billion. The case was initiated by the issuance of the proposed decision on March 23, 2018, a few years after the payments - and at a time when accounting records should still be kept under both Danish and US law. Incidentally, it highlights that the pension plan can simply obtain the necessary documentation from ED&F Man. *If* the pension plan actually owned shares, that would be easy to show.

There is no doubt in the matter; there is no evidence of the alleged share deals. And there are far too many undocumented facts in the material the Pension Plan has presented to support their "story". The Danish National Tax

Tribunal is of the opinion, that if there is any doubt in this case, it is solely because the Pension Plan fails to produce documents that *must* be in its possession. This is to the detriment of the Pension Plan.

The Pension Plan states the following in its submission dated June 19, 2019 (p. 3):

*"The Danish Tax Agency thus also acknowledges on page 17 that the statistics only show that <u>a proportion</u> of refund requests have been unjustified. The appellant cannot comment on the accuracy of the statement, but emphasizes that, on the other hand, the Danish Tax Agency acknowledges that part of the refunds has been paid correctly, see also point 2 below."*

The latter is not correct. The fact that the figures support "*that a large proportion of refund requests have been unjustified*", see the Danish Tax Agency's 1st submission of September 27, 2018, p. 17, two last paragraphs, does not mean that the Danish Tax Agency recognizes that the remaining proportion of refund requests must be justified. This is an erroneous conclusion.

2.    THE DANISH TAX AGENCY'S OVERALL ASSESSMENT OF THE CASE

2.1  The pension plan did not own shares and did not receive dividends

The Pension Plan cannot prove that it paid for shares. Nor can the Pension Plan prove that it owned shares. Or that it has received the net proceeds from the shares it claims to have owned. On the other hand, it is clear that the pension plan did not have enough money to make the alleged investments, and there is no evidence that any external financing was obtained.

In itself, it is implausible that the Pension Plan, without significant assets, is buying such large amounts of shares. This impression is considerably reinforced when the Pension Plan does not provide documentation for cash flows to/from the Pension Plan's own (bank) accounts.

It is striking that the pension plan has continued to fail to produce relevant material which must be in its possession if, as it alleges, share dealing has taken place, including, for example, relevant contractual documents, bank statements and purchase and sale orders.

3.    THE PENSION PLAN PLACES GREAT EMPHASIS ON ED&F MAN

The pension plan attaches great weight to the fact that the alleged share purchases were made through ED&F Man. In its Statement of opposition dated August 3, 2018 (p. 2) the Pension Plan describes ED&F Man as

*"a large and reputable global financial brokerage firm, authorized and regulated by the Financial Conduct Authority ("FCA")".*

In its submission of June 19, 2019, p. 3–4, the pension plan highlights that it has not used any of the 4 custodians controlled by Sanjay Shah (Solo Capital, Old Park Lane, Telesto and West Point) and that the Danish Tax Agency's comments regarding these custodians are "*quite irrelevant to the present case and is yet another example of the Danish Tax Agency's deliberate attempt to make the appellant's case subject to facts which do not apply to the appellant and which are consequently completely irrelevant to the appellant.*"

The Pension Plan also states in its submission of June 19, 2019, p. 15, that ED&F Man is not sued as a "fraud-defendant" in England, but only as a "non-fraud-defendant", which means that the Danish Tax Agency does not claim that ED&F had knowledge of or participated in the alleged fraud."

The pension plan's comments must be understood as meaning that the use of ED&F Man as broker and custodian distinguishes this case in a decisive way from the group of cases concerning fraud involving the refund of withheld dividend tax. When ED&F Man has been involved, everything has -- according to the pension plan -- been done in a neat and orderly manner.

If there were a difference in the cases where pension plans used Shah-controlled custodians versus ED&F Man, one would think that the Pension Plans' documentation would be complete and satisfactory in the cases where ED&F Man was involved. If ED&F Man is regulated by the FCA, one would expect the documentation to be flawless and in general top notch.

In addition, one would expect a pension plan with a modest capital base that buys shares for up to a billion DKK to keep documentation of these share purchases. Not for tax purposes, but for its own sake - to ensure it has evidence of ownership of the shares.

It was also to be expected that such a Pension Plan would be willing to provide information – especially when both the Danish Tax Agency and the Danish Tax Appeals Agency, both explicitly request additional information.

However, it is noted that the material provided by ED&F Man is incomplete, that the pension plan cannot provide evidence of having owned the alleged shares and the Pension Plan - despite being requested to do so - continues to fail to provide material that it *must* have in its possession, including its own bank statements and the basis of the agreement for the cooperation with ED&F Man.

The most important matter in the case, regardless of whether the custodian is Shah-controlled or ED&F Man, is that there is no evidence that the Pension Plan owned the shares that formed the basis of the refunds paid.

And it goes without saying that it is not proof of ownership that ED&F Man has acted as custodian (and/or broker).

3.1  Share purchase: terms of settlement not in line with market

Until October 6, 2014, the standard for share trades in Denmark was that shares were delivered three days after the contract was entered into (i.e., settlement T+3). After October 6, 2014, the standard was delivery after two days (i.e., T+2) (Appendix W). Only business days are included in the calculation of delivery time - i.e., weekends and public holidays are not included.

The pension plan's share transactions are settled as follows:

|  | Purchase (settlement) | Sale (settlement) |
|---|---|---|
| TDC | 03/06/2014 (T+4) | |
| Danske Bank | 03/18/2014 (T+4) | |
| Novo Nordisk | 03/20/2014 (T+4) | |
| Tryg | 04/03/2014 (T+4) | |
| D/S Norden | 04/23/2014 (T+4) | |
| Coloplast | 05/08/2014 (T+4) | |
| TDC | 03/04/2015 (T+2) | |
| DSV | | |
| Pandora | 03/17/2015 (T+2) | |

| Danske Bank | 03/13/2015 (T+1) | |
| Novo Nordisk | 03/13/2015 (T+2) | |

As can be seen, the settlement of purchases in 2014 was not made under market conditions (T+3 until 6 October 2014 and T+2 thereafter), but with a one-day longer delivery time than under market standards. The pension plan has not explained this.

The deviation from market conditions is noteworthy, as the deviation, even if there had been share transactions and not just accounting entries, makes it very difficult to verify. This is due to the "timing" of distributions on the Danish market:

A company decides to make a distribution at its general meeting. According to the market conditions for delivery, the day of the general meeting will be considered as "day 0". Once a company has decided to make a distribution, the ex-date (ex-dividend date) is determined. The ex-date is the first day after the general meeting on which the shares are traded without dividend and will therefore be considered as "day 1".

The record date is then determined. The date is determined by the trading platform with market conditions for the delivery of shares. Those, who have registered as depository proprietors, will receive the dividend on that date (record date). By delivering T+2, the record date will be considered as "day 2". By delivering T+3, the record date will be considered as "day 3".

Prior to October 6, 2014, the market standard was T+3 delivery. This meant that if you acquired shares on Monday August 11, 2014, you would receive the shares (be registered as owner) on Thursday August 14, 2014. Shares therefore had to be acquired three days before the record date if one was to be registered as an owner on the record date. In fact, trading two days before the record date would mean that, under normal delivery conditions (T+3), the shares would not be received before the company determined the ownership structure for the payment of the dividend, and thus the seller would receive the dividend. The ex-date was therefore two days before the record date.

Therefore, to be entitled to dividends, shares had to be acquired at least three days before the record date. Thus, according to the market standard (T+3), one would receive the shares and be registered as an owner at the time when the distributing company determines the ownership, and one would receive the dividend.

On October 6, 2014, the market standard was changed to T+2 delivery. This means that the ex-date became the day before the record date - i.e., one day closer to the record date due to the shortened delivery time.

However, in purchasing shares, the Pension Plan has deviated from the market standard in several cases, see above. Therefore, in these cases, the Pension Plan did not receive the dividend directly from the distributing company or through its own sub-custodians, this is even evident from their own agreements. The alleged dividends, on the other hand, were paid to a seller who was a custodian on the record date but who had obligation to continue the distribution, since according to the Pension Plan the share had been sold including the dividend (before the ex-date).

The Pension Plan thus claims to have been the owner, even though it was not registered as owner on the record date, since it acted on terms that deviated from market standards. This is a set-up that makes verification very difficult, as the pension plans, according to their own company records, will not even be registered as the owner of the share on the record date, on which the company records the owners and pays the dividend. Because the Pension Plan claims that it receives the shares at a later date and that they are entitled to the dividend, that their seller receives. This situation increases the burden of proof on the side of the Pension Plan.

There is no information on whether the pension plan has followed market standards in most of its share sales.

3.2  ED&F Man specific error 1: Improper currency conversion

The Danish Tax Agency has found that the supporting documentation from the Pension Plan's custodian, ED&F Man, is in many places significantly inaccurate. For an illustration of this, see Appendix X.

Appendix X is an account from another pension plan that - like AIG - uses ED&F Man as its custodian. The account contains a futures position which as of April 11, 2013, has a value of DKK 6,030,486 (Trade Date Amount). As the account is held in Euro (EUR), the value of the futures position is converted into EUR. The conversion is shown on the top line under "Cash Summary", see extract below.

**Cash Summary**

| Cur Layer | Trade Date Amount | Conv Rate | TD Reporting Amt (EUR) |
|---|---|---|---|
| DKK Var Margin | 6,030,486.00 Cr | 7.45610(0) | 44,963,906.66 Cr |
| | | | 44,963,906.66 Cr |

As can be seen, the value of the futures position of DKK 6,030,486 is converted into EUR 44,963,906.66 by multiplying by the exchange rate of 7.4561. However, when converting from DKK to EUR, the amount should obviously have been divided by the exchange rate. This obvious error makes the value of the futures position much higher than it really is. If the amount had been converted correctly, the future position would have had a value of EUR 808,798.97. ED&F has therefore registered the future position with a value which is approximately 55 times higher than the real value of the future position. As a result of this error, the Total Account Value is precisely EUR 44,963,906.66, see Appendix X, p. 2. This is a calculation error of over EUR 330 million.

It makes no sense that custodian would make such a mistake. The documents from the custodian allegedly concern investments of many million DKK in many different Danish companies. The amounts involved are therefore very large. This will of course require an IT system that does not make mistakes. An error of that nature in supporting documentation from the Pension Plan's custodian, ED&F Man, is in itself discrediting.

3.3  ED&F Man specific error 2: Shareholding

ED&F Man, has in another of the cases within the dividend case group, issued documentation to a pension plan for ownership of 50,000 shares of IC Company A/S (Appendix Y). As shown in the attachment, the Ex-date was September 25, 2014.

The Danish Tax Agency is in possession of the custodial account statement for the account in which ED&F Man apparently held this shareholding (Appendix Z). As shown therein, ED&F Man acquired 5,000 shares from Jefferies International Ltd. on September 19, 2014, which were delivered on September 26, 2014. The shares were "traded" at DKK 0, which strongly suggests that this was a stock loan. For these shares, ED&F Man was paid dividends to its account. On September 29, 2014, ED&F Man transferred 5,000 shares to Jefferies International Ltd. for DKK 0, suggesting that this was a return of the above-mentioned shareholding. The delivery took place on September 30, 2014.

In addition, it appears that ED&F Man acquired 10 x 5,000 shares on September 24, 2014, which were delivered on September 30, 2014 (T + 4). ED&F Man sold 10 x 5,000 shares on September 25, 2014, and delivered the shares on September 30, 2014 (T + 3). The shares were thus delivered under the purchase agreement on the same day as they were to be delivered under the sale agreement. As a result of this, on September 30th, 2014, ED&F Man received 50,000 shares and delivered them on the same day. In other words, the shares merely "touched" ED&F Man's account.

The shares were acquired at DKK 167.5 each and sold at DKK 165.5 each. The loss was thus DKK 2.00 per share. For 50,000 shares, the loss on purchase/sale was therefore exactly DKK 100,000.00.

ED&F Man has thus borrowed 5,000 shares, according to the custodial account statement. In addition, ED&F Man "purchased" 50,000 shares on the 24th, which were sold on the 25th, the purchase and sale being completed on the same date and for perfectly rounded amounts.

Overall, there is no evidence that ED&F Man would have owned any of these shareholdings. On the contrary, the documents show how ED&F Man attempted to make it appear, through trades in/out of custody, that it held shares on behalf of pension plans. Yet ED&F Man certified ownership of the shares.
And as a result of this, that documentation cannot be given any evidential value.
3.4  One of the alleged share trades was made through a coffee company

One of the purchase confirmations provided (Appendix 5a) is a "Cash Equity Confirmation" issued by Volcafe.

It is noteworthy that this purchase confirmation concerning the purchase of shares for a total of approximately DKK 112 million do not specify the year this purchase was made.

Volcafe, which issued these purchase confirmations, is located in Switzerland and, according to its website (www.volcafe.ch), is a coffee company belonging to ED&F Man (Appendix AE).

No details have been given as to why this share purchase was made by a coffee company.

According to the Swiss company register (Zefix - Zentraler Firmenindex), Volcafe has the following for objectives, see Appendix Ø:
*«Zweck:*
*Die Gesellschaft bezweckt die Durchführung von Import-, Export-, Transithandels- und Kommissionsgeschäften mit Waren aller Art, vornehmlich mit Kaffee, in der Schweiz sowie im Ausland. Die Gesellschaft kann Zweigniederlassungen und Tochtergesellschaften im In- und Ausland errichten und sich an anderen Unternehmen im In- und Ausland beteiligen. Die Gesellschaft kann Grundstücke und Immaterialgüterrechte im In- und Ausland erwerben, halten, verwalten, verwerten und veräußern. Die Gesellschaft kann alle kommerziellen, finanziellen und anderen Tätigkeiten ausüben, die geeignet erscheinen, den Zweck der Gesellschaft zu fördern, oder die mit diesem zusammenhängen.»*

The text above can "roughly" be translated as follows:

*«Purpose:*
*The purpose of the company is to carry out import, export, transit trade and commission business in goods of all kinds, primarily coffee, in Switzerland and abroad. The Company may establish branches and subsidiaries in Switzerland and abroad and acquire interests in other companies in Switzerland and abroad. The Company may acquire, hold, manage, exploit and sell real estate and intangible property rights in Switzerland and abroad. The Company may engage in all commercial, financial and other activities which appear suitable to promote the purpose of the Company or which are related thereto. »*

As can be seen above, brokerage is not even mentioned of the company's purpose statement.

4.    DOCUMENTATION FROM ED&F MAN HAS NO EVIDENTIAL VALUE
The Danish Tax Agency has obtained information on three ED&F Man deposits registered with SEB. The information includes shareholdings, dividends received and account movements (cash flows).

The information on ED&F Man's holdings can be compared to other pension plans' information on purchases and sales of shares, as well as those pension plans' information on claimed dividends.

It cannot be excluded that ED&F Man has additional shareholdings. However, the Danish Tax Agency has based their decisions on cases where the information from ED&F Man's deposits exactly matches the pension plan's information. On this basis, it must therefore be assumed that it is precisely these deposits that are linked to the pension plans' alleged investments.

The documents submitted by the pension plans to the Danish Tax Agency do not reflect the actual situation. On the contrary, the "documentation" issued by ED&F Man cannot be given any be evidential significance.

Indeed, the review shows that ED&F Man has constructed documentation for share transactions and that ED&F Man has certified ownership that is contradictory to the facts. At the same time, there is evidence to suggest that ED&F Man has done this systematically.

When, in just one case, the ownership documentation issued by ED&F Man is found to be contrived and incorrect, the result is that the ED&F Man documentation cannot be relied upon in any of the cases. And the Danish Tax Agency's review has revealed significant errors in the ED&F Man documentation for several trades across the pension plans in the caseload.

This means that "documentation" produced by ED&F Man is worthless in evidentiary terms. It also means that when there is a need to construct false "documentation", this unequivocally shows that no trading has taken place. It certainly increases the burden of proof for pension plans.

4.1  Chr. Hansen shares - 2014
The overall process, as described in detail below, shows:
1. that ED&F Man borrows shares,
2. that ED&F Man "sells" the borrowed shares to another ED&F Man account
3. that ED&F Man "buys back" the borrowed (and "sold") shares from the same ED&F Man account two minutes later, and
4. that the shares borrowed are returned to the share lender after payment of dividends.

The transactions in bullets 2 and 3 are quite closely related.

Yet American Investment Group Of New York, L.P. Pension Plan (SANST Case. No. 18- 0005426 - Leading Case) ("AIG") uses documents from Transaction No. 3 to "document" a purchase (Section 4.1.1, below) However, those documents are without any connection to reality. After all, no shares were purchased by the Pension Plan (or on behalf of the pension plan). Rather, ED&F Man "sold" and immediately "repurchased" shares internally, thereby constructing purchase documentation (without any reality) that the pension plan uses as the basis for its claim to have purchased and owned shares.

*4.1.1    ED&F Man documentation for purchase is contrived and of no probative value*

The appellant, AIG, alleges that the pension plan acquired 800,000 Chr. Hansen shares on November 27, 2014 with delivery (settlement/value date) on December 1, 2014 (Appendix Å1). The price was DKK 207,122,592.

As evidence of the acquisition, AIG has provided

- a "confirmation from ED&F Man", which is an internal ED&F Man email from Paul Schofield to Sara Mina (Appendix Å1, p. 2)
- an account statement from ED&F Man ("Account Equity") in the name of the pension plan where the trade is posted (Appendix Å1, p. 3); and
- a SWIFT notification showing the completion of the payment (Appendix Å1, p. 4).

ED&F Man has also issued a Tax Voucher stating that AIG owned 800,000 Chr. Hansen shares beyond the dividend date (ex-date was November 28, 2014) (Appendix Å1, p. 5).

The Danish Tax Agency has verified this information in relation to ED&F Man's dealings with Chr. Hansen shares. The review has revealed that there is no reality behind the documents provided by the pension plan, as the "purchase" is contrived.

As Appendix Å2, a redacted extract of all Chr. Hansen transactions on ED&F Man's accounts is attached with the Danish Tax Agency's highlights. The appendix shows that ED&F Man did indeed "purchase" 800,000 Chr. Hansen shares on November 27, 2014 with delivery on December 1, 2014 for DKK 207,122,592. Meanwhile, the shares had been "sold" on the same day to the same contracting party for DKK 207,120,000, in other words DKK 2,592 less (Appendix Å2, p. 1, deposit no. ██████2806):

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 12/01/2014 | SEB, acc. ED&F Man Capital Markets Limited | 11/27/2014 | Buy | 800,000.00 | -207,122,592.00 |
| 12/01/2014 | SEB, acc. ED&F Man Capital Markets Limited | 11/27/2014 | Sale | -800,000.00 | 207,120,000.00 |

As can be seen, the counterparty to the transactions is another account registered in the name of ED&F Man.

A review of the related Cash Account (excerpt provided as **Appendix Å3**) actually shows that - at least at the time of delivery - the shares were correctly sold and then bought back two minutes later (my presentation of the information):

| | | | |
|---|---|---|---|
| *[SALE]* | *at 05.12AM* | *Securities sale* | *207,120,000.00 CR* |
| *[BUY]* | *at 05.14AM* | *Securities buy* | *207,122,592.00 DR* |

This shows that ED&F Man did not buy 800,000 shares for AIG for DKK 207,122,592. Instead, ED&F Man moved 800,000 borrowed shares back and forth between two internal accounts, thereby constructing an account movement of shares and a cash flow. In other words, ED&F Man constructed a "purchase" by "selling" the borrowed shares to itself and then immediately "buying back" the shares from itself. The documentation for the "repurchase" is the documents AIG has provided as evidence of having purchased and owned shares. The purchase is thus contrived and without substance. The documents (Appendix Å1) do not show a share purchase - but merely that 800,000 shares have been moved back and forth. ¬And the payments almost look like a "fee" of DKK 2,592 (the difference in the two trades) has been paid for the "inconvenience". The trades alone have resulted in a minimal liquidity move of DKK 2,592.

**4.1.2 ED&F has certified their ownership contrary to the actual facts**

ED&F Ownership of Chr. Hansen shares beyond the dividend date (ex-date of November 28th, 2014) for five pension plans:

| Shareholder (Pension Plan) | Claimed Withheld dividend tax | Share | Number of shares | Ex-date |
|---|---|---|---|---|
| American Investment Group Of New York, L.P. Pension Plan | 814,320.00 DKK | Chr. Hansen Holding A/S | 800,000 | 11/28/2014 |
| | 834,678.00 DKK | Chr. Hansen Holding A/S | 820,000 | 11/28/2014 |
| | 834,678.00 DKK | Chr. Hansen Holding AIS | 820,000 | 11/28/2014 |
| | 834,678.00 DKK | Chr. Hansen Holding AIS | 820,000 | 11/28/2014 |
| | 834,678.00 DKK | Chr. Hansen Holding A/S | 820,000 | 11/28/2014 |

ED&F Man has thus certified ownership of a total of 4,080,000 shares over the dividend period. This corresponds exactly to the number of shares that ED&F Man held in its share deposit over and above the exchange date (Appendix Â2, p. 1).

The Danish Tax Agency has carried out a detailed examination of ED&F Man's deposit. The audit shows that 800,000 of the shares in the deposit were acquired for DKK 0 (Appendix Â2, p. 1):

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 11/28/2014 | Morgan Stanley International Ltd | 11/24/2014 | Buy | 300,000.00 | 0.00 |
| 11/28/2014 | Morgan Stanley International Ltd | 11/21/2014 | Buy | 250,000.00 | 0.00 |
| 11/28/2014 | Morgan Stanley International Ltd | 11/21/2014 | Buy | 250,000.00 | 0.00 |

When the shares are acquired for 0 DKK, it probably means that the shares are borrowed. It could also be the return of borrowed shares, but this is not the case here, as no loans have previously been made by Chr. Hansen shares from the account.

