# Exhibit 3



# ØSTRE LANDSRET
# DOM
### afsagt den 28. april 2022

---

**Sag BS-26436/2020-OLR**
(12. afdeling)

Skatteforvaltningen
(advokat Boris K. Frederiksen, advokat Steffen Sværke og
advokat Jacob Sølling)

mod

Bech-Bruun I/S
(advokat Ole Spiermann og Jakob Lentz)

de tilsidesat god advokatskik ved at påtage sig at udføre advokatundersøgelsen, og at Bech-Bruun ikke havde krav på salær herfor.

Advokatnævnets kendelse af 4. juli 2019 blev indbragt for domstolene af Bech-Bruun. Østre Landsret afsagde dom i sagen den 23. juni 2021, hvorefter Advokatnævnets kendelse blev opretholdt for så vidt angår adfærdsklagen vedrørende de fire partnere, og Skatteministeriet blev frifundet for Bech-Bruuns salærkrav. Dommen er anket til Højesteret, som endnu ikke har truffet afgørelse i sagen.

### 3. Forklaringer
Der er afgivet forklaring af Jens Brøchner, Arne Riis, Gunnar Volkers, Christian Baden Ekstrand, Lisbeth Rømer, Anders Oreby Hansen og Sven Nielsen.

### 3.1. Jens Brøchner
**Jens Brøchner** har forklaret blandt andet, at han ved sin tiltræden som departementschef i 2012 havde to hovedarbejdsopgaver: at føre organiseringen af skattevæsenet tilbage til en klassisk myndighedsstruktur med et "smalt" departement og fagstyrelser frem for den hidtidige enhedsforvaltning i SKAT samt at fortsætte effektiviseringerne i overensstemmelse McKinsey-rapporten. McKinsey-rapportens overordnede konklusion var, at der var et betydeligt effektiviseringspotentiale i SKAT opgjort til en lille mia. kr. Den analyse var der på daværende tidspunkt ingen, der stillede spørgsmål ved.

Skatteministeriets Interne Revisions rapporter indgår som en del af Skatteministeriets overordnede koncerntilsyn. Skatteministeriets departement er ikke og må ikke være inddraget i den konkrete skattesagsbehandling. Direktionen i SKAT havde til opgave at udarbejde handleplaner for kontrolindsatserne på de enkelte områder i lyset blandt andet af rapporterne fra Skatteministeriets Interne Revision (SIR). Der var en klar fremgangsmåde for, hvordan man skulle forholde sig i SKAT, når der blev modtaget en rapport fra SIR. En rapport blev således altid sendt til den ansvarlige direktør og økonomichefen samt til Rigsrevisionen, ligesom der blev udarbejdet en handleplan for opfølgning mv. Rapporterne fra SIR angav gennem farvekoderne rød, gul og grøn, hvilket behov der var for reaktion på konklusionerne i rapporterne, men rapporterne sagde ikke i selv noget om risikoen for svig. Et gult punkt kunne godt lukkes i handleplanen, selvom det ikke var løst, men man skulle forholde sig til problemstillingen.

Den omstændighed, at der i 2013 alene skete forelæggelse af 3 rapporter fra SIR for vidnet, indebærer ikke, at de almindelige procedurer ikke er blevet fulgt i forhold til forelæggelse for de ansvarlige direktører og direktørområder mv. Der var jo tale om driftsrelaterede problemstillinger, der under alle omstændigheder skulle afklares i de enkelte driftsenheder. I 2015 fik vidnet på baggrund af

modning til Tyskland. Han ved ikke, hvilken dialog svaret henviser til. Han husker ikke nærmere om opfølgningen. Han ved, at han og Anne Munksgaard har talt om Tyskland, og at det var svært at få oplysninger.

Bent Bertelsen videresendte mailen af 10. oktober 2016 fra Finanzamt für Steuerstrafsachen til ham. Identiteten på den tyske bank fremgik ikke, men de forsøgte ihærdigt over en lang periode at få oplysningen fra de tyske myndigheder, men det lykkedes ikke. Oplysningen må være tilgået politiet i stedet. Han overvejede ikke, hvem den tyske bank kunne være. Han noterede sig blot oplysningerne. Han ved ikke, om Anne Munksgaard eller andre blev orienteret om mailen. De undersøgte ikke nærmere på baggrund af denne mail, da de havde anmeldt det, der var at anmelde i sagen. Om de brugte oplysningerne i forhold til aktuelle sager, husker han ikke.

Han fulgte ikke specielt med i udbuddet af advokatundersøgelsen i december 2016, men han afleverede nogle dokumenter til brug herfor. Opdraget var alle dokumenter fra perioden, der kunne være relevante for svindelsagen. Han vidste, at Bech-Bruun vandt udbuddet. Han var ikke med til at finde materiale til andre undersøgelser, bortset fra SIR's rapport fra september 2015.

Det skal nok passe, at der i 2015 var en gennemsnitlig sagsbehandlingstid mellem otte dage og to måneder i sager om refusion af udbytteskat.

### 3.5. Lisbeth Rømer
**Lisbeth Rømer** har forklaret blandt andet, at hendes arbejdsplads fysisk var placeret i Ballerup og Høje-Taastrup, selvom ledelsen havde kontorer i Jylland.

Hun har ikke udarbejdet notat af 5. september 2007 om udbytteadministrationen i Ballerup. Hun erindrer ikke at have set notat af 17. september 2006 om forceret tilbagebetaling af indeholdt dansk udbytteskat mv., men hun er bekendt med den problemstilling, der omtales i notatet.

Hun er bekendt med Skatteministeriets notat af 14. november 2007 om tilbagebetaling af dansk udbytteskat til begrænset skattepligtige. Hendes enhed skulle altid gøre meget for at overbevise resten af organisationen om, at der var reelle problemer på udbytteskatteområdet. Hendes fokus var i begyndelsen rettet mod vanskelighederne i forbindelse med overholdelse af den regel på 30 dage, der gjaldt i forhold til rentebetaling. Det var efter hendes opfattelse ikke en problemstilling, der kunne løses med omlægning af de administrative procedurer, således som Skatteministeriet lagde op til. I forbindelse med en lovændring i 2012 blev der da også indført en seks måneders regel.

Hun har afgivet en dækkende forklaring i Undersøgelseskommissionen vedrørende SKAT om SIR's revisionsundersøgelse fra 2009 af provenuet fra kildebe-

skatningen af udlændinge. Hun har ligeledes afgivet en dækkende forklaring i undersøgelseskommissionen om sin vurdering af konklusionen i SIR's rapport fra 2010. I SIR's rapport fra 2010 var det anført, at det var muligt at udstede flere udbyttenotaer vedrørende det samme udbytte, når der var tale om omnibusdepoter. Hendes fornemmelse var dog ikke, at det var sådan, det forholdt sig, men det er rigtigt, at der var en risiko for det. Der kom ikke noget ud af det notat, som hun fremsendte til Lars Nørding med mail af 28. oktober 2010, idet Danmark på daværende tidspunkt var dybt engageret i drøftelserne i OECD.

