**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.: 18-cv-04051;
18-cv-09840; 18-cv-09841; 18-cv-10098;
19-cv-01812; 19-cv-01866; 19-cv-01898.

MASTER DOCKET

18-md-2865 (LAK)

**PLAINTIFF SKATTEFORVALTNINGEN'S REPLY MEMORANDUM OF**
**LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

REPLY .......................................................................................................................2

I.    The Revenue Rule Is No Bar to Partial Summary Judgment........................................2

    A.    The Revenue Rule Does Not Bar Partial Summary Judgment Against the
    Solo Bellwether Defendants ................................................................................3

    B.    The Revenue Rule Does Not Bar Partial Summary
    Judgment Against the ED&F Bellwether Defendants ......................................4

        1.    SKAT is not collaterally estopped from disputing the application of
        the revenue rule in the ED&F bellwethers where the English court
        decided an English law issue that was not precisely the same, and
        that court's reasoning was rejected on appeal........................................4

        2.    The ED&F bellwether defendants' meritless Danish law beneficial
        owner arguments do not implicate the revenue rule ............................4

II.   There Is No Genuine Dispute That SKAT Is Entitled
    to Summary Judgment and Prejudgment Interest on Its Restitution Claims ...............5

    A.    There Is No Genuine Dispute That the Plans
    Were Not Entitled to Tax Refunds Under Danish law ......................................5

        1.    There is no genuine dispute that the Solo Bellwether plans
        were not beneficial owners of Danish shares and dividends ................8

            i.    Beneficial ownership of dividends requires custody of
            shares...................................................................................8

            ii.   The Solo Custodians needed to custody Danish shares
            to settle defendants' purported trades .....................................11

            iii.  Defendants do not dispute Mr. Dubinsky's conclusions that
            the Solo Custodians did not hold shares or receive
            dividends...............................................................................12

        2.    There is no genuine dispute that the ED&F Bellwether plans were
        not beneficial owners of Danish shares and dividends ......................13

            i.    There is no genuine dispute that ED&F, not the plans, was
            the beneficial owner of any shares or dividends.....................13

        ii.       There is no genuine dispute that the plans were not the beneficial owners of shares and dividends in the cum-ex trades involving ED&F Dubai. ................................................14

        iii.      There is no genuine dispute that the plans were not the beneficial owners of shares and dividends in the so-called non-Annex E cum-ex trades....................................................15

B.      There Is No Genuine Dispute That the Money Defendants Received Belonged to SKAT............................................................................17

C.      There Is No Genuine Dispute That Defendants Received SKAT's Money ....17

      1.       There is no genuine dispute that Altbach, Klugman, Markowitz, and van Merkensteijn received SKAT's money ..................................17

      2.       There is no genuine dispute that Bradley and his Proper Pacific plan, and Lehman and his FWC Capital plan, received SKAT's money .....18

      3.       There is no genuine dispute that Crema, Schulman, and Acer received SKAT's money ......................................................20

D.      There Is No Requirement That SKAT Exhaust Other Legal Remedies Before Seeking Summary Judgment on Its Legal Restitution Claims............21

E.      There Is No Genuine Dispute That in Equity and Good Conscience, Defendants Should Not Be Permitted to Keep SKAT's Money.....................21

F.      SKAT's Motion Does Not Rely on Inadmissible Evidence ..........................24

      1.       There is no genuine dispute that the Solo Custodian records are authentic.................................................................................25

      2.       The Solo Custodian records are admissible ........................................26

G.      There Is No Genuine Dispute That SKAT's Restitution Claims Are Not Time-Barred................................................................................27

H.      SKAT Is Entitled to Pre-Judgment Interest ....................................................28

III.    There Is No Genuine Dispute That SKAT Is Entitled to Partial Summary Judgment on the False Statement Element of Its Misrepresentation Claims...............29

A.      There Is No Genuine Dispute That the Plans' Refund Applications Included False Representations ......................................29

B.      There Is No Genuine Dispute That the ED&F Bellwether Plans' Refund Applications Included Misrepresentations of Fact ...........................................30

IV.     SKAT Does Not Seek an Impermissible Advisory Opinion as to Altbach .................30

CONCLUSION......................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112
(2d Cir. 1984)....................................................................................................23

*Alvarez v. All Star Boxing Inc.*, 258 So.3d 508 (Fla. Dist. Ct. App. 2018) ..................................20

*Am. Safety Ins. Serv, Inc. v. Griggs*, 959 So.2d 322 (Fla. Dist. Ct. App. 2007)............................20

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103
(2d Cir. 2001)......................................................................................................3

*Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, No. 03 Civ. 0015
(RWS), 2005 WL 1595283 (S.D.N.Y. July 6, 2005)...........................................22

*Belda v. Doerfler*, No. 14-cv-941 (AJN), 2015 WL 5737320 (S.D.N.Y. Sep. 30,
2015) ...............................................................................................................18

*Bietola v. McCue*, 308 A.D.2d 416 (1st Dep't 2003) ...................................................19

*Blecker v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 605 B.R. 570
(S.D.N.Y. 2019)...........................................................................................26, 27

*Caldwell v. Compass Entm't Grp. LLC*, No. 6:14-cv-1701-Orl-41TBS, 2016 WL
7136181 (M.D. Fla. Feb. 4, 2016) ..........................................................................20

*Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261
(S.D. Fla. 2011).................................................................................................20

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014)..............................................26

*Cobalt Multifamily Invs. I, LLC v. Arden*, 857 F. Supp. 2d 349 (S.D.N.Y. 2011) ........................23

*Cohn & Berk v. Rothman-Goodman Mgmt. Corp.*, 125 A.D.2d 435 (2d Dep't
1986) ...............................................................................................................23

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund
Scheme Litig.*, No. 18-md-2865 (LAK), 2021 WL 2689908 (S.D.N.Y. June
30, 2021) ............................................................................................17, 18, 19, 21

*Fed. Ins. Co. v. Groveland State Bank*, 37 N.Y.2d 252 (1975) ....................................................23

*Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union
Bancaire Privee*, 160 F.3d 146 (2d Cir. 1998) .........................................................23

*Gameologist Grp., LLC v Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141 (S.D.N.Y. 2011) ............................................................................................................24

*Harvey v. Fla. Health Scis. Ctr., Inc.*, 728 F. App'x 937 (11th Cir. 2018) ...................................20

*Jenkins v. Prime Ins. Co.*, No. 2:21-cv-00130-DAK, 2021 WL 3726620 (D. Utah Aug. 23, 2021) ......................................................................................................4

*Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465 (Utah 2011)....................................................4

*JPMorgan Chase Bank, N.A. v. Maurer*, No. 13 Civ. 3302(NRB), 2015 WL 539494 (S.D.N.Y. Feb. 10, 2015) ........................................................................18

*Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317 (S.D.N.Y. 2010) .............................................................................................................25

*Kind v. Gutter & Sons, Inc.*, 191 Misc. 331 (City Ct. 1947) .........................................................24

*L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144 (PAC), 2006 WL 988143 (S.D.N.Y. Apr. 13, 2006)..............................................................................15

*Menlo v. Friends of Tzeirei Chabad*, No. 11-CV-1978 (JPO), 2012 WL 137504 (S.D.N.Y. Jan. 17, 2012)...........................................................................21, 22

*Newbro v. Freed*, 409 F. Supp. 2d 386 (S.D.N.Y. 2006)........................................................22, 24

*Peoples Westchester Sav. Bank v. Fed. Deposit Ins. Co.*, 961 F.2d 327 (2d Cir. 1992) .............................................................................................................11

*Picard v. Gettinger (In re Bernard L. Madoff Inv. Secs. LLC)*, 976 F.3d 184 (2d Cir. 2020) .............................................................................................................11

*Quiroga v. Fall River Music, Inc.*, No. 93 CIV. 3914 (RPP), 1998 WL 851574 (S.D.N.Y. Dec. 7, 1998)..............................................................................3

*Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*, No. 21 Civ. 979 (ER), 2022 WL 603998 (S.D.N.Y. Mar. 1, 2022) ......................................................................18

*Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500 (N.D. Ill. 2011)..........................................15

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) ..........................................................................12

*SH575 Holdings LLC v. Reliable Abstract Co.*, 149 N.Y.S.3d 62 (1st Dep't 2021) ....................24

*Sharp v. Bowling*, 511 So.2d 363 (Fla. Dist. Ct. App. 1987)........................................................19

*In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300 (S.D.N.Y. 2019) ......................2, 3, 5

*In re SKAT Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2020 WL 7059843 (S.D.N.Y. Dec. 2, 2020)..............................................................28

*Spaces LLC v. Orlando*, 160 A.D.3d 561 (1st Dep't 2018)..........................................22

*State Farm Mut. Auto. Ins. Co. v. Stokos*, 65 Misc.2d 316 (Civ. Ct. Queen Cty. 1970) ....................................................................................................................23

*Staudinger+Franke GMBH v. Casey*, No. 13 Cv. 6124 (JGK), 2015 WL 3561409 (S.D.N.Y. Jun. 8, 2015) ....................................................................................18

*Swiss Watch Int'l, Inc. v. Movado Grp., Inc.*, No. 00-7703-CIV, 2001 WL 36270980 (S.D. Fla. June 21, 2001) ........................................................................20

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843 (JG)(ARL), 2010 WL 3310262 (S.D.N.Y. Aug. 19, 2010) ..........................................................24

*U.S. Fire Ins. Co. v. Federal Ins. Co.*, 858 F.2d 882 (2d Cir. 1988) ...........................28

*United States v. Kalish*, 403 F. App'x 541 (2d Cir. 2010)...........................................26

*VIIV Healthcare Co. v. Mylan Inc.*, No. 12-cv-1065-RGA, 2014 WL 2195082 (D. Del. May 23, 2014) ............................................................................................15

*In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522 (E.D.N.Y. 2011)...........................8

*White v. Robinson*, 145 A.D. 751 (1st Dep't 1911) ......................................................18

*Williamson v. Stallone*, 28 Misc.3d 738 (Sup. Ct. N.Y. Cty. 2010) .............................22

*Zamor v. L & L Assocs. Holding Corp.*, 85 A.D.3d 1154 (2d Dep't 2011) ...................22

**Statutes and Rules**

U.C.C. § 8-503(b) .........................................................................................................11

**Treatises and Periodical Materials**

Restatement (Third) of Restitution and Unjust Enrichment § 4, comment e................21

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this reply memorandum of law in support of its motion for partial summary judgment in the seven bellwether cases.[1]

## PRELIMINARY STATEMENT

After four years of litigation, the Solo bellwether defendants have finally abandoned all pretense that the Danish shares they claimed to have owned and the Danish dividends they claimed to have received, ever existed.  The record indisputably establishes that the ED&F bellwether defendants likewise did not own shares or dividends.  Necessity being the mother of invention, defendants are left arguing the farcical proposition that under Danish law shares need not exist to be owned, that two parties can create new shares and dividends by entering into a private agreement that can never be consummated, and that "owners" of non-existent shares are entitled to a refund of non-existent tax that was never paid on non-existent dividends.

