UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re

CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION

MASTER DOCKET
18-md-2865 (LAK)

**PLAINTIFF SKATTEFORVALTNINGEN'S RESPONSES TO DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, as modified by the Court's Orders dated November 16, 2021 (ECF No. 675) and March 24, 2022 (ECF No. 745), Plaintiff Skatteforvaltningen ("SKAT") submits this response to the Defendants' Response in Opposition to Skatteforvaltningen's Supplemental Local Rule 56.1 Statement (the "Defendants' 56.1 Response") and Counterstatement of Material Facts.

**I.    The Defendants' 56.1 Response is Improper**

Sections II and III of the Defendants' 56.1 Response are little more than an addendum to their summary judgment brief intended to serve as an end around to the page limits the parties agreed on and the Court so-ordered. Order dated April 25, 2022, ECF No. 792. Defendants' 56.1 Response is not an appropriate place to include additional legal argument requesting denial of SKAT's summary judgment motion, and these sections of the response should be disregarded.

Defendants' arguments are also legally infirm. For instance, SKAT's Supplemental Local Rule 56.1 Statement does not violate the "spirit" or the "text" of Local Rule 56.1. (Defendants' 56.1 Response 1-2 (quoting *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. Of Pomona*, 138 F. Supp. 3d 352, 395 (S.D.N.Y.).) SKAT's statements of material undisputed fact are all

103163521_2

conclusively established by the cited admissible evidence. Nor are they "replete with argument" or "opinions." (Defendants' 56.1 Response 2 (quotation omitted).)

In that regard, there is no merit to Defendants' argument that Federal Rule of Civil Procedure 32(a)(3) precludes SKAT from seeking admission of the testimony of ED&F's Rule 30(b)(6) witnesses. (Defendants' 56.1 Response 2-4.) Even if SKAT is not an "adverse party" to ED&F within the meaning of the rule, the testimony of ED&F's witnesses "based on [their] personal knowledge" is still admissible. *L-3 Commc'n Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144(PAC), 2006 WL 988143, at *2 (S.D.N.Y. Apr. 13, 2006). Thus, as SKAT explained in its opposition to defendants' summary judgment motion, Mr. Wall's testimony admitting the falsity of the Annex E vouchers is admissible because it was based on his personal knowledge acquired by review of ED&F's business records. (SKAT Opp. 6-7, 41-44.) And so are ED&F's representations in the documents from SKAT's English action (Defendants' 56.1 Response 4-6), which representations ED&F's Rule 30(b)(6) witnesses affirmed in their testimony. ED&F's reports to the FCA are likewise admissible. (SKAT Opp. 43-44.)

ED&F has in fact admitted in SKAT's English action, to this Court, in two reports to the FCA, and through its two Rule 30(b)(6) witnesses that the ED&F Bellwether Defendant plans did not receive shares for which a dividend was paid and were not entitled to the "refunds" SKAT paid based on ED&F's false Annex E tax vouchers related to the plans' cum-ex trades involving ED&F Dubai. (SKAT Mem. 24-28; SKAT Opp. 6-7, 41-44.)[1] Neither ED&F nor defendants dispute that these repeated statements and admissions were accurate. Accordingly, Defendants' arguments

---

1. *See also* Decl. of Marc A. Weinstein, dated June 27, 2022 ("Third Weinstein Decl."), Ex. 308 (Oct. 5, 2021 Hr'g Tr.) 9:10-14 (ED&F's counsel stated: "The issue . . . relates to a series of subset of approximately 80 tax vouchers which ED&F has acknowledged incorrectly stated that the pension plans were entitled to a withholding reclaim or, as it's stated, that they suffered withholding tax.").

2

regarding ED&F's repeated and consistent admissions represent their latest attempt to avoid the admitted and inevitable fact that the tax vouchers they submitted to SKAT were false.

