**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | MASTER DOCKET |
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | 18-md-2865 (LAK) |
| This document relates to all associated dockets. | |

## DECLARATION OF FOREIGN LAW OF FELICITY TOUBE QC

**TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................................3

    A.   Qualifications..........................................................................................3

    B.   Preparation of the Declaration ................................................................4

    C.   Summary of Opinions .............................................................................5

    D.   Summary of Response to Declaration of Foreign Law of Richard
        Salter ......................................................................................................6

    E.   The Factual Background..........................................................................8

II.  ANALYSIS.......................................................................................................13

    A.   Contractual Construction – Applicable Legal Principals .....................13

    B.   Application of the Contract Suite to the Purported Securities
        Transactions ..........................................................................................18

        i.   Pursuant to the Terms, all right, title and interest to the Securities
            Transferred to ED&F when financing was provided to the Pension Plans
            ................................................................................................18

        ii.  Custody Agreement Is Not Applicable When ED&F Provided Financing
            For The Purchase Of The Danish Shares..................................24

        iii. Title to the Securities Transferred to ED&F.............................31

        iv.  The Security Deed Supplemented and Did not Supersede the Terms.......33

    C.   Responses To Mr Salter's Declaration .................................................39

        i.   The Terms governed right, title and interest to the Securities if and to the
            extent that ED&F advanced funds to the Clients to purchase the Securities
            ................................................................................................39

        ii.  Pursuant to the Terms, all right, title and interest to the Securities
            transferred to ED&F immediately upon receipt ........................42

        iii. Claims of Estoppel and/or Rectification Would be Highly Unlikely To
            Succeed ....................................................................................61

    D.   Conclusion ............................................................................................68

I, Felicity Toube, declare the following:

1.      Counsel for SKAT,  which is the Customs and Tax Administration of the Kingdom of Denmark, has requested my expert opinion on whether, as a matter of the construction of certain English law documents (the Contract Suite documents - as defined in paragraph 19 below), ED&F Man Capital Markets Limited ("**ED&F**") held all right, title and interest to certain Danish securities (the "**Securities**") and related dividends ("**Dividends**") which it held as collateral to secure obligations owed by the pension plan clients (the "**Pension Plans**")[1] to ED&F when Dividends were declared in respect of those Securities, or whether it held the Securities as bare trustee (the "**Issue**").

## I.      INTRODUCTION

### A.      <u>Qualifications</u>

2.      I am a barrister practicing at the Bar of England and Wales from Chambers known as South Square, which is located at 3-4 South Square, Gray's Inn, London WC1R 5HP. I have an Upper Second Class Honours Bachelors Degree in Law and a First Class Honours Masters Degree in Law from Oxford University (BCL) (both from Magdalen College, Oxford). I am currently engaged in a part-time DPhil (PhD) at the University of Oxford, in issues of cross border insolvency. I was called to the Bar in 1995. I was appointed as Queen's Counsel in 2011.

3.      I was appointed as a Mediator by ADR in 2014 and am Co-Chair of the INSOL ADR Colloquium. I am a Vice President of the International Insolvency Institute ("**III**"),

---

1.   "Pension Plans" includes the ED&F bellwether defendant plans:  American Investment Group of New York L.P. Plan ("AIG Plan") and the Riverside Associates Defined Benefits Plan ("Riverside Plan").

and am regularly asked to speak at, and Chair, conferences in the UK and internationally (including by INSOL, III, and GRR).

4.        My CV is attached as Appendix A.  As that CV shows I am a specialist in corporate and individual insolvency law (and in particular cross-border insolvency) and my practice at the Bar encompasses a wide range of business law, including questions of construction of commercial agreements and issues of title. I have appeared in numerous reported cases involving financial and commercial law, including acting for the liquidators and office-holders of numerous banks and financial institutions, including Bank of Credit and Commerce International (BCCI), Lehman Brothers, MF Global, and the Icelandic banks. I have also authored or co-authored a large number of publications relating to insolvency and commercial law, including as editor of "International Asset Tracing in Insolvency" published by the Oxford University Press in 2010, Moss, Fletcher and Isaacs on the EC Regulation, Halsbury's Laws, and (until the last edition) Dicey on Conflict of Laws.

## B.        **Preparation of the Declaration**

5.        I have been requested to provide an expert Declaration concerning certain issues of English law which are relevant to the above-captioned proceedings (the "**Proceedings**") which are pending before the United States District Court for the Southern District of New York (the "**Court**"). I understand that this Declaration will be placed before the Court and I understand my duties to the Court.  The analysis in this Declaration draws heavily from earlier reports I prepared for SKAT in this litigation, including the Expert Report of Felicity Toube, dated December 17, 2021 ("**Initial Toube Report**") and the Reply Report of Felicity Toube, dated

February 25, 2022 ("**Reply Toube Report**"). [2]  For purposes of this Declaration, I incorporate the definitions, background, analyses, and opinions detailed in the Initial Toube Report and the Reply Toube Report, as applicable.

6.      I am being paid an hourly fee of £850 for my services in this engagement. My fee is not contingent on the outcome of this action or the conclusions expressed in this Declaration.  In preparing this Declaration, I have received assistance from a junior barrister also practising from South Square.

7.      In forming my opinions, I have reviewed a number of documents provided to me by SKAT's counsel, including ED&F account documentation, ED&F account statements, and other documents exchanged between ED&F and the Pension Plans.

8.      In providing this Declaration, I do not intend to, and do not, waive any legal professional privilege belonging to SKAT and SKAT's rights are reserved.

C.      **Summary of Opinions**

9.      As a matter of English Law, it is my opinion that on the proper construction of the relevant documents:

(1) The Terms are the general provisions that govern the relationships between ED&F and the Pension Plans in relation to the holding of collateral, and provide for collateral to be held subject to the title transfer collateral agreement (**"TTCA"**) in the Terms;

---

2.  I understand that the Initial Toube Report has been attached as Exhibit 94 to the Declaration of Marc Weinstein, dated April 29, 2022 (No. 18-md-2865, ECF No. 824), and the Reply Toube Report has been attached as Exhibit 305 to the contemporaneously filed Declaration of Marc Weinstein, dated June 2022.

(2) As a result, all right, title, and interest in the Securities and any Dividends, which were purchased using funds loaned by ED&F to the Pension Plans, would have automatically passed to ED&F.

10.     In addition, it is my opinion that as a matter of English law, and the proper construction of the relevant documents:

(1) The Custody Agreement is only applicable to the extent that any Pension Plan had custody assets (*i.e.* assets that were acquired without financing from ED&F).

(2) It was those assets (and those assets alone) that would belong beneficially to the clients and would be held by ED&F as bare trustee under the Custody Agreement.

(3) The Custody Agreement was intended to ensure that ED&F complied with its obligations pursuant to the FCA Rules, in circumstances where it may have been holding custody assets (*i.e.* assets that were acquired without financing from ED&F) belonging to the Pension Plans in the course of its business dealings with clients.

11.     Further, it is my opinion that as a matter of English law:

(1) The Terms continued to apply to the relationship between ED&F and its clients in relation to the Securities; and

(2) The Terms were not subordinated to the other Contract Suite documents but ought to be interpreted consistently with those documents (and would be so interpreted by an English court).

**D.     Summary of Response to Declaration of Foreign Law of Richard Salter**

12.     Mr Richard Salter submitted to this Court a Declaration of Foreign Law, dated June 6, 2022 (No. 18-md-2865, ECF No. 822) ("**Salter Declaration**") opining on the same

issues discussed herein.  I have reviewed the Salter Declaration and have detailed several responses below.

13.     Mr Salter's only material area of disagreement with my Initial Toube Report is his contention that the transfer of title under clause 10(b)(ii) of the Terms did not take place automatically when the Securities were purchased using funds loaned by ED&F to the Pension Plans, but rather that an English court would read into the Terms an additional, unwritten requirement that ED&F take an affirmative action in order for the title transfer to occur.  For the reasons set out in this Declaration, it remains my opinion that all right, title, and interest to the Securities transferred to ED&F immediately on receipt pursuant to the TTCA in the Terms, and therefore that ED&F owned the Securities at the times to which these proceedings relate. In particular, it is my opinion that:

14.     First, Mr Salter's preferred construction fails to give proper effect to the clear words of the Terms, specifically clause 10(b)(iii), and does not address the parties' recognition of the application of clause 10(b)(ii) as established in the Variation Letters. Therefore the English courts would be likely to reject Mr Salter's construction on the grounds that it effectively renders the Terms a nullity.

15.     Secondly, the statutory provisions and regulatory rules cited by Mr Salter establish book-keeping procedures to record evidence of title to a security, and do not override or amend the substantive rights established by the agreements between ED&F and the Pension Plans contained in the Contract Suite.  At most, Mr Salter has demonstrated that ED&F had failed to comply with regulatory rules, a failure from which they would not be permitted to benefit themselves, rather than that the title transfer clause of the Terms was not automatic.

16.     Thirdly, the additional factual information related to the subsequent conduct of the parties and pre-contractual negotiations relied upon by Mr Salter would not be considered by an English court in interpreting the Contractual Suite.  Moreover, even if this information were considered, it demonstrates that ED&F and the Pension Plans were aware that the pursuant to the Terms, all right, title and interest to the Danish Shares would transfer to ED&F immediately upon receipt, as collateral to secure the Clients' obligations to repay the purchase monies advanced by ED&F.

17.     As to Mr Salter's arguments regarding estoppel and rectification, Mr Salter's assertions are in my opinion not supported by English Law.  It is an established principle of English law that estoppel is only capable of binding the parties to the representation or common assumption on which the estoppel is founded, and therefore even if ED&F were to be estopped from making arguments premised on the TTCA provision of the Terms, that estoppel cannot serve to prevent SKAT from raising arguments that the representations contained in the Tax Voucher were fraudulent.  Similarly, an English Court would employ rectification principles to bar a third party from bringing claims arising from the original, uncorrected, agreement.

E.     **The Factual Background**

18.     The following is my understanding (from the various documents with which I have been provided) of the relevant facts and matters by way of factual background for my analysis set out below:

(1) SKAT has initiated legal Proceedings against the Pension Plans and related entities and individuals in the United States.[3]

(2) The Pension Plans, acting through their agents and representatives, applied to SKAT claiming repayments of tax withheld on Dividends that they purported to have earned on shares of Danish companies.[4]

(3) SKAT alleges that these applications were fraudulent because the Pension Plans did not own the shares that they claimed to own, did not earn the Dividends they claimed to have earned, did not suffer any withheld tax and so were not entitled to the tax refunds they claimed.   SKAT also alleges that these applications were

---

3.   *See* Amended Complaint against American Investment Group Plan, No. 18-cv-09841, ECF No. 89 (S.D.N.Y. April 22, 2020); Amended Complaint against DW Construction Plan, No. 18-cv-09797, ECF No. 131 (S.D.N.Y. April 22, 2020); Amended Complaint against Goldstein Law Group Plan, No. 18-cv-02865, ECF No. 155 (S.D.N.Y. April 22, 2020); Amended Complaint against Kamco Investments, Inc. Plan, No. 18-cv-09836, ECF No. 87 (S.D.N.Y. April 22, 2020); Amended Complaint against Kamco LP Plan, No. 18-cv-09837, ECF No. 87 (S.D.N.Y. April 22, 2020); Amended Complaint against Newsong Fellowship Church Plan, No. 18-cv-10100, ECF No. 126 (S.D.N.Y. April 20, 2020); Amended Complaint against Linden Associates Plan, No. 18-cv-09838, ECF No. 82 (S.D.N.Y. April 22, 2020); Amended Complaint against Riverside Associates Plan, No. 18-cv-09840, ECF No. 88 (S.D.N.Y. April 22, 2020); Amended Complaint against Moira Associates Plan, No. 18-cv-09839, ECF No. 88 (S.D.N.Y. April 22, 2020); Amended Complaint against Autoparts Group Trust, No. 18-cv-09549, ECF No. 73 (S.D.N.Y. April 24, 2020); Amended Complaint against Bluegrass Retirement Group Trust, No. 18-cv-09511, ECF No. 74 (S.D.N.Y. April 24, 2020); Amended Complaint against Casting Pensions Group Trust, No. 18-cv-09498, ECF No. 72 (S.D.N.Y. April 24, 2020); Amended Complaint against Central Technologies Group Trust, No. 18-cv-09507, ECF No. 73 (S.D.N.Y. April 24, 2020); Amended Complaint against Industrial Pensions Group Trust, No. 18-cv-09497, ECF No. 71 (S.D.N.Y. April 24, 2020); Amended Complaint against MSJJ Retirement Group Trust, No. 18-cv-09552, ECF No. 82 (S.D.N.Y. April 24, 2020); Amended Complaint against JSH Farms Plan, No. 18-cv-09489, ECF No. 84 (S.D.N.Y. April 24, 2020); Amended Complaint against KRH Farms Plan, No. 18-cv-09491, ECF No. 84 (S.D.N.Y. April 24, 2020); Amended Complaint against MGH Farms Plan, No. 18-cv-09439, ECF No. 86 (S.D.N.Y. April 24, 2020); Amended Complaint against SRH Farms Plan, No. 18-cv-09434, ECF No. 85 (S.D.N.Y. April 24, 2020); Amended Complaint against Triton Farms Plan, No. 18-cv-09490, ECF No. 84 (S.D.N.Y. April 24, 2020); Amended Complaint against Del Mar Asset Management Plan, No. 18-cv-05374, ECF No. 110 (S.D.N.Y. April 24, 2020); Amended Complaint against Federated Logistics Plan, No. 18-cv-08655, ECF No. 95 (S.D.N.Y. April 22, 2020); Amended Complaint against Acorn Capital Strategies Plan, No. 18-cv-10088, ECF No. 62 (S.D.N.Y. April 22, 2020); Amended Complaint against Sterling Alpha Plan, No. 18-cv-04894, ECF No. 77 (S.D.N.Y. April 22, 2020); Amended Complaint against Cambridge Way Plan, No. 18-cv-10090, ECF No. 59 (S.D.N.Y. April 22, 2020); Amended Complaint against KK Law Firm Plan, No. 18-cv-10127, ECF No. 77 (S.D.N.Y. April 22, 2020).

4.   *Id.* ¶ 4.

fraudulent because the Pension Plans did not meet the requirements to be an exempt entity pursuant to the double taxation treaty between the U.S. and Denmark.[5]

(4) ED&F acted as a custodian for several of these Pension Plans and generated "tax voucher" documents for the Pension Plans' applications claiming that the respective Pension Plan held a specific Danish security over the dividend date. [6]

(5) The Pension Plans traded on margin provided by ED&F, using ED&F funding to purchase the Securities at issue.[7] As such, at all material times there were sums owed by the Pension Plans to ED&F.

19.     ED&F maintained a number of agreements with the Pension Plans concerning the Pension Plan accounts and custody of the assets therein.  Below are the relevant agreements between ED&F and the Pension Plans with which I have been provided (collectively, the "**Contract Suite**"):[8]

(1)     New Account/Elective Categorization Letter;

(2)     ED&F Terms and Conditions of Business (the "**Terms**");

(3)     First Variation Letter from ED&F to Pension Plan (the "**First Variation Letter**");

(4)     Second Variation Letter from ED&F to Pension Plan (the "**Second Variation Letter**");

---

5.   *Id.* ¶ 4.

