**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.:
18-cv-09840 and 18-cv-09841

MASTER DOCKET

18-md-2865 (LAK)

**PLAINTIFF SKATTEFORVALTNINGEN'S MEMORANDUM OF LAW**
**IN OPPOSITION TO ED&F BELLWETHER DEFENDANTS' AND**
**THIRD-PARTY DEFENDANT'S MOTION IN LIMINE TO EXCLUDE**
**THE PROPOSED TESTIMONY OF GRAHAM WADE**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## TABLE OF CONTENTS

**Page**

FACTUAL SUMMARY ....................................................................................................... 4

    A.    Mr. Wade's Qualifications................................................................................. 4

    B.    Mr. Wade's Opinions ......................................................................................... 6

ARGUMENT .................................................................................................................... 6

    A.    Mr. Wade Is Qualified to Provide Expert Testimony. ........................................ 8

    B.    Mr. Wade's Opinions Are Proper. ..................................................................... 12

    C.    Mr. Wade's Opinions Are Reliable. .................................................................. 17

        1.    Mr. Wade's Opinion that the ED&F Bellwether Defendant plans
               did not Receive any Real Dividends is Reliable....................................... 18

            a)    Mr. Wade Provides a Clear Definition of Real Dividends ........... 19

            b)    Mr. Wade Provides a Clear and Consistent Definition  of
                    Dividend Compensation Payment.................................................. 21

            c)    Mr. Wade Provides a Clear and Consistent Definition  of
                    Cum-Ex Transactions.................................................................... 22

        2.    Mr. Wade's Opinion that the Only Economic Explanation for the
               ED&F Bellwether Defendants' Cum-Ex Trades was to Generate
               Tax Refund Claims is Reliable and Well Supported. ............................... 23

            a)    Mr. Wade's Analysis of the Essential Similarity Between
                    the Annex E and non-Annex E Cum-ex Trades Bears
                    Upon a Central Issue. ................................................................... 24

            b)    Mr. Wade's Pricing Analysis is Well Supported and
                    Reliable. ....................................................................................... 25

        3.    ED&F Has Confirmed the Accuracy of Mr. Wade's Opinion that
               ED&F Did Not Have Custody of Sufficient Shares to Support the
               Tax Vouchers. ........................................................................................ 27

        4.    Mr. Wade's Opinion that the ED&F Tax Voucher Process Was
               Highly Unusual and Inappropriate is Reliable.......................................... 28

    D.    Defendants' Motion is Overbroad and Premature ................................................. 30

CONCLUSION.................................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alford v. United States*, No. 17-cv-5217 (JFK), 2020 WL 376749 (S.D.N.Y. Jan. 23, 2020)..............................................................................................................8

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ...................................................8

*Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011)...............................................................................................8, 9, 10, 12

*Auto. Ins. Co. of Hartford, Connecticut v. Electrolux Home Prod., Inc.*, No. 10-cv-0011 (CS), 2012 WL 6629238 (S.D.N.Y. Dec. 20, 2012) ..................................7

*Baxter Diagnostics, Inc. v. Novatek Med., Inc*., No. 94-cv-5520 (AJP), 1998 WL 665138 (S.D.N.Y. Sept. 25, 1998) ....................................................................32

*In re Blech Sec. Litig.*, No. 94-cv-7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ...............................................................................9, 15, 16, 17

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99-cv-1725 (VM), 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) ..............................................................9

*Chill v. Calamos Advisors* LLC, 417 F. Supp. 3d 208, 247 (S.D.N.Y. Oct. 9, 2019) ................................................................................................29, 31

*Com. Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-cv-3796 (PKL), 2005 WL 1026515 (S.D.N.Y. May 2, 2005)............................................33

*Cooper Crouse-Hinds, LLC v. City of Syracuse*, No. 16-cv-1201 (MAD), 2021 WL 4950565 (N.D.N.Y. Oct. 25, 2021), *reconsideration denied*, 2022 WL 344053 (N.D.N.Y. Feb. 4, 2022).............................................................33

*Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12-cv-0580 (JLG), 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013).........................12

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993)...............3, 7, 8, 20

*ECD Inv. Grp. v. Credit Suisse Int'l*, No. 14-cv-8486 (VM), 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017) .......................................................................12, 33

*First Nat. Bank of Chicago v Comptroller of Currency of U.S.*, 956 F2d 1360, 1368 (7th Cir 1992) ...........................................................................27

*Floyd v. City of New York*, 861 F. Supp. 2d 274 (S.D.N.Y. 2012)................................8

*In re Fosamax Prod. Liab. Litig.*, 924 F. Supp. 2d 477 (S.D.N.Y. 2013) ..................................20

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391
    (S.D.N.Y. 1998)..........................................................................................................14

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999).......................................19

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................8

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)......................................................7, 9

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358
    (SAS), 2008 WL 1971538 (S.D.N.Y. May 7, 2008) .......................................................18, 19

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers* LLP, 232 F. Supp. 3d 558
    (S.D.N.Y. 2017)..........................................................................................................32

*In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y.
    2018)..........................................................................................................................20

*Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120 (2d Cir.
    2006)..........................................................................................................................18

*Palmieri v. Defaria*, 88 F.3d 136 (2d Cir. 1996) .......................................................................33

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010) .........................................................................16

*Roman v. Sprint Nextel Corp.*, No. 12-cv-276 (VEC), 2014 WL 5026093
    (S.D.N.Y. Sept. 29, 2014) ............................................................................................7

*S.E.C. v. U.S. Env't, Inc.*, No. 94-cv-6608 (PKL), 2002 WL 31323832 (S.D.N.Y.
    Oct. 16, 2002)...........................................................................................9, 14, 15, 33

*SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC,* 467 F.3d 107 (2d
    Cir. 2006)....................................................................................................................8

*In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC), 2020 WL
    5849142 (S.D.N.Y. Sept. 30, 2020) ................................................................ *passim*

*Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001) ...............................................18

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004) ..........................................................................28

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .................................................9, 14, 16

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) ..................................................................14

*United States v. Rosario*, No. 09-cr-415-2 (VEC), 2014 WL 6076364 (S.D.N.Y. Nov. 14, 2014) ................................................................................................................7

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ............................................................9

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015) ......................................8, 12

*Yaccarino v. Motor Coach Indus., Inc.*, No. 03-cv-4257 (CPS), 2006 WL 5230033 (E.D.N.Y. Sept. 29, 2006) .......................................................................................12

**Statutes and Rules**

Fed. R. Evid. 704(a) ....................................................................................................................14

Fed. R. Evid. 702 ...............................................................................................................7, 9, 18

**Reports**

*Final Report on Cum/Ex, Cum/Cum and Withholding Tax Reclaim Schemes*, EUR. SECS. & MKTS. AUTH. (Sept. 23, 2020), https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclai m_schemes.pdf ..........................................................................................................2, 11

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in opposition to the motion in limine by the ED&F Bellwether Defendants[1] and third-party defendant ED&F Man Capital Markets Ltd. ("ED&F," along with the ED&F Bellwether Defendants, the "Defendants") to exclude from evidence the expert reports, opinions, and testimony of Graham Wade (the "Defendants Motion") in the two bellwether cases.[2]

## PRELIMINARY STATEMENT

Defendants' attack on SKAT's equity finance[3] and market practice expert, Graham Wade, is without merit.  The argument that Mr. Wade is not qualified to offer the opinions contained in his report is risible.  Indeed, it is difficult to imagine an individual with greater real-world experience directly on point to the issues in this proceeding than Mr. Wade, a former managing director of Barclays Investment Bank ("Barclays") with over two decades of experience in equity finance, who was responsible from 2012 onwards for making sure Barclays did not engage in the type of cum-ex trades that the Defendants used to defraud SKAT.  Defendants' contention that Mr. Wade's report should be precluded because he personally never executed cum-ex transactions, which the European Securities and Markets Authority concluded were designed "to allow persons to obtain tax refunds on dividend tax which was not paid, and which is likely to

---

1.  The ED&F Bellwether Defendants are Acer Investment Group, LLC ("Acer"), American Investment Group of New York, L.P Pension Plan (the "AIG Plan"), David Schulman, Riversides Associates Defined Benefit Plan (the "Riverside Plan"), Robert Crema, and Stacey Kaminer.

2.  All capitalized terms used herein and not otherwise defined have the meaning ascribed to them in the Wade Reports or Plaintiff Skatteforvaltningen's Memorandum of Law in Support of its Motion for Partial Summary Judgment, dated April 29, 2022 (Dkt. No. 1:18-md-2865, ECF No. 817) ("SKAT Summary Judgment Brief").

