# Exhibit 1

Confidential — Attorneys' Eyes Only
Stacey Kaminer — April 19, 2021

Page 1

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2             MASTER DOCKET 18-MD-2865(LAK)
                 CASE NO. 18-CV-09797
 3

 4   _____
                                           )
     IN RE:                                )
 5                                         )
     CUSTOMS AND TAX ADMINISTRATION OF     )
 6   THE KINGDOM OF DENMARK                )
     (SKATTEFORVALTNINGEN) TAX REFUND      )
 7   SCHEME LITIGATION                     )
                                           )
 8   _____)

 9

10

11         CONFIDENTIAL — ATTORNEYS' EYES ONLY

12

13

14                  DEPOSITION OF
                    STACEY KAMINER
15                    VOLUME 1

16              Monday, April 19, 2021
               8:07 a.m. — 4:46 p.m.
17
                 Remote Location
18              Via Huseby Connect
                All Parties Remote
19

20

21

22

23

24         Stenographically Reported By:
                Erica Field, FPR
25
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

```
1          Markets, Ltd.

2               MR. BLESSINGTON:  I should've also made it

3          clear that Brandon Dillman is also on from K&L

4          Gates representing Stacey Kaminer.

5     Whereupon,

6               STACEY KAMINER,

7     having been first duly sworn or affirmed, was examined

8     and testified as follows:

9               THE WITNESS:  Yes.

10              MR. OXFORD:  Just before we start, John,

11         did you want to put a statement on the record

12         about the protective order.

13              MR. BLESSINGTON:  I just want to make sure

14         that everybody who is actually listening in is

15         subject to the protective order that's in this

16         case.  Because when we are doing it remotely -- I

17         mean, actually, now that that person has dropped,

18         we can see everybody's name.

19              But obviously, we are going to be

20         discussing some confidential information and we

21         want to make sure it's subject to the protective

22         order.

23              MR. KAPLAN:  This is Marty Kaplan speaking.

24         For the record, Scott Goldstein may join this and

25         he obviously is a defendant and subject to the
```

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 19, 2021

```
1    can't recall a particular document.

2         Q.    Yeah.  I'm talking about in preparation for

3    your deposition, Ms. Kaminer.

4         A.    I don't think I saw anything in preparation

5    for my deposition that I hadn't already seen and given

6    thought to.

7         Q.    Okay.  So back to 2428, you write to

8    Victoria Foster, but at her -- what appears to be a

9    non-ED&F work address.

10              Do you see that?

11        A.    Yes.

12        Q.    Do you know why you were writing to her

13   outside of her ED&F address?

14        A.    I received an e-mail -- to my recollection,

15   I received an e-mail from her that she was having issues

16   or I think it even says it in this e-mail:  Sorry, I had

17   some tech issues, sent this from my outside e-mail to

18   your outside e-mail.

19        Q.    You write:  Vic, I've been over your Danish

20   list with Bob.  I will be tackling the Belgium next.  So

21   just pausing there.

22              Which Bob is this, is this Bob Messina or

23   Bob Crema?

24        A.    This would be Bob Crema.

25        Q.    And then you write to Ms. Foster:  I've
```

```
 1    been over your Danish list.

 2                What does that mean?

 3         A.    It means she would have sent me a list of

 4    securities that they felt they could provide funding for

 5    and, potentially, provide liquidity for.

 6         Q.    And what did you and Mr. Crema discuss

 7    about that list?

 8         A.    I don't recall the exact conversation we

 9    had about that list.

10         Q.    Okay.  And generally, your process would be

11    what?

12         A.    In general, we would've discussed what was

13    the dividend on those securities, what was the general

14    market on those securities, what did we think the profit

15    was going to be that the plan would make, stuff akin to

16    that.

17         Q.    Okay.  Let's pause there.

18                How did you calculate what profit the plan

19    would make?

20         A.    It was partially based on, like I said,

21    what the -- so when I say something like, the market,

22    what I'm referring to in this instance is the fact that

23    just even just entering into the transaction at all,

24    buying the security and selling the hedge, has a market

25    cost.  It's usually expressed as an all-in or a
```

1    percentage of the dividend.

2              So whereas in Denmark, 73 percent is the

3    underlying dividend entitlement.  The market for

4    something might be 80, 84, 92.  And, therefore, you know

5    that once you pay that away to the market, then there are

6    certain other knowable costs, such as the execution costs

7    of even doing this transaction, and that the financing

8    costs that would be associated with getting the leverage

9    or funding.

10             And when you then add in all those costs,

11   you arrive at the gross profit that the pension would

12   make.

13        Q.   And would Acer get a percentage of that

14   gross profit?

15        A.   ED&F would charge their fee.  After that

16   gross profit, Acer would charge ED&F a fee.

17        Q.   Were those fees based on a percentage of

18   that gross profit you just described?

19        A.   As we discussed earlier, they were based on

20   other factors, but expressed as a percentage -- ED&F's

21   fee was expressed as a percentage.

22        Q.   And generally, what was ED&F's fee as a

23   percentage of the gross profit you've just described?

24             MR. BINDER:  Objection to form.

25             MR. BLESSINGTON:  Objection.

Confidential – Attorneys' Eyes Only
Stacey Kaminer – April 19, 2021

Page 184

```
 1            Q.    So it's your testimony that your -- Acer
 2    followed ED&F's previously used structure for Danish
 3    dividend arbitrage trading?
 4                  MR. BLESSINGTON:  Objection.
 5                  You can answer.
 6            A.    With one caveat.
 7    BY MR. OXFORD:
 8            Q.    What's the caveat?
 9            A.    We liked holding the securities longer
10    term.
11            Q.    And did ED&F ever provide you with a trade
12    structure for Danish dividend arbitrage?
13            A.    We would have discussed it verbally.
14            Q.    But nothing in writing?
15            A.    No.
16            Q.    Any particular reason -- any reason why
17    not?
18            A.    I don't recall them ever providing us a
19    trade structure in writing on anything.
20            Q.    Just taking a quick look at Exhibit 2480,
21    can you point out the material differences between the
22    structure reflected there and the structure ultimately,
23    you used for the Danish dividend arbitrage trading
24    through ED&F?
25            A.    To begin with, the client would not have
```

1    BY MR. OXFORD:

2         Q.    From a capital allocation perspective, does

3    it matter which country the securities are issued in?

4         A.    I couldn't attest to whether that mattered

5    on ED&F's side or not.

6         Q.    Okay.  Did ED&F need to allocate capital in

7    order to facilitate the Acer plans Danish securities

8    purchases?

9              MR. BINDER:  Objection to form.

10        A.    They would have needed to arrange funding,

11   yes.

12   BY MR. OXFORD:

13        Q.    Okay.  There's a reference here to

14   Ms. Foster saying:  You were going to send over a

15   trade -- a trade diagram.

16              Do you see that?

17        A.    Yes.

18        Q.    Why is Ms. Foster asking you for a trade

19   diagram?

20        A.    We just looked at the one I sent them.

21        Q.    Okay.  I understand.

22              Did you put together an indicative trade

23   schedule as requested by Ms. Foster?

24        A.    I can't tell from this e-mail, but I don't

25   see why I wouldn't have.