# Exhibit 12

*Nothing in this Report shall constitute a waiver of legal privilege*

*Strictly Private and Confidential*
*This report is to treated as confidential information pursuant to section 348 of FSMA*

# Rosenblatt Investigation into Danish trading activity of ED&F Man Professional Trading (Dubai) Ltd ("MPT Dubai") dated 16 September 2019

**Produced in response to the FCA's requests for information investigation under S.171 of the Financial Services and Markets Act 2000 ("FSMA")**

**FCA Ref: ENF WS00377**

**Index:**

A.  Summary and Rosenblatt/FTI Conclusions
B.  Summary of the MPT Trading Structure (the Danske Trades)
C.  What MCM's Board Understood Mr Whitehead was doing – the EF Desk and MPT Business Plans + MCM Compliance Regime
D.  Failure to inform MCM's Board and Directors of the MPT Trading Structure
    a.  Who at MCM knew of the MPT Trading Structure
    b.  Mr Whitehead's failure to inform MCM's Board (2012-2014)
    c.  ██████████████████████████████
    d.  Ms Foster's explanation of MPT related trading;
E.  Remedial Action undertaken by MCM.

Appendix 1 – Scope of Rosenblatt and FTI Review
Appendix 2 – MCM's General Compliance Regime 2012-2015
Appendix 3 – MCM's Current Compliance Regime
Appendix 4 – Scope of 2019 Rosenblatt Compliance Audit
Appendix 5 – Documents (the supporting documents are released for the purposes of the FCA report only)

CONFIDENTIAL

ED&F-00609825

*Nothing in this Report shall constitute a waiver of legal privilege*

### A.  Summary and Rosenblatt/FTI Conclusions

1.  This Report follows Rosenblatt's report of 21 June 2019 (the "June Report") and the investigation by Rosenblatt and FTI into uncovered short selling of shares by MPT Dubai to MCM's pension plan clients ("the PPs") between 2012 and 2015. The Report addresses:

    a.  how MPT Dubai's naked short selling of shares to the PPs occurred;

    b.  the impact of MPT Dubai's short selling of shares on the legitimacy of Withholding Tax ("WHT") reclaims made by the PPs;

    c.  who was involved in these trades;

    d.  Whether MCM's Board was aware of or ought to have been aware that MPT was engaged in the short selling of shares to the PPs and the impact of such practice on the legitimacy of the PPs' WHT reclaims;

    e.  Whether MCM had systems and controls in place which could have prevented the above from occurring; and

    f.  The steps taken by MCM to ensure that such trading is not repeated.

2.  Rosenblatt's June Report made initial findings that MPT's practice of naked short selling had resulted in errors to 80 of the 420 Danish related Tax Vouchers produced by MCM on behalf of the PPs between 2012 and 2015 (the "80 Vouchers"). Specifically, that these 80 Vouchers referred to the PPs having received dividends from underlying Danish companies net of 27% Danish WHT when the PPs had instead received compensation payments from MPT Dubai equivalent to their dividend entitlement less 27%. On 6 September 2019, having confirmed the initial findings as set out in the June Report, MCM served SKAT with an Amended Defence admitting certain misrepresentations with respect fo 80 of the Tax Vouchers. A copy of MCM's Amended Defence is at pages 1 to 42 of Appendix 5 of this Report.

CONFIDENTIAL

ED&F-00609826

*Nothing in this Report shall constitute a waiver of legal privilege*

3. Since the June Report, Rosenblatt and FTI have conducted and are continuing to conduct an in depth review of all the transactions involving MPT Dubai where these led to PPs submitting WHT reclaim applications together with a review of all relevant documents and email accounts in MCM's and MPT Dubai's control. Details of those materials reviewed to date are at Appendix 1.

4. As outlined below, Rosenblatt's and FTI's further investigation into MPT Dubai's trading has concluded:

    a. ███████████████████████████████████████████████;

    b. MPT Dubai had no involvement in the transactions which led to MCM's production of the remaining 340 Danish Tax Vouchers. Further, those documents and data reviewed by FTI and Rosenblatt confirm that MCM had no reason to doubt the accuracy of these 340 Vouchers – i.e. that the PPs acquired the relevant Danish shares from the market over the dividend date and received dividends paid by the relevant Danish companies net of WHT;

    c. By contrast, as regards those elements of the 80 Vouchers which are incorrect[1], in none of the relevant transactions by which Danish shares were short sold to the PPs did MPT Dubai acquire shares from the market. Instead, the trading structure involving MPT Dubai ("the MPT Trading Structure") was as follows: in every case where MPT Dubai short sold to the PPs rights to Danish shares on a cum-dividend basis (which it did via inter dealer brokers), it filled these trades by buying back the rights from the PPs after the ex date (again via inter dealer brokers). Each of these trades was then automatically settled by MCM's custodian bank with shares which the custodian bank held on behalf of MCM and which MCM was entitled to use to settle its clients' trades as the PPs' and MPT Dubai's broker. These same shares were then automatically recycled (i.e. sold back to MPT Dubai and resold to a PP) thereby settling every PP and MPT Dubai trade. The

---

[1] Some of the 80 Vouchers were only partially incorrect. As set out in Schedule 1 to Annex E of the Amended Defence, while each of the 80 Vouchers represent a PP's position on conclusion of multiple trades, only some of these trades involved MPT Dubai and the MPT Trading Structure.

3

ED&F-00609827

*Nothing in this Report shall constitute a waiver of legal privilege*

consequence of this was that, while each PP acquired and received Danish shares, they did not receive shares in respect of which a dividend was paid and, therefore, no WHT reclaim was due[2].

d.  This MPT Trading Structure, the facts of which have only come to light since the June Report as a result of Rosenblatt's and FTI's investigation, was effected by MPT Dubai and MCM's Equity Finance Desk (the "EF Desk") under the direction of Mr Whitehead.  As regards how the MPT Trading Structure came about and who was aware of it, Rosenblatt's conclusions are as follows:

   i.  Mr Whitehead and those under his direction, in particular Ms Foster, effected the MPT Trading Structure over a period of more than two years;

   ii.  This MPT Trading Structure was entirely different from the trading structures which had been notified to and approved by MCM's Board and/or ED&F Man Holdings Ltd when Mr Whitehead had set up the EF Desk and MPT Dubai (all of which envisaged the PPs and MPT Dubai acquiring shares from and selling shares to the market)[3];

   iii.  Mr Whitehead and those under his direction effected the MPT Trading Structure without notice to or knowledge of MCM's Board and its various risk committees and, in contravention of MCM's compliance regimes[4];

   iv.  While Ms Foster maintains that at no stage did she ever consider that the MPT Trading Structure was resulting in illegitimate WHT reclaims, she and  Mr Whitehead appear to have withheld  the true nature of the MPT Trading Structure even after MCM had been notified of MPT Dubai's practice of short selling by its custodian banks in May 2014; further, in Ms Foster's case, she continued to

---

[2]     See B below for details of the MPT Dubai Trading Structure.
[3]     See C below.
[4]     See C below.

4

*Nothing in this Report shall constitute a waiver of legal privilege*

withhold the true nature of the MPT Trading Structure from MCM, Rosenblatt and the FCA even after the commencement of the FCA's investigation and the issue of the SKAT proceedings[5].

5.  Mindful of its regulatory obligations, MCM has taken the following actions; it has:

a.  [6]);

b.  dissolved the EF Desk;

c.  dismissed Ms Foster;

d.  amended its Defence in the SKAT proceedings;

e.  is in the process of instructing Rosenblatt to conduct a full audit of all of its systems and controls[7]; and

f.  instructed Rosenblatt to advise on the potential for clams against Mr Whitehead, Ms Foster and others for breach of fiduciary duty and breach of contract.

---

[5] See D below.
[6] FTI are also still investigating how the WHT reclaim money was distributed for the MPT related trades.
[7] An outline of which is at Appendix 4.

CONFIDENTIAL

ED&F-00609829

*Nothing in this Report shall constitute a waiver of legal privilege*

## B. Summary of the MPT Trading Structure

Set out below is an explanation of the MPT Dubai related trades in Danske Bank A/S ("Danske") shares for the March 2014 dividend event, these trades being representative of all of the MPT related trades and of the MPT Trading Structure generally[8].

Despite an exhaustive search, no emails, documents, schematics or legal/tax opinions have been found which explain or address the genesis, legality or structure of the MPT Trading Structure. As explained in the June Report and further in Section D below, knowledge of the MPT Trading Structure appears to have been kept exclusively within the close knit team which Mr Whitehead brought with him from MF Global The explanation which follows (whose accuracy has been confirmed by Ms Foster) arises instead from the review of each trade conducted by FTI and Rosenblatt subsequent to the June Report (in particular the emailed trade instructions and confirmations, SWIFTs, reconciliation spreadsheets, client cash and security accounts).

