# Exhibit 18

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Master docket No. 18-MD-2865(LAK)
Case Nos. 18-cv-09505

_____
                                    )
IN RE:                              )
                                    )
CUSTOMS AND TAX ADMINISTRATION OF   )
THE KINGDOM OF DENMARK (SKATTEFOR   )
VALTNINGEN) TAX REFUND SCHEME       )
LITIGATION,                         )
                                    )
_____)

REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
DOSTON BRADLEY
DATE: October 14, 2020
REPORTED BY:  MICHAEL FRIEDMAN, CCR

Doston Bradley - October 14, 2020

5 (Pages 14 to 17)

Page 14

1   A    Because it was 2013.
2   Q    Okay. So in the period of 2013
3   through 2014 or '15, there were six pension
4   plans established on your behalf for which
5   you were the sole participant.
6        Is that correct?
7   A    No, that is not correct.
8   Q    Can you tell me how that was not
9   correct?
10  A    I was the sole participant on one.
11  I was trustees for the others.
12  Q    Okay. And right now, are you
13  referring to the ones that were set up in
14  2013?
15  A    Yes, sir.
16  Q    All right. And there came a time
17  that -- subsequently, when five additional
18  pension plans were set up for which you were
19  the sole participant?
20  A    Yes, sir.
21  Q    All right. So in total, there were
22  six pension plans that existed for which you
23  were the sole participant.
24       Is that right?
25  A    Yes, sir.

Page 15

1   Q    Okay. And did you understand at
2   the time that reclaims submissions were being
3   made on behalf of your six pension plans to
4   the Danish government?
5   A    Not when I set those up, no, sir.
6   Q    But did there come a time -- well,
7   withdrawn.
8        At any point in 2014 and 2015, did
9   you understand that reclaim submissions were
10  being made to SKAT in Denmark on behalf of
11  your pension plans?
12  A    Yes.
13  Q    All right. Did you think those
14  reclaim submissions were legitimate at the
15  time they were being submitted?
16  A    Yes.
17  Q    Can you explain to me all the
18  reasons on which you thought those reclaim
19  submissions put in for your pension plans
20  were legitimate?
21  A    I had confirmations that I bought
22  shares.
23  Q    And who did you receive those
24  confirmations from?
25  A    From brokers who executed those

Page 16

1   transactions.
2   Q    Did you receive those directly from
3   the brokers?
4   A    Those came through e-mails to the
5   individual pension plan from the brokers.
6   Q    Okay. And you said to "the
7   individual," and I couldn't hear the last
8   word.
9   A    Through the individual pension
10  plans from the broker.
11  Q    Okay. And it was your
12  understanding that those -- well, withdrawn.
13       When you say you received
14  confirmations, what's a "confirmation?"
15  A    Well, a transaction confirmation
16  that I bought shares at a price and they
17  charged me a broker fee. So it was a
18  confirmation, trade confirmation.
19  Q    Did you have an understanding of
20  what your pension plans were representing to
21  Denmark with respect to your purchase of
22  those shares?
23  A    No. No, I did not. I purchased
24  shares.
25  Q    And was it your understanding at

Page 17

1   the time those submissions were made that the
2   pension plans received dividends from the
3   shares that it purchased?
4   A    I did not know the full strategy.
5   I know that I purchased shares.
6   Q    All right. So at the time that the
7   reclaim submissions were made, you did not
8   know whether or not the plans had received
9   dividends from the shares?
10       MR. ALLISON: Object to form. You
11  can answer.
12  A    I did not run the strategy. I know
13  that I bought shares. I did not -- that's
14  what I know.
15  Q    All right. Did you have an
16  understanding of the volume of shares that
17  were being purchased for your plan?
18  A    No, I did not.
19  Q    Was that information on the
20  confirmations that you received from the
21  brokers?
22  A    When I saw the confirm, I
23  recognized it and I saw the volume.
24  Q    How did your pension plans afford
25  to pay for the shares that you saw were

Page 54

1  Q   I think you just described, in
2  part, a conversation that you had that
3  prompted you to open up some entities in
4  2013.
5       Who did you talk to in that
6  conversation?
7  A   Okay.  Well, I was at a meeting.  I
8  didn't primarily speak.
9       There were some gentlemen there who
10 spoke to a group of us about an investment
11 opportunity.  And that's what started my
12 process to thinking about opening up these
13 entities, sir.
14 Q   Okay.  And I'm going to try it like
15 for the fourth time.
16      Can you say the names of the people
17 who were speaking at this meeting?
18 A   I believe, to the best of my
19 recollection, Matt Tucci, Dan Fletcher, Carl
20 Vergari.  I know him as "C.A.," so that's how
21 I know him.  Sean Driscoll, Rosilene Anderson
22 was there.  Mike — I don't know his last
23 name and Sanjay Shah.
24      I believe that's everyone to the
25 best of my recollection.

