

**Hughes
Hubbard
& Reed**

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: +1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

Marc A. Weinstein
Partner
Direct Dial: +1 (212) 837-6460
Direct Fax: +1 (212) 299-6460
marc.weinstein@hugheshubbard.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-13-2023

BY HAND DELIVERY

Honorable Lewis A. Kaplan                                November 10, 2023
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:    *In re Customs and Tax Administration of the Kingdom of Denmark*
>        *(Skatteforvaltningen) Tax Refund Scheme Litigation*, 18-md-2865 (LAK)

Dear Judge Kaplan:

    We write on behalf of plaintiff Skatteforvaltningen ("SKAT") to update the Court that on November 8, 2023, the Supreme Court of the United Kingdom issued the enclosed decision affirming the English Court of Appeal's February 25, 2022 decision and concluding that the English version of the revenue rule does not bar SKAT's claims against Sanjay Shah and companies related to him pending in the English High Court of Justice.[1]

    The Supreme Court of the United Kingdom held that the revenue rule did not bar SKAT's claims in England for the same reason this Court held the U.S. revenue rule did not preclude SKAT's claims. *See In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300 (S.D.N.Y. 2019). Like this Court, the Supreme Court held that "[t]he revenue rule only applies to proceedings in which there is an unsatisfied demand for tax which foreign tax authorities seek directly or indirectly to recover." (U.K. Supreme Court Op. ¶ 36.) And "[t]he substance of" SKAT's "claim is not to recover tax but to recover payments made by [SKAT] which were induced by fraud and to which the recipients were not entitled on any basis." (*Id.* ¶ 38.) SKAT pleaded that the "parties who made withholding tax refund applications and who received what may be described as 'refunds', did not hold shares in the relevant Danish companies, had not received dividends net of withholding tax, were not subject to any liability to pay withholding tax, had not suffered deduction of any withholding tax and had no entitlement to recover any withholding tax." (*Id.* ¶ 39.) As such, the Supreme Court concluded, "there never was any tax payable . . . let alone evaded," thus "the essential requirement for the application of the revenue rule is missing." (*Id.*)

---

1.  SKAT previously provided the Court a copy of the English Court of Appeal's February 25, 2022 decision by letter dated March 3, 2022.

Respectfully submitted,


<u>/s/ Marc A. Weinstein</u>
Marc A. Weinstein

Enclosure

cc:     (via email, with attachment)
         Alan Schoenfeld, Esq. (co-lead counsel for defendants)
         Sharon McCarthy, Esq. (co-lead counsel for defendants)
         Neil Binder, Esq. (counsel for third-party defendant ED&F)



Michaelmas Term
[2023] UKSC 40
*On appeal from: [2022] EWCA Civ 234*

# JUDGMENT

# Skatteforvaltningen (the Danish Customs and Tax Administration) (Respondent) *v* Solo Capital Partners LLP (in special administration) and others (Appellants)

before

**Lord Hodge, Deputy President**
**Lord Lloyd-Jones**
**Lord Briggs**
**Lord Hamblen**
**Lord Richards**

## JUDGMENT GIVEN ON
8 November 2023

**Heard on 5 and 6 July 2023**

*Appellants*
Kieron Beal KC
Nigel Jones KC
Lisa Freeman
Laurence Page
(Instructed by Meaby & Co LLP)


*Respondent*
Lord Pannick KC
James Goldsmith KC
Andrew Scott KC
Jonathan Schwarz
Abra Bompas
James Ruddell
KV Krishnaprasad
(Instructed by Pinsent Masons LLP (London))

**LORD LLOYD-JONES (with whom Lord Hodge, Lord Briggs, Lord Hamblen and Lord Richards agree):**

1.      This appeal concerns the admissibility of claims made in the Commercial Court in London by Skatteforvaltningen, the Danish Customs and Tax Administration, ("the respondent") against Mr Sanjay Shah and companies related to Mr Shah ("the appellants"). The appellants contend that the claims seek to enforce, directly or indirectly, the revenue laws or the public laws of the Kingdom of Denmark.

2.      *Dicey, Morris & Collins, The Conflict of Laws*, 16th ed (2022), states the general principle as follows (at para 8R-001):

> "Rule 20 – English courts have no jurisdiction to entertain an action:
>
> (1) for the enforcement, either directly or indirectly, of a penal, revenue or other public law of a foreign State; …"

The essential questions arising on this appeal are the scope of Rule 20(1) and whether it has any application to the facts of the present case. In its application to the tax laws of a foreign State the principle is often referred to as "the revenue rule". For convenience, its application to public laws of a foreign State will be referred to in this judgment as "the sovereign authority rule".

<u>Factual background</u>

3.      Mr Shah was a founding member of Solo Capital Partners LLP ("SCP") which was established in 2011. SCP was until 2015 a Financial Conduct Authority-regulated custodian claiming to specialise in tax structured financial products. It purported to provide custodian services to clients including US Pension Plans ("USPPs"), companies registered in the International Business and Financial Centre, Malaysia ("Labuan companies") and finance brokers.

4.      The respondent is an independent ministerial authority established under Danish law. It is part of the sovereign authority of the Kingdom of Denmark which is a single legal personality. It is recognised in Danish law as having sufficient legal capacity to bring claims in its own name.

5.    A number of other defendants to the consolidated Commercial Court claims (CL-2018-000297, 000404, 000690, CL-2019-000487 and 000369) are not appellants before the Supreme Court. The respondent accepts that, subject to the precise terms of this judgment, the claims against these other defendants will be dismissed if the appellants' appeal is allowed.

6.    The case concerns certain applications in which claims were made for the refund of Danish withholding tax ("WHT"). Non-residents of Denmark who receive dividends from Danish companies are liable to pay 27% tax which is withheld at source. Non-residents of Denmark who meet the requirements set out in the Danish Withholding Tax Act ("WHT Act") and applicable double taxation treaties are entitled to a partial or full refund of the tax so withheld.

7.    Non-residents of Denmark are liable to tax under either section 2 of the WHT Act or section 2 of the Danish Corporation Taxation Act on dividends they have a right to receive from Danish companies. The Danish company must withhold 27% of the dividend it has declared pursuant to section 65 of the WHT Act and pay this to the respondent pursuant to section 66 of the WHT Act, to discharge the tax liability described above. As reflected in section 69B(1) of the WHT Act, a non-resident shareholder who is liable to tax (under section 2 of the WHT Act or section 2 of the Danish Corporation Taxation Act) and who has a right to receive dividends, from which tax has been withheld by the Danish company, may claim repayment if the tax withheld exceeds the final tax that Denmark is permitted to levy in accordance with the terms of a relevant double taxation treaty.

