DEWEY PEGNO & KRAMARSKY LLP

777 THIRD AVENUE   NEW YORK, NEW YORK   10017
PHONE: (212) 943-9000   FACSIMILE: (212) 943-4325
WWW.DPKLAW.COM

January 24, 2024

**BY ECF**

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *In re Customs and Tax Administration of the Kingdom of Denmark*
       *(Skatteforvaltningen) Tax Refund Scheme Litigation*, 18-md-2865 (LAK)

Pursuant to the Court's order at the January 10, 2024 Case Management Conference, Defendants submit this letter memorandum addressing whether the Court should adopt SKAT's proposed trial plan.[1]

SKAT's proposed first trial—a sprawling proceeding encompassing each of the 51 cases in which one or more of Richard Markowitz, John van Merkensteijn, Robert Klugman and/or Michael Ben-Jacob is a defendant ("SKAT's Proposal"), along with eight additional individuals ("friends and family" and their personal plans)—is logistically unworkable, manifestly prejudicial, and a grossly inefficient means of moving the mass of cases in this MDL to resolution.[2]

Instead, the Court should adopt either: (a) Defendants' proposal for a first trial of all claims against Markowitz, van Merkensteijn, and Klugman and their associated plans, with a separate subsequent trial for Ben-Jacob and separate trial(s) for the other defendants in this group ("Defendants' Original Proposal"); or (b) the Court's suggestion of an initial combined bellwether trial, which Defendants submit should include the three summary judgment

---

[1] The defendants identified in Appendix A to this memorandum (the "Markowitz and van Merkensteijn Defendants") join in this memorandum as to Sections I and II, and so much of the Preliminary Statement as does not contemplate an "issues" trial. The Markowitz and van Merkensteijn Defendants do not join in the remainder of this memorandum, and do not agree to an "issues" trial as contemplated in Section III.

[2] Consistent with the Court's comments at the January 10, 2024 Conference, this letter only pertains to SKAT's proposal for an initial trial. Once the Court decides what should be the initial trial, the trial plan for the remaining sets of SDNY cases can be negotiated by the parties, with the Court's involvement if necessary.

bellwether cases against Markowitz, van Merkensteijn, and Klugman—*Basalt* (19-cv-01866), *RJM Capital* (19-cv-01898), and a substitute for *Roadcraft* (19-cv-01812)[3]—severing Ben-Jacob and the "friends and family" defendants ("Defendants' Proposed Trial Bellwether").

Either of these alternatives is far superior to SKAT's Proposal.  Both would be logistically workable and efficient, allow the jury to fairly and efficiently navigate the unique factual issues pertaining to each defendant (in particular as to scienter), and avoid the deeply prejudicial consolidated trial in which Ben-Jacob—a trusts and estates lawyer who was just one of many lawyers at Kaye Scholer who provided U.S. legal advice to Markowitz, van Merkensteijn, and Klugman—must take positions antagonistic to his own clients.  In particular, for Ben-Jacob, a consolidated trial would force him to defend himself against allegations from both his clients and SKAT, and face trial for the actions or inactions of a non-party law firm, its lawyers, and a litany of foreign lawyers who advised on issues of foreign law outside his area of expertise.

If the Court does not proceed with Defendants' Original Proposal or Defendants' Proposed Trial Bellwether, Defendants submit that the Court should order an initial issues trial focused on the issues of falsity (whether the plans that traded through Solo Capital falsely stated that they beneficially owned the shares for which they sought refunds), reliance (whether SKAT reasonably relied on those statements), and the statute of limitations, which would mitigate the fundamental problems with SKAT's Proposal, promote judicial efficiency, and avoid prejudice to the Defendants.

## I.     THE COURT SHOULD REJECT SKAT'S PROPOSED TRIAL PLAN

### A.     SKAT's Proposal is logistically problematic, unwieldly, and manifestly unfair to all defendants.

SKAT's Proposal of an initial omnibus trial of 51 cases encompassing 12 individual and 63 pension plan defendants would set an impossible task for the jury.[4]  As a threshold matter,

---

[3] In light of Mr. Altbach's passing, Defendants suggest substituting for the *Roadcraft* case what would have been the parties' mutually acceptable first backup summary judgment bellwether involving the Bareroot Capital Investments LLC 401(k) Plan (Case No. 19-cv-01783), or another mutually agreeable case such that Markowitz, van Merkensteijn, and Klugman will all be bellwether defendants, and in any case severing Michael Ben-Jacob from that trial.

[4] SKAT proposes to include in the opening trial all claims it has asserted against the following 12 individual defendants and their associated plans:  Richard Markowitz, John van Merkensteijn, Robert Klubman, Jocelyn Markowitz, Elizabeth van Merkensteijn, Michael Ben-Jacob, Robin Jones, Joseph Herman, Edwin Miller, Perry Lerner, Ronald Altbach, and David Zelman.  (ECF No. 948, at 3.)  SKAT's suggestion that these 12 individual defendants and 63 pension plans are represented by "just" five law firms understates the problem, as it ignores participation by counsel for numerous plans against whom the cases have been stayed for several months.  Even if this obstacle were avoided, all firms will likely have at least two trial counsel each.  Assuming SKAT would agree to be limited to two trial counsel itself,

physically fitting that number of individuals and their counsel, court staff, and the jury in the courtroom would be challenging enough.  But even assuming the logistical hurdles could be surmounted, it would be impossible for the jury to track the number of players and moving parts.  To say that these cases are highly complex is an understatement: *any* trial of SKAT's claims, even of a single case with a single defendant, would already test the bounds of what any jury could reasonably process given the number of legal and factual issues to be resolved.  As just one metric to illustrate the complexity, the parties have among them engaged 14 experts and foreign law declarants to address issues such as securities trading and market practices, U.S. pension law, foreign securities law, attorney professional responsibility, forensic review of financial records, the revenue rule, the Danish statute of limitations, and Danish law concerning beneficial ownership.  Navigating these complex issues and determining the scienter of 12 individual defendants would not be possible and the jury would be forced to impermissibly group defendants into categories and decide scienter by group, which would be contrary to law.

