# Exhibit 5

The court in Glostrup



**Transcript of the judgment book**

**J U D G E M E N T**

delivered on 2 February 2024

Court No. AL-2664/2022
Police No. SØK-76141-00005-20

Prosecutor's Office
against
Guenther Klar
social security number 060969-ABMM

Pursuant to Section 12(8) of the Code of Civil Procedure, two legal judges
and three lay judges were involved in this case

Indictment received on March 9, 2022.

Guenther Klar is charged with

**Fraud of a particularly serious nature within the meaning of section 279
of the Danish Criminal Code, cf. Art. 286 (2)**

In the period from February 2012 to July 2015, by unlawfully inducing the
recovery of dividend tax in order to obtain for himself or others unjust
enrichment, by causing the development, implementation and operation of a
system in which a company ultimately owned and managed by him,
Salgado Capital (a now discontinued company in the Comoros), recorded
share transactions and loans relating to Danish, quoted shares and money
movements between, on the one hand, two US 401(k) pension plans, an
English pension scheme and a Luxembourg company (collectively referred
to as the "investors") and, on the other hand, Salgado Capital, which trades,
loans and cash movements were fictitious or of such a nature that the
investors did not thereby receive dividends or a right thereto, whereupon he
commenced that Salgado Capital prepared dividend notes containing
incorrect information about the receipt of dividends from Danish shares to
investors, which the investors, with his knowledge, submitted in 147 cases
via a reclaim agent, Goal Taxback Limited, to the Danish Tax Agency (then
SKAT) together with an application for full or partial reimbursement of the
dividend tax stated in the dividend notes, which led employees of the
Danish Tax Agency into a delusion as to whether that the investors had
received dividend tax deducted in Denmark and were entitled to a refund
thereof by virtue of double taxation conventions, whereby the Danish Tax
Agency was ordered to pay not less than DKK 320,758,845 to the reclaim
agent and thereby suffered a corresponding loss of assets, whereupon the
reclaim agent passed on the money subtracted his fee to Salgado Capitals

Std 75284

bank account

## Claims

The prosecutor has asked for imprisonment for 7 years.

The prosecutor has alleged that Guenther Klar is to be expelled pursuant to section 49(1) of the Aliens Act, cf. section 24 (1), cf. section 22, (1) and (6), with an entry ban valid forever, cf. section 32, subsection 4, no. 7.

The prosecutor also requests that Guenther Klar be disqualified for the time being from participating in the management of a business enterprise in Denmark or abroad without being personally and indefinitely liable for the company's obligations, cf. section 79(2), second sentence, cf. section 79(1), cf. section 78(2) of the Danish Criminal Code.

Finally, the prosecution service has requested that DKK 219,594,870.60 is to be confiscated from Guenther Klar pursuant to section 75(1) of the Danish Criminal Code, cf. section 76(1), or alternatively (4).

Guenther Klar has pleaded not guilty.

Guenther Klar claims that the allegations of deportation, disqualification and confiscation should be dismissed.

At the main hearing, Guenther Klar claimed that the action was inadmissible on the basis of Article 10a of the Criminal Code and Article 50 of the Charter of Fundamental Rights of the European Union or, in the alternative, under Article 10b of the Criminal Code, read in conjunction with the pending criminal proceedings in Belgium.

The prosecution claims that the case is not dismissed.

## Facts of the case

Evidence has been given by defendant Guenther Klar and by the witnesses, the former employee of SKAT, Lisbeth Rømer, Deputy Director of Finanstilsynet, Anders Kragnæs Balling, product manager at Euronext Securities, Helen Sørensen, former director of Salgado Capital, Andrew Moray Stuart, former director of Khajuraho Equity Trading S.á.r.l., Janice Brenda Allgrove, investors Kevin Kenning, Todd James Bergeron and Barry Michael O'Sullivan, Guenther Klar's English lawyer, Kevin Robinson, and the former employee of SKAT, Sven Jørgen Nielsen.

Excerpts have been documented from, among others:

- 147 applications for dividend tax refunds. The applications consist of a request from Goal Taxback Ltd., SKAT's form "petition for exemption from Danish dividend tax", dividend note from Salgado Capital ("Credit Advice"), power of attorney from the investor to Goal Taxback Ltd and certification of the investor's tax situation.

- Company documents relating to Salgado Capital, Khajuraho Equity Trading S.á.r.l., Europa LLP Executive Pension Scheme, Blue Ocean Equity LLC and Blue Ocean Equity Retirement Plan & Trust as well as Cole Enterprise USA, LLC and COLE Enterprises USA Retirement Plan & Trust.

- Salgado Capital's accounting for investors in the form of Custody Statements containing information on, among other things, "Open Positions", "Equity Transactions" and "Cash Statements", trading notes ("Broker Confirmations") and agreements on equity loans ("Stock Loan Confirmation" and "Stock Loan Unwind Confirmation").

- Bank account statements
    - From Caledonian Bank and Global Fidelity Bank regarding Salgado Capital's accounts in GBP, USD and EUR and Guenther Klar's accounts in GBP, USD and EUR,

    - From Global Fidelity Bank regarding Amalthea Ltd.'s accounts in USD and GBP,

    - From Dansk Bank regarding SKAT.

- Disclosure information regarding the reclaim agent Goal Taxback Ltd.'s transfer of refunded dividend tax to Salgado Capital.

- Decisions of the Danish National Tax Tribunal concerning the Europa LLP Executive Pension Scheme, Khajuraho Equity Trading S.á.r.l., Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust, in which SKAT was successful in finding that the investors had not documented that they had been the owner of the alleged shares or received dividends on the shares, and that the investors had therefore not been entitled to dividend tax refunds.

- Information about pending or completed civil cases between the Danish Tax Agency and individuals or companies related to the case, including pleadings from the civil case that the Danish Tax Agency conducts in England against, among others, Guenther Klar.

- Information on the settlement between Mr O'Sullivan and the Belgian tax

authorities and the Belgian Public Prosecutor.

- The contested judgment in Belgium concerning Guenther Klar.

- Information that the prosecution has dropped charges against Kevin Kenning and Todd Bergeron.

**Guenther Klar** explained that from 2002 to 2013 his name was Guenther Grant-Klar as a result of his marriage to his first wife, Antonia. Before and after marriage, his name was Guenther Klar.

Shown extract 2, page 13, exhibit 76-36-00-2487 (translation extract page 14), CV, he explained that he has lived in England since the age of 6. He went to school in York and studied mathematics at Oxford, graduating in 1991. He later trained as a chartered accountant, employed by Deloitte's tax department in London. He was admitted in 1997. After that, he worked in the tax departments of Shell and Enron. At Enron, he was engaged in financial transactions from a tax perspective. He was employed by ABN AMRO Bank from 2001-2008. He worked with a group that traded bonds and other financial products, but not stocks. He was not involved in the actual securities trading, but had to try to optimize the trades from a tax point of view. He also worked to provide liquidity for the bank. Others were involved in securities trading, and the bank's German branch was particularly concerned with this. He was, however, familiar with the trade patterns used in this context.

During the financial crisis, he became unemployed. Through a contact he had previously worked with at Enron, Raj Shah, he was introduced to Sanjay Shah. Despite the surname, the two gentlemen are not related to each other. Sanjay Shah ran the company Solo Capital Ltd. Sanjay Shah knew a lot about Cum-Ex trades and had worked in securities trading, but did not have a schooled background himself. Raj Shah and the defendants' backgrounds were therefore interesting to Sanjay Shah because they knew how to raise money, build a structure in a financial company, and set it in motion. The defendant could talk to regulators, accountants and lawyers. Sanjay Shah therefore proposed a collaboration in 2009.

They set up an Irish investment fund ("trust"), Broadgate, and were looking for investors. The investment fund had to trade in German shares because the tax conditions between Ireland and Germany were favourable compared to dividend tax refunds. He contacted a number of potential investors, including Barry O'Sullivan, who worked in a Dublin-based family business, QED. He described the business idea to Barry O'Sullivan. The investment fund would work on buying shares before the Ex-day with the right to the dividend payment, but with the delivery of the shares after the transaction date. It was thus ultimately Cum-Ex trading where the investment fund

would acquire a Market Claim equal to the dividend. The investment fund itself had to hedge risks in connection with price fluctuations ("hedging"), and it was therefore less important to the investment fund what happened to the share price. The  profit consisted solely of the refund of dividend tax from Germany, and the purpose of the transaction was to recover tax. You buy a shareholding before the dividend date with the associated right to the dividend, but because the shares are agreed to be transferred only after the dividend payment, you receive the shares without the right to dividend. The buyer therefore does not receive the de facto dividend, but rather the right to a payment for it (Market Claim). In 2010, this was a common business model. This is how it looked from the perspective of the investment fund. The counterparty was supposed to be a short seller who borrowed the shares for the delivery date.

They were very open in presenting the business model, and Barry O'Sullivan understood it and had no doubts about anything. However, in 2010 he did not want to invest. Instead, they got in touch with an American company, Argre, which wanted to invest DKK 40 million. It was either GBP or EUR, but today he does not remember the currency. Solo Capital Ltd. was in charge of finding financing ("leverage"), was the investment manager, custodian and made sure to hedge the exchange rate risk ("hedging"), and decided everything related to the purchase and sale of the securities. The fund's primary broker was Merrill Lynch, who was also in charge of leverage. The investments were leveraged 1:20 so that Solo Capital Ltd. could invest for 800 million. Sanjay Shah was in charge of the securities deals themselves. Everything else he and Raj Shah stood for.

On the advice of the defenders, Guenther Klar did not want to answer whether it was he who developed the strategy for the Irish investment fund.

He was first hired by Solo Capital Ltd. in 2010 while in London. In 2009, they had a more informal collaboration. In 2011, he lived in Dubai and was no longer employed. They had a consulting agreement, and he was still working for Sanjay Shah that way. In effect, he was doing the same thing as in 2010. During 2011, he divorced and stopped working for Sanjay Shah. He wanted to prioritize his family. He couldn't work as hard as Sanjay Shah wanted. The two parted amicably. Formally, their cooperation did not end until January 2012. After that, he no longer worked for Sanjay Shah or Solo Capital Ltd., but he has been a client of Solo Capital Ltd.

In February 2012, he founded the company Salgado Capital.

He does not believe that his divorce affected his ability to establish his own business, except that the two events took place simultaneously.

Shown Extract 2, page 383, Exhibit 53-15-00-151, consent order, item E, Guenther Klar explained that he did not as such expect to earn £42 million, of

which his ex-wife would receive 70 percent. At the time of the deal, he had already been trading for a year and had an indication that the business could become profitable. It was based on trades made in the Europa LLP Executive Pension Scheme and Khajuraho Equity Trading S.á.r.l. (hereinafter Khajuraho).

Shown from extract 2, page 380, exhibit 53-15-00-101, mail from Guenther Klar to Antonia Grant on May 24, 2012 (translation extract page 48), which states, among other things: "1. *We both want a divorce without ties by using part of the profits on the lump sums that accrue to me as a result of the tax refunds due to my business. 2. I will pay you a flat rate (80%) of all these refunds until it totals £30m."* he explained that it was deliberately very simplistic outlined. His ex-wife was aware that tax refunds were the only earnings on the Cum-Ex trades of Solo Capital Ltd. He did not want her to know that he intended to assume market risk on price fluctuations. She wouldn't fully understand it, and the part she wanted to understand would make her worried.

He wasn't at all sure that he would be able to make money in 2012 on that scale. When the divorce agreement was reached in 2013, he was still not sure about the earning possibilities, but he had become more convinced. There is no reference in the divorce agreement to tax refunds, which was because everyone was now aware that his business model was not solely about tax refunds.

Asked why he would pay his ex-wife nearly £30m based on future earnings, Guenther Klar explained that he felt guilty about the divorce, which he felt ruined their children's lives. They had had a good life together and a good standard of living. He wanted to take good care of the children and share his possible surplus with them.

About the Europa LLP Executive Pension Scheme, Guenther Klar explained that he founded the company at the end of 2010 due to the divorce. He was both beneficiary and trustee. He wanted his retirement funds collected before they were to be divided at the time of divorce. He explained that "trustee" can best be compared to a director of a company. "Beneficiary" corresponds to the shareholder of a corporation. As trustee and beneficiary owner of the Europa LLP Executive Pension Scheme, he could decide everything regarding the company. He originally deposited £320,000, and after the divorce half remained. In 2010–2012, the deposit was just held in an interest-bearing English account. When Europa LLP Executive Pension Scheme became a client of Salgado Capital, it invested in an account in the name of Salgado Capital. Later, the money was returned at the request of the Europa LLP Executive Pension Scheme. Profits on securities transactions were continuously drawn upon.

The Europa LLP Executive Pension Scheme no longer exists. He believes it was dissolved in 2021 when assets were exhausted on paying charges and fees.

He set up Khajuraho in May 2012 with the aim of trading shares in Luxembourg. It was not Cum-Ex trades, but part of the business foundation was tax optimization of securities trades. The transactions were subject to tax rules in Luxembourg. Dividend tax refunds were part of the activity. He was the sole shareholder. He believes that it was a requirement that there should be a local director due to tax regulations. On paper, the decisions were made by the director, but in reality it was he who made the decisions. He decided everything regarding the stock trades. The director, Janice Allgrove, took care of everything else, including bookkeeping and accounting. The company generated profits in various ways. He could withdraw money from the company if, as sole shareholder, he wished to do so, for example as dividends. If he wanted to get money out, he actually consulted the bookkeeping department on how best to do it.

The company was dissolved in November 2020, probably through a forced dissolution. The Luxembourg tax authorities alleged that the company had unpaid tax debts. The company had appealed against the tax assessment through its external auditor, but the appeal was unsuccessful.

Khajuraho and Europa LLP Executive Pension Scheme became clients of Salgado Capital.

It was also he who created Salgado Capital. He knew he would need a broker and custodian when he started thinking about running his new business. He contacted the worldwide company, Atlas, in Dubai about the best way to obtain a broker's license. Atlas did not offer this as a service, but he was advised to look for providers in the Indian Ocean, specifically Comoros. Atlas would be able to provide services to a custodian if he obtained a broker's license. He was told that Atlas would be able to help him find a professional director and a shareholder. Atlas specifically proposed a Mauritian charitable foundation. He then contacted Comoros and set up Salgado Capital. He approached him by phone and mail, but was never in the Comoros himself. He spoke with one Thomas Jenkins. All actions were taken through Anjoun Corporate Services Ltd. (hereinafter ACS). He does not recall any direct contact with the authorities ("regulators"), but his understanding was that there was a close connection between the ACS and the authorities. There was a coincidence of personalities between the officials of the Authority and the employees of ACS. He made his first contact with ACS by searching the Internet. ACS obtained Salgado Capital a brokerage license.

Salgado Capital's business address in Anjouan was obtained through ACS, which offered to rent an office for the company. Khajuraho had similarly rented an

office in Luxembourg. There was no operation from the office address at Anjouan, but he believes someone picked up the phone. He remembers receiving phone messages from there, but doesn't remember when. After a year, he no longer needed the office, and he believes that Salgado Capital only paid for the rent of the office for a year. Salgado Capital also had an email address.

He was the only authorized broker for Salgado Capital. Salgado Capital used a custodian as a sub-custodian. Salgado Capital got the securities prices from there.

When asked if Salgado Capital had special software for brokerage and custodian operations, Guenther Klar explained that he prepared documents relating to the registration of trades, confirmations, dividend notes ("DCA") and Salgado Capital's account cards. He did it on his own PC using Word and Excel. He worked from his place of residence and did not have an office. He made all registrations manually. He lived in Dubai until early 2014. From the beginning of 2015, he lived in Manchester. In the intervening year, he lived in both places.

Comoros was used as the home of Salgado Capital because the brokerage license could be obtained quickly and at low cost. The decision as to which regulatory control was or was not in the Comoros did not play a role. He knew that all trades had to be to EU standards, and he didn't want to do anything "off-shore" that he couldn't do "on-shore". He may have been off-shore, but that wasn't crucial and he didn't plan to do anything that might affect his reputation. He contacted Atlas in Dubai because he lived there at the time. Atlas was a global service provider. He did not consider Dubai as the home of Salgado Capital because Atlas specifically proposed Comoros. He doesn't think he considered other places of residence. He obtained the licenses he wanted through ACS in Comoros.

However, he had a contact with a law firm in Panama. It was around the same time. He asked whether it would be legal in Panama to carry on the type of business he had planned. The law firm returned and stated that it would not be legal. It was either short selling or OTC trades [over the counter] that were not allowed. It was possibly both that were not legal. He was told that the local brokers only traded on an exchange, or a seller was not allowed to short sell.

When he founded Salgado Capital, he had started researching the various potential markets. He knew that he wanted to trade on the Danish market and soon after decided to involve Belgium and Austria. The Swedish market only came into existence in 2013.

Shown extract 2, pages 19-20, exhibits 76-36-00-2493 and 2494 (translation extract page 17), business plan, under "Market, subparagraphs (a) and (b), Guenther Klar explained that the description is broader than what the company realized. He also

researched markets other than the four mentioned, but chose not to pursue them further. He knew that his company was also going to be a custodian. He also applied for and obtained through ACS license for this. It is an oversight that it is not mentioned in the business plan.

Shown the same appendix, page 20, under "Short and Medio, Term Objectives", he explained that today he does not remember how he arrived at the expectation of an annual turnover of 240 million shares. He is sure that the figure is based on a calculation he has made.

Shown extract 2, page 35, Exhibit 76-36-00-2509 (translation extract page 27), application to ACS, where under item 8 on expected annual turnover it says "USD 200,000", he explained that this was his expectation at the time. He is sure that it was based on a real calculation. Revenue still appears realistic compared to trading 240 million shares per year. When he made the business plan, it was his expectation for revenue.


When Salgado Capital was founded, he was not the legal owner of the capital. It was a "nominee" company, Hillingdon Turner Nominees Ltd., which was procured at his request by ACS. He accepted it, so it was effectively he who appointed Hillingdon Turner Nominees Ltd.

This company became a legal owner, but was not a beneficial owner. The beneficiary was a "Trustee" who at the time was himself. Typically, there is a contract between the "nominee" company and the beneficiary that the "nominee" company, as "legal owner", held the shares of the beneficiary. Hillingdon Turner Nominees Ltd. was, I believe, a subsidiary of ACS. He suspects this because the director of Hillingdon Turner Nominees Ltd. also worked for ACS. He knows nothing about this company other than that it was connected to ACS. The functions to be performed by Hillingdon Turner Nominees Ltd. were provided as services by ACS.

He didn't want to be the beneficiary. He turned to Atlas again and they founded the Mauritian charitable foundation, The Salgado Charitable Trust, which was registered as a shareholder in June 2012. At some point from its inception in February 2012 and the registration of the charitable foundation as owner in June 2012, the contract with Hillingdon Turner Nominees Ltd. was terminated. Thereafter, The Salgado Charitable Trust was both owner and beneficial owner. The purpose of the Foundation was to support education, and the beneficiary was Lady Margaret Hall, an educational institution in Oxford. This institution was never told that it was a beneficiary, nor is it necessary under the rules governing these beneficiary funds.


Even after the ownership rights over Salgado Capital's shares were transferred to The Salgado Charitable Trust, it was essentially he who controlled Salgado Capital, even though he was not legally the owner. In connection with a civil case brought by Skat,

he has for a long period misunderstood what he was asked to explain. Therefore, he explained about the legal construction. But he now answers what the substance was like.

He had a power of attorney to head Salgado Capital. The power of attorney was, I believe, valid for one year. It was Hillingdon Turner Nominees Ltd.'s director who issued the power of attorney. After that year, he formally missed the legal right to head the company. He did not want to act on a power of attorney and he did not want Hillingdon Turner Nominees Ltd. as directors of Salgado Capital.

Shown Extract 2, page 30, Exhibit 76-36-00-2504, Personal Questionnaire, he explained on paragraph 3 that "controller" is to be understood as the one who controlled or controlled the company. This did not imply that he had an accounting or auditing role.

There would have been nothing to prevent him from being the legal owner of Salgado Capital. The company could also have entered into the deals that it did. Based on his experience with Europe and the tax authorities, he knew that authorities were more likely to look at the company if there were interested parties involved in transactions. This was to ease the compliance burden. He wanted to use his own firms to trade in, and it was better that he did not also own the company that was the custodian and broker. If he had owned Salgado Capital, it would be his burden of proving to the tax authorities that he had acted at arm's length. If he was not the owner, the burden of proof was that of the authorities.


It was another Hillingdon Turner company, Hillingdon Turner Director, who was a director of Salgado Capital and who issued the power of attorney to him. It mattered to him who was formally the director of the company. He did not want Hillingdon Turner Director to be a long-term director or to act by proxy himself. Not having to act by proxy would also reduce the compliance burden.


He therefore appointed Andrew Moray Stuart as director. He was one of the professional directors that Atlas could offer. Andrew Moray Stuart worked for Atlas in Mauritius. He did a background check on Stuart in 2012, and at the time, there was nothing to make him think that Stuart shouldn't be a professional director. In addition, as mentioned, he worked for Atlas, which was a globally reputable company. The change of director coincided with the transfer of the shares to The Salgado Charitable Trust.

He has never met Andrew Moray Stuart. He spoke with a woman, Karin van Rensburg, who contacted Stuart. At least that is how he saw it.


The prosecutor documented from

- Extract 2, page 74, Exhibit 76-41-00-1157, Register of Shareholders, Salgado Capital, where the share is transferred to The Salgado Charitable Trust on 11 June 2012, and

- Extract 2, page 75, Exhibit 76-41-00-1158, Register of Directors etc., Salgado Capital, of which Andrew Moray Stuart was appointed as a director on June 11, 2012.

Guenther Klar explained that the annexes, which are respectively a list of shareholders and of directors/management, correspond to what he has just explained. He himself had the annexes notarized in Dubai. He believes that he got the vouchers notarized because he needed them in connection with the company opening a bank account with Caledonian Bank.

The prosecutor documented from

- Extract 2, page 265, Exhibit 53-47-00-19, Register of Shareholders, Salgado Capital, transferring the share from Hillingdon Turner Nominees Ltd. to Guenther Ready on June 11, 2012.

Asked about the connection between these two different shareholder records, Guenther Klar explained that the listing on page 74 of the extract was used in connection with a bank account at Caledonian Bank in 2012. It had taken a long time to get that account in place because of the rules around KYC ("Know Your Customer"). The bank asked for it in their pigeon diligent process. Caledonian Bank investigated both The Salgado Charitable Fund, as well as the director and the company's trustee.

By 2015, Caledonian Bank had gone bust and Salgado Capital had to be registered as a creditor of the bank's estate. Salgado Capital had a deposit in the bank in the region of $10 million at the time. The liquidation of Caledonian Bank was carried out by Ernst & Young. In order to register as a creditor, Ernst & Young had to carry out due diligence.

He had also become concerned that the registered director, Andrew Moray Stuart, might appropriate Salgado Capital's funds when he found out how much the company had in deposit. He simply decided to announce that he was a director ("call myself out"). He should not have done that.

Part of the deposit belonged to his own companies, the Europa LLP Executive Pension Scheme and Khajuraho. The remaining money belonged to Salgado Capital's other clients COLE Enterprises USA Retirement Plan, Blue Ocean Equity Retirement Plan & Trust and Heber, except for approximately $1 million which belonged to Salgado Capital itself. He was the only one who knew the distribution of ownership of the funds in the account of Caledonian Bank.

He was in no way trying to appropriate funds that did not belong to him, but wanted to

ensure that the funds that would come from the liquidation were passed on to the right people.

In 2015, it was also urgent for Salgado Capital to open a new bank account. He predicted that it would be a very lengthy process if it appeared that The Salgado Charitable Trust was the shareholder. Facing Salgado Capital's new banking partner, Global Fidelity Bank, he therefore said that he was the shareholder. Obviously he shouldn't have done that, but as I said, he didn't do it to cheat anyone.

He used the register of shareholders [Exhibit 53-47-00-19] to open the new account with Global Fidelity Bank. He has produced the appendix himself – either in Word or Excel. He obtained a copy of the annex, notarised in England. No check was carried out other than that the copy corresponded to the original annex he had produced.

The prosecutor documented from

- Extract 2, page 264, Appendix 53-47-00-18, Register of Directors etc., Salgado Capital, where Guenther Klar is listed as a director from 11 June 2012.

Guenther Klar explained that it was probably these two annexes [Exhibits 53-47-00-18 and 53-47-00-19] that he used to set up the new bank account with Global Fidelity Bank.

The prosecutor documented from

- Extract 2, pages 248-249, Exhibits 53-47-002 to 3, account application, signed by Guenther Klar, director, on April 16, 2015, and

- Extract 2, page 216, Exhibit 53-46-00-76, Register of Shareholders, Salgado Capital listing 3 shareholder names.

Guenther Klar explained that he probably used this register of shareholders [Exhibit 53-46-00-76] in connection with the creditor registration because Caledonian Bank had already performed due diligence around The Salgado Charitable Trust when the account was opened.

The prosecutor documented from

- Extract 2, page 219, Annex 53-46-00-79, Register of Directors etc., Salgado Capital, where Guenther Klar is listed as a director from 24 May 2015.

Guenther Klar explained that he believes he used the annexes [53-46-00-76 and 53-46-00-79] together. He also had these documents notarized in England, about two months after the first endorsements. The notary did not notice anything. He himself panicked after the collapse of the Caledonian Bank. Salgado Capital had to have an effective bank account. He should have become a shareholder and director in the

spring of 2015. He had no intention of depriving anyone of anything. He tried to save Salgado Capital's clients so that they got what was due to them.

He did not legally become the director and owner of Salgado Capital in the spring of 2015. When asked, Guenther Klar explained that he probably had the power to enforce it. This would have required him to initiate the transfer of the stock from The Salgado Charitable Trust and to strip Andrew Moray Stuart of the title of director. He thinks it would have been possible, but he's not sure. He could have contacted Atlas, who was the corporate trustee of The Salgado Charitable Trust. Corporate trustee is just term that it is a corporation that is inserted as trustee instead of an individual. A contract was in place for Atlas' obligations and rights ("Trust Deed"). He does not remember the content, but, as previously explained, a trustee can be compared to a director of a company. He would have had to pay something to acquire the stock of Salgado Capital before the company had a value in 2015. Among other things, it had a claim of $10 million against the liquidation estate of Caledonian Bank. Of this, approximately USD 1 million was Salgado Capital's own money. The dividend of the claim was less than 100, but there was a claim. Salgado Capital continues to own the claim, and there is still $1 million in funds in the Cayman Islands. If Salgado Capital is dissolved, the amount shall accrue to the beneficiary, Lady Margaret Hall.

When he founded Salgado Capital, the cost was around $40,000. He did not receive payment for giving the company to The Salgado Charitable Trust. The business had only just started and was not worth anything special. Nor does he believe he paid Atlas to be a corporate trustee. If he did, he would then receive a refund from Salgado Capital.

The prosecutor documented from

- Extract 2, page 158, Exhibit 53-46-00-18, Register of Shareholders, Salgado Capital with Hillingdon Turner Nominees Ltd. as shareholder.

Guenther Klar explained that this voucher was sent to Caledonian Bank when Salgado Capital opened the first account with the bank. Sometime after June 2012, the company needed to open another account, and then, as far as he remembers, the stock listing showing the transfer of the share to The Salgado Charitable Trust was included. He does not recall any questions being asked from either Global Fidelity Bank or Ernst &Young about the validity of the shareholder or director listings sent to them.

The Salgado Charitable Trust was founded by Hillingdon Turner Nominees Ltd. Lady Margaret Hall was the beneficiary of The Salgado Charitable Trust. Atlas

Corporate Service Ltd. was the trustee. The Salgado Charitable Trust had not authorized him to act on his behalf. He had control of Salgado Capital, but apart from the original power of attorney, there were no other documents proving that he was entitled to control the company. He did not control Salgado Capital From a legal perspective, but in substance. In practice, he made all trading decisions and was in charge of the brokerage and custody banking services. This was the case throughout the entire period of Salgado Capital's existence. Legally, he could not tie up Salgado Capital. He was not authorized to do so.

Impugned email dated 16 December 2019 from ACS to the Attorney General (Extract 2, page 1, Exhibit 76-36-00-2475, translation extract page 13), which states, inter alia: *"The person who has signed the application form and who has transferred funds is Guenther Grant Klar, who was also the registered and beneficial owner of the company, although his shares were listed with the Salgado Charitable Trust at 121 & 122 Grand Baie Business Centre, Grand Baie, Mauritius.",* he explained that he does not agree with ACS's description. He does not know on what basis the ACS has reached that conclusion. He cannot have been both the registered and the beneficial owner. The company's stock was placed in The Salgado Charitable Trust and therefore ACS must have understood that The Salgado Charitable Trust was the registered owner and that the beneficial owner was The Salgado Charitable Trust's beneficiary, Lady Margaret Hall.


Asked again how he could act on behalf of Salgado Capital when he had no power of attorney, legal owner or director of the company, he explained that he does not know how to elaborate on his previous answers.

Salgado Capital did not have any employees. The director of the company could make ordinary decisions in the same way as directors of other companies. He was told that Andrew Moray Stuart was a professional director. He did not perceive Andrew Moray Stuart as a rubber stamp. It is his understanding that Andrew Moray Stuart was really dealing with the things he had to deal with on behalf of Salgado Capital. He could decide to sign or not.


Hillingdon Turner Director also had normal directorial powers. When Salgado Capital was incorporated, a power of attorney was created, which allowed him to legally bind the company. He did not exercise this right. The power of attorney was revoked at some point between the incorporation and the appointment of Andrew Moray Stuart as director.

The prosecutor documented from Amended Consolidated Schedule 1 to Mr. Klar's Amended Consolidated Defence (Additional Extract 2, pages 461 and 462, Exhibits 53-49-04-46 and 47, paragraph a3(b), which states: *"It is admitted Mr Klar was the directing mind and will of Salgado."*

To this, Guenther Klar explained that it is a different formulation, but that is how it

was.

Shown letter dated 10 December 2012 from the Registrar of International Business Companies to Salgado Capital (extract 2, page 77, exhibit 76-38-00-413, translation extract page 28), Guenther Klar explained that the decision for the company to cease was in fact taken by him, but formally he could not implement the decision as he was not a shareholder or the registered owner. He remembers expressing that he no longer needed the company. This happened to ACS and to Karin van Rensburg, who had been associated with Atlas but not with Andrew Moray Stuart. He was not aware in December 2016 that the company had been shut down. He only found out later. He also later found out that Atlas had sold its activities to a third party and that Karin van Rensburg was therefore working for a new company.

When asked, he explained that an agreement was reached between him personally and Salgado Capital for the remuneration of brokerage and advisory services. The agreement was made to document that he provided services to Salgado Capital. He used the agreement as the basis for paying his ex-wife as part of the divorce settlement. Shown the Trading Advisory Services Agreement of May 15, 2013 (Extract 2, page 80, Exhibit 53-15-00-20, translation extract page 29), he explained that this is the agreement that was made with Salgado Capital. The agreement was only made at that time, because it was only intended to be used as a basis for fulfilling the divorce agreement. In May 2013, a judge had approved the consent order, and as part of the judge's decision, he was obliged to provide documentation of the basis for the payments to Antonia Saunokonoko. Therefore, the agreement with Salgado Capital was formalized and it expressed what he was already doing for Salgado Capital. It is the same agreement that he made with his trading companies. He entered into similar agreements between the Europa LLP Executive Pension Scheme and Khajuraho. He does not believe there was a conflict of interest between Khajuraho, the Europa LLP Executive Pension Scheme and him.

He has not entered into similar agreements with clients COLE Enterprises USA Retirement Plan, Blue Ocean Equity Retirement Plan & Trust, Granard and Heber.

Maintained his email of 17 May 2023 to Antonia@ (Extract 2, page 78, Exhibit 53-15-00-18), which states, inter alia: *"Three documents for your records: (i) agreement between me & Salgado Capital (one of Sanjay's companies), under which I provide trading advisory services; (ii) my invoice to Salgado Capital for £466,709.04",* Guenther Klar explained that he wrote that Sanjay was the owner to reassure Antonia Saunokonoko. She knew that he had worked for Solo Capital Ltd. and then Sanjay Shah. They were getting divorced and she was very nervous. He wanted to give her a sense of continuity between his previous occupation and

what he was doing now. He wanted her to be assured that she would get the money she was supposed to get under the divorce agreement. Salgado Capital was not one of Sanjay Shah's companies. He didn't want her to be worried.

Shown Invoice number 001 dated 15 May 2013 from Guenther Grant-Klar to Salgado Capital (extract 2, page 86, exhibit 53-15-00-26) and asked about the invoice amount, he explained that he does not believe that there was any specific science calculation on the basis of the amount. All the invoices for trading and advisory services he sent to Salgado Capital were intended to document the money trail from Salgado Capital to him so that he could show that he complied with the terms of the divorce agreement. What actually happened was that he withdrew the Europa LLP Executive Pension Scheme or Khajuraho's profits from the securities traders from their account with Salgado Capital. He was worried that Antonia Saunokonoko would not understand where the money came from if he documented it as it was. It was to make it simpler for her. Antonia Saunokonoko got all the money to which she was entitled. He didn't do it to hide anything from her or to prevent her from getting what she should have.

The cash flow was from Salgado Capital's bank account to his. With the transfers, Salgado Capital fulfilled an order from Europa LLP Executive Pension Scheme and Khajuraho that profit withdrawals should be transferred directly to him as payment for services he had provided to those companies. It was he who acted on behalf of the Europa LLP Executive Pension Scheme and Khajuraho. He was also authorized to withdraw money from Salgado Capital's bank account. All payments from Salgado Capital's bank account had to be approved by him. Although the money was in Salgado Capital's bank account, it was the Europa LLP Executive Pension Scheme or Khajurahos. Salgado Capital was a custodian, as was Citibank. It was not money that Salgado Capital could dispose of.

Shown emails of 14 and 15 January 2014 between Guenther Grant-Klar and Antonia Grant (extract 2, page 96, appendix 53-15-00-36) and asked what is meant by some of the money coming from Luxembourg, he explained that he does not remember the email thread. As you know, Khajuraho was based in Luxembourg, and the company had traded some shares from Luxembourg, but he cannot remember whether this is related to the specific email.

Alleged that, according to the prosecution, 13 invoices were issued for the amount of GBP 17,730,985.30 up to 15 November 2014, and asked why the invoicing of Salgado Capital stopped at that time, Guenther Klar explained that Antonia Saunokonoko at one point expressed that he should no longer pay her. She said she had enough money to get by. He doesn't remember if it was at the time, but that may be the reason why he stopped sending the invoices. She also said at one point that he did not need to send proof of the payments and therefore it may also

be related to that. The invoices were made solely for the purpose of fulfilling the divorce agreement's requirements for documentation.

Salgado Capital had a bank account with Caledonian Bank in the Cayman Islands. It was his decision to create the account there. He already had a relationship with Caledonian Bank during that period, and he believes that is why he chose the Cayman Islands. When he set about setting up Salgado Capital's first bank account, which he believes was before June 2012, he stated that Hillingdon Turner Nominee Ltd. was the shareholder and Hillingdon Turner Director was a director, and that they were doing so on his behalf ("nominee shareholders and nominee directors"). He disclosed this because he wanted to get to the bottom of what checks the bank should carry out as part of their "KYC" [Know Your Customer]. Sometime after June 2012, when Andrew Moray Stuart had become a director and The Salgado Charitable Trust was the shareholder, Salgado Capital opened a further account with Caledonian Bank. The bank was supposed to perform "KYC" on them too. A lot of checks were made on The Salgado Charitable Trust because Caledonian Bank also had to carry out the checks on the trustee and the director. He remembers it as a long process.

Shown his email of April 12, 2012, to Brent C. Ebanks (Extract 2, page 148, Exhibit 53-46-00-8, translation extract page 34), he explained that the email was written in connection with the initial account creation. He does not remember exactly why he doubted that Anjouan was an approved jurisdiction. He believes that he had received some material from Caledonian Bank describing approved jurisdictions and that it was based on that description. He was the one who had control of the account, and he believes it was only him. He is not aware that Salgado Capital opened bank accounts anywhere other than Caledonian Bank and later with Global Fidelity Bank. It is possible that the director of Salgado Capital has opened other accounts. The director would have been entitled to do so, but as far as he knows, it has not happened.

The prosecution documented from EY Cayman Ltd's letter of 19 February 2019 to the Royal Cayman Islands Police Service (Extract 2, page 141, Exhibit 53-46-00- 1).

Guenther Klar explained that Salgado Capital managed without a bank account until September 2012. In practice, the only amounts paid into Salgado Capital's bank accounts were dividend tax refunds recovered by Salgado Capital's customers. He does not believe that there were applications for dividend tax recovery until the end of the year 2012. Therefore, there was no need for a bank account before that time.

Claiming that, according to Salgado Capital's statements, Europa LLP Executive Pension Scheme had traded shares worth around DKK 4.25 billion in September 2012, he explained that this could be done without leading to cash flows in Salgado Capital's

bank account. The shares were purchased from a short seller who was also a client of Salgado Capital. As described in the submission, when the omnibus depository bank's customers trade among themselves, the statement of sales and the result of the transactions will be calculated with accounting at customer level. Salgado Capital's clients had accounts with Salgado Capital and it was posted here.

Money also went through Salgado Capital's bank accounts of clients COLE Enterprises USA Retirement Plan, Blue Ocean Equity Retirement Plan & Trust, Granard and Heber, but that was later.

Impugned First affidavit of Guenther Klar of 4 August 2020 (extract 4, pages 116 and 126-127, annexes 36-07-00-106 and 116-117, paragraph 56, translation extract pages 99-100), appendix to the hearings in Belgium, which states, inter alia:

*"Salgado was a newly founded company and that created a number of problems. My intention was to trade for profit, which meant that from the start I expected Salgado to hold funds belonging to my trading companies. The lack of documentation of results created a credit risk. The way I handled that risk was to require Salgado to give me control of the bank account opened in their name to deposit funds belonging to my companies. This they accepted and an account was opened with a bank that I designated, Caledonian Bank in the Cayman Islands, and I was a signatory to that account."*

he explained that when Salgado Capital opened the account, Europa LLP Executive Pension Scheme and Khajuraho were the only clients of Salgado Capital.

Asked about the amount of approximately one million dollars still left for Salgado Capital derived from the Caledonian Bank account, he explained that if the money ever becomes available, it will belong to the beneficiary Lady Margaret Hall. Claiming that the most recent register of shareholders he sent to the liquidator of Caledonian Bank shows that he personally owns the stock and that, according to his explanation, Lady Margaret Hall is not aware that it is a beneficiary, he explained that he is aware that the money is due to Lady Margaret Hall.

He was also the only authorised signature to the Global Fidelity Bank account. He believes that all accounts at Global Fidelity Bank are closed now. There is no deposit. He can't remember if there was a deposit when Salgado Capital closed in December 2016. Shown transcript from Salgado Capital's GBP account at Fidelity Bank, Closing Balance 31 December 2017 (Extract 3, page 1428, Exhibit 17-04-00-8), he explained that he does not remember the specific transfer. It may be profit withdrawal on behalf of the Europa LLP Executive Pension Scheme or Khajuraho, but he will not be able to say that without checking the trading listings. He was also a creditor of Salgado Capital because he had made payments of costs for licenses and for Goal Taxback. As previously explained, at the end of

2016, he was not aware that Salgado Capital had closed. He did not renew the licenses because he stopped trading securities in 2015. He has received his private receivables and is no longer a creditor of Salgado Capital.


Salgado Capital had an agreement with a sub-custodian, Thales Securities, based in Panama. Salgado Capital had an account there, and he had power of attorney to trade on the account. In reality, he was the one who made the agreement with the sub-custodian, but he does not remember who signed the agreements. He doesn't think it was himself, but he doesn't remember which of Salgado Capital's directors it was. It was he who found the sub-custodian bank. It met Salgado Capital's needs. All custodians have a sub-custodian in case there is a mismatch between the purchases and the sales ordered by the custodian's customers. If a net position occurs, then it must be in the sub-custodian bank. He believes that the agreement with the sub-custodian bank was made around the time of its formation because Salgado Capital began trading immediately thereafter. He didn't think it was unusual to choose a Panama-based company, even though European shares were traded. The sub-custodian bank offered custody services and brokerage services. He received quotes on the securities from Thales Securities through their online portal that operated in real time. When he offered prices to Salgado Capital's clients, he went on this portal and checked the prices.

Confronted with Lundgren's letters to the Danish Tax Appeals Board dated 3 and 9 August 2018 concerning the Europa LLP Executive Pension Scheme and Khajuraho (extract 2, pages 677 and 679 and page 963), which state, inter alia: *"The complainant has not – and never had – any overlapping interests with Salgado Capital."*, Guenther Klar explained that it is not he who drafted the documents.

The prosecutor documented from the Defence of the Ninth Defendant in the Second Claim and the 64th and 65th Defendants in the First Claim of 1 April 2019 (Extract 4, page 746 and page 763, paragraph (7), Exhibits 70-02-00-1 and 18).

Guenther Klar explained that it is a pleading from a civil case in England. The words used in the documents were chosen very carefully by his lawyers after they had spoken to him. As he understood it, the legal form of how the companies were connected was the most important in England. There was no writing, as he understood it, about the real control of the companies. Although he signed the document, it was the lawyers who formulated the text, and he got the impression that they carefully considered the choice of words.

During questioning, he was asked by Belgian police whether he was the formal

owner and beneficial owner and director of Salgado Capital. He thought he was being asked about the same thing that had come up in the civil case in Britain. It was the question of the formality that he answered when he told that he did not control Salgado Capital. In a later interrogation, he understood that the police asked if he really ("in substance") controlled Salgado Capital, to which he replied yes. He also remembers that between these police interviews he was asked by the Belgian investigating judge about the same facts. He asked the investigating judge to elaborate on whether he was asked whether he was the one who had prepared the papers. The investigating judge confirmed that this was what he wanted to know, to which Guenther Klar replied that it was he who had drawn up the papers.

Regarding the trading strategies of Salgado Capital, he explained that it was to speculate on the movements in stock prices and Cum-Ex trading. There was a short seller who speculated on falling prices and a buyer who speculated on rising prices. The deal was concluded before Ex-day, when the buyer acquired ownership, and with delivery after the "Record date". Therefore, the short seller had to pay Market Claim to the buyer. The buyer would receive Market Claim, but probably lose money on stock price performance because the price usually falls after the dividend payment. The short seller who paid Market Claim would generally profit from the share price movement. The buyer and short seller at that time earned and lost the same amount. It was a zero-sum game, trading costs aside. It was the dividend tax refund that was supposed to cover the loss that either the buyer or short seller had and make a profit. Market Claim is dividends in a Danish tax context, so the buyer can seek a refund of withheld dividend tax. That's the theory behind the trading strategy. All the securities trades were OTC [over the counter]. This was necessary because he wanted settlement conditions that deviated from the terms of the stock exchange. For the sake of Market Claim, he wanted the deal to be settled according to the "Record date". It was simply about costs. With the trading strategy that was in place, you could trade without having to use your own capital or obtain financing from a primary broker. This saved capital and financing costs.

This was possible because the buyer and short seller were customers of the same depository bank. On the settlement date, the buyer holding ownership of the shares could lend the shares to a short seller against cash collateral. The short seller had to borrow the shares in order to deliver the shares to the buyer and received the agreed purchase price upon delivery. The task of the broker was to match loans and lending. Since both the buyer and the short seller were customers of the custodian, the custodian could handle the settlement. It was incumbent on the custodian to match the transactions so that they had a buyer for the same number of shares that the short seller would commit to raising. Due to the coincidence in time, the net settlement between the buyer and the short seller was

settled without the need for funding from a primary broker. The strategy always entailed that there was lending of shares in connection with the transactions and that the trading should take place internally in Salgado Capital.

Potentially, both buyer and short seller could make a profit. This could happen, for example, if the price fell so much that the short sale yielded a profit that exceeded Market Claim but was less than Market Claim and the dividend tax refund to which the buyer was entitled upon receipt of Market Claim. This would not be the case with every single transaction, but if you executed enough trades in enough markets over a sufficient period of time, the hope was that both the buyer and the short seller would make money.

Both the buyer and the short seller made their own independent decisions. The deal was associated with risk. They traded as independent parties even when Salgado Capital was a short seller. There were no cases where the buyer and short seller were controlled – owned – by the same person. The total net profit was dependent on price developments, over which he had no influence. It was a zero-sum game before the dividend tax refund, but who made money after the dividend tax refund was determined by the price development.

Shown the trading note dated February 29, 2012 (Extract 3, page 1, Exhibit 76-41-00-792), Guenther Klar explained that Salgado Capital in this trade was a short seller. Salgado Capital did not hold the shares on the trade date. Salgado Capital had coverage for short sales in the sense that it had the support of Salgado Capital in its capacity as a broker. If Salgado Capital, as a short seller, needed to borrow the shares on the settlement date, then you could do so. Salgado Capital could know that there was an opportunity to borrow a similar shareholding because of the way the transaction was put together. Although the entire transaction was not preordained, there was an expectation that the buyer Europa LLP Executive Pension Scheme would sell. He acted for Salgado Capital both as a broker and seller. He also acted for the Europa LLP Executive Pension Scheme. He wore different hats, but basically, it was him. The Europa LLP Executive Pension Scheme net settled the sale with both shares and settlement date. It was not set in stone, but it was expected that the Europa LLP Executive Pension Scheme could lend the shares and thereby obtain capital to cover the purchase.

From the perspective of the European LLP Executive Pension Scheme, the idea was to make a profit, among other things, from the result of the actual purchase/sale of the shares and the Market Claim received. In addition, if possible in the specific trade, the Europa LLP Executive Pension Scheme could also obtain

dividend tax refunds. From the result should deduct transaction costs. Salgado Capital was supposed to make money short-selling. The main cost was Market Claim, but you have to look at the total transaction to see if there was profit.

It was possible that both the buyer and the short seller would make money from the trade, but it depended on something that was out of his control, namely the development of the share price.

Shown the Stock Loan Confirmation dated 6 March 2012 (Extract 3, page 2, Exhibit 76-41-00-793), he explained that the size of the collateral of DKK 379.5 million was due to the structure of the transaction. The Europa LLP Executive Pension Scheme was to raise DKK 379.5 million, and therefore the amount was set for this. Claiming that the value of the shares on 6 March 2012 was no longer DKK 379.5 million, Guenther Klar explained that it is quite common for equity loans to have a "haircut" like this. It was a structured transaction where, from the perspective of the Europa LLP Executive Pension Scheme, the purpose was to raise funds to buy the shares, while from Salgado Capital's perspective, it was to borrow the shares that it had committed to sell. Although the collateral was set at DKK 379.5 million at the settlement date, the collateral was continuously adjusted to match the value of the shares. It could happen at the end of the settlement day or the next day.

Shown the Cash Statement for the period 29 February 2012 to 5 April 2012 (Extract 3, page 176, Exhibit 76-41-00-690), he explained that the dividend ("dividend") was credited to the Europa LLP Executive Pension Scheme's account with Salgado Capital. Market Claim reflects net dividends. When you buy shares before the Ex-day, you become entitled to the dividend, but if the purchase is only settled after the "record date", then the buyer does not get the dividend, even if you are the owner of it. Instead, you get a Market Claim. In practice, the seller's custodian pays the Market Claim amount to the buyer's custody. The seller's account is debited from the amount and the buyer's account is credited. The amount is the net dividend that the buyer should have received if the buyer was registered as the owner on the dividend date.

It was he who made the accounting of customers' accounts. Salgado Capital, as the seller, did not receive the dividend, as Salgado Capital was also not the legal owner at the time of the dividend. Salgado Capital was a short seller. None of Salgado Capital's clients were registered as legal owners of the shares.

Salgado Capital had a client account just like Europa LLP Executive Pension Scheme and Khajuraho. The dividend - the Market Claim amount - was debited to Salgado Capital's own client account. It is a completely normal documentation of the activity. All financial institutions have an intermediary account like this, even between connected legal entities, because from an audit perspective it must be registered for the individual company ("entity").

Shown the trading note dated March 29, 2012 (Extract 3, page 9, Exhibit 76-41-00-800), he explained that it is a coincidence that the shares were sold to Salgado Capital exactly one month later. He does not remember the specific reason for the sale. Anyone who realised a loss as a result of price developments probably wanted to limit the loss. He doesn't remember it since it was so long ago. Nor does he remember the specific reason why Salgado Capital wanted to buy the Novozymes A/S shares.

Shown the Stock Loan Unwind Confirmation dated April 2, 2012 (Extract 3, page 12, Exhibit 76-41-00-803), he explained that the agreement to reroll the share loan was made to obtain the shares to be sold. Under the same agreement, the Europa LLP Executive Pension Scheme was required to return the cash collateral. The Europa LLP Executive Pension Scheme did not carry forward the net loss of approximately DKK 4.3 million, but the amounts were debited and credited at custodian level to customers.

Shown the Europa LLP Executive Pension Schemes Cash Statement for the period 29 February 2012 to 5 April 2012 (Extract 3, page 176, Exhibits 76-41-00-690), Guenther Klar explained that the just over GBP 4 million was debited from the company's account. The amount was not settled or claimed to be paid. That is not how it works. When trades take place between clients with the same custodian bank, the results of the trade will only appear in trading summaries. The customer can withdraw profits or deposit amounts to cover losses. It is exactly the same thing that is done in, for example, Citibank. The result of transactions between customers of the custodian bank will never be visible in any other way than by the internal bookkeeping. In this particular case, Salgado Capital will have made a profit on the deal that will match the losses of the Europa LLP Executive Pension Scheme.

He can't remember if he was the rightful beneficiary owner in April 2012, but if he was, he agrees that the overall score for him was 0. In early 2013, Heber became a short seller. In this context, Heber inherited Salgado Capital's position and performance as a short seller. Salgado Capital had been trading as a short seller for most of 2012. This was the trade result that Heber inherited. Heber took over Salgado Capital's account. He does not recall the exact result, but Salgado Capital had made a total loss on the transactions.

The trades of securities and the results thereof were carried out. It will never be visible anywhere other than electronic data. That's how it happens everywhere. It's not just at Salgado Capital. No one but himself was aware of the specific transaction concerning the sale of the shares in Novozymes A/S.

When asked if LLP Executive Pension Scheme's custody in Salgado Capital at

any time during the period from 29 February to 2 April 2012 contained Novozymes A/S shares, Guenther Klar explained that this was not the case, but that is how short selling works. Neither Salgado Capital nor Europa LLP Executive Pension Scheme held shares before the transaction or when the overall transaction was completed. When both buyer and short seller are customers of the same custodian, the shareholding at the custodian will be net and the total holding will not move. It will look similar from Salgado Capital's point of view.

In spring 2012, Salgado Capital had only the clients Europa LLP Executive Pension Scheme, Khajuraho and Salgado Capital itself.

The Europa LLP Executive Pension Scheme applied for a dividend tax refund because it was the beneficial owner of the shares before the "Ex-day") and was entitled to the dividend. The Europa LLP Executive Pension Scheme received an amount equivalent to the net dividend as Market Claim. He understood that Market Claim was to be regarded as dividend for tax purposes and that the Europa LLP Executive Pension Scheme was therefore entitled to receive a dividend tax refund. The accounting of Salgado Capital did not determine the decision to seek reimbursement. It was the transaction that gave entitlement to a dividend tax refund.

The Europa LLP Executive Pension Scheme has applied for dividend tax refunds on 11 share positions in 2012. Trading in the share positions was conducted in the same way in all cases.

It didn't happen quite the same way in Khajuraho's acting in 2012. Khajuraho was subject to Luxembourg's tax rules. For tax purposes, Khajuraho had to retain ownership of a certain part of the traded shares in order for the dividends and transaction profits to be tax-free. Therefore, for around EUR 6 million, Khajuraho kept shares for more than 12 months. On the stock positions Khajuraho held for more than 12 months, they earned a manufactured dividend on the equity loan. It was not a dividend in a Danish tax context, and therefore no dividend tax refund was sought for this part. However, the basic structure of short selling and net settlement remained the same.

Regarding his collaboration with Kevin Kenning and Todd Bergeron, he explained that around the summer or fall of 2012 he had contact with first Barry O'Sullivan and then Kevin Kenning and Todd Bergeron. He explained the trading strategy that Salgado Capital was able to deliver to its clients to Barry O'Sullivan. Barry O'Sullivan already had a very good knowledge of-ex trades, but Salgado Capital's strategy was different because it involved a market risk. Barry O'Sullivan fully understood this, and he expressed interest in becoming both a short seller and a buyer. Barry O'Sullivan suggested that he contact Kevin Kenning since Barry O'Sullivan knew he was already doing the-ex trade. He

contacted Kevin Kenning, who explained the business strategy and was interested in participating. Kevin Kenning had a business partner who he wanted to be involved as well, Todd Bergeron. Both Kevin Kenning and Todd Bergeron were at the time involved in-ex trading via another broker. Kevin Kenning did not make his own trading decisions with this broker. Kevin Kenning understood that it would be different at Salgado Capital, and he agreed ("comfortable") because Todd Bergeron had experience in stock trading. They had a joint meeting in Dublin in autumn 2012.

Accused that Barry O'Sullivan has described it as a "whiteboard meating", he explained that you can call it that. He went through it all with Barry O'Sullivan, Kevin Kenning and Todd Bergeron. All three were interested. They understood that the buyer in the transactions would receive Market Claims and that they had to decide for themselves whether Market Claim was dividend tax refund eligible in Denmark. Kevin Kenning was an American tax lawyer with years of experience. He said that he already traded-ex in a number of European countries, including Denmark. Kevin Kenning therefore understood that Market Claim was dividends seen in a Danish tax context. Kevin Kenning was fine with making trading decisions and taking market risk. Both Kevin Kenning and Todd Bergeron understood at the meeting that if they became clients of Salgado Capital and bought shares, the short seller would be entities belonging to Barry O'Sullivan. He told Kevin Kenning, Todd Bergeron and Barry O'Sullivan that the settlement would be net settlement and that on settlement date there was a buyer who would lend the same number of shares as had been purchased. Therefore, the transaction could be net-settled. When the trade was net settled, the trade had taken place and there were shares that had been traded.

All three of them had worked at ABN AMRO Bank, so they were all familiar with net settlement. He knew them from there. They also understood that Barry O'Sullivan, as a short seller, would be the one to borrow the shares, and that Market Claim came from the seller. This is always the case. They also talked about how the reversal of the share loan should take place. There was no specific discussion about the timing of the rollback, but he was able to suggest a rollback timing in the transactions. However, it was the customers who, as independents, had to decide on the rollback themselves. They could do it at the same time as the shares were sold, but they had to decide for themselves. Sometimes you want to limit the loss and sometimes you want to realize a gain on the price development.

They talked about the fact that there was a "dividend season" in the various markets and that every time there was a dividend distribution, it was a trading opportunity. The trading decision had to be made by each client, and it was the client who had to indicate whether they wanted to trade at all and, if so, with how many shares.

It sometimes happened that there was a trading opportunity that no one was interested in. He has continuously suggested shares, the number of shares and prices, but it was up to the customers themselves to decide what they wanted. It is his understanding that they knew that they were also assuming a market risk. They were all experienced securities traders. They certainly knew that there was no hedging. As far as he remembers, they did not discuss the economic scale of investment at the meeting. There is always a winner and a loser in stock trades, so they knew that one of them's gains on price development would result in a loss for the counterparty.

When asked if anyone related to the credit risk of those involved being start-ups and pension plans, Guenther Klar explained that the credit risk was more theoretical than real. Because of the dividend tax refunds, both buyer and short seller could make money.

Heber took credit risk to, among others, Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust. They all already knew each other, and he sees that as an important element. There was an understanding that if you looked at the individual trade, there might be a credit risk, but also an understanding that if you traded to a sufficient extent, it would even out. They traded in several markets, so even though the "dividend season" was short, it was so that they could trade continuously. There was a common understanding that if something terrible happened, it could cause great loss to one of the parties. There was no agreement that trade would take place for a specific period. There was no agreement that either party could not withdraw a profit on the deal. He doesn't believe that in 2013, the Blue Ocean Equity Retirement Plan & Trust had a larger amount available to cover a loss, and if one knew, Heber would be inclined to keep trading. When asked about the credit risk of allowing Blue Ocean Equity Retirement Plan & Trust to buy $3.5 billion worth of shares, he explained that Heber also had other transaction counterparties outside of Salgado Capital, so it is not possible to give an answer to the question.

Shown the trade note dated 28 February 2013 (Extract 3, page 440, Exhibit 76-36-00-1984), he explained that it was a short sale. When Salgado Capital was a broker, it was also a seller in the relationship with Blue Ocean Equity Retirement Plan & Trust. They sold as a broker in their own name, but a back-to-back agreement had been made with Heber, who was a short seller.

Shown the Stock Loan Confirmation of March 6, 2013 (Extract 3, page 441, Exhibit 76-36-00-1985), Guenther Klar explained that Salgado Capital was not the final stock borrower. There was another loan agreement where Salgado Capital was the lender and Heber was the borrower. When asked why the net cash did not correspond to the market value of the stock, he explained that, like the previous example, the purpose was, on the one hand, to provide funding for Blue Ocean Equity Retirement Plan & Trust's purchase of the shares and, on the other hand, to

ensure that Heber could borrow the shares that they were to provide as a short seller. Therefore, the price of the loan should be the same as the share purchase. Any change in the share price has been reflected in the adjustment of the collateral. The value of the collateral was revalued daily. It was included in the net settlement, which was made on an ongoing basis.

When Blue Ocean Equity Retirement Plan & Trust, COLE Enterprises USA Retirement Plan & Trust Blue, Heber and Granard became customers, there was no need for them to inject any capital. If one of the clients had kept losing out on price fluctuations, then there could be a deposit of assets, but it would depend on the outcome of hundreds of stock trades. In reality, it did not happen. All of Salgado Capital's clients generated profits. This also applied to customers who did not receive dividend tax refunds. Barry O'Sullivan's investment companies Heber and Granard never received dividend tax refunds, but they made money from the trades, which O'Sullivan pulled out as profits. None of the customers deposited funds with Salgado Capital.

Shown the Equity Transaction dated 31 March 2013 relating to the Blue Ocean Equity Retirement Plan & Trust (Extract 3, page 521, Exhibit 76-36-00-1884, Dividend Statement Novozymes), he explained that the amount is the net dividend on the shares from the transaction reviewed. Market Claim was credited to the buyer and debited to the short seller, who was Heber.

When asked whether the net dividend from Novozymes A/S had been paid to Heber or Blue Ocean Equity Retirement Plan & Trust, he explained that the net dividend was paid by Novozymes A/S to the registered owner ("legal owner") on "record date". None of Salgado Capital's clients were registered owners on the "record date". Heber was also not the legal owner. Heber was a seller and paid Market Claim to Blue Ocean Equity Retirement Plan & Trust. Market Claim is always paid from seller to buyer.

Guenther Klar was reprimanded for his email of 15 July 2018 to Kevin Kenning (extract 2, page 1248, appendix 53-48-00-18, translation extract page 72) which states, among other things:

*"Please note, however, that the share transaction from Day 1 has not been settled, which means that the plan – although eligible for dividends as the beneficial owner of the shares – will not directly receive the dividend as it is not yet the legal owner of the shares. In such cases, Danish custodians, like custodians in most other markets, use a process called "entitlement compensation", whereby securities depositories belonging to sellers of shares that have not yet been settled on the date of registration of dividends are debited if they have received the net dividend in their capacity as legal owners, even though they are no longer beneficial owners. On the other hand, as the purchaser of shares not settled on the date of registration of dividends, the plan will have its securities depository credited with the net dividend, reflecting the plan's eligibility to receive the*

*dividend, even if it is not yet the legal owner of the shares."*

To this, he explained that he replied to an email that he does not remember the contents of. It is not a requirement that the stock seller receives the net dividend. What he has written is also correct. If the legal owner does not settle the share transaction until after the dividend date, the registered owner must pay Market Claim. After having had the opportunity to review the email thread, Guenther Klar added that what he was specifically asked about was regarding the situation where the seller was a legal owner.

In 2012, Europa LLP was the Executive Pension Scheme and Salgado Capital as sole customers of Salgado Capital. Later, Khajuraho joined. The trades took place like the stock loan and rollback trading that has already been documented and reviewed. Customers Blue Ocean Equity Retirement Plan & Trust, COLE Enterprises USA Retirement Plan & Trust, Granard and Heber joined in 2013, but Heber acted solely as a short seller. Kevin Kenning and Todd Bergeron knew that Barry O'Sullivan's company was the short seller and that Salgado Capital was the broker, but Guenther Klar is not sure if they knew that Barry O'Sullivan was trading through an entity and, if so, which one. He also does not know if Barry O'Sullivan knew the names of the companies that bought, but Barry O'Sullivan knew that the buyers in the transactions were represented by Kevin Kenning and Todd Bergeron.

Referring to the 2013 transaction reviewed between the new parties, Guenther Klar confirmed that all 33 dividend tax recoveries resulting from dividend distributions between February 2013 and August 2013 and equity positions between Salgado Capital's clients Blue Ocean Equity Retirement Plan & Trust, COLE Enterprises USA Retirement Plan & Trust, Europa LLP Executive Pension Scheme and Khajuraho, rested on trades made according to the same structure. Guenther Klar clarified that the structure was that the rightful ownership was acquired the day before Ex-day and the purchase of the shares was financed by equity loans on the settlement date. Until the sale, the buyers were beneficial owners of the shares. The share purchases were reversed by sale of the shares on the trading date with delivery of shares on the settlement date, with delivery being made by the share loan being rolled back.

He believes Heber was Barry O'Sullivan's company. When Heber became Salgado Capital's client, Barry O'Sullivan had to provide Salgado Capital with a lot of KYC documentation about Heber, including a founding document and information about the owner, as part of the onboarding process. As he recalls, Barry O'Sullivan was the owner of Heber, and if he was not the legal owner, he was the beneficial owner.

Heber became a client of Salgado Capital in early 2013 either in January or February. That was before the yield season in March. When Heber started trading as a client of Salgado Capital, it was either a Cypriot or a Maltese company, but during 2014, Barry

O'Sullivan said that the company had been transferred to the British Virgin Islands. He remembers that in 2017 the company was removed from the register in the British Virgin Islands.

When asked where the KYC material on Heber is today, he explained that when he became aware that Salgado Capital had ceased, there was no longer a reason to keep the material and it no longer exists.

The prosecutor documented from

- Additional Extract 2, pages 159-160, Annex 11-03-00-1 and 2, information provided by Orbis on the Maltese company, Heber Securities Trading Ltd., showing a date of incorporation on 11 August 2014 and a dissolution date on 12 January 2016.

Guenther Klar explained that he saw a founding document on the company that Barry O'Sullivan used as a short seller in early 2013 when it became a client of Salgado Capital.

The prosecutor documented from

- Additional Extract 2, 159-160, Exhibit 11-03-00-1 and 2, details of address and latest director of the company, and

- Paradise Papers, Additional Extract 2, pages 167-168 and 170, Exhibits 11-03-00-9, 10 and 12, which show that 66 companies had the same address in Malta and that the director, Rodney Lee Berger, was a director of 126 companies.

Claiming that this could indicate straw man activity, Guenther Klar explained that he has never heard of Rodney Lee Berger, but he may well have been a nominee director for the company when Barry O'Sullivan onboarded Heber at Salgado Capital. When the customer relationship with Heber began, Barry O'Sullivan was the director and the person Guenther Klar had contact with. He had no reason to doubt Barry O'Sullivan.

On the transactions made by Barry O'Sullivan's company, Granard, in which no shares have been traded in Denmark, Guenther Klar confirmed that Heber acted as a short seller when Granard bought Belgian shares.

Asked if Barry O'Sullivan was trading himself, Guenther Klar confirmed this, but added that Barry O'Sullivan did not know because Salgado Capital was also the broker in those transactions. In the bigger picture, Heber short-sold to a number of customers. There was no direct link between a specific amount of shares, at a certain price, bought by Granard and the short sale that Heber made. Heber's short sales were mixed with all the other short sales. The number would be different, and prices also varied between individual trades. For example, if Heber short-sold to four customers, those four customers would have bought the shares at different

prices. There would be a difference, even if it wasn't big. From Heber's perspective, the total number of shares was short-sold at a blended average of prices, and there would be no "over-all" difference for Heber. As a broker, you had to match the trades. For example, if a buyer 1 bought a share for $1 and another buyer bought a share for $2, Heber would short sell two shares for $1.5.

When asked who negotiated the price with Heber, he explained, referring to the example, that Salgado Capital would offer Heber to short-sell two shares of $1.5 to Salgado Capital. If Heber accepted, it would happen. Salgado Capital would then allow the first buyer to buy a share for $1 and the second buyer the option to buy a share for $2. If everyone agreed, the deal would be carried out on those terms. An email from Barry O'Sullivan would have indicated Heber's interest in shortselling, and defendants would return via Salgado Capital with offers to buy a number of shares, the price and the terms of settlement.

In relation to Granard's purchase, the process was the same, just on the buyer side. He would probably remind the buyer before Ex-day of a trading opportunity, but it was the buyer who indicated whether they were interested in trading. Barry O'Sullivan wanted to send an email about sales on behalf of Heber and the same day an email about purchases for Granard. Guenther Klar would suggest the number of shares. It was a process. It was a similar process when Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust acted. However, these two companies were only buyers and never acted as short sellers. It happened that all five of Salgado Capital's customers bought shares at the same time, but he does not believe that this happened with Danish shares. The total number of shares bought and sold always had to be the same, otherwise the trades could not be net settled and the brokers would not have been able to make a match. Europa LLP Executive Pension Scheme and Khajuraho also acted as buyers in deals where Heber was a short seller.

Pointed out that the double taxation treaty with Belgium sets a maximum dividend tax of 15 percent and asked whether Heber could not have simply recovered the dividend tax himself [instead of the Europa LLP Executive Pension Scheme and Khajuraho], he explained that this was not possible because Heber never became the rightful owner until Ex-day. Since Heber was not the beneficial owner before Ex-day, the company did not receive dividends, and therefore could not seek a refund of withheld dividend tax.

Asked if the shares being traded would not have existed at all if Heber and the Europa LLP Executive Pension Scheme had not traded, Guenther Klar explained that he did not understand the question.

When asked whether the beneficial ownership of the traded share position arose solely from the transaction or as a result of the transaction, or whether Europa LLP

Executive Pension Scheme or Heber would otherwise have been the beneficial owner of the shares, he explained that you have to buy shares to become the beneficial owner. In order to buy shares, there must also be a seller, possibly a short seller. That is what happened. There was a buyer and a short seller who agreed on the number of shares to be traded, the price and the settlement terms. This was done on the settlement date. On the settlement date, settlement took place as net settlement. When a settlement was carried out, there were shares and there were trades in shares.

Asked if there were ever shares on Europa LLP Executive Pension Schemes or Heber's custody, Guenther Klar explained that because there were trades on the settlement date, it meant there were also shares.

The prosecutor documented from

- Extract 3, page 97, Annex 76-41-00-888, trading note dated 26 November 2013, in which Salgado Capital sells 1.41 million Chr. Hansen shares to Europa LLP Executive Pension Scheme with settlement date of 2 December 2013.

Guenther Klar explained that from around August 2013, Salgado Capital acted exclusively as a broker. Heber was the short seller every time. Heber sold to Salgado Capital and did not know the final buyer. The deals in relation to the Europa LLP Executive Pension Scheme came about in the same way that he has just reviewed. He would say that there were emails here too. The day before Ex-day, Salgado Capital found out from its clients who would buy Chr. Hansen shares and how many shares Heber would shortsell. Once prices and quantity were agreed, trades were confirmed and recorded, and trade confirmations were prepared. No emails were sent between Europa LLP Executive Pension Scheme and Salgado Capital because he acted on behalf of both.

Shown emails dated 24 and 25 February 2015 between Salgado Capital and Kevin Kenning (extract 3, pages 847-848, exhibits 53-48-00-10 and 11, translation extract page 85 f.), he explained that it looks like a typical correspondence in connection with a stock trade. In 2013-2014, he typically traded with Todd Bergeron, but he remembers well that Kevin Kenning entered the correspondence in 2015. This had been evidenced by Todd Bergeron's withdrawal from retirement plans. Asked how he could know how many shares the retirement plans wanted to buy, he explained that he didn't know, but he suggested a number. This was done on the basis of a calculation ("science"). His starting point was a certain percentage of the free shares ("free float") of the joint-stock company. The interested pension plan then announced how many shares it would buy compared to the proposed starting point. Sometimes one wanted to buy more or less than what was proposed. Sometimes you didn't want to act at all. U.S. retirement plans didn't always buy at the same time – sometimes only Blue Ocean Equity

Retirement Plan & Trust bought. Other times, only COLE Enterprises USA Retirement Plan & Trust purchased. Quite often, the number of shares proposed by him was traded, but not always.

Asked how Salgado Capital found ("located") the shares, he explained that assuming Heber would short sell, the terms of the deal were created. If Heber would not sell, there was no trade. There were no trades where Heber was not a short seller.

The prosecutor documented from

- Extract 3, page 98, Annex 76-41-00-889, trading note dated 27 November 2013, in which Salgado Capital acquires 1.41 million Chr. Hansen shares for the Europa LLP Executive Pension Scheme with a settlement date of 2 December 2013.

Guenther Klar explained that Salgado Capital was the broker in the purchase of the Chr. Hansen shares from the Europa LLP Executive Pension Scheme. Salgado Capital acted in its own name, but Heber was the underlying buyer, and Salgado Capital had a back-to-back agreement with Heber.

Shown emails of 26 February 2015 between Salgado Capital and Kevin Kenning (extract 3, page 849, exhibit 53-48-00-12, translation extract page 87), he explained that it corresponds to a typical correspondence about the reversal of a stock position after August 2013. That was after Ex day.

Accused of the statement *"Thanks for your message..."* he explained that he would believe Kevin Kenning had sent mail asking to sell the shares and asking about the price and settlement terms.

With reference to the sale and purchase of Chr. Hansen shares with a settlement date of 2 December 2013, Guenther Klar explained that the transactions were net settlement.

When asked whether Heber had 1.41 million Chr. Hansen shares before 2 December 2013, he explained that it is probably the same question as before and that the prosecutor is turning it upside down. The opposite is true. If there is settlement of the trade, and it was there because there was net settlement, then there were also shares. Before 2 December 2013, Heber did not have 1.41 million Chr. Hansen shares, nor did Heber after 2 December 2013, but neither was it needed.

Hansen traded the shares in its own name ("was principal"). Behind the scenes, Salgado bought Capital bought  from Heber in own name. Heber knew they were selling to Salgado Capital, but not to whom Salgado Capital was selling the shares. Europa LLP Executive Pension Scheme knew that Heber was the short seller when they bought and that Salgado Capital sold on to Heber when the company sold.

The prosecutor documented from

- Extract 3, pages 243-244, Annexures 76-41-00-757 and 758, statement of accounts and cash statement for the Europa LLP Executive Pension Scheme for 30 November 2013.

Guenther Klar explained that this was how the transactions in the Chr. Hansen shares [extract 3, pages 97 – 98] were booked with Salgado Capital. The debited loss of £954,041.45 was credited via Salgado Capital to Heber on their custody statement. That's how it happened, and as it always happens in stock trading. Some win and others lose on a trade, but it is the same amount that is won or lost.

At the end of 2013, there was a deliberate change in the pattern of transactions. This is what the prosecutor referred to during the presentation as "phase 1" and "phase 2". The main reason for the change was that in Salgado Capital's first phase, a longer ownership period ("holding period") of 1-2 months was operated with a greater risk of fluctuations in the share price market. It was too volatile, and it wasn't worth the risk. In the second phase, he decided to reduce the risk by reducing the ownership period so that the buyer was the beneficial owner for only one day. One bought on day 1 and sold on day 2. It was he who proposed the changed trading strategy, but all the clients accepted the change. He discussed the change with Barry O'Sullivan, Kevin Kenning and Todd Bergeron and shared what he wanted. He didn't know in advance if they would agree with him, but they were. After that, it was agreed to trade with terms stating that the exit was the day after purchase.

The strategy in phase 2 has a name you can look up on the internet, "Dividend Capture". It is a common strategy where the buyer hopes that the dividend they receive is greater than the loss due to the fall in the share price that comes due to the stock now trading without attached dividends ("Ex-dividend"). The short seller hopes for the opposite, so that the Market Claim is covered by the gain from the price drop. The strategy is the same in phase 1, but the price risk is less because you hold the shares for a shorter time.

When asked what would have happened if investors would not sell the shares the very day after the purchase, he explained that no shares would have been sold the following day. He doesn't think it happened in phase 2.

All transactions relating to the total of 100 equity positions for which Khajuraho, Europa LLP Executive Pension Scheme, COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust applied for dividend tax refunds, and for which dividends had been distributed from November 2013 to August 2015, proceeded in the manner he has just explained.

When asked if at the end/end of any trading day in 2012-2015 was a holding of Danish shares in Salgado Capital, he explained that the

answer is no. He does not believe that this is the relevant question, because there need not be shares in custody at the end of the trading day. You need the shares for the liquidation. Assuming that on the settlement date there is actually settlement of the transactions to be settled, this means that there were shares. That was how it was done in each case. It is not remarkable, and it happens every day when it is customers of the same custodian who buy and sell or borrow and lend the shares.

When asked if there was a single holding of Danish shares in custody at Salgado Capital at any time during 2012-2015, he explained that he would think it is the same question again. He must therefore reiterate that in net settlement, which has been the settlement method, there have been shares. He understands that it's not very intuitive. He has consulted a trading expert ("trading expert") and described in detail the trading strategy. The expert confirmed that Salgado Capital's transactions complied with all applicable EU trading standards and that there were shares and dividends.

When asked if Salgado Capital ever transferred Danish shares to or from another custodian, he explained that this was not the case because it was not necessary. The trades were executed by net settlement. All that was needed was for Salgado Capital to book the deals made by its clients. Since the same number of shares were bought or sold, and the same number of shares were borrowed or lent, there was no need to hold shareholdings in the sub-custodian.

When asked how long it took from their "whiteboard meeting" in the fall of 2012, where the trading strategies were reviewed, until the first deals were made, Guenther Klar explained that he does not remember it in detail. Barry O'Sullivan, Kevin Kenning and Todd Bergeron should perhaps consider it before they started acting. Maybe they asked some questions, but at least they returned, and he "onboarded" them in January or February 2013, maybe a little later in Granard's case.

Shown the January 15, 2013 email between Kevin Kenning and Salgado Capital (Extract 2, page 1056, Exhibit 56-48-00-2), he explained that he does not remember the correspondence, but they had apparently been talking at the time. He does not remember if Kevin Kenning had already expressed a desire to participate in the trading strategy.

It was Barry O'Sullivan who suggested that the defendant contact Kevin Kenning. He was in charge of contacting Kevin Kenning himself. Barry O'Sullivan did not receive a fee for making contact with Kevin Kenning. The defendant already knew Kevin Kenning himself and therefore there was no reason to agree on a fee. He had known Kevin Kenning for 10 years. He had frequently contacted Kevin Kenning about U.S. tax matters while employed by ABN AMRO Bank. There was no reason whatsoever to pay Barry O'Sullivan.

When asked whether custody services, brokerage services, price lists, GMSLA and its add-ons, as discussed during the submission, were concluded with Salgado Capital's other clients, he explained that similar agreements were concluded with all clients, including Europa LLP Executive Pension Scheme, Khajuraho, Granard and Heber. It was part of the process of opening an account with Salgado Capital.

There was no Trading Advisory Service Agreement with Blue Ocean Equity Retirement Plan & Trust or COLE Enterprises USA Retirement Plan & Trust. There were no advisory agreements with any of the companies either on his part or on Salgado Capital's part.

The prosecutor documented from

- Extract 3, page 536, Exhibit 76-36-00-1899, Cash Statement dated May 31, 2013 for Blue Ocean Equity Retirement Plan & Trust debiting a trading advisory fee of $1,845,180.03.

Guenther Klar explained that he remembers being questioned in Belgium about who this fee was for and that he did not remember the answer at the time. He has had the opportunity to think about it, and he believes that Kevin Kenning had told him that he wanted this type of advisory fees posted. They had to be debited from the Blue Ocean Equity Retirement Plan & Trust and, in some cases, also from COLE Enterprises USA Retirement Plan & Trust and credited with one of Barry O'Sullivan's companies. He does not remember which company. He simply did what Kevin Kenning instructed him to do.

Asked if, in addition to the formal agreements between Salgado Capital and Blue Ocean Equity Retirement Plan & Trust respectively, COLE Enterprises USA Retirement Plan & Trust, there were agreements on profit distribution, he explained that there were not. The stock trading profit made belonged to each company 100 percent. The Danish dividend tax refunds received also belonged 100 percent to the American pension plans. Trade profits and tax refunds were also accounted for as such with the two companies.

Salgado Capital took in more clients, giving more substance than just what customers Europa LLP Executive Pension Scheme and Khajuraho could provide. The company got bigger and more deals could be made. He personally did not make more money from the new clients, but Salgado Capital did, which profited from the trading costs charged. The increased substance mattered in relation to the applications for dividend tax refunds. It was better for Europa LLP Executive Pension Scheme and Khajuraho that Salgado Capital had more customers and that SKAT would see refund requests from other customers. This would reduce the

compliance burden. This is related to the attention SKAT would have if there were more customers.

Asked if reimbursement applications did not stand up to scrutiny, he explained that there was nothing wrong with the applications sent from a custodian bank on the basis of verifiable bookkeeping. If third parties did the same with the custodian, SKAT would feel more comfortable that there was nothing wrong.

When asked whether the investor who bought the shares could appear at the general meeting of the limited liability company and exercise voting rights, he explained that he is not a legal expert, but that he would think that the investor should be registered as a shareholder on the day of the general meeting in order to cast a vote.

The prosecutor documented from

- Additional Extract 2, page 982, Annex 53-49-12-7, Khajuraho's purchase of 1 million Chr. Hansen shares on 27 November 2012,

- Additional Extract 2, page 981, Annex 53-49-12-6, Khajuraho's sale of 700,000 Chr. Hansen shares on 27 December 2012 and

- Additional Extract 2, page 979, Appendix 53-49-12-4, Khajuraho's sale of an additional 60,000 Chr. Hansen shares on 18 June 2013.

The prosecutor summed up that Khajuraho was thus allowed to retain 240,000 Chr. Hansen shares.

When asked who could attend the general meeting of Chr. Hansen A/S on 26 November 2013 and vote for the 240,000 shares, Guenther Klar explained that although Khajuraho owned shares in Chr. Hansen, they were only the beneficial owner. The company had ceased to be a legal owner when it lent the shares. Khajuraho could therefore not have been registered as the owner. He does not know who was registered as the owner. The shares had certainly been lent to Salgado Capital in 2012, and presumably to Heber in 2013.

When asked whether Salgado Capital or Heber could have appeared at the general meeting of Chr. Hansen A/S and cast votes, he explained that Salgado Capital's customers were only legal owners on the day of the transaction, and not otherwise. So none of Salgado Capital's customers were registered owners, and no customers could therefore participate with voting rights at the general meeting. Nor does he believe that if you have shares in an omnibus depot, you are the registered owner, so in his understanding you cannot exercise voting rights at the general meeting of the limited liability company.

When asked whether the Chr. Hansen shares held by Khajuraho and accounted for by Salgado Capital were registered in the sub-depot that Salgado Capital held with Thales

Security, he explained that this was not the case. In order for the custodian to have shares registered with the sub-custodian, it is a prerequisite that there is a "mismatch" between the shareholdings held by the custodian's buyers and sellers.

Although Khajuraho was the rightful owner of 240,000 shares in Chr. Hansen for more than a year, and even though Khajuraho lent the shares for more than a year, no one could attend the general meeting with voting rights. As mentioned, only the legal owner can attend the general meeting, and none of Salgado Capital's customers were the "legal owner" on the day they had to be in order to vote at the general meeting.

It was he who made the stock dividend calculation for the traded shares. The calculation was made by multiplying the number of shares by the dividend per share adopted by the company making the distribution. He made the calculations himself and got the information from publicly available information. For example, it could be the company's website, or it could be from the sub-custodian, Thales Securities. He would say he got information from both sources.

Shown the dividend note ("Credit advice") for a share position with the Europa LLP Executive Pension Scheme as beneficial owner and with a record date of 26 March 2012 and a net dividend of DKK 22,484,000 (Extract 1, page 71, Exhibit 54-07-07-21), he explained that the company bought the shares from Salgado Capital, which acted as a short seller. He calculated the gross and net dividends shown in the annex.

Shown the Cash Statement from 29 February 2012 to 5 April 2012 for the Europa LLP Executive Pension Scheme (Extract 3, page 176, Exhibit 76-41-00-690), he explained that he believes that the 27 March 2012 credit of £2,527,586.60 corresponds to the net dividend mentioned in the reviewed dividend note. The transaction is matched by the debit of Market Claim at Salgado Capital. Neither Europa LLP Executive Pension Scheme nor Salgado Capital had paid DKK 8.316 million in tax. It is the distributing company that withholds and pays the dividend tax. Neither the custodian nor the short seller is required to pay any dividend tax. Salgado Capital had not received the net dividend from the distributing company because Salgado Capital was not the legal owner at the settlement date.

He prepared the template for the dividend notes used by Salgado Capital. He had based it on the format of dividend notes that appeared on the website of the central securities depository Clearstream. A dividend note is the document that the custodian uses to notify its customers that the net dividend has been credited to the customer's account. The net dividend also includes Market Claim.

Relying on the previous Exhibit [76-41-00-690] showing that Salgado Capital had a

receivable of approximately GBP 4 million from the Europa LLP Executive Pension Scheme as at 5 April 2013, he explained that Salgado Capital did not require payment of the amount. The balance of the custody account with the custodian bank constantly moved up and down. Only if the account were to be accounted could there be any question of withdrawing/collecting the balance. A negative balance can be seen as a kind of overdraft. No funds were deposited or withdrawn from that account at that time. The Europa LLP Executive Pension Scheme would not have been able to pay in the balance sheet at that time because it did not have cash of that magnitude. He cannot comment on whether the Europa LLP Executive Pension Scheme was technically insolvent.

All broker confirmations, all stock loan certificates and dividend notes were prepared by him. If a document needed to be stamped or signed by others, he emailed it to Karin von Rensburg, who was his contact person at Atlas in Mauritius and later, I believe, in South Africa. She took care of the necessary signatures and/or stamps. He received the original documents back by courier. He sent the dividend notes to Goal Taxback. Other documents – such as trade confirmations and custody transcripts – that needed to be sent to Goal Taxback may also need to be stamped or signed for tax purposes. I do not think the Danish tax authorities required this type of documentation. It was Goal Taxback who took care of everything about this, and he never had contact with SKAT himself. He doesn't recall examples of documents being changed while they were at Atlas.

Salgado Capital's clients were sent trade confirmations on the trading day. Every month he sent custody account statements. The original dividend notes were sent to Goal Taxback. The customer only had to confirm that they wanted a refund of the dividend tax. The contact with Goal Taxback about the refund requests went through him.

The client's custody statements showed all transactions in purchases and/or sales, as well as stock loans and/or share lending. In addition, Market Claims paid or received as well as refunds of dividend tax and any profits or losses from share trading were shown. Finally, the transaction costs for Salgado Capital, lending fees and any interest on the collateral ("cash collateral pool") were shown.

He doesn't recall Kevin Kenning or Todd Bergeron ever addressing errors in these statements while the deals were ongoing. When he found out that Salgado Capital had been closed, he contacted all the clients to see if they had all the trading documents they needed. Kevin Kenning said he had not kept all the papers and that he might need to receive some of the documents again.

There was no oversight by the authorities on Anjouan. It was not required. Once a

year, he had to comply with some requirements in order to renew Salgado Capital's brokerage license. There was no requirement to submit annual accounts.

When asked, Guenther Klar explained that the accounting of Salgado Capital was not audited by an independent party. Khajuraho's accounts were sent to an external auditor who prepared Khajuraho's tax statement and self-declaration on the basis of the trading papers prepared by Salgado Capital. Mr Khajuraho filed tax returns with the Luxembourg authorities on the basis of which the tax was calculated, including on the dividends distributed by the company to him as sole shareholder. The company also paid wealth tax on its net assets, which consisted of the trading profits of Salgado Capital. During the period in which Khajuraho traded, there were quite large tax payments – hundreds of thousands of euros – in dividend tax and wealth tax combined. Salgado Capital's accounting formed the basis for the statements.

The Europa LLP Executive Pension Scheme did not file any financial statements or tax returns, as this was not a requirement in the UK for a pension plan. He created management accounts based on Salgado Capital's trading papers. These profit and loss accounts have been produced as part of his evidence.


He does not know how Heber, Granard, Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust acted in relation to documentation requirements in their respective home countries. Salgado Capital's accounting and internal financial statements were not audited by any third party.

The various KYC information on Heber no longer exists because Salgado Capital was closed. He would say that Salgado Capital's documents contained what you would typically expect, namely bookkeeping and records, lists of directors and shareholders, KYC information from clients, trading papers and the like. He deleted the records after confirming that none of Salgado Capital's clients needed the records. He kept all the trading documents for the Europa LLP Executive Pension Scheme and Khajuraho because these companies were involved in tax matters in Denmark. He did not consider at the time that there was a need to retain additional material.

Claiming that Khajuraho was involved in a tax case in Sweden and that COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust also had a pending tax case in Denmark, he explained that he did not think about keeping the material at the time. He wishes today that he had kept Salgado Capital's trading statements for the other clients, as well as the KYC information for those clients. He did not foresee the need at the time.


Claiming that Monica van Zyl has signed on behalf of Salgado Capital and that none of the four documented director records mention her, he explained that Monica van Zyl became a director at the end of 2015 around the month of

October. Referring to the contents of his email of 19 October 2015 (extract 2, page 26, Exhibit 76-36-00-2479), and asked who "Christine" is, he explained that he would think the email was sent to ACS. That's it's the only thing that makes sense. They were responsible for all registrations relating to Salgado Capital, and specifically for the director and shareholder register.

Alleged that in 2019 Europa LLP Executive Pension Scheme in the tax case in Denmark produced the list of directors set out in extract 2, page 73, Annex 76-41-00-959, of which Andrew Moray Stuart was director, and asked why this happened in 2019 when Andrew Moray Stuart had resigned as director in 2015, he explained that he does not know. It didn't happen to hide anything.

The prosecutor documented from

- Extract 3, page 561, Exhibit 76-36-00-1924, Cash Statements for Blue Ocean Equity Retirement Plan & Trust as of November 30, 2013 showing a balance sheet of $18,471,095.65,

- Extract 3, page 563, Exhibit 76-36-00-1926, Equity Transactions for Blue Ocean Equity Retirement Plan & Trust as of December 31, 2013 exhibiting a series of loss-making stock trades in December 2013 with a total loss of $18,431,779.68.

Guenther Klar explained that these trades were "day trades". Kevin Kenning and Todd Bergeron together made the decision on the deals. He remembers that specific day, December 24, 2013, because there were so many trades and because the Blue Ocean Equity Retirement Plan & Trust had such huge losses. He had both Kevin Kenning and Todd Bergeron on the phone. They were the ones who called him. He did not provide any advice in connection with these day trades. It was Barry O'Sullivan who stood on the other side of all these deals. Perhaps he had called Barry O'Sullivan a day earlier or sent him an email in connection with Kevin Kenning and Todd Bergeron expressing a desire to "day trade" that day and with the stocks in question. He can't remember if they sold or bought the shares first. Salgado Capital acted as a broker, and Heber, as mentioned, was on the other side of the trades. He had been alerted a few days before December 24 that they would act on December 24. He does not remember when he got the information about what quantities and what specific shares they wanted to trade. It was probably only on the trading day itself. Prices have certainly only been fixed on the day itself. They contacted him regularly when they wanted to enter or exit a trade. He confirmed as broker the trades once Barry O'Sullivan had confirmed that he would be the counterparty. The rates were set as the market rates. They did not necessarily trade during trading hours of the exchange. He got the courses from his sub-depot. When the trade was an OTC trade, it was possible to trade after the exchange was closed. It may have been at the closing price. There is always a price, even when the stock exchange is closed.

Claiming that the Cash Statement of 31 December 2013 of the Blue Ocean Equity Retirement Plan & Trust (Extract 3, page 564, Exhibit 76-36-00-1927) states that the opening balance sheet and the loss on day trades in December 2013 almost coincide in amount, he explained that it is a coincidence. He acted solely as a mediator.

The prosecutor documented from

- Extract 3, page 593, Annex 76-36-00-1956, Equity Transactions for Blue Ocean Equity Retirement Plan & Trust, trading in Belgian shares as of 29 April 2015.

Guenther Klar explained that he does not know what the background to the deal on April 29, 2015 was. In the case of day trades, he acted solely as a broker.

The prosecutor documented from

- Extract 3, page 599, Annex 76-36-00-1956, Equity Transactions for Blue Ocean Equity Retirement Plan & Trust, trading in Belgian shares as of 22 September 2016.

Guenther Klar explained that he cannot say more about the deals.

The prosecutor documented from

- Extract 3, page 600, Exhibit 76-36-00-1963, Cash Statement for Blue Ocean Equity Retirement Plan & Trust as of September 30, 2016, with withdrawal of $3,881,949.77.

Asked directly whether the listed "day trades" for the Blue Ocean Equity Retirement Plan & Trust were done to make fit the amount it was agreed that Kevin Kenning would receive, Guenther Klar explained that there was never an agreement on any particular distribution that Salgado Capital's clients were to receive. Clients were entitled to withdraw their trading profits on the trades they had completed. If there hadn't been the loss-making day trade on September 22, 2016, Kevin Kenning could have withdrawn an additional $319,070.10.


The prosecutor documented from

- Extract 3, page 776, Exhibit 76-38-00-2157, cash statement for COLE Enterprises USA Retirement Plan & Trust as of December 31, 2013 with balance sheet of $43,474.42, and

- Extract 3, page 775, Exhibit 76-38-00-2156, equity statement for COLE Enterprises USA Retirement Plan & Trust for trades as of December 27, 2013 with a total loss of $13,847,804.80.

Guenther Klar explained that the deals were conducted in the same way as he has explained with regard to Blue Ocean Equity Retirement Plan & Trust's day trades. He believes that both Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trusts deals were completed simultaneously, so it is possible that he also spoke with both Kevin Kenning and Todd Bergeron about COLE Enterprises USA Retirement Plan & Trusts deals on December 27, 2013. He doesn't remember for sure. He acted solely as a broker in connection with Salgado Capital's clients' day trades. He has no comment on the fact that Kevin Kenning and Todd Bergeron contacted him about trading for DKK 5.3 billion Novo Nordisk and DKK 2.4 billion Maersk shares on December 27, 2013 after the loss-making deals on December 24, 2013.

The prosecutor referred to the historical Nasdaq prices shown in Additional Extract 1, page 237 and charged the defendant that the prices that COLE Enterprises USA Retirement Plan & Trust bought (975.84) and sold (969.61) Novo Nordisk shares before 27 December 2013, converted into DKK, are outside the spread of the share price.

Guenther Klar explained that, as already stated, he got the rates from his sub-custodian bank. The prosecutor's rates appear to be stated in DKK, but the custody account statements were kept in USD.

The prosecutor documented from

- Extract 3, page 811, Exhibit 76-38-00-2192, Equity Statement for COLE Enterprises USA Retirement Plan & Trust for trades as of November 17, 2015 at a loss of $370,749.85, and

- Extract 3, page 812, Exhibit 76-38-00-2193, Cash Statement for COLE Enterprises USA Retirement Plan as of November 30, 2015 with withdrawals of $3,597,101.75.

Asked if it was a coincidence that COLE Enterprises USA Retirement Plan & Trust withdrew the deposit on the same day that $370,749.85 was lost on day trade, Guenther Klar explained that it is the other way around. First there was a "day trade", and after the trade there was an amount in the account, which COLE Enterprises USA Retirement Plan & Trust withdrew.

He chose the company Goal Taxback as a "reclaim agent" based on cost considerations. They were cheaper than competitors. They demanded GBP 5,000 per recovery as a flat fee. He had obtained offers from other agents. Salgado Capital had a contract with Goal Taxback, and Goal Taxback also had a contract with all Salgado Capital clients who wanted to recover dividend tax. Only £1 x £5,000 fee was paid per recovery. Goal Taxback may have invoiced the fee to Salgado Capital, but it was Salgado Capital's client who had to cover the fee. The fee was deducted from the refunded tax amount. Goal Taxback paid the dividend

tax refund amounts received from SKAT into Salgado Capital's bank account. This is how it happens with all "reclaim agents". The tax refund must always be made to the custodian, who holds the money on behalf of their customers.

The prosecutor documented from

- Extract 3, pages 2261-2262, Exhibits 53-15-00-368 and 369, mail correspondance between Guenther Klar and Goal Taxback on February 4, 2013.

When asked why he requested a withdrawal to his own account, Guenther Klar explained that he knew in connection with this payment that one of his trading vehicles was going to pay him for trading services, so the money had to end up with him anyway. He would, of course, have done the correct bookkeeping. He had simply overlooked the fact that Goal Taxback was obliged to make a payout to Salgado Capital.

The Europa LLP Executive Pension Scheme also conducted "day trading. He needs to check the supporting documents to be able to answer whether this happened as early as 2012.

The prosecutor documented from

- Additional Extract 2, page 531, Annex 53-49-05-22, Custody record for Europa LLP Executive Pension Scheme of 5 June 2012, and

- Additional Extract 2, page 533, Annex 53-49-05-24, Equity Transaction Statement for Europa LLP Executive Pension Scheme, period 29 February 2012 to 5 June 2012, relating to the purchase and sale of 2.2 million Novo Nordisk shares for approximately GBP 194 million and approximately GBP 198 million respectively on 14 May 2012, and the purchase and sale of the same nominal share position on 16 May 2012 for approximately GBP 190 million and approximately GBP 196 million respectively.

Guenther Klar explained that the amounts quoted must be in GBP before the account was held in that currency. He will say that the documented trades are expressions of "day trade". It appears from the documents that there was a profit of GBP 3 million and GBP 6 million respectively. Salgado Capital was on the other side of the trades. It was he who has decided on the trades both for Salgado Capital and for the Europa LLP Executive Pension Scheme. He was authorized to act on behalf of both companies. The deals do not imply that money should be moved between the two companies. "Day trading" is not about moving money around, and the result is based on the fluctuations of prices, which he had no control over. You never know if you will win or lose, and therefore it is unsuitable for moving money. He could not expect profit for both companies trading. He didn't know which company would win or lose. It's a zero-sum game. However, the purpose of both companies was to make a profit.

Although he acted on behalf of both companies, he was not the beneficial owner of Salgado Capital in May 2012. He was no longer the rightful beneficiary owner. It was Hillingdon Turner Nominee Ltd. For a period between February 2012 and June 2012, Hillingdon Turner Nominee Ltd. was the rightful owner of Salgado Capital. The Salgado Charitable Trust had been incorporated, but the stock had not yet been transferred to the charitable foundation.

The deposits in Salgado Capital's bank account came mainly from refunds of recovered dividend tax in Denmark, Sweden, Austria and Belgium. All tax refunds were deposited into Salgado Capital's account. It is certainly true that a total of approximately GBP 60 million in dividend tax refunds have been paid through Goal Taxback, as shown in NSK's statement (Exhibit 38-209-00-30 in Extract 3, page 905). He does not know the origin of the GBP 314,583.36 deposit on 14 November 2014 (Extract 3, page 959, Exhibit 17-02-00-6) into Salgado Capital's Caledonian Bank account. He does not know if it can be a deposit from Amalthea.

Claiming that it is the prosecution's view that all other external deposits into Salgado Capital's bank account originate from Goal Taxback, Guenther Klar explained that he would not expect to see any other deposits in Salgado Capital's account.

The trades and associated Market Claims were booked with Salgado Capital at the client level and would therefore never appear in the bank account. It happens in exactly the same way at Citibank when their customers do business with each other. There too, only amounts from dividend tax refunds would be seen.

Claiming that in the English tax case it has been admitted that DKK 320,758,845 in dividend tax has been recovered in Denmark corresponding to the amount stated in the indictment, he explained that he has not checked the amount, but he believes that this is the amount that Goal Taxback on behalf of Salgado Capital's clients has received from SKAT.

He was the sole holder to sign in Salgado Capital's bank account. When he wanted to withdraw money from Salgado Capital for his companies, he did so on the basis of his service advisory agreements with the companies. When the companies redeemed their profits with Salgado Capital, it was effectively debited to Salgado Capital's bank account and then his own bank account was credited. This paid for the services he had provided to Khajuraho and the Europa LLP Executive Pension Scheme. There was no pattern in these disbursements. He believes that a total of approximately GBP 42 million has been raised, divided into approximately GBP 24 million as trading profit for the Europa LLP Executive Pension Scheme and approximately GBP 18 million as trading profit for Khajuraho. The payments from Khajuraho were a little more complicated than just paying for consulting services.

Shown the Caledonian Bank bank statement for Salgado Capital's GBP account (Extract 3, page 954, Exhibit 17-02-00-1) and asked about the entry on 7 February 2013, Guenther Klar explained that the just over £1.1 million was transferred to his account. It was a withdrawal of profits on securities trades made by his trading vehicles. Such was the case for all the withdrawals that were made. The specific withdrawal may have been for the Europa LLP Executive Pension Scheme or Khajuraho, or for both.

Shown Excel file (TE2.-x, file 12, exhibit 53-49-07-17), he explained that it is Khajuraho's management accounts that he has prepared. He has essentially converted the company's trading documents into a balance sheet and balance sheet. These profit and loss accounts are what Khajuraho's auditor used to prepare Khajuraho's accounts and tax returns in Luxembourg. When asked about deposits/withdrawals and the amount of €5 million in February, Guenther Klar explained that it was dividends from Khajuraho to him as a shareholder. Of this amount, he received EUR 4.25 million, while the remaining EUR 750 000 was a dividend tax paid to the tax authorities in Luxembourg. Objecting to the fact that there is no payment equivalent to EUR 4.25 million on the bank statement, he explained that he is confident that the payment of the dividend tax will be found in the bank account. Payment will have been made to Administration Des Contribution Direct. The EUR 4.25 million will also have been drawn from the bank account, but it may have been split into several payments and it is possible that he has received the amount in GBP. Therefore, the exchange rate may have an impact on whether it is exactly EUR 4.25 million. This also applies to the payment of dividend tax, which can also be stated in GBP. Shown the Caledonian Bank bank statement for Salgado Capital's GBP account (Extract 3, page 958, Exhibit 17-02-00-5) and asked about the entry on 25 March 2014, he explained that it is similar to the amount of dividend tax paid to Luxembourg. He will believe that the dividend appears in the profit and loss account in February 2014, because it had to be declared at that time. It's just a delay between registering the dividend tax and when it was due. It is probably correct that the amounts were paid out from the account later than February 2014.

In 2015, he received an additional amount from Khajuraho's trading profits in Salgado Capital. This was equivalent to EUR 20 million, but it was paid in GBP. He believes it ended up being GBP 14 or 15 million.

The prosecutor documented from

- bank statement from Global Fidelity Bank, Salgado Capital's GBP account (extract 3, page 1422, voucher 17-04-00-02, transfer on 17 August 2015).

In addition, Guenther Klar explained that he had received advice from Khajuraho's accountant on how to book the payment of the approximately GBP 14.3 million, but

this is a withdrawal of Khajuraho's trading profits from the account with Salgado Capital. The amount was paid from Khajuraho to him, and it was the division of the payment from Khajuraho to him that he received advice on. The amount was recorded as repayment of shareholder loans amounting to EUR 500 000, as payment from his share premium account amounting to EUR 17 million and finally as payment for services under the agreement with EUR 2.5 million. He knows that the breakdown of the amounts is set out in one of the documents produced by his defence counsel in the case.

A "share premium account", as he understands it, is an opportunity to capitalise – save – profits, for example from stock trades, instead of paying out the amount as dividends. This is an option for all companies in Luxembourg. Khajuraho capitalized profits during the years when they traded securities transactions. He was advised in 2015 to have the amount of EUR 17 million paid ("redeemed") as a "share premium account".

In 2014, the entire amount - EUR 5 million - was paid as dividends.

He was also responsible for drawing up the profit and loss account   ("management" (account) for the Europa LLP Executive Pension Scheme.

The prosecutor documented from

- Open Position Statement of 5 October 2012 regarding Deposits/ (withdrawals) (extract 3, page 188, Annex 76-41-00-702), and
- TE2.-x, file 2, appendix 53-49-05-57-57

He explained that the Excel file is the management accounts of the Europa LLP Executive Pension Scheme. It is similar to the inventories he made for Khajuraho. He is a trained accountant, so he made them himself. In Europe, the LLP Executive Pension Scheme did not produce proper accounts because it is not a requirement for UK Pension schemes. He wrote "share capital" in quotation marks under the tab "balance sheet" because the Europa LLP Executive Pension Scheme is not legally a corporation and therefore does not have a share capital. The GBP 160,000 was, as intended, transferred to Salgado Capital's bank account. It wasn't a requirement, but it was his decision. He does not remember whether the amount was paid to another account afterwards.

Shown the Europa LLP Executive Pension Scheme, Open Positions and Cash Statement of 30 November 2013 (Extract 3, pages 242 and 244, Annexures 76-41-00-756 and 758), he explained that an amount equivalent to the deposit of GBP 160,000 was withdrawn, but it cannot be said that it is the same amount. As he remembers it, however, that's how he posted it. At that time, Europa LLP Executive Pension Scheme's custody account was positive and therefore withdrawals from the account could be justified. He remembers that there was a problem with paying the

amount directly to the Europa LLP Executive Pension Scheme's account in England. It was Europa LLP Executive Pension Schemes bank that had a general problem with receiving amounts from banks in the Cayman Islands. He believes that the bank told him that he could solve the problem ("get around that") by first transferring to his own account and then transferring the amount further. Salgado Capital had to pay the amount to him privately, and then he transferred it to the Europa LLP Executive Pension Scheme.

Claiming that there were no movements in Salgado Capital's account with Caledonian Bank before February 2013, he explained that he does not remember any further details.

Shown the bank statement of Caledonian Bank, movements on 22 November 2013 and 5 December 2013 (extract 3, page 957, Exhibit 17-02-00-4), he explained that here it is seen that the money was sent back. He does not remember when he paid out the amount to the Europa LLP Executive Pension Scheme through his own account, but that was after 5 December 2013.

He did not always have the accounts posted to customers' accounts at the same time as the bank transfers. Sometimes there was a mismatch between the time of transfer and the posting. Looking at the period of trading as a whole, the total amount withdrawn and the amount debited from the custody account were the same. He no longer remembers the specific reasons why withdrawals were not always posted at the same time. He made customers' custody listings monthly. Sometimes he missed some transactions in a given period, but when he created management accounts, he caught the errors and corrected them. He knows it came to fit in the end, because otherwise the balance wouldn't fit. It was typically in connection with the preparation of profit and loss accounts that he caught the errors.

The prosecutor documented from

- Europa LLP Executive Pension Scheme, Open Positions and Cash Statement for EUR02 of 31 March 2015 (Additional Extract 2, pages 697 and 699, Annex 53-49-05-188 and 190)

He believes that it indicates that he corrected a posting error when he has entered "( *Salgado trade creditor)"* under the item Deposits/ (Withdrawals). He does not remember whether a sum of GBP 339,033.33 was withdrawn during the period, but he believes it is a correction of an error. He will be able to answer it if he is given the opportunity to see the balance sheet. Shown the 2015 profit and loss account (TE2.-x, file 4, exhibits 53-49-05-181-181), Guenther Klar explained that this indicates a correction. He will think it may be a correction to reconcile the closing and opening balance of the custody account that month. He doesn't know for sure, but that may be the explanation. He just knows that he made mistakes

("human mistakes"). He wasn't trying to do anything wrong.

When asked about a transfer dated 5 April 2017 from Global Fidelity Bank and presented with the bank statement GBP account (extract 3, page 1428, Exhibit 17-04-00-8), he explained that it was he who made the payment from the account. If it was payment to other clients of Salgado Capital, it was on their orders, but it was he who authorised the payment on behalf of Salgado Capital.

When asked, Guenther Klar explained that he started making two Custody records for the Europa LLP Executive Pension Scheme. When he initiated it, the general idea was to have one account with inventory for Danish shares and another for the trade in Swedish shares. That was largely the idea, but it didn't quite work that way in practice. He believes that he made the decision at the beginning of 2014, when Europa LLP Executive Pension Scheme only traded in the Danish and Swedish markets.

Two custody accounts were also created for other clients. After discussing it with Khajuraho's accountant, Khajuraho proceeded with one custody account. The accountant preferred it that way. Granard, an Irish pension scheme ("Pension Scheme"), also had only one custodial account.

COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust themselves suggested that two custody accounts be kept for them, but this was largely for the same reasons. The American investors traded in Denmark and Belgium, preferring one account for each of the countries. That was the idea, but in practice it did not work out that way. It was decided around late 2013 or early 2014 that they would have two custody accounts. This was at the same time that he made the decision for the Europa LLP Executive Pension Scheme.

When COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust wanted to withdraw money, he was approached by Kevin Kenning or Todd Bergeron. They instructed him how much money to withdraw and where to send the money. He acted at their requests on behalf of Salgado Capital. In any case, these were de facto withdrawals of profits from the trading of shares, and he treated the requests as such. Sometimes Kevin Kenning and Todd Bergeron would have the money paid to COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity LCC Retirement Plan & Trust accounts in the United States and sometimes to other ("third parties"). It was both Todd Bergeron and Kevin Kenning who asked him to pay out to others ("third parties"). He has found a few examples in the case file. This was done, for example, through the Global Fidelity Bank in several cases. From Salgado Capital's various bank accounts include transfers to Patrick C. Enright, Friends of the Orphans and Kevin T& Margaret McNicholas and Chicago Youth Programs. He has also recovered a transfer to DLA Piper from his GBP account at

Caledonian Bank. Although the amount was transferred through his account, it was based on a request from Todd Bergeron. It was posted to the custody account as a withdrawal with COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust. That's how Todd Bergeron wanted the transfer to be accomplished. He does not remember what justification he was given.

He is of the opinion that NSK's summary of the transfers [Extract 3, page 905, Exhibit 38-209-00-30] did not include the amounts transferred at the request of COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust to third parties. Guenther Klar added that it is also not an accurate description of the cash flows to Barry O'Sullivan. The table does not include the amounts that otherwise went to Barry O'Sullivan.

When asked about the overview, Guenther Klar explained that the amounts quoted are consistent with how much was raised by COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust. The amounts raised were trade profits and not received dividend tax refunds. NSK's statement completely ignores the stock trades and their profits.

When asked, he explained that he has also made mistakes in COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust's accounting such that there have been discrepancies at times. In the situation, he did not worry, as long as the overall statement was correct, which it was. If he had realised that someone was going to suggest that he was doing something wrong, he would have done more to make sure that at no time was there any mismatch between the payments from bank accounts and the time when the profit withdrawals were recorded.

The prosecutor documented from

- Bank statement Global Fidelity Bank, Salgado Capital, Closing balance December 31, 2015 (Extract 3, page 1421, Exhibit 17-04-00-1), withdrawals May 13, 2015, June 29, 2015, October 2, 2015 and November 10, 2015 totaling approximately USD 3,881 million, and

- Open Position and Cash Statement of September 30, 2016, Blue Ocean Equity Retirement Plan & Trust (Extract 3, pages 598 and 600, Exhibit 76-36-00-1961 and 1963).

Guenther Klar explained that it could happen that a cash statement was not made for a few months if the client had not made stock trades. He cannot say with certainty that this is what is happening here. The balance sheet may have been made for periods longer than one month. He believes that this balance sheet was made in September 2016 because there was trading activity that month. Shown

the Equity Transaction dated 30 September 2016 (Extract 3, page 599, Exhibit 76-36-00-1962), he explained that – as he has already explained earlier – it was a case of "day trading".

The prosecutor documented from

- Open Position and Cash Statement of 30 November 2013, Europa LLP Executive Pension Scheme (Extract 3, pages 242 and 244, Annexures 76-41-00-756 and 758),

- Open Position and Cash Statement of November 30, 2013, Khajuraho (Extract 3, pages 382 and 388, Exhibits 53-15-00-351 and 357),

- Open Position and Cash Statement dated November 30, 2013, Blue Ocean Equity Retirement Plan & Trust, (Extract 3, pages 558 and 561, Exhibits 76-36-00-1921 and 1924), and

- Open Position and Cash Statement dated November 30, 2013, COLE Enterprises USA Retirement Plan & Trust, (Extract 3, pages 770 and 773, Exhibits 76-78-00-2151 and 2154).

When asked whether Salgado Capital would have been able to pay customers' receivables of approximately GBP 40.5 million, EUR 20 million, USD 18.7 million and USD 13.9 million on November 30, 2013, Guenther Klar explained that it is not easy to answer without seeing the bank account and custody accounts of the other customers as well. The balance in Salgado Capital's bank account combined with the custody accounts of the other clients will correspond to the amounts listed.

Alleged that Salgado Capital's bank account held a balance of £395,570.87 on 30 November 2013 [Extract 3, page 957, Exhibit 17-02-00-4], he explained that the remainder of the amounts were offset by a negative custody account with Heber and Granard.

Salgado Capital was not a bank, but similar principles applied. It's not borrowing and lending money, but it's kind of the same. Salgado Capital owed some of its clients money, and some other clients owed money to Salgado Capital. This is how it will be in any financial institution. He does not believe that any financial institution would be able to honour if all customers withdrew their receivables at once.

There was no agreement with COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust that they were not allowed to withdraw their profits on the stock trades. From his point of view, there was no correlation between their receivables on 30 November 2013 and the day trade carried out on 24 and 26 December 2013. He acted only as a broker ("broker"). What was the customers' justification for entering into these "day trades", one has to ask the witnesses about [Kevin Kenning, Todd Bergeron and Barry O'Sullivan].

However, the large market fluctuations were the reason why the trading strategy had to be changed in the autumn of 2013 so that they held on to equity positions for a shorter period of time. In his opinion, customers were taking too much market risk. It was too volatile, but it wasn't like he just woke up one morning and didn't want anyone to owe such large amounts.

Shown Salgado Capital's GBP account (Extract 3, page 957, Exhibit 17-02-00-4) and asked about the transfers on 8 October 2013 to Barry O'Sullivan and on 15 October 2013 to Granard Investments, Guenther Klar explained that – like all other transfers to clients – they were made on instructions from the client. In this case, it was Barry O'Sullivan.

The amount paid to Granard was a withdrawal of Granard's stock trading profits. The amount that went to Barry O'Sullivan was a withdrawal of stock trading profits for Heber. He recalls that Barry O'Sullivan had been advised at the time that if it was registered as a share sale, Barry O'Sullivan would not be subject to income tax. On paper, therefore, it was documented as a stock sale from Barry O'Sullivan to him, but it was essentially a transfer of Heber's profits. Claiming that he explained that on 30 November 2013 Heber and Granard's custody accounts had a loss corresponding to the receivables of the other customers, he explained that, as already explained, he cannot remember what Heber's and Granard's balance sheets were at specific times.

Shown Salgado Capital's GBP account (extract 3, page 957, exhibit 17-02-00-4) and asked about the transfer on January 10, 2014, he explained that it was also trade profit. These were all payments to Granard and Heber, including those that were transferred through others.

Shown Salgado Capital's GBP account (extract 3, page 959, exhibit 17-02-00-6) and asked about the transfer on September 8, 2014, Guenther Klar explained that CurrencyFair Ltd. was a company used by Barry O'Sullivan. Salgado Capital transferred the money here on the instructions of Barry O'sullivan, who wanted to get the withdrawal of the stock trading profits in euros. He understood that Barry O'Sullivan could obtain a favourable exchange rate from CurrencyFair Ltd. It is his understanding that CurrencyFair Ltd. exchanged from GBP to Euro for Barry O'Sullivan.

Shown Salgado Capital's EUR account (extract 3, page 973, Annex 17-02-00-20) and asked about the transfer on January 14, 2015, he explained that Barry O'Sullivan stated that he had received tax advice. Barry O'Sullivan wanted the disbursement documented as loans. There was no intention that the loan would be repaid, and as he understood it, Barry O'Sullivan got a tax advantage. He does not believe that he was ever told what exactly the tax advantage consisted of. It was an interest-free loan, and he believes that a loan agreement was made, but he does not think he has it anymore. He remembers that it was a future tax advantage that could not be realized until 6-7 years later.

The prosecutor documented from

- bank statement Global Fidelity Bank, Salgado Capital GBP account (extract 3, page 1422, exhibit 17-02-00-2) transfers 12 May 2015 and 16. 2015, and

- bank statement Global Fidelity Bank, Amalthea Enterprises Ltd. GBP account (Additional Extract 2, page 228, Exhibit 53-47-00-240) transfers 16. 16, 2015 and 17. June 2015.

To this, Guenther Klar explained that it was also the payment of profits from stock trading. It was Barry O'Sullivan who asked for the sum of almost GBP 1.2 million to be transferred via Amalthea Enterprises Ltd. It is a company domiciled in the Cayman Islands, which the defendant himself owned. Amalthea Enterprises Ltd. was not part of the stock transactions conducted through Salgado Capital. The company engaged in stock lending and bought and sold derivatives. The company acted as a broker. It always lent the same number of shares as it had borrowed itself, or sold the same number of shares it had bought. Amalthea Enterprises Ltd. was not a client of Salgado Capital.

He doesn't remember the details of the specific payout, but for some reason, Barry O'Sullivan didn't want to receive the amount directly from Salgado Capital. It continued to be a profit increase on the stock trades.

The prosecutor documented from

- bank statement Global Fidelity Bank, Salgado Capital GBP account (extract 3, page 1423, voucher 17-02-00-3) transfer 12 November 2015, and

- bank statement Global Fidelity Bank, Amalthea Enterprises Ltd. GBP account (Additional Extract 2, page 229, Exhibit 53-47-00-241) transfers 12 November 2015 and 13 November 2015.

Guenther Klar explained that this transfer was in fact a withdrawal of trading profits. Walter Odlum & Co was Barry O'Sullivan's Irish law firm. Barry O'Sullivan wanted it to appear as a purchase of shares, and he was instructed to transfer the amount to Walter Odlum & Co. As far as he understood, it was Granard Investment in which shares were purchased. He has not done business at Granard Investment. Barry O'Sullivan is to his knowledge still a director of Granard Investment and uses the company.

Shown a transcript from his GBP account with Global Fidelity Bank, period 1 January 2016 to 31 December 2016 (Extract 3, page 1113, Exhibit 17-03-00-10) and asked about the deposit on 26 September 2016, Guenther Klar explained that

it is repayment of a loan plus interest. He had given a loan of GBP 2 million which had been paid to Pinsent Masons. It concerned an investment in renewable energy. The loan was repaid directly from Barry O'Sullivan.

There were also other transactions from and to his private account, which are indirectly related to Barry O'Sullivan. They made a couple of investments together, including in an Irish hotel and an Irish company dealing with renewable energy. He transferred EUR 800 000 and EUR 2.5 million to a law firm, Madigans. The investments and the amount on September 26, 2016 were related to him personally. The investments had nothing to do with Salgado Capital, Heber or Granard and therefore the transfers will not appear in entries in custody accounts or bank accounts of Salgado Capital.

Shown a transcript from his GBP account with Global Fidelity Bank, period 6 February 2015 to 31 December 2015 (extract 3, page 1105, Exhibit 17-03-00-2) and asked about the transfer on 7 August 2015, he explained that it may well be true that it was the last transfer to Antonia Saunokonoko to fulfil the divorce agreement ("consent order"). They had divorced in mid-2013 and, under the divorce agreement, he had to make payments of up to £30 million. Around mid-2014, Antonia told Saunokonoko that she had changed her mind and that she only wanted £12 million. Therefore, payments ceased for a period of time. When she emigrated to Australia, she contacted him. She wanted more money when she had to buy a house. He made one or more payments until she said again that she didn't need any more money for the house purchase. After that, payments to her ceased.

When asked again about the transfer on 17 August 2015 of just over £14.3 million (Extract 3, page 1422, Exhibit 17-04-00-2), Guenther Klar explained that there was no particular reason why he withdrew such a large amount at the time. He has neither delayed nor withheld a payment to limit Antonia Saunokonokoko's rights after the divorce settlement. It is a random temporal relationship. He had no concerns whatsoever that the tax authorities would stop paying dividend tax refunds.

Asked by his lawyer, Guenther Klar explained that the global team he was part of at ABN AMRO Bank consisted of about 80 people. It was both the bank's own positions and customers' positions that he worked with. The main purpose of the team's work was that either the bank or the client obtained a tax benefit. Barry O'Sullivan and Kevin Kenning were part of the team. He himself worked from the London office, while Barry O'Sullivan worked from the Dublin office, which reported to the London office. They saw a lot of each other. Barry O'Sullivan was in the London office almost every month, and they talked about it. They didn't have transactions together, but they talked more generally about what was going on in the team. The whole group worked with tax-driven transactions, but how they were composed differed. Kevin Kenning was based in the United States, and

he was an expert on taxation regulations in the United States. Every time he had anything to do with American tax, he would talk to Kevin Kenning because his knowledge of the US tax rules was far greater. They didn't see each other as often, but it was at least once a year. They talked by phone every month. Among other things, he and Kevin Kenning have collaborated on a bond issue at HSBC Bank, but they worked together on several transactions. At the time, they had a meeting together in the United States, where he represented the London office. He knew both Kevin Kenning and Barry O'Sullivan well in 2012.

He gained his first experience with net settlements at ABN AMRO Bank. This happened in connection with ABN AMRO Bank entering as a short seller of some Philippine government bonds. Some French banks could obtain a tax advantage but did not want to assume the credit risk. ABN AMRO Bank's London division short-sold the bonds to its Philippine division and the deal was net settled. The trading structure was approved by the bank's compliance and finance and tax departments. There weren't any problems with that.

When he decided to trade securities on his own account, he knew he needed a broker and a custodian. He wanted to do it as cheaply as possible, and he looked into it very carefully.

He also did an in-depth study of the possibility of seeking dividend tax refunds in different markets. SKAT in Denmark had published a guideline that was available in English on SKAT's website. Clearstream also had guidance that included information on how and to what extent to seek dividend tax refunds in individual countries. He researched various Western European countries. There were some markets where the intended trading strategy would have been effective before tax ('pre-tax') but where the beneficial owner would not have been eligible for a dividend tax refund.

Some of the countries he studied required not only the beneficial owner, but also the legal owner. Those countries published the rules describing this, and those rules were included in Clearstream's tax guidelines. It was done in different ways. In some countries, for example Finland, Market Claim was not dividends in a tax context. He talks about the rules as they were then. That may have changed. In France and Germany, the "DCA" [dividend credit advice] to the tax authorities had to be issued by a local custodian.

Other countries had what he calls "tracing rules" where you had to submit documentation that the dividends paid could be traced from the dividend distributor to the person sending the dividend tax refund request. Such rules

apply, for example, in Switzerland and Ireland. The starting point is always - in all countries - that the beneficial owner is entitled to a dividend tax refund. This has been the rule in Denmark since 2002. It was his sincere opinion that even without being the legal owner, the beneficial owner of the shares was entitled to apply for a dividend tax refund in, among other places, Denmark.

Each country also had different ways of checking compliance with its rules. Some countries required the dividend tax refund applicant to submit their trade confirmation because it is very clear from a trade confirmation when the deal is settled. Thereby, it is also clear whether the applicant has received dividends or whether it is a Market Claim. Other countries required that it could be specified from a local custodian, even if the share position was in a foreign custodian. This is another way for the tax authorities to see the correlation between the payments made by the distributing company and the applicant for a dividend tax refund. Denmark did not make any of these demands, and for that reason too he believed that there was nothing wrong with what he was doing.

Similar commercial transactions involving the beneficial owner but not a legal owner were carried out in all major banks from the beginning of 2000 and perhaps earlier than that. This was done, among other things, in Macqaurie Bank.

He knew of other persons who carried out similar transactions. Dewey Ballentine, head of tax at Dewey Ballentine, who later became global head of KPMG's legal department, personally invested in the same type of transactions through a U.S. pension plan. He was actually in partnership with, among others, Kevin Kenning. They invested in a number of European markets, including Denmark.

The tax manager at law firm Clifford Chance, London, Michael Brosnahan, joined investment manager Aronville. They made transactions with similar features, namely that the beneficial owners applied for reimbursement of dividends, even though they were not also the legal owners. Aronville invested in a number of European markets, including Denmark.

They were a number of highly respected individuals with tax expertise.

He became aware of Kevin Kenning and Fred Gander's connection before the fall 2012 meeting. At the meeting with Kevin Kenning, Todd Bergeron and Barry O'Sullivan, Kevin Kenning brought a Danish tax opinion, which he showed to the meeting participants. The tax opinion expressed that Market Claim was dividend for tax purposes. This was in relation to transactions that were hedged and where the only profit was the withheld dividend tax. It was different from his trading strategy, where dividend tax refunds were only one of the sources of income. He

does not remember which law firm wrote the tax opinion or to whom it was addressed, but it was a Danish law firm that had prepared it.

Kevin Kenning knew that in the trades he was already doing there was also a short seller, but he did not know who the short seller was. Kevin Kenning knew that the short seller had a custodian with BNP Paribas and that the broker, ED&F Man, used BNP Paribas as a sub-custodian. There may well have been net settlement in those transactions at BNP Paribas level.

In recent years, he has been contacted by his English lawyer, who said that he had been contacted by Mr Swoboda. Packeisen, who worked for either both Kevin Kenning and Todd Bergeron, or only for Kevin Kenning. He doesn't remember exactly when it happened. Mr Packeisen had asked Guenther Klar to make a statement that Kevin Kenning and Todd Bergeron were not aware that they were buying from a short seller. He said he wouldn't because they knew not only that there was a short seller, but also who it was, namely Barry O'Sullivan.

Shown bank statement Caledonian Bank, Salgado Capital GBP account (Extract 3, page 964, Exhibit 17-02-00-11) and asked about the transfer on 8 October 2013, Guenther Klar explained that it was profit withdrawal for Heber. Heber became a client in early 2013.

The Europe LLP Executive Pension Scheme and Khajuraho were not in "0-percent countries". He used the trading vehicles he already had. The dividend tax refund option was part of the motivation for the trades, but not the only one, which is why he used these companies. He could have set up new companies, which would then have been able to get a larger tax refund.

Shown the statement of Khajuraho's outstanding tax of 15 October 2020 (Additional Extract 2, page 973, translation in Additional Extract 3, page 61, Annex 53-49-07-207), he explained that it was the auditor in Luxembourg who advised him on when to make tax payments. It was he himself who made the payment, but the accountant booked it for Khajuraho. It was the tax authorities who determined how the tax was distributed over the different tax years. When Khajuraho was established in 2012, a prior prior declaration of tax assessment had been obtained from the tax authorities. It did not become applicable because the decision was not implemented in time due to bureaucracy. He made the stock trades anyway because the transactions still made sense even before dividend tax refunds.

Khajuraho was subject to wealth tax. The company's assets were calculated on the basis of the balance sheet from Salgado Capital. The fortune was quite large because the accountant had advised him to make "Share premium account" instead of paying

dividends from Khajuraho. If it had been paid as dividends, the profits would have been taxed with dividend tax instead. The company's assets were obtained from the profit on trading shares.

His trading strategy differed from regular-ex trading in particular in that there was no hedging. The profit did not come solely from dividend tax refunds. It also arose from price developments and Market Claims. In his trading strategy, his clients also made their own trading decisions. In-ex trades, it is an investment manager who makes the trading decisions. In a normal-ex trade, the shares are sold the day after Ex-day, while in his trading strategy one should hold on to the shares for one to two months. Solo Capital Ltd. did that type of Cum-Ex trade.

Shown his email to Kevin Kenning dated February 24, 2015 (extract 3, page 847, 53-48-00-10, he explained that he sent a similar email to the client every time before a stock trade. The short seller also got a similar email.

The defence counsel documented from

- Additional Extract 2, page 1013, Annex 53-49-08-2, "Khajuraho raw data 2015", Guenther Klar's annual statement of Khajuraho's results.

To this, he explained that he has hand-listed Khajuraho's stock trading performance across all markets. He has divided it into the sub-items dividends, dividend tax refunds and trade profits. In the last column, he has converted from EUR to GBP. You can see that Khajuraho made a profit on the stock trade after recognizing dividends of GBP 6 million. The company raised EUR 5 million in 2014 and EUR 20 million in 2015. He has extracted the figures from the management accounts, which are based on Khajuraho's custody statements. He has calculated it across all markets because it is not meaningful to calculate without looking at the overall result. The overall strategy was the same, and it was the overall result across the markets that constituted the profit that Khajuraho was able to raise. His calculation shows that Khajuraho made a profit on the stock trades and withdrew more money than the dividend tax refund paid.

The defence counsel documented from

- Additional Extract 2, page 1014, Annex 53-49-08-3, "Europe 2015 profit & loss", Guenther Klar's annual statement of the number of deals and results of the Europa LLP Executive Pension Scheme by country market.

Guenther Klar explained that he has listed by hand in the top table the number of dividends, stock trades, dividend tax refunds and "day trades" per year. In the tables below, he has calculated the annual share trading profit distributed among

the various markets. The calculation shows that Europa LLP Executive Pension Scheme made a profit on its share trading in Denmark, but losses in Austria and Sweden. He has made similar calculations for COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust.

The defence counsel documented from

- Additional Extract 2, page 1016, Annex 53-49-08-5.

The figures he has used in his calculations for COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust are available from various sources. He no longer holds the material relating to COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust stock trading results.

He has the dividend tax refund statement from NSK's calculations, which are made on the basis of Salgado Capital's bank account. On the basis of the dividend tax refund paid, he was able to calculate the net profit. In Belgium, some of the dividend taxes recovered were not paid, but he has found details of this in a Belgian police report. The amount raised by COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust as profits he has also taken from NSK's statement. COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust's losses on the actual stock trades are a balanced figure. All the figures can be found in the file.

When questioned by the prosecutor, Guenther Klar explained that the actual loss on the stock trades can be calculated if one knows the net dividend, the dividend tax recovered and the amount withdrawn as profits on the transactions. It was information about net dividends, recovered dividend tax and withdrawn profits that he had at his disposal. Shown his calculation (Additional Extract 2, page 1015, Exhibit 53-49-08-4), he explained that he has calculated the amount of £102 million in sharetrading profits/(losses) on the basis of the other figures of £85 million, £26 million and £9 million shown in the material.

When asked again about the profit and loss account of the Europa LLP Executive Pension Scheme (TE2.-x, File 4, 53-49-05-181), he explained that he only produced the management accounts at an overall level across markets. The company had the same trading strategy in all markets, and therefore it did not make sense to make a profit and loss account for the individual market.

It was the individual client who decided for himself whether to apply for a refund of dividend tax. For COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust, the decision was made by Kevin Kenning and Todd Bergeron.

Shown his email to Kevin Kenning dated February 15, 2015 (Extract 2, page 326, Exhibit 38-210-00-57), he explained that he sent the email to disclose the information about the documentation requirement in relation to the recovery of withheld dividend tax. He had received the information from Goal Taxback. Since the application concerned the Blue Ocean Equity Retirement Plan & Trust, it was Kevin Kenning's responsibility to decide whether to submit the application. It was also Kevin Kenning who had to fill it. He would like to point out that in the application form itself states that it is the beneficial owner and not the legal owner who has the right to recover dividend tax.

He and Antonia Saunokonoko each had their own lawyer for the divorce. He was very open with her and the lawyers about the transactions he would make and that it would have to do with dividend tax refunds. He had nothing to hide. No one asked questions about this.

Guenther Klar further explained that there was full transparency in ABN AMRO Bank regarding the working methods and financial structures that were put in place. It was the bank's policy that any transaction should be approved and that the transactions in this connection should be presented on a fully disclosed basis ("full disclosure"). This applied to all members and transactions in the global group. Kevin Kenning and Barry O'Sullivan were also familiar with this way of working. He has worked according to the same principle also after his time at ABN AMRO Bank.

Asked about his knowledge of the recommendation that Barry O'Sullivan made to QED Equity's investor committee, he explained that there was also a short seller in the model they had talked about and that Barry O'Sullivan presented in QED Equity. It also appeared that a Market Claim was generated in the structure. Barry O'Sullivan told him that QED Equity would not invest in Solo Capital Ltd.'s trading platform because the returns were not large enough. He did not mention anything about it being because of the reputational risk.

Barry O'Sullivan and he spoke in the summer of 2012 about leaving Solo Capital Ltd. He told that Salgado Capital had been established and on a general level what the trading strategy of Salgado Capital would be. Barry O'Sullivan was told that the trading strategy was similar to that presented to QED Equity, but also in what respects it differed. He suggested they meet to discuss whether Barry O'Sullivan would enter the trading structure as a short seller. When they met, they started talking about involving U.S. retirement plans. During the meeting, Barry O'Sullivan expressed his interest in being a short seller and suggested that defendants contact Kevin Kenning.

He also explained at the meeting that, contrary to the strategy presented to QED

Equity, there was no need for funding because the trading structure involved the short seller borrowing the shares from the share buyer, who financed his purchase of the shares with the collateral from the share lending. He explained that Barry O'Sullivan and the stock buyers had to make the trading decisions themselves. This was one of the other differences between Salgado Capital's trading structure and the QED Equity proposal. In his proposal, there was not an investment manager who made the trading decisions, as was the case in Solo Capital Ltd.

After the meeting, he contacted Kevin Kenning by phone. This was also in the summer of 2012 and before the "whiteboard meeting" in Dublin. It was during those phone calls that Kevin Kenning shared that he was already involved in dividend arbitrage deals through Kevin Kenning Law Firm Retirement Plan &Trust. Kevin Kenning explained that for the deals in Kevin Kenning Law Firm Retirement Plan & Trust pension, he had to provide a deposit leveraged by a financial institution ("prime broker"). The defendant explained that the funding through Salgado Capital's trading platform was to come from lending the shares. He also pointed out that Kevin Kenning had to make the trading decisions himself, as there was no investment manager.

He did not say anything at the "whiteboard" meeting in Dublin about Solo Capital Ltd. being the short seller, or he had access to Solo Capital Ltd.'s trading platform. It was very clear when he gave his description of the trading structure that it was Barry O'Sullivan or one of his entities that was to be a short seller. There was also no need for access to institutional investors who could provide access to sharelenders, because Barry O'Sullivan had to borrow the shares from the share buyer, who thereby financed his share purchase.

He described how the trading structure of Salgado Capital would differ from dividend arbitrage. You had a long discussion about the economic aspects. He talked to them about dividend arbitrage because this was hedged and that the profit was therefore only a refund of the withheld dividend tax, whereby the amount of profit was known and the distribution could be agreed in advance. His strategy was different in that the profits made by the buyer or short seller would not be known in advance because they depended on the share price when the stock loan was reversed. The share price was a variable that could not be known in advance. Everyone at the meeting completely understood what he was talking about. No agreement was reached on the distribution of profits. It was not discussed at all.

It was Kenning Kenning who asked him to debit COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust custody accounts in May, June and July 2013 for trading advisory fees and transfer the amounts to Barry O'Sullivan.

Criticizing Barry O'Sullivan's explanation that U.S. retirement plans could not pay a

fee from his profits below the bottom line, but had to do so above the bottom line, Guenther Klar explained that it was not something he was aware of until Barry O'Sullivan's explanation.

He brought a financial model to the meeting in Dublin, which also described the size of the share trades that were part of the trading structure. He had built the model for the 2012 dividend season. When asked, he explained that Barry O'Sullivan, Kevin Kenning and Todd Bergeron were made aware of the size of the expected share transactions. They reviewed the economic model in detail. It described each share that they would trade, with information on the company's issued share capital, the number of free floats and the size of the trades. Information was also included about the Ex-day, the "Record date", the dividend payment date, the dividend per share both gross and net and the withheld dividend tax. He showed the number of shares they could potentially trade, and the model calculated the size of each trade and the net dividends they would receive, and the withheld dividend tax they would be able to seek a refund. Nothing was agreed at the meeting, but it was simply to give them an idea of the size of the trades and therefore of the net dividends and the dividend tax recovered that they might receive. Therefore, as Todd Bergeron explained in his testimony, the size of the deals was not a surprise, even though Kevin Kenning indicated that he had been surprised.

When asked about the onboarding process, he explained that all Salgado Capital customers got the same contracts. These were a broker contract ("Client brokerage"), custody and GMSLA. No contracts for Advisory Agreements were concluded with clients. An advisory services agreement had been signed between him and Salgado Capital, Europa LLP Executive Pension Scheme and Khajuraho. These were the only advisory agreements that he or Salgado Capital entered into.

When asked again about the "day trades" made on December 24 and 27, 2013, he explained that it was primarily Kevin Kenning who was the initiator of the American pension plans. It was both Kevin Kenning and Todd Bergeron who contacted him. However, he noticed Kevin Kenning's involvement because virtually all of the other deals included in the 2013 and 2014 retirement plans were made through Todd Bergeron.

At the time, he had no knowledge of the tax filings of U.S. pension plans. He first heard about it during Kevin Kenning's explanation.

Kevin Kenning received Custody Statements from time to time. It was done as Todd Bergeron explained that they were sent continuously. This happened once

they had been drawn up, which was usually monthly. It was information from the custody account statements that Kevin Kenning used for retirement plans' tax returns to the "IRS" [Internal Revenue Service]. Kevin Kenning has never called or texted regarding funds in the custody account. He didn't have to.

Referring to the prosecution's auxiliary appendix 13 – daytrades, Guenther Klar explained that the list of "day trades" is not complete. There are some "day trades" missing that the Europa LLP Executive Pension Scheme undertook.

Shown to Equity Transactions, Europa LLP Executive Pension Scheme, EUR02, dated 31 March 2014 (Additional Extract 2, page 649, Annex 53-49-065- 140), he explained that the deal with Andritz AG was also a "day trade". When the deal was concluded, they were intended to close on the same day, March 24, 2014. No dividend tax refund was sought for that share position.

Shown Equity Transactions, Europa LLP Executive Pension Scheme, EUR02, dated 31 May 2014 (Additional Extract 2, page 661, Annex 53-49-05-152) On 31 May 2014, he explained that two of the listed trades are day trades, Schoeller Bleckmann Oilfield and Wienerberger AG. Here, too, it was intended that the equity positions would be rolled back ("unwound") on the same day. No dividend tax refund was requested on any of these share positions.

Shown to Equity Transactions, Europa LLP Executive Pension Scheme, EUR02, dated 30 June 2014 (Additional Extract 2, page 664, Annex 53-49-05-155), he explained that exactly the same was true of this share position.

If you include these "day trades" in the prosecution's statement, you will find that the Europa LLP Executive Pension Scheme did not have a profit on "day trades" of just over GBP 6 million, as the prosecution assumes, but approximately GBP 1 million.

Defence counsel presented Supporting Exhibit 2 relating to Exhibits 17, 18 and Q of the case with Guenther Klar's handwritten notes [based on Exhibits 3.-x, file 27, tab "Table 3 and Exhibit 3", Exhibit 45-10-01-1]. Guenther Klar explained that he had found errors in the prosecution's statements, including in lines 36 and 64, where column J included one digit too much in the net dividend table. This means that in the calculation of the net dividend, approximately DKK 60 million and approximately DKK 77 million have been overcalculated, which affects the total. The total amount has been used in other statements included in the case.

When asked about the Prosecution's Auxiliary Exhibit 14, he explained that it is his view that the prosecution has not included dividend tax refunds paid from

Belgium and that this would affect the determination of the percentage of dividend tax refunds paid to the US pension plans as trading profits.

He did not transfer any money to Barry O'Sullivan from Salgado Capital's bank accounts that related to anything other than the trading profits from Salgado Capital's platform made by Barry O'Sullivan's companies ("vehicles"). The payments and transfers he made to Barry O'Sullivan, relating to their other investments and agreements, were made from the defendant's own accounts.

Defending Barry O'Sullivan's explanation that Granard Investments' bank account was transferred to and controlled by defendants in connection with the transfer of share capital, he explained that he has no control over Granard Investments' bank account. He doesn't even know if Granard Investment has a bank account. The shares in Granard Investment were transferred to him, but only on paper ("paper transaction"), as was the case with the EUR 1 million loan. He was only the shareholder on paper. This was the legal construct they agreed upon in order for Barry O'Sullivan to obtain a lighter taxation. The reality was that it was a payment for the trading profits of Salgado Capital. He had no interest in owning or controlling Granard Investment and he never used it for anything. It is an inactive company ("dorment company").

Asked about Heber Securities Trading Limited, he explained that Barry O'Sullivan had previously told him that he had changed the company's domicile from Malta to the Virgin Islands. He was not given an explanation as to why Barry O'Sullivan had changed the domicile.

The bank transfers he made to COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust were always made at the request of Kevin Kenning, even those relating to Todd Bergeron. When it came to payments to third parties, the requests came from either Kevin Kenning or Todd Bergeron. Todd Bergeron has asked him to make payments to Blue Star 8 INC. and DLA Piper. All other transfers were made at the request of Kevin Kenning, including those made to charities with which Todd Bergeron was associated. Little did he know that Todd Bergeron was on the board of the charity Wings Program. They've never talked about the Wings Program, so he doesn't know why Kevin Kenning should have gotten the impression that defendants were going to donate to this. The payment to Kevin T & Margaret McNicholas on October 11, 2015, was made at the direction of Kevin Kenning, who said it was a friend who had fallen ill and needed help paying for his treatments. All payments to third parties were recorded as withdrawals to the custody accounts.

Shown Khajuraho Equity Trading S.à.R.L, SE 34, 36, 38, Information Required (extract 2, page 882, annex 53-15-00-365, translation extract page 64), he

explained that he drew up the document for the Swedish tax authorities. In 2013, Khajuraho and Europa LLP Executive Pension Scheme had applied for a refund of dividend tax in Sweden, which had been granted. The companies applied again in 2014 and it was some of these dividend tax refund applications that triggered questions from the Swedish tax authorities. He was contacted about it by Goal Taxback. The Swedish tax authorities wanted the dividend note from the local custodian. He made the answer to explain to the Swedish tax authorities why there was no dividend note from a local custodian. He described exactly what the trading strategy was like in Sweden. It was the same structure in all the markets Salgado Capital had traded in.

The response was sent to the Swedish tax authorities via Goal Taxback. He did not consider the structure of trade to be a problem and he openly disclosed this to the Swedish tax authorities. He did not discuss the reply with a Swedish tax advisor before sending. When the Swedish tax authorities received the reply, they decided that the refund applications would not be accepted. At that time, he contacted a Swedish tax expert for advice on whether to appeal the decision. He showed his answer to the tax authorities and explained the trading strategy openly ("full disclosure"). The tax advisor informed him that Sweden had changed its rules from 2013 to 2014 and that, as a result of the rule change, Market Claim was no longer considered a dividend for Swedish tax purposes. There would therefore be no point in appealing against the decision. He no longer sought dividend tax refunds in Sweden, even though Khajuraho had traded Swedish shares around the dividend date and had received Market Claim.

When asked about the prosecution's auxiliary appendix 12, he explained that all the trades listed here were made after the trading strategy had changed – phase 2 – and where the time the shares were owned was much shorter ("overnight"). Since the sale [rollback] was on the Ex-day, the share price would have fallen roughly equal to the size of the gross or net dividend. He does not believe that there is any unnatural pattern. The trades were rolled back at the price of the shares at the time of the rollback. There may be 40 to 50 trades that show a 0 result, but there were a total of 147 stock positions and the others did not end in a 0 result. NSK economic consultants have also stated that they could not point to a pattern.

Challenged by the prosecution's view that there have been "day trades" where there has been trading outside the price spread ("off market"), he explained that in the example highlighted by the prosecution [Additional Extract 1, page 237, with reference to Extract 3, page 775, Exhibit 76-38-00-2156], the assumption was based on a conversion in currency from USD to DKK at Danmarks Nationalbank's stated daily rate. The prosecution had calculated that the stock had traded less than one percent outside the price spread. In his view, it may just as well be an expression of fluctuations in the exchange rate ("FX index").

When asked about what the prosecution has described as errors in Custody Statements, the defendant explained that he can explain some of them very specifically, such as the case where three different versions of the same one have been documented, including one that was partially anonymised ["Open Positions", Extract 3, Page 807, Extract 2, Page 1716 and Extract 2, page 1809]. The custody account statement was shown from May 2015. The anonymity was at Kevin Kenning's request. The statement included some Belgian share positions that Kevin Kenning did not want to show to SKAT, and therefore Kevin Kenning asked to move the trades from account COL01 to account COL02. He made a new version where the trades had been moved and therefore did not appear in the custody account statement. He sent the new edition to Kevin Kenning. At a later date, Kevin Kenning returned because SKAT wanted a version signed by Salgado Capital. He had it signed in December 2015 by Monica van Zyl, who had been appointed director in place of Andrew Moray Stuart, I believe, in October 2015. In general, he considers that the material from the custody statements included in the proceedings concerning COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust is incomplete. Kevin Kenning has only disclosed information to SKAT regarding one of the two pension plans' custody accounts and not the other. Therefore, the prosecution does not have them either.

When asked about the errors in the indication of ISIN numbers found in the dividend notes, he explained that Goal Taxback and SKAT were not aware of it either. Sven Jørgen Nielsen from SKAT also explained that this had no impact on his review of the applications for dividend tax refunds.

Shown Exhibit 53-49-08-4 with his handwritten notes (Additional Extract 2, page 1015), he explained that the calculations are based on NSK statements. In step 1 ("step 1"), he has converted the statements from DKK to GBP and distributed the amounts among the individual investors in different markets. In step 2 ("step 2"), he calculated the Market Claims that COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust received from the short seller, Heber Securities Trading Limited. It is calculated backwards based on the dividend tax that was recovered. He has also included the dividend tax applied for in Belgium, which was not paid. This is why the numbers in step 1 and step 2 do not coincide. He has the GBP 9 million from the Belgian criminal proceedings. The figures in step 3 ("step 3") are derived from NSK's analysis of Salgado Capital's bank accounts. There is still about $1 million in the account, which is what Salgado Capital earned in transaction costs. In step 4 ("step 4"), based on the figures from steps 1-3, he has calculated the result of the share trades themselves. These are not figures he has from the appendix material ("it's a balancing figure"). Heber Securities Trading Limited paid for and did not receive "Market Claims" because it was a short seller. For the same reason, Heber Securities Trading Limited has not recovered dividend tax.

When asked by the prosecution who was the counterparty to the day trade of the Europa LLP Executive Pension Scheme and re-shown Equity Transactions dated 31 March 2014 (Additional Extract 2, page 649, Exhibit 53-49-065- 140), he explained that it was Heber Securities Trading Limited. When asked about the same annex, "Dividend, 27-Mar-14, -£372,465.06", the defendant explained that the determined negative dividend was a Market Claim. This was a consequence of not having the share position reversed on the same day. It was a short sale because the stock was sold and bought back later. It was intended to be "day trade" and when the Europa LLP Executive Pension Scheme made "day trade" the counterparty was always Heber Securities Trading Limited. Heber Securities Trading Limited did not seek a dividend tax refund on this Market Claim. In 2014, Austria had changed its rules on whether Market Claim was dividends for tax purposes. It had been in Austria in 2012, but that was no longer the case in 2014. Therefore, Heber Securities Trading Limited could not recover dividend tax.

Shown to Equity Transactions, Europa LLP Executive Pension Scheme, EUR02, dated 30 June 2014 (Additional Extract 2, page 664, Annex 53-49-05-155), he explained that exactly the same was true of this share position.

Re-shown to Equity Transactions, Europa LLP Executive Pension Scheme, EUR02, dated 31 May 2014 (Additional Extract 2, page 661, Annex 53-49-05-152), he explained that this too was intended to be a "day trade" where purchases and sales were to be settled on the same day. He can see that the sale was on the last day of accrued dividends ("day"). It was not intended that a refund of dividend tax should be sought. They did not manage to liquidate the share position in time. That's all it was.

Shown Equity Transactions, Europa LLP Executive Pension Scheme, EUR02, dated 30 June 2014 (Additional Extract 2, page 664, Annex 53-49-05-155), he explained that the same was true with that transaction.

When asked what settlement terms had been agreed, he explained that "day trades" were agreed with the settlement terms T+3. As they had not closed these deals on the same day, they used T+2 terms on the rollback, otherwise the trades would not be net settled. The terms were agreed on the individual "day trades".

When asked, Guenther Klar explained that he still owns the shares in Granard Investment. He has not replaced Barry O'Sullivan as a director of the company. The defendant was never intended to have any influence on the company or use it. He had no interest in that. He does not know whether he has the right to replace the director, but he is the owner of the capital.

Asked by his lawyer, Guenther Klar explained that he became aware that Austria had changed the rules on whether Market Claims were a dividend for tax purposes after seeing a circular ("a circular") from the Ministry of Finance in Austria. He doesn't remember when he saw it.

**Lisbeth Rømer has** explained that she has previously been employed by SKAT. She is a qualified lawyer and was hired on 1 May 1979. She began working with dividend tax on 1 July 2002, when she became functional manager, and remained so until 30 November 2013, when she retired. The dividend tax department was initially located in Nærum, but was physically moved to Taastrup. Organisationally, the department belonged to the bookkeeping, accounting 2. The department was the only one in the country and was particularly concerned with dividend tax, including refund payments to foreign shareholders resident in countries with which double taxation treaties had been concluded. The department also handled royalty.

In 2012, her deputy manager was Laurits Cramer. In addition, the department consisted of Sven Jørgen Nielsen, Bente Fridberg and a handful of other employees and an accounting department that was responsible for the actual payments of dividend tax refunds. It was smartest that the department itself could pay out refunds that had been approved. Most of the employees in the department had been employed when the withholding tax was introduced in 1970. They had reached an age when they retired, and as a result there was a general dissolution of the department. Until the witness's own retirement in 2013, no more employees were hired. On the contrary, the department was almost shut down in 2013. She doesn't know if more employees joined the department after her retirement, but she hasn't heard of that.

Sven Jørgen Nielsen was the department's prime mover on the dividend tax refund applications, but he received help to a lesser extent, among other things during holiday periods. Sven Jørgen Nielsen was probably responsible for reviewing at least 90 percent of all dividend tax refund requests.

When questioned, the witness explained that it was very much an administrative department and not a control department. The task of processing dividend tax was first consolidated in 2002 and came from the central bookkeeping. The task was interpreted as a bookkeeping task and not a control task.

The applications for dividend tax refunds were received in two different ways. They came in either as letters from the applicant or through the "banking scheme". SKAT had made an arrangement with banks where they acted as intermediaries to the real applicants. The "banking scheme" largely accounted for the refund requests, and banks could bundle them into larger chunks. SKAT agreed with the banks that they were responsible for ensuring compliance with the underlying recipients. It was easier because SKAT could pay out a total amount to the bank, which the bank redistributed to those entitled. The control task was delegated to the banks. SKAT called it a cascading responsibility.

Laurits Cramer was in charge of the initial review of the applications. He skimmed through the letters and made sure there was a completed application form, a stamp from the applicant's resident tax authority, and a dividend note. It was largely "people themselves" who sent requests for dividend tax refunds. She knows agencies came later. It was developing rapidly. Once Laurits Cramer had done his review, the task passed on to Sven Jørgen Nielsen, who was to handle the actual casework. He took care of almost all the applications when he was there.

They were a reasonably small office and they had a lot to do with each other. It was a tax area where there wasn't a "fact list", so when they saw something mysterious or striking, they talked about it. She has only exceptionally approved applications for dividend tax refunds. This has happened in connection with Sven Jørgen Nielsen being on holiday.

When shown Customs & SKAT's forms "petition for exemption from Danish dividend tax" (extract 1, pages 52 and 262, exhibits 54-07-07-2 and 54-07-266-212), the witness explained that this was what the application forms looked like. SKAT changed them during the period because they thought it was stupid that the certificate was on page 2 of the application while all the applicant information was on page 1. There had to be a dividend note attached to the application, which was to support the reimbursement claim, so that the custodian "stood by" that the amount had been paid to the applicant concerned. The certificate from the applicant's resident tax authority also had to be attached, since the dividend tax refund was based on double taxation treaties. In Denmark, the dividend tax was deducted by the distributing company and the dividend tax refund was made in order to avoid double taxation of the dividend. Shown Customs & TAX's "Attestation of" (Extract 1, page 56, Exhibit 54-07-07-6), the witness explained that it is a certificate from the English Tax Service. Shown the IRS's "Certification program" of April 8, 2013 (Extract 1, page 225, Exhibit 54-07-234-175), the witness explained that there were special rules for American "pension funds" that are not pension funds as we understand it in Denmark. The US "pension funds" were approved as taxpayers in 2010. They tried to investigate the "pension funds" behind several applications, but it was extraordinarily difficult.

The requirement for SKAT to grant an application for dividend reimbursement was that SKAT assessed that the applicant had received dividends that had been taxed. In addition, the applicant had to be resident in a country with which a double taxation treaty had been concluded. No dividend tax refund could be recovered multiple times for the same share.

SKAT had no information about foreign shareholders, and therefore it was the dividend note containing third parties' information about withheld dividend tax that SKAT assessed on the basis of. The dividend notes were made by banks or by

depository institutions. They relied on the information contained in the dividend notes. What was checked was whether the requirements set by SKAT regarding the application material had been met.

In connection with SKAT's case processing, each refund amount had to be booked with a specific number and approved in the system, 3S. When Sven Jørgen Nielsen had finished the approval and had entered the information, the approval had to be countersigned by Laurits Cramer. The case then went to the bookkeeping, which was responsible for the actual payment. SKAT used bundle numbers to be able to follow the payments. The 3S system did not contain any control options. The dividend tax refunds could be applied for several calendar years and backwards in time. It could be recovered at least for 5 years and for some things for 20 years. The statute of limitations changed along the way. SKAT booked the payment at the time of recovery and therefore could not reconcile the applications for the individual year in relation to the companies' dividend payments. Foreign owners of shareholdings were not registered in Denmark, and therefore the ownership itself could not be checked.

Shown the FDU report (Extract 1, page 687, Exhibit 55-07-00-1), she explained that a report from the 3S system was printed for each bundle. Shown the same appendix (extract 1, page 690) and asked about the change in income year, she explained that she does not know why it is listed here "income year 2011", even though it relates to applications from 2012. The FDU report went on to the bookkeeping. She can't remember if the bookkeeping department got anything other than the FDU report. The bookkeeping department should try to execute the refund payment within the applicable deadlines. In the beginning, SKAT only had 30 days to complete the processing of a dividend tax refund application, but at some point they were given 6 months so that they did not miss the deadline.

She does not remember if there were special rules if the amount applied for was very large. They had "internal rules" so they responded if applications were received that were very exorbitant, atypical or strange. The department was not a control authority and they could not carry out audits, so if the department responded, it was done by writing to whoever had issued the dividend note. If the dividend note was maintained, they had to rely on the information.

They did not have the possibility to check whether the applicant for a dividend tax refund had actually received a taxed dividend. There was no register of foreign shareholders. There were several initiatives during the period when she was head of the department, but it did not go so well. This took place at OECD and EU level, but it did not lead to anything.

They had written guidelines. The 3S system had been established in the autumn of 2002, and there was a user guide, but since it was Sven Jørgen Nielsen who

processed most applications, it was mostly him "they looked up in". There was a risk that the lack of control would be abused. When you can't control something, it's difficult to stop. At the time, she had no concrete suspicion that the scheme was being abused. It was the risk of abuse that there were concerns about. The department did not have "manpower" of distributing companies. From their point of view, there were many inconveniences in the system. They could see that there was a risk, even if the payments were based on third-party devices.

She proposed various things several times, including a net settlement scheme, because that would be the easiest. There were problems on several fronts. The department tried to make a catalogue of suggestions for improvement. Many things were improved, but not in the area of dividend tax refunds. A great many papers were written about it. The problem "drowned". In 2002, the department was located in one of 30 regions, all of which had the same tasks in connection with general tax control, etc., but the department was the only office dealing with dividend tax. The 30 regions were more concerned with the issues that cut across all the regions when it came "higher up". She brought it up many times.

She was happy when Internal Audit came to the department, because the Internal Audit report had to be handed over to the permanent secretary. Internal audit was good at helping describe the problem. Not that it helped. This did not lead to any action in relation to the risk with foreign shareholders. Some gaps were closed in relation to Danish shareholders, and their primary work in relation to dividends was to ensure that Danes paid their dividend tax.

When asked about the development of the dividend tax refund, the witness explained that it went up and down a bit, but the department followed the development. They did not have "manpower" to manage, but they compared month by month also compared to previous years. If they thought something was strange, they reacted. It was the total refund amount of dividend tax she followed.

It was not common during her time as manager for applicants to use reclaim agents. The department was visited by some reclaim agents who wanted to know what requirements had to be met in order for it to "go as smoothly as possible". They did not discuss how it could be made more transparent for SKAT. The reclaim agents visited all over Europe to clarify this with the individual tax authorities. She doesn't know if the reclaim agents had started when the visit was made.

She has no knowledge of Goal Taxback. She did not consider it remarkable that applications started coming from reclaim agents, because it corresponded well with the increase in foreign shareholders.

She does not know the company Salgado Capital. Shown Credit Advice signed May 14, 2014 (Extract 1, page 446, Exhibit 54-08-372-101), the witness

explained that she does not recall seeing dividend notes like this. She can see that it contains the information that should be in a dividend note in order to form the basis for SKAT's processing of an application.

She doesn't know what Market Claim or dividend compensation is.

When questioned by the defence counsel, the witness explained that she very quickly became aware that there were control challenges. The misery goes all the way back to the 1980s to the establishment of the Central Securities Depository, where shares went from paper to EDP. In the Central Securities Exchange there was only registration of Danish shareholders.

When asked if it is true that on November 15, 2004, she wrote an email to SKAT's Main Center with the content*: "With this letter, the Dividend Tax Administration wishes to draw attention to control problems that have been experienced in daily work. Hopefully, it can inspire future control measures,"* she explained that it can easily be true. She wrote several times, but today does not remember the times. When asked if she wrote, *"There is no control over whether refunds are made both through spreadsheets and paper applications sent directly to the dividend tax administration", the* witness explained that this may well be true.

SKAT had developed the 3S system directly for the processing of dividend tax. At some point, it was "thrown into" SAP, which was without control functions over Danish shareholders. It was not possible to identify the income year to which the dividend tax reports referred. The system recorded only the date of the declaration. After two years, the department returned to the 3S system.

The department could send information about "strange" applications to SKAT's Main Centre. She remembers that in 2006 an application for a dividend tax refund had been received in respect of TDC A/S. They received the refund application from France, where there was 0 percent dividend tax. Normally, Denmark had to pay 15 percent in refunds, but in this case it concerned the refund of the entire dividend tax. It was such a large amount that they had to slow down. The department wondered why the French should have so many TDC shares. When they investigated, it turned out that the applicant had to hold more than 50 percent of the free shares – which were not owned by institutional investors – to be eligible for the amount applied for. SKAT ended up paying the dividend tax refund applied for, but to this day she does not believe that it was right.

Shown note to the Board of Management of the Danish Customs and Tax Administration dated 29 September 2006 (Exhibit 53-49-14-2- 3), the witness explained that she prepared the note in connection with the TDC shares in question. The department would react if something looked "strange". She has seen other applications that she has reported to the Main Centre. It happened "many times," but she doesn't remember them concretely. There was little understanding of the problems. There had to be "bodies on the table". The TDC share application was not enough. It was not a "red flag" that applications came from

0-percent countries. It depended on the amount.

It was quite early that they made the problem catalog. It may well have been in 2006. She doesn't remember what ideas they had in relation to dividend tax refunds other than net inventory and registration of foreign shareholders. The department discussed equity lending, but it was not much. Stock lending was not common during the time she was in SKAT.

Laurits Cramer countersigned for the entire period except for the last month of her employment, when he had retired. The witness was reprimanded from the judgment of the Eastern High Court of 28 April 2022 (extract 4, page 1168, Annex 77-01- 00-146), from which the transcript of the witness's testimony states, among other things:

*"Countersignature was abolished in 2011, as there were so few employees left that they could not maintain a separation of functions."*

In addition, the witness explained that she does not remember whether they abolished the countersignature as early as 2011. This may well be true, because they became fewer and fewer employees.

When questioned, the witness explained that the adoption of Section 69B of the Withholding Tax Act did not lead to any more means of control. The provision changed the period they had to process the applications. That was what had an impact on the department. This was to avoid interest on the dividend tax refund.

The workload of processing applications went in waves depending on when distributions occurred.

Internal Audit visited every two or three years. She also described to Internal Audit the challenges in the area of dividend tax refunds. The department did not receive any remarks in this area. She pointed out that there was a risk, which Internal Audit passed on.

When she retired, it was intended that someone in Ringkøbing would take over her function. It wasn't going to last long. Dorte Panderup took over instead, and Sven Jørgen Nielsen could remain in Taastrup. Dorte Panderup had a background in bookkeeping. That was after the witness's retirement. There was very little transfer of knowledge from her to her colleague in  Ringkøbing.

**Anders Kragnæs Balling** has explained that he is Deputy Director of the Danish Financial Supervisory Authority. He works with the economic part of the regulation of capital markets. He is a trained economist and has been employed by the Danish Financial Supervisory Authority since 2011 or 2012. He came from an employment in the Ministry of Finance. Among other things, the Danish FSA is tasked with ensuring that there is confidence in a well-functioning stock market and that information is released about what a share is traded for. The Danish FSA also monitors the listing and

delisting of shares, market abuse and insider trading.

A share is an ownership interest in a company, which, among other things, gives the right to share in the profits of the enterprise. The profit sharing in a limited company takes place by dividend distribution, which is generally recommended by the management, the board of directors, and must be approved at the general meeting. Shares are registered electronically only. This has been the case for many years, but in the old days stock securities existed.

In Denmark, the registration of the settlement of share transactions is carried out in Euronext Securities. Limited liability companies also keep a share register, as they need to know who can vote at the general meeting.

A broker/broker mediates stock sales. This can either be done by the broker dealing directly with the share buyer or seller or by the broker putting a buyer and seller together.

A custodian is where the shares on behalf of the owners are registered in custodians.

Stock exchange trading – and there are many exchanges – is done by allowing the stock trader to place an order and hope that you "meet" an interested seller or buyer. You cross each other on course.

OTC [over the counter] trading is trading outside the exchanges. It can be a little harder to find a counterparty. You must have found the counterparty in advance, or a broker/bank may have found one.

When securities are traded, they must be moved from the seller's securities account to the buyer's, and at the same time, funds are moved from the buyer's cash account to the seller's. There is a certain delay between the conclusion of the agreement and implementation, which is now two days. The settlement term T + 2 is the standard on stock exchanges today. It has previously been settlement terms T+3. He does not remember when market conditions changed. Since everything runs automatically on the stock exchanges, and the same share can in principle be sold 100 times in one day, this is not possible in practice with individually negotiated terms.

OTC trading allows settlement terms to be agreed more freely, but standard exchange terms are often used. The actual exchange of services takes place in the same way as in stock exchange transactions. The regulation of OTC trades has changed since 2012. Today, there is an obligation on the part of the intermediary broker/bank to report trades on Danish shares to the Danish Financial Supervisory Authority. There may be several links in a securities transaction, and then the obligation falls on all the links. The transactions can therefore be followed by the Danish Financial Supervisory Authority. As a general rule, the obligation only applies to players who are domiciled in the EU, but there may be certain derived obligations for other players in the case of trading on the stock exchange. What needs to be reported is who has traded, how many shares, the price and the time of the trade. The current rules have applied since 3 January 2018. Before that, there were also some reporting

obligations, but they were less extensive. He does not remember when reporting obligations were introduced.

Short selling – going short – is a stock position where you speculate that the stock price will fall. The typical way to short sell is to enter into a deal where you commit to selling a stock position at a certain time at a certain price. Equity loans are not a completely defined concept, but are typically made to a player who sells the share position in the market with the hope that the share position can later be bought at a cheaper price [before the share loan is to be rerolled]. It may be a way to short sell, but it is his impression that stock loans are used somewhat more widely.

When asked about his knowledge of the conditions for the sale of loaned shares, the witness explained that the Danish FSA does not have much knowledge of the underlying conditions. He knows that there are industry standards, but he does not know the content of them. An additional share does not arise from a share loan, even if it is subsequently sold. The rights and obligations, including in relation to dividends on the loaned shares, are regulated in the industry standard agreement. If the share lending is regulated as an ordinary sale, then the share borrower will take over the ordinary rights also to dividends.

**Helen Sørensen** has explained that she is employed by Euronext Securities, which was previously called VP Securities A/S. She holds a cand.merc. He holds a PhD in Innovation and Business Management and has been employed since 2012. She is a product manager and has stocks, investment certificates and structured stock trading products as her responsibilities. She is in touch with everything from statistics, IT development, service development, prices to budgets.

Euronext Securities is Denmark's central securities depository, where all securities are "born", issued and registered. Euronext Securities records custody of securities, conducts settlement settlements where money and securities change hands between depositories, and records ongoing corporate actions including dividend payments.

When questioned, the witness explained that the ISIN code is used to uniquely identify a security, such as a company's share. Euronext Securities is the numbering agency for all ISIN codes issued in Denmark. There is also an international organisation, ANNA, which ensures that it is done properly worldwide.

Euronext Securities' customers are mainly banks. These are both local banks and savings banks and international banks, including "global custodians". Euronext Securities has no direct customer relationship with the investors who own the shares in custody. The investors are customers of the bank and the bank is a customer of Euronext Securities. The share-issuing companies have signed a tripartite agreement, so Euronext Securities has a legal agreement with them, but the main contact is between Euronext Securities and the banks.

Euronext Securities records general information on Danish shares. It is information about the company itself, its LEI code, the company's share capital, the unit size of the share and the total amount of shares. The share price is not recorded. Euronext Securities has a general ledger for each limited liability company representing the fully issued share capital, which will be distributed in different depositories of the CSD.

It depends on the individual depository what is registered in Euronext Securities regarding ownership. If it is an ordinary Danish investor, e.g. a private individual, then the contents of the deposit will be registered with the individual owner. Shares can be registered by name, but do not have to be. It will also be registered what type of depot it is. For example, it could be a pension deposit or a share savings. This registration has an impact on the tax rate associated with the depository.

If it is an omnibus or nominee structure where the custodian is not the owner of the share, then the ownership information will be registered with the custodian, which is the customer of Euronext Securities. If it is a nominee structure where the custodian holds the shares of only one owner, the underlying ownership may be registered with Euronext Securities. In an omnibus depot, it will usually only be registered that the depot is held on behalf of several underlying customers. Omnibus or nominee depots are not required to register the underlying ownership with Euronext Securities.

Euronext Securities does not work with the concepts of legal owner and beneficial owner.

This has been done in this way also in the period from 2012 to 2015, except that there were no LEI codes.

In the period from 2012 to 2015, trading in shares on stock exchanges was recorded by the buyer and seller each entering "settlement instructions" at the close of the exchange, typically at 5 pm. They have one hour to enter the information. During that period, the standardised settlement terms were T+3, which meant that the settlement instructions were executed three days after they were given to Euronext Securities on the trading day, T. More precisely, it was carried out after two calendar days at 17.59.59, where the IT system makes a "round-the-clock switch". There, Euronext Securities will implement the settlement instructions and money and rights over the shares will change hands. It is a kind of legal stamp that the trade thereby gets. The days between the conclusion of the agreement and the settlement are, among other things, to ensure that there is liquidity for the buyer to complete the transaction. Today, T+2 are standard settlement terms on a global scale. You are working towards T+1 and "real time settlement", but today this requires both buyer and seller to give it as the settlement instruction.

It was possible to execute trades outside the exchanges where settlement terms other than T+3 had been agreed. Such agreements were concluded mainly between financial institutions or institutional investors.

Shares may be traded with accrued dividends. Dividends are "declared" by the distributing company, typically at the company's general meeting. If you own the stock on the day the dividend is declared, you are entitled to the dividend. However, the dividend distribution is not executed on the day it is declared, but two calendar days later by "day and night". This is called the "record date". The dividend is paid to the person who is registered as the owner of the share – their custodian – on a record date. If a trade with T+3 terms is entered into on the day the dividend is declared and the parties file the settlement instruction on the same day, then the share buyer will also receive the dividend because the settlement date and dividend execution date will coincide. The custodian receives the dividend, as it is the one that has a folio account with Danmarks Nationalbank. When the dividend is moved from the folio account to the custodian bank's own account, it becomes "commercial money" that can be passed on to the custodian.

Euronext Securities system looks at which custodians the shares to which dividend distributions have been made are located. It is the ISIN code that the system searches. The system calculates the gross and net dividends at the custody level with the account servicing bank based on the tax rate registered at the custody. Euronext Securities makes the calculation. Information is also sent to Danmarks Nationalbank and the responsible issuing bank so that they know how much money is to be available. The distributing company uses the statements to withhold withholding tax on the dividend.

If a share transaction is entered into only after the dividend has been declared, the general meeting date, then you will buy the shares without entitlement to the dividend, which will usually be reflected in the pricing.

Shown diagram "Yield" (Extract 4, page 1086, Exhibit 37-03-0026), the witness explained that she does not remember seeing it before. The chart is largely accurate, but an arrow from VP to SKAT is missing, as a report is sent from VP to SKAT about what has been calculated by dividend tax on the individual depository. This was also the case in 2012. Custody Bank in the chart will get the money from the Danish local custodian after conversion to the relevant currency.

When asked whether accrued dividends have been traded if the settlement terms T+4 have been agreed on the declaration date, the witness explained that this will not be the case. If both parties to the trade file a settlement instruction on the condition T+4, then it is market standard that it is a purchase without entitlement to the dividend.

When questioned, the witness explained that she knows what Market Claim and

dividend compensation are. In the period from 2012 to 2015, this was done fairly manually for trades that were not settled under the agreement [T + 3]. This could be the case, for example, if there had been a registration error in the settlement or the buyer was missing money on the settlement date. In the event that the buyer did not receive the dividend as expected, a correction was made by paying a Market Claim or dividend compensation. The correction was made by the account servicing institution, but it was recorded in VP Securities. Reports were made to SKAT after the current month plus one month.

Each depot has a letter and number code that shows what type of depot it is. It is the type of custody that determines what tax rate will be associated with the custody. For depositories related to free funds, the tax is 27 percent. For foreign custodians, a tax of 27 percent will also be registered, which forms the basis for calculating the net dividend.

Share lending will not be registered in Euronext Securities unless the shareholding is thereby moved to another depository. Share loans are based on contracts entered into in the custodian between the custodian and their customers, or between the custodian's customers. The registration in Euronext Securities does not relate to the legal construction. They record what is lying in the depots.

When asked by the defence counsel whether a share transaction is entered into with accrued dividends if it is entered into two days before the general meeting with settlement terms T+6, the witness explained that the decisive factor in relation to who receives the dividend, and thus whether or not accrued dividends are traded, is who is the registered owner on the "record date".

Shown the Dividend Tax Administration Report (Extract 6, page 263, Exhibit 75-04-00-124), the witness explained that she does not believe she has seen the report before. Relying on the same appendix (Extract 6, page 287), which states, inter alia: *"For example, in the case of share loans which are recorded as a sale in the VP, the borrower will receive the dividend, while the lender will still be the fiscally beneficial owner of the dividend (unless the borrower has resold the share)",* the witness explained that Euronext Securities' registration depends on the structure of the depository. If it is a share loan in an omnibus depository, then a share loan will not be registered as a sale. If a stock position is moved from one custody to another custody as a result of the share loan, then there has been settlement instruction and it will be recorded as a sale. Euronext Securities' system does not address who is the beneficial owner for tax purposes.

**Andrew Moray Stuart** has explained that his educational background is primary school at A-level. He went to school in England. He has had many different occupations, including working for an oil and gas company in Dubai, as a restaurateur in Scotland, at a golf club in the Emirates and as a professional entertainer for 15 years in the Middle East.

When he lived in Cyprus for 4 years, he was asked by Jess Hester, owner of Atlas Corporate Services, if he was interested in being a "nominee director". He was probably asked because he had a lower title of nobility. He was not interested at that time. He later moved back to the Emirates, where Atlas Corporate Services had also moved. His own work did not go so well, and he therefore asked himself if he could become a "nominee director". He probably started working for Atlas Corporate Services around 2006 or 2007.

Later he moved with Atlas Corporate Services to Mauritius and later - when the company was sold - on to South Africa, where he was for 3 years. In the period 2012-2015 he lived partly in Mauritius and partly in South Africa. While in South Africa, he settled his own involvement as "nominee director" and he has lived in the UK for the last 7 years.

He has never engaged in stock trading. He honestly did not know that in the period 2012-2015 he was a director of a company called Salgado Capital. He only investigated this in connection with the interrogations that the prosecution wanted to carry out a few years ago.

The prosecutor documented from Exhibit 21-30-00-8, email from the witness to the prosecutor dated December 29, 2020, which states:

*"Secondly, from the end of 2012 till the end of 2015 I was acting as a nominee director for a company based in South Africa where I was residing at the time. Consequently, after receiving your letter, I wrote to them regarding any information they could give me in connection to Salgado Capital.*

*The only information they gave me was that I resigned as Shareholder and Bank Signatory on the 30th April 2012 and as Director on the 15th October 2015."*

Andrew Moray Stuart explained that he was writing to a company in South Africa, Gracire. Until December 2020, he did not know that he had been a director of Salgado Capital. He was the "nominee director" of hundreds of companies. It may well be true that he explained earlier that there were more than 800 companies. His employer was originally Atlas Corporate Services, but that company was sold on to Gracire. He will believe that it happened at the end of 2012. Jess Hester then sold the company to a woman he knew from Dubai, Christina van den Berg. Christina van den Berg also moved to South Africa. I think she was originally an accountant.

When he started, he was not given any information about the companies for which he was the "nominee director". He just made a little money. He was not paid per company, but a total amount. It was initially £10,000 a year, but the last two years in South Africa he got £25,000.

As a "nominee director", he was not supposed to go into the details. He just got the

papers to sign. He does not know how he was appointed director. Most often, he was given only the page where the signature should appear. He has no understanding of corporations. He came to the office and signed whatever was ready for signature. In 2012, he lived in Mauritius and came to the office there. The tasks in the office lasted between 2 and 10 minutes. He didn't really look at what he was signing, and he didn't read it through. He has never refused to sign anything. He got his salary from Atlas Corporate Services and Gracire, and never from the companies he was a director of. He has never met or spoken with Guenther Klar.

Shown undated signature on the Client Custody Agreement for COLE Enterprises USA Retirement Plan & Trust (Extract 2, pages 1501-1507, Exhibit 53-48-00-227 to 233), the witness explained that it appears to be his signature. He does not recognize the document, but it was not unusual for him to be given such documents for signature.

Shown undated signature on the "Broker Confirm" (Extract 3, page 306, Exhibit 53-15-00-275), he explained that he has signed the document. He does not recognize the document and does not know what a "Broker Confirm" is. He would not be surprised to have to sign such a document in 2013.

Shown undated signature on "Stock Loan Confirmation" (Extract 3, page 307, Exhibit 53-15-00-276), the witness explained that he has signed the document. He does not recognize the document and does not know what a "Stock Loan Confirmation" is. He would not be surprised to have to sign such a document in 2013.

Shown signature dated 4 December 2014 on Credit Advice (Extract 1, page 500, Exhibit 54-09-18-11), he explained that he has signed the document. He does not recognize the document and does not know what a "Credit Advice" is. He would not be surprised to have to sign such a document in December 2014. He did not live in Mauritius in December 2014, but in South Africa.

He stopped being "nominee director" at the end of 2015. He had slowly realized what was going on, and he took three years to get out of it so that other "nominee directors" could take over. He had become aware of how easy it all was and that he was being paid by people who legally dodged paying taxes in Britain by using offshore companies. It was Atlas Corporate Services and later Gracire who replaced him with other "nominee directors", who were eventually all people who were friends with Christina van den Berg.

Shown "notice of termination of consultancy agreement" on 31 July 2014, (extract 2, page 338, exhibit 38-210-00-69, translation extract page 41), the witness explained that in a way he both resigned himself and was terminated. During the three years in

South Africa, it was a smooth process in which he was replaced. He knows nothing further about the company "Interco Supply Service Limited". He has seen the name "Interco" before, but he does not know the relationship between the company and Atlas Corporate Services. The address listed in Mauritius was Atlas Corporate Services' address. He considered the appendix to be his resignation from Gracire. He recognizes Christina van den Berg's signature. He does not know the address of the Seychelles or why the company should be registered there.

Shown letter dated 11 January 2016 from Interco Supply Service Limited (extract 2, page 341, Annex 38-210-00-72, paragraph 2) stating: *"Should any penalties be payable for any of the Companies you were appointed to, these will be paid by Interco Supply Services Ltd, the provider of services to Gracire Consultants (Pty) Ltd."* explained to the witness that he was not aware whether he was employed by Gracire or Interco.

Shown letter dated 16 October 2014 from Interco Supply Service Limited (extract 2, page 339, annex 38-210-00-70, translation extract page 42, paragraphs 1, 4, 5 and 6), he explained that he never asked for copies of the papers he signed during the period 2012-2015. He also never contacted the companies of which he was a director.

Asked who succeeded him as a director of Salgado Capital, Andrew Moray Stuart explained that he doesn't know. It was a chain of different people who took over his "nominee director" positions. He left the job of "nominee director" along with a woman who also traveled from South Africa. When questioned, the witness explained that he recognizes the name "Monica van Zyl". She was a South African friend of Christina van den Berg. He has been to a rugby match with Monica van Zyl and her husband. Monica van Zyl's role was originally to do the paperwork in the office. He believes that Christina van den Berg wanted a woman and not a black employee. He himself did not get along so well with Christina van den Berg. Monica van Zyl's background was a housewife. She, like the witness herself and the other nominee directors, had no special qualifications.

Shown letter dated 11 January 2016 (Extract 2, page 341, Exhibit 38-210-00-72), the witness explained that it does not tell him anything that Monica van Zyl has at that time signed as a director and shareholder. He remembers getting the letter, but he was leaving South Africa at the time. He left South Africa at the end of January 2016. You could make anyone a director.

The companies "Hillingdon Turner Nominees Ltd." and "Hillingdon Turner Directors" do not say anything to the witness.

**Janice Brenda Allgrove** has explained that she left primary school at O-level in England. She has worked in banking in London for 19 years. She has lived in

Luxembourg for 28 years. Today she is retired. In 2012 to 2015, she worked for Khajuraho.

Shown "Circular resolutions of the sole shareholder" (Extract 2, page 886, Annex 39-213-00-38), she explained that she was given the directorship when Guenther Klar came to B.U.R.O.S, Sàrl, where she was employed, to open the company Khajuraho. She had no prior knowledge of Mr Klar.

Shown from Extract 2, page 796, Exhibit 76-46-00-48, about the founding of Khajuraho on May 23, 2012, and from the same place, page 806, Exhibit 76-46-00-58, which states that Severin Lesgardeur was Khajuraho's first director, the witness explained that she knew Lesgardeur a little. Lesgardeur worked with accounting in a company that she does not remember the name of. The witness does not know the reason why Khajuraho replaced his director.

She had the title of "gérante", which corresponds to director. The task was to ensure that the company was subject to Luxembourg law and complied with the rules of Luxembourg. She arranged for Khajuraho to file accounts and tax returns. It is a requirement in Luxembourg that there is a local "gérante". Asked if she was responsible for paying Khajuraho's taxes to the authorities in Luxembourg, she reiterated that her task was to ensure that accounts and tax returns were submitted in a timely manner.

Among other things, B.U.R.O.S Sàrl rented out offices to customers and was responsible for distributing mail. It was a separate thing that she was assumed as the director of Khajuraho. She was not a director of other companies in the period 2012–2015, as far as she remembers.

Khajuraho's purpose was to buy and sell shares. She did not have any decision-making powers. Guenther Klar gave her instructions, and she had nothing to do with the company's bank.

It is the witness who has signed on the application to Global Fidelity Bank (Extract 2, pages 894 and 895, Exhibits 53-47-00-95 and 96). She had not selected the bank. She has never signed anything from Global Fidelity Bank.

In 2012, she was not involved in Khajuraho's purchase of shares in companies based in Luxembourg. Khajuraho had obtained a tax opinion from a law firm on the purchase and sale of shares, which had been approved and accepted by the Luxembourg authorities. She doesn't know if it was a pre-approval from the tax authorities.

Alleged that Khajuraho went bankrupt on November 16, 2020, the witness explained that she was then no longer a director. She believes she stepped down as director in July 2019. She will believe that Khajuraho went bankrupt because of a letter from the tax authorities that believed that the company owed taxes. She does not recall any rules requiring a company to be solvent in connection with the presentation of its annual accounts.

She had no control over Khajuraho's dealings with Salgado Capital. She was aware that there were balances and that Guenther Klar controlled Salgado Capital.

Referring to the agreements Khajuraho had entered into with Salgado Capital on 24 May 2012 (Client Custody Agreement, Client Brokerage Agreement, Price List Agreement, GMSLA and sidelets thereof), she explained that she has not seen or reviewed the agreements since she became a director.

Shown the Trading Advisory Services Agreement dated 25 May 2012 (Additional Extract 2, page 761, Exhibit 53-49-06-8), the witness explained that she did not know about the agreement, which she has not seen or read either.

It was Guenther Klar who made all decisions regarding Khajuraho's trading of shares in Denmark, Belgium, Austria and Sweden. The witness did not decide anything and had no detailed knowledge of the trades or of the trading strategy behind the trades. She merely ensured that it was in accordance with the rules in Luxembourg.

She assumes that Khajuraho paid a deposit to Salgado Capital in connection with the stock trades, but she does not know. She does not know how Khajuraho financed the stock trades.

Referring to the interview carried out by the Luxembourg police in 2018 at the request of the Belgian police and the witness's email reply of 17 August 2018 (extract 4, pages 1013 et seq., Annex 39-211-00-379), she explained that she made the answer herself. Asked to answer the question 1, which states " [Salgado Capital]  *This is the company that provided the loan capital for Khajuraho Equity Trading SARL to make its investments."* she explained that she remembers that it was Salgado Capital that had the loan capital. She does not recall seeing any loan documents in this regard.

Referring to the extent of Khajuraho's share purchases and sales as well as shareholding without hedging, and asked whether Khajuraho was financially "loaded" to bear the price risk, the witness explained that Guenther Klar must answer that. Khajuraho received dividends on the shares, but she does not remember where the dividends were put in.

When questioned, the witness confirmed that she has been sued by SKAT in England, but that the case is closed. Relying on information from a statement of defence in this case (Extract 4, page 1017, Exhibit 70-10-00-1), which states on page 1020, paragraph 10, (2): *"the dividends due in respect of all of the relevant shares were received by Khajuraho (net of WHT) by payment into its bank account with Salgado.", the* witness explained that she would think that this was so, that it was going on. She has not seen dividends received anywhere other than through Salgado Capital. She was not aware that Salgado Capital was a custodian and not an actual bank.

Another company was responsible for dividend tax recoveries in Denmark. She

does not remember the name. It may well be true that it was Goal Taxback. It was Guenther Klar who chose that company.

She did not authorize the power of attorney Khajuraho gave Goal Taxback and signed (Extract 1, pages 125-126, Exhibits 54-07-149-75 and 76). She does not remember where the power of attorney came from. She does not know whether Khajuraho received the amount of approximately DKK 10 million for which the company applied for reimbursement through Goal Taxback.

She has no further knowledge of why Khajuraho retained parts of the stock positions for more than a year. The witness was confronted from his e-mail reply to the Luxembourg police (extract 4, page 1014, Annex 39-211-00-380, question 7), which states:

"[Khajuraho] *This is the Luxembouirg company that was created by Mr Gunther Klar, Shareholder and Beneficial owner. The company purchased shares in quoted companies to a value of over €6 million so that under the Luxembourg parent subsidiary exemption any dividend income and capital gains made would be tax free.*"

To this, the witness explained that she would guess that this means that the dividends from the shares owned by Guenther Klar were exempt from tax. When asked whether it was only a requirement that you owned more than six million euros or whether you also had to own the shares for a certain period of time, she explained that this was what the law firm had written. She more or less used the wording of the law firm's "legal opinion". She had no independent knowledge of the rules in question.

She has no knowledge that Khajuraho received money from Salgado Capital in a bank account outside Salgado Capital. The ongoing bookkeeping in Khajuraho was done by an external company. She was not in charge of the bookkeeping.

She does not recall the "Khajuraho's General Ledger" of 30 September 2014 (Additional Extract 2, page 917, Exhibit 53-49-07-151), but she must have seen the appendix earlier. She did not draw up the annex herself.

Shown "2013_Khajuraho finance cost per stock" (TE2.-x, file 6, spreadsheet for Additional Extract 2, Exhibit 53-49-07-10), she explained that she does not remember the appendix or whether she has seen it before. That was 11 years ago. She has not drawn up the annex. Khajuraho's annual accounts were made by the same company that was in charge of the bookkeeping. She has signed financial statements and management report for 23 May 2012 to 30 September 2012 (Additional Extract 2, pages 769-770, Exhibits 53-49-07-3 and 4). She reviewed the accounts before signing them. The signature was not just a formality. It was not she who proposed profit distribution. It would be Guenther Ready when he made all the decisions. She had contact with Guenther Klar by email and only when necessary. It's hard to say how often it was, but maybe once a month.

**Kevin Kenning** explained that he has a college degree from Valparaiso University in accounting and that he has taken his law degree at John Marshall Law School. His business career began with tax and accounting work for large multinational corporations, primarily in the financial sector. Later he joined Ernst & Young and for about 12 years he was employed by ABN AMRO Bank, headquartered in the Netherlands. He worked from Chicago, but was part of a global group of about 70 employees working on arbitrage opportunities and cross-border trading of debt securities and stocks. The trading partners were mainly other multinational banks. He worked with leasing and structured finance across borders. His role was to assess the tax aspects in relation to US tax law. He had frequent contact with the other employees in the group and also met with them in various contexts. Before 2012, his own knowledge of stock trading was rather tenuous, and he only knew indirectly about the refund of withheld dividend tax and the dividend arbitrage in which ABN AMRO Bank was involved.

When asked whether the witness himself participated in the work of dividend arbitrage, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

The bank gave up the business areas he had worked in, in connection with the 2008 financial crisis, so he left the bank. He was unemployed for a period, after which he started his own law practice. In 2011, a client asked him to become CFO of ICG International. After six months, one of ICG International's partners, Todd Bergeron, left the venture and suggested to the witness that the two start a company together. Initially, the witness got to know Todd Bergeron through mutual acquaintances in the finance industry. Todd Bergeron needed general advice on corporate tax matters. The witness himself was also not satisfied ("comfortable") with the management and also left ICG International. The joint company he and Todd Bergeron established was called Lotus Capital. They ran the company for about three years until they had to close in 2015. Since then, the witness has worked with legal and tax advice. In 2018, he joined a Chicago law firm, Duggan Bertsch, where he remains employed.

Lotus Capital was engaged in lending to smaller companies in the "micro cap" market, where you could get security in the companies' share capital for a modest price. These were so-called "penny stocks".

The companies Blue Ocean Equity LLC and Cole Enterprise USA LLC  the witness and Todd Bergeron created together. Through the collaboration in Lotus Capital, they had investigated and explored the framework for the company and what they could not do within the private capital market. They wanted to carry out other activities that did not fit under the structure of Lotus Capital and set up the companies Blue Ocean Equity LLC and Cole Enterprise USA LLC for that purpose.

They wanted to earn on referral and consulting fees. Todd Bergeron was in charge of marketing the companies. It is quite common in the United States to set up separate companies ("legal vehicles") for different business purposes. Blue Ocean Equity LLC and Cole Enterprise USA LLC were to do different business. The companies continue to exist, but there has been no activity in recent years.

When asked about the earnings of the companies, the witness, on the advice of his lawyers, stated that he did not want to answer the question.

Claiming that the tax information of the companies is included as supporting documents, the witness explained that the tax returns he has prepared are not publicly available. On the advice of his lawyers, he indicated that he did not wish to answer further questions regarding the earnings of the companies.

When asked about the purpose of creating the two 401(k) retirement plans, the witness explained that the purpose was the same as with all other 401(k) retirement plans, namely to make savings for retirement. The cost of setting up the retirement plans was minimal.

When asked why the witness and Todd Bergeron created two retirement plans—one for each LLC company—when both retirement plans had the same beneficiaries, the witness explained that the development of the retirement plans depended on the activities of their sponsors [the parent company]. Blue Ocean Equity LLC generated income from activities other than Cole Enterprise USA LLC, and therefore they created two retirement plans.

Blue Ocean Equity LLC and Cole Enterprise USA LLC were not established solely for the purpose of being able to create the two affiliated retirement plans.

When asked what deposit they made into the retirement plans, the witness explained that it was not that much. He will believe that both he and Todd Bergeron injected $6,000 into one company and $4,000 into the other. The exact amount is stated on their tax returns. 401(k) retirement plans are used by small businesses and are "solo retirement plans". Todd Bergeron and the witness were both "trustees" and beneficiaries of both retirement plans, and there were no beneficiaries other than them.

Confronted with the fact that Todd Bergeron left both Blue Ocean Equity LLC and Cole Enterprise USA LLC in December 2014, the witness explained that disagreement arose between him and Todd Bergeron over the business strategy of the companies. The companies did not generate any profits, and the witness and Todd Bergeron's relationship deteriorated. Todd Bergeron therefore left the companies and rolled his share of the profits into another retirement plan. Asked if Todd Bergeron's resignation had to do with the fact that the Danish FSA

in the United States ("SEC") had opened an investigation into ICG International, and Todd Bergeron's role in doing so, the witness explained that Todd Bergeron himself should answer that. The witness predicted that Todd Bergeron would have to leave Lotus Capital, which also happened, and the witness did not think it was appropriate that Todd Bergeron remained associated with Blue Ocean Equity LLC and Cole Enterprise USA LLC. He himself continued to run the companies because he had established them and the retirement plans.

About his relationship with Guenther Klar, Kevin Kenning explained that they knew each other from their time as employees at ABN AMRO Bank. Guenther Klar was from the London office affiliated with the same global group as the witness. There were meetings for the whole group where the two met. The witness was the group's American tax expert and also answered questions from Guenther Klar. It was probably around 2005 or 2006 that they got to know each other. The witness left the bank in 2009. They had no contact between 2009 and 2012. The witness also did not follow what Guenther Klar was doing or where he was staying. In 2011 or 2012, the witness himself had started to get involved with dividend-related transactions for other clients. Barry O'Sullivan, with whom the witness had maintained contact from ABN AMRO Bank, said Guenther Klar worked in dividend-related business ("the dividend market"). It was probably in 2012 that Barry O'Sullivan indicated that Guenther Klar might be interested in collaborating with U.S. retirement plans.

It is possible that Todd Bergeron was present when the witness first met Guenther Klar. The meeting took place in Dublin, and the participants were the witnesses themselves, Guenther Klar and Barry O'Sullivan – and possibly also Todd Bergeron. In other words, it was Barry O'Sullivan who reintroduced the witness to Guenther Klar. The witness guesses that the meeting took place in the second half of 2012. He doesn't remember the exact location in Dublin.

Barry O'Sullivan and the witness had been part of the same global team at ABN AMRO Bank, and they were on friendly terms. When the witness was in Dublin, the two would meet for dinner or go out for drinks together. They also spoke about a business cooperation. Barry O'Sullivan was working at the time, I think, for a private investment firm, QED Equity, owned by one of the wealthiest Irish.

When questioned, the witness explained that he did not know the name of Barry O'Sullivan's entities. Only much later – in 2018 – did the witness become aware of the companies Granard and Heber.

During the meeting in Dublin, they talked about Guenther Klar's trading platform ("business platform"), that is, Salgado Capital. Guenther Klar explained the idea behind the involvement of American pension plans, and they discussed whether the witness's and Todd Bergeron's retirement plans could be included.

When asked what the witness was told at the meeting in Dublin about the trade strategy, the witness explained that they were not given much explanation about how it was to be implemented in concrete terms. He did not have a background in the investment field, and they did not get any precise information about the strategy. He only had knowledge of dividend arbitrage from the investment manager he used. He was not sufficiently familiar with the field to be able to assess or understand a strategy. However, he could understand that Guenther Klar had been working for several years and had developed a system.

When asked what the witness was told in detail during the Dublin meeting, the witness explained that he was presented with the possibility that they could work with Salgado Capital as a broker and investment advisor. The pension plans were to be included in share trades in markets where dividend tax advantages could be obtained as a result of double taxation treaties. At the first meeting, I think, they also talked about a number of specific markets, but they did not take any decisions. Denmark was mentioned as a possible market.

Asked how much time elapsed between the Dublin meeting and retirement plans beginning to trade in shares through Salgado Capital, the witness explained that he believes it took a few months. He believes that he discussed the possibility with Todd Bergeron and that they agreed that the strategy for the transactions was legal. They felt comfortable with Salgado Capital and decided to move on so they could become customers ("onboarded").

They did not get more information about the business strategy before they started the onboarding process. It was about getting the paperwork and documentation ready for the pension plans to become clients of Salgado Capital.

When asked what Todd Bergeron and the witness did in detail to be reassured before the imminent relationship with Salgado Capital, the witness explained that the most important thing was that they had a Danish tax opinion that was made in connection with another platform and the other investment advisor with whom the witness was involved. He revisited the tax assessment to examine what applied in a Danish tax context. He also had some faith in Guenther Klar, who had a good reputation.

When asked if they were given any indication of the volume of stock trades that were to take place before the trades were started, the witness explained that there was no precise indication except that it should relate to minimal shares of the overall market. The pensions plans made a small deposit. The pension plans also did not have many funds.

When asked how the stock deals were to be financed, the witness explained that, on

the advice of his lawyers, he will only comment on what he was told when the pension plans became clients of Salgado Capital. The deals were to be financed through equity loans and equity lending.

When asked who the pension plans were to buy the shares from, the witness explained that he was not told who to buy shares from.

When asked if the witness was told that there was a short seller involved, the witness explained that that term was never used. He assumed that Guenther Klar operated a regulated enterprise with access to the stock market and that Guenther Klar had experience in acting in the manner in which he suggested the pension plans to trade. The witness understood that Guenther Klar had access to other institutional actors.

When asked if the witness knew if Guenther Klar had access to Solo Capital's platform, the witness explained that he did not. He first heard about Solo Capital in 2015 when the stories of Sanjay Shah came to light.

When questioned, the witness explained that he was not given information about to whom the shares were to be lent. As with the witness's involvement with the other investment advisor, it was information that was never shared with the retirement plans.

When asked what the witness was told about how long the pension plans would hold the shares, the witness, on the advice of his lawyers, indicated that he did not want to answer the question.

Asked what the witness was told about when the shares were to be sold, he explained that he does not believe he was told anything specific. He presumed that the shares should be sold through the market to the connections that Salgado Capital had.

When asked how the retirement plans were going to make money, the witness, on the advice of his lawyers, stated that he did not want to answer the question.

When asked about his earnings expectations for the retirement plans, the witness, on the advice of his lawyers, stated that he did not want to answer the question.

When asked if the witness was given any details about what the pension plans could expect to earn, he explained that no specific amount was disclosed. He expected it to be on a smaller scale.

Asked if the witness knew about Salgado Capital's other clients, he explained that he did not.

The specific stock transactions of the pension plans came about in such a way that Guenther Klar contacted either the witness or Todd Bergeron about an option for a specific purchase for a specific amount on a specific date. They decided on the basis of Guenther Klar's proposal. They did not carry out any detailed assessment of the proposal. The witness knew less than nothing about the European stock market and trusted Salgado Capital's and Guenther Klar's ratings. He doesn't think they ever turned down Guenther Klar's proposal to buy. It may have happened in one or two cases.

When asked if he knew that all the share transactions would be settled through net settlement, the witness explained that he did not know that concept at the time. He later became familiar with the concept.

When asked about the distribution of profits, the witness explained that their pension plans should have one-third of the overall profits of the dividend arbitrage and the dividend tax returned. There was no written agreement to this effect. He understood that the remaining two-thirds went to Salgado Capital.

When asked whether the profit consisted of profit/loss on stock trades plus dividends plus dividend tax refunded, the witness, on the advice of his lawyers, stated that he did not wish to answer the question.

There was no agreement on how a loss on stock trades would be covered.

When asked about the reasons why the Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust pension plans decided to become clients of Salgado Capital, the witness explained that they had established the pension plans to make investments and grow so that they could generate assets for their retirement.

Alleged that Guenther Klar has explained that during the Dublin meeting he explained and reviewed all parts of Salgado Capital's trading strategy of short selling, stock lending to the short seller and reversal of the share loan, the witness explained that he was not given any information about short selling. He was given information about stock loans and stock lending.

Alleged that Guenther Klar explained that the witness and Todd Bergeron were told that the seller would always be one of Barry O'Sullivan's companies, the witness explained that they were not given that information. He can reject that.

"The witness was shown an email from December 14, 2018, from the witness to Guenther Klar with a forwarded email from Wolfgang Packeisen to the witness (extract 2, pages 1254-1255, annex 53-48-0-24 and 25) and was asked what Wolfgang Packeisen refers to with the phrasing:" *"From where we are right now there is no volunteer for such a claim, unless someone will have the decency to explain to us why Cole/Blue took such decisions (credible explanation). Without any communication that seems a somewhat*

*bold expectation."*

In addition, the witness explained that in 2018 he had obtained certain additional financial statements and information from Salgado Capital.

When asked whether it was a question of whether both pension plans had assumed significant financial risk in relation to price developments from the outset, the witness explained that after the conversations he had with Wolfgang Packeisen, who is a kind of trading expert, this is how he understands it today. That was the risk to which the question was directed.

When asked how the onboarding at Salgado Capital took place, the witness explained that Salgado Capital had sent various papers – questionnaires, power of attorney forms and KYC requests. He assumed that standard material for the jurisdiction in which Salgado Capital was established. It was completely similar to what other brokers would do.

In 2013 and 2014, Todd Bergeron was primarily in contact with Salgado Capital. Todd Bergeron had set up a separate email account for Guenther Klar's and Salgado Capital's stock selection inquiries. They would receive recommendations to buy, and they could either accept or decline. The witness could also access the email account and respond, for example when Todd Bergeron was traveling or otherwise out of contact with the email account. From 2015, it was always the witness who communicated with Guenther Klar and Salgado Capital.

When asked whether they received trading documents from Salgado Capital in the immediate vicinity of the trades, the witness explained that his memory is somewhat hazy on that point. They received confirmation of the deal. It came maybe 1-2 days later, maybe only after a week. It was sent to them from Guenther Klar. He did not check what he received. He wouldn't know what to look for.

When asked what he knew about the exchange rate risk of the pension plans, the witness explained that he probably did not understand – or acknowledge – the risk associated with market developments, but since they had very limited funds in the pension plans, they would not be able to cover a major loss. He therefore assumed that Guenther Klar had dealt with this and mitigated the risk ("mitigate"). When asked, he explained that he was not told that there was hedged.

They had no agreement on what would happen in the event that pension plans suffered a capital loss.

When asked whether the trading pattern changed during the cooperation with Salgado Capital, the witness explained that it was his understanding that Guenther

Klar wanted to change Salgado Capital's trading pattern ("approach") in 2014. The equity loans used in 2013 entailed certain costs. The witness did not fully understand what the change was, but Guenther Klar wanted to use a more cost-effective method. Both the witness and Todd Bergeron were asked if they could accept the change, and they answered yes, trusting Guenther Klar.

When asked if the witness was given information about what it would mean for the market risk if one chose to go "long" for a shorter period of time, the witness explained that he did not.

Shown Custody Statement, Open Positions, for Blue Ocean Equity Retirement Plan & Trust on March 31, 2013 (Extract 3, page 520, Exhibit 76- 00/36/1883), the witness explained that he has seen the Appendix but first several years later than the date. He did not get this type of information until sometime after 2015. Up to this point, he received exclusively trade confirmations.

The witness was shown Equity Transactions for Blue Ocean Equity Retirement Plan & Trust on 31 March 2013 (Extract 3, page 521, Exhibit 76-36-00-1884), from which it appears that the pension plan had purchased shares for approximately USD 475 million or approximately DKK 2.7 billion and alleged that the pension plan also purchased Maersk shares for approximately USD 140 million, and therefore owned Danish shares totalling approximately DKK 3.5 billion.

To this the witness explained that he has since realized that this was the case. He only realized this in 2016, when he received the statements and could see that the deals had been much more significant than he had imagined. It is true that he regularly received the trading confirm, but he did not realize the extent and did not review the papers as one would have done if one were a securities dealer. He had another job. He simply did not have an overview of the total volume of the trades.

When asked whether Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust could have covered a loss of USD 1-3 million resulting from a slight fall in the price of a stock portfolio of that magnitude, the witness explained that the pension plans would not have had the finances to cover this. $10,000-$15,000 had been deposited in each of the retirement plans, as he previously explained.

Asked if a 401(k) pension plan could go bankrupt, the witness explained that he does not know the answer, but that creditors would probably be able to bring creditor action if the pension plans suffered such losses. A 401(k) plan is a self-contained legal entity.

The prosecution confronted the witness with the that Cole Enterprises USA LLC was incorporated on 13 February 2013 with a capital injection of USD 100 and that COLE Enterprises USA Retirement Plan & Trust was incorporated on February 15, 2013, presenting Open Positions and Equity Transactions dated 31

March 2013 to COLE Enterprises USA Retirement Plan & Trust (Extract 3, pages 732 and 733, Exhibits 76-38-00-2113 and 2114. The prosecutor summarized that, according to the annexes, the pension plan bought Danish shares for approximately USD 474 million or approximately DKK 2.7 billion and furthermore – before any of these shares were sold – bought Maersk shares for USD 175 million or approximately DKK 800 million, after which COLE Enterprises USA Retirement Plan & Trust owned shares worth approximately DKK 3.5 billion, a share portfolio equivalent to Blue Ocean Equity Retirement Plan & Trust's portfolio at the same time.

In addition, the witness explained that, as was the case with the Blue Ocean Equity Retirement Plan & Trust, he did not have an overview of the volume of the deals at that time.

Asked if he spent more time keeping up with price and stock after the trades were initiated, he explained that he did not. He trusted Salgado Capital to be their broker and investment manager, and he trusted their judgment.

When asked how the pension plans came out of the trades ("exit"), the witness explained that it also happened on the advice of Salgado Capital. They did not independently assess whether it was a good time to sell the shareholdings.

When questioned, the witness explained that it was his understanding that the retirement plans received net dividends after deducting taxes from their shareholdings. He assumed at the time that their net dividends were credited to their accounts with Salgado Capital after their omnibus account with the custodian had been credited. He assumed that it was done in exactly the same way as if they had become customers of Merrill Lynch or other custodian banks. He did not receive information that appears in the Annex [Exhibit 76-38-00-2114] until sometime in 2016, but as far as he can see, this attribution is also what the Annex reflects.

When asked if they could verify that they were credited with the net dividends, the witness explained that they could not. They were not sent statements corresponding to the documents shown to him in court today. There was no online access to documents and statements back then. He suspects that the statements and documents were prepared by Guenther Klar in his own system.

When asked if they received dividend notes on an ongoing basis, the witness explained that he does not think so, but he does not remember for sure.

The witness was confronted with the fact that Blue Ocean Equity Retirement Plan & Trust recovered dividend tax totalling DKK 105 million and that COLE Enterprises USA Retirement Plan & Trust recovered a total of DKK 101 million, and was asked how the recoveries were carried out.

To this, the witness explained that he believes that during the onboarding process

he had given Salgado Capital power of attorney so that Guenther Klar and Salgado Capital could recover taxes through the reclaim agent, Goal Taxback. It was Salgado Capital's decision to apply Goal Taxback.

When asked where refunded dividend tax was paid, the witness explained that he did not receive current bank statements. He was notified by Guenther Klar when payments had arrived. Guenther Klar asked if he should pay out the amount or if it should remain in the custody account.

Asked if he was aware at the time of trading that the pension plans were making "day trades" under the auspices of Salgado Capital, the witness explained that he did not know that at the time.

Shown Equity Transactions for Blue Ocean Equity Retirement Plan & Trust as of December 31, 2013, showing the purchase and sale of 12 Belgian share positions on December 24, 2013 for a total of approximately USD 1.69 billion and a total loss of just over USD 18.4 million (Extract 3, page 563, Exhibit 76-36-00-1926), the witness explained that he did not receive this statement at that time either.

When asked if it was the witness and/or Todd Bergeron who requested these trades, the witness explained that he does not believe it. He cannot say for sure that it was not them. He was regularly notified of buying and selling by Guenther Klar and Salgado Capital, but usually they traded around the dividend day. It would have been unusual with so many trades on the same day, and he doesn't think they were asked to approve those transactions. Unfortunately, he no longer has access to the emails they corresponded through at the time.


Confronted with the fact that Guenther Klar has explained about a telephone contact with both the witness and Todd Bergeron in the days leading up to December 24, 2013, about these very deals, the witness explained that he does not recall such a conversation. He very much doubts that this should be the case. Todd Bergeron may remember it.

Confronted with the fact that on December 24, 2013, the deals took place outside the dividend season and that the pension plan had not traded for some time, and that Guenther Klar has explained that it was the witness and Todd Bergeron who initiated the deals, the witness explained that he can safely deny that. All deals were concluded on the initiative of Guenther Klar. The trades they participated in were arbitrage trades and not "day trade" trades that they did not understand. He did not receive the statement in 2013/2014, and when he saw it in 2016, he was shocked, to say the least.

Presented the Cash Statement for Blue Ocean Equity Retirement Plan &Trust on December 31, 2013, showing "Starting Cash Balance" of $18,471,095.65 and "Equity trades profit or loss" of $-18,431,799.68 (Extract 3, page 564, Exhibit 76-36-00-1927), the witness explained that when he saw this Cash Statement at a later date, he became concerned about what was going on in Salgado Capital.

When asked when he saw the appendix [76-36-00-1927], the witness explained that around mid-2015, news of Solo Capital's business practices hit Denmark. In the second half of 2015, he was contacted by SKAT about a single transaction, and he needed to obtain more information. In 2016, he received the Custody Statements from Salgado Capital.

Shown Equity Transactions for COLE Enterprises USA Retirement Plan & Trust on December 31, 2013, on the purchase and sale of two Danish equity positions on December 27, 2013, and the Cash Statement of the same date showing "Starting Cash Balance" of USD 13,911,757.06 and "Equity trades profit or loss" of USD -13,847,804.80 (Extract 3, pages 775 and 776, Exhibits 76-38-00- 2156 and 2157), explained to the witness that his answer is the same as regarding the papers on Blue Ocean Equity Retirement Plan & Trusts trades on December 24, 2023. They did not instruct Salgado Capital to do day trading on December 27, 2013. When they finally received the statements, they realized that the custody account balance and the loss on "day trades" offset each other.


The prosecutor presented Equity Transactions dated 30 April 2015 relating to Blue Ocean Equity Retirement Plan & Trust's trading in a Belgian equity position on 29 April 2015 (Extract 3, page 593, Exhibit 76-36-00-1956) and stated that COLE Enterprises USA Retirement Plan & Trust traded the same stock on the same day (Extract 3, page 805, Exhibit 76-38-00-2186)

To this, the witness explained that he does not remember whether he has seen those summaries before. He assumes that he received them in the package of summaries that he handed over to SKAT. They received, as explained, ongoing requests to buy and sell, but they did not monitor the market themselves. Their broker, Salgado Capital, did. In his experience, it is not common to receive "real-time information" about "day trades", but when he saw the charts, it certainly gave cause for concern ("pause").

Shown Equity Transactions dated 30 September 2016 for Blue Ocean Equity Retirement Plan & Trust's trading in a Belgian share position on 22 September 2016 (Extract 3, page 599, Exhibit 76-36-00-1962) and asked whether the pension plan traded shares through Salgado Capital in 2016, the witness explained that this was not the case. In late 2014, when Todd Bergeron left the retirement plans, Guenther Klar asked if the witness would continue trading in 2015. They agreed to continue through the 2015 dividend season and then cease trading and tax recoveries. The witness also does not recall obtaining certificates of residence to be included in the applications for reimbursement of Belgian dividend tax for 2016. He therefore does not see how it should be dividend arbitrage.


Shown the Cash Statement dated September 30, 2016 of the Blue Ocean Equity Retirement Plan & Trust (Extract 3, page 600, Exhibit 76-36-00-1963) exhibiting

Ending Cash Balance -$0.00, the witness explained that he does not know the background to the entries or how the account went to zero.

When asked how the pension plans got money out of Salgado Capital, the witness explained that Salgado Capital and Guenther Klar contacted them once dividend tax refunds had been received. Guenther Klar then asked if they wanted to keep the amount in the custody account at Salgado Capital or if they wanted the amount transferred to the US accounts that the pension plans had set up. Most often, they notified that they wanted the amount paid to the US accounts. The witness confirmed that there was a connection between the possibility of having amounts transferred and Salgado Capital's receipt of a dividend tax refund. He understood it to coincide with dividend distributions.

When asked what the pension plans have received from Salgado Capital, the witness explained that over the three years of trading, he received approximately $9.8 million as his share, and Todd Bergeron – who was with for a shorter period – received approximately $2 million.

Shown "Payments Recieved by Plan, Blue Ocean – KK" (Extract 3, page 2310, Exhibit 53-48-00-238), the witness explained that he has made the table subsequently to calculate the portion he had received in the pension plans. The record shows the amounts that the witness - through the pension plans' US accounts - received from Salgado Capital.

Asked if this means that Todd Bergeron received similar amounts in 2013 and 2014, the witness explained that this will roughly be the case. At one point, he compiled a similar inventory of the sums Todd Bergeron received. They were 50:50 owners and shared the dividends from Salgado Capital 50:50. However, there could be little difference in when they were paid the money and therefore differences in the exchange rate. Salgado Capital kept accounts in GBP and EUR, and the pension plans' accounts in the US were in USD. The statement [Exhibit 53-48-00-238] is in USD with direct reference to the independent parties, brokerage firms, on the right. Unfortunately, he cannot answer which part of the calculated amounts relates to trading in Danish shares, and certainly not for 2015. The amounts will also have included Belgian dividend tax refunds, especially in 2015.

Shown "Payments Recieved by Plan, COLE – KK only" (Extract 3, page 2325, Exhibit 53-48-00-253), the witness explained that it is a corresponding statement relating to the COLE Enterprises USA Retirement Plan & Trust. His intention was to document that these were the only amounts the pension plan- ners received from Salgado Capital. He understands that the Belgian police have traced withdrawals from Salgado Capital's accounts to him.

Presented with tax return for Blue Ocean Equity Retirement Plan &Trust for 2013, paragraphs 7 and 8 (Extract 2, pages 1109-1110, Exhibits 76-36-00-108 and 109), and asked where the $1,000,510 asset increase originated, the witness explained that these

were precisely funds from Salgado Capital as per the statements that have just been reviewed. Salgado Capital payouts went to both Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust.

When asked whether the witness and/or Todd Bergeron or the pension plans should pay Barry O'Sullivan, the witness explained that was not the case. They did not pay referral fees or the like. The witness understood the agreement with Guenther Klar and Salgado Capital to mean that if advisory or referral fees were to be paid to Barry O'Sullivan for introducing the parties, it would be deducted from Salgado Capital's profit portion. The witness has never received invoices in this regard, and when he received Custody Statements, there were no entries for referral fees or the like.

The witness was presented with the Cash Statement dated 31 May 2013 of the Blue Ocean Equity Retirement Plan & Trust (Extract 3, page 536, Exhibit 76-36-00-1899) and the entry of Trading Advisory Fees of -$1,845,180.03 and charged that Trading Advisory Fees are similarly booked for the following two months and that the same applies to COLE Enterprises USA Retirement Plan & Trust.

To this the witness explained that he did not see the statements until several years later. In 2015/2016, he assumed that it was fees that Guenther Klar raised in accordance with the agreement ("the understanding") or that it was expenses for the share loans that were part of the structure. He was not given details of the postings and they have not been mentioned between them. In 2013, he was not aware that fees were being paid in the amount of USD 1.8 million, because he did not see the statements.

The witness confirmed that it was he who made the tax returns for all the American companies.

Shown the Cash Statement dated December 31, 2013 for Blue Ocean Equity Retirement Plan & Trust's "Ending Balance" of $12,372.82 and asked if the amount was included as "plan assets" in the pension plan's tax return, the witness explained that he considers himself to be a pretty good accountant. He keeps good working documents. The said amount will have been included in the asset statement together with the balance in the U.S. accounts of the pension plans and been indicated as a foreign account.

When asked where the witness got the information about the balance with Salgado Capital when he did not receive the Custody Statements, the witness explained that he emailed/texted Guenther Klar to find out the various balances.

There were also "compliance forms" other than the tax return that pension plans had to complete in the United States, for example "Form 5500", where the highest balance

during the year had to be disclosed. He must also have obtained this information from Guenther Klar.

Confronted that this must mean that the witness had knowledge that the pension plan during 2013 had a deposit of approximately $18.5 million, the witness explained that the information had to be filed on another form and he must check it in order to answer the question.

Asked whether the witness was aware that Barry O'Sullivan was to receive a referral fee, he explained that there were no written agreements and that it was not part of the oral discussions. However, it was his understanding at the Dublin meeting that Barry O'Sullivan would receive such a fee, which was also not unusual in the industry. The witness never discussed the size of a fee with Barry O'Sullivan or with Guenther Klar. It was a middle ground between them. In the market place, a fee is between 10 and 30 percent normal, depending on the role played by the recipient.

When asked whether the witness and/or Todd Bergeron asked Salgado Capital to pay to anyone other than themselves or the two retirement plans, the witness explained that he does not remember.

Confronted with the fact that Salgado Capital bank statements show withdrawals that could be on the instructions of the witness or Todd Bergeron and confronted with a payout to "Blue Star 8 INC." the witness explained that Blue Star 8 INC was a separate entity at Todd Bergeron's disposal and that $75,000 was paid thereto. The witness does not remember the exact reason for this.

Shown Salgado Capital's GBP account and payment of £25,805.94 to "Reuven Gitter" on 27 May 2013 (Extract 3, page 955, Exhibit 17-02-00-2), the witness explained that he believes the transfer related to payment for some jewellery purchased for his spouse. He believes that the transfer was treated as a distribution ("distribution").

Impugned payments to the "Chicago Youth Programs" (same appendix), the witness explained that it is a charitable association of which he was a board member. The amounts were transferred at his request from Salgado Capital. He could also have made the donations directly from the retirement plans.

Confronted with payments to the "Wings Program" (same appendix), the witness explained that it is a charity for battered women and children, of which Todd Bergeron sat on the board. Guenther Klar had earned large profits and also wanted to contribute to charity. When asked whether the transfers to charity came from the pension plans' profits or from Guenther Klar, the witness explained that, as previously mentioned, they did not receive account statements in 2013. In connection with the sporadic payments, he discussed with Guenther Klar that now that they had generated a significant profit, they could donate to charity.

It is common to contact your network and to depend on the donations you can raise from there to charity. He saw the donations as a joint donation, but was also aware that since Guenther Klar did all the bookkeeping, the retirement plans' custody accounts would be debited for part, if not all, of the donation. Transfers to "Friends of the Orphans" also relate to charity in which the witness was involved, and this was done in connection with an annual event to which he wished to donate.

Shown transfer to "Kevin T & Margaret M McNicholas - Medical Insurance" on October 11, 2015 of US$14,960 (Extract 3, page 1421, Exhibit 17-04-00-1), the witness explained that he does not know about the transfer and that it has not been made at his request. The transfer on September 1, 2016 to "Wilderness Property LLC" of $210,162.19 (same Exhibit, Extract 3, page 1424) is known to the witness, as COLE Enterprises USA LLC had created a separate company, Wilderness Property LLC, which owned land in the United States. At the time, there were problems receiving dividends into the COLE Enterprises USA Retirement Plan & Trust's account, so the amount was transferred to the account of Wilderness Property LLC.

The transfer of $30,000 to "Patrick C. Enright" on October 27, 2016 was prompted by the witness, who himself lacked liquidity. Enright was a salesman used by the witness. According to Guenther Klar, there were still funds in the account with Salgado Capital and the witness therefore asked that the amount be transferred directly to Patrick Enright.

Questioned by the defence counsel, the witness explained that after the financial crisis he left ABN AMRO Bank in 2009. He took about a year off and then started his own law practice. He created the Kevin Kenning Law Firm Retirement Plan & Trust after about a year. It may have been in 2011. It was also a 401(k) retirement plan, and it also made stock trades.

When asked what Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust did to be reassured before the "onboarding" at Salgado Capital, the witness explained that they had the tax opinion obtained for another trading platform.

When asked if the tax assessment described the trades that they had to execute with Salgado Capital, the witness explained that he does not recall the descriptions of the trading structure in the tax assessment in detail. Overall, it was the tax assessment that reassured him that the proposed dividend arbitrage transactions in Denmark would be legal.

Alleged that the witness explained that he did not receive information from Guenther Klar during the Dublin meeting - or later - about the trade strategy, and

asked how the tax assessment could then reassure him, the witness explained that he knew Guenther Klar and he trusted Guenther Klar to know the market and know what was legal and in accordance with the standards in Denmark.

When asked if it was not necessary to know Salgado Capital's strategy more closely, the witness explained that he understood the general aspects of dividend arbitrage trading in Denmark. The tax assessment was made on a different basis to another trading platform.

When asked whether he had received the tax assessment in connection with the Kevin Kenning Law Firm Retirement Plan & Trust, the witness explained that the tax assessment did not relate only to the retirement plan. He had an investment manager in his firm, and he also had partners/colleagues who were familiar with European markets and regulations, so the assessment was more general.

Asked about his earnings expectations for Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust through Salgado Capital, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

Confronted with the fact that the witness has explained that he expected to earn "a small amount" in connection with the trades through Salgado Capital, the witness explained that it should be understood that his expectation was that the volume of the trades would not constitute a large share of the market. He did not expect dividends of the magnitude that he actually received.

On re-shown the Cash Statement for the Blue Ocean Equity Retirement Plan & Trust on December 31, 2013 (Extract 3, page 564, Exhibit 76-36-00-1927), the witness confirmed that he did not see this type of voucher until sometime after mid-2015. When asked if he had not understood in 2013 that the pension plan had earned approximately $18.4 million, the witness explained that he had not. The witness reiterated that he and Todd Bergeron were "co-trustees" in both retirement plans and thus both were underwriters.

When asked again about the "day trades" on December 24, 2013 [Exhibit 76-36-00-1926], which resulted in a loss of approximately $18.4 million, the witness explained that it was a long time ago. He does not remember if they authorized the trades on December 24, 2013, Christmas Eve, but it's possible they were approved.

Asked what he would have done if the trades had been executed without their authorization and that Guenther Klar had thereby caused Blue Ocean Equity Retirement Plan & Trust a loss of approximately $18.4 million, the witness explained that he would probably have spoken to someone with knowledge in the securities trading field to find out who had approved such a trade. He did nothing when he received the papers and could see the loss.

Re-shown Open Positions and Equity Transactions dated 31 March 2013 to COLE Enterprises USA Retirement Plan & Trust (Extract 3, pages 732 and 733, Exhibits 76-38-00-2113 and 2114) and reproaching his statement that he only

received the statements in 2016, the witness explained that he does not remember exactly what documentation he secured when reporting the assets of the pension plan. He had the information about cash distributions to the U.S. accounts and the information about the balance in custody accounts with Salgado Capital.

When asked whether the witness should also disclose the amount of shares the pension plan owned, he explained that it was not a required disclosure. Information about foreign accounts was not to be sent to the IRS, but to another agency, which should also have the information about the highest balance in the account during the year.

Alleged that the witness explained that he received trade confirmations on an ongoing basis and asked how he could then be surprised by the volume of trades, he explained that it was not the number of trades but the volume of the trades that surprised him. It was not possible for him to calculate or predict what dividends the trades would bring. Claiming that the trade confirmations described the volume of shares traded, the witness explained that it is probably true that he had knowledge of the volume of the trades in this way and that it was also described in the correspondence of the parties about the trades.


**Todd James Bergeron** explained that he has a bachelor's degree in foreign languages and a minor in business from Illinois State University. He also obtained a general stockbroker license, Series 7, and license to trade Treasury bonds while in college. He does not have additional educations. Throughout his career, he has traded stocks and investments
In banks, he has been an entrepreneur and worked in venture capital, finance and lending. For the past 7-8 years he has been a project manager within economic development.

When asked whether the witness has extensive experience with stock trading, the witness explained that he has to a certain extent.

When asked what stock trading strategies the witness was aware of before the cooperation with Salgado Capital was initiated, the witness explained that it was trading in securities ("small securities") and "micro cap" shares.

When asked about his relationship with Kevin Kenning, the witness explained that in 2011 he hired Kevin Kenning as CFO and general councel of International Capital Group, ICG. It was a purely commercial relationship between them. They also started the company Lotus Capital together, and later Blue Ocean Equity LLC and Cole Enterprise USA LLC. Lotus Capital operated in lending with institutional investors backed by micro-cap stocks, and the witness was the CEO. Today, he has no relation to Kevin Kenning.

The witness met Guenther Klar through Kevin Kenning. The relationship was purely professional during the two years when the pension plans traded shares through Salgado Capital and where Guenther Klar acted as broker and investment advisor. He has no relation to Guenther Klar today.

Barry O'Sullivan met the witness a few times through Kevin Kenning. It was a business relationship and "dinner & drinks". The witness has no relation to Barry O'Sullivan today.

Salgado Capital got to know the witness through Kevin Kenning and Guenther Klar in 2012 or 2013. He does not remember if it was Kevin Kenning or Guenther Klar who mentioned Salgado Capital. He was informed that Salgado Capital was a brokerage firm trading shares from the Comoros. He was not given information about who owned Salgado Capital or who controlled the company. Guenther Klar's role in relation to Salgado Capital was to be a stockbroker and stock trader.

He first met Guenther Klar in London during a business trip he was on with Kevin Kenning. All three of them had dinner together. He does not believe that anyone else participated. Presumably, you were also talking about Salgado Capital. He received additional information about Salgado Capital through telephone discussions with Kevin Kenning and Guenther Klar. No more meetings were held before they met in Dublin. It may well be true that the meeting took place in autumn 2012. It sounds correct that the meeting was between Guenther Klar, Kevin Kenning, Barry O'Sullivan and the witness. He doesn't really remember what happened at the meeting, but it was about Salgado Capital and the stock exchange trading the company made.

Claiming that the meeting has been described as a "whiteboard meeting" and that Guenther Klar drew diagrams of a trading strategy, the witness explained that it sounds faintly familiar.

When asked what information the witness received about Salgado Capital's past operations, the witness explained that he was told that Guenther Klar and Kevin Kenning had acted in a similar manner for several years. He does not remember if it appeared that they had traded through Salgado Capital.

Asked what the witness was told about the strategy, he explained that Guenther Klar would let them know what to buy, how much and when. They then had to notify if they wanted to buy.

When asked whether Guenther Klar advised on the deals, the witness explained that it was more a matter of coordinating the deals. When Guenther Klar made proposals for a deal, they had to accept. They did not make an independent assessment of the trade proposal. Guenther Klar managed all the risk and capital involved, and he was the expert who knew how it worked and what to do.

When asked about the financing of the trades, the witness explained that the financing was done through Salgado Capital. He did not know how Salgado Capital provided the financing.

When asked if equity loans were included in the structure, the witness explained that he believes this was the case, but he does not know more precisely how it happened.

When asked what the witness was told at the meeting in Dublin about how long they were to keep the shares that were purchased, the witness explained that it

was usually a matter of a few days.

When asked who would buy the shares, the witness explained that it was Guenther Klar who bought the shares for the two retirement plans the witness and Kevin Kenning owned together. He was not told from where Salgado Capital obtained the shares. When questioned, the witness explained that the shares were held in custody with Salgado Capital. He does not know to whom the shares were sold afterwards.

Asked whether the refund of dividend tax was an essential element of the strategy, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

When asked if he had knowledge that there were other entities ("vehicles") involved in the trading strategy, the witness explained that he does not remember talking about it.

When asked about price risk and who carried the market risk for it, the witness explained that Salgado Capital did.

When asked if he made deposits into the Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust pension plans, the witness explained that he believes so. The deposits were not very large. No other security was provided to Salgado Capital.

When asked about net settlement, the witness explained that he does not remember anything about it being disclosed. He believes he heard that there was a short seller involved. However, he does not remember which short seller was involved. He does not recall Heber Securities Trading Ltd. being mentioned as a short seller. When asked what markets Salgado Capital would trade on, the witness explained that it was probably mentioned. It may well be true that Denmark, Germany and Belgium were mentioned. He does not remember the reason why it was these markets that were mentioned.

It is possible that there was talk about the distribution of profits on the trade through Salgado Capital.

When asked what elements the witness expected to be included in the profit, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

Confronted with the fact that it has been explained that it was agreed that the Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan &Trust pension plans should receive one-third of the profit, the witness explained that this is true. When asked who should calculate the profit, the witness explained that he should not do so. It was Gunther Klar who had to do it. It was also Guenther Klar who was to receive the remaining two-thirds of the profit.

When asked about the background to this distribution, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

When asked whether there was a written agreement on the distribution of profits, the witness explained that he does not recall such an agreement.

When asked whether information emerged at the meeting in Dublin or in connection with the meeting that Guenther Klar had access to Solo Capital's trading platform, the witness explained that he does not remember.

Alleged that Guenther Klar has explained that both Kevin Kenning and the witness were told that the stock seller would be one of Barry O'Sullivan's companies, the witness explained that he does not remember that. It is true that Barry O'Sullivan was involved, but the witness does not remember how. However, it sounds familiar that Barry O'Sullivan was supposed to be a short seller. The witness does not recall receiving information that Barry O'Sullivan was trading in Salgado Capital through any companies. He has no idea what companies Barry O'Sullivan might use. He knew that Barry O'Sullivan worked in Dublin for a "family business".

When asked if the witness at the time had experience with dividend arbitrage and dividend tax recovery, he explained that he had not at all.

Confronted with the information that Blue Ocean Equity LLC was incorporated on October 23, 2012, the witness confirmed that it is probably true. The company was formed so that the witness and Kevin Kenning could complete business that they did not want to be completed in Lotus Capital. The activities of the companies were very different, and Blue Ocean Equity LLC made more  one-off  and opportunistic trades than Lotus Capital. Blue Ocean Equity LLC was jointly owned by Kevin Kenning and the witness, and they were both directors.

Confronted with the information that on November 1, 2012, Blue Ocean Equity LLC created a pension plan, the witness confirmed this. It was a retirement plan like any other, and he was a trustee. They were at the same time setting up COLE Enterprises USA LLC and had no other retirement plans.

When asked about the expectations of Blue Ocean Equity LLC's profits, the witness, on the advice of his lawyers, indicated that he did not want to answer the question.

The company did not invest much in the Blue Ocean Equity Retirement Plan & Trust, perhaps $10–$20,000, but the witness does not recall it further.

When asked whether the Blue Ocean Equity Retirement Plan & Trust was created to trade through Salgado Capital, the witness, on the advice of his lawyers, indicated that he did not want to answer the question.

Confronted with the information that COLE Enterprises USA LLC was incorporated on February 13, 2013, the witness explained that it sounds right. The reason for its creation was the same as when they created Blue Ocean Equity LLC.

The two companies did not differ much from each other. It is common practice to form several different companies. The witness and Kevin Kenning were joint owners and beneficiaries.

Confronted with the information that the COLE Enterprises USA Retirement Plan & Trust pension plan was created on February 15, 2013, the witness confirmed this. When asked about the purpose of this, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

The beneficiaries of the retirement plan were the witness and Kevin Kenning. The deposit was similar to what he has explained about the Blue Ocean Equity Retirement Plan & Trust.

When asked why the witness, along with Kevin Kenning, formed a company in October 2012 and another company in February 2013 with the same line of business, the witness, on the advice of his lawyers, indicated that he did not want to answer the question.

When asked about the activities of the pension plans while participating, the witness explained that it was trades through Salgado Capital and other routine securities trades. They also traded with others than Salgado Capital. They had accounts with Fidelity and with Stifel Nicolaus.

When asked about the onboarding process for the pension plans at Salgado Capital, the witness explained that it happened shortly after establishing the pension plans, but that he does not remember the process further. He does not recall that he should have received more information than he had already received in Dublin during the autumn 2012 meeting.

When asked whether the witness took any action to ensure that there were legitimate trading strategies, the witness explained that he did not.

The witness was shown Broker Confirm for Blue Ocean Equity Retirement Plan & Trust's purchase on February 28, 2013 (Extract 3, page 440, Exhibit 76-36-00-1984) and Broker Confirm for COLE Enterprises USA Retirement Plan &Trust's purchase on the same date (Extract 3, page 650, Exhibit 76-38-00-2210), and charged that this is the pension plans' first deal, made two weeks after the establishment of COLE Enterprises USA Retirement Plan & Trust.

To this the witness explained that in practice the trades were made by Guenther Klar informing them 1-2 days before a trade. Guenther Klar disclosed the type of share, volume and timing. It was Guenther Klar who took the initiators of trades. The witness had no contact with anyone else from Salgado Capital in connection with the deals. The contact was via Skype messages. It was both the witness and Kevin Kenning who were in contact with Guenther Klar. They did not discuss anything among themselves before taking action. The witness does not recall any further details about these trading decisions.

When asked again about the same transaction [Exhibit 76-36-00-1984] and asked how the pension plan could buy shares for approximately DKK 444 million or approximately USD 78 million, the witness explained that Salgado

Capital financed the purchase. He has no idea how Salgado Capital raised the financing. He would say that he received Broker Confirmations in connection with the trades. As far as he knows, the retirement plans bought the shares of Salgado Capital. He does not know if Salgado Capital bought the shares from a short seller, but he was aware that there could be a short seller involved. He did not know the identity of such a short seller.

When questioned, the witness explained that Blue Ocean did not lend shares.

Confronted with "Stock Loan Confimation", Trade Date 6 March 2013 (Extract 3, page 441, Exhibit 76-36-00-1985), the witness explained that the Annex looks familiar. He cannot remember whether he was sent such documents on an ongoing basis. He does not recall Blue Ocean Equity Retirement Plan & Trust lending stock. When he first answered the stock lending question, he thought it related to Blue Ocean Equity LLC. He does not recall whether Blue Ocean Equity Retirement Plan & Trust lent shares, but he can see from the Exhibit [Exhibit 76-36-00-1985] that this was the case.

When asked about the stock trading through 2013, the witness explained that it took place as he has just explained. Guenther Klar contacted them. There was contact over Skype. It was not decided in advance when they would sell again. Guenther Klar would contact them about that. Of course, they would have been able to sell at another time. There was a common understanding that they would follow the suggestions that came from Guenther Klar.

When asked where this understanding came from, the witness replied that it was Guenther Klar who had determined the strategy and had the experience, and they had agreed to do as Guenther Klar suggested.

When asked if they received any documents from Salgado Capital other than the mentioned trade confirmations ("Broker Confirms"), the witness explained that they occasionally received other documents. He doesn't remember how often, but it may well have been on a monthly basis. Kevin Kenning handled all the paperwork.

Shown the Custody Statement dated 31 March 2013 to the Blue Ocean Equity Retirement Plan & Trust (Extract 3, pages 520-525, Exhibit 76-36-00-1883 to 1888), the witness explained that it was such documents that they occasionally received ("on occasion"). As he remembers it, he did not look at the material that they received. He didn't see the need to review the material.

The witness was again shown "Equity Transactions" dated 31 March 2013 to Blue Ocean Equity Retirement Plan & Trust (Extract 3, page 521, Exhibit 76-36-00-1884) and alleged that on 28 February 2013 the pension plan purchased Danish shares for approximately USD 475 million or approximately DKK 2.7 billion and that the pension plan purchased additional shares before any of the shares were sold, and asked if the witness was aware that the retirement plan had bought so many shares.

To this, the witness explained that he was aware that Blue Ocean Equity Retirement

Plan & Trust had purchased the shares. It was Salgado Capital that financed the purchase, but he did not know how Salgado Capital arranged the financing. When questioned about collateral, the witness explained that no security was provided.

When asked if this did not surprise the witness, the witness, on the advice of his lawyers, indicated that he did not wish to answer the question.

Presented with the fact that even a small fall in the price of such a shareholding would result in a large loss, and when asked who would cover such a loss, the witness replied that it should Salgado Capital. As the witness recalls, there was no written agreement to this effect.

Confronted with the fact that, according to Guenther Klar's explanation, it was the pension plans that were to bear the risk of such a capital loss, the witness explained that in 2013 he had the understanding that it was Salgado Capital that bore the market risk.

Shown the Dividend Note ("Credit Advice") of the Blue Ocean Equity Retirement Plan & Trust (Extract 1, page 130, Exhibit 54-07-149-80), the witness explained that he does not recall seeing the voucher or similar documents earlier.

When asked whether the witness and Kevin Kenning kept records of receiving the payments to which they were entitled, the witness explained that he did not keep accounts. He figured others did. He assumed Guenther Klar was watching it.

Asked whether neither the witness nor Kevin Kenning reviewed the Custody Statements for the pension plans, the witness explained that he does not know what Kevin Kenning did. The witness did not. He and Kevin Kenning did not really discuss the ongoing investments they made in pension plans.

When asked whether Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust received dividends on the shares they purchased, the witness explained that he believes the retirement plans did. He assumed that the dividends came from the companies in which they owned shares. That's how dividend distribution takes place [from the limited liability companies].

Confronted with the fact that Blue Ocean Equity Retirement Plan & Trust and  COLE Enterprises USA Retirement Plan & Trust recovered dividend tax in Denmark for a total of approximately DKK 76 million and when asked how the searches took place, the witness explained that he has no idea. Salgado Capital was in charge of the recoveries. He believes that a reclaim agent was used. Asked if Goal Taxback was the reclaim agent, he explained that was the case.

When asked if there was an agreement with Guenther Klar that he was in charge of the recoveries through Goal Taxback, the witness explained that that was the deal. The witness was not contacted every time a dividend tax refund was requested, but he knew that the refund was sought on an ongoing basis.

Asked if trading patterns changed during the cooperation and if the witness was informed about this, Todd Bergeron explained that he has no idea if this is the case.

Confronted with the information that Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust made "day trades" according to the documents and asked if the witness remembers such trades, he explained that he does not remember anything about it.

The witness was shown Equity Transactions for Blue Ocean Equity Retirement Plan & Trust as of 31 December 2013, showing the purchase and sale of 12 Belgian share positions on 24 December 2013 for a total of approximately USD 1.69 billion or approximately DKK 9.2 billion and a total loss of just over USD 18.4 million (Extract 3, page 563, Exhibit 76-36-00-1926), and was asked if the witness remembers these trades. To this he explained that he does not. He has no idea if the deals were made by the retirement plans.

When asked again whether he was aware of the loss of just over USD 18.4 million, the witness explained that he does not remember the deals, but the document ("the paperwork") he has seen in connection with his statement ("deposition") to SKAT. Before he testified to SKAT, he had no recollection of the transactions.

Relying on Guenther Klar's testimony that there had been telephone contact with both the witness and Kevin Kenning a few days before the trades on December 24, 2013, the witness explained that he does not recall such a telephone conversation. Claiming that according to Guenther Klar's testimony, the initiative for the deal came from the witness and Kevin Kenning, the witness explained that, he recalls, it should not have happened.

Shown Equity Transactions for COLE Enterprises USA Retirement Plan & Trust on December 31, 2013, on the purchase and sale of two Danish equity positions on December 27, 2013, and the Cash Statement of the same date showing "Starting Cash Balance" of USD 13,911,757.06 and "Equity trades profit or loss" of USD -13,847,804.80 (Extract 3, pages 775 and 776, Exhibits 76-38-00- 2156 and 2157), explained to the witness that his answer is the same as regarding the transactions relating to the Blue Ocean Equity Retirement Plan & Trusts on December 24, 2023.

Asked what he was doing when he realised the losses suffered by the pension plans in December 2013, the witness explained that he does not recall doing anything.

When asked about his own income from Salgado Capital's investments before the pension plans, the witness explained that his own stake amounted to approximately USD 2 million.

When asked when money from Salgado Capital was paid out, the witness explained that it happened from time to time. It was Guenther Klar who contacted them and told them that there was a possibility of receiving profits. He does not remember whether it was agreed in advance that this would be the case.

Shown the cash statement dated November 30, 2013 of Blue Ocean Equity Retirement Plan & Trust, with "Ending Cash Balance" $18,471,095.65, and asked if the witness was aware of this receivable, he explained that he does not remember.

When asked whether he could have claimed payment of such a receivable if Custody Statements were sent to him on an ongoing basis, the witness explained that he probably could ("sure").

When asked why neither the witness nor Kevin Kenning claimed payment of the receivables, the witness explained that he did not look at the statements.

When asked where Salgado Capital paid out amounts to the witness, he explained that Salgado Capital paid out to one of the other brokerage accounts they had in Fidelity or Stifel Nicolaus.

When asked if the witness requested Salgado Capital and Guenther Klar to pay out to others - for example, Blue Star 8 inc. - the witness explained that it is possible. He was the sole owner of the company. He was probably the one who asked for the transfer.

When asked about payment to the Wings Program, the witness explained that he was a board member and director of that charity program. He believes Guenther Klar offered to make a donation to the program.

When asked about a transfer of GBP 119,260 on 11 August 2014 to DLA Piper, LLP (Extract 3, page 928, Exhibit 17-01-00-4), the witness explained that he has requested Guenther Klar to make that transfer.

When asked about a $14,960 transfer to Kevin T & Margaret M McNicholas, Medical Insurance, made on November 10, 2015 — and thus after the witness had left the retirement plans — the witness explained that he knows nothing about that transfer.

When asked whether the witness or the pension plans ever paid a referral fee to Barry O'Sullivan, the witness explained that, to his knowledge, this was not the case. He does not know if anyone else has paid fees to Barry O'Sullivan.

Shown the Cash Statement dated 31 May 2013 of the Blue Ocean Equity Retirement Plan & Trust (Extract 3, page 536, Exhibit 76-36-00-1899) and the entry of "Trading Advisory Fees" -$1,845,180.03, and asked what the transaction relates to, the witness explained that he does not know.

Confronted with  Guenther Klar's statement that trading advisory fees, after agreement with the witness and Kevin Kenning, were to go to Barry O'Sullivan's companies from both Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust and confronted with the fact that trading advisory fees have been posted several times, the witness explained that he does not recall, that should be the case.

Presented that the annexes in the case show that in December 2014 the witness resigned from Blue Ocean Equity LLC and Cole Enterprise USA, LLC and from the associated pension plans, the witness explained that it sounds true. The background was that he and Kevin Kenning went their separate ways as business partners. They divided the assets of the pension plans equally, and Kevin Kenning then took over both Blue Ocean Equity LLC, Cole Enterprise USA, LLC and the associated retirement plans. After December 2014, the witness had nothing more to do with Salgado Capital.

Questioned by the defence counsel, Todd Bergeron explained that it is correctly understood that it was his opinion that the pension plans received dividends and recovered withheld dividend tax and additionally received gains and losses respectively on stock trades.

When asked how this related to the witness's statement that they should receive one-third of the profit, the witness explained that it was one-third of the net profit ("they would net out"). He remembers no written agreement that it should be done like this.

The witness was again shown Stock Loan Confirmation, Trade Date 6 March 2013 (Extract 3, page 441, Exhibit 76-36-00-1985) and asked whether it was in this way – through equity lending – that Blue Ocean Equity Retirement Plan & Trust financed the share transactions, the witness explained that it is possible.

When questioned, the witness explained that he does not know what a "Market Claim" is.

When asked what you receive instead of dividends if you are not the legal owner of a stock on dividend date, the witness explained that he does not know.

When asked if the relationship with Guenther Klar alone was professional, the witness explained that it is true. He believes it was Guenther Klar who himself asked about the charities the witness was in. When asked if Guenther Klar himself asked if he could make donations to the charities in which the witness was sitting, the witness explained that he does not remember.

**Barry Michael O'Sullivan** explained that in 1991 he received a degree in economics and philosophy at Trinity College. In 1992 he joined ABN AMRO Bank in Dublin and obtained an advanced diploma in accounting and finance. When he started at ABN AMRO Bank, he was in a training program. He was immediately placed in a tax-oriented role. In the 1990s, the departments dealing with tax matters in financial institutions were not as large as they are now. He was hired in the early days. His task was initially to assist the more experienced forces, but over time it became a business development role. He was first with ABN AMRO Bank for 3 or 4 years, after which he switched to Royal Bank of Scotland. After about 5 years, he returned to ABN AMRO Bank, where he was employed for about 12 years until 2008.

In 2008, he started working for a Japanese hedge fund, where he was engaged in aircraft rental. In the last period before setting up Granard Investment in 2011, he was employed by a private equity fund, QED Equity, which sought to take advantage of the opportunities created by the banking crisis. He believes that it was in October 2011 that Granard Investment was established.

Granard Investment was a company that acted as an intermediary in investment contexts. He found investment opportunities for third parties in areas such as renewable energy and bridge funding. Today he is a director of a few companies. He is essentially an intermediary ("arranger") in connection with the sale of aircraft.

Before 2013, he had not dealt with stock dividend arbitrage.

He got to know Guenther Klar through ABN AMRO Bank. Guenther Klar worked in the same global department as the witness, but from the bank's London office. They worked in different parts of the department dealing with structured deals in tax matters. The witness spent part of his working time in London and travelled extensively. He and Guenther Klar didn't have much professional contact, but they talked when the witness was in London and went out to dinner together a couple of times. This was in the period from about 2005 to 2008. Guenther Klar left ABN AMRO Bank before the witness. I think that was in 2007. He maintained contact with Guenther Klar, and they developed a friendship. They ate together when Guenther Klar was in Dublin.

In 2011, Guenther Klar came to Dublin on behalf of Solo Capital to talk to Bank of Ireland, among others, about prime brokerage. Dublin was the centre of many of the major banks involved in such deals during the period, including Scotia Bank, Invest Tech, Citibank, Deutsche Bank and Merrill Lynch. They were seen 3-4 times in Dublin, and the witness attended Guenther Klar's 40th birthday. When they made investments together in subsequent years, they were seen much more. They were friends. It's hard to define their relationship today, but it's not a friendship.

He knows Kevin Kenning, who was also part of ABN AMRO Bank's structuring team. It was the same global team that the witness and Guenther Klar were associated with, but Kevin Kenning was located in Chicago. Kevin Kenning was head of the group's US tax affairs. They were on fairly friendly terms. Kevin Kenning often came to Dublin to play golf. At events at the bank, they often sought each other. They kept in touch after their time at ABN AMRO Bank. They emailed together. When the witness joined QED Equity, they were often in contact because Kevin Kenning was looking for investment opportunities. They still have a relationship, but because of the case, they are not really in touch.

He also knows Todd Bergeron, but not as well as Guenther Klar or Kevin

Kenning. Todd Bergeron was head of Lotus Capital and the witness met him through Kevin Kenning. He has no contact with Todd Bergeron anymore.

When questioned, the witness explained that Guenther Klar and he were in contact in 2010 to discuss whether QED Equity was interested in investing via Solo Capital. Guenther Klar came to Dublin quite frequently. The witness was on behalf of QED Equity in London almost every week to find out what was going on in the market and to uncover new opportunities. There were many rumors in the market that Solo Capital had had very successful trades in Germany. When they met, the witness asked about these trades. They had some conversations about it and as it was presented, the transaction only had documentation risk.

It is quite plausible in structured finance world that hedges can be applied so that the underlying risks – provided the documentation is in place – are highly quantifiable. He was very impressed. So impressed, in fact, that he went to QED Equity and suggested they invest £25m through Solo Capital's trading platform. Solo Capital's business model was equity dividend arbitrage.

Guenther Klar and Sanjay's – he does not remember the name of the third person –background was in stock dividend arbitrage. All large banks, including Danske Bank, had been doing dividend arbitrage for 30 years. Following the financial crisis, there were changes in prudential rules, whereby some of the banks' traditional activities were no longer viable from a regulatory cost point of view. This meant that the traditional dividend arbitrage in banks was no longer effective. What happened in the market was that hedge funds began to play the role of banks. "Big players" began to appear in the market, including the head of the legal department at KPMG and the head of the tax department at law firm Clifford Chance, who resigned from their positions and joined new companies like Solo Capital. As he perceived it, Solo Capital was at the forefront of development. Although one might question Solo Capital's activities in Germany, Germany continued to pay and, as far as he knows, there was never any question of criminal proceedings against Solo Capital in Germany.

He thought it was a credible opportunity. He had spoken to tax advisors in Dublin and securities dealers in London. The feedback he received was that Solo Capital was where to go.

The investment committee of QED Equity rejected his recommendation because members considered there was a "reputational risk". After the financial crisis, most banks had been bailed out by their governments and the reputational risk was judged too great. The principal investor was an Irish billionaire and financier who was more concerned about his own tax risks. It was normal for a reputation

risk assessment to be carried out in investment contexts. Throughout his career, he has had to submit trade structures before they were launched. In ABN AMRO Bank there was an "ethics committee" where it was assessed what it would mean if a structured trade became public. Solo Capital's trading structure appeared to be workable.

He left QED Equity in 2012, but he remained a director and advisor in a number of companies. He had decided to pursue opportunities in stock dividend arbitrage. It was a growing sector within the market. He had conversations with Guenther Klar, and the witness knew that Guenther Klar was looking for a director of an Irish company. The witness suggested that he set up an Irish pension plan to take advantage of the tax advantages provided for in the tax treaties between Ireland and Belgium and, probably, Austria as well. It was the Granard Life &; Pension Insurance Scheme that was affiliated ("subsidiary to") with Granard Investment. I think he created it in early 2012.

As far as he understood from his conversations with Guenther Klar, there was no existing structure that included Dublin. The witness saw this as an obvious possibility. He visited Guenther Klar and talked about putting in place a structure specifically aimed at exploiting the Irish tax treaty network. Guenther Klar explained the structural aspects and the witness had spoken to tax advisers in Dublin. The witness was aware that others were making similar transactions, and he indicated to Guenther Klar that he would like to "join". During the meeting, Guenther told Klar that he had left Solo Capital. He was surprised, but Guenther Klar explained that it was because Solo Capital had grown big and was very heavily regulated. Guenther Klar didn't want to be a part of it anymore. I think there was also a disagreement between him and the management of Solo Capital about the distribution of profits. It was very vague, but Guenther Klar said that as part of his severance plan, he would continue to have access to Solo Capital's trading platform ("platform") to some extent. The witness understood this to mean that Guenther Klar still had access to brokerage and custodian banking and access to shares and derivatives. He remembers that part of the conversation quite clearly.

He does not recall whether Guenther Klar said where he was employed. Guenther Klar had probably started Salgado Capital, which was supposed to be his version of Solo Capital. He thinks he heard about Salgado Capital in 2011. Salgado Capital was to be a client brokerage firm. The business was to come from Guenther Klar and completely controlled by him. He does not know how the company was structured, but he assumes that Guenther Klar was the beneficial owner. He was aware that the company was established in a regulatory "light environment". It was quite normal, since everyone in the industry engaged in this type of trade set up their companies in non-traditional jurisdictions.

They had very specific conversations about investments via Salgado Capital where they explored the possibilities of obtaining value in dividend tax refunds in Belgium through an Irish company. Under the Double Taxation Agreement between Belgium and Ireland, the Irish tax authorities had to approve applications for refunds. The witness was aware that the structure would be carefully examined beforehand by the Irish tax authorities, but once it was approved the Irish tax authorities would inform the Belgian tax authorities that they would have to pay the recoveries.

At a later date, which he does not remember exactly, Guenther Klar mentioned that the preferred double taxation treaty over seeking dividend tax refunds was the American one. Guenther Klar knew from experience that U.S. retirement plans took advantage of double taxation treaties in Europe. As part of the additional activities of Granard Investment, the witness suggested that he might make contact with some American retirement plans. He called Kevin Kenning, a tax attorney who had previously been in Ernst & Young's tax department, and whose professionalism the witness had great respect for. He explained to Kevin Kenning that he was in contact with Guenther Klar and asked what Kevin Kenning thought about U.S. retirement plans being involved in dividend arbitrage. Kevin Kenning had heard of Solo Capital.

To his surprise, Kevin Kenning was already engaged in stock dividend arbitrage with Fred Gander via Ballance Capital Market Ltd. He thought it was absolutely amazing since two very credible individuals were already engaged in dividend tax arbitrage through U.S. retirement plans and weren't worried. Kevin Kenning said it was possible he had an interest in collaborating with Salgado Capital. The witness therefore arranged a meeting in Dublin between Kevin Kenning, Todd Bergeron and Guenther Klar. The meeting was held at St. Stephen's Green Club in a meeting room reserved by the witness and attended by himself.

Kevin Kenning and Guenther Klar knew about each other from ABN AMRO Bank, but he does not believe they talked or were friends. Guenther Klar kept a low profile in ABN AMRO Bank.

Before the witness had contact with Kevin Kenning, Guenther Klar had explained that Salgado Capital had access to facilitate transactions between different European jurisdictions and the United States. When asked, he confirmed that Guenther Klar's description of the trade structure before the meeting was rather general.

At the meeting in Dublin, Guenther Klar went into much more detail and showed on a whiteboard how the structure would work. In essence, the trading structure implied that the U.S. pension plans would have to borrow shares and seek tax refunds on the stock dividends attached to the shares. The players in the trading structure were the

US pension plans, Salgado Capital as a broker and custodian, and the stock lender, whoever it was in the market. He will think that it was mentioned at the meeting who was going to be the sharelender. Todd Bergeron had a good understanding of the market. It was the witness' assumption that the sharelender was Solo Capital or one of their affiliated entities ("client brokerage"). As he remembers it, the conversation was quite detailed. The focus of the witness and Kevin Kenning was on tax risks and not the underlying trade. When asked about the tax risk, the witness explained that they were concerned with the criteria that had to be met in order to be eligible to apply for a refund. Kevin Kenning had already been through probably one dividend season, and he was well versed in how the retirement plan should be established. Kevin Kenning was also familiar with the practical aspects of Ballance Capital Market Ltd. as a result of his experience at Ballance Capital Market Ltd.


They were aware that leading tax advisors in the market had given the "green light" to this type of transaction. It wasn't a particularly complicated transaction structure, though he realizes it sounds strange.

Presented with the fact that it has emerged during the proceedings that the trading structure was different from what the witness had described, he explained that it was his understanding that the underlying trading structure was based on share loans in 2013. They held another meeting in 2014, where Guenther Klar stated that the price of obtaining equity loans had increased due to an increased number of players in the market. Therefore, the structure had to be changed so that there were actual share sales. It wasn't crucial to his role, but it was his understanding that it changed in 2014. He was essentially "the organizer" ("the arranger"). He introduced Guenther Klar and Kevin Kenning and acted as an intermediary and advisor during the course of the transactions. It has obviously been a bumpy journey. It has been his competence and role in business contexts to start things up and to establish relationships. He has never been a particularly technically focused person.

Granard Life &; Pension Insurance Scheme was also to act through Salgado Capital. He's pretty sure he established the Granard Life & Pension Insurance Scheme during the 2012 dividend season. Granard Life &; Pension Insurance Scheme sought reimbursement in Belgium and Austria and, as part of the regular process, was contacted by Irish tax authorities who asked a number of questions. He was given the necessary information by Guenther Klar, and the witness met with the Irish tax authorities, who were completely confused. It took a whole afternoon, and he himself became more and more confused.

When asked about the 2012 meeting in Dublin again, the witness explained that Kevin Kenning and Todd Bergeron were not told that the Granard Life & Pension Insurance Scheme would also attend. It did not concern them. The meeting did not disclose what had previously been activity at Salgado Capital. It was his opinion that Salgado Capital was a start-up company.

As he understood it, the whole purpose of the trading structure was solely to make stock dividend arbitrage. He did not participate in all the conversations, but it was his understanding. There was no capital loss risk associated with the investments, at least not for the pension plans. Nor does he believe that anyone else had a capital loss risk in the first version of the equity loan structure. In the version with share buying and selling, of course, there have been large fluctuations, but as he understood it, these fluctuations would be net settled at the custodian. When he says large fluctuations, it is also influenced by what he has subsequently gained knowledge about. When asked what it means that it was net settled, the witness explained that Salgado Capital as a broker was in the middle and that Salgado Capital had someone who wanted to go "long" on the one hand and someone who wanted to go short on the other. Their balances were net settled and therefore there was no cash requirement. It was the ordinary vanilla structure that banks had used for 25-30 years. These were referred to as uncollateralized undertakings. He wasn't that interested in the details at the time. He was just happy to get a percentage of the profits ("the benefit").

In the stock sale structure, someone will have gained and someone lost on market fluctuations. When asked who bore the risk of market fluctuations, the witness explained that in structured trading you want a winner and loser, but as a whole it is equal. That's how he looked at it. He cannot imagine that there was a net loss for either party. If there had been, it would have been significant and none of those involved had the capital to cover such a loss.

Granard Life &; Pension Insurance Scheme did not have to make a deposit and he did not provide any securities other than the company's own capital. He also doesn't think the U.S. retirement plans made a deposit or provided collateral, but he can't say for sure.

When asked whether the witness stated in his statement to the police that Guenther Klar was given a derivative which contained a contractual right to receive and sell shares, the witness explained that he does not believe that he expressed himself as such. He believes that he said that he believed that Guenther Klar believed that it was a derivative where, because he had a "long" and a "short", he had a Market Claim. It is important for him to stress that the regulatory authorities in London, Frankfurt and New York had been looking at similar transactions for 30 years. When the authorities were satisfied ("seemed happy"), he found no reason to look at it so closely.

The profit on the trading structure was the dividend tax recoverable.

He does not know if there was a written agreement between the US pension plans and Salgado Capital on the distribution of profits. He himself had his only conversation

about it at the meeting in Dublin in 2012. They didn't have actual conversations about it after that. He relied entirely on the American pension plans and Guenther Klar's honesty because he could say that the expenses were X or Y. The witness asked at the meeting for one-third of the profit, which consisted of the dividend tax recoveries. In practice, he got about 20 percent, but he was more than satisfied with what he got out of the transactions. There was an element of trust on his part because of his history with the others. His understanding was that, under the rules of U.S. retirement plans, retirement plans could not pay out their profits below the bottom line, but had to do so above the bottom line ("above" or "below the line"). So, in essence, his share of the profits would be paid to him before it was included in the American retirement plans.

Confronted with Guenther Klar's statement that it was mentioned at the meeting that the witness or one of the witness's companies should be the short seller in all the deals, he explained that this is a ridiculous claim. He would not have the profits, balance sheet or assets to source those shares. If Guenther Klar had said from the outset that it would be a circular transaction, then under no circumstances would the witness have promoted it ("promoted"), and Kevin Kenning certainly would not have participated in the transactions either. It could never have tolerated closer examination. The witness has been involved in structured transactions for 20 years and he would have foreseen that he would never be able to explain how he or a company he controlled could source e.g. 3 million Belgian shares.

Confronted with Guenther Klar's testimony stating that one of the witness's companies was to "inherit" Salgado Capital's position and results as a short seller, the witness explained that this is completely new information to him.

Granard Life & Pension Insurance Scheme made transactions through Salgado Capital in 2012. Granard Life & Pension Insurance Scheme did not trade with Salgado Capital after 2012 and never heard from Salgado Capital again.

Impugned Client Brokerage Agreement dated 22 April 2013 between Salgado Capital and Granard Life &; Pension Insurance Scheme (Additional Extract 1, page 97, Exhibit 41-07-471), the witness explained that he understood it to mean that they only recovered in the first season and he assumed that it was in 2012. It may well have been in 2013. The Granard Life & Pension Insurance Scheme was dissolved by the Irish authorities at the end of 2013 and the dissolution of the pension plan only occurred after there had been transactions and applications for dividend tax refunds. The dissolution was completed after a cumbersome and difficult review by the Irish tax authorities.

In practice, it was Goal Taxback that applied for a dividend tax refund, but it was Salgado Capital that executed the transaction ("the derivative"). Salgado Capital went to Goal Taxback and gave them ISIN numbers and other information about the deal.

Shown email thread dated April 26, 2013 (Additional Extract 1, pages 111-113, Exhibits 41-07-485 to 487), the witness explained that he received trade confirmations that followed a market standard. It was he who wrote to Guenther Klar, but the witness had been informed by Guenther Klar up to the dividend season which shares would receive dividends and when it would happen. Against this background, he contacted Salgado Capital about purchasing shares on behalf of Granard Life & Pension Insurance Scheme. He would have no real knowledge of the shares or pricing, but he did know that the Granard Life & Pension Insurance Scheme would have to own and lend the shares over the dividend date in order to qualify for a dividend tax refund.

He did not receive any other documents from Salgado Capital other than the trade confirmations. When asked, he explained that he is pretty sure he has not received any Custody Statements from the custodian. It's been 10 years, so he's not 100 percent sure.

The Belgian authorities contacted the Irish authorities to confirm that the Granard Life & Pension Insurance Scheme was a pension company meeting the requirements of the Double Taxation Convention. He was summoned to a meeting of the Irish tax authorities who explained that they had been contacted by Belgium regarding applications for dividends and tax refunds and that they would discuss it. In Ireland, all pension plans are required to have two trustees and one to be independent. He went in there with the independent trustee and the witness was asked to review the deals. The Irish tax authorities were interested in explaining how a pension plan with £0.25 million in capital could make such large share deals. He spent hours explaining the structure. He provided all the information about the deals, including the trade confirmations, to the Irish tax authorities.

He was asked to contact Salgado Capital and Goal Taxback. All dividend tax refunds were to be "frozen" until further investigation. He contacted Guenther Klar and probably also Goal Taxback. He received confirmation that recoveries were "frozen" either by Guenther Klar or one of his colleagues. He believes he received written confirmation that Goal Taxback had been instructed not to proceed with the dividend tax applications.

A further meeting with the Irish tax authorities was held, attended by a larger group of people. They reviewed the structure and he gave them copies of the documents he had, including contract documents, trade confirmations and settlements. At that meeting, the independent trustee said he didn't understand what was going on. The tax authority expressed that it was required when he had to certify that he had authorized the deals. When the independent "trustee" could not attest to it, the tax authority wrote that stock dividend arbitrage was not an

option for the Granard Life & Pension Insurance Scheme. He was informed that the Irish tax authorities had written to Belgium and, I believe, Goal Taxback requesting that all dividend tax refund applications should be withdrawn. He doesn't remember if Salgado Capital had also been written. He thought it had been all right and, until recently, he was not aware that dividend tax refunds had actually been paid from Belgium on the basis of applications from the Granard Life &; Pension Insurance Scheme.

He was contacted in 2016 by a Belgian authority who raised a claim, but when he pointed out that they had been instructed not to process the recoveries and to revoke them, he heard nothing more until 2018. At that time, the authority wrote again, but now for a higher amount of EUR 1.6 or 1.8 million. He called and asked for copies of transfers of dividend tax refunds. He heard nothing until, in the week leading up to Christmas in 2020, he was informed that the bailiff would seize his home and contents on the basis of court decisions made in Belgium. He again contacted the authority in Belgium and told again about the agreement with Salgado Capital and Goal Taxback. He did not receive a single document, which is why he phoned the Irish authority and said that he had not received any money from Belgium. After the Irish authority had

In contact with the Belgian, they decided not to enforce the court decision, as they had not received the documentation either. The Belgian tax authorities were later able to obtain evidence of transfers to Goal Taxback based on refund requests initiated by Salgado Capital on behalf of the Granard Life &; Pension Insurance Scheme. He therefore had to compensate for the loss.


After the first dividend season, he stopped trading through Salgado Capital. He can say this categorically because the Granard Life & Pension Insurance Scheme – not Granard Investment – was dissolved.

Presented a letter from Granard Life & Pension Insurance Scheme to International Financial Data Service dated July 2015 (Additional Extract 1, page 141, Exhibit 41-07-00-515), the witness explained that he does not understand why Granard Life &; Pension Insurance Scheme should have written a letter in July 2015 regarding a shareholding. It's his signature, and Granard Life & Pension Insurance Scheme had shares in that company, but he can see that the date doesn't fit. He is certain that the Granard Life & Pension Insurance Scheme had been dissolved. He has the letter of dissolution resolution in his possession.

When questioned by Heber Securities Trading Limited, the witness explained that he had the company set up in Malta because he was aware that he was the only one paying tax on the profits. In 2014, he met with Kevin Kenning and Guenther Klar. He's not sure if Todd Bergeron was there as well. At the time, there were no market rumours that the underlying trading structure was being questioned. He

made an off-shore company that could receive the profit portion. He had obtained a tax opinion which determined that a company in Malta was the best place. Therefore, he founded Heber Securities Trading Limited, which was a rather unique name. However, the company was never put into service as he decided that the tax risk was too great if he did not move to Malta. Due to his family circumstances, this was not an option. In the end, therefore, Heber Securities Trading Limited was a dorment company that never had income or expenses. He has neither before nor after had another company with a similar name.


Shown transcript dated 11 December 2023 from the Offshore Leaks Database (Additional Extract 4, pages 1 and 7, Exhibit 11-03-00-17 and 20), he explained that he did not set up the company himself, but asked SFM Corporate Service S.A. to do so and to appoint a director.

Shown to The Virgin Island Official Gazette of 14 April 2016, Strike Off List (Additional Extract 4, pages 10 and 12, Exhibit 11-03-00-23 and 25), and asked how it is that a company with a very similar name was registered in the Virgin Islands, the witness explained that he has no knowledge of it. He has not been involved in founding or registering Heber Securities Trading Limited anywhere other than Malta.

When asked about cash flows, he explained that the deal was that he would receive his payments as advisory fees from the U.S. pension plans. An advisory agreement had been entered into, which I believe had been sent from Guenther Klar. Heber Securities Trading Limited had made agreements with Salgado Capital, but when he decided not to use Heber Securities Trading Limited, it was changed to the Granard Life &; Pension Insurance Scheme so that he could receive the payments in Ireland.

Guenther Klar took control of Granard Investment, so he no longer has access to bank account information. Today, he can only comment with certainty on two transfers. He received EUR 1.5 million, which was part of his profit share from the dividend tax recoveries. He thinks it was for recoveries in Belgium, Austria and Denmark, but since he has not had access to the underlying documents, he cannot say for sure. It was carried out as a sale of shares in Granard Investment because the witness could thereby obtain a lighter tax rate, 33 percent instead of 48 percent. In addition, he was transferred approximately £142,000 on 15 October 2013. Salgado Capital's bank, Caledonian, was based in the Cayman Islands. The bank got into trouble. He doesn't know if it went bankrupt, but its customers' accounts were frozen.


The witness has to access bank statements in order to explain himself about the various payments. He now has it in the back of his mind that Heber Securities Trading Limited should have "inherited" Salgado Capital's position and results. When asked about the

transfer on 8 September 2014 to CurrencyFair Ltd. of GBP 844,126.38 (Extract 3, page 959, Exhibit 17-02-00-6, Salgado Capital's GBP account with Caledonian Bank), the witness explained that he believes it was a loan he received of EUR 1 million. The loan had an interest rate of 6 or 7 percent and it was given secured by Granard Investment shares. Shown transcript from Salgado Capital's EUR account, transfer of EUR 1,000,000 on 14 January 2015 (extract 3, page 974, Exhibit 17-02-00-21), the witness explained that this must be the loan agreement he told about. He does not know what the GBP 844 126.38 covers. When questioned by the defence counsel, he explained that he used the company CurrencyFair Ltd., which was a company that exchanged currency at low cost. He does not know if it was he who received the amount.

When asked about the transfer on 12 May 2015 to Barry O'Sullivan in the amount of GBP 427,888.21 (Extract 3, page 1422, Exhibit 17-04-00-2, Salgado Capital's GBP account with Global Fidelity Bank), the witness explained that he does not know specifically what the transfer covers. Payments to him were made by Salgado Capital and Guenther Klar, which did not relate to payments of the profit share from the recoveries. He has been paid DKK 2 million, which related to a short term financing ("bridge funding") over 3-4 months, on which he paid 12.5 percent interest. In addition, he received an investment of DKK 2.5 million in a renewable energy company. He and Guenther Klar were involved in several investments together.

When asked about the transfer on 13 November 2015 to Walter Odlum & Co, "Sharepurchase", of EUR 5,049,810 (Additional Extract 2, page 229, Exhibit 53- 47-00-241, Amalthea Enterprises Ltd. EUR account with Global Fidelity Bank), the witness explained that Walter Odlum & Co was a law firm acting on his behalf. It was the payment for the sale of 70 percent of the shares in Granard Investment. Guenther Klar was then the sole owner of the company.

When asked about the transfer on 4 June 2014 to Thomas R. Callan Ltd. of £12,500 (Extract 3, page 958, Exhibit 17-02-00-5, Salgado Capital's GBP account with Caledonian Bank), the witness explained that he does not recall hearing of that company. When asked, he explained that he remembers buying a watch while he was with Guenther Klar. They were together in Manchester when he bought the watch.

The witness knows about attorney Kevin Robinson because Kevin Robinson contacted him by phone in November 2022. Kevin Robinson told him that the witness was due to stand trial in Belgium "in 5 days". He was really shocked and he remembers the conversation very clearly. When asked why, Kevin Robinson said it was said that "Heber has done some terrible things". Kevin Robinson expressed that the witness had to go to Belgium and explain himself. The witness said, "what the fuck has Heber got to do with anything?". Kevin Robinson advised him to get a lawyer. He had been talking to the Belgian prosecutor since May and no one had said anything to him about a court hearing. He thought it was bizarre.

When questioned, the witness explained that he has not said anything to Kevin Robinson about Custody Statements. The witness said that he would help Guenther Klar if possible and that he still had documents. He was asked to collect them together. He was introduced to a Belgian lawyer, who immediately advised him not to do anything until he knew the contents of the charges against the witness. Kevin Robinson contacted him again. At the second interview with Kevin Robinson, he confirmed that their conversations were covered by client/attorney confidentiality.

Shown email correspondence for the period 10 to 11 November 2022 between barry@granardinvestments.com and Kevin Robinson (Additional Extract 2, pages 77-78, Exhibits 53-49-11-1 and 2), he explained that he is still using this email address. He doesn't remember exactly what they emailed about, but he remembers them writing back and forth because he couldn't understand why the Belgian court didn't have his contact details when he was in contact with the chief prosecutor. He thinks he read the email from Kevin Robinson, but he had completely forgotten about it.

The witness was charged with the same appendix (Additional Extract 2, page 78, bottom paragraph 3), which states:

*"Finally, please let me know as soon as you locate Heber trading documentation, that is very important because the Belgians say that Heber never existed, and they have made that claim a key part of the case against you and Guenther, so to disprove that is crucial for you both."*

In this connection, the witness explained that he meant documents of incorporation of Heber Securities Trading Limited and the Trading Advisory Agreement and documents of the Granard Life &; Pension Insurance Scheme. Why would he destroy documentation of trading activities if it was so important to his defense.

The witness noted that he had found the copy of the document in which the Granard Life & Pension Insurance Scheme was dissolved. The pension plan was dissolved in 2015.

When questioned by the defence counsel, the witness explained that he would not call Guenther Klar's mention of the possibility of QED Equity's investment on Solo Capital's trading platform a "pitch". They had a conversation about Solo Capital's platform having the ability to bring in third-party capital. He made a detailed presentation of how he perceived the trading structure for QED Equity's investment committee. He is still in possession of the paper. When asked, he explained that he would like to hand over a copy of it. There is nothing secret in it.

When asked again about the meeting in Dublin in 2012 and his earlier statement about the distribution of profits, the witness explained that he asked for a third. It was his

understanding of the meeting that he would get the same share of the profits as Kevin Kenning and Todd Bergeron. However, he has found that he only got about 20 percent of the profit.

The witness was reprimanded for his testimony in the interrogation report dated 19 September 2023 (Additional Extract 2, page 18, paragraph 4, Exhibit 37-04-00-59), which states, inter alia:

*"The interrogator explained that in parallel with the above, he agreed to a profit-sharing arrangement with Kevin Kenning and Todd, whereby 50% of the profits generated by the US pension funds based on the trading strategy went to the interrogator. The interrogator explained that due to US law, profit-sharing had to be done in Salgado before payment to the pension funds."*

To this, the witness explained that he has said this to the police. He does not know why it is written "concurrently". He does not remember whether it was agreed at the Dublin meeting, but he expected to have 30 percent of the whole "cake", which was equivalent to 50 percent of what was due under the American pension plans. In preparation for his testimony, he has read statements for the Belgian case, and it is his opinion that it ended up with 20 percent. It was a deal that was made by everyone in the room. However, the reality is that the broker – Guenther Klar – was the only one who had an overview of the numbers. The witness no longer has access to bank accounts in Granard Investment as the company is owned and controlled by Guenther Klar.

Asked what evidence the witness had gone through before his questioning today, he explained that he had only read Guenther Klar's statement in the Belgian criminal case because Guenther Klar made charges against the witness. Alleged that the witness has just said "statements" [plural], the witness explained that it was a slip of the tongue. He's getting tired.

When questioned, the witness explained that he spoke to various players including PWC and KPMG in Dublin to make sure the trading structure was legal, but he relied on Kevin Kenning's experience. There was a tax assessment ("tax opinion") and he will think he has read it, but does not remember the specific content.

He has not moved the seat of Heber Securities Trading Limited to the Virgin Islands. He has no explanation as to why a company with the same name should have been registered in the Virgin Islands. He would like to see when it is registered, including whether it is before or after he got the company name registered in Malta.

Heber Securities Trading Limited became an onboarded client of Salgado Capital. The idea was that his share of the profits would be paid as advisory fees to a bank

account belonging to Heber Securities Trading Limited. The basis for such transfers was supposed to be a commercial agreement with Salgado Capital, and therefore he "onboarded" Heber Securities Trading Limited. How else was he supposed to explain why Heber Securities Trading Limited received payments from Salgado Capital. Nor does he believe that Salgado Capital would be able to transfer amounts to a company that was not a customer. Guenther Klar was very aware of that. Heber Securities Trading Limited never got a bank account.

There was no written agreement on the distribution of profits. When asked how this relates to the explanation that there were commercial agreements as a basis for payments, the witness explained that he had no insight into the total profits. No written agreement was made on profit-sharing.

In his communication with Kevin Robinson, he has not said anything about Heber Securities Trading Limited trading with Salgado Capital. Kevin Robinson knew his contact information and did not inform about the ongoing trial until the week before it was to be held. Kevin Robinson obviously does not have the interests of the witness in mind. When questioned, the witness indicated that he does not want to release attorney Kevin Robinson from the confidentiality promised to the witness during the interview.

The witness was again confronted with the fact that Kevin Robinson in his email of November 11, 2022, states "trading documentation" (Additional Extract 2, page 78, 3rd bottom paragraph, Exhibit 53-49-11-2) and asked why he believes attorney Kevin Robinson is asking that the witness send trading documentation to Heber Securities Trading Limited.

To this the witness explained that he did not at the time realize the meaning of the word ["trading documentation"] in that sentence. He was asked about a number of matters. He was shocked by the call from Kevin Robinson, which he received at 4-5 p.m. on a Friday. Kevin Robinson said prosecutors said Heber Securities Trading Limited had never existed. Kevin Robinson did not explain in detail what terrible things were said about Heber Securities Trading Limited, but he needed a lawyer as soon as possible.

When asked about the transfer on 8 October 2013 of £1,267,194.70 to Barry O'Sullivan (Extract 3, page 964, Exhibit 17-02-00-11, Salgado Capital's GBP account with Caledonian Bank), the witness explained that he does not remember for sure. He thinks it was payment for the first sale of shares in Granard Investment. He is in possession of the Share Sale Agreement.

When asked about transfers on 15 October 2013 of GBP 142,062.41 and on 10 January 2014 of GBP 86,683.84 to Granard Investments (Europe) no. 1 (Extract 3, page 964, Exhibit 17-02-00-11, Salgado Capital's GBP account with Caledonian

Bank), the witness explained that he is not sure and does not want to answer incorrectly. He does not remember the last amount at all.

When asked again about Salgado Capital's EUR account, transfer of EUR 1,000,000 on 14 January 2015 (extract 3, page 974, Exhibit 17-02-00-21), the witness explained that – as he said earlier – it was probably the payment of a loan. It was for an investment, and the loan was given secured by the shares of Granard Investment. There was a loan document according to which the loan was to be repaid, but it was not intended that the amount should be repaid. This has nothing directly to do with Granard Investment or Heber Securities Trading Limited, but he cannot deny that it has to do with the distribution of profits from Salgado Capital.

When re-questioned about the transfer on 12 May 2015 to Barry O'Sullivan in the amount of GBP 427,888.21 (Extract 3, page 1422, Exhibit 17-04-00-2, Salgado Capital's GBP account with Global Fidelity Bank), the witness explained that he does not remember what it was about. If there is no reference to Granard Investment, he will think that the transfer has nothing to do with Granard Investment, but as I said, he does not remember it.

The witness was shown transfer on 16 June 2015 of GBP 1,198,241.62 to Amalthea Enterprises from Salgado Capital's GBP account with Global Fidelity Bank (Extract 3, page 1422, Exhibit 17-04-00-2) and transfer on 17 June 2015 of GBP 1,198,191.62 to Barry O'Sullivan from Amalthea Enterprises GBP account with Global Fidelity Bank (Additional Extract 2, page 236, Exhibit 53-49-01-2).

To this the witness explained that he does not remember what that transfer covers.

When re-questioned about the transfer on 13 November 2015 to Walter Odlum & Co, "Sharepurchase", of 5,049,810 euros (Additional Extract 2, page 229, Exhibits 53-47- 00-241, Amalthea Enterprises Ltd. EUR account with Global Fidelity Bank), the witness explained that it was the payment for the sale of the remaining shares in Granard Investment. This was in fact the amount due to him as advisory fees from the US pension plans and thus for his share of the profits from Salgado Capital. For the sake of his Irish tax, he made it as profit on the sale of the shares. In its financial statements, Granard Investment had a receivable from Salgado Capital as an asset. By selling the shares, he was in effect paid the receivable. With the purchase of the shares, Guenther Klar assumed the right to the receivable from Salgado Capital. Granard Investment's assets consisted both of the receivable from Salgado Capital and of other investments, including real estate. He does not remember how they ended up with a sum as round as EUR 5,050 000. The EUR 50 000 was intended to cover the cost of the sale. As far as he knows, Granard Investment does not currently have active operations ("dorment company"). When asked, he explained that he does not know who is the registered director. He hasn't checked it. It may be the witness himself, as he himself was a registered director when he sold the shares.

He does not have the power to appoint another director. The profit from Salgado Capital came from dividend tax refunds from for different jurisdictions. He has not repaid the amounts he received from Salgado Capital. It is not his company and he has not been asked to repay the amounts. He does not know for what period the profit paid on November 13, 2015 was made. He will believe that it was information that the broker had. Either Guenther Klar or Kevin Kenning have said that the witness' share of the profits was "X" and asked if he wanted the share paid out.


He and Guenther have worked with investments in, among others, Power Capital and talked almost every day until 2020.

**Kevin Robinson** explained that he is a lawyer, but that he has not practiced since August 2023. There is no risk that he will break any confidentiality by giving evidence today. It is not true that Barry O'Sullivan has a right to client confidentiality. The only circumstance that could give rise to a claim to confidentiality would be if O'Sullivan had been the witness's client. If there had been a client relationship, there should have been a written agreement on the scope and scope of the work in accordance with the professional rules. Such an agreement does not exist and never existed.


When questioned by the defence counsel, the witness explained that he had conversations with Barry O'Sullivan in November 2022. The background to this was complex, as Guenther Klar had been questioned by Belgian police in February/March 2022. After four, five or six interrogations, it became clear that Belgian police did not believe that a company called "Heber" existed. The witness suggested that Guenther Klar's Belgian lawyer contact Barry O'Sullivan, but the Belgian lawyer did not want to do so for tactical reasons. The witness agreed, of course. The Belgian lawyers suggested that the investigating judge contact Barry O'Sullivan, but this was refused and the Court of Appeal upheld the refusal.

The only option, therefore, was for them to contact Barry O'Sullivan themselves to obtain evidence from him as a witness. Guenther Klar's Belgian lawyers asked the witness to conduct the contact because the witness already knew Barry O'Sullivan, whom he had met a few years earlier. The witness therefore called Barry O'Sullivan on November 10, 2022, and asked if he was willing to provide information, which Barry O'Sullivan confirmed.

Asked if they discussed whether the content of the telephone conversations could be disclosed, the witness explained that it was implied, saying that Barry O'Sullivan himself would be tried in Belgium the following week. Barry O'Sullivan didn't know this until the witness told him during their phone conversation on November 10, 2022. This was the same case in which Guenther Klar was indicted in Belgium. In connection with the second conversation with Barry O'Sullivan on November 11, 2022, the witness gave neither the impression nor the assurance that the conversation

would be confidential.

He has represented Guenther Klar since mid-2018, when SKAT initiated the civil case in London. The case developed into an extradition request to Belgium in 2019, and the Danish criminal case came later. There was also an ongoing investigation in Austria. The witness's representation has always concerned civil matters.

The witness knows that Salgado Capital was a brokerage firm and a licensed custodian. The company was established in Anjouan in Comoros. It was, as he recalls, founded on February 28, 2012 by a professional company, Anjouan Corporate Services (ACS). As he recalls, one share had been issued which was owned by a subsidiary of ACS. The directorial role was held by another ACS subsidiary. In June 2012, legal ownership of the share was transferred to a UK charitable foundation. The founder of this fund was, I think, the ACS subsidiary, Hillingdon Turner. The beneficiary was Lady Margaret Hall College, Oxford University, as the owner of the share. Under British law, the beneficiary often does not know that he has been inserted as a beneficiary. Nor is it a requirement that the beneficiary knows. This charitable foundation structure with separation of legal and beneficial ownership is used for commercial reasons. The Salgado Charitable Trust was incorporated in Mauritius. Salgado Capital's director was Andrew Moray Stuart. There was also an administrative staff who answered phones and emails. The company was dissolved in 2016. The witness knows from conversations with Guenther Klar that he was not aware that Salgado Capital was dissolved at the time it happened. They only became aware of the company dissolution when their client relationship was established. This appeared from the papers submitted by SKAT in the civil case.

About Granard Investment, the witness explained that the company was owned by Barry O'Sullivan. He must consult his notes if he is to respond at the time of formation. From the Belgian criminal case, he knows that the company was intended for Barry O'Sullivan's investments. Recently, in connection with questioning by the Danish police, the witness examined the Irish registers of companies. There it appears that Granard Investment continues to exist and that Barry O'Sullivan is the sole director.

The Granard Life & Pension Insurance Scheme was a retirement plan that Barry O'Sullivan created to be able to trade shares in different jurisdictions in the way known as dividend arbitrage. The pension plan sent several tax refund requests to Belgium. A total of 19 applications were sent for a total of around EUR 1.9 million. Only 12 or 13 applications were accepted for a total of around EUR 1.28 million. The refund payments were examined by the Irish tax authorities, who ruled that they were illegal because the way the pension plan had been established did not allow the use of double taxation treaties. The witness is aware of a May 2022 email from Barry O'Sullivan to the Belgian prosecution in which he states

that the Irish tax authorities investigated Granard Life & Pension Insurance Schemes deals and described the designs as technically correct. As the witness understands it, the retirement plan no longer exists.

Heber Securities Trading Limited was also owned by Barry O'Sullivan. It was an entity of which the Belgian authorities did not acknowledge the existence. This was a crucial part of their assumptions that no deals had ever taken place.

The witness knows from the instructions given to him by Guenther Klar that Heber Securities Trading Limited acted as a short seller on Salgado Capital's platform where five other clients of Salgado Capital bought shares. The witness understood that Heber Securities Trading Limited was a covered short seller within the meaning of the Shortselling Regulation 2012 and that Heber was subject to Article 12b when share loan agreements were entered into to enable the trades to be settled. As such, their short selling activities were thus legal and effective.

The witness had already met Barry O'Sullivan at a social event in November 2017, before these cases had arisen. That is why it was the witness who contacted Barry O'Sullivan on November 10, 2022.

The purpose of the contact was to clarify three things. First, the witness wanted to talk about a letter that Barry O'Sullivan had received about questioning by the Belgian police. The letter was probably from 2018. The letter was important because the Belgian prosecutor tried to get the court to prosecute Barry O'Sullivan in absentia, as the prosecution claimed not to know the whereabouts of Barry O'Sullivan. The witness wanted a copy of the letter, which he had seen in 2019, in order to prove that the Belgian prosecution acted against his better knowledge.

Secondly, the witness wanted Barry O'Sullivan to confirm that Heber Securities Trading Limited existed and that it had acted as a short seller with Salgado Capital.

Thirdly, the witness wanted to inform Barry O'Sullivan that he was due to stand trial in Belgium nine days later in criminal proceedings. The witness therefore recommended that Barry O'Sullivan obtain a Belgian lawyer and indicated that he would ask Guenther Klar's Belgian defence lawyers to propose suitable candidates. These three topics were addressed in a hotchpotch during the conversation with Barry O'Sullivan on November 10, 2022.

During the conversation, Barry O'Sullivan confirmed that Heber Security Trading Limited existed, that it had acted, that it had acted as a short seller. Barry O'Sullivan stated during the conversation that as proof of this, he had all the custody records. The witness asked for copies of these documents because they were crucial to both Guenther Klar's and Barry O'Sullivan's own case, where it

was important to disprove the prosecution's claim that Heber Security Trading Limited did not exist.

Barry O'Sullivan said he did not have the papers on hand. He had been divorced and his documents were kept in a place where he had to retrieve them from.

On the same night that the witness first spoke with Barry O'Sullivan, Barry O'Sullivan sent three emails. After reading these emails, the witness had some follow-up questions. Therefore, the next morning, November 11, 2022, he sent an email with the questions asking if Barry O'Sullivan had retrieved the custody records. He stressed that it was important. Barry O'Sullivan did not respond, but he also did not ask what the witness was referring to in his emails or indicate that he had misunderstood their conversation. Later that day, the witness called Barry O'Sullivan to review the questions he had formulated in the email. He asked again about the custody statements and whether he had managed to get hold of them. Barry O'Sullivan referred to busyness, but that he would try to procure them. The custody statements of Heber Securities Trading Limited ("the Heber custody records") have not been mentioned since. In other words, the witness stressed the necessity of getting the custody notes in writing in an email on November 11, 2022 and in the telephone conversation on the same day. Barry O'Sullivan on none of these occasions said anything about the fact that he did not know what the witness was talking about.

Shown mail of November 11, 2022 from the address
Kevin.Robinson@howardkennedy.com (Additional Extract 2, page 77, Annex 53-49-11-1) explained to the witness that it was his email address at the time. The address   barry@granardinvestment.com   was the address that Barry O'Sullivan had given on the phone the night before.

The witness explained that he wrote the email and it is the email he just explained about. Referring to the same email (Additional Extract 2, page 78, Exhibits 53-49-11-2), which states, inter alia: *"Finally, please let me know as soon as you locate Heber trading documentation",* he explained that he spoke to Barry O'Sullivan the same day. Because it was all incredibly urgent, on November 11, 2022, the witness called Barry O'Sullivan for a verbal answer. The trial in Belgium was to begin a few days later. Barry O'Sullivan had stated on 10 November 2022 that Heber Securities Trading Limited had traded in Salgado Capital and he did not state on 11 November 2022 that this had not happened.

Shown handwritten notes (Additional Extract 2, page 81, Exhibit 53-49-11-5), the witness explained that the appendix is a copy of a notebook in which he was in the habit of recording daily about his conversations with Guenther Klar and about what he did for Guenther Klar. He numbered the tasks with a circle around them. As can be seen at the bottom of page 82, (2) (Annex 53-49-11- 6) , immediately after the telephone conversation, he sent an email to "Antaxius", who were Guenther Klar's

Belgian lawyers. He stated in the email that he had spoken with Barry O'Sullivan.
Item (3) was a review of papers submitted to the UK authorities concerning the
extradition request from Denmark. The indication "10-11-22" at the top of page 81 is
the dating of the notes. He made notes in cue form during the telephone conversation
with Barry O'Sullivan. *"Heber have custody records"* should be understood as:
*"Heber? I [Barry] have custody records"* That's how Barry O'Sullivan explained and
as the witness noted. *"Have hard copies of trading records"* should be understood as:
"I *[Barry] have hard copies"*. This concerned paper versions of the commercial
documents at the heart of the Belgian case.


The witness explained that he was aware that American pension plans were
customers of Salgado Capital. He has not heard Barry O'Sullivan talk about
an agreement on the distribution of profits between himself and these
American pension plans. He has never discussed American retirement plans
with Barry O'Sullivan. There were only the three items on the agenda, as the
witness has already explained.

Asked if the witness is aware of money transfers from Salgado Capital to Barry
O'Sullivan, he explained that he knows that money has been transferred, but that
he has not been involved in the transfers. His knowledge of the transfers stems
from the Belgian criminal case, and not from Guenther Klar.

Questioned by the prosecutor, the witness explained that he got to know
Guenther Klar in 2016. They became friends and continue to be. It wasn't until
2018 that the witness became a lawyer for Guenther Klar. He had not previously
performed legal duties for Guenther Klar. He also didn't know about Salgado
Capital until 2018. The testimony given by the witness about Salgado Capital is
based on information from Guenther Klar and the evidence in the civil case with
TAX.

Referring to his statement that Salgado Capital had staff in Mauritius who
answered the phone and answered emails, the witness explained that he
himself has never spoken to these staff. His explanation is based on
information from Guenther Klar and on the evidence from the case with
SKAT, from the interrogations with the Belgian police and from the Danish
tax courts. He has seen that documents are signed and stamped in Mauritius.


When asked whether he was involved in the establishment of Granard
Investment and/or the Granard Life & Pension Insurance Scheme, the
witness explained that he has not. In that case, he would have acted on behalf
of Barry O'Sullivan, and he never did.

When asked whether the witness's knowledge of the Granard companies thus
stems from Guenther Klar, the Belgian criminal case and from the information he

obtained from Barry O'Sullivan in November 2022, he confirmed this. The witness also knows that in May 2022, Barry O'Sullivan sent a very long email to the Belgian prosecutor in which he described over four pages why he had done nothing wrong and how he had negotiated with the Irish authorities. The witness's knowledge thus comes from a number of sources other than Guenther Klar.

Asked what Barry O'Sullivan disclosed during the telephone conversations in November 2022 about the periods during which periods Heber Securities Trading Limited had acted as a short seller, the witness explained that time periods were not discussed. He received confirmation that Heber Securities Trading Limited existed and had acted as a short seller.

When asked whether Guenther Klar disclosed the time periods during which Heber Securities Trading Limited acted as a short seller, the witness explained that there was some discussion as to when Heber Securities Trading Limited was incorporated. Belgian police had questioned Guenther Klar quite closely ("tested") on that issue. He himself was present during the interrogations and he took notes. Belgian police believed that Heber Securities Trading Limited was formed only after the trades had begun. Guenther Klar's response was that he was unsure when Heber Securities Trading Limited commenced their activities because Salgado Capital itself acted as a short seller in the beginning. Guenther Klar insisted that from 2013 onwards, Barry O'Sullivan's entity was the short seller. The name of the device was uncertain. The witness also recalls questions about whether the Heber company incorporated in Malta was the only Heber company and that it was suggested that Barry O'Sullivan had founded a Heber company in the Caribbean.

When asked whether the witness was informed that Heber Securities Trading Limited "inherited" Salgado Capital's role and positions when it took over the role of short seller, the witness explained that it was never mentioned.

Shown pleading dated 1 April 2019 from the civil proceedings in England (Extract 4, page 746, Exhibit 70-02-00-1), the witness explained that he recognises the annex. It is formulated by Guenther Klar's lawyer with the right to appear ("barrister"). The witness has cooperated with this lawyer in the preparation of the document, but has not formulated the document.

The witness was confronted with the same appendix (extract 4, page 763, exhibit 70-02-00-18, paragraph 7), which states, inter alia: *"Nor, by contrast to the majority of the defendants who are individuals in these proceedings, did the HK Defendants own, control, or hold senior positions at any of the Custodians (in particular Salgado). Salgado was an arm's length professional service provider over which the HK Defendants had no control."* and asked if this was also the witness's perception of the situation. The defence counsel stated that this was covered by client confidentiality and that Guenther Klar did not wish to waive confidentiality on this point.

Asked if Guenther Klar has explained that he knew who was the trustee of the Salgado Charitable trust, the witness explained that in 2018 he was told ("was instructed") that Guenther Klar did not know who was the trustee. In 2023, Guenther Klar has said that through the Danish lawsuit he has found out who was the trustee. The witness does not remember who he was told was a trustee.

When the witness uses the word "instructions", it covers confidential information relevant to the case or advice requested or given in the case. It is a British technical term.

When asked whether Mr. Wolfgang Packeisen has contacted the witness on behalf of the American pension plans, the witness explained that he has been contacted by telephone by a person who called himself "Wulfi". He does not know if it is Wolfgang Packeisen. The witness believed that the person was mad ("food"). He did not find out what it was about. The conversation lasted an hour, and the witness was only introduced three words.

**Sven Jørgen Nielsen** explained that he joined SKAT in October 1970. He has a regular clerical education. He believes he started working with dividend tax sometime in the 1980s. Dividend tax refunds only later became part of his field of work. I think that was in the late 1980s. The witness was employed by SKAT until 2016 or 2017. For the last 10–15 years of his employment, he worked exclusively with dividend tax recovery. In 2012, only he was engaged in the recovery of dividend tax. Lisbeth Rømer was his boss until she retired. Colleague Laurits Cramer probably retired before Lisbeth Rømer. There were far too many reshuffles in the area, and new people were constantly arriving and others were leaving. He referred to Lisbeth Rømer until her retirement. He then referred to another for a period before Dorte Panderup became leader. The last period when the witness worked in SKAT, he did not really have anyone to refer to. He sat alone with all the recovery tasks until 2014 or 2015, when an adult student was hired. The witness had no other duties than the recovery of dividend tax. It was plentiful.

In 2012–2015, applications for reimbursement were submitted by post to SKAT. They came mainly from banks, private investors and reclaim agents. Laurits Cramer saw the post before the witness, and the recovery requests were withdrawn. The witness sorted the applications into trays according to how the applications should be processed. If a private investor submitted five applications, they were combined, because then the same bank information only had to be passed on once to the accounting department. All applications from the same reclaim agent were combined, because there they also had to be paid to the same bank.

The witness saw that the required information had been filled in on the form, that there was a certificate from the foreign tax authority about tax liability and that there was a voucher from the bank, a so-called credit advice, about what had been paid and what had been withheld and when it had been paid.

Shown "Petition for exemption from Danish dividend tax" (extract 1, page 52, exhibit 57-07-07-02), the witness explained that he recognizes the annex as the older version of the application form. Shown Claim to Relief from Danish Dividend Tax (extract 1, page 262, exhibit 54-07-266-212), he explained that it is the newer version of the application, where the applicant could fill in only one one-page form with reference to underlying bank vouchers, even though there were several share positions.

Shown Attestation of (Extract 1, page 56 and page 127, Exhibit 54-07-07-6 and Exhibit 54-07-149-77), the witness explained that the stamps are examples of attestations from foreign tax authorities. The US authorities had been allowed to enclose their own form, referred to as "6166". Shown Extract 1, page 225, Exhibit 54-07-234-175, he explained that it is an example of this.

The credit advice document had to show which company had distributed dividends, how much dividends had been distributed, which tax had been withheld and the date of the transaction. The witness took it as a condition for the refund of dividend tax that the applicant had received dividends from the distributing company and that tax had been deducted from the dividends. An investor could not apply for a dividend tax refund for the same stock more than once. The dividend note ("credit advice") was quite crucial for the handling of the case, because the annex documented that dividends had been paid and that tax had been deducted. He had no choice but to rely on the information contained in the dividend notes received. The information had to be available that way.

Once the witness had made sure that the required information was available, he entered the information into the registration system, 3S. It was recorded which company had made the distribution, on which recovery was made. It was also recorded which investor had recovered so that one could follow what was being recovered for. The same applicant could appear many times if it was different shares on which dividend tax was claimed.

"Bundle number" was SKAT's archive number. It was the witness who continuously assigned the bundle numbers. They were consecutive. The application for recovery was approved once the information had been entered into 3S. After this, a payment report was printed, which went on to the bookkeeping.

Shown FDU report (Extract 1, page 687, Exhibit 55-07-00-11), the witness explained that the exhibit shows such a report. The witness checked the payout list for typos and reconciled it with the applications before proceeding to payment at the accounting department. There was no countersigning. This had been done originally. The witness can only guess at the reason why the requirement for countersigning was abandoned. The list went on to the bookkeeping, and the witness does not know more precisely

what went on there. The accounts department had been given all the relevant information in order to be able to make the payments.

When asked whether the witness could verify whether an applicant had actually received dividends from the limited liability company on which tax refunds were sought, the witness explained that he could only review the documents submitted. He could not make any other control measures. In 3S, there was only the control function that it "came up" if the same investor had already sought reimbursement on the same distributing company. Application No. 2 was then rejected.

No one checked the witness's work. The bosses regularly took out cases for control, but he was not involved in that. He was not aware of the criteria that the commanders might apply for this control. He doesn't remember being involved in taking "strange cases" out for scrutiny.

It is true that colleagues talked about the risk of abuse of the dividend tax refund system. Wherever money is involved, there is a risk of abuse. They felt that they were reasonably well covered by the requirements placed on the applications. He remembers that there was talk of a 'big gap' in control, but he cannot explain this today.

There was a large increase in applications for reimbursement of dividend tax, but this coincided with an increase in dividends in Danish limited liability companies. He was therefore not surprised. The witness did not take any action on that matter.

The witness cannot remember exactly when the reclaim agents started sending applications, but that was before 2012-2015. The witness remembers the agent Goal Taxback, but does not recall that there was anything remarkable about this agent. He did not find it objectionable that investors began to use agents. It was part of the development, and it also took place within the royalty area.

When questioned, the witness explained that he does not know about Salgado Capital.

Shown the refund application submitted by Goal Taxback to the tax authorities on 27 May 2014 (Extract 1, pages 444-446, Exhibits 84-08-372-99 to 101), the witness explained that he cannot remember whether he has seen the voucher. He has seen many similar credit advices. They could have different designs. He is of the opinion that the credit advice presented [page 446] could form the basis for a refund because the required information is available. SKAT did not conduct any investigation into those who issued credit advice. He looked at the name of the issuer of the credit advice, which was supposed to indicate that it was a financial undertaking.

The witness is not familiar with the terms "Market Claim" or dividend compensation.

Shown credit advice dated 27th March, 2014 (Extract 1, page 463, Exhibits 54-08-472-118) and the inscribed "1,080,000", the witness explained that it resembles his handwriting. He often recorded figures on the dividend notes corresponding to 13%, because this was usually the amount that had to be reported in the 3S system.

Shown the credit advice dated 8th April, 2015 (Extract 1, page 625, Exhibit 54-09-386- 136), the witness explained that it is not he who has noted "23,652,000" or has made the green markings. It is not his handwriting.

Shown the FDU report for bundle number 713 (Extract 1, pages 690-691, Exhibit 55-07-00-4 and 5) and the statement "income year 2011" and charged that the underlying documents indicate that these are reimbursement applications relating to income year 2013, the witness explained that the year 2011 is derived from the reports of the distributing company.

Questioned by the defence counsel, the witness explained that it was in fact he who made the checks made by SKAT on the recoveries. He didn't check ISIN numbers. He also did not check whether there was registration in VP Security, because SKAT could not. There was a guide in this area and it described the four points that he had to check. The instructions had been written long before the witness came to work on the recoveries. If the bosses took out applications for control, the witness was not told more. When asked whether there was a control department for applications above a certain amount, the witness explained that there was a department in the 1980s which was physically located elsewhere. The scheme stopped without the witness remembering why or when. He doesn't remember there being a control department that stopped in 2007.


The witness has held a meeting with two female representatives from Goal Taxback. The witness believes it was sometime in the period between 2011 and 2013. At least that was after the department had come to Høje Taastrup. Only the witness participated on behalf of SKAT. The agent had called and asked for a meeting and asked for various questions about the procedure. The agent was interested in switching to electronic application by email, but there was resistance to this in SKAT at the time. It was a fairly short meeting. The witness does not recall any later correspondence with Goal Taxback about the procedure for the applications.

**Defendant Guenther Klar** has explained about his personal circumstances that he has been married to his current wife since 2015. She has 3 special children. He has 3 children from his first marriage. The wife and her children live in Manchester. His children, aged 14, 16 and 18, live in Sydney, Australia. He was detained in England in June 2019 and was held there until February 2022. His detention consisted of passport deposit, electronic surveillance and restrictions on his movements. Among other things, he was not allowed to approach the airports. This made contact with his children difficult. Since he was imprisoned in Belgium, he has only been able to write to his children. In Denmark, it has also been very difficult to make phone calls to them

because of the time difference. He only has the opportunity to visit Vestre Prison once a month. When he is released, he will return to Manchester and continue his life. His bank accounts were frozen, so his wife and her dependent children have been very affected by his situation and have had to move out of the family home, for which there are still expenses. Negotiations with the prosecution about the sale of the home have been unsuccessful, although he has offered that the proceeds could be paid to the prosecution. Instead, the home has now been seized ("restrained") and remains uninsured and unmaintained.

When questioned by the prosecutor, the defendant explained that he had never lived in Denmark, which he visited exclusively for business visits until he was extradited from Belgium. He has neither family nor friends in Denmark.

In connection with the case, the defendant has been detained in Denmark from the June 14, 2023. In a letter dated 30 June 2023, the Belgian Public Prosecutor's Office has stated that the defendant has been held in custody from 8 June 2023 to 13 June 2023 with a view to surrender to Denmark in accordance with the European arrest order.

### *Legal basis*

Sections 65(1) and 69B of the Danish Withholding Tax Act (Legislative Order no. 1403 of 7 December 2010 as amended) read as follows during the period of the offence:

> **"§ 65.** In connection with any decision or decision on the payment or crediting of dividends on shares or shares in companies or associations, etc. covered by the Danish Companies Tax Act
>
> § 1 (1), no. 1, 2, 2 e, 2 h, 4 and 5 a, the company or association concerned must contain 27 per cent of the total dividend, unless otherwise determined pursuant to subsection (3) or follows from paragraphs 4 to 6. Deduction of 27 per cent must also be made in the total payment or credit in connection with the Company's acquisition of own unlisted shares, etc. covered by section 16B(1) of the Danish Tax Assessment Act, unless otherwise provided in subsection (5). Dividends include everything distributed by the company to shareholders or shareholders, with the exception of free shares and free shares and distribution of liquidation proceeds made in the calendar year in which the company is finally wound up, subject to section 16A(3)(1) of the Danish Tax Assessment Act. The provisions of Paragraph 46(3) shall apply mutatis mutandis. The amount deducted is referred to as 'dividend tax'.
>
> ...

**§ 69 B. Has anyone liable to tax under section 2 or section 2 of the** Danish Companies Tax Act received dividends, royalties or interest in which, pursuant to sections 65-65D, withholding tax has been deducted in excess of the final tax under a double taxation convention, Directive 2011/96/EU on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or Directive 2003/49/EU on a common system of taxation applicable to interest or royalty payments, the amount shall be refunded within 6 months from receipt of the request for refund by the Customs and Tax Administration. If repayment is made after this date, the taxpayer will receive interest equal to the interest pursuant to section 7(2) of the Danish Collection Act, plus 0.4 percentage points per month commenced.

*Paragraph 2. Where, owing to the circumstances of the beneficiary, the* customs and tax authorities are unable to verify whether the conditions for repayment of withholding tax have been fulfilled, the period for payment referred to in paragraph 1 shall be suspended until the circumstances of the beneficiary cease to impede checks.

*Paragraph 3.* If the customs and tax administration considers that payment on the basis of the facts would involve an obvious risk of loss, it may require the beneficiary to provide a security. The customs and tax administration may require security only if the claim for withholding tax has been disputed and not finally settled by an administrative appeal body or the courts."

Section 69B of the Danish Withholding Tax Act was inserted by Act No. 591 of 18 June 2012 amending the Companies Tax Act, the Withholding Tax Act, the Tax Control Act, the Tax Administration Act and various other acts. The special comments on Bill No. 12 (LFB2011-2012.1.173) state, among other things:

"...

Where the payment of dividends, interest or royalties has been subject to withholding tax and the withholding tax exceeds what can be finally withheld under a double taxation convention, Directive 2011/96/EU on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or Directive 2003/49/EC on a common system of taxation applicable to interest or royalty payments, the beneficiary is entitled to reimbursement of the amount.

As regards the refund, it should be noted that if, for example, it follows from a double taxation convention that the withholding tax is to be reduced but not waived, and this results in Denmark not

withholding tax, it will be the full amount that is refunded to the recipient. The tax authorities must, within 6 months of receipt of the request for payment, arrange for the amount to be paid to the beneficiary. If payment is made later than 6 months after receipt of the request, it is proposed that the claim be remunerated at an interest rate equal to the interest pursuant to section 7(2) of the Act on the Collection of Taxes and Duties, etc. plus 0.4 percentage points per commenced month.

Thus, the level of interest on interest on withholding tax claims corresponds essentially to the rate of return on repayment of excess taxes. The interest on the excess amount is made no earlier than after 6 months, giving the tax authorities a period of 6 months to process the request for a refund. The deadline has been chosen taking into account that cases concerning withholding tax can in many cases be complex to uncover. In order to assess whether the taxpayer requesting repayment is actually entitled to receive the excess amount, in-depth investigations must often be carried out, for example, of group structure and overlying ownership. The 6-month deadline follows the Commission's recommendations set out in the 'Recommendation on withholding tax relief procedures C(2009)7924 of 19 October 2009'.

...

In concrete terms, the tax authorities assess what information is necessary to check whether the conditions for payment of withholding tax are met. It is the recipient's duty to provide evidence or plausibility of this information. If the recipient does not comply with the tax authorities' request, the tax authorities are entitled to interrupt the payment deadline under the proposed Section 69B(1) of the Withholding Tax Act.

...

It is to be expected that in the future the tax authorities will increase their focus and control on the refund of withholding taxes. This should be done to ensure that there is no undue refund to a foreign recipient who is not considered a beneficial owner. The proposed Section 69B of the Withholding Tax Act applies to requests for refunds not decided by the Customs and Tax Administration by

30. 2012, cf. section 10(1) of the bill.

..."

**Reasons and findings of the Court**

*The plea of inadmissibility*

The defendant requests that the case be dismissed as inadmissible under Section 1 of the Penal Code 10a and Article 50 of the Charter of Fundamental Rights of the European Union (2010/C 83/02), with reference to the fact that the Belgian criminal judgment of 21 April 2023 under appeal against has been handed down in respect of the same act of which Guenther Klar is accused in Denmark.

Guenther Klar is charged with gross fraud by misleading SKAT through the company Salgado Capital and based on 147 specific applications for reimbursement of dividend tax to believe that four investors received dividends or a right thereto on which dividend tax was deducted.

In its judgment of 14 September 2023, Case C-27/22, the Court of Justice of the European Union has stated in paragraphs 66 and 70 on the understanding of Article 50:

*"According to established case law, the determining factor for identifying whether the offence is the same hinges on the 'fact of the facts' criterion. This refers to a constellation of specific and indissolubly connected circumstances leading to the person in question's final acquittal or conviction. Consequently, Article 50 of the Charter explicitly prohibits imposing multiple criminal sanctions for the same acts, following distinct procedures initiated for this aim (judgment of 22 March 2022, bpost, C-117/20, EU:C:2022:202, paragraph 33 and referenced case law)."*

...

*In that regard, it should be pointed out that, as is apparent from paragraph 66 of this judgment, the principle ne bis in idem laid down in Article 50 of the Charter can be applied only if the circumstances to which the two procedures in question or the two sanctions in question relate are identical. It is therefore not sufficient for those situations to be similar (see, to that effect, judgment of 22 March 2022, bpost, C-117/20, EU:C:2022:202, paragraph 36)."*

Following the present Belgian criminal judgment, the court finds that it relates to alleged offences committed by Guenther Klar through Salgado Capital in relation to specific applications for dividends tax refunds submitted to the Belgian tax authorities. The Court of First Instance must also consider that the Belgian criminal judgment is not final.

In those circumstances, the court finds that Guenther Klar has not been charged with the same act within the meaning of Article 10a of the Criminal Code or that advancing the case would be contrary to Article 50 of the Charter of Fundamental Rights of the European Union, and therefore dismisses the plea of inadmissibility.

### *Preliminary remarks on the evidence*

The share trades and equity loans that formed the basis for SKAT's dividend tax refunds and the related cash movements were recorded in Salgado Capital. The material from Salgado Capital's accounting and recorded trading activities that has been included in the evidence has not been complete. Part of the funds paid out from Salgado Capital's accounts has gone to recipients whose bank statements have not been part of the evidence.

Kevin Kenning, Todd Bergeron and Barry O'Sullivan testified during the trial. In assessing the probative value of the individual parts of their statements, the Court of First Instance took into account the fact that these witnesses, inter alia, as a consequence of the financial result of Salgado Capital's activity and as a result of their roles in the transactions, may have an independent interest in the Court's evidentiary findings.

### *Basis of the indictment*

It is a basic premise of the indictment that the 147 dividend tax refund applications contained false dividend tax disclosures relating to the equity positions held by the two US pension plans, Blue Ocean Equity Retirement Plan & Trust and COLE Enterprises USA Retirement Plan & Trust, the UK Pension Scheme, Europa LLP Executive Pension Scheme, and Khajuraho Equity Trading S.á.r.l. (hereinafter the investors) considered itself entitled to reimbursement following the applications.

The Court finds that it is undisputed that the applications for refund of dividend tax were made by Goal Taxback Ltd. on behalf of those investors at the request of Salgado Capital and that it was Salgado Capital that provided the information to Goal Taxback Ltd.

After Guenther Klar's explanation, the court further concludes that it was he who made the calculations and dividend notes ("Credit advice") prior to their endorsement and arranged for them to be sent to Goal Taxback Ltd.

It is undisputed that the calculations and the applications for dividend tax refunds were based on the shareholding positions which, according to Salgado Capital's custody account statements, were traded between Salgado Capital and the investors.

The court concludes that all applications covered by the indictment were sent by Goal Taxback Ltd. stating, inter alia: *"Please see attached recovery form together with proof of payment and tax deduction paid on the above-mentioned customer's securities."* The documentation referred to consisted of the dividend note ("Credit advice"), which, in addition to the description of the security, stated, inter alia, the following main points:

Name of beneficial owner [Name of the beneficial owner] Dividend registration date [record date] Ex-dividend date Payment date

**Dividend details [Dividend details]:**
Gross dividend [Gross dividend] Withholding rate Tax amount [Tax amount] Net dividend [Net dividend]

**Due dividend payment details information:**

Due payment amount

Forfaldsdato [Due payment date]

After the evidence has been adduced, the court finds that, in relation to the applications covered by the indictment, SKAT made a decision on the refund of dividend tax on the basis of the material received from Goal Taxback Ltd. and that no additional information was obtained for the purpose of processing the applications.

Former employee of SKAT, Sven Jørgen Nielsen, has explained that in 2012 and until 2014 or 2015, only he processed the applications for dividend tax refunds. In the course of the proceedings, he ensured that the required information was available on the application form, a certificate from a foreign tax authority and a credit advice. He further explains that he considered it a condition for the refund of dividend tax that the applicant had received dividends from the company making the distribution and that tax had been deducted from those dividends.

According to the explanations given by Sven Jørgen Nielsen and former Head of Department at SKAT, Lisbeth Rømer, it must be assumed that during the period of the offence it was not really possible for the dividend tax department at SKAT to verify the accuracy of the information in the applications received from foreign applicants through independent sources.

### Regarding Salgado Capital

On 28 February 2012, Salgado Capital was certified by the Anjouan Offshore Finance Authority as an international company in Anjouan in the island state of Comoros and was granted a licence to operate, inter alia, as a stock brokerage and custody services.

On 22 February 2012, Guenther Klar, as "controller", replied to a personal questionnaire to Anjouan Corporate Services Ltd in relation to Salgado Capital. Guenther Klar has explained on this matter that "controller" is to be understood as the one who controlled or controlled the company. This did not imply that he had an accounting or auditing role.

At the time of its establishment, the share in Salgado Capital was owned by Hillingdon Turner Nominees Ltd. and, after Guenther Klar's explanation, it is concluded that he was a beneficiary owner at that time and that Hillingdon Turner Nominees Ltd. owned the stock on his behalf. The court concludes that until June 2012 the director of Salgado Capital was Hillingdon Turner Directors Ltd. On 11 June 2012, according to the share list, the share was transferred to The Salgado Charitable Fund, which from that date was both legal owner and beneficiary owner. Guenther Klar has explained that the beneficiary of The Salgado Charitable Fund was Lady Margaret Hall, an educational institution of Oxford University. Also on 11 June 2012, Andrew Moray Stuart was appointed director at Guenther Klar's request, a position he held until October 2015, when Monica van Zyl became director. Following the explanations given by Guenther Klar and Andrew Moray Stuart, the Court finds that the two directors were provided by Atlas Corporate Services Ltd.

Salgado Capital opened its first bank accounts on September 10, 2012 with Caledonian Bank Limited. The Court finds that Guenther Klar opened accounts for Salgado Capital with Global Fidelity Bank in April 2015 as a result of Caledonian Bank Limited's liquidation.

Salgado Capital was removed from the Anjouan business register with effect from 28 November 2016.

The court finds that it was Andrew Moray Stuart, as a director of Salgado Capital, who signed the dividend and credit advice returns included in the applications for dividend tax refunds in all 147 cases.

On the basis of the evidence, including Guenther Klar's explanation, the court finds that it was Guenther Klar who planned, negotiated and initiated the transactions with and between Salgado Capital's customers, had Salgado Capital's bank accounts and made all decisions significant to the company. The court also finds that it was Guenther Klar who was responsible for the accounting in Salgado Capital, including the investors' custody accounts. In continuation of this, the court finds that Guenther Klar was the real manager and ultimately had financial control of the company as an owner.

### Regarding Europa LLP Executive Pension Scheme

The Europa LLP Executive Pension Scheme was registered with the UK Tax Authority on 8 December 2010.

Under a Deed of Amendment dated 26 September 2012, Guenther Klar was to become the "Trustee" of the Europa Executive LLP Pension Scheme. Guenther Klar signed the document both on behalf of Europa LLC and himself.

The Court finds that four contractual documents were created on 29 February 2012 between Salgado Capital, on the one hand, and the Europa LLP Executive Pension Scheme, on the other. Under the Client Custody Agreement of 29 February 2012, Salgado Capital became the custodian of the Europa LLP Executive Pension Scheme, while under the Client Brokerage Agreement, Salgado Capital became the broker of the Europa LLP Executive Pension Scheme. An agreement was also reached on 29 February 2012 regulating securities lending in the form of the Global Master Securities Lending Commitment (GMSLA), version 2010, and an addendum to the GMSLA.

The Court finds that in the period from 21 December 2012 to 7 May 2015, Goal Taxback Ltd. applied on behalf of Europa LLP Executive Pension Scheme for a refund of dividend tax in 59 cases, and that SKAT paid out a total of DKK 104,010,252, corresponding to 12 per cent of the total dividend, which, What was stated in the refund requests was the gross dividend on the share positions. The applications were based on dividend notes ("Credit advice") signed in the period from 29 November 2012 to 25 March 2015.

After Guenther Klar's explanation, the court further finds on that it was Guenther Klar who planned, negotiated and initiated the deals with Salgado Capital and the other investors, and took all decisions significant to the Europa LLP Executive Pension Scheme. It was Guenther Klar who decided that the sums paid by Salgado Capital should go to him as payment for advisory services. The Court further finds that Guenther Klar was the beneficial manager and could dispose financially of the Europa LLP Executive Pension Scheme as an owner.

### *Regarding Khajuraho Equity Trading S.á.r.l*

Following Guenther Klar's explanation, the court finds that he established the company in 2012.

The Court finds that on 24 May 2012 four contractual documents were created between Salgado Capital, on the one hand, and Khajuraho Equity Trading S.á.r.l, on the other. Under the Client Custody Agreement of 24 May 2012, Salgado Capital became the custodian of Khajuraho Equity Trading S.á.r.l, while Salgado Capital became the broker of Khajuraho Equity Trading S.á.r.l. An agreement was also reached on the regulation of securities lending in the form of the Global Master Securities Lending Agreement (GMSLA),  version 2010, and an addendum to the GMSLA.

On 5 June 2012, Khajuraho Equity Trading S.á.r.l was registered in the Luxembourg Business and Companies Register with a share capital of EUR 12,400 and Guenther Grant-Klar as the owner of the share capital. The director appointed at the time of its foundation, Séverine Lesgardeur, resigned by

resolution of 14 June 2012, signed by Guenther Grant-Klar as shareholder. By the same resolution, Janice Allgrove was appointed as the new director.

Following the explanations of Guenther Klar and Janice Allgrove, the court finds that she was the company's registered director in the period up to the company's bankruptcy on 16 November 2020. However, after Guenther Klar's explanation, the court finds that he took all decisions relating to securities transactions and that the company's profits were paid to him on his instigation.

The court finds that in the period from 4 March 2013 to 23 January 2014, Goal Taxback Ltd. on behalf of Khajuraho Equity Trading S.á.r.l requested a refund of dividend tax in 7 cases, and that SKAT paid out a total of DKK 10,038,888 corresponding to 12 percent of the total dividend which, in connection with the refund requests, it was stated, was the gross dividend on the stock positions. The applications were based on dividend notes ("Credit advice") signed in the period from 21 December 2012 to 3 December 2013.

Guenther Klar has explained that it was he who made all trading decisions for the company, as well as deciding when and in what way the amounts paid out by Salgado Capital should go to him. Based on this information, the court finds it proved that Guenther Klar was both the real manager and the owner of Khajuraho Equity Trading S.á.r.l.

### Regarding Blue Ocean Equity Retirement Plan & Trust

The court finds that Blue Ocean Equity LLC was established on October 23, 2012.

Effective January 1, 2012, Blue Ocean Equity LLC established Blue Ocean Equity Retirement Plan & Trust as a so-called 401(k) retirement plan.
In the pension plan, Kevin Kenning and Todd Bergeron were inserted as "Trustees". The pension plan was signed on behalf of Blue Ocean Equity LLC by Kevin Kenning, CFO, on November 1, 2012. On the basis of the evidence, including the explanations given by Kevin Kenning and Todd Bergeron, it must be assumed that about USD 5,000 was invested in the pension plan.

It appears that on February 5, 2013, four contract documents were created between Salgado Capital on the one hand and Blue Ocean Equity Retirement Plan & Trust on the other. Under the Client Custody Agreement of 5 February 2013, Salgado Capital became the custodian of the Blue Ocean Equity Retirement Plan & Trust, while under the Client Brokerage Agreement, Salgado Capital became the broker for the Blue Ocean Equity Retirement Plan & Trust. Following the explanations, the Court assumes that an agreement on the regulation of securities lending in the form of the Global Master Securities Lending Agreement (GMSLA), version 2010, and an addendum to the The GMSLA.

Todd Bergeron retired as a member of Blue Ocean Equity LLC effective December 31, 2014.

On the basis of the evidence, including the explanations given by Kevin Kenning and Todd Bergeron, it must be concluded that they were the sole members and financial beneficiaries of the pension plan until 31 December 2014 and that it was Kevin Kenning alone thereafter.

The court finds that in the period from 13 March 2013 to 7 May 2015, Goal Taxback Limited applied on behalf of Blue Ocean Equity Retirement Plan & Trust for a refund of dividend tax in 41 cases, and that SKAT paid out a total of DKK 105,633,585, corresponding to 27 per cent of the total dividend, which, as stated in the refund requests, was the gross dividend on the share positions. The applications were based on dividend notes ("Credit advice") signed in the period from 7 March 2013 to 8 April 2015.

### Regarding COLE Enterprises USA Retirement Plan & Trust

The court finds that COLE Enterprises USA, LLC was established on February 12, 2013, by Kevin Kenning and Todd Bergeron, who each contributed $50 and owned 50 percent of the company.

Effective January 1, 2013, COLE Enterprises USA, LLC established COLE Enterprises USA Retirement Plan & Trust, a so-called 401(k) retirement plan. In the retirement plan, Kevin Kenning and Todd Bergeron were inserted as "Trustees". The pension plan was signed on behalf of Blue Ocean Equity LLC by Kevin Kenning, CFO, on February 15, 2013. Based on the evidence, including the explanations given by Kevin Kenning and Todd Bergeron, it must be concluded that about USD 5,000 was invested in the pension plan.

The Court finds that on February 18, 2013, four contract documents were created between Salgado Capital, on the one hand, and COLE Enterprises USA Retirement Plan & Trust, on the other. Under the Client Custody Agreement of 16 February 2013, Salgado Capital became the custodian of the COLE Enterprises USA Retirement Plan & Trust, while under the Client Brokerage Agreement, Salgado Capital became the broker of the COLE Enterprises USA Retirement Plan & Trust. An agreement was also reached on the regulation of securities lending in the form of the Global Master Securities Lending Agreement (GMSLA), version 2010, and an addendum to the GMSLA.

Todd Bergeron retired effective December 31, 2014, as a member of COLE Enterprises USA, LLC.

On the basis of the evidence, including the explanations given by Kevin Kenning and Todd Bergeron, it must be concluded that they were the sole members and financial

beneficiaries of the pension plan until 31 December 2014 and that it was Kevin Kenning alone thereafter.

The court finds that in the period from 17 April 2013 to 7 May 2015, Goal Taxback Limited applied on behalf of COLE Enterprises USA Retirement Plan & Trust for a refund of dividend tax in 40 cases, and that SKAT paid out a total of DKK 101,076,120 corresponding to 27 per cent of the total dividend. which, as stated in the refund requests, was the gross dividend on the share positions. The applications were based on dividend notes ("Credit advice") signed between 28 March 2013 and 8 April 2015.

### *About the structuring of the trades made through Salgado Capital*

As an undisputed fact, the Court of First Instance finds that it was Guenther Klar who developed and implemented the structure of the transactions that prompted the applications for dividend tax refunds.

The court finds that these transactions from February 2012 to autumn 2013 were structured in such a way that the investor purchased shares from Salgado Capital on the last day with accrued dividends ("-day")  with agreed delivery and settlement of the transaction after the date on which ownership should be registered ("record date").  Registration of ownership with the bank responsible for the issuer of the joint-stock company formed the basis payment of dividend distributions of the joint-stock company. At the same time as the agreement to purchase the shares, an agreement was reached whereby the buyer lent a corresponding share position to Salgado Capital on the delivery and settlement date. The collateral Salgado Capital had to provide for the share loan was the same amount as the investor's purchase price, so neither the investor nor Salgado Capital had to finance the share purchase agreement or share loan because the transaction could be net settled at the custody account level.

The court further finds that Salgado Capital did not own the share position at the time of the conclusion of the share sale agreement to the investor and thus appeared to be a short seller.

As part of this part of the transaction structure, the investor was credited to his custody account ("Cash statement") with Salgado Capital an amount ("Net evidence")  – a so-called Market Claim – corresponding to the share dividend that the investor would have received after withholding dividend tax if the investor had registered with ownership of the share position on the "record date". This Market Claim was used by Salgado Capital as the basis for the application for a dividend tax refund.

As the final link in the transaction structure, the share position was sold back by the investor to Salgado Capital with a fixed settlement date. At the same time, an agreement was reached between Salgado Capital and the investor on the rollback of the share lending on the settlement date.

It must be assumed that from February 2012 to 28 February 2013, the trading structure included only Salgado Capital, Europa LLP Executive Pension Scheme and Khajuraho, whereupon COLE Enterprises USA Retirement Plan & Trust and Blue Ocean Equity Retirement Plan & Trust were included as investors in the structure.

The court finds that it is undisputed that from autumn 2013 there was a change ("phase 2") resulting in the equity loans and reversal of equity loans no longer being a part of the structured trade. The investor bought shares of Salgado Capital on the last day with accrued dividends ("-day") with agreed delivery and settlement of the trade the day after the "record date". The investor sold the share position to Salgado Capital on the first day without accrued dividend ("Ex-day"), also with agreed delivery and settlement the day after the "record date". As a result of this trading structure, neither the investor nor Salgado Capital had to obtain financing for the share purchases because the transaction could be net settled at the custody account level.

At the time of the share sale agreement, Salgado Capital did not own the share position and thus appeared to be a short seller.

On the basis of the evidence, it must be concluded that no hedging agreements were entered into in relation to the price development of the shares included in the trading structure, either before or after August 2013.

Guenther Klar explains that Salgado Capital, although acting in its own name with investors, in the period after February 2013 was in fact acting solely as an intermediary, since at the same time as the trading agreements with the investors, completely similar agreements – on "back to back" terms – were entered into with Barry O'Sullivan's company Heber Securities Trading Limited, which was thus effectively the short seller.

Guenther Klar has explained that neither Salgado Capital as a short seller nor the investors as share buyers received a share dividend, but that a Market Claim was paid that reflected the net dividend that the share buyer should have received if the buyer was registered as the owner on the dividend date.

### *Regarding the tax law consequence in relation to section 69B of the Danish Withholding Tax Act*

According to section 65(1) of the Danish Withholding Tax Act in force during the deed period (LBKG no. 1403 of 7 December 2010), a company that adopts or decides to pay or credit dividends on shares must withhold 27 percent of the total dividend (dividend tax).

It follows, inter alia, from Section 69B(1) of the Danish Withholding Tax Act that taxpayers for whom withholding tax has been deducted pursuant to Section 65 on, among other things, dividends exceeding the final tax under the Double Taxation Convention, are entitled to a refund of the amount (dividend tax refund) within 6 months of receipt of the request for refund.

The court finds that it must be regarded as a necessary condition for entitlement to a dividend tax refund under Section 69B(1) that the taxpayer applying for a refund has been entitled to dividends in respect of which dividend tax has been deducted and has been paid a taxed dividend, or has acquired the right to the taxed dividends from someone who has been taxed on the dividends.

As stated, it must be established on the basis of evidence that no one in the transactions described has received a taxed dividend or has entered into agreements for the acquisition of shares from a third party taxed on a dividend.

Guenther Klar has explained that he understood it to mean that the Market Claim in a Danish tax context was to be regarded as a dividend and that the share buyer – the investor – was entitled to seek a refund of withheld dividend tax.

The Court finds that it is unsupported by the wording of Section 69B(1) of the Withholding Tax Act or by its preparatory work that the justification for a refund of dividend tax should arise solely as a result of a structured transaction in which a share short seller, as part of the transaction, credits the share buyer with a Market Claim corresponding to a calculated net dividend.

The Court notes that such an understanding of Paragraph 69B(1) of the Withholding Tax Act would mean that an unlimited number of applicants, irrespective of the total distribution of dividends and their taxation, would be entitled to a dividend tax refund.

The dividend tax refunds made as a result of investors' applications were thus made in contravention of Section 69B(1) of the Danish Withholding Tax Act and the amounts were wrongly received.

### About cash flows

As is not disputed, the Court finds that in the period from 15 January 2013 to 10 July 2015, SKAT paid a total of DKK 320,758,845 to Goal Taxback Ltd.'s bank account at National Westminster Bank Plc. as payment of the dividend tax refund applications submitted on behalf of the investors.

The court further finds that in the period from 6 February 2013 to 20 July 2015, Goal Taxback Ltd. transferred GBP 31,398,323 in respect of the Danish dividend tax refunds corresponding to DKK 313,706,968. Goal Taxback Ltd. charged a total fee of GBP 735,000, which, the court found, was set off before the transfer to Salgado Capital's bank account.

As stated, Salgado Capital's first bank account at Caledonian Bank was established on September 10, 2012. The first movement in the bank account occurred on 6 February 2013, when Goal Taxback Ltd. deposited GBP 1,132,596.46

Salgado Capital received a total of GBP 60,645,266 from Goal Taxback Ltd. in its Caledonian Bank and Global Fidelity Bank accounts and it is assumed that the excess amount of GBP 29,246,943 was derived from dividend tax refunds received from other European jurisdictions. The Court notes that this  is  not covered by the indictment.

According to the statements of accounts, Salgado Capital did not include any significant amounts from anyone other than Goal Taxback Ltd., including no deposits from investors.

After Guenther Klar's explanation, these bank accounts were Salgado Capital's only ones.

The court then proceeds on the basis that Salgado Capital did not receive any money as a result of the described trading structure other than the payments obtained from the tax authorities of the European jurisdictions from which dividend tax refunds had been applied for.

From Salgado Capital's bank accounts, between 7 April 2014 and 5 April 2017, GBP 31,550,848 was transferred and seen received in Guenther Klar's personal accounts with Caledonian Bank and Global Fidelity Bank. This amount included a transfer on 14 August 2014 of GBP 119,308. In addition, GBP 11,232,323 was transferred from Salgado Capital's bank accounts with the entry text "W/T to Guenther Grant-Klar" and *"Transfer to Guenther Klar".* There is no concrete evidence of the bank account or accounts to which these  amounts  were transferred.

As stated, Guenther Klar was the sole underwriter of Salgado Capital's bank accounts. With regard to the transfers on 15 May 2013 amounting to GBP 466,709.04, on 15 October 2013 amounting to GBP 500,089.56, on 24 October 2013 amounting to GBP 670,080.68 and on 14 January 2014 amounting to GBP 2,239,921.62, the amounts correspond to invoices 1 to 4 issued by Guenther Klar to Salgado Capital for Trading Advisory Services in order to document the payments for the purpose of fulfilling the divorce agreement ("consent order") with Antonia Saunokonoko. The court accordingly proceeds on the basis that the full sum of GBP 11,232,323 was transferred to Guenther Klar, and that he thus personally received not less than GBP 42,765,851.

From Salgado Capital's accounts with Caledonian Bank and Global Fidelity Bank, 37 transfers were made in the period from 23 May 2013 to 10 November 2015 with entry texts containing "Blue Ocean" and "Cole". A total of USD 9,425,155 and GBP 1,723,345 were transferred in this connection. It is common ground that those amounts relate to payments for the commitment of the US pension plans to Salgado Capital. The prosecution service has calculated this at a total of DKK 78,230,441.

I

2013, there were five transfers to COLE Enterprises USA Retirement Plan &Trust totalling DKK 5,726,930 (GBP 657,320), while there were six transfers to Blue Ocean LLC Retirement Plan &Trust totalling DKK 6,201,323 (GBP 714,161).

In 2014, there were six transfers to COLE Enterprises USA Retirement Plan &Trust totaling $6,507,437 ($154,707 and $843,341) and six transfers to Blue Ocean LLC Retirement Plan &Trust totaling $7,597,128 ($199,094 and $956,865).

Guenther Klar has explained that Kevin Kenning and Todd Bergeron instructed him to make payouts from Salgado Capital to Bluestar 8 Inc., Reuven Gitter, Chicago Youth Programs, Wings Program, Friends of the Orphans, Kevin T&Margarat M McNicholas – Medical Insurance, Wilderness Property LLC and Patrick Enright. He further explains that Mr Bergeron instructed him to transfer GBP 119,308 to DLA Piper, which was transferred from Salgado Capital's bank account on 14 August 2014 to Guenther Klar's personal account, from which a corresponding amount, including fees, had already been transferred to DLA Piper on 11 August 2014. He has explained about the transfers that they were booked as withdrawals of the US pension plans' profits in Salgado Capital.


The Court finds that thereafter, and after Kevin Kenning and Todd Bergeron's explanations about their relations with the beneficiaries – with the exception of Kevin T & Margaret M McNicholas – Medical Insurance – it must be assumed that these 15 transfers totalling GBP 207,047 and USD 504,311, approximately DKK 5.5 million, also relate to payments for the US pension plans' involvement in Salgado Capital. The total amount that went to the US pension plans over the entire period was thus approximately DKK 83.7 million.

In 2013, the total amount transferred to these third parties was approximately DKK 1,230,000 (GBP 145,546). Thus, the court assumes that the total amount paid out from Salgado Capital in 2013, which related to payments for the US pension plans' involvement in Salgado Capital, amounted to approximately DKK 13,158,000.

In 2014, there were total transfers to third parties of approximately DKK 1,726,000 (USD 119,308 and GBP 66,501.12). The total amount paid out from Salgado Capital in 2014, which was related to the US pension plans, thus amounted to approximately DKK 15,831,000.

Salgado Capital's GBP account with Caledonian Bank further shows that the entry " *Granard Investment (Europe) no. 1"* transferred GBP 142,062.41 on 15 October 2013 and GBP 86,683.84 on 10 January 2014. On 8 October 2013, GBP 1,267,194.70 was transferred with the indication *"Barry O'Sullivan",* which according to the entry texts also received EUR 1,000,000 on 14 January 2015 from Salgado Capital's EUR account, and according to the Global Fidelity Bank statement of accounts, GBP 427,888.21 was transferred on 12 May 2015. On 16

June 2015, 1,198,091.62 was transferred to Amalthea Enterprises Ltd. According to the bank statement from Amalthea Enterprises Ltd.'s bank account at Global Fidelity Bank, a similar amount – less fee – was transferred on June 17, 2015 with the entry text *"W/T to Barry O'Sullivan"*.

On 12 November 2015, EUR 5,050,000 was transferred from Salgado Capital to Amalthea Enterprises Ltd., which was transferred on 13 November 2015 with the entry text *"WT to Walter Odlum & Co – Share purchase"*.

On 8 September 2014, GBP 848,126.38 was transferred from Salgado Capital's Caledonian Bank account with the entry *"W/T to CurrencyFair Ltd – Client Account"*.

On 4 June 2014, GBP 12,500 was transferred from Salgado Capital's account with Caledonian Bank, stating *"W/T to Thomas R Callan Ltd"*.

Guenther Klar explains that the payment of all those amounts was made at the direction of Barry O'Sullivan and effectively constituted payments for Granard Investment and Heber Securities Trading Limited's profits on the trades of Salgado Capital. He explains in more detail that the payment of EUR 1 000 000 was documented as a loan and that the payment of EUR 5 050 000 was carried out as a sale of shares in Granard Investment because Barry O'Sullivan wanted this.

Barry O'Sullivan has explained that the sums of EUR 6 050 000 went to him and accused the other transfers that he does not remember what they covered, apart from the GBP 12 500 to Thomas R Callan Ltd, which was the payment for a watch purchased while he was with Guenther Klar. In his testimony, he did not deny that the other sums were paid to him, nor did he explain that he could not deny that they were related to the distribution of the profits from Salgado Capital.

The Court finds that it must be concluded that these transfers from Salgado Capital totalling GBP 4,482,547 and EUR 6,050,000 were received directly and indirectly by Barry O'Sullivan, corresponding to a total amount of approximately DKK 83.4 million.

### The court's guilt assessment

According to their content, the applications on the basis of which the tax authorities paid dividend tax refunds to Goal Taxback Ltd. appeared to mean that the investors had acquired rights over shareholdings in which dividend tax had been deducted in connection with dividend distributions.

In the light of Guenther Klar's explanation and of the evidence, it must also be assumed that none of the companies involved in the structured trade received taxed dividends. The Court further finds that none of the persons involved in

the transactions acquired rights over shares from outstanding third parties as part of or for the purpose of the transactions.

The court finds it proved that SKAT was thereby misled, which determined the payments of the 147 dividend tax refunds totalling DKK 320,758,845 in violation of section 69B(1) of the Danish Withholding Tax Act.

Guenther Klar has explained that he made an in-depth study of the possibility of applying for dividend tax refunds in various markets, including Denmark, where SKAT had published a guideline that was available in English on SKAT's website. He investigated various Western European countries. He has also explained that in some countries, for example Finland, Market Claim was not dividends in a tax context. Other countries had "tracing rules" where proof had to be provided that the dividends paid could be traced from the dividend distributor to the person submitting the dividend tax refund claim. Guenther Klar has further explained that it was his sincere opinion that the beneficial owner of the shares was entitled to apply for a dividend tax refund in Denmark, among others, even without being the legal owner. According to his explanation, he was of the opinion that there was nothing wrong with what he was doing, also because the tax authorities in Denmark did not specify the documentation of the transactions or the fact that the dividend notes had been issued by a local custodian bank.

Guenther Klar has explained about the agreements made between Salgado Capital and the investors that they represented real deals. He has also explained that investors made independent trading decisions and that Salgado Capital did not act as an investment advisor, but only as a broker and custodian. When the trade was net settled, the trade had taken place and there were shares that had been traded. He has further explained that the trading structure differed from dividend arbitrage because the trades were not hedged and because investors did not get an investment manager and therefore had to make trading decisions themselves. It was the investors who had the market risk, and the profits for investors depended on the development of the share price, which was not known in advance. Guenther Klar has also explained that there was no agreement with the investors COLE Enterprises USA Retirement Plan & Trust and Blue Ocean LLC Retirement Plan & Trust or with Barry O'Sullivan, on the distribution of profits on the dividend tax refunds. He has further explained that the company "Heber" owned and controlled by Barry O'Sullivan was the real short seller when Salgado Capital entered into agreements with "Heber" which were similar to the share sales and purchases Salgado Capital made to investors.

The Court of First Instance has emphasised that in the period from February 2012 to February 2013, dividend tax refund applications were submitted only on the basis of transactions entered into between Salgado Capital on the one hand and Khajuraho and the Europa LLP Executive Pension Scheme. These three legal entities were all

effectively controlled by Guenther Klar, which was also able and effectively disposed of the financial resources. Thus, the reality was that the agreements on share trading and share loans were self-contracting without any independent commercial justification.

Guenther Klar has explained that in February 2013, Salgado Capital took in more clients to get more substance. The increased substance mattered in relation to the applications for dividend tax refunds. It was better for Europa LLP Executive Pension Scheme and Khajuraho that Salgado Capital had more customers and that SKAT would see refund requests from other customers. This would reduce the compliance burden. He has further explained that it was related to the attention SKAT would have if there were more customers. He has also explained on this matter that there was nothing wrong with the applications, which were sent from a custodian bank on the basis of verifiable bookkeeping. If third parties did the same with the custodian, SKAT would feel more comfortable that there was nothing wrong.

The court has emphasized that the real participants in the structured transactions in the period from February 2013 to July 2015 consisted of a narrow circle of persons who had prior professional and partly personal relationships.

The court also emphasized that the trading structure was characterized throughout the period by being a closed, circular "system" in which each party to the agreement financed the obligations of the opposing contracting party which, in the net statements, to a large extent effectively offset each other. Thus, the trading structure was also characterized by the fact that the book buying and selling of shareholdings amounting to significant billions of kroner did not entail any need for financing or a financing risk.

In this regard, the court has assumed that the participants, in relation to the decisions on the execution of trades, stock lending, and borrowing, which formed the basis for the applications for dividend tax refund, acted in a way that in reality reflected that the trading structure and each step in the trades were predetermined by Guenther Klar. Todd Bergeron has explained about this that it was Guenther Klar who initiated contact in the individual trades with the American pension plans. He further explained that there was a mutual understanding that they would follow the suggestions coming from Guenther Klar, because it was Guenther Klar who had set the strategy and had the experience, and that they had agreed to do as Guenther Klar explained.

Kevin Kenning has explained that the pension plans' specific stock deals came about in the way that Guenther Klar contacted either him or Todd Bergeron about an option for a specific purchase for a specific amount on a specific date. They decided on the basis of Guenther Klar's proposal. They did not carry out any detailed assessment of the proposal. He further explained that he and Todd Bergeron knew less than nothing about the European stock market and relied on the valuations of Salgado Capital and

Guenther Klar. He does not think they ever turned down Guenther Klar's proposal to buy. It may have happened in one or two cases.

Guenther Klar has explained that he does not believe that after the change in trading structure in August 2013 ("phase 2"), investors did not sell back their share positions the day after the share purchase.

It is further attributed significance that the legal persons participating in the structured transactions had very limited capital resources and thus would not be able to carry losses due to share price fluctuations to any significant extent. In this connection, the Court also assumes that neither the investors nor Salgado Capital ever required payment as security for book receivables, which at that time amounted to three-digit million amounts. Todd Bergeron has explained about the market risk that it was his understanding that it was Salgado Capital that had the risk of the price development and that he did not review the trading documents that the pension plans received from Salgado Capital. Kevin Kenning has explained that he probably did not understand – or acknowledge – the risks associated with market developments, but since they had very limited funds in their pension plans, they would not be able to cover a major loss. They had no agreement on what would happen in the event that pension plans suffered a capital loss. He therefore assumed that Guenther Klar had dealt with this and mitigated the risk. Kevin Kenning has also explained that he found no reason to follow the price development of the US pension plans' equity positions.

The court has also emphasized that the only money that went to the participants in the trade structure came from European tax authorities, including Denmark. The real consequence of this was that investors distributed only the money resulting from dividend tax refund payments. Kevin Kenning and Todd Bergeron have explained that it was agreed that the US pension plans' portion of the profits was one-third of the profits from the returned dividend tax.

Kevin Kenning and Todd Bergeron's explanations are supported on this point by the fact that, when the last payment from Salgado Capital was made, the US pension plans had, as stated, been paid a total of approximately DKK 83.7 million out of the total dividend tax refunds of approximately DKK 255.86 million that the pension plans had obtained through Salgado Capital's applications in Denmark and Belgium.

The explanations are further supported by the fact that it must be assumed that at the end of 2013, before the costs of Goal Taxback Ltd., the US pension plans had obtained dividend tax refunds totalling DKK 40,678,875. In Salgado Capital's custody account accounting, dividend tax refunds were credited to the US pension plans totalling approximately DKK 39.8 million (USD 6,952,624), and in 2013

the pension plans received approximately DKK 13,158 million and, according to the custody account statement as of December 31, 2013, had a receivable of approximately DKK 302,000 (USD 55,846.24).  In this connection, the court also emphasized that at the end of November 2013, the receivable on the book custody accounts of the US pension plans totalled USD 32,382,802.71. According to the accounting of Salgado Capital, the receivable was essentially lost on day trades on December 24, 2013 and December 27, 2013 as a result of price losses on shares at a purchase price of approximately USD 3.15 billion.

Guenther Klar has explained that these day trades came about at the initiative of Kevin Kenning and Todd Bergeron and that they had contacted him together over the phone a few days before December 24, 2013. He further explained that Salgado Capital acted as a broker and that Heber was on the other side of the deals. They contacted him regularly when they wanted to enter or exit a trade. He confirmed as broker the trades once Barry O'Sullivan had confirmed that he would be the counterparty.

Kevin Kenning has explained that he can safely deny initiating the trades on December 24, 2013, and that they did not instruct Salgado Capital to "day trade" on December 27, 2013. He further explained that he did not see the custody account statements where the trades appear until 2016. Todd Bergeron has explained that he does not recall participating in discussions about day trades in December 2013.

Barry O'Sullivan has explained that Heber Securities Trading Ltd. has not made any trades and, on the basis of the evidence, it must be assumed that the company was only incorporated in August 2014.

Kevin Kenning and Todd Bergeron's explanations about profit sharing are further supported by the fact that according to the custody account statements from Salgado Capital, the US pension plans in 2014 were credited with approximately DKK 45.83 million as dividend tax refunds (USD 8,028,917) and were paid approximately DKK 15,831,000.

Thus, the Court has assumed that the US pension plans not only received an amount equivalent to approximately 1/3 of the dividend tax refunds paid out in total over the entire period, but also by the end of 2013 and 2014 had received approximately 1/3 of the dividend tax refunds received at those times.


Barry O'Sullivan has explained about the distribution of profits that he expected to get 30 percent of the entire "pie," which was equivalent to 50 percent of what was due to the American pension plans. He has also explained that it is his opinion that it ended up with 20 percent, but that the reality is that Guenther Klar was the only one who had an overview of the figures. As stated, the court has assumed that Barry O'Sullivan received a total of approximately DKK 83.4 million from Salgado Capital.

Kevin Kenning has explained that he understood the agreement with Guenther Klar and Salgado Capital to mean that if advisory fees or referral fees were to be paid to Barry O'Sullivan for introducing the parties, it would be deducted from Salgado Capital's profit portion. However, it was his understanding that Barry O'Sullivan would receive such a fee, which was also not unusual in the industry.

Barry O'Sullivan's explanation that he should receive a share of the profits of the US pension plans is supported by the fact that their custodial account statements for May, June and July 2013 included debits of trading advisory fees which, according to Guenther Klar's explanation, were also credited with one of Barry O'Sullivan's companies.

This explanation is also supported by the fact that a transfer of GBP 1,267,194.70 was made from Salgado Capital's bank account to Barry O'Sullivan on 8 October 2013. Guenther Klar's explanation that the amount was a withdrawal of share trading profits for Heber Securities Trading Ltd. is incompatible with his explanation that Heber Securities Trading Ltd. was the real short seller and thus the investors' counterparty to the share trades. The Court notes that at that time, according to the custody account statements, investors had significant three-digit million amounts of profits on the share trades from "Equity trades profit or loss" and from Market Claims ("Net dividends").

In the light of the foregoing, the Court finds that it has been proved that the transactions in the accounts and share loans between the investors, on the one hand, and Salgado Capital, on the other, had no other purpose than to form the basis for unlawful applications for reimbursement of dividend tax and to explain the apportionment of the dividend tax paid. The Court also finds that it has been proven that Guenther Klar at least considered it to be highly probable that the applications for dividend tax refunds were unjustified, and thus that the employees of SKAT were misled to believe that the investors had been deprived of dividend tax in Denmark. The court thus disregards Guenther Klar's explanation that it was his clear view that, on the basis of the Market Claims entered in the accounts, a refund of dividend tax could legitimately be sought. Based of this, and for the other reasons given, Guenther Klar is found guilty of the charge.

### Sentencing

The penalty is fixed at imprisonment for 6 years, cf. section 286(2) of the Penal Code, cf. section 279.

In determining the sentence, the court has based its decision on the fact that Guenther Klar has been found guilty of fraud amounting to more than DKK 320 million, of which, according to the results of the evidence, he himself received quite substantial proceeds. In aggravating terms, the Court of First Instance emphasised that Guenther Klar carried out the fraud after careful planning, that, after recovering dividend tax through the investors he controlled, he took the initiative to withdraw the US pension

plans, that the fraud continued for three years and that Guenther Klar carried out the fraud after careful planning, that the fraud continued for three years and that the fraud was only brought to an end when SKAT paused dividend tax refunds in 2015 as a result of a suspicion of fraud.

As mitigating circumstances, the court has emphasized the length of the proceedings and the time that has elapsed since the offence, cf. section 82, no. 13 and 14 of the Penal Code in force at the time. The Court notes that, following the suspicion of extensive dividend tax fraud, SKAT reported, among other things, Salgado Capital on 24 August 2016. Guenther Klar was remanded in absentia on January 20, 2022, and the indictment is dated March 9, 2022. Guenther Klar was reportedly placed in detention in the form of a shackle-like arrangement in England on 18 June 2019 with a view to extradition to Belgium. Guenther Klar was extradited from Belgium to Denmark on 13 June 2023.

The court has not attached any special importance to the fact that the fraud has taken place against SKAT, including that SKAT's administration of the control of dividend tax refund applications has not been taken into account in the sentencing.

After the sentence meted out, regardless of the aggravating circumstances, there is not fully sufficient reason to apply Section 88(1)(2) of the Criminal Code.

### *Deportation*

Guenther Klar has been sentenced to an unconditional sentence of imprisonment for 6 years for fraud of a particularly serious nature pursuant to section 279 of the Penal Code, cf. section 286(2). The conditions for deporting him pursuant to section 24(1) of the Aliens Act, cf.

Sections 22(1) and (6) are therefore complied with. According to section 26(2) of the Aliens Act, Guenther Klar must be expelled unconditionally, unless it is certain that it would be contrary to Denmark's international obligations.

As the offence was committed before 1 January 2021, it follows from Executive Order no. 1700 of 23 November 2020 implementing certain provisions of the Withdrawal Agreement between the United Kingdom and the EU with regard to the right of entry, residence and work in Denmark § 16(1), cf. Article 20(1) of the Withdrawal Agreement, that Guenther Klar's circumstances are to be assessed as for foreigners, that are subject to EU rules.

It follows from section 26b of the Aliens Act that expulsion may only take place in accordance with the principles that apply under EU rules to restrictions on the right to free movement. The possibility of expulsion is therefore determined by Articles 27(2) and 28(1) of Directive 2004/38/EC of 29 April 2004 (Residence Directive), since Guenther Klar has not resided in Denmark as covered by Article 28(3)(1).

In view of the nature of the crime committed, including the fact that the offence

was committed according to a carefully thought out plan in advance, to a significant extent and vis-à-vis a public authority, the court finds that the crime is an expression of conduct that constitutes a genuine, present and sufficiently serious threat affecting a fundamental public interest, cf. Article 27(2), second indent, of the Residence Directive.

On the basis of the information available concerning Guenther Klar's circumstances, including the fact that he has never lived in Denmark and has no family, work or social ties with it, read together with the information that he has a dependent spouse and his special children in England, the defendant does not have such links with Denmark that expulsion can be regarded as contrary to the principle of proportionality laid down in Article 27 of the Directive. paragraph 2, first indent, in conjunction with Article 28(1);

Therefore, the Residence Directive cannot be regarded as preventing expulsion, cf. Article 33(1) of the Directive and Section 26b of the Aliens Act, cf. Section 2(3). In those circumstances, the application for expulsion under the provisions relied on must be upheld as set out below.

The entry ban is fixed permanently in accordance with section 32(4)(7) of the Aliens Act.

### Disqualification

The offences were committed in Guenther Klar's capacity as beneficial manager and owner of the companies Salgado Capital and Khajuraho Equity Trading S.á.r.l and as a manager and financial beneficiary of the Europa LLP Executive Pension Scheme.

Subsequently, and according to the extent and nature of the fraud, cf. what has been said about the determination of the sentence, the conditions laid down in Section 79(2), second sentence, cf. Section 79(2) of the Danish Criminal Code are laid down. § 79 (1) cf. § 78 (2) to deny Guenther Klar the right to participate in the management of a business enterprise in Denmark or abroad without being liable personally and without limitation for the obligations of the company to be fulfilled.

Although Guenther Klar has no previous criminal record, the court finds that there are grounds for following the prosecution's claim that the disqualification takes place until further notice, cf. section 79(3) of the Danish Criminal Code.

### Confiscation

Finally, the prosecution service has requested that DKK 219,594,870.60 be confiscated from Guenther Klar pursuant to section 75(1) of the Danish Penal Code, cf. section 75(1) of the Danish Criminal Code.

Paragraph 76(1) or, in the alternative, subsection (4). The amount is calculated as 70 percent of the DKK 313,706,968 that Goal Taxback Ltd. paid to Salgado Capital as a result of dividend tax refunds from SKAT.

According to section 75(1)(1) of the Danish Penal Code, the proceeds of a

criminal offence or an equivalent amount may be confiscated. Confiscation pursuant to section 75(1) may be made from the person to whom the proceeds have accrued immediately as a result of the offence, cf. section 76(1) of the Criminal Code.

The Court notes first of all that, on the basis of the evidence, there is no necessary basis for establishing the amount of Guenther Klar's proceeds from the fraud against SKAT. The amount of confiscation must therefore be determined on a discretionary basis, cf. section 75(1), second sentence, of the Danish Criminal Code.

In this connection, the court has attributed the amount that SKAT paid Goal Taxback Ltd. in connection with Guenther Klar's own investors' refund applications (approx. DKK 114 million) and on SKAT's payments in connection with the US pension plans' reimbursement applications (approx. DKK 206 million), of which Guenther Klar has received approx. 1/3 according to the result of the evidence, significance. The court has also taken into account the information about the fees charged by Goal Taxback before payment to Salgado Capital (approx. DKK 7 million).

The Court notes that no documentation has been provided or information has been relied upon about costs in relation to the fraud against the Danish tax authorities, which in practice can be deducted when determining the amount of confiscation.

With these observations, the court upholds the claim for confiscation with DKK 175 million, cf. section 75(1) of the Danish Penal Code, cf. section 76(1).

**The Court is hereby adjudicated:**

Accused Guenther Klar is to be punished with imprisonment for 6 years.

For the time being, the defendant is disqualified from participating in the management of a business enterprise in Denmark or abroad without being personally and without limitation liability for the company's obligations.

DKK 175 million will be confiscated from the defendant.

The defendant is expelled from Denmark.

The defendant is permanently banned from entering the country.

The defendant must pay the costs of the case, however, the Treasury must pay the fees of the appointed defence counsel in connection with the hearing on 8 November 2023.

Mikkel Bensby Nøhr,

Judge.
The court in Glostrup, 2 February 2024


Karina Joconde
Administrator