# Exhibit 7



Neutral Citation Number: [2024] EWHC 148 (Comm)

Case No: CL-2022-000642

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, WC4A 1NL

Date: 2 February 2024

Before :

**MR JUSTICE BRIGHT**

- - - - - - - - - - - - - - - - - - - - -

Between :

**Skatteforvaltningen**
**(the Danish Customs and Tax Administration)**

**Claimant**

- and -

**MCML Limited**
**(previously known as ED&F Man Capital Markets**
**Limited)**

**Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Charles Graham KC, KV Krishnaprasad and Sam O'Leary (instructed by Pinsent Masons LLP)
for the Claimants
Ali Malek KC and Adam Temple (instructed by Rosenblatt) for the Defendants

Hearing dates: 23, 24, 25 January 2024
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 9:30am on 02/02/2024 by circulation to the
parties' representatives by e-mail and by release to the National Archives.

.............................

Mr Justice Bright:

<u>Introduction</u>

1.    In 2018 and 2019, the Claimant ("SKAT") commenced several actions in this court, in each of which it brought claims against multiple defendants for damages, as well as other relief ("the Original Proceedings"). The various claims all related to payments that SKAT had made between August 2012 and July 2015 as tax refunds in respect of withholding tax ("WHT") on dividends paid by Danish companies. SKAT said the recipients of those refund payments had not been entitled to them, and that SKAT had been induced to make the refunds by misrepresentations made by the various defendants.

2.    One of the various actions was against the Defendant in this case ("ED&F Man"), which was a global financial brokerage business. Tax reclaim agents had submitted applications for WHT refunds on behalf of ED&F Man's pension plan clients ("PP clients"), supported in each case by a Tax Voucher that ED&F Man had produced. SKAT's case was that some of the Tax Vouchers contained false information about the dividends received by ED&F Man's PP clients and about their entitlement to WHT refunds.

3.    The case against ED&F Man involved over 400 Tax Vouchers and WHT refund payments totalling the DKK equivalent of approximately £70 million.

4.    Similar allegations, both in that action and in the other actions, were made by SKAT in respect of other custodians (and their clients). The total sums claimed were equivalent to approximately £1.5 billion.

5.    In general, SKAT's claims were advanced on the basis that the defendants had acted fraudulently. Such claims were, in general (and along with other causes of action), for the tort of deceit. However, in relation to ED&F Man, SKAT did not allege fraud/deceit but only negligent misrepresentation.

6.    The actions constituting the Original Proceedings were all commenced in 2018 and 2019. The particular action involving ED&F Man (along with various co-defendants) was commenced on 4 May 2018.

7.    On 5 December 2022, SKAT issued fresh proceedings in which ED&F Man was the sole Defendant ("the 2022 Proceedings"). SKAT now alleged that ED&F Man knew that the representations in the Tax Vouchers were false or was reckless. SKAT's claim in these fresh proceedings is for deceit.

8.    On 30 March 2023, ED&F Man issued the application with which this judgment is concerned, for the claim in the 2022 Proceedings to be struck out.

9.    ED&F Man's case before me was principally represented at the hearing by Mr Ali Malek KC. On some of the important factual aspects, ED&F Man's case was presented orally by Mr Adam Temple. It is very pleasing that Mr Malek KC allowed Mr Temple this opportunity. The oral submissions on behalf of SKAT were made by Mr Charles Graham KC.

10.     I am grateful to them all and to both sides' wider teams for the very considerable assistance that I have received. I have in mind not only the submissions made at the hearing (which I know will not have been the work-product only of the advocates who delivered them) but also the very detailed skeleton arguments, the chronology and the extremely helpful and carefully structured electronic hearing bundles (without which this hearing would have taken much longer).

Procedural history

11.     The various actions then in existence were consolidated prior to the first CMC on 16 July 2020. Andrew Baker J was appointed as designated judge (with alternates). This was because the judge in charge of the Commercial Court (then, Cockerill J) had concluded that all the related cases should be managed together. This would best suit the interests of the parties and also the wider interest of using the court's resources efficiently.

12.     At the first CMC, Andrew Baker J made clear his intention to keep a firm hand on the litigation. He analysed its likely future progress as falling into various separate stages. He directed that there should be trials of two separate series of preliminary issues – respectively, the "Revenue Rule" trial and the "Validity" trial – followed by a final trial to determine all the other issues ("the Main Trial").

13.     The Revenue Rule trial was to take place in March 2021. The outcome of the Revenue Rule trial was to be binding on all parties, whether or not they chose to file submissions or participate. The Revenue Rule issue was defined as follows:

> "Are any of SKAT's claims, as alleged, inadmissible in this court under the rule of law stated, e.g. as Dicey Rule 3… If so, which claims are inadmissible and why?"

14.     Dicey Rule 3 (now Rule 20 of Dicey, Morris & Collins on the Conflict of Laws (16th ed.) at 8R-001) stated that English courts have no jurisdiction to entertain an action for the enforcement (direct or indirect) of a penal, revenue or other public law of a foreign state.

15.     The intention at that time was that the Validity trial should take place towards the end of 2021, and the Main Trial should take place in January 2023 and last until Easter 2024.

16.     The Claimant was ordered to provide regular progress reports to Andrew Baker J.  I highlight this because it shows his vigorous commitment to the active case management of the litigation.

17.     During the run-up to the Revenue Rule trial, the parties provided disclosure. In the event, ED&F Man's disclosure was given in nine tranches, the first on 3 August 2020, the last on 19 March 2021.

18.     The Revenue Rule trial was heard on 22 to 25 March 2021. Judgment and the Judge's order were handed down on 27 April 2021. Andrew Baker J held that all of SKAT's claims were inadmissible under the Revenue Rule. He therefore ordered that all SKAT's claims be struck out.

19.    SKAT applied to the Judge for permission to appeal on two grounds:

   (1) That he erred in concluding that SKAT's claims as alleged fell within the Revenue Rule.  (This ground was relied on for some but not all individual losses claimed against ED&F Man.)

   (2) That he erred in concluding that the Revenue Rule remained applicable to SKAT's claims notwithstanding that they were "civil and commercial" matters under the Brussels Regulations.

