# EXHIBIT 6

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

_____
                                    )
IN RE:                              )
                                    )
CUSTOMS AND TAX ADMINISTRATION OF   )
THE KINGDOM OF DENMARK              )
(SKATTEFORVALTNINGEN) TAX REFUND    )
SCHEME LITIGATION                   )
                                    )
This document relates to case nos.  )
19-cv-01783; 19-cv-01788; 19-cv-01794; )
19-cv-01798; 19-cv-01918            )
_____)


C O N F I D E N T I A L
SUBJECT TO THE PROTECTIVE ORDER


REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
RICHARD MARKOWITZ
DATE: April 8, 2021




REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 154

1  Q   All right.  And do you know what
2  the standard settlement date was in Denmark
3  for Danish securities at the time?
4  A   I don't recall.  It was trade date
5  plus a certain number of business days.
6      I don't exactly recall the number.
7  Q   Okay.  I'll represent to you that
8  at the time it was "T plus 3."
9      And do you understand "T plus 3" to
10 mean that the settlement date is three days
11 past the trade date?
12 A   Three business days, correct.
13 Q   Yes.  I was about to say that
14 excludes weekends or holidays.
15     Correct?
16 A   Yes.
17 Q   Okay.  So I'll represent to you
18 that there was a two-day weekend between
19 those two dates, which would make it a
20 "T plus 4" settlement.
21     Were you aware that the pension
22 plan was purchasing Danish securities with a
23 "T plus 4" settlement date?
24 A   Assuming there were no other
25 holidays other than the weekend you've

Page 155

1  described, then this would be "T plus 4."
2  Q   Okay.  Were you aware that the
3  settlement date used in the transaction at
4  the time was a day beyond the normal
5  settlement date?
6      MR. BONGIORNO:  Objection.
7  A   Again, I don't agree with your
8  premise.  I was aware that it was a
9  "T plus 4" settlement.
10 Q   Okay.  Were you aware that the
11 standard in Denmark at the time was
12 "T plus 3?"
13 A   The standard for exchange
14 transactions done on the exchange, or
15 over-the-counter transactions?
16 Q   Is there a separate standard
17 settlement date for over-the-counter
18 transactions?
19     MR. BONGIORNO:  Objection.
20 A   Settlement date is whenever the
21 parties agree, and if the exchange is one of
22 the parties, they say what it is.  If it's
23 between two counterparties, the settlement
24 date could be "T plus zero" up to
25 "T plus 110."

Page 156

1  Q   Did you understand that the
2  standard exchange settlement date in Denmark
3  at the time was "T plus 3?"
4  A   I don't know if I knew of those
5  particulars at the time.
6  Q   But were you aware at the time that
7  part of the strategy was that the settlement
8  for the purchase of the shares would happen
9  one day past the exchange -- the standard
10 settlement date on the exchange?
11     MR. BONGIORNO:  Objection.
12 A   All I was aware of was -- again,
13 taking your word for it -- that in this case,
14 that trades settled four business days later
15 than the trade date.
16 Q   Okay.  And your understanding is
17 that that was a negotiated term.
18     Is that right?
19 A   Yes.
20 Q   Okay.  Why did the pension plan
21 negotiate that term, Mr. Markowitz,
22 "T plus 4?"
23 A   (Witness reviewing.)
24     More is better to come up with the
25 cash required.

Page 157

1  Q   That was your understanding, that
2  the plan negotiated because more was better
3  to get the cash required?
4  A   Yes.  In my experience, the more
5  days you have to settle the trade, the better
6  it is for the party obligated to pay.
7  Q   Okay.  And what was your
8  understanding as to why the seller of the
9  shares in this case would be willing to give
10 you more time to buy the shares than is the
11 standard settlement time in the country?
12 A   Part of the negotiation on the
13 price at which the transaction would be done.
14 Q   Wasn't the transaction
15 negotiated -- wasn't the price negotiated to
16 just be end-of-day market price?
17 A   As I explained earlier, the seller
18 and the market pricing allocates a certain
19 amount of the profit of a dividend arbitrage
20 transaction to the other counterparties in
21 the deal, including the seller.  So accepting
22 a certain share, or pricing and market terms,
23 they would have agreed to this "T plus 4."
24 Q   Who undertook this negotiation with
25 the seller on behalf of the Michelle plan?

