# EXHIBIT 8

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

---------------------------------------
                                        )
IN RE:                                  )
                                        )
CUSTOMS AND TAX ADMINISTRATION OF       )
THE KINGDOM OF DENMARK                  )
(SKATTEFORVALTNINGEN) TAX REFUND        )
SCHEME LITIGATION                       )
                                        )
This document relates to case nos.      )
19-cv-01783; 19-cv-01788; 19-cv-01794;  )
19-cv-01798; 19-cv-01918                )
---------------------------------------)


C O N F I D E N T I A L


REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
EXAMINATION OF
JOHN VAN MERKENSTEIJN
DATE: April 19, 2021




REPORTED BY:  MICHAEL FRIEDMAN, CCR

Page 78

1  called Aquila (Cayman)?
2       A     No, sir.
3       Q     All right.  And prior to the
4  Xiphias plan having entered into stock
5  lending deals with that entity, did you have
6  any knowledge of what it was?
7       A     No, I have no knowledge.
8       Q     Do you know who introduced that
9  entity into the transaction?
10      A     I don't know, no.
11      Q     All right.  Was it your
12 understanding that Solo Capital was bringing
13 in the various counterparties?
14      A     Yes, sir.
15      Q     Okay.  So here we saw a purchase of
16 future and a stock loan for the TDC stock.
17            Was it your understanding that Solo
18 arranged to have those various counterparties
19 involved?
20      A     Yes.  Solo, for us, was one-stop
21 shopping.  They provided each of the parties
22 that we needed to do the transaction.
23      Q     Okay.  With respect to the purchase
24 of the stock, at the time, did you have any
25 understanding of any arrangement that had

Page 79

1  been made with the sellers?
2       A     By Solo?
3       Q     Yeah.
4       A     Yeah, no.  We don't know what they
5  arranged.
6       Q     Okay.  With respect to any of the
7  counterparties that the plan transacted with,
8  did you perform any due diligence on them?
9       A     I did not, no, sir.
10      Q     Okay.  Do you know if any of your
11 Argre partners did?
12      A     I don't know what they did or
13 didn't do.  I wasn't involved in it a lot.
14      Q     I think you muted yourself.
15            MS. MCCARTHY:  John, we can't hear
16      you.  There you go.  Now we can hear
17      you.  Do you want to have the question
18      repeated, John?
19            THE WITNESS:  Well, wait a minute,
20      wait a minute.  It's not --
21            MS. MCCARTHY:  Okay.  Something
22      got.
23            THE WITNESS:  It's not -- it's
24      disconnected itself somehow.  We could
25      enter mechanics there.

Page 80

1       Q     We can hear you now.
2             Can you hear me?
3       A     Yes.  Now I hear you through my
4  headset.
5             MS. MCCARTHY:  And we hear you
6       well.
7       A     And I have a circle going around
8  and around and around.  There we go.  Okay.
9             I don't know why it decided to do
10 that.
11            So where were we?
12            MR. WEINSTEIN:  Mike, maybe you
13      could read the last question and the
14      beginning of the answer?
15            (Whereupon the record was read back
16      by the reporter.)
17      A     So I was responding to your earlier
18 question where I said, "Did I do any due
19 diligence on any of these parties?"  And I
20 remember there was one that I did go visit
21 the office and meet the people.
22      Q     Which one was that?
23      A     That was called Old Park Lane.
24      Q     Okay.  Is it fair to say that with
25 respect to a stock lending counterparty like

Page 81

1  Aquila (Cayman), that you were not familiar
2  with the financial condition of the entity?
3       A     Correct.
4       Q     All right.  You would not know
5  where Aquila (Cayman) would get the money to
6  provide the financing for the plan's
7  purchase.
8             Is that right?
9       A     No.  I didn't know anything about
10 Aquila.
11      Q     Can you turn to Exhibit 2275?
12            MR. WEINSTEIN:  Mark this as 2275.
13            (Whereupon the above mentioned was
14      marked for Identification.)
15      A     (Witness reviewing.)
16      Q     So the first page of Exhibit 2275
17 is a cover letter from Acupay to SKAT
18 attaching a reclaim application for the
19 Xiphias Pension Plan.
20            Do you see that?
21      A     I see that.
22      Q     All right.  Were you aware that
23 after the Xiphias plan made purchases of
24 Danish securities, that Acupay would file
25 reclaim applications to SKAT for refunds?

