# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to the cases identified in Appendix A. | 18-md-02865-LAK<br><br>**Request for International Judicial Assistance pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters** |

    The United States District Court for the Southern District of New York presents its compliments to the appropriate judicial authority of the Kingdom of Denmark, and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above captioned matter.  This request is made pursuant to and in conformity with the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.

    This Court requests the assistance described herein as necessary in the interests of justice.  The assistance requested is that the appropriate judicial authority of Denmark compel the below named individual to produce testimony.

    This Court considers that the evidence sought is directly relevant to issues of fact and law that may influence the final determination of the existence, non-existence, and/or extent of any liability in this matter.  It is expected, based on existing timetables, that the trial will begin on January 7, 2025.

    The particulars of this Hague Evidence Request are as follows:

1. **Sender**     Honorable Lewis A. Kaplan
                                 District Judge

|   |   |   |
|---|---|---|
|   |   | United States District Court for the Southern District of New York |
| **2.** | **Central Authority of the Requested State** | Ministry of Justice<br>Procedural Law Division<br>Slotsholmsgade 10<br>1216 COPENHAGEN K<br>Denmark |
| **3.** | **Person to whom the executed request is to be returned** | Marc A. Weinstein<br>Hughes Hubbard & Reed LLP<br>One Battery Park Plaza<br>New York, NY 10017<br>Tel.:   (212) 837-6460<br>Fax:   (212) 299-6460<br>Email: marc.weinstein@hugheshubbard.com |

**4.   Specification of the day by which the requesting authority requires receipt of the response to the Letter of Request**

| **Date** | June 28, 2024 |
|---|---|
| **Reason for Urgency, if applicable** | Trial is scheduled to begin on January 7, 2025, with pretrial motions due August 15, 2024. |

**IN CONFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:**

| **5a. Requesting judicial authority (Article 3,a)** | Honorable Lewis A. Kaplan<br>District Judge<br>United States District Court for the Southern District of New York |
|---|---|
| **5b. To the competent authority of (Article 3,a)** | The Kingdom of Denmark |
| **5c. Names of the case and any identifying number** | In re Customs and Tax Administration of the Kingdom of Denmark (SKAT) Tax Refund Scheme Litigation, 18-md-2865 (LAK) |

2

6. **Names and addresses of the parties and their representatives**

|  |  |
|---|---|
| **a. Plaintiff** | Skatteforvaltningen<br>Hannemanns Allé 25<br>DK-2300 Copenhagen S<br>Denmark |
| **Representatives** | William R. Maguire<br>Marc A. Weinstein<br>Neil J. Oxford<br>Hughes Hubbard & Reed LLP<br>One Battery Park Plaza<br>New York, New York 10004-1482<br>United States of America |
| **b. Defendants** | Please refer to the attached Appendix A |
| **Representatives** | Please refer to the attached Appendix A |

7. **Nature of the Proceedings**

   **a. Nature of the Proceedings**

In May and June 2018, Plaintiff SKAT filed 140 similar complaints in eleven different federal judicial districts. On October 3, 2018, the federal complaints were consolidated in this Multi-District Litigation ("MDL") and assigned to the Honorable Lewis A. Kaplan. Since that time, SKAT filed several additional complaints which were consolidated into the MDL. SKAT filed amended complaints in April 2020, which defendants answered on June 29, 2020. On April 1, 2024, the Court scheduled a trial involving a subset of the defendants in the MDL (the "Defendants") to begin on January 7, 2025.

Defendants are six individuals and 69 pension plans that Defendants assert were qualified under section 401(a) of the United States Internal Revenue Code, exempt from taxation under section 501(a) of the United States Internal Revenue Code, and residents of the United States of

3

America for purposes of U.S. taxation. SKAT disputes that the 69 pension plans were qualified under section 401(a) of the United States Internal Revenue Code and exempt from taxation under section 501(a) of the United States Internal Revenue Code. Defendant pension plans participated in a dividend arbitrage trading strategy, which SKAT alleges was fraudulent. Danish companies are required to withhold 27% tax on dividends they pay to shareholders. Under certain double taxation treaties between Denmark and other countries, including the United States, this tax is reimbursable to certain non-Danish shareholders, including pension plans qualified under section 401(a) of the Internal Revenue Code. Defendant pension plans, acting through others, applied to SKAT claiming repayments of tax withheld on dividends that they earned on shares of Danish companies that they held. SKAT paid one or more of those tax repayments. SKAT claims that Defendant pension plans did not own the shares forming the basis of those tax reclaim applications and were not entitled to the refund payments.

