**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX REFUND<br>SCHEME LITIGATION<br><br>This document relates to case nos.: 18-cv-07828;<br>19-cv-01785; 19-cv-01867; 19-cv-01893; 19-cv-<br>01781; 19-cv-01783; 19-cv-01866; 19-cv-01895;<br>19-cv-01794; 19-cv-01865; 19-cv-01904; 19-cv-<br>01798; 19-cv-01869; 19-cv-01922; 19-cv-01800;<br>19-cv-01788; 19-cv-01870; 18-cv-07827; 19-cv-<br>01791; 19-cv-01792; 19-cv-01928; 19-cv-01926;<br>19-cv-01868; 18-cv-07824; 19-cv-01929; 19-cv-<br>01803; 19-cv-01806; 19-cv-01906; 19-cv-01801;<br>19-cv-01894; 19-cv-01808; 19-cv-01810; 19-cv-<br>01809; 18-cv-04833; 19-cv-01911; 19-cv-01898;<br>19-cv-01812; 19-cv-01896; 19-cv-01871; 19-cv-<br>01813; 19-cv-01930; 18-cv-07829; 18-cv-04434;<br>19-cv-01815; 19-cv-01818; 19-cv-01931; 19-cv-<br>01918; 19-cv-01873; 19-cv-01924; 19-cv-10713;<br>21-cv-05339. |

MASTER DOCKET

18-md-2865 (LAK)

### PLAINTIFF SKATTEFORVALTNINGEN'S RESPONSE TO DEFENDANTS' AMENDED MOTION FOR ISSUANCE OF A REQUEST FOR INTERNATIONAL JUDICAL ASSISTANCE TO OBTAIN EVIDENCE IN DENMARK

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this response to Defendants'

Amended Motion for Issuance of a Request for International Judicial Assistance to Obtain

Evidence in Denmark.[1]

### SKAT's Response

SKAT joined in defendants' initial motion for issuance of a letter of request to the Danish

judicial authorities seeking Sanjay Shah's testimony provided trial commences, as scheduled, on

---

1. *See* First Mot. to Amend/Correct Mot. for Issuance of a Request for Int'l Judicial Assistance to Obtain Evidence in Denmark, No. 18-md-02865-LAK, ECF Nos. 983–85.

January 7, 2025, irrespective of whether the Danish judicial authorities have executed any letter of request issued by the Court or Shah's testimony has been taken in Denmark, while reserving its right to object to the admissibility of any testimony obtained from Shah.  SKAT, however, does not join in defendants' amended motion because it does not address sufficiently the Court's concerns with respect to issuing defendants' proposed letter of request identified at the April 26, 2024 conference.

First, the Court should not issue defendants' proposed letter rogatory unless defendants agree that they will not seek to delay the scheduled January 7, 2025 trial in the event that the letter rogatory is still pending before the Danish courts or Shah's testimony has not been taken. At the April 26 conference, the Court asked defendants "whether they're going to all commit to proceeding to trial on January 7th unless otherwise ordered regardless of whether this is completed."  (April 26, 2024 Conf. Tr. at 7:15-18.)  In their amended motion, defendants refuse to so commit, stating instead that they "cannot categorically waive their right" to seek to move the trial.  (ECF No. 984 at 1.)  Notwithstanding defendants' expectation that Shah's "testimony can be taken well in advance of January 7, 2025," (*id.*), it is uncertain when, or even if, Shah's testimony can be taken in Denmark.  And if Shah's testimony cannot be taken as expeditiously as they expect, defendants should not be permitted to use any delay in obtaining Shah's testimony in Denmark as a basis for seeking to delay the start of trial, particularly given defendants' own delay in seeking Shah's testimony in the first place.

