# EXHIBIT 1

Michael Ben-Jacob's Additions to Plaintiff SKAT's proposed questions to Anthony Mark Patterson

1. Were you an employee of or consultant to Solo Capital Partners, which I will refer to as "Solo"?

2. When were you first employed by or retained as a consultant to Solo?

3. Who owned Solo?

4. How did you come to be employed at or retained by Solo?

5. What was your job title?

6. What were your responsibilities?

7. **What qualifications did one need to be hired at Solo?**

8. **What type of professional backgrounds and qualifications did your coworkers at Solo have?**

9. **Do you have any legal background?**

10. **Why were you interested in the position at Solo?**

11. **Prior to joining Solo, had you worked at Macquarie Bank?**

12. **When you worked at Macquarie Bank, did you have any exposure to dividend arbitrage trading?**

13. **If yes, please describe.**

14. Are you familiar with Solo's so-called dividend arbitrage strategy?

15. What did you understand that strategy to be?

16. Who explained the strategy to you?

17. **Had you ever heard of this type of trading strategy before?**

18. **Were you aware of any others participating in dividend arbitrage trading?**

19. **If yes, who else participated in the dividend arbitration trading strategy?**

1

20. Who developed the dividend arbitrage strategy?

21. Did you have any role with respect to developing the dividend arbitrage strategy?

22. If so, what was your role in developing the strategy?

23. Did you have any role in executing the strategy on behalf of Solo's customers?

24. If so, what was your role?

25. Did you at any point come to believe there were any problems with the Solo strategy or the execution of that strategy?

26. If so, when was that?

27. **How long had you been working for Solo before you came to believe there were problems with Solo's strategy or the execution with that strategy?**

28. What were those problems, if any?

29. **What, if anything, did you do in response to your belief that those problems existed?**

30. How did you confirm that there were problems with the Solo strategy?**Did you question anyone about the problems?**

31. **If yes, when?**

32. **Who did you question?**

33. **What were you told?**

34. **Did you question Shah?**

35. **If yes, what did you told?**

36. **Were you given the explanation that legal opinions supported the structure?**

37. **Do you know how many?**

38. **If yes, how many?**

39. **Did you see any of those legal opinions?**

40. **Do you know prepared those legal opinions?**

41. **If yes, who?**

42. **Do you know when were those legal opinions prepared?**

43. **If yes, when?**

44. **Did you ever seek or obtain advice as to the legality of Solo's strategy or its execution of that strategy?**

45. **If yes, when?**

46. **If yes, from whom?**

47. **Did you know, when you worked for Solo, whether it was an FCA-regulated entity?**

48. **What was your understanding of what it meant to be an FCA-regulated entity?**

49. **What was your understanding of the frequency or intensity of regulatory oversight into FCA-regulated entities?**

50. **Did Solo employees have the opportunity to contact the FCA or NCA if they thought that Solo's trading practice were somehow wrong?**

51. **Did you ever contact the FCA or NCA regarding Solo's trading practices?**

52. **Did you ever communicate in writing with any of your coworkers regarding your concerns about Solo's trading practices?**

53. **When did your employment with Solo end?**

54. **How long after you came to believe there were problems with Solo's trading strategy did you leave the company?**

55. **Did you continue to work for Sanjay Shah after leaving Solo?**

56. **If so, for how long?**

57. **What year did you stop working for Sanjay Shah?**

58. Can you please review this document? [Mar. 1 2024 criminal judgment]

59. Can you explain what this document is?

60. Does this document accurately describe the testimony you gave to the Court in Denmark?

61. In the second paragraph on page 4 of the criminal judgment, it says you testified that your role at Solo "primarily was to allocate the correct number of trades to each investor" and "inform the customers how many shares they should buy," do you see that?

62. Please explain for the benefit of people who are not familiar with your business what this primary role was, and how you carried out that role?

63. And in the next two sentences, the judgment says you testified that, "It was controlled centrally. It was quite unusual." Do you see that?

64. Please explain what you meant that the allocation of the correct number of trades to each investor and how many shares they should buy was "controlled centrally"?

65. Who controlled the allocation to each customer?

66. How was that allocation determined?

67. Why was that central control "quite unusual"?

68. Did Solo's customers include United States-based pension plans that purportedly purchased Danish shares?

69. In the second full paragraph from the bottom of page 4, the judgment recounts that you testified that the trading that led to the tax refund claims "was a circular closed system where nothing came in from outside," do you see that?

