# Exhibit 2

Robert Klugman - January 28, 2021

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3    _____
                                              )
 4    IN RE:                                  )
                                              )
 5    CUSTOMS AND TAX ADMINISTRATION OF       )
      THE KINGDOM OF DENMARK                  )
 6    (SKATTEFORVALTNINGEN) TAX REFUND        )
      SCHEME LITIGATION                       )
 7                                            )
      This document relates to case nos.      )
 8    19-cv-01783; 19-cv-01788; 19-cv-01794;  )
      19-cv-01798; 19-cv-01918                )
 9    _____)

10

11

12

13

14       REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                     EXAMINATION OF

16                     ROBERT KLUGMAN

17                 DATE: January 28, 2021

18

19

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Robert Klugman - January 28, 2021

Page 2

1        TRANSCRIPT of the videotaped deposition
2    of the witness, called for Oral Examination in the
3    above-captioned matter, said deposition being taken
4    by and before MICHAEL FRIEDMAN, a Notary Public and
5    Certified Court Reporter of the State of New Jersey,
6    via WEBEX, ALL PARTIES REMOTE, on January 28, 2021,
7    commencing at approximately 10:06 in the morning.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    attorney-in-fact?
2         A    There's a lot of those technical
3    terms.  I'm not sure, but I know that I did
4    give Michael Ben-Jacob power of attorney.
5         Q    And why did you give him power of
6    attorney?
7         A    To help set up the transaction, all
8    the elements in the transaction.
9         Q    And do you recall what elements of
10   the transaction he was helping you with?
11        A    All of it, every element.
12        Q    And that's from setting up the LLCs
13   and the plans and onboarding with the
14   different counterparties and custodians?
15        A    Yes, yes.  And when I say "him," I
16   mean also his firm, so there were -- it
17   wasn't just him.
18             But yes.
19        Q    And then, once the plans were set
20   up, what kind of services -- how involved was
21   he in terms of helping you with the actual
22   administration or monitoring of the trading,
23   the account statements, or any of the actual
24   transactions that you were doing?
25        A    Well, Kaye Scholer was involved in

1     every part of the transaction.  The intensity
2     was more in the setting up.
3            But then there were also plenty of
4     other issues, plenty of other U.S. issues
5     involved in reporting and U.S. tax, et
6     cetera.
7         Q    And that was all in connection with
8     the Danish trading transaction?
9         A    And Belgium trading.
10        Q    Do you recall, right before the
11    first trades, the August 2014 trades, you
12    reached out to Sanjay Shah to catch up with
13    him?
14        A    I don't recall that.  It's quite
15    possible.
16        Q    Do you recall at the end of August
17    meeting him for dinner at the Nomad Hotel?
18        A    Yeah, I recall a dinner, I believe,
19    with -- Rich Markowitz and John Van
20    Merkensteijn were there and maybe -- I don't
21    recall who, but other members of Sanjay's
22    team.
23        Q    And what do you recall being
24    discussed at that dinner?
25        A    I think just about the transaction

1     scheme?
2          A    I'm not sure how I would describe
3     it, but it wasn't -- it was in line with the
4     role of lawyers that I've worked with, you
5     know, throughout my entire career from big
6     law firms.
7               It was just, generally speaking,
8     making sure everything was done correctly.
9          Q    And how did Kaye Scholer know how
10    you were doing in the Danish trades?
11         A    Well, they were -- again, in
12    general, involved in every aspect.  And this
13    is before I got there, so I assume there was,
14    you know, two-plus years of learning because
15    I was -- I was definitely behind the curve.
16              But from what I saw, it was -- you
17    know, kind of from -- to use an overused
18    expression, "from womb to tomb," they helped
19    us in setting up the entities, they helped in
20    getting us to be approved clients of the
21    entities.  They knew what trades were going
22    on.
23              They helped us with tax issues,
24    securities law issues, reporting issues,
25    yeah, just in line with how I've worked with

Robert Klugman - January 28, 2021

Page 303

```
1    other law firms my whole career.
2         Q    And how did Kaye Scholer know how
3    you were doing the Danish trades?
4         A    Well, I mean, they knew all the
5    agreements we were entering into.  They
6    obviously knew how the trade worked.  They
7    wrote it in their memorandum.
8              The trade wasn't that much
9    different, as we went through, i.e. -- I
10   mean, I -- they must have seen the confirms.
11   I don't know if they did or didn't, but they
12   knew the agreements under which the confirms
13   were being entered -- were -- you know, were
14   for, for the stock loan purchase and forward
15   contracts, you know.
16             And there was a lot of back and
17   forth on -- as I saw in this memo, about
18   securities limitations under securities law
19   in Denmark, which they helped us work
20   through.  I know there were a lot of issues
21   back and forth with Treasury on how to report
22   this.  There were obviously tax issues as we
23   saw from the memorandum.
24             So they couldn't have possibly
25   answered those questions without knowing
```

```
 1    everything that be we were doing.
 2        Q    And were you open in disclosing
 3    what you were doing to Kaye Scholer?
 4        A    Absolutely.
 5        Q    Did you withhold any information
 6    from Kaye Scholer?
 7        A    No.
 8             MR. MAGUIRE:  That's all.  Thank
 9    you, sir.
10             THE WITNESS:  Thank you.
11             MR. MULLEN:  I do have a few
12        follow-up questions.
13
      CONTINUED EXAMINATION BY MR. MULLEN:
14
15        Q    I apologize, Mr. Klugman.  I bet
16    you thought you were getting out of here.
17        A    No, don't apologize.  I understand.
18             Are you Canadian?
19        Q    I'm not Canadian, no.
20        A    Okay.  I apologize for asking.  Go
21    ahead.  I like to know.
22        Q    Fine.  Just a few follow-up
23    questions.
24             First, is it correct you don't know
25    whether or not Kaye Scholer saw the trade
```

1              C E R T I F I C A T E

2              I, MICHAEL FRIEDMAN, a Certified Court

3     Reporter and Notary Public, qualified in and for

4     the State of New Jersey do hereby certify that

5     prior to the commencement of the examination ROBERT

6     KLUGMAN was duly sworn by me to testify to the

7     truth the whole truth and nothing but the truth.

8              I DO FURTHER CERTIFY that the foregoing

9     is a true and accurate transcript of the testimony

10    as taken stenographically by and before me at the

11    time, place and on the date hereinbefore set forth.

12             I DO FURTHER certify that I am neither a

13    relative of nor employee nor attorney nor counsel

14    for any of the parties to this action, and that I

15    am neither a relative nor employee of such attorney

16    or counsel, and that I am not financially

17    interested in the action.

18

19

20

21    _____

22    MICHAEL FRIEDMAN, CCR of the

23    State of New Jersey

24    License No:  30XI00228600

25    Date:  January 30, 2021