# Exhibit 4

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2               CASE NO.  18-MD-2865 (LAK)

 3    _____
                                             )
 4    IN RE:                                 )
                                             )
 5    CUSTOMS AND TAX ADMINISTRATION OF      )
      THE KINGDOM OF DENMARK                 )
 6    (SKATTEFORVALTNINGEN) TAX REFUND       )
      SCHEME LITIGATION                      )
 7                                           )
      This document relates to case nos.     )
 8    19-cv-01783; 19-cv-01788; 19-cv-01794; )
      19-cv-01798; 19-cv-01918               )
 9    _____)

10

11

12                C O N F I D E N T I A L

13           SUBJECT TO THE PROTECTIVE ORDER

14

15    CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

16                 ORAL EXAMINATION OF

17               JOHN VAN MERKENSTEIJN

18                     VOLUME II

19                DATE: April 20, 2021

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 251

1          TRANSCRIPT of the continued videotaped

2     deposition of the witness, Volume II, called for

3     Oral Examination in the above-captioned matter, said

4     deposition being taken by and before MICHAEL

5     FRIEDMAN, a Notary Public and Certified Court

6     Reporter of the State of New Jersey, via WEBEX, ALL

7     PARTIES REMOTE, on April 20, 2021, commencing at

8     approximately 10:33 in the morning.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 366

1    dissolved?

2        A    I think just a cost-cutting

3    exercise.

4        Q    Was there any need for the

5    partnerships after Denmark stopped paying

6    reclaims?

7        A    There was no need.  There was an

8    opportunity to use them, but we -- you know,

9    we decided to -- I guess we decided to

10   terminate them.

11       Q    Mr. Van Merkensteijn, in the

12   litigations in which you are a defendant, are

13   you asserting as a defense the advice -- the

14   reliance on advice of counsel?

15       A    I relied on counsel.

16       Q    And you are asserting that as a

17   defense in the case?

18       A    I believe so, yes.

19       Q    From which lawyers did you receive

20   advice that you are relying on as a defense

21   in the litigation?

22       A    From Kaye Scholer and other firms

23   that we used from time to time.

24       Q    What other firms did you use and

25   receive advice from that you were relying on

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 367

```
 1      as a defense in this -- in these actions?
 2          A    Early on, we had another law firm
 3      involved.  I'm bad on names, so I am trying
 4      to remember the name, and I'll think of it in
 5      a minute.
 6              Crowell & Moring.
 7          Q    When you say "early on" --
 8          A    I'm trying to --
 9          Q    I'm sorry.  If I can stop you on
10      that one.
11              You mentioned early on you used
12      Crowell & Moring.
13              During what period of time?
14          A    They were involved at the time we
15      first started working with Solo.
16          Q    Did you receive advice from Crowell
17      & Moring that you were relying on as a
18      defense in these actions?
19          A    I can't -- I can't -- I'm just
20      telling you what law firms we used.  I don't
21      know what we're relying on in this action.
22              MS. MCCARTHY:  Marc, I'm going to
23          object.  We've done a broad waiver of
24          attorney/client privilege and we've
25          asserted a reliance defense.  So I
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 369

```
 1          Q     On what issues did Crowell & Moring

 2     provide you legal advice in connection with

 3     dividend arbitrage trading?

 4          A     I don't recall.  What I recall is

 5     that they were involved at the time we first

 6     started negotiating an agreement with Solo.

 7          Q     Negotiating which agreement?

 8          A     An agreement.

 9          Q     Do you recall what that agreement

10     was?

11          A     No.

12          Q     How many agreements have you had

13     with Solo?

14          A     I think the agreement with Solo has

15     modified itself over time.  I don't know if

16     it was in written form or just verbally

17     negotiated.

18                I don't know what we did in the

19     end.

20          Q     So, as you sit here today, you

21     don't recall specifically what advice Crowell

22     & Moring provided, but you know they were

23     involved in the negotiations of the first

24     agreement with Solo?

