# Exhibit 4

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3   _____
                                             )
 4   IN RE:                                  )
                                             )
 5   CUSTOMS AND TAX ADMINISTRATION OF       )
     THE KINGDOM OF DENMARK                  )
 6   (SKATTEFORVALTNINGEN) TAX REFUND        )
     SCHEME LITIGATION                       )
 7                                           )
     This document relates to case nos.      )
 8   19-cv-01783; 19-cv-01788; 19-cv-01794;  )
     19-cv-01798; 19-cv-01918                )
 9   _____)

10

11

12              C O N F I D E N T I A L

13            SUBJECT TO THE PROTECTIVE ORDER

14

15    CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

16                 ORAL EXAMINATION OF

17                JOHN VAN MERKENSTEIJN

18                      VOLUME II

19                DATE: April 20, 2021

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 251

1              TRANSCRIPT of the continued videotaped
2       deposition of the witness, Volume II, called for
3       Oral Examination in the above-captioned matter, said
4       deposition being taken by and before MICHAEL
5       FRIEDMAN, a Notary Public and Certified Court
6       Reporter of the State of New Jersey, via WEBEX, ALL
7       PARTIES REMOTE, on April 20, 2021, commencing at
8       approximately 10:33 in the morning.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 366

```
1     dissolved?
2         A    I think just a cost-cutting
3     exercise.
4         Q    Was there any need for the
5     partnerships after Denmark stopped paying
6     reclaims?
7         A    There was no need.  There was an
8     opportunity to use them, but we -- you know,
9     we decided to -- I guess we decided to
10    terminate them.
11        Q    Mr. Van Merkensteijn, in the
12    litigations in which you are a defendant, are
13    you asserting as a defense the advice -- the
14    reliance on advice of counsel?
15        A    I relied on counsel.
16        Q    And you are asserting that as a
17    defense in the case?
18        A    I believe so, yes.
19        Q    From which lawyers did you receive
20    advice that you are relying on as a defense
21    in the litigation?
22        A    From Kaye Scholer and other firms
23    that we used from time to time.
24        Q    What other firms did you use and
25    receive advice from that you were relying on
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 367

```
 1    as a defense in this -- in these actions?
 2         A    Early on, we had another law firm
 3    involved.  I'm bad on names, so I am trying
 4    to remember the name, and I'll think of it in
 5    a minute.
 6              Crowell & Moring.
 7         Q    When you say "early on" --
 8         A    I'm trying to --
 9         Q    I'm sorry.  If I can stop you on
10    that one.
11              You mentioned early on you used
12    Crowell & Moring.
13              During what period of time?
14         A    They were involved at the time we
15    first started working with Solo.
16         Q    Did you receive advice from Crowell
17    & Moring that you were relying on as a
18    defense in these actions?
19         A    I can't -- I can't -- I'm just
20    telling you what law firms we used.  I don't
21    know what we're relying on in this action.
22              MS. MCCARTHY:  Marc, I'm going to
23         object.  We've done a broad waiver of
24         attorney/client privilege and we've
25         asserted a reliance defense.  So I
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 369

```
1           Q    On what issues did Crowell & Moring
2      provide you legal advice in connection with
3      dividend arbitrage trading?
4           A    I don't recall.  What I recall is
5      that they were involved at the time we first
6      started negotiating an agreement with Solo.
7           Q    Negotiating which agreement?
8           A    An agreement.
9           Q    Do you recall what that agreement
10     was?
11          A    No.
12          Q    How many agreements have you had
13     with Solo?
14          A    I think the agreement with Solo has
15     modified itself over time.  I don't know if
16     it was in written form or just verbally
17     negotiated.
18               I don't know what we did in the
19     end.
20          Q    So, as you sit here today, you
21     don't recall specifically what advice Crowell
22     & Moring provided, but you know they were
23     involved in the negotiations of the first
24     agreement with Solo?
25          A    That's what I recall now, yeah.
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 372

