# Exhibit 5

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 1

```
1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2              MASTER DOCKET 18-MD-2865(LAK)
                   CASE NO. 18-CV-09797
3
   _____
4                                           )
   IN RE:                                   )
5                                           )
   CUSTOMS AND TAX ADMINISTRATION OF        )
6  THE KINGDOM OF DENMARK                   )
   (SKATTEFORVALTNINGEN) TAX REFUND         )
7  SCHEME LITIGATION                        )
                                            )
8  _____)
9
10
11
12            C O N F I D E N T I A L
13
14
15    REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL
16                  EXAMINATION OF
17                MICHAEL BEN-JACOB
18              DATE: October 11, 2021
19
20
21
22
23
24
25       REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 2

```
 1
 2
 3
 4
 5            TRANSCRIPT of the videotaped deposition
 6     of the witness, called for Oral Examination in the
 7     above-captioned matter, said deposition being taken
 8     by and before MICHAEL FRIEDMAN, a Notary Public and
 9     Certified Court Reporter of the State of New Jersey,
10     via WEBEX, ALL PARTIES REMOTE, on October 11, 2021,
11     commencing at approximately 9:00 in the morning.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 18

```
 1        Q    I'm asking you for your
 2   understanding, in your words, if you
 3   understand that's what you were called upon
 4   to do?
 5        A    Well, since I don't have a
 6   recollection of using those words, I would
 7   say it is not true that we were called upon
 8   to use -- to -- I say "we," meaning my
 9   firm -- was called upon to implement or
10   advise upon all aspects.
11             We were asked to advise upon U.S.
12   legal issues, U.S. tax and pension plan
13   issues, and occasional other coordination of
14   advice with foreign counsel and
15   administrative matters.
16             But I was certainly not involved in
17   all aspects.
18        Q    Let me ask you, please, to turn to
19   Exhibit 4480?
20             MR. MAGUIRE:  Mark 4480.
21             (Whereupon the above mentioned was
22        marked for Identification.)
23        A    I'm sorry.  Yes, so I have this
24   exhibit in front of me.
25        Q    And can you tell us, what is this
```

1        A    To clarify -- sorry.
2             Can you just rephrase or restate
3    your question?
4        Q    Let me give you a different
5    question.
6             Did you tell your clients that you
7    approved their entering into the Danish
8    trading transactions?
9        A    I did not tell my clients.  And to
10   my knowledge, others in the firm did not tell
11   the clients that we approved of the Danish
12   trading transactions, nor were we asked by
13   the clients to render that advice.
14       Q    Did you -- whether you told anyone
15   or not -- ever approve of your clients
16   entering into any Danish trading
17   transactions?
18            MR. DEWEY:  Objection.
19       A    What the firm approved were the
20   U.S. tax implications and treatment and U.S.
21   regulatory treatment of the -- yeah, of the
22   trading.
23       Q    Did you ever tell your clients that
24   you or your firm did not approve of any
25   aspects of any Danish trading transactions?

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 22

1            MR. DEWEY:  Objection.
2       A    Again, to be clear, we did not
3  advise on the trading of Danish securities.
4  We advised only on the U.S. and pension
5  aspects -- U.S. tax aspects of the ownership
6  of those shares.
7       Q    Was there any aspect of the trading
8  in Danish shares in the establishment of any
9  LLCs, the sponsoring of any plans, the
10 trading or transactions associated with that,
11 or the making of any applications for
12 reclaims to Denmark?
13           Taking that entire ex-dividend
14 strategy as a whole, was there any aspect of
15 that as to which you or your firm told any of
16 your former clients they should not do or
17 that you believed it was not appropriate to
18 do?
19           MR. DEWEY:  Objection.
20      A    You listed seven or eight things.
21 I would have to ask you to take them one by
22 one.
23      Q    Let me put it to you as a more
24 broad and general question.
25           Is there any time in your

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 54

1    trade costs about $10,000 to do per plan.
2    That includes custodian and broker fees.
3         It goes on to say, "For Belgian
4    last year, our 30 plans generated reclaims of
5    approximately 25 million Euro or about
6    31 million U.S. dollars at current exchange
7    rates."
8         Do you see that?
9    A    I see that language, yes.
10   Q    You see the reference to Sanjay?
11   You understand that to be to Sanjay Shah?
12   A    Yes, I do.
13   Q    You understood that Sanjay Shah
14   owned Solo Capital?
15   A    To the best of my understanding,
16   yes.
17   Q    Did you meet Sanjay Shah?
18   A    No.
19   Q    Have you ever spoken with Sanjay
20   Shah?
21   A    I have a vague recollection that
22   there was a conference call with the client
23   group, others of Sanjay or Solo Capital's
24   employees, and I think Sanjay Shah may have
25   been on that call.

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 55

1     I don't believe, to the best as I
2  can recall, ever having any direct
3  conversations with him.
4     Q   What do you recall of that
5  conference call?
6     A   I can't remember.
7     Q   You'll see here that the plans were
8  generating -- had generated about $31 million
9  over 30 plans in the prior year.
10        Do you see that?
11    A   Can you point that language out to
12 me, please?
13    Q   The one we just read, yeah, "For
14 Belgium last year?"  Do you see that
15 sentence?
16    A   Yes, I'm sorry.  I was simply
17 reading the language from the e-mail that
18 says, "For Belgium last year, our 30 plans
19 generated reclaims of approximately Euro
20 25 million (or about USD 31,000,000 at
21 current exchange rates)."
22        Yes, I see that language.
23    Q   And separately from this e-mail,
24 did your former clients relate to you that
25 the expectation from the trades with

1    A    I do.  Yes, I see that.
2    Q    Why were these details, in fact,
3    important to set forth in the memo?
4    A    As a general matter of practice,
5    the law is applied to a set of facts.  And so
6    we were advising here on the U.S. law matters
7    and U.S. tax matters.
8         We needed to understand and say we,
9    the firm, and those who were drafting this
10   memo, needed to understand the facts upon
11   which the law would apply.
12   Q    And did you personally understand
13   the facts?
14        MR. DEWEY:  Objection.  You mean
15        the facts as referenced in this
16        paragraph, Bill?
17        MR. MAGUIRE:  Yes, and it continues
18        over to the next page.
19        MR. DEWEY:  Fair enough.
20   A    I do recall that I reviewed the
21   memo before it was issued.  And I do recall
22   that I had a general understanding of the
23   facts at the time.
24   Q    Was there anyone at your firm who
25   you relied on to understand the business

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 108

1      arrangement here?
2           A    Well, I relied on the other subject
3      matter experts in this particular instance
4      that would have been mostly -- because this,
5      I believe, is pension issues -- would have
6      been mostly Arthur Woodard and
7      Kathleen Wechter.
8                But I would say that I relied upon
9      them to understand the business arrangements
10     to the extent necessary to render their
11     advice.
12          Q    On Page 4 of the memo, there's a
13     paragraph in the middle of the page that
14     starts, "The Michelle plan simultaneously
15     entered into a securities lending agreement
16     with a third party under which it lent
17     securities in exchange for cash."
18               Do you see that?
19          A    I do.
20          Q    Do you understand the
21     "simultaneously" there refers to
22     simultaneously with the purchase of the
23     Danish shares?
24               MR. DEWEY:  Objection.
25          A    (Witness reviewing.)

```
 1    partnership structure."
 2            Do you see that?
 3       A    I do.
 4       Q    And what was the answer to that
 5    question?
 6       A    (Witness reviewing.)
 7            Well, again, I don't -- I don't
 8    recall what the context was surrounding this
 9    e-mail, and if it seems to derive from a
10    conversation that begins with, "As we
11    discussed," I have no recollection of that
12    conversation, so I can't place the context of
13    that comment.
14       Q    Do you recall you or anyone at your
15    firm addressing the issue of whether a
16    pension plan could represent to Denmark that
17    it is the beneficial owner of tax reclaims
18    when that plan was a partner in a
19    partnership?
20            MR. DEWEY:  Objection.
21       A    Yes, I do recall that there were
22    internal discussions related to that general
23    question.
24       Q    And who participated in those
25    general discussions?
```

1    A    To the best of my recollection, I
2    don't have an exclusive list, but to the best
3    that I can recall, it would have been Peter
4    Wells, Kathleen Wechter, Arthur Woodard.
5         There may have been others, but I
6    can't recall specifically other names.
7    Q    And what was the upshot of those
8    discussions?
9         MR. DEWEY:  This is discussions on
10        the representation to Denmark, Bill,
11        right?
12        MR. MAGUIRE:  Yes.
13        MR. DEWEY:  Okay.
14   A    The general conclusion we reached
15   was that we were -- we are not Danish lawyers
16   and can't advise on Danish law matters.  And
17   we turned back to the clients, in particular
18   in this instance, Jerome Lhote, as I seem to
19   recall, to ask if that was an issue that he
20   had vetted with Danish counsel.
21        And he indicated that he had and
22   that a -- and that that representation could
23   be made.
24   Q    And did he tell you who was the
25   Danish counsel that he had vetted that with?

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 182

1    tax provisions or the tax impact of the
2    document, not the business or transactional
3    side of the document.  They themselves, as
4    I've mentioned, being attorneys, felt
5    competent, I believe, to handle those
6    aspects.
7         And to the best of my recollection,
8    it would have been Louis Tuchman who is
9    copied on this e-mail who would have reviewed
10   these documents.
11        Q    So you did not review the general
12   master securities lending agreement -- I'm
13   sorry, the global masters securities lending
14   agreement?
15        A    I don't have a specific
16   recollection of this e-mail exchange or the
17   document in question.  I may have reviewed it
18   briefly, I may not have.  I just don't
19   recall.
20        But the -- but the -- you know, the
21   real legal analysis, tax analysis of the
22   document would have been conducted by Louis
23   Tuchman.
24        Q    Are you aware whether you or anyone
25   at your firm reviewed a global master

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 183

```
 1   securities lending agreement in connection
 2   with any Danish trades by your client group?
 3        A    Again, I don't have a specific
 4   recollection of who reviewed those documents,
 5   or documents under that title, but I do
 6   recall that we were being asked by the client
 7   group to review the U.S. tax impact of those
 8   documents.
 9             In that context, those documents
10   would have been referred to the tax experts,
11   primarily Louis Tuchman in my firm at the
12   time.
13        Q    If you go to the second-to-last
14   paragraph on this e-mail, it says, "Any fee
15   that the stock borrower or lender will be
16   paid is going to be paid by Solo out of their
17   revenues from these transactions."
18             Do you see that?
19        A    Yes, I do.
20        Q    Was that generally the case in
21   respect of the Danish transactions?
22             MR. DEWEY:  Objection.
23        A    As I think I'd mentioned earlier, I
24   don't recall the specific workings of the
25   documentation that governed the Danish
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 300

1   this e-mail or the related exchanges and
2   discussions, but the statement says what it
3   says.
4       Q   And was it a true statement?
5           MR. DEWEY:  Objection.
6       A   I -- as I sit here today, I have no
7   reason to think that I didn't think it was
8   correct at the time I wrote it.
9       Q   What did you mean when you said
10  that "the pension plan would trade on behalf
11  of the partnership?"
12          MR. DEWEY:  Objection.
13      A   Again, I can't recall what my
14  thinking was when I drafted this e-mail.
15      Q   Sir, did Patrick Michelle assist
16  you in connection with the Danish trading
17  transactions?
18          MR. DEWEY:  Objection.
19      A   I do generally recall that a number
20  of the U.S. side securities regulatory
21  questions arose and that those matters were
22  referred to our firm experts at the time,
23  Patrick Michelle being one of them.
24      Q   And did Patrick Michelle tell you
25  that Solo needed to be registered with FINRA

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 324

1           C E R T I F I C A T E

2           I, MICHAEL FRIEDMAN, a Certified Court

3   Reporter and Notary Public, qualified in and for

4   the State of New Jersey do hereby certify that

5   prior to the commencement of the examination

6   MICHAEL BEN-JACOB was duly affirmed by me to

7   testify to the truth the whole truth and nothing

8   but the truth.

9           I DO FURTHER CERTIFY that the foregoing

10  is a true and accurate transcript of the testimony

11  as taken stenographically by and before me at the

12  time, place and on the date hereinbefore set forth.

13          I DO FURTHER certify that I am neither a

14  relative of nor employee nor attorney nor counsel

15  for any of the parties to this action, and that I

16  am neither a relative nor employee of such attorney

17  or counsel, and that I am not financially

18  interested in the action.

19

20              [signature]

21          _____

22          MICHAEL FRIEDMAN, CCR of the

23          State of New Jersey

24          License No:  30XI00228600

25          Date:  October 13, 2021