# Exhibit 2

Page 1

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2             MASTER DOCKET 18-MD-2865(LAK)
                 CASE NO. 18-CV-09797
 3

 4     _____
                                              )
       IN RE:                                 )
 5                                            )
       CUSTOMS AND TAX ADMINISTRATION OF      )
 6     THE KINGDOM OF DENMARK                 )
       (SKATTEFORVALTNINGEN) TAX REFUND       )
 7     SCHEME LITIGATION                      )
                                              )
 8     _____)

 9

10

11

12            C O N F I D E N T I A L

13

14

15     REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                  EXAMINATION OF

17                MICHAEL BEN-JACOB

18             DATE: October 11, 2021

19

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 13

```
 1                  P R O C E E D I N G S

 2

 3     M I C H A E L   B E N - J A C O B,

 4            called as a witness, having been first

 5     duly affirmed according to law, testifies as

 6     follows:

 7                       * * * * * *

 8     EXAMINATION BY MR. MAGUIRE:

 9          Q    Good morning, Mr. Ben-Jacob?

10          A    Good morning.

11          Q    My name is Bill Maguire.  I'm going

12     to be asking you some questions.

13               If there's any question that you

14     don't understand, please don't answer it.

15     Please just let me know you don't understand

16     the question and give me an opportunity to

17     clarify the question so you do understand it.

18               Is that okay?

19          A    Sure.  Thank you.

20          Q    That way we'll have a clear record.

21     And we will know that when you have answered

22     a question, you understood the question.

23               Is that fair?

24          A    Yes.

25          Q    Now, sir, we're going to be talking
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 158

```
 1              MR. DEWEY:  I'm sorry, Bill.  I'm

 2        just -- is that better in terms of

 3        hearing us?

 4              (Whereupon a discussion was held

 5        off the record.)

 6        Q    How did you get this opinion?

 7        A    Well, it was forwarded to us by the

 8   client group, by someone at the client group.

 9              I can't recall who it was.

10        Q    And when did you get it?

11        A    I don't recall.

12        Q    Did you get it before the plans

13   engaged in Danish transactions or afterwards?

14        A    I don't recall.

15        Q    Did you read the opinion?

16        A    I generally recall reading it at

17   the time it was received.

18        Q    Do you know in which year you

19   received it?

20              MR. DEWEY:  Objection.

21        A    I really can't recall.

22        Q    Is there anything you could look to

23   to see -- or that might refresh you as to

24   when you received this?

25        A    Not that I can think of.
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 159

```
 1        Q    So when you received this, did you
 2   understand this opinion?
 3        A    I can't say now what I thought at
 4   the time.  I don't recall what my thinking
 5   was at the time of reading this opinion.
 6        Q    Do you recall whether there was
 7   anything in this opinion that you did not
 8   understand?
 9        A    I can't say now what my thinking
10   was at the time this opinion was received.  I
11   don't recall.
12        Q    Sir, if you turn to the second page
13   of the opinion, there's some numbered
14   paragraphs at the top.
15        A    Yes.
16        Q    You'll see there's a Paragraph 6
17   which says, "It is possible that in the
18   period until sale, the equities would be lent
19   out under a stock loan."
20             Do you see that?
21        A    I see that.
22        Q    Did you understand that in the
23   Danish transactions that your client group
24   was undertaking with Solo that there would be
25   a stock lending agreement, not as a matter of
```

```
 1    plan assets with assets of other clients?

 2              MR. DEWEY:  Objection.

 3        A    I would need to review the entire

 4    document to familiarize myself with its

 5    provisions.

 6        Q    Did you understand that the plans

 7    were required to be used for the exclusive

 8    benefit of the participants and their

 9    beneficiaries?

10        A    I do generally recall that the

11    concept under pension plan law of the plan

12    assets being used for -- I don't remember if

13    the word is correctly exclusive, primary,

14    or -- I don't remember, but needs to be used

15    for the benefit of the plan.

16              Beneficiaries was an issue that was

17    raised with Mr. Woodard.

18        Q    And what did Mr. Woodard say on

19    that subject?

20        A    I don't recall the precise advice

21    that he gave.  You would need to ask him.

22        Q    Did your discussion with

23    Mr. Woodard include whether using the plans

24    for the Danish trading would benefit Solo and

25    your client group, and not just the plans
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 258

1    themselves?

2         MR. DEWEY:  Objection.

3      A    I do recall that the topic of

4    whether plan assets could be viewed as

5    benefiting others outside the plan was a

6    topic that was raised and addressed by

7    Mr. Woodard.

8      Q    And you understood that in this

9    case, using the plans would bring substantial

10   benefits to Solo?

11        MR. DEWEY:  Objection.

12     A    I, at the time and today, have no

13   way of determining what benefits, you know,

14   were received by Solo and whether they --

15   whether Solo viewed them as substantial.

16     Q    Well, you knew that Solo was going

17   to get two-thirds of the profits.

18        Right?

19     A    I did.

20     Q    And that, obviously, was a benefit

21   to Solo, was it not?

22        MR. DEWEY:  Objection.

23     A    And I would surmise that that

24   was -- that would be a benefit to Solo.  I

25   don't know if that was substantial.

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 259

```
 1              That's a matter for Solo.
 2      Q     And were the plans of the friends
 3    and family, the 5 percent interests in the
 4    partnerships, where their plans participated
 5    in Danish trades, those plans would get
 6    5 percent of what was left over after Solo
 7    was paid off, and the other 95 percent would
 8    go to the other members of the partnership.
 9              Right?
10              MR. DEWEY:  Objection.
11      A     I'm sorry, sir.  Could you repeat
12    the question?  I'm not sure I understood your
13    question.
14      Q     Yeah.  The individuals that we were
15    talking about -- Lerner Altbach, Hermann,
16    those people -- all had plans that had a
17    5 percent share in their respective
18    partnerships.
19              Right?
20      A     As I think I mentioned earlier, I
21    don't recall the specific allocation among
22    the various -- what we'll call "friends and
23    family plans."
24      Q     But you will recall generally that
25    it was 5 percent or 10 percent?
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 260

```
 1        A     I recall it was in that general

 2    range.

 3        Q     You understood that generally,

 4    then, for those plans, 90 percent of the

 5    benefit went to your client group?

 6              MR. DEWEY:  Objection.

 7        A     I'm sorry.  Forgive me.  I'm not

 8    sure I follow your math.  If -- even if they

 9    had -- even if they had 5 percent and

10    70 percent went to -- or 60 percent went to

11    Solo, how does 90 percent go to the client?

12              Can you break down your math,

13    please?

14        Q     Well, let's go through the math,

15    then.

16              So Solo gets 66 -- it gets

17    two-thirds and the plan gets one-third.

18              Right?

19        A     Okay.

20        Q     And if that plan is in a

21    partnership, then that one-third gets divided

22    up, 5 or 10 percent to the plan and the other

23    90 percent, say, of that remaining third --

24        A     The remainder, yes.  Yes, yes.

25        Q     -- to your client group?
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 261

```
 1        A    Yes.  So it's -- just to make sure
 2    I understand you.
 3        Q    So your client group ends up
 4    getting about 90 percent of the one-third?
 5        A    Of the one-third, yes.  Now I
 6    follow your math.  So I'm sorry.  Please ask
 7    your question.
 8        Q    And that 90 percent of the
 9    one-third was a benefit to your client group,
10    was it not?
11        A    That's --
12             MR. DEWEY:  Objection.  Go ahead.
13        A    That's my general understanding,
14    yes.
15        Q    And did you discuss with anyone
16    whether using the plans for Danish trading
17    would be a benefit for the client group and
18    not just for the plans themselves?
19             MR. DEWEY:  Objection.
20        A    The benefit -- the economic benefit
21    related to the plan, any related pension law
22    issues surrounding that, were addressed by
23    Mr. Woodard.
24        Q    Sir, if you have Exhibit 977 in
25    front of you, if you could go to the page
```