**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION<br>OF THE KINGDOM OF DENMARK<br>(SKATTEFORVALTNINGEN) TAX REFUND<br>SCHEME LITIGATION<br><br>This document relates to case nos.:<br><br>18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-01893; 19-cv-01781; 19-cv-01783; 19-cv-01866; 19-cv-01895; 19-cv-01794; 19-cv-01865; 19-cv-01904; 19-cv-01798; 19-cv-01869; 19-cv-01922; 19-cv-01800; 19-cv-01788; 19-cv-01870; 18-cv-07827; 19-cv-01791; 19-cv-01792; 19-cv-01928; 19-cv-01926; 19-cv-01868; 18-cv-07824; 19-cv-01929; 19-cv-01803; 19-cv-01806; 19-cv-01906; 19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-01810; 19-cv-01809; 18-cv-04833; 19-cv-01911; 19-cv-01898; 19-cv-01812; 19-cv-01896; 19-cv-01871; 19-cv-01813; 19-cv-01930; 18-cv-07829; 18-cv-04434; 19-cv-01815; 19-cv-01818; 19-cv-01931; 19-cv-01918; 19-cv-01873; 19-cv-01924; 19-cv-10713; 21-cv-05339. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

### PLAINTIFF SKATTEFORVALTNINGEN'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF DR. EMRE CARR

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 3

LEGAL STANDARD ................................................................................................... 9

ARGUMENT ................................................................................................................ 10

I.    Dr. Carr's opinions concerning net settlement and economic claims to dividends
      are unreliable, irrelevant, and prejudicial. ........................................................ 10

      A.    Dr. Carr's opinions concerning net settlement and economic claims to
            dividends are unreliable. ......................................................................... 10

      B.    Dr. Carr's opinions concerning net settlement and economic claims to
            dividends are irrelevant and prejudicial. ................................................ 15

II.   Dr. Carr's opinions about what the defendants knew are inadmissible ............ 17

CONCLUSION ............................................................................................................. 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ............................. 10, 11

*Bd. of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
    No. 09 Civ. 686(SAS), 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .................................... 17

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund*
    *Litig.*, No. 18-CV-04051, 2023 WL 8039623 (S.D.N.Y. Nov. 20, 2023) .............................. 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579, 113 S. Ct. 2786 (1993) .......................................................... 1, 9, 10

*Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365 (S.D.N.Y. 2014) .................................. 9

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512 (1997) ........................................ 10

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ........................ 17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) ................................. 9

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384 (S.D.N.Y. 2019) ........................ 17

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ...................................... 9, 10, 16

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ....................................... 12

*U.S. v. Gatto*, No. 17-cr-0686 (LAK), 2019 WL 266944 (S.D.N.Y. Jan. 17, 2019) .................... 16

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
    571 F.3d 206 (2d Cir. 2009) ................................................................... 15

*In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (S.D.N.Y. 2007) ..................................... 10

**Statutes and Rules**

Fed. R. Evid. 403 ........................................................................... 3, 10, 16

Fed. R. Evid. 702 ..................................................................... 1, 2, 9, 10, 11, 16

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in support of its motion to exclude defendants' expert Dr. Emre Carr's proposed testimony.

## PRELIMINARY STATEMENT

Defendants have a massive gap to fill at trial, as it is abundantly clear that no shares existed underlying their purported purchases of billions of dollars of Danish stock. Sanjay Shah, who owned and controlled the Solo custodians, has admitted as much in his testimony in England.[1] Defendants are hoping to fill that hole through purported expert testimony of Dr. Emre Carr, who, if permitted, will suggest to the jury that the concept of a custodian "net settling" the circular trading positions of its customers might somehow create share ownership where the custodians' customers never purchased a single share in the market. Dr. Carr's proffered testimony that the Solo custodians "net settled" the defendant plans' trades for billions of dollars of Danish shares, thus giving the plans "economic claims" to billions of dollars in Danish dividends, is unreliable, irrelevant, and prejudicial. The Court should preclude Dr. Carr from offering any such opinions at trial under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

Dr. Carr proposes to testify that the Solo custodians settled the plans' supposed share purchases without having the shares or cash to do so, *i.e.*, without the plans providing any of the billions of dollars needed to purchase the shares or the sellers delivering any of the massive amounts of shares supposedly purchased. In Dr. Carr's view, neither shares nor cash were needed because the plans' "trades" with the Solo custodians' other customers collectively offset, *i.e.*, netted to zero. In other words, the plans' circular Solo trading—in which the plans

---

1. The "Solo custodians" are Solo Capital Partners LLP, Old Park Lane Capital Limited, West Point Derivatives and Telesto Markets.

supposedly bought shares, via executing brokers, from short sellers (which had no shares) that supposedly borrowed the shares from stock loan intermediaries (which had no shares) that supposedly borrowed the shares from the plans (which had no shares)—made actual cash or shares unnecessary for settlement. And in Dr. Carr's opinion, because the Solo custodians "net settled" the plans' share purchases, the Solo trading created billions of dollars of "economic claims" to Danish dividends out of thin air. Indeed, under Dr. Carr's far-fetched theory, the only limit to the amount of such "economic claims" to dividends that defendants and Sanjay Shah could have created was their imagination.

Unsurprisingly, none of the sources on which Dr. Carr relies supports his opinions. Rather, they are purely his *ipse dixit*. And his opinions are flatly contradicted by the U.K. Financial Conduct Authority's findings that there is no evidence that the Solo custodians settled any trades and that purported "net settlements," absent shares or cash, do not create shareholdings or entitlement to dividends. As such, Dr. Carr's opinions on "net settlement" and "economic claims" to dividends are unreliable and inadmissible under Federal Rule of Evidence 702.

Further, such opinions also should be precluded as irrelevant because they will not assist the jury in determining any fact at issue or understanding the evidence. As the Court previously held in denying defendants' summary judgment motion, Danish law follows the doctrine *nemo dat quod non habet*, *i.e.*, no one gives what they do not have. Thus, even if, as Dr. Carr supposes, the Solo custodians could have "net settled" trading in shares without any shares, that would say nothing as to whether the plans' representations of share ownership in the tax refund claims at issue were true. The truth of those representations still would depend on whether the sellers from whom the plans supposedly purchased shares had the shares to give, in the first

place. And, likewise, whether the plans had what Dr. Carr terms "economic claims" to dividends is irrelevant to whether the plans in fact received dividends, net of withholding tax, as defendants represented in the tax refund claims.

For much the same reasons, Dr. Carr's opinions on "net settlement" and "economic claims" to dividends should be excluded under Federal Rule of Evidence 403, even if they were in some way marginally relevant. Any probative value of such opinions is far outweighed by the potential danger that they will mislead and confuse the jury as to the relevant issues of whether the defendants' representations that the plans owned shares and received dividends, net of withholding tax, were true.

Finally, what the defendants knew is not an appropriate subject of expert opinion, thus Dr. Carr's proposed testimony on such matters should be precluded.

## BACKGROUND

Dr. Carr is a "Senior Managing Director in the Forensic and Litigation Services Practice at FTI Consulting, Inc.," who defendants retained to "review" the defendant pension plans' "trades in Danish securities and associated instruments" and "explain how the pension plans conducted stock trading, hedging through flex futures and forward contracts, and financing through stock lending, and the mechanics of payments related to corporate dividends." (Declaration of Marc A. Weinstein, dated June 21, 2024 ("Weinstein Decl."), Ex. 1 (Expert Report of Emre Carr, dated Dec. 31, 2021 (the "Carr Report")) ¶¶ 1-2, 5.)[2]

---

2. Dr. Carr, among other things, holds a Ph.D. degree in Accounting Information and Management from the Kellogg School of Management at Northwestern University and earned an MBA degree with a concentration in finance from the University of Southern California. (*Id.* ¶¶ 5-12.)

**Dr. Carr's Expert Report.**

Dr. Carr's December 31, 2021 expert report "describe[s] transactions" by two defendant pension plans "in shares of two Danish companies and related hedging transactions . . . conducted though Solo Capital Partners LLP . . . and Old Park Lane Capital Limited." (*Id.* ¶ 3.) And he concludes, based on his review, that the plans engaged in a run of the mill dividend arbitrage strategy. (*Id.* ¶¶ 17(a), 129-43.)[3]

In Dr. Carr's description, the plans in both transactions purchased Danish shares "over-the-counter" from an executing broker, which then "gave up" the trade, pursuant to a "give-up agreement," to one of the Solo custodians for clearing and settlement. (*Id.* ¶¶ 43-44.) The plans hedged the risk of fluctuations in the price of the shares by entering "flex futures" or "forward contracts" to sell the shares on a future date at a fixed priced and financed their share purchases by loaning out the just-purchased shares on the same day the share purchase trade was due to settle. (*Id.* ¶¶ 68-117.)

In Dr. Carr's opinion, as soon as the share purchases were executed, "the economic risk associated with holding shares in those relevant stocks was instantly transferred from the seller of the shares to the buyer even though clearing and settlement did not happen that day." (*Id.* ¶ 17(c).) And since the plans purchased the shares before "the 'ex-dividend' date for the stock, the Plans paid a 'cum-dividend' price, meaning that the [plans] had an economic claim to the forthcoming dividend amount." (*Id.*)[4]

---

3. Dr. Carr was "provided with documents related to trades in several other Danish stocks" and concluded that "from an economic perspective, the trades in those stocks also seem to have followed the" same dividend arbitrage strategy. (*Id.* ¶ 19 n.3.)

4. Dr. Carr defines the "ex-dividend date" as "the date as of which purchasers of stock do not have a claim to the forthcoming dividend declared at the issuer's most recent Annual General Meeting." (*Id.* ¶ 23 n.13.)

Dr. Carr's report, however, does not address whether the Solo custodians, as the "clearing brokers" and "custodians," in fact settled any of the plans' share purchases or held custody of any Danish shares.  He acknowledged that settlement of a trade "refers to the delivery of securities from the seller to the buyer, and the delivery of cash due, if any, on the transaction from the buyer to the seller." (*Id.* ¶ 46)[5]  That "[s]ecurities settlements may involve a" central securities depository or "CSD," "which is an institution that immobilizes securities and enables the transfer of title by book-entry."  (*Id.* ¶ 57 (internal quotation omitted).)  That "foreign custodians holding shares of Danish companies . . . . may be either direct participants" at the Danish CSD VP Securities "or indirect participants, where their holdings are reflected in the omnibus account of another custodian."  (*Id.* ¶ 60.)  And that "[f]or clients of U.K. custodians investing in securities issued by foreign companies," such as the defendant plans, "the chain of custody . . . may include additional sub-custodians and will include the foreign CSD," *i.e.*, VP Securities for Danish shares.  (*Id.* ¶ 63.)

Yet Dr. Carr simply assumed that the Solo custodians settled the plans' share purchases and held custody of the Danish shares the plans supposedly purchased.  (*See, e.g.*, *id.* ¶ 95 ("The stock loan term in the Analyzed Transactions started on the same day the stock trades settled . . . ."); ¶ 55 ("the RJM Plan and the Proper Pacific Plan custodied their stock holdings at Solo Capital and Old Park Lane, respectively").)[6]  In doing so, Dr. Carr ignored the record evidence that the Solo custodians did not hold any Danish shares at a sub-custodian with an account at VP Securities or otherwise.  Nor did he consider the record evidence showing that defendant plans'

---

5.  *See also id.* ¶ 47 ("Together, clearing and settlement form a process that ensures that sellers get payment for the sold securities and buyers get delivery of the purchased securities.").

6.  *See also id.* ¶ 44 ("Solo Capital provided clearing, settlement, and custody services for the RJM Plan").

share purchases and stock loans were part of circular transactions with Solo's other customers. Instead, his conclusions rested solely on documents that the Solo custodians and executing brokers issued to the defendant plans. (*See, e.g.*, *id.* ¶ 55 ("the MAERSKB stock purchased by the RJM Plan was reflected in its stock holdings on its April 2013 account statement from Solo Capital").)

**Dr. Carr's Rebuttal Report.**

On February 1, 2022, Dr. Carr submitted a rebuttal to the reports of SKAT's expert witnesses Bruce Dubinsky and Graham Wade. (Weinstein Decl. Ex. 2 (Rebuttal Report of Emre Carr, dated Feb. 1, 2022 ("Carr Rebuttal")). Mr. Dubinsky likewise analyzed the defendant plans' purported trading, but he concluded that the plans' share purchases and stock loans were part of circular transactions that did not result in the Solo custodians holding any Danish shares or receiving any dividends. (*See, e.g.*, Weinstein Decl. Ex. 3 (Expert Report of Bruce G. Dubinsky, dated Dec. 31, 2021 ("Dubinsky Report")) ¶¶ 146-50.)[7] In particular, Mr. Dubinksy found based on his review of the discovery record, including the Solo custodians' bank and sub-custodian account statements, that the Solo custodians never held any Danish shares or received any Danish dividends. (Dubinsky Report ¶¶ 132-45.) And Mr. Dubinsky concluded based on his review of all the Solo custodians' trading records, not just those related to the plans' trades that Dr. Carr reviewed, that each trade was circular: the defendant plan purportedly bought shares, via one or more executing brokers, from a short seller that borrowed the shares from the

---

7. SKAT's expert Mr. Wade likewise concluded that the Solo trading was circular and did not result in the Solo custodians holding any shares or dividends. (Weinstein Decl. Ex. 4 (Expert Report of Graham Wade, dated Dec. 31, 2021) ¶¶ 225-66.)

plan via one or more intermediaries. (*Id.* ¶¶ 146-203.)[8]  In other words, the plan bought shares

from a seller that had none, and then purported to lend those (again, non-existent) shares to the

seller, so that the seller could fulfill its obligation to deliver the (non-existent) shares it had just

sold to the plan by borrowing those (non-existent) shares from the plan.

In rebuttal, Dr. Carr argued that "the lack of Danish holdings on behalf of the Solo

Custodians at the sub-custodians . . . cannot demonstrate that [the defendant plans] did not

purchase . . . shares" because "a custodian can settle multiple trades simultaneously, and net

settle offsetting transactions." (Carr Rebuttal ¶¶ 113-14.)  Dr. Carr admitted that the plans'

"economic exposure," and so their economic claims to dividends, would be "altered" if the Solo

"custodian[s] fail[ed] to settle the purchased securities." (*Id.* ¶ 110.)[9]  But Dr. Carr found that

the plans' Solo custodian-issued "account statements showed that the trades settled and the

shares were held by the custodian in the plan's account." (*Id.* ¶ 7.)

To explain how the Solo custodians could have settled the plans' share purchases without

any shares, Dr. Carr opined that "if two or more clients of a Solo Custodian engage in offsetting

trades in a Danish stock . . . settling on the same day, the custodian can net all the trades" and

"[i]f the trades involve the same number of shares, the custodian's holding will not change after

these offsetting trades." (*Id.* ¶ 113.)  And "if the Solo Custodians' settlement of the trades

involved the settlement of offsetting trades on the same date then it would not require sourcing

shares externally as the trades netted to zero." (*Id.* ¶ 111.)  So "given the offsetting" (*i.e.*,

circular, in SKAT's characterization) "trades by Solo's clients, the net shareholdings in Solo's

---

8.  The short sellers and stock loan intermediaries trading records were included in the documents SKAT obtained
    from Sanjay Shah's Elysium companies in Dubai that were produced in discovery in these actions.  (ECF No.
    286.)

9.  *See also id.* ¶ 89 n.111 ("An investor's economic exposure is only impacted if a custodian fails to settle the
    purchased securities.").

sub-custodian accounts do not demonstrate that the pension plan trades were fake." (*Id.* ¶ 83 n.104.)  Thus, Dr. Carr argued, SKAT's experts had "ignore[d] that an investor's economic exposure to a stock starts when the trade is confirmed and is not impacted by how the custodian settled the trades or the identities of the counterparties to those trades." (*Id.* ¶ 8(f).)

**Dr. Carr's Reply Report.**

On February 28, 2022, Dr. Carr submitted a reply report to Mr. Dubinsky's and Mr. Wade's rebuttal reports.  (Weinstein Decl. Ex. 5 (Reply Report of Emre Carr, dated Feb. 28, 2022 ("Carr Reply")).)  In his reply, Dr. Carr further explained his opinion that the Solo Custodians "settled" the plans' share purchases "using the well-accepted and common practice of internalized settlement and netting." (*Id.* ¶ 10(vii).)  "Because the pension plan purchases of shares of stock in Danish Companies were offset by sales by other clients," Dr. Carr opined, "the Solo Custodians did not need to source the shares for the pension plan purchases from an external source." (*Id.* ¶ 10(viii).)

So, according to Dr. Carr, SKAT's experts "failure to locate holdings in Danish shares at some of the Solo sub-custodians is not sufficient to demonstrate that the pension plan purchases were fake" because "if [the] Solo Custodians settled the trades through the well-accepted and common practice of internalized settlement and netting, then the shares purchased by the pension plans would not show up in Solo Capital's omnibus accounts with various sub-custodians." (*Id.* ¶ 11(i).)  And that is the case, in Dr. Carr's view, irrespective of whether the Solo custodians or any of their clients ever had any shares in the first place. (*Id.* ¶ 29 (Mr. Dubinsky's "claim of 'no shares' shows that he fails to consider the process of internalized settlement").)  For instance, Dr. Carr testified at his deposition that if the Solo custodians never held any Danish shares, that would not "necessarily change [his] opinion . . . because of . . . both the possibility and

prevalence of net settlement and internalized settlement in financial institutions." (Weinstein Decl. Ex. 6 (Carr Dep. Tr.) 253:7-254:12.)[10]

## **LEGAL STANDARD**

Under Federal Rule of Evidence 702, an expert witness "may testify in the form of an opinion or otherwise" if (i) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (ii) "the testimony is based on sufficient facts or data;" and (iii) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[11] and its progeny require the Court to play a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony" and "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).

"Weighing whether the expert testimony assists the trier of fact goes primarily to relevance," which "can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (quoting *Daubert*, 509 U.S. at 501, 113 S. Ct. at 2796). And "reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [the] methodology and the expert's conclusions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). "To warrant

---

10. Sanjay Shah has subsequently confirmed in his testimony in SKAT's English litigation that the Solo custodians in fact never held any Danish shares. (*See* Weinstein Decl. Ex. 7 at 132:16-137:3.)

11. 509 U.S. 579, 113 S. Ct. 2786 (1993).

admissibility . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable," the Court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Defendants, as the parties seeking to "present[]" Dr. Carr's testimony, bear "the burden of proving each element necessary to the admissibility of" his testimony. *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (S.D.N.Y. 2007).

And even if an expert's testimony is admissible under Rule 702, the Court may still exclude it under Federal Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403. Rule 403 is "uniquely important . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," so the Court "in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595, 113 S. Ct. at 2978 (citation omitted).

## ARGUMENT

I. **Dr. Carr's opinions concerning net settlement and economic claims to dividends are unreliable, irrelevant, and prejudicial.**

A. **Dr. Carr's opinions concerning net settlement and economic claims to dividends are unreliable.**

While the "focus" of the Court's Rule 702 inquiry "must be solely on principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 594-95, 113 S. Ct. at 2797, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec.*

*Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).  Thus, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence" based "only" on "the *ipse dixit* of the expert."  *Id.*  And when," as here, "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

Dr. Carr's conclusion that the plans had an economic claim to dividends is premised on his opinion that the Solo custodians "net settled" the plans' share purchases without any shares or cash to complete the settlement.  (Carr Rebuttal ¶ 110 ("Clearing and settlement are post-trade operations that do not alter the economic exposure of the investor *unless a custodian fails to settle the purchased securities*" (emphasis added)).)  But Dr. Carr's opinion that the Solo custodians could have "net settled" the share purchases, without any shares, and by doing so created share ownership among trading parties none of whom ever acquired a share from the market, is based on nothing more than his say so.

Nothing in any of the sources on which Dr. Carr relies supports his opinion that the Solo custodians could have used "net settlement" or "internalization," irrespective of whether they held or had access to any shares.[12]  For instance, the December 2019 Federal Reserve note Dr. Carr cites explains that when a "dealer" uses "internalization" to acquire shares for a customer's short position, it uses "*existing securities* of either a client or the dealer itself" and "matches clients who wish to short a security either with other clients who have long positions in the same security or with the dealer's own inventory positions."  (Weinstein Decl. Ex. 8 at 3 (emphasis

---

12.  Dr. Carr's opinions in this regard have nothing to do with his experience as he has never worked in the front, middle, or back office of any financial services company, nor has he ever cleared or settled any trades. (Weinstein Decl. Ex. 6 (Carr Dep. Tr.) 17:4-18:8.)

added).)[13]  Similarly, the section of the Rules of the London Stock Exchange on which Dr. Carr

relies does not support his opinions because it is specific to trades that are cleared through a

"central counterparty" pursuant to a "clearing membership agreement," which Dr. Carr does not

contend was the case for any of the plans' over-the-counter share purchases.  (Weinstein Decl.

Ex. 9 at 65; *see also* Carr Reply ¶ 68 n.101.)[14]  And the other sources Dr. Carr cites say nothing

one way or the other about whether settlement without shares at the Solo custodians was

possible.[15]  Thus, "there is simply too great an analytical gap between" the sources on which Dr.

Carr relies "and the opinion proffered."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531,

540 (S.D.N.Y. 2004) (internal quotation omitted).

      Further, Dr. Carr's opinions on the Solo custodians' supposed use of "net settlement" are

inconsistent with the U.K. Financial Conduct Authority's conclusions.[16]  On May 6, 2021, the

FCA fined Sapien Capital Limited, one of Solo's executing brokers, for participating in the

---

13.  *See* Carr Rebuttal ¶ 117 n.141.

14.  A "central counterparty" under the London Stock Exchange Rules is "a body that assumes the risk for central counterparty trades by acting as the selling party to a matched buyer and the buying party to a matched seller or their clearing member, as appropriate."  (Weinstein Decl. Ex. 9 at 5.)

15.  *See generally* Carr Rebuttal ¶ 115 & n.137 ("Denmark's CSD, VP's settlement model allows for net simultaneous settlement of funds and securities."); *id.* ¶ 116 & n.138 ("EU Regulations issued in July 2014 specifically recognize internalized settlement."); *id.* ¶ 116 & n.139 ("A report issued by the European Securities and Markets Authority . . . notes that 'the majority of internalised settlement instructions (based on their number) concerns equities.'" (alterations accepted)); *id.* ¶ 117 & n.143 ("If a [prime broker] has two clients that are taking opposite positions on the same asset (one long, the other short), the PB may internally net these amounts to avoid having to fund the positions elsewhere: a client short position is therefore funding a client long position."); Carr Reply ¶ 62 & n.92 ("as of 2019, ESMA not only explicitly acknowledged internally settled transactions, but it also required them to be reported"); *id.* ¶ 71 & n.104 (internalizing "refers to the concept that the bank, in some cases, can source financing for a customer internally, without the need to attract additional funding from the external marketplace for funds"); *id.* ¶ 74 & n.106 ("Notably, ESMA added the language about parallel movement in response to the comments provided by European Banking Federation . . . .").  Each of these sources Dr. Carr cites are appended as exhibits to the Weinstein Declaration. (*See* Weinstein Decl. Exs. 8-19, 24.)

16.  As Dr. Carr notes, the Solo custodians were registered with the FCA "and as such were subject to its handbook of rules and guidance, particularly as it applied to broker-dealers and custodians."  (Carr Rebuttal ¶ 15.)

purported trading "characterized by a purported circular pattern of extremely high value OTC equity trading, back-to-back securities lending arrangements and forward transactions." (Weinstein Decl. Ex. 20 ¶ 2.5.)  Contrary to Dr. Carr, the FCA found "no evidence of ownership of the shares by the Solo Clients, or custody of the shares and settlement of the trades by the Solo Group."  (*Id.* ¶ 2.10.)[17]

And in September 2023, the FCA fined the "sole controller and chief executive" of Indigo Securities Limited for participating in an identical "purported" "dividend arbitrage equity trading strategy involving Danish shares" where "the Purported Trading would proceed in a predetermined, circular and centrally-controlled pattern, such that the trades netted off to zero without any money or shares changing hands."  (Weinstein Decl. Ex. 21 ¶¶ 2.1, 2.3, 2.8.)[18] Again, contrary to Dr. Carr, the FCA concluded that Indigo's "systematic and premeditated practice of setting trades off against one another, *in the absence of any real shares or money*, constituted an abuse of the normal (albeit exceptional) industry practice of internalized, or book-entry, settlements."  (*Id.* ¶ 4.20 (emphasis added).)

As the FCA explained, "[i]n general, settlement between two different custodians is required and those custodians must coordinate with the relevant clearing and settlement institutions the simultaneous and reciprocal transfer of securities and cash."  (*Id.* ¶ 4.18.)  As such, "a custodian can execute a securities settlement only if th[e] client has made available the resources needed," *i.e.*, "[t]he seller needs to provide its custodian with a sufficient quantity of

---

17.  The FCA's "investigation and conclusions in respect of the purported trading [were] based on a range of information including, in part, analysis of transaction reporting data, material received from Sapien, the Solo Group, and five other Broker Firms that participated in the Solo Trading."  (*Id.* ¶ 2.7.)

18.  Indigo Securities Limited issued the fraudulent dividend credit advices that defendant Markowitz's Routt Capital Pension Plan submitted to SKAT in certain of its tax refund claims that are at issue in this first trial.

stock to be delivered, while the buyer needs to provide a sufficient amount of cash to be paid in exchange." (*Id.*)

"[S]ettlement may be effected via 'book-entry' or 'internalised' settlement . . . if both buyer and seller happen to *hold assets on deposit* at the same custodian (if for example the custodian is a large bank with a large and diverse customer base)." (*Id.* ¶ 4.19 (emphasis added).) But in the case of Indigo, the FCA found that "the supposed internalized settlements were pre-engineered, and occurred between one small group of Clients, at one small custodian, which purported to act as both custodian and clearing broker, but without access to any of the underlying cash or equities." (*Id.* ¶ 4.20.) "[I]t was fundamental to [Indigo]'s role to verify the availability of sufficient funds or shares that would enable trade settlement between buyers and sellers," but Indigo "allowed clearance and approval of purported equity trades, knowing they were not genuine, and that if they had been, the Clients concerned had insufficient funds or shares to complete them." (*Id.* ¶ 2.7.)[19]

The FCA "accept[ed] that it is possible that some legitimate trades between parties who use the same custodian can be net settled." (*Id.* Appendix C ¶ 12.) But "net settlement as the result of a 'self-balancing loop,'" like the trading Dr. Carr and SKAT's experts analyzed, "in which none of the participating parties held shares at the outset of the transactions cannot result in share ownership." (*Id.*) And nor "can it result in entitlement to a real dividend which gives the recipient rights against the issuer of the securities." (*Id.*)[20]

---

19. For example, "[i]n one instance, a single trade purportedly cleared and settled by [Indigo] consisted of a sale of 12.5m shares of a Danish stock at a total price of over DKK 3 billion," even though "[Indigo]'s Clients had neither the money nor shares to complete such transactions." (*Id.* ¶ 4.17.)

20. Dr. Carr's opinions also are contrary to Denmark's Eastern High Court's April 2022 opinion that the similar circular trading at North Channel Bank, which served as the purported custodian for two of the plans whose refunds are issue in the first trial, "was either proforma or solely consisted of paper transactions without any shares and actual cashflows" and "must be deemed to be ordinary fraud under criminal law that is merely

14

Dr. Carr's fanciful, unsupported opinions to the contrary that trades can be "net settled" without any party having shares or cash are too "speculative," "conjectural" and "unrealistic" to be admissible. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009). And since his opinions that the plans' share purchases settled are inadmissible, Dr. Carr's opinions concerning the plans' "economic claims" premised on those opinions likewise are too.

### B.    Dr. Carr's opinions concerning net settlement and economic claims to dividends are irrelevant and prejudicial.

Even assuming *arguendo* that Dr. Carr's opinions were reliable (and they are not), they are in any event irrelevant. As the Court previously concluded, "Danish law follows the doctrine '*nemo dat quod non habet*' ('no one gives what they do not have'), including with respect to transfers of ownership of shares." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-CV-04051, 2023 WL 8039623, at *8 (S.D.N.Y. Nov. 20, 2023). Thus, even if, as Dr. Carr contends, the Solo custodians net settled billions of dollars of share purchases without any party providing any cash or shares, that still would not mean that defendants' representations in their tax refund claims that the plans owned shares and received dividends, net of withholding tax were true.

Rather, "the starting point" still "would be whether the [short sellers] from which the defendants purportedly purchased the shares owned the shares in the first place." *Id.* at *9. Even if the plans had what Dr. Carr calls "economic claims" to dividends against the Solo custodians or the executing brokers, that would not mean that the plans received actual dividends, paid by Danish companies, net of withholding tax, if as Dr. Carr tacitly acknowledges, the Solo

---

disguised by complicated transactions." (Weinstein Decl. Ex. 22 at 4.) And the English High Court of Justice's April 2023 opinion that "net settlement" without shares does not result in any shares being "transferred" or any party to such trades becoming "a shareholder." (Weinstein Decl. Ex. 23 ¶¶ 118-19.)

custodians held no underlying Danish shares on their behalf.  *See U.S. v. Gatto*, No. 17-cr-0686 (LAK), 2019 WL 266944, at *11 (S.D.N.Y. Jan. 17, 2019) (precluding expert testimony that "would have had no relevance to any fact of consequence" (internal quotation omitted)), *aff'd*, 986 F.3d 104 (2d Cir. 2021).  Thus, Dr. Carr's proposed testimony on supposed net settlements and "economic claims" to dividends will do nothing to "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

Just the opposite, even if the testimony were minimally relevant under Rule 702, any probative value is far outweighed by the "danger" that it will "confus[e] . . . the issues" and "mislead[] the jury."  Fed. R. Evid. 403.  For instance, given "the unique weight [expert testimony] may have in [the] jury's deliberations," *Nimely*, 414 F.3d at 397, Dr. Carr's proposed net settlement testimony may confuse and mislead the jury into thinking, contrary to the Court's summary judgment opinion, that the sellers did not need to own the shares they supposedly sold to the pension plans for the defendants' representations of share ownership to be true.  *See Gatto*, 2019 WL 266944, at *11 ("proposed testimony risked misleading the jury on the law" where it "might have given undue support to defendants' improper line of argument").  Likewise, Dr. Carr's proposed testimony may confuse and mislead the jury to think the relevant issue is whether the defendant plans had some sort of ill-defined "economic claims" to dividends or some form of contract claims against their purported trading counterparties, rather than whether they in fact received any such dividends, net of withholding tax, as defendants represented in the tax refund claims.[21]

---

21.  At his deposition, Dr. Carr could not say what entity actually paid the plans any dividends as a result of their supposed "economic claims" for dividends.  (*See* Weinstein Decl. Ex. 6 (Carr Dep. Tr.) 263:11-266:1.)

## II.    Dr. Carr's opinions about what the defendants knew are inadmissible.

Finally, Dr. Carr's opinions about what the defendants knew are inadmissible.  For instance, Dr. Carr testified in his Rebuttal Report that SKAT's experts had not "demonstrate[ed] that the pension plans were aware of the transactions to which they were not a party or the identity of the counterparties in those transactions" because "[t]he pension plans' trade confirmations from IDBs and account statements from Solo did not provide information about the other side of their stock and futures trades."  (Carr Rebuttal ¶ 8(g).)  Likewise, Dr. Carr testified that the SKAT experts "fail to demonstrate that the pension plans knew that Solo never held any actual Danish securities."  (Carr Rebuttal ¶ 83 (internal quotation omitted).)[22]

"[O]pinions concerning state of mind are an inappropriate topic for expert opinion."  *Bd. of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 686(SAS), 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011).  And as such, Dr. Carr's opinions about what SKAT's experts failed to demonstrate in that respect are "both irrelevant and inadmissible."  *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 410 (S.D.N.Y. 2019), *on reconsideration in part*, No. 17CV1789 (DLC), 2019 WL 2114067 (S.D.N.Y. May 8, 2019).  Thus, to the extent Dr. Carr testifies at trial, the Court should preclude him from offering his opinions about what the defendants knew.  *See, e.g.*, *Highland Cap. Mgmt., L.P. v. Schneider¸* 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (finding inadmissible expert's "opinion as to the state of mind and knowledge possessed by defendants and non-parties to th[e] action").

---

22.  *See also* Rebuttal Report ¶ 78 ("Both Mr. Dubinsky's and Mr. Wade's analyses consider information that was not available to the pension plans.").

## CONCLUSION

For the reasons set forth above, SKAT respectfully requests that the Court grants its motion to exclude Dr. Carr's proposed expert testimony on net settlement and "economic claims" to dividends.

Dated:  New York, New York                          HUGHES HUBBARD & REED LLP
        June 21, 2024

                                                    By: /s/ Marc A. Weinstein
                                                        William R. Maguire
                                                        Marc A. Weinstein
                                                        Neil J. Oxford
                                                        Dustin P. Smith
                                                        Gregory C. Farrell
                                                        One Battery Park Plaza
                                                        New York, New York 10004-1482
                                                        Telephone: (212) 837-6000
                                                        Fax: (212) 422-4726
                                                        bill.maguire@hugheshubbard.com
                                                        marc.weinstein@hugheshubbard.com
                                                        neil.oxford@hugheshubbard.com
                                                        dustin.smith@hugheshubbard.com com
                                                        gregory.farrell@hugheshubbard.com

                                                        *Counsel for Plaintiff Skatteforvaltningen*
                                                        *(Customs and Tax Administration of the*
                                                        *Kingdom of Denmark)*