# Exhibit 4

CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**EXPERT REPORT OF GRAHAM WADE**

**December 31, 2021**

**Table of Contents**

I.      PURPOSE OF THE ENGAGEMENT ........................................................................1

II.     QUALIFICATIONS ...............................................................................................1

III.    PREPARATION OF THIS REPORT ....................................................................3

IV.     SUMMARY OF OPINIONS...................................................................................4

V.      FACTUAL BACKGROUND....................................................................................7

    A.      Summary of Plaintiff's Claims .....................................................................7

    B.      The Parties ......................................................................................................9

        1.      The ED&F Man Pension Plans .............................................................9

        2.      The Investment Managers.....................................................................9

        3.      ED&F Man ............................................................................................9

        4.      Solo Custodians ..................................................................................11

VI.     EQUITY FINANCE CONCEPTS RELEVANT TO THE TRANSACTIONS AT ISSUE ...12

    A.      Definition of Key Trading Terms ...............................................................12

        1.      Trade Date...........................................................................................12

        2.      Settlement Date ...................................................................................12

        3.      Record Date .........................................................................................13

        4.      Ex-Dividend Date (or Ex-Date) .........................................................13

        5.      Market Claim ......................................................................................14

        6.      Payment Date ......................................................................................14

    B.      A Basic Definition of Equity Finance Transactions ..................................15

        1.      Definition of a Stock Loan Transaction .............................................17

        2.      Market Standard Collateral Amounts in International Stock Loan Transactions, Margins, and Haircuts ..................................................19

        3.      Valuation of Securities in Stock Loans...............................................20

        4.      Settlement Risk in Stock Loans ..........................................................22

        5.      Stock Loans and Dividend Withholding Taxes ..................................23

        6.      Basic Definition of Forwards and Futures ..........................................24

    C.      Dividends and Withholding Tax in Equity Finance Markets ...................26

        1.      The Pricing and Economics of Equity Finance Transactions .............26

        2.      The Importance of Dividends in Equity Finance Transactions...........28

        3.      Differential Tax Treatment of Various Participants in the Market and Its Impact on Pricing ..................................................................28

    D.      Dividend Compensation Payments Are Not Real Dividends ...................30

    E.      A Description of Cum-Ex Transactions .....................................................32

        1.      Cum-Dividend vs Ex-Dividend Transactions .....................................32

2.    Cum-Ex Transactions ..................................................................................33

3.    Origins of "Cum-Ex" Transactions Which Resulted from Settlement Fails..................33

4.    Cum-Ex Transactions Do Not Require Dividend Compensation Payments..................34

**VII.    OPINIONS AND BASES FOR THE OPINIONS.........................................................35**

**A.    Opinion 1: All the ED&F Man-Related Appendix C Transactions Were Cum-Ex Transactions, Which Means the ED&F Man Pension Plans Did Not Receive Any Real Dividends ..................................................................................................35**

**B.    Opinion 2: The Only Reason to Participate in The Appendix C Cum-Ex Trades Was to Generate a Fabricated Tax Reclaim That Was Shared by the Parties to the Transactions ........................................................................................36**

1.    Apart from the Tax Reclaim, the Transaction Economics for the Participants Were Self-Cancelling ..................................................................................38

Description of the Economics of the Annex E Cambridge Way - MPT Dubai COLOB 2013 Transaction, Which Is Representative of All So-Called Annex E Transactions ....................................................................................... 38

The Annex E Cambridge Way - MPT Dubai COLOB 2013 Transaction Bears the Hallmark Characteristics of Cum-Ex Transactions as Further Outlined in the Bases for Opinion #2 ................................................................................ 44

2.    Transactions Conducted by ED&F Man Through the Ostensibly Independent External Third-Party Inter-Dealer Brokers ("IDBs") Were Simply Camouflage. The Common Characteristics of the non-Annex E Transactions Are Demonstrable ...........................45

Description of the Economics of Non-Annex E AIG - LUTETIA TDC 2014 Transaction, Which Is Representative of All Non-Annex E Cum-Ex Transactions ....................................................................................... 45

3.    The IDB Transactions Are Inextricably Linked to Each Other and Their Commonality is Demonstrable .............................................................................................54

4.    Hedging a Cum-Ex Transaction Does Not Require Any Party to Receive a Real Dividend.......................................................................................................57

5.    No Real Dividend Was Received by Any Participant in the Annex E Transactions and the Pricing Strongly Suggests Real Dividends Were Also Not Received in Other Non-Annex E Transactions ....................................................................................63

6.    Pricing of the Cum-Cum Transactions at Around 90% of the Gross Dividend Was Expected....................................................................................................65

7.    No Reputable Market Participant Would Have Considered the Appendix C Cum-Ex Trades as Legitimate ..................................................................................67

8.    There Was Deliberate Coordination of the Participants at the Outset of the Trades .......67

9.    The Unusual Risk Sharing and Failure to Properly Consider Trading Risks and Margin Demonstrates That the Trades Were Not Real..............................................................67

10.    Profits from Refund Payments Were Essentially Guaranteed Up Front Because the Trades Were Pre-Ordained, Circular, Non-Market Facing Transactions ........................71

11.    Prior to Execution of Each Transaction All Participants Would Have Known That the Unwind Transactions Were Inevitable and They Would Not Have Executed the Opening

Transactions if This Were Not the Case. Thus, These Transactions Were Prearranged and Codependent..................................................................................................71

**C.       Opinion 3: ED&F Man, Custodian for the ED&F Man Pension Plans, Did Not Actually Have Custody of a Sufficient Number of Shares to Support the Tax Vouchers That Were Issued for the ED&F Man Pension Plans........................................................71**

1.   The Number of Actual Shares Settled Was Not Connected to the Transaction Amounts .........................................................................................................................72

2.   The Share Amounts That Were Purportedly Transacted Were Wholly Inconsistent with Realistic Average Daily Traded Volumes ("ADTV") Because These Purported Amounts Could Not Have Been Risk Managed by the Parties ........................................................78

**D.       Opinion 4: ED&F Man's Tax Voucher Process Was Highly Unusual, Inappropriate, and Resulted in Fabricated Tax Vouchers with False Statements................81**

1.   The Tax Vouchers That ED&F Man Produced Contained False Representations, Were Essential to Filing False Tax Reclaims, and All Participants in the Order and Execution of These Trades Would Have Been Fully Aware of This..................................................86

2.   ED&F Man's Failure to Obtain Any Legal and Tax Advice Was a Breach of Its U.K. Regulatory Obligations.  The Tax Opinions That Were Provided by PwC and Hannes Snellman Appear to Simply Be Marketing Opinions Which Bear Little or No Relation to the Transactions Actually Undertaken and Were Used to Provide Cover for the Participants Rather Than Proper Consideration of The Appropriateness of the Transactions as Conducted ...............................................................................86

**E.       Opinion 5: The Transactions That Solo Engaged in Also Involved Fabricated Cum-Ex Transactions in Which (i) No Shares Were Delivered to or Received by the Solo Pension Plans, (ii) No Cash Was Exchanged, (iii) The Solo Pension Plans' Counterparties and Other Parties to the Transactions Did Not Receive A Real Dividend, (iv) The Trades Deviated from Market Standards in Numerous Ways,  Were Not Arm's-Length, and as Such, Avoided and Ignored Real Market Risks, (v) None of The Parties Were at Risk of Any Real Market Risk Gain or Loss, Except for the Receipt of a Fabricated Dividend Tax Reclaim, and (vi) It Appears That the Communications About Executing The Trades Were All Automatically Generated by Solo, With No Independent Involvement of Any of The Parties ............................................................................................................89**

1.   Detailed Description of the "Delvian Carlsberg 2013 Transaction", Which May Also be Referred to as the "Solo" Transaction.      ..................................................90

2.   Solo Held No Shares in Its Sub-Custodian Accounts, and, Netting Offsetting Trades at the Custodian or Sub-Custodian Level Cannot Create Shares or Dividends...................94

3.   The Circular Nature of the Solo Trades with Delvian Means That There Was No Requirement for Shares or Cash; The Purported Trades were Completely Fake ...........96

4.   All the Trades Were Dictated to the Solo Pension Plans by Solo and Eventually Automated; Both These Facts are Highly Irregular and Further Evidence That These Transactions Were Fake.................................................................................97

5.   The Terms of the Stock Loan Agreements are Highly Irregular for Multiple Reasons...98

6.   The Terms of the Futures Trades and Solo's Transactions of Futures at Its Sub-Custodians were Also Irregular ................................................................101

       a)    The Pricing of the Futures Appears to be Priced using the exact Net Dividend with no implied sourcing cost and no bid offer spread. ................... 101

**b)** The Pattern of Futures Trading in Solo's Omnibus Accounts is Highly Irregular and Has No Market Rationale ........................................................... 102

**c)** It Is Not the Market Standard to Engage in Equally Offsetting Futures in Equity Finance Transactions Where the Costs of Commissions, Fees, and the Bid-Ask Spread Were Ignored by Solo and Which are the Equivalent of Wash Trades ........................................................................................................... 104

7. It is not the Market Standard for Parties to a Stock Loan or Broker-Custodians to Retroactively Alter the Terms of the Original Stock Loan So That the Trades Net to Zero ........................................................................................................................ 104

**Appendix A: Curriculum Vitae of Graham Wade** ........................................................... **108**

**Appendix B: Materials Considered** ........................................................................................ **111**

**Appendix C: ED&F Man and Solo Cum-Ex Trades** ........................................................ **124**

**Appendix D: ED&F Man's Claimed Share Ownership is Not Credible Given the Unmanageable Risk Implications** ............................................................................................................ **130**

**Appendix E: A Description of the Economics of Various Transactions** ........................... **131**

1. Annex E AIG - MPT Dubai TDC 2014 Transaction ..................................................... 131

2. Non-Annex E Cambridge Way – Mitsubishi COLOB 2013 Transaction with External Equity Finance ................................................................................................................. 136

**Appendix F: Cum-Cum Trades** ............................................................................................. **140**

**List of Appendices**

Appendix A: Curriculum Vitae of Graham Wade

Appendix B: Materials Considered

Appendix C: ED&F Man and Solo Cum-Ex Trades

Appendix D: ED&F Man's Claimed Share Ownership is Not Credible Given the Unmanageable Risk Implications

Appendix E: A Description of the Economics of Various Transactions

Appendix F: Cum-Cum Trades

## I.    PURPOSE OF THE ENGAGEMENT

1.    Counsel for SKAT, the Customs and Tax Administration of the Kingdom of Denmark, has requested my opinion on the nature and structure of the financial transactions purportedly executed by various pension plans (the "Pension Plans") and other defendants; whether those financial transactions were executed in a manner consistent with standard market practice; and whether the financial transactions executed by the various defendants would entitle an entity or individual to a dividend. [1]

## II.    QUALIFICATIONS

2.    My name is Graham Wade.  I serve as an Independent Consultant to Charles River Associates International ("CRAI"). CRAI is a leading global consulting firm that offers expertise to major law firms, corporations, accounting firms, and governments.  CRAI has a diverse team of over 800 consultants in more than 50 countries around the world.

3.    I have over twenty years of professional experience in structured financial transactions.  For more than thirteen years I worked for Barclays Investment Bank ("Barclays").  Eleven of these years were in the Structured Capital Markets ("SCM") group, which was the bank's leading structuring division until its closure in 2012.  During my tenure at the bank, I led various teams focused on structured transactions, oversaw substantial risk reduction initiatives, and sat on a number of Board, group, and investment bank committees with responsibility for transaction approval and other risk management roles.

4.    In 2008, I relocated to New York and became the SCM Head of Americas.  In this role, I led the bank's integration of Lehman Brothers' equivalent North American business.  I was appointed to the position of Global Head of SCM at the end of 2011 and returned to London.  In this role, amongst other duties, I was responsible for setting, supervising, and promulgating guidelines for all equity finance

---

[1] I understand from counsel that Plaintiff was known as "SKAT" at the time of the events alleged in the complaint. Pursuant to Danish Legal Order 804, entered on June 6, 2018, Plaintiff changed its legal name to Skatteforvaltningen, effective July 1, 2018.

transactions with tax risk, including those undertaken by the Global Equities and Global Prime Services businesses, where applicable. In this role, I also worked jointly with Barclays' Legal, Tax, and Compliance Teams on an annual process of reviewing and promulgating trading and execution guidelines for all markets in which Barclays undertook equity finance activities. In 2012, I became responsible for the restructuring and management of a range of legacy activities at Barclays, reflecting the recalibration of the bank's risk appetite at that time.

5.    While at Barclays, I was also a director of Barclays Capital Securities Limited, the principal United Kingdom (U.K.) broker-dealer of the Barclays Group, and a member of the bank's Markets Management and Global Partnership Committees.

6.    Since leaving Barclays at the end of 2014, I have worked on a wide variety of projects in the financial services sector. For the last two years I have directed my focus towards a U.K. software start-up firm which is developing reporting tools for the wealth industry. Prior to that, between July 2015 and July 2019, I was Co-CIO of a U.K. Financial Conduct Authority- ("FCA") regulated investment management firm. This firm was investment manager for a fund that invested in bank capital instruments issued by the world's largest banks.

7.    I am a qualified chartered accountant (Fellow of the Institute of Chartered Accountants in England and Wales). While at Barclays, I held the Financial Industry Regulatory Authority ("FINRA") Series 24 (General Securities Principal Exam), Series 7 (General Securities Representative Exam), and Series 63 (Uniform Securities Agent State Law Exam) licenses. I hold a master's degree in mathematics from Corpus Christi College, Cambridge, United Kingdom, and an executive certificate in leadership decision making from Harvard University's Kennedy School of Government. I also hold a certificate in investments (securities and financial derivatives) from the Securities and Investment Institute.

8.    My curriculum vitae, which is attached to this report in Appendix A, provides more detail about my qualifications and experience.

### III.    PREPARATION OF THIS REPORT

9.      I have prepared this report to express certain opinions; to describe the bases and rationale underlying them; and to disclose the facts and data on which I have relied in reaching my opinions.  I do not express legal opinions in this report.  The work that I have conducted in this matter has been informed by my education; knowledge; experience in the design, implementation, and management of complex structured transactions; and detailed knowledge of a range of equity finance activities and the tax, accounting, legal requirements, credit, operations, and regulations of businesses in the financial services industry.  The information in this report is based upon discovery to date and the information that is currently available.  I have considered and compiled materials as cited herein with the assistance of CRAI personnel working under my direction and supervision.

10.      A complete listing of the materials I reviewed and considered in forming my opinions and conclusions rendered in this report is attached hereto as Appendix B.  In Appendix C, I provide a summary of the transactions at issue in this matter, which were conducted for various Pension Plan funds by ED&F Man Capital Markets, Ltd ("ED&F Man"), Solo Capital Partners LLP ("Solo"), and, or the Solo related custodians, West Point Derivatives Ltd., Old Park Lane Capital Ltd., and Telesto Markets LLP (collectively the "Solo Custodians"), [2] all brokers-custodians for the Pension Plans.  Throughout this report, I refer to these trades as "Appendix C Cum-Ex Trades", and the Pension Plans either as "ED&F Man Pension Plans" or "Solo Pension Plans".  In Appendix D, I provide trade and volume analysis of shares that ED&F Man claimed to own on behalf of its customers that are pertinent to this matter. [3]  In

---

[2] It has been represented to me by counsel that the transactions undertaken by West Point Derivatives Ltd., Old Park Lane Capital Ltd., and Telesto Markets LLP are substantially identical to those undertaken by Solo. Accordingly, to the extent this is accurate, my analysis applies equally to Solo and the other Solo Custodians.

[3] See, for example, Dividend Reconciliation Excel Workbook (ED&F-00081150, at tab 'FRONTSHEET') in which ED&F Man reports claimed ownership of 8,337,116 shares issued by Coloplast A/S held on behalf of the ED&F Man Pension Plans and other clients on December 10, 2013.  As I explain in detail later in this report, it is my opinion that ED&F Man did not own a vast majority of these shares.  However, had ED&F Man held such shares either in its own name or on behalf of its clients, including the ED&F Man Pension Plans, I consider it appropriate to review the aggregate positions allegedly held by ED&F Man and all its clients for purposes of the

Appendix E, I provide descriptions of two transactions that ED&F Man conducted to illustrate the steps involved in the transactions at issue in this matter. In Appendix F, I provide a list of transactions that I used to evaluate the pricing issues of the transactions in this matter.

11.     This report is my independent work product, and contains my objective, unbiased opinions in relation to matters within my expertise, and the opinions I express represent my true and complete professional opinion.

12.     I reserve the right to amend or supplement my opinions based upon further information learned, produced, relied upon, in response to opinions in any reports or disclosures of defendants' experts, other updated relevant information, or based upon any stipulation of the parties. I also understand that fact discovery remains ongoing because on December 22, 2021 the Court ordered ED&F Man to produce a new Rule 30(b)(6) witness fully and properly prepared to answer questions relating to certain topics relevant to this report, including the circumstances of ED&F Man's issuance of the Annex E vouchers and its admission that those vouchers were false, and the U.K.'s FCA's investigation into ED&F.

13.     Therefore, the analyses and opinions described herein are subject to change based upon future discovery or other developments.

14.     My hourly billing rate in this matter is $1,200 per hour. Neither my nor CRAI's compensation is contingent upon the outcome of this case.

## IV.    SUMMARY OF OPINIONS

15.     The following is a summary of my opinions related to the transactions for the ED&F Man Pension Plans for which ED&F Man served as a custodian as set forth in greater detail in this report:

---

analysis for which Appendix D is used (the consideration of prudent risk management of large shareholding positions).

a.      All the ED&F Man-Related Appendix C Transactions involved were Cum-Ex transactions, which means the ED&F Man Pension Plans did not receive any real dividends.

b.      The only reason to participate in the Appendix C Cum-Ex trades was to generate a fabricated tax reclaim that was shared by the parties to the transactions. The bases for this opinion are the following: (i) Apart from the tax reclaim, the transaction economics for the participants were self-cancelling; (ii) Transactions conducted by ED&F Man through the ostensibly independent external third-party inter-dealer brokers ("IDBs") were simply camouflage. [4]  The Cum-Ex characteristics of these transactions are demonstrable; (iii) The IDB transactions are inextricably linked to each other and their commonality is demonstrable; (iv) Hedging a Cum-Ex transaction does not require any party to receive a real dividend; (v) No real dividend was received by any participant in the Annex E transactions and the pricing strongly suggests real dividends were also not received in other non-Annex E transactions; (vi) Pricing of the Cum-Cum transactions at around 90% of the gross dividend was expected; (vii) No reputable market participant would have considered the Appendix C Cum-Ex trades as legitimate; (viii) There was deliberate coordination of the participants at the outset of the trades; (ix) The unusual risk sharing and failure to properly consider trading risks and margin demonstrates that the trades were not real; (x) Profits from refund payments were essentially guaranteed up front because the trades were pre-ordained, circular, non-market facing transactions; and (xi) Prior to execution of each transaction all participants in the order and execution of these trades would have known that the unwind transactions were inevitable and they would not have executed the opening transactions if this were not the case.  Thus, these transactions were prearranged and codependent.

---

[4] In this report, the term "Inter-Dealer Brokers" ("IDBs") refers to the numerous external counterparties that ED&F Man and the ED&F Man Pension Plans used for the Appendix C Cum-Ex Trades, their related hedges, and the Solo Capital broker firms' trades.  Strictly speaking, some of these firms are not IDBs but are classified as other types of regulated financial counterparties.  The role these firms played in these transactions is consistent with the function of an IDB, which is generally taken to mean a party who acts as an intermediary between two other authorised firms to arrange or execute a transaction.

c.       ED&F Man, custodian for the ED&F Man Pension Plans, did not actually have custody of a sufficient number of shares to support the Tax Vouchers that were issued for the ED&F Man Pension Plans.  The bases for this opinion are the following: (i) The number of actual shares settled was not connected to the transaction amounts; and (ii) The share amounts that were purportedly traded were wholly inconsistent with realistic average daily trading volumes ("ADTV") because these purported amounts could not have been risk managed by the parties.

d.       ED&F Man's tax voucher process was highly unusual, inappropriate, and resulted in fabricated Tax Vouchers with false statements.  The bases for this opinion are the following: (i) The Tax Vouchers that ED&F Man produced contained false representations, were essential to filing false tax reclaims, and all participants in the order and execution of these trades would have been fully aware of this; and (ii) ED&F Man's failure to obtain any legal and tax advice was a breach of its U.K. regulatory obligations.  The tax opinions that were provided by PwC and Hannes Snellman bear little or no relation to the transactions actually undertaken and appear to simply be marketing opinions that were used to provide cover for the participants rather than proper consideration of the appropriateness of the transactions as conducted.

16.     The following is a summary of my opinions related to the transactions for the Solo Pension Plans that used Solo as a custodian as set forth in greater detail in this report.

a.       The transactions that Solo engaged in also involved fabricated Cum-Ex transactions in which: (i) No shares were delivered to or received by the Solo Pension Plans; (ii) No cash was exchanged; (iii) The Solo Pension Plans' counterparties and other parties to the transactions did not receive a real dividend; (iv) The trades deviated from market standards in numerous ways, were not arm's-length, and as such, avoided and ignored real market risks; (v) None of the parties were at risk of any real market gain or loss, except for the receipt of a fabricated dividend tax reclaim; and (vi) It appears that the communications about executing the trades were all

automatically generated by Solo, with no independent involvement of any of the parties. The bases for this opinion are the following: (i) Solo held no shares in its sub-custodian accounts, and, netting and offsetting trades at the custodian or sub-custodian level cannot create shares or dividends; (ii) The circular nature of the Solo trades with Delvian means that there was no requirement for shares or cash; the purported trades were completely fake; (iii) All the trades were dictated to the Solo Pension Plans by Solo and eventually automated; both these facts are highly irregular and further evidence that these transactions were fake; (iv) The terms of the stock loan agreements are highly irregular for multiple reasons; (v) The terms of the futures trades and Solo's transactions of futures at its sub-custodians were also irregular; and (vi) It is not the market standard for parties to a stock loan or broker-custodians to retroactively alter the terms of the original stock loan so that the trades net to zero.

## V.    FACTUAL BACKGROUND

### A.    Summary of Plaintiff's Claims

17.    This report pertains to litigation brought by Plaintiff, SKAT, in the United States against multiple parties including various pension plans, authorized representatives for the pension plans and related parties involved in scheme to defraud SKAT into refunding "over 12.7 billion Danish Kroner ('DKK'), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax." [5]

18.    SKAT is the Danish national agency responsible for assessing and collecting Danish taxes. [6] Danish law requires companies to withhold a 27% tax on dividends paid to shareholders. [7] Pursuant to certain double taxation treaties between Denmark and other countries, including the United States

---

[5] Amended Complaint & Demand for Jury Trial, SKAT v. Acorn Capital Corp. Employee Profit Sharing Plan et al., ¶¶ 5, 8, and 26 NO 18-cv-10088-LAK (S.D.N.Y. April 22, 2020). The total amount refunded by SKAT includes amounts paid to parties located in foreign jurisdictions, and amounts paid to parties that have settled.

[6] Ibid, at ¶ 4.

[7] Ibid, at ¶¶ 6 and 21.

("U.S."), this withheld dividend tax is refundable to foreign shareholders that meet certain specified criteria. [8]  I understand that the Pension Plans, acting through their agents and representatives, applied to SKAT claiming repayments of amounts withheld on dividends that they purported to have earned on shares of Danish companies that they claimed to hold.  These applications are alleged to have been false because the Pension Plans did not own the shares that they claimed to own, did not earn the dividends they claimed to have earned, and/or were not entitled to the refund amounts they claimed.

19.     The Claimants allegedly effectuated the scheme by appointing agents to apply to SKAT for refunds in respect of shares in Danish companies that they did not own or for which they were otherwise not entitled. [9]  The Claimants each submitted refund claims seeking the full 27% withholding tax that had allegedly been withheld from distributions on shares of Danish companies the Claimants purported to own. [10]  These claims were submitted through payment agents, who in turn submitted the claims by mail or email transmission to SKAT. [11]  Each entity claiming a withholding tax refund submitted a "credit advice," "income advice," "tax voucher," or similar document (a "Tax Voucher") to SKAT that was created by a custodian  that purported to show the Claimant's ownership of shares in Danish companies listed on the OMX Copenhagen 20 Index. [12]

---

[8] Ibid, at ¶¶ 22 and 23.

[9] See, Amended Complaint & Demand for Jury Trial, SKAT v. American Investment Group of New York L.P. Pension Plan, et al., No. 18-cv-09841, ECF No. 89 (S.D.N.Y. April 22, 2020).

[10] Ibid.

[11] Ibid.

[12] Ibid.

### B.    The Parties

#### 1.    The ED&F Man Pension Plans

20.    The "ED&F Man Pension Plans" are the Pension Plans that submitted dividend withholding tax refund applications to SKAT based on Tax Vouchers provided by ED&F Man. The ED&F Man Pension Plans' formation agreements show various individuals detailed therein, including beneficiaries, trustees, and the ED&F Man Pension Plans' controlling individuals. [13]

#### 2.    The Investment Managers

21.    ED&F Man traded in Danish securities on behalf of the U.S. ED&F Man Pension Plans. [14]  Many of the ED&F Pension Plans used an investment manager ("Investment Manager"). [15]  The Investment Managers served as intermediaries between the plans and ED&F Man, and structured related transactions to finance and hedge the plans' trades in Danish stock. [16]  The Investment Managers were authorized to act on behalf of the ED&F Man Pension Plans and give instructions to ED&F Man, broker-custodian for the ED&F Man Pension Plans. [17]

#### 3.    ED&F Man

22.    ED&F Man is a financial brokerage company based in the U.K. [18]  ED&F Man is authorized and regulated by the FCA and part of a global financial brokerage business. [19]  From 2012 to 2015, ED&F

---

[13] Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts, p. 3. Related to UK Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487; and CL-2020-000369.

[14] Ibid.

[15] Ibid, at p. 5.

[16] Ibid, at pp. 5 - 6.

[17] Ibid, at p. 6

[18] Ibid, at p. 1.

[19] Ibid, at p. 3.

Man acted as a broker-custodian for the ED&F Man Pension Plans that are defendants in this matter and the ED&F Man Pension Plans were ED&F Man's clients.[20]    ED&F Man classified the ED&F Man Pension Plans as "elective professional clients".[21]    The ED&F Man Pension Plans received various services from ED&F Man, including: "(1) securities, lending and financing services; (2) execution, clearing and settlement services for equities and derivatives; and (3) custodian services for on-exchange and over-the-counter ('OTC') transactions."[22]

23.    The ED&F Man Pension Plans applied to SKAT claiming repayments of tax withheld on dividends that they purported to have earned on shares of Danish companies.[23]    ED&F Man completed Tax Vouchers supporting these reclaims and sent them to tax reclaim agents acting on behalf of the ED&F Man Pension Plans.[24]    The tax reclaim agents submitted applications to SKAT, which included a tax relief form and the Tax Vouchers prepared by ED&F Man.[25]    ED&F Man prepared 191 Tax Vouchers for the ED&F Pension Plans which are the subject of the claims in this matter.[26]

24.    ED&F Man has admitted that certain of the Tax Vouchers it produced for the ED&F Man Pension Plans contained inaccuracies.[27]    ED&F concedes that the vouchers listed in Schedule 1 to Annex E to its Amended Defence in related English litigation were so inaccurate that they should not have been issued at all, because the plans received no dividends.[28]    In Schedule 2 to Annex E, ED&F Man concedes that

---

[20] Ibid, at p. 3.

[21] Ibid, at p. 8.

[22] Ibid, at p. 9.

[23] Ibid, at pp. 10-12.

[24] Ibid, at pp. 10-12.

[25] Ibid, at pp. 10-12.

[26] Ibid, at p. 10, not including settled pension plans.

[27] Hashemi Tr. Vol. 2 at 251:18 – 252:25.

[28] See, ED&F Man's Re-Amended Defence to Schedule 5T, ¶19.1.

the vouchers were inaccurate because they overstated the number of shares held, dividends received, and tax allegedly suffered by the ED&F Man Pension Plans. [29]

25.    ED&F Man also produced Tax Vouchers that I understand it maintains are accurate.  The majority of those additional Tax Vouchers were based on Cum-Ex transactions.  As described more fully below, in a Cum-Ex transaction, the transaction date and agreed price terms typically indicate that the buyer of the securities will receive the dividend, but the settlement cycle is extended so the buyer of the securities does not receive the shares until after the Record Date, and so the buyer does not actually receive a dividend.

### 4.    Solo Custodians

26.    The Solo Custodians were founded and/or controlled by Sanjay Shah.    The Solo Custodians allegedly provided global security services, investment management, brokerage and proprietary trading services to the Solo Pension Plans. [30]  The "Solo Pension Plans" are the Pension Plans that submitted dividend withholding tax refund applications to SKAT based on Tax Vouchers provided by a Solo Custodian.

---

[29] See, ED&F Man's Re-Amended Defence to Schedule 5T, ¶19.1

[30] Report and Financial Statements for Solo Capital Partners, March 31, 2012, pp. 2 and 5.

## VI.    EQUITY FINANCE CONCEPTS RELEVANT TO THE TRANSACTIONS AT ISSUE

### A.    Definition of Key Trading Terms

#### 1.    Trade Date

27.    This refers to the date two counterparties agree to transact ("T").   In a purchase transaction, the trade date is the date on which the buyer agrees to purchase shares, typically through a call, email, or Bloomberg Chat [31] message, followed shortly thereafter by the buyer's receipt of a trade confirmation. [32]

#### 2.    Settlement Date

28.    This refers to the date the transfer of securities occurs between the buyer and seller.  On this date, the buyer makes a payment to the seller to settle the share transaction and the seller delivers the shares to the buyer.  Until October of 2014, the standard settlement cycles for Danish equity transactions occurred on the third business day after the Trade Date ("T + 3"). [33]  After October 2014, the standard settlement cycles for Danish equity transactions occurred on the second business day after the Trade Date ("T + 2"). [34]

---

[31] The Bloomberg Terminal and associated Financial Data Platform ("Bloomberg") is a third-party data vendor offering a trading platform that is widely used in the finance industry to review historical financial data.

[32] The Trade Date is "the day on which a security or a commodity future trade actually takes place.  Trades generally settle (are paid for) 1-5 business days after a trade date.  With stocks, settlement is generally 3 business days after the trade.  The settlement date usually follows the trade date by five business days but varies depending on the transaction and method of delivery used."  See, https://www.nasdaq.com/glossary/t/trade-date, accessed December 12, 2021.

[33] The Settlement Date is "the date on which payment is made to settle a trade.  For stocks traded on U.S. exchanges, settlement is currently three business days after the trade."  The primary listings of the shares in question are on the Copenhagen Stock Exchange, which has been owned since 2005, by Nasdaq, a U.S.-based exchange.  See, https://www.nasdaq.com/glossary/s/settlement-date and http://www.nasdaqomxnordic.com/about_us, accessed December 12, 2021.

[34] In July 2014, the European Commission adopted Regulation (EU) No 909/2014.  One of the regulation's provisions was shortening the trade settlement cycle from three to two business days.  According to the regulator, the purpose of the change was to reduce uncertainty and risk for securities settlement systems participants.  See, https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32014R0909#d1e1394-1-1, ¶ 13, accessed December 22, 2021.  Denmark adopted the new settlement cycle on October 6, 2014.  See,

### 3. Record Date

29.    This refers to the date by which a shareholder is required to own shares (meaning that the shareholder is the registered owner of the shares in the shareholder register) to be entitled to receive a dividend. [35]    A company's board of directors typically declares a dividend, which is then ratified at a general meeting of shareholders.  The board of directors also determines a Record Date for the dividend. Any holder of shares who is registered as the owner of the securities at close of business on the Record Date is paid the dividend. [36]

### 4. Ex-Dividend Date (or Ex-Date)

30.    This refers to the first trading date on which the buyer of a share is not entitled to the receive the most recently announced dividend because any purchase transactions entered into after this date will not settle prior to the Record Date. [37]    Until October 2014, the Ex-Dividend Date for Danish securities was typically two business days before the Record Date ("Record Date - 2").   After October 2014, pursuant to changes in the European Commission's Regulation EU No 909/2014 which shortened the settlement

---

https://www.globenewswire.com/news-release/2013/11/21/591590/0/en/NASDAQ-OMX-Nordic-will-implement-T-2-settlement-on-6-October-2014.html, accessed December 22, 2021.

[35] See, https://www.investor.gov/introduction-investing/investing-basics/glossary/ex-dividend-dates-when-are-you-entitled-stock-and, accessed December 1, 2021.

[36] In practice, it is typical that the client's custodian or sub-custodian is listed as the actual registered holder of shares on the register.  For example, if BNP Paribas is a client's custodian, then the share register will likely include an entry of shares registered to BNP Paribas' client account.  In a share transaction, if the shares have not been delivered to the buyer's custodian by close of business on the Record Date, the dividend is paid to the seller and not the buyer.

[37] "Once the company sets the record date, the ex-dividend date is set based on stock exchange rules … If you purchase a stock on its ex-dividend date or after, you will not receive the next dividend payment.  Instead, the seller gets the dividend.  If you purchase before the ex-dividend date, you get the dividend."  See, https://www.investor.gov/introduction-investing/investing-basics/glossary/ex-dividend-dates, accessed December 1, 2021.

cycle, the Ex-Dividend Date for Danish securities is usually set one business day before the Record Date ("Record Date - 1").[38]

### 5.    Market Claim

31.    A market claim is the process by which amounts related to the proceeds of a distribution of a security may be contractually passed on to the contractually entitled party in the case that such party did not receive that distribution directly ("Market Claim").[39]  In the transactions considered in this report, Market Claims arose where the buyer of securities was not the registered holder of shares on or before the Record Date.  There is no obligation for securities transactions to give the buyer a right to a Market Claim, and its determination is subject to the terms of the contract between the parties.

### 6.    Payment Date

32.    This refers to the date on which the company pays the dividend to the holders of record.[40]  The payment date normally occurs a few days after the Record Date, although in certain instances it can occur up to a few weeks later, as determined by the company's board of directors.  The Payment Date for the dividends relevant to this report was typically one to three days after the Record Date.  The length of time between the Payment Date and Record Date allows the company, custodians, and any other payment

---

[38] See, https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32014R0909#d1e1394-1-1, ¶ 13. To illustrate, under the typical settlement before October 2014, a trade on Record Date – 2 would settle three business days later, on Record Date + 1 (= Record Date – 2 + 3), a day later than the last date on which a registered owner of shares is entitled to receive a dividend.  After October 2014, a trade on Record Date – 1 would settle two business days later, on Record Date + 1 (= Record Date – 1 + 2), a day later than the last date on which a registered owner of shares is entitled to receive a dividend.

[39] According to the European Market Standards, a market claim is defined as "the process to reallocate the proceeds of a distribution by the contractually entitled party."  See, https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg130316_T2SMarketClaimStandards.en.pdf, p. 3, accessed December 9, 2021.  The term "distribution" includes dividends paid on listed shares.

[40] The Payment Date is "the date on which shareholders of record will be sent a check for the declared dividend."  See, https://www.nasdaq.com/glossary/p/payment-date, accessed December 12, 2021.

agents involved in the payment process to confirm the payees and make appropriate arrangements for dividend payment. [41]

### B.    A Basic Definition of Equity Finance Transactions

33.    Equity finance is a broad term describing a wide range of trading activities in equity markets. Most large financial institutions have equity finance desks which manage the funding requirements of their clients' and the firms' own positions.  It is my understanding that the ED&F Man transactions in question were undertaken by the Equity Finance Desk of ED&F Man. [42]

34.    At the heart of equity finance transactions is the provision of equities by one party ("Cash Borrower" or "Securities Lender") as collateral in return for delivery of another asset in return, most commonly cash, by another party ("Cash Lender" or "Securities Borrower").  The simplest form of an equity finance transaction involves a bank lending money to a client in the form of a secured or margin loan in exchange for the client pledging its equities as collateral for the loan.  The economic result of this basic transaction can also be achieved through other more complex transactions such as: (i) a secured loan with a pledge, (ii) a secured loan with title transfer of equities, (iii) a stock loan, (iv) a repurchase agreement ("repo"), (v) a sale of stock vs a futures contract, (vi) a sale of stock vs a forward contract, or (vii) a sale of stock vs an equity swap.

35.    While the nature of such transactions may vary in complexity, technical detail, and basic form, they are all similar in certain fundamental respects:

   i.    The initial owner of the equities (the Securities Lender) may generate cash or other assets from the equities for the duration of the transaction; and,

---

[41] A payment agent is a third-party company appointed by a listed corporation to manage the record keeping and payment of dividends and any other similar corporate actions.

[42] See, for example, ED&F Man's response to written questions from the FCA, confirming the transactions in question were undertaken by ED&F Man's Equity Finance Desk, ED&F-00443887.

ii.    The Securities Lender retains economic exposure to changes in the price of the equities during the life of the transaction.

36.    The choice of transaction to undertake is based on a range of factors, including:

i.    **Legal or regulatory restrictions -** Pension funds, for example, may be permitted to undertake stock lending but prohibited from engaging in other types of transactions.

ii.    **Pricing dynamics -** Market participants constantly monitor pricing disparities in different markets and try to generate financing spread (i.e., premium) by borrowing in a transaction with a lower borrowing cost compared to the lending transaction.

iii.    **Tax considerations -** Tax treatment of financing transactions varies by transaction type and jurisdiction. For example, countries may have specific tax rules which only govern stock loan transactions but do not apply to other types of financing transactions.

iv.    **Regulatory capital and accounting –** Recognition rules depend on the type of financing transaction. For example, if the Securities Lender engages in a sale of stock versus a futures contract transaction, accounting rules may result in the equities being treated as disposed of for accounting purposes.  Disposed securities do not appear on the Securities Lender's balance sheet.  In contrast, in repo or stock loan transactions, the equities typically remain on the Securities Lender's balance sheet. [43]

37.    In the following section, I describe the basic features of stock loans, forwards, and futures because they are the three types of equity financing transactions that were used in the transactions that are relevant to this matter. As I explain in later sections of this report, it is my opinion that the parties in this matter used these transactions in ways that market participants would neither consider normal nor

---

[43] Accounting rules on the treatment of equities on the Securities Lender's balance sheet for various financing transactions during the Relevant Period are explained in the application guidance for financial instruments, IAS 39 Financial Instruments: Recognition and Measurement.  See, https://www.frc.org.uk/getattachment/915560dd-82f1-4cee-add5-07591d976666/2017-01-IAS-39-AG-Blue-book_CR.pdf, accessed December 15, 2021.

arm's-length.  The circularity of these transactions led to the parties ignoring many of the commercial considerations that are typical in such transactions.

### 1.    Definition of a Stock Loan Transaction

38.    The International Securities Lending Association ("ISLA") is an industry association which represents the interests of "securities lending and financing market participants across Europe, Middle East and Africa." [44]  One of ISLA's initiatives is the publication of the Global Master Securities Lending Agreement ("GMSLA"), a widely used industry-standard securities lending agreement, that is used by the vast majority of market participants to undertake stock lending transactions. [45]

39.    A stock loan (or securities loan) is a financing transaction in which one party (Securities Lender) transfers legal title of a security or basket of securities to another party (Securities Borrower) for a limited period of time, in exchange for collateral that can either be in the form of cash or other securities. [46]  Most securities lending transactions are structured to give the Securities Borrower legal title to the securities for the life of the transaction, even though, economically, the terms of such transactions more closely resemble a loan.

40.    The Securities Lender is typically compensated by way of a fee, "borrow-fee", which is generally agreed upon before the transaction, along with any interest due related to the loan.  In Europe, both amounts are charged pursuant to provisions in the GMSLA.  Generally, the Securities Lender is

---

[44] See, https://www.islaemea.org/, accessed December 19, 2021.

[45] See, https://www.islaemea.org/gmsla-title-transfer/, accessed December 19, 2021.

[46] International Securities Lending Association, "*Global Master Securities Lending Agreement*", available at https://www.islaemea.org/wp-content/uploads/2019/03/GMSLA_2010_amendments_July_2012-1.pdf, accessed December 23, 2021, pp. 3 and 5.

entitled to receive payments calculated by reference to any dividends or coupons paid by the issuers of the transferred securities during the life of the transaction.[47]

41.    Transfer of legal title allows the Securities Borrower to use the loaned securities in other transactions, such as another stock loan or the settlement of an outright trade.  As a result, stock loans are often linked to short-sale transactions, which involve the sale of loaned securities by the Securities Borrower immediately after borrowing them.  The Securities Borrower hopes to earn a profit by selling the securities and buying them back at a lower price.

42.    At the end of the transaction, the Securities Borrower returns the loaned securities to the Securities Lender, while the Securities Lender returns the collateral to the Securities Borrower.  In a stock loan transaction, the Securities Lender retains market exposure to the loaned securities at all times, because the Securities Borrower's obligation is only to return the loaned securities, regardless of any changes to their value during the life of the transaction.

43.    Securities lending involves exposure to various risks, including gap risk, which is the risk of a significant change in the price of securities (an increase or decrease) that would leave one party to the stock loan with unsecured credit exposure to the other in the event of a default. Under the GMSLA, theoretically, the exposed party can request a margin adjustment any time there are changes in the value of either the loaned securities or the collateral, but in practice, most market participants operate a daily review and margin adjustment process.  In spite of the risk of gap exposure, most market participants measure their gap risk over a longer period of time (usually three to five days) because a counterparty's failure to immediately take steps to remedy a price change can be caused by various other unrelated reasons, such as operational errors and processing delays and is typically not treated as an immediate

---

[47] Ibid, p. 10.

default.  Generally, a default process starts only after a prolonged or unexplained failure to post additional margin.

44.    The expected amount of gap risk in securities lending is typically calculated by reference to value-at-risk ("VAR"), which is a measure of the "amount of potential loss that could happen in an investment portfolio over a given period of time." [48]  VAR calculations are performed using historical data on security price volatility.  To illustrate, if a stock loan's 5-day 99% VAR is $10 million, this means that, based on historic share price changes, there is a 1% chance of losses exceeding $10 million over a 5-day period. It is unusual for securities lending transactions to explicitly reference VAR calculations, but they are usually used by credit or risk departments to calibrate the appropriate margin levels and haircuts that are included in the GMSLA.  Collateral, margins, and haircuts are described hereafter.

### 2.    Market Standard Collateral Amounts in International Stock Loan Transactions, Margins, and Haircuts

45.    Reflecting the existence of gap risk, the amount of collateral posted in international stock lending transactions depends on the underlying securities.  Liquidity and volatility are the two main driving factors that market participants consider when determining the amount of collateral to post in a transaction.  Generally, the party requesting the loan provides collateral to the party providing the loan. The parties agree on the amount of collateral to be given to the Securities Lender as well as the required daily overcollateralization loan amount the Securities Borrower needs to maintain.  For example, if a bank wants to borrow stocks from a large pension fund and the parties agree to 105% overcollateralization, the bank is required to post and maintain collateral with a value of 105% of the loaned securities' market value.  The amount in excess of 100% of the loaned securities' market value, 5% in this example, is referred to as "margin".  Similarly, if a party wants to finance a stock position, the amount available to borrow is usually lower than the loaned securities' market value.  The amount below

---

[48] See, https://corporatefinanceinstitute.com/resources/knowledge/trading-investing/value-at-risk-var/, accessed December 23, 2021.

100% of the loaned securities' market value is referred to as a "haircut". In general, compared to a single stock loan, a diversified portfolio has lower volatility, which in turn leads to lower haircut requirements for a diversified portfolio.

46.     Margins and haircuts in securities lending transactions typically range from about 2% for high quality government bonds to between 5% and 20% for liquid listed securities and depend on the markets in which those securities are traded. For example, U.S. securities have lower margin requirements compared to emerging markets' securities. Security concentration also affects margin and haircut amounts. Thus, a single share requires a higher margin than a basket of 50 shares. Finally, liquidity also affects margins and haircuts, with illiquid shares attracting higher margins than liquid ones. In the wake of the 2008 financial crisis, margin and haircut amounts have increasingly been recalibrated upward, through a combination of regulatory action and market participants' changing risk appetite. [49] Various new regulatory requirements "limit the amount of financing that can be provided against a given security and minimum standards on cash collateral reinvestment." [50]

### 3.     Valuation of Securities in Stock Loans

47.     The securities in a stock loan are typically marked-to-market daily. Under the standard GMSLA, transactions are usually subject to two-way margin terms, meaning the agreement anticipates margin transfers between parties in both directions when net exposures exceed a specified threshold. [51] Daily

---

[49] See, Financial Stability Board, "*Strengthening Oversight and Regulation of Shadow Banking: Regulatory Framework for Haircuts on Non-Centrally Cleared Securities Financing Transactions*", available at https://www.fsb.org/wp-content/uploads/r_141013a.pdf?page_moved=1, accessed December 19, 2021, p. 8.

[50] See, Financial Stability Board, "*Strengthening Oversight and Regulation of Shadow Banking: Policy Framework for Addressing Shadow Banking Risks in Securities Lending and Repos*", available at https://www.fsb.org/wp-content/uploads/r_130829b.pdf, accessed December 19, 2021, p. 2.

[51] International Securities Lending Association, "*Global Master Securities Lending Agreement*", available at https://www.islaemea.org/wp-content/uploads/2019/03/GMSLA_2010_amendments_July_2012-1.pdf, accessed December 23, 2021, pp. 12 - 13.

margin transfers are "calculated on the basis of the current mark to market exposure of the [trades]. [52]  In simple terms, the market values of both the securities lent and the collateral provided are determined each day and a transfer amount is calculated.  The transfer amount is the amount of collateral to be added or returned to ensure that the ratio of the market value of the securities to the market value of the collateral matches the haircut that was originally agreed to.

48.     In my experience, traders do not typically talk about the value of the shares and instead focus on terms related to the number of shares, interest rates and spreads, and dividend component percentages. Matters about collateral (such as haircut, eligible collateral, and collateral concentration limits) and adjustments for corporate actions are normally negotiated at the time of execution of the overall GMSLA but not as part of an actual trade. [53]

49.     In a securities lending transaction, the securities are priced subject to terms in the GMSLA. [54]  In my experience, pricing of the securities involved in the stock lending transaction occurs at the time of the trade and is continually monitored thereafter on a daily basis.  Pricing is determined using an agreed pricing source, typically third-party data vendors such as Bloomberg and Refinitiv Eikon, [55] or a panel of dealers named in the GMSLA.  Under the GMSLA's standard lending agreement, the requirement to deliver cash or other collateral is a function of the market value of the shares at the time of transfer.  Any

---

[52] See, Committee on the Global Financial System, "*CGFS Papers No 36: The Role of Margin Requirements and Haircuts in Procyclicality*" available at https://www.bis.org/publ/cgfs36.pdf, accessed December 19, 2021, p. 6.

[53] For example, if a merger, rights issue, redemption, or similar corporate event occurs during the life of the securities loan, then the parties need to agree on whether and how to make an adjustment.

[54] International Securities Lending Association, "*Global Master Securities Lending Agreement*", available at https://www.islaemea.org/wp-content/uploads/2019/03/GMSLA_2010_amendments_July_2012-1.pdf, accessed December 23, 2021.

[55] Refinitiv Eikon, previously known as Reuters, is a third-party data vendor offering a trading platform that is widely used in the finance industry to review historical financial data.

deviation from a current and arm's-length market value would inevitably expose one of the counterparties to credit risk.

### 4.    Settlement Risk in Stock Loans

50.    The Securities Lender generally has settlement exposure to the Securities Borrower. Specifically, this is the risk that the Securities Borrower fails to transfer the cash collateral in return for the securities at the start of the transaction or fails to return the shares when the Securities Lender returns the cash collateral at the end of the transaction. The Securities Borrower has the equivalent but opposite settlement exposure to the Securities Lender.

51.    This settlement exposure is typically mitigated by delivery versus payment ("DVP") settlement, a process which guarantees the transfer of securities if and only if payment is received.[56] DVP settlement is generally managed by the custodian responsible for safe custody of the securities and allows the Securities Borrower to keep the shares if the Securities Lender does not repay borrowed cash, and vice versa.  DVP settlement is also used in a range of other scenarios where two counterparties have agreed to transfer securities in return for cash and most buys and sells are also settled via DVP processes.

52.    Typically, the parties would agree on a settlement custodian to manage the DVP settlement and then the cash provider would place the cash into its account with that custodian.  Likewise, the securities provider would place its securities into its account with that custodian.  The custodian checks that both parties have agreed the terms to the trade and that these terms match it (generally these are booked as expected or confirmed trades in the custodian's system) and then once it can see a matched trade and the presence of cash and securities it will give effect to an instantaneous transfer.  Any failure, which should

---

[56] The Bank for International Settlements defines DVP as a framework where "the securities settlement system adheres to the principle of delivery versus payment (DVP), that is, if it creates a mechanism that ensures that delivery occurs if and only if payment occurs."  See, The Committee on Payment and Settlement Systems of the Central Banks of the Group of Ten Countries, *Delivery versus payment in securities settlement systems*, available at https://www.bis.org/cpmi/publ/d06.pdf, accessed December 15, 2021, p. 15.

not be possible in theory, would generally be indemnified by the custodian and the parties know that the custodian will only remove their cash or securities when they have already received the corresponding amounts from the other party.

### 5.    Stock Loans and Dividend Withholding Taxes

53.    Stock loans provide a means of transferring shares between parties in the market and such stock loans will often extend over the Record Date of one of more of the loaned securities.

54.    The parties to the stock loans will often have a different tax outcome on the receipt of the same dividend.  This could be for many reasons including different country of residence, legal form or a special status.  For example, pension funds are often granted tax exemptions under relevant laws or double taxation agreements.

55.    Many countries, like Denmark, levy dividend withholding taxes and so market participants need to understand the impact of such taxes on the Securities Borrower and Securities Lender and take them into account when arranging and executing stock loans. [57]

56.    An investor's liability for dividend withholding tax depends on relevant tax rules, and, in particular, on whether a double taxation agreement exists between the investor's country and the country in which the investor's income arises, which is typically the country of residence of the share issuer. Some special categories of investor, like pension funds, may have rights to special treatment under double taxation treaties.  Depending on the tax treaty, a foreign investor may be able to file a reclaim to obtain a refund of the difference between the dividend withholding tax borne and the exemption or reduced rate

---

[57] A dividend withholding tax is "tax on income imposed at source, i.e., a third party is charged with the task of deducting the tax from certain kinds of payments and remitting that amount to the government. Withholding taxes are found in practically all tax systems and are widely used in respect of dividends, interest, royalties, and similar tax payments. The rates of withholding tax are frequently reduced by tax treaties."  See, https://www.oecd.org/ctp/glossaryoftaxterms.htm, accessed December 22, 2021.

provided for in the relevant double taxation agreement. In other instances, investors may be able to file forms which indicate their tax status and request a reduced withholding tax rate be applied on the original dividend (this is known as 'relief at source'). [58]

### 6.    Basic Definition of Forwards and Futures

57.    A forward contract or 'forward' is a "contract agreement to buy or sell an asset at a specific price on a specified date in the future" [59]. Examples of assets that a party can agree to buy or sell include stocks, commodities, interest rates, and currencies.  Forwards typically do not trade on centralized exchanges and are viewed as over the counter ("OTC") arrangements.  Since the forward contract refers to the underlying asset that will be delivered on the specified date, it is considered a type of derivative." [60]  The price that the parties agree to in the contract is referred to as a "forward price".  The forward price is primarily derived from the current market price of the underlying asset (or spot price), a hypothetical interest return, and an amount representing any expected dividends during the term of the forward.  The theoretical contract price can simply be expressed and thought of as follows: [61]

*Forward Price = Current Market Price plus Interest minus Expected Dividends*

58.    One way for the person writing the forward contract to hedge themselves is to borrow money to buy the shares and hold them until the completion of the forward contract before delivering them to complete the contract.  The person would then have interest-like funding cost on the value of the shares

---

[58] For example, form W8-BEN is the standard form used by foreign investors to request relief at source in the U.S.

[59] See, https://corporatefinanceinstitute.com/resources/knowledge/trading-investing/derivatives/, accessed December 23, 2021.

[60] See, https://corporatefinanceinstitute.com/resources/knowledge/finance/forward-contract/, accessed December 20, 2021.  A derivative is a financial contract "whose value is linked to the value of an underlying asset".  Derivatives are used for various purposes including hedging and obtaining market access.  See, https://corporatefinanceinstitute.com/resources/knowledge/trading-investing/derivatives/, accessed December 20, 2021.

[61] This ignores dividend withholding tax as well as normal commissions, bid-offer spreads etc.

purchased but would receive any dividends paid during the life of the forward. The equation above is an expression of these economics.

59.    A forward contract also specifies other terms including the underlying asset, the amount of the underlying asset to be exchanged, the contract's expiration date, and contract settlement terms. Generally, a forward contract is settled by physical delivery of the underlying asset. A forward can be used as a hedge against market uncertainty because the contract establishes a fixed price to buy or sell the underlying asset in the future.

60.    Like a forward, a futures contract or 'future' is "an agreement to buy or sell a specific quantity of a commodity or financial instrument at a specified price on a particular date in the future." [62] A futures contract specifies the quantity, delivery date, and delivery location of the underlying asset. Contracts are usually settled with cash or closed out, as explained below, and rarely involve physical delivery of the underlying asset. The principal difference between futures and forwards is that unlike forwards, futures are standardized and trade on centralized exchanges. Exchange-trading provides anonymity of market participants' identities and credit disintermediation (both parties in the transaction are exposed to credit risk with the clearing counterparty and not with each other) and makes it possible for a party to close out a position by taking the opposite side of a contract since the buyer of a contract can sell the same contract and vice versa. [63]

61.    Forwards can be used in equity finance transactions because they hedge price risk without immediately transferring legal ownership of securities. In practice, however, they are much less common than futures because they are not exchange-traded; they are bilateral contracts between two counterparties under a bespoke agreement. The existence of a bilateral contract obligating the seller to deliver the shares

---

[62] See, https://www.investor.gov/introduction-investing/investing-basics/glossary/futures-contract, accessed December 20, 2021.

[63] Since an exchange acts as a central counterparty to all futures, an open futures position can be closed by entering into the opposite position with any market participant and not just the one with whom the open position was executed.

to a specific counterparty on a specific date makes forwards less preferable to most market participants because they bear various risks including credit, settlement, and tax recharacterization risks. [64]

62.    Futures are more commonly used in equity finance transactions because they are independent contracts which can be closed separately from transactions involving the underlying shares. As a result, a party in a transaction can purchase a specified quantity of shares (maintain a 'long' position in the shares) and sell the same quantity of shares in the futures market (maintain a 'short' position in the shares via futures). The party maintaining a long-stock short-future position is not obliged to sell shares to any specific buyer. As a result, the party legally owns the shares (via the long position in the shares) and fully hedges the market price risk of the trade. Note that, unlike a forward, a future can easily be closed out by entering into an offsetting future transaction, such that the owner of the shares is under no current obligation to dispose of the shares to any specific person. The other key attraction of futures is that the credit risk exposure under a future is against the clearing counterparty (generally a highly regulated and creditworthy institution) and not the person who has taken the other side of the futures contract.

### C.    Dividends and Withholding Tax in Equity Finance Markets

#### 1.    The Pricing and Economics of Equity Finance Transactions

63.    The following are the typical economic components in pricing an equity finance transaction:

i.    **Price Returns –** This refers to the difference in price of the underlying equities at the end of the transaction compared to the start. In equity financing transactions, the Cash Borrower/Securities Lender is exposed to price returns. To illustrate, in the basic secured loan transaction example, the Cash Borrower does not transfer the equities to the Cash Lender at any point during the transaction. Under agreed transaction terms, the Cash Borrower is

---

[64] Tax recharacterization risk is the risk that starting from the date parties enter into a forward contract, a tax authority might deem the counterparty to be the owner of shares involved in the contract. From the tax authority's perspective, the counterparty would be the tax owner of the real dividend, and not the original party.

instead required to repay the fixed cash loan principal irrespective of the price of the equities at loan maturity.  Therefore, the Cash Borrower remains fully exposed to price returns. Similarly, in a sale of stock versus a futures contract transaction, the Cash Borrower disposes of the equities at the start of the transaction, eliminating the Cash Borrower's exposure to price movements in the equities.  The futures contract requires the Cash Borrower to buy the equities at a fixed price on the future's expiration date irrespective of the market price, thus restoring the Cash Borrower's exposure to price returns. [65]

ii.    **Financing Costs -** The Cash Lender expects to earn interest on the loan made to the Cash Borrower.  In a simple margin loan, the amount of interest charged is determined in the same way as a normal interest-bearing loan.  In a stock loan or repo, the interest the Cash Lender earns is generally calculated in an identical way to the simple margin loan, but then embedded into the transaction.  In a stock loan, the interest is included in a fee paid by the Cash Borrower to the Cash Lender.  In a repo transaction, the price at which the equities are repurchased is calculated as the original sale price plus interest for the duration of the contract.

iii.    **Dividends -** Generally, equity finance transactions are structured to ensure that the economic benefit of any real dividends paid over the course of the transaction are passed to the Securities Lender.  In the case of a simple loan secured with a pledge, the Securities Lender retains legal and economic ownership of the securities, and therefore directly receives the real dividend.  For other transactions, a different party may receive the real dividend, so the Securities Lender needs to be compensated for the missed real dividend.  This is usually by

---

[65] See, for example, Eurex Contract Specifications for Futures Contracts, Subpart 1.6: Contract Specifications for Futures Contracts on Shares, available at https://www.eurex.com/resource/blob/1512866/b86228baaf963f5c1b722d59f3ddd9e0/data/2019_04_08_cs_1_his tory.pdf, accessed December 30, 2021.

way of a contractual payment known as a dividend compensation payment. Alternatively, the real dividend can be included in the overall pricing of the contract, as in the case of a futures contract where compensation payments are absent, but the contract's price reflects the market's expectation of real dividends to be paid during the life of the contract.

iv.     **Other Corporate Actions –** The occurrence of certain corporate events such as mergers, rights issues, and bonus issues can also affect the pricing of equity financing transactions. Such events are outside the scope of the claims in this matter, and accordingly I do not consider them.

## 2.      The Importance of Dividends in Equity Finance Transactions

64.     Share prices can be viewed as representations of the value of future cash flows earned from holding the shares. These future cash flows are primarily in the form of dividends. Therefore, a crucial component of pricing for any equity finance transaction is understanding the transaction's impact on the right to dividends.

65.     While the dividend rate paid by most companies is relatively low, [66] any dividend compensation payments are typically an order of magnitude larger than the interest on the loan because securities financing transactions are generally short-term, resulting in low interest amounts.

## 3.      Differential Tax Treatment of Various Participants in the Market and Its Impact on Pricing

66.     Tax, a fundamental component of all equity transactions, engenders both opportunities and pitfalls for the unwary, and as such requires active consideration and management.

---

[66] In my experience, average dividend yields are around 2%, but they can vary significantly across issuers.

67.     By way of example, in the U.S., dividend tax withholding rates can range from 0% to 30% depending on an individual's tax residency status:

i.      0% - Many U.S. investors are exempt from a dividend withholding tax.

ii.     15% - Most foreign investors from countries with double tax treaties with the U.S. may reduce their withholding tax rates to 15%.

iii.    30% - The default rate generally applies to foreign investors from countries without tax treaties with the U.S. (Cayman Islands, for example) or investors who have not fulfilled certain obligations, including, for example required paperwork, or in more recent years, holding period and hedging requirements.

68.     Understanding these widely varying tax treatments is crucial to properly pricing equity finance transactions.  Like all other financial markets, the agreed compensation in these financing transactions was driven by market supply and demand consideration and typically corresponded with levels at which no type of investor (U.S. or foreign) paid an actual tax.  The most important factors in the pricing of these transactions were:

i.      **Market liquidity** – For example, during the Relevant Period, financial markets in Germany and the U.S. were highly liquid.  In contrast, Denmark was an illiquid market.

ii.     **Perceived tax risk** – Typically, the original Securities Lenders are indifferent to the transaction's tax treatment and do not take any tax risk in the transaction.  If a Securities Lender negotiates a dividend compensation payment of 91%, most standard agreements provide for the payment of this amount regardless of the ultimate net dividend received by the Securities Borrower.  The result of such terms is that the Securities Borrower, the real dividend recipient, becomes exposed to tax risk.  A Securities Borrower who expects to earn a gross real dividend (100%) but ends up paying a withholding tax incurs a loss from the requirement to pay the agreed on 91% dividend compensation.

If the hypothetical scenario described above occurred in Denmark, a Securities Borrower would be required to pay 91% dividend compensation even if a tax credit reclaim was

ultimately not obtained.  The withholding of the 27% Danish dividend withholding tax would result in a net dividend of 73%, which translates to an incurred loss of 18% of the gross dividend (i.e., 91% -73% = 18%). [67]

The market's view of the certainty of a financing transaction's tax treatment significantly impacted the level of dividend compensation payments.

iii.    **Other market and credit risks** – The Cash Lender typically takes on some credit risk.  In addition, certain financing transactions also expose the Cash Lender to market risk in the event a transaction fails due to a default.  Cash Lenders require compensation for these risks, which in turn impacts overall pricing levels.

### D.    Dividend Compensation Payments Are Not Real Dividends

69.    It is well understood in equity finance markets that a real dividend is different from a dividend compensation payment.

70.    A real dividend involves the direct payment of a dividend from a share issuer, and results from being a shareholder of record on the dividend Record Date.  A real dividend may pass through one or more custodians or sub-custodians, but it derives directly from the rights which the recipient owns in the underlying shares on which the real dividend is paid.

71.    A dividend compensation payment (or manufactured dividend), on the other hand, is a contractual payment which arises under a contract for the sale or transfer of securities.  It is representative of the amount of a dividend on the underlying shares but is not, in fact, a real dividend.  Dividend compensation payments can arise under various transactions, including stock loans, repos, or the sales of securities.  Subject to the caveat that I include a discussion about whether the Solo trades actually occurred, the

---

[67] 18% loss = 91% dividend compensation – 73% net dividend; 73% net dividend = 100% gross dividend – 27% Danish dividend withholding tax. Traders typically refer to these percentages using terms such as "all-in-level of 91" or "18 dividend points trade loss if the withholding tax reclaim is not received".

Market Claims which arose in all the ED&F Man and Solo Appendix C Cum-Ex Trades involved purported dividend compensation payments.

72.     Since real dividends are payments derived from rights granted by owning shares in a company, the starting point of most laws is to assume that real dividends can only be received directly from a company.  Dividend compensation payments are a contractual right that can be received in several formats and under various types of contracts.

73.     Certain jurisdictions have detailed rules on the treatment of dividend compensation payments. These jurisdictions require payers of such payments to withhold dividend tax and also include provisions for the recipients to obtain tax credits.  The U.K. Manufactured Overseas Dividend rules were one of the most advanced and complicated examples.  During the Relevant Period during which the Appendix C Cum-Ex Trades occurred, it was well understood by market participants that there was a significant difference between receiving a real dividend and receiving a dividend compensation payment.  For example, U.K. guidance on manufactured dividend rules contain the following explanation: [68]

> *Manufactured payments also occur where a dealer sells securities 'cum div' (with dividend) but delivers securities that are 'ex div' (without dividend). The sum that the dealer pays to the buyer to compensate it for not receiving the real dividend is a manufactured payment. The sales that give rise to such payments are often 'short' sales… as the dealer does not own the securities at the time of selling them, it is required to acquire them between the date of the bargain and the delivery date and may only be able to acquire 'ex div' stock.*

74.     The two most common pitfalls an entity in a financing transaction can encounter are:

    i.    The risk that a compensating party agrees to pass on a dividend compensation payment of 85% or 91% of the real dividend to a client but then discovers that it is subject to a 27%

---

[68] See, Her Majesty's Revenue and Customs Corporate Finance Manual, published April 16, 2016, updated November 23, 2021, available at https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74430, accessed December 11, 2021.

withholding tax on the real dividend, which would result in the compensating party only receiving a net dividend of 73% and incurring a trading loss on the transaction: or,

ii.    The risk that a market participant borrows shares from an investor who is entitled to receive 100% of a real dividend and pays the investor a dividend compensation payment of 85% per the transaction terms.  The market participant would be concerned about receiving indemnity claims from the lending party for the missing 15% which represents an amount the borrowing counterparty has already paid the relevant tax authority and cannot recover.

75.    Therefore, by default, many banks and custodians only contractually accept responsibility for passing on the net receipts that they actually receive as a dividend compensation payment.  These entities make no warranties or indemnities in respect of the tax treatment or tax credits linked to such payments.  Only the largest hedge funds or financial counterparties can get their lenders to agree to more generous terms.  Even then, careful procedures must be implemented to monitor the inventory position of the banks' clients.

76.    Generally, market participants are wary of receiving dividend compensation payments instead of real dividends.  In my experience, market participants were highly skeptical of situations that appeared to suggest that a dividend compensation payment was the same as a real dividend.

### E.    A Description of Cum-Ex Transactions

#### 1.    Cum-Dividend vs Ex-Dividend Transactions

77.    In the days leading up to the Ex-Date, shares are said to trade cum-dividend (derived from the Latin word, cum, for "with").  Once the market is reasonably satisfied that a company will pay a real dividend, the price of the company's shares typically reflects this expectation.  For instance, the price of a share worth DKK 100 with a real dividend expectation of DKK 5 per share is expected to be DKK 105 immediately before the Ex-Dividend Date.

78.    On the Ex-Date, there is no longer any expectation that a buyer will receive the announced real dividend, so, all else being equal, the share price would be expected to drop to DKK 100.  The shares are then said to be trading "ex-dividend".

### 2. Cum-Ex Transactions

79.     A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex-Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date.  This means the transaction is a Cum-Dividend sale with Ex-Dividend settlement, hence the name Cum-Ex.

80.     In a Cum-Ex transaction, the transaction date and agreed price terms typically would suggest that the buyer of the securities will receive the real dividend.  However, the settlement cycle is extended so the buyer of the securities does not receive the shares until after the Record Date.  The buyer of the securities is not the registered holder on the Record Date and does not receive a real dividend from the company which issued the shares.

81.     The terms and design of the transaction require the seller of the securities to compensate the buyer for the missed real dividend through a dividend compensation payment. Using the previous example, if party A agreed to purchase shares from party B for DKK 105 on a Cum-Ex basis, by the time party A received them they would be worth DKK 100.  As a result, Party A would expect a manufactured payment of DKK 5 from Party B. [69]

### 3. Origins of "Cum-Ex" Transactions Which Resulted from Settlement Fails

82.     Across equity and other financial markets numerous settlements fail daily.  Settlement failure can occur because banks or custodians make errors which need to be corrected or because counterparties default.  Reasons for defaults range from complete credit failure to simply missing the cut-off time for the relevant market.  In nearly all circumstances, failed trades are simply reattempted the next day and generally settle a maximum of one or two days later.  Sometimes the counterparties involved may agree

---

[69] For simplicity, this example ignores dividend withholding tax consequences.

to compensate each other for a loss in these circumstances, although such compensation is relatively rare due to the small financial impact of a one-day delay in settlement.

83.    In a situation involving a buyer's purchase of shares in a normal cum-dividend purchase that subsequently fails, it is customary for the seller to make a compensation payment to the buyer via a Market Claim.  This compensation amount is typically an amount equal to the net real dividend received by the buyer (calculated after deducting any dividend withholding tax).  It is my understanding that the earliest examples of Cum-Ex transactions arose as a result of accidents due to settlement failures.

84.    It would be highly unusual for the seller to make any representations or warranties to the buyer to protect or indemnify them from potential consequences of receiving a dividend compensation payment instead of the real dividend in such circumstances and large market participants would invest considerable time and care to avoid settlement fails close to dividend Record Date.

### 4.    Cum-Ex Transactions Do Not Require Dividend Compensation Payments

85.    Another point to highlight about Cum-Ex transactions is that a dividend compensation payment is not required.  This payment arises only because of a consensual choice made by the parties to the cum-ex transaction to 'mis-price' the purchase transaction in the first place.

86.    To illustrate, assume the price of shares on Ex-Dividend basis in Company C is DKK 100. Further, assume Company C has already declared a real dividend of DKK 5 per share to be paid to holders on the Record Date.

87.    The following two transactions are economically equivalent to each other:

i.     Party A agrees to sell 100 shares of Company C to Party B for DKK 105 each (the cum-dividend price) on the business day before the Ex-Dividend Date, with settlement occurring on the first business day after the Record Date, and makes a dividend compensation payment of DKK 5 to Party B.

ii.    Party A agrees to sell 100 shares of Company C to Party B for DKK 100 each (the ex-dividend price) on the business day before the Ex-Dividend Date, with settlement also

occurring on the first business day after the Record Date. In this scenario, no dividend compensation payment will be made.

88.    In both scenarios, Party B acquires 100 shares in Company C for the net price of DKK 100 per share and the shares are delivered on the first business day after the Record Date.

89.    There is no requirement for parties in a financing transaction to include dividend compensation payments. Even when parties agree to include dividend compensation payments in a transaction, there is no objective way of determining what amount that dividend compensation payment would have been. The existence and amounts of dividend compensation payments are determined by the terms of the contract between the parties, which is influenced by market practice, and other pertinent facts and circumstances.

90.    Agreeing to deliberately settle the trades with a settlement period longer than the market standard settlement cycle (i.e., a T+4 basis instead when the market standard was T+3), as was the case with the Appendix C Cum-Ex Trades, indicates that the contracts were bespoke, over-the-counter ("OTC") transactions. There was no economic requirement for the contracts to be priced on a cum-dividend basis when they in fact were ex-dividend purchase contracts, and there was no requirement that the parties agree to make dividend compensation payments in connection with these transactions.

## VII.    OPINIONS AND BASES FOR THE OPINIONS

91.    In this section, I provide my overall opinions and basis for the opinions. Based on my review and analysis of the evidence, I have concluded the following.

### A.    Opinion 1: All the ED&F Man-Related Appendix C Transactions Were Cum-Ex Transactions, Which Means the ED&F Man Pension Plans Did Not Receive Any Real Dividends

92.    The schedule in Appendix C contains a full list of the relevant terms related to the ED&F Man Cum-Ex Trades. These transactions were claimed to have caused a "real" dividend event, which, in turn, gave rise to the tax reclaim submitted by the ED&F Man Pension Plans to SKAT. Included in this

schedule is the supporting documentation that I reviewed in detail, which includes trading emails and trade confirmations that are relevant to the Appendix C Cum-Ex Trades.  By reference to independent sources, I also identified the relevant Announcement, Annual General Meeting of the Directors ("AGM"), Ex-Dividend, Record, and Payment Dates. [70]  As this schedule shows, in each instance, it is evident the parties agreed to the transactions before the Ex-Dividend Date and settled them after the Record Date, making them Cum-Ex transactions.

93.      These Appendix C transactions are, therefore, Cum-Ex purchases and the parties who purchased the securities would not be the holders of record on the Record Date.  Thus, the ED&F Man Pension Plans who purportedly purchased the securities could not have received real dividends.

       **B.**      **Opinion 2: The Only Reason to Participate in The Appendix C Cum-Ex Trades Was to Generate a Fabricated Tax Reclaim That Was Shared by the Parties to the Transactions**

94.      In the following sections, I provide a detailed description of two types of transactions, which are representative of the universe of Appendix C Cum-Ex Trades.  The first trade I describe, the "Cambridge Way - MPT Dubai COLOB 2013" transaction, [71]  is referred to as an "Annex E" transaction.

95.      My discussion of the bases for Opinion 2 applies equally to all ED&F Man Appendix C Cum-Ex trades, except for subsections 2 ("Transactions Conducted by ED&F Man Through the Ostensibly Independent External Third-Party Inter-Dealer Brokers ("IDBs") Were Simply Camouflage. The Common Characteristics of the Annex E and non-Annex E Transactions Are Demonstrable") and 3 ("The IDB Transactions Are Inextricably Linked to Each Other and Their Commonality is

---

[70] The relevant dates for all dividend events related to the Appendix C Cum-Ex trades were verified independently using Bloomberg.

[71]  See, Appendix C, Trade 17.

Demonstrable"), which apply to the non-Annex E transactions only insofar as they involved external IDBs.

96.     I generally describe the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction as a prelude to the first basis for my Opinion 2. [72]  I then provide a more detailed description of this transaction and incorporate it in the basis of my Opinion 2 as part of a description of the general impropriety of what ED&F admits is an improper, and in my opinion is also a fictitious Cum-Ex transaction.  The Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction involved ED&F Man's use of an internal IDB.

97.     The second transaction described in detail is the "AIG - LUTETIA TDC 2014" transaction. [73]  It provides the second basis for my Opinion 2.  The AIG- LUTETIA TDC 2014 transaction involved ED&F Man's use of an external third-party IDB and may be described as a "non-Annex E" transaction.  While the non-Annex E AIG - LUTETIA TDC 2014 transaction is somewhat more complex than the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction, the pertinent features of both transactions are essentially the same.

98.     In his deposition, Mr. Hashemi, who I understand was ED&F Man's corporate witness, attempted to draw a distinction between Annex E trades and non-Annex E trades. He claimed that Annex E trade packs would not include documents, e.g., SWIFT messages, showing the receipt of a dividend issued by the company. [74]  This is a distinction without a difference.  In fact, none of the Cum-Ex trades shown in

---

[72] I am advised by counsel that the selection of bellwether cases for summary judgment purposes has not been agreed by the parties, and that SKAT was not notified of defendants' objection to its proposal that Cambridge Way be a bellwether case until December 26, 2021.  Therefore, I reserve the right to supplement this report to address the agreed upon or Court-ordered bellwether cases.

[73] See, Appendix C, Trade 25.

[74] See, Hashemi Tr. Vol. 2 at 309:7-19: "Q: When you gave me a list of documents that were contained in the non-Annex E trade packs -- do you remember that? A: Yes. Q: Were those or similar documents also contained in the Annex E trade packs? A: So I explained that some of them would be similar. But the one that I referred to or the ones about the dividends being received, issued from the company or in the market recall, wouldn't be in the Annex E packs."

Appendix C could have resulted in a real dividend payment, since in these trades the ED&F Man Pension Plans never held the relevant shares over the Record Date. SWIFT messages or email correspondence showing that a manufactured dividend payment was transferred to ED&F Man are completely irrelevant because they do not change the character of the receipt by the Pension Plans. Whether a given trade featured a manufactured dividend payment or not has no bearing on the pertinent facts of the trade, which have to do entirely with the question of who held the relevant shares over the Record Date. As such, the distinction drawn by Mr. Hashemi between Annex E trades and non-Annex E trades is irrelevant and, as I explain below, the Tax Vouchers issued on the non-Annex E trades were equally invalid and ED&F Man should not have issued them either. In addition, as will be described in more detail later in the report, it also makes no difference whether or not MPT Dubai held the shares because the payment that would be made had MPT Dubai owned the shares would still have simply been a dividend compensation payment and not the real dividend.

99.     Included in Appendix E is a full description of two other transactions which I have reviewed, and which demonstrate the fundamental similarities of the Cum-Ex transactions in Appendix C. These transactions are the Annex E AIG - MPT Dubai TDC 2014 transaction and the Non-Annex E Cambridge Way - Mitsubishi COLOB 2013 transaction.

100.    The bases for Opinion 2 are the following:

### 1.     Apart from the Tax Reclaim, the Transaction Economics for the Participants Were Self-Cancelling

#### Description of the Economics of the Annex E Cambridge Way - MPT Dubai COLOB 2013 Transaction, Which Is Representative of All So-Called Annex E Transactions

101.    The circularity and self-cancelling nature of the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction by Cambridge Way LLC 401k Profit Sharing Plan ("Cambridge Way") over the B

Shares in the company named Coloplast A/S (hereafter 'Coloplast' for the issuer and 'COLOB' for the shares respectively) demonstrates the basic contrivance of the scheme.

102.    The Investment Manager in this transaction was Zeta Financial Partners ("Zeta").    The counterparty to the transaction was an ED&F Man affiliate based in Dubai ("MPT Dubai").

103.    Analyzing this transaction is helpful to explain several features, which are consistent across all the ED&F Man Appendix C Cum-Ex Trades that I have reviewed.  In these transactions, it is possible to observe the steps taken by ED&F Man, Zeta, and Cambridge Way, as well as the hedging steps undertaken by MPT Dubai.  From my review of these transactions, the following features are evident:

i.    Purchasing a security in a Cum-Ex transaction does not require any participant to have any shares in its possession.

ii.    There is no necessary link between a Market Claim and a real dividend.

iii.    The process of generating fully offsetting and circular hedging transactions was critical for the counterparties organizing the transactions to reduce their costs and minimize the difficulties of sourcing large quantities of relatively illiquid Danish shares.

iv.    The Tax Vouchers issued and used for reclaims are fictitious and not in any way linked to real dividends.

104.    On October 31, 2013 Coloplast announced a proposed real dividend of DKK 7 per share. [75]  This announcement was confirmed at Coloplast's AGM on December 5, 2013. [76]  The announced real dividend was to be paid to shareholders who were holders of record on December 10, 2013 (Record Date).  Using a market standard settlement cycle of T+3, the timing of the Record Date meant that the Ex-Dividend

---

[75] Coloplast Annual Report 2012/13, Oct. 31, 2013, available at,
https://www.annualreports.com/HostedData/AnnualReportArchive/c/coloplast_2013.pdf, accessed December 30, 2021, p. 10.

[76] Coloplast Announcement No. 11/2013, Dec. 5, 2013, Coloplast Investor Relations News Archive,
https://investor.coloplast.com/investor-relations/announcements-news/, accessed December 31, 2021.

Date was December 6, 2013, because a trade executed on this date would settle on December 11, 2013, one day after the Record Date.

105.    A timeline with the relevant dates is shown below in Figure 1.  The two weekend dates do not count in the T+N convention since T+3 refers to the third business day after the Trade Date.

**Figure 1**

Illustrative Settlement Timeline



106.    On December 5, 2013 (the "Buy Date"), Zeta, acting for Cambridge Way, approached ED&F Man, with a request for ED&F Man to buy 500,000 COLOB shares [77] and simultaneously short 5,000 BClear Single Stock Futures over the same underlying shares. [78]  Pursuant to transaction terms, the parties

---

[77] ED&F-00045042, at 52.  The occurrence of the Trade Date on the same date as Coloplast's final AGM is unlikely to have been a coincidence.  Had the trade been finalized prior to this date, participants would have had to deal with the risk of the company cancelling the previously announced real dividend.  Dividend cancellation is rare, but not unheard of, and is a risk that any market participant would have been aware of.   Selecting a trade date when the real dividend was legally finalized eliminated the risk of dividend cancellation.

[78] Ibid. Each BClear Contract is an arrangement to buy 100 COLOB shares for a fixed price. 5000 Futures are equivalent to a contract to buy 500,000 shares.

agreed to settle the trade on T+4, December 11, 2013 (Settlement Date). Since the trade was agreed to before the Ex-Dividend Date, at the cum-dividend price, and with settlement occurring after the Record Date, this was a Cum-Ex transaction (hereafter referred to as the Cum-Ex Transaction or Cum-Ex Purchase or Sale, respectively).

107.    As is evident from various emails and trade confirmations, ED&F Man, Volcafe (an internal IDB and affiliate of ED&F), and MPT Dubai collectively arranged for MPT Dubai to take the other side of this Cum-Ex Transaction, with MPT Dubai agreeing to sell 500,000 shares on a T+4 basis (Cum-Ex) and buy 5000 BClear futures. [79]

108.    On December 6, 2013 (the "Sell Date"), Zeta arranged for ED&F Man to enter into equal and opposite trades, which this time involved selling 500,000 COLOB shares and buying 5,000 BClear futures contracts. Again, MPT Dubai was on the other side of these trades. The parties agreed to settle this transaction using the market standard T+3 settlement cycle, meaning the plan was to complete the transaction on the Settlement Date.

109.    As summarized in the diagram below, it is evident that by the close of business on December 6, 2013, Cambridge Way and MPT Dubai had two completely offsetting futures trades and two completely offsetting buy and sell trades that were both due to settle on the Settlement Date, essentially creating a non-market facing circular trade. Figure 2 below illustrates the circularity of these trades.

---

[79] ED&F-00045042, at 53-55 (ED&F MCM buys 500,000 shares on behalf of Cambridge Way at DKK 352.80), ED&F-00045042, at 56 (ED&F MCM sells 5,000 futures on behalf of Cambridge Way at DKK 347.22), ED&F-00045042, at 58-59 (ED&F MCM sells 1,000,000 shares on behalf of ED&F MPT Dubai at DKK 352.80), and ED&F-00045042, at 60 (ED&F MCM buys 5,000 futures on behalf of ED&F MPT Dubai at DKK 347.22).

**Figure 2**

**The Circular Nature of The Cum-Ex Transactions: The Annex E Cambridge Way – MPT Dubai COLOB 2013 Transaction**



110.    Ignoring the immaterial commissions and clearing costs for the futures, it is evident that the economics of the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction involved a series of self-cancelling trades, which resulted in the generation of a tax reclaim that was shared by the parties to the transaction.

111.    The relevant real dividend amounts in respect of the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction were as follows:

|  | DKK per share |
|---|---|
| Gross real dividend per share | 7.00 |
| Withholding tax per share (Gross real dividend x 27%) | 1.89 |
| Net real dividend per share (Gross real dividend minus withholding tax) | 5.11 |

112.    The Buy Date transactions and Sell Date transactions can be combined to prepare a simplified profit and loss summary of the transactions from the viewpoint of Cambridge Way and MPT Dubai, individually as well as from a combined perspective.  Apart from the tax reclaim, Cambridge Way's position is equal and opposite to MPT Dubai's since both parties are on the opposite side of each of the four trades. [80]  No external flows or risks exist for either party.

| ANNEX E CAMBRIDGE WAY - MPT DUBAI COLOB 2013 TRANSACTION PROFIT AND LOSS SUMMARY | | | |
|---|---|---|---|
|  | Cambridge Way Profit and Loss (DKK Per Share) | MPT Dubai Profit and Loss (DKK Per Share) | Combined ED&F Man and Client Positions (DKK Per Share) |
| *Buy Date* |  |  |  |
| Cost of purchase of shares | (352.80) | 352.80 | - |
| Contract price under future | 347.22 | (347.22) | - |
| Net Buy Date Loss | (5.58) | 5.58 | - |
| *Sell Date* |  |  |  |
| Sale proceeds from shares | 347.50 | (347.50) | - |
| Contract price under future | (347.52) | 347.52 | - |
| Sell Date loss | (0.02) | 0.02 | - |
| Dividend compensation (equal to net real dividend) | 5.11 | (5.11) | - |
| **Net pre-tax profit/(loss)** | **(0.49)** | **0.49** | **-** |
| Tax Reclaim | 1.89 | - | 1.89 |
| **Net profit** | **1.40** | **0.49** | **1.89** |

---

[80] These calculations ignore trade and futures-related commissions (they are immaterial), the impact of ED&F Man fees, and the distribution of net profits between Zeta and Cambridge Way as these factors are not relevant to understanding the economics of the overall transaction.

113.    The following points should be noted in the way the table above is prepared:

i.    If one party has a buy and sell trade over a fixed number of shares with both trades settling on the same date, the market price of the shares is not required to determine the profit or loss on the transaction. This is because no net shares are required.  The profit or loss is simply the arithmetic difference between the purchase and sale price of the two contracts.

ii.    Similarly, if one party has two equal and opposite futures of the same type and maturity, the profit or loss is, necessarily, the difference between the contract price of each futures contract.

iii.    Taking points i. and ii. together, one can combine the sale price and futures contract price for a sale matched by an opposite long position in a futures contract to compute the fixed gain or loss under the contract as the difference between the sale price and the futures contract price.

iv.    The tax reclaim on this transaction was DKK 1.89 per share, the equivalent of the amount of withholding tax on the purported real dividend received. [81]

> **The Annex E Cambridge Way - MPT Dubai COLOB 2013 Transaction Bears the Hallmark Characteristics of Cum-Ex Transactions as Further Outlined in the Bases for Opinion #2**

114.    As can be seen above, the parties entered into entirely circular and self-cancelling transactions. The only real-world result of these transactions was the provision of a "tax voucher" by ED&F Man to Cambridge Way.  Cambridge Way used the Tax Voucher to claim DKK 1.89 per share of tax refund from SKAT.

115.    ED&F Man has subsequently conceded that the Tax Voucher should have been created for this transaction, and rightly so. [82]  There are many reasons why these Tax Vouchers should not have been

---

[81] ED&F-00045042 (DKK 7.00 * 27% = DKK 1.89).

[82] See, ED&F Man's Re-Amended Defence to Schedule 5T, ¶19.1: "As to subparagraphs 18 (a) (b) (c) and (d) (the Annex E Tax Vouchers), it is admitted that ED&F Man admits that the Annex E Tax Vouchers were inaccurate: this information was volunteered by ED&F Man in the September 6, 2019 Amended Defence (and in particular in Annex E thereof) following a review which revealed that the relevant PPs had received a payment which was *equivalent in value* to a dividend net of 27% WHT (but not the identified net dividend itself."
See, also, Hashemi Tr. Vol. 2 at 251:18 – 252:22. For instance, Mr. Hashemi provided the following responses to questions about the tax vouchers: "Q: Is it correct that ED&F Man's position is that the Annex E tax vouchers contain certain inaccuracies? A: The Annex E tax vouchers contain inaccuracies… Q: In what sense are they inaccurate? A: Because – they were inaccurate because the pension plans weren't due a dividend from the company." Volume 2 of the Deposition Transcript of Mr. Hashemi, October 8, 2021, 251:18 – 22 and 252:22 - 252:25.

issued.  I present these reasons and the Tax Voucher process in my discussion of Opinion 4.  I understand the reason ED&F Man has given for its concession of the impropriety of these transactions is that it knows for certain that MPT Dubai did not have the shares when the latter agreed to the Cum-Ex Sale to Cambridge Way, which means that the dividend compensation payment received by Cambridge Way could not have been the real dividend. [83, 84]

116.    In my view, it makes no difference whether or not MPT Dubai held the shares because the payment that would be made had MPT Dubai owned the shares would have been a dividend compensation payment and not the real dividend.

117.    Nevertheless, ED&F Man's concession is relevant for all the other ED&F Man Appendix C Cum-Ex Trades because it is clear to me that none of the external IDBs in the non-Annex E transactions owned the underlying shares at the time they entered into the Cum-Ex Sales, and all participants in the order and execution of these trades would have been aware of this at the time.

**2.    Transactions Conducted by ED&F Man Through the Ostensibly Independent External Third-Party Inter-Dealer Brokers ("IDBs") Were Simply Camouflage. The Common Characteristics of the non-Annex E Transactions Are Demonstrable**

**Description of the Economics of Non-Annex E AIG - LUTETIA TDC 2014 Transaction, Which Is Representative of All Non-Annex E Cum-Ex Transactions**

118.    Key elements of the admittedly improper Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction (conducted by ED&F Man with an internal IDB) are fundamentally the same as those in the

---

[83] See ED&F Man's Re-Amended Defence to Schedule 5T ¶ 18.7.2, ¶19.1 and Annex E.

[84] See Hashemi Tr. Vol. 1 at 14:14 – 20:3. In his deposition, Mr. Hashemi, the designated witness for ED&F Man, also explained that the Tax Vouchers were invalid "because on the trade date, MPT Dubai did not have a contractual right to the shares in which it sold."

non-Annex E AIG - LUTETIA TDC 2014 transaction (conducted by ED&F Man with external IDBs).  I provide a description of the non-Annex E AIG - LUTETIA TDC 2014 transaction below.

119.    Beginning on March 6, 2014, Acer, acting on behalf of the American Investment Group of NY LP ED&F Man Pension Plan ("AIG"), began arranging a transaction that was superficially more complicated than the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction.  As demonstrated below, key transaction elements and issues raised in respect of the false Tax Vouchers are fundamentally similar in both transactions, and all the ED&F Man Appendix C transactions.

120.    On March 6, 2014, dividend distribution was approved at TDC Group AS' ("TDC's") AGM. [85] The announced real dividend was to be paid to holders of record on March 11, 2014 (Record Date).  Using a market standard settlement cycle of T+3, the timing of the Record Date meant that the Ex-Dividend Date was March 7, 2014, because a trade executed on this date would settle on March 12, 2014, one day after the Record Date.  The illustrative timeline is shown in Figure 3 below.

---

[85] TDC Announcement No. 7/2014, March 6, 2014.

**Figure 3**



121.    On March 6, 2014, Acer's Ms. Stacey Kaminer, acting on behalf of AIG, requested liquidity from ED&F Man for the purchase of 2,000,000 TDC shares at DKK 52.55 each, with settlement on T+4 (a Cum-Ex Purchase). [86]  Ms. Kaminer, again acting on behalf of AIG, also submitted a request to open the hedging short position of 20,000 BClear June futures contract for the same amount at a price of DKK 50.736. [87]

---

[86] ED&F-00040919, at 54.

[87] ED&F-00040919 at 57.  Note that the internal confirmation issued by ED&F Man to AIG states that the future is the 21 March 2014 expiry future not the June 20, 2014 expiry.  I have concluded that this was a typo because the trade email request (ED&F-00040919, at 54), the external confirm with Mariana, and the offsetting trade with Arian all referenced the June 20, 2014 future. In addition, the subsequent unwinding transactions were undertaken on April 14, 2014, at which point the March 21, 2014 future no longer existed.

122.    ED&F Man arranged a Cum-Ex Purchase of 2,000,000 TDC shares settling on date T+4 from Lutetia Capital, acting on behalf of AIG. [88]  ED&F Man arranged the short futures trade with Mariana Capital ("Mariana"). [89]

123.    On March 12, 2014, ED&F Man sold 2,000,000 TDC shares on a T+1 settlement basis to Link Asset and Securities ("Link"). [90]  On the same date, ED&F Man also purchased 20,000 BClear futures of the June contract over the TDC shares.  This transaction was executed by Arian Financial ("Arian"). [91]

124.    Notably, the sale to Link and the purchase of futures from Arian were both undertaken by ED&F Man in its own name (on a proprietary or 'prop' basis), meaning that in these transactions, ED&F Man was not acting on AIG's behalf.  However, since ED&F Man did not have any TDC shares to sell to Link, it covered the delivery under the sale to Link by allegedly re-hypothecating the shares from AIG's custody account on the delivery date under the Cum-Ex purchase. [92]  As a result, ED&F Man had now established its own short position in the shares that arose from its obligation to buy TDC shares at a later date and return them to the AIG account and then hedged this exposure using the futures with Arian.

125.    Taking these transactions at face value, the parties had the following exposures:

| Transaction | AIG Exposure Long/(Short) in number of TDC shares | ED&F Man Exposure Long/(Short) in number of TDC shares |
|---|---|---|
| Cum-Ex Purchase with Lutetia | 2,000,000 | - |
| Future with Mariana | (2,000,000) | - |
| Future with Arian | - | 2,000,000 |
| Sale to Link | - | (2,000,000) |
| Net exposure | - | - |

---

[88] ED&F-00040919, at 56, 72-75.

[89] ED&F-00040919, at 66-71.

[90] ED&F-00252021.

[91] ED&F-00252025.

[92] I understand from counsel that a separate expert will address certain legal issues regarding the transfer of the ED&F Plans' right, title, and interest in the shares at issue in these cases.  I express no opinion as to these issues.

126.    On April 14, 2014 the futures were unwound [93] and were replaced by a total return swap ("TRS") [94] between AIG and ED&F Man. [95]   A TRS is a purely internal transaction with an economic outcome similar to that achieved using futures.  On this date, both AIG and ED&F Man had no net market exposure, but AIG now had the right to receive the shares it purportedly owned that had been allegedly re-hypothecated by ED&F Man.  AIG's exposure to the market risk in this position is passed back to ED&F Man by the TRS, since under the TRS, AIG is short the shares.

127.    ED&F Man was still under obligation to acquire the allegedly re-hypothecated shares back for re-delivery to AIG, resulting in ED&F Man's short exposure to market price changes in TDC shares until it repurchased the shares.  This exposure was fully hedged by the TRS (ED&F Man is long the share price under the TRS).

| Transaction | AIG Exposure Long/(Short) in number of TDC shares | ED&F Man Exposure Long/(Short) in number of TDC shares |
|---|---|---|
| Shares acquired via Cum-Ex Purchase with Lutetia | 2,000,000 | - |
| Total return swap | (2,000,000) | 2,000,000 |
| Allegedly Re-hypothecated shares sold to Link which ED&F Man is obligated to buy and return | - | (2,000,000) |
| Net exposure | - | - |

---

[93] See, for example, ED&F-00206754 where Oliver Bottomley coordinates the purchase of a range of futures across a range of transactions and accounts to close out existing positions.

[94] In this report, we are interested in equity based TRSs although it is possible to write a total return swap on any underlying security.  A TRS is a derivative contract which is generally implemented under Global Master Agreement with most market participants using the International Swaps and Derivatives Association ("ISDA") Master Agreement.  In simple terms a total return swap is contract where one party agrees to pay the other all of the gains or income on an underlying security and the other party agrees to pay any losses on that security plus an interest like return on the notional value of the security.  See for example *"ISDA Legal Guidelines for Smart Derivatives Contracts: Equity Derivatives"*, available at https://www.isda.org/a/CLXTE/ISDA-Legal-Guidelines-for-Smart-Derivatives-Contracts-Equities.pdf, accessed December 23, 2021.

[95] See, ED&F-00190456, Email from Sara Mina of ED&F Man to Stacey Kaminer of Acer and others confirming the futures unwinds and replacement swaps.

128.    In June 2014 ED&F Man and AIG agreed to unwind the position.  Unwinding the position required the purchase of shares by ED&F Man from an IDB, the return of shares to AIG, the sale of the same shares by AIG to an IDB, and the simultaneous unwind of the TRS.

129.    These steps were all arranged and agreed between ED&F Man's Sara Mina, Acer's Alan Goldman and Stacey Kaminer in a single email chain which clearly indicates all parties shared an understanding of the combined client and proprietary positions held at ED&F Man. [96]  Acer makes no attempt to confirm the prices at which these unwinds will take place, highlighting the fact that Acer and AIG were completely indifferent to the price performance of the shares because of the TRS.

130.    The only point of discussion in the email chain appears to be that ED&F Man confirmed that it would charge AIG for two days of funding for the unwind.  Ms. Mina stated that "Denmark is slightly more efficient settlement wise than Belgium so 25% coverage should suffice." [97]

131.    I understand this email chain to mean that Ms. Mina needed to borrow a small fraction of the shares claimed to be owned by AIG in order to unwind the positions. [98]  Accordingly, the funding charge which ED&F Man advised Acer about was related to the fact that ED&F Man would pass on to Acer the cost of borrowing the TDC shares to complete the unwind.  There appears to be no evidence that Acer was surprised by this cost or negotiated it.  It is unsurprising to me because understanding and willing

---

[96] ED&F00201236.

[97] Ibid.

[98] Later in this report, I discuss this settlement cycle in more detail.

acceptance of the funding charge would clearly have been part of the overall scheme's design from the start. [99]

132.    ED&F Man arranged a two-day stock borrow of 3,030,000 shares from Scotiabank. [100] As I explain in more detail later in this report, this amount only represents 10% of the total TDC positions which ED&F Man needed to settle across all of its Acer related clients on June 14, 2014.

133.    The only effect AIG's extended 'ownership' had was the creation of a false impression that AIG had owned TDC shares for an extended period of time.  No trading position was expressed as both ED&F Man and AIG were completely hedged and the legal rights to vote on the shares or otherwise participate in corporate actions were also fully transferred back to the market.  In addition, the absence of any evidence of a security margin, which would be required to maintain such a position in an arm's-length prime brokerage arrangement, clearly indicates that ED&F Man and Acer coordinated and collaborated in these transactions.  Further, it is my opinion that this was not a real trading position, but, instead, was a fabricated position created to present the illusion that AIG was a long-term owner of TDC shares.

134.    Demonstrating long-term ownership would have been useful to the parties in the event that SKAT queried the withholding tax reclaims.  I note that from her deposition testimony that this is a factor of which Ms. Kaminer of Acer was well aware. [101]  Although Ms. Kaminer presents as her view that the ED&F Man Pension Plans wished to be long term holders of the underlying shares, it is obvious to me that Acer believed that these arrangements would allow AIG to say that it 'owned' the TDC shares for an extended period of time.  They no doubt considered this to be an important indicator of ownership and

---

[99] For example, in an email from Victoria Foster to Stacey Kaminer around the time of Acer setting up its accounts with ED&F Man Victoria says, "I'm not sure if we have been through our funding costs with you etc" and then explains the funding rates.  ACER_00024721, at 22.

[100] See, Bloomberg Chat (ED&F-00444356) arranging the borrows; the email dated June 13, 2014, from David Goddard at Scotiabank advising ED&F Man of the upcoming requirement to return the borrowed shares (ED&F-00255639).

[101] Kaminer Tr. Vol. 1 at 177:18 to 180:21.

were positioned to point to it if their reclaims were challenged.  There is no other reason that I can see for the maintenance of a long term fully hedged position by AIG and Ms. Kaminer is unable to provide any other rationale in the deposition.  Based on the material provided to me in this matter, I have seen evidence of similar patterns in the trades of other Investment Managers in similar transactions. [102]

135.    Therefore, it is evident that when the non-Annex E AIG TDC 2014 transaction is stripped down to its essential components, it is fundamentally the same as the Annex E Cambridge Way MPT Dubai COLOB 2013 transaction. See Figure 4 below further describing the circular and offsetting nature of the transaction.

**Figure 4**



---

[102] For example, Duet Group used a similar technique, but involving a low exercise put option ("LEPO") structure.  A LEPO is essentially the same as a TRS, except in the extremely rare case that the shares of a company become valueless.  A LEPO can be used to achieve very similar results to a TRS.  See, email from Sara Mina of ED&F Man to Nicholas Payne of Duet which mentions "rolling" the hedge from future expiry into a LEPO (ED&F-00190325).

136.    As illustrated above, ED&F Man once again arranged two circular and self-cancelling sets of transactions: a Cum-Ex Purchase and Sale, which both settled on March 12, 2014, and two futures contracts which were fully offset from March 12, 2014 onwards.

When the external IDBs are combined into one group, a profit and loss picture that is nearly identical to that observed for the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction emerges:

| | AIG Profit and Loss (DKK Per Share) | Combined IDBs Profit and Loss (DKK Per Share) | Combined Transaction (DKK Per Share) |
|---|---|---|---|
| *Buy Date* | | | |
| Cost of purchase of shares | (52.55) | 52.55 | - |
| Contract price under future | 50.74 | (50.74) | - |
| Net Buy Date Loss | (1.81) | 1.81 | - |
| *Sell Date* | | | |
| Sale proceeds from shares | 48.88 | (48.88) | - |
| Contract price under future | (48.89)) | 48.89 | - |
| Sell Date loss | (0.01) | 0.01 | - |
| Dividend compensation (equal to net real dividend) [103] | 1.61 | (1.61) | - |
| **Net pre-tax profit/(loss)** | **(0.21)** | **0.21** | **-** |
| Tax reclaim | 0.59 | - | 0.59 |
| **Net profit** | **0.38** | **0.21** | **0.59** |

137.    Note that there was no necessity for the dividend compensation payment of DKK 1.61 per share and the parties could just as easily have agreed to execute the original Cum-Ex purchase transaction at the price of DKK 50.94 per share (being the actual price used less the dividend compensation amount i.e., DKK 52.55 – DKK 1.61) and it would not have changed the economics for any of the parties. [104]  Put another way, the dividend compensation payment paid by Lutetia can be viewed as having been funded

---

[103] The dividend compensation payment in this transaction was part of the overall Market Claim made to Lutetia via RBC, which I assume provided operations support for Lutetia, on 6,000,000 shares.  The Market Claim was requested by Michael Meade of ED&F Man on March 13, 2014 and was paid for value on March 17, 2014. ED&F-00040990.

[104] See the earlier discussion on the fact that there is no requirement for a dividend compensation payment in Cum-Ex transactions.

by the payment of excess purchase price by AIG and so there was no net economic cost to Lutetia of paying the dividend compensation payment and it did not need to receive a real dividend in order to fund the payment as I will explain in more detail below.

138.    In the transaction above, AIG earned approximately DKK 760,000 (=2,000,000 shares x DKK 0.38 per share) of gross profit, which closely approximates a contemporaneous calculation that appears to have been prepared by ED&F Man. [105]

### 3.    The IDB Transactions Are Inextricably Linked to Each Other and Their Commonality is Demonstrable

139.    During the Relevant Period, most U.K. IDBs were subject to more regulatory limitations by the FCA, and much lower capital requirements compared to the significantly larger, full-service major trading firms. [106]  In particular, the IDBs were restricted to only trading on an agency or a matched principal basis.

140.    The larger trading firms ran traditional market-making desks from which they were able to take proprietary risk by entering into or exiting client trades.  For example, a market maker in a larger trading firm with a belief that shares were going to increase in value was permitted to buy shares from a client

---

[105] See, Excel Spreadsheet ED&F-00265891, 'Sheet 1'.  This worksheet calculates profit across a range of transactions. Cell AM12 shows the profit shared between ED&F Man and AIG in the amount of DKK 676,817, but this amount includes various future fees, commissions, and interest and accounts for the costs of the unwind of the futures on April 14, 2014.  Adjusting for these additional costs yields an approximate profit of DKK 751,000. The remaining difference is largely accounted for by the rounding of figures I performed for the simplicity of the table above.

[106] Firms that meet the conditions of Article 96(1) of the EU Capital Requirements Regulation are treated by the FCA as "limited activity."  See, https://www.eba.europa.eu/regulation-and-policy/single-rulebook/interactive-single-rulebook/548, accessed December 15, 2021.  Firms subject to this treatment benefit from significantly lower regulatory capital requirements exemption from various other rules which apply to larger full-service broker dealers.  Article 96(1)(a) defines relevant firms as:

> "investment firms that deal on own account only for the purpose of fulfilling or executing a client order or for the purpose of gaining entrance to a clearing and settlement system or a recognised exchange when acting in an agency capacity or executing a client order."

See, FCA Handbook on Permissions, Question 16, available at https://www.handbook.fca.org.uk/handbook/PERG/13/3.html, accessed December 15, 2021.

and maintain a long position in the shares for a period of time before selling them in the hope of earning a profit.

141.    In contrast, the IDBs' limited regulatory permissions only allowed them to trade if they were either simply acting as an agent linking two counterparties or if they had lined up parties to engage in both sides of the transaction prior to trading, which ensured a perfect hedge from the point the trade was initiated.

142.    In addition, even if the IDBs were permitted to enter the transactions on a proprietary basis, an IDB could not credibly have been able to find genuine third-party clients, exchange liquidity to trade futures in the sizes which ED&F Man arranged for the ED&F Man Pension Plans or have been prepared to manage the risk of the number of shares involved in the transactions. [107]   I provide additional information related to this point later in this report.

143.    Another fundamental issue for the IDBs was the relative illiquidity of single stock BClear futures, especially over Danish shares. [108]   It is not credible that the IDBs could have hedged the futures they

---

[107] Futures volume data available from Bloomberg indicates that the volume of these futures that was traded on the OMX Nordic Exchange was substantially smaller than that traded by Volcafe and other parties and is a better indication of the true liquidity of the futures.  To explain, futures can be traded in two ways:

1.    A party can place an order with the exchange on which the futures are traded and wait to see if market-makers on that exchange are prepared to trade at the size and price offered.  A large percentage of trades for liquid securities are executed in this way.

2.    A party can engage a broker to go and find specific willing buyers or sellers to make offers to match the party's trade.

The future volumes data indicates that most trades in single stock futures for Danish shares would first have been negotiated and agreed off-exchange, and then cleared post-trade.  Put another way, it simply would not have been possible to place an order on the exchange for the number of futures required and expect it to be filled at an acceptable price from the normal market flows.

[108] The liquidity of a future is a function of the liquidity of the underlying shares because liquidity providers on the future need to trade the shares as a hedge.  Moreover, liquidity is driven by the overall market size and desire of other global market participants to take trading positions in the underlying shares.  The Danish Stock Market is not ranked in the top 10 global equity markets.  For context, the U.S. alone accounts for 56% of global equity volume, while the U.K., Germany, and France comprise 67% of the European equity market capitalization.  See, https://www.statista.com/statistics/710680/global-stock-markets-by-country/, accessed December 15, 2021;

entered into, except by directly or indirectly completing the circle that led back to ED&F Man's Cum-Ex Sale counterparty. Stated differently, Lutetia had to hedge its short market risk exposure directly or indirectly via back-to-back trades with Mariana because failure to do so would have inevitably made the transaction unprofitable for it. If we express the profit per share for all of the IDBs as a percentage of the purchase price of the shares we can see that the total profit is only 0.4% of the price of the shares (0.21/52.55). Based on my experience, it is not credible that market participants could have genuinely independently hedged transactions of this size in relatively illiquid shares and futures with costs of less than 0.4% and they would have been exposed to very significant market risks, market impact, and potential slippage could easily have been 5% or more of the share price if they found themselves unable to place or unwind their hedges. [109] Notably, the ED&F Man spreadsheet reconciling the profit from the various TDC Cum-Ex transactions undertaken with Acer does not include any amounts of bid/offer spreads between the prices at which the shares and the hedges were traded. This confirms my view that all transactions were fully pre-ordained and 'crossed' between the various IDBs. [110]

144.    In conclusion, no meaningful difference that is relevant to the generation of the false tax vouchers exists between the Annex E Cambridge Way-MPT Dubai COLOB 2013 transaction and the non-Annex E AIG-LUTETIA TDC 2014 transaction. Both transactions involve a Cum-Ex purchase by a Pension Plan and a completely offsetting sale of the same shares which settled on the same date as the original purchase so that no actual shares were required to be held by ED&F Man and its Pension Plan clients. In

---

European Securities and Markets Authority, "*EU Securities Markets ESMA Annual Statistical Report*", 2020, p. 16, https://www.esma.europa.eu/sites/default/files/library/esma50-165-1355_mifid_asr.pdf, accessed December 15, 2021.

[109] Slippage is a common term used for the various costs between a position and its hedge. It is caused by various execution costs, including bid/offer spreads, commission, price differences due to market impact, or differences in the time or venue of execution.

[110] Excel Spreadsheet ED&F-00265891. I understand this ED&F Man spreadsheet to be a profit and loss reconciliation of the various transactions undertaken by ED&F Man and Acer over TDC shares. Save for immaterial commissions, which appear to be a standard DKK 7.46 per futures contract, there were no significant costs to the hedging of all of these trades.

both transactions, the Tax Voucher was issued for a dividend compensation payment and not a real dividend. In both transactions, the sizes, timing, and amounts of the trades indicate that neither ED&F, the ED&F Man Pension Plans nor the IDBs could have contemplated the risk management consequences of the trades had the parties not known and pre-planned the circularity of the transactions.

145. Importantly, ED&F Man cannot draw a direct line to a real dividend received by any other party in the non-Annex E AIG - LUTETIA TDC 2014 transaction. As I will explain, it is my view that Lutetia did not own the shares it sold to AIG at the time of the Cum-Ex Transaction or receive a real dividend. Therefore, the reasons for ED&F Man's admissions relating to the Tax Vouchers in the Annex E transactions apply equally to the non-Annex E transactions and imply that ED&F Man should also have withdrawn the Tax Vouchers in respect of all the other transactions.

### 4.    Hedging a Cum-Ex Transaction Does Not Require Any Party to Receive a Real Dividend

146. For the remainder of this section, I refer to the counterparty to the Cum-Ex purchase by the Pension Plan as IDB1. Setting the Cum-Ex trade's settlement to the day after the Record Date means that the options available to IDB1 to hedge itself fundamentally changed compared to a normal Cum-Dividend Sale. This holds true even if IDB1 is actually required to deliver the shares on the Settlement Date and cannot assume another offsetting trade will occur in the meantime. [111]

147. Once IDB1 enters into the Cum-Ex Sale, it has two key components of risk to hedge:

  i.    IDB1 is short the market price of the shares. If share prices decrease before IDB1 offsets the Cum-Ex sale, it will generate higher profits because it will be cheaper to purchase the shares to deliver.

  ii.    IDB1 has to transfer shares to the Pension Plan on the day after the Record Date.

---

[111] If IDB1 was aware that another offsetting trade would occur in the meantime, its hedging would be simpler as demonstrated by MPT Dubai in the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction.

148.    Of note in this scenario is the fact that these obligations are independent and can be hedged separately.  In practical terms, it also means that the IDB1 neither needs to own the shares on the Record Date or to identify a third party who does (and so need to make a dividend compensation payment to that third-party), as I will now demonstrate with an example.

149.    Assume a second IDB, IDB2, exists.  The hedge can be achieved as shown in Figure 5 below:

**Figure 5**



150.    On the first trading day, T, the Pension Plan simultaneously enters into a Cum-Ex purchase with IDB1 and a futures hedge.  The Pension Plan is 'long' the shares and 'short' the share price risk under a future.  Throughout this report, my use of "long" and "short" means positive and negative exposure to share prices, respectively.  IDB1 is short the shares and IDB2 is long via the future under its trade with the Pension Plan.  Therefore, IDB1 and IDB2 can both hedge their market exposure by trading a future under which IDB1 is long and IDB2 is short.  It is not necessary for both IDBs to trade directly with each other.  It is sufficient that the natural process of market price discovery would have made it more efficient

for them to trade with each other instead of any other market participant, because neither party would have incurred any basis risk (i.e., a difference between the price movements of the shares and the future hedge) or slippage costs (i.e., costs that may result from the rapidly changing market conditions as a transaction is either placed or liquidated).  See Figure 6 below.

**Figure 6**



151.     On day two, T+1, IDB1 needs to arrange for delivery of the shares to Pension Plan on T+4. [112] As the shares are now trading on an Ex-Dividend basis, IDB1 will be able to source a borrow without having to borrow shares over a dividend Record Date, which would require compensating any party in its transactions for the missed real dividend.  See Figure 7 below.

---

[112] In theory, share delivery can occur on other dates such as T+2 or T+3 as long as IDB1 ensures that its borrow and Cum-Ex sale settle on T+4.

**Figure 7**



152.    On the final day, T+4, both the stock loan and the original Cum-Ex purchase can settle.  The proceeds from the Cum-Ex sale can be used by IDB1 to provide collateral under the stock loan.  In this scenario, IDB1 is long a future and short an obligation to return a borrow.  IDB2 has matched and offsetting futures.  The Pension Plan is long shares that are hedged with a short via a future.  In the Appendix C Cum-Ex Trades, these positions would all be unwound shortly thereafter, in some cases on the same day, T+4.

153.    By splitting the management of the market risk (covered by going long via a future) and the settlement obligation (by borrowing the shares one day after the initial Cum-Ex transaction and agreeing to settle the stock borrow on or before the Settlement Date), it is evident that the stock loan settles after the Record Date, which means that IDB1 will not have to compensate the Securities Lender in the stock loan transaction for any missed real dividends.  Sourcing shares to settle after the Record Date is also considerably easier as most market participants would not attribute significant commercial value to such a stock loan, since the right to receive a dividend has expired.

154.    All the Appendix C Cum-Ex Trades involved a variation of the steps I have described above.

155.    Importantly, IDB1 and IDB2, possibly in conjunction with one or more other IDBs, would either have known, been informed, or have easily discovered of the other participant's identity, such that each party could recognize the other from the specific size and transaction terms. [113]  It is evident to me that this process was coordinated by the Investment Managers and ED&F Man. [114]  The fact that Acer, acting as Investment Manager for the ED&F Man Pension Plans, not only regularly requested ED&F Man to arrange the transactions, but also gave directions on which brokers ED&F Man should speak to clearly indicates that Acer was fully aware not just of the steps taken by ED&F Man on its behalf, but also of the coordination required between the IDBs.  Coordination was crucial and required careful preparation given the sizes of the shares and futures transactions. [115]

156.    Knowing or being tipped off about the identities of the other parties to the transaction allowed the IDBs to put on and close out their trades at the same time and at the same prices as any other hedges by other counterparties in the overall wider transaction without any slippage.  The IDBs were confident that they did not need to find any shares to deliver, except for an intra-day borrow of Ex-Dividend shares to settle the offsetting transactions, if needed.  I discuss the settlement mechanics below.  As a result, the IDBs had no significant hedging or market impact costs. In particular, they did not need to either receive a real dividend or find an investor who had received the real dividend.

---

[113] This is not, in of itself, an indicator of impropriety by any specific IDB.  The role of an IDB is to find liquidity to trade, and if there is a large, completely opposite trade being shown around the market one would expect the IDB to find it.

[114]  See, for example, the email chain ED&F-00040920 in which Stacey Kaminer of Acer tells Oliver Bottomley of ED&F Man that, "I heard MINT might have some liquidity on the futures."  Similarly, in ED&F-00045805, she writes that "I heard MAIKO might have liquidity on the future."

[115]Credit lines between ED&F Man and its various IDBs and other counterparties would have been carefully managed given the large size of some of the transactions.

157.    There appears to be no evidence to support ED&F Man's assertion in the Rosenblatt correspondence that the payment of the Market Claim made to Lutetia is, in of itself, evidence that it received a real dividend.[116]  As I demonstrated in the above example, it is perfectly possible for Lutetia to perform its obligations under a Cum-Ex Sale without ever owning the underlying shares.  This fact would have been understood by ED&F Man's Equity Finance team and all other participants in the transaction.  My discussion of pricing in the next section of this report strongly supports my view that this is in fact what happened.

158.    Accordingly, if Lutetia had no requirement to own the shares, it follows that it was not necessary for it to receive a real dividend.  Its Market Claim is a dividend compensation payment that is not directly connected to the receipt of a real dividend.  As explained earlier in the report, it is equally valid to consider a dividend compensation payment as a return of the excess purchase price in an originally mispriced Cum-Ex transaction.  ED&F Man's arrangement of the Annex E transactions indicates that ED&F Man was aware of this fact.

159.    Finally, European markets did not operate in a way that market claims and real dividends were interchangeable, and if they had it would have rendered regimes like the U.K. Manufactured Overseas Dividend regime redundant.  To illustrate one problem with ED&F Man's logic: If Lutetia had covered its short position under the Cum-Ex sale to AIG by borrowing shares from another IDB after the Record Date, both AIG and the IDB would have received the 'real' dividend on the same shares when clearly only one party could be entitled to it.

---

[116] See, letter from Rosenblatt LLP to Pinsent Masons LLP dated March 5, 2021 concerning the Annex E Tax Vouchers.  Referring to the actions of Mr. Meade it is stated that "he did not understand that the Annex E Tax Vouchers should have distinguished payments which the Pension Plans received in compensation of their right to a dividend, from dividends which were actually paid by the underlying Danish company".  However, I see no basis for concluding that the payment from Lutetia was a real dividend and for the reasons given believe it is directly equivalent to the MPT Dubai dividend compensation payments.

**5.** **No Real Dividend Was Received by Any Participant in the Annex E Transactions and the Pricing Strongly Suggests Real Dividends Were Also Not Received in Other Non-Annex E Transactions**

160.    The schedule in Appendix C contains details of the pricing of the transactions from the relevant transaction confirms I have reviewed.  A useful way to think about any dividend transactions is to determine the implied pricing of the dividend supposedly being 'purchased'.  The following demonstrates how implied pricing may be used to determine whether or not a dividend is real.

161.    Participants of the Cum-Ex transactions expect one to believe that they are similar to other normal equity finance transactions and that the ED&F Man Pension Plans acquired the rights to a real dividend, and therefore a tax reclaim.  As with other equity finance transactions, the price that participants in the Cum-Ex transactions paid for this 'dividend' can be extracted by combining and comparing the pricing for the Cum-Ex Purchase with that of the hedging transactions.

162.    Separately, I have reviewed various other contemporaneous transactions undertaken by ED&F Man that involved the transfer of shares which settled prior to the Record Date, which means they are transactions under which ED&F Man or one of its clients did in fact obtain a real dividend.  Thus, the pricing of these transactions necessarily involves the economic compensation of a third-party financial institution from which the shares were obtained, most often through a stock loan that settled prior to the Record Date.  I will refer to these transactions as "Cum-Cum" transactions.

163.    My review indicates that the Cum-Ex transactions were priced on average at a significantly lower rate compared to the Cum-Cum transactions which required market level compensation payments because the shares were lent over Record Dates. The average market level for ED&F Man's Cum-Cum

transactions was approximately 90%. In contrast, the average market level for the Cum-Ex transactions was approximately 80%. [117]

| Market Levels for Cum-Ex and Other Transactions | | | |
|---|---|---|---|
| | Number | Average | Std Dev |
| Cum-Ex | 86 | 79.8% | 3.3% |
| Cum-Cum | 53 | 89.5% | 2.2% |

164.    The reason for the observed disparity between these two types of transactions is simple. In a transaction where one party receives the real dividend on shares that have been borrowed, a different market participant (the Securities Lender) is deprived of the opportunity to receive the real dividend. [118] The market level was set by the overall supply and demand in the market at around 90% of the real dividend (the reasons for this are covered in the next section).

165.    This constraint was absent in Cum-Ex transactions, since the minimum level was simply determined by the facilitation fees that need to be paid to the third-party IDBs. As these IDBs were neither required to obtain the real dividend nor borrow stock over the Record Date and so pay for a real dividend, it was possible for them to price the Cum-Ex transactions on a cost-plus basis.

---

[117] While the individual trades had varying terms, each group's standard deviation was only a few dividend points. Ten transactions around the Chr. Hansen A/S dividend event in November 2013 are excluded because half of that dividend was declared as a special dividend and triggered an adjustment event under the terms of the futures contracts. See Appendix C Note 1 as well as the Nasdaq OMX Derivative Market Notification on October 23, 2013, available at https://www.globenewswire.com/fr/news-release/2013/10/23/582769/0/en/Derivatives-Anticipated-adjustment-in-Christian-Hansen-due-to-extra-dividend-57-13.html, accessed December 14, 2021. It is not clear from the evidence available to me exactly how the parties dealt with this event and so I cannot determine the implied pricing of the dividend.

[118] I use the term "borrow" in an economic or accounting sense, and not necessarily as it relates to a stock loan under the GMSLA.

166.    In a Cum-Ex transaction the dividend compensation payment made, is in economic terms, simply a return of part of the incorrectly grossed up purchase price. The dividend compensation payment can be set at whatever level the participants decide up front. The reason Cum-Ex transactions were generally structured so that the trade price was the Cum-Dividend price on the Trade Date and included a dividend compensation payment equal to the net dividend was that the parties could then claim two things, both of which are incorrect:

a.    The trade was done at the market price, which is irrelevant, because the quoted market prices are only relevant for trades with standard settlement terms.

b.    The net dividend compensation payment received is the real dividend, which it is not.

### 6.    Pricing of the Cum-Cum Transactions at Around 90% of the Gross Dividend Was Expected

167.    The largest investment banks generally control the relationships with the largest shareholders, principally major European asset managers and major European pension funds and often have first option on borrowing the inventory of these clients. These investment banks can generally earn 85% of the gross real dividend on any shares they own, without the need to undertake any onward lending. This is because they are generally entitled to reclaim a portion of the WHT, such that they receive 85% of the gross real dividend under tax treaties with Denmark. For the investment banks to be incentivized to either lend out their inventory or source additional inventory to lend out, they must earn a meaningful spread above the 85% level.

168.    Based on my experience, I can see no reason why a person who was due to receive the real dividend on shares they owned or controlled would be prepared to offer them for use in a transaction without being compensated at the market level (which as we have seen is around 90% in Denmark in the relevant period). In the case of the Cum-Ex transactions there was no such requirement to compensate

any third party providing the opportunity to price below the market level for real dividend compensation payments.

169.    Although a detailed review of the Cum-Cum transactions is outside the scope of this report, there are two other observations which I think are relevant:

a.        First, it is evident all parties understood the difference between Cum-Cum and Cum-Ex transactions.  The structuring and pricing of the transactions were different, and the parties would have fully understood the reasons for this.

b.        Second, the sizes of the Cum-Cum transactions are a more reliable indication of the true ability of ED&F Man to source shares for owning over the Record Date.  For example, for the March 11, 2014 Record Date, the TDC Dividend Worksheet [119] shows that ED&F Man held 24.8 million shares in its BNP Paribas account, but issued vouchers for 163.4 million shares. [120] A minimum of 6.9 million of these 24.8 million shares relate to Cum-Cum transactions [121] and ED&F Man does not link any of them to the Cum-Ex transactions in its dividend reconciliation worksheets.  Whilst the share amounts actually obtained by ED&F Man are still significant, they are more in line with the number of shares which I would expect ED&F Man to have been able to source.

---

[119] See ED&F-00040919 at 83.

[120] The Excel File ED&F-00603586 which I understand to be a report from BNP Paribas of dividends paid on shares for which it was the custodian on record date contains a single dividend row for the TDC shares on the Record Date of March 11, 2014 and corroborates that BNP Paribas credited ED&F Man with the net dividend on 24,845,000 shares (being DKK 399M or 24.8m x 1.606 net dividend per share).

[121] Compare ED&F-00040919 at 83 to ED&F-00040919 at 76 (1 million shares are traded Cum-Cum on behalf of AIG), ED&F-00041108 at 165 (1 million shares are traded Cum-Cum on behalf of Kamco LP Profit Sharing Plan), and ED&F-00041180 at 200 (4.9 million share are traded Cum-Cum on behalf of Cubix).

7.      **No Reputable Market Participant Would Have Considered the Appendix C Cum-Ex Trades as Legitimate**

170.    Based on my knowledge, gained from covering all major equity markets while working at Barclays and my extensive knowledge of equity finance market practice, no reputable market participant would have considered it appropriate to engage in a Cum-Ex transaction in Denmark like those in Appendix C. During the Relevant Period, it was my understanding that Cum-Ex transactions were invalid as a basis for a WHT refund claim in any European jurisdiction. This view was widely held by leading market participants and their advisers. It is my belief that both ED&F Man's personnel and the E&F Man Pension Plans' agents, including but not limited to Investment Managers such as Acer, would have been well aware of this market view.

8.      **There Was Deliberate Coordination of the Participants at the Outset of the Trades**

171.    The Appendix C Cum-Ex Trades were entered into deliberately, in coordination, and in such a fashion that there was no legitimate prospect that the Sell Date transactions would not have followed inevitably from the Buy Date Transactions. I detail the basis for my conclusion in the following sections.

9.      **The Unusual Risk Sharing and Failure to Properly Consider Trading Risks and Margin Demonstrates That the Trades Were Not Real**

172.    I have reviewed the approach taken by ED&F Man to determining the appropriate risk capital or margin which it required the ED&F Man Pension Plans to provide for it to undertake the transactions and it is my view that this clearly indicates that the transactions were effectively a joint venture between the Investment Managers, ED&F Man Pension Plans and ED&F Man. They were clearly not independent investment transactions undertaken by the ED&F Man Pension Plans using typical arm's-length prime brokerage arrangements.

173.    In the case of the Acer ED&F Man Pension Plans profit and risk sharing agreement was explained by Stacey Kaminer in her deposition. The approach that Acer and ED&F Man used to assess and

undertake the transactions was based on their concept of risk capital. I understand this to be the downside risk that the participants would have if the tax reclaim was unsuccessful and it is calculated using what they referred to as the "Negative Dividend" [122] plus the other transaction fees like funding costs, futures and share commissions. [123] Ms. Kaminer later confirms that the risk the Acer ED&F Man Pension Plans had of losing money on these transactions was limited to their contribution to the risk capital. [124]

174.    This arrangement makes complete sense in the context of a joint venture to generate tax reclaims from SKAT but is otherwise a highly unusual arrangement as between a prime broker and its client. Normally a prime broker would require the client to provide margin to support all the risks that funding, clearing, and settling the clients' positions creates for the prime broker.

175.    In the case of Acer, it appears that very limited capital was required to protect ED&F Man from any trading risks on the portfolio and ED&F Man goes further, lending the ED&F Man Pension Plans the majority of the funds [125] to provide margin on its trades such that ED&F Man is effectively providing the risk margin to itself (completely defeating the object of margin as a risk mitigation tool).

176.    In an arm's-length prime brokerage agreement, it would be customary for the client to provide a much more significant amount of capital to support the levels of trading which the ED&F Man Pension

---

[122] Negative Dividend appears to be the loss that arises on the stock sourcing transaction if the tax reclaim was unsuccessful. For example, I have reviewed ACER_00010868 which appears to be an internal planning schedule prepared by Acer to consider transaction in the second half of 2014. In the first row of the first tab of this spreadsheet we can see that the negative dividend is calculated as USD 42,536 (being 4,400,000 shares x the gross dividend of 0.3867 per share x the loss in dividend points 0.145 (All-In Cost of 87.5% - Net Dividend of 73%) that would arise converted to USD at an approximate rate of DKK 1:0.17 USD).

[123] Again, referring to ACER_00010869. In her deposition, Ms. Kaminer (Kaminer Tr. Vol. 1 at p. 207:4 – 207:18) confirms that the Acer risk capital is 50% of the sum of the relevant columns. Taking again the first row as an example, we can see that the risk capital on the planned UN trade is the sum of the Negative Dividend, Brokerage and DTCC multiplied by 50% (being Acer's share of the downside risk).

[124] See Kaminer Tr. Vol. 1 at 208:20 – 208:23.

[125] See for example, the discussion around pages 213 of Volume 1 of Ms. Kaminer's Deposition and the email from Victoria Foster of ED&F Man to Ms. Kaminer dated July 18, 2012 explaining the terms of the new prime brokerage agreements which indicates that "We would propose that you fund the account with some money, i.e., any capital at risk plus some to cover a percentage of the Initial Margin" (ACER_00024721, at 22).

Plans claimed to have undertaken. In an unhedged situation, margin of somewhere between 15% and 50% of the gross trading exposure would be customary. [126] This would also be subject to various further concentration limitations, for example, no more than 10% of the portfolio in any single name. In the case of hedged equity finance transactions where the prime broker has full visibility and the necessary security interests in all the positions and hedges then it would be possible for lower levels of margin to be agreed. However, it appears that Acer and ED&F Man agreed that risk margin of less than 0.15% was all that was required to support the trades. [127] This is the equivalent of providing nearly 700 times leverage on a trading position. In my experience, even some of the largest hedge funds are limited to leverage in the range of 20-40 times their margin by their prime brokers.

177.    I have also looked at the custody statements provided as part of the trade packs by ED&F Man as part of its production to compare the actual margin held versus the trading positions undertaken. I have only been provided with snapshots of the position of the account on a particular trading date for each dividend event and so it is not straightforward to determine exactly how these arrangements worked. However, what is clear is that there are numerous occasions where the ED&F Man Pension Plan clients had negative balances and were effectively in a position where any margin they provided had already been fully consumed and they were therefore borrowing in an overdraft-like situation. This is a clear indicator that the participants viewed the transactions as effectively a complete pass through from a risk perspective with no real requirements for ED&F Man to demand margin from their clients (no doubt

---

[126] Providing 50% margin would mean that if a client wants to buy USD 100 of shares then the client would have to provide USD50 of margin capital and then the prime broker would lend it the other USD 50. The first USD 50 of loss on the shares purchase would be borne by the client (because the prime broker could sell the shares and use the funds to repay its loan). Only if the shares declined below USD 50 would the prime broker be at risk of losing money.

[127] Referring again to the UN proposed trade in the first line of the first table of ACER_00010869 we see that risk capital of approximately USD 47,000 was all that was required to justify total gross exposure of USD 31.9 M (calculated as 4,400,000 shares x current share price DKK 42.62 x approx. FX rate of 0.17)

because it viewed itself as doing all the execution on their behalf and only executing fully self-offsetting transactions).

178.    At the time the parties entered into the non-Annex E AIG – Lutetia TDC 2014 transaction, the margin position in the AIG account statement shows that AIG was overdrawn in the amount of approximately USD 3.8M. [128]

179.    At this time AIG had committed to buying 5,000,000 TDC shares with a total gross exposure of approximately USD 47M and short position in 50,000 futures requiring initial margin of USD 2.4M per the account statement. A 5% one-day price increase of the TDC shares, hardly an unprecedented swing in financing markets, would have resulted in a margin call on the future of at least USD 2.4M.  AIG was not in a position to finance such a margin call.

180.    I have seen multiple similar account statements which show negative margin in the Pension Plan statements including another AIG account statement at the time of Novo Nordisk A/S dividend on March 21, 2014 which shows AIG as being overdrawn to the tune of USD 34.3M whilst having over 180,000 open futures contracts requiring initial margin of USD 29.6M around the relevant dividend dates. [129]

181.    The combination of the testimony from Stacey Kaminer on how the risk capital and risk sharing works and the review of the account statements leaves me in no doubt that the participants had absolutely no regard for the types of normal market risks and margin requirements, and further confirms my views that the correct way to view these transactions is as circular schemes designed purely to generate the tax reclaims.

---

[128] ED&F-00040919 at 82.

[129] For example, Acorn Capital Strategies LLC (ED&F-00047428), Riverside Associates Defined Benefit Plan (ED&F-00041310) and AIG (ED&F-00048728).

**10.  Profits from Refund Payments Were Essentially Guaranteed Up Front Because the Trades Were Pre-Ordained, Circular, Non-Market Facing Transactions**

182.    MPT Dubai was offered a pair of trades on the Buy Date which essentially guaranteed it a profit. Coincidentally, MPT Dubai also offered, via ED&F Man, to conduct trades that perfectly matched Cambridge Way's trades.  This strategy appears to be nothing more than a fully pre-ordained series of circular, non-market facing transactions.

**11.  Prior to Execution of Each Transaction All Participants Would Have Known That the Unwind Transactions Were Inevitable and They Would Not Have Executed the Opening Transactions if This Were Not the Case. Thus, These Transactions Were Prearranged and Codependent**

183.    If MPT Dubai and ED&F Man did not have complete confidence that the transactions would reverse and offset with the Sell Date trades, then both parties would have needed to take very significant and costly steps to hedge the Cum-Ex transactions with Cambridge Way.  Such hedging would have been non-trivial.  MPT Dubai would have needed to either arrange a stock borrow of 500,000 shares or enter into an equal and opposite purchase and futures contract involving MPT Dubai's shorting of 5000 Bclear Futures and purchase of 500,000 shares in the market. Obtaining a last minute borrow or purchase of 500,000 shares on the day before Ex-Dividend Date would either have been very expensive or, more likely, impossible.  No evidence appears to support such a borrow or purchase being contemplated by MPT Dubai.

**C.  Opinion 3: ED&F Man, Custodian for the ED&F Man Pension Plans, Did Not Actually Have Custody of a Sufficient Number of Shares to Support the Tax Vouchers That Were Issued for the ED&F Man Pension Plans**

184.    In this section, I make several key points as the basis for my Opinion 3.  First, the amount of dividend reclaims in the ED&F Man Cum-Ex transactions bore no relation to the transacted share amounts.  Second, the share amounts that were purportedly transacted in the Cum-Ex transactions were

wholly inconsistent with realistic average daily trading volumes.  Third, these purported transaction amounts could not have been risk managed by the parties to these Cum-Ex transactions.

### 1.    The Number of Actual Shares Settled Was Not Connected to the Transaction Amounts[130]

185.    I have reviewed the BNP Paribas records that were made available to me in respect of the Annex E Cambridge Way – MPT Dubai COLOB 2013 transaction and the non-Annex E AIG – LUTETIA TDC 2014 transaction to confirm if and how the various trades were settled.

186.    It appears to me that book entries were made in ED&F Man's custody account at BNP Paribas for cash movements that were required to settle the trades. [131]  It also appears that in and out entries were made for all of the share transactions, although based on the evidence I have reviewed it is not possible to directly link any given settlement movement to a specific transaction due to the lack of details about the exact coding used by BNP Paribas. [132]

187.    Based on my experience, my review of the BNP Paribas records and my review of the typical trading volumes of COLOB during the Relevant Period, it is clear that an important element in the design

---

[130] This is also addressed in the context of my Opinion 4 below.

[131] See, for example ED&F-00605792, at 07 to 09, which relate to all of the COLOB transactions settled on December 11, 2013 including the Annex E Cambridge Way - MPT Dubai COLOB 2013 transaction.  It appears that the purchase movements debit the ED&F Man account for the value of the Cum-Ex Purchases and then the credit column is showing the receipt from the T+3 sales on December 6, 2013.  The expected amounts for the transaction being discussed are 176,400,000 for the Cum-Ex Purchase and 173,750,000 for the Sell Date sale.  There are entries which are very close in amount to these expected values, and I assume the differences are commissions although the quality of the pdfs is very poor.

[132] The key documents are:

1.  ED&F-00604196 which contains entries for the ED&F Man account 778523F which I understand to be one the main client omnibus accounts of ED&F Man at BNP Paribas used to custody the ED&F Man Pension Plan's shares.

2.  ED&F-00604678 which contains entries for the ED&F Man account 778054F which I understand to be another client omnibus account of ED&F Man at BNP Paribas.  It is not clear what this account was used for.

of these transactions is that the participants did not actually need to acquire or borrow shares in sizes anywhere near the total gross notional value of the purported transactions. [133]

188.    Acquiring such a number of shares would have been both very expensive and risky for ED&F Man.  I will address this later in my report.  Further, market conditions around dividend dates would have been highly competitive, with other market counterparties undertaking more legitimate equity finance transactions.  The key to solving this problem is that it would have been possible for ED&F Man to facilitate the settlement of its client share transactions by arranging to borrow a much smaller number of shares and using them repeatedly over the course of the Settlement Date to settle multiple transactions. [134] ED&F Man could pre-book all the trades it needed to settle and then 'prime the pump' at its custodian with the smaller number of shares it had borrowed.  The smaller number of shares would then be automatically recycled through multiple intra-day settlement cycles before being returned to ED&F Man to close out its borrow. [135]

189.    A common issue in securities settlement processes is that there can be many linked or closely related transactions due to settle on the same day.  Because most settlements usually take place on a DVP basis, a failure in one part of the payment chain can cause all later trades to fail to settle.  Providers of custodial services address this issue through the use of:

    i.    Chained settlements: Assume A sells shares to B and B sells the same shares to C.  If A delivers the shares to the custodian and C delivers cash for the shares, then the custodian can be instructed to automatically and simultaneously settle both trades by moving the shares straight from A to C and the cash straight from C to A.  A, B, and C are all considered to have fully discharged their settlement obligations.  Note that A, B, and C can all be

---

[133] See, Appendix D.

[134] This could be a borrow from a third-party financial institution as in the Scotiabank example below or from hypothecating the shares from other client long positions.

[135] See, for example, Hashemi Tr. Vol. 2 at 391:1 – 391:9 that refers to an email between traders mentioning that Denmark's settlement cycles were quicker than Belgium's, so only 25% of the shares were required.

completely unrelated parties as long as they agree to settle the transactions through the same custodian.

ii.    Multiple settlement cycles – There are multiple settlement cycles each day, including some which are outside trading hours. [136]  As a result, if anything in a transaction goes wrong, it can be retried in the next settlement cycle.  Alternatively, a large settlement can be deliberately planned to settle across two or more settlement cycles.

iii.   Tranching or "shapes" – It is common to break a larger settlement of shares into smaller 'shapes', for example, 1,000,000 shares as 4 shapes of 250,000 each, to provide more flexibility in the settlement process.  Tranching can also be used to match up an IDBs settlement with the other external trades it had entered which matched the trade in question.

190.    This point is best illustrated by a review of the unwind of the non-Annex E Transaction AIG - LUTETIA TDC 2014 as this demonstrates the way such large settlements were achieved by re-cycling shares and also the problems of locating shares of such large amounts.

191.    In June 2014, about three months after TDC's Record Date, the Scotiabank trader who supplied the shares used to unwind the non-Annex E Transaction AIG – LUTETIA TDC 2014 was approached by ED&F Man to arrange borrows of various shares including 3,030,000 TDC shares.

192.    The Scotiabank trader stated that Danish shares are "usually a little more tricky to source". [137]  It appears to take Scotiabank until the next trading day to locate enough shares to lend to ED&F Man to facilitate the unwind despite the fact that, in the case of the TDC shares, ED&F Man was only looking to borrow 10% of the total shares it needed to unwind. [138]

---

[136] By way of comparison, as of 2021, Clearstream, one of the two leading custodians for European Equities, offers 7 daily settlement cycles for Danish shares.  It would have been possible for ED&F Man to settle multiple transactions in each cycle so long as they fully netted.  See, https://www.clearstream.com/clearstream-en/products-and-services/market-coverage/europe-t2s/denmark/settlement-process-denmark-1281608, accessed 11 December 2021.

[137] See, Bloomberg Chat ED&F-00444356, at p. 2.

[138] ED&F Man borrowed 3,030,000 shares and then used them to close out total positions of 30,300,000 across all its clients.  This is the total number of shares on which all the Acer ED&F Man Pension Plans made tax reclaims for the TDC dividend on 11 March 2014.  See, for example, the dividend reconciliation worksheet ED&F-00040919 at 83 and the trade confirms for the unwind trades at ED&F-00201239.

193.    A review of the two relevant custody statements shows the following: [139]

    a.    Account 778045F has 50 rows on 13 June 2014 and every single line entry is 3,030,000 shares either in or out.  The total net movement for the day is 30,300,000.

    b.    Account 778523F has 54 rows on 13 June 2014.  Again, every single line entry is 3,030,000 shares in or out.  The total net movement for the day is also 30,330,000.

194.    On June 16, 2014 only account 778523F has any entries for the TDC shares and this includes two rows, both again for 3,030,000 shares which I assume to represent the close out of the borrow with Scotiabank.

195.    It is not clear to me what the purpose of the two different accounts is or why there are so many entries but based on the movements on June 16, 2014 it is possible that each step requires two entries in the account. The unwind of the transaction requires the following steps to be executed:

    a.    ED&F Man returns allegedly re-hypothecated shares to ED&F Man Pension Plan

    b.    ED&F Man Pension Plan sells to IDB

    c.    ED&F Man buys from IDB

196.    It is possible that what we see are two entries each for the 10 buys and sells plus 10 entries for the alleged re-hypothecation return which would give 50 entries plus the entries required for the original borrow from Scotiabank, but this is speculation on my part as it is not possible to link individual entries in the BNP Paribas statements to specific ED&F Man transactions.

197.    However, what these statements do confirm, which is the key point highlighted by this example, is that the Acer ED&F Man Pension Plans (including AIG) and ED&F Man have reused the same

---

[139] See ED&F-00604196 and ED&F-00604678 both on tabs DK0060228559 which is the ISIN of TDC.

3,030,000 shares lent by Scotiabank to settle positions that are ten times as big as the actual positions they claim to have held in these transactions.  See Figure 8 below.

**Figure 8**



198.    Secondly, I have reviewed the trade settlements contained in the BNP Paribas custody accounts [140] for the period around the Coloplast dividend with Record Date of December 11, 2013.  These

---

[140] ED&F-00604196 and ED&F-00604678 on tab DK0060448595 which is the ISIN of COLOB.

include the Annex E Cambridge Way-MPT Dubai COLOB 2013 transaction and the non-Annex E Cambridge Way-Mitsubishi COLOB 2013 transaction.

199.     The BNP account records confirm that there were 1,037,116 shares actually held on the Record Date, but that ED&F Man produced Tax Vouchers for 8.3m shares.  Based on my review of the ED&F Man dividend reconciliation worksheets [141], it is possible to identify that none of the 1,037,116 shares relate to Cum-Ex transactions that I have reviewed, and that 500,000 relate to a Cum-Cum transaction.

200.     There are a number of significant trades which ED&F Man executed for its Pension Plans during this period including Cambridge Way claiming ownership of 2,000,000 shares and also Mitsubishi selling 2,800,000 shares in a Cum-Ex Sale to ED&F Man. [142]

201.     The custody records contain a total of 564 transactions over the COLOB shares in the period from 2 December to 12 December 2013 and the net movement across both accounts for the whole period is an outflow of 250,000 shares.  The maximum single settlement that ED&F Man made over this whole period was for 500,000 shares.   Whilst I cannot be definitive because I am not aware of any unique transaction matching code, it would have been possible for ED&F Man to complete the settlement of the 564 transactions, including all of the Cum-Ex transactions, by re-hypothecating and recycling some or all of the 1,037,116 shares which ED&F Man did actually acquire from the market for its other trades.

202.     Thirdly, I have reviewed the settlement transactions related to the Annex E AIG-MPT Dubai NZYMB 2015 Transaction [143] which occurred when Skandinaviska Enskilda Banken AB (publ), Sverige ("SEB") was the custodian for Danish shares.  This involved the Cum-Ex purchase of 750,000

---

[141] ED&F-00045042 at 75.

[142] ED&F-00045042.

[143] Appendix C, Trade 45.

Novozymes shares with settlement on March 2, 2015. [144]  I have reviewed the historic settlement schedule provided by SEB [145] which I understand contains the complete history of relevant external settlements by SEB.  On this schedule we can see the receipt and return of the shares borrowed by ED&F Man in other trades in the net amount of 1,115,000 (being 1,125,000 less 10,000 which appear to have been borrowed from Macquarie) which were received by February 27, 2015 and were returned on March 4, 2015.  I understand that these relate to two Cum-Cum transactions which are outside the scope of this report, but which can be seen on the dividend reconciliation worksheet for this dividend. [146]

203.    There are no other share settlements involving Novozymes shares on any other dates in the historic settlement report.  However, we can see on the extract from the SEB Finess system [147] that there is a settlement on March 2, 2015 of 750,000 shares which appears to be the Cum-Ex Purchase by AIG from MPT Dubai [148].  Therefore, it is evident a significant Cum-Ex purchase transaction was settled by ED&F Man without any net movement into or out of the main ED&F Man Client Account with SEB used by the ED&F Man Pension Plans.

### 2.    The Share Amounts That Were Purportedly Transacted Were Wholly Inconsistent with Realistic Average Daily Traded Volumes ("ADTV") Because These Purported Amounts Could Not Have Been Risk Managed by the Parties

204.    Most market participants have trading limits that are based on average daily trading volume ("ADTV"), which is the average number of shares which change hands in the markets on a given day.  It

---

[144] ED&F-00076389, at 90.

[145] SEB_00000093.  Historic settlement report produced from SEB Finess, which I understand to be the relevant settlement system used by SEB for Danish share settlements.

[146] ED&F-00076389, at 02.

[147] SEB_00000092. Extract from SEB Finess.

[148] There is no definitive unique reference number that I am aware of connecting the Finess entry to the Annex E AIG-MPT Dubai NZYMB 2015 transaction but the Trade Date, Settlement Date, number of shares and total consideration all match the expected amounts.

appears that the desk mandate for ED&F Man's Equity Finance Team had a limit of 20% of ADTV calculated over a 20 Day period for a comparable dividend period both for Stock Loans and other Equity trading positions. [149] It is not clear whether or how this limit was applied in practice because the volumes purported to be traded were significantly in excess of this limit as explained below.

205.    These limits exist to address the possibility that a party stuck with a large volume of shares following a counterparty's default will need to sell them to exit its position. Firms and their traders are usually concerned about having to sell large numbers of shares because such a sale inevitably causes the markets to move against them, which can result in very large losses before completing the sale of securities. ADTV provides information on the length of time it would take to exit a position. A market participant would only be able to sell a portion of its ADTV without market impact. Most traders typically need to take extra risk mitigation steps if the expected exit time exceeds 3-5 days. Although liquidity increased around dividend dates, the number of shares purported to be traded far exceeded ED&F Man's and its clients' capabilities. In my experience, a limit of around 200% of ADTV would be typical for an equity finance trading desk.

206.    I have reviewed the daily trading volumes for all the shares in the Appendix C Cum-Ex Trades and show the results of this analysis in Appendix D. Focusing solely on trades done in respect of the COLOB real dividend on December 11, 2013, it is evident that the 1,000,000 shares purported to be purchased by Cambridge Way and AIG were nearly more than 350% of the ADTV for the 30 trading days around the Record Date, which was approximately 273,000. Across all its clients, ED&F Man claims to have traded over 3,000% of the ADTV. No sensible risk manager would ever have permitted such trading limits, and this is a clear indication to me that it was clearly understood by all the participants

---

[149] ED&F Man Europe Risk Mandates document from January 2014 (ED&F-00444677, at 84).

that there would in fact be no market risks because all of the trades were completely pre-ordained, circular, and self-cancelling.

207.    A similar pattern is observed around nearly all of the real dividend events covered by the Appendix C Cum-Ex Transactions.  The total withholding tax reclaims made by ED&F Man and its clients amounted to an average of over 2,000% of ADTV.  See Figure 9 below.

**Figure 9**



Note: Average Daily Trading Volume is calculated over the 15 trading days preceding each Record Date and 15 trading days following it.

Sources: Bloomberg, Dividend Reconciliation Forms in ED&F Trade Packets received from counsel.

208.    It is simply not credible for the participants in these transactions to claim that these were real investment positions.  Had these reported amounts actually been transacted, they would have materially moved the market and posed serious risk management considerations for both ED&F Man and the market.

209.    To illustrate this point, there are 6 dividend events listed in Appendix D for which the number of shares ED&F Man claimed to hold was 9% or more of the total issued share capital of the companies.  In my experience, accumulating real positions of this magnitude in a major listed entity would have serious market impact, reputation and legal risks associated with it and could well have required disclosure to the Danish securities regulator. [150]  I have seen no evidence that any of these issues were ever considered or discussed by the participants which confirms my view that these were not real trading positions for either ED&F Man or the ED&F Man Pension Plans.

### D.    Opinion 4: ED&F Man's Tax Voucher Process Was Highly Unusual, Inappropriate, and Resulted in Fabricated Tax Vouchers with False Statements

210.    ED&F Man also had a highly unusual and inappropriate process for creating Tax Vouchers for its clients in the Appendix C Cum-Ex Trades.

211.    It is entirely customary for banks, prime brokers, or custodians to hold securities in co-mingled or omnibus accounts and through a series of sub-custodians.  It is equally customary for the client-facing broker, ED&F Man in this case, to produce a specific tax voucher for its client confirming the details of any real dividends or interest that the client has received from assets the client-facing broker holds on the

---

[150] See the current rule which requires reporting holdings greater than 5% at https://www.dfsa.dk/Reporting/Major-shareholder-notifications and a 2012 version of the rule at https://www.dfsa.dk/-/media/Lovgivning/Oversat-lovgivning/Acts/C_Act855_2012-pdf.pdf, both accessed on December 14, 2021.

Nasdaq OMX Nordic provides notifications of such changes in large holdings at http://www.nasdaqomxnordic.com/news/companynews, and no such records of ED&F Man positions are available.

client's behalf. Additionally, this voucher is produced on the basis of a calculation of the relative portion of the real dividend received by the broker.

212.    However, what is highly unusual and inappropriate in the claims related to this matter is the production of Tax Vouchers on the basis of lists of traded but unsettled transactions that had been conducted but remained unsettled by the Ex-Record Date, rather than based on the shares that ED&F Man actually held in its custody accounts.[151] I note by way of comparison that the terms and conditions of the SEB Custody Agreement Country Annex for Denmark,[152] which applied to ED&F Man when it used SEB as custodian for a number of the relevant transactions after April 2014, states that [tax reclaims must be filed] "for settled positions only" and later that "no tax reclaims will be filed for stock lending, where the given entity is not entitled to the refund". In my experience the approach outlined by SEB is typical of the market standard approach.

213.    As is readily apparent from the transaction description above, no member of ED&F Man's group ever held any shares or received any real dividend for the event involving Appendix C Cum-Ex trades. Even if the counterparties in these transactions had been the holder of record on the Record Date, producing tax vouchers solely on the basis of a Market Claim was highly unusual and should not have been done without extensive legal advice, appropriate disclosures, and caveats related to the tax voucher itself. I note that ED&F Man's own Risk Mitigations and Controls Framework shared with the FCA states that all trades have relevant opinions which are reviewed and independently revised by Group

---

[151] See, ED&F Man Dividend Reconciliation Excel Workbook (ED&F-00081150) which includes the dividend compensation amounts in the transaction being considered here. This includes 7 rows totaling 2,000,000 shares which formed the basis for the tax voucher issued to Cambridge Way (ED&F-00220082).

[152] SEB_00000016.

Tax. [153]  However, ED&F Man has stated that it did not obtain any of its own legal opinions which would have been customary given the importance of this process to these significant transactions. [154]

214.    In respect of the dividend paid by Coloplast on December 11, 2013, the dividend reconciliation schedule [155] indicates that it issued tax vouchers for approximately 8.3M shares when it actually only had 1.0M shares in its BNP Paribas custody account on the Record Date and it appears that BNP Paribas only credited ED&F Man with the net dividend on those 1.0M shares. [156]  The significant divergence between purported and actual share amounts highlights the extent to which the dividend Tax Vouchers were divorced from the payment of real dividends.

215.    From April 2013 to April 2014, ED&F Man held the Pension Plans' shares in BNP account 778523F [157].  I have verified that for 13 of the 14 relevant dividend events in this period, the numbers of shares held by ED&F in this BNP account are the same in the BNP dividend history ED&F-00603586 as in ED&F's own dividend reconciliation forms. [158]  These share counts held by BNP are under 20% of the

---

[153] See ED&F-00444656 at 70.

[154] See, for example Hashemi Tr. Vol. 1 at 50:10 – 50:19.

[155] See, the ED&F Man Dividend Reconciliation Excel Workbook (ED&F-00081150)

[156] See the Excel Workbook ED&F-00603586 which I understand is an extract from BNP Paribas of dividends credited to ED&F Man.  This has three rows for the dividend from COLOB paid on 11 December 2013.  Two of these rows have no shares and no net dividend and the final row shows a dividend being credited for a position of 1,037,116 shares which matches the ED&F Man Dividend Reconciliation Form ED&F-00045042 at 75.

[157] Draft SKAT and ED&F Man Market Limited and Others Schedule of Agreed Facts Appendix 2, at p. 3.

[158] ED&F-0063586 and each individual ED&F Man trade pack.  There is one dividend event discrepancy for the A.P. Møller Mærsk A/S – Class A April 3, 2014 dividend event, which is excluded from this chart.  ED&F's dividend reconciliation form (ED&F-00039716 at 26) does not show any shares held at BNP, but BNP's Dividend Schedule ED&F-00603586 has 2 rows for this dividend totaling 2,500 shares.  For all 13 other dividend events in this period, which are included in this chart, the numbers of shares held at BNP are consistent between ED&F and BNP's respective records.  I also note that for a few of these dividend events, ED&F's dividend reconciliation forms do indicate that some shares were held at external brokers other than BNP Paribas.  However, this caveat does not alter the opinion that ED&F did not hold enough real shares to cover their tax voucher claims.

number of shares for which ED&F Man claimed a Tax Voucher for 11 of the 14 dividend events.  See Figure 10 below.

**Figure 10**



ED&F Claimed Ownership of Many More Shares than They Actually Held at BNP

■ Percentage of Shares Claimed for Tax Vouchers by ED&F That Were Actually Held at BNP

Note: This chart includes all dividend events during the time period over which ED&F held the pension plans' securities in account number 778523F, which is April 2013 to April 2014 as per Hashemi Exhibit 4152, page 3.

Sources: BNP Custody Statements (EDF-00603586.xlsx),  Dividend Reconciliation Forms in ED&F Trade Packets received from counsel.

216.    I have also looked at an example dividend event relating to the period after which ED&F Man had switched from BNP Paribas to SEB as its custodian for Danish shares.  Specifically, I have looked at the dividend paid by Novozymes A/S on March 2, 2015, discussed earlier in the context of understanding how ED&F Man settled these transactions.  This dividend event shows an identical position to that

observed when BNP Paribas was the custodian.  The dividend reconciliation schedule for this dividend shows that ED&F Man issued Tax Vouchers for a total of 2,615,000 shares. [159]  However, the SEB schedule of dividends credited to the ED&F Man client account used by the ED&F Man Pension Plans only held shares of 1,115,000 shares (i.e., the shares previously identified as relating to Cum-Cum trades transferred from Macquarie) and ED&F Man was credited with a dividend on this number of shares by SEB. [160] No dividend was credited to ED&F Man by SEB for the other 1,500,000 shares but ED&F Man issued Tax Vouchers for amounts calculated by reference to these shares anyway.

217.    Finally, because the trades were self-cancelling, it is also notable that, in a number of cases, including in the MPT Dubai trade, the normal market discipline of actually settling and matching up trades with external counterparties was missing making the booking process prone to error.

218.    For example, in a January 7, 2014 email to ED&F Man, several weeks after the transactions, Darren Thorpe of Zeta disclosed that the trade bookings for Cambridge Way were incorrect. [161]  The records indicated that Cambridge Way had bought 3,000,0000 COLOB shares and sold 2,500,000 of them, when in fact, the confirms, assuming these were real trades, suggested that Cambridge Way bought and sold 2,000,000 COLOB shares.  Although Darren Thorpe of Zeta confirmed that ED&F Man's Operations Team had credited Cambridge Way with the 'correct' amount, the error in this instance clearly points to the production of tax vouchers being wholly divorced from the payment of real dividends.

219.    A similar discrepancy is also apparent in an unrelated transaction.  It appears that in respect of a dividend event for the Lundbeck A/S shares ("LUN DC"), the total reclaims made based on ED&F Tax Vouchers, which I understand ED&F Man refers to as the Annex A tax vouchers, did not match the

---

[159] ED&F-00076389, at 02

[160] SEB_0000095 which I understand to be a report of all dividends paid into the ED&F E1 73% POOL (Account Ref: 05295142806) during the relevant period.

[161] See, ED&F-00152620.

amounts which ED&F Man's own process indicated vouchers should have been issued and an excess of DKK 312,120 was received from SKAT. It appears that no attempt was made to return these funds to SKAT or correct the error and that it was booked as extra profit. [162]

**1.** **The Tax Vouchers That ED&F Man Produced Contained False Representations, Were Essential to Filing False Tax Reclaims, and All Participants in the Order and Execution of These Trades Would Have Been Fully Aware of This**

220.   ED&F Man produced fabricated dividend Tax Vouchers. Without these Tax Vouchers, there would have been no possibility for any of ED&F Man's customers to submit tax reclaim applications. Further, reclaims are a relatively straightforward matter for a customer with a tax voucher in hand. The Tax Vouchers were issued by a U.K. regulated financial institution and clearly stated that Cambridge Way was "holding the security over the dividend date" and that "the dividends paid specified on this voucher we paid net of withholding tax". [163] Similar statements are made in every Tax Voucher ED&F Man issued in respect of the Appendix C Cum-Ex transactions. All these statements are simply false.

**2.** **ED&F Man's Failure to Obtain Any Legal and Tax Advice Was a Breach of Its U.K. Regulatory Obligations. The Tax Opinions That Were Provided by PwC and Hannes Snellman Appear to Simply Be Marketing Opinions Which Bear Little or No Relation to the Transactions Actually Undertaken and Were Used to Provide Cover for the Participants Rather Than Proper Consideration of The Appropriateness of the Transactions as Conducted**

221.   As has been clearly demonstrated above by the economics of the transactions in question, the sole purpose of the transactions was to generate tax reclaims from SKAT. Despite being well-versed in the transactions and in spite of its own Risk Mitigation and Controls framework requiring opinions to be obtained and 'revised' by Group Tax, ED&F Man has stated that it did not obtain any of its own tax or

---

[162] See, Hashemi Tr. Vol. 2 at 324:1 – 325:8; emails from Marcus Howard of ED&F Man, July 3, 2013 (ED&F-00060769) and Christina Mackinnon of ED&F Man, December 18, 2013 (ED&F-000195488).

[163] See, ED&F-00220082.

legal opinions. [164]  ED&F Man and Duet Group were both regulated by the FCA and Acer was regulated by FINRA in the US. [165]  My expectation is that all of the ED&F Man Pension Plan advisers would have been under at least some basic form of fiduciary and regulatory duty of care to the ED&F Man Pension Plans in question.  As such, the transaction participants would have been under regulatory and legal duty to appropriately due diligence any transactions.  In addition, both the FCA and FINRA require adequate recordkeeping of the due diligence performed so that it can be audited or referred to in subsequent investigations by the regulators.

222.    Highlighting these requirements, in November 2021 the FCA fined Sunrise Brokers, a broker for equity trades in some of the Appendix C Cum-Ex Trades, over £600,000 for failure to properly conduct due diligence transactions of the type involved in this case with Solo. [166]  The notice for this fine makes it clear that the FCA's view is that any UK regulated firm has a responsibility to properly understand the transactions it does with its clients and to take reasonable steps to mitigate financial crime.   I have seen no evidence that these FCA requirements were properly adhered to by the parties.

223.    In very similar terms the FCA fined Sapien Capital £178,000 and heavily criticized it for its role in the Solo Transactions (discussed in more detail later).  Again, the FCA makes clear that it considers that UK regulated entities have a responsibility to understand the transactions they arrange for

---

[164] ED&F-00445164 at 70.

[165] Duet Group and Acer are regulated by the FCA and FINRA respectively.  For Duet Group, see, https://www.duetgroup.net/, accessed December 29, 2021. For Acer, see, https://brokercheck.finra.org/firm/summary/107062, accessed December 29, 2021.

[166] See, https://www.fca.org.uk/news/press-releases/sunrise-brokers-llp-fine-serious-financial-crime-control-failings, accessed December 24, 2021.  It has been represented to me that Sunrise Brokers was also a broker for transactions undertaken by Roadcraft similar to the Solo Transactions described herein.

clients.  It states that the "way the trades were conducted in combination with their scale and volume are highly suggestive of financial crime". [167]

224.    Furthermore, the tax opinions that I have reviewed which relate to the Appendix C Cum-Ex trades would not have been accepted as suitable support for transactions of this nature at any reputable institution. [168]  These opinions are based on highly hypothetical transactions which bear little or no relation to the transactions actually undertaken.  Furthermore, based on my experience in reading similar opinions, I find many of the conclusions very surprising and would have significantly challenged the conclusions in those opinions.  I would have been highly skeptical about my ability to rely upon them. In my view and based upon my experience, these opinions fall into the category of marketing opinions, which are opinions often used by promoters of schemes to convince parties external to the scheme of its legitimacy, whilst avoiding all the difficult aspects of the transaction that would render the opinion null and void.

---

[167] See, FCA, Final Notice to Sapien Capital, ¶ 2.13 (May 6, 2021), available at
https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf, accessed December 28, 2021.

[168] See, PwC Opinion to Vale (GP) Limited (DELM002768) which contains a range of assumptions which are demonstrably not applicable to the transactions being considered, not least that "the main objective behind Hamlyn LPs transactions […] is not speculating on double taxation treaty benefits".  See also Hannes Snellman opinion dated June 3, 2013 to Belador Advisors UK Limited which makes statements like "USPP *may* lend out the Danish Equity' [emphasis in the original] and 'the Danish Equity will be held by USPP through a custodian and will be recorded with the custodian' and so clearly does not envisage a completely circular transaction where the shares never actually settle"

    **E.**    **Opinion 5: The Transactions That Solo Engaged in Also Involved Fabricated Cum-Ex Transactions in Which (i) No Shares Were Delivered to or Received by the Solo Pension Plans, (ii) No Cash Was Exchanged, (iii) The Solo Pension Plans' Counterparties and Other Parties to the Transactions Did Not Receive A Real Dividend, (iv) The Trades Deviated from Market Standards in Numerous Ways, Were Not Arm's-Length, and as Such, Avoided and Ignored Real Market Risks, (v) None of The Parties Were at Risk of Any Real Market Gain or Loss, Except for the Receipt of a Fabricated Dividend Tax Reclaim, and (vi) It Appears That the Communications About Executing The Trades Were All Automatically Generated by Solo, With No Independent Involvement of Any of The Parties**

225.    In the following section, I provide a detailed description of a transaction undertaken by Solo, which supposedly acted as a clearing firm for it. [169]  I show that the transaction was completely circular, did not require holdings of either shares or cash, and its participants—Solo's purported clients and counterparties—faced no market risk whatsoever. Based on my review of the evidence, Solo never held any actual Danish securities, a fact that Sanjay Shah effectively concedes by admitting in his pleadings in the parallel English action that the Solo trades all netted completely to zero. [170]  I conclude that the transaction was in totality, completely fictitious.  Further it is my view that fictious nature of the transactions should have been obvious to any of the participants involved and should have raised important regulatory or money laundering red flags for them.

226.    While I have only reviewed two Solo trades, Counsel has represented to me that Bruce Dubinsky in his Expert Report opines that he has seen no evidence that any of the 2,599 trades conducted by the Solo Custodians that are at issue in this litigation differ in any material respect. Assuming that to be so, the opinions I set out below apply equally to the remaining Solo transactions.

---

[169] All confirmation emails from Solo contain the following text:
"In relation to the trade referred to below (Trade), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis: (i) You may seek liquidity for the Trade (via the Broker that you have identified), and (ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) – partial execution of the Trade is not approved. Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade. In case of any queries, please contact custody@solo.com. Global Securities Services Solo Capital Partners LLP. "

[170] In the High Court of Justice, Business and Property Courts of England & Wales, Commercial Court, SKAT v. Solo Capital Partners (in Special Administration) & Others, *Sanjay Shah Defendants' Response to Claimant's Request Dated June 4, 2019 for Further Information Under CPR 18* ("Shah Response"), p. 15, Response 21.

1.    **Detailed Description of the "Delvian Carlsberg 2013 Transaction", Which May Also be Referred to as the "Solo" Transaction.** [171]

227.    The parties to the transaction were:

a.    Delvian LLC Pension Plan ("Delvian"), one of the U.S. Solo Pension Plans for which Solo supposedly provided custody services. [172]

b.    Aquila Cayman Ltd. ("Aquila"), an entity which served as a stock loan intermediary.

c.    Gulf Management Group, an entity which served as a short seller. [173]

d.    FGC Securities LLC, an entity which served as a broker / futures intermediary.

228.    The shares that were supposedly traded were Carlsberg A/S ("Carlsberg") B shares ("CARLB"). CARLB's annual dividend of DKK 6 had an Ex-Date of March 22, 2013, a Record Date of March 26, 2013, and a Payment Date of March 27, 2013. [174]

---

[171] I have also reviewed the trades of the Roadcraft Technologies LLC Roth 401(k) Plan (the "Roadcraft NZYMB 2015" transaction) surrounding the March 2015 dividend issued on Novozymes A/S – B shares. Like the Delvian Plan's Carlsberg trades, the Roadcraft NZYMB 2015 transaction's trades were also part of a circular loop of fake trades. The two differences between the Delvian example and the Roadcraft example do not change this conclusion: First, in the Roadcraft Novozymes 2015 Transaction trade loop there were additional intermediary brokers, futures counterparties, and stock loan counterparties. Second, the Roadcraft NZYMB 2015 transaction's trades used forwards as a hedge instead of futures. As stated, these differences do not change my conclusion that they are designed only to generate a false dividend credit advice to receive a tax refund from SKAT.

[172] Amended Complaint & Demand for Jury Trial, SKAT v. John van Merkensteijn et al., dated April 27, 2020, ¶¶ 26, 65-66, and 86, 19-cv-10713-LAK (S.D.N.Y. April 7, 2020)

[173] It is theoretically possible that Gulf Management Group had other CARLB shares as part of some other unrelated transaction at the time of entering into its Cum-Ex sale to Delvian so that, strictly speaking, it would not be a 'short seller' in respect of some or all of the CARLB shares. However, given that it subsequently 'settles' the sale using shares acquired via its stock loan from Aquila I proceed on the basis that it did not have any such shares. Even if it did own such other shares it would not impact my conclusions in any way because no shares were held by the Solo Custodians so I can be confident it did not use any such shares in this transaction.

[174] See, https://www.carlsberggroup.com/investor-relations/shares/investment-calculator/, accessed December 28, 2021.

229.    The transaction constructed by Solo can be described from the perspective of the Solo Pension Plan as follows:  Delvian purchased 600,000 CARLB shares at DKK 586.4698 per share, for a total purchase price of DKK 351,881,880.  The transaction purportedly had a Trade Date of March 21, 2013 and was due to settle six days later on March 27, 2013. [175]  This trade shared the same fictitious Cum-Ex characteristics as the Annex E Cambridge Way – MPT Dubai COLOB 2013 transaction, which is described in Opinion 2, and included and summarized in Appendix C.  The opinions I have expressed in Opinion 2 above, regarding the Appendix C Cum-Ex trades apply with equal force to this and any other similarly structured trade that the Defendants conducted with the Solo Custodians [176].

230.    The following events occurred with respect to the Solo transaction:

- An equal and exactly opposite trade confirmation was emailed from Solo [177] to an entity called Gulf Management Group, which also had an account with Solo. [178]

---

[175] ELYSIUM-01463019.

[176] There are some differences which are worth highlighting as a result of the differences in the transactions and the differing evidence I have seen.  These are as follows:

1.  The two transactions I have reviewed are most similar to Annex E transactions in that we can see that no party held any shares over Record Date and therefore some of the points made about the non-Annex E trades are not relevant.  However, it is self-evident from the points I explain below that the IDBs in these transactions were even less independent than those in the ED&F Man transactions.

2.  I have not reviewed the pricing, risk sharing and detailed margin arrangements of the Solo Transactions but again it is self-evident that these were coordinated schemes and there was in fact no proper consideration of these issues because all the trades were both fictitious and fully self-offsetting so that none of the parties had any meaningful risk apart from any de minimus brokerage costs.

[177] All emails originated from solotradeapprovals@solo.com.

[178] ELYSIUM-01463069.

- Delvian, in turn, hedged its price risk exposure by selling 6,000 futures contracts for CARLB shares at a price of DKK 582.49. [179]  Again, Gulf Management Group received a trade confirmation for the opposite trade. [180]

- On the Record Date, March 26, 2013, Delvian arranged to finance its purchase by entering into a stock loan under which it agreed to lend out the 600,000 CARLB shares at DKK 586.4698 per share to an entity called Aquila, which also had an account with Solo. [181]  Concurrently, Aquila lent the same shares under the same terms to Gulf Management Group, the purported short seller, thus completing the circle. [182]

231.    On the Payment Date, the following allegedly occurred:

- Delvian paid the purchase price of DKK 351.9 million to acquire the 600,000 shares of CALRB from Gulf Management Group.

- Delvian funded its 'purchase' of the 600,000 CARLB shares with the DKK 351.9 million cash collateral it received under the stock loan with Aquila.

- Delvian received the 600,000 CARLB shares from Gulf Management Group and delivered them to Aquila.

- Aquila delivered the 600,000 CALRB shares to Gulf Management Group and received DKK 351.9 million in cash collateral.

- Gulf Management Group sold the shares to Delvian and received a sale price of DKK 351.9 million.

---

[179] ELYSIUM-01463050.

[180] ELYSIUM-01463066.

[181] ELYSIUM-01487895.

[182] ELYSIUM-01487882.

- Delvian, sold 6,000 futures contracts for CARLB shares at a price of DKK 582.49 to Gulf Management. Group

232.    After the Dividend Date, the trade was left outstanding until June 10, 2013, when it was unwound by reversing the steps from the original trade:

- Delvian sold the shares; Gulf Management Group bought the same shares. [183]

- Delvian recalled the shares it had lent out by using the cash from the sale of shares; Aquila did the same. [184]

- Delvian bought a future to close its hedge; Gulf Management Group sold the same future. [185]

233.    Delvian filed a withholding tax refund claim with SKAT on April 8, 2013 and supported it with a "Dividend Credit Advice" prepared by Solo. [186]  The circularity of the scheme is evident.  See Figure 11 below.

---

[183] ELYSIUM-01789225, ELYSIUM-01789227.

[184] ELYSIUM-01805039, ELYSIUM-01805041.

[185] ELYSIUM-01789224, ELYSIUM-01789231.

[186] SKAT_MDL_001_00079683, at 725-730.

**Figure 11**



**2.**  **Solo Held No Shares in Its Sub-Custodian Accounts, and, Netting Offsetting Trades at the Custodian or Sub-Custodian Level Cannot Create Shares or Dividends**

234.    I reviewed several documents with information on the amounts of Danish securities held by Solo during the Relevant Period.  I conclude that at no time during the Relevant Period did Solo in fact hold a long position in any Danish stock.

235.    I reviewed declarations made by JPMorgan Chase Bank, N.A. – London Branch and J.P. Morgan Securities plc (together "JPMorgan") and SEB, two of the institutions in which Solo supposedly held custody accounts. [187]  The JPMorgan Declaration lists Solo as one of the entities for

---

[187] I understand that Solo Capital had a custody account with JPMorgan during the relevant period, and that JPMorgan has confirmed that this account did not hold the relevant shares during the relevant period.  See, Declaration of Matthew J. Totman, ¶ 8: "JPMorgan… identified no holdings of any of the Danish Securities [e.g.,

which JPMorgan "identified no holdings of any of the Danish Securities during the Applicable Period." [188]  The SEB Declaration lists Solo among one of the entities for which "SEB Denmark has searched the customer database for SEB Denmark's custody business… in the Applicable Period" but found none. [189.]

236.    In an English litigation filing, Sanjay Shah, who I understand to be the owner of Solo and the other Solo Custodians, maintains that Solo "held claims against JP Morgan and SEB in the sum of zero because the long and short positions in the account netted off. This was same for dividend payments." [190]

237.    Solo appears to be claiming that where clients have equal and offsetting long and short positions, the client is entitled to treat the long counterparty as if it did, in fact, have actual shares for which it is entitled to real dividends.  This is obviously wrong.  In my experience, a custodian would only issue tax vouchers which totaled its combined net *long* position, not the long side of its net *flat*, or equal and offsetting long and, short positions.  Market participants would request segregated client accounts if they expected dividend receipts to be an important economic factor for them, precisely

---

CARLB] during the Applicable Period [e.g., March 2013-June 2013] for the following entities: … Solo Capital Partners LLP…."  Statements from the purported trade date, March 21, 2013, show a series of exactly offsetting long and short futures positions.  ELYSIUM-01479796.

[188] Declaration of Matthew J. Totman (JPMorgan), December 15, 2021, ¶ 8.

[189] Declaration of Anders Peter Bryde Rasmussen, May 17, 2021, ¶¶ 12-13.  In addition, counsel has represented to me that Solo Capital's U.K. solicitors, Reed Smith LLP, reported to the U.K. FCA that from 2014 to 2015 Solo Capital also used Société Générale SA to sub-custody securities.  ELYSIUM-05327063, at 2.  Counsel has represented to me that the Expert Report of Bruce Dubinsky concludes that the Société Générale's records of Solo's cash and securities holdings include no evidence that Solo Capital or the other Solo Capital Custodians held the Danish securities the Plan's claimed to SKAT to have owned.

[190] Shah Response, p. 15, Request 21: "Please confirm whether it is alleged that SCP [Solo Capital Partners] was a client of the credit institutions and was entitled to and did hold claims against those credit institutions for shares and net dividend payments in respect of the WHT [withholding tax] Applications." Response 21: "During the periods specified above, SCP was a client of JP Morgan, SEB (and Citi), who are each credit institutions. At the relevant times, it held claims against JP Morgan and SEB in the sum of zero because the long and short positions in the account netted off. This was same for dividend payments."

to prevent accidental rehypothecation or netting, which could prevent the clients from earning the expected income.

### 3. The Circular Nature of the Solo Trades with Delvian Means That There Was No Requirement for Shares or Cash; The Purported Trades were Completely Fake

238.    Notwithstanding the theoretical ability to net settle offsetting DVP transactions, one could not independently settle any of these transactions because there was no cash [191] and even if one of the parties had access to cash it still could not have worked because there were no shares [192].  Put another way, Delvian could not initiate settlement because it did not have cash [193], and in any event, Gulf Management Group did not have any shares to give Delvian such that even if Delvian could access cash from Aquila this settlement could not have been completed on a normal DVP basis.

239.     However, by what appears to be an inexplicable bookkeeping-entry, Solo settled all the trades despite lacking cash, or the shares provided by any of its clients.  For the avoidance of doubt, in my experience, this is not a usual or appropriate thing for a custodian to do for its clients.

240.    Both the original trades in March 2013 and the unwinds in June 2013 are completely circular. There were no shares, and no cash was used to settle the trades, so the transaction was simply fictitious.  The three-month "holding period" was undoubtedly a position designed to demonstrate in the event of an inquiry by SKAT or Solo Capital's other regulators that Delvian was a long-term owner of the shares but as was the case with ED&F Man Cum-Ex Transactions I do not consider that these positions represented legitimate trading positions.

---

[191] Counsel has represented to me that the Expert Report of Bruce Dubinsky concludes that the Solo Custodians did not have sufficient cash within their environment to facilitate the settlement of this transaction during the Relevant Period.

[192] As confirmed for the reasons given in the previous section.

[193] At least this is my presumption given the perfectly matching stock loan to Aquila which it used to fund the 'settlement'.

4.    **All the Trades Were Dictated to the Solo Pension Plans by Solo and Eventually Automated; Both These Facts are Highly Irregular and Further Evidence That These Transactions Were Fake**

241.    The Solo trade initiation was even more unusual than the pre-planning and pre-ordination seen in the ED&F Man Annex E trades.  With the Solo trades, purported traders working for the Solo Pension Plans would receive instructions from Solo with directions on which shares each Plan was to trade, trade volumes, and trade counterparties. [194]  This is highly irregular and means that the purported trades were not at arm's-length.

242.    More egregiously, beginning in early 2015, the purported trades began to be auto generated by Brokermesh, an automated system created by Solo to generate and book trades. [195]  It is not uncommon for some hedge funds to build sophisticated trade automation systems and many high-frequency hedge funds delegate trading entirely to algorithms.  However, that is not at all like the Solo/Brokermesh process.  The Brokermesh system appears to have generated emails purporting to be from one firm to another firm or from Solo to various firms offering trades and then confirming them. [196]  These trades were all conducted internally on Solo's platform. [197]  According to the U.K.'s FCA, "Brokermesh was always able to locate liquidity for OTC trades worth over £6.3 billion that were executed by Sapien [a broker that participated in the Solo trades], even though access to the platform was closed, being limited to clients introduced to the brokers by the Solo Group." [198]

---

[194] See, for example, Klugman Tr., at 110:6-23; Lehman Tr., at 331:7-11, 338:3-6, 348:21-23, 357:22 – 358:13, 377:9-16; JHVM_0004863 and attachments.

[195] See, FCA, Final Notice to Sapien Capital ¶ 4.114 (May 6, 2021), available at https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf ("FCA Sapien Final Notice"), accessed December 28, 2021; FCA, Final Notice to Sunrise Brokers LLP ¶ 4.123 (November 12, 2021), available at https://www.fca.org.uk/publication/final-notices/sunrise-brokers-llp-2021.pdf ("FCA Sunrise Notice"), accessed December 28, 2021.

[196] FCA Sunrise Final Notice ¶ 4.123.

[197] FCA Sunrise Final Notice ¶ 4.125.

[198] FCA Sapien Final Notice, ¶ 4.129.

243.    The observations I made earlier in respect of the ED&F Man Cum-Ex transactions about the size of the trades relative to the ADTV are equally applicable to Solo.  It is inconceivable to me that these IDBs were genuinely able to provide instant access to liquidity equal to more than the ADTV of the shares in question. [199]  Rather it is a further indication that these were fictitious and circular transactions which were accepted without question by all the parties because they understood the circularity of the transactions and knew they had no trading risk.

244.    Additionally, all of the transactions I have reviewed were structured such that same day trades took place at exactly the same price with no bid/offer spreads on any of the legs and as mentioned below, the stock loans further used the same prices as buy and sell trades conducted on previous dates irrespective of intervening price moves.  Therefore, even if we were to accept that the IDBs were genuinely seeking liquidity and providing it to other of Solo's clients (via Brokermesh or otherwise), which I do not, then there does not appear to have been any opportunity for them to generate the normal brokerage bid offer spreads which is the only reason why a real IDB would participate in a real brokerage platform.

245.    In conclusion, there is no way in which this Brokermesh can be considered a genuine liquidity finding venue and these facts further support the conclusion that these transactions were simply fictitious and that all the supposed participants were in league with Solo, which was organizing and coordinating all of the false bookings and tax reclaims.

### 5.    The Terms of the Stock Loan Agreements are Highly Irregular for Multiple Reasons

246.    First, for the Solo transaction discussed above, the stock loan confirmation states that Aquila, the borrower, would pay 100% of dividends back to the lender, Delvian. [200]  However, since the stock loan

---

[199] For example, Appendix D shows that the ADTV of Novozymes A/S shares used in the Roadcraft NZYMB 2015 transaction was approx. 524,000 shares per day when the number of shares traded by the participants was 681,437 shares.

[200] ELYSIUM-01487895.

was traded on the Record Date for settlement after the Record Date, this provision appears to be meaningless because there was no need for any manufactured payments during the life of the stock loan. This is because even if there had actually been any real shares, the real dividend on those shares would not have been received by Aquila, which would only have taken delivery after the Record Date.[201] Further, had Carlsberg announced and paid a special dividend during the term of the loan, Aquila would have lost 27% of any such dividend paid as it would not be able to recover any withholding tax and would have had to pay the gross amount.[202] This demonstrates that the terms of the stock loan transaction were unmoored from the realities of the actual market or any economic considerations, and would have only been undertaken to create the illusion of a dividend to support a reclaim application by Delvian.

247.     Second, since there was no haircut on the stock loan, Delvian would have received 100% financing of the share purchase price.  Apart from the obvious reason that the transaction allowed the completely fabricated trade flows to perfectly net out, there is no obvious logic to the terms of the stock loan from the perspective of the stock borrower, Aquila.  In effect, Aquila is providing a thinly capitalized pension fund with complete financing for its 'trading' position and so is effectively at risk of any losses that arise. In my experience, no stock borrower would agree to such terms as it would require the party to ignore all counterparty and market risk inherent in any stock loan transaction.  As I have explained in the discussion on margin, haircuts, and valuation of securities, the fundamental purpose of many of the

---

[201] A dividend compensation payment under a stock loan is paid only when the loan extends over the Record Date. See section 6.2 of the GMSLA which provides that: "Where the term of a Loan extends over an Income Record Date in respect of any Loaned Securities, Borrower shall, on the date such Income is paid by the issuer, or on such other date as the Parties may from time to time agree, pay or deliver to Lender such sum of money or property as is agreed between the Parties or, failing such agreement, a sum of money or property equivalent to (and in the same currency as) the type and amount of such Income that would be received by Lender in respect of such Loaned Securities assuming such Securities were not loaned to Borrower and were retained by Lender on the Income Record Date."  International Securities Lending Association, "Global Master Securities Lending Agreement", available at https://www.islaemea.org/wp-content/uploads/2019/03/GMSLA_2010_amendments_July_2012-1.pdf, accessed December 23, 2021.

[202] Aquila appears to have been registered in the Cayman Islands, which does not have a double taxation treaty with Denmark.

provisions of a GMSLA is for the counterparties to properly mitigate their credit risk to each other and these considerations have been completely ignored in the way the stock loans were executed.

248.    I have reviewed an email chain between Delvian and Aquila in which Aquila (the stock loan intermediary) initiates the loan transaction by seeking shares from Delvian. [203]  It is not clear to me why an intermediary like Aquila would be looking to borrow shares if this were a true arm's-length situation and even if it was why it would speculatively reach out to a pension fund client.   I do not give any credibility to this supposed initiation by Aquila but in any event the approach of using no haircut is clearly not something which would be agreed if Aquila and Delvian were acting at an arm's-length (particularly for such a large single-share stock loan transaction).  If Aquila needed the shares then Delvian would demand margin, and if Delvian were in need to funding then Aquila would demand a haircut.  The same issue obviously applies to the onward lending of shares from Aquila to Gulf Management Group.

249.    Third, Delvian received financing based on the value of collateral which was already two days out of date at the point the trade occurred.  This financing amount guaranteed that one of the counterparties would have significant credit risk to the other, from the point of initiation of the trade.  In fact, the closing price on March 26, 2013, the date of the stock loan was DKK 573.0000, [204] implying that Aquila gave funding of DKK 586.4698 per share when the value of the collateral was only worth DKK 573.0000 per share.  Aquila provided Delvian with significant margin when it would have been customary instead for Aquila to demand a haircut from Delvian.  This is not something which would have been agreed to between arm's-length counterparties.

---

[203] MPSKAT00075810 & MPSKAT00075813.  I have reviewed a document which appears to be instructions for the individuals who purportedly executed the Solo trades about how the transaction approvals and booking process worked for many of the Solo trades.  JVHM_0004863.  It appears from this document that it was the standard practice for the impression to be created that it was the stock loan intermediary seeking liquidity from the Pension Plan.

[204] Bloomberg.

250.    Fourth, Delvian appears to have not taken any steps to finance its purchase of DKK 351.9M of CARLB shares for the 5 days between the Trade Date of its Cum-Ex purchase and the Trade Date of the stock loan it used to finance itself.  As a thinly capitalized pension fund this is a highly imprudent approach to take if it were not part of the completely pre-ordained set of transactions.  I also note that I have seen no evidence that any of the counterparties to Delvian were at all concerned about such a large unfunded position or had taken any steps to address what would happen if Delvian's funding stock loan had been declined.  There is simply no way that arm's-length counterparties would have dealt with each other on this basis.

> **6.    The Terms of the Futures Trades and Solo's Transactions of Futures at Its Sub-Custodians were Also Irregular**

> **a)    The Pricing of the Futures Appears to be Priced using the exact Net Dividend with no implied sourcing cost and no bid offer spread.**

251.    As explained in my introduction about futures and forwards the price of a future or forward can be expressed as:

> Forward or Future Price = Current Market Price plus interest less expected dividends

252.    I have reviewed the pricing of the futures in the Annex E Cambridge Way – MPT Dubai COLOB 2013 transaction and the forwards in the Roadcraft NZYMB  2015 transaction [205]  and both appear to have been priced to that the forward price assumed that the recipient would receive precisely the net dividend of 73%. [206]

---

[205] See, Appendix C, Solo Capital Cum-Ex Trades.

[206] In the Delvian Carlsberg 2013 Transaction I calculate the theoretical forward price as 582.51, being Current Price (DKK 586.4968) plus interest (586.4968 x 3/12 x 0.002735) minus Net Dividend (DKK6 x 0.73), compared to the actual rate used of 582.49.  I have used the Danish 3-month CIBOR rate from 21 March 2013 of 0.2735%.

In the Roadcraft NZYMB 2015 transaction, I calculate the theoretical forward price as 320.095, being Current Price (DKK 322.5) plus interest (322.5 x 4/12 x -0.002) minus Net Dividend (DKK3 x 0.73) compared to the

253.    As we saw with the stock loans, it is my opinion that this 'perfect' pricing is a function of the need to ensure that the various cash flows offset each other and is a further indication that none of the transactions were done at arm's-length.

254.    Generally, the pricing of futures and forwards is affected by supply and demand considerations, which in turn, can distort pricing away from their theoretical value.  A market with distorted pricing creates the opportunity for more parties to participate in the market by filling liquidity shortfalls. Specifically, limited market liquidity puts upward pressure on share prices.

255.    Further, the pricing of futures is also affected by other factors, including the market level for dividend compensation payments, interest rates, and other factors, which can, for example, result from the complex interdependence between equity future markets, government bonds, foreign exchange, and cash markets.  The largest cash managers, including banks, can deploy some of their surplus cash in equities hedged by futures as an alternative to buying government bonds or depositing cash with another bank.  Depending on the yield curve and the short-term liquidity in the market, there may be temporary periods where the prices of equity single stock futures are significantly driven by these dynamics and again deviate from their theoretical value.

**b)**    **The Pattern of Futures Trading in Solo's Omnibus Accounts is Highly Irregular and Has No Market Rationale**

256.    Because the Solo Pension Plans and the short sellers, such as Delvian and Gulf Management Group, took offsetting futures positions, Solo's position in its sub-custodians' futures omnibus accounts would net to zero.  This was accomplished through the buying and selling of equal lots of futures in rapid succession.[207]  It was Solo's practice to never hold open futures positions in its own sub-custodian

---

actual rate used of 320.1105.  I have calculated an interpolated Danish 4-month CIBOR rate of -0.2% effective from February 25, 2015.

[207] See, for example, ELYSIUM-01460217; ELYSIUM-02038702.

omnibus accounts, and Solo put in systems in place to ensure this would not happen. [208] While ostensibly made on behalf two separate clients, Solo's pairing of a purchase and a sale of a futures in equal lots meant that Solo itself never held an open futures position in its sub-custodian omnibus accounts, even though it booked fictious open positions in its clients' account statements.

257.    These trading patterns are highly irregular, and both JPMorgan and SEB raised issues with Solo's trading patterns. [209] In response to one inquiry from JPMorgan, Solo responded that the "commercial rational behind the business is to charge clients a premium for a facility to clear through a Global Bank such as JPMorgan where they would not normally have direct access to such a provider. [210] I do not accept this response: it is not clear what purpose any of the IDBs serve in the Solo Transactions but it is clear that they are complete pass-through entities which take no risk and have no opportunity for profit and as part of this pattern the matching futures are all transacted at exactly the same rates (including futures which appear to be different contract maturities). [211] It is my opinion that the IDBs were used to create the impression that Delvian and Roadcraft were engaging with real external IDBs and were transacting on 'market' terms.

---

[208] See ELYSIUM-01550252, which appears to be an internal procedures guide produced by Solo Capital and explains a range of controls to ensure that Solo Capital never enters into mismatched trades (no doubt because it would have not had the systems or financial resources to manage any trades by its 'clients' which were not perfectly offsetting. This would have required Solo Capital to provide significant margin to its clearing counterparties (i.e., JP Morgan and SEB).

[209] ELYSIUM-01746161; ELYSIUM-02521340.

[210] ELYSIUM-01746161.

[211] See for example the trades on 20 March 2013 in the JP Morgan statement (ELYSIUM-01460217). This has 8 trades for the September 20, 2013 expiry single stock future over Novo Nordisk A/S shares and 8 trades of similar sizes over the December 20, 2013 expiry contract which coincidentally match the prices on the September 20, 2013 expiry contracts exactly.

c)    **It Is Not the Market Standard to Engage in Equally Offsetting Futures in Equity Finance Transactions Where the Costs of Commissions, Fees, and the Bid-Ask Spread Were Ignored by Solo and Which are the Equivalent of Wash Trades**

258.    In my experience, in transactions where futures are used as hedging instruments in equity finance transactions, it is not market standard for the gains and losses on the component elements of a trade to net perfectly to zero. Netting to zero, in this instance, refers to a zero gain or loss for Delvian after combining the equity purchase, future sale, equity sale, future purchase, net dividend, stock loan interest, and fees. This outcome is uncommon because of additional costs, such as trading commissions, exchange clearing fees, financing spreads (typically parties in the transaction want to earn some spread), sourcing cost (the shares in the transaction have to come from somewhere; the party with the shares expects compensation for the expected real dividend and this cost is built into the share price and future), as well as other possible supply and demand factors which need to be priced.

7.    **It is not the Market Standard for Parties to a Stock Loan or Broker-Custodians to Retroactively Alter the Terms of the Original Stock Loan So That the Trades Net to Zero**

259.    In my experience, it is not market standard for the custodian's employees to manually adjust the stock loan fees and interest to make the trade (excluding the tax reclaim) net out perfectly to zero for trades that would otherwise leave the reclaim applicant with a loss or gain if the actual terms of the trade were applied. The reason this occurrence seems unlikely is that an independent arm's-length transaction involves retrospective renegotiation of a contract. If it did, one party would necessarily lose out financially, causing the transaction to lose its appeal and making it less likely that any party that was assured of loss would agree to participate in such a transaction.

260.    Here, Solo, Delvian, and Aquila did precisely this: they retroactively adjusted interest and fees on the original stock loan agreement such that Delvian's trades netted out to zero, so that there was zero trading loss or gain on the plan's transactions. This left the dividend withholding tax refund paid by SKAT as the only gain.

261.    An example of this can be seen in the Delvian Plan's trades around the dividend issued by Chr. Hansen Holdings A/S ("Chr. Hansen") in November 2012.  On November 27, 2012, Delvian purported to purchase 1,080,000 shares of Chr. Hansen stock, for a notional value of DKK 202,716,216.00. [212]  On the same day, Delvian sold an offsetting future for a notional value of DKK 200,620,800.00 [213]   On November 30, Delvian loaned the same number of shares to Aquila with the interest rate set at DKK Libor plus 70 basis points, payable to Aquila, and a fee of overnight DKK Libor plus 37.953 basis points, again payable to Aquila. [214]  Delvian purportedly received a net dividend of DKK 2,286,360.00 from the Chr. Hansen shares. [215]

262.    In March 2013, Delvian unwound the trades.  It sold 1,080,000 shares of Chr. Hansen at for DKK 223,276,824.00, [216] purchased offsetting futures at DKK 223,279,200.00, [217] and recalled the loan from Aquila. [218]  This series of trades did not perfectly net to zero:

| Step | Value (DKK) |
|---|---|
| Equity Buy | -202,716,216.00 |
| Forward Sale | 200,620,800.00 |
| Net Dividend | 2,286,360.00 |
| Equity sale | 223,276,824.00 |
| Forward Purchase | -223,279,200.00 |
| Stock Interest Original | -369,580.18 |
| Stock Fee Original | 194,895.75 |
| **Total to Delvian** | 13,883.57 |

---

[212] ELYSIUM-00921145.

[213] ELYSIUM-00921138.

[214] ELYSIUM-08440461.

[215] MPSKAT00078034.

[216] ELYSIUM-01400202.

[217] ELYSIUM-01527432.

[218] ELYSIUM-01417327.

263.    Thus, under the original terms of the stock loan agreement, Delvian ought to have earned DKK 13,833.57 on the series of trades.  These figures are reflected in an internal Solo spreadsheet [219] generated in March 2013, which shows DKK 369,580.18 interest due to Aquila and a fee of DKK 194,895.75 due to the Delvian Plan. [220]

264.    Delvian's account statement tells a different story.  It lists DKK 387,305.00 interest due to Aquila and a fee of DKK 198,737.33 due to Delvian. [221]  After substituting in these new numbers, Delvian's Chr. Hansen trades nearly perfectly net to zero:

| Step | Value (DKK) |
|---|---|
| Equity Buy | -202,716,216.00 |
| Forward Sale | 200,620,800.00 |
| Net Dividend | 2,286,360.00 |
| Equity sale | 223,276,824.00 |
| Forward Purchase | -223,279,200.00 |
| Stock Interest Original | -387,305.00 |
| Stock Fee Original | 198,737.33 |
| **Total to Delvian** | 0.33 |

265.    Thus, by modifying the stock loan interest rate and fees, Solo retroactively made Delvian's trades effectively net to zero DKK, leaving the dividend withholding tax refund as the only profit to Delvian. More than two months after the unwind of the transactions on May 26, 2013, the retroactive changes were agreed to in an email chain between Aquila and Delvian, in which Aquila informed Delvian that the

---

[219] The spreadsheet calculation only runs up to March 11, 2013 whereas the transaction unwound on March 14, 2013 so the correct figure would be slightly smaller, but this is immaterial to the observations I am making.

[220] ELYSIUM-01439314 and ELYSIUM-01439315.

[221] MPSKAT00078034.

interest rate was incorrect. [222]  Without protest, Delvian acceded to this change, despite the fact that it would cost Delvian about DKK 14,000. [223]

266.    As stated above, it is highly abnormal for participants in equity finance transactions to retroactively modify the interest and fees on stock loans to net the trades to zero because it would cause a loss to one party to the trade – here the Delvian Plan.  Further, it is highly abnormal for a custodian to modify an account statement to not reflect the original terms of a trade.    These facts combined are further confirmation that the purported trading was being dictated by Solo and that no real shares or real money ever traded hands.


Based on my review of the facts and circumstances in this litigation, various documents produced, and the analyses presented in this expert report, I submit that the opinions contained herein are an accurate representation of my views on this matter.

Submitted by:

Graham Wade
December 31, 2021

---

[222] MPSKAT00082940.

[223] A review of the Delvian Plan's 2014 account statement also shows that the agreed upon stock loan interest rate had been adjusted.  The original terms of the stock loan for the Novo Nordisk AS-B shares of list an interest rate 0.7000% (ELYSIUM-02915049, whereas the account statement lists the interest rate as 0.76213% (MPSKAT00168085 at 8091). With the manipulated interest rate in the account statement, the value of all of Delvian's purported trades in Danish securities effectively net to zero.