# Exhibit 9



# Rules of the London Stock Exchange

## Rule Book

EFFECTIVE DATE  1 July 2019

**Table of Contents**

| **Contents** | **Page Number** |
|---|---|
| Introduction to the Rulebook | 3 |
| Definitions | 4 |
| Core Rules | 17 |
| Order Book Trading Rules | 34 |
| Off Order Book Trading Rules | 43 |
| Market Making Rules | 52 |
| Settlement, Clearing and Benefit Rules | 61 |
| Compliance | 76 |
| Default | 92 |

## Introduction

Reference to any statute and statutory provision shall be construed as those in force from time to time. References to time shall mean the time in London unless stated otherwise. References to days are business days unless otherwise stated.

Chapter headings, section headings and the titles and numbers of rules are for guidance and ease of reference only.

For the purpose of these rules, an act or course of conduct includes both acts and omissions. Terms in bold are defined terms and shall have the meanings set out in the Definitions unless the context otherwise requires, and cognate expressions shall be construed consistently with them.

Rules with supplementary guidance are flagged with the notation "G" with the relevant guidance located immediately after the rule. A breach of the guidance is evidence of a breach of the rule.

A breach of the Rules would be subject to the disciplinary processes currently in place.

These rules shall be construed in accordance with, and governed by, the laws of England and Wales.

The Exchange shall not be liable in damages for anything done or omitted in the discharge of these rules unless it is shown that the act or omission was done in bad faith.

The Exchange's rules make a clear distinction between a member firm acting as principal and as agent. Two trades with a member firm interposed as agent is deemed to be a single transaction. Two trades with a member firm interposed as principal are deemed to be two transactions.

**Structure**

This Rulebook is structured as follows:

| Section | Rules beginning | Content |
|---|---|---|
| Definitions | ~ | Definitions applicable to these rules |
| Core Rules | 1000 | Ongoing requirements for member firms and rules that apply at all times |
| Order Book Trading Rules | 2000 | Rules applying when trading on an order book |
| Off Order Book Trading Rules | 3000 | Rules applying when trading away from an order book |
| Market Making Rules | 4000 | Rules applying to market makers |
| Settlement, Clearing and Benefit Rules | 5000 | Rules applying to settlement, clearing and benefits |
| Compliance | C series | Compliance procedures |
| Default | D series | Default rules |

**Supporting documentation**

The Guide to the trading system provides an overview of the functionality of the trading system and supports the Rulebook.

Rules that are supported by information in the Guide to the trading system are flagged with a "GT" for ease of reference.

The Millennium Exchange & TRADEcho Business Parameters ("parameters") has also been created to support the Rulebook. This provides the specific system thresholds that govern member firm interaction with the trading system. The parameters is kept up-to-date to ensure that they fully describe the operation of tradable instruments in the various segments of the Exchange's markets. Rules that are supported by specific parameters are flagged with a "P". The parameters provides the specific system thresholds that govern member firm interaction with the trading system.

**RULES OF THE LONDON STOCK EXCHANGE**

## <u>DEFINITIONS</u>

Where the context is appropriate the plural form of a defined term is also deemed as being the defined term and as such appears in bold text within the rules.

| | |
|---|---|
| **admitted to trading** | admission to trading on the **Exchange's** markets |
| **agency cross** | a trade by which a **member firm** acting as an **agent** matches the buy and sell orders of two or more non-members at the same price and on the same terms |
| **agent** | a **member firm** acting on behalf of a **customer** in an agency capacity<br><br>*(Amended N37/09 – effective 19 August 2009)* |
| **AIM** | the market provided by the **Exchange** for transactions in **AIM securities** |
| **AIM security** | a security which the **Exchange** has **admitted to trading** on **AIM** |
| **AIM primary market registered organisation** | a trading venue that is included in the **AIM primary market registered organisation** list that the **Exchange** maintains and publishes on its corporate website. Trading venues will be considered for inclusion on this list upon request of a **member firm** |
| **AIM secondary market registered organisation** | a Regulated Market, Multilateral Trading Facility, or Approved Publication Arrangement that does not have a primary market relationship with **AIM** companies that meets the criteria as set out by the **Exchange** from time to time<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **back** | a situation where a **best offer price** is lower than the **best bid price**, in the same security<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **best bid** | the highest **bid price** displayed on the **trading system**<br><br>*(Amended N26/10 – effective 14 February 2011)* |
| **best offer** | the lowest **offer price** displayed on the **trading system**<br><br>*(Amended N26/10 – effective 14 February 2011)* |
| **bid price** | the price at which a **member firm** is prepared to buy securities<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **broker dealer** | in relation to transactions in securities of any description, a **member firm** which is not a **market maker** in those securities<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **business day** | any day on which the **Exchange** is open for dealing |

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **buyer** | (a)   a **member firm** purchasing securities from another **member firm**; |
| | (b)   in the case of a **central counterparty trade** a **matched buyer**; or |
| | (c)   in respect of a **lending arrangement**, on the outward leg the borrower and on the return leg the lender |
| **buying-in** | an **Exchange** mechanism which facilitates the delivery of securities in unsettled, sold, **on Exchange** trades |
| **buying-in notice** | a notice issued by the **Exchange** at the instigation of the **buyer** to a **seller** who has failed to deliver a security in settlement of an **on Exchange** trade |
| **call payment day** | the last day fixed by the issuer for payment of call monies |
| **central counterparty** | a body that assumes the risk for **central counterparty trades** by acting as the selling party to a **matched buyer** and the buying party to a **matched seller** or their **clearing member**, as appropriate |
| **central counterparty contract** | any contract arising between **Non Clearing Members**, **clearing members**, clients of agency trades and a **central counterparty**, resulting from a **central counterparty trade** |
| | *(Amended N06/19 – Effective 18 March 2019)* |
| **central counterparty netting service** | a service which allows a **member firm** to transfer a net amount of **central counterparty securities** and a net amount of cash to satisfy their settlement obligations with respect to a number of **central counterparty contracts** involving the same **central counterparty securities** and cash |
| **central counterparty rules** | the rules, general regulations, default rules and procedures of a **central counterparty** |
| **central counterparty security** | a security designated by the **Exchange** and a **central counterparty** as eligible for **central counterparty** processing |
| **central counterparty trade** | an electronically matched order on the **trading system** in a **central counterparty security** |
| | *(Amended N26/10 – effective 14 February 2011)* |
| **choice** | a situation where the **best bid** and **best offer** for a security are the same |
| **clearing member** | a **General Clearing Member** or an **Individual Clearing Member** |
| **clearing membership agreement** | the agreement entered into between a **central counterparty** and a **clearing member** under which, amongst other things, a **central counterparty** agrees to make available clearing services in respect of **central counterparty contracts** |
| **compliance procedures** | the 'C' series of these rules which sets out the rules and procedures for disciplinary proceedings and disciplinary and non-disciplinary appeals |
| **contra** | a trade undertaken on the **trading system** that is equal and opposite to a previous trade in the same security, undertaken by the same participants in order to negate the original trade.  By its nature, a **contra** must be agreed upon by both parties to the original trade |
| | *(Amended N26/10 – effective 14 February 2011)* |

RULES OF THE LONDON STOCK EXCHANGE

| | | |
|---|---|---|
| **counterparty** | (a) | for the purposes of the **default rules**, the **person**(**s**) contracting as **principal** with the **defaulter** in respect of an unsettled **Stock Exchange market contract** whether directly or through the agency of a **member firm** and/or a third party; or |
| | (b) | for other purposes, a **person** who is not a **customer** with whom a **member firm** undertakes a trade **on Exchange** and including a **central counterparty** |

*(Amended N08/10 – effective 15 April 2010)*

**covered warrant**
a security that is a **warrant** issued by a party other than the issuer or originator of the underlying asset

**CREST**
the settlement system operated by Euroclear UK & Ireland Ltd

**CREST instruction deadline**
the latest date and time specified under the relevant **central counterparty** rules for submitting an electronic **instruction notice** to **CREST** in respect of a corporate action in a **central counterparty security**.  The **instruction notice** must be in respect of transactions executed at least the day before the **CREST instruction deadline**

**CurveGlobal Markets**
the market operated by London Stock Exchange plc for derivatives

*(Amended N09/19 – effective 1 July 2019)*

**customer**
a **person** for whom a **member firm** undertakes a trade or otherwise performs services **on Exchange**

**default official**
the individual appointed by the **Exchange** to administer the default in accordance with the **default rules**

*(Amended N08/10 – effective 15 April 2010)*

**default rules**
the 'D' series of these rules which sets out rules and procedures in the event of default by a **member firm**

*(Amended N08/10 – effective 15 April 2010)*

**defaulter**
a **member firm** declared to be in default by the **Exchange** in accordance with the **default rules**

*(Amended N08/10 – effective 15 April 2010)*

**deferred publication**
a facility for **member firms** to delay the publication of a trade for a period of time dependent on its size as set out in **MiFID** and reflected in the **parameters**

*(Amended N09/17 – effective 3 January 2018)*

**direct electronic access**
an arrangement whereby a **member firm** provides **direct market access** and/or **sponsored access** services

*(Amended N09/17 – effective 3 January 2018)*

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **direct market access** | a service provided by a **member firm** through which a **customer** is able to submit orders to the **trading system** under the **member firm**'s trading codes and via the **member firm's** order management systems, but without manual intervention by the **member firm** (and where the **customer** can exercise discretion regarding the exact fraction of a second of order entry and lifetime of the order within that timeframe) |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **electronic form** | recorded in book-entry form within a central securities depository |
| | *(Amended N13/14 – effective 5 January 2015)* |
| **employee** | in relation to a **member firm** a director, partner or principal or **person** employed in or about the firm's business as a **member firm**, whether under a contract of service or for services (including a training contract) and any **person** seconded to work in or about that business |
| **EU regulated market** | a multilateral system operated and/or managed by a market operator, which brings together or facilitates the bringing together of multiple third-party buying and selling interests in financial instruments – in the system and in accordance with its non discretionary rules – in a way that results in a contract, in respect of the financial instruments admitted to trading under its rules and/or systems, and which is authorised and functions regularly and in accordance with the provisions of Title III of **MiFID** |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **exceptional circumstances** | the meaning given to it in Article 3 of Commission Delegated Regulation (EU) 2017/578 |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **Exchange** | London Stock Exchange plc which trades as the "London Stock Exchange" including, where the context so permits, any committee, sub-committee, employee or officer to whom any function of the London Stock Exchange plc may for the time being be delegated |
| **Exchange enforced cancellation** | the cancellation by the **Exchange** of an automated trade executed on the **trading system**, either in response to a request from a party to the trade or undertaken unilaterally by the **Exchange**.  Discretion as to whether or not to cancel a trade lies solely with the **Exchange** |
| | *(Amended N26/10 – effective 14 February 2011)* |
| **Exchange market size** | the minimum quantity, as specified by the **Exchange**, of securities for which a **market maker** is obliged to quote a firm two way price on the **trading system** |
| | *(Amended N26/10 – effective 14 February 2011)* |

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **Exchange price list** | the documents published by the **Exchange**, from time to time, setting out charges and fees for: |

    (a)    membership of the **Exchange**;

    (b)    use of the **trading system**;

    (c)    trades reported to the **Exchange**; or

    (d)    other services and products provided by the **Exchange**

*(Amended N26/10 – effective 14 February 2011)*

| | |
|---|---|
| **exchange traded product** | a tradable unitised debt security that derives its price from one or more underlying assets |

*(Amended N17/10 – effective 2 August 2010)*

| | |
|---|---|
| **exchange traded fund** | a security that derives its price from a diversified group of assets and is issued by a collective investment scheme |

*(Amended N17/10 – effective 2 August 2010)*

| | |
|---|---|
| **executable quote** | an electronic quote that can be automatically executed against and used by **market makers** in **order-driven securities**.  The relevant spread and minimum size of the quotes is provided in **parameters** |
| **fine** | a monetary penalty levied by the **Exchange** other than a **fixed penalty** |
| **firm quote** | a non executable **firm quote** used by **market makers** in **quote-driven securities**.  The relevant spread and minimum size of the quotes is provided in **parameters** |
| **fixed interest security** | a security, other than a **gilt-edged security**, which carries a right to a stated rate of interest or dividend on an annual or other periodic basis and which is **admitted to trading** |
| **fixed penalty** | a penalty, set out in a **notice**, of a stated amount of money for each instance of a breach of a specific rule |
| **FSMA** | the Financial Services and Markets Act 2000 |
| **General Clearing Member** | a **member firm** that is party to a valid and subsisting **clearing membership agreement** with a **central counterparty** and which may clear with the **central counterparty**, **central counterparty contracts** resulting from **central counterparty trades** dealt by the **member firm** itself or another **member firm** |
| **gilt-edged security** | a security **admitted to trading**, including an index-linked gilt-edged security and a gilt strip, issued by the **United Kingdom** government and appearing on a list of gilt-edged securities maintained by the UK Debt Management Office |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **Guide to the trading system** | the **Exchange** publication that describes how the **Exchange's trading system** functions and referenced in these rules by the notation "GT" |

*(Amended N26/10 – effective 14 February 2011)*

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **hammer price** | the appropriate price determined by the **Exchange** in accordance with rule D131 in the case of a declaration of default with respect to a **member firm**. |
| | *(Amended N08/10 – effective 15 April 2010)* |
| **holding company** | as defined in section 1159 of the Companies Act 2006 |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **index** | an **index** whose components are securities traded on an **Exchange** market |
| **Individual Clearing Member** | a **member firm** that is party to a valid and subsisting **central counterparty agreement** with a **central counterparty** and which may clear with the **central counterparty**, **central counterparty contracts** resulting from its own **central counterparty trades** only |
| **instruction notice** | an instruction from a **buyer** in respect of a corporate event either submitted in writing to a **seller** or, where appropriate, electronically to **CREST**.  The instruction must be given via **CREST** in respect of **central counterparty trades** and must be given on settlement instructions.  It cannot be given on gross transactions which have been, or are to be, netted |
| **introducing firm** | a **member firm** that uses the services of a **model B firm** |
| **ISIN** | the international security identification number |
| **lapsing instruction** | an **instruction notice** by the **buyer** to the **seller** that the **buyer** does not wish to take up the offer in respect of the undelivered **rights** |
| **large in scale** | an order which is equal to or larger than the minimum size of orders provided for in **MiFIR** and reflected in the **parameters** |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **last time for claims** | subject to these rules, shall be 16.00 hours two days before the **call payment day** or **registration day** |
| **latest time for delivery** | the **specified time** on the day before the **call payment day** or **registration day** |
| **LEI** | the Legal Entity Identifier, a unique code based on the ISO standard 17442 |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **lending arrangement** | an arrangement entered into between a **member firm**, whether acting as **agent** or **principal**, and another party under which one party is to transfer securities to the other party and securities of the same kind and amount are to be transferred by that other party to the first party |
| **liable party** | a **member firm** against whom a **buying-in notice** is issued by the **Exchange**, or the **member firm** to whom a **buying-in notice** is passed. For **buying-in notices** in respect of settlement instructions resulting from **central counterparty trades**, the **liable party** will be determined by the **Exchange** |

RULES OF THE LONDON STOCK EXCHANGE

*(Amended N19/09 – effective 30 March 2009)*

| | |
|---|---|
| **LSE ID** | the unique instrument ID assigned to the product by the **Exchange** |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **LSEG Transaction Reporting Guide for Non-MiFID Firms** | means the document providing guidance that is published on the **Exchange's** website as amended from time to time |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **mandatory period** | the daily period during which **market makers** have obligations under these rules (and as described in the **parameters**) |

| | |
|---|---|
| **market maker** | in relation to securities designated by the **Exchange**, a **member firm** which is registered as a **market maker** and is obliged to quote prices in at least the **Exchange market size** |

| | |
|---|---|
| **market making agreement** | the agreement entered into between a **member firm** and the **Exchange** whereby the **member firm** agrees to act as a **market maker** in relation to certain specified products |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **market making scheme** | market making incentive schemes that the **Exchange** is mandated to offer under Article 48(2)(b) of **MiFID** and Article 1 of Commission Delegated Regulation (EU) 2017/578 |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **market making strategy** | shall have the meaning given to it in Article 17(4) of **MiFID** |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **market situation** | a general term used to describe one or more issues that may impact the orderliness of trading multiple securities, this may include an **exceptional circumstance** |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **matched buyer** | a **member firm** on the buy side of an electronically matched order on the **trading system** |

*(Amended N26/10 – effective 14 February 2011)*

| | |
|---|---|
| **matched principal transaction** | a trade in which a **member firm** interposes itself between the buyer and seller in such a way that the **member firm** is never exposed to market risk throughout the execution, with both sides executed simultaneously and the trade concluded at a price where the **member firm** makes no profit or loss, other than a previously disclosed commission, fee, or charge, for the trade |

*(Amended N09/17 – effective 3 January 2018)*

| | |
|---|---|
| **matched seller** | a **member firm** on the sell side of an electronically matched order on the **trading system** |

*(Amended N26/10 – effective 14 February 2011)*

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **member firm** | a partnership, corporation, legal entity or sole practitioner admitted to **Exchange** membership and whose membership has not been terminated. For the purposes of the **compliance procedures**, **member firm** shall include a former **member firm** where appropriate |
| **member ID** | the highest level of identification of a **member firm** in the trading system |
| **Member Portal** | means the online communication tool operated by the **Exchange** for the management of **member firm** information |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **membership profile** | the trading or non-trading profile of a **member firm** as held by the **Exchange** and communicated to the market via Member Firm Information Sheets |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **MiFID** | Markets in Financial Instruments Directive 2014/65/EU] |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **MiFIR** | means the Markets in Financial Instruments Regulation No. 600/2014 |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **MiFID transparent security** | a financial instrument admitted to trading on an **EU regulated market** |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **model B firm** | a **member firm** that takes on all immediate liabilities for trades dealt by an **introducing firm** |
| **named order** | a non-anonymous limit order used by **market makers** in **Exchange Traded Funds** and/or **Exchange Traded Products** to submit bid/offer quotes in place of **executable quotes** |
| | *(Amended N11/18 – effective 18 June 2018)* |
| **National ID** | the identifier set out in Article 6 and Annex II of the Commission Delegated Regulation (EU) 2017/590 |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **negotiated trade** | a trade, conducted in an **EU regulated market** security, that is not subject to pre-trade transparency on the **trading system** and which is on terms that are no worse than those that could be achieved on the relevant **Exchange** order or quote book at the time of the trade.  In an illiquid security where there is no spread on the relevant order or quote book at the time of the trade the **negotiated trade** shall be within a percentage of a suitable reference price as set out in the **parameters**.  In the absence of a suitable reference price the **Exchange** will consider whether the trade price is reasonable taking in to account the market conditions at the time of the trade. |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **Non Clearing Member** | a **member firm** that is not a **clearing member** in respect of a particular trade |

| | |
|---|---|
| **Non-MiFID firm** | **member firms** that are not subject to Regulation (EU) No 600/2014 of the European Parliament and of the Council on markets in financial instruments (**MiFIR**) or Directive 2014/65/EU of the European Parliament and of the Council (**MiFID**)<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **notice** | any notice issued by the **Exchange** from time to time to **member firms** generally or to any class of **member firms** |
| **offer price** | the price at which a **member firm** is prepared to sell securities<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **on Exchange** | a trade executed under the Rules of the **Exchange** as defined by rules 2000 and 3000 |
| **order book** | a facility operated by the **Exchange** for the electronic submission and automatic execution of orders and **quotes**<br><br>*(Amended N02/17 – effective 13 March 2017)* |
| **order-driven security** | a security traded on an **order-driven trading service**<br><br>*(Amended N07/15 – effective 5 May 2015)* |
| **order-driven trading service** | a trading service subject to the **order-driven trading service** rules with the provision of **executable quotes** or **named orders**<br><br>*(Amended N11/18 – effective 18 June 2018)* |
| **overseas** | outside the **United Kingdom** |
| **parameters** | Millennium Exchange & TRADEcho Business Parameters.  A document of the **Exchange's** system and control parameters referenced in these rules by the notation "P"<br><br>*(Amended N09/17 – effective 3 January 2018)* |
| **person** | an individual, corporation, partnership, association, trust or other entity as the context admits or requires |
| **principal** | a **member firm** or other **person** acting as principal |
| **PTM levy** | the levy set by and payable to the Panel on Takeovers and Mergers |
| **quote** | an **executable quote**, a **firm quote**, a **named order** or a **RFQ quote**<br><br>*(Amended N11/18 – effective 18 June 2018)* |
| **quote-driven security** | a security traded on a **quote-driven trading service** |
| **quote-driven trading service** | a trading service subject to the **quote-driven trading service** rules, with the provision of **firm quotes**<br><br>*(Amended N07/15 – effective 5 May 2015)* |
| **registrar** | the keeper of a register of securities |

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **registration day** | the last day fixed for the receipt of an application for registration of securities issued under the offer |
| **regular trading** | the period during the **mandatory period** when an **order book** is not in an auction |
| | *(Amended N07/15 – effective 5 May 2015))* |
| **Regulated Activities Order** | the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **Reg S traded security** | securities of US issuers (as defined under US securities law) issued pursuant to the offshore safe harbour from registration requirements available under Category 3 of Regulation S under the US Securities Act of 1933, as amended, and identified as such on the **trading system** with the letters "REG S" |
| | *(Amended N26/10 – effective 14 February 2011)* |
| **relevant agency contract** | a **Stock Exchange market contract** to which a **defaulter** is party as an **agent** |
| **relevant contracts** | any contracts arising between the **Exchange** and a **member firm**, including but not limited to the Membership Application Form |
| **relevant market** | the trading venue with the highest turnover within the European Economic Area for that financial instrument |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **relevant principal contract** | a **Stock Exchange market contract** to which a **defaulter** is party as a **principal** |
| **requesting party** | a **member firm** that requests the **Exchange** to buy-in undelivered securities |
| **RFQ quote** | an electronic quote provided in response to a request for quote submitted to the **trading system** |
| | *(Amended N02/17 – effective 13 March 2017)* |
| **rights** | renounceable documents or, if the context permits, the equivalent **uncertificated securities** |
| **RNS** | the regulatory and financial communications channel operated by the **Exchange** that is used by companies and the **Exchange** to communicate with investors and market participants |
| | *(Amended N05/09 – effective 26 January 2009)* |
| **Rules of the London Stock Exchange** | the rules set out in this document and the **Rules of CurveGlobal Markets** |
| | *(Amended N09/19) – effective 1 July 2019)* |
| **Rules of CurveGlobal Markets** | the rules for any activity conducted on **CurveGlobal Markets** only |
| | *(Amended N09/19) – effective 1 July 2019)* |

| | |
|---|---|
| **Scheduled Level 1 Only auction** | daily intra-day auction at a known time where only the cumulative size of orders and price at the **best bid** and the **best offer**, along with indicative uncrossing volume and price are disseminated throughout auction call and any extensions |
| | *(Amended N01/16 – effective 21 March 2016)* |
| **seller** | (a)  a **member firm** selling securities to another **member firm**; |
| | (b)  in the case of a **central counterparty trade** a **matched seller**; or |
| | (c)  in respect of a **lending arrangement**, on the outward leg the lender and on the return leg the borrower |
| **settlement agent** | a **person** providing settlement services |
| **settlement rules** | the '5000' series of these rules which sets out detailed rules and procedures for settlement of **on Exchange** trades |
| | *(Amended N17/10 – effective 2 August 2010)* |
| **specified time** | (a)  for inter office delivery: |
| | (i)  11.45 hours in the case of delivery to any **member firm** by a **member firm** acting as **agent**; |
| | (ii)  12.15 hours in the case of delivery by a **member firm** acting as **principal** to a **member firm** acting as **principal**; |
| | (iii)  13.00 hours in the case of delivery by a **member firm** acting as **principal** to a **member firm** acting as **agent**; or |
| | (b)  in the case of a delivery to any **member firm** in **CREST**, by the final time for that type of delivery specified in **CREST's** daily processing timetable |
| | *(Amended N09/09 – effective 23 February 2009)* |
| **sponsored access** | a direct technical connection that enables a **customer** to access the **trading system** directly under a sponsoring **member firm's** trading codes. Orders submitted in this manner do not pass through the order management systems of the sponsoring **member firm** but will pass through the Exchange's controls (and where the **customer** can exercise discretion regarding the exact fraction of a second of order entry and lifetime of the order within that timeframe) |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **standard settlement** | the normal settlement arrangement applicable to a security |
| **standard trade report deadline** | as close to real-time as technically possible and, in any event within: |
| | (a)  one minute of the relevant transaction for shares, depositary receipts, **exchange traded funds**, certificates and other similar financial instruments, as set out in the **parameters**; or |
| | (b)  fifteen minutes of the relevant transaction for bonds or structured finance products as set out in the **parameters** |
| | *(Amended N09/17 – effective 3 January 2018)* |

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **Stock Exchange market contract** | any **on Exchange** trade including **lending arrangements** and **central counterparty contracts**. All **Stock Exchange market contracts** are market contracts pursuant to section 155 of the Companies Act 1989 |
| **stock situation** | an event whereby a holder of securities may be entitled to other securities pursuant to a takeover offer, scheme of arrangement, conversion, redemption or other event affecting those securities |
| **stressed market conditions** | periods of short term volatility, as defined by the **Exchange**, during which a **market maker's** obligations pursuant to a **market making scheme** may change |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **subsidiary** | as defined in section 1159 of the Companies Act 2006 |
| **TRADEcho** | an **Exchange** service that includes its off **order book** trade reporting solution |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **trade report** | a report of the details of a trade effected **on Exchange** which is made to the **trading system** and which the **Exchange** may publish subject to certain criteria |
| | *(Amended N26/10 – effective 14 February 2011)* |
| **trade reporting period** | (a)   the period each day between 07.15 hours and 17.15 hours; or |
| | (b)   the period each day between 08:15 hours and 18:15 hours Central European Time |
| | when the **trading system** will accept **trade reports** |
| | *(Amended N26/10 – effective 14 February 2011)* |
| **trader group** | the level at which authorisation and / or role enablement for trading actions in a particular Market is performed in the trading system |
| **trading system** | the trading system operated by the **Exchange** |
| | *(Amended N26/10 – effective 14 February 2011)* |
| **transaction reporting fields** | means, for **non-MiFID firms**, certain fields contained in the annex to Commission Delegated Regulation (EU) 2017/590 that the **Exchange** may require to be submitted for the purposes of meeting its transaction reporting obligation |
| | *(Amended N09/17 – effective 3 January 2018)* |
| **uncertificated securities** | a security admitted to **CREST** pursuant to the UK Regulations (or pursuant to the Irish Regulations, the Isle of Man Regulations, or the Jersey Regulations) as defined in the CREST Manual |
| **United Kingdom** | England, Scotland, Wales and Northern Ireland |

RULES OF THE LONDON STOCK EXCHANGE

| | |
|---|---|
| **unsettled claim** | any outstanding obligation to pay or right to receive a sum of money or shares resulting from a dividend payment or a corporate action event that arises from an **on Exchange** trade and that remains unsettled at the time of a declaration of default with respect to a **member firm** that has such an obligation to pay or a right to receive and that is notified to the Exchange within such time as specified in accordance with rule D021. |
| | *(Amended N08/10 – effective 15 April 2010)* |
| **warning notice** | a letter issued by the **Exchange** to a **member firm** outlining any relevant rule breach |
| **warrant** | an instrument which gives the holder the right to acquire or dispose of securities at a stipulated price |
| **when issued dealing** | trades effected in accordance with these rules in securities which are the subject of an application to be **admitted to trading**, entered into before, and conditional upon, trading becoming effective |

# CORE RULES

## Member firms

### Categories of Membership [1000]

| | | | |
|---|---|---|---|
| G | 1000 | | The **Exchange** may permit membership under one of the following categories: |
| | | 1000.1 | a full **member firm**; |
| | | 1000.2 | a **General Clearing Member**; |
| | | 1000.3 | a derivatives only member; or |
| | | 1000.4 | a non-trading **member firm**. |

*Guidance to Rule:*

*For the purposes of these rules, references to* **member firm** *includes all categories of membership as defined above, save that:*

- *A* **member firm** *whose scope of* **on Exchange** *business is solely to act as a* **General Clearing Member** *on behalf of other* **member firms** *shall be bound by the applicable Core Rules, Settlement and Clearing Rules,* **compliance procedures** *and* **default rules**.

- *A* **member firm** *whose scope of business is solely to trade in derivatives on* **CurveGlobal Markets** *shall be bound by the* **Rules of CurveGlobal Markets**.

- *A* **member firm** *whose scope of business includes trading in derivatives on* **CurveGlobal Markets** *shall be bound by the* **Rules of the London Stock Exchange**.

- *A non-trading* **member firm** *shall be bound by the applicable Core Rules and* **compliance procedures,** *however, their* **membership profile** *does not permit them to trade as a* **member firm**. *Any* **on Exchange** *stock borrowing and lending activity undertaken by non-trading* **member firms** *shall be bound by Rules 3001 - 3004, Settlement and Clearing Rules and* **default rules**.

*(Amended N09/19 – effective 1 July 2019)*

### Authorisation [1010-1014]

| | | |
|---|---|---|
| G | 1010 | A **member firm** must at all times be authorised under relevant **United Kingdom**, or appropriate **overseas** legislation, or in the view of the **Exchange** be otherwise sufficiently regulated, in respect of capital adequacy, and fitness and probity. |

*Guidance to Rule:*

*The* **Exchange** *may consider a* **person** *that is a legal entity to be appropriately authorised or sufficiently regulated if that* **person** *is:*

1.  *an investment firm, as defined under Directive 2014/65/EU, which is authorised or permitted within the meaning of that Directive to carry on a regulated activity, or the equivalent of a regulated activity, in its home state;*

2.  *a credit institution, as defined under Directive 2013/36/EU, which is authorised or permitted within the meaning of that Directive to carry on a regulated activity, in its home state;*

3.  *any other* **person** *who:*

   *(a)  is of sufficiently good repute;*

   *(b)  has a sufficient level of trading ability, competence and experience;*

RULES OF THE LONDON STOCK EXCHANGE

(c) has, where applicable, adequate organisational arrangements; and

(d) has sufficient resources for the role they are to perform and, where applicable, clearing and settlement arrangements.

The **Exchange's** assessment of a **person's** application for membership may include, but is not limited to, consideration of:

• the scope of its authorisation or applicable exemption, including where relevant, under the **Regulated Activities Order** and any applicable local law or regulation; and

• evidence of the applicant's financial resources, its fitness and probity, and compliance with Rule 1020.

Where the **Exchange** deems it necessary to protect the integrity of the **Exchange's** markets, action may be taken under Rule 1014 without prior notice to the **member firm** concerned.

(Amended N06/19 – effective 18 March 2019)

| | | |
|---|---|---|
| | 1011 | A **member firm** must hold a valid, issued and duly renewed **LEI** code at all times. |

(Amended N09/17 – effective 3 January 2018)

| | | |
|---|---|---|
| G | 1012 | **Non-MiFID firms** must provide the **Exchange** with the required **transaction reporting fields** for their **on Exchange** trades in the format and within the timescale prescribed by the **Exchange**, from time to time. |

Guidance to Rule:

In addition to Rule 1011, where a **customer** of a **non-MiFID firm** is eligible for a **LEI** code, the **non-MiFID firm** must ensure it has obtained the **LEI** from its **customer** before any trades are executed **on Exchange** on behalf of the **customer**, including by way of **direct market access**.

For the avoidance of doubt the **Exchange** will not transaction report on behalf of those **member firms** that are authorised as an investment firm under Directive 2014/65/EU.

(Amended N09/17 – effective 3 January 2018)

| | | |
|---|---|---|
| G | 1013 | **Non-MiFID firms** shall have appropriate controls in place to ensure that the required **transaction reporting fields** are accurately populated. |

Guidance to Rule:

The means and format by which the **transaction reporting fields** are submitted to the **Exchange** are set out in the **LSEG Transaction Reporting Guide for Non-MiFID Firms**. Acceptance of **transaction reporting fields** by the **Exchange** does not provide or imply that the **Exchange** considers this requirement has been met.

In the event that a **non-MiFID firm** discovers one or more **transaction reporting fields** have been inaccurately or incompletely populated, the **non-MiFID firm** must report this to the **Exchange** immediately and must cooperate with the **Exchange** to rectify any errors.

(Amended N09/17 – effective 3 January 2018)

| | | |
|---|---|---|
| 1014 | | If, at any time, a **member firm** does not comply with rule 1010, rule 1012, rule 1013 or is the subject of an intervention order or an order having equivalent effect served by an authority responsible for the supervision or regulation of a regulated activity, the **Exchange** may: |
| | 1014.1 | restrict the scope of **on Exchange** business conducted by the **member firm**; or |
| | 1014.2 | terminate the membership of the **member firm**. |

(Amended N09/17 – effective 3 January 2018)

**Suitability** [1020-1025]

| G | 1020 | | A **member firm** must, to ensure compliance with these rules, at all times have: |
|---|---|---|---|
| | | 1020.1 | adequate trade execution, recording, reporting and settlement procedures and systems and, if relevant, order and quote management procedures and systems; |
| | | 1020.2 | sufficient staff with adequate knowledge, experience, training and competence; |
| | | 1020.3 | adequate internal procedures and controls; and |
| | | 1020.4 | one or more compliance officers who shall be identified to the **Exchange** and be competent to advise the **member firm** and its **employees** on the application of these rules. |

*Guidance to Rule:*

*The **Exchange** may undertake an assessment of a **member firm's** compliance with these rules at any time, including a **member firm's** compliance with the requirements set out in Commission Delegated Regulation (EU) 2017/584. In order to support this assessment, the **Exchange** will ask for such reasonable information it deems fit from a **member firm**. Where this is the case, **member firms** are required to respond in a timely and complete manner.*

*(Amended N09/17 – effective 3 January 2018)*

| | 1021 | | Where the **Exchange** has reason to believe that a **member firm** is not conducting, or may not conduct, its operations in a business-like manner, and that requirements or restrictions are reasonably necessary to ensure that it does so, the **Exchange** may at any time: |
|---|---|---|---|
| | | 1021.1 | suspend, either in part or in full, a **member firm's** membership of the **Exchange** or its access to any of the **Exchange's** services; |
| | | 1021.2 | impose on the **member firm** requirements relating to the **member firm's** level of staffing, training, internal procedures and controls or any other matter relevant to the continuing suitability of the **member firm**; or |
| | | 1021.3 | restrict the scope of **on Exchange** business conducted by the **member firm**. |

| G | 1022 | | In accordance with notification rule 1050, a **member firm** shall notify the **Exchange** immediately of any matter that is material to the **member firm's** suitability as a **member firm**. |
|---|---|---|---|

*Guidance to Rule:*

*Such matters shall include, but are not limited to:*

*(i) the presentation of a petition for the winding up of the **member firm** or of a company which is a **subsidiary** or **holding company** of the **member firm**;*
*(ii) the appointment of a receiver, administrator or trustee of the **member firm**;*
*(iii) the making of a composition or arrangement with creditors of the **member firm**;*
*(iv) where the **member firm** is a partnership, an application or the giving of notice to dissolve the partnership;*
*(v) where the **member firm** is a sole trader, the presentation of a petition for a bankruptcy order or an award of sequestration;*
*(vi) the imposition of disciplinary measures or sanctions on the **member firm** or any **employee** by any statutory, professional or other body exercising a regulatory or disciplinary jurisdiction, whether within the **United Kingdom** or elsewhere;*
*(vii) an event equivalent to those identified in (i) to (vi) above under **overseas** legislation; and*
*(viii) any material change to any matter previously notified to the **Exchange** that is pertinent to the **Exchange's** consideration of a **member firm's** authorisation.*

*(Amended N09/14 effective 29 September 2014)*

| G | 1023 | A **member firm** shall be bound by and observe: |
|---|---|---|
|   | 1023.1 | these rules (as amended from time to time); |
|   | 1023.2 | any rules and procedures set out in any supplementary documentation issued by the **Exchange** under these rules; |
|   | 1023.3 | the provisions of any **notice**; and |
|   | 1023.4 | any requirement, decision or direction of the **Exchange**. |

*Guidance to Rule:*

*A **member firm** may appeal against a decision of the **Exchange** pursuant to these rules and in accordance with rule 1040.*

| 1024 | A **member firm** shall take all reasonable steps to ensure that its **employees** comply with all applicable obligations arising under these rules. |
|---|---|

| 1025 | A former **member firm** shall be bound by these rules in respect of all activities which took place prior to termination of membership (and which were subject to these rules) until the latest of: |
|---|---|
| 1025.1 | one year after it ceases to be a **member firm**; |
| 1025.2 | the date on which all of its **on Exchange** trades are settled and completed; or |
| 1025.3 | the date on which all outstanding subscriptions, charges or other sums due to the **Exchange** have been paid in full. |

**Resignation of membership** [1030-1033]

| 1030 | A **member firm** may resign by giving the **Exchange** at least three months written notice. |
|---|---|

| 1031 | The **Exchange** may postpone the effective date of resignation and may impose other measures that it considers necessary for the protection of investors who may be **customers** or **counterparties** of the **member firm** when the resignation would have otherwise become effective.  The **member firm** shall supply, when required by the **Exchange**, such information concerning the circumstances of the resignation as shall, in the opinion of the **Exchange**, be necessary for it to determine whether to exercise its powers under this rule. |
|---|---|

| 1032 | The **Exchange** may, in its absolute discretion, refuse to accept a notice of resignation given by a **member firm** if the **Exchange** considers that any matter affecting the **member firm** should be investigated. |
|---|---|

| 1033 | A **member firm** that has ceased to carry on business activities for which it was deemed suitable for membership may have its membership terminated with immediate effect or otherwise by the **Exchange**. |
|---|---|

**Appeals and complaints** [1040]

| G | 1040 | An applicant or **member firm** may appeal against a decision of the **Exchange** pursuant to these rules and in accordance with the rules in the **compliance procedures**. |
|---|---|---|

*Guidance to Rule:*

*Any appeal under this rule shall be conducted in accordance with the procedures set out in the **compliance procedures**.*

*There may be situations where the **Exchange's** decisions may not be appealed e.g. where the reversal of a decision would lead to market instability or disorder.  However in these cases, a complaint can be made against the **Exchange's** decision.  Details of how to make a complaint can be found on the **Exchange's** website:*

*http://www.londonstockexchange.com/traders-and-brokers/rules-regulations/making-complaint/making-complaint.htm*

*(Amended N37/09 – effective 19 August 2009)*

**RULES OF THE LONDON STOCK EXCHANGE**

<u>Notifications</u> [1050-1052]

**Immediate notifications**

| G | 1050 | A **member firm** shall, immediately upon becoming aware of any circumstances which have, will or may lead to a contravention of any of the rules, including system problems, notify the **Exchange** of such circumstances in as much detail as is available to it. Failure of a **member firm** to notify the **Exchange** in such circumstances may result in a contravention of the rules by the **member firm**. |
|---|------|---|

*Guidance to Rule:*

*A **member firm** system problem is any in-house technical difficulty which prevents a **member firm** from accessing, viewing data from or submitting data to the **trading system**. Where a **member firm** provides **direct market access** to **customers**, a **customer** system problem may also constitute a notifiable event.*

*Such notifications should be made to the Market Supervision department on (+44 (0)20 7797 3666, STX 33666.*

*(Amended N26/10 – effective 14 February 2011)*

**Advanced notifications**

| G | 1051 | A **member firm** shall notify the **Exchange** in writing, at least 21 calendar days in advance of the proposed effective date, of any proposed changes to its **membership profile**. |
|---|------|---|

*Guidance to Rule:*

*The **Exchange** would expect notification of, at a minimum, the following profile changes:*

- *name and address of the **member firm**;*
- *senior executive officer or compliance officer of the **member firm**;*
- *scope of trading activity in relation to **on Exchange** business, including trading codes;*
- *access to the **trading system**; and*
- *scope of settlement and clearing arrangements in relation to **on Exchange** business including settlement and clearing codes.*

*Such notifications should be made to the Membership department through the **Member Portal**.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 1052 | A **member firm** shall notify the **Exchange** in writing, at least 21 calendar days in advance of the proposed effective date or, if that is not possible, immediately on becoming aware of a change of control of the **member firm** within the meaning given under **FSMA**. |
|---|------|---|

*Guidance to Rule:*

*A notification under this rule shall be made to the Membership department through the **Member Portal**.*

*(Amended N09/17 – effective 3 January 2018)*

<u>Trade confirmations</u> [1060]

| G | 1060 | A **member firm** shall not inform a **customer** that a trade is subject to the Rules of the London Stock Exchange unless the trade is **on Exchange**. |
|---|------|---|

*Guidance to Rule:*

*The rule ensures that a **customer** is not misinformed that a trade is subject to the rules of the **Exchange** when it is not. A **member firm** may however state on its business letters, notices and other publications that it is a member of the **Exchange** and may where it issues a confirmation inform a **customer** that a trade is subject to the rules of the **Exchange**.*

**Trade records** [1070]

| | 1070 | A **member firm** shall retain a record of each **on Exchange** trade entered into by it which is subject to these rules, including a **lending arrangement**, for at least five years.  Any such record shall be produced for inspection to the **Exchange** on demand and, where it is not retained in legible form, must be capable of being reproduced in that form. |
|---|---|---|

*(Amended N09/17 – effective 3 January 2018)*

**English language requirement** [1080]

| | 1080 | Every document that is required to be provided to the **Exchange** under these rules shall be in English. |
|---|---|---|

**Voice recording** [1090-1091]

| | 1090 | Voice recording equipment shall be installed, maintained and used by every **market maker** with respect to its market making activities. |
|---|---|---|

*(Amended N16/11 -  effective 26 September 2011)*

| | 1091 | Recordings made under rule 1090 shall be retained for at least one month after the end of the normal settlement period for the relevant **Exchange** market. |
|---|---|---|

**Panel on Takeovers and Mergers Levy**

| G | 1092 | A **member firm** should ensure the collection of the appropriate **PTM levy** from their **customers**, regardless of whether the trades in question are executed under the Rules of the London Stock Exchange, on another exchange, multi-lateral trading facility or over-the-counter. |
|---|---|---|

*Guidance to Rule:*

*Information on the current **PTM levy** is available on the Panel on Takeovers and Mergers' website at http://www.thetakeoverpanel.org.uk/the-code/ptm-levy*

*(Amended N02/17 – effective 13 March 2017)*

# Member firm services

**Settlement agent** [1100]

| G | 1100 | A **member firm** may act as, or use the services of, a **settlement agent** to settle **on Exchange** business. |
|---|---|---|

*Guidance to Rule:*

***Member firms** must make their own arrangements for settling their **on Exchange** trades.  A **member firm** may, but is not obliged to, employ one or more **settlement agents**, which could include its **General Clearing Member**.  **Individual Clearing Members** may also use a separate **settlement agent**.*

**Model B firms** [1110]

| G | 1110 | A **member firm** may act as a **model B firm** for an **introducing firm** with the prior written consent of the **Exchange** with regard to each **introducing firm** to which it wishes to offer its services. |
|---|---|---|

*Guidance to Rule:*

*Whilst the **Exchange** places an obligation on the **model B firm** to seek prior written consent, there remains an obligation on both the **model B firm** and the relevant **introducing firm** to notify the **Exchange** of the change to their settlement and clearing arrangements in accordance with notification rule 1051.*

# Compliance and enforcement

### Compliance and enforcement [1200]

| | | |
|---|---|---|
| | 1200 | The **Exchange** may, at its discretion, waive the enforcement of these rules. |

### Information, monitoring and investigation [1210-1214]

| | | |
|---|---|---|
| G | 1210 | The **Exchange** may request or require information from a **member firm,** or interview any **employee** of a **member firm,** about any matter which it considers may relate to these rules or to the integrity of the **Exchange's** markets, or which the **Exchange** may require for the purpose of compliance with applicable law or regulation. |

*Guidance to Rule:*

*Examples of the form of information which the **Exchange** may request include, but are not limited to, trade data, voice recordings where applicable, contract notes, or underlying client data.*

*In relation to any request for information or interview, the **Exchange** would expect the following standards to be met:*

- *the provision of accurate information in a timely manner about the **member firm's** business and trades in a format, electronic or otherwise, specified by the **Exchange**; or*

- *the interview of any **employee**, or agent, of a **member firm**, which will be recorded in writing.*

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| | 1211 | A **member firm** shall comply or procure compliance with any requirement of the **Exchange** made pursuant to these rules. |

| | | |
|---|---|---|
| | 1212 | A **member firm** is responsible to the **Exchange** for the conduct of its **employees** and agents. Such conduct shall be treated for the purposes of these rules as conduct of the **member firm**. |

| | | |
|---|---|---|
| | 1213 | A **member firm** shall not knowingly provide the **Exchange** with any information (including information for the purpose of becoming a **member firm**) which is false, misleading or inaccurate and shall comply or procure compliance with a request by the **Exchange** for explanation or verification of information provided to the **Exchange**. |

| | | |
|---|---|---|
| | 1214 | The **Exchange** may disclose information and documents: |
| | 1214.1 | to co-operate, by the sharing of information and documents and otherwise, with any recognised exchange or clearing house which clears and/or settles **on Exchange** trades and any authority, body or **person** in the **United Kingdom** or elsewhere having responsibility for the supervision or regulation of any regulated activity or other financial service or for law enforcement purposes; |
| | 1214.2 | for the purpose of enabling it to institute, carry on or defend any proceedings including any court proceedings; |
| | 1214.3 | for any purpose referred to in **FSMA** or any regulations or order under it; |
| | 1214.4 | under compulsion of law; |
| | 1214.5 | for the purpose of enabling the **Exchange** to discharge its functions having regard in particular to the protection of investors and the maintenance of high standards of integrity and fair dealing; or |
| | 1214.6 | for any other purpose with the consent of the **person** from whom the information was obtained and, if different, the **person** to whom it relates. |

**Imposition of sanctions** [1215-1217]

| | |
|---|---|
| 1215 | If the **Exchange** considers that a **member firm** has contravened any of these rules and considers that any sanction(s) as set out in the **compliance procedures** should be imposed, it may refer the matter to the Disciplinary Committee or the Executive Panel as appropriate. |

| | |
|---|---|
| 1216 | The **Exchange** may bring disciplinary proceedings against a former **member firm** whilst the former **member firm** is bound by these rules. |

| | |
|---|---|
| 1217 | Where cases against more than one **member firm**, but which concern related matters, are to be brought before the Disciplinary Committee or the Appeals Committee, the **Exchange** may decide, with the agreement of the Disciplinary Committee or the Appeals Committee, as appropriate, to bring such cases at the same time, if it would be fair and practicable to do so and with the agreement of the relevant **member firms**. |

# Charges and fees

**Exchange charges [**1300-1303]

| | | |
|---|---|---|
| 1300 | | A **member firm** shall pay to the **Exchange**: |
| | 1300.1 | all applicable subscriptions, charges or other sums set out in the relevant **Exchange price list**; |
| | 1300.2 | all other sums due in accordance with **relevant contracts** between the **Exchange** and the **member firms**; and |
| | 1300.3 | all other sums notified by the **Exchange**. |

| | |
|---|---|
| 1301 | Unless otherwise specified by the **Exchange**, any subscriptions, charges or other sums due to the **Exchange** shall be paid in full within 30 calendar days of receipt of the invoice. |

| | |
|---|---|
| 1302 | In order to pay charges and sums due to the **Exchange**, the **Exchange** may require a **member firm** to execute and maintain in force a direct debit mandate in the **Exchange's** favour on a bank account in the **United Kingdom.** |

*(Amended N01/08 – effective 18 February 2008)*

| | |
|---|---|
| 1303 | Where a **member firm** fails to pay in accordance with these rules other than in the case of legitimate dispute, the **Exchange** may terminate its membership without prejudice to any other action which the **Exchange** may take. |

# General conduct

**Misleading acts, conduct and prohibited practices** [1400]

| | | | |
|---|---|---|---|
| G | 1400 | | A **member firm** shall not, in respect of its **on Exchange** business: |
| | | 1400.1 | do any act or engage in any course of conduct which creates or is likely to create a false or misleading impression as to the market in, or the price or value of, any security; |
| | | 1400.2 | cause a fictitious trade or a false price to be input into the **trading system**; |
| | | 1400.3 | effect a trade at any price which differs to an unreasonable extent from any firm price displayed on the **trading system** in that security; |
| | | 1400.4 | do, or attempt, any act or engage in any course of conduct, which constitutes or is likely to constitute market abuse under Regulation 596/2014 of the European Parliament and of the Council on market abuse (MAR); |
| | | 1400.5 | do any act or engage in any course of conduct which is likely to damage the fairness or integrity of the **Exchange's** markets; or |
| | | 1400.6 | do any act or engage in any course of conduct which causes, or contributes to, a breach of the **Exchange's** rules by another **member firm**. |

*Guidance to Rule:*

**Order book** *conduct*

*A **member firm** is at all times bound by suitability rule 1020.*

*A **member firm** submitting an order to the **trading system** is responsible for that order under the above Rule. This applies whether the order is submitted by the **member firm** itself or has been automatically routed from a third party (whether another **member firm** or not).*

*Certain trading practices that exploit the commitment given by firms that act as RSPs are considered to be detrimental to the fairness and integrity of the **Exchange's** markets and should be discouraged. For example, an order is entered onto the **order book** with the intention of creating a new best price, away from generally accepted trading levels, for the principle purpose of executing a larger order against an RSP by virtue of the RSP's previous commitment to deal on the basis of the current best **order book** price.*

*In any instance where a firm trades either as **principal** or as **agent** on behalf of an employee of the firm in a manner and with an intention similar to that described above, the **Exchange** will conduct a full investigation into the circumstances of the activity and, if considered appropriate, will initiate disciplinary action.*

*Where a firm deals in a manner similar to that described above (regarding the commitment given by firms that act as RSPs) on behalf of a **customer**, the firm will not be in breach of the **Exchange's** rules per se. However, although the **Exchange's** rules do not specifically require a firm to establish the motives behind a **customer's** trade, if the Exchange becomes aware that a firm is knowingly engaging in such a trading strategy on behalf of a **customer**, the **Exchange** will conduct an investigation and consider whether disciplinary action or a referral to another regulatory body is appropriate.*

*Entry and deletion of orders*

*All orders entered on to the **order book** are firm. While the **Exchange** understands that trading decisions of **member firms** may change, **member firms** should not enter orders into the auction or during **regular trading** with the intention of deleting or otherwise amending them before execution. This can give a potentially misleading impression of the level of liquidity in the market or the likely auction uncrossing price and volume to other participants. Such activity may constitute a breach of rule 1400.*

*Short selling*

***Member firms** are required to have at all times adequate systems and controls to ensure that their business is being conducted and settled in accordance with the **Exchange's** rules. These systems should enable **member firms** to monitor trading positions (long and short), identify stock shortages, settlement delays or backlogs, particularly where these may be attributable to running a substantial short position in a particular security. **Member firms** are also obliged under rule 1400 not to do any act or engage in any course of conduct which is likely to damage the fairness or integrity of the **Exchange's** markets, or which might create a false or misleading impression as to the markets or price of a security. **Member firms** must ensure that when they undertake short selling on a substantial scale, either on their own account or on behalf of **customers**, they have a clear strategy for ensuring the settlement of their short positions. If **member firms** believe at any point that they will be unable to fulfil their settlement obligati ons they should not continue to pursue their short selling strategy.*

*Short selling on a substantial scale can lead to significant settlement problems, which in turn can result in the **Exchange** having to issue a market status message warning the market of settlement problems. Where the **Exchange** issues such a message firms should consider very carefully whether further short selling will exacerbate the situation, in which case **member firms** should not continue to short sell (unless stock is available to cover any new positions). **Member firms** should cooperate with the **Exchange** to ensure timely settlement, including making every effort to settle outstanding unsettled short positions.*

*Where a market status message has been issued, **member firms** are reminded of the requirement for firms to comply with the FCA Principles for Business, in particular Principle 1 (Integrity) and Principle 6 (Customers' Interests).*

***Member firms** may be able to mitigate the settlement problems which can arise from short selling through the use of the guaranteed delivery facility and the **Exchange's** buying-in arrangements.*

*Roll over trading*

*When conducting a roll over trade or a sale and buyback, **member firms** should consider the volume of business that these trades account for, relative to the daily market turnover in the security.  **Member firms** should ensure that they have adequate procedures in place to monitor this activity and controls to prevent **customers** circumventing these by using different methods to deal, such as opening a position by telephone whilst at the same time closing another using one of the **member firm's** web based systems.*

*Where these trades are conducted in less liquid securities, the market may see inflated turnover in the security which is actually only a **customer** buying and selling the same position.  Undertaking such sale and buyback trades, in addition to the regular rolling of trades, could give a false or misleading impression to the market and the **Exchange** may consider this to fall under general conduct rules 1400.*

*(Amended N09/17 – effective 3 January 2018)*

**Share price manipulation** [1410]

| G | 1410 | A **member firm** trading in a security shall not do any act or engage in any course of conduct the sole or main intention of which is to move the price of that security or the level of any **index** of which that security is a component. |
|---|---|---|

*Guidance to Rule:*

*Rule 1410 does not preclude a **member firm** from pursuing a bona fide trading strategy, as **principal** or on behalf of **customers**, or from effecting trades in the normal course of its business.  However, in all cases, a **member firm** should ensure that it is in a position to be able to justify to the **Exchange** that, in effecting a trade or pursuing a particular trading strategy, it acted in pursuit of a bona fide commercial purpose.*

*The **Exchange** is likely to seek further information and detailed explanations from a **member firm** in respect of any activity that appears to amount to a breach of rule 1410.  Examples of activity that may lead the **Exchange** to seek further information from a **member firm** include, but are not limited to, instances where:*

- *in executing a **customer** order based on a reference price of a security, a **member firm** submits a number of comparatively small orders, shortly before the reference point, which are not proportionate to previous, related business by the **member firm** and appear to be intended to profit the **member firm** at the **customer's** expense;*

- *towards the striking or expiry of a hedged derivative position, a **member firm** trades in the cash market beyond the level required to set up or unwind the hedge and this appears to be done principally in order to benefit the firm's derivative position;*

- *a **member firm** with a partially hedged, or un-hedged, OTC futures or options position, trades in the cash market, apparently uneconomically in respect of that cash business, but to the benefit of the OTC position; or*

- *a **member firm** accepts an order from a **customer**, where the **customer's** stated intention is to move the price of a security or value of an **index** (this would include a situation where, for example, a **customer** instructs a **member firm** to ensure that an **index** closes above a certain level).*

*Additional guidance for closing auctions*

*In executing a trade to achieve the closing price for a **customer**, **member firms** may wish to use a market order in the closing auction.  A **member firm** may also enter a priced order on the other side of the **order book** if this represents genuine trading interest.  This would not of itself constitute a breach of rule 1410.*

*The **Exchange** monitors all situations where a **member firm** executes against itself, particularly around sensitive times such as the end of the trading day or during **index** expiry pricing periods, due to the potential for a **member firm** to influence prices in this manner.  In carrying out this strategy, **member firms** should have regard to the impact on the market and should consider the following:*

- *the timing of orders entered, to allow other **member firms** to react to these orders; the price of the orders or quotes as compared to the prevailing market price; and*

**RULES OF THE LONDON STOCK EXCHANGE**

- *other regulatory requirements, including whether this strategy should be disclosed to the **customer**.*

*Should a **member firm** have concerns about whether a particular trading strategy might be called into question by the **Exchange**, they should contact the Market Supervision department on +44 (0)20 7797 3666 (STX 33666) – option 2, as far in advance as possible, to discuss the proposed strategy. All such enquiries will be treated in the strictest confidence by the **Exchange**.*

*(Amended N09/17 – effective 3 January 2018)*

**System testing** [1420-1422]

| G | 1420 | A **member firm** shall not submit orders, **quotes** or **trade reports** to the **trading system** for the purpose of testing any systems or controls. |
|---|---|---|

*Guidance to Rule:*

*The **Exchange** requires **member firms** to test their systems or controls prior to submitting orders, **quotes** or **trade reports** to the **trading system**. To enable this testing, the **Exchange** offers **member firms** a separate connection to a testing environment packaged within a number of services such as the Customer Development Service, Application Certification, High Volume Testing and Participant Test Weekends, in addition to the use of specific test segments on the **trading system**. **Member firms** are encouraged to contact their Technical Account managers to discuss their testing requirements. **Exchange** approved testing undertaken by **member firms** (including the **Exchange** test segment on the **trading system**) is not prohibited by this rule.*

*Testing on the **trading system** is prohibited as it has the potential to impact the market, particularly as testing may result in unusually priced and/or sized orders, **quotes** or trade reports being entered. The **Exchange** relies on **member firms** to submit only bona fide business to the **trading system**. Submitting orders, **quotes** or **trade reports** to the **trading system** for the purpose of testing a **member firm's** or its **direct market access customer's** systems or controls is not an acceptable market practice.*

*This rule is not intended to preclude a **member firm** from initiating new trading strategies (whether manual or algorithmic) as part of a controlled release procedure.*

***Member firms** that require further information on how to conduct testing with the **Exchange** should contact Client Technology Group on +44 (0)20 7797 3939 (email: londontam@lseg.com)*

*(Amended N09/17 – effective 3 January 2018)*

| G<br>GT | 1421 | **Member firms** are required to conduct conformance testing prior to the deployment or substantial update of: |
|---|---|---|
| | 1421.1 | the access to the **Exchange's** systems; and |
| | 1421.2 | the **member firm's** trading system, trading algorithm or trading strategy. |

*Guidance to Rule:*

*Such testing must take place on the **Exchange's** conformance testing facilities. The conformance testing must ensure that the basic functioning of the **member firm's** trading system, algorithm and strategy complies with the **Exchange's** requirements as set out in the **Guide to the trading system**.*

***Member firms** that require further information on how to conduct testing with the **Exchange** should contact Client Technology Group on +44 (0)20 7797 3939 (or email: londontam@lseg.com)*

*(Amended N09/17 – effective 3 January 2018)*

| G | 1422 | **Member firms** that operate, or plan to operate an algorithm must, prior to the deployment or substantial update of a trading algorithm or trading strategy related to that algorithm, certify to the **Exchange** that the algorithm to be deployed has been tested so as to avoid contributing to or creating disorderly trading conditions. |
|---|---|---|

*Guidance to Rule:*

*The **Exchange** will provide **member firms** with a testing environment to facilitate this requirement.   A **member firm** must confirm how its algorithms have been tested via the **Member Portal**.  Where a **member firm** confirms an order was generated by an algorithm (by providing a short code identifier for the algorithm on the order) this will be deemed as confirmation to the **Exchange** that the submitting **member firm** has adequately tested the algorithm in accordance with this rule.*

*(Amended N09/17 – effective 3 January 2018)*

# Systems and trading

### Member firm system problems [1500]

| G<br>GT | 1500 | Where a **member firm** identifies a system problem it shall inform the **Exchange** in accordance with notification rule 1050 and follow any subsequent instructions from the **Exchange**.  An authorised employee of a **member firm** may request the deletion of orders or **quotes**. |
|---|---|---|

*Guidance to Rule:*

*For the purposes of this rule, a system problem would include, but not be restricted to, one preventing:*

- *a **member firm** accessing its orders on the **trading system**;*
- *a **member firm** submitting a **trade report**;*
- *a **market maker** maintaining, amending or deleting its **quotes**; or*
- *a **market maker** from answering its telephone lines.*

<u>*Dealing during a systems failure:*</u>

*While a **member firm** is experiencing a system failure it is not precluded from dealing in the relevant securities.  However, the **member firm** must ensure that any **on Exchange** trades are reported to the **Exchange** in compliance with the rules.*

<u>*Orders and quotes:*</u>

***Member firms** are reminded that, while orders remain on the **trading system** they are firm and available for execution.  Accordingly, it is essential that a **member firm** contact the **Exchange** as soon as possible when it experiences a system failure, especially if it wishes to have its orders deleted from the book.*

*Once the systems problem is rectified, the **member firm** should contact the Market Supervision department to notify them of this fact.  The **member firm** can recommence order input to the **trading system** as soon as the systems problem is rectified.*

*If a **member firm** wishes to reverse an automatically executed trade in accordance with rule 2110 while it is experiencing a systems problem, it should seek guidance from the Market Supervision department on (+44 (0)20 7797 3666, (STX 33666) - option 2, to determine whether a **contra** submission should be made immediately or after the system problem is resolved.*

<u>*Order and **quote** deletion and restriction of submission:*</u>

***Member firms** have primary responsibility for deleting their own orders and restricting the submission of their orders.  Where this is not possible, the **Exchange** will aim to provide a back-up service to delete orders and/or to restrict the **member firm's** access to submit orders.*

*The **Exchange** will maintain a list of **employees** in the **Member Portal** authorised by each **member firm** to request the deletion of orders and **quotes** or to restrict access.  A person authorised by a **member firm** must be "a director, partner or principal or person employed in or about the firm's business as a **member firm**, whether under a contract of service or for services (including a training contract) and any person seconded to work in or about that business".*

*If a **member firm** requests the **Exchange** to delete its orders or **quotes** and/or to restrict their access, the **Exchange** will only action this request if it comes from a person named on the*

**RULES OF THE LONDON STOCK EXCHANGE**

*member firm's authorised person list. The **Exchange** will refuse to provide details of the names on a **member firm's** authorised list to anyone not themselves on the list and a request received from someone not on the authorised list will be declined. In this event the **Exchange** will contact the **member firm's** compliance department for clarification in respect of the request.*

***Member firms** that choose to segregate their business by multiple **Trader Groups** will need to provide a list of individuals authorised to delete orders on behalf of each **Trader Group**. **Member firms** are advised to ensure that the list is broad enough to provide sufficient coverage in cases of staff absence. For example, it may be more practical to have a number of nominated people in compliance who are authorised to request deletions for all **Trader Groups**.*

***Member firms** should register authorised **employees** or changes in their status with the **Exchange** using the **Member Portal**.*

*Recognition of new authorised **employees** will be effective on the **business day** after the notification is received by the **Exchange**.*

*When contacting the **Exchange** to request the deletion of an order or **quote**, the authorised person must provide the following information:*

- *the name of the **member firm**;*
- *the **member firm's member ID**;*
- *the **member firm's trader group**; or*
- *the **member firm's** Comp ID;*
- *the identity of the caller and a contact number; and*
- *the reason for the request (e.g. system problems, building evacuation).*

*For single order deletions (up to a maximum of five), the **member firm** must also provide the Order ID. If this is not available, the **member firm** should provide:*

- *the name of the security;*
- *whether it is a buy or a sell;*
- *the price and size; and*
- *the time the order was entered.*

*If a **member firm** requests the deletion of more than one order in a single security, each of the orders will count towards the maximum allowed number of five order deletions. The Market Supervision department will normally delete all orders within a particular segment. However, upon application, the Market Supervision department will consider the deletion of individual orders providing the total of individual orders does not exceed five.*

*For mass order deletions, the **member firm** must provide the following information:*

- *whether it wants all orders and/or **quotes** deleted; and*
- *the specific segments to which the deletions should apply.*

***Member firms** should be aware that all parked orders will be deleted during a mass order deletion performed by the **Exchange**.*

*The Market Supervision department will attempt to delete orders, **quotes** and/or restrict access on a best endeavours basis and at its absolute discretion, as soon as possible after receipt of a valid request to do so.*

*However, if an order is executed during the period between a **member firm** requesting deletion of its orders and the Market Supervision department effecting the deletions or access restriction the **member firm** will be obliged to honour the trade.*

<u>*Trade reporting:*</u>

*Where a **member firm** has a system problem that prevents it from submitting a **trade report** (where it has the responsibility to do so), the **member firm** must immediately upon execution of the trade having exhausted all means of its connectivity to the **Exchange**, inform the Market Supervision department on (+44 (0)20 7797 3666, (STX 33666).*

*The **Exchange** will determine what trade details it requires until such time as the problem is resolved. This will normally be any trade in a size that is in excess of six times the **Exchange market size** for the security (or the equivalent average daily turnover) or a consideration in excess of £1,000,000. The same procedure will apply to the correction of a*

**RULES OF THE LONDON STOCK EXCHANGE**

*trade report during a system problem. Such trades must not then be re-reported by the* **member firm** *once the system problem has been resolved.*

*If any trades are re-reported, they should be cancelled as soon as the* **member firm** *becomes aware of the error. If a* **member firm** *is unable to effect a cancellation it should contact the* **Exchange** *immediately.*

*If the* **Exchange** *is not informed of a* **member firm's** *trade reporting difficulties, it will treat resultant late trade reports as breaches of rule 3020.*

*Market maker systems:*

*In the event of a* **market maker** *system problem, including a problem arising from an act or omission beyond the* **market maker's** *control, the* **market maker** *should notify the* **Exchange** *that it is unable to update its* **quotes** *on the* **trading system***. If system problems persist on subsequent* **business days***, the* **market maker** *is required to notify the Market Supervision department on (+44 (0)20 7797 3666, (STX 33666) prior to the start of the* **mandatory period** *of each subsequent day.*

*If a* **market maker** *cannot update or delete its own* **quotes***, it may ask the* **Exchange** *to close its prices in a sector or segment until the fault has been repaired. Where a reported fault affects a dealer terminal only, that* **market maker** *in a* **quote-driven security** *is expected to continue to quote firm prices over the telephone.*

*If a* **market maker** *in a* **quote-driven security** *has problems with any telephone lines associated with its dealing desk, the* **market maker** *should notify the* **Exchange** *as soon as possible.*

*The* **market maker** *should re-enter its* **quotes** *as soon as it is able to do so, notifying the* **Exchange** *beforehand. In all cases a* **market maker** *shall ensure that the Market Supervision department is kept appropriately informed.*

*Amended N09/17 – effective 3 January 2018)*

**Regulatory suspensions** [1510-1513]

| G | 1510 | The **Exchange** may prohibit any trade or class of trades from being dealt **on Exchange**. |
|---|---|---|

*Guidance to Rule:*

*Examples of a regulatory suspension are:*

- *a suspension imposed by the competent authority or market operator of the* **relevant market***; or*

- *a suspension for orderly market reasons imposed by the* **Exchange***.*

*When a security is suspended by the* **Exchange***, the* **Exchange** *will delete any orders and close any quotations present in the* **trading system** *in the suspended security.*

*The* **Exchange** *may exercise its power to suspend or remove from trading a* **MiFID transparent security** *which no longer complies with the rules unless such a step would be likely to cause significant damage to the interests of investors or the orderly functioning of the financial markets.*

*(Amended N09/17 – effective 3 January 2018)*

| | 1511 | A **member firm** shall not effect a trade in securities in respect of which trades are prohibited under these rules or which are the subject of a **notice** or order suspending trading **on Exchange** other than in accordance with rule 1513. |
|---|---|---|

| G | 1512 | Where a **member firm** learns of a regulatory suspension of a security on a **relevant market** where that security, or a security underlying that security is also on the **trading system**, it should promptly notify the **Exchange** and any other **member firms** which approach it to deal in the affected security on the **trading system**. |
|---|---|---|

*Guidance to Rule:*

*Where* **overseas** *securities traded on the* **Exchange** *are not listed by the UKLA, the treatment of suspensions must be co-ordinated with the actions of other exchanges and the*

**RULES OF THE LONDON STOCK EXCHANGE**

*needs of the market.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 1513 | A **member firm** may apply to the **Exchange** for permission to effect trades in a security in which trading is suspended by the **Exchange**. Permission must be obtained in respect of each proposed **on Exchange** trade. |
|---|------|---|

*Guidance to Rule:*

*Normally permission to effect trades in suspended securities is only granted to enable the* **member firm** *to:*

*(i)     fill a short position which was acquired before the suspension or prohibition was imposed;*
*(ii)    complete a derivative contract;*
*(iii)   wind-up a deceased* **person's** *estate; or*
*(iv)   create or redeem shares in an* **exchange traded fund**.

*Permission will not be granted where the suspension is required by a regulator under Article 69(2)(m) of* **MiFID**. *Applications for permission to deal under this rule should be addressed to the Market Supervision department using the dealing request form available on the corporate website as far in advance of the planned trade date as possible.*

*In permitting trading to 'complete a derivative contract' a* **member firm** *would be enabled to carry out a cash hedging trade which was envisaged as part of a derivative contract but which was not able to be executed before the suspension took place.*

*In the case of CFDs, this would cover a situation in which the CFD had been written prior to the suspension of the underlying equity and, as part of that contract, the* **member firm** *intended to either buy or sell in the cash market to hedge the CFD but had not been able to do so before the stock was suspended. In this scenario,* **member firms** *can seek permission from the* **Exchange** *to trade during a suspended period in order to complete the cash leg of the contract.*

*Where a* **member firm**, *or its client, has an open CFD position, this does not mean that permission to trade will be given under the exemption for filling a short position. In such cases, the* **Exchange** *will enquire about the status of any hedging trade executed before the suspension. If the hedging trade entered into by the* **member firm** *involved the creation of a short equity position (which may or may not been covered by stock borrowing), then the* **Exchange** *may give permission to trade during the suspended period in order to close the short equity position. In order to confirm that a short equity position is held, the* **Exchange** *will ask for details of the equity hedging trade. Permission to trade the equity hedge will not be given where the* **member firm** *wishes to enter into a new CFD position or close out a CFD position by transferring it to a third party. This is to ensure equal treatment with other* **member firms** *that have an equity exposure to the security.*

*(Amended N11/18 – effective 18 June 2018)*

**Market situations** [1520]

| G<br>GT | 1520 | The **Exchange** may suspend automatic execution on the **trading system** or impose a temporary trading suspension or trading halt for a particular market, market segment or tradable instrument as **market situations** dictate and as described in the **Guide to the trading system**. |
|---------|------|---|

*Guidance to Rule:*

*The* **Exchange** *may waive or amend the following* **market maker** *obligations:*

- *the obligation to maintain* **quotes***;*
- *the obligation to maintain a maximum spread;*
- *the obligation to refresh* **quotes** *within a minimum time period and/or*
- *the obligation to deal at displayed prices.*

*(Amended N09/17 – effective 3 January 2018)*

RULES OF THE LONDON STOCK EXCHANGE

**When issued dealing** [1530-1532]

| 1530 | The **Exchange** will permit **when issued dealing** in a security provided that the **Exchange** is satisfied that there can be a fair and orderly market for the trading of that security and: |
|---|---|
| 1530.1 | a **when issued dealing** application having been made in accordance with guidance provided on the **Exchange's** website (http://www.londonstockexchange.com/traders-and-brokers/rules-regulations/when-issued-stabilisation.htm); |
| 1530.2 | the listing particulars or other appropriate documentation, as applicable, being expected to be approved and published during the first day of **when issued dealing**; and |
| 1530.3 | the offer price and full allocation details having been publicly announced prior to commencement of **when issued dealing** together with details of when the listing particulars or other documentation will be available from. |

*(Amended N11/18 – effective 18 June 2018)*

| G | 1532 | All **when issued dealing** trades will be for deferred settlement and if the resulting securities are not admitted to unconditional trading, every **when issued dealing** trade effected is void. |
|---|---|---|

*Guidance to Rule:*

*Member firms that enter into an on Exchange off order book trade during the when issued dealing period should ensure that settlement does not take place until listing or admission to trading has taken place.*

*Further guidance can be found on the Exchange's website at:*
http://www.londonstockexchange.com/traders-and-brokers/rules-regulations/when-issued-stabilisation.htm

*(Amended N11/18 – effective 18 June 2018)*

**Stabilisation** [1535]

| 1535 | A **member firm** intending to act as or on behalf of a stabilising manager in a security to be traded **on Exchange** shall, prior to the commencement of the stabilising period, provide the **Exchange** with information regarding the stabilisation in accordance with the guidance on the **Exchange's** website (http://www.londonstockexchange.com/traders-and-brokers/rules-regulations/when-issued-stabilisation.htm). |
|---|---|

*(Amended N11/18 – effective 18 June 2018)*

**Conditional trades** [1540]

| 1540 | Other than in the case of **when issued dealing**, a **member firm** shall not effect a trade **on Exchange** subject to a condition precedent or condition subsequent. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

**Reg S traded securities** [1550]

| G | 1550 | A **member firm** shall not effect a trade in a **Reg S traded security** unless it has reasonable basis to believe after inquiry and confirmation that the trade complies with the requirements of US securities laws. |
|---|---|---|

*Guidance to Rule:*

*Rule 1550 imposes upon a member firm an obligation not to engage in any trade in a Reg S traded security unless it has a reasonable basis to believe, after inquiry and confirmation, that the trade complies with the requirements of the securities laws of the United States of America ("United States" or "US"). The following guidance is provided by way of assistance only and a member firm should seek independent legal advice as to the applicability of these laws. Member firms are also directed to the disclosure relating to Regulation S, Category 3 restrictions under the US Securities Act of 1933, as amended (the "US Securities Act") or other restrictions under US securities laws in the relevant prospectus.*

**RULES OF THE LONDON STOCK EXCHANGE**

*For the purposes of the rules, the term Reg S traded security refers to any security identified to the Exchange as such by or on behalf of the issuer of the security. When a security has been so identified, the Exchange will require that the letters 'REG S' be added to the end of its name as shown in the trading system. The 'REG S' identifier signifies that the relevant securities are subject to Regulation S, Category 3 restrictions under the US Securities Act and are deemed to include the restrictive legend required by Rule 903(b)(3)(iii)(B)(3) under the US Securities Act. The Exchange will place the security in a separate sector of the trading system containing other Reg S traded securities only for the duration of the period of restriction. Upon notification by the issuer to the Exchange that restrictions no longer apply, the 'REG S' marker will be removed from the security's name and it will be placed in an appropriate sector. This information will be disseminated via Datasync, the Exchange's Reference Data Service. A list of Reg S traded securities is available on the Exchange's website, which will specify the standard place of settlement for the security.*

*Generally, Reg S traded securities have been issued by companies incorporated in the United States and initially offered and sold without being registered with the U.S. Securities and Exchange Commission ("SEC") under the US Securities Act and are subject to a one-year distribution compliance period under Regulation S. (Note, there are also companies incorporated outside the United States that may fall within the definition of "domestic issuer" for Regulation S purposes.) As such, Reg S traded securities are considered "restricted" securities, and they must be traded only in accordance with Regulation S, pursuant to registration under the US Securities Act or pursuant to an available exemption from the registration requirements of the US Securities Act.*

*Among other requirements, Regulation S provides that securities issued pursuant thereto may not be purchased by, or on behalf of, "US persons" (as defined in Rule 902(k) of Regulation S) in reliance on Rule 904 under Regulation S during the one-year distribution compliance period commencing upon the closing of the initial public offering. Generally, therefore, a security will be identified as a Reg S traded security until the first anniversary of its admission to trading. However, it is the responsibility of the issuer to determine when the restrictions applicable to trading of its Reg S traded security may be removed, and, accordingly, at the issuer's discretion and by agreement with the Exchange, a security may be treated as a Reg S traded security for a period longer than one year.*

*Prior to purchasing a Reg S traded security, a member firm must take reasonable steps to ascertain whether its customer is resident in the United States or may otherwise be considered to be a US person or is acting for the account or benefit of a US person. A member firm must design, implement and maintain measures to assure compliance with the rule, such as, by way of example, obtaining or reconfirming within the last 12 months a certification from its customer that he, she or it is not a US person within the meaning of the above-mentioned Rule 902(k) and that such customer understands and accepts the restrictions and limitations imposed by Regulation S on purchasers of such securities. Reg S traded securities may not be purchased on behalf of a US person, unless the Reg S traded security is also identified as being Rule 144A eligible. A Reg S traded security also identified as being 144A eligible may be purchased by, or on behalf of, a US person who is also a qualified institutional buyer ("QIB") as defined in Rule 144A and who is purchasing in reliance on Rule 144A.*

*Regulation S also requires that offers to sell Reg S traded securities not be made to persons in the United States; that, at the time a buy order is originated, the seller and any person acting on its behalf reasonably believe that the buyer is outside the United States; and that neither the seller nor any person acting on its behalf knows that the trade has been pre-arranged with a buyer in the United States. In addition, Regulation S requires that no "directed selling efforts" (as defined in Rule 902(c) of Regulation S) are made in the United States by the seller, an affiliate or any person acting on their behalf, and that if the seller is a dealer or a person receiving a selling concession, fee or other remuneration in respect of the securities offered or sold, neither the seller nor any person acting on its behalf knows that the offeree or buyer is a US person.*

*Guidance associated with Rule 5000 provides that where an agency broker deals with a market principal on behalf of a customer, the market principal and the Exchange rely on the agency broker to ensure the performance of its customer. If the customer fails to deliver securities or cash, then the agency broker is responsible for any shortfall. This includes trades in Reg S traded securities which are rejected for settlement because the purchaser of the securities is identified as a US person.*

*(Amended N17/15 – effective 1 September 2015)*

# ORDER BOOK TRADING RULES

## Trades

**On Exchange trades** [2000]

| | |
|---|---|
| 2000 | A trade is **on Exchange** if it is effected automatically on an **Exchange order book**. |

*Guidance to Rule:*

*A trade can also be considered to be **on Exchange** if conducted away from an **order book** as detailed in rule 3000.*

*For the purpose of this rule, a trade includes a **central counterparty contract**.*

## Order entry

**Access to the trading system and the responsibility of member firms** [2100-2109]

| G | 2100 | | Each order or **quote** submitted to the **trading system** shall be: |
|---|---|---|---|
| | | 2100.1 | firm; |
| | | 2100.2 | subject only to the terms relating to benefit entitlements prevailing at the time of execution; and |
| | | 2100.3 | orders only, should contain all information as set out in Commission Delegated Regulation (EU) 2017/580. |

*Guidance to Rule 2100.3:*

*This information will include details about the financial instrument and the order, details about the client of the transmitting firm and, whenever relevant, an identifier for the person or computer algorithm, that is responsible for the investment decision in relation to the order.   A **member firm** which enters an abbreviated identifier on its orders (e.g. an abbreviation of a **National ID**) must subsequently submit the complete identifier before 18.00 hours on the same day, through the **Member Portal**.  Where a **member firm** becomes aware that it has submitted an incorrect identifier the **member firm** must inform the **Exchange** immediately.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 2101 | Any obligations and liabilities arising from the submission of electronic messages and orders to the **trading system** under a **member firm's** trading codes, are the responsibility of that **member firm**.  The **member firm** shall, at all times, have sufficient order management systems, procedures and controls designed to prevent the entry of erroneous orders and **quotes** to the **trading system**. |
|---|---|---|

*Guidance to Rule:*

*A **member firm** is at all times bound by suitability rule 1020.*

*In determining whether a **member firm** has met the requirements of rules 1020 and 2101, the **Exchange** will consider the level of training and qualifications of individual traders, including the taking of any relevant examinations.*

*A **member firm** submitting an order or a **quote** to the **trading system** is responsible for that order or **quote**.   If an order has been submitted by or automatically routed from a third party (whether another **member firm** or not), then the **member firm** should consider how it is going to control the order flow.*

*Erroneous orders and quotes*

*An erroneous order or **quote** is an order or **quote** entered mistakenly where there was no intention to trade in the security or an order or **quote** where the terms entered, mistakenly, did not represent the intended transaction.  For the avoidance of doubt the terms of an order or **quote** include but are not limited to price, size, buy and sell (direction of trade).*

*In determining whether an order or **quote** is erroneous, the **Exchange** will ask the **member firm** for details of the background to the order or **quote**.  Below is a non-exhaustive list of scenarios where the **Exchange** may query an order or a **quote** with a **member firm**:*

- *orders or **quotes** that exceed the **Exchange's** price monitoring thresholds;*

- *an aggressively priced limit order that executes against a significant number of orders on one side of the **order book**, which could take place, for example, if price and size have been entered in the wrong fields;*

- *an order that is divided into sizes either not intended by the **member firm** or which are so small or so large as to be inappropriate; or*

- *a very high priced buy order or a very low priced sell order entered into the auction period when it might be more appropriate to use a **market order** to guarantee execution.*

***Member firms** should aim to prevent the entry of erroneous orders and **quotes** to the **trading system** and should ensure that their systems are designed to identify and prevent the entry of such orders and **quotes**. In determining whether a **member firm's** systems are adequate in this regard, **member firms** should use controls and system alerts, which may be based on some or all of the following:*

- *the last **order book** traded price (from the previous day if appropriate);*

- *the current spread in the market;*

- *trader, security-specific or firm-wide size and price limits;*

- *the likely movement in the price of the security if the order or **quote** is submitted;*

- *a minimum and maximum financial consideration per order or **quote**; and*

- *controls on limit orders and market orders submitted during an auction.  When entering limit and market orders in auctions **member firms** must have sufficient systems and controls in place so that the type of order they submit does not have an inappropriate affect on the uncrossing price of the security in question. For instance, a **member firm** may wish to submit a market order to an auction to maximise its probability of execution but should have regard to the possible impact of a large market order on the auction uncrossing price.*

*The above list is not exhaustive and **member firms** are likely to wish to develop their own bespoke controls and system alerts to prevent the entry of orders and **quotes** which, because of their price, size and/or nature, could impact on the smooth running of the market.*

*The parameters for any such alerts should be determined by each **member firm**, with reference to the nature of its business.  Parameters should be set at levels such that, if no alert is generated in relation to any particular order, then the **member firm** should be satisfied with the execution price(s) achieved.*

***Member firms'** procedures and controls should be designed to ensure that orders and **quotes** are entered correctly and that any alerts generated are responded to appropriately.*

***Member firms** should be aware that in deciding what action to take against a **member firm** for the submission of any apparently erroneous order or **quotes**, the **Exchange** will consider both the potential and the actual market impact.  It will also have regard to the relative frequency with which the **member firm** submits such orders or **quotes**.*

*(Amended N09/17 – effective 3 January 2018)*

| GT | 2102 | A **member firm** should enter a trading capacity, as described in the **Guide to the trading system**, when submitting orders to the **trading system**. |
|---|---|---|

*(Amended N09/17 – effective 3 January 2017)*

| G | 2103 | The **Exchange** reserves the right to restrict or segregate a **member firm's** access to and use of the **trading system** as it sees fit. |
|---|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

*Guidance to Rule:*

*The **Exchange** may decide to segregate a **member firm's** access to and use of the **trading system** in order to protect market orderliness or for other regulatory reasons.*

*Whilst the **Exchange** does not mandate how a **member firm** should segregate its **order book** business at trader group level, the **Exchange** reserves the right to do this as it sees fit. Typically, this would be where it suspects a **member firm's** controls to be inadequate or inappropriate, or, more generally, where it considers this to be in the interest of maintaining a fair and orderly market.*

*For instance, where a **member firm** chooses to use only one or a limited number of **trader groups** for its order flow, and the **member firm** has repeated problems in relation to erroneous orders being entered by a **direct market access customer**, the **Exchange** may require that all orders from that **customer** are assigned to a specific **trader group**.*

*(Amended N26/10 – effective 14 February 2010)*

| | | |
|---|---|---|
| | 2104 | The **Exchange** reserves the right to delete any order or **quote** submitted to the **trading system** where the **Exchange** believes it necessary in order to preserve market orderliness. |

*(Amended N09/17 – effective 3 January 2017)*

| | | |
|---|---|---|
| | 2105 | When using the **trading system** a **member firm** shall comply with the procedural, operational and technical requirements of the **Exchange's** systems and networks as specified by the **Exchange** from time to time. |

*(Amended N09/17 – effective 3 January 2017)*

**Contra request** [2110]

| | | |
|---|---|---|
| G<br>GT | 2110 | If a **member firm** submits an order incorrectly which is subsequently executed, it may submit a request to **contra** the resultant trade(s). |

*Guidance to Rule:*

*All orders submitted to the **trading system** are firm. Accordingly, where an order is entered in error, any trade executed as a result of it will be valid. If an order is entered in error and subsequently executed, it may be subject to a **contra** with the agreement of the **buyer** and **seller**.*

*For electronically executed trades on an **order book** with a **central counterparty**, where there is **counterparty** anonymity, agreement to **contra** can only be secured by the Market Supervision department intermediating.*

***Member firms** are under no obligation to **contra** a trade at the request of a **counterparty**. Further information on the **contra** request process can be found in the **Guide to the trading system**.*

*(Amended N26/10 – effective 14 February 2010)*

**Exchange enforced cancellation of erroneous trades** [2120-2121]

| | | |
|---|---|---|
| G | 2120 | The **Exchange** views all trades undertaken under its rules as firm. However, the **Exchange** may, in exceptional circumstances, undertake an **Exchange enforced cancellation** of an automated trade executed on the **trading system**, either at the request of a **member firm** or of its own volition. In considering a **member firm's** request for an **Exchange enforced cancellation**, the **Exchange** will have regard to a number of factors that are set out in the guidance below, and whether: |
| | 2120.1 | both parties to the trade(s) are unable to agree to use the **contra** facility; |
| | 2120.2 | the request for an **Exchange enforced cancellation** is submitted to the Market Supervision department within a time period specified by the **Exchange** in the guidance to this rule; |
| | 2120.3 | the **member firm** requesting the **Exchange enforced cancellation** provides appropriate information to the Market Supervision department as set out in the guidance below; and |
| | 2120.4 | a **member firm** has incurred an amount of loss through an automated trade conducted on the **trading system** as specified in the guidance to this rule. |

*Guidance to Rule:*

*The **Exchange** may, in its absolute discretion, cancel trades across all its markets, either in response to a request from a **member firm** or of its own volition. The **Exchange's** decision regarding an **Exchange enforced cancellation** is final. Examples of situations in which the **Exchange** will consider cancelling trades of its own volition include, but will not be limited to, where there has been a clear miscommunication of a corporate event or where a stock's closing price has been significantly distorted by the entry of erroneous orders during the closing auction.*

*Generally, the Exchange will only consider a **member firm's** request for an **Exchange enforced cancellation** when it considers, in its sole discretion, that to cancel the trade is in the best interests of the overall market.*

*The **Exchange** is prepared to receive a request for an **Exchange enforced cancellation** at the same time as a **contra** request. The Exchange will only accept a cancellation request if it is accompanied by a **contra** request. The Market Supervision department will use reasonable endeavours to obtain a **contra** for the **member firm** prior to considering the request for an **Exchange enforced cancellation**. As a result, the **Exchange** expects **member firms** to:*

- *submit a **contra** request against the relevant trade on the **trading system**; and*

- *request the **counterparty's** consent to the **contra**.*

*Should the **contra** request be turned down the **Exchange** may then consider cancelling the trade.*

*<u>Criteria for the consideration of an Exchange enforced cancellation</u>*

*When considering a **member firm's** request for an **Exchange enforced cancellation**, the **Exchange** will generally have regard to the following non-exhaustive list of considerations:*

- *automated execution – the **Exchange** will only consider requests relating to automated executions on the **trading system**;*

- *time elapsed since the trade(s) – any requests from **member firms** to cancel trades should be made to the Market Supervision department as soon as possible and in any event within 30 minutes of the trade time. Requests from **member firms** to cancel the uncrossing of closing auctions which conclude after 16.30 hours must be made to the Market Supervision department no later than 17.00 hours.*

- *erroneous nature of the trade - any trades to be cancelled must be manifestly erroneous in the judgement of the **Exchange**.*

- *market impact - the **Exchange** may take into account other factors including, but not limited to, the potential market disorder that would be caused if the trade(s) were upheld or the potential adverse market impact if the trade(s) were cancelled.*

*Further, specific additional criteria apply respectively to automated executions in each of the tradable instruments available on the trading system. These are set out below.*

*<u>Additional criteria for automated executions in equity securities</u>*

*In considering a **member firm's** request for an **Exchange enforced cancellation** in equity securities the Market Supervision department will also consider:*

- *the potential loss to the **member firm** involved. The potential loss, based on an **Exchange** reference price, to the **member firm** requesting the **Exchange enforced cancellation** should be significant. The Market Supervision department will only consider an **Exchange enforced cancellation** where the amount of loss is £100,000 or more in relation to automated trades conducted in a single stock on the **trading system** and £200,000 or more in relation to automated trades conducted in more than one stock on the **trading system**; and*

- *whether any information requested by the Market Supervision department is complete, accurate and provided promptly. The Market Supervision department will determine what information it requires from **member firms** on a case by case basis.*

**RULES OF THE LONDON STOCK EXCHANGE**

*Additional criteria for automated executions in **exchange traded funds** and **exchange traded products***

*In considering a **member firm's** request for an **Exchange enforced cancellation** in **exchange traded funds** and **exchange traded products** the Market Supervision department will also consider:*

- *the potential loss to the **member firm** involved. The potential loss, based on an **Exchange** reference price, to the **member firm** requesting the **Exchange enforced cancellation** should be significant.  The Market Supervision department will only consider an **Exchange enforced cancellation** where the amount of loss is £50,000 or more in relation to automated trades conducted in a single stock on the **trading system** and £100,000 or more in relation to automated trades conducted in more than one stock on the **trading system**; and*

- *whether any information requested by the Market Supervision department is complete, accurate and provided promptly.  The Market Supervision department will determine what information it requires from **member firms** on a case by case basis.*

*Additional criteria for automated executions in **covered warrants**, investment certificates and leverage certificates*

*In determining whether an automated trade in one of the above instruments qualifies for potential **Exchange enforced cancellation**, the Market Supervision department will also consider the following:*

- *the amount of loss incurred by a **member firm** – the Market Supervision department will only consider an **Exchange enforced cancellation** where the amount of loss is £10,000 or more for a single automated trade conducted on the **trading system** and £20,000 or more for a series of automated trades conducted on the **trading system**;*

- *the theoretical price of the instrument – the onus is on the **member firm** submitting the request to provide the Market Supervision department, within 60 minutes of the trade, with a calculation of the theoretical price of the instrument together with its evidence indicating that the trade may be erroneous;*

- *the percentage at which the trade has executed away from the requesting **member firm's** theoretical value – the Market Supervision department will only consider an **Exchange enforced cancellation** where the trade has executed at 20% or more away from the intended theoretical value; and*

- *the prevailing market conditions, price movement of the underlying instrument, market activity and volatility.  **Member firms** are reminded that requests for **Exchange enforced cancellations** cannot be accepted by the **Exchange** in circumstances where an erroneous trade has occurred in the underlying security.*

*If the **counterparty** to the trade does not agree to **contra**, the Market Supervision department will inform the **counterparty** if it is considering cancelling the trade(s).  Within 60 minutes from the trade being executed the **counterparty** to the trade may provide to the Market Supervision department evidence that the price of the execution was correct. The Market Supervision department will then determine whether the trade(s) should be cancelled.*

***Member firms** are reminded that they may only request an **Exchange enforced cancellation** for a trade in one of these instruments where the trade meets the criteria as set out above.  Any subsequent trade as a result of the original trade will only be considered for **Exchange enforced cancellation** if it was executed on the **order book**.*

*Additional criteria for automated executions in gilt-edged securities and fixed interest securities*

*In determining whether an automated trade in one of the above instruments qualifies for potential **Exchange enforced cancellation,** the Market Supervision department will also consider:*

- *the potential loss to the **member firm** requesting the **Exchange enforced cancellation**, based on an **Exchange** reference price.  The Market Supervision department will only consider an **Exchange enforced cancellation** where the amount of loss is £10,000 or more in relation to automated trades conducted in a single stock on the **trading system** and £20,000 or more in relation to automated trades conducted in more than one stock*

*on the **trading system**; and*

- *whether any information requested by the Market Supervision department is complete, accurate and provided promptly.  The Market Supervision department will determine what information it requires from **member firms** on a case by case basis.*

*The Exchange's handling of Exchange enforced cancellations for trades executed before 16.30 hours*

*This guidance applies to trades executed before 16:30 hours including uncrossing trades from automatic execution suspension periods.*

*When the **Exchange** decides to cancel a trade it will aim to effect this, where practicable, within one hour of the trade time.  At the latest the **Exchange** will endeavour to do this before the start of the **mandatory period** on the next **business day**. The Exchange will inform the market of its decision to cancel a trade via a Stock Exchange Notice.*

*The Exchange's handling of Exchange enforced cancellations for the uncrossing of closing auctions concluding after 16.30 hours*

*When the **Exchange** is considering cancelling the uncrossing of a closing auction that concludes after 16.30 hours, it will endeavour to inform the market via **RNS** by 17.15 hours.  Should the **Exchange** decide to cancel the uncrossing and restate the closing price, it will aim to inform the market of this decision and the new closing price via a Stock Exchange Notice by 17.30 hours.  Should the **Exchange** decide not to restate the closing price it will aim to inform the market via **RNS** by 17.30 hours.*

*(Amended N06/19 – effective 18 March 2019)*

| | 2121 | An appropriate **market maker** may be required from time to time to assist the **Exchange** by providing a theoretical price of a **covered warrant,** investment certificate or a leverage certificate in circumstances where the **Exchange** is asked to consider cancelling a trade in one of these instruments. |
|---|---|---|

**Direct electronic access** [2122–2125]

| G | 2122 | A **member firm** may allow a **customer direct electronic access** to the **trading system** under the **member firm's** trading codes, either by way of **direct market access** or by providing **sponsored access**, subject to the **member firm** having in place adequate systems and controls. |
|---|---|---|

*Guidance to Rule:*

*Direct market access and sponsored access*

*Submission of **customer** orders may be facilitated by either **direct market access** or via a **sponsored access** to the **trading system**.*

*Direct market access is a service through which a **member firm** allows a **customer** to submit orders to the **trading system** under the **member firm's** trading codes and via the **member firm's** order management systems, but without manual intervention by the **member firm**.  These order management systems may be housed within the **member firm's** facilities or hosted within the **Exchange's** Primary Data Centre. A **member firm** must notify the **Exchange** via the **Member Portal** prior to implementing a **direct market access** service for its **customers** or when a **member firm** discontinues providing such a service for its **customers**.  Note that a **member firm** is not required to notify the **Exchange** separately each time it offers **direct market access** to a new **customer**.*

*Sponsored access is a direct technical connection provided so that a **customer** is able to access the **trading system** under a sponsoring **member firm's** trading codes.  As the connection is direct, orders submitted by the **customer** to the **trading system** do not pass through the order management systems of the sponsoring **member firm**.*

*Exchange level controls are provided within the **trading system** to assist **member firms** with **sponsored access** order flow validation.  All orders submitted via **sponsored access** will pass through the **Exchange** level controls before reaching the **order book**.*

**RULES OF THE LONDON STOCK EXCHANGE**

*Responsibility for **customers'** order flow (whether submitted to the **Exchange** via **direct market access** or **sponsored access**)*

**Member firms** *providing* **customers** *with* **direct market access** *or* **sponsored access** *to the* **trading system** *are responsible for all obligations and liabilities arising from the entry, deletion and execution of all orders submitted by that* **customer***.*

*The* **Exchange** *is aware that* **member firms** *may have contractual arrangements with their* **customers** *that mean the* **customer** *bears the financial risks of entering erroneous orders. However, under the* **Exchange's** *Rules the responsibility for such orders rests wholly with the* **member firm** *under whose trading codes the order is entered.*

*The* **Exchange** *requires a* **member firm** *providing* **direct market access** *to be able to delete a* **customer's** *orders from the* **trading system***.*

**Member firms** *providing* **sponsored access** *may contact the Market Supervision department to delete a* **customer's** *orders from the* **trading system** *following the guidance set out under rule 1500. Where the number of individual order deletions exceeds five, a mass order deletion is required. As the Market Supervision department actions such requests using reasonable endeavours,* **member firms** *should consider utilising the proactive kill switch to delete orders immediately where a mass order deletion is necessary.*

**Member firms** *must be able to restrict a* **customer's** *ability to submit orders to the* **trading system***.*

**Member firms** *must have the ability to delete a* **customer's** *orders or restrict their ability to submit orders to the trading system without having the express consent of the* **customer***. These actions may be instigated unilaterally by the* **member firm** *because of its own concerns regarding the* **customer's** *behaviour or at the specific instruction of the* **Exchange***.*

*The* **member firm** *is expected to adopt a regime where sufficient consideration is given to assess matters such as:*

- *the training that has been given to the individuals entering orders;*

- *the access controls over order entry that the* **customer** *applies;*

- *security controls over any network link between the* **customer** *and the* **member firm***. These should be sufficient such that the* **member firm** *can be sure that an order purporting to come from a* **customer** *actually has done so (e.g. by use of authentication codes in a similar manner to the secure interactive interface linking the* **member firm** *to the* **Exchange***); and*

- *clear allocation of responsibility for dealing with actions and errors (e.g. it should be clear how, when and by whom orders on the book would be deleted).*

*All of these matters should be dealt with in formal agreements between the* **member firm** *providing* **direct market access** *or* **sponsored access** *and its* **customer***.*

<u>Direct market access</u>

*Whilst ongoing education, training and guidance for a* **member firm's customers** *that submit orders through the* **member firm** *to the* **trading system** *are to be encouraged, these cannot entirely replace the safeguards that internal system controls and alerting functionality can provide.*

*In order to prevent the submission of erroneous orders by a* **customer***, a* **member firm** *should implement the following controls and system alerts:*

- *prevention of submission of an order if the* **customer** *has overridden alerts and/or notification to the* **member firm** *that the* **customer** *has attempted to override the alert;*

- *the segregation of this order flow by the use of the* **Trader Group** *facility within the* **trading system***;*

- *appropriate training, education and guidance provided to those* **customers** *entering orders;*

- *controls over maximum order sizes that can be submitted by different* **customers***;*

**RULES OF THE LONDON STOCK EXCHANGE**

- *controls over prices of orders and having system parameters that would generate an alert if the order would execute at a price with which the **member firm** would not be satisfied;*

- *monitoring and controls over the total exposure of the **member firm** to orders submitted for a particular **customer**; and*

- *the utilisation of a proactive kill switch facility to disconnect a **customer** which it has reason to believe is behaving inappropriately.*

### *Sponsored access*

*The **Exchange** does not require **sponsored access** order flow to pass through the **member firm's** own system controls but mandates that all orders submitted via **sponsored access** will pass through **Exchange** level controls before reaching the **order book**. **Member firms** should also assess whether any additional controls are necessary to appropriately manage **customer** order flow, taking into consideration the nature and complexity of its **customer's** business.*

***Member firms** are responsible for determining the limits of the configurable **Exchange** level controls within the parameters provided by the **Exchange** and ensuring that they are appropriate for each individual **sponsored access customer**, based on the scope and scale of its business.*

*A **member firm** that provides this facility for a **customer** must:*

- *complete a **sponsored access** application form for each of its **sponsored access customers** and inform the **Exchange** if it becomes aware that the information provided on the form has changed;*

- *ensure that relevant staff at the **customer** are conversant with the Rules and, in particular, those relating to **order book** trading. Relevant staff include the Head of Trading, the Head of Compliance and person(s) who signs off trading algorithms at the **customer**;*

- *segregate each **customer's** order flow from the **member firm's** order flow using the **Trader Group** facility within the **trading system**. This is necessary to assist the Exchange in maintaining fair and orderly markets;*

- *provide the **Exchange** with the name, **LEI**, registered office address and country of incorporation of the **member firm's customer** for regulatory purposes. This information will be treated as confidential and will not be subject to commercial use;*

- *have systems in place which will allow the **member firm** to accept and review drop copy feeds, on a real-time basis from the **Exchange** and monitor all **sponsored access** order and post-trade flow;*

- *proactively utilise the **Exchange's** proactive kill switch facility to disconnect a **customer** which it has reason to believe is behaving inappropriately; and*

- *inform the **Exchange** and take appropriate action if it loses either its connectivity with the **Exchange** or its connection to the drop copy feed from the **Exchange** where that connection allows the **member firm** to monitor the **customer(s)** order and post-trade flow. The **Exchange** mandates the use of its cancel on disconnect facility.*

*Where a connection is dropped by either the **member firm** or its **sponsored access customer**, all of the **sponsored access customer's** orders will be deleted from the **order book**.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 2123 | A **member firm** must undertake due diligence on any **customer** to which it provides or intends to provide **direct electronic access**, in order to assess the suitability of any such **customer** to have a **direct electronic access** connection. The **member firm** must confirm to the **Exchange** that such due diligence has been undertaken for either a **direct market access** or a **sponsored access customer**. |
|---|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

*Guidance to Rule:*

*The due diligence carried out by **member firms** on prospective **customers** to whom **direct electronic access** is provided should be adapted to the risks posed by the nature, scale and complexity of their expected trading activities and the nature of the access being provided.*

*In particular, the due diligence assessment is required to cover:*

- *the governance and ownership structure of the **customer**;*

- *the types of strategies to be undertaken by the **customer**;*

- *the operational set-up, the systems, the pre-trade and post-trade controls and the real time monitoring of the **customer**;*

- *the responsibilities within the **customer** for dealing with actions and errors;*

- *the historical trading pattern and behaviour of the **customer**;*

- *the level of expected trading and order volume of the **customer**; and*

- *the ability of the **customer** to meet its financial obligations to the **member firm***

***Member firms** are also required to review their due diligence processes annually, and carry out an annual risk-based reassessment of the adequacy of its **customers'** systems and controls, taking into account any changes to the scale, nature or complexity of their trading activities or strategies, changes to their staffing, ownership structure, trading or bank account, regulatory status, financial position and whether a **customer** has expressed an intention to sub-delegate the access it receives from the **member firm**.*

### *Sponsored access*

***Member firms** are required to confirm when submitting an application form that they have undertaken appropriate due diligence to be satisfied on each of the above points. The **Exchange** will exercise its right under rule 2124 to refuse **sponsored access** if it believes that the **member firm's** due diligence is inadequate.*

*A **member firm** that becomes aware that a **customer** no longer meets the requirements must notify the **Exchange** immediately and cooperate with the **Exchange** to halt the **customer's sponsored access**.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 2124 | The **Exchange** reserves the right to refuse a **member firm's** request that a **customer** be provided with **sponsored access** to the **trading system**. |
|---|---|---|

*Guidance to Rule:*

*The **Exchange** may refuse a request to provide a **member firm's customer** with **sponsored access** where the **Exchange** is not satisfied in any respect with the due diligence undertaken by the **member firm** or where, in the **Exchange's** view, provision of the connection would present a risk to the orderly functioning of the **Exchange's** markets. Whilst the **Exchange** does not conduct due diligence on **member firms'** prospective **customers**, it may refuse a request to provide a **member firm's customer** with **sponsored access** where it is aware of adverse information about the prospective **customer** which may not have been detected by a **member firm's** due diligence;*

*The **Exchange** may also, at its own discretion, take other factors into account in applying this rule.  The **Exchange's** view of the risks that may be posed by the provision of **sponsored access** to a **member firm's customer** overrides any contrary view taken by the **member firm**.*

*(Amended N09/17 – effective 3 January 2018)*

| | 2125 | The **Exchange** reserves the right to terminate or suspend a **customer's sponsored access** without notice or consultation with the **member firm** or its **customer** where the **Exchange** believes this is necessary to preserve the orderly functioning of the **Exchange**'s markets. |
|---|---|---|

*(Amended N09/17 – effective 3 January 2018)*

# <u>OFF ORDER BOOK TRADING RULES</u>

## Trades

### On Exchange trades [3000]

| | | |
|---|---|---|
| G P | 3000 | A trade is **on Exchange** if one or both of the parties to the trade is a **member firm** and the trade is effected: |
| | 3000.1 | in a security **admitted to trading** on the **Exchange's** markets other than those specified in rule 3000.2 (as detailed in **parameters**) and the **member firm** and its **customer** or **counterparty** agree at or prior to the time of effecting the trade that it shall be subject to the rules of the **Exchange**; or |
| | 3000.2 | in an **AIM security** not listed on another **EU Regulated Market** (as detailed in **parameters**) unless the **member firm** and its **customer** or **counterparty** agree at or prior to the time of effecting the trade that it shall be off **Exchange** and: |
| | | (a) subject to the requirements of an **AIM primary market registered organisation;** or |
| | | (b) subject to the requirements of an **AIM secondary market registered organisation** and reported to it in accordance with that organisation's requirements; or |
| | | (c) where the **member firm** executes a trade through a mechanism that is not an **AIM primary market registered organisation** or an **AIM secondary market registered organisation**, the **member firm** is required to report the trade to the **Exchange**, on a real-time basis as a non-publishing, off **Exchange trade report**. |

*Guidance to Rule:*

*Rules 3000.1 and 3000.2*

*In relation to rules 3000.1 and 3000.2, where a **member firm** is interposed between two principal trades entered at the same time and price and one trade has been reported for publication, there is no obligation to report the second leg to the **Exchange**. **Member firms** should note that if they wish the second leg to be regarded as an **on Exchange** trade then they will have to submit a separate, non publishing **trade report**. This will ensure the **Exchange** has a satisfactory audit trail of the second principal trade.*

*A trade may be brought **on Exchange** where one or more of the following apply:*

- *the **member firm** or its counterparty is a registered **market maker** in that security and maintains an **on Exchange executable quote**, **firm quote** or **named order** at the time that the trade is agreed, or the trade is executed outside the **mandatory period**;*
- *the trade is **large in scale**;*
- *the trade is a **negotiated trade**;*
- *the trade is the second leg of a **matched principal transaction** (non-publishable) where the market leg has been published;*
- *the trade(s) is/are the second leg(s) of a riskless principal trade where the market leg(s) has/have been published.*

*Rule 3000.2*

*In relation to 3000.2(c), the **member firm** should provide a non-publishing, off **Exchange trade report** irrespective of whether the **member firm** had the reporting obligation for the trade conducted off **Exchange** through another mechanism. The **counterparty** should be reported as non member where trading anonymously.*

*AIM primary market registered organisation*

***Member firms** may only treat a transaction dealt on an **AIM primary market registered organisation** as being off **Exchange** if (i) the issuer whose security is being traded is regulated by that **AIM primary market registered organisation** in accordance with the considerations outlined in the paragraph below and (ii) they are a member of that **AIM primary market registered organisation** and are reporting the trade to it.*

**RULES OF THE LONDON STOCK EXCHANGE**

*In determining whether a trading venue qualifies as an **AIM primary market registered organisation**, the **Exchange** will consider whether the trading venue has rules that place a*

*continuing obligation on the **AIM** issuer for the timely disclosure of corporate information; whether those rules also oblige the issuer to provide all necessary information to the trading venue to maintain a proper market in the **AIM securities**; and whether the trading venue has the discretion to refuse to admit to trading, to suspend from trading and to cancel from admission to trading the securities of **AIM** issuers.*

*It is expected that most **AIM primary market registered organisations** will be **overseas** venues on which **AIM** issuers have chosen to list their securities in addition to being **admitted to trading** on **AIM**.*

<u>*AIM secondary market registered organisation*</u>

*The regime for **AIM secondary market registered organisations** is designed to provide **member firms** with the ability to trade and report their trades in **AIM securities** in a manner that will allow the **Exchange** to retain adequate oversight of the **AIM** market and to ensure the maintenance of high regulatory standards. In particular, the regime allows the **Exchange** to maintain a proper market in **AIM securities**. The requirement to operate a proper market is set out in the Recognition Requirements Regulations and associated FCA Handbook ("REC").*

*Where no primary market relationship exists between the applicant and the issuer, the **Exchange** will apply the following criteria to establish the suitability of an applicant to be an **AIM secondary market registered organisation**. The criteria that follow represent the minimum standards which the **Exchange** will apply for the purpose of deciding whether an applicant may qualify for recognition as an **AIM secondary market registered organisation** in accordance with Rule 3000.2.*

1. *The **AIM secondary market registered organisation** must have the ability and have appropriate gateways to communicate freely with the **Exchange** on regulatory matters generally, without regard to matters such as client confidentiality or commercial secrecy;*

2. *The **AIM secondary market registered organisation** must provide at least equivalent post-trade transparency as that provided by the **Exchange** on **AIM**;*

3. *The **AIM secondary market registered organisation** must implement practical operational mechanisms (to be approved by the Exchange) to provide real time trading information to the **Exchange** on a continuous basis, in respect of transactions in **AIM securities** reported to the **AIM secondary market registered organisation**. These arrangements may vary from case to case, but must include information that will enable the **Exchange**, in relation to trading in **AIM securities**, to:*

   - *see all executed trades immediately, including any unpublished trades;*

   - *identify both counterparties to the trades; and*

   - *identify through its surveillance system whether any anomalous trades or unusual trading is taking place on the **AIM secondary market registered organisation**.*

*The above information is required in order that the **Exchange** can ensure a proper market in **AIM securities**. Any material failure to meet these criteria will result in the Exchange withdrawing **AIM secondary market registered organisation** status with immediate effect.*

*The **Exchange** maintains a list of the approved **AIM primary market registered organisations** and **AIM secondary market registered organisations** on its website.*

<u>*General Exclusions*</u>

*The following trades would not be considered to be **on Exchange**:*

   - *The creation and redemption of **Exchange Traded Funds** (unless bringing **on Exchange** for stamp relief reasons in which case such trades can be reported as non publishing trade reports).*

*In addition a contract to place, offer or underwrite securities that are the subject of an application to be **admitted to trading**, or admitted to trading on a venue where the contract is made before the application is accepted.*

**RULES OF THE LONDON STOCK EXCHANGE**

*Primary allocations subject to listing are off **Exchange**.*

*An exception to this is the exercise of an over-allotment option ("green shoe") which is*

*commonly agreed by a sponsoring **member firm** as part of the stabilisation and underwriting arrangements for an introduction to admission to trading, as well as for further new issues of shares.  Whether the option is ever exercised, and the extent to which it is utilised, will depend on the take up of the issue, the underlying share price in the market and the stabilisation transactions undertaken.  Such trades can be brought **on Exchange** under the following circumstances:*

- *the terms of the green shoe option must be agreed and included in the circular, prospectus or an **AIM** admission document, where such documentation is required by law or is voluntarily published, prior to sign-off, including confirmation that the option writer holds sufficient shares to meet any obligation under the option;*

- *that at the point of exercise the shares to be delivered are **admitted to trading**; and*

- *a regulatory news announcement has disclosed that exercise has taken place.*

*Once the shares have been **admitted to trading**, and if all the above points have been met, the exercise of the green shoe option may be trade reported to the Exchange immediately after the agreement to exercise.  This will typically be at the same time as the disclosure announcement is made that the exercise has taken place.  **Member firms** who wish to report such arrangements to the **Exchange** should contact the Market Supervision department on +44 (0) 20 7797 3666 (STX 33666). The **Exchange's** guidance on reporting the exercise of a green shoe does not override a **member firm's** obligations under UKLA rules.*

*(Amended N06/19 – effective 1 July 2019)*

**Lending Arrangements** [3001-3004]

| | | |
|---|---|---|
| G | 3001 | Where a **member firm** chooses to bring a **lending arrangement on Exchange** this can be effected through a settlement instruction to **CREST** marked up with the appropriate flag indicating the transaction was effected on the **Exchange**. |

*Guidance to Rule:*

*A **member firm** should submit a separate settlement instruction in respect of both the transfer and the return of the security concerned at the time the transaction is effected.*

| | | |
|---|---|---|
| | 3002 | A **member firm** shall, before entering into any **lending arrangement**, enter into an agreement in writing ("lending agreement"), with the other party. |

| | | |
|---|---|---|
| | 3003 | Where the **Exchange** has authorised a standard form of agreement which covers the circumstances in which a **member firm** proposes to enter into any **lending arrangement**, that **member firm** shall ensure that the lending agreement substantially corresponds to the standard form of agreement. |

| | | |
|---|---|---|
| | 3004 | Where the **Exchange** has not authorised a standard form of agreement which covers the circumstances in which a **member firm** proposes to enter into any **lending arrangement**, that **member firm** shall ensure that the lending agreement includes provisions of equivalent effect to those referred to in rule D161 in the **default rules**. |

*(Amended N08/10 – effective 15 April 2010)*

**Requirement to trade report** [3010-3013]

**Obligation to trade report**

| | | |
|---|---|---|
| G | 3010 | A trade report shall be submitted to the **Exchange** in respect of every **on Exchange** trade to which a **member firm** is a party in accordance with the trade reporting responsibility rule 3012. |

*Guidance to Rule:*

*Every **on Exchange** trade must have a **trade report**, whether it is to be published or not, with each trade representing a distinct market contract that will have the protection of the **Exchange's** rules, including default, buying-in and settlement.  The absence of a **trade report** therefore means either:*

**RULES OF THE LONDON STOCK EXCHANGE**

1.  the trade is an "off Exchange" trade; or

2.  where there is other supporting evidence that a trade was intended to be **on**

   **Exchange,** a breach of the **Exchange's** trade reporting responsibility rules.

**On Exchange** principal crosses, riskless principal trades and **matched principal transactions,** where there are distinct market and client side contracts, require distinct **trade reports** if all legs are to be brought **on Exchange.**

**On Exchange agency crosses,** where there is only one contract, require a single **trade report.**

For the purposes of this rule, a trade is considered concluded or executed as soon as:

(a)  the terms of the trade with regard to the price and volume are agreed between the buyer and the seller; or

(b)  where a trade includes multiple legs and where an agreement on the terms of each of the legs is a pre-condition to the completion of the trade, the trade is completed when all the legs have been put in place and agreed.

<u>Erroneous trade reports</u>

**Member firms** who consistently override the **TRADEcho** price and size validity check are expected to be able to provide on request, details of what alternative systems and controls they have in place to prevent the submission of erroneous **trade reports.**

Where the **Exchange** identifies a **member firm** consistently sending in erroneous **trade reports,** which could have been identified by the **TRADEcho** price and size validity check and the **member firm** has chosen to override this check on a systematic basis, the **Exchange** would consider this as evidence that the **member firm** did not have adequate systems and controls in accordance with rule 1020.

(Amended N09/17 – effective 3 January 2018)

| | | |
|---|---|---|
| G | 3011 | An **on Exchange trade report** must not duplicate another **trade report** in respect of the same execution unless it is being brought **on Exchange** as part of a riskless principal trade, a volume weighted average price trade, or a **matched principal transaction** and is marked appropriately. |

Guidance to Rule:

A **member firm** should not submit a publishing **trade report** where one has already been submitted to the **Exchange.** Examples of this would include, but not be limited to:

1.  where a **trade report** was automatically generated by the **Exchange's trading system;**
2.  where one leg of a riskless principal trade has been published and the subsequent leg(s) are/is for the same price;
3.  where one leg of a **matched principal transaction** has been published; or
4.  where the trade represents an average price for a **customer** and the market facing trades have all been published.

In relation to points 2, 3 and 4 above, a **member firm** should enter a non-publishing **trade report** where the trade is **on Exchange.**

In relation to multi-legged trades between **member firms,** the **Exchange** would expect the publication arrangements to be clear and agreed by all parties involved who have a potential publication obligation. Typically the **member firm** in the middle has visibility of both trades and is therefore principally responsible for ensuring that there is no duplicate publication (either within a single venue or across multiple venues).

This may require the middle **member firm** (and all others) to engage in dialogue with its **counterparties** about publication intentions – **member firms** should already be fully engaged on reporting intentions.

As a general principle the **Exchange** suggests that the 'market' facing leg(s) should be published and the 'client' facing leg(s) should not be published irrespective of which legs are **on Exchange** or off **Exchange.** In the absence of an overt 'market' facing leg(s) and 'client'

*facing leg(s), the **member firm** in the middle is best placed to determine which leg should be published, though this conclusion should be agreed with all parties involved who have a potential publication obligation under the **Exchange's** rules or otherwise.*

*To illustrate this, the following riskless principal, **matched principal transaction** or principal cross scenarios could arise:*

- *if both legs are **on Exchange**, then publishing 'market' **trade report** and non-publishing 'client' **trade report***

- *if one leg is **on Exchange**, then either publishing 'market' **trade report** where the off **Exchange** leg is not published; or non-publishing 'client' **trade report** where the off **Exchange** leg is published*

- *if neither leg is **on Exchange**, then no **trade reports**.*

*(Amended N09/17 – effective 3 January 2018)*

**Responsibility for submission of a trade report**

| G<br>P | 3012 | | The following **trade reporting** responsibility rules apply, unless otherwise agreed in accordance with rule 3013: |
|---|---|---|---|
| | | 3012.1 | a trade between a **member firm** and a non-member, the **member firm** reports; |
| | | 3012.2 | a trade between a **market maker** and a **broker dealer**, the **market maker** reports; |
| | | 3012.3 | a trade between two **market makers**, the selling **market maker** reports; and |
| | | 3012.4 | a trade between two **broker dealers**, the selling **broker dealer** reports. |

*Guidance to Rule:*

<u>*Rule 3012.1*</u>

*This would include an **agency cross** where the orders are matched by the **member firm**.*

<u>*Rules 3012.2 & 3012.3*</u>

*For the purposes of determining the obligation to submit a **trade report**, a **market maker** in one subset of securities as defined in the **parameters** (e.g. Equity Main Market, AIM etc) shall be regarded as a **market maker** in all securities within that subset.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 3013 | In relation to rule 3012, where two **member firms** agree at or prior to the time of the trade, the responsibility for trade reporting may be delegated to the other **member firm**. |
|---|---|---|

*Guidance to Rule:*

*The rule recognises that **member firms** may wish to delegate the trade reporting responsibility to the other **member firm**. This may arise where a **member firm** trades infrequently and hence wishes to always delegate the reporting process or where the non reporting **member firm** wishes to gain protection under the **deferred publication** facility but the reporting **member firm** does not.*

*(Amended N09/17 – effective 3 January 2018)*

**Standard trade report deadlines** [3020-3021]

| G | 3020 | Where a trade is executed during the **trade reporting period**, a **trade report** shall be submitted to the **trading system** in accordance with the **standard trade report deadline**. |
|---|---|---|

*Guidance to Rule:*

*The **trading system** will immediately publish a **trade report** unless **deferred publication** is requested (and the trade qualifies for a delay).*

*(Amended N09/17 – effective 3 January 2018)*

**RULES OF THE LONDON STOCK EXCHANGE**

| | 3021 | Where a trade is effected outside the **trade reporting period**, a **trade report** shall be submitted immediately at the start of the next **trade reporting period**. |
|---|---|---|

**Exchange enforced cancellations** [3022]

| G | 3022 | The **Exchange** views all trades undertaken under its rules as firm.  However, the **Exchange** may, in exceptional circumstances undertake an **Exchange** enforced cancellation of an off **order book** trade at its own volition. |
|---|---|---|

*Guidance to Rule:*

*Examples of situations in which the **Exchange** will consider cancelling off **order book** trades of its own volition include, but will not be limited to, where there has been a clear miscommunication of a corporate event or where the pricing of off **order book** trades have been impacted by erroneous on **order book** trades, which have themselves been subject to **Exchange enforced cancellation**.*

*(Amended N09/17 – effective 3 January 2018)*

**Trade Publication** [3030-3035]

**Deferred publication**

| G P | 3030 | | A **member firm** may elect to use the **deferred publication** facility: |
|---|---|---|---|
| | | 3030.1 | in a share, depository receipt, **exchange traded fund**, certificate or other similar financial instrument where the trade is between a **member firm** dealing as **principal** on its own account and a **counterparty** or **customer**; |
| | | 3030.2 | in a bond, structured finance product or securitised derivative provided one of the following conditions is satisfied: |
| | | | (a)  the trade is large in scale as reflected in the **parameters**; |
| | | | (b)  the trade is in a financial instrument or a class of financial instruments for which there is not a liquid market; or |
| | | | (c)  the trade is between a **member firm** dealing as **principal** on its own account and its **counterparty** or **customer** and one or more components to the trade are in financial instruments that are above the size specific to the instrument. |

*Guidance to Rule:*

*A **member firm** may elect to delay the publication of a trade by submitting a **trade report** with the appropriate indicator.  This facility does not apply to a trade:*

- *in relation to rules 3030.1 and 3030.2(c) where the **member firm** reporting the trade is acting in an agency or a matched principal capacity;*
- *where it is a riskless principal trade;*
- *offsetting an existing **deferred publication**; or*
- *in a security that is suspended.*

*A **member firm** may release a **deferred publication** trade for publication at any time prior to automatic publication.*

*(Amended N09/17 – effective 3 January 2018)*

| | 3031 | | A **member firm** shall not: |
|---|---|---|---|
| | | 3031.1 | aggregate trades in order to qualify for treatment under the **deferred publication** facility; |
| | | 3031.2 | add subsequent trades to a **deferred publication** in order to increase its size; or |
| | | 3031.3 | submit or agree to submit a correction for the sole purpose of re-reporting a trade in order to gain or extend a delay in publication. |

| G | 3033 | A **member firm** may improve on the terms of a trade that has been negotiated and reported to the **Exchange**.  Once the improvement has been agreed, the **member firm** must cancel the original **trade report** and submit a new **trade report** with the original date and time. |
|---|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

*Guidance to Rule:*

*A **member firm** can pass on any improvement to its **customer** if it improves on the price of the original **trade report**.*

*When passing on improvement to the **customer** a **member firm** should cancel the original **trade report** and re-book as a new **trade report** using the appropriate flag "AMND". The new **trade report** should show the revised terms but reflect the date and time of the original trade. The **trading system** will determine whether any further delay is applicable to the re-booked trade otherwise it will publish immediately.*

*(Amended N09/17 – effective 3 January 2018)*

**Required content of trade reports** [3040]

| G<br>P<br>GT | 3040 | A **member firm** must ensure that the content of a **trade report** is accurate and entered in accordance with the guidance to this rule and the **parameters**. |
|---|---|---|

*Guidance to Rule:*

***Counterparty** identification*

*Where the **customer** or **counterparty** is an **introducing firm**, the member ID for the **introducing firm** must be used and not the **member ID** of the **model B firm** that represents it.*

*Where the **customer** or **counterparty** is a **member firm** that employs a **settlement agent**, the **member ID** for the **member firm** must be used and not the **member ID** of the **settlement agent**.*

*A non-trading **member firm**, as defined by Rule 1000.4, cannot be a named **counterparty** to an **on Exchange** trade. Any trades executed with such **member firms** should be trade reported against non member.*

*Date and time of trades*

***Member firms** shall submit the exact date and time of when a trade is agreed to the nearest second. Therefore, the trade time submitted on a **trade report** should not automatically default to 00 seconds or any other automatic default of time traded.*

*The time of execution of a 'give up', which should be shown as the trade time on the **trade report** for the 'give up', is the time at which the 'give up' is agreed between the two **member firms** involved.*

*Instrument Identification code*

*The **LSE ID** or the **ISIN** of the relevant instrument should be provided.*

*Purchase or sale*

*The reporting party must state whether they are the **buyer** or the **seller**.*

*Quantity*

*The number of shares or amount of stock traded. Any splitting of transactions for settlement purposes shall be done within the settlement system and shall not have an impact on the **trade report**.*

*Trade price and Currency*

*All **trade reports** must be the gross price (excluding any commission) and include the traded currency.*

*Trading capacity*

***Member firms** must ensure that their trading capacity ("DEAL", "MTCH" or "AOTC") is entered accurately on every **trade report** they submit to the **Exchange**. Doing so may prove important, for instance, in the event of a **member firm** (either the firm reporting the trade or another firm) being declared a **defaulter** on the **Exchange**.*

**RULES OF THE LONDON STOCK EXCHANGE**

*Settlement due date*

Trades are for **standard settlement** unless agreed otherwise in accordance with Rule 5010.

**Member firms** must ensure that the settlement due date is included in the **trade report** where the trade is for non-**standard settlement**.

*(Amended N09/17 – effective 3 January 2018)*

**Trade report corrections** [3050]

| | | |
|---|---|---|
| G | 3050 | If a **member firm** becomes aware of a **trade report** it has submitted in error, or of an error in a **trade report** submitted by it under these rules, it shall immediately submit a cancellation to the **trading system**, which shall contain all the original **trade report** details including the original Trade ID and, where correcting an error in the original **trade report**, submit a new **trade report** (which must contain the corrected trade details, the original Trade ID and the "AMND" flag). |

*Guidance to Rule:*

**Member firms** are required to ensure that their trade management systems only send a **trade report** cancellation and amendment where fields contained in the guidance to rule 3040 are being amended.

*(Amended N09/17 – effective 3 January 2018)*

**Trading through other member firms** [3060-3061]

| | | |
|---|---|---|
| | 3060 | A **member firm** may not appoint any **person** to transact business **on Exchange** on its behalf, other than another **member firm**. |

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| | 3061 | Where a **member firm** seeks to effect a trade in a **quote-driven security** under Rule 3060, prior to asking for a price and prior to dealing, it shall disclose that it is acting for another **member firm** and, if appropriate, that it is acting for a **market maker** registered in the security.  If requested to do so the **member firm** shall disclose the identity of the **member firm** for which it is acting unless it is a **market maker** in **gilt-edged** or **fixed interest securities**. |

*(Amended N09/17 – effective 3 January 2018)*

**Obligations of member firms to market makers in quote-driven securities** [3080]

| | | |
|---|---|---|
| G | 3080 | A **broker dealer** acting as **principal** in a **quote-driven security** shall disclose it is acting as **principal** to a **market maker**, prior to attempting to deal unless the **broker dealer** is conducting a riskless principal or **matched principal transaction**. |

*Guidance to Rule:*

Contracts for difference and hedging business may constitute riskless principal or **matched principal transactions** for the purpose of this rule.

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| G | 3081 | A **member firm** shall not execute a trade **on Exchange** which is on terms that are worse than any of the individual **firm quotes** available in the relevant **quote-driven security**, after taking into account any relevant trading, settlement and clearing costs. |

*Guidance to Rule:*

The **Exchange** reserves the right to contact either **counterparty** to obtain confirmation that a trade has been executed in accordance with this rule.

Where a **member firm** has executed a trade on terms that could not be accommodated by any of the individual **firm quotes** in the relevant **quote-driven security**, the **Exchange** will not consider that trade to be subject to this rule. This would include, but is not limited to, trades in a size above that displayed in any of the individual **firm quotes** available, or where **standard settlement** does not apply.

*(Amended N10/12 – effective 2 July 2012)*

## Gilt-edged and fixed interest securities

**Trade terms: Pricing formulae (gilt-edged securities)** [3100-3101]

| | 3100 | It is the responsibility of **member firms** to ensure that they agree all the terms necessary to effect a trade in a **gilt-edged security**, including the pricing formula to be adopted by the parties and the information required to submit a **trade report** and for settlement. |
|---|---|---|

| | 3101 | In the event of a dispute between **member firms** in connection with the pricing formula, the formula applicable to the trade shall be that current at the time of the trade as notified to the market by release from the UK Debt Management Office. |
|---|---|---|

**Accrued interest (gilt-edged and fixed interest securities)** [3110]

| G P | 3110 | | Unless otherwise agreed at the time of effecting a trade in a **gilt-edged security** or a **fixed interest security**, the price shall not include accrued interest, which shall be separately accounted for between the **buyer** and the **seller** and be paid without deduction of income tax. The cum or ex dividend status, and therefore the direction of the accrued interest payment, shall be determined by reference to the settlement date of the trade, in accordance with the **settlement rules** such that: |
|---|---|---|---|
| | | 3110.1 | a trade in a **gilt-edged security** for settlement before or on the ex dividend date shall be cum dividend and the **buyer** shall account to the **seller** for accrued interest representing the number of days between the previous dividend payment date up to and including the settlement date; |
| | | 3110.2 | a trade in a **fixed interest security** for settlement before the ex dividend date shall be cum dividend and the **buyer** shall account to the **seller** for accrued interest representing the number of days between the previous dividend payment date up to and including the settlement date; |
| | | 3110.3 | a trade, other than a special cum trade, for settlement between the ex dividend date up to and including the dividend payment date, shall be dealt ex dividend and the **seller** shall account to the **buyer** for the accrued interest representing the number of days between the settlement date up to and including the dividend payment date; |
| | | 3110.4 | for any trade for settlement after the dividend payment date, the **buyer** shall account to the **seller** for the accrued interest representing the number of days between the dividend payment date up to and including the settlement date; and |
| | | 3110.5 | for a special cum trade in a **fixed interest security**, the **buyer** shall account to the **seller** for the accrued interest representing the number of days between the previous dividend payment date up to and including the settlement date. |

*Guidance to Rule:*

*Further to the above, the convention for some **fixed interest securities** is to quote and trade inclusive of accrued interest. The pricing conventions for fixed interest segment/sectors on the **trading system** are set out in the **parameters**.*

*(Amended N09/17 – effective 3 January 2018)*

# MARKET MAKER RULES

## Registration

### Registration and de-registration for all market makers [4000-4003]

| | | |
|---|---|---|
| G | 4000 | A **member firm** that intends to act as a **market maker** shall register as such with the **Exchange**. |

*Guidance to Rule:*

*Registration as a **market maker** shall be effective in a single security unless the **Exchange** considers it appropriate to do otherwise.  Provided an application to become a **market maker** is received by the Exchange by 17.30 hours on the day prior to the effective date of the registration and all relevant requirements relating to the application are met, registration shall normally become effective at the start of the next day.  A request made outside of this requirement should be made to the Market Supervision department on +44 (0)20 7797 3666. These will be dealt with on an individual basis and registration may not be actioned the requested date.*

*Where a security is moved from one trading service to another or is subject to a change in the security line (for instance in the event of a corporate action or re-structuring), the **Exchange** will automatically carry over the **market maker** registrations where appropriate, unless the **market maker** specifically requests otherwise.*

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| G | 4001 | Unless otherwise agreed with the **Exchange**, a **market maker** may not de-register from a security within three months of its initial registration or re-register in a security within three months of de-registration in respect of the same security. |

*Guidance to Rule:*

*The **Exchange** may waive this requirement where a security moves from an **order-driven trading service** to a **quote-driven trading service**, or vice versa, providing the **market maker** does not have a direct relationship with the issuer of the security.*

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| G<br>GT | 4002 | Where the **Exchange** considers it appropriate it may de-register a **market maker** from a security. |

*Guidance to Rule:*

*The **Exchange** may deem it necessary to de-register a **market maker** from one or more securities where that firm is consistently in breach of **market maker** obligation rules.*

| | | |
|---|---|---|
| G | 4003 | In certain circumstances a **member firm** may request from the **Exchange** a temporary withdrawal from its market making obligations. |

*Guidance to Rule:*

*Any request for a withdrawal must be made to the Market Supervision department on +44 (0)20 7797 3666.  An example where permission may be granted includes where a **member firm** is acting both as broker and **market maker** to an issuer that is subject to a bid situation or where the **member firm** has system problems in accordance with rules 1050 and 1500 in core rules.*

*(Amended N09/17 – effective 3 January 2018)*

### Treatment of member firms which include a market maker [4010]

| | | |
|---|---|---|
| G | 4010 | For the purpose of **market maker** obligations, a **member firm** that operates under only one **member ID** which also includes a **market maker** shall be treated as if it was a **market maker**. |

*Guidance to Rule:*

*The rule applies only where there is no clear segregation by **member ID** of a **member firm's market making** and non **market making** operations.*

## Market makers in order-driven securities

### Obligations of market makers in order-driven securities [4100-4103]

| | | |
|---|---|---|
| | 4100 | The **market maker** obligation rules apply unless exception rule 4110 applies or as varied by a **market situation** in accordance with rule 1520. |

| | | | |
|---|---|---|---|
| G P | 4101 | | A **market maker** must maintain an **executable quote**, or **bid and offer named orders** in each security in which it is registered. The **executable quote** or **named orders** must be maintained: |
| | | 4101.1 | for at least 90% of **regular trading** during the **mandatory period**; |
| | | 4101.2 | until the conclusion of the closing auction including any extensions; and |
| | | 4101.3 | at the execution time of an off **order book on Exchange trade** except as permitted in the guidance to this rule; |
| | | 4101.4 | where relevant, for the duration of the intra-day auction for the FTSE index expiries, including any extensions; |
| | | 4101.5 | where relevant, for the duration of the **Scheduled Level 1 Only auction**, including any extensions; and |
| | | 4101.6 | in relation to certain securities designated by the **Exchange** trading on the Order book for Retail Bonds or the Order book for Fixed Income Securities a **market maker** provides bid only prices in at least the **Exchange market size**. |

*Guidance to Rule:*

*Market makers will not be able to enter **executable quotes** that are outside the maximum spread, if they attempt to do so a rejection message will be sent to the **market maker**.*

*Market makers using **named orders** must display bid and offer orders at the same time in at least **Exchange market size** and observe the maximum spread thresholds set out in **parameters**.*

*Rule 4101.1*

*The 90% threshold is measured daily for each security in which a **market maker** is registered. Where an intra-day auction has been triggered in a security due to a price monitoring breach, the time in which the security will have been in **regular trading** will be reduced. Therefore, **market makers** will be required to maintain an **executable quote** or **named orders** for 90% of the reduced period.*

*Rule 4101.2*

*Where a security does not have a closing auction, **market makers** must maintain their **executable quotes** or **named orders** until the end of the **mandatory period**.*

*Rule 4101.3*

*Rule 4101.3 does not apply outside the **mandatory period** or where:*
  - *the trade is **large in scale**;*
  - *the trade is a **negotiated trade**;*
  - *the trade is the second leg of a **matched principal transaction** (non-publishable) where the market leg has been published;*
  - *the trade(s) is/are the second leg(s) of a riskless principal trade where the market leg(s) has/have been published.*

*Rule 4101.4*

*Market makers must maintain their **executable quotes** during the FTSE index expiries. The following expiries are covered by this rule:*

**RULES OF THE LONDON STOCK EXCHANGE**

- *FTSE 100 monthly options*
- *FTSE 100 quarterly futures*
- *FTSE 250 quarterly futures*

*(Amended N06/19 – effective 1 July 2019)*

| G | 4102 | The **Exchange** may, on the request of a **market maker**, suspend or vary **market maker** obligations. |
|---|---|---|

*Guidance to Rule:*

*The Exchange occasionally allows **market makers** to relax spreads when an individual security is subject to wide price movements. This is very rare and normally will not last more than a day.*

*In order to relax **market maker** spread obligation when there are wide price movements, the **Exchange** may temporarily increase the maximum spread regime to an existing spread level, for example move a security with a 5% spread to a 10%,15% or 25% tolerance rather than provide a blanket waiver.*

*(Amended N21/10 – effective 1 June 2011)*

| | 4103 | If a **market maker** and its **customer** or **counterparty** conduct an **on Exchange** trade away from the **trading system**, the **market maker** is obliged to deal at least at its displayed price and size. |
|---|---|---|

*(Amended N21/10 – effective 1 June 2011)*

**Exceptions to obligations to market makers in order-driven securities** [4110]

| G | 4110 | A **market maker** has no obligation to maintain its **executable quotes** or **named orders**: |
|---|---|---|
| | 4110.1 | in a security during the opening auction or where an unscheduled intra-day auction has been triggered due to a price monitoring breach; |
| | 4110.2 | in a security during the closing auction on the Order book for Retail Bonds; |
| | 4110.3 | in a **covered warrant** when it is the expiry day of that **covered warrant**; |
| | 4110.4 | in a security, or a security underlying that security, where there is a public holiday on the **relevant market**; |
| | 4110.5 | in a security, or a security underlying that security, where there is a trading halt on the **relevant market**.  A **market maker** must re-enter its **executable quote** or **named orders** on resumption of trading; or |
| | 4110.6 | in an **exchange traded fund** or an **exchange traded product**, where no firm price is available for at least 10% of the underlying securities or instruments which make up the **exchange traded fund** or **exchange traded product**. |

*Guidance to Rule:*

*Rule 4110.6*

*A **market maker** shall be responsible for informing the **Exchange** and seeking permission for suspension of market making obligations by contacting the Market Supervision department on +44 (0)20 7797 3666 option 2, STX 33666, where it believes that there is no firm price available for 10% or more of the underlying securities or instruments in an **exchange traded fund** or **exchange traded product**.  If approved, the suspension applies to all **market makers** in the particular **exchange traded fund** or **exchange traded product**. This suspension only applies to the day in question and a **market maker** must make separate requests on a daily basis, if necessary.*

*(Amended N11/18 – effective 18 June 2018)*

# Market makers in quote-driven securities

**Obligations of market makers in quote-driven securities during the mandatory period**
[4200-4209]

| G | 4200 | The **market maker** obligation rules apply unless exception rules 4220 to 4221 apply. |
|---|---|---|

*Guidance to Rule:*

*A **market maker** is only obliged to interact with another **member firm** on the basis of its **Exchange firm quote**.*

| G | 4201 | A **market maker** must, during the **mandatory period**, maintain a **firm quote** in each security in which it is registered. |
|---|---|---|

*Guidance to Rule:*

*Where a **market maker** displays prices on the **trading system** prior to the commencement of the relevant **mandatory period** such prices are indicative.*

*(Amended N26/10 – effective 14 February 2011)*

| | 4202 | Where a **market maker** is approached by a **member firm**, other than a **market maker** in that security, it shall actively offer to buy and sell at its displayed price and in any size up to that displayed in its **firm quote**. |
|---|---|---|

| | 4203 | Where a **market maker**, who has not caused a **back** or a **choice** under rule 4204, is approached by another **market maker** in the same security, the **market maker** shall effect a trade with the enquiring **market maker** at the approached **market maker's** displayed price in up to the **Exchange market size** where the enquiring **market maker**; |
|---|---|---|
| | 4203.1 | wishes to sell the security, and it is displaying on the **trading system** a lower **bid price** and a lower **offer price** than the **market maker** approached; or |
| | 4203.2 | wishes to buy the security, and it is displaying on the **trading system** a higher **bid price** and a higher **offer price** than the **market maker** approached. |

*(Amended N09/17 – effective 3 January 2018)*

| G | 4204 | A **market maker** which actively causes a **back** or **choice** shall be obliged to deal at its displayed price and in its displayed size upon enquiry from any **member firm**. |
|---|---|---|

*Guidance to Rule:*

*Where a **market maker** creates a **back** or **choice** by automatically opening at its overnight price, and the opening price does not reflect the fair value for the security, it is deemed to have actively caused a **back** or **choice**.*

*Except where a **market maker** is 'left behind' a moving market, a **market maker** is not deemed to have actively created a **back** or **choice** by virtue of another **market maker** changing its quote.*

*Where a **market maker** that creates a **back** or a **choice** has already been approached under rule 4204, its obligations under 4205 shall begin with **market makers** with whom it had not already dealt under rule 4204.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 4205 | If a **choice** or a **back** persists for more than five minutes during the **mandatory period**, the **market maker** that created it shall: |
|---|---|---|
| | 4205.1 | contact the first competing **market maker** with the then best opposing **bid price** or **offer price** (as the case may be) and offer to effect a trade in up to its own quoted size and at its own quoted price; |
| | 4205.2 | if its business remains incomplete, contact subsequent **market makers** with the then best opposing **bid price** or **offer price** (as the case may be) on a similar basis; and |
| | 4205.3 | change its price once its business is completed. |

RULES OF THE LONDON STOCK EXCHANGE

*Guidance to Rule:*

*This rule will not apply:*
- *if either of the relevant **market makers** has notified the **Exchange** of relevant system problems; or*
- *if the enquiring **market maker's firm quote** on the **trading system** is closed.*

*(Amended N09/17 – effective 3 January 2018)*

| 4206 | Where a **market maker** is approached under rule 4205, the approached **market maker** must effect a trade in accordance with rule 4203 and, if it deals in less than the challenged size, immediately change its **firm quote** such that it is no longer contributing to the **back** or a **choice**. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

| 4207 | If a **market maker** changes its **firm quote** to create a new **best bid** or **best offer** within five minutes of the end of the **mandatory period**, it shall remain open for the shorter of five minutes or until it trades at a new price. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

| 4208 | Where on enquiry a **market maker** quotes a price in a size larger than it is displaying on the **trading system**, the **market maker** is obliged to deal at that quoted price and size. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

| 4209 | The **Exchange** may, on the request of a **market maker**, suspend or vary **market maker** obligations. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

**Obligations of market makers in quote-driven securities outside the mandatory period** [4210-4211]

| G | 4210 | Where a **market maker** elects to remain open after the end of the **mandatory period** all mandatory obligations and exceptions will continue to apply. |
|---|---|---|

*Guidance to Rule:*

*Subject to the five minute obligation rule 4204, a **market maker** can close its **firm quote** at any time after the end of the **mandatory period**.*

| 4211 | Where a **market maker** has removed its **firm quote** after the end of the **mandatory period**, it may only re-open its **firm quote** provided it maintains it until the close of the **trade reporting period**. |
|---|---|

**Exceptions to obligations of market makers in quote-driven securities** [4220-4221]

| G | 4220 | A **market maker** is under no obligation to: |
|---|---|---|
| | 4220.1 | deal where it is approached by a **broker dealer** acting for a **market maker** registered in the security in question; |
| | 4220.2 | deal where it is approached by a **broker dealer** dealing on own account; |
| | 4220.3 | deal in the price and size displayed in its **firm quote** where effecting a trade would result in a breach of rule 3081; |
| | 4220.4 | deal in a security, or a security underlying that security, where there is a public holiday on the **relevant market**; or |
| | 4220.5 | deal in a security, or a security underlying that security, where there is a trading halt on the **relevant market** and may delete its **firm quotes**. A **market maker** must re-enter its **firm quotes** on resumption of trading. |

*Guidance to Rule:*

*Rules 4220.1 & 4220.2*

*The rationale is to protect **market makers** in their capacity as named liquidity providers when performing business in accordance with their obligations.*

*Rule 4220.2*

*A **market maker** would however continue to be obliged to deal with a **broker dealer** acting as **principal** for a **customer** (e.g. as part of a riskless principal trade, a **matched principal transaction** or a 'give up').*

*(Amended N09/17 – effective 3 January 2018)*

| G | 4221 | Where a **market maker** has effected a trade in a security and received another enquiry to deal in the same security before having had a reasonable time to alter its price the **market maker** shall be entitled to declare "dealer in front" to the **person** making the enquiry and alter the price at which it is prepared to deal. |
|---|------|---|

*Guidance to Rule:*

*The use of the "dealer in front" rule is only applicable where the trades in question were conducted **on Exchange**.*

*(Amended N09/17 – effective 3 January 2018)*

## Interaction with a market maker in quote-driven securities

### One stock one call [4300-4301]

| | 4300 | Unless both parties agree, a **market maker** is only obliged to quote for and/or execute one trade in a single telephone call from another **member firm**. |
|---|------|---|

| | 4301 | Where, in relation to a security, a **market maker** declares "dealer in front" and the enquiring **member firm** does not therefore effect a trade, the enquiring **member firm** is entitled to ask for a quote in a different security in the same telephone call. |
|---|------|---|

*(Amended N26/10 – effective 14 February 2011)*

### Front running – part orders [4330-4334]

| G | 4330 | A **market maker** which does not complete business disclosed to it by an enquiring **counterparty** shall not act in such a way as to prejudice the completion of that business elsewhere for a period of three minutes unless otherwise agreed between the parties.  In particular it shall not attempt to deal with a **market maker** in that security. |
|---|------|---|

*Guidance to Rule:*

*The rule sets out a general provision that a **market maker** must not prejudice the completion of business which has been opened to it but which it has not itself completed.*

*In certain circumstances, a period of less than three minutes might be appropriate and is allowed provided that both parties agree.  In particular where the **member firm** has neared completion of its business it might not be necessary for the remaining **market makers** that need to be contacted to hold their quotes for the full three minutes.*

*(Amended N09/17 – effective 3 January 2018)*

| G | 4331 | If, where rule 4330 applies the **market maker** is, or becomes sole **best bid** or **best offer** during the period referred to in rule 4330, the **market maker** shall immediately change its **firm quote** and may not thereafter declare dealer in front. |
|---|------|---|

*Guidance to Rule:*

*If the **market maker** maintains the same spread this may, in some circumstances, result in a new best price on the opposite side of the touch. This is acceptable and a **market maker** is not forced to widen its spread to avoid it.*

**RULES OF THE LONDON STOCK EXCHANGE**

| 4332 | During the restricted period specified in 4330, unless rule 4331 applies, a **market maker** may change its **firm quote**, provided that in doing so it does not alter the **best bid** or **best offer** being displayed in the security, either by it or another **market maker**. |
|---|---|

| 4333 | If the **market maker** is maintaining its **firm quote** during the restricted period specified in rule 4330 and is challenged by another **member firm**, it may either deal at its displayed price or declare dealer in front and quote a revised price over the telephone. |
|---|---|

*Guidance to Rule:*
*A **market maker** which is not sole **best bid** or **best offer** and maintains its **quote** may declare dealer in front to a challenging **member firm** and is therefore not obliged to deal at its displayed price and size.  It may then quote a different price to the challenger and must deal at that quoted price if requested to do so. It does not have to alter its displayed price if the challenger does not deal.  If the challenger does deal at the orally quoted price the restrictions on the **market maker's** activities are lifted under rule 4334.1.*

| 4334 | The **market maker** is released from the restrictions set out in rule 4330 if, during the restricted period; |
|---|---|
| 4334.1 | it has entered into a trade at a revised price having declared dealer in front, in accordance with rule 4333; |
| 4334.2 | a competing **market maker** creates a new **best bid** or **best offer** for that security, including a **choice** or a **back**; or |
| 4334.3 | the initiating **member firm** completes the order and notifies the **market maker** accordingly. |

## Market making agreements - algorithmic trading

### Market making agreement requirements [4400-4403]

| G | 4400 | Where a **member firm** engages in algorithmic trading to pursue a **market making strategy**, the **member firm** shall be required to enter into a **market making agreement** with the **Exchange** as soon as possible.  The **member firm** shall be bound by the terms of the **market making agreement**. |
|---|---|---|

*Guidance to Rule:*

*A **member firm** should enter into a **market making agreement** via the **Member Portal**.  A **member firm** that is subject to a **market making agreement** shall be required to meet the obligations that are set out within the **market making agreement**, in respect of the relevant instruments and for each **business day**, except in **exceptional circumstances** as advised by the **Exchange**.*

*(Amended N09/17 – effective 3 January 2018)*

**RULES OF THE LONDON STOCK EXCHANGE**

| | | |
|---|---|---|
| P | 4401 | The obligations on a **member firm** pursuant to a **market making agreement** are as follows: |
| | 4401.1 | the terms of the **market making agreement** shall apply to all relevant instruments in which the **member firm** pursues a **market making strategy**; |
| | 4401.2 | the **member firm** shall post firm, simultaneous two-way orders of comparable size and competitive prices for at least 50% of **regular trading** during the **mandatory period**;<br>- for orders to be of comparable size, there must be no more than 50% difference between the bid and ask sizes;<br>- for prices to be competitive they must be within the maximum bid-offer spread defined by the **Exchange** in the **parameters**; |
| | 4401.3 | where a **member firm** is participating in a **market making scheme**, the terms of the scheme must also be met; |
| | 4401.4 | the **member firm** shall not be obligated to post simultaneous two-way orders of comparable size and competitive prices during the period that **stressed market conditions** are in force pursuant to a **market making scheme** (rule 4412); |
| | 4401.5 | the **member firm** shall have adequate systems, controls and procedures in place to effectively monitor and audit its compliance with the **market making agreement**; |
| | 4401.6 | the **member firm** shall appropriately flag orders submitted to the **Exchange** pursuant to the **market making agreement** in order to distinguish those orders from other order flows; |
| | 4401.7 | a **member firm** shall maintain records of orders and trades relating to its market making activities pursuant to the **market making agreement**, which shall be clearly distinguished from other trading activities, and shall make those records available to the **Exchange** upon request. |

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| G | 4402 | A **member firm** that is subject to a **market making agreement** may notify the **Exchange** of its intention to cease pursuing a **market making strategy** and of its intention to exit from the **market making agreement** in one or more instruments, providing at least one day's notice. |

*Guidance to Rule:*

*Member firms should notify the Exchange via the Member Portal.  Subject to the notice period, the Exchange shall accept the request and terminate the agreement in respect of the relevant instruments.*

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| | 4403 | Where a **member firm** engaged in algorithmic trading recommences a **market making strategy**, the **member firm** shall be required to re-enter into a **market making agreement** in accordance with Rule 4400. |

*(Amended N09/17 – effective 3 January 2018)*

## <u>Market making schemes – algorithmic trading</u>

### Exchange operated market making schemes [4410-4412]

| | | |
|---|---|---|
| G | 4410 | The **Exchange** operates one or more **market making schemes**, covering certain instruments admitted to its markets, with the objective of encouraging regular and predictable liquidity provision in those instruments. |

*Guidance to Rule:*

*The Exchange's market making schemes contain the requirements that must be met in terms of presence, size and spread together with any incentives offered by the Exchange for scheme participants, in both normal and stressed market conditions.*

*(Amended N09/17 – effective 3 January 2018)*

**RULES OF THE LONDON STOCK EXCHANGE**

| | |
|---|---|
| 4411 | **Member firms** that wish to participate in a **market making scheme** are required to enter into a **market making agreement**. |

| | |
|---|---|
| 4412 | **Member firms** participating in a **market making scheme** may be subject to different obligations and/or other incentives during the period that **stressed market conditions** are in force.  **Stressed market conditions** shall be in force for a **market making scheme** when: |
| | (a)   the **Exchange**, in its sole discretion, publicly declares **stressed market conditions** to be in force in certain specified instruments that are subject to a **market making scheme**; or |
| | (b)   certain pre-defined market conditions are met in specified instruments that are subject to a **market making scheme**, which for the purpose of this rule, are defined as 60 seconds following the end of a price monitoring interruption to **regular trading**. |

*(Amended N11/18 – effective 18 June 2018)*

# SETTLEMENT, CLEARING AND BENEFIT RULES

## Settlement

### Obligation to settle [5000]

| | | |
|---|---|---|
| G | 5000 | A **member firm** shall ensure that every **on Exchange** trade effected by it is duly settled. |

*Guidance to Rule:*

*A **member firm** is responsible for ensuring the delivery of securities on the agreed settlement due date for all its **on Exchange** business, whether the **member firm** sold as **agent** or **principal**.*

*Settlement can be gross or net. In the absence of agreement to the contrary, gross settlement should be assumed.*

*This rule is included to ensure the orderly functioning of the **Exchange's** markets and because the **Exchange** has an obligation under its recognition by the FCA to have in place arrangements for the performance of all transactions conducted using the **Exchange's** facilities. **Member firms** are obliged to ensure the settlement of trades entered into under their name. This obligation exists even if the reason for non-settlement is because of a **customer** or **counterparty** failing to settle and / or when the **member firm** is acting as **agent**.*

*(Amended N05/13 – effective 16 April 2013)*

### Time of settlement [5010-5011]

| | | |
|---|---|---|
| P | 5010 | Unless otherwise agreed at the time of trade, trades are for **standard settlement** for the security or market as detailed in the **parameters**. |

| | | |
|---|---|---|
| G | 5011 | Unless otherwise agreed with the **Exchange** a **member firm** shall not agree a settlement due date for an **on Exchange** trade more than 20 days after the date of the trade. |

*Guidance to Rule:*

*This maximum restriction does not apply in the case of a return of stock under a **lending arrangement**.*

*(Amended N02/12 – effective 1 February 2012)*

### Guaranteed delivery [5020]

| | | |
|---|---|---|
| G | 5020 | A **member firm** shall only effect a trade for 'guaranteed delivery' where stock is readily available to the **member firm** at the time of trading. |

*Guidance to Rule:*

*Where trades are effected under rule 5020, the **seller** shall raise the settlement priority (or take other equivalent action) of guaranteed delivery trades above any other trades not dealt for guaranteed delivery which are due for settlement on the same day.*

*(Amended N02/12 – effective 1 February 2012)*

### Method of settlement [5025]

| | | |
|---|---|---|
| | 5025 | A selling **member firm** should ensure that securities due to be delivered as the result of an automated execution on the **trading system**, are recorded in **electronic form** on, or before the intended settlement date of the trade. |

*(Amended N17/15 – effective1 September 2015)*

**RULES OF THE LONDON STOCK EXCHANGE**

**Place of settlement** [5030]

| | | |
|---|---|---|
| G | 5030 | A **member firm** should agree the place of settlement at the time of the trade but where this is not the case it should settle trades in the 'standard' place of settlement for the security or market. |

*Guidance to Rule:*

*This rule is only applicable to bilateral trades.  **Central counterparty** trades will be subject to the rules and procedures of the relevant **central counterparty**.*

*A trade shall be settled in accordance with the rules and procedures of the clearing and settlement system used.  Any special terms or conditions relating to the settlement of a trade shall be agreed at or prior to the time the trade is effected and shall be clearly stated and described as such on any confirmation of the trade.  Partial settlement shall not be permitted without the prior agreement of both parties to the trade subject to the procedures of the relevant settlement system operator.*

*A **member firm** shall:*
- *conform to the good delivery requirements of the clearing and settlement system used;*
- *ensure that securities delivered in settlement of a trade are free of any charge or encumbrance;*
- *be responsible for the authenticity of transfer documents and certificates submitted by it whether on its own behalf or on behalf of another **person**, and whether directly or through any agency.*

*Non-electronic settlement*

*Bearer securities*
- *When settling trades in bearer securities or renounceable letters of allotment, a **member firm** shall keep a record of the number of the certificate or letter together with a record of the trade.*
- *A buying **member firm** may only return a certificate which has been delivered in an imperfect condition, (materially torn or damaged, having a material part of the wording obliterated or with insufficient or irregular coupons), within eight days of its delivery.*
- *The delivery of bearer securities (other than securities normally dealt for next day settlement) without the coupon before they are made ex coupon is not good delivery.*
- *Where bearer securities other than securities normally dealt for next day settlement are made ex dividend on or before the due date for settlement of a trade, the **seller** shall deliver the securities ex the coupon and account to the buyer for the dividend paid net of income tax.*

*Trades in assented shares*
*Where a trade is dealt in assented shares, the delivery of unassented shares accompanied by a form of assent is not good delivery.*

*Certified Transfers*
*The **buyer** of securities may refuse to pay for a transfer unaccompanied by the certificate unless, in the case of securities on a **United Kingdom** register, the transfer is certified by the issuer.*

*Payment*
- *A **buyer** is not obliged to pay before the due date for settlement for securities delivered before that date.  Unless otherwise agreed, a **buyer** shall pay for securities against delivery.*
- *A **member firm** is not obliged to pay a **customer** or **counterparty** of another **member firm** for securities bought **on Exchange** from that **customer** or **counterparty** unless required to do so by proceedings in accordance with the **default rules**.*

*(Amended N07/15 - effective 5 May 2015)*

**Closed registers of companies in liquidation** [5040-5042]

| | |
|---|---|
| 5040 | Where a register has been closed following liquidation of the issuer, a buying **member firm** shall pay against delivery of the transfer and certificate, or certified transfer, provided that it is accompanied by an authorisation from the registered holder to the liquidator that the liquidator pay to the **buyer** or its **customer** or **counterparty** any return of capital. |

RULES OF THE LONDON STOCK EXCHANGE

*Guidance to Rule:*

*By agreement between the **buyer** and **seller**, in place of the documentation set out in rule 5040, the **seller** may pass a 'letter of undertaking' to the **buyer** promising to pass on any distribution by the liquidator.*

*(Amended N02/12 – effective 1 February 2012)*

| 5041 | A **seller** who is unable to deliver the documentation under rule 5040 may not require payment until completion of the winding-up, at which time any distribution by the liquidator shall be delivered to the **buyer**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5042 | Where settlement of a **central counterparty contract** cannot take place because of a court, administrative, or regulatory order, or because of an insolvency event affecting the issuer of such securities, such **central counterparty contracts** shall be settled in accordance with the rules of the **central counterparty**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Registration of securities delivered in non electronic form** [5050-5052]

| 5050 | Except as provided for in rule 5051, a **member firm** which has purchased securities, other than as part of a riskless principal or **matched principal transaction**, either on its own behalf or on behalf of a **customer** or **counterparty**, must ensure that the securities received are duly registered prior to any subsequent delivery of those securities in settlement of a sold trade. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

| 5051 | Rule 5050 applies to **market makers** unless, within two days of receipt of the securities by a **market maker**, that recipient **market maker** onward delivers the securities or, submits the securities for splitting, to facilitate settlement of a sold trade already dealt. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5052 | Any **member firm** granted an exemption under rules 5050 or 5051 must state clearly on the stock transfer form or subsequent split transfer forms its name and the date of onward delivery. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Late settlement** [5060-5061]

**Failure to deliver**

| 5060 | Each **member firm** agrees that a failure by one party to a trade to deliver or pay for securities on the due date for settlement shall not in itself be a ground for either party to that trade to treat the trade as repudiated. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5061 | A **buyer** may not claim that there is no obligation to pay for securities merely by reason of the fact that the securities were delivered later than on the due date for settlement. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Buying-in** [5070-5083]

**Request to buy-in**

| G | 5070 | In accordance with timescales and detailed guidance provided on the **Exchange** website, a **member firm** may request that the **Exchange** buy-in securities which have not been delivered in settlement of an **on Exchange** trade. |
|---|---|---|

*Guidance to Rule:*

*Further detailed information relating to buying-in can be found on the **Buying-in** section of the **Exchange** website:* http://www.londonstockexchange.com/traders-and-brokers/rules-regulations/buying-in/buying-in.htm

**RULES OF THE LONDON STOCK EXCHANGE**

*(Amended N02/12 – effective 1 February 2012)*

**Withdrawal of a buying-in request**

| 5071 | The **requesting party** must accept and pay for any securities delivered by the **Exchange** that result from a **buying-in** trade where the **requesting party** has failed to withdraw the **buying-in** request before the deadline set by the **Exchange**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5072 | The **requesting party** cannot withdraw a **buying-in** request in respect of a **central counterparty trade** and will be required to accept delivery where settlement of the trade in respect of which it has issued the **buying-in** request has already occurred. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Suspension of buying-in**

| 5073 | The **Exchange** may, at its discretion, suspend, postpone (either for a defined period or indefinitely) or cancel the **buying-in** of securities at any time, either generally, or in relation to a particular **member firm**, or a particular security. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Settlement of buying-in trades**

| 5074 | The **Exchange** shall notify the **liable party** of the details of the **buying-in** trade following which the **liable party** must immediately match a delivery instruction with the **Exchange** in **CREST** or in such other settlement system as notified by the **Exchange**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5075 | Securities resulting from a **buying-in** trade shall be delivered to the **liable party** as instructed by the **Exchange**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5076 | The **liable party** must ensure that securities received from the **Exchange** are immediately used to settle, in accordance with instructions received from the **Exchange**, the trade to which the **buying-in** request is related. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Failure to buy-in**

| 5077 | Where the **Exchange** does not succeed in executing a trade pursuant to a **buying-in** request, the **Exchange** will notify the **requesting party**.  Unless the **requesting party** then withdraws the **buying-in** request, the **Exchange** may, at its discretion, attempt **buying-in** on one more occasion only as follows: |
|---|---|
| 5077.1 | for trades other than those dealt for guaranteed delivery, any time up to five days after the first attempt; or |
| 5077.2 | for trades dealt for guaranteed delivery, on the next day following the first attempt. |

*(Amended N02/12 – effective 1 February 2012)*

**Agreements to pass on costs**

| 5078 | Unless otherwise agreed in writing at the time of dealing, a **buyer** shall not pass on to a **seller** the costs incurred by it as a result of its failure to deliver against another trade, even though those costs may have been incurred because of that **seller's** failure to deliver. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Liabilities**

| 5079 | Subject to rule 5080, the **liable party** shall indemnify the **Exchange** against any and all liability in respect of any costs or losses sustained by the **Exchange** arising out of the execution of a **buying-in** request. |
|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

*(Amended N02/12 – effective 1 February 2012)*

| 5080 | A **member firm** that requests the **Exchange** to buy-in securities is responsible for any errors or omissions in its request and the **Exchange** shall not be liable in respect of any such errors or omissions. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Price and charges**

| 5081 | All charges and fees in respect of a **buying-in** request, as detailed in the guidance provided on the **Exchange's** website, shall be payable to the **Exchange** by the **liable party**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5082 | In order to obtain delivery of the relevant securities to fulfil a **buying-in** request, the **Exchange** may execute a trade at a price higher than the current market price.  The **liable party** shall pay the **Exchange** such price, regardless of the price of the original trade that is the subject of the **buying-in** request. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5083 | Any difference between the price paid to the **Exchange** and the price of the original trade shall not be recoverable from, or payable to, the **requesting party** on settlement of the original trade. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

# Clearing through a Central Counterparty

**Clearing arrangements** [5100-5102]

| 5100 | A **clearing member** may only clear or agree to clear a trade in a given **central counterparty security** if it is party to a **clearing membership agreement** with the relevant **central counterparty**.  A **clearing member** must comply with the rules and regulations and any reasonable conditions imposed by a **central counterparty** with which it has entered into a **clearing membership agreement.** |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| G | 5101 | A **member firm** shall not enter an order in a **central counterparty security** into the **trading system** unless the following arrangements have been agreed with the **Exchange**: |
|---|---|---|
| | 5101.1 | it is a **Non Clearing Member** or **clearing member** and is party to a current, valid clearing agreement with a separate **General Clearing Member** that will clear any resulting trades; or |
| | 5101.2 | it is a **clearing member** itself and is clearing the resulting trade. |

*Guidance to Rule:*

*Where a model B arrangement is in use, rules 5101.1 and 5101.2 apply to the **model B firm** although the **introducing firm** will have the technical connection to the **trading system**.*

***Individual Clearing Members** can only clear trades they executed themselves acting as **principal** or **agent**.*

*(Amended N06/19 – effective 18 March 2019)*

| 5102 | A **General Clearing Member** shall be bound by the terms of a trade entered into in accordance with rule 5101.1, irrespective of anything contained in any agreement or arrangement between the **General Clearing Member** and the **Non Clearing Member**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Termination of clearing services** [5110]

| G | 5110 | A **General Clearing Member** must notify the **Exchange** prior to suspending its services as a **clearing member** to any **member firm**. |
|---|------|---|

*Guidance to Rule:*

*A **General Clearing Member** must notify the Market Supervision department on +44 (0)20 7797 3666, (STX 33666) – option 1, and follow this up with written confirmation. In this event, the **Exchange** shall, at an agreed time, or as soon as is reasonably practicable, suspend the **member firm** from submitting orders in relation to all **central counterparty securities**, and delete any existing orders of that **member firm** residing in the **trading system**. The **General Clearing Member** remains liable for all trades involving the **member firm** executed prior to completion of these processes by the **Exchange**.*

*(Amended N09/14 – effective 29 September 2014)*

**Central counterparty contracts** [5120-5124]

|   | 5120 | The point at which a **central counterparty contract** comes into being will be defined in the rules of the relevant **central counterparty**. |
|---|------|---|

*(Amended N02/12 – effective 1 February 2012)*

|   | 5121 | Where a **central counterparty contract** arises between a **General Clearing Member** and a **central counterparty**, another **central counterparty contract** shall arise between the **Non Clearing Member** (either as **agent** or **principal**) and the **General Clearing Member** (as **principal**) which shall be on the same terms as the **central counterparty contract** except that: |
|---|------|---|
|   | 5121.1 | if the **General Clearing Member** is **seller** it will be a **buyer** in the resulting **central counterparty contract**; and |
|   | 5121.2 | if the **General Clearing Member** is **buyer** it will be a **seller** in the resulting **central counterparty contract**. |

*(Amended N02/12 – effective 1 February 2012)*

| G | 5122 | If a **central counterparty**, in accordance with its rules, gives notice to the **Exchange** of its intention to cease registering **central counterparty trades**, no **central counterparty contract** shall arise from the point that registration is suspended. From the point that the registering **central counterparty trades** are suspended the **Exchange** may either: |
|---|------|---|
|   | 5122.1 | switch **central counterparty securities** to automatic execution with bilateral trading and without a **central counterparty**; or |
|   | 5122.2 | continue automatic execution with those **central counterparties** which have not ceased registering **central counterparty trades**; or |
|   | 5122.3 | suspend automatic execution. |

*Guidance to Rule:*

*In the event that the **Exchange** is informed by a **central counterparty** of its intention to cease registering **central counterparty trades**, it will first suspend automatic execution in accordance with the **market situation** rule 1520. The **Exchange** will then either reinstate automatic execution with bilateral settlement, continue automatic execution with any remaining **central counterparty(ies)** where the securities traded are supported by more than one **central counterparty**, or continue to suspend automatic execution until such time that bilateral settlement can take place or until the **central counterparty** can again register **central counterparty trades**.*

*The withdrawal of **central counterparty** service by a **central counterparty** is expected to be an extremely rare occurrence and in particular, it is considered unlikely that a **central counterparty** would withdraw its services following a technical problem - such as temporary system unavailability - that was expected to be recoverable without damage to its financial integrity.*

**RULES OF THE LONDON STOCK EXCHANGE**

*Bilateral trading*

*In the event that the **Exchange** has switched to bilateral trading without a **central counterparty**, **member firms** that wish to continue to trade on the **order book** will be expected to trade and settle on a bilateral basis in accordance with the **Exchange's** rules. As such, **member firms** that wish to participate in bilateral trading should have procedures and processes in place to ensure that their internal systems can manage the receipt of **counterparty** data and settle on a bilateral basis. These should cover front, middle and back office systems.*

*The **Exchange** will provide **member firms** with reasonable notice of its intention to move to bilateral trading. The length of the notice period will depend on the circumstances at the time. However, **member firms** are advised that the **Exchange** may commence bilateral trading within a trading day. As such, **member firms** should consider in advance how they will implement a move to bilateral trading.*

*In order to facilitate the move to bilateral trading, automatic execution in **central counterparty** eligible securities will be suspended for a period of time. During this time, **member firms** that do not wish to participate in bilateral trading can delete their existing orders. The **Exchange** will also terminate access to the **order book** for those **member firms** whose **membership profile** is limited to trading in **central counterparty securities**. Trading will recommence with an auction call period.*

*The trading message received by **member firms** following the execution of an automatic trade will contain the **member ID** for its **counterparty** rather than the code for the **central counterparty**.*

*Member ID codes are disseminated each morning as part of the daily Reference Data download. Alternatively, **member IDs** can be located in the Membership section of the **Exchange's** website.*

*Following a move to bilateral trading, centralised netting will not be available to those **member firms** which currently net. As such, all **member firms** will need the ability to settle trades on a gross basis. Whilst individual **member firms** can agree between themselves to settle on a net basis, they will need to be able to settle on a gross basis with those **member firms** who do not net settle.*

*Continuation of automatic execution with remaining **central counterparties***

*Where trading in securities is supported by two or more **central counterparties**, the **Exchange** may continue automatic execution with the remaining **central counterparties**. The **Exchange** will provide **member firms** with reasonable notice of its intention to continue trading in this way. Only those **member firms** with clearing arrangements with one of the available **central counterparties** will be permitted to enter orders in those securities. As such, **member firms** may wish to consider in advance how they would implement a move to an alternative **central counterparty**.*

*(Amended N09/14 – effective 29 September 2014)*

| G | 5123 | If a **central counterparty** fails, in accordance with its rules, to give notice to the **Exchange** of its intention to (a) cease registering and/ or (b) suspend the processing of, **central counterparty trades**, in the absence of any contrary indication from the **Exchange** [whereby the **Exchange** may act in accordance with rule 5122 above], the **matched buyer** and the **matched seller** shall be deemed to be subject to a bilateral trade on the same terms and at the same time as the orders were matched so that the **matched buyer** and **matched seller** settle the trade with each other directly. If the **Exchange** and the relevant **central counterparty** agree for the **central counterparty** to register a **central counterparty trade** which it has previously declined to register, upon such registration the bilateral trade between the **matched buyer** and **matched seller** shall be cancelled and a central counterparty contract(s) shall arise. |
|---|---|---|

*Guidance to Rule:*

*Treatment of pre-suspension trades*

*The **Exchange** will always wish to ensure that any trade executed before the suspension of **central counterparty** services will be treated as a centrally cleared trade. However, the treatment of such trades will depend on the cause of the suspension.*

*The **Exchange** will communicate the status of pre-suspension trades as soon as possible*

**RULES OF THE LONDON STOCK EXCHANGE**

*after the conclusion of discussions with the relevant **central counterparty**.*

*(Amended N02/12 – effective 1 February 2012)*

| | | |
|---|---|---|
| G | 5124 | Notwithstanding the settlement arrangements, for **central counterparty contracts**, the **clearing member** clearing the trade remains responsible for ensuring that every **central counterparty contract** to which it is a party is settled. |

*Guidance to Rule:*

*This particularly relates to the situation where a **Non Clearing Member**, or its **settlement agent**, settles directly with the **central counterparty**.  In this case, the **General Clearing Member** remains responsible to the **central counterparty** for settlement.*

*(Amended N02/12 – effective 1 February 2012)*

**Settlement netting** [5130-5131]

| | | |
|---|---|---|
| | 5130 | Where pursuant to a **central counterparty contract** a **clearing member** has elected to settle a trade on a net basis in accordance with a **central counterparty netting service**, it must do so in accordance with the terms of that **central counterparty netting service**. |

*(Amended N02/12 – effective 1 February 2012)*

| | | |
|---|---|---|
| | 5131 | Pursuant to rule 5121, where the **Non Clearing Member** acts as **agent** and it, or its **settlement agent**, is performing settlement directly with the **central counterparty** on a net basis, the **Non Clearing Member** should ensure that its principal has consented to it settling on this basis.  The **General Clearing Member's** obligations in respect of the trade to the **Non Clearing Member's** principal shall be performed when the net settlement is settled in accordance with the terms of the **central counterparty netting service**. |

*(Amended N02/12 – effective 1 February 2012)*

**Net settlements – effect of settlement** [5140-5143]

| | | |
|---|---|---|
| G | 5140 | The obligations of the **central counterparty**, the **clearing member** and the **Non Clearing Member** in respect of the trade shall be performed when the net settlement is settled in accordance with the terms of the **central counterparty netting service**. |

*Guidance to Rule:*

*Under the terms of the **central counterparty netting service**, a net settlement which results in a zero cash and zero stock position may still be created, 'settle' on ISD and be time-stamped at the time of settlement.  In such a case, the relevant **central counterparty contracts** are performed at the time indicated by the relevant time-stamp.*

*(Amended N02/12 – effective 1 February 2012)*

| | | |
|---|---|---|
| | 5141 | Partial performance of net settlement instructions created through the use of the **central counterparty netting service** where trade date netting is used ("partial performance of net settlements") from the **central counterparty** will be treated as being pro rata performance of the underlying **central counterparty contracts** between the **central counterparty** and the relevant **clearing member** and between the **General Clearing Member** and the **Non Clearing Member** where the **central counterparty** is settling directly with the **Non Clearing Member** or its **settlement agent**. |

| | | |
|---|---|---|
| | 5142 | In the event of a default of the **General Clearing Member** or **Non Clearing Member** where partial performance of net settlements has not been allocated to the **Non Clearing Members** and the **default procedures** are invoked, the onward principal **central counterparty contracts** will be deemed as unsettled **relevant principal contracts**. |

*(Amended N02/12 – effective 1 February 2012)*

**RULES OF THE LONDON STOCK EXCHANGE**

| 5143 | In the event of partial performance of net settlements where trade date netting is used between the **General Clearing Member** and the **Non Clearing Member** or its **settlement agent** (or directly from the **central counterparty** to the **Non Clearing Member** or its **settlement agent** as in rule 5141) resulting from agency trades, the **General Clearing Member's** obligations to the **Non Clearing Member's customers** in respect of these **central counterparty contracts** shall be deemed to have been partially performed on a pro rata basis. If the **Non Clearing Member**, or its **settlement agent** does not allocate, or allocates on an alternative basis, then it shall be deemed to have been pro rata and it shall be a term of the **central counterparty contract** that it shall be deemed partially performed on this basis. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5144 | The effect of partial performance of net settlement instructions created through the use of the **central counterparty netting service** where continuous net settlement is used shall be defined in the rules of the **central counterparty netting service.** |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

## General benefits

### Entitlement to benefits [5200]

| 5200 | A trade in a security effected on a day (including a trade effected before the **mandatory period**) that the **Exchange** makes a security ex an entitlement or at any time thereafter, shall be settled ex that entitlement, unless otherwise agreed at the time of dealing, or as specified in rule 5250. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

### Central counterparty rules [5210]

| 5210 | For **central counterparty trades**, where deadlines and procedures are mandated within the **central counterparty rules** for the processing of **buyers'** instructions in relation to benefit distributions and **stock situations, member firms** should adhere to the **central counterparty rules**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

### Benefits for assented trades [5220]

| 5220 | Any trade which is dealt in an assented security shall be dealt cum all benefits not already marked ex due in respect of the underlying security unless otherwise agreed at the time of dealing. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

### Overseas securities [5230]

| 5230 | Excluding **central counterparty securities** a **member firm** shall treat **overseas** securities whose **relevant market** is not the **Exchange** as being ex a benefit from the time they are marked ex that benefit on the **relevant market**, unless otherwise agreed with the **counterparty** to the trade. This rule does not apply where the **Exchange** has marked the security as ex a benefit. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

### Special Cum trades [5240]

| 5240 | A **member firm** shall not **on Exchange** effect a special cum trade on or after the payment date in the case of a cash benefit or on or after the distribution date in the case of a stock benefit. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

### Special Ex trades [5250-5252]

| 5250 | A trade in a **fixed interest security** due to be settled on or after the date on which the **Exchange** makes that security ex an entitlement, shall be dealt ex that entitlement unless otherwise agreed at the time of dealing. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5251 | A **member firm** shall not **on Exchange** effect a special ex trade in a fixed interest non-convertible security issued by a **United Kingdom** incorporated company or maintained on a register in the **United Kingdom** earlier than seven calendar days before the ex date. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5252 | A **member firm** shall not **on Exchange** effect a special ex trade in a security registered in the **United Kingdom** other than a security falling within rule 5251 earlier than the tenth day before the ex date. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Calls on partly-paid securities** [5260]

| 5260 | Unless otherwise agreed, where delivery of partly-paid securities has not been made prior to the last time for registration before the **call payment date**, the **seller** shall be obliged to pay the call and the **buyer** shall reimburse the **seller** upon delivery of the fully paid (or next instalment paid) securities. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

## Dividends

**Payment of dividends** [5300]

| 5300 | The **seller** is responsible for any dividend due to the **buyer** unless there has been a delay of more than six months from the record date or three months from the pay date (whichever is the later) in claiming the dividend.  After this time the **seller** must use reasonable endeavours to obtain the dividend from their **customer** or **counterparty** on behalf of the **buyer**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Settlement of dividend claims** [5310]

| G | 5310 | A dividend claim made by one **member firm** to another and not disputed shall be settled not later than 28 calendar days after receipt of the claim or 14 calendar days after the payment date, whichever is the later. |
|---|---|---|

*Guidance to Rule:*

*Unless otherwise agreed at the time of the trade, dividends shall be payable in the same currency as that paid through the settlement system.*

*(Amended N02/12 – effective 1 February 2012)*

**Dividends with alternatives** [5320]

| 5320 | Except in the case of **overseas** securities and **central counterparty securities**, where a company declares a dividend with one or more alternatives, a **buyer** wishing to opt for an alternative shall give the **seller** an **instruction notice** stating the form in which it requires the dividend: |
|---|---|
| 5320.1 | if the **seller** is acting as **agent**, not later than three days before the last date given by the company for accepting an alternative; or |
| 5320.2 | if the **seller** is acting as **principal** not later than four days before the last date given by the company for accepting an alternative. |

*(Amended N02/12 – effective 1 February 2012)*

**Deduction of dividends** [5330]

| 5330 | Where the **seller** delivers securities direct to the **buyer**, the **buyer** may deduct a dividend to which it is entitled from payment if delivery is made after the last day on which transfers are accepted for registration cum dividend. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Cancellation of dividends** [5340]

| 5340 | | On receipt of information cancelling or deferring the recommendation or declaration of a dividend, the **Exchange** may issue a **notice** cancelling the ex action and, as a result: |
|---|---|---|
| | 5340.1 | any **notice** published making the security ex dividend is automatically cancelled and devoid of effect; |
| | 5340.2 | any document issued by the **Exchange** in respect of a cancelled dividend is automatically withdrawn and devoid of effect; |
| | 5340.3 | a transaction effected ex dividend, other than a transaction effected special ex dividend, shall not be adjusted; |
| | 5340.4 | a trade effected special cum or special ex dividend shall be adjusted by either, refunding the cash equivalent in respect of the cancelled dividend or, the **seller** re-attaching the coupon in respect of the dividend, in the case of a bearer certificate. |

*(Amended N02/12 – effective 1 February 2012)*

## Rights Issues

**Relevant day** [5400]

| 5400 | Where the **call payment day** or **registration day** is not a **business day** the relevant day is the immediately preceding **business day**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Last time for issue of rights claims** [5410]

| G | 5410 | A **buyer** that issues a claim to a **seller** to deliver **rights** or registered securities shall do so in writing not later than the **last time for claims** in order to become entitled to those **rights** or the new securities as the case may be. |
|---|---|---|

*Guidance to Rule:*

*If the underlying securities are to be settled through a system that automatically generates claims such as* **CREST** *a claim for the associated* **rights** *is not required, as a notification will be issued to a* **seller** *requiring that* **seller** *to deliver as specified.*

*(Amended N02/12 – effective 1 February 2012)*

**Delivery in settlement of trades in rights** [5420]

| 5420 | Except as is otherwise provided by these rules, where a **rights** offer is made by means of renounceable documents, the **rights** shall be delivered through **CREST**, unless the parties agree that they shall be delivered in renounceable documents fully renounced. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Last times for delivery of rights** [5430]

| G | 5430 | A **seller** to whom a **rights** claim is issued shall deliver the **rights** at or before the **latest time for delivery** and a **buyer** is not obliged to accept delivery of **rights** after that time. |
|---|---|---|

*Guidance to Rule:*

*Where either the* **seller** *fails to deliver, or the* **buyer** *does not accept delivery, settlement of the* **rights** *shall take place in accordance with rule 5440.*

*(Amended N02/12 – effective 1 February 2012)*

**Obligations of seller where rights not delivered** [5440-5441]

| 5440 | Where nil paid or partly paid **rights** are not delivered by the **latest time for delivery**, the **seller** shall, unless a **lapsing instruction** has been given, make any payment due on the **call payment day** on behalf of the **buyer**. The **buyer** shall then refund to the **seller** the call payment against delivery of the paid up shares, or partly paid **rights**, as the case may be. |
|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

*(Amended N02/12 – effective 1 February 2012)*

| 5441 | Where fully paid **rights** are not delivered by the **latest time for delivery**: |
|---|---|
| 5441.1 | the **seller** shall deliver the registered securities to the **buyer**; and |
| 5441.2 | the **seller** is liable for any additional duties or fees payable in order to comply with legislation. |

*(Amended N02/12 – effective 1 February 2012)*

**Late claims in respect of nil paid rights** [5450-5451]

| 5450 | Where a **buyer** issues a **rights** claim after the **last time for claims** but before the last time for acceptance of an offer, the **seller** shall, unless it has been able to prevent the rights lapsing, pay to the **buyer** an amount representing the lapsed rights premium, if any. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5451 | Where a **buyer** issues a **rights** claim more than six months after the last time for acceptance of an offer, its claim shall be treated as invalid, and the selling firm shall not be required to make any payment to the buying firm in respect of the lapsed rights premium. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Late claims in respect of partly or fully paid rights** [5460]

| 5460 | Where a **buyer** issues a **rights** claim in respect of partly paid or fully paid rights after the **last time for claims**, the **seller** shall deliver the registered securities, and the **buyer** is liable for any additional duties or fees payable in order to comply with legislation. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Lapsing instructions** [5470-5471]

| 5470 | Where a **buyer** does not receive full delivery of nil paid **rights** by the **latest time for delivery** the **buyer** may give the **seller** a **lapsing instruction** provided the instruction is received by 11.00 on the day before **call payment day**. |
|---|---|

*Guidance to Rule:*

*Where a **lapsing instruction** is given orally, the **buyer** shall confirm it in writing by close of business on the day on which the instruction was given. The **member firms** concerned shall exchange the reference codes allocated by them to the trade and any subsequent confirmation relating to that **lapsing instruction** shall incorporate both reference codes.*

*(Amended N02/12 – effective 1 February 2012)*

| G | 5471 | Where a **lapsing instruction** has been given and, if necessary, confirmed, delivery of the **rights** may be dispensed with by agreement. |
|---|---|---|

*Guidance to Rule:*

*The delivery of the **rights** is dispensed with where the **lapsing instruction** is given via **CREST** in respect of a **central counterparty security**. Where the delivery of nil-paid **rights** is not required, the **buyer** must make payment in settlement of the trade and the **seller** must pay the **buyer** any lapsed premium which becomes payable.*

*(Amended N02/12 – effective 1 February 2012)*

## Capitalisation issues

**Capitalisation claims** [5500]

| 5500 | Where a **buyer** of securities cum capitalisation, or **CREST** on behalf of the **buyer**, makes a claim for the benefit of the capitalisation issue, the **member firm** against which the claim is made shall meet that claim by delivering the new securities within six months from the record date or three months from the pay date (whichever is the later). |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

RULES OF THE LONDON STOCK EXCHANGE

**Valuations** [5510-5513]

| 5510 | Except for **central counterparty trades**, where new securities have not been delivered in settlement of a free of payment claim in a transferable security resulting from an **on Exchange** transaction which has settled, the **buyer** may give the **seller** notice in writing that the **seller** shall deliver the new securities, or pay the value thereof, by the close of business on the third **business day** after receipt of the valuation notice. Such notice may be given from the fourth day after the new securities have been made available by the issuer or its agent. The **seller** shall deliver the new securities, or pay their value as instructed. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5511 | Except for **central counterparty trades**, where a **seller**, having paid the value of the new securities, delivers all or some of them, the **buyer** shall repay the **seller** the value of the new securities in proportion to the securities delivered against a claim from the **seller**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

| 5512 | | The value of the new securities shall be calculated: |
|---|---|---|
| | 5512.1 | by reference to the middle of the quotation shown on the Stock Exchange Daily Official List on the day the valuation notice is issued; or |
| | 5512.2 | where there is no quotation shown on the Stock Exchange Daily Official List, on the opening price of the security obtained from the principal market on which it is dealt on the day the valuation notice is issued. |

*(Amended N02/12 – effective 1 February 2012)*

| 5513 | Except for **central counterparty trades**, where a security has been sold and a benefit or its cash equivalent is to be paid to holders of the security in a foreign currency, but it is agreed that the **seller** shall account for it in sterling, then unless otherwise agreed, the conversion rate in respect of the benefit shall be the closing mid-price spot rate on the day the benefit is due. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

## Entitlement issues

**Application** [5600]

| 5600 | Rules 5600 to 5630 apply where securities are offered, by the issuer or a third party, to the holders of existing securities in proportion to their existing holdings by means of an assignable application form or the equivalent **uncertificated security**. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Entitlement claims** [5610]

| 5610 | Where a **buyer** of securities cum entitlement, or **CREST** on behalf of a **buyer**, makes a claim in writing for the assignment of the application form or the equivalent **uncertificated security** in favour of the **buyer** not later than 16.00 two days before the last day for acceptance, the **buyer** is entitled to receive the assigned application form or the equivalent **uncertificated security**, as applicable. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Last times for delivery** [5620]

| 5620 | A **buyer** is not obliged to accept delivery of an assigned application form or the equivalent **uncertificated security** after the **specified time** on the day before the closing of the offer. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

**Obligations of seller where application form not delivered** [5630]

| 5630 | Where the assigned application form or the equivalent **uncertificated security** is not delivered by the time specified in rule 5620, and unless a **lapsing instruction** is received from the **buyer** prior to 11.00 on the day before the **call payment date**, the **seller** shall take up the entitlement and deliver the new shares against payment of the application money. |
|---|---|

*(Amended N02/12 – effective 1 February 2012)*

## Stock Situations

<u>Instruction notices</u> [5700-5702]

| | | |
|---|---|---|
| G | 5700 | In **stock situations** including conversions and takeovers a **buyer** may give an **instruction notice** specifying the option to which it relates, to the **seller** requiring delivery of: |
| | 5700.1 | the unassented shares at a date which is not later than two days before the election date, the event record date or the final registration date whichever is the earlier; or |
| | 5700.2 | the result of a **stock situation** or a specified election under the terms of the **stock situation** if it becomes effective. |

*Guidance to Rule:*

*Effective means unconditional in all respects in relation to takeovers.*

*(Amended N02/12 – effective 1 February 2012)*

| | | |
|---|---|---|
| G | 5701 | In the case of any **instruction notice**, other than those in a **central counterparty security**, the **seller** shall deliver the unassented shares or the result as instructed if the instruction was received no later than three or, in the case of a selling **principal**, four days before: |
| | 5701.1 | the election date in the case of a specified election; |
| | 5701.2 | the final registration date in the case of delivery of underlying shares if that is prior to the election date. |

*Guidance to Rule:*

*For the purposes of these rules final election date is also taken to mean:*

*- the next closing date in relation to takeovers or similar events; or*
*- the last day for election for a specific conversion opportunity or similar event.*

*(Amended N02/12 – effective 1 February 2012)*

| | | |
|---|---|---|
| | 5702 | For **instruction notices** in **central counterparty securities**, the **seller** shall deliver the unassented shares or the result as instructed if the instruction was received by the **seller** before the **CREST instruction deadline** and, for voluntary events in **central counterparty securities**, where the intended settlement date of the trade was on or before the date of the **CREST instruction deadline**. |

*(Amended N02/12 – effective 1 February 2012)*

<u>Delivery of results for non-optional events</u> [5710]

| | | |
|---|---|---|
| G | 5710 | Where the **seller** fails to deliver securities as traded, prior to the last time for registration in a non optional **stock situation** and the **buyer** has not given instructions to elect for any alternatives which may be available, the **seller** shall be obliged to deliver the results of the event against an amount of money equal to the original bargain consideration. |

*Guidance to Rule:*

*Rule 5710 applies to non-optional **stock situations** such as consolidations, subdivisions, redemptions, compulsory acquisitions, schemes and other **stock situations** where the holder of the securities has no option as to whether or not to participate.*

*Compulsory Acquisitions*

*Where settlement has not taken place prior to expiry of compulsory acquisition notices, and in the absence of any instruction from the **buyer** to elect for an alternative, the **seller's** obligation shall be to deliver the consideration available to dissenting shareholders post expiry of the compulsory acquisition notices.*

*(Amended N02/12 – effective 1 February 2012)*

**RULES OF THE LONDON STOCK EXCHANGE**

**<u>Drawn securities</u>** [5720]

| | |
|---|---|
| 5720 | Unless a trade has been dealt with a settlement due date prior to the drawing in question, a **buyer** shall, if the securities in question have been drawn since the trade was dealt, accept from the **seller** the drawing payment in place of the drawn securities in settlement of the trade. |

*(Amended N02/12 – effective 1 February 2012)*

# <u>COMPLIANCE PROCEDURES</u>

## Disciplinary process

Where the **Exchange** believes there has been a breach of these rules by a **member firm**, the **Exchange** may commence disciplinary action against such **member firm**.  The **Exchange** may impose a **fixed penalty**, issue a warning notice and/or refer disciplinary matters to either the Executive Panel or the Disciplinary Committee. In appropriate cases (including where a greater sanction than the Executive Panel is authorised to impose is deemed appropriate by the Executive Panel), the Executive Panel may refer the case to the Disciplinary Committee.

There are a number of factors which the **Exchange** takes into account when considering what disciplinary action to take in relation to a rule breach.  These are set out below:

- The seriousness, size and nature of the rule breach

- How the rule breach came to light

- The actual or potential market impact of the rule breach, and any other repercussions

- The extent to which the rule breach was deliberate or reckless

- The general compliance history of the **member firm**, and specific history regarding the rule breach in question

- Consistent and fair application of the rules (any precedents of previous similar rule breaches)

- The responsiveness and conduct of the **member firm** in relation to the matter under investigation.

The **Exchange's** approach to regulation is aimed at maintaining the integrity, orderliness, transparency and good reputation of its markets and changing **member firms'** behaviour in those markets where necessary.  The **Exchange** will investigate the facts of each case, seeking to understand why the rule breach occurred and will assess whether any remedial action the **member firm** has taken is adequate to prevent similar future occurrence.

The Executive Panel is a panel comprised of appropriately experienced senior members of the **Exchange's** staff.  The procedures followed by the Executive Panel are set out in rules C200 to C290.  The Executive Panel also considers appeals against **fixed penalties**.  Any final decision of the Executive Panel (other than a decision to refer a matter to the Disciplinary Committee) may be appealed to the Appeals Committee.  There is no appeal on interim decisions.

The Disciplinary Committee is drawn from a pool of appropriately experienced (non-**Exchange**) persons and its procedures are set out in rules C300 to C390.  The Disciplinary Committee may impose a wider range of sanctions than the Executive Panel and has discretion to publicise its findings.  Any final decision of the Disciplinary Committee may be appealed to the Appeals Committee.  There is no appeal on interim decisions.

The Appeals Committee is also drawn from a pool of appropriately experienced (non-**Exchange**) persons and hears appeals against the findings of both the Executive Panel and the Disciplinary Committee. The procedures followed by the Appeals Committee are set out in rules C400 to C490.  The Appeals Committee may uphold, quash or vary any decision it is asked to consider.

The table below summarises the disciplinary process operated by the **Exchange**.

RULES OF THE LONDON STOCK EXCHANGE

| Process | Normal use | Constitution | Appellate body |
|---|---|---|---|
| Warning Notices | • Rule breaches | (no hearing) | |
| Fixed penalties | • Rule breaches where a **fixed penalty notice** is in issue | (no hearing) | Executive Panel |
| Executive Panel | • Disciplinary matters<br>• Appeals against **fixed penalties** | Senior Exchange staff | Appeals Committee |
| Disciplinary Committee | • Disciplinary matters | Appropriately experienced (non-**Exchange**) persons | Appeals Committee |
| Appeals Committee | • Disciplinary appeals against Executive Panel findings<br>• Disciplinary appeals against Disciplinary Committee findings | Appropriately experienced (non-**Exchange**) persons | |

The table below summarises the sanctions available to the **Exchange** for any breach of these rules.

| Process | Available sanctions | Appellate body |
|---|---|---|
| Warning Notices | • May stipulate corrective action required<br>• Formal record of action for **member firm's** case history | |
| **Fixed Penalty** | • As set out in any applicable **fixed penalty notice** | Executive Panel |
| Executive Panel1 | One of:<br>• Private censure<br>• **Fine** up to £50,000 per breach<br>• Referral to Disciplinary Committee | Appeals Committee |
| Disciplinary Committee2 | One or more of:<br>• Private censure<br>• Public censure<br>• Unlimited **fine**<br>• Suspension of activities<br>• Restitution<br>• Expulsion from membership | Appeals Committee |
| Appeals Committee2 | Executive Panel referrals:<br>• Any sanction available to the Executive Panel<br>Disciplinary Committee referrals:<br>• Any sanction available to the Disciplinary Committee | |

1. Findings of the Executive Panel in respect of breaches of these rules by **member firms** are published anonymously by the Exchange from time to time.

2. Disclosure of findings is at the discretion of the Committee hearing the case (subject to rule C020) in accordance with these rules.  Matters subject to appeal will not be published before the appeal is completed.

## Non-disciplinary appeal process

In the first instance, appeals against decisions of the **Exchange** permitted under these rules are heard by the Executive Panel.  The Executive Panel may uphold, quash or vary any decision it is asked to consider.  There is no appeal on the **Exchange's** decision to refer a matter to the Executive Panel or the Disciplinary Committee.

Appeals against the findings of the Executive Panel, and referrals from the Executive Panel are heard by the Appeals Committee.  The Appeals Committee may uphold, quash or vary any decision it is asked to consider.

The table below summarises the non-disciplinary appeals process operated by the **Exchange**.

| Process | Normal use | Constitution | Appellate body |
|---------|-----------|--------------|----------------|
| Executive Panel | • All non-disciplinary appeals (in the first instance) | Senior Exchange staff | Appeals Committee |
| Appeals Committee | • Appeals against Executive Panel findings in non-disciplinary matters | Appropriately experienced (non-**Exchange**) persons | |

The table below summarises the sanctions available to the **Exchange** for any breach of these rules.

| Process | Sanction | Appellate body |
|---------|----------|----------------|
| Executive Panel | One of:<br>• Uphold decision<br>• Quash decision<br>• Vary decision | Appeals Committee |
| Appeals Committee | One of:<br>• Uphold decision<br>• Quash decision<br>• Vary decision | |

# Process and Procedures

### Burden of proof [C010]

| C010 | The burden of proof shall be on the **Exchange**. The Exchange, the Executive Panel, the Disciplinary Committee or the Appeals Committee (as appropriate) shall not find an allegation proved unless it is satisfied on the balance of probabilities. |
|------|---|

### Market guidance [C020]

| C020 | The **Exchange** reserves the right to publish, without disclosing the identity of any party concerned, in part, in summary or in full the findings of the Executive Panel, Disciplinary Committee or Appeals Committee where the **Exchange** believes that to do so would be of assistance to the market. |
|------|---|

# Warning Notices

### Function of Warning Notices [C080 – C081]

| C080 | The **Exchange** may issue a **warning notice** to a **member firm** for a breach of these rules. |
|------|---|

| C081 | A **warning notice** forms part of a **member firm's** formal compliance record. |
|------|---|

## Fixed Penalties

**Fixed penalty regime** [C100-C102]

| C100 | The **Exchange** may impose a **fixed penalty** on a **member firm** for a breach of these rules if the breach is one for which the **Exchange** has set out a **fixed penalty** by a **notice** in force at the time of the breach. |
|---|---|

| C101 | The **Exchange** imposes a **fixed penalty** by notifying a **member firm's** compliance department in writing of the breach and the amount of the **fine**, and specifying that the fine be paid within 30 days of receipt of the notification. |
|---|---|

| C102 | If the **Exchange** considers the circumstances of a case sufficiently serious, the **Exchange** may issue a **warning notice** or refer the matter to the Executive Panel or the Disciplinary Committee. |
|---|---|

**Appeal** [C180-C185]

| C180 | A **member firm** may appeal against a **fixed penalty** imposed by the **Exchange** to the Executive Panel. |
|---|---|

| C181 | Appeals must be made by service of a notice in writing on the **Exchange** within five days of being notified of the penalty, setting out the name of the **member firm** and the decision appealed against. Within 10 days of being notified of the penalty the **member firm** shall notify the **Exchange** of the grounds of appeal and all material facts and shall provide copies of all documents relevant to the appeal. |
|---|---|

| C182 | Within 10 days of receipt of the **member firm's** notice of appeal, the **Exchange** may submit to the **member firm** a statement of case setting out all material facts and attaching to it copies of all documents relevant to the charge(s). |
|---|---|

| C183 | The **member firm** may respond to the **Exchange's** statement of case in writing, within five days of receipt of the **Exchange's** statement of case. The **Exchange** and the **member firm** may vary this period for response by written agreement. |
|---|---|

| C184 | At the expiry of the period referred to in rule C183, the **Exchange** shall submit to the Executive Panel the statement of case (which shall include the notice of appeal) and the **member firm's** response (if any), together with copies of all other relevant documents. |
|---|---|

| C185 | The Executive Panel will conduct the appeal in accordance with the procedure set out in rules C200 to C290. |
|---|---|

## Executive Panel

**Role** [C200-C201]

| C200 | The Executive Panel shall, when acting as a tribunal of first instance, hear and determine charges against a **member firm** in respect of a breach of these rules. |
|---|---|

| C201 | | The Executive Panel shall, when acting as an appellate tribunal, hear and determine appeals: |
|---|---|---|
| | C201.1 | by a **member firm** against a **fixed penalty**; |
| | C201.2 | by an appellant against a decision of the **Exchange**. |

**Disciplinary Powers** [C205-C206]

| C205 | | Where the Executive Panel acting as a tribunal of first instance finds an allegation proven on the balance of probabilities the Executive Panel may: |
|---|---|---|
| | C205.1 | issue a written warning (a private censure); |
| | C205.2 | impose a **fine** of up to £50,000 for each breach; or |
| | C205.3 | refer the case to the Disciplinary Committee for hearing. |

RULES OF THE LONDON STOCK EXCHANGE

| C206 | The Executive Panel may grant a consent order in respect of any settlement within its powers that may be negotiated between the **Exchange** and a **member firm** in relation to any disciplinary action taken by the **Exchange**. |
|---|---|

**Appeal powers** [C207]

| C207 | The Executive Panel may, when acting as an appellate tribunal, uphold, quash or vary (in accordance with these rules) any decision by the **Exchange** which can be appealed under these rules or refer the matter to the Appeals Committee for further consideration. |
|---|---|

**Membership** [C210-C216]

| C210 | Members of the Executive Panel shall be appropriately experienced senior members of the **Exchange's** staff. |
|---|---|
| C211 | The Executive Panel appointed pursuant to a referral or an appeal shall have between three and five members (including the Chairman) and shall have a quorum of three. |
| C212 | No member of the **Exchange's** staff who has been involved in the investigation or prosecution of the charge(s) in a disciplinary case shall be appointed to the Executive Panel considering that disciplinary case. |
| C213 | No member of the **Exchange's** staff who has been involved in a decision by the **Exchange** which is the subject of an appeal to the Executive Panel shall be appointed to the Executive Panel considering an appeal against that decision. |
| C214 | The names of the members of the Executive Panel will be disclosed to the **member firm**. |
| C215 | Each Executive Panel hearing a case shall appoint one of its members to be the Chairman. |
| C216 | A party may object to the membership of the Executive Panel on the grounds of conflict of interest or breach of rules C212 or C213. Such objection must be notified promptly, and prior to the hearing of the case, to the **Exchange**. If the Executive Panel upholds the objection, it will take appropriate action to address the objection. The decision of the Executive Panel under this rule is an interim decision and cannot be appealed separately from an appeal against the final decision of the Executive Panel under rule C280. |

**Confidentiality** [C220]

| C220 | Other than as set out in these rules, and other than as between a party and its advisers, each party shall keep confidential any matters relating to any proceedings save where disclosure is permitted or required by law. |
|---|---|

**Mode of referral when acting as a tribunal of first instance** [C230-C233]

| C230 | Proceedings before the Executive Panel shall be commenced by the **Exchange** submitting a statement of case to the **member firm**. The statement of case shall set out the charge(s) and all material facts taken into account and shall have attached to it copies of all documents relevant to the charge(s). |
|---|---|
| C231 | The **member firm** may, within five days (or such other period agreed between the parties) of receipt of the statement of case, submit to the **Exchange** a statement in response setting out all material facts and having attached to it copies of all documents relied upon. |
| C232 | The Chairman of the Executive Panel may vary the period referred to in rule C231 at the request of the **member firm**. |
| C233 | Following receipt of the **member firm's** statement of response, the **Exchange** shall submit to the Executive Panel the statement of case and the **member firm's** response (if any), together with copies of all other relevant documents. |

**RULES OF THE LONDON STOCK EXCHANGE**

**Mode of referral when acting as an appellate tribunal** [C240-C243]

| C240 | Appeals to the Executive Panel must be commenced by service of a notice in writing on the **Exchange** within 10 **business days** of the service of the decision by the **Exchange**. The notice should set out the name of the appellant, the decision appealed against, the grounds of appeal, all material facts and shall have attached to it copies of all documents relevant to the appeal. The notice should be copied to the **Exchange's** Company Secretary, who will ensure that the notice is transmitted to the Chairman of the Executive Panel. |
|---|---|
| C241 | The **Exchange** may, within 10 **business days** (or such other period agreed between the parties) of receipt of the notice under rule C240, submit to the Chairman of the Executive Panel a statement in response setting out all material facts and having attached to it copies of all documents relied upon. Such statement shall be copied to the appellant (subject to any legal duty of confidentiality with respect to any details in such response). |
| C242 | On receipt of a notice under rule C240 and any statement in response under rule C241, the Chairman of the Executive Panel will arrange a hearing as soon as reasonably practicable. |
| C243 | The Chairman of the Executive Panel may vary the time periods referred to in rules C240 – C242 (other than the period during which an appeal may be made under rule C240) at the request of either party. |

**Procedure** [C250-C253]

| C250 | Save in circumstances where either party notifies the Chairman of the Executive Panel that it believes an oral hearing is essential to establish all the relevant facts and requests the Chairman to hold such an oral hearing, proceedings before the Executive Panel will take place through the consideration of documents with no oral hearing. |
|---|---|
| C251 | Where there is to be a hearing in accordance with rule C250, the Executive Panel will conduct it in private. |
| C252 | The parties may attend the hearing but any hearing may proceed in the absence of one or both of the parties. |
| C253 | The Executive Panel will give not less than five **business days** notice of the time and place of any hearing to the parties. This notice period may be shortened with the agreement of the parties. |

**Deliberations and decisions** [C270-C273]

| C270 | The Executive Panel may deliberate at any time and make any decision in the absence of the parties. The Executive Panel is entitled to reach decisions on a majority basis. Where a majority decision is reached, this will not be disclosed. |
|---|---|
| C271 | When considering appeals, the Executive Panel will only quash or vary a decision of the **Exchange** if it is satisfied, on the balance of probabilities, that the decision is a misinterpretation or an erroneous application of any of these rules or is not justified by the evidence on which it is based. |
| C272 | Following its determination, the Executive Panel will notify the parties in writing of: |
| C272.1 | its decision; |
| C272.2 | the reason(s) for its decision; and |
| C272.3 | in disciplinary cases, whether any penalty is to be imposed under rule C205. Any **fine** must be paid by the **member firm** within 30 days of receipt of such notification unless appealed in accordance with these rules; and |
| C272.4 | a time limit for lodging any appeal against the decision or any part thereof, which will be not less than 10 days from the date of service of the decision on the parties. |
| C273 | If the Executive Panel decides to refer a case to the Disciplinary Committee as set out under rule C205.3, no public announcement will be made until the Disciplinary Committee has reached a decision. |

**Appeal** [C280-C283]

| C280 | Appeals against final decisions of the Executive Panel (as notified to the parties under rule C272) are heard by the Appeals Committee, in accordance with its procedures. Appeals must be commenced by service of a notice in writing on the Chairman of the Executive Panel within 10 days of the service of the Executive Panel's decision (or such other time period as prescribed under rule C272.4), setting out the name of the appellant, the decision appealed against, the grounds of appeal, all material facts and attaching copies of all documents relevant to the appeal. |
|---|---|
| C281 | On receipt of a notice under rule C280, the Chairman of the Executive Panel will arrange for the appointment of a Secretary of the Appeals Committee who will arrange a hearing as soon as reasonably practicable. |
| C282 | The Chairman of the Executive Panel or the Appeals Committee may extend the time for appeal. |
| C283 | Notwithstanding rule C280, appeals against decisions of the Executive Panel on grounds of new evidence (including those where there are other grounds of appeal), shall be heard by way of rehearing by the Executive Panel before the right of appeal to the Appeals Committee arises. Where the appellant wishes to rely on evidence which was not before the Executive Panel, this shall be stated in the appeal notice and copies or details of such evidence shall be attached to the notice. |

**Changes to the procedures** [C290]

| C290 | The Executive Panel may vary any of its procedures to adapt to the circumstances of any particular case. |
|---|---|

# Disciplinary Committee

**Role** [C300]

| C300 | The Disciplinary Committee shall, as a tribunal of first instance, hear and determine charges against a **member firm** in respect of a breach of these rules. |
|---|---|

**Disciplinary powers** [C305-C306]

| C305 | If the Disciplinary Committee finds an allegation proven on the balance of probabilities it may impose one or more of the following sanctions: |
|---|---|
| C305.1 | a written warning (censure) which may be public or private; |
| C305.2 | an unlimited **fine** for each breach; |
| C305.3 | an order that the **member firm** make restitution to any **person** (when the **member firm** has profited from a breach of the **Exchange's** rules at that **person's** expense); and |
| C305.4 | where the **Exchange** recommends it: |
| | 1.  suspension of the right to use any system of the **Exchange**; |
| | 2.  suspension from dealing in securities, or any class of securities, dealt on **Exchange**; and |
| | 3.  expulsion from membership. |

| C306 | The Disciplinary Committee may grant a consent order in respect of any settlement that may be negotiated between the **Exchange** and a **member firm** in relation to any disciplinary action taken. |
|---|---|

**Membership** [C310-C323]

| C310 | The Disciplinary Committee appointed pursuant to a referral shall have a quorum of three (including the Chairman). The maximum number of members of the Disciplinary Committee shall be seven. Any person whom the Disciplinary Committee co-opts will count as a member of the Disciplinary Committee. |
|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

| C311 | Members of the Disciplinary Committee are drawn from a panel ("the panel") appointed by the **Exchange**. |
|---|---|

| C312 | The Disciplinary Committee may co-opt any person whom it considers appropriate. |
|---|---|

| C313 | No-one who is a member of the **Exchange's** staff may be appointed or co-opted. |
|---|---|

| C314 | The Chairman may appoint a legally qualified adviser who shall be independent of any party. Such legal adviser will not be counted as a member of the Disciplinary Committee, but shall advise the Disciplinary Committee on legal matters. The Chairman may replace the legal adviser. |
|---|---|

| C315 | Members of the Disciplinary Committee will notify the Secretary or the Chairman of any possible conflict of interest at the earliest possible opportunity and in any event prior to any hearing to be held under rule C352 or C355 below.  The Chairman will take appropriate action and will then notify the parties to the disciplinary proceedings of the names of the members of the Disciplinary Committee and any proposed legal adviser.  If any party to the disciplinary proceedings believes that a potential conflict of interest exists, it shall notify the Chairman at the earliest possible opportunity.  The Chairman will take appropriate action. |
|---|---|

| C316 | | Where the Disciplinary Committee wishes to co-opt a person or to appoint a person to replace a member unable to act whether because of illness, conflict of interest or otherwise and/or the Chairman wishes to replace the legal adviser and the hearing has commenced: |
|---|---|---|
| | C316.1 | the appointment shall only take effect with the consent of the parties and the person co-opted or appointed will be subject to the provisions of rule C360; and |
| | C316.2 | if, in the absence of such consent, the Disciplinary Committee does not wish or is not able to continue with the hearing, it will cease to deal with the referral and an entirely new Disciplinary Committee will be appointed from the panel, and a new legal adviser will be appointed by the new Chairman in both cases in accordance with these procedures, and the hearing, but not any pre-hearing procedures, will start afresh in front of the new Disciplinary Committee. |

**Secretary** [C320-C323]

| C320 | A Secretary ("the Secretary") to the Disciplinary Committee shall be appointed by the **Exchange**. The parties will be notified of the name of the Secretary as soon as reasonably practicable.  For the avoidance of doubt, the Secretary may be a member of the **Exchange's** staff. |
|---|---|

| C321 | The Secretary will carry out any administrative functions. Any notices, notifications and other documents required to be submitted to the Disciplinary Committee must be served upon the Secretary who will ensure that copies are provided to the other parties, the members of the Disciplinary Committee and any legal adviser as appropriate. Where the Disciplinary Committee wishes to notify the parties of any matter it shall do so through the Secretary. |
|---|---|

| C322 | | Any notices or other documents required to be served shall be served by delivering by hand or posting by first class post or by sending a fax with a confirmatory copy by first class post to the addresses set out below, save that the Secretary may agree with any of those referred to at C322.1 to C322.2 a different place for service upon them: |
|---|---|---|
| | C322.1 | in the case of a **member firm**, to its head office; |
| | C322.2 | in the case of the **Exchange**, to the Secretary with a copy to the Company Secretary, at the **Exchange's** registered office; and |
| | C322.3 | in the case of any other party, to a place agreed with the Secretary. |

| G | C323 | Service shall be deemed effective on the date of delivery by hand or, where first class post is used, on the second day after posting. |
|---|---|---|

Guidance to Rule:

**Member firms** can send a courtesy copy in advance by fax, but service is deemed effective on the date of delivery either by hand, or on the second day, after posting first class.

**RULES OF THE LONDON STOCK EXCHANGE**

**Confidentiality** [C325-C327]

| | |
|---|---|
| C325 | All communications relating to the proceedings (save those which would be privileged from production in a court of law) between the parties and with the Disciplinary Committee shall be channelled through the Secretary. |

| | |
|---|---|
| C326 | If any Disciplinary Committee member or the legal adviser is approached by any person  to discuss any matter connected with the proceedings such member shall, without delay, notify the Chairman who will take appropriate action. |

| | |
|---|---|
| C327 | Other than as set out in these rules, and other than as between the parties and their advisers, all parties shall keep confidential any matters relating to any proceedings save where disclosure is permitted or required by law. |

**Mode of referral** [C330-C331]

| | |
|---|---|
| C330 | The **Exchange** shall refer cases to the Disciplinary Committee by service of a written statement of case on the Secretary, who will as soon as reasonably practicable serve a copy of the statement of case on the **member firm**.  The statement of case shall set out the charges and a summary of the main facts to be relied on |

| | |
|---|---|
| C331 | In the case of referral by the Executive Panel (under rule C205.3), the Exchange shall serve a copy of the statement of case together with the statement of response made by the **member firm**. |

| | | |
|---|---|---|
| C350 | | Following service of a statement of case pursuant to rule C330 or C331: |
| | C350.1 | the **member firm** may submit to the Disciplinary Committee a statement in response (or in the event of referral under rule C205.3 – a further statement of response) and shall submit to the Disciplinary Committee a statement of all material facts and attach to it copies of all documents relied upon; and |
| | C350.2 | each party will then notify the Disciplinary Committee of any directions to be sought at a pre-hearing review or their assessment that there is no need for a pre-hearing review. |

| | |
|---|---|
| C351 | The Secretary may by agreement with the parties set a timetable for the completion of the steps under rule C350.  If no agreement is reached, the Chairman of the Disciplinary Committee may specify by notice in writing to the parties the time limits within which the steps at rule C350 are to be carried out. |

**Directions** [C352]

| C352 | | Following the completion of the procedures set out in rule C350, the Chairman or any member of the Disciplinary Committee whom he nominates may give any directions and take any other steps he considers appropriate for the clarification of the facts and issues and generally for their just, efficient and expeditious presentation and the determination of the matters in issue. The Chairman or any member of the Disciplinary Committee whom he nominates may hold one or more pre-hearing reviews for those purposes and the determination of the matters in issue. By way of example, these directions may include: |
|---|---|---|
| | C352.1 | fixing a time and place for any pre-hearing review and hearing; |
| | C352.2 | by written consent of all parties, directing that the hearing or any part of the hearing shall proceed by written representations; |
| | C352.3 | recording any admissions made by any party and any request to any party to make admissions; |
| | C352.4 | directing any party to indicate whether it admits any particular fact(s) or document(s); |
| | C352.5 | directing any party to disclose and serve copies of any documents; |
| | C352.6 | setting time limits for any purpose of the proceedings; |
| | C352.7 | extending or abridging time limits; |
| | C352.8 | adjourning the pre-hearing review, with such orders as it thinks fit; |
| | C352.9 | granting leave to amend (including adding documents to) any statement submitted pursuant to rule C350; |
| | C352.10 | varying any previous directions; and |
| | C352.11 | making any order for the payment of costs of or in connection with pre-hearing preparation or any pre-hearing review. |

**The hearing** [C355-C364]

| C355 | The Disciplinary Committee will usually conduct hearings in private, although a **member firm** which is subject to proceedings has the right to ask for such hearing to be conducted in public.  A **member firm** requiring such hearing to be conducted in public shall notify the Chairman at least five days prior to commencement of the hearing. |
|---|---|

| C356 | A party may be legally represented at any pre-hearing review or hearing. |
|---|---|

| C357 | A party may submit evidence to the Disciplinary Committee at any time until two **business days** before the hearing. |
|---|---|

| C358 | The parties will be given not less than three **business days** notice of the time and place of a pre-hearing review and seven **business days** notice of the time and place of the hearing by the Secretary.  Any shorter notice period may apply if the parties agree. |
|---|---|

| C359 | If any party fails to attend or be represented at a pre-hearing review or a hearing, the Disciplinary Committee may proceed in its absence. |
|---|---|

| C360 | | At the hearing: |
|---|---|---|
| | C360.1 | the members of the Disciplinary Committee and the legal adviser will be introduced to the parties by the Chairman who will state that each of the members and the legal adviser believes himself to have no conflict of interest in hearing the case; |
| | C360.2 | the parties will be asked to confirm that there is no reasonable objection to any of the Disciplinary Committee members hearing the case or the legal adviser on the grounds of conflict of interest; and |
| | C360.3 | if the Disciplinary Committee, which for these purposes shall exclude any member objected to and shall have a quorum of two, upholds an objection it may appoint another **person** from the panel to replace any relevant member and where the objection relates to the legal adviser the Chairman may appoint another **person** to replace the legal adviser; in all cases the appointment shall be made in accordance with these procedures. |

| C361 | | Unless otherwise ordered by the Disciplinary Committee, the order of proceedings at the hearing shall be as follows: |
| --- | --- | --- |
| | C361.1 | the allegation(s) made by the **Exchange** will be read and the **member firm** will state whether the allegation(s) is/are admitted; |
| | C361.2 | each party (the **Exchange** followed by the other party(ies)) may present its evidence and/or call witnesses, who may be cross-examined and re-examined by the other parties and questioned by the Disciplinary Committee, and may make submissions to the Disciplinary Committee; and |
| | C361.3 | where the Disciplinary Committee is satisfied that any allegation has been proved it shall take into account any representations made by the parties on whether any and if so what sanction(s) should be imposed before deciding whether and if so what sanction(s) should be imposed. |

| C362 | | At a hearing the Disciplinary Committee may: |
| --- | --- | --- |
| | C362.1 | admit any evidence whether oral or written, whether direct or hearsay, without any requirement that it be on oath and whether or not the same would be admissible in a court of law; |
| | C362.2 | make any directions which may be given at a pre-hearing review, and vary any direction which has been made; and |
| | C362.3 | make all such directions with regard to the conduct of and procedure at the hearing as the Disciplinary Committee considers appropriate for securing a proper opportunity for the parties to present their cases and otherwise as may be just. |

| C363 | A record of the pre-hearing review may be made at the request of any party or if the Chairman so decides.  A transcription or copy of the record will be made available to a party on payment of the cost of making such transcription or copy or a proportion thereof as the Secretary in his discretion shall determine.  For the avoidance of doubt, it shall be sufficient for such record to be in the form of minutes taken by the Secretary. |
| --- | --- |

| C364 | A record of the hearing will be made.  A transcription or copy of the record will be made available to a party on payment of the cost of making such transcription or copy or a proportion thereof as the Secretary in his discretion shall determine.  For the avoidance of doubt, it shall be sufficient for such record to be in the form of minutes taken by the Secretary. |
| --- | --- |

**Deliberations and decisions** [C370-C375]

| C370 | The Disciplinary Committee may deliberate at any time and make any decision in the absence of the parties.  The Disciplinary Committee may adjourn any hearing at any time as it thinks fit. The Disciplinary Committee is entitled to reach decisions on a majority basis. Where a majority decision is reached, this fact will not be disclosed.  In the case of an equality of votes, the Chairman shall have a second or casting vote which shall be exercised in favour of the **member firm**. |
| --- | --- |

| C371 | | Following the conclusion of the proceedings, the Disciplinary Committee will notify the parties in writing of: |
| --- | --- | --- |
| | C371.1 | its decision(s), including any penalty under rule C305 and any statement intended for publication; |
| | C371.2 | the reason(s) for its decision(s); |
| | C371.3 | any order for costs to be imposed; and |
| | C371.4 | a time limit for the lodging of any appeal against the written decision or any part thereof which will be not less than 10 days from the date of service on the parties of the written decision save in exceptional circumstances where the Disciplinary Committee may order a shorter period. |

| C372 | The matters at rules C371.1 to C371.3 will not take effect until the expiry of the period for the lodging of any appeal or any extension thereof.  If an appeal is lodged in relation to any or all of rules C371.1 to C371.3 the relevant matters at rules C371.1 to C371.3 will not take effect until the appeal is withdrawn or the Disciplinary Appeals Committee orders that they or any of them shall take effect. |

| C373 | The Disciplinary Committee may order any party to pay such reasonable costs as it thinks fit, regardless of any finding or the outcome of the case.  Such costs may include the remuneration and expenses of members of the Disciplinary Committee, the legal adviser, the Secretary and any costs incurred by the other party in the preparation and presentation of its case.  Costs may be awarded against the Exchange only if, in the opinion of the Disciplinary Committee, the Exchange has acted in bad faith in bringing or conducting the proceedings. Such order will be made only after the parties to the proceedings have been given the opportunity to make submissions on costs to the Disciplinary Committee. |

| C374 | Any **fine** shall be paid within 30 days of receipt of the written decision of the Disciplinary Committee or the conclusion of any appeal against that determination and any costs ordered to be paid shall be paid within 30 days of receipt of the notification in writing of the amount payable. |

| C375 | The Disciplinary Committee may publish part or all of its written decision or a summary of it, and the reasons for the decision. Where the sanction imposed is a private censure the Disciplinary Committee may publish its decision in part or a summary of it and the reasons for the decision without revealing the identity of the **member firm** sanctioned. |

**Appeal** [C380-C382]

| C380 | Appeals must be made by service of a notice in writing, within 10 days of the service of the Disciplinary Committee's decision, setting out the name of the appellant, the decision appealed against, the grounds of appeal, the principal matters relied upon and attaching copies of any documents relied upon on the Secretary to the Disciplinary Committee who will as soon as reasonably practicable serve a copy on the other party.  Where the appellant wishes to rely on evidence or documentation which was not before the Disciplinary Committee, this shall be stated in the notice together with details of such evidence and copies of such documentation shall be attached to the notice. |

| C381 | On receipt of a notice under rule C380, the Secretary to the Disciplinary Committee will arrange for the **Exchange** to appoint the Chairman and Members of the Appeals Committee and the Chairman will arrange a hearing as soon as reasonably practicable. |

| C382 | The Disciplinary Committee or the Appeals Committee may extend the time for appeal. |

**Changes to the procedures** [C390]

| C390 | The Disciplinary Committee may vary any of these procedures to adapt to the circumstances of any particular case. |

# Appeals Committee

**Role** [C400]

| C400 | The Appeals Committee shall hear and determine appeals against decisions of the Disciplinary Committee made pursuant to referrals made under rule C380 and appeals against decisions of the Executive Panel made pursuant to rule C280. |

**Sanctions** [C405]

| C405 | The Appeals Committee may uphold, quash or vary any decision by the Disciplinary Committee or the Executive Panel.  In the case of an appeal from the Executive Panel in a disciplinary case, the Appeals Committee may vary any penalty imposed by the Executive Panel subject to awarding a maximum **fine** of £50,000 for each breach. |

**Membership** [C410-C423]

| C410 | The Appeals Committee appointed following service of a notice pursuant to rule C280 or rule C380 (as applicable) shall have a quorum of three (including the Chairman).  The maximum number of members of the Appeals Committee shall be seven.  Any person whom the Appeals Committee co-opts will count as a member of the Appeals Committee. |

**RULES OF THE LONDON STOCK EXCHANGE**

| C411 | Members of the Appeals Committee are drawn from the panel referred to in rule C311. |
|---|---|

| C412 | The Appeals Committee may co-opt any person whom it considers appropriate. |
|---|---|

| C413 | The Chairman may appoint a legally qualified adviser who shall be independent of any party. Such legal adviser will not be counted as a member of the Appeals Committee but shall advise the Appeals Committee on legal matters. The Chairman may replace the legal adviser. |
|---|---|

| C414 | No-one who served on the Disciplinary Committee, whose decision is the subject of the appeal, nor its legal adviser nor anyone who is at the relevant time a member of the **Exchange's** staff, may be appointed or co-opted to the Appeals Committee. |
|---|---|

| C415 | Members of the Appeals Committee will notify the Secretary or the Chairman of any possible conflict of interest at the earliest possible opportunity and in any event prior to any hearing to be held under rule C452 or C455 below. The Chairman will take appropriate action and will then notify the parties to the disciplinary proceedings of the names of the members of the Appeals Committee and any proposed legal adviser. If any party to the disciplinary proceedings believes that a potential conflict of interest exists, it shall notify the Chairman at the earliest possible opportunity. The Chairman will take appropriate action. |
|---|---|

| C416 | | Where the Appeals Committee wishes to co-opt a person or to appoint a person to replace a member unable to act whether because of illness, conflict of interest or otherwise and the hearing has commenced: |
|---|---|---|
| | C416.1 | the appointment shall only take effect with the consent of the parties and the person co-opted or appointed will be subject to the provisions of rule C458; or |
| | C416.2 | if in the absence of such consent the Appeals Committee does not wish or is not able to continue with the hearing it will cease to deal with the appeal and an entirely new Appeals Committee will be appointed in accordance with these procedures and the hearing, but not any pre-hearing procedures, will start afresh in front of the new Appeals Committee. |

**Secretary** [C420-C423]

| C420 | The Secretary will carry out any administrative functions and act as secretary to the Appeals Committee. The parties will be notified of the name of such person as soon as reasonably practicable. For the avoidance of doubt, the Secretary may be a member of the Exchange's staff and notwithstanding rule C414 may be the same Secretary who was Secretary of the Disciplinary Committee. |
|---|---|

| C421 | Any notices, notifications and other documents required to be submitted to the Appeals Committee must be served upon the Secretary who will ensure that copies are provided to the other parties, the members of the Appeals Committee and any legal adviser as appropriate. Where the Appeals Committee wishes to notify the parties of any matter it shall do so through the Secretary. |
|---|---|

| C422 | | Any notices or other documents required to be served shall be served by delivering by hand or posting by first class post or by sending by fax with a confirmatory copy by first class post to the addresses set out below, save that the Secretary may agree with any of those referred to at C422.1 to C422.2 a different place for service upon them: |
|---|---|---|
| | C422.1 | in the case of an appellant, to its head office; |
| | C422.2 | in the case of the **Exchange**, to the Secretary with a copy to the Company Secretary, at the **Exchange's** registered office; and |
| | C422.3 | in the case of any other party, to a place agreed with the Secretary. |

| G | C423 | Service shall be deemed effective on the date of delivery by hand or, where first class post is used, on the second day after posting. |
|---|---|---|

*Guidance to Rule:*

*Member firms can send a courtesy copy in advance by fax, but service is deemed effective on the date of delivery either by hand, or on the second day, after posting first class.*

**Confidentiality** [C425-C427]

| C425 | All communications relating to the proceedings (save those which would be privileged from production in a court of law) between the parties and with the Appeals Committee shall be channelled through the Secretary. |
|---|---|

| C426 | If any Appeals Committee member or the legal adviser is approached by any person to discuss any matter connected with the hearing the member or legal adviser, as appropriate, shall notify the Chairman without delay, who will take appropriate action. |
|---|---|

| C427 | Other than as set out in these rules, and other than as between the parties and their advisers, all parties shall keep confidential any matters related to the appeal save where disclosure is permitted or required by law. |
|---|---|

**Procedure** [C450-C464]

| C450 | | Following service of a notice pursuant to rule C280 or C380 and the appointment of the Appeals Committee: |
|---|---|---|
| | C450.1 | the appellant may submit to the Appeals Committee a statement amending or expanding upon the notice; and |
| | C450.2 | any other party may submit to the Appeals Committee a statement in support of its case and any such party wishing to rely on evidence or documents not already before the Appeals Committee must submit a statement containing details thereof and attach to it copies of any such documents. |

| C451 | If both parties consent in writing to the Secretary, the appeal may be by written submissions only. |
|---|---|

**Directions** [C452]

| C452 | The Appeals Committee shall make any directions including any that may be made by the Disciplinary Committee and take any other steps it considers appropriate including holding pre-hearing reviews for the clarification of the facts and issues and generally for their just, efficient and expeditious presentation and the proper determination of the appeal. |
|---|---|

**The hearing** [C455-C464]

| C455 | The Appeals Committee will usually conduct hearings in private, although an appellant which is subject to proceedings has the right to ask for such hearing to be conducted in public. An appellant requiring such hearing to be conducted in public shall notify the Chairman at least five days prior to commencement of the hearing. |
|---|---|

| C456 | Any party may be legally represented at any hearing. |
|---|---|

| C457 | The parties will be given not less than 10 days notice of the time and place of the hearing by the Secretary. The notice period may be shortened with the consent of the parties. |
|---|---|

| C458 | If a party fails to attend or be represented at any hearing or pre-hearing review, the Appeals Committee may proceed in its absence. |
|---|---|

| C460 | | At the hearing: |
|---|---|---|
| | C460.1 | the members of the Appeals Committee and the legal adviser will be introduced to the parties by the Chairman who will state that each of the members and the legal adviser believes himself to have no conflict of interest in hearing the appeal; |
| | C460.2 | the parties will be asked to confirm that there is no reasonable objection to any of the Appeals Committee members hearing the appeal or to the legal adviser on the grounds of conflict of interest or otherwise; and |
| | C460.3 | if the Appeals Committee, which for these purposes shall exclude any member objected to and shall have a quorum of two, upholds an objection, the Chairman may appoint a replacement in accordance with these procedures. |

| C461 | The order of proceedings shall be at the discretion of the Appeals Committee. |
|---|---|

| C462 | No party may rely on any statement or document not served on the Appeals Committee more than two **business days** before the hearing save with the leave of the Appeals Committee. |

| C463 | Save in exceptional circumstances and with the leave of the Appeals Committee, no party may present evidence (including calling new witnesses) that was not available to the Disciplinary Committee or the Executive Panel, although additional submissions may be made. Whether such new evidence should be permitted and, where it is permitted, the procedure for its presentation shall be decided on a case by case basis by the Appeals Committee. |

| C464 | A record of any hearing will be made. A transcription or copy of the record will be available to any party, on payment of the cost of making such transcription or copy or a proportion thereof as the Secretary in his discretion shall determine.  For the avoidance of doubt, it shall be sufficient for such record to be in the form of minutes taken by the Secretary. |

**Deliberations and decisions** [C470-C475]

| C470 | The Appeals Committee may deliberate at any time and make any decision in the absence of the parties. The Appeals Committee may adjourn any hearing at any time as it thinks fit. The Appeals Committee is entitled to reach decisions on a majority basis.  Where a majority decision is reached this will not be disclosed.  In the case of an equality of votes, the Chairman shall have a second or casting vote which shall be exercised in favour of the appellant. |

| C471 | The Appeals Committee will only quash or vary a decision of the Disciplinary Committee or the Executive Panel if it is satisfied, on the balance of probabilities, that the decision is a misinterpretation of or an erroneous application of any of these rules or is not justified by the evidence on which it is based. |

| C472 | Following the conclusion of the proceedings, the Appeals Committee will notify the parties in writing of: |
| C472.1 | its decision(s), including any statement intended for publication; |
| C472.2 | the reason(s) for its decision; and |
| C472.3 | any order for costs to be imposed. |

| C473 | The Appeals Committee may order any party to the proceedings to pay such reasonable costs as it thinks fit regardless of any finding or the outcome of the case.  Such costs may include the remuneration and expenses of members of the Appeals Committee, the Secretary and the legal adviser and any costs incurred by any other party in the preparation and presentation of its case.  Costs may be awarded against the Exchange only if, in the opinion of the Appeals Committee, the Exchange has acted in bad faith in bringing or conducting the proceedings. Such order will be made only after the parties to the proceedings have been given the opportunity to make submissions on costs to the Appeals Committee. |

| C474 | Any **fine** shall be paid within 30 days of receipt of the written decision of the Appeals Committee and any costs ordered to be paid shall be paid within 30 days of receipt of the notification in writing of the amount payable. |

| C475 | The Appeals Committee may publish part or all of its written decision or a summary of it, and the reasons for the decision. |

**Changes to the procedures** [C490]

| C490 | The Appeals Committee may vary any of these procedures to adapt to the circumstances of any particular case. |

## Consent orders

| C500 | At any time after the **Exchange** has decided to refer a case to the Executive Panel or Disciplinary Committee, the **Exchange** and the **member firm** may without prejudice negotiate a proposed settlement ("consent order") and jointly submit it in writing to the Executive Panel or Disciplinary Committee for approval.  A disciplinary action may at the discretion of the **Exchange** be delayed, and if already commenced – halted, by the commencement of the negotiation of a consent order. |
|---|---|

| C501 | At the request of the **member firm**, the consent order submitted to the Disciplinary Committee for approval may be anonymous, provided the **Exchange** has reasonable grounds for believing that this will have no impact on the decision taken by the Disciplinary Committee.  The Disciplinary Committee retains the right to insist that the name of the **member firm** is disclosed to it. |
|---|---|

| C502 | If the Executive Panel or Disciplinary Committee approve the proposed consent order, or any variation agreed by the **Exchange** and the **member firm**, it shall immediately make the order. |
|---|---|

| C503 | The consequences of a consent order made by the Executive Panel or Disciplinary Committee shall be the same as those of a decision made by the Executive Panel or Disciplinary Committee sitting as a tribunal of first instance, except that there can be no appeal and the consent order and penalties on any charges to which it relates shall have immediate effect. |
|---|---|

| C504 | The Executive Panel or Disciplinary Committee shall, in considering the consent order, take into account and give due weight to the fact that the parties are jointly applying for the consent order to be made. |
|---|---|

| C505 | If the Executive Panel or Disciplinary Committee does not approve the proposed consent order, there shall be no reference in any hearing before the Executive Panel or Disciplinary Committee to the negotiations, the proposed consent order or the submissions made to the Executive Panel or Disciplinary Committee, all of which shall be confidential. |
|---|---|

| C506 | Where rule C505 applies, the Executive Panel or Disciplinary Committee constituted to hear the disciplinary charges shall contain no person who was part of the Executive Panel or Disciplinary Committee that considered the consent order. |
|---|---|

# DEFAULT RULES

**Default rules** [D010 ]

| | | |
|---|---|---|
| | D010 | In the case of default by a **member firm**, the provisions of the **default rules** prevail over the rules and the **settlement rules**, insofar as they conflict. |

*(Amended N08/10 – effective 15 April 2010)*

**Unsettled contracts** [D020]

| | | |
|---|---|---|
| G | D020 | Any **relevant principal contract** or **relevant agency contract** shall be unsettled for the purpose of these **default rules** if at the time of declaration of default the contract has not been fully performed. |

*Guidance to Rule:*

*A **relevant agency contract** is deemed to be fully performed for the purposes of these rules once the market principal has performed its obligations to the agency broker. Onward performance from the agency broker to the end client is outside the scope of the **default rules**.*

*Central counterparty contracts*

*Contracts between LCH.Clearnet Ltd and **General Clearing Members** ("clearing members") are subject to LCH.Clearnet Ltd rules on default. In the event of a clearing member default, LCH.Clearnet Ltd may decide to allow clearing member positions relating to trades by **Non Clearing Members** to settle, or to transfer them to other clearing members, in which case such **on Exchange** dealing member contracts will not become **relevant agency contracts / relevant principal contracts** under the **Exchange's** rules. In the event that LCH.Clearnet Ltd closes out such clearing member contracts under its **default rules**, then related **on Exchange** contracts between the clearing member and the dealing member will become **relevant agency contracts / relevant principal contracts** under the **Exchange's** rules.*

*Partial performance of a **central counterparty contract** is deemed as full performance of that part of the contract for the purposes of rule D020 and the rest of the contract shall be treated as a **relevant agency contract / relevant principal contract**.*

*(Amended N09/17 – effective 3 January 2018)*

| | | |
|---|---|---|
| G | D021 | Rule D020 shall apply to any **unsettled claims** which are notified to the **Exchange** by the **defaulter** or the counterparty within such time as may be specified by the **Exchange** in relation to the default. The time so specified by the **Exchange** will be a minimum of 30 calendar days. Any claims which are not so notified will not be regarded as **unsettled claims** only for the purpose of applying the **Exchange's default rules**. |

*Guidance to Rule:*

*The **Exchange** will require those parties that believe they have **unsettled claims** with the **defaulter** to provide details of those **unsettled claims** to the **Exchange**. If such details are provided, the **Exchange** will determine whether the relevant **unsettled claim** qualifies for inclusion in its default procedures (i.e. whether they were, indeed, unsettled with the **defaulter** at the time the default was declared and arose from an unsettled **on Exchange** trade).*

*As a general rule, where the trade as executed (including the impact of any claim) has the same cum or ex status as the **hammer price**, the resulting net amount calculation will take the claim into account. However, where this is not the case, the resulting net amount calculation will be amended to reflect the claim.*

*References to trades in the **default rules** include references to **unsettled claims** where appropriate.*

*(Amended N08/10 – effective 15 April 2010)*

**RULES OF THE LONDON STOCK EXCHANGE**

**The default official** [D050-D052]

| | |
|---|---|
| D050 | The **Exchange** shall appoint and may from time to time remove and replace a **default official** who shall have power to represent the **Exchange** in relation to, and to assist in the administration of the affairs of, a **member firm** which has been declared a **defaulter** in accordance with the rules of the **Exchange** and to perform such functions in relation thereto as the **Exchange** may from time to time determine (subject to the provisions of any applicable laws of any territory). |

| | | |
|---|---|---|
| D051 | | The powers and functions of the **default official** shall include the right to: |
| | D051.1 | obtain from a **defaulter** copies of or information as to its original books of account, records and all other necessary documents; |
| | D051.2 | attend meetings of creditors; |
| | D051.3 | summon that **member firm** or any officer thereof before such meetings; |
| | D051.4 | enter into a strict examination of every account; |
| | D051.5 | investigate and report to the **Exchange** upon any contracts found to have been effected at unfair prices; |
| | D051.6 | require that **member firm** or any officer thereof to assist with any inquiries raised; and |
| | D051.7 | issue such certificates as may be required pursuant to these rules. |

| | |
|---|---|
| D052 | One or more deputy **default officials** may also be appointed by the **Exchange** and reference in these rules to the **default official** shall include a deputy **default official** unless the context otherwise requires. |

**Declaration of defaulters** [D100-D115]

| | | |
|---|---|---|
| D100 | | A **member firm** may, and shall if the **Exchange** is so directed pursuant to section 166 or 167 Companies Act 1989, be declared a **defaulter** by direction of an authorised signatory or signatories of the Exchange where the **member firm**: |
| | D100.1 | is unable to fulfil its obligations in respect of one or more **Stock Exchange market contract** (s); or |
| | D100.2 | appears to be or to be likely to become so unable. |

| | |
|---|---|
| D105 | Declaration of default shall be made in such manner as the **Exchange** shall decide. |

| | |
|---|---|
| D106 | Once a **member firm** has been declared a **defaulter** in accordance with rule D100, the rules and procedures set out in the **default rules** shall apply to any **Stock Exchange market contract** to which the **defaulter** is at the time of default a party.<br><br>(Amended N08/10 – effective 15 April 2010) |

**Cessation of membership** [D110-D111]

| | |
|---|---|
| D110 | Any **member firm** declared a **defaulter** shall thereupon cease to be a **member firm**, but shall nevertheless be bound to take or refrain from taking all such action, and suffer all such things to be done, as the **default rules** require in the case of a **defaulter** and shall continue to be bound by the **default rules** in relation to all matters, transactions and circumstances arising while it was a **member firm**. |

*(Amended N08/10 – effective 15 April 2010)*

| | |
|---|---|
| D111 | A **member firm** has seven days from the date of declaration of default in which to appeal against the termination of its membership. A **member firm** may appeal against the termination of its membership in accordance with the procedures set out in the **compliance procedures** but may not appeal against the declaration of default. In the event that the **defaulter** does not appeal within this time, or the appeal against termination of membership is dismissed, the **defaulter** will cease to be a **member firm**. |

**RULES OF THE LONDON STOCK EXCHANGE**

**Notifications** [D115]

| D115 | Upon a declaration of default the **default official** shall, as soon as is reasonably practicable: |
|---|---|
| D115.1 | notify the **defaulter** of the declaration; |
| D115.2 | arrange for the removal of all displayed orders and suspend the submission of any new orders of the **defaulter** in **central counterparty securities** on the **Exchange trading system** and if the **defaulter** is a General Clearing Member orders of any **member firm** for which the **defaulter** clears; |
| D115.3 | in relation to any unsettled or any unexercised **relevant principal contracts** notify the parties to such contracts of the default and of any decision taken under the **default rules** in relation to those contracts; |
| D115.4 | in relation to any unsettled or any unexercised **relevant agency contracts** and any associated **central counterparty contracts** to which the **defaulter** is a party notify the parties to such contracts of the default and the identity of the other party to the contract; and |
| D115.5 | in the case of a **clearing member** default: |
| | 1. request the **settlement system operator** to suspend settlement of all on **Exchange** transactions to which the **defaulter** is a party; and |
| | 2. declare that any unsettled **central counterparty contract** between the **defaulter** and the **central counterparty** be dealt with in accordance with the rules of the relevant **central counterparty**. |

**Unsettled relevant principal contracts** [D120-D149]

| D120 | It shall be a term of every **relevant principal contract**, that from and after the making of a declaration of default in respect of a **member firm** which is party thereto as a **principal**, the obligations of the **defaulter** and the **counterparty** under the contract to deliver and pay against delivery (if the contract is unsettled at the time of the declaration) shall be discharged and be replaced by an obligation on one of them to pay to the other the amount calculated in accordance with rules D140 to D144 and the liability of each other **person** who is party thereto as **agent** shall thereupon cease. |
|---|---|

*(Amended N09/17 – effective 3 January 2018)*

**Fixing hammer prices on declaration of default** [D130-D132]

| D130 | In every case of declaration of default, the **default official** shall for any security which is the subject of an unsettled **relevant principal contract**, except in respect of a **relevant principal contract** which has been transferred in accordance with rule D195, fix the **hammer price** and notify the **defaulter** and its **counterparty** of the **hammer price**. |
|---|---|

**RULES OF THE LONDON STOCK EXCHANGE**

| | | |
|---|---|---|
| D131 | | In relation to rule D130, the **hammer price** shall be determined by the **Exchange**: |
| | D131.1 | for any security **admitted to trading** at the time of default (and not suspended), in accordance with: |
| | | 1.  the middle price current in the market immediately before a declaration of default if the time of default is during the **mandatory period**; or |
| | | 2.  the closing price before a declaration of default if the time of default is after the end of the **mandatory period**; |
| | D131.2 | for any security suspended or not **admitted to trading** at the time of default, such price as is reasonably determined by the **Exchange** to be the most relevant for that security.  In making its determination, the **Exchange** shall have regard to the following factors in order of priority: |
| | | 1.  the price or prices at which any business was last done in the relevant security on the **Exchange**; |
| | | 2.  the appropriate middle price current on another market immediately before a declaration of default, or the price or prices at which any business was last done on such a market, where that market is reasonably determined by the **Exchange** to be the most relevant for that security; |
| | | 3.  the price or prices current in the market (whether an **Exchange** market or another market) at a relevant time prior to a declaration of default including, where appropriate, a relevant time preceding a suspension or other event that resulted in a cease to trading in a given security (temporarily or permanently) on the **Exchange**; |
| | | 4.  information from any member firm or any relevant governmental or regulatory body (e.g. the UK's Debt Management office) that is relevant to the pricing of a given security; or |
| | | 5.  information from the **registrar** or company secretary of the relevant company as to the consideration for any recent transfers of that security. |
| | D131.3 | If the price or prices derived under D131.1 or D131.2 are not available or not appropriate, such price as is reasonably determined by the **Exchange** to be the most relevant for that security, in which it may have regard to all, any or none of the factors set out in rule D131.2. |

*(Amended N08/10 – effective 15 April 2010)*

| | |
|---|---|
| D132 | The determination of **hammer prices** by the **default official** shall, in the absence of manifest error or successful objection, be final and binding on all concerned. |

*(Amended N08/10 – effective 15 April 2010)*

**Establishing the net amount due [D140-D144]**

| | | |
|---|---|---|
| D140 | | If the **hammer price** exceeds the **contract price**, the **defaulter** shall: |
| | D140.1 | if the **relevant principal contract** was for purchase by the **defaulter**, be entitled to receive from the **counterparty** the amount of such excess; |
| | D140.2 | if the **relevant principal contract** was for sale by the **defaulter**, be obliged to pay to the **counterparty** the amount of such excess. |

*(Amended N08/10 – effective 15 April 2010)*

**RULES OF THE LONDON STOCK EXCHANGE**

| D141 | | If the **hammer price** falls short of the **contract price**, the **defaulter** shall, |
|---|---|---|
| | D141.1 | if the **relevant principal contract** was for purchase by the **defaulter**, be obliged to pay to the **counterparty** the amount of such shortfall; |
| | D141.2 | if the **relevant principal contract** was for sale by the **defaulter**, be entitled to receive from the **counterparty** the amount of such shortfall. |

*(Amended N08/10 – effective 15 April 2010)*

| D142 | If the **hammer price** is the same as the **contract price**, neither the **defaulter** nor the **counterparty** shall be obliged to make any payment to the other. |
|---|---|

*(Amended N08/10 – effective 15 April 2010)*

| D143 | | The **Exchange** shall establish the net amount to be paid to the **defaulter** by each **counterparty** or claimed from the **defaulter** by each **counterparty** as the result of the application of these **default rules** to any unsettled **relevant principal contract** after: |
|---|---|---|
| | D143.1 | aggregating all sums due by each **principal** to the other in relation to such contracts; and/or |
| | D143.2 | offsetting the aggregate sums due by each **principal** to the other in relation to such contracts. |

*(Amended N08/10 – effective 15 April 2010)*

| D144 | | For the purpose of discharging the amounts calculated in respect of all unsettled **relevant principal contracts** as between the **defaulter** and the **counterparty:** |
|---|---|---|
| | D144.1 | there shall be aggregated all the relevant amounts which are in the same currency, treating amounts due by the **defaulter** as positive and amounts due by the **counterparty** as negative ("currency aggregate"); |
| | D144.2 | if a currency aggregate is not denominated in sterling, it shall be converted into sterling at the wholesale spot rate of exchange as reasonably determined by the **Exchange** to be the prevailing market rate, according to a suitable provider of wholesale currency exchange rate data, for the purchase of sterling with the relevant currency at the time of default or, in the absence of such a rate of exchange, such other rate of exchange deemed appropriate by the **default official** ("currency aggregate sterling equivalent"). |
| | D144.3 | all the currency aggregate sterling equivalents and in the case of any currency aggregate denominated in sterling, the amount of that currency aggregate shall then be aggregated ("final sterling amount"); |
| | D144.4 | if the final sterling amount is a negative figure, the **counterparty** shall be obliged to pay to the **defaulter** in sterling an amount equal to the final sterling amount; and |
| | D144.5 | if the final sterling amount is a positive figure, the **defaulter** shall be obliged to pay to the **counterparty** in sterling an amount equal to the final sterling amount. |

*(Amended N08/10 – effective 15 April 2010)*

**Objections** [D145]

| D145 | Any objection as to the **hammer price** or, where applicable, the spot rate(s) of exchange used to calculate currency aggregate sterling equivalents shall be lodged with the **default official** in writing within five days of the date of notification.  Any objection to the **hammer price** or the spot rates of exchange shall be determined by two senior **Exchange** personnel (who are not involved in the operation of the default and who have been appointed for this purpose by a director of the **Exchange)**, whose determination shall be final and binding on all concerned. |
|---|---|

*(Amended N08/10 – effective 15 April 2010)*

**Certification** [D146-148]

| | |
|---|---|
| D146 | The **Exchange** shall certify the net amount to be paid to or claimed from the **defaulter** as the result of the application of these **default rules** to any unsettled **relevant principal contract**, or, if such be the case, that none is to be paid, and shall notify the parties to such contracts. |

*(Amended N08/10 – effective 15 April 2010)*

| | |
|---|---|
| D147 | In respect of a **relevant principal contract** the amount of any consideration which is unpaid or overpaid shall, with reference to the terms of the contract, be calculated by the **default official** who shall ensure that the calculated amount is included in establishing the net amount for certification. |

*(Amended N08/10 – effective 15 April 2010)*

| | |
|---|---|
| D148 | A **member firm** acting as **agent** for a **counterparty** in relation to a **relevant principal contract** in respect of which rules D140 to D144 take effect shall not be liable for any amount due to or from that **counterparty** by virtue thereof. |

*(Amended N08/10 – effective 15 April 2010)*

**Securities already delivered** [D149]

| | |
|---|---|
| D149 | Rules D120 to D148 shall not apply in respect of securities the subject of a **relevant principal contract** which have been delivered and paid for prior to declaration of default, and those securities shall not be returned. |

*(Amended N08/10 – effective 15 April 2010)*

**Unsettled relevant agency contracts** [D150-D155]

| | |
|---|---|
| D150 | Notwithstanding the declaration of default, those persons who are parties as **principal** to an unsettled **relevant agency contract** (other than a **relevant agency contract** in respect of a **central counterparty transaction**) shall remain obliged to complete that contract on the terms on which it was originally dealt. |

| | | |
|---|---|---|
| G | D151 | For a transaction falling under rule D150 the **default official** shall provide details of the **defaulter's customer** or **counterparty** in respect of any such contract to the non-defaulting **member firm** and the non-defaulting **member firm** shall write to that **customer** or **counterparty** forthwith in a form prescribed by the **Exchange** requiring him to settle the contract. |

*Guidance to Rule:*

*If the **defaulter** is acting as a **Non Clearing Member** in relation to an unsettled **relevant agency contract**, rules D150 and D151 shall continue to apply and the relevant **General Clearing Member** of the **defaulter** shall be the non-defaulting **member firm** for the purposes of rule D151.*

*As set out in rule 5253, partial performance of net settlements between the **General Clearing Member** and the **Non Clearing Member** or its **settlement agent** (or directly from the **central counterparty** to the **Non Clearing Member** or its **settlement agent**) in respect of agency **central counterparty transactions** shall be deemed to have performed the **General Clearing Member's** obligations to the **Non Clearing Member's** clients in respect of these **central counterparty contracts** on a pro rata basis, whether or not allocation has been made on this basis.*

*(Amended N08/10 – effective 15 April 2010)*

| | | |
|---|---|---|
| G | D152 | Rules D150 and D151 will not be applicable where a **defaulter** has acted in both **principal** and agency capacity in relation to a single trade, as detailed in the guidance below. The **Exchange** will instead treat the agency trade as a **relevant principal contract.** Accordingly, the relevant **hammer price** will be applied to these trades and a net sum calculated in accordance with rules D140-144, payable to or from the **defaulter** by each of the **defaulter's customers**, as appropriate. |

*Guidance to Rule:*

*For the purposes of this rule, a **defaulter** will be deemed to have acted in both principal and agency capacity in relation to a single trade if its agency operation (using a **member ID** identified as being associated with its agency operation) has traded with its market making or principal trading operation (using a different **member ID** identified as being associated with its principal operation) when executing some or all of its agency business.  In such cases, the application of the **Exchange's default rules** for unsettled **relevant agency contracts** would not be effective as the broker on both sides of the trade is the **defaulter**. Instead, the **Exchange** will treat the trade as an unsettled **relevant principal contract** (i.e. as though the **defaulter** dealt as **principal** with its **customer**), so that there can be a resolution of the unsettled transaction.*

*(Amended N08/10 – effective 15 April 2010)*

| | D154 | If the **member firm** which originally dealt the unsettled **relevant agency contract** with the **defaulter** is unable to settle the contract with the **defaulter's customer** or **counterparty** within one month of writing to that **customer** or **counterparty** pursuant to rule D151, having made all reasonable efforts to do so, then such **member firm** shall be permitted to close the unsettled **relevant agency contract** by purchasing or selling securities in the market and either accounting for any profit arising to that **customer** or **counterparty** or claiming any loss arising against that **customer** or **counterparty**. |
|---|---|---|

*(Amended N08/10 – effective 15 April 2010)*

| | D155 | If the **default official**, in relation to an unsettled **relevant agency contract** in the form of an **agency cross** to which the **defaulter** is a party, is unable to settle the contract with the **defaulter's customer** or **counterparty**, within one month of writing to that **customer** or **counterparty** pursuant to rule D151, having made all reasonable efforts to do so, then the **default official** shall be permitted to close the unsettled **relevant agency contract** by purchasing or selling securities in the market and either accounting for any profit arising to that **customer or counterparty** or claiming any loss arising against that **customer** or **counterparty**. |
|---|---|---|

*(Amended N08/10 – effective 15 April 2010)*

**Lending arrangements** [D160-D164]

| G | D160 | Rule D161 shall apply only to lending arrangements which are notified to the **Exchange** by the **defaulter** or the **counterparty** within such time as may be specified by the **Exchange** in relation to the default.  The time so specified by the **Exchange** will be a minimum period of 30 calendar days.  Any **lending arrangements** which are not so notified will not be regarded as **Stock Exchange market contracts** only for the purpose of applying the **Exchange's default procedures**. |
|---|---|---|

*Guidance to Rule:*

*Where the **defaulter** and **counterparty** do not notify unsettled **on Exchange lending arrangements** to the **Exchange** within the period specified by the **Exchange** in relation to the default, those **lending arrangements** will be excluded from the **default procedures**. However they will continue to be regarded as **Exchange** transactions for all other purposes (e.g. SDRT relief).  The time specified by the **Exchange** for notifying lending arrangements may be extended where the **Exchange** considers that circumstances require.*

*(Amended N43/09 – effective 21 September 2009)*

**RULES OF THE LONDON STOCK EXCHANGE**

| D161 | Upon declaration of default in respect of a **member firm** which is a party as **principal** to an unsettled **Stock Exchange market contract** in the form of a **lending arrangement**, all unperformed obligations of the **defaulter** and the **counterparty** shall be discharged and replaced by an obligation on one of them to pay to the other the amount, if any, calculated in accordance with the following provisions: |
|---|---|
| D161.1 | the value of securities to be delivered by each party shall be established in accordance with the agreement regulating lending procedures between them; |
| D161.2 | the value of cash payments to be made by each party shall be established in accordance with the agreement regulating lending procedures between them; and |
| D161.3 | on the basis of those values, an account shall be taken as at the time of the declaration of default, of what is due from each party to the other and the sums due from one party to the other shall be offset against the sums due from that other and only the balance of the account shall be payable by the party having the claim valued at the lower amount pursuant to these provisions. |

*(Amended N43/09 – effective 21 September 2009)*

| D162 | Rule D161.1 shall apply notwithstanding any requirement in the agreement regulating lending procedures that the **counterparty** shall provide any notification to the **defaulter** or elect to withhold any delivery or payment provided for under the agreement. |
|---|---|

*(Amended N43/09 – effective 21 September 2009)*

| D163 | In the case of an unsettled **Stock Exchange market contract** in the form of a **lending arrangement**, any reference in rule D161 to securities shall include any asset other than cash provided by way of collateral pursuant to the agreement regulating lending procedures between the **defaulter** and the **counterparty**. |
|---|---|

*(Amended N43/09 – effective 21 September 2009)*

| D164 | The **Exchange** shall ensure that any net sum resulting from the application of rule D161 is included in establishing the net amount for certification. |
|---|---|

*(Amended N43/09 – effective 21 September 2009)*

**General clearing member contracts** [D195]

| D195 | In the event of the default of a **General Clearing Member** the rights and obligations of the **defaulter** under any unsettled **central counterparty contracts** between the **defaulter** and a **member firm** using the services of the **defaulter** may be transferred to another **General Clearing Member** or allowed to settle as dealt at the sole discretion of the relevant **central counterparty**, in which event the **Exchange's default rules** will not be applied in respect of those contracts. |
|---|---|

**Exceptions from these rules** [D200]

| D200 | Any unsettled **relevant principal contract** or **relevant agency contract** that is dealt for settlement by means of any settlement process will be subject to the **default rules** unless: |
|---|---|
| D200.1 | the settlement process will proceed despite the declaration of default because: |
| | 1. the contract entered into by the **defaulter** is to be settled through that settlement process through the service of an **agent**; or |
| | 2. the process replaces or alters the rights and obligations of the contracting parties such that the declaration cannot disrupt or interrupt the process; or |
| D200.2 | in respect of unsettled **relevant contracts**, the settlement process has **default rules** that, in the opinion of the **Exchange**, adequately provide for their binding resolution |

*(Amended N08/10 – effective 15 April 2010)*

