# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CUSTOMS AND TAX ADMINISTRATION O0F THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**EXPERT REBUTTAL REPORT OF MARCIA S. WAGNER**

**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

I, Marcia S. Wagner, hereby submit the following Expert Rebuttal Report in connection with the above-captioned matter.

## I.    INTRODUCTION AND PURPOSE OF REPLY

1.    I previously submitted an expert report on this matter on December 31, 2021 ("Initial Expert Report").  After Defendants submitted their Report, counsel for the Plaintiffs asked me, as an expert on the standards applicable to the qualification and administration of 401(k) retirement plans, to comment on the Expert Report of Fred Reish dated December 31, 2021 (the "Reish Report") and whether it adequately assesses whether the 193 plans at issue departed from those standards. [1]  My qualifications as an expert and my compensation for preparing this rebuttal are the same as stated in my Initial Expert Report.  Capitalized terms herein have the same meaning as in my Initial Expert Report.  In addition to the documents reviewed in connection with my Initial Expert Report, I have also reviewed the documents listed in Appendix A hereto for purposes of this rebuttal.

2.    I declare that the opinions expressed below, which are based on over three decades of experience with the administration and qualification of pension plans under the Code, are true and correct to the best of my knowledge and belief.

## II.    SUMMARY

3.    Based on my long involvement with the governance and administration of tax-qualified retirement plans, it is my opinion that the Reish Report not only falls short of its stated objective of helping the fact finders in this case evaluate whether the Defendant Plans were true tax-qualified retirement plans but is also misleading due to its failure to take a comprehensive

---

[1] In my Initial Expert Report, I also expressed my opinion on the professional standards that applied to the defendant Michael Ben-Jacob ("Ben-Jacob"), in connection with certain of the Plans, and on whether Ben-Jacob departed from applicable professional standards. The Reish Report does not address that aspect of my Expert Report.

review of the Plans' numerous violations of tax-qualified plan requirements and their departures

from fiduciary norms that included establishing Plans:

- · For purposes other than providing retirement benefits to Plan participants;

- · Calculated to benefit third parties to whom they paid virtually
  the entire proceeds received from participating in DWT refund claims;

- · Having from the outset a temporary nature and duration;

- · Whose sponsors generally conducted no trade or business and had no income
  therefrom to support contributions to the Plan;

- · Locked into transactions no other broker was offering with excessive, if not
  confiscatory, fees;

- · Generally funded improperly and operated with no distinction between Plan assets
  and assets of Plan participants;

- · Whose assets were held by foreign trusts in violation of U.S. norms;

- · Whose trusts allowed the improper commingling of Plan assets; and

- · That in many instances were administered in disregard of the terms in the Plan and
  trust instruments.

4.      The Reish Report asserts that the Plans were merely deficient in meeting a few

vague and correctable "concept[s] of propriety," but this conclusion is premised on treating

certain deficiencies in isolation from one another and ignoring others.  A more holistic and less

superficial review that considers everything together makes it apparent that the Plans were

merely vehicles used to carry out the Solo transactions which benefitted a narrow group of

individuals, such as Sanjay Shah and the Argre principals.  Not every Plan was similarly situated,

and not every Plan was guilty of every qualified plan requirement violation cited in my Initial

Expert Report, but this would not have prevented them from disqualification based on the

particular facts applicable to each Plan as well as how they were used together.

III.    OPINIONS

A.    Characterizing the Scheme as A Nontraditional Investment Strategy Is Disingenuous

5.    The Reish Report states that one-person 401(k) plans may invest in a broader range of investments than larger 401(k) plans, and that one-person plans may be willing to pursue less traditional investment strategies.[2]  While it is true that a plan investment manager (or plan participant in the case of a self-directed plan) may choose to invest plan assets in any type of nontraditional asset with a reasonable strategy for long-term gain, the Reish Report neglects to say that this does not apply if the transaction is calculated to enrich others, as it was here. Moreover, most plan documents, including those I have reviewed in this case, require thorough vetting of an investment to determine its prudence, a process that was largely ignored by the Plan sponsors.[3] However, in my opinion, the most fundamental objection to describing the Solo transaction as a nontraditional investment strategy is that it was not a real investment, and the Plans did not actually commit any of their own funds to the purchase of Danish stocks; they simply lent their names to the filing of withheld dividend reclaims in return for a fee.[4]

6.    Moreover, the Reish Report's classification of the Danish stock trading and DWT refund claims as a non-traditional investment strategy is not meaningful or probative as to the

---

[2] Paragraphs 19-21 of the Reish Report comment that one-person pension plans are commonplace and recognized by the Internal Revenue Service ("IRS").  I do not take issue with this observation, but it is irrelevant, since neither the Complaint nor my Initial Expert Report suggests to the contrary.  My criticism relates to the way in which the Plans were used which fell far outside pension industry norms.

[3] See, e.g., J. van Merkensteijn Tr. at 74:6-9 ("This is -- this is trading. I'm not involved in the trading, number one, so I didn't get into the detail of that."); D. Bradley Tr. at 17:15 – 18:5; R. Jones Tr. at 75:7-11.

[4] See, e.g. R. Altbach Dep. Tr. at 39:7-10 ("Specifically that I would have no risk and no investment.  You're calling it an investment, but I didn't make an investment."); D. Zelman Dep. Tr. at 28:23-24 (Zelman was told by van Merkensteijn that Zelman "would not have to put money up"); id. at 31:3-4 ("My understanding was that I didn't have any financial risk."); J. van Merkensteijn Dep. Tr. at 131:11-12 (van Merkensteijn would have told Zelman he didn't have to put up any money.); id. at 177:6-8 (van Merkensteijn told Edwin Miller that he did not have any financial risk of losing money); Id. at 177:21-78:1 (same for Ronald Altbach and Perry Lerner); R. Klugman Tr. 126:2-19 (Klugman understood the plans purchased shares with no money down, with all the cash for the purchase coming from a stock loan transaction); P. Lerner Dep. Tr. at 43:24 – 45:15.

prudence or acceptability of the scheme as a retirement plan asset.  Purported offsetting transactions in foreign securities (the precise mechanics of which not even the most sophisticated Plan participant admits to having understood)[5] undertaken at the direction of third parties to obtain dividend refunds primarily for the  benefit of those third parties should not, in my opinion, be viewed as an investment strategy, let alone, a  proper investment strategy for the types of 401(k) plans at issue in this proceeding.  The Solo Capital transaction was qualitatively different from an aggressive nontraditional investment that might have been preferred by a sophisticated one-person plan investor, who would in fact be the person making the investment decision, generally after receiving a detailed private placement memorandum from a legitimate financial institution describing the transaction and its attendant risks and rewards.  This is vastly different from the "opportunity" pursued by the Plans in this litigation in light of the number of unresolved legal and economic viability issues raised by Solo Capital's scheme that should have been recognized by the Plan sponsors and addressed by their advisors.

B.    <u>The IRS Is Not The Sole Party That Can Determine The Tax-Qualified Status of A Plan</u>

7.    The Reish Report is correct that the IRS is the federal agency with the primary authority to determine a retirement plan's tax qualified status. Contrary to the Reish Report's suggestion, it is not true that, without IRS disqualification, a plan with operational defects must be treated as qualified.  While it is widely regarded as a best practice for a plan to obtain a favorable determination letter or an opinion letter confirming that the plan in form is a tax-qualified plan, there is no requirement under the Code that approval by the IRS is a necessary condition to establish its tax qualified status. Similarly, a plan can cease to be tax-qualified in the

---

[5] *See, e.g.*, R. Lehman Dep. Tr. at 223:4-17; R. Klugman Dep. Tr. at 103:24 – 104:14; R. Markowitz Dep. Tr. at 175:6-25, 273:17 - 20; J. van Merkensteijn Dep. Tr. at 69:5 – 70:21.

absence of an IRS determination to that effect. For example, in the bankruptcy context, a bankruptcy court can determine that a plan is no longer tax-qualified even after the IRS has issued a favorable determination letter because, as the Reish Report acknowledges, as a substantive matter a plan must be qualified in both form and operation.[6] This point was reiterated in the IRS opinion letter issued to Broad Financial, the document preparer of the RJM Capital Plan, which stated: "Our opinion on the acceptability of the form of the plan is not a ruling or determination as to whether an employer's plan qualifies under Code section 401(a) … The terms of the Plan must be followed in operation."[7] Therefore, the fact that the IRS has not formally disqualified a plan does not necessarily mean that it should be treated as tax-qualified. Given that the IRS does not review the vast majority of plans, the contrary view espoused by the Reish Report would permit sponsors and investment providers who successfully avoid plan audits to run amok, despite their disregard of substantive rules.

     C.    <u>IRS Audits Do Not Address All Potential Qualified Plan Violations</u>

    8.    Reish's Report indicates his familiarity with what an IRS audit of a qualified plan ordinarily entails. In my opinion, the scope and depth of an audit differs in every situation, but if the full range of the Plans' operational lapses in this case were disclosed to the IRS, along with the circumstances surrounding the Plans' formation and use, the likely result would be Plan disqualification in every instance.

    9.    The Reish Report assumes that because an IRS audit of the RJM Capital Plan ("RJM Plan") resulted in a "no change" letter and, in the course of this audit, the IRS reviewed certain documents related to other Plans, neither the RJM Plan nor the other Plans had

---

[6] *See*, *In re Plunk*, 481 F. 3d 302 (5th Cir. 2007); *In re Blais*, 220 B.R. 485 (S.D. Fla. 1997); *In re Willis*, 104 AFTR 2d 2009-5669 (Bkrtcy. Fla. 2009).

[7] WH-MDL-00356531.

operational defects.  Of course, that conclusion depends on both the issues that the IRS was examining on audit and the information that the IRS reviewed.  Generally speaking, an IRS audit does not seek to review compliance with all of the requirements of the Code and would not necessarily be focused on issues such as the exclusive benefit rule, permanence, domestic trust, and impermissible commingling of plan assets.

10.     My review of the IRS information requests and closing letter with respect to the audit in question indicates that the government's principal concern was the accurate reporting of the RJM Plan's assets on IRS Forms 5500-EZ for the period 2012-2016[8] and the correlative issue of whether Markowitz had correctly reported distributions from various Plans as taxable income on his Forms 1040.[9]  No questions appear to have been asked regarding any of the tax-qualification requirements for retirement plans discussed in my Initial Expert Report.  In this connection, the Reish Report does not assert and I have not seen anything in the record indicating that Markowitz or his representatives disclosed to the IRS examiner the RJM Plan's massive purchases of Danish stocks or the extraordinary percentage (_i.e._, 65 percent) of the proceeds from dividend refunds invoiced by and paid to Solo Capital's off-shore affiliate, Ganymede, by the Plan.  While the RJM Plan's responses to IRS inquiries noted that Solo Capital was subject to U.K. regulators, such as the Financial Conduct Authority ("FCA"), subsequent to the close of the audit, the FCA found that Solo Capital had likely engaged in

---

[8] _See, e.g._, the IRS's first information request focused on the following facts: "The 12/31/2012 [Plan] asset balance [was] $0, but investment earnings were $6,806,136 in 2013.  Submit all monthly 2013 bank and broker statements that show the source(s) that comprise the $6,806,136 investment earnings in 2013 and provide a detailed explanation of each source." Monthly bank and broker statements were also requested for the years 2014-2016. WHD_MDL_00357023.

[9] Id. The information request also focused on a potential discrepancy between $3,837,258 of Gross Pension distributions reported on Markowitz's 2015 Form 1040 and rollovers and distributions from other Plans requiring withdrawal and deposit information on bank and broker statements.

criminal activity.[10]  Thus, the IRS had little reason based on the limited information it had to

question the tax-qualified status of the RJM Plan.  The sole consequence of the audit, as stated in

the IRS closing letter, dated February 3, 2020, was "Our recent examination of your return(s)

[Form 5500-EZ] for the above year(s) [2016], shows *no change is necessary in the information

reported*.  We are pleased to inform you that we have accepted the returns, as filed."[11] (Italics

added.)  This result was in no way a determination of the qualified status of the RJM Plan or any

other Plan.

11.    The RJM Plan may have been better positioned than other defendant Plans to

satisfy certain conditions for tax-qualified status, such as the trade or business requirement, due

to the fact that its LLC sponsor had been established a number of years before the Danish trading

began and was able to assert that the LLC actively engaged in a trade or business.   However,

while the RJM Plan's unique history and circumstances might enable it to avoid retroactive

disqualification on these grounds, it nevertheless engaged in many of the other operational

defects discussed in my Initial Expert Report and should have been disqualified on that basis.[12]

---

[10] *E.g.*, in May 2021, after investigating Solo Capital, the U.K.'s FCA found that "purported" trading by Solo
Capital's clients and settlement of the trades by the Solo Group was "*highly suggestive of sophisticated financial
crime*."  FCA, Final Notice to Sapien Capital at 3-4 (May 6, 2021), available at
https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf (Italics added.)

[11] IRS Form Letter 992-A, WH-MDL-00358607.

[12] Even in those few cases where the LLC plan sponsors were longstanding entities and disregard of the trade or
business requirement was less transparent, it appears that the LLCs owed their longevity to the fact that they had
been dormant off-the shelf shell entities. The Argre principals maintained many such LLCs for use as needed to
which their owners arbitrarily assigned consulting income earned in the owners' personal capacities without regard
to which LLC had actually performed the services. See, *e.g.* van Merkensteijn Dep. Tr. at 289:20-22.  In addition,
van Merkensteijn testified that he and Markowitz had a reciprocal arrangement pursuant to which their various
LLCs would bill the LLCs of the other party to the arrangement (and the LLCs of their respective spouses) for
services rendered in advising and helping each other and investigating potential transactions for their pension plans.
The aggregate billings by the LLCs of each party to the arrangement were intended to be commensurate. Id. at
281:17-288:16. Such practices by van Merkensteijn and Markowitz had the effect of artificially creating trade or
business income for the LLCs that would have supported sponsorship of a 401(k) plan and, accordingly, should be
disregarded to the extent created by such practices.  LLC owners were generally deficient with respect to timely
documenting the nature and magnitude of the consulting services purportedly performed by the LLC Plan sponsors

Even if the IRS audit had considered all of the tax qualification issues raised in my Initial Expert Report and confirmed the RJM Plan's qualified status, or if the Plan were to receive such a confirmation in the future, in my experience, the determination would be meaningless and should be overturned once the IRS became aware of the larger picture of the Plan's participation in the Solo scheme.

12.      Finally, the RJM Plan was in no way representative of all the other Plans subject to this litigation that were irrefutably deficient with respect to permanence and trade or business issues, as well as numerous other tax-qualification rules.  Most Plan sponsors admitted that their newly established LLCs were funded with minimal assets, had never conducted any business activity and never generated any income.[13]

### D.      EPCRS Would Not Be Available to Correct These Operational Defects

13.      While the Reish Report may be correct from a quantitative perspective in asserting that in recent decades IRS audits seldom result in plan disqualification, that information has no bearing on whether the defendant Plans were or were not qualified. No matter how

---

and in keeping the service agreements and other contractual instruments between the LLCs and their clients up to date.

[13] Defendants Gavin Crescenzo, Doston Bradley and Matthew Tucci are typical of Defendants whose LLCs did not meet the trade or business requirement.  Crescenzo began participating in Solo's scheme in early 2014 by forming a first round of three LLCs and three Plans (one each for himself, his wife and his brother).  Crescenzo contributed about $100 to each LLC.  Deposition of Gavin Crescenzo, November 24, 2020 at 47.  In late 2014, Crescenzo formed 15 new LLCs and Plans, five each for himself, his brother, and his mother.  Crescenzo testified that none of these entities conducted any business activity.  Crescenzo Dep. Tr. at 45:16 – 46:20, 48:15-18 and 109:8-12.

   Similarly, Defendant Doston Bradley established a number of LLCs for himself and his immediate family (wife, mother, father, and sister), funding many of the LLCs with only $1,000.  Deposition of Doston Bradley, November 14, 2020 at 146.  On deposition, Bradley admitted that none of these LLCs had engaged in an active trade or business.  Bradley Dep. Tr. at 122:9-21, 126:21 – 127:19, 128:24 – 129:2, 130:5-10, 131:25 – 132:5 and 153:4-16. Bradley noted that he had been considering the acquisition of rental real estate for this purpose but acknowledged that he never followed through on this thought.

   Like many others, Matthew Tucci formed or helped form 27 LLCs and Plans for himself, his family members, and his friends.  The first two LLCs and Plans appear to have been set up for Tucci and his wife in August 2013.  On deposition, Tucci admitted that his LLCs never generated business income of any kind. Tucci Dep. Tr. at 27:20 – 28:11, 34:12-22 and 36:4-20.

infrequently the IRS disqualifies a plan, the specific issue is whether the manner in which the

193 Defendant Plans were operated would have resulted in their loss of tax-qualified plan status.

14.     Reish indicates that it may be possible to avoid disqualification by proceeding

under the Employee Plans Compliance Resolution System ("EPCRS").[14]  In the context of this

litigation, I disagree with that conclusion on two bases.  First, certain operational defects are not

correctable. The basic concept under EPCRS is to place the plan in the position in which it would

have been in had it been operated in the proper fashion.  However, if the plan sponsor never had

a trade or business or from the outset it was clear that the plan was established for reasons other

than providing retirement benefits or as a temporary vehicle for a single short-term transaction,

as was the case here, those types of operational errors generally could not have been retroactively

corrected.  Second, and more importantly, EPCRS "is not available to correct plan failures

relating to the diversion or misuse of plan assets."[15] In any event, there is no prospect of the

Plans seeking a return of the excessive fees they paid to Solo and Ganymede, since both firms

are now defunct.

15.     Further, one of the IRS's primary reasons for providing relief from its strict

standards for plan qualification by the introduction of EPCRS in 2002 was to avoid the adverse

tax consequence resulting from plan disqualification on otherwise innocent non-highly

compensated employees participating in plans other than one-person plans.[16]  While one-person

---

[14] Revenue Procedure 2021-30. 2021-31 I.R.B.; Wagner, Marcia S. BNA Tax Management Portfolio: "EPCRS – Plan Correction and Disqualification".

[15] Ibid., Section 4.11. In addition, I would observe that EPCRS is a procedural innovation that considerably post-dated pre-ERISA aspects of plan tax-qualification rules as well as changes made to those rules by the enactment of ERISA in 1974.  It has never been viewed as altering substantive law on the topic.

[16] This view is mirrored with respect to the penalties for violating the Code's minimum plan participation and minimum plan coverage rules which do not fall on non-highly compensated employees.  For the avoidance of doubt, I am not stating that all participants in one-person plans are highly compensated in terms of their compensation level, but because of their ownership in the business sponsoring the plan, the Code treats them as such.

plans are nevertheless entitled to seek relief under EPCRS, in my opinion, the participants in such plans were not the intended beneficiaries of such relief and this would eliminate any tolerance or forbearance in the conditions for correction under EPCRS that they could expect.[17] Moreover, most errors that occur in the operation of one-person plans that might be eligible for EPCRS relief are not comparable to the multitude of egregious uncorrectable violations in the Plans at issue in this litigation.

###### E.    A Prohibited Transaction Violation Does Not Preclude Plan Disqualification

16.    The Reish Report states that if a plan engages in a prohibited transaction, the remedies for the prohibited transaction are separate and apart from plan disqualification.  While my Initial Expert Report did not suggest that a prohibited transaction necessarily results in the disqualification of a plan (and Reish does not assert that these remedies preclude disqualification), nevertheless the Reish Report, in my opinion, does not accurately describe the relationship between prohibited transactions and plan disqualification where pervasive violations of qualified plan and other legal requirements occurred in every phase of activity (including, formation, administration, "investment" and termination) relating to the 193 Plans engaging in DWT refund claims.[18]   The operational violations were ubiquitous, even though not every Plan violated each and every condition for qualified-plan status cited in my Initial

---

[17] Egregious violations are subject to limited relief under EPCRS. One type of egregious violation is a defined contribution plan in which a contribution is made on behalf of a highly compensated employee that is several times greater than the dollar limit under Code Section 415(c). As discussed in greater detail in the discussion of improper funding, it is likely that type of violation would have been among the numerous Plan sponsor actions that the IRS would consider as a basis for plan disqualification.

[18] In Wingers Department Store, 82 TC 869 (1984), the Tax Court provided a more accurate explanation of this relationship as follows: "Nor do we believe that the excise tax in [Code] Section 4975 [triggered by a prohibited transaction] was intended to preempt the sanction of disqualification under the exclusive benefit rule in the case now before us. We are not here dealing with an isolated prohibited transaction described in Section 4975. Rather, our decision that the petitioner's trust did not operate for the exclusive benefit of employees is based on the totality of the transgressions that occurred and pervaded the entire operation of the Trust. The fact that some of these transactions are described specifically in Section 4975 and subject to an excise tax are merely fortuitous."

Expert Report, although some did.  This disregard of norms meant that the Plans were never qualified notwithstanding simultaneous application of the prohibited transaction rules and the fact that many of the factors indicating violation of both the qualified plan and prohibited transaction rules overlapped.

      F.    <u>Improper Investment Strategy Can Result in Plan Disqualification</u>

      17.    The Reish Report indicates that broad language in a trust agreement insulates the plan from disqualification based upon the investments that it selects.  I disagree and, in my opinion, the Reish Report ascribes too much significance to the buffer provided by investment language in Plan instruments by ignoring the fact that such language cannot override fundamental plan standards, such as the operation of a plan for the exclusive benefit of its participants.[19]  As a virtually universal norm in the retirement industry, a version of the exclusive benefit rule is present in all of the Defendant Plan documents I have reviewed[20] and limits the scope of any permissive plan investment language on which the Reish Report may be relying.  Moreover, as I have previously pointed out, the Solo Capital transaction was not a real investment, since it did not require monetary contributions from the Plans; it was, therefore, a transaction outside Plan investment provisions.

---

[19] In IRS <u>Revenue Ruling 73-532</u>, 1973-2 C.B. 128, the Service held that a retirement plan trust that provided the trustee with complete power to invest trust funds without regard to whether investments may be new, speculative, hazardous, adventurous, or productive of income is not designed for the exclusive benefit of employees and does not qualify under Code Section 401(a).  In <u>Westchester Plastic Surgical Associates, P.C.</u>, T.C.M. 1999-369, the Tax Court stated that "there is no question that improper trust administration and investment policies may result in violations of the exclusive benefit rule." In <u>Ada Orthopedic, Inc.</u>, T.C.M. 1994-606, the Tax Court held the exclusive benefit rule was violated when a plan invested in a tax shelter that would generate significant losses for a period of years before obtaining capital gains treatment.  The Tax Court concluded that the sole purpose of the investment was to provide an additional source of capital to an enterprise controlled by the plan's trustee and family members.

[20] <i>See</i>, <i>e.g.</i>, Article XII.B of the RJM Capital Pension Plan Trust which requires a Plan fiduciary, such as a Plan sponsor or investment manager, to "discharge his or her duties with respect to the Plan solely in the interests of the Participants and Beneficiaries and 1. For the exclusive purpose of (a) Providing benefits to Participants and their Beneficiaries; (b) Defraying reasonable expenses of administering the Plan; …" WH_MDL_00356217 – 00356218.

G.    The Reish Report's Reading of Trust Agreements Is Selective

18.    Reish also interprets Plan trust language too selectively.  For example, the investment language in the RJM Plan quoted in the Reish Report states that Plan assets must be invested "all in a manner conforming with the then existing law."[21]  I venture no opinion on whether the activity of the RJM Plan or other Defendant Plans violated the laws of foreign states, as some of those states have concluded,[22] but as noted in my Initial Expert Report, there were many aspects of the Plans' involvement with Solo Capital that were highly questionable under U.S. law as well as the Plan documents.

H.    The Plans Were Improperly Funded

19.    The Reish Report correctly states that plans can be funded in a variety of ways, including plan sponsor contributions, participant deferrals of compensation, and transfers from other qualified plans.  However, since most Plans had minimal assets, given that their sponsors lacked income from a trade or business, and even the modest Plan assets attributable to sponsor contributions and participant deferrals were insulated from risk by excepting them from being transferred to Solo Capital's investment platform, none of these funding methods were consistent with the manner or the magnitude of the financing activity that Solo Capital and its affiliates purported to undertake on behalf of the Plans.  In effect, the Plans were "investing" exclusively with funds putatively advanced or arranged for by other actors in the scheme, such as Solo Capital and/or other Shah-controlled entities, as described in my Initial Expert Report.  There is no conceivable way that funding from or arranged by Solo Capital would be an acceptable

---

[21] Article III.C.7 of the RJM Capital Pension Plan Trust adds to this restriction by stating that "neither the Committee, any Investment Manager nor Participant shall direct the purchase sale or retention of any Trust assets if such directions are not in compliance with the applicable provisions of the Code and ERISA and any regulations or rulings issued thereunder." WH_MDL_00356209.

[22] *See,* Footnote 8, <u>supra</u>.

contribution to the Plans, since the only third-party contributions to a plan that are allowed are restorative payments to correct a breach of fiduciary duty or securities law by the third party making the contribution.  No Plan funding by Solo Capital, its affiliates or counterparties in the derivative transactions with the Plans could reasonably be characterized as a restorative payment.[23]

I.    A Plan's Investment in A Partnership Is Impermissible if It Violates The Exclusive Benefit Requirement

20.    The Reish Report states that it is not impermissible for a plan to invest in a partnership and receive its allocable share of partnership profits.  Although accurate in the abstract, this statement is both misleading and irrelevant.  First, it obfuscates the question of what portion of the Solo transaction's proceeds was paid to non-Plan parties.  As discussed, the Plans were not participating in an investment, let alone a typical investment opportunity, and most of the refund proceeds received by the Plans due to their status under the Treaty were passed on to entities controlled by Sanjay Shah. The sole reason for the Plans' participation in partnerships was to divert the bulk of the proceeds remaining after Solo Capital's and Ganymede's fees to other members of the partnerships.  In other words, while the putative earnings consisted solely of tax refunds premised on the Plans' tax-qualified status, most of what was left of these earnings after fees was routed to others.  This is not some innocuous misdemeanor involving a "general or vague concept of propriety," as stated in the Reish Report[24] but an attempt to establish and operate a Plan for the benefit of third parties having no relationship to providing retirement income for the benefit of a Plan participant.

---

[23] Treas. Reg. 1.415(c)-1(b)(2)(ii)(C). See also Treas. Reg. 1.415(c)-1(b)(4), providing the Commissioner with discretion to treat certain allocations to participants' accounts as annual additions.

[24] The Reish Report, paragraph 32.

21.     The Reish Report also misstates the nature of the alleged exclusive benefit violation.  It is not simply that fees paid to a service provider were excessive; it was that in most cases, the entire arrangement was designed to provide refund proceeds to individuals and entities that had no right to them under the Treaty.  For the Plans engaging with Solo Capital, this appears to have been accomplished by creating a paper trail purporting to show that the Plans were the owners of various Danish stocks.[25]

J.     The Plans Were Impermanent from The Outset

22.     The Reish Report misstates the alleged permanence violation to the extent it condones establishing a Plan to take advantage of a particular strategy in year one and then terminating or abandoning the plan several years later, because the strategy is no longer viable. Before establishing a plan, tax-qualification rules require its sponsor to assess the likelihood of the plan's near-term abandonment or termination.  If the plan is subsequently terminated, the termination must be due to unanticipated business reasons of the plan sponsor, such as the sponsor's financial inability to make further plan contributions.[26]  The vast majority of the Plans in this case were not permanent plans from day one, because their sponsors and the Plans themselves ceased any further activity relating to additional contributions or investment of Plan assets once the dividend refund scheme was discovered in 2015, an event having nothing to do with the Plan sponsor's business.[27]  In some cases, abandonment occurred well before the scheme's discovery, since individual Plan sponsors were encouraged to set up new Plans if they

---

[25] *See*, FCA Notice, sections 2.5, 2.9 & 4.22 at pp.3 & 9, cited at Footnote 8, supra.

[26] The IRS has ruled that "when a plan is discontinued within a few years after its adoption for any cause other than business necessity, the original presumption of intended permanence must be replaced by a presumption that the employer did not intend the plan as a permanent program from the beginning." IRS Revenue Ruling 69-25, 1969-1 C.B. 11.

[27] Initial Expert Report at 58-59, 65-66.

wished to continue their participation in Solo's "investment opportunity," and this resulted in abandonment of the original Plans.[28]

23.    Moreover, Reish makes no attempt to explain why Plans generally engaged in only a few years (if not a single year) of purported trading in Danish stocks before Plan contributions ceased and the Plans were effectively abandoned, only to be followed by the establishment of new Plans by the same sponsors for any further participation they wished to have in Shah's "investment" scheme.[29]  This unique pattern of conduct hid the fact that the reclaims were engineered by a small group of individuals (most of whom were operating in conjunction with Sanjay Shah) but provided only negligible benefits to the Plans or their participants (in their capacity as such).   The effect of submitting reclaims from hundreds of plans disguised the fact that most of the proceeds from the refunds were going to these individuals rather than to the Plans.

K.    The Plans Were Not True Retirement Plans

24.    The Reish Report concludes that the Plans were not shams, apparently on the ground that in form and operation they complied with the requirements of the Code.  However, as a starting point for determining if a plan is a sham, it is necessary to have a standard by which to make that determination.  The term "sham" has a technical meaning under the Code, but since the Reish Report does not appear to be using it in its Code sense, my analysis will focus on whether the Plans were shams in the lay person sense, not in the sham transaction sense as defined under the Code and by the Courts.  Under that framework, and applying standard dictionary definitions, a sham can be defined as something that is phony, a ruse, a fraud; not

---

[28] *See*, Crescenzo Dep. Tr. at 103:6-25 and Tucci Dep. Tr. at 58:15 - 59:3.

[29] Initial Expert Report at 31-34.

what is displayed; anything that is not what it purports to be; something false, fake, or fictitious that only appears to be genuine. The Defendant Plans fit this sense of the definition, because their entire purpose was to serve as vehicles to implement Solo's scheme to obtain refunds of withheld dividends.

25.    In that regard, it is significant that the Reish Report did not discuss the context in which the Plans were established, which was as a means to take advantage of the Treaty provisions for tax-exempt entities. A determination as to whether the Plans were arrangements other than retirement plans must take account of this context, because in determining the manner in which an entity should be characterized, context matters.[30]

26.    Shah's scheme required him to locate plan sponsors willing to provide the Plan's name for purposes of filing DWT reclaims without committing sponsor or Plan assets, because a necessary element of the scheme under the Treaty was the participation of a tax-exempt entity,[31] such as a tax-qualified plan. Under Reish's approach, the first thing to be considered in determining whether or not the Plans were authentic was the execution of a volume submitter plan document. To the contrary, my view is that evaluation of whether the Plans were artificial arrangements calculated to look like retirement plans needs to focus on whether they were established and operated primarily, if not exclusively, to obtain Treaty benefits for third parties. Solo Capital's recruitment activities, its encouragement of potential Plan sponsors to establish

---

[30] *Holman v. Comm'r.*, 601 F.3d 763 (8th Cir. 2010); *Fisher v. United States*,106 AFTR 2010-6144 (S.D. Ind. 2010).

[31] Tax-exempt pension plans were not the only type of tax-exempt entity that would have been entitled to the favorable treatment under the Treaty. It would have been permissible to establish tax-exempt charities. However, there are no documents establishing tax-exempt charities analogous to prototype 401(k) plans; most, if not all, jurisdictions would require a board of trustees of at least three (3) individuals; application for tax-exempt status must be submitted to the IRS; and filings are required at the state rather than the federal level.

multiple plans[32] in order to participate in its transactions with a specified allocation of the transaction to each Plan, its representations to Plan sponsors that they did not risk their own or their Plan's assets by participating therein and Solo's execution of the transactions without Plan money all indicate that Solo, with the complicity of the Plan sponsors, was using the Plans for a purpose entirely unrelated to retirement benefits.   In determining whether an arrangement of any type is a genuine retirement plan, it is necessary to look holistically at such factors which indicate its true purpose.

      27.     In contrast, the Reish Report seeks to silo various rules applicable to tax-qualified plans (one-person plans are permissible, nontraditional investments are permissible, investment by plans in partnerships is permissible) without providing any context for any of those propositions.  For example, the Reish Report does not address the fact that many sponsors of Plans that engaged in the scheme established multiple Plans to do so.  Arguments that this multiple plan structure would have been entirely permissible under the Code, so long as all of the restrictions that would be applicable to an individual plan applied to each of the other plans, would be unavailing, even though technically accurate, since they would lack any context for the

---

[32] *See, e.g.*, the number of Plans maintained by the following list of certain Plan sponsors:

| Defendant | Number of Plans | Citation |
|---|---|---|
| Klugman | 6 (one did not submit reclaims to SKAT) | ELYSIUM-05822425 |
| Lerner | 5 | ELYSIUM-05822425 |
| Doston Bradley | 7 | ELYSIUM-05822425 |
| Monica Bradley | 5 | ELYSIUM-05822425 |
| Joanne Bradley | 7 | ELYSIUM-05822425 |
| Matthew Tucci | 6 | ELYSIUM-05822425 |
| Danielle Tucci | 5 | ELYSIUM-05822425 |
| Hayden Guli | 5 | ELYSIUM-05822425 |
| Lehman | 5 | ELYSIUM-05822425 |
| Altbach | 5 | ELYSIUM-05822425 |
| Richard Markowitz | 6 (also co-participant in another 3 plans) | ELYSIUM-05822425 |
| van Merkensteijn | 6 (also co-participant in another 3 plans) | ELYSIUM-05822425 |
| Gavin Crescenzo | 6 | ELYSIUM-05822425 |

actions taken by the Pension Plans in this case.  Similarly, Reish relies on the possibility of

correcting Plan mistakes without noting that certain operational errors were not correctable, such

as the diversion of Plan assets to a now defunct entity or the failure of a liquidated Plan sponsor

to have ever conducted a trade or business that generated income.

28.    While each of Reish's conclusions, taken in isolation, have a veneer of truth, the

presence of numerous related plan sponsors with duplicative minimally funded retirement Plans

claiming ownership of massive amounts of publicly-traded Danish securities also needs to be

considered in determining whether the Plans were qualified or just a sham.  Similarly, (i) the

extraordinary degree of debt in the Solo transactions, (ii) the participants' lack of concern about

the financial strength of  the counterparties in the complex derivative transactions that, when

aggregated, purported to constitute purchases of millions of dollars of Danish stocks or the

broker-custodians' ability to settle these transactions, (iii) general indifference to the tax

advantages associated with the Plans, (iv) inattention to the merits of the particular stocks in

which the Plans purportedly invested, including the potential for market gains or losses, (v) the

Plan sponsors' treatment, in many cases, of the Plans as personal savings accounts rather than as

separate entities whose assets were subject to significant protective restrictions, (vi) the frequent

commencement of transactions before Plan assets were actually transferred to the custodian, (vii)

the lack of knowledge, in many cases, whether the Plans continued in existence after they ceased

trading, and (viii) with few exceptions, the general disregard of recordkeeping requirements, all

must be taken into account in determining whether the Plans were no more than unsatisfactory

imitations of arrangements intended to provide retirement benefits.

29.    There may be no bright line test as to the circumstances under which a tax-

qualified plan would be treated as a sham, and there could conceivably be close cases.  However,

in my opinion, the present litigation does not present a close case, and the Plans should be treated as arrangements calculated to rapidly obtain a high return with no effort or risk other than a small outlay for LLC and Plan documentation with most of the return going to the scheme's promoter. This was unrelated to the only legitimate purpose of a retirement plan which is the gradual accumulation of benefits to support plan participants in retirement. Because of their widespread departures from standards embraced by the retirement plan industry, the Plans in this case simply were not what they purported to be.

* * * * * * *

This Rebuttal is executed this first day of February 2022 at Boston, Massachusetts.

Marcia S. Wagner

# Appendix A

## APPENDIX A: MATERIALS CONSIDERED

**I.**     Bates Stamped Documents

- ACER_00001703
- ACER_00001894
- ACER_00015174
- AIG_00000368
- AIG_00000435
- AIG_00000605
- ATLDHR00000311
- CAYMAN_00002694_CAYMAN001
- CAYMAN_00002695_CAYMAN001
- CAYMAN_00002806_CAYMAN001
- CAYMAN_00003294_CAYMAN001
- CRESCENZO00000506
- EDF-00027746
- EDF-00050166
- ELYSIUM-05822425
- FWCCAP00000079
- FWCCAP00000194
- FWCCAP00000536
- FWCCAP00000564
- FWCCAP00000630
- FWCCAP00001033
- GUNDERSON00009337
- GUNDERSON00009434
- GUNDERSON00009781
- GUNDERSON00009815
- GUNDERSON00009847

- GUNDERSON00010029
- JHVM_0001821
- JHVM_0001927
- JHVM_0002167
- JHVM_0003506
- JHVM_0007471
- JHVM_0010589
- JHVM_0010590
- JHVM_0017739
- JHVM_0028887
- KF_MDL_13834
- KF_MDL_14645
- KF_MDL_14972
- KLUGMAN00007264
- KLUGMAN00008986
- KLUGMAN00048773
- LIND_00001156
- MBJ_0035575
- MBJ_0040346
- MBJ_0046252
- MBJ_0046256
- MBJ_0052776
- MBJ_0065409
- MBJ_STOR-0002719
- MBJ_STOR-0002851
- MBJ_STOR-0004921
- MBJ_STOR-0004927_native
- MBJ_STOR-0004928_native
- MBJ_STOR-0005220
- MBJ_STOR-0007019

- MPSKAT00003776
- MPSKAT00003967
- MPSKAT00003969
- MPSKAT00003971
- MPSKAT00003975
- MPSKAT00003979
- MPSKAT00003983
- MPSKAT00003985
- MPSKAT00003987
- MPSKAT00003989
- MPSKAT00003991
- MPSKAT00003995
- MPSKAT00007347
- MPSKAT00008759
- MPSKAT00020864
- MPSKAT00023949
- MPSKAT00024171
- MPSKAT00024173
- MPSKAT00024174
- MPSKAT00024667
- MPSKAT00025932
- MPSKAT00045527
- MPSKAT00056658
- MPSKAT00057016
- MPSKAT00057018
- MPSKAT00068862
- MPSKAT00078902
- MPSKAT00082600
- MPSKAT00148667
- MPSKAT00251781

- MPSKAT00256678
- MPSKAT00256699
- MPSKAT00269096
- MPSKAT00269098
- MPSKAT00274815
- NEW_00000904
- PROPPACIF00000113
- PROPPACIF00000375
- PROPPACIF00000955
- PROPPACIF00000991
- PROPPACIF00003619
- PROPPACIF00003628
- PROPPACIF00003696
- RC00000059
- SKAT_MDL_001_00265426
- SKAT_MDL_001_00413998
- VALER00000098
- VALER00000242
- VALER00000273
- WH_MDL_00000346
- WH_MDL_00000391
- WH_MDL_00002741
- WH_MDL_00002743
- WH_MDL_00002745
- WH_MDL_00002747
- WH_MDL_00020362
- WH_MDL_00020558
- WH_MDL_00024858
- WH_MDL_00026778
- WH_MDL_00028536

- WH_MDL_00029159
- WH_MDL_00029362
- WH_MDL_00029366
- WH_MDL_00029401
- WH_MDL_00033719
- WH_MDL_00035630
- WH_MDL_00037273
- WH_MDL_00051374
- WH_MDL_00115436
- WH_MDL_00139331
- WH_MDL_00169251
- WH_MDL_00212188
- WH_MDL_00213231
- WH_MDL_00219494
- WH_MDL_00219501
- WH_MDL_00219749
- WH_MDL_00219760
- WH_MDL_00227810
- WH_MDL_00227861
- WH_MDL_00274933
- WH_MDL_00297405
- WH_MDL_00303907
- WH_MDL_00324709
- WH_MDL_00324712
- WH_MDL_00324715
- WH_MDL_00324718
- WH_MDL_00324721
- WH_MDL_00324724
- WH_MDL_00324727
- WH_MDL_00327237

- WH_MDL_00331778
- WH_MDL_00331778
- WH_MDL_00339896
- WH_MDL_00356182
- WH_MDL_00356182
- WH_MDL_00356221
- WH_MDL_00356221
- WH_MDL_00356375
- WH_MDL_00356379
- WH_MDL_00356393
- WH_MDL_00356531
- WH_MDL_00356533
- WH_MDL_00356533
- WH_MDL_00356535
- WH_MDL_00356535
- WH_MDL_00356537
- WH_MDL_00356537
- WH_MDL_00356539
- WH_MDL_00356540
- WH_MDL_00356541
- WH_MDL_00356542
- WH_MDL_00356570
- WH_MDL_00356571
- WH_MDL_00356577
- WH_MDL_00356579
- WH_MDL_00356582
- WH_MDL_00356583
- WH_MDL_00356585
- WH_MDL_00356591
- WH_MDL_00356595

- WH_MDL_00356600
- WH_MDL_00356758
- WH_MDL_00356778
- WH_MDL_00356931
- WH_MDL_00356933
- WH_MDL_00356937
- WH_MDL_00356938
- WH_MDL_00356939
- WH_MDL_00356940
- WH_MDL_00356941
- WH_MDL_00356942
- WH_MDL_00356943
- WH_MDL_00356944
- WH_MDL_00356945
- WH_MDL_00356946
- WH_MDL_00356947
- WH_MDL_00356948
- WH_MDL_00356949
- WH_MDL_00356950
- WH_MDL_00356951
- WH_MDL_00356952
- WH_MDL_00356954
- WH_MDL_00356972
- WH_MDL_00356974
- WH_MDL_00356976
- WH_MDL_00356978
- WH_MDL_00356980
- WH_MDL_00356982
- WH_MDL_00356986
- WH_MDL_00356986

- WH_MDL_00356990
- WH_MDL_00357011
- WH_MDL_00357011
- WH_MDL_00357028
- WH_MDL_00357029
- WH_MDL_00357030
- WH_MDL_00357033
- WH_MDL_00357034
- WH_MDL_00357035
- WH_MDL_00357037
- WH_MDL_00357038
- WH_MDL_00357039
- WH_MDL_00357041
- WH_MDL_00357043
- WH_MDL_00357045
- WH_MDL_00357046
- WH_MDL_00357047
- WH_MDL_00357049
- WH_MDL_00357050
- WH_MDL_00357052
- WH_MDL_00357054
- WH_MDL_00357057
- WH_MDL_00357060
- WH_MDL_00357063
- WH_MDL_00357067
- WH_MDL_00357068
- WH_MDL_00357070
- WH_MDL_00357072
- WH_MDL_00357075
- WH_MDL_00357077

- WH_MDL_00357078
- WH_MDL_00357080
- WH_MDL_00357082
- WH_MDL_00357083
- WH_MDL_00357085
- WH_MDL_00357088
- WH_MDL_00357089
- WH_MDL_00357090
- WH_MDL_00357092
- WH_MDL_00357095
- WH_MDL_00357096
- WH_MDL_00357097
- WH_MDL_00357099
- WH_MDL_00357102
- WH_MDL_00357104
- WH_MDL_00357105
- WH_MDL_00357107
- WH_MDL_00357108
- WH_MDL_00357110
- WH_MDL_00357112
- WH_MDL_00357114
- WH_MDL_00357120
- WH_MDL_00357126
- WH_MDL_00357132
- WH_MDL_00357138
- WH_MDL_00357144
- WH_MDL_00357150
- WH_MDL_00357156
- WH_MDL_00357162
- WH_MDL_00357168

- WH_MDL_00357176
- WH_MDL_00357182
- WH_MDL_00357188
- WH_MDL_00357194
- WH_MDL_00357200
- WH_MDL_00357208
- WH_MDL_00357216
- WH_MDL_00357222
- WH_MDL_00357228
- WH_MDL_00357234
- WH_MDL_00357242
- WH_MDL_00357248
- WH_MDL_00357256
- WH_MDL_00357262
- WH_MDL_00357268
- WH_MDL_00357274
- WH_MDL_00357280
- WH_MDL_00357286
- WH_MDL_00357292
- WH_MDL_00357298
- WH_MDL_00357304
- WH_MDL_00357310
- WH_MDL_00357316
- WH_MDL_00357324
- WH_MDL_00357330
- WH_MDL_00357336
- WH_MDL_00357342
- WH_MDL_00357348
- WH_MDL_00357354
- WH_MDL_00357356

- WH_MDL_00357357
- WH_MDL_00357358
- WH_MDL_00357359
- WH_MDL_00357360
- WH_MDL_00357361
- WH_MDL_00357362
- WH_MDL_00357363
- WH_MDL_00357364
- WH_MDL_00357365
- WH_MDL_00357366
- WH_MDL_00357367
- WH_MDL_00357372
- WH_MDL_00357377
- WH_MDL_00357378
- WH_MDL_00357379
- WH_MDL_00357382
- WH_MDL_00357383
- WH_MDL_00357384
- WH_MDL_00357385
- WH_MDL_00357387
- WH_MDL_00357399
- WH_MDL_00357410
- WH_MDL_00357418
- WH_MDL_00357420
- WH_MDL_00357432
- WH_MDL_00357434
- WH_MDL_00357442
- WH_MDL_00357454
- WH_MDL_00357466
- WH_MDL_00357467

- WH_MDL_00357469
- WH_MDL_00357470
- WH_MDL_00357471
- WH_MDL_00357472
- WH_MDL_00357473
- WH_MDL_00357474
- WH_MDL_00357476
- WH_MDL_00357477
- WH_MDL_00357478
- WH_MDL_00357479
- WH_MDL_00357480
- WH_MDL_00357482
- WH_MDL_00357483
- WH_MDL_00357485
- WH_MDL_00357487
- WH_MDL_00357489
- WH_MDL_00357491
- WH_MDL_00357493
- WH_MDL_00357495
- WH_MDL_00357497
- WH_MDL_00357499
- WH_MDL_00357501
- WH_MDL_00357503
- WH_MDL_00357505
- WH_MDL_00357507
- WH_MDL_00357510
- WH_MDL_00357512
- WH_MDL_00357514
- WH_MDL_00357516
- WH_MDL_00357518

- WH_MDL_00357520
- WH_MDL_00357522
- WH_MDL_00357524
- WH_MDL_00357526
- WH_MDL_00357528
- WH_MDL_00357530
- WH_MDL_00357532
- WH_MDL_00357534
- WH_MDL_00357536
- WH_MDL_00357538
- WH_MDL_00357540
- WH_MDL_00357542
- WH_MDL_00357544
- WH_MDL_00357546
- WH_MDL_00357548
- WH_MDL_00357550
- WH_MDL_00357552
- WH_MDL_00357554
- WH_MDL_00357556
- WH_MDL_00357558
- WH_MDL_00357560
- WH_MDL_00357564
- WH_MDL_00357569
- WH_MDL_00357573
- WH_MDL_00357576
- WH_MDL_00357579
- WH_MDL_00357583
- WH_MDL_00357588
- WH_MDL_00357591
- WH_MDL_00357594

- WH_MDL_00357597
- WH_MDL_00357600
- WH_MDL_00357603
- WH_MDL_00357607
- WH_MDL_00357611
- WH_MDL_00357615
- WH_MDL_00357619
- WH_MDL_00357622
- WH_MDL_00357627
- WH_MDL_00357630
- WH_MDL_00357633
- WH_MDL_00357637
- WH_MDL_00357641
- WH_MDL_00357645
- WH_MDL_00357648
- WH_MDL_00357652
- WH_MDL_00357655
- WH_MDL_00357659
- WH_MDL_00357663
- WH_MDL_00357666
- WH_MDL_00357669
- WH_MDL_00357673
- WH_MDL_00357676
- WH_MDL_00357679
- WH_MDL_00357682
- WH_MDL_00357685
- WH_MDL_00357688
- WH_MDL_00357692
- WH_MDL_00357695
- WH_MDL_00357700

- WH_MDL_00357704
- WH_MDL_00357707
- WH_MDL_00357711
- WH_MDL_00357715
- WH_MDL_00357719
- WH_MDL_00357722
- WH_MDL_00357726
- WH_MDL_00357729
- WH_MDL_00357732
- WH_MDL_00357736
- WH_MDL_00357741
- WH_MDL_00357745
- WH_MDL_00357749
- WH_MDL_00357753
- WH_MDL_00357757
- WH_MDL_00357760
- WH_MDL_00357764
- WH_MDL_00357769
- WH_MDL_00357772
- WH_MDL_00357776
- WH_MDL_00357777
- WH_MDL_00357784
- WH_MDL_00357792
- WH_MDL_00357799
- WH_MDL_00357805
- WH_MDL_00357811
- WH_MDL_00357818
- WH_MDL_00357825
- WH_MDL_00357832
- WH_MDL_00357839

- WH_MDL_00357846
- WH_MDL_00357853
- WH_MDL_00357860
- WH_MDL_00357867
- WH_MDL_00357874
- WH_MDL_00357882
- WH_MDL_00357889
- WH_MDL_00357896
- WH_MDL_00357903
- WH_MDL_00357911
- WH_MDL_00357918
- WH_MDL_00357926
- WH_MDL_00357932
- WH_MDL_00357939
- WH_MDL_00357948
- WH_MDL_00357955
- WH_MDL_00357962
- WH_MDL_00357969
- WH_MDL_00357976
- WH_MDL_00357986
- WH_MDL_00357993
- WH_MDL_00357999
- WH_MDL_00358010
- WH_MDL_00358018
- WH_MDL_00358025
- WH_MDL_00358032
- WH_MDL_00358041
- WH_MDL_00358050
- WH_MDL_00358057
- WH_MDL_00358064

- WH_MDL_00358073
- WH_MDL_00358079
- WH_MDL_00358088
- WH_MDL_00358094
- WH_MDL_00358101
- WH_MDL_00358107
- WH_MDL_00358113
- WH_MDL_00358120
- WH_MDL_00358127
- WH_MDL_00358134
- WH_MDL_00358141
- WH_MDL_00358151
- WH_MDL_00358158
- WH_MDL_00358167
- WH_MDL_00358175
- WH_MDL_00358182
- WH_MDL_00358188
- WH_MDL_00358195
- WH_MDL_00358202
- WH_MDL_00358209
- WH_MDL_00358218
- WH_MDL_00358224
- WH_MDL_00358234
- WH_MDL_00358242
- WH_MDL_00358248
- WH_MDL_00358259
- WH_MDL_00358269
- WH_MDL_00358277
- WH_MDL_00358288
- WH_MDL_00358299

- WH_MDL_00358311
- WH_MDL_00358320
- WH_MDL_00358329
- WH_MDL_00358339
- WH_MDL_00358349
- WH_MDL_00358359
- WH_MDL_00358369
- WH_MDL_00358381
- WH_MDL_00358392
- WH_MDL_00358404
- WH_MDL_00358414
- WH_MDL_00358423
- WH_MDL_00358433
- WH_MDL_00358438
- WH_MDL_00358449
- WH_MDL_00358460
- WH_MDL_00358471
- WH_MDL_00358480
- WH_MDL_00358492
- WH_MDL_00358503
- WH_MDL_00358515
- WH_MDL_00358528
- WH_MDL_00358539
- WH_MDL_00358548
- WH_MDL_00358562
- WH_MDL_00358573
- WH_MDL_00358583
- WH_MDL_00358584
- WH_MDL_00358585
- WH_MDL_00358586

- WH_MDL_00358587
- WH_MDL_00358588
- WH_MDL_00358589
- WH_MDL_00358590
- WH_MDL_00358591
- WH_MDL_00358598
- WH_MDL_00358600
- WH_MDL_00358600
- WH_MDL_00358606
- WH_MDL_00358608
- WH_MDL_00358608
- WH_MDL_00367435
- WH_MDL_00369263
- WH_MDL_00370118
- WH_MDL_00406094

**II.**  Individual and Plan Defendant Responses to Plaintiff SKAT's Interrogatories and Requests for Admission

- Michael Ben-Jacob Responses and Objections to SKAT's Interrogatories
- The Individual Defendants' (Altbach, Herman, Jones, Lerner, Miller and Zelman) Responses and Objections to SKAT's First Set of Interrogatories
- The Plan Defendants' Responses and Objections to SKAT's First Set of Interrogatories
- Goldstein Plan Responses to SKAT's Interrogatories
- Shelson and Scott Goldstein Responses to SKAT's Interrogatories
- Acer Investment Group Answers to SKAT Interrogatories
- D. Schulman Answers to SKAT's Interrogatories
- D. Wittwer Answers to SKAT's Interrogatories
- DWC Plan Answers to SKAT's Interrogatories
- J. Mitchell Answers to SKAT's Interrogatories
- J. Schulman Answers to SKAT's Interrogatories

- Kamco Inv Plan Answers to SKAT's Interrogatories
- Kamco LP Plan Answers to SKAT's Interrogatories
- Linden Plan Answers to SKAT's Interrogatories
- Moira Plan Answers to SKAT's Interrogatories
- Newsong Plan Answers to SKAT's Interrogatories
- Riverside Plan Answers to SKAT's Interrogatories
- S. Kaminer Answers to SKAT's Interrogatories
- Doston Bradley's Answers to SKAT's Interrogatories
- Doston Bradley's Plans' Answers to SKAT's Interrogatories
- Roger Lehman's Answers to SKAT's Interrogatories
- Roger Lehman's Plans' Answers to SKAT's Interrogatories
- Defendant, Tucci's Objections & Answers to SKAT's First Set of Interrogatories
- Defendant, Tucci's Plans' Objections & Answers to SKAT's First Set of Interrogatories
- Jocelyn Markowitz' Responses and Objections to SKAT's First Interrogatories
- Markowitz Entity Defendants' Responses and Objections to SKAT's First Interrogatories
- Markowitz Plan Defendants' Responses and Objections to SKAT's First
- Richard Markowitz' Responses and Objections to SKAT's First Interrogatories
- Bernina Trust and Omenica Trust Responses and Objections to SKAT's First Interrogatories
- E. van Merkensteijn Responses and Objections to SKAT's First Interrogatories
- J. van Merkensteijn Responses and Objections to SKAT's First Interrogatories
- Van Merkensteijn Plan Defendants' Responses and Objections to SKAT's First Interrogatories
- Ben-Jacob's Responses and Objections to SKAT's Requests for Admission
- Altbach, Herman, Jones, Lerner, Miller, Zelman's Responses and Objections to SKAT's Requests for Admission
- Klugman Plan Defendants' Responses and Objections to SKAT's Requests for Admission
- R. Klugman Responses and Objections to SKAT's Requests for Admission
- RAK Trust Responses and Objections to SKAT's Requests for Admission

- Acer Investment Group LLC Response to SKAT's Requests for Admission
- AIG Plan Response to SKAT's Requests for Admission
- D. Schulman Responses to SKAT's Requests for Admission
- D. Wittwer Responses to SKAT's Requests for Admission
- DWC Plan's Response to SKAT's Requests for Admission
- J. Schulman Response to SKAT's Requests for Admission
- Kamco Investments Response to SKAT's Requests for Admission
- Kamco LP Plan Response to SKAT's Requests for Admission
- Linden Plan Response to SKAT's Requests for Admission
- Mitchell Response to SKAT's Requests for Admission
- Moira Plan Response to SKAT's Requests for Admission
- Newsong Plan Response to SKAT's Requests for Admission
- R. Crema Responses to SKAT's Requests for Admission
- Riverside Plan Response to SKAT's Requests for Admission
- S. Kaminer Responses to SKAT's Requests for Admission
- Doston Bradley Responses to SKAT's Requests for Admission
- Doston Bradley's Plans' Responses to SKAT's Requests for Admission
- Roger Lehman Responses to SKAT's Requests for Admission
- Roger Lehman's Plans' Responses to SKAT's Requests for Admission
- Tucci's Plans Objections and Responses to SKAT's First Requests for Admission to Certain Plan Defendants
- M. Tucci's Objections and Responses to SKAT's First Requests for Admission
- J. Markowitz' Responses and Objections to SKAT's Requests for Admission
- Markowitz Plan Defendants Responses and Objections to SKAT's Requests for Admission
- Markowitz' Entity Defendants Responses and Objections to SKAT's Requests for Admission
- Bernina Trust and Omenica Trust Responses and Objections to SKAT's Requests for Admission
- E. van Merkensteijn's Responses and Objections to SKAT's Requests for Admission

- Van Merkensteijn Plan Defendants' Responses and Objections to SKAT's Requests for Admission

**III.** Expert Reports

- Reish Expert Report in this matter, dated December 31, 2021.

**IV.** Other Documents

I incorporate by reference all documents listed in <u>Appendix E</u> of my initial expert report in this matter, dated December 31, 2021.