# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

CUSTOMS AND TAX ADMINISTRATION O0F THE
KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

MASTER DOCKET

18-md-2865 (LAK)

**EXPERT REPLY REPORT OF MARCIA S. WAGNER**
**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

{14353/A0684102.1}

I, Marcia S. Wagner, hereby submit the following Expert Reply Report in connection with the above-captioned matter.

A.    INTRODUCTION AND PURPOSE OF REPLY

1.    I previously submitted an expert report on this matter as an expert on the standards applicable to the qualification and administration of 401(k) retirement plans on December 31, 2021 ("Wagner Expert Report").  Counsel for the Plaintiff subsequently asked me to comment on the Expert Report of C. Frederick Reish, dated December 31, 2021 on behalf of Defendants (the "Reish Report") and these comments were submitted in my Expert Rebuttal Report ("Wagner Rebuttal Report"), dated February 1, 2022.  I am now called upon by Plaintiff to submit this Expert Reply Report relating to the comments of Mr. Reish in his Rebuttal Expert Report, dated February 1, 2022 on behalf of Defendants (the "Reish Rebuttal").  My qualifications as an expert and my compensation for preparing this rebuttal are the same as stated in my Initial Expert Report.  Capitalized terms herein have the same meaning as in my Initial Expert Report.  In addition to the documents reviewed in connection with my Initial Expert Report and Expert Rebuttal Report, I have also reviewed the documents listed in Appendix A hereto for purposes of this Expert Reply Report.

2.    I declare that the opinions expressed below, which are based on over three decades of experience with the administration and qualification of retirement plans under the Code, are true and correct to the best of my knowledge and belief.

B.    SUMMARY

3.    Any one of a list of transgressions applicable to the Plans, such as (i) the diversion of Plan assets in violation of the Code's exclusive benefit rule, (ii) improper funding of Plans benefitting only owner-employees (*i.e.*, the Individual Defendants), (iii) failure to maintain a permanent Plan, and (iv) pooling of Plan assets in the control of a foreign custodian could, on its own, justify disqualification of the Defendant Plans.  Reviewed collectively, however, the pattern of pervasive transgressions across the Plans demonstrates that the vast majority of them were not intended to, and did not in fact, operate as true qualified pension plans. Rather, they were vehicles to advance a dividend refund scheme.  In trying to avoid this conclusion, the Reish rebuttal makes a number of errors, including but not limited to the following:

i. The Reish Rebuttal's position that the exclusive benefit rule does not apply to excessive fees or partnership allocations, such as those received by Solo Capital, Ganymede, and the Argre principles is incorrect.

ii.      The Reish Rebuttal incorrectly states the applicable Code rule for making contributions to a one-participant 401(k) plan on behalf of its owner-employee participant. The actual Code rule specifically requires such contributions to be derived from the earnings of the plan sponsor's trade or business.  Most of the LLC sponsors of the Defendant Plans conducted no business activity whatsoever, and many of the Plans that purported to have done so  met this requirement only by shifting income to a Plan sponsor LLC from sources unrelated to that LLC.  These perfunctory attempts to meet the requirement in form rather than substance would not give rise to a legitimate trade or business for the purposes of plan qualification.

iii.      Contrary to the Reish Rebuttal, objective facts must be considered in determining whether a plan was intended to be a permanent retirement program as required by the Code, and the circumstances of a premature termination must stem from business reasons of the plan sponsor unrelated to the availability or viability of a particular plan investment.

iv.  The holding of hundreds of millions of dollars of Plan assets derived from withheld dividend refunds by a foreign custodian, such as Solo Capital, in an overseas jurisdiction violated Code rules that a court within the United States must be able to exercise primary supervision over the administration of a fund holding plan assets and that United States persons must possess the authority to control all substantial decisions regarding the fund.  Notwithstanding these rules, English courts had exclusive jurisdiction over Plan assets held by the Solo Capital and Solo Capital controlled it by virtue of its holding and allocation of fund assets as well as the authority granted under its custodial agreement.  In practice the Plans rarely (if ever) deviated from Solo Capital's investment instructions, and all substantial decisions

regarding Plan assets held by Solo Capital were made by overseas entities in violation of the Code.[1]

4.    The Reish Rebuttal fails to acknowledge that a fact pattern revealing systemic and persistent violations of ERISA and retirement industry standards may confirm that plans engaging in such conduct were never intended to be operated as tax-qualified plans established for retirement purposes.  In reviewing plan qualification, the IRS takes a holistic view, and ERISA and other industry standard norms would certainly be considered by the IRS.

5.    The Reish Rebuttal makes several unwarranted inferences and, in particular, asserts that an IRS "no change" letter issued at the conclusion of a plan audit with respect to the RJM Plan's filing of an annual report (Form 5500-EZ) with respect to its asset balance, contributions, and number of participants signifies a determination that the RJM Plan is tax-qualified on an ongoing basis and prevents the IRS from subsequently disqualifying the Plan on a retroactive basis.[2]

C.    KEY ASPECTS OF THE PLANS' CREATION AND EXPLOITATION

6.    I strongly disagree with certain interpretations of Tax Code conditions for qualified retirement plan status expressed in the Reish Rebuttal, as well as its application of these conditions to the Defendant retirement Plans in this case.[3]  A key reason for this disagreement is the failure of the Reish Rebuttal and its predecessor, the Reish Report, to take any notice of the nature and characteristics of the unprecedented transaction for which the Plans were created and exploited which is at the center of this case.[4]  I have taken pains to advise that the full extent of the Defendant Plans' violations of tax-qualification rules cannot be understood unless a comprehensive view of all the circumstances surrounding the formation of the Plans and their engagement in these transactions is undertaken.  On the other hand, both Reish Reports take a narrow, blinkered approach that discusses each qualified plan rule in isolation from any other

---

1    <u>See</u> Ira Reibeisen / Lehman Testimony.

2.    <u>See</u> ¶¶94 n.11, 101-116 Reish Rebuttal.

3.    <u>See, e.g.</u>, ¶¶167-70, 179 Reish Rebuttal.

4.    <u>See, e.g.</u>, ¶180 Reish Rebuttal; <u>see also generally</u> Reish Report and Reish Rebuttal.

qualified plan rule or customary practice and ignores the sole activity in which most of the Plans were engaged, namely the transaction designed by Solo Capital which purported to purchase massive amounts of stock in Danish companies in order to claim stock dividend refunds from SKAT.  Consequently, it is important to understand the history of how the Plans came into being and how they were utilized to facilitate the transactions.

7.    Solo Capital's scheme was designed to benefit itself and its affiliates but needed retirement plans to participate in the scheme, because only certain U.S. tax-exempt entities, such as tax-qualified retirement plans, were entitled to seek refunds of withheld taxes under the applicable tax Treaty.[5]  Plans recruited and/or created for this purpose were required to pay Solo a fee equal to 66% -75% or more of the refund proceeds (nominally labeled a services fee) as a condition for participation.[6]  The Solo transaction was attractive, because no one else was offering a transaction with similar features, such as the lack of a requirement to transfer any of the participants' own funds to the provider, thus limiting their outlays to the cost of setting up LLCs and Plans.[7]  Since the establishment of LLCs and Plans was merely part of an onboarding process that needed to be completed in short order and did not necessarily originate with the desire to establish a vehicle for accumulating retirement assets, for many Plans there was a haphazard approach to their documentation and operation.  Additionally, since the Plans were needed only to serve as vehicles to facilitate the Solo transaction, most of the sponsoring entities did not conduct any trade or business.[8]  Accordingly, the creation and operation of the Plans departed from the standards applicable to solo 401k pension plans, which are ordinarily established by small active businesses to provide future retirement income for their owners.

8.    Solo Capital was initially successful in obtaining refunds on withheld dividends from SKAT on behalf of the Plans based on the Dividend Credit Advice documents it issued to the Plans.  The refunds received by the Plans became Plan assets on receipt but were subsequently reduced significantly by Solo's fee, an exorbitant amount if viewed as a fee,

---

5.    JHVM_0010589 (Ex. 2245); Klugman Dep. Tr. at 65:16-21; Lehman Dep. Tr. at 472:13-25.

6.    JHVM_0010589 (Ex. 2245)

7.    See, e.g., Crescenzo Dep. Tr. at 52:16 – 53:1; LaChance Dep. Tr. at 211:25 – 212:7; Kertelits Dep. Tr. at 175:5-9.

8.    See, e.g., Defendant Doston Bradley's Objections & Answers to Plaintiff Skatteforvaltningen's First Set of Interrogatories to Certain Plan Defendants, Responses to Interrogatories Nos. 8 & 9.

although this diversion of the refunds might also be accurately described as Solo's share of a lopsided profit split with the Plans. In effect, Solo and other non-Plan entities were the primary beneficiaries of profits from the Plans' purported transactions, and the Plans were simply receiving a fee for renting out their name and tax-exempt status.

9.      Certain irregular behaviors on the part of individual Defendants and their Plans were associated with the Solo transactions and demonstrate that the pension plans were not established for legitimate purposes.  For example, many individual Defendants established multiple Plans (as many as seven each)[9] to participate in the scheme, motivated by Solo's per Plan allocation of shares in each new round of transactions.  Dissimilar names for LLCs and Plans unrelated to their actual business activity were used and, in some cases, invented and assigned by lawyers before the entities themselves were established or the attorneys knew who would be the members of the LLCs and the participants in the Plans.[10]  In my experience, these are not the actions taken by legitimate qualified pension plans. Rather, these tactics served to hide the fact that the source of all the dividend reclaims was a small group of individuals associated with Solo.  With this background, I will now discuss why the conclusions of the Reish Rebuttal justifying the formation and activity of the Plans are fatally flawed.

D.      EXCLUSIVE BENEFIT RULE

10.      The Reish Rebuttal wrongly argues that Solo's fees and other diversions of Plan assets consisting of the tax refunds did not cause the Plans to violate the Tax Code's exclusive benefit rule, because it is not impermissible for third-parties to benefit from plan investments.[11] While Mr. Reish states that he has never heard of the exclusive benefit rule being connected to reasonable fees,[12] this connection is directly stated in ERISA and in a number of the Plan documents, including the  RJM Plan instrument.[13]  While the version of the exclusive benefit rule expressed in the Code and its applicable regulations does not literally state that excessive

---

9.    ELYSIUM-05822425.

10.    KLUGMAN00007264; WH_MDL_00297405.

11.    ¶¶30–43, 45-46, 49 Reish Rebuttal.

12.    Reish Rebuttal ¶33.

13.    See ERISA section 404(a)(1)(A)(ii) and section XII.B.1(ii) of the RJM Capital Pension Plan Trust.

fees are a violation, it is uniformly understood that fees for investment transactions cannot be used as a cover for diverting plan assets to purposes other than providing retirement benefits. Indeed, the policy of the IRS has long been that in order for a plan investment to comply with the exclusive benefit rule, its cost must not exceed fair market value at time of purchase.[14]  The Reish Reports' conclusion on this matter further undermined because he does not consider the fact that Solo, its affiliate Ganymede, the Argre Principals, Lehman, and a few others received virtually the entire proceeds of the transactions.

11.     The Reish Rebuttal asserts that the fees received by Solo Capital were not excessive in light of Solo's expenses[15] and that, in any event, the plan sponsors could be counted on to act in their own best interest.[16]  Mr. Reish does not indicate the dollar amount of Solo's expenses or point to anything in the record that establishes their magnitude. He does not provide any support for what services Ganymede and Solo provided to the Plans that would justify the millions of alleged "costs and fees" that were siphoned from the Plans.  Rather, he relies on an otherwise unsupported statement by Mr. Markowitz.[17]  As to the individual LLC owners and Plan participants, they were indeed profiting from the scheme, since the deal did not require them to assume any risk and guaranteed a handsome return compared to the level of their commitment.  Thus, the usual incentives were turned upside down and compliance with traditional qualified plan rules only served to jeopardize the promised return. The crucial issue to determine if there is a violation of the exclusive benefit rule is not that the Plans made something

---

14.  The policy of the IRS has long been that in order for a plan investment to comply with the exclusive benefit rule, its cost must not exceed fair market value at time of purchase.  See Revenue Ruling 69-494,1969-2 CB 88.

15.  See ¶42 Reish Rebuttal.

16.  See ¶42 Reish Rebuttal which states: "There is no logical reason for a plan to subordinate the interest of participants to benefit an unrelated party, in particular for solo 401(k)s where the decision-maker is also the sole account holder."

17.  ¶43.b Reish Rebuttal.  At his deposition, Markowitz was asked to interpret a draft memorandum prepared by Kaye Scholer, dated September 9, 2013, that made the following statement, based on an unattributed source, about Solo's anticipated fees in a proposed transaction: "We [i.e., Kaye Scholer attorney Michael Ben-Jacob] have been informed that the fees to Solo equal approximately [25%] of the net profits realized on transactions, after payment of the additional costs for other brokers and other service providers used to effect the purchases and sales discussed above."  WH_MDL_00217652 at -657. On deposition, Markowitz's interpretation of this statement was, "Based on my understanding and consistent with the earlier memo we looked at, that 25 percent was our understanding and therefore correct."  Deposition of Richard Markowitz, April 9, 2021, at 540: 7-11.

from nothing, but that Solo, the Argre Principals, and a few others made orders of magnitude more than the Plans.

12.    Referring to the diversion of tax refund proceeds owned by the Plans to the Argre principals and Klugman through the Plans' participation in partnerships, the Reish Rebuttal states that he has never heard of an investment vehicle for qualified retirement plans that did not allocate profits in basic proportion to the amounts invested by its various investors.[18]  However, there was no commitment of funds to the Solo transaction by either the Plans or any other investors, so that proportionality was irrelevant as to the distribution of assets.  For instance, the Roadcraft Plan's U.S. bank account was funded with $100 from the owner/member's (Ronald Altbach) personal funds, but no contributions to the Solo investment platform were made from the Roadcraft Plan, the Roadcraft Plan's two partners—the Routt Capital Trust (controlled by Markowitz) and the RAK Capital Trust (controlled by Klugman)—or the partnership representing the three Plans, even though the Markowitz and Klugman trusts purportedly contributed 95% of the partnership's capital on a combined basis.[19]  Even if there had been an investment in Danish stock—which as many Defendants testified, there was not—the only party that had any claim whatsoever to a dividend reclaim would have been the Plan, not the other non-Plan partner "investors."  This is another example of how Reish's repeated reliance on his "experience" cannot be applied to the unprecedented nature of Solo transaction and its surrounding circumstances.[20]

13.    The Reish Rebuttal asserts that the allocation of partnership profits remaining after Solo's fee to the various entities in partnerships with the Plans was appropriate, since these Plans were entitled to benefit from earnings on their investment in the partnerships where they

---

18.  See ¶¶41, 44 Reish Rebuttal.

19.  WH_MDL_00029401. I do not credit as relevant the $40,000 paid by certain Plan partners into the Plans' Old Park Lane custody accounts as these were intended to be a loan to the partnership, not a capital contribution. See, e.g., JHVM_0004486; JHVM_0005683.

20.  The Reish Rebuttal makes several references as to the legitimacy of fees paid to mutual funds and other collective investment vehicles as if those fees are no different than the fees or division of profits in this case. (See ¶¶30, 32 and 41 of Reish Rebuttal.)  However, in the Solo transaction, there were no mutual funds, partnerships or any other collective investment vehicle holding an actual equity interest in Danish stocks or interests in derivative contracts giving rise to such an equity interest.

constituted the majority partners.[21]  I disagree, since, as a fiduciary matter, it would have been

unfair to structure a partnership with 95% majority Plan partners (whose participants were

insiders having direct contacts with Sanjay Shah) and 5% minority Plan partners, none of which

(majority or minority partners) made a contribution to the capital of the partnership that was

actually committed to investment in the Solo transaction.[22]  Under these circumstances, the

partnership allocation itself is arbitrary and inappropriate even if the respective partnership

contributions of the majority and minority partners had been, say $95,000 and $5,000, where

none of these contributions were actually utilized in producing millions of dollars of profits from

tax refunds.[23]  Further, since none of the funds alleged to have been contributed by the Plans to

the partnership were actually used to support the alleged trading transactions, there was never

any actual risk exposure for any of the Plans in the partnership.[24]  As such, it was impossible for

there to have been any proportional risk that would support the skewed split of the dividend tax

refunds seen here.  In sum, the principle of proportionality is illusory in the warped

circumstances of this case.

      14.     The reality of the partnership structure was that the 5% minority Plan partner

would simply relinquish to the majority partners 95% of what it was purportedly entitled to with

no justifiable business reason or explanation.[25]  This surrender of the lion's share of the profits is

particular egregious, because the minority Plans' purported right to a dividend reclaim was the

only profit generating asset of the partnership and there was never any intention or expectation

---

21.   See ¶45(d) Reish Rebuttal.

22.   See, e.g., WH_MDL_00029401. As stated, I do not credit as relevant the $40,000 paid by certain Plan partners into the Plans' Old Park Lane custody accounts as these were intended to be a loan to the partnership, not a capital contribution.  See, e.g., JHVM_0004486; JHVM_0005683.

23.   As Mr. Klugman testified, the Plan's purchases of Danish equities was completely funded by the Plans loaning out the same shares they had just purchased.

24.   Footnote discussing loans to partnerships.

25.   See, e.g., R. Altbach Dep. Tr. at 39:7-10 ("Specifically that I would have no risk and no investment. You're calling it an investment, but I didn't make an investment."); D. Zelman Dep. Tr. at 28:23-24 (Zelman was told by van Merkensteijn that Zelman "would not have to put money up"); id. at 31:3-4 ("My understanding was that I didn't have any financial risk."); J. van Merkensteijn Dep. Tr. at 131:11-12 (van Merkensteijn would have told Zelman he didn't have to put up any money.); id. at 177:6-8 (van Merkensteijn told Edwin Miller that he did not have any financial risk of losing money); Id. at 177:21-78:1 (same for Ronald Altbach and Perry Lerner); R. Klugman Tr. 126:2-19 (Klugman understood the plans purchased shares with no money down, with all the cash for the purchase coming from a stock loan transaction); P. Lerner Dep. Tr. at 43:24 – 45:15.

that the partnership would earn money from any other "asset," or that the 95% majority partners would contribute any assets from which the 5% partner could earn money. In sum, the partnerships were plainly a mechanism to funnel the divided tax refunds received by the Plans to the Argre Principals and Klugman, and in my experience the IRS would not hesitate to find that such an arrangement was a violation of the exclusive benefit rule.

E.    PLAN FUNDING AND LLC TRADE OR BUSINESS

15.    The Reish Rebuttal is critical of my Expert Report's statement regarding the need for LLC plan sponsors to have a trade or business capable of generating a regular stream of earnings from the business.[26] Mr. Reish asserts that an owner of an LLC can contribute capital to the LLC for purposes of enabling the LLC to make a contribution[27] and infers that a LLC or other business entity funded and capitalized by an individual is not prohibited from making qualified plan contributions until it can afford to do so from its own profits.[28]

16.    I agree with Mr. Reish that in some circumstances, such as contributions to the 401(k) accounts of common law employees, the source for plan contributions does not need to be the sponsor's business earnings.[29] But contributions to solo 401(k) plans on behalf of self-employed owner employees are a special case.[30] To permit the self-employed owner of an LLC sponsor to set up a retirement plan in which the owner will participate, the sponsor must have the potential to generate regular earnings from its trade or business sufficient to cover contributions for the benefit of the owner.[31] In the vast majority of cases, the Defendant LLC Plan sponsors

---

26.    See generally Reish Rebuttal ¶¶52-60.

27.    ¶¶52-53, 67.a Reish Rebuttal.

28.    ¶¶ 54, 57, 64 Reish Rebuttal.

29.    See, e.g., ¶54 Reish Rebuttal.

30.    For income tax purposes, an LLC with only one member, as in the case of the Defendant LLCs, is treated as an entity disregarded as separate from its owner, unless it elects to be treated as a separately-taxed corporation. For example, Markowitz's written response to an IRS question during his audit confirms the view that he participated in the RJM Plan "in his capacity as a "self-employed individual treated as an employee under Code section 401(c)(1)." WH_MDL_00356193.

31.    As a condition of qualified plan status, Code Section 401(d) requires plan contributions on behalf of an owner-employee to be made with respect to the owner's earned income derived from the specific trade or business with respect to which the plan is established. For this purpose, earned income includes only income with respect to a trade or business in which personal services of the taxpayer are a material income-producing factor. Code

lacked this attribute.[32]  A vague intention to start a rental real estate operation—as Bradley suggested[33]—does not count.  A vague intention to start a business at some indefinite future time, as some sponsors testified, does not count.[34]  In addition, under the terms of the Code, if an owner-employee maintains multiple LLCs, each of which sponsors a 401(k) plan in which the owner is the sole participant, contributions to each plan must be derived only from the earned income of the particular LLC which sponsors each respective plan.  In all such scenarios, contributions attributable to the owner-employee's personal savings are not allowed.

17.     Thus, the conduct of business activity by a potential sponsor of a solo 401(k) plan is a prerequisite to establishing the plan and inquiries as to the existence and nature of the business are the first questions many lawyers or advisers will ask  when dealing with a self-employed client who proposes to do so.[35]  The Reish Rebuttal inaccurately resolves the trade or business issue applicable to sponsors of solo 401(k) plans by implying that they can use funding

---

section 402(c)(2)(A)(i).  Moreover, passive income items, such as rentals from real property, are specifically excluded from net earnings which would have added to the difficulty of establishing a trade or business for LLCs based on rental real estate as contemplated, but never brought to fruition, by certain individual Defendants. Code Section 1402(a)(1).  As to the extent and duration of the required business activity, in Commissioner v. *Groetzinger*, 480 U.S. 23 (1987), the U.S. Supreme Court held that *activities conducted with continuity and regularity for the primary purpose of earning income or making a profit* will generally qualify as a trade or business. (Italics added.)

Additionally, a contribution on behalf of a self-employed individual may not create a net operating loss. That is, the contribution may not exceed the individual's earned income determined without regard to the deduction for the contribution. Code Section 404(a)(8)(C).  So, in my experience, a self-employed individual could not make any contribution to a plan established by his or her look-through entity (e.g., an LLC) if the individual had no earned income derived from the entity.

32.  See, e.g., Crescenzo Dep. Tr. at 109:4-12; Deposition of Perry Lerner, September 16, 2020, at 85:10-20, 86:8-16, 88:10-11, 90:15-22, 92:10-25 and 93:1-16.

33.  Defendant Doston Bradley's Objections & Answers to Plaintiff Skatteforvaltningen's First Set of Interrogatories to Certain Plan Defendants, Responses to Interrogatories Nos. 8 & 9.

34.  See, e.g., Defendant Roger Lehman's Objections & Answers to Plaintiff Skatteforvaltningen's First Set of Interrogatories, Response to Interrogatory No. 15.

35.  At first glance, the futile attempt by many individual Defendants to rely on their inchoate intent to start business activities in their LLCs appears inapplicable to the better advised LLCs of certain Defendants, such as Markowitz and van Merkensteijn who assigned purported personal consulting income to their LLCs contemporaneously with the Solo transactions.  However, as noted in my initial Rebuttal, a deeper investigation indicates that this effort to paint a picture of LLC business activity was tainted by Markowitz and van Merkensteijn having their LLCs bill each other commensurate amounts for purported services and ideas.

sources other than LLC earnings to support plan contributions as might be allowed with respect to contributions on behalf of common-law employees.[36]

18.    The Reish Rebuttal is also wrong to criticize the observation in Paragraph 97 of my Initial Report about the potential problem of properly classifying the financial support that Solo capital may have rendered to the Plans as either a Plan contribution or an extension of credit.[37] Neither of these distractions diminishes or excuses the fact that, with few exceptions, the LLCs violated yet another condition for qualified plan status by not having a trade or business.

19.    It is significant that many LLC sponsors and Plans in this case received minimal funding (generally, a few hundred dollars to $1,000) that was preposterously insufficient to finance the massive purchases the Plans proposed to make.[38] Even then, they were asked neither to risk these small amounts in Solo Capital's stock transactions nor to make additional Plan contributions for purposes of funding the transactions. As I have explained, the reason for the token funding of both LLCs and Plans was that the so-called Plan "investment" did not require the commitment of any money.[39] As no monetary commitment was actually required, the token funding only served to provide window dressing to make the Plan's establishment appear legitimate. Setting up an LLC and Plan was merely part of the onboarding process necessary to participate in this deal, and as a result, most of the participants did not comply with the more difficult operational requirement of engaging in business through the LLC which they overlooked or disregarded even though it would have enabled greater Plan contributions.[40]

---

36.    ¶¶72-75 Reish Rebuttal.

37.    ¶¶50-53 Reish Rebuttal.

38.    See, e.g., Crescenzo Dep. Tr. at 47:12-22; Bradley Dep. Tr. at 146:11-25, 148:10-17; see also Defendant Doston Bradley's Objections & Answers to Plaintiff Skatteforvaltningen's First Set of Interrogatories to Certain Plan Defendants, Responses to Interrogatories No. 7.

39.    See, e.g., ¶¶24, 129, 166 Wagner Expert Report.

40.    See, e.g., Defendant Doston Bradley's Objections & Answers to Plaintiff Skatteforvaltningen's First Set of Interrogatories to Certain Plan Defendants, Responses to Interrogatories Nos. 8 & 9. P. Lerner Tr. at 86:2-20, 89:24 – 93:16.

20.    The Reish Rebuttal asserts that, "there is no "minimum" contribution under IRS rules that is required to constitute "proper" funding of a 401(k) or similar plan."[41]  This is, yet another argument based on a claim I never made.  Mr. Reish's point seems to be based on a misunderstanding of my Report attributable to his refusal to consider the broader facts, such as the financial backing Solo Capital provided to the Plans and whether this should be treated as a Plan contribution.  To state this issue more bluntly, Mr. Reish overlooks the improbability of a Plan with assets of only $250 purchasing stock worth millions without outside help.

21.    With respect to the trade or business requirement for the LLCs, the Reish Rebuttal seeks to justify van Merkensteijn's allocation of consulting income to his LLCs participating in the Solo transaction by observing that "where an individual provides similar services (for example, consulting services) through more than one entity, the individual will necessarily need to decide which entity is providing the particular service and allocate the revenues to that entity."[42]  But as I have commented, each LLC must have had its own trade or business in order to set up a plan,[43] which it appears many of the sponsoring LLCs did not do.  That necessarily implies that each LLC would be holding itself out to the public as performing certain services or engaging in some other income-producing activity.  One cannot retroactively assign personal consulting income to an LLC that needs to have it for some other purpose, such as making a case that the LLC actually was regularly engaged in income producing activity.  The LLC that earns the income needs to be decided before the services are performed.  The issue has nothing to do with whether certain LLC Plan contributions could or could not be traced to a capital contribution, on which point my Report does not touch.  Here, it appears that the decision of Klugman, Markowitz, and van Merkensteijn to establish an LLC was determined by the number of Plans that Solo had allocated to them, rather than based on any legitimate intention to operate separate and distinct businesses.  Klugman, Markowitz, and van Merkensteijn then allocated purported business income to existing and new LLCs for the Plans that Solo had allocated to them, rather than based on the actual  business activity conducted by

---

41.    ¶66 Reish Rebuttal.

42.    ¶67 Reish Rebuttal.

43.    See, e.g., ¶¶130, 132 Wagner Expert Report.

each LLC.[44]  The entire process was backward looking with Klugman, Markowitz, and van Merkensteijn receiving an allocation from Solo and then establishing LLCs and Plans and dividing purported income to backfill and create the veneer of support for the allocation.[45] It is my opinion that the IRS would not find that this would constitute appropriate funding for a pension plan and would deem the Plans unqualified.

F.    PLAN PERMANENCE

22.    Regarding the issue of Plan permanence which is another of the Tax Code conditions for tax qualification of a retirement plan, the Reish Rebuttal insists that "it is only the "intent" that is relevant to qualification."[46] In Mr. Reish's experience, "the IRS does not require that qualified plans be permanent, or even necessarily long term. Rather, the IRS requires that the *intent*, at the time of plan establishment, is that it be other than a temporary vehicle, for example, that the plan is intended to last for an indefinite duration, as opposed to an intention that it only exist for a limited duration."[47]  Mr. Reish's assertions about the effect of a plan sponsor's intent in satisfying the requirement that a qualified retirement plan be a permanent program is contradicted by the IRS's interpretation of the requirement which I cited in my Initial Expert Report and is as follows: "when a plan is discontinued within a few years after its adoption for any cause other than business necessity, the original presumption of intended permanence must be replaced by a presumption that the employer did not intend the plan as a permanent program from the beginning."[48]

23.    The Reish Rebuttal argues that the lack of further contributions to the Defendant Plans by their sponsors resulted in their becoming frozen plans that nevertheless continued as permanent programs and retained their qualified plan status.[49] In Mr. Reish's view, a discretionary profit sharing plan would get special treatment on this issue, and the IRS would not

---

44.   R. Klugman Tr. at 23:6 – 25:19; J. van Merkensteijn Tr. at 170:25 – 172:5.

45.   Id.; KLUGMAN00007264; WH_MDL_00297405.

46.   ¶78 Reish Rebuttal.

47.   Id.

48.   Rev. Rul. 69-25, 1969-1 CB 113.  See also Treasury Regulation section 1.401-1(b)(2).

49.   ¶¶79-83 Reish Rebuttal.

consider relevant factors, such as the likelihood of the employer's ability to continue making contributions or whether recurring and substantial contributions have been made in determining permanence.[50]

24.    It is impossible to agree with the standards for plan permanence set forth by Mr. Reish, which fly in the face of applicable regulations and practice.  First, frozen plan status is not a limbo state in between a terminated plan and an ongoing active plan; being a frozen plan requires a formal plan amendment that specifies the scope of the freeze (e.g.,  ceasing admission of new participants or stopping further contributions or accrual of benefits).  The term, "abandonment," which the IRS uses in its rulings on plan permanence and as used in my Report in relation to the Defendant Plans,[51] refers to its ordinary dictionary sense of discontinuing any sort of activity with respect to something, here, any activity by the Plans.  The conduct of the vast majority of LLC sponsors and their owners in this case come within this meaning: after SKAT shut down the refund program, most Plans ceased receiving any further Plan contributions (either by way of LLC contributions, participant deferrals, rollovers, or any other mechanism) and the Plans engaged in no further investment activity of any kind.[52]  In many cases, LLC owners had little or no sense as to whether the Plans remained in existence.[53]  In many cases, they dissolved Plan bank accounts.[54]  In others, the owners dissolved the LLCs with no understanding as to what this meant for the Plans.[55]  The later circumstance appears to be what Mr. Reish defines as an "abandoned" plan.  In my opinion, the IRS would not think twice about retroactively disqualifying one of these Plans with a $250 bank account but having had no

---

50.   ¶¶80-83 Reish Rebuttal.

51.   ¶¶73, 100, 102, 135-36, 148, 158 Wagner Expert Report.

52.   Defendant Doston Bradley's Responses and Objections to Plaintiff Skatteforvaltningen's First Set of Interrogatories, Response to Interrogatory Nos. 7; Defendant Roger Lehman's Responses and Objections to Plaintiff Skatteforvaltningen's First Set of Interrogatories, Response to Interrogatory Nos. 19.

53.   The Plan Defendants Responses and Objections to Plaintiff SKAT's First Set of Interrogatories, Response to Interrogatory Nos. 11 & 12.

54.   G. Crescenzo Tr. at 50:9-23, 204:2-20; D. Bradley Tr. at 271:23 272:2; see also M. Tucci Tr. at 33:2 – 34:3.

55.   M. Tucci Tr. at 32:21 – 33:14.

prospect of additional contributions once the Plan ceased to take part in the Danish scheme and/or SKAT suspended its refund program.[56]

25.    Second, Mr. Reish's opinion on factors relevant to a determination of Plan permanence are in direct opposition to IRS regulations.  Mr. Reish asserts that he has never seen the IRS attempt to disqualify a plan or challenge its permanence so long as it has operated for at least five years.[57]  He draws support for this proposition from IRS Form 5310 which the IRS issues to a terminating plan that is applying for a determination as to its qualification and asks for contribution and participant information for the year of termination and the preceding 5 years.[58]  Reish also notes that Form 5310 requires the applicant to indicate the reason for the termination, which he surmises provides the IRS with the information needed to evaluate whether a plan that was intended to be permanent.[59]

26.    The five-year rule cited by Mr. Reish is not the correct standard: The length of time that a plan must operate in order to satisfy the permanency requirement is not specified in the Code or regulations and is of no relevance in the circumstances of this case where most Plans were abandoned before 2018.  As to the relevance of Form 5310, Questions 16 and 19 of the Form are concerned with plan vesting and have nothing whatsoever to do with whether or not the plan qualifies as a permanent program.  Thus, a less than fully vested participant who has separated from service will be precluded from claiming past service credit for vesting purposes if he or she ever returns to service after incurring five one-year breaks in service.  These questions provide the IRS with information on the unvested participants who have terminated service in the five years before the plan's termination. The five-year period looks backward in time from the plan's formal termination date, not forward from the plan's establishment date.

---

56.    Treasury Regulation section 1.401-1(b)(2) states: "The permanency of the plan will be indicated by all of the surrounding facts and circumstances, *including the likelihood of the employer's ability to continue contributions* as provided under the plan.  In the case of a profit-sharing plan, other than a profit-sharing plan which covers employees and owner-employees (see section 401(d)(2)(B)), it is not necessary that the employer contribute every year or that he contribute the same amount or contribute in accordance with the same ratio every year. However, *merely making a single or occasional contribution out of profits for employees does not establish a plan of profit-sharing. To be a profit-sharing plan, there must be recurring and substantial contributions* out of profits for the employees." (Italics added.)

57.    ¶85 Reish Rebuttal.

58.    ¶¶87-89 Reish Rebuttal.

59.    ¶89 Reish Rebuttal.

27.    Regarding the reason for a plan's termination, Item 14 in IRS Form 5310 gives the following choices to respond to the question of why the plan is being terminated:

    a. Change in ownership by merger.
    b. Liquidation or dissolution of employer.
    c. Change in ownership.
    d. Adverse business conditions (attach an explanation).
    e. Adoption of new plan. Enter type of new plan.
    f. Other (specify).

Unless the applicant responds to Line 14.f by stating the plan was never intended to be permanent, it is difficult to see how this item can give the IRS information about a plan's permanence or impermanence.  It should be noted that Lines 14 a-e relate to conditions affecting the plan sponsor, not to plan investment issues and that, if applicable, an answer to Line 14.f should be similarly limited in scope.

28.    Mr. Reish maintains that the IRS sanctions other acceptable reasons for plan termination, such as a "substantial change in stock ownership" and even "employee dissatisfaction with the plan."[60]  But these are just additional business conditions affecting the LLC plan sponsors, and many of the LLCs in this case did not have any businesses whatsoever,[61] much less adverse business developments which might have influenced the LLCs to terminate their retirement plans.  In this case, everything turned on the viability of Solo's scheme which was a Plan matter, and Mr. Reish cannot transform SKAT's termination of its refund program into a negative business development affecting the LLCs.

29.    Mr. Reish's final observation on the Plan permanence issue is that a plan established to take advantage of a particular investment opportunity that unexpectedly ceases to exist would, in his opinion, be treated as a permanent plan, because its sponsor did not intend for the plan to be a short-term tax deferral vehicle upon establishment and the termination was due to an unforeseen factor that arose after the Plan was established.[62]  Apart from the IRS's view that the criteria for determining permanence includes sponsor business reasons but not plan investment reasons, there is false logic in Mr. Reish's opinion.  Specifically, there does not seem

---

60.    ¶90 Reish Rebuttal.

61.    See e.g., P. Lerner Tr. at 85:10-20, 86:8-16, 88:10-11, 90:15-22, 92:10-25 and 93:1-16.

62.    ¶¶22, 78, 91, 97-100 Reish Report.

to be a link between the sponsor's intent to set up a permanent retirement program and the availability of a single investment opportunity.  It was not infeasible for the plan to continue operating with alternative investment opportunities.  There is also the more practical point that the Plans in this case appear to have been incidental to the Solo transaction and do not appear to have been established with the intent to provide retirement benefits but to facilitate the transaction.  In my opinion, Mr. Reish's tortured logic regarding plan permanence is unsupported.

30.     A constant refrain in the Reish Rebuttal is that a prospective plan sponsor's subjective intent to establish a permanent retirement plan supersedes all questioning of whether the plan was, in fact, a permanent retirement program.[63]  However, when it comes to plan permanence, the IRS views ascertainment of an employer's true intention to be impossible and instructs its examiners to review objective factors, such as employer earnings records, to determine the employer's ability to make future payments to the plan. The permanence rule relates back to the ultimate question of whether the Defendant Plans were <u>bona fide</u> retirement programs for the exclusive benefit of employees.  The various objective factors I have cited as to why the Defendant Plans were impermanent arrangements established for purposes other than providing retirement benefits should be instructive and determinative in this regard.[64] While I do not believe that it is an expert's role to opine on a defendant's intent, if asked, and based on the totality of circumstances here, I would advise that there is no reason to believe that the Defendants intended to establish permanent plans, and that the objective factors I have reviewed point decidedly to the contrary.  I further believe that the IRS would come to the same conclusion if provided all the relevant evidence.

G.     IRS NO CHANGE LETTER

31.     The Reish Rebuttal notes that the IRS requested and reviewed substantial information relating to the RJM Plan going back several years in a nearly two-year audit that concluded on February 3, 2020 with the issuance of  a "no change" letter accepting the RJM

---

63.   See id.

64.   <u>See</u> ¶¶16, 100-102, 135, 148, 158 Wagner Expert Report.

Plan's 2016 Form 5500-EZ filing as previously filed.[65]  Mr. Reish implies that this was
tantamount to an IRS determination that the RJM Plan continued to be a qualified plan as to its
form and operation, or at least indicating that the IRS did not find any disqualifying defects in
the form or operation of the Plan.[66]  However, the no change letter said no such thing and only
referred to the government's acceptance of the Form as filed.[67]  In my experience, the IRS is
precise in its taxpayer communications and would never take the expansive interpretation
adopted by Mr. Reish.  The scope of an IRS audit examination rarely covers all the conditions
for tax qualification and IRS determinations are correspondingly narrowed. [68]

       32.     The IRS's initial letter announcing the audit stated that the RJM Plan was either
randomly selected or part of a special project.[69]  The initial questions related to eligibility to
participate as reflected in payroll records, the vesting and distribution of benefits, compliance
with deduction limits, discrimination in favor of highly compensated employees, trustee records
as reflected in ledgers and journals and controlled group issues, meaning the RJM Plan's
relationship with other employers controlled by Markowitz.[70]  Thus, the focus of the audit was
not on investments of the RJM Plan.

       33.     Mr. Reish notes that the IRS requested and received, "all monthly bank and
broker statements" for 2012 - 2016 for the RJM Plan, along with significant additional
information, including documents with information about the "plan account at Solo Capital
Partners" and significant tax and financial information concerning Solo and other investment
partnerships.[71]  In light of these gaps and revisions in the information provided to the IRS, it is

---

65.  ¶¶101-114 Reish Rebuttal.

66.  See ¶ 116 Reish Rebuttal.

67.  WH_MDL_00358606.

68.  The information on Form 5500-EZ is largely restricted to the number of plan participants and the amount of its
assets and contributions from participants and employers.  The RJM Plan's filing for 2016, the year being
audited, reported one participant, no employer or participant contributions and assets of $4,594,115 and
$4,994,409 at the beginning and end of the year, respectively.  This information conveys almost nothing about
the RJM Plan's operations and whether they met the conditions for tax qualification.

69.  IRS Letter to Markowitz, dated March 21, 2018.  WH_MDL_00356183.

70.  Id. at WH_MDL_00356185 – 00356187.

71.  ¶106 Reish Rebuttal.

difficult to see how its examiner could have discovered a diversion of Plan assets leading to the conclusion that the Plan had violated the exclusive benefit rule. Thus, any attempt to extrapolate the audit's favorable conclusion to mean that the IRS somehow sanctioned the Plan's involvement in the Solo transaction must, in my opinion, fail.

34.    The Reish Rebuttal states that, in Mr. Reish's opinion, the IRS examiner had access to sufficient information to enable her to determine whether the RJM Plan should have been formally disqualified, and the fact that the IRS did not take this step at the conclusion of the audit signifies its judgment that the RJM Plan was then and is now qualified.[72] Mr. Reish attempts to substantiate this tendentious claim by citing three classes of materials he asserts were received by the IRS: (i) all the RJM Plan's "monthly bank and broker statements" for 2012 – 2016; (ii) information about the RJM Plan account at Solo and (iii) significant tax and financial information concerning Solo and other investment partnerships.[73] The Reish Rebuttal does not identify any specific information included in these materials except that they showed that the RJM Plan was formed in 2013.[74] The Reish Rebuttal appears to suggest that the IRS examiner was aware of certain anomalous aspects of the RJM Plan's investment activity.[75]

35.    Given this background, there are two problems with Mr. Reish's conclusion that the IRS did not object to the RJM Plan's participation in the Solo transaction. First, it rests on pure speculation as to the specific facts the IRS knew.[76] For instance, there is no indication in the record that the RJM Plan disclosed to the IRS that it had entered an agreement with Ganymede—a Solo affiliate—to pay over 66% of the refunds received from SKAT, nor that Solo was acting not only as custodian, but also essentially dictating the purported trades in which the Plans engaged. Nor is there any indication that the IRS would have been aware that the partnerships in which the RJM Plan held an interest were designed so that the 5% minority partner Plan literally gave away 95% of the

---

72.    ¶¶104, 107 Reish Rebuttal.

73.    ¶106 Reish Rebuttal.

74.    ¶106 Reish Rebuttal.

75.    ¶¶104-110 Reish Rebuttal.

76.    Solo Capital's Open Position Statements gave little clue as to the excessive nature of its fees given that these statements listed clearing charges and brokerage, custody and equity fees as zero. WD_MDL_00524103; WD_MDL_00524112.

dividend tax refund to the majority partners. Mr. Reish's conclusion also makes unwarranted assumptions about the scope of the audit and what the IRS was looking for. The audit purported to be about the accuracy of the RJM Plan's 5500-EZs. Certain inaccuracies were identified and corrected and certain transfers into and out of the RJM Plan from and to other Markowitz retirement vehicles were explained. This may have been sufficient to satisfy the IRS's limited objectives without straining its finite resources.[77]

36.    In addition, it is doubtful that the information furnished to the IRS disclosed the reciprocal billing arrangement between the Markowitz and van Merkensteijn families which either inflated or completely invented trade or business income for many of their LLCs.[78] Markowitz's response to the IRS regarding the business activities for each of his family's LLCs was generic and failed to indicate which businesses were associated with each LLC.[79] In light of the fact that the income of the various LLCs was reported on the joint tax returns of Markowitz and his spouse, the IRS apparently chose not to pursue the question of whether the income was properly allocated to each Plan. How much of the LLC income was attributable to years before the RJM Plan was established in 2013 and how much related to planning, advice, and recordkeeping to other participants in the Solo transaction cannot be determined. Even if the RJM LLC engaged in bona fide business activity, this has no bearing on whether the other sponsoring LLCs formed on the eve of participation in the Solo transaction met the trade or business requirement. As pointed out in my Rebuttal Report, the RJM LLC's unique circumstances do not apply to other sponsoring LLCs,[80] and the particular facts and circumstances surrounding each LLC and Plan, as well as

---

77.    There is no indication that any of the IRS's information requests pertained to the indicators of fraud listed in its Internal Revenue Manual, see Internal Revenue Manual § 25.1.2.3, or that it had instituted internal procedures for investigating fraud, id. § 25.1.9.5.1.

78.    ¶11 n.12 Wagner Rebuttal Report. I understand that on November 3, 2021, SKAT served interrogatories on the Markowitz defendants, seeking a information about the specific business of the LLCs sponsoring the RJM and other Plans, but that the Markowitz defendants have to date not provided that information.

79.    Markowitz's response to the IRS's question regarding business activities "for each" LLC was as follows: "The business activities conducted by Mr. Markowitz through these companies consist of (1) consulting and advisory services regarding private investments, financings, mergers and acquisitions, and business strategy, (2) advisory, administrative and recordkeeping services provided to third-party investment vehicles, (3) assistance with raising capital for third-party companies, and (4) investment in e-Learning companies, private equity transactions, hedge funds, and early-stage financial services companies." WH_MDL_00356586 at -587.

80.    ¶¶10-12 Wagner Rebuttal Report.

how the Plans were used together, must be considered in determining whether the conditions for tax-qualification were met.[81]

37.     Mr. Reish maintains that he has not seen any evidence that Defendant Plans other than the RJM Plan should or would have been disqualified by the IRS and, using his word, "presumes" the IRS would have taken action against these other plans if it had any reason to suspect that their operation failed to meet tax-law requirements.[82] The limited scope of Mr. Reish's review of the Plans and the transaction in which they engaged would seem to make this an unreliable presumption, but in any event, the observation is made even more untrustworthy by the fact that the RJM Plan was something of a one-off compared to the general run of Plans.

38.     Other LLCs and Plans were handled in a more egregious manner than the Markowitz Plans.  For example, five LLCs and five Plans were formed by Kaye Scholer on behalf of Defendant Perry Lerner, who was recruited by Argre principal, van Merkensteijn.  The five LLCs were (1) Loggerhead Services LLC, (2) Eclouge Industry LLC, (3) First Ascent Worldwide LLC, (4) PAB Facilities Global LLC and (5) Trailing Edge Productions LLC.  In each case, Mr. Lerner testified that the names were assigned to him in order to participate in the Solo transaction and that: (i) he never intended to use these entities to conduct business activities, (ii) he never actually conducted any business through the LLCs, and (iii) the LLCs never generated any business income.[83] Mr. Lerner even testified that he participated only as a favor to his friend van Merkensteijn.[84] This was clearly a case in which the self-employed owner of the LLCs not only failed to meet the trade or business requirement but where the Plans were simply a vessel for the Solo transaction with no relationship to the purpose of providing retirement benefits.  Further, while the RJM Plan only paid Solo 66% of the refunds from SKAT, Mr. Lerner's five Plans paid Solo 75% and then (after fees) 95% of the remainder to the Routt Capital Trust (controlled by Markowitz), the Omineca Trust (controlled by van Merkensteijn), and/or the RAK Investment Trust (controlled by Klugman).  The RJM Plan was left with 33% of the refunds, but Mr. Lerner's Plans were left with at most 1.25% (.25 x .05), an even more

---

81.   ¶¶4, 28 Wagner Rebuttal Report.

82.   ¶116 Reish Rebuttal.

83.   P. Lerner Tr. at 85:10-20, 86:8-16, 88:10-11, 90:15-22, 92:10-25 and 93:1-16.

84.   P. Lerner Tr. at 43:20 – 45:15.

egregious violation of the exclusive benefit rule.[85]  In the materials I have reviewed, Mr. Lerner's Plans were not an exception in this respect.

39.     The Reish Rebuttal comments that the IRS examiner did not request or analyze any information concerning the RJM Plan's adherence to fiduciary standards derived solely from ERISA or that have become embedded in industry norms and practice due to the influence of ERISA over the nearly half century since ERISA's enactment.[86]  While the IRS does not enforce ERISA, the IRS would certainly have found important the diversion of Plan assets and the transitory nature of most of the Plans which were camouflaged by lack of information about the Solo transaction.  In addition, the IRS would have found it relevant to the issue of Plan tax-qualification that the LLC Plan sponsors ignored or sought to evade the trade or business requirement and that the Plans were operated in disregard of fiduciary provisions and tax rules protective of Plan interests embedded in the Plan documents.

H.     IMPERMISIBLE POOLING OF PLAN ASSETS

40.     The Reish Rebuttal rejects the applicability of the IRS's group trust rulings to the Solo transaction.[87]  The objective of these rulings is to ensure that "it must be impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the plan and the trust or trusts, for any part of the corpus or income to be used for, or diverted to, purposes other than for the exclusive benefit of the employees or their beneficiaries."[88]  This is achieved by requiring written safeguards to be incorporated in the group trust document ensuring the preservation of the contributing plans' separate interests as a condition of their continued tax-qualification under the Code.  As Mr. Reish notes, this generally does not affect the pooling of plan assets where a plan's interest is reflected in investment units, such as a mutual fund shares, partnership interests or other equitable interests in investment fund

---

85.  WH_MDL_00012540; WH_MDL_00012555; WH_MDL_00012567; WH_MDL_00012586; WH_MDL_00012603.

86.  ¶115 Reish Rebuttal.

87.  ¶¶120, 130-31 Reish Rebuttal.

88.  Revenue Ruling 1981-100, 1981-1 CB 326.

vehicles.[89]  However, there are key differences in the case of the Solo transaction which Mr.
Reish has failed to consider.

41.    In the Solo transaction, there were no mutual fund shares, legitimate partnership
interests, membership interests, funds, or other investment vehicles in which Plans held an interest
through a fund unit.  Moreover, the parameters of the business or investment activity by the fund
is generally communicated to the plan investor.  Even in an alternative investment fund structured
as a partnership, the asset classes on which the fund will focus are specified.

42.    The Solo transaction was strikingly different.  It did not require the Plan investors
to commit any funds whatsoever,[90] and its only profits were generated from the refunds paid by
SKAT.[91]

43.    Solo Capital's  custody agreement provided that "Investments may be pooled with
the investments of other clients."[92]  The custody agreement also stated: "The Custodian will not
segregate TTC funds [essentially, cash owed to Solo, such as its 65% - 75% share of dividend
refund proceeds] from the Custodian's own assets and the Custodian may use TTC Funds in the
course of its own business."[93]  This was the arrangement in which tax refunds from SKAT were
held by Solo Capital.  If Solo were to become insolvent, as actually occurred, the Custody
agreement provided that "the Client will rank only as a general creditor."[94]  The custody
agreement denied "any fiduciary or equitable duties by the Custodian to the Client" arising under
the custody agreement or the services provided by the custodian.[95]  The arrangement was
functionally equivalent to a group trust joined by all the trusts of the Defendant Plans in which the
custodian retained the right to treat the assets in any way it saw fit, including their allocation

---

89.    ¶¶122-31 Reish Rebuttal.

90.    See footnote 23, infra.

91.    J. van Merkensteijn Tr. at 142:13-18.

92.    Section 6.2 Solo Client Custody Agreement, NYCATAX00000150 at -153.  The language in the Old Park
        Lane, Telesto, and West Point agreements I have reviewed present the same issues.  See JHVM_0004738 §
        7.2; ELYSIUM-03756404 § 7.2; ELYSIUM-04645256 § 7.2.

93.    Section 4.3.2 Solo Client Custody Agreement, NYCATAX00000150 at -152.

94.    Id.

95.    Section 16.8 Solo Client Custody Agreement, NYCATAX00000161.

among the Plan investors.[96] This is exactly the situation at which the protections specified in IRS group trust rulings are aimed.

44.      The Reish Rebuttal's analysis of the asset pooling issue focusses on conventional forms of investment.[97]  It presumes that Solo's transaction was like them without ever grappling with its unique characteristics.  It simply does not matter that the Solo transaction was not on a list of proscribed investments which seems to be the standard applied by Mr. Reish.

I.      APPLICABILITY OF ERISA STANDARDS

45.      The Reish Rebuttal comments that "virtually all" the Defendant Plans were owner-employee 401(k) plans in which the owner was the sole participant so that ERISA's provisions did not apply.[98] Yet, some of the Defendant Plan documents incorporate ERISA fiduciary standards either by reference, word for word provisions mirroring sections of ERISA or paraphrasing of ERISA fiduciary language.[99]  Some of the Plans with ERISA language include a carve-out for plans otherwise not subject to ERISA that renders the ERISA fiduciary rules inapplicable to solo 401(k) plans.  However, other Plans with ERISA language do not include such a carve-out, [100]and in this event, the ERISA rules included in the document would be enforceable as a contractual matter or under state fiduciary law.[101]  In addition, since a qualified plan is by definition a "written program,"[102] persistent and deliberate violations of a plan instrument's written terms regarding

---

96.   To the extent there was any methodology for allocating the cash refunds held by Solo Capital, it appears to have been based on a per Plan allocation assigned by Solo prior to the transaction that differed from Plan to Plan and was not dependent on the relative size of the Plan's commitment of funds.

97.   ¶¶122-31 Reish Rebuttal.

98.   ¶135 Reish Rebuttal.

99.   See, e.g., WH_MDL_00024858.

100.  See, e.g., WH_MDL_00024858

101.  See e.g., *Hartshorne v. Roman Catholic Diocese of Albany*, 2021 NY Slip Op 07329 (Appellate Division of the Supreme Court of New York, Third Department, Dec. 23, 2021).  While it would be unrealistic for an owner-employee participating in one of the Defendant Plans to successfully bring such a case, this would not be true for an innocent beneficiary of the participant.

102.  Treasury Regulation section 1.401-1(a)(2).

ERISA standards raises the potential for disqualification by the IRS or a court on the grounds that the violations rendered the written program a nullity (*i.e.* no applicable writing).[103]

46.    The Reish Rebuttal implies that solo 401(k) Plan sponsors/participants should be trusted to take care of their own interests without government regulators looking over their shoulder.[104]  As I have previously observed, however, in this case, self-interest motivated the individual Defendants to disregard fundamental standards related to the basic purpose of their Plans (*i.e.*, accumulating assets for use after retirement), since the Solo transaction was available only if they agreed to depart from those standards by allocating most of the proceeds to third parties.

47.    The Reish Rebuttal also asserts that the IRS does not enforce ERISA's fiduciary standard of care for managing investments,[105] which I interpret as an attempt to read prudence out of the Code.[106]  However, when imprudence takes the form of ceding unfettered control of plan investments to third parties who use plan assets for their own purposes to the plan's detriment, I am on solid ground in predicting that the IRS would act to disqualify the plan, since its very purpose is eviscerated.  Solo Capital's control over the allocation of dividend proceeds and the unwitting agreement of Perry Lerner to split his Plans' interest in the net dividend proceeds remaining after Solo Capital's fee with a Markowitz Plan (70%) and a Klugman Plan (25%) are two of many examples that come to mind.[107]

J.    LOCATION AND CUSTODY OF ASSETS

48.    Plan assets were required to be held within the jurisdiction of U.S. courts. Under ERISA, there are alternative ways of complying with this mandate, but they generally

---

103.  The fact that the standardized plan documents adopted by the non-ERISA Plans in this case included ERISA fiduciary rules is a measure of how thoroughly ERISA standards have been accepted by the retirement industry and embedded in its practices.

104.  See generally ¶¶143-80, 182-83 Reish Rebuttal.

105.  ¶138 Reish Rebuttal.

106.  ¶138 Reish Rebuttal.

107.  Lerner Deposition at 127:25 – 128:3 and 129:10 – 130:20.  In Lerner's case, the remaining 5% of dividend refund proceeds his Plans received after Solo Capital's 65% fee and the split with the Markowitz and Klugman plans meant that a Lerner Plan received 1.75% of the gross refund (35% x 5%) paid in the name of the Lerner Plan by SKAT.

involve some degree of control over plan assets by U.S. financial institutions, even if the assets are held by custodians overseas. Solo Capital's holding of cash attributable to dividend refunds on behalf of the Plans would not have met these requirements, since its client custody agreement granted exclusive jurisdiction in the settlement of claims and disputes to English Courts.[108] As acknowledged by the Reish Rebuttal, certain Defendant Plans included provisions in their documents prohibiting the indicia of Plan assets from being held outside the jurisdiction of U.S. District Courts,[109] a requirement that was clearly not met in this case in light of the custody agreements' exclusive jurisdiction provisions.[110] I do not understand the logic of Mr. Reish's apparent conclusion in ¶¶ 149 and 150 of his Rebuttal that such a provision is not meant to be enforced with respect to a non-ERISA plan, such as the solo 401(k) Plans in this case, and he provides no support or explanation for this conclusion. If that is, in fact, what he meant, then it cannot be taken seriously, since the provision in the cited Plans, and others like them, is not aimed solely at ERISA plans and does not direct compliance with ERISA. Rather, it directs that Plan assets be held within the jurisdiction of U.S. courts, although relaxation of this rule in accordance with ERISA regulations is allowed in certain circumstances not applicable to this case. As I have previously noted, ERISA principles are widely viewed as providing advantages to non-ERISA retirement vehicles, as well as to ERISA plans.

49.    Concern about the reliability of overseas trustees and custodians also appears in tax-qualification requirements which mandate that the trust holding plan assets be created or organized in the United States and maintained as a "domestic trust."[111] Similar requirements

---

108. Section 30 Solo Client Custody Agreement, NYCATAX00000164.

109. See ¶¶145-55 Reish Rebuttal.

110. For example, section 10.02(g) of the Battu Holdings LLC Roth 401K Plan, the Roadcraft Technologies LLC Roth 401(k) Plan and the Trailing Edge Productions LLC Roth 401(k) Plan all contained the following verbiage: "The Trustee shall not hold the indicia of ownership of any assets of the Trust Fund outside the jurisdiction of the District Courts of the United States unless in compliance with Section 404(b) of ERISA and regulations thereunder." KF_MDL_12517; WH_MDL_00024858; WH_MDL_00012429.

111. As I have previously noted, Treasury Regulation section 1.401-1(a)(3)(i) provides that "In order for a trust forming part of a pension, profit-sharing, or stock bonus plan to constitute a qualified trust under section 401(a), the following tests must be met: (i) It must be created or organized in the United States, as defined in section 7701(a)(9), and it must be maintained at all times as a domestic trust in the United States." ¶107 Wagner Expert Report.

apply to a group trust, that is, a trust designed to hold the assets of many individual or separate retirement plans.[112]  The exclusive jurisdiction afforded to English courts by its custodial agreement would, by definition, prevent Solo Capital from being treated as a domestic trust.[113]  As previously discussed, Solo Capital was operated and maintained for the commingling and collective investment of funds from other qualified plan trusts, specifically the trusts of the 193 Defendant Plans.  In effect, Solo Capital functioned as the de facto—yet non-compliant— trustee of a group trust.  The trustee of a group trust subject to U.S. tax law may seek a determination from the IRS that it is a tax-exempt entity for Federal income tax purposes; assuming it had no contacts or activity in the United States, Solo would have had no need for such a determination, but, in any event, it would not have met the requirements for tax-exemption in view of its inability to qualify as a domestic trust.

50.    The consequences of Solo's failure to qualify as a domestic trust were more dire for the Defendant Plans and their trusts that adopted the arrangement with Solo.  IRS group trust rulings make it clear that the basis for the limitations imposed on a group trust is the qualified plan requirement stated in Code section 401(a)(2) that "under each trust instrument it must be impossible,  … for any part of the corpus or income of the trust to be used for or diverted to purposes other than for the exclusive benefit of the employees or their beneficiaries."[114]  The relationship with Solo Capital did not entail any of the documentary or operational conditions set forth in the group trust rulings, including the domestic trust requirement, that were meant to ensure this fundamental objective.   Thus, the Defendant Plans that participated in the noncompliant arrangement with Solo Capital are subject to the penalty of disqualification.

51.    Mr. Reish disagrees with the import of the group trust rulings, and states: "What is required is that the investment purchased (*e.g.*, the shares of a mutual fund or the interest in a

---

112.  Rev. Rul. 2014-24, 2014-37 IRB 529, Rev. Rul. 2011-1, 2011-2 IRB 251, Rev. Rul. 81-100, 1981-1 CB 326.

113.  26 CFR § 301.7701-7(a)(1)(i) defines the meaning of a "domestic trust" for which purpose it requires United States courts to have "primary jurisdiction over the administration of the trust.". In addition, one or more United States persons must have the authority to "control all substantial decisions of the trust."

114.  Rev. Rul. 81-100, supra.

partnership) be then held in the trust."[115]  However, this scenario can be distinguished from Solo
Capital's arrangement, under which Plan assets held in cash by the custodian were comingled
with the assets of other Plans as well as assets of non-plan Solo customers instead of being held
in segregated trust accounts.  Mr. Reish states that the custodian's holding of "stocks and bonds,
shares of a mutual fund or otherwise, does not mean that plan assets have been impermissibly
diverted or 'commingled.'"  But this ignores the fact that Solo Capital's custodial agreement
failed to include any of the separate accounting provisions, or prohibitions on assignments by
plans adopting the arrangement of any part of their interest in the group trust, such as the IRS
requires to be included in group trust instruments.

K.    APPLICABILITY OF PROHIBITED TRANSACTION RULES

52. The Reish Rebuttal takes the position that prohibited transactions under ERISA *and*
under the Code, such as excessive fee arrangements with plan providers and the plan custodian's
involving the Plans in putative stock loan transactions with the custodian's affiliates, cannot
result in plan disqualification under section 401(a) of the Code.[116]  As noted in my Rebuttal
Report, in many cases there is an overlap between the two sets of rules, and the fact that a plan
has engaged in a prohibited transaction is no bar to its disqualification based on the same set of
facts that gave rise to the prohibited transaction.[117]  The Tax Court in the *Wingers Department
Store* case provides the appropriate analysis for the situation in the present case.[118]  As in the
*Wingers* case, the fact that the Plans' pervasive operational transgressions are described under
Code section 4975 (relating to prohibited transactions) is no reason why those same
transgressions do not also disqualify the plan under the exclusive benefit rule.

L.    PATTERN OF DISREGARDING RECORDS REQUIREMENTS

53.    The Reish Rebuttal concedes that all retirement plan sponsors should undertake
the measures my Expert Report cites as common to bona fide retirement plans, such as

---

115.  ¶121 Reish Rebuttal.

116.  ¶¶162-65 Reish Rebuttal.

117.  ¶16 Wagner Rebuttal Report.

118.  We are not here dealing with an isolated prohibited transaction described in Section 4975. Rather, our decision
       that the petitioner's trust did not operate for the exclusive benefit of employees is based on the totality of the
       transgressions that occurred and pervaded the entire operation of the Trust. The fact that some of these
       transactions are described specifically in Section 4975 and subject to an excise tax are merely fortuitous."

maintaining records reflective of plan operations, filing government reports where required[119] and reporting plan distributions on IRS Form 1099-R.[120]  But he then argues that the 193 Defendant Plans associated with Solo Capital that violated or neglected to comply with most of these requirements should be viewed in the same way as compliant plans.  This is not to say that all the Defendant plans were guilty of each and every qualified plan violation I have cited or that each of them disregarded every industry standard discussed.[121]  But the fact that all the Plans' failed in multiple ways to observe rules, regulations and standards, along with their specific violations of qualified plan rules, indicates that they were merely tools for the profit of Solo, the Argre principals, and a few others, and that the Plan sponsors were generally indifferent to satisfying the conditions for tax-qualification or meeting their participants' retirement needs.

54.    As to TIC and FBAR reporting, Mr. Reish reports his "understand[ing]" that the Defendant Plans associated with Argre consistently filed the applicable forms.[122]  The Reish Rebuttal then suggests that all the other Defendant Plans made similar filings.[123]  Mr. Reish also states that these putative filings are an indicia of the tax-qualified status of the Plans on behalf of which they were made.[124]  As made clear in my initial report, the record indicates that it was the Lehman (and not the Argre or Kaye Scholer plans) that consistently and egregiously failed to file the appropriate regulatory filings, which as stated is another indicia that the Plans were not designed as legitimate entities.

M.    RELEVANCE OF RETIREMENT INDUSTRY STANDARDS

55.    The Reish Rebuttal criticizes my Report's use of noncompliance with retirement industry standards by the Defendant Plans as an analytical tool to evaluate their status as tax-

---

119.  E.g., Form 5500 to the IRS, Treasury International System (TIC) forms to the Federal Reserve Bank and Foreign Bank and Financial Assets (FBAR) submissions to the Financial Crimes Enforcement Network (FinCEN).

120.  ¶¶168-75 Reish Rebuttal.

121.  Indeed, my report makes clear that my criticisms based upon the records requirement are limited to certain of the Plans.

122.  ¶174 Reish Rebuttal.

123.  ¶174 Reish Rebuttal.

124.  ¶174 Reish Rebuttal.

qualified plans.[125]  Any one of a list of transgressions—such as the diversion of plan assets in violation of the exclusive benefit rule, failure to maintain a permanent plan, improper funding of plans benefitting only owner-employees and the pooling of Plan assets in the control of a foreign custodian—would, on its own, justify disqualification.  The point about the Plans' departures from industry standards is that, when viewed holistically, nothing else about the operation of these Plans looked right: the recruitment process in which individual Plan sponsors saw only the signature pages of the LLCs, Plans and partnerships that were being formed, the redundant multiple Plans, the unique naming process for LLCs and Plans, the failure of most LLCs to conduct business activity, the meager bookkeeping by many Plans, the failure to resolve regulatory issues, the misleading responses to government regulators, and the extraordinary returns achieved with no commitment of Plan funds, all spoke to the likelihood that the Plans were not established for retirement purposes, as required by the conditions the IRS has set forth for tax-qualification.

N.      CONCLUSION

56.     The Reish Rebuttal's presentation of qualified plan rules is unreliable, as exemplified by its failure to accurately state the Code's funding requirements for solo 401(k) plans, such as the Defendant Plans.  But in my view, its greater defect is the failure to apply these rules to the facts of this case.  The Reish Rebuttal's approach is to set forth Mr. Reish' selective version of a rule in isolation from any other rule and then, without considering facts (but in some cases relying on an "understanding" not derived from the record), to conclude that he has never seen or never heard of the IRS disqualifying a plan under the rule in question in the circumstances of this case.  This approach does not assist a reader in understanding how the abstract principles of the Code and regulations apply to new and unique factual patterns, such as the steps taken in implementing the Solo transactions.  As I have previously stated, making sense of this case requires a comprehensive view of the gestation, execution, and results of these transactions.  Finally, the Reish Rebuttal relies too heavily on unwarranted inferences.  In theory and in practice, an IRS "no change" letter with respect to the filing of a plan report does not signify its sanction of the plan's qualified status or prevent the IRS from subsequently taking action to retroactively disqualify the Plan.

---

125.  ¶¶176-80 Reish Rebuttal.

* * * * * * * *

This Reply Report is executed this 28th day of February 2022 at Boston, Massachusetts.


Marcia S. Wagner

# Appendix A

## APPENDIX A: MATERIALS CONSIDERED

**I.    Bates Stamped Documents**

- CAYMAN_00004215

- ELYSIUM-04645256

- ELYSIUM-00335145

- ELYSIUM-03756404

- ELYSIUM-05822425

- JVHM_0004486

- JVHM_0004738

- JHVM_0010589

- JHVM_0005683

- KF_MDL_12517

- KLUGMAN00007264

- MBJ_0023464

- MPSKAT00008759

- MPSKAT00010288

- NYCATAX00000164

- NYCATAX00000161

- NYCATAX00000153

- NYCATAX00000152

- WH_MDL_00368734

- WH_MDL_00223633

- WH_MDL_00356185

- WH_MDL_00358606

- WH_MDL_00356193

2

Appendix A

- WH_MDL_00356183
- WH_MDL_00356587
- WH_MDL_00217657
- WH_MDL_00024858
- WH_MDL_00012540
- WH_MDL_00012603
- WH_MDL_00012555
- WH_MDL_00012429
- WH_MDL_00012567
- WH_MDL_00029401
- WH_MDL_00012587
- WH_MDL_00297405
- WH_MDL_00523288
- WH_MDL_00283898
- WH_MDL_00284312
- WH_MDL_00523289
- WH_MDL_00363224
- WH_MDL_00523290
- WH_MDL_00523291
- WH_MDL_00523292
- WH_MDL_00523293
- WH_MDL_00523294
- WH_MDL_00523295
- WH_MDL_00523296
- WH_MDL_00523297
- WH_MDL_00523298

Appendix A

- WH_MDL_00523299
- WH_MDL_00523300
- WH_MDL_00523301
- WH_MDL_00523302
- WH_MDL_00523303
- WH_MDL_00523304
- WH_MDL_00523305
- WH_MDL_00523306
- WH_MDL_00523307
- WH_MDL_00523339
- WH_MDL_00523369
- WH_MDL_00523397
- WH_MDL_00523429
- WH_MDL_00523465
- WH_MDL_00523495
- WH_MDL_00523523
- WH_MDL_00523549
- WH_MDL_00523577
- WH_MDL_00523607
- WH_MDL_00523637
- WH_MDL_00523663
- WH_MDL_00523693
- WH_MDL_00523723
- WH_MDL_00523749
- WH_MDL_00523781
- WH_MDL_00523801

**Appendix A**

- WH_MDL_00523827

- WH_MDL_00523859

- WH_MDL_00523887

- WH_MDL_00523915

- WH_MDL_00523941

- WH_MDL_00523971

- WH_MDL_00524005

- WH_MDL_00524035

- WH_MDL_00524071

- WH_MDL_00524103

- WH_MDL_00524112

- WH_MDL_00524130

- WH_MDL_00524141

- WH_MDL_00524142

- WH_MDL_00524143

- WH_MDL_00524144

- WH_MDL_00524145

- WH_MDL_00524146

- WH_MDL_00524147

- WH_MDL_00524148

- WH_MDL_00524149

- WH_MDL_00524150

- WH_MDL_00524151

- WH_MDL_00524152

- WH_MDL_00524153

- WH_MDL_00524154

- WH_MDL_00524160

- WH_MDL_00524161

- WH_MDL_00524162

- WH_MDL_00524163

- WH_MDL_00524164

- WH_MDL_00524165

- WH_MDL_00524166

- WH_MDL_00524167

- WH_MDL_00524168

- WH_MDL_00524169

- WH_MDL_00524170

- WH_MDL_00524172

- WH_MDL_00524173

- WH_MDL_00524174

- WH_MDL_00524175

- WH_MDL_00524176

- WH_MDL_00524178

- WH_MDL_00524179

- WH_MDL_00524180

- WH_MDL_00524182

- WH_MDL_00524184

- WH_MDL_00524185

- WH_MDL_00524187

- WH_MDL_00524189

- WH_MDL_00524191

- WH_MDL_00524192

- WH_MDL_00524194
- WH_MDL_00524196
- WH_MDL_00524198
- WH_MDL_00524200
- WH_MDL_00524202
- WH_MDL_00524204
- WH_MDL_00524206
- WH_MDL_00524208
- WH_MDL_00524210
- WH_MDL_00524212
- WH_MDL_00524214
- WH_MDL_00524216
- WH_MDL_00524218
- WH_MDL_00524220
- WH_MDL_00524222
- WH_MDL_00524224
- WH_MDL_00524280
- WH_MDL_00524304
- WH_MDL_00524324
- WH_MDL_00524351
- WH_MDL_00524377
- WH_MDL_00524405
- WH_MDL_00524431
- WH_MDL_00524455
- WH_MDL_00524481
- WH_MDL_00524507

Appendix A

- WH_MDL_00524531

- WH_MDL_00524563

- WH_MDL_00524587

- WH_MDL_00524617

- WH_MDL_00524631

- WH_MDL_00524657

- WH_MDL_00524677

- WH_MDL_00524705

- WH_MDL_00524741

- WH_MDL_00524765

- WH_MDL_00524789

- WH_MDL_00524831

- WH_MDL_00524837

- WH_MDL_00524843

- WH_MDL_00524849

- WH_MDL_00524857

- WH_MDL_00524865

- WH_MDL_00524871

- WH_MDL_00524877

- WH_MDL_00524885

- WH_MDL_00524891

- WH_MDL_00524897

- WH_MDL_00524905

- WH_MDL_00524911

- WH_MDL_00524917

- WH_MDL_00524923

**Appendix A**

- WH_MDL_00524929
- WH_MDL_00524935
- WH_MDL_00524941
- WH_MDL_00524947
- WH_MDL_00524953
- WH_MDL_00524959
- WH_MDL_00524965
- WH_MDL_00524971
- WH_MDL_00524977
- WH_MDL_00525023
- WH_MDL_00525067
- WH_MDL_00525109
- WH_MDL_00525155
- WH_MDL_00525197
- WH_MDL_00525241
- WH_MDL_00525285
- WH_MDL_00525331
- WH_MDL_00525345
- WH_MDL_00525393
- WH_MDL_00525439
- WH_MDL_00525485
- WH_MDL_00525529
- WH_MDL_00525575
- WH_MDL_00525621
- WH_MDL_00525665
- WH_MDL_00525709

- WH_MDL_00525751

- WH_MDL_00525793

- WH_MDL_00525839

- WH_MDL_00525883

- WH_MDL_00525925

- WH_MDL_00525977

- WH_MDL_00525978

- WH_MDL_00525979

- WH_MDL_00525980

- WH_MDL_00525981

- WH_MDL_00525982

- WH_MDL_00525983

- WH_MDL_00525984

- WH_MDL_00525985

- WH_MDL_00525986

- WH_MDL_00525987

- WH_MDL_00525988

- WH_MDL_00525989

- WH_MDL_00525990

- WH_MDL_00525991

- WH_MDL_00525992

- WH_MDL_00525993

- WH_MDL_00525994

- WH_MDL_00525995

- WH_MDL_00525996

- WH_MDL_00525997

- WH_MDL_00525998

- WH_MDL_00525999

- WH_MDL_00526000

- WH_MDL_00526001

- WH_MDL_00526011

- WH_MDL_00526017

- WH_MDL_00526023

- WH_MDL_00526029

- WH_MDL_00526037

- WH_MDL_00526043

- WH_MDL_00526049

- WH_MDL_00526055

- WH_MDL_00526061

- WH_MDL_00526067

- WH_MDL_00526073

- WH_MDL_00526079

- WH_MDL_00526087

- WH_MDL_00526095

- WH_MDL_00526103

- WH_MDL_00526111

- WH_MDL_00526119

- WH_MDL_00526127

- WH_MDL_00526135

- WH_MDL_00526143

- WH_MDL_00526151

- WH_MDL_00526159

**Appendix A**

- WH_MDL_00526167

- WH_MDL_00526173

- WH_MDL_00526181

- WH_MDL_00526189

- WH_MDL_00526197

- WH_MDL_00526199

- WH_MDL_00526201

- WH_MDL_00526203

- WH_MDL_00526205

- WH_MDL_00526207

- WH_MDL_00526209

- WH_MDL_00526211

- WH_MDL_00526213

- WH_MDL_00526215

- WH_MDL_00526217

- WH_MDL_00526219

- WH_MDL_00526221

- WH_MDL_00526223

- WH_MDL_00526225

- WH_MDL_00526227

- WH_MDL_00526229

- WH_MDL_00526231

- WH_MDL_00526233

- WH_MDL_00526235

- WH_MDL_00526237

- WH_MDL_00526239

Appendix A

- WH_MDL_00526241

- WH_MDL_00526243

- WH_MDL_00526245

- WH_MDL_00526247

- WH_MDL_00526249

- WH_MDL_00526251

- WH_MDL_00526253

- WH_MDL_00526255

- WH_MDL_00526257

- WH_MDL_00526259

- WH_MDL_00526261

- WH_MDL_00526263

- WH_MDL_00526265

- WH_MDL_00526267

- WH_MDL_00526269

- WH_MDL_00526271

- WH_MDL_00526273

- WH_MDL_00526281

- WH_MDL_00526289

- WH_MDL_00526297

- WH_MDL_00526305

- WH_MDL_00526313

- WH_MDL_00526321

- WH_MDL_00526327

- WH_MDL_00526335

- WH_MDL_00526343

- WH_MDL_00526351

- WH_MDL_00526359

- WH_MDL_00526367

- WH_MDL_00526375

- WH_MDL_00526383

- WH_MDL_00526391

- WH_MDL_00526395

- WH_MDL_00526399

- WH_MDL_00526402

- WH_MDL_00526405

- WH_MDL_00526410

- WH_MDL_00526414

- WH_MDL_00526420

- WH_MDL_00526423

- WH_MDL_00526426

- WH_MDL_00526430

- WH_MDL_00526434

- WH_MDL_00526438

- WH_MDL_00526441

- WH_MDL_00526445

- WH_MDL_00526450

- WH_MDL_00526454

- WH_MDL_00526457

- WH_MDL_00526462

- WH_MDL_00526466

- WH_MDL_00526469

**Appendix A**

- WH_MDL_00526474
- WH_MDL_00526478
- WH_MDL_00526481
- WH_MDL_00526486
- WH_MDL_00526489
- WH_MDL_00526494
- WH_MDL_00526500
- WH_MDL_00526504
- WH_MDL_00526508
- WH_MDL_00526513
- WH_MDL_00526521
- WH_MDL_00526529
- WH_MDL_00526537
- WH_MDL_00526545
- WH_MDL_00526551
- WH_MDL_00526559
- WH_MDL_00526567
- WH_MDL_00526575
- WH_MDL_00526583
- WH_MDL_00526591
- WH_MDL_00526599
- WH_MDL_00526607
- WH_MDL_00526615
- WH_MDL_00526623
- WH_MDL_00526631
- WH_MDL_00526632

- WH_MDL_00526633

- WH_MDL_00526634

- WH_MDL_00526635

- WH_MDL_00526636

- WH_MDL_00526637

- WH_MDL_00283828

- WH_MDL_00283828

- WH_MDL_00283831

- WH_MDL_00288664

- WH_MDL_00456451

- WH_MDL_00368734

## II.     **Individual and Plan Defendant Responses to Plaintiff SKAT's Interrogatories and Requests for Admission**

- R. Crema Responses to SKAT's Interrogatories
- AIG Plan's Responses to SKAT's Interrogatories.

## III.     **Deposition Exhibits**

- BEN-JACOB EXHIBIT 4486

- BEN-JACOB EXHIBIT 4494

- BEN-JACOB EXHIBIT 4512

- BEN-JACOB EXHIBIT 4506

- BEN-JACOB EXHIBIT 4503

- MARKOWITZ EXHIBIT 2124

- MARKOWITZ EXHIBIT 2240

- MARKOWITZ EXHIBIT 2239

- MARKOWITZ EXHIBIT 2242

- MARKOWITZ EXHIBIT 2265

- MARKOWITZ EXHIBIT 2188

- MARKOWITZ EXHIBIT 2244

- MARKOWITZ EXHIBIT 2245

- VAN MERKENSTEIJN EXHIBIT 2234

- VAN MERKENSTEIJN EXHIBIT 2260

- VAN MERKENSTEIJN EXHIBIT 2224

- VAN MERKENSTEIJN EXHIBIT 2235

- VAN MERKENSTEIJN EXHIBIT 2254

- WELLS EXHIBIT 3114

- WELLS EXHIBIT 3128

- ZELMAN EXHIBIT 1434

## IV.    <u>Other Documents</u>

- I incorporate by reference all documents listed in Appendix E of my initial report in this matter, dated December 31, 2021.

- I incorporate by reference all documents listed in Appendix A of my rebuttal expert report in this matter, dated February 1, 2022.