# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 18-MD-2865 (LAK)

_____
                                        )
IN RE:                                  )
                                        )
CUSTOMS AND TAX ADMINISTRATION OF       )
THE KINGDOM OF DENMARK                  )
(SKATTEFORVALTNINGEN) TAX REFUND        )
SCHEME LITIGATION                       )
_____)


C O N F I D E N T I A L


REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

EXAMINATION OF

MARCIA WAGNER


DATE: April 14, 2022


REPORTED BY: MICHAEL FRIEDMAN, CCR

Page 102

1    **A**    Great.

2    **Q**    You wrote that. Right, Ms. Wagner?

3    **A**    And as I've said before, you're
4 reading only part of what I wrote. So for
5 the record, I would like to say what the
6 entire sentence says so it's not misleading
7 in any way, shape or form.

8    And I quote, "While I do not
9 believe that it is an expert's role to opine
10 on a defendants' intent, if asked, and based
11 on the totality of circumstances here, I
12 would advise that there's no reason to
13 believe that the defendant intended to
14 establish permanent plans and that the
15 objective factors I have reviewed point
16 decidedly to the contrary."

17    That is the full sentence, and
18 that's why I thought it was important that
19 the full sentence and not the first clause
20 thereof be that which we are referring to.

21    Now --

22    **Q**    I asked you a simple question,
23 Ms. Wagner. Do you or do you not believe
24 that it is an expert's role to opine on a
25 defendants' intent?

Page 103

1    MR. MAGUIRE: Asked and answered,
2 but you can --

3    THE WITNESS: Asked and answered --

4    MR. MAGUIRE: You can answer again.

5    **A**    Again, my third time answering
6 this, I specifically wrote that, no, that is
7 not in general the role of an expert, and
8 then I said, however, if asked, my answer
9 would be.

10    Is that helpful to you, Mr. Dewey?

11    **Q**    And you're not opining on
12 defendants' intent, or so you just told us.
13 Right?

14    **A**    That would be true, Mr. Dewey.

15    **Q**    You nonetheless say a few pages
16 later in the report that the individual
17 defendants were motivated by self-interest.
18 Right?

19    **A**    Would you please give me the
20 paragraph and the page so I can look at what
21 exactly you're referring to to give you again
22 a fulsome answer?

23    **Q**    Sure. It's page 25, Paragraph 46.

24    **A**    And what sentence are you talking
25 about, please?

Page 104

1    **Q**    So it's six lines down. "As you
2 previously observed, however, in this case
3 self-interest motivated the individual
4 defendants," and then the sentence goes on.

5    You felt comfortable expressing
6 that opinion, didn't you, Ms. Wagner?

7    **A**    Again, you seem to like to take
8 words out of context.

9    The full sentence states, and I
10 quote, "As I have previously observed,
11 however, in this case, self-interest
12 motivated the individual defendants to
13 disregard fundamental standards related to
14 the basic purpose of their plans, i.e.,
15 accumulating assets for use after retirement
16 since the Solo transaction was available only
17 if they agreed to depart from those standards
18 by allocating most of the proceeds to third
19 parties."

20    That is what I wrote, and that is
21 what I stand by. You can't just look at one
22 clause. It's not accurate.

23    **Q**    And you do not view that as an
24 opinion on defendants' intent. Right?

25    **A**    I view it for exactly what it

Page 105

1 states.

2    **Q**    You do not view that as an opinion
3 on defendants' intent. Right?

4    **A**    I view that as a statement that
5 they were motivated by self-interest, and
6 that motivation led to the abdication of
7 general principles applicable to retirement
8 plans.

9    **Q**    Okay. And that's a statement of
10 intent, isn't it, Ms. Wagner?

11    MR. MAGUIRE: Objection.

12    **A**    I don't think so.

13    **Q**    So saying someone is motivated by
14 self-interest is not a statement about a
15 person's intent in your opinion?

16    MR. MAGUIRE: Objection.

17    **A**    I really don't know what you're
18 saying. I don't know what to say other than
19 I think people create plans motivated out of
20 self-interest.

21    **Q**    Okay. You haven't opined on any
22 defendant's intent in your view. Right,
23 Ms. Wagner?

24    **A**    As I believe I stated, I have not
25 opined on that, but if I were asked, my

Page 118

1     I am not sure if the IRS received
2 those plan documents, and if that's what
3 you're asking, I can't say definitively one
4 way or the other.
5     Q    So you just don't know as we sit
6 here today whether the IRS got other plan
7 documents.  Right?
8     A    I believe I can say definitively
9 that the IRS got K1s with respect to other
10 plans, but I'm not sure.  I'm not sure if the
11 IRS looked at any other plan documents,
12 although I don't think so.  I don't think I
13 saw that in the record.
14     Q    Okay.  And those other plans were
15 plans that were also engaged in dividend
16 arbitrage trading in Denmark.  Right?
17     A    As I recall, those plans were in
18 partnerships so-called with other nominee
19 plans, and those plans that were run by
20 Mr. Markowitz, Mr. Van Merkensteijn and
21 others, Mr. Klugman received, I believe it
22 was almost 95 percent of the dividends of the
23 reclaim dividends, and that is -- that was
24 their source of income.
25     I'm not sure the IRS was aware of

Page 119

1 that, but they did receive those K1s, so yes.
2     Q    Okay.  The audit was closed in
3 February of 2020.  Right?
4     A    I don't recall the date of closure.
5     Q    Okay.  Well, in any event it was
6 closed long after the dividend arbitrage
7 trading in Denmark had stopped.  Right?
8     A    It depends how you define long
9 after.
10     Q    Five years long enough?
11     A    If it was five years, I'd like to
12 call it five years.
13     Q    Do you know, Ms. Wagner, when the
14 dividend arbitrage trading in Denmark
15 stopped?
16     (Whereupon a discussion was held
17 off the record.)?
18     A    I believe toward the end of 2015.
19 I could be off by a few months.
20     Q    Okay.  And the RJM audit was
21 several years after that.  Right?
22     A    I believe so.
23     Q    Okay.  And, indeed, the RJM audit
24 occurred after the first of these lawsuits
25 had been filed.  Right?

Page 120

1     A    I'm not sure.  When were the
2 first -- you would have to give me the exact
3 date when the -- the exact date as to when
4 these filings were made.
5     Q    Okay.  So maybe we can refer,
6 Ms. Wagner, to your February 1st rebuttal
7 report.
8     MR. DEWEY:  Mark this as 5352.
9     (Whereupon the above mentioned was
10 marked for Identification.)
11     A    Okay.
12     MR. MAGUIRE:  Whenever you're
13 ready, Tom.
14     MR. DEWEY:  Okay.
15     Q    You have the document, Ms. Wagner?
16     A    The expert rebuttal report of
17 Marcia S. Wagner; is that the one you're
18 talking about?
19     Q    Indeed, yeah.  And you'll see that
20 on the first page it bears a master docket
21 number 18 MD 2865.  Do you see that?
22     A    I do.
23     Q    So assuming that that denotes 2018,
24 the RJM audit ended after 2018.  Correct?
25     A    You're going -- I don't know.  I

Page 121

1 don't know when the RJM audit ended.  If you
2 would like to tell me or point me to
3 something, that would be helpful.
4     Q    Okay.  If you would turn, please,
5 Ms. Wagner, to Page 6, paragraph 10 of this
6 rebuttal report.
7     Are you with me, Ms. Wagner?
8     A    Yes, I am on Page 6, paragraph 10.
9     Q    Excellent.
10     So about ten lines up from the
11 bottom, you say, "In this connection the
12 Reish report does not assert and I have not
13 seen anything in the records indicating that
14 Markowitz or representatives disclosed to the
15 IRS examiner the RJM plan's massive purchases
16 of Danish stocks."
17     Do you see that?
18     MR. MAGUIRE:  Sorry.  Where is
19 that, Tom?  I thought you said ten lines
20 up from the bottom.
21     A    Yeah, I do see it.  It's right
22 here.
23     MR. MAGUIRE:  Okay.
24     A    Yes, I see it.
25     Q    Okay.  In fact, those purchases

CONFIDENTIAL
Marcia Wagner - April 14, 2022

Page 122

1  were disclosed to the IRS, weren't they,
2  Ms. Wagner?
3          MR. MAGUIRE:  Objection to form.
4      A    Well, it's a question as to whether
5  I had that documentation at the time.  We
6  received a lot of documentation by the time
7  of the reply, but it seems that the audit
8  documentation that I received wasn't complete
9  I believe at the time of this, but I do
10 believe that, yes, at some point after I
11 believe this was written I did see that type
12 of disclosure.
13     Q    Okay.  So the statement that you
14 made here is inaccurate.  Right, Ms. Wagner?
15         MR. MAGUIRE:  Objection to form.
16     A    I don't think I said that.  I think
17 it was accurate when written with the
18 information that was disclosed.
19         The audit information that was
20 provided was not provided to me, I think,
21 from you all on a timely basis.
22         MR. DEWEY:  I'm sorry.  You froze
23 again.  Can you hear me now?
24         MR. MAGUIRE:  Yeah, we can hear you
25 fine.

Page 123

1          MR. DEWEY:  Okay.
2      Q    So in any event, the IRS had data
3  concerning the RJM plan purchases of Danish
4  stocks.  Right?
5      A    Could you read back the answer that
6  I provided to make sure I got -- it got into
7  the record?  Because I think that answered
8  the question.
9      Q    Well, you froze, so I apologize
10 if --
11         MR. MAGUIRE:  Mike got the full
12 answer.
13     A    Well, I think I've answered that
14 question, Mr. Dewey.
15     Q    And the answer is yes.  Right?
16         MR. MAGUIRE:  Objection.
17     A    The answer is I eventually got the
18 information.
19     Q    And the information showed that the
20 trading in Danish stocks of the RJM plan was
21 disclosed to the IRS.  Right?
22     A    That was information that was
23 eventually provided to me, yes.
24     Q    Okay.
25         MR. DEWEY:  Okay.  Lunch still?

Page 124

1          MR. MAGUIRE:  Sounds good, Tom.
2          MR. DEWEY:  1:15?
3          MR. MAGUIRE:  Do you want to do
4  1:10?
5          MR. DEWEY:  Sure.  That's fine,
6  yeah.
7          MR. MAGUIRE:  Okay.
8          THE VIDEOGRAPHER:  Okay.
9          Stand by.
10         The time is 12:37 p.m., and we're
11 going off the record.
12         (Lunch recess taken.)
13         THE VIDEOGRAPHER:  Stand by.
14         The time is 1:20 p.m., and we're
15 back on record.
16     Q    Good afternoon, Ms. Wagner.
17     A    Good afternoon, Mr. Dewey.
18     Q    You state in your CV which is an
19 exhibit to your initial expert report --
20         MR. MAGUIRE:  I think you froze on
21 us, Tom.
22         (Whereupon a discussion was held
23 off the record.)
24     Q    I will start again.
25         You state in your CV that is

Page 125

1  attached as an exhibit to your report,
2  Ms. Wagner, that you were a partner in K&L
3  Gates.  Right?
4      A    Well, actually I think I was a
5  partner at Warner & Stackpole that became K&L
6  Gates.
7      Q    So I guess my question is were you
8  or were you not ever a partner at the K&L
9  Gates law firm?
10         MR. MAGUIRE:  Tom, you froze again.
11         (Whereupon a discussion was held
12 off the record.)?
13     A    No, I was a partner at Warner &
14 Stackpole that became known as K&L Gates.
15         Similarly, I was an associate at
16 Bingham Dana & Gould, which is now known as
17 Morgan Lewis & Bockius.  These firms change
18 their names.
19     Q    So you were a partner at the Warner
20 & Stackpole firm.  Right?
21     A    And I believe that Warner &
22 Stackpole was acquired by K&L Gates, yes.
23     Q    Do you know that to be the case?
24     A    I don't know if it was acquired in
25 total, but I do know that there was a merger,

Page 146

1          In fact, if I can direct you to the
2   next paragraph, it says, "While the
3   documentation of the transaction cannot be
4   ignored, it should also be noted that the
5   intent of the parties was that the
6   arrangement was the nature of the -- of a
7   partnership," so effectively the plans are a
8   partnership with Solo -- with Solo receiving
9   a very significant part of the profits.
10         That, I can assure you, is
11  extraordinarily atypical and not what I've
12  ever seen plans do when they invest in
13  partnerships.
14      Q    So hypothetically, if a plan
15  invests in a hedge fund and the plan agrees
16  to pay the hedge fund 3, 3 and 30, which I
17  assume you understand, is that in your view
18  acceptable or not?
19      A    I've never seen a 3 and 30.  I have
20  seen a 2 and 20.  I just haven't seen a 3 and
21  30.
22      Q    Would that, in your opinion,
23  Ms. Wagner, be a violation of the exclusive
24  benefit rule?
25      A    It's a facts and circumstances

Page 147

1   issue based on the services proffered by the
2   hedge fund and if it's reasonable given the
3   marketplace.
4       Q    Okay.  So you can express an
5   opinion as we sit here today on a
6   hypothetical circumstance where a payment of
7   3 and 30 would be acceptable or not?
8       A    What I am saying definitively is
9   I've not seen in any of the transactions.
10  I've worked on hedge funds charging 3 and 30.
11          What I said is that I have seen in
12  the past, though not recently, a more typical
13  2 and 20 type of arrangement, though I'm not
14  sure I have seen that in the more recent
15  past.  That was the more distant past.
16      Q    Do you know, Ms. Wagner, how many
17  plans were disqualified in the last two years
18  for paying excessive fees under the exclusive
19  benefit rule?
20      A    I do not.
21      Q    Okay.  Would it surprise you if the
22  answer were zero?
23      A    I don't know one way or the other.
24      Q    You cite in your reports,
25  Ms. Wagner, various recordkeeping

Page 148

1   requirements.  Do you recall that?
2       A    Yes.
3       Q    Those requirements are not a
4   qualification requirement under the code, are
5   they?
6       A    No.
7       Q    I want to direct you, if I may,
8   Ms. Wagner, to your reply report, which is a
9   reply to Mr. Ross, that is, which is, I'm
10  told it's Exhibit 5354.
11          (Whereupon the above mentioned was
12          marked for Identification.)
13          MR. MAGUIRE:  It's the last one in
14      the big binder.
15          (Whereupon a discussion was held
16          off the record.)?
17      A    Yes, I have Exhibit 5354.
18      Q    Okay.  You understand, do you not,
19  Ms. Wagner, that Mr. Ben-Jacob is not a
20  pension lawyer.  Right?
21      A    Do I understand that Mr. Ben-Jacob
22  is not an ERISA lawyer?  Yes, that's my
23  understanding.
24      Q    And he's not a pension lawyer at
25  all.  Right?

Page 149

1          MR. MAGUIRE:  Sorry, Tom.  You cut
2      out a little bit there.
3          Can you just repeat that question?
4          MR. DEWEY:  Sure.
5       Q    My question was do you understand
6   that Mr. Ben-Jacob is not a pension lawyer?
7       A    I understand that Mr. Ben-Jacob is
8   not a pension lawyer.
9       Q    Okay.  And you certainly
10  understand, do you not, Ms. Wagner, that
11  Mr. Ben-Jacob is not a Danish lawyer.  Right?
12      A    I believe that Mr. Ben-Jacob is not
13  a Danish lawyer.
14      Q    Okay.  And if I could direct you to
15  Page 13 of 5354.
16      A    Sorry.  Page 13, you said?
17      Q    One, three, yes.  That's right.
18      A    Okay.
19      Q    And directing your attention,
20  Ms. Wagner, to Footnote 36 on Page 13 --
21          MR. MAGUIRE:  Sorry, Tom.  You cut
22      out for that question.
23          MR. DEWEY:  Sorry.
24      Q    Yes, Page 13, Footnote 36.
25      A    Okay.

Page 218

1    Page 19, Ms. Wagner. Are you
2 there?
3    A    I am.
4    Q    Okay. You reference in the last
5 sentence of this rebuttal report, "Widespread
6 departures from standards embraced by the
7 retirement plan industry."
8    Do you see that?
9    A    I do.
10    Q    And you reference retirement plan
11 industry standards other times throughout
12 your reports. Right?
13    A    I may.
14    Q    Is alleged inconsistency with
15 retirement industry standards a basis for
16 plan disqualification?
17    A    If they -- well, I think we're
18 conflating two issues here. The basis of
19 disqualification would be the exclusive
20 benefit rule issue, the commingling issue,
21 the funding issue, the permanence issue.
22    The issue with respect to whether
23 these plans were shams, I think you look at
24 the whole variety of other issues; are they
25 mirror paper transactions.

Page 219

1    So, for example, Mr. Klugman
2 specifically stated, "Hey, I did this. I was
3 promised a million bucks a plan."
4    People in general, it's okay for
5 somebody to sign a piece of paper without
6 reading the plan document. It doesn't happen
7 that often. It's highly atypical for plan
8 sponsors not to care about deductibility.
9 It's highly atypical for there to be no
10 investment whatsoever by the plan.
11    It's highly atypical that things be
12 fully leveraged, like infinite leverage. I
13 mean it's highly atypical for there to be no
14 trade or business supporting a plan.
15    The list goes on and on with things
16 that are highly, highly atypical.
17    Q    Do you remember what question I
18 asked you, Ms. Wagner?
19    A    Yes, I do remember what question
20 you asked me. I believe the question is, is
21 the fact that you're departing from
22 retirement industry standards a basis for
23 plan disqualification?
24    And I believe I answered that the
25 bases for plan disqualification that I

Page 220

1 clearly put in my reports are as follows:
2 Commingling of trust assets, permanency,
3 funding, exclusive benefit.
4    I further state that there are many
5 indicia that make it look like these plans
6 were shams.
7    Q    So is the answer to my question no,
8 Ms. Wagner?
9    A    I think I answered your question
10 appropriately.
11    Q    Not really.
12    My question for the third time is,
13 is an alleged departure from a retirement
14 industry standards a basis for plan
15 disqualification?
16    MR. MAGUIRE: Asked and answered,
17 but you can answer again.
18    A    If the departure again is
19 commingling of plan assets, if the departure
20 is extreme violations of basic rules such as
21 exclusive benefit permanency and funding,
22 absolutely.
23    There are other rules that make
24 this appear just like a sham that are basic
25 industry standards; no records, no

Page 221

1 recordkeeping, the plan participants having
2 no idea if their plans exist or if they're
3 abandoned or if the LLCs exist or if they're
4 abandoned, having no idea if contributions
5 were deductible, having money that was
6 distributed from Solo when it was not going
7 to plans themselves but to people such as
8 with the Lehman plans.
9    There were just so many violations
10 of basic fundamental foundational retirement
11 industry standards what a true pension plan
12 does that this looks like a sham.
13    MR. DEWEY: So I move to strike the
14 non-answer.
15    Q    If you could turn, please, to your
16 February 28th rebuttal report, Ms. Wagner --
17 sorry, it's a reply report, which is 5353.
18    Directing your attention,
19 Ms. Wagner, to page 10, 35, Footnote 35.
20    A    I'm sorry. Where?
21    Q    Page 10, Footnote 35.
22    A    Yes.
23    Q    There's a reference there to the
24 better-advised LLCs.
25    Do you see that, Ms. Wagner?