# Exhibit 1

**In re**

**CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND LITIGATION**

Expert Report of

Stephen E. Shay

December 31, 2021

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..........................................................................................3

    A.     Engagement and Assignment ...............................................................3

    B.     Qualifications.......................................................................................4

    C.     Independence .......................................................................................6

    D.     Information Considered........................................................................6

    E.     Summary of Conclusions .....................................................................6

    F.     Structure of This Report ....................................................................10

II.    FACTUAL BACKGROUND AND LEGAL CONTEXT ............................11

    A.     Facts ...................................................................................................11

    B.     SKAT Learns of and Investigates the Alleged Fraud .........................14

    C.     The Litigations ...................................................................................18

        1.     The U.S. Litigations ...............................................................18

        2.     Non-U.S. Litigations ..............................................................20

III.   CONTEXTUALIZING THE REVENUE RULE IN U.S. TAX LAW AND
      TAX TREATY POLICY ..........................................................................22

    A.     Overview ............................................................................................22

    B.     The Revenue Rule Principle in the United States................................24

        1.     National Tax Enforcement in a Global Economy ...................24

        2.     The Revenue Rule in the United States...................................26

        3.     SKAT's Claim........................................................................28

    C.     The U.S. Cross-Border Dividend Withholding Tax Regime ...............32

    D.     Mutual Assistance Under U.S. International Tax Agreements ............46

        1.     Overview.................................................................................46

        2.     U.S. Bilateral Income Tax Treaties – Mutual Assistance and
            Dividend Withholding ............................................................47

    E.     Tax Information Exchange Agreements ..............................................55

IV.    THE REVENUE RULE, SEPARATION OF POWERS, AND RESPECT FOR
      SOVEREIGNTY ......................................................................................57

    A.     Separation of Powers ........................................................................57

        1.     The Standard ..........................................................................57

2.     The Policy Equivalence of a Return of a Tax Refund and
Collection of an Underpaid Tax ............................................58

3.     Practical Consequences of Revenue Rule Inapplicability to
Recovery of a Tax Refund ...............................................61

B.     Intrusion in Foreign Country's Sovereignty ..................................64

1.     The Standard ...........................................................64

2.     Determining the Tax Refund Claim. .............................................65

V.     CONCLUSIONS .......................................................................68

APPENDIX A – CURRICULUM VITAE ....................................................70

APPENDIX B – DOCUMENTS CONSIDERED ...............................................80

## I.     INTRODUCTION

### A.     Engagement and Assignment

1.      Counsel for Defendants has retained me to provide context and background on the role the "revenue rule" plays in the design and implementation of U.S. international tax law and treaty policy from the perspective of a former Executive Branch policymaker who has served as a senior international tax official in the U.S. Treasury Office of Tax Policy in the Reagan and Obama Administrations, and as a practitioner and scholar who has studied and written on this subject.

2.      The purpose of this Report is to assist the Court in its assessment of how entertaining Plaintiff Skatteforvaltningen's ("SKAT's") fraud and related claims for return of tax refunds would:

2.1.    intersect with policies underlying the design of U.S. international tax law governing the administration and enforcement of tax on items of taxable income paid to nonresidents;

2.2.    relate to the existing limited collection assistance treaty provisions in the U.S. network of bilateral income tax treaties, including the treaty with Denmark, and the reservation contained in the collection assistance provisions in the multilateral Council of Europe/OECD[1] Convention on Mutual Administrative Assistance in Tax Matters (the "Convention"), each of which has received advice and consent of the U.S. Senate; and

2.3.    potentially affect future Legislative and Executive Branch policy considerations, including:

i.      future Executive Branch negotiations and diplomacy with respect to collection assistance in international treaties; and

---

[1] Organisation for Economic Co-operation and Development.

ii.      the scope of Executive Branch authority to negotiate collection assistance
provisions in future executive agreements.

**B.      Qualifications**

3.      I am the Paulus Endowment Senior Tax Fellow and Adjunct Professor at Boston College
Law School.[2]  For this engagement, I am acting as a consultant for Ropes & Gray LLP
("Ropes") in Boston, Massachusetts.  I was an international tax partner at Ropes from 1987
to 2009, when I retired from the firm to join the Obama Administration as Deputy Assistant
Secretary for International Tax Affairs in the U.S. Department of the Treasury ("DAS
International Tax").

4.      As DAS International Tax, I served as the U.S. delegate to the reconstituted G20/OECD
Global Forum for Transparency and Exchange of Information in Tax Matters (when it
opened to non-OECD participation and expanded to 130+ countries).   Among other
responsibilities, I was actively engaged in the passage of the Foreign Account Tax
Compliance Act and had oversight responsibility for the U.S. tax treaty network.

5.      On leaving the Treasury in 2011, I joined the faculty of Harvard Law School as a Professor
of Practice.  I have taught U.S. tax law courses as a Lecturer at Yale Law School, Oxford
University's MSc. in Taxation and the Leiden International Tax Institute.   I was the
International Bureau of Fiscal Documentation ("IBFD") Professor in Residence in
Amsterdam for 2015.

6.      In the course of my private practice at Ropes, I regularly represented U.S. multinational
corporations and private equity sponsors on cross-border tax planning and controversy
matters.   During this period, I served as Associate Reporter for the American Law
Institute's Federal Income Tax Project: International Aspects of United States Income

---

[2] The opinions expressed in this Report are my own and do not necessarily represent the views of any institution with
which I am affiliated.

Taxation II, Proposals of the American Law Institute on United States Income Tax Treaties.[3]

7.    From 1982 to 1987, I served in the Office of International Tax Counsel at the U.S. Department of the Treasury, including in the role of International Tax Counsel.[4] I actively participated in the enactment of the international provisions of the Tax Reform Act of 1986 and in the negotiation of bilateral income tax treaties. I served as the U.S. delegate to the negotiation of the 1988 Council of Europe and OECD Multilateral Convention for Mutual Assistance in Tax Matters.

8.    I currently serve on the Executive Committee of the New York State Bar Association Tax Section and the Leadership Council of the Harvard Law School Wilmer Hale Legal Services Center. I am a Fellow of the American College of Tax Counsel and Member of the College's Amicus Committee. I am also a past President of the American Tax Policy Institute Board of Trustees and have been active in the American Bar Association Tax Section as a Council Director and Chair of the Committee on Foreign Activities of U.S. Taxpayers. I am a Life Member of the American Law Institute.

9.    I received my B.A. from Wesleyan University in 1972 and a J.D. and M.B.A. from Columbia University in 1976. I am a member of the Bars of Massachusetts and New York.[5]

10.    I have written scholarly, policy-focused, and practitioner articles on international taxation and have testified numerous times before Congressional tax-writing and investigatory committees. I have been retained as an expert on U.S. and international taxation by U.S. and Canadian law firms, the Australian Commissioner of Taxation, the New Zealand Crown Counsel, and the Irish Office of the Revenue Commissioners, and have testified as

---

[3] Exhibit 1 (American Law Institute, FEDERAL INCOME TAX PROJECT - INTERNATIONAL ASPECTS OF UNITED STATES INCOME TAXATION II (1992) (Reporters David R. Tillinghast & Hugh J. Ault and Associate Reporter Stephen E. Shay)).

[4] There was no DAS International position in the Office of International Tax Policy at that time. The International Tax Counsel was the senior exclusively international tax position.

[5] I am not admitted to practice law in Denmark or any foreign country.

an expert in courts in the U.S, Ireland, and New Zealand and before international arbitration tribunals.

11.    My curriculum vitae is attached as Appendix A.

### C.    Independence

12.    I am providing my services as an expert on international taxation policy in my capacity as a consultant to Ropes & Gray LLP.  Working under my direction, attorneys at Ropes have assisted me in the preparation of this Report.  Ropes bills on a time and materials basis for work in connection with this assignment.  My Ropes hourly rate for this assignment is $1,930 for 2021.  Payment for my services does not depend in any way on my opinions expressed herein or the outcomes in this matter.

13.    I am independent from the parties and their legal advisors.  I confirm my genuine belief in the opinions expressed herein.

### D.    Information Considered

14.    In preparation of this Report, I have reviewed a large number of documents, including record factual documents, supplied by counsel to Defendants.  I have engaged in discussions with counsel to Defendants.  To gain a more thorough background for this proceeding, I have also reviewed the pleadings and prior decisions in this case.

15.    In preparing this Report, I relied upon the information cited herein and considered the material listed in Appendix B.  I have included as exhibits, following Appendix B, copies of information or documents that I relied upon that may not be readily accessible to the reader.  I have also relied on my own knowledge, experience and understanding of U.S. international tax law and international tax treaties.

### E.    Summary of Conclusions

16.    This Report offers conclusions from my perspective as a former tax policymaker and treaty negotiator regarding the implications of allowing SKAT's fraud and associated common law claims to proceed on U.S. international tax policy, tax treaty negotiation, and tax diplomacy.

17.    This Report contains overviews of the revenue rule in U.S. jurisprudence, the design of U.S. and Danish international tax laws governing source taxation of dividends paid to non-residents, collection assistance provisions contained in the U.S. network of bilateral income tax treaties and the Convention, and the role of tax information exchange agreements. This background is context for my conclusions. At a high-level, the relevant contextual information explains that:

17.1.    U.S. courts have applied the revenue rule to bar direct and indirect enforcement of a foreign sovereign's tax claims in U.S. courts to protect separation of powers and preserve international tax and foreign policy considerations for the Executive and Legislative Branches. Further, U.S. courts have applied the revenue rule to preserve respect for foreign nations' sovereignty. *See infra* Part III.B.

17.2.    U.S. international tax policy has developed against the backdrop of the revenue rule and takes its limits on collection assistance into account. *See infra* Parts III.B.3 & III.C.

  i.    Tax sovereigns take different policy-based approaches to the design of their tax administration and enforcement systems, including with respect to the taxation of dividends paid to nonresidents.

  ii.    Certain countries, including Denmark, have implemented "withholding tax reclaim systems" for payments of income to nonresidents whereby tax is withheld on items of income (*e.g.*, dividends) by withholding agents, the amounts are paid over to the taxing authority, and nonresidents must claim treaty-protected amounts as refunds by providing documentation to the taxing authority.

  iii.    Other countries, including the United States, have a "relief at source system" whereby nonresidents claim reduced rates under an applicable income tax treaty by providing the withholding agent with documentation enabling the withholding agent to withhold the tax at a reduced rate and obviating the

need for the nonresident to make a claim for a tax refund to the taxing authority.

iv.  The decision of which withholding system to use is a policy decision that rests on multiple factors.  Opportunities for tax avoidance using financial instruments routinely employed in financial markets exist under both systems, and sovereigns respond to such avoidance in different ways based on their respective policy considerations.

17.3.  Like U.S. international tax policy, U.S. treaty policy also has developed with the revenue rule operating in the background and takes its limits on collection assistance into account.  *See infra* Parts III.D-III.E.

i.  The United States has agreed to broad collection assistance provisions in only six in-force bilateral income tax treaties, generally excluding assistance in relation to a U.S. citizen or entity.  The U.S. treaty with Japan, however, authorizes collection in relation to an individual U.S. national in a case of fraud.

ii.  In 26 bilateral income tax treaties, the United States and the treaty partner have authorized collection assistance only to ensure that treaty relief is not afforded to those not entitled to it.

iii.  Thirty-five in-force bilateral income tax treaties do not provide for any collection assistance.

18.  With this context as background, I reach the following conclusions:

18.1.  Accepting SKAT's claim would upend a carefully structured regime for collection assistance that would open U.S. courts to myriad claims for assistance with return of tax refunds by foreign sovereigns in the matters covered by this case and others.  This risks interference with U.S. international tax policymaking and diplomacy.

18.2.  For purposes of international tax enforcement policy, there is no relevant distinction between a sovereign's demand for repayment of an inappropriate tax refund and a

sovereign's claim for collection of unpaid tax. Allowing SKAT's common law claims to proceed here would give rise to an asymmetry whereby treaty and non-treaty countries with tax reclaim withholding systems would be afforded unilateral judicial collection assistance (in other words, civil lawsuits) against U.S. nationals in U.S. courts for recovery of tax refunds, whereas the United States would be deprived of the assurance of reciprocal benefits in the other jurisdiction in seeking under withheld U.S. tax under its relief at source withholding system. A sovereign's tax and enforcement policy decisions underlying its design of its cross-border income tax withholding system should not affect revenue rule analysis. *See infra* Part IV.A.2.

18.3.   The foreign relations decision of whether to assist another country in revenue collection, including from U.S. citizens, should be the province of the Executive Branch consistent with the taxing and treaty consent authority of the Legislative Branch. Unilateral judicial collection assistance—as would occur if SKAT's claim proceeds—would encroach on decisions that are primarily the province of the Executive and Legislative Branches and implicate separation of powers concerns that the revenue rule is designed to avoid. This would deprive the Executive Branch of the ability to determine which countries it should assist in collection and materially alter the balance negotiated between sovereigns in existing bilateral income tax treaties. *See infra* ¶¶ 78-79.

18.4.   Allowing SKAT's case to proceed would materially reduce the United States' ability to negotiate collection assistance provisions in bilateral treaties, multilateral instruments, and executive agreements to the extent the other country is granted unrestricted access to U.S. court to recover refunds that would meet the treaty or agreement partner's collection assistance objectives. Such unilateral judicial collection assistance would not come with standard treaty protections, including assurance of reciprocal benefits, the ability to evaluate collection assistance partners on a country-by-country basis, the requirement of finality of the claim under the law of the treaty partner, limitations of collection assistance to cases involving non-U.S. nationals, the ability to cabin collection procedures to U.S.

administrative processes used for the collection of taxes, and the ability to decline to assist with collection on public policy grounds determined by the Executive Branch.  It also could have the effect of significantly burdening U.S. courts with tax claims by foreign sovereigns.  *See infra* Part IV.A.3.

18.5.    Finally, adjudicating SKAT's case would require application of Danish law with respect to entitlement to a tax refund under the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Den.-U.S., Aug. 19, 1999, as amended by Protocol signed May 2, 2006 (the "Treaty"), [6] including the determination of beneficial ownership of the dividends under Article 3(2) of the Treaty.  A legal determination of the definition of beneficial ownership is inherently intrusive to treaty policy considerations.  A U.S. court's interpretation and application of Danish tax law in applying the Treaty by its nature would be an intrusion on Denmark's sovereignty.  That intrusion is specifically avoided by treaties requiring that assistance be limited to claims finally determined in the requesting country and foreclosing review of the claim by the requested country. *See infra* Part IV.B.2.

## F.    Structure of This Report

19.    The structure of this Report is as set out in the Table of Contents.  Part II provides factual background and the legal context of SKAT's claims in this litigation as relevant to this Report.  Part III contextualizes the revenue rule in U.S. international tax law and tax treaty policy.  Part IV describes the ramifications of SKAT's case for U.S. international tax and treaty policy and their likely impact on the political branches' existing policy and framework for international collection assistance and ongoing U.S. international tax policy, treaty policy, and tax diplomacy.  Part V sets out my conclusions.

---

[6] Exhibit 2 (Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Den.-U.S., Aug. 19, 1999, T.I.A.S. 13056, as amended by Protocol signed May 2, 2006 [hereinafter "Treaty"]); Exhibit 3 (Protocol Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Den.-U.S., May 2, 2006, T.I.A.S. 07-1228 [hereinafter "Protocol"]).  For ease of reference, attached to this Report as Exhibit 4 is a combined version of the Treaty and Protocol published by IBFD that integrates the Protocol's amendments to the Treaty into a single document.

## II.    FACTUAL BACKGROUND AND LEGAL CONTEXT

### A.    Facts[7]

20.    Plaintiff SKAT, the Customs and Tax Administration of the Kingdom of Denmark, is "the agency responsible for assessing and collecting taxes in Denmark and issuing tax refunds to claimants under certain double taxation treaties between Denmark and other countries."[8] Under the Treaty, a U.S. pension fund that qualifies for the benefits of the Treaty and is the beneficial owner of a dividend is exempt from Danish tax on the dividend.[9]

21.    Under the applicable Danish dividend withholding tax regime, the Danish company issuing the dividend or its agent automatically withholds Danish tax of 27% of the gross amount of a Danish dividend paid to shareholders, regardless of whether that tax is actually owed.[10] This is a final tax on a nonresident unless the dividend is attributable to a Danish business of the nonresident taxed by Denmark on a net basis or the nonresident beneficial owner of the dividend is entitled to a lower rate by treaty.[11]  Under Article 10(2)(b) of the Treaty, since January 1, 2001, the country from which the dividend is paid is not entitled to charge a tax on the dividend above 15% where the dividend is beneficially owned by a resident of the other contracting state that satisfies the conditions of the limitation on benefits article.[12] In such cases, SKAT is obliged to refund 12% of the withheld tax (27% - 15% = 12%).

---

[7] The following facts are from material in the record and are believed to be uncontroverted.  The purpose of this description of facts is to establish the context in which the Court must determine whether the revenue rule applies, though as explained in this Report, the Court's decision will have ramifications far beyond this case for the United States as well as for other countries.  No inferences drawn from the facts or descriptions of law in this Report are intended to express a legal opinion on the application of the revenue rule in this case.

[8] Exhibit 5 (*In re Skat Tax Refund Scheme Litigation*, 356 F.Supp.3d 300, 308 (S.D.N.Y. 2019) [hereinafter "Motion to Dismiss Opinion"]).  For purposes of this Report, I accept that the Motion to Dismiss Opinion accurately describes the complaints and their allegations.  I express no opinion as to the legal analysis or outcome of the Motion to Dismiss Opinion, nor do I adopt the characterization of facts as set forth in the Motion to Dismiss Opinion or SKAT's complaints.  *See also* Exhibit 6 (Am. Compl. & Demand for Jury Trial ¶ 16, ECF No. 58 [hereinafter "Am. Compl."]).

[9] Exhibit 2 (Treaty, *supra* note 6, at arts. 10(3)(c), 22(2)(e)).

[10] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 307-08); *see also* Exhibit 6 *(*Am. Compl., *supra* note 8, at ¶ 37); Exhibit 7 (Jakob Bundgaard, *Withholding Tax in the Era of BEPS, CIVs and Digital Economy – Denmark Report*, *in* IFA CAHIERS 2018 – VOLUME 103B 14 (IFA 2018)); *see infra* III.C for a fuller description of the global custody system for cross-border ownership of stocks and the U.S. and Danish regimes for administering tax withholding.

[11] Exhibit 7 (Bundgaard, *supra* note 10, 7-8, 13, 15-16).

[12] Exhibit 2 (Treaty, *supra* note 6, at arts. 10(2)(b), 22(1), 29).

Under Article 10(3)(c) of the Treaty, since February 1, 2008, a dividend is exempt from taxation by the country from which the dividend is paid where the dividend is beneficially owned by a pension plan of the other contracting state that satisfies the qualifications of Article 22(2)(e) of the Treaty.[13] In such cases, under the Danish withholding regime, SKAT is obliged to refund all or part of the withheld tax.[14]

22.    "[D]efendants are U.S. pension plans, their authorized representatives, and, in at least one case, the incorporator involved in creating plans."[15] Payment agents and broker custodians involved in the alleged underlying conduct are not named as defendants in SKAT's complaints in this action.[16] SKAT alleges that, between 2012 and August 2015, the Defendants submitted tax refund applications that included a claim form seeking refunds of dividend taxes (*i.e.*, claiming treaty relief).[17]

22.1.    Documents reflect that the U.S. pension fund defendants ("USPFs") were set up as employee benefit plans/trusts, were U.S. residents for tax purposes, intended to

---

[13] *Id.* at art. 10(3)(c), 22(2)(e); Exhibit 3 (Protocol *supra* note 6, at art. V(2)(b)). The beneficial owner limitation was used in the original treaty's Article 10, which article was wholly replaced in the Protocol. As discussed *infra* ¶ 90.1 this raises the issue whether, if there is a difference in accepted meaning of "beneficial owner" between those two dates for Danish tax law purposes, which date (or a third date such as the date of the dividend) is relevant. The revised Article 10 substituted by the Protocol included two significant policy changes, the adoption of a zero tax rate on dividends paid to (i) qualifying corporate shareholders with 80% or more in voting power, and (ii) qualifying pension funds.

[14] See Exhibit 5 (Motion to Dismiss Opinion), *supra* note 8, at 308; *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 39); *see also* Exhibit 2 (Treaty, *supra* note 6, at arts. 10(3)(c), 22(2)(e); *infra* ¶¶ 49, 58). The U.S. withholding system and its policies are described *infra* ¶¶ 50-56 and contrasted with the Danish withholding system *infra* ¶ 58.

[15] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 16-35).

[16] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8 at 308); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 9(b)-(c)). However, as discussed, *infra*, certain of the U.S. pension plan defendants have brought third-party complaints against their broker custodian, ED&F Man Capital Markets Ltd. *See infra* ¶ 30.

[17] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308-09); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 42-49); In particular, SKAT alleges that "[b]etween August 20, 2012 and September 17, 2014, the Defendants in this action caused 327 separate withholding tax refund claims to be submitted to SKAT, representing that fourteen claimants were entitled to refunds totaling DKK 820,015,992.76, or at least $120,615,000 (US)." Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 54.]).

qualify under 26 U.S.C. ("I.R.C.") § 401(a), and intended to be exempt from U.S. taxation under I.R.C. § 501(a).[18]

22.2.  A reclaim agent or payment agent (*e.g.*, Goal Taxback Limited) for each USPF submitted a reclaim form to SKAT on behalf of the USPF in order to obtain a refund of the dividend tax withholding under the Treaty.[19]

22.3.  The reclaim form bore SKAT's logo, was entitled "Claim to Relief from the Danish Dividend Tax," and listed the applicable USPF as beneficial owner.[20]

23.  The reclaim applications reflect that the reclaim form was submitted to SKAT with the following attachments:

23.1.  A Dividend Credit Advice[21] prepared by the USPF's broker-custodian (*e.g.*, Solo Capital Partners LLP ("Solo")). Certain Solo Dividend Credit Advices state that the broker-custodian "ha[s] credited your account" with a "payment [that] represents the dividend as shown below," and listing information including the security name, ex date, record date, pay date, dividend per share, number of shares owned, the amount of the gross dividend, the withholding tax, and the net dividend paid;[22]

---

[18] *See, e.g.*, Exhibit 8 (SKAT_MDL_00000391); Exhibit 9 (WH_MDL_00331778); Exhibit 10 (SKAT_MDL_00000346); Exhibit 11 (WH_MDL_00033719); Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265430, SKAT_MDL_001_00265435, and SKAT_MDL_001_00265440); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414003 and SKAT_MDL_001_00414007).

[19] *See, e.g.,* Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265426-28[, SKAT_MDL_001_00265433, SKAT_MDL_001_00265438, and SKAT_MDL_001_00265443); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00413998-4000, and SKAT_MDL_001_00414005).

[20] *See, e.g.,* Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265426-28); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00413998-99).

[21] I understand from counsel that some reclaim applications attached a Tax Voucher instead of a Dividend Credit Advice.

[22] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265429, SKAT_MDL_001_00265434, and SKAT_MDL_001_00265439); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414001-02 and SKAT_MDL_001_00414006).

23.2.   A Form 6166 from the U.S. Internal Revenue Service ("IRS") certifying that, "to the best of [the IRS'] knowledge, the [USPF] is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation;"[23]

23.3.   A power of attorney from the USPF in favor of the reclaim agent.[24]

24.    SKAT paid the refund payments to the USPFs' reclaim agents.[25]

### B.    SKAT Learns of and Investigates the Alleged Fraud

25.    In June 2015, "SKAT received information indicating that certain claimants may have submitted fraudulent tax refund claims based on the double taxation treaty between Denmark and Malaysia."[26]  In August 2015, SKAT "stopped paying all claims for refunds of dividend withholding tax while it investigated the fraudulent scheme."[27]

26.    From November 2015 through June 2018, SKAT sought information from the United States and had periodic meetings with the IRS under the authority of Article 26(1) of the Treaty.[28]

---

[23] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265430, SKAT_MDL_001_00265435, and SKAT_MDL_001_00265440); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414003 and SKAT_MDL_001_00414007).

[24] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265431-32, SKAT_MDL_001_00265436-37, and S SKAT_MDL_001_00265441-42); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414004 and SKAT_MDL_001_00414008-09).

[25] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308-09); Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 43-44).

[26] Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 6).

[27] *Id.* at ¶ 8.  The quoted language does not mean and should not be taken to suggest that SKAT had determined in 2015 that the scheme was fraudulent (as SKAT now alleges).

[28] Exhibit 14 (Exhibit 3962 to Tr. of Dep. of Gry Ahlefeld-Engel, *In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-28865-LAK (S.D.N.Y Sept. 24, 2021) [hereinafter "Ahlefeld-Engel Dep. Ex. 3962"], at ¶ 36.2); Exhibit 15 (Ex. AJS27 to the Eighth Witness Statement of Alan John Sheeley, *Skatteforvaltningen (The Danish Customs & Tax Admin.) v. Solo Capital Partners LLP & Ors* [2021] EWHC 974 (Comm) [hereinafter "AJS27"]).  *See also* Exhibit 16 (Tr. of Dep. of Christian Ekstrand at 163-72, 285-94, *In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-cv-09797 (S.D.N.Y. May 6-7, 2021) [hereinafter "Ekstrand Dep. Tr."]); Exhibit 17 (SKAT_MDL_001_00468547_T).

26.1.    In particular, Article 26(1) of the Treaty provides in part:

> The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of [the Treaty] or of the domestic laws of the Contracting States concerning taxes covered by the [Treaty] insofar as the taxation thereunder is not contrary to the [Treaty], including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by [the Treaty].[29]

26.2.    Further, such disclosure is restricted to "persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the [Treaty] or the oversight of the above."[30] Finally, "[s]uch persons or authorities shall use the information only for such purposes," including "in public court proceedings."[31]

26.3.    Under this exchange of information process, representatives of SKAT and the IRS met regarding SKAT's investigation.[32] These meetings and communications involved representatives of each country's competent authority as well as each country's single point of contact for the Joint International Taskforce on Shared Intelligence and Collaboration ("JITSIC").[33] JITSIC is organized by the OECD's

---

SKAT continues its effort to discover the facts through broad discovery in this proceeding. *See, e.g.,* Pls. Mot. to Compel, ECF No. 678.

[29] Exhibit 2 (Treaty, *supra* note 6, at art. 26(1)).

[30] *Id.* at art. 26(1). Note that art. 26(4) expands for purposes of the article the taxes covered by the Treaty "to taxes of every kind imposed by a Contracting State." *Id.* at art. 26(4).

[31] *Id.* at art. 26(1).

[32] *See* Exhibit 14 (Ahlefeld-Engel Dep. Ex. 3962, *supra* note 28 at ¶ 33.1) (SKAT statement that, "[b]etween November 2015 and June 2018, SKAT had periodic communications (including at certain meetings) with the Internal Revenue Services of the United States of America (the "**IRS**") by which SKAT requested and was provided with information pursuant [*sic*] Article 26 of the Denmark/USA Double Taxation Agreement (the "**IRS Material**")" (emphasis in original)); Exhibit 18 (Tr. of Dep. of Lill Drost at 90-102, *In re Customs & Tax Admin. of the Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-2865-LAK (S.D.N.Y. Oct. 1, 2021) [hereinafter "Drost Dep. Tr."]); Exhibit 16 (Ekstrand Dep. Tr., *supra* note 28, at 163-72; 285-94; SKAT_MDL_001_00468547_T).

[33] Exhibit 18 (Drost Dep. Tr., *supra* note 32, at 90-102); Exhibit 16 (Ekstrand Dep. Tr., *supra* note 28, at 163-72; 285-94; Exhibit 17 (SKAT_MDL_001_00468547_T).

Forum on Tax Administration to bring "together members of the world's national tax administrations that have committed to more effective and efficient ways to deal with tax avoidance. JITSIC offers a platform to enable its members to actively collaborate within the legal framework of effective bilateral and multilateral conventions and tax information exchange agreements – sharing their experience, resources and expertise to tackle the issues they face in common."[34]

26.4. SKAT stated that the purpose of these requests was:

> to assist it to come to informed views as to:
>
> (i) whether to accept pending applications for the refund of dividend withholding tax, which are not the subject of this claim (but included some applications on behalf of US pension plans who made other WHT applications that are the subject of the claim and which SKAT considered might be fraudulent); and/or
>
> (ii) whether SKAT's previous administrative decisions to accept WHT applications on behalf of US pension plans were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions; and/or
>
> (iii) the circumstances in which claims for a refund of dividend withholding tax should be accepted in the future (including what, if any, changes should be made to SKAT's processes and procedures).[35]

26.5. The IRS agreed with SKAT's description of the purpose of SKAT's requests. In October 2020, the IRS granted SKAT, through its counsel, "consent to disclose IRS documents pertaining to the Dividend Withholding Tax Refund scheme worked between the United States (U.S.) tax administration and the Danish Customs and

[34] *Joint International Taskforce on Shared Intelligence and Collaboration*, IRS, https://www.irs.gov/businesses/international-businesses/joint-international-tax-shelter-information-centre (last visited Dec. 22, 2021).

[35] Exhibit 14 (Ahlefeld-Engel Dep. Ex. 3962, *supra* note 28 at ¶ 33.1(b)(i)-(iii)).

Tax administration, ("SKAT")" in the [U.K. Litigation (as defined in ¶ 32, *infra*)].[36] The IRS confirmed its view of SKAT's request in its October 2020 response to SKAT's request to disclose information received under the Treaty by citing the Treaty's "confidentiality and use restrictions set forth in Article 26."[37]  In its response, the IRS justified its authorization to SKAT to use the information in the U.K. Litigation on the grounds that those proceedings "arise out of and are inextricably linked to a dividend tax fraud scheme.  Consequently, for purposes of the [Treaty], they are judicial proceedings concerning the administration of covered taxes, and the disclosure of information in those proceedings would be for tax administration purposes."[38]

26.6.    The processes described in ¶¶ 26.1-26.5 are specified in Article 26 of the Treaty and follow longstanding U.S. policy and international practice of limiting treaty information exchange to information "relating to the . . . collection of, the enforcement or prosecution in respect of, . . . the taxes covered by the Convention" and disclosure of that information only to persons, including courts, involved in the same.[39]  This treaty-based approach balances the policy goals of reciprocal international cooperation while restricting the exchange to treaty partner countries that are trusted to preserve the confidentiality of taxpayer information consistent with the provisions of the treaty.

27.    I am advised by counsel for Defendants that in 2017, SKAT wrote to many of the Solo and ED&F Man Capital Market Ltd. ("ED&F Man") Applicants advising of its intent to rescind its original determinations and made a demand for repayment.[40]  I am further advised that

---

[36] Exhibit 15 (AJS27, *supra* note 28, at K1/58/2).

[37] *Id*. at K1/58/3.

[38] *Id.*

[39] Exhibit 2 (Treaty, *supra* note 6, at 26(1)).

[40] *See, e.g.*, Exhibit 19 (Decision – Withdrawal of Prior Decisions to Refund Dividend Taxes 2, 16-17, Apr. 6, 2018, ECF. No. 36-5) ("SKAT is not demanding payment of the incorrectly issued dividend tax refund in connection with this decision.  This is a departure from the previously proposed decision that SKAT sent to Bradley on March 24, 2017.").

in April, 2018, SKAT wrote to many of the applicants a second time and instead purported to withdraw its intent to demand repayment of the refunded dividend tax.[41] I am further advised by counsel that several revocation letters issued by SKAT on April 17, 2018 stated that "on behalf of SKAT, legal counsel for the Danish government is going to send a writ with a demand for reimbursement and compensation."[42] Finally, counsel for Defendants advised that the amount to be recovered by SKAT did not change.

## C.    The Litigations

28.    Following its change in approach described in ¶ 27, I am advised by counsel for Defendants that SKAT filed over 500 lawsuits in courts around the world—including in the United States, the United Kingdom., Dubai, and Malaysia—relating to claims to recover amounts paid pursuant to reclaim applications.  SKAT asserts different causes of action against defendants having different roles in the alleged misconduct in the various jurisdictions.

### 1.    The U.S. Litigations

29.    Beginning in May 2018, SKAT filed complaints in this Court and courts around the United States.[43]  On October 3, 2018,140 actions pending in 11 districts were consolidated into the present multidistrict litigation.[44]  I am advised by counsel for Defendants that since that time, SKAT filed an additional 45 actions in the MDL.

29.1.    SKAT "claims that the defendants defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies

---

[41] *See, e.g.*, *id.* ("Thus, SKAT's decisions to refund dividend taxes to Bradley are based on false premises.  For this reason, SKAT is withdrawing its prior decisions to refund dividend taxes.").

[42] *See, e.g.*, *id.*

[43] The first complaints were filed on May 4, 2018.  *See* Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The Bradley London Pension Plan, et al*, No. 1:18-cv-04047 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The DMR Pension Plan et al,* No. 1:18-cv-04049 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The Houston Rocco LLC 401K Plan et al*, No. 1:18-cv-04050 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The Proper Pacific LLC 401K Plan et al*, No. 1:18-cv-04051 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The LBR Capital Pension Plan et al;* No. 1:18-cv-04052 (S.D.N.Y. May 4, 2018), ECF No. 1.

[44] Transfer Order, *In re: Customs and Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Scheme Litig.*, No. 1:18-md-02865-LAK (J.P.M.L. Oct. 3, 2018), ECF No. 1.

that had paid dividends net of withholding tax. In fact, the complaints allege, the defendants did not own those stocks and had had no taxes withheld from any dividends. Nevertheless, the defendants allegedly obtained many millions of dollars in tax refunds from the Danish treasury under false and fraudulent pretenses."[45]  SKAT alleges that it "paid out approximately $2.1 billion as a result of this fraudulent tax refund scheme."[46]

29.2.   SKAT brought these actions for damages asserting variously six state common law claims against Defendants: (1) fraud; (2) aiding and abetting fraud; (3) payment by mistake; (4) unjust enrichment; (5) money had and received; and (6) negligent misrepresentation.[47]

30.   Certain USPFs and associated individual defendants in the instant litigation have, in turn, brought third-party complaints against their broker custodian, ED&F Man alleging *inter alia*, fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, promissory estoppel, unjust enrichment, equitable indemnification, and contribution.[48] While SKAT has not sued ED&F Man in the United States, it has sued ED&F Man (for negligence, but not fraud) in the United Kingdom, as discussed more fully below in Paragraph 32.[49]

---

[45] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 307-308); *see also* Exhibit 6 (Am. Comp., *supra* note 8, at ¶¶ 54-117).

[46] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 309); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 2). The same number was used in the U.K. litigation, described *infra* ¶ 32, suggesting that the number is a global estimate. *See infra* note 58.

[47] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 309); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 118-48). SKAT has alleged civil conspiracy against one Defendant. *See* Compl., *Skatteforvaltningen v. Michael Ben-Jacob*, No. 1:21-cv-05339, (S.D.N.Y. June 16, 2021), ECF No. 1.

[48] *See, e.g.*, Third Party Compl., *Del Mar Asset Mgmt. Sav. & Ret. Plan, et. al. v. ED&F Man Cap. Mkts. Ltd.*, No. 18-md-2865 (S.D.N.Y. Nov. 5, 2019), ECF No. 220; *In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Litig.*, Nos. 18-md-2865, 18-md-5053, 2020 U.S. Dist. LEXIS 3064 at *1-2 (S.D.N.Y. Jan. 7, 2020).

[49] *See infra* ¶ 32.

### 2.    Non-U.S. Litigations

31.    The instant litigation presents one set of claims against a subset of actors alleged to be involved in the alleged fraud.   The following summaries of the non-U.S. litigations highlight the variety of claims against other parties that SKAT has brought around the world in connection with the same pattern of conduct.   This Report's discussion of the policies underlying the revenue rule takes account of these other claims as well as third-party claims in the instant litigation.

32.    Beginning in March 2018, SKAT filed a series of complaints that, ultimately through amendments and further filings, named 114 separate defendants in the United Kingdom. These complaints were consolidated in the Commercial Court, Queen's Bench Division of the High Court of Justice of England and Wales (the "U.K. Litigation").[50]  An April 27, 2021 decision was rendered in the U.K. Litigation ("the April 2021 U.K. Decision") dismissing SKAT's claims against all parties.[51]  I understand that that dismissal is the subject of a pending appeal which is scheduled to be heard by the English Court of Appeal, civil division, of the High Court of Justice of England and Wales on January 25, 2022.  The parties to the U.K. Litigation include Sanjay Shah ("Shah"), his business, Solo, and certain individuals employed by Solo,[52] which served as certain of the USPFs' broker custodian;[53] certain other corporate parties including Goal Taxback Ltd.,[54] which served as certain of

---

[50] Exhibit 20 (*Skatteforvaltningen (The Danish Customs & Tax Admin.) v. Solo Capital Partners LLP & Ors* [2021] EWHC 974 (Comm) [2], (Baker J) (Eng.) [hereinafter "April 2021 U.K. Decision"]).

[51] For purposes of this Report, I accept that the April 2021 U.K. Decision accurately describes the relevant U.K. actions and their allegations.  I express no opinion as to the legal analysis or outcome of the April 2021 U.K. Decision, nor do I adopt the characterization of facts as set forth in the April 2021 U.K. Decision.

[52] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶¶ 9-10).

[53] Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265429, SKAT_MDL_001_00265434, and SKAT_MDL_001_00265439); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414001-02 and SKAT_MDL_001_00414006).

[54] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶¶ 7, 12).

the USPFs' reclaim agent;[55] and ED&F Man,[56] which was associated with certain refund applications that Solo was not.[57]

32.1.    According to the April 2021 U.K. Decision, SKAT alleged that it was induced by misrepresentations from August 2012 to July 2015 to pay out tax refunds for which it was not liable, totaling over DKK 12.5 billion, or approximately £1.5 billion.[58] The April 2021 U.K. Decision explains that certain double taxation agreements ("DTAs"), "including DTAs particularly relevant to this litigation with the USA and Malaysia," provide certain foreign (non-Danish) resident parties the right to receive a refund of withholding tax deducted at source by Danish companies.[59]

32.2.    The April 2021 U.K. Decision explains that "[t]he primary focus, of all the causes of action said by SKAT to arise, is the information said by SKAT to be conveyed to it by a completed [dividend tax] refund claim form and the documents sent with it, and what SKAT[] . . . did with that information."[60] The April 2021 U.K. Decision states that, "[b]y its claims, SKAT therefore seeks the return of amounts it says it was wrongly induced to pay out as tax refunds."[61]

32.3.    According to the April 2021 U.K. Decision, SKAT brought a fraud claim (and associated conspiracy claim) against only the Solo defendants.[62] SKAT alleged negligence, mistaken payments, knowing receipt, and unjust enrichment against the

---

[55] *See, e.g.,* Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265426-28, SKAT_MDL_001_00265433, SKAT_MDL_001_00265438, and SKAT_MDL_001_00265443); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00413998-4000, and SKAT_MDL_001_00414005).

[56] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, ¶ 13).

[57] *Id.* SKAT does not allege fraud or dishonesty with respect to the ED&F Man Applications. *Id.* at ¶ 30.

[58] *Id.* at ¶ 2. The U.S. and U.K. complaints share substantial similarities. SKAT asserts essentially the same aggregate amount of incorrect refunds (translated into U.S. dollars) in its complaint in this litigation without specifying or estimating the aggregate amounts at issue in other countries.

[59] *Id.* at ¶ 6.

[60] *Id.* at ¶ 11.

[61] *Id.* at ¶ 8.

[62] *Id.* at ¶ 11.

Solo defendants and certain other parties.[63]   Accordingly, there are defendants (specifically, the non-Solo defendants, including ED&F Man) facing only non-fraud claims in the U.K. Litigation.

33.   According to news reports, SKAT has also pursued claims in Dubai and Malaysia.[64]  The claims in Dubai were against Shah and two of his companies.[65]

## III.   CONTEXTUALIZING THE REVENUE RULE IN U.S. TAX LAW AND TAX TREATY POLICY

### A.   Overview

34.   U.S. international tax law and regulations are drafted, and U.S. bilateral income tax treaties are negotiated, against the background of the common law principle, referred to as the "revenue rule," which "prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws."[66]  An international agreement to which the United States is a party may overcome the revenue rule while imposing standards and limitations that protect the tax and enforcement policy interests of each country.[67]  The

---

[63] *Id.* at ¶¶ 11-13.

[64] Exhibit 21 (Richard Crump, *Denmark Suffers Blow to Dubai Arm of $2B Tax Fraud Case*, LAW360 TAX AUTHORITY (Aug. 13, 2020, 9:08 PM), https://www.law360.com/tax-authority/articles/1300939/denmark-suffers-blow-to-dubai-arm-of-2b-tax-fraud-case (last accessed Dec. 29, 2021)).

[65] *Id.*

[66] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 310), citing Exhibit 22 (*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 130-31 (2d Cir. 2001)).  As the United States said in the *Pasquantino* oral argument before the Supreme Court: ". . . what becomes left [of revenue rule jurisprudence in the 20th century] are sovereignty cases where a country is seeking to exert its sovereign power inside the United States or inside a foreign country -- the United States, itself, tried it once in Canada -- to collect taxes. And countries said, 'We're not going to do that. We're going to leave it to the treaty process.'"  Exhibit 23 (Tr. of Oral Arg. at 46:12-18, *Pasquantino v. U.S.*, 544 U.S. 349 (2005) (No. 03-72)).

[67] "The [revenue] rule avoids involving the judiciary in making judgments about foreign tax policies and procedures and interwoven foreign policy considerations, and it leaves the Executive Branch and the Senate free to decide through the treaty-making process the extent to which exceptions to that [revenue rule] principle should be recognized." Exhibit 24 (Brief for U.S. et al. as Amicus Curiae Supporting the Court at 7, *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001) (No. 01-1317) [hereinafter "U.S. *Canada* Cert. Amicus Brief"]). This brief was submitted in response to the Court's order inviting the Solicitor General to express the views of the United States regarding whether the Supreme Court should grant Canada's petition for writ of certiorari to review the Second Circuit's decision in Exhibit 22, *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001), which is discussed throughout this Report, *see infra* ¶ 41.1.  *See* Exhibit 24 (U.S. *Canada* Cert. Amicus Brief at 1).  In addition to the Acting Solicitor General, Assistant Attorneys General, and Department of Justice Attorneys, the U.S. *Canada* Cert. Amicus Brief was filed by William H. Taft, IV, Legal Advisor to the Department of

revenue rule encourages reliance on reciprocal international agreements instead of unilateral judicial assistance. These agreements allow international cooperation to be restricted to countries identified by the United States as appropriate treaty partners, to be subject to limitations consistent with U.S. policies and norms, and to imbue discretion in the Executive Branch responsible for making and carrying out tax policy and enforcing the tax law.[68]

35.    In order to contextualize the discussion of how SKAT's claims in the instant litigation intersect with the topics covered in this Part III of the Report, I first describe the role the revenue rule plays in the U.S. tax system, how the revenue rule has been applied in U.S. cases, and, from a policy perspective, the strained nature of SKAT's claim in relation to the revenue rule.

36.    Subsequent sections of Part III of the Report will describe:

36.1.    the structure of U.S. international tax law governing the imposition, administration, and enforcement of the tax on items of taxable income paid to nonresidents, how it contrasts with the Danish system, and how the relationship between the two sovereigns' systems is mediated by the revenue rule;

36.2.    collection assistance treaty provisions in the existing U.S. network of bilateral income tax treaties, including the treaty with Denmark, and the multilateral Convention, and their relation to the revenue rule; and

36.3.    the role of tax information exchange agreements ("TIEAs") authorized by Congress and entered into as executive agreements, and the potential to expand the legislative grant to authorize collection assistance provisions incorporating safeguards as a

---

State and George B. Wolfe, Deputy General Counsel to the Department of Treasury. As such, it is indicative of the position of tax policymakers and treaty negotiators at that time.

[68] The U.S. *Canada* Cert. Amicus Brief (Exhibit 24), is the last occasion I am aware of where multiple affected agencies of the Federal government have expressed views of the government publicly on the role of revenue rule in a case brought by a foreign government. In my experience, views expressed by multiple Federal agencies before a court in a case such as *Canada* are the product of an inter-agency process, which usually includes representatives of the Office of the Solicitor General, and are not changed without undertaking a similar process. I endeavor to reference the U.S. *Canada* Cert. Amicus Brief where the views expressed in that brief are relevant to my discussion of policy.

means to quickly and efficiently expand international collection assistance, including with countries that are not currently parties to a bilateral income tax treaty.

**B.    The Revenue Rule Principle in the United States**

**1.    National Tax Enforcement in a Global Economy**

37.    The economy is global, but governments are national.  The ability of any government to function rests on the ability of its tax system to generate revenue.  For that reason, tax systems are granted extraordinary powers,[69] afforded unique protections,[70] and subject to special obligations.[71]  This reflects recognition of the importance of maintaining public trust in the tax system and supporting revenue collection.

37.1.    Maintaining taxpayer trust in and public support for the tax system is an ongoing U.S. policy concern in order to maintain a high level of voluntary tax compliance. While intangible, U.S. voluntary tax compliance is a national asset.

37.2.    Protecting revenue collection and maintaining public confidence in its tax system is a critical sovereign function.

38.    The administration and enforcement of a tax system in the modern era inevitably takes an international cast, but starts from a national base.  Cross-border administration and enforcement operates within the constraints of national jurisdiction.  Because of the limits of that jurisdiction, tax systems and tax authorities increasingly rely on international cooperation, most significantly with respect to information exchange by international

---

[69] Subtitle F of the Internal Revenue Code houses the provisions that provide the authority and means to administer and enforce U.S. Federal taxes.  *See* I.R.C. §§ 6001 – 7874.

[70] For example, the so-called Tax Anti-Injunction Act adopted in 1867 at the federal level and the Tax Injunction Act adopted in 1937 in relation to the states seek to protect the enforcement ability of the respective tax systems.  Tax Injunction Act, 28 U.S.C. § 1341.  As another example, it is a criminal offense to use force or threats of force against a U.S. officer or employee to impede or obstruct a tax investigation.  I.R.C. § 7212.  It also is a criminal offense for certain senior Executive Branch officials, including the President, the Vice President, and the Secretary of the Treasury, "to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer."  I.R.C. § 7217.

[71] The IRS is required to protect the confidentiality of taxpayer information and its employees are subject to criminal penalties for unauthorized disclosures of taxpayer information.  I.R.C. §§ 6103, 7213, 7213A.

agreement.[72]  Collection assistance by reciprocal agreement also has expanded, though not to the same degree as information exchange.  While the United States has been slower to advance collection assistance, it has concluded 35 bilateral income tax treaties that include collection assistance provisions.[73]  The revenue rule has been an important element in achieving the sought-after U.S. policy of balancing its interests in assisting other countries, protecting taxpayer rights, and preserving control over commitment of U.S. enforcement and collection resources.[74]

39.      This policy balance is achieved uniquely through international agreement-based mutual assistance.  The revenue rule plays a critical structural role in constraining unilateral and potentially open-ended judicial assistance and in encouraging mutual agreements.

    39.1.    An important reason for the revenue rule is to restrict unilateral use by potentially any foreign government, democratic or otherwise, of U.S. courts to enforce extraterritorially its tax laws against persons or property over which the U.S. courts may have jurisdiction.[75]

    39.2.    The effect of revenue rule preclusion is to channel U.S. administrative and judicial assistance through bilateral (or multilateral) agreements.[76] This, in turn, allows the Legislative and Executive Branches to balance protections of individual rights and U.S. tax, economic, and foreign relations interests against the gains that come from international cooperation in tax administration and enforcement.[77]

---

[72] International cooperation in information exchange based on agreements has become a global norm.  This is evidenced by the presence of information exchange provisions in bilateral treaties; the development and global adoption of TIEAs that expand the range of countries exchanging information to those that may not have reason for a bilateral income tax treaty; and the broad adoption of the OECD and Council of Europe Multilateral Convention for Mutual Assistance in Tax Matters.  *See* Exhibit 25 (Perla Gyöngyi Végh, *OECD: Towards a Better Exchange of Information*, EUR. TAX'N, 394-99 (2002)).

[73] *See infra* ¶¶ 64-69.

[74] *See id.*

[75] *See infra* ¶¶ 40-41, 83-87.

[76] *See infra* ¶¶ 61-74.

[77] *See infra* ¶¶ 81-88.

39.3.   Subject to the common law boundaries of, *inter alia*, the revenue rule, foreign sovereigns are accorded access to U.S. courts in much the same way as other litigants.

    i.   In recognition of their sovereign status, moreover, foreign sovereigns are granted broad immunity from suit in U.S. courts unless the suit involves commercial activity with a link to the United States and subject to certain other exceptions.[78]

    ii.   The availability of U.S. courts to foreign sovereigns is balanced, however, by the revenue rule.  In *Republic of Colombia v. Diageo North America, Inc.*, for example, the claims brought by a foreign sovereign based on its commercial activities were not barred by the revenue rule because they "do not involve the kind of moral and political judgments that the tax or revenue laws typically involve."[79]  On the other hand, the claims of the Republic of Colombia for damages relating to lost (*i.e.*, unpaid) liquor taxes were barred by the revenue rule.[80]

## 2.   The Revenue Rule in the United States

40.   Historically, the common law revenue rule precluded foreign sovereigns from using U.S. courts to enforce their tax judgments or unadjudicated tax claims.[81]  U.S. courts emphasize the revenue rule's purposes "to ensure respect for sovereignty by keeping courts out of the

---

[78] *See* Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1602-08 ("FSIA").  FSIA provides the sole basis for obtaining subject matter jurisdiction over suits against foreign sovereigns.  *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 611 (1992); *see also* 28 U.S.C. § 1330; *id.* § 1604. The history of Foreign Sovereign Immunities Act has been found to support the "restrictive" view of sovereign immunity under the FISA statute governing a sovereign's exposure to U.S. courts.  *Argentina*, 504 U.S. at 612-13.

[79] *Republic of Colombia v. Diageo N. Am., Inc.*, 531 F.Supp.2d 365, 386 (E.D.N.Y. 2007).

[80] *Id.* at 394.

[81] *See Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1166 (9th Cir. 1979) (holding that the revenue rule bars courts of the United States from enforcing a judgment for taxes by courts of a foreign government); Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 134-35 (holding Canada's RICO claim was barred by the revenue rule)); Exhibit 26 (*Pasquantino v. U.S.*, 544 U.S. 349, 351-52 (2005)) (finding wire fraud case brought by the U.S. Executive Branch distinguishable from a case brought by a foreign government to collect tax revenue in that the revenue rule did not bar the U.S. executive from seeking to punish criminal fraud within its own borders); Exhibit 27 (Restatement (Fourth) of Foreign Relations Law § 489 cmt. a (Am. Law Inst. 2018)).

business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices" and "to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government."[82]

41.    Two leading cases concerning the enforcement of extraterritorial tax claims frame how the U.S. application of the revenue rule protects these interests.

    41.1.    In *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, the Second Circuit affirmed the dismissal of Canada's action brought under the Racketeer Influenced and Corrupt Organizations ("RICO") Act claiming lost tax revenue as damages.[83]

        i.    The Canadian government argued that the lost tax revenue was an injury to business or property for purposes of the civil RICO statute. The Second Circuit was unpersuaded by this interpretation as the U.S. court nonetheless would have to make a determination on "the validity of the Canadian revenue laws," a determination that the court considered prohibited by the revenue rule.[84]

        ii.    The Second Circuit explained that the revenue rule "has been defended on several grounds, including respect for sovereignty . . . and separation of powers."[85]  As to the policy protecting the separation of powers, the Second

---

[82] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 310), citing Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 111-13). *See also* Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 113-14) ("Tax laws embody a sovereign's political will . . . They mirror the moral and social sensibilities of a society . . . '[C]ourts have observed that the rule prevents foreign sovereigns from asserting their sovereignty within the borders of other nations, thereby helping nations maintain their mutual respect and security."); Exhibit 26 (*Pasquantino*, 544 U.S. at 369 *citing U.S. v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)) ("In our system of government, the Executive is 'the sole organ of the federal government in the field of international relations.'").

[83] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 105-06).

[84] *See id.* at 108 ("[T]o pursue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws. Enforcing foreign revenue laws is precisely the type of meddling in foreign affairs the Revenue Rule forbids.").

[85] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 136).

Circuit noted that "[t]he conduct of foreign relations is committed largely to the Executive Branch, with power in the Legislative Branch to, *inter alia*, ratify treaties with foreign sovereigns. The doctrine of separation of powers prohibits federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch." [86] The Second Circuit explained the revenue rule's policy of protecting sovereignty as one preventing courts from passing judgment on the moral and political choices embodied in a foreign sovereign's tax policy. [87]

41.2. *Pasquantino v. U.S.* held that the U.S. government's criminal case brought under the federal wire fraud statute was *not* barred by the common law revenue rule. [88] The Supreme Court pointed to the distinction between a foreign government bringing an action to recover its tax revenue and the U.S. government bringing an action to punish "fraudulent domestic criminal conduct" occurring in the United States. [89] The Supreme Court noted that where the U.S. government acts to enforce its own laws, the policy reasons behind the revenue rule described in the preceding paragraph are not implicated. [90]

### 3.    SKAT's Claim

42.    SKAT's theory appears to be that once taxes are refunded, even though induced by allegedly fraudulent tax refund claims on SKAT-prescribed tax reclaim forms, the case to

---

[86] *Id.* at 114.

[87] *Id.* at 112-13. As in the present case, Canada also asserted common law fraud claims in the U.S. District Court for the Northern District of New York (the "District Court"). In granting the motion to dismiss the RICO claims, the District Court also declined to exercise supplemental jurisdiction over the common law fraud action. *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 103 F. Supp. 2d 134, 155 (N.D.N.Y. 2000). The Second Circuit's decision affirming dismissal of Canada's RICO claims effectively mooted the common law fraud supplemental jurisdiction request.

[88] Exhibit 26 (*Pasquantino*, 544 U.S. at 354-55).

[89] *Id.* at 362-65.

[90] *Id.* at 364.

recover the refund falls outside of the revenue rule and its purposes because SKAT "do[es] not seek unpaid taxes."[91]

43.     To my knowledge, a claim based on the position that a tax refund inoculates the proceeding from its revenue origins for purposes of the revenue rule is novel, at least in the United States. [92]

43.1.   But for the refund aspect, the claim in this case bears a similarity to Canada's claim in *Attorney General of Canada*. If in *Attorney General of Canada* the tax evasion were accomplished by the filing of a false tax return claiming a refund without any prior payment of tax, as happens in the United States,[93] there is nothing to suggest that the Second Circuit would have reached a different conclusion merely because the mechanism was a fraudulently induced tax refund instead of nonpayment in the first instance.

43.2.   The recovery of an incorrect withholding tax refund and the collection of an under withheld tax amount are merely different means to the same end of revenue collection: a determination that taxes should or should not be paid under a nation's tax laws. From a policy perspective, revenue collection and revenue protection through recovery of incorrect tax refunds cannot be de-linked in a functioning tax system.[94]

---

[91] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 311).

[92] This essentially is the same claim as was made in the U.K. litigation in relation to "Dicey Rule 3," which is the U.K. reference to the revenue rule. Exhibit 28 (A.V. Dicey, et al., *The Conflict of Laws* 5R-019-5-020, (15th ed. 2010)). The April 2021 U.K. Decision indicates that the claim was equally novel in the U.K. courts. Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 88) ("The decided cases on Dicey Rule 3 to date have not considered the case of a tax refund wrongly paid by a sovereign tax authority and a claim to recoup that erroneous payment, or compensation for it.").

[93] *See, e.g.*, *United States v. Wardell*, 218 Fed. App'x 695, 696 (10th Cir. 2007) (in a sentencing appeal, the Court recited the underlying facts: "While incarcerated in a Colorado state prison, Wendel R. Wardell and other prisoners engaged in a scheme to obtain fraudulent tax refunds by submitting false tax returns. The scheme involved submitting false tax returns in their own names, and in the names of other inmates, to obtain refunds to which they were not entitled. Wardell was eventually convicted of seventeen counts of tax fraud and one count of conspiracy").

[94] *See infra* ¶¶ 77-80.

43.3.    As an everyday U.S. example, consider the U.S. mechanism for withholding income taxes on wages and compensation paid to employees. Employers withhold at a rate of tax, based on level of income and exemptions, and pay those amounts over to the IRS.[95] Employees may claim refunds of over-withheld income taxes on their individual income tax returns based on many factors (*i.e.*, credits, deductions).[96] Refunds paid with respect to individual income tax returns are often processed automatically, with review only for form, execution, and mathematical accuracy.[97] The IRS may subsequently audit the taxpayer, determine that more tax is due, and seek a return of the previously paid refund of withheld income taxes via either the (1) deficiency procedure set forth in I.R.C. §§ 6211-6215 or (2) a civil action to recover any portion of the tax that was erroneously refunded under I.R.C. § 7405.[98] Both avenues for the recovery of the previously paid refund are revenue claims.

44.    SKAT appears to put weight on an applicant's not having previously paid tax.[99] That element fails as a meaningful distinction for determining whether recouping a tax refund constitutes tax enforcement.

---

[95] I.R.C. § 3402.

[96] Exhibit 29 (Bittker & Lokken, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶ 114.7 (Thomas Reuters/Tax & Accounting, 2d/3d ed. 1993-2019, with updates through November 2021) (online version accessed on Checkpoint (www.checkpoint.riag.com), [Dec. 28, 2021])).

[97] Exhibit 30 (Bittker, McMahon & Zelenak, FEDERAL INCOME TAXATION OF INDIVIDUALS ¶ 47.01 (Thomas Reuters/Tax & Accounting, 3d ed. 2002, with updates through November 2020) (online version accessed on Checkpoint (www.checkpoint.riag.com), [Dec. 28, 2021])).

[98] *Beer v. Comm'r*, 733 F.2d 435, 436-37 (6th Cir. 1984) (per curiam) (affirming Tax Court decision sustaining IRS determination that petitioner was liable for deficiencies arising out of wrongful refunds of taxes withheld from wages and holding that suit to recover erroneous refund does not preclude IRS use of deficiency procedures); *see also Brown v. Comm'r.*, Tax Ct. Dkt. No. 10823-95, 97 T.C.M. 567 (RIA), at *6-7 (Dec. 23, 1997) ("A suit for a recovery of an erroneous refund under section 7405 is merely one of several remedies . . . . It is a civil action brought in the name of the United States and does not preclude an alternative remedy; namely, the determination of a deficiency by the Commissioner. [] It has been firmly established in our tax law that the Commissioner may proceed through the deficiency route where there has been an erroneous refund as in this case.") (internal citations omitted); *Lock v. Comm'r*; Nos. 23762-14S, 24629-14S; T.C. Summ. Op. 2017-10 (upholding IRS deficiencies seeking returns of refunds of taxes withheld from wages).

[99] *See* Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 311). Clearly, non-payment of tax (and non-filing of a tax return) is not relevant to a revenue rule analysis as the foreign government RICO cases for lost tax revenues demonstrate. *See, e.g.*, *Colombia*, 531 F.Supp.2d at 394-95.

44.1.  There are situations where the tax law creates a right to refund that is separated from payment of tax, as in the case of a wholly or partially refundable tax credit.[100] A claimant may file for a refund of the tax credit amount without having previously paid tax.  There are situations where timing may require the filing of a refund claim for a carryover of a loss or nonrefundable credit when the payment of tax purportedly offset was incorrect and not actually paid.  In such circumstances, the tax authority will seek to recoup the refund of the tax credit or for the carryover via the applicable tax enforcement process.  Recovery of an incorrect tax refund in these cases implicates tax enforcement as much as collection of additional tax.

44.2.  In a case where the law has (advertently or not) created a duplicate (or an ambiguous) right to a refund, there may be a legitimate claim for refund without a prior payment of tax.  For instance, determining which person should be treated as the beneficial owner of a dividend in the case of stock lending has been a recurring problem in the tax law.[101]  Where in the case of a stock loan the tax law is ambiguous or deficient in identifying a single tax owner as between the stock lender and the stock borrower, both applicants may have a plausible claim in law to a refund of tax, though only one will have paid the tax.[102]  This may be a mistake of the legislature, and may give rise to a double benefit, but that does not mean it is necessarily incorrect as a legal matter.[103]  In such case, one of the claimants will not have paid the tax, and if the tax authority honors the claims of both, it may seek return of one or both of the tax refunds via its tax enforcement process.

---

[100] Examples of refundable credits for individuals in the U.S. are the earned income tax credit (I.R.C. § 32), the child tax credit (I.R.C. § 24), the American opportunity (education) credit (I.R.C. § 25A), and the recovery rebate tax credit (I.R.C. § 6428).

[101] *See infra* note 121.

[102] *See infra* ¶¶ 51-52 for a discussion of a stock loans and equity swap derivative transaction used in the U.S. market and subsequently addressed by I.R.C. § 871(m).

[103] *See Gitlitz v. Comm'r.*, 531 U.S. 206 (2001) (upholding a S corporation shareholder loss for stock basis increased by cancellation of indebtedness income excluded from tax gross income). The result in *Gitlitz* was overruled by an amendment to the relevant Code provision preventing excluded cancellation of indebtedness income of an S corporation from increasing shareholder basis.  Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, § 402, 116 Stat. 21, 40 (2002) (amending then I.R.C. § 108(d)(7)).

45.     From a policy perspective, adopting the position that recovering an incorrect tax refund, whether of a prepaid tax or not, is not tax enforcement does not pass muster.

    45.1.   The facts of this case occur wholly within the Danish tax system. The alleged fraudulent claim for refund is made to SKAT, the Danish authority that assesses and collects taxes. The refund claim uses SKAT tax refund forms and procedures to claim a refund under the Treaty. SKAT's initial determination was that a refund was warranted under the provisions of the Treaty and Danish law. SKAT's claim for recovery is a conclusion that the conditions of the Treaty, including applicable Danish law, for the tax refund were not satisfied.

    45.2.   There is nothing about this case that as a policy matter is not tax enforcement. The sovereign interest in protecting against incorrect tax refunds is central to administering and maintaining the public's trust in a tax system.

46.     The following two sections set out the context in which the revenue rule operates, first in the design and operation of the U.S. regime for taxing U.S. corporations' dividends paid to nonresidents and enforcing the tax in Section C, and second in relation to collection assistance provisions employed in U.S. bilateral income tax treaties in Section D. The objective is to evaluate how narrowing the application of the revenue rule would affect positions taken by the United States in its laws and treaties in relation to cross-border interactions with other countries. Section E briefly discusses TIEAs, executive agreements that are a potential instrument for expanding collection assistance to countries that are not currently parties to a bilateral income tax treaty but would be a desirable collection assistance partner.

## C.      The U.S. Cross-Border Dividend Withholding Tax Regime

47.     The scope of enforcement jurisdiction and the revenue rule underlie how and the extent to which the United States taxes non-U.S. persons on U.S. source dividends (and other items of "fixed and determinable annual and periodical" income (FDAP)) not effectively

connected with a U.S. trade or business.[104]  The United States imposes a tax on the gross amount of such income and collects the tax through withholding at source.[105]

48.　　The internationally accepted system of having the payor of a dividend or other income (or its agent) withhold a gross basis tax at source addresses directly the inability of the source country (here, the United States), absent a treaty, to collect taxes not paid voluntarily by a nonresident having no presence in the United States or assets subject to U.S. jurisdiction.  Without direct enforcement jurisdiction, and because of international acceptance of principles underlying the revenue rule limiting the extraterritorial exercise of sovereign tax enforcement, the United States generally would not be able to obtain international judicial assistance absent a treaty or international agreement.

49.　　The United States and Denmark each tax dividends paid to nonresident shareholders, but under different regimes for administering the tax.  Both systems employ withholding for collecting tax on gross dividend amounts.  While both systems require applicants to make a claim for entitlement to reduced tax rates, the United States employs a system of relief at source based on documentation and Denmark employs a withholding tax reclaim system, based on documentation.[106]  In this respect, Denmark's approach is similar to other countries that also employ a tax reclaim system in respect of dividends, however, the details of each country's underlying substantive legal rules and enforcement skills capacity matter.  As will be discussed in the context of U.S. tax law, these differences in approach reflect tax policy decisions taking into account multiple factors, including the related substantive tax laws and what may be thought of as the tax compliance culture of the country involved.[107]

---

[104] I.R.C. §§ 871(a)(1), 881(a)(1).

[105] *Id.* §§ 1441, 1442.  *See generally,* Exhibit 31 (Stephen E. Shay, J. Clifton Fleming, Jr. & Robert J. Peroni, *The David R. Tillinghast Lecture: 'What's Source Got to Do With It?' Source Rules and U.S. International Taxation*, 56 TAX L. REV. 81, 121-28, 135-36 (2003)).

[106] *See* Treas. Reg. § 1.1441-1(a).  In certain situations, not relevant here, the Danish system mimics a relief at source system where certain taxpayers are entitled to exemptions from or reductions to withholding tax on dividends without submitting a reclaim.  *See* Exhibit 7 (Bundgaard, *supra* note 10, at 14).

[107] The reasons for Denmark's revenue loss in this case should await the outcome of ongoing investigations and review in Denmark.  They likely will be found to have multiple causes, including a combination of failures to remedy defects

50.    This section first describes the structure of the U.S. system of taxation and withholding based on relief at source in broad terms and observes how that structure intersects with the revenue rule. It then briefly describes the Danish system applicable to foreign shareholders like the USPFs, shows the potential for asymmetry of burdens on the other country under the two systems, and explains how the revenue rule promotes reciprocity by encouraging cooperation through bilateral agreement.[108]

50.1.    The United States requires withholding agents to withhold taxes on dividends at a rate of 30% unless reliable documentation substantiates that a lower rate (*e.g.*, by reason of a treaty) is proper.[109] A withholding agent that does not withhold and pay required amounts of tax will be liable for the payments, as well as penalties and interest.[110] Withholding agents are those with control, receipt, custody, disposal, or payment of certain items of income of a nonresident.[111]

50.2.    When insufficient taxes are withheld and the IRS has jurisdiction over withholding agents but not the nonresident shareholder, withholding agent liability serves as an important backstop for the IRS to collect applicable taxes. More than one person

---

in substantive tax law provisions addressing equity lending and derivatives, as well as failures to design or implement basic financial controls and disciplines in making tax refunds. *See* discussion of U.S. dividend withholding enforcement experiences, *infra* ¶¶ 51-52.

[108] *See* Exhibit 32 (William S. Dodge, *Breaking the Public Law Taboo*, 43 HARV. INT'L L. J. 161, 163 (2002)) ("With respect to governmental claims, which would include tax law, criminal prosecutions, and the government's civil enforcement of antitrust and securities laws, the political branches should provide for the reciprocal enforcement of foreign public law through treaties, and courts should not enforce foreign public law in suits by governments in the absence of such treaties, because courts are institutionally incapable of ensuring reciprocity.").

[109] Treas. Reg. § 1.1441-1(b)(1).

[110] Treas. Reg. §§ 1.1441-1(b)(7)(i) and 1.1441-1(b)(7)(iii). For example, a "withholding agent must withhold 30 percent of any payment of an amount subject to withholding made to a payee that is a foreign person unless it can reliably associate the payment with documentation upon which it can rely to treat the payment as made to a payee that is a U.S. person or as made to a beneficial owner that is a foreign person entitled to a reduced rate of withholding." Treas. Reg. § 1.1441-1(b)(1).

[111] Treas. Reg. § 1.1441-7(a). This description does not get into the details of the qualified intermediary (QI) system. For a description, *see* Exhibit 33 (*Issues Involving Banking Secrecy Practices & Wealthy American Taxpayers: Hearing Before Subcomm. on Select Revenue Measures of the H. Comm on Ways & Means*, 111 Cong. (March. 31, 2009) (statement of Stephen E. Shay)); Exhibit 29 (Bittker & Lokken, *supra* note 96, at ¶ 67.4.6); Exhibit 34 (S. I. Langbein, FEDERAL INCOME TAXATION OF BANKS & FINANCIAL INSTITUTIONS ¶ 14.08[2] (Thomas Reuters/Tax & Accounting, 7th ed. 2002, with updates through November 2021) (online version accessed on Checkpoint (www.checkpoint.thomsonreuters.com) [Dec. 28, 2021])).

in a chain of payees of dividends may be a withholding agent.[112]  In this case, the IRS may pursue any of the potential agents.[113]

50.3.    On the other hand, the withholding agent is protected from liability for taxes to the extent that it applies the processes in the Treasury regulations designed to assure reliability of the documentation or to rely on regulatory presumptions largely designed to protect the fisc.[114]  If the withholding agent has actual knowledge or reason to know that liability is *greater* than what is indicated by documentation (or presumptions), the withholding agent is exposed to liability irrespective of the documentation received (or presumption).[115]

50.4.    The U.S. regulations accordingly incentivize withholding agents to avoid exposure to liability for under withholding by protecting withholding agents that withhold unless proper documentation rebuts the presumption of withholding applicability.[116]  On the other side of the equation, foreign investors who are direct or indirect clients of the withholding agent generally do not want to file tax returns with the IRS, even if necessary to claim refunds in the case of over withholding. This provides an incentive for the withholding agent to engage in appropriate diligence to obtain client documentation that is correct in the first instance.  In the author's experience, U.S. global custodians' back offices provide substantial technical support to foreign banks and foreign investors and their representatives

---

[112] I.R.C. §§ 1441(a), 1442(a); Treas. Reg. § 1.1441-7(a)(2).  This includes a foreign person meeting the definition of withholding agent.

[113] Under I.R.C. § 1463, if a withholding agent fails to withhold but the tax is paid, the withholding agent remains potentially liable for applicable interest and penalties.  In a chain of securities custody for stock in a U.S. public company, there always will be a financial institution within reach of U.S. enforcement jurisdiction.  Stocks are held through the Depositary Trust Corporation (DTC) whose members are domestic banks or bank branches acting as custodians. Normal commercial practice is to contractually assign the obligation to withhold tax to a person in the payment chain with that capability.  *See U.S. Tax Withholding Services*, DTCC, https://www.dtcc.com/settlement-and-asset-services/global-tax-services/us-tax-withholding-services (last accessed Dec. 21, 2021).

[114] Treas. Reg. § 1.1441-1(b)(3)(ix)(A).

[115] Treas. Reg. § 1.1441-1(b)(3)(ix)(B), *Id.* § 1.1441-6(b)(1).  *See also* Exhibit 35 (Richard E. Andersen, ANALYSIS OF UNITED STATES INCOME TAX TREATIES ¶ 9.02 (Thomas Reuters/WG&L, with updates through November 2021) (accessed on Checkpoint (www.checkpoint.riag.com), [Dec. 28, 2021])).

[116] *See, e.g.*, Treas. Reg. § 1.1461-1(e).

that are direct and indirect clients regarding a myriad of documentation and related tax compliance matters.

50.5.   The policy decision to adopt relief at source is based on multiple considerations. These include:

i.      It minimizes the burden on payments in the U.S. capital markets, which are the largest in the world involving billions of dollars of cross-border income payments on average each business day.[117]

ii.     The reliance on withholding agents shifts substantial portions of the cost burden from the government to private financial institutions that provide services.[118]  The banking industry in turn seeks to pass on the cost to the customers that benefit from the efficiencies of the market.

iii.    The compliance benefits from this structure include placing a diligence obligation on the financial institutions with incentives described previously to assure quality.   The Qualified Intermediary ("QI") system in turn endeavors to shift this obligation to the institution with the closest relationship with the beneficial owner.[119]

---

[117] In 2019, $1.125 trillion of U.S.-source FDAP income was reported paid to nonresidents.  IRS Statistics of Income, Foreign Recipients of U.S. Income Under Chapter 3 Withholding Tbl 1. Forms 1042S, 2019 (cell C10). Assuming 260 business days, that would result in payments exceeding $4 billion each day.

[118] In 1982-1983 the banking industry defeated an initiative spearheaded by Senator Bob Dole to impose a 10% withholding tax on interest.  In response, Senator Dole promoted and saw passage of the interest and dividend back-up withholding regime that has been the domestic counterpart to cross-border withholding and now FATCA.  Exhibit 36  (*Interest    Withholding    Requirement    Repealed*, 39    CQ    ALMANAC    (1984) http://library.cqpress.com/cqalmanac/cqal83-1198852).  All of these regimes place the primary cost burden initially on the banking industry

51. The United States, like Denmark, has had to respond to the tax enforcement difficulties presented by stock lending and equity trading strategies. The history to 2008 of successive U.S. steps to address tax avoidance relating to dividend withholding tax is referred to in the hearing documents for the Permanent Subcommittee on Investigations ("PSI") 2008 Hearing on Dividend Tax Abuse.[120] The steps taken by the United States to protect against dividend withholding tax avoidance include the following (the third step was subsequent to and an outcome of the PSI hearing):

51.1. modifying source rules (to address a stock lending dividend withholding tax avoidance strategy);[121]

51.2. requiring a minimum equity holding period to qualify for double taxation relief (to address certain trading around dividend dates);[122] and

51.3. looking through the substance of derivative positions (to address dividend withholding tax avoidance using derivative positions).[123]

52. A transaction addressed by the most recent of these rules is the following:

52.1. Example: Foreign owner A ("FO-A") of U.S. equity X lends the X shares in advance of a dividend to a foreign affiliate, foreign owner B ("FO-B") resident in

---

[120] Exhibit 38 (*Dividend Tax Abuse: How Offshore Entities Dodge Taxes on U.S. Stock Dividends: Hearing Before Permanent S. Subcomm. on Investigations of the S. Comm. of Homeland Security and Gov'tal Affs.*, 110 Cong. (2008) [hereinafter "Dividend Tax Abuse Hearing"]).

[121] *See* Treas. Reg. § 1.861-3(a)(6). First proposed in 1992, 57 Fed. Reg. 860 (Jan. 9, 1992), and finalized in 1997 (T.D. 8735 (Oct. 6, 1997)), the U.S. adopted a source rule that treats a substitute dividend payment on a stock loan as U.S. source income classified as a dividend. As a result, when a dividend is paid on U.S. stock loaned by an offshore shareholder to a U.S. person (usually a bank or other financial institution) and the U.S. borrower is obligated to make a "substitute payment" of the same amount to the stock lender, that substitute payment is subject to withholding in the same manner as a U.S. dividend to the stock lender. The same rule applies to a stock sale-repurchase (repo) transaction. Following issuance of the regulations, the Treasury issued I.R.S. Notice 97-66, 1997-2 C.B. 328, to address a concern with cascading U.S. withholding on a foreign-to-foreign securities loan. For example, foreign owner A (FO-A) of U.S. equity X lends the X shares to foreign owner B (FO-B) who receives dividends. The dividend to B is subject to withholding tax and B's substitute payment to FO-A also is subject to withholding tax. I.R.S. Notice 97-66 ameliorated the risk of an excessive second withholding tax, but in such a way that it left exposed to dividend tax avoidance other transactions. *See supra* ¶ 54.

[122] *See* I.R.C. § 901(k) (1997).

[123] *See* I.R.C. § 871(m) (2010).

a country subject to a U.S. dividend withholding rate at least equal to the rate that would apply to FO-A's country of residence.[124]  FO-B sells the X shares to a U.S. financial institution and enters into a total return equity swap with a financial institution as counterparty in which FO-B agrees to pay the U.S. financial institution (the counterparty) amounts at an agreed rate on the equity value of the shares plus any depreciation in value of the shares, and the counterparty pays FO-B amounts based on the dividends and any appreciation on X shares.[125]  FO-B in turn pays substitute dividend payments to FO-A without withholding.[126]  Some time after the dividend FO-B terminates the equity swap with the U.S. financial institution (the counterparty) and purchases X shares to close out the stock loan from FO-A.

52.2.    Following adoption of I.R.C. § 871(m), the dividend equivalent payment portion of the equity swap would be characterized as a U.S. source dividend and therefore subject to withholding.  These are examples of policy decisions that the United States implemented to combat dividend withholding tax avoidance.

53.    The U.S. approach to avoidance generally is to adopt a specific legislative response.  An alternative approach used by some countries is to adopt a "general anti-avoidance rule."[127]  Whichever approach is taken is a policy response that is based on a mix of factors that are specific to a country's legal system and culture of tax compliance.[128]

---

[124] Under this condition, I.R.S. Notice 97-66 would by its terms excuse FO-B's substitute payment to FO-A from withholding. Commentators argued that this was an inappropriate application of I.R.S. Notice 97-66 in the context of this example, but that argument did not align with market practice.

[125] The dividend equivalent payment on an equity swap was treated as foreign source income not subject to withholding under Treas. Reg. 1.863-7 (prior to its 2013 amendment in T.D. 9572 to conform to I.R.C. § 871(m)).

[126] Exhibit 38 (Dividend Tax Abuse Hearing, *supra* note 120, at 4 (statement of Sen. Levin)).

[127] Exhibit 39 (Richard Krever, *Chapter 1: General Report GAARS* , *in* GAARs–A KEY ELEMENT OF TAX SYSTEMS IN THE POST-BEPS TAX WORLD (M. Lang, et al. eds. 2015) ¶ 1.1) ("Quite possibly no other feature of tax law provides a better insight into a nation's tax psyche than its anti-avoidance rules.").

[128] *See, e.g., id.*; Exhibit 40 (Hoon Lee & Candice M. Turner, *Anti-avoidance measures of general nature and scope– GAAR and other rules–United States Report*, *in* IFA CAHIERS 2018 - VOLUME 103A 6-7 (IFA 2018)).

54.     The United States follows a beneficial owner concept for withholding tax reductions for dividends under treaties (as well as in its domestic law unilateral exemption for so-called portfolio interest).[129]

54.1.   Under the Treaty, which is similar in this respect to most U.S. bilateral income tax treaties, the definition of a term, not otherwise defined in the Treaty, including beneficial owner, is governed by Article 3(2).[130]   The term "beneficial owner" is not defined in the Treaty and has not been the subject of a competent authority agreement under Article 25.   Article 3(2) of the Treaty provides that:

> [A]ny term not defined therein shall, unless the context otherwise requires, … have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

This is standard language in U.S. bilateral income tax treaties and reflects U.S. practice.

54.2.   One question is whether the "context" would support a different definition than a domestic law definition.   Some commentators argue for an "international definition" of beneficial owner, freed from domestic law, in order to promote uniformity of treaty interpretation.[131]   As seen from the technical explanation of the Treaty, the United States has not adopted such an approach.[132] Several reasons likely explain this.

---

[129] See I.R.C. §§ 871(h), 881(c); Treas. Reg. §§ 1.1441-1, 1.1441-6.  For this reason, U.S. withholding regulations implement beneficial owner standards separately for domestic statutory law and for treaty purposes.

[130] Exhibit 2 (Treaty, *supra* note 6, art. 3(2)); *see also* Exhibit 41(I.R.S., Technical Explanation to *id.*).

[131] Exhibit 42 (Philip Baker, *Beneficial Ownership: After Indofood*, VI GITC REV. 15, 23 (2007)) ("What the term needed was a 'international fiscal meaning' rather than a meaning that depended on the domestic law of the country where the issue arose." (footnote omitted)); Exhibit 43 (Robert Danon, *Clarification of the Meaning of "Beneficial Owner" in the OECD Model Tax Convention–Comment on the April 2011 Discussion Draft*, 65 BULL. INT'L TAX'N 437, 441 (2011)) ("First, the OECD should make it very clear that beneficial ownership is a treaty concept that leaves no room for the application of the domestic law of the source state.").

[132] *See infra* ¶ 54.3. As explained by John Avery-Jones, "[u]nless the competent authorities agree to a common interpretation, article 3(2) of the OECD Model means that common interpretation in the sense of a term having an autonomous meaning can arise only if the context otherwise requires the domestic law meaning not to be applied,

i.  First, the OECD Model Commentary to Article 10 on beneficial ownership has shifted over time.  From 1977, the Commentary was designed to prevent nominees and agents from claiming treaty benefits in place of their principals.  The OECD Model Commentary took a different turn in 2003 to incorporate an anti-treaty abuse purpose into the beneficial owner condition.[133] The OECD Model Commentary on "beneficial owner" was modified again in 2014 to clarify that use of beneficial owner did not pre-empt other approaches to protecting against treaty abuse,[134] which was long the U.S. position as reflected in its incorporation of a separate limitation on benefits article in its tax treaties since the early 1980s.[135] The 2014 OECD Model Commentary also confirmed that a payment to an agent acting for a beneficial owner resident in a treaty jurisdiction was not denied treaty relief merely by being paid to a nominee or agent.[136] The U.S. approach has been consistent with these positions.  U.S. practice is to take account of OECD Model Commentary that is relevant to an issue (which can include later

---

which, because of the need to keep the treaty relieving provisions in line with the domestic law tax charge, is likely to be infrequent.  Judging from the US experience, where the power to make mutual agreements on interpretation that override the rest of article 3(2) is contained in about 38 of their treaties since 1982, this power is also likely to be used infrequently."  Exhibit 44 (John Avery-Jones, TREATY INTERPRETATION, GLOBAL TAX TREATY COMMENTARIES (IBFD 2018) at ¶ 1.1.2.2).

[133] Exhibit 45 (OECD Comm. on Fiscal Affs., *OECD Income & Cap. Model Convention & Comment.*, comment. to Art. 10, ¶¶ 12-12.1 (IBFD Jan. 28, 2003) [hereinafter "2003 OECD Comment."]).  This change was based on the 2002 report.  Exhibit 46 (OECD, *Restricting the Entitlement to Treaty Benefits*, 8 ISSUES IN INT'L TAX'N 7, 26-31 (2003)).  At the same time, the 2003 changes to the OECD Commentary clarified that domestic law anti-abuse rules applied in relation to treaties.  *See* 2003 OECD Comment., *supra* note 133, at comment. to Art. 1, ¶¶ 9.1-9.5, 22.-22.2.  This had long been the U.S. position.

[134] Exhibit 47 (OECD Comm. on Fiscal Affs., *The 2014 Update to the OECD Model Tax Convention*, comment. to Art. 10, ¶ 12.5 (July 15, 2014) [hereinafter "2014 OECD Comment."]) ("Whilst the concept of 'beneficial owner' deals with some forms of tax avoidance (*i.e.* those involving the interposition of a recipient who is obliged to pass on the dividend to someone else), it does not deal with other cases of treaty shopping and must not, therefore, be considered as restricting in any way the application of other approaches to addressing such cases.").

[135] All U.S. treaties ratified since 1986 have included a limitation on benefits article.  Since the 1986 Act adoption of a statutory limitation on benefits rule overriding treaties in I.R.C. § 884, all U.S. treaties that did not have a limitation on benefits article have been re-negotiated.  Exhibit 48 (The OECD Comm. on Fiscal Affs., *Model Tax Convention on Income & on Capital 2017 (Full Version)*, art. 29 (Nov. 21, 2017) [hereinafter "2017 OECD Model Treaty"]), Art. 29 added a broad "principal purpose text" limitation on benefit provision in Article 29.

[136] Exhibit 47 (2014 OECD Comment., *supra* note 134, at comment. to Art. 10, ¶ 12.2).

versions of the OECD Model Commentary), but not to be bound by it.[137] Other countries may take different approaches.

ii.     A second reason is that the United States has regularly advocated for international standards to mirror its own rules.[138]

iii.    A third reason is that in treaties since the early 1980s, the United States' negotiating position has been to authorize the competent authority to agree (under the mutual agreement article) on a specific meaning of a term and to give that meaning precedence over domestic law (in Article 3(2)).[139] This approach assures that any deviation from domestic law is for a specific objective and is not open-ended.

54.3.   The U.S. Technical Explanation to the Treaty's 2006 Protocol revising Article 10 provides, consistent with Article 3(2), with respect to beneficial owner:

> The term 'beneficial owner' is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (*i.e.*, the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State. [140]

54.4.   In determining to whom dividend income is attributable for tax purposes, the United States looks to the person who includes the income for U.S. tax purposes. This

---

[137] For a leading example of use of OECD Model Commentary in applying a treaty provision, *see Taisei Fire & Marine Ins. Co., Ltd. v. Comm'r*, 104 T.C. 535 (1995). Since the U.S. does not rely on the OECD Model Commentary as authority, it avoids the issue of which commentary was relevant. For example, should it be the commentary at the date the treaty was signed? The date the provision is added to a treaty? The date of the transaction?

[138] In the current negotiations for a global minimum tax, the public statements to date have included approaches that would accommodate differences between the U.S. global intangible low tax income (GILTI) regime, I.R.C. §§ 250, 951A, and the OECD's specification of its Pillar 2 proposal. OECD/G20 Base Erosion & Profit Shifting Project- -Statement on a Two-Pillar Solution to Address the Tax Challenges Arising from the Digitalisation of the Economy (2021), https://www.oecd.org/tax/beps/statement-on-a-two-pillar-solution-to-address-the-tax-challenges-arising-from-the-digitalisation-of-the-economy-october-2021.pdf.

[139] *See* Exhibit 49 (Model Convention for the Avoidance of Double Taxation & the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, U.S., art 3(2), June 16, 1981); Exhibit 35 (Andersen, *supra* note 115, at ¶ 2.04[2]).

[140] Exhibit 50 (I.R.S., Technical Explanation to Protocol, *supra* note 6, at art. II ¶ 2).

determination is informed by U.S. substance over form doctrines such as assignment of income,[141] as well as incorporating rules authorized by regulations, including regulations under I.R.C. § 7701(l) incorporating specified anti-conduit principles.[142]

54.5.    The U.S. domestic law definition of beneficial owner for withholding purposes is defined similarly, but with greater elaboration, in the withholding regulations.[143]

54.6.    The meaning of "beneficial owner" under the OECD Model Commentary is uncertain.[144] Its meaning is developed by each country in light of its tax policies and the role the term plays in its tax law. The United States has used legislative and regulatory rules to avoid placing weight on determinations of beneficial owner. Other countries rely on less bright line approaches. The choice essentially is one of policy (informed by local tax culture).

---

[141] *Lucas v. Earl*, 281 U.S. 111, 114-15 (1930).

[142] To make a tax lawyer's life difficult, the I.R.C. § 7701(l) anti-conduit regulations are found under I.R.C. § 881. *See* Treas. Reg. § 1.881-3.

[143] Treas. Reg. § 1.1441-1(c)(6)(i) provides:

> **(6) Beneficial owner—(i) General rule.** This paragraph (c)(6) defines the term beneficial owner for payments of income other than a payment for which a reduced rate of withholding is claimed under an income tax treaty. The term beneficial owner means the person who is the owner of the income for tax purposes and who beneficially owns that income. A person shall be treated as the owner of the income to the extent that it is required under U.S. tax principles to include the amount paid in gross income under section 61 (determined without regard to an exclusion or exemption from gross income under the Internal Revenue Code). Beneficial ownership of income is determined under the provisions of section 7701(l) and the regulations under that section and any other applicable general U.S. tax principles, including principles governing the determination of whether a transaction is a conduit transaction. Thus, a person receiving income in a capacity as a nominee, agent, or custodian for another person is not the beneficial owner of the income. In the case of a scholarship, the student receiving the scholarship is the beneficial owner of that scholarship. In the case of a payment of an amount that is not income, the beneficial owner determination shall be made under this paragraph (c)(6) as if the amount were income.

Special rules apply to foreign partnerships, foreign simple trusts, and foreign grantor trusts, and other foreign trusts and foreign estates. Treas. Reg. § 1.1441-1(c)(6)(ii). Payments covered by a treaty are subject to a different regulation that in form defers to the treaty, but by reason of the treaty definition rules similar to those in the Treaty, the definition of beneficial owner effectively is directed back to domestic law beneficial owner rules. *See* Treas. Reg. § 1.1441-6.

[144] Charl du Toit, a student of the beneficial owner concept for over 20 years, summarizes the state of the literature at the end of 2021: "There has been a big increase in articles, commentaries and court cases on beneficial ownership the last number of years, with the only points of agreement probably being that the term is controversial and its meaning uncertain." Exhibit 51 (Charl P. du Toit, *Beneficial Owner: The Enigma Storms Ahead*, 75 BULL. INT'L TAX'N 11/12, 2 (2021)).

55.     U.S. substantive law changes, such as adoption of the anti-conduit regulations and the legislative fixes described above in relation to dividend tax avoidance, have had meaningful effect in part because of the shared incentives of withholding agents under the U.S. regime to implement what have been increasingly complex rules.

56.     Several observations are relevant regarding the U.S. taxation of dividend payments to nonresidents and the relief at source approach to withholding:

56.1.   U.S. withholding agents effectively share with the IRS an interest in assuring accurate tax collection.  The volumes of payments in the U.S. markets are substantial and the risks from errors are substantial.[145]

56.2.   The U.S. relief at source regime causes withholding agents to emphasize upfront quality controls to minimize the need for manual interventions and thereby achieve payment efficiencies.  It also minimizes the circumstances in which there are underpayments of taxes.

56.3.   From the perspective of the U.S. government, in the case of under withholding, the joint and several liability of withholding agents for the tax largely assures that there are assets subject to U.S. tax enforcement jurisdiction from which to collect the tax without having to resort to foreign collection assistance.

56.4.   The U.S. withholding regime enhances the effectiveness of substantive law anti-abuse rules and doctrines because the withholding agents' direct and indirect contractual relationships with beneficial owners allow withholding agents to require customers, as a condition of maintaining an account, to provide information necessary to implement the law.

57.     International acceptance of the revenue rule or an analogue generally has been presumed in designing the relevant tax law (a tax on gross income) as well as withholding procedures.

---

[145] In 2019, $1.125 trillion of U.S.-source FDAP income was reported paid to nonresidents of which $115 billion was subject to withholding, resulting in tax withheld and paid over totaling of $21 billion.  IRS Statistics of Income, *supra* note 117.

The procedures presuppose that collection assistance for additional tax will not be available in the absence of a treaty or international agreement.

58.    A relief at source system such as that used in the United States contrasts with a tax reclaim system, such as the one employed by Denmark. Under Denmark's tax reclaim system, once the withholding agent withholds and pays over the maximum taxes that could be due to the revenue authority, the withholding agent and indeed the entire withholding chain between the issuer of the stock and the investor appear to be out of the picture.[146] Upon receipt of a reclaim application, SKAT determines whether it is entitled to retain the tax it has received from the withholding agent, whether a refund of this tax is due, or whether further investigation is warranted. Following that determination, SKAT refunds any amounts determined to be over-withheld directly to the applicant or applicant's reclaim agent.[147]

58.1.    Under a tax reclaim system it is the responsibility of the revenue authority, in this case SKAT, to get the tax refund right.

58.2.    Where taxes are refunded incorrectly by a tax reclaim country to a person outside the enforcement jurisdiction of that country, the tax reclaim country's recourse appropriately is collection assistance under a treaty or other international agreement.

58.3.    In contrast, allowing SKAT's case to recoup allegedly incorrect tax reclaims to proceed here would allow a tax reclaim country to file suit in U.S. courts without regard to the revenue rule. Where, as in the case of Denmark, a country's dividend withholding tax regime uses a reclaim system, this policy decision should not avoid the reach of the revenue rule merely because its policy results in tax enforcement after an incorrect refund.

i.    In the U.K. Litigation, SKAT's counsel submitted that SKAT could not make a claim under the European Union's Mutual Assistance Recovery

---

[146] Exhibit 7 (Bundgaard, *supra* note 10, at 9, 13).

[147] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308-09); Exhibit 6 (Am. Compl. *supra* note 8, ¶¶ 43-44).

Directive, Directive 2010/24/EU, ("MARD").[148]  Regardless of whether or not claims for return of incorrect tax refunds are eligible for collection assistance under a treaty or supranational legislation such as EU laws, SKAT's theory in this case would permit requests for judicial assistance (in other words, civil lawsuits) from every country completely independent of whether they were a party to a treaty with collection assistance.

ii.    If, contrary to the view of SKAT's U.K. counsel, reclaim of an incorrect tax refund *were* within scope of the MARD or another international collection assistance agreement, not applying the revenue rule to bar claims for erroneous tax refunds would provide access to foreign courts in addition to the ability to seek relief under MARD.  It is possible under this approach that a foreign government could have the option of either making a request for assistance under a treaty *or* seeking assistance through the courts (or both, either simultaneously or sequentially).

59.    SKAT's view is that Denmark and any similarly situated tax reclaim country would have access to courts of other countries to recoup mistaken tax refunds because "they do not seek unpaid taxes."[149]  In contrast, a relief at source country, like the United States, would be barred by the revenue rule for the equivalent claim of under withheld taxes because it would be a claim for unpaid taxes.

59.1.   This would give rise to a material asymmetry in application of judicial collection assistance based upon the sovereign's policy decisions in designing and implementing its tax administrative and enforcement system.

---

[148] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 123).  Justice Baker observed: "I think it inconceivable that a request for assistance in respect of recovering a WHT refund said by the requesting tax authority to have been wrongly paid out could or would be resisted on the ground that it fell outside the scope of MARD as defined by Article 2(1)(a)."  *Id.* at ¶ 124.  SKAT presumably would not be bound by a counsel's statement should it later determine that a claim would be eligible for treaty assistance.

[149] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 311).

59.2.   This asymmetry is also at odds with reciprocity, which is an important factor in international tax relations generally and is a fundamental factor underlying international tax treaties and agreements (as discussed in the next section).[150]

59.3.   As a practical matter, it also is an untenable distinction.[151]

60.   The potential implications of such an asymmetry on U.S. positions in international tax legislation, collection assistance under treaties, and on use of U.S. judicial resources is taken up in Part IV of this Report.

### D.    Mutual Assistance Under U.S. International Tax Agreements

#### 1.    Overview

61.   U.S. international tax diplomacy in relation to negotiation of its bilateral and multilateral tax treaties and agreements also operates against the background of the revenue rule.[152]  As a result of negative legislative reaction to collection assistance in the post-World War II period and extending to present (at possibly lower levels of antagonism), the United States to date has authorized only narrowly drawn collection provisions in agreements that have received approval of the Senate.

62.   This section of the Report provides an overview of U.S. positions taken in relation to collection assistance in bilateral income tax treaties and the Convention.  The discussion at

---

[150] *See* Exhibit 52 (Brian Arnold, *Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretative Guideline or Misguided Policy?*, *in* THINKER, TEACHER, TRAVELER: REIMAGINING INTERNATIONAL TAX – ESSAYS IN HONOR OF DAVID ROSENBLOOM 2.1-2.3 (Georg Kofler, Ruth Mason, and Alexander Rust eds., IBFD 2021)) (observing that commentaries to both the OECD and UN Model Conventions acknowledge that some countries may not be able to provide collection assistance called for under Article 27 of the conventions (including for policy or administrative reasons) and such countries should not include Article 27 in their treaties. "In this context reciprocity is a factor in deciding whether to include Article 27 in a treaty; however, once the contracting states agree to include that provision in their treaty, it operates on a reciprocal basis").  Arnold also observes that treaty reciprocity is formal and does not require equivalent effects in both countries. *Id.* at 25. In my experience, substantive reciprocity is evaluated in connection with the overall decision whether to enter into a treaty with a particular country.

[151] *See* discussion, *infra* ¶¶ 77-87.

[152] As stated by the United States in its amicus brief filed in connection with the *cert* petition in *Att'y Gen. of Canada*: "The revenue rule is not only a well-established feature of the common law and of international law; it provides the background understanding against which the United States has entered into treaties that address the extent to which a foreign nation may seek assistance from the United States and its courts in enforcing its tax claims." Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 9 (*citing* S. Exec. Rep. No. 1, 82d Cong., 1st Sess. 21 (1951))).

Part IV considers the implications for U.S. negotiating positions regarding assistance in collection if this case were to proceed.

### 2. U.S. Bilateral Income Tax Treaties – Mutual Assistance and Dividend Withholding

63.    The United States has 67 bilateral income tax treaties in force.[153]  These treaties obtain source-country taxation relief for its residents where there is risk of double taxation.[154]  These treaties also support the administration and enforcement of the two countries' tax laws through exchanges of information for tax purposes and in certain cases, as discussed below, collection assistance.[155]

63.1.    Unlike most other countries, the United States generally does not enter into a treaty with a country, such as a low tax investment hub or "tax haven," where there does not exist a risk of double taxation of income.[156]

---

[153] See IRS, Tax Treaty Tables, Tbl 3, available at https://www.irs.gov/pub/irs-utl/Tax_Treaty_Table%203.pdf (last accessed Dec. 22, 2021).  The U.S. treaty with Bermuda is not included in that it is limited in scope and only applies to insurance enterprises.  U.S. bilateral income tax treaties generally follow the pattern of the OECD Model, but also include rules to address specific U.S. policies or limitations.  A U.S. model treaty is issued by the U.S. Treasury in part to indicate where U.S. negotiating positions differ from the OECD Model.  In some cases, these positions are "red lines" because the Senate will not ratify a treaty without the provision.  The U.S. Treasury consults with the Senate Foreign Relations Committee and the Congressional tax writing committees to assess views on treaty issues.

[154] The purposes of U.S. bilateral income tax treaties are to promote closer economic cooperation between the two countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the two countries.  Treaties accomplish this by reducing or eliminating double taxation of income earned by residents of each country from sources within the other country, while not creating opportunities for double non-taxation, and by preventing avoidance or evasion of the taxes of the two countries.  See Exhibit 53 (I.R.S., Preamble to 2016 U.S. Model Income Tax Convention (Feb. 17, 2016)); Exhibit 54 (Staff of J. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty between the United States and Poland, 1 (JCX-68-14, June 17, 2014)); see also Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 32 (2015) (statement of Robert B. Stack, Deputy Assistance Sec'y for Int'l Tax Affs., Dep't of Treasury)) (highlighting several policy goals in negotiating international tax treaties, which include to ensure reciprocal benefits to each country, to take into account the compatibility of the other country's tax system and to prevent abuse of treaties to ensure the United States will be able to successfully negotiate with other countries in the future to "secure for U.S. persons the benefits of reductions in source-country tax on their investments in that country.").

[155] TIEAs are discussed in the next section.

[156] Exhibit 35 (Andersen, supra note 115, at ¶ 1.01) (noting purpose of tax treaties focuses on reduction of double taxation).  Where there have been exceptions and treaties have been entered into, for example, with a tax haven, those treaties generally have been terminated (e.g., treaties with the British Virgin Islands (1983), the Netherlands Antilles (1987 (articles except the interest article and its ancillary provisions).  See id. at ¶ 1.04[6][a]]) or renegotiated so their use as a treaty shopping conduit is constrained (e.g., the treaty with Barbados (2004) and the Netherlands (1994)).  In other investment hub cases, the treaty adopts stringent limitations on benefits rules (e.g., the treaty with Malta (2008)).

63.2.    In its bilateral income tax treaties, the United States provides reciprocal source taxation relief for inbound investment from the treaty partner country.[157]

    i.    In the case of dividends, under U.S. treaties the country from which the dividend derives (the source country) generally is allowed to impose a tax up to a prescribed rate, with different rate caps applying based on the classification of the beneficial owner of the share.[158]

    ii.    In the United States' treaties with Australia, Belgium, Denmark, Finland, France, Germany, Japan, Mexico, New Zealand, Sweden, and the United Kingdom, each at Article 10(3), a direct dividend is exempt from source country tax provided an 80% ownership threshold (50% in the case of the Japanese treaty) and certain other conditions are satisfied. Where the country of residence of the beneficial owner also may tax the dividend, it commits to provide relief from double taxation for the tax imposed by the source country.[159]

    iii.    In certain U.S. treaties, including the treaty with Denmark, a pension plan may be entitled to exemption from source taxation as well.[160]

63.3.    U.S. bilateral income tax treaties employ limitation on benefits articles designed to prevent or mitigate "treaty shopping" (where third-country residents could use

---

As discussed in the next section, the United States does not limit countries with which it would enter into a TIEA, which is an executive agreement.

[157] The United States is a large net capital exporter of foreign direct investment and a large net importer of portfolio capital. IMF Data, *Outward Direct Investment Position, Top 10 Reporting Economies in the World, US Dollars, Millions, 2019*, INT'L MONETARY FUND, https://data.imf.org/?sk=40313609-F037-48C1-84B1-E1F1CE54D6D5&sId=1482249019300 (last accessed Dec. 21, 2021); IMF Data, *Inward Direct Investment Position, Top 10 Reporting Economies in the World, US Dollars, Millions, 2019*, INT'L MONETARY FUND, https://data.imf.org/?sk=40313609-F037-48C1-84B1-E1F1CE54D6D5&sId=1482247616261 (last accessed Dec. 21, 2021).

[158] If the beneficial owner is an individual or a corporation that owns less than 10% of the issuer's stock, the rate is usually 15%. If the beneficial owner is a corporation owning 10% or more of the stock the "direct dividend" rate is usually 5%.

[159] *See*, *e.g.*, Exhibit 2 (Treaty, *supra* note 6, at art. 23).

[160] *Id.* at art. 10(3)(c) added in the 2006 Protocol. *See* Exhibit 3 (Protocol, *supra* note 6).

treaty partner entities to obtain source treaty relief indirectly) that generally are stricter than anti-treaty shopping provisions found in non-U.S. income tax treaties.[161]

64.     The administrative provisions of treaties authorize assistance directly between the two countries' tax authorities. Not only is this generally more efficient than relying on judicial assistance, it takes precedence over the revenue rule.[162] Accordingly, under an income tax treaty, one country's tax authority will exchange tax information with the other country's tax authority to administer and enforce taxes covered by the treaty, as well as other taxes.[163] The administrative assistance articles, like others, are reciprocal in form and authorize administrative assistance between the treaty countries' respective tax authorities in each direction. U.S. judicial assistance in collection of a foreign tax judgment normally is precluded outside of a treaty by state adoption of one of the versions of the Uniform Foreign Money-Judgments Recognition Acts or the revenue rule.[164]

---

[161] *Compare* Exhibit 56 (Convention for the Avoidance of Double Taxation & the Prevention of Tax Evasion with Respect to Taxes on Income, U.S., art. 22 (2016) [hereinafter "2016 U.S. Model Treaty"]) *with* Exhibit 48 (2017 OECD Model Treaty, *supra* note 135, at art. 29).

[162] A TIEA, the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, and 28 U.S.C. § 1782, as well as a tax treaty can overcome this limitation in the case of taxes to the extent of the scope of the agreement. Collection assistance in relation to taxes is not afforded under a TIEA or the Hague Convention.

[163] *See* Exhibit 2 (Treaty, *supra* note 6, at art. 26(4)) (exchange of information for tax purposes is not limited to taxes covered by the treaty, as set out in Art. 2.) *See* below in respect of collection assistance.

[164] Exhibit 57 (Uniform Foreign Money-Judgments Recognition Act § 1(2) (Unif. L. Comm'n 1962)) (defining "foreign judgment" as a money judgment "other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters"); Exhibit 58 (Uniform Foreign-Country Money Judgments Recognition Act § 3(b) (Unif. L. Comm'n 2005)) (providing that the act does not apply "to the extent that the judgment is: (1) a judgment for taxes; (2) a fine or other penalty; (3) a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations"). The 1962 Uniform Foreign Money-Judgements Recognition Act is applied in 11 states including the U.S. Virgin Islands while the 2005 Uniform Foreign-Country Money Judgments Recognition Act has been adopted by 29 states including the District of Columbia. *See Foreign-Country Money Judgements Recognition Act 2005*, UNIF. L. COMM'N, https://www.uniformlaws.org/committees/community-home?communitykey=ae280c30-094a-4d8f-b722-8dcd614a8f3e&tab=groupdetails (last visited Dec. 9, 2021); *Foreign-Country Money Judgements Recognition Act 1962*, UNIF. L. COMM'N, https://www.uniformlaws.org/committees/community-home?CommunityKey=9c11b007-83b2-4bf2-a08e-74f642c840bc (last visited Dec. 9, 2021). In a state that has not adopted a version of the Uniform Foreign Money Judgment Recognition Act that excludes taxes, the revenue rule would apply. *See, e.g.*, *Bullen v. Her Majesty's Gov't of the U.K.*, 553 So. 2d 1344, 1345 (Fla. Dist. Ct. App. 1989). Florida's Uniform Out-of-country Foreign Judgment Recognition Act became effective on January 1, 1995, after the 1989 *Bullen* decision. *See* Uniform Out-of-country Foreign Money-Judgement Recognition Act, 1994 Fla. Laws ch. 239.

65.    Of 67 in-force U.S. bilateral income tax treaties, all provide for assistance through exchange of information, but 35 lack any provision for collection assistance.[165] The remaining 32 treaties take two general approaches to authorizing assistance in collection, which I will refer to as Category 1 and Category 2.

65.1.    Twenty-six Category 1 U.S. treaties[166] authorize collection assistance only to assure that treaty relief is not going to a person not entitled to its benefits.[167]

65.2.    Six Category 2 U.S. treaties include a broad assistance in collection article that extends beyond assistance to collect amounts necessary to ensure that relief from tax under the treaty does not inure to the benefit of persons not entitled to the relief.

---

[165] The treaty with the former USSR applies to nine countries formerly a part of the USSR.

[166] The Category 1 treaties are with Austria, Australia, Belgium, Cyprus, Egypt, Estonia, Finland, Germany, Greece, Hungary, Iceland, Indonesia, Italy, Jamaica, Korea, Latvia, Lithuania, Luxembourg, New Zealand, Norway, Philippines, Romania, South Africa, Sri Lanka, Trinidad and Tobago, and the United Kingdom. Exhibit 35 (Andersen, *supra* note 115, at ¶ 24.03[1][b][i] Tbl 24-5).

[167] For example, Article 26(1) of the U.S.-Belgium income tax treaty provides:

> Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such taxes imposed by that other Contracting State as will ensure that any exemption or reduced rate of tax granted under this Convention by that other Contracting State shall not be enjoyed by persons not entitled to such benefits.

Exhibit 59 (Convention for the Avoidance of Double Taxation and Prevention of Fiscal Evasion to Taxes on Income, Belg.-U.S., art. 26(1), Nov. 27, 2006, T.I.A.S. 07-1228.2). Paragraph 2 of Article 26 of the Belgian treaty provides the limitation that a Contracting State is not obligated to carry out measures different from what it would use in collection of its own taxes or that would be contrary to its sovereignty, security or public policy. *Id.* at art. 26(2).

This version of collection assistance is found in the exchange of information article of Exhibit 56, the 2016 U.S. Model Treaty, *supra* note 161, at art. 26(7). The 2016 U.S. Model Treaty generally sets out preferred U.S. positions, but deviations are made to take account of the circumstances of relations with individual treaty partner countries. A similar scope of collection assistance is set out in the OECD Model Treaty Commentary as an alternative to the broader collection assistance of 2017 OECD Model Treaty, at art. 27. *See* Exhibit 48 (2017 OECD Model Treaty, *supra* note 135, at comment. to art. 27 ¶¶ 10-14). Article 27(9) of the Treaty has language similar to that used in a Category 1 treaty, but because paragraph 8 of Article 27 forbids its application to a person who was a U.S. citizen or entity for the taxable period for which the claim is made, it addresses, for example, claims against persons in other countries. *See* Exhibit 2 (Treaty, *supra* note 6, at arts. 27(8), 27(9)). Exhibit 60, the I.R.S., Technical Explanation to the U.S. Model Income Tax Convention of Sept. 20, 1996, art. 27(9), provides as an example: "For example, if a U.S. source dividend is paid to an addressee in a treaty partner, the withholding agent probably will withhold at the treaty's portfolio dividend rate of 15 percent. If, however, the addressee is merely acting as a nominee on behalf of a third country resident, paragraph 9 would obligate the other Contracting State to withhold and remit to the United States the additional tax that should have been collected by the U.S. withholding agent."

i.     In five of the six Category 2 treaties, assistance is excluded in relation to a claim against a citizen of the requested state or a company, estate, or trust that derives its status as such under the law of the requested state.[168]  The treaty with Denmark is one of the five treaties, which means that the two nations have fundamentally agreed that Danish nationals will not be subject to suit in Denmark for U.S. tax claims, while U.S. nationals will not be subject to suit in U.S. courts for Danish tax claims.  Accordingly, the SKAT cases against U.S. citizen and entity defendants would be precluded from assistance by the terms of the Treaty.[169]

ii.    In the sixth Category 2 treaty with Japan, the exception from assistance for an individual that is a "national" (which includes a citizen) of a requesting state is carved back in Article 27(2)(b) and does *not* apply, *inter alia*, if the individual has filed a fraudulent claim for refund.  The collection provision was added to the 2003 U.S. treaty with Japan (the "                    ") in the 2013 Protocol and was characterized to the Senate Foreign Relations Committee as a "significant" departure from previous bilateral treaties, the U.S. model treaty, and the OECD model treaty.[170] The provision makes no distinction between a fraudulent claim for refund of a tax that has been paid and a refund for a tax that was never paid.

66.    While Denmark is precluded from treaty collection assistance under the Treaty with respect to U.S. nationals, the                    , as amended by the Protocol signed in 2013 and ratified in 2019, illustrates that the United States has negotiated an exception that

---

[168] These five Category 2 treaties are with Canada, Denmark, France, the Netherlands, and Sweden.  *See* Exhibit 2 (Treaty, *supra* note 6, at art. 27(8)).

[169] It is public record that SKAT has employed the collection assistance article in the case of a Danish citizen resident in the United States.  The United States defended SKAT's right to do so against collateral attack in Federal court. *Dileng v. Comm'r*, 157 F.Supp.3d 1336 (N.D. Ga. 2016).

[170] Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 34 (2015) (statement of Robert B. Stack, Deputy Assistant Sec'y for Int'l Tax Affs., Dep't of Treasury)); Exhibit 61 (Protocol Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Japan-U.S., art. XIII, Nov. 6, 2003, T.I.A.S. 19-830 (2019) [hereinafter "Japanese Protocol"]).

authorizes assistance for claims against U.S. citizens in the case of fraudulent claims for tax refunds under the treaty.[171]

66.1.    This evidences that it would be possible for Denmark to seek an amendment to the Treaty to provide for collection assistance in relation to SKAT's claims for return of incorrect tax refunds in this case.[172]

66.2.    The Japan protocol also strongly suggests that the United States would not consider a case involving a fraudulent (or incorrect) refund of tax as outside the scope of a collection assistance article.   Indeed, the distinction between an underpaid tax and an excessive claim for tax refund is not a customary boundary for application of tax laws for reasons of practical tax administration.[173]

67.    The broad contours of the history of U.S. income tax treaty collection assistance may be summarized as follows.

67.1.    In four early treaties from the 1930s and 1940s, the United States committed to broad collection assistance.[174]

67.2.    In order to achieve ratification of a successor 1946 U.S.   France Treaty, under pressure from "private interests" who objected to French tax collection from U.S. persons, a Supplementary Protocol was negotiated and ratified in 1948 reinstating

---

[171] Like the U.S. withholding regime, the Japanese withholding system allows relief at source.  If, however, there is over withholding on the initial payment, an applicant may file a tax refund claim through the withholding agent.  The refund of tax on a dividend is paid by the Japanese tax authority to the withholding agent, which in turn pays the shareholder.  Exhibit 62 (Naoki Matsuda, *Withholding tax in the era of BEPS, CIVs and digital economy – Japanese report*, *in* IFA CAHIERS 2018 - VOLUME 103B 5-23 (2018) (IBFD 2018)).  Procedural differences from the Danish system would not affect the ability to craft a comparable treaty exception for Denmark.

[172] An amendment to add or modify collection assistance may apply retrospectively to tax debts arising before entry into force of the treaty.  *See, e.g.*, Exhibit 48 (2017 OECD Model Treaty, *supra* note 135, at comment. to art. 27, ¶14). If Denmark were to retain its formal position that the return of a refund is not a payment of tax and is concerned that a return of refund would not be covered by the collection provision, this concern could be addressed in the definition of tax claim used in the treaty.  If Denmark is unable to bring a claim because of procedural aspects of Danish law, such as an inability to render a tax assessment in respect of an incorrect tax refund, those deficiencies presumably could be remedied by Danish domestic legislation or regulation as the case may be.

[173] *See* discussion, *supra* ¶¶ 43-44.

[174] These treaties were with Denmark, France, the Netherlands, and Sweden.

the nationality limitation on collection assistance (of Article 22) of the 1939 U.S.  France Treaty.[175]  Accordingly, citizens, corporations, or other entities of the requested state were outside the reach of collection assistance with respect to requesting state taxes.  Until the exception added in the 2013 Protocol to the U.S.  Japan Treaty ratified in 2019, no currently in-force treaty with a Category 2 collection article permitted collection assistance for a collection claim against a U.S. citizen or entity.

67.3.  In 1951, the Senate adopted an understanding that broad collection provision treaties proposed with Greece, Norway, and South Africa, would be applied so as to conform to the standard found in treaties with Norway and Switzerland that each government "would assist in collecting the other's taxes only to the extent necessary to insure that the provisions of the convention would not be enjoyed by persons not entitled to its benefits."[176]  This corresponds to Category 1 collection articles described above.

67.4.  From 1951 to the 2019 ratification of the 2013 Protocol to the U.S.  Japan Treaty, only the 1995 Protocol to the                    adopted a Category 2 provision and included the exclusion from collection assistance for claims against contracting state citizens, corporations, and entities.[177]

68.  The U.S. posture toward collection assistance in most, but not all, treaties—and, in the few treaties with broader collection assistance, crafting clear exceptions for U.S. citizens, corporations, and entities—demonstrates the reluctance of the political branches of

---

[175] *See* Exhibit 63 (Message from the President transmitting Supplementary Protocol with France Relating to Taxes on Estates and Inheritances, *reprinted in* 1 Staff of J. Comm. on Tax'n, LEGISLATIVE HISTORY OF U.S. TAX CONVENTIONS 1133, 1135 (1962)).

[176] Exhibit 64 (Comm. on Foreign Relations, S. Exec. Rep. No. 12 (84 Cong., 1st Sess.) Exhibit 1 (1955) *reprinted in* 2 Staff of J. Comm. on Tax'n, LEGISLATIVE HISTORY OF U.S. TAX CONVENTIONS, at 1667-68 (1962)).

[177] Exhibit 65 (Revised Protocol Amending the 1980 Tax Convention with Canada, Can.-U.S., art 15, Mar. 17, 1995, S. EXEC. DOC. NO. 104-4 (adding art. XXVI A)).  Paragraph 8 sets out the exclusion for nationals of the requested state.  *See Retfalvi v. U.S.*, 930 F. 3d 600 (4th Cir. 2019) (upholding District Court dismissal of challenge to the constitutionality of treaty authorizing the United States to collect unpaid income taxes on behalf of Canada against a lawful permanent resident of the United States).

government to accept expansive collection of foreign taxes from U.S. nationals, except as necessary to protect the boundaries of treaty relief.[178]

69.    These treaty positions were adopted against the background of the revenue rule.[179]  If SKAT's case were deemed to fall outside the revenue rule, it would open U.S. courts to claims for relief based on allegations of improper refunds in a broad range of cases not restricted to the dividend withholding tax scenario.  Indeed, there would be no limiting principle preventing foreign tax authorities from seeking recovery in U.S. courts for tax refunds to which the recipient was allegedly not entitled, whether on grounds of fraud or otherwise.  It is difficult to reconcile such a restrictive view of the revenue rule with Congressional determinations to limit treaty collection assistance to cases covered by the treaties.[180]

### 3.    Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters

70.    The multilateral Convention was developed by the Council of Europe and the OECD as an instrument devoted to facilitating international cooperation among tax administrators, including by mutual assistance extending from exchange of information to the recovery of

---

[178] See Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 32 (2015) (statement of Robert B. Stack, Deputy Assistant Sec'y for Int'l Affs., Dep't of Treas.)) (noting while collection assistance provisions are "part of the international norm of tax treaty policy . . . this has not been a policy that the Treasury Department has followed as a general matter, largely because of . . . concerns that such treaty obligations could lead to a disproportionate amount of additional burden on the IRS without the commensurate benefit to the U.S. fisc.").

[179] See Exhibit 24 (U.S. Canada Cert. Amicus Brief, supra note 67, at 11) ("[T]he revenue rule has served as the foundation for United States tax treaties"); see id. at 9 (citing S. Exec. Rep. No. 1, 82d Cong., 1st Sess. 21 (1951)) ("The revenue rule is not only a well-established feature of the common law and of international law; it provides the background understanding against which the United States has entered into treaties that address the extent to which a foreign nation may seek assistance from the United States and its courts in enforcing its tax claims.").

[180] Exhibit 66 (Technical Explanation to the Convention with Respect to Taxes on Income and on Capital, Can.-U.S., art. 15, Sept. 26, 1980, T.I.A.S. 11087, as amended by the Protocol, signed June 14, 1983 and the Protocol, signed March 28, 1984) ("Finally, given the close cooperation already developed between the United States and Canada in the exchange of tax information, the U.S. and Canadian negotiators concluded that the potential benefits to both countries of obtaining assistance would be immediate and substantial and would far outweigh any cost involved."). In terms of the 2013 Japan Protocol ratified in 2019 Senators noted that collection assistance provisions are reviewed "on a case-by-case basis, and [the U.S.] will commit to such treaty provisions if, based on a thorough consultation with the IRS, [they] conclude that establishing collection assistance obligations with a particular country would on balance enhance the collection of U.S. taxes."  Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 33 (2015) (statement of Robert B. Stack, Deputy Assistance Sec'y for Int'l Tax Affs., Dep't of Treasury)).

foreign tax claims.[181]  The Convention was first opened for signature in 1988 to any member of the OECD or Council of Europe.[182]  The Convention's assistance in recovery provisions did not exclude application to the requested state's nationals.  Consistent with the U.S. position with respect to collection assistance as reflected in its bilateral income tax treaties, the Senate consented to the Convention subject to a reservation to Section II of the Convention authorizing assistance in recovery.[183]

### E.    Tax Information Exchange Agreements

71.    In addition to bilateral income tax treaties, which include exchange of information articles,[184] the United States has entered into TIEAs with other countries that allow the U.S. competent authority and the competent authority of the TIEA partner to exchange information regarding tax matters to provide assistance in the administration and enforcement of their respective domestic tax laws.[185]

71.1.    Because it addresses administrative assistance and not avoidance of double taxation, a TIEA may be entered into with any country, without regard to the kinds of taxes it imposes or whether there is risk of double taxation.

71.2.    Countries with low income tax rates or indeed no income taxes have entered into TIEAs.  In some cases the objective is to obtain a benefit, in others to avoid being

---

[181] *Convention on Mutual Administrative Assistance in Tax Matters*, OECD, https://www.oecd.org/tax/exchange-of-tax-information/convention-on-mutual-administrative-assistance-in-tax-matters.htm (last accessed Dec. 22, 2021).  The treaty was an early example of modern multilateral cooperation in tax enforcement.

[182] I was the person in the Treasury Office of International Tax Counsel serving as the U.S. delegate to the negotiations of the text of the Mutual Assistance Convention.

[183] *See* Exhibit 67 (William S. Dodge, *Chapter 3: The Penal and Revenue Rules, State Law, and Federal Preemption*, *in* FOREIGN COURT JUDGEMENTS AND THE UNITED STATES LEGAL SYSTEM (Paul B. Stephan ed., 2014) 54, 76 (quoting Convention on Mutual Administrative Assistance in Tax Matters, art. 11, 27 I.L.M. 1160, 1168 (1988)) (noting U.S. "entered a reservation to Article 11 so that it would not be obligated 'to recover tax claims of [other signatories] as if they were its own tax claims'").

[184] *See, e.g.*, Exhibit 2 (Treaty, *supra* note 6, art. 26).

[185] I.R.S., *Tax Information Exchange Agreements (TIEAs)*, U.S. DEP'T OF TREASURY, https://home.treasury.gov/policy-issues/tax-policy/tax-information-exchange-agreements-tieas (last accessed Dec. 21, 2021).  The United States has TIEAs with jurisdictions that do not have an income tax, *e.g.*, Bermuda and the Cayman Islands.

subject to blacklists and other sanctions by countries seeking to counter what are considered harmful tax practices by the countries with low or no income taxes.[186]

72.     The first U.S. TIEA was entered into with Dominica under the authority of the Caribbean Basin Initiative, which added I.R.C. § 274(h)(6)(C) authorizing the tax information agreement.[187]  The requirement of a TIEA was a condition for the country to qualify for the so-called "convention tax deduction," which permitted tax deductions for attending meetings in specified foreign countries under the same standards as for meetings in the United States.[188]

73.     The authority for a TIEA was extended beyond Caribbean Basin countries by an authorization enacted as part of the 1984 foreign sales corporation ("FSC") legislation in I.R.C. § 927(e)(3).[189]  As an executive agreement authorized by legislation, a TIEA may be negotiated, entered into force, and implemented more quickly than a treaty.[190]

74.     TIEA statutory authorizations do not include the possibility of mutual assistance in collection.[191]   In support of the view that collection assistance is appropriately

---

[186] *Harmful Tax Competition: An Emerging Global Issue*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT (1998), https://www.oecd.org/ctp/harmful/1904176.pdf) (last accessed Dec. 20, 2021); *see also* OECD, *Countering Offshore Tax Evasion: Some Questions and Answers on the Project*, 28 Sept. 2009 (available at https://www.oecd.org/ctp/exchange-of-tax-information/42469606.pdf) (last accessed Dec. 20, 2021).

[187] I.R.C. § 274(h)(6)(C).  Exhibit 68 (Agreement for the Exchange of Information with Respect to Taxes, Dominica-U.S., Oct. 1, 1987, T.I.A.S. 11543).

[188] I.R.C. § 274(h)(6)(D).  I was the person in the Treasury Office of International Tax Counsel with the primary responsibility for drafting I.R.C. §274(h)(3) in 1983.  I worked with Richard Owens and James Springer of the Department of Justice to draft the form of tax information agreement used with Caribbean Basin Initiative beneficiary countries (as defined in I.R.C. § 274(h)(6)(B)).

[189] I.R.C. § 927(e)(3).  *See* Exhibit 69 (Susan C. Morse, *Why FATCA Intergovernmental Agreements Bind the U.S. Government*, 70 TAX NOTES INT'L 245 (Apr. 15, 2013)).

[190] The U.S. currently has 34 TIEAs in force.  *See I.R.S., Country-by-Country Reporting Jurisdiction Status Table*, IRS (Nov. 20, 2021), https://www.irs.gov/businesses/country-by-country-reporting-jurisdiction-status-table; Exhibit 70 (Jason R. Connery, Seth Green & Kimberly Tan Majure, *Current Status of U.S. Tax Treaties and International Tax Agreements*, 50 T.M.I.J. (BNA) (Dec. 3, 2021)) (as of 2021 the U.S. has TIEAs with Antigua and Barbuda, Argentina, Aruba, the Bahamas, Barbados, Bermuda, Brazil, the British Virgin Islands, the Cayman Islands, Colombia, Curacao, Costa Rica, Dominica, the Dominican Republic, Gibraltar, Grenada, Guernsey, Guyana, Honduras, Hong Kong, Isle of Man, Jamaica, Jersey, Liechtenstein, Marshall Islands, Mauritius, Mexico, Monaco, Netherlands Antilles, Panama, Peru, Singapore, St. Lucia, and Trinidad & Tobago).

[191] I was Deputy International Tax Counsel and the person in the Treasury Office of International Tax Counsel with primary responsibility for drafting I.R.C. §927(e)(3).

implemented by agreement,[192] it would be possible for Congress to authorize by legislation the addition of collection assistance provisions to TIEAs or to authorize separate collection assistance agreements, with such limitations and protections as specified or delegated to the executive's discretion in the legislative grant of authority.

## IV.  THE REVENUE RULE, SEPARATION OF POWERS, AND RESPECT FOR SOVEREIGNTY

75.  This Court has identified two justifications for the revenue rule: "[T]o preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government;" and "[T]o ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices."[193]  This Part will assess from the perspective of a former policymaker in relation to each justification the implications of allowing SKAT's claims to be made in U.S. courts.

### A.  Separation of Powers

#### 1.  The Standard

76.  *Attorney General of Canada* outlines the factors to guide a determination of when separation of powers considerations counsel judicial deference to the political branches of government.  "The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch."[194]

76.1.  The Second Circuit identified extraterritorial tax enforcement as directly implicating relations between the United States and other countries, and judicial involvement in such enforcement risking U.S. courts being "drawn into issues and

---

[192] *See supra* note 183.

[193] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 310 (citations omitted)).

[194] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 114, quoting *In re Austrian and German Holocaust Litig.,* 250 F.3d 156, 163–64 (2d Cir.2001) (per curiam)).

disputes of foreign relations policy that are assigned to—and better handled by— the political branches of government."[195]

76.2.    Moreover, the Second Circuit recognized that the political branches of our government had intended to "define and limit the parameters of any assistance given with regard to the extraterritorial enforcement" of another country's tax laws.[196]

### 2.    The Policy Equivalence of a Return of a Tax Refund and Collection of an Underpaid Tax

77.    As explained above, SKAT's claim to recoup an allegedly incorrect tax refund in a tax reclaim withholding system is functionally indistinguishable from a claim for underpaid tax in a relief at source withholding tax system.  There is no relevant difference for purposes of tax enforcement.

77.1.    In a tax reclaim withholding system, the country receiving the tax withheld is entitled to keep as tax only what the applicant is not eligible to claim as a refund. In a relief at source withholding system, the applicant is entitled to keep only what it does not owe as tax.

77.2.    In each case, the analysis is the same: what amount of tax is due the government and what is the government obligated to pay the applicant?[197]

---

[195] *Id.*  The Court recognized that "the arguments for judicial reserve are quite strong" with respect to "the extraterritorial collection of taxes by a foreign sovereign." *Id.* at n. 9.

[196] *Id.* at 115.

[197] Justice Baker articulated this point in the April 2021 U.K. Decision:

> To say that SKAT is obliged to pay a WHT refund if eligibility conditions are satisfied is to say that SKAT is entitled to keep, as tax, what it collected up front only to the extent that those eligibility conditions are not satisfied. A conditional entitlement to keep, as tax, amounts collected up front, in effect pending final assessment of the tax due, is conceptually and functionally the same as an entitlement to assess and collect tax due by reference to those eligibility conditions; and it is that entitlement to keep as tax what it had collected up front that SKAT seeks to enforce by its claims.

Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 97).

77.3.   The alleged fraudulent claim for refund is made using SKAT tax refund procedures and only could be made against SKAT. The claim is a creature of the Danish tax system.[198] Moreover, there is no relevant policy difference between this case and a case in which a fraudulent tax return had been filed claiming that no tax is due and a refund is owed. In both cases, the claim is made to the tax authority and the result is a loss of revenue. As a policy matter, there is nothing about this case that is not tax enforcement in the same way as an underpayment of tax.

77.4.   In each case, whether or not accompanied by allegations of fraud, the claim for recovery, whether of unpaid tax or return of a tax refund, is a tax enforcement action brought by a sovereign acting in its capacity as such. The sovereign's revenue loss is the same in both cases whether the case involves fraud or non-fraud error.

78.   Also as explained above with respect to an allegedly fraudulent tax reclaim, the government interest in pursuing its return, irrespective of whether tax was previously paid, is as much to protect government revenues as a recovery of underpaid taxes.

78.1.   This is the clear implication of the                    aty provision allowing collection assistance against a U.S. citizen in the case of a foreign government claim for recovery of a fraudulent tax refund.[199] There is no distinction in that provision between whether the fraud is in relation to a tax that had been paid or a fraud with no basis other than filing a tax form.[200]

78.2.   From the perspective of a former tax policymaker, whether to extend the benefit of such a provision to other countries should be the province of the Executive Branch under authority from or with the advice and consent of the Legislative Branch. That is the only way to set out limits in advance to assure reciprocity and capacity to execute the policy.

---

[198] *See supra* ¶ 45.1.

[199] *See* Exhibit 61 (Japanese Protocol, *supra* note 170, at art. XIII).

[200] *Id.*

79.    There are suggestions in deposition testimony (as well as in the U.K. Litigation) that SKAT does not have a legal basis in Denmark to pursue the return of an incorrectly paid tax refund.[201]  Regardless of whether Denmark has a domestic legal basis to pursue claims for incorrect tax refunds, from a policy perspective the structure of the other country's tax administration and enforcement processes should not affect the determination whether the return of an incorrect tax refund is the enforcement of a tax law for purposes of a revenue rule analysis.[202]  That an applicant is nonresident and the country's enforcement has procedural deficiencies should not, as a policy matter, result in allowing that country to shift its tax enforcement burden to the residence country of the nonresident (or to other countries where the nonresident may hold assets).  At a minimum, a policy decision to provide such assistance should be one for the Executive and Legislative Branches.

79.1.    The policy concern is greater where the result would be an asymmetric burden on the residence country.

i.    It would be reasonable for the residence country to expect the other country to repair the deficiency in its own legislation or process.

ii.    Another alternative in the present case would be to negotiate an amendment to the Treaty's collection assistance provisions along the lines of the 2013 protocol to the Treaty with Japan.

iii.    These policy responses would have little force if Denmark has unilateral access to U.S. courts.

79.2.    Importantly, what constitutes a revenue claim is a question of U.S. law, not one of foreign practice.[203]

---

[201] *See infra* ¶ 27; Exhibit 16 (Ekstrand Dep. Tr., *supra* note 28, at 83:4-20); Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 103).

[202] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 131, *quoting* 1 Dicey & Morris, THE CONFLICT OF LAWS 91 (13th ed. 2000)) ("Indirect enforcement occurs when a foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect . . . .").

[203] *See Huntington v. Attrill*, 146 U.S. 657, 683 (1892) (In relation to whether a law is penal: "The test is not by what name the statute is called by the legislature or the courts of the state in which it was passed, but whether it appears, to

80.     From a former tax policymaker's perspective, there is no policy basis to treat an incorrect tax refund in a tax reclaim withholding system differently from an under withheld tax in a relief at source withholding system.

### 3.     Practical Consequences of Revenue Rule Inapplicability to Recovery of a Tax Refund

81.     For purposes of assessing the practical impact of excluding recovery of tax refunds from the scope of the revenue rule, there is no principled way to cabin the exception that SKAT proposes in the instant litigation to dividend withholding in tax reclaim systems, nor to cases of fraud. [204]   Accordingly, the assessment of the practical import of a narrow application of the revenue rule must be viewed in the context of cases involving incorrect refunds generally.

82.     It is self-evident that if the revenue rule is applied with such a narrow scope, the value of the fraud exception for individuals in the U.S.   Japan treaty is diminished for the party that bargained for it, as well as the value of the concession by the United States in agreeing to it.  Along the same lines, the United States would obtain fewer benefits in exchange for agreeing to the same concession in a future treaty or executive agreement.

83.     From the perspective of a former negotiator, the effect of a narrow revenue rule as a general matter would reduce the ability of the United States to negotiate for collection assistance to the extent that another country's access to U.S. courts (here, in tax refund recovery cases) already substantially addresses the other country's needs for collection assistance.

83.1.     To the extent another country has access to U.S. courts on a unilateral basis, either where the country is not a party to an income tax treaty or would have access without regard to whether there also is a treaty with collection assistance, the United

---

the tribunal which is called upon to enforce it, to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person"); *see also* Exhibit 27 (Restatement (Fourth) of Foreign Relations Law § 489 Reporters' Note 4 (Am. Law Inst. 2018)).

[204] It is noteworthy that the American Law Institute's 1992 study recommended that collection assistance be expanded, not by cutting back on the revenue rule, but by agreement.  Exhibit 1 (Tillinghast, Ault & Shay, *supra* note 3, at 124) (recommending that "[t]he United States should include in income tax treaties with selected treaty partners provisions authorizing reciprocal judicial recognition and enforcement of tax judgments rendered by courts of the treaty partner").

States loses the benefit of standard protections found in tax treaty collection assistance articles including reciprocal treatment by the treaty partner.[205]

83.2.    These protections may include exceptions to assistance that in some cases may be exercised at the discretion of the Executive Branch.  Standard protections, which would not necessarily apply in a case unilaterally initiated in a court, include, but may not be limited to:

i.    A requirement of finality of determination of the claim under the law of the requesting state;[206]

ii.    Limitation of collection assistance to cases involving non-U.S. nationals;[207]

iii.    The ability to limit collection procedures to those administrative processes used in collection of U.S. taxes;[208]

iv.    The ability to decline to assist on public policy grounds; and

v.    The ability to decline a request "if the applicant State has not pursued all appropriate collection in its own jurisdiction or in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State."[209]

---

[205] As articulated by the United States in its amicus brief in the cert. petition in *Attorney General of Canada*: "when a court enforces a foreign tax claim, it cannot ensure that the United States will enjoy a reciprocal privilege in the foreign country's courts. Indeed, judicial enforcement of foreign tax claims would deprive the Executive Branch of leverage to secure such reciprocity through the negotiation of bilateral treaties." Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 10).  *See also Republic of Honduras v. Phillip Morris Cos., Inc.*, 341 F.3d 1253, 1259 (11th Cir. 2003) ("The political branches undisputedly have not entered into any type of tax treaty with any of the Republics that would allow the Republics to enforce their tax claims underlying this suit in this country.").

[206] While it is not clear that SKAT has litigated the cases before this Court to a final determination (as Treaty article 27(2) would prescribe) in Denmark, the Treaty would require Danish certification to that effect. Once accepted, the U.S. would proceed to collection.  *See Dileng*, 157 F. Supp. 3d at 1342-43, 1345-46.

[207] This condition is not satisfied in some if not all the cases before this Court.

[208] This is a burden limitation measure that will not necessarily be the same in unilateral judicial collection assistance.

[209] Exhibit 41 (I.R.S., Technical Explanation to Treaty, *supra* note 130, at art. 27(12)). The determination of when public policy is a basis for refusal has diplomatic implications for relations between countries that properly are the

84.     An additional foreign relations interest is to evaluate each potential collection assistance partner on a country-by-country basis.

85.     In addition to being a favored investment location for global capital generally, the United States is a safe haven for investment by residents of countries with internal crime and security issues and countries with autocratic, unreliable, or corrupt governance. Accordingly, many potential foreign taxpayers (in relation to the country that is the source of the income) may have assets within the reach of U.S. courts.[210]  These taxpayers may come from countries that the United States would not want to assist as a foreign relations matter.[211]

86.     The cases before the Court, along with recently filed claims by another government's tax authority, Belgium,[212] are a possible foreshadowing of the potential for increased case burdens on the U.S. judicial system and costs placed on the U.S. fisc from considering SKAT's claim outside of the revenue rule.  Cases brought in other countries in this same matter could, if a judgment were reached, be brought in the United States to collect on the judgment if defendant assets were located here.  The burden on the judicial system of additional cases if SKAT's case is allowed to proceed likely would be more than *de minimis*. This is the kind of situation intended to be addressed in treaty provisions that authorize the

---

province of the Executive Branch. *See supra* note 180.  The evaluation of benefits and burden of collection assistance is not available in unilateral judicial collection assistance.

[210] Yet again, as observed by the United States in its amicus brief in the cert. petition in *Att'y Gen. of Canada*: "Indeed, if Canada's RICO suit were deemed permissible here, the doors to United States courts would also apparently be open to RICO treble damages actions by countries far less friendly to the United States, based on tax systems of questionable compatibility with our own, and perhaps against a background in which the political branches had rejected or been unable to secure any reciprocal treaty obligations to assist in tax collection efforts.  The court of appeals therefore correctly concluded that a claim such as petitioner's RICO claim for tax loss is barred by the revenue rule."  Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 14).

[211] *See, e.g.*, countries described in I.R.C. § 901(j)(2)(A)(i)-(iv).

[212] *See* Compl., *Kingdom of Belgium, Federal Public Service Finance v. Michelle Investments LLC Pension Plan, et. al.*, No. 1:21-cv-06405 (S.D.N.Y. July 27, 2021), ECF No. 1; Compl., *Kingdom of Belgium, Federal Public Service Finance v. Delvian LLC Pension Plan, et. al.*, No. 1:21-cv-06404 (S.D.N.Y. July 27, 2021), ECF No. 1; Compl., *Kingdom of Belgium, Federal Public Service Finance v. Lion Advisory Inc. Pension Plan, et. al.*, No. 1:21-cv-06402 (S.D.N.Y. July 27, 2021), ECF No. 1; Compl., *Kingdom of Belgium, Federal Public Service Finance v. Xiphias LLC Pension Plan, et. al.*, No. 1:21-cv-06392 (S.D.N.Y. July 27, 2921), ECF No. 1.

requested country to weigh whether the burden on it is disproportionate to the benefit to be derived by the applicant country.[213]

87.     To the extent that the application of the revenue rule is restricted, access to U.S. courts is opened to all countries—including those not having treaties with the United States.[214]  This may make it more difficult to negotiate a new treaty with a non-treaty country that may desire collection assistance.  Suppose, hypothetically, that collection assistance was a significant interest for Brazil, a country with which the United States has long pursued a treaty while seeking conditions so far found unacceptable to Brazil.  If recovery of refund claims were a significant interest, allowing Brazil unilateral judicial assistance in U.S. courts would diminish the value of collection assistance and could make successful negotiation more difficult.

88.     Allowing SKAT's claim to proceed would require adoption of a restricted revenue rule that would materially affect and in substance encroach on decisions that are primarily the province of the Executive and Legislative Branches.

### B.     Intrusion in Foreign Country's Sovereignty

#### 1.     The Standard

89.     The second justification for the revenue rule is to ensure respect for another country's sovereignty.  Tax laws are expressions of sovereign action and keeping courts out of adjudicating and enforcing foreign countries' tax laws protects against incursion into those decisions.[215]

89.1.   An early expression of the second justification is the rationale of Judge Learned Hand in *Moore v Mitchell* where he said:

---

[213] *See, e.g.*, Exhibit 2 (Treaty, *supra* note 6, at art. 27(12)(b)).

[214] Again, as observed by the United States in its amicus brief in the cert. petition in *Att'y Gen. of Canada*: "[J]udicial enforcement of foreign tax claims that are not authorized by treaty would intrude on the Executive Branch's treaty-making authority as well as the specific policy judgments reflected in particular treaties. Those considerations fully justify the continued application of the revenue rule."  Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 10).

[215] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 111).

> While the origin of the exception in the case of penal liabilities does not appear in the books, a sound basis for it exists, in my judgment, which includes liabilities for taxes as well. Even in the case of ordinary municipal liabilities, a court will not recognize those arising in a foreign state, if they run counter to the 'settled public policy' of its own. Thus a scrutiny of the liability is necessarily always in reserve, and the possibility that it will be found not to accord with the policy of the domestic state. This is not a troublesome or delicate inquiry when the question arises between private persons, but it takes on quite another face when it concerns the relations between the foreign state and its own citizens or even those who may be temporarily within its borders.[216]

89.2.  Judge Hand's articulation does not suggest that the intrusion into the other foreign country's sovereign role need be problematic in each case under consideration. The second justification is that applying (not merely recognizing) the other country's law (after *Pasquantino*, more than incidentally) is inherently problematic.

89.3.  The Supreme Court in *Pasquantino* observed in dicta that U.S. courts are capable of applying foreign law to resolve "incidental" foreign law issues.[217] While the American Law Institute observes that concern about encroaching on sovereignty "has little force when a court is asked simply to enforce a foreign tax judgment," it distinguishes that case from needing "to determine the tax claim in the first instance."[218]

### 2.  Determining the Tax Refund Claim.

90.  What SKAT seeks in this litigation goes much further than recognizing a foreign tax judgment or incidental application of Danish tax and treaty law. It essentially requires the Court to determine the tax claim in the first instance.

90.1.  In determining whether a person claiming a given refund did so correctly or even in good faith, a court would be required to determine not only how the Treaty and Denmark's own domestic law should apply, but also how the Treaty would apply

---

[216] *Moore v. Mitchell*, 30 F. 2d 600, 604 (2d Cir. 1929).

[217] Exhibit 26 (*Pasquantino*, 544 U.S. at 370) ("Rule 26.1 gives federal courts sufficient means to resolve the incidental foreign law issues they may encounter in wire fraud prosecutions.").

[218] Exhibit 27 (Restatement (Fourth) of Foreign Relations Law § 489 Reporters' Note 2 (Am. Law Inst. 2018)).

to a resident of the treaty partner (*i.e.*, whether dividend tax was payable by that resident under Danish law and the Treaty and, if so, how much dividend tax was payable).

90.2.  Such determinations would be inherently intrusive into Denmark's interest in interpreting and applying its own tax law, particularly where, as appears to be the case, the operation of Danish law is unsettled or changing.[219]

91.  Another reason for concern over allowing unilateral judicial collection assistance in this case is that a decision adverse to the applicant regarding treaty relief is normally within the scope of the Treaty's Article 25 mutual agreement procedure.[220]  Even if not asserted in this case, pursuing a recovery of a tax refund is no different than the denial of a tax refund. After denial by Denmark, it would be possible for the claimant to take its case to its competent authority for resolution between the two countries under the mutual agreement procedure.

91.1.  Initiating competent authority assistance generally occurs before recourse to a court in the event the decision is negative.[221] If Denmark is permitted to pursue judicial collection under a fraud theory, the mutual agreement process under the Treaty would be undermined.

91.2.  Denmark has made use of the Treaty's exchange of information provisions in investigating the conduct underlying this case.[222]  It would be inconsistent with the design and spirit of the Treaty for a restricted application of the revenue rule to allow a country to obtain information under the exchange of information article and

---

[219] *See supra* ¶ 44.2.

[220] In the reverse case where the United States is the source of the dividend, the taxpayer would have the further possibility of judicial review if competent authority denied treaty relief.  *See Starr Int'l Co., Inc. v. U.S.*, 910 F.3d 527 (D.C. Cir. 2018) (taxpayer allowed to challenge IRS competent authority denial of discretionary treaty eligibility for dividend tax refund in tax refund case).

[221] *See, e.g.*, Rev. Proc. 2015-40 (Procedures for Requesting Competent Authority Assistance under Tax Treaties).

[222] *See supra* ¶ 26.

then pre-empt a mutual agreement process by pursuing the same case under a different guise in a unilateral judicial proceeding.

92.    SKAT's complaint asserts that the USPFs did not own the shares, but the reclaims included documents prepared by the USPF's broker-custodians indicating the number of shares and the dividend amounts received. Certain of those documents state that the broker-custodian "ha[s] credited your account" with a "payment [that] represents the dividend" reflected in the document.[223]

93.    Depending on the relevant governing law, a person may be the beneficial owner of shares for tax purposes on a dividend record date without having title recorded in that person's name.[224]

93.1.    A party could acquire shares as a contractual matter and be treated as the owner on a brokerage firm's records, for example, over a dividend record date but prior to settlement.

93.2.    There are a variety of ways in which the risk of "long" exposure to the shares could be hedged and that shares could be used to generate income subsequent to settlement (including a stock loan or a share repurchase agreement), none of which would necessarily cause the shares to be recorded in the name of the economic owner.

93.3.    In modern financial markets, attribution of ownership can be complex. As observed previously, this includes ownership without having an entitlement to or book entry ownership of shares (*e.g.*, a total return equity swap).[225] Countries may rely on the concept of beneficial ownership, as set out in treaties, to ground their tax analysis, and their approaches to beneficial ownership differ.[226]

---

[223] *See supra* ¶ 23.1.

[224] Indeed, in many cases of stock beneficial ownership, the applicant would not have record ownership of the shares.

[225] *See supra* ¶ 52.1.

[226] Exhibit 71 (Charl du Toit, *The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years*, 64 BULL. INT'L. TAX'N. 10 (2010), Journals IBFD).

94.    A legal determination of how beneficial owner should be defined and applied in a sophisticated financial context is inherently intrusive to tax treaty policy considerations.

94.1.    If reference is to be made to an OECD definition, an issue arises whether the operative OECD definition is the definition in place as of the date the term is agreed for use in the treaty (1999), as of the date the term is agreed for the specific provision being applied (2006), or as of the time of the payments of the dividends (2012 2015).[227]

94.2.    If there is no authoritative Danish law on this question, but solely tax authority practice (*e.g.*, if it is customary for the tax authority to follow the OECD definition), whether or not to accept that practice as authoritative is a legal decision infused with policy concerns.

95.    These are necessarily intrusive legal analyses that go far beyond simply providing recognition to foreign tax law. In my judgment, it would rankle the United States for a foreign court to, in essence, advise how U.S. tax law should be interpreted and applied. This is precisely why treaty-based tax collection assistance requires the tax claim to be determined by the country whose tax issues are implicated.[228]

## V.    CONCLUSIONS

96.    From the perspective of a former policymaker, permitting SKAT's fraud, unjust enrichment, and related claims to proceed in U.S. courts without exclusion by the revenue rule would affect U.S. negotiating positions and complicate the Executive Branch's ability to negotiate and complete treaties that would be ratified by the Congress. This would

---

[227] The OECD interpretation of beneficial owner has evolved between these three dates. *Compare* Exhibit 72 (OECD Comm. on Fiscal Affs., *Comments. on the Articles of the Model Tax Convention*, comment. to art. 10 (1998)); Exhibit 73 (OECD Comm. on Fiscal Affs., *Income & Capital Model Convention and Comment.*, comment. to art. 10 (July 15, 2005)); Exhibit 74 (OECD Comm. on Fiscal Affs., *Model Tax Convention on Income & Capital*, comment. to art. 10 (July 22, 2010); Exhibit 47 (2014 OECD Comment., *supra* note 134, at comment. to art. 10). *See supra* ¶ 54.2.

[228] *See, e.g.*, Exhibit 2 (Treaty, *supra* note 6, Article 27(2)):

"2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted."

implicate the separation of powers justification for the revenue rule, as opening the door to unilateral judicial collection assistance would encroach on decisions that are primarily the province of the Legislative and the Executive Branches.  The context of the SKAT case also implicates the second justification for the revenue rule: to avoid a risk that a court would intrude on Danish sovereignty in applying Danish tax law.

I affirm my genuine belief in the opinions expressed in this Report.

I reserve the right to update or modify this Report for additional information that may come to my attention, including information that was unavailable as of the date of this Report.

Executed this 31st day of December 2021 at Cambridge, Massachusetts.

By: Stephen E. Shay