# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to all cases listed in Appendix A. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**EXPERT REPORT OF MICHAEL S. ROSS**

**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

## TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ...................................................................................................... 1

II.  OVERVIEW OF THE OPINION ................................................................................. 2

III. QUALIFICATIONS ................................................................................................... 4

IV.  METHODOLOGY USED IN DEVELOPING OPINIONS .................................................. 6

V.   STATEMENT OF ASSUMED FACTS ......................................................................... 6

VI.  OPINION ..............................................................................................................23

  A.   BEN-JACOB REASONABLY RELIED ON THE ARGRE PRINCIPALS TO
       CONDUCT THEIR OWN DUE DILIGENCE WITH RESPECT TO VARIOUS
       MATTERS OUTSIDE THE SCOPE OF HIS EXPERTISE, AND HE WAS
       PERMITTED TO RELY ON THEIR REASONABLE REPRESENTATIONS ......................23

     1.   INTRODUCTION ........................................................................................23

     2.   THE RULES PROHIBITING KNOWINGLY COUNSELING A CLIENT TO
          ENGAGE, OR ASSISTING A CLIENT, IN A CRIME OR FRAUD ...................23

     3.   AN ATTORNEY'S DUTY TO ACT COMPETENTLY AND DILIGENTLY
          AND ITS RELATIONSHIP TO A POSSIBLE DUTY TO INVESTIGATE
          READILY AVAILABLE FACTS ....................................................................26

     4.   UNDER THE ASSUMED FACTS, THE SCOPE OF KAYE SCHOLER'S
          REPRESENTATION DETERMINED BEN-JACOB'S REQUIRED SCOPE OF
          COMPETENCE .........................................................................................32

     5.   UNDER THE ASSUMED FACTS, CONTRARY TO THE WAGNER
          REPORT, BEN-JACOB REASONABLY RELIED ON THE ARGRE
          PRINCIPALS TO CONDUCT THEIR OWN DUE DILIGENCE AND WAS
          PERMITTED TO RELY ON THEIR REASONABLE REPRESENTATIONS ..........43

VII. CONCLUSION .......................................................................................................58

# I.

## INTRODUCTION.

1.     I am a principal of the Law Offices of Michael S. Ross, where I concentrate my practice in Attorney Ethics.  I am also an Adjunct Professor at Benjamin N. Cardozo Law School, where I have taught Litigation Ethics and other ethics-related courses since 1983, and at Brooklyn Law School, where I have taught Professional Responsibility since 2005.  I am a former Assistant United States Attorney in the Criminal Division of the Southern District of New York and a former Assistant District Attorney in Kings County.

2.     I have been retained in this matter by attorneys for defendant Michael Ben-Jacob, Esq., to provide opinions as an expert on the attorney ethics issues raised in connection with the December 31, 2021 expert report of Marcia S. Wagner, Esq. (the "Wagner Report").  The Wagner Report opined, in sum and substance, that defendant Michael Ben-Jacob ("Ben-Jacob"), a New York lawyer and then-partner at Kaye Scholer LLP ("Kaye Scholer"),[1] departed from applicable professional standards in rendering advice concerning certain 401(k) retirement plans to several highly sophisticated investor clients.

3.     I have been asked to address the central issues raised by the Wagner Report, including whether certain aspects of the allegedly necessary work were within the scope of the engagement; and whether, and to what extent, Mr. Ben-Jacob was obligated to investigate his clients' factual representations and other matters.

4.     My hourly fee for this work is $850.  No part of my compensation is affected by the outcome of the case.

---

[1]Kaye Scholer merged with Arnold & Porter LLP, and Ben-Jacob is currently a partner at Arnold & Porter Kaye Scholer LLP.

## II.

### OVERVIEW OF THE OPINION.

5.      By way of brief overview, I have been asked to assume the following facts, which

are supported by the evidence and materials that I have reviewed (set forth in Appendix B):

- John van Merkensteijn, Jerome Lhote, Matthew Stein, and Richard Markowitz (the "Argre Principals") are highly sophisticated investors.  Ben-Jacob's initial engagement letters with certain of the Argre Principals described the scope of the engagement as relating to tax and estate planning.  Over the years, Ben-Jacob advised the Argre Principals concerning certain discrete matters within the scope of that engagement, including U.S. tax issues related to dividend arbitrage transactions in Denmark.

- Ben-Jacob did not provide securities advice, foreign law advice, or advice on any other topic (outside U.S. tax and trusts and estates advice) that may have been relevant to the trading strategies the Argre Principals pursued.

- Ben-Jacob understood that the Argre Principals conducted their own due diligence with respect to contemplated transactions and were equipped to conduct their own research, including legal research, with respect to the transactions they entered.  When the Argre Principals sought legal advice from Ben-Jacob with respect to a transaction, they typically did so by posing discrete legal questions.  When the questions related to legal issues that were outside of Ben-Jacob's expertise, it was his practice to consult, or put the Argre Principals in direct contact with, other Kaye Scholer lawyers who had expertise in the relevant legal fields.

- The Argre Principals did not ask Ben-Jacob to review all aspects of the investments they entered; and neither Ben-Jacob nor Kaye Scholer was requested to provide a comprehensive assessment of the dividend arbitrage strategy or advise as to its risks and benefits.

- The Danish tax authority has alleged that Ben-Jacob failed to conduct due diligence that would have disclosed, among other things, that certain pension plans were not qualified as such; that these plans did not beneficially own certain Danish securities, as certified by Ben-Jacob acting as agent or attorney-in-fact for the relevant pension plans; that the plans did not make investments; that there was no precedent for the trading strategy; and that the

plans were engaged in borrowing funds without the support of a "known or reputable banking institution."

6.      As discussed in detail below, an attorney's duty to be competent, and the attendant duty to make inquiries into a client's suspicious factual representations, pivot on the concepts of knowledge and scope.  Generally, an attorney's scope of retention does not necessarily encompass every aspect of a client's matter, and a lawyer therefore need not be competent in every aspect of that matter.  The rules of professional conduct permit reasonable limitations on scope of retention, and sophisticated clients frequently retain specialist lawyers with respect to discrete aspects of their business matters.  That is how the Argre Principals chose to conduct their business in this matter.

7.      Ben-Jacob did not have actual knowledge of any crime or fraud, and the Wagner Report does not express such a view.  Rather, the Wagner Report argues that Ben-Jacob should have conducted due diligence by, among other things, understanding the trading strategy and engaging outside experts to confirm legal opinions of foreign attorneys concerning that strategy. In fact, however, ethics rules and case law reflect the view that sophisticated clients may choose to conduct their own due diligence in matters involving regulatory agencies such as the Internal Revenue Service ("IRS").  In such circumstances, an attorney retained to perform discrete tasks does not violate the rules by failing to challenge that client's objectively reasonable representations as to that due diligence.

8.      Accordingly, as set forth more fully below, based upon the statement of assumed facts, it is my opinion that Ben-Jacob reasonably relied on the Argre Principals to conduct their own due diligence with respect to various matters outside the scope of his expertise and retention, and Ben-Jacob was permitted to rely on his clients' objectively reasonable

representations and reasonably relied on his partners as to matters outside the scope of his expertise.

## III.

### QUALIFICATIONS.

9.      I am an Adjunct Professor at Benjamin N. Cardozo School of Law (where I teach Fall and Spring courses in Litigation Ethics) and an Adjunct Associate Professor at Brooklyn Law School (where I teach Fall, Spring and Summer courses in Professional Responsibility).  In addition, in my more than three decades of teaching at Cardozo Law School, I have taught a variety of ethics, trial practice and judicial administration courses and, from 1984 through 2010, I served as the Executive Director/Team Leader of Cardozo's annual two-week Intensive Trial Advocacy Program.  I have continued to serve on the Program's faculty and, each Fall, I provide the mandatory two-hour introductory lecture to all of the Program's students in connection with evidentiary objections and evidentiary foundations.

10.      I earned my Bachelor of Arts degree, *cum laude*, from Rutgers University in 1971, where I was elected to the Phi Beta Kappa Society.  I earned my *Juris Doctor* in 1974 from New York University School of Law.  After graduating law school, I served as a Kings County Assistant District Attorney and, thereafter, as an Assistant United States Attorney for the Southern District of New York's Criminal Division.

11.      Since 2001, in addition to teaching ethics at two law schools, I have maintained a private law practice, the Law Offices Of Michael S. Ross, with offices located at 60 East 42nd Street, 47th Floor, New York, New York 10165.  My work (and that of my staff) consists of regularly providing ongoing consultation and guidance to lawyers and law firms concerning appropriate courses of action when dealing with ethical and related issues that arise in the day-to-

day practice of law.  I regularly consult with lawyers and law firms to assess potential and actual claims of legal malpractice, and possible violations of the New York Judiciary Law relating to disciplinary and fiduciary duty issues.  I regularly advise lawyers and law firms with respect to issues of candor in connection with representations made to tribunals and third parties.

12.    I am a very active Continuing Legal Education speaker.  I have lectured extensively on ethics-related matters speaking every year to thousands of admitted lawyers on issues relating to attorney ethics.  I have taught and lectured on ethics issues at well over 350 Continuing Legal Education programs for lawyers, law firms and judges, sponsored by, among others:  the New York State Academy of Trial Lawyers; the Federal Bar Council; the New York State Bar Association; the Appellate Divisions, First, Second and Third Judicial Departments; the American Bar Association; the Association of Professional Responsibility Lawyers (a national group of ethics lawyers); the Practicing Law Institute; the Association of the Bar of the City of New York; the New York County Lawyers' Association; and the New York State Trial Lawyers' Association.

13.    Over the years, I have served as a member of the Association of the Bar of the City of New York's Committee on Professional Discipline; the New York County Lawyers' Association Committee on Professional Discipline; the New York State Bar Association's Committee on Professional Discipline; the New York State Bar Association's Special Committee on Procedures for Judicial Discipline; the New York State Bar Association's Special Committee on Unlawful Practice of Law (which considered the activities of suspended and disbarred attorneys as well as individuals who are not admitted attorneys); and the New York State Bar Association's Special Committee on Mass Disaster (which has worked on the ethical provision

of services during public disasters).  I have also served on the Board of Advisors of the New York County Lawyers' Association Institute of Legal Ethics.

14.　　My background, training and practical experience in the field of attorney ethics and professional responsibility are set forth in my *curriculum vitae*, a copy of which is attached hereto as **Exhibit A**.

15.　　I render this expert report in my individual capacity and not in connection with any of the entities with which I am connected.

### IV.

### METHODOLOGY USED IN DEVELOPING OPINIONS.

16.　　An expert must assume a set of facts for purposes of analysis.  In this case, I assumed the facts recited above and expanded upon below and then analyzed those facts against a backdrop of rules and court decisions and my experience in the practice of law.  If asked to consider a different set of facts, I will apply those facts and render my opinion to a reasonable degree of professional certainty.  The methodology I have used in this case is the same that I have utilized during all of the years I have worked in the field of attorney ethics.  The methodology is consistent with the methodology utilized by other attorney ethics attorneys and experts.

### V.

### STATEMENT OF ASSUMED FACTS.

17.　　For purposes of this expert report, I have assumed the following facts provided to me by Mr. Ben-Jacob's attorneys, which are consistent with the documents they provided to me:

#### *Introduction to Argre Principals and Early Relationship*

- In 2007, Ben-Jacob was a partner at Withers Bergman LLP ("Withers") in the firm's private client group, whose practice focused on counseling

high-net worth individuals and family offices on wealth planning issues, in particular on issues related to U.S. taxation. In or about that year, Ben-Jacob began an attorney-client relationship with John van Merkensteijn, who engaged Ben-Jacob to provide advice concerning state income tax issues related to the sale of foreign securities that van Merkensteijn held from an earlier foreign tax arbitrage transaction. Ben-Jacob was asked only to opine on the state tax implications of the contemplated sale.

- In the course of that representation, van Merkensteijn introduced Ben-Jacob to two of his colleagues: Jerome Lhote and Matthew Stein, who also engaged Ben-Jacob to provide similar tax advice concerning property received from the same transaction. As with van Merkensteijn, Ben-Jacob was asked by Lhote and Stein only to opine on the state income tax implications of the contemplated sale. Ben-Jacob was later introduced to a third colleague of van Merkensteijn's, Richard Markowitz.

- These four investors, van Merkensteijn, Stein, Lhote, and Markowitz (collectively, the "Argre Principals"), were members of Argre Management LLC, an entity they had formed to share expenses and resources for various joint investments in which the Argre Principals engaged.

- Over the next two years while Ben-Jacob was still at Withers, Ben-Jacob provided tax planning and personal trusts and estates advice to each of the Argre Principals, including advice regarding U.S. tax issues related to tax arbitrage opportunities they pursued. He did not provide securities advice, foreign law advice, or advice on any other topic (outside U.S. tax and trusts and estates advice) that may have been relevant to the investment strategies the Argre Principals pursued. Ben-Jacob entered engagement letters with certain of the Argre Principals, which described the scope of the engagements as relating to tax and estate planning.

- Ben-Jacob understood that the Argre Principals were highly sophisticated clients:

  o   van Merkensteijn was a U.S. tax lawyer and had been a tax partner at two law firms, Coudert Brothers and Gottesman, Evans & van Merkensteijn, for eleven years before becoming a professional investor in 1981.

  o   Lhote had earned a business law degree from the University of Paris – Sorbonne and worked for two decades at KPMG in Luxembourg and New York, where he focused

on international tax matters and cross-border structured finance transactions.

- o  Markowitz had been a Managing Director at Goldman Sachs in the investment banking division, where he was head of the Structured Finance Group. After leaving Goldman Sachs and before joining Argre, Markowitz was a Managing Director at the CIT Group, Inc., in the firm's structured finance division.

- o  Stein had been a partner in the New York office of a major international accounting firm, with a focus on the development of cross-border structured finance transactions.

- Ben-Jacob understood that the Argre Principals conducted their own diligence with respect to contemplated transactions and were equipped to and did conduct much of their own research, including legal research, with respect to the transactions they entered. When the Argre Principals sought advice from Ben-Jacob with respect to a transaction, they typically did so by posing discrete legal questions. They did not ask Ben-Jacob to review all aspects of the investments they entered, and Ben-Jacob understood that they would not have wanted to pay him or Withers to replicate diligence and research that the Argre Principals had already conducted, or that had been performed by a separate advisor.

- When the questions the Argre Principals posed to Ben-Jacob were within his areas of knowledge, he would research the questions himself or oversee a more junior attorney in doing so. When the questions fell outside of Ben-Jacob's areas of knowledge, it was Ben-Jacob's practice to consult with other attorneys who were specialists in the relevant areas, and/or to put the Argre Principals into direct contact with an appropriate subject matter expert.

- Given the nature of the representation, in which Ben-Jacob continued to provide personal tax and estate advice and to respond to discrete legal questions concerning particular transactions as they arose, Ben-Jacob did not ask the Argre Principals to execute new engagement letters each time they came to him with a new question. This was typical of Ben-Jacob's practice generally.

- In January 2010, Ben-Jacob moved his practice from Withers to Kaye Scholer LLP ("Kaye Scholer"). The Argre Principals decided to continue

their attorney-client relationship with Ben-Jacob at his new firm and requested that Withers transfer their client files to Kaye Scholer.

- At Kaye Scholer, Ben-Jacob continued to provide tax and estate planning advice to the Argre Principals.   Ben-Jacob did not execute new engagement letters with any of the Argre Principals.

- The Argre Principals also continued to pose discrete questions to Ben-Jacob related to investment transactions they had entered or were contemplating.   As at Withers, it was Ben-Jacob's practice to learn as much about the transaction as was necessary to respond to the questions posed, which often related to U.S. tax issues but sometimes involved U.S. trust law or estate law issues.   When the questions related to legal issues that were outside of Ben-Jacob's knowledge, it was his practice to consult, or put the Argre Principals in direct contact with, other Kaye Scholer lawyers who were specialists in the relevant legal fields.

- Kaye Scholer invoiced the Argre Principals for the time that Ben-Jacob and other Kaye Scholer lawyers billed in responding to their questions. Those invoices included descriptions of the work the lawyers performed, and the time they spent performing it.   It would have been apparent to the Argre Principals if Ben-Jacob and Kaye Scholer were not reviewing aspects of their transactions that they had expected Ben-Jacob and Kaye Scholer to review.

### *The Argre Principals Pursue Dividend Arbitrage Trading in Germany*

- From 2008-2010, the Argre Principals researched and investigated a strategy they had not previously pursued called dividend arbitrage.   Ben-Jacob and Kaye Scholer had no involvement in this due diligence process or the Argre Principals' decision to pursue dividend arbitrage.

- In March 2010, the Argre Principals posed questions to Ben-Jacob concerning a dividend arbitrage strategy, which involved the use of an Irish fund to purchase German securities (the "Broadgate Transaction"). Consistent with his typical practice, Ben-Jacob learned as much as necessary about the transaction to provide the specific U.S. legal advice sought by the Argre Principals, but did not seek to understand every facet of the transaction and did not ask the Argre Principals to enter new engagement agreements.   He understood that the Argre Principals had at least one other law firm advising on aspects of the Broadgate Transaction.

- The work conducted by Ben-Jacob and other Kaye Scholer attorneys with respect to the Broadgate Transaction was limited:  Kaye Scholer attorneys

billed less than 10 hours of work related to the Broadgate Transaction in March 2010, and billing entries reflect that Kaye Scholer's work was focused on responding to questions from the Argre Principals concerning U.S. treatment of foreign tax credits. It would have been apparent to the Argre Principals from the bills received from Kaye Scholer that Ben-Jacob and Kaye Scholer were not reviewing any other aspects of this transaction and did not bill time sufficient to perform such an analysis. Upon receiving Kaye Scholer's invoices, the Argre Principals did not tell Ben-Jacob that they had expected a more thorough review of the Broadgate Transaction, nor did they do so at any other time. At no point did they ask Ben-Jacob or anyone at Kaye Scholer to advise on whether they should pursue the Broadgate Transaction, or on the foreign law involved or the actual mechanics of the transaction.

- In December 2010, Markowitz emailed Ben-Jacob to inform him that the Argre Principals were considering participating in a new trading strategy in 2011 that would be similar to the Broadgate Transaction. Markowitz said that he might use funds in his IRA account to invest in the strategy, and asked Ben-Jacob for advice concerning the procedures for obtaining a custodian for his IRA. Ben-Jacob connected Markowitz with an appropriate specialist at Kaye Scholer who provided the requested advice.

- The Argre Principals informed Ben-Jacob that in pursuing this strategy, the Argre Principals would be working with Sanjay Shah, a UK- and Dubai-based former investment banker, who operated an investment company called Solo Capital that participated in dividend arbitrage trading strategies. Ben-Jacob learned that the Argre Principals had worked with Shah in connection with the previous Broadgate Transaction and the Argre Principals had conducted extensive due diligence of Solo Capital and Shah, including travelling to London to meet with Solo Capital and hiring an investigative firm to prepare due diligence reports on Solo Capital and Shah, before deciding to participate in that strategy. The Argre Principals did not ask Ben-Jacob or Kaye Scholer to conduct due diligence on Sanjay Shah or Solo Capital.

- The Argre Principals contacted Ben-Jacob again in February 2011 concerning the new trading strategy. They explained that it would involve a pension fund or charitable organization that would purchase German securities before the issuing company declared a dividend, sell the shares after the dividend declaration date, and then apply for a refund of dividend taxes withheld by the German government pursuant to the terms of the US-German tax treaty. The Argre Principals did not ask Ben-Jacob for advice concerning the mechanics of the trading strategy or their

entitlement to a refund of dividend tax withholdings under German law, and instead continued their practice of asking discrete questions. This is reflected, for example, in Ben-Jacob's email to his partners in Exhibit 2110, in which he describes the strategy as taking advantage of a tax "loophole" and lists two questions related to discrete issues of U.S. tax and pension law that he believes the Argre Principals want Kaye Scholer to address. Ben-Jacob brought in a tax partner and a pension partner to advise the clients, as the questions posed were outside his areas of knowledge.

- Over the next several months, the Argre Principals continued to pose legal questions to Ben-Jacob that arose during their preparation to engage in dividend arbitrage trading in Germany. Some of these questions touched on areas of law that were outside of Ben-Jacob's areas of specialization, in which cases he consulted, or put the Argre Principals in direct contact with, other Kaye Scholer lawyers who were specialists in the relevant fields. On many aspects of the strategy, such as beneficial ownership under German law, the Argre Principals did not seek legal advice from Ben-Jacob or Kaye Scholer. I am aware that certain discrete questions of German law were directed to a German Kaye Scholer partner but that these were specific and limited requests that did not amount to a comprehensive assessment of the German law issues relevant to the trading strategy.

- In March 2011, the Argre Principals asked Ben-Jacob for assistance in identifying a U.S. charity that could participate in the trading strategy. Ben-Jacob identified and contacted three potential charities; the Argre Principals ultimately decided to move forward with one, the Ezra Academy of Queens ("Ezra"), which was a Yeshiva high school that Ben-Jacob had attended as a student and with which he had maintained connection.

- In March and April 2011, Ben-Jacob acted as a liaison between the Argre Principals and Ezra, collecting (and in some cases drafting at the request of the Argre Principals) corporate organizational documents and compiling other due diligence documents that Solo Capital and various institutions required Ezra submit before it could engage in the trading. Ben-Jacob was assisted in these tasks by Peter Wells, an associate who worked with Ben-Jacob in Kaye Scholer's private client group, and at times by other Kaye Scholer lawyers and staff.

- It was Ben-Jacob's understanding that Solo Capital provided the structure for the strategy, including the use of a total return swap. Solo Capital

provided documents regarding the swap, including a template total return swap they said could be adapted to be used in connection with the strategy. At the Principals' direction, Ben-Jacob asked a tax partner at Kaye Scholer to adapt the swap for the Argre Principals' use, which the tax partner did. Pursuant to this swap, which occurred between Ezra and an entity controlled by the Argre Principals, Ezra would obtain the money to participate in the trades from the Argre Principals.

- The Argre Principals told Ben-Jacob that they understood the trading strategy was consistent with German law and that they were obtaining legal advice concerning the German law aspects of the trading strategy from the law firm Norton Rose. They provided Ben-Jacob drafts of an opinion by Norton Rose, which Ben-Jacob reviewed for context. He was not asked to advise on the accuracy of the opinion's assumptions or its sufficiency to accomplish the Argre Principals' purposes.

- Ben-Jacob had no role in the trading implementation itself, and as reflected in an April 2011 email (WH_MDL_00456451), on at least two occasions preceding the first trades, advised the Argre Principals of his lack of any knowledge or experience in implementing trades of this sort.

- Ezra executed some limited trading in Germany, but ultimately withdrew its refund requests after an unfavorable ruling against an unrelated entity engaging in similar trading. Before Ezra withdrew the requests, Ben-Jacob was asked to provide, and provided, assistance in responding to inquiries concerning the refund requests by the German tax authorities. Ezra ultimately submitted a letter to the German tax authorities responding to the inquiries. Though the letter is signed by Ben-Jacob, I have been asked to assume that the contents of the letter that relate to the trading itself, and the application of German law to the trading, was prepared by some combination of Norton Rose and the Argre Principals, and was reviewed for accuracy as to German law by one of Ben-Jacob's colleagues in Kaye Scholer's German office. As this was a discrete request to Ben-Jacob and Kaye Scholer, Ben-Jacob and Kaye Scholer did not consider this an expansion of the scope of their representation to include foreign law issues outside of this letter.

### *The Argre Principals Pursue Dividend Arbitrage Trading in Belgium*

- In March 2012, the Argre Principals informed Ben-Jacob that they intended to again pursue dividend arbitrage trading, this time in Belgium. The Argre Principals told Ben-Jacob that they intended to use pension plans and/or IRA accounts to conduct these trades and also work with Ezra

again if Ezra agreed. At the Argre Principals' request, Ben-Jacob contacted Ezra, which agreed to participate in the trading.

- In April 2012, at the Argre Principals' request, Ben-Jacob and Wells collected and organized due diligence information from Ezra and submitted that information to the relevant counterparties. Ben-Jacob also reviewed various draft contracts—such as a client custody agreement, "give up" agreement, and global master securities lending agreement—that the Argre Principals were negotiating with entities that would be involved in the trading strategy. Many of those agreements involved economic arrangements that were outside of Ben-Jacob's areas of knowledge. As reflected in Exhibit 4510, Ben-Jacob's review was thus focused on general contract drafting issues – such as inconsistent terms, vague language, or provisions that could disadvantage his clients—that would be apparent to lawyers not specialized in the relevant areas (i.e., Ben-Jacob). He also provided advice concerning potential revisions based on the Argre Principals' explanations of the purposes of these contracts and the terms they wished to see incorporated in the contract, and advice as to how particular contract terms interacted with U.S. tax law.

- When providing these agreements for Ben-Jacob's review, the Argre Principals explained that funding for the transaction would be provided by an entity called Aquila (Cayman) Limited ("Aquila"). Ben-Jacob understood from the Argre Principals that there would be a series of financial transactions to obtain financing and purchase the shares, and that it was understood, based on foreign legal advice obtained, that these transactions would allow the plans or charity to claim beneficial ownership of the securities at the proper time so as to be entitled to reclaim the withheld dividend tax. Ben-Jacob did not advise on these trading mechanics or whether they properly accomplished the Argre Principals' goals.

- Ben-Jacob understood that the Argre Principals were separately receiving advice from Freshfields Bruckhaus Deringer ("Freshfields") concerning the Belgian law aspects of the trading strategy. I am aware that in April 2012 Freshfields provided to Argre (who forwarded to Ben-Jacob) a memorandum stating that, as to a certain version of dividend arbitrage trades, the entitlement to a reclaim was somewhat doubtful (Exhibit 4492). I have been further made aware that the Argre Principals then provided Freshfields with additional facts concerning the specific trades they were contemplating and that Freshfields subsequently provided two draft opinions in May 2012 specific to those contemplated transactions, one concerning the pension plan version of the strategy and the other the

charity version, both of which reached favorable conclusions concerning the entitlement of the trading entities to receive reclaims and were also provided to Ben-Jacob. (WH_MDL_00283828, WH_MDL_00283831, WH_MDL_00283843).

- As reflected in Exhibit 2236, Ben-Jacob reviewed and provided comments on the May 2012 opinions, which concluded that the pension plans and charities should be entitled to benefit from the dividend tax withholding exemption provided for under the US-Belgium taxation treaty. Ben-Jacob was not a specialist on the Belgian law issues or the U.S. pension law issues addressed in the draft opinions. His comments to the opinions were focused on ensuring consistency between the two documents (by handwriting onto one draft any language that only appeared in the other), clearing up ambiguous sentences through, for example, the introduction of defined terms, and, per the Argre Principals' request, providing background information concerning Ezra in the charity-focused opinion.

- The Argre Principals went forward with the Belgian dividend arbitrage trading strategy beginning in April 2012. Kaye Scholer was not involved in the execution of the strategy: neither Ben-Jacob nor Kaye Scholer knew in advance or during the trading which securities the Argre Principals' entities or Ezra would purchase as part of the trading strategy, the volume in which they would trade, when the trades would occur or who the counterparties would be.

- In May 2012, the Argre Principals asked Ben-Jacob and Kaye Scholer to determine if the trading entities needed to file monthly Treasury International Capital ("TIC") reports, which were forms of which Ben-Jacob had no previous knowledge. Kaye Scholer determined that the forms were regulatory reports that should be filed by the trading entities that would disclose the purchases of the Belgian shares by Ezra and the pension plans to the U.S. Federal Reserve. The Argre Principals then requested that Ben-Jacob and Kaye Scholer assist with the filing of the TIC forms, which they did. This task was managed by Wells, who would receive information on the amount of trades from the Argre Principals, transcribe those numbers into the TIC reports, and submit them. The U.S. Federal Reserve asked various follow-up questions after the submissions of some monthly reports, which Wells (and in some cases other attorneys at Kaye Scholer) answered after he and Ben-Jacob consulted with the Argre Principals and the Argre Principals provided the substance of the responses.

### *Legal Advice from Late-2012 through Early-2014*

- Beginning in fall 2012, the Argre Principals began asking for legal advice on a range of issues concerning U.S. tax, pension, and securities law issues related to the dividend arbitrage trading strategy, almost all of which were outside of Ben-Jacob's areas of knowledge and required Ben-Jacob to enlist the assistance of other subject matter experts at Kaye Scholer.

- As was his typical practice with these clients, if only a limited consultation with a subject matter expert was necessary, Ben-Jacob would sometimes consult with the subject matter expert himself and revert to the Argre Principals with that lawyer's advice.  But if more substantial assistance was required, Ben-Jacob put the Argre Principals into direct contact with the subject matter experts.  Ben-Jacob was generally apprised of the advice his subject matter expert colleagues were providing to the Argre Principals on areas outside of his knowledge, but he relied on them to provide appropriate advice in those areas in which he was unknowledgeable.  As one example, in July 2014, the Argre Principals asked Ben-Jacob if they could function as "co-trustees" instead of "authorized traders" for certain plans involved in the trading.  As reflected in Exhibit 3112, Ben-Jacob raised this question with subject-matter experts in the relevant areas (pension and securities law) and deferred to their conclusions in providing a recommendation to the Argre Principals.  Similarly, Exhibit 4493 is an example of Ben-Jacob acknowledging an issue was outside his area of expertise and asking a colleague to address the client's questions directly.

- Ben-Jacob trusted the subject matter experts he consulted at Kaye Scholer both to gather whatever additional facts they would need to provide the advice sought and to provide proper advice.  Because the advice provided by Kaye Scholer lawyers was limited to answering specific questions of U.S. law presented by the strategy, it was not necessary for Ben-Jacob or other Kaye Scholer lawyers to understand all aspects of the trading strategy to the extent they were not relevant to the U.S. law questions posed.

- Among the areas of law for which the Argre Principals sought advice that required the assistance of other Kaye Scholer attorneys were Foreign Account Tax Compliance Act issues (David Sausen), U.S. swap-related issues (Louis Tuchman and Madeline Tan), U.S. securities law issues (Stephen Culhane, George Williams, and Patrick Michel), and U.S. "controlled group" issues (Sidney Unger).

- The Argre Principals also sought advice concerning several issues related to U.S. pension law, for which Ben-Jacob enlisted the assistance of two Kaye Scholer pension law specialists, Arthur Woodard and Kathleen Wechter. The focus of most of the advice provided by Woodard and Wechter was on whether any aspects of the strategy might be deemed "prohibited transactions" by the U.S. Department of Labor ("DOL"), which could subject the proceeds of the trading strategy to taxes and penalties. (The consequence of engaging in a prohibited transaction would not be a criminal penalty, but only a financial penalty.) One prohibited transactions issue on which Woodard and Wechter advised was as to whether the amount of the fee the plans would pay to Solo Capital for Solo Capital's brokerage and other services in connection with the strategy would be considered "unreasonable" by the DOL and thus a prohibited transaction. Ben-Jacob understood that Woodard and Wechter had advised the Argre Principals that there was a risk the DOL would deem the fee payment a prohibited transaction, but that the consequence of such a designation if it were made would only be the payment of additional taxes. Ben-Jacob understood this fell into a "gray area" and it was not clear one way or the other whether the IRS, if it reviewed the transaction, would issue tax penalties, and that it was the client's decision how to proceed in the face of that (and other) uncertainties.

- From late 2012 through early 2014, the Argre Principals explored, and in some cases implemented, several changes to the structure of the dividend arbitrage trading and the U.S. entities that would be involved in the trading. One such change was that the Argre Principals determined that they would use only pension plans, and not charitable entities, for dividend arbitrage trading going forward, and would rely both on pension plans for which they were the beneficiaries, and also plans for which their friends or family members were the beneficiaries. The Argre Principals told Ben-Jacob they intended to create partnerships between the third-party plans and the Argre Principals' own plans whereby the Argre Principals' plans would receive the majority of the trading strategy profits net of fees. At the Argre Principals' request, Ben-Jacob and Wells drafted partnership agreements with the economic terms they requested. Kaye Scholer also provided advice on U.S. legal issues related to the Principals' proposed partnership structures.

- In July 2013, the Argre Principals asked Kaye Scholer to provide a summary of the advice it had provided with respect to ex dividend trading by the pension plans. Ben-Jacob worked with the other lawyers who had provided advice to the Argre Principals to generate a list of all significant issues on which it had provided advice and sent the list to the Argre

Principals, in response to which Lhote identified additional questions that he appeared to believe had been addressed by Kaye Scholer. The list of issues with Lhote's additions (Exhibit 2240) does not include any items related to beneficial ownership or foreign law, the impact of the contemplated and executed structures (including the partnership arrangements) on issues of beneficial ownership or foreign law, or any aspect of the actual trading mechanics.

- I am aware of an earlier November 2012 email (Exhibit 2238) in which Peter Wells lists a number of open questions the clients and the firm were discussing, two of which related to the impact of the partnership structure and the anticipated use of a loan to finance the transactions on the plans' beneficial ownership of the shares. I have been asked to assume (as Ben-Jacob testified at his deposition at 154:14-155:20) that Kaye Scholer ultimately determined beneficial ownership was an issue of foreign law on which they could not, and did not, opine, and that Ben-Jacob understood the Argre Principals received all advice related to beneficial ownership under foreign law from foreign law firms. This is ultimately reflected in the later summary of Kaye Scholer's advice discussed previously (Exhibit 2240) in that the memo does not list foreign law issues, beneficial ownership, or the impact of the partnership structure or use of debt financing on beneficial ownership.

- The Argre Principals requested Kaye Scholer prepare a formal Tax Opinion in support of the pension law aspects of the strategy. After Ben-Jacob consulted with Woodard, a Kaye Scholer pension law specialist, he asked Woodard to explain to the Argre Principals why a formal Tax Opinion would not be helpful to them. I am aware of a September 2013 email (Exhibit 4512) in which Ben-Jacob asked Woodard to remind the Argre Principals of the several pension issues that were "well into the gray area" and that the fact-intensive nature of the analysis, among other difficulties given the lack of clear precedent, meant that a Tax Opinion would likely be nearly valueless for them. In this email Ben-Jacob asks Woodard to first assure the Argre Principals that Woodard believes "the transactions as structured work," and I have been asked to assume that Ben-Jacob intended this to refer only to the issues on which Woodard advised, which related solely to pension law.

- After Ben-Jacob advised the Argre Principals that a formal Tax Opinion would likely not be worthwhile (Exhibit 3111), the Argre Principals requested that certain of these issues instead be covered in a memorandum. Throughout late 2013 and early 2014, Kaye Scholer prepared memoranda summarizing certain pension law issues on which

Kaye Scholer had advised.  Kaye Scholer ultimately completed and provided to the Argre Principals three separate legal memoranda regarding U.S. pension law issues arising out of the dividend arbitrage trading in June 2014—one of which focused on the issue of "controlled group" transactions under U.S. pension law, and the other two focused on transactions with potential "disqualified persons" under the IRS code (which, if so designated, would mean the transactions were prohibited transactions and subject to U.S. tax penalties), analyzed under two different pension plan structures used for the dividend arbitrage trading.

- Ben-Jacob, and Kaye Scholer, did not advise on foreign law related to the dividend arbitrage trading, and they understood the Argre Principals obtained the foreign law advice they needed to engage in the transactions from foreign lawyers.  This is reflected in WH_MDL_00288664, in which Adam La Rosa (an Argre employee) asked Ben-Jacob and Wells if he could sign, as part of the reclaim application process, a form certifying the plans were the beneficial owners of the shares they had purchased as part of the strategy.  Wells responded that he and Ben-Jacob understood this to be a question of Belgian law and that they understood the most recent draft legal opinion obtained by Argre from Freshfields had opined that the plans were the beneficial owners under Belgian law for purposes of these forms.  Wells advised that on the basis of Freshfields' advice, and on the assumption that nothing had changed, La Rosa could sign the form.

- The Argre Principals had begun dividend arbitrage trading in Danish securities with Solo Capital in fall of 2012, and they informed Ben-Jacob that they had received advice from Danish counsel that the plans engaged in the trading were entitled under Danish law to the withholding tax refunds they sought.  I am aware that the Argre Principals obtained a formal tax opinion prepared by the Danish law firm Hannes Snellman for Solo Capital in support of the dividend arbitrage trading strategy that addressed, among other things, beneficial ownership under Danish law. (Exhibit 1851)  I have been asked to assume that Ben-Jacob was not asked to analyze this opinion.[2]  I have also been asked to assume that Ben-Jacob understood that it was not his role to have a full understanding of beneficial ownership issues under Danish law.  Therefore, he would not have been responsible for vetting such issues or having a full

---

[2]The Wagner Report states on multiple occasions that Ben-Jacob was provided the Hannes Snellman opinion. (Wagner Report at p. 77 ¶168)  However, the Wagner Report cites to portions of Ben-Jacob's deposition transcript that do not support that assertion, and separately to the Hannes Snellman opinion itself, which does not provide any indication of whether Ben-Jacob received it.

understanding of these issues with regard to the Hannes Snellman opinion. I also understand from Ben-Jacob's testimony that he separately received confirmation from Jerome Lhote that the Argre Principals had received sufficient Danish advice to allow them to represent that the plans beneficially owned the relevant securities and were entitled to dividend tax reclaims.

- Throughout this period, Kaye Scholer – and principally Wells – continued managing the filing of monthly TIC reports as necessary with the Federal Reserve, based on trading data provided to Kaye Scholer by the Argre Principals. Kaye Scholer also assisted with filing Reports of Foreign Bank and Financial Accounts ("FBARs") for those individuals and entities involved in the dividend arbitrage trading required to file those reports. Though others generally prepared the FBARs, Ben-Jacob had a supervisory role regarding their completion and submission.

- Also throughout this period, Kaye Scholer continued submitting regular invoices for the billed time of its attorneys, with descriptions of the legal work performed. These bills, which the Argre Principals received and paid, reflected the scope of the work that Ben-Jacob and other Kaye Scholer attorneys performed.

### The Disbanding Of Argre and The Provision Of Administrative Assistance By Kaye Scholer Thereafter

- In early 2014, Argre disbanded. Markowitz and van Merkensteijn wished to continue dividend arbitrage trading despite the departure of Stein and Lhote and the loss of the Argre administrative staff. They obtained a third investor, Robert Klugman, and continued to work with Solo Capital to prepare for a new round of dividend arbitrage trading that would take place later that year.

- No longer possessing their own administrative staff, Markowitz and van Merkensteijn asked Ben-Jacob if Kaye Scholer could take on various administrative services related to implementing the dividend arbitrage trading strategy. Ben-Jacob agreed that Kaye Scholer would do so. He did not ask Markowitz, van Merkensteijn, or Klugman to execute engagement agreements that would govern this work, as he considered this to simply be a continuation of the previous work with an added administrative component.

- In June 2014, Markowitz and van Merkensteijn asked Kaye Scholer to assist with various tasks related to the creation of a new set of pension plans (the "Post-Argre Plans")[3] through which they intended to continue dividend arbitrage trading in Denmark. At their request, Kaye Scholer attorneys and administrative staff arranged for the registration of several new Delaware LLCs, drafted LLC agreements and other corporate documents such as powers of attorney, arranged for a third-party vendor to prepare form pension plans for each of the LLCs, applied to the IRS to obtain Form 6166 certifications that each pension plan was tax-qualified in form under U.S. tax laws, and coordinated the onboarding of the pensions plans with the various financial entities with which they would need a relationship in order to enter the necessary transactions. These tasks were largely administrative and were performed by more junior attorneys and Kaye Scholer administrative staff, though Ben-Jacob held a supervisory role. As with the prior plans, neither Ben-Jacob nor Kaye Scholer was requested to provide a comprehensive assessment of the trading strategy or advise as to its risks and benefits.

- Among the entities with which the Post-Argre Plans needed to be onboarded were "reclaim agents." Reclaim agents were third party service providers who would complete and submit the tax withholding reclaim application with the government on behalf of a taxpayer who claimed entitlement to a reclaim. The taxpayer would represent to the reclaim agent that it owned a certain number of securities for which a dividend was paid and dividend taxes were collected, and that the taxpayer was entitled to recover some or all of the withheld dividend taxes. As part of the onboarding process with the reclaim agent, each plan submitted to the reclaim agency a "Beneficial Ownership Declaration" ("BOD") representing that the plan is tax-qualified under Section 401(a) of the Internal Revenue Code and the beneficial owner of the securities and dividends for which the reclaim was sought. At the request of the clients, and in order to facilitate the onboarding, Ben-Jacob signed the BODs and reclaim services contracts on behalf of many of the Post-Argre Plans. Kaye Scholer submitted these documents on the plans' behalf to the reclaim agents as part of the onboarding process. For some plans, Ben-Jacob executed these documents pursuant to a Power of Attorney issued by the plan to Ben-Jacob. For others, Ben-Jacob executed the documents as an "attorney-in-fact." In all instances, Ben-Jacob signed the

---

[3]The Wagner Report refers to the "Kaye Scholer Plans," but I understand from counsel that Kaye Scholer had no interest in these plans, that no Kaye Scholer attorney was a beneficiary or a trustee of these plans, and that Kaye Scholer did not sponsor these plans.

forms at the request of his clients and based on assurances by his clients that they had received foreign legal advice that the plans could truthfully represent that they would be the beneficial owners of the securities for which they sought refunds.

- From June 2014 through August 2015, Kaye Scholer continued to provide administrative support for the dividend arbitrage trading strategy and manage FBAR and TIC filings based on information provided by the clients. Kaye Scholer also assisted with responding to U.S. government agency follow-up questions with respect to those filings. For example, in June 2015, the Federal Reserve asked: "To the extent that [the trades conducted by the plans] are recommended by some other party (e.g., Solo) is there any document that can be provided which more clearly explains their role vis-à-vis the plan?" Ben-Jacob and Wells consulted with the Argre Principals, who informed them that they did not have a specific written document explaining Solo's role. Ben-Jacob and Wells were not separately aware of any existing document that explained Solo's role, and they conveyed that response to the Federal Reserve (Exhibit 3125).

- Similarly, in October 2015, the Federal Reserve asked: "Since it's the same securities across all the plans, is there a single investment advisor overseeing all of these trades or is the U.K. broker providing recommendations to the plans for their purchases?" Ben-Jacob did not have any involvement in the trading mechanics and did not personally know the answer to this question. He and Kaye Scholer consulted with the Argre Principals and, based on their statements, Kaye Scholer responded: "NO, THERE WAS NO SINGLE INVESTMENT ADVISOR OR UK BROKER ACTING ON BEHALF OF THE PLANS WITH RESPECT TO THEIR PURCHASES." (Exhibit 3128) That response was consistent with Ben-Jacob's understanding from the Argre Principals that they worked with multiple entities, including multiple brokers, with respect to the trading. Ben-Jacob understood this to be an accurate and sufficient response to the question posed. Ben-Jacob further understood that failing to register as an investment advisor as required is, at most, a basis for civil penalties, and he believed that his clients were entitled to decide whether they wanted to risk incurring a penalty as a business decision.

- During this period, Kaye Scholer also continued to answer sporadic U.S. legal questions posed by the clients to Ben-Jacob or other attorneys. As before, virtually all of those questions related to issues of U.S. law in which Ben-Jacob was not a specialist, for which he would consult with the appropriate subject matter experts at his firm or put those attorneys into direct contact with the clients.

- In July 2015, van Merkensteijn asked Ben-Jacob to review financial statements prepared by an accountant for one of the plans that participated in the trading, with the instruction: "just thought you could take a look and see if you spot anything in presentation." Ben-Jacob gave three comments, one of which was that a heading in the general ledger for "Reclaim Services Fees" with a zero entry should be removed. I understand that Ben-Jacob testified he did so because his "general practice when thinking about books and records from a tax perspective is that if there's a zero with relation to an item, you wouldn't include the item on the balance sheet, because it doesn't exist." Ben-Jacob Day One Tr. 76:20-25. In any event, it is my understanding that Ben-Jacob believed that an accounting professional would make the final decision concerning the entries on the ledger.

- There was one instance in which Markowitz asked Ben-Jacob to find a Danish attorney to answer some questions concerning Danish financial reporting requirements. Ben-Jacob did so, and provided a summary of the Danish lawyer's responses (Exhibit 1852). As this was a "specific request to Ben-Jacob to assist on a discrete issue, in which Ben-Jacob conveyed the advice provided by a foreign lawyer, Ben-Jacob and Kaye Scholer did not consider this an expansion of the scope of their representation to include Danish law issues.

18.     In preparing this expert report, I have reviewed relevant aspects of certain documents provided to me by Mr. Ben-Jacob's attorneys, a list of which is set forth in the annexed Appendix B.

19.     This expert report is based upon the information and assumptions set forth herein. If the information or assumptions prove inaccurate in any material way, my opinion may change.

# VI.

## OPINION.

**A.     BEN-JACOB REASONABLY RELIED ON THE ARGRE PRINCIPALS TO CONDUCT THEIR OWN DUE DILIGENCE WITH RESPECT TO VARIOUS MATTERS OUTSIDE THE SCOPE OF HIS EXPERTISE, AND HE WAS PERMITTED TO RELY ON THEIR REASONABLE REPRESENTATIONS.**

### 1.     INTRODUCTION.

20.     For the reasons set forth below, it is my opinion that Ben-Jacob reasonably relied on his clients, the Argre Principals, to conduct their own due diligence with respect to various matters outside the scope of his expertise, and he was permitted to rely on their reasonable representations concerning factual matters of which he had no knowledge.

21.     It is also my opinion that Ben-Jacob referred issues outside his areas of competence to colleagues with relevant expertise and reasonably relied upon those colleagues to provide appropriate advice as to those issues.

22.     I discuss below the applicable rules collectively governing Ben-Jacob's conduct in connection with his dealings with the Argre Principals, including the duty to avoid knowingly aiding illegal or fraudulent conduct.  I then address the "knowledge" requirement and the duty to investigate a client's factual representations in the context of an attorney's obligations of competence and diligence.  I then separately address those obligations in the context of a representation that is limited in scope (specifically, to exclude due diligence).

### 2.     THE RULES PROHIBITING KNOWINGLY COUNSELING A CLIENT TO ENGAGE, OR ASSISTING A CLIENT, IN A CRIME OR FRAUD.

23.     The applicable rules collectively governing Ben-Jacob's conduct in connection with his dealings with the Argre Principals is set forth in the New York Rules of Professional Conduct (the "Rules").  See 22 N.Y.C.R.R. Part 1200.  Rule 1.1(a) provides that a "lawyer shall

23

provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Rule 1.3(a) further provides that a "lawyer shall act with reasonable diligence and promptness in representing a client." Rule 1.3(c) further instructs that a lawyer shall not intentionally fail "to carry out a contract of employment entered into with a client for professional services…."

24.     Rule 1.2(d) prohibits a lawyer from counseling a client to engage, or assisting a client, in conduct the lawyer "knows" is illegal or fraudulent. Rule 1.0(k) defines the terms "knows" and "knowingly" as "actual knowledge of the fact in question," which "may be inferred from circumstances."[4]

25.     Rule 1.2 pivots on the knowledge standard (and, as discussed separately below, on the scope of the representation). Comment [10] to Rule 1.2 observes that a "lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed." Comment [13] further explains that "[i]f a lawyer comes to know or reasonably should know that a client expects assistance not permitted by the Rules of Professional Conduct or other law, or if the lawyer intends to act contrary to the client's instructions, the lawyer must consult with the client regarding the limitations on the lawyer's conduct." See also Rule 1.4(a)(5) (requiring that a lawyer consult with a client concerning relevant limitations on the lawyer's conduct when the lawyer knows the client expects assistance not permitted by the rules or law).

---

[4]Several other Rules also govern an attorney's duty of truthfulness. Rule 4.1 prohibits an attorney from knowingly making a "false statement of fact or law to a third person." Rule 8.4(c) further prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation."

26.     Although an attorney's knowledge of a fact may be inferred from the circumstances (see Rule 1.0[k]), ethics authorities have opined that a "good reason to believe" a fact does not provide the attorney with "actual knowledge" of a fact.[5]

27.     The "actual knowledge" standard has been consistently applied by the courts in New York and elsewhere.  See, e.g., Doe v. Federal Grievance Committee, 847 F.2d 57, 62 (2d Cir. 1988) ("[a lawyer] must clearly know, rather than suspect, that a fraud on the court has been committed before he brings this knowledge to the court's attention").  It is important to emphasize that "knows" or "knowledge" does not mean mere suspicion, nor does it mean "reasonably should know."[6]

28.     The Second Circuit's decision in United States v. Parse, 789 F.3d 83 (2d Cir. 2015), truly highlights the importance of the knowledge element.  In Parse, the Second Circuit found that defense counsel did not have actual knowledge that a juror had lied during voir dire – which would have triggered a duty to report the fraud on the tribunal to the judge.  The district court had held that Parse's attorneys "knew that [juror] Conrad was a suspended attorney" (which was critical to concluding that Parse's attorneys knew that the juror was lying during voir

---

[5]See D.C. Bar Opinion 350 (Oct. 2009) (distinguishing having "good reason to believe a fact" from having "actual knowledge" of a fact and concluding that the former would not satisfy the knowledge standard).

[6]There are many cases which make this point in many different contexts.  See, e.g., Matter of Lucarelli, 611 N.W.2d 754 (Sup. Ct. Wis. 2000) (in rejecting the claim that a prosecutor knowingly brought a case unsupported by probable cause, the court rejected the argument that "knowledge" can be satisfied by a finding of "reasonably should know"); United States v. Del Carpio-Cotrina, 733 F. Supp. 95, 99 (S.D. Fla. 1990) (noting that various federal and state courts "have generally equated a firm factual basis and proof beyond a reasonable doubt with the actual knowledge standard"); United States v. Shaffer Equip. Co., 11 F.3d 450, 459 (4th Cir. 1993); Addamax Corp. v. Open Software Found., 151 F.R.D. 504, 510 (D. Mass. 1993).  See also N.Y. State Bar Assn. Op. 635 (9-92) (opining that knowledge means more than mere suspicion and more than reasonable belief); Nassau Co. Bar Assn. Op. 93-41 (where an attorney "clearly believes" that his co-counsel and client have committed fraud, he is obligated to report the misconduct).

dire) or that, in the alternative, even if Parse's attorneys "did not have actual knowledge that Conrad was the suspended attorney, they would have known had they exercised due diligence." Id. at 106.  The Second Circuit rejected the district court's finding that Parse's lawyers *knew*, prior to the end of trial, that the juror was a suspended attorney, noting that "[b]elief, surmise, and opinion are not the same as knowledge."  Id. at 117.  The Second Circuit concluded that the record demonstrated only that Parse's attorney's *suspected* that the juror had lied during voir dire – not that Parse's attorneys had actual knowledge that the juror had lied.  Id. at 115-18.

29.    If Ben-Jacob knew that the Argre Principals were engaged in criminal or fraudulent conduct, the relevant rules of professional conduct would prohibit him from assisting them in such conduct.  Likewise, if Ben-Jacob knew that the Argre Principals asked him to convey false information to third parties, he would have been prohibited from doing so.

30.    Of course, the "knowledge" requirement cannot be sidestepped by a willful ignorance of obvious facts, and an attorney's "knowledge may be inferred from circumstances." Rule 1.0(k).

31.    I discuss below the "knowledge" requirement in the context of an attorney's obligations of competence and diligence and then, separately, in the context of a limited scope representation.

### 3.    AN ATTORNEY'S DUTY TO ACT COMPETENTLY AND DILIGENTLY AND ITS RELATIONSHIP TO A POSSIBLE DUTY TO INVESTIGATE READILY AVAILABLE FACTS.

32.    In general, a lawyer's duty to inquire into a client's factual representations is governed by the lawyer's duties of competence and diligence.  In addressing an attorney's duty to act competently and diligently in connection with factual representations, courts have started with the premise that "an attorney is entitled to rely on his or her client's statements as to factual

claims when those statements are objectively reasonable." Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1329 (2d Cir. 1995).[7]

33.     Given that an attorney must act competently and diligently (see Rules 1.1 and 1.3) and may not willfully ignore bad facts, some ethics literature has expressed the view that attorneys have, in some situations, a duty to affirmatively investigate readily available facts before proceeding with a representation.

34.     In 1974, the ABA's Standing Committee on Ethics and Professional Responsibility issued Opinion 335, expressing the view that, "while a lawyer should make adequate preparation including inquiry into the relevant facts …, and while he [or she] should not accept as true that which he [or she] should not reasonably believe to be true, he [or she] does not have the responsibility to 'audit' the affairs of his [or her] client or to assume, without reasonable cause, that a client's statement of the facts cannot be relied upon."[8]

35.     More recently, the ABA's Standing Committee on Ethics and Professional Responsibility addressed an attorney's obligations of candor in the context of non-litigation settings in Formal Opinion 491 (Apr. 29, 2020). As a general matter, the Opinion noted that, in addition to any attorney's obligations under Model Rule 1.2(d) (which is identical to Rule

---

[7]Over the years, the Hadges case has been cited by multiple courts for the proposition that an attorney is entitled to rely on his or her client's statements when those statements are objectively reasonable. See, e.g., Goldman v. Barrett, 825 F. Appx. 35, 38 (2d Cir. 2020); In re Cushman, 589 B.R. 469, 495 (Bankr. D. Me. 2018); In re Nosek, 406 B.R. 434, 443 (D. Mass. 2009); Henderson v. Jupiter Aluminum Corp., 2006 U.S. Dist. LEXIS 7777, at *20 (N.D. Ind. Feb. 15, 2006); Fusco v. Medeiros, 965 F. Supp. 230, 236 (D.R.I. 1996).

[8]In New York State, bar committee advisory ethics opinions are not binding on courts or disciplinary bodies. Nonetheless, attorneys may reasonably rely on ethics opinions that interpret and explain state disciplinary rules. See Miano v. AC&R Advertising, Inc., 148 F.R.D. 68, 83 (S.D.N.Y. 1993) (bar ethics opinions "are instructive in applying ethical rules to attorney conduct in litigation and provide guidance to attorneys themselves in conforming their conduct to ethical proscriptions"); see also Charlap v. Khan, 41 Misc.3d 1070, 1083-84 (Sup. Ct. Erie Co. 2013).

1.2[d]), a "lawyer may be obliged to inquire further in order to meet duties of competence, diligence, communication, honesty, and withdrawal under Rules 1.1, 1.3, 1.4 [the duty to communicate], 1.13 [duties in the context of representation organizations], 1.16 [duties upon withdrawal], and 8.4."

36.     As discussed below, the "knowledge" standard is not diluted by Opinion 491. Rather, Opinion 491 simply addresses the concept of knowledge in the context of the issue of competence.

37.     Opinion 491 expressed the view that a lawyer has an obligation to investigate whether a client seeks to use the lawyer's services in a transactional or non-litigation matter for prohibited ends when the facts known to the lawyer establish a "high probability" that the client or prospective client seeks to use the lawyer's services for criminal or fraudulent activity.  In reaching this conclusion, the Opinion relied on various illustrative authorities, including:

a.     In re Blatt, 324 A.2d 15 (N.J. 1974), where the "New Jersey Supreme Court disciplined a lawyer for participation in a real estate transaction where '[o]n their face the [transaction] documents suggest[ed] impropriety if not outright illegality.'" Opinion 491 at 3, quoting Blatt, 324 A.2d at 18 (emphasis supplied by Opinion 491).

b.     ABA Informal Opinion 1470 (1981), which stated that a "lawyer must be satisfied, on the facts before him and readily available to him, that he can perform the requested services without abetting fraudulent or criminal conduct….."  Opinion 491 at 4.

c.     New York City Ethics Opinion 2018-4, which "concluded that lawyers must inquire when 'retained to assist an individual client in a transaction that appears to the lawyer to be suspicious.'" Opinion 491 at 4, quoting N.Y City Ethics Op. 2018-4.  The Opinion expressed the view that "assisting in a suspicious transaction is not competent where a reasonable lawyer prompted by serious doubts would have refrained from providing assistance or would have investigated to allay suspicions before rendering or continuing to render legal assistance.... What constitutes a suspicion sufficient to trigger inquiry will depend on the circumstances."  Opinion 2018-4 further noted that a failure to

inquire may constitute "conscious avoidance" when, for example, "the lawyer is aware of serious questions about the legality of the transaction and renders assistance without considering *readily available facts* that would have confirmed the wrongfulness of the transaction." Opinion 491 at 3 (emphasis added).

    d.    <u>Matter of Dobson</u>, 427 S.E.2d 166 (S.C. 1993), where the "respondent deliberately evaded knowledge of facts which tended to implicate him in a fraudulent scheme." Opinion 491 at 5, quoting <u>Dobson</u>, 427 S.E.2d at 168.

38.    Opinion 491 (at p. 5 n.22) acknowledged the existing "tension between the 'actual knowledge' standard of Model Rule 1.2(d), on the one hand, and those authorities applying a reasonably should know standard." The Opinion concluded "only that the standard of actual knowledge set out in the text of Model Rules 1.2(d) and 1.0(f) is met by appropriate evidence of willful blindness," observing that "[w]hen the Model Rules intend a lower threshold of scienter, such as 'reasonably should know,' the text generally makes this explicit." <u>Id.</u> The Opinion concluded by warning against hindsight bias, observing that:

> "A lawyer's reasonable judgment under the circumstances presented, especially the information known and reasonably available to the lawyer at the time, does not violate the rules. Nor should a lawyer be subject to discipline because a course of action, objectively reasonable at the time it was chosen, turned out to be wrong with hindsight."

Opinion 491 at 9.

39.    In light of the ethics literature discussed above, including Opinion 491, and my own decades of experience in advising and representing law firms, it is my view that another way to articulate the test of what is objectively reasonable in circumstances such as those facing Ben-Jacob is to ask whether a lawyer has before them a set of facts that are *not*: (1) facially incorrect; (2) internally inconsistent; and/or (3) objectively and conclusively inconsistent with other facts known to that lawyer. That being said, even ethical and honest lawyers will, on occasion, not identify or understand the true nature of the facts before them. For that reason, to

the extent that Ben-Jacob did not, for example, understand that among the totality of the facts that he had once reviewed there were inconsistent facts, that does not necessarily mean that he willfully aided or participated in a fraud.

40.    Here, it is my view based upon the assumed facts set forth above that Ben-Jacob relied on the objectively reasonable representations of his clients in the context of his role in the representation, which was limited in scope, as discussed below.

41.    For example, with respect to the BODs and reclaim services contracts, Ben-Jacob signed the forms based on assurances by his clients that they had received the requisite foreign legal advice that the plans could truthfully represent that they would be the beneficial owners of the securities for which they sought refunds.  Ben-Jacob was entitled to rely on his clients objectively reasonable representations in this regard because those representations were not facially incorrect; internally inconsistent; and/or objectively and conclusively inconsistent with other facts known to Ben-Jacob.  As discussed below, Ben-Jacob did not have a duty to make inquiries into objectively reasonable representations of the Argre Principals with respect to matters which were outside the scope of his retention, particularly in light of the level of sophistication of the clients who were providing the representations.

42.    The Wagner Report argues that Ben-Jacob could not rely on his clients and, instead, was required to undertake an investigation that "would have included seeking a legal opinion explaining how the Plans could truthfully represent their beneficial ownership despite the facts indicating otherwise."  (Wagner Report at p. 77 ¶167)  However, the Argre Principals told Ben-Jacob that they had secured advice with respect to this issue from Danish counsel, and, under the governing ethical principles discussed above, Ben-Jacob was entitled to rely on this objectively reasonable representation because it was not:  (1) facially incorrect; (2) internally

inconsistent; and/or (3) objectively and conclusively inconsistent with other facts known to Ben-Jacob.

43.    The Wagner Report discusses the aforementioned "facts indicating otherwise" as including the following:

> "that the Plans were not investing any of their own money to acquire Danish shares, that the Plans were supposedly acquiring the shares with loans arranged by Solo Capital and were paying Solo Capital and Ben-Jacob's clients the lion's share of the proceeds obtained from SKAT (which were the only proceeds of the transactions), and that, in the case of Plans that were members of partnerships, their supposed ownership of the shares in their trading accounts was merely as undisclosed agent or nominee for the partnership."

44.    This argument in the Wagner Report raises two separate issues under the competence rule which relate to scope and knowledge: 1) whether Ben-Jacob knew that he was aiding in a crime or fraud; and 2) whether he had a duty to conduct due diligence on these matters because they were within the scope of his retention.

45.    *First*, with respect to the knowledge issue, Ben-Jacob did not have actual knowledge of any illegal or fraudulent conduct.  The transactions involved a trading strategy and other issues which were outside the scope of Ben-Jacob's expertise and which were outside his scope of retention.

46.    *Second*, as discussed below, Ben-Jacob did not have a duty to seek a separate legal opinion (in addition to the one his clients told him they had secured from Danish counsel) because such work also fell outside the scope of Ben-Jacob's retention.  For similar reasons, Ben-Jacob did not have a duty to inquire into other aspects of the plans' investment strategy.

**4. UNDER THE ASSUMED FACTS, THE SCOPE OF KAYE SCHOLER'S REPRESENTATION DETERMINED BEN-JACOB'S REQUIRED SCOPE OF COMPETENCE.**

47.    It is axiomatic that lawyers and law firms may limit the scope of their engagements with clients.  Indeed, courts have long recognized that "an attorney's power of representation is confined to the matters which have been entrusted to [them], in the absence of express authority for more general representation."  Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp, 216 F.2d 920, 927 (2d Cir. 1954); see Restatement (Third) of the Law Governing Lawyers, § 26 (discussing "A Lawyer's Actual Authority").

48.    The Rules codify this principle in Rule 1.2(c), which provides that:  "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances, the client gives informed consent and where necessary notice is provided to the tribunal and/or opposing counsel."  Rule 1.0(j) defines "informed consent" as "deno[ting] the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives."  Rule 1.2(c) does not require that informed consent be confirmed in writing, and a client can consent to a limited scope representation explicitly or implicitly through a course of dealings.  (See para. 50 n.10, infra [discussing cases].)

49.    New York State Bar Association ("NYSBA") unofficial Comment [6] to Rule 1.2 provides additional guidance, in relevant part, as follows:

> "The scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client.  When a lawyer has been retained by an insurer to represent an insured, for example, the representation may be limited to issues related to the insurance coverage.  A limited representation may be appropriate because the client has limited objectives for the representation.  In

addition, the terms upon which representation is undertaken may exclude specific means that might otherwise be used to accomplish the client's objectives. Such limitations may exclude actions that the client thinks are too costly or that the lawyer regards as repugnant or imprudent."

50.    Rule 1.2(c), Rule 1.4(b) and Rule 1.5(b) require lawyers and law firms to communicate limitations on scope to the client, although not necessarily in writing. See Rule 1.4(b) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."); Rule 1.5(b) ("A lawyer shall communicate to a client the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible."). Typically, some limitations on scope are set forth in retainer agreements.[9] In the absence of a retainer agreement that defines the scope of an attorney-client relationship, courts determine the scope of the relationship by examining the parties' course of dealings and communications.[10]

---

[9] See, e.g., Stewart v. NY City Tr. Auth., 125 A.D.3d 129, 133 (N.Y. App. Div. 1st Dept 2014) ("we are guided by the clear and unequivocal language of the retainer agreement in this case, which was expressly limited to work through trial"); Hallman v. Kantor, 72 A.D.3d 895, 896-97 (N.Y. App. Div. 2d Dept. 2010) (retainer agreement was dispositive of the fact that "plaintiff's individual liability on the notes was a matter outside of the scope of the defendants' representation of the plaintiff in her capacity as co-executor of the estate"); Pritisker v. Zamansky, 2018 N.Y. Slip Op. 33980[U], *2 (Sup. Ct. N.Y. Co. 2018) ("the retainer agreement between plaintiff and defendants shows that defendants' representation was limited to an arbitration between plaintiff and two other parties").

[10] See, e.g., Portus Sing. PTE Ltd. v. Kenyon & Kenyon LLP, 449 F. Supp. 3d 402, 412 (S.D.N.Y. 2020) ("The parties do not point to any formal retainer or contract that spelled out the engagement between Kenyon and Portus. Rather, the 'scope' of the engagement between Portus and Kenyon was set out in the communications between Kenyon and Portus's agent, Mr. Treloar."); Askew v. New York State, 2010 U.S. Dist. LEXIS 157136, at *14 (N.D.N.Y. 2010) ("After scrutinizing the long string of emails, the Court ultimately concludes that it was wishful thinking, albeit overcast by indirect and inadequate responses from Sussman, on Rev. Askew's part that Sussman would continue as her attorney on a contingency fee basis."); Genesis Merchant Partners, L.P. v. Gilbride, Tusa, Last & Spellane, LLC, 157 A.D.3d 479, 482 (N.Y. App. Div. 1st Dept. 2018) (noting that there was no engagement letter and examining the parties' conduct and e-mails; VPC Projects, LLC v. Golenbock Eiseman Assor Bell & Peskoe LLP,

(continued…)

51.    Limited-scope engagements are common, particularly in the context of sophisticated clients who have their own skill sets and who retain multiple lawyers to perform different tasks for them.  Rule 1.2(c) "affords the lawyer and client substantial latitude to limit the representation," so long as the client understands the limitation.  NYSBA unofficial Comment [7] to Rule 1.2(c).  There are multiple facts which are indicative of the Argre Principals' sophistication and ability to determine the scope of Kaye Scholer's and Ben-Jacob's retention:

a.    As discussed above, the Argre Principals were extremely sophisticated investors; they relied on the advice of multiple law firms in connection with their trading strategy.

b.    The Argre Principals were equipped to, and did, conduct their own due diligence, having spent approximately two years investigating and researching the trading strategy and also conducting due diligence on Solo Capital and Sanjay Shah before pursuing the strategy, without the involvement of Ben-Jacob and Kaye Scholer.

c.    The Argre Principals received and paid Kaye Scholer's invoices, which included descriptions of the tasks performed by Kaye Scholer attorneys and made clear the scope of the legal work that Kaye Scholer performed.

d.    From February through June of 2011, the Argre Principals (in connection with their trading strategy in Germany) handled various issues themselves, including negotiating terms with Solo Capital and assessing the trading mechanics Solo Capital presented, without seeking legal advice from Ben-Jacob.

e.    The Argre Principals told Ben-Jacob that they understood that their dividend arbitrage trading strategy was consistent with German law and that they were obtaining legal advice concerning the German law aspects of the strategy from Norton Rose (and provided Ben-Jacob with drafts of a

---

(…continued)
2020 N.Y. Slip. Op. 32069(U) (Sup. Ct. N.Y. Co., Jun. 2, 2020) ("there was no discussion between Robert Millstone and defendant regarding insurance coverage when Robert Millstone retained defendant to litigate the Jou Action"); Golub v. Shalik, Morris & Co., LLP, 2019 Slip Op. 32589(U), at *18 (Sup. Ct. N.Y. Co. Sept. 3, 2019) ("Defendants also demonstrate *prima facie* that after the 2012 Form 709 was filed in 2013, their representation of ARG was not in connection with the trust but was a continuation of their provision of general tax services.").

Norton Rose opinion as to which his independent analysis of the conclusions and their sufficiency was not sought).

f.    The Argre Principals also pursued dividend arbitrage trading in Belgium. Ben-Jacob understood that the Argre Principals were separately receiving advice from Freshfields, and Freshfields provided advice concerning the Belgium law aspects of the trading strategy (and copies of two draft opinions were provided to Ben-Jacob, as to which his independent analysis of the conclusions and their sufficiency was not sought).

g.    The Argre Principals also pursued dividend arbitrage trading in Denmark. Ben-Jacob understood that the Argre Principals received advice concerning Danish law aspects of the trading strategy from a Danish law firm (and Ben-Jacob's advice as to that opinion was not sought).

h.    Ben-Jacob did not advise on foreign law related to the dividend arbitrage trading, and the Argre Principals obtained the foreign law advice they needed to engage in the transactions elsewhere.

52.    As a general matter, sophisticated clients better understand limitations on engagements, including the need for separate counsel and the impact on cost. See New York City Bar Association Committee on Professional & Judicial Ethics Opinion 2001-3 (Jul. 2001) (explaining that, "[i]n some circumstances, such as where the client is a large corporation already represented by inside or outside counsel, or a sophisticated individual, the client would, after disclosure, be able to provide meaningful consent" to a limited scope engagement). Here, it would not be surprising, given the long history of dealings between the Argre Principals and Ben-Jacob and the obvious trust built between them, that informed consent not be confirmed in writing and instead, provided through course of conduct.

53.    Irrespective of the limits on a representation, a lawyer must remain competent and diligent as required by Rule 1.1 and Rule 1.3, respectively. But the scope of Ben-Jacob's representation determined his required *scope* of competence. See NYSBA unofficial Comment [7] to Rule 1.2 (citing Rule 1.1 and explaining that: "Although an agreement for a limited representation does not exempt a lawyer from the duty to provide competent representation, the

35

limitation is a factor to be considered when determining the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."); see generally M. N. Struffolino, *Taking Limited Representation to the Limits: The Efficacy of Using Unbundled Legal Services in Domestic-Relations Matters Involving Litigation*, 2 St. Mary's J. Legal Mal. & Ethics 166, 218 (2012) ("By explicitly referencing each other, the comments to the rules governing competency and limited representation indicate that limited representation might somewhat relax the duty to make inquiries and investigate.").

54.    In defining competence in the context of legal malpractice actions, this Court and the New York Court of Appeals have observed that:  "What constitutes ordinary and reasonable skill and knowledge cannot be fixed with precision, but should be measured at the time of representation."  Portus Sing. PTE Ltd. v. Kenyon & Kenyon LLP, 449 F. Supp. 3d 402, 411 (S.D.N.Y. 2020), quoting Darby & Darby, P.C. v. VSI Intern., Inc., 95 N.Y.2d 308 (N.Y. 2000). Generally, "ordinary and reasonable skill" is determined "by looking to standards of legal practice in the State of New York."  Id. at 411.  An attorney is "not held to a standard of 'infallibility' and the 'perfect vision of hindsight'…."  Id. at 414 (citing trial court's opinion in Nomura, infra; quotation marks omitted).

55.    Rule 1.1(b) makes clear that an attorney is permitted to handle a legal matter which the attorney "is not competent to handle" by "associating with a lawyer who is competent to handle it."  Attorneys who work in the same law firm are "associated" within the meaning of the Rules; and this is the classic manner in which lawyers in multi-lawyer firms service clients – i.e., by routing work within the firm to attorneys with experience and competence in a given area of the law.  Stated another way in order to meet the competence standard of Rule 1.1, an attorney may "associate" with other lawyers who possess the relevant expertise – including, for example,

36

colleagues in the lawyer's firm who are experts in an area of law.  NYSBA unofficial Comment [2] to Rule 1.1 confirms this principle by explaining that "[c]ompetent representation can also be provided through the association of a lawyer of established competence in the field in question."

56.    With limited exceptions, "pursuant to New York law, 'a violation of a disciplinary rule does not generate a cause of action[.]'"  Karas v. Katten Muchin Zavis Rosenman, 2006 U.S. Dist. LEXIS 90116, at *5 (S.D.N.Y. Dec. 8, 2006) (citations omitted); see Preamble [12] to the Rules ("Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached.").

57.    Over the years, the New York Court of Appeals has addressed issues in connection with defining the scope of a law firm's retention in two important cases:  AmBase Corp. v. Davis Polk & Wardwell, 8 N.Y.3d 428 (N.Y. 2007) and Nomura Asset Capital Corp. v. Cadwalader, Wickersham & Taft LLP, 26 N.Y.3d 40 (N.Y. 2015), which I discuss below.

58.    AmBase involved a situation where a law firm that had been retained to resolve discrete tax issues was subsequently sued for failing to provide more general tax advice concerning issues related to primary and secondary liability.  Following the liquidation of its parent company (the City Investing Company ["City"]), the plaintiff corporation AmBase assumed primary liability for City's federal income taxes and secondary liability for all other liabilities.  8 N.Y.3d at 432.  The IRS found City liable for six years' worth of withholding taxes, which were to be imputed to AmBase under the liquidation agreement.  Id.  AmBase retained Davis Polk & Wardwell ("Davis Polk"), pursuant to a written retainer agreement, to resolve the tax issues before the IRS, and the law firm successfully challenged the IRS's determination that AmBase was liable.  Id. at 432-33.  AmBase then sued Davis Polk for legal malpractice on the

ground that it had failed to advise AmBase that it was only secondarily (and not primarily) liable for payment of taxes.  Id. at 433.

59.    In an Opinion affirming the Order of the Appellate Division, First Judicial Department, the Court of Appeals held that a legal malpractice claim did not lie where the scope of the retention was limited to litigating the amount of the client's tax liability and did not include any determination as to whether the liability could be allocated to another.  As the Court explained:

> "The plain language of the retainer agreement indicates that [the law firm] was retained to litigate the amount of tax liability and not to determine whether the tax liability could be allocated to another entity.    Thus,  the  issue  whether  plaintiff  was  primarily  or secondarily liable for the subject tax liability was outside the scope of its representation.   As such, defendants exercised the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession when they focused their efforts on the controversy between AmBase and the IRS."

AmBase Corp., 8 N.Y.3d at 435.

60.    Though AmBase involved a written retainer agreement, the principles set forth in that case also apply to a situation without a retainer agreement, i.e., the attorney must still exercise ordinary and reasonable skill and knowledge by focusing their efforts on matters within the scope of retention.    However, in the absence of a retainer agreement, the scope of the retention is determined by examining the parties' course of dealings, including the advice provided, invoices for services rendered and other communications.  (See discussion at para. 50 and n.10, supra.)

61.    Almost  a  decade  later,  in  Nomura  Asset  Capital  Corp.  v.  Cadwalader, Wickersham & Taft LLP, 26 N.Y.3d 40 (N.Y. 2015), the Court of Appeals reaffirmed the principles set forth in AmBase in a case factually similar to the facts presented by the matter

which is the subject of this expert report.  The <u>Nomura</u> case, which I discuss in detail below, is particularly instructive in this matter.

62.    Nomura established a commercial mortgage-backed securities business and engaged Cadwalader to advise and confirm that Nomura's securitized commercial mortgage loans qualified as real estate mortgage investment conduit ("REMIC") trusts.  <u>Id.</u> at 43-44.  Over the next several years, Cadwalader's work on Nomura REMIC securitizations "garnered immense profits for Nomura and significant legal fees for Cadwalader."  <u>Id.</u> at 44.  (REMIC qualification "is advantageous because it allows the trust to be treated as a pass-through entity and claim certain tax exemptions."  <u>Id.</u> at 44 n.3.)

63.    The professional relationship between Cadwalader and Nomura deteriorated when a 1997 REMIC securitization, known as the series 1997-D5 securitization (the "D5 securitization"),[11] "embroiled Nomura in federal litigation and demands for a buyback of a defaulted loan."  <u>Id.</u>

64.    In an effort to recoup its losses, Nomura sued Cadwalader for malpractice, alleging that it failed to provide competent legal advice and perform necessary due diligence concerning whether its securitized commercial mortgage loans qualified as REMIC trusts under federal tax regulations.  <u>Id.</u> at 44.  The evidence, however, ultimately established that it was Nomura's responsibility to review the securitization appraisals and that Nomura did not ask Cadwalader to independently verify the accuracy of Nomura's representations and warranties –

---

[11]The D5 securitization in <u>Nomura</u> consisted of "156 loans, secured by first liens on 220 commercial and multifamily properties"; and, in order for "these mortgage loans to be pooled in a REMIC-qualified trust they had to be in compliance with certain federal Internal Revenue Code requirements, including that substantially all of the assets be 'qualified mortgages and permitted investments' within the meaning of the Code (26 USC § 860D [a] [4])."  <u>Id.</u> at 44.

and, for those reasons, Cadwalader was not required to conduct due diligence on those matters. Id. at 53.

65.    Early in the representation, Cadwalader had advised Nomura that the REMIC regulations required that mortgage loans be secured by real property equal to 80% of the loan. Id. at 50.  Thereafter, over the course of a decade, Cadwalader repeatedly advised Nomura about how to comply with the 80% test during the course of numerous conversations.  Id. at 51.  As new questions would arise, Cadwalader would continually advise Nomura, throughout the ten-year period, concerning the 80% test and what type of collateral would satisfy that test.  Id.  In addition, Cadwalader advised Nomura that, if it had any questions regarding whether a property contained sufficient real property in compliance with the REMIC regulations, Nomura needed to consult with outside counsel prior to making the loan.  Id. at 52.

66.    A reading of the Nomura case seems to indicate that, as in this matter, there was no retainer agreement which determined the scope of the relevant engagement.  Rather, the Court relied on the testimony of Nomura's representatives, a partner at Cadwalader and "testimony from experts regarding the accepted practice of attorneys dealing with REMIC qualification and securitization, which further supports the conclusion that a duty to review appraisals was beyond the scope of Cadwalader's representation."  Id. at 53.

67.    Nomura argued, among other things, that Cadwalader failed to make sure that Nomura understood how to comply with the 80% test.  Id. at 53.  Nomura also argued that Cadwalader failed to conduct the requisite due diligence prior to issuing its pre-closing REMIC opinion letter, which confirmed that the loans in the D5 securitization were REMIC-qualified. Id. at 46, 53.  Cadwalader had also drafted the D5 securitization's pooling service agreement (PSA) and mortgage loan purchase and sale agreement (MLPSA).  The PSA and the MLPSA

stated that Nomura warranted that each mortgage loan was a "qualified mortgage" within the meaning of the Internal Revenue Code, and that the loans in the trust were secured by mortgages on real property with a fair market value of at least 80% of the principal amount of the loan.  Id. at 53.

68.    With respect to Nomura's first claim for failure to advise, the Court found that the "evidence sufficiently established that Cadwalader adequately advised Nomura concerning REMIC qualification as applicable to the D5 securitization."  Id. at 53.

69.    With respect to Nomura's second claim predicated upon a supposed lack of due diligence by Cadwalader, Nomura argued that, under the circumstances, "in order to fulfill its professional responsibilities, Cadwalader could not simply rely on Nomura's representations, but instead had to review the appraisals for all the mortgage loans in the D5 securitization to ensure that each loan was REMIC-qualified."  Id. at 53.  In response, Cadwalader argued that Nomura did not retain it to conduct or review appraisals, specifically, or in its role as securitization counsel, generally.  Id.

70.    Based upon the evidence, the Court of Appeals rejected Nomura's argument which, as discussed below (at pp 46-47, infra), is functionally the same argument advanced in the Wagner Report with respect to, among other things, beneficial ownership under Danish law and the legitimacy of the dividend arbitrage strategy and Solo Capital.  See id. at 54-55.  The Court of Appeals found that the evidence made clear that the parties understood that Nomura – which the Court described as a sophisticated business entity in the securitization field – chose to be responsible for securing the appraisals; reviewing whether, based on those appraisals, the loans complied with the 80% test; and confirming the veracity and accuracy of their own warranties as set forth in the mortgage loan purchase and sale agreement.  Id. at 54.  This is similar to the

situation involving the Argre Principals, who are sophisticated individuals in the structured finance field who chose to be responsible for due diligence over certain aspects of their transactions. The Court in Nomura concluded with the following observation, which is apt in this matter:

> "Essentially Nomura seeks to have us ignore the fact that it assumed the responsibility for ensuring that the loans complied with the 80% test based on independent appraisals that Cadwalader did not conduct or review. However, we cannot ignore that Nomura chose to run its business in this way, and that Cadwalader acted upon and relied on that business model in its representation of Nomura."

Id. at 55.

71.    New York State Appellate Divisions have adhered to the principle established in AmBase and Nomura that "an attorney may not be held liable for failing to act outside the scope of a retainer…." Attallah v. Milbank, Tweed, Hadley & McCloy, LLP, 168 A.D.3d 1026, 1028 (N.Y. App. Div. 2d Dept. 2019) (citing AmBase, supra). Consistent with prior precedent, the Second Department in Attallah concluded that a letter of engagement requiring Milbank to "investigate and consider options that may be available to urge administrative reconsideration of your dismissal from the New York College of Osteopathic Medicine" did not also impose upon it a separate duty to "negotiate administrative reconsideration on the plaintiff's behalf." Id.

72.    District Court Judge John G. Koeltl addressed the issue of scope in Portus Sing. PTE Ltd. v. Kenyon & Kenyon LLP, 449 F. Supp. 3d 402 (S.D.N.Y. 2020). Relying on AmBase, supra, and Attallah, supra, the Court similarly concluded that a failure by a lawyer to take actions outside the scope of that lawyer's representation of a client cannot form the basis of a legal malpractice suit. Portus had instructed Kenyon, without a formal retainer agreement, to file an application for the national stage of the international patent application under 35 U.S.C. § 371, which Kenyon did. Portus then sued Kenyon for malpractice alleging that Kenyon failed to

Case 1:18-md-02865-LAK     Document 1062-1     Filed 06/21/24     Page 46 of 113

"advise Portus about the theoretical advantages of another application." Id. at 413-14. The Court concluded that "Portus has failed to establish that, on the undisputed facts of this case, a reasonable jury could find that Kenyon was negligent, given the scope of the engagement, either when Kenyon failed to advise Portus about the advantages and disadvantages associated with filing a national stage or continuation bypass application in June 2001 or when Kenyon went ahead and filed a national stage application in June 2001." Id. at 419. As the Court explained:

> "Just as in Davis Polk and Milbank, Tweed, the scope of the agreement between the parties in this case did not impose upon the defendant an obligation to advise the plaintiff about matters outside the scope of that representation. In particular, Kenyon had no free-standing obligation separate and apart from the scope of the engagement to advise Portus about the drawbacks and advantages associated with a continuation bypass application and a national stage application in June 2001 when Portus retained Kenyon."

Id. at 414.

73.     I discuss below the above ethical principles as they apply to the Wagner Report.

**5.     UNDER THE ASSUMED FACTS, CONTRARY TO THE WAGNER REPORT, BEN-JACOB REASONABLY RELIED ON THE ARGRE PRINCIPALS TO CONDUCT THEIR OWN DUE DILIGENCE AND WAS PERMITTED TO RELY ON THEIR REASONABLE REPRESENTATIONS.**

74.     The Wagner Report opines that Ben-Jacob should have investigated various aspects of the Argre Principals' trading strategy in light of the following "red flags" assumed in the Wagner Report:

- The "lack of any investment by the Plans, and the use of the Plans as a supposed front for Solo Capital." (Wagner Report at p. 77 ¶166)

- "There was no precedent for the Solo Capital strategy or for the extraordinary fee structure that channeled two-thirds (later three-quarters) of the reclaims to Solo." Id.

43

- "The Plans were supposedly engaging in massive borrowings without the support of any known bank."  Id.

- "The Plans' representations that they were the beneficial owners of Danish shares."  Id.

- "The Plans' representations that they were qualified plans."  Id.

75.     Addressing the last of these points first, Ben-Jacob reasonably relied on his colleagues to provide the appropriate pension law advice in response to queries from the clients.

76.     Tax-qualification of pension plans is a technical issue of pension law, an area in which Ben-Jacob has no relevant experience or knowledge.  He was, therefore, not personally competent to advise on such issues.  As discussed in Paragraph 55, supra, however, a lawyer who is not competent as to an issue is still permitted to handle it where he associates himself with others who *are* competent as to that issue.  This is specifically permitted in Rule 1.1(b).

77.     Ben-Jacob, recognizing his lack of knowledge or experience in issues of pension law, brought in Arthur Woodard (and later Kathleen Wechter) to advise the clients on any pension law issues that arose.  Woodard and Wechter were a Kaye Scholer partner and of-counsel, respectively, with expertise in pension and other employee benefits law matters.  Having associated himself with attorneys with expertise in an area in which he was not competent, Ben-Jacob reasonably relied on his colleagues to provide appropriate advice in that area.  Accordingly, Ben-Jacob had no obligation to monitor for "red flags" with respect to the qualification of the pension plan; nor is it clear, even if he had, that he would have recognized any facts collected as a "red flag" given his lack of knowledge of pension law.

78.     With respect to the remaining "red flags" assumed in the Wagner Report, several observations are in order.

79.     *First*, Kaye Scholer was not retained to advise the Argre Principals on the plans' investment decisions, Solo Capital's strategy that it brought to the Argre Principals, the economics of the fees the Argre Principals agreed to pay, the legitimacy of the counterparties involved in the trading and financing, or the determination of beneficial ownership under foreign law.  Rather, Ben-Jacob personally rendered advice with respect to specific questions posed to him as to matters involving areas within his scope of expertise, including U.S. tax law and standard contract law issues, and other attorneys at Kaye Scholer advised the Argre Principals as to matters on which the Principals requested advice, including U.S. regulatory issues such as Foreign Account Tax Compliance Act issues; U.S. tax form filing requirements triggered by the investments; the tax-qualified status of the plans; and other U.S. pension issues, such as those related to prohibited transactions.  The inclusion of these items in the scope of representation, and the omission of the items discussed at the beginning of this paragraph, is reflected in the 2013 written summary of the significant issues on which Kaye Scholer had advised, which the Argre Principals reviewed and on which they provided input (Exhibit 2240).  This represents a reasonable limitation of responsibility under Rule 1.2, and Ben-Jacob was not required to be competent with respect to issues outside of his area of practice and expertise on which he rendered no advice.

80.     Separately, I have been asked to assume that, although Ben-Jacob reviewed various documents in the course of representing the Argre Principals which related to the trading strategy, Ben-Jacob reviewed those documents only for U.S. tax implications as well as certain advice concerning potential revisions based on the Argre Principals' explanations of the purposes of these contracts and the terms they wished to see incorporated.  But a cabined review of documents related to the trading strategy does not entail an obligation of continuing due

45

diligence on the part of Ben-Jacob as to the economic terms or operation of the trading strategy. Likewise, Ben-Jacob would file TIC reports (see discussion at p. 14, supra) based upon trading data provided by his clients, but he was not retained to perform due diligence with respect to that data. This was a reasonable limitation on scope within the meaning of Rule 1.2.

81.    The position taken by the Wagner Report is similar to the position advanced by the plaintiff in Nomura, 26 N.Y.3d at 44 (discussed supra), and that position was rejected by the Court of Appeals. As discussed above, Nomura alleged that Cadwalader failed to provide competent legal advice and perform necessary due diligence concerning whether its securitized commercial mortgage loans qualified as REMIC trusts under federal tax regulations. Id. (Like pension plans, REMIC trusts are federally regulated entities.) However, despite these regulations, the evidence showed that Nomura chose to take on the responsibility of reviewing the securitization appraisals and that Nomura did not ask Cadwalader to independently verify the accuracy of its representations and warranties – and, for those reasons, Cadwalader was not required to conduct due diligence on those matters. Id. at 53.

82.    Like Nomura, the Argre Principals similarly chose to conduct their own due diligence, such as by spending multiple years investigating dividend arbitrage before participating in it, performing due diligence on Solo Capital and Sanjay Shah, assessing the viability of the strategy and weighing the risks and benefits of participating in it, all without involvement of Ben-Jacob or Kaye Scholer. This was a reasonable limitation on the representation consistent with Rule 1.2(c) to which the Argre Principals consented by virtue of employing Ben-Jacob and Kaye Scholer to advise them on discrete issues. Compare Nomura, 26 N.Y.3d at 44 (client assumed duty to conduct its own due diligence) with RocketFuel Blockchain Co. v. Ellenoff Grossman & Schole LLP, 2022 U.S. Dist. LEXIS 4638, at *10 (S.D.N.Y. Jan. 7,

2022) (law firm's retention to "supervise and manage all necessary due diligence" to effectuate merger was "all-encompassing" and required law firm to perform certain patent law work).

83.     As reflected in an email from Ben-Jacob in April 2011 (WH_MDL_00456451), the Argre Principals were on notice of this limitation when Ben-Jacob explained that he was in no position to advise on the trading mechanics.  And as reflected in an email from Wells in November 2012 (WH_MDL_00288664), the Argre Principals were similarly on notice of this limitation when Wells made clear that Kaye Scholer was not separately opining on foreign legal advice (and, in particular, issues of beneficial ownership) and instead based its advice on an understanding that the foreign lawyer's advice was applicable and favorable.

84.     *Second*, as discussed above (at pp. 26-31), Ben-Jacob was ethically permitted to rely upon his clients' objectively reasonable representations as to factual matters of which he had no actual knowledge, including that the trades actually occurred, issues of beneficial ownership of the Danish shares and Danish dividends; and the basis for Solo Capital's fee.  The Argre Principals chose to run their business in a manner that required them to conduct the due diligence as to these matters, and Ben-Jacob reasonably relied on that business model.  See Nomura, 26 N.Y.3d at 53 ("Nomura chose to run its business in this way, and that Cadwalader acted upon and relied on that business model in its representation of Nomura.").

85.     The Wagner Report argues that Ben-Jacob was not permitted to rely on an "oral assurance" provided by one of his clients (Lhote) that the plans could represent that they beneficially owned Danish shares, and, instead, was required to obtain a written legal opinion. (Wagner Report at p. 78 ¶168)  The Wagner Report does not cite any authority for this position. In my view, based on the ethics literature, an attorney may rely on oral assurances provided by a client where, as discussed above, the assurances are objectively reasonable and not:  (1) facially

incorrect; (2) internally inconsistent; and/or (3) objectively and conclusively inconsistent with other facts known to that lawyer.

86.     The Wagner Report also argues that Ben-Jacob had in his possession an opinion by Hannes Snellman indicating that the plans could not be obligated to pay the reclaim to others as well as other documents reflecting that the plans were obligated to pay the vast majority of the reclaim to others, and argues that these documents were inconsistent with representations made by Ben-Jacob regarding the beneficial ownership of the securities.  (Wagner Report at pp. 86-89, ¶¶188-92)  In this regard, I am aware that the Argre Principals obtained a formal tax opinion prepared by the Danish law firm Hannes Snellman for Solo Capital in support of the dividend arbitrage trading strategy that addressed, among other things, beneficial ownership under Danish law.  (Exhibit 1851)

87.     However, Ben-Jacob was not asked to analyze the Hannes Snellman opinion and, as discussed above, it was not his role to have a full understanding of beneficial ownership issues under Danish law.  Rather, Ben-Jacob received confirmation from Jerome Lhote that the Argre Principals had received sufficient Danish advice to allow them to represent that the plans beneficially owned the relevant securities and were entitled to dividend tax reclaims.  Given that this was an issue of Danish law and the Argre Principals knew that Ben-Jacob was not admitted in Denmark and was not retained to provide advice regarding Danish law, Ben-Jacob reasonably relied on the representations of his client (Lhote) in making factual representations with respect to this issue.

88.     The Wagner Report argues that Ben-Jacob departed from certain unidentified "standards of professional conduct, by suggesting to van Merkensteijn that 'reclaim service fees' be either removed from or recharacterized in Plan records."  (Wagner Report at p. 93, ¶199)  The

Wagner Report does not take the position that this advice was somehow incorrect but, rather, claims that it was an effort to "hide the ball."  Id. at ¶200.  In this regard, I understand that one of the Argre Principals asked Ben-Jacob to review financial statements prepared by an accountant for one of the plans that participated in the trading.  Based upon his tax law experience, Ben-Jacob suggested that removing a heading in the general ledger for "Reclaim Services Fees" was appropriate because it contained a zero entry.  Ultimately, however, Ben-Jacob understood that an accounting professional would make the final decision concerning the entries on the ledger.

89.    The Wagner Report also argues that Ben-Jacob made false representations to the Federal Reserve in response to the question of whether there was a "single" investment advisor. (Wagner Report at p. 92, ¶¶197)  The Wagner Report takes the position that "Ben-Jacob failed to explain how it was appropriate for him and his clients to fail to disclose the role of Solo Capital…."  Id.  However, Ben-Jacob's response that there was no single investment advisor was consistent with his understanding of the facts at the time – i.e., that the Argre Principals worked with multiple entities, including multiple brokers, with respect to the trading.  Ben-Jacob was not involved in the trading mechanics, did not personally know the answer to this question, and relied on his clients for the substance of the response.

90.    As in Nomura, the scope of Ben-Jacob's retention was limited.  Ben-Jacob's initial engagement letters with certain of the Argre Principals described the scope of the engagement as relating to tax and estate planning.  Over the years, Ben-Jacob advised the Argre Principals concerning certain discrete matters within the scope of that engagement, including U.S. tax issues related to dividend arbitrage transactions in Denmark.  He did not provide securities advice, foreign law advice, or advice on any other topic (outside U.S. tax and trusts and estates advice) that may have been relevant to the trading strategies the Argre Principals

pursued. The Argre Principals did not ask Ben-Jacob to review all aspects of the dividend arbitrage investments they entered; and neither Ben-Jacob nor Kaye Scholer was requested to provide a comprehensive assessment of the trading strategy or advise as to its risks and benefits. Moreover, Ben-Jacob understood that various aspects of the trading strategy had been vetted by other counsel, including foreign counsel, or intentionally were being addressed by the Argre Principals themselves, who were sophisticated lawyers and finance professionals with relevant expertise.

91.    The scope of Kaye Scholer's retention can be determined from their course of dealings and communications. I understand that there were no formal engagement letters to cover certain aspects of the work performed by Kaye Scholer and Ben-Jacob. However, Kaye Scholer invoiced the Argre Principals for the time that Ben-Jacob and other Kaye Scholer lawyers billed in responding to their questions. Those invoices included descriptions of the work the lawyers performed, and the time they spent performing it. Wells also circulated a memorandum which described the work performed by Kaye Scholer on various aspects of the matters (Exhibit 2240). It would have been apparent to the Argre Principals from a review of the bills submitted to them, or this memorandum, that Ben-Jacob and Kaye Scholer were not reviewing trading strategy issues and other matters outside the scope of retention. These facts confirm that the Argre Principals would have understood the limited scope of Kaye Scholer's representation, as required by Rule 1.2(c), as do WH_MDL_00456451 and WH_MDL_00288664, discussed at Paragraph 83, supra, which would have alerted the Principals that Kaye Scholer was not advising on the trading mechanics or beneficial ownership under foreign law.

92.     The Wagner Report tacitly acknowledges that investigating whether the plans could truthfully make the representation that they were the beneficial owners of the Danish shares was, in itself, outside the scope of Ben-Jacob's competence, explaining that he should have obtained an expert opinion on this matter (i.e., rather than relying on the representations of his clients).  (Wagner Report at p. 77 ¶167)  However, the Wagner Report cites no authority for the proposition that Ben-Jacob was required to distrust his clients and obtain an opinion on an issue of foreign law which his clients did not request.

93.     *Third*, the Wagner Report opines, among other things, that "massive purchases [by the plans] were supposedly being made by new and unfunded 401(k) plans warranted a clear explanation and understanding of the nature of the strategy" by Ben-Jacob.  The Wagner Report cites no authority in support of this position.  (Wagner Report at p. 76 ¶166)  Wagner provides no reason for why Ben-Jacob should have been suspicious that his high-net-worth clients, some of whom were sophisticated in structured finance, could arrange for funding.  Moreover, the Wagner Report does not reference any assumed facts which support the view that Ben-Jacob or Kaye Scholer were retained to advise the Argre Principals with respect to the trading mechanics, including the volume of purchases and method of funding, which would have required the competence to understand the nature of those mechanics.  (See discussion at p. 37-43, supra, regarding scope of retention determining required scope of competency.)  In fact, it appears that the Wagner Report acknowledges that Ben-Jacob may not have been aware of the scale of the purported transactions.  (See Wagner Report at p. 76 ¶166 n.323 [noting only that "Ben-Jacob *had access* to information on the scale of the purported transactions."] [emphasis added].)

94.     Ben-Jacob was not retained to evaluate and understand the nature of a complex trading strategy, and Ben-Jacob did not hold himself out as an attorney competent to advise on

the nature of a complex trading strategy.  Rather, a review of the matters on which Ben-Jacob and Kaye Scholer advised the Argre Principals demonstrates the limited scope of the retention.

95.    Where, as here, the scope of retention is limited to rendering advice on discrete legal issues such as those listed in Exhibit 2240 and discussed above, there is no separate obligation to assure ongoing compliance and monitor for "red flags" with respect to a pension plan's underlying trading strategy.

96.    Relatedly, I understand that, after Argre disbanded in 2014, Ben-Jacob and Kaye Scholer provided administrative assistance to certain Argre Principals and Robert Klugman in implementing the dividend arbitrage trading strategy.  Among other things, Kaye Scholer attorneys and administrative staff arranged for, at the direction of the clients, the registration of new Delaware LLCs, drafted LLC agreements and other corporate documents, worked with a third-party vendor to prepare form pension plans for new LLCs, applied to the IRS to obtain certifications that these new pension plan was tax-qualified as to form under U.S. tax laws, and coordinated the onboarding of the pensions plans with the various financial entities with which they would need a relationship in order to enter the necessary transactions.

97.    In this regard, the scope of the retention was modified by Ben-Jacob and Kaye Scholer to add an administrative component to the then existing representation but they continued to rely on objectively reasonable factual representations of their clients.  In other words, although Kaye Scholer would have been responsible for making sure the filings it made were accurate, it was permitted to rely on the due diligence of its clients.  As discussed above, case law demonstrates that a law firm may ethically represent a client which makes the decision to conduct their own due diligence.  Neither Ben-Jacob nor Kaye Scholer was requested to provide a comprehensive assessment of the trading strategy or advise as to its risks and benefits.

In such circumstances, a lawyer or law firm (such as Ben-Jacob and/or Kaye Scholer) may rely on the reasonable representations of their clients with respect to factual matters for the purpose of making filings with regulatory agencies.

98.     *Fourth*, the Wagner Report relies extensively on advisory Formal Ethics Opinion 2018-4 of the New York City Bar Association's Committee on Professional Ethics ("City Bar"), which provides guidance but is distinguishable from the assumed facts at issue here.  I discuss this Opinion below to provide context.

99.     In City Bar Opinion 2018-4, the New York City Bar Association's Committee on Professional Ethics addressed the question of what, if any, duties an attorney may have if the attorney is asked by a client to assist in a suspicious transaction.  Opinion 2018-4 observed that the Rule 1.2(d) prohibits a lawyer from *knowingly* assisting a client's crime or fraud, but that the Rules do not explicitly address a lawyer's duty when the lawyer *merely has doubts about the lawfulness* of the client's conduct.  And the Rules do not explicitly require a lawyer to investigate in such circumstances in order to ascertain whether the legal services would, in fact, assist a crime or fraud before assisting the client.  However, Opinion 2018-4 expressed the view that, in some circumstances, a duty of inquiry is "implicit in the Rules."

100.     Opinion 2018-4 arose out of an inquiry by a lawyer who represented a client in the sale of a business.  In the hypothetical, the client had advised the lawyer that the proceeds of the transaction would be used to purchase a different business.  The client directed the lawyer that, after the sale closed, all payments were to be sent to a bank in a well-known secrecy jurisdiction.  The client subsequently asked the lawyer to proceed with the purchase of the second business.  However, while the lawyer was preparing documents for the purchase transaction and doing general due diligence that fell within the scope of their retention, they

realized that the proposed purchase price was much more than the business was worth.  The lawyer also learned, inadvertently, that the client had two passports from other secrecy jurisdictions.  On the basis of this information, the lawyer suspected, but did not know, that the transaction would involve a fraud or crime, such as money laundering or tax evasion, by the client.  In contrast to ABA Opinion 491, where the question arose as to where the lawyer may accept facts provided by a client without further investigation, Opinion 2018-4 addresses an entirely different hypothetical – i.e., one where the lawyer, on their own, suspects fraud and criminality by the client based upon the overtly suspicious nature of the facts presented.

101.    Opinion 2018-4 took the position that, in some circumstances, a transactional lawyer may or will have a duty to investigate a client's conduct and then take other steps.  The Opinion stated that the question of what are the obligations of a lawyer who suspects, but does not know, that a client is engaged in criminal or fraudulent conduct implicates several duties and Rules, in particular, "the lawyer's duties of competence [Rule 1.1], of confidentiality [Rule 1.6], and to refrain from assisting a client in conduct that the lawyer knows is illegal or fraudulent [Rule 1.2(d)]."

102.    Opinion 2018-4 first expressed the view that a lawyer's duty of competent representation under Rule 1.1(a) may, in some circumstances, require the lawyer to conduct due diligence into the client's potentially illegal or fraudulent conduct.  According to the Opinion, in many instances, the purpose of a representation is to provide advice about the lawfulness of a client's proposed course of conduct or to assist the client in structuring a proposed transaction in a manner that conforms to the law.  And Rule 1.2(d) authorizes a lawyer to "discuss the legal consequences of any proposed course of conduct with a client."

103.    Opinion 2018-4 then stated that "competent representation presupposes that the lawyer is rendering assistance in carrying out a client's *lawful* objectives and that "[c]ommitting a crime or engaging in other illegal or fraudulent conduct is not a lawful objective."  (Emphasis added.)  Further, even if a lawyer does not "know" that a client is engaging in or contemplating illegal or fraudulent conduct:

> "furthering a client's illegal or fraudulent transaction – thereby subjecting a client to criminal or civil liability – may run afoul of the Rules if the lawyer did not act competently under Rule 1.1(a). *In general, assisting in a suspicious transaction is not competent where a reasonable lawyer prompted by serious doubts would have refrained from providing assistance or would have investigated to allay suspicions before rendering or continuing to render legal assistance."*  (Emphasis added.)

104.    Opinion 2018-4 also took the position that, in some circumstances, a lawyer who fails to investigate potentially fraudulent or illegal client conduct may violate Rule 1.2(d).  The Opinion observed that, although Rule 1.2(d) only prohibits a lawyer from assisting a client in conduct that the lawyer *knows* to be criminal or fraudulent, Rule 1.0(k) states that "knowledge may be inferred from the circumstances."  And, "consistent with the criminal law standard of 'conscious avoidance,' a lawyer may be deemed to have knowledge that the client is engaged in a criminal or fraudulent transaction if the lawyer is aware of serious questions about the legality of the transaction and renders assistance without considering readily available facts that would have confirmed the wrongfulness of the transaction."  Put another way, "while Rule 1.2(d) does not require lawyers to inquire when there is no ground for suspicion, they cannot ignore 'red flags.'"

105.    Opinion 2018-4 is not similar to the situation involving Ben-Jacob because the hypothetical in Opinion 2018-4 assumed the lawyer *already suspected* that the transaction would involve a crime or fraud – a fact not present here.  Moreover, in contrast to the situation of Ben-

Jacob in which the Argre Principals provided him information that the Wagner Report claims was suspicious, in Opinion 2018-4, the lawyer who was engaged to conduct due diligence had the suspicious information *withheld* from them by their own client and had to discover the information on their own.

106.    More fundamentally, the hypothetical from Opinion 2018-4 is not similar to the situation involving Ben-Jacob because the lawyer in that hypothetical discovered the inflated purchase price in the course of "general due diligence" which was within the scope of that lawyer's retention.    That is a key distinguishing factor.    Ben-Jacob's required scope of competence was determined (and limited) by the scope of his retention; and the Argre Principals did not ask Ben-Jacob to conduct due diligence as to every aspect of the trading strategy.  See Nomura, 26 N.Y.3d at 44.    A hypothetical involving a solo attorney representing a single individual in the sale of a business is far removed from the situation at issue here.

107.    Indeed, Ms. Wagner's conclusions, for the most, are based upon the flawed premise that Ben-Jacob received, scrutinized, and understood certain aspects of this complicated trading strategy, foreign legal advice on the strategy, and certain aspects of pension law, all of which fell outside his role or expertise.    Based upon these incorrect assumptions, Ms. Wagner argues that Ben-Jacob must have seen purported inconsistencies between the legal opinions and the facts or pension law rules and the plans' operation and thereby would have had serious doubts.    This premise is flawed, however, because, as discussed in this report, Ben-Jacob had a limited role in the matter; was not responsible for reviewing and understanding every aspect of the transaction; and, separately, the information that was known to him did not raise red flags. The Wagner Report does not consider the fact that Kaye Scholer's limited scope of engagement

did not require Ben-Jacob to investigate and conduct due diligence in such a manner as would have alerted him to any purported inconsistencies in legal opinions, etc.

108.    *Fifth*, Ben-Jacob's non-secretive conduct throughout the representation further belies the notion that Ben-Jacob aided his clients in fraudulent conduct. During the relevant period of time, Ben-Jacob was a partner in one of the nation's most respected firms, and his open communications with lawyers in that firm about the nature of the representation of the Argre Principals without any apparent effort to hide facts from other lawyers in the firm (e.g., Exhibit 2110) is inconsistent with a concerted effort to engage in fraud.

109.    I understand that, in a September 2013 email (Exhibit 4512), Ben-Jacob asked Woodard to remind the Argre Principals of the several pension issues that were "well into the gray area." Attorneys have a right to assist in transactions which have gray areas: every major law firm, every day, can be seen to have its lawyers asserting aggressive positions in transactional and regulatory matters with respect to issues that are in a gray area. Indeed, that is what creative lawyers do. Further, attorneys are entitled to advise clients of risks associated with gray areas and clients are entitled to decide whether to take on those risks. Here, Ben-Jacob and his firm assisted clients and advised them that certain positions were in the gray area, might not succeed, and might lead to tax penalties. The clients took that advice and decided to proceed. That is a far cry from a violation of Rule 1.2(d), which provides that a "lawyer shall not counsel a client to engage, or assist a client, in conduct the lawyer *knows* is illegal or fraudulent." (Emphasis added.) As discussed above (at para. 24, supra), knowledge is a defined term and means *actual knowledge.* Here, it is my opinion that Ben-Jacob did not knowingly counsel or assist his clients in illegal or fraudulent conduct.

# VII.

## CONCLUSION.

110.    Based on the assumed facts set forth above, it is my opinion that Ben-Jacob reasonably relied on the Argre Principals to conduct their own due diligence with respect to various matters outside the scope of his expertise and retention, and Ben-Jacob was permitted to rely on his clients' objectively reasonable representations with respect to factual matters of which he had no personal knowledge.  It is also my opinion that Ben-Jacob referred matters outside his areas of competence to colleagues with relevant expertise and reasonably relied on those colleagues to provide appropriate advice as to those issues.

Dated: February 1, 2022
    New York, New York


    ____/s/Michael S. Ross____
    Michael S. Ross, Esq.

58

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | MASTER DOCKET<br><br>18-md-2865 (LAK) |
| This document relates to all cases listed in Appendix A. | |

### APPENDIX "A" TO EXPERT REPORT OF MICHAEL S. ROSS

This document relates to the following dockets:

- 1:18-cv-04434-LAK
- 1:18-cv-07824-LAK
- 1:18-cv-07827-LAK
- 1:18-cv-07828-LAK
- 1:18-cv-07829-LAK
- 1:19-cv-01781-LAK
- 1:19-cv-01783-LAK
- 1:19-cv-01785-LAK
- 1:19-cv-01788-LAK
- 1:18-cv-04434-LAK
- 1:18-cv-07824-LAK
- 1:18-cv-07827-LAK
- 1:19-cv-01791-LAK
- 1:19-cv-01792-LAK
- 1:19-cv-01794-LAK
- 1:19-cv-01798-LAK
- 1:19-cv-01800-LAK
- 1:19-cv-01801-LAK
- 1:19-cv-01803-LAK
- 1:19-cv-01806-LAK
- 1:19-cv-01808-LAK
- 1:19-cv-01809-LAK

- 1:19-cv-01810-LAK
- 1:19-cv-01812-LAK
- 1:19-cv-01813-LAK
- 1:19-cv-01815-LAK
- 1:19-cv-01818-LAK
- 1:19-cv-01866-LAK
- 1:19-cv-01867-LAK
- 1:19-cv-01868-LAK
- 1:19-cv-01869-LAK
- 1:19-cv-01870-LAK
- 1:19-cv-01871-LAK
- 1:19-cv-01873-LAK
- 1:19-cv-01894-LAK
- 1:19-cv-01896-LAK
- 1:19-cv-01918-LAK
- 1:19-cv-01922-LAK
- 1:19-cv-01926-LAK
- 1:19-cv-01928-LAK
- 1:19-cv-01929-LAK
- 1:19-cv-01931-LAK
- 1:21-cv-05339-LAK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | MASTER DOCKET |
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | 18-md-2865 (LAK) |
| This document relates to all cases listed in Appendix A. | |

### APPENDIX "B" TO EXPERT REPORT OF MICHAEL S. ROSS

In preparing the expert report, I have reviewed relevant aspects of the following documents provided to me by Ben-Jacob's attorneys:

#### *Bates Stamped Documents*

- JHVM_0007471
- WH_MDL_00355007 – WH_MDL_00355135
- MBJ_STOR-0002851 – MBJ_STOR-0002860
- MBJ_STOR-0004921 – MBJ_STOR-0004926
- MBJ_STOR-0004927-28
- MBJ_STOR-0007019 – MBJ_STOR-0007024
- WH_MDL_00021973 – WH_MDL_00021974
- WH_MDL_00024858 – WH_MDL_00024958
- WH_MDL_00212188 – WH_MDL_00212189
- WH_MDL_00219494
- WH_MDL_00219760
- WH_MDL_00219761 – WH_MDL_00219771
- WH_MDL_00276456 – WH_MDL_00276458
- WH_MDL_00276471 – WH_MDL_00276473
- WH_MDL_00324709 – WH_MDL_00324711
- WH_MDL_00324712 – WH_MDL_00324714
- WH_MDL_00324715 – WH_MDL_00324717
- WH_MDL_00324718 – WH_MDL_00324720
- WH_MDL_00324721 – WH_MDL_00324723
- WH_MDL_00324724 – WH_MDL_00324726
- WH_MDL_00324727 – WH_MDL_00324729

- WH_MDL_00369604 – WH_MDL_00369624
- WH_MDL_00370118 – WH_MDL_00370120
- WH_MDL_00406094
- WH_MDL_00288664 – WH_MDL_00288665
- MBJ_0051855 – MBJ_0051857
- WH_MDL_00456451
- WH_MDL_00283828
- WH_MDL_00283831
- WH_MDL_00283843

### *Exhibits*

- Exhibit 1851
- Exhibit 1852
- Exhibit 2109
- Exhibit 2110
- Exhibit 2189
- Exhibit 2196
- Exhibit 2236
- Exhibit 2238
- Exhibit 2240
- Exhibit 2265
- Exhibit 3111
- Exhibit 3112
- Exhibit 3125
- Exhibit 3128
- Exhibit 4481
- Exhibit 4491
- Exhibit 4492
- Exhibit 4493
- Exhibit 4496
- Exhibit 4502
- Exhibit 4506
- Exhibit 4510
- Exhibit 4512

### *Documents*

- Report of Marcia Wagner dated December 31, 2021
- In Re Skat Tax Refund Scheme Litigation Defendant Michael Ben-Jacob's Objections and Responses to Plaintiff's First Set of Interrogatories

- Transcript of Deposition of Michael Ben-Jacob dated October 11, 2021 (Volume One)
- Transcript of Deposition of Michael Ben-Jacob dated October 12, 2021 (Volume Two)
- Roadcraft Technologies Amended Complaint dated April 21, 2020
- Skatteforvaltningen v. Michael Ben-Jacob, Complaint, dated June 16, 2021

# EXHIBIT A

As of February 1, 2022

**RESUME**

**MICHAEL S. ROSS**

J.D., New York University School of Law, 1974

B.A., Rutgers University, 1971

Principal in:

Law Offices Of Michael S. Ross
One Grand Central Place
60 East 42nd Street
Forty-Seventh Floor
New York, New York 10165
Telephone (212) 505-4060
Facsimile (212) 505-4054
Email "michaelross@RossLaw.org"

Formerly a principal partner in the law firms of LaRossa & Ross,
    from 1998 through November of 2001; LaRossa, Mitchell & Ross,
    from 1986 through 1998; and LaRossa, Cooper, Axenfeld,
    Mitchell & Bergman from 1984 through 1986.

Practice concentrated in the areas of the representation of
    attorneys in ethics and professional responsibility matters.

Assistant United States Attorney, Southern District of New York,
    Criminal Division; May, 1978 through November, 1981.

Assistant District Attorney, Kings County; August, 1974 through
    May, 1978.

Adjunct Professor, Benjamin Cardozo Law School; having taught
    courses over the years in Trial Practice, Advocacy, Judicial
    Administration and Professional Responsibility courses (1979
    through the present) and having served as Faculty Advisor of
    the Cardozo Law School Moot Court Program from 1978 through
    2004. Currently teaching Litigation Ethics (Fall and Spring
    Semesters). Co-founder in 1983 and Executive Director/Team
    Leader (1984 through 2012) of the Law School's annual two week
    Intensive Trial Advocacy Program ("ITAP"). Currently an
    instructor at the annual program and from 1983 through 2019,
    presented the provided the evidence lecturer for the program's
    students.

Adjunct Associate Professor, Brooklyn Law School; teaching
    Professional Responsibility (2005 - to the present [Fall,
    Spring and Summer Courses].

Listed in Martindale-Hubbell's "Bar Register Of Preeminent Lawyers"
    (status as "AV Preeminent Rated Lawyer" with primary practice

Page 1 of 47

areas listed as "Attorney Discipline"; and "Professional
Liability".

Listed in "Super Lawyers" – New York Edition – in the field of
Civil Litigation Defense.

Listed in 2021 in "Best Lawyers in America" as "Lawyer of the Year
in the practice area of Ethics and Professional Responsibility
in New York City;" and in 2021 in 27th Edition of "Best Lawyers
in America" in the practice area of Ethics and Professional
Responsibility Law.

Listed in Who's Who In American Law.

Recipient, "Ethics Practitioner of the Year Award," Institute of
Jewish Humanities (2007).

Recipient, "Educator of the Year Award," Institute of Jewish
Humanities (2017).

Recipient, "Service to the Society Award" from the Legal Aid
Society of the City of New York, 2010 Pro Bono Awards
Presentation.

Member, Continuing Legal Education Advisory Board, New York County
Lawyers Association (2003 to present).

Member, New York State Bar Association Committee on Technology and
the Legal Profession (2017 to present).

Member, Ethics Institute Advisory Board, New York County Lawyers'
Association (2008 to present).

Member, Committee on Professional Discipline of the New York State
Bar Association (1991 through 1994; 1998 to 2004; 2005 to
present).

Member, Committee on Professional Discipline of the Association of
the Bar of the City of New York (various terms).

Member, Committee on Professional Discipline (more recently named
Committee on Professionalism and Professional Discipline), New
York County Lawyers Association (1992 to present).

Member, Special Committee on the Unlawful Practice of Law, New
York State Bar Association (2005).

Member, Committee on Mass Disaster Response (which addresses, in
part, the manner in which lawyers attempt to solicit clients
after mass disasters), New York State Bar Association (2000 to
present).

Member, Task Force On Lawyer Advertising, New York State Bar Association (2005 to 2007).

Member, New York State Continuing Legal Education Board (Chair, Subcommittee on Pro Bono Credits; Chair, Subcommittee on Internet Issues). Among other things, the Board addresses the accreditation of continuing legal education providers in the State (appointment by the Presiding Justice of the Division, First Department - 2000 to 2005 [having served two consecutive terms].

Member, Special Committee on Procedures for Judicial Discipline of the New York State Bar Association (2001).

Section Liaison of the American Bar Association Criminal Justice Section to the American Bar Association Standing Committee on Ethics and Professional Responsibility (1994-1997).

Member, American Bar Association "Criminal Justice Council" – the twenty member policy making body of the ABA's Criminal Justice Section (1990 through 1993).

Member, New York Council of Defense Lawyers (1987 through present); former member of the Board of Directors (1989 through 1992).

Former Chairperson, Association of the Bar of the City of New York, Committee on Criminal Advocacy (1988-1990).

Former Chairperson, American Bar Association "Grand Jury Committee" (1988 through 1990); Vice-Chairperson (1987-1988).

Member, American Bar Association Special "Criminal Justice In Crisis Committee" (1988 through 1990).

Member, American Bar Association Special Nine Member "Committee On Criminal Justice In a Free Society" (1987 through 1988).

Member, New York State Association of Criminal Defense Lawyers; former member of Board of Directors (1987-1989).

Member, New York City Bar Association Subcommittee on "U.S. Sentencing Commission Guidelines" (1986 and 1987).

Member, National Order of the Barristers (elected in 1981).

CourtTV Live Guest On-Air Commentator, on forty-two occasions between 1999 and 2006.

Bloomberg 1130 Radio Live Guest, "The Money Show," discussing how the public can deal with lawyer misconduct, May 15, 2002.

Lecturer, "The Disciplinary Process In The First Judicial Department," presented as part of the mandatory continuing legal education for newly admitted attorneys in the Division, First Judicial Department, October 18, 2017.  (The video of this presentation is now part of the required viewing for all newly admitted attorneys in the First Judicial Department.)

Lecturer at monthly swearing-ins of all new attorneys in the Division, First Judicial Department, speaking on the topic of "The Ethical Issues Facing Newly Admitted Attorneys," (1999 through 2010; and May 4, 2016).

Instructor at National Institute of Trial Advocacy ("NITA"), National Program in Boulder, Colorado (July 2000).

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 8, 9 and 10, 2019).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 9, 2019).

Instructor at NITA, Northeast Region held at Hofstra Law School in: 1980; 1981; 1982; 1983; 1984; 1985; 1986; 1987; 1988; 1989; 1990; 1991; 1992; 1993; 1994; 1995; 1996; 1997; 1998; 1999; 2000; 2001; 2002; 2003; 2004; 2005; 2006; 2007; 2008; 2009; 2010; 2011; 2012; 2013; 2014; 2015; 2016; 2017; 2018; 2019; and 2021.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA") Northeast Regional Program at Hofstra Law School, August 12, 2021 (and at each of the previous annual programs since 1998).

Panelist, "Ethical Issues: What To Do When You Mess Up/Make A Mistake," Continuing Legal Education Program sponsored by the American Bar Association Family Law Section, New Orleans, La. (April 23, 2022).

Panelist, "Thou Shalt Not Commingle Funds and Other Related Legal Ethics Commandments" Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, February 9, 2022.

Lecturer, "Avoiding the Grievance Committee with Today's Technology," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, November 5, 2021.

Panelist, "The Ethics Of BS," Continuing Legal Education Program sponsored by the Federal Bar Council and the Eastern District Association, November 4, 2021.

Panelist, "How to Prevent Common Disciplinary Problems," Continuing Legal Education Program sponsored jointly by the Attorney Grievance Committee for the First Judicial Department and the New York County Lawyers Association, October 27, 2021.

Lecturer, "Ethics Update For Court Attorneys," Continuing Legal Education Program for Appellate Division staff, Second Judicial Department, sponsored by the  Division, Second Judicial Department, October 6, 2021.

Lecturer, "Ethics: 2020-2021 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, September 30, 2021.

Panelist , "Annual Ethics Update 2021," Continuing Legal Education Program sponsored by the Queens County Bar Association, four hour program presented on May 6 and May 11, 2021.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (April 16, 2021).

Panelist, "Ethics Issues That Keep Lawyers Up at Night," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, March 16, 2021.

Lecturer, "Legal Malpractice 2021:  The New York Disciplinary Process and Law Firm Risk Management," Continuing Legal Education Program sponsored by the Torts, Insurance and Compensation Law Section and Trial Lawyers Section, New York State Bar Association, March 12, 2021.

Panelist, "The Ethics Of Accepting A Frivolous Or Questionable Representation," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 19, 2021.

Panelist, "A CLE Evening on American and Talmudic Law," Continuing Legal Education Program sponsored by Touro Law School and the Chabad of Armonk, Chappaqua and Pleasantville, December 8, 2020.

Panelist and Lecturer, "The Litigator's Duty To The Truth," and "Ethics:  2019-2020 Update," Continuing Legal Education Program sponsored by the Division, Third Judicial Department, Albany, New York, December 1, 2020.

Panelist, "Ethics & Professionalism: Best Practices for Attorneys 2020," Continuing Legal Education Program sponsored by the Committee on Professional Discipline, of the Association of the Bar of the City of New York, October 19, 2020.

Panelist, "Ethical Issues In Dealing With The Covid-19 Pandemic," Continuing Legal Education Program sponsored by the Brooklyn Women's Bar Association, October 2, 2020.

Lecturer, "Ethics: 2019-2020 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, September 29, 2020.

Panelist, "The Lawyer's Obligation to Avoid Counseling or Assisting in a Crime or Fraud: ABA Formal Opinion 491 and Beyond," Webinar sponsored by Celesq Attorney Education Center, June 8, 2020.

Panelist, "Law Firm Life Savers: What You Need to Know to Keep Your Practice Running During COVID-19 – Ethical Implications of the Virus for Attorneys," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, April 10, 2020.

Panelist, "Annual Ethics Update 2020," Continuing Legal Education Program sponsored by the Queens County Bar Association, March 11, 2020.

Lecturer, "Ethics Update For Court Attorneys," Continuing Legal Education Program for Law Clerks to the  Division, Second Judicial Department, sponsored by the  Division, Second Judicial Department, February 20, 2020.

Panelist, "When the Lawyer is Obliged to Turn Against His Client," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 28, 2020.

Lecturer, "Ethics: 2018-2019 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 27,2019]); (Long Island, New York [September 29,2019]); (Brooklyn, New York [November 15, 2019]);(Westchester, New York [November 8, 2019]).

Panelist, "The Attorney Client Privilege in the Age of Corruption Investigations," Continuing Legal Education Program sponsored by the Criminal Advocacy Committee of the Association of the Bar of the City of New York, June 30, 2019.

Panelist, "25 Trial Issues That Keep You Up In The Middle Of The Night," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, June 17, 2019.

Lecturer, "Conflicts Of Interest For Court Attorneys," Continuing Legal Education sponsored by the Division, First Judicial Department, June 7, 2019.

Lecturer, "Hot Topics In Ethics 2019," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers; Albany, New York (April 3, 2019); Syracuse, New York (April 3, 2019); Rochester, New York (April 4, 2019); Buffalo, New York (April 4, 2019); Brooklyn, New York (May 22, 2019); and Westchester, New York (May 23, 2019).

Panelist, "Professional Discipline: A Year In Review," Continuing Legal Education Program sponsored by the Professional Discipline of the Association of the Bar of the City of New York, March 28, 2019.

Lecturer, "Legal Malpractice 2019: Attorney Discipline and Risk Management for Lawyers," Continuing Legal Education Program sponsored by the Law Practice Management Committee and the Committee for Continuing Education of the New York State Bar Association, New York City, March 25, 2019.

Panelist, "Annual Ethics Update 2019," Continuing Legal Education Program sponsored by the Queens County Bar Association, February 27, 2019.

Panelist, "The Ethical Obligations of a Lawyer to Learn the *True* Facts," New York State Bar Association General Practice Section & Committee On Professional Discipline, Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 15, 2019.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 9, 10 and 11, 2018).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 11, 2018).

Lecturer, "A 2018 Ethics Update: An Analysis Of Key Decisions And Opinions," Continuing Legal Education Program sponsored by the Division, Third Judicial Department, Albany, New York, October 25, 2018.

Panel Moderator, "Ethics for Corporate Counsel 2018," Continuing Legal Education Program sponsored by the New York State Bar

Association Corporate Counsel Section and the Continuing Legal Education Committee, November 30, 2018.

Lecturer, "Ethics: 2017-2018 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 21,2018]); (Long Island, New York [September 28,2018]); (Brooklyn, New York [November 2, 2018]);(Westchester, New York [November 16, 2018]).

Lecturer, "Raising The Bar: Creating An Ethical And Inclusive Workplace," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (Plainview, New York [June 28, 2018]; Brooklyn, New York [September 12, 2018]).

Lecturer, "Ethical Concerns for Cross-Examination," Cross to Kill 2018 Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, New York, New York(May 4, 2018).

Lecturer, "2018 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, February 15, 2018.

Moderator and Panelist, "Law Firm Cyber Protection: Everything You Wanted To Know," New York State Bar Association Commercial & Federal Litigation Section Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 24, 2018.

Panelist, "Whistleblowers, Reporting Up, and the Professional Rules of Conduct," New York State Bar Association Business Law Section & Corporate Counsel Section Continuing Legal Education Ethics Program, Annual Meeting of the New York State Bar Association, New York City, January 24, 2018.

Moderator and Panelist, "Loose Lips and Emailing Lawyers: The Ethics of Protecting Client Confidences," Continuing Legal Education Program sponsored by the New York State Bar Association General Practice Section and the Committee on Professional Discipline, Annual Meeting of the New York State Bar Association, New York City, January 23, 2018.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 11, 12 and 13, 2017).

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 13, 2017).

Lecturer, "Ethics: 2016-2017 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [October 13, 2017]); (Long Island, New York [October 27, 2017]); (Brooklyn, New York [November 3, 2017]);(Westchester, New York [November 17, 2017]).

Instructor, National Institute of Trial Advocacy ("NITA") LEAP (New York City metropolitan area consortium of public interest organizations) Teacher Training Program, New York City, October 2, 2017.

Lecturer, "Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Queens Law Associates (Criminal Defender Group), July 10, 2017.

Panelist, "Injustice and Ethics," Continuing Legal Education Program for Court Attorneys, sponsored by the Division of the Supreme Court, Second Judicial Department, June 28, 2017.

Panelist, "Injustice and Ethics," Continuing Legal Education Program sponsored by Stroock & Stroock & Lavan, LLP, June 12, 2017.

Panelist, "A 2016-2017 Ethics Update: A Review Of Key Cases And Ethics Opinions," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 10, 2017.

Panelist, "Legal Malpractice 2017: Attorney Discipline and Risk Management for Lawyers," Continuing Legal Education Program sponsored by the New York State Bar Association Continuing Legal Education And Practice Management Committee, New York City(March 24, 2017) and Melville, New York (March 31, 2017).

Lecturer, "Hot Topics In Ethics 2017," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers Syracuse, New York (March 8, 2017); Rochester, New York (March 9, 2017); Buffalo, New York (March 9, 2017);New York City (April 5, 2017); Long Island, New York (April 6, 2017); and Brooklyn, New York (April 20, 2017).

Panelist, "Current Ethics Issues In Commercial Litigation," Continuing Legal Education Program sponsored by the Commercial and Litigation Section of the New York State Bar Association, New York State Bar Association Annual Meeting, New York City, January 25, 2017.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma. (December 8, 2016).

Lecturer, "Recurring Ethical Issues For Criminal Defense Attorneys: Superstar Trial Seminar 2016," Continuing Legal Education

Program sponsored by the New York State Association of Criminal Defense Lawyers, Rochester, New York(December 2, 2016).

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 7 and 8, 2016).

Lecturer, "Ethics: 2015-2016 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 3, 2016]); (Long Island, New York [September 30, 2016]); (Brooklyn, New York [November 4, 2016]);(Westchester, New York [November 18, 2016]).

Panelist, "Common Disciplinary Problems and How to Prevent Them: Use of Client Funds and Escrow Accounts," Continuing Legal Education Program for the Manhattan District Attorney's Office, sponsored by the Policy Committee of the Grievance Committee for the First Judicial Department, November 16, 2016.

Panelist, "Understanding Potential Liability With Respect To Quickly Developing And Changing Social Media Landscape: Best Practices For Making Sure That Attorneys Don't End Up With Clients They Never Intended To Represent And The Ethics Of Using Social Media In Jury Selection, Monitoring And Investigation," American Conference Institute Forum on Lawyers' Professional Liability/Legal Malpractice, New York City, October 24, 2016.

Panelist, "New York's New Statewide Disciplinary Rules," Continuing Legal Education Program sponsored by Brooklyn Law School's Center For Criminal Justice, October 29, 2016.

Panelist, "Ethical Issues Arising From The Panama Papers Incident," Continuing Legal Education Program sponsored by the Federal Bar Council, Federal Bar Council Fall Bench and Bar Retreat, Skytop Lodge, Skytop, Pa. October 21, 2016.

Panelist, "Defending the Indefensible: Navigating the Strategic and Ethical Landscape of Defending Clients Who Have Engaged in Indefensible Conduct;" Continuing Legal Education Program sponsored by the Tort, Trial and Insurance Practice Section of the American Bar Association ("ABA"); ABA Annual Meeting, San Francisco, Ca. (August 5, 2016).

Lecturer, "Nuts & Bolts Part I: The Ethics Of IOLA Accounts," Continuing Legal Education Program sponsored by the Asian American Bar Association of New York, June 22, 2016.

Panelist, "A 2015-2016 Ethics Update: A Review Of Key Cases And Ethics Opinions," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 11, 2016.

Lecturer, "2016 Ethics Update For Criminal Law Practitioners And An Introduction To The New State-Wide Uniform Disciplinary Procedures," Continuing Legal Education Program sponsored by the Division, First Department, Assigned Counsel Plan, March 24, 2016.

Panelist, "The Disciplinary Process And Sanctions In The First Judicial Department," Continuing Legal Education Program sponsored by the Policy Committee of the Departmental Disciplinary Committee for the First Judicial Department, March 16, 2016.

Lecturer, "2016 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, March 10, 2016.

Moderator, "Implementation Of Uniform Rules and Sanctions As Proposed by the Commission On Statewide Attorney Discipline," Continuing Legal Education Program sponsored by the New York State Bar Association General Practice Section and the Committee on Professional Discipline, Annual Meeting of the New York State Bar Association, New York City, January 26, 2016.

Lecturer, "Ethical Considerations In Investigations Utilizing Deception," Continuing Legal Education Program sponsored by the National Attorney General Training And Research Institute, Miami, Fla., December 8, 2015.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma., December 7, 2015.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 6 and 7, 2015).

Panelist, "A Continuing Legal Education Evening On American and Talmudic Law: Ethical Yet Effective Practice," Continuing Legal Education Program sponsored by the Jewish Legal Society, December 3, 2015, 2015 (Armonk, New York).

Lecturer, "Ethics: 2014-2015 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (New York City [September 25, 2015]); (New Hyde Park, New York [October 2, 2015]); (Brooklyn, New York [November 13, 2015]);(West Harrison, New York [November 20, 2015]).

Lecturer, "The Legal Aid Lawyer – A Review Of Conflict Of Interest and Related Principles," Continuing Legal Education Program sponsored by the Legal Aid Society of the City Of New York, September 16, 2015.

Lecturer, "The Ethical Use Of Deception And Interference In The Political Process," Continuing Legal Education Program sponsored by the National Attorney General Training And Research Institute, Philadelphia, Pa., June 10, 2015.

Instructor, National Institute of Trial Advocacy ("NITA") LEAP (New York City metropolitan area consortium of public interest organizations) Teacher Training Program, New York City, May 18, 2015.

Moderator and Panelist, "Exploring Attorney Client Privilege Among General Counsel," Continuing Legal Education Program sponsored by the Commercial and Federal Litigation Section, New York State Bar Association Spring Meeting (Sagamore, N.Y.), May 16, 2015.

Lecturer, "A Fresh Look At The Law Of Retainer And Fee Sharing Agreements," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, April 22, April 23, May 13 and May 14, 2015 (Albany, New York; Syracuse, New York; Rochester, New York; Buffalo, New York).

Panelist, "A 2014 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, April 29, 2015.

Panelist, "The Lawyer's Duty to Check His/Her Facts," Continuing Legal Education Program sponsored by Stroock & Stroock & Lavan, LLP, March 11, 2015.

Panelist, "Sanctions in Criminal and Civil Proceedings and the Implications for Ethics and Professional Discipline," Continuing Legal Education Program sponsored by the General Practice Section & Committee on Professional Discipline, New York State Bar Association Annual Meeting, February 23, 2015.

Lecturer, "A 2014 Ethics Issue Review," Continuing Legal Education Program sponsored by the Division, Third Judicial Department, Albany, New York, January 23, 2015.

Lecturer, "New York's New Contingent Fee Retainer Rule," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, January 21, 2015, Brooklyn Bar Association, Brooklyn, New York.

Lecturer, "Ethical Issues In Aggressive Litigation," National Institute of Trial Advocacy ("NITA"), Building Trial Skills Program, Boston, Ma., December 8, 2014.

Speaker, "Aiding and Abetting Claims Against Professionals," DRI Professional Liability Seminar, New York City, December 4, 2014.

Instructor, National Institute of Trial Advocacy ("NITA") Building Trial Skills Program, Boston, Ma. (December 7 and 8, 2014).

Panelist, "Disciplinary Actions:  What To Do When You Receive The Notice From Your State Bar," American Conference Institute Forum on Legal Malpractice Litigation/Legal Malpractice, New York City, November 19, 2014.

Lecturer, "Important Issues In Ethics And Criminal Law," Continuing Legal Education Program sponsored by the Suffolk County Criminal Bar Association, October 30, 2014.

Panelist, "Juror Misconduct," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Inn at Pocono Manor, October 26, 2014.

Lecturer, "Important Ethical Issues for Federal Practice," Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, October 24, 2014.

Panel Moderator, New York State Bar Association Corporate Counsel Section's Fall Continuing Legal Education Ethics Program, October 23, 2014.

Lecturer, "A Critical Update:  New York's New Contingent Fee Retainer Rule," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (October 1, 2014 [New York City] and May 15, 2014 [Plainview, New York]).

Lecturer, "Hot Topics In Ethics: 2013-2014", Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (New York City, Brooklyn; Buffalo; Syracuse; Rochester, Albany; Plainview; April - June 2014).

Panelist, "A 2013-2014 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 8, 2014.

Panelist, "Interacting With The Media In High-Profile Cases," Continuing Legal Education Program sponsored by the Winston & Strawn law firm, April 29, 2014.

Lecturer, "2014 Ethics Update For Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, February 28, 2014.

Panelist, "Common Disciplinary Problems and How to Prevent Them," Continuing Legal Education Program sponsored by the Policy Committee of the Departmental Disciplinary Committee for the First Judicial Department, January 9, 2014.

Lecturer, "Emerging Ethical Issues For the Criminal Defense Practitioner," Federal Practice for the State Practitioner, Continuing Legal Education Program sponsored by the New York State Association of Criminal Defense Lawyers, October 4, 2013.

Lecturer, "The Ethics Of Reporting Attorney Misconduct; Correction Of fraud By Clients And Others; and Fee Sharing," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, July 23, 2013.

Panelist, "Ethics and the Municipal Practitioner," Thirteenth Annual Municipal Law Institute, Practicing Law Institute, July 12, 2013.

Panelist, "Legal Malpractice," Continuing Legal Education Program for Principal Law Clerks in the First and Second Judicial Departments, sponsored by the  Division, First Judicial Department, June 25, 2013.

Panelist, "Ten Important Keys For A Criminal Practitioner To Understand In Order To Avoid Ethical Difficulties," Continuing Legal Education Program sponsored by the New York Women's Bar Association, June 18, 2013.

Lecturer, "Ethical Conflicts," Webcast sponsored by the Federal Bar Council, June 12, 2013.

Panelist, "The Role of Empathy in Judicial Decision Making," sponsored by the New York County Lawyers' Association," May 2, 2013.

Lecturer, "Ethical Issues in Civil and Criminal Litigation," Continuing Legal Education Program for Court Attorneys, Principal Law Clerks and Law Secretaries, sponsored by the Division, Second Judicial Department, Brooklyn, New York, April 24, 2013..

Lecturer, "Ethics: 2012-2013 Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers (Brooklyn, New York [June 5, 2013]; New York City [June 6, 2013]; Buffalo [April 10, 2013]; Syracuse, New York [April 9, 2013]; Rochester, New York [April 10, 2013]; Albany, New York [April 9, 2013]; Plainview, New York [June 13, 2013]).

Panelist, "A 2011-2012 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, February 20, 2013.

Lecturer, "Ethics and Lawyer Civility," Continuing Legal Education Program sponsored by the Torts, Insurance and Compensation Law Section and Trial Lawyers Section, New York State Bar Association Annual Meeting, New York City, January 24, 2013.

Lecturer, "The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the Division, Third Judicial Department, Albany, New York, December 5, 2012.

Lecturer, "Ethics/Mandatory Reporting Laws In A Multi-Disciplinary Practice," Continuing Legal Education Program sponsored by the Life Care Planning Law Firms Association, Cleveland, Ohio, October 12, 2012.

Panelist (and drafter of Program Hypotheticals), "America's Got Ethics," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Skytop, Pa., September 23, 2012.

Lecturer, "A 2012 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," (New York City [September 21, 2012], Hauppage, New York [September 28, 2012]); Brooklyn, New York [November 16, 2012]); and Westchester, New York (November 30, 2012).

Panelist, "Balancing Duty To Clients With Duty Of Candor To Courts," United States Immigration Court, Southern District of New York Annual Judges Training Program, July 23, 2012.

Panelist, "The Business of Criminal Law:  Retainer Agreements," Continuing Legal Education Program, New York State Association of Criminal Defense Attorneys, July 11, 2012.

Lecturer, "2012 New York Ethics Update," Continuing Legal Education Program sponsored by the Kings County Law Secretaries Association, June 12, 2012.

Speaker, "Ethical Pitfalls Facing The Newly Admitted Lawyer," Orientation Program for Newly Admitted Attorneys, sponsored by the Division, Second Judicial Department, June 8, 2012.

Panelist, "The Interface Between Legal Malpractice Actions And Disciplinary Proceedings," 38th American Bar Association National Conference On Professional Responsibility, Continuing Legal Education Program, Boston, Ma., May 31, 2012.

Lecturer, "The New Ethical Tererain: The Ethical Challenges Of Electronic Data," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, May 30, 2012.

Lecturer, "15 Ethical Scenarios Attorneys Must Know," Continuing Legal Education Program sponsored by LawLine, May 22, 2012.

Panelist, "Inequitable Conduct Before And After The AIA" and "Conflicts Arising In Patent Litigation," The New York Intellectual Property Law Association Annual Meeting Program, Continuing Legal Education Program, May 22, 2012.

Lecturer, "Ethical Pitfalls In Padilla C.P.L. Section 440 Proceedings," Continuing Legal Education Program conducted by New York County Defender Services, May 17, 2012.

Lecturer, "When The '*Rubber Hits The Road':* How Ethical Principles Relating To Conflict And Candor Can Collide," Continuing Legal Education Program, National Academy of Elder Law Attorneys Annual Conference, Seattle, Washington, April 28, 2012.

Lecturer, "Bridge The Gap Program:  The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, April 22, 2012.

Lecturer, "The Seven Dangerous Ethical Challenges," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (Syracuse, New York [April 17, 2012]; Brooklyn, New York [April 19, 2012]; Buffalo [April 25, 2012]; Albany, New York [April 17, 2012]; New York City [May 21, 2012]).

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, April 13, 2011.

Lecturer, "Ethics in Criminal Law:  A 2011-2012 Ethics Update," Continuing Legal Education Program sponsored by the Kings County Criminal Bar Association, March 29, 2012.

Panelist, "Ethics And Professional Misconduct: An Ethics Update 2010-2011," Continuing Legal Education Program sponsored by the Puerto Rican Bar Association, March 7, 2012.

Panelist, "The Ethics Of Aggressive Lawyering," Continuing Legal Education Program sponsored by The Jewish Lawyers Guild and Stroock & Stroock & Lavan, LLP, February 28, 2012.

Lecturer, "A 2010-2011 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," (New York City [September 23, 2011], Plainview, New York [September 24, 2011]) and Brooklyn, New York [November 18, 2011]).

Lecturer, "Cutting Edge Ethics Issues For 2011," Continuing Legal Education Program sponsored by LawLine, November 29, 2011.

Lecturer, "A 2010-2011 Ethics Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, November 16, 2011.

Lecturer, "Ethical Issues in Connection With An Attorney's Handling Of Potentially False Documents," Continuing Legal Education Program sponsored by the National Academy of Elder Law Attorneys, National Aging and Law Institute, Boston, Ma. November 11, 2011.

Panelist, "Best Practices for Solo and Small Firm Practitioners," Convocation on Lawyer Independence Challenges and Best Practices Continuing Legal Education Program sponsored by the New York State Judicial Institute on Professionalism in the Law and Hofstra Law School, November 4, 2011.

Panelist, "Public Forum on Judicial Independence," sponsored by the New York County Lawyers' Association," November 2, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 4, 2011.

Panel Moderator, "Ethics Panel – Annual Seminar – Criminal Law, Procedure and Evidence," Continuing Legal Education Program sponsored by Brooklyn Law School, September 17, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 11, 2011.

Lecturer, "Ethical Issues Relating To Candor By Attorneys," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, July 26, 2011.

Lecturer, "Top Ten Ethical Tips for Practicing Law in New York," Continuing Legal Education Program sponsored by the Division, First Department, Assigned Counsel Plan, May 9, 2011.

Lecturer, "Bridge The Gap Program: New York New Rules Of Professional Conduct – A Critical Key To Litigating Ethically And Avoiding Pitfalls," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, April 17, 2011.

Presenter, "New York New Rules Of Professional Conduct – A Critical Key To Litigating Ethically And Avoiding Pitfalls," Continuing Legal Education Program sponsored by LawLine, April 12, 2011.

Panelist, "Crossing the Line:  When Sharp Practice Becomes Unethical," Continuing Legal Education Program sponsored by the Medical Malpractice Committee of the Association of the Bar of the City of New York, April 7, 2011.

Lecturer, "Hot Topics in Ethics: Litigation and Conflicts," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, (Brooklyn, New York [March 3, 2011]; New York City [March 3, 2011]; Buffalo [March 9, 2011]; Syracuse, New York [March 10, 2011]; Rochester, New York [March 10, 2011]; Albany, New York [March 11, 2011]; Plainview, New York [March 17, 2011]).

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 7, 2011.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 3, 2011.

Lecturer, "The Ethics Of Dealing With Possibly Fraudulent Documents," Continuing Legal Education Program sponsored by the New York State Bar Association Elder Law Section, 2010 Fall Section Meeting, White Plains, New York, October 30, 2010.

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 5, 2010.

Panelist, "Or Else:  Blackmail, Extortion, Threats and Damage Control In Negotiations," Continuing Legal Education Program sponsored by the Federal Bar Council, Fall Bar Council Fall Retreat Presentation, Lenox, Massachusetts, October 3, 2010.

Lecturer, "A 2009-2010 Ethics Update," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," September 24 and September 25, 2010 (New York City and Plainview, New York).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing

Legal Education Program sponsored by the Practicing Law Institute, August 12, 2010.

Lecturer, "New York's New Rules of Professional Responsibility: The First Year's Shake Out," Continuing Legal Education Program sponsored by the Benjamin N. Cardozo School of Law, May 23, 2010.

Panelist, "The Dissection and Treatment of Ponzi Schemes in the Post-Madoff Word," Continuing Legal Education Program sponsored by the Federal Bar Council, United States Courthouse, Eastern District Federal Courthouse, Central Islip, New York, May 13, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," March 23, 2010 (Rochester, New York and Buffalo, New York).

Panelist, "Representing Clients in Federal and State Criminal Tax Investigations: Defense Strategies and Prosecution Initiatives Every Attorney Needs to Know," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 11, 2010.

Lecturer, "Legal Fee Disputes: Old Issues, New Rules," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers and the Brooklyn Bar Association," March 10, 2010.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 1, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," January 27, 2010 (Syracuse, New York and Albany, New York).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 19, 2010.

Lecturer, "Legal Fees and Disputes," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers," December 2, 2009 (Plainview, New York) and December 7, 2009 (New York City).

Panelist, "Decoding The New Rules Of Professional Conduct: The Changes That Matter," Continuing Legal Education Program

sponsored by the Federal Bar Council, United States Courthouse, Southern District of New York, Central Islip, New York, December 3, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009," Continuing Legal Education Program sponsored by the Queens County Bar Association, November 17, 2009.

Lecturer, "The 2009 Ethics Update," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, October 14, 2009.

Panelist, "The Attorney Disciplinary Process in Federal Court," Continuing Legal Education Program sponsored by the American Bar Association Section of Real Property, Trust and Estate Law (October 7, 2009).

Lecturer, "Ethics Update – 2008," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, October 2, 2009 (New York City) and October 3, 2009 (Smithtown, N.Y.).

Lecturer, "What Every Attorney Must Know About Ethics," and Panelist, "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, September 21, 2009.

Panelist, "Defending Immigration Removal Proceedings 2009 – Ethical Issues in Removal Proceedings," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 18, 2009.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 13, 2009.

Panelist, "What Every Attorney Must Know About Ethics," and "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 13, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Criminal Law Practitioners," Continuing Legal Education Program sponsored by the Division, First Department, Assigned Counsel Plan, May 18, 2009.

Panelist, "Decoding The New Rules Of Professional Conduct: The Changes That Matter," Continuing Legal Education Program sponsored by the Federal Bar Council, Central Islip, New York, May 14, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by Brooklyn Defender Services, April 28, 2009.

Lecturer, "Ethics for Criminal Defense Attorneys," Criminal Advocacy Institute:  Criminal Defense Practice, Continuing Legal Education Program sponsored by the New York County Lawyers Association, April 23, 2009.

Lecturer, "New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by District Council 37 (AFSCME) Municipal Employees Legal Services, New York University School of Law, April 7, 2009.

Lecturer, "Ethics Update:  Need-to-know Information about New York's New Ethical Rules Effective April 1, 2009 As They Relate To Assigned Criminal Counsel," Continuing Legal Education Program sponsored by the New York State Defenders Association, New York University School of Law, February 28, 2009.

Lecturer, "Ethics In Litigation," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, February 27, 2009.

Lecturer, "Ethics Update:  New York's New Ethical Rules Effective April 1, 2009," Continuing Legal Education Program sponsored by the Kings County Chapter Of The American Inns of Court, Kings County Supreme Court, February 24, 2009.

Panelist, "Private Conduct:  Should It Be Subject To Discipline?" Continuing Legal Education Program sponsored by the New York State Bar Association Committee on Professional Discipline for the State Bar's Annual Meeting, New York City, January 28, 2009.

Lecturer and Panelist, "What Every Attorney Must Know About Ethics," and "The Deadly Dozen: Twelve of the Most Common Mistakes Lawyers Make When Dealing With Clients," Continuing Legal Education Program sponsored by the Practicing Law Institute, January 20, 2009.

Panelist, "Confronting Ethical Issues Arising in Criminal Law Practice – The Search for Truth, Zealous Advocacy v. Zealous Ethics in Criminal Law," Continuing Legal Education Program sponsored by the New York County Lawyers Association, November 19, 2008.

Panelist, "Managing Complex Litigation 2008: Ethical Issues Arising In Settlements," Continuing Legal Education Program sponsored by the Practicing Law Institute, November 11, 2008.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, October 7, 2008.

Lecturer, "Conflicts Of Interests: Thinking 'Inside The Box' On Issues Of Informed Consent And Multiple Representation," Continuing Legal Education Program sponsored by the Columbian Lawyers Association, October 7, 2008.

Lecturer, "Ethics Update – 2008," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, September 27, 2008 (New York City) and September 28, 2008 (Melville, N.Y.).

Lecturer, "Ethical Issues Relating To Judicial Recusal And Conflicts Of Interest In New York State," Continuing Legal Education Program sponsored by the Association Of Justices Of The Supreme Court Of The State Of New York, September 19, 2008 (West Point, New York).

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, August 14, 2008.

Panelist and Moderator, "Ethics In Litigation:  A 2008 Update," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, July 30, 2008.

Lecturer,"Professional Responsibility Fundamentals: Common Ethical Issues In Litigation," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, May 13, 2008.

Panelist, "Ethical Considerations In Litigation: A 2008 Update," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 7, 2008.

Lecturer, "Ethical Issues Relating To The Attorney Client Privilege," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, March 13, 2008.

Panel Moderator and Lecturer, "Ethical Bounds Of Aggressive Litigation – a 2007 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, February 26, 2008.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," The New York Bar Admission Process," New York University School of Law, February 11, 2008.

Lecturer, "The Ethics Of Negotiation," Continuing Legal Education Program sponsored by the New York State Bar Association Joint Trial Lawyer/Torts Insurance Law Sections (Annual Meeting Program), January 31, 2008.

Panelist, "The Ethics Of Witness Preparation," Continuing Legal Education Program sponsored by the New York State Bar Association Commercial and Federal Litigation Section (Annual Meeting Program), January 30, 2008.

Lecturer, "Conflicts Of Conflicts: 'Thinking Inside The Box' on Issues of Informed Consent and Multiple Representation," Continuing Legal Education Program sponsored by the Division, First Department, January 28, 2008.

Panelist, "Should Lawyers Be Constrained By The Truth?" Continuing Legal Education Program sponsored by LawLine, December 21, 2007.

Lecturer, "What Every Attorney Must Know About Ethics," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 12, 2007.

Lecturer, "Ethics Update 2007 – The Changing Face of the Attorney-Client Privilege," Continuing Legal Education Program presented under the auspices of the New York State Office of the Attorney General for members of the New York State Legislature, December 7, 2007.

Panel Moderator, "Prosecution And Defense Ethics In Criminal Cases, A 2007 Update," Continuing Legal Education Program sponsored by Brooklyn Law School, December 1, 2007.

Lecturer, "Ethics for the Criminal Law Practitioner – A 2007 Update," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, November 27, 2007.

Lecturer, "How To Deal With An Ethics Or Grievance Complaint and Ethics Update – 2007," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, October 23, 2007.

Lecturer, "What Is 'Effective Counsel' In A Criminal Case?" Continuing Legal Education Program sponsored by the Division, First Department, October 16, 2007.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: The Changing Face Of The Attorney-Client

Privilege," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 12, 2007.

Lecturer, "Ethical Issues That Arise In Criminal Practice: What Is 'Effective Counsel'?" Continuing Legal Education Program sponsored by the Division, First Judicial Department and the New York County Lawyer's Association, October 11, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, October 10, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored by the New York State Academy Of Trial Lawyers, September 28, 2007 (New York City) and September 29, 2007 (Huntington, N.Y.).

Lecturer, "Ethics For The Younger Attorneys," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, September 25, 2007.

Lecturer, "Ethics Update – 2007," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, August 20, 2007.

Panelist, "Pressures from the Commission on Judicial Conduct," a Continuing Legal Education Program sponsored by the New York County Lawyers' Association Task Force on Judicial Independence, New York University School of Law, June 14, 2007.

Panelist, "Ethical Considerations In Litigation," Continuing Legal Education Program sponsored by the Queens County Bar Association, May 9, 2007.

Lecturer, "Current Ethics Events: New Attorney Advertising Rules-The Fallout From Hewlett Packard," Continuing Legal Education Program sponsored by the National Employment Lawyers Association, May 4, 2007.

Lecturer, "Ethics Issues In The Zealous Representation Of Mentally Impaired Clients - a Program For Mental Hygiene Legal Services," Continuing Legal Education Program sponsored by the New York State Judicial Institute, April 25, 2007 and May 2, 2007.

Lecturer, "Understanding New York's New Advertising Rules For Attorneys," Continuing Legal Education Program sponsored jointly by the New York State Academy Of Trial Lawyers and the Brooklyn Bar Association, April 11, 2007.

Lecturer, "Ethical Issues Arising In Criminal Practice," Continuing Legal Education Program sponsored by the  Division, First Department, March 28, 2007.

LawLine.Com televised program, entitled: "The Judicial Disciplinary Process," (appeared with Robert Tembeckjian, Chief Counsel of the New York State Commission on Judicial Conduct), March 28, 2007.

Lecturer, "Defense Ethics In Criminal Cases," Continuing Legal Education Program sponsored by Brooklyn Defender Services, March 27, 2007.

Panelist, "Understanding the Boundaries & Effectively Representing Your Client," Bridge The Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 12, 2007.

Panelist, "As Much Dirt As Possible: The Corporate Mole, The Lawyer, And The Consequences," 2007 Mid-Year Meeting, Association of Professional Responsibility Lawyers, February 9, 2007, Miami, Florida.

Panelist, "Addressing Bar Admission Issues After Law School Graduation," New York University Law School, February 7, 2007.

Lecturer, New York Judicial State Institute, "Criminal Ethics Issues Update (2007)," Continuing Legal Education Program for court attorneys, January 8, 2007 and January 11, 2007.

Panelist, "Ethics For Criminal Defense Lawyers (2007)," Continuing Legal Education Program sponsored by the New York Criminal Bar Association and the Legal Aid Society, January 8, 2007.

Panel Chair and Lecturer, "Ethics for Litigators: Real Problems of Everyday Practice," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 18, 2006.

Panelist, "Ethics And New York's No-Contact Rule," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 18, 2006.

Lecturer, "Ethics In Litigation," Practicing Law Institute Continuing Legal Education Bridge The Gap Program, December 13, 2006.

Lecuturer, "Defense Ethics In Criminal Cases," Continuing Legal Education Program sponsored by Brooklyn Defender Services, December 12, 2006.

Panelist, "Ethics For Real Estate Lawyers," Continuing Legal Education Program sponsored by the New York State Bar Association, December 6, 2006.

Panel Moderator, "Prosecution And Defense Ethics In Criminal Cases," Developments In Criminal Law, Criminal Procedure And Evidence Continuing Legal Education Program sponsored by Brooklyn Law School, December 2, 2006.

Lecturer, New York Judicial State Institute, "Ethics Issues Relating To Judicial Recusal In New York State," Continuing Legal Education Program for court attorneys from civil, criminal and family courts throughout New York State; September 27, 2006 [Rochester, N.Y.].

Lecturer, "The Attorney-Client Privilege In The Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 28, 2006.

Panelist, "Everyday Ethical Challenges In The Practice Of Law," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, November 21, 2006.

Panelist, "Ethics Issues Relating To Judicial Recusal In New York State," 19th Annual Term, First and Second Judicial Departments, Judicial Educational Seminar, Continuing Legal Education Program sponsored by the New York State Judicial Institute, November 20, 2006.

Lecturer, "Ethical Considerations In Matrimonial Litigation," Continuing Legal Education Program sponsored by the New York Family Law, American Inn of Court, Nassau County Bar Association, November 15, 2006.

Panelist, "Ethical Pitfalls in Medical Malpractice Litigation," Continuing Legal Education Program sponsored by the Medical Malpractice Committee of the Association of the Bar of the City of New York, September 20, 2006.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: Second Corporate Counsel Institute," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 13, 2006.

Lecturer, "Blueprint For Building Your Own Practice 2006: Ethical Considerations For The Single Practitioner"; Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 13, 2006.

Panelist, "Ethics Update 2006: Recent Decisions," Continuing Legal
    Education Program sponsored by the Brooklyn Bar Association,
    October 11, 2006.

Panelist, "Ethical Pitfalls in Medical Malpractice Litigation,"
    Continuing Legal Education Program sponsored by the
    Association of the Bar of the City of New York, September 20,
    2006.

Lecturer, "Ethics And Professionalism: What Every Lawyer Must Know
    About Ethics," Continuing Legal Education Program sponsored by
    the Practicing Law Institute, August 21, 2006.

Lecturer, Summer College for District Attorneys, "Prosecution
    Ethics," Continuing Legal Education Program sponsored by the
    New York State Prosecutor's Training Institute, August 16,
    Syracuse, New York.

Lecturer, Annual Basic Course for Prosecutors, sponsored by the New
    York State Division of Criminal Justice Services; lectured on
    "Practical Aspects of Evidence at Trial"; Syracuse, New York;
    August 16, 2006 (previously delivered this same lecture each
    year from 1978 on).

Lecturer, "How to Avoid Ethical Problems in Your Day-to-Day
    Practice," Bridge the Gap 2: A Program for Newly Admitted
    Attorneys Second-Year Program for Newly Admitted Attorneys,
    Continuing Legal Education Program sponsored by the New York
    County Lawyers' Association, August 4, 2006.

Lecturer, "Ethical Challenges In Litigation," Continuing Legal
    Education Program sponsored by the New York Lawyers'
    Association American Law Academy, July 24, 2006.

Lecturer, New York State Judicial Institute, Summer Judicial
    Seminar, "Laying Proper Foundations In Civil Cases," July 19,
    2006.

Lecturer, "Ethics Update 2006: Ethics In Advertising," Continuing
    Legal Education Program sponsored by the New York State
    Academy Of Trial Lawyers, July 12, 2006, Huntington, New York.

Panelist, "Functions and Procedures of the Grievance Committees,"
    Continuing Legal Education Program sponsored by the Divisions
    First and Second Department for their court staff, June 20,
    2006.

Program Coordinator, "Prosecutorial Misconduct and the Disciplinary
    System," National Conference on Professional Responsibility,
    a Continuing Legal Education Program sponsored by the American
    Bar Association, Vancouver, British Columbia, June 2, 2006.

Lecturer, "Ethics For New Trial Attorneys," Continuing Legal Education Program sponsored by the New York State Trial Lawyers' Association, May 10, 2006.

Panelist, "Ethics Update 2006: Proposed Changes To The Lawyer Advertising Rules," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, May 3, 2006.

Lecturer, "Second-Year Program for Newly Admitted Attorneys," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 28, 2006.

Lecturer, "Ethics for the Criminal Law Practitioner," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, April 25, 2006.

Panel Member, "Watch Out! Ethical Perils and Pitfalls Facing Small Firm Practitioners," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, April 5, 2006.

Lecturer, "The Disciplinary Process from Respondent's Point of View," Continuing Legal Education Program sponsored by The Departmental Disciplinary Committee For The First Department, Committee Member Orientation Program, March 31, 2006.

Panel Moderator, "The Disciplinary Process: How It Works," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, March 16, 2006.

Panel Moderator and Lecturer, "Ethical Bounds Of Aggressive Litigation," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, March 15, 2006.

Lecturer, "Ethics In Litigation: A 2006 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, March 15, 2006.

Panel Member, "Lawyers in the Dock: When Does Good Lawyering Become Criminal Conduct?" Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, February 16, 2006.

Lecturer, "Ethical Issues Arising In Criminal Practice," New York County Lawyer's Association Twenty-Eighth Annual Criminal Trial Advocacy Institute, Continuing Legal Education Program, First Department, January 26, 2006.

Panel Chair and Lecturer, "Ethics for Litigators: Real Problems of Everyday Practice," Continuing Legal Education Program sponsored by the Practicing Law Institute, December 21, 2005.

Lecturer, "The Attorney-Client Privilege In the Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 15, 2005.

Lecturer, New York State Institute, "Ethics Update," Continuing Legal Education Program for court attorneys from civil, criminal and family courts throughout New York State; September 28, 2005 [Rochester, N.Y.]; November 1, 2005 [Saratoga, N.Y.]; January 10, 2006 [White Plains, N.Y.]; March 7. 2006 [Uniondale, N.Y.]; and April 4, 2006 [Uniondale, N.Y.].

Lecturer, "Emerging Issues In Attorney Ethics: A Judicial Perspective," Legal Education Program sponsored by the Division, First Department, for Court Attorneys, November 15, 2005.

Lecturer, "The Attorney-Client Privilege In The Litigation Process," Continuing Legal Education Program sponsored by Fordham University School of Law, November 15, 2005.

Lecturer, "Professional Ethics – Recent Litigation Developments," Continuing Legal Education Program sponsored by the Columbian Lawyers' Association, November 9, 2005.

Lecturer, "Ethical Issues Arising In Criminal Practice," Continuing Legal Education Program sponsored by the Division, First Department, October 24, 2005.

Panel Moderator and Lecturer, "Critical Issues, Fresh Ideas, Best Practices: First Corporate Counsel Institute," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, September 23, 2005.

Panelist, "Ethics Roundtable 2005," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, September 16, 2005.

Panel Moderator and Lecturer, "Emerging Issues in Litigation Ethics," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 14, 2005.

Lecturer, "How to Avoid Pitfalls in Your Day-to-Day Practice," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, August 12, 2005.

Panelist, "Ethics for Law Firm Practitioners: Managing Attorney
    Trust Accounts and Attorney Trust Accounts and Law Office
    Recordkeeping," Continuing Legal Education Program sponsored
    by the Practicing Law Institute, August 10, 2005.

Lecturer, "Ethical Challenges In Litigation," Continuing Legal
    Education Program sponsored by the New York Lawyers'
    Association American Law Academy, July 25, 2005.

Lecturer, "The Corporate Counsel Forum – Managing The Attorney-
    Client Relationship In The Corporate Counsel Setting,"
    Continuing Legal Education Program sponsored by American
    Lawyer Media (May 12-15, 2005).

Lecturer, "What To Do When The Commission On Judicial Conduct Comes
    Calling," Continuing Legal Education Program sponsored by the
    Association of Judges of Hispanic Heritage, May 10, 2005.

Panel Moderator and Lecturer, "Emerging Ethical Issues For The
    Corporate Lawyer," Continuing Legal Education Program
    sponsored by the New York County Lawyers' Association, May 5,
    2005.

Lecturer, "Ethical Pitfalls In Criminal Defense," Continuing Legal
    Education Program sponsored by the New York State Association
    of Criminal Defense Lawyers, April 22, 2005.

Lecturer, "Bridge the Gap 2: A Second Year Ethics Program for Newly
    Admitted Attorneys," Continuing Legal Education Program
    sponsored by the Practicing Law Institute, April 29, 2005.

Lecturer, "Ethics In Litigation: A 2005 Update," Continuing Legal
    Education Program sponsored by Fordham University School of
    Law, April 21, 2005.

Lecturer, "Ethics Update 2005," Continuing Legal Education Program
    Sponsored by the Brooklyn Bar Association, April 13, 2005.

Lecturer, "The Ethical Limits Of Zealous Representation – A View
    From Corporation Counsel's Office," In-House Continuing Legal
    Education Program conducted by the Corporation Counsel of the
    City New York, March 21, 2005.

Panelist, "Lynn Stewart: The Verdict And Its Implications,"
    Brooklyn Law School, February 17, 2005.

Lecturer, "Ethical Dilemmas For the Civil and Criminal Litigator:
    A 2005 Practical Review," Continuing Legal Education Program
    sponsored by the  Division, First Department, February 7,
    2005.

Panelist, "Current Issues In Professional Discipline – 'A Lawyer's Conundrum' – What To Do With Inadvertently Disclosed Information?" Continuing Legal Education Program sponsored by the Committee On Professional Discipline, 128th Annual Meeting of the New York State Bar Association, January 26, 2005.

Panelist, "General Ethics Pitfalls In Litigation," Continuing Legal Education Program sponsored by the Committee On Landlord Tenant Proceedings, 128th Annual Meeting of the New York State Bar Association, January 27, 2005.

Panel Moderator, "Prosecutorial Misconduct and the Disciplinary System," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, January 19, 2005.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation – A Year 2004 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, January 12, 2005.

Lecturer, at In-House continuing legal education program for the Wilens & Baker lawfirm, and addressed the issue of "Litigation Ethics," November 23, 2004.

Lecturer, "The Role Of Defense Counsel," United States Department of Justice Training Program For Dutch Counsel, New York University Law School, November 17, 2004.

Lecturer, "Ethics In Litigation: A 2004 Update," Continuing Legal Education Program sponsored by Fordham University School of Law, November 16, 2004.

Lecturer and Panel Moderator, "Designing Ethics Programs: What Is Ethics And Professionalism? How Do You Weave It Seamlessly Into A Substantive Program?" Accredited Provider Conference, sponsored by the New York State Continuing Legal Education Board, New York State Judicial Institute, White Plains, New York, November 4, 2004.

Lecturer, "Litigation Ethics: A 2004 Practical Review," Continuing Legal Education Program sponsored by the New York State Academy of Trial Lawyers, October 30, 2004 (Long Island) and October 16, 2004 (New York City).

Panel Moderator and Lecturer, "Emerging Ethical Trends For Corporate Counsel – A Year 2004 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 29, 2004.

Lecturer, "Blueprint For Building Your Practice – Ethical Issues," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 22, 2004.

Lecturer, "Professional Ethics: A 2004 Practical Review," Continuing Legal Education Program sponsored by the Division, First Department, October 19, 2004.

Lecturer, "Recent Developments In Litigation Ethics: A 2004 Update," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, October 7, 2004.

Panel Moderator and Lecturer, "Ethics For Corporate Counsel – A Year 2004 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 22, 2004.

Panelist, "Everyday Ethical Challenges in the Practice of Law," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, September 20, 2004.

Panelist, "Ethics In Litigation," Continuing Legal Education in-house program at the U.S. Commodity Futures Trading Commission, New York City Office, July 29, 2004.

Lecturer and Panel Moderator, "Emerging Issues In Litigation Ethics," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, July 22, 2004.

Panelist, "What is Fraud and Why Does It Matter?," 2004 National Conference on Professional Responsibility, Plenary Session, June 4, 2004, Naples, Florida.

Panelist, "Confidentiality and Current, Former, Prospective Clients: It's Not Just About Crowded Elevators Any More," 2004 National Conference on Professional Responsibility, June 4, 2004, Naples, Florida.

Lecturer, "What Every New Attorney Must Know About Ethics," Practicing Law Institute Continuing Legal Education Bridge The Gap Programs; May 26, 2004 (and previous dates, including August 23, 2000; January 2, 2001; May 29, 2001; July 25, 2001; July 25, 2001; August 22, 2001; October 8, 2001; November 30, 2001; January 2, 2002; April 10, 2002; August 29, 2002; November 25, 2002; May 27, 2003; and November 24, 2003).

Lecturer, "Protecting The Record: The Respondent's Point Of View," Continuing Legal Education Program sponsored by The Departmental Disciplinary Committee For The First Department (Refresher Course for Referees), April 29, 2004.

Chair and Panel Moderator, "Bridge The Gap 2: How To Avoid Ethical Pitfalls In Your Day-to-Day Practice," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 16, 2004.

Lecturer, "Confronting Possible Client Fraud: Is 'Don't Ask, Don't Tell' An Ethically Acceptable Approach," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, April 14, 2004.

Lecturer, "Recent Developments In Criminal Litigation Ethics And Fee Regulations," Continuing Legal Education Program Sponsored by the Kings County Criminal Bar Association, April 1, 2004.

Lecturer, "Addressing Client Fraud: The Permissible Bounds Of Advocacy," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, (two part presentation) March 24 and April 27, 2004.

Lecturer, "Competency of Government Attorneys In The Face Of Excessive Caseloads: The Individual Attorney's Duties," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, February 24, 2004.

Lecturer, 27th Annual Criminal Trial Advocacy Institute, sponsored by the  Division, First Department and the New York County Lawyers' Association; "Practical Aspects of Evidence at Criminal Trials"; February 21, 2004 (previously delivered this same lecture on a yearly basis from 1982 on).

Lecturer, "Recent Developments In Litigation Ethics," Continuing Legal Education Program Sponsored by the New York City Small Claims Arbitrators' Association, February 18, 2004.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation -- A Year 2002 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, January 21, 2004.

Lecturer, "Recent Developments In Criminal Litigation Ethics And Fee Regulations," Continuing Legal Education Program sponsored by the  Division, First Department, Office Of Special Projects, December 15, 2003.

Lecturer, Seventeenth Annual  Terms' Education Seminar, speaking on "Ethics 2003 Primer: Ethical Highlights - The Year In Review and A Contemporary Overview of the Limits To Aggressive Litigation," St. John's University School of Law, December 1, 2003 (and previously delivered annual updates at the  Term's

annual conferences on November 20, 2002, January 8, 2002 and November 29, 2000).

Lecturer, "Litigation Pitfalls for the New Practitioner," Continuing Legal Education Program sponsored by the New York University School of Continuing And Professional Studies, November 22, 2003.

Lecturer, "Ethics Update 2003: Significant Decisions And Impending Changes," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, November 12, 2003.

Lecturer, "Professional Ethics -- Recent Litigation Developments," Continuing Legal Education Program sponsored by the Columbian Lawyers' Association, November 5, 2003.

Lecturer, "Ethics For Corporate Counsel – A Year 2003 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 27, 2003.

Lecturer and Program Moderator, "Ethics For The Transactional Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyer's Association, September 17, 2003.

Lecturer, "Bridge The Gap II" Ethics Program, Practicing Law Institute, August 18, 2003 (and multiple other dates).

Panel Moderator, "Ethics For The Entertainment Lawyer," Continuing Legal Education Program Sponsored by the Association of the Bar of the City of New York, June 11, 2003.

Lecturer, "Legal Ethics In Corporate Transactions," Bridge the Gap Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, May 28, 2003.

Lecturer, "Ethics For Corporate Counsel – A Year 2003 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 23, 2003.

Lecturer, "Conflicts Of Interests In The Immigration Context: Issues For Government Attorneys," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, April 22, 2003.

Lecturer, "Emerging Issues In The Field Of Conflicts Of Interests For The Criminal Practitioner," Continuing Legal Education Program Sponsored by the Brooklyn Criminal Bar Association, February 27, 2003.

Panelist, "Ethics For The Busy Lawyer: Avoiding Ethical Dilemmas In Your Law Practice," Continuing Legal Education Program

sponsored by the New York County Lawyers' Association, February 26, 2003.

Lecturer, "The Duty of Zealous Advocacy And Its Limits: Basics For Newly Admitted Attorneys," Continuing Legal Education Program sponsored by Fordham University School of Law, February 25, 2003.

Lecturer, at In-House Continuing Legal Education program for Freshfields Bruckhaus Deringer, LLP, entitled: "Ethics For The Transactional Lawyer – A Year 2003 Update," January 23, 2003.

Lecturer, "Recent Developments In The Field Of Attorney Candor In Litigation," Continuing Legal Education Program sponsored by the United States Department Of Homeland Security, Office Of The District Counsel, January 28, 2003.

Lecturer, "The Attorney-Client Privilege:  Is It Alive And Well?" Continuing Legal Education Program sponsored by the  Division, First Department, Office Of Special Projects, December 9, 2002.

Panelist, "Clarence Darrow:  Crimes, Causes and the Courtroom," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 26, 2002.

Lecturer, "Ethics For Corporate Counsel – A Year 2002 Update," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 25, 2002.

Panelist, Ethics Panel following the dramatic presentation entitled "Impeach Justice Douglas!" Continuing Legal Education Program sponsored by the New York County Lawyers' Association, October 25, 2002.

Lecturer, "Ethical Considerations in Aggressive Trial Lawyering," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled <u>Litigation Summit</u>, The New York Hilton Hotel, October 15, 2002.

Lecturer, "Emerging Issues In The Field Of Conflicts," Continuing Legal Education Program Sponsored by the Brooklyn Bar Association, October 9, 2002.

Lecturer and Panel Moderator, "Ethical Bounds of Aggressive Litigation – A Year 2002 Update," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, September 18, 2002.

Lecturer and Panel Moderator, "Emerging Challenges In Ethical Issues For The Corporate Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, June 26, 2002.

Speaker, "New York State Judicial Institute On Professionalism In The Law:  Summit on the Internet and the Practice of Law: Charting a Course for the Twenty-First Century," speaking on the issues of "On-Line Attorney Referral Service:  Partnering With Non-Attorneys and Fee-Splitting Among Attorneys," Fordham University School of Law, June 18, 2002.

Lecturer, "An Ethical Perspective for General Counsel," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled General Counsel Conference, The St. Regis Hotel, June 15, 2004 (previously spoke at the same program in June 2001 and June 2003).

Lecturer, "Recent Developments in Criminal Litigation Ethics," Continuing Legal Education Program sponsored by the Division, First Department and the Criminal Justice Coordinator's Office, April 22, 2002.

Lecturer, "Ethical Conduct In The Workplace," Practicing Law Institute Program entitled "The Law Library 2002," April 10, 2002.

Lecturer, "Civility and Professionalism," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, April 10, 2002.

Panelist, "The Disciplinary Process:  How It Works," Continuing Legal Education Program sponsored by the Committee on Professional Discipline of the Association of the Bar of the City of New York, April 9, 2002.

Panelist, "Ethics – When Your Case Is On The Line," Continuing Legal Education Program sponsored by the New York County Lawyers' Association "American Inn of Court" Program, April 4, 2002.

Lecturer and Panel Moderator, "Ethical Bounds Of Aggressive Litigation -- An Update on Developments," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, April 3, 2002.

Panelist, "An Ethics Roundtable For 2002," Continuing Legal Education Program sponsored by the New York State Trial Lawyers Institute, March 22, 2002 (previously served as panelist for this program in March 2001).

Panelist, "Clarence Darrow:  Crimes, Causes and the Courtroom," Continuing Legal Education Program sponsored by the New York County Lawyers' Association, March 18, 2002.

Lecturer, "Ethics and the Criminal Law Practitioner – Avoiding Ethical Pitfalls," Continuing Legal Education Program sponsored by the New York State Defenders Association, March 16, 2002.

Lecturer, "Avoiding Ethical Pitfalls:  Basics for the New Practitioner," Continuing Legal Education Program sponsored by Fordham University School of Law, March 13, 2002.

Lecturer, at ten In-House continuing legal education programs for Kaye Scholer LLP, entitled: "Ethics In Aggressive Litigation"; "Ethics In Complex Litigation"; "Ethics In Transactional Lawyering"; "Ethical Issues In Aggressive Discovery"; and "Ethical Issues In Aggressive Lawyering" (November 2006; December 2006; March 2003; February 2003; December 2000; May 2001; January 2002).

Lecturer, "Ethics and the Criminal Practitioner," Continuing Legal Education Program sponsored by the Criminal Law Section and the Committee on Continuing Legal Education of the New York State Bar Association, November 16, 2001.

Lecturer, "Ethics For Corporate Counsel," Continuing Legal Education Program sponsored by the Corporate Counsel Section of the New York State Bar Association, October 25, 2001.

Lecturer and Panel Moderator, "Bridge The Gap Ethics:  What Every Practicing Lawyer Must Know," Continuing Legal Education Program sponsored by the Association of the Bar of the City of New York, October 22, 2001.

Lecturer, "Ethics For Lawyers In The 21st Century:  Ethics And The Internet," Continuing Legal Education Program sponsored by the New York University School of Continuing And Professional Studies, October 6, 2001.

Lecturer, "How [Not] To Commit Malpractice With Your Computer," Continuing Legal Education Program at "LegalTech," sponsored by Law Journal Seminars/American Lawyers Media, the ABA Law Practice Management Section and other entities; New York Hilton (September 25, 2001).

Lecturer, "Emerging Ethical Issues In Aggressive Litigation," Continuing Legal Education Program sponsored by the Suffolk County Bar Association, September 22, 2001.

Lecturer and Program Moderator, "Ethics For The Transactional Lawyer," Continuing Legal Education Program sponsored by the New York County Lawyer's Association, November 7, 2001.

Lecturer, "Emerging Ethical Issues In Litigation," Continuing Legal Education Program sponsored by the New York City Law Department, September 5, 2001.

Lecturer, "Avoiding Ethical Pitfalls," New York County Lawyers' Association "Bridge The Gap Program: A Program For Newly Admitted Attorneys," August 10, 2001.

Lecturer, "Avoiding Ethical Pitfalls," Association of the Bar of the City of New York "Bridge The Gap Program," June 14, 2001.

Lecturer, "Aggressive Lawyering," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, April 11, 2001.

LawLine.Com televised program, entitled: "The Disciplinary Committee," (appeared with Thomas Cahill, Chief Counsel of the Departmental Disciplinary Committee for the First Judicial Department), April 8, 2001.

Lecturer, "Ethics In Litigation: Aggressive Litigation Tactics," Continuing Legal Education Program sponsored by the Division, First Department and the Criminal Justice Coordinator's Office, April 2, 2001.

Lecturer, "Ethics and Professionalism," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled <u>Civil Litigation – A View From The Bench And The Bar</u>, The New York Hilton, March 23, 2001.

Lecturer, "Protecting The Record: The Respondent's Point Of View," Internal Training Course For Referees Of The Departmental Disciplinary Committee For The First Department, March 15, 2001.

Lecturer, "Limits to Aggressive Litigation," Continuing Legal Education Program sponsored by the General Practice, Solo and Small Firm Section, New York State Bar Association Annual Meeting, January 24, 2001.

Lecturer, "Avoiding Ethical Pitfalls," New York County Lawyers' Association "Bridge The Gap Program," December 1, 2000.

Panelist, Symposium entitled "The Cooperating Witness Conundrum: Is Justice Obtainable?" held at the Benjamin N. Cardozo School of Law, addressing the issue of "Proposal for Change – Internal and External Disciplinary Systems," November 30, 2000.

Lecturer, "Recurring Ethical Issues Facing Attorneys During Their Careers," Orientation Program For Candidates For Admission To The Bar, sponsored by the Office of the Committee on Character and Fitness,  Division, First Department, October 24, 2000; November 14, 2000; December 5, 2000; January 9, 2001; and March 27, 2001.

Lecturer, "Ethics and the Internet," Continuing Legal Education Program sponsored by the Brooklyn Bar Association, November 8, 2000.

Panelist, "Ethics In Litigation," speaking on the topics of "Is Deceit Acceptable In The Litigation Process," and, "Offering Questionable Testimony And Documents," Continuing Legal Education Program sponsored by the  Division, First Department, October 16, 2000.

Lecturer, "Ethics In Aggressive Litigation:  The Rules of Engagement," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton Hotel, October 5, 2000.

Panelist, "Ethical Considerations in Public Sector Law," American Bar Association Annual Convention For Year 2000, sponsored by the A.B.A.'s Government & Public Sector Lawyer Division, July 7, 2000, Warwick Hotel, New York City.

Panelist, "Ethical Problems Facing Prosecutors," American Bar Association Annual Convention For Year 2000, sponsored by the A.B.A.'s Criminal Justice Section, July 7, 2000, New York Hilton Hotel, New York City.

Panelist, "Ethical Issues On The Internet," Meeting Of The New York State Association Of Disciplinary Attorneys," May 18, 2000.

Lecturer, "The Internet Effect On Ethical Obligations Of The Law Firm To Its Clients:  Confidentiality And The Internet," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers, May 16, 2000.

Lecturer, "The Internet Effect On Ethical And Managerial Functions That Effect Law Firms Internally," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers, May 9, 2000.

Program Chair, "Civil Trial Practice:  Firefights In The New Millennium," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media; also lecturing at that program on the subject of Ethical Considerations in Trial Lawyering and on the issue of Effective Motions In Limine; The New York Hilton & Towers, May 1 and May 2, 2000.

Lecturer, "The Respondent's Perspective On The Disciplinary Process In The First Department," Internal Training Course For Referees And Panel Members Of The Departmental Disciplinary Committee For The First Department; April 11, 2000.

Panelist, "Basic Legal Ethics Program," speaking on the topic of "Avoiding Ethical Pitfalls In The Area Of Legal Fees," Continuing Legal Education Program sponsored by the Division, First Department; March 27, 2000.

Lecturer, "Ethics and Professionalism," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, entitled <u>Civil Litigation — A View From The Bench And The Bar</u>, The New York Hilton & Towers; March 21, 2000.

Lecturer, "Understanding The Ethics Terrain," Practicing Law Institute Continuing Legal Education Bridge The Gap Program; February 21, 2000.

Lecturer, "How Not To Commit Malpractice With Your Computer," Continuing Legal Education Program at "LegalTech-ABA Small Firm Track series," sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton & Towers; January 25, 2000.

Lecturer, "Avoiding Ethical Pitfalls," Marino Institute for Continuing Legal Education Program sponsored by the New York Criminal & Civil Courts Bar Association; December 7, 1999.

Lecturer and Demonstration, "Summations," Hofstra Law School Advanced Trial Seminar; December 2, 1999.

Lecturer, "Ethical Challenges For The Experienced Lawyer," Legal Education Program sponsored by St. John's University Law School; October 14, 1999.

Lecturer, "Avoiding Ethical Pitfalls Facing Experienced Practitioners," Continuing Legal Education Program sponsored by Law Journal Seminars/American Lawyers Media, New York Hilton, May 11, 1999 and October 4, 1999.

Lecturer, St. John's Law School, Continuing Legal Education Program on the "Client Fraud Exception To The Attorney-Client Privilege,"; April, 1999.

Panelist, 1998 New York State Bar Association Annual Meeting, Panel sponsored by the Committee on Professional Discipline, "New Rules Governing Lawyers,"; January 29, 1998.

Panelist, Association of Professional Responsibility Lawyers, American Bar Association 1996-1997 Houston, Texas Mid-Year Meeting, "Constitutional and Ethical Implications of Using Law

Firm Personnel as Confidential Informants in Disciplinary Investigations,"; January, 1997.

Panelist, Pace University School of Law, Center for Continuing Education, "Pitfalls In Client Billing In The 1990's," (March, 1997) (sponsored by the Westchester County Women's Bar Association).

Panelist, along with New York Court of Appeals Chief Judge Judith Kaye, at New York Press Club Foundation "Fourth Annual Conference on Journalism," Program on "The Impact of Television in the Courtroom," Columbia University; November 1996.

Lecturer, Brooklyn Bar Association Continuing Legal Education Program; "Pre-trial Hearings and Motions--The Wade Hearing"; 1995.

Instructor, Legal Aid Society Criminal Defense Division Trial Advocacy Program; 1986 through 1994.

Lecturer, Criminal Trial Advocacy In the Federal Courts Course, sponsored by the United States District Court, Eastern District of New York and the Brooklyn Bar Association; "Federal Sentencing Guidelines"; November, 1993.

Symposium moderator at Program entitled:  "Should The Exclusionary Rule Be Scrapped?"; New York City Association; October, 1996.

Symposium moderator at Program entitled: "Are Prosecutors Really Subject To The Traditional Enforcement Of Ethical Rules?"; New York City Bar Association; June, 1994.

Lecturer at New York State Association of Criminal Defense Lawyers Program Entitled:  "Cross-Examination To Kill" – The Cross-Examination Of A Fingerprint Expert"; June, 1994.

Panelist, at U.S. Department of Justice First Annual Conference of Professional Responsibility Officers, Washington, D.C., "Private Bar Perspective"; October, 1994.

Symposium moderator at Program entitled:  "Confronting Client Fraud in 1990's:  Disasters in the Making"; New York County Lawyers' Association; June, 1993.

Instructor at U.S. Attorney General's Advocacy Institute, Advanced Advocacy Courses, on the topic of "The Ethics of Defending and Prosecuting Cases"; 1989-1990.

Panelist, Benjamin N. Cardozo School of Law Forum entitled:  "The Pregnancy Police: Prosecution of Maternal Substance Abuse"; April, 1992.

Resume of Michael S. Ross

Lecturer, Cornell Law School Seminar on "Abuses In The Government's Application Of The RICO Statute"; April, 1992.

Panelist, New York School Symposium entitled, "The United States Supreme Court In The 1990's"; February, 1992.

Panelist, WNYC Radio Program on the topic of "Grand Jury Abuse,"; January 13, 1992.

Lecturer, New York State Bar Association Continuing Legal Education Program on "Evidence and the Trial of a Criminal Case" (New York City, Albany, Tarrytown and Rochester, 1991).

Moderator, New York Council of Defense Lawyers Sentencing Program — "Advocacy With the Prosecutor"; October, 1991.

Lecturer, New York County Lawyers' Association Forum on "Forfeiture Laws: An Overview For the Federal and State Practitioner"; January, 1991.

Lecturer, Criminal Trial Advocacy in the Federal Courts Program, sponsored by the United States District Court for the Eastern District of New York and the  Division, Second Department: "Plea Bargaining and Cooperation Under the New Sentencing Guidelines"; November, 1990.

Sponsored Association of the Bar of the City of New York Public Forum entitled:  "When Criminal Advocates Talk To The Press: On And Off The Record After Gentile"; April, 1992.

Chaired Association of the Bar of the City of New York public forum entitled:  "Are Federal Prosecutors Exempt From Professional Rules of Ethics?"; March, 1991.

Panelist, American Bar Association Program Entitled:  "Blasting Into the 90's: Hot Issues In Criminal Law Practice -- The Grand Jury Witnesses of the 90's . . ." November, 1990 (Washington, D.C.).

Lecturer, American Law Institute's Seminar on "The Federal Sentencing Guidelines," Washington, D.C.; April, 1989.

Lecturer, Federal Bar Association (Philadelphia Chapter), Criminal Law Committee Seminar on "Federal Sentencing Guidelines," Philadelphia, Pa.; June, 1989.

Lecturer, Federal Courts Committee, Brooklyn Bar Association on "How To Practice Law and Not Lose Your Fees"; January, 1990.

Lecturer, Criminal Law and Procedure Course, sponsored by the Division, Second Department and the Brooklyn Bar Association; 1984; 1986; and 1988.

Guest lecturer since 1981 at special programs and classes at various law schools, including Cornell Law School, Brooklyn Law School, St. John's Law School, New York Law School, Hofstra Law School and John Jay College of Criminal Justice, speaking on criminal law and ethics issues.

Appeared in half-hour interview on CSPAN, on the topic of Grand Juries – their operations and possible abuses (Washington, D.C.; February 26, 1998).

Participant in nationally syndicated program, "American Journal," in mock jury selection for O.J. Simpson trial; September, 1994.

Panelist in the nationally broadcast CBS program "Nightwatch," and discussed the government's attempts to compel attorneys to disclose information concerning their clients; February 1990.

Participant in the Legal Aid Society's Consulting Colleague Program (the "Mentor Program"); 1989-1990.

Testified before Congress' Federal Courts Study Committee on Long Range Planning For the Federal Judiciary; January, 1990.

Testified before the New York State Senate and Assembly Committee on Codes, Joint Legislative Hearings, in connection with "Forfeiture Under New York State Law:  A Five Year Assessment"; August, 1989.

Testified before the New York State Law Enforcement Council in connection with proposed amendments to New York State's forfeiture laws; February, 1989.

Testified as expert witness before the House of Representatives, Committee on the Judiciary, on behalf of National Association of Criminal Defense Attorneys in connection with amendments to Federal law governing grand jury practice; June, 1987.

Lecturer at New York Women's Bar Association, Litigation Skills Committee meeting on " Practice"; November, 1987.

Lecturer, National Network For the Right to Counsel's "Conference on Defending the Right to Counsel"; November, 1986.

Panelist, Citizen's Crime Commission of New York City, "The Proposed State RICO Statute"; May, 1986.

Lecturer, Criminal Law Institute, St. John's Law School; "Seeking Forfeiture of Attorney's Fees, A New Weapon For the Assault Upon Organized Crime"; March, 1986.

Lecturer, Nassau Academy of Law White Collar Crime Program; "The Defense of Criminal RICO Cases"; January, 1986.

Lecturer at In-House Training programs since 1978 for various local prosecutors' offices including the Brooklyn District Attorney's Office, the Staten Island District Attorney's Office, etc.

Lecturer, New York County Criminal Bar Association Continuing Education Lecture Series; lectured on "Defense Perspectives on Court Ordered Electronic Surveillance"; February, 1982.

Instructor and lecturer at U.S. Attorney General's Advocacy Institutes on Public Corruption (San Diego, 1979; New Orleans, 1980); Grand Jury Practice (Denver, 1981; Chicago and Washington, D.C., 1982); and Economic Fraud (Atlanta, 1981; Chicago, 1982).

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on Economic Crime; lectured on "Grand Jury Practice and the Search for Documentary Evidence"; March, 1981.

Instructor, N.Y. City Corporation Counsel "Trial Techniques Program"; February, 1981.

Instructor, N.Y. State Attorney General's Training Program; lectured on "The Acquisition of Evidence at the Grand Jury Stage"; January, 1980.

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on Scientific Evidence and Expert Testimony; lectured on "The Utilization of Expert Testimony at Trial"; April, 1980.

Lecturer, N.Y. State Division of Criminal Justice Services Seminar on the Prosecution and Defense of Rape Cases; lectured on "The Acquisition and Use of Physical Evidence At a Rape Trial"; May, 1979.

Lecturer, N.Y. City Annual Criminal Justice Training Program for Law Students; lectured on "Lineups, Identification Procedures and Electronic Eavesdropping"; 1979 and 1980.

## PUBLICATIONS

Authored various articles and monographs to accompany the Continuing Legal Education Programs as described above.

Co-authored "Defending The Indefensible:  Navigating The Strategic And Ethical Landscape Of Defending Clients Who Have Engaged In Indefensible Conduct," American Bar Association *Tort, Trial &*

*Insurance Practice Law Journal*, Volume 52, Issue 3 – Spring/Summer 2017.

Editorial Consultant, <u>The New York Rules Of Professional Conduct: Rules And Commentary</u>, (Winter 2012) Oxford University Press, Edited by the New York County Lawyers' Association Ethics Institute.

Co-authored chapter entitled "Client and Witness Perjury," in the American Bar Association, Section of Litigation, book entitled <u>Litigation Ethics:  Course Materials For Continuing Legal Education</u>, (2000).

"How Not To Commit Malpractice With Your Computer," <u>Legal Tech Newsletter</u>, Vol. XVIII, Number 6 (September 2000) and Vol. XVIII, Number 7 (October 2000) (A Two-Part Series) (Published by American Lawyer Media).

"Strategic Moves To Defend White Collar Fees:  Is A 'Good' Fee In A White Collar Case Always Really 'Good'," <u>A.B.A. Criminal Justice Magazine</u>, Summer 1999 (Cover Article), Vol. 14, No. 2, pp. 4,<u>et seq.</u>

Authored chapter entitled "Evidentiary Issues and Objections," in <u>New York Criminal Practice (2d ed. 1998)</u>, published by the New York State Bar Association.

"Cooperating with Federal Authorities:  Operating on the Outer Limits," <u>A.B.A. Criminal Justice Magazine</u>, Summer 1997 (Cover article), Vol. 12, No. 2, pp. 4,<u>et seq.</u>

"Ethics Column:  Alternative Forums for Ethics Disputes," <u>A.B.A. Criminal Justice Magazine</u>, Spring 1996, Vol. 11, No. 1, pp. 42,<u>et seq.</u>

"Ethics Column:  Defense – A Decade of Litigating Dangerously: Time to Replace Rhetoric with Reason," <u>A.B.A. Criminal Justice Magazine</u>, Fall 1994, Vol. 9, No. 3, pp. 36,<u>et seq.</u> (co-authored with Sheldon Krantz).

Authored various "amicus" briefs on behalf of the American Bar Association's Criminal Justice Section, the Association of the Bar of the City of New York Criminal Advocacy Committee and the New York County Lawyer's Association Committee on Professional Discipline in connection with issues relating to attorney subpoenas, attorney fee forfeiture and attorney discipline issues.

Authored the original American Bar Association 1988 attorney subpoena resolution and supporting report; and in 1989, authored the original Model Rule of Professional Conduct (i.e., Rule 3.8[f]), adopted in 1990 (later repealed), which

required prior judicial approval of prosecutorial subpoenas to attorneys.

Monograph, <u>Practical Evidentiary Problems at Trial</u>; 1978 through 2002 editions of <u>Manual for Basic Course for Prosecutors</u> (published by the New York State Division of Criminal Justice Services).

Monograph, <u>Practical Aspects of Evidence at Trial</u>; 1995 through 2002 editions of <u>New York County Lawyers' Association Continuing Legal Education Manual For Annual Program On Criminal Trial Advocacy.</u>

Article, "The Forfeiture of Attorney Fees in Criminal Cases: A Call For Immediate Remedial Action," <u>The Record of the Association of the Bar of the City of New York</u>, Vol. 41, No. 4, pp. 469525 (May, 1986).

Monograph, <u>Issuance of Subpoenas Upon Lawyers In Criminal Cases: A Defense Attorney's Perspective</u> (March, 1985); published and distributed by the Association of the Bar of the City of New York.

Monograph, <u>Special Considerations in the Utilization of Title III Electronic Surveillance in Official Corruption and Fraud Cases</u> (April 1982); published and distributed nationally by U.S. Attorney General's Advocacy Institute.

Monograph, <u>Constitutional and Statutory Privileges Before Federal Grand Juries</u> (April, 1982); published and distributed nationally by U.S. Attorney General's Advocacy Institute.

Article, "<u>Robbins v. California</u> and the Standards For Searching and Seizing Packages," <u>Search and Seizure Law Report</u>, Vol. 8, No. 9 (September, 1981).

Monographs, <u>New York State Grand Jury Practice and the Search For Documentary Evidence</u> and <u>Multiple Representation at the Grand Jury Stage</u> (February, 1981); published and distributed throughout N.Y. State by N.Y. State Division of Criminal Justice Services.

Monograph, <u>The Utilization of Expert Testimony At Trial</u> (June, 1980); Reprinted in <u>Manual for Basic Course for Prosecutors</u> (N.Y. State Division of Criminal Justice Services).

Monograph, <u>The Constitutional Acquisition Of Evidence From the Defendant and Its Use At Trial</u> (April, 1979); Reprinted in <u>Handbook on Scientific Evidence and Expert Testimony</u> (N.Y. State Division of Criminal Justice Services).

Monograph, <u>Evidentiary Aspects Of the Preparation and Trial Of a Rap Case</u> (April, 1979); Reprinted in <u>Sex Offense Manual</u> (N.Y. State Division of Criminal Justice Services).

Monograph, <u>Electronic Surveillance and the Grand Jury</u>, (April, 1978).

## SUPPLEMENTARY BACKGROUND INFORMATION

### ADDITIONAL LEGAL EDUCATION

National College of District Attorneys, Houston, Texas; Criminal Trial Advocacy Course (June, 1977).

Cornell Institute on Organized Crime (August, 1976).

### EDUCATIONAL HONORS

Law School:

Note and Comment Editor, <u>New York University Review of Law and Social Change</u>

International Moot Court Team; Runner-up, International Moot Court Regional Competition (Harvard, 1972)

Undergraduate:

Phi Beta Kappa
Omicron Delta Pi — National Honorary Economics Society
Tau Kappa Alpha — National Honorary Forensics Society
Henry Rutgers Scholar Program (Honors Program)

Graduated with "Honors"
Graduated with "Distinction" from the Department of Economics
Dean's List: 1968-71