# Exhibit 4

In re

CUSTOMS AND TAX ADMINISTRATION OF

THE KINGDOM OF DENMARK

(SKATTEFORVALTNINGEN) TAX REFUND

LITIGATION*

*This Report relates to all related dockets in *In re: Skat Tax Refund Scheme Litigation*, 1:18-md-2865.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No.18-MD-2865 (LAK)

# Reply Expert Report

of

C. FREDERICK REISH

1800 Century Park East, Suite 1500

Los Angeles, CA 90067

February 28, 2022

CONFIDENTIAL

# Table of Contents

I.   Introduction ............................................................................................................. 1

   A.   Assignment and Scope ...................................................................................... 1

   B.   Summary of Opinions ....................................................................................... 2

II.   The Plans Met the Only Three Qualification Requirements Discussed in the Wagner Rebuttal Report ............................................................................................................ 3

   A.   The Benefits Realized By Others In This Case Did Not, and Could Not Under IRS Standards, Result in a Violation of the Exclusive Benefit Rule ................................ 4

   B.   There Is No Evidence That the Plans Were "Impermanent From the Outset" ............... 9

   C.   Ms. Wagner's Arguments Concerning "Improper Funding" Are Demonstrably Incorrect ............................................................................................................. 12

III.   The Investments in this Case Did Not, and Would Not, Cause Plan Disqualification ...... 13

IV.   The Only Relevant Issue Is Whether the Plans Were Qualified (i.e., Tax-Exempt); To The Extent Ms. Wagner Means Something Else By "True Retirement Plans," It Is An Imaginary and Irrelevant Standard ................................................................................................ 16

V.   Wagner Invents a "Holistic Review" Standard That Does Not Accurately Reflect Tax-Qualification Standards ........................................................................................... 20

VI.   IRS Audits Focus On Violations of the Qualification Requirements and Prohibited Transactions; The RJM Plan Audit Was Thorough And Would Have Identified the Violations Alleged by Ms. Wagner, If They Were In Fact Violations ............................................. 25

   A.   The RJM Plan Audit Addressed Qualification Issues .................................................. 26

   B.   Ms. Wagner's Assertion that the IRS's Findings Would Be "Meaningless" Even If It Considered All The Purported Qualification Issues She Raises, Is Not Credible On Its Face . 30

   C.   Ms. Wagner's Claim That The RJM Plan Is Unique Among The Defendant Plans Is Inconsistent With The Facts ....................................................................................... 31

VII.   Prohibited Transactions Do Not Cause Plan Disqualification; The Fact that Both Can Occur in the Same Case Is Not Relevant ................................................................... 32

VIII.   Miscellaneous Errors in Ms. Wagner's Rebuttal Report ................................................ 35

   A.   Ms. Wagner's Discussion of the Trust Agreement(s) Is Both Irrelevant and Unsubstantiated ....................................................................................................... 35

   B.   Certain Courts Can Rule On the Qualified Status of a Plan; This Does Not Mean the Plans In This Case Are Disqualified ......................................................................... 36

   C.   The Discussions in the Wagner Rebuttal Report about EPCRS Do Not Contain Substantive Arguments, and Do Not Present the Issue In A Complete or Accurate Manner... 38

IX.   Conclusion .......................................................................................................... 42

CONFIDENTIAL

# I.    Introduction

## A.    Assignment and Scope

1.    I have been retained on behalf of certain Defendants in this case to analyze and opine on issues related to the qualification of pension plans, the practices of the Internal Revenue Service ("IRS") as the agency with the authority to determine whether a pension plan is qualified under section 401(a) of the Internal Revenue Code ("IRC" or the "Code"), and the approach of the federal regulators in their oversight of pension plans.

2.    Counsel has asked me to review the Expert Rebuttal Report of Marcia S. Wagner dated February 1, 2022 (the "Wagner Rebuttal Report") and to opine on Ms. Wagner's responses to my initial Expert Report (the "Reish Initial Report"), with respect to her claims that the pension plans at issue in this litigation are not tax-exempt under Section 401(a) of the Code (that is, "tax-qualified" or "qualified").

3.    As with the Initial Report and the Rebuttal Report, I was assisted in the preparation of this Reply Report by Josh Waldbeser of my firm.  In addition, for this Reply Report, I was assisted by Emily Kile-Maxwell of my firm.

4.    In preparing this Reply Report, I reviewed the materials listed on Exhibit 1, attached, in addition to the materials listed on the Exhibits to the Initial Report and my Rebuttal Report.

5.    Before responding to Ms. Wagner's specific opinions, I am compelled to correct her false claim about statements in my Initial Report.  Specifically, Ms. Wagner claims:

> The Reish Report asserts that the Plans **were merely deficient in meeting a few vague and correctable "concept[s] of propriety,"** but this conclusion is premised on treating certain deficiencies in isolation from one another and ignoring others.

Wagner Rebuttal Report ¶ 4 (emphasis added).  Whether or not deliberate, this is a blatant misrepresentation of the opinions in my initial report.  That statement suggests that I made admissions concerning plan defects in my Initial Report that I did not make; rather, what I stated was:

> In other words, the qualification of a plan is based on the satisfaction of specific and detailed rules, and not on a **general or vague concept of propriety** based on its investments, strategies or other purposes.

CONFIDENTIAL

Reish Initial Report ¶ 32 (emphasis added). I included the above passage in my Initial Report because I understood that SKAT's position that the plans were not qualified rested on its allegations that the plans were "shams." *See* Reish Initial Report ¶ 15 & n.6. In the documents that I reviewed, there was little description or discussion of the meaning of these allegations. Furthermore, as I explain further below, I am not aware of the existence of a "sham" plan as a concept recognized or contemplated by the Code. Nevertheless, because SKAT alleged that the plans were "shams" without explaining or defining that term, I stated in my initial report that a plan's tax-qualified status has nothing to do with any "general or vague concept of propriety based on its investments, strategies or other purposes." I did not—and do not—conclude that the plans were "deficient in meeting a few vague and correctable "concept[s] of propriety," as Ms. Wagner incorrectly states.

### B.    Summary of Opinions

6.    The Wagner Rebuttal Report, like the Wagner Report before it, mostly discusses pension law requirements inapplicable to the plans at issue here, pension law rules unrelated to whether a plan is tax-qualified, and "typical" pension plan practices, to which a plan is not required to adhere and that would not be a basis for disqualification.

7.    The little of the Wagner Rebuttal Report that addresses actual tax qualification requirements does not correctly state the applicable standard for those requirements, misstates the factors the IRS would rely on in determining whether those standards are met, and, as a result of these flaws, incorrectly concludes that these plans would be found to be not qualified.

8.    All but conceding that the plans at issue here met the letter of the Code's qualification requirements, Ms. Wagner argues that the correct way to assess qualification is to take a comprehensive view of the plan, the investments it enters, its counterparties, and the reasons it was sponsored and engaged in those investments. Ms. Wagner manufactures this "holistic review" standard out of whole cloth. Never in my experience has the IRS engaged in such a review. I have never heard of it doing so and I have never heard any suggestion it has ever considered doing so.

2

9.    Though Ms. Wagner attempts to minimize the relevance of the IRS's audit and resulting issuance of a "no change" letter to the RJM Plan, its importance cannot be overstated. The IRS spent two years scrutinizing the qualification of one of the very defendant plans that Ms. Wagner claims suffers from egregious and pervasive flaws rendering it not qualified. If any of Ms. Wagner's conclusions had merit, the IRS—after receiving documents that on their face show the facts Ms. Wagner relies on for her conclusions— would have disqualified the plan. It did not.

II.    **The Plans Met the Only Three Qualification Requirements Discussed in the Wagner Rebuttal Report**

10.   As was the case with Ms. Wagner's initial report submitted December 31, 2021 ("Wagner Initial Report"), assertions related to qualification requirements, ERISA requirements (which are not applicable to Defendant Plans), prohibited transaction rules (which are not a basis for plan disqualification), and general industry practices (also not a basis for disqualification) are interwoven through the Wagner Rebuttal Report. To assess the merits of her conclusion that the plans are not qualified, it is crucial to separate her statements that relate to qualification from those that simply do not (although, as discussed *infra*, neither alter my conclusion that there are no grounds on which the IRS would disqualify the plans).

11.   As I understand it, U.S. pension law is only relevant to this litigation insofar as the plans were required to be "pensions" under the U.S.-Danish Tax Treaty, which SKAT argues required the plans to be qualified under Section 401(a) of the Code.[1] Like the Wagner Initial Report, the Wagner Rebuttal Report spends a majority of its discussion on inapplicable legal standards and vague, unsubstantiated notions of typical industry practices, both of which are not relevant to the qualification question at hand.

12.   As Ms. Wagner points out, and as I stated in my Initial Report, a qualified plan must be qualified in form and operation. Amidst the panoply of purported deficiencies Ms. Wagner claims in her Initial Report and Rebuttal Report that do not concern qualification,

---

[1] I do not know if the Danish-U.S. Tax Treaty does or does not require that the pension plans applying for refunds be tax-qualified or not. As I stated in my rebuttal report (¶ 3 n. 2) ("Reish Rebuttal Report"), I am not an international tax lawyer, have not read the US-Denmark tax treaty, and express no opinion as to whether a plan must be tax-qualified under the IRC to qualify as a "pension" and be entitled to dividend withholding tax reclaims under the Treaty.

CONFIDENTIAL

she raises exactly three <u>actual</u> requirements for tax-qualification under Section 401(a) of the Internal Revenue Code: (1) that the plans be operated for the exclusive benefit of their participants; (2) that the plans were intended to be permanent; and (3) that any plan funding came from "proper" sources.  I address the assertions in her Rebuttal Report as to each in turn.

A.    **The Benefits Realized By Others In This Case Did Not, and Could Not Under IRS Standards, Result in a Violation of the Exclusive Benefit Rule**

13.    The Wagner Rebuttal Report concedes that third parties can benefit from a qualified plan's investments (as investment managers, general partners to partnerships, and other third-party providers obviously do in all cases), but then argues the *relative amount* of benefit to the third parties here was too great:

> The Reish Report states that it is not impermissible for a plan to invest in a partnership and receive its allocable share of partnership profits. **Although accurate in the abstract**, this statement is both misleading and irrelevant. First, **it obfuscates the question of what portion of the Solo transaction's proceeds was paid to non-Plan parties**. As discussed, the Plans were not participating in an investment, let alone a typical investment opportunity, and **most of the refund proceeds received by the Plans due to their status under the Treaty were passed on to entities controlled by Sanjay Shah**.

Wagner Rebuttal Report ¶ 20 (emphasis added).

14.    Section IV of my Rebuttal Report already addresses why the investments did not run afoul of the exclusive benefit rule, including the rather common-sense observations that plans can use investment fund managers and other service providers, and they are permitted to pay those managers and providers.  Reish Rebuttal Report ¶¶ 31-32.  I have also already shown that Ms. Wagner vastly overstates the profit share that went to the Solo Capital parties.  Reish Rebuttal Report ¶¶ 43.b-c; 45.c. Most critically, however, and as explained in my Rebuttal Report, excessive payments to third parties (which I do not concede occurred here) do not violate the exclusive benefit rule regardless.  Reish Rebuttal Report ¶¶ 43-46.

15.    Indeed, as discussed further *infra*, and as I explained in my Rebuttal Report, the IRS did not disqualify the RJM Plan after learning (from its audit of the Plan) that the Plan was paying the fees to Solo Capital parties that Ms. Wagner claims were excessive and grounds for disqualification.  Reish Rebuttal Report ¶¶ 105-107.  The IRS's decision not

4

CONFIDENTIAL

to disqualify the RJM Plan is further indication that Ms. Wagner's conclusion that the RJM Plan violated the exclusive benefit rule is not correct.

16.    Ms. Wagner seems to separately argue that the plans' *only purpose* in participating in the strategy was to enrich others, and that for this reason the plans violated the exclusive benefit rule. *See, e.g.,* Wagner Rebuttal Report ¶ 5 (acknowledging general rule that nontraditional investment strategies do not run afoul of any rules governing qualified plans but asserting this "does not apply if the transaction is calculated to enrich others, as it was here"); Wagner Report ¶ 20 (the Plans were not participating in a "typical investment opportunity"; rather, "[t]he sole reason for the Plans' participation in partnerships was to divert the bulk of the proceeds remaining after Solo Capital's and Ganymede's fees to other members of the partnerships."); Wagner Report ¶ 21 ("The Reish Report also misstates the nature of the alleged exclusive benefit violation. . . . the entire arrangement was designed to provide refund proceeds to individuals and entities that had no right to them under the Treaty.").

17.    But it is simply factually incorrect that the sole purpose of the plans' participation was to enrich others.  Ms. Wagner's assertions fail to consider the opportunity offered to the plans from the plans' perspectives.  The plans participated in the strategy, and invested in the partnerships, because doing so was profitable to the *plans*.  To get access to the strategy, they had to pay fees to Solo Capital and invest in partnerships.  So it is factually incorrect that the "sole reason" was to divert proceeds to others.  The plans paid fees to Solo Capital and entered the partnerships to grow retirement benefits for their participants by gaining access to a profitable investment strategy to which they otherwise would not have had access.  In my understanding of the requirements and experience with IRS audits and qualification programs, the IRS would not find this arrangement to violate the exclusive benefit rule. The exclusive benefit rule is an objective requirement, and in the context of investments it mandates that investments must be undertaken to help fund benefit payments; it is not a subjective standard that hinges on whether a third party would view any particular investment decision as "typical."

18.    Ms. Wagner makes other scattered references in her Rebuttal Report to the exclusive benefit rule but does not make any additional substantive arguments to support her claim

CONFIDENTIAL

that the plans in this case violated the rule.  For example, in Section III(F) of the Wagner Rebuttal, she argues that:

> *(T)he Reish Report ascribes too much significance to the buffer provided by investment language in Plan instruments by ignoring the fact that such language cannot override fundamental plan standards, such as the operation of a plan for the exclusive benefit of its participants. As a virtually universal norm in the retirement industry, a version of the exclusive benefit rule is present in all of the Defendant Plan documents I have reviewed and limits the scope of any permissive plan investment language on which the Reish Report may be relying.*

Wagner Rebuttal Report ¶17.

19. To the extent this passage refers to purported "fundamental plan standards" or "universal norm(s)" outside the qualification requirements, it has no relevance to qualification, as the Internal Revenue Code qualification provisions do not include a requirement to follow "fundamental plan standards" or "universal norms."  In fact, neither of those phrases appear in the qualification rules in Code section 401(a).  I agree with Ms. Wagner's statement that the Plan instrument cannot supersede the exclusive benefit rule.  However, I have not opined at any juncture that plan or trust language can somehow "permit" exclusive benefit violations.  Her point only has relevance if such violations – in fact – occurred. As I have shown, they have not.

20. As another example of a reference to the exclusive benefit rule, Ms. Wagner states that my report "misstates the nature of the alleged exclusive benefit violation" because:

> *It is not simply that fees paid to a service provider were excessive; it was that in most cases, the entire arrangement* ***was designed to provide refund proceeds to individuals and entities that had no right to them under the Treaty****.*

Wagner Rebuttal Report ¶ 21 (emphasis added).  This statement, however, does not indicate how the Code's qualification requirements, including the exclusive benefit rule, would be violated by such an investment.  As a result, it is not possible to provide a direct response.  However, while I am not qualified as an expert on the provisions of the Treaty, I can say I have never seen the IRS disqualify a plan (or even propose to do so) based on the laws of another country or based on a provision in a treaty.  Nor at the many conferences, IRS meetings and plan qualification programs that I have participated in have I ever heard of that possibility.  The statements about this issue in Ms. Wagner's reports are simply unrelated to the question of plan qualification.

CONFIDENTIAL

21.    Ms. Wagner also cites to several legal authorities purporting to support her position that the plans violated the exclusive benefit rule. But the legal authorities cited do not provide any support for that position.

22.    First, she cites to a 1973 IRS ruling holding that, under the Internal Revenue Code of 1954, a trust agreement which permits investments regardless of whether they are "speculative, hazardous, adventurous, or productive of income" is inconsistent with the exclusive benefit rule. Wagner Rebuttal Report ¶ 17 n. 19. Even if this ruling had not been overridden by a later IRS regulation (which, as I explain below, it has been), the ruling was issued in a much different regulatory context before the Code's plan qualification rules were substantially amended in 1974 and over a decade before the currently-applicable iteration of the Internal Revenue Code (1986). But regardless, the IRS's position in that IRS ruling has been supplanted by the current IRS regulation cited at ¶ 32 below, which provides that:

> *No specific limitations are provided in section 401(a) with respect to investments which may be made by the trustees of a trust qualifying under section 401(a). Generally, the contributions may be used by the trustees to purchase **any investments permitted by the trust agreement to the extent allowed by local law** . . .*

[Treas. Reg §1.401-1(b)(5)] (emphasis added). This current regulation is consistent with my understanding of the IRS's practices based on my experience representing plans before the IRS. I have never experienced or heard of the IRS purporting to disqualify a plan because it participated in any particular investment (offered by a third party and not the employer).

23.    Next, the Wagner Rebuttal Report cites two cases, neither of which support Ms. Wagner's claim that the plans violated the exclusive benefit rule. Ms. Wagner's opinions regarding these cases are conclusions of law, not opinions regarding IRS practice or a description of her experience with actual plan operations. However, faced with those citations in her Rebuttal Report, I am obliged to respond. As I explain further below, the facts in these cases are distinct from the facts in the present litigation, based on the materials I have considered. Additionally, the holdings in these cases are consistent with the IRS regulation cited at ¶ 33 below (and not with the superseded 1973 IRS ruling cited by Ms. Wagner).

7

CONFIDENTIAL

a. First, Ms. Wagner cites to <u>Westchester Plastic Surgical Associates, P.C.</u>, T.C.M. 1999-369, a Tax Court holding, for the proposition that "improper trust administration and investment policies may result in violations of the exclusive benefit rule." Wagner Rebuttal Report ¶ 17 n. 19. But <u>Westchester</u> involved an employer-sponsored plan under which the defendant trustee was also the sole shareholder of the sponsoring employer, and who used plan assets to provide himself with access to funds for non-plan purposes, even though the plan assets also supported the benefits of rank-and-file employees (and the plan was subject to ERISA's fiduciary standards). In its opinion, the court found that the trustee and sole shareholder, Morrissey, used the plan assets for his personal benefit. The court explained: "It is clear from examining the activity in the Trust account at the Bank of New York that Morrissey was using the Defined Benefit Plan as a checking account for his personal needs rather than as a retirement plan for the exclusive benefit of petitioner's employees and beneficiaries." <u>Westchester</u>, T.C.M. 1999-369, *8.

b. Second, Ms. Wagner cites to <u>Ada Orthopedic, Inc.</u>, T.C.M. 1994-606, in which:

> ...the Tax Court held the exclusive benefit rule was violated when a plan invested in a tax shelter that would generate significant losses for a period of years before obtaining capital gains treatment. The Tax Court concluded that the sole purpose of **the investment was to provide an additional source of capital to an enterprise controlled by the plan's trustee and family members**.

Wagner Rebuttal Report ¶ 17 n. 19 (emphasis added). However, that quote omits a material fact about the case. That is, a trustee and sole shareholder diverted plan assets for his personal benefit, even though the plan assets also supported the benefits of rank-and-file employees (and the plan was subject to ERISA's fiduciary standards). <u>Ada Orthopedic</u>, T.C.M. 1994-606, *7. For this reason, <u>Ada Orthopedic</u> is distinguishable from the facts as I understand them in this litigation.

c. These are examples of how plan investments can reasonably be construed as violating the exclusive benefit rule – when they are used by a fiduciary or the plan sponsor or its affiliates, family, or other parties with whom the plan sponsor

CONFIDENTIAL

or fiduciary has a relationship that supports the use of plan assets for ulterior private interests, rather than to generate profits for retirement benefits for participants – consistent with the distinction recognized in the IRS regulation cited at Paragraph 32.  Neither <u>Westchester</u> nor <u>Ada Orthopedic</u> concerned allegedly excessive payments to a third-party service provider as a basis for an exclusive benefit violation, as Ms. Wagner argues for here.

d.  Neither decision stands for the proposition suggested by the Wagner Reports that investments can cause plan disqualification because they are unusual for plans, high-risk, unorthodox, or involve the payment of significant fees to service providers.  Instead, they illustrate the proposition that qualified plan funds cannot be diverted and applied to the personal benefit of the fiduciaries, the plan sponsors, their families, or entities they control.  Based on the materials I have considered, no such diversion occurred here.

e.  Ms. Wagner also cites to <u>Wingers Department Store</u>, 82 TC 869 (1984), Wagner Rebuttal Report ¶ 16 n. 18, but this case only further demonstrates the correct standard, as I have summarized it above.  In that case, the Tax Court cites to a number of other cases in which exclusive benefit violations were found relating to investments, and without exception they all involved situations where the plan invested in employer securities, lent money to the employer, and similar situations (and not where third party providers were compensated for services for the investments or otherwise).  <u>Wingers, 82 TC at 878-81.</u>

B.  **There Is No Evidence That the Plans Were "Impermanent From the Outset"**

24.  In Section III(J) of the Wagner Rebuttal Report, Ms. Wagner argues that, because many of the plans ceased making contributions or otherwise were more limited in their operations shortly after Solo Capital ceased operations, the plans were not intended from inception to be qualified retirement plans.  In relevant part, she states that:

> *Before establishing a plan, tax-qualification rules require its sponsor to assess the likelihood of the plan's near-term abandonment or termination. If the plan is subsequently terminated, the termination* ***must be due to unanticipated business reasons of the plan sponsor, such as the sponsor's financial inability to make further plan contributions.***

9

Wagner Report ¶ 22 (emphasis added).

25. This argument subtly but crucially misstates what is required for a plan not to violate the permanency requirement. I agree that, at the time of plan establishment, the plan sponsor must not intend that the plan be merely a temporary tax-deferral vehicle (in other words, the sponsor cannot plot to establish a plan with the intent that it then terminate it after a short period). Treas. Reg. §1.401-1(b)(2), while recognizing the right of sponsors to terminate plans, explains that "(t)he term 'plan' implies a permanent as distinguished from a temporary program." But contrary to Ms. Wagner's claim there is no requirement that a plan sponsor engage in some sort of economic analysis of its long-term business solvency or of the possibility of future changes in circumstances to "assess the likelihood of the plan's near-term abandonment or termination" prior to establishing the plan. *See* Reish Rebuttal Report ¶¶ 83-84.a. If such a requirement existed, plan disqualification would occur often and unexpectedly, and Ms. Wagner concedes that this is not so. Wagner Rebuttal Report ¶ 13 ("[T]he Reish Report may be correct . . . that in recent decades IRS audits seldom result in plan disqualification"). Such a requirement could also have the effect of barring qualified plans for start-ups and small un-established businesses that could not be certain about their long-term solvency.

26. Additionally, I disagree with Ms. Wagner that the only permissible reason for terminating a plan is because of "unanticipated business reasons of the sponsor." *See* Reish Rebuttal Report ¶¶ 84.c-86; 89-91.

27. Where a plan seeks a favorable determination letter from the IRS upon termination (using IRS Form 5310), there are a number of specified reasons that would justify a plan termination within 5 years of the plan being established. In addition, "Other" reasons are permitted. The Internal Revenue Manual specifically explains to IRS agents that, with respect to situations where "Other" is marked on the application for a determination letter as the reason for termination, there are additional acceptable reasons, including just "employee dissatisfaction with the plan." IRM Sec. 7.12.1.3; *see* Reish Rebuttal Report ¶ 90. This guidance directly contradicts Ms. Wagner's claim that the *only* acceptable reason for termination is "unanticipated business reasons." Practice runs contrary to Ms. Wagner's assertion as well. Indeed, as I stated in my rebuttal report, plan terminations occur all the time for a myriad of reasons (with and without IRS approval via the

10

determination letter process, which is not required).  Reish Rebuttal Report ¶ 87. In my experience, plan terminations are not limited to situations where a sponsor is financially unable to continue making contributions, and the IRS does not have a practice of disqualifying plans that terminated for other reasons.

28.    Ms. Wagner states that:

> Moreover, Reish makes no attempt to explain why Plans generally engaged in only a few years (if not a single year) of purported trading in Danish stocks before Plan contributions ceased and the Plans were effectively abandoned, only to be followed by the establishment of new Plans by the same sponsors for any further participation they wished to have in Shah's "investment" scheme. This unique pattern of conduct hid the fact that the reclaims were engineered by a small group of individuals (most of whom were operating in conjunction with Sanjay Shah) but provided only negligible benefits to the Plans or their participants (in their capacity as such). The effect of submitting reclaims from hundreds of plans disguised the fact that most of the proceeds from the refunds were going to these individuals rather than to the Plans.

Wagner Report ¶ 23.

29.    The claim that I make "no attempt to explain" these matters is false, because the passage above merely repeats and combines Ms. Wagner's arguments concerning plan "permanency" and the exclusive benefit rule.  My reports have addressed each of the three actual qualification requirements raised in the Wagner reports (the exclusive benefit, permanency, and funding requirements in the Code).  Further, there is no truth to the implication that multiple non-violations of the qualification rules – considered together – would somehow disqualify a plan where they would not when considered separately.  While multiple violations of the qualification requirements could be viewed more seriously than a single violation, there is no concept in the law, informal agency guidance, or IRS practices in which a plan can be disqualified without there being a violation of one of the qualification provisions in section 401(a) of the Code.  As a result, several of the arguments in the Wagner reports fail, for example, that norms, practices, ERISA fiduciary provisions, or foreign treaties determine plan qualification.

30.    The following statement by Ms. Wagner is untrue for similar reasons:

> In that regard, it is significant that the Reish Report did not discuss the context in which the Plans were established, which was as a means to take advantage of the Treaty provisions for tax-exempt entities. A determination as to whether the Plans

CONFIDENTIAL

> *were arrangements other than retirement plans must take account of this context, because in determining the manner in which an entity should be characterized, context matters.*

Wagner Rebuttal ¶ 25.  As I have explained, in the absence of the diversion of plan assets to the personal benefit of the plan sponsor, fiduciaries and other parties in whom they may have an interest, the exclusive benefit rule contemplates only that a plan's investments be designed to generate income to fund benefit payments; where this is satisfied, the rules are not concerned with the nature of the underlying investment activities, or whether a plan was established with a view toward taking advantage of a particular investment opportunity.  The above passage simply repeats Ms. Wagner's incorrect implications to the contrary.

### C.    Ms. Wagner's Arguments Concerning "Improper Funding" Are Demonstrably Incorrect

31.    In Section III(H) of the Wagner Rebuttal Report, while Ms. Wagner concedes that plan funding can come from a number of sources, she nonetheless makes the unconditional claim that funding sources in this case were improper:

> *. . . none of these funding methods **were consistent with the manner or the magnitude of the financing activity that Solo Capital and its affiliates purported to undertake on behalf of the Plans.** In effect, **the Plans were "investing" exclusively with funds putatively advanced or arranged for by other actors** in the scheme, such as Solo Capital and/or other Shah-controlled entities, as described in my Initial Expert Report. **There is no conceivable way that funding from or arranged by Solo Capital would be an acceptable contribution to the Plans** . . . .*

Wagner Rebuttal Report ¶ 19 (emphasis added).

32.    First, this statement is inconsistent with Ms. Wagner's prior statements.  In her Initial Expert Report, in contrast to her "no conceivable way" claim above, she admitted that:

> *Generally speaking, only plan participants or the plan sponsor may contribute to a tax-qualified plan, and the IRS will view such advances as a loan or other extension of credit. However, **in the circumstances of the Plans, it is unclear whether a regulator, such as the IRS, would view such amounts as plan assets, a loan or an illegal contribution** given that only plan participants or the plan sponsor may contribute to a tax-qualified plan.*

Wagner Initial Report ¶ 87 n. 224 (emphasis added).

12

CONFIDENTIAL

33.    Regardless of this inconsistency, her statement above that "funding from or arranged by Solo Capital" would not be an "acceptable contribution to the Plans" is also demonstrably untrue however it is interpreted, although it is not clear exactly what she is alleging.

    a.    On one hand, if the point is that money was advanced to the LLCs by Solo Capital in order for the LLCs to make contributions to their plans, it is only necessary to observe that there is no prohibition under section 401(a) of the Code (and the Wagner Reports do not point to one) against using borrowed or advanced funds for plan contributions. Plan sponsors borrow money all the time from banks, by issuing bonds, and otherwise. Once these dollars are in the plan sponsor's possession, they are fungible with any and all other monies. There is no explicit or implied requirement whatsoever that plan contributions somehow have to be "traced" to particular sources, to the exclusion of others.

    b.    On the other hand, if Ms. Wagner's objection is that the plans had some type of advance made on their behalf by Solo Capital in the context of its investment activities (because they received credit for revenues relating to transactions they did not fund with their own cash) the objection lacks merit. While the Wagner Rebuttal Report is not clear on the factual basis for that conclusion (that money was advanced on behalf of the plans), it would not be extraordinary if it did happen. That is because qualified plans (and all other types of investors, for that matter) participate in investment transactions which involve credits or advancements being made on their behalf by brokers, clearing houses, investment funds and financial counterparties, or that use derivatives or other instruments which do not require the cash purchase of the underlying security. There can be no serious argument that the counterparties in these types of marketplace transactions are "contributing" illegally to other people's 401(k) plans. The argument lacks merit because, like many of the violations Ms. Wagner suggests have occurred, it is not actually a violation.

## III.    The Investments in this Case Did Not, and Would Not, Cause Plan Disqualification

34.    In Section III(A) of the Wagner Rebuttal Report, Ms. Wagner argues that it is incorrect to describe what she refers to as the "scheme" as a non-traditional investment. Ms.

CONFIDENTIAL

Wagner goes on to opine that the investment strategy was not prudent, and that the investment strategy "should not, in [her] opinion, be viewed as an investment strategy" at all. Wagner Rebuttal Report ¶ 6. These claims are both incorrect and irrelevant to whether the plans are qualified.

35.    First, the facts she relies on as showing the investment strategy was not a real investment are either innocuous or inaccurate. There is nothing improper about a plan entering "offsetting transactions in foreign securities," or a plan participant not fully understanding "the precise mechanics" of an investment the plan enters. Wagner Rebuttal Report ¶ 6. And the plans did not enter the trades "primarily for the benefit of . . . third parties," *id.*; the Plans entered the trades for their own benefit, as I explained previously, Reish Rebuttal Report ¶¶ 39-49; *supra* at ¶ 12. The qualification requirements do not contain any provisions of the type implied by Ms. Wagner. Moreover, Ms. Wagner's statements are incorrect even in the abstract. Many plans invest in hedge funds and other partnerships that utilize swaps, foreign exchange transactions, derivatives, and other instruments, and on the whole plan sponsors do not (and are not required to) understand the "precise mechanics" of such activities, which is why they use third-party investment managers and similar parties to do so in the first place.

36.    Second, her assertion that the plans' investment strategy is not really an "investment" and/or is not an "investment" a plan can enter under the Code is also incorrect. As explained in more detail below, (1) the strategy meets a typical definition of investment, (2) the Code does nothing to narrow that definition, and (3) while there is a narrow set of investments that may implicate a plan's qualification status, these investments are not in that category.

37.    Cambridge Dictionary defines the term "investment" simply as:

> *the act of putting money, effort, time, etc. into something to make a profit or get an advantage, or the money, effort, time, etc. used to do this.*

Based on my understanding of the plans' trading strategy, it falls under this definition.

38.    Section 401(a) of the Code does not define "investment." (although in the context of retirement plans it is generally understood to refer to something undertaken for economic gain). Further, IRS regulations confirm unequivocally that there are no restrictions on

14

the investments that qualified plans can make, except that where investments benefit *the plan sponsor* outside the plan (e.g., loans to an employer or purchase of employer stock, situations not alleged here) special considerations may apply due to the exclusive benefit rule:

> *No specific limitations are provided in section 401(a) with respect to investments which may be made by the trustees of a trust qualifying under section 401(a). Generally, the contributions may be used by the trustees to purchase **any investments permitted by the trust agreement to the extent allowed by local law.***

> [but]

> *…Where the trust funds are invested **in stock or securities of, or loaned to, the employer or other person described in section 503(b)**, full disclosure must be made of the reasons for such arrangement and the conditions under which such investments are made in order that a determination may be made **whether the trust serves any purpose other than constituting part of a plan for the exclusive benefit of employees**.*

[Treas. Reg §1.401-1(b)(5)] (emphasis added).  These special considerations are applicable only to a plan sponsored by a governmental or church employers.  Above and beyond this discussion of the meaning of "investment", the concept is that plan assets be used productively for accumulating retirement benefits.

39.   The investments at issue here were third-party partnership interests, and Ms. Wagner does not state that any trust agreement prohibited them, or that they were prohibited under the local law(s) where their trusts were situated.  On the issue of plan disqualification, this should end the "investment" inquiry.

40.   Despite Ms. Wagner's constant suggestions to the contrary, the simple fact is that under Section 401(a) of the Code, plan qualification is not lost based on the nature of the plan's investments (other than as described in Treas. Reg. § 1.401-1(b)(5) cited *supra* at ¶ 32, which does not apply here).  This is the case regardless of Ms. Wagner's use of terms like "scheme," or her opinion as to what is reasonable, advisable or typical.  While ERISA imposes a prudence requirement as to investments (and plan administration generally), ERISA does not apply to one-person 401(k)s or other individual plans (and ERISA violations do not disqualify plans even where ERISA requirements apply, which, again, they do not here).  Sections IX and X of my Rebuttal Report address these irrelevant and obfuscating charges of Ms. Wagner, and nothing contained in Ms.

CONFIDENTIAL

Wagner's Rebuttal Report provides any reason for me to alter those opinions. In my career I have never experienced the IRS purporting to disqualify a plan in the absence of a violation of one of the qualification requirements in Code section 401(a), e.g., because of an asserted violation of ERISA's fiduciary provisions. In any event, this argument is a red herring because the investments in this case were made to produce returns for the plans, which is consistent with ERISA's provisions.

41.   The Wagner Rebuttal also implies that the investments were not "real" because the Plans "did not actually commit any of their own funds." Wagner Rebuttal Report ¶5. As it relates to plan qualification, this notion is baseless. As previously explained, there are no limitations in the qualification rules concerning investments except as I have already noted (e.g., involving loans to, or securities of, the employer), and certainly nothing governing contributions of capital by plans. This should end the inquiry. Moreover, and while the qualification requirements are the only relevant matter, Ms. Wagner's argument is incorrect even in the abstract. Plans routinely invest in hedge funds and other partnerships and vehicles that utilize options, futures and other derivatives, swaps, short sales and a myriad of other instruments; in those cases, the values of the assets and liabilities are not necessarily correlated with the cash contributions from investors.

## IV.   The Only Relevant Issue Is Whether the Plans Were Qualified (i.e., Tax-Exempt); To The Extent Ms. Wagner Means Something Else By "True Retirement Plans," It Is An Imaginary and Irrelevant Standard

42.   Section III(K) of the Wagner Rebuttal Report attempts to assail the Plans as not being "true" retirement plans, or "shams." Both in the abstract and the particulars, these claims are completely detached from the only relevant matter, which is the issue of tax qualification under Section 401(a) of the Code.

43.   A qualified plan is one that complies with the requirements of Section 401(a) in form and operation, nothing more and nothing less. Reish Rebuttal ¶ 9. The IRS states on its website that:

> *A qualified plan must satisfy the Internal Revenue Code in both form and operation. That means that the provisions in the plan document must satisfy the requirements of the Code and that those plan provisions must be followed.*

16

CONFIDENTIAL

[https://www.irs.gov/retirement-plans/a-guide-to-common-qualified-plan-requirements].  Ms. Wagner says as much in her initial report.  Wagner Report ¶ 88 ("requirements of tax-exempt status" are "set forth in section 401(a) of the Code"); ¶ 90 ("a tax-qualified plan must meet certain requirements contained in the code in order to receive tax-favored treatment").

44.     Tax qualification has nothing to do with what a typical plan might or might not do, whether a plan seeks high investment returns or invests as most other plans do, what business or businesses the plan sponsor is in, or anything else besides the qualification requirements set out in Section 401(a) of the Code.

45.     Nonetheless, while claiming the plans are "shams," the Wagner Rebuttal Report states that it will not address the term "sham" in any legal sense, but rather:

> *will focus on whether the Plans were shams in the lay person sense, not in the sham transaction sense as defined under the Code and by the Courts. Under that framework, and applying standard dictionary definitions, a sham can be defined as something that is phony, a ruse, a fraud; not what is displayed; anything that is not what it purports to be; something false, fake, or fictitious that only appears to be genuine. The Defendant Plans fit this sense of the definition, because their entire purpose was to serve as vehicles to implement Solo's scheme to obtain refunds of withheld dividends.*

Wagner Rebuttal Report ¶ 24.

46.     Ms. Wagner's arguments that the plans were "shams" are not substantive.  Rather, they represent an attempt to again re-state her existing arguments, but with different labels. Perhaps the most obvious instance of this is the last sentence in the above passage, which is a mere recitation of her incorrect claim that, if plan sponsors were motivated by a desire to invest through Solo Capital when forming their plans, or perhaps if others involved with Solo Capital also made money from the investments at issue, the plans are disqualified.  But the simple fact is the qualification requirements contain no prohibitions of the type Ms. Wagner implies, and for this reason she does not (and cannot) point to one.  Section 401(a) of the Code does not contain any reference – directly or in concept – to a "sham" plan; instead it addresses whether a plan is qualified (tax-exempt), which

17

is the only relevant inquiry.[2]  Any argument that a plan can be disqualified for a reason other than a violation of the qualification requirements is simply wrong, irrespective of the rhetoric in which it is cloaked.[3]

47.    While it is difficult to reply to such a claim, it appears to be based on the perceived motivations of certain parties that are simply irrelevant to the issue of plan qualification.

48.    For example, while it may be fair to presume that the motivations of Solo Capital and its affiliates were private gain, that is irrelevant.  After all, presumably every investment provider or other party in the marketplace is ultimately motivated – at least primarily – to make money.  Every investment manager or promoter who wishes to launch an investment has to find investors.  In fact, some types of investment products are only available to retirement plans, so in those cases plan investors have to be found. Regardless of Ms. Wagner's suggestions to the contrary, there is no rule or concept in the qualification requirements that a one-person 401(k) plan or any other plan is disqualified simply because it makes an investment or hires a service provider whose motivation is to make money.

49.    Ms. Wagner also states that

> Shah's **scheme** required him to locate plan sponsors **willing to provide the Plan's name** for purposes of filing DWT reclaims without committing sponsor or Plan assets, because a necessary element of the scheme under the Treaty was the participation of a tax-exempt entity.

Wagner Rebuttal Report ¶ 26 (emphasis added).  Such opinions and intimations regarding the legitimacy of Solo Capital's conduct—about which I express no opinion—have no

---

[2] To the extent Ms. Wagner refers to the sham *transaction* concept, which does exist under the Code, that is also not relevant, as it relates to the propriety of a particular transaction and does not impact whether the plan engaging in that transaction is tax-qualified.

[3] Ironically, Ms. Wagner questions how I opined on whether the Plans were "shams" without defining the term.  I used the term "sham" because SKAT alleged in the complaints that I reviewed that the plans were "shams."  *E.g.* Roadcraft Technologies Amended Complaint ¶¶ 45, 68. My primary opinion regarding these allegations was that there is no concept under the Code of a plan being a "sham."  Though Ms. Wagner claims "the Code" and "the Courts" have a definition of the term, she fails to provide one and relies instead on a lay definition (which would be indefensible if the Code, in fact, had one).  I note further that SKAT stated in an interrogatory response that the basis for its claim that the plans were "sham entit[ies]" was its contentions that the plans violated the Code's exclusive benefit, permanency, and funding rules, and were thus not qualified.  Plaintiff Skatteforvaltningen's Responses and Objections to Defendants' First Set of Interrogatories to Plaintiff Skatteforvaltningen, July 15, 2021 ("Interrogatory Responses") at 6-10.  SKAT did not identify in its interrogatory response any applicable definition of "sham" under "the Code" or "the Courts."

CONFIDENTIAL

relevance to the issue of tax-qualification.  Instead, any reasonable inquiry about tax qualification would focus on the plans themselves, and would not be based on the motivations of Solo Capital.

50.    Ms. Wagner continues further with a list of factors purportedly in support of her opinion that the Plans were "shams."  Wagner Rebuttal Report ¶ 28.  Without exception these factors do not relate to any requirement imposed upon tax-qualified retirement plans to obtain or maintain their qualified status.  For this reason there is no need to respond in detail to all of the factors that Ms. Wagner lists, other than to note that they have nothing to do with tax qualification.  For example, Ms. Wagner alleges "extraordinary debt" in the Solo Capital transactions and that transactions occurred before plan assets were transferred to the custodian, neither of which – even if true – would bear on any qualification requirement.  But a few more detailed and specific comments are in order:

    a.  Ms. Wagner claims that participants were unconcerned about the solvency of investment counterparties and the merits of individual stock investments.  In effect, she appears to assert that the participants were not skilled or knowledgeable investors, and therefore their plans should be disqualified. That's obviously not how the regulation of qualified retirement plans actually works.  And, that is the reason that most qualified plans hire knowledgeable persons to manage their investments.  In other words, whether true or not, this does not have any relevance to plan qualification.

    b.  Ms. Wagner claims that the participants showed "general indifference" to the tax advantages associated with the Plans.  Again, whether true or not, this is irrelevant to plan qualification.  It is manifest that qualified plans are tax-advantaged vehicles – the Code does not condition plan qualification on a person's knowledge, personal attitudes or priorities concerning tax issues, and certainly does not require that they make oral or written statements commemorating their tax goals to prove their motivations.

    c.  Ms. Wagner accuses the parties of a general indifference concerning "recordkeeping requirements."  There are no actual recordkeeping requirements in Section 401(a) of the Code.  Regardless, in my experience plan sponsors

19

CONFIDENTIAL

typically utilize third-party administrators, accountants, and similar professionals for these types of tasks. Certainly, such providers were used in these cases, as their plan documents were professionally prepared. Likewise, with respect to the RJM Plan and numerous other plans examined by the IRS as part of the audit discussed in Section VI below, Forms 5500 were prepared by a professional accountant, which were approved as filed by the IRS. This approval was given in the RJM Plan audit following the submission of very detailed financial records involving the plans at issue and their underlying investments in Solo Capital. It also appears that a professional accountant filed Forms 1099-R on behalf of the RJM Plan and other plans.[4] Ms. Wagner's blanket accusation that "recordkeeping requirements" were disregarded is at best unfounded and at worst flatly inconsistent with the evidence in the record.

51.    In sum, Ms. Wagner's arguments that the plans were somehow "shams" do not demonstrate, and largely do not even attempt to demonstrate, that the plans violated the Code's qualification rules.

## V.    Wagner Invents a "Holistic Review" Standard That Does Not Accurately Reflect Tax-Qualification Standards

52.    With her Rebuttal Report, Ms. Wagner changes tactics: While conceding that many of the issues and implications raised in the Wagner Report would not (or at very least, in her view, might not) trigger plan disqualification in and of themselves, she argues that when examined "holistically" they demonstrate that the plans were not "real" or were "shams." She states:

> In determining whether an arrangement of any type is a **genuine retirement plan**, it is necessary to look holistically at such factors which indicate its true purpose…
>
> …In contrast, the Reish Report seeks to silo various rules applicable to tax-qualified plans (one-person plans are permissible, nontraditional investments are permissible, investment by plans in partnerships is permissible) without providing any context for any of those propositions.

Wagner Rebuttal Report ¶¶ 26-27 (emphasis added).

---

[4] WH_MDL_00327129, WH_MDL_00327143, WH_MDL_00329622.

CONFIDENTIAL

53.   While perhaps appealing on its face, this theory has no basis in law or actual regulatory practice.  As I have previously explained, the qualification rules are a definitive, finite list of objective requirements set forth in Section 401(a) of the Code.  The idea that non-violations of the qualification requirements cause plan disqualification simply because there is more than one is invented from thin air.  Where a plan is tax-qualified there is no basis to assail it on the notion that it is not "genuine." As a practical matter, the IRS has not raised that kind of argument in the hundreds of IRS audits and IRS plan corrections that I have worked on.  It simply isn't a qualification requirement; if specific qualification requirements are violated then the plan has a qualification defect, and if they not are violated, then there is no qualification defect.   This is regardless of whether it is "genuine" by whatever made-up standard Ms. Wagner applies.

54.   In this context, it is again crucial to differentiate between the actual qualification requirements that apply to plans (she addresses only three) on one hand, and the panoply of theories Ms. Wagner presents that are simply irrelevant on the issue of plan qualification on the other. Even a "holistic" view of plan qualification is not a license to import a myriad of inapplicable standards and personal opinions on matters not contemplated in Section 401(a) of the Code.

55.   In stating that I have analyzed the issues in isolation or somehow out of context, she provides the following example:

> *For example, the Reish Report does not address the fact that **many sponsors of Plans that engaged in the scheme established multiple Plans to do so**.  Arguments that this multiple plan structure would have been entirely permissible under the Code, so long as all of the restrictions that would be applicable to an individual plan applied to each of the other plans, **would be unavailing, even though technically accurate, since they would lack any context for the actions taken by the Pension Plans in this case.***

Wagner Rebuttal Report ¶ 27 (emphasis added).  But at the end of the day, she does not (and cannot) point to any provision in section 401(a) of the Code that prohibits establishing multiple plans.  There is no such a provision.  To the extent she is again advancing her viewpoints on what typical or advisable retirement plan practices are, her statements are not relevant to qualification.

21

56.    Stated simply, and contrary to Ms. Wagner's intimations, there is no "broader context" required, other than the qualification requirements in the law and regulations (as interpreted and applied by the IRS).

57.    The fact that Ms. Wagner is not arguing objectively from the perspective of the qualification requirements in Section 401(a) of the Code is demonstrated over and over again by her choice of language.  Note that in the passage from Paragraph 27 of the Wagner Rebuttal Report cited above, Ms. Wagner states unequivocally that arguments concerning the use of multiple plans, even if "technically accurate," would still be wrong in her opinion.

58.    On the issue of single-participant plans like the Solo 401(k)s at issue she makes a very similar statement:

> *Paragraphs 19-21 of the Reish Report comment that one-person pension plans are commonplace and recognized by the Internal Revenue Service ("IRS"). I do not take issue with this observation, but it is irrelevant, since neither the Complaint nor my Initial Expert Report suggests to the contrary. My criticism relates to the way in which the Plans were used which fell far outside* **pension industry norms**.

Wagner Rebuttal Report ¶ 5 n.2 (emphasis added).  The issue in this case is plan qualification, not adherence to other considerations such as industry norms, or inapplicable laws like ERISA.

59.    She continues:

> *While each of Reish's conclusions, taken in isolation, have a veneer of truth, the presence of numerous related plan sponsors with duplicative minimally funded retirement Plans claiming ownership of massive amounts of publicly-traded Danish securities also needs to be considered in determining* **whether the Plans were qualified or just a sham.**

Wagner Rebuttal Report ¶ 28 (emphasis added).  Section 401(a) of the Code deals with qualified plans versus non-qualified plans, not the false dichotomy of qualified plans versus "sham," "not genuine," or "not real," plans.  Ms. Wagner repeats again in this passage her baseless claims concerning multiple plans and proper "funding," which I have addressed.  Ms. Wagner's other arguments are so far afield from the issue of plan disqualification that it is difficult to respond to them, other than to point out that she is "creating" qualification standards that do not exist.

CONFIDENTIAL

60.    The fact that the IRS does not recognize a so-called "holistic" standard of qualification analysis (at least, in the way Ms. Wagner suggests) is bolstered by its findings in the audit of the RJM Plan addressed in Section VI.  For brevity I will not repeat those points, but they demonstrate that Ms. Wagner's conclusions are based on an apparent distaste for the Solo Capital arrangement and have nothing to do with regulatory practice or the plans themselves.  In the RJM Plan audit, the IRS found no violations despite a very thorough review (including a review of the Solo Capital investments), notwithstanding Ms. Wagner's sweeping statements such as: "If the full range of the Plans' operational lapses in this case were disclosed to the IRS, along with the circumstances surrounding the Plans' formation and use, the likely result would be Plan disqualification in every instance."  Wagner Rebuttal Report ¶ 8.

61.    I have responded in detail to Ms. Wagner's opinions concerning the three specific qualification requirements that are addressed in her arguments.  On those that do not implicate any qualification requirements, I would merely offer some short responses.

62.    She asserts that the plans' investments with Solo Capital were not "real" investments:

> *In my opinion, the most fundamental objection to describing the Solo transaction as a nontraditional investment strategy is that it was not a real investment, and the Plans did not actually commit any of their own funds to the purchase of Danish stocks; they simply lent their names to the filing of withheld dividend reclaims in return for a fee.*

Wagner Rebuttal Report ¶ 5.  Not only is there no requirement in section 401(a) concerning the "commitment" of plan funds to an investment, but this statement is factually false.  While the above passage may be a useful characterization for Ms. Wagner's purposes, the plans paid Solo Capital a fee for assistance participating in a strategy in which they otherwise would have had no ability to participate. The plans and individual participants presumably had little experience in foreign securities trading, arranging counterparties, and similar functions, which is why they paid Solo a fee to administer the program.

63.    In the last paragraph of her Rebuttal Report, Ms. Wagner concludes by suggesting that tax-qualified plans are not merely required to maintain compliance with the objective requirements under Section 401(a) of the Code (which is in fact all they are required to

CONFIDENTIAL

do), but rather that there is some other nebulous "normalcy" standard that they must also satisfy. On the issue of what this standard requires, or might involve, in her view, her only additional suggestion (that I have not already responded to) is that it prohibits high investment returns over short periods:

> There may be **no bright line test** as to the circumstances under which a tax qualified plan would be treated as a sham...
>
> ...the Plans **should be treated as arrangements calculated to rapidly obtain a high return** with no effort or risk other than a small outlay for LLC and Plan documentation with most of the return going to the scheme's promoter. This was unrelated to the **only legitimate purpose of a retirement plan which is the gradual accumulation of benefits** to support plan participants in retirement.

Wagner Rebuttal Report ¶ 29 (emphasis added).

64.    I should emphasize that this passage does not even purport to be about plan qualification, as it clearly contemplates that "tax qualified plans" can nonetheless be "shams" (and not that "sham" plans are not qualified).  On this basis it is not clear to me how it could be relevant.

65.    Regardless, and for the avoidance of any possible doubt, there is no qualification requirement whatsoever – explicit or implicit – that imposes a minimum "effort" or "risk" requirement concerning plan investments. Ms. Wagner does not and cannot point to one. (I have already responded to her claims about "most of the return going to the scheme's promoter," which is just another reference to the exclusive benefit rule).

    a.    There is also no qualification requirement – explicit or implicit – that requires plans to make large capital outlays for investments.  Ms. Wagner does not and cannot point to one.

    b.    There is also no qualification requirement – explicit or implicit – that prohibits plans from earning high investment returns over short periods (or, stated inversely, that requires investment earnings to be accrued only gradually).  Ms. Wagner does not and cannot point to one.

66.    While it is difficult to respond to arguments based on non-existent standards, the truth of my assertions above is demonstrated again by the RJM Plan audit discussed Section VI *supra*.  As explained therein, the IRS received very detailed information about the

24

CONFIDENTIAL

amounts and timing of contributions, the Solo Capital investments, and the plan account balances. That documentation included copies of Forms 5500-EZ for the RJM Plan, which, on their first pages, disclosed the growth of the value of the Plan's assets. There can be no serious argument that the IRS did not understand the inflows, returns, outflows, and investment results, and the IRS did not find or even suggest that the investments resulted in some type of qualification violation.

67. Ms. Wagner's arguments appear to be based on her distaste for the arrangement and not on the law or regulatory practice. For example, she ends her Rebuttal Report with this conclusory sentence: "Because of their widespread departures from **standards embraced by the retirement plan industry**, the Plans in this case simply were not what they purported to be." Wagner Rebuttal Report ¶ 29 (emphasis added). Irrespective of Ms. Wagner's notions about what plans should be, should invest in, or should otherwise do, these were qualified plans under section 401(a) of the Code, and that is all that matters. Arguments concerning matters other than plan qualification are irrelevant, regardless of how often they are repeated or the rhetorical language in which they are presented.

## VI. IRS Audits Focus On Violations of the Qualification Requirements and Prohibited Transactions; The RJM Plan Audit Was Thorough And Would Have Identified the Violations Alleged by Ms. Wagner, If They Were In Fact Violations

68. The "elephant in the room" for Ms. Wagner's assertions that these Plans were littered with pervasive and egregious errors that each, independently and collectively, clearly establishes the plans as not qualified is the IRS audit of the RJM Plan that resulted in a "no change" letter.

69. Section III(C) of the Wagner Rebuttal Report makes the following claims in this basic order:

   a. The IRS might not have focused on fundamental tax qualification issues in its audit of the RJM Plan. Wagner Rebuttal Report ¶ 9.

   b. "Even if the IRS audit had considered all of the tax qualification issues raised in my Initial Expert Report and confirmed the RJM Plan's qualified status, or if the

CONFIDENTIAL

Plan were to receive such a confirmation in the future, in my experience, the determination would be meaningless." Wagner Rebuttal Report ¶ 11.

c. The RJM Plan "was in no way representative of all the other plans subject to this litigation." Wagner Rebuttal Report ¶ 12.

70.   As a threshold point, these claims are not affirmative, substantive arguments. Rather, they are an attempt to reconcile Ms. Wagner's theoretical claims regarding IRS regulatory practices with the contrary facts of what the IRS actually did when asked to examine one of the actual plans at issue in this case. Held up to the light, each is meritless.

**A.      The RJM Plan Audit Addressed Qualification Issues**

71.   On the first claim, Ms. Wagner's statements are untrue both in the abstract and with respect to this case. It is true that IRS audits do not necessarily address every detail of a plan's operations. However, I disagree that the IRS disregards fundamental issues of tax qualification when performing its audits. Doing so would make the entire audit process pointless and superfluous. As I pointed out in my Rebuttal Report, the Internal Revenue Manual's "Overview of Form 5500 Examination Procedures" (which covers Form 5500-EZ examinations like the one conducted for the RJM Plan) makes absolutely clear that the qualification rules are the focus:

> *(1)      EP Examinations determines **if a retirement plan is qualified under IRC 401** and the underlying regulations, and therefore, exempt from tax under IRC 501.*
>
> *(2)      Policy Statement 4-119 provides that the primary objective of the Employee Plans examination program is regulatory, with e**mphasis on continued qualification** of employee benefit plans. IRS selects and examines returns to:*
>
> *a.      Promote the highest degree of voluntary compliance with the **tax laws governing plan qualification**.*
>
> *b.      Determine the extent of compliance and the causes of noncompliance with the tax laws by qualified plans.*
>
> *c.      Determine whether such plans meet the applicable **qualification requirements in operation.***

Reish Rebuttal Report ¶ 103 (quoting IRM Section 4.71.1.1.1 (last updated Nov. 29, 2019)) (emphasis added). The reason that the IRS examines these types of issues is that plan qualification (or lack thereof) dictates the tax treatment of trust earnings and benefit

26

CONFIDENTIAL

payments.  A plan that is not qualified provides no tax benefits.  It is therefore false for Ms. Wagner to suggest that this was a "tax audit" unrelated to the qualification of the RJM Plan and the others reviewed.  The chapter of the manual that governs IRS audits like the one the IRS conducted with respect to the RJM Plan makes clear that during such audits, the IRS examines the plans' qualification status.

72.   Further, the Wagner Rebuttal Report claims repeatedly that violations of the qualification requirements occurred that were clear on their face, and were of a massive scope and scale.  For example, her Rebuttal Report states that there were "multiple of egregious uncorrectable violations" that were "pervasive" and "ubiquitous."  Wagner Rebuttal Report ¶¶ 15-16.  As described *supra*, while she concedes on one hand that IRS audits seldom result in plan disqualification, Wagner Rebuttal Report ¶ 13, she nonetheless states that the violations in these cases were so extreme and widespread that all 193 Plans would be disqualified, Wagner Rebuttal Report ¶ 8.  I do not believe it is credible to argue that the IRS overlooked such numerous and fundamental issues when auditing the RJM Plan; rather, the logical conclusion is that the IRS did not conclude that such violations had occurred.

73.   This conclusion is bolstered by the actual audit correspondence.  Among numerous other items, the IRS requested and received documents concerning "all sources of plan income (other than investment earnings)" (which would clearly include contributions and when contributions stopped, and transfers/rollovers) from the effective date of the plans through December 31, 2016 for the RJM Plan and several others.  Reish Rebuttal Report ¶ 109 n. 14 (quoting Response to IRS' September 13, 2018 Request for Information, dated October 4, 2018, WH_MDL_00356990); *see also id.* ¶ 112.  The correspondence makes clear that the IRS was informed of the Plans' effective dates.  Reish Rebuttal Report ¶¶ 109, 111.  The same correspondence also addressed "non-taxable" distributions from Roth (after-tax) accounts from the RJM Plan and another plan.  *See* WH_MDL_00356990.  If the RJM Plan were not qualified, it could not distribute money as a tax-free rollover.

74.   Similarly, and regardless of the Wagner Report's claims to the contrary, the IRS requested and received monthly bank and broker statements from the RJM Plan from

CONFIDENTIAL

2012 to 2016, including statements for the Plan account at Solo Capital, that provided the IRS with extensive details of the RJM Plan's trading activity, including its purchases of Danish securities, the receipt of funds from payment agents following the trading in Danish securities, the fees it paid to Ganymede, and distributions the RJM Plan received from other plans pursuant to partnership agreements.  Response to IRS' February 4, 2019 Request for Information, dated February 25, 2019, WH_MDL_00357011; *see also* Reish Rebuttal ¶ 106.

    a.   The Solo Capital account statements that the RJM Plan provided to the IRS include detailed lists of the Danish securities in which the RJM Plan traded, the dates on which the trades occurred, and the volume and price of the securities traded.  WH_MDL_00524103; WH_MDL_00524103; WH_MDL_00524103. Thus, contrary to Ms. Wagner's claim, the RJM Plan *did* "disclose[] to the IRS examiner" information regarding its "purchases of Danish stocks."  Wagner Rebuttal Report ¶ 10.  Yet the IRS, having received this information, did not disqualify or take any adverse action against the RJM Plan.

    b.   The monthly bank statements requested by the IRS and provided by the RJM Plan reflect deposits received from Goal Taxback Limited—which the RJM Plan explained in correspondence to the IRS represented "direct payment of proceeds from withholding tax refund claims to the RJM Plan," WH_MDL_00357011 at 012, followed immediately by wire transfers of funds out to Ganymede. WH_MDL_00357011.  In some months, the receipt of funds from the payment agent and the corresponding payment to Ganymede were the only transactions that occurred, and the amount paid to Ganymede was equal to 68% of the money received from the payment agent.  WH_MDL_00357083; WH_MDL_00357068.  Thus, contrary to Ms. Wagner's claim, the RJM Plan *did* disclose to the IRS examiner that "65 percent"—or more—"of the proceeds from dividend refunds" was "paid to . . . Ganymede."  Wagner Rebuttal Report ¶ 10.  Yet the IRS, having received this information, did not disqualify or take any adverse action against the RJM Plan.

CONFIDENTIAL

    c. Other bank statements show wire transfer inflows of funds from other plans. WH_MDL_00357083; WH_MDL_00357092; WH_MDL_00357099. The RJM Plan explained in correspondence to the IRS that these amounts were "paid to the RJM Plan by another partner in the investment partnership that acted on behalf of the partnership in receiving investment proceeds and paying out partnership distributions in accordance with the applicable partnership agreement." WH_MDL_00357011 at 012. And, although not specifically requested, the RJM Plan also produced to the IRS 2013 and 2014 Schedule K-1 returns, which state the percentage of the RJM Plan's interest in its investment partnerships and the amount of distributions received from those partnerships.[5]

    d. Thus, the IRS was provided with documents indicating that the RJM Plan received payments from its partners representing the investment proceeds the RJM Plan was entitled to under its partnership agreement, and further that the amounts paid to the RJM Plan represented "the bulk of the proceeds remaining after Solo Capital's and Ganymede's fees to other members of the partnership." Wagner Rebuttal Report ¶ 20. Yet the IRS, having received this information, did not disqualify or take any adverse action against the RJM Plan.

75. Subsequent correspondence includes further detail about the business activities of Mr. Markowitz and the various entities and the sources of contributions to the RJM Plan and several other plans. *See* Response to IRS dated April 3, 2019. Likewise furnished was additional information about the "contribution history" of the RJM Plan. *See* Response to IRS dated April 9, 2019.

76. As I previously noted in my Rebuttal Report [Section VII], the information summarized above would have been more than adequate to apprise even a neophyte IRS agent of fundamental qualification defects (if they were defects, which they were not) of the type alleged by Ms. Wagner relating to plan formation and investments in Solo Capital, including "permanency" (effective date and timing of contribution stoppage), the

---

[5] WH_MDL_00524141; WH_MDL_00524142; WH_MDL_00524143; WH_MDL_00524144; WH_MDL_00524145; WH_MDL_00524146; WH_MDL_00524147; WH_MDL_00524148; WH_MDL_00524149; WH_MDL_00524150; WH_MDL_00524151; WH_MDL_00524152; WH_MDL_00524153.

CONFIDENTIAL

exclusive benefit rule (compensation to third parties and payments to partners), and purportedly "improper sources of funding" (sources of transfers, contributions, etc. and business activities), and so on.

77.    The audit lasted for almost two years, which is consistent with a thorough review of large amounts of financial and other information.  I have represented clients in IRS plan audits on numerous occasions, and I am very confident that it would not take two years to simply reconcile the figures reported on the RJM Plan's Form 5500-EZ series filings with subsequent tax returns concerning distributions.   Contrary to contentions in the Wagner Rebuttal Report, this was not merely an exercise of checking two sets of documents for consistency.  Wagner Rebuttal Report ¶ 10.  The purpose of the IRS's Form 5500 series audit program is to identify plan defects affecting qualification, which in turn affect federal income taxation.

**B.    Ms. Wagner's Assertion that the IRS's Findings Would Be "Meaningless" Even If It Considered All The Purported Qualification Issues She Raises, Is Not Credible On Its Face**

78.    Next Ms. Wagner states that, even if the IRS had done a thorough review (in her view) of the qualification issues and still found the RJM Plan qualified, it would not matter:

> *(W)hile the RJM Plan's unique history and circumstances might enable it to avoid retroactive disqualification on these grounds, it nevertheless engaged in many of the other operational defects discussed in my Initial Expert Report and should have been disqualified on that basis…*
>
> *…**Even if the IRS audit had considered all of the tax qualification issues raised in my Initial Expert Report** and confirmed the RJM Plan's qualified status, or if the Plan were to receive such a confirmation in the future, in my experience, the determination would be meaningless and should be overturned once the IRS became aware of the larger picture of the Plan's participation in the Solo scheme.*

Wagner Rebuttal Report ¶ 11 (emphasis added).

79.    This is an extraordinary claim, and it demonstrates further that Ms. Wagner's Reports – while purporting to be based on the qualification rules under Section 401(a) of the Code – are actually based on other standards or opinions that do not apply to plan qualification. Ms. Wagner apparently takes the view that, even starting with the premise the IRS considered *every single issue she raises* and *still* confirmed the RJM Plan's qualified status (and as I demonstrate in my rebuttal report at ¶¶ 104-112 and *supra* at ¶¶ 51-54,

30

the IRS had sufficient information to take action against the plans' alleged violations of the exclusive benefit, permanency, and funding rules, had it actually considered them to be violations), the outcome of that audit should be considered "meaningless." Such a position is completely inconsistent with my experience and defies belief.

C. **Ms. Wagner's Claim That The RJM Plan Is Unique Among The Defendant Plans Is Inconsistent With The Facts**

80. Third, Ms. Wagner claims that the RJM Plan was, or may have been, different (i.e., than the other 192 Plans):

> *The RJM Plan may have been better positioned than other defendant Plans to satisfy certain conditions for tax-qualified status, such as the trade or business requirement, due to the fact that its LLC sponsor had been established a number of years before the Danish trading began and was able to assert that the LLC actively engaged in a trade or business . . . . Finally, the RJM Plan was in no way representative of all the other Plans subject to this litigation that were irrefutably deficient with respect to permanence and trade or business issues, as well as numerous other tax-qualification rules. Most Plan sponsors admitted that their newly established LLCs were funded with minimal assets, had never conducted any business activity and never generated any income.*

Wagner Rebuttal Report ¶¶ 11-12.

81. In short, the Wagner Rebuttal Report argues for a rather convenient coincidence: that the one plan out of 193 specifically reviewed by the IRS just happened to be the one that suffered from the least defects (even though she still argues that the RJM Plan "should have been disqualified"), unlike the 192 remaining which she maintains were "irrefutably deficient." Wagner Rebuttal Report ¶ 11.

82. The Wagner Rebuttal Report gives no weight to (nor does it even address) the fact that the RJM Plan provided the IRS with extensive documentation related to several other plans in the course of its audit, and that the IRS took no steps to disqualify any of those plans based on the information provided. The documents provided by the RJM Plan as to other plans included, for example, bank statements and K-1 returns that reflected the plans' participation in investment partnerships and payments received from other plans in those partnerships. *E.g.*, WH_MDL_00524170; WH_MDL_00524160.

83. To the extent that any further response to this final claim is necessary, the only substantive differences between the RJM Plan and the others that the Wagner Rebuttal

31

Report suggests relate to (i) "permanency" and (ii) her notion that the LLCs had insufficient assets or income. Both of these matters are separately addressed both in my previous reports and herein (See Sections II.B and II.C, respectively), and those discussions need not be repeated here.

## VII. Prohibited Transactions Do Not Cause Plan Disqualification; The Fact that Both Can Occur in the Same Case Is Not Relevant

84. Section III(E) of the Wagner Rebuttal Report argues only that prohibited transactions under Section 4975 of the Code, and plan disqualification due to violations of Section 401(a) of the Code, are not mutually exclusive. While legally accurate, this is a straw man argument. In my initial report I did not state that prohibited transactions would preclude plan disqualification. Rather, I stated that the existence or lack thereof of a prohibited transaction does not make a plan more or less likely to be qualified; Reish Initial Report ¶¶ 28, 52.3, 53.3.

85. However, to the extent Ms. Wagner opines or implies that failing to abide by a prohibited transaction rule is a basis for disqualification, she is mistaken. Whether a prohibited transaction has occurred is an independent and separate question from whether the qualification rules have been violated. Indeed, prohibited transactions rules appear in an entirely different subchapter of the Code from rules regarding tax-qualification.

86. Additionally, I have never been personally involved in a case where the IRS asserted both a prohibited transaction and plan disqualification based on the same facts, although I agree that this could occur in rare cases (which would usually, if not always, involve the use of plan assets for the personal benefit of the "control persons", that is, the plan sponsor, the trustee, or an owner of the plan sponsor, or for the personal benefit of a family member of the control person or another person in whom the plan sponsor or trustee (that is, a control person) had a personal interest that would cause the use of plan assets to advantage that entity or person). Instead, the relevant point is that the IRS does not use the prohibited transactions rules *as a basis* for plan disqualification, because the qualification rules do not require avoidance of prohibited transactions. For this reason, Wingers (cited at Wagner Rebuttal Report ¶ 16) is not relevant to this matter.

32

CONFIDENTIAL

87.     The only relevant issue is whether the plans complied with the qualification rules in Section 401(a) of the Code.  The proposition Ms. Wagner argues for—that the existence of a prohibited transaction violation does not preclude the existence of an exclusive benefit rule violation—has absolutely no bearing on whether a plan is qualified or not, either in general or in this case.  Indeed, Section III(E) of the Wagner Rebuttal does not actually argue to the contrary.  Ms. Wagner states in that section that "(t)he Reish Report states that if a plan engages in a prohibited transaction, the remedies for the prohibited transaction are separate and apart from plan disqualification," and admits further that in her initial report she "did not suggest that a prohibited transaction necessarily results in the disqualification of a plan."  Wagner Rebuttal Report ¶ 16.  Both statements are true and show the prohibited transaction rules to be irrelevant to making a determination as to whether a plan is tax-qualified.

88.     Despite this, in the Wagner Report, in addition to approximately 300 references to "ERISA" and numerous lengthy discussions about vague concepts such as industry norms and industry practices, there are 42 references to the terms "prohibited transaction" or "prohibited transactions."  All of these various concepts were grouped together in a conflating and confusing manner, as if to imply that they cause plan disqualification.  The qualification rules in Section 401(a) do not require compliance with ERISA, industry norms or industry practices, or avoidance of prohibited transactions.  My reason for addressing prohibited transactions was simply to make that point clear and avoid obfuscation.

89.     At times, Ms. Wagner appears to argue—contrary to the above—that the existence of a prohibited transaction violation *does* have some bearing on whether the exclusive benefit rule has been violated.  For instance, Ms. Wagner advances the following vague and unsubstantiated claim which conflates a number of separate concepts:

> The **operational violations** were ubiquitous, even though not every Plan violated each and every **condition for qualified-plan status** cited in my Initial Expert Report, although some did. This **disregard of norms** meant that the Plans were never **qualified notwithstanding simultaneous application of the prohibited transaction rules** and the fact that many of the factors indicating violation of both the qualified plan and prohibited transaction rules overlapped.

Wagner Rebuttal Report ¶ 16 (emphasis added).

33

CONFIDENTIAL

90. The above-cited passage, while confusing, in relevant part stands for no more than the proposition that the qualification rules and prohibited transaction restrictions can apply simultaneously. To the extent that there are common facts affecting both, only a discussion of the impact on plan qualification is relevant. Conversely, a discussion of prohibited transactions rules and whether they were violated is not relevant to an inquiry into a plan's qualified status. Instead, the proper inquiry is whether the qualification requirements of Code section 401(a) were violated.

91. As another example, Ms. Wagner asserts: "the Reish Report, in my opinion, does not accurately describe the relationship between prohibited transactions and plan disqualification where pervasive violations of qualified plan and other legal requirements occurred in every phase of activity (including, formation, administration, "investment" and termination) relating to the 193 Plans engaging in DWT refund claims." Wagner Rebuttal Report ¶ 16.

92. Where there are "pervasive violations of qualified plan" rules, that can lead to disqualification irrespective of prohibited transactions rules. And, of course, where there are no violations of the qualification rules, it does not matter (for qualification purposes) whether there are violations of the prohibited transaction rules. There is, in fact, *no* "relationship between prohibited transactions and plan disqualification," other than the possibility that a particular set of facts can support violations of both the qualification rules and the prohibited transaction restrictions. Ms. Wagner's reference to "other legal requirements," again, has nothing to do with qualification.

93. While this part of my Reply report goes in to some detail on the application of the prohibited transaction rules, that should in no way be taken to suggest that these prohibited transactions rules have ***anything*** to do with any relevant issue in this case, including whether the plans at issue violated the exclusive benefit rule. If excessive compensation was paid to Solo Capital and its affiliates, the excess amount would be a prohibited transaction and the amount of the compensation in excess of a reasonable amount would not be enforced as an exclusive benefit violation. These concepts are commonly understood in the retirement plan community and are applied as I described by the IRS.

34

**VIII.    Miscellaneous Errors in Ms. Wagner's Rebuttal Report**

94.    There are several other minor points Ms. Wagner raises that are not worth significant attention but must still be addressed.  This section briefly addresses those in turn.

    **A.    Ms. Wagner's Discussion of the Trust Agreement(s) Is Both Irrelevant and Unsubstantiated**

95.    In Section III(G) of the Wagner Rebuttal Report, Ms. Wagner, in a single paragraph, (i) makes the vague and unsubstantiated claim that I have read the Plan's trust terms too selectively (in and of itself, this is not a substantive argument), (ii) offers a single example of this alleged misreading (and the plan she focuses on , the RJM Plan, was audited by the IRS and not disqualified), (iii) states that she will "venture no opinion" on violations of foreign laws, and (iv) claims that "there were many aspects of the Plans' involvement with Solo Capital that were highly questionable under U.S. law…" without stating what, if any, specific violations she is referring to.  Wagner Rebuttal Report ¶ 18.  I make the following limited responses.

96.    The Wagner Rebuttal Report states that the RJM Plan terms required adherence to the "then existing law" when investing. Wagner Rebuttal Report ¶ 18.  However, even if the reference to "highly questionable" is interpreted to mean actual violations of U.S. law, the only "then existing law" applicable to this inquiry would be Section 401(a) of the Code, which, as I have demonstrated herein and in my two previous reports, was not violated.  This is bolstered by the findings of the IRS audit, as discussed previously. No other purported examples of U.S. law are offered upon which I could submit a reply. However, as a practical matter, this argument obviously lacks merit.  For example, if a corporation whose stock is traded on the New York Stock Exchange committed a criminal violation, would all of the qualified plans that held the stock in that corporation be disqualified?  Would all qualified plans invested in a mutual fund be disqualified if the fund violated SEC rules?  Obviously not.

97.    Turning to possible violations of foreign laws, because the Wagner Rebuttal Report does not "venture an opinion" I cannot offer a substantive reply.  But one point should be made.  Based on my experience dealing with the IRS and qualified plans in general, I am confident that a boilerplate statement in a prototype plan document concerning general

35

legal compliance would not lead to plan disqualification due to a violation of a foreign tax law.  In fact, in my experience, the only plan terms that IRS agents contend would possibly result in disqualification if not followed are those that are intended to satisfy specific Code qualification provisions.  Stated slightly differently, I have not seen the IRS assert a qualification failure due to provisions that do not apply to the plan's compliance with the qualification requirements of specific Code provisions.

98.    Ms. Wagner also asserts that: "Moreover, most plan documents, including those I have reviewed in this case, require thorough vetting of an investment to determine its prudence, a process that was largely ignored by the Plan sponsors."  Wagner Rebuttal Report ¶ 5.  As a general proposition, most plan documents refer to "prudence" because, unlike those at issue in this case, most plans are subject to ERISA's prudence standard (there is no such standard under the qualification rules).  I disagree with the general claim that the plan documents in this case require "thorough vetting of [investments] to determine [their] prudence."  But even to the extent that some of the plans' documents contain references to "prudence" this is neither applicable to them, nor does it implicate their qualified status in any way.  In my experience the IRS does not disqualify plans because of non-adherence to a legal standard that does not apply to the plan and does not relate to a qualification requirement in the first place.  And, as pointed out in my Rebuttal Report (¶ 139.a), some of the plans at issue have specific provisions that declare that if the plan is not governed by ERISA, the fiduciary provisions do not apply for purposes of those documents.

**B.    Certain Courts Can Rule On the Qualified Status of a Plan; This Does Not Mean the Plans In This Case Are Disqualified**

99.    Section III(B) of the Wagner Rebuttal Report states that parties other than the IRS can rule on the qualified status of plans, and she points out that bankruptcy courts have done so.  This is true, but it is both a straw man argument and irrelevant.

100.    As Ms. Wagner points out, a qualified plan must be qualified in form and operation.  I agree, and I have never stated otherwise.  But she goes on to state that:

> *Therefore, the fact that the IRS has not formally disqualified a plan does not necessarily mean that it should be treated as tax-qualified. Given that the IRS does not review the vast majority of plans, the contrary view espoused by the Reish*

CONFIDENTIAL

> *Report would permit sponsors and investment providers who successfully avoid plan audits to run amok, despite their disregard of substantive rules.*

Wagner Rebuttal Report ¶ 7.

101.    I have not opined that plans can evade disqualification by avoiding IRS audits.  Both my Initial Report and Rebuttal Report make clear that I do not believe the IRS would disqualify the plans even if they were audited – see, for example:

    a. Reish Initial Report, ¶35 ("Based on my experience, the IRS would not disqualify or otherwise take action where a recently-formed LLC sponsors a pension plan formed for the purpose of engaging in a specific investment strategy, so long as the plan is formed and operated in accordance with the qualification requirements in the IRC.")

    b. Reish Initial Report, ¶ 44 ("I am not aware of any reason that, had the IRS undertaken an audit of any other plans with arrangements similar to the RJM Plan, it would not have issued a 'no change' letter similar to the one issued with respect to the RJM Plan.")

    c. Reish Initial Report, ¶ 50 ("There is nothing in the plan documents, or anything in my experience, that would lead me to believe that the IRS would disqualify the plans for engaging in the investment strategy at issue in this case.")

    d. Reish Initial Report, ¶ 52 ("[The payment of significant fees to Solo Capital] would not lead the IRS to disqualify those plans in the event of an IRS audit of the plans.")

    e. Reish Rebuttal Report, ¶ 7 ("As set out in my initial report, based on the documents that I have reviewed, there is no reason to believe that the IRS would disqualify the plans at issue on any basis.")

102.    As the only relevant issue is whether the plans actually violated the qualification requirements under Section 401(a) of the Code, no further response is warranted.  For the same reason, the cases cited by Ms. Wagner at footnote 6 of her Rebuttal Report (which in my view would be more appropriate for inclusion in legal briefs) offer no probative value.

CONFIDENTIAL

103.  Finally, the Wagner Rebuttal Report states that: "Contrary to the Reish Report's suggestion, it is not true that, without IRS disqualification, a plan with operational defects must be treated as qualified." Wagner Rebuttal Report ¶ 7.  And relatedly, she points out that "a plan can cease to be tax-qualified in the absence of an IRS determination to that effect.  For example, in the bankruptcy context, a bankruptcy court can determine that a plan is no longer tax-qualified." *Id.*  To reiterate, I have not argued that plans can avoid disqualification simply by avoiding an IRS audit.  However, while the IRS is undoubtedly the subject matter expert on tax qualification, the qualification rules are the same regardless of whether the IRS or a bankruptcy court (or other court) is making the determination.  As a result, my arguments for why the IRS would not disqualify the plans would apply equally to a determination by a court.  As I have opined, my review of the facts of this case does not reveal any violations of the Code section 401(a) qualification rules and, as a practical matter, my experience in dealing with IRS audits and corrections is that the IRS would not disqualify these plans, if it audited them.  That is bolstered by the IRS audit of the RJM Plan which did not find any violations despite an extensive review of the facts and documents in this case (resulting in a "no change" letter from the IRS).

**C.    The Discussions in the Wagner Rebuttal Report about EPCRS Do Not Contain Substantive Arguments, and Do Not Present the Issue In A Complete or Accurate Manner**

104.  While my Initial Report pointed out that, even if there were a disqualifying defect, the qualification rules would allow for the defect to be corrected under IRS guidance, this issue is used as a red herring in the Wagner Rebuttal Report.  That is because the correction programs are only needed if there is a disqualifying defect.  While the Wagner Reports make sweeping statements of "schemes" and other generalized allegations of behavior that she disagrees with, they lack any detailed description of violations of specific Code qualification requirements.  On the other hand, the detailed discussions in my Initial and Rebuttal Reports address the general allegations in the Wagner Reports and explain, at a detailed level, why the plans did not have disqualifying defects.  Without a disqualifying defect, the IRS correction programs are not needed.  Nonetheless I will address some of the statements regarding EPCRS in the Wagner Rebuttal Report.

CONFIDENTIAL

105. In Section III(D) of the Wagner Rebuttal Report, while conceding on one hand that "IRS audits seldom result in plan disqualification," Ms. Wagner nonetheless states that all 193 Plans in this case would be disqualified, and that EPCRS would not be available to correct the alleged defects. Wagner Rebuttal Report ¶¶ 8, 13-15. These arguments are misleading, and in any case, they do not raise additional substantive points.

106. Her first point, unsupported by citations to EPCRS (Rev. Proc. 2021-30), is that:

> *[I]f the plan sponsor never had a trade or business or from the outset it was clear that the plan was established for reasons other than providing retirement benefits or as a temporary vehicle for a single short-term transaction, as was the case here, those types of operational errors generally could not have been retroactively corrected.*

Wagner Rebuttal Report ¶ 14. Elsewhere, Ms. Wagner describes the claimed qualification rule violations in this case as "egregious." Wagner Rebuttal Report ¶ 15.

107. As I have made clear herein and in my prior two reports, based on the materials I have reviewed, in my opinion the plans at issue in this case did not commit any qualification violations, much less "egregious" ones. Regardless, I do not agree with Ms. Wagner's sweeping generalizations. Even the Wagner Rebuttal Report concedes in a footnote that "egregious violations are subject to limited relief under EPCRS." Wagner Rebuttal Report ¶ 16 n. 17. Specifically, egregious violations can be corrected through a Closing Agreement with the IRS, as part of its Audit Closing Agreement Program ("Audit CAP"), one of the three EPCRS programs.

108. Moreover, the IRS offers a separate Voluntary Closing Agreement program ("VCAP") which allows plans to maintain qualified status. As compared to Audit CAP, which is designed to address qualification failures discovered by the IRS on audit, VCAP is designed for qualification failures that are identified and self-reported to the IRS by the plan sponsor. As the IRS website explains:

> *Retirement plan sponsors can submit voluntary closing agreement (VCAP) requests to the IRS Employee Plans (EP) Voluntary Compliance function.* ***These requests are for issues that can't be addressed under the Employee Plans Compliance Resolution System (EPCRS)****.*

[https://www.irs.gov/retirement-plans/employee-plans-voluntary-closing-agreements] (emphasis added).

CONFIDENTIAL

109.   Her second point, which is actually taken from EPCRS, is that EPCRS "is not available
       to correct plan failures relating to the diversion or misuse of plan assets."  Clearly, this is
       yet another reference to the exclusive benefit rule under Section 401(a)(2) of the Code:

> *[U]nder the trust instrument it [must be] impossible, at any time prior to the
> satisfaction of all liabilities with respect to employees and their beneficiaries under
> the trust, for any part of the corpus or income to be (within the taxable year or
> thereafter)* **used for, or diverted to, purposes other than for the exclusive benefit**
> *of his employees or their beneficiaries . . . .*

For all the reasons set forth in my Initial Expert Report, Rebuttal Report and this
document (See, e.g., Section II(f)), the investments with Solo Capital were third-party
investments.  Those investments should not and would not be treated as exclusive benefit
violations under IRS rules and practices.  This is the case regardless of whether they
might have been inconsistent with Ms. Wagner's notions of typical plan practices or
otherwise unorthodox investment strategies, investments that high on the risk/reward
spectrum, or strategies not consistent with ERISA.  By referencing Ms. Wagner's view
on investments, I do not mean to appear to concur with the factual statements.  For
example, hedging is a strategy that is ordinarily used to reduce risk, not to heighten risk.

110.   Finally, the implication that the IRS would not (or could not) allow a plan to remain
       qualified even where an exclusive benefit violation had occurred is demonstrably false,
       irrespective of the literal language set forth in the EPCRS guidelines (that is, in Rev.
       Proc. 2021-30, which is an IRS procedure, not a law or binding regulation).  In fact, I am
       aware of a matter brought before this Court in which the IRS found that a qualified plan
       had violated the exclusive benefit rule under Section 401(a)(2) of the Code, but agreed
       via a Closing Agreement to keep the plan qualified.

111.   In <u>Borelli v. The Secretary of Treasury</u>, 343 F. Supp. 2d 249 (S.D.N.Y. 2004), aff'd, 155
       F. App'x 556 (2d Cir. 2005), Judge Stein found that under principles of sovereign
       immunity the IRS was entitled to make this discretionary determination within its
       enforcement powers, and could not be compelled by private plaintiffs to disqualify the
       plan.  *Id.* at 254 ("[P]laintiffs are not challenging the federal defendants' determination
       that violations of 26 U.S.C. § 401(a)(2) occurred in connection with the transfers of
       assets from the pension funds. Rather, they are challenging the federal defendants' choice
       [to enter into] the January 2003 Closing Agreement instead of disqualifying the pension

40

funds . . . . [P]laintiffs have not demonstrated their entitlement to judicial review of the I.R.S.'s decision to enter into the January 2003 Closing Agreement with New York City, instead of disqualifying the pension funds from tax-exempt status."). To be clear, I cite this case to comment on a deficiency in the Wagner reports, not as proof of the law. The attorneys representing the parties to this case can argue the law to the Court.

112. This is consistent with my personal experience representing plan sponsors before the IRS. I have been directly involved with multiple cases (handled under both EPCRS and the Voluntary Closing Agreement Program ("VCAP")) involving hundreds of plans, in which the IRS has approved correction methodologies that are not approved under its general EPCRS guidelines (Rev. Proc. 2020-30).

113. To sum up the discussion of EPCRS, VCAP, and the IRS's broad discretion to allow plans to remain qualified despite operational errors, some of the tax qualification rules under Section 401(a) of the Code are quite technical. In my experience counseling plan sponsors, virtually every qualified plan experiences operational errors from time to time; yet disqualification is extraordinarily uncommon, even for more serious violations.

114. Understood in this context, as a matter of practicality the IRS does not expect or require that a plan be treated as not qualified unless and until the IRS makes a finding of disqualification. If this were not the case, plans would be in a constant state of limbo between possible "qualified" and "disqualified" status due to identified and unidentified operational errors.

115. Finally the Wagner Rebuttal Report states, without qualification or citation, that the IRS would not show "tolerance or forbearance" here because the Plans were individual plans. Wagner Rebuttal Report ¶ 15. She does not, however, state any formal or informal IRS policy in this regard. And in fact, there is none. In my own practice I have never experienced a situation where the IRS withheld the availability of relief because of the type of plan involved.

116. The simple fact is that the IRS almost always works with plan sponsors to allow plans to remain qualified, regardless of the circumstances, and outside of EPCRS guidelines.

41

CONFIDENTIAL

117.   Again, though, Ms. Wagner's entire discussion of the EPCRS program is not relevant. The relevant issue is whether the plans have failed any of the specific and detailed qualification provisions in Code section 401(a). The purpose of the discussion of the IRS corrections program is only to point out that the actual practice in the enforcement of the rules is not to disqualify plans, but instead to rehabilitate them, if there are defects.

## IX.    Conclusion

118.   In summary, Ms. Wagner's Rebuttal Report largely continues her discussions of viewpoints concerning typical and common industry practices, and unrelated legal standards. However, the only relevant point is whether the plans suffered from qualification defects under section 401(a) of the Code, and her arguments about those practices and unrelated standards just diverts attention from the actual qualification standards. The qualification of the plans and the propriety of the investments cannot be changed by the inappropriate use of prejudicial language, such as describing practices or transactions as being "not real," "not genuine" or "shams." Those labels are not qualification standards and take the focus off the Code's specific qualification requirements.

119.   For the reasons I have pointed out, at the end of the day Ms. Wagner's arguments only assert that there were (3) violations of the qualification requirements. And, for the reasons I have also pointed out, none of these claims withstand scrutiny. Some of Ms. Wagner's arguments simply don't apply to determine whether a plan is qualified, while others misstate the application of rules that do exist; but none of those arguments supports the contention that the plans were not qualified.

120.   My arguments, unlike Ms. Wagner's, do not rest on "holistic" views; instead, they are based on the Code's specific requirements for qualified plans. If there were violations of the Code's requirements, then the Wagner reports could rely on those. But, since there are not any violations of the qualification requirements, those reports must rely on vague (and nonexistent) arguments of industry standards and holistic requirements. The IRS audit of the RJM Plan (which also involved the sharing of information on numerous other plans at issue) demonstrates that her claims do not reflect the realities of regulatory

42

practice.  Stated plainly, the scope, scale and manifest nature of the violations Ms. Wagner alleges cannot be reconciled with the actual outcome of the IRS audit.

This Report is executed:

Date: February 28, 2022

_____
                 C. Frederick Reish

43

**Exhibit 1**
**Additional Materials Considered**

RJM Plan Bank Statement, First Republic Bank, Simplified Business Checking, May 1, 2013 to May 31, 2013, WH_MDL_00357092

RJM Plan Bank Statement, First Republic Bank, Simplified Business Checking, June 1, 2013 to June 30, 2013, WH_MDL_00357099

RJM Plan Bank Statement, First Republic Bank, Simplified Business Checking, July 1, 2013 to July 31, 2013, WH_MDL_00357050

RJM Plan Bank Statement, First Republic Bank, Simplified Business Checking, April 1, 2014 to April 30, 2014, WH_MDL_00357083

RJM Plan Bank Statement, First Republic Bank, Simplified Business Checking, May 1, 2014 to May 31, 2014, WH_MDL_00357068

RJM Plan Partner K1 Return, Raubritter General Partnership II, February 1, 2013 to December 11, 2013, WH_MDL_00524141

RJM Plan Partner K1 Return, Lion Advisory General Partnership II, February 1, 2013 to December 11, 2013, WH_MDL_00524142

RJM Plan Partner K1 Return, DFL Investments General Partnership, February 1, 2013 to December 11, 2013, WH_MDL_00524143

RJM Plan Partner K1 Return, California Catalog General Partner II, February 1, 2013 to December 11, 2013, WH_MDL_00524144

RJM Plan Partner K1 Return, Rajan Investments General Partnership II, February 1, 2013 to December 11, 2013, WH_MDL_00524145

RJM Plan Partner K1 Return, Spirit on the Water General Partnership, February 4, 2013 to December 31, 2013, WH_MDL_00524146

RJM Plan Partner K1 Return, Traden Investments General Partnership, February 1, 2013 to December 31, 2013, WH_MDL_00524147

RJM Plan Partner K1 Return, Lion Advisory General Partnership II, 2014, WH_MDL_00524148

RJM Plan Partner K1 Return, Spirit on the Water General Partnership, 2014, WH_MDL_00524149

CONFIDENTIAL

RJM Plan Partner K1 Return, Rajan Investments General Partnership II, 2014, WH_MDL_00524150

RJM Plan Partner K1 Return, Traden Investments General Partnership II, 2014, WH_MDL_00524151

RJM Plan Partner K1 Return, Raubritter General Partnership II, 2014, WH_MDL_00524152

RJM Plan Partner K1 Return, DFL Investments General Partnership II, 2014, WH_MDL_00524153

Routt Plan Bank Statements, January 1, 2016 to January 31, 2016, WH_MDL_00524170

Routt Plan Partner K1 Return, Trailing Edge Productions General Partnership, 2015, WH_MDL_00524160

Routt Plan Partner K1 Return, Loggerhead Services General Partnership, 2015, WH_MDL_00524161

Routt Plan Partner K1 Return, Green Scale Management General Partnership, 2015, WH_MDL_00524162

Routt Plan Partner K1 Return, PAB Facilities Global General Partnership, 2015, WH_MDL_00524163

Routt Plan Partner K1 Return, Cedar Hill Capital Investments General Partnership, 2015, WH_MDL_00524164

Routt Plan Partner K1 Return, Eclouge Industry General Partnership, 2015, WH_MDL_00524165

Routt Plan Partner K1 Return, Keystone Technologies General Partnership, 2015, WH_MDL_00524166

Routt Plan Partner K1 Return, Bareroot Capital Investments General Partnership, 2015, WH_MDL_00524167

Routt Plan Partner K1 Return, Roadcraft Technologies General Partnership, 2015, WH_MDL_00524168

Routt Plan Partner K1 Return, First Ascent Worldwide General Partnership, 2015, WH_MDL_00524169

Routt Plan Partner K1 Return, Trailing Edge Productions General Partnership, 2016, WH_MDL_00524172

CONFIDENTIAL

Routt Plan Partner K1 Return, Eclouge Industry General Partnership, 2016, WH_MDL_00524173

Routt Plan Partner K1 Return, First Ascent Worldwide General Partnership, 2016, WH_MDL_00524174

Routt Plan Partner K1 Return, Loggerhead Services General Partnership, 2016, WH_MDL_00524175

Solo Custodian Statements, RJM Capital Pension Plan, March 31, 2013, WH_MDL_00524130

Solo Custodian Statements, RJM Capital Pension Plan, April 30, 2013, WH_MDL_00524112

Solo Custodian Statements, RJM Capital Pension Plan, March 16, 2015, WH_MDL_00524103

Email from Ronald J. Carlen to Richard Markowitz, February 19, 2016, WH_MDL_00327129

RJM Plan Form 1096, 2015, WH_MDL_00329622

RJM Plan Form 1099-R, 2015, WH_MDL_00327143

CONFIDENTIAL