# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 18-MD-2865 (LAK)

IN RE:

CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION

C O N F I D E N T I A L

REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL EXAMINATION OF

BRUCE DUBINSKY

DATE: March 29, 2022

REPORTED BY: MICHAEL FRIEDMAN, CCR

the ultimate conclusion of whether there was fraud will be up to the judge or jury in this case.

Q Okay. I understand your report speaks for itself, sir, but this is a deposition so I'm going to be asking you questions about your report.

Okay? You understand that, right?

A Yes.

Q Okay. And you just said a moment ago that you're not reaching any legal conclusions. You're not an attorney.

Right?

A That's correct. I'm not.

Q Are you offering any opinion in this case about whether the plans were the beneficial owners of the dividends?

MR. WEINSTEIN: Objection to form.

A Again, I think that's asking for a legal conclusion, and I'm not issuing that legal conclusion.

Q Okay. And so you're not offering any opinion, either about whether the plans were the beneficial owner of dividends under Danish tax law.

Right?

MR. WEINSTEIN: Objection, form.

A Again, I'm not opining anything as to Danish tax law. I'm not a Danish tax law expert and not being offered as one.

Q You're not an expert on what it means to be the beneficial owner of dividends under Danish tax law.

Right?

A I would agree with you.

Q Okay. And you're not offering any opinion about legal ownership under Danish law.

Right?

A I would agree with you. That would call for a legal conclusion.

Q And similarly, you're not offering an opinion about legal ownership under U.S. law, then.

Right?

A I would agree with you again. That would call for a legal opinion.

I'm not a lawyer.

Q Okay. And you're not offering an opinion about the intent of the defendants in

this case, are you?

A No, I'm not.

Q And you're also not offering an opinion about whether SKAT reasonably relied on the reclaim applications at issue in the case.

Right?

A That is correct. I am not.

Q Okay. Mr. Dubinsky, have you ever worked as a trader?

A I have not worked as a trader, no.

Q So you don't have any experience in trading Danish securities.

Is that a fair statement?

A I would agree with you, yes.

Q Have you ever engaged in dividend arbitrage trading?

A I have not.

Q Do you have any experience in arranging structured transactions?

MR. WEINSTEIN: Objection to form.

A I have not. I'm just trying to think.

I have not been involved in arranging structured transactions.

individual clients and pension plans, retirement plans on investments.

Q And at Duff & Phelps, you did this type of work that you do now.

Is that right?

A No, I did not. So when I joined Duff & Phelps, I let my license lapse at that point because I was not doing that work anymore.

And just to maintain the registration requirements was too much red tape. So I let the license lapse at that point.

Q So what did you do at Duff & Phelps?

A I was a managing director at Duff & Phelps in their disputes and investigation practice, and so I handled everything from investigations to commercial disputes, expert witness work.

That was my role at Duff & Phelps.

Q Okay. And in this matter, you were retained to do a forensic accounting of the cash flows of the tax refund payments paid out by SKAT.

Is that right?

A Among other things, yes, that was part of what I was asked to do.

Q Okay. And your forensic accounting was of the payments that allegedly went to Solo clients.

Right?

A That portion of the work was, yes, looking at the refund claim payments paid by SKAT and the money flow from those payments, where did the money go.

Q You did not do a forensic accounting of SKAT, did you?

A No, I did not.

Q Okay. You did not do a forensic accounting to assess whether the withholding tax associated with the refund claims in this case was actually paid to SKAT.

Right?

A No, I did not.

Q Did you develop a view of whether SKAT collected dividend withholding tax from any of the sellers in the trades associated with this case?

MR. WEINSTEIN: Objection to form.

litigation?
A That's my understanding to this particular litigation, yes.
Q Okay. You had access to a set of documents that came from an entity called Elysium Global.
Right?
A Yes.
Q Okay. And do you have any understanding of what those documents represent?
A I think in general, my understanding was those were documents that Solo had maintained that was part of a Solo umbrella of companies. So there were a lot of different documents in that database.
But they were business records related to Solo and various entities under Solo's control.
Q Okay. Why don't you open up your report, your initial report, which is Exhibit 5200.
A Okay.
Q And I want you to go to Footnote 5 on a Page 8.

at a custodian that actually holds custody of them, yes.

Q Let's go to your opening report, which is Exhibit 5200 at Page 39.

Do you have that in front of you?

A I do.

Q Okay. And I'm going to point you to Paragraph Roman Numeral 6, Opinion Number 1.

Do you see that?

A I do.

Q And this is the one in all caps and bolded.

"There is no evidence that the plans ever owned actual shares of Danish securities from their Solo trades or received actual dividends issued by the Danish companies whose stock was purportedly used in the Solo trades."

Do you see that?

A Yes.

Q Ownership is a legal concept, isn't it?

A I think it certainly -- well, it's an accounting and legal concept. But from

the standpoint of in the ultimate determination who had legal title, yes, that would be a legal determination.

Q And that's not a determination that you're qualified to make.

Right?

A Again, I'm not a lawyer. I was doing a forensic accounting investigation to determine whether there was evidence that these shares actually existed, and that's what I was discussing.

Q Okay. But this doesn't -- this opinion doesn't talk about whether the shares actually existed.

It talks about ownership, doesn't it?

MR. WEINSTEIN: Objection to form.

A Well, the heading says what it says. But as you go through the report, the basis for the opinion is that I saw no evidence to support that the shares actually existed.

And therefore, if the shares didn't exist, certainly from a forensic accounting standpoint, the plans couldn't have owned

not -- there was no evidence that the shares existed. And therefore, the dividends weren't -- couldn't have existed, weren't paid, and that was my conclusion.

Q I'm asking you regarding your statement regarding ownership, sir. And I'm asking you whether it was under U.S. principles of ownership.

What is your answer to that question?

A Again, I think you're asking for a legal conclusion and I'm not here to give you a legal opinion on -- I'm here to tell you what I did and under what basis that I opined.

Q So the concept of ownership in your Opinion Number 1, you're not willing to tell me under what principle you're giving that opinion, whether it's U.S., EU, Danish, or whatever?

MR. WEINSTEIN: Objection to form, asked and answered.

A Again, I'm not here to issue a legal opinion. I think that would call for a legal opinion.

think certainly I'd have to go back through the report.

I think I talk about the transaction and the fact that the LLCs, most of them, were newly formed, the pension plans didn't have liquidity. So in the context of that, someone would certainly have to question how could they possibly be doing this type of transaction.

But I'm not opine -- I can't opine on what people thought at that time, that those are going to have to be facts that come from fact witnesses at trial.

I can't jump into their head.

Q When you say "someone would have to question," is that a legal requirement that they'd have to question it --

A No, I think just --

MR. WEINSTEIN: Objection.

Q -- or is that just your opinion?

A Just general common sense. I mean, if you -- you know, it's just -- as a newly formed pension plan with little or no money, call it 10,000, $40,000, how in the world -- if I'm putting myself, and I get

representations the SKAT corporate designee made during his testimony.
Correct?
A That is correct. I didn't see his testimony and didn't read it.
Q Let's go to -- back to your opening report, Exhibit 5200, Paragraph 131.
A Okay.
Q It's on Page 39, I think.
A Okay.
Q Can you read that paragraph to yourself? And I'll ask you some questions.
A Which paragraph was it?
Q 131.
A Okay.
(Witness reviewing.)
Okay.
Q Just a question for you.
You can see, in the first sentence of that paragraph, you reference "actual dividends?"
A Yes.
Q When you say here that the pension plans did not receive any actual dividends, you're not offering any kind of opinion about

the plans' entitlement to dividends, are you?

A That's correct. The -- I'm sorry. Something just beeped.

I think that's a legal conclusion. In that regard, I was just looking for evidence whether the plans actually received any actual dividends in this transaction.

Q Let's go back to Exhibit 5217.

A Okay.

Q And we'll go to the last page of that document.

A The one Bates --

Q "Cash Equity." Sorry.

A Yeah, I was going to say, the one ending in 75374 Bates number?

Q Yes.

A Okay.

Q The price you see there, "Trade Price, 586.3316," that was a market price at that time.

Right?

A I don't recall specifically on this whether that was the closing price on that day. Typically, the trades were purportedly executed or approved during the day and then

know one way or another where these documents went, so I can't say.

Q And in order to determine what you called the "closed loop," you needed to see these documents, didn't you?

A Correct. These were the steps of the purported transaction.

Q Mr. Dubinsky, you're not an expert in trade settlement operations.

Right?

A That is correct. I wouldn't consider myself an expert in trade settlement.

I do have some experience with it, but I'm not being proffered here and I understand somebody else is dealing with trades and settlement issues.

Q Do you understand what "net settlement" is?

A As a general concept, yes.

Q It's a -- two or more transactions that offset each other in settlement.

Is that right?

A Well, I think that's a very general description. You know, it's a -- very

supposed to result in a transfer of securities from one securities account to another in the books of the settlement internalizer without any external parallel securities movement along the holding chain."

Do you see that?

A Yes, I see that.

Q This description of internalization reflects that in some context the settlement instruction may result without involving external parties in a holding chain.

Correct?

A Again, this is the first time I'm seeing this document. I haven't gone through it. I'm not a -- I'm not professing to be an expert in net settlement.

So without going through this and trying to decipher it, I don't know. I mean, it says what it says and you read it.

Q You don't know whether or not it reflects that in some context, settlement may occur without any external parallel securities movement along the holding chain?

A That's what it seems to indicate, under certain circumstances. I don't know,

A Again, you're asking for a legal conclusion. I'm just not comfortable giving you one.

Q So you would agree with me that beneficial ownership is a legal question?

A My answer was, in most contexts where I've seen it, it has been a question of law and interpretation of law to apply that. I've seen it in other contexts, but that's generally where I have seen the term.

Q Okay.

MR. BONGIORNO: I don't have any more questions.

Thank you, Mr. Dubinsky.

THE WITNESS: Thank you.

MR. BONGIORNO: I don't know if anybody else has questions, but I don't have any more.

MR. LOPICCOLO: Hey, this is Joe LoPiccolo. Can you hear me?

THE WITNESS: Yes, but I can't see who is talking.

MR. LOPICCOLO: Oh, wait. Sorry. Let me see if this works. Hold on.

(Whereupon a discussion was held