**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re
CUSTOMS AND TAX ADMINISTRATION OF
THE     KINGDOM     OF     DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

MASTER DOCKET
18-md-02865-LAK

This document relates to:     The cases identified
                              in Appendix A

---

## MEMORANDUM OF LAW TO EXCLUDE THE PROPOSED EXPERT REPORTS, OPINIONS, AND TESTIMONY OF GRAHAM WADE

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 2

BACKGROUND ............................................................................................................................ 2

LEGAL STANDARD..................................................................................................................... 4

ARGUMENT .................................................................................................................................. 5

I.      Mr. Wade's Expert Opinions Usurp the Role of the Court and the Jury ........................... 6

      A.      Whether the Pension Plans Owned Securities Is Not the Proper Subject of Mr. Wade's Expert Testimony.............................................................................. 6

      B.      Whether the Pension Plans Received Dividends Is Not the Proper Subject of Mr. Wade's Expert Testimony ........................................................................... 8

      C.      Mr. Wade's Conclusions that There Were Misrepresentations on the Reclaim Applications Usurp the Role of the Jury ................................................ 9

II.     Mr. Wade's Contractual Obligations to Barclays Prevent a Robust Cross-Examination ........................................................................................................................ 10

CONCLUSION............................................................................................................................. 12

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amorgianos v. National Railroad Passenger Corp.*,
  303 F.3d 256 ...........................................................................................................................10

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ..............................................................................................4, 11

*Daubert v. Merrell Dow Pharms. Inc.*,
  509 U.S. 579 (1993)....................................................................................................4, 10, 11

*Dracz v. Am. Gen. Life Ins. Co.*,
  426 F. Supp. 2d 1373, 1376 n.10 (M.D. Ga. 2006), *aff'd*, 201 F. App'x 681
  (11th Cir. 2006) ....................................................................................................................10

*Hous. Works, Inc. v. Turner*,
  362 F. Supp. 2d 434 (S.D.N.Y. 2005) (Kaplan, J.)..............................................................4, 5

*In re: Lehman Bros. Sec. & Erisa Litig. v. Ernst & Young LLP*,
  No. 09 MD 2017, 2015 WL 13707447 (S.D.N.Y. Sep. 13, 2015) (Kaplan, J.)......................5

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)..................................................................................................6, 8

*Oneida, Ltd. v. United States*,
  43 Fed. Cl. 611 (Ct. Fed. Cl. 1999).........................................................................................11

*Price v. Fox Entertainment Group, Inc.*,
  499 F. Supp. 2d 382 (S.D.N.Y. 2009)........................................................................................4

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991).................................................................................................5, 9

*United States v. Scop*,
  846 F.2d 135 (2d Cir. 1988).......................................................................................................5

*Zaremba v. General Motors Corp.*,
  360 F.3d 355 (2d Cir. 2004).......................................................................................................4

**Statutes**

U.K. Finance Act of 2013 ..............................................................................................................8

**Rules**

Federal Rule of Evidence 702............................................................................................4,

## PRELIMINARY STATEMENT

SKAT has offered Graham Wade as an expert on complex structured transactions, but his testimony has nothing to do with educating the jury so that the jury can more easily determine the facts and apply the law to those facts. Rather, it is meant to instruct the jury as to the law and tell the jury what it should conclude. Mr. Wade does not hide from those propositions. During his deposition he admitted that his opinions are in part based on Danish legal principles for which he has no experience or training. And the "expert conclusions" he wants to tell the jury about, such as that the Defendants were "in league" with Solo, do not pretend to be couched in technical analysis, but are the closing arguments SKAT will make at trial cloaked in the potency of expert testimony. Mr. Wade's opinions are inappropriate as a matter of law, wholly unreliable, attempt to usurp the role of the jury, and ultimately should be inadmissible.

## BACKGROUND

SKAT has submitted Graham Wade as an expert on complex structured transactions and "a range of equity finance activities and the tax, accounting, legal requirements, credit, operations, and regulations of businesses in the financial services industry." Wade Rep. ¶ 9 ("Exhibit A"). Mr. Wade has offered six opinions in his expert report:

> (i) No shares were delivered or received by the Solo Pension Plans; (ii) No cash was exchanged; (iii) The Solo Pension Plans' counterparties and other parties to the transactions did not receive a real dividend; (iv) The trades deviated from market standards; (v) None of the parties were at risk of any market gain or loss; and (vi) It appears that the communications about executing the trades were all automatically generated by Solo.

Exhibit A ¶ 16. During his deposition, Mr. Wade clarified that when concluding that the plans did not receive a "real" dividend, the word real was in contrast to either a "manufactured dividend" or a "dividend compensation payment." Wade Dep. Tr. at 129-30 ("Exhibit B"). Mr. Wade also

2

testified that it was his expert conclusion that the Pension Plans did not suffer a tax loss, although it is unclear whether SKAT intends to elicit this opinion.  Exhibit B at 125-26.

Mr. Wade made clear he is not offering any opinions on:  (1) specific state or mind or knowledge of any individual in the case; (2) whether a dividend compensation payment entitles an individual to a tax reclaim; (3) anything related to the administration of the United States or Danish tax systems; (4) the practices and approaches of SKAT or its personnel; and (5) whether the United States or Danish tax systems recognize dividend equivalent payments.  Exhibit B at 76:3-5, 174:2-7, 271:8-11, 187-288, 294:1-21, 314:20-316:3.  SKAT has informed Defendants that Mr. Wade will not testify on the portions of his report "that related exclusively to dividend refund applications for which the dividend credit advice were generated by ED&F Man."  Email from Marc Weinstein to Defense Counsel, May 15, 2024) ("Exhibit C").  Defendants understand this to mean that he will be testifying chiefly about pages 89-107 of his opening expert report, which are the only pages that address the Solo Pension Plans.  Exhibit A at 89-107.

Mr. Wade is relying on his experience working in the structured finance group at Barclays to form his opinions, although during his deposition he refused to answer certain questions about his experience at Barclays because "under my contractual position with Barclays, I have to be careful about talking about the specifics of a given transaction."  Exhibit B at 209:7-11; *see also id.* at 218:20-23 ("I have to be – for the reasons I gave earlier, I have to be very careful here because I know, obviously, there has been a significant hearing in the U.S. [on a tax position Barclays took."); *id.* at 226:16-18 (explaining that in answering the question, "I mean, I have to think about what my duty of confidentiality to the client is . . . .").

## <u>LEGAL STANDARD</u>

Under Federal Rule of Evidence 702, expert testimony is admissible only if the expert is "qualified as an expert by knowledge, skill, experience, training, or education" and if the testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "is based on sufficient facts or data"; (3) "is the product of reliable principle and methods"; and (4) is "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 580 (1993) (holding that courts must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"); *see also Hous. Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 447 (S.D.N.Y. 2005) (Kaplan, J.) (noting that courts must determine "(1) whether the [expert] testimony is grounded in sufficient facts, (2) whether the underlying methodology is reliable, and (3) whether the witness has applied the methodology reliably to the facts") (citing *Zaremba v. General Motors Corp.*, 360 F.3d 355, 358 (2d Cir. 2004)). The Court's role in evaluating whether an expert should testify and how that testimony should be constrained is essential as "expert witnesses have the potential to be both powerful and quite misleading." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citations omitted); *see also Daubert*, 509 U.S. at 595 (1993); *Price v. Fox Entertainment Group, Inc.*, 499 F. Supp. 2d 382, 387 (S.D.N.Y. 2009) (citing *Daubert*, 509 U.S. at 595 (1993)). For that reason, expert testimony must be subject to testing by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596 (1993). It is the proponent of the testimony who bears the burden of establishing by a preponderance of the evidence that the testimony is both relevant and reliable. *See Hous. Works, Inc.*, 362 F. Supp. at 447.

There are several additional limiting factors to consider when evaluating an expert, depending on the specific circumstances of each case. One such limitation is that an expert opinion must not draw or contain legal conclusions. *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissible . . . [as they] encroach upon the court's duty to instruct on the law."); *see also Hous. Works, Inc.*, 362 F. Supp. at 447 (finding a witness' legal conclusion opinion was "well beyond the bounds of permissible expert testimony").

Further, testimony that "would amount to little or nothing more than a closing argument from the witness stand" should be curtailed. *In re: Lehman Bros. Sec. & Erisa Litig. v. Ernst & Young LLP*, No. 09 MD 2017, 2015 WL 13707447, at *1 (S.D.N.Y. Sep. 13, 2015) (Kaplan, J.); *see also United States v. Scop*, 846 F.2d 135, 139-41 (2d Cir. 1988) (finding that an expert's statement that defendants' conduct established a manipulative and fraudulent scheme exceeded the permissible scope of expert opinion testimony). Otherwise, the expert's testimony could encroach upon the province of the jury and "threaten unnecessary and likely substantially prejudicial confusion between the Court's instructions on the legal issues" and the witness's opinions. *In re: Lehman Bros.*, 2015 WL 13707447, at *1.

## ARGUMENT

Mr. Wade's expert opinions should be rejected for a number of reasons. First, the core of his testimony — that the Pension Plans never owned Danish shares — is a determination wholly dependent on Danish securities law. It is a subject about which it is inappropriate for Mr. Wade to testify and on which he has no formal training or experience. Second, Mr. Wade's sweeping conclusions that the Defendants made misrepresentations on the reclaim applications, were "in league" with Solo, and his speculation that it would be obvious to the Defendants that the trading

was fictitious go far beyond his expert analysis in structured transactions and are little more than Plaintiff's closing arguments.  Exhibit A ¶ 245.  Third, Mr. Wade's broad generalizations that all of the transactions represent fraud are particularly unreliable as he has only reviewed two sets of trades among 2,599 transactions.  He cannot possibly speak to more than the transactions he actually reviewed.  Finally, Mr. Wade's contractual and fiduciary obligations that prevent him from answering questions about certain matters at Barclays would prevent the kind of robust cross-examination that is necessary in particular for expert witnesses.

## I.    Mr. Wade's Expert Opinions Usurp the Role of the Court and the Jury

As noted by the Second Circuit, "expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citations omitted).  Mr. Wade's opinion, however, that there were no shares owned by the Pension Plans, directly relies on a determination of what constitutes legal ownership of securities under Danish law.  Mr. Wade is not competent to testify as to matters of ownership under Danish law and it would be inappropriate for him to do so.

### A.    Whether the Pension Plans Owned Securities Is Not the Proper Subject of Mr. Wade's Expert Testimony

Mr. Wade's first opinion, that the Pension Plans never received or owned Danish securities, is a determination that the jury must make and can only make after being instructed in Danish law.  Mr. Wade is not competent to opine on Danish law and it would be inappropriate for him to do so.  Mr. Wade himself acknowledged the legal complexities of ownership in his deposition when asked what it means to be an owner of shares in Denmark:

6

> What I'm saying is that over the course of my career I spent a long time and I understand that the question you're asking me can be a much more complex question than it appears because it requires understanding the exact facts and circumstances, for what purpose, i.e., you know, is it tax, is it accounting, is it regulation, is it, you know, record holder from the issuer's perspective? There's a range of different ways in which one can think about who the owner of a share is.

Exhibit B at 106:23-107:10; *see also id.* at 138:3-11 (noting that the definition of owner "may well be defined in a number of different ways depending on what the situation and the context and the facts are"). Mr. Wade went on to explain that the same complexity exists when trying to define beneficial owner, which similarly "can have different meanings in different contexts". *Id.* at 112:20-23. Indeed, Mr. Wade admitted that "two people can be the owner of the same share for different purposes." *Id.* at 108:12-16.[1] Because ownership is such a complex issue, Mr. Wade admitted that the issue as to who owned Danish shares and who was the beneficial owner of Danish shares is a legal issue about which he is not competent to testify:

> [O]ver the course of my career, one of the many things I have learned is that there are a wide range of different legal regimes and legal concepts. And even within Denmark I'm sure there are a number of different legal regimes which may be relevant and they may all have different definitions of what 'legal ownership' means.

*Id.* at 115:8-17.

Mr. Wade is simply not competent to testify as to whether the Pension Plans owned securities because that determination requires an understanding of Danish law. Moreover, it is ultimately the jury that must make that determination, but it can only do so after being instructed on the law. As noted by the Second Circuit, "expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not aid the jury in making a decision; rather, it

---

[1] Mr. Wade could not even answer what it means for shares to be delivered to a Plan or individual. In his deposition, when asked a question about the delivery of shares, he responded: "what does – what does 'delivered' mean? That's a slightly imprecise term." Exhibit B at 159:8-10.

undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). In such cases, the expert testimony must be excluded. *Id.*

**B.    Whether the Pension Plans Received Dividends Is Not the Proper Subject of Mr. Wade's Expert Testimony**

Mr. Wade similarly should not be allowed to testify as to whether the Pension Plans received, and thus owned dividends as opposed to what he calls dividend compensation payments. In his report, Mr. Wade concluded that the Pension Plans "did not receive a "real" dividend. Exhibit A at 89. Mr. Wade explained in his deposition that as opposed to a "real" dividend, what the Pension Plans received at most was a "dividend compensation payment":

> [W]hat the cum ex purchaser has been given is a dividend compensation payment. And based on my experience, what would have – what could have been appropriate is if the cum ex – a purchaser had been given a voucher which said, 'You received a dividend compensation payment.' That – that – but that's not what the tax vouchers state that they are.

Exhibit B at 172:9-18. When asked on what he based his determination that the funds received by the Pension Plans were dividend compensation payments as opposed to a "real" dividend, Mr. Wade could only cite U.K. tax law (although, notably, U.K. tax law that does not even contain the phrase "dividend compensation payment"). Exhibit B at 187:21-23 (citing to the U.K.'s Revenue and Customs Manual on manufactured payments, which in turn is based on the U.K. Finance Act of 2013); Exhibit A at 31 n. 68, 189 (same). Indeed, Mr. Wade was asked twenty-one times during his deposition if his concept of "dividend compensation payment" was a legal determination, and twenty-one times he provided evasive answers. Exhibit B at 65:12-75:21*; see, e.g.,* Exhibit B at 67:25-68:7 ("Q. Okay. Is the question of whether someone is entitled to a dividend informed by legal principles? A. Well, I think in this particular case, my opinions on that question are as outlined in my report and subject to the fact that I've reviewed in this case."); Exhibit B at 73:10-

25 ("Q. Respectfully, sir, that's not my question.  My question is whether or not that analysis depends on legal principles or knowledge of the law.  Can you answer that question with a 'yes' or 'no'?  A. I'm sorry, but I'm going to keep giving you the same answer, which is the opinions for the specific purpose on which I've drawn distinctions between dividends and dividend compensation payments in my report is for the reasons and on the basis that I've included in my report.").  Mr. Wade would not answer the question because how the dividends are characterized turns in part on underlying issues of Danish securities law. It is an inappropriate subject upon which Mr. Wade to testify and he has no relevant experience in making such determinations. *Bilzerian*, 926 F.2d at 1295.

### C.    Mr. Wade's Conclusions that There Were Misrepresentations on the Reclaim Applications Usurp the Role of the Jury

While disclaiming any intention to offer opinions about defendants' intent, Mr. Wade offers sweeping conclusions that the Defendants made misrepresentations, were "in league" with Solo, and knew or should have known the reclaim applications had misrepresentations.  Exhibit A at ¶ 245.  These are determinations for the jury, not Mr. Wade.  *Nimely,* 414 F.3d at 397.

Mr. Wade offers multiple opinions that go far beyond instructing the jury on his expertise on structured transactions, which simply echo what SKAT's arguments will be at trial:

> I conclude that the transaction was in totality, completely fictitious. Further it is my view that fictious nature of the transactions should have been obvious to any of the participants involved and should have raised important regulatory or money laundering red flags for them.
>
> Exhibit A ¶ 225
>
> In conclusion, there is no way in which this Brokermesh can be considered a genuine liquidity finding venue and these facts further support the conclusion that these transactions were simply fictitious and that all the supposed participants were in league with Solo, which was organizing and coordinating all of the false bookings and tax reclaims.
>
> Exhibit A ¶ 245

> My opinions relate to the fact that if we go back to the tax vouchers, there are three key facts in the tax vouchers:
> Number 1, that the pension plans held shares;
> Number 2, that they received dividends; and
> Number 3, that they suffered tax.
> And my opinions are fundamentally that those three statements are false.
>
> Exhibit B at 125:20-126:2

In each case, Mr. Wade is not purporting to use his expertise to assist the jury to reach its own conclusion by presenting them with scientific and technical knowledge that is the product of reliable principles and methods — he is simply telling the jury what he thinks are the answers to the questions it must decide. That is not the proper province of an expert.

Defendants also note that Mr. Wade cites the so-called Elysium Documents in his report, which SKAT has represented were documents seized in the execution of a search order by the Dubai International Financial Courts. As described more fully in Defendants' Daubert motion to exclude the testimony of Bruce Dubinsky, who relies on the documents extensively, the Elysium Documents are inadmissible and unauthenticated hearsay without any indicia of reliability. If Mr. Wade is permitted to testify at all, the Court should not permit Mr. Wade to testify as to the conclusions he drew based on these documents. *See Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 ("[W]hen an expert opinion is based on data . . . that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."); *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1376 n.10 (M.D. Ga. 2006), *aff'd*, 201 F. App'x 681 (11th Cir. 2006) ("Plaintiff has made no showing that [a proffered expert's] data procured from unauthenticated internet web sites" are "'facts or data' . . . of a type reasonably relied upon by experts in the field[.]").

## II.    Mr. Wade's Contractual Obligations to Barclays Prevent a Robust Cross-Examination

10

Finally, should Mr. Wade be allowed to testify, his duties of confidentiality related to his time working for Barclays, upon which he basis his expertise, inappropriately would curtail a vigorous cross-examination.  Thus, should Mr. Wade testify at all, he should not be able to hide behind any notions of confidentiality.

As noted above, "expert witnesses have the potential to be both powerful and quite misleading." *Cooper*, 259 F.3d at 199 (citations omitted) *see also Daubert*, 509 U.S. at 595 (1993).  To that end, "the integrity and reliability of the truth finding process in a case should be paramount and must include a full and fair opportunity to cross examine a testifying expert, including possible impeachment of the expert." *Oneida, Ltd. v. United States*, 43 Fed. Cl. 611, 619 (Ct. Fed. Cl. 1999).  If Mr. Wade is allowed to cite confidentiality related to his work at Barclays, however, his cross-examination may be blunted.

Mr. Wade previously worked at Barclays for over thirteen years, eleven of which he was in the Structured Capital Markets group.  Exhibit A ¶ 3.  It is Mr. Wade's work at Barclays in structured finance that primarily informs his expert opinions in this case.  *See, e.g.,* Exhibit A ¶ 170; Exhibit B at 63:6-15.  Indeed, in response to an attack on his credentials in a prior motion to disqualify Mr. Wade, SKAT noted that Mr. Wade was a member of the Markets Management Committee at Barclays, which was responsible for strategy and governance across all of Barclays' trading.  Pl. Resp. Opposing Mot. to Disqualify Graham Wade, Dkt. 848.  Plaintiff proffered that in that position he was responsible for ensuring that Barclays did not do the type of cum-ex trades at issue here.  *Id.* at 4.

However, Barclays did execute cum-ex transactions prior to 2012 when Mr. Wade worked at Barclays.  Exhibit B at 163:22-164:7.  Thus, his condemnation of cum-ex transactions in this case and SKAT's argument that he was in charge of making sure that Barclays did not execute

cum-ex transactions, is at odds with his oversight and risk management role during the time when Barclays did execute such transactions. His work at Barclays is thus a formidable area of cross-examination, but during his deposition Mr. Wade was hesitant to answer certain questions based on duties of confidentiality to his former employer. *See* Exhibit B at 209:7-11 (testifying that "under my contractual position with Barclays, I have to be careful about talking about the specifics of a given transaction"); *id.* at 218:20-23 ("I have to be – for the reasons I gave earlier, I have to be very careful here because I know, obviously, there has been a significant hearing in the U.S. [on a tax position Barclays took]"); *id.* at 226:14-18 (explaining that in answering the question, "I mean, I have to think about what my duty of confidentiality to the client is . . . ."). Unless Plaintiff is going to represent that Mr. Wade will not invoke similar protections at trial, Defendants' cross-examination of SKAT's primary expert will be unduly hampered.

Mr. Wade should either agree to answer such questions or be precluded from testifying.

## **CONCLUSION**

Mr. Wade's expert testimony raises a hornet's nest of issues. His opinions that the Pension Plans never owned Danish shares or received dividends is wholly dependent on the definition of ownership under Danish law; his conclusions that it should have been obvious to the Defendants that the trades were fictitious, the Defendants were in league with Solo, and there were misrepresentations on the applications usurps the role of the jury. Mr. Wade's opinions would not help the jury to understand the evidence and are not the product of reliable principles and methods, but merely serve as a closing argument for Plaintiff. As such, his testimony and report should be excluded.

Alternatively, should the Court allow Mr. Wade to generally educate the jury on structured transactions, his testimony and report should remove any references to: (1) the Defendants' state

12

of mind; (2) whether the plans "owned" Danish securities; (3) whether the plans either received dividends or dividend compensation payments; and (4) the Elysium documents; and (5) the ultimate issues of whether there were misrepresentations or fraud.  In addition, he should not be allowed to hide behind any confidentiality agreement or other fiduciary duties owed to Barclays during cross-examination.

Dated:  New York, New York
        June 21, 2024

Respectfully submitted,

DEWEY PEGNO & KRAMARSKY LLP

By:_____/s/ Thomas E.L. Dewey_____
Thomas E.L. Dewey
777 Third Avenue – 29th Floor
New York, New York 10017 Tel.: (212) 943-9000
Fax: (212) 943-4325
tdewey@dpklaw.com

KEKER, VAN NEST & PETERS LLP

By:_____/s/ Elliot R. Peters_____
Elliot R. Peters
Julia L. Allen
633 Battery Street
San Francisco, CA 94111
Tel.: (415) 962-7188
epeters@keker.com

*Attorneys for Defendant Michael Ben-Jacob*

KOSTELANETZ LLP

By: _____/s/ Sharon L. McCarthy_____
Sharon L. McCarthy
7 World Trade Center, 34th Floor
New York, New York 10007
Tel:       (212) 808-8100
Fax:       (212) 808-8108
smccarthy@kflaw.com

*Attorneys for Defendants John van Merkensteijn,III, Elizabeth van Merkensteijn, Azalea Pension Plan, Basalt Ventures LLC Roth*

14

*401(K) Plan, Bernina Pension Plan, Bernina Pension Plan Trust, Michelle Investments Pension Plan, Omineca Pension Plan, Omineca Trust, Remece Investments LLC Pension Plan, Starfish Capital Management LLC Roth 401(K) Plan,*

*Tarvos Pension Plan, Voojo Productions LLC Roth 401(K) Plan, Xiphias LLC Pension Plan*

WILMER CUTLER PICKERING HALE AND DORR LLP

By:          /s/ Alan E. Schoenfeld
     Alan E. Schoenfeld
     7 World Trade Center250 Greenwich Street
     New York, NY 10007
     Telephone: (212) 230-8800
     alan.schoenfeld@wilmerhale.com

*Attorneys for Defendants Richard Markowitz, Jocelyn Markowitz, Avanix Management LLC Roth 401(K) Plan, Batavia Capital Pension Plan, Calypso Investments Pension Plan, Cavus Systems LLC Roth 401(K) Plan, Hadron Industries LLC Roth 401(K) Plan, RJM CapitalPension Plan, RJM Capital Pension Plan Trust, Routt Capital Pension Plan, Routt Capital Trust*

KATTEN MUCHIN ROSENMAN LLP

By:          /s/ David L. Goldberg
     David L. Goldberg
     Michael M. Rosensaft

     50 Rockefeller Plaza
     New York, NY 10020
     Tel.: (212) 940-8800
     Fax: (212) 940-8776
     david.goldberg@katten.com

*Attorneys for Defendants Robert Klugman, RAK Investment Trust, Aerovane Logistics LLC Roth 401K Plan, Edgepoint Capital LLC Roth 401K*

15

*Plan, Headsail Manufacturing LLC Roth 401K
Plan, The Random Holdings 401K Plan, The
Stor Capital Consulting LLC 401K Plan*