# EXHIBIT A

**CONFIDENTIAL PURSUANT TO RULE 26(C) PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



In re

CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION

MASTER DOCKET

18-md-2865 (LAK)

**EXPERT REPORT OF GRAHAM WADE**

**December 31, 2021**

## I.    PURPOSE OF THE ENGAGEMENT

1.     Counsel for SKAT, the Customs and Tax Administration of the Kingdom of Denmark, has requested my opinion on the nature and structure of the financial transactions purportedly executed by various pension plans (the "Pension Plans") and other defendants; whether those financial transactions were executed in a manner consistent with standard market practice; and whether the financial transactions executed by the various defendants would entitle an entity or individual to a dividend.[1]

## II.   QUALIFICATIONS

2.     My name is Graham Wade. I serve as an Independent Consultant to Charles River Associates International ("CRAI"). CRAI is a leading global consulting firm that offers expertise to major law firms, corporations, accounting firms, and governments. CRAI has a diverse team of over 800 consultants in more than 50 countries around the world.

3.     I have over twenty years of professional experience in structured financial transactions. For more than thirteen years I worked for Barclays Investment Bank ("Barclays"). Eleven of these years were in the Structured Capital Markets ("SCM") group, which was the bank's leading structuring division until its closure in 2012. During my tenure at the bank, I led various teams focused on structured transactions, oversaw substantial risk reduction initiatives, and sat on a number of Board, group, and investment bank committees with responsibility for transaction approval and other risk management roles.

4.     In 2008, I relocated to New York and became the SCM Head of Americas. In this role, I led the bank's integration of Lehman Brothers' equivalent North American business. I was appointed to the position of Global Head of SCM at the end of 2011 and returned to London. In this role, amongst other duties, I was responsible for setting, supervising, and promulgating guidelines for all equity finance

---

[1] I understand from counsel that Plaintiff was known as "SKAT" at the time of the events alleged in the complaint. Pursuant to Danish Legal Order 804, entered on June 6, 2018, Plaintiff changed its legal name to Skatteforvaltningen, effective July 1, 2018.

### III. PREPARATION OF THIS REPORT

9. I have prepared this report to express certain opinions; to describe the bases and rationale underlying them; and to disclose the facts and data on which I have relied in reaching my opinions. I do not express legal opinions in this report. The work that I have conducted in this matter has been informed by my education; knowledge; experience in the design, implementation, and management of complex structured transactions; and detailed knowledge of a range of equity finance activities and the tax, accounting, legal requirements, credit, operations, and regulations of businesses in the financial services industry. The information in this report is based upon discovery to date and the information that is currently available. I have considered and compiled materials as cited herein with the assistance of CRAI personnel working under my direction and supervision.

10. A complete listing of the materials I reviewed and considered in forming my opinions and conclusions rendered in this report is attached hereto as Appendix B. In Appendix C, I provide a summary of the transactions at issue in this matter, which were conducted for various Pension Plan funds by ED&F Man Capital Markets, Ltd ("ED&F Man"), Solo Capital Partners LLP ("Solo"), and, or the Solo related custodians, West Point Derivatives Ltd., Old Park Lane Capital Ltd., and Telesto Markets LLP (collectively the "Solo Custodians"),[2] all brokers-custodians for the Pension Plans. Throughout this report, I refer to these trades as "Appendix C Cum-Ex Trades", and the Pension Plans either as "ED&F Man Pension Plans" or "Solo Pension Plans". In Appendix D, I provide trade and volume analysis of shares that ED&F Man claimed to own on behalf of its customers that are pertinent to this matter.[3] In

---

[2] It has been represented to me by counsel that the transactions undertaken by West Point Derivatives Ltd., Old Park Lane Capital Ltd., and Telesto Markets LLP are substantially identical to those undertaken by Solo. Accordingly, to the extent this is accurate, my analysis applies equally to Solo and the other Solo Custodians.

[3] See, for example, Dividend Reconciliation Excel Workbook (ED&F-00081150, at tab 'FRONTSHEET') in which ED&F Man reports claimed ownership of 8,337,116 shares issued by Coloplast A/S held on behalf of the ED&F Man Pension Plans and other clients on December 10, 2013. As I explain in detail later in this report, it is my opinion that ED&F Man did not own a vast majority of these shares. However, had ED&F Man held such shares either in its own name or on behalf of its clients, including the ED&F Man Pension Plans, I consider it appropriate to review the aggregate positions allegedly held by ED&F Man and all its clients for purposes of the

Appendix E, I provide descriptions of two transactions that ED&F Man conducted to illustrate the steps involved in the transactions at issue in this matter. In Appendix F, I provide a list of transactions that I used to evaluate the pricing issues of the transactions in this matter.

11. This report is my independent work product, and contains my objective, unbiased opinions in relation to matters within my expertise, and the opinions I express represent my true and complete professional opinion.

12. I reserve the right to amend or supplement my opinions based upon further information learned, produced, relied upon, in response to opinions in any reports or disclosures of defendants' experts, other updated relevant information, or based upon any stipulation of the parties. I also understand that fact discovery remains ongoing because on December 22, 2021 the Court ordered ED&F Man to produce a new Rule 30(b)(6) witness fully and properly prepared to answer questions relating to certain topics relevant to this report, including the circumstances of ED&F Man's issuance of the Annex E vouchers and its admission that those vouchers were false, and the U.K.'s FCA's investigation into ED&F.

13. Therefore, the analyses and opinions described herein are subject to change based upon future discovery or other developments.

14. My hourly billing rate in this matter is $1,200 per hour. Neither my nor CRAI's compensation is contingent upon the outcome of this case.

## IV.  SUMMARY OF OPINIONS

15. The following is a summary of my opinions related to the transactions for the ED&F Man Pension Plans for which ED&F Man served as a custodian as set forth in greater detail in this report:

---

analysis for which Appendix D is used (the consideration of prudent risk management of large shareholding positions).

  c. ED&F Man, custodian for the ED&F Man Pension Plans, did not actually have custody of a sufficient number of shares to support the Tax Vouchers that were issued for the ED&F Man Pension Plans. The bases for this opinion are the following: (i) The number of actual shares settled was not connected to the transaction amounts; and (ii) The share amounts that were purportedly traded were wholly inconsistent with realistic average daily trading volumes ("ADTV") because these purported amounts could not have been risk managed by the parties.

  d. ED&F Man's tax voucher process was highly unusual, inappropriate, and resulted in fabricated Tax Vouchers with false statements. The bases for this opinion are the following: (i) The Tax Vouchers that ED&F Man produced contained false representations, were essential to filing false tax reclaims, and all participants in the order and execution of these trades would have been fully aware of this; and (ii) ED&F Man's failure to obtain any legal and tax advice was a breach of its U.K. regulatory obligations. The tax opinions that were provided by PwC and Hannes Snellman bear little or no relation to the transactions actually undertaken and appear to simply be marketing opinions that were used to provide cover for the participants rather than proper consideration of the appropriateness of the transactions as conducted.

16. The following is a summary of my opinions related to the transactions for the Solo Pension Plans that used Solo as a custodian as set forth in greater detail in this report.

  a. The transactions that Solo engaged in also involved fabricated Cum-Ex transactions in which: (i) No shares were delivered to or received by the Solo Pension Plans; (ii) No cash was exchanged; (iii) The Solo Pension Plans' counterparties and other parties to the transactions did not receive a real dividend; (iv) The trades deviated from market standards in numerous ways, were not arm's-length, and as such, avoided and ignored real market risks; (v) None of the parties were at risk of any real market gain or loss, except for the receipt of a fabricated dividend tax reclaim; and (vi) It appears that the communications about executing the trades were all

automatically generated by Solo, with no independent involvement of any of the parties. The bases for this opinion are the following: (i) Solo held no shares in its sub-custodian accounts, and, netting and offsetting trades at the custodian or sub-custodian level cannot create shares or dividends; (ii) The circular nature of the Solo trades with Delvian means that there was no requirement for shares or cash; the purported trades were completely fake; (iii) All the trades were dictated to the Solo Pension Plans by Solo and eventually automated; both these facts are highly irregular and further evidence that these transactions were fake; (iv) The terms of the stock loan agreements are highly irregular for multiple reasons; (v) The terms of the futures trades and Solo's transactions of futures at its sub-custodians were also irregular; and (vi) It is not the market standard for parties to a stock loan or broker-custodians to retroactively alter the terms of the original stock loan so that the trades net to zero.

## V.   FACTUAL BACKGROUND

### A.   Summary of Plaintiff's Claims

17.   This report pertains to litigation brought by Plaintiff, SKAT, in the United States against multiple parties including various pension plans, authorized representatives for the pension plans and related parties involved in scheme to defraud SKAT into refunding "over 12.7 billion Danish Kroner ('DKK'), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax." [5]

18.   SKAT is the Danish national agency responsible for assessing and collecting Danish taxes. [6] Danish law requires companies to withhold a 27% tax on dividends paid to shareholders. [7] Pursuant to certain double taxation treaties between Denmark and other countries, including the United States

---

[5] Amended Complaint & Demand for Jury Trial, SKAT v. Acorn Capital Corp. Employee Profit Sharing Plan et al., ¶¶ 5, 8, and 26 NO 18-cv-10088-LAK (S.D.N.Y. April 22, 2020). The total amount refunded by SKAT includes amounts paid to parties located in foreign jurisdictions, and amounts paid to parties that have settled.

[6] Ibid, at ¶ 4.

[7] Ibid, at ¶¶ 6 and 21.

Market Claims which arose in all the ED&F Man and Solo Appendix C Cum-Ex Trades involved purported dividend compensation payments.

72. Since real dividends are payments derived from rights granted by owning shares in a company, the starting point of most laws is to assume that real dividends can only be received directly from a company. Dividend compensation payments are a contractual right that can be received in several formats and under various types of contracts.

73. Certain jurisdictions have detailed rules on the treatment of dividend compensation payments. These jurisdictions require payers of such payments to withhold dividend tax and also include provisions for the recipients to obtain tax credits. The U.K. Manufactured Overseas Dividend rules were one of the most advanced and complicated examples. During the Relevant Period during which the Appendix C Cum-Ex Trades occurred, it was well understood by market participants that there was a significant difference between receiving a real dividend and receiving a dividend compensation payment. For example, U.K. guidance on manufactured dividend rules contain the following explanation: [68]

> *Manufactured payments also occur where a dealer sells securities 'cum div' (with dividend) but delivers securities that are 'ex div' (without dividend). The sum that the dealer pays to the buyer to compensate it for not receiving the real dividend is a manufactured payment. The sales that give rise to such payments are often 'short' sales… as the dealer does not own the securities at the time of selling them, it is required to acquire them between the date of the bargain and the delivery date and may only be able to acquire 'ex div' stock.*

74. The two most common pitfalls an entity in a financing transaction can encounter are:

   i. The risk that a compensating party agrees to pass on a dividend compensation payment of 85% or 91% of the real dividend to a client but then discovers that it is subject to a 27%

---

[68] See, Her Majesty's Revenue and Customs Corporate Finance Manual, published April 16, 2016, updated November 23, 2021, available at https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74430, accessed December 11, 2021.

### 7. No Reputable Market Participant Would Have Considered the Appendix C Cum-Ex Trades as Legitimate

170. Based on my knowledge, gained from covering all major equity markets while working at Barclays and my extensive knowledge of equity finance market practice, no reputable market participant would have considered it appropriate to engage in a Cum-Ex transaction in Denmark like those in Appendix C. During the Relevant Period, it was my understanding that Cum-Ex transactions were invalid as a basis for a WHT refund claim in any European jurisdiction. This view was widely held by leading market participants and their advisers. It is my belief that both ED&F Man's personnel and the E&F Man Pension Plans' agents, including but not limited to Investment Managers such as Acer, would have been well aware of this market view.

### 8. There Was Deliberate Coordination of the Participants at the Outset of the Trades

171. The Appendix C Cum-Ex Trades were entered into deliberately, in coordination, and in such a fashion that there was no legitimate prospect that the Sell Date transactions would not have followed inevitably from the Buy Date Transactions. I detail the basis for my conclusion in the following sections.

### 9. The Unusual Risk Sharing and Failure to Properly Consider Trading Risks and Margin Demonstrates That the Trades Were Not Real

172. I have reviewed the approach taken by ED&F Man to determining the appropriate risk capital or margin which it required the ED&F Man Pension Plans to provide for it to undertake the transactions and it is my view that this clearly indicates that the transactions were effectively a joint venture between the Investment Managers, ED&F Man Pension Plans and ED&F Man. They were clearly not independent investment transactions undertaken by the ED&F Man Pension Plans using typical arm's-length prime brokerage arrangements.

173. In the case of the Acer ED&F Man Pension Plans profit and risk sharing agreement was explained by Stacey Kaminer in her deposition. The approach that Acer and ED&F Man used to assess and

E.  **Opinion 5: The Transactions That Solo Engaged in Also Involved Fabricated Cum-Ex Transactions in Which (i) No Shares Were Delivered to or Received by the Solo Pension Plans, (ii) No Cash Was Exchanged, (iii) The Solo Pension Plans' Counterparties and Other Parties to the Transactions Did Not Receive A Real Dividend, (iv) The Trades Deviated from Market Standards in Numerous Ways, Were Not Arm's-Length, and as Such, Avoided and Ignored Real Market Risks, (v) None of The Parties Were at Risk of Any Real Market Gain or Loss, Except for the Receipt of a Fabricated Dividend Tax Reclaim, and (vi) It Appears That the Communications About Executing The Trades Were All Automatically Generated by Solo, With No Independent Involvement of Any of The Parties**

225. In the following section, I provide a detailed description of a transaction undertaken by Solo, which supposedly acted as a clearing firm for it.[169] I show that the transaction was completely circular, did not require holdings of either shares or cash, and its participants—Solo's purported clients and counterparties—faced no market risk whatsoever. Based on my review of the evidence, Solo never held any actual Danish securities, a fact that Sanjay Shah effectively concedes by admitting in his pleadings in the parallel English action that the Solo trades all netted completely to zero.[170] I conclude that the transaction was in totality, completely fictitious. Further it is my view that fictious nature of the transactions should have been obvious to any of the participants involved and should have raised important regulatory or money laundering red flags for them.

226. While I have only reviewed two Solo trades, Counsel has represented to me that Bruce Dubinsky in his Expert Report opines that he has seen no evidence that any of the 2,599 trades conducted by the Solo Custodians that are at issue in this litigation differ in any material respect. Assuming that to be so, the opinions I set out below apply equally to the remaining Solo transactions.

---

[169] All confirmation emails from Solo contain the following text:
"In relation to the trade referred to below (Trade), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis: (i) You may seek liquidity for the Trade (via the Broker that you have identified), and (ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) – partial execution of the Trade is not approved. Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade. In case of any queries, please contact custody@solo.com. Global Securities Services Solo Capital Partners LLP. "

[170] In the High Court of Justice, Business and Property Courts of England & Wales, Commercial Court, SKAT v. Solo Capital Partners (in Special Administration) & Others, *Sanjay Shah Defendants' Response to Claimant's Request Dated June 4, 2019 for Further Information Under CPR 18* ("Shah Response"), p. 15, Response 21.

which JPMorgan "identified no holdings of any of the Danish Securities during the Applicable Period."[188] The SEB Declaration lists Solo among one of the entities for which "SEB Denmark has searched the customer database for SEB Denmark's custody business… in the Applicable Period" but found none.[189,]

236. In an English litigation filing, Sanjay Shah, who I understand to be the owner of Solo and the other Solo Custodians, maintains that Solo "held claims against JP Morgan and SEB in the sum of zero because the long and short positions in the account netted off. This was same for dividend payments."[190]

237. Solo appears to be claiming that where clients have equal and offsetting long and short positions, the client is entitled to treat the long counterparty as if it did, in fact, have actual shares for which it is entitled to real dividends. This is obviously wrong. In my experience, a custodian would only issue tax vouchers which totaled its combined net *long* position, not the long side of its net *flat*, or equal and offsetting long and, short positions. Market participants would request segregated client accounts if they expected dividend receipts to be an important economic factor for them, precisely

---

CARLB] during the Applicable Period [e.g., March 2013-June 2013] for the following entities: … Solo Capital Partners LLP…." Statements from the purported trade date, March 21, 2013, show a series of exactly offsetting long and short futures positions. ELYSIUM-01479796.

[188] Declaration of Matthew J. Totman (JPMorgan), December 15, 2021, ¶ 8.

[189] Declaration of Anders Peter Bryde Rasmussen, May 17, 2021, ¶¶ 12-13. In addition, counsel has represented to me that Solo Capital's U.K. solicitors, Reed Smith LLP, reported to the U.K. FCA that from 2014 to 2015 Solo Capital also used Société Générale SA to sub-custody securities. ELYSIUM-05327063, at 2. Counsel has represented to me that the Expert Report of Bruce Dubinsky concludes that the Société Générale's records of Solo's cash and securities holdings include no evidence that Solo Capital or the other Solo Capital Custodians held the Danish securities the Plan's claimed to SKAT to have owned.

[190] Shah Response, p. 15, Request 21: "Please confirm whether it is alleged that SCP [Solo Capital Partners] was a client of the credit institutions and was entitled to and did hold claims against those credit institutions for shares and net dividend payments in respect of the WHT [withholding tax] Applications." Response 21: "During the periods specified above, SCP was a client of JP Morgan, SEB (and Citi), who are each credit institutions. At the relevant times, it held claims against JP Morgan and SEB in the sum of zero because the long and short positions in the account netted off. This was same for dividend payments."

243. The observations I made earlier in respect of the ED&F Man Cum-Ex transactions about the size of the trades relative to the ADTV are equally applicable to Solo. It is inconceivable to me that these IDBs were genuinely able to provide instant access to liquidity equal to more than the ADTV of the shares in question.[199] Rather it is a further indication that these were fictitious and circular transactions which were accepted without question by all the parties because they understood the circularity of the transactions and knew they had no trading risk.

244. Additionally, all of the transactions I have reviewed were structured such that same day trades took place at exactly the same price with no bid/offer spreads on any of the legs and as mentioned below, the stock loans further used the same prices as buy and sell trades conducted on previous dates irrespective of intervening price moves. Therefore, even if we were to accept that the IDBs were genuinely seeking liquidity and providing it to other of Solo's clients (via Brokermesh or otherwise), which I do not, then there does not appear to have been any opportunity for them to generate the normal brokerage bid offer spreads which is the only reason why a real IDB would participate in a real brokerage platform.

245. In conclusion, there is no way in which this Brokermesh can be considered a genuine liquidity finding venue and these facts further support the conclusion that these transactions were simply fictitious and that all the supposed participants were in league with Solo, which was organizing and coordinating all of the false bookings and tax reclaims.

### 5. The Terms of the Stock Loan Agreements are Highly Irregular for Multiple Reasons

246. First, for the Solo transaction discussed above, the stock loan confirmation states that Aquila, the borrower, would pay 100% of dividends back to the lender, Delvian.[200] However, since the stock loan

---

[199] For example, Appendix D shows that the ADTV of Novozymes A/S shares used in the Roadcraft NZYMB 2015 transaction was approx. 524,000 shares per day when the number of shares traded by the participants was 681,437 shares.

[200] ELYSIUM-01487895.