EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3

 4    _____)
      IN RE:                                 )
 5                                           )
                                             )
 6    CUSTOMS AND TAX ADMINISTRATION OF )
      THE KINGDOM OF DENMARK               )
 7    (SKATTEFORVALTNINGEN) TAX REFUND  )
      SCHEME LITIGATION                    )
 8    _____)

 9

10

11

12

13              C O N F I D E N T I A L

14

15

16

17    REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

18                  EXAMINATION OF

19                  GRAHAM WADE

20

21              DATE: March 16, 2022

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 63

1    were no dividends received on the other -- on

2    the cum ex transactions.

3         Q    Okay.  And I'm asking you what you

4    consider your expertise to be that allows to

5    you draw that conclusion?

6         A    My expertise?  Well, it's, you

7    know, the -- I've spent a significant portion

8    of my career involved in structured financial

9    transactions, and I am able to -- you know, I

10   have reviewed the trades that were done, how

11   they were arranged, and all the details as

12   laid out in my report, and I -- I think I've

13   given the reasons why I reached those

14   conclusions as a result of that experience in

15   my report.

16        Q    Okay.  Again, if it's not a legal

17   opinion, would you agree that whether

18   financial transactions executed by the

19   various defendants would entitle an entity or

20   individual to a dividend is informed by legal

21   principles?

22             MR. OXFORD:  Objection to form.

23        A    No, not really, no.  I think, as

24   I've said, my opinions lead me to conclude

25   that as a matter of fact, there were no

```
 1              MR. OXFORD:  Objection to form.
 2       A    Okay.  Well, apart from
 3   the -- apart from the absence of shares, the
 4   other most fundamental reason, although, as
 5   I've said, there are others in my report, is
 6   that the nature of the way the cum ex
 7   transactions were structured is that even if
 8   there had been shares, it would still not
 9   have been the receipt of the dividend.  It
10   would have been a receipt of a dividend
11   compensation payment.
12       Q    Okay.  And whether something is a
13   dividend or a dividend compensation payment,
14   that's informed by legal principles.
15              Right?
16              MR. OXFORD:  Objection to form.
17       A    I think it's formed by an
18   understanding of the market practice that
19   relates to security financing and equity
20   finance transactions.
21       Q    Okay.  So it's your testimony that
22   whether something is a manufactured dividend
23   or a real dividend or a dividend compensation
24   payment is not informed by any legal
25   principles?
```

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1              MR. OXFORD:  Objection to form.
 2       A    No, that's not my -- that's not my
 3    testimony.
 4       Q    Okay.  So is the determination of
 5    whether something is a real dividend or a
 6    dividend compensation payment or a
 7    manufactured dividend informed by legal
 8    principles?
 9              MR. OXFORD:  Objection to form.
10       A    My response is that understanding
11    the market practices around those issues is
12    something that, based on my experience, I
13    believe I have expertise to offer an opinion
14    on.
15              Can we agree on a break before the
16    next question?
17              MR. OXFORD:  The witness is asking
18         for a break, Greg.  We've been going
19         about an hour and 12 minutes.
20              MR. PRUDEN:  That's fine.
21              MR. OXFORD:  Thank you.
22              THE VIDEOGRAPHER:  The time is
23         8:12 a.m. New York time and we're going
24         off the record.
25              (Whereupon a discussion was held
```

1          off the record.)

2               THE VIDEOGRAPHER:  Stand by.  The

3          time is 8:27 a.m. New York time and

4          we're back on record.

5          Q    Okay.  Before I ask you a

6     substantive question, I just want to make

7     sure you can see me this time, Mr. Wade.

8               Am I visible?

9          A    No.  No, actually you're not.

10    You're --

11              MR. OXFORD:  You're kind of small.

12         You've grown.  Okay.  You're good.

13         A    Okay.  That's good.

14         Q    Okay.  Great.

15              I just want to ask again:  Is the

16    question of whether someone is entitled to a

17    dividend informed by any legal principles, in

18    your view?

19              MR. OXFORD:  Objection to form.

20         A    I think, as I've said, my opinion

21    on that matter is as expressed in this report

22    and is based on the facts of the case and my

23    market experience looking at similar

24    transactions.

25         Q    Okay.  Is the question of whether

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 68

```
1    someone is entitled to a dividend informed by

2    legal principles?

3            MR. OXFORD:  Objection to form.

4       A    Well, I think in this particular

5    case, my opinions on that question are as

6    outlined in my report and subject to the

7    facts that I've reviewed in this case.

8       Q    Okay.  Without reference to what's

9    in your report, can you tell me whether your

10   belief is that whether someone is entitled to

11   a dividend is informed by legal principles?

12           MR. OXFORD:  Objection to form.

13      A    In order for me to answer that

14   question, I would need to understand what you

15   mean by what circumstances you're talking

16   about, and for what purposes you are asking

17   that question.  Because it could have

18   different answers depending on that.

19      Q    I'm asking you, as a general

20   matter, if someone receives a payment and

21   you're trying to figure out whether they're

22   entitled to keep a dividend, whether that

23   payment and that analysis is informed by

24   principles of the law.

25           Can you answer that question?
```

```
 1              MR. OXFORD:  Objection to form.
 2       A    No, not in those general terms, I
 3   couldn't answer that question.  I would need
 4   to understand the facts and circumstances of
 5   the situation to which that question related
 6   to.
 7       Q    Why can't you answer the question?
 8              MR. OXFORD:  Objection.  He's just
 9         told you why he can't answer the
10         question.
11       Q    What additional facts and
12   circumstances would you need to know?  My
13   previous question's withdrawn.
14       A    I would need to know --
15              MR. OXFORD:  Objection to form.
16         Sorry, Graham.
17       A    I would need to know all the facts
18   and circumstances.
19       Q    Okay.  Can you tell me any
20   particular facts and circumstances that would
21   be relevant to your analysis of whether a
22   payment that somebody receives is a dividend?
23              MR. OXFORD:  Objection to form.
24       A    No, because that's such a broad
25   hypothetical that I don't even know -- I
```

```
 1    can't -- I wouldn't even know where to start.
 2            I would need to understand all the
 3    facts and circumstances of your hypothetical,
 4    and then I could -- and also, as I said
 5    before, for what purpose you wanted me to
 6    answer that question, and then I -- and then
 7    I could give you a response.
 8        Q    Okay.  For the ED&F trades, in the
 9    circumstances where you contend that ED&F
10    clients received a dividend compensation
11    payment and not a dividend, is the
12    distinction between "dividend" and "dividend
13    compensation payment" informed by legal
14    principles?
15            MR. OXFORD:  Object to the form.
16        A    It's -- my opinion on that matter
17    is informed by my expertise as someone who
18    has been involved in the equity finance
19    industry for a long period of time.
20        Q    That's not my question.
21            Is that distinction informed by
22    legal principles?
23            MR. OXFORD:  Objection to form.
24        A    And my answer is the same.
25            My opinion on that question is
```

1    informed by market practices, market

2    knowledge, understanding of how these

3    transactions are designed and executed, and

4    all the other factors that I gave in my

5    report.

6        Q    Okay.  And so it's your testimony

7    that that opinion is not informed by any

8    legal principles?

9            MR. OXFORD:  Objection to form.

10       A    My position is that my opinions on

11   the question of the nature of the payment is

12   as laid out in my report and is based on my

13   understanding of market practice, how these

14   transactions were structured, and the

15   detailed facts, again as outlined in my

16   report.

17       Q    Is there a reason you can't answer

18   my question specifically of whether

19   distinction between a dividend and a dividend

20   compensation payment is informed by legal

21   principles?

22           MR. OXFORD:  Objection to form.

23       A    Because my opinion in this

24   situation is predicated on all the facts and

25   circumstances and all the market practice and

1    knowledge of these types of transactions.

2        Q    Okay.  Is that your complete answer

3    to my question of whether or not the

4    distinction between a dividend and a dividend

5    compensation payment is informed by legal

6    principles?

7            MR. OXFORD:  Objection to form.

8        A    My answer to the question, again,

9    even with the question of whether a dividend

10   and a dividend compensation payment are

11   different, can be for any number of purposes.

12           So what I'm being clear on is the

13   distinction I have drawn in making any

14   opinions is based on the facts and

15   circumstances and all the other details as

16   outlined in my report.

17           So, in a different situation, there

18   might be different things.  But in the case

19   of the conclusions I've reached on that

20   particular topic for the purposes I've

21   reached it in my report, it's based on my

22   study of the case and my market knowledge and

23   practice over many years.

24       Q    Okay.  And does your analysis on

25   the ED&F transactions in your report rely in

```
 1    any way on your knowledge of legal

 2    principles?

 3              MR. OXFORD:  Objection to form.

 4        A    It relies on all the factors that

 5    I've included in my report, including market

 6    practice, understanding the nature of the

 7    transactions, and understanding all the facts

 8    and circumstances of the case as outlined in

 9    my report.

10        Q    Respectfully, sir, that's not my

11    question.

12              My question is whether or not that

13    analysis depends on legal principles or

14    knowledge of the law.

15              Can you answer that question with a

16    "yes" or "no?"

17              MR. OXFORD:  Objection to form.

18        You can answer if you're able.

19        A    I'm sorry, but I'm going to keep

20    giving you the same answer, which is the

21    opinions for the specific purpose on which

22    I've drawn distinctions between dividends and

23    dividend compensation payments in my report

24    is for the reasons and on the basis that I've

25    included in my report.
```

```
 1      Q    Okay.  So you're not able to answer
 2   "yes" or "no."
 3           Right?
 4           MR. OXFORD:  Objection to form.
 5      A    No.  I'm just saying that
 6   the -- the answer I'm giving is that the
 7   opinions I've given on that particular issue
 8   are as outlined in my report and are based on
 9   market practice and experience as -- and the
10   facts and circumstances as included in my
11   report.
12      Q    So you are able to answer "yes" or
13   "no?"
14           MR. OXFORD:  Objection.
15      A    I just said it.
16      Q    If you are able to answer "yes" or
17   "no," could you please respond to the
18   question -- of whether, for the ED&F
19   transactions you analyzed, is the distinction
20   between a dividend and a dividend
21   compensation payment informed by legal
22   principles or knowledge of the law -- with a
23   yes-or-no answer?
24           MR. OXFORD:  Objection to form.
25      A    And I think as I've said, my
```

```
1     opinions are the basis of my market practice
2     and my review of all the facts and
3     circumstances of this case.
4          Q    I'm entitled to know, respectfully,
5     sir, whether or not your opinion relies in
6     any way on legal principles.  So I'm going to
7     ask you one more time.
8          Does your analysis of the ED&F
9     transactions in your reports and the
10    distinction between whether a payment
11    received is a dividend compensation payment
12    or a dividend informed by legal principles?
13          MR. OXFORD:  Objection to form.
14         A    The conclusions -- opinions in my
15    report that are relevant to the question of
16    the difference between a dividend
17    compensation payment and a real dividend as
18    far as it is relevant to the questions in my
19    report are formed by my review of the
20    transactions and my understanding of market
21    practice in the security financing market.
22         Q    Okay.  It's also your view in your
23    report that you are not opining on the state
24    of knowledge of the pension plans or anyone
25    else.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1          Right?

2          MR. OXFORD:  Objection to form.

3      A   I have not given an opinion on the

4   specific state of mind or knowledge of any

5   individual in the case.

6      Q   Okay.  I want to move on now to

7   some questions about the transfer of

8   ownership rights in securities transactions.

9          Is it your understanding, Mr. Wade,

10  that a trade instruction and a trade

11  confirmation taken together form a securities

12  contract?

13         MR. OXFORD:  Objection to form.

14     A   No, it's not.

15     Q   Okay.  What do you disagree with in

16  that definition that I provided?

17         MR. OXFORD:  Hold on.  Just let me

18      get my objection.  I object to the form.

19         You can answer.

20     A   They are -- they are relevant

21  factors in understanding in terms of a

22  securities transaction, but they are not

23  necessarily the only factors that may be

24  relevant.

25     Q   I'm not sure you understood my

1   have -- you know, there are a whole range of

2   different forms of legal ownership.

3           So I need you to be a bit more

4   precise.

5       Q    Okay.  Is it your understanding

6   that what it means to own a share depends on

7   the legal circumstances in which you're

8   asking that question?

9           MR. OXFORD:  Objection to form.

10      A    Again, the question of what

11  ownership means for the particular purposes

12  in which that question's asked, I need to

13  know what purposes it's asked, and all the

14  facts and circumstances that surround that

15  particular share.

16          So if you give me a specific

17  example, I can give you my thoughts.

18      Q    Is it your testimony that you're

19  unable to tell me, as a general principle,

20  what it means to be a legal owner of a share

21  in Denmark?

22          MR. OXFORD:  Objection.

23      A    What I'm saying is that over the

24  course of my career I spent a long time and I

25  understand that the question you're asking me

CONFIDENTIAL
Graham Wade - March 16, 2022

1     can be a much more complex question than it

2     appears because it requires understanding the

3     exact facts and circumstances, for what

4     purpose, i.e., you know, is it tax, is it

5     accounting, is it regulation, is it, you

6     know, record holder from the issuer's

7     perspective?

8             There's a range of different ways

9     in which one can think about who the owner of

10    a share is.  And without the full facts and

11    circumstances and the specifics and for what

12    purpose the question is being asked, I -- I

13    can't answer it.

14        Q    Is it your understanding that the

15    legal owner of a share can be a different

16    person in different circumstances?

17            MR. OXFORD:  Object to the form.

18        A    It would be highly unusual if a

19    given share for the same -- going back to my

20    point about there are different

21    purposes -- if we're talking about a specific

22    definition of "ownership," in my experience,

23    it would be highly unusual if two people can

24    be the same owner of the share for the same

25    purpose.

CONFIDENTIAL
Graham Wade — March 16, 2022

```
 1      Q    What about whether two people can
 2  be the same owner of the share for different
 3  purposes?
 4          MR. OXFORD:  Sorry.  Just let me --
 5      let me get my objection in, please,
 6      Mr. Wade.
 7          So can you just repeat that
 8      question, Greg?
 9          MR. PRUDEN:  Yeah.  There was an
10      error in my question anyway, so let me
11      re-ask it.
12      Q    What about whether two people can
13  be the owner of the same share for different
14  purposes?
15          MR. OXFORD:  Object to the form.
16      A    That's possible, yeah.
17      Q    Okay.  What's your understanding
18  that the owner can be a different person in
19  different circumstances based on?
20          MR. OXFORD:  Object to the form.
21      A    My -- over the course of my career,
22  you know, as I said, you've got accounting
23  regulation, you've got nominee ownership.  It
24  is possible and I've seen instances over the
25  course of my career where the owner for one
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    is you've given me no information about what

2    the terms of the transaction are, who the

3    people are, for what purpose they did the

4    transaction, whether it was on-exchange,

5    off-exchange.

6            You just haven't given me any

7    information, so I'm unable to answer your

8    question.

9        Q    Okay.  So you're unable to answer

10   my question?  That's your answer?

11       A    For the reasons I just gave, I am

12   unable to answer that question, yes.

13       Q    Are you familiar with the term

14   "beneficial owner?"

15           MR. OXFORD:  Object to the form.

16       A    Yes.

17       Q    What's your understanding of what

18   the definition of "beneficial owner" is?

19           MR. OXFORD:  Object to the form.

20       A    Again, it depends on the

21   circumstances and it can have -- even the

22   term "beneficial owner" can have different

23   meanings in different contexts.

24           But as a general proposition, it

25   tends to mean the person who has the overall

1    you may mean nominee ownership, but I don't

2    know.

3        Q    I'm asking you as a general matter

4    whether you understand that there's a general

5    definition of what it means to be the legal

6    owner of a Danish issuer in Denmark?

7              MR. OXFORD:  Object to the form.

8        A    And my answer, going back to an

9    answer I gave a short while ago, is that over

10   the course of my career, one of the many

11   things I have learned is that there are a

12   wide range of different legal regimes and

13   legal concepts.  And even within Denmark I'm

14   sure there are a number of different legal

15   regimes which may be relevant and they may

16   all have different definitions of what "legal

17   ownership" means.

18             So I can't really -- without being

19   really specific, I can't answer that.

20       Q    Okay.  And if you were to use the

21   term "legal ownership" as a general term, it

22   wouldn't be readily understood what you meant

23   by the term.

24             Right?

25             MR. OXFORD:  Object to the form.

CONFIDENTIAL
Graham Wade - March 16, 2022

1    when did the buyer of the shares become the

2    legal owner of the shares?

3        A    I'm really sorry, that -- sorry.  I

4    just didn't catch that question.

5            The sound has been a bit worse

6    since we've restarted again.  I don't know if

7    that's -- that's the only change.

8            Sorry, but could you repeat the

9    question?

10       Q    Yes.  For the purposes of making a

11   tax reclaim application in Denmark, in the

12   transactions that you analyzed in this case,

13   when did the buyer of the shares become the

14   owner of those shares?

15           MR. OXFORD:  Object to the form.

16       A    I don't believe I've given an

17   opinion as to the requirements for when or

18   what exactly is required to make a tax

19   reclaim.

20           My opinions relate to the fact that

21   if we go back to the tax vouchers, there are

22   three key facts in the tax vouchers.

23   Number 1, that the pension plans held shares;

24   Number 2, that they received dividends; and

25   Number 3, that they suffered tax.

CONFIDENTIAL
Graham Wade - March 16, 2022

1           And my opinions are fundamentally

2     that those three statements are false.  But I

3     have offered no opinion as to, you know, what

4     the Danish tax consequences of -- as a result

5     of that are.

6        Q    Okay.  Well, you said that -- you

7     told me in response to a question that I

8     asked you, Mr. Wade, whether and in what

9     context I was using the term "ownership"

10    would inform your answer to my question.

11          I'm not asking you about opinions

12    that you provided or not.  What I'm asking

13    you right now is whether you understand that

14    for the purpose of making a tax reclaim in

15    Denmark, when, in a securities transaction,

16    the ownership would transfer from the seller

17    to the buyer?

18          MR. OXFORD:  Object to the form.

19       A    And my response is that given the

20    opinions that I gave and the fact that I am

21    not giving opinions on Danish tax law, I have

22    not given an opinion on the question of what

23    the precise conditions required are to obtain

24    a Danish tax reclaim.

25          But it's my opinion that the three

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1         A    Well, I think -- I don't -- I don't
 2    really understand that question because my --
 3    under my definition, which I think is the --
 4    well, I know, based on my market practice, is
 5    the accepted market definition of a dividend
 6    compensation payment -- a dividend
 7    compensation payment is a contractual payment
 8    made under the contract for transfer of
 9    securities.
10              So it's definitionally not a
11    dividend.
12         Q    Okay.  So your testimony is that a
13    payment that's made from the seller to a
14    buyer of securities can never represent a
15    real dividend?
16              MR. OXFORD:  Object to the form,
17         misstates his testimony.
18         A    That's -- that's not what I said.
19         Q    Okay.  Is it your testimony that a
20    contractual payment that represents a
21    dividend from the seller to a buyer of shares
22    is always a manufactured dividend?
23              MR. OXFORD:  Object to the form.
24         A    I don't think I said that.  I
25    defined -- I gave my definition, which is the
```

1    generally accepted market definition, that a

2    dividend compensation payment –– or a

3    manufactured dividend, if you prefer that ––

4    is a contractual payment made under contract

5    for the transfer of securities.

6        Q    Okay.  And can that ever be

7    considered a real dividend?

8            MR. OXFORD:  Object to the form.

9        A    For what purpose?

10       Q    For the purposes of determining

11   whether the payment received is a dividend?

12           MR. OXFORD:  Object to the form.

13       A    Well, my understanding of the term

14   "dividend" is a dividend is a payment from an

15   issuing company made to a shareholder in

16   respect of that person's being the owner of

17   shares in a company.

18           So, in that sense, a dividend and a

19   manufactured dividend, as I've previously

20   just defined them and are included in my

21   report, cannot be the same thing under

22   those –– as defined for those purposes.

23       Q    Okay.  Well, how do you determine

24   whether somebody is the owner of shares in a

25   company?

1    is an owner of a share?

2              MR. OXFORD:  Object to the form.

3        A    As I said, based on my extensive

4    experience over many years in the structured

5    finance industry, it would be very imprudent

6    of me to use the general English meaning of

7    "owner" when we're talking about securities

8    transactions where "owner" may well be

9    defined in a number of different ways

10   depending on what the situation and the

11   context and the facts are.

12       Q    Okay.  And have any of the

13   documents you reviewed in this case formed a

14   basis for your opinion as to who is

15   determined to have received a dividend paid

16   by an issuer?

17             MR. OXFORD:  Object to the form.

18       A    My -- my opinions are as they are

19   covered in the report in detail, and all the

20   facts and circumstances and the documents

21   that I've relied on are as covered in my

22   report.  So if there's a specific aspect of

23   that that you'd like to go through, I'm happy

24   to.

25       Q    Okay.  Can you give me one example

1      execute a trade before the trade date, but

2      only deliver ex-dividend shares.

3          Q    Okay.  And is your only basis for

4      stating that ex-dividend shares were

5      delivered that the shares were delivered

6      after the record date?

7                MR. OXFORD:  Object to the form.

8          A    No, because -- and again, what

9      does -- what does "delivered" mean?  That's a

10     slightly imprecise term.

11               But in the transactions in this

12     case and for all the reasons given in the

13     report, including the way they were

14     settled -- the pricing, who the

15     counterparties were, the nature of all the

16     arrangements -- it is clear to me that what

17     the parties intended to do was have a

18     contract where the cum ex seller had agreed a

19     trade under which they were going to deliver

20     ex-dividend shares.

21               That's -- that's my opinion.

22         Q    Mr. Wade, I used your term.  You

23     said, "What people understand that to mean is

24     a transaction where you're going to execute a

25     trade before the trade date but only deliver

CONFIDENTIAL
Graham Wade - March 16, 2022

1    give rise to a tax reclaim on a contract,

2    which is the contract for delivery of

3    ex-dividend shares.

4            And if someone were long

5    immediately before doing a cum ex, so they

6    were doing a cum ex out of a long position,

7    that is not an impossible thing to happen,

8    but it would be a quite unusual thing to be

9    done.

10    Q    And what's the basis for that

11    testimony?

12    A    The basis for that testimony is

13    being responsible and working in the

14    structured finance industry for many years.

15    Q    Have you ever executed cum ex

16    transactions yourself?

17    A    No.

18    Q    Have you, as far as you're aware,

19    worked for an institution that ever entered

20    into cum ex transactions?

21            MR. OXFORD:  Object to form.

22    A    I believe it's a matter of public

23    record that Barclays has executed cum ex

24    transactions, but limited to -- as I say in

25    my report, the nature of cum ex transactions

CONFIDENTIAL
Graham Wade - March 16, 2022

1    changed significantly, so not in 2012.

2            In my experience, prior to my

3    involvement in this case, it was only ever my

4    understanding that cum ex transactions were

5    executed in Germany and prior to the various

6    legislative changes that were made in

7    Germany.

8        Q    Okay.  So you, prior to this case,

9    had no understanding of cum ex transactions

10   being executed in any context other than in

11   the German market prior to 2012.

12           Is that right?

13           MR. OXFORD:  Object to the form,

14       misstates his testimony.

15       A    Yeah.  My answer was, I think, that

16   Barclays, to my knowledge, only undertook

17   cum ex transactions prior to the legislative

18   changes in Germany and only ever undertook

19   them in respect of German shares, the reason

20   for that being that based on my market

21   experience and extensive understanding of the

22   European securities, no market participant or

23   advisor who I ever dealt with ever considered

24   the outside of those parameters, that a

25   cum ex transaction was effective.

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1            Okay?
 2            MR. OXFORD:  Object to the form.
 3      A     Okay.  That's counterfactual, but
 4  go on.
 5      Q     Okay.  And I want you to assume
 6  that the seller of those shares had a long
 7  position in the securities that they sold on
 8  the trade date, which is the day before the
 9  ex date.
10            Is that clear?
11            MR. OXFORD:  Objection to form.
12      A     That's clear.
13      Q     Okay.  And then the transaction has
14  an intended settlement date and an actual
15  settlement date of the day after the record
16  date.
17            Okay?
18      A     Understood.
19      Q     Okay.  Assuming those facts, would
20  that change your opinion on whether the buyer
21  of the shares would be entitled to a
22  dividend?
23            MR. OXFORD:  Object to the form.
24      A     So the only -- so the change versus
25  the facts as I understand them is that the
```

```
 1    date in order to be entitled to the dividend?
 2             MR. OXFORD:  Object to the form.
 3        A    The -- there are a range of reasons
 4    why I would reach that conclusion, that
 5    amongst those is the fact that based on, you
 6    know, my extensive market practice of
 7    situations like this, what the -- in the
 8    assumed facts that you've given, it's still
 9    the case that what the cum ex purchaser has
10    been given is a dividend compensation
11    payment.
12             And based on my experience, what
13    would have -- what could have been
14    appropriate is if the cum ex -- a purchaser
15    had been given a voucher which said, "You
16    received a dividend compensation payment."
17             That -- that -- but that's not what
18    the tax vouchers state that they are.
19        Q    And what in your extensive market
20    practice experience leads you to believe that
21    the payment that's made by a seller to a
22    buyer in the hypothetical I just described
23    would not be considered a dividend?
24             MR. OXFORD:  Objection to form.
25        A    Well, because it is definitionally
```

```
1    cum ex seller was long at the time where it
2    entered into the cum ex sale.
3              Is that -- my understanding of your
4    assumption correct?
5         Q    Well, I'm not going to agree that
6    that's different from the facts, but that's
7    the assumption I'm asking you to assume.
8         A    Okay.  Understood.
9              That would not change my ultimate
10   opinion conclusion that the information on
11   the tax vouchers was incorrect.
12        Q    Okay.  And what information on the
13   tax vouchers would have been incorrect in
14   that circumstance?
15             MR. OXFORD:  Object to form.
16        A    All -- all three.  All three of the
17   key items on the tax voucher would still be
18   incorrect.
19             Because the cum ex purchaser did
20   not own the shares on the record date, it did
21   not receive the dividend, and it did not
22   suffer the tax.
23        Q    Okay.  What is the basis for your
24   assertion that in any circumstance, a
25   purchaser must own the shares on the record
```

1    compensation payment.

2         If -- and I express no opinion on

3    this because I'm not expressing opinions on

4    Danish tax -- if the pension plan were able

5    to take a receipt for a dividend compensation

6    payment to the Danish tax authorities and

7    make a reclaim, if you -- you know, if that's

8    something that were possible, it would be

9    highly surprising to me, based on market

10   practice and, you know, my involvement in the

11   European securities market, including

12   understanding, you know, quite a lot about

13   different tax regimes in that market, it

14   would be very surprising.

15        But if it was the case that a

16   receipt for a dividend compensation payment

17   entitled you to a tax reclaim in Denmark,

18   that's not something I've offered an opinion

19   on.

20       Q    Okay.  But you would agree that

21   whether or not what you described as a

22   "dividend compensation payment" would entitle

23   you to a tax reclaim in Denmark is a matter

24   of Danish law.

25            Right?

```
 1      think it's as I defined it earlier today.
 2              A dividend -- there's been
 3      a -- there's been a contract for the transfer
 4      of securities between the seller and the
 5      buyer and you've asked me to assume that the
 6      seller makes a payment under that contract to
 7      the -- to the buyer.
 8              So I -- that would be -- unless
 9      there's some other feature that I haven't
10      understood properly, that is definitionally a
11      dividend compensation payment.
12      Q    Under whose definition?
13      A    Under both my definition I've used
14      in my report and the general market HMRC
15      people involved in the European equity
16      finance industry.
17      Q    Can you point to anything more
18      specific than that as the source of the
19      definition that you're reciting now?
20              MR. OXFORD:  Object to the form.
21      A    Well, amongst others, as I cite in
22      my report, there's the HMRC definition which
23      is covered in my report.  So that's one which
24      I think I state in my report as, you know, I
25      think would be considered a fairly
```

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1    options at Barclays for Renaissance

 2    Technologies known as "Cult"?

 3              MR. OXFORD:  Object to the form.

 4        A    Yes.

 5        Q    And what do you understand Cult to

 6    be?

 7        A    Well, I have to be careful here

 8    because, you know, I -- under my contractual

 9    position with Barclays, I have to be careful

10    about talking about the specifics of a given

11    transaction.

12              And this was a transaction that

13    Barclays executed for one of its clients, so.

14        Q    Okay.  Let's do it this way.  I'll

15    ask you questions and you tell me if you

16    agree or not.

17              Were Cult options designed to be

18    written for a period of longer than 12 months

19    so that Renaissance could realize long-term

20    capital gains even on short-term trading that

21    they did within the options basket?

22              MR. OXFORD:  Object to the form.

23        A    The -- the transactions as I

24    understand them were originally designed by

25    Renaissance Technologies, so I am unable
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    law.

2        Q    Okay.  Have you ever taken a view

3    of U.S. tax law in your work at Barclays that

4    was contrary to the view that was taken by

5    the IRS?

6            MR. OXFORD:  Object to form.

7        A    That's a -- that's a very -- that's

8    a very wide-open question and, you know, I

9    wouldn't -- I wouldn't like to be able to be

10   specific on that.

11           In this particular case, the -- and

12   as the memo explains, it was not Barclays

13   that was taking a -- the relevant U.S. tax

14   position.  It was our client.

15       Q    Yeah.  And that was one of the

16   reasons why Barclays continued to write the

17   options for RenTech after this memo came out.

18           Right?

19           MR. OXFORD:  Object to the form.

20       A    I have to be -- for the reasons I

21   gave earlier, I have to be very careful here

22   because I know, obviously, there has been a

23   significant hearing in the U.S.  And I also

24   know -- I'm sure it's a matter of public

25   record that Nason Square and Flowana may

CONFIDENTIAL
Graham Wade - March 16, 2022

1      still be in dispute with the IRS.

2              But on this particular transaction,

3      it is fair to say there was a -- particularly

4      at this time, there was a -- there were

5      differing views on what the appropriate U.S.

6      tax consequences for this transaction were.

7          Q    Okay.  Well, given your

8      restrictions, let's make reference to a

9      document.

10             Can you go back to Tab 8, please?

11         A    Sorry?  Tab 8?

12         Q    Eight, correct.  It was the one we

13     were on before, the exhibits that started

14     with your e-mail.

15             Are you there?

16         A    Yeah.

17         Q    Okay.  Can you go to the fourth

18     page?  It says "Exhibit 61" on the bottom,

19     and it's a memo with a Barclays header on it.

20         A    Sorry?  Page?

21         Q    It's the fourth page.  It has a

22     Bates number at the bottom,

23     Barclays-PSI-016946.

24         A    6946.  Sorry.  My 6946 is Page 1 of

25     the -- a memo, "SCMUS Prudence Committee."

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 226

1    throughout the transaction, it was -- it's

2    clearly their tax filings and there was very

3    clear contractual arrangements around that.

4            That -- so each individual option

5    was not really a separate transaction.  It

6    was part of an overall synthetic prime

7    brokerage arrangement between Barclays and

8    one of its important clients.

9        Q    And do you recall at the time

10    whether Barclays itself disagreed with the

11    IRS' reading of the revenue laws that

12    prohibit the Cult transactions?

13            MR. OXFORD:  Objection to form.

14        A    I'm not sure that's what I just

15    said.  I think our client -- my recollection,

16    and I have to be getting close to -- I mean,

17    I have to think about what my duty of

18    confidentiality to the client is -- but my

19    recollection is that the clients have made us

20    aware that the IRS was investigating, through

21    the normal IRS audit process, the

22    transactions and that they opened a

23    transparent dialogue between us, Renaissance,

24    and the IRS had already existed before the

25    IRS issued the notice that's in this pact.

CONFIDENTIAL
Graham Wade - March 16, 2022

1    different tax jurisdictions, it is -- it

2    would be almost inconceivable to me that the

3    Danish payment and collection process is

4    exactly the same as the U.S. payment and

5    collection process.

6         Q    But you don't know?

7              MR. OXFORD:  Objection to form.

8         A    I -- no, I'm not giving an opinion

9    on the exact details of either the U.S. tax

10   administration system or the Danish tax

11   administration system.  Hopefully, I've been

12   clear that that's not something I'm here

13   giving an opinion on.

14             But I think you previously asked

15   me, in general terms, what is my

16   understanding of how these processes work,

17   which is what I was trying to answer.

18        Q    Okay.  So you're not giving a

19   specific opinion on the details of the

20   administration of the Danish tax system.

21             Are you giving a general opinion on

22   the administration of the Danish tax system,

23   sir?

24             MR. OXFORD:  Object to the form.

25        A    I am not giving any opinion as

CONFIDENTIAL
Graham Wade - March 16, 2022

1       A     I do not believe I've issued an

2   opinion on exactly what documents were

3   distributed to which participants in

4   the -- in the transactions.

5       Q     Did you give an opinion as to

6   generally what documents were distributed to

7   various participants?

8            MR. OXFORD:  Objection.

9       A     I don't believe I've given an

10  opinion as to the specific knowledge of any

11  individual participant.

12      Q     So you don't have any opinion

13  either way on what Mr. Markowitz,

14  Ms. Markowitz, or the plans actually saw in

15  terms of documents.

16            Is that right?

17            MR. OXFORD:  Objection to the form.

18      A     Yeah, I -- I have not expressed an

19  opinion on what any participant, including

20  those people, may or may not have seen and

21  exactly what documents they saw.

22      Q     Are you familiar with the term "net

23  settlement?"

24            MR. OXFORD:  Objection to form.

25      A     The phrase "net settlement" can be

```
 1      Q    Okay.  Sorry.  Go ahead.

 2      A    Yeah, I just -- the detail --

 3   the -- like I said, it's probably been at

 4   least eight years if not longer since I've

 5   last had the need to look at 871(m).

 6      Q    So you don't know whether or not

 7   the U.S. tax system has a concept of dividend

 8   equivalent payments?

 9           MR. OXFORD:  Object to the form.

10      A    I do not recall whether or not it

11   does take it into the concept of 871(m).

12      Q    Do you know whether or not the

13   Danish tax system has a concept of derivative

14   equivalent payments?

15           MR. OXFORD:  Object to the form.

16      A    The -- well, my use of the term

17   "dividend compensation payment" was as it

18   relates to the market practice of what the

19   actual transactions were.

20           I do not believe I've expressed an

21   opinion as to the application of the

22   consequences of the transactions under any

23   specific Danish tax provision.

24      Q    Yeah, my question was whether or

25   not -- and perhaps I misspoke -- whether or
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 315

```
 1    not you know whether or not the Danish tax
 2    system has a concept of dividend equivalent
 3    payments.
 4          You can answer that if you know.
 5          MR. OXFORD:  Objection to form.
 6      A    I'm sorry.  I know you've already
 7    repeated it, but I didn't -- I didn't hear
 8    the precise question.
 9          Can you go through it one more
10    time?
11      Q    Well, I'll try one more time.  I
12    take it that the answer to my question is
13    "no" as to whether or not you know whether or
14    not the Danish tax system has a concept of
15    dividend equivalent payments.
16          MR. OXFORD:  Objection to form.
17      A    Do I know whether or not, under a
18    specific provision of Danish tax law, there
19    is a different definition of "dividend
20    compensation payment" which is different from
21    the way in which I've used it in my reports,
22    which means the market practice, and general
23    equity finance definition of dividend
24    compensation payment?
25          I do not know if there is such a
```

 1    provision in Danish tax law and I have not

 2    offered an opinion on the contents of Danish

 3    tax law.

 4        Q    Okay.  So if I asked you whether or

 5    not you knew whether there was -- I asked you

 6    about dividend equivalent payments under U.S.

 7    tax law, and you said you were not clear if

 8    that was a specific concept used in the U.S.

 9    tax system.

10        Right?

11        MR. OXFORD:  Object to the form.

12        A    I think my response was that I

13    could not recall exactly how 871(m) defines

14    the situations and the payments on which

15    there are withholding obligations.

16        Q    Okay.  So let's look at

17    Exhibit 124, briefly.  I'm going to point you

18    to the second paragraph.

19        "Section 51(m) imposes a 30 percent

20    withholding tax on dividend equivalent

21    payments that are made or deemed to be made

22    to non-U.S. persons with respect to certain

23    derivatives that reference equity (equity

24    derivatives) of a U.S. issuer."

25        Do you see that?