**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | MASTER DOCKET |
| CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION | 18-md-2865 (LAK) |

This document relates to case nos.:
18-cv-07828; 19-cv-01785; 19-cv-01867;
19-cv-01893; 19-cv-01781; 19-cv-01783;
19-cv-01866; 19-cv-01895; 19-cv-01794;
19-cv-01865; 19-cv-01904; 19-cv-01798;
19-cv-01869; 19-cv-01922; 19-cv-01800;
19-cv-01788; 19-cv-01870; 18-cv-07827;
19-cv-01791; 19-cv-01792; 19-cv-01928;
19-cv-01926; 19-cv-01868; 18-cv-07824;
19-cv-01929; 19-cv-01803; 19-cv-01806;
19-cv-01906; 19-cv-01801; 19-cv-01894;
19-cv-01808; 19-cv-01810; 19-cv-01809;
18-cv-04833; 19-cv-01911; 19-cv-01898;
19-cv-01812; 19-cv-01896; 19-cv-01871;
19-cv-01813; 19-cv-01930; 18-cv-07829;
18-cv-04434; 19-cv-01815; 19-cv-01818;
19-cv-01931; 19-cv-01918; 19-cv-01873;
19-cv-01924; 19-cv-10713; 21-cv-05339.

**Declaration on certain aspects of Danish law**
**By**
**Mads Bryde Andersen,**
Professor of Law
Center for Business Law and Public Regulation
University of Copenhagen

Copenhagen, Denmark
June 24, 2024

# Contents

I.    QUALIFICATIONS ...................................................................................................... 4

II.    OVERALL MANDATE AND DOCUMENTATION REVIEWED ...................................... 5

   A.    The questions raised ............................................................................................... 5

   B.    Documentation viewed............................................................................................ 6

   C.    Legal method........................................................................................................... 6

III.    THE STANDARD OF PROOF FOR TORT CLAIMS UNDER DANISH LAW.............. 7

IV.    THE BENEFICIAL OWNERSHIP CONCEPT ............................................................. 9

   A.    The term "beneficial owner" ................................................................................... 9

   B.    Starting point .......................................................................................................... 9

   C.    Practice from the Danish Tax Tribunal ................................................................ 10

   D.    Recent Danish Court Practice ............................................................................... 14

   E.    The Supreme Court and Eastern High Court's decision in the Bech-Bruun case.......... 15

   F.    Conclusion ............................................................................................................ 16

V.    SKAT'S STATUS AS A LEGAL ENTITY UNDER DANISH LAW ............................... 17

   A.    SKAT's role in the Kingdom of Denmark ........................................................... 17

      1.    The legal personality of the Kingdom of Denmark vs. SKAT .................................. 17

      2.    Section 14 of the Constitutional Act of Denmark ...................................................... 18

      3.    Legal literature........................................................................................................... 20

      4.    Offset of claims between different branches of the Danish government. .................. 22

   B.    Danish ministries as plaintiffs in litigation. ......................................................... 23

      1.    Locus standi ............................................................................................................... 23

      2.    Section 240 of the Danish Administration of Justice Act ......................................... 25

   C.    Examples from Danish case law ........................................................................... 29

      1.    Bankruptcy proceedings ........................................................................................... 30

      2.    Tort claims................................................................................................................. 30

      3.    Other cases................................................................................................................. 32

   D.    Conclusion............................................................................................................. 34

VI.    Statutory limitations of monetary claims in Danish law................................................ 35

   A.    Overview of the Danish statute of limitations...................................................... 35

      1.    The scope of the Danish Statute of Limitations ....................................................... 36

2.    The main rules of the DLA ........................................................................ 37

3.    The DLA rules of suspension .................................................................... 38

B.    Conclusion ..................................................................................................... 49

I, Mads Bryde Andersen, professor of law, declare the following:

## I.    QUALIFICATIONS

1.      Since 1991 I have served as a professor of private law at the University of Copenhagen, Denmark, from which university I graduated with a *candidatus juris* degree (LL.M.) in 1981. During the years 1981-1986 I worked as a lawyer for a mid-size Copenhagen law firm. I was admitted to the High Courts of Denmark in 1984. I joined the University of Copenhagen Law Faculty in 1987 at which faculty I took the doctor juris degree in 1989 with a dissertation on contract and tort liability for computer malfunctions. I have three honorary doctorate degrees, one from Oslo University in Norway (2005), the other from Helsinki University in Finland (2023) and the third from the University of Bergen (2024).

2.      Alongside my academic career I have held a number of positions of trust within various Danish government branches. I served as *chairman* of the board of the Danish Financial Supervisory Authority (*Finanstilsynet*) from 2014-2016, of the Danish Radio and Television Council (*Radio- og tv-nævnet*) from 2011-2016, and of the Danish Government IT Security Council (*IT-sikkerhedsrådet*) from 1995-2002. I have also served as a *board member* of the Danish Government Commercial Complaints Board (*Erhvervsankenævnet*) from 1995-2014. Since 2018 I have served as a board member of Statistics Denmark (*Danmarks Statistik*).

3.      For further information on my background, I refer to the enclosed CV (attached as Exhibit 1).

4.      I have written this legal Declaration at the request of Plaintiff, Customs and Tax Administration of The Kingdom of Denmark (Skatteforvaltningen), in the following referred to as "SKAT".

5.     SKAT is compensating me for my work in preparing this Declaration on a per-hour basis.

6.     I have also assisted SKAT as an expert in related litigations initiated by SKAT in other jurisdictions.

7.     In the present litigation, I have previously rendered the following statements:

- Declaration Regarding Danish Law (on the question of SKAT's legal standing), dated 12 July 2019 (attached as Exhibit 2, in the following referred to as, "*Andersen I*");
- Declaration Regarding the Danish Statute of Limitations, dated 23 November 2020 (attached as Exhibit 3, in the following referred to as, "*Andersen II*");
- Declaration on certain aspects of Danish law, dated 6 June 2022 (attached as Exhibit 4, in the following referred to as, "*Andersen III*").

## II.    OVERALL MANDATE AND DOCUMENTATION REVIEWED

### A.    The questions raised

8.     Counsel for SKAT has invited me to describe certain parts of Danish law that pertain to the following main areas:

9.     *First*, I have been invited to comment on the Danish law standard of proof for SKAT's claims and whether the conduct SKAT alleges in its New York law fraud and aiding and abetting fraud claims would give rise to liability under Danish tort law (discussed below in Section III).

10.    *Secondly*, I have been invited to comment on the "beneficial owner" concept as applied in the 1999 Convention between the United States of America and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income with Protocol as amended by a protocol of 2 May 2006 (attached as Exhibit 5 and hereinafter, *the "US/Denmark Convention"*).[1] Both this convention and its protocol are based on

---

[1] I note that certain of the exhibits attached to my declaration are not certified translations.

the OECD Model Conventions. My discussion on this issue and of the nature of SKAT's claims in overview is presented below in Section IV.

11.     *Third*, I have been invited to comment on SKAT's status as a legal entity in Danish law (discussed below in Section V).

12.     And *finally* I have been invited to comment on the statutory limitations period for monetary claims in Danish law (discussed below in Section VI).

## B.     Documentation viewed

13.     True and correct copies of the Danish authorities that I have cited herein are attached as Exhibits to this Declaration, with accompanying English translations. For the purpose of rendering this statement, I have studied the following documents:

- Declaration of Foreign Law of Kasper Bech Pilgaard, dated 11 June 2019;
- Declaration of Foreign Law of Anders Ørgaard, dated 22 November 2021;
- Declaration of Foreign Law of Kasper Bech Pilgaard, dated 27 April 2022;
- Declaration of Foreign Law of Anders Ørgaard, dated 24 June 2022;
- Declaration of Foreign Law of Kasper Bech Pilgaard, dated 27 June 2022.

## C.     Legal method

14.     I render this Declaration being an expert in the Danish Legal system in general and in particular on the Danish private law.

15.     As a basis for my analysis, I have studied relevant decisions from Danish Courts. The main part of this case law is reported in the Danish Weekly Law Report ("Ugeskrift for Retsvæsen", in the following referred to as "**U**", followed with a number indicating the relevant year, page number and a symbol indicating the court in question – e.g., *U 1963.377 H* where "**H**" stands for "Højesteret", i.e. the Danish Supreme Court).[2] Certain cases have been reported in the

---

[2] Danish courts appear at three levels: The lower level consists of 24 *City Courts*. The middle level consists of two *High Courts* (one for the Eastern Circuit and one for the Western). On the top of the judicial hierarchy there is one

periodical "Tidsskrift for Skatteret" (*Journal of Tax Law*), in the following referred to as **TfS** to which I will refer by the same principles of abbreviation.

16.    I have also referred to cases from other Danish courts, including *Østre Landsret* (the Eastern High Court, referred to as "**Ø**"), and *Vestre Landsret* (the Western High Court, referred to as "**V**").

17.    Furthermore, I have made reference to cases decided by *Landsskatteretten* (in the following referred to as **the Tax Tribunal**). The Tax Tribunal is an administrative complaints board which is not part of the Danish judiciary system. Since, however, it is considered to be independent of the Danish government (including SKAT and the Ministry of Taxation) its decisions are generally regarded as indicative of Danish tax law.

18.    A taxpayer who has not prevailed in a case before the Tax Tribunal may bring its case to a state court within three months after the decision has been made. This rule follows from Section 48, sub-paragraph 3, of the Danish Tax Administration Act ("Skatteforvaltningsloven", see Consolidated Act No. 835 of 3 June 2022 as amended, attached as Exhibit 6). If such litigation is not initiated, the Tax Tribunal's decision becomes final. In the following I will only make references to such decisions from the Tax Tribunal which have not been brought before a state court.

### III.    THE STANDARD OF PROOF FOR TORT CLAIMS UNDER DANISH LAW

19.    I understand from counsel that SKAT's *fraud claims* in the present litigation rely on the allegations that the defendants (including the pension plans and their representatives,

---

single *Supreme Court*. In general, cases are heard in the first instance by a City Court from which they can be appealed to a High Court and – under certain circumstances, and subject to permission from the Appeals Permissions Board – further on to the Supreme Court. The reasoning of the Supreme Court is, in principle, binding for lower courts, and even for the Supreme Court itself in subsequent cases.

advisors and agents) made misrepresentations to SKAT about certain material facts, and by doing so, they caused financial losses to SKAT.

20.     I am also informed by counsel that SKAT's *aiding and abetting fraud claims* in this litigation rely on the allegations that a fraud was perpetrated on SKAT and that the defendants had knowledge of, or realized the probability of fraud, but refrained from confirming the fraud in order later to be able to deny actual knowledge, and through their conduct furthered the fraud, causing financial losses to SKAT.

21.     Under Danish law, a defendant who commits the conduct SKAT alleges in its claims described above is liable for the resulting losses because such conduct qualifies as *tortious*.

22.     Under general judge-made principles in Danish law, a party whose willful or negligent acts cause damage to another party, will be liable towards that other party for the full amount of the caused damage.

23.     I understand that under New York law, the standard of proof for a claim of fraud or aiding and abetting fraud is clear and convincing evidence.

24.     As a general rule, Danish law imposes on the claimant the burden of proving its claims. The standard of proof is the greater weight of the evidence or the preponderance of the evidence. Being a general rule, Danish courts impose this burden on all civil claimants for all civil claims, however subject to reservations in individual cases not relevant here.

25.     There is no basis in contemporary Danish legal literature for assuming that in civil law cases, Danish courts require a higher standard of proof for fraud claims than for other tort claims. As a general rule, Danish courts impose the same standard of proof for fraud claims as for any other claim, including negligence.

## IV.    THE BENEFICIAL OWNERSHIP CONCEPT

### A.    The term "beneficial owner"

26.    Under Article 10(3) of the US/Denmark Convention, a refund of tax withheld on Danish dividends is available to a qualifying "pension fund" (as defined in Article 22(2)(e) of the Convention) that is a "beneficial owner" of the dividend.

27.    For the (typical) investors who buy shares to own them, to enjoy dividend payments from them, and at some point in time, to sell them again at a higher price, the beneficial ownership concept does not give rise to any doubt. But in more complicated transactions regarding the distribution of ownership of real shares, the concept may give rise to uncertainties.

28.    In the following, I will discuss this issue in the light of the general understanding of "ownership" in Danish law, and by making reference to illustrative case law from the Danish Tax Tribunal, the Eastern High Court and the Supreme Court.

### B.    Starting point

29.    It is obvious that the word "ownership" is generally used for situations where a party can dispose of any right to the property in question unless otherwise provided.

30.    To substantiate this conclusion, I refer to the definition by Professor Henrik Zahle in the Danish Encyclopedia ("Den Store Danske", attached as Exhibit 7):

> *"Ownership, full ownership, [is] the right to dispose of one's own property in all respects, to the extent that no special restrictions have been made by private declarations of will or by legislation. Restrictions due to declarations of will may follow from, for example, a pledge or leasing agreement, and restrictions according to the legislation may follow from provisions in e.g. environmental or urban planning legislation. Property right is also referred to as immediate property right because the right is not derived from another higher right."*

31.    SKAT in its "Legal Guidance" (Section C.F.8.2.2.10.1.3, attached as <u>Exhibit 8</u>) gives the following illustrative examples of "Intermediaries" (mellemmænd) who receive dividends, but who are not the beneficial owners and thus are not "recipients" within the meaning of the OECD Model Conventions:

> *"...*
> - *An agent*
> - *A nominee, ie. a named representative of the beneficial owner*
> - *A conduit company*
> - *A fiduciary, i.e. person who formally owns an asset (here a share or other ownership interest), but where the return actually accrues to a beneficiary (eligible).*
> *…"*

## C.    <u>Practice from the Danish Tax Tribunal</u>

32.    The Legal Guidance, as quoted above, makes reference to a number of cases where the concept has been challenged.

33.    Without going into the details of those cases it is important to note that they all related to shares that *existed*. At least, nothing else is indicated, and this presumption must be assumed as being quite evident. None of the cases thus dealt with "ownership" of shares that were bought from a purported seller that did not actually possess any actual shares and who never delivered any such shares.

34.    I am not aware of any decision by any Danish authority that supports the viewpoint that ownership of shares may be established under Danish law merely by entering into a contract to purchase shares, even if the shares are fictitious, that is, where the seller has no shares to sell and never delivers any actual shares.

35.    Quite contrary, recent practice from the Tax Tribunal has recognized that SKAT was defrauded into paying reclaims by applicants who submitted applications falsely claiming to own shares over which they had no ownership of any kind.

36.    Illustrative of this principle is the decision rendered on *16 July 2020* by the Danish Tax Tribunal in relation to the FWC Capital LLC Pension Plan (attached as <u>Exhibit 9</u>).

37.    The FWC Capital LLC Pension Plan had requested that the Tax Tribunal should reverse SKAT's *6 April 2018* decision whereby SKAT *revoked* all its previous Withholding Tax (**WHT**) refund decision towards the FWC Capital LLC Pension Plan. The Tax Tribunal denied that request.

38.    The reasoning of the Tax Tribunal's decision was that the pension plan had failed to *prove* that it had owned shares and received dividends from those shares from which WHT had been withheld and that it had not established that proof, by reference to the said set of transactions. In the absence of such proof, there was no legal basis for the refund amounts already paid.

39.    It transpires from pages 6-10 of the Tax Tribunal's 16 July 2020 decision that FWC Capital LLC Pension Plan had alleged that it was entitled to a WHT refund on grounds that it has participated in a so-called *share arbitrage transaction* of the kind also known in the present litigation. The FWC plan argued (see page 116/229 of both the English and Danish version of the decision, <u>Exhibit 9</u>), that "it is a fundamental principle [under] the law of obligations in Danish law that ownership of a given asset is acquired when a final and binding agreement has been concluded between the parties."

40.    The statement is, however, without relevance insofar as it relates to agreements that do not relate to any assets at all. It is obviously meaningless to claim ownership of something that does not exist.

41.    For that reason, it is not surprising – as indicated above in paras 36 to 40 – that this allegation was dismissed by the Tax Tribunal in its 16 July 2020 decision. Contrary to the plans' contentions that its "final and binding" purchase agreements were conclusive, the Tax Tribunal found (see page 227/229 of the English version, and page 227/229 of the Danish version of the decision, Exhibit 9):

> "*The documentation provided in respect of transactions involving the purchase of stocks, stock lending and the conclusion of forwards is merely the presentation of a series of agreements, etc., which do not demonstrate the Pension Plan's ownership of the alleged stocks in question. Thus, there does not appear to be the requisite link to the Pension Plan to prove that there have been stock transactions etc. which have passed through the Pension Plan's finances. No evidence has been provided that the Pension Plan paid initial capital to the Custodian, and no evidence has been provided of other transfers of funds to the Pension Plan from the Custodian or other actors involved in the alleged stock transactions, etc. Only a large number of constructed agreements, account statements, trade notes, etc. with the Custodian as the agent in the alleged transactions have been provided, which, notwithstanding what has been provided, does not demonstrate that the Custodian traded stocks on behalf of the Pension Plan.*"

42.    In effect, this dismissal means that SKAT's 6 April 2018 revocation was and is upheld.

43.    I understand that FWC Capital LLC Pension Plan chose *not* to challenge the 16 July 2020 decision from the Tax Tribunal by bringing action against SKAT before the Eastern High Court. This means that the 16 July 2020 decision stands as a final and binding decision between the said parties on the merits of the case.

44.    I have also been informed that other pension plans, including some of those whose refunds are at issue in the trial scheduled for January 2025, filed similar proceedings before the Tax Tribunal challenging SKAT's revocation decisions. In all cases, I have been

12

informed that the plan either *withdrew* the appeal, or that the Tax Tribunal decided the appeal *in favor of SKAT*, rejecting the arguments of the applicant that it was entitled to the reclaims that it had been paid on a theory that it was the owner of Danish shares.

45.    Furthermore, I have been informed that certain pension plans did bring actions before the Eastern High Court challenging the Tax Tribunal's decisions, and that those plans subsequently withdrew their actions before they were decided.

46.    In my opinion, those applicants who chose *not* to challenge SKAT's revocations by making similar complaints have thereby in effect "accepted" that their claim for WHT refunds were unfounded. Such acquiescence towards the relevant revocation decisions must in my opinion clearly qualify as an acceptance that the *refund claims* could not stand under the scrutiny offered by the Tax Tribunal and – if the parties disagreed on the Tribunal's conclusion – ultimately by a Danish court. This can only mean that the applicants have decided *not* to pursue their allegation that they did in fact have "beneficial ownership" to the said shares by challenging SKAT's revocation decision.

47.    Similarly, those applicants that challenged the revocation decision but withdrew their appeals before the Tax Tribunal could render judgment, likewise must be considered to have accepted that the *refund claims* could not stand under the scrutiny offered by the Tax Tribunal and – if the parties disagreed on the Tribunal's conclusion – ultimately by a Danish court.

48.    I made the above statements in my 6 June 2022 Declaration on certain aspects of Danish law to the United States District Court, Southern District of New York and stand behind the facts, considerations and conclusions expressed herein (just as I do for any other statement of this and other reports that I have signed).

13

49.    For the sake of good order, I have revisited the practice from the Tax Tribunal in the period from then and up to now. None of the Tax Tribunal's subsequent cases bear on the issue of "beneficial ownership" I discuss above.

## D.    **Recent Danish Court Practice**

50.    Since my Declaration on certain aspects of Danish law was rendered on 6 June 2022, the Danish Supreme Court has decided three cases that have interpreted the "beneficial ownership" concept to have the meaning ascribed to it in the Model Tax Conventions developed by the OECD. This concept which – as stated above in para. 10 – is included in the *"US/Denmark Convention"* has been included in the OECD Model Conventions since their 1977 revisions.

51.    The first of these cases (to which the other cases make reference) was decided on 9 January 2023 and is reported in *U 2023.1575 H* (attached as Exhibit 10). The two other cases were decided later that year and reported in *U 2023.3198 H* and *U 2023.4403 H* (attached as Exhibits 11 and 12, respectively). None of these Supreme Court decisions dealt with a purported transfer of shares from a seller who did not own any shares and did not deliver any shares to the purchaser. The subject matter of all three cases were private equity company structures with the parent company placed in a low taxation nation.

52.    In *U 2023.1575 H* the Supreme made the following, general, observation on the interpretation of the "beneficial owner" concept:

> *"The Supreme Court must conclude that the term 'Beneficiary Owner' must be understood in Light of the OECD Model Convention, Including the OECD's 1977 Commentaries on Counteracting Abuse.*
>
> *According to these comments, the term aims to ensure that double taxation treaties do not facilitate tax evasion or tax avoidance through "maneuvers" and "artificial legal constructions" that make it "benefit both from the tax advantages available under certain domestic laws and the reliefs from tax provided for in double taxation conventions." In*

*the revised comments from 2003, this is elaborated and clarified, stating, among other things, that "it would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned."*

*...*

*As noted by the High Court, the preparatory works for the 2001 legislative amendment do not contain any mention of the term 'beneficiary owner' (or 'actual income recipient'). The Supreme Court finds that there are also no grounds for a different understanding of the term 'beneficiary owner' than the one mentioned. What the Minister of Taxation has stated in responses to the Parliament regarding opportunities for, among other things, restructuring and the insertion of intermediary holding companies cannot be understood as intending to allow abuse in the form of 'artifice,' etc., which, according to the model convention and the associated comments, precisely justify that there is no tax exemption.*"

53.    Although the case dealt with matters of public law (tax legislation), i.e. whether the plaintiff should withhold dividend tax on distributions to foreign parent companies, it is obvious that the Supreme Court would reach the same conclusion on the interpretation of the "beneficial ownership" concept, if that concept were to be decisive for the determination of a private law claim (e.g. a claim for damages caused by fraud): The Supreme Court's reference to the principle that double taxation treaties should not "facilitate tax evasion or tax avoidance through 'maneuvers' and 'artificial legal constructions'" would so much more be relevant in a situation where the taxpayer claims "ownership" of shares that do not exist, merely by making reference to purchase contracts.

## E.    <u>The Supreme Court and Eastern High Court's decision in the Bech-Bruun case</u>

54.    In a judgment rendered on 20 November 2023 (reported in *U 2024.746 H*), the Danish Supreme Court allowed SKAT's claims against the Danish law firm *Bech-Bruun* for negligence in failing to detect a scheme to defraud SKAT involving the custodian North Channel Bank (attached as <u>Exhibit 13</u>).

55.     The Supreme Court found that a lawyer with Bech-Bruun (in the below quotation referred to as "A") who had provided the bank with a written legal opinion was liable for failing to realize that the transactions were paper transactions without actual shares. In dealing with this question, the Supreme Court relied on the fact – which was undisputed between the parties before the Supreme Court[3] – that the refund applications were based on fictitious transactions, as there were neither shares, dividends, nor cash flows.

56.     For the High Court, the parties had not stated an explicit agreement on the fictitious nature of the transactions (although it clearly transpires from the file that the transactions were, indeed, fictitious). Perhaps for that reason, the Eastern High Court made the following observation in its reasons:

> *"The question is then whether A should have realised what turned out to be the case that the stakeholders in the tax set-up would act in such a way that the tax set-up would be circular and that it was either proforma or solely consisted of paper transactions without any shares and actual cashflows.*
>
> *The High Court notes that implementing the tax set-up as proforma or without any shares and actual cashflows must be deemed to be ordinary fraud under criminal law that is merely disguised by complicated transactions*." (Emphasis added)[4]

**F.    Conclusion**

57.     In conclusion, Danish law does not provide any basis for the argument that the defendants acquired any form of "ownership" of shares originating from share purchase contracts with purported "sellers" that *did not* deliver any actual shares.

---

[3] See page 849 of the Reasons of the Supreme Court: "Parterne er i den forbindelse enige om, at refusionsansøgningerne var baseret på fiktive transaktioner, idet der hverken var aktier, udbytter eller pengestrømme."
[4] See BS-26436/2020-OLR (attached as Exhibit 14).

58.     Based on the aforementioned legal sources it is my firm conclusion that a party cannot create any form of ownership under Danish law, including "beneficial ownership" under the US/Denmark Tax Convention, by entering into a contract to purchase shares from a purported "seller" that does not deliver any actual shares under that contract.

## V.     SKAT'S STATUS AS A LEGAL ENTITY UNDER DANISH LAW

### A.     SKAT's role in the Kingdom of Denmark

59.     Plaintiff in the present litigation is SKAT (the Customs and Tax Administration of The Kingdom of Denmark).

60.     In *Andersen I*, Section III, I have explained that SKAT is an integral arm (or branch) of The Kingdom of Denmark, mandated with the administrative tasks related to the collection of taxes in Denmark and related services.

61.     In *Andersen I*, paras. 23-38, I have explained how the various ministries within the Kingdom of Denmark are not separate legal persons but indeed just branches of the Kingdom of Denmark, and I have shown how this understanding is reflected in Section 14 of the Constitutional Act of Denmark. I will repeat that explanation below in Section V(A)(2).

### 1.     The legal personality of the Kingdom of Denmark vs. SKAT

62.     SKAT is a ministry within the Danish government administration that, along with every other Danish government ministry, is an integral constituent part of one and the same legal entity (or "legal person"), namely the Kingdom of Denmark.

63.     The Kingdom of Denmark bears the basic characteristics of any other separate legal person: Whereas a *corporation* has its by-laws defining its legal personality and executive functions, a nation like Denmark has its *constitutional act* ("Danmark Riges Grundlov": *The Constitutional Act of Denmark*, no. 169 of 5 June 1953, presented as <u>Exhibit 15</u>).

64.     As I revert to below in Section V(A)(3), Section 14 of the Constitutional Act of Denmark defines, among other things, the *executive powers* at the supreme level. And likewise: Just like the by-laws of an association or corporation indicate how its *capital* is provided, the Danish constitution and additional regulations set forth the conditions by which Danish government finances are made available and spent.

65.     These constitutional roles and responsibilities are necessary to understand the legal personality of The Kingdom of Denmark.

66.     It should, however, also be underlined that statutory and constitutional rules on how the government income of whatever origin should be *administered* and how this task is *distributed* between various government agencies *do not* affect the right of a Danish government agency to raise claims against private individuals or undertakings. Whether there is such a right, depends on the distribution of responsibilities, as decided by the government. I will revert to that issue in the following.

### 2.     Section 14 of the Constitutional Act of Denmark

67.     In Danish constitutional law, the basic rule on the distribution of powers and competences within the Danish government administration is Section 14 of the Constitutional Act of Denmark (Exhibit 15), which reads as follows:

> *"Section 14.*
>
> *The King shall appoint and dismiss the Prime Minister and the other Ministers. He shall decide upon the number of Ministers and upon the distribution of the duties of government among them. The signature of the King to resolutions relating to legislation and government shall make such resolutions valid, provided that the signature of the King is accompanied by the signature or signatures of one or more Ministers. A Minister who has signed a resolution shall be responsible for the resolution."*

18

68.     The important part of this provision appears from the last part of the *second sentence* according to which "the King" (which for all practical purposes should be understood as ultimately the *Prime Minister*) "*... shall decide upon the number of Ministers and upon the distribution of the duties of government among them*" [italics inserted by me].

69.     This part of Section 14 does not give the Prime Minister the power to change the *substance* of the said "responsibilities" of the various government branches, i.e. the legal powers provided by legislation and assumed in Section 13 of the constitution.

70.     It does however make clear that regardless of any statutory act, the Prime Minister is by *government decree* empowered to decide *which branch* of the Danish government (and notably, which minister and ministry) should be in charge of any of the responsibilities as set forth by statute. In doing so Section 14 assumes that a minister (and a ministry) in the Kingdom of Denmark, is not a separate legal person but merely an administrative entity or branch being one among several other branches in the government administration and one legal entity: The Kingdom of Denmark.

71.     In accordance with the division of government tasks, decided by the Prime Minister, each *ministry* or other *administrative branch* or *agency* acts under the responsibility and supervision of a *minister* who is in turn appointed by the Prime Minister according to the Danish constitution. A ministry is therefore in itself not its own separate legal entity. It undertakes its tasks in the interest of the state (i.e. The Kingdom of Denmark) and in correspondence with the relevant rules and regulation.

72.     Accordingly, SKAT (being a part of the ministry of taxation) is like any other ministry an integral part of the Kingdom of Denmark.

73.    Article 13 (2) of the Danish constitution (Exhibit 15) provides that "The ministers shall be responsible for the conduct of government; their responsibility shall be defined by statute." However, particularly when read in conjunction with Article 14, this provision does not indicate that a minister or a ministry is a separate legal entity. According to well-established legal principles, it merely indicates that the powers and tasks allocated to government should be defined by statute, not by government decree.

74.    It is also important to note that the responsibility for the conduct of government is not a delegated or assigned responsibility but an original and primary responsibility.

75.    Accordingly, the relevant ministry or governmental body will act as party to (a) contracts, (b) in lawsuits and (c) in the general conduct of government.

76.    It follows as a consequence hereof that any minister may within its mandate also prosecute claims, e.g. for damages, either by negotiation or by way of litigation.

### 3.    Legal literature

77.    My above reading of the said provision is supported by numerous statements in scholarly literature of which I limit myself to the following two quotations:

78.    In his 2018 book on Administrative Law ("Forvaltningsret"), on page 133, Professor, and today High Court Justice *Niels Fenger* states as follows:

> *"Under section 14 of the Danish Constitution, the Government (in practice the Prime Minister) may by Royal Decree transfer one duty established by law from one minister to another (from one ministerial department to another). The powers transferred in this manner are comparable to powers originally granted and, hence, in terms of administrative law, are not delegated powers.*
>
> *The distribution of duties can also occur purely administratively. ..."*

79.    A photocopy of the relevant page and of the title page of the Professor Fenger's book is attached to this statement as Exhibit 16.

80.    Furthermore, in his 1993 book "Administrative Law, Tasks, Authority, Organisation" (in Danish: "Forvaltningsret Opgaver Hjemmel Organisation"), on page 310, professor *Bent Christensen* makes the following statement:

> *"Section 14 of the Danish Constitution is a royal prerogative or a government prerogative exercised by the Prime Minister. The fact that it is a prerogative means that the Legislature cannot deprive the Prime Minister of these organizational powers.*
>
> *What this means is clear insofar as the number of ministers.*
>
> *If a law, including an appropriation law, specifies a number of ministers, the Prime Minister is not required to abide by the number specified. He may appoint additional ministers. Also, the additional ministers can demand payment even if their salary is not specified in the appropriation law. Their demands are thus considered equivalent to salary demands based upon guarantees, judgments etc. that do not require parliamentary appropriation.*
>
> *This is not to imply, of course, that the legislature acts "unlawfully" in any sense by granting pay to a fixed number of ministers. To establish a budget, a fixed number of ministers must necessarily be established. However, the number specified is not binding, nor as a prerequisite for the budget.*
>
> *Regarding the allocation of tasks between the ministers, or in the terminology of this book: the distribution of duties between the ministerial departments, the meaning of section 14 is not as clear.*
>
> *It is well established that the legislature cannot remove or transfer the organizational powers vested in the Prime Minister under section 14.*
>
> *It is also well established that the numerous designations in laws and decrees assigning specific duties to certain ministers or ministries do not prevent the Prime Minister from transferring such duties to another minister by Royal Decree without the involvement of the legislature. The referral to a specific minister in the law or decree is thus considered to be a depiction of the distribution of duties between different ministerial areas that existed at the time the law was passed. This is in line with the practice relating to consolidated acts. If a law, after having been amended in part by a new law, is reprinted in a consolidated version with the amended content of the law, there is an opportunity that can be used to revise the ministerial designation even if it was not affected by the legal amendment, if the duties have since been transferred another minister by an intervening Royal Decree."*

81.     A photocopy of the relevant page and of the title page of Professor Christensen's book is attached to this statement as Exhibit 17.

82.     As indicated in the last paragraph of this quotation, the power rested with the Prime Minister by Section 14 even gives the Prime Minister the right to *change the wording* of statutory legislation in order to "rename" public authorities into the names that the Prime Minister may decide in consequence of a decision to distribute government responsibilities.

83.     Such renaming of government branches takes place every time a new administration takes over. As the most recent example hereof, I refer to royal resolution ("Kongelig resolution") of 15 December 2022 on the distribution of tasks between the ministries (Exhibit 18). The resolution was made when the sitting Prime Minister (Ms Mette Frederiksen) took office the second time in December 2022, following the national election on 1 November 2022. To further illustrate this point, albeit from a historic perspective, Section 19 of the previous royal resolution, made on 27 June 2019, decided – as one among several changes in the distribution of powers that follows – that the responsibility for collective bargaining, salaries, pensions, management and personnel is transferred from the Ministry of Finance to the Ministry of Taxation (Exhibit 19).

### 4.     Offset of claims between different branches of the Danish government.

84.     In *Andersen I*, para. 39, I have substantiated the above points by making reference to how the offset of claims between various government agencies within the Danish government administration are made. This practice clearly confirms the conclusion above that the Kingdom of Denmark is in effect *one* legal entity, and not several legal entities. This observation pertains to the offset of claims between various government agencies within the Danish government administration:

85.     If, for example, government branch "D" is a debtor for a particular claim towards a particular *citizen*, and government branch "C" is a creditor in relation to a completely different claim towards that same citizen, then "D" may use "C"'s claim towards the citizen as a counterclaim to compensate or counterbalance its debt towards the citizen.

86.     This principle has been established for generations in Danish case-law since the first landmark decision from the Danish Supreme Court, reported in *U 1955.13 H* (attached as Exhibit 20). The said practice has subsequently been upheld by the Supreme Court and in various High Court decisions, including the one reported in *U 2002.2396 Ø* (attached as Exhibit 21).

**B.     Danish ministries as plaintiffs in litigation.**

87.     I next discuss the circumstances in which the Danish government or any of its ministries, including SKAT, may appear as a plaintiff in litigation.

88.     As discussed below, it transpires from the foregoing that SKAT may, just as the Ministry of Taxation and any other ministry or ministerial authority or branch, indeed be a plaintiff in litigations regarding civil law claims.

89.     In the following sections I will offer my view on the legal issues that this procedural question may give rise to, and provide a non-extensive list of cases to illustrate this point.

### 1.     Locus standi

90.     In order to bring a case before the courts, any plaintiff must have *locus standi.* For the Kingdom of Denmark or any ministry or ministerial authority within it, this standing is given by the fact that the Kingdom of Denmark is a legal person of which any ministry and ministerial authority or branch is an integral part.

91.     As I will revert to below in Section V(B)(2) this viewpoint is reflected both in scholarly literature as well as in court practice. I do not know of any single case in which it has been held – or even alleged – that a ministry, ministerial authority or any other branch of the Danish government did not have the necessary *locus standi*.

92.     In this connection it is noteworthy that an allegation of that nature was *not* raised by the Bech-Bruun law firm in the 2023 Supreme Court decision, reported in *U 2024.746 H* (Exhibit 13), discussed above in Section IV(E), despite the fact that this case had one of the top four Danish law firms as defendant, and was litigated by some of the most prominent Danish counsels.

93.     I understand that in the present litigation it has been alleged that the case decided in *U 2009.58 Ø* (Exhibit 22) should be such an example. I disagree to this interpretation.

94.     In the said case, the Ministry of Employment had raised a claim against the Labour Market Appeals Board. The case was dismissed, but not due to "lack of standing". The Eastern High Court did *not* decide whether the Ministry of Employment had "standing" in the case (being a part of the Danish government and such an arm of the Kingdom of Denmark that was clearly so, and the Ministry in fact participated in the case throughout the proceedings). Quite contrary. The court admitted the case with the ministry as a party. What the court said, after having heard the case, was that the ministry lacked *legal interest* in raising the claim. That is something completely different from standing.

95.     To understand the background of this outcome, it is necessary to understand the merits of the case. It concerned an administrative practice regarding a particular type of payment from private unemployment funds. This practice had been brought before the Labour Market Appeals Board where it had been overturned on grounds that the Board interpreted certain

provisions differently than the Ministry had. Even though, as a result of this overturning, huge amounts of money should now be paid from those private funds, and even though the Ministry for political reasons had decided to reimburse the unemployment funds for their costs due to this interpretation, the Ministry of Employment did not have any financial interest herein (and thereby no "legal interest" in the litigation) since the Ministry had not acted under a legal obligation to refund any part of these amounts to the funds.

### 2.    Section 240 of the Danish Administration of Justice Act

96.     It follows from *Andersen I*, Section III(B), that Danish ministries appear before Danish courts in their own names when litigating private law claims such as SKAT's claims for compensation or restitution in the present litigation.

97.     This principle is assumed in Section 240 of the Danish Administration of Justice Act ("Retsplejeloven") (attached as <u>Exhibit 23</u>) which reads as follows:

> *"(1) The home court of the State is the court for the judicial district in which the office of the authority being sued on behalf of the State is located.*
>
> *(2) Subject to Section 245, proceedings concerning judicial review of decisions made by a central government authority must be instituted in the plaintiff's home court if the plaintiff's home court is in Denmark."*

98.     By making reference to "the authority being sued on behalf of the State", the first sub-paragraph of this Section confirms the conclusions presented above, that the Kingdom of Denmark may be sued by plaintiffs bringing action against the relevant "authority". However, the provision does not define *towards which* among several possible authorities proceedings should be instituted.

99.     The Law Report (no. 1052, published in 1985) that lead to the present wording of Section 240, offers on page 75 the following comment to this issue:

25

> *"The question about which authority can be sued on behalf of the state must,*
> *as to date, be decided on the basis of general principles of administrative law.*
> *A lawsuit can, in general, be brought against the administrative authority that*
> *has the capacity and competence on its own to reach a decision or ruling in the*
> *particular case."*

100.    A photocopy of the excerpted page of the said Law Report is attached to this

statement as Exhibit 24.

101.    In accordance with the conclusions presented above, it is generally recognized in

Danish law that public agencies act in their own name in cases where their decisions are being

challenged. Accordingly, in Danish legal practice you will not find cases of such nature with

"The Kingdom of Denmark" appearing on the government side, either as plaintiff or defendant.

102.    In the Danish legal literature on Section 240 one may find many reflections on

what particular government entities may be subject to private litigation. To my knowledge, no

Danish legal scholar has brought into question that Section 240 presumes an understanding

whereby the Danish state or the Kingdom of Denmark should be the relevant legal person to

bring action against due for the mere reason that it the ultimate subject to the rights and

obligations in question.

103.    In *Bernhard Gomard & Michael Kistrup's* book *Civilprocessen*, 8. udg. (2020)

("Civil Procedure", 8th ed. (2020)) (excerpts attached as Exhibit 25) – which is the most

comprehensive textbook in the field – the authors make the following statement on pages 108-

109 and 347 to Section 240:

> *"The provision covers all central government authorities, i.e. ministries, agencies and*
> *government complaints bodies, but not decentralised state authorities such as local state*
> *administrations, police commissioners, labour market regions and social welfare boards.*
> *Autonomous administrative entities are also excluded. ... A prerequisite for the application*
> *of that provision is that the plaintiff has its registered office in Denmark. If this is not the*
> *case, the seat of the State must be elected, cf. Section 235(1).*

*Only cases relating to review of decisions of those State authorities are covered by Section 240(2). Civil law actions brought against the State shall be brought in accordance with general rules on jurisdiction, cf. U 2010.2030 V. If the action concerns both a review of the decision of a central State authority and a claim for damages against the same authority, both facts may be reviewed in the plaintiff's domicile, cf. Section 249." [pages 108-109]*

*...*

*Every independent administrative entity has the capacity to be a party. Administrative entities are, in addition to the State and the municipality, e.g. the Danish Central Bank and the Danish Radio. [page 347]*

104.    On page 345 of this book the authors also make the following observations about the status in general of public entities:

*"**The State**, municipalities, companies, foundations and associations, **self-governing institutions and any other public** or private **entity**, legal person, which has legal capacity because it may be the holder of rights or obligations, also has party capacity, so that it can sue or sue others before its organs, cf. U 2015.2684 V and U 2014.1249 V [both on housing associations], also in cases concerning the entity's capacity to be a party, ..." [references omitted, emphasis added]*

105.    Secondly, I find it relevant to quote *Ulrik Rammeskow Bang-Pedersen, Lasse Højlund Christensen & Clement Salung Petersen* in their book "The Civil Procedure" 5th edition (2020) (*Den civile retspleje*, 5. udg. (2020)) (excerpts attached as <u>Exhibit 26</u>), with the following observations to the provision:

*"The seat of the State shall be in the district where the authority sued on behalf of the State has its office, cf. DAJA Section 240(1). The substance of this rule is that each State authority has its own seat (and thus implicitly independent capacity to be a party to proceedings, cf. Chapter II.2.2.1)." [Page 221]*

106.    Also on the latter issue of "processuel partsevne" (i.e. *locus standi*), the authors express the following view in the sections referred to in the quote before [pages 51 to 55]:

*"Procedural capacity (party capacity) means the ability to be a party to legal proceedings before a Danish court." [Page 51]*

27

...

*Anyone who can be a party in a legal relationship, i.e. has legal capacity (legal personality), generally also has procedural party capacity. However, this does not necessarily mean that the party itself can exercise its powers to the proceedings, ... [references omitted to the authors' discussion of cases where minors etc. appear as parties]" [Page 52]*

...

*Public authorities have procedural capacity to be parties in litigation. This goes for state administrative authorities such as ministries, directorates and agencies, boards and councils, etc., cf. implicitly DAJA Section 240. This also applies to regions and municipalities which, unlike the state administration, are based on principles of municipal unitary administration, which is why the individual municipal administration does not have the capacity to be a party to proceedings, cf. also implicitly DAJA Section 239.*

*A number of cases concerning the review of the constitutionality of laws (see Chapter VI.2.4.2) and U 2001.1249 H on the review of the conformity of a statutory act with EU law, were brought against one or more named ministers. However, the cases were treated as if the relevant ministry was a party to the proceedings. Self-governing institutions, associations, foundations, etc., established by law or pursuant to law, normally also have procedural capacity. Examples include the Danish universities, the Danish Central Bank and the Danish Broadcasting Corporation. ..." [pages 54-55]*

107.    If one chooses to approach the subject from an administrative law perspective, the same conclusion is maintained. On page 904 of Professor Niels Fengers aforementioned 2018 book on Administrative Law he states the following:

*"In most cases, it is self-evident who shall appear as litigating party on the administration's side, namely the authority that issued the disputed administrative decision ...*

*Additionally, the case must be brought against the authority responsible for the decision that is to be tried."*

108.    A photocopy of the excerpted page of Professor Fenger's book is included in Exhibit 16 of this statement.

28

C.    **Examples from Danish case law**

109.    In *Andersen II*, para. 118, I have already given one example from Danish Supreme Court practice that shows how Danish government branches may appear in litigation, namely *U 1981.473 H* (attached as Exhibit 27). In this case, SKAT (at that time named "Statsskattedirektoratet") raised a claim for damages against the CEO of a bankrupted company who had failed to withhold WHT in the company's salaries to its employees.

110.    I also made the point that there are no substantial differences between the private law claim that SKAT raised in the 1981 decision, and the claims that SKAT has raised in the present litigation.

111.    Furthermore, I made the point that there are also numerous cases in which *the Ministry of Finance* appears as a party in a civil law claim. This happens every year in cases regarding government officials ("tjenestemænd").

112.    *Finally*, I made reference to the Supreme Court decision in *U 1939.296 H* (attached as Exhibit 28) in which the Supreme Court interpreted the provisions in the bond for a Danish government loan that gave creditors the option to receive payment in gold or gold equivalent. The case was litigated for the Kingdom of Denmark (being the *named debtor* in the bond) by the Ministry of Finance.

113.    The following presents a (still) non-extensive list of cases I have picked to illustrate this point within the bulk of case law involving public entities reported in the Danish Weekly Law Report. For practical reasons, I have only included cases reported *after* the turn of the century. For easy reference I have presented these examples under the sub-categories (1) "Bankruptcy proceedings", (2) "Tort claims" and (3) "Other cases".

### 1.    Bankruptcy proceedings

114.    There are numerous cases which relate to bankruptcy proceedings where the Danish tax authorities have appeared as a *claimant* / plaintiff (e.g. for claims based on the liability of board members or executives for mismanagement of the bankrupted company).

115.    One such example, *U 1981.473 H* (attached as Exhibit 27), is already referred to above in para 109. In this case, SKAT (at that time named "Statsskattedirektoratet") raised a claim for damages against the CEO of a bankrupted company who had failed to withhold WHT in the company's salaries to its employees.

116.    The Danish tax authorities may also appear as the alleged *debtor* / defendant for claims raised by the bankruptcy estate (e.g. avoidance actions [5] under the provisions of the Danish Bankruptcy Act):

117.    An example of such a litigation is the case reported in *U 2010.959 Ø* (attached here as Exhibit 29) which concerned a claim for avoidance raised by the bankruptcy estate of a company under Section 67(1) of the Danish Bankruptcy Act. The claim for avoidance related to three payments made to the relevant tax authorities two months before the company went bankrupt. The Eastern High Court awarded the claim.

### 2.    Tort claims

118.    The second example of case law illustrates how a Danish government entity or branch may appear in litigation concerning tort claims.

---

[5] In Danish bankruptcy law a claim of *avoidance* (in Danish "omstødelse") may be made by a bankruptcy estate towards a creditor in the bankruptcy estate who has received a disproportional payment of his claim or other financial advantages shortly before the bankruptcy filing. The avoidance claim seeks to unwind (or "avoid") such transactions that occurred before the bankruptcy filing. The purpose of such clawback claims is to undo the transaction so that the assets or values in question are brought back into the bankruptcy estate

119.    A sub-category of this concerns claims raised against private parties (including individuals and companies) whose culpable actions or omissions in the management of a company now in bankruptcy, might give basis for liability. Whereas some of these cases have been litigated by the bankruptcy estate (as decided by its creditors), others have been litigated by SKAT (because the bankruptcy estate has chosen not to litigate them) being the main creditor in the bankruptcy estate.

120.    In *U 2016.1870 H* (Exhibit 30), SKAT brought a tort action against a private individual, Mr Kølendorf, for his role as the main shareholder, board member and (until 2004) managing director of a limited company, for losses suffered due to alleged fraudulent VAT statements made by the management of the company (not including Mr Kølendorf himself). SKAT alleged that Mr Kølendorf had failed to take steps to secure a prudent organization of the company. The Supreme Court held that SKAT had not established that Mr Kølendorf had acted negligently and therefore acquitted him.

121.    A *second* sub-category where similar principles apply involves cases where other ministerial directorates are sued by a private party in tort cases for alleged culpable actions or omissions.

122.    In *U 2014.3045 Ø* (Exhibit 31) a man who had served time in a Danish prison claimed that the treatment he had undergone there violated Denmark's obligations under the European Convention of Human Rights. The Eastern High Court agreed. Although the basis of the claim was thus the obligations of the Kingdom of Denmark under an international treaty, the case was decided with "*The Danish Prison and Probation Service*" (*Direktoratet for Kriminalforsorgen*) appearing as the government party.

123.    *U 2020.2861 H* (Exhibit 32) was a class action raised by a group of users of the Danish land registration system (in Danish: tinglysningssystemet). The group claimed that "*the Court Administration*" (*Domstolsstyrelsen*), which is a directorate under the Ministry of Justice responsible for the land registration system, was liable in tort for damages caused to the group members on grounds that a new system for digital land registration of documents had been delayed, thus causing multiple delays in the expedition of land registrations. The Court Administration was acquitted from the claims, but not on grounds that it was not capable of being sued.

### 3.    Other cases

124.    I will finally mention a number of cases that fall into different categories, but where, nonetheless, the procedural roles and parties illustrate the points made above in relation to the various branches of the Danish government structure (and thereby, the Kingdom of Denmark), acting as parties in civil law litigations.

125.    Some of these cases reflect disputes that have come up in other different litigations, others reflect the substantial dispute between the parties:

126.    *U 2003.2425 V* (Exhibit 33) decided a dispute regarding the ownership of a painting which for decades had been hanging on the wall in the office of the manager of a Danish estate owned by a German noble family.

127.    In 1946, after the end of World War II, the Danish parliament adopted an act that gave the Danish state the right to confiscate German and Japanese property. Under this act, all property of the said estate was now being confiscated by the Danish state who in turn took ownership of these assets. The painting, however, remained in the possession of the manager, until he retired in 1980. In 1999 he moved to a nursing house and gave the painting as a present to his three daughters.

128.    Following a publicly known auction sale of the painting which showed that it was made by a famous Norwegian artist, the Danish State, by the Ministry of the Environment ("*Den Danske Stat ved Miljøministeriet*") brought action against the three daughters, claiming that the painting was subject to the confiscation that had taken place in 1946. The court acquitted the three daughters on grounds that the Directorate had not provided sufficient evidence for its ownership.

129.    In *U 2004.104 H* (Exhibit 34) the Supreme Court decided a claim for compensation based on contracts and torts raised by a farmer (Mr Mortensen) against "The Directorate of Plants" ("*Plantedirektoratet*") under "*the Ministry of Agriculture and Fishery*" (today *the Ministry of Agriculture, Food and Fishery*, in Danish: "*Ministeriet for Landbrug, Fiskeri og Fødevarer*"). Mr Mortensen claimed that the Directorate had promised to pay compensation to him because of its mishandling of an administrative case, alternatively – and irrespective of such promise – that it was liable in tort for its alleged mismanagement. The Supreme Court acquitted the Directorate from both claims, but not on grounds that the Directorate could not be sued.

130.    Another directory under "the Ministry of Agriculture and Fishery" was involved in the case referred to in *U 2016.1526 H* (Exhibit 35), namely "The Danish Food Authority" ("*Fødevarestyrelsen*"). The case concerned a request for document production made by two journalists into a report on the presence of *Methicillin Resistente Staphylococcus Aureus* bacteria in Danish pigs. The Danish Food Authority appeared as a defendant in the litigation.

131.    In *U 2004.316 H* (Exhibit 36) the Supreme Court (on appeal) reversed a decision taken by the Land Registration Court ("*Tinglysningsretten*") upon a request made by *Danske Statsbaner* (the "Danish Railways"), which at that time was a ministerial authority in charge of railway infrastructure, to have a document of rights over a piece of property registered. The dispute concerned the requirements for documentation of the right provided by such documents.

132. The case reported in *U 2010.603 Ø* (Exhibit 37) involved SKAT being sued as a private law entity, however not in relation to its actions as an administrative body. Three former employees of a local branch of SKAT in the small city of Maribo in the south-eastern part of Denmark claimed that they had been subject to unlawful age discrimination when ordered to change their place of work to a small city (Ringkøbing) in Western part of Denmark. The claim was successful and SKAT was ordered to pay compensation to the three former employees.

133. The case reported in *U 2010.1253 Ø* (Exhibit 38) was a procedural decision taken by the Eastern High Court in an ongoing litigation raised by a company against two government entities organized under two different ministries: *Økonomistyrelsen* and *Rigspolitiet*. To explain the roles of these different entities, *Økonomistyrelsen* is "the Agency for Public Finance and Management" under the Danish Ministry of Finance (*Finansministeriet*). *Rigspolitiet* is "The Danish Police" under "the Ministry of Justice" (*Justitsministeriet*).

134. The merits of the case concerned a tort claim raised by the limited company after a public procurement which in its opinion had been illegitimate. The procedural decision concerned a request for document production made by the plaintiff.

135. Under appeal of the same case the Supreme Court was subsequently faced with a similar request. This request was decided in *U 2014.899 H* (Exhibit 39) with the same result. Neither in this point of the matter was the *locus standi* of the defendants raised as an issue. As already stated above in para. 92, the top four Danish law firm Bech-Bruun did not either raise the issue in the 2023 Supreme Court decision, reported in *U 2024.746 H* (Exhibit 13).

### D.    Conclusion

136. SKAT is not a separate legal person separated from the Kingdom. SKAT is a ministerial arm within the Danish government and an integral part of the legal person that the

Kingdom of Denmark is. As I have shown above, the responsibility for the conduct of government is not a *delegated* or *assigned* responsibility (e.g. by proxy, agency or power of attorney) but an original and primary responsibility. By its actions, the relevant ministry or governmental body will always bind the Kingdom of Denmark. This is so, regardless of whether such action relate to contracts, lawsuits or the public law competences in question.

137.    Therefore, under Danish rules SKAT has the necessary *locus standi* that empowers it to bring private law claims that arise from payments SKAT made to claimants resulting from false dividend WHT reclaim applications.

138.    The present litigation has caused substantial political concern in Denmark because of the magnitude of the amounts allegedly lost by the Kingdom of Denmark. No decision, however, has been taken to remove the responsibility to collect these amounts from SKAT to the Ministry of Finance, or any other government entity. That is because SKAT – as the deceived party – is branch of the Danish government that has the responsibility to raise the claims presented in the present litigation.

## VI.    Statutory limitations of monetary claims in Danish law

### A.    <u>Overview of the Danish statute of limitations</u>

139.    The following analysis is based upon my interpretation of the Danish Limitation Act ("Forældelsesloven"), no. 552 of 6 June 2007, published as Consolidated Act No. 1238 of 9 November 2015 as amended in 2018, referred to as "**DLA**", with a particular focus on the *start* of the limitation period and its *suspension*.

140.    DLA is the general legal basis for statutory limitations applicable to monetary claims in Denmark, which includes both claims of a private law nature and public law claims.

141.    DLA is subject to an extensive (1157 pages) and highly reputed handbook by Professor *Bo von Eyben*, the 2nd edition of which came out in 2019 under the title: "Forældelse efter forældelsesloven af 2007" (*Time bar limitation under the 2007 DLA*). In the following I shall refer to this book as "***von Eyben***" (excerpts attached as Exhibit 40).

### 1.    The scope of the Danish Statute of Limitations

142.    The DLA came into force on 1 January 2008, cf. Section 29, and applies to monetary claims arising after that date. Before that, a 5-year statute of limitation applied pursuant to Section 1 of Act No. 274 of 22 December 1908 on the limitation of monetary claims (in the following referred to as "**the 1908 Act**"). A number of provisions of the 1908 Act, including the rules of suspension (as discussed below in Sections VI(A)(3)), are in substance similar to the suspension rules in the DLA.

143.    According to *Section 1*, the DLA applies to the limitations of *claims for money or other performances* ("fordringer på penge eller andre ydelser") (attached as Exhibit 41).

144.    In the following I will focus on those of SKAT's claims in the present litigation that are "claims" in this understanding of the word (in Danish: *fordringer*), i.e. not proprietary rights. The 3-year period set forth in Section 3 (1) of the DLA, as discussed below in Section VI(A)(3), applies to all SKAT's *monetary* claims in this litigation. This conclusion holds true regardless of whether the claim in dispute is a tort claim or a claim for restitution.

145.    In any event, the deceived owner may – depending upon the circumstances – raise alternative claims, either against the fraudster or against parties responsible for the theft, *e.g.*, for liability in tort. Such claims for tort or restitution would be subject to the general rules of limitation under the DLA.

146.    The DLA makes no distinction in regard to (1) the legal basis for the monetary claim in question, (2) what kind of performance it relates to, (3) who is the creditor or claimant (be it a private entity or a state institution), or (4) whether the claim is by nature contractual, based on tort law, or on statutory legislation.

### 2.    The main rules of the DLA

147.    According to DLA *Section 3 (1)*, the limitation period is 3 years, unless otherwise provided by other provisions (attached as Exhibit 43).

148.    DLA *Section 2 (1)* provides that the limitation periods under the act shall be calculated from the earliest point in time where the claimant could claim satisfaction of its claim, unless otherwise provided by other provisions (attached as Exhibit 42).

149.    In relation to SKAT's claims in the present litigation, the 3-year limitation period should be calculated for each defendant in relation to each of the claims:

150.    In regard to SKAT's *Tort Claims*, e.g. for misrepresentation or fraud, DLA *Section 2 (4)* applies. According to this provision, the limitation period for such "claims for compensation for non-contractual damages" is calculated from the *time of the occurrence* of the damage that gives rise to the tort claim.

151.    This means that SKAT's claims *arise* on the date when SKAT suffered the loss. For all practical purposes, that will also be the date where a payment was made.

152.    The fact that the tortious actions or omissions might have been prepared or committed *prior* to the date of payment does not modify this conclusion, since these actions or omissions did not *cause* the damage *at* these earlier points in time. SKAT allegedly suffered the damage when the unlawful payment was made – not before, not later.

153.    SKAT's *Restitutional Claims* came into existence on the date that a specific "WHT payment" was made. This is so, regardless of whether the WHT refund payment was made to a specific *party*, or to an *agent* acting on behalf of that party.

154.    SKAT's *Unjust Enrichment Claims* came into existence on the date when the alleged unlawful enrichment took place.

155.    This date will also be the date where an amount *originating* from a WHT repayment was *credited* to an account held by the enriched debtor. In cases where an amount has been transferred from one account to another, this point in time may be different from the point in time where SKAT made the payment.

156.    Similar rules as those just described also applied under the 1908 Act. Therefore, case law from those earlier times are still relevant for the interpretation of the DLA.

### 3.    The DLA rules of suspension

#### a)    Introduction

157.    It follows from DLA *Section 3 (2)* that if the claimant was *unaware of the claim*, including the *role of the defendant*, then the 3-year limitation period set forth in *Section 3 (1)* shall be calculated from the day when the claimant *became aware* or *should have become aware* of its claim. In Danish legal terminology, the calculation of the limitation period is said to be *suspended* until that time.

158.    A suspension rule similar to DLA Section 3 (2) also applied according to Section 3 of the 1908 Act, however with one reservation: Whereas the claimant's unawareness of the *whereabouts* of the debtor was previously considered to be a part of the general statutory rule in Section 3 of the 1908 Act, this situation is now subject to a particular rule under DLA Section 14, which I will not discuss further here.

159.    The test for whether the claimant "should have" become aware of its claim is whether the claimant had sufficient information for a prudent person acting in the claimant's shoes to assess the basis for its claim, which includes (but is not limited to) knowing what is necessary to plead its claim. According to this "prudent person" test a Danish court will consider what information a public entity (and a branch of such an entity) will generally have as the basis for its decision.

160.    In its interpretation of this concept, Danish courts have distinguished between on *one side* cases where unawareness of the claim was caused by inaccurate information provided by the debtor, and on the *other side* cases where the debtor had disclosed all information to the creditor. I discuss these two categories below in Sections b) and c).

161.    In addition to these two main categories, I have been asked to discuss whether in cases of fraud and in cases where information regarding the claim was not otherwise obvious to the creditor it makes any difference that the creditor might have known of its claim upon thorough investigation. I discuss this question below in Section c).

### b)    Cases where the debtor has provided the creditor with inaccurate information

162.    There is a well-established court practice in Denmark that the statutory limitation of a monetary claim is suspended if the creditor was unaware of the claim because of inaccurate information provided by the debtor. In the present litigation this leads to a distinction between cases where the taxpayer has *withheld* information towards SKAT in one category, and in another category cases where the taxpayer has *disclosed* all relevant information to SKAT who, in turn, has failed to establish its claim upon inspection.

163.    An early example of this practice is the Supreme Court decision in *U 1935.715 H* (Exhibit 44), where the taxpayer had failed to report a substantial amount that he had received as

an income in 1925. The Danish Supreme Court held that the time bar limitation of the claim for taxation of this amount was *suspended* until this information became known to the tax authorities in 1932. Regardless of whether one describes the facts of the case to the effect that the taxpayer acted fraudulently or not (which he may indeed have done, although this aspect is not in itself decisive for the outcome of the case), he had in fact *failed* to report a substantial amount that he had received as an income in 1925. The Danish Supreme Court held that time bar limitation of the claim for taxation of this amount was therefore *suspended* until this information became known to the tax authorities in 1932.

164.    In most of the cases regarding withheld information, SKAT has inspected individual tax files, either on a routine basis, or because information on SKAT's claims came to its knowledge in other ways. These cases are thus characterized by the fact that the taxpayer *failed* to give SKAT the information sufficient to calculate its tax claim in the first place.

165.    A *second* case stating the same principle is *U 1936.823 Ø* (attached as Exhibit 45), also referred to in *Andersen III,* para. 160. In this case a taxpayer had reported to SKAT that he was not obliged to pay *wealth tax* during the years from 1926 to 1933 (where he passed away) due to the fact that in 1925 he had founded a *trust* that had taken ownership of a substantial part of his assets. Since, however, the board of that trust did not fulfill the basic requirement in Danish trust law, that the taxpayer (as its founder) must not receive any proceeds from the trust, SKAT claimed payment for wealth tax during the said period.

166.    The court held that none of these tax amounts were time bar limited, because the said dispositions were not *known* to SKAT until later. The case is noteworthy because it accepts suspension of the limitation period even though SKAT by conducting a review at an earlier point in time would clearly have been informed of its claim.

167.     A *third* case that came out with the same result is *U 1959.380/2 Ø* (attached as Exhibit 46). This case involved the obligation to pay *weight tax* on a truck trailer for the years from 1938 to 1942. Shortly after having been registered in the motor vehicle register, the owner reconstructed the trailer so that a truck load was mounted. Due to this reconstruction the owner had paid a lower duty of the trailer than he should have. Whereas criminal liability for the owner was time-barred, his liability to repay the duties owed was not. SKAT's claim for weight tax for the full period was thus suspended until a criminal investigation in July 1956 made the said evasion known to SKAT.

168.     A *fourth* example is *U 1994.168 H* (attached as Exhibit 47). The main facts of the case were the following:

169.     During the period from 1972 to 1984, a Danish limited company had deducted yearly amounts in its income tax as so-called "discounts" (in Danish: "rabat"), "goods discounts" (in Danish: "varerabat") and "royalty" (in Danish: "provision"). The company had paid the amounts to a Swiss company which, according to SKAT, was under the control and influence of the main shareholder of the Danish company. During a tax review that took place in 1983, SKAT (acting through a local municipality) was informed of the deduction. This information led SKAT to decide that the said amounts were not deductible expenses in the Danish company, but (in substance) a dividend paid to its shareholder. The Supreme Court held that the tax amount could be raised for the full period, without any suspension, because "there were no basis [to assume] that SKAT should have taken steps for a revision prior to 1983."

170.     A *fifth* example is reported in *TfS 2001171 Ø* (attached as Exhibit 48), referred to in *Andersen II*, para. 39. Here, a Danish company had obtained *custom free* status in relation to certain goods imported from Bangladesh. After expiry of the limitation period, SKAT discovered

that the certificates of origin were false and that the goods were most likely imported from China, from which such custom free status did not apply. The court held that SKAT should *not* have known of its claim for repayment of customs. Therefore, due to suspension, SKAT's tax claim was not time-barred.

171.    I would also like to articulate my reference in *Andersen II*, para. 39, to the high court decision reported in *TfS 1988.641 V* (attached as Exhibit 49) because its factual circumstances share many points of similarity with the WHT case complex. The main facts of the case were as follows:

172.    In October 1979 SKAT changed its practice on taxation of interest income and expenses for loan-financed government bonds. During meetings between a tax-payer and SKAT in November 1979, the tax-payer gave SKAT several pieces of inaccurate information regarding his ownership of a number of such government bonds that he had purchased by taking a loan with a stock broker. Had this information been truthful, SKAT could have raised its claim for taxes at that time. The court held that nothing in the information provided by the taxpayer at that time could have given SKAT reason to doubt the correctness of the information.

173.    In 1980, SKAT initiated investigations with various stock brokers regarding those practices of loan-financed bond purchases. It was not until the start of 1983 that SKAT visited the stock broker involved in the said transaction. At first, the stock broker refused to hand out the relevant documentation which was not provided until 22 November 1984. Therefore, the limitation period for SKAT's 1978 tax claim started at that date.

174.    The decision reported in *U 2006.1492 H* (attached as Exhibit 50) concerned the income taxation of two holding companies that were held by a married couple. The wife had sold a company to the holding companies for an amount of 100 GBP, which was the price she had

paid for it a few months before. During those few months, however, its assets had now grown to an amount of circa 10 million DKK due to certain financial transactions orchestrated by the married couple. After having been informed of these transactions by police authorities, SKAT put forward a claim for income tax in the two holding companies based on their real values (and not the 100 GBP that the company had been sold for). Since SKAT should not have known of the transactions that had led to these real values, its tax claim was not time-barred.

175.    Therefore, in conclusion, a claimant "should not have" known its claim for repayment when it has relied on fraudulent information, even though the truthful information might have been known had the creditor taken steps to investigate the case further.

176.    The above cases show that this principle both applies in cases where the tax authorities only upon inspection of individual tax files could have found out that a taxpayer had failed to provide specific relevant information and in cases where the information provided by him was false.

### c)    Cases where the debtor has disclosed full information to the creditor

177.    As stated above I find it relevant to categorize cases where the taxpayer provided full disclosure to SKAT (as obliged to under applicable rules) in one category. In my opinion this case law confirms the principle that no suspension will take place if the taxpayer provided all relevant and accurate information to the tax authority, even though SKAT could not establish its claim unless it looked into these details.

178.    An early example of the *second* category is the Supreme Court decision in in *U 1936.677 H* (attached as Exhibit 51), the taxpayer had provided SKAT with all relevant information, although this information resulted in an unjustified low tax payment. SKAT's claim was therefore time bar limited and there was no room for suspension. SKAT's tax claim

originated in the taxpayer's incorrect deduction of premium expenses for a life insurance. The claim was time bar limited because SKAT was in possession of the information necessary to raise the tax claim.

179.    The same goes for *U 1963.377 H* (attached as <u>Exhibit 52</u>). Here the taxpayer had rendered truthful information in its tax reports. Although SKAT, upon subsequent inspection, concluded that this information should lead to higher tax payment, the tax claim was subject to limitation under the 1908 Act because there was no basis for suspension.

180.    A case that has given rise to some discussion is the Supreme Court decision reported in *U 1981.72 H* (attached as <u>Exhibit 53</u>). The case concerned a taxpayer who conducted two businesses, one as a farmer, the other as a real estate agent. Under the rules of that time, the turnover of the farming business *was* subject to VAT, but the real estate turnover *was not.*

181.    During a control inspection in February or March 1978, it came to SKAT's knowledge that the taxpayer had deducted a VAT expense in his *farming* business (the turnover of which *was* subject to VAT) that rightfully should have been deducted in the income of his *real estate agent* business (the turnover of which was *not* subject to VAT). The two businesses had an accounting year starting on 1 February and ending on 31 January. SKAT initiated legal proceedings on 18 December 1978. The question before the Supreme Court was whether the claims for the period from 1 August 1972 to 31 January 1973 were time-barred on grounds that SKAT should have known of the claim before 1 February 1973.

182.    The Supreme Court was divided in deciding this issue: *Three* justices held that no suspension should apply to SKAT's VAT claim for the period from 1 August 1972 to 31 January 1973, because (1) SKAT had *had* the opportunity to control the VAT declarations during these months, (2) statutory account keeping regulations only provided for a 5 year saving obligation

44

for the relevant documentation, and (3) SKAT was expected to conduct its control inspections at least every fifth year. *Two* justices held that SKAT should not have known of its claim at that time, since no statutory rules *obligated* SKAT to make inspections more frequently than they actually had in this case. It was therefore the view of these two justices that the time-bar of SKAT's claim was suspended until SKAT gained actual knowledge of the erroneous VAT reporting.

183.    In his comments to the decision, Professor *von Eyben* has stated that the result may appear "tough" ("strengt"), but that its result may be justified by the fact that the local VAT authorities (as it also transpired from the case) according to prevailing practice were expected to make inspections of such VAT filings at least once within any five year period, and that such an inspection would have disclosed the facts.

184.    I am not aware that a similar rule of inspections applies in the present litigation. However, if – for the sake of argument – it was assumed that SKAT was under such an obligation to provide inspections within certain fixed intervals on WHT applications, the time bar period would only be suspended if the nature of the required inspections would have revealed the allegedly fraudulent information. Whereas the wrongful deduction of the VAT amount would have been obvious under an ordinary inspection in the *U 1981.72 H* case, it depends on the evidence of any particular case whether a particular claim based on fraud would have been obvious upon inspection.

### d)    Does it matter whether the creditor might have known of its claim by conducting a thorough investigation?

185.    As said above under a), I have been invited to discuss whether in cases of fraud it makes any difference that the creditor might have known of its claim upon thorough investigation.

45

186.    As I will show in the following, Danish courts have been reluctant to accept such a duty of investigation, both for private parties and for public entities.

187.    To illustrate how this the case decided by the Danish High Court of the Eastern Circuit, *U 2020.160 Ø* (attached as <u>Exhibit 54</u>) is illustrative:

188.    In 2008, two owners of an apartment had been granted an amount by a municipality to renovate the building in which the apartment was located. The grant was to be repaid to the municipality when the apartment was sold. In 2012, the owners sold the apartment without repaying the grant. The municipality obtained knowledge hereof as part of an audit exercise that took place when it became known that many owners in similar cases had failed to repay their grants. When the municipality claimed repayment in litigation, the two owners alleged that they had reported their moving from the apartment (and thereby the sale of it) to the branch of the municipality responsible for the National Register. Both the high court and the city court held that this did not imply that the municipality "should have" known that the amount was due for repayment.

189.    Upon reflection of the outcome of this case, one may ask whether the case is in conformity with the fact that Danish public entities are obliged to take steps to collect the information necessary to handle the cases (a principle which is sometimes referred to as the "inquisitorial procedure").

190.    In my opinion the fact that public entities exercising their duties under public administration law are, as a general principle, obliged to collect the factual information necessary to handle and decide each case, does not imply a duty to investigate into each and every detail that might be of relevance for deciding the case in question.

46

191.    The Supreme Court decision reported in *U 2010.261 H* (attached as <u>Exhibit 55</u>) is also illustrative of that principle. The case concerned a specific investigation relating to environmental damage on a specific piece of land. The claimant in question (a county) had taken active steps to investigate into the causes of the detected pollution and had received a report (in August 1999) that confirmed the suspicion that a particular enterprise was liable. From that time (but not before), the county could therefore not have been unaware of its claim.

192.    In reaching this result, the Supreme Court has maintained earlier high court practice in similar cases relating to *specific* investigative measures.

193.    Danish courts also apply the said reluctant attitude also for private parties. An example hereof is *U 1997.1546/2 V* (attached as <u>Exhibit 56</u>). In this case, the Nordic Copyright Bureau (NCB) – a collecting society mandated with the collection of license fees on sold records – brought an action against the management and owner of a record company (now in bankruptcy) who had delivered fraudulent information to NCB on its payable turnover. On the basis of this fraudulent information NCB had collected much lower copyright fees than it was entitled to. NCB became suspicious of possible irregularities in 1988 when a "market review" (the details of which are not reported in the case) had been conducted. Based on this review, NCB decided to conduct a direct "investigation" on the turnover information submitted by the company to NCB.

194.    The results of that investigation were provided in a private investigation report of 28 January 1990, commissioned by NCB. The report suggested that the company had committed fraud towards NCB in a period that went back to 1984. The day after, on 29 January 1990, NCB reported the two defendants to the police. During a subsequent police investigation, further details of the fraud (and of the substantial magnitude of NCB's claim) became known. The court

held – with no further reasoning being set out – that NCB should *not* be expected to have known of the fraud until the report of the investigation was produced on 28 January 1990.

195.    To understand the case it is important to know that the creditor (NCB) only had a *suspicion* that it *might* have been the victim of fraud when it decided to start the investigation after the result of the market review was known in 1988. At that time NCB had no *knowledge* as to whether this suspicion was justified. Until that suspicion was confirmed, NCB could not know whether it had a claim or not. NCB obtained that knowledge in the investigative report of 28 January 1990 (which NCB had commissioned). Until that point in time, the time-barring of NCB's claim was therefore suspended.

196.    Elaborating on that example, if SKAT had a suspicion from information available at a certain time that this or that third party (e.g. a specific custodian) had participated in fraudulent activities in relation to WHT applications, SKAT would still have to investigate that suspicion in order to know that it had a claim for fraud (i.e. a tort claim based on wilful breach of the culpa rule) against particular identified third parties (such as specific custodians). Following the reasoning of the NCB case (*U 1997.1546/2 V*), SKAT's claim for damage would then be suspended until the outcome of this investigation was available.

197.    Moreover, the limitation period would not start running without SKAT knowing *which* particular WHT applications were the subject to such fraud because each fraudulent application gives rise to a separate claim.

198.    The same result would apply in a situation where SKAT would have to go through thousands of pages of bank statements relating to one entity believed to be party to the fraud. Also here, the decisive point for fixing the length of the suspension period will be the time where SKAT had sufficient knowledge of the existence of particular claims against particular

defendants to bring legal action against them, although the exact size of the claimed amount would not be known until later.

199.    If the knowledge of SKAT was limited to the fact that particular applicants after careful review of bank statements, had received larger payments than the average, however without any indication that particular applicants had committed fraud, such situation is comparable to NCB case in *U 1997.1546/2 V.* Since expert evidence would then be necessary to interrogate the financial data obtained, the limitations period will not start until SKAT had obtained evidence of which particular defendants might be held liable for fraudulent acts.

**B.    Conclusion**

200.    When the case law referred to above is applied in regard to the present WHT litigation, it is essential to note that SKAT alleges that the WHT applicants submitted fraudulent information to SKAT in the form of information that referred to fictitious transactions and shares.

201.    In addition, it should be noted that the claims raised in the present litigation are not tax claims ("revenue claims") but claims under private law rules. SKAT is not a police unit mandated with the task to solve crimes and bring criminals to justice. To undertake such a task, it is first of all necessary to possess the right skills (which police professionals have).

202.    There is in my opinion no basis for assuming that SKAT due to the "inquisitorial procedure" applicable in Danish law should have possessed all relevant information more or less as the WHT refund payments were made.

203.    The presented case law does not assume that such an obligation *exists.* As discussed above in para. 183 in relation to Professor *von Eyben*'s comments to *U 1981.72 H*, it may follow from internal case handling rules that SKAT should generally make control

inspections within certain periods. Outside the scope of such rules, there is no basis to assume that such an obligation to make certain tax inspections within certain periods of time exists – with the far reaching consequences it might have on SKAT's possibility to prosecute its claims. In all circumstances, the presence of such a rule has no place in relation to claims that can only be ascertained after investigations like those necessitated in the present litigation.

204.    Quite contrary, the case law referred to above clearly shows that in cases where SKAT has been misinformed by the taxpayer to a much *lower degree* (characterized by the fact that SKAT *could* – by investigating – easily have discovered the "realities" of the case), the time bar of SKAT's claims will be suspended.

205.    Under the Danish statute of limitations, a critical question is, at *what point in time* SKAT should have known of this fraudulent information, with the consequence that SKAT at least at that time "should have" known its claim against a particular defendant.

206.    As I have stated in *Andersen II*, para. 46, it is important to note that the information of the ownership of stocks and receipt of dividends that gave basis for each application and for the distribution of the WHT amounts that SKAT paid out to the beneficiaries of the pension plans *were not* public information that SKAT had access to. Even if SKAT suspected that some applications might be fraudulent, such suspicion would require specific examinations to reject or ascertain, and perhaps additional examination to determine the person or persons responsible for such fraud.

207.    To make such tort claims, SKAT would have to investigate the WHT applications that defendants participated in submitting to ascertain which ones were lawful or wrongful, and if wrongful, the identity and roles of each participant in the scheme. Since that task in itself

would require substantial resources and planning, I cannot conclude as a matter of Danish law when SKAT "should have" known either its claims or the relevant defendants to the claims.

208.    Therefore, in relation to each defendant, there is a need to provide evidence of *when* SKAT became aware of – or should have been aware of – its possible claim for damage in regard to that *individual* case. Again, I am not able to establish that particular point in time since it will depend on the particular circumstances in relation to each claim.

209.    This also means that if SKAT had no such knowledge of any facts that might provide a basis for raising a claim against a specific defendant, the 3 year time bar period does not start to run, until SKAT became aware or with reasonable diligence should have become aware of its claim against that defendant.

210.    In my opinion, the requirement under DLA Section 3 (2) that the claimant "obtained or should have obtained such knowledge" of the individual claim is not fulfilled in regard to information of a general nature that might imply that a claim existed. Therefore, the fact that SKAT at one point have been informed by third parties that it *might* have been the victim of a fraud (something alleged to have happened in June/July 2015) does not, in my opinion, justify suspension of SKAT's claims under DLA Section 3 (2). For such suspension to take place, SKAT would need to acquire the additional information that enabled it (or which should have enabled it) to know that it had claims against particular defendants (meaning the particular defendant arguing that SKAT's claim against it is time-barred).

211.    In my opinion the case law referred to above provides a solid basis for concluding that the suspension of the 3 year time bar limitation period under DLA Section 3 (2) ends only when the creditor became aware or with reasonable diligence should have become aware of its claim.

212.    The Supreme Court decision of 20 November 2023 in the Bech-Bruun case (reported in *U 2024.746 H* (Exhibit 13) and referred to above in paras. 54-55) confirms these observations.

213.    In this case, Bech-Bruun alleged that SKAT should have known of its claim against Bech-Bruun on 10 October 2016 where SKAT was contacted by the German authorities with reference to a statement made by Bech-Bruun to a German bank (which, being the only German bank involved in the scheme, as a custodian, must have been North Channel Bank) according to which the bank had acted lawfully in the scheme.

214.    This time bar allegation was denied by the Supreme Court.

215.    First, and generally, the Supreme Court held that the time bar limitation period should not run from the date of payment by SKAT to the pension plans (i.e. the time where the damage occurred, see DLA Section 2 (4)). The limitation period was thus suspended until the time when SKAT became aware, or ought to have become aware, of the claim or the debtor (in other words, of the claim against the particular debtor, here Bech-Bruun).

216.    Secondly, the Supreme Court held that there were no other circumstances that could justify that the suspension of the limitation period had ended on 8 June 2017, i.e. three years (being the time bar period) before SKAT sued Bech-Bruun. In particular, the Supreme Court held that the 10 October 2016 email to SKAT did not or should not have given SKAT reason to believe that Bech-Bruun was liable to it in tort, cf. DLA Section 3 (2).

217.    For these reasons SKAT's claim against Bech-Bruun was not time-barred at the time of the proceedings on 8 June 2020.

218.    In conclusion, I fail to see that the case law referred to above justifies the existence of a general principle that public entities like SKAT shall make *active investigations*

(like police investigations in criminal matters) on a presumption that facts of relevance to the case may be hidden somewhere, and that such principle is sufficient to trigger the statute of limitations against such a public entity.

-----oo0oo-----

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 24, 2024

_____
Mads Bryde Andersen