# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to: 1:18-cv-04833-LAK. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**Declaration Regarding The Danish Statute of Limitations**
**By**
**Mads Bryde Andersen,**
Professor of Law
Center for Market and Economic Law
University of Copenhagen

Copenhagen, Denmark
November 23, 2020

I, Mads Bryde Andersen, professor of law, declare the following:

## I.    QUALIFICATIONS

1.    Since 1991 I have served as a professor of private law at the University of Copenhagen, Denmark, from which university I graduated with a *candidatus juris* degree (LL.M.) in 1981. During the years 1981-1986 I worked as a lawyer for a mid-size Copenhagen law firm. I was admitted to the High Courts of Denmark in 1984. I joined the University of Copenhagen Law Faculty in 1987 at which faculty I took the doctor juris degree in 1989 with a dissertation on contract and tort liability for computer malfunctions.

2.    For further information on my background, I refer to the enclosed CV (attached as Appendix A).

3.    I have written this legal Declaration at the request of Plaintiff, Customs and Tax Administration of The Kingdom of Denmark (Skatteforvaltningen), in the following referred to as "SKAT".

4.    SKAT is compensating me for my work in preparing this Declaration on a per-hour basis.

## II.    DOCUMENTATION REVIEWED

5.    For the purpose of giving this Declaration, I have reviewed the following documents in the litigation initiated by SKAT against Raubritter LLC Pension plan, Alexander Burns, Richard Markowitz, and John van Merkensteijn:

   a.    SKAT's April 27, 2020, Amended Complaint;

     b.   Defendant Alexander Burns' October 27, 2020, memorandum of law in support of his motion to dismiss SKAT's amended complaint.

6.     Counsel for SKAT has invited me to describe certain parts of Danish law on the limitations periods applicable to monetary claims with a particular view to the beginning of the limitations period according to statutory legislation.

7.     Secondly, I have been invited to present the general rules of *suspension* of limitations in Danish law, and in light of the defendant Burns' argument about the particular rule of suspension in cases where the whereabouts of the debtor is not known, I also address the applicability of that particular rule.

## III.    LEGAL SOURCES

8.     My below legal analysis is based upon my interpretation of the Danish Limitation Act ("Forældelsesloven"), no. 552 of 6 June 2007, published as Consolidated Act No. 1238 of 9 November 2015, in the following referred to as "**DLA**". DLA is the general legal basis for statutory limitations applicable to monetary claims in Denmark.

9.     The DLA came into force on 1 January 2008, cf. Section 29, and applies to monetary claims arising after that date. Before that, a 5-year statute of limitation applied pursuant to Section 1 of Act No. 274 of 22 December 1908 on the limitation of monetary claims (in the following referred to as "**the 1908 Act**"). A number of provisions of the 1908 Act, including the rules of suspension (as discussed below in *Sections IV(c) to (e)*), are in substance similar to the suspension rules in the DLA.

10.    As a basis for my analysis, I have studied relevant decisions from Danish Courts. The main part of this case law is reported in the Danish Weekly Law Report ("Ugeskrift for Retsvæsen", in the following referred to as "**U**", followed with a number indicating the relevant

year, page number and a symbol indicating the court in question – e.g., *U 1963.377 H* where "**H**" stands for "Højesteret", i.e. the Danish Supreme Court).[1] Certain cases have been reported in the periodical "Tidsskrift for Skatteret" (*Journal of Tax Law*), in the following referred to as **TfS** to which I will refer by the same principles of abbreviation.

11.    I have also referred to cases from other Danish courts, including *Østre Landsret* (the Danish High Court for the Eastern Circuit, referred to as "**Ø**"), and *Vestre Landsret* (the Danish High Court for the Western Circuit, referred to as "**V**").

12.    The DLA is subject to an extensive (1157 pages) and highly reputed handbook by Professor *Bo von Eyben*, the 2nd edition of which came out in 2019 under the title: "Forældelse efter forældelsesloven af 2007" (*Prescription under the 2007 DLA*). In the following I shall refer to this book as "***von Eyben***".

## IV. PRESENTATION

### a. The scope of the Danish Statute of Limitations

13.    According to *Section 1*, the DLA applies to the limitations of *claims for money or other performances* ("fordringer på penge eller andre ydelser").

14.    In the following I will focus on those of SKAT's claims in the present litigation that are "claims" in this understanding of the word (in Danish: *fordringer*), i.e. *not* proprietary rights. The 3-year period set forth in Section 3 (1) of the DLA, as discussed below at *subsection (b)*, applies to all SKAT's *monetary* claims in this litigation. This conclusion holds true regardless of whether the claim in dispute is a *tort* claim or a claim for *restitution*.

---

[1]    Danish courts appear at three levels: The lower level consists of 24 *City Courts*. The middle level consists of two *High Courts* (one for the Eastern Circuit and one for the Western). On the top of the judicial hierarchy there is one single *Supreme Court*. In general, cases are heard in the first instance by a City Court from which they can be appealed to a High Court and – under certain circumstances, and subject to permission from the Appeals Permissions Board – further on to the Supreme Court. The reasoning of the Supreme Court is, in principle, binding for lower courts, and even for the Supreme Court itself in subsequent cases.

15.    On the contrary, claims of a *proprietary* nature fall outside the DLA. Such claims are therefore *not* limited under the DLA. This is presumed by the Supreme Court in *U 2018.3512 H.* In this case, an amount held on a bank account for the benefit of an individual was subject to limitation under the DLA since he was not the *owner* of the amount.

16.    On pages 116-117 *von Eyben* confirms the assertion that the *property right* to a stolen "thing" is not prescribed under the DLA.

17.    It is my opinion that an individualized sum of money, *e.g.*, bank notes in an envelope, equals a "thing". Furthermore, it is my opinion that the same should be the case if a stolen amount is individualized and held on a separate account. This means that such proprietary rights to monetary sums that can be individualized as such are not subject to limitation under the DLA.

18.    This view is confirmed in Danish case law which has accepted the vindication of monetary amounts that can be pointed out as individualized sums, even though the amounts have been exchanged to other currencies. *See e.g.*, *U 1991.467 V.* The Amended Complaint, however, does not disclose the facts necessary to determine whether the amounts that SKAT claims can be pointed out as individualized sums. Accordingly, it is not possible without a fully developed factual record to determine whether or not SKAT's claims are proprietary and, if so, are not subject to any limitations under Danish law.

19.    In any event, the deceived owner may – depending upon the circumstances – raise alternative claims, either against the fraudster or against parties responsible for the theft, *e.g.*, for liability in tort. Such claims for tort or restitution would be subject to the general rules of limitation under the DLA as described at *subsection (b)*.

20.     The DLA makes no distinction in regard to (1) the *legal basis* for the claim, (2) what kind of *performance* it relates to, (3) who is the *creditor* or claimant (be it a private entity or a state institution), or whether (4) the claim is by nature *contractual*, based on *tort* law, or on *statutory legislation*.

### b. The main rules of the DLA

21.     According to DLA *Section 3 (1)*, the limitation period is *3 years*, unless otherwise provided by other provisions.

22.     DLA *Section 2 (1)* provides that the limitation periods under the act shall be calculated from the *earliest* point in time where the claimant could *claim satisfaction* of its claim, unless otherwise provided by other provisions.

23.     In relation to SKAT's claims in the present litigation, the 3-year limitation period should be calculated for each defendant in relation to each of the claims:

24.     In regard to claims for the *repayment* of amounts that SKAT has paid to applicants as alleged Withholding Tax (in the following, "**WHT**") on the basis of fraudulent information, the earliest time for calculating the limitation period is the *date of payment* of the said WHT to the applicant, or an agent acting on his behalf.

25.     In regard to claims for *liability of all defendants* for misrepresentation or fraud, DLA *Section 2 (4)* applies. According to this provision the limitation period for claims regarding compensation for non-contractual damages is calculated from the *time of the occurrence* of the damage. In practical terms, this leads to the same limitation period starting at the date where the WHT amount was actually paid to the applicant or the agent acting on his behalf since this event caused the damage to SKAT.

26.     Similar rules as those just described also applied under the 1908 Act.

27.     The starting point of the limitation period for tort claims is when the harmed party is damaged. Where the damage is not *clearly visible* to the harmed party when the damage took place, the 3-year limitation period would *in isolation* prevent the harmed party from recovery if the loss and the role of the party causing the damage was not discovered until after the expiration of the 3-year period.

28.     In such cases, rules of suspension may come into play.

### c.  The DLA rules of suspension

29.     It follows from DLA *Section 3 (2)* that if the claimant was *unaware* of the *claim*, including the *role of the defendant*, then the 3-year limitation period set forth in *Section 3 (1)* shall be calculated from the day when the claimant *became aware* or should have become aware of its claim. I will discuss this provision in particular at *subsection (d)* below.

30.     Apart from Section 3 (2), *Chapter 4* of the DLA provides for a number of rules, where suspension occurs in circumstances where the creditor has taken certain legal steps towards the debtor.

31.     As I will revert to at *subsection (e)*, DLA *Section 14 (1)* provides for a specific *one year* suspension rule applicable to cases where the *whereabouts* of the debtor is unknown, or when *other obstacles* not caused by the claimant's circumstances apply.

### d. DLA Section 3 (2)

32.     As noted above in para. 30, it follows from DLA *Section 3 (2)* that if the claimant was *unaware* of the claim or of the debtor, then the 3-year limitation period in Section 3 (1) shall be calculated from the day when the claimant *became* aware or *should have* become aware of its

claim. In Danish legal terminology, the calculation of the limitation period is said to be *suspended* until that time.

33.    A suspension rule similar to DLA Section 3 (2) also applied according to Section 3 of the 1908 Act, however with one reservation: Whereas the claimant's unawareness of the *whereabouts* of the debtor was previously considered to be a part of the general statutory rule in Section 3 of the 1908 Act, this situation is now subject to a particular rule under DLA Section 14, which I will discuss below at *subsection (e)*.

34.    In a recent case decided by the Danish High Court of the Eastern Circuit, *U 2020.160 Ø*: In 2008, two owners of an apartment had been granted an amount by a municipality to renovate the building in which the apartment was located. The grant was to be repaid to the municipality when the apartment was sold. In 2012, the owners sold the apartment without repaying the grant. The municipality obtained knowledge hereof as part of an audit exercise that took place when it became known that many owners in similar cases had failed to repay their grants. When the municipality claimed repayment in litigation, the two owners alleged that they had reported their moving from the apartment (and thereby the sale of it) to the branch of the municipality responsible for the National Register. Both the high court and the city court held that this did not imply that the municipality "should have" known that the amount was due for repayment.

35.    The test for whether the claimant "should have" become aware of its claim is whether the claimant had sufficient information for a prudent person acting in the claimant's shoes to assess the basis for its claim, which includes (but is not limited to) knowing what is necessary to plead its claim.

36.     I have been advised that the factual record that governs the motion before the Court is limited to the allegations in SKAT's Amended Complaint. That pleading does not allege when SKAT learned of the defendant Burns or his role in the alleged scheme. Apart from what I can read out of the documentation referred to above in para. 5, I have not examined the details of the circumstances under which the WHT repayment claims subject to the present litigation came to SKAT's knowledge.

37.     Danish courts have held that a claimant "should not have" known its claim for repayment when it has relied on fraudulent information, even though the truthful information might have been known had the creditor taken steps to investigate the case further.

38.     This principle has been applied in cases where tax authorities upon inspection of individual tax files have found out that a taxpayer had failed to provide specific relevant information or that the information provided by him was false.

39.     An early example of such court practice is *U 1935.715 H*, where the taxpayer had failed to report a substantial amount that he had received as an income in 1925. The Danish Supreme Court held that *prescription* of the claim for taxation of this amount was *suspended* until this information became known to the tax authorities in 1932. Also, in the cases reported in *U 1994.168 H*, *TfS 2001 171 Ø*, *TfS 1988 641 V*, *U 2006.1492 H* and *U 2018.3119 H*, the taxpayer had made efforts to misinform the tax authorities. Therefore, the claims were not prescribed.

40.     The result turned out otherwise in *U 1936.677 H*, where the taxpayer had provided the tax authorities with all relevant information, although this information resulted in an unjustified low tax payment. SKAT's claim for taxation was therefore prescribed, i.e. there was no room for suspension.

41.     Numerous subsequent cases have confirmed the principle that no suspension will take place if the taxpayer provided all relevant and truthful information to the tax authority. *See, e.g.*, *U 1963.377 H*, *U 1981.72 H*, and *TfS 1988 581 V*. In all these cases, the taxpayer had rendered truthful information in their tax reports. Although SKAT, upon subsequent inspection, concluded that this information should lead to higher tax payment, the tax claim was subject to limitation under the 1908 Act because no suspension took place.[2]

42.     When this case law is applied in regard to the present WHT litigation, it is essential to note that SKAT alleges that the WHT applicants submitted false information to SKAT.

43.     Assuming that the allegations in the Amended Complaint are true, I must therefore conclude that SKAT is entitled to claim suspension in regard to claims for repayment of WHT compensation that are caused by false information rendered to SKAT.

44.     The next question then occurs, at *what point in time* SKAT should have known of this *false* information, with the consequence that SKAT at least at that time "should have" known its claim.

45.     On the limited record contained in the Amended Complaint, it is not possible for me to conclude on the timing of the suspension period. If SKAT's allegations are correct, we are faced with a highly complicated fraudulent scheme with many parties playing different roles.

---

[2]     The case law quoted here involves public entities acting as claimants. There is also extensive case law on Section 3 (2) that involve private individuals as claimants. In a recent decision from the Danish High Court for the Eastern Circuit, reported in *U 2020.1961 Ø*, a pre-school teacher had received a lower salary from her employer (a municipality) than she was entitled to, due to a mistake. The mistake was made when she took the position in 2009 and her previous work experience was not given due credit as it should under applicable rules. The mistake became known 6 ½ after the first salary payment. Although certain circumstances of the case (including the fact that the incorrect information was indicated in her first pay check in 2009 which showed a wrong "date of experience"), the court held that she had reasons to believe that the municipality would base salary payments on correct information on her work experience. For that reason, her salary claim was suspended from the first payment and her claim for repay of salary was not terminated.

46.    It is also important to note that the information of the ownership of stocks that gave basis for each application, the cash flow of the WHT amounts that were subject to SKAT's demand for repayment, and the beneficiaries of the pension plans were not public information that SKAT had access to.

47.    According to the Amended Complaint, the information shared with SKAT in June 2015 by the whistleblower only indicated that fraudulent activities took place with entities seeking refunds pursuant to the double taxation treaty with Malaysia. It did not *in itself* give SKAT a basis to pursue its claims against each of the U.S. pension plan recipients and to claim damage from parties who willingly or by negligence participated in the fraud. SKAT would have to look into every WHT application and WHT payment to ascertain whether it had been lawful or wrongful, and if wrongful, the identity and roles of each participant in the scheme. Since that task in itself would require substantial resources and planning, I cannot conclude that SKAT "should have" known either its claims or the relevant defendants to the claims in June 2015.

48.    Therefore, in relation to each Defendant, there is a need to provide evidence of *when* SKAT became aware of – or should have been aware of – its possible claim for damage in regard to that individual case. I am not able to establish that particular point in time since it will depend on the particular circumstances in relation to each claim.

### e. Section 14 of the DLA

49.    Defendant raises DLA Section 14 (1), which provides that suspension also occurs if the claimant has been unable to suspend limitation due to *unawareness* of the defendant's whereabouts or because of an obstacle which is not caused by the claimant's circumstances. If that is so, limitation at the earliest occurs one year after the claimant obtained, or should have obtained, knowledge of the defendant's whereabouts and one year after the obstacle ceased to

exist, respectively. This provision does not limit or impair the general suspension of limitations when a claimant is unaware of the damage or the identity or role of a defendant, as I have described above. DLA Section 14 (1) merely provides an additional suspension that a claimant may need after determining its claim and the identity and role of the defendant, but is unable to find the defendant.

50.    Section 14 of the DLA reads as follows:[3]

> *(1) If the creditor has been unable to suspend the prescription due to unawareness of the debtor's whereabouts or because of an obstacle which is not caused by the creditor's circumstances, the prescription of the earliest occurs 1 year after the creditor obtained, or should have obtained knowledge of the debtor's whereabouts and 1 year after the obstacle ceased to exist, respectively.*
>
> *(2) The provision in subsection (1) cannot result in an extension of the time limits pursuant to section 3, subsection (3) and may at the most extend the other time limits or additional time limits within 10 years.*

51.    Whereas Section 3 (2) refers to circumstances that have caused unawareness on the claimant's side, Section 14 refers to other obstacles that may *prevent* the claimant from exercising his claim. Section 14 is thus a *lex specialis* which only refers to those particular obstacles and with a more limited legal effect of causing an *additional* suspension of up to 1 year. It is important to note that this 1-year suspension does not replace the suspension that may occur under other DLA provisions.

52.    Since the two rules apply in parallel, the fact that DLA Section 14 includes a shorter time period does not affect the conclusions above in relation to DLA Section 3.

---

[3] The Danish wording of the provision reads:
**§ 14.**
Stk. 1. Hvis fordringshaveren har været afskåret fra at afbryde forældelse på grund af ukendskab til skyldnerens opholdssted eller på grund af en hindring, som ikke beror på fordringshaverens forhold, indtræder forældelse tidligst 1 år efter, at fordringshaveren fik eller burde have fået kendskab til skyldnerens opholdssted, henholdsvis 1 år efter hindringens ophør.
Stk. 2. Bestemmelsen i stk. 1 kan ikke medføre en forlængelse af fristerne efter § 3, stk. 3, og kan højst forlænge andre frister eller tillægsfrister med 10 år."

## V. CONCLUSION

53.     The analyses presented above lead me to conclude that a defence based on limitation under the rules of the DLA cannot be established based on the limited record set forth in the Amended Complaint..

54.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 23, 2020

_____

Mads Bryde Andersen

## VI. APPENDIX

<u>Appendix A</u>: CV for Professor Mads Bryde Andersen

## Exhibit A

**MADS BRYDE ANDERSEN**
PROFESSOR, DR.JUR.

UNIVERSITY OF COPENHAGEN
FACULTY OF LAW
KAREN BLIXENS PLADS 16 (6A-3-26)
2300 COPENHAGEN S
DENMARK

HOME ADDRESS:
GARDES ALLE 25
2900 HELLERUP
DENMARK

Office Phone +45 3532 3133
Mobile Phone +45 4058 0925

E-mail mads@jur.ku.dk

October 2020

**CV for Mads Bryde Andersen, professor of law**

Professor Mads Bryde Andersen (b. 1958) **graduated** from the University of Copenhagen in 1981with a *candidatus juris* degree (LL.M.). After military service he worked for a mid-size Copenhagen law firm and was admitted to the High Courts of Denmark in 1984. He joined the University of Copenhagen Law Faculty in 1987 where he took the **doctor juris** degree in 1989 with a dissertation on contract and tort liability for computer malfunctions. In 1991 he was appointed professor of private law at the University of Copenhagen.

Mads Bryde Andersen is the author, or editor, of several books and articles in his field of expertise which is the law of contracts and obligations, intellectual property law and computer and high technology law. His **authorship** includes "Lærebog i Obligationsret I" (*The law of Obligations, I*, forthcoming 5th edition, 2020), "Dansk Pensionsret" (*Danish Pension Law*, 2nd edition, 2017), "Grund-læggende aftaleret" (*Basic Contract Law*, 4th edition, 2013), "Enkelte transaktioner" (*Commercial Transactions,* 4th edition 2016), "Praktisk aftaleret" (*Contract Law in Practice*, 5th edition 2019), "Advokatretten" (*The law of Advocates*, 2005), "IT-retten" (*The law of IT,* 2nd edition, 2005) "Ret og metode" (*Legal Method,* 2002), "Lærebog i edb-ret" (*Computer Law Textbook*, 1991), "Bio-teknologi og patentret" (*Biotechnology and Patent Law*, with M. Koktvedgaard, 1990), "Edb og ansvar" (*Computer Systems and Liability Law* - doctoral dissertation, 1989), and "Arbejdsmarkedspension" (*Labor Market Pension Law*, with Jens Kristiansen, 2009). He has published numerous academic articles and has, among other works, co-edited "Aftaleloven 100 år" (*The 100 Year Anniversary of the Nordic Contract Act*) together with Johan Bärlund, Boel Flodgren & Johan Giertsen and "The CISG Convention and Domestic Contract Law – Harmony, Cross-Inspiration, or Discord?" (with J. Lookofsky, 2014). Since 2003 he has been the editor-in-chief of the most prestigious Danish legal periodical Ugeskrift for Retsvæsen, section B (*The Weekly Law Report*).

Among other positions of trust, Professor Andersen is the **chairman** the Copenhagen Law Society (Juridisk Forening i København, established in 1881). He is also a **board member** of Statistics Denmark (*Danmarks Statistik*) and chair or co-chair of a several private foundations.

Professor Andersen has previously served as chairman of the board of the Danish Financial Supervisory Authority (*Finanstilsynet*, 2014-2016), the Danish Radio and Television Council (*Radio- og tv-nævnet*, 2011-2016) and of the Danish Government IT Security Council (*IT-sikkerhedsrådet*, 1995-2002). He has also served as a member of the Danish Government Commercial Complaints Board (*Erhvervsankenævnet*, 1995-2014).

Since 1992, Professor Andersen has been the Danish **delegation** to *UNCITRAL*, the United Nations Commission on International Trade Law. From 1997 to 1998 he **chaired** the UNCITRAL working group on Electronic Commerce. He has been involved in a number of working groups within the *OECD* dealing with security and consumer issues of the information society and was the head of the Danish delegation during the OECD talks on encryption policy (1995-1996). From 2003 to 2012 he was co-chairman and later chairman of the Danish Guarantee Fund for Depositors and Investors.

Professor Andersen is a frequently used arbitrator in domestic and international **arbitration** matters and has been involved in more than 100 arbitration cases, either as chairman or co-arbitrator. He represents Denmark in the *ICC Commission of Arbitration* and has given several courses on international arbitration. He has an extended network within domestic and international arbitration. In the years 2006-2008 he was the president of the Danish Arbitration Institute (*Voldgiftsinstituttet*, www.denarbitra.dk) and in the years 2004-2008 he was on the board of the Danish Arbitration Society (*Dansk Forening for Voldgift*), the last year as vice-chairman.

Professor Mads Bryde Andersen has received various **marks of honour** and awards for his work. In 2005 he was awarded the *doctor juris honoris causae* from the University of Oslo. In 2017 he received *Knut och Alice Wallenbergs Stiftelses pris för rättsvetenskapliga insatser* (the Wallenberg award for jurisprudential contributions) – a 1 million Swedish Croner prize awarded every three years to an outstanding legal scholar from one of the five Nordic countries. In 2011 he was appointed honorary member of *the Finnish Law Society*. In 2018, on the occasion of his 60 years birthday, 39 colleagues published a 797 pages long "Festskrift for Mads Bryde Andersen" in his honor on Djoef Publishing.