So, ED&F Man has borrowed 800,000 shares. It is not clear whether ED&F Man is borrowing the shares on behalf of a particular pension plan or on behalf of other clients or on its own behalf.

The shares are returned immediately after the dividend date in the same way without payment and to the same counterparty:

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 12/02/2014 | Morgan Stanley International Ltd | 12/01/2014 | Sale | -300,000.00 | 0.00 |
| 12/02/2014 | Morgan Stanley International Ltd | 12/01/2014 | Sale | -250,000.00 | 0.00 |
| 12/02/2014 | Morgan Stanley International Ltd | 12/01/2014 | Sale | -250,000.00 | 0.00 |

ED&F Man has borrowed at least 800,000 shares. No information is available as to whether the other 3,280,000 shares are *actually held by (other)* ED&F Man customers or whether they are also borrowed shares, with the loan merely

masked further. In any event, the Danish Tax Agency notes that ED&F Man has not registered Chr. Hansen shares in its possession other than during the period from November 28, 2014 to December 8, 2014.

No dividend refund can be claimed for borrowed shares - because the refund belongs to the owner (lender), not the borrower.

*Yet* ED&F Man has certified ownership of 4,080,000 shares - and thus *at least* 800,000 borrowed shares. ED&F Man has thus certified *ownership* - on a Tax voucher - of *borrowed* shares. ED&F Man has *known* that this could be used to reclaim withheld dividend tax - even though there is no right to do so for borrowed shares.

When ED&F Man issues documentation that is contrary to the true facts in just one case, this means that the Danish Tax Agency cannot rely on documentation from ED&F Man. Because it is uncertain whether the documentation corresponds to the actual ownership. And, as the following paragraphs will show, in many cases ED&F Man's documentation has been found to be inaccurate and/or misleading.

The 800,000 shares borrowed correspond exactly to AIG's alleged shareholding. It thus *appears that* it is AIG's shareholding that has been borrowed from Morgan Stanley International Ltd.

### 4.1.3    Has ED&F Man tried to mask the facts?

In other words, what has been done is that ED&F Man has borrowed some shares (section 4.1.2, above). It may be for the pension plan, but it doesn't have to be. A share borrower is not entitled to a dividend refund. The pension plan does not obtain evidence of ownership by the fact that ED&F Man has borrowed some shares.

Proof of ownership is obtained by ED&F Man selling the borrowed shares to an internal account. Two minutes later, the shares are sold back to ED&F Man's first account. The last trade is used to prove that the pension plan is the owner of the shares.

The arrangement shows that ED&F Man is aware that share borrowers are not entitled to dividend distribution, otherwise buying and selling back within two minutes would not be necessary.

The process also shows the dubious nature when the second and third transactions can serve no other purpose than to mask the real facts. The pension plan is the highest but it is also not documented the borrower of stocks. And it is undisputed that the borrower is not entitled to reimbursement.

In addition, ED&F Man fully manages the "trades" including hedging and funding on behalf of the pension plans (see section 5.3). It is thus - apparently - ED&F Man that controls this entire set-up and then documents ownership contrary to the facts. This significantly tightens the documentation requirements for pension plan shareholdings.

This has significant commonalities with the pattern of changing the numbers and unrealistic trades seen in the cases where pension plans have used custodians from the Solo group controlled by Sanjay Shah.

### 4.2    TDC Shares - 2014

With regard to the TDC shares in 2014, it may - as was the case for Chr. Hansen shares in 2014 – be observed that internal "purchases/sales" of shareholdings were made in order to construct a "purchase" with trade notes and SWIFT with splits, which the pension plan presents as proof that shares were traded, but which are without factual basis and which do not correspond to the underlying facts.

In the case of TDC shares, too, it can be seen that shares have been borrowed beyond the dividend date, and the purpose of the internal 'trades' thus appears to be solely to mask the fact that the shareholdings are borrowed and that there is thus no entitlement to dividend distribution.

In addition, for the TDC shares, a "sale" of shares has also been constructed and a pension plan claims to have owned TDC shares at a time when there were no TDC shares in ED&F Man's deposits. Yet the pension plan provides ED&F Man documents to support this claim:

In one of the other lead cases, Kamco LP Profit Sharing Pension Plan (SANST case no. 18-0005414) ("Kamco"), the pension plan (which is also represented by Lundgrens) claims to have owned 2,901,000 TDC shares from August 7, 2014 to September 22, 2016 - i.e., for over two years - and has submitted "documentation" from ED&F Man to this effect.

The Danish Tax Agency has verified the documentation and it can be concluded that it is contrived and in no way proves that ED&F, let alone Kamco, would have owned the shares to which the 'documentation' relates:

- At the time of the pension plan "purchase", ED&F Man had borrowed TDC shares in its custodial account.
- ED&F Man's "purchase" on behalf of the pension plan is constructed by "selling"/"buying" shares internally between two ED&F Man accounts.
- For long periods from the pension plan's "purchase" to the "sale", ED&F Man had no TDC shares at all in its custodial accounts. In other words, the pension plan could not have owned the alleged shares.
- At the time of the pension plan "sale," ED&F Man had only borrowed shares in its custodial accounts. That means, that the pension plan could not have owned the shares it claims to have "sold."
- The "sale" is constructed by "selling"/"buying" shares internally between two ED&F Man accounts.

A redacted extract of all TDC transactions on ED&F Man's accounts is provided as Appendix AA1. On the attachment it is highlighted in yellow where the account "goes to 0" for a period of time, i.e., where there are no TDC shares remaining in the ED&F Man account.

In light of the large number of transactions, the Danish Tax Agency has prepared some auxiliary appendices (Appendix AA2 and Appendix AA3) with extracts from this Appendix to highlight certain facts.

### 4.2.1    ED&F Man documentation for purchase is contrived and of no probative value

Kamco claims to have purchased 2,901,000 TDC shares on August 7, 2014 for DKK 150,273,685.65. To document this, Kamco has submitted a purchase order from **ED&F (Appendix AA4, p. 2).**

The Danish Tax Agency has checked this information in relation to ED&F Man's deposits. In this context, the Danish Tax Agency has found the following transactions on the three ED&F Man accounts (Appendix AA1), where precisely 2,901,000 TDC shares were traded on August 7, 2014:

Account ▮▮▮▮▮2806

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|------------|------------|------------|---------|-------------|
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Buy | 2,901,000.00 | 0.00 |

Account ▮▮▮ 2814

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Buy | 2,901,000.00 | -150.273,685.65 |
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Sale | -2,901,000.00 | 0.00 |
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Sale | -2,901,000.00 | 150,271,800.00 |

Account ▮▮▮ 2822

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Sale | -2,901,000.00 | 150,273,685.65 |
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Buy | 2,901,000.00 | -150,271,800.00 |

The transaction highlighted in yellow matches the transaction for which Kamco has provided a SWIFT notification and trade note for.

However, the transaction does not constitute a share deal. As can be seen, the transactions are carried out with ED&F Man itself as "counterparty". And the shares are "sold back" for DKK 150 271 800. The price difference of DKK 1,885.65 looks almost like a "fee" for the inconvenience. And the transactions ("purchase"/"sale") are carried out at two-minute intervals (Appendix AA5).

As was the case with Chr. Hansen shares (section 5.1.1, above), ED&F Man has thus constructed the "acquisition". 2,901,000 TDC shares have not been purchased (on behalf of the pension plan). Shares have simply been moved back and forth between two internal ED&F Man accounts in order to produce "documentation".

However, the statement of account (Appendix AA1, see for example p. 1) shows that shares have been borrowed in a large number of cases. The back-and-forth internal transactions thus look like an attempt to mask the actual holdings so that a dividend refund can be requested even though the shares are actually borrowed.

*4.2.2    ED&F Man documentation for ownership and sale is contrived and contrary to fact*

Kamco has referred to Appendix AA4, p. 5, where it appears that the 2,901,000 TDC shares were sold on September 22, 2016 for DKK 115,401,780 and that the sale was completed on September 23, 2016.

Thus, according to the 'documentation' provided, the pension plan has owned the shares for more than two years.

This is in no way consistent with the fact that the ED&F Man accounts have not held a single TDC share for long periods of time. In particular, no TDC shares were held in the accounts during the following periods (Appendix AA2):

September 20, 2014 to November 16, 2014
November 25, 2014 to March 3, 2015

March 20, 2015 to August 5, 2015
August 26, 2015 to December 15, 2015
December 22, 2015 to September 22, 2016

As a result of this, Kamco cannot have held TDC shares from August 7, 2014 to September 22, 2016. As can be seen, during most of the alleged ownership period, ED&F Man did not hold any TDC shares.

Thus, the information on Kamco's ownership issued by ED&F Man is without foundation in factual data.

Kamco's "sale" in 2016 is constructed by ED&F Man lending TDC 3.5 million shares from ING Bank N.V. ED&F Man "sold" these shares to another ED&F Man account, after which ED&F Man "repurchased" the shares from the same account. The shares were thus simply "moved" back and forth between internal ED&F Man accounts to construct a "sale" of 2,901,000 shares.

The TDC trades for 2016 are presented in excerpt as Appendix AA3. At the beginning of 2016, ED&F Man did not hold any TDC shares in its accounts.

As Appendix AA3 shows, a large number of transactions are carried out in a few days in August. However, only two of the transactions are with an external party, ING Bank N.V.:

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 09/23/2016 | SEB, acc. ING Bank N.V. | 09/22/2016 | Buy | 3,500,000.00 | 0.00 |
| 09/26/2016 | SEB, acc. ING Bank N.V. | 09/23/2016 | Sale | -3,500,000.00 | 0.00 |

As it appears, ED&F Man borrows 3,500,000 TDC shares from ING Bank N.V. on Thursday, September 22, 2016, which will be delivered on Friday, September 23, 2016.

The borrowed shares will be returned on Friday September 23, 2016, and the return will take place on Monday September 26, 2016.

These borrowed shares are "sold" back and forth between ED&F Man's accounts many times during the borrowing period, including the following two transactions:

| Date | Cprt. | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-------|-----------|-----------|---------|-------------|
| 09/23/2016 | MACVGB22XXX | 09/22/2016 | Sale | -2,901,000.00 | 115,401,780.00 |
| 09/23/2016 | MACVGB22XXX | 09/22/2016 | Buy | 2,901,000.00 | -115,403,230.50 |

The "sale" that is being conducted here on September 23, 2016 of 2,901,000 TDC shares and that was agreed upon on September 22, 2016, is being conducted at a price that precisely matches the "sale" that Kamco has presented as "documentation" for the pension plan to divest its alleged shareholding. It must therefore be Kamco's sale of shares.

The "Co-contractor" name field is empty for the two transactions, but an ID code, "MACVGB22XXX", is indicated. This ID code covers ED&F Man (Appendix AA6).

A review of the related Cash Account (excerpt provided as Appendix AA7) shows that - at least at the time of delivery - the shares were sold and then bought back four minutes later (my presentation of the information):

| | | | |
|---|---|---|---|
| [SALE] | at 05.15 | Securities sale | 115,401,780.00 CR |
| [BUY] | at 05.19 | Securities purchase | 115.403.230,50 DR |

This shows that ED&F Man did not sell 2,901,000 TDC shares for Kamco for DKK 115,401,780 in these transactions. Instead, ED&F Man moved 2,901,000 shares back and forth between two internal accounts, thereby constructing a "sale" with an account movement of shares and a cash flow.

The "sale" is thus contrived and without reality. The document (Appendix AA4, p. 5) does not show a sale of shares - only those 2,901,000 shares have been moved back and forth. And the payments almost look like a "fee" of DKK 1,450.50 (the difference in the two trades) was paid for the "inconvenience".

The transactions have thus only resulted in a minimal cash inflow of DKK 1,450.50.

It is particularly clear that ED&F Man could not have sold 2,901,000 TDC shares on behalf of Kamco on the 22nd of September 2016. For ED&F Man only held borrowed shares in 2016. Namely the 3,500,000 shares that had been borrowed from ING Bank N.V.

### 4.2.3   ED&F Man never purchased, owned or disposed of the alleged 2,901,000 TDC Share

Overall, the above shows that ED&F Man has not purchased 2,901,000 TDC shares on behalf of Kamco. Indeed, the "purchase" is merely internal entries between two of ED&F Man's accounts, which offset each other except for a net cash outflow (perhaps a fee) of DKK 1,885.65.

ED&F Man, in turn, has a large number of shares borrowed beyond the dividend date (ex-date of August 8, 2014), see, e.g., Exhibit AA1, p. 1. The "trades" can therefore - as in the case of Chr. Hansen shares (section 4.1, above) - have been intended to mask share lending in order to obtain dividend distribution on a false basis.

In addition, ED&F Man has not held any shares at all during the entire period for which Kamco claims to have held the TDC shares. For most of Kamco's alleged ownership period, ED&F Man held no shares in TDC.

Finally, the "sale" of the stock is also constructed. ED&F Man borrowed a share from ING Bank N.V., which was moved back and forth between two internal accounts at ED&F Man to construct a "sale" before the borrowed share was returned to ING Bank N.V.

These facts mean that "documentation" issued by ED&F Man is worthless. ED&F Man has in fact issued documentation for purchases, sales and shareholdings without the documents corresponding to the actual facts.

5.   LACK OF DOCUMENTATION AND INCONSISTENT SET-UP

5.1   Purchase and sale confirmations provided do not document that the pension plan has bought shares
The Pension Plan has provided purchase and sale confirmations from ED&F Man for most of the stock traders. However, there is no evidence that the purchase confirmations were sent to the Pension Plan or otherwise made known to the Pension Plan.

The purchase confirmations are, by the way, purchase confirmations sent as emails internally in ED&F Man.

Similarly, there is no evidence that the Pension Plan had any knowledge of the sales confirmations that were submitted.

In addition, no evidence has been provided that the Pension Plan has given purchase and sales orders to ED&F Man. This is particularly noteworthy when the Danish Tax Agency, in its submission dated September 27th 2018 (p. 27, request 7), already called on the Pension Plan to provide "all correspondence with ED&F Man". It is also remarkable when considering that ED&F Man - according to the Pension Plan - has purchased shares on behalf of the Pension Plan for upwards of several hundred million at a time.

It appears from the office meeting minutes of May 10, 2019, p.1, that the representatives of the pension plan "believed", that

*"a framework agreement was concluded between the pension plan and EDF on the purchase, sale of shares, etc. That is why there was no further correspondence thereafter."*

No documentation is provided for the existence of such a framework agreement. This is unbelievable that the pension plan does not contain a (copy of) framework agreement that would give authorization to ED&F Man to buy shares for worth of several hundred million kroner on behalf of the pension plan. Even if such a framework agreement existed, it would be unbelievable that there was no correspondence on explicit buy and sell orders in the case of such large shareholdings.

Nor, as the minutes of the office meeting show, have any agreements been produced between the Pension Plan and the trustee as to how the Pension Plan's modest funds were to be invested.

5.2    There is no evidence of financing

It is undisputed that the pension plan did not have the necessary capital base to make the alleged¬ share purchases of several hundred million DKK. The pension plan needed external financing.

The Pension Plan states in its submission of June 11, 2019 (among other things, p. 8) that "there appears to be no basis for addressing the issue of financing". The pension plan does not even try to explain how it has been able to finance share purchases of up to one billion DKK at a time, with its modest capital basis. In the Pension Plan's opinion, evidence of the financing of the share deals (including the specific contractual basis) is therefore irrelevant to the question of ownership. This is clearly wrong. For the issue in the case is whether the pension plan can prove to have acquired alleged massive shareholdings of several hundred million DKK. This requires financing, otherwise one cannot buy shares when one is not even close to having a sufficient capital base.

The pension plan did not have - and has never had - the necessary capital to make the massive investments in Danish shares that are the basis for the pension plan's claims for refund of the withheld tax.

The failure to provide the specific contractual basis for the financing is therefore of obvious evidential importance. When the pension plan cannot prove that it financed the purchase of the shares, the pension plan is forced to claim, contrary to all reality, that the financing is the irrelevant. Again, this demonstrates the lack of reality of the alleged stock transactions.

Incidentally, it is noteworthy that the pension plan will not even explain how the share purchases are financed. For example, in the leading case Del Mar Asset Management Saving & Retirement Plan (SANST case no. 18 0005308), where the pension plan is also represented by the Law Firm Lundgrens and where the pension plan has also "traded" shares through ED&F Man, there is at least an attempt to explain the funding. The explanation is largely undocumented, but there is at least an attempt at an explanation. The pension plan in the present case has not bothered to do so.

The pension plan has still not provided evidence of having entered into financial agreements that would provide the pension plan with liquidity to make the alleged share purchases.

Nor has the pension plan provided any evidence of having hedged against price losses (which the pension plan would undoubtedly not be able to bear), for example by hedging in the form of futures, even though reference is made to futures in Appendix 11, for example.

In addition, the pension plan statements submitted to ED&F Man show very significant overdrafts without any documented collateral. As an example, Appendix 11 shows that on May 27, 2014 the pension plan had a negative 'Running Balance' of approximately DKK 1,4 billion.

It is highly unlikely that a financial company like ED&F Man would provide billions of credits without collateral. It was even more unlikely in the years immediately after the financial crisis. It should also be noted that any security in the shares would not adequately protect ED&F Man in the event of a fall in its share price.

The huge unsecured overdraft is in the entirety without explanation. The information supports that the account statement does not show the pension plan's share holdings. On the contrary, the account statement illustrates that the pension plan would not have the finances to trade such shareholdings as required to obtain the dividend distribution to which the pension plan claims to be entitled.

5.3    There is no link between equities and the pension plan's finances

The evidence provided by the pension plan does not prove that the pension plan has owned shares, if only because there is no link between shares/money and the pension plan's finances.

The alleged stock trades far exceed the pension plan's capital base, and the pension plan has not documented - or even explained - how the stock purchases are financed. However, according to the pension plan's ED&F Man account statements, it is apparently ED&F Man that is providing massive and unsecured credits. In other words, the shares were purchased with ED&F Man's money.

The pension plan has still not provided any bank statements, and thus there is no documented flow of funds between the pension plan's bank accounts and the account at ED&F Man. Therefore, firstly, there is no evidence that the pension plan has transferred funds to ED&F Man (e.g., to cover losses on equity investments). It is therefore also unclear who should cover the pension plan's losses of approximately DKK 17 million and approximately DKK 42 million on Novo Nordisk shares and TDC shares respectively (see Appendix 7a in conjunction with Appendix 7c and Appendix 9a in conjunction with Appendix 9d). It is certain, however, that the pension plan did not itself have capital to cover such losses. Secondly, there is no evidence of what happens to the gains of the pension plan. It is not documented that gains from investments, net dividends and refunds are included in the pension plan's bank account.

It is therefore not known where the pension plan gets the money for the massive share purchases, and it is not known where the pension plan's income goes.

In addition, the pension plan has not provided any evidence of the basis of¬ the agreement between the pension plan and ED&F Man, respectively, the pension plan and the trustee. Purchase and sale orders were also not provided.

The evidence provided regarding the purchase and sale of shares (purchase and sale confirmations, SWIFT notifications and account statements with ED&F Man) does not document the pension plan's ownership of the shares. As indicated, the following has not been presented:

- purchase and sale orders from the Pension Plan,
- evidence of ED&F Man's authority to trade hundreds of millions worth of stock on behalf of the Pension Plan,
- proof that the purchase and sales confirmations have been made known to the Pension Plan,

- documentation (in the form of bank statements) of cash flows to/from the Pension Plan's bank accounts,
- documentation of the pension plan's hedging of foreign exchange risks,
- evidence of the funding of the pension plan.

It is thus not documented that the transactions have been made to the¬ pension plan, nor that the transactions have passed through the Pension Plan's finances.

The share transactions thus have no link to the pension plan, but appear mostly as transactions by and for ED&F Man. In other words, the evidence presented shows at most that ED&F Man has bought or borrowed shares, but not that this has been done, where appropriate, on behalf of the pension plan and at the pension plan's expense and risk.

(...)".

**Representative's statement of November 22, 2019**
In a submission dated November 22, 2019, the representative stated:

"(...).

It is noted that the plea in law is upheld.

It appears, from the Danish Tax Agency's submission of August 12th, the Danish Tax Agency does not consider that the documentation received by the appellant from ED&F Man Capital Markets Ltd ("ED&F") can be given evidential weight in the decision of the case.

It should be noted that ED&F has acted as custodian on behalf of the appellant and that ED&F has been entrusted with the execution of the transactions that the appellant has been able to carry out. It has always been the appellant's view that ED&F followed the authorization given to ED&F by the appellant and that ED&F bought and sold shares in accordance with the authorization.

By its very nature, the appellant is not in a position to say with certainty what happened internally within ED&F in relation to the execution of the transactions. As a result of this, the appellant lacks a basic understanding and insight into the internal affairs of ED&F to be able to express an opinion as to whether the transactions in question, which the appellant has instructed ED&F to carry out, have actually been carried out.

However, the appellant has no objective basis to conclude that ED&F did not act honestly and properly, in accordance with the authorization given by the appellant and in compliance with applicable law.

**********

The appellant has noted that ED&F has alleged in English court proceedings that certain tax vouchers issued by ED&F are defective.

This has led the Danish Tax Agency to make a number of comments in case 18–0005426 American Investments Group and case 18-0005414 Kamco LP Profit Sharing Plan. The appellant suspects that similar comments will be made in the present case, and therefore the appellant will comment in this post on the comments made by the Danish Tax Agency in the two cases at issue regarding the tax vouchers issued by ED&F.

It should be noted that the appellant has not received - either from ED&F or the Danish Tax Agency - any explanation as to why the tax vouchers in question should be incorrect. Nor has the appellant received any

information as to the basis on which this conclusion was reached. Finally, the appellant has not received any evidence showing that the conclusion is correct.

On the basis of this, the appellant must necessarily rely on the documents received from ED&F, until proven otherwise, and as a consequence the appellant is still of the belief, that the documents submitted accurately document the facts relevant to the case, namely:

- That the appellant had financing for the purchase of the shares in question
- That the appellant purchased the shares in question through ED&F since the appellant received confirmation from ED&F that it had purchased the shares
- That the appellant has paid the purchase price for the shares in question
- That the shares in question have been registered in the appellant's custodial account with ED&F
- That the appellant has received dividends from the dividend-paying company
- That the appellant has had withholding tax withheld on the dividend distribution
- That the appellant subsequently sold the shares in question
- That the appellant has received the sale price for the shares in question

The appellant has provided the usual and proper documentation of the above facts, which documentation has also led the Danish Tax Agency to decide that the Danish Tax Agency would refund the withholding tax withheld that the Danish tax Agency had received from the dividend distributing company in relation to the dividend distributions received by the appellant.

**********

The Danish Tax Agency's submission of August 12th has as its supporting element the premise that the documentation received by the appellant from ED&F cannot be relied upon. In its submission of October 18th in Cases 18-0005426 American Investments Group and 18-0005414 Kamco LP Profit Sharing Plan, the Danish Tax Agency supplemented this view with the fact that ED&F had reported in English court proceedings that there were several tax vouchers with incorrect content.

As stated above, the appellant has no basis on which to conclude that the documentation received from ED&F is not accurate and a correct reflection of the facts.

Nor is the appellant aware of the reasons why ED&F stated in the English proceedings that the tax vouchers in question were incorrect and that the recipients of the tax vouchers in question had not been paid dividends and should therefore not have had withholding tax deducted. If this were otherwise correct - which, as stated above, the appellant has not received any evidence to show - ED&F should not have issued the tax vouchers in question and the pension fund, as the recipient, should not have submitted a claim for reimbursement of the withholding tax withheld.

It should be noted, however, that ED&F's assertion that certain of the tax vouchers at issue were inaccurate appears to contradict other documentation that the Pension Plan otherwise received from ED&F - documentation that ED&F did not disclose was inaccurate.

The appellant is not aware of the reasons why the tax vouchers in question were incorrect while other documentation received from ED&F illustrating the same transactions was correct. The Danish Tax Agency has not provided any further evidence that the alleged circumstances are incorrect, nor has the Danish Tax Agency explained why it considers these Tax Vouchers to be incorrect.

This leaves the appellant with no insight into what has happened at ED&F and what the alleged errors may be due to. As stated above, the appellant must therefore necessarily rely on the documentation which it has

received from ED&F on an ongoing basis (the appellant is not a party to the action brought in London and from which the information in question originates) and the appellant must therefore also necessarily maintain that all the Tax Vouchers received (and the other documents in the case) are of course correct.

It is only noted for the record that even if ED&F may have issued erroneous Tax Vouchers to the appellant, this does not apply to the full amount received by the appellant in refund of withholding tax, and it can therefore also be concluded that the Tax Vouchers representing the difference must conversely have a correct content which could serve as a basis for the appellant's justified receipt of refund of withholding tax.

**********

In its submission of August 12, 2019, the Danish Tax Agency described a transaction with Chr. Hansen shares which, according to the Danish Tax Agency, cannot be given evidential value.

This is contested.

The Danish Tax Agency's view is based on an incorrect understanding of how the shares were traded. The Danish Tax Agency's conclusion is also erroneous.

The trade with Chr. Hansen shares described by the Tax Agency in its submission of August 12th is repeated in full in the Tax Agency's submission of October 18th in cases 18-0005426 American Investments Group and case 18-0005414 Kamco LP Profit Sharing Plan.

The Danish Tax Agency's submissions of August 12th and October 18th in the two cases in question serve to cast doubt on the probative value of documents received from ED&F. As this point is also the point made by the Tax Administration in the present case in its submission of August 12th in the present case, the appellant finds reason to comment on the Danish Tax Agency's submission of October 18th in cases 18-0005426 American Investments Group and case 18-0005414 Kamco LP Profit Sharing Plan in the present submission as well - notwithstanding that the Danish Tax Agency has not (yet) produced the relevant documentation in the present case.

The appellant will therefore examine the transaction in question below - and do so with reference to the evidence provided by the appellant itself in the present case and the evidence provided by the Danish Tax Agency in its submission of October 18th in cases 18-0005426 American Investments Group and case 18-0005414 Kamco LP Profit Sharing Plan.

The review will show that the Danish Tax Agency's conclusion is erroneous and that the appellant purchased the shares in question, received dividends on them and had withholding tax withheld on the same distribution.

Overall, it is the conclusion of the Danish Tax Agency that the Pension Plan's recovery on Chr. Hansen shares has not been lawful since they were allegedly 'borrowed' shares, cf. the argumentation and documentation submitted in case 18-0005414 Kamco LP Profit Sharing Plan.

However, this is not correct. The pension plan did not borrow the shares in question and the Danish Tax Agency's conclusion is thus based on a misunderstanding of the facts or a misunderstanding or misrepresentation of the evidence provided.

According to the supporting documentation provided (discussed below), the pension plan was the legal owner of the shares in question on the date the dividend was declared.

In this context, it is irrelevant how ED&F acquired the shares in question - the only decisive factor is whether the Pension Plan actually purchased them.

It must be stressed that the appellant had no knowledge of how the trades were de facto carried out and that the appellant thus had no knowledge of how ED&F acted under the authorization given by the appellant to ED&F to buy and sell shares. Thus, the following considerations are based on appellant's understanding of the exhibits produced and submitted by the IRS in this case and the two "leading" cases, 18-0005426 American Investments Group and Case 18-0005414 Kamco LP Profit Sharing Plan.

Based on the supporting material now submitted - including the supporting material in the two lead cases - of which the appellant had no knowledge or awareness at the time the transactions were carried out - it is the appellant's view that the course of events was as follows:

It appears correct that ED&F borrowed DKK 800,000 of shares from Morgan Stanley, see Appendix Å2.

As the documents submitted appear to the appellant, ED&F must have posted them to a custodial account belonging to ED&F.

The appellant does not have access to ED&F's full custody account and therefore appellant can only speculate as to where ED&F made the dispositions internally in their system.

However, it can be concluded that even if ED&F borrowed shares in the market, ED&F's custody account submitted as Appendix Å2 shows that there was still a sale of the share in question from ED&F to the Pension Plan - a sale which resulted in the pension plan becoming the civil owner and the tax owner under Danish tax law.

The Danish Tax Agency's statement that the Pension Plan was not entitled to a refund of withholding tax withheld because the shares were allegedly borrowed from ED&F overlooks the fact that the custody account from ED&F shows that the pension plan did in fact make a civil law purchase of the shares from ED&F.

As a result, the pension plan has been the civil law owner of the subject share and the pension plan has been the tax law owner of the subject share.

As is clear, these are not "borrowed shares". The pension plan purchased the shares in question from ED&F. Ownership of the shares has thus passed to the pension plan. There are therefore no 'borrowed shares'.

The pension scheme purchased and acquired the shares in question under civil law, as is clear from the Danish Tax Agency's own documentation in the case.

The financing of the transaction can be seen from Appendix Å1 p. 2 under 'pending trades'. It is therefore incorrect for the Danish Tax Agency to claim that the pension plan - including the appellant- did not have the financial means to finance the trade in question'.

**The Danish Tax Appeals Agency's recommendation**
The Danish Tax Appeals Agency's recommendation in which The Danish Tax Agency's decision is upheld.

The Danish Tax Agency has through the attorney for the government, in a submission dated August 20, 2020, agreed with the ruling and referred to the Danish National Tax Tribunal's decisions and the Danish Tax Agency's observations in the leading cases with Case Nos. 18-0005426, 18-0005308 and 18-0005414, where - as in this case - the appellant have used ED&F Man as custodian.

**The Danish National Tax Tribunal's decision**

Section 69b(1) of the Withholding Tax Act states that if a person liable to tax under Section 2 or Section 2 of the Danish Corporate tax Act, has received dividends, royalties or interest in respect of which withholding tax has been withheld under Sections 65 to 65d in excess of the final tax under a double taxation agreement, the amount shall be repaid within six months, of the Customs and Tax Administration receiving the request for a refund.

The Double Taxation Agreement between the United States and Denmark states in Article 10(3)(c) that dividends from a company resident in Denmark are not taxable in Denmark if the beneficial owner is a pension fund, is a resident in the US, as referred to in Article 22(2)(e). It is a condition that such dividends are not derived from the carrying on of business by the pension fund or through an associated enterprise.

Article 22(2)(e) of the Double Taxation Agreement between the United States and Denmark states that a person who is a resident of a Contracting State shall be entitled to all the benefits of this Agreement only if that person is a legal person, whether exempt from taxation or not, organized under the laws of a Contracting State for the purpose of providing retirement or similar benefits under a defined benefit scheme to employed persons, including self-employed persons. It shall be a condition that more than 50% of the beneficiaries, members or participants of such person are natural persons resident in one of the Contracting States.

The refund of dividend tax is conditional on the Pension Plan having owned shares and the Pension Plan having received dividends on those shares, where dividend tax has been included in the payment of the dividends.

The Danish National Tax Tribunal considers that the Pension Plan is required to prove that these conditions are met and that, on this basis, the Pension Plan was entitled to a refund of dividend tax.

It should be noted here that in Danish civil law, including tax law, there is a principle of straightforward burden of proof. This means, among other things, that the person stating to have a claim must prove that the claim exists. It follows from the general rules on the burden of proof that the person who is closest to obtaining and securing the relevant evidence also bears the burden of proof.

The Danish National Tax Tribunal does not consider that this burden of proof has been met.

The Danish National Tax Tribunal has determined that the Pension Plan was not entitled to the dividend refund. In this regard, it is emphasized that there is no evidence that the Pension Plan had purchased and was the owner of the alleged shares in question or that they received dividends from the shares. The documentation provided in the form of emails to and from ED&F Man, transcripts from ED&F Man referred to as Account Equity, Account Transactions, and Account Statements regarding transactions in the purchase and sale of shares and the entering into of options and swaps does not demonstrate the Pension Plan's ownership of the shares. Nor do the SWIFT notifications provided, which according to the Pension Plan are proof that the purchase price of the shares was paid, meet the requirements for proof that shares were traded on behalf of the Pension Plan.

It is also considered that it is not further explained how the Pension Plan's large arrears, e.g., approximately DKK 4 million on April 21, 2015 according to Account Transactions, were to be financed, noting that it seems unlikely that ED&F Man would provide such large credits to the Pension Plan without collateral. In this regard, there does not seem to be the necessary connection to the Pension Plan documenting that the share transactions etc. have passed through the Pension Plan's finances, and no documentation has been provided for the cash flows to and from the Pension Plan concerning share transactions from the custodian or other actors involved in the share transactions etc., nor has any

documentation been provided for the Pension Plan's financing of share purchases. It should be noted that despite the Danish Tax Appeals Agency's request for, among other things agreements between the Pension Plan and its trustee and agreements with ED&F Man, correspondence between the Pension Plan and ED&F Man and the agreement between the Pension Plan and ED&F Man on the purchase/sale of shares, etc., no material has been provided in this respect.

The Danish National Tax Tribunal does not agree that only the present case of withdrawal of refund of dividend should be considered without an assessment of the original case of dividend tax refund.

The conditions for a decision to be null and void and thus to be annulled are that the decision in question suffers from a defect of law, that the defect is substantial and that there are no special circumstances militating against nullity. Legal defects include, among other things, defects relating to legal subsumption, i.e., the question whether the conditions for issuing the decision and the requirements for its content are met in the case in question. The reason for this may be that the authority was under a misapprehension of the facts when issuing the decision. Such legal defects are generally considered to be substantial in themselves and will typically lead to the decision being considered invalid. In this respect, the court refers, among other things, to F0B2005.527.

As the appeals body, the Danish National Tax Tribunal must verify whether the conditions for the Danish Tax Agency's revocation/cancellation of the decisions previously made on the refund of dividend tax have been met. This review includes a necessary assessment of whether there was a basis for granting the refund of dividend tax in the first place.

The Danish National Tax Tribunal is of the opinion that the Pension Plan has not provided the Danish Tax Agency or the Danish National Tax Tribunal with the necessary underlying evidence to support that the conditions for refund of dividend tax have been met. Reference is made to the Danish National Tax Tribunal's decisions dated December 19, 2019 (published as SKM2019.650.LSR), dated January 13, 2020 (published as SKM2019.29.LSR), and the decision dated July 7, 2020 (published as SKM2020.371.LSR).

Since the Pension Plan is not considered to have owned shares or received dividends as declared in the applications for the recovery of dividends, the Danish Tax Appeals Agency considers that the Danish Tax Agency has paid the reimbursements on an incorrect basis, on the basis of the Pension Plan's applications. The Danish Tax Agency was therefore entitled to annul the original decisions to pay dividend refunds, noting that the Danish Tax Agency's use of the word "withdrawal" cannot lead to a different result.

As a result of this, the contested decision is therefore upheld.

Susanne Dahl
Presiding Judge
[signature]

Anja Marie Pedersen
Case Worker

**Indicative assessment**

The Danish Tax Appeals Agency must give an opinion with regards to the extent to which they agree or disagree with the complaint.

The decision given here with have an impact on the extent to which the appellant can be reimbursed for the costs of advice given during the complaint procedure. The finding is indicative only. The application for reimbursement of costs must be sent to the Danish Tax Agency, which will make the final decision.

The Danish Tax Appeals Agency states the following:

The agency does not agree with the complaint as stated.

**The decision is sent to:**

Riverside Associates Defined Benefit Plan, 5532 Lillehammer Lane, Suite 103, Park City,

The Law Firm LUNDGRENS ADVOKATPARTNERSELSKAB, Tuborg Boulevard 12, 2900 Hellerup

The Danish Tax Agency

The law firm Poul Schmith, Kammeradvokaten I/S, Vester Farimagsgade 23, 1606 Copenhagen V

Skatteankestyrelsen

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S
Vester Farimagsgade 23
1606 København V
Danmark
Att: Steffen Sværke

**Kontakt**
Send post til
Skatteankestyrelsen her

Telefon          3376 0909

**Sagsbehandler**
Anja Marie Pedersen
Direkte telefon   33762670

Vores sagsnr.   18-0005368

Dit sagsnr.

2. oktober 2020

**Post fra Skatteankestyrelsen**

Du får hermed en kopi af et brev fra Skatteankestyrelsen.

Vi beder dig henvise til Skatteankestyrelsens sagsnummer, hvis du kontakter os om dette brev.

Med venlig hilsen

Skatteankestyrelsen

Cvr-nr. 10 24 28 94
www.skatteankestyrelsen.dk



Skatteankestyrelsen

Riverside Assosiates Defined Benefit Plan
5532 Lillehammer Lane, Suite 103, Park City
UT 84098 Park City
Amerikas Forenede Stater (USA)

**Kontakt**
Send post til
Skatteankestyrelsen her

Telefon          3376 0909

**Sagsbehandler**
Anja Marie Pedersen
Direkte telefon   33762670

Vores sagsnr.    18-0005368

2. oktober 2020

**Afgørelse**

Der er klaget over SKATs afgørelse af 04-05-2018 for Riverside Assosiates Defined
Benefit Plan. Landsskatteretten har nu truffet afgørelse i sagen. Afgørelsen vedlæg-
ges.

**Vejledning om sagsanlæg**
Afgørelsen kan indbringes for domstolene senest <u>3 måneder</u> efter afgørelsens dato.
Reglerne om domstolsprøvelse fremgår af skatteforvaltningslovens §§ 48-49.

Sagen skal indbringes for den byret, hvor den skattepligtige har hjemting. Stævnin-
gen skal udtages mod Skatteministeriet, Nicolai Eigtveds Gade 28, 1402 København
K. Den nærmere vejledning om sagsanlæg fremgår af www.domstol.dk.

Med venlig hilsen

Janne Rasmussen

Cvr-nr. 10 24 28 94
www.skatteankestyrelsen.dk

# Afgørelse

### fra

# Landsskatteretten

### 2 OKT. 2020
Sagsnr. 18-0005368

| | |
|---|---|
| I afgørelsen har deltaget: | Susanne Dahl, Bodil Toftemann og Tine Roed |
| Klager: | Riverside Assosiates Defined Benefit Plan |
| Klage over: | SKATs afgørelse af 04-05-2018 |
| Tildelt cvr-nr.: | 20762 |

**Møde mv.**
Der har været afholdt møde med repræsentanten for Riverside Associates Defined Benefit Plan.

**Faktiske oplysninger**
Riverside Associates Defined Benefit Plan (Pensionsplanen), der er stiftet 1. januar 1995, er registreret som en pensionskasse i USA.

SKAT har i perioden 26. marts 2014 til 26. marts 2015 efter anmodning fra Pensionsplanens agent, Goal Taxback Limited, udbetalt refusion af udbytteskat via Goal Taxback Limiteds bankkonto ▇▇▇▇5159 i NatWest Bank.

Goal Taxback Limited har på vegne af Pensionsplanen sendt følgende anmodninger til SKAT om at få refunderet indeholdt udbytteskat på i alt 12.724.425 kr. for følgende aktier:

| SKATs bundt nr. | Dato for anmodningen | Aktie | Antal | Ex-dato | Udbytte i alt DKK | Refunderet udbytteskat DKK |
|---|---|---|---|---|---|---|
| 19414 | 26-03-2014 | TDC A/S | 2.150.000 | 07-03-2014 | 4.730.000 | 1.277.100 |
| 21814 | 04-04-2014 | Danske Bank A/S | 2.000.000 | 19-03-2014 | 4.000.000 | 1.080.000 |
| 21814 | 04-04-2014 | Novo Nordisk A/S B | 2.000.000 | 21-03-2014 | 9.000.000 | 2.430.000 |
| 27814 | 16-04-2014 | Tryg A/S | 175.000 | 04-04-2014 | 4.725.000 | 1.275.750 |
| 37214 | 06-05-2014 | Dampskibsselskabet Norden | 322.500 | 24-04-2014 | 1.612.500 | 435.375 |
| 37214 | 28-05-2014 | Coloplast A/S - B | 850.000 | 09-05-2014 | 3.400.000 | 918.000 |
| 25015 | 13-03-2015 | TDC A/S | 2.000.000 | 06-03-2015 | 2.000.000 | 540.000 |

| 25015 | 18-03-2015 | DSV A/S | | 850.000 | 13-03-2015 | 1.360.000 | 367.200 |
| 31415 | 26-03-2015 | Pandora A/S | | 300.000 | 19-03-2015 | 2.700.000 | 729.000 |
| 31415 | 26-03-2015 | Danske Bank A/S | | 1.200.000 | 19-03-2015 | 6.600.000 | 1.782.000 |
| 31415 | 26-03-2015 | Novo Nordisk A/S B | | 1.400.000 | 20-03-2015 | 7.000.000 | 1.890.000 |
| I alt | | | | | | 47.127.500 | 12.724.425 |

Anmodningerne var vedlagt følgende bilag:

1. Blanket 06.003 ENG – Claim to Relief from Danish Dividend Tax.
2. Tax Vouchers – udarbejdet af Pensionsplanens custodian ED&F Man Capital Markets Limited (ED&F Man).
3. FORM 6166 from Internal Revenue Service (IRS) – Certificate of resident in USA (udstedt af de amerikanske skattemyndigheder).
4. Power of Attorney.

Ad 1. I blanket 06.003 erklæres det, at Pensionsplanen er den retmæssige ejer af aktierne og er omfattet af dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Ad 2. Ifølge Tax Vouchers udarbejdet af custodian ED&F Man har Pensionsplanen modtaget nettoudbytte af aktierne.

Med udgangspunkt i at Pensionsplanen skal eje aktierne på tidspunktet for generalforsamlingen (dagen før ex-datoen), er anskaffelsessummen for Pensionsplanens køb af de aktier, som fremgår af anmodningen, beregnet på baggrund af lukkekursen på sidste børsdag før ex-datoen:

| Aktie | Kursdato | Antal | Kurs | Beregnet anskaffelsessum DKK |
|---|---|---|---|---|
| TDC A/S | 06-03-2014 | 2.150.000 | 52,65 | 113.197.500 |
| Danske Bank A/S | 18-03-2014 | 2.000.000 | 145,70 | 291.400.000 |
| Novo Nordisk A/S B | 20-03-2014 | 2.000.000 | 245,80 | 491.600.000 |
| Tryg A/S | 03-04-2014 | 175.000 | 551,50 | 96.512.500 |
| Dampskibsselskabet Norden | 23-04-2014 | 322.500 | 228,00 | 73.530.000 |
| Coloplast A/S - B | 08-05-2014 | 850.000 | 468,10 | 397.885.000 |
| TDC A/S | 05-03-2015 | 2.000.000 | 54,00 | 108.000.000 |
| DSV A/S | 12-03-2015 | 850.000 | 219,20 | 186.320.000 |
| Pandora A/S | 18-03-2015 | 300.000 | 614,50 | 184.350.000 |
| Danske Bank A/S | 18-03-2015 | 1.200.000 | 175,30 | 210.360.000 |
| Novo Nordisk A/S B | 19-03-2015 | 1.400.000 | 341,90 | 478.660.000 |

Alle aktier i danske børsnoterede selskaber er registreret hos VP Securities, som er den danske værdipapircentral. Til denne registrering hører et værdipapirdepot i en dansk bank oprettet i en aktionærs navn. Et værdipapirdepot indeholder aktionærens aktiebeholdninger, som kan være sammensat af aktier i forskellige danske børsnoterede selskaber. Et værdipapirdepot og dets beholdning kan også have flere ejere (benævnt et omnibusdepot).

Ved søgning i oplysninger fra VP Securities er der ikke fundet noget værdipapirdepot i en dansk bank, hvor Pensionsplanen er registreret som ejer.

SKAT har via kompetent myndighed i Danmark og USA modtaget oplysninger fra IRS i USA.

IRS har i brev af 16. marts 2016 oplyst:

- At IRS har modtaget oplysninger fra Pensionsplanen ved FORM 5500-EZ for 2012 og 2013 samt FORM 5500 SF (Short Form) for 2014
- At IRS ikke har modtaget FORM 5500 for 2015, da fristen for indsendelse først udløber senere.
- Det fremgår af oplysningerne fra de modtagne blanketter, at Pensionsplanens formue ultimo og antal deltagere i 2012, 2013 og 2014 udgør:

| Kalenderår: | USD iflg FORM 5500 EZ | DKK kurs ultimo året | DKK beregnet | Antal deltagere |
|---|---|---|---|---|
| 2012 | 1.569.191 | 5,6591 | 8.880.209 | 1 |
| 2013 | 1.039.640 | 5,4127 | 5.627.259 | 1 |
| 2014 | 763.315 | 6,1214 | 4.672.556 | 1 |

IRS har ved brev af 13. december 2016 vedlagt selskabets FORM 5500 for 2014 og 2015:

| Kalenderår: | USD iflg FORM 5500 EZ | DKK kurs ultimo året | DKK beregnet | Antal deltagere |
|---|---|---|---|---|
| 2013 | 1.039.640 | 5,4127 | 5.627.259 | 1 |
| 2014 | 763.315 | 6,1214 | 4.672.556 | 1 |
| 2015 | 981.917 | 6,83 | 6.706.493 | 1 |

IRS har i forbindelse med generelle spørgsmål om pensionsplaner og indskud herpå fremsendt links til IRS' hjemmeside vedrørende "Topics for Retirement Plans". Af hjemmesiden fremgår bl.a. andet følgende:

- At en One-Participant 401(k) plan dækker en virksomhedsejer uden nogen ansatte ud over personen og dennes nærtstående personer.
- At det årlige indskud er begrænset til mellem 12.500 og 53.000 USD alt efter indskyders alder (over eller under 50 år).

IRS har til SKAT, Kompetent Myndighed, generelt oplyst:

- At hvis en skattefri pensionsplan driver virksomhed (Unrelated Business Income) skal den betale skat af indtægterne herfra, og der skal indgives en Form 990-T til IRS.
- At hvis en skattefri pensionsplan har lånefinansieret indkomst (Dept-finances Income) skal der betales skat af indtægterne heraf, og der skal indgives en Form 990-T til IRS.
- At hvis en pensionsplan udlodder midler, skal dette indberettes til IRS på en Form 1099, hvor det skal oplyses, hvor meget der er udbetalt og til hvem. Den person, der har modtaget midlerne, er skattepligtig af indtægten og skal selvangive denne.

Skatteankestyrelsen har anmodet repræsentanten om yderligere oplysninger og dokumentation til brug for sagen, herunder:

- Regnskaber for Pensionsplanen for 2012 – 2014, bankkontoudtog for Pensionsplanen for 2012 – 2014 og kontoudtog for Pensionsplanens konto hos ED&F Man for 2014.
- Aftale mellem Pensionsplanen og ED&F Man om køb/salg af aktier.
- Account Equiry vedrørende køb af aktier samt udskrift fra bankernes fælles SWIFT-system.

Repræsentanten har ikke fremsendt disse oplysninger til Skatteankestyrelsen

Endvidere er fremlagt Cash Equity Confirmation fra Volcafe samt e-mails til og fra ED&F Man om køb og salg af aktier.

Endelig er fremlagt Account Transactions (General Ledger) vedrørende køb og salg af aktier samt Account Equity om beholdning af aktier, futures og swaps.

**SKATs afgørelse**
SKAT har tilbagekaldt tidligere afgørelser om refusion af udbytteskatter på i alt 12.724.425 kr. til Pensionsplanen, idet Pensionsplanen ikke har været berettiget til at modtage udbytteskatten.

SKAT har anført:

"Afgørelse – Tilbagekaldelse af tidligere afgørelser om refusion af udbytteskatter

SKAT har tidligere truffet afgørelser om refusion af udbytteskatter til Riverside Associates Defined Benefit Plan (RIVERSIDE) på baggrund af anmodninger fra RIVERSIDE's agent GOAL TaxBack Limited (GOAL).

SKAT tilbagekalder de tidligere afgørelser om refusion af udbytteskatter på i alt 12.724.425 kr., idet RIVERSIDE ikke har været berettiget til at modtage udbytteskatten.

Tilbagekaldelsen angår følgende afgørelser:

|  | Dato | Udbytteskat |
| --- | --- | --- |
| Anmodning af | 26. marts 2014 | 1.277.100 kr. |
| Anmodning af | 4. april 2014 | 3.510.000 kr. |
| Anmodning af | 16. april 2014 | 1.275.750 kr. |
| Anmodning af | 6. maj 2014 | 435.375 kr. |
| Anmodning af | 28. maj 2014 | 918.000 kr. |
| Anmodning af | 13. marts 2015 | 540.000 kr. |
| Anmodning af | 18. marts 2015 | 367.200 kr. |
| Anmodninger af | 26. marts 2015 | 4.401.000 kr. |
| I alt |  | 12.724.425 kr. |

Det er SKATs vurdering, at RIVERSIDE ikke ejer eller har ejet de aktier, som fremgår af anmodningerne, og at udbytterne vedrørende de aktier, som fremgår af anmodningerne, ikke er tilgået RIVERSIDE.

Det er endvidere SKATs vurdering, at RIVERSIDE ikke har haft den fornødne kapital til at foretage de investeringer i danske aktier, der ligger til grund for de nævnte anmodninger om refusion af udbytteskat.

RIVERSIDE skulle ifølge de indsendte Tax Voucher have investeret aktier i danske selskaber for et betydeligt beløb og modtaget udbytter heraf. Sagens oplysninger giver ikke grundlag for sådanne betydelige investeringer.

SKAT har lagt vægt på:
- At RIVERSIDE kun har en enkelt deltager med de deraf begrænsede indskudsbeløb.
- At RIVERSIDE har indsendt FORM 5500 i USA, hvor af det fremgår, at RIVERSIDE's aktiver ultimo 2012 til 2015 var:

| Kalenderår: | USD iflg FORM 5500 EZ | DKK kurs ultimo året | DKK beregnet | Antal del- tagere |
|---|---|---|---|---|
| 2012 | 1.569.191 | 5,6591 | 8.880.209 | 1 |
| 2013 | 1.039.640 | 5,4127 | 5.627.259 | 1 |
| 2014 | 763.315 | 6,1214 | 4.672.556 | 1 |
| 2015 | 981.917 | 6,8300 | 6.706.493 | 1 |

Det er således på baggrund af de nu foreliggende oplysninger SKATs vurdering, at RIVERSIDE ikke har haft økonomiske muligheder for at eje aktier i et sådant omfang som angivet i RIVERSIDE's ansøgninger om refusion af dansk udbytteskat. Dette fremgår eksempelvis ved:

- At RIVERSIDE den 18 - 19. marts 2015, har angivet at være ejer af aktier i henholdsvis Novo Nordisk A/S, Danske Bank A/S og Pandora A/S til en samlet værdi af i alt DKK 873.370.0003.

RIVERSIDE opfylder således ikke betingelserne for at få refunderet indeholdte udbytteskatter af danske aktier, jf. artikel 10 i dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

SKAT har derfor refunderet de nævnte udbytteskatter til RIVERSIDE på et urigtigt grundlag, og SKAT tilbagekalder derfor de tidligere afgørelser om refusion af udbytteskatter.

SKATs afgørelse er i overensstemmelse med det tidligere fremsendte forslag, idet RIVERSIDE ikke er fremkommet med dokumentation for deres påstande i deres indsigelse af 23. april 2018.

Kammeradvokaten vil på vegne af SKAT rejse krav om tilbagebetaling og erstatning over for RIVERSIDE.

Det kan i øvrigt oplyses, at det er SKATs opfattelse, at udbetalingerne til RIVERSIDE indgår som led i et større internationalt kompleks, som SKAT har anmeldt til Statsadvokaten for Særlig Økonomisk og International Kriminalitet (SØIK) som formodet svindel mod den danske stat. SKAT har anmeldt komplekset som omfattet af straffelovens § 279 ved uberettiget tilbagesøgning af indeholdt udbytteskat, hvor den ansøgende pensionskasse ikke ejer eller har ejet de aktier, som fremgår af anmodningerne, og hvor udbytterne vedrørende de aktier, som fremgår af anmodningerne, ikke er tilgået den ansøgende pensionskasse.

For yderligere begrundelse henvises til nedenstående sagsfremstilling og de bilag der blev fremsendt sammen med SKATs forslag af 23. marts 2018."

**Klagerens opfattelse**

Pensionsplanens repræsentant har nedlagt påstand om, at SKATs afgørelse af 26. april 2018 ændres, således at SKATs tidligere afgørelser om refusion af udbytteskatter til Pensionsplanen på i alt 12.724.425 kr. stadfæstes.

Pensionsplanen blev stiftet 1. januar 1995 og er en amerikansk pensionsplan, der efter interne amerikanske regler er fritaget for skattepligt og som efter dobbeltbeskatningsoverenskomsten mellem Danmark og USA er undtaget for betaling af kildeskat på udbytteudlodninger fra Danmark.

Pensionsplanen har i 2014 og 2015 foretaget investeringer i danske aktier og har i den forbindelse modtaget udbytter af disse aktier. I forbindelse med udbetalingen af disse udbytter er der blevet indeholdt

kildeskat på udbyttebetalingen. Pensionsplanen har efterfølgende løbende søgt disse indeholdte udbytteskatter udbetalt, hvilket SKAT har godkendt.

Nærværende sag omhandler det forhold, at SKAT i den påklagede afgørelse nu har tilbagekaldt disse tidligere afgørelser, hvorved SKAT anerkendte Pensionsplanens ret til at få udbetalt indeholdte udbytteskatter.

Pensionsplanens repræsentant har yderligere anført:

" 1. Baggrunden for investeringerne
Riverside Associates Defined Benefit Plan (Riverside) blev stiftet 1. januar 1995. Riverside har siden stiftelsen foretaget en lang række investeringer i både amerikanske og udenlandske (ikke-amerikanske) værdipapirer, finansielle produkter og kontrakter m.m.

I 2014 – 21 år efter stiftelsen - begyndte klager at orientere sig imod investeringer i danske aktier. Efter at have undersøgt de markedsmæssige betingelser for aktieinvesteringer i danske aktier valgte klager at tilføje de omhandlede investeringer til den portefølje af investeringer, som klager i forvejen foretog i regi af brokerselskabet ED&F Man Capital Markets Limited.

ED&F Man Capital Markets Limited, der er en del af ED&F Man Group, er et stort og velrenommeret globalt finansielt broker-selskab, autoriseret og reguleret af Financial Conduct Authority ("FCA") (194926). Selskabet har kontoradresse på 3 London Bridge Street, London, SE1 9SG og er registreret i England med et svarende til dansk CVR.nr. 1292851.

ED&F Man Group blev etableret i 1783 og beskæftiger i dag omkring 6.000 ansatte i 60 lande. I forbindelse med samarbejdet mellem klager og ED&F Man Capital Markets Limited blev der indgået en række ramme-aftaler, som dannede grundlag for samarbejdet og de investeringer, klager valgte at foretage i de efterfølgende år.

Klager har ikke - og har aldrig haft - nogen sammenfaldende interesser med ED&F Man Capital Market Ltd.

For at få en bedre forståelse af ED&F Man Capital Markets Ltd. almindelige serviceydelser kan henvises til selskabets hjemmeside, hvor der blandt andet anføres følgende:

"We provide fixed income, equity and commodity exchange-traded funds and source liquidity for listed and OTC block trades. We help customers from banks to hedge and real money funds with algorithmic trading strategies and voice, electronic, chat, and FIX staged access."

"We provide equity crossing in pan-European, Asian, US and Canadian equities. With a client base across Europe, North America and Asia-Pacific, we can quickly execute over-the-counter or on-exchange trades. We also offer execution and clearing of ICE and Eurex single stock futures and options."

"We provide clearing and settlement for equities and fixed-income securities. We offer global services for on-exchange securities deals and settlement, and custodian services for on-exchange and overthe-counter transactions. We can provide a full list of markets covered on request."

"We provide specialized securities lending and financing services to hedge funds and proprietary trading firms."

Som det fremgår af ovenstående, tilbyder ED&F Man Capital Markets Ltd. sine kunder en bred vifte af forskellige investeringsmuligheder i alle former for værdipapirer mm.

2. De foretagne investeringer

Som nævnt ovenfor, blev klager stiftet 1. januar 1995 og har siden da foretaget finansielle investerin-
ger, herunder hos ED&F Man Capital Market Limited.

I 2014 blev klager anbefalet at investere i danske aktier – blandt andet som en følge af, at klager som
amerikansk pensions plan har ret til 100% refusion af dansk indeholdt kildeskat på udbytter.

På den baggrund foretog klager i 2014 og 2015 samlet 11 handler i danske børsnoterede aktier, som
alle gav udbytte, hvor der blev indeholdt sædvanlig kildeskat på udbyttet, og hvor den indeholdte
udbytteskat efterfølgende blev tilbagesøgt af klager.

*********

Som nævnt har klager igennem mange år foretaget investeringer i værdipapirer i en række forskellige
lande. For ikke at skulle sætte sig ind i tilbagesøgningsproceduren i hvert enkelt land, har klager gen-
nem flere år anvendt forskellige professionelle serviceudbydere til at stå for den praktiske tilbagesøg-
ning af indeholdt kildeskat efter de regler, der gælder for investeringer i det pågældende land.

Efter at klager i 2012 begyndte at investere gennem ED&F Man Capital Markets Limited, blev klager
introduceret for Goal TaxBack, som ED&F Man Capital Markets Ltd. havde et samarbejde med. Goal
TaxBack udbyder den service at tilbagesøge indeholdt udbytteskat for udenlandske investorer.

Som følge af disse forhold udstedte klager fuldmagt til Goal TaxBack med henblik på at Goal TaxBack
kunne tilbagesøge den indeholdte kildeskat. Som bilag 2 fremlægges den fuldmagt, der blev udstedt
til brug herfor.

I forbindelse med tilbagesøgningen af indeholdt kildeskat indsendte Goal TaxBack, på vegne af klager,
en anmodning om refusion af den indeholdte udbytteskat.

Som bilag 3 fremlægges en af Goal TaxBack udfyldt tilbagesøgningsblanket, af hvilken fremgår samtlige
de informationer, som SKAT – dengang som nu – efterspørger for at kunne træffe beslutning om refu-
sion af den indeholdte udbytteskat. Anmodningen fra Goal TaxBack indeholdt således følgende doku-
menter:

• Købsnota, der dokumenterer købet af de udbytteudloddende aktier

• En udbytteerklæring (Tax Voucher), der dokumenterer del udbytteudlodningen, dels den indeholdte
udbytteskat

• En såkaldt "Hjemstedserklæring", der skal dokumentere, at den person (fysisk eller juridisk) der til-
bagesøger udbytteskatten, er skattemæssigt hjemmehørende i det land, med hvem Danmark har ind-
gået en dobbeltbeskatningsoverenskomst, der giver hjemmel til at tilbagesøge indeholdte kildeskatter
på udbytter.

Denne "hjemstedserklæring" ("Form 6166") udstedt af det amerikanske Finansministerium, fremlæg-
ges som bilag 4. Det fremgår heraf, at klager er en pensionsplan, der er skattemæssigt hjemmehø-
rende i USA og som er undtaget fra amerikansk skattepligt. Udover at dokumentere, at klager er skat-
temæssigt hjemmehørende i USA, dokumenterer erklæringen ligeledes, at klager er en amerikansk
pensions plan, hvorfor klager efter artikel 10 (3) i den dansk-amerikanske dobbeltbeskatningsoverens-
komst er berettiget til at få refunderet hele den indeholdt udbytteskat.

Det skal understreges, at denne Form 6166 er en standardform, som det amerikanske finansministe-
rium anvender som dokumentation for tilbagesøgning af indeholdt udbytteskat i henhold til alle dob-
beltbeskatningsoverenskomster, som USA har indgået. Der er således ikke tale om en blanket der er
udarbejdet særligt til klager, eller særligt til tilbagesøgning af udbytteskat fra danske aktier.

På baggrund af disse dokumenter tilbagesøgte Goal TaxBack den kildeskat, der var blevet indeholdt
på den udlodning, der var sket på de aktier, klager ejede på udlodningstidspunktet.

Efter SKAT's gennemgang af ovenstående materiale traf SKAT beslutning om at udbetale den indeholdte kildeskat, idet klager iht. dobbeltbeskatningsoverenskomsten mellem USA og Danmark var berettiget til at få udbetalt 100 % af den indeholdte kildeskat.

\*\*\*\*\*\*\*\*\*\*

### ANBRINGENDER

Til støtte for den nedlagte påstand gøres det overordnet gældende, at klager har været retmæssig ejer (beneficial owner) af de omhandlede aktier på tidspunktet for vedtagelsen af udbytteudlodningerne.

Efter danske regler er det ejeren af aktierne kl. 23:59:59 på dagen for generalforsamlingens vedtagelse at udbytteudlodningen, der anses for at være den retmæssige ejer af det udloddede udbytte, og dermed også den der er berettiget til at tilbagesøge den indeholdte danske udbytteskat på aktierne.

Klager er en lovformeligt stiftet og registreret pension plan i medfør af dobbeltbeskatningsoverenskomsten mellem USA og Danmark. Der foreligger dokumentation for, at klager er skattemæssigt hjemmehørende USA men er undtaget fra amerikansk skattepligt, jf. bilag 4.

Klager har modtaget dokumentation fra ED&F Man Capital Market Limited på at have ejet og været i besiddelse af de omhandlede aktier på tidspunktet for vedtagelsen af udbytteudlodning fra det udloddende selskab.

Klager har yderligere modtaget dokumentation for at have modtaget selve udbytteudlodningen eksklusiv indeholdt kildeskat. Således har klager også modtaget dokumentation for, at der på den pågældende udbytteudlodning faktisk har været indeholdt dansk kildeskat.

Klager opfylder således betingelserne for at få refunderet den indeholdte kildeskat, jf. dobbeltbeskatningsoverenskomsten mellem USA og Danmark artikel 10.


Klager har således været berettiget til at modtage refusion af den indeholdte kildeskat på udbytteudlodningerne, og det er derfor med urette, at SKAT ved den påklagede afgørelse tilbagekaldt sin tidligere begunstigende forvaltningsakt.

\*\*\*\*\*\*\*\*\*\*

SKAT har i kendelsen p. 2 oplyst, at det er SKAT's opfattelse, at refusionerne til klager skulle være formodet svindel, og det fremgår ligeledes, at SKAT har anmeldt denne – og tilsyneladende andre – sager til SØIK som følge af en mistanke om, at klager ikke skulle have ejet de aktier, som ligger til grund for tilbagesøgningerne, og som følge af en mistanke om, at klager ikke skulle have modtaget selve udbytteudlodningen fra det udloddende selskab.

Helt grundlæggende synes disse påstande ganske løsrevet fra sagens faktiske omstændigheder.

Yderligere er disse påstande i strid med den dokumentation, som klager har modtaget fra ED&F Man Capital Market Limited, og klager kan derfor ikke genkende det billede, SKAT tegner ved denne beskrivelse.

Klager har foretaget sædvanlige investeringer i danske aktier. Samtlige disse investeringer – herunder ejerskabet og modtagelsen af udbytteudlodningerne - har udmøntet sig i helt sædvanlige registreringer og posteringer på klagers konto i et internationalt stort anerkendt investeringsfirma, der er underlagt kontrol af de britiske finansmyndigheder.

Den dokumentation, der er fremlagt med tilbagesøgningsblanketten er og var helt sædvanlig og også fuldt tilstrækkelig dokumentation for både ejerskab og pengestrømme. Den omhandlede dokumentation svarer ganske til den dokumentation, SKAT fortsat anbefaler man vedlægger sin anmodning om refusion af indeholdte kildeskatter, og dokumentationen svarer ganske til den dokumentation, SKAT har krævet gennem mange års fast praksis.

Klager har på intet tidspunkt haft grundlag for at betvivle validiteten af den dokumentation, klager har modtaget fra ED&F Man Capital Market Ltd., og klager har fortsat intet belæg for at betvivle, at de posteringer og registreringer, der fremgår af materialet fra ED&F Man Capital Market Ltd. Ikke skulle være korrekte."

Klageren har yderligere den 19. juni 2019 fremlagt bilag bl.a. i form af e-mails til og fra ED&F Man om køb af aktier, flere Account Equity for handel med danske aktier, flere Account Transactions vedrørende aktier og futures og SWIFT-udskrifter vedrørende aktiehandler.

I den forbindelse har repræsentanten bl.a. anført om SWIFT-udskrifterne:

"SWIFT står for Society for Worldwide Interbank Financial Telecommunication. Det er et datanetværk, der udveksler betalingsdata mellem 8.300 finansielle virksomheder i 208 lande. Der er således tale om et data-netværk udviklet af internationale banker til brug for international hurtig ekspedition af kontooverførsler mellem de 8300 internationale finansielle virksomheder.

Følgende information kan læses ud af bekræftelsen:

1) at der er overført DKK 104.501.320 kr., hvilket svarer til købsprisen på aktierne, jf. rubrik 35
2) at beløbet er overført med effekt den 12. marts 2014, jf. rubrik 36, hvilket stemmer med betalingsdatoen i købsbekræftelsen, jf. bilag 5a
3) at beløbet omhandler betaling for 2.000.000 aktier i TDC A/S, jf. rubrikkerne 17, 13 og 14
4) at der er en reference til trade date, jf. rubrik 11, og settlement date, jf. rubrik 12
5) at den angivne settlement date stemmer ganske overens med dato for overførslen af beløbet.

Det kan således konstateres, at der foreligger objektiv dokumentation for betalingen af de købte aktier.

Betalingen er sket gennem Society for Worldwide Interbank Financial Telecommunication – SWIFT-systemet, der administreres og kontrolleres af et netværk af internationale banker. Det kan således også konkluderes, at dokumentationen for betalingen af købesummen stammer fra uafhængig tredjemand og at det derfor foreligger objektivt ubestridelig dokumentation for, at købesummerne for aktierne er blevet betalt.

Henset til at der foreligger sådan objektivt dokumentation for betaling af købesummen er der efter klagers opfattelse intet nuværende grundlag for at kommentere på Skattestyrelsens udokumenterede påstande om manglende betaling, ligesom der ikke synes at være grundlag for at beskæftige sig med spørgsmålet om finansieringen når det kan objektivt konstateres at selve betalingen for aktierne er foretaget."

Repræsentanten har tillige om de fremlagte bilag anført:

"Danske Bank A/S – 2.000.000 stk.
Som bilag 6 fremlægges udskrift fra Bloomberg vedrørende aktien i Danske Bank A/S. Dette bilag er modtaget af klager direkte fra ED&F og er et dokument, der viser information offentliggjort i forbindelse med meddelelse fra Danske Bank A/S til børsmarkedet om hvilket udbytte der foreslås udbetalt på den kommende generalforsamling i selskabet.

Som 6a fremlægges bekræftelse fra ED&F på køb af 2.000.000 aktier købt den 18. marts 2014 med betalingsdag den 24. marts  2014.

Det kan således lægges til grund at klager samlet købte 2.000.000 aktier i Danske  Bank A/S primo marts 2014 med betalingsfrist få dage efter  erhvervelsen.

Købet af aktierne blev registreret hos klagers custodian, ED&F Man Capital Market Ltd.
Som bilag 6b fremlægges Equity Account fra ED&F hvoraf fremgår, at de omhandlede 2.000.000 aktier blev lagt i depot hos ED&F Man Capital Market Ltd. Det kan således lægges til grund at de foretagne køb er registreret i depot hos klagers custodian.

**********

Til dokumentation for betalingen af aktierne fremlægges som bilag 6c udskrift fra bankernes fælles SWIFT-system. Der henvises vedrørende indholdet og forståelsen her af til beskrivelsen ovenfor.

**********

For god ordens skyld fremlægges som bilag 6d kopi af bekræftelse på klagers salg af de pågældende aktier.

Novo-Nordisk A/S – 2.000.000 stk.
Som bilag 7 fremlægges udskrift fra Bloomberg vedrørende aktien i Novo-Nordisk A/S. Dette bilag er modtaget af klager direkte fra ED&F og er et dokument, der viser information offentliggjort i forbindelse med meddelelse fra Novo-Nordisk A/S til børsmarkedet om hvilket udbytte der foreslås udbetalt på den kommende generalforsamling i selskabet.

Som 7a fremlægges bekræftelse fra ED&F på køb af samlet 2.000.000 aktier købt den 20. marts 2014 med betalingsdag 26. marts 2014.

Det kan således lægges til grund at de foretagne køb er registreret i depot hos klagers custodian.

**********

For god ordens skyld fremlægges som bilag 7c kopi af bekræftelse på klagers salg af de pågældende aktier.

Coloplast A/S – 1.300.000 stk.
Som bilag 8 fremlægges udskrift fra Bloomberg vedrørende aktien i Tryg A/S. Dette bilag er mod- taget af klager direkte fra ED&F og er et dokument, der viser information offentliggjort i forbindelse med meddelelse fra Tryg A/S til børsmarkedet om hvilket udbytte der foreslås udbetalt på den kom- mende generalforsamling i selskabet.

Som 8a fremlægges 2 bekræftelser fra ED&F på klagers 2 køb af samlet 1.300.000 aktier købt den 3. april 2014 med betalingsdag den 9. april 2014.

Det kan således lægges til grund at klager købte 175.000 aktier i Tryg A/S den 8. maj 2014 med beta- lingsdag 14. maj 2014.
**********
Købet af aktierne blev registreret hos klagers custodian, ED&F Man Capital Market Ltd.

Som bilag 8b fremlægges Account Equity fra ED&f hvoraf fremgår, at de omhandlede 1.300.000 aktier blev lagt i depot hos ED&F Man Capital Market Ltd.

Det kan således lægges til grund at de foretagne køb er registreret i depot hos klagers custodian.
**********
Som bilag 8c fremlægges SWIFT-udskrift til dokumentation for betalingen for aktierne.

**********

Som bilag 8d fremlægges kopi af klagers salg af de omhandlede aktier.

Det kan således lægges til grund at klager samlet købte 2.000.000 aktier i Novo-Nordisk A/S i marts 2014 med betalingsfrist få dage efter erhvervelsen.
**********

Købet af aktierne blev registreret hos klagers custodian, ED&F Man Capital Market Ltd.

Som bilag 7b fremlægges Account Equity fra ED&f hvoraf fremgår, at de omhandlede 2.000.000 blev lagt i depot hos ED&F Man Capital Market Ltd.

TDC A/S – 3.500.000 stk.
Som bilag 9 fremlægges udskrift fra Bloomberg vedrørende aktien i TDC A/. Dette bilag er mod-taget af klager direkte fra ED&F og er et dokument, der viser information offentliggjort i forbin-delse med meddelelse fra Dampskibsselskabet TDC A/S til børsmarkedet om hvilket udbytte der foreslås udbetalt på den kommende generalforsamling i selskabet.

Som bilag 9a fremlægges bekræftelse fra ED&F på køb af samlet 3.500.000 aktier købt den 7. august 2014 med betalingsdag den 11. august 2014.

**********

Købet af aktierne blev registreret hos klagers custodian, ED&F Man Capital Market Ltd.
Som bilag 9b fremlægges Account Equity fra ED&f hvoraf fremgår, at de omhandlede 175.000 aktier blev lagt i depot hos ED&F Man Capital Market Ltd.

Det kan således lægges til grund at de foretagne køb er registreret i depot hos klagers custo-dian.
**********

Til dokumentation for betalingen af aktierne fremlægges som bilag 9c udskrift fra bankernes SWIFTsystem, jf. ovenfor.
**********

Endelig fremlægges som bilag 9d bekræftelse på klagers efterfølgende salg af de samme aktier.

A.P. Møller Mærsk – 5.595 stk.

Som bilag 10 fremlægges udskrift fra Bloomberg vedrørende aktien i A.P. Møller Mærsk A/S. Dette bilag er modtaget af klager direkte fra ED&F og er et dokument, der viser information offentliggjort i forbindelse med meddelelse fra A.P. Møller Mærsk A/S til børsmarkedet om hvilket udbytte der foreslås udbetalt på den kommende generalforsamling i selskabet.

Som bilag 10a fremlægges bekræftelse på at klager havde købt de pågældende aktier og at de på-gæl- dende aktier var blevet registreret og lagt i depot hos hos klagers custodian, ED&F Man Capital Market Ltd.

Det kan således lægges til grund at de foretagne køb er registreret i depot hos klagers custo-dian. Som bilag 10b fremlægges dokumentation for betalingen af købesummen for de omhand-lede aktier.
**********

Af ovenstående dokumentation ses de transaktioner, klager har foretaget. Skatteankestyrelsen har anmodet om at få fremlagt fuldstændig udskrift af klagers konto hos ED&F. Denne frem-lægges som bilag 11.

De transaktioner, der er beskrevet ovenfor, har alle afspejlet sig i bilag 11."

### Skattestyrelsens indlæg af 12. august 2019

Skattestyrelsen v/Kammeradvokaten har ved indlæg af 12. august 2019 anført følgende:

"Riverside Associates Defined Benefit Plans (herefter "pensionsplanen") indlæg af 19. juni 2019 giver Skattestyrelsen anledning til følgende supplerende bemærkninger:

Pensionsplanen gør i indlægget, s. 6, gældende, at det fremlagte materiale "*med al tydelighed*" dokumenterer, at pensionsplanen har erhvervet aktierne, har været retmæssig ejer af det udbetalte udbytte og dermed også været berettiget til at tilbagesøge den indeholdte udbytteskat på aktierne.

Faktum er imidlertid, at pensionsplanen ikke har dokumenteret at have ejet de påståede aktier eller at have modtaget de påståede nettoudbytter.

Det fremlagte materiale er mangelfuldt. Dette er i sig selv mistillidsskabende – særligt fordi materialet angiveligt skulle dokumentere aktiehandler for flere hundrede millioner kroner. Pensionsplanens egenkapital var langt fra tilstrækkelig til at foretage de påståede investeringer, og pensionsplanen har fortsat ikke dokumenteret, hvordan den skulle have finansieret de massive aktiekøb.

Pensionsplanen har fortsat kun *delvist* besvaret Skattestyrelsens opfordringer af 27. september 2018. Bl.a. har pensionsplanen ikke fremlagt regnskaber, bankkontoudtog og korrespondance med sin custodian.

(...)

1. BEVISBYRDE

Det er pensionsplanen, der har anmodet om refusion af indeholdt udbytteskat, og det er dermed også pensionsplanen, der har bevisbyrden for, at betingelserne for refusion af udbytteskat er opfyldt, jf. f.eks. UfR 2003.2312/3H.

Det er irrelevant, om pensionsplanen på ansøgningstidspunktet har fremlagt dokumenter, som – hvis de havde været korrekte – var tilstrækkelig dokumentation efter SKATs måde at gøre det på i 2014-2015. Det afgørende er, om Landsskatteretten på baggrund af sagens oplysninger finder, at pensionsplanen har bevist, at den opfyldte betingelserne for refusion af udbytteskat.

Pensionsplanens forklaring om transaktionerne, der skulle have givet ret til udbytterefusion, er usandsynlig, jf. nærmere nedenfor, og bevisbyrden er derfor skærpet, jf. f.eks. UfR 1998.898 H.

Pensionsplanen gør omvendt gældende, at bevisbyrden har flyttet sig, således at Skatteforvaltningen er nærmest til at bære risikoen for bevistvivl (indlæg af 11. juni 2019, s. 14).

Skattestyrelsen bestrider, at bevisbyrden på den måde kan vendes, også når der henses til sagernes karakter.

Pensionsplanen har i perioden marts 2014 til april 2015 anmodet om refusion på baggrund af meget store påståede aktiebesiddelser. Pensionsplanen har således efter eget udsagn foretaget investeringer for mange hundrede millioner kroner. Sagen blev startet ved udsendelse af forslag til afgørelse den 23. marts 2018 og dermed få år efter udbetalingerne – og på et tidspunkt, hvor bogføring fortsat burde være gemt efter både dansk og amerikansk ret. I øvrigt fremhæves det, at pensionsplanen blot kan indhente den nødvendige dokumentation fra ED&F Man. *Hvis* pensionsplanen faktisk har ejet aktier, vil det jo være nemt at vise.

Der er ikke bevistvivl i sagen; der er nemlig ingen dokumentation for de påståede aktiehandler. Og der er alt for mange udokumenterede forhold i det materiale, som pensionsplanen har fremlagt for at

under- bygge deres "historie". Hvis der efter Landsskatterettens opfattelse foreligger bevistvivl, skyldes det alene, at pensionsplanen undlader at fremlægge dokumenter, der *må* være i dens besiddelse. Dette kommer pensionsplanen bevismæssigt til skade.

Pensionsplanen anfører følgende i indlæg af 19. juni 2019 (s. 3):

*"Skattestyrelsen anerkender dog også på side 17, at statistikken alene viser, at* en andel *af refusionsanmodningerne har været uretmæssige. Klager kan ikke forholde sig til udsagnets rigtighed men kan konstatere, at Skattestyrelsen omvendt anerkender, at en del af refusionerne er udbetalt retmæssigt, jf. i øvrigt nedenfor under pkt. 2."*

Sidstnævnte er ikke korrekt. Det forhold, at tallene understøtter "at en stor andel af refusionsanmodningerne nødvendigvis må være uretmæssige.", jf. Skattestyrelsens 1. indlæg af 27. september 2018, s. 17, 2. sidste afsnit, betyder ikke, at Skattestyrelsen anerkender, at den resterende andel af refusionsanmodningerne nødvendigvis må være retmæssige. Dette er en fejlslutning.

2. SKATTESTYRELSENS OVERORDNEDE VURDERING AF SAGEN

2.1 Pensionsplanen ejede ikke aktier og modtog ikke udbytte

Pensionsplanen kan ikke dokumentere, at den har betalt for aktier. Pensionsplanen kan heller ikke dokumentere, at den har ejet aktier. Eller at den har modtaget nettoudbyttet fra de aktieposter, som den påstår at have ejet. Til gengæld ligger det fast, at pensionsplanen ikke havde penge nok til at foretage de påståede investeringer, og der er ingen dokumentation for, at der skulle være skaffet ekstern finansiering.

I sig selv er det utroværdigt, at pensionsplanen uden væsentlige aktiver køber store aktieposter. Det indtryk forstærkes betydeligt, når der heller ikke er nogen pengestrømme til/fra pensionsplanens egne bankkonti.

Allerede på den baggrund skal afgørelsen stadfæstes, idet pensionsplanen ikke har bevist, at der er ret til refusion af indeholdt udbytteskat.

Det er påfaldende, at pensionsplanen fortsat har undladt at fremlægge relevant materiale, som må være i dens besiddelse, hvis der – som den påstår – er foregået aktiehandler, herunder f.eks. relevante aftalegrundlag, bankkontoudtog samt købs- og salgsordrer.

3. PENSIONSPLANEN LÆGGER STOR VÆGT PÅ ED&F MAN

Pensionsplanen tillægger det tilsyneladende stor vægt, at de påståede aktiekøb er blevet foretaget gennem ED&F Man. Pensionsplanen beskriver i sin klageskrivelse af 3. august 2018 (s. 2) ED&F Man som

*"et stort og velrenommeret globalt finansielt broker-selskab, autoriseret og reguleret af Financial Conduct Authority ("FCA")".*

I sit indlæg af 19. juni 2019, s. 3-4, fremhæver pensionsplanen, at den ikke har benyttet nogen af de 4 custodians, der er kontrolleret af Sanjay Shah (Solo Capital, Old Park Lane, Telesto og West Point), og at Skattestyrelsens bemærkninger omkring disse custodians er *"ganske irrelevant for nærværende sag og er endnu et eksempel på, at Skattestyrelsen tilsyneladende forsøger at få klagers sag til at være omfattet af nogle forhold, som ikke gør sig gældende for klager og som følgelig er fuldstændig irrelevante for klager."*

Pensionsplanen anfører også i sit indlæg af 19. juni 2019, s. 15, at ED&F Man ikke er sagsøgt som "fraud-defendant" i England, men alene som "non-fraud-defendant"

*"hvilket betyder, at Skattestyrelsen ikke gør gældende at ED&F har haft viden om eller deltaget i den påståede svindel."*

Pensionsplanens indlæg må forstås således, at brugen af ED&F Man som broker og custodian på afgørende vis adskiller denne sag fra sagskomplekset om svindel med refusion af indeholdt udbytteskat. Når ED&F Man har været involveret, er det hele – ifølge pensionsplanen – foregået pænt og ordentligt.

Hvis der var forskel på sagerne, hvor pensionsplaner har benyttet Shah-kontrollede custodians henholdsvis ED&F Man, skulle man tro, at pensionsplanernes dokumentation var fyldestgørende i de tilfælde, hvor ED&F Man var involveret. Når ED&F Man er reguleret af FCA, måtte man forvente, at dokumentation var uden mangler og i det hele taget i top.

Derudover måtte man forvente, at en pensionsplan, der har et beskedent kapitalgrundlag, og som køber aktier for beløb på helt op til en milliard kr., gemmer dokumentation for disse aktiekøb. Ikke af hensyn til skattemyndighederne, men af hensyn til *sig selv* – for at sikre *sig selv* dokumentation for ejerskab til aktierne.

Man måtte også forvente, at en sådan pensionsplan var villig til at oplyse sagen – særligt når både Skattestyrelsen og Skatteankestyrelsen udtrykkeligt anmoder om yderligere oplysninger.

Det kan imidlertid konstateres, at det fremlagte materiale fra ED&F Man er mangelfuldt, at pensionsplanen ikke kan fremlægge dokumentation for at have ejet de påståede aktier, og at pensionsplanen – trods opfordret hertil – forsat forsømmer at fremlægge materiale, som den *må* være i besiddelse, herunder sine egne bankkontoudtog og aftalegrundlag for samarbejdet med ED&F Man.

Kernen i sagskomplekset er – uanset om custodian er Shah-kontrolleret eller ED&F Man – at der ikke er dokumentation for, at pensionsplanen har ejet de aktier, der har dannet grundlag for de udbetalte refusioner.

Og det siger sig selv, at det ikke er dokumentation for ejerskab, at ED& Man har fungeret som custodian (og/eller broker).

3.1 Aktiekøb: Vilkår for settlement er ikke markedskonforme

Frem til den 6. oktober 2014 var standarden for aktiehandler i Danmark, at aktier blev leveret tre dage efter aftaleindgåelsen (dvs. settlement T+3). Efter 6. oktober 2014 var standarden levering efter to dage (dvs. T+2) (bilag W). Ved beregningen af leveringstid medregnes kun hverdage – dvs. hverken weekender eller helligdage medregnes.

Pensionsplanens aktiehandler er settlet således:

| | Køb (settlement) | Salg (settle- |
|---|---|---|
| TDC | 6/3-14 (T+4) | |
| Danske Bank | 18/3-14 (T+4) | |
| Novo Nordisk | 20/3-14 (T+4) | |
| Tryg | 3/4-14 (T+4) | |
| D/S Norden | 23/4-14 (T+4) | |
| Coloplast | 8/5-14 (T+4) | |
| TDC | 4/3-15 (T+2) | |
| DSV | | |
| Pandora | 17/3-15 (T+2) | |

| Danske Bank | 13/3-15 (T+1) | |
| Novo Nordisk | 13/3-15 (T+2) | |

Som det fremgår, er settlement af *køb* i 2014 ikke sket på markedsvilkår (T+3 frem til 6. oktober 2014 og T+2 derefter), men med en dags længere leveringstid end efter markedsstandarden. Pensionsplanen har ikke redegjort herfor.

Afvigelsen fra markedsvilkårene er bemærkelsesværdig, idet afvigelsen – selv hvis der havde været aktiehandler og ikke blot bogføringsmæssige posteringer – i høj grad vanskeliggør kontrol. Det skyldes"tidsplanen" ved udlodninger på det danske marked:

Et selskab beslutter at foretage udlodning på selskabets generalforsamling. I henhold til markedsvilkårene for levering, vil dagen for generalforsamling være at betragte som "dag 0". Når et selskab har besluttet at foretage udlodning, bliver ex date (ex dividend-date) fastlagt. Ex date er den første dag efter generalforsamlingen, hvor aktierne handles uden udbytte, og vil derfor være at betragte som "dag 1".

Herefter bliver record date fastlagt. Datoen fastlægges af handelsplatformen ud fra markedsvilkårene for levering af aktier. De, der er registreret som depotindehavere på den pågældende dato (record date), vil modtage udbyttet. Ved levering T+2 vil record date være at betragte som "dag 2". Ved levering T+3 vil record date være at betragte som "dag 3".

Før den 6. oktober 2014 var markedsstandarden, at levering skete T+3. Det betød, at hvis man erhvervede aktier mandag den 11. august 2014, ville man få aktierne leveret (blive registreret som ejer) torsdag den 14. august 2014. Aktier skulle derfor erhverves tre dage før record date, hvis man skulle være registreret som ejer på record date. Ved handel to dage før record date ville man nemlig – ved almindelige vilkår for levering (T+3) – ikke længere nå at modtage aktierne, inden selskabet fastlagde ejerkredsen med henblik på udbetaling af udbyttet – og dermed ville sælgeren få udbyttet. Ex date var derfor to dage før record date.

For at opnå ret til udbytte skulle man derfor erhverve aktier senest tre dage inden record date. Dermed ville man – ifølge markedsstandarden (T+3) – modtage aktierne og være registreret som ejer på det tidspunkt, hvor det udloddende selskab fastlægger ejerkredsen, og man ville få udbyttet udbetalt til sig.

Den 6. oktober 2014 blev markedsstandarden ændret, således levering sker T+2. Det betyder, at ex date blev dagen før record date – altså en dag tættere på record date pga. den forkortede leveringstid.

Ved pensionsplanens køb af aktier har den imidlertid afveget fra markedsstandarden i flere tilfælde, jf. ovenfor. Pensionsplanen har derfor i disse tilfælde end ikke ifølge sine egne aftaler modtaget udbyttet direkte fra det udloddende selskab eller gennem egne sub-custodians. Det påståede udbytte er derimod blevet udbetalt til en sælger, der var depotindehaver på record date, men som havde pligt til at videreføre udlodningen, da aktien jo ifølge pensionsplanen var blevet solgt inkl. udbytte (før ex date).

Pensionsplanen gør dermed gældende, at den har været ejer, selvom den ikke har været registreret som ejer på record date, da den har handlet på vilkår, der afveg fra markedsstandarden. Det er et set-up, som i høj grad vanskeliggør kontrol, da pensionsplanen dermed – end ikke ifølge egne papirer – vil være registreret som ejer af aktien på record date, hvor virksomheden noterer ejerne og udbetaler udbyttet. For pensionsplanen hævder, at den får aktierne leveret senere – og med ret til det udbytte, deres sælger modtager. Forholdet indebærer, at pensionsplanens bevisbyrde skærpes.

Der er ikke oplysninger om, hvorvidt pensionsplanen ved de fleste af sine *salg* af aktier har fulgt markedsstandarden.

3.2 ED&F Man fejl 1: Valutaomregning foretaget forkert
Skattestyrelsen har konstateret, at bilagsmateriale fra pensionsplanens custodian, ED&F Man, er væsentligt fejlbehæftet. Til illustration heraf fremlægges bilag X.

Af bilag X fremgår en konto fra en anden pensionsplan, der anvender ED&F Man som custodian. Kontoen indeholder en future-position, der pr. 11. april 2013 har en værdi på 6.030.486 DKK (Trade Date Amount). Da kontoen føres i euro (EUR), omregnes future-positionens værdi til EUR. Omregningen fremgår på øverste linje under "Cash Summary", jf. uddraget nedenfor.

```
Cash Summary

 Cur Layer          Trade Date Amount      Conv Rate    TD Reporting Amt (EUR)

 DKK Var Margin        6,030,486.00 Cr     7.45610003        44,963,906.66 Cr
                                                        ==========================
                                                           44,963,906.66 Cr
```

Som det ses, omregnes future-positionens værdi på 6.030.486 DKK til 44.963.906,66 EUR ved at gange med vekselkursen 7,4561. Ved omregningen fra DKK til EUR skulle beløbet dog naturligvis have været *divideret* med vekselkursen. Denne åbenlyse fejl bevirker, at future-positionens værdi bliver langt højere, end den i virkeligheden er. Hvis beløbet var blevet omregnet rigtigt, ville future-positionen have haft en værdi på 808.798,97 EUR. ED&F Man har altså registeret future-positionen med en værdi, der er ca. 55 gange højere end future-positionens rigtige værdi. Denne fejl resulterer i, at kontoværdien (Total Account Value) bliver lig med netop 44.963.906,66 EUR, jf. bilag X, s. 2. Det er altså en regnefejl på over 330 millioner kr.

Det giver ikke nogen mening, at custodian kan begå en sådan fejl. Dokumenterne fra custodian angår
angiveligt investeringer for mange millioner kr. i mange forskellige danske selskaber. Det er således
meget store beløb, der er på spil. Det vil nødvendigvis kræve et IT-system, som ikke laver fejl.
En fejl af den karakter i bilagsmateriale fra pensionsplanens custodian, ED&F Man er i sig selv mistillidsskabende.

3.3 ED&F Man fejl 2: Aktiebesiddelse
ED&F Man har i en anden af sagerne inden for udbyttesagskomplekset udstedt dokumentation til en pensionsplan for ejerskab til 50.000 aktier i IC Company A/S (bilag Y). Som det fremgår af bilaget, var Ex date den 25. september 2014.

Skattestyrelsen er i besiddelse af depotudskrift for den konto, hvor ED&F Man tilsyneladende besad denne aktiepost (bilag Z). Som det fremgår heraf, erhvervede ED&F Man 5.000 aktier fra Jefferies International Ltd. den 19. september 2014, som blev leveret den 26. september 2014. Aktierne blev "handlet" til 0 kr., hvilket kraftigt tyder på, at det var et aktieudlån. For disse aktier fik ED&F Man udbetalt udbytte til sin konto. Den 29. september 2014 afhændede ED&F Man 5.000 aktier til Jefferies International Ltd. for 0 kr., hvilket tyder på, at det var tilbagelevering af ovennævnte aktiepost. Levering skete den 30. september 2014.

Herudover fremgår det, at ED&F Man erhvervede 10 x 5.000 aktier den 24. september 2014, som blev leveret den 30. september 2014 (T + 4). ED&F Man solgte 10 x 5.000 aktier den 25. september 2014 og leverede aktierne den 30. september 2014 (T + 3). Aktierne blev således leveret under købsaftalen samme dag, som de skulle leveres under salgsaftalen. Den 30. september 2014 modtog ED&F Man således 50.000 aktier og sendte dem videre samme dag. Aktierne "rørte" dermed blot ED&F Mans konto.

Aktierne blev erhvervet til 167,5 kr. stykket og solgt til 165,5 kr. stykket. Tabet var dermed 2,00 kr. pr. aktie. For 50.000 aktier blev tabet på køb/salg således præcis 100.000,00 kr.

ED&F Man har således ifølge depotudskriften lånt 5.000 aktier. Derudover har ED&F Man "købt" 50.000 aktier den 24., som blev solgt den 25., hvor køb og salg blev gennemført samme dato og for helt runde beløb.

Der er samlet set *ingen* dokumentation for, at ED&F Man skulle have ejet nogen af disse aktiebeholdninger. Tværtimod viser dokumenterne, hvordan ED&F Man ved handler ind/ud af depot har forsøgt at få det til at ligne, at de holdt aktier på vegne af pensionsplaner. Alligevel har ED&F Man attesteret ejerskab til aktierne. Og den dokumentation kan derfor ikke tillægges betydning.
3.4 En af de påståede aktiehandler er foretaget via et kaffefirma

En af de fremlagte købsbekræftelser (bilag 5a) er en "Cash Equity Confirmation" udstedt af Volcafe.

Det er bemærkelsesværdigt, at denne købsbekræftelse vedrørende køb af aktier for ca. 112 millioner kr. ikke er forsynet med årstal.

Volcafe, som har udstedt disse købsbekræftelser, er beliggende i Schweiz, og er ifølge sin hjemmeside
(www.volcafe.ch) en kaffevirksomhed hørende under ED&F Man (bilag Æ).

Der er ikke redegjort nærmere for, hvorfor dette aktiekøb er foretaget af en kaffevirksomhed.

Ifølge det schweiziske virksomhedsregister (Zefix – Zentraler Firmenindex) har Volcafe følgende formål, jf. bilag Ø:

> *«Zweck:*
> *Die Gesellschaft bezweckt die Durchführung von Import-, Export-, Transithandels- und Kommissionsgeschäften mit Waren aller Art, vornehmlich mit Kaffee, in der Schweiz sowie im Ausland. Die Gesellschaft kann Zweigniederlassungen und Tochtergesellschaften im In- und Ausland errichten und sich an anderen Unternehmen im In- und Ausland beteiligen. Die Gesellschaft kann Grundstücke und Immaterialgüterrechte im In- und Ausland erwerben, halten, verwalten, verwerten und veräussern. Die Gesellschaft kann alle kommerziellen, finanziellen und anderen Tätigkeiten ausüben, die geeignet erscheinen, den Zweck der Gesellschaft zu fördern, oder die mit diesem zusammenhängen.»*

Det kan – groft – oversættes som følger:

> *"Formål*
> *Formålet med virksomheden er at gennemføre import, eksport, transit og provision af varer af enhver art, primært kaffe, både i Schweiz og i udlandet. Virksomheden kan oprette filialer og datterselskaber i Tyskland og i udlandet og deltage i andre virksomheder i Tyskland og i udlandet. Selskabet kan erhverve, besidde, styre, genbruge og afhænde jord- og immaterielle ejendomsrettigheder i Tyskland og i udlandet. Selskabet kan engagere sig i alle kommercielle, finansielle og andre aktiviteter, der måtte være hensigtsmæssige for at fremme eller tjene selskabets formål."*

Brokervirksomhed er således end ikke i periferien af selskabets formålsbestemmelse.

4. DOKUMENTATION FRA ED&F MAN HAR INGEN BEVISMÆSSIG VÆRDI
Skattestyrelsen har indhentet oplysninger om tre ED&F Man-depoter, der er registreret hos SEB. Oplysningerne omfatter aktiebeholdning, modtagne udbytter og kontobevægelser (pengestrømme).

Oplysningerne om ED&F Mans depoter skal sammenholdes med pensionsplanernes oplysninger om køb og salg af aktier, samt pensionsplanernes oplysninger om påståede udbytter.

Det kan ikke udelukkes, af ED&F Man har yderligere aktiedepoter. Skattestyrelsen har imidlertid taget udgangspunkt i tilfælde, hvor oplysningerne fra ED&F Mans depoter *nøjagtigt* matcher pensionsplanernes oplysninger. På det foreliggende grundlag må det derfor lægges til grund, at det er netop disse depoter, der hænger sammen med pensionsplanernes påståede investeringer.

Dokumenterne, som pensionsplanerne fremlægger for Skatteankestyrelsen, ikke er udtryk for de faktiske forhold. Tværtimod kan "dokumentationen" udstedt af ED&F Man ikke tillægges nogen bevismæssig betydning.

Gennemgangen viser nemlig, at ED&F Man har konstrueret dokumentation for aktiehandler, og at ED&F Man har attesteret ejerskab i strid med de faktiske forhold. Samtidig er der oplysninger, der tyder på, at ED&F Man har gjort dette *systematisk*.

Når det bare i ét tilfælde kan konstateres, at dokumentationen for ejerskab udstedt af ED&F Man er konstrueret og forkert, medfører det, at ED&F Man-dokumentationen ikke kan lægges til grund i *nogen* af sagerne. Og Skattestyrelsens gennemgang har afsløret *betydelige* fejl i ED&F Man-dokumentationen for *flere handler* på tværs af pensionsplanerne i sagskomplekset.

Det betyder, at "dokumentation" fremstillet af ED&F Man i bevismæssig henseende er værdiløs. Det betyder også, at når der har behov for at konstruere forkert "dokumentation", viser dette entydigt, at der ikke har fundet handler sted. Det skærper i hvert fald pensionsplanernes bevisbyrde.

4.1 Chr. Hansen-aktier – 2014

Det samlede forløb, som er beskrevet i detaljer nedenfor, viser:

1. at ED&F Man låner aktier,

2. at ED&F Man "sælger" de lånte aktier til en anden ED&F Man-konto,

3. at ED&F Man "køber" de lånte (og "solgte") aktier tilbage fra samme ED&F Man-konto *to minutter* efter, og

4. at de lånte aktier tilbageleveres til aktielångiver efter udbetaling af udbytte.

Transaktion nr. 2 og 3 hænger helt tæt sammen.

Alligevel anvender American Investment Group Of New York, L.P. Pension Plan (SANST j.nr. 18-0005426 – førersag) ("AIG") dokumenter fra transaktion nr. 3 til at "dokumentere" et køb (afsnit 4.1.1, nedenfor). De dokumenter er imidlertid uden nogen realitet. Der er jo ikke *købt* aktier af pensionsplanen (eller på pensionsplanens vegne). Tværtimod har ED&F Man "solgt" og straks "tilbagekøbt" aktier internt, for derved at *konstruere* købsdokumentation (uden nogen realitet), som pensionsplanen bruger som grundlag for sin påstand om at have købt og ejet aktier.

*4.1.1 ED&F Man-dokumentationen for køb er konstrueret og uden bevisværdi*

AIG har gjort gældende, at pensionsplanen erhvervede 800.000 Chr. Hansen-aktier den 27. november 2014 med levering (settlement/value date) den 1. december 2014 (bilag Å1). Prisen var 207.122.592 kr.

Til dokumentation af købet har AIG fremlagt

> • en "bekræftelse fra ED&F Man", der er en intern mail hos ED&F Man fra Paul Schofield til Sara Mina (bilag Å1, s. 2),
> • et kontoudtog fra ED&F Man ("Account Equity") i pensionsplanens navn, hvor handlen er posteret (bilag Å1, s. 3), og
> • en SWIFT-meddelelse, der viser gennemførsel af betalingen (bilag Å1, s. 4).

ED&F Man har da også udstedt en Tax Voucher, hvori det angives, at AIG ejede 800.000 Chr. Hansen-aktier hen over udbyttedatoen (ex date var den 28. november 2014) (bilag Å1, s. 5).

Skattestyrelsen har kontrolleret disse oplysninger i forhold til ED&F Mans handler med Chr. Hansen-aktier. Ved gennemgangen er det blevet afdækket, at der ikke er nogen realitet bag de dokumenter, som pensionsplanen har fremlagt, idet "købet" er konstrueret.

Som bilag Å2 fremlægges bearbejdet uddrag af alle Chr. Hansen-transaktioner på ED&F Mans konti med Skattestyrelsens fremhævninger. Bilaget viser, at ED&F Man ganske rigtigt "købte" 800.000 Chr. Hansen-aktier den 27. november 2014 med levering den 1. december 2014 for 207.122.592 kr. Imidlertid var aktierne samme dag blevet "solgt" til samme aftalepart for 207.120.000 kr. – altså 2.592 kr. mindre (bilag Å2, s. 1, depot nr. ▮▮▮▮2806):

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|------------|------------|---------|-------------|
| 2014-12-01 | SEB, acc. ED&F Man Man Capital Markets Limited | 2014-11-27 | Buy | 800.000,00 | -207.122.592,00 |
| 2014-12-01 | SEB, acc. ED&F Man Man Capital Markets Limited | 2014-11-27 | Sale | -800.000,00 | 207.120.000,00 |

Som det fremgår, er modparten til transaktionerne en anden konto, der er registreret i ED&F Mans navn.

En gennemgang af den tilhørende Cash Account (uddrag fremlægges som **bilag Å3**) viser faktisk, at der – i hvert fald på leveringstidspunktet – rettelig er tale om, at aktierne blev solgt og derefter købt tilbage to minutter senere (min opstilling af oplysningerne):

| | | | |
|---|---|---|---|
| *[SALG]* | Kl. 05.12 | *Securities sal* | *207.120.000,00 CR* |
| *[KØB]* | Kl. 05.14 | *Securities pur* | *207.122.592,00 DR* |

Dette viser, at ED&F Man ikke købte 800.000 aktier til AIG for 207.122.592 kr. ED&F Man har i stedet flyttet 800.000 lånte aktier frem og tilbage mellem to interne konti og dermed konstrueret en kontobevægelse af aktier og en pengestrøm. ED&F Man har med andre ord konstrueret et "køb" ved "sælge" de lånte aktier til sig selv for straks derefter at "tilbagekøbe" aktierne fra sig selv. Dokumentationen for tilbagekøbet" er de dokumenter, AIG har fremlagt som dokumentation for at have købt og ejet aktier. Købet er således konstrueret og uden realitet. Dokumenterne (bilag Å1) viser ikke et aktiekøb – men blotat 800.000 aktier er blevet flyttet frem og tilbage. Og betalingerne ligner næsten, at der er blevet betalt et "gebyr" på 2.592 kr. (differencen i de to handler) for "ulejligheden". Handlerne har således alene medført et *minimalt* likviditetstræk på 2.592 kr.

*4.1.2 ED&F Man har attesteret ejerskab i strid med de faktiske forhold*
*ED&F Man har attesteret ejerskab til Chr. Hansen-aktier hen over udbyttedatoen (ex date den*
*28. november 2014) for fem pensionsplaner:*

| Shareholder (Pension Plan) | Claimed Withheld dividend tax | Share | Number of shares | Ex-date |
|---|---|---|---|---|
| American Investment Group Of New York, L.P. Pension Plan | 814.320,00 kr. | Chr. Hansen Holding A/S | 800.000 | 28-11-2014 |
| | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |
| | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |
| | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |
| | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |

ED&F Man har således i alt attesteret ejerskab til 4.080.000 aktier hen over udbyttedatoen. Det stemmer nøjagtigt overens med det antal aktier, som ED&F Man holdt i sit aktiedepot hen over udbyttedatoen (bilag Å2, s. 1).

Skattestyrelsen har foretaget en nærmere gennemgang af ED&F Mans depot. Gennemgangen viser, at 800.000 af aktierne på depotet blev erhvervet for 0 kr. (bilag Å2, s. 1):

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-11-28 | Morgan Stanley International Ltd | 2014-11-24 | Buy | 300.000,00 | 0,00 |
| 2014-11-28 | Morgan Stanley International Ltd | 2014-11-21 | Buy | 250.000,00 | 0,00 |
| 2014-11-28 | Morgan Stanley International Ltd | 2014-11-21 | Buy | 250.000,00 | 0,00 |

Når aktierne er erhvervet for 0 kr., er det *sandsynligvis* udtryk for, at aktierne er *lånte*. Det *kunne* også være tilbagelevering af lånte aktier, men det er ikke tilfældet her, hvor der ikke tidligere er foretaget udlån af Chr. Hansen-aktier fra kontoen.

ED&F Man har altså lånt 800.000 aktier. Det ses ikke, om ED&F Man låner aktierne på vegne af en bestemt pensionsplan eller på vegne af andre kunder eller på vegne af sig selv.

Aktierne tilbageleveres umiddelbart efter udbyttedatoen på samme vis uden betaling og til samme medkontrahent:

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-12-02 | Morgan Stanley International Ltd | 2014-12-01 | Sale | -300.000,00 | 0,00 |
| 2014-12-02 | Morgan Stanley International Ltd | 2014-12-01 | Sale | -250.000,00 | 0,00 |
| 2014-12-02 | Morgan Stanley International Ltd | 2014-12-01 | Sale | -250.000,00 | 0,00 |

ED&F Man har altså *lånt* i hvert fald 800.000 aktier. Der foreligger ikke oplysninger om, hvorvidt de øvrige 3.280.000 aktier *faktisk* ejes af (andre af) ED&F Mans kunder, eller om der ligeledes er tale om lånte aktier, hvor lånet blot er maskeret yderligere. Skattestyrelsen kan i hvert fald konstatere, at ED&F

Man ikke har registreret Chr. Hansen-aktier i sin besiddelse andet end i perioden 28. november 2014 til 8. december 2014.

Der kan ikke søges udbytterefusion for lånte aktier – for refusionen tilkommer ejeren (långiver), ikke låntager.

*Alligevel* har ED&F Man attesteret ejerskab til 4.080.000 aktier – og dermed *i hvert fald* til 800.000 lånte aktier. ED&F Man har således attesteret *ejerskab* – på en Tax voucher – til *lånte* aktier. ED&F Man har *vidst*, at denne ville kunne anvendes til at tilbagesøge indeholdt udbytteskat – selvom der ikke er ret hertil for lånte aktier.

Når ED&F Man udsteder dokumentation i strid med de faktiske forhold i bare ét tilfælde, medfører det, at Skattestyrelsen ikke kan lægge dokumentation fra ED&F Man til grund. For det er usikkert, om dokumentationen stemmer overens med de *faktiske* ejerforhold. Og som de følgende afsnit vil vise, er det i *mange* tilfælde, at ED&F Mans dokumentation har vist sig urigtig og/eller vildledende.

De 800.000 lånte aktier svarer i øvrigt nøjagtig til AIGs påståede aktiebesiddelse. Det *ligner* dermed, at det er AIGs aktiepost, der er lånt fra Morgan Stanley International Ltd.

*4.1.3 Har ED&F Man forsøgt at maskere de faktiske forhold?*

Sagt med andre ord; det man har gjort er, at ED&F Man har lånt nogle aktier (afsnit 4.1.2, ovenfor). Det kan være til pensionsplanen, men det behøver ikke at være det. En aktielåntager har ikke ret til udbytterefusion. Pensionsplanen opnår ikke dokumentation for ejerskab ved, at ED&F Man låner nogle aktier.

Dokumentation for ejerskab skaffer man ved, at ED&F Man sælger de lånte aktier til en intern konto. To minutter efter sælges aktierne tilbage til ED&F Mans første konto. Den sidste handel bruger man som dokumentation for, at pensionsplanen er ejer af aktierne.

Arrangementet viser, at ED&F Man er klar over, at aktielånere ikke har ret til udbytterefusion, for ellers ville køb og tilbagesalg inden for to minutter ikke være nødvendigt.

Forløbet viser også den dubiøse karakter, når anden og tredje transaktion ikke kan tjene andet formål end at maskere de virkelige forhold. Pensionsplanen er højest – men det er heller ikke dokumenteret – aktielåner. Og det er ubestridt, at låntager ikke har ret til refusion.

Dertil kommer, at ED&F Man til fulde styrer "handlerne" inkl. kurssikring og finansiering på vegne af pensionsplanerne (jf. afsnit 5.3). Det er således – tilsyneladende – ED&F Man, der styrer hele dette set- up og derefter dokumenterer ejerskab i strid med de faktiske forhold. Det skærper kravene til dokumentation for pensionsplanens aktiebesiddelser betydeligt.

Det har betydelige fællestræk med det mønster for skrivebordsøvelser og urealistiske handler, der ses i sagerne, hvor pensionsplanerne har anvendt custodians fra Solo-gruppen, der er kontrolleret af San- jay Shah.

4.2 TDC-aktier – 2014

Ved TDC-aktierne i 2014 kan det – som for Chr. Hansen-aktierne i 2014 – konstateres, at der foreta- ges interne "køb/salg" af aktieposter for at konstruere et "køb" med handelsnotaer og SWIFT-med- delelser, som pensionsplanen fremlægger som bevis for, at der er handlet aktier, men som er uden realitet og som ikke stemmer overens med de underliggende forhold.

Også ved TDC-aktierne kan det konstateres, at der er *lånt* aktier hen over udbyttedatoen, og formålet med de interne "handler" synes således alene at være at maskere, at aktiebesiddelserne er lånte, og at der dermed ikke er krav på udbytterefusion.

Dertil kommer, at der for TDC-aktierne dels også er konstrueret et "salg" af aktier, og dels at en pensionsplan hævder at have ejet TDC-aktier på et tidspunkt, hvor der ikke var TDC-aktier i ED&F Mans depoter. Alligevel fremlægger pensionsplanen dokumenter fra ED&F Man til støtte herfor:

Kamco LP Profit Sharing Pension Plan (SANST j.nr. 18-0005414) ("Kamco") hævder at have ejet 2.901.000 TDC-aktier fra 7. august 2014 til 22. september 2016 – altså i over to år – og har fremlagt "dokumentation" fra ED&F Man herfor.

Skattestyrelsen har efterprøvet dokumentationen, og det kan konstateres, at den er konstrueret og på ingen måde dokumenterer, at ED&F, endsige Kamco, skulle have ejet de aktier, som "dokumentationen" angår:
- På tidspunktet for pensionsplanens "køb" havde ED&F Man lånte TDC-aktier i sine depoter.
- ED&F Mans "køb" på pensionsplanens vegne er konstrueret ved, at aktier "sælges"/"købes" internt mellem to ED&F Man-konti.
- I lange perioder fra pensionsplanens "køb" til "salg" havde ED&F Man slet ingen TDC- aktier i depoterne. Dvs. pensionsplanen *kan* ikke have ejet de påståede aktier.
- På tidspunktet for pensionsplanens "salg" havde ED&F Man *kun* lånte aktier i sine depoter. Dvs. pensionsplanen *kan* ikke have ejet de aktier, som den påstår at have "solgt".
- "Salget" er konstrueret ved, at aktier "sælges"/"købes" internt mellem to ED&F Man-konti

Som bilag AA1 fremlægges bearbejdet uddrag af alle TDC-transaktioner på ED&F Mans konti. På bilaget er markeret med gult, hvor kontoen "går i 0" for en periode, dvs. hvor der *ikke* er nogen TDC-aktier tilbage på ED&F Mans konto.

Henset til det store antal transaktioner har Skattestyrelsen udarbejdet nogle hjælpebilag (bilag AA2 og bilag AA3) med uddrag fra dette bilag for at fremhæve bestemte forhold.

*4.2.1 ED&F Man-dokumentationen for køb er konstrueret og uden bevisværdi*

Kamco hævder at have købt 2.901.000 TDC-aktier den 7. august 2014 til 150.273.685,65 kr. Til dokumentation heraf har Kamco fremlagt købsordre fra **ED&F (bilag AA4, s. 2).**

Skattestyrelsen har tjekket disse oplysninger i forhold til ED&F Mans depoter. Skattestyrelsen har i den sammenhæng fundet følgende transaktioner på de tre ED&F Man-konti (bilag AA1), hvor netop 2.901.000 TDC-aktier handles den 7. august 2014:

Konto ▮▮▮▮2806

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Buy | 2.901.000,00 | 0,00 |

Konto ▓▓▓▓ 2814

| Dato | Cprt. name | Tra de | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-08-11 | SEB, acc. ED&F Man Capital Mar-kets Limited | 2014-08-07 | Buy | 2.901.000,00 | -150.273.685,65 |
| 2014-08-11 | SEB, acc. ED&F Man Capital Mar-kets Limited | 2014-08-07 | Sale | -2.901.000,00 | 0,00 |
| 2014-08-11 | SEB, acc. ED&F Man Capital Mar-kets Limited | 2014-08-07 | Sale | -2.901.000,00 | 150.271.800,00 |

Konto ▓▓▓▓ 2822

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Sale | -2.901.000,00 | 150.273.685,65 |
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Buy | 2.901.000,00 | -150.271.800,00 |

Transaktionen fremhævet med gult matcher den transaktion, som Kamco har fremlagt SWIFT-medde-lelse og handelsnota for.

Transaktionen er imidlertid ikke udtryk for en aktiehandel. Som det fremgår, gennemføres transaktio-nerne med ED&F Man selv som "medkontrahent". Og aktierne "tilbagesælges" for 150.271.800 kr. Pris- forskellen på 1.885,65 kr. ligner nærmest et "gebyr" for ulejligheden. Og transaktionerne ("køb"/"salg") gennemføres med to minutters mellemrum (bilag AA5).

Som det var tilfældet ved Chr. Hansen-aktierne (afsnit 4.1.1, ovenfor), har ED&F Man således konstru-eret "købet". Der er ikke blevet købt 2.901.000 TDC-aktier (på pensionsplanens vegne). Der er bare blevet flyttet aktier frem og tilbage mellem to interne ED&F Man-konti for at kunne producere "doku-mentation".

Derimod fremgår det på kontoudtoget (bilag AA1, se f.eks. s. 1), at der i en lang række tilfælde er lånt aktier. De interne handler frem og tilbage ligner dermed et forsøg på at maskere de faktiske forhold så der kan søges udbytterefusion, selvom aktierne faktisk er lånte.

*4.2.2 ED&F Man-dokumentationen for ejerskab og salg er konstrueret og i strid med de faktiske forhold*

Kamco har henvist til bilag AA4, s. 5, hvor det fremgår, at de 2.901.000 TDC-aktier blev afhændet den 22. september 2016 for 115.401.780 kr., og at salget blev gennemført den 23. september 2016.

Pensionsplanen har således i henhold til den fremsendte "dokumentation" ejet aktierne i mere end to år.

Det stemmer *på ingen måde* overens med, at ED&F Man-kontiene i lange perioder ikke har holdt én eneste TDC-aktie. Blandt andet var der ingen TDC-aktier på kontiene i følgende perioder (bilag AA2):

20. september 2014 til 16. november 2014
25. november 2014 til 3. marts 2015

20. marts 2015 til 5. august 2015
26. august 2015 til 15. december 2015
22. december 2015 til 22. september 2016

Kamco kan dermed ikke have ejet TDC-aktier fra den 7. august 2014 til den 22. september 2016. For i størstedelen af den påståede ejerperiode havde ED&F Man ikke nogen TDC-aktier.

Oplysningerne om Kamcos ejertid, som er udstedt af ED&F Man, er således uden hold i de faktiske forhold.

Kamcos "salg" i 2016 er konstrueret ved, at ED&F Man lånte TDC- 3,5 mio. aktier fra ING Bank N.V. ED&F Man "solgte" disse aktier til en anden ED&F Man-konto, hvorefter ED&F Man "tilbagekøbte" aktierne fra samme konto. Aktierne blev altså bare "flyttet" frem og tilbage mellem interne ED&F Man-konti for at konstruere et "salg" af 2.901.000 aktier.

TDC-handlerne for 2016 er fremlagt i uddrag som bilag AA3. Ved indgangen til 2016 havde ED&F Man ikke nogen TDC-aktier på deres konti.

Som bilag AA3 viser, foretages en lang række transaktioner på få dage i august måned. Imidlertid er kun to af transaktionerne med en ekstern part, nemlig ING Bank N.V.:

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 2016-09-23 | SEB, acc. ING Bank N.V. | 2016-09-22 | Buy | 3.500.000,00 | 0,00 |
| 2016-09-26 | SEB, acc. ING Bank N.V. | 2016-09-23 | Sale | -3.500.000,00 | 0,00 |

Som det fremgår, *låner* ED&F Man 3.500.000 TDC-aktier fra ING Bank N.V. torsdag den 22. september 2016, som bliver leveret fredag den 23. september 2016.

De lånte aktier bliver aftalt tilbageleveret fredag den 23. september 2016, og tilbageleveringen sker man- dag den 26. september 2016.

Disse *lånte* aktier "sælges" i låneperioden frem og tilbage mellem ED&F Mans konti mange gange, her- under ved følgende to transaktioner:

| Dato | Cprt. | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-------|-----------|-----------|---------|-------------|
| 2016-09-23 | MACVGB22XXX | 2016-09-22 | Sale | -2.901.000,00 | 115.401.780,00 |
| 2016-09-23 | MACVGB22XXX | 2016-09-22 | Buy | 2.901.000,00 | -115.403.230,50 |

"Salget" der her gennemføres den 23. september 2016 af 2.901.000 TDC-aktier og som er aftalt den 22. september 2016, sker til en pris, der netop matcher det "salg", som Kamco har fremlagt som "do- kumentation" for, at pensionsplanen afhændede sin påståede aktiebeholdning. Det må derfor være Kamcos salg af aktier.

"Medkontrahentens" navnefelt er tomt ved de to transaktioner, men der er angivet en ID-kode, "MACVGB22XXX". Den ID-kode dækker over ED&F Man (bilag AA6).

En gennemgang af den tilhørende Cash Account (uddrag fremlægges som bilag AA7) viser, at der – i hvert fald på leveringstidspunktet – er tale om, at aktierne blev solgt og derefter købt tilbage *fire minutter* senere (min opstilling af oplysningerne):

| | | | |
|---|---|---|---|
| [SALG] | Kl. 05.15 | Securities sal | 115.401.780,00 |
| [KØB] | Kl. 05.19 | Securities pur | 115.403.230,50 |

Dette viser, at ED&F Man <u>ikke</u> solgte 2.901.000 TDC-aktier for Kamco for 115.401.780 kr. ved disse transaktioner. ED&F Man har i stedet flyttet 2.901.000 aktier frem og tilbage mellem to interne konti og dermed konstrueret et "salg" med en kontobevægelse af aktier og en pengestrøm.

"Salget" er således konstrueret og uden realitet. Dokumentet (bilag AA4, s. 5) viser ikke et aktiesalg – men blot at 2.901.000 aktier er blevet flyttet frem og tilbage. Og betalingerne ligner næsten, at der er blevet betalt et "gebyr" på 1.450,50 kr. (differencen i de to handler) for "ulejligheden".

Handlerne har således alene medført et *minimalt* likviditetstræk på 1.450,50 kr.

Det er *særligt* tydeligt, at ED&F Man ikke kan have solgt 2.901.000 TDC-aktier på vegne af Kamco den 22. september 2016. For ED&F Man besad *kun* lånte aktier i 2016. Nemlig de 3.500.000 aktier, der var blevet lånt fra ING Bank N.V.

### 4.2.3 ED&F Man har aldrig købt, ejet eller afhændet de påståede 2.901.000 TDC-aktier

Samlet set viser ovenstående, at ED&F Man ikke har købt 2.901.000 TDC-aktier på vegne af Kamco. "Købet" er nemlig blot interne posteringer mellem to af ED&F Mans konti, som udligner hinanden bortset fra en nettopengestrøm (måske et gebyr) på 1.885,65 kr.

ED&F Man har til gengæld en stor mængde aktier, der er *lånt* hen over udbyttedatoen (ex date den 8. august 2014), jf. f.eks. bilag AA1, s. 1. "Handlerne" kan derfor – ligesom ved Chr. Hansen-aktierne (afsnit 4.1, ovenfor) – have haft til formål at maskere aktieudlån for at opnå udbytterefusion på urigtigt grundlag.

Dertil kommer, at ED&F Man slet ikke har besiddet aktier i hele den periode, som Kamco hævder at have ejet TDC-aktieposten i. I størstedelen af Kamcos påståede ejerperiode havde ED&F Man ingen aktier i TDC.

Endelig er også "salget" af aktieposten konstrueret. ED&F Man lånte en aktiepost fra ING Bank N.V., der blev flyttet frem og tilbage mellem to interne konti hos ED&F Man for at konstruere et "salg", inden den lånte aktiepost blev leveret tilbage til ING Bank N.V.

Disse forhold bevirker, at "dokumentation" udstedt af ED&F Man er værdiløs. ED&F Man har nemlig udstedt dokumentation for køb, salg og aktiebesiddelser, uden dokumenterne stemmer overens med de faktiske forhold.

## 5. MANGLENDE DOKUMENTATION OG USAMMENHÆNGENDE SET-UP

### 5.1 Fremlagte købs- og salgsbekræftelser dokumenterer ikke, at pensionsplanen har købt aktier

Pensionsplanen har for de fleste af aktiehandlerne fremlagt købs- og salgsbekræftelser fra ED&F Man. Det er imidlertid ikke dokumenteret, at købsbekræftelserne er sendt til pensionsplanen eller i øvrigt kommet pensionsplanen til kundskab.

Købsbekræftelserne er i øvrigt sendt som mails internt i ED&F Man.

Tilsvarende er det ikke dokumenteret, at de fremlagte salgsbekræftelser er kommet til pensionsplanens kundskab.

Derudover er der ikke fremlagt dokumentation for, at pensionsplanen har afgivet købs- og salgsordrer til ED&F Man. Det er særligt bemærkelsesværdigt, når Skattestyrelsen allerede i sit indlæg af 27. september 2018 (s. 27, opfordring 7) opfordrede pensionsplanen til at fremlægge *"al korrespondance med ED&F Man"*. Det er også bemærkelsesværdigt, når der henses til, at ED&F Man – ifølge pensionsplanen – har købt aktier på pensionsplanens vegne for flere hundrede millioner kr. ad gangen.

Det fremgår af kontormødereferatet af 10. maj 2019, s. 1, at pensionsplanens repræsentanter *"mente"*, at

*"der var indgået en rammeaftale mellem pensionsplanen og EDF om køb, salg af aktier m.v., hvorfor der ikke var videre korrespondance herom."*

Der er ikke fremlagt nogen form for dokumentation for eksistensen af en sådan rammeaftale. Det fore- kommer ganske utroværdigt, at pensionsplanen ikke ligger inde med en (kopi af) en rammeaftale, der skulle bemyndige ED&F Man til at købe aktier for flere hundrede millioner kr. på pensionsplanens vegne. Selv hvis en sådan rammeaftale eksisterer, er det helt usandsynligt, at der ikke skulle være korrespondance med udtrykkelige købs- og salgsordrer, når der er tale om så store aktieposter.

Som det fremgår af kontormødereferatet, er der heller ikke fremlagt aftaler mellem pensionsplanen og trustee om, hvordan pensionsplanens beskedne midler skulle investeres.

5.2 Der er ikke dokumentation for finansiering

Det er ubestridt, at pensionsplanen ikke havde det fornødne kapitalgrundlag til at foretage de påstå- ede aktiekøb på flere hundrede millioner kr. Pensionsplanen havde brug for ekstern finansiering.

Pensionsplanen anfører i indlægget af 11. juni 2019 (bl.a. s. 8), at *"der ikke synes at være grundlag for at beskæftige sig med spørgsmålet om finansieringen"*. Pensionsplanen forsøger ikke engang at for- klare, hvordan den med sit beskedne kapitalgrundlag har kunne finansiere aktiekøb for op til en milli- ard kr. ad gangen. Efter pensionsplanens opfattelse er dokumentation for finansiering af aktiehand- lerne (her- under det specifikke aftalegrundlag) altså uden relevans for spørgsmålet om ejerskab. Dette er klart forkert. For spørgsmålet i sagen er, om pensionsplanen kan bevise at have erhvervet påståede massive ak- tiehandler på flere hundrede millioner kr. Det kræver finansiering, for ellers kan man ikke købe aktier, når man ikke selv er i nærheden af at have et tilstrækkeligt kapitalgrundlag.

Pensionsplanen havde ikke – og har aldrig haft – den fornødne kapital til at foretage de massive inve- steringer i danske aktier, som ligger til grund for pensionsplanens anmodninger om refusion af udbyt- teskat.

Den manglende fremlæggelse af det konkrete aftalegrundlag vedrørende finansiering har derfor en åben- lys bevismæssig betydning. Når pensionsplanen ikke kan bevise at have finansieret køb af aktier, bliver pensionsplanen nødt til i strid med at virkelighed at påstå, at finansieringen er lige meget. Også dette viser den manglende realitet i de påståede aktiehandler.

Det er i øvrigt bemærkelsesværdigt, at pensionsplanen end ikke vil *forklare*, hvordan aktiekøbene er finansieret. I f.eks. førersagen Del Mar Asset Management Saving & Retirement Plan (SANST j.nr. 18-0005308), hvor pensionsplanen også er repræsenteret af Lundgrens, og hvor pensionsplanen også har "handlet" aktier gennem ED&F Man, er der i det mindste et forsøg på en *forklaring* af finansieringen. Forklaringen er i det hele udokumenteret, men der er i det mindste et forsøg på en forklaring. Det har pensionsplanen i nærværende sag altså ikke ulejliget sig med.

Pensionsplanen har *fortsat* ikke fremlagt dokumentation for at have indgået finansielle aftaler, der kunne skaffe pensionsplanen likviditet til at foretage de påståede aktiekøb.

Pensionsplanen har *fortsat* heller ikke fremlagt dokumentation for at have sikret sig mod kurstab (som pensionsplanen ubestridt ikke ville kunne bære) eksempelvis ved hedging i form af futures, selvom der henvises til futures i f.eks. bilag 11.

Hertil kommer, at pensionsplanens fremlagte kontoudtog hos ED&F Man viser meget betydelige over- træk uden nogen dokumenteret sikkerhedsstillelse. Det fremgår f.eks. af bilag 11, at pensionsplanen den 27. maj 2014 havde en negativ "Running Balance" på ca. 1,4 milliarder kr.

Det er højst usandsynligt, at en finansiel virksomhed som ED&F Man skulle stille så store kreditter til rådighed uden sikkerhedsstillelse. Det var endnu mere usandsynligt i årene umiddelbart efter finans-krisen. Det skal dertil bemærkes, at eventuel sikkerhed i aktierne ikke vil sikre ED&F Man tilstrækkeligt i tilfælde af kursfald.

Det enorme usikrede overtræk er i det hele uden forklaring. Oplysningerne underbygger, at konto-udtoget ikke viser pensionsplanens aktiebesiddelser. Tværtimod illustrerer kontoudtoget, at pensi-onsplanen ikke havde økonomi til at handle sådanne aktieposter, som krævedes for at opnå den udbytterefusion, som pensionsplanen gør gældende at være berettiget til.

5.3 Der er ingen kobling mellem aktier og pensionsplanens økonomi

Pensionsplanens fremlagte materiale dokumenterer ikke, at pensionsplanen har ejet aktier, allerede fordi der ikke er nogen kobling mellem aktier/penge og pensionsplanens økonomi.

De påståede aktiehandler overstiger langt pensionsplanens kapitalgrundlag, og pensionsplanen har ikke dokumenteret – eller blot forklaret – hvordan aktiekøbene er finansieret. Ifølge pensionsplanens konto- udtog fra ED&F Man er det dog tilsyneladende ED&F Man, der yder massive og usikrede kre-ditter. Aktierne er med andre ord købt for ED&F Mans penge.

Pensionsplanen har fortsat ikke fremlagt bakkontoudtog, og der er således ikke dokumenteret penge-strømme mellem pensionsplanens bankkonti og kontoen hos ED&F Man. Det er derfor – for det første – ikke dokumenteret, at pensionsplanen har overført midler til ED&F Man (f.eks. til at dække tab på ak- tieinvesteringer). Det er derfor også uklart, hvem der skulle dække pensionsplanens tab på ca. 17 millioner kr. henholdsvis ca. 42 millioner kr. på Novo Nordisk-aktier og TDC-aktier (jf. bilag 7a sam-menholdt med bilag 7c henholdsvis bilag 9a sammenholdt med bilag 9d). Sikkert er det dog, at pensi-onsplanen ikke selv havde kapital til at dække sådanne tab. For det andet er det ikke dokumenteret, hvad der sker med pensionsplanens gevinster. Det er således ikke dokumenteret, at gevinster fra in-vesteringer, nettoudbytte og refusion indgår på pensionsplanens bankkonto.

Det vides altså ikke, hvorfra pensionsplanen får penge til de massive aktiekøb, og det vides ikke, hvor pensionsplanens indtægter ryger hen.

Dertil kommer, at pensionsplanen ikke har fremlagt nogen form for dokumentation for aftalegrundla-get mellem pensionsplanen og ED&F Man henholdsvis pensionsplanen og trustee. Der er heller ikke fremlagt købs- og salgsordrer.

Det fremlagte materiale vedrørende køb og salg af aktier (købsbekræftelser, SWIFT-udskrifter og konto- udtog hos ED&F Man) dokumenterer ikke pensionsplanens ejerskab til aktierne. Som anført er der ikke fremlagt

- købs- og salgsordrer fra pensionsplanen,
- dokumentation for ED&F Mans bemyndigelse til at handle aktier for flere hundrede millio-ner kr. på pensionsplanens vegne,
- dokumentation for, at købsbekræftelser er kommet pensionsplanen til kundskab,

- dokumentation (i form af bankkontoudtog) for pengestrømme til/fra pensionsplanens bank-konti,
- dokumentation for pensionsplanens hedging af kursrisici,
- dokumentation for pensionsplanens finansiering.

Det er således ikke dokumenteret, hverken at transaktionerne er kommet pensionsplanen til kund-skab, eller at transaktionerne har passeret pensionsplanens økonomi.

Aktietransaktionerne har dermed ikke nogen forbindelse til pensionsplanen, men fremstår mest af alt som transaktioner foretaget af og for ED&F Man. Det fremlagte materiale viser med andre ord højst, at *ED&F Man* har købt eller lånt aktier, men ikke at dette i givet fald er sket på pensionspla-nens vegne og for pensionsplanens regning og risiko.

(…)".

### Repræsentantens indlæg af 22. november 2019

Repræsentanten har ved indlæg af 22. november 2019 anført følgende:

"(…).

Det bemærkes at den nedlagte påstand fastholdes.

Det fremgår af Skattestyrelsens indlæg af 12. august at Skattestyrelsen ikke finder at den doku-mentation, klager har modtaget fra ED&F Man Capital Markets Ltd. ("ED&F") kan tillægges bevis-mæssig vægt ved sagens afgørelse.

Det skal hertil bemærkes, at ED&F har ageret som custodian på vegne af klager, og at ED&F har haft til opgave at foretage de handler, klager havde autoriseret ED&F til at foretage. Det har stedse været klagers opfattelse at ED&F fulgte den autorisation klager havde givet til ED&F og at ED&F købte og solgte aktier i henhold til autorisationen.

Klager er i sagens natur ikke i stand til at udtale sig med sikkerhed om hvad der er sket internt i ED&F i forbindelse med gennemførelsen af transaktionerne. Klager mangler således forståelse af og indsigt i de interne forhold hos ED&F til at kunne udtale sig om hvorvidt ED&F faktisk gennem-førte de transaktioner som klager havde autoriseret ED&F til at udføre.

Klager har imidlertid intet objektivt grundlag for at konkludere at ED&F ikke har ageret loyalt og korrekt, i overensstemmelse med den af klager afgivne autorisation og i overensstemmelse med gældende lovgivning.

**\*\*\*\*\*\*\*\*\*\***

Klager har noteret sig at ED&F i en engelsk retssag har givet udtryk for at visse tax vouchers udstedt af ED&F skulle være fejlbehæftede.

Dette har foranlediget Skattestyrelsen til at fremkomme med en række bemærkninger i sag 18-0005426 American Investments Group og sag 18-0005414 Kamco LP Profit Sharing Plan. Klager har en formodning om at tilsvarende bemærkninger vil blive gjort gældende i nærværende sag, hvorfor klager i nærværende indlæg vil kommentere på de bemærkninger, Skattestyrelsen har haft i de to omhandlede sager vedrørende de af ED&F udstedte tax vouchers.

Det skal bemærkes, at klager ikke – hverken fra ED&F eller Skattestyrelsen – har modtaget nogen forklaring på hvorfor de pågældende tax vouchers skulle være ukorrekte. Ligeledes har klager ikke

modtaget nogen oplysning om på hvilket grundlag denne konklusion skulle være truffet. Endelig har klager ikke har modtaget nogen dokumentation, der viser at konklusionen er korrekt.

På denne baggrund må klager – indtil andet er dokumenteret - nødvendigvis lægge de dokumenter til grund, som klager har modtaget fra ED&F og som følge heraf må klager fortsat indtage det stand-punkt at de fremlagte dokumenter netop dokumenterer de for sagen relevante forhold, nemlig;

- At klager har haft finansiering til køb af de omhandlede aktier
- At klager gennem ED&F har købt de omhandlede aktier eftersom klager fra ED&F har mod-taget bekræftelse på at have købt aktierne
- At klager har betalt købesummen for de omhandlede aktier
- At de pågældende aktier er blevet registreret på klagers depot hos ED&F
- At klager har modtaget udbytte fra det udbyttebetalende selskab
- At klager har fået indeholdt kildeskat på udbytteudlodningen
- At klager efterfølgende har solgt de omhandlede aktier
- At klager har modtaget salgssummen for de omhandlede aktier

Klager har fremlagt sædvanlig og behørig dokumentation for ovenstående forhold, hvilken doku-mentation da også foranledigede skattemyndighederne til at træffe afgørelse om tilbagebetaling af den indeholdte kildeskat, som skattemyndighederne modtog fra det udbytteudloddende selskab i forbindelse med at klager modtog selve udbytterne.

**********

Skattestyrelsens indlæg af 12. august har som det bærende element en forudsætning om at der ikke kan fæstnes lid til den dokumentation, klager har modtaget fra ED&F. Skattestyrelsen har i sit indlæg af 18. oktober i sagerne 18-0005426 American Investments Group og sag 18-0005414 Kamco LP Profit Sharing Plan suppleret synspunktet med det forhold at ED&F i en engelsk retssag skulle have oplyst at der er flere tax vouchers, der skulle have et ikke korrekt indhold.

Som ovenfor anført har klager på det foreliggende grundlag ikke grundlag for at konkludere at den dokumentation, man har modtaget fra ED&F, ikke skulle være retvisende og et korrekt udtryk for de faktiske omstændigheder.

Klager er heller ikke bekendt med baggrunden for at ED&F i den engelske retssag udtaler at de omhandlede tax vouchers skulle være forkerte og at modtagerne af de pågældende tax vouchers ikke skulle hav fået udbetalt dividende og derfor ikke skulle have fået indeholdt kildeskat. Hvis dette ellers skulle være korrekt – hvilket klager som nævnt ikke har modtaget dokumentation for skulle være tilfældet – skulle ED&F ikke have udstedt de omhandlede tax vouchers og pensionspla-nen ville som modtager i så fald ikke have indleveret anmodning om refusion af indeholdt kildeskat.

Det skal dog bemærkes, at ED&F´s udsagn om at visse af de omhandlede tax vouchers skulle være ukorrekte synes at være i modstrid med anden dokumentation, som pensionsplanen i øvrigt har modtaget fra ED&F – en dokumentation som ED&F ikke har oplyst skulle være ukorrekt.

Klager er ikke bekendt med baggrunden for at de omhandlede tax vouchers skulle være fejlbehæf-tede mens anden dokumentation modtaget fra ED&F illustrerende de samme handler skulle være korrekt. Skattestyrelsen har ikke fremlagt nogen yderligere dokumentation for at de påståede for-hold skulle være ukorrekte, ligesom Skattestyrelsen ikke har forklaret hvorfor man anser disse Tax Vouchers for fejlagtige.

Tilbage står således at klager ikke har indsigt i hvad der er sket hos ED&F og hvad de påståede fejl kan skyldes. Som ovenfor anført må klager på denne baggrund nødvendigvis henholde sig til den

dokumentation, klager har modtaget løbende fra ED&F (klager er ikke part i det søgsmål, der er anlagt i London og hvorfra de omhandlede informationer stammer) og klager må derfor også nødvendigvis fastholde at samtlige de modtagne Tax Vouchers (og sagens øvrige dokumenter) naturligvis er korrekte.

Det bemærkes blot for god ordens skyld at selv hvis ED&F måtte have udstedt fejlagtige Tax Vouchers til klager, så gør dette sig ikke gældende for det fulde beløb, som klager har modtaget i refusion af indeholdt kildeskat, og det kan derfor også konkluderes at de tax vouchers der repræsenterer forskelsbeløbet omvendt må have et korrekt indhold som kan tjene som grundlag for klagers berettigede modtagelse af refusion af indeholdt kildeskat.

**********

Skattestyrelsen har i sit indlæg af 12. august 2019 beskrevet en handel med Chr. Hansen-aktier, som efter Skattestyrelsens indhold ikke kan tillægges vægt.

Dette bestrides.

Skattestyrelsens opfattelse bygger på en forkert forståelse af hvorledes aktierne blev handlet. Skattestyrelsens konklusion er ligeledes fejlagtig.

Den handel med Chr. Hansen-aktier, som Skattestyrelsen har beskrevet i sit indlæg af 12. august er gentaget i sin helhed i Skattestyrelsens indlæg af 18. oktober i sagerne 18-0005426 American Investments Group og sag 18-0005414 Kamco LP Profit Sharing Plan.

Skattestyrelsens indlæg af 12. august og 18. oktober i de to pågældende sager tjener det formål at så tvivl om bevisværdien af dokumenter modtaget fra ED&F. Da denne pointe ligeledes er den pointe som Skattestyrelsen har lavet i nærværende sag i sit indlæg af 12. august i nærværende sag, finder klager anledning til at kommentere Skattestyrelsens indlæg af 18. oktober i sagerne 18-0005426 American Investments Group og sag 18-0005414 Kamco LP Profit Sharing Plan i nærværende indlæg også – uanset at Skattestyrelsen (endnu) ikke har fremlagt den pågældende dokumentation i nær- værende sag.

Klager vil således i det følgende gennemgå den pågældende handel – og gøre dette med henvisning til den dokumentation klager selv har fremlagt i nærværende sag og den dokumentation Skattestyrelsen har fremlagt i sit indlæg af 18 oktober i sagerne 18-0005426 American Investments Group og sag 18-0005414 Kamco LP Profit Sharing Plan.

Gennemgangen vil vise at Skattestyrelsens konklusion er fejlagtig og at klager har købt de pågældende aktier, modtaget dividende på disse og fået indeholdt kildeskat på samme udlodning.

Helt overordnet er det Skattestyrelsens konklusion at pensionsplanen tilbagesøgning på Chr. Hansen-aktierne ikke har været retmæssig eftersom der skulle være tale om "lånte" aktier, jf. argumentationen og den fremlagte dokumentation i sag 18-0005414 Kamco LP Profit Sharing Plan.

Det er imidlertid ikke korrekt. Pensionsplanen har ikke lånt de pågældende aktier og Skattestyrelsens konklusion bygger således på en forkert forståelse af de faktiske forhold eller en forkert forståelse eller gengivelse af den fremlagte dokumentation.

Ifølge det fremlagte bilagsmateriale (der gennemgås i det følgende) har pensionsplanen været civil- retlig ejer af de pågældende aktier på datoen for vedtagelse af udbytteudlodningen.

Det er i den forbindelse uden betydning hvorledes ED&F har anskaffet de pågældende aktier – afgørende er alene hvorvidt pensionsplanen har foretaget et reelt køb af disse.

Det skal kraftigt betones at klager ikke har haft kendskab til hvorledes handlerne de facto er blevet gennemført og at klager således ikke har haft viden om eller kendskab til hvorledes ED&F har ageret iht. den af klager afgivne autorisation til ED&F om køb og salg af aktier. De følgende betragtninger er således baseret på klagers forståelse af det bilagsmateriale, Skattestyrelsen har fremskaffet og fremlagt i sagen og de to "førersager" 18-0005426 American Investments Group og sag 18-0005414 Kamco LP Profit Sharing Plan.

Baseret på det nu fremlagte bilagsmateriale – herunder bilagsmaterialet i de to førersager - som klager ikke har haft kendskab til eller viden om på tidspunktet for gennemførelsen af transaktionerne – er det klagers opfattelse at hændelsesforløbet har været som følger:

Det synes korrekt at ED&F har lånt 800.000 kr. aktier af Morgan Stanley, jf. bilag Å2.

Som de fremlagte bilag fremstår for klager, må ED&F have bogført disse på en custody account tilhørende ED&F.

Klager har ikke adgang til ED&F's fulde custody account og klager kan derfor kun gisne om hvorledes ED&F foretog dispositionerne internt i deres system.

Det kan dog konkluderes, at selv hvis ED&F lånte aktier i markedet, så fremgår det af ED&F's custody account fremlagt som bilag Å2, at der stadig skete et salg af den pågældende aktiepost fra ED&F til pensionsplanen – et salg der resulterede i at pensionsplanen blev den civilretlige ejer og den skattemæssige ejer efter dansk skattelovgivning.

Skattestyrelsens udsagn om at pensionsplanen ikke var berettiget til refusion af indeholdt kildeskat som følge af at der skulle være tale om aktier som ED&F havde lånt, overser det faktum at det fremgår af custody account fra ED&F at pensionsplanen faktisk foretog et civilretligt køb af aktierne fra ED&F.

Som følger heraf har pensionsplanen været den civilretlige ejer af den omhandlede aktiepost og pensionsplanen har været den skattemæssigt retmæssige ejer af den omhandlede aktiepost.

Som det tydeligt fremgår er der ikke tale om "lånte aktier". Der er tale om at pensionsplanen har købt de omhandlede aktier fra ED&F.

Ejerskabet til aktierne er således overgået til pensionsplanen. Der er derfor ikke tale om "lånte aktier".

Pensionsplanen har købt og civilretligt erhvervet de omhandlede aktier, hvilket da også fremgår af Skattestyrelsen egen dokumentation i sagen.

Finansieringen af handelen kan ses af bilag Å1 p. 2 under "pending trades". Det er således ikke korrekt når Skattestyrelsen påstår at pensionsplanen – herunder klager - ikke har haft økonomisk mulighed for at finansiere den pågældende handel".

**Skatteankestyrelsens kontorindstilling**
Skatteankestyrelsen har udsendt kontorindstilling, hvori SKATs afgørelse er indstillet stadfæstet.

Skattestyrelsen v/Kammeradvokaten har ved indlæg af 20. august 2020 erklæret sig enig i kontorindstillingen og henvist til Landsskatterettens afgørelser og Skattestyrelsens bemærkninger i førersagerne med j.nr. 18-0005426, 18-0005308 og 18-0005414, hvor klagerne – ligesom i denne sag – har anvendt ED&F Man som custodian.

**Landsskatterettens afgørelse**

Det fremgår bl.a. af kildeskattelovens § 69 b, stk. 1, at har nogen, der er skattepligtige efter § 2 eller selskabsskattelovens § 2, modtaget udbytte, royalty eller renter, hvori der efter §§ 65-65 d er inde-holdt kildeskat, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst, tilbage-betales beløbet inden 6 måneder fra told- og skatteforvaltningens modtagelse af anmodning om tilba-gebetaling.

Af dobbeltbeskatningsoverenskomsten mellem USA og Danmark fremgår af artikel 10, stk. 3, litra c, at udbytte fra et selskab hjemmehørende i Danmark ikke beskattes i Danmark, såfremt den retmæssige ejer er en pensionskasse, som omtalt i artikel 22, stk. 2, litra e, der er hjemmehørende i USA. Det er en forudsætning, at sådant udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

Af dobbeltbeskatningsoverenskomstens artikel 22, stk. 2, litra e, fremgår, at en person, der er hjemme-hørende i en kontraherende stat, alene skal være berettiget til alle fordele efter denne overenskomst, hvis denne person er en juridisk person, hvad enten fritaget for beskatning eller ikke, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende. Det er en forudsætning, at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater.

Refusion af udbytteskat er betinget af, at Pensionsplanen har ejet aktier, og at Pensionsplanen har mod-taget udbytte af disse aktier, hvor der i forbindelse med udbetalingen af udbyttet er indeholdt udbytte-skat.

Landsskatteretten finder, at det påhviler Pensionsplanen at bevise, at disse betingelser er opfyldte, og at Pensionsplanen på den baggrund var berettiget til refusion af udbytteskat.

Det bemærkes herved, at der indenfor dansk civilret, herunder skatteretten, gælder et udgangspunkt om ligefrem bevisbyrde. Dette vil bl.a. sige, at den, der påstår at have et krav, skal godtgøre, at kravet består. Det følger således af de almindelige bevisbyrderegler, at den, der er nærmest til at tilvejebringe og sikre sig den relevante dokumentation, også bærer bevisbyrden.

Landsskatteretten finder ikke, at denne bevisbyrde er løftet.

Landsskatteretten finder, at Pensionsplanen ikke var berettiget til udbetaling af udbytterefusion. Der er herved lagt vægt på, at det ikke er dokumenteret, at Pensionsplanen har købt og været ejer af de om-handlede påståede aktier eller har modtaget udbytte af aktierne. Den dokumentation, der er fremlagt i form af e-mails til og fra ED&F Man, udskrifter fra ED&F Man benævnt Account Equity, Account Transac-tions og Account Statement vedrørende køb og salg af aktier og indgåelse af optioner og swaps, doku-menterer ikke Pensionsplanens ejerskab til aktierne. Heller ikke de fremlagte SWIFT-meddelelser, der ifølge Pensionsplanen er dokumentation for, at aktiernes købesum er betalt, opfylder krav til dokumen-tationen for, at der handlet aktier på Pensionsplanens vegne. Det er tillige lagt til grund, at det ikke nær-mere er forklaret, hvorledes Pensionsplanens store restancer, f.eks. ca. 4 mil. kr. den 21. april 2015 ifølge Account Transactions, skulle finansieres, idet bemærkes, at det forekommer usandsynligt, at ED&F Man uden sikkerhedsstillelse ville stille så store kreditter til rådighed for Pensionsplanen. Der ses således ikke at være den fornødne forbindelse til Pensionsplanen, der dokumenterer, at aktietransaktionerne m.v. har passeret Pensionsplanens økonomi, og der er ikke fremlagt dokumentation for pengestrømme til og fra Pensionsplanen vedrørende aktiehandler fra custodian eller andre aktører involveret i

aktietransaktionerne m.v., ligesom der ikke er fremlagt dokumentation for Pensionsplanens finansiering af aktiekøb. Det bemærkes, at der på trods af Skatteankestyrelsens anmodning om bl.a. aftaler mellem Pensionsplanen og dennes trustee samt aftaler med ED&F Man, om korrespondance mellem Pensionsplanen og ED&F Man og om aftale mellem Pensionsplanen og ED&F Man om køb/salg af aktier m.v. ikke er fremlagt materiale herom.

Landsskatteretten finder ikke, at der alene skal tages stilling til den foreliggende sag om tilbagekaldelse af udbytterefusion uden en vurdering af den oprindelige sag om refusion om udbytteskat.

Betingelserne for at en afgørelse er ugyldig og dermed bør annulleres er, at den pågældende afgørelse lider af en retlig mangel, at denne er væsentlig, og at særlige omstændigheder ikke taler imod ugyldighed. Til retlige mangler hører bl.a. mangler, der angår den retlige subsumption, det vil sige spørgsmålet om, hvorvidt betingelserne for at udstede afgørelsen og kravene til dens indhold er opfyldt i det pågældende tilfælde. Årsagen hertil kan være, at myndigheden ved afgørelsens udstedelse har befundet sig i en vildfarelse om sagens faktiske omstændigheder. Sådanne retlige mangler anses i almindelighed som væsentlige i sig selv og vil typisk føre til, at afgørelsen anses for ugyldig. Retten skal i den forbindelse bl.a. henvise til FOB2005.527.

Landsskatteretten skal som klageinstans efterprøve, om betingelserne for SKATs tilbagekaldelse/annullation af de tidligere trufne afgørelser om refusion af udbytteskat har været opfyldt. I denne prøvelse indgår en nødvendig vurdering af, om der oprindeligt var grundlag for at yde refusion af udbytteskat.

Det er Landsskatterettens vurdering, at Pensionsplanen hverken for SKAT eller Landsskatteretten har fremlagt det fornødne bagvedliggende materiale, som kan understøtte, at betingelserne for refusion af udbytteskat er opfyldt. Der henvises til Landsskatterettens afgørelser af 19. december 2019 (offentliggjort som SKM2019.650.LSR) og 13. januar 2020 (offentliggjort som SKM2020.29.LSR) og 7. juli 2020 (offentliggjort som SKM2020.371.LSR).

Da Pensionsplanen ikke er anset for at have ejet aktier eller modtaget udbytte som angivet i forbindelse med anmodningerne om udbytterefusion, finder Landsskatteretten, at SKAT har udbetalt refusionerne på et urigtigt grundlag på baggrund af Pensionsplanens ansøgninger. SKAT har derfor været berettiget til at annullere de oprindelige afgørelser om udbetaling af udbytterefusion, idet bemærkes, at SKATs anvendelse af ordet "tilbagekaldelse" ikke kan føre til et andet resultat.

Den påklagede afgørelse stadfæstes derfor.

Susanne Dahl
Ledende retsformand

Anja Marie Pedersen
Sagsbehandler

**Vejledende medholdsvurdering**

Skatteankestyrelsen skal komme med en udtalelse om, i hvilket omfang der er givet medhold i klagen.

Medholdsvurderingen har betydning for, i hvilken grad klageren kan få omkostningsgodtgørelse af udgifter til rådgivning under klagesagen. Medholdsvurderingen er kun vejledende. Ansøgning om omkostningsgodtgørelse skal sendes til Skattestyrelsen, som træffer afgørelsen.

Skatteankestyrelsen udtaler følgende:

Der er ikke givet medhold i de påklagede forhold.

**Afgørelsen sendes til**

Riverside Assosiates Defined Benefit Plan, 5532 Lillehammer Lane, Suite 103, Park City,

LUNDGRENS ADVOKATPARTNERSELSKAB, Tuborg Boulevard 12, 2900 Hellerup

Skattestyrelsen

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S, Vester Farimagsgade 23, 1606 København V