Hun har i forbindelse med sin forklaring i undersøgelseskommissionen givet en dækkende beskrivelse af spørgsmålet om kontrollen med udbytteområdet. For hendes enheds vedkommende var der tale om en bogholderi- og tasteopgave. De havde forgæves søgt om at få midler til at foretage kontrol. Hun er således enig i den beskrivelse af opgaven med administration af udbytteskat, der er foretaget i pkt. 3 i borger- og retssikkerhedschefens redegørelse fra februar 2016.

Hun opfattede det anførte i SIR's rapport fra 2013 således, at der blev ført formel, men ikke materiel, kontrol under blanketordningen. For så vidt angår regnearksordningen (bankordningen) var forholdet nærmere det, at bankerne gjorde det arbejde, som egentlig hørte under hendes enhed. De var trygge ved bankernes varetagelse af opgaven.

Hun har afgivet en dækkende forklaring i undersøgelseskommissionen om den fortsatte aktualitet af SIR's rapport fra 2010 også efter afgivelsen af SIR's rapport fra 2013.

Når hun i undersøgelseskommissionen har forklaret, at "enhver overordnet chef" kendte til problemet med, at der reelt ikke var nogen mulighed for at føre kontrol med refusion af udbytteskat, sigter hun blandt andre til Lars Nørding, Jens Sørensen og René Frahm Jørgensen.

Hun har givet en dækkende forklaring i undersøgelseskommissionen om forløbet af dialogmødet med Jesper Rønnow Simonsen den 24. oktober 2013. Det anførte i hendes forklaring vedrørende "hullet vedrørende refusioner" sigtede til, at der ikke var nogen kontrolmulighed, og at man måtte forlade sig på det materiale, der blev modtaget fra tredjemand.

Når hun i mail af 4. oktober 2011 sendte et notat direkte til kontorchef Lise Bo Nielsen i departementet, skyldtes det, at departementet på dette tidspunkt ikke var adskilt fra SKAT. Lars Nørding var bekendt med, at hun havde rettet henvendelse til departementet. Lise Bo Nielsen videresendte henvendelsen til Jakob Schou, der imidlertid fuldstændig afviste den. Det er i det lys, at hendes mail af

21. november 2011 til blandt andre Jakob Schou skal læses. Hun kan ikke huske, om hun fik noget svar på mailen.

Ansøgningerne i blanketordningen blev modtaget med almindelig post. Laurits Cramer stod for at åbne og visitere posten. Laurits Cramer gik på pension den 1. november 2013, og hun fulgte selv efter den 1. december 2013.

Alle ansøgninger blev som udgangspunkt lagt til Sven Nielsen. I 2013 begyndte det at gå ned ad bakke med antallet af medarbejdere. Hun kan ikke huske, hvem der stadig var i enheden, da hun gik på pension. Det skal nok passe, at Sven Nielsen i 2007 og de følgende år behandlede omkring 90 pct. af alle ansøgninger om udbytterefusion. Sagsbehandlingen skete i 3S-systemet, hvorfra der blev genereret lister til brug for udbetalingerne. Alt blev gemt i bundter, så de havde godt styr på dokumentationen.

Hun har afgivet en dækkende forklaring i undersøgelseskommissionen om adgangen til udbetaling af refunderet udbytteskat og om kontrasignatur. Kontrasignatur blev afskaffet i 2011, da de efterhånden var så få medarbejdere tilbage, at de ikke kunne opretholde en funktionsadskillelse. Bogholderiet fik alene overdraget listen over udbetalinger, ikke selve ansøgningsmaterialet.

Hun har afgivet en dækkende forklaring i undersøgelseskommissionen om lokal regnskabsgodkendelse. Det foregik som anført i Bente Oddershedes mail af 14. maj 2014.

I forhold til gyldigheden af de dokumenter, som de fik forelagt, kunne de ikke gøre andet end at se på det tilsendte og forlade sig på, at materialet var ægte og oplysningerne korrekte. Det var et krav, at blanketten skulle være attesteret og underskrevet af den udenlandske skattemyndighed, således at de kunne vide, hvilken dobbeltbeskatningsoverenskomst der var tale om. Manglede attestation og underskrift, blev ansøgningerne sendt retur. Det skete ofte, og man gik ikke bort fra denne praksis i hendes tid. På et tidspunkt skete der dog en ændring i forhold til ansøgninger fra USA, således at det var tilstrækkeligt, at der blev vedlagt et certifikat fra de amerikanske myndigheder. Hun kan ikke huske, hvem der besluttede, at det var tilstrækkeligt til at opfylde dokumentationskravet.

Hun er bekendt med, at der blev anvendt reclaimagenter. Denne ordning opstod en gang efter 2010, hvor der blev indført nulskat på pensioner i USA. Ansøgningerne om udbytterefusioner fra amerikanske pensionsplaner begyndte så småt at blive indsendt fra 2010. De brugte meget "krudt" på at finde ud af, hvad pensionsplaner overhovedet var for en størrelse. Hun husker ikke, at der var tale om så store beløb, som man f.eks. ser i ansøgningen af 12. maj 2014 fra Goal Group. Hun var i øvrigt ikke bekendt med denne reclaimagent. I hendes tid lå

de store beløb i bankordningen, således som hun også har forklaret over for undersøgelseskommissionen. Brugen af reclaimagenter foregik kun på blanket-ordningen. Gennem bankordningen var der jo ikke brug for agenter.

North Channel Banks "dividend advice" af 9. april 2014 til Vanderlee Technologies Pension Plan er et eksempel på en udbyttenota. Hun kan ikke genkende den håndskrift, der er påført notaen. Hun har over for undersøgelseskommissionen afgivet en dækkende forklaring om, hvorvidt der blev stillet formkrav til en sådan udbyttenota. Udbyttenotaen var helt central for sagsbehandlingen. Hun stolede på bankerne. Denne sag kan kun være blevet så stor, fordi der var nogen, som de ellers stolede på, der svindlede. En bank, der har udstedt en udbyttenota, har ikke mulighed for at se, om der rent faktisk er indeholdt udbytteskat i det udloddende selskab, ligesom banken ikke har mulighed for at afgøre, hvem der er rette "beneficial owner". Udbyttenotaen skal dokumentere, at der er udbetalt udbytte til den angivne modtager. Udbyttenotaerne blev udstedt af de banker, som pengene løb gennem, og bankerne havde i hvert fald mulighed for at følge pengestrømmen. Pengene skulle jo havne hos udbytte-modtageren. Et refusionsbeløb på 37 mio. kr. var ikke unormalt. De havde ikke oplevet svindel med udbyttenotaer, men de tænkte da på, hvad der kunne ske undervejs i denne proces.

Hun erindrer ikke at være stødt på navnet Don Donaldson/Donald Donaldson, som blandt andet fremgår af fuldmagten af 15. april 2014 udstedt af Vanderlee Technologies Pension Plan.

Hun har ikke set særligt mange certifikater svarende til certifikat af 7. april 2014 udstedt til Vanderlee Technologies Pension Plan af det amerikanske Department of Treasury. Brugen af disse certifikater var i sin vorden i hendes tid i SKAT. Den udenlandske skattemyndighed skulle i overensstemmelse med kravene i den relevante dobbeltbeskatningsoverenskomst attestere, at den refusionssøgende var skattepligtig i det pågældende land. Hun er ikke stødt på certifikater, hvor det af vandmærket fremgår, at certifikatet er "void". Det ville hun have undret sig over.

Hun husker ikke Solo Capital.

Ved deres gennemgang af ansøgningerne prøvede de at sikre sig, at der reelt var tale om en amerikansk pensionskasse. De skulle imidlertid alene forholde sig til de formelle forhold, og hvis blanketten så ud til at være i orden, havde de ikke så mange andre muligheder end at udbetale den refunderede udbytteskat. Kravet i henhold til dobbeltbeskatningsoverenskomsten om, at mindst 50 pct. af de begunstigede skulle være hjemmehørende i USA, blev ikke efterprøvet nærmere, og det blev således forudsat, at det forholdt sig således. Havde man haft en underskrift fra de amerikanske myndigheder på blanketten, ville de

amerikanske myndigheders underskrift også omfatte en attestation af dette for-hold.

For så vidt angår præmisserne på s. 19, første afsnit, i Østre Landsret dom af 23. maj 2018 i ankesagen mod blandt andre Sven Nielsen var det ikke en sædvanlig fremgangsmåde, at der ikke blev kontrasigneret. Laurits Cramer foretog en grundig gennemgang af ansøgningerne ved modtagelsen af sagen, og allerede på dette tidspunkt blev flere ansøgninger afvist. Herefter blev ansøgningen re-gistreret i 3S. Listen fra 3S skulle kontrasigneres af Laurits Cramer, inden den gik videre til bogholderiet, og på dette tidspunkt så Laurits Cramer ikke på an-søgningerne en gang til. De var meget få ansatte, og mængden af ansøgninger steg meget. De havde en enorm arbejdsbyrde, så de kunne ikke kontrollere alt muligt, hvad de jo heller ikke måtte, for så ville alt gå i stå. Kontrasignaturen inden overgangen til bogholderiet var derfor en formssag. I bogholderiet skulle der også være to underskrifter. Hun mener, at der var en særlig procedure i bogholderiet ved udbetalinger over en vis grænse. Hun kan ikke huske, om man i 2011/2012 gik bort fra kravet om kontrasignering. Hvis det så rigtigt ud, skulle de honorere udbetalingsanmodningen. De skulle ikke foretage andet end formel kontrol.

I 2011 rettede Skattecenter Holbæk, der havde til opgave at føre kontrol med skatteforholdene for ansatte i SKAT, henvendelse til hende med oplysning om, at man havde en verserende sag vedrørende Sven Nielsen. Hun fik imidlertid aldrig at vide, hvad sagen drejede sig om. Hun havde afgjort tillid til Sven, der stod for at udvikle udbyttedelen i 3S-systemet og i øvrigt var fantastisk dygtig til sit arbejde. Hun var fuldkommen målløs, da hun fandt ud af, at Sven Nielsen havde begået kriminalitet.

Hun var med til at udarbejde problemkataloget i 2006. Udbytteskat udgør en meget lille del af skattesystemet, og provenuet er ikke stort. Derfor var der nok ikke så mange, der interesserede sig for området. Man besluttede i sin tid, at administrationen af udbytteskatten skulle ske sammen med rentesystemet, hvilket ikke var hensigtsmæssigt, da udbytte jo kun kommer til udbetaling en gang årligt. Det var et problem, at der ikke skete nogen afstemning mellem det, der blev indberettet, og det, der blev selvangivet.

Udbytteadministrationen fik altid anmærkninger fra SIR, fordi man ikke kunne nå at udbetale den refunderede udbytteskat inden 30 dage. Det betød, at der løb renter på beløbet. Dette blev senere ændret, således at der først påløb renter efter seks måneder, og denne problemstilling blev også afbødet gennem indfø-relse af bankordningen.

Hun så lovændringen i 2009 som en stor forbedring. Lovændringen i 2012 førte ikke til, at sagsbehandlingen på udbytteområdet blev grundigere, men nu kunne man afslutte sagsbehandlingen inden for fristen for betaling af renter.

Udfordringerne vedrørende omnibusdepoterne var et globalt problem, og Danmark lagde meget energi i arbejdet i OECD. Hun var også involveret i dette arbejde og har deltaget i mange møder i OECD-regi. Der blev blandt andet arbejdet på en løsning med en central indberetningsordning vedrørende udlodninger, men det kunne hverken sikkerhedsmæssigt eller it-mæssigt lade sig gøre. Hende bekendt var Ivar Nordland ikke særligt involveret i TRACE, men han var jo udlandsdirektør og har sikkert fulgt med. Om TRACE var fremtidsmusik kom jo an på, hvordan man skruede det sammen, men et akut problem kunne ikke løses i TRACE.

**3.6. Anders Oreby Hansen**
**Anders Oreby Hansen** har forklaret blandt andet, at han har genlæst sin forklaring for landsretten som gengivet i dom af 23. juni 2021 som forberedelse til i dag, og han kan vedstå denne.

Han havde mange forskellige roller hos Bech-Bruun. Han havde sin daglige gang i skatteafdelingen, men han havde også med fast ejendom at gøre. Han deltog i mange internationale konferencer, hvor hans funktion var at sælge firmaet bedst muligt. Der kom ad den vej en bred vifte af sager, som han videresendte.

Jones Day var på Bech-Bruuns liste over foretrukne samarbejdspartnere i Tyskland, og firmaerne besøgte indimellem hinanden. Han har givetvis mødt Martin Bünning i den forbindelse. Han havde ikke tidligere hørt om North Channel Bank.

Da han modtog mailen af 3. februar 2014 fra Martin Bünning, havde han en idé om, hvad "dividend stripping" var, men det var langt fra hans eget fagområde, så han vidste straks, at mailen skulle videre til den fagrelevante partner. Han havde fra Arne Riis og Carsten Pals hørt noget om "smuthullerne i den tyske skattelovgivning", men han troede ikke, at dette kunne forekomme i Danmark. Han mener ikke, at han hørte om dette, før han modtog mailen af 3. februar 2014. Han tænkte nok på baggrund af mailen, at der var en klient, der var bekymret for, hvor de befandt sig i forhold til lovgivningen. Han får indimellem mails, hvor folk er bekymrede for, om de har gjort eller vil gøre noget strafbart. Han husker ikke, om han tænkte nærmere over formuleringerne i mailen. For ham var det alene et spørgsmål om at få henvendelsen hen til den fagrelevante partner. Han var måske i tvivl om, hvorvidt henvendelsen skulle til banking-afdelingen eller skatteafdelingen. Arne Riis kunne have valgt at videresende mailen eller afvise den.

**5. Landsrettens begrundelse og resultat**

Sagen angår et erstatningskrav fra Skatteforvaltningen mod Bech-Bruun I/S i anledning af den rådgivning, som advokat Arne Riis ydede North Channel Bank i 2014 vedrørende et muligt ansvar for banken ved at medvirke til et påtænkt skattearrangement med refusion af dansk udbytteskat. Advokat Arne Riis kommunikerede herom med advokater fra advokatfirmaet Jones Days tyske afdeling.

På daværende tidspunkt refunderede SKAT indeholdt dansk udbytteskat efter ansøgning vedlagt dokumentation for udbetaling af udbytte med indeholdt dansk udbytteskat samt dokumentation for, at udbyttemodtageren var omfattet af en dobbeltbeskatningsoverenskomst, hvorefter udbyttet ikke var skattepligtigt i Danmark. Det var et helt centralt element for refusion, at der forelå en udbyttenota (Dividend Credit Advice).

Allerede efter den indledende mail af 3. februar 2014 fra advokat Martin Bünning og Arne Riis' svar herpå samme dato og opdraget er det klart, at Arne Riis' opgave var at vurdere North Channel Banks mulige straf- eller erstatningsansvar ved at udstede en Dividend Credit Advice, herunder ved at der i arrangementet ville blive udstedt to Dividend Credit Advices for samme udbytte, hvorved der ville være risiko for, at der ville blive søgt og udbetalt dobbelt refusion af udbytteskat. North Channel Banks mulige ansvar ville være mest nærliggende, hvis modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, ikke skattemæssigt ville være rette udbyttemodtager.

Arne Riis havde således allerede fra opgavens start en særlig anledning til at udvise forsigtighed ved sin rådgivning. Rådgivningen, der må betegnes som modelrådgivning, må derfor bedømmes efter en skærpet culpanorm. SKAT (senere Skatteforvaltningen) vil som skadelidt kunne gøre et sådant culpaansvar gældende, selv om rådgivningen er ydet over for opdragsgiver, men der foreligger ikke herudover nogen særlig forpligtelse til at varetage SKAT's interesser.

Arne Riis underskrev og afgav den 4. august 2014 en erklæring (Danish Opinion), i form af en legal opinion, om North Channel Banks forhold i skattearrangementet. Efter mailkorrespondancen den 5. maj 2014 og den efterfølgende mail af 23. juni 2014 fra Ulf Kreppel og Arne Riis' fakturering samme dag må det imidlertid lægges til grund, at indholdet af rådgivningen lå fast allerede den 5. maj 2014.

I forhold til Arne Riis' rådgivning foreligger to helt forskellige hovedspørgsmål. For det første, om Arne Riis har handlet culpøst ved at konkludere, at North Channel Bank "ikke bør være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion" ved gennemførelsen af de transaktioner, der er beskrevet i skattearrangementet. Dette indebærer en juridisk bedømmelse af transaktionerne. For det andet, om Arne Riis har handlet culpøst ved ikke at have indset det, som viste sig at blive tilfældet, at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme. Dette indebærer en bedømmelse af, hvad der måtte antages faktisk at ville ske.

*Rådgivningen om de beskrevne transaktioner*

Bedømmelsen af Arne Riis' ansvar for rådgivningen kan ikke foretages alene på grundlag af konklusionen i hans Danish Opinion, men må inddrage det samlede indhold i denne, herunder både den beskrevne model (de påtænkte transaktioner) i pkt. 3 og de udtrykkelige forudsætninger herfor i pkt. 4, set i lyset af opdraget og de informationer, Arne Riis havde modtaget i rådgivningsforløbet. Der kan således ikke ses bort fra forudsætninger og forbehold.

Til grund for rådgivningen lå tidligt i forløbet en Danish Tax Opinion af 27. juni 2012, udarbejdet af advokat Nikolaj Bjørnholm fra Hannes Snellmann Advokatpartnerselskab, der vedrørende den deri beskrevne model blandt andet konkluderede, at en amerikansk pensionsfond bør være berettiget til at kræve fuld refusion af det danske indeholdte udbytte på aktierne (dvs. den danske udbytteskat) i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Under rådgivningsforløbet blev den af advokat Nikolaj Bjørnholm beskrevne model imidlertid ændret på forskellige punkter, dels på initiativ af opdragsgiver dels på initiativ af Arne Riis. Hertil kom, at Arne Riis fik yderligere oplysninger om modellen i forhold til de oplysninger, der fremgik af advokat Nikolaj Bjørnholms tax opinion. Der forelå således ikke en tax opinion vedrørende den model, Arne Riis rådgav om, og dermed heller ikke en udefrakommende skatteretlig bedømmelse af, om modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, skattemæssigt ville være rette udbyttemodtager.

Arne Riis var bevidst herom, idet han i erklæringen i pkt. 5.2 udtrykkeligt gav udtryk for, at dette indebar et usikkerhedsmoment ved konklusionen.

Ifølge pkt. 2.1.1 i Arne Riis' erklæring vurderes ikke den skattemæssige behandling i Danmark af andre parter end North Channel Bank i den påtænkte transaktion. Videre indeholder erklæringen i pkt. 4.5-7 forskellige forudsætninger om ejerskab til aktierne. Dette ejerskab må efter deres ordlyd og sammenhængen samt Arne Riis forklaring for landsretten anses for at angå det juridiske/civilretlige ejerskab til aktierne og ikke det skatteretlige ejerskab.

Erklæringen indeholder således ikke nogen stillingtagen til eller forudsætning om, at modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, skattemæssigt ville være rette udbyttemodtager. Som anført ovenfor ville North Channel Banks mulige ansvar imidlertid være mest nærliggende, hvis modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, ikke skattemæssigt ville være rette udbyttemodtager. Spørgsmålet for Arne Riis var således, om North Channel Bank ville pådrage sig ansvar for at udstede en Dividend Credit Advice uden viden om eller stillingtagen til, om modtageren skattemæssigt ville være rette udbyttemodtager.

Arne Riis foretog da også overvejelser om betydningen af risikoen for, at udbyttemodtageren ikke anses for skattemæssigt at ville være rette udbyttemodtager. Arne Riis forklarede således for landsretten, at det skattemæssige ejerskab var centralt for hans rådgivning, at han vurderede, at Bjørnholms tax opinion var korrekt, og at han lagde denne til grund. Arne Riis gjorde endvidere i konklusionen i pkt. 5.2.1 – 5.2.3 udtrykkeligt opmærksom på tre forskellige omstændigheder, som forhindrede ham i at nå en mere definitiv vurdering af North Channel Banks position. Disse omstændigheder omhandlede alle det skattemæssige ejerskab.

Det blev allerede tidligt i mailkorrespondancen beskrevet for Arne Riis, at North Channel Banks rolle i arrangementet ville være begrænset til at levere tjenester som depotbank til parterne i arrangementet. Arne Riis indsatte i overensstemmelse hermed udtrykkelige forudsætninger i erklæringens pkt. 4.9 til 4.12, der skulle sikre, at banken udelukkende var depotbank og agerede som sådan i overensstemmelse med både egne standardprocedurer og normale depotbankprocedurer.

Landsretten finder på den ovenfor anførte baggrund ikke, at Arne Riis under de i erklæringen angivne forudsætninger har handlet culpøst ved ikke i erklæringen udtrykkeligt at forholde sig til, om modtageren af udbyttet skattemæssigt ville være rette udbyttemodtager, konkludere, at dette ikke ville være tilfældet, og som konsekvens heraf fraråde North Channel Bank at deltage i arrangementet.

Parterne har under landsrettens behandling af sagen har været enige om, at sælgerens salg af de lånte aktier indebærer en skattemæssig afståelse af disse, hvilket indebærer, at pensionsplanen skatteretligt anses for retmæssig ejer af aktierne, medmindre pensionsplanen har disponeret over aktierne på en sådan måde, at det skatteretlige ejerskab er overgået til tredjemand. Landsretten finder, at der i det mindste ikke er en sådan sikkerhed for, at pensionsplanen ved udlån af aktierne eller ved indgåelse af forwardaftalerne som beskrevet i arrangementet ikke længere skal anses for ejer af aktierne i skattemæssig henseende, at det kan anses for culpøst at anse det skatteretlige ejerskab for at forblive hos pensionsplanen.

Det forhold, at der af en anden bank tidligere er udstedt en Dividend Credit Advice for udbyttet, indebærer ikke i sig selv, at North Channel Bank ikke er berettiget til at udstede en Dividend Credit Advice for det samme udbytte, når modtageren af denne Dividend Credit Advice er såvel civilretlig ejer, således som forudsat, som rette skattemæssige ejer.

Det bemærkes endvidere, at der næppe kan tænkes noget ansvar for North Channel Bank, såfremt tredjemand, der i arrangementet udlåner aktierne til sælger, søger refusion af udbytteskat, selv om vedkommende ikke vil være berettiget hertil. Den pågældende tredjemand har i arrangementet ingen relation til North Channel Bank, banken har ikke udstedt nogen Dividend Credit Advice til ham, og banken har ifølge forudsætningen i pkt. 4.13 ingen grund til at antage eller oplysninger eller viden om, hvorvidt tredjemanden vil indgive ansøgning om refusion af udbytteskat på aktierne. En sådan ansøgning og refusion ville da også være strafbar som bedrageri.

Arne Riis' rådgivning, der som anført er en "should-opinion", om transaktioner udført i overensstemmelse med den angivne model kan således ikke anses for culpøs.

*Papirtransaktioner uden aktier og reelle pengestrømme.*

Spørgsmålet er herefter, om Arne Riis burde have indset det, som viste sig at blive tilfældet – at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme.

Landsretten bemærker, at gennemførelse af skattearrangementet som proforma eller uden aktier og reelle pengestrømme strafferetligt må anses som almindeligt bedrageri, der blot er kamufleret ved komplicerede transaktioner.

Landsretten finder, at det efter Arne Riis' forklaring ikke kan lægges til grund, at Arne Riis gennemgik og forstod det tyske diagram. Arne Riis meddelte således den 14. april 2014, da han modtog diagrammet, at hans tyskkundskaber uheldigvis var utilstrækkelige til det krævede niveau, og han gav opdragsgiver tre muligheder for at løse denne situation, herunder at opdragsgiver skulle betale (en beskeden sum) for oversættelse heraf. Opdragsgiver valgte imidlertid en anden mulighed – nemlig den, at Arne Riis i stedet skulle basere sin videre rådgivning på den tidligere model med nogle ændringer og den af Ulf Kreppel udarbejdede mere overordnede engelske tekstbeskrivelse af transaktionerne, som Arne Riis fik tilsendt dagen efter. Det følger heraf, at Arne Riis efter aftale med sin opdragsgiver ikke skulle inddrage det tyske diagram ved sin rådgivning.

Landsretten finder, at det ikke kan anses for culpøst, at Arne Riis ved forudsætningerne i erklæringens pkt. 4.9 til 4.12 om bankens rolle udelukkende som almindelig depotbank, bestemmelserne i pkt. 3 om tredjemændenes rolle, i pkt. 3.4 om pensionsplanens modtagelse af udbyttet og forudsætningerne i pkt. 4.5-4.7 om aktier og udbytte gik ud fra, at interessenterne i skattearrangementet ville disponere i overensstemmelse med modellen, således at arrangementet ikke ville blive cirkulært, og således at der var tale om reelle aktier og pengestrømme.

Landsretten finder således ikke, at Arne Riis har handlet culpøst ved sin rådgivning ved ikke at have indset, at modellen ville blive brugt til at bedrage den danske statskasse for udbytteskat, og som konsekvens heraf frarådet anvendelsen af modellen.

Landsretten tager derfor Bech-Bruun I/S' principale påstand om frifindelse til følge.

Landsretten bemærker i øvrigt, at Skatteforvaltningen ved de ovenfor angivne anbringender ikke kan anses for at have fremsat et nyt anbringende og således være gået uden for rammerne af landsrettens kendelse af 28. februar 2022.

*Sagsomkostninger*

Sagsgenstandens størrelse udgøres af et erstatningskrav på ca. 725 mio. kr. med tillæg af renter, i alt ca. 1,25 mia. kr.

Sagen har været hovedforhandlet i 18 retsdage. Der har været en omfattende forberedelse, herunder med kendelse om edition. Der foreligger ikke oplysninger om, hvor mange advokattimer der er anvendt på sagen.

Sagsomkostningerne i en sag om så store værdier må efter praksis fastsættes skønsmæssigt efter en vurdering af, hvad der kan anses for rimeligt, også under hensyn til sagens omfang og karakter. Der skal endvidere tages hensyn til både arbejdets omfang og det ansvar, der er forbundet med sagens førelse.

På denne baggrund fastsætter landsretten sagsomkostningerne til Bech-Bruun I/S til 6 mio. kr. ekskl. moms til dækning af udgifter til advokatbistand.

Herudover skal Skatteforvaltningen refundere Bech-Bruun I/S' udgifter til oversættelser med 189.953,70 kr.


**THI KENDES FOR RET:**


Bech-Bruun I/S frifindes.

I sagsomkostninger skal Skatteforvaltningen inden 14 dage betale 6.189.953,70 kr. til Bech-Bruun I/S. Beløbet forrentes efter rentelovens § 8 a.

**6. Bilag**

Tysk transaktionsoversigt modtaget af Bech-Bruun den 10. april 2014 (bilag 4).

(vedlægges separat)

Publiceret til portalen d. 28-04-2022 kl. 10:27
Modtagere: Sagsøger Skatteforvaltningen, Sagsøgte Bech-Bruun



EASTERN HIGH COURT
[Image]
COURTS OF DENMARK

# EASTERN HIGH COURT
# JUDGMENT
### handed down on April 28, 2022

**Case BS-26436/2020-OLR**
(Division 12)

Tax Administration
(Attorney-at-law Boris K. Frederiksen, attorney-at-law Steffen Sværke, and attorney-at-law Jacob Sølling)

v

Bech-Bruun I/S
(Attorney-at-law Ole Spiermann and Jakob Lentz)

[…]

**3. Testimony**

Testimony was given by Jens Brøchner, Arne Riis, Gunnar Volkers, Christian Baden Ekstrand, Lisbeth Rømer, Anders Oreby Hansen, and Sven Nielsen.

[…]

[…]

### 3.5 Lisbeth Rømer

**Lisbeth Rømer** testified, amongst other things, that her physical workplace was in Ballerup and Høje Taastrup, even though the management had offices in Jylland.

She did not write the memorandum dated September 5, 2007 concerning the dividend unit in Ballerup. She does not recall having seen the memorandum of September 17, 2006, concerning the forced repayment of withheld Danish dividend tax etc., but she is familiar with the problem discussed in the memorandum.

She is familiar with the Danish Ministry of Taxation's memorandum of November 14, 2007, concerning the repayment of Danish dividend tax to limited taxpayers. Her unit always made every effort to convince the rest of the organization that there were real problems in the area of dividend tax. Her focus was initially on difficulties in connection with complying with the 30-day rule, which applied in relation to interest payments. In her view, this was not a problem that could be solved by adjusting the administrative procedures, as the Danish Ministry of Taxation suggested. In connection with a statutory amendment in 2012, a six-month rule was then actually introduced.

She testified in depth to the Investigative Commission on the Danish Customs and Tax Administration (SKAT) in relation to the 2009 audit performed by SKAT Internal Audit of the revenue from the taxation at source of foreigners.

She also testified in depth to the Investigative Commission on her assessment of the conclusion of SKAT Internal Audit's 2010 report, which said that it was possible to issue multiple dividend credit advices for the same dividend in the case of omnibus custodian accounts. Her impression was not, however, that that was what was happening, but it was correct to say that there was a risk of that happening. Nothing came of the memorandum that she emailed to Lars Nørding on October 28, 2010, since Denmark was then ensconced in discussions within the OECD.

In connection with her testimony to the Investigative Commission, she described in depth the controls in the area of dividends. As far as her unit was concerned, this was an accounting and data entry question. They had tried and failed to secure funding to put in place controls. She thus agreed with the description of the administration of dividend tax in Point 3 of the February 2016 report by the Head of Public Confidence and Legal Certainty at SKAT.

She understood the content of SKAT Internal Audit's 2013 report to mean that formal but not substantive controls were exercised over the form scheme. As regards the spreadsheet scheme (the bank scheme), it was more the case that the banks did the work that actually fell within the remit of her unit. They were confident in the banks' performance of the task.

She testified in depth to the Investigative Commission on the continued relevance of SKAT Internal Audit's 2010 report, even after the issue of SKAT Internal Audit's 2013 report.

When she told the Investigative Commission that 'every senior head' was aware of the problem that there was no real way to exercise controls over the refund of dividend tax, she was referring to Lars Nørding, Jens Sørensen, and René Frahm Jørgensen, amongst others.

She testified at depth to the Investigative Commission on the course of the meeting with Jesper Rønnow Simonsen on October 24, 2013. The part of her testimony on the 'refund loophole' alluded to the fact that it was not possible to exercise any controls and that they had to rely on materials received from third parties.

When, in an email dated October 4, 2011, she sent a memorandum directly to office head Lise Bo Nielsen, in the Ministerial Office, this was because the ministerial office, at that time, was not separate from SKAT. Lars Nørding knew that she had written to the Ministerial Office. Lise Bo Nielsen forwarded the communication to Jakob Schou, who completely rejected it, however. It is in this light that her email of November 21, 2011, to Jakob Schou, amongst others, should be read.

She cannot recall whether she received any email response.

The applications under the form scheme were received by ordinary post. Laurits Cramer was responsible for opening and forwarding the post. Laurits Cramer retired on November 1, 2013, and she herself followed him on December 1, 2013.

All applications were in principle referred to Sven Nielsen. In 2013, the number of employees started to dwindle. She cannot remember who was still in the unit when she retired. It is probably the case, though, that Sven Nielsen, in 2007 and in subsequent years, handled around 90 percent of all applications for dividend refunds. The processing took place in the 3S system, which generated lists used for payments. Everything was kept in bundles, so that they kept a good grip on the documentation.

She testified at depth to the Investigative Commission on the approach to paying refunds of dividend tax and countersignatures. The latter were abandoned in 2011, as there were by then so few employees left that they could not maintain a division of duties. Accounting just received the list of payments, not the actual application materials.

She testified in depth to the Investigative Commission about local accounting approval. This took place as stated in Bente Oddershede's email of May 14, 2014.

In relation to the validity of the documents they were presented with, they could do no more than review what was sent in and assume that the material was genuine and that the information was correct. It was a requirement that the form be certified and signed by the foreign tax authority, so they could find out which double tax agreement was at issue. If the certification and signature were missing, the application in question was returned. This happened often, and this practice was maintained during her time. At one point, however, a change took place in relation to the applications from the U.S.A., such that it was sufficient for a certificate to be appended from the U.S. American tax authorities. She cannot recall who decided that this was sufficient for the documentation requirement to be met.

She is aware that refund agents were used. This scheme arose at some point after 2010, when zero tax was introduced on pensions in the U.S.A. The applications for dividend tax refunds from U.S. American pension plans then gradually started being sent in from 2010 onwards. They spent a lot of time and energy finding out what these pension plans even were. She does not recall that these involved large sums, as one for example sees in the application of May 12, 2014, from Goal Group. She was also not familiar with this refund agent. In her time, the large amounts were in the bank scheme, as she also told the Investigative Commission.

The use of refund agents took place only in the form scheme. In the bank scheme, there was obviously no need for agents.

North Channel Bank's 'dividend advice' of April 9, 2014, to Vanderlee Technology Pension Plan is an example of a dividend credit advice. She does not recognize the signature on the advice. She testified at depth to the Investigative Commission on whether formal requirements were imposed in respect of such a dividend credit advice. The dividend credit advice was absolutely key to the processing. She trusted the banks. This case was capable of growing to the size it did only because it was ordinarily trusted entities that were committing the fraud. A bank that has issued a dividend credit advice cannot identify whether dividend tax really was withheld at the distributing company, and the bank also had no way of determining who was the real 'beneficial owner'. The dividend credit advice is supposed to document the fact that a dividend was paid to the recipient indicated. The dividend credit advices were issued by the banks that the funds were flowing through, and the banks in any case were able to follow the flow of money. The money, of course, was supposed to end up in the hands of the dividend recipient. A refund amount of DKK 37 million was not unusual. They had not experienced fraud with dividend credit advices, but they considered at that time what could take place during the course of this process.

She does not remember coming across the name *Don Donaldson* or *Donald Donaldson*, who, amongst others, is named in the power of attorney dated April 15, 2014, issued by Vanderlee Technologies Pension Plan.

She has not seen all that many certificates like the certificate of April 7, 2014, issued to Vanderlee Technologies Pension Plan, issued by the U.S. Department of the Treasury. The use of these certificates was in its infancy during her time at SKAT. The foreign tax authority, in accordance with the requirements in the relevant double taxation agreement, was supposed to certify that the refund application was a taxpayer in the relevant country. She did not come across certificates where the watermark showed that the certificate was void. That is something that she would have remarked upon.

She does not remember Solo Capital.

In their review of the applications, they tried to assure themselves that the institution in question really was a U.S. American pension plan. However, they were supposed to examine only the formal aspects, and, if the form appeared to be in order, they did not have many options other than paying the refunded dividend tax. The requirement under the double tax agreement to the effect that at least 50 percent of the beneficiaries had to be resident in the U.S.A. was not checked in greater detail, and it was thus assumed that this test was met. If there had been a signature from the U.S. American authorities on the form, the signature of the U.S. American authorities would also include certification of this.

As regards the grounds on page 19, first section, of the judgment of the Eastern High Court of May 23, 2018, in the appeal case against Sven Nielsen, amongst others, it was not a usual procedure for no countersignature to be provided. Laurits Cramer undertook a thorough review of the applications on receipt of the case, and even at that time several applications were rejected. Then, the application would be recorded in 3S. The list from 3S was supposed to be countersigned by Laurits Cramer before it was passed on to bookkeeping, and, at that time, did Laurits Cramer did not review the applications a further time. There were very few employees, and the number of applications was rising greatly. They had a lot of work, so they could not check everything, which they obviously were not obliged to do, either, because everything would then have ground to a halt. The countersignature before the transfer to accounting was therefore a formality. In accounting, there were also supposed to be two signatures. She believes that there was a special procedure in accounting for payments over a certain threshold. She cannot recall whether, in 2011–2012, they set aside the requirement for a countersignature. If it looked right, they were supposed to honor the payment request. They were not supposed to do more than exercise a formal control.

In 2011, Holbæk Tax Center, which was supposed to exercise controls on the tax affairs of employees at SKAT, approached her and told her that they had a case underway concerning Sven Nielsen. She never learned, however, what the case was about. She fully trusted Sven, who was responsible for developing the dividend section of the 3S system and was also extremely competent. She was completely dumbfounded when she found out that Sven Nielsen had committed a crime.

She participated in drawing up the list of problems in 2006. Dividend tax is a very small part of the tax system, and the revenue is not significant. There were therefore not very many people interested in the area. They decided at that time that the administration of dividend tax would be combined with that of the interest system, which was not suitable, because dividends are obviously paid just once a year. It was a problem that no one reconciled what was reported and what was contained in the self-assessment declarations.

The dividend unit always received comments from SKAT Internal Audit, because they did not manage to pay the refunded dividend tax within 30 days. This means that interest would accrue on the amount. This was later changed, so that interest would then accrue only after six months, and this problem was also solved by introducing the bank scheme.

She saw the change in the law in 2009 as a significant improvement. The change in the law in 2012 did not result in the processing in the dividend area becoming more thorough, but it was now possible to complete the processing before the date on which interest would start accruing.

The challenges concerning the omnibus custodian accounts were a global problem, and Denmark contributed significantly to the work undertaken within the OECD. She was also involved in this work and has taken part in many meetings organized by the OECD. The work involved developing a central reporting scheme for distributions, but this was impossible both from a security point of view and from an IT point of view. As far as she was aware, Ivar Nordland was not particularly involved in TRACE, but he was, of course, the foreign affairs director and certainly followed the proceedings. Whether TRACE was a pipe dream naturally depended on how it was cobbled together, but TRACE was not going to be able to solve an acute problem.

**5. The High Court's grounds and decision**

The case concerns a claim for reimbursement, on the part of the Danish Tax Administration against Bech-Bruun I/S, due to the advice that the attorney-at-law Arne Riis provided to North Channel Bank in 2014 concerning possible liability on the part of the bank in respect of its collaboration in a planned tax scheme involving the refund of Danish dividend tax. The attorney-at-law Arne Riis discussed this with attorneys-at-law from the German branch of the law firm Jones Day.

At the time, SKAT was refunding withheld Danish dividend tax when it received an application to which was appended documentation for the payment of a dividend from which Danish dividend tax was withheld and documentation of the fact that the dividend recipient was covered by a double taxation agreement, under which the dividend was not taxable in Denmark. It was a key element in the refund process that a dividend credit advice be available.

Even after the introductory email of February 3, 2014, from attorney-at-law Martin Bünning and Arne Riis's response of the same date concerning the same brief, it was clear that Arne Riis's brief was to assess North Channel Bank's possible liability under criminal law and tortious liability for issuing a dividend credit advice, including by virtue of the fact that, as part of the scheme, two dividend credit advices would be issued for the same dividend, generating a risk that a double refund of dividend tax would be applied for and paid out. North Channel Bank's possible liability would be most likely if the recipient of the dividend credit advice North Channel Bank would issue were not the right dividend recipient from a taxation point of view.

Right from the start of the assignment, Arne Riis thus had particular cause to exercise caution in the provision of his advice. The advice, which must be classified as 'model advice', must therefore be assessed in the light of a more stringent standard for tortious liability. SKAT (later the Danish Tax Administration), as the aggrieved party, could bring a claim for such tortious liability even if the advice were given to a client, without there being any particular obligation over and above that to uphold SKAT's interests.

Arne Riis signed and issued, on August 4, 2014, a statement in the form of a legal opinion ('the Danish Opinion') concerning North Channel Bank's position within the tax scheme. Following the email correspondence of May 5, 2014, and the subsequent email of June 23, 2014, from Ulf Kreppel and Arne Riis's invoicing on the same day, it must nonetheless be concluded that the content of the advice had already been formulated by May 5, 2014.

In relation to Arne Riis's advice, there are two quite distinct questions. The first question is whether Arne Riis acted culpably by saying that North Channel Bank 'should not be liable under Danish civil law, entailing an obligation to compensate the Danish State for any losses flowing from the bank's role in the planned transaction' in connection with the implementation of the transactions described in the tax scheme. This entails a legal assessment of the transactions. The second question is whether Arne Riis acted culpably by not realizing—as proved the case—that the parties involved in the tax scheme would transact in such a way that the tax scheme would be circulated and that the scheme was either 'proforma' or consisted exclusively of paper transactions without shares and actual flows of funds. This entails an assessment of what it ought to have been assumed would actually happen.

*The advice concerning the transactions described*

The assessment of Arne Riis's liability for the advice cannot be performed solely on the basis of the conclusion in his Danish Opinion but must incorporate all of the content thereof, including both the model described (the planned transactions) in Point 3 and the explicit assumptions behind this in Point 4, seen in the light of the brief and the information Arne Riis had received during the course of the advice. The assumptions and reservations cannot therefore be disregarded.

At an early stage in the proceedings, the advice was based on a Danish Tax Opinion dated June 27, 2012, drawn up by the attorney-at-law Nikolaj Bjørnholm from Hannes Snellmann Advokatpartnerselskab, which concluded, in relation to the model described, amongst other things, that a U.S. American pension fund ought to be entitled to demand a full refund of the dividend on the shares withheld in Denmark (namely the Danish dividend tax) under the double tax agreement between Denmark and the U.S.A.

During the period when the advice was being provided, the model described by the attorney-at-law Nikolaj Bjørnholm changed on various points, partly at the behest of the client, and partly at the best of Arne Riis. In addition, Arne Riis received further information about the model in relation to the information set out in attorney-at-law Nikolaj Bjørnholm's tax opinion. There was thus no tax opinion concerning the model Arne Riis was advising on, and there was also no external tax assessment of whether the recipient of the dividend credit advice North Channel Bank would issue would be the right dividend recipient from a taxation point of view.

Arne Riis was aware of this, since, in the opinion, in Point 5.2, he expressly said that this represented an element of uncertainty in the conclusion.

According to Point 2.1.1 of Arne Riis's opinion, the tax treatment in Denmark of other parties in the planned transaction than North Channel Bank was not assessed. Furthermore, Points 4.5–7 of the opinion sets out various assumptions concerning ownership of the shares. This ownership, given their wording and context and Arne Riis's testimony to the High Court, must be viewed as concerning the legal ownership or ownership under civil law of the shares, not the ownership for tax law purposes.

The opinion thus contains no view on or assumption that the recipient of the dividend credit advice North Channel Bank was going to be issuing would be the right dividend recipient from a taxation point of view. As indicated above, North Channel Bank's possible liability would nonetheless be most likely if the recipient of the dividend credit advice North Channel Bank was going to be issuing were not the right dividend recipient from a taxation point of view. The question for Arne Riis was thus whether North Channel Bank would incur liability for issuing a dividend credit advice without knowledge of or without a decision about whether the recipient would be the right dividend recipient from a taxation point of view.

Arne Riis then also considered the significance of the risk that the dividend recipient would not be considered to be the right dividend recipient from a taxation point of view. Arne Riis thus told the High Court that the ownership for tax purposes was key to his advice, that he took the view that Bjørnholm's tax opinion was correct, and that he used this as his basis. Arne Riis furthermore expressly drew attention in the conclusion, Points 5.2.1–5.2.3, to the three different factors that prevented him from arriving at a more definitive assessment of North Channel Bank's position. These factors all concern ownership from a taxation point of view.

Arne Riis had already been told at an early stage of the email correspondence that North Channel Bank's role in the scheme would be limited to providing services as a depository bank to the parties in the scheme. Arne Riis accordingly included express assumptions in Points 4.9–4.12 of the opinion, which were intended to ensure that the bank was exclusively the depository bank and would be acting as such in accordance with both its own standard procedures and normal depository bank procedures.

In the light of the background set out above, the High Court does not conclude that Arne Riis, given the assumptions set out in the opinion, acted culpably by failing in the opinion to take an express view on whether the dividend recipient would be the right dividend recipient from a tax appoint of view, to conclude that this would not be the case, and consequently to advise North Channel Bank against participating in the scheme.

During the High Court's deliberations on the case, the parties agreed that the vendor's sale of the loaned shares represents a disposal thereof from a taxation point of view, which means that the pension plan is considered the lawful owner of the shares, unless the pension plan transacted in relation to the shares in such a way that the ownership for tax purposes were transferred to a third party. The High Court concludes that, at the very least, there is no certainty that the pension plan, when lending the shares or concluding forward agreements as described in the scheme, would no longer be considered the owner of the shares from a taxation point of view, and that it could be viewed as culpable to consider that the tax ownership would remain with the pension plan.

The fact that a dividend credit advice was previously issued by a different bank in respect of the dividend does not in itself mean that North Channel Bank it not entitled to issue a dividend credit advice for the same dividend when the recipient of this dividend credit advice is both the owner under civil law—as presumed—and the correct owner from a taxation point of view.

It is furthermore noted that there can hardly be thought to exist any liability on the part of North Channel Bank where a third party, who, as part of the scheme, lends out shares to a vendor, applies for a refund of dividend tax, even if the party in question were not entitled thereto. The third party in question, within the scheme, has no relationship to North Channel Bank, the bank has not issued any dividend credit advice to him, and the bank, in accordance with the assumption set out in Point 4.13, has no grounds for assuming that and no information or knowledge about whether a third party would be submitting an application for a refund of dividend tax on the shares. Such an application and refund would then also be punishable as fraud.

Arne Riis's advice, which, as indicated, constitutes a 'should opinion', on transactions carried out in accordance with the model indicated, cannot therefore be viewed as culpable.

*Paper transactions without shares and actual flows of funds*

The question is then whether Arne Riis should have realized—as proved the case—that the parties involved in the tax scheme would transact in such a way that the tax scheme would be circulated and that the scheme was either 'proforma' or consisted exclusively of paper transactions without shares and actual flows of funds.

The High Court notes that the implementation of the tax scheme as a 'proforma' arrangement or without shares and actual flows of funds, from a tax law point of view, must be viewed as common fraud, which is merely camouflaged by the complexity of the transactions.

The High Court concludes that, based on Arne Riis's opinion, it cannot be presumed that Arne Riis reviewed and understood the German diagram. Arne Riis after all said on April 14, 2013, when he received the diagram, that his German was unfortunately not good enough and he gave the client three options for solving this problem, including the client paying (a modest sum) for translation thereof. The client, however, chose another option, namely Arne Riis instead basing his advice on the earlier model with a few changes and the more general English text description of the transactions drawn up by Ulf Kreppel, which Arne Riis was sent the day after. Consequently, Arne Riis, in agreement with his client, was not to include the German diagram in his advice.

The High Court concludes that it cannot be seen as culpable for Arne Riis, given the assumptions contained in Points 4.9–4.12 of the opinion on the bank's role exclusively as an ordinary depository bank, the provisions set out in Point 3 on the third party's role and in Point 3.4 on the pension plan's receipt of the dividend, and the assumptions set out in Points 4.5–4.7 on shares and dividends, to assume that the parties involved in the tax scheme would transact in accordance with the model in such a way that the scheme would not be circulated and thus that the shares and flows of funds were real.

The High Court thus does not find that the Arne Riis acted culpably in his advice by failing to realize that the model would be used to defraud the Danish Treasury of dividend tax and to therefore advise against use of the model.

The High Court therefore upholds Bech-Bruun I/S's main claim for dismissal.

The High Court furthermore notes that the Danish Tax Administration, in respect of the submissions set out above, cannot be viewed as having filed a new submission, thus acting outside the scope of the High Court's decision of February 28, 2022.

*Litigation costs*

The case concerns a claim for compensation of approximately DKK 725 million plus interest, producing a total of approximately DKK 1.25 billion.

The trial in this case ran over 18 days of hearings. There was extensive preparation, including an order on the submission of documents. There is no information concerning how many hours were spent by attorneys-at-law on this case.

The case costs in a case concerning such high values must, in accordance with standard practice, be determined discretionarily, following an assessment of what can be considered reasonable, including given the scope and nature of the case. Account must furthermore be taken of both the scope of the work and the responsibility associated with pursuit of the case.

Consequently, the High Court awards Bech-Bruun I/S DKK 6 million to cover the costs of the assistance provided by attorneys-at-law.

In addition, the Danish Tax Administration will refund Bech-Bruun I/S's translation costs of DKK 189,953.70.


**RULING:**


The claim against Bech-Bruun I/S is dismissed.

In relation to litigation costs, the Danish Tax Administration, within 14 days, must pay DKK 6,189,953.70 to Bech-Bruun I/S plus interest in accordance with Section 8 a of the Interest Act.

## 6. Annex

German transaction overview received by Bech-Bruun on April 10, 2014 (Exhibit 4).

(Appended separately)

Published online on April 28, 2022, 10:27
Recipients: Claimant: Danish Tax Administration, Defendant: Bech-Bruun



100 Park Avenue, 16th Fl

New York, NY 10017

www.consortra.com

STATE of NEW YORK          )
                                    )                    ss:
COUNTY of NEW YORK      )

### ***CERTIFICATE OF ACCURACY***

This is to certify that the attached document, "Dom" -- originally written in *Danish*-- is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: 6/20/2022

Sworn to and signed before ME this 20th day of June, 2022

_____

Stephanie Dahl
Senior Projects Manager
Consortra Translations

_____

Notary Public

JAMES G MAMERA
Notary Public - State of New York
No. 01MA6157195
Qualified in New York County
My Commission Expires Dec. 4, 2022



New York, NY  |  Washington DC  |  Houston, TX  |  San Francisco, CA  |  Hong Kong