Defendants are thus unable to raise a genuine dispute as to any material fact showing that SKAT is entitled to partial summary judgment.  Their primary arguments that the revenue rule bars SKAT's claims and that the defendant plans were entitled to tax refunds are based on erroneous interpretations of law that the Court may resolve on summary judgment.  As a matter of law, SKAT's claims are not precluded by the revenue rule because SKAT is not asking the Court to collect any Danish taxes.  The Court will not enforce Danish tax law in rejecting defendants' preposterous Danish law arguments that their plans could conjure ownership of shares out of thin air, merely be agreeing to buy shares from sellers that did not have or ever deliver any shares.  And as a matter of Danish law (and common sense), the defendant plans were not entitled to refunds of tax they never paid based on Danish shares they did not own and

---

1.  Capitalized terms not defined herein have the meanings ascribed to them in SKAT's Memorandum of Law in Support of its Motion for Partial Summary Judgment ("SKAT Mem."), ECF No. 817 (unless indicated otherwise, citations to the docket are to case number 18-md-02865).

Danish dividends they did not receive.  Defendants' far-fetched arguments to the contrary have
been rejected repeatedly by the Danish National Tax Tribunal.

As demonstrated below, defendants' other arguments similarly rest on misinterpretations
of law or fail to raise any genuine dispute of material fact.

## REPLY

### I.     The Revenue Rule Is No Bar to Partial Summary Judgment.

SKAT's claims do not seek direct or indirect enforcement of Danish tax law.[2]  SKAT
does not seek to recover Danish taxes, nor claims that defendants ever owed any Danish taxes.
Defendants do not argue otherwise.  Instead, defendants argue that SKAT's claims will require
the Court to enforce Danish tax law directly or indirectly (they are not clear on which) because
ruling in SKAT's favor will require the Court to reject their far-fetched Danish law arguments
that the plans were the beneficial owners of Danish shares and dividends created out of thin air,
simply by contracting to buy shares from sellers that did not have and never delivered any actual
shares.  (*See, e.g.*, Defs. Opp. 1.)  But any such "argument that an action is one for 'enforcement'
if it involves the determination that defendants were not eligible for or entitled to tax refunds
under Danish law is foreclosed by the case law."  *In re SKAT Tax Refund Scheme Litig.*, 356 F.
Supp. 3d 300, 318 (S.D.N.Y. 2019).

Defendants do not address that caselaw, citing no case providing any support for their
argument that, contrary to the Court's decision, determining that the plans were not entitled to
tax refunds under Danish law would constitute enforcement of Danish tax law.  Tellingly,
defendants cite no revenue rule caselaw at all.  (*See generally* Defs. Opp. 6-11.)  Presumably that
is because the caselaw and the record are clear that the revenue rule applies only where, unlike

---

2.   Pl. Skatteforvaltningen's Mem. of Law in Opp. to Defs.' and Third-Party Def.'s Mot. for Summary Judgment
     ("SKAT Opp."), at 14-15, 26-31, ECF No. 831.

here, "the substance of the claim is, either directly or indirectly, one for tax revenues."  *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 130 (2d Cir. 2001).[3]

      **A.**      **The Revenue Rule Does Not Bar Partial Summary Judgment Against the Solo Bellwether Defendants.**

Notwithstanding defendants' arguments about the need to choose between "competing view[s] of beneficial ownership," (Defs. Opp. 8), the revenue rule does not preclude the Court awarding SKAT partial summary judgment in the Solo bellwethers.  As SKAT demonstrated, indisputable record evidence establishes that the Solo bellwether defendant plans never owned any Danish shares or dividends (SKAT Mem. 12-20; SKAT Opp. 15-21; Section II.A.1, *infra*), a fact that defendants effectively concede, and so never owed any Danish taxes for SKAT to collect.[4]

---

3.   Defendants also misconstrue the Court's previous decision.  For instance, the Court held that SKAT's claims do not seek to enforce Danish tax law directly because the claims are not for tax revenue, SKAT having "not alleged a single instance of tax evasion."  *In re SKAT*, 300 F. Supp. 3d at 311.  Not, as defendants contend, simply because SKAT alleged "'fraud, pure and simple,' untethered to any actual securities transactions."  (Defs. Opp. 10 (quoting *In re SKAT*, 356 F. Supp. 3d at 311).)  While defendants correctly point out that their motion to dismiss failed to advance any evidence that the plans had "any ownership interest of any sort— whether legal or beneficial—in any Danish shares," (Defs. Opp. 10), defendants ignore the Court's subsequent explanation of why, in any event, "determining whether the defendants owned the shares in any respect would not necessarily implicate the revenue rule."  *In re SKAT*, 356 F. Supp. 3d at 317.

4.   Nor, for that matter, has the Ministry of Taxation "essentially endorsed" defendants' erroneous "position" that under Danish law all that is required for beneficial ownership of shares and dividends is a "final, binding, unconditional" agreement to purchase shares.  (Defs. Opp. 7, 8.)  The Ministry's September 2015 note "describes the tax treatment of dividends and dividend compensation in connection with share loans."  (Decl. of Alan Schoenfeld, dated June 6, 2022 ("Schoenfeld Decl."), Ex. 16T at 1.)  Nowhere did the Ministry address, let alone endorse, defendants' frivolous argument that one can create and become the beneficial owner of Danish shares and dividends by contract alone.  (*See generally id.*)  Defendants failed to submit an admissible certified translation of the Ministry's Danish language document, *see Quiroga v. Fall River Music, Inc.*, No. 93 CIV. 3914(RPP), 1998 WL 851574, at *2 n.3 (S.D.N.Y. Dec. 7, 1998) ("[t]ranslations of foreign-language documents which are not certified as true and accurate translations" are not admissible), instead relying on a "rough translation" with obvious translation errors making it hard to understand at times.  (*See, e.g.*, Schoenfeld Decl. Ex. 16T at 8 ("if two parties seek credit or a refund for the same dividend tax, this is done untated [sic] and will be in direct violation of law").)

**B.    The Revenue Rule Does Not Bar Partial Summary
Judgment Against the ED&F Bellwether Defendants.**

**1.    SKAT is not collaterally estopped from disputing the application of
the revenue rule in the ED&F bellwethers where the English court
decided an English law issue that was not precisely the same, and that
court's reasoning was rejected on appeal.**

SKAT is not, as defendants contend (Defs. Opp. 9), collaterally estopped from litigating

the revenue rule's applicability to its ED&F bellwether claims.  (SKAT Opp. 31-34.)  For one

thing, defendants cannot meet their burden to demonstrate that the English law Dicey Rule 3

issue the English High Court of Justice (the "High Court") decided is "*precisely the same*" issue

as the U.S. revenue rule issue that this Court must decide, *Jenkins v. Prime Ins. Co.*, No. 2:21-cv-

00130-DAK, 2021 WL 3726620, at *3 (D. Utah Aug. 23, 2021) (internal quotation omitted),

because different "legal standards" and "interpretive case law" apply to each issue.  *Jensen ex

rel. Jensen v. Cunningham*, 250 P.3d 465, 476-77 (Utah 2011).[5]  Nor would the doctrine's

purposes be served by applying it here, where the English Court of Appeal has rejected the

reasoning in the High Court's decision on which defendants rely.  The Court of Appeal held,

contrary to the High Court, that Dicey Rule 3 does not preclude the kind of claims SKAT asserts

against the ED&F bellwether defendants to "recover monies which had been abstracted from

SKAT's general funds by fraud."  (Decl. of Brandon R. Dillman, dated Apr. 29, 2022, Ex. 141

¶ 128.)

**2.    The ED&F bellwether defendants' meritless Danish law beneficial
owner arguments do not implicate the revenue rule.**

As with the Solo bellwethers, the revenue rule does not preclude the Court awarding

SKAT partial summary judgment in the ED&F bellwethers.  Indisputable facts establish that

---

5.    In attempting to distinguish the decision of the English Court of Appeal, defendants themselves assert that its
reasoning "is inapposite here."  Defs.' & Third-Party Def.'s Mem. In Supp. of Mot. for Summary Judgment, 29
n.24, ECF No. 799.

none of the ED&F bellwether defendants ever owed any Danish taxes.  As ED&F has admitted

for some of the trades, the plans' cum-ex trades did not result in the plans receiving any

dividends from which tax was withheld.  (SKAT Mem. 23-34; SKAT Opp. 22-23, 41-44;

Sections II.A.2.ii & iii, *infra*.)  And with respect to all the plans' trading, cum-ex or cum-cum,

any shares or dividends that did exist belonged to ED&F, not the plans, under the plans'

agreements with ED&F.  (SKAT Mem. 22, 56-58; Section II.A.2.i, *infra*.)  There is no merit in

defendants' arguments that the revenue rule bars the Court from "determining who . . . was the

'beneficial owner'" of any shares or dividends or whether the purported trades entitled the plans

to tax refunds.  (Defs. Opp. 10-11.)  At most, the issue raised is one of English contract law, not

Danish tax law.  But even if Danish law was involved, this Court has held that those sorts of

"argument[s] that an action is one for 'enforcement' if it involves the determination that

defendants were not eligible for or entitled to tax refunds under Danish law is foreclosed by the

case law."  *In re SKAT*, 356 F. Supp. 3d at 318.[6]

## II.    There Is No Genuine Dispute That SKAT Is Entitled to Summary Judgment and Prejudgment Interest on Its Restitution Claims.

### A.    There Is No Genuine Dispute That the Plans Were Not Entitled to Tax Refunds Under Danish law.

Defendants cannot avoid summary judgment on SKAT's restitution claims by arguing

that the plans owned shares simply by entering into a "final and binding agreement" to buy

shares, regardless of whether the sellers had or ever delivered any actual shares.  (Defs. Opp. 12-

15.)  That argument is patently absurd and has already been debunked in Denmark.  As SKAT

has explained, defendants and their expert Mr. Pilgaard's arguments about "final and binding"

---

6.    *See also id.* at 317-18 ("Court need not pass on the validity of any of Denmark's tax laws to determine whether the defendants were the beneficial owners of the shares," but "merely would recognize any relevant law and determine its effect").

agreements were already made to and rejected by the Danish National Tax Tribunal, (SKAT

Opp. 11-13, 16-17), a fact both defendants and Mr. Pilgaard fail to mention.  (*See generally*

Defs. Opp.; Decl. of Foreign Law of Kasper Bech Pilgaard, dated Apr. 27, 2022 ("Pilgaard

Decl.").)  It is especially disingenuous for ED&F to make this argument, having previously,

contrary to its current litigation position, admitted that its Annex E tax vouchers were false and

reported to its UK regulator the Financial Conduct Authority that "no [withholding tax] reclaim

was due" to plans that "did not receive shares in respect of which a dividend was paid,"

notwithstanding the plans having entered into final and binding agreements to purchase shares

before the ex-dividend date.  (Decl. of Marc A. Weinstein, dated June 6, 2022 ("Second

Weinstein Decl."), Ex. 261 ("Sept. 2019 FCA Report") at 3-4.)

　　　　In any event, as defendants' foreign law expert Mr. Pilgaard recognizes, Danish civil law,

not tax law, determines whether the plans acquired ownership rights in Danish shares.  (*See*

Pilgaard Decl. ¶ 155 ("principle of Danish law, including Danish tax law, that ownership of a

given asset is obtained" on "a final and binding and unconditional agreement").)[7]  And it is a

"fundamental" universally applicable principle of Danish "property law" that "a seller, who does

not own an asset, is incapable of transferring ownership to a purchaser."  (Decl. of Foreign Law

of Henning Aasmul-Olsen, dated June 6, 2022 ("Aasmul-Olsen Decl."), ¶ 25.)  Nothing in

Danish tax law displaces this fundamental principle of Danish property law.  (*Id.* ¶ 42.)

---

7.　*See also* Second Weinstein Decl. Ex 190 at 116 (FWC plan's Danish National Tax Tribunal submission (by Mr. Pilgaard's firm)) (conceding: "In principle, tax law is governed by civil law.  This also applies to the question of acquiring ownership of stocks;" and arguing that "ownership of a given asset is acquired when a final and binding agreement has been concluded between the parties, which is legally valid."), 227 (Danish National Tax Tribunal decision rejecting the argument and finding insufficient to establish ownership the plan's "presentation of a series of agreements, etc., which do not demonstrate the Pension Plan's ownership of the stocks in question. . . . No evidence has been provided that the Pension Plan paid initial capital to the Custodian, and no evidence has been provided of other transfers of funds to the Pension Plan from the Custodian or other actors. . . .  Only a large number of constructed agreements, account statements, trade notes, etc., with the Custodian as the agent in the alleged transactions have been provided, which, notwithstanding what has been provided, does not demonstrate that the Custodian traded stocks on behalf of the Pension Plan.").

Thus, Danish law follows the "legal principle" of "*nemo dat quod non habet* ('no one gives what they do not have')," so if the sellers in the plans' supposed "final and binding" share purchase agreements had no shares to sell, the plans could not, as a matter of Danish law, have acquired any ownership interests, beneficial or otherwise, in Danish shares or dividends.  (*Id.* ¶¶ 26, 44.)  Final and binding share purchase agreements do not "transfer ownership until the delivery of [the] share[s] or the completion of other means of segregation of such share[s] from other similar shares for the benefit of the purchaser."  (*Id.* ¶ 41.)[8]  That is the case regardless of whether the custodians made "book entries" in the plans' accounts reflecting shares and dividends.  (Aasmul-Olsen Decl. ¶¶ 8-9.)

As such, in the Solo bellwethers, there is no genuine dispute that the plans were not the beneficial owners of Danish shares and dividends.  (SKAT Mem. 13-18; SKAT Opp. 18-21.)[9]  Likewise, in the ED&F bellwethers, as ED&F admits, the plans were not the beneficial owners of dividends in the cum-ex trades with ED&F Dubai because ED&F Dubai had no shares with dividend rights to transfer to the plans.  (SKAT Mem. 24-28; SKAT Opp. 6-7, 22; Section II.A.2.ii, *infra*.)  The same is true with respect to the ED&F bellwether plans' remaining cum-ex trades.  (SKAT Mem. 28-34; SKAT Opp. 22-23; Section II.A.2.iii, *infra*.)  And, in any event, with respect to all the ED&F trades, the plans transferred to ED&F all right, title and interest in any Danish shares or dividends.  (SKAT Mem. 56-58; SKAT Opp. 22-23; Section II.A.2.i,

---

8.  Defendants' assertion that "every trade" in the Solo bellwethers "was settled in accordance with standard market practices," (Defs. Opp. 14), is contrary to Danish law, (Aasmul-Olsen Decl. ¶ 41), and the FCA's finding that there was "no evidence of . . . settlement of the trades."  (*See, e.g.*, Decl. of Marc A. Weinstein, dated Apr. 29, 2022 ("Weinstein Decl."), Ex. 76 ("Sapien Notice") ¶ 2.10.)

9.  Defendants mistakenly rely on SKAT's current website and the Ministry of Taxation's September 2015 note about tax treatment of share loans, (Defs. Opp. 14, 14 n.8), both of which are premised on the borrower in the share loan agreement borrowing actual shares and further transferring those actual shares to a third-party buyer. Here, by contrast, the "borrowers" from which the plans purportedly purchased shares had no shares to sell, having "borrowed" the "shares" from the plans themselves, which had no shares either.  (SKAT Mem. 15-18.)

*infra.*)  Defendants' debunked Danish law arguments that the plans were nonetheless beneficial owners of shares and dividends do not preclude summary judgment in SKAT's favor.  *See In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 540 (E.D.N.Y. 2011) ("Disputes among experts regarding foreign law do not create issues of fact.").

### 1.   There is no genuine dispute that the Solo Bellwether plans were not beneficial owners of Danish shares and dividends.

Defendants argue that SKAT has not established that the Solo bellwether plans were not beneficial owners, (Defs. Opp. 15-25), but in doing so, they do not dispute the dispositive facts, *i.e.*, that the Solo Custodians held no Danish shares and received no Danish dividends on their behalf, showing that the plans did not own shares or dividends in any sense—beneficial or otherwise.[10]  Rather, defendants fall back on their erroneous Danish law argument that a final and binding agreement to purchase shares is all that is needed for ownership.  (Defs. Opp. 16.) And from this faulty premise, defendants draw the equally untenable conclusions that "the presence or absence of shares has no significance," "one need not receive a dividend to be liable for dividend withholding tax (or entitled to a refund)," and "delivery of shares as part of a settlement process" is not required.  (*Id.* at 16, 19, 23.)

#### i.   Beneficial ownership of dividends requires custody of shares.

Because all that is needed for ownership of Danish shares and dividends is a final and binding share purchase agreement, it must be, defendants argue, that one does not need to custody Danish shares or receive Danish dividends to be the beneficial owner of them.  (Defs.

---

10.  SKAT did not "mislead[] the Court" concerning the FCA's fines of Sapien and Sunrise.  (Defs. Opp. 16.)  The FCA fined Sapien and Sunrise for, among other things, having "inadequate systems and controls to identify and mitigate the risk of being used to facilitate fraudulent trading," which the FCA characterized as "a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions." (*See, e.g.*, Sapien Notice ¶¶ 2.2(a), 2.5.)  Further, defendants' point that a "search for physical share certificates would be misguided," as if that were what SKAT did, is irrelevant.  (Defs. Opp. 15 n.9.)  None of the Solo Custodians' sub-custodians' records include any "electronic book entries" of Danish shares.  (SKAT Mem. 13-14.)

Opp. 16-21.)  But that conclusion conflicts with Danish securities law, under which publicly

traded Danish companies, such as those whose shares defendants pretended to own, issue a fixed

number of shares "in the systems of VP Securities," the Danish central securities depository.

(Aasmul-Olsen Decl. ¶¶ 11-15.)

 "[O]wnership of any share in a Danish company" refers "to ownership of a share existing

as book-entry in the systems of VP Securities, and it will moreover always refer to a share

allocated to a specific account," which share the account holder may be holding on behalf of

"end-investors," including through a chain of sub-custodians.  (*Id.* ¶¶ 17, 19-20.)  It is not

possible for two parties to create additional shares in a Danish company, as defendants contend,

simply by agreeing to buy and sell shares that the contracting parties do not have and never

deliver.  (*Id.* ¶¶ 11-18.)  "A custodian downstream from VP Securities must hold shares that can

be traced upstream through every level of custody until the VP Securities level" for an investor

to own Danish shares.  (*Id.* ¶ 46.)  Thus, as none of the Solo Custodians' sub-custodians held any

Danish shares, (SKAT Mem. 13-14), "it is impossible as a matter of Danish law for the" plans to

have "own[ed] the Danish shares they claimed to own."  (Aasmul-Olsen Decl. ¶ 47.)[11]

 The Danish legal authorities, other materials, and hypotheticals on which defendants rely

in trying to show otherwise are inapposite and far afield from the facts here. The only Danish

legal authorities that address defendants' and Mr. Pilgaard's argument that a final and binding

---

11.  Likewise, under Danish law, "[d]ividends are a distribution of equity made by a company to the owners of its
shares."  (*Id.* ¶ 37.)  "Publicly traded companies can only pay dividends through VP Securities," which in
instances where the VP Securities account holder is holding shares on behalf of others, are then remitted
"downstream" through "chains of custodians."  (*Id.* ¶¶ 37-38 (emphasis removed).)  As with shares, two parties
cannot create additional "dividends" simply by entering into an agreement to buy and sell underlying shares that
cannot be traced to an account at VP Securities.  (*Id.* ¶¶ 58-60.)  If "by reason of the *'nemo dat quod non habet'*
principle," the defendant plans did "not become an owner of shares," then the plans did not "obtain the right to
receive a dividend" either.  (*Id.* ¶ 39.)

agreement is sufficient for beneficial ownership of shares and dividends are the Danish National Tax Tribunal's decisions rejecting their argument.  (*Id.* ¶¶ 65-71.)

Defendants point first to a Danish City Court case to argue that the "presence or absence of shares has no significance" for ownership, but the case says nothing of the sort.  (Defs. Opp. 16-17.)[12]  Mr. Pilgaard's day trading hypothetical is likewise inapposite because the hypothetical involves actual shares that are delivered.  (Defs. Opp. 17 (quoting Pilgaard Decl. ¶ 157).)[13]  And, as discussed above, the "securities lending paradigm," (Defs. Opp. 17), is also no help to defendants.  (*See supra*, pg. 7 n.9.)  Finally, the Danish Supreme Court's March 2020 decision on which defendants rely did not hold "that certain shareholders were responsible for paying dividend withholding tax even though they never received dividends."  (Defs. Opp. 19 (citing Pilgaard Decl. Ex. 83).)  Just the opposite, the Supreme Court held that because the "daughters were current shareholders at the time when the dividend was distributed . . . the entitlement to the dividend belong[ed] to them as a starting point."  (Pilgaard Decl. Ex. 83 at 3.)  "[T]he daughters cannot be released from the obligation to pay dividend tax," the Court reasoned, "by transferring the entitlement to the dividend" to their father.  (*Id.*)[14]

---

12.  In that case (SKM2010.259.BR), one company sold to another company its shares in a third company for either a fixed number of shares in the buying company or, if the buyer chose, their market value at the time of payment, which the buyer could and did defer for one year.  (Pilgaard Decl. Ex. 55 at 1.)  At the end of the one-year term, the buyer chose to pay in shares, the seller sold those shares shortly thereafter, and the issue before the Court was to determine the share "acquisition price" used to calculate the seller's gain for tax purposes.  (*Id.*)  The case says nothing about when the seller became the owner of the shares it received in payment, which there was no question existed and were delivered, and did not even involve a final and binding agreement to acquire the shares, the buyer having had the discretion to pay in cash.  (Aasmul-Olsen Decl. Appendix 5 at 2.)

13.  Mr. Pilgaard acknowledges that the hypothetical day trade settles by delivery of shares several days later.  (Pilgaard ¶ 157.)  Until that settlement, the day trader may have a potential claim against the seller should the trade fail, but not ownership of shares.  (Aasmul-Olsen Decl. ¶ 44.)  To the extent defendants offer Mr. Pilgaard's hypothetical to demonstrate that "[d]elivery of the share as part of the transaction settlement process is not required for the transfer of ownership," (Defs. Opp. 17 (quoting Pilgaard Decl. ¶ 157)), his hypothetical falls far short, is contrary to his assumption that the seller has shares and that the trade indeed settles, and does not even address the circumstances where the seller never delivers any shares.

14.  Defendants' argument that Article 8 of the Uniform Commercial Code provides that one can own shares even if its securities intermediary does not possess them, (Defs. Opp. 20), confuses a "security entitlement" with share ownership.  Under Article 8, "an entitlement holder only has rights to actual securities held by a securities

10

### ii.   The Solo Custodians needed to custody Danish shares to settle defendants' purported trades.

Having thoroughly mangled Danish law, defendants argue that there was no need for the Solo Custodians to hold or receive any Danish shares to settle the plans' purported Danish trading because of "standard settlement operations of netting and internalized settlement."  (Defs. Opp. 21-23.)  According to defendants and their expert, the trading at the Solo Custodians was circular, *i.e.*, "the trades involved 'settlement of offsetting trades' where the 'trades netted to zero,'" so "the Solo Custodians did not need to 'source shares externally' from the market."  (*Id.* at 21 (quoting Carr Rebuttal ¶ 111).)  Rather, "because the 'trades involve the same number of shares'—*i.e.*, they fully offset—'the custodian's holdings will not change after these offsetting trades,' and the custodian can simply 'net all the trades.'"  (*Id.* (quoting Carr Rebuttal ¶ 113).)  Thus, defendants protest, "if the Solo Custodians did not custody Danish shares" (as the record establishes), "it was because they did not need to custody Danish shares."  (*Id.*)

This fallacy ignores the obvious fact that to "net" two offsetting positions, one must hold a position in the first place.  Using internal book entries to cover offsetting positions would not alleviate the need for the Solo Custodians to custody shares that they are supposed to own, in the first instance on behalf of the seller, and after settlement on behalf of the buyer.  Indeed, quite the opposite: "netting" would only accentuate the need to custody shares because, absent custody of actual shares, the Solo Custodians would have had nothing to net against the supposedly offsetting positions.  Thus, notwithstanding defendants' claims that ownership does not require

---

intermediary."  *Picard v. Gettinger (In re Bernard L. Madoff Inv. Secs. LLC)*, 976 F.3d 184, 198 (2d Cir. 2020); *see also* U.C.C. § 8-503(b) ("entitlement holder's property interest with respect to a particular financial asset . . . is a pro rata interest in all interest in that financial asset held by the securities intermediary").  Nor does "the concept" of "fractional reserve banking provide[] a useful analogy" for the defendants.  (Defs. Opp. 20 n.13.)  Customers do not in fact "own every cent listed in their account statements," (*id.*), but rather generally transfer title to deposited money to the bank.  *See Peoples Westchester Sav. Bank v. Fed. Deposit Ins. Co.*, 961 F.2d 327, 332 (2d Cir. 1992) ("an owner of a general deposit is a general creditor of a bank").

the custody of actual shares, the Solo Custodians' regulator the FCA found "no evidence of

ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades

by the" Solo Custodians.  (*See, e.g.*, Sapien Notice ¶ 2.10.)  Consistent with the FCA's

conclusions, under Danish law, "net" or "internalized" settlement of the trades by the Solo

Custodians in the manner described would not result in the plans owning any Danish shares.

"[N]etting and internalized settlement are premised on the custodian holding actual shares."

(Aasmul-Olsen Decl. ¶ 35.)  So "[i]f none of the sellers having accounts with the custodian own

(or has contracted to own) any share of the relevant class, none of the sellers are capable of

conveying ownership to any purchaser under the '*nemo dat quod non habet*' principle, and any

'net' or 'internalized' settlement would not cause a transfer of ownership."  (*Id.*)

### iii.    Defendants do not dispute Mr. Dubinsky's conclusions that the Solo Custodians did not hold shares or receive dividends.

Rather than challenge SKAT's expert Mr. Dubinsky's conclusions that the Solo

Custodians held no shares and received no dividends on behalf of the plans, defendants claim

that Mr. Dubinsky's investigation was "meaningless" by re-hashing their arguments that none of

the custodians needed to hold shares or receive dividends.  (Defs. Opp. 23-25.)

Nor has SKAT left a "critical question unanswered" because the materials seized from

Elysium included an inaccessible hard drive.  (Defs. Opp. 24 n.16.)  Defendants themselves do

not contend that the Solo Custodians ever held any Danish shares or received any dividends, so

can hardly be heard to speculate that the drive might contain evidence of such supposedly

unneeded shares and dividends, especially where no such evidence has been found in any of the

millions of documents accessible to the parties.  *See Scotto v. Almenas*, 143 F.3d 105, 114 (2d

Cir. 1998) ("unsubstantiated speculation" is insufficient to create a genuine dispute).  The same

is true for defendants' argument that Reed Smith's letter to the FCA leaves open the possibility

that the Solo Custodians may have used other sub-custodians, of which there is no trace in the

record.  (Defs. Opp. 25.)  Indeed, such speculation appears to be foreclosed by the key admission

in that letter (and by Sanjay Shah's failure to identify any other sub-custodians in the English

proceedings), which confirms that the Solo Custodians did not hold any Danish shares.  (SKAT

Mem. 13-14, 19-20.)  Asked to clarify whether the Solo Custodians "received dividends paid on

securities," Reed Smith admitted on their behalf that "the Firms did not receive dividends on

Danish securities in cash."  (Weinstein Decl. Ex. 113 at 3.)  Defendants fail to explain how the

plans could have owned shares and suffered withholding tax without receiving the dividends on

those shares.

> **2.      There is no genuine dispute that the ED&F Bellwether plans were not
> beneficial owners of Danish shares and dividends.**

>> **i.      There is no genuine dispute that ED&F, not the plans, was the
>> beneficial owner of any shares or dividends.**

Under the "Absolute title transfer" provision of the English-law governed Terms and

Conditions to which the plans agreed, for any shares or dividends the plans acquired using

ED&F's financing, "full ownership in such assets . . . absolutely transferred to [ED&F], and all

right, title and interest in and to such assets . . . pass[ed] to [ED&F] outright and absolutely for

the purposes of covering [the plan's] obligations to [ED&F]."  (Weinstein Decl. Ex. 171

§ 10(b)(ii).)  As such, to the extent there were any shares or dividends, ED&F, not the plans, was

the beneficial owner of them.  (SKAT Mem. 22, 56-58; SKAT Opp. 22-23; *see also generally*

Decl. of Felicity Toube QC, dated June 24, 2022 ("Toube Reply Decl.").)

Defendants argue that under the Terms, title to the shares and dividends did not transfer

to ED&F immediately, but rather was contingent upon ED&F exercising "its right to use the

asset[s] as collateral," such as by making an entry in a so-called "B-Loan Account."  (Defs. Opp.

26-27.)  This is so, defendants argue, because the provision says that all the plans' assets

received by ED&F "will be *actually or potentially* in respect of margin or collateral." (*Id.* at 27 (quoting Terms and Conditions).) But "English courts are likely to interpret the clear words of" the provision "as effective to transfer all right, title and interest to the Securities to ED&F immediately upon receipt." (Toube Reply Decl. ¶ 88.) There is nothing in the provision itself that conditions title transfer on any further step. (*Id.*) Nor does it "specify what hypothetical further step would be required." (*Id.*) The "potentiality" in the provision "does not relate to ED&F's choice as to whether to treat the Securities as collateral, but rather the nature of the obligation which the collateral is meant to secure," *i.e.*, the plans' current obligations or potential future ones. (*Id.* ¶ 110.)[15]

Finally, "it is an established principle of English law that estoppel is only capable of binding the parties to the representation or common assumption on which the estoppel is founded." (*Id.* ¶ 116.) Thus, SKAT is not estopped from advancing its own interpretation of the contract. (Defs. Opp. 28.) Nor are principles of rectification relevant. (Defs. Opp. 28.) No party has ever sought such a remedy from an English court. (Toube Reply Decl. ¶ 124(3).)

> ### ii. There is no genuine dispute that the plans were not the beneficial owners of shares and dividends in the cum-ex trades involving ED&F Dubai.

ED&F has admitted in SKAT's English action, to this Court, in two reports to the FCA, and through its two Rule 30(b)(6) witnesses that the plans did not receive shares for which a dividend was paid and were not entitled to the "refunds" SKAT paid based on ED&F's false Annex E tax vouchers related to the plans' cum-ex trades involving ED&F Dubai. (SKAT Mem.

---

15. Nor is it significant that ED&F may not have complied with regulatory requirements and its own record keeping policies. (Defs. Opp. 27.) "[U]nder English law, ownership falls to be determined by the relevant agreements governing those ownership rights." (Toube Reply Decl. ¶ 93(4).) Whether ED&F failed to keep adequate records to distinguish between its assets and the plans' assets is irrelevant. (*Id.*) And it is defendants' argument, not SKAT's, that ignores "the commercial purpose" of the Terms, (Defs. Opp. 28), which was to protect ED&F from exposure to its clients to which it had loaned money. (Toube Reply Decl. ¶ 110.)

24-28; SKAT Opp. 6-7, 41-44.)[16]  Neither ED&F nor defendants dispute any of this.  Instead,

they argue, despite ED&F's repeated admissions, there is no admissible evidence that the Annex

E vouchers were false.  (Defs. Opp. 33-35.)  But, as SKAT has explained, Mr. Wall's testimony

admitting the falsity of the Annex E vouchers is admissible because it was based on his personal

knowledge acquired by review of ED&F's business records.  (SKAT Opp. 41-43.)[17]  Nor does

Federal Rule of Civil Procedure 32(a)(3) bar admission of ED&F's Rule 30(b)(6) witnesses'

testimony, including their testimony affirming ED&F's representations in the English action,

"based on [their] personal knowledge."  *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Civ.

9144(PAC), 2006 WL 988143, at *2 (S.D.N.Y. Apr. 13, 2006).[18]  And ED&F's reports to the

FCA are likewise admissible.  (SKAT Opp. 43-44.)

> ### iii.   There is no genuine dispute that the plans were not the beneficial owners of shares and dividends in the so-called non-Annex E cum-ex trades.

Defendants concede that the non-Annex E cum-ex transactions "were broadly similar in

structure" to the Annex E cum-ex transactions, which ED&F has admitted did not result in the

---

16.  *See also* Decl. of Marc A. Weinstein, dated June 27, 2022 ("Third Weinstein Decl."), Ex. 308 (Oct. 5, 2021 Hr'g Tr.) 9:10-14 (ED&F counsel: "The issue . . . relates to a series o[r] subset of approximately 80 tax vouchers which ED&F has acknowledged incorrectly stated that the pension plans were entitled to a withholding reclaim or, as it's stated, that they suffered withholding tax.").

17.  Even assuming *arguendo* that he lacked personal knowledge, Mr. Wall's testimony on ED&F's corporate position as to why the Annex E tax vouchers were false is also admissible under the line of cases on which defendants rely admitting non-party Rule 30(b)(6) testimony when it is based on "corporate," rather than personal, knowledge.  *See, e.g.*, *Sara Lee Corp. v. Kraft Foods Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011).  Mr. Wall's testimony is on precisely the sort of topic that is "particularly suitable for Rule 30(b)(6) testimony," and raises none of the hearsay dangers that may arise when a Rule 30(b)(6) witness testifies, for instance, about a "car accident in lieu of the corporation's truck driver who actually witnessed the event."  *Id.*  Nor did Wall's testimony rely "on another employee's knowledge."  *VIIV Healthcare Co. v. Mylan Inc.*, No. 12-cv-1065-RGA, 2014 WL 2195082, at *2 (D. Del. May 23, 2014).

18.  *See* Defs. Resp. in Opp. to Skatteforvaltningen's Supplemental Local Rule 56.1 Statement, 2-6, ECF No. 819.  Defendants' response to SKAT's supplemental Local Rule 56.1 statement of undisputed material facts improperly begins with six pages of additional meritless arguments as to why SKAT's motion should be denied in an obvious attempt to circumvent the Court-ordered page limits for the parties' briefs.

plans receiving a dividend.[19]  Defendants' experts were unable to identify any distinction in the structure of the trades, and could point only to the identity of the seller (an immaterial fact) as a distinguishing feature between the two categories of trades.[20]

ED&F's September 2019 report to the FCA, withheld from production until after expert discovery concluded, admitted that the Annex E cum-ex trades were structured to be circular, such that the counterparty (ED&F Dubai) covered its purported short sale to the plans by buying those very same shares back from the plans.  (Sept. 2019 FCA Report at 3-4; SKAT Opp. 7.) ED&F admitted that it never acquired shares from the market, and that the "dividends" ED&F credited to the plans were not dividends paid by an underlying Danish company net of withholding tax—instead they were merely credits calculated to equal the total value of a real dividend.  (*Id.*)  This circular trading structure in which no dividend is actually received concededly cannot result in a valid dividend tax voucher regardless of whether the counterparty to the trade was ED&F's Dubai affiliate, or Mitsubishi, Lutetia or some other party.[21]

Accordingly, given that ED&F has not come forward with a single material characteristic distinguishing the non-Annex E tax vouchers from the admittedly false Annex E tax vouchers, the Court should grant summary judgment in SKAT's favor on all cum-ex claims.[22]

---

19. Mem. of Law in Supp. of Mot. *In Limine* to Exclude the Proposed Expert Reports, Opinions and Testimony of Graham Wade, 21, ECF No. 812.

20. *See, e.g.*, Third Weinstein Decl. Ex. 306 (Hayden Dep.) 84:16-89:17 (identifying the "key difference" between Annex E and non-Annex E transactions that ED&F Dubai was the party to the former but not the latter); *id.* Ex. 307 (Warren Dep.) 179:10-184:11, 184:19-195:18, 196:7-207:21 (initially testifying that he identified numerous differences between the Annex E and non-Annex E transactions, but after a lengthy cross-examination followed by a break, conceding that the only difference was that the purported seller of the Annex E shares was ED&F's Dubai affiliate).

21. Mr. Wall's testimony on ED&F's recycling of shares was not limited as ED&F suggests.  The Court-ordered do-over of ED&F's Rule 30(b)(6) deposition included as a topic the FCA investigation, which covered all 420 tax vouchers issued by ED&F, and Mr. Wall himself did not purport to limit his testimony to the Annex E transactions.

22. The plans' purported receipt of "market claim" payments as part of the non-Annex E transactions proves nothing, as ED&F similarly credited the plans with "market reclaim" payments for the Annex E transactions, but now admits that these payments did not reflect real dividends that could serve as the basis of dividend tax

**B.      There Is No Genuine Dispute That the Money
         Defendants Received Belonged to SKAT.**

The argument that SKAT cannot prove its restitution claims because the amounts SKAT

paid belonged to the Kingdom of Denmark, (Defs. Opp. 35-36), is a reprise of defendants'

meritless argument that the Court should dismiss SKAT's claims for lack of standing and fails

for the same reason.  (SKAT Opp. 48-49.)  The Kingdom of Denmark and SKAT are not

separate legal entities.  (Decl. of Mads Bryde Andersen, dated June 6, 2022 ("Andersen Decl."),

¶¶ 97-128.)

**C.      There Is No Genuine Dispute That Defendants Received SKAT's Money.**

**1.      There is no genuine dispute that Altbach, Klugman, Markowitz, and
         van Merkensteijn received SKAT's money.**

Defendants argue that SKAT "has offered no evidence" that defendants Altbach,

Klugman, Markowitz, and van Merkensteijn received SKAT's money, but acknowledge that

SKAT has offered evidence sufficient to show that they are the sole beneficiaries of plans that

did receive SKAT's money.  (Defs. Opp. 37-38.)  Whether defendants have yet withdrawn any

of SKAT's money from their respective plans is irrelevant; the plans hold the money solely for

their benefit.  *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund

Scheme Litig.*, No. 18-md-2865 (LAK), 2021 WL 2689908, at *5 n.47 (S.D.N.Y. June 30, 2021)

---

refunds.  (Sept. 2019 FCA Report at 3-4.)  Defendants' quibbles with the methodologies employed by or
inferences to be drawn from SKAT's expert Mr. Wade's pricing and average daily trading volume analyses are
no substitute for the ED&F bellwether defendants' failure to put forth any evidence supporting their speculation
that the non-Annex E trades, notwithstanding their indistinguishable structure from the Annex E trades, resulted
in the receipt of actual dividends for which the plans could submit refund applications.  As a result, the Court
need not parse through the defendants' various complaints with Mr. Wade's findings to grant summary
judgment, and SKAT will not burden the Court with the multitude of substantive responses to rebut each such
complaint.

17

(sole participant in plan was "enriched when" plan "received the funds, even though the funds may not have been distributed to him individually at that time").[23]

The Court's previous decision cannot be distinguished on the ground that whether the defendants were "enriched" is somehow a different question than whether they "received money." (Defs. Opp. 37-38.) Under New York law, the elements of unjust enrichment and money had and received claims are "essentially identical." *Belda v. Doerfler*, No. 14-cv-941 (AJN), 2015 WL 5737320, at *4 n.4 (S.D.N.Y. Sep. 30, 2015).[24]

### 2. There is no genuine dispute that Bradley and his Proper Pacific plan, and Lehman and his FWC Capital plan, received SKAT's money.

Nor is there any genuine dispute that Bradley and Lehman, and their respective plans the Proper Pacific and FWC Capital plans, received SKAT's money. With respect to the plans, despite arguing that the plans had "every right to use and enjoy" the fictitious dividend payments that the Solo Custodians booked to their accounts, defendants argue that the plans never received any of the SKAT "refund" payments that the Solo Custodians also credited to their accounts. (Defs. Opp. 13, 38-42.) The plans' custodial statements show that the plans received SKAT's payments on their refund applications (minus the payment agent's fee), and then approximately 95 percent of those amounts was paid to Shah's Ganymede, (Weinstein Decl. Ex. 117 at FWCCAP00000225-26; *id.* Ex. 120 at PROPPACIFIC00000142-44), leaving the Proper Pacific

---

23. *See also JPMorgan Chase Bank, N.A. v. Maurer*, No. 13 Civ. 3302(NRB), 2015 WL 539494, at *6 (S.D.N.Y. Feb. 10, 2015) ("unjust enrichment accrues immediately when the form of enrichment is an annuity or other asset that pays out over the course of many years . . . . the plaintiff may sue over the entire asset immediately, rather than waiting for the defendant to receive each dividend").

24. Unlike the cases on which defendants rely, the plans are not companies that received SKAT's money for their own use and benefit. *See White v. Robinson*, 145 A.D. 751, 765 (1st Dep't 1911) (plaintiff's money "went to the company or was expended for its benefit"); *Remcoda, LLC v. Ridge Hill Trading (PTY) LTD*, No. 21 Civ. 979 (ER), 2022 WL 603998, at *11 (S.D.N.Y. Mar. 1, 2022) (complaint alleged only that the company, not the individuals, received money); *Staudinger+Franke GMBH v. Casey*, No. 13 Cv. 6124(JGK), 2015 WL 3561409, at *9 (S.D.N.Y. Jun. 8, 2015) (similar).

and FWC Capital plans, and Bradley and Lehman as the plans' sole beneficiaries, with the remaining approximately five percent of SKAT's payments.  *See In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Scheme Litig.*, 2021 WL 2689908 at *5 n.47.

While the plans' closing balances were $0 (Defs. Opp. 39, 40 n.30), that is only because the plans used their money to pay various fees over the course of many months, including a monthly "Custody Clearing Fee" in excess of $10,000.  (Weinstein Decl. Ex. 117 at FWCCAP00000223-26; *id.* Ex. 120 at PROPPACIFIC00000144-45.)  Thus, SKAT's money did not "disappear[]" from the plans' accounts and its presence there was not "fleeting[]." *Bietola v. McCue*, 308 A.D.2d 416, 417 (1st Dep't 2003).  That the plans spent the money does not mean that they and their sole beneficiaries should not be required in equity and good conscience to pay it back. *See Sharp v. Bowling*, 511 So.2d 363, 364 (Fla. Dist. Ct. App. 1987) (reversing dismissal of unjust enrichment claim because defendant "had spent the windfall").

Further, the only reasonable inference that can be drawn from the evidentiary record is that the supposed "fees" Bradley and Lehman were paid for "introducing" their plans to the Solo Custodians also was SKAT's money.  (SKAT Mem. 11-12; SKAT Opp. 69-72.)  Neither has any credible explanation for why anyone would pay them, by their own account, at least $100,000 (Bradley) or $700,000 to $800,000 (Lehman) simply for establishing a U.S. pension plan and introducing it to the Solo Custodians.[25]

Defendants argue that SKAT cannot show that it conferred a direct benefit on Lehman with respect to the "introducing broker fee" because SKAT supposedly "cannot[] specifically and directly trace the monies received by Lehman to SKAT's tax reclaim monies."  (Defs. Opp.

---

25.  SKAT's expert Mr. Dubinsky did not conclude that neither Bradley, Lehman, nor their plans received SKAT's money.  (Defs. Opp. 38, 40.)  Mr. Dubinsky merely noted that, as Bradley and Lehman admit, the so-called "introducing broker fees" each received were all paid to them personally, rather than to any of the plans they established to participate in the fraud.  (Weinstein Decl. Ex. 89 (Dubinsky Report) ¶¶ 245, 251.)

40-41.)  But none of the cases on which defendants rely even hint that there is such a direct

tracing requirement.  For instance, in *Swiss Watch Int'l, Inc. v. Movado Grp., Inc.*, the court

dismissed the unjust enrichment claim not because of any failure on the plaintiff's part to trace

the benefit, but because the plaintiff's "limit[ing] its purchases" of defendants' watches in the

unauthorized "grey market" at most "may have conferred an indirect benefit" on defendant.  No.

00-7703-CIV, 2001 WL 36270980, at *5 (S.D. Fla. June 21, 2001).[26]

Nor are SKAT's damages, *i.e.*, five percent of the "refund" payments and the amount of

Lehman's and Bradley's "introducing broker" fees, not "measurable and quantifiable."  (Defs.

Opp. 41-42 (quoting *Alvarez v. All Star Boxing Inc.*, 258 So.3d 508, 512 (Fla. Dist. Ct. App.

2018)).)  In *Alvarez*, the court remanded on damages because, unlike here, the plaintiff's

"assumed earnings" damages theory lacked any "fact-based chain of reasoning to allocate or

quantify to some degree the plaintiff's contribution to those earnings."  258 So.3d at 514.

### 3. There is no genuine dispute that Crema, Schulman, and Acer received SKAT's money.

SKAT paid the AIG plan, in which defendant Crema was the sole participant, and the

Riverside plan, in which defendant Schulman was the sole participant, DKK 21,060,000 and

DKK 12,724,425, respectively.  (SKAT Mem. 36.)  Of these amounts, the AIG and Riverside

plans transferred DKK 11,307,555 and DKK 5,938,663, respectively, to ED&F.  (*Id.* at 37-38.)

As the sole participants in their plans, Crema and Schulman received and benefitted from

SKAT's payments to the same extent as their plans.  *See In re Customs & Tax Admin. of the*

---

26. The unjust enrichment claims in the other cases on which defendants rely likewise failed because the plaintiff
had not conferred a direct benefit on the defendant, not because of any purported tracing requirement.  *See
Caldwell v. Compass Entm't Grp. LLC*, No. 6:14-cv-1701-Orl-41TBS, 2016 WL 7136181, at *2 (M.D. Fla.
Feb. 4, 2016); *Harvey v. Fla. Health Scis. Ctr., Inc.*, 728 F. App'x 937, 947 (11th Cir. 2018); *Century Sr. Servs.
v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011); *Am. Safety Ins. Serv, Inc. v.
Griggs*, 959 So.2d 322, 331 (Fla. Dist. Ct. App. 2007).

*Kingdom of Denmark (SKAT) Tax Refund Scheme Litig.*, 2021 WL 2689908 at \*5 n.47.  Further,

from the amounts transferred to ED&F, Acer received DKK 3,308,314 of the AIG plan's

"refunds" and DKK 2,307,875 of the Riverside plan's "refunds."  (SKAT Mem. 38.)  Thus,

contrary to defendants' argument (Defs. Opp. 42), there is no genuine dispute that Crema,

Schulman, and Acer each received SKAT's money.

  **D.**  **There Is No Requirement That SKAT Exhaust Other Legal Remedies Before Seeking Summary Judgment on Its Legal Restitution Claims.**

  The argument that the Court cannot "resort to equitable remedies unless and until SKAT

has demonstrated that no adequate remedy at law exists," (Defs. Opp. 43), ignores the fact that

SKAT's New York and Utah law money had and received claims and Florida law unjust

enrichment claims are actions at law, not in equity, and SKAT's motion seeks money damages

only, not equitable remedies.  (SKAT Mem. 39-41, 51-52, 54; SKAT Opp. 55-56.)[27]

  **E.**  **There Is No Genuine Dispute That in Equity and Good Conscience, Defendants Should Not Be Permitted to Keep SKAT's Money.**

  Defendants' arguments—that somehow "[e]quity and good conscience dictate that

Defendants should be permitted to keep" millions of dollars of SKAT's money to which they had

no entitlement, or "[a]t the least, there is a triable question regarding the balance of the equities"

(Defs. Opp. 44)—cannot be squared with the undisputed facts demonstrating that the defendants

obtained SKAT's money via false tax refund applications.

  Defendants argue that "[i]n similar circumstances, courts routinely deny summary

judgment," (Defs. Opp. 44), but none of the cases they cite involved circumstances at all similar.

For instance, in *Menlo v. Friends of Tzeirei Chabad*, the court denied summary judgment

---

27.  *Cf.* Restatement (Third) of Restitution and Unjust Enrichment § 4, comment e (requirement that there be no available legal remedy is generally of no practical significance since "a modern claim in restitution or unjust enrichment is so often the equivalent of a cause of action that was available at law").

because of a genuine dispute of material fact "over the required timing and conditions of

repayment under" the parties' loan agreement.  No. 11-CV-1978 (JPO), 2012 WL 137504, at *3

(S.D.N.Y. Jan. 17, 2012).[28]  By contrast, where, as here, the record conclusively establishes that

defendants received and benefited from money to which they had no entitlement, courts grant

summary judgment on restitution claims.  *See, e.g.*, *Newbro v. Freed*, 409 F. Supp. 2d 386, 400

(S.D.N.Y. 2006) (plaintiff "satisfied the third element of a restitution claims as a matter of law"

because "equity and good conscience militate[d] against permitting defendants to retain the . . .

funds" (internal quotation omitted)).[29]

   The argument that SKAT was not, in fact, mistaken in paying defendants' refund

applications and supposedly knew the plans were not entitled to tax refunds, (Defs. Opp. 45), is

unsupported: there is no evidence in the record showing that SKAT knew the representations of

share ownership and dividend receipt were false.  (SKAT Opp. 56-58.)

   Next, defendants argue that even if they were not entitled to the "refunds" (they were

not), "reasonable fact-finders still could conclude that equity and good conscience do not require

Defendants to return any money to SKAT" because, for instance, they might conclude that

SKAT was somehow "more culpable than Defendants."  (Defs. Opp. 45.)  But defendants'

examples of SKAT's supposed "culpability," for example, not requiring applicants "to disclose

---

28.  In *P360 Spaces LLC v. Orlando*, issues of fact precluded summary judgment because the plaintiff had "signed a contract of sale in which it agreed that the basement space was not being conveyed to it" and "defendants shared the mistaken belief that they had the right to use the space."  160 A.D.3d 561, 562 (1st Dep't 2018). And in *Zamor v. L & L Assocs. Holding Corp.*, a triable issue of fact existed as to whether the defendant should retain the benefit plaintiff conferred by "payment of property taxes and maintenance fees" on property after it was conveyed to defendant.  85 A.D.3d 1154, 1156-57 (2d Dep't 2011).

29.  *See also Williamson v. Stallone*, 28 Misc.3d 738, 750 (Sup. Ct. N.Y. Cty. 2010) (granting summary judgment on money had and received claim where "undisputed evidence" demonstrated that partnership's "net asset value was overvalued when defendants withdrew and that defendants received inflated disbursements from the partnership"); *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, No. 03 Civ. 0015 (RWS), 2005 WL 1595283, at *4 (S.D.N.Y. July 6, 2005) (granting summary judgment on unjust enrichment claim to recover "royalty payments and other fees" paid "based on agreements that either already had terminated or were void *ab initio*").

whether they had purchased shares that had been borrowed," fall flat, and, in any event, would not have prevented defendants' fraud.  (Defs. Opp. 46.)[30]  And they are a far cry from the "unconscionable fraud upon the investing public" that led the court in *Cobalt Multifamily Invs. I, LLC v. Arden* to dismiss the plaintiff's unjust enrichment claim on equitable grounds.  857 F. Supp. 2d 349, 367 (S.D.N.Y. 2011).[31]

Similarly, defendants argue that the equities may favor defendants because of "SKAT's (at best) negligent actions."  (Defs. Opp. 46.)  But the cases on which defendants rely in which courts considered the fault of the payor all involved two innocent parties, both victims of a non-party's fraud, and the question before the court was which of the two should bear the loss.  *See Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146, 148 (2d Cir. 1998) (fraudster sent forged check to defendant bank and directed the bank to deposit the check into his account and "transfer the bulk of the proceeds to two accounts at different banks").[32]  Defendants cite no caselaw supporting their position that they should keep the profits they made at SKAT's expense.

Finally, defendants argue that reasonable fact finders could conclude they should keep SKAT's money because they received it in good faith.  (Defs. Opp. 47.)  But "defendants have identified no case law suggesting that . . . the recipient of ill-gotten funds may retain those funds

---

30. Defendants' examples of their supposed innocence—*i.e.*, their purportedly "objectively reasonable" interpretation of Danish law under which the plans owned Danish shares and received dividends that never existed and their purported compliance with all SKAT's documentation requirements, even though the dividend credit advices they submitted were false—are likewise uncompelling.  (Defs. Opp. 45-46.)

31. *See also Cohn & Berk v. Rothman-Goodman Mgmt. Corp.*, 125 A.D.2d 435, 436 (2d Dep't 1986) (unjust enrichment claim barred "by the doctrine of unclean hands").

32. *See also Fed. Ins. Co. v. Groveland State Bank*, 37 N.Y.2d 252, 256 (1975); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 126 (2d Cir. 1984); *State Farm Mut. Auto. Ins. Co. v. Stokos*, 65 Misc.2d 316, 317 (Civ. Ct. Queen Cty. 1970).

simply because . . . the recipient, at one time, thought he had rightfully acquired them." *Newbro*, 409 F. Supp. 2d at 399.[33]

### F.    SKAT's Motion Does Not Rely on Inadmissible Evidence.

Defendants argue that the Solo Custodians' purported trading records seized from Elysium are inadmissible because SKAT has not shown their authenticity and they are hearsay. (Defs. Opp. 50-56.)  Neither argument has merit.  While defendants challenge the admissibility of these documents, they do not dispute that the purported trading at the Solo Custodians was circular, and in fact offer the circular nature of the trading as an explanation of why neither the Solo Custodians nor their sub-custodians held any Danish shares.  (*See, e.g.*, Defs. Opp. 21.) Defendants themselves rely on Solo Custodian records (which can be found in the documents seized from Elysium and are identical in form to the ones on which SKAT relies) to try to show that the plans owned Danish shares and dividends.  Defendants also assert, without explanation, that SKAT "cannot establish the elements of its claims as a matter of law" without these records, (Defs. Opp. 56), but the Solo Custodians' bank records showing no dividends, their admission to the FCA that they received no cash dividends, and their sub-custodians' records and statements showing no shares, along with the FCA's investigation reports finding that the purported trading was circular, and the absence of records seized from Elysium demonstrating any share ownership

---

33.  In *SH575 Holdings LLC v. Reliable Abstract Co.*, the court dismissed the unjust enrichment and money had and received claims because the plaintiff did not allege "a relationship between the parties that could have caused reliance or inducement."  149 N.Y.S.3d 62, 64 (1st Dep't 2021).  The other cases on which defendants rely are likewise inapposite.  *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843 (JG)(ARL), 2010 WL 3310262, at *2 (S.D.N.Y. Aug. 19, 2010) (applying "broad exception to the rule of *nemo dat quod non habet* in the case of money" that "even an outright thief has the power to pass title to a good faith holder for value"); *Kind v. Gutter & Sons, Inc.*, 191 Misc. 331, 333 (City Ct. 1947) ("If a pawnor who has no title thereto sells pawned property subject to the pawnbroker's lien, and the purchaser expends part of the purchase price in redeeming the goods, no claim will lie against the pawnbroker, if the transaction be made in good faith."); *Gameologist Grp., LLC v Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 167 (S.D.N.Y. 2011) (unjust enrichment and quantum meruit claims failed "because there [was] no evidence that the plaintiff provided anything of value to the defendants or that the defendants accepted services from the plaintiff").

or dividend receipt, all establish conclusively that the plans that used the Solo Custodians owned no shares and received no dividends.

> ### 1.    There is no genuine dispute that
> ### the Solo Custodian records are authentic.

Defendants argue that SKAT has not shown the authenticity of the trading records on which it relies because SKAT has not shown "a connection between Elysium and Solo via Sanjay Shah," but do not dispute that Shah owned the Solo Custodians.  (Defs. Opp. 51-52.)[34] And record evidence establishes the Elysium companies were Shah's too.  (Second Weinstein Decl. Ex. 202 (Bradley Dep.) 325:12-326:6 (Elysium was "Mr. Shah's company"); Third Weinstein Decl. Ex. 310 (Lehman Dep.) 256:18-20 (Elysium was "an entity associated with Sanjay Shah"); Sapien Notice ¶ 4.137 ("Elysium Global" was "a corporate vehicle connected to Mr[.] Shah").)  And defendants' argument that SKAT "has offered nothing" to show that the records are Solo Custodian documents ignores their distinctive characteristics, which identify the four Solo Custodians and the plans, reflect trades that match (in issuers, dates, numbers of shares, prices) the plans' trades, and are the same form of documents that the defendants received from the Solo Custodians, the authenticity of which is not in question.  (SKAT Mem. 44-47.)[35]

---

34.  The Solo Custodian trading records on which SKAT relies were seized, pursuant to Dubai International Financial Centre court order, from Shah's Elysium companies.  (Weinstein Decl. Ex. 97.)  Defendants' assertion that SKAT "flout[ed] its disclosure obligations" and produced Rana Shashaa's declaration "for the first time when SKAT served" its summary judgment motion on April 29, 2022, is false.  (Defs. Opp. 51 n.37.)  SKAT produced the declaration to the defendants on December 3, 2021, before the close of fact discovery and about a week after the declaration was signed.  (Third Weinstein Decl. Ex. 309 at 2.)

35.  *See also Kaur v. New York City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 324 (S.D.N.Y. 2010) ("circumstantial evidence" established "documents [were] authentic and reliable" where they were "produced on Defendant's letterhead," witnesses testified "to the existence of a performance review policy in which [similar documents] were produced," and plaintiff "offered" documents that were "identical in form").

## 2.     The Solo Custodian records are admissible.

As an initial matter, SKAT does not offer the Solo Custodian records for the truth of any statement therein, *i.e.*, that any of the purported trading occurred, so the documents are not excluded by the rule against hearsay.  (SKAT Mem. 47-48.)[36]  SKAT offers the trading records only to show that even according to Solo Custodians' own records, the plans' purported share purchases would not have resulted in the plans owning Danish shares or receiving dividends.

Further, even assuming SKAT were seeking to admit the records for the truth of any statement therein, which it is not, the records are admissible under the business records exception.  (SKAT Mem. 48-50.)  SKAT does not, as defendants contend, argue that "the documents alone are sufficient to provide the foundation for their admissibility."  (Defs. Opp. 54.)  Defendants themselves contemporaneously received the same form of documents from the Solo Custodians and rely on such documents to attempt to show that the trading was genuine. (SKAT Mem. 49-50.)  Further, the trustworthiness of the documents on which SKAT relies is shown by the fact that the documents identify the plans' purported trades (by issuers, dates, number of shares, prices), along with the purported trades of the "sellers" and "stock-lenders" in the circular trading loop.  (SKAT Mem. 50-51); *see Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 691 (S.D.N.Y. 2014) ("requirements for qualification as a business record can be met . . . by circumstantial evidence").[37]

---

36.  *See also United States v. Kalish*, 403 F. App'x 541, 545-46, 546 n.4 (2d Cir. 2010) (admission of "[p]laques . . . purporting to depict successful loans and satisfied customers" to show that defendant "intentionally overstated [company's] efficacy" did not violate rule against hearsay because they "were not entered into evidence for their truth").

37.  None of SKAT's experts "have pointed out a lack of trustworthiness" in the Solo Custodian records in documenting that the plans' supposed trading was circular.  (Defs. Opp. 54-55.)  In fact, relying on the Solo Custodian records, Mr. Dubinsky confirmed that all the plans' purported trading followed the same circular patterns.  (SKAT Mem. 17 n.24.)  And while the Solo Custodians' records also show how the Solo Custodians had to retroactively manipulate certain "interest and fees" to artificially net the fictitious trades to zero, (Defs. Opp. 54), SKAT does not rely on the documents to establish that any such interest or fees were actually incurred or paid.  *See Blecker v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 605 B.R. 570, 585 (S.D.N.Y.

26

Nor does SKAT need "testimony by a Solo Custodian representative" to establish "which Solo Custodian was associated with which email address or letterhead."  (Defs. Opp. 55.)  That connection is apparent from the face of the documents, (SKAT Mem. 49), and in any event, can be confirmed by defendants, who received and who rely on trading documents from these same email addresses and on the same letterhead.[38]

### G.   There Is No Genuine Dispute That SKAT's Restitution Claims Are Not Time-Barred.

Defendants' argument that SKAT's claims are untimely under Denmark's three year-limitations period rests on the false premise that SKAT supposedly had a duty "to make *active investigations*" of all tax refund applications "on a presumption that facts of relevance to the case may be hidden somewhere."  (SKAT Opp. 51 (quoting Andersen Decl. ¶ 155).)[39]  But under Danish law, SKAT's duty to investigate is sufficient to trigger the limitations period only where SKAT already has available to it, and so should have known, the information necessary to file its claim.  (SKAT Opp. 50-52; Andersen Decl. ¶ 156.)  Defendants fail to raise any genuine factual issue as to whether SKAT should have known immediately, or by end of 2014 at the latest, that the plans' refund applications were false, or that SKAT had the ability to identify their refund applications, out of the multitude it received, as fraudulent.  Defendants do not even attempt to make such a showing that SKAT had the means or information to detect their malfeasance, such

---

2019) (rejecting argument that "books and records relevant to profit withdrawals [were] not trustworthy because BLMIS's internal records were 'permeated with fraud'").

38. Defendants' argument that the Solo Custodian records are uncorroborated by their own records misses the mark. (Defs. Opp. 55.)  Many of the Solo Custodian records identify the defendants' purported trades and the other trades completing the circles in the same document.  (SKAT Mem. 46-47, 50.)  Nor is SKAT asking "the Court to extrapolate a facially sufficient showing under Rule 803(6)(A) to the millions of pages of Elysium documents" that have been produced in this litigation.  (Defs. Opp. 55.)  At this stage, SKAT seeks admission only of the particular trading records on which it relies in this motion.

39. Defendants assert that all SKAT's claims are untimely (Defs. Opp. 56), but some of the claims are unquestionably timely under Danish law because they were filed within three years of SKAT's payments.

that it should have known of its claims.  As a matter of Danish law, none of the supposed red

flags defendants identified in their motion was sufficient to trigger the running of the three-year

Danish limitations period on SKAT's claims.  (Andersen Decl. ¶¶ 179-89, 195-97.)

        With respect to defendants' new argument that SKAT's money had and received claims

in the ED&F bellwethers are untimely under Utah's four-year limitations period, (Defs. Opp. 56-

57), SKAT sued the AIG plan and the Riverside plan and Schulman on May 4 and June 7, 2018,

respectively, *i.e.*, within four years of most of SKAT's payments.  SKAT's money had and

received claims based on those payments are unquestionably timely and the Court should award

summary judgment on them.  With respect to SKAT's claims against the AIG and Riverside

plans and Schulman (and against Acer and Crema) based on payments SKAT made more than

four years before it filed its complaints, SKAT withdraws its summary judgment motion.[40]

### H.    SKAT Is Entitled to Pre-Judgment Interest.

        Defendants argue that SKAT is not entitled to prejudgment interest on its money had and

received claims in the New York Solo bellwethers because SKAT does not assert breach of

contract claims and SKAT's claims are of an "equitable nature."  (Defs. Opp. 57 (quoting CPLR

§ 5001(a)).)  But SKAT's money had and received claims are actions at law, not in equity, and

based on a contract implied by law.  (SKAT Mem. 39-41.)  Courts have "recognized that a

plaintiff who recovers for breach of a contract implied by the court is entitled to interest as of

right under § 5001(a)" and "the history of" that section also "supports the conclusion that a

plaintiff who recovers under an implied contract was meant to recover predecision interest as a

matter of law."  *U.S. Fire Ins. Co. v. Federal Ins. Co.*, 858 F.2d 882, 889 (2d Cir. 1988).

---

40.  Defendants ignore Utah's "fraudulent concealment" equitable discovery rule that applies to toll the limitations
     period where "given the defendant's actions, the plaintiff acted reasonably in failing to file before the
     limitations period expired."  *In re SKAT Tax Refund Scheme Litig.*, No. 18-md-2865 (LAK), 2020 WL 7059843,
     at *7 (S.D.N.Y. Dec. 2, 2020) (internal quotation omitted).

Next, defendants argue that prejudgment interest cannot be awarded on SKAT's Florida law unjust enrichment claims based on "the evidentiary record before the Court" because the dates SKAT made the payments at issue are somehow "irrelevant" to determining the dates on which SKAT's claims were liquidated.  (Defs. Opp. 57-58.)  But those are the dates SKAT paid the amounts at issue to the plan via its payment agent.  That the plan subsequently transferred some of the money to Ganymede, thereby reducing the amount by which it was enriched, does not change that the dates of SKAT's payments are when the plan, and Lehman as sole beneficiary, received SKAT's money.  To the extent the Court determines that prejudgment interest on Lehman's "introducing broker fee" should run from the date the money was funneled to him personally, SKAT seeks prejudgment interest on that amount running from that date.

Finally, defendants argue prejudgment interest cannot be awarded in the ED&F bellwethers because SKAT has not shown that the defendants "continued to possess the funds it disbursed." (Defs. Opp. 58.)  Defendants cite no Utah statute or caselaw even indicating that there is such a requirement.

### III.    There Is No Genuine Dispute That SKAT Is Entitled to Partial Summary Judgment on the False Statement Element of Its Misrepresentation Claims.

#### A.    There Is No Genuine Dispute That the Plans' Refund Applications Included False Representations.

Defendants' argument that the plans' refund applications never represented that the plans' owned securities, received dividends and suffered withholding tax, and if they did, such representations were true, (Defs. Opp. 59-61), fails for the reasons set forth in SKAT's opposition to defendants' summary judgment motion seeking dismissal of SKAT's claims on these grounds.  (SKAT Opp. 40.)  For the RJM Capital, Basalt Ventures, Roadcraft Technologies, Proper Pacific, AIG and Riverside plans, the cover letters for each refund application specifically represented that the enclosed application included "evidence of payment

and tax deduction paid on the [plan's] securities." (*See, e.g.*, Weinstein Decl. Exs. 163-65, 172-76.)  Likewise, the cover letters for the FWC Capital plan's refund applications specifically represented that the plan was seeking "a complete refund of Danish Dividend Tax that was previously withheld in relation to [the plan's] investments." (*See, e.g.*, *id.* Ex. 177.)[41]

> **B.     There Is No Genuine Dispute That the ED&F Bellwether Plans' Refund Applications Included Misrepresentations of Fact.**

There is no merit to the argument that whether the ED&F bellwether plans' representations were statements of fact or opinion presents a genuine dispute of material fact. (Defs. Opp. 61-62.)  Nor is there anything to defendants' argument, (Defs. Opp. 61), that they were inactionable legal conclusions.  (SKAT Opp. 35-38.)  And, as SKAT has demonstrated, the representations unquestionably were false.  (SKAT Mem. 22-34; Section II.A.2, *supra*.)

**IV.     SKAT Does Not Seek an Impermissible Advisory Opinion as to Altbach.**

In the Roadcraft Technologies plan bellwether, SKAT seeks partial summary judgment as to whether the plan's representations were materially false.  (SKAT Mem. 61-63.)  That is not an advisory opinion.  (Defs. Opp. 62-63.)  Whether Altbach is liable for those representations presents a fact issue for trial.  (SKAT Opp. 75-79, 83-84.)

## CONCLUSION

For the reasons set forth above and in SKAT's Memorandum of Law in Support of its Motion for Partial Summary Judgment, SKAT respectfully requests that the Court grant its motion for partial summary judgment in the seven bellwether cases.

---

41. Further, the RJM Capital plan's April 3, 8 and 17, 2013 refund applications included the representation that the plan was the "owner/usufructuary" of the shares.  (Joint 56.1 ¶¶ 172-76.)  Bradley and Lehman admitted in their answers to SKAT's pleadings that their plans "represented to SKAT that [they] held shares in, and received dividends net of withholding tax from, large Danish-listed companies."  *See* Answer of Doston Bradley, ¶ 37, No. 18-cv-04041-LAK, ECF No. 88; Answer of Roger Lehman, ¶ 37, No. 18-cv-10098-LAK, ECF No. 85.  And the AIG and Riverside plans likewise admitted that their refund applications represented that the plans were "the beneficial/legal owner of the shares identified in th[e] applications."  (Weinstein Decl. Ex. 101 (RFA Response No. 38); *id.* Ex. 102 (RFA Response No. 19).)

Dated: New York, New York
June 27, 2022

HUGHES HUBBARD & REED LLP

By:____/s/ Marc A. Weinstein_____
    William R. Maguire
    Marc A. Weinstein
    Neil J. Oxford
    Dustin P. Smith
    Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Fax:  (212) 422-4726
bill.maguire@hugheshubbard.com
marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
dustin.smith@hugheshubbard.com
gregory.farrell@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*