## II. Response and Objection to the Defendant's Counterstatement of Material Facts

As to the Defendant's Counterstatement of Material Facts, SKAT responds and objects as follows:

1. For each of what SKAT refers to as the 13 "Cum-Cum" transactions executed by ED&F on behalf of the ED&F Bellwether Plans, the relevant ED&F Bellwether Plan made a trade request to ED&F to purchase shares in a Danish company with an upcoming dividend event. *See* DSMF ¶¶ 196, 205, 218, 227, 236, 254, 275, 307, 315, 324, 340, 350, 359.

**SKAT's Response:** Undisputed. *See* SKAT's 56.1 Resp. ¶¶ 196, 205, 218, 227, 236, 254, 275, 307, 315, 324, 340, 350, 359.

2. For each "Cum-Cum" transaction, ED&F executed a trade with a trade date prior to the ex-dividend date for the relevant dividend event, and provided confirmation of that trade to Stacey Kaminer and/or Acer Investment Group. *See* DSMF ¶¶ 197, 206, 219, 228, 237, 255, 276, 308, 316, 325, 341, 351, 360.

**SKAT's Response:** Disputed. The statement does not accurately describe the nature of the purported purchases. *See* SKAT's 56.1 Resp. ¶¶ 197, 206, 219, 228, 237, 255, 276, 308, 316, 325, 341, 351, 360.

3. For each "Cum-Cum" transaction, ED&F received a SWIFT message confirming settlement of the trade from its sub-custodian, which in each case was either BNP Paribas or Skandinaviska Enskilda Banken. *See* DSMF ¶¶ 198, 208, 220, 229, 238, 256, 277, 309, 317, 326, 342, 352, 361.

**SKAT's Response:** Disputed. In and of itself, an MT545 message does not mean that any particular transaction by a Pension Plan has been validly settled or completed. *See* SKAT's 56.1 ¶ 79, 114, 117; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832; SKAT's 56.1 Resp. ¶¶ 198, 208, 220, 229, 238, 256, 277, 309, 317, 326, 342, 352, 361.

4.     Each "Cum-Cum" transaction settled on or before the record date for the relevant dividend event. *See* DSMF ¶¶ 198, 208, 220, 229, 238, 256, 277, 309, 317, 326, 342, 352, 361.

**SKAT's Response:** Undisputed, but the cited documents do not support the statement. *See also* SKAT's 56.1 Resp. ¶¶ 198, 208, 220, 229, 238, 256, 277, 309, 317, 326, 342, 352, 361.

5.     Following each "Cum-Cum" transaction, ED&F received from its sub-custodian a SWIFT message demonstrating receipt by the sub-custodian of a dividend payment from the relevant Danish issuer, which in each case was equal to 73% of the dividend rate multiplied by the number of shares held. DSMF ¶¶ 202, 213, 224, 233, 242, 259, 280, 312, 321, 332, 347, 356, 367.

**SKAT's Response:** Disputed.  In and of itself, an MT566 message does not demonstrate the receipt by the sub-custodian of a dividend payment from the relevant Danish issuer.  *See* First Weinstein Declaration Ex. Ex. 92 (Wade Rebuttal Report) ¶¶ 172-176, Ex. 93 (Wade Reply Report) ¶ 96.

6.     For each of what SKAT refers to as the 12 "Cum-Ex" transactions, the relevant ED&F Bellwether Plan made a trade request to ED&F to purchase shares in a Danish company with an upcoming dividend event. *See* DSMF ¶¶ 142, 151, 160, 169, 178, 187, 245, 260, 266, 281, 289, 298.

**SKAT's Response:** Undisputed.  *See* SKAT's 56.1 Resp. ¶¶ 142, 151, 160, 169, 178, 187, 245, 260, 266, 281, 289, 298.

7.     For each "Cum-Ex" transaction, ED&F received a SWIFT message confirming settlement of the trade from its sub-custodian, which in each case was either BNP Paribas or Skandinaviska Enskilda Banken. DSMF ¶¶ 144, 153, 162, 171, 180, 189, 247, 262, 268, 283, 291, 300.

**SKAT's Response:** Disputed.  In and of itself, an MT545 message does not mean that any particular transaction by a Pension Plan has been validly settled or completed.  In particular ED&F attempted to settle the Cum-Ex transactions by reusing the same shares multiple times until all shapes of the trade had been resolved, and as a result never held the full amount of shares that were part of the cum-ex transactions.  *See* SKAT's 56.1 ¶¶ 79, 114-118; Second

4

Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832; SKAT's 56.1 Resp. ¶¶ 144, 153, 162, 171, 180, 189, 247, 262, 268, 283, 291, 300.

8. VP Securities, Denmark's Central Securities Depository, permitted parties trading in Danish securities during the relevant period to agree on "any settlement date from the trading day, T+0, to T+365." *See* Danmarks Nationalbank, Assessment of the VP settlement system against the ECSB/CESR Recommendations for Securities Settlement Systems, at 12, available at https://www.nationalbanken.dk/en/publications/Documents/2012/04/Assesment%20of%20the%20VP%20settlement%20system_2012.pdf.

**SKAT's Response:** SKAT does not dispute this statement but disputes its materiality.

9. Each "Cum-Ex" transaction settled the day after the record date for the relevant dividend event. *See* DSOF ¶¶ 143, 152, 161, 170, 179, 188, 246, 261, 267, 282, 290, 299; JSUMF ¶¶ 300-15.

**SKAT's Response:** SKAT disputes this statement and its materiality. SKAT disputes that settlement of the transactions occurred because the counterparty purporting to sell the shares in the "Cum-Ex" transactions did not have shares to sell and the transactions were not validly settled or completed. In particular ED&F attempted to settle the Cum-Ex transactions by reusing the same shares multiple times until all shapes of the trade had been resolved, and as a result never held the full amount of shares that were part of the cum-ex transactions. *See* SKAT's 56.1 ¶¶ 79, 114-118; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609832–35; SKAT's 56.1 Resp. ¶¶ 143, 152, 161, 170, 179, 188, 246, 261, 267, 282, 290, 299.

10. Global securities markets recognize the concept of a "market claim," which may be used to transfer a dividend from the seller of a share to the buyer of the share. *See*, *e.g.*, European Central Bank and Target2 Securities, T2S Corporate Actions Standards: Market Claims, at 3 (May 16, 2013), available at

https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2S MarketClaimStandards.en.pdf.

**SKAT's Response:** SKAT disputes this statement and its materiality, and objects that the statement is too broad for SKAT to meaningfully respond to. The cited document defines a

5

103163521_2

market claim as "a process to reallocate the proceeds of a distribution to the contractually entitled party."  *See also* First Weinstein Declaration Ex. 93 (Wade Reply Report) at ¶¶ 63-65.

      11.     Securities markets recognize that a market claim is appropriate in circumstances where the parties intend to settle a transaction after the record date and in circumstances where the parties intend to settle a transaction before the record date, but fail to do so. *See* European Central Bank T2S Corporate Actions Standards Frequently Asked Questions, Questions 1.1, 1.3, 1.5, 1.22 (March 8, 2018), available at ecb.targetseccasg180308_T2SCAStandardsFAQsUpdatedMarch2018.en; Corporate Action Joint Working Group, Market Standards for Corporate Actions Processing at 41 (2012), available at . https://www.ebf.eu/wp-content/uploads/2017/07/CAJWG-Standards-revised-version-2012-final-clean-_-priorities-marked.pdf ("Market Claims should be created . . . when trade date is before Ex Date and there is a Pending Transaction at close of business of Record Date").

**SKAT's Response:**  SKAT disputes this statement and its materiality, and objects that the statement is too broad for SKAT to meaningfully respond to.  In particular, the cited rules assume regular way trades using exchange-standard terms, while the trades at issue in this case all took place over the counter.  *See* First Weinstein Declaration Ex. 93 (Wade Reply Report) ¶¶ 63-65.

      12.     For the two "Cum-Ex" transactions not included on Annex E, the counterparties, Lutetia Capital and Mitsubishi UFJ Financial Group ("MUFG"), confirmed by email that ED&F was due a dividend by virtue of the trading between the parties, and paid their dividend along to ED&F. DSMF ¶¶ 251, 271.

**SKAT's Response:** Disputed.  The facts stated in this paragraph are not supported by the evidence cited. This statement also omits key context.  The AIG Plan received no dividend from the share issuer for the shares purportedly purchased from Lutetia Capital or MUFG; Lutetia Capital and MUFG each made a contractual payment to the AIG Plan through ED&F; and this payment is not traceable to the issuer of securities. SKAT's 56.1 ¶¶ 105-106, 108.

13.     In seeking the dividend payments from Lutetia Capital and MUFG, ED&F specified that it was "claiming the below dividend due to cum dividend trades settling after the dividend record date." *See, e.g.*, Dillman Decl. Ex. 115 (ED&F-00044985) at ED&F-00044997.

**SKAT's Response:** Disputed.  This statement omits key context.  The AIG Plan received no dividend for the shares purportedly purchased from Lutetia Capital or MUFG; Lutetia Capital and MUFG each made a contractual payment to the AIG Plan through ED&F; and this payment is not traceable to the issuer of securities. SKAT's 56.1 ¶¶ 85(f)(iv), 105-106, 108.

14.     For the ten "Cum-Ex" transactions underlying the tax vouchers listed on Annex E, ED&F's securities operations personnel debited the dividend payment from MPT Dubai and credited the dividend payment to the relevant ED&F Bellwether Plan. *See, e.g.*, Weinstein Decl. Ex. 150.

**SKAT's Response:** Disputed. The payment from MPT Dubai and credited to the relevant ED&F Bellwether Plan was not a dividend payment.  MPT Dubai received no dividend and could not make dividend payments to the ED&F Bellwether Plans.  Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35; SKAT's 56.1 ¶¶ 94(a), 96 – 99.

15.     MPT Dubai was not the seller of the shares for any transaction at issue other than those underlying the tax vouchers listed on Annex E. *See* DSMF ¶¶ 145, 154, 163, 172, 181, 190, 263, 284, 292, 301; *see generally* DSMF ¶¶ 142-369.

**SKAT's Response:**  Undisputed.

16.     For both "Cum-Cum" and "Cum-Ex" transactions, account statements provided by ED&F to the relevant ED&F Bellwether Plan show that, as of the ex-dividend date for the relevant dividend event, the relevant ED&F Bellwether Plan owned the shares for which they received confirmation of acquisition. DSMF ¶¶ 146, 155, 164, 173, 182, 191, 200, 210, 222, 231, 240, 249, 272, 286, 293, 302, 310, 319, 330, 345, 354, 365.

**SKAT's Response:** Disputed.  *See* SKAT's 56.1 Resp. ¶¶ 146, 155, 164, 173, 182, 191, 200, 210, 222, 231, 240, 249, 272, 286, 293, 302, 310, 319, 330, 345, 354, 365.  Further, because any shares were held in an unsegregated omnibus account, under ED&F's Terms & Conditions, "all right, title, and interest" in the ED&F Bellwether Plan's assets held at ED&F transferred to ED&F outright.  Weinstein Decl. Ex. 171 at 18.

17.     For both "Cum-Cum" and "Cum-Ex" transactions, ED&F credited the expected amount of the dividend received on account of those shares to the relevant ED&F Bellwether Plan, which was in all cases equal to 73% of the dividend rate multiplied by the number of shares owned. DSMF ¶¶ 140, 149, 158, 167, 176, 185, 194, 205, 216, 225, 234, 243, 264, 278, 287, 296, 304, 313, 324, 339, 348, 359.

**SKAT's Response:**  SKAT objects to this alleged fact as confusing, and unclear as to what amount is meant by an "expected amount of the dividend received."  It is undisputed that for Cum-Cum transactions, ED&F credited the ED&F Bellwether Plans' account with the amount of the dividend received by ED&F, though under ED&F's Terms & Conditions, "all right, title, and interest" in the ED&F Bellwether Plan's assets held at ED&F transferred to ED&F outright. First Weinstein Decl. Ex. 171 at 18.  For Cum-Ex transactions, SKAT maintains that ED&F credited the ED&F Bellwether Plans' accounts with an amount based on an artificial calculation by ED&F to replicate the dividend that would be paid on actual shares subject to Danish withholding tax, but which shares were not actually owned by the Plans and which dividends were not actually received.  SKAT's 56.1 ¶ 99; Second Weinstein Decl. Ex. 261 (Sept. 2019 FCA Report) at ED&F-00609833–35.

18.     For "Cum-Cum" and "Cum-Ex" transactions alike, ED&F prepared tax vouchers stating that the dividend amounts received and credited to the ED&F Bellwether Plan were net of withholding tax.  JSUMF ¶¶ 324-345.

**SKAT's Response:** Undisputed.

19.     Each tax reclaim application submitted to SKAT on behalf of the relevant ED&F Bellwether Plan included the relevant tax voucher(s) produced by ED&F. JSUMF ¶¶ 359, 368.

**SKAT's Response:**  Undisputed.

20.     SKAT has stated in a pleading in its action against ED&F in England, and thus has admitted, that "[f]or the purposes of Danish tax laws (including in relation to . . . the eligibility for a refund of withholding tax), a share is acquired or disposed of at the time when a final and binding agreement exists on the acquisition or disposal." *See* Dillman Decl. Ex. 138 (Claimant's Further Particulars Regarding the Validity of WHT Refund Applications) at ¶ 15.3.

8

103163521_2

**SKAT's Response:** Disputed. The statement omits context from SKAT's pleadings in the English Actions that "the rule that a share is acquired or disposed of at the time when there is a final or binding agreement is not an exception to the principle [of *nemo dat quod non habet*]. That is to say, a person who contracts to buy shares does not become the owner of the shares by entering into a final and binding agreement to purchase shares unless the seller owned the shares at the time of conclusion of the agreement," and ultimately delivered those shares to the buyer. Dillman Decl. Ex. 138 (Claimant's Further Particulars Regarding the Validity of WHT Refund Applications) at ¶ 15.4 (emphasis in original).

21. Clause 10(b)(ii) of the ED&F Terms and Conditions of Business states that "all assets . . . received by us . . . in respect of your account will be actually or potentially in respect of margin or collateral." Blessington Decl. Ex. 13 (ED&F Terms and Conditions of Business), at ACER_00011114.

**SKAT's Response:** Disputed. The full statement is: "all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us."

22. When ED&F exercised its right to use client assets as collateral for financing provided to the ED&F Bellwether Plans, ED&F made a record of entry to a separate "B-Loan Account." The B-Loan Account for the AIG Plan was called "CC:AMERIC-BLOAN" and the B-Loan Account for the Riverside Plan was called "CC:RIVERS-BLOAN." *See, e.g.*, Blessington Decl. Ex. 14 (ACER_00001624) (showing relevant transactions for TDC DC for March 2014 dividend event).

**SKAT's Response:** Disputed. The cited document does not support the statement.

23. Under the Double Taxation Treaty in place between the United Kingdom and Denmark, ED&F, as a resident of England, would have been entitled to a refund of dividend tax withheld in excess of 15% of the gross dividend amount if it had been "beneficial owner" of the

relevant shares and had applied to SKAT for a tax reclaim. *See* UK/Denmark Double Taxation Convention art. 10(2)(a), signed November 18, 1980.

**SKAT's Response:**  Disputed, but only to the extent that for ED&F to have been entitled to such a refund, ED&F would have had to own the relevant shares at the relevant time and have received dividends on those shares from which it suffered withholding tax and otherwise satisfied the criteria set forth in the UK/Denmark Double Taxation Convention.

24.  SKAT alleged in England that the contractual arrangements between ED&F and the ED&F Bellwether Plans were "intended to enable a [pension plan] to make a withholding tax application," and that the "chain of transactions" in fact "had no other purpose." *See* Dillman Decl. Ex. 136 (SKAT Re-Amended Schedule 5T) at ¶ 5(b).

**SKAT's Response:**  SKAT does not dispute this statement but disputes its materiality.

103163521_2