6.   *See e.g.* ED&F's Memorandum of Law in Opposition to Motions to Dismiss Amended Counterclaims at 7, Case No. 1:18-md-02865, ECF No. 357 (June 9, 2020); *see also* Deposition Tr. of Shahab Hashemi at 403:20 – 404:4.

7.   *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

8.   Deposition Tr. of Shahab Hashemi at 329:4 -330:8 (confirming that each Pension Plans executed a Custody Agreement, Security Deed, ISDA, 'fee agreement letter' and Terms with ED&F, and that some plans executed a GMSLA).

(5)     ED&F Custody Agreement (the "**Custody Agreement**");

(6)     ED&F Security & Set-Off Deed (the "**Security Deed**");

(7)     International Swaps and Derivatives Association Master Agreement (ISDA); and

(8)     Global Master Securities Lending Agreement (GMSLA), as applicable.

20.     The relationship between ED&F and the Pension Plans was governed by the terms of the Contract Suite.[9]  All of the Pension Plans executed substantially identical versions of the Agreement comprising the Contract Suite.[10]  For ease of reference, documents from the Contract Suite referenced within this Declaration are those executed by American Investment Group of New York, L.P. Pension Plan, but the analysis contained in this Declaration is equally applicable to the other Pension Plans.

21.     In addition to the Contract Suite, ED&F also had a Client Money and Assets Policy ("**CMA Policy**")[11] that set forth ED&F's policies regarding the manner in which it held and controlled client money and non-cash assets as either collateral or in custody agreements.

22.     All the agreements in the Contract Suite are governed by English Law.

23.     The Terms set out contractual terms governing the relationship between ED&F and the Pension Plans, subject, where relevant, to any transaction-specific documentation.[12]

---

9.  *See e.g.* Amended Counterclaims of Third-Party Defendant ED&F Man at ¶ 1, 26, Case No. 1:18-md-02865-LAK, ECF No. 325 (April 20, 2020); Deposition Tr. of Shahab Hashemi at 329:4 -330:8 (confirming that each Pension Plan executed a Custody Agreement, Security Deed, ISDA, 'fee agreement letter' and Terms with ED&F, and that some plans executed a GMSLA).

10.  Deposition Tr. of Shahab Hashemi at 329:4 -330:8.

11.  ED&F 00050166.

12.  *See e.g.,* Amended Counterclaims of Third-Party Defendant ED&F Man at ¶ 26, Case No. 1:18-md-02865-LAK, ECF No. 325 (April 20, 2020).

24.     From the documents with which I have been provided, the following appears to be common ground:

(1) The Pension Plans lacked sufficient funds to purchase the Securities at issue in the Proceedings.[13]

(2) ED&F extended financing to the Pension Plans for the purchase of the Securities.[14] ED&F charged the Pension Plans interest on this financing.[15]

(3) At the direction of the Pension Plans' Investment Managers ED&F executed transactions in the Securities[16] utilizing the financing extended by ED&F.  The Securities purportedly purchased on behalf of the Pension Plan formed the basis for the Pension Plan's respective withholding tax ("**WHT**") reclaim applications submitted to SKAT.[17]

(4) ED&F has asserted that any rehypothecation of the Securities did not occur until after the ex-date, which is the date on which the Securities began trading without a right to the Dividend.[18]

---

13.  ED&F Re-Amended Defence to Schedule 5T ¶ 5.4 and ¶ 4.2.4.4. Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487 (June 12, 2020); *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

14.  *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

15.  *See e.g.* Deposition Tr. of Shahab Hashemi at 85:2 – 23 (noting that ED&F would charge to the Pension Plans interest on financing received from ED&F).

16.  ED&F Re-Amended Defence ¶ 10.4.1., Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487 (June 12, 2020).

17.  *See e.g.* ED&F's Memorandum of Law in Opposition to Motions to Dismiss Amended Counterclaims at 7-8, Case No. 1:18-md-02865, ECF No. 357 (June 9, 2020).

18.  *See e.g.* Letter from N. Binder to N. Oxford, dated July 13, 2020, at 6 (noting that "the exercise of ED&F's right of rehypothecation in respect of such shares, the shares were (1) (before the ex-date) returned to and held by the PP, as indicated in the Trade Packs, and (2) were not sold, lent or disposed of by the PP until after the ex-date.")

(5) The amounts SKAT paid pursuant to a Pension Plan's WHT refund applications were paid into the Pension Plan's ED&F account.[19]  After the WHT refund was deposited into the Pension Plan's account, ED&F recouped any costs related to financing the Pension Plan's trading, along with charging additional fees to the Pension Plan's account.[20]

## II.   ANALYSIS

### A.   Contractual Construction – Applicable Legal Principals

25.   Where parties enter into a number of agreements at the same time, the courts will consider the overall legal effects of the agreements as if they are, in substance, component parts of a single transaction: Re Walden, ex parte Odell (1878) 10 Ch.D. 76; Smith v Chadwick (1882) 20 Ch. D. 27 at [6263].

26.   Alternatively, where two contracts are linked, the law will try to read them consistently with each other: Durham v BAI (Run Off) Ltd [2012] UKSC 14 at [69].

27.   When interpreting contracts, the ultimate aim is to ascertain what a reasonable person, with all the background knowledge available to the parties in the situation they were in at the time of the contract, would have understood the parties to have meant: Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896 at [912]; Rainy Sky v Kookmin Bank [2011] UKSC 50 at [14]; Wood v Capita Insurance Services Limited [2017] UKSC at [10].

---

19.  *See e.g.* Deposition Tr. of Shahab Hashemi at 332:1 – 25.

20.  *See e.g.* Deposition Tr. of Shahab Hashemi at 81:9 – 88:18.

28.     Where there are two possible interpretations of a contract, the court is entitled to prefer the interpretation which is most consistent with business common sense: Rainy Sky v Kookmin Bank at [21]; Wood v Capita Insurance Services at [11].

29.     The court will also take into account that the parties are unlikely to have intended to agree to something that is legally ineffective: Bank of Credit and Commerce International SA v Ali [2002] 1 A.C. 251 at [39]. Agreements should be interpreted in such a way that they are effective rather than ineffective, even if they are defective in part: Middlegreen LP v Dominion Developments (2005) Ltd [2011] EWCA Civ 646 at [55].

30.     Where one mode of reading an agreement destroys the agreement and the other preserves it, the court should lean towards that construction which preserves rather than that which destroys. This principle applies equally where preserving the agreement requires the court to adopt a more liberal meaning than the literal meaning of the words, and supply words to make the agreement mean what the court concludes the parties intended it to mean: Langston v Langston 5 E.R. 167 at [217].

31.     As to when the foregoing principles can be applied:

(1) The court is entitled to prefer the interpretation which preserves rather than destroys the agreement where the rival constructions are evenly balanced: Re Baden's Deed Trusts [1969] 2 Ch. 388 at [400].

(2) The principle can be invoked where its application means that the contract exists, rather than effectively being something close to a nullity which is worthless from the moment that it was executed: Tecnicas Reunidas Saudia for Services and Contracting Co Ltd v Korea Development Bank [2020] EWHC 968 (TCC) at [30] and [40].

(3) However, if the court concludes that one construction is clearly preferable to the other, the principle will not apply: <u>IRC v Williams</u> [1969] 1 W.L.R. 1197 at [1201].

32.     I generally agree with Mr Salter that the English law as to contractual construction is as he sets out in paragraphs 11 to 31 of the Salter Declaration.  However, I would add that Mr Salter fails to give proper consideration to the following principles which would also apply.

### i.     The court will give clear words meaning

33.     The context of the document as a whole will not usually override the plain meaning of the words used. Effect is to be given to every word so far as possible and words should not be added which are not there, unless the language that the parties actually used creates an ambiguity which cannot be solved otherwise: <u>Barts and the London NHS Trust v Verma</u> [2013] UKSC 20 at [26].

34.     The proper mode of construing any written instrument is to give effect to every part of it, insofar as possible, and not to strike out or nullify one clause in a deed, unless it is impossible to reconcile it with another and more express clause in the same deed: <u>Morris v Blackpool Borough Council</u> [2014] EWCA Civ 1384 at [27].

35.     The court starts from a presumption that clauses included in a contract are intended to affect the parties' rights and obligations. The presumption applies more forcefully against alternative interpretations of the contract which nullify an entire clause of the agreement: <u>Dwr Cymru Cyfyngedig (Welsh Water) v Corus UK Ltd</u> [2007] EWCA Civ 285 at [13].

### ii.     The relevant factual matrix

15

36.     Pre-contractual negotiations are not admissible evidence as to the meaning of a contract. As set out by Lord Hoffman in Investors Compensation Scheme v West Bromwich Building Society [1998] 1 W.L.R. 896 (as cited by Mr Salter at paragraphs 12 and 24 of his Declaration):

> *"The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear."*

37.     One of several justifications for the exclusion was set out by Lord Wilberforce in Prenn v Simmonds [1971] 1 W.L.R. 1381 at [1384] as follows:

> *"The reason for not admitting evidence of these exchanges is not a technical one or even mainly of convenience ... It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter are changing and until the final agreement, though converging, still different. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to."*

38.     Further, Waller LJ set out in The Rio Assu (No.2) [1999] 1 Lloyd's Rep. 115 at [124]:

> *"It is dangerous to make the assumption that one party intended to have something supplied or provided for by the contract, or that the other party intended to have something else supplied or provided by the contract. Contracts are negotiated and ultimately each may think that he has what he wishes, but it is for the Court to interpret the language of the contract. There is no doubt about the correctness of the principle."*

39.     The English courts have been very strongly opposed to attempts to introduce evidence of parties' actions and words in the course of negotiations: c.f. Falkonera Shipping Co v

Arcadia Energy Pte Ltd [2012] EWHC 3678 (Comm) at [28]. Claims for rectification and estoppel by convention are not exceptions to the rule but operate outside of it. However, such claims must be specifically pleaded and clearly established: Chartbrook Homes Ltd v Persimmon Homes Ltd [2009] 1 A.C. 1101 at [35], [38], [42] and [47].

40.     The conduct of the parties subsequent to formation of the contract is of no greater probative value in the interpretation of the contract than prior negotiations. Evidence to this effect is not admissible unless it evidences a new agreement or forms the basis of an estoppel: Schuler (L.) AG v Wickman Machine Tool Sales Ltd [1973] 2 W.L.R. 683 at [261]. In particular, the conduct of a party after the making of a contract does not provide relevant factual context to explicate the meaning with which the parties used the words at the time they made the contract: Sattar v Sattar [2009] EWHC 289 (Ch) at [36].

### iii.     Admissible evidence to show the genesis and aim of the transaction

41.     I generally agree with Mr Salter's statement of the law, as set out at paragraphs 28 to 31 of his Declaration, as to the admission of pre-contractual documents to show the genesis and aim of a contract.

42.     However, as set out above (and further below) the English courts will not accept evidence of pre-contractual negotiations to elucidate detailed points of interpretation of a contract, and the English courts will be very cautious about accepting such material as admissible evidence as to the aim of the transaction. That this is the case is a fact that Mr Salter recognizes (Salter Declaration ¶¶ 30-31).  As Arden LJ (as she then was) set out in Scottish Widows Fund and Life Assurance Society v BGC International [2012] EWCA Civ 607 at [33]-[35]:

> *"Pre-contractual negotiations rarely descend into detail on every point; the negotiations are unlikely to throw any light on the detailed points of interpretation that generally arise after execution.*

*However this does not necessarily mean that the pre-contractual negotiations should be accepted as evidence even as to the general object of the transaction. Statements made in the course of negotiations are often no more than statements of a negotiating stance at that point in time, thus shedding more heat than light on issues as to interpretation of the final deal…*

*…*

*[J]udges should exercise considerable caution before treating as admissible communications in the course of pre-contractual negotiations relied on as evidencing the parties' objective aim in completing the transaction."* (emphasis added)

43.     Further, to the extent that pre-contractual material is admissible at all, it is restricted to identifying the general aim of the transaction, rather than to draw inferences about what the contract means: Gwynt Y Mor Ofto Plc v Gwynt Y Mor Offshore Wind Farm Ltd [2020] EWHC 850 (Comm) at [65].

44.     In relation to the question of the genesis or aim of the contract, the court will consider pre-contractual material as an aid to determining the genesis or aim of the contract not in a subjective sense, but rather in the objective sense of what reasonable persons would have considered the genesis or aim of the contract to have been in the situation of the parties: Reardon-Smith Line Ltd v Hansen-Tangen [1976] 1 W.L.R. 989 at [996].

**B.     Application of the Contract Suite to the Purported Securities Transactions**

>   **i.     Pursuant to the Terms, all right, title and interest to the Securities Transferred to ED&F when financing was provided to the Pension Plans.**

45.     The material provisions of the Terms are as follows:

(1) The third recital provides that: "*It is important that you retain these Terms and Conditions as your rights are governed by them.*"

(2) Clause 1 provides that "*The services to be provided are set out in these Terms and Conditions.*"

(3) Clause 10(b) provides:

*"i. Requests for segregation*

*You may instruct us to hold some or all of your assets in accordance with the FSA Rules on client money (in the case of cash) or in custody accounts segregated from our own assets (in the case of financial instruments). If you give us such an instruction then we will send you a written notification identifying (by account number) which of your accounts are accounts that benefit from client money protection/segregation to enable you to identify those assets in relation to which client money protection/safe custody segregation will apply and, with effect from your receipt of that notification, the relevant provisions of clauses 14 and 15 shall apply in substitution for the applicable provisions of this clause 10 in relation to those assets, but subject in each such case to the charge described in clause 11.*

*ii. Absolute title transfer*

*Except in relation to assets in respect of which you have received a notification of the type described in paragraph (a) above, all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us. Upon such transfer we will become obliged, subject to the following provisions, to re-transfer to you assets equivalent, but not necessarily identical, to the assets so transferred to us. Our obligation will be reduced to the extent that such assets are applied, in accordance with the margin and collateral arrangements in place between us, in discharge of your obligations to us. We will re-transfer assets to you either: (i) at our absolute discretion; or (ii) at your request, but only if and when we determine in our absolute discretion that you have no present or future, actual, contingent or prospective obligations to us or to the extent that we determine in our absolute discretion that such liability is adequately covered by collateral or margin remaining held by us."*

(4) Clause 10(c) provides:

*"The effects of absolute title transfer under paragraph (b)(ii) above are as follows:*

*i. the relevant assets cease to be your assets and you will no longer have a proprietary claim over them. They will not be held subject to the rules of the FSA in safe custody (where they are financial instruments) or subject to client money protection (where they are cash). The assets become our assets and we can deal with them in our own right;*

*ii. you will have (subject to the limitations described in paragraph (b)(ii) above) an unsecured contractual claim against us for re-transfer of equivalent assets; and*

*iii. as a result, the assets will not be subject to a trust or otherwise isolated in our insolvency and in such event, you may not receive back everything so transferred to us and you will only rank as a general creditor."*

(5) Clause 11 provides:

*"As a continuing security for the payment and discharge of all obligations owing to us by you (whether present or future, actual or contingent) you hereby charge to us with full title guarantee by way of fixed and floating charge:*

*(a) all your beneficial interests in and to all derivatives contracts carried on your account;*

*(b) all your assets transferred to us under clause 10 and all your rights against us with respect to the cash accounts referred to in clause 10(e) above."*

46.     The Terms therefore provide a TTCA, pursuant to which all right, title and interest in and to Securities held as collateral would automatically be transferred to ED&F.

47.     The Terms are also expressly referred to in two separate Variation Letters sent by ED&F to the Pension Plans:

(1)  The Variation Letters state that the Terms (and in particular the TTCA contained therein) apply in relation to both non-cash and cash assets.

(2) The First Variation Letter is dated 26 March 2012.

(a) It states that: "*Any cash received in respect of OTC products or to cover DVP transactions and any non-cash assets we hold for you as collateral will be dealt with in accordance with clause 10(b)(ii) ('Assets Transferred') and will be treated on an Absolute Title Transfer basis.*"

(b) The letter also states that: "*At the start of business on the following Business Day, our operations staff will review your positions to determine the total*

*amount of your outstanding liabilities to MCM relating to the above specified business and transfer any surplus cash in excess of €1,000 to a segregated cash account also held in your name in accordance with clause 10(b)(i). ('Assets Transferred')"*

(c) Accordingly, the parties expressly recognised that the Terms applied at the time of the First Variation Letter as the Client had made an election for excess cash to be segregated pursuant to clause 10(b)(i), and non-cash collateral was expressly held on a title transfer basis pursuant to clause 10(b)(ii).

(3) The Second Variation Letter is dated 17 May 2013.

(a) It states: "*We refer to [the First Variation Letter] which set out a procedure pursuant to which E D & F Capital Markets ('MCM') agreed on a daily basis to transfer surplus cash in excess of €1000 in your trading account into a segregated cash account. Upon a review of the operation of this procedure, we have concluded that such cash transfers created undue complexity, operational risk and potential uncertainty as to the reconciliation of your balances, in particular in relation to liabilities on your trading account (such as margin, commissions, fees and interest) arising on a continuous, not a daily basis. However please note that if you wish for any surplus finds to be held on a segregated basis, then you will need to instruct us accordingly. We would therefore like to revert to our former procedure of dealing with any cash received in respect of OTC products or to cover DVP transactions and any non-cash collateral assets*

*we hold for you in accordance with Clause 10(b)(ii) ('Assets Transferred') of [the Terms] and to treat such cash and assets on an Absolute Title Transfer basis*".

(b) Accordingly, the parties reaffirmed their recognition that the Terms applied and that non-cash collateral was expressly held on an absolute title transfer basis pursuant to clause 10(b)(ii).

48.    The Terms were also referred to in the undated client categorisation letter (the "**Client Categorisation Letter**") with which the Pension Plans were provided, and to which a copy of the Terms was attached. The Client Categorisation Letter provides that:

(a) "*The [Terms] set out the contractual terms that govern [the parties'] relationship but are subject to, where relevant, any transaction-specific documentation (e.g. ISDA and GMRA) as entered into between [the Pension Plans and ED&F] from time to time and as the case may be.*"

(b) "*Any assets, including cash, held or received by us from you or in respect of your account will be dealt with in accordance with clause 10(b) ('Assets Transferred') of [the Terms].*"

(c) The Letter also sets out that: "*In respect of certain products [ED&F] may be able to offer you a segregated account*", which in my opinion also emphasises that ED&F may be able to segregate assets, but only at the Pension Plan's election and not as a default.

(d) There is a separate signature line for the Pension Plan expressly to acknowledge that it understands its accounts with ED&F "*will be treated as ATT [Absolute Title*

Transfer]" and that ED&F "*does not provide segregation where [the client] has been granted a credit facility*".

49.     I further note that the ED&F Client Money and Asset Policy with which I have been provided sets out as follows:

(1) Section II, paragraph 6.2 provides that: "*Clients classified as Professional ... may be offered the option of having their money held as collateral on an absolute title transfer ('ATT') basis where suitable. Under a title transfer collateral arrangement ATTT, MCM is not required to treat money received as client money.*" [21]

(2) Section III paragraph 2.1 provides that ED&F will "*accept non-cash assets from non-Retail Clients under the Title Transfer Collateral Provisions (TTCA) of CASS 6.1.6 and CASS 7.2.3 (respectively) which it uses to secure obligations from those clients ('Collateral')*". Paragraphs 2.2 and 2.3 make it clear that the "*non-cash assets held by MCM shall be transferred into the firm's name upon receipt with only an obligation to return equivalent assets to the client concerned upon satisfaction of a client's obligations to the firm*" and that "*MCM will maintain records to ensure that collateral held is identifiable and clients are able to distinguish those assets held as collateral and those assets held in safe custody in the periodic statements sent to them.*"

50.     It is my opinion that the Terms are the general provisions that govern the relationships between ED&F and the Pension Plans in relation to the holding of collateral, and provide for collateral to be held subject to the TTCA in the Terms for the following reasons:

---

21. The Pension Plans elected to be treated as professional clients. *See, e.g.,* Client Categorization Letter, AIG_00000624.

(1) The Terms should, if possible, be interpreted in a manner that they have some application to some part of the relationship between the Pension Plan and ED&F.

(2) The First Variation Letter provides that the Terms apply to the holding of collateral, except in relation to surplus cash.

(3) The Second Variation Letter removed the exception in relation to surplus cash and reiterated that the Terms applied. I note that the Second Variation Letter was written after the parties had entered into the Security Deed to which I refer below, and in my opinion amounts to an express recognition that the parties intended for the Terms to continue be effective (including where the Security Deed also applied to govern their relationship).

(4) The ED&F Client Money and Asset Policy envisaged that the TTCA (which was provided for by the Terms) applied to collateral.

51.     Under the facts presented in these Proceedings, the Terms apply, and the Securities will be subject to the TTCA, and therefore all right, title and interest to the Securities (and Dividends) would have passed to ED&F Man.

### ii.     Custody Agreement Is Not Applicable When ED&F Provided Financing For The Purchase Of The Danish Shares

52.     ED&F contends that the Custody Agreement applies to the holding of the Securities, and that they were held under that agreement by ED&F as bare trustee for the Client.[22] I set out below why in my opinion that contention is misconceived as a matter of construction of the relevant documents.

---

22. *See* Rosenblatt Letter to Pinsent Masons dated July 13, 2020.

53.     In summary, ED&F contends (as set out in the letter from Rosenblatt to Pinsent Masons dated 13 July 2020) that:

(1) *"The relevant securities (the Danish shares) acquired on behalf of the pension plans and on their instructions were held at all material times in the Omnibus Account at ED&F Man's sub-custodian (BNP) in an account which was used for the settlement of customer trades;*

(2) *dividends in relation to such securities were received into the DKK Omnibus Account at BNP in an account which was used to hold customer cash receipts;*

(3) *The pension plans' Custody Accounts (Equity and Cash Account Statements) recorded the shares and dividends as being held to the pension plans' account (no transfer of rights in such shares and dividends having been made to our client as a matter of fact);*

(4) *the Tax Vouchers (prepared for Pension Plan customers at their request) made clear that ED&F Man held no beneficial interest in the shares or dividends (because it held the relevant shares and dividends solely in its capacity as custodian and trustee); and*

(5) *the economic interest in the dividends was held at all times by the pension plans (the income from the dividends being (a) received by the pension plans and (b) used by the pension plans to pay transaction costs…"*

54.     I should record that I have not seen a copy of the statements on the custody accounts or the tax vouchers. However, I do not regard such ex post facto statements as being relevant to (or detracting from) the question of the transfer of title pursuant to the Terms, as the transfer of all right, title and interest would have occurred automatically at the moment of any Securities (or other assets) were delivered to ED&F and been governed by the contractual agreements between the parties.

55.     The material terms of the Custody Agreement are as follows:

(1) Clause 2(a) provides:

*"The Client hereby appoints the Custodian to act as bare trustee for the purposes of safekeeping the Client Property upon the terms of this Agreement and the*

*Custodian agrees to act as such upon the terms and conditions set out in this Agreement."*

(2) Clause 2(e) provides:

*"The Client Securities shall be held, recorded, registered and segregated in accordance with the FSA Rules or, where held outside the United Kingdom, the equivalent of the FSA Rules relating solely to these matters, provided that the Custodian shall not be required to comply with any equivalent of the FSA Rules which require any consent to be obtained or notification to be given by the Custodian"*

(3) Clause 5(b) provides that:

*"The Custodian will identify in the Custodian's books that the Client Securities are beneficially owned by the Client. The Custodian will require Sub-Custodians to identify in their books that the Client Securities are held to the order of the Custodian."*

(4) Clause 5(c) provides that:

*"The Custodian may pool the Client Securities with securities held by the Custodian for other clients. The Client Securities may be held by the Custodian or by any Sub-Custodian in a fungible account in which case the Custodian will identify in its books that such Client Securities belong to the Client. The Custodian may use the Client Securities for the account of another customer and vice versa."*

(5) Clause 5(d) provides that:

*"The Custodian may hold any document of title or document evidencing title to the Client Securities:*
  *a)   in the Custodian's physical possession;*
  *b)   with a Sub-Custodian; or*
  *c)   otherwise, with the prior consent of the Client."*

(6) Clause 5(e) provides that:

*"Notwithstanding any other provision of this Agreement, but without prejudice to the Client's proprietary right, the Client Securities will be deemed to be fungible for the purposes of this Agreement. Accordingly, the Customer's redelivery rights in respect of the Client Securities are not in respect of the Securities actually deposited with the Custodian from time to time but rather in respect of Securities*

26

*of the same number, class, denomination and issue as those Securities originally deposited with the Custodian from time to time. A reference in this Agreement to 'Client Securities' (and similar expressions) shall be construed accordingly."*

(7) Clause 6(b) provides that:

*"The Client acknowledges that where Client Securities are registered in the name of the Custodian, the Client Securities may not be segregated from other securities held by the Custodian and the Client Securities and may not be identifiable by separate certificates or other physical documents of title. Consequently, should the Custodian become insolvent, the Client securities may not be protected from claims made on behalf of the general creditors of the Custodian."*

(8) 'Client Securities' are defined in Clause 1.1 as:

*"any securities (including evidence thereof, evidence of title thereto and all rights in respect thereof) deposited or transferred by the Client or on the Client's behalf to the Custodian or Sub-Custodian or collected by the Custodian or a Sub-Custodian for the Client's account".*

56.     The regulatory background to the Custody Agreement can be found in the fact that Financial Conduct Authority ("**FCA**") (previously the Financial Services Authority – "**FSA**") imposes certain obligations on firms which:

(1) Handle safe custody assets belonging to clients. Safe custody assets are defined as follows:

(a) In relation to a MiFID business,[23] which is defined as a business which carries on investment services and activities including reception and transmission of orders in relation to financial instruments and execution of orders on behalf of clients, the definition of a safe custody asset includes transferable securities.

---

23.  *MiFID* is the *Markets in Financial Instruments Directive* (2004/39/EC). *See also* CASS 6.1.1R.

(b) In relation to a safeguarding and administering investments business that is not a MiFID business, which safeguards and administers assets consisting of and including any security belonging to another, where security includes shares pursuant to Article 76 of the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 (SI 2001/544) (the "**Regulated Activities Order**"), a safe custody asset is defined as any Specified Investment under the Regulated Activities Order.

(2) Handle client money. Client money is defined as money of any currency (a) that a firm receives or holds or on behalf of a client in the course of or in connection with its MiFID business or (b) that the firm holds for a client in the course of carrying on designated investment business that is not MiFID business.

57.     In my opinion, when dealing with the clients, ED&F was either conducting a MiFID business, as it appears to have purportedly received, transmitted and executed orders of transferable securities on behalf of clients, or alternatively was conducting a safeguarding and administering investments business, as it was purportedly safeguarding and administering securities belonging to clients. Further, ED&F could have (at least in theory) handled client money in the course of its business.

58.     Accordingly, ED&F would have been under an obligation to comply with the following FCA rules (amongst others) when holding assets belonging to clients (as opposed to assets belonging to the firm):

(1) CASS 6.2.1R: A firm must, when holding safe custody assets belonging to clients, make adequate arrangements so as to safeguard clients' ownership rights, especially in the event of the firm's insolvency, and to prevent the use of safe custody assets

belonging to a client on the firm's own account except with the client's express consent.

(2) CASS 6.2.2R: A firm must introduce adequate organisational arrangements to minimise the risk of the loss or diminution of clients' safe custody assets, or the rights in connection with those safe custody assets, as a result of the misuse of the safe custody assets, fraud, poor administration, inadequate record-keeping or negligence.

59.     In my opinion, the Custody Agreement was intended to ensure that ED&F complied with its obligations pursuant to the FCA Rules, in circumstance where it may have been holding safe custody assets belonging to the Pension Plans. In such cases, the Pension Plans' ownership rights would have needed to be adequately safeguarded, and ED&F would have needed to put in place adequate organisational arrangements in place to minimise the risk of loss or diminution of those assets.  This position is supported by:

(1) Clause 2(a), which provides that such securities would be held by ED&F as bare trustee *"for the purposes of safekeeping the Client Property"*.

(2) Clause 2(e), which provides that these securities "*shall be held, recorded, registered and segregated in accordance with the FSA Rules or, where held outside the United Kingdom, the equivalent of the FSA Rules relating solely to these matters…"*.

(3) Clause 2(f) which provides that: *"The Custodian shall only accept custody under this Agreement of Client Property."*

(4) Clause 5(b) of the Custody Agreement, which provides that the Custodian will identify in the Custodian's books that the securities "*are beneficially owned by the Client*".

(5) Clause 5(e) which provides that the Client Securities will be deemed to be fungible but *"without prejudice to the Client's proprietary rights"*.

(6) Clause 6(b) which provides that the Pension Plan acknowledges that where Client Securities are registered in the name of the Custodian, the Client Securities *"may not be segregated from other securities held by the Custodian"* in which case they may not be protected if ED&F becomes insolvent. The Custody Agreement therefore seeks express consent from the Pension Plan to dilute the safeguarding provisions in certain circumstances, in accordance with CASS 6.1.1R

60.     Accordingly, in my opinion, the Custody Agreement governed title to the Securities which ED&F held as custodian. In other words, it applied where (and only where) safe custody assets belonging to clients were held by ED&F (as opposed to where assets were held as collateral). This would occur where the Pension Plan had advanced their own funds to ED&F to purchase securities or where the Pension Plan had repaid the funds loaned by ED&F to purchase securities. This opinion is also supported by the references to the parties as *"Client"* and *"Custodian"* throughout.

61.     However, it is also my opinion that the Custody Agreement supports the contention that ED&F *always* acted as a custodian when it is holding Pension Plan assets. In the alternative to holding assets which belonged to clients on a segregated basis, ED&F could (and did) hold the assets as collateral – in circumstances where title was not held by the Pensions Plan but instead was held by the firm.  As identified above, in that case, the issue of title was addressed

30

by the Terms and governed by a title transfer agreement, in which case ED&F would not need to comply with the FCA Rules on segregation as the assets would no longer be safe custody assets that belonged to the Pension Plans (as opposed to belonged to the firm) or client money.

62.     My opinion is further supported by the following provisions which indicate that collateral and custody arrangements were treated by ED&F as separate and distinct from each other:

(1) Section III Clause 1.1 of the CMA Policy sets out that ED&F holds and controls non-cash assets on behalf of clients *"either as collateral or in custody arrangements."*

(2) Section III Clause 2.3 of the CMA Policy which provides that ED&F will maintain records to ensure that clients are able to distinguish those assets *"held as collateral and those assets held in safe custody"*.

**iii.     Title to the Securities Transferred to ED&F**

63.     The Securities which were purchased using funds loaned by ED&F to the Pension Plans which had not been repaid would not be held as safe custody assets pursuant to the Custody Agreement and would instead be governed by the Terms (and by virtue of the TTCA, all right, title and interest to those Securities would have passed to ED&F). Such Securities would in particular not be governed by the Custody Agreement as they cannot properly be said to *"belong"* to the Pension Plan.

64.     As a result, in relation to the Securities in the present case, it is my opinion that they were collateral, were governed by the Terms and were therefore subject to a TTCA by which all right, title, and interest passed to ED&F.

65.     It therefore follows that in my opinion the Securities were not, as a matter of English law, governed by the Custody Agreement, which applied to custody assets (*i.e.* assets that were acquired without financing from ED&F). It was those assets (and those assets alone) that would belong beneficially to the clients and would be held by ED&F as bare trustee under the Custody Agreement.

66.     Moreover I note that if the position were that *all* non-cash assets in relation to which ED&F claims to have held "custody" in the omnibus custody account were governed by the Custody Agreement, then it would follow that the relevant provisions of the Terms (and the Variation Letters) would have had no application as between the Pension Plan and ED&F. As I set out above, it is a general principle of English law that meaning and effect should be given to all contractual documents insofar as possible. It therefore follows that it is inherently unlikely that the Terms and the Variation Letters were of no effect, simply because ED&F had "custody" of all client assets (in the sense that it held them).

67.     I reach this conclusion even if the position were factually that all Securities were held by ED&F in its omnibus custody accounts, regardless of whether they were assets that were held as collateral subject to a title transfer or were truly held as subject to custody arrangements. As a matter of English law, the proper legal construction cannot be undone by an inconsistent course of operation by a party following the entry into the agreement and remains as I set out above, namely that:

> (1)  Securities (and Dividends) which had been purchased using funds loaned by ED&F to the Pension Plans which had not been repaid were collateral and were subject to the Terms and all right, title and interest to these Securities and Dividends would have transferred to ED&F; and

(2) Where the Pension Plan had advanced its own funds to ED&F to purchase Securities or where the Pension Plan had repaid the funds loaned by ED&F to purchase Securities, those assets would have been held in custody by ED&F and would have been subject to the Custody Agreement.

### iv.    The Security Deed Supplemented and Did not Supersede the Terms

68.    Having reached the conclusion that the Securities were non-cash assets held as collateral and were held on the basis of the Terms and not the Custody Agreement, I also consider the relevance of the Security Deed.

69.    The material terms of the Security Deed are as follows:

(1) Clause 5 provides that the Pension Plan charges all of its rights, title, interest and benefit, present and future, in and to/under (a) the Investments, (b) the Custody Accounts and (c) the Custody Agreement to the Chargee (*i.e.* ED&F) by way of fixed legal mortgage and floating charge.

(2) Clause 14(a) provides:

*"The Chargee may, at any time, apply the Charged Property, or any of it, to satisfy any obligations of the Chargor to the Chargee under any Transaction Document."*

(3) Clause 17.5 of the Security Deed provides:

*"To the extent that any of the Charged Property constitutes 'financial collateral' and this Deed and the obligations of the Chargor hereunder constitute a 'security financial collateral arrangement' (in each case for the purposes of the Financial Collateral Arrangements (No.2) Regulations (SI 2003/3226)) the Chargee shall have the right to appropriate all or any part of such financial collateral in or towards discharge of the Secured Liabilities".*

70. In my opinion, the Security Deed was intended to add to and complement the Terms rather than supersede them, which opinion is supported by the following terms of the Security Deed:

(1) Clause 8 provides:

> *"The security created by this Deed and the rights of the Chargee under this Deed shall be in addition to, and not prejudiced by, any other security or guarantee or any other right which the Chargee has in respect of or in connection with any or all of the Secured Liabilities. All such rights may be exercised from time to time as often as the Chargee may deem expedient."*

(2) Clause 14(b) grants ED&F as Chargee the right to set off any obligation of the Pension Plan as Chargor to make a payment to ED&F and provides that *"[t]his right is in addition to the Chargee's rights under any Terms of Business, the ISDA Master Agreement"*.

71.     The Security Deed and the Terms are linked documents, and as a matter of English law governing questions of construction (as set out above) the court will read them consistently, insofar as possible.

72.     In my opinion, the Security Deed and the Terms can be read consistently as to the treatment of the Securities, as follows:

(1) The Terms governed the title of the Securities when ED&F purchased the Securities using funds it had loaned to the Pension Plan. Any such Securities were held pursuant to Clause 10(b)(ii) of the Terms as non-cash collateral.

(2) When the Pension Plan discharged its obligations to ED&F (in the present case, where it repaid the purchase monies), ED&F was under an obligation to transfer title to the underlying Securities to the Pension Plan.

(3) However, if the Pension Plan had at that time outstanding obligations to ED&F, (which were not covered by collateral or margin), ED&F was also entitled to performance of those outstanding obligations. In those circumstances, without any additional provision for security, when the Pension Plan had made the principal

34

repayment or otherwise discharged its obligations (and ED&F's transfer obligation arose) ED&F would not have held any security in respect of the Pension Plan's outstanding obligations (title to the assets having already passed back from ED&F to the Pension Plan by this time).

(4) In order to cover this "gap" in security, pursuant to Clause 11(b) of the Terms, the Pension Plan granted a fixed and floating charge over all assets transferred to ED&F under Clause 10. Clause 11 therefore provided that those Securities will be subject to a fixed and floating charge securing the Pension Plan's remaining obligations to ED&F.

(5) The Clause 11 charge could only bite when the assets no longer belonged to ED&F but were subject to an obligation to be transferred from ED&F to the Pension Plan (in other words when the Pension Plan had repaid the purchase monies or discharged any other obligations to ED&F).

(6) The purpose of the Security Deed is in my opinion to provide the specific terms governing the nature and extent of the fixed and floating charge set out in Clause 11 of the Terms:

(a) Clause 5.1 of the Security Deed provides that the fixed charge will be by way of first fixed legal mortgage and sets out the specific property which will be charged, namely the Investments, the Custody Accounts and the Chargee's rights under the Custody Agreement. The definition of Investments includes the Securities.

(b) Clause 5.2 of the Security Deed provides that the floating charge attaches to the same property as the fixed charge in Clause 5.1. It also provides that

the floating charge shall rank behind all fixed charges and mortgages created by Clause 5.1 and sets out the circumstances in which the floating charge will crystallise.

(7)    The foregoing security structure therefore protects ED&F. When the Pension Plan's obligations are outstanding, it will have absolute title to the Securities. However, when the Pension Plan discharges those obligations, and ED&F is under an obligation to re-transfer the Securities, ED&F will retain a fixed and floating charge over the Securities to secure the Pension Plan's remaining obligations (whether or not they are covered by margin or collateral).

(8)    The security structure also protects the Pension Plans, for when the Pension Plan has performed its obligations (save in respect of outstanding sums which were matched by margin or collateral), the effect of Clause 11 of the Terms is that ED&F will no longer have absolute title to the underlying Securities under Clause 10(b) but will instead have the rights of a secured creditor pursuant to the Security Deed, in respect of any outstanding obligations. Accordingly, if the Pension Plan has performed its obligations (or its obligations were fully secured by margin or collateral), it would have a proprietary claim to the Securities in the event of ED&F's insolvency. However, prior to that point, and before the charge under Clause 11 of the Terms and the Security Deed arises, the Pension Plan will only have an unsecured contractual claim in ED&F's insolvency.

73.    I have considered the possible alternative that the Security Deed should instead as a matter of English law be interpreted as a transaction-specific document which supersedes the provisions of the Terms. If that were the case, the Securities might be said to be

held by ED&F as bare trustee (under the Custody Agreement), but subject to the charge in the Security Deed. In my opinion, this construction is incorrect for the following reasons:

(1) As set out above, the Security Deed does not provide that it supersedes or is intended to supersede the Terms. Clauses 8 and 14(b) expressly provide that the rights under the Security Deed are intended to be in addition to ED&F's rights under other agreements (in particular, Clause 14(b) identifies the Terms as containing additional rights).

(2) It would render the Variation Letters, the second of which was entered into after the Security Deed, otiose as the parties would have been agreeing to the modification and reinstatement of the provision of an Agreement that allegedly was of no effect between the parties (*i.e.* Clause 10(b)(ii) of the Terms);

(3) The examples of transaction-specific documentation given in the Client Categorisation Letter include the ISDA and GMRA, but <u>not</u> the Security Deed or Custody Agreement.

(4) Furthermore, if this were the proper construction of the Contract Suite, when ED&F loaned funds to the Pension Plans to purchase the Securities, it would not (and could not) hold any of the Securities as collateral on a title transfer basis, as the Terms would not be effective to transfer all right, title and interest in the Securities. ED&F would have instead held all Securities under the Custody Agreement as a bare trustee subject to the charge under the Security Deed.

(5) Again, preferring this construction would therefore require the court to conclude that ED&F agreed, by entering into documents which superseded the Terms, to be a secured creditor in the event of the Pension Plan's insolvency rather than the

proprietary owner of the Securities, even in circumstances where the Pension Plan had not repaid the purchase monies for those Securities.

74.     In any event, even if the court concluded that the merits of the rival constructions are evenly balanced, the court will take into account that the parties are unlikely to have intended to agree something that is legally ineffective (*i.e.* gives the Terms no meaning or effect) and is likely to prefer the interpretation which preserves the legal effect of the instrument. As the alternative construction does away with the Terms, in my opinion, it is plain that this alternative construction should be rejected.

75.     This construction is also preferable as it fits more clearly with business common sense. Brokers are likely to want to maintain security in respect of any exposure to their clients, but in particular are likely to want to maintain even more inviolable security rights where their exposure is greater, such as where assets have been purchased using funds which the broker has loaned to the client which have not been repaid. Accordingly, it makes commercial sense that ED&F would itself hold the title to the Securities (on a title transfer basis pursuant to the Terms) until the loan for the purchase monies had been repaid by the Client. It makes much less commercial sense that ED&F would have surrendered those rights to ownership available under the Terms by entering into transaction specific documents which only afforded it the rights of a secured creditor in respect of the Securities.

76.     In summary, my opinion is therefore that the Terms and the Security Deed should be read together as follows:

(1) When ED&F had loaned the funds to Clients to purchase Securities, it held the underlying Securities pursuant to Clause 10(b)(ii) of the Terms, on an absolute title transfer basis.

(2) When the Pension Plan repaid the loan, ED&F would have been under an obligation to transfer the underlying Securities to the Pension Plan. However, to ensure ED&F was protected in respect of the Pension Plan's remaining obligations, Clause 11 of the Terms provided that it would obtain a charge over the Securities.

(3) The Security Deed sets out the nature and extent of the charge granted pursuant to Clause 11 of the Terms.

77.    I therefore remain of the conclusion that the proper construction of the documents is that title to the Securities passed to ED&F under the TTCA in the Terms at the time of the purchase of the Securities.

## C.    Responses To Mr Salter's Declaration

### i.    The Terms governed right, title and interest to the Securities if and to the extent that ED&F advanced funds to the Clients to purchase the Securities

78.    I disagree with Mr Salter's statement (at paragraph 107 of his Declaration) that my characterisation of the operation of the Contract Suite begs the question of the correct interpretation of the parties' contractual arrangement. I note that in fact Mr Salter and I appear to be in agreement as to the interrelationship between the Contract Suite agreements, but that Mr Salter disagrees with me as to when the Securities were governed by the Terms. In essence, Mr Salter takes the view that title to the Securities would only be governed by the Terms when ED&F had undertaken some act of exercise of its right to take title under clause 10(b)(ii) (as set out, for example, in paragraphs 61 and 62 of his Declaration). I do not agree. As set out above, the Custody Agreement governed where ED&F held the Securities as custodian for the Client, while the Terms governed where ED&F had advanced funds to the Client to purchase the Securities and the Security Deed supplemented the security granted to ED&F pursuant to the Terms.

79.     In my opinion, the flaw with Mr Salter's preferred construction is that it fails to give proper effect to the clear words of the Terms, and that therefore the English courts would be likely to reject Mr Salter's construction on the grounds that it effectively renders the Terms a nullity.

80.     I agree with Mr Salter's statement of the law in paragraph 106.1 as to arguments based on surplusage, where the relevant terms are unnecessary and can be omitted without disadvantaging any party (as to which, for example, see the extract from Merthyr (South Wales) Limited v. Merthyr Tydfil County Borough Council [2019] EWCA Civ 526 at [39] which is cited in footnote 118 of Mr Salter's Declaration).  However, the English Courts' hesitancy to give weight to surplusage or redundancy arguments is only applicable when the allegedly surplus provision at issue is redundant or insignificant.  As clause 10(b)(ii) of the Terms is not redundant or insignificant, but instead goes to the heart of the collateral protections provided to ED&F, Mr Salter's argument in respect of surplusage is misplaced.

81.     I therefore disagree with Mr Salter's characterisation (at paragraph 94.1 of his Declaration) of the principle that the Terms ought to be given effect insofar as possible as *"simply a pointer"* which *"may or may not be useful as an aid to interpretation"*. The proper mode of construing any written instrument is in fact to give effect to every part of it insofar as possible. When construing an agreement the court will start from the presumption that clauses in that agreement are intended to affect the parties' rights and obligations. This presumption applies even more forcefully where, as here, one proposed construction effectively renders an entire clause (clause 10(b)(ii)) a nullity. Mr Salter suggests at paragraph 106.2 of his Declaration that clause 10(b)(ii) would still have effect *"as regards surplus cash"*, however he fails to explain what would

be considered "surplus cash" in this context, and it falls to be inferred that, on his construction, clause 10(b)(ii) would have no legal effect.

82.     I agree with Mr Salter's suggestion (insofar as one is made) that the principles set out in paragraphs 29 to 31 above would not be useful as an aid to interpretation in some circumstances.  For example, as I set out in paragraph 31(3) above, those principles may be disapplied where a construction of an agreement which nullifies that agreement is clearly preferable to one which does not. However, in my opinion, such circumstances do not arise here for the following reasons:

(1) As set out in paragraph 47 above, in the First and Second Variation Letters the parties expressly recognised that the Terms applied and affected their rights and obligations. These letters reiterated that the Securities would be held by ED&F as collateral on an absolute title transfer basis under the TTCA, to the extent that the Client had not requested that those Securities be segregated in the period between the First and Second Variation Letter.

(2) There was therefore not only one, but two, reaffirmations of the existence of the title transfer after the contract was entered into. In my opinion, this strongly supports the construction of the documents which I have already put forward, namely that the Terms governed the relationship between the parties and had legal effect to transfer title to the Securities to ED&F.

(3) It is my opinion that any construction which nullifies the Terms contradicts the express acknowledgment of the parties in the First and Second Variation Letters that the Terms applied to their relationship and were effective to govern their rights.

(4) I note that Mr Salter does not refer to these letters in his Declaration, aside from to acknowledge in paragraph 106.2 that those letters contemplate clause 10(b)(ii) of the Terms having legal effect.

(5) In the light of all the documents, including the First and Second Variation Letters it is my view that the English court would be highly unlikely to conclude that a construction which nullifies the Terms is *"clearly preferable"* to an interpretation which gives effect to all of the Contract Suite Agreements.

(6) Accordingly, the English court would be entitled to (and, in my opinion, likely to) prefer the construction of the Contract Suite agreements set out above to the construction proposed by Mr Salter (which would effectively render the Terms a nullity).

### ii.   Pursuant to the Terms, all right, title and interest to the Securities transferred to ED&F immediately upon receipt

83.    I agree with Mr Salter's statement in paragraph 61 of his Declaration that the only material issue in dispute between us is whether transfer of title under clause 10(b)(ii) of the Terms took place automatically when the Securities were purchased using funds loaned by ED&F to the Clients, or whether the transfer of title was dependent on ED&F exercising its rights to treat the Securities as collateral.

84.    For the reasons set out above in Section II(B) and for the reasons set out below, I remain of the opinion that pursuant to the Terms Agreements all right, title, and interest to the Securities was underlined immediately transferred to ED&F when financing to purchase the Securities was provided to the Pension Plans. ED&F was not required to take any further steps for title to the Securities to be transferred, including, but not limited to, making book entries recording that title to the Securities had transferred.

42

85.     At paragraph 93 of his Declaration, Mr. Salter provides the following reasons for disagreeing with my opinion on this point:

(1) Firstly, that it is *"well-arguable"* that a transfer of Securities held as collateral requires accounting entries to be made in the records of the relevant intermediary in order to be effective, as a matter of the applicable regulations and CASS Rules (as set out in paragraph 46 of Mr Salter's Declaration).

(2) Secondly, that the court, upon taking into account the wider context of the parties' relationship, would be likely to conclude that right, title and interest to the Securities did not pass to ED&F immediately on receipt as ED&F treated the Securities as safe custody assets, held in a segregated client account.

(3) Thirdly, that some further step was required to transfer title to the Securities to ED&F as a matter of the plain language of the Terms.

86.     I note that Mr Salter's conclusions are somewhat tentatively advanced in paragraph 93.1, where he notes that he cannot point to a single decided case to support his argument concerning transfers of book entry interests in intermediated securities. He also reaches a conclusion that it is "*likely*" that the transfer requires the making of "*some sort of accounting entry*".

a)     <u>No further steps were required for title to the Securities to transfer</u>

87.     I generally agree that Mr Salter accurately describes the common practice in respect of Intermediated Securities at paragraphs 36 to 39 of his Declaration, and generally agree with the manner in which he describes the general practice of segregating and pooling client money or assets in paragraphs 40 to 45 of his Declaration. However, the common practice in either respect is not relevant to the question of the ownership of the Securities in the present case, as that it is a

matter which falls to be determined by the agreement governing those ownership rights (*i.e.* the Terms). In particular, for the reasons set out in paragraphs 88 to 99 below, the beneficial ownership of assets held by an intermediary falls to be determined by reference to the relevant agreement governing ownership of those assets, and not the manner in which those assets are later held by the intermediary. If the Terms require the assets to be treated in a certain way, but they are not in fact treated in that way, that would be a breach of the Terms, and not a means for reinterpreting what the Terms required. In other words, even if the facts are as asserted by ED&F, as to which I express no concluded opinion, that is evidence (at best) that there was a breach of the Terms, but provides no proper guidance as to the proper interpretation of the Contact Suite.

88. In particular, as set out above, Clause 10(b)(ii) provides, materially, that *"all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us"*. In my opinion, the English courts are likely to interpret the clear words of clause 10(b)(ii) as effective to transfer all right, title and interest to the Securities to ED&F immediately upon receipt. In particular, clause 10(b)(ii) is in absolute terms, and the title transfer is not expressed to be conditional on any further step. Importantly, clause 10(b)(ii) also does not specify what hypothetical further step would be required in order for title to the Securities to transfer to ED&F, which strongly indicates that no such further step was required.

89. This interpretation also accords with business common sense. It would be impractical for ED&F to have to calculate the balance of each Client's obligations at the time of

receipt of the Securities, in order to assess whether it required further collateral to secure those obligations, and then to have to take some further step to make it clear if and when it had chosen to accept those Securities as collateral.  Further, clause 10(b)(ii) does not set out how ED&F would exercise its choice to treat the assets as collateral, and it is highly unlikely that sophisticated commercial parties would have intended to leave such a significant gap in the Terms. It is highly unlikely that where ED&F lent funds to the Pension Plans to purchase the Securities, that it would have agreed that the Pension Plans' obligations to repay those funds would be secured by collateral but only if and to the extent that ED&F elected to exercise its right to such security, dependent on some ambiguous and unstated method of exercise.

90.     Mr Salter sets out in paragraph 45 of his Declaration that it is *"well-arguable"* that a transfer of title in Securities, even in the case of a financial collateral arrangement, requires accounting entries to be made in the records of the relevant intermediary in order to be effective. In my opinion, to the extent that an intermediary is required to make accounting entries to record the transfer of title to assets held as financial collateral, that is not, as Mr Salter suggests, a requirement for the transfer of those assets to be effective, but merely evidences that the intermediary has in fact done so.

91.     I generally agree that the relevant regulations, definitions and features of a TTCA and Security FCA are as set out by Mr Salter in paragraphs 47 to 51 and paragraphs 53 to 54 of his Declaration, and that the CASS Rules set out in paragraph 56 are accurate. I also agree with his statement in paragraph 52 that the existence of a right to rehypothecate collateral is not necessarily conclusive that an arrangement is a TTCA as opposed to a Security FCA. The existence of rehypothecation is neutral in this regard.

92.     However, I disagree that the statutory provisions and regulatory rules cited by Mr Salter support the contention that book entries are required for a transfer to be effective. Rather, the statutory provisions and regulatory rules are general procedural book-keeping rules. These provision and rules do not determine, let alone override, the substantive rights between a collateral provider and a collateral taker, which would be set out in the relevant contracts between the parties (here, the Terms).  In particular:

(1)  Article 1(g) of the FCD provides that title to financial collateral consisting of financial instruments *"is evidenced by entries in a register or account maintained by or on behalf of an intermediary"*. It does not provide that title to financial collateral is effected by book entries.

(2)  Article 1.5 sets out the requirements for *"[t]he evidencing of the provision of financial collateral"* which *"must allow for the identification of the financial collateral"* and goes on to state that it is sufficient for this purpose to prove that the book entry securities collateral has been credited to the relevant account. Again, it does not provide that title to financial collateral is effected by book entries, but rather that book entries are sufficient to prove the provision of financial collateral and identify that collateral.

(3)   The definition of "relevant account" set out in the FCARs provides that it refers to *"the register or account, which may be maintained by the collateral-taker"*. Accordingly, it is not imperative for a collateral-taker to maintain a register or account. It follows that it is not necessary that a book entry must be made in the register or account in order for the collateral-taker to obtain title to the collateral.

93.     I agree with Mr Salter that ED&F would have been obliged to comply with the CASS Rules cited in paragraph 56 of his Declaration, and that those rules form part of the admissible background in aid of interpretation.  However, in my opinion, failure to comply with those regulatory requirements does not amount to a failure to transfer title to the Securities to ED&F, for the following reasons.

(1) The breach of the regulatory requirements by a firm does not mean that the regulatory requirements are without any force. In particular, mere failure to segregate client money or client assets does not defeat the regulatory provisions.

(2) One particular example of this point is exemplified in  Re Lehman Brothers International (Europe) (In Administration) [2012] UKSC 6 ("**LBIE**"), in which the Supreme Court held at [62] that the statutory trust imposed on Client Money under CASS Rule 7 arose upon receipt of the Client Money by a firm and remained of effect throughout the time in which such Client Money remained held, even if the firm failed to comply with its obligations to segregate the Client Money. It follows that the English courts will not permit a firm to rely on its own failure to comply with the CASS Rules in order to retain assets to which it should not have had title if it had properly complied with its CASS obligations.

(3) The court made it clear at [2] that procedural steps, such as segregating money into separate bank accounts, are not sufficient to establish a proprietary interest in those funds in anyone other than the account holder, and a declaration of trust would be required to protect those funds in the event of the firm's insolvency. Accordingly, procedural steps, such as segregation or book entries, are not sufficient to establish

parties' proprietary interests in the relevant assets (but may be sufficient to evidence those interests).

(4) In my opinion, the English courts are highly likely to adopt the same approach in the present situation and apply the same reasoning. Accordingly, if ED&F failed to keep adequate records to distinguish between its own assets and safe custody assets, that does not mean that those assets will be deemed to be safe custody assets. Rather, under English law, ownership falls to be determined by the relevant agreements governing those ownership rights.

(5) Further, compliance (or non-compliance) with the procedural steps required by CASS Rules is not sufficient to establish that ED&F did not own the relevant Securities at the relevant times.

94.    As to the specific rules relied on by Mr Salter, the purpose of CASS 6.5 is to ensure that regulated firms maintain adequate records, accounts, and reconciliations as a matter of good practice. In my opinion, it is plain that CASS 6.5 does not affect the substantive rights of the parties as to safe custody assets or the firm's own applicable assets. Otherwise, it would lead to the result (and one that would be contrary to the conclusion in LBIE) that a firm's failure to comply with its regulatory obligations, including maintaining adequate records, would mean that it could rely on its own wrongdoing to obtain title to assets or money which would have belonged to its clients if it had complied with those obligations.

95.    Further, I disagree with Mr Salter's statement (in paragraph 56.2 of his Declaration) that CASS 3.1.7. assumes that a firm will exercise its rights under a TTCA by identifying the assets in its own books and records. The remainder of the relevant sentence, as cited in footnote 74 of Mr Salter's Declaration, provides that: *"The firm may exercise its right to*

*treat the asset as its own by, <u>for example</u>, clearly so identifying the asset in its own books and records"*. Accordingly, in my opinion, it is not inconsistent with CASS 3.1.7 that ED&F did not in fact need to exercise its right by identifying the assets in its books and records to treat the Securities as its own. Its right to do so under the TTCA arose immediately on receipt of those Securities.

96.     I agree that CASS 3.2.3. indicates that unless and until a firm exercises its rights to treat assets as its own the CASS custody rules will still apply. However, it is not inconsistent with this provision that ED&F did not have to take additional hypothetical steps to exercise its rights under the TTCA in order to treat the Securities as its own (or to have right, title, and interest to those Securities), and therefore that the custody rules ceased to apply immediately on receipt of the Securities by ED&F.

97.     Further, I agree with Mr Salter's statement of ED&F and the Pension Plans' pleaded case in paragraph 92 of his Declaration. However, the statements made by those parties that clause 10(b)(ii) required ED&F to exercise or assert its rights to the Securities are just assertions. They are not relevant to the proper interpretation of the Terms.

98.     In summary, I disagree with Mr Salter's conclusion in paragraph 83 of his Declaration that an English court would be likely to hold that ED&F was required to take additional hypothetical steps to exercise its right under the TTCA before title in the Securities would pass from the Pension Plans to ED&F for the following reasons:

(1) In my opinion, the fact that book entries can be relied upon to provide sufficient evidence of title to Securities held as financial collateral does not mean that those book entries were necessary for ED&F to have title to those Securities.

(2) Failure to comply with the CASS Rules, or other regulatory obligations, is not determinative of the parties' substantive rights. If ED&F failed to record the transfers of title to the Securities in its books, that does not mean that it did not obtain such title. Title falls to be determined by reference to the provisions and operation of the Terms, which are the relevant agreement governing the parties' ownership rights.

(3) Finally, it is not inconsistent with the CASS Rules that title to the Securities would transfer to ED&F immediately. Those rules do not specify any particular method of exercising rights to treat assets as collateral. They simply provide that recording a transfer in the firm's books is one example of how such rights could be exercised.

      b)      <u>Proper Factual Matrix to Interpret the Contract Suite</u>

99.     I disagree with Mr Salter's statements at paragraph 94.2 of his Declaration that my analysis as outlined above *"ignores crucial aspects of the wider documentary, factual and commercial context"*.

100.    The information with which I had been provided was limited to that which would be properly admissible before the English courts as a guide to interpreting the Contract Suite agreements. In contrast, Mr Salter's Declaration impermissibly relies on the subsequent conduct of the parties and pre-contractual negotiations as an aid to construing the Contract Suite agreements.

101.    I deal below with each of the categories of additional documents relied upon in Mr Salter's Declaration.

102.    First, at paragraphs 104 and 97.2 of his Declaration Mr Salter cites examples of the conduct of the ED&F and the Pension Plans, and certain account statements sent by ED&F to the Pension Plans after formation of the Contract Suite Agreements.

(1) I disagree with Mr Salter's conclusion at paragraph 93.3 that such conduct and documents would *"make most English judges at least pause before deciding that the true interpretation of the document was so very different",* his statement at paragraph 67 of his Declaration that such conduct and the relevant documents *"would be regarded by an English judge as providing the best guide to the true meaning of those agreements"* and his statement at paragraph 101.1 that subsequent conduct can be looked at if *"its relevance is that it is the operation by the parties of the machinery laid down in the contact".*

(2) As set out in paragraph 40 above, pursuant to established principles of English law, courts are not entitled in most circumstances to rely on the subsequent conduct of the parties as an aid to interpreting the agreements. In my opinion, the decision of any judge who relied on the materials in the manner suggested by Mr Salter would be liable to being overturned on appeal on that basis.

103.    Secondly, although I agree with Mr Salter's further statement in paragraph 93.3 of his Declaration that if an English court would be apprised of the facts cited in his Declaration in the context of an alternative claim for rectification or on the basis of estoppel, the court would not be entitled to rely on those facts as an aid to interpretation.

(1)    Claims for rectification and/or estoppel assume that the proper interpretation of the documents requires some amendment.

(2)     The English court would be careful to ensure that it considered the separate claims in isolation by reference to the proper factual matrix for each and would therefore exclude any evidence as to the subsequent conduct or pre-contractual negotiations when interpreting the meaning of the Contract Suite agreements.

104.    Thirdly, Mr Salter also refers to various correspondence in paragraph 69 of his Declaration which was exchanged between the parties prior to Custody Agreement being entered into on 21 June 2012 and therefore amounts to pre-contractual negotiations. As to this:

(1) The copy of the Terms with which I have been provided is not dated. However, I have been provided with copies of the Application documentation completed by the Pension Plans when opening accounts with ED&F Man.[24] The classification letter provided by ED&F to the Pension Plans set out that the Terms were attached to that letter. The Pension Plans signed the attached "Acknowledgement of ATT Status", by which they represented that *"I have read and understood the relevant sections of the MCM Terms and Conditions"*. It follows that the Application documentation was completed prior to the Terms being agreed, as the Pension Plans were required to verify the provisions of the Terms in that documentation.

(2) However, if the Terms were entered into in after the correspondence referred by Mr Salter in paragraph 69 of his Declaration was exchanged, those would be pre-contractual negotiations which are generally not relevant to questions of construction.

(3) More particularly, as I have already set out above, pre-contractual negotiations are not generally relevant or admissible as evidence regarding the proper interpretation

---

24. ED&F-00018041.

of the Contract Suite agreements, as such negotiations comprise evidence of the parties' subjective beliefs as to the meaning of the agreements, which subverts the objective nature of the exercise of interpretation undertaken by the court, to determine what a reasonable person would have understood the parties to have meant.

(4) I agree that <u>some</u> of the evidence as to the parties' subsequent conduct or pre-contractual negotiations on which Mr Salter relies may be admissible to show the commercial purpose or aim of the transactions. However, contrary to Mr Salter's conclusion in paragraph 67 of his Declaration, the court will be very cautious about admitting such evidence. In my opinion, the English court is highly unlikely to admit evidence of the parties' pre-contractual negotiations in the manner suggested by Mr Salter.

(5) That is because, as I have already set out above, evidence of pre-contractual negotiations can go no further than to establish the objective commercial purpose or aim of the arrangements. They cannot be relied on to establish detailed points of interpretation.

(6) The evidence referred to by Mr Salter in paragraph 69 of his Declaration is relied on by him to establish detailed points of interpretation of the relevant agreements, regarding the operation of specific clauses in the Custody Agreement and the Terms, including his assertion that the Terms required some act of exercise on the part of ED&F before title would pass to ED&F (paragraph 70). In my opinion such evidence would not be admitted by the English courts for the purpose of establishing such points of interpretation.

105.    In any event, the evidence relied on by Mr Salter in paragraph 69 of his Declaration does not establish that the commercial purpose or aim of the arrangements was that the Pension Plans should hold beneficial title to the Securities on the Reference Date, or that the Terms required some act of exercise on the part of ED&F to transfer title to the Securities, as expressed by Mr Salter in paragraphs 68 and 70 respectively:

(1) First, while ED&F's Defence to Re-Amended Schedule 5T in the proceedings in the Commercial Court in London is pleaded as Mr Salter describes, the Defence merely expresses ED&F's subjective belief as to the commercial purpose or aim of the transaction and does not demonstrate the objective intention of the parties.

(2) The email dated 4 May 2012 referred to in paragraph 69.4 of Mr Salter's Declaration in fact supports the interpretation of the operation of the Terms set out above in Section IB, as it provides that *"all money and assets in the hands of ED&F Man are, in fact not your money and assets at all (but give you only a right of claim as an ordinary creditor), unless your specific instructions say otherwise … for any such other categories of cash and non-cash you are an unsecured creditor only (ie the standard position applies)"*. Importantly, the email does not provide that the Clients' money and assets would be transferred to ED&F if it exercised its right to transfer those assets, but instead states that all assets *"in the hands of ED&F Man" i.e.* any assets received by ED&F, would be held by ED&F on a title transfer basis subject to the Client specifically requesting that those assets be treated differently. Further, this is described as *"the standard position"*, indicating that it is the default position regarding title to the Securities.  This correspondence demonstrates that ED&F did not in fact need to take any additional steps to effectuate the TTCA

provisions of the Terms. Instead, it was the Pension Plans who were required to take additional actions to the extent they did not want the TTCA provisions to apply to their assets. Accordingly, this demonstrates the opposite of the construction advanced by Mr Salter in his Declaration.

(7) The email dated 16 May 2012 referred to in paragraph 69.5 of Mr Salter's Declaration also demonstrates that the parties recognised that the TTCA in clause 10(b)(ii) provides for the Securities to be held on a different basis from the bare trust provision in clause 2(a) of the Custody Agreement.

(8) The email from Endeavour Advisory referred to in paragraph 69.6 of Mr Salter's Declaration provides that *"the terms of the custody agreement are intended to prevail over the terms and conditions of business in so far as they relate to custody"*.[25]   However, as set out at paragraph 61 above, clause 10(b)(ii) of the Terms does not relate to custody but is a TTCA which concerns the holding of the Securities as collateral. Accordingly, this email does not establish that the Custody Agreement was intended to prevail over the Terms in respect of the TTCA.

(9) Further, the email from Endeavour Advisory is inconsistent with Mr Salter's case, as it provides that absolute transfer of title *"may be inconsistent with certain objectives of the proposed transaction"* (my emphasis):

(a)   Mr Salter identifies the purported objective of the arrangements at paragraph 68 of his Declaration as being to ensure that the Pension Plans were intended to own the Securities beneficially on the Reference Date. If that were correct, the TTCA would be inconsistent with what Mr Salter suggests was the

---

25.  ACER_00022658.

central aim of the arrangements, rather than only potentially inconsistent ("*may be*") with "*certain objectives*" of the arrangements.

(b) The email does not identify the "*objectives*" of the proposed transaction with which the TTCA "*may be inconsistent*".

(c) Mr Salter suggests at paragraph 72 of his Declaration that the documents he has seen "*clearly show that both parties were well aware that the automatic application of the TTFCA provision in clause 10(b)(ii) to [the Securities] would defeat the <u>entire commercial purpose</u> of the contractual arrangements between [ED&F and the Pension Plans]*" (emphasis added). I do not agree. In my opinion, the highest the email from Endeavour Advisory can be put, is that it shows that Endeavour Advisory acting on behalf of ED&F subjectively believed that the TTCA "*may be inconsistent*" with "*certain objectives*" of the proposed transaction. It does not clearly show that both parties were aware of anything in particular. It does not show that the TTCA provision would defeat the purpose of the arrangements. It does not show that the TTCA would defeat the entire commercial purpose of the arrangements. It is unclear from this document what "*objectives*" there were to the transaction (and in fact suggests that there were additional "*objectives*" other than those relating to title to the Securities).  It therefore, even if admissible (which it is not), does not establish that the TTCA was not intended to apply to the Securities.

106.     Accordingly, I disagree with Mr Salter's conclusion in paragraph 72 that an English judge would be likely to hold that the facts referred to support his interpretation of the

agreements. In my opinion, for the reasons set out above, the English courts are highly unlikely to have regard to the materials relied on by Mr Salter when interpreting the agreements at all, as they are inadmissible and being improperly relied on to establish detailed points of interpretation, rather than the broad and objective genesis or aim of the agreements. In any event, the materials relied on do not support any conclusion that contradicts the opinion I have previously expressed, namely that, pursuant to the Terms, all right, title and interest to the Securities would transfer to ED&F <u>immediately</u> upon receipt, as collateral to secure the Clients' obligations to repay the purchase monies.

107.    Furthermore, prior to preparation of this Declaration, I have been provided with a selection of the Account Statements produced by ED&F for the Pension Plans which are referred to in paragraph 98 of Mr Salter's Declaration. As these statements constitute evidence of the subsequent conduct of the parties, which is not admissible as an aid to interpreting the Contract Suite agreements, they do not alter my opinion as to the correct interpretation of the Terms.

108.    In any event, even if the Account Statements were admissible as to the construction of the Contract Suite agreements, I would remain of the same conclusion as to the correct interpretation of the Terms, for the following reasons:

(1) The Account Statements do not have any bearing on the correct interpretation of the Terms. As set out above, book entries in ED&F's account statements are not determinative of ownership of the Securities, although they may provide evidence that a transfer of ownership has taken place. Accordingly, if ED&F did fail to record the transfers of title to the Securities in its books, that does not mean that it did not obtain such title.

(2) In any event, the Account Statements that I have seen in fact support my opinion that book entries and/or records were not necessary for title to the Securities to transfer to ED&F:

    (a) Mr Salter appears to accept at paragraph 52 of his Declaration that ED&F had the right to re-hypothecate or otherwise deal with the Securities. Further, in paragraph 10.4 of its Re-Amended Defence in the English Proceedings ED&F pleaded that the acquisition and subsequent sale by the Pension Plans of the Securities took place by the process set out therein (as set out in part in paragraph 63 of Mr Salter's Declaration), including a step in which the Clients could recall the Securities from ED&F.

    (b) The Account Statements with which I have been provided do not distinguish between positions in the accounts which were held by the Pension Plans and those which had been rehypothecated by ED&F. I have also seen no indication in the documents I have reviewed that the Pension Plans were, at least with any regularity or formality, informed when the Securities were rehypothecated or used by ED&F.  Further, I have been informed that there is no supporting documentation which demonstrates that the Pension Plans recalled Securities from ED&F.

    (c) Accordingly, it appears that when the parties exercised their rights to deal with the Securities (including in the manner pleaded by ED&F), no corresponding book entries were made in the Account Statements, and no other record of the dealing was kept by ED&F (at least insofar as that record was shared with the Pension Plans).

(d) It follows that book entries were not necessary for the parties to exercise their respective rights to deal with the Securities, and therefore that book entries were not necessary for title to the Securities to transfer to ED&F pursuant to the TTCA.

c)      Plain Language of the TTCA

109.    My opinion as to the immediacy of the transfer of title to the Securities upon receipt is also supported by the plain language of the TTCA. In particular, I disagree with Mr Salter's statement at paragraph 93.4.1. of his Declaration that an English judge would be likely to interpret the wording *"actually or potentially"* in clause 10(b)(ii) of the Terms to mean that, for the purpose of securing the client's obligations, ED&F is to have a choice whether and when to treat such assets as collateral. In my opinion, the English courts are highly unlikely to conclude that this is what a reasonable person, with all the background knowledge available to the parties at the time of the contract, would have understood the parties to have meant.

110.    As I set out in paragraph 72 above, when ED&F loaned funds to Clients to purchase the Securities, it would be exposed to the Clients until the purchase monies had been repaid. The purpose of the TTCA is to protect ED&F from such exposure to the Clients, including in respect of future, actual, contingent or prospective obligations, by transferring absolute title to the Securities to ED&F upon receipt of those Securities. It follows that assets would be held *"actually"* in respect of margin or collateral for the purpose of securing the Client's present and actual obligations and would be held *"potentially"* as collateral in respect of margin or collateral for the purpose of securing the Client's future, contingent or prospective obligations which may be incurred from time to time. The potentiality expressed in clause 10(b)(ii) does not relate to

ED&F's choice as to whether to treat the Securities as collateral, but rather the nature of the obligation which the collateral is meant to secure.

111.    I also disagree with Mr Salter's statement at paragraph 93.4.2. of his Declaration that an English judge would be likely to interpret the words *"will be…transferred"* and *"upon such transfer"* in clause 10(b)(ii) of the Terms as indicating that some separate act of transfer is to take place after receipt of the Securities by ED&F.  Clause 10(b)(ii) provides that the Securities *"will be absolutely transferred"* and that all right, title and interest in and to the Securities *"will pass to us outright and absolutely"*. In my opinion, the mandatory and absolute terms of clause 10(b)(ii) support the interpretation that title to the Securities transferred to ED&F immediately upon receipt. This view is also supported by the absence in the Terms of any mechanism exercisable by ED&F to effect such a transfer which, as set out in paragraph 88 above, strongly indicates that title transferred immediately.

112.    Further, the re-transfer obligation in clause 10(b)(ii) is not inconsistent with title to the Securities having transferred to ED&F immediately upon receipt. Clause 10(b)(ii) sets out that ED&F *"will re-transfer assets"* and the re-transfer obligation is not expressed to be conditional on ED&F's right to accept the Securities as collateral being exercised. Accordingly, in my opinion, the re-transfer obligation also arises immediately upon receipt of the Securities, which indicates that the Securities were immediately transferred to ED&F in the first place, rather than transfer being subject to some ambiguous method by which ED&F could exercise its right to take the Securities as collateral.

d)      The CMA Policy

113.    I agree with Mr Salter's statements at paragraphs 94.3.1. of his Declaration that if ED&F and the Pension Plans did not both have knowledge of or access to the CMA Policy

at the time of formation of the Contract Suite then it is not relevant or admissible as an aid to interpretation. However, whether it was a document available to both parties is a matter of fact on which I do not express an opinion.

114.    As I have set out in paragraph 62 above, if the CMA Policy is admissible, I remain of the view that it would support the preferable interpretation of the Contract Suite that I have set out therein for the following reasons.

(1) As correctly pointed out by Mr Salter at paragraph 93.2 of his Declaration, the CMA Policy implemented the relevant regulatory provisions. As set out in paragraph 94 above, a firm's failure to comply with its procedural regulatory obligations does not affect the substantive rights of the parties to the relevant assets.

(2) Accordingly, in my opinion, it did not affect ED&F's title to the Securities even if ED&F did not transfer the Securities into its own name or into a non-segregated account upon receipt. The CMA Policy sets out the effect of the regulatory CASS Rules, breach of which rules is not determinative of the parties' ownership rights to the Securities.

115.    I note that even if the CMA Policy is not relevant or admissible as an aid to interpretation, I remain of the opinion that the English court would be likely to conclude that the Terms governed title to the Securities on the basis of the material that was available to the contracting parties at the relevant time.

### iii.   Claims of Estoppel and/or Rectification Would be Highly Unlikely To Succeed

116.    I generally agree with Mr Salter's statement of the law on estoppel as set out in paragraphs 81 to 87 of his Declaration.  However, contrary to Mr Salter's suggestion in

paragraph 87, it is an established principle of English law that estoppel is only capable of binding the parties to the representation or common assumption on which the estoppel is founded.

117.    The position in respect of estoppel by representation is summarised in Halsbury's Laws of England, Vol.23 at [308][26]:

> *"Where a person has by words or conduct made an unequivocal representation of fact or law to another, either knowing of its falsehood or with the intention that it should be acted upon, or having conducted himself so that another would, as a reasonable person, understand that it was intended to be acted upon, and the other person has acted upon such representation and thereby detrimentally altered his position, <u>an estoppel arises against the party who made the representation</u>, and he is not allowed to state that the fact is otherwise than he represented it to be."*
> (emphasis added)

118.    The fact that two parties so conduct themselves as to give rise to a representation by one that the facts (or the law) are X and a detrimental reliance by the other that the facts (or the law) are X does not *make* the facts (or the law) X. All it does is to estop the parties to that agreement from asserting <u>as against each other</u> that the facts (or the law) are anything other than X.

119.    Estoppel therefore only binds the parties to the deed containing the representation relied upon and does not affect the rights of strangers to the deed:  <u>Mowatt v Castle Steel and Iron Works Co</u> (1886) 34 ChD 58 at [63]. Every estoppel has to be reciprocal in order to bind both parties, and that is the reason that a stranger shall neither take advantage nor be bound by the estoppel: <u>Gaunt v Wainman</u> (1836) 3 Bing NC 69 at [336].

120.    Estoppel by convention also binds the parties to their shared, although mistaken, understanding or assumption of the law or facts on which their rights are to be

---

26. This summary was approved by the court in <u>Laroche v Spirit of Adventure (UK) Limited</u> [2008] EWHC 788 (QB).

determined, rather than providing a cause of action: <u>Dixon v Blindley Heath Investments Ltd</u> [2015] EWCA Civ 1023 at [73]. (It is a shield and not a sword.)

121.    As a result, whatever the position that ED&F and its counterparty (the Clients) take, that does not bind third parties. I note that Mr Salter does not cite any case where an estoppel asserted between two parties binds a third party, and that in paragraph 88 of his Declaration he just states that he is not aware of a case where a third party has contended that the agreement between the parties to a contract does not bind him. That is, no doubt, because estoppels bind the parties *inter se*, and therefore it would be inconsistent with the doctrine of estoppel for it to be contended that they bind a third party.

122.    I generally agree that Mr Salter accurately states the law of rectification at paragraphs 75 to 78 of his Declaration. I would add that the following principles also apply:

(1) Whether or not a particular instrument should be rectified is a question of fact, rather than a matter of law: <u>Snell's Equity</u>, 34th Edition at [16-011].

(2) The burden of proving that the concluded instrument does not represent the common intention of the parties is particularly onerous where the contract has been entered into between sophisticated commercial parties: c.f. <u>Phillips Petroleum Co UK Ltd v Snamprogetti Ltd</u> [2001] EWCA Civ 889 at [34]-[36].

(3) Further, rectification may be refused if the party claiming rectification has affirmed the instrument with knowledge of the error contained therein: <u>Goff & Jones on The Law of Unjust Enrichment</u>, 9th Edition at [40-39].

123.    Mr Salter concludes at paragraph 111 of his Declaration that *"it must be highly likely that a claim for rectification and/or a claim based upon estoppel would succeed"*.

However, I note that the language he uses elsewhere in relation to these claims is much more equivocal.

(1) He states in paragraph 77 that if ED&F and/or the Pension Plans could show that they had a common intention which was mistakenly not accurately recorded in the documents *"then they <u>could in principle</u> be entitled to rectification of the documents".*

(2) He states in paragraph 87 that that *"[t]wo kinds of estoppel <u>could perhaps preclude the other from asserting the contrary</u>".*

(3) He states in paragraph 81 that account statements "*may sometimes found an estoppel in favour of the client".*

(4) He asserts in paragraph 82 that account statements "*can…amount to a representation of fact which, if relied upon by the client represente[d] to that client's detriment, could found an estoppel…*".

124.    In any event, I disagree with Mr Salter's conclusion that it would be highly likely that a claim for rectification or estoppel would succeed.

(1) Whether a claim for rectification and/or estoppel would succeed is a matter of fact which falls to be determined by reference to evidence as to the parties' intentions and/or representations.

(2) In particular, when considering evidence of the parties' true intentions to support rectification, it has to be shown that one party's representation which the other party relied on to its detriment to support estoppel by representation or alternatively a shared assumption founding estoppel by convention.

(3) The burden of proof is on the party alleging the estoppel and/or claiming that the agreement should be rectified, and the claims must be specifically pleaded and clearly established.  I understand that neither ED&F or the Pension Plans have pleaded a claim as to estoppel and/or rectification, having raised them for the first time in this context, at a late stage in the litigation, and therefore the latter requirement is not satisfied.

(4) I agree with Mr Salter's statement at paragraph 100 of his Declaration that the facts cited in section (E1) of his Declaration would be admissible in respect of a claim for rectification and/or estoppel.  However, I disagree that those facts would be capable of supporting claims for rectification or estoppel.

(5) In my opinion, those facts are insufficient to discharge the burden of proof in respect of any of the relevant claims, as there is no evidence that ED&F and the Pensions Plans in fact mutually intended that the Terms should not apply to transfer the Securities immediately to ED&F (or that one party made a representation to that effect which the other party relied on to its detriment).

(6) In particular, the evidence is insufficient to discharge the high burden of proof required to rectify agreements which have been negotiated by sophisticated commercial parties.

125.    In my opinion, the Pension Plans would be unlikely to succeed in a claim for estoppel and/or rectification in the manner suggested by Mr Salter. There is no assertion of, or evidence of, any written or oral agreement to the effect that ED&F would not take title to the Securities until after the Reference Date. In particular, I am informed that SKAT has received the following responses to Interrogatories:

(1) In respect of a request to Acer to "*Identify the terms of Your relationships with ED&F and the Plans, including any oral or written agreements to provide services or distribute profit and loss or fees among You, ED&F, the Plans, and any other individual or entity*" Acer referred to (i) the Power of Attorney executed in connection with the Defendant Plans' accounts at ED&F, (ii) the documentation with PACT investors, and (iii) *"Acer's invoices to ED&F"*. The Power of Attorney documents and the Acer invoices do not provide any evidence of an agreement between ED&F and the Pension Plans capable of supporting estoppel and/or rectification. Further, ED&F was not a party to the documentation with PACT investors, and that documentation also does not provide any evidence supporting rectification and/or estoppel; and

(2) In respect of a request to the Pension Plans to *"Identify the terms of the Plan's relationships with Acer and ED&F, including any oral or written agreements to provide services to or distribute profit and loss or fees among the Plan, Acer, ED&F, or any other individual or entity"* the Pension Plans referred to *"[the] Plan's the account documents with ED&F and to the power of attorney executed in connection with the opening of the Plan's accounts at ED&F [sic]"*.

126.    I also note that rectification is an equitable remedy which may be refused if the party seeking rectification has affirmed the agreement with knowledge of the error contained therein.

(1) If it were the case that the application of the TTCA to the Securities was an "error", ED&F would be prevented from claiming that the Contract Suite agreements ought to be rectified in order to remove application of the TTCA.

(2) In particular ED&F expressly affirmed the application of the TTCA in the First and Second Variation Letters, which affirmation is in my opinion entirely inconsistent with any claim made by either party for rectification or estoppel.

(3) Further, in my opinion, to the extent that the Pension Plans did not object to the First and Second Variation Letters, the English courts would be likely to conclude that they had also affirmed the TTCA, and they would also therefore be prevented from claiming rectification on that basis.

127.    In any event, as I set out above, it is my opinion that estoppel (whether by representation, convention or otherwise) will not bind a party which was not a party to the representation or common assumption relied on to found the estoppel. SKAT was not a party to any representation or common assumption that the Securities were held by ED&F on bare trust for the Clients, or alternatively that some further step was required for the Securities to be transferred to ED&F. Accordingly, in my opinion, SKAT would not be bound by any estoppel arising between ED&F and the Pension Plans.

128.    It is also my opinion that the English courts would be unlikely to prevent SKAT from arguing for ED&F to have greater rights than those reflected in the parties' mutual dealings (to the extent that this is correct). It would not be necessary for SKAT to establish some wrongful conspiracy with the Pension Plans, as suggested in paragraph 100.1 of Mr Salter's Declaration. The English courts are unlikely to permit ED&F to rely on a self-serving agreement with the Pension Plans in order to rewrite the express provisions of the Terms.

129.    For the reasons set out above, I disagree with Mr Salter's conclusion in paragraph 100.2 of his Declaration that it is likely than an English court would regard SKAT as

being precluded from arguing that ED&F had all right, title and interest to the Securities immediately upon receipt pursuant to the TTCA.

**D.      Conclusion**

130.    In conclusion, and for all the reasons set out above, I remain of the view that the Terms applied to govern ED&F's rights to the Securities when it had advanced funds to the Clients to purchase the Securities. Pursuant to those Terms, all right, title and interest to the Securities would transfer to ED&F immediately upon receipt, and no further step was required for the title transfer to be effective.

131.    Under English law SKAT would not be bound by any estoppel arising between ED&F and the Pension Plans, as it was not a party to any representation or common assumption capable of founding such an estoppel. It is also my opinion that claims of estoppel and/or rectification brought by ED&F and/or the Pension Plans would be unlikely to succeed, as I have seen no evidence capable of supporting either claim. Further, ED&F (and the Pension Plans to the extent they did not object) expressly affirmed the application of the TTCA in the First and Second Variation Letters, and would be likely to be prevented from claiming rectification by the English courts on that basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 24, 2022

_____
Felicity Toube QC

**APPENDIX A**

# Felicity Toube QC

QC 2011, Called to the Bar 1995

+44 (0)20 7696 9900
felicitytoube@southsquare.com




---

Felicity Toube QC specialises in domestic and cross-border insolvency and restructuring, banking and financial services, commercial litigation, civil fraud, and company law. Felicity appears in the Cayman Islands on a regular basis. She also acts as an expert in international proceedings in English law, as well as the law of other common law jurisdictions. She is asked to speak regularly at conferences, including at INSOL and Offshore Alert.

Felicity has acted in relation to most of the recent major corporate restructurings or insolvencies and related litigation including most recently in *NMC, GateGroup, Codere, Saad, Madoff, Lehman, Stanford, Rastogi, Nortel, SPhinX, Sigma, Landsbanki, MF Global,* and *Rafidain Bank.*

Felicity is widely recognised in all the legal directories as an expert in several fields. She won Chambers and Partners Insolvency/Company Silk of the Year 2020 and is ranked as a Leading Silk both nationally and internationally by Chambers & Partners in Insolvency/Restructuring, Commercial Dispute Resolution, Company Law, and Commercial/Chancery Litigation .

Chambers UK Bar 2019 refers to her as *"at the top of her game – very bright, supremely user-friendly and great with clients."* Other comments include:

*"Felicity is quick-witted and extremely responsive. She's redoubtable and very highly regarded, yet eminently approachable."*

*"She is extremely user-friendly and provides clear, thoughtful and pragmatic advice quickly and in a very helpful format."*

*"Felicity is an intelligent and empathetic silk who quickly gets to the heart of the matter."*

*"Very much a strong leader, with strong submissions of her own style."*

She is ranked by Legal 500 2020 as a Leading Silk for Insolvency, Banking and Finance, Civil Fraud, Commercial Litigation, and Offshore: with comments including: "*Her written opinions should stand as an example of precisely what clients and instructing attorneys want to see – clear, concise and reliable.*"

Felicity is also ranked in Who's Who in Insolvency and Asset Tracing, and also as a Thought Leader in Insolvency.

Felicity also publishes widely across all her fields of experience, including as editor and contributor to Toube on "International Asset Tracing in Insolvency" (OUP) and as Editor of *Insolvency Intelligence*.

Felicity is an ADR Group Accredited Civil & Commercial Mediator, an accredited Arbitrator by CiArb, and is Co-Chair of the INSOL Mediation Colloquium.

**APPENDIX A**

## Insolvency and Restructuring

Instructed in all varieties of administrations and liquidations, including in respect of financial institutions (*NMC, GateGroup, Codere, Saad, Madoff, Lehman, Stanford, Nortel, SPhinX, Sigma, Landesbanki, MF Global, Debenhams, BHS,* and *Rafidain Bank*).

Recent cases include:

- **Smile Telecoms** [2021] EWHC 685 (Ch), [2021] EWHC 933 (Ch) (restructuring plan – sanction – effect of conditions, cross class cram down)
- **Smile Telecoms** [2021] EWHC 395 (Ch) (restructuring plan – convening)
- **GateGroup** [2021] EWHC 775 (Ch) (restructuring plan – sanction)
- **GateGroup** [2021] EWHC 304 (Ch) (restructuring plan – convening – insolvency proceeding)
- **Swissport Fuelling 2** [2020] 12 WLUK 171 (scheme of arrangement – sanction)
- **Swissport Fuelling 2** [2020] EWHC 3064 (Ch) (scheme of arrangement – convening)
- **New Look Financing Plc** [2020] EWHC 3613 (Ch) (scheme of arrangement – sanction)
- **New Look Financing Plc** [2020] EWHC 2793 (Ch) (scheme of arrangement – convening)
- **Pizza Express** [2020] EWHC 2873 (Ch) (restructuring plan – convening)
- **Flybe** (acting for administrators re Flybe administration in multiple disputes)
- **Hood** [2020] EWHC 3232 (Ch) (acting for creditor in relation to change of carriage petition in bankruptcy – appeal)
- **Codere Finance 2 (UK) Ltd** [2020] EWHC 2441 (Ch) (scheme of arrangement)
- **Matalan Finance Plc** [2020] EWHC 2345 (Ch) (scheme of arrangement – sanction)
- **Matalan Finance Plc** [2020] EWHC 1953 (Ch) (scheme of arrangement – convening)
- **Swissport Fuelling** [2020] EWHC 1773 (Ch) (scheme of arrangement – sanction)
- **Swissport Fuelling** [2020] EWHC 1499 (Ch) (scheme of arrangement – convening)
- **Re A Company** [2020] EWHC 1406 (Ch) (injunction to restrain presentation of winding-up petition pending CIGA)
- **Peak Hotels** [2020] EWHC 1365 (Ch) (costs of valuation of services under section 245 Insolvency Act 1986)
- **Gertner v. CFL** [2020] EWHC 1241 (Ch) (successful appeal re good faith in IVAs) and [2021] EWHC 1404 (Ch) (third party costs order)
- **Carluccio's Limited** [2020] EWHC 886 (Ch) (adoption of furloughed contracts in administration)
- **CFL Finance v. Bass** [2019] EWHC 1837 (Ch) (ability to vote in IVA/bankruptcy petition)
- **Peak Hotels** [2019] EWHC 2558 (Ch) (application of test for valuation of services under section 245 Insolvency Act 1986)
- **Peak Hotels** [2019] EWCA Civ 345 (test for valuation of services under section 245 Insolvency Act 1986)
- **Crumpler v Candey Ltd** [2018] EWCA Civ 2256 (Court of Appeal) (Nature of ownership of monies paid into Court – floating charge)
- **Re Lehman Brothers Europe Ltd** [2017] EWHC 2031 (Ch) (Distribution to shareholders in administration by newly appointed director)
- **Re LB Holdings Intermediate 2 Ltd (In Administration) and others** [2017] EWHC 2032 (Ch) (Sanction of settlement of Waterfall III litigation)
- **Chubb v Rafidain Bank** Chancery Division (Companies Court), 27 July 2017 (unreported)

## APPENDIX A

- (Declaration of meaning of scheme of arrangement)
- ***Leeds v Lemos*** [2017] EWHC 1825 (Ch) (privilege in bankruptcy does not pass to trustee in bankruptcy even in relation to "assets" documents)
- ***PricewaterhouseCoopers v SAAD Investments Co Ltd*** (In Official Liquidation) Privy Council (Bermuda), 17 November 2016 [2016] UKPC 33; [2017] 1 W.L.R. 953 (costs of aborted document production exercise not paid by office holders)
- ***Lehman Brothers Luxembourg Investments S.A.R.L. v Lehman Brothers UK Holdings Limited (In Administration)*** [2016] EWHC 617 (Ch) (Construction of loan document and subordination)
- ***Citicorp International Ltd v Castex Technologies Ltd*** [2016] EWHC 349 (Comm) (contents of notice for mandatory conversion notice)
- ***Indah Kiat International Finance Co BV*** [2016] EWHC 246 (Ch); [2016] B.C.C. 418 (adjournment of convening meeting for scheme of arrangement – requirements for convening order)
- ***Centaur Litigation SPC (In Liquidation) v Terrill*** [2015] EWHC 3420 (Ch) (freezing order – breach of duty by director)
- ***MF Global UK Ltd (In Special Administration)*** [2015] EWHC 2319 (Ch) [2016] Ch. 325 (denial of section 236 order against foreign respondents)
- ***Black Diamond Offshore Ltd v Fomento De Construcciones Y Contratas SA*** [2015] EWHC 1035 (Ch) (denial of stay of proceedings pending homologation proceedings in Spain; subsequent relief granted in favour of Black Diamond)
- ***Northsea Base Investment Ltd*** (and 7 others) [2015] EWHC 121 (Ch) (COMI of 7 Cypriot companies in England)
- ***Re Business Environment Fleet St*** [2014] EWHC 3540 (Ch) (powers of administrators to sell disputed assets)
- ***Pricewaterhouse Coopers v Saad Investments Company Limited*** [2014] UKPC 35 (ability of stranger to liquidation to set aside winding-up order)
- ***Singularis Holdings Limited v Pricewaterhouse Coopers*** [2014] UKPC 36 (extent of common law assistance in cross border insolvencies; existence of common law power to assist investigations as to assets)
- ***Re ARM Asset Backed Securities*** (EC Regulation and Luxembourg) [2014] EWHC 1097 (Ch)
- ***JSC Bank of Moscow and others v Kekhman*** (No: 4893 of 2012) [2014]
- ***London Scottish Finance*** [2013] EWHC 4047 (Ch) Ch D
- ***ARM Asset Backed Securities*** [2013] EWHC 3351 (Ch)
- ***Re Tambrook*** [2013]
- ***Re Nortel Networks NV; Re Lehman Brothers International (Europe)*** [2013] UKSC 52
- ***Lehman Brothers Special Financing v Carlton Communications*** [2012] EWCA Civ 419
- ***Re Nortel Bloom v The Pensions Regulator*** [2011] EWCA Civ 1124
- ***Lehman Brothers Special Financing v Carlton Communications*** [2011] EWHC 718 (Ch)
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm)
- ***Re Nortel Bloom v The Pensions Regulator*** [2010] EWHC 3010 (Ch)
- ***Madoff Securities International v Financière Meeschaert*** [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC 47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] EWHC 3228 (Ch); [2009] WLR (D) 371
- ***Re Stanford International Bank*** [2009] EWHC 1441 (Ch)
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)

**APPENDIX A**

## Banking and Finance

Recently instructed in a variety of issues including the client money litigation, as well as cases arising under ISDA Master Agreements, Facility Agreements and other security documents, and issues relating to schemes of arrangement (*Saad, Lehman, Stanford, SPhinX, Sigma, Landesbanki, MF Global, and Rafidain Bank*).

Recent cases include:

- ***ING Bank v. Santander*** [2020] EWHC 3561 (Comm) (jurisdiction question)
- ***BCV*** (acting for receiver in relation to dispute between Maduro and Guaido Central Bank of Venezuela)
- ***Akers v Samba Financial Group*** [2014] EWHC 540 (Ch)
- ***London Scottish Finance*** [2013] EWHC 4047 (Ch)
- ***Lehman Brothers Special Financing v Carlton Communications*** [2012] EWCA Civ 419
- ***Lehman Brothers Special Financing v Carlton Communications*** [2011] EWHC 718 (Ch)
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm)
- ***Madoff Securities International v Financière Meeschaert*** [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC 47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] EWHC 3228 (Ch); [2009] WLR (D) 371
- ***Re Stanford International Bank*** [2009] EWHC 1441 (Ch)
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)
- ***Black Diamond Offshore Ltd v Fomento de Construcciones y Contratas SA*** [2016] EWCA Civ 1141; [2017] 1 B.C.L.C. 196 (construction of bond documentation/insolvency events of default)
- ***Lehman Brothers Luxembourg Investments Sarl v Lehman Brothers UK Holdings Ltd*** Chancery Division (Companies Court), 21 March 2016 [2016] EWHC 617 (Ch); [2017] 1 All E.R. (Comm) 393; [2016] 2 B.C.L.C. 244 (Construction of subordination agreement – solvency issues)
- ***Citicorp International Ltd v Castex Technologies Ltd*** Queen's Bench Division (Commercial Court), 24 February 2016 [2016] EWHC 349 (Comm) (issues of notice requirements in relation to convertible bonds)

## Commercial Litigation and Arbitration

Major commercial litigation, and in particular civil fraud claims. Recent commercial cases and arbitrations include:

- ***Flybe*** (acting for administrators re Flybe administration in multiple disputes)
- ***BCV*** (acting for receiver in relation to dispute between Maduro and Guaido Central Bank of Venezuela)
- ***ING v. Santander*** (jurisdiction challenge re English/Spanish proceedings)
- ***Re Smith*** [2020] EWHC 1280 (Comm) (multi party fraud claim – acting for Jersey Viscount)

## APPENDIX A

- ***Mohamed v. Breish*** [2020] EWCA Civ 637 (one voice principle)
- ***Mohamed v. Breish*** [2020] EWHC 696 (Comm) – Identity of Chairman of Libyan Investment Authority
- ***Mohamed v. Breish*** [2019] EWHC 1768 (Comm) – one voice principle
- ***Mohamed v. Breish*** [2019] EWHC 306 (Comm) – authority dispute within Libyan Investment Authority
- ***Crumpler v Candey Ltd*** [2018] EWCA Civ 2256 (Court of Appeal) (Nature of ownership of monies paid into Court – floating charge)
- ***Shaw v Breish*** [2017] EWHC 2972 (Comm) (Collateral use of documents; variation of court appointed receivership)
- ***UBS AG, London Branch v Glas Trust Corp Ltd*** [2017] EWHC 1788 (Comm) (powers of Note Trustee)
- ***Black Diamond Offshore Ltd v Fomento de Construcciones y Contratas SA*** [2016] EWCA Civ 1141; [2017] 1 B.C.L.C. 196 (construction of bond documentation/insolvency events of default)
- ***Lehman Brothers Luxembourg Investments Sarl v Lehman Brothers UK Holdings Ltd***
- ***Chancery Division*** (Companies Court), 21 March 2016 [2016] EWHC 617 (Ch); [2017] 1 All E.R. (Comm) 393; [2016] 2 B.C.L.C. 244 (Construction of subordination agreement – solvency issues)
- ***Libyan Investment Authority v Codeis Securities SA*** Queen's Bench Division (Commercial Court), 02 November 2016 [2016] EWHC 2773 (Comm) (powers of court appointed receiver where authority dispute in Libya) ***RBG v Rastogi and others*** [2014] EWHC 2316 (Ch)
- ***Akers v Samba Financial Group*** [2014] EWHC 540 (Ch)
- ***Lehman Brothers Special Financing v Carlton Communications*** [2012] EWCA Civ 419
- ***Lehman Brothers Special Financing v Carlton Communications*** [2011] EWHC 718 (Ch)
- ***Re Nortel Bloom v The Pensions Regulator*** [2010] EWHC 3010 (Ch)
- ***Madoff Securities International v Financière Meeschaert*** [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC  47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] WLR (D) 371
- ***Re Stanford International Bank*** [2009] EWHC 1441 (Ch)
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)
- ***Citicorp International Ltd v Castex Technologies Ltd*** Queen's Bench Division (Commercial Court), 24 February 2016 [2016] EWHC 349 (Comm) (issues of notice requirements in relation to convertible bonds

---

## Company

Recently instructed in a variety of company law cases including in relation to schemes of arrangement and restructuring plans, for company or AHG.

- ***Smile Telecoms*** [2021] EWHC 685 (Ch), [2021] EWHC 933 (Ch) (restructuring plan – sanction – effect of conditions, cross class cram down)
- ***Smile Telecoms*** [2021] EWHC 395 (Ch) (restructuring plan – convening)
- ***GateGroup*** [2021] EWHC 775 (Ch) (restructuring plan – sanction)
- ***GateGroup*** [2021] EWHC 304 (Ch) (restructuring plan – convening – insolvency proceeding)
- ***Swissport Fuelling 2*** [2020] 12 WLUK 171 (scheme of arrangement – sanction)

## APPENDIX A

- ***Swissport Fuelling 2*** [2020] EWHC 3064 (Ch)  (scheme of arrangement – convening)
- ***New Look Financing Plc*** [2020] EWHC 3613 (Ch) (scheme of arrangement –  sanction)
- ***New Look Financing Plc*** [2020] EWHC 2793 (Ch) (scheme of arrangement – convening)
- ***Pizza Express*** [2020] EWHC 2873 (Ch) (restructuring plan – convening)
- ***Flybe*** (acting for administrators re Flybe administration in multiple disputes)
- ***Hood*** [2020] EWHC 3232 (Ch) (acting for creditor in relation to change of carriage petition in bankruptcy – appeal)
- ***Codere Finance 2 (UK) Ltd*** [2020] EWHC 2441 (Ch) (scheme of arrangement)
- ***Matalan Finance Plc*** [2020] EWHC 2345 (Ch) (scheme of arrangement – sanction)
- ***Matalan Finance Plc*** [2020] EWHC 1953 (Ch) (scheme of arrangement – convening)
- ***Swissport Fuelling*** [2020] EWHC 1773 (Ch) (scheme of arrangement – sanction)
- ***Swissport Fuelling*** [2020] EWHC 1499 (Ch) (scheme of arrangement – convening)
- ***Swissport Fuelling*** [2020] 11 WLUK 96 (second scheme of arrangement for airline related company)
- Scheme proponent in the ***Sphinx*** case in the Cayman Islands
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm)
- ***Madoff Securities International v Financière*** Meeschaert [2010] EWHC 133 (Ch)
- ***Re Lehman Brothers International (Europe) v CRC*** [2010] EWHC  47
- ***Re Lehman Brothers International (Europe) v CRC*** [2009] WLR (D) 371
- ***Re Sigma*** [2009] UKSC 2
- ***Re Global Trader Europe*** [2009] EWHC 602 (Ch)

---

## Civil Fraud and Asset Recovery

Recent cases include:

- ***Re Smith*** [2020] EWHC 1280 (Comm) (multi party fraud claim – acting for Jersey Viscount)
- ***RBG v Rastogi and others*** [2014] EWHC 2316 (Ch)
- ***Akers v Samba Financial Group*** [2014] EWHC 540 (Ch)
- ***NMC***
- ***Madoff***
- ***Stanford***

---

## Offshore

Felicity has appeared in the following foreign jurisdictions, the Cayman Islands (where she appears on a regular basis in the Grand Court), the BVI (including appearing in the  BVI Court),  ADCM, Antigua, USA, EU (in particular realising property and unravelling frauds in  France  and  Spain), Jersey, Guernsey and Isle of Man.

Also acts as an expert in international proceedings in English law, as well as the law of other common law jurisdictions. Currently retained in one case by the US Department of Justice as an expert on foreign law.

**APPENDIX A**

Recent cases include:

- ***Pacific Drilling*** (Cayman Islands provisional liquidation in support of Chapter 11 restructuring)
- ***NMC*** (Abu Dhabi administrations of UAE based healthcare group) – multiple ongoing issues
- ***Port Fund*** (Cayman Islands – section 22 proceedings re limited partners' rights to information from Fund)
- ***Peak Hotels*** (BVI proceedings re expense claim in liquidations)
- ***Ardon Maroon*** (Eastern Caribbean Court of Appeal – redemptions between Master and Feeder Fund)
- ***BCV*** (acting for receiver in relation to dispute between Maduro and Guaido Central Bank of Venezuela)
- ***Libyan Investment Authority***: proceedings in the Cayman Islands in relation to Palladyne
- ***Pricewaterhouse Coopers v Saad Investments Company Limited*** [2014] UKPC 35 (ability of stranger to liquidation to set aside winding-up order)
- ***Singularis Holdings Limited v Pricewaterhouse Coopers*** [2014] UKPC 36 (extent of common law assistance in cross border insolvencies; existence of common law power to assist investigations as to assets)
- ***Re Saad*** (Bermuda, Cayman, and Saudi Arabia)
- ***SPhinX*** liquidation (Cayman Islands)
- ***Re ARM*** (EC Regulation and Luxembourg) [2014] EWHC 1097 (Ch)
- ***Tambrook*** (Jersey)
- ***Madoff SIPA Trustee v Harley*** (Cayman Islands)
- ***Stanford International Bank*** (Antigua, Switzerland, and Canada)
- ***Global Distressed Alpha Fund 1 Limited Partnership v PT Bakrie Investindo*** [2011] EWHC 256 (Comm) (Indonesia)
- ***PricewaterhouseCoopers v SAAD Investments Co Ltd*** (In Official Liquidation) Privy Council (Bermuda), 17 November 2016 [2016] UKPC 33; [2017] 1 W.L.R. 953 (costs of aborted document production exercise not paid by office holders)

---

## Awards and Recommendations

Chambers and Partners

Restructuring/ Insolvency

*"She is able to combine a fierce intellect with a commercial understanding and a commercial approach. She is a go-to for insolvency, schemes of arrangement and CVA work."*

*"Felicity is really technically excellent, easy to work with, turns things round very quickly and has an informal, easy style that translates well with clients."*

*"A powerhouse in international insolvency law. She is incredibly responsive, user-friendly and pragmatic."*

*"She is fantastic, very down to earth and has an encyclopedic knowledge of the law. She's also very*

**APPENDIX A**

*easy to deal with and accessible – the perfect barrister."*

*"She's extremely good and unbelievably responsive. She turns out extremely high-quality work at all times of day and is a really, really good advocate."*

Chancery: Commercial

*"A really good litigator, who's very clever, very personable and completely committed to her clients. She is a real insolvency expert and a very good, tough advocate."*

*"Felicity is superb – really responsive, thoughtful and fantastic with clients. She's an outstanding barrister."*

Commercial Dispute Resolution

*"A very polished and persuasive advocate." "She is incredibly responsive, user-friendly and pragmatic, even when clearly under pressure."*

*"She is very responsive, very clever and very easy to deal with."*

Company

*"Gives thoughtful, rigorous and technically detailed advice, and delivers it in a practical and commercial way."*

*"She's incredibly responsive, user-friendly and pragmatic."*

*"Felicity is excellent: she's pragmatic, user-friendly and brilliant on her feet. She's popular with clients and open and easy to work with."*

Offshore

*"She is incredible and very polished. She has gravitas with the judges and is an encyclopedia on insolvency."*

**Legal 500**

Insolvency

*"'Extremely respected; prodigious work ethic – my go-to QC."*

Banking and Finance

*"A consummate team player, and a very good advocate."*

Offshore

*"Felicity is fiercely intelligent, robust, user-friendly and responsive. She is my go-to Leading Counsel for insolvency work."*

Commercial litigation

*"Highly responsive and practical, really fights the client's corner, and does it all with a sense of*

APPENDIX A

*perspective and humour and is great to work with."*

Company/Insolvency Silk of the Year 2020

Junior Insolvency and Corporate Restructuring Barrister of the Year 2006

---

## Career

| | |
|---|---|
| 2020 | Co-Chair of INSOL Mediation Colloquium |
| 2019 onwards | Teaching on Corporate Insolvency Law course, BCL, University of Oxford |
| 2015 | Appointed to INSOL International Mediation Panel |
| 2015 | ADR group Accredited Civil and Commercial Mediator |
| 2012 | First Called to the Bar of the Cayman Islands (on the cases of SPhinX and Harley) |
| 2011 | Appointed Queen's Counsel |
| 1995 | Called to the Bar of England and Wales |
| 1994-1995 | Taught Restitution with with Prof Peter Birks from All Soul's College, Oxford |

---

## Memberships

Commercial Bar Association

Chancery Bar Association

International Insolvency Institute (Board Member)

---

## Publications

Editor of and contributor to ***International Asset Tracing in Insolvency*** (Toube, OUP 2009)

Editor of ***Insolvency Intelligence***

Contributor to ***Insolvency Intelligence***

**APPENDIX A**

Editor of **Totty & Moss on Insolvency** case summaries

Case editor for **Sweet & Maxwell Complete Insolvency Service** CD Rom

Contributor to **EC Regulation on Insolvency Proceedings** (Moss, Fletcher and Isaacs)
Contributor to **Lightman & Moss on Receivers and Administrators**

Author of chapter in **Rowlatt on Surety**

Contributor to **Halsbury's Laws of England** Volume 3(2) (fourth edition, 2002 reissue)

Co-editor of **Halsbury's Laws of England** Volume 7 (fifth edition, 2013 reissue)

Author of **Restitution for Public Lawyers** [1996] JR 92

Author of **Restitution under Article 85(2) EC Treaty – Can it be Done?** (F Rose)

Author of **Cross-Border Security Enforcement and the Conflict of Laws** (F Rose)

---

## Lectures and Seminars

Speaker and Chair and numerous events on insolvency and asset tracing (in particular cross-border insolvency issues): INSOL, INSOL Europe, R3, ILA, IWIRC, Offshore Alert

---

## Education and Qualifications

2020-       Oxford University, part time DPhil
1993-1994 Magdalen College, Oxford University, BCL, First Class
1990-1993 Magdalen College, Oxford University, BA

---

## Prizes and Scholarships

Princess Royal Scholarship (ICSL)

---

## Interests

Charity work (Chair W11 Children's Opera, Trustee of Magdalen College Development Trust, Legal Friends of the Hebrew University, New West End Synagogue, and various other deaf, homeless, and educational charities)

Cooking, reading, cricket