3.  "Equity Finance" is a catchall term describing a wide range of trading activities in equity markets, including the types of transactions purportedly undertaken by the ED&F Bellwethers that gave rise to their dividend withholding tax refund claims to SKAT.  Additional background on equity finance transactions is included in Section VI of the Wade Report.

represent a fraud under national legislation,"[4] is absurd, and would exclude any type of expert from testifying about any type of fraud that the expert had no personal experience committing.

Defendants' desire to preclude Mr. Wade's opinions, while meritless, is understandable. Mr. Wade's reports demonstrate that the Defendant plans' cum-ex transactions were all circular, that ED&F never acquired shares from the market, and that the plans never received real dividends, *i.e.* dividends that are traceable to the issuer company, but instead merely received contractual payments made in the amount of a net dividend.  The accuracy of this analysis and opinion was subsequently confirmed by the admissions contained in ED&F's reports to its regulator, the UK Financial Conduct Authority ("FCA"), which ED&F withheld until after Mr. Wade completed his reports.  Mr. Wade also opines that ED&F did not hold sufficient shares to support all the tax vouchers they issued to the pension plans, and instead recycled the same shares over and over again, to support multiple reclaims for each share.  Again, the accuracy of this analysis and opinion was subsequently confirmed after the completion of Mr. Wade's reports by ED&F's (belatedly produced) reports to the FCA.  Because the Defendants cannot and do not dispute that ED&F made these admissions to the FCA, they are left to argue that the FCA reports are somehow inadmissible, and that the non-Annex E cum-ex trades (which the Defendants' experts studiously avoided investigating) must be different, if only because they involve different counterparties than the Annex E transactions.  But the record establishes that the transactions were identical in all material respects to the circular Annex E transactions.

In any event, the challenges to Mr. Wade's opinions speak only to the weight the fact finder should afford his opinions, not their reliability under the standards established by *Daubert*

---

4.   *See, e.g., Final Report on Cum/Ex, Cum/Cum and Withholding Tax Reclaim Schemes*, EUR. SECS. & MKTS. AUTH. (Sept. 23, 2020), https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf.

and its progeny. Whether taking issue with the definitions Mr. Wade used in his report, his analysis of the economics and structure of the ED&F Bellwether Defendants' purported transactions, or his explanations that the ED&F Bellwether Defendants did not actually receive dividends (confirmed by the admissions of ED&F), the Defendants' Motion is naught but a hodgepodge of topics for potential cross-examination at trial.  Not one of the Defendants' challenges raises the type of fundamental methodological flaws that warrant exclusion of Mr. Wade's reports or testimony.

The argument that Mr. Wade's opinions constitute impermissible statements of ultimate legal conclusions or law, despite his repeated insistence to the contrary, is similarly baseless.[5] Mr. Wade has opined, based on his twenty plus years of experience, on the structure and economics of the ED&F Bellwether Defendants' transactions, the information that would have been available to the ED&F Bellwether Defendants and other participants in the transactions, and the standard market practices related to the types of transactions purportedly undertaken by the ED&F Bellwether Defendants.  Opinions of this nature are not only permissible, but they can be of particular assistance to the fact finder in making determinations regarding the transactions at issue by providing background and context for complicated series' of transactions that a lay person likely has no understanding of or context to consider.

Defendants' arguments on reliability similarly fail to challenge Mr. Wade's actual opinions.  Instead, Defendants set up strawmen, excerpt words or phrases (often partially quoted) from Mr. Wade's reports or deposition, claim inconsistencies while disregarding what he actually

---

5.   Mr. Wade's reports and testimony make clear that he was not opining on the Defendants' intent or offering any legal conclusions.  *See* Defendants Motion at 9; Wade Reply ¶ 219; Wade Report ¶ 3; *see also infra* note 16. For clarity, SKAT does not intend to proffer Mr. Wade's reports or testimony as a determination of the Defendants' state of mind or any ultimate legal issue.

said, and offer no analyses contrary to those he presents.  None of the scattershot criticisms the

Defendants level at Mr. Wade's opinions is sufficient to establish that any individual statement is

unreliable, let alone that the entirety of Mr. Wade's reports and testimony should be excluded.

To the contrary, the criticisms are, at best, quintessential issues of expert judgment that go to the

weight, not the admissibility, of Mr. Wade's opinions, and are properly addressed through cross

examination at trial and not by preclusion.

## FACTUAL SUMMARY

In support of its claim that Defendants' tax refund claims to SKAT were false, SKAT

submitted three reports from structured finance and securities market practice expert Mr. Wade

(collectively, the "Wade Reports").[6]

### A.    Mr. Wade's Qualifications

Mr. Wade, a career professional with nearly twenty-five years of experience in the

financial services industry and equity finance transactions,[7] is supremely well-qualified to opine

on the purported Danish securities transactions that underpin the issues in this case.  The majority

of Mr. Wade's career was spent working for and eventually leading Barclays' Structured Capital

Markets team, the largest structured finance business at Barclays, and one of the largest of its type

in any investment bank.  *See* Wade Report ¶ 3; *see also* Wade Report, Appendix A.

From 2008 to 2014, Mr. Wade was a Managing Director of Barclays, and in that role led

a team of over 200 people, oversaw a range of significant and complex structured transactions

with the bank's largest clients and many of the world's largest financial institutions, and managed

---

6.    The Wade Reports are: (i) Expert Report of Graham Wade, dated Dec. 31, 2021 (Decl. of Brandon R. Dillman, dated June 6, 2022 ("Dillman Decl."), Ex. 1) ("Wade Report"); (ii) Rebuttal Report of Graham Wade, dated Feb. 1, 2022 (Dillman Decl., Ex. 2) ("Wade Rebuttal"); and (iii) Reply Expert Report of Graham Wade, dated Feb. 28, 2022 (Dillman Decl., Ex. 3) ("Wade Reply").

7.    *Supra* note 3.

Barclays' European equity finance business, which had a multi-billion-pound balance sheet.  *See* Wade Report ¶¶ 4-5; *see also* Wade Report, Appendix A.  He was also a member of the bank's Markets Management Committee, which comprised a group of senior leaders responsible for strategy and governance across all of Barclays' trading, served as a board member of Barclays Capital Securities Limited, the bank's principal European Broker Dealer, and sat on the bank's Global Partnership and Investment Bank Treasury Committees, which were responsible for, *inter alia*, the bank's liquidity and regulatory capital.  *See* Wade Report ¶ 5; *see also* Wade Report, Appendix A.  From 2012, Mr. Wade's responsibilities included ensuring that Barclays did not do the type of cum-ex trades that the Defendants used to defraud SKAT.  *See* Wade Report ¶¶ 4, 170; *see also* G. Wade Dep. Tr. 258:1-9.[8]

Following his departure from Barclays at the end of 2014, Mr. Wade remained actively involved in the financial services industry, including founding a regulated investment fund that invested in bank capital instruments.  *See* Wade Report, Appendix A.  Mr. Wade is a fellow of the Institute of Chartered Accountants in England and Wales, having qualified while working in Deloitte's financial services practice, and has held several regulatory qualifications over the course of his career, including FINRA Series 7, 24, and 63.  *See* Wade Report ¶ 7.

---

8.  Additionally, from 2008 to 2011, Mr. Wade also led Barclays' integration of Lehman Brothers' equivalent North American business into the existing Structured Capital Market division. This involved establishing new trading activities, including equity finance, as well as setting overall guidelines for equity finance activities involving tax risk across business lines in all the Americas and coordinating Barclays' Legal, Tax, and Compliance Teams to establish an annual review process to analyze all potential transactions in detail and set guidelines to ensure that all business conducted by Barclays' traders was appropriate and carefully managed risk.  *See* Wade Report, Appendix A.  Prior to 2008, Mr. Wade worked in a variety of roles in the Structured Capital Markets business and was, at different times, responsible for various governance, transaction review, and execution matters across the business.  *Id.*

B.      **Mr. Wade's Opinions**

The Wade Reports offer opinions on: (i) the structure of the purported transactions that served as the basis of the ED&F Bellwether plans' dividend refund claims and market practices related to "cum-ex" transactions, (ii) market practices related to dividends, (iii) whether the ED&F Bellwether plans received the dividends Defendants claimed they received in their refund applications, (iv) the economics and structure of the purported transactions and how they relied on obtaining a dividend refund claim from SKAT to be profitable, (v) whether ED&F held sufficient shares to support the tax vouchers that it issued to the ED&F Bellwether plans and that were submitted to SKAT as part of their applications, and (vi) whether ED&F's process for issuing tax vouchers was consistent with standard market practice.[9]  Mr. Wade also sat for a seven hour deposition.  In response to Mr. Wade's reports, Defendants presented reports by two putative experts: Mr. Adam L. Warren and Mr. Max Hayden.[10]

## ARGUMENT

Under Federal Rule of Evidence 702, there are three basic requirements for expert testimony to be admissible: (i) the expert must be qualified, (ii) the testimony must be reliable, and (iii) the testimony must be relevant.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-95, 113 S. Ct. 2786, 2795-98 (1993).  The standard for admissibility is not a rigid one and, in keeping with the purpose of the Federal Rules of Evidence, it has been liberally applied by federal courts in this Circuit.  *See United States v. Rosario*, No. 09-cr-415-2

---

9.   Mr. Wade also offered opinions on the purported transactions related to the Solo Bellwether Defendants in his reports, which are not the subject of the instant motion.  Accordingly, any determination on the motion should be limited to the above captioned cases.

10.  Mr. Warren and Mr. Hayden also testified to having no personal experience with cum-ex transactions and, in Mr. Hayden's case, no personal experience with dividend arbitrage.  *See* M. Hayden Dep. Tr. 36:11-23, 136:9-16 (Decl. of Neil J. Oxford, dated June 30, 2022 ("Oxford Decl."), Ex. 6); A. Warren Dep. Tr. 65:14-66:22 (Oxford Decl., Ex. 5).

(VEC), 2014 WL 6076364, *1 (S.D.N.Y. Nov. 14, 2014) (finding that the Supreme Court has rejected a "rigid" standard and that such a standard would be "inconsistent with the liberal thrust of the Federal Rules") (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995)); *Auto. Ins. Co. of Hartford, Connecticut v. Electrolux Home Prod., Inc.*, No. 10-cv-0011 (CS), 2012 WL 6629238, at *1 (S.D.N.Y. Dec. 20, 2012) ("The admissibility of expert testimony is governed principally by Rule 702[] which represents a more liberal standard of admissibility for expert opinions, as compared to the previous, more rigid standard…") (citing *Daubert*, 509 U.S. at 588-89, 113 S. Ct. at 2795-96); *Roman v. Sprint Nextel Corp.*, No. 12-cv-276 (VEC), 2014 WL 5026093, at *4 (S.D.N.Y. Sept. 29, 2014) ("in accordance with the 'liberal admissibility standards of the federal rules,' only flaws in reasoning or methodology 'large enough that the expert lacks good grounds for his or her conclusions' warrant exclusion") (citing *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)).

Doubts regarding an expert's testimony are resolved in favor of admission, *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308 (S.D.N.Y. 2015) (citation omitted), and gaps in an expert witness's qualifications or knowledge generally go to the weight, not the admissibility, of the testimony. *See SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (citation omitted). Thus, "rejection of expert testimony is the exception rather than the rule," *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (citation omitted), and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (citation omitted). Further, when the Court is reviewing expert testimony in the context of a motion for summary judgment, the gatekeeper function is lessened. *See Alford v. United States*, No. 17-cv-5217 (JFK), 2020 WL 376749, at *15 (S.D.N.Y. Jan. 23, 2020) ("Where the gatekeeper and the

factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened."). Claims that an expert's opinions are unreliable is generally an argument that goes to their weight rather than admissibility. *See Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (citations omitted). "As the Supreme Court stated, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of assessing the value of admissible expert testimony." *Id*. (quoting *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798).

Defendants do not challenge the relevance of Mr. Wade's testimony. Nor could they, as courts have recognized that expert testimony on the structure of complicated securities transactions and the market practices and understanding related to them is helpful to a fact finder.[11] Rather, Defendants' arguments are limited to questions of Mr. Wade's qualifications, and the scope and reliability of his opinions. For the following reasons, each argument is without basis in fact or law and should be rejected.

### A.   Mr. Wade Is Qualified to Provide Expert Testimony.

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education." *McCullock*, 61 F.3d at 1042 (quoting Fed. R. Evid. 702). To determine whether a proffered witness is qualified,

---

[11]. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts"); *In re Blech Sec. Litig.*, No. 94-cv-7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (permitting expert testimony regarding the scope of "ordinary broker activity" and customs and practices of the securities industry); *S.E.C. v. U.S. Env't, Inc.*, No. 94-cv-6608 (PKL), 2002 WL 31323832, at *3, *5 (S.D.N.Y. Oct. 16, 2002) (permitting expert testimony analyzing the parties' stock transactions and about the "practices and usages" of the securities trading industry); *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC), 2020 WL 5849142, at *13 (S.D.N.Y. Sept. 30, 2020) (permitting expert testimony regarding defendants' trading transactions, along with expert's observations of commodities market).

a court need only "ascertain whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background," and then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Arista Records*, 2011 WL 1674796, at *2 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

Courts in this Circuit "have liberally construed expert qualification requirements when determining if a witness can be considered an expert," *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99-cv-1725 (VM), 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (collecting cases), and noted that "an expert should not be required to satisfy an overly narrow test of his own qualifications." *Arista Records*, 2011 WL 1674796, at *3.

Mr. Wade is more than adequately qualified to offer the opinions contained in his reports about the characteristics and economics of the ED&F Bellwether Defendants' purported transactions in Danish securities, as well as the market practices surrounding such transactions. Mr. Wade has nearly twenty-five years of experience in the securities industry and, from his time at Barclays, over a dozen years of experience with structured equity finance transactions, which includes the type of transactions underlying the ED&F Bellwether Defendants' purported dividend arbitrage strategy. *See* Wade Report ¶¶ 3-4, 9; Wade Report, Appendix A. Mr. Wade sat on the board of Barclays' principal European Broker Dealer and managed Barclays' European equity finance business, with responsibility for legal, tax, and compliance as well as oversight of trading activities and structures. *See* Wade Report, Appendix A. He also led the integration of Lehman Brothers' equivalent North American business into Barclay's existing business line, which required the coordination of different legal, tax and regulatory regimes. *Id.* Further, as part of his duties at Barclays, Mr. Wade had managerial oversight over the Barclays desk that was

9

the functional equivalent of the ED&F Equity Finance Desk[12] that facilitated the ED&F Bellwether Defendants' purported transactions.  *Id.*  In sum, there are few individuals better qualified than Mr. Wade to opine on the structure, operation, and market understanding of the equity finance transactions in which the ED&F Bellwether Defendants engaged.

The Defendants' sole basis for challenging Mr. Wade's experience is that he has not personally executed cum-ex transactions – *i.e.*, transactions that respected securities organizations have deemed to be abusive or fraudulent.  *See* Defendants Motion at 6-7.  It is, of course, non-sensical to require an expert's qualifications to include personal experience in transactions that the expert and relevant authorities consider to be of questionable effectiveness and legality.  *See, e.g.*, G. Wade Dep. Tr. at 168:4-10; 260:1-4 (Oxford Decl., Ex. 3).  The European Securities and Markets Authority, on which Defendants' own experts rely, has explained that the purpose of cum-ex transactions is to "allow[] persons to obtain tax refunds on dividend tax which was not paid, and which is likely to represent a fraud under national legislation.[13]  Further, cum-ex transactions have been the subject of multiple investigations, criminal charges and convictions across Europe.[14]  The fact that Mr. Wade did not personally execute or approve transactions that

---

12. Additional information on ED&F's Equity Finance Desk's role in the dividend tax refund scheme is contained in two investigative reports authored by ED&F's UK counsel and outside investigators, respectively, Rosenblatt and FTI, and ultimately produced to the UK's FCA in response to official requests for information.  *See* ED&F-00609800  (Oxford Decl., Ex. 11) ("June FCA Report");  ED&F-00609825 (Oxford Decl., Ex. 12) ("September FCA Report").

13. *See Final Report on Cum/Ex, Cum/Cum and Withholding Tax Reclaim Schemes*, EUR. SECS. & MKTS. AUTH. (Sept. 23, 2020), https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf.  The Annex E and non-Annex E transactions are similar in structure to the cum-ex transactions detailed in Annex 1 to the European Securities Market Authority ("ESMA") Report.  *Id* at 59.  The Defendants' own expert relies upon ESMA guidance in his report.  *See* Expert Report of Max Hayden, dated Feb. 1, 2022 (Oxford Decl., Ex. 8) ("Hayden Report"), ¶ 47(e).

14. For example, Martin Shields, who was the principal of an investment manager that advised non-bellwether defendant pension plans that submitted tax refunds to SKAT based on ED&F tax vouchers, was convicted of criminal tax evasion in Germany arising from cum-ex transactions, which were described as a "blatant grab from the bag that holds all taxpayers' contributions." Josefine Fokuhl & Karin Matussek, *Dividend-Tax Trades*

were likely to be fraudulent is no basis to exclude his reports and testimony.  On the contrary, from 2012 onwards Mr. Wade was responsible for promulgating guidelines for Barclays' European equity trading unit to ensure that it did not engage in cum-ex trading, which required him to understand the trades in order to prohibit them.  *See, e.g.,* G. Wade Dep. Tr. 258:1-9; Wade Report ¶¶ 4, 170.  If the Defendants' logic were accepted, the potential well of experts in this proceeding would be limited to the shallow pool of individuals who structured cum-ex transactions and have so far evaded criminal indictment.  Defendants' contorted logic would also require the Court to preclude their own experts, as they too have no experience in structuring or executing cum-ex transactions.  *See* M. Hayden Dep. Tr. 36:11-23, 136:9-16 (Oxford Decl., Ex. 6); A. Warren Dep. Tr. 65:14-66:22 (Oxford Decl., Ex. 5); E. Carr Dep. Tr. 83:18-86:9 (Oxford Decl., Ex. 4).

In addition to being illogical, Defendants' argument finds no support in the law.  Courts in this circuit have repeatedly found that an expert is qualified to provide testimony when he has experience and knowledge in a general field, and that lack of experience in a specific sub-specialty area is not an appropriate basis for exclusion.  *See S.E.C. v. Revelation Capital Mgmt.*, *Ltd.*, 215 F. Supp. 3d 267, 274 (S.D.N.Y. 2016) (finding that expert's twenty-five years of experience in international finance and at least a dozen years of experience working in the securities industry qualified to opine on an underwriting agreement notwithstanding the expert's lack of experience with the specific type of underwriting at issue).[15]  Here, Mr. Wade's extensive professional

_____

*Were Criminal Act and 'Blatant' Money Grab, Court Says*, BLOOMBERG (July 28, 2021), https://www.bloomberg.com/news/articles/2021-07-28/cum-ex-trading-strategy-was-criminal-germany-s-top-court-rules; *see also* David Segal, *It May Be the Biggest Tax Heist Ever. And Europe Wants Justice.*, N.Y. TIMES (Jan. 23, 2020), https://www.nytimes.com/2020/01/23/business/cum-ex.html (quoting a former participant who described cum-ex transactions as "the devil's machine").

15. *See also Arista Records,* 2011 WL 1674796, at * 3 *(*noting the permissibility of expert testimony on topics closely related to an expert's area of expertise"); *ECD Inv. Grp. v. Credit Suisse Int'l*, No. 14-cv-8486 (VM), 2017 WL 3841872, at *11 (S.D.N.Y. Sept. 1, 2017) (finding expert's general experience with capital markets

experience in structured equity finance transactions qualifies him to give an expert opinion about cum-ex transactions directly related to his experience.

*S.E.C. v. Tourre*, on which Defendants rely, is easily distinguished.  950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).  There the Court held that the proposed expert was not qualified to opine on the market understanding of "economically material information" related to Collateral Debt Obligations ("CDOs") because his exposure to them was limited to providing prior expert services, he had never analyzed a CDO, admitted he could not speak to industry practices related to CDOs, and had never worked for a financial institution or any institution involved in CDOs. *See id.* at 677-78.  Accordingly, *Tourre* is simply not applicable here, when Mr. Wade has over a decade of experience managing all aspects of equity finance transactions at one of the world's largest financial institutions, including, from 2012 to 2014, a specific mandate to ensure that the trading desk steered well clear of the type of cum-ex transaction that ED&F facilitated during that same period.

### B.     Mr. Wade's Opinions Are Proper.

Defendants also challenge Mr. Wade's opinions because they allegedly contain opinions on an ultimate issue of fact (*i.e.,* Defendants' intent) or legal conclusions.  *See* Defendants' Motion at 8-9.  These arguments miss the mark because Mr. Wade's reports do not contain any determinations as to the Defendants' intent, much less any conclusions of law.  In fact, as the

---

rendered him qualified to opine on convertible securities and share lending facilities even though he did not have experience with these more specialized matters); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) ("Thus, if the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent"); *Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12-cv-0580 (JLG), 2013 WL 978980, at *5 (S.D.N.Y. Mar. 12, 2013) ("The court rejects too the argument that [the expert] is unqualified because he has no specialized expertise in the narrow field [defendant] has drawn…"); *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-cv-4257 (CPS), 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006) (finding a court "need not preclude an expert from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute").

Defendants recognize, Mr. Wade specifically notes that he is not opining on the Defendants'
intent or reaching any legal conclusions.  *See* Defendants Motion at 9; Wade Reply ¶ 219; Wade
Report ¶ 3.[16]  Rather, his opinions are focused on the structure and economics of the ED&F
Bellwether Defendants' transactions, the information that would have been available to them and
other participants in the transactions, and the standard market practices related to the types of
transactions purportedly undertaken by the ED&F Bellwether Defendants, all of which are proper
subjects for expert testimony.

It is well-settled that "an opinion is not objectionable just because it embraces an ultimate
issue."  Fed. R. Evid. 704(a); *see also U.S. Env't, Inc.*, 2002 WL 31323832, at *4 ("[T]he expert
can make factual conclusions that embrace an ultimate issue to be decided by the fact-finder, the
expert cannot give testimony stating ultimate legal conclusions based upon those facts…"); *Term
Commodities*, 2020 WL 5849142, at *13 ("Courts must 'distinguish between factual conclusions
that may be included in an expert's testimony—though they embrace an ultimate issue to be
decided by the jury—and opinions embodying legal conclusions that encroach upon the court's
duty to instruct on the law.'") (quoting *Bilzerian*, 926 F.2d at 1294).  Expert opinion only crosses
the line when it "undertakes to tell the jury what result to reach."  *Kidder, Peabody & Co. v. IAG
Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 399 (S.D.N.Y. 1998) (quoting *United States v.
Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).  Mr. Wade did no such thing.  His opinions instead
provide permissible "groundwork" for "the jury to make its own informed determination"
concerning the merits of SKAT's claims.  *See id*. (quoting *Duncan*, 42 F.3d at 101).  In short, Mr.
Wade's opinions "are more similar to factual conclusions that embrace an ultimate issue," which

---

16.  In his deposition Mr. Wade noted numerous times that he was not opining on the law. *See, e.g.,* G. Wade Dep.
Tr. 43:15-25, 44:13-21, 55:3-57:7, 57:19-58:3, 98:18-99:22, 101:5-10.

"may be included in an expert's testimony," rather than impermissible "legal conclusions that 'encroach upon the court's duty to instruct on the law.'" *U.S. Envtl. Inc.*, 2002 WL 31323832, at *4 (quoting *Bilzerian*, 926 F.2d at 1294).  Explanations by an expert, like those contained in Mr. Wade's reports, as to why the Defendants would have had knowledge of particular facts in a securities transaction, opinions on industry customs and practices, and opinions on whether certain trading patterns raised "red flags" have all been deemed appropriate.  *See Blech Sec. Litig.*, 2003 WL 1610775, at *23; *U.S. Envtl., Inc.*, 2002 WL 31323832, at *3.  The permissibility of opinions on these subjects is demonstrated by Defendants' own expert reports that offer multiple opinions on market practices and the understandings of market participants.[17]

In an attempt to render the permissible impermissible, Defendants cherry-pick isolated statements from Mr. Wade's reports, but even these individual statements are admissible.  *See* Defendants' Motion at 8-9.  For example, Mr. Wade's explanations as to the structure and economics of the transactions undertaken by the ED&F Bellwether Defendants are perfectly permissible.[18]  *See U.S. Envtl., Inc.*, 2002 WL 31323832, at *3.  Similarly, Mr. Wade's explanations of standard market practices, the manner in which securities markets operate, and summaries of the facts that would have been available to the participants in the transactions when they entered into the various purported trades are also permissible.[19]  *See Term Commodities,*

---

17. *See e.g.*, Hayden Report ¶¶ 14, 18, 25-30, 32, 34, 35, 40, 44, 49, 51, 58; Expert Report of Adam Warren, dated Dec. 31, 2021 (Oxford Decl., Ex. 7) ("Warren Report") ¶¶ 17, 23, 24; Reply Expert Report of Adam Warren, dated Feb. 28, 2022 (Oxford Decl., Ex. 9) ("Warren Reply") ¶ 15(e).

18. *See* Wade Report ¶¶ 15(b), 221(explaining that the defendants' transaction would require filing tax reclaims to be profitable), 129 (noting that the failure to confirm prices confirmed the purpose of the defendants' total return swap); Wade Reply ¶¶ 20 (explaining how the pricing of the transactions would indicate to a market participant that the transaction did not involve actual dividends), 189 (explaining the factual support for the circular structure of the Defendants' transactions and the required economics of the transactions), 192 (explaining the structure and economics of the transactions).

19. Wade Report ¶¶ 106 n.77 (explaining market risk related to settlement), 117 as supported by 91-117 (noting that the fact that sufficient shares did not exist for the Annex E trades would have been apparent based on the

14

2020 WL 5849142, at *14 ("Plaintiffs' expert is permitted to synthesize the record and explain the market conditions and industry standards that made Defendants' statements allegedly misleading."); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 472 (S.D.N.Y. 2010) (permitting expert's testimony of what information an entity would have available based on a review of pricing data and his own experience). Mr. Wade's explanations of market understanding related to cum-ex transactions and dividends and comparisons of standard market practices to the actions taken by the Defendants or third parties are also proper.[20] *See id.* at *13 (finding opinions on market practices permissible); *Blech Sec. Litig.*, 2003 WL 1610775, at *19 (allowing expert testimony about "what ordinary broker activity entails and as to customs and practices of the industry"); *Bilzerian*, 926 F.2d at 1295 (noting that "testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice") (citation omitted).

Additionally, Mr. Wade's references to and quotations from foreign regulatory notices and industry body reports, which the Defendants dramatically characterize as mind divination, are not only proper but also demonstrate the reliability of Mr. Wade's opinions on market

---

information available to the participants in the transactions), 142-144 (explaining the facts that support the conclusion that the Defendants' circular transactions would have needed to have been pre-planned), 155-156 (explaining that the operation of the securities market would have allowed the participants in the Defendants' circular transactions to be identified and that the transactions would have required planning to execute), 157 (explaining that market practice allows a party to pay a dividend market claim to the Defendants even if it does not hold any Danish shares), 169(a) (summarizing Defendants' use of different pricing and structure for cum-cum and cum-ex transactions), 170 (explaining that legitimate market participants would not have engaged in similar cum-ex transactions in Denmark), 177 (explaining the significance from a market practice perspective of the failure of ED&F to require standard margin from the ED&F Bellwether Defendants), 181 (explaining how the participants ignoring standard market risks and margin requirements supports the conclusion that the transactions were circular), 206, 208 (explaining how the size of the transactions indicated that the transactions were circular and was inconsistent with standard market risk policies).

20.  Wade Report ¶¶ 15(d) (comparing the market practices for issuing tax vouchers to the actions taken by ED&F), 69, 76 (explaining the market understanding of dividends and dividend compensation payments).

practices and understandings.[21]   For example, Defendants object to paragraphs 221 to 224 of the Wade Report where Mr. Wade states that the FCA and FINRA have record keeping and due diligence requirements, summarizes final notices issued by the FCA, and states that based on his experience, legal opinions related to the cum-ex transactions were insufficient as a market practice.  However, these statements are properly the subject of expert testimony.  *See Blech Sec. Litig.,* 2003 WL 1610775, at *3 (permitting expert testimony regarding the Self-Regulatory Organizations rules because they were evidence of industry practice and the effect of any "red flags" in the context of those rules was relevant); *Term Commodities,* 2020 WL 5849142, at *14 (permitting expert's reference to federal regulations to support opinions).

Further, Defendants' claim that it is improper for Mr. Wade to opine that the economics of the Defendant plans' transactions demonstrate that the sole purpose of the transactions was to generate a tax refund flies in the face of their own pleadings.  *See* Defendants' Motion at 8. Defendants in fact agree with Mr. Wade, affirmatively arguing in their own summary judgment filing that the "transactions undertaken by the ED&F Bellwether Plans make no commercial sense unless the ED&F Bellwether Plans could make a tax refund to SKAT…."  *See* Defendants' Opposition to SKAT's Motion for Summary Judgment (No. 18-md-2865, ECF No. 818) at 28.

Finally, Mr. Wade made clear throughout his reports and testimony that he was not opining on the Defendants' state of mind or on ultimate legal issues, and SKAT does not proffer Mr. Wade's opinions for this purpose.[22]   However, to the extent that the Court has any concern regarding the scope of Mr. Wade's statements, the proper relief would be the issuance of a limiting

---

21.  *See* Wade Report ¶¶ 222-223, Wade Reply ¶¶ 10, 11, 112-113.  Notably, the Defendants' own expert fails to meet the standard that the Defendants put forth and opines on the purpose of various regulations. *See, e.g.,* Hayden Report ¶¶ 27-30, 33, 37, 39, 44, 46, 55.

22.  *See supra* note 5.

instruction as opposed to a blanket preclusion of Mr. Wade's testimony. *See Term Commodities,* 2020 WL 5849142, at \*23 (permitting expert testimony and noting that "[t]o the extent any of [the experts'] statements fall on [the] line [of legal conclusions], a limiting instruction to the jury may be appropriate to resolve the issue").

### C.    Mr. Wade's Opinions Are Reliable.

The Defendants' arguments regarding the reliability of Mr. Wade's opinions are a grab bag of disagreements and contentions unrelated to the actual reliability of Mr. Wade's methods and opinions, and are based, in large part, on partial and misleading quotations and a refusal to recognize or address ED&F's own admissions. *See, e.g.,* Defendants Motion at 9-29.   Even viewed in the most flattering light, the Defendants' concerns about the reliability of Mr. Wade's opinions go to the weight, not the admissibility, of his opinions. *See Revelation Capital,* 215 F. Supp. 3d at 277-78.

The Court's inquiry into the reliability of an expert's method focuses "not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 301 (S.D.N.Y. 2001) (citations omitted).   "The district court's inquiry into the reliability of expert testimony is flexible," and "[t]he trial judge has great latitude not only in deciding whether an expert's testimony is reliable, but in deciding how to make that inquiry." *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 133 (2d Cir. 2006) (citations omitted).   This flexible approach is even more applicable where the expert's knowledge is non-scientific and based on his experience. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig*., MDL No. 1358 (SAS), 2008 WL 1971538, at \*6 (S.D.N.Y. May 7, 2008); Advisory Committee Notes, 2000 Amendment, Fed. R. Evid. 702 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony").   In cases where experts "draw a conclusion from a set of observations

based on extensive and specialized experience," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

156, 119 S.Ct. 1167, 1178 (1999), "the method is the application of experience to facts," *MTBE*,

2008 WL 1971538, at *6.

        **1.   Mr. Wade's Opinion that the ED&F Bellwether Defendant plans did
not Receive any Real Dividends is Reliable.**

Having just argued that it would be improper for Mr. Wade to offer legal opinions, the

Defendants pivot 180 degrees to argue that Mr. Wade's opinions are unreliable because he fails

to answer the ultimate question as to whether the ED&F Bellwether Defendants would be entitled

under Danish Law to submit tax reclaim submissions, assuming that they had received a dividend

compensation payment rather than a real dividend that an issuer paid to its shareholders or their

custodians.  *See* Defendants Motion at 9-11.  While the Defendants may want to have their cake

and eat it too, they fail to provide any explanation or legal support as to how Mr. Wade's

unwillingness to offer legal opinions or conclusions makes his opinions unreliable, nor could

they.  *Id.*

Despite the Defendants' contentions to the contrary, Mr. Wade was clear as to the reason

why the pension plans' failure to receive a dividend goes to a central issue in this litigation,

namely that the representations in the ED&F tax vouchers were incorrect and inconsistent with

market practice and understanding.[23]   The Defendants' arguments amount to no more than

disagreement with Mr. Wade's opinions, which is not a proper basis for the exclusion of his

---

23.  *See* G. Wade Dep. Tr. 125:20-126:5 ("My opinions relate to the fact that if we go back to the tax vouchers,
there are three key facts in the tax vouchers.  Number 1, that the pension plans held shares; Number 2, that
they received dividends; and Number 3, that they suffered tax. And my opinions are fundamentally that those
three statements are false. But I have offered no opinion as to, you know, what the Danish tax consequences of
-- as a result of that are"), 171:19-22 ("All three of the key items on the tax voucher would still be incorrect.
Because the cum ex purchaser did not own the shares on the record date, it did not receive the dividend, and it
did not suffer the tax.").

testimony. *See Term Commodities*, 2020 WL 5849142, at *16 (noting that defendants "largely package their disagreement with [expert's] conclusions as deficiencies with the legal sufficiency of his opinions" which "are better resolved by the trier of fact and go to the weight given to [expert's] opinions rather than their admissibility").

Similarly, the Defendants' arguments that the terms and definitions Mr. Wade uses in his reports are inconsistent is little more than a continuation of their summary judgment arguments in a different filing, and are unmoored from the actual standards of expert qualification. *See* Defendants Motion at 10-18. Even assuming *arguendo* that Mr. Wade's reports were inconsistent in this manner, which they are not, arguments over inconsistency are not a proper basis for exclusion of expert testimony. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 174 (S.D.N.Y. 2018) (rejecting arguments that expert opinions were "speculative, internally inconsistent, and contradicted by the evidence"); *In re Fosamax Prod. Liab. Litig.*, 924 F. Supp. 2d 477, 496 (S.D.N.Y. 2013) ("As with any witness, inconsistencies in an expert witness's testimony do not implicate *Daubert*, but rather are properly addressed during cross examination."). Accordingly, Defendants' arguments should be rejected.

In addition to being legally insufficient, the Defendants' arguments are factually incorrect and premised on incomplete and misleading citations and references.

a) <u>Mr. Wade Provides a Clear Definition of Real Dividends</u>

The Defendants first argue that Mr. Wade's definition of a "real dividend" is inconsistent because Mr. Wade allegedly defines a "real dividend" in his reports as a direct payment from a share issuer but stated in his deposition that a real dividend may be passed to a shareholder by a sub-custodian or custodian. Defendants Motion at 11-14. In fact, the Defendants' argument is premised on a partial quotation from Mr. Wade's report and cannot withstand the most cursory review of how Mr. Wade defined "real dividend" in his report, which states:

> "It is well understood in equity finance markets that a real dividend is different from a dividend compensation payment.
>
> A real dividend involves the direct payment of a dividend from a share issuer, and results from being a shareholder of record on the dividend Record Date. *A real dividend may pass through one or more custodians or sub-custodians, but it derives directly from the rights which the recipient owns in the underlying shares on which the real dividend is paid.*

Wade Report ¶ 70 (emphasis added).[24]

Thus, it is plain that Mr. Wade was clear from the outset that a real dividend may pass through a custodian or sub-custodian before being paid to the owner of the shares on the record date.[25]

Finally, SKAT notes that Defendants' own expert, Mr. Hayden, did not share ED&F's purported difficulties in comprehending Mr. Wade, and indicated that he was substantially in agreement with Mr. Wade's definition of a 'real dividend,' when he testified that "a definition of a real dividend is going to be essentially it's paid by a company and could be traced back to that company."  M. Hayden Dep. Tr. 91:22-92:7.

---

24. In Denmark, all shares must be registered at VP Securities, but shares can be held by an end investor in a chain of custody down-stream from VP Securities.  *See* Declaration of Foreign Law of Henning Aasmul-Olsen, dated June 6, 2022 (Dkt. No. 1:18-md-02865, ECF No. 836), ¶¶ 15-16, 19.

25. Similarly, Defendants' arguments that Mr. Wade allegedly failed to provide a definition of ownership at his deposition demonstrate inexact and vague questioning, not inconsistencies in Mr. Wade's reports.  In fact, far from expressing "bafflement," "equivocating" or being unable to answer, Mr. Wade provided a detailed explanation as to why the questions from defendant's counsel were too vague to answer without clarification of the question.  *See e.g.*, G. Wade Dep. Tr. at 106:18-107:13.

   Additionally, Mr. Wade did not, as Defendants suggest, contend generally that the identity of the record holder on the company's share register as of the record date was not relevant to his opinion.  Rather, his point is that with respect to the ED&F Bellwether plans, the issue is not relevant because the plans did not hold sufficient shares on the record date to support their tax vouchers, a fact confirmed by ED&F.  *See* September FCA Report at 8; *see also* Andrew Wall Dep. Tr. 213:13-214:11, 238:12-239:19.

b) Mr. Wade Provides a Clear and Consistent Definition
of Dividend Compensation Payment

The Defendants' attempts to cast Mr. Wade's definition of "dividend compensation payment" as inconsistent fare no better. Defendants Motion at 14. As a starting point, Mr. Wade's Report provides a clear definition of a dividend compensation payment:

> A dividend compensation payment (or manufactured dividend), on the other hand, is a contractual payment which arises under a contract for the sale or transfer of securities. It is representative of the amount of a dividend on the underlying shares but is not, in fact, a real dividend. Dividend compensation payments can arise under various transactions, including stock loans, repos, or the sales of securities.

Wade Report ¶ 70. As this definition makes clear, dividend compensation payments are not real dividends. *Id.* ¶¶ 70, 80. Mr. Wade further makes clear that this difference was recognized by the market, *id.* ¶ 159, and that cum-ex transactions, like those purportedly engaged in by the ED&F Bellwether Defendants, result in dividend compensation payments (or manufactured dividends) rather than real dividends.[26] *Id.* ¶ 80. And contrary to Defendants' contention, *see* Defendants Motion at 10, Mr. Wade cites to specific European regulations that support his definition.[27]

---

26. The Defendants' characterization of Mr. Wade as being equivocal when answering "it depends" to counsel for Defendants' question on whether settlement is required prior to the record date in order to receive a real dividend is once again a result of selective quotation. *See* Defendants Motion at 17. When asked about the specific cum-ex transactions at issue in this litigation, Mr. Wade responded:

"It's my position based on market practice and understanding how the equity finance markets work that the -- and I think I've laid this out quite extensively in my report -- that in a cum ex transaction, the whole point of a cum ex transaction is that a -- the seller is not selling the real dividend because they don't have it." G. Wade Dep. Tr. 152:5-11.

27. *See, e.g.,* Wade Report ¶ 91 citing to HMRC Manufactured Overseas Dividend ("MOD") Rules ("Manufactured payments also occur where a dealer sells securities 'cum div' (with dividend) but delivers securities that are 'ex div' (without dividend). The sum that the dealer pays to the buyer to compensate it for not receiving the *real dividend* is a manufactured payment. The sales that give rise to such payments are often 'short' sales (CFM74110): as the dealer does not own the securities at the time of selling them, it is required to acquire them between the date of the bargain and the delivery date and may only be able to acquire 'ex div' stock.") (emphasis added).

The Defendants also argue that Mr. Wade's definition of a dividend compensation payment is inconsistent with the definition of "market claim," but this argument is premised on the Defendants' failure to recognize the difference between a payment and a process. *See* Defendants Motion at 15-17.  Put simply, a dividend compensation payment is, as the name suggests, a payment from one party to another.  Wade Report ¶ 70.  In contrast, a "market claim" is the process by which one party makes a claim to another party requesting the contractual payment of an amount equal to the proceeds of a distribution, which when paid, will constitute a dividend compensation payment.  *Id.* ¶ 31 ("A market claim is the *process* by which amounts related to the proceeds of a distribution of a security may be contractually passed on to the contractually entitled party in the case that such party did not receive that distribution directly) (emphasis added).[28]  As such, there are no inconsistencies in Mr. Wade's definitions, rather, the two terms describe the call ("Market Claim") and response ("Dividend Compensation Payment") by which parties may make payments under securities contracts.

c) Mr. Wade Provides a Clear and Consistent Definition
of Cum-Ex Transactions.

Similarly, Defendants' claim that Mr. Wade's definition of cum-ex transactions is a "moving target" that later "smuggles" in his "desired conclusion" is based on their failure to acknowledge his initial report.  Defendants Motion at 17-18.  That initial report could scarcely be clearer: "A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is

---

28. The Defendants' contentions regarding paragraph 93(2) of Mr. Wade's report are also misplaced. In that section, Mr. Wade was addressing how the MOD Rules address the specific question of whether a buyer is entitled to a real dividend in the specific scenario of parties entering into a cum-cum transaction, but the shareholder register was not correctly updated prior to the payment of the dividend.  As Mr. Wade notes, this rule is not applicable to the transactions listed on Annex C of his report (the cum-ex transactions) as these were designed from the outset to be cum-ex transactions.

agreed to be after the Record Date. This means the transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex."  Wade Report ¶ 79 (emphasis added).

Again, using partial quotations, the Defendants assert that Mr. Wade has "noted" that the timing and pricing of a cum-ex transaction "typically indicate that the buyer will receive the dividend."  Defendants Motion at 17.  The Defendants, however, omit ellipses that would alert the Court to the fact that this is a partial quotation.  Mr. Wade in fact stated:

> "As described more fully below, in a Cum-Ex transaction, the transaction date and agreed price terms typically indicate that the buyer of the securities will receive the dividend, *but the settlement cycle is extended so the buyer of the securities does not receive the shares until after the Record Date, and so the buyer does not actually receive a dividend.*"

Wade Report ¶ 25 (emphasis added).  As the full quotation makes clear, Mr. Wade's opinion is not that a buyer in a cum-ex transaction will receive a dividend, but rather the opposite.

### 2. Mr. Wade's Opinion that the Only Economic Explanation for the ED&F Bellwether Defendants' Cum-Ex Trades was to Generate Tax Refund Claims is Reliable and Well Supported.

Defendants erroneously argue that Mr. Wade improperly opines on the intent of the parties in entering into cum-ex trades, but he does no such thing.  Defendants Motion at 19-21.  Rather, he offers a detailed opinion on what participants in the market would have known or understood about various aspects of the ED&F transactions, which is an appropriate subject of expert testimony.  *See, supra,* Section B.  Mr. Wade explains the economics of the Appendix C Cum-Ex transactions and how they could only generate a profit by obtaining a tax refund, and supports this opinion with a detailed analysis of the structure of the transactions.  This analysis demonstrates that the market risk of the transactions was hedged and therefore the only way for

the transactions to generate a profit was by obtaining a tax refund.  Wade Report ¶¶ 94-117.[29]

Further, the propriety and reliability of Mr. Wade's opinion is demonstrated by the Defendants'

own admission that their cum-ex transactions make no commercial sense unless the ED&F

Bellwether Plans could make tax reclaim applications to SKAT.  *See* Defendants' Opposition to

SKAT's Motion for Summary Judgment (No. 18-md-2865, ECF No. 818) at 28.

Nor is the fact that Mr. Wade noted coordination among the parties in the cum-ex

transactions improper.  Defendant Stacy Kaminer testified to the very fact that Acer and ED&F

coordinated on the structure and economics of the ED&F Bellwether Defendant plans' Danish

transactions.  *See, e.g.,* Stacey Kaminer Dep. Tr. 98:19-100:21, 184:1-19 (Oxford Decl., Ex. 1).

And the coordination of the cum-ex transactions through interdealer brokers is demonstrated by

the Annex E transactions, all of which involved the use of specific interdealer brokers.  *See*

September FCA Report at 6-7.  Mr. Wade's explanations of what information would have been

available to the parties as a matter of market practice are also properly the subject of expert

testimony.  *See, infra,* Section B.

a) Mr. Wade's Analysis of the Essential Similarity Between the Annex
E and non-Annex E Cum-ex Trades Bears Upon a Central Issue.

The Defendants' admission that the non-Annex E cum-ex transactions and the cum-ex

transactions were similar in structure demonstrates the essential reliability of Mr. Wade's

opinions and goes to the heart of one of the main issues in this litigation: whether the ED&F

Bellwether Defendant plans received dividends from any cum-ex transactions.  *See* Defendants

Motion at 21-22.  As detailed in the Wade Report, the ED&F Bellwether Defendants' Annex E

---

29. Contrary to the Defendants' assertion, Mr. Wade's identification of inconsistencies between Ms. Kaminer's
testimony and the economics of the transactions and market practice is not improper.  *Term Commodities.*,
2020 WL 5849142, at \*14 (permitting expert testimony that defendants' statements were "contrary to facts and
misleading").

trades were circular in nature and involved ED&F's Dubai affiliate short selling to the defendant

plans and then covering their short position by ultimately purchasing the same shares back from

the ED&F Bellwether Defendants.  Wade Report ¶¶ 184-209.  Circular transactions of this nature

cannot give rise to real dividends.  Defendants instead received contractual payments equal in

amount to a net dividend, on which no tax has been paid, a fact confirmed by ED&F to the FCA.

*See* September FCA Report at 3.  Mr. Wade's pricing analysis, along with other factors explained

in his report, demonstrate that entities from which the ED&F Bellwether plans purportedly

purchased their securities were, just like ED&F's Dubai affiliate, short sellers.  *See* Wade Report

¶¶ 160-169.  The fact that the Defendants now admit that the Annex E and non-Annex E

transactions used a similar structure confirms the reliability of Mr. Wade's opinions, including

that the defendant plans did not receive a dividend.

     b) <u>Mr. Wade's Pricing Analysis is Well Supported and Reliable.</u>

  The Defendants' assertions regarding the robustness of the data set supporting Mr. Wade's

pricing analysis are similarly misplaced.  *See* Defendants Motion at 22-25.  First, Mr. Wade

testified that based on his extensive market experience, the market level for transactions involving

dividend bearing shares is 90%.  *See* G. Wade Dep. Tr. 203:16-205:2.  Defendants do not

challenge his market-based understanding of the prevailing market price.  Mr. Wade's pricing

analysis corroborates his market understanding.  Second, it is hard to imagine a better data set to

analyze the market pricing of the ED&F Bellwether Defendants' cum-ex transactions than

transactions undertaken by the same parties, in the same securities, during the same time period

as the analyzed cum-ex transactions.[30]  The Defendants' real objection lies not with the robustness

---

30. As Mr. Wade notes in his report, liquidity is one among many factors that goes into a pricing analysis.  *See*
  Wade Report ¶ 68.  Further, the illiquid nature of the Danish securities market cuts against the Defendant's
  augment as the limited number of potential sellers demonstrates why they would be able to demand higher all-

of the data set (which they themselves created), but with the conclusion Mr. Wade draws from ED&F's own data: if the sellers had shares, the only rational economic decision would have been to enter into cum-cum transactions at a 90% price level; the fact that the parties instead entered into cum-ex transactions at the reduced 80% level indicates that they did not possess dividend-bearing shares to transfer to the defendants.[31]   ED&F accepts this necessary conclusion for Annex E but resists it, without explanation, for the non-Annex E trades.   Third, as a general rule, arguments over the size of an expert's data set challenges the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.   *See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (noting "small sample size goes to the weight rather than to the reliability (and admissibility) of a study") (collecting cases).   Similarly, Defendants' arguments regarding the materiality of the 10% difference between the dividend price for the cum-cum and cum-ex transactions is a subject for cross examination, but not a basis to exclude his testimony.[32]   Finally, contrary to the Defendants' assertion that Mr. Wade's pricing analysis is superfluous, it supports his conclusion that there were no real dividends in the transactions, demonstrating the robustness and reliability of his opinion.

---

in prices since the market level price is set by the overall supply and demand. *See* Wade Report ¶ 164. Further, the Defendants' incomplete citation to dicta from *First Nat. Bank of Chicago v Comptroller of Currency of U.S.*, 956 F2d 1360, 1368 (7th Cir. 1992) is insufficient to support the conclusion that Mr. Wade's pricing analysis is incorrect, let alone sufficient to justify exclusion.

31. Defendants speculate that a different data set may produce different results, but offer no alternative analysis or basis to support that claim that Mr. Wade's calculation is incorrect.

32. Mr. Wade also addressed the materiality of the 10% spread in the Wade Reply reports which explains: "To put this margin into context, for a trade of 2 million shares over the TDC March 2014 dividend event, 9.7% of the gross dividend is the equivalent of DKK426,800, which represents a spread of around 40 bps on a relatively short-dated trade. This was a very significant margin compared to typical financing spreads which, in my experience, often ranged between 5-20 bps annualized (i.e., less than 1 basis point on a one-week trade)." Wade Reply ¶ 55.

3.   **ED&F Has Confirmed the Accuracy of Mr. Wade's Opinion that ED&F Did Not Have Custody of Sufficient Shares to Support the Tax Vouchers.**

Mr. Wade's opinion that ED&F did not have custody of a sufficient number of shares to support the tax vouchers issued to the ED&F Bellwether plans has been confirmed by ED&F and is otherwise reliable.   While ED&F withheld the two reports it submitted to the FCA until after Mr. Wade issued his reports and provided deposition testimony, [33] the FCA reports confirm the accuracy of Mr. Wade's opinions that ED&F did not acquire any shares from the market, reused the same limited number of shares to settle all of the Annex E Cum-Ex transactions and never held a sufficient number of shares to support the tax vouchers issued on the Annex E transactions.

The Defendants' arguments that Mr. Wade's review of the BNP Paribas records is unreliable is premised purely on citations to his initial report and ignores the contents of Mr. Wade's subsequent reports.   *See* Defendants Motion at 26-27.   As Mr. Wade made clear in his Rebuttal and Reply Reports, he was able to fully reconcile the custody records and track the BNP settlements via the SWIFT messages to specific trades, and this additional analysis further supports his opinion that ED&F did not in fact custody sufficient shares for the cum-ex transactions.   Wade Rebuttal ¶¶ 177-218; Wade Reply ¶¶ 22, 95-98.   The limitations regarding the information from BNP initially identified by Mr. Wade demonstrates the detailed and thoughtful analysis that he undertook in forming his opinions.[34]

As with their argument related to pricing data, the Defendants' arguments regarding Mr. Wade's opinion that the quantity of shares purportedly purchased by the defendant plans was

---

33.   *See* Memo Endorsed Order, dated May 4, 2022 (No. 18-md-2865, ECF No. 797).

34.   Tellingly, the Defendants do not argue that the accounts reviewed by Mr. Wade were not the relevant accounts that ED&F would use to custody any securities for the defendant pension plans.

wholly inconsistent with realistic average daily trading volumes, *see* Defendants Motion at 27-

29, is not a proper basis for exclusion.  *See Chill v. Calamos Advisors* LLC, 417 F. Supp. 3d 208,

247 (S.D.N.Y. Oct. 9, 2019) (noting "[a]s a general rule, the factual basis of an expert opinion

goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to

examine the factual basis for the opinion in cross-examination") (citation omitted).[35]  Mr. Wade's

opinion that the ADTV indicates that the defendant plans could not have purchased the volume

of shares that the defendant plans claimed in their tax refund has been confirmed by ED&F's

subsequent admission that it did not actually obtain sufficient shares to support the defendant

plans' tax vouchers, and instead recycled the same shares multiple times.  *See* September FCA

Report at 8; A. Wall Dep. Tr. 213:13-214:11, 238:12-239:19.[36]

### 4.    Mr. Wade's Opinion that the ED&F Tax Voucher Process Was Highly Unusual and Inappropriate is Reliable.

As with their other contentions, the Defendants fail to demonstrate any actual issues with

the reliability of Mr. Wade's opinion that ED&F's tax voucher creation process was unusual,

improper and resulted in the issuance of incorrect tax vouchers.  Instead, their objection is little

more than a list of disagreements that are properly the subject of cross examination, not a basis

for preclusion.  Mr. Wade's opinion that ED&F's process of issuing tax vouchers on positions

_____

35.  Defendants once again speculate that Mr. Wade's analysis would be different if he employed a different time period, but again fail to provide contrary analysis.  Using a different time period for the ADTV review would not have changed the analysis. Wade Report ¶ 212.  Defendants contend that they can demonstrate a "spike" in trading activity around a dividend event, but their lone example is of a French stock, TotalEnergies, and is therefore immaterial to Mr. Wade's analysis of the ADTV of Danish shares.  Defendant's Opposition to SKAT's Motion for Summary Judgment (No. 18-md-2865, ECF No. 818) at 30; *see also* Hayden Report ¶ 49(b)(iv).  The Defendants fail to provide any example of an increase in trading activity in any of the relevant Danish shares.

36.  The reasonableness of Mr. Wade's 200% threshold is demonstrated by the fact that ED&F's own policies limited purchases in any security of 20% of the ADTV (or one-tenth of the limit used by Mr. Wade). Wade Report ¶ 210.  Regardless, the Defendants claim to have held close to 7,000 % of ADTV, 350 times ED&F's avowed limit and 35 times Mr. Wade's generous concession.

that were not settled by the record date[37] was inconsistent with market standards is properly based on his own experience in the creation of tax vouchers, and further supported by the tax voucher creation practices of ED&F's own custodians.  *See* G. Wade Dep. Tr. 174-176; Wade Report ¶ 212 ("I note by way of comparison that the terms and conditions of the SEB Custody Agreement Country Annex for Denmark, which applied to ED&F Man when it used SEB as custodian for a number of the relevant transactions after April 2014, states that [tax reclaims must be filed] 'for settled positions only' and later that 'no tax reclaims will be filed for stock lending, where the given entity is not entitled to the refund'"); *see also Chill*, 417 F. Supp. 3d at 246 ("It is axiomatic that 'an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'") (citation omitted).  The reliability of Mr. Wade's determination that ED&F's tax voucher process was unusual and inappropriate is demonstrated by the fact that ED&F has admitted that its tax voucher creation process resulted in the issuance of incorrect tax vouchers.[38]  Similarly, the reliability of Mr. Wade's opinion that ED&F issued tax vouchers purporting to show ownership of a greater number of shares then it held has been confirmed by ED&F which admitted to the FCA that it reused the same shares over and over to settle the ED&F Bellwethers plans' transactions.[39]

---

37. Mr. Wade states repeatedly throughout his report that shares must be settled by the record date in order to receive a dividend and consistently testified to this point at his deposition. *See, e.g.,* Wade Report ¶¶ 25, 29, 30, 79, 80; Wade Reply ¶¶ 65, 79, 82; G. Wade Dep. Tr. 102:12-19, 131:14-23, 135:21-136:1, 137:4-13, 171:19-22.  The Defendants' feigned ignorance as to the meaning of "ex-record date", or after the record date, is therefore baffling.  *See* Defendants Motion at 29.  Regardless, the Defendants' counsel failed to ask any questions on this issue during the seven hours of Mr. Wade's deposition.

38. While the internal step by step process by which ED&F created tax vouchers is not material to Mr. Wade's report, ED&F has itself identified the internal operation flaws that led to the creation of the false tax vouchers, including, among other things, listing on the tax vouchers withholding tax amounts that had never been paid to SKAT and reliance on legal opinions that did not exist.  *See* September FCA Report at 2-4, 6.

39. As the Defendant's recognize, Mr. Wade examined BNP Paribas Account 778523F because ED&F represented in communications with SKAT's counsel in the English Litigation that it held the pension plans' shares in that account.  *See* Wade Report ¶ 215.

**D.**     **Defendants' Motion is Overbroad and Premature**

Courts have cautioned that only specific objections to evidence, including expert opinions, taken in their appropriate context, should be considered in a motion in limine and have disfavored motions in limine that seek to exclude evidence wholesale.  *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers* LLP, 232 F. Supp. 3d 558, 566 (S.D.N.Y. 2017) (finding parties' motion in limine "reflect inappropriate use of such motion" because they "[sought] to employ their in limine motion as preemptive weapons with which they endeavor to strike, in shotgun fashion, at whole topics and sources of prospective evidence…out of context and before any specific objection against its proper backdrop is raised"); *Baxter Diagnostics, Inc. v. Novatek Med., Inc*., No. 94-cv-5520 (AJP), 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion in limine because the motion "lack[ed] the necessary specificity with respect to the evidence to be excluded" and was "too sweeping in scope" to be considered prior to trial). Defendants' request for a general exclusion based on an undifferentiated general objection should be denied.  *See Cooper Crouse-Hinds, LLC v. City of Syracuse*, No. 16-cv-1201 (MAD), 2021 WL 4950565, at *7–8 (N.D.N.Y. Oct. 25, 2021), *reconsideration denied*, 2022 WL 344053 (N.D.N.Y. Feb. 4, 2022) (reserving judgment on the admissibility of expert's opinion and declining to "excavate the relevant expert opinions from the expansive record" where defendant failed "to make its objections with the specificity required for the Court to determine whether the motion is meritorious" and did "not direct the Court to which opinions it believes should be precluded").

Similarly, the Defendants' Motion is also premature.  While a court may decide questions regarding the admissibility of evidence on summary judgment, the need to do so only arises when the court must rely on such evidence to resolve an issue raised on summary judgment in the first instance.  *See ECD Inv. Grp.,* 2017 WL 3841872, at *11.  Many of the opinions that the

Defendants seek to exclude are not at issue on summary judgment (*i.e.*, the reasonableness of ED&F's tax voucher creation process), and a determination on these opinions without the proper factual context would be premature.  *See Com. Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-cv-3796 (PKL), 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005) ("A court considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."); *U.S. Env't, Inc.*, 2002 WL 31323832, at *2 ("Indeed, courts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context.").  Deferring ruling on aspects of the expert reports not at issue now would "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial…" *Palmieri v. Defari*a, 88 F.3d 136, 141 (2d Cir. 1996).

## <u>CONCLUSION</u>

For the reasons set forth above, SKAT respectfully requests that the Court deny the ED&F Bellwether Defendants and Third-party Defendant ED&F's Motion in Limine to exclude the expert reports, opinions and testimony of Mr. Wade.

Dated: New York, New York
       June 30, 2022

HUGHES HUBBARD & REED LLP

By:   /s/ Neil J. Oxford
    William R. Maguire
    Marc A. Weinstein
    Neil J. Oxford
    Dustin P. Smith
  One Battery Park Plaza
  New York, New York 10004-1482
  Telephone: (212) 837-6000
  Fax:  (212) 422-4726
  bill.maguire@hugheshubbard.com
  marc.weinstein@hugheshubbard.com
  neil.oxford@hugheshubbard.com
  dustin.smith @hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen (Customs and Tax Administration of the Kingdom of Denmark)*