1. *The Acquisitions* (the "A Trades"):

    a. On the Trade Date[9] (ex-dividend day minus 1), MCM's EF Desk[10] acquired, on the PPs' behalf, from an inter-dealer broker ("IDB"), the contractual rights to cum-dividend Danske Shares with settlement on a T+4 basis. An instruction SWIFT was generated for the settlement of each A Trade acquisition;

    b. Each PP's A Trade acquisition was split into small amounts or 'shapes' ("the Splits"), with no single Split being for more than 3million shares[11];

    c. Despite acquiring the rights to these shares from an IDB, the PPs' ultimate counterparty in every one of these acquisitions was MPT Dubai, also a client of the EF Desk, whose sales were effected by an IDB – i.e. MPT Dubai sold the rights to Danske shares to the IDB, who sold them to MCM, who sold them to the PPs;

    d. Because at the time MPT Dubai held no Danske shares of its own, its sales of the rights to Danske shares constituted uncovered short-sells;

---

[8]    The MPT Trading Structure was used for Danish trades from December 2012. ███████████ .

[9]    18 March 2014.

[10]    The PPs' investment managers would instruct the EF Desk's Mr Oliver Bottomley (cc'ing Ms Foster) to acquire the shares.

[11]    Note: MCM entered into multiple A Trade Acquisitions for multiple PPs on the Trade Date, with all of these A Trades amounting to purchases of c48m Danske shares.

6

*Nothing in this Report shall constitute a waiver of legal privilege*

    e. MCM's Operations Desk recorded each position as book entries in the PPs' equities account crediting the PPs with these rights and corresponding debits in MPT Dubai's equities account;

2. *The A Trade Single Stock Futures*

    a. Simultaneously with MPT Dubai short-selling the rights to Danske shares, MPT Dubai acquired from MCM, and MCM acquired from the PPs, single stock futures enabling the PPs and MPT Dubai to hedge against the price of the Danske shares moving;

    b. The price of these A Trade Single Stock Futures would be fixed on the relevant exchange.

3. *The Sales* (the "B Trades"):

    a. On the day following the A Trade Trade Date (ex-dividend day[12]), the EF Desk sold on the PPs' behalf[13] (or re-hypothecated from the PPs and sold), again via an IDB, their rights to the Danske shares, again in Splits of 3 million or less, but with settlement on a T+3 basis, such that the A Trades and B Trades would settle on the same day[14];

    b. Again the PPs' ultimate counterparty in all of these B Trade sales was MPT Dubai, on whose behalf the EF Desk facilitated the purchase of the rights to the Danske shares from the PPs via the same IDB[15] - i.e. MPT Dubai acquired the rights to Danske shares from MCM, who acquired them via an IDB, who acquired them from MCM, who acquired them from the PPs;

    c. MCM's Operations Desk then recorded these rights as credits in MPT Dubai's equities account, thereby covering its short sale of these rights of the previous day, and recorded the sale of these rights as debits in the equities account of the PPs thereby selling the rights purchased the previous day;

    d. Again, an instruction SWIFT was automatically generated for the settlement of each B Trade Split.

4. *The B Trade Single Stock Future:*

    a. Simultaneously with MPT Dubai acquiring the rights to the Danske shares which it had sold to PPs the previous day, MPT Dubai sold Single Stock Futures

---

[12] 19 March 2014.
[13] As with the A Trades, the PPs' B Trade sales were effected by Mr Bottomley.
[14] 24 March 2014.
[15] As with the A Trades, MPT Dubai's B Trade acquisitions were effected by Ms Mina.

CONFIDENTIAL    ED&F-00609831

*Nothing in this Report shall constitute a waiver of legal privilege*

to MCM and MCM sold (or re-hypothecated) Single Stock Futures to the PPs, thereby allowing the parties to hedge against the price of Danske shares moving.

5. *The Settlement*:

   a. Where instruction SWIFTS have been created, MCM's clients' trades are automatically settled by its custodian bank provided MCM holds in its account with the bank sufficient cash or credit and sufficient shares to settle these trades[16];

   b. Thus, with respect to both the A and B Trades, provided MCM held sufficient Danske shares in its 'depot' with BNP to settle the largest Split (the "Depot Shares") and sufficient cash or a sufficient credit limit with BNP to pay for this Split, each of the A Trades and B Trades would settle automatically on the Settlement Date;

   c. On the Settlement Date,  MCM held a sufficient number of Danske shares in its depot account with BNP and a sufficient credit limit with BNP to pay for the largest of the Splits[17]. Accordingly, each of the A Trade and B Trade Splits settled on a delivery versus payment basis – MCM's custodian bank automatically used the Depot Shares to settle the first of the PP's A Trade acquisitions from  MPT Dubai, and then used these same Depot Shares to settle the first of the PP's B Trade sales back to MPT, with these Depot Shares then being recycled until such time as all of the A Trades and B Trades had automatically settled. Each of these settlements was done on the same day and without any cash or shares actually entering or leaving the custodian bank.

   d. By the end of the Settlement Day, with all of the A Trades and B Trades having automatically settled and netted off against each other, settlement SWIFTs  had been automatically generated confirming the settlement of each of the A Trade acquisitions of Danske shares and each of their B Trade sales of these same Danske shares.

   e. Thus, through this process, the  PPs and MPT Dubai collectively bought and sold between themselves a total of c48million Danske shares but with the same limited number of Danske shares (the Depot Shares) being used to settle all of the trades.

---

[16]    Note: under its terms of business, MCM was/is contractually entitled to settle trades on behalf of a client (by using its own shares or its own cash) and, in the absence of a client reimbursing MCM, then re-hypothecate (use) such settled shares for its own purposes, including to settle another client's trade.

[17]    As outlined above, none of the A Trade or B Trade Splits exceeded 3m shares.

8

*Nothing in this Report shall constitute a waiver of legal privilege*

6. *The Compensation Payment*:

    a. Subsequent to settlement, Mr Michael Meade of MCM's Operations Desk prepared (using trading data held on Shadow, MCM's internal system) Dividend Reconciliation spreadsheets identifying, as of ex-date minus one, the PPs' respective dividend entitlements on the shares they had acquired pursuant to the A Trades;

    b. Because the Trade Date of each of the PPs' A Trade acquisitions was prior to the ex-date, and because these A Trade acquisitions had subsequently all settled, the PPs were contractually entitled to a dividend on the Danske shares which they had purchased. Mr Meade, aware that MPT Dubai was the counterparty to the A Trades, debited (and included a debit in his Dividend Reconciliation) MPT Dubai's cash account and credited (and included in his Dividend Reconciliation a credit) the PPs' cash accounts to reflect compensation payments made by MPT Dubai to the PPs in lieu of the PPs' dividend entitlement (i.e. sums equivalent to the dividends to which they were entitled and which would have been payable to the PPs by Danske in respect of all of their A Trades[18]);

    c. When crediting/debiting such compensation payments, Mr Meade debited/credited them net of a sum equivalent to Danish WHT at 27%. Mr Meade maintains that he thought this was standard practice and that he did so without giving consideration as to whether this amount had actually been withheld by SKAT;

    d. Ms Foster and Ms Christina MacKinnon (Head of Securities Operations) then signed off the Dividend Reconciliations.

7. *The Tax Vouchers*:

    a. Mr Meade then copied and pasted information from his Dividend Reconciliation spreadsheets into the relevant fields of a draft Tax Voucher using a template which had been drafted by Simmons & Simmons.

    b. Each Voucher recorded:

---

[18] As per paragraph 2, page 7 of the June Report, Mr Meade has informed Rosenblatt that he knew MPT Dubai were short over the dividend date, but maintains that he was solely concerned with accurately representing the DKK to which the PP was contractually entitled. Mr Meade maintains that nobody instructed him to reconcile the trades int his manner.

CONFIDENTIAL                                                                                    ED&F-00609833

*Nothing in this Report shall constitute a waiver of legal privilege*

    i. The PP "*holding the below security over the dividend date*", below which was a figure accurately representing the total number of Danske shares acquired by means of the PP's  A Trade on the Trade Date and which settled (with a confirmatory SWIFT) on the Settlement Date[19];

    ii. An "*amount received*", next to which was a figure representing the total sum which Mr Meade had credited to the PP as a compensation payment; and

    iii. "*WHT Suffered*", next to which was a figure representing the sum which Mr Meade had deducted from this compensation payment to reflect a payment net of tax and which, as a consequence, he says he considered the PP had "suffered"[20].

c. Ms MacKinnon then signed off the Tax Vouchers and provided these to Mr Marcus Howard of MCM's EF Desk. Mr Howard sent them to the PPs' investment managers. It was these investment managers who, via reclaim agents, then used the Tax Vouchers to apply for WHT reclaims.

d. A total of 80 Tax Vouchers included information relating to transactions that had been based on the MPT Trading Structure [21]. A total of circa £22m (183,902,400DKK) was subsequently paid out by SKAT in relation to compensation payments generated by these transactions, such payment being made to the  PPs' reclaim agents who paid this on to MCM after deducting their fees. MCM charged approximately £6.5m in fees, which was deducted from the WHT. Rosenblatt believes that the remainder was paid to the PPs' investment managers[22].

8. *Rosenblatt/FTI Conclusion*

a. The MPT Trading Structure should not have resulted in successful WHT reclaim applications by the PPs because the shares received by the PPs pursuant to the MPT Trading Structure were not acquired from the market (the trades being settled with only a limited number of Depot Shares) and, therefore,

---

[19]    Mr Meade was not on MCM's settlement team and may not therefore have necessarily known that the PPs' A Trades had been settled with just a limited number of Depot Shares.

[20]    This was not however WHT which had ever been suffered by SKAT.

[21]    As per Schedule 1 of Annex E of the Amended Defence, these 80 Vouchers represented a PP's position on the conclusion of multiple trades and therefore also included non MPT related transactions which resulted in legitimate WHT entitlements.

[22]    FTI have yet to conclude its investigation into how MCM distributed the DKK which it received from the reclaim agents.  This is likely to take another 6-8 weeks.

10

 ED&F-00609834

*Nothing in this Report shall constitute a waiver of legal privilege*

no dividends net of WHT were paid by the underlying Danish companies to the PPs in relation to these shares.

b.  Rosenblatt's view, as outlined below, is that the MPT Trading Structure was effected by MPT Dubai and the EF Desk under Mr Whitehead's direction in a manner which was contrary to the approved business plans and compliance regimes of the EF Desk and MPT Dubai and without notice to or approval by MCM's directros, Board and risk committees, or MPT Dubai's Board, or the Board of ED&F Man Holdings Ltd.

11

CONFIDENTIAL

ED&F-00609835

*Nothing in this Report shall constitute a waiver of legal privilege*

**C.** **What MCM's Board Understood Mr Whitehead was doing – the approved business plans of the EF Desk and MPT Dubai + MCM's Compliance Regime**

As outlined below, it is Rosenblatt's view that the MPT Trading Structure, as effected by the EF Desk and MPT Dubai under Mr Whitehead's direction, was:

    a. contrary to the approved business plans and trading structures of the EF Desk and MPT Dubai; and

    b. not in accordance with the approval and reporting requirements of MCM's ongoing Compliance Regime as specifically applicable to the EF Desk[23].

**a.** **The approved Business Plans and Trading Structures**

*The EF Desk*

1. The EF Desk's business plan and approved trading structures were set out in an initial presentation document, entitled "*Structured Equity Finance Opportunities*" [24] whose contents were prepared by Mr Whitehead's subordinates, Ms Foster and Mr Chris Henstock, and which on 20 February 2012 was presented to and approved by MCM's Financial Risk Committee (and subsequently included in the pack of documents sent to the FSA by MCM when seeking its license approval).

2. Pursuant to this presentation:

    a. the EF Desk was to conduct two principal business streams under Mr Whitehead's direction: a "*client facilitation business*" and a "*principal trading business*" with trades executed "*in response to a corporate event e.g. a dividend payment*";

    b. The EF Desk was to effect trades in accordance with the trading structures as set out in the explanations and schematics included in the presentation, none of which involved MCM's principal/proprietary business short-selling to MCM's pension plan clients, but all involved trades with the market, specifically:

        i. Where acting as principal, "*MCM trading desk send order to market to buy a given equity…*"

---

[23] It was also not in accordance with the general Complance Regime operated at MCM in 2012-2015, a summary of which is at Appendix 2.

[24] Page 43 of the supporting documents at Appendix 5.

12

*Nothing in this Report shall constitute a waiver of legal privilege*

      ii.  Where acting for clients, "*Client sends order to buy stocks to MCM… who then execute in the market on client's behalf*;"

    c.  All trades would be traded through brokers on an OTC basis and would be "*delta hedged*", involving  "*long equity positions*" hedged with "*a single stock future*", such that they would carry no market risk; further

    d.  the EF Desk would ensure it had "*sophisticated tax and legal advice surrounding every trade*" with  "*legal and tax opinions…sought by ourselves and separately by our customers*"'.

3.  A second presentation, "*MCM's  Structured Equity Finance – Risk Approval*", of March 2012[25] was then prepared to secure formal approval of the EF Desk's credit and risk limits and of its "*generic trading structures*"  from the Group Risk Committee. Again, none of these generic trading structures envisaged MCM's proprietary/principal business short-selling to its PP clients. Instead the presentation's explanations and schematics set out four "*generic trading structures*" pursuant to all of which the EF Desk would purchase equities *"from the market"* and in accordance with annually updated tax and legal advice.  Moreover, were the EF Desk to consider any trading structures beyond these generic structures, it was stipulated that this would require the prior approval of a specially designated Working Committee made up of the directors of both ED&F Holdings Ltd and MCM. It was on this basis that the Group Risk Committee gave its approval to the EF Desk on 15 March 2012[26].

*MPT Dubai*

4.  As outlined in the June Report, the EF Desk never in fact engaged in any proprietary trading because in the spring of 2012 MCM amended the terms of its licence. Subsequently, in June 2012, Mr Whitehead proposed setting up MPT Dubai as an entity which could conduct proprietary trading as a client of MCM's EF Desk.

5.  Mr Whitehead (with the assistance of Mr Oliver Bottomley) drew up a presentation entitled, "*ED&F Man Professional Trading (Dubai) Ltd Business Plan*", which was submitted to and approved by MCM's New Business Initiative Committee in July 2012[27].  As with the EF Desk proposed proprietary business, Mr Whitehead presented MPT Dubai as an entity trading, not with other clients of the EF Desk, but with the market on its own account, specifically it would be:

---

[25]     Page 56 of the accompanying documents at Appendix 5.
[26]     C.f. Derek Peach's email to Phil Howell of 15 March 2012 at page 72 of Appendix 5.
[27]     Pages 74-85 of Appendix 5.

13

ED&F-00609837

*Nothing in this Report shall constitute a waiver of legal privilege*

    a. "*A proprietary trading company. No products or services will be offered to clients from this entity*" and "*No customers/ 100% proprietary trading*"; which

    b. would benefit MCM by "*increased clearing revenues and volumes*" (i.e. there was no suggestion that it would be used to facilitate the PPs' trades) with "*Chinese walls and a compliance framework to mitigate potential conflicts in other locations*".

**b.    MCM's ongoing Compliance Regime as specifically applicable to the EF Desk**

*Compliance Risk Assessments*

1. To ensure ongoing compliance with the terms of approval for each of its lines of business, and "*to help it assess, monitor compliance risk and drive the Compliance Plan*" [28], MCM's Compliance Department prepared annual Compliance Risk Assessments ("CRAs") for the EF Desk.

2. On 19 June 2012 Evita Koutsopoulou, Compliance Officer, emailed members of the EF Desk,[29] including Mr Whitehead, regarding the review of the CRA for the EF Desk:

> "*In the Compliance Risk Assessment it is referenced that you have had tax and legal opinions obtained for all transactions. Can you please provide evidence of these. Are these one-off opinions or do we get an opinion on a trade by trade basis? Are these provided by external Tax advisors? Furthermore – under point 12 below – it states that all transactions are reviewed and approved by Senior Management. Is this statement correct? Following our conversations yesterday my understanding is that as long as the transactions are within the Desk and Risk Mandates no Management approval is required on a per trade basis. Can you please confirm.*"

3. Mr Whitehead replied to this email explaining that in respect of "*Tax and legal opinions obtained for all transactions*", these are historical, and for "*For recent developments in the market we have liaised with our internal tax dept who in turn have spoken to external counsel (███████████████████████)*", and "*For new transactions we would seek external advice*". In response to Ms Koutsopoulou's query regarding all transactions being reviewed and approved by senior management, Mr Whitehead replied "*If already*

---

[28]    Page 86 of Appendix 5 - the "Compliance Function and Arrangements" dated March 2012.
[29]    Page 90 of Appendix 5 - Mr Whitehead's email to Evita Koutsopoulou of 19 June 2012.

CONFIDENTIAL                                                     ED&F-00609838

*Nothing in this Report shall constitute a waiver of legal privilege*

*mandated then that is not the case. If a new structure then it is reviewed by a committee of senior management and support partner".*

4. Thereafter each of the CRAs for the EF Desk from 2012-2015 stated, with Mr Whitehead's express confirmation:

    a. as an existing mitigation strategy to Market Abuse Potential, *"Tax and legal opinions obtained for all transactions";* and

    b. for Regulatory Environment and Historical Issues, *"Tax and legal opinions obtained for all new transactions."*

    c. Further, that "*New transactions that are not covered by the Desk Mandate require review and approval by Senior Management through New Business & Transactions Committee process.*"[30]

*Risk Mandates*

5. In addition to the CRAs, MCM and MPT Dubai also had in place trade risk mandates,[31] which set out the constraints within which everyday trading activity could take place without the need for trade-by-trade approval and pursuant to which transactions that did not represent "*everyday trading activity*" had to be escalated for specific approval even if they were accommodated by the Risk Mandate. The Risk Mandate explained that such transactions that may require to be escalated include:

   • Transactions of disproportionate size to those typical of the trading desk's activity in a market, or executed in an unusual manner; and

   • Transactions where the client appeared more driven by the accounting treatment of a structure than by its substance.

6. These risk mandates required that any transactions or portfolios requiring escalation had to be taken for approval to either the Chief Executive Officer (Europe), Chief Risk Officer (Europe) and European New Products Committee Chairman.

---

[30]    Pages 92-106 of Appendix 5 - Compliance Risk Assessments: February 2012, July 2012, January 2013, January 2014, and February 2015.

[31]    Pages  107-178 of Appendix 5 - MCM Risk Mandate (dated March 2013) updated January 2014 and January 2015, and MPT Dubai Risk Mandate (dated April 2013) updated January 2014 and January 2015.

15

ED&F-00609839

*Nothing in this Report shall constitute a waiver of legal privilege*

### D.  Failure to properly inform MCM's Board of the MPT Trading Structure

**Who at MCM knew of the MPT Trading Structure**

1.  Rosenblatt believe that full details  of the MPT Trading Structure were known by (and its potential impact on the legitimacy of the PPs' WHT reclaims ought to have been understood by) at least the following individuals:

    a.  Mr Whitehead – Head of Structured Equities;

    b.  Ms Foster – Managing Director of the EF Desk;

    c.  Mr Henstock – Sole trader and Director at MPT Dubai; and

    d.  Ms Christina MacKinnon – Head of MCM's Securities Operations and Settlement team (who signed the Tax Vouchers but who must also have known that the MPT related trades had been settled with recycled Depot Shares).

2.  The following less senior individuals may also have known the full details of the MPT Trading Structure:

    a.  Mr Oliver Bottomley – a trader on the EF Desk who effected the PPs' trades;

    b.  Ms Sara Mina  – senior trader on the EF Desk who effected MPT Dubai's trades;

    c.  Mr Marcus Howard – prime brokerage specialist on the EF Desk; and

    d.  Michael Meade – a member of the Security Operations team.

3.  Rosenblatt has not identified any documents or communications which indicate that either MCM's Compliance Team, or its Board, or the Board of MPT Dubai (other than Mr Whitehead and Mr Henstock[32]), or ED&F Man Holdings Ltd[33] were aware of the MPT Trading Structure or that it was being used in relation to applications by the PPs for WHT reclaims.

4.  As explained above, and despite an exhaustive search (as outlined at Appendix 1), Rosenblatt has failed to find any documents or emails which address or even allude to

---

[32]     The MPT Dubai Board Minutes and Agendas to MPT Dubai's Board are at pages 179-213 of Appendix 5. There is no mention in any of these documents of  MPT short selling to other MCM clients.

[33]     Rosenblatt has not reviewed documents held by ED&F Holdings Ltd. These have been reviewed by Clyde & Co who have confirmed that they have not found any such materials.

16

ED&F-00609840

*Nothing in this Report shall constitute a waiver of legal privilege*

the MPT Trading Structure beyond those email instructions and confirmations which effected the trades themselves.

5. The reasonable assumption to be made as a result of the above, is that the true nature of the MPT Trading Structure was kept exclusively within Mr Whitehead's team.

**Failure to inform MCM's Board from 2012 to May 2014**

6. Rosenblatt's view is that the MPT Trading Structure – being a structure whereby the PPs acquired shares not from the market but by means of MPT Dubai's uncovered short-selling – did not fall within the EF Desk's approved 'generic trading structures' and did not fall within MPT Dubai's approved business plan. Instead, it constituted a new trading structure which under MCM's Compliance Regime should not have been effected without (a) strict ethical Walls (given the trading between MPT Dubai and other MCM clients) (b) formal approval from the Finance Risk Committee, the Group Risk Committee and the Working Committee and (c) favourable independent legal and tax opinions. Under Mr Whitehead's direction, none of this occurred.

*No Ethical Walls*

7. While MPT Dubai effected both the A and B Trades via inter-dealer brokers, its status as a client of MCM's EF Desk,  the involvement of the EF Desk personnel in both its trades and those of the PPs, Mr Whitehead's management of both MPT Dubai and the EF Desk and MPT Dubai's reliance on MCM's Operations Desk meant that there were in effect no realistic ethical walls.

*No legal opinions*

8. Despite it being a condition of the Group Risk Committee's approval that legal and tax opinions be obtained for every transaction, Rosenblatt has not found any legal or tax opinions which refer to the MPT Trading Structure.

9. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

17

ED&F-00609841

*Nothing in this Report shall constitute a waiver of legal privilege*



*No notification to the FRC, GRC or Working Committee*

10.  Despite the MPT Trading Structure being a structure which fell outside the 'generic trading structures' approved by the Finance Risk Committee and Group Risk Committee in that it involved MPT Dubai short selling to MCM's PP clients with no acquisitions from the market, no notification of the MPT Trading Structure was ever made to these Committees.

*Mr Whitehead's apparent misdirection in the CRAs*

11.  As outlined above, Mr Whitehead repeatedly provided apparently false information to MCM's Compliance desk for the purposes of the annual CRAs – i.e. there were *"Tax and legal opinions obtained for all transactions"*, *"For recent developments in the market we have liaised with our internal tax dept who in turn have spoken to external counsel (▬▬▬▬▬▬▬▬▬▬)"*, and *"For new transactions we would seek external advice"[35]*.

*Failure to escalate in accordance with Risk Mandates*

12. Despite the unusual nature of the MPT Trading Structure, which should have obliged Mr Whitehead to seek specific approval of the Structure from MCM's European CEO (Mr Hawksworth) under the EF Desk's Risk Mandate, no such approval was ever sought.

*MPT Dubai Short Selling*

13.  Despite MPT Dubai being engaged in short selling to MCM clients from the outset of its operations in November 2012, in none of their reports to MPT Dubai's Board or in any of the MPT Dubai Board meetings did either Mr Whitehead or Mr Henstock ever acknowledge such short selling to their co-directors, Mr Hawksworth or Mr Chris Smith.

14. Furthermore, and as explained below, even when Mr Hawksworth became aware of such short selling in May 2014, Mr Whitehead failed to provide a full explanation of the MPT Trading Structure or how it was being used in connection with applications by the PPs for WHT reclaims.

---

[34]     Page 214 of Appendix 5.
[35]     Cf 19 June 2012 email by Evita Koutsopoulou to Mr Whitehead, Page 90 of Appendix 5.

CONFIDENTIAL

ED&F-00609842

*Nothing in this Report shall constitute a waiver of legal privilege*



19

ED&F-00609843

*Nothing in this Report shall constitute a waiver of legal privilege*



20

CONFIDENTIAL

*Nothing in this Report shall constitute a waiver of legal privilege*

21

ED&F-00609845

*Nothing in this Report shall constitute a waiver of legal privilege*

**Ms Foster's explanation of the MPT related Danish trading**

1.  In July 2019, Ms Foster, who managed the EF Desk and reported directly to Mark Whitehead from the inception of the desk until he left MCM,  confirmed FTI's and Rosenblatt's understanding of the MPT Trading Structure as set out at Section B of this Report. She further confirmed to Rosenblatt that she never spoke to Mr Hawksworth or anyone on MCM's board about the MPT related trading or the MPT Trading Structure until the FCA commenced its investigation.

2.  Ms Foster maintains that at no stage did she ever consider what she was doing unlawful. On the contrary she considers MCM had provided nothing other than normal prime brokerage services when facilitating the MPT Trading Structure, in particular:
    a.  It executed the trades on its clients' instructions;
    b.  It did so through IDBs;
    c.  It provided custody services as per its Custody Agreement;
    d.  It provided financing in accordance with its terms of business; and
    e.  It settled the each trade with its own shares, as it was entitled to do under its terms of business – it being perfectly lawful to settle multiple trades by means of re-hypothecation and recycled settlements.

2.  She has further asserted that at all times between 2012 and 2015 she understood the Danske Trades (and the MPT Trading Structure generally) to be lawful and standard cum-ex trades where one party (MPT Dubai) sells stock "cum" to a tax efficient party (the pension plan) and then buys back the stock "ex". These trades (as effected by the MPT Trading Structure) and the subsequent WHT reclaims were in her view lawful exploitations of a tax loophole because:
    a.  the PPs acquired shares prior to the ex-date (cum dividend);
    b.  they did so on an arms-length basis via IDBs such that  the pension plans did not know where the shares came from; and
    c.  each of these acquisitions settled with SWIFT confirmations.

3.  Ms Foster cites Mr Whitehead as the source of this understanding; further, that she understood Mr Whitehead had secured legal opinions to this effect, albeit the admitted that she had never seen any of these opinions.

4.  Whether or not this was Ms Foster's understanding in 2012-2015, Rosenblatt are concerned that Ms Foster has chosen to both withhold the full details of the MPT

CONFIDENTIAL

*Nothing in this Report shall constitute a waiver of legal privilege*

Trading Structure and to have misled MCM, Rosenblatt and the FCA since the outset of the FCA's investigation and the commencement of the SKAT proceedings, the consequence of which has been the submission of the erroneous 28 March 2018 Memorandum to the FCA and service of an incorrect Defence in the SKAT proceedings. This concern arises from the following:

a.  Prior to July 2019, Ms Foster repeatedly told MCM and Rosenblatt that MPT Dubai had acquired the Danske shares from the market – this being her assertion as set out in MCM's Memorandum to the FCA of 28 March 2018. Ms Foster maintained this false position despite being explicitly informed by MCM's non executive director, Ms Jacqueline Kilgour, and by Rosenblatt that the FCA, in its request of 19 March 2018, wanted to know from where MPT Dubai acquired the Danske shares which were sold to the PPs and despite at all times knowing that MPT Dubai had in fact settled its trades with MCM's Depot Shares. At no stage prior to MCM's discovery of the MPT Trading Structure in July 2019 (as a result of the Rosenblatt and FTI review) did Ms Foster ever explain the true nature of the MPT Trading Structure;

b.  Ms Foster was further instrumental in amending MCM's 28 March 2018 Memorandum to the FCA's request of 19 March 2018 so as to avoid making clear that MPT Dubai was covering its short sales with ex dividend stock. Thus, on her instigation, the first draft of this response, which originally stated "*MCM's understanding of MPT's trading strategy in respect of the relevant transactions was to sell <u>the stock cum dividend</u>…. Some days later, MPT would <u>buy stock ex dividend</u> from an IDB….*" was amended to read as: "*MCM's understanding of MPT's trading strategy in respect of the relevant transactions was for MPT to <u>enter into a short sale of stock</u>…. Some days later MPT <u>would buy stock</u> from an IDB*" (empahasis added);

c.  Ms Foster additionally confirmed to Rosenblatt on multiple occasions (both orally and in writing) that the relevant PP received the relevant dividend net of WHT in relation to all of the Tax Vouchers that are the subject of SKAT's claim;

d.  Ms Foster also repeatedly confirmed to Rosenblatt (both orally and in writing) that none of the Danish Tax Vouchers involved or led to multiple WHT reclaim applications.

23

ED&F-00609847

*Nothing in this Report shall constitute a waiver of legal privilege*

5.    As set out below, Ms Foster's employment has now been terminated.

CONFIDENTIAL

ED&F-00609848

*Nothing in this Report shall constitute a waiver of legal privilege*

**E.  MCM's remedial action**

**MCM's closure of the EF Desk**

1.  The EF Desk has been closed with FTI instructed to monitor and supervise the wind-down of its trading books, a process which was completed at the end of July 2019.

2.  As part of this exercise, all of the EF Desk staff have been made redundant save, initially, Ms Foster, who was retained to assist with the wind-down and with the FCA investigation.

**Termination of Ms Foster's employment**

3.  As outlined above, Rosenblatt's enquiries arising out of the FCA Investigation led it to conclude that Ms Foster has withheld information about the MPT Trading Structure.

4.  MCM has consequently ceased all communication with Ms Foster and has terminated her employment contract.

**Service of an Amended Defence**

5.  On 6 September 2019, MCM served SKAT with an Amended Defence in which, amongst other things, it admitted that certain representations in the 80 Tax Vouchers were incorrect.

**Proceedings against Mr Whitehead and others**

6.  Rosenblatt has been asked to investigate potential claims against Mr Whitehead, Ms Foster and others in respect of the MPT Trading Structure.

25

*Nothing in this Report shall constitute a waiver of legal privilege*

**Appendix 1**

**Scope of Rosenblatt and FTI Document Review**

**FTI's Review of trading**

1. In light of the FCA's investigation Rosenblatt instructed FTI to review all Danish trading carried out by MCM between 2012 and 2015 (the "Relevant Period").

2. FTI harvested all Danish trading data from MCM's transaction processing databases called SecOps and Shadow.

3. In relation to equities traded the data shows every principle transaction (buy, sell, borrow and return) carried out by MCM i.e. MCM's transactions with the market and MCM's transactions with each of its clients.

4. FTI extracted all MCM trades for the 15 Danish stock traded[38] during the Relevant Period and established each client's position for the 39 dividend events that took place during the Relevant Period. FTI cross-checked each position to the dividend reconciliation sheets created by the EF Desk at the time of trading, as described in paragraph B6 on page 9 of this report.

5. FTI identified 11 dividend events between December 2013 and February 2015 that involved MPT Dubai.

6. The pattern of trading for each dividend event was the same. MPT Dubai sold shares on a T+3 basis on ex-dividend day minus 1 and repurchased the same amount on ex-dividend day on a T+4 basis. There was no record of MPT Dubai having either purchased or borrowed any other shares in every occasion.

7. From the data extracted FTI could ascertain that the counterparty to each of these transactions was a pension plan client of MCM.

**Document Review**

1. Further to Appendix 4 of the June report. Rosenblatt have continued its document review of MCM's email.

---

[38] A.P. Møller Mærsk A/S – A, A.P. Møller Mærsk A/S – B, Carlsberg A/S – B, Chr. Hansen Holding A/S, Coloplast A/S – B, Dampskibsselskabet Norden A/S, Danske Bank A/S, DSV A/S, FLSmidth & Co A/S, IC Group A/S, Lundbeck A/S, Novo Nordisk A/S – B, Novozymes A/S – B, Pandora A/S, Simcorp A/S, TDC A/S and Tryg A/S.

26

ED&F-00609850

*Nothing in this Report shall constitute a waiver of legal privilege*

2. Rosenblatt have reviewed all:

    a. all emails relevant to the MPT related Danish trading, trading including all instructions, orders and confirmations between MCM, its clients and the inter-dealer brokers. All board reports of MCM and MPT Dubai;

    b. All Compliance Reports of MCM between 2012 and 2015;

    c. All of Ms Foster, Mr Whitehead and Ms MacKinnon's emails between 19 May 2014 and June 2014.

3. The keyword listed below have also been applied to the following custodian email accounts for the period 1 January 2012 to 31 April 2015:

    a. Christopher Henstock;

    b. Mark Whitehead;

    c. Victoria Forster;

    d. Christina Mckinnon;

    e. Micheal Meade;

    f. Steve Hawksworth;

    g. Marcus Howard; and

    h. Oliver Bottomley.

4. 75,533 number of documents were returned by the searches.

5. Rosenblatt have reviewed approximately 25,000 documents and will report its finds to the FCA on conclusion of the review.

Keywords:

i. "Cum-ex"

ii. "Reclaim"

iii. "Withholding tax" OR "WHT" OR "wht"

iv. "Strategy" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

v. "Structure" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

vi. "Dividend Arbitrage"

vii. "Short-selling" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

viii. "Short" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

27

ED&F-00609851

*Nothing in this Report shall constitute a waiver of legal privilege*

ix.    "div-arb" OR "div arb"

x.    "Legal opinion" OR "legal advice" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

xi.    "Trade Mandate" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

xii.    "Risk Mandate" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

xiii.    "business plan" AND ("Dubai" OR "MPT" OR "Man Professional Trading")

xiv.    "█████████████████"

xv.    "tax ops"

xvi.    "beneficial ownership" AND ("auditors" OR "Ernst & Young")

xvii.    "treatment of dividends"

xviii.    "██████████████"

xix.    "█████████████████████"

xx.    "Mark Whitehead trades"

xxi.    "client facilitation"

xxii.    "unregulated entity"

xxiii.    "Mark's business"

xxiv.    "equities steering"

xxv.    "Market reclaim"

xxvi.    "compensation payment"

xxvii.    naked

xxviii.    "cum/ex"

xxix.    "ex-div

xxx.    "ex div"

xxxi.    "ex-dividend"

xxxii.    "ex dividend"

28

CONFIDENTIAL

*Nothing in this Report shall constitute a waiver of legal privilege*

**Appendix 2**

**MCM's General Compliance Regime 2012-2015**

1.  During the course of 2012-2015, MCM established a number of policies and procedures, which applied to the EF Desk, to ensure compliance with its regulatory obligations.  In addition to having a general Compliance Risk Policy[39] and Compliance and Regulatory Policy[40], which observed MCM's adherence to the FCA's principles and regulations, its commitment to create and maintain compliance policies and its protection against risks associated with money laundering, financial crime and conflicts of interest,  MCM's internal policies also included, specifically (1) an Anti-Money Laundering (AML) & Financial Crime Policy ("AML Policy");[41] (2) a Conflicts of Interest Policy;[42] (3) a Market Abuse Policy;[43] and (4) an Account Opening Policy and Procedures.[44]

2.  *AML Policy*

    a.  The AML Policy (which came into force in April 2013) provided for a clear reporting procedure, in respect of any incidents that were suggestive of money laundering, and the matters to consider in terms of suspicious behaviour, by both MCM's clientele, as well as its staff generally.

    b.  The AML Policy explained precisely what was meant by money laundering, as well as the obligations expected of individual staff members to report upon any suspicious activity, as it concerned MCM's clients, staff members' own involvement, and the consequences of not reporting.  The AML policy also clearly provided for staff members obligations, as it related to ensuring that third parties were not "tipped off", if there was knowledge or suspicion of money laundering, and provided clear guidance in relation to the reporting lines to the

---

[39]    Pages 400-425 of Appendix 5 - Compliance Risk Policy (2012), updated March 2013, March 2014 and March 2015.

[40]    Pages 426-452 of Appendix 5 - Compliance and Regulatory Policy (2012), updated April 2013, April 2014 and April 2015.

[41]    Pages 453-470 of Appendix 5 - Anti-Money Laundering & Financial Crime Policy (April 2013), updated December 2013 and August 2015.

[42]    Pages 471-479 of Appendix 5 - Conflicts of Interest Policy (April 2013), updated April 2014 and December 2014.

[43]    Pages 480-540 of Appendix 5 - Market Abuse Policy (March 2012), updated June 2013, June 2014 and June 2015.

[44]    Pages 541-598 of Appendix 5 - Account Opening Policy and Procedures (April 2013), updated August 2014, May 2015 and December 2015.

29

*Nothing in this Report shall constitute a waiver of legal privilege*

Money Laundering Reporting Officer and the Deputy Money Laundering Reporting Officer.

c.  The AML policy also provided examples of money laundering and suspicious behaviour, for example:

- an agent or intermediary being involved and there appearing to be no real need for them;
- Unusual Terms pricing: The deal being of an unusual type, size or price for the client or counterparty or being in an inappropriate market or being conducted with unusual frequency.
- The involvement of multiple jurisdictions, and whether there are an unusually/unreasonably complex corporate structure for the client's type of business activities or goals.

d.  In accordance with the AML Policy, all staff were required to be trained in relation to the AML procedures, identification, reporting and deterring. The AML Policy also expected the ongoing training of staff.

e.  In January 2015, the AML Policy was updated to include enhanced due diligence for customers presenting higher risk, such as politically exposed persons, as well as the provision of appropriate management information and reporting to senior management. The section on "tipping off" was also updated to include further descriptions of what that precisely entailed, and the necessity to undertake appropriate reporting of any suspicious transactions or events to the Money Laundering Reporting Officer, or the Deputy Money Laundering Reporting Officer.

3.  *Conflicts of Interest Policy*

a.  The Conflicts of Interest Policy (which came into force in April 2013) outlined the procedures for identification, reporting and mitigation of actual and potential conflict of interests between MCM and their clients and between more than one client.

30

*Nothing in this Report shall constitute a waiver of legal privilege*

b.  The Conflicts of Interest Policy made it clear that all employees are responsible for escalating potential, perceived or actual conflicts.  Under the Conflicts of Interest Policy each employee was required to be vigilant for conflicts and to escalate them in accordance with the appropriate part of the policy.

c.  The Conflicts of Interest Policy also provided examples of instances for which conflict was likely or would exist:

- A financial gain possibly being made, or a financial loss being avoided at the expense of a client;
- MCM or an employee having an interest in the outcome of a service provided to, or a transaction with a client that was distinct from the client's interest in the outcome;
- MCM receiving some form of remuneration in relation to services provided other than standard commissions or fees for services.

d.  Under the Conflicts of Interest Policy, all employees were provided with on-going training to strengthen their understanding of identifying and managing conflicts, and which policies and procedures applied.

4.  *Market Abuse Policy*

a.  The purpose of the Market Abuse Policy (which came into force in March 2012) was to ensure that all reasonable steps were taken to prevent MCM's employees from engaging in market abuse, setting out (a) the approach for identifying risks of market abuse in the course of MCM's business, and (b) setting out the responsibilities of employees in identifying suspicious transactions.

b.  The Market Abuse Policy specifically stated that employees were prohibited from engaging in insider trading or market manipulation and identified that it was MCM's regulatory obligation to report, without delay, any transactions that it had reasonable grounds to suspect constituted market abuse.

c.  The Market Abuse Policy also provided examples of instances for which market abuse was likely or would exist, including:

31

ED&F-00609855

*Nothing in this Report shall constitute a waiver of legal privilege*

- Manipulating transactions, such as wash trades, where a sale or purchase was made and there was no change in beneficial interest or market risk, or where the transfer of beneficial interest or market risk was only between parties acting in concert or collusion.

- Manipulating devices, such as a transaction or series of transactions that were designed to conceal the ownership of a qualifying investment, so that disclosure requirements were circumvented by holding the qualifying investment in the name of a colluding party, such that disclosures were misleading in respect of the true underlying holding.

- Misleading behaviour, which gave the regular user of a market a false or misleading impression as to the supply of, demand for or price or value of a financial instrument.

d.  In addition to providing examples, the Market Abuse Policy also provided case studies, outlining instances where financial institutions and professionals had breached FCA rules and regulations (relating to market abuse).

5. *Account Opening Policy and Procedure*

a.  The purpose of the Account Opening Policy and Procedure (which came into force in April 2013) was to outline the procedure for opening accounts of prospective clients.  The policy stated that it was the personal responsibility of each Account Executive to know their clients and only to submit an application after sufficient due diligence.

b.  Ongoing monitoring and review were a key part of the policy. Each Account Executive was responsible for their clients' accounts including monitoring transactions, cash movement and activity, as well as notification to Compliance (without delay) if there was anything unusual or suspicious.

6. *Training Records*

a.  In accordance with the policies outlined in this section, MCM also maintained records in respect of compliance training undertaken by its staff.[45]   Those

---

[45] Page 599 of Appendix 5 - MCM Training Record (dated 3 January 2017).

CONFIDENTIAL                                ED&F-00609856

*Nothing in this Report shall constitute a waiver of legal privilege*

training records show that Mr Whitehead and Ms Foster both undertook anti-money laundering training in early 2013, ethics and market conduct training in mid-2013, and financial crime training in early 2015.  Mr Whitehead and Ms Foster also completed conduct of business training in 2014, (specific) conflict of interest training in early 2015 and client assets training in 2014.

7. Board Reports

   a. Mr Julian Courtney, MCM's  Head of Compliance and Legal, updated MCM's Board on  potential and actual breaches of the Complilance Regime on a monthly and quarterly basis. None of these reports, which Rosenblatt has reviewed, ever referred to the MPT Trading Strucutre and, in particular, its practice of short selling to the PP clients.

33

ED&F-00609857

*Nothing in this Report shall constitute a waiver of legal privilege*

### Appendix 3

### MCM's Current Compliance Regime (2019)

As set out below, MCM has sought to improve the robustness of its Compliance Regime since 2015, as well as undertaking staff hires to improve its capacity.

<u>Policies and Procedures</u>

1. In addition to MCM's existing compliance policies and procedures, including its general Compliance Risk Policy,[46] and Compliance and Regulatory Policy,[47] MCM has also now introduced a Prevention of Facilitation of Tax Evasion Policy,[48] and updated their AML Policy;[49] Conflicts of Interest Policy;[50] Market Abuse Policy;[51] and Account Opening Policy and Procedure.[52]

2. *Prevention of Facilitation of Tax Evasion Policy*

   2.1. The Prevention of Facilitation of Tax Evasion Policy was introduced in 2017 to comply with highest standards of ethical practice in all markets and jurisdictions in which MCM operates. The policy also states that where local requirements are set at a lower standard than the UK, then the UK standard will apply to all of MCM's business and activities.

   2.2. The policy sets out six guiding principles of the prevention procedures:

   - Risk Assessment;
   - Proportionality of risk-based prevention procedures;
   - Top level commitment;
   - Due diligence;
   - Communication (including training); and

---

[46]  Pages 600-611 of Appendix 5 - Compliance Risk Policy, updated July 2016 and December 2017.

[47]  Pages 612-621 of Appendix 5 - Compliance and Regulatory Policy, updated April 2016 and August 2017.

[48]  Pages 622-627 of Appendix 5 - Prevention of Facilitation of Tax Evasion Policy (dated September 2017), updated September 2018.

[49]  Pages 628-645 of Appendix 5 - AML Policy, updated October 2016, October 2017 and October 2018.

[50]  Pages 646-654 of Appendix 5 - Conflicts of Interest Policy, updated February 2016, February 2017 and January 2018.

[51]  Pages 655-681 of Appendix 5 - Market Abuse Policy, updated October 2016, November 2017 and May 2019.

[52]  Pages 682-737 of Appendix 5 - Account Opening Policy and Procedure, updated October 2016, November 2017 and May 2018.

34

*Nothing in this Report shall constitute a waiver of legal privilege*

- Monitoring and review.

3. *AML Policy*

3.1.    In 2017, a new section was incorporated into the AML Policy called "Responsibilities for AML". This section clearly sets out the responsibility of each MCM employee. Senior Management are responsible for ensuring the policies, controls and procedures are appropriately designed, implemented and operated. The Money Laundering Report Officers are responsible for the oversights of MCM's anti-money laundering controls. MCM's Nominated Officer is responsible for reviewing all Suspicious Activity Reports and determining if they are to be submitted to the National Crime Agency. All MCM Employees are responsible for complying with the AML Policy and for reporting anything suspicious. The clear statement of responsibilities of each employee of MCM strengthens the significance of the policy and allows each employee to understand their role in upholding the procedures.

3.2.    The AML Policy has also strengthened the training focus, with all employees required to complete anti-money laundering training sessions regularly. Attention has also been brought to a Risk Assessment and Risk Based Approach of identifying and verifying customers which in turn dictates the level of due diligence required.

4. *Conflicts of Interest Policy*

4.1.    In 2017, the Conflicts of Interest Policy added a "Disclosure and Oversight" section. This section sets out the procedure of management of conflicts, ensuring a high level of detail in recording, to allow for well informed decisions to be made. It is also specified that compliance maintains a Conflicts Register that includes details of each conflict and its mitigation.

4.2.    In 2018, the Conflicts of Interest Policy was updated further, to increase the level of detail and examples of where a conflict of interest might arise. Additional sections focused on examples of general circumstances where a conflict might arise and instances of conflicts by businesses, as well as by product type. The training focus has also been updated, to highlight specific possible occurrences of conflicts within the MCM business, giving employees

35

*Nothing in this Report shall constitute a waiver of legal privilege*

further tools to use to identify and therefore escalate any actual or potential conflicts of interest.

5. *Market Abuse Policy*

5.1.    In accordance with the Market Abuse Regulation, which came into effect on 3 July 2016, MCM's Market Abuse Policy has been updated accordingly.  The present policy (April 2019) is intended to be read in conjunction with MCM's Personal Account Dealing, Rumour Policies and the FCA's Code of Market Conduct, and descriptions of behaviour, which would be construed as being market abuse, as well as the reporting requirements and the consequences of breach.

6. *Account Opening Policy and Procedure*

6.1.    The Account Opening Policy and Procedure has been updated over time to strengthen the checks and balances involved with the onboarding new clients. In 2016, the policy introduced "Enhanced Due Diligence" which is to be applied in situations where a higher risk of money laundering may be present.  This Enhanced Due Diligence involves, obtaining extra information about customers; more robust verification of the beneficial owners from independent sources; understanding the client's reputations and carrying out searches on their directors or other controlling individuals; inquiring as to the legitimacy of the customers source of wealth; and if necessary escalating by obtaining a legal opinion, where necessary.

6.2.    In 2017, the Account Opening Policy and Procedure was significantly updated to include the following additional sections:

- Client Risk Assessment: Each client is awarded a risk rating that in turn determines the level of due diligence, monitoring and frequency of ongoing review.
- KYC Form: A KYC form has been introduced that is filled out by the Account Executive spread over two parts, before onboarding and after the KYC documents are received.

36

*Nothing in this Report shall constitute a waiver of legal privilege*

- Client File Sheets: These are completed by the documentation or Risk Teams to confirm the financial review of each new client.

- Red Flags: This section details red flags in the account opening process. It set out examples of red flags, ensuring that employees are aware of what to look out for when setting up new client accounts.

- Approval of new clients: The approvals required for new clients are detailed against their risk rating.

- Customer due diligence: Due diligence requirements must be fulfilled before any business relationship may commence.

- Translation of Documentation in a Foreign Language: This is not be undertaken by the client, and documentation must be translated by MCM or a third party.

- Client Screening and Internet Searches for Adverse Media: These sections were introduced to detail the procedure of investigating any potential adverse information for new clients.

- Quality Assurance: A quality assurance plan is in place to ensure that policies and onboarding procedures are being followed.

6.3.    The updates to the Account Opening Policy and Procedure now incorporate realistic examples and scenarios for employees to consider, when onboarding new clients.

<u>Compliance Plans and Reporting</u>

7.    The MCM Board continue to be apprised of developments on a quarterly basis at each Board Meeting by way of a quarterly compliance report, which is submitted to the MCM Board for their review.[53]  An annual Compliance Plan is provided to the MCM Board, setting out regulatory developments, areas of regulatory focus and change, explaining internal compliance developments and changes by MCM over the past twelve months, as well as the present position, and setting out intended steps to be taken with compliance by MCM over the next twelve months.[54]

---

[53]    Pages 738-759 of Appendix 5 - See for example, the Quarterly Board Report on Compliance for the period April 2019 – June 2019 dated July 2019.

[54]    Pages 760-778 of Appendix 5 - See for example, the Annual Compliance Plan for the period 1 October 2018 – 30 September 2019 dated December 2018.

37

*Nothing in this Report shall constitute a waiver of legal privilege*

8.  MCM also continues to prepare monthly compliance reports, which cover compliance assurance, financial crime, trade surveillance, regulatory and industry updates, and training.[55]   MCM also prepares Management Information Reports, dealing with compliance and trade surveillance.[56]

Compliance Risk Assessments

9.  MCM recruited Robert Phasey as Head of Operational Risk in 2018, to bolster their risk offering and have taken steps to improve their risk processes.  MCM have developed an Operational Risk Management Framework,[57] which is in ongoing development, and a risk workshop.[58]  The new processes involve the front office and back office staff and the Control Functions, completing (on an annual basis) the Risk and Control Self-Assessment,[59] for submission to the Board for approval.  The Risk and Control Self-Assessment, is intended to explain the risks associated with the business, and controls provided to give an overall inherent risk weighting.

10.  In terms of steps to be taken with the Risk and Control Self-Assessment, initially the Business Desk is required to provide a risk rating for each business risk.   The assessment then involves the Business Desk explaining how they intend to mitigate the business risk, and provides for the residual risk after any such controls.   The process is intended to uncover the most harmful risks to the business, for the purposes of risk mitigation (and the retention of any necessary capital).

11.  Once the self-assessment explained above is completed by the Business Desk, their assessment is then open to challenge by senior management/Control Functions, who undertake a review process.  The Board (then following this review process) evaluate whether the residual risks are permittable.   As part of the review, proposed new business and trading is subject of assessment, as well as ongoing business.  This Risk and Control Self-Assessment also covers possible legal, regulatory and tax risks, that sub-categorised under business risks.

---

[55]     Pages 779-789 of Appendix 5 – See for example, Compliance Monthly Report for April 2019.
[56]     Pages 790-797 of Appendix 5 – See for example, Management Information Report – Compliance & Trade Surveillance dated May 2019.
[57]     Pages 798-819 of Appendix 5 – See the Operational Risk Management Framework dated December 2018.
[58]     Pages 820-831 of Appendix 5 – See Risk Control Self-Assessments Training 2019.
[59]     Pages 832-833 of Appendix 5 – See for example, the Risk and Control Self-Assessment for the front offices of the Business Desks (in September 2017).

CONFIDENTIAL                                              ED&F-00609862

*Nothing in this Report shall constitute a waiver of legal privilege*

Compliance Staff Overhaul

12. During the course of 2017, MCM also undertook steps to hire new legal and compliance staff, to improve its capacity in this area.  In October 2017, Kate Binions, an experienced corporate and regulatory lawyer, was hired as the new Head of Legal and Compliance.  Shortly thereafter, in December 2017, Tom Mayne (who has now left MCM) was hired as Head of Legal, in a separate resource capacity for the legal team.

13. In February 2018, MCM hired Michael Hodnett, as Head of Compliance and Money Laundering Reporting Officer.  Mr Hodnett has now been replaced, by Jay Iyer as Head of Compliance.  MCM also hired Lewis Roberts in September 2018, to provide additional support to their compliance offering, as a Compliance Analyst.

14. Separately, MCM hired Lucy Jenkins as Chief Operating Officer in 2018, to provide operational management and support.

15. A number of legal and compliance staff also exited MCM during the period 2017-2019.  Julian Courtney (the former Head of Compliance and Legal) left MCM in October 2017 by mutual agreement.  Shique Ismail (formerly Counsel at MCM) also left during the same period.  In July 2018, Jurgen Bischof (formerly a Compliance Manager) left MCM by mutual agreement, and Svetlana Comrie (the former Deputy Money Laundering Reporting Officer) left by mutual agreement in February 2019.

39

CONFIDENTIAL

ED&F-00609863

*Nothing in this Report shall constitute a waiver of legal privilege*

**Appendix 4**

**Scope of Rosenblatt's Independent Compliance Audit**

1. As result of the matters that have arisen from the FCA's investigation, MCM is in the process of instructing Rosenblatt to undertake an independent Compliance Programme to identify and mitigate the company's financial crime risks associated with bribery and corruption, employee misconduct, fraud, market abuse, money laundering and terrorist finance, modern slavery, tax avoidance/evasion (including facilitation of tax evasion by associated persons) and sanctions (non-exhaustive)[60].

2. It is currently envisaged that the Compliance Programme will commence in October 2019 and will take approximately three months to complete.

3. The Compliance Programme will, at the very least, include:

   a. Scoping for planning the programme;
   b. Risk assessment to identify and evaluate the risks for the business;
   c. Review of existing procedures and controls to assess effectiveness;
   d. Gap analysis between the risks identified by Rosenblatt; Rosenblatt's recommendations and MCM's existing procedures, systems, and controls;
   e. Enhancement or implementation of procedures, systems, and controls including training to employees and 'associated persons' such as contractors;
   f. Monitoring and review to ensure procedures and controls are effective.

4. The Compliance Programme will be documented and made available to the FCA to discuss and explore any other recommendations.

---

[60] The investigation to be conducted by Manraj Somal and his team. Mr Somal is an accredited counter fraud specialist and head of Rosenblatt's financial crime legal division who was formerly the Head of Corporate Crime Legal at KPMG LLP.

40

CONFIDENTIAL

*Nothing in this Report shall constitute a waiver of legal privilege*

**Appendix 5**

**Documents**

**The supporting documents are released for the purposes of the FCA report only**

| No | Document | Page |
|---|---|---|
| 1. | Amended Defence | 1 |
| 2. | Structured Equity Finance Opportunities Presentation | 43 |
| 3. | MCM's  Structured Equity Finance – Risk Approval | 56 |
| 4. | Derek Peach's email to Phil Howell of 15 March 2012 | 72 |
| 5. | MPT Dubai Business Plan July 2012 | 74 |
| 6. | Compliance Function and Arrangements | 86 |
| 7. | Mr Whitehead's email to Evita Koutsopoulou of 19 June 2012 | 90 |
| 8. | Compliance Risk Assessment February 2012 | 92 |
| 9. | Compliance Risk Assessment July 2012 | 95 |
| 10. | Compliance Risk Assessment January 2013 | 98 |
| 11. | Compliance Risk Assessment January 2014 | 101 |
| 12. | Compliance Risk Assessment February 2015 | 104 |
| 13. | MCM Risk Mandate (dated March 2013) | 107 |
| 14. | MCM Risk Mandate updated January 2014 | 120 |
| 15. | MCM Risk Mandate updated January 2015 | 134 |
| 16. | MPT Dubai Risk Mandate (dated April 2013) | 148 |
| 17. | MPT Dubai Risk Mandate updated January 2014 | 158 |
| 18. | MPT Dubai Risk Mandate updated January 2016 | 169 |
| 19. | MPT Dubai Board Meeting Agenda – 30.10.2012 | 179 |
| 20. | MPT Dubai Board Meeting Minutes – 30.10.2012 | 181 |
| 21. | MPT Dubai Board Meeting Agenda - 01.07.2013 | 182 |
| 22. | MPT Dubai Board Meeting Minutes - 01.07.2013 | 184 |
| 23. | MPT Dubai Board Meeting Agenda - 29.10.2013 | 187 |
| 24. | MPT Dubai Board Meeting Minutes - 29.10.2013 | 189 |
| 25. | MPT Dubai Board Meeting Agenda - 28.01.2014 | 192 |
| 26. | MPT Dubai Board Meeting Agenda – 01.05.2014 | 195 |
| 27. | MPT Dubai Board Meeting Minutes – 01.05.2014 | 198 |
| 28. | MPT Dubai Board Meeting Agenda – 10.07.2014 | 201 |
| 29. | MPT Dubai Board Meeting Minutes – 10.07.2014 | 203 |
| 30. | MPT Dubai Board Meeting Agenda - 22.09.2014 | 206 |
| 31. | MPT Dubai Board Meeting Minutes - 22.09.2014 | 208 |
| 32. | MPT Dubai Board Meeting Minutes – 18.03.2015 | 211 |
| ██ | ███████████████████████████████████ | ██ |
| ██ | ███████████████████████████████████ | ██ |
| 35. | Compliance Risk Policy (2012) | 400 |
| 36. | Compliance Risk Policy updated March 2013 | 407 |
| 37. | Compliance Risk Policy updated March 2014 | 414 |
| 38. | Compliance Risk Policy updated March 2015 | 420 |
| 39. | Compliance and Regulatory Policy (2012) | 426 |
| 40. | Compliance and Regulatory Policy updated April 2013 | 438 |
| 41. | Compliance and Regulatory Policy updated April 2014 | 443 |
| 42. | Compliance and Regulatory Policy updated April 2015 | 448 |
| 43. | Anti-Money Laundering and Financial Crime Policy (April 2013) | 453 |
| 44. | Anti-Money Laundering and Financial Crime Policy updated December 2013 | 459 |

41

*Nothing in this Report shall constitute a waiver of legal privilege*

| No | Document | Page |
|---|---|---|
| 45. | Anti-Money Laundering and Financial Crime Policy updated August 2015 | 465 |
| 46. | Conflicts of Interest Policy (April 2013) | 471 |
| 47. | Conflicts of Interest Policy updated April 2014 | 474 |
| 48. | Conflicts of Interest Policy updated December 2014 | 477 |
| 49. | Market Abuse Policy (March 2012) | 480 |
| 50. | Market Abuse Policy updated June 2013 | 500 |
| 51. | Market Abuse Policy updated June 2014 | 519 |
| 52. | Market Abuse Policy updated June 2015 | 530 |
| 53. | Account Opening Policy and Procedures (April 2013) | 541 |
| 54. | Account Opening Policy and Procedures updated August 2014 | 553 |
| 55. | Account Opening Policy and Procedures updated May 2015 | 567 |
| 56. | Account Opening Policy and Procedures updated December 2015 | 583 |
| 57. | Placeholder Excel Spreadsheet: MCM Training Record (dated 3 January 2017) | 599 |
| 58. | Compliance Risk Policy updated July 2016 | 600 |
| 59. | Compliance Risk Policy updated December 2017 | 606 |
| 60. | Compliance and Regulatory Policy updated April 2016 | 612 |
| 61. | Compliance and Regulatory Policy updated August 2017 | 617 |
| 62. | Prevention of Facilitation of Tax Evasion Policy (dated September 2017) | 622 |
| 63. | Prevention of Facilitation of Tax Evasion Policy updated September 2018 | 625 |
| 64. | Anti-Money Laundering and Financial Crime Policy updated October 2016 | 628 |
| 65. | Anti-Money Laundering and Financial Crime Policy updated October 2017 | 634 |
| 66. | Anti-Money Laundering and Financial Crime Policy updated October 2018 | 640 |
| 67. | Conflicts of Interest Policy updated February 2016 | 646 |
| 68. | Conflicts of Interest Policy updated February 2017 | 649 |
| 69. | Conflicts of Interest Policy updated January 2018 | 652 |
| 70. | Market Abuse Policy updated October 2016 | 655 |
| 71. | Market Abuse Policy updated November 2017 | 665 |
| 72. | Market Abuse Policy updated May 2019 | 675 |
| 73. | Account Opening Policy and Procedures updated October 2016 | 682 |
| 74. | Account Opening Policy and Procedures updated November 2017 | 698 |
| 75. | Account Opening Policy and Procedures updated May 2018 | 718 |
| 76. | Quarterly Board Report on Compliance for the period April 2019 – June 2019 dated July 2019 | 738 |
| 77. | Annual Compliance Plan for the period 1 October 2018 – 30 September 2019 dated December 2018 | 760 |
| 78. | Compliance Monthly Report for April 2019 | 779 |
| 79. | Management Information Report – Compliance & Trade Surveillance dated May 2019 | 790 |
| 80. | Operational Risk Management Framework dated December 2018 | 798 |
| 81. | Risk Control Self-Assessments Training 2019 | 820 |
| 82. | Placeholder Excel Spreadsheet: Risk and Control Self-Assessment (for September 2017) | 832 |
| 83. | Placeholder Excel Spreadsheet: Risk and Control Self-Assessment (for September 2017) | 833 |

CONFIDENTIAL

ED&F-00609866