Page 55

1  Q   Okay.  And if you refer to "C.A."
2  throughout the day, that's Carl Vergari?
3  A   Yes, sir.  That's how I know him
4  sir, so I apologize.
5  Q   No, that's fine.  I just want to
6  make sure that we're talking about the same
7  person.  If you refer to him, I won't ask
8  each time if that's Mr. Vergari.
9  A   Yes, sir.
10 Q   Okay.  Thank you.
11      Where did this meeting take place?
12 A   I believe it was at the Thompson
13 Hotel, sir.
14 Q   In Manhattan?
15 A   Yes, sir, in Manhattan.
16 Q   All right.  And so it sounds like
17 there were a number of you who worked on the
18 desk together at Standard Credit.
19      Is that right?
20 A   Yes, sir.
21 Q   And then, two other individuals, I
22 just want to make sure if they worked there
23 or not.
24      You mentioned Mike.  You forgot his
25 last name.

Page 56

1       Was he someone that worked at
2  Standard Credit with you?
3  A   No, sir.
4  Q   Okay.  And did you know him prior
5  to the meeting?
6  A   No, sir.
7  Q   All right.  And then you mentioned
8  Sanjay Shah?
9  A   Yes, sir.
10 Q   Okay.  Was he someone you worked
11 with?
12 A   No, sir.
13 Q   Okay.  What led you to attend this
14 meeting with Mr. Shah, Mike, and the others
15 from Standard Credit?
16 A   Dan Fletcher, sir.
17 Q   What did Mr. Fletcher tell you that
18 led you to joining this meeting?
19 A   I believe, prior to the meeting, he
20 said there's this interesting investment
21 opportunity and that we should listen to it.
22 Q   Did he describe the opportunity?
23 A   No, sir.
24 Q   Did he explain who you would be
25 meeting with?

Page 57

1  A   No, sir.
2  Q   Did he give you any understanding
3  as to how he knew about this investment
4  opportunity?
5  A   No, he did not.  Not to the best of
6  my recollection, sir.
7  Q   All right.  Leading up to that
8  meeting, had you ever known of Sanjay Shah?
9  A   No, sir.
10 Q   Was this investment opportunity
11 described during that meeting?
12 A   I believe a term "DIV-ARB" may have
13 been said, but that was the extent.
14 Q   Okay.  Who was presenting
15 information about DIV-ARB during that
16 meeting?
17 A   No one presented any information
18 about it.  They just said that word, sir.
19 Q   All right.  Who was doing most of
20 the speaking?
21 A   I believe it was a combination of
22 Mike and Mr. Shah, sir.
23 Q   All right.  Did they introduce
24 themselves?
25 A   I can't recall.  I'm sure — I

Page 230

1  documents to the IRS other than the form that
2  you filled out?
3      A    I believe at that time, to the best
4  of my recollection, we -- IRS required the
5  investment trust document for the pension
6  plans, sir.
7      Q    All right.  Did you have any
8  understanding as to why the IRS required the
9  pension trust document be performed?
10     A    No, sir, I had no idea.  Still
11 don't.
12          But, you know, I've been -- you
13 know, a compliant citizen.  If that's what
14 the IRS needs, I am never going to go against
15 the IRS.
16          So I did what they requested, sir.
17     Q    In what countries did you request
18 forms for?
19     A    To the best of my recollection,
20 sir, I believe I checked Denmark and Belgium,
21 sir.
22     Q    All right.  And for what reason did
23 you check those two countries?
24     A    To the best of my recollection, I
25 believe Solo informed me that those were the

Page 231

1  countries that I needed to file 6166s for,
2  sir.  So, at that point, that's what I did.
3          And that's when I realized, you
4  know, dividends had something to do with the
5  strategy, sir.
6      Q    Who at Solo told you that?
7      A    I'm not for sure, sir.  I can't put
8  it on anyone because honestly I don't
9  remember.
10          But I remember I had to do that and
11 that was something that I was informed that
12 needed to be done.
13          But I can't -- in my mind, I don't
14 know who at that point, sir.  I can't really
15 say.
16          I apologize.
17     Q    At the point where you were
18 requesting these forms for Denmark and
19 Belgium, was it then your understanding that
20 tax reclaims were to be filed with those two
21 countries on behalf of your plan and your
22 family's plans?
23     A    At that time, I have to say I
24 didn't know, to be honest with you, sir.  You
25 know, you fill out -- you get the 6166s.  I

Page 232

1  did that.
2          I asked them.  They said, you know,
3  "our contact, Acupay."  I did that.  I filled
4  out those forms, engaged Acupay, passed, I
5  believe, to the best of my recollection, the
6  6166s to Acupay.
7          And at that point, sir, I have no
8  idea what happened.  I don't know what the
9  process is.  I still don't.
10         And, you know, as I said, I relied
11 upon Solo and their guidance in this
12 investment strategy.  And when they told me
13 to do those things, I -- you know, I relied
14 on their guidance and I did those things,
15 sir.
16     Q    Okay.  Earlier, I think, when you
17 first got introduced to the opportunity, you
18 said that you had a question about potential
19 tax liability and that you wouldn't
20 participate until you got that question
21 answered.
22         At this point in time, towards the
23 end of 2013, now that you're being told you
24 have to go get some things from the IRS, and
25 that's something called tax reclaims which

Page 233

1  may be filed with these two countries, did
2  you ask anybody involved, "Well, what is this
3  about?  What are these tax reclaims for which
4  I'm getting these forms for the IRS?"
5      A    At that time, I don't believe I
6  did.  I can't remember, sir.  I didn't fully
7  understand the process and even filling out
8  the forms.
9          And all that took time.  Obviously,
10 I was working a full-time job at that time as
11 well.  So I relied upon Solo, sir.
12         And like I said, you know, prior
13 to, you know, getting this far down the road,
14 I had, through my previous conversations,
15 diligence, and getting comfortable, I got
16 comfortable with them.  You know, I trusted
17 they had been doing this strategy prior to me
18 showing up.
19         The FSA apparently was comfortable
20 with whatever business Solo was doing.  I
21 don't believe that was the first time.  If
22 they had, you know, maybe executed a
23 strategy, that these type of forms had been
24 submitted and to -- reclaims to whatever
25 countries they were operating in.

Page 274

1 putting those accounts aside, as far as you
2 know, have you or your family members, or any
3 entities or plans associated with you, ever
4 gotten money from Solo for the trading done
5 for the five plans?
6      A    If I understand your question
7 correctly sir, are you asking me if the plans
8 received money from Solo into the bank
9 accounts in the U.S. that was opened for
10 them, sir?
11      Q    I'm actually asking a little bit
12 broader than that at this point, because I
13 think you already answered that.
14           I just want to make sure that with
15 respect to those five plans -- for which your
16 understanding was trading was done through
17 Solo Capital.
18           Correct?
19      A    Yes, sir.
20      Q    All right.  Putting aside if there
21 may be money still in Solo Capital's accounts
22 for those five plans, have you or any of your
23 family members or any entities associated
24 with you or your family members received any
25 money from the trading done through Solo

Page 275

1 Capital?
2      A    To the best of my knowledge, no one
3 in my family or I have received money in
4 relation to the trading that was done in
5 the -- at Solo Capital, sir.
6      Q    Have you or your family members or
7 any entities associated with them received
8 any money from the refunds that SKAT paid for
9 those five plans, other than what might still
10 be in the Solo accounts today?
11      A    To the best of my knowledge and
12 understanding of your question, we have not
13 received any money based upon the trading
14 related to those accounts.
15           I believe that's what you asked,
16 sir.  I apologize.
17           MR. ALLISON:  He was asking more
18      specific to the refund claims as well.
19           THE WITNESS:  Oh, to the refund
20      claims?
21      A    I mean, can you be more specific,
22 sir?  I'm sorry.
23      Q    Yeah.  Well, I was pretty broad on
24 the last question, but then you said
25 specifically to trading.  So I just want to

Page 276

1 understand.
2           With respect to any trading
3 activity, dividends, or reclaim submissions
4 made on behalf of those five plans, and other
5 than what may still be in a Solo account for
6 those plans, have you, your family members,
7 or any entities associated with any of you
8 received any money from any of that activity?
9      A    Myself, personally, sir?  I
10 received money from introducing broker fees.
11           But that's it, sir.
12      Q    And can you explain what you mean
13 by that?
14      A    I believe in the industry it's
15 customary, if you introduce customers to
16 plans or organizations, they will -- you can
17 be or they will pay you introducing fees for
18 introducing those customers, sir.
19      Q    All right.  So who paid you for
20 introducing customers?
21      A    Mike.  I don't remember the last
22 name.  Novus paid me.  Later, Dan Fletcher.
23           And then, later, Mr. Shah, sir.
24      Q    Okay.  Starting with Mike, Mike
25 paid you for introducing who to what?

Page 277

1      A    Mike paid me for introducing my
2 friends in 2013 to him, sir.
3      Q    So Mike paid you for introducing
4 the five plans that participated for you and
5 your family in 2013?
6      A    Yes, sir.
7      Q    How much did he pay you for that?
8      A    To the best of my recollection,
9 sir, I believe it was, I think, maybe around
10 300,000, to the best, give or take, sir.
11           I can't absolutely remember a
12 hundred percent, sir.
13      Q    When did he pay that money to you?
14      A    I believe that was in 2014, sir.
15      Q    Okay.  And do you recall -- and was
16 it a one-time payment?
17      A    I don't believe so, sir.
18      Q    All right.  How many different
19 times did he pay you in order to aggregate to
20 approximately $300,000?
21      A    I believe he paid me twice, sir.
22      Q    All right.  Into what account did
23 you receive that money?
24      A    I'm not a hundred percent sure,
25 sir.  I don't remember.  But it was one of my

Page 302

1  the trade execution they facilitated, sir.
2      Q    All right. If you look at -- can
3  you look at Exhibit 765?
4           MR. WEINSTEIN: Mark this as 765.
5           (Whereupon the above mentioned was
6      marked for Identification.)
7      Q    This is an invoice from Ganymede
8  for the Joanne E. Bradley plan dated June 4,
9  2014.
10          Is this the kind of invoice that
11  you would receive?
12     A    To the best of my recollection,
13  sir, I believe that is what it would look
14  like, sir.
15     Q    All right. And it says in the
16  description, "Fee Due Under Services
17  Agreement."
18          Were you familiar with the services
19  agreement that existed?
20     A    Off the top of my head, sir, no, I
21  can't tell you that I am, sir.
22     Q    All right. Do you know if, on
23  behalf of the plan, you ever executed a
24  services agreement with Ganymede?
25     A    I'm not a hundred percent sure,

Page 303

1  sir. I cannot say that.
2           To the best of my recollection, I
3  can't say that I did or did not, sir, to be
4  honest. I don't know at this point, sir.
5      Q    The amount requested in this
6  invoice is approximately 28.9 million Danish
7  kroner.
8           You have no idea what this entity
9  did for the plan for which it earned
10  28.9 million kroner?
11     A    No, I do not, sir.
12     Q    You didn't ask any questions about
13  that to anyone at Solo?
14     A    To the best of my recollection,
15  sir, I don't recall. But, you know,
16  obviously, as I said to you earlier, I
17  figured this trade strategy had leverage
18  associated with it, that I did not know,
19  obviously, how that was going to be provided,
20  and obviously, what that entailed as far as
21  the costs.
22          So I have no idea. I did pay the
23  invoices that I did receive, though, sir.
24     Q    Okay. With respect to the $300,000
25  that you got paid from Mike, do you have any

Page 304

1  documents reflecting that, meaning, is there
2  an invoice of some sort?
3      A    To the best of my recollection, I
4  do not believe there was an invoice. I
5  believe Mike wired me the money, as I said
6  previously.
7      Q    All right. So other than the bank
8  records reflecting that wire transaction or
9  transactions, you don't know of any documents
10  regarding that payment?
11     A    To the best of my ability and
12  recollection, no, sir, I do not.
13     Q    All right. Do you know if any of
14  the other Standard Credit people who were
15  involved with this program received similar
16  fees when they brought themselves or their
17  family members in?
18     A    I have no idea what they did or did
19  not do, sir. You would have to ask them,
20  sir.
21     Q    All right. And did you receive any
22  kind of similar payments from anyone, any
23  other brokers or people involved, with
24  respect to any plans that you were associated
25  with?

Page 305

1      A    I received nothing from no one, any
2  other brokers, other than the individuals I
3  told you about earlier, sir.
4      Q    Okay. And that was the 300,000
5  from Mike.
6           Is that right?
7      A    Yes, sir.
8      Q    Okay. Any other monies ever
9  received from Mike?
10     A    No, sir.
11     Q    All right. And then, I think you
12  mentioned Danny Fletcher?
13     A    Yes, sir.
14     Q    And when did Mr. Fletcher pay you?
15     A    I believe that was in 2015, sir.
16     Q    Okay. Why did Mr. Fletcher pay
17  you?
18     A    We had like an introducing broker
19  agreement, consulting type agreement, which
20  is a broker introducing agreement, to the
21  best of my recollection, sir.
22     Q    All right. And was that a verbal
23  agreement or a written agreement?
24     A    I believe it was a written
25  agreement, sir.

Page 306

1   Q   Okay.  The agreement was between
2   which two parties?
3   A   I believe Mr. Fletcher and myself,
4   sir, to the best of my recollection, the
5   entities in which I -- the companies I had,
6   sir.
7   Q   Okay.  And do you have a copy of
8   that consulting -- not consulting --
9   introducing broker agreement?
10  A   I'm not a hundred percent sure,
11  sir.  I don't believe -- if I did, I think I
12  probably made it available to counsel, sir,
13  if I still had that, sir.
14  Q   All right.  How much did
15  Mr. Fletcher pay you in connection with that
16  agreement?
17  A   I believe, sir, to the best of my
18  recollection, I believe it was somewhere
19  around a half million dollars, give or take,
20  sir.
21  Q   In how many payments?
22  A   I believe it was a couple, maybe,
23  payments, two to three.  I'm not for sure.
24      I believe it was definitely more
25  than one, but I can't specifically give

Page 307

1   you -- but that would be reflected in my bank
2   statements, sir.
3   Q   All right.  Do you recall into
4   which bank account you received those funds?
5   A   I do not, sir, specifically
6   remember which bank accounts it would be.  I
7   believe, sir, it was one of my company bank
8   accounts, which I believe you requested and I
9   did provide for you, sir.
10  Q   Okay.  And then, did you also say
11  that you received a payment from Mr. Shah?
12  A   I received an introductory fee
13  payment in relation to Mr. Shah, yes, sir.
14  Q   Okay.  And -- well, I'm sorry.
15  Let's just go back to the payments from
16  Mr. Fletcher.
17      For what plans did he pay you for
18  introducing?
19  A   He paid me for introducing my plans
20  in 2015 to him, sir.
21  Q   Okay.  And I guess we'll get into
22  this in more detail.
23      But in -- you opened up five new
24  plans for which you were the sole
25  beneficiary?

Page 308

1   A   Yes, sir.
2   Q   And are those the plans for which
3   Mr. Fletcher paid you?
4   A   Yes, sir.
5   Q   All right.  And then you also
6   opened up ten other plans for family members.
7       Correct?
8   A   That is correct, sir.
9   Q   All right.  Did Mr. Fletcher pay
10  you for those at all?
11  A   No, sir.
12  Q   All right.  Can you tell us for
13  what introductions did Mr. Shah make payments
14  to you?
15  A   He made introductions to me for
16  those five -- those ten additional plans.
17  Five for my sister, five for my wife, I
18  believe that's what it was, sir.
19  Q   All right.  How much did Mr. Shah
20  pay?
21  A   I believe it was $500,000 per plan,
22  so I think it was something like an
23  introductory fee of, in total, $5 million,
24  sir.
25  Q   Mr. Shah paid you $5 million to

Page 309

1   bring ten more plans for your family into
2   this program?
3   A   To the best of my recollection,
4   sir, that is correct.
5   Q   And so is it your testimony that
6   that money that he paid you was not the
7   profits from the trading itself on behalf of
8   those ten plans, but that's simply an
9   introductory fee for Doston Bradley, Junior
10  for having introduced those plans to him?
11  A   Yes, sir.  To the best of my
12  knowledge, that's what it was, and that's
13  what I thought it was, sir.
14  Q   Okay.  Will you tell us why in --
15  well, when did you open up five additional
16  plans for yourself?
17  A   I believe that was in 2015, early
18  2015, sir, I believe, sir.
19  Q   Okay.  And so the plan that you had
20  opened up in 2013 had stopped trading.
21      Is that right?
22  A   I believe so, sir.  I believe they
23  didn't do any trades past 2014, to the best
24  of my recollection, sir.
25  Q   Okay.  And now you wanted to open

Page 322

1   A   Yes, sir.
2   Q   All right. And then there was,
3 again, approximately $250 sent to the plan's
4 account?
5   A   Yes, sir.
6   Q   All right. And did those LLC bank
7 accounts or plan bank accounts receive any
8 additional monies at any point in time?
9   A   No, they didn't because, obviously,
10 things occurred with Solo that -- you know,
11 as we know.
12       So no, they did not, sir.
13   Q   All right. So other than the $5
14 million that Sanjay Shah paid to you, and
15 money that may still be in accounts at Solo
16 Capital, did you or your family or the plans
17 or LLCs get any other money as a result of
18 having opened up those 15 new plans?
19   A   I did not receive any money as a
20 result of opening up those 15 new plans.
21   Q   How would you describe your
22 relationship with Sanjay Shah back in 2015?
23   A   In 2015, I didn't have a real
24 relationship with Sanjay Shah, to be honest,
25 sir.

Page 323

1   Q   All right. Did you have a
2 relationship with him at any time after 2015?
3   A   I would say I had more
4 conversations, obviously, because of,
5 obviously, what we're sitting talking about
6 now, just trying to find out, you know, to
7 the best that I could, what happened. And,
8 you know, obviously, my family is involved in
9 this and I was concerned.
10       So I, you know, tried to, you know,
11 see if, you know, what was being said and
12 reported, you know, was accurate or not
13 accurate, sir.
14   Q   And what did he tell you?
15   A   That, you know, there's nothing to
16 worry about. It's not true. We traded. We
17 held shares.
18       Everything was legitimate to the
19 best of my recollection, sir.
20   Q   Okay. And at that point, did you
21 trust him?
22   A   At that point, sir, I had no reason
23 not to. I didn't know anything. I was
24 pretty much in the dark.
25       I had no idea, as I mentioned

Page 324

1 earlier. I mean, he would know better than
2 anyone else.
3       So that's why I asked him, sir.
4   Q   All right. So did you continue to
5 have a relationship with him after that point
6 in time?
7   A   After 2015, sir?
8   Q   Yeah.
9   A   Yes, I did, sir.
10   Q   Okay. And other than asking him if
11 the allegations that were being thrown out
12 there were true, how would you describe your
13 relationship with him after 2015?
14   A   I still would say it was more of a
15 business type relationship, sir.
16   Q   All right. And so what kind of
17 business did you do with him after 2015?
18   A   I didn't do any. I actually --
19 well, one of my companies engaged in
20 receiving a loan from him, sir.
21   Q   Which company was that?
22   A   I believe it was Blackrain, Inc.,
23 sir.
24   Q   And what business is Blackrain,
25 Inc. in?

Page 325

1   A   Well, I -- you know, as I said
2 before, when I did the investing, you asked
3 if I pursued opportunities in the -- I
4 believe family rental, sir. And I said that
5 I tried to do one on a property and then I
6 own the land and am trying to sell it.
7       So I did that through the money
8 that I borrowed -- my firm, I should say,
9 Blackrain, Inc. borrowed from Mr. -- I
10 believe Mr. Shah's company, and so did some
11 of that as well as investing, sir.
12   Q   Okay. So the activity that you did
13 in trying to pursue rental property after
14 2015 was funded by Mr. Shah?
15   A   I would not say a hundred percent.
16 But yes, my company received a loan from
17 Mr. Shah's company, sir.
18   Q   Okay. Do you recall what company
19 loaned your company the money?
20   A   To the best of my recollection, I
21 think it was Elysium, but I'm not a hundred
22 per percent sure, sir. Off the top of my
23 head, sir, I don't know off the top of my
24 head, sir.
25       But I believe that's it.

Doston Bradley - October 14, 2020

Page 365

```
 1                  C E R T I F I C A T E
 2          I, MICHAEL FRIEDMAN, a Certified Court
 3   Reporter and Notary Public, qualified in and for
 4   the State of New Jersey do hereby certify that
 5   prior to the commencement of the examination DOSTON
 6   BRADLEY was duly sworn by me to testify to the
 7   truth the whole truth and nothing but the truth.
 8          I DO FURTHER CERTIFY that the foregoing
 9   is a true and accurate transcript of the testimony
10   as taken stenographically by and before me at the
11   time, place and on the date hereinbefore set forth.
12          I DO FURTHER certify that I am neither a
13   relative of nor employee nor attorney nor counsel
14   for any of the parties to this action, and that I
15   am neither a relative nor employee of such attorney
16   or counsel, and that I am not financially
17   interested in the action.
18
19
20
21          _____
22          MICHAEL FRIEDMAN, CCR of the
23          State of New Jersey
24          License No:  30XI00228600
25          Date:  October 18, 2020
```