8.    Danish public companies distribute the dividend declared, net of tax withheld, to the accounts of custodians or individuals as designated by the Danish central securities depositary based on the information in its register. A custodian registered with the central securities depositary may have clients who are themselves custodians.

9.    Non-residents of Denmark usually hold shares via a custodian, rather than directly with the central securities depositary.

10.    Dividend tax refund applications were made by the USPPs and Labuan companies who were clients of SCP and three related custodians ("the Solo WHT Applications").

11.    At the relevant time there were various ways in which a WHT reclaim might be made. So far as relevant, a shareholder or its agent could make an application by submitting to the respondent a standardised form seeking a refund of Danish dividend tax, with accompanying documents. In this case the accompanying documents included (i) a covering letter from a tax reclaim agent acting on behalf of the relevant applicant;

(ii) a credit advice note issued by a relevant custodian in respect of the purported shares, dividends and tax; and (iii) a document from the relevant foreign tax authority certifying that the applicant was resident in the relevant foreign jurisdiction.

12.     The respondent's pleaded case is that the Solo WHT applicants owned no shares in any relevant Danish companies, received no dividends on any such shares and suffered no withholding of Danish tax in respect of any such dividends. The respondent alleges that, in respect of each of the 4,590 applications made to it by clients of the custodians in these proceedings, the representations made by the Solo WHT applicants were false and made dishonestly or recklessly. It alleges that it was fraudulently induced to make payments amounting to about DKK 12.09 billion (equivalent to about £1.44 billion) pursuant to these claims.

13.     The defendants deny the claims against them. In particular, they maintain that the trade structures resulted in the USPPs and Labuan companies being entitled under Danish tax law to make bona fide claims pursuant to section 69B(1) of the WHT Act. Alternatively, they maintain that they had a reasonable belief that the trades were lawful and complied with Danish tax law.

Procedural history

14.     The respondent has issued five sets of proceedings in England and Wales which have been consolidated. There are currently 89 defendants. The claim is put primarily on the basis of common law causes of action in the law of England and Wales. The causes of action pleaded against the defendants are principally deceit and unlawful means conspiracy. The respondent also brings claims for dishonest assistance, knowing receipt and unjust enrichment. The respondent seeks equitable relief and restitutionary remedies and asserts a proprietary interest in the sums it paid out and the traceable proceeds thereof. An alternative case is advanced under Danish private law.

15.     At a case management hearing in July 2020 Andrew Baker J delivered a preliminary issues ruling and directed that the claim should be tried in three principal stages: (i) the trial of a first preliminary issue as to whether the claim as pleaded is inadmissible under *Dicey, Morris & Collins* Rule 20(1); (ii) the trial of a second preliminary issue to consider the parameters of a valid WHT application ("the validity trial"); and (iii) a main trial for the purposes of making findings on liability and quantum: [2020] EWHC 2022 (Comm).

16.     The first preliminary issue trial took place online between 22 and 25 March 2021. On 27 April 2021 Andrew Baker J handed down his judgment on the first preliminary issue, dismissing the claims in their entirety on the basis that they were

inadmissible pursuant to *Dicey, Morris & Collins* Rule 20(1): [2021] EWHC 974 (Comm).

17.    The respondent appealed against the decision of Andrew Baker J on the admissibility issue in respect of all defendants except one. On 25 February 2022 the Court of Appeal (Sir Julian Flaux, Chancellor of the High Court, Phillips and Stuart-Smith LJJ) allowed the appeal: [2022] EWCA Civ 234; [2022] QB 772.

18.    As a result, the validity trial and the main trial were reinstated. The validity trial took place before Andrew Baker J between 17 January and 10 February 2023. In a judgment handed down on 24 March 2023, [2023] EWHC 590 (Comm), the judge upheld the respondent's pleaded case as to the content of the relevant eligibility requirements under Danish law.

19.    The main trial is listed to commence before Andrew Baker J on 15 April 2024 and to last for nearly four legal terms.

20.    On 28 October 2022 the Supreme Court granted permission to appeal on the admissibility issue.

Ground 1: the Court of Appeal erred in its legal characterisation of the claims advanced by Skatteforvaltningen. It wrongly found the judge had erred in recording the inextricable link between Skatteforvaltningen's claims and the recovery of tax.

The scope of the revenue rule

21.    The editors of *Dicey, Morris & Collins* state (at para 8-002 ff) that there is a well-established and almost universal principle that the courts of one country will not enforce the penal and revenue laws of another country. Whether a foreign law falls within the categories of those laws which the English court will not enforce is a matter for English law. Although Rule 20 is expressed in terms of lack of jurisdiction, the editors suggest (at para 8-003) that it is the foreign State which has no international jurisdiction to enforce its law abroad and the English court will not exercise its own jurisdiction in aid of an excess of jurisdiction by a foreign State. (See *In re State of Norway's Application (Nos 1 and 2)* [1990] 1 AC 723, 808.) They explain (at paras 8-004 – 8-005) that Rule 20(1) applies to both the direct and indirect enforcement of foreign laws of the type in question.

> "Direct enforcement occurs where a foreign State or its nominee seeks to obtain money or property, or other relief, in reliance on the foreign rule in question." (para 8-004)

> "Indirect enforcement occurs where the foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect; or where a private party raises a defence based on the foreign law in order to vindicate or assert the right of the foreign State." (para 8-006)

However, the Rule does not prevent recognition of a foreign law of the type in question and where direct or indirect enforcement does not arise a foreign law of this type will be recognised if it is relevant to the issue and provided it is not contrary to public policy (paras 8-004, 8-011). The revenue rule is, furthermore, subject to exceptions where there exists a contrary agreement by treaty or convention and the editors note that substantial inroads have been made into the revenue rule by international agreement, for example international arrangements for mutual assistance in the collection of tax debts (paras 8-009, 8-012).

22.    In *Government of India v Taylor* [1955] AC 491, where the Government of India sought to enforce in this jurisdiction an Indian tax debt, Lord Keith of Avonholm identified two possible rationales for the revenue rule. The first he described (at p 511) as follows:

> "One explanation of the rule thus illustrated may be thought to be that enforcement of a claim for taxes is but an extension of the sovereign power which imposed the taxes, and that an assertion of sovereign authority by one State within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties."

An alternative rationale, he considered, was to be found in the risk that the enforcement of such a foreign liability might be contrary to the public policy of this country and that for a domestic court to rule on such a foreign law might result in inter-State embarrassment. The former view is, in my view, to be preferred. Today courts in this jurisdiction frequently have to express critical views on the conduct of foreign countries or their public institutions, for example in deportation, asylum or extradition cases or in cases concerning forum non conveniens. (See the observations of Lord Sumption in *Belhaj v Straw* [2017] UKSC 3; [2017] AC 964, at para 241.) The risk of embarrassing the executive in the conduct of international relations does not, in my view, provide a

satisfactory basis for the revenue rule. (I note, however, that the latter view, inspired by Judge Learned Hand in *Moore v Mitchell*, 30 F 2d 600, 604 (2d Cir 1929), (cited by Kingsmill Moore J in *Peter Buchanan Ld v McVey* [1955] AC 516 at p 528 and by Lord Keith in *Government of India v Taylor* [1955] AC 491 at p 511) still finds favour in the United States. See *Attorney General of Canada v R J Reynolds* 268 F 3d 103 (2d Cir 2001) per Judge Katzmann at pp 112-113; *European Community v R J R Nabisco Inc* (2005) 8 ITLR 323 per Judge Sotomayor at p 328, both considered below. Cf *Banco Nacional de Cuba v Sabbatino* (1964) 376 US 398, 448 per White J dissenting on other grounds.) By contrast, the former view provides a principled basis which has found favour in the subsequent authorities in this jurisdiction (*In re State of Norway's Application (Nos 1 and 2)* [1990] 1 AC 723 per Lord Goff at p 808; *Webb v Webb* [2020] UKPC 22 per Lord Kitchin at paras 32, 55) and among commentators (*Dicey, Morris & Collins*, para 8-002).

23.    The competing submissions of the parties on this ground have focussed on the submission on behalf of the respondent that the authorities establish that the revenue rule applies only if the claim under consideration is one made directly or indirectly for the payment of tax which is due and that if no tax is due the claim cannot be within the revenue rule.

24.    In this jurisdiction the revenue rule was applied in three first instance cases decided early in the twentieth century. In *Municipal Council of Sydney v Bull* [1909] 1 KB 7 Grantham J held inadmissible an action to enforce a liability under the law of New South Wales to contribute to municipal improvements on the basis that it was "in the nature of an action for a penalty or to recover a tax" (at p 12). In *King of the Hellenes v Brostrom* (1923) 16 Ll L Rep 190 Rowlatt J held that "a foreign government cannot come here … and sue a person found in [this] jurisdiction for taxes levied and which he is declared to be liable to by the country to which he belongs" (at p 193). In *In re Visser* [1928] Ch 877, where the Queen of Holland sued the estate of a deceased Dutch national for unpaid succession duty, Tomlin J observed during the course of argument that the question was whether the English courts were to be "collectors of taxes" for foreign governments (at p 879) and concluded (at p 884):

> "My own opinion is that there is a well-recognized rule, which has been enforced for at least 200 years or thereabouts, under which these courts will not collect the taxes of foreign States for the benefit of the sovereigns of those foreign States; and this is one of those actions which these courts will not entertain."

In each case the formulation of the rule is consistent with the respondent's submission, although the question as to the ambit of the rule was not in issue.

25.    The same is true of *Government of India v Taylor*, the first authoritative statement of the principle by the House of Lords. Viscount Simonds described the issue as "whether there is a rule of law which precludes a foreign State from suing in England for taxes due under the law of that State" (at p 503). Referring to the three first instance decisions described above, he expressed his surprise that it should be suggested "that the courts of this country would and should entertain a suit by a foreign State to recover a tax" (at p 503). Lord Morton, Lord Reid and Lord Keith concurred with Viscount Simonds. Similarly, Lord Somervell in his speech identified the issue as "whether a foreign State can use the courts of this country for the collection of its taxes" (p 513). Once again, the formulation of the rule is consistent with the respondent's submission, although the question as to the ambit of the rule was not directly in issue. Lord Pannick KC, on behalf of the respondent, has, however, drawn to our attention a concession in the argument of counsel for the respondent taxpayer in *Government of India* (at p 500) which he says is analogous to the present case:

> "Penal, revenue and confiscatory laws deal with public claims by the sovereign and not private rights. The position would not be the same as the present if after the Indian Government had obtained possession of a taxpayer's money it was stolen by a thief; the Government could sue to recover it in this country."

26.    In his speech in *Government of India* Lord Keith commended the judgment of Kingsmill Moore J in the High Court of Eire in *Peter Buchanan Ld v McVey* (21 July 1950) which is reported as a note to the decision of the House of Lords [1955] AC 516. *Buchanan* provides an example of an attempt indirectly to enforce a foreign revenue law. A tax debt was due to the Revenue from a Scottish company which had been asset stripped. The Revenue, the only creditor of the company, took steps to wind up the company, appoint a liquidator and recover the tax debt. The liquidator brought a claim in the Irish High Court against Mr McVey claiming an account as a director and also a claim for money had and received. Kingsmill Moore J held that Mr McVey's whole object had been to defeat the tax claims of the Revenue. He concluded that the Irish court was not precluded from expressing an opinion on whether the arrangement in question operated as a fraud on the Revenue under Scots law or as to its validity under that law (at p 523). However, he went on to hold that, since the substance and natural effect of the liquidator's claim was to recover a revenue debt, the claim was inadmissible. In coming to this conclusion he emphasised that:

> "In every case the substance of the claim must be scrutinized, and if it then appears that it is really a suit brought for the purpose of collecting the debts of a foreign revenue it must be rejected." (at p 529)

27.     The question whether the exclusionary rule applies where the claim is not one made directly or indirectly for the payment of tax which is due was expressly considered by the House of Lords in *Williams & Humbert Ltd v W & H Trade Marks (Jersey) Ltd* [1986] AC 368. For present purposes, it is not necessary to refer in any detail to the facts of that case which was concerned with the effect of Spanish expropriatory decrees. The defendants pleaded that the plaintiff was not entitled to the relief sought because the proceedings were an attempt to enforce a foreign law which was penal or which otherwise ought not to be enforced by the court. The decision is relevant because it was submitted in that case that *Buchanan* supported a general principle that even when an action is raised at the instance of a legal person distinct from the foreign government and even where the cause of action relied upon does not depend to any extent on the foreign law in question, nevertheless if the action is brought at the instigation of the foreign government and the proceeds of the action would be applied by the foreign government for the purposes of a penal, revenue or other public law of the foreign State relief cannot be given. (See Lord Mackay at p 440D-E).

28.     In rejecting this submission, Lord Mackay, with whose speech Lords Scarman, Bridge and Brandon concurred, observed in relation to the facts of *Buchanan*:

> "Most important there was an outstanding revenue claim in Scotland against the company which the whole proceeds of the action apart from the expenses of the action and the liquidation would be used to meet. No other interest was involved." (at p 440F-G)

Lord Mackay then stated (at pp 440H – 441B):

> "Having regard to the questions before this House in *Government of India v Taylor* [1955] AC 491 I consider that it cannot be said that any approval was given by the House to the decision in the *Buchanan* case except to the extent that it held that there is a rule of law which precludes a state from suing in another state for taxes due under the law of the first state. No countenance was given in *Government of India v Taylor*, in *Rossano's* case [1963] 2 QB 352 nor in *Brokaw v Seatrain UK Ltd* [1971] 2 QB 476 to the suggestion that an action in this country could be properly described as the indirect enforcement of a penal or revenue law in another country when no claim under that law remained unsatisfied. The existence of such unsatisfied claim to the satisfaction of which the proceeds of the action will be applied appears to me to be an essential feature of the principle enunciated in the

> *Buchanan* case [1955] AC 516 for refusing to allow the action
> to succeed."

Lord Mackay went on to note that there was there no allegation of any unsatisfied claim under the law of Spain.

29.    This approach also accords with the approach of Lord Templeman with whose speech Lords Scarman, Bridge and Brandon also agreed. Lord Templeman, while doubting that the Spanish law was penal, agreed with the judge at first instance, Nourse J, that the object of the expropriatory decrees had been achieved by perfection of the State's title in Spain and that accordingly, "on a simple but compelling view of the matter there is nothing left to enforce" (at pp 428G-429A). Furthermore, in rejecting a submission that *Buchanan* applied because the object of the plaintiffs was to collect assets which would indirectly enure for the benefit of a foreign government, Lord Templeman stated (at p 433B-D):

> "In my opinion, however, the *Buchanan* case only concerns a
> revenue claim.
>
> The principle that a country cannot collect its taxes outside its
> territories cannot be used to frustrate or contradict the
> principle that the courts of this country will recognise the law
> of compulsory acquisition of a foreign country of assets
> within the foreign country and will accept and enforce the
> consequences of that compulsory acquisition."

30.    *QRS 1 ApS v Frandsen* [1999] 1 WLR 2169, on which the appellants rely, was, on its facts, indistinguishable from *Buchanan*. The Danish tax authority claimed in this jurisdiction against the plaintiff companies, all incorporated in Denmark and in compulsory liquidation, substantial sums in respect of corporation tax and interest. The Danish tax authority appointed a liquidator and funded the proceedings brought by the plaintiff companies in England against the defendant, the former owner of the companies who was accused of asset stripping. The only creditor in whose interest the liquidator was acting was the Danish tax authority. In the Court of Appeal Simon Brown LJ (with whom Auld and Thorpe LJJ agreed) considered (at p 2173) that *Buchanan* was indistinguishable and continued:

> "It can, therefore, equally be said of the plaintiffs' claim here
> as was said of the liquidator's claim in the *Buchanan* case,
> 'that the whole object of the suit is to collect tax for a foreign
> revenue, and … this will be the sole result of a decision in

favour of the plaintiff ...' (per Kingsmill Moore J [1955] AC
516, 529.)"

Simon Brown LJ roundly rejected a submission that Rule 3 of *Dicey and Morris* (now
Rule 20 of *Dicey, Morris & Collins*), at least insofar as it extended to indirect
enforcement, was no longer to be regarded as sound. He then emphasised "the relative
narrowness of [the rule] in so far as it applies to this particular kind of indirect
enforcement" (at p 2176C-D). He then cited extensive passages from the speech of Lord
Mackay in *Williams & Humbert*, including the passages cited above, and observed that
he readily understood Lord Mackay's insistence on the narrowness of the *Buchanan*
decision. There is nothing here to assist the appellants.

31.    The same is true of *Ben Nevis (Holdings) Ltd v Commissioners for HM Revenue
and Customs* [2013] EWCA Civ 578; [2013] STC 1579. The revenue rule had no
application in that case, which concerned an international agreement which permitted
foreign tax claims to be brought in this jurisdiction. The case fell within an
acknowledged exception to the revenue rule.

32.    In *Webb v Webb* [2020] UKPC 22; [2021] 1 FLR 448 Lord Kitchin delivering the
opinion of the Judicial Committee of the Privy Council stated the principle in the
following terms (at para 32):

> "It is a long-standing principle of the common law that the
> courts will not collect taxes of a foreign state for the benefit of
> the sovereign of that foreign state."

Once again, this formulation is consistent with the restricted scope of the principle as
identified by Lord Mackay.

33.    The appellants drew attention to two US authorities which, they claimed, applied
the revenue rule where there was no claim for taxes due. However, on a close
examination this proposition is simply not borne out. Each is a case in which an action
was brought to recover indirectly taxes due and owing.

34.    In *Attorney General of Canada v R J Reynolds* 268 F 3d 103 (2d Cir 2001) the
Attorney General sued on behalf of Canada in the New York courts under the Racketeer
Influenced and Corrupt Organizations Act ("RICO") 18 USC para 1961 et seq, "for
damages based on lost tax revenue and additional law enforcement costs" alleged to
have arisen from a scheme facilitated by the defendants to avoid Canadian cigarette
taxes by smuggling cigarettes across the border for sale on the Canadian black market.
The US Court of Appeals, Second Circuit observed that Canada's action proceeded on

the premise that the taxes it allegedly lost as a result of the defendants' alleged violations fell within RICO's damages provisions. The court held that as the relief sought by Canada would be foreclosed by the revenue rule in the absence of RICO, and as there was no indication that Congress intended RICO to abrogate the revenue rule with respect to claims brought by foreign sovereigns under the statute, the court had no choice but to conclude that RICO may not be used by Canada to seek recovery of lost tax revenues and tax enforcement costs as RICO damages. The following passages from the judgment of Judge Katzmann leave no doubt that these proceedings were for the recovery of taxes due to Canada.

> "As to direct enforcement, Canada alleges that '[d]efendants evaded the payment of customs and excise tax and duty owed directly to Canada. This evasion was a direct cause of lost revenue to Canada … Defendants' conduct forced Canada to roll back tobacco taxes in 1994, resulting in lost revenue into the future.' As the Canadian Supreme Court said in *Harden* [[1963] SCR 366, 371 (Can)], we must look to the 'object' of the claim. When we do so, we see that, at bottom, Canada would have a United States court require defendants to reimburse Canada for its unpaid taxes, plus a significant penalty due to RICO's treble damages provision. Thus, Canada's object is clearly to recover allegedly unpaid taxes.
>
> We also conclude that Canada's claim for damages based on law enforcement costs is in essence an indirect attempt to have a United States court enforce Canadian revenue laws, an exercise barred by the revenue rule." (at p 131)

With regard to the claim in respect of the cost of law enforcement, Judge Katzmann observed:

> "We do not believe that the mechanism for the enforcement of a tax law can be so easily separated from the tax law itself. It would certainly be anomalous for the Court to permit the collection of the law enforcement costs while holding that the object of those law enforcement efforts was uncollectable. Particularly in light of the separation of powers and foreign relations concerns discussed above, we must decline to allow Canada to indirectly enforce its revenue laws simply by pleading tort damages based on the costs of enforcing those laws." (at p 132)

35.     *European Community v R J R Nabisco, Inc* 8 ITLR 323 (US CA (2d Cir)), 13
September 2005 was a very similar claim. The European Community and a number of
States brought actions in the United States pursuant to RICO against tobacco companies
for loss of tobacco revenue duty, alleging that tobacco companies directed and
facilitated the smuggling of contraband cigarettes. The US Court of Appeals, Second
Circuit, held that RICO barred civil suits by foreign governments claiming violation of
their tax laws, the whole purpose of which was the collection of tax revenue and the
recovery of associated costs. Judge Sotomayor emphasised at p 330 that the whole
object of the suit was to collect tax revenue and the costs associated with its collection.

36.     I consider that the respondent is correct in its submission that the revenue rule is
limited in the manner described by Lord Mackay in *Williams & Humbert*. The revenue
rule only applies to proceedings in which there is an unsatisfied demand for tax which
foreign tax authorities seek directly or indirectly to recover. In my view, the statement
of principle by Lord Mackay cited above forms a part of the ratio decidendi of the
decision in *Williams & Humbert*; it is an essential step in the reasoning which supports
the decision. In any event, it is consistent with what I consider to be the rationale of the
revenue rule. If there is no claim, directly or indirectly, to recover tax which is due,
there is no attempt to assert the sovereign authority of the State which imposed the taxes
within the territory of another. It is also consistent with the authorities considered
above. Furthermore, there can be no justification for extending this exclusionary rule
beyond what is required by its rationale. Finally, this limitation on the revenue rule is
consistent with the principle, which is well established and which was common ground
before us, that the revenue rule does not prohibit courts in this jurisdiction from
recognising, as opposed to enforcing, a foreign tax law, provided that such recognition
does not otherwise conflict with the public policy of this jurisdiction.

Application to facts of this case

37.     Turning to the application of these principles to the facts of this case, the
essential question is whether the substance of the respondent's claim as pleaded is a
claim for the direct or indirect enforcement of foreign tax laws. For this purpose, it must
be assumed that the respondent will be able to prove at trial the facts alleged in its
pleadings. In my view, it clearly is not a claim for the direct or indirect enforcement of
foreign tax laws.

38.     An examination of the substance of the respondent's pleaded claim shows that it
is not a claim for sums due as tax in Danish law, nor is it a claim that the appellants are
liable to the respondent because they have cheated the respondent out of tax which was
due to it. It is not alleged by the respondent that any sums are due from the appellants as
tax, nor is it alleged that any of the appellants were at any time under a liability to pay
tax. Indeed, on the pleaded case there never has been any unpaid tax in this case. The
respondent has been paid all the tax to which it was entitled by the genuine shareholders

in the Danish companies. The substance of the claim is not to recover tax but to recover payments made by the respondent which were induced by fraud and to which the recipients were not entitled on any basis. It is a claim by a victim of fraud for reimbursement of the sums of which it has been defrauded.

39.    A complete answer to the appellants' objection under the revenue rule to the admissibility of this claim is provided by the fact that there are no taxes due from the appellants. This essential requirement for the application of the revenue rule is missing. On the respondent's pleaded case, there never were any taxes due from the appellants. Those parties who made withholding tax refund applications and who received what may be described as "refunds", did not hold shares in the relevant Danish companies, had not received dividends net of withholding tax, were not subject to any liability to pay withholding tax, had not suffered deduction of any withholding tax and had no entitlement to recover any withholding tax. As a result, the present proceedings do not involve the indirect enforcement of any liability for fraudulently evaded tax. On the respondent's pleaded case there never was any tax payable by any of the appellants, let alone evaded. The Danish tax system undoubtedly provided the context and the opportunity for the alleged fraud and the operation of the fraud can be understood only by an examination of that system. It may well be that at the trial of this action it will be necessary to address that in detail. However, as we have seen, there is no objection to the recognition of foreign tax laws in that way. Because the present proceedings do not involve an unsatisfied claim to pay taxes due in Denmark, they fall outside the scope of the revenue rule.

40.    It was common ground before us, correctly in my view, that where the revenue rule otherwise applies fraud does not of itself remove a claim from the operation of the revenue rule. A claim to recover tax which had been fraudulently evaded would fall within the rule. However, in the present case there was no fraudulent evasion of tax because the applicants for "refunds" were never taxpayers.

41.    The appellants seek to circumvent this difficulty by nevertheless portraying the refund applicants as taxpayers. It is said that by making applications for withholding tax refund applications the applicants brought themselves within the Danish tax system and became Danish taxpayers. It is also said that the respondent by paying "refunds" accepted them into the Danish tax system. It is further said that in rescinding the "refunds" the respondent was acting in the capacity of a taxing authority. The appellants therefore maintain that, in all the circumstances, the recipients of "refunds" and the respondent were in the relationship of taxpayer and taxing authority. As the Court of Appeal pointed out (at para 136) this submission is misconceived. The applications for "refunds" were all based on the lie that the applicants had paid tax in the first place which, on the respondent's pleaded case, they had not. This attempt to portray the applicants as taxpayers cannot bind the respondent as the victim of their fraud and the applicants cannot take advantage of their own wrongdoing in order to bring themselves within the revenue rule.

42.    Nor are the appellants assisted by seeking to mischaracterise the claim as the vindication of the respondent's "asserted right to recover overpaid refunds". The appellants were not in a tax relationship with the respondent. The present claim for damages and restitution lacks the character of a charge by a foreign state pursuant to its tax laws; it is, rather, a claim founded on the appellants' liability for their own wrongdoing. Furthermore, although this would not of itself be conclusive, it is significant that the claim does not rely on any Danish legislation as giving rise to an obligation to repay. The claim is put on the basis of common law causes of action in English law; an alternative case is advanced on the basis of Danish private law. These private law causes of action in English or Danish law are enjoyed by all legal and natural persons. There is no question of Denmark invoking its sovereign rights.

43.    The matter is summed up admirably by the Chancellor in the Court of Appeal (at para 143):

> "Whilst, because it was induced to do what it did by fraud, SKAT thought it was making repayments or refunds to the Solo etc Applicants, they were not in fact repayments or refunds at all, but abstraction of monies by the fraudsters, … , in the same way as if they had broken into SKAT's safe and stolen the monies."

44.    On behalf of the appellants, Mr Kieron Beal KC placed at the forefront of his submissions reliance upon a case comment by Lord Collins of Mapesbury in the Law Quarterly Review ("The enforcement of foreign revenue laws", (2014) 130 LQR 353). This was a commentary on the decision of the Court of Justice of the European Union ("CJEU") in Case C-49/12 *Revenue and Customs Commissioners v Sunico ApS* [2014] QB 391. The Revenue brought proceedings in England claiming that a Danish company, Sunico, had been party to a fraud in the supply of mobile phones and that the Revenue had, as a result, been deprived of about £40 million in unpaid VAT. It was not alleged that Sunico itself had been liable for the tax, but it was alleged to have been part of a fraudulent conspiracy. In the course of the litigation the Revenue obtained attachment orders from a Danish court over assets in Denmark belonging to Sunico in order to secure payment of the claim for damages, which corresponded to the amount of VAT claimed to have been lost by the Revenue. The question whether an English judgment in favour of the Revenue would be enforceable in Denmark under the Agreement with Denmark (Agreement between the European Community and the Kingdom of Denmark on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (2005)) parallel to the Brussels I Regulation (Council Regulation (EC) No 44/2001) was referred by the Danish court to the CJEU. In particular, the Danish Court asked whether the scope of the Agreement extended to cover a case in which the authorities of a member state brought a claim for damages against undertakings and natural persons resident in another member state on the basis of an allegation, made pursuant to the national law of the first member state, of a tortious

conspiracy to defraud consisting in involvement in the withholding of VAT due to the first member state.

45.    The CJEU considered that proceedings by a public authority in the exercise of public powers were not a civil or commercial matter within the scope of the Agreement. However, "civil and commercial matters" within article 1(1) included an action in which a public authority of one member state claimed for loss caused by a tortious conspiracy to commit VAT fraud. The legal relationship between the Revenue and the defendants was not based on public law involving the exercise of powers of a public authority for three reasons. First, the action against Sunico was based not on UK VAT law but on Sunico's involvement in a conspiracy to defraud (para 37). Secondly, Sunico was not subject to VAT under the laws of the United Kingdom (para 38). Thirdly, in the context of that legal relationship the Revenue did not exercise any exceptional powers by comparison with the rules applicable to the relationships between persons governed by private law (para 39). It concluded therefore that the relationship between the Revenue and Sunico was not based on public law, in this instance tax law, involving the exercise of powers of a public authority. Moreover, the fact that the amount of the damages claimed corresponded to the amount of output VAT payable by a taxable person in the United Kingdom did not mean that the action involved the exercise of public authority, because the legal relationship between the Revenue and Sunico was not governed by UK VAT law but by the law of tort (para 41).

46.    Lord Collins commented (p 354):

> "This is a surprising result. The test for what amounts to a
> civil or commercial matter has no direct equivalent in the
> English conflict of laws, but the rule in England is that the
> English court will not allow a claim for the direct or indirect
> enforcement of a penal, revenue or other public law of a
> foreign state, and no doubt if an English court were
> considering an action by (say) the Irish Government in a
> similar claim against an English company it would regard the
> claim as being an inadmissible claim for the indirect
> enforcement of foreign taxes; …"

47.    The commentary by Lord Collins does not assist the appellants in this case, however. In *Sunico* there had been a fraud on the taxing authority which resulted in the evasion of tax which was due. In English law neither the allegation of fraud nor the fact that the claim was founded on common law causes of action as opposed to a statutory entitlement to recover tax would take the claim outside the ambit of the revenue rule. The claim was a claim to recover, albeit indirectly, tax which was due and which had been fraudulently evaded. The observations of Lord Collins in relation to the decision of the CJEU therefore have considerable force; in English law that would be an

inadmissible claim for the indirect enforcement of foreign tax laws. By contrast, in the present case, no tax is or ever was due, unpaid or evaded. The Danish taxation system simply provided the context for the fraud. For the reasons given above, the revenue rule is inapplicable.

48.    In the context of his submission that the appellants are within the scope of a foreign tax regime because they were recognised as being entitled to a refund, Mr Beal KC sought to draw a more general analogy with the VAT regime and to rely on cases concerning missing trader, intra-Community fraud. In particular, he drew attention to a number of decisions including *Mobilx Ltd (in administration) v Revenue and Customs Commissioners* [2010] EWCA Civ 517; [2010] STC 1436; *Natwest Markets plc v Bilta (UK) Ltd (in liquidation)* [2021] EWCA Civ 680; *Revenue and Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] AC 1174. He submitted that the decision of the Court of Appeal in the present proceedings is inconsistent with the VAT regime in that claims by a foreign taxing authority to recover sums due because of wrongful deduction of input tax would necessarily be caught by the revenue rule. They would, he submitted, be attempts to enforce a liability that arises only within a foreign tax regime. However, as Lord Pannick explained, this is a false analogy and none of these authorities assists the appellants. First, none of the cases was concerned with the revenue rule which was not raised or considered. Secondly, the cases all concerned claims where tax had been evaded by taxpayers closely linked to a party to the proceedings. Thirdly, the cases do not assist because they are all concerned with specific statutory regimes and directives relating to VAT which impose a charge to tax at each stage in the chain of production of goods and services. In the present case, by contrast, no unpaid tax is being claimed.

49.    Finally, in this regard, I note that the same conclusion as to the non-application of the revenue rule has been arrived at for similar reasons in parallel litigation in relation to the same subject matter in the United States and in Malaysia.

50.    *In re Skat Tax Refund Scheme Litigation* 356 Fed Supp, 3d 300 (2019) concerned parallel proceedings by the present respondent in the US District Court, S D New York. District Judge Lewis A Kaplan dismissed a motion to dismiss the actions on the basis of the US version of the revenue rule. The judge held that if the plaintiff could prove that the defendants never in fact owned the relevant Danish stocks the revenue rule would not apply "because the substance of the claims would be for garden variety commercial fraud" (at p 308). Judge Kaplan observed (at p 311):

> "These actions plainly do not seek direct enforcement of Danish tax law. The defendants' attempt to frame them as seeking to recover lost tax revenue – when the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax

> revenue is because the defendants' alleged victim was the
> Danish tax authority – is too clever by half."

51.      Similarly, in *Customs and Tax Administration of The Kingdom of Denmark v Saling Capital Ltd* [2021] MLJU 856, which concerned parallel proceedings brought in Malaysia by the respondent in the present appeal, the Court of Appeal (Putrajaya) rejected a submission that, in claiming to recover Danish withholding tax refunds wrongly paid out, it was seeking to claim or enforce its revenue laws directly or indirectly in Malaysia. Addressing the substance of the pleaded case and the evidence filed, it considered (at paras 80, 85, 86) that the claim was an attempt to seek redress and remedies under the laws recognised by Malaysia, in particular, the tort of deceit or fraudulent misrepresentation and was not based on a debt accruing from taxes due and owing or tax evasion under the tax regime of Denmark. It observed that the claim did not arise from the tax regime of Denmark because the defendants "never owned Danish shares and were therefore never within the Danish tax regime to begin with". The claim for the recovery of monies or property was no different from that which could be brought by any private individual or entity, being the victim of a fraud and, as a result, the revenue rule had no application.

52.      For these reasons, I consider that the revenue rule has no application to this case.

Ground 2 – the Court of Appeal erred in finding that Skatteforvaltningen was not exercising sovereign rights when advancing its claims. It failed to recognise Skatteforvaltningen's status as a privileged litigant with extensive executive powers which it deployed to assist in the prosecution of its claim.

53.      Under this second ground of appeal the appellants rely on the broader principle reflected in *Dicey, Morris & Collins* Rule 20, namely that an action for the enforcement, either directly or indirectly, of a public law of a foreign State is inadmissible: the sovereign authority rule. They submit that the Court of Appeal erred in concluding that the respondent's claims did not involve an act of a sovereign character, the enforcement of a sovereign right or the attempted vindication of a sovereign power. In their submission the Court of Appeal was wrong to treat the respondent as making a claim as the putative victim of fraud for the restitution of monies of which it alleged it had been defrauded, in the same way as if it were a private citizen. They submit that the claims are necessarily dependent on a series of executive and legislative acts undertaken by the Danish legislature and the respondent which have the character of sovereign acts. In particular, it is said that Denmark exercised sovereign rights in establishing a tax regime involving withholding tax, in setting the tax rate and in ensuring that Danish companies accounted for that tax at source. The Danish legislature opted to levy tax at a "full" rate and then permit applications for refunds where an entitlement was asserted. It is said that the fact that the claims are civil ones raising causes of action based on tort and equity cannot disguise the sovereign or governmental character of the steps which the

respondent is taking. The appellants submit that the respondent is inviting the English court "to recognise its prerogative right to recover sums of money which have been imposed as tax by Danish legislation".

54.    For the reasons set out above in relation to ground 1, this is not a claim to recover sums of money which have been imposed as tax by Danish legislation. Nor is it, as the appellants put it, "a claim to recover specific sums of overpaid tax which [Skatteforvaltningen] alleges were wrongly paid out". If the present claim falls outside the scope of the revenue rule, it might be thought that it would require exceptional circumstances to bring it within the wider sovereign authority rule stated by *Dicey, Morris & Collins*. However, in any event, the claim pursued here is clearly not of a sovereign character.

55.    The distinction between sovereign and non-sovereign acts of a foreign state forms the basis of the decision of the Court of Appeal in *Mbasogo v Logo Ltd* [2007] QB 846 where the Republic of Equatorial Guinea and its head of State brought private law claims, including claims in conspiracy, for damages arising out of the alleged acts of the defendants in support of a failed coup d'état. The Court of Appeal held that the claims of Equatorial Guinea to vindicate its national security interests amounted to the exercise of sovereign authority in the territory of a foreign state which was not justiciable in the English courts. Sir Anthony Clarke MR, delivering the judgment of the Court of Appeal, referred (at para 27) to *Emperor of Austria v Day and Kossuth* (1861) 3 De GF & J 217 as "an authority which recognises the fundamental distinction between an action which amounts to the exercise of sovereign authority in the territory of another and an action brought to protect property rights, such as might be brought by an individual". He stated the principle as follows (at para 50):

> "The critical question is whether in bringing a claim, a claimant is doing an act which is of a sovereign character or which is done by virtue of sovereign authority; and whether the claim involves the exercise or assertion of a sovereign right. If so, then the court will not determine or enforce the claim. On the other hand, if in bringing the claim the claimant is not doing an act which is of a sovereign character or by virtue of sovereign authority and the claim does not involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it. As we see it, that was the broad distinction of principle which the court was seeking to draw in the *Emperor of Austria* case 3 De GF & J 217. In deciding how to characterise a claim, the court must of course examine its substance, and not be misled by appearances: see for example, *Huntington v Attrill* [1893] AC 150."

56.    The Court of Appeal in *Mbasogo* (at para 42) drew particular attention to and approved (as did the Court of Appeal in *Attorney General of New Zealand v Ortiz* [1984] AC 1) a passage in an article by Dr F A Mann, "Prerogative Rights of Foreign States and the Conflict of Laws" (1954) 40 Tr Gro Soc 25 (reprinted in his *Studies in International Law* (1973) pp 492-514) in which Dr Mann stated, at p 34:

> "Where the foreign State pursues a right that by its nature could equally well belong to an individual, no question of a prerogative claim arises and the State's access to the courts is unrestricted. Thus a State whose property is in the defendant's possession can recover it by an action in detinue. A State which has a contractual claim against the defendant is at liberty to recover the money due to it. If a State's ship has been damaged in a collision, an action for damages undoubtedly lies. On the other hand, a foreign State cannot enforce in England such rights as are founded upon its peculiar powers of prerogative. Claims for the payment of penalties, for the recovery of customs duties or the satisfaction of tax liabilities are, of course, the most firmly established examples of this principle."

57.    Dr Mann returned to this subject in a later article, "The International Enforcement of Public Rights" (1987) 19 New York University Journal of International Law and Politics 603, where he concluded at pp 629-630:

> "The decisive question is whether the plaintiff asserts a claim that, by its nature, involves the assertion of a sovereign right. Where the state's claims arise from '*actus qui a rege sed ut a quovis alio fiant*' [H Grotius, De Jure Belli ac Pacis bk II, ch 14, vi (1625) (the quotation translates, roughly, to 'acts that may be done [not only] by the king but also by any one else')] then they are capable of international enforcement.

Dr Mann went on to state (at p 630):

> "The true question is whether in substance the claim asserts a public right. If it does, then the rule stated by Dicey and Morris in regard to English law should be applied: 'English courts have no jurisdiction to entertain an action … for the enforcement, either directly or indirectly, of a penal, revenue, or other public law of a foreign State'."

58.     In the present case, the appellants are undoubtedly able to point to prior exercises of sovereign power by Denmark in creating its laws relating to the taxation of dividends and in operating the tax system. This, however, merely provides the context for the present claims. The substance of the claims, as we have seen, does not involve any act of a sovereign character, any exercise or enforcement of a sovereign right, or any vindication of sovereign power. On the contrary, the respondent is simply bringing restitutionary claims to recover monies of which it has been defrauded, a course open to any private citizen who had been similarly defrauded. Furthermore, as the Court of Appeal pointed out, the attempt to challenge that conclusion by seeking to characterise the payment of the refunds as sovereign acts does not assist the appellants. First, even if, notwithstanding the fact they were induced by fraud, the making of the payments was correctly characterised as a sovereign act, there is no reason why an attempt to recover the payments should be considered a vindication of sovereign power. Secondly, the respondent is not seeking to vindicate the payments but to invalidate them on grounds of fraud.

59.     In this regard, Lord Pannick drew to the court's attention a US decision, *Nordrhein-Westfalen v Rosenthal* 17 AD 2d 145 (NY App Div 1962); 232 NYS 2d 963, which concerned two awards made by the plaintiff, one of the Federated States of the Federal Republic of Germany, under the Federal Indemnification Law, to the defendant as a victim of Nazi persecution. Section 7 of the Indemnification Law expressly provided for the revocation and recovery of awards induced by false or misleading statements. The plaintiff sued the defendant in New York alleging both the revocation of the award and fraud on the part of the defendant. The defendant questioned the jurisdictional basis of the revocation award. The Appellate Division of the Supreme Court of New York, First Department, confined its consideration to the first cause of action. It held that the defendant must be held to have submitted to the revocation proceedings. It held, further, that there was no contravention of domestic public policy in giving effect to the revocation. It observed (at pp 147-148) that while the plaintiff was a sovereign, its aim was merely the restoration of an outlay wrongfully obtained from it. The object of the action was not vindication of the public justice but reparation to one aggrieved. (*Nordrhein-Westfalen v Rosenthal* was applied in *Harvardsky Prumyslovy Holding AS v Kozeny* 983 NYS 2d 240 (2014).)

60.     *Nordrhein-Westfalen v Rosenthal* supports Lord Pannick's submission that reliance on a statutory cause of action conferred by a foreign State's law for the purposes of recovering an overpayment by the State is not a sovereign act. In the present case, however, the point does not arise. The respondent does not rely on any statutory cause of action in Danish law entitling it to recover the sums of which it claims to have been defrauded. Indeed, it is expressly pleaded on behalf of the respondent in these proceedings that no such cause of action exists. The respondent has pleaded that there is no unpaid tax or unsatisfied tax debt due under Danish revenue law from any of the defendants. In addition, it has pleaded that it is not entitled under Danish law to issue a tax assessment to any of the defendants or make any other public law decision obliging them under Danish revenue or public law to pay the sums sought in these proceedings

(Re-Amended Reply to the Defence of Mr Knott and Mr Hoogewerf, para 5.1(b)).  As a result, it is not necessary to express a concluded view as to whether reliance on a statutory cause of action for recovery of an overpayment was correctly considered in *Nordrhein-Westfalen* not to be a sovereign act. I should, however, add that, contrary to the submission of Mr Beal, I do not understand Dr Mann in his 1987 article at pp 624-625 to cast doubt on that decision.

61.     It was next submitted on behalf of the appellants that the respondent has used sovereign powers to obtain evidence in the present case. In particular, it is said that the respondent has invoked mutual assistance agreements at the international level in order to obtain information from a number of other States. Here I find myself once again in agreement with the observations of the Chancellor in the Court of Appeal. The respondent has been open with the defendants as to the information it has obtained and has not sought to use it in these proceedings so as to give itself some special advantage only available to a sovereign body. More fundamentally, however, whether the respondent's claims fall within the scope of the wider sovereign authority rule stated in *Dicey, Morris & Collins*, Rule 20 is a question of the characterisation of the substance of the claims brought. The use of powers of investigation is, at most, of merely peripheral significance in that regard.

62.     Lord Pannick submits in the alternative that, if the bringing of these proceedings has involved an exercise of sovereign authority, they nevertheless fall within a public policy exception to the broader sovereign authority rule. He relies upon *Government of the Islamic Republic of Iran v The Barakat Galleries Ltd* [2009] QB 22 at paras 151 ff, and upon the statement at para 8-021 of *Dicey, Morris & Collins* that the result of the authorities in the Court of Appeal is that the English court will not enforce a claim based on foreign public law if the claim involves the exercise or assertion of a sovereign right, unless it is contrary to public policy for the claim to be shut out. (It was common ground before us that any such public policy exception does not extend to the narrower revenue rule. See *Williams & Humbert* per Lord Templeman at p 428F.) Lord Pannick points to the fact that a large number of the individuals who are alleged to have participated in these frauds were resident in this jurisdiction or British nationals or both, and that the majority of "refunds" paid out were received into bank accounts in this jurisdiction. In essence, he submits that it would be contrary to public policy to deny access to the courts of this jurisdiction to foreign public authorities which have been defrauded in this way. In the circumstances, however, it is not necessary to consider whether the present proceedings fall within such a public policy exception.

63.     Finally, it is necessary to say something about a further submission on behalf of the appellants which is advanced under both the first and second grounds of appeal. On behalf of the appellants, Mr Beal asked rhetorically what the respondent could have done "to enforce the repayment of the tax refund it alleges was wrongly paid out" if it could not bring a civil claim in this jurisdiction. In response he drew attention to a number of international arrangements, in particular Council Directive 2010/24/EU of 16

March 2010 concerning mutual assistance for the recovery of claims relating to taxes, duties and other measures ("MARD"), the Convention on Mutual Administrative Assistance in Tax Matters, 1 June 2011 and the UK/Denmark Tax Convention, 1 January 2001. Lord Pannick addressed us in some detail as to whether these international arrangements had any application to the facts of the present case. It is not necessary to address these submissions, however. The short answer is that these international instruments are of no relevance to the issues this court has to decide. First, as Judge Kaplan observed in response to a similar submission in *In re Skat Tax Refund Scheme Litigation* "the US-Denmark Treaty and its provisions for 'assistance in the collection of a revenue claim' are irrelevant because the plaintiff's claims do not seek to collect tax owed by the defendants and covered by the treaty" (para 18). Secondly, the purpose of these international arrangements is to assist States to recover sums due by conferring additional powers; they do not impose barriers to other means of recovery. They have no bearing on the question whether the revenue rule or the wider sovereign authority rule applies in the circumstances of this case. For the reasons set out above, I have come to the firm conclusion that neither of those rules applies and that the present proceedings are admissible.

Ground 3: the Court of Appeal accordingly erred in overturning the judge's findings that the claims are inadmissible under the law stated in *Dicey, Morris & Collins* Rule 20(1). The Court of Appeal was wrong to conclude that an allegation of fraudulent extraction of tax from a state sufficed to render *Dicey, Morris & Collins* Rule 20(1) inapplicable.

64.    This ground adds nothing of substance to the matters addressed under Grounds 1 and 2.

Conclusion

65.    I would therefore dismiss the appeal.