SKAT's proposed lumping of 12 differently situated individual defendants together in one trial compounds those complexities and all but ensures these defendants will not receive fair individualized consideration.  *See In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) ("Although consolidation may enhance judicial efficiency, considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial . . . The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause not be lost in the shadow of a towering mass litigation.") (internal quotations and citations omitted); *Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993) ("The benefits of efficiency can never be purchased at the cost of fairness… 'We are mindful of the dangers of a streamlined trial process in which testimony must be curtailed and jurors must assimilate vast amounts of information.'"), (reversing consolidation order post-trial, and finding "there is an unacceptably strong chance that the [jury verdict] amounted to the jury throwing up its hands in the face of a torrent of evidence") (quoting *In re Brooklyn Navy Yard Asbestos Litig.*¸ 971 F.2d 831, 853 (2d Cir. 1992)).

A prime example of the impossible task that SKAT seeks to impose on the jury is evaluating the requisite scienter: assessing the mental states of each of 12 individual defendants and determining whether, and if so when, *each* defendant developed the required mental state for *each* of the various claims SKAT has asserted (fraud, aiding and abetting fraud, negligent misrepresentation, etc.), which all have differing mental state requirements, is unworkable.  To illustrate the complexities, we highlight the following:

- The 12 defendants had different levels of involvement in, and knowledge concerning, the ex-dividend trading at different times.  Defendants Markowitz and van Merkensteijn were among a group of investors (only two of whom SKAT has sued here) who began working with Sanjay Shah in 2010 and were involved in ex-dividend trading in Denmark from 2012 to 2015.  Defendant Klugman did not participate in the

---

there would be a *minimum* of 12 attorneys, 12 defendants, and one or more paralegals participating in the trial.  Defendants' Original Proposal, on the other hand, would only concern three individual defendants.

Danish trading strategy until late 2014.  The eight "friends and family" defendants (Robin Jones, Joseph Herman, Edwin Miller, Perry Lerner, Ronald Altbach, David Zelman, Jocelyn Markowitz, and Elizabeth van Merkensteijn) each learned about the ex-dividend trading opportunity in separate discussions with either Markowitz or van Merkensteijn, and, as discussed further below, the defendants dispute among themselves the scope of Ben-Jacob's involvement over the entire period of the trading.  Much of the evidence on which SKAT relied during the depositions in an attempt to establish a culpable mental state was seen by some defendants and not others, or was seen by the defendants at different times in different contexts.  If the volume of exhibits submitted in connection with seven bellwether summary judgment cases is any indication, then it is safe to say that trial exhibits in a case involving nine times as many cases will number in the thousands.

- The structure of the ex-dividend trading itself, as well as the entities and relationships between the entities involved in the trading strategy, evolved over the three years in which it was practiced, and each defendant's understanding of those details was different at different times.  A central plank of SKAT's scienter case is that the identity and the structuring of the entities involved in the trading were themselves suspicious, and so a trial of 12 individual defendants will require the jury to not only understand the highly complex financial arrangements involved, but also sort through what each defendant understood about those arrangements as they changed.

- Establishing defendant Ben-Jacob's mental state alone will require SKAT to cover years of communications between Ben-Jacob and various non-parties relevant for no other purpose than determining what facts *Ben-Jacob* knew and when he knew them.  For example, Markowitz, van Merkensteijn, and Klugman obtained advice from Kaye Scholer lawyers other than Ben-Jacob over the years on a variety of issues.  SKAT has sought to impute the knowledge obtained, and the advice provided, by those lawyers to Ben-Jacob—and indeed separately deposed three of Ben-Jacob's Kaye Scholer colleagues.  A substantial portion of any trial involving Ben-Jacob will require the jury to parse years of internal Kaye Scholer correspondence that may not be relevant to the trial of the other defendants.

- Even the eight defendants whose knowledge SKAT argues was in some sense derivative of other defendants (the spouses of each of Markowitz and van Merkensteijn and the six "friends and family") cannot be easily managed.  Each had their own discussions with Markowitz and van Merkensteijn and formed their own views of the trading that jurors will have to separately assess.  And again, the evidence on these points will be relevant to these defendants' mental states and no others.

- On top of this dense web of factual disputes, SKAT is pursuing claims with differing mental state requirements.  Fraud, for example, requires a knowing or reckless false statement, *e.g.*, *Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 723–24 (S.D.N.Y. 2022), whereas the standard for aiding and abetting fraud claims is more rigorous, requiring "actual knowledge," *e.g., Fraternity Fund Ltd. v. Beacon Hill*

4

*Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007). The jury's evaluation of whether, and when, each of the 12 defendants developed "actual knowledge" would by itself be a monumentally difficult task, as it is not enough for SKAT to show what the defendants should have understood, but it must instead make the far more individualized showing of what each defendant actually understood at different points in time. And that is just for the aiding and abetting claims: each of the complex factual questions addressed above will have to be evaluated under different legal standards, over several years, and with respect to multiple plans and many trades—rendering the decision tree for just one defendant complicated, let alone 12.

But scienter is not the sole issue on which there is a thicket of complex factual issues the jury would have to parse differently for each defendant. Take the issue of falsity, for which SKAT has alleged, among other things, that the plans falsely represented that they were "qualified" plans under U.S. law. SKAT's pension law expert has identified no fewer than six purported qualification requirements under the Internal Revenue Code that these plans allegedly failed to meet, and Defendants' pension law expert will counter each of these supposed requirements identified by SKAT's expert as either not requirements at all or badly mischaracterized by SKAT's expert, and opine that by all indications the defendant pension plans met the requirements for "qualification." Addressing these points will necessarily take the trial deep into the esoterica of the US tax code and IRS enforcement practice, which are difficult enough for non-pension lawyers to grapple with, nevermind the lay jury.

And, critically, there are factual questions the jury will have to resolve—separately for each of the 63 pension plan defendants—to assess SKAT's claims that the plans were not qualified. For example, one of SKAT's arguments is that the plans' sponsors were not carrying on a trade or business, which SKAT asserts is a requirement for plan qualification. Putting aside SKAT's mischaracterization of the relevant rule, discovery has revealed a range of activities among the sponsors of the various plans that could constitute the carrying on of a trade or business, all of which will need to be individually assessed. Further, one of the 63 defendant plans was audited by the IRS *after* the events at issue, at the conclusion of which IRS issued the most favorable result it can: a "no change" letter indicating that the plan remained qualified. (ECF No. 800, ¶¶ 66-75.) The jury will need to assess what that means not only for this plan, but also for the other 62 defendant plans. On top of that, the jury will also be tasked with keeping track of which pension plan is associated with each individual defendant—a daunting prospect in itself in that most of SKAT's complaints name between two and four individual defendants associated with each plan in a myriad of different combinations. (*See* ECF No. 948, 13-16).[5]

---

[5] And still just on the issue of falsity, the jury will also have to assess to which individual defendant each false statement can be attributed. Defendants' summary judgment motion has demonstrated just how complex that issue can be even for one defendant, touching on thorny legal issues involving agency and alter ego principles, that a jury would have to separately process for all 12 defendants. (*See* ECF No. 799 at 89-97). Further muddying the waters, there will likely be direct conflicts in the trial positions of at least six of the "friends and family" defendants on the one hand, and Ben-Jacob on the other, as to certain of these issues. By way of example, the Court held there is a factual dispute to be resolved at trial regarding whether particular statements in the reclaim applications submitted by reclaim agents were

As a final example, several of these defendants have their own individualized statute of limitations defenses based on when SKAT learned of that defendant's involvement in the alleged fraud.  Defendants Markowitz and van Merkensteijn intend to demonstrate that SKAT received warnings in August 2015 that several of their pension plans were suspected of engaging in a dividend tax withholding fraud, which renders claims filed in late 2019 untimely.  (ECF No. 773).  Defendant Ben-Jacob will demonstrate on a separate set of facts that claims filed against him in June 2021 were untimely.  (ECF No. 948, at 9.)  Trying these defendants alongside nine others would force the jury to keep track of vast amounts of information relevant to only a subset of defendants—creating substantial risk of juror confusion.

SKAT's suggestion that these problems can be remedied with "ample use of summary exhibits pursuant to Federal Rule of Evidence 1006" (ECF No. 948, at 4) is obviously incorrect and only underscores the prejudice to the Defendants in a consolidated trial: SKAT's Proposal demonstrates its intent to try to gloss over these fundamental differences among the Defendants and deny each their right to individualized consideration.  Nor would a proliferation of dozens of jury instructions clarifying which evidence is admissible against which defendant for which purpose make the task for the jury of sorting through these issues any easier.  There is simply no way to make the trial SKAT proposes comprehensible and fair.

**B.      Michael Ben-Jacob should be severed and tried separately from Markowitz, van Merkensteijn and Klugman.**

SKAT's Proposal also should not be adopted because a trial against Ben-Jacob should proceed separately to avoid prejudice to both him and his clients—at least some of whom remain his clients on unrelated matters.  *See* Fed. Rule of Civ. Proc. 42(b) ("a "court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims" for "convenience, to avoid prejudice, or to expedite and economize").  Ben-Jacob is a trusts and estates lawyer who represented Markowitz, van Merkensteijn, and Klugman on various U.S. legal issues during the time period when those clients were conducting the trades that are the subject of SKAT's fraud claims, but was not himself involved in the day-to-day actions to execute those trades.  Ben-Jacob will argue, among other things, that he had no involvement in the due diligence his clients conducted with respect to Sanjay Shah (whom he never met) and Solo Capital, had little direct contact with Shah, Solo Capital, and related entities involved in the trading process, and did not receive any proceeds from the trades.[6]  Markowitz,

---

authorized, and thus potentially imputable to the friends and family defendants, prior to submission.  (See ECF No. 189 at 49-52).  The friends and family defendants intend to present evidence that their delegation of authority to Ben-Jacob to take actions on behalf of their plans did not include the authority to appoint the reclaim agents; Ben-Jacob intends to present evidence that all acts he undertook as the plans' agent were authorized by and performed at the direction of his principals.

[6] While Ben-Jacob's law firm Kaye Scholer received payment for the legal services that he and his colleagues provided, and Ben-Jacob received annual compensation from Kaye Scholer, his total compensation (which was of course based on all his contributions to the firm, including his hundreds of other representations) during the relevant period was only a miniscule fraction of the trading proceeds— and less than 1% of the damages SKAT seeks from Ben-Jacob.  (*See* ECF No. 805, at 2-4.)  And SKAT

van Merkensteijn, and Klugman will argue, however, that Ben-Jacob and Kaye Scholer had complete information pertaining to all material aspects of the trading strategy, and all information necessary for them to rely on their advice (generally communicated through Ben-Jacob) covering a range of topics beyond U.S. trusts and estate law issues.  Against this backdrop and as explained in greater detail below, Ben-Jacob is differently situated and should be severed and the claims against him tried separately from his clients to avoid both substantial prejudice and inefficiencies.

### 1.    Consolidated trials against Ben-Jacob and his clients would result in substantial prejudice.

Forcing Ben-Jacob to defend himself alongside his clients would prejudice all defendants given the dispute surrounding Ben-Jacob's role.  It would be particularly unfair to Ben-Jacob, whose clients are likely to serve as an echo chamber for SKAT's case against him on critical issues, forcing him to face SKAT's case in chief twice.

Ben-Jacob and his clients disagree as to the scope of Ben-Jacob's representation—a key issue that goes both to Ben-Jacob's and his clients' mental states.  Markowitz, van Merkensteijn, and Klugman have asserted that they relied on Ben-Jacob's advice as part of a defense that they lacked scienter.  Specifically, they intend to suggest that they involved Ben-Jacob in nearly all aspects of the ex-dividend trading strategy and conducted their trades with Ben-Jacob's blessing.  In contrast, Ben-Jacob will describe a narrower role: he answered discrete U.S. legal questions within his area of expertise as they arose, connected his clients with other lawyers at Kaye Scholer who specialized in other relevant areas of law, and (particularly beginning in 2014) performed and supervised various administrative tasks for Markowitz, van Merkensteijn, and Klugman.  In his view, his clients did not involve him in all aspects of the trading and did not ask him to assess the legality of the trading, opine on whether the trading strategy "worked" under Danish law, or advise on any other issues of Danish law.  Under these circumstances, trying Ben-Jacob alongside the 11 other defendants would be unduly prejudicial: the jury could only believe the clients on the one hand, or their lawyer, on the other.  *See* Manual for Complex Litigation (4th ed.), § 11.631 Consolidation ("Cases with major conflicts between the basic trial positions of parties should not be consolidated, at least not without ensuring that no prejudice results.").

The court's reasoning in *U.S v. Aronson* underscores the need for separate trials here.  In *Aronson*, the court determined that separate trials were necessary for an attorney co-defendant and his former client co-defendant where the former client intended to raise an advice of counsel defense.  No. 2:12-cr-00245-ADS-GXB, Dkt. 167 (E.D.N.Y. May 5, 2013).  The court reasoned that because the jury must necessarily disbelieve the testimony of [client co-defendant]" "in order to believe the testimony of [the attorney]," the trials should proceed separately.  *Id.* At *13.

---

has already conceded that it cannot draw a connection between the refunds it paid and the compensation Ben-Jacob received: it did not oppose Ben-Jacob's argument on summary judgment that its claims against him in the bellwether cases for unjust enrichment, money had and received, and payment by mistake must be dismissed, (ECF No. 831, at 1 n.1), and later stipulated to the dismissal of those claims in *all* complaints against Ben-Jacob (ECF No. 918).

As applied in these proceedings, the jury would have to disbelieve the testimony of Ben Jacob's clients in order to accept Ben-Jacob's view on the scope of his representation. *See id.* At *13; *see also U.S. v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990) (determining that the jury "must necessarily disbelieve one defendant's story in order to believe another"); *U.S. v. Al Fawwaz*, 2013 WL 311043, at *3 (S.D.N.Y. June 20, 2013) (J. Kaplan) (severance required "where a defendant has shown that acceptance of one party's defense would tend to preclude the acquittal of the other.") (quotation omitted).

Not only would the jury be forced to disbelieve either Ben-Jacob or his clients, Ben-Jacob would be prejudiced by SKAT effectively presenting its case against him twice: once through SKAT's lawyers and again through counsel for Ben Jacob's clients.  Counsel for Ben-Jacob's clients would serve as an "echo chamber" for SKAT's counsel—leading to "a serious risk that the jury would be prevented from making a reliable judgment about [liability] even with limiting instructions by the court." *U.S. v. Shrkeli*, 260 F.Supp.3d 247, 256 (E.D.N.Y 2017).  The defense strategy of Ben Jacob's clients presents a scenario in which Ben-Jacob "will be substantially prejudiced by having to wage a defense on two fronts, in a single trial, before the jury." *Id.*  "The jury's ability to make a reliable judgment may be [sic] affected by the compounded effect of hearing [SKAT's] case in chief twice, once from [SKAT] and then again from" Ben-Jacob's clients.  *Id.*

Ben-Jacob will also be prejudiced when SKAT and his clients both attempt to conflate the distinctions between his work and the work performed by other lawyers at Kaye Scholer with differing expertise, such as in U.S. pension law.  Ben-Jacob is the only attorney from Kaye Scholer who has been sued by SKAT. SKAT also has not sued Kaye Scholer.  Nevertheless, SKAT and Ben-Jacob's clients regularly reference the work of "Kaye Scholer" (the law firm), *see e.g.*, ECF No. 951, Jan. 10, 2024 Case Mgmt. Conf. Tr. 15:6-11 (counsel for Ben-Jacob's clients stating "*Kaye Scholer* set up all those pension plans. *Kaye Scholer* knew . . . . There's going to be some pushing off on to *Kaye Scholer*[.]") (emphasis added).  SKAT and Ben-Jacob's clients also reference the work of other attorneys at Kaye Scholer who advised Markowitz, van Merkensteijn, and Klugman.  Because Ben-Jacob's clients claim to have relied not only on Ben-Jacob's advice but on other lawyers at Kaye Scholer as well, what those other lawyers at Kaye Scholer did or said is necessarily relevant to their defense.  That same evidence is not relevant, and indeed is prejudicial, to Ben-Jacob's defense: Ben-Jacob should not be held liable for work done by his colleagues.  And in a trial with 11 other individual defendants and all the legal and factual work described above for the jury to process and decide, it is more likely that a jury would improperly hold Ben-Jacob responsible for their actions or inactions.

Finally, Ben-Jacob's professional obligations as an attorney further weigh in favor of separate trials: his ongoing duties of loyalty and confidentiality to his clients constrain his ability to present his defense.  While Ben-Jacob "*may* reveal or use confidential information" to defend himself, he is not required to do so.  *See* New York Rules of Professional Conduct 1.6(a) (emphasis added); *id.*, comment 6.  As a practicing attorney, Ben-Jacob should not be forced to choose whether to defend himself or to maintain utmost loyalty to his clients.  SKAT suggested that these ethical issues will be the same whether Ben-Jacob is a witness in a trial against the other defendants or is a defendant himself.  That's wrong.  In a consolidated trial, Ben-Jacob would have to filter his defense through the lens of his ethical duties while competing for airtime

with his clients—creating risk that he would be unable to present certain evidence to a jury that could render a finding in his favor.

Ben-Jacob cannot fairly be tried alongside his clients and thus the claims against him should be tried separately following any trial against his clients.

**2.      Consolidating trials against Ben-Jacob and his clients would result in immense inefficiencies.**

Putting aside the prejudice to all defendants that would result from including Ben-Jacob in a trial alongside his clients, doing so would also be inefficient given the number of issues unique to Ben-Jacob (and irrelevant to the remaining defendants) that will require substantial attention.

For example, SKAT's pension law expert purports to opine that Ben-Jacob "departed from professional standards" in providing legal services to Markowitz and van Merkensteijn in the face of certain supposed "red flags" indicating to him that the trading strategy his clients pursued may have been fraudulent.  It is clear SKAT intends to rely on this testimony and evidence in its attempt to show Ben-Jacob had the requisite mental state for each of the claims SKAT has asserted against him, but it is not at all relevant to any other defendants.  Further, Ben-Jacob will counter with his own expert—who, unlike SKAT's pension law expert, has a deep background in attorney professional responsibilities—and who has opined based on a detailed review of Ben-Jacob's years-long representation of these clients that Ben-Jacob's conduct was in line with professional standards and that SKAT's purported "red flags" fell outside his scope of representation, and indeed would not have presented to Ben-Jacob as "red flags" at all given the scopes of his representation, knowledge, and expertise.  And even if expert testimony on an attorney's professional responsibilities is excluded, the alleged "red flags" identified by SKAT's pension law expert provide a road map as to how SKAT intends to prove its claims against Ben-Jacob, and sorting through those issues alone is a trial all in itself: it will require, among other things, granular analyses of Ben-Jacob's role and substantive knowledge of legal memoranda prepared by Ben-Jacob and his Kaye Scholer colleagues, inquiries into whether, when, and for what purpose Ben-Jacob specifically reviewed various documents, and Ben-Jacob's personal understanding of the trading strategy his clients were pursuing at various points in the attorney-client relationship.  None of these issues are relevant to any other defendant.

Further, as noted above, much of the relevant legal advice that Markowitz, van Merkensteijn, and Klugman obtained from Kaye Scholer was provided by Kaye Scholer lawyers other than Ben-Jacob.  SKAT has sought to make Ben-Jacob responsible for all the advice provided by his colleagues: indeed, SKAT's pension law expert managed to devote several pages of her opening expert report to criticizing Ben-Jacob for allegedly failing to attend to various plan qualification issues, without once acknowledging that Ben-Jacob is not a pension lawyer and that pension law advice was provided by other lawyers at Kaye Scholer.  This creates an additional thicket of Ben-Jacob-specific issues for the jury to work through, including at a minimum the following: the extent to which Ben-Jacob was aware of the advice, and the bases for the advice his colleagues provided; whether Ben-Jacob was aware of information provided by the clients to his colleagues; the legal research conducted by his colleagues relevant to the issues

on which they were working, and whether (and the circumstances in which) Ben-Jacob was responsible for the advice his colleagues gave and the knowledge they possessed.  This is not a simple inquiry: the other Kaye Scholer lawyers involved, the extent of their involvement, and the issues for which they provided legal services all changed over time.  And Ben-Jacob also intends to rely on his attorney professional responsibilities expert to educate the jury on the workings of large law firms and the extent to which lawyers may rely on the expertise of their colleagues consistent with their professional obligations.  All of these issues have nothing to do with SKAT's claims against any of the other defendants.

### 3.    SKAT cannot overcome these core problems.

SKAT's arguments to include Ben-Jacob in a consolidated trial with 11 other individual defendants are not persuasive.  SKAT's central argument in favor of consolidation focused on efficiency—that this was a "rinse and repeat" fraud in which the same activity occurred with respect to multiple plans (ECF No. 951, at 8)—provides no support for Ben-Jacob's inclusion, and in fact is only an argument in favor of Defendants' Opening Proposal to try all the claims against Markowitz, van Merkensteijn, and Klugman and their plans together.  SKAT employing summary exhibits to demonstrate that multiple plans traded the same security on the same day does nothing to explain why Ben-Jacob should be lumped in with the other defendants or how SKAT's Proposal reduces the burden on the jury of spending days of trial time on categories of evidence relevant only to one distinct attorney defendant.

Further, SKAT's arguments that Ben-Jacob would be a "crucial witness" in a trial of SKAT's claims against Markowitz, van Merkensteijn, and Klugman, and that a separate trial of Ben-Jacob would be "duplicative" in that there would be some overlap in the documents and testimony on which SKAT would rely, do not address how SKAT could make comprehensible the firehose of information it seeks to turn upon the jury in a combined trial.  (*See* ECF No. 948, at 5.)  Crucially, the task for the jury is not just the amount of information received but what the jury is asked to do with that information.  If Ben-Jacob is a witness and not a defendant, the jury does not have to focus on and make findings on the multitude of Ben-Jacob-specific issues discussed above.  Nor would the jury hear days of testimony on professional responsibility issues, as just one example of a substantial issue that would be removed from the trial entirely.  SKAT further ignores that the parties could streamline any second trial and avoid undue repetition of issues covered in a preceding trial through negotiated stipulations.

Finally, SKAT's broad suggestion that imposing a sprawling consolidated trial of all claims against 12 individual defendants will drive certain of those defendants to pretrial settlements is completely wrongheaded.  (*See* ECF No. 951 at 6, 7).  For one thing, common sense and experience dictate that the exact opposite approach of a narrow initial trial that allows all of the MDL parties to see how a jury resolves certain claims or issues is more likely to result in resolutions, particularly given the number of unsettled legal and factual issues in these cases.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508, 2013 WL 664176, at *1 (S.D.N.Y Feb. 25, 2013) ("bifurcation [pursuant to Rule 42(b),] may be appropriate to avoid prejudice and promote judicial efficiency, where litigation of one issue may obviate the need to try another case").  What SKAT proposes is settlement at gunpoint: that defendants are more inclined to settle faced with the threat of an unfair consolidated trial in which it would be impossible for the jury to make fine distinctions among the defendants and

where individualized defenses would be lost in the undifferentiated sea of evidence presented to the jury. That "ends justify the means" mentality is no basis for the Court to adopt SKAT's manifestly unjust proposal.

**C.    Trying the "friends and family" defendants alongside Richard Markowitz, John van Merkensteijn, Robert Klugman, would also be prejudicial.**

The paramount concern for the friends and family defendants and their plans is that they will not receive a fair jury trial on the fraud-based claims if they are tried alongside the defendants that introduced them to the investment.[7] Counsel for SKAT appeared to suggest at the January 10, 2024 Case Management Conference that the scienter of Markowitz and van Merkensteijn somehow can be ascribed to these defendants simply by virtue of their longstanding relationships with one other. Indeed, in support of the contention that the friends and family defendants' knowledge of the facts and circumstances of the investments did not differ from that of Markowitz and van Merkensteijn, counsel for SKAT handed up an exhibit at the Conference that merely listed the plans of the friends and family defendants. From that document, counsel for SKAT reached the unfounded conclusion that the issues respecting the friends and family defendants and the defendants that introduced to the investments are the "same" despite the fact that the email itself showed that it was neither drafted by nor transmitted to the friends and family defendants and, at most, proved a point not in contention—namely, that Markowitz and van Merkensteijn introduced the friends and family defendants to the investment. This purported exhibit proves the friends and family defendants' point. Unlike the Court, a jury could be led astray about the significance of exhibits. To protect against such confusion, counsel for the friends and family defendants would need to assert objections to the admissibility of exhibits against her clients, objections that Markowitz, van Merkensteijn and Klugman may not have. This too would confuse a jury and likely require the Court to instruct the jury repeatedly during the trial, and after, about arcane evidentiary rules with which a jury is likely to have no familiarity or interest.

**II.    A CONSOLIDATED BELLWETHER TRIAL WITH BEN-JACOB AND FRIENDS AND FAMILY DEFENDANTS SEVERED IS SUPERIOR TO SKAT'S PROPOSAL**

If the Court is not inclined to proceed with Defendants' Original Proposal, then Defendants submit that the Court's suggestion of a bellwether trial is superior to SKAT's Proposal. Specifically, Defendants propose that the Court instead begin with a trial of the three bellwether cases associated with Markowitz, van Merkensteijn, and Klugman (*Basalt* (19-cv-01866), *RJM Capital* (19-cv-01898), and Bareroot Capital Investments LLC 401(k) Plan (Case

---

[7] There are eight such friends and family defendants, each of whom must be proven, by clear and convincing evidence, to have harbored an intent to deceive SKAT through the submission of the reclaim applications, which alone contain the allegedly fraudulent statements. A trial including the eight friends and family defendants and their plans, another 28 defendants, would require a jury to sift through and distinguish the evidence as to each of them, presenting its own quagmire and potentiality of jury confusion and prejudice.

No. 19-cv-01783),[8] or another mutually agreeable case such that Markowitz, van Merkensteijn, and Klugman will all be bellwether defendants, severing Ben-Jacob and the "friends and family" defendants for the reasons described above.

Bellwether trials are standard practice in large MDLs like this, and a bellwether trial here, particularly if limited to those three individual defendants, is superior to SKAT's Proposal because it would eliminate the courtroom logistics difficulties, greatly reduce the demands placed on the jury, allow the parties to test key claims and defenses, and facilitate settlement when the parties see how the jury resolves those claims and defenses in a representative case. *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prod.*, No. 1:00-1898, 2007 WL 1791258, at *2 (S.D.N.Y. June 15, 2007) ("A bellwether trial also allows a court and jury to give the major arguments of both parties due consideration without facing the daunting prospect of resolving every issue in every action… [E]very experienced litigator understands that there are often a handful of crucial issues on which the litigation primarily turns.  A bellwether trial allows each party to present its best arguments on these issues for resolution by a trier of fact.  Moreover, resolution of these issues often facilitates settlement of the remaining claims."); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar."); 4 Newberg and Rubenstein on Class Actions § 11:11 (6th ed.) ("[T]he bellwether trial may bind the individual litigant to it, but it will have no binding effect on the other cases within the pool or MDL generally.  This limits the purpose of the bellwether process to an informational goal—that what the parties learn will help structure a settlement—but so valuable does that purpose prove to be, that most MDL courts regularly engage in bellwethers in appropriate cases.").

The parties would have further work to do to set the contours of and address the logistical details of a combined bellwether trial, but those efforts would be far more straightforward than making SKAT's Proposal manageable.

## III.    AN ISSUES TRIAL IS ALSO A SUPERIOR ALTERNATIVE TO SKAT'S PROPOSAL.[9]

Should the Defendants' Opening Proposal and Defendants' Proposed Trial Bellwether not be adopted, Defendants submit that an opening "issues" trial on the issues of falsity, reliance,

---

[8] This is Defendants' proposed substitute for the *Roadcraft* case given Mr. Altbach's passing as it would have been the parties' mutually acceptable first backup summary judgment bellwether.

[9] The Markowitz and van Merkensteijn Defendants, who take no part in this Section III, are not opposed to exploring the possibility of and parameters for an "issues" trial through discussions with SKAT. However, SKAT's stated objections to this approach, the apparent lack of useful precedent to guide an understanding of how such a proceeding might work in this case, and the absence of any meaningful dialogue with SKAT on the topic prevent the Markowitz and van Merkensteijn Defendants from stating whether any particular issue is susceptible to an "issues" trial of the type proposed by other defendants.

and the statute of limitations is superior to SKAT's Proposal.  Specifically, Defendants propose an opening trial limited to the following common issues: (1) whether the plans that traded through Solo Capital beneficially owned the shares for which they sought refunds (*i.e.*, whether they made false statements in that regard), (2) whether SKAT reasonably relied on representations that the plans did beneficially own the shares, and (3) whether and on what date SKAT's claims against all defendants became time-barred.

Defendants submit that proceeding in this fashion would avoid the problems with SKAT's Proposal, promote judicial efficiency, and avoid prejudice to the parties.  *See, e.g.,* Manual for Complex Litigation (4th ed.) § 11.632 Separate Trials ("Whether the litigation involves a single case or many cases, severance of certain issues for separate trial under Federal Rule of Civil Procedure 42(b) can reduce the length of trial, particularly if the severed issue is dispositive of the case, and can also improve comprehension of the issues and evidence."); *see also Papst Licensing GmbH & Co., KG v. Samsung Elec. Co., Ltd.*, No. 6:18-CV-00388, 2018 WL 10127016 (E.D. Tex. Oct. 25, 2018) (bifurcating issues of patent infringement from the defendant's scienter due to "the complex litigation history" of a related MDL and "the high risk of prejudice . . . and confusion to the jury" should both issues be presented in the same trial).

*First*, each of these issues is itself highly complex and requires the jury's complete focus, and so removing all three from the set of issues that a jury would have to consider when evaluating individual defendant liability will lead to more manageable future trials.  The issue of whether the plans beneficially owned the shares, for example, will require extensive consideration of, among other things, securities market and trade booking practices (for which both sides have experts), Danish law concerning securities ownership (for which both sides have experts), and the intricacies of the U.S.-Denmark tax treaty at the root of SKAT's claims (for which Defendants have an expert).  (*See* ECF No. 799, at 16-25, 45-57.)  And SKAT's position that the trades underlying the pension plans' dividend withholding tax refund requests never occurred at all will require examination of financial records of Solo Capital and affiliates, the records and testimony of several other financial institutions from which SKAT has sought discovery, and more expert testimony to help the jury make sense of it all.  (*See* ECF No. 817, at 12-19.) Indeed, the English court hearing SKAT's claims against Solo Capital held a multiweek trial on the sole issue of whether the ex-dividend trading structure practiced by Solo Capital was sufficient to meet the eligibility requirements for refunds of withheld dividend taxes under Danish law.  (ECF No. 923, at 8.)

*Second*, there is substantial overlap in the documents and testimony relevant to each of these three issues.  By way of example, each requires a thorough understanding of the dividend withholding regime in Denmark and SKAT's administration of it, several fundamental concepts of capital markets and securities trading, the structure of the ex-dividend trading strategy, and a range of Danish legal issues.  As to issues of reliance and the statute of limitations, Defendants have amassed a wealth of evidence demonstrating that SKAT was aware of, and disregarded, massive flaws in its administration of the dividend withholding tax system over a period of years leading up to the alleged fraud, which demonstrates both that SKAT's reliance on Defendants' statements was unreasonable, and that it should have known of its claims far earlier than it says it did.  (*See* ECF No. 799, at 58-71, 79-82).  Addressing these three issues together accordingly is an efficient approach to resolving key issues in this mass of cases.

*Third*, a resolution of these three key issues is far more likely to drive settlements across the MDL than SKAT's proposed omnibus trial of one grouping of defendants (and to do so without the threat of an unfair trial), and any cases that do not settle could be tried in a streamlined fashion.  If SKAT succeeds, for example, in demonstrating that Defendants' statements concerning ownership of the shares were false, and that its claims are not otherwise barred due to unreasonable reliance or the statute of limitations, substantial current sources of uncertainty will be removed and Defendants will be able to make individualized decisions about resolution based on their particular circumstances.  And if SKAT loses on any or all of these issues, no future proceedings may be necessary at all, or SKAT too will have a more realistic picture of its likelihood of success against the individual defendants.  Courts have ordered bifurcated issues trials for that very reason—in particular when defendants are pursuing a statute of limitations defense.  *See, e.g., Adams v. Zimmer,* No. 5:18-cv-000621, at Dkt. 158 (E.D. Pa. Mar. 13, 2022) (granting bifurcation on statute of limitations defense because "the statute of limitations defense could be dispositive and has the ability to end the case"); *Young v. Mentor Worldwide, LLC,* 312 F. Supp. 3d 765 (E.D. Ark. 2018) (granting bifurcation of statute of limitations defense for product liability action following transfer back from MDL because the defense "is potentially dispositive, and a preliminary trial will not consume the time and expense necessary for a trial on the merits"); *MP Nexlevel of Calif., Inc. v. Cvin, LLC*, No. 1:14-cv-288, 2016 WL 5815895 (E.D. Cal. Oct. 5, 2016) (bifurcating preliminary question as to whether the plaintiff's contracting license was valid because "if a jury found that MP's Class A license was invalid or insufficient then [Plaintiff] is precluded . . . from maintaining any of its claims").

Defendants acknowledge that many logistical details concerning the structure and conduct of an issues trial would need to be worked out, and that the English court's successful use of an "issues trial" structure to adjudicate SKAT's claims against Solo Capital does not provide a perfect model here given differences between our legal system and theirs.  But these difficulties are in no way insurmountable, and if the Court were to order the parties to proceed in this fashion, an appropriate framework can be devised.

*        *        *        *        *

For the foregoing reasons, Defendants respectfully request that the Court decline to adopt SKAT's Proposal for the opening trial in this MDL, and instead order the parties to proceed with one of Defendants' proposed alternatives.

Respectfully submitted,

*/s/ Thomas E.L. Dewey*
Thomas E.L. Dewey

Cc: All counsel of record via ECF

14

**APPENDIX A**

| Defendants | Associated Case(s) |
|---|---|
| John van Merkensteijn, III | 19-cv-01866 |
| Elizabeth van Merkensteijn | 19-cv-01865 |
| Azalea Pension Plan | 19-cv-01906 |
| Basalt Ventures LLC Roth 401(K) Plan | 19-cv-01894 |
| Bernina Pension Plan | 19-cv-01911 |
| Bernina Pension Plan Trust | 19-cv-01871 |
| Michelle Investments Pension Plan | 19-cv-01930 |
| Omineca Pension Plan | 19-cv-01873 |
| Remece Investments LLC Pension Plan | 19-cv-01924 |
| Starfish Capital Management LLC Roth 401(K) Plan | 19-cv-10713 |
| Tarvos Pension Plan | 19-cv-01893 |
| Voojo Productions LLC Roth 401(K) Plan | |
| Xiphias LLC Pension Plan | |
| Richard Markowitz | 19-cv-01867 |
| Jocelyn Markowitz | 19-cv-01895 |
| Avanix Management LLC Roth 401(K) Plan | 19-cv-01869 |
| Batavia Capital Pension Plan | 19-cv-01868 |
| Cavus Systems LLC Roth 401(K) Plan | 19-cv-01898 |
| Calypso Investments Pension Plan | 19-cv-01896 |
| Hadron Industries LLC Roth 401(K) Plan | 19-cv-01906 |
| RJM Capital Pension Plan | 19-cv-01911 |
| RJM Capital Pension Plan Trust | 19-cv-01924 |
| Routt Capital Pension Plan | 19-cv-10713 |
| Michelle Investments Pension Plan | 19-cv-01904 |
| Michelle Investments Pension Plan | |
| Remece Investments LLC Pension Plan | |
| Xiphias LLC Pension Plan | |