20.    The Judge refused permission to appeal on ground 1 but gave permission on ground 2. SKAT renewed its application for permission to appeal on ground 1, but not as against ED&F Man.  It is apparent from comments made by counsel in submissions to the Court of Appeal that this decision had to do with the fact that SKAT did not allege fraud against ED&F Man, only negligence.

21.    On 29 September 2021, Males LJ gave permission to appeal on ground 1 – but not, naturally, as against ED&F Man. So far as concerned SKAT's claim against ED&F Man, the Judge's conclusion that they were within the Revenue Rule was not challenged, and SKAT relied only on ground 2.

22.    The appeal on the Revenue Rule issue was heard on 25 to 27 January 2022.  Judgment was handed down on 25 February 2022. The Court of Appeal reversed the decision of Andrew Baker J on the basis of ground 1, holding that SKAT's claims were not within the Revenue Rule and so were not inadmissible. This was enough to decide the appeal in respect of all SKAT's claims, apart from the claim against ED&F Man.

23.    The Court of Appeal then held that, because SKAT remained fixed with the Judge's conclusion that its claim against ED&F Man was within the Revenue Rule, the Brussels Regulations did not assist, i.e. SKAT could not succeed on the basis of ground 2, because there it did not challenge the Judge's conclusion as to the applicability of the Revenue Rule (as against ED&F Man).

24.    SKAT's appeal therefore succeeded in respect of all its claims, apart from those against ED&F Man. It is apparent from their judgment that the Court of Appeal would have reversed the Judge's conclusion in relation to the claim against ED&F Man, if SKAT had asked for and obtained permission to appeal on ground 1. The reasoning of the Chancellor, giving the main judgment, would have applied to claims in negligence just as much as to claims in fraud.  However, because SKAT did not pursue its application for permission to appeal on ground 1 in respect of its claim against ED&F Man in the Original Proceedings, the conclusion of Andrew Baker J as to the applicability of the Revenue Rule stands, in respect of that claim.

25.    Following the judgment of Andrew Baker J on the Revenue Rule, all progress in the Original Proceedings had effectively stopped, the claims having been dismissed. The effect of the judgment of the Court of Appeal was to reverse this – except as regards SKAT's claim against ED&F Man.

26.    It therefore was necessary to re-start the Original Proceedings and give fresh directions, including new dates for the Validity Trial and the Main Trial. This happened at a further

CMC on 11 May 2022. Andrew Baker J gave directions for the Validity Trial to be heard in January 2023 and for the Main Trial to commence in April 2024.

27.   Less than four weeks later, SKAT gave formal notice to ED&F Man of its intention to bring the claim now before the court – i.e., one in which SKAT alleges fraud and which is for the tort of deceit. This was by a letter before claim dated 6 June 2022. ED&F Man responded on 9 August 2022.  SKAT replied on 25 October 2022.

28.   As already noted, SKAT's claim form in the 2022 Proceedings was issued on 5 December 2022.

29.   The Validity Trial in the Original Proceedings was heard on 17 January to 10 February 2023.  Andrew Baker J gave judgment on 24 March 2023.

30.   On 8 November 2023, the Supreme Court upheld the decision of the Court of Appeal on the Revenue Rule. My understanding is that ED&F Man took no part in the proceedings before the Supreme Court.

31.   The Main Trial in the Original Proceedings will commence on 9 April 2024 and will run for the rest of the year.

ED&F Man's application

32.   In the submissions before me, ED&F Man's position was presented on its behalf by Mr Malek KC as follows:

(1)   First, ED&F Man relied on issue estoppel, said to have been created by the decision of Andrew Baker J as between SKAT and ED&F Man in the Original Proceedings.

(2)   Second, ED&F Man relied on what Mr Malek KC described as *Henderson v Henderson* abuse of process, saying that the claim in the 2022 Proceedings should have been raised in the Original Proceedings and that the 2022 Proceedings were abusive. In support of the contention that SKAT's conduct was abusive, Mr Malek KC said that he drew particular support from the guidance of Thomas LJ in *Aldi Stores Ltd v WSP Group plc* [2007] EWCA Civ 1260, at [29] to [31].

Issue estoppel: the legal principles

33.   The legal principles of issue estoppel were not really in dispute, but it is appropriate to summarise them.

34.   A convenient starting-point is the much-cited definition of the doctrine in the judgment of Diplock LJ in *Thoday v Thoday* [1964] P 181, at p. 198:

> "There are many causes of action which can only be established by proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfilment of an identical condition is a requirement common to two or more different causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent jurisdiction,

either upon evidence or upon admission by a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfilment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was."

35.    The doctrine was explained in simpler language by Lord Keith (with whom the others agreed) in *Arnold v National Westminster Bank Plc (No.1)* [1991] 2 AC 93, at p. 105 D-E:

> "Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant one of the parties seeks to reopen that issue."

36.    There can be special circumstances in which issue estoppel will not prevent a litigant from raising an issue previously determined, where further material (legal or factual) has become available: *Arnold v National Westminster Bank Plc (No.1)* [1991] 2 AC 93 at 109B.  However, such special circumstances only arise in very unusual cases such as *Arnold*.  Mr Graham KC did not suggest that this case presents such special circumstances.

37.    Many judgments both before and since *Arnold v National Westminster Bank Plc (No.1)* have noted the significance of the requirement that the issue must be the same in each case and have emphasized that this criterion is considered very strictly.  The most striking example may be *New Brunswick Railway Company v British and French Trust Corporation Ltd* [1939] AC 1, where Lord Maugham LC said at p. 20 that it must be possible to say, "beyond all possible doubt" that the issues are the same; and it is insufficient for that purpose if they are merely "similar".  See also per Lord Romer at 42-43, rejecting a test of "substantially similar".

38.    A logical corollary of this principle is that "issue estoppel cannot be enlarged by evidence, inference or argument": Spencer Bower and Handley, *Res Judicata* (5th edition, 2019) at §8.22. In the *Duchess of Kingston's Case* (1776) 2 Smith's LC 644, Sir William de Grey CJ said that the principle did not extend to "any matter to be inferred by argument from" the previous judgment (at 479, 483).

39.    This has recently been confirmed by the decision of Hildyard J in *Re Lehman Brothers Holdings Plc* [2023] EWHC 3056 (Ch), where he said at [97]:

> "The fact that the approach of the court on an issue arising in one case may be determinative of a different issue in another case between the same parties does not, without more, establish an issue estoppel. The issue in the later case must be one which was expressly decided, or a necessary and fundamental part of or step in the decision in the earlier case. Parity of reasoning or confluence in the reasoning in the two cases is not enough."

40.    Hildyard J based this on a passage from the seminal judgment of Dixon J in the High Court of Australia in *Blair v Curran* (1939) 62 CLR 464, 531-533, which was itself

based on the judgment of Lord Shaw in *Hoystead v. Commissioner of Taxation* [1926] AC 155.

41.   In his own judgment at [95], Hildyard J added that "a deduction from the earlier decision" in circumstances where "that earlier decision did not decide the issue" was not sufficient for issue estoppel.  I agree.

42.   Issue estoppel may not prevent a litigant from raising an issue previously determined, if there are special circumstances such that further material relevant to the determination of the point has become available: *Arnold v National Westminster Bank* [1991] 2 AC 93, per Lord Keith at p. 109B. That material may include developments in the law, or additional factual matters, but this exception is confined to matters that could not with reasonable diligence have been adduced at the previous hearing. It arises only on unusual facts such as those of *Arnold*.  It was not said by SKAT to arise in this case.

Issue estoppel: application to the facts

43.   I asked Mr Malek KC what the issue was that was precisely identical in both the

      Original Proceedings and the 2022 Proceedings.  His answer was:

          "… whether SKAT's claims for compensation for making tax refunds it was not
          obliged to make was a foreign revenue claim for the purpose of Dicey Rule 3,
          now Dicey Rule 20."

44.   The problem with this, from ED&F Man's point of view, is that the claims for compensation in the Original Proceedings were not the same as the claim now pursued in the 2022 Proceedings. Put shortly, the former claims were for negligent misrepresentation, the latter for deceit. As Mr Malek KC fairly acknowledged, these are different causes of action.

45.   The reality is that the issue considered and decided by Andrew Baker J at the Revenue Rule trial was the issue that he had defined at the CMC, in a formulation that he repeated in his judgment at [4(i)].  This formulation was as set out in paragraph 13 above – i.e. it related expressly to "… SKAT's claims, as alleged."  Andrew Baker J used the same formulation again in his order on the judgment, also of 27 April 2021.

46.   The limiting words "as alleged" meant "as pleaded" or "on the facts pleaded".  I note that this was acknowledged by SKAT when it sought permission to appeal on ground 1. The wording of that ground was that the Judge had erred in his determination of the applicability of the Revenue Rule to "SKAT's claims as alleged".  SKAT explained the meaning of this in paragraph 5 of its skeleton argument for the application to the Court of Appeal as "(i.e., on the facts pleaded)".

47.   In the Original Proceedings, what was "alleged" in respect of the claim against ED&F Man, in the sense of the facts that had been pleaded, was negligent misrepresentation. The facts pleaded did not amount to fraud.  The cause of action pleaded was not deceit.

48.   The issue as between SKAT and ED&F Man in the Revenue Rule trial was similar to the analogous Revenue Rule Issue that in principle arises on the 2022 Proceedings, but

the two are not identical. It is certainly possible to infer or deduce both how Andrew Baker J would have decided the latter issue, and how the Court of Appeal and the Supreme Court would have decided it. Each tribunal would have come to the same decision as it did on the claims that were, in fact, alleged in the Original Proceedings; the distinction between negligent misrepresentation and fraud would have made no difference. However, mere similarity and/or a possible inference or deduction is not sufficient to bring into play the doctrine of issue estoppel.

49.    ED&F Man's application therefore fails, in so far as it relies on issue estoppel.

*Henderson v Henderson* abuse of process: the legal principles

50.    This doctrine owes its name to the case decided by Wigram V-C in 1843: *Henderson v Henderson* (1843) 3 Hare 100, at p. 115.  The name remains unchanged, but the doctrine has inevitably developed in the long period since then.  The modern decision that provides the most reliable starting-point is *Johnson v Gore-Wood* [2002] 2 AC 1, in particular per Lord Bingham at 30H to 31B:

> "It may very well be, as has been convincingly argued (Watt, "The Danger and Deceit of the Rule in *Henderson v Henderson:* A new approach to successive civil actions arising from the same factual matter" (2000) 19 CLJ 287), that what is now taken to be the rule in *Henderson v Henderson* has diverged from the ruling which Wigram V-C made, which was addressed to res judicata. But *Henderson v Henderson* abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them.  The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter.  This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then,

> I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice."

51.     Of particular practical assistance both to practitioners and to judges is *Dexter Ltd v Vlieland-Boddy* [2003] EWCA Civ 14 at [49], where Clarke LJ summarised these principles in numbered form:

> "i) Where A has brought an action against B, a later action against B or C may be struck out where the second action is an abuse of process.
>
> ii) A later action against B is much more likely to be held to be an abuse of process than a later action against C.
>
> iii) The burden of establishing abuse of process is on B or C or as the case may be.
>
> iv) It is wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive.
>
> v) The question in every case is whether, applying a broad merits based approach, A's conduct is in all the circumstances an abuse of process.
>
> vi) The court will rarely find that the later action is an abuse of process unless the later action involves unjust harassment or oppression of B or C."

52.     Despite the volume of judicial ink that has been spilt in this area during the intervening 20 years, this summary is still entirely sound.  It has been referred to at appellate level with approval many times, most recently in *Orji v Nagra* [2023] EWCA Civ 1289, per Coulson LJ at [57].

53.     It is necessary both (a) that the claimant could have raised the matter in the earlier proceedings and (b) that the claimant should have done so.  These conditions are separate but related: the applicant seeking to have the claim struck out will only succeed on "should have" if it can succeed on "could have"; but "should have" does not follow inevitably from "could have".

54.     Moreover, these two conditions are not necessarily sufficient. Even if the claimant could have and should have raised the matter in the earlier proceedings, there still must be the broad, merits-based approach referred to by Lord Bingham in *Johnson v Gore-Wood* and by Clarke LJ in *Dexter v Vlieland-Boddy*, in order to determine whether the claimant's conduct amounts to abuse.  There is no prima facie assumption that bringing new proceedings in relation to issues that have been decided in earlier proceedings is abusive: *Michael Wilson & Partners Ltd v Sinclair* [2017] EWCA Civ 3, per Simon LJ at [48(2)].

55.    This is because a claimant is not lightly to be shut out from bringing a genuine cause of action: *Stuart v Goldberg Linde* [2008] EWCA Civ 2, per Lloyd LJ at [65] (adding that "it must clearly be shown to be an abuse"); *Clutterbuck v Cleghorn* [2017] EWCA Civ 137 per Kitchin LJ at [66] (therefore there must be "a scrupulous examination of all the circumstances"); *Orji v Nagra* [2023] EWCA Civ 1289, per Coulson LJ at [56] (the applicant faces "a high hurdle", needing to show that the claimant's conduct is "so objectionable that they should forfeit their right to take part in a trial").  It follows that, even where the court concludes that abuse is made out, it will not necessarily strike out the claim. There are numerous alternative remedies; striking out a valid claim should also be the last option: *Orji v Nagra* per Coulson LJ at [58].

56.    Usually, in addition to "could have" and "should have", there must also be unjust harassment or oppression of the applicant: *Dexter Ltd v Vlieland-Boddy* [2003] EWCA Civ 14, per Clarke LJ at [53]; *Orji v Nagra* [2023] EWCA Civ 1289, per Coulson LJ at [57].  The reason for this is the importance of what Lord Bingham identified in *Johnson v Gore-Wood* as the primary factor underlying the public interest that justifies the doctrine: "… that there should be finality in litigation and that a party should not be twice vexed in the same matter."

57.    The additional factor that Lord Bingham treated as having a reinforcing effect in justifying the doctrine is also significant: "… the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole."  In other words: the CPR overriding objective. The role of this additional factor as a possible reason for finding A's conduct abusive was given extra prominence by the judgment of the Court of Appeal in *Aldi Stores Ltd v WSP Group plc* [2007] EWCA Civ 1260, per Thomas LJ at [29] to [31], culminating with this guidance:

       "… for the future, if a similar issue arises in complex commercial multi-party litigation, it must be referred to the court seised of the proceedings. It is plainly not only in the interest of the parties, but also in the public interest and in the interest of the efficient use of court resources that this is done.  There can be no excuse for the failure to do so in the future."

58.    The importance of this has been underscored in a number of judgments since then. Confining myself to cases in the Court of Appeal, the examples I have been made aware of include *Stuart v Goldberg Linde* [2008] EWCA Civ 2, per Sedley LJ at [77] and per Clarke LJ at [86] and [90] to [97]; *Gladman Commercial Properties v Fisher Hargreaves Proctor* [2013] EWCA Civ 1466, per Briggs LJ at [64] to [66]; *Clutterbuck v Cleghorn* [2017] EWCA Civ 137 per Kitchin LJ at [74] to [82]; *Otkritie Capital International Ltd v Threadneedle Asset Management Ltd* [2017] EWCA Civ 274; *Orji v Nagra* [2023] EWCA Civ 1289, per Coulson LJ at [57].  In the language of Sedley and Clarke LJ in *Stuart v Goldberg Linde*, the claimant should put his cards on the table, rather than keeping them up his sleeve.

59.    However, neither side drew to my attention any case where the claim was been struck out on the basis of  *Henderson v Henderson* abuse of process merely because the claimant failed to comply with *Aldi Stores Ltd v WSP Group plc*, in circumstances where there was no element of harassment or oppression or unfairness to the applicant – or, at least, some kind of prejudice (whether or not the court used the terms harassment, oppression or unfairness).

(1) In *Aldi Stores Ltd v WSP Group plc*, *Stuart v Goldberg Linde*, *Otkritie Capital International Ltd v Threadneedle Asset Management Ltd* and *Orji v Nagra*, the claims ultimately were not struck out, despite a failure to follow the *Aldi* guidance. In *Otkritie Capital International Ltd v Threadneedle Asset Management Ltd*, the failure to follow the *Aldi* guidance was reflected in the court's treatment of costs.

(2) In *Gladman Commercial Properties v Fisher Hargreaves Proctor*, the claimant's conduct was expressly said to constitute oppression.

(3) In *Clutterbuck v Cleghorn*, the Court of Appeal upheld the Judge's decision to strike out two claims (the Pont Street claim and the Oriel claim) that the Judge had said involved oppression (see at [54]) and an abusive collateral attack on the earlier judgment (see at [72] to [73]).  The Court of Appeal agreed with the Judge's reasoning on these claims and noted that re-litigating the same issues again in these claims would have involved huge expense (see at [91], [93] and [95]).  The claimant's appeal against striking-out was allowed in relation to a third claim (the Cliveden claim) where there was a breach of the *Aldi* guidance but no other factor indicative of abuse (see at [103] to [107]).  The Court of Appeal also said that breach of the *Aldi* guidance is not dispositive, on the question of abuse: [91].

(4) In *Re Lehman Brothers Holdings Plc* the court concluded that *Aldi* was not engaged (see at [116]).  In any event, the claim was not struck out.

60.     I note that, in *Re Lehman Brothers Holdings Plc*, Hildyard J said at [109] that the *Aldi* guidance should not be elevated to the status of an inflexible, overriding rule:

> "That would not be consistent with the decision and guidance given by the Supreme Court in *Johnson v Gore Wood* (which Thomas LJ cited as the principal authority) and Lord Bingham's emphasis in that case (a) that it was wrong "*to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment*" and (b) that *"there will rarely be a finding of abuse unless the later proceedings involve what the court regards as unjust harassment of a party"*"

61.     Once again, I agree with Hildyard J.

62.     This does not mean that failure to comply with the *Aldi* guidance could never, by itself, amount to abuse.  If the overall circumstances were that the failure was especially egregious, and if it was clear all along that the consequences were likely to be especially serious, it might be appropriate to strike out the claim even without harassment or oppression or unfairness to the applicant.  However, such extreme circumstances are likely to be rare.

63.     I was referred to Zuckerman, *Civil Procedure* (4th ed., 2021) at §26.122 to §26. 128, where *Aldi Stores Ltd v WSP Group plc* and *Otkritie Capital International Ltd v Threadneedle Asset Management Ltd* are criticised on the basis that the claims should have been struck out in both cases. I am of course bound by appellate decisions, but, even if I were not, I would regard it as (in general) draconian to strike out what may be a sound claim, because of a mere failure to follow the *Aldi* guidance. I have in mind the authorities that I have cited in paragraphs 55 and 56 above.

64.     There are three further points I should note:

(1)  First, Lord Bingham said in the passage cited from *Johnson v Gore-Wood* that "it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances". In other words, the court should adopt an iterative approach, when conducting its "broad, merits-based" assessment of whether the claimant's conduct amounts to abuse.

(2)  Second, the burden is on the applicant to establish abuse, and remains on the applicant throughout. This was clearly stated both by Lord Bingham in *Johnson v Gore-Wood* and by Clarke LJ in *Dexter v Vlieland-Boddy*. Mr Malek KC suggested that there is a shifting evidential burden, relying on *Finzi v Jamaican Redevelopment Foundation* [2023] UKPC 29, per Lord Leggatt at [91]. I am sceptical that this is what Lord Leggatt can have meant, because a shifting evidential burden would be inconsistent with the iterative approach that Lord Bingham preferred. I note that this appears to have been the reason the Privy Council insisted that the burden is on the applicant throughout in *Investec Trust v Glenalla* [2018] UKPC 7, per Lord Kerr at [190].

(3)  Third, because what is known as the *Henderson v Henderson* principle is concerned with abuse of process, the application to strike out can be supported by reference to matters that are not necessarily within the scope of narrow res judicata points. The broad, merits-based assessment can take into account other, separate matters such as dishonesty by the claimant (cf. Lord Bingham's acknowledgment in *Johnson v Gore-Wood* that, where dishonesty is present, the later proceedings are more likely to be held abusive). That this is so reflected in some of the later judgments, e.g. *Orji v Nagra* per Coulson LJ at [69].

65.     Finally, I should refer to *Playboy Club v Banca Nazionale* [2018] EWCA Civ 2025. SKAT placed great emphasis on this case. The claimant first pleaded negligence, lost at trial, then pleaded fraud in a second action. The second claim was struck out at first instance, but the Court of Appeal allowed the appeal on the basis that, while the claimant had acquired some evidence of fraud at the time of the first trial and could properly have pleaded fraud, that evidence was speculative and weak and the claimant had been entitled to be cautious. By the time the claimant brought the second claim, additional evidence had been obtained, which was highly material to deceit (see at [47]), indeed a decisive matter that put the claimant in a much stronger position (see at [53]). The claimant had not deliberately kept material up its sleeve (see at [51]). In the circumstances, the Judge had been wrong to say that the claimant "should have" pleaded fraud in the first action; the second claim was not abusive (see at [41], [45], [55] to [57]).

66.     *Playboy Club v Banca Nazionale* illustrates the difference between "could have" and "should have". It also illustrates the importance of the facts. Ultimately, it was the Court of Appeal's view of the facts that drove the outcome (see at [47] and [50]).

<u>When could/should SKAT have pleaded fraud?</u>

67.     ED&F Man's primary position was that SKAT could and should have pleaded fraud by the commencement of the Revenue Rule trial, i.e. by 22 March 2021. In the alternative,

it should at least have told the Court of Appeal that it intended to plead fraud at the hearing of the appeal, i.e. 25 to 27 January 2022.

68.    In the course of submissions, Mr Malek KC added a further long-stop: SKAT should at least have told Andrew Baker J that it intended to plead fraud at the CMC hearing that followed the judgment of the Court of Appeal, i.e. 11 May 2022.

69.    Identifying the differences between SKAT's pleaded case against ED&F Man in the Original Proceedings and its pleaded case in the 2022 Proceedings is not straightforward.  However, the significant elements of the new case, which were not present in the Original Proceedings and which, together, have enabled SKAT to put its case in terms of fraud, are the following:

(1)    ED&F Man's PP clients had not been paid the dividends in respect of which they had claimed WHT refunds and had not owned shares in the relevant Danish companies on the dividend date.

(2)    They purported to have purchased shares prior to the dividend date, but the purported sellers did not themselves own shares in the relevant Danish companies and were naked short sellers.

(3)    These transactions were circular, the purchases by ED&F Man's PP clients being covered by matching sales back to the purported sellers.

(4)    ED&F Man knew all these matters, in that individuals within ED&F Man's Security Operations team and its Equity Finance desk had close oversight, knowledge and involvement.

70.    If correct, the combination of these elements would mean not only that ED&F Man's PP clients were not entitled to be refunded WHT and that the Tax Vouchers submitted on behalf of those PP clients contained misrepresentations, but also that ED&F Man knew this.

71.    Some of these elements had been known to SKAT, at least partially, at the time of the Revenue Rule trial.

(1)    ED&F Man had admitted at an early stage of the Original Proceedings that some of the PP clients had not been paid dividends, and so had not been entitled to WHT refunds, in respect of some of the Tax Vouchers. These admissions were incorporated into SKAT's case, by amendment.  However, ED&F Man did not admit negligence (let alone fraud); and these admissions related to (in total) only 89 of the Tax Vouchers, leaving 340 Tax Vouchers unaffected.

(2)    In different contexts, in other countries, SKAT took points that have some resemblance to some aspects of this case.  In particular, Mr Malek KC relied on suggestions made by SKAT to the Prosecutor and to the Tax Tribunal in Denmark in 2018 and again in 2019, which involved circular trading and/or the purchase of shares from affiliated companies.   However, making accusations to these investigating authorities, for them to follow up, is not the same as pleading and pursuing an allegation in civil proceedings, let alone pleading fraud under the

English rules.  What was said by SKAT in 2018 and 2019 was incomplete and lacked detail.

72.   SKAT was only able to plead the totality of the elements that I have set out above when it received ED&F Man's disclosure of all the documents relating to both the transactions by which ED&F Man's PP clients purportedly purchased shares in the relevant Danish companies (referred to as the "A Trades"), and also the transactions by which the sellers purported to cover their short sales (referred to as the "B Trades").

73.   ED&F Man's disclosure was provided in tranches, from 3 August 2020 onwards.  The documents relating to the A Trades were gathered by ED&F Man and their solicitors into "Trade Packs", for the purposes of disclosure.  These Trade Packs were disclosed in tranches on 16 September 2020 and 2 November 2020.

74.   The documents relating to the B Trades were not gathered together but were disclosed piecemeal, described only as documents responsive to keyword searches, in tranches from the first tranche, on 3 August 2020, through to the eighth, on 26 February 2021.

75.   There was one further tranche of disclosure – the ninth, on 19 March 2021. It contained further documents described as responsive to keyword searches, but it did not contain any documents relating to either the A Trades or the B Trades and so was not critical to SKAT's ability to plead fraud.  However, SKAT could not know this until it had reviewed the documents in this final tranche.

76.   The result is that SKAT could not have pleaded fraud until it had completed reviewing the entirety of ED&F Man's disclosure, running to 182,842 documents.  This would have entailed detective-work, to establish which of the documents scattered through ED&F Man's disclosure related to the B Trades, and how the B Trades compared with the A Trades.  It would also have required checking which individuals were involved consistently, so as to establish knowledge.  Finally, it would have required evaluation, ideally by an expert in this kind of trading.

77.   ED&F Man's disclosure was completed by a ninth tranche, disclosed on 19 March 2021. This was a Friday. The Revenue Rule trial commenced on the following Monday, 22 March 2021.

78.   By then SKAT had in its hands the documents that, when fully considered, cross-referenced and analysed by someone appropriately knowledgeable, enabled it to plead fraud.  Accordingly, it is theoretically possible that SKAT could have analysed ED&F Man's disclosure and established that it could plead fraud by the time of the Revenue Rule trial.  However, this is true only in a very remote and abstract sense. It was not practically achievable, within the time available before 22 March 2021.

79.   Furthermore, it has to be borne in mind that ED&F Man's disclosure was never going to be relevant to the Revenue Rule trial, which related to a question of pure principle based expressly on the case "as alleged".  The disclosure (or some of it) could be relevant to the issues arising at the Validity trial (due to begin at the end of October 2021), and still more to the Main Trial (due to commence in January 2023).  SKAT had no reason to complete its analysis of disclosure any earlier than required by this timetable.

80.     Moreover, Andrew Baker J's reasons for dividing the litigation into stages involving these preliminary issues included the greater efficiency and cost-saving that could result.  One of the perceived benefits was that, if the outcome of the Revenue Rule trial meant that the whole process came to a halt, no further costs would or should be expended.  For this reason as well, SKAT therefore was fully entitled to defer analysis of the disclosure until later.

81.     In the event, Andrew Baker J's judgment meant that SKAT thereafter had no reason to consider ED&F Man's disclosure, for the purposes of the Original Proceedings.  This only changed with the handing-down of the judgment of the Court of Appeal, on 25 February 2022.

82.     In fact, however, SKAT's understanding had moved on somewhat before that date. This is because, as well as bringing claims in this jurisdiction, SKAT had also commenced proceedings in the United States of America. SKAT's evidence before me consisted of two witness statements of Ms Jennifer Craven, of Pinsent Masons LLP (SKAT's solicitors).  Ms Craven said that, in the course of the US proceedings, SKAT instructed an expert, Mr Graham Wade, to report on the nature and structure of the transactions comprising the A Trades and the B Trades. Mr Wade was instructed in November 2021 and produced his first report on 31 December 2021.  He produced two further reports on 1 and 28 February 2022.

83.     It is apparent from the report of 31 December 2021 that the materials that Mr Wade was given and asked to consider consisted, essentially, of the same documentation as was disclosed in the Original Proceedings in relation to the A Trades and the B Trades.  Mr Wade analysed these documents, explained the nature and structure of the transactions and expressed conclusions that cover all the points that I have summarised above as the elements of the fraud case now pleaded by SKAT in the 2022 Proceedings.

84.     Ms Craven's evidence on this was as follows:

        "SKAT was not in a position to understand, without the assistance of Mr Wade's expertise, the significance of the documents disclosed by EDFM in the US Proceedings or the Original Proceedings in so far as they related to what are now referred to at the B Trades (whether in the context of the Annex E Cum-Ex Trades or the Non-Annex E Cum-Ex Trades), or EDFM's orchestration of the round-tripping of a small parcel of shares supposedly to settle circular trades involving much larger numbers of shares. It was only when Mr Wade produced his reports in the US Proceedings that SKAT began to understand the significance of that disclosure."

85.     I accept this evidence, with the qualification that, having read all three reports, I have no doubt that SKAT must have gained this understanding sufficiently from the first report of 31 December 2021. The subsequent reports were confirmatory, but they will not otherwise have advanced SKAT's understanding in any respect material to its ability to plead fraud.

86.     I should also say that, no doubt because it was intended to be used in the US proceedings, Mr Wade's report explains matters in a highly accessible manner. It is reasonably lengthy, but it is not difficult to read and understand. Its implications for SKAT's ability to allege fraud against ED&F Man under the rules that cover these

matters in England will have been obvious to any English lawyer immediately, even on a first reading.

87.  Accordingly, while it follows from Ms Craven's evidence that 31 December 2021 was when SKAT "began to understand" the position, it cannot have taken SKAT very long at all to have developed its understanding sufficiently to know that it was entitled to assert fraud against ED&F Man.  I would put this in terms of days rather than weeks. The work of setting this out in the terms appropriate to a pleading would have taken longer, but this could in principle have been done in a few weeks.

88.  Mr Graham KC said in submissions that the court should have in mind that parties and their lawyers are entitled to be reticent about alleging fraud, and that in technical cases like this they may take the view that fraud should only be pleaded with the support of a suitable expert.  He further said that I should have in mind that the views of practitioners vary; some are gung-ho about pleading fraud, others are more cautious; I should assess what SKAT should have done by reference to the more cautious end of this spectrum.

89.  I accept all this. But it still follows that, in principle, SKAT must have appreciated that it was in a position to plead fraud within days or at most weeks of Mr Wade's first report – i.e., within the first few weeks of January 2022.

90.  This is when SKAT first could have pleaded fraud.  It is not when SKAT should have done so. In England, SKAT still faced the problem that, unless and until the judgment of Andrew Baker J on the Revenue Rule issue was reversed by the Court of Appeal, there could be no case against ED&F Man at all.

91.  However, in principle, Mr Malek KC is right to say that SKAT could have raised the existence of a case in fraud against ED&F Man with the Court of Appeal, in the course of the hearing of the appeal; and/or at the CMC of 11 May 2022.

92.  ED&F Man's reason for identifying the hearing in the Court of Appeal as a suitable time for SKAT to have raised the existence of a case in fraud (i.e., 25 to 27 January 2022) is that in the course of submissions, the court asked counsel for SKAT (who was not Mr Graham KC) why the claim against ED&F Man was being treated differently, in terms of the appeal, from those against other defendants. The answer given related to the fact that the claim against ED&F Man did not include allegations in fraud.  Mr Malek KC says, and I agree, that, in the interests of transparency and candour, the Court of Appeal should have been told that, while the case "as alleged" in the Original Proceedings did not include fraud, SKAT had in mind to bring a fraud claim, for the tort of deceit, in the near future.

93.  I do not know whether SKAT had in fact decided to bring a fraud claim against ED&F Man, by 25 to 27 January 2022.  SKAT, unsurprisingly, has not waived privilege over the decision-making process that will have been going on (subject to one other piece of evidence from Ms Craven, discussed below). However, whether or not SKAT had in fact already made this decision, it could and should have done so. It must have anticipated the possibility that the appeal would succeed.  It could and should have considered Mr Wade's report in this light.

94.  This is all the more the case in relation to the CMC on 11 May 2022. Bearing in mind Andrew Baker J's role as designated judge and the obvious desirability of his being told

about any new claim, it is extremely surprising that he was not told in clear terms that SKAT now intended to allege fraud against ED&F Man.

95.     Ms Craven's evidence about this responds to evidence from ED&F Man, given by Mr Justin Nimmo of Rosenblatt (ED&F Man's solicitors). Ms Craven said:

> "Mr Nimmo suggests that SKAT failed to mention to the Court the possibility of a fraud claim against EDFM after SKAT had decided to bring such a claim. This suggestion is incorrect. Without waiving privilege, I can say that, within a short period of time after SKAT formed the intention to bring the Current Claim against EDFM, SKAT informed the Court of that possibility; this was on 11 May 2022: [96:18 to 97:1]."

96.     Ms Craven there refers to pages 96 and 97 of the transcript of the hearing on 11 May 2022. What Andrew Baker J was actually told at that hearing by counsel for SKAT (again, not Mr Graham KC) was that, as the result of developments in the US proceedings, "it is not inconceivable that proceedings may be brought against ED&F Man based on a fraud…"

97.     This was very guarded language.  It will have implied to the court that, while it was conceivable that a fraud claim might be brought, it was no less conceivable that it might not; in other words, no decision had yet been made.

98.     However, Ms Craven's language – "… within a short period of time after SKAT formed the intention to bring the Current Claim against EDFM…" – is not guarded. It is unambiguous. It means that, some time before 11 May 2022, SKAT had already formed the intention to bring a fraud claim.

99.     That is not what was conveyed to Andrew Baker J. It should have been, on 11 May 2022 if not before. In the event, SKAT sent its letter of claim on 6 June 2022.  On the basis of Ms Craven's evidence and in the light of the contents of Mr Wade's report of 31 December 2021, SKAT was in a position to write such a letter substantially before the CMC, and should have done so.

What difference would it have made?

100.    The classic situation where an applicant relies on issue estoppel or *Henderson v Henderson* abuse of process is one where the claimant has brought a first claim, which failed, and now wishes to bring a second claim which, if pursued, will effectively mean that the same matters (or at least similar matters) have to be re-litigated.  This will require the applicant to spend time and incur costs in a way that would not have arisen if the issues in the second claim had been incorporated into the original proceedings. It is this kind of prejudice that is generally characterised as constituting harassment or prejudice.

101.    In many cases, this is so obvious that it is not necessary for the court to explain in any detail whether, how or to what extent the applicant will be prejudiced if the second claim is not struck out. In the case before me, however, this is an aspect worth exploring. That requires considering what would have happened if the fraud had been alleged against ED&F Man in the Original Proceedings, prior to the Revenue Rule trial (by 22 March 2021); or if SKAT had revealed that it intended to plead fraud either at the

hearing in the Court of Appeal (on 25 to 27 January 2022) or at the subsequent CMC (on 11 May 2022).

102.    If SKAT's case against ED&F Man had included fraud allegations prior to the Revenue Rule trial, this would have made no difference to the outcome before Andrew Baker J. However, it would have meant that SKAT made no distinction between its position as against ED&F Man and its position in respect of the claims against other defendants, when it applied for permission to appeal.  The appeal in relation to ED&F Man would have proceeded on the basis of ground 1 as well as ground 2, with the permission of the Court of Appeal, and would have succeeded. It would also have taken part and succeeded in the appeal to the Supreme Court (which, in the event, it did not). ED&F Man would then have taken part in the Validity trial in the Original Proceedings in early 2023, and would also have taken part in the Main Trial which will commence on 9 April 2024.

103.    On this hypothetical scenario, ED&F Man would have had a greater stake in the Court of Appeal hearing (in respect of two grounds rather than only on one), and, I assume, a correspondingly greater responsibility in costs. It would then have taken part in the appeal to the Supreme Court, which in the event it did not.

104.    Its involvement in the Validity trial and in the Main Trial would have been comparable to the involvement that it now faces of having its validity issues and other issues being determined with no other defendants.  The issues, as between it and SKAT, will be no different and (in themselves) their determination will take no more or less time. However, they will arise in hearings that will not involve any other issues, affecting other defendants, so the duration of the hearings, and the periods when the attendance of ED&F Man's legal team will be required, will be reduced.

105.    In short, ED&F Man would have been no better off if SKAT had pleaded fraud against it in the Original Proceedings, prior to the Revenue Rule trial. Indeed, it may well have been somewhat worse off, if my assumptions about cost-sharing among the defendants to the Original Proceedings are correct, and in so far as it will now take part in hearings that will be much shorter overall.

106.    The only issues litigated so far as between SKAT and ED&F Man are the Revenue Rule issues.  These will not need to be re-litigated, because the outcome in the Court of Appeal and then in the Supreme Court make that unnecessary (as Mr Malek KC accepted, with characteristic realism).

107.    If SKAT's fraud claim against ED&F Man had been raised at the Court of Appeal hearing on 25 to 27 January 2022, this would have had no bearing on the outcome in the Court of Appeal.  However, the point now being in the open, it would inevitably have been canvassed in correspondence between the parties.  That process could and no doubt would have accelerated in the period leading up to the CMC on 11 May 2022.

108.    Whether or not the prospective fraud claim had been discussed in correspondence between the parties prior to 11 May 2022, if Andrew Baker J had been told in clear terms that SKAT intended to bring a claim against ED&F Man alleging fraud, for the tort of deceit, it is quite obvious that this would have affected his directions at the CMC. In the event, nothing more was said or done about the position of ED&F Man.  If Andrew Baker J had known that a fresh set of proceedings would be commenced, which

also required to be case managed, I have no doubt whatsoever that he would have wished to investigate whether, and if so on what terms, it could be brought within the scope of the procedural timetable for the other claims.

109. The new case would need to be pleaded out, but in the circumstances, this could probably have been achieved more quickly than if the parties were coming to the matter afresh.   The scope for additional disclosure would have been limited.   The Revenue Rule point could no longer arise, but there might well be new Validity issues which would emerge in due course from the pleadings; these could possibly have been decided at the Validity trial involving the other defendants, or separately at a bespoke Validity trial that only involved ED&F Man.

110. It is not possible to say whether Andrew Baker J could or would have made directions intended to enable the new claim against ED&F Man to form part of the Main Trial involving the other defendants.  It is entirely conceivable that he might have done this, perhaps setting a slightly later date for the commencement of the Main Trial in order to make this workable.  However, I cannot say that this outcome would have been certain, or even likely.

111. However, while I do not know what Andrew Baker J would have decided, I am extremely confident that he would have wished to be given the opportunity to investigate all these possibilities.  That is what active case management requires, and (as already noted) his vigorous commitment to active case management was clearly in evidence at all points.

112. If Andrew Baker J had managed matters such that the new claim against ED&F Man were part of the Main Trial commencing on 2 April 2024, this would not have put ED&F Man in any better position than it now faces. The only difference is that the issues between it and SKAT will instead be resolved separately from those involving the other defendants (and thus in the context of a shorter trial), and later. ED&F Man is unlikely to have to spend more time or incur greater costs in resisting SKAT's claim. It may well be that the cost to ED&F Man will actually be lower.

113. Accordingly, SKAT's failure to raise or plead its case in fraud against ED&F Man has made no real difference to ED&F Man, except that ED&F Man may, possibly, be slightly better off; and the claim will be resolved later.

114. It has made a difference to SKAT itself. If SKAT had acted more promptly, this may well have made it possible for its fraud case against ED&F Man to be case-managed and decided along with the claims against the other defendants. That would probably have been less convenient for ED&F Man, but would probably have led to efficiencies of scale for SKAT, i.e. SKAT would probably have spent less time and incurred lower costs overall.

115. It certainly would have made a difference to the court (and, indirectly, to other court-users). The rationale for the claims against all the defendants being consolidated into Original Proceedings, and case-managed together by a designated judge, was that this would enable the Commercial Court's time and resources to be deployed to maximum efficiency. SKAT's failure to comply with the *Aldi* guidance has had an adverse impact on this.

116.    However, this is not a case where there has been any harassment or oppression of ED&F Man.  ED&F Man has not been prejudiced by SKAT's delay.

117.    On the contrary, like many defendants, ED&F Man seems to be content for the case against it to proceed slowly.

    (1)   ED&F Man took until 9 August 2022 to respond to SKAT's letter.  As every London litigation practitioner knows, a substantial letter sent in early August will not receive a response until well into the following September or October, and that is indeed what happened.  This is, in part, why it was not until 5 December 2022 that SKAT issued its claim form in the 2022 Proceedings.

    (2)   Particulars of Claim were served on 2 February 2023, and Amended Particulars of Claim on 18 July 2023, but ED&F Man has not yet served any Defence, preferring to await the outcome of this application (issued on 30 March 2023, as I have already noted).

    (3)   I infer that ED&F Man is not unhappy that the fraud claim against it will probably not be determined until after the Main Trial.

Conclusion

118.    ED&F Man's case on issue estoppel fails as already explained.

119.    On *Henderson v Henderson* abuse of process, SKAT could not have pleaded or raised a case in fraud against ED&F Man by January 2021, i.e. in time for the Revenue Rule trial.  It could and should have raised its intention to plead fraud with the Court of Appeal in January 2022, and (more importantly) with Andrew Baker J prior to or at the CMC of 11 May 2022.  Its failure to do so was a breach of the guidance of Thomas LJ in *Aldi Stores Ltd v WSP Group plc* [2007] EWCA Civ 1260, at [29] to [31].

120.    However, this is not a case where there has been any harassment or oppression of ED&F Man. Indeed, ED&F Man has suffered no prejudice whatsoever; it may even have benefited marginally from SKAT's failure.

121.    This is a very substantial claim (equivalent to at least £56 million), which may well be sound.  In all the circumstances, it would be unjust to deprive SKAT of the opportunity to have its claim adjudicated.

122.    In reaching this conclusion, I principally have in mind that the court must be cautious about shutting litigants out of their right to justice. The need for caution features prominently in several of the authorities in this area (see paragraph 55 above), and is also required by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

123.    However, it also seems to me relevant that the case SKAT wishes to bring is one of fraud.  The general interests of justice, and the wider interests of society as a whole, are not well served if serious financial fraud is not brought to light.  If fraud has been committed, the fraudsters should be exposed.

*Skatteforvaltningen v MCML Limited*

124.   My conclusion that SKAT has not complied with the *Aldi* guidance will, however, almost certainly be of very great significance in relation to costs (as was the position in *Otkritie Capital International Ltd v Threadneedle Asset Management Ltd*).