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

41 (Pages 158 to 161)

Page 158

1  A    Back in April of 2012, following
2  the e-mail you mentioned, we had a call with
3  Solo in which we learned that they were
4  becoming a custodian, and terms of trades and
5  liquidity in the market and pricing in the
6  market was explained to us at that time.
7       And that included a share between
8  the seller and the buyer.
9  Q    Okay.  Were you part of that
10 discussion that you just described happened
11 with Mr. Shah?
12 A    Yes.
13 Q    Where did that take place?
14 A    A telephone discussion.
15 Q    Okay.  Who was a participant?
16 A    I was on the call, one or more of
17 my partners may have been on the call, and
18 representatives of Solo Capital were on the
19 call.
20 Q    Okay.  And during that call, the
21 Solo people said that they were becoming a
22 custodian?
23 A    That they had become a custodian.
24 Q    Okay.  And so we saw a bunch of
25 e-mails earlier where they were trying to get

Page 159

1  other financial institutions to serve as
2  custodian.
3       Did they not get any that would
4  serve in that role?
5  A    I don't know.
6  Q    Okay.  But it turned out that when
7  the dividend arbitrage trading began with
8  Denmark, it was going to be Solo Capital who
9  was the custodian for the trading?
10 A    The discussions we had with Solo
11 initially were that the trading would be in
12 Belgium and those were the trades we did
13 initially.
14 Q    Okay.  And for the Belgian trades
15 initially, Solo Capital was going to be the
16 custodian?
17 A    Yes.
18 Q    And then, as we see in August of
19 2012, this plan started trading in Denmark.
20      Was Solo Capital --
21 A    Yes.
22 Q    Was Solo Capital the custodian as
23 well?
24 A    Yes.
25 Q    Okay.  So tell me,

Page 160

1  what -- withdrawn.
2       What did the Solo folks tell you on
3  that phone call about how the trading would
4  work and the counterparties?
5  A    They said that Solo had worked to
6  get approvals from the British regulators to
7  become a custodian, that they had hired legal
8  and compliance staff, securities finance
9  people, and that with customers who became
10 clients of Solo as a custodian, they would be
11 able to purchase shares from -- through
12 brokers, from the market, for other sellers
13 of the shares, and hedge those transactions
14 through their accounts at Solo for futures
15 contracts and, if needed, lend shares to a
16 borrower who would post collateral pursuant
17 to a standard stock lending agreement.
18 Q    Okay.  You mentioned earlier
19 that -- something about that there would be
20 negotiations with the sellers of the shares
21 about terms such as price and settlement
22 date.
23      What did they tell you on that
24 phone call about that?
25 A    That the pricing -- market pricing

Page 161

1  would be a 50-50 split between the buyers and
2  the sellers, and that the customer of Solo,
3  our customer, on the long side, the purchaser
4  of shares, would pay the normal 34 percent of
5  its profit to Solo, as we did when they were
6  acting as the investment manager.
7  Q    Okay.  How was the 50-50 split
8  between the buyer and seller going to work?
9  How did they accomplish that?
10 A    From our earliest days of the
11 Broadgate Fund, in cases where you had to
12 file for a refund, we insisted that other
13 participants in the deal accept their profit
14 in the trade on a contingent basis, so that,
15 ordinarily, the pricing would be reflected in
16 the price you sold shares for in the hedging
17 of the transaction.
18      But starting with the Broadgate
19 Fund and Merrill Lynch, and the
20 counterparties that Merrill Lynch involved,
21 we wanted to have the other participants
22 receive their profit on a contingent basis.
23 So that's where, whether it was 75/25, 60/40,
24 or 50/50, when the transactions were
25 completed and you tallied up the pluses and

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

43 (Pages 166 to 169)

Page 166

1  get its money, the profit -- the 50 percent
2  profit that is earned from this strategy?
3      A    I don't know.
4      Q    From whom is the seller going to
5  get that money?
6      A    Based on our experience from the
7  Broadgate Fund, it would be up to the
8  arrangers of the trade, the other
9  participants in the trade, to compensate
10 those other counterparties.  And we were not
11 privy to those discussions.  We're not party
12 to those discussions.
13          And as I said, we left it to Solo
14 to decide when and if and how they would pay
15 those other counterparties who were
16 participating in the trades.
17     Q    Okay.  So Solo was the arranger in
18 this trade?
19     A    Yes, arranger and custodian.  They
20 had a lot of responsibilities in order to
21 allow and facilitate the trades on behalf of
22 various counterparties.
23     Q    Okay.  And the "T plus 4"
24 settlement date, who was responsible for
25 negotiating that with the seller?

Page 167

1      A    I don't recall.  No, let me take
2  that back.  I'm sorry.
3           The pension plan would ask
4  for -- ask brokers if there was liquidity in
5  the market to buy shares on the following
6  terms.  Terms included closing price, market
7  price, trade date, settlement date.
8           And so, those terms were given to
9  the broker, and if the broker could fill
10 those trades at those terms, the transaction
11 would move forward.
12          So I assume the pension plan giving
13 instructions and requests for liquidity from
14 brokers would start that process.
15     Q    And was that use of brokers going
16 into the market to execute on behalf of a
17 client, was that a typical process from your
18 experience in the financial industry?
19     A    I'm sorry.  You faded out towards
20 the end of that question.
21          If you could repeat it?
22     Q    Yeah.  Was the use of brokers to go
23 into the market to try to execute a trade on
24 behalf of a client, was that a typical
25 process in your experience in the financial

Page 168

1  industry?
2      A    Among two institutions who wanted
3  to effect trades, the use of an inter-dealer
4  broker or an institutional dealer broker,
5  yes, that was common.
6      Q    Okay.  An inter-dealer broker in
7  the market, what they do is, one institution
8  calls and says "we want to buy a certain
9  amount of a certain share at a certain
10 price," and then they go into the market and
11 see if they can meet that request.
12          Right?
13     A    I don't know specifically how they
14 work.  I assume they would call up other
15 customers who might be willing sellers of
16 that share, of that security, and are
17 matching a buyer with a seller.
18     Q    And in this case, when you said
19 that the pension plan would issue
20 instructions to the broker for what trade it
21 wanted to do, you're talking about what
22 share, what price, and what volume.
23          Correct?
24     A    And the settlement terms.
25     Q    Meaning what?  Meaning just the

Page 169

1  "T plus 4" or the "T plus 3?"
2           Is that what you mean?
3      A    Yes.
4           MR. BONGIORNO:  Objection.
5      Q    When you instructed the broker to
6  seek someone in the market for that trade,
7  did you put in the instructions that one of
8  the terms is a 50/50 split on the overall
9  profit from the dividend arbitrage strategy?
10     A    No.
11     Q    Wasn't that a key term in getting
12 this deal executed?
13     A    I assume that you -- the broker was
14 aware of that in terms of being offered that
15 to a potential seller, that Solo was aware of
16 that.  And if the sellers and the brokers
17 were customers of Solo, Solo would make that
18 aware to them.
19          And again, we allowed or left all
20 of that to Solo.  And if there was a seller
21 who didn't demand 50 percent, may have
22 demanded zero or 10 percent, that was up to
23 Solo and the brokers to figure that one out.
24 We were not party to those discussions.
25          We knew what we would be -- our

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

44 (Pages 170 to 173)

Page 170

1 percentage would be, and it would be up to
2 the other counterparties to source the shares
3 from the market. That's the commissions we
4 pay a broker to do, and with knowledge, if
5 they needed it, of what additional potential
6 profit or earnings they could make on that
7 transaction.
8     Q    Okay. But -- so when you're
9 instructing the broker, you're -- it sounds
10 like you're not giving all the terms of the
11 ultimate deal with the selling counterparty.
12        Right?
13    A    We gave the terms of the trade that
14 we needed to do to execute the trade. And
15 again, the contingent profitability is in
16 every dividend arbitrage strategy we worked
17 on going back to Merrill Lynch and the
18 Broadgate Fund.
19        It was up to the -- I will borrow
20 your term -- the arrangers to sort out how
21 they brought other counterparties to the
22 trade to make it successful and on -- comply
23 with all the legal and tax requirements
24 needed to do so.
25    Q    Okay. And here, this TDC trade on

Page 171

1 behalf of the Michelle plan, that wasn't the
2 only trade that was going to be happening as
3 part of this strategy, right?
4        Meaning, just to be clear, there
5 were going to be other plans executing very
6 similar trades in the same stock.
7        Correct?
8    A    Yeah, dividend-paying stocks.
9 Those were -- that was the focus on the
10 strategy.
11    Q    Right. So, for example, on a day
12 where the Michelle plan was going to buy this
13 many shares of TDC, you understood that other
14 pension plans associated with you or the
15 Argre principals were also going to buy TDC
16 shares in similar volumes on the same day.
17        Right?
18    A    No. I understood that on that
19 trade date, or around that trade date, as
20 long as it was prior to the date of the
21 general annual meeting, many pension funds,
22 both here in the U.S. or Canada, around the
23 world, people who had tax treaties would look
24 to trade dividend-paying stocks.
25    Q    And of those many, there were going

Page 172

1 to be quite a few that had your name attached
2 to it or your Argre principals' names
3 attached to them.
4        Correct?
5        MR. BONGIORNO: Objection.
6    Q    Let me withdraw it.
7        It's very simple, Mr. Markowitz.
8 When you undertook this trade on behalf of
9 the Michelle plan on August 8, 2012, you
10 understood that other pension plans
11 associated with the Argre principals were
12 also going to purchase TDC shares in similar
13 amounts on the same trade date.
14        Correct?
15    A    Other pension plans were customers
16 of Solo, were focused and interested in a
17 dividend arbitrage trades on the terms that
18 we understood them, and I don't know about
19 your comment on the amounts, if they were
20 similar or different. I don't know that.
21        Each of the customers would be
22 trading an amount that was consistent with
23 their own investment needs and/or the
24 liquidity in the marketplace.
25    Q    And how did you understand the

Page 173

1 brokers were going to go find the liquidity
2 for these trades in the marketplace?
3    A    From sellers of shares.
4    Q    Okay. Where did you expect they
5 were going to find these sellers?
6    A    In all the dividend arbitrage
7 strategies we had looked at and participated
8 in, that was up to the brokers to find that
9 liquidity, given the economics of the trade
10 and the advantage of dividend arbitrage.
11        As I said, profitability could be
12 shared. The sellers could have been other
13 investors who were not entitled to the tax
14 benefits. They could have been short
15 sellers, long sellers.
16        So the source of the stock was up
17 to the brokers and the sellers to obtain
18 based on market liquidity.
19    Q    Okay. And was it your
20 understanding that the sellers in each case
21 would be executing on the Solo platform?
22    A    We were informed by Solo that other
23 counterparty to the trade would likely be
24 customers of Solo as well.
25    Q    Okay. And is that -- that's true

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

52 (Pages 202 to 205)

Page 202

1  how those fees would be parceled out.  But it
2  was part of the overall construction of the
3  trade.
4      Q    Okay.  Other than facilitating
5  getting the money to the right places, did
6  Ganymede, the entity, provide services to the
7  pension plans?
8      A    I viewed Ganymede and Solo and
9  Sanjay Shah as one entity.  So yes, in my
10 belief, there were significant services
11 provided in developing and becoming a
12 custodian at Solo Capital, and hiring all the
13 staff necessary to allow the custodian to
14 function, and to allow our pension plans or
15 other pension plans to execute these trades.
16     Q    Okay.  So you viewed Solo Capital
17 and Ganymede as interchangeable?
18     A    Yes.
19     Q    Okay.  And do you -- did you have
20 an understanding as to why you got an
21 instruction from Mr. Shah to use the Ganymede
22 entity on certain occasions as opposed to the
23 Solo Capital entity?
24     A    No.
25     Q    Okay.  Solo Capital had operations

Page 203

1  in what locations, as far as you knew?
2      A    We visited their offices in London.
3  I don't know if they had legal offices
4  elsewhere in the world.
5      Q    Do you know if they had offices in
6  Dubai?
7      A    I don't know for sure.
8      Q    Okay.  And where did -- do you know
9  where Ganymede was located?
10     A    I don't recall exactly.
11     Q    Can you turn to the document marked
12 Exhibit 2124?
13          MR. WEINSTEIN:  Mark this as 2124.
14          (Whereupon the above mentioned was
15     marked for Identification.)
16     A    (Witness reviewing.)
17     Q    This is a document that's titled
18 "Tax Reclaim Advisory Services Agreement
19 Between Ganymede Cayman Limited and Michelle
20 Investments Pension Plan Trust."
21          Are you familiar with this
22 document?
23     A    Yes.
24     Q    Okay.  And did you -- on behalf of
25 Michelle plan, did you execute it?

Page 204

1      A    Yes.
2      Q    Given that the title of the
3  Ganymede entity is "Ganymede Cayman Limited,"
4  do you know -- does that refresh your
5  recollection as to where Ganymede was
6  located?
7      A    Yes.
8      Q    Okay.  Was it in the Cayman
9  Islands?
10     A    Yes.
11     Q    Did you ever get to visit?
12     A    Unfortunately not.
13     Q    Yeah, okay.  It says "Dated" on the
14 first page, but it doesn't have a date.
15 Then, on the last page, there's a schedule
16 which says, "This schedule is accurate as of
17 19th of October, 2012."
18          Do you believe that's approximately
19 the time that you would have executed the
20 agreement?
21     A    (Witness reviewing.)
22          I don't know.
23     Q    Did Mr. Shah instruct you to enter
24 into this agreement with Ganymede?
25     A    Sorry.  Did Mr. Shah do what?

Page 205

1      Q    Instruct you to enter into this
2  agreement with Ganymede?
3      A    He requested that we enter into
4  this agreement.
5      Q    Okay.  Did you have any discussions
6  with him about that?
7      A    The discussions predate this date
8  to what I explained earlier about our
9  understanding of how the pension plan would
10 participate in these investments, earn its
11 return, have to share the profitability with
12 other parties in the transaction, and that
13 as -- similar to the transaction with Merrill
14 Lynch, we would pay away everything that we
15 were not entitled to to Solo or Sanjay or
16 Ganymede, what entity they designated, and
17 pay that away and let them distribute those
18 funds as they believed were necessary.
19     Q    In the deal with Merrill Lynch, did
20 Merrill Lynch ask you to enter into an
21 advisory services agreement with an entity in
22 the Cayman Islands that you never heard of?
23     A    I don't remember.
24     Q    Is it fair to say unlikely, as you
25 sit here today, that that happened?

Page 214

1 that -- when Michelle purchased the TDC
2 shares in August of 2012?
3   A   That was my understanding of the
4 terms of the economics to the pension plan
5 and the other counterparties in the trades.
6   Q   Okay.  So why isn't that term
7 reflected in this agreement, that you're
8 going to pay Ganymede 66.67 percent, but that
9 part of that has to go to the seller because
10 the seller gets 50 percent of the profit?
11       Why was that term not in this
12 agreement?
13       MR. BONGIORNO:  Objection.
14   A   I don't know the answer to that
15 question other than in many business
16 transactions I've worked on, including ones
17 with hundreds of pages of documents, some
18 agreements are discussed and then embodied in
19 percentages, but the parties agree to what
20 the terms are.
21       And in every dividend arbitrage
22 transaction we looked at, no matter who the
23 participants were, the most important term
24 was the trading level.  And therefore, that
25 was agreed up front with Solo what the

Page 215

1 trading level would be.
2   Q   And by "trading level," you mean
3 how much the seller gets of the profit of the
4 whole strategy?
5   A   Yes.
6   Q   All right.  And why was the most --
7 in your words, why was the most significant
8 term to that deal not reflected in a contract
9 like the one we see here?
10   A   It is reflected.  It's embodied in
11 that percentage.
12   Q   Okay.
13   A   And if I might add, from the
14 pension plan's perspective, what it is
15 concerned about is how much profitability it
16 can retain from a dividend arbitrage or
17 structured investment transaction.  And how
18 the money that it isn't retaining is paid or
19 not or spent is not the concern of the
20 investor, from my experience.
21   Q   Prior to entering into the Danish
22 transactions, did you have any understanding
23 from Sanjay Shah about what you could expect
24 to earn for each pension plan that
25 participated?

Page 216

1   A   We were supplied with trading
2 information on names of companies that paid
3 dividends, not just in Denmark, but Belgium,
4 and we were able to confirm the amounts of
5 the dividend, the various dates associated
6 with those dividend payments, and we would
7 ask for information from any investment
8 manager or prime broker what liquidity they
9 might be able to achieve in the marketplace.
10       And it is likely that we received
11 indications of that from Solo Capital.
12   Q   Did Solo Capital give you any
13 indication of a certain amount of money that
14 you could expect to earn for every pension
15 plan that participated?
16   A   I don't recall if they said this
17 pension plan would earn this or not.  They
18 gave us a sense of the size of the market in
19 terms of liquidity and shares that they
20 thought would be available and subject to
21 other constraints, and the number of plans
22 that we could have as customers of Solo that
23 would mathematically lead to estimates of
24 profits.
25   Q   What estimates of profits did it

Page 217

1 lead to?
2   A   I don't recall.
3   Q   Do you recall whether the estimates
4 of profits were in the thousands, hundreds of
5 thousands, millions?
6       MR. BONGIORNO:  Objection.
7   A   They were in the millions.
8   Q   Was that with respect to each
9 particular plan that would be involved, or
10 was that on an aggregate basis?
11       MR. BONGIORNO:  Objection.
12   A   I suspect we looked at it in the
13 aggregate, but knew that at the end of the
14 day there would be different customers
15 earning different amounts based on the
16 volumes that they invested in, the shares
17 they owned, and the trading.
18   Q   So when you said you think the
19 estimate was in the millions, were you
20 talking on an aggregate basis?
21   A   Yes.
22   Q   Okay.  Are you -- by "millions," do
23 you mean several million, or tens of
24 millions, or can you define it any more
25 precisely?

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

68 (Pages 266 to 269)

Page 266

1    Q    Okay. Can you turn, please, to
2  Exhibit 2142?
3         MR. WEINSTEIN: Mark this as 2142.
4         (Whereupon the above mentioned was
5         marked for Identification.)
6    A    (Witness reviewing.)
7    Q    Do you see it's an e-mail
8  originally from Solo Capital to, you know,
9  its clients that there's a change in the
10 custody agreement with an increase to the
11 minimum cash balance to 500,000 Euros?
12   A    Yes.
13   Q    Okay. Do you know if that new
14 margin requirement applied to the plans that
15 you were associated with?
16   A    I assume it applied to all clients
17 at that time, as of August 1, 2014.
18   Q    Did the plans that you were
19 associated with comply with that new margin
20 requirement?
21   A    The plans that we previously had
22 been talking about stopped trading with Solo
23 at that point in time.
24   Q    Okay. So there was still trading
25 going on, but Solo was not the custodian?

Page 267

1    A    I'm sorry. Can you repeat that?
2    Q    Sure. There was still trading
3  going on, but Solo was not the custodian?
4    A    No.
5    Q    Okay. So, in July 2014, were any
6  plans that you were associated with trading
7  in Danish securities using Solo as custodian?
8    A    No.
9    Q    In July 2014, were any plans you
10 were associated with trading in Danish
11 securities with some other entity as
12 custodian?
13   A    No.
14   Q    So there was no Danish trading
15 going on during this period of time?
16   A    During the time you said, yes.
17   Q    Okay. And was there any Danish
18 trading going on with any of your plans in a
19 time where they used Solo as the custodian
20 and during a time period in which the minimum
21 cash balance was 500,000 Euros?
22   A    No.
23   Q    Okay. As part of the Danish
24 securities trading, did the plans onboard
25 with various securities brokers?

Page 268

1    A    Yes.
2    Q    Do you recall which brokers were
3  used for Danish trading?
4    A    One was the e-mail we were
5  previously looking at, FGC Securities.
6    Q    Okay.
7    A    I recall another name, Novus
8  Capital, and there were probably one, two, or
9  three more that I don't recall their names at
10 this point.
11   Q    Okay. Were you familiar with Novus
12 Capital prior to doing trading with Solo
13 Capital?
14   A    No.
15   Q    Who introduced Novus as a broker?
16   A    Solo.
17   Q    Did you perform any due diligence
18 on Novus other than to obtain DML or Patriot
19 Act certificates?
20   A    No. It wouldn't have been our --
21 it wouldn't have been something we would have
22 done to deal with a broker that was
23 intermediating trades for us.
24   Q    Prior to using any brokers for the
25 purposes of this Danish trading, were you

Page 269

1  familiar with any of them that acted in that
2  role?
3    A    Yes.
4    Q    Which ones were you familiar with
5  prior to dealing with Solo?
6    A    We had met one or two when we made
7  our first due diligence trip to London in
8  2010. In addition to meeting Merrill Lynch
9  and Acupay, we met one or more institutional
10 dealer -- institutional brokers.
11        And the names I don't recall at
12 this point, but we met at least two of them
13 at that trip.
14   Q    Did you end up using those one or
15 two institutional brokers as part of the
16 Danish trading?
17   A    I don't recall.
18   Q    Okay. Had you been familiar with
19 FGC Securities before dealing with Solo?
20   A    No.
21   Q    Who introduced FGC Securities as a
22 broker?
23   A    Solo.
24   Q    Can you turn, please, to Exhibit
25 2143?

Page 274

reports that Solo asked him "to onboard with three new brokers yesterday," and then he identifies those three.

**Q** Do you have any understanding why Solo asked to have the plans onboarded with three new brokers?

**A** No.

**Q** Had you ever heard of Bastion Capital, Mako Financial or the TJM Partnership prior to Mr. LaRosa introducing them through this e-mail?

**A** No.

**Q** As far as you understood, was it Solo that introduced those brokers into the mix?

**A** Solo asked Mr. LaRosa to onboard with those three new brokers.

**Q** Okay. Do you know if the plans ever used any of these three brokers in connection with trading of Danish securities?

**A** I think so, yes.

**Q** Okay. Whose job was it on behalf of the plans to decide which broker to go to to seek liquidity for any particular trade?

**A** It's part of the allocation process

Page 275

that we received from Solo in terms of the liquidity and shares. We'd also be given information as to which of those brokers would source that liquidity or had access to that liquidity.

So Solo would provide us a number of shares that they saw in the marketplace or could arrange in the marketplace, and also the identity of the brokers who would be able to handle the trades on behalf of the pension plans.

**Q** So prior to the plans entering into the purchase of the securities, the plan would receive information from Solo about which brokers to reach out to to fill certain, you know, liquidity for any particular stock.

Is that right?

**A** Yes.

**Q** If you look at the Michelle plan's purchase of TDC shares in August of 2012, did the various plans that were set up in 2012 trade in other Danish stocks in 2012?

**A** Yes.

**Q** And did the trades follow the same

Page 276

patterns as what we saw with the TDC purchase, meaning a purchase, a stock loan, and a hedge?

**A** In order, a purchase, a hedge, a receipt of dividend, and a stock loan.

**Q** Okay. Do you know how many plans that you were associated with traded in Danish securities in 2012?

**A** Approximately six.

**Q** Okay. As part of the transactions you just described, one of the ones you mentioned was the receipt of the dividend.

How did the pension plan receive the dividend in connection with the shares that it purchased?

**A** Received it into its custodial account at Solo Capital.

**Q** Do you know who sent -- well, withdrawn.

From where did the dividend come that came into the custodial account of the plan?

MR. BONGIORNO: Objection.

**A** Can you repeat the question, please?

Page 277

**Q** Sure. Where did the dividend come from that would be credited to the plan's custodial account?

**A** In our experience, learning about dividend arbitrage trading, it either came directly from the company paying the dividend or, if that payment got redirected somewhere else by mistake, or by not having proper records, at the central security depository, then the seller of the shares would have to make a payment and they would receive the dividend directly.

**Q** Okay. In connection with the purchase of Danish securities that was done on behalf of these pension plans, do you know, typically, did the dividend that was received come directly from the issuer company?

**A** Again, as I said, we're talking about the theoretical, that's how the payments were made. Money into our account is money, and it was a dividend payment.

And I have -- don't have any idea as to the routing or origin of that payment, but it was a dividend payable by the company.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 18-MD-2865 (LAK)

_____
                                    )
IN RE:                              )
                                    )
CUSTOMS AND TAX ADMINISTRATION OF   )
THE KINGDOM OF DENMARK              )
(SKATTEFORVALTNINGEN) TAX REFUND    )
SCHEME LITIGATION                   )
                                    )
This document relates to case nos.  )
19-cv-01783; 19-cv-01788; 19-cv-01794; )
19-cv-01798; 19-cv-01918            )
_____)


C O N F I D E N T I A L
SUBJECT TO THE PROTECTIVE ORDER


CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER
ORAL EXAMINATION OF
RICHARD MARKOWITZ
VOLUME II
DATE: April 9, 2021


REPORTED BY:  MICHAEL FRIEDMAN, CCR

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

38 (Pages 451 to 454)

Page 451

1    A    We received advice that explained
2  the issues surrounding that related to a
3  different jurisdiction in Denmark, and that
4  it created additional tax risk for the
5  pension plans.
6    Q    Okay.  Can you turn, please, to
7  Exhibit 1829?
8         MR. BONGIORNO: Day 1, Volume 1.
9    Q    This e-mail from you is about
10 Danish reclaim payments received from Syntax.
11        Is that right?
12   A    Yes.
13   Q    And you say in the e-mail that "the
14 amounts on the spreadsheet were sent to each
15 plan's respective custodian, and then
16 75 percent of the gross reclaim was paid out
17 to Ganymede."
18        And in 2015, why was 75 percent of
19 the gross reclaim paid out to Ganymede?
20   A    In late 2014, after the partners of
21 Argre decided not to work together, we
22 weren't sure we would be able to continue
23 doing business with Solo Capital or its
24 related entities.
25        And as I mentioned, two of my

Page 452

1  former partners, Mr. Stein and Mr. Lhote, had
2  decided to go off and do business on their
3  own.  And they had acquired North Channel
4  Bank, got authorizations to have it act as a
5  custodian, had decided to work with former
6  employees of Solo, and were going to be
7  effectively competing in this dividend
8  arbitrage marketplace.
9         So with respect to Solo Capital,
10 where Mr. Van Merkensteijn and myself, and
11 ultimately Mr. Klugman, preferred to continue
12 our relationship and client business, we had
13 discussions that initially were tense because
14 Mr. Shah thought that Mr. Van Merkensteijn
15 and myself were investors in the bank, aware
16 of the developments, were going to be
17 competing.
18        And we assured them that that was
19 farthest from the truth.  We had no
20 relationship with that, we're not aware of
21 it, or became aware of it at the time that
22 Argre Management effectively dissolved.
23        And Mr. Shah said that he would
24 consider allowing us to participate as
25 customers and clients with different

Page 453

1  entities, those that were no longer
2  affiliated with or related to Mr. Stein
3  and -- Mr. Stein and Mr. Lhote, and the
4  economics would most likely change because
5  there would be additional competitors in the
6  marketplace, North Channel Bank, the ability
7  to get liquidity in shares would be impacted,
8  and that we would be -- the pension plans
9  would be receiving a lower percentage based
10 on the market pricing and the fees paid to
11 the other counterparties.
12        And that became 66 percent to
13 75 percent that would be paid away by the
14 pension plans because of this market
15 development, and perhaps Mr. Shah being upset
16 and associating Mr. Van Merkensteijn and
17 myself with the actions of my former
18 partners.
19   Q    So, in this particular case, adding
20 competitors into the market actually drove up
21 the fee as opposed to the additional
22 competitors usually driving a fee down?
23   A    No.  Additional competitors in the
24 marketplace drive up the cost of borrowing
25 shares if it's a stock lending transaction,

Page 454

1  or more people competing for the same
2  potential sellers of shares, whether they're
3  sourcing them through short sales or not.
4         So you have the same number of
5  shares in the marketplace, fixed by shares
6  outstanding or those willing to participate
7  as sellers in the transaction, same number of
8  shares, now another competitor looking to
9  acquire those shares for a structured trade.
10        And if I'm the party supplying
11 those shares, I'm happy, because I'm going to
12 charge more money, because there's two more
13 parties -- another party competing for my
14 limited resource.
15   Q    Okay.  Would you expect that that
16 price impact would also impact the former
17 Argre people who were now working through
18 North Channel Bank?
19   A    I assume so, yes.
20   Q    Okay.  But you don't know if that
21 was the case?
22   A    I don't know.
23   Q    After this change where 75 percent
24 would be paid to Ganymede, were there new
25 services agreements between the pension plans

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

62 (Pages 547 to 550)

Page 547

1   Q   You understand that Sanjay Shah has
2   been criminally charged for his role in the
3   dividend arbitrage strategy?
4   A   I'm not aware of the details of the
5   charges or what the equivalent terminology is
6   in Denmark.
7   Q   You understand he has been charged,
8   but you don't know the details?
9   A   Again, I just -- whatever I've read
10  in the press is all I know.  So I have not
11  been instructed on it or told about it or
12  given any details, no.
13  Q   Okay.  Have you had any
14  conversations with Mr. Shah since he was
15  charged?
16  A   No.
17  Q   Can you turn to Exhibit 2244?
18      MR. WEINSTEIN:  Mark this as 2244.
19      (Whereupon the above mentioned was
20      marked for Identification.)
21  A   Can you tell us what book that's
22  in?
23      MR. BONGIORNO:  I think it's in
24      today's book.
25  A   (Witness reviewing.)

Page 548

1   Q   Exhibit 2244 is an e-mail from
2   Mr. Ben-Jacob to you and others in which he
3   attaches Kaye Scholer's finalized memorandum
4   discussing disqualified person issues as they
5   relate to the Michelle structure.
6       Do you see that?
7   A   Yes.
8   Q   Okay.  And on Page 3, towards the
9   top of the page, it says that "we understand
10  that Solo provided the entire structure of
11  the trading strategy to the trustee."
12      Was that correct?
13  A   I'm sorry.  Which page?
14  Q   Page 3.
15  A   (Witness reviewing.)
16      Yes.
17  Q   Okay.  If you turn to Page 5, the
18  first full paragraph, the second sentence
19  says, "The documents for the transaction
20  indicate that of the gross amount payable to
21  the Michelle plan, the Michelle plan retained
22  approximately 34 percent and the remaining
23  66 percent was paid to Solo."
24      Correct?
25  A   Yes.

Page 549

1   Q   You told us earlier today that at
2   some point in 2014 or early '15, the amount
3   paid to Solo increased to 75 percent.
4       Is that right?
5   A   Yes.
6   Q   Did you go back to Kaye Scholer and
7   ask whether any advice that they had provided
8   changed or would remain the same in light of
9   that new fee structure?
10  A   They were aware of the new fee
11  structure and never advised us that we would
12  need to update or receive an additional
13  memorandum.
14  Q   Okay.  So you didn't receive any
15  analysis from Kaye Scholer in light of the
16  new fee structure?
17  A   We didn't receive any written
18  information from Kaye Scholer.  And the fee
19  schedule was disclosed and made aware to
20  Kaye Scholer.
21      And if they had a concern about it,
22  including needing to revisit this memorandum,
23  they would have instructed us and informed us
24  of that.
25  Q   Okay.  It says -- after that

Page 550

1   sentence, it says, "Solo was responsible for
2   paying significant costs and expenses
3   associated with the transaction, including
4   trading commissions, legal fees, brokerage
5   fees, accounting fees, tax reclaim service
6   fees, custodial service fees, leverage
7   provided fees, and guarantee fees."
8       And did they obtain that
9   information from you and the other Argre
10  principals?
11  A   I don't recall.
12  Q   Okay.  They don't list a 50 percent
13  profit share with the seller amongst the
14  costs and fees that Solo would have to pay.
15      Do you know why that is?
16  A   No.
17  Q   The last paragraph on that page
18  says, "While the documents provide that the
19  66 percent paid to Solo is a fee to Solo, the
20  understanding of the parties at the time the
21  transaction was entered into was that Solo
22  and the Michelle plan were instead
23  effectively engaged in a partnership under
24  which the profits would be shared between
25  them under the above profit allocation, with