Page 86

1  the Xiphias plan under this agreement?
2      A    Well, I'm not familiar with the
3  agreement, so I didn't have an understanding.
4      Q    Okay.  If you look at the schedule
5  at the back, it lists a relevant percentage
6  of 66.67 percent.
7      A    Okay.
8      Q    Was it your understanding that
9  Ganymede would get 66.67 percent of the
10 reclaim that was submitted for the plan?
11     A    I didn't have an understanding.
12 I'm not familiar with this agreement.
13     Q    Okay.  Well, did you have an
14 understanding that Solo Capital would get a
15 66.67 percent share of the reclaims?
16     A    Yes.  As we talked about earlier,
17 they had a shifting percentage.
18          And at some point, two-thirds would
19 have been a number that sounds right.
20     Q    Okay.  And was the two-thirds
21 percentage that Solo Capital ultimately got,
22 was that to provide the same services that
23 they had been providing throughout the
24 various dividend arbitrage investments?
25     A    Yes.

Page 87

1      Q    Were there various costs associated
2  with the trading?
3      A    Yes.
4      Q    And who did you understand was
5  responsible to pay the various costs?
6      A    Well, I can't list all the costs,
7  but there were fees to the brokerage firm
8  that sold the shares.  There were fees, and
9  possibly participations in the profit, I
10 don't know, with the lenders.
11          There were fees with the hedge
12 party.  There were fees internal to the trade
13 itself.
14          So there were a number of -- a
15 number of the elements were covered by Solo
16 in their negotiation with the parties that
17 they brought in.  And then there were
18 additional fees that we paid directly.
19     Q    Okay.  And so you mentioned, I
20 think, in connection with the stock lender,
21 there could have been both fees and a profit
22 percentage?
23     A    Sure.
24     Q    And a --
25     A    We don't know.

Page 88

1      Q    Okay.  You don't know one way or
2  the other?
3      A    No.
4      Q    Okay.  Did you know at the time
5  whether any other participant was getting a
6  profit share beyond just their standard fees?
7      A    No, we don't know.
8      Q    Did each -- well, you mentioned, at
9  some point, the two-thirds arrangement sounds
10 right, that Solo would get two-thirds, the
11 plan would get another third, and then there
12 were fees that might come as part of that.
13          Was that the case for each of the
14 pension plans, or were there different
15 arrangements depending on the plan?
16     A    I think it was the same or similar
17 in each case.  I don't know specifically what
18 got charged to each plan.
19     Q    Okay.  By the way, you mentioned
20 earlier the Duet deal, and you said you got a
21 better arrangement with Solo.
22          Is that right?
23     A    My recollection is that,
24 economically, we were better off in the
25 arrangement with Solo than we were with Duet.

Page 89

1      Q    Okay.  Do you recall being informed
2  that Duet was saying that in order to invest,
3  your group would have to put up about
4  $700,000, and then, if successful, can expect
5  a return of about 1.1 million?
6      A    There were lots of conversations
7  between Duet and our group.  I wasn't party
8  to those conversations, so I don't know what
9  specifically got discussed in numbers.
10     Q    Okay.  If you could look back at
11 the summary chart, the one that you ripped
12 out?
13     A    Yes.
14     Q    It's Exhibit 27 -- 2273.  The
15 Xiphias LLC was established in 2007.
16          Did that LLC conduct business?
17     A    I believe it did, yes.
18     Q    What kind of business?
19     A    I don't remember which entity did
20 what.  But this is a period when we did some
21 transactions.  And for every transaction, we
22 formed LLCs.
23          And this one, presumably, was for a
24 series of transactions.  I just don't
25 remember which is which.

Page 154

1   Q   All right. And do you know what
2   the standard settlement date was in Denmark
3   for Danish securities at the time?
4   A   I don't recall. It was trade date
5   plus a certain number of business days.
6       I don't exactly recall the number.
7   Q   Okay. I'll represent to you that
8   at the time it was "T plus 3."
9       And do you understand "T plus 3" to
10  mean that the settlement date is three days
11  past the trade date?
12  A   Three business days, correct.
13  Q   Yes. I was about to say that
14  excludes weekends or holidays.
15      Correct?
16  A   Yes.
17  Q   Okay. So I'll represent to you
18  that there was a two-day weekend between
19  those two dates, which would make it a
20  "T plus 4" settlement.
21      Were you aware that the pension
22  plan was purchasing Danish securities with a
23  "T plus 4" settlement date?
24  A   Assuming there were no other
25  holidays other than the weekend you've

Page 155

1   described, then this would be "T plus 4."
2   Q   Okay. Were you aware that the
3   settlement date used in the transaction at
4   the time was a day beyond the normal
5   settlement date?
6       MR. BONGIORNO: Objection.
7   A   Again, I don't agree with your
8   premise. I was aware that it was a
9   "T plus 4" settlement.
10  Q   Okay. Were you aware that the
11  standard in Denmark at the time was
12  "T plus 3?"
13  A   The standard for exchange
14  transactions done on the exchange, or
15  over-the-counter transactions?
16  Q   Is there a separate standard
17  settlement date for over-the-counter
18  transactions?
19      MR. BONGIORNO: Objection.
20  A   Settlement date is whenever the
21  parties agree, and if the exchange is one of
22  the parties, they say what it is. If it's
23  between two counterparties, the settlement
24  date could be "T plus zero" up to
25  "T plus 110."

Page 156

1   Q   Did you understand that the
2   standard exchange settlement date in Denmark
3   at the time was "T plus 3?"
4   A   I don't know if I knew of those
5   particulars at the time.
6   Q   But were you aware at the time that
7   part of the strategy was that the settlement
8   for the purchase of the shares would happen
9   one day past the exchange -- the standard
10  settlement date on the exchange?
11      MR. BONGIORNO: Objection.
12  A   All I was aware of was -- again,
13  taking your word for it -- that in this case,
14  that trades settled four business days later
15  than the trade date.
16  Q   Okay. And your understanding is
17  that that was a negotiated term.
18      Is that right?
19  A   Yes.
20  Q   Okay. Why did the pension plan
21  negotiate that term, Mr. Markowitz,
22  "T plus 4?"
23  A   (Witness reviewing.)
24      More is better to come up with the
25  cash required.

Page 157

1   Q   That was your understanding, that
2   the plan negotiated because more was better
3   to get the cash required?
4   A   Yes. In my experience, the more
5   days you have to settle the trade, the better
6   it is for the party obligated to pay.
7   Q   Okay. And what was your
8   understanding as to why the seller of the
9   shares in this case would be willing to give
10  you more time to buy the shares than is the
11  standard settlement time in the country?
12  A   Part of the negotiation on the
13  price at which the transaction would be done.
14  Q   Wasn't the transaction
15  negotiated -- wasn't the price negotiated to
16  just be end-of-day market price?
17  A   As I explained earlier, the seller
18  and the market pricing allocates a certain
19  amount of the profit of a dividend arbitrage
20  transaction to the other counterparties in
21  the deal, including the seller. So accepting
22  a certain share, or pricing and market terms,
23  they would have agreed to this "T plus 4."
24  Q   Who undertook this negotiation with
25  the seller on behalf of the Michelle plan?

Confidential - Subject to The Protective Order
Richard Markowitz - April 8, 2021

41 (Pages 158 to 161)

Page 158

1    A    Back in April of 2012, following
2  the e-mail you mentioned, we had a call with
3  Solo in which we learned that they were
4  becoming a custodian, and terms of trades and
5  liquidity in the market and pricing in the
6  market was explained to us at that time.
7         And that included a share between
8  the seller and the buyer.
9    Q    Okay.  Were you part of that
10 discussion that you just described happened
11 with Mr. Shah?
12   A    Yes.
13   Q    Where did that take place?
14   A    A telephone discussion.
15   Q    Okay.  Who was a participant?
16   A    I was on the call, one or more of
17 my partners may have been on the call, and
18 representatives of Solo Capital were on the
19 call.
20   Q    Okay.  And during that call, the
21 Solo people said that they were becoming a
22 custodian?
23   A    That they had become a custodian.
24   Q    Okay.  And so we saw a bunch of
25 e-mails earlier where they were trying to get

Page 159

1  other financial institutions to serve as
2  custodian.
3         Did they not get any that would
4  serve in that role?
5    A    I don't know.
6    Q    Okay.  But it turned out that when
7  the dividend arbitrage trading began with
8  Denmark, it was going to be Solo Capital who
9  was the custodian for the trading?
10   A    The discussions we had with Solo
11 initially were that the trading would be in
12 Belgium and those were the trades we did
13 initially.
14   Q    Okay.  And for the Belgian trades
15 initially, Solo Capital was going to be the
16 custodian?
17   A    Yes.
18   Q    And then, as we see in August of
19 2012, this plan started trading in Denmark.
20        Was Solo Capital --
21   A    Yes.
22   Q    Was Solo Capital the custodian as
23 well?
24   A    Yes.
25   Q    Okay.  So tell me,

Page 160

1  what -- withdrawn.
2         What did the Solo folks tell you on
3  that phone call about how the trading would
4  work and the counterparties?
5    A    They said that Solo had worked to
6  get approvals from the British regulators to
7  become a custodian, that they had hired legal
8  and compliance staff, securities finance
9  people, and that with customers who became
10 clients of Solo as a custodian, they would be
11 able to purchase shares from -- through
12 brokers, from the market, for other sellers
13 of the shares, and hedge those transactions
14 through their accounts at Solo for futures
15 contracts and, if needed, lend shares to a
16 borrower who would post collateral pursuant
17 to a standard stock lending agreement.
18   Q    Okay.  You mentioned earlier
19 that -- something about that there would be
20 negotiations with the sellers of the shares
21 about terms such as price and settlement
22 date.
23        What did they tell you on that
24 phone call about that?
25   A    That the pricing -- market pricing

Page 161

1  would be a 50-50 split between the buyers and
2  the sellers, and that the customer of Solo,
3  our customer, on the long side, the purchaser
4  of shares, would pay the normal 34 percent of
5  its profit to Solo, as we did when they were
6  acting as the investment manager.
7    Q    Okay.  How was the 50-50 split
8  between the buyer and seller going to work?
9  How did they accomplish that?
10   A    From our earliest days of the
11 Broadgate Fund, in cases where you had to
12 file for a refund, we insisted that other
13 participants in the deal accept their profit
14 in the trade on a contingent basis, so that,
15 ordinarily, the pricing would be reflected in
16 the price you sold shares for in the hedging
17 of the transaction.
18        But starting with the Broadgate
19 Fund and Merrill Lynch, and the
20 counterparties that Merrill Lynch involved,
21 we wanted to have the other participants
22 receive their profit on a contingent basis.
23 So that's where, whether it was 75/25, 60/40,
24 or 50/50, when the transactions were
25 completed and you tallied up the pluses and

Page 162

1    A    We communicated to him that we were
2  not part of that bank in Germany that had
3  been bought by Matt and Jerome, and got to a
4  point where he understood we weren't part of
5  that exercise, which is what he was upset
6  about.
7         And therefore, he offered to
8  continue to trade with us, but not with Matt
9  and Jerome.
10   Q    Would the same entities, the same
11 plans be used going forward?
12   A    Well, the entities we had as Argre
13 which, in the end, stop trading, there was a
14 period where we talked about toning down the
15 Argre trades or something, but it got too
16 complicated.  And in the end, there were no
17 more Argre-related plans and we had to
18 substitute plans.
19   Q    Okay.  Were there any discussions
20 with Mr. Shah about how many plans could be
21 formed to continue the trading?
22   A    Yes.  As before, he would tell us
23 how many plans we could have.
24   Q    All right.  And so, for this period
25 of time, do you recall how many plans he said

Page 163

1  you could have?
2    A    I don't have an exact recollection.
3  I think it was 30-something.
4    Q    Was this the point in time in which
5  the fee and profit-sharing arrangement
6  changed from two-thirds to 75 percent?
7    A    I don't remember when that shifted,
8  percentages changed.
9    Q    Okay.  But whenever that shift
10 happened, the new split was 75 percent Solo,
11 25 percent to the plan?
12   A    I believe so.
13   Q    All right.  Just bear with me.  I'm
14 crossing one or two exhibits off my list
15 here, which is a good thing.
16   A    Sorry?
17   Q    I'm just crossing a few documents
18 off the list.  That's always a good thing, so
19 bear with me.
20        Can you turn, please, to
21 Exhibit 2265?
22   A    2265.  It's the other volume.
23   Q    Sorry.  Okay.  If you can turn to
24 the last page -- or the third page, at least,
25 at the top of it?

Page 164

1    A    (Witness reviewing.)
2         Yes.
3    Q    There's an e-mail from Peter Wells.
4         Was he an attorney at Kaye Scholer
5  assisting with the plans?
6    A    He was a partner, I believe, at
7  Kaye Scholer, yes.
8    Q    All right.  He writes to you and
9  Mr. Markowitz, "I wanted to follow up with
10 you both on the status of the additional
11 information regarding the new ex-dividend
12 trades.  As you may recall, you were going to
13 provide us with, among other things, a list
14 who is going to be involved in the various
15 partnerships and related LLCs," and it goes
16 on.
17        The reference to the "new
18 ex-dividend trades," was that the same
19 dividend trading strategy through Solo, but
20 with new plans?
21   A    Yes.  This is where Argre had
22 split, and Rich and I were going to do
23 separate.
24   Q    Okay.  So the -- you had made known
25 to the lawyers at Kaye Scholer that a new set

Page 165

1  of plans were going to be set up to continue
2  the trading?
3    A    Well, more than that.  Once Argre
4  split, Rich and I had no office, no
5  secretary, no staff, no assistants.
6         And since Kaye Scholer had been
7  involved in the trading from day one, and
8  knew every aspect of it, I asked the firm not
9  only to continue to work with us, but also to
10 fulfill the administerial functions.
11        So I told Michael Ben-Jacob that we
12 needed paralegal or other clerical
13 assistance, because we had nobody that worked
14 for us at all.  And therefore, I asked him to
15 undertake all of the organizational
16 paperwork, all of the documentation
17 paperwork.
18        And Michael assigned that work to
19 Peter Wells to supervise.  And then he had
20 associates and paralegals do the mechanical
21 parts.
22        So they did both the clerical
23 administrative stuff as well as the
24 continuing legal advice.
25   Q    The additional roles that you asked

Page 206

1  agreement.
2          A    A sequence of those steps.
3          Q    In each case, was it your
4  understanding that the pension plan's ability
5  to purchase the stock would be dependent on
6  the stock loan transaction?
7          A    I think it depended on what Solo
8  was able to allocate to the pension plan.
9  And then, it required a stock loan and that
10 had to be in place, too.
11              All the elements had to be in
12 place.  If you didn't have one of them, you
13 couldn't do the trade.
14         Q    And so with respect to the purchase
15 of the stock, the hedge transaction, and the
16 stock loan, was it your understanding that
17 each of the counterparties were customers of
18 Solo Capital?
19         A    They were introduced by
20 Solo Capital, so I guess they had a
21 relationship with the customer, sure.
22         Q    Did Solo Capital provide the
23 details of the trades that we -- that would
24 be executed prior to the trade date of the
25 purchase?

Page 207

1          A    Well, the -- the securities and the
2  date on which they declared the amount of a
3  dividend was all publicly available.  What
4  Solo provided was what the amount of
5  securities that was available to be purchased
6  would be.
7          Q    Right.
8          A    And then they pulled together the
9  other elements to make sure that the trade
10 had all the components.
11         Q    Meaning the hedge and the stock
12 loan?
13         A    Right.
14         Q    Okay.  Would they arrange those
15 components prior to the trade date?
16         A    I assume so, because on the trade
17 date you'd want to know all the other
18 elements were available.
19         Q    So once the trade date comes, what
20 was it that Mr. Cooper and Mr. Reibeisen had
21 to do other than send the requests out that
22 Solo Capital had already arranged?
23         A    Well, I'm not -- you know, I wasn't
24 involved in the trading directly.  So I don't
25 know what they had to do.

Page 208

1          Q    Can you turn to Exhibit 1777?
2          A    Okay.
3               (Witness reviewing.)
4               Okay.
5          Q    And do you see that this e-mail
6  chain attaches a set of instructions for the
7  execution of the various aspects of the
8  trades?
9          A    Yeah.  And do you want me to read
10 it all or...
11         Q    No.  No, I'm not going to go
12 through it with you.
13              I just wanted to know, was it your
14 understanding that Mr. Cooper and
15 Mr. Reibeisen would be following these
16 instructions as provided?
17         A    I don't know about these
18 instructions.  I haven't read through what
19 the instruction were.
20         Q    Okay.
21         A    But whatever needed to happen, they
22 were tasked with the task of doing it.  And I
23 think Rob and Rich explained to them what
24 needed to be done, and I think this reflects
25 that conversation of what the instructions

Page 209

1  were.
2          Q    Were you involved in those
3  discussions?
4          A    No.
5          Q    Can you turn to Exhibit 1780?
6          A    (Witness reviewing.)
7               Okay.
8          Q    Mr. Markowitz refers to a "software
9  license for the automated trading system."
10              Do you know what that was?
11         A    There was some movement towards an
12 automatic trading system.  I don't know what
13 it was and I don't know what it entailed.
14         Q    Do you know, at some point,
15 Mr. Cooper and Mr. Reibeisen were no longer
16 needed?
17         A    Well, I know they were no longer
18 needed when we stopped trading.  But I don't
19 know if there was an earlier step.
20         Q    Okay.  And then, the next sentence
21 says, "There's -- the second is the new form
22 of the custody agreement, which all four
23 custodians are using."
24         A    Okay.
25         Q    "The one that's attached is for Old