The witness whose testimony is sought pursuant to this Letter of Request is Anthony Mark Patterson, a former employee or consultant of the firm Solo Capital Partners and who recently pleaded guilty in Denmark to charges of criminal fraud. SKAT alleges that Patterson's former employer Sanjay Shah, who founded Solo Capital Partners, designed and operated the dividend arbitrage trading strategy conducted by Defendant pension plans. SKAT seeks to examine Anthony Mark Patterson about the Danish dividend arbitrage strategy so that the Court in New York can receive in admissible form a record of his testimony for the benefit of the jury that will hear SKAT's claims to recover its losses.

### b. Summary of Complaints

The allegations in Plaintiff SKAT's complaints in each of the consolidated actions are substantially similar. SKAT brought complaints against the pension plans that received dividend

withholding tax refunds; individuals who signed powers of attorney authorizing Payment Agents to submit dividend withholding tax refund claims to SKAT, and defendants who incorporated business entities they claim are associated with the pension plans. SKAT has also brought claims against defendants it claims aided and abetted the other defendants. The conduct at the heart of Plaintiff SKAT's complaints—the allegedly fraudulent dividend arbitrage trading strategy designed by Shah—is alleged to have occurred between 2012 and 2015. Plaintiff SKAT asserts claims for fraud, aiding and abetting fraud, civil conspiracy, payment by mistake, unjust enrichment, negligent misrepresentation, and related claims.

### c. Summary of Defenses

Defendants deny all allegations of wrongdoing made by SKAT and assert numerous defenses to SKAT's allegations. Among many other defenses, Defendants maintain that they acted at all times reasonably and with due care, reasonably relied upon the actions and statements of others, and did not directly or indirectly cause, induce, aid, or abet any acts constituting the claims asserted by SKAT. Defendants also assert that they did not act with the mental state required by SKAT's claims, among other reasons because they relied directly or indirectly on documents, statements, and information provided by Sanjay Shah and others, including Patterson.

| | |
|---|---|
| **8a. Evidence to be obtained or other judicial act to be performed (Article 3,d)** | Plaintiff SKAT seeks testimony from Anthony Mark Patterson. |
| **8b. Purpose of the evidence or other judicial act sought** | The witness's testimony is relevant to establishing one or more of the parties' claims or defenses in this action. |

5

| | |
|---|---|
| **9. Identity and address of any person to be examined (Article 3,e)** | Anthony Mark Patterson is a former employee or consultant of Solo Capital Partners ("Solo") who on March 1, 2024 was sentenced to eight years in prison after pleading guilty before the District Court in Glostrup, Denmark to charges of fraud.<br>On information and belief, Anthony Mark Patterson is currently in the custody of Danish authorities serving his prison sentence. |

**10. Questions to be put to the person to be examined or statement of the subject-matter about which they are to be examined (Article 3,f)**

    a. **Definitions**

        i.    "Dividend Arbitrage Trading Strategy" – the trading strategy developed by Sanjay Shah that SKAT alleges involved fraudulent claims for repayments of tax withheld on dividends issued on shares of Danish companies.

    b. **Subject of Testimony**

    The subject of Anthony Mark Patterson's testimony will be:

        i.    The mechanics and component parts of the Dividend Arbitrage Trading Strategy;

        ii.    The operation of the Dividend Arbitrage Trading Strategy;

        iii.    Anthony Mark Patterson's and Solo's communications with Defendants concerning the Dividend Arbitrage Trading Strategy, including the operation of that Strategy;

        iv.    Whether Solo or any other custodian or sub-custodian held custody of any Danish shares as part of the Dividend Arbitrage Trading Strategy;

        v.    Whether Solo or any other entity engaged in any actual transfers of shares or cash in connection with the purchase or sale of any shares, or received

any actual cash, directly or indirectly, from dividends from any Danish company as part of the Dividend Arbitrage Trading Strategy; and

vi. How Solo, or any related entity, distributed the proceeds of the refunds paid by SKAT as a result of the Defendant pension plans' refund applications.

**11. Documents or other property to be inspected (Article 3,g)**

N/A.

| | |
|---|---|
| **12. Any requirement that the evidence be given on oath or affirmation and any special form to be used (Article 3,h)** | The examinations shall be taken under the Federal Rules of Civil Procedure of the United States of America, except to the extent such procedure is incompatible with the law of the Kingdom of Denmark.  The testimony shall be given under oath. |
| **13. Special methods or procedure to be followed (Articles 3,I and 9)** | The United States District Court for the Southern District of New York respectfully requests that: <br><br> a. The Parties' United States and Danish lawyers be permitted to examine and cross-examine the witnesses directly and consistent with the Federal Rules of Civil Procedure of the United States; or <br><br> b. In the event the examination is conducted by the Danish Court, that the Court pose to the witness the questions identified in Appendix B hereto that pertain to the subjects of testimony indicated in Section 10(b), and that the Parties have the opportunity to submit to the Court in advance a list of additional questions to be posed to the witness on those same subjects, and that the Parties' United States and Danish lawyers be permitted to attend the oral testimony and ask supplementary questions to the witness; or <br><br> c. The Danish Court should conduct the examination in any way it deems appropriate pursuant to applicable law; <br><br> d. The Parties' United States and Danish lawyers be allowed to participate in the examination of the requested witness by video-conference per the |

7

|  |  |
|---|---|
|  | enclosed 'Optional Form For Video-Link Evidence,' as practicable and in discussion with the Ministry of Justice regarding technical logistics and that the video-conference be recorded and a copy provided to the Parties; |
|  | e. Oral testimony of the witnesses be videotaped and recorded verbatim, and that a professional videographer and a professional stenographer be permitted to attend the oral testimony in order to record the testimony; the costs of the court reporter or of the videographer being at the charge of Plaintiff SKAT. |
| **14. Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified (Article 7)** | It is requested that testimony be taken at such place, date or time as ordered by the Ministry of Justice and/or as otherwise scheduled by the representatives of SKAT and Defendants and/or as otherwise agreed to by the witness and the respective representatives of the Parties.<br><br>Notice thereof should be made to Plaintiff's Danish designees:<br><br>Poul Schmith/Kammeradvokaten<br>Boris Frederiksen<br>Anne Christine Kjaer Egholm<br>Kalvebod Brygge 32<br>DK-1560 Copenhagen V<br>Tel: +45 33 15 20 10<br>Email: bor@poulschmith.dk<br>         ace@poulschmith.dk<br><br>Notice thereof should be made to Defendants' Danish designee:<br><br>Notice thereof should be made to Defendants' Representatives, as listed in Appendix A. |
| **15. Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request (Article 8)** | None. |

| | |
|---|---|
| **16. Specification of privilege or duty to refuse to give evidence under the law of the State of origin (Article 11,b)** | Under the laws of the United States, a party has a privilege to refuse to disclose the contents of a confidential communication between that party and an attorney that was made for the purpose of obtaining legal advice.  Waiver of the privilege over some communications, in some circumstances, can be deemed a waiver of privilege over other communications concerning the same subject matter.<br><br>United States law also in certain circumstances recognizes a testimonial privilege against compulsory criminal self-incrimination.<br><br>Outside the strict area of privilege, certain limited immunities are available that may place restrictions on the giving of evidence, such as the limited protection of documents created by attorneys in anticipation of litigation. |
| **17. The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by** | Plaintiff SKAT |

Date of Request:

_____
Signature and Seal of the Requesting Authority

### APPENDIX A

| Defendants | Counsel | Associated Case(s) |
|---|---|---|
| John van Merkensteijn, III<br><br>Elizabeth van Merkensteijn<br><br>Azalea Pension Plan<br><br>Basalt Ventures LLC Roth 401(K) Plan<br><br>Bernina Pension Plan<br><br>Bernina Pension Plan Trust<br><br>Michelle Investments Pension Plan<br><br>Omineca Pension Plan<br><br>Omineca Trust<br><br>Remece Investments LLC Pension Plan<br><br>Starfish Capital Management LLC Roth 401(K) Plan<br><br>Tarvos Pension Plan<br><br>Voojo Productions LLC Roth 401(K) Plan<br><br>Xiphias LLC Pension Plan | Sharon L. McCarthy<br>Caroline Ciraolo<br>Nicholas S. Bahnsen<br>Kostelanetz & Fink LLP<br>7 World Trade Center, 34th Floor<br>New York, New York 10007<br>Tel: (212) 808-8100<br>Fax: (212) 808-8108<br>cciraolo@kflaw.com<br>smccarthy@kflaw.com<br>nbahnsen@kflaw.com | 18-cv-04833<br>19-cv-01788<br>19-cv-01794<br>19-cv-01798<br>19-cv-01800<br>19-cv-01801<br>19-cv-01803<br>19-cv-01809<br>19-cv-01810<br>19-cv-01813<br>19-cv-01818<br>19-cv-01865<br>19-cv-01866<br>19-cv-01871<br>19-cv-01873<br>19-cv-01893<br>19-cv-01894<br>19-cv-01906<br>19-cv-01911<br>19-cv-01918<br>19-cv-01924<br>19-cv-01928<br>19-cv-01930<br>19-cv-01931<br>19-cv-10713 |
| Richard Markowitz<br><br>Jocelyn Markowitz<br><br>Avanix Management LLC Roth 401(K) Plan<br><br>Batavia Capital Pension Plan<br>Calypso Investments Pension Plan | Alan E. Schoenfeld<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>Telephone: (212) 230-8800<br>alan.schoenfeld@wilmerhale.com | 18-cv-04833<br>19-cv-01781<br>19-cv-01783<br>19-cv-01785<br>19-cv-01791<br>19-cv-01792<br>19-cv-01806<br>19-cv-01808<br>19-cv-01812<br>19-cv-01815 |

| | | |
|---|---|---|
| Cavus Systems LLC Roth 401(K) Plan<br><br>Hadron Industries LLC Roth 401(K) Plan<br><br>RJM Capital Pension Plan<br><br>RJM Capital Pension Plan Trust<br><br>Routt Capital Pension Plan<br><br>Routt Capital Trust | | 19-cv-01867<br>19-cv-01868<br>19-cv-01869<br>19-cv-01870<br>19-cv-01895<br>19-cv-01896<br>19-cv-01898<br>19-cv-01904<br>19-cv-01906<br>19-cv-01911<br>19-cv-01922<br>19-cv-01924<br>19-cv-01926<br>19-cv-01929<br>19-cv-10713 |
| Robert Klugman<br><br>RAK Investment Trust<br><br>Aerovane Logistics LLC Roth 401(K) Plan<br><br>Edgepoint Capital LLC Roth 401(K) Plan<br><br>Headsail Manufacturing LLC Roth 401(K) Plan<br><br>The Random Holdings 401(K) Plan<br><br>The Stor Capital Consulting LLC 401(K) Plan | David L. Goldberg<br>Michael M. Rosensaft<br>Zhanna A. Ziering<br>Katten Munchin Rosenman LLP<br>50 Rockefeller Plaza<br> New York, NY 10020<br>Tel.: (212) 940-8800<br>Fax: (212) 940-8776<br>david.goldberg@katten.com | 18-cv-04434<br>18-cv-07824<br>18-cv-07827<br>18-cv-07828<br>18-cv-07829<br>19-cv-01781<br>19-cv-01783<br>19-cv-01785<br>19-cv-01788<br>19-cv-01791<br>19-cv-01792<br>19-cv-01794<br>19-cv-01798<br>19-cv-01800<br>19-cv-01801<br>19-cv-01803<br>19-cv-01806<br>19-cv-01808<br>19-cv-01809<br>19-cv-01810<br>19-cv-01812<br>19-cv-01813<br>19-cv-01815<br>19-cv-01818<br>19-cv-01870<br>19-cv-01918<br>19-cv-01922<br>19-cv-01926<br>19-cv-01928<br>19-cv-01929 |

|  |  | 19-cv-01931 |
|---|---|---|
| Michael Ben-Jacob | Thomas E. L. Dewey<br>Dewey Pegno & Kramarsky LLP<br>777 Third Avenue – 29th Floor<br>New York, New York 10017<br>Tel.: (212) 943-9000<br>Fax: (212) 943-4325<br>tdewey@dpklaw.com<br><br>Elliot R. Peters<br>Julia L. Allen<br>Keker, Van Nest & Peters LLP<br>633 Battery Street<br>San Francisco, CA 94111<br>Tel.: (415) 962-7188<br>epeters@keker.com | 18-cv-04434<br>18-cv-07824<br>18-cv-07827<br>18-cv-07828<br>18-cv-07829<br>19-cv-01781<br>19-cv-01783<br>19-cv-01785<br>19-cv-01788<br>19-cv-01791<br>19-cv-01792<br>19-cv-01794<br>19-cv-01798<br>19-cv-01800<br>19-cv-01801<br>19-cv-01803<br>19-cv-01806<br>19-cv-01808<br>19-cv-01809<br>19-cv-01810<br>19-cv-01812<br>19-cv-01813<br>19-cv-01815<br>19-cv-01818<br>19-cv-01866<br>19-cv-01867<br>19-cv-01868<br>19-cv-01869<br>19-cv-01870<br>19-cv-01871<br>19-cv-01873<br>19-cv-01894<br>19-cv-01896<br>19-cv-01918<br>19-cv-01922<br>19-cv-01926<br>19-cv-01928<br>19-cv-01929<br>19-cv-01931<br>21-cv-05339 |

# APPENDIX B

<u>Plaintiff SKAT's proposed questions to Anthony Mark Patterson</u>

1. Were you an employee of or consultant to Solo Capital Partners, which I will refer to as "Solo"?

2. When were you first employed by or retained as a consultant to Solo?

3. Who owned Solo?

4. How did you come to be employed at or retained by Solo?

5. What was your job title?

6. What were your responsibilities?

7. Are you familiar with Solo's so-called dividend arbitrage strategy?

8. What did you understand that strategy to be?

9. Who explained the strategy to you?

10. Who developed the dividend arbitrage strategy?

11. Did you have any role with respect to developing the dividend arbitrage strategy?

12. If so, what was your role in developing the strategy?

13. Did you have any role in executing the strategy on behalf of Solo's customers?

14. If so, what was your role?

15. Did you at any point come to believe there were any problems with the Solo strategy or the execution of that strategy?

16. If so, when was that?

17. What were those problems, if any?

18. How did you confirm that there were problems with the Solo strategy?

19. Can you please review this document? [Mar. 1 2024 criminal judgment]

20. Can you explain what this document is?

21. Does this document accurately describe the testimony you gave to the Court in Denmark?

22. In the second paragraph on page 4 of the criminal judgment, it says you testified that your role at Solo "primarily was to allocate the correct number of trades to each investor" and "inform the customers how many shares they should buy," do you see that?

23. Please explain for the benefit of people who are not familiar with your business what this primary role was, and how you carried out that role?

24. And in the next two sentences, the judgment says you testified that, "It was controlled centrally. It was quite unusual." Do you see that?

25. Please explain what you meant that the allocation of the correct number of trades to each investor and how many shares they should buy was "controlled centrally"?

26. Who controlled the allocation to each customer?

27. How was that allocation determined?

28. Why was that central control "quite unusual"?

29. Did Solo's customers include United States-based pension plans that purportedly purchased Danish shares?

30. In the second full paragraph from the bottom of page 4, the judgment recounts that you testified that the trading that led to the tax refund claims "was a circular closed system where nothing came in from outside," do you see that?

31. Can you explain what you meant that it "was a circular closed system"?

32. What did you mean by "nothing came in from outside"?

33. Were any actual Danish shares entering the Solo system?

34. In the preceding paragraph, there is a reference to "the trading loop," do you see that?

35. Can you explain what the "trading loops" were?

36. Were any shares actually transferred between the counterparties as a result of the transactions in the trading loops?

37. Was any money actually transferred between the counterparties as a result of the transactions in the trading loops?

38. Turning back to the second full paragraph from the bottom, you testified, "No dividends came from outside, and therefore no dividend tax had been paid," do you see that?

39. Can you explain what you meant by that?

40. During the time you worked for Solo, did Solo hold custody of any of the Danish shares its customers purported to acquire as part of the dividend arbitrage strategy?

41. During the time you worked for Solo, did any other custodian or sub-custodian hold custody of Danish shares on behalf of Solo or its customers?

42. During the time you worked for Solo, did Solo receive any dividends issued on Danish shares on behalf of its customers who participated in the dividend arbitrage strategy?

43. During the time you worked for Solo, did any other custodian or sub-custodian receive any dividends on Solo's or its customers' behalf as part of the dividend arbitrage strategy?

44. Are you aware that, as part of the dividend arbitrage strategy, Solo's customers submitted tax refund claims to the Danish tax authority seeking refunds of tax supposedly withheld from dividends the customers received?

45. In your experience at Solo, as part of the dividend arbitrage strategy, did Solo's customers receive dividends issued on Danish shares from which tax was withheld?

46. Turning to page 5 of the criminal judgment, in the first full paragraph, you testified, "None of them made the decisions on their own about the Danish shares." Do you see that?

47. Can you explain what you meant by that?

48. What decisions were being made regarding Danish shares?

49. Who was making those decisions regarding Danish shares?

50. Were these decisions part of what you testified (at page 4 of the criminal judgment) was being "controlled centrally"?

51. On page 5, you testified, "The only profit they made was the dividend tax they were refunded." Do you see that?

52. Who were you referring to?

53. Can you explain why the only profit was the dividend tax they were refunded?

54. How did you come to learn that there was no money coming in from customers to buy shares?

55. Turning to page 4 of the criminal judgment, in the last full paragraph on that page, you testified that when you "started in March 2013, [you] had not been aware that it was a closed trading system" and "[i]n the autumn of 2013, [you] could see that something was wrong." Do you see that?

56. What was it you were able to see "was wrong" by autumn of 2013?

57. How were you able to determine that?

58. At the end of the third full paragraph of page 5, you testified that in November 2013: "At this point, he had the full picture of the circular trading structure – of the loop." What was the full picture?

59. Turning to the top of page 6, you testified that you "did not have access to view accounts in the Solo companies," is that correct?

60. Can you explain what those accounts were that you did not have access to?

61. Are you familiar with Old Park Lane, West Point Derivatives, and Telesto Markets?

62. What were those entities?

63. Who were they controlled by?

64. Does your testimony about the trading at Solo also apply to the trading at these companies?

65. What similarities and/or differences are there?

66. Turning to page 6 of the document, you testified that you moved to Dubai in the beginning of 2014, do you see that?

67. Why did you move to Dubai in the beginning of 2014?

68. In the next paragraph, you testified that in Dubai, you "established the company Fiveways Consultancy, and through that company continued working for Sanjay Shah"?

69. What was Fiveways Consultancy?

70. Why did you establish it?

71. In the next sentence, you testified you "entered an agreement with Ganymede Cayman Ltd. and with Shah personally," do you see that?

72. What was Ganymede Cayman?

73. Did your responsibilities with respect to the dividend arbitrage strategy change after you moved to Dubai?

74. If so, in what way?

75. At the end of the next paragraph, you testified that you "became a risk manager at Elysium Global Dubai in May 2015," is that correct?

76. What was Elysium Global Dubai?

77. In the following paragraph, you testified, "In the beginning of 2015, GSS became more automated," do you see that?

78. What was "GSS"?

79. What did you mean that, in the beginning of 2015, GSS became more automated?

80. Did that affect your responsibilities with respect to the dividend arbitrage strategy?

81. Did that automation have any impact on how shares were allocated to Solo's customers for the dividend arbitrage strategy?

82. Did the customers have any greater role in deciding how many shares each would purchase due to the automation?

83. At the end of that paragraph, you testified that you "assisted in making e-mails look right, worded as a trader would put it," do you see that?

84. Can you explain what you meant by that?

85. Why did you need to make the emails "look right"?

86. Was Sanjay Shah or any entity he controlled paid any portion of the tax refunds that Solo's customer received as a result of the dividend arbitrage strategy?

87. How were any such payments made?

88. What was your annual salary at Solo?

89. After you moved to Dubai in 2014, what was your annual salary when you worked for Ganymede Cayman Ltd., Sanjay Shah, and Elysium Global Dubai?

90. In addition to the salary you were paid, did Sanjay Shah pay you any additional amounts?

91. How much?

92. On page 7 of the document, you testified that you received, separate from your salary, a payment of DKK 100 million. Is that correct?

93. Were those additional amounts part of the proceeds from the tax refunds?

94. When you worked for Solo, were you also known by the nickname "Pogo"?

95. Were you charged with any crimes in Denmark for your role in the dividend arbitrage strategy?

96. Turning to page 1 of the criminal judgment, is it correct that you were charged with "complicity in fraud of a particularly aggravating nature" under the Danish Criminal Code?

97. Turning to page 2, is it correct that you were also charged with "attempted complicity in fraud of a particularly aggravating nature" under the Danish Criminal Code?

98. How did you plead to the charges?

99. Did the court find you guilty?

100. What was your sentence imposed by the court?

101. Where are you currently living?