Second, in that respect, defendants attempt to justify their having waited until now to seek Shah's testimony—and to distinguish their own request from SKAT's request for a letter rogatory for Anthony Mark Patterson's testimony—by asserting that they could not have obtained Shah's testimony during discovery because he was in Dubai.  (*Id.* at 2-3.)  But, as

SKAT explained in moving for issuance of a letter rogatory for Patterson's testimony, defendants could have sought a letter rogatory to the Dubai International Financial Centre ("DIFC") courts for Shah's testimony.  (ECF No. 990 at 6-7.)  They also have made no showing that they attempted to obtain Shah's deposition voluntarily, without the need for a letter of request.  (*Id.* at 7.)  And even after Shah was extradited to Denmark in December 2023, defendants still waited another four months, until after Shah began testifying at his criminal trial in Denmark, to move for a letter rogatory.  (*Id.* at 7-8.)  Thus, even by the March 28, 2024 scheduling conference, defendants still had not decided "as a strategic matter" whether to seek Shah's deposition.  (*Id.*)  Trial should not be delayed while defendants belatedly seek Shah's testimony.[2]

Third, the Court noted at the April 26 conference that if the Danish court does not permit the parties' counsel to question Shah, as the initial proposed letter rogatory requested, but instead questions Shah itself on the identified topics, the parties may "get nothing much of value" and defendants may return to the Court "to start over all again with a new letter rogatory."  (Apr. 26, 2024 Conf. Tr. 14:4-18.)  In response, defendants' new proposed letter rogatory requests that if the Danish court conducts the examination, that the parties have the opportunity to submit in advance a list of questions for Shah.  (ECF No. 984 at 8.)  SKAT's position is that to avoid delay in Denmark and given the uncertainty about the procedure the Danish court would apply in executing the letter rogatory, the parties should, as SKAT understood the Court to suggest at the April 26 conference, include their questions for Shah on the identified topics in the letter

---

2.  Following the March 28, 2024 conference, defendants asked SKAT to inquire whether it is possible to obtain from the Danish court conducting Shah's criminal trial a record or summary of his testimony and to consider whether it would stipulate to a motion for the issuance of a letter rogatory.  SKAT responded on April 10 that its understanding is that any right of a non-party under Danish law to obtain a court record from a criminal case would not apply until the case is final and all appeal options have been exhausted.  In response, on April 10, defendants informed SKAT that they intended to move for issuance of a letter rogatory, and on April 12, SKAT asked to see defendants' motion papers.  Defendants sent SKAT their draft motion papers on April 17, and SKAT responded the next day on April 18 that it would join in the motion and sent its proposed revisions to the motion papers the following day on April 19.

rogatory itself.  To that end, SKAT has enclosed herewith its questions for Shah in the following appendix.[3]

Finally, SKAT has included as Exhibit 1 to the May 7, 2024 Declaration of Marc A. Weinstein a redlined version of defendants' new proposed letter rogatory reflecting certain revisions that should be included should the Court issue it.  In particular, the description of the "Nature of the Proceedings" and "Summary of Complaints" in section 7 of defendants' new proposed letter rogatory omits SKAT's revisions that were included in the initial letter rogatory. Should the Court issue defendants' proposed letter rogatory, it should include the parties' joint, even-handed descriptions in section 7, which SKAT included in its proposed letter rogatory for Patterson's testimony.  *See Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 122 (S.D.N.Y. 2019) (editing proposed letter of request to address "Defendants' concerns and the Court's interest in ensuring the request is neutral as to the merits of the case").  The new proposed letter rogatory likewise omits certain additions SKAT made to the testimonial topics in section 10(b) that were included in the initial proposed letter rogatory.  SKAT's revisions to the topics, as well as an additional topic concerning the authenticity of the Solo custodians' records seized from Shah's Elysium companies in Dubai in 2018 pursuant to orders of the DIFC courts, should be included if the Court issues the letter rogatory.  And section 6(a) of the proposed letter rogatory includes an outdated address for SKAT—its current address is Hannemanns Allé 25, DK-2300 Copenhagen S.

---

3.   If the Court would prefer, defendants intend to "submit a further revised Letter of Request" including their questions for the Danish court to pose to Shah in case the parties are not permitted to question Shah themselves. (ECF No. 984 at 8.)  If defendants submit a further revised letter rogatory including their questions for Shah, SKAT reserves the right to supplement its questions for Shah based on defendants' questions.  In addition, should the Court issue a version of defendants' proposed letter rogatory including the parties' questions for Shah, SKAT intends to submit the documents that are the subject of its questions to the Danish court in advance of any examination of Shah.

Dated: New York, New York
       May 7, 2024

HUGHES HUBBARD & REED LLP

By:      /s/ Marc A. Weinstein
     William R. Maguire
     Marc A. Weinstein
     Neil J. Oxford
     Gregory C. Farrell
 One Battery Park Plaza
 New York, New York 10004-1482
 Telephone: (212) 837-6000
 Fax:  (212) 422-4726
 bill.maguire@hugheshubbard.com
 marc.weinstein@hugheshubbard.com
 neil.oxford@hugheshubbard.com
 gregory.farrell@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen
(Customs and Tax Administration of the
Kingdom of Denmark)*

<u>**APPENDIX**</u>

<u>Plaintiff SKAT's proposed questions to Sanjay Shah</u>

1.  Are you a defendant in a legal proceeding filed by Skatteforvaltningen in the Business and Property Courts of England and Wales before Justice Andrew Baker?

2.  In that proceeding, have certain parties agreed to various facts, which have been filed as the "Consolidated List of Common Ground as of 5 April 2024" ("Common Ground")?

3.  Can you please review this document?  [Common Ground filing]

4.  Is this an accurate copy of the Common Ground filing?

5.  Are you one of the Sanjay Shah Defendants?

6.  Is one of those agreed facts, which has been admitted by the Sanjay Shah Defendants, that: "None of the Solo Group Custodians or the Solo Sub-Custodians held any Danish shares for, or on behalf of, any of the participants to the Solo Model trading."?  (Common Ground, p. 15, 14B1.)

7.  Is this statement accurate?

8.  Do you understand the term "Solo Group Custodians" to refer to and include Solo Capital Partners?

9.  Do you understand the term "Solo Group Custodians" to refer to and include Old Park Lane?

10. Do you understand the term "Solo Group Custodians" to refer to and include West Point Derivatives?

11. Do you understand the term "Solo Group Custodians" to refer to and include Telesto Markets?

12. Between 2012 and 2015, were you the owner of Solo Capital Partners, which I will refer to as "Solo"?

13. Between 2012 and 2015, were you the owner of Old Park Lane?

14. Between 2012 and 2015, were you the owner of West Point Derivatives?

15. Between 2012 and 2015, were you the owner of Telesto Markets?

16. When I refer to the Solo Group Custodians, do you understand I am referring to Solo Capital Partners, Old Park Lane, West Point Derivatives and Telesto Markets?

17. This statement refers to "the participants to the Solo Model trading" – do these participants include U.S. pension plans that were clients of the Solo Group Custodians?

18. And specifically, do these participants include pension plans that were established by Richard Markowitz?

19. Do these participants include pension plans that were established by John van Merkensteijn?

20. Do these participants include pension plans that were established by Robert Klugman?

21. Do these participants include pension plans that were established for friends or family of Messrs. Markowitz and van Merkensteijn?

22. Under the Solo Model of trading, between 2012 and 2015, did any Solo customers acquire any Danish shares from a party that was external to Solo, *i.e.*, a party that was not a Solo customer or Solo itself?

23. If so, identify the external parties from whom they acquired the shares.

24. Did Solo itself ever acquire Danish shares from an external party?

25. If so, identify any such external parties.

26. When did Old Park Lane first act as a custodian for United States pension plans trading under the Solo Model?

27. Between that date and 2015, under the Solo Model of trading, did any Old Park Lane customers acquire any Danish shares from a party that was external to Old Park Lane, *i.e.*, a party that was not an Old Park Lane customer or Old Park Lane itself?

28. If so, identify the external parties from whom they acquired the shares.

29. Did Old Park Lane itself ever acquire Danish shares from an external party?

30. If so, identify any such external parties.

31. When did West Point Derivatives first act as a custodian for United States pension plans trading under the Solo Model?

32. Between that date and 2015, under the Solo Model of trading, did any West Point Derivatives customers acquire any Danish shares from a party that was external to West Point Derivatives, *i.e.*, a party that was not a West Point Derivatives customer or West Point Derivatives itself?

33. If so, identify the external parties from whom they acquired the shares.

34. Did West Point Derivatives itself ever acquire Danish shares from an external party?

35. If so, identify any such external parties.

36. When did Telesto Markets first act as a custodian for United States pension plans trading under the Solo Model?

37. Between that date and 2015, under the Solo Model of trading, did any Telesto Markets customers acquire any Danish shares from a party that was external to Telesto Markets, *i.e.*, a party that was not a Telesto Markets customer or Telesto Markets itself?

38. If so, identify the external parties from whom they acquired the shares.

39. Did Telesto Markets itself ever acquire Danish shares from an external party?

40. If so, identify any such external parties.

41. From 2012 to 2015, please identify any sub-custodians used by the Solo Group Custodians?

42. For any sub-custodian identified, did that sub-custodian custody Danish shares on behalf of any of the Solo Group Custodians or any of the Solo Group Custodians' customers?

43. Between 2012 and 2015, did JPMorgan Chase custody any Danish shares on behalf of any of the Solo Group Custodians or any of the Solo Group Custodians' customers?

44. Between 2012 and 2015, did Skandinaviska Enskilda Banken AB ("SEB") custody any Danish shares on behalf of any of the Solo Group Custodians or any of the Solo Group Custodians' customers?

45. Between 2012 and 2015, did Société Générale custody any Danish shares on behalf of any of the Solo Group Custodians or any of the Solo Group Custodians' customers?

46. Returning to the Common Ground, is one of the agreed facts, which has been admitted by the Sanjay Shah Defendants, that: "A number of the owners of counterparties to the Solo Model trading were former employees of Solo or Elysium Group Companies, including Jason Browne, Sanjeev Dave and Dilip Shah, Guenther Klar and Rebecca Robson."? (Common Ground, p. 16, 14C.)

47. Is this statement accurate?

48. Does the word "counterparties" in this statement include the entities that sold Danish shares to U.S. pension plans that were Solo clients?

49. Does the word "counterparties" in this statement include the entities that borrowed Danish shares from the U.S. pension plans that were Solo clients?

50. Was Guenther Klar a Solo employee?

51. During what period of time?

52. What was Guenther Klar's role at Solo?

53. Was Klar affiliated with Amalthea, a Solo Group Custodian client that borrowed stock from U.S. pension plans?

54. Was Klar a director of Amalthea?

55. Are you generally aware of when Amalthea was established?

56. Was Amalthea incorporated on or around February 14, 2013?

57. Where was it incorporated?

58. Was Amalthea formed so that it could participate in trades arranged by the Solo Group Custodians?

59. Was Klar also associated with other counterparties to the Solo Model?

60. Was he a director and shareholder of Leda?

61. Did Leda sell shares to the U.S. pension plans?

62. Was he a director of Metis?

63. Did Metis sell shares to the U.S. pension plans?

64. Were Leda and Metis formed so they could participate in trades arranged by the Solo Group  Custodians?

65. Where were Leda and Metis incorporated?

66. Did you discuss the formation of any of these entities with Klar?

67. Was Jason Browne an employee of Solo or Elysium?

68. During what period of time?

69. What were Browne's roles at that entity or entities?

70. Was Browne affiliated with any entities that sold shares to the U.S. pension plans?

71. Was Browne the owner of several such entities?

72. Was Browne a director and beneficial owner of CBCB International, which was later called Brazzle?

73. Where was CBCB incorporated?

74. Was Browne a director and beneficial owner of FBFB International, which was later called Tappleton?

75. Where was FBFB incorporated?

76. Was Browne a director and beneficial owner of JBJB International, which was later called Ice Rock?

77. Where was JBJB incorporated?

78. Was Browne a director and beneficial owner of JCJC International, which was later called Campdown?

79. Where was JCJC incorporated?

80. Did you discuss the formation of any of these entities with Browne?

81. Were these entities formed so they could participate in trades arranged by the Solo Group Custodians?

82. Are you generally aware of when CBCB International, FBFB International, JBJB International, and JCJC International were established?

83. Are you aware that they were all incorporated on or around December 5, 2014?

84. Please review the following financial statements:
   o Solo Capital Limited Director's Report and Financial Statements for the Period Ended March 31, 2010
   o Solo Capital Limited Director's Report and Financial Statements for the Period Ended March 31, 2011
   o Solo Capital Limited Director's Report and Consolidated Financial Statements for the Period Ended March 31, 2012
   o Solo Capital Limited Director's Report and Consolidated Financial Statements for the Period Ended March 31, 2013
   o Solo Capital Limited Director's Report and Financial Statements for the Period Ended March 31, 2014
   o Solo Capital Limited Director's Report and Financial Statements for the Period Ended March 31, 2015
   o Solo Capital Partners LLP Report and Financial Statements for the Period Ended March 31, 2012
   o Solo Capital Partners LLP Report and Financial Statements for the Period Ended March 31, 2013
   o Solo Capital Partners LLP Report and Financial Statements for the Period Ended March 31, 2014
   o Solo Capital Partners LLP Report and Financial Statements for the Period Ended March 31, 2015
   o Old Park Lane PLC's Director's Report and Financial Statements for the Period Ended December 31, 2012
   o Old Park Lane PLC's Director's Report and Financial Statements for the Period Ended December 31, 2013
   o West Point Derivatives Limited's Report and Financial Statements for the Period Ended December 31, 2012
   o West Point Derivatives Limited's Report and Financial Statements for the Period Ended December 31, 2013
   o West Point Derivatives Limited's Report and Financial Statements for the Period Ended March 15, 2015
   o Telesto Markets LLP's Report and Financial Statements for the Period Ended March 15, 2015

85. Are these accurate copies of the financial statements for these entities?

86. Was each of these statements posted on the Solo Group Custodians' websites and available to the public within months of the year end that is the subject of the respective balance sheet date?

87. Please confirm that you have been provided with the transcripts of proceedings in the English court on the dates when you testified, and an opportunity to correct the transcript by filling out an errata sheet containing any corrections.

88. For each transcript, please confirm that, subject to any corrections you have made on the errata sheet, the transcript is an accurate record of the questions you were asked and the answers you provided.

89. Are or were you affiliated with an entity called Elysium Global (Dubai) Limited?

90. If so, what is your affiliation with Elysium Global (Dubai) Limited?

91. Are or were you affiliated with an entity called Elysium Properties Limited?

92. If so, what is your affiliation with Elysium Properties Limited?

93. In 2018, did SKAT commence proceedings in the Dubai International Financial Centre courts against Elysium Global (Dubai) Limited and Elysium Properties Limited?

94. As part of those proceedings, did the Dubai International Financial Centre courts issue search orders for documents in the possession of Elysium Global (Dubai) Limited and Elysium Properties Limited?

95. Pursuant to those search orders, were documents collected from the offices of Elysium Global (Dubai) Limited and Elysium Properties Limited in Dubai?

96. Between 2012 and 2015, did the Solo Group Custodians create account statements for its customers who participated in the Danish dividend arbitrage strategy?

97. Did those account statements reflect the customers' supposed transactions involving Danish shares?

98. How were those account statements created?

99. Were they created contemporaneously with the transactions described therein?

100.     Did the Solo Group Custodians create the account statements as a regular practice?

101.     Did the Solo Group Custodians maintain the account statements as part of the regular course of its business?

102.     Did the Solo Group Custodians use the account statements in the regular course of conducting its business?

103.     During the period 2012 to 2015, did the Solo Group Custodians create trade confirmations for its customers' purported transactions in Danish shares?

104.     How were those trade confirmations created?

105.     Were they created contemporaneously with the transactions described therein?

106.     Did the Solo Group Custodians create the trade confirmations as a regular practice?

107.     Did the Solo Group Custodians maintain the trade confirmations as part of the regular course of its business?

108.     Did the Solo Group Custodians use the trade confirmations in the regular course of conducting its business?

109.     In 2018, were the account statements created by the Solo Group Custodians during the years 2012 through 2015 kept in the offices of Elysium Global (Dubai) Limited and Elysium Properties Limited?

110.     In 2018, were the trade confirmations created by the Solo Group Custodians during the years 2012 through 2015 kept in the offices of Elysium Global (Dubai) Limited and Elysium Properties Limited?

111.     How did the Solo Group Custodians' records come to be kept in the offices of Elysium Global (Dubai) Limited and Elysium Properties Limited?

112.     What was the relationship between the Solo Group Custodians and Elysium Global (Dubai) Limited?

113.     What was the relationship between the Solo Group Custodians and Elysium Properties Limited?