70. Can you explain what you meant that it "was a circular closed system"?

71. What did you mean by "nothing came in from outside"?

72. Were any actual Danish shares entering the Solo system?

73. **Are you aware that in Denmark shares are dematerialized?**

74. In the preceding paragraph, there is a reference to "the trading loop," do you see that?

75. Can you explain what the "trading loops" were?

76. Were any shares actually transferred between the counterparties as a result of the transactions in the trading loops?

77. **Was any money actually transferred between the counterparties as a result of the transactions in the trading loops?**

78. Turning back to the second full paragraph from the bottom, you testified, "No dividends came from outside, and therefore no dividend tax had been paid," do you see that?

79. Can you explain what you meant by that?**Are you aware that Solo issued dividend credit advice slips to its customers that stated they had received dividends from which Danish dividend tax of 27% was withheld?**

80. **Do you have any personal knowledge regarding whether during the time you worked for Solo it held custody of any Danish shares its customers acquired as part of the dividend arbitrage strategy?**

81. During the time you worked for Solo, did Solo hold custody of any of the Danish shares its customers purported to acquire as part of the dividend arbitrage strategy?

82. **What is the basis for that understanding?**

83. **Do you have any personal knowledge regarding whether during the time you worked for Solo any other custodian or sub-custodian held custody of any Danish shares on behalf of Solo or its customers?**

84. During the time you worked for Solo, did any other custodian or sub-custodian hold custody of Danish shares on behalf of Solo or its customers?

85. **What is the basis for that understanding?**

86. **Do you have any personal knowledge regarding whether during the time you worked for Solo it received any dividends issued on Danish shares on behalf of its customers who participated in the dividend arbitrage testimony?**

87. During the time you worked for Solo, did Solo receive any dividends issued on Danish shares on behalf of its customers who participated in the dividend arbitrage strategy?

88. **What is the basis for that understanding?**

89. **Do you have any personal knowledge regarding whether during the time you worked for Solo any other custodian or sub-custodian received any dividends issued on Danish shares on behalf of its customers who participated in the dividend arbitrage testimony?**

90. During the time you worked for Solo, did any other custodian or sub-custodian receive any dividends on Solo's or its customers' behalf as part of the dividend arbitrage strategy?

91. **What is the basis for that understanding?**

92. Are you aware that, as part of the dividend arbitrage strategy, Solo's customers submitted tax refund claims to the Danish tax authority seeking refunds of tax supposedly withheld from dividends the customers received?

93. **Did you have any personal involvement with preparing or submitting the tax refund claims?**

94. **Do you have personal knowledge regarding whether as part of the dividend arbitrage strategy Solo's customers received dividends issued on Danish shares from which tax was withheld?**

95. In your experience at Solo, as part of the dividend arbitrage strategy, did Solo's customers receive dividends issued on Danish shares from which tax was withheld?

96. **What is the basis for that understanding?**

97. Turning to page 5 of the criminal judgment, in the first full paragraph, you testified, "None of them made the decisions on their own about the Danish shares." Do you see that?

98. Can you explain what you meant by that?

99. What decisions were being made regarding Danish shares?

100. Who was making those decisions regarding Danish shares?

101. Were these decisions part of what you testified (at page 4 of the criminal judgment) was being "controlled centrally"?

102. On page 5, you testified, "The only profit they made was the dividend tax they were refunded." Do you see that?

103. Who were you referring to?

104. **What is the basis for that understanding?**

105. Can you explain why the only profit was the dividend tax they were refunded?

106. How did you come to learn that there was no money coming in from customers to buy shares?

107. Turning to page 4 of the criminal judgment, in the last full paragraph on that page, you testified that when you "started in March 2013, [you] had not been aware that it was a

7

closed trading system" and "[i]n the autumn of 2013, [you] could see that something was wrong." Do you see that?

108. What was it you were able to see "was wrong" by autumn of 2013?

109. How were you able to determine that?

110. At the end of the third full paragraph of page 5, you testified that in November 2013: "At this point, he had the full picture of the circular trading structure - of the loop." What was the full picture?

111. Turning to the top of page 6, you testified that you "did not have access to view accounts in the Solo companies," is that correct?

112. Can you explain what those accounts were that you did not have access to?

113. Are you familiar with Old Park Lane, West Point Derivatives, and Telesto Markets?

114. What were those entities?

115. Who were they controlled by?

116. Does your testimony about the trading at Solo also apply to the trading at these companies?

117. What similarities and/or differences are there?

118. Turning to page 6 of the document, you testified that you moved to Dubai in the beginning of 2014, do you see that?

119. Why did you move to Dubai in the beginning of 2014?

120. In the next paragraph, you testified that in Dubai, you "established the company Fiveways Consultancy, and through that company continued working for Sanjay Shah"?

121. What was Fiveways Consultancy?

122. Why did you establish it?

123. In the next sentence, you testified you "entered an agreement with Ganymede Cayman Ltd. and with Shah personally," do you see that?

124. What was Ganymede Cayman?

125. Did your responsibilities with respect to the dividend arbitrage strategy change after you moved to Dubai?

126. If so, in what way?

127. At the end of the next paragraph, you testified that you "became a risk manager at Elysium Global Dubai in May 2015," is that correct?

128. What was Elysium Global Dubai?

129. In the following paragraph, you testified, "In the beginning of 2015, GSS became more automated," do you see that?

130. What was "GSS"?

131. **Who is Omar Arti?**

132. **What role did Omar Arti play at GSS?**

133. **Did you ever meet with Omar Arti?**

134. **When?**

135. **Did you ever disclose to Omar Arti your concerns regarding Solo's trading strategy?**

136. What did you mean that, in the beginning of 2015, GSS became more automated?

137. Did that affect your responsibilities with respect to the dividend arbitrage strategy?

138. Did that automation have any impact on how shares were allocated to Solo's customers for the dividend arbitrage strategy?

139. Did the customers have any greater role in deciding how many shares each would purchase due to the automation?

9

140. **Was it abnormal for companies to use software to facilitate or streamline trading, in your experience?**

141. **Were you aware of any other entities or companies using automation technology, such as software, to facilitate trades?**

142. At the end of that paragraph, you testified that you "assisted in making e-mails look right, worded as a trader would put it," do you see that?

143. Can you explain what you meant by that?

144. Why did you need to make the emails "look right"?

145. Was Sanjay Shah or any entity he controlled paid any portion of the tax refunds that Solo's customer received as a result of the dividend arbitrage strategy?

146. **What is the basis for that understanding?**

147. How were any such payments made?

148. What was your annual salary at Solo?

149. After you moved to Dubai in 2014, what was your annual salary when you worked for Ganymede Cayman Ltd., Sanjay Shah, and Elysium Global Dubai?

150. In addition to the salary you were paid, did Sanjay Shah pay you any additional amounts?

151. How much?

152. On page 7 of the document, you testified that you received, separate from your salary, a payment of DKK 100 million. Is that correct?

153. Were those additional amounts part of the proceeds from the tax refunds?

154. **What is the basis for that understanding?**

155. When you worked for Solo, were you also known by the nickname "Pogo"?

10

156. **Between 2012 and 2015, did you have any understanding of what it means to be the beneficial owner of stocks or dividends under Danish law?**

157. **If yes, what was your understanding at that time?**

158. **What was the basis for that understanding?**

159. **Between 2012 and 2015, did you have any understanding of United States pension plan qualifications under United States law for purposes of applying for tax refunds from SKAT?**

160. **If yes, what was your understanding at that time?**

161. **What was the basis for that understanding?**

162. **Did there come a time when you were arrested in connection with your work for Sanjay Shah?**

163. **When were you arrested?**

164. **Did you have any communications with anyone from SKAT after your arrest?**

165. **If yes, please describe.**

166. **Did you have any communications with any of SKAT's lawyers after your arrest?**

167. **If yes, please describe.**

168. **When did you first believe that you had engaged in criminal behavior in connection with your work with Solo?**

169. Were you charged with any crimes in Denmark for your role in the dividend arbitrage strategy?

170. Turning to page 1 of the criminal judgment, is it correct that you were charged with "complicity in fraud of a particularly aggravating nature" under the Danish Criminal Code?

171. Turning to page 2, is it correct that you were also charged with "attempted complicity in fraud of a particularly aggravating nature" under the Danish Criminal Code?

172. How did you plead to the charges?

173. **Did you have communications with the Danish government prior to pleading to the charges?**

174. **If yes, please describe those communications.**

175. **Did the Danish government reduce your sentence in connection with your agreement to plead to the charges?**

176. **Did the Danish government reduce the amount of money confiscated in connection with your agreement to plead to the charges?**

177. **Do you believe you received any benefit as a result of your agreement to plead to the charges?**

178. **If yes, what benefit, or benefits, did you receive?**

179. Did the court find you guilty?

180. What was your sentence imposed by the court?

181. Where are you currently living?

182. **Prior to your testimony here today, did you discuss your testimony with anyone from the Danish government?**

183. **Did you discuss the taking of this testimony in any way with anyone from the Danish government?**

184. **Are you familiar with a person named Michael Ben-Jacob?**

185. **How do you know Michael Ben-Jacob?**

186. **When did you first come into contact with Michael Ben-Jacob?**

187. **Have you ever met Michael Ben-Jacob in person?**

188. **Have you ever had a phone conversation with Michael Ben-Jacob?**

189. **If yes, how many times?**