25          A     That's what I recall now, yeah.
```

Confidential — Subject to The Protective Order
John Van Merkensteijn — April 20, 2021

Page 372

1    them.

2        Q    Did they actually provide you with

3    legal advice regarding the issues on whether

4    they were qualified under the Internal

5    Revenue code?

6        A    I don't recall specific advice.  We

7    asked them to organize the plans, they

8    organized the plans.

9            If they weren't qualified, then I

10   would have heard about it somehow.

11       Q    Did Kaye Scholer provide you legal

12   advice regarding the requirements under the

13   Danish U.S. double taxation treaty?

14       A    Well, the underlying principal of

15   the transaction was to have pension plans

16   that qualified under the treaty, and they

17   formed them.

18           So did we get written advice that

19   said that they qualified?  I don't know.

20           But we asked them to form entities

21   that qualified, and they did.

22       Q    Did Kaye Scholer provide legal

23   advice regarding whether the pension plans

24   were the beneficial owners of the securities

25   at issue in the Danish trading?

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 373

```
 1          A    Again, I don't have specific

 2     concrete building blocks of what advice they

 3     gave us.  We gave them everything we did.  We

 4     gave them all the information about

 5     everything as we went along.

 6               And if they had seen any red flags,

 7     which occasionally on some issue or another

 8     they did, we would discuss it, figure out how

 9     to resolve it, or if we saw a red flag, they

10     would help us resolve it.

11               So I don't recall.

12          Q    Do you recall any red flags that

13     you or the group brought to Kaye Scholer's

14     attention?

15          A    I don't know who originated some of

16     the issues about the Commodity Trading

17     Securities Law aspects.

18               I don't know who raised those

19     issues.

20          Q    Do you recall any other red flags

21     that you or the Argre group brought to

22     Kaye Scholer's attention?

23          A    I can't recall.

24          Q    Do you recall any red flags that

25     Kaye Scholer raised after getting the
```

```
 1      discussions with Kaye Scholer about that

 2      question?

 3           A    Again, we're talking about ten

 4      years ago.   I don't remember the discussions.

 5           Q    Do you recall having any

 6      discussions with Kaye Scholer about that same

 7      question, but in the context of the U.S.

 8      Denmark trading?

 9           A    I don't recall the specific

10      conversations, no.

11           Q    All right.  Do you know if you

12      received any written advice from them on that

13      issue?

14           A    On which issue?

15           Q    Whether a 401(k) or other similar

16      pension plan that can be easily set up,

17      controlled, and administered would meet the

18      definition of a pension within the meaning of

19      the U.S. Denmark treaty?

20           A    Well, again, if that answer had

21      been negative, we would not have proceeded.

22           Q    So were you operating at the time

23      under the assumption that if Kaye Scholer had

24      raised an issue, and then the transaction

25      proceeded, that Kaye Scholer had resolved the
```

Confidential — Subject to The Protective Order
John Van Merkensteijn — April 20, 2021

Page 384

```
 1     issue?

 2             MR. DEWEY:  Objection.

 3       A     Looking back at it, yes.  I take

 4     the advice of lawyers.  If they say it

 5     doesn't work, I wouldn't do it.

 6       Q     Did you have substantive

 7     discussions with them about the issues, or

 8     did you rely on them to resolve them, and if

 9     they went forward, you assume they were

10     resolved?

11       A     Well, at the time I may have had

12     substantive discussions.  I don't recall

13     them.

14             My entire career from the time I

15     was a beginning lawyer is always to have

16     other lawyers involved in every step of every

17     transaction that I do.

18       Q     Okay.  Turning back to the first

19     page, that first sentence underneath, where

20     it says "by way of background?"

21       A     Yes.

22       Q     Would you say that that accurately

23     describes the trading in Denmark as well?

24       A     (Witness reviewing.)

25             No, I don't know that.
```

Confidential — Subject to The Protective Order
John Van Merkensteijn — April 20, 2021

Page 385

```
 1         Q    Okay.  Were the pension plans in

 2    the Danish transactions seeking a tax refund

 3    from the Danish government for taxes that

 4    they did not, in fact, pay?

 5         A    I don't know that.

 6         Q    You don't know one way or the

 7    other?

 8         A    I don't know one way or the other,

 9    right.

10         Q    Can you turn, please, to

11    Exhibit 2234?

12              MR. WEINSTEIN:  Mark this as 2234.

13              (Whereupon the above mentioned was

14         marked for Identification.)

15         A    Okay.  Hard to read.

16              (Witness reviewing.)

17         Q    At the bottom of the first page,

18    there's an e-mail from Mr. Markowitz to

19    someone named Axel Haelterman at the

20    Freshfields law firm.

21         A    Okay.

22         Q    Are you familiar with that firm?

23         A    I'm familiar with the firm, yes.

24         Q    Do you recall whether your group

25    sought any legal advice from Freshfields in
```

Confidential — Subject to The Protective Order
John Van Merkensteijn — April 20, 2021

Page 386

```
 1      connection with dividend arbitrage trading?

 2           A    Well, it appears from the e-mail

 3      that we did, yes.

 4           Q    In his e-mail, Mr. Markowitz says,

 5      "I believe that some colleagues of ours at

 6      Solo Capital contacted you on our behalf."

 7               Did you consider the people at

 8      Solo Capital to be your colleagues?

 9           A    I don't know what he meant by the

10      word "colleague."

11           Q    Do you know why Solo Capital

12      contacted the Freshfields firm on your

13      behalf?

14           A    I don't know.

15           Q    Do you recall having any

16      discussions with any lawyers at Freshfields

17      in connection with dividend arbitrage

18      trading?

19           A    Me?  No, I don't recall.

20           Q    Mr. Haelterman responds on

21      April 23, 2012, and says, "Further, to our

22      phone calls, and prior to finalize any

23      document, I first wanted you to review the

24      wording that you will find attached in the

25      unfinished draft memo.  I just wanted to make
```

Confidential — Subject to The Protective Order
John Van Merkensteijn — April 20, 2021

Page 392

```
 1      And that's shortly after that Danish article

 2      about reclaim processing stopping came out.

 3              Do you recall that?

 4         A    Yes.

 5         Q    And Mr. Markowitz attaches an

 6      opinion from the Hannes Snellman law firm to

 7      Solo Capital?

 8         A    Right.

 9         Q    Do you know why Mr. Markowitz was

10      sending you that opinion on September 2,

11      2015?

12         A    I don't recall.

13         Q    Do you know if that opinion that he

14      attached is one that you had seen at all

15      prior to September 2, 2015?

16         A    Well, it's familiar, but I don't

17      recall when I first saw it.

18         Q    Do you know if that was advice that

19      you relied on at any point in time prior to

20      September 2, 2015?

21         A    I think it formed the basis for the

22      conclusion that we could do the dividend

23      arbitrage transactions in Danish securities.

24         Q    Was there a point in time prior to

25      September 2, 2015 that you saw it?
```

Confidential — Subject to The Protective Order
John Van Merkensteijn — April 20, 2021

Page 395

```
 1          A    I don't have an exact date.

 2    Somewhere in the 2000s.

 3          Q    Did Mr. Ben-Jacob provide you with

 4    legal services prior to any Solo transactions

 5    being on the table?

 6          A    Yes, he did.

 7          Q    Does he continue to be an attorney

 8    for you up through today?

 9          A    Yes, he does.

10          Q    Over the course of -- well,

11    withdrawn.

12               So would you say you have a 15 to

13    20-year relationship with him, a business

14    relationship?

15               MR. DEWEY:  Objection.

16          A    Yeah, I don't know how to do the

17    calculation because I can't remember when we

18    were first starting to work with each other.

19               He was introduced to me through

20    another partner of a firm that he was at at

21    the time, and I started working with him on

22    trust and estates and other matters for me,

23    and I just don't recall when that started.

24               But it was prior to any of these

25    dates.
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 451

```
 1                    C E R T I F I C A T E

 2            I, MICHAEL FRIEDMAN, a Certified Court

 3    Reporter and Notary Public, qualified in and for

 4    the State of New Jersey do hereby certify that

 5    prior to the commencement of the examination JOHN

 6    VAN MERKENSTEIJN was duly sworn by me to testify to

 7    the truth the whole truth and nothing but the

 8    truth.

 9            I DO FURTHER CERTIFY that the foregoing

10    is a true and accurate transcript of the testimony

11    as taken stenographically by and before me at the

12    time, place and on the date hereinbefore set forth.

13            I DO FURTHER certify that I am neither a

14    relative of nor employee nor attorney nor counsel

15    for any of the parties to this action, and that I

16    am neither a relative nor employee of such attorney

17    or counsel, and that I am not financially

18    interested in the action.

19

20

21    _____

22    MICHAEL FRIEDMAN, CCR of the

23    State of New Jersey

24    License No:  30XI00228600

25    Date:  April 21, 2021
```