```
 1    them.
 2         Q    Did they actually provide you with
 3    legal advice regarding the issues on whether
 4    they were qualified under the Internal
 5    Revenue code?
 6         A    I don't recall specific advice.  We
 7    asked them to organize the plans, they
 8    organized the plans.
 9              If they weren't qualified, then I
10    would have heard about it somehow.
11         Q    Did Kaye Scholer provide you legal
12    advice regarding the requirements under the
13    Danish U.S. double taxation treaty?
14         A    Well, the underlying principal of
15    the transaction was to have pension plans
16    that qualified under the treaty, and they
17    formed them.
18              So did we get written advice that
19    said that they qualified?  I don't know.
20              But we asked them to form entities
21    that qualified, and they did.
22         Q    Did Kaye Scholer provide legal
23    advice regarding whether the pension plans
24    were the beneficial owners of the securities
25    at issue in the Danish trading?
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 373

```
 1        A    Again, I don't have specific
 2   concrete building blocks of what advice they
 3   gave us.  We gave them everything we did.  We
 4   gave them all the information about
 5   everything as we went along.
 6             And if they had seen any red flags,
 7   which occasionally on some issue or another
 8   they did, we would discuss it, figure out how
 9   to resolve it, or if we saw a red flag, they
10   would help us resolve it.
11             So I don't recall.
12        Q    Do you recall any red flags that
13   you or the group brought to Kaye Scholer's
14   attention?
15        A    I don't know who originated some of
16   the issues about the Commodity Trading
17   Securities Law aspects.
18             I don't know who raised those
19   issues.
20        Q    Do you recall any other red flags
21   that you or the Argre group brought to
22   Kaye Scholer's attention?
23        A    I can't recall.
24        Q    Do you recall any red flags that
25   Kaye Scholer raised after getting the
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 383

1    discussions with Kaye Scholer about that
2    question?
3         A    Again, we're talking about ten
4    years ago.  I don't remember the discussions.
5         Q    Do you recall having any
6    discussions with Kaye Scholer about that same
7    question, but in the context of the U.S.
8    Denmark trading?
9         A    I don't recall the specific
10   conversations, no.
11        Q    All right.  Do you know if you
12   received any written advice from them on that
13   issue?
14        A    On which issue?
15        Q    Whether a 401(k) or other similar
16   pension plan that can be easily set up,
17   controlled, and administered would meet the
18   definition of a pension within the meaning of
19   the U.S. Denmark treaty?
20        A    Well, again, if that answer had
21   been negative, we would not have proceeded.
22        Q    So were you operating at the time
23   under the assumption that if Kaye Scholer had
24   raised an issue, and then the transaction
25   proceeded, that Kaye Scholer had resolved the

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 384

```
 1     issue?
 2             MR. DEWEY:  Objection.
 3        A    Looking back at it, yes.  I take
 4     the advice of lawyers.  If they say it
 5     doesn't work, I wouldn't do it.
 6        Q    Did you have substantive
 7     discussions with them about the issues, or
 8     did you rely on them to resolve them, and if
 9     they went forward, you assume they were
10     resolved?
11        A    Well, at the time I may have had
12     substantive discussions.  I don't recall
13     them.
14             My entire career from the time I
15     was a beginning lawyer is always to have
16     other lawyers involved in every step of every
17     transaction that I do.
18        Q    Okay.  Turning back to the first
19     page, that first sentence underneath, where
20     it says "by way of background?"
21        A    Yes.
22        Q    Would you say that that accurately
23     describes the trading in Denmark as well?
24        A    (Witness reviewing.)
25             No, I don't know that.
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 385

1      Q    Okay.  Were the pension plans in
2   the Danish transactions seeking a tax refund
3   from the Danish government for taxes that
4   they did not, in fact, pay?
5      A    I don't know that.
6      Q    You don't know one way or the
7   other?
8      A    I don't know one way or the other,
9   right.
10     Q    Can you turn, please, to
11  Exhibit 2234?
12          MR. WEINSTEIN:  Mark this as 2234.
13          (Whereupon the above mentioned was
14      marked for Identification.)
15     A    Okay.  Hard to read.
16          (Witness reviewing.)
17     Q    At the bottom of the first page,
18  there's an e-mail from Mr. Markowitz to
19  someone named Axel Haelterman at the
20  Freshfields law firm.
21     A    Okay.
22     Q    Are you familiar with that firm?
23     A    I'm familiar with the firm, yes.
24     Q    Do you recall whether your group
25  sought any legal advice from Freshfields in

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 386

```
 1    connection with dividend arbitrage trading?
 2        A    Well, it appears from the e-mail
 3    that we did, yes.
 4        Q    In his e-mail, Mr. Markowitz says,
 5    "I believe that some colleagues of ours at
 6    Solo Capital contacted you on our behalf."
 7             Did you consider the people at
 8    Solo Capital to be your colleagues?
 9        A    I don't know what he meant by the
10    word "colleague."
11        Q    Do you know why Solo Capital
12    contacted the Freshfields firm on your
13    behalf?
14        A    I don't know.
15        Q    Do you recall having any
16    discussions with any lawyers at Freshfields
17    in connection with dividend arbitrage
18    trading?
19        A    Me?  No, I don't recall.
20        Q    Mr. Haelterman responds on
21    April 23, 2012, and says, "Further, to our
22    phone calls, and prior to finalize any
23    document, I first wanted you to review the
24    wording that you will find attached in the
25    unfinished draft memo.  I just wanted to make
```

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 392

1    And that's shortly after that Danish article
2    about reclaim processing stopping came out.
3        Do you recall that?
4    A    Yes.
5    Q    And Mr. Markowitz attaches an
6    opinion from the Hannes Snellman law firm to
7    Solo Capital?
8    A    Right.
9    Q    Do you know why Mr. Markowitz was
10   sending you that opinion on September 2,
11   2015?
12   A    I don't recall.
13   Q    Do you know if that opinion that he
14   attached is one that you had seen at all
15   prior to September 2, 2015?
16   A    Well, it's familiar, but I don't
17   recall when I first saw it.
18   Q    Do you know if that was advice that
19   you relied on at any point in time prior to
20   September 2, 2015?
21   A    I think it formed the basis for the
22   conclusion that we could do the dividend
23   arbitrage transactions in Danish securities.
24   Q    Was there a point in time prior to
25   September 2, 2015 that you saw it?

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 395

1        A    I don't have an exact date.
2    Somewhere in the 2000s.
3        Q    Did Mr. Ben-Jacob provide you with
4    legal services prior to any Solo transactions
5    being on the table?
6        A    Yes, he did.
7        Q    Does he continue to be an attorney
8    for you up through today?
9        A    Yes, he does.
10       Q    Over the course of -- well,
11   withdrawn.
12            So would you say you have a 15 to
13   20-year relationship with him, a business
14   relationship?
15            MR. DEWEY:  Objection.
16       A    Yeah, I don't know how to do the
17   calculation because I can't remember when we
18   were first starting to work with each other.
19            He was introduced to me through
20   another partner of a firm that he was at at
21   the time, and I started working with him on
22   trust and estates and other matters for me,
23   and I just don't recall when that started.
24            But it was prior to any of these
25   dates.

Confidential - Subject to The Protective Order
John Van Merkensteijn - April 20, 2021

Page 451

1                C E R T I F I C A T E
2            I, MICHAEL FRIEDMAN, a Certified Court
3     Reporter and Notary Public, qualified in and for
4     the State of New Jersey do hereby certify that
5     prior to the commencement of the examination JOHN
6     VAN MERKENSTEIJN was duly sworn by me to testify to
7     the truth the whole truth and nothing but the
8     truth.
9            I DO FURTHER CERTIFY that the foregoing
10    is a true and accurate transcript of the testimony
11    as taken stenographically by and before me at the
12    time, place and on the date hereinbefore set forth.
13           I DO FURTHER certify that I am neither a
14    relative of nor employee nor attorney nor counsel
15    for any of the parties to this action, and that I
16    am neither a relative nor employee of such attorney
17    or counsel, and that I am not financially
18    interested in the action.
19
20
21    _____
22    MICHAEL FRIEDMAN, CCR of the
23    State of New Jersey
24    License No:  30XI00228600
25    Date:  April 21, 2021

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE