# Exhibit 5

# Executive Order 2000-04-14 no. 13

# of the Convention of August 19, 1999 between the Government of the Kingdom of Denmark and the Government of the United States of America for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income

(*)

as amended by bki 2008-02-18 no. 1

On August 19, 1999, a Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income was signed in Washington.

The text of the Agreement and a Protocol to the Agreement reads as follows: Consolidated version of AGREEMENT BETWEEN THE GOVERNMENT OF THE KINGDOM OF DENMARK AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA FOR THE avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income

as amended by Protocol No 1 of 2006-05-02

The Government of the Kingdom of Denmark and the Government of the United States of America desiring to conclude a convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income have agreed as follows:

**Article 1. - Scope of application of the Agreement**(1)Unless otherwise provided in the Agreement, this Agreement shall apply to persons who are residents of one or both of the Contracting States.

*Section 2.* This Agreement shall not in any way limit any benefit now or hereafter granted:

a)  under the laws of any of the Contracting States ; or
b)  by any other agreement between the Contracting States.

*Paragraph 3.* Notwithstanding the provisions of paragraph 2(b), the following shall apply:

a)  only the provisions of Article 25 (Procedure for reaching mutual agreements) of this Agreement shall apply to any disagreement as to whether a measure falls within the scope of this Agreement and only the procedures under this Agreement shall apply to such disagreement; and
b)  unless the competent authorities decide that a tax measure is not within the scope of this Agreement, only the non-discrimination provisions of this Agreement shall apply to that measure, excluding any national treatment or most-favored-nation obligations that may apply to trade in goods under the General Agreement on Tariffs and Trade (GATT). No national treatment or MFN obligations under any other agreement shall apply in respect of this measure.

c)  For the purposes of this paragraph, the term "measure" means a law, regulation, rule, procedure, decision, administrative action or similar provision or action.

*Paragraph 4.* Except as otherwise provided in paragraph 5, this Convention shall not affect the taxation of a Contracting State on residents of that State (as defined in Article 4 (Tax Residence)) and its nationals. Notwithstanding the other provisions of this Convention, a former national or a long-term resident of a Contracting State may be taxed in accordance with the laws of that Contracting State for the period of ten years after the renunciation of such status.

*Paragraph 5.* The provisions of paragraph 4 shall not be affected:

a)  the benefits granted by a Contracting State under paragraph 2 of Article 9 (Related Enterprises), paragraphs 7 and 8 of Article 13 (Capital Gains), paragraphs 1(c), 2 and 5 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support), Article 23 (Relief from Double Taxation), Article 24 (Non-Discrimination) and Article 25 (Reciprocal Agreement Procedure); and
b)  the benefits accorded by a Contracting State under Article 19 (Public Service), Article 20 (Students and Trainees), and Article 28 (Members of Diplomatic and Consular Posts) to individuals who are neither nationals of nor permanent residents of that State.

**Article 2. - Taxes covered by the Agreement**(2)The applicable taxes to which this Agreement shall apply are:

a)  in the United States:

(ii)  the federal income taxes imposed u n d e r  t h e Internal Revenue Code of the United States (but not social security taxes); and
(ii)  the federal excise taxes imposed on private foundations;

b)  in Denmark:

(i)  income tax to the state;
(ii)  the municipal income tax;
(iii)  the county municipal income tax; and
(iv)  taxes according to the Hydrocarbon Tax Act.

*Paragraph 2.* This Agreement shall also apply to all taxes of the same or substantially the same kind imposed after the date of signature of this Agreement in addition to, or in place of, the taxes in force. The competent authorities of the Contracting States shall inform each other of any significant changes which have been made in their respective taxation or other laws affecting their obligations under the Agreement and of any official published material

concerning the application of this Agreement, including comments, regulations, pronouncements or judicial decisions.

**Article 3. - General Definitions**(3)Unless the context otherwise requires, the following terms used in this Agreement shall have the meanings set forth below:

a) The term "person" includes a natural person, an estate, a trust, a partnership, a company and any other association of persons;

b) the term "company" means any legal person or any entity which is treated as a legal person for tax purposes under the laws of the State in which it is incorporated;

c) The terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of the other Contracting State; the terms also include an enterprise carried on by a resident of a Contracting State through an entity which is considered to be fiscally transparent in that Contracting State;

d) the term "international traffic" means any carriage by ship or aircraft, except where such carriage is performed solely between places in a Contracting State;

e) the term "competent authority" means:

(i) in the United States, the Secretary of the Treasury or his authorized deputy; and

(ii) in Denmark: the Minister of Taxation or his authorized deputy;

f) the term "United States" means the United States of America and includes the States and the District of Columbia; the term also includes the territorial sea of the United States, the seabed and subsoil of the submarine areas adjacent to such territorial sea within which the United States exercises sovereign rights in accordance with international law; however, the term does not include Puerto Rico, the Virgin Islands, Guam, or any other possession or territory of the United States;

g) the term "Denmark" means the Kingdom of Denmark, including any area outside the territorial waters of Denmark which in accordance with international law is or may hereafter be designated in Danish law as an area within which Denmark may exercise sovereign rights with respect to exploration and exploitation of natural resources on the seabed or in its subsoil and overlying waters and with respect to other activities for the purpose of exploration and economic exploitation of the area; the term "Denmark" does not include the Faroe Islands or Greenland;

h) the term "national of a Contracting State" means:

(i) any natural person who is a national of that State; and

(ii) any legal person, partnership or association existing under the laws in force in that State;

i) the term "qualified public entity" means:

(i) any person or group of persons constituting an authority of a Contracting State or one of its political subdivisions or local authorities;

(ii) a person wholly owned, directly or indirectly, by a Contracting State or a political subdivision or local authority thereof, provided that the person is organized under the laws of the Contracting State, that its earnings accrue to itself so that no part of its income inures to the benefit of any private person, and that its assets upon dissolution accrue to the Contracting State, political subdivision or local authority; and

(iii) a pension trust or fund of a person described in (i) or (ii) established and operated for the sole purpose of administering or providing the pensions referred to in Article 19 (Public office);

provided that an entity referred to in point (ii) or (iii) is not engaged in a commercial activity.

*Paragraph 2.* As regards the application at any time of this Agreement in a Contracting State, unless the context otherwise requires or the competent authorities agree on a common meaning in accordance with the provisions of Article 25 (Procedure for the conclusion of reciprocal agreements), any term not defined in the Agreement shall have the meaning which it has at that time under the laws of that State concerning the taxes to which the Agreement applies, any meaning under the applicable tax laws of that State prevailing over a meaning under other laws of that State.

**Article 4. - Tax residence**(4)Unless otherwise specified in this paragraph, in this Agreement the term

"a resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, nationality, place of management, registration or any other criterion of a similar nature.

a) The term "a resident of a Contracting State" does not include a person who is liable to tax in that State solely on income from sources in that State or on profits attributable to a permanent establishment in that State.

b) A juridical person formed under the laws of a Contracting State which is generally exempt from tax in that State and is incorporated and maintained in that State, either

(i) solely for religious, charitable, educational, scientific or other similar purposes; or

(ii) for the purpose of providing pension or other similar benefits to employees, including self-employed persons, under a scheme

shall, for the purposes of this paragraph, be deemed to be a resident of that Contracting State.

c) A qualified public entity shall be deemed to be a resident of the Contracting State in which it is incorporated.

d) Income, profits or gains derived by an entity which is fiscally transparent under the laws of one of the Contracting States shall be deemed to be derived by a resident of a State to the extent that such income, profits or gains are treated as income, profits or gains of a resident under the tax laws of such Contracting State.

*Paragraph 2. Where by* reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, his status shall be determined as follows:

a) such person shall be deemed to be a resident of the State in which he has a fixed abode available to him; if such person has a fixed abode available to him in both States, he shall be deemed to be a resident of the State with which he has the strongest personal and economic ties (center of his vital interests);

b) if it is not possible to determine in which of the States he has the center of his vital interests, or if he has no fixed abode available to him in either State, he shall be deemed to be a resident of the State in which he has his habitual residence;

c) if he has his habitual residence in both States, or if he has no habitual residence in either of them, he shall be deemed to be a resident of the State of which he is a national;

d) if the person is a national of both States or of neither of them, the competent authorities of the Contracting States shall seek to settle the question by mutual agreement.

*Paragraph 3.* Where by reason of the provisions of paragraph 1 a non-individual is a resident of both Contracting States, the competent authorities of the Contracting States shall by mutual agreement endeavor to settle the question and to determine the manner in which this Convention shall apply to such a person.

*Paragraph 4.* A citizen of the United States or an alien lawfully admitted to permanent residence in the United States is a resident of the United States, but only if such person has a substantial presence, a fixed abode, or is ordinarily resident in the United States.

**Article 5 - Permanent Establishment**(5)In this Agreement, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

*Paragraph 2.* The term "permanent establishment" includes in particular:

a) A place from which an organization is managed;

b) In branch;

c) An office;

d) A factory;

e) a workshop; and

f) a mine, an oil or gas well, a quarry or any place where natural resources are extracted.

*Subsection 3.* A building site or construction or installation work, or an installation, drilling rig or vessel used for the exploration of natural resources, constitutes a permanent establishment only if it lasts or the activity continues for more than 12 months. For the purposes of this paragraph, the activities of an enterprise which is connected with another enterprise as defined in Article 9 (Connected Enterprises) shall be deemed to be carried on by the enterprise with which it is connected if the activities in question:

a) is substantially the same as the business carried on by the latter; and

b) relates to the same project or operation;
except to the extent that these activities are carried out simultaneously.

*Paragraph 4.* Notwithstanding the foregoing provisions of this Article, the term "permanent establishment" shall be deemed not to include:

a) the use of facilities exclusively for the storage, display or dispensing of goods belonging to the business;

b) the maintenance of a stock of goods belonging to the undertaking exclusively for the purpose of storage, display or distribution;

c) the maintenance of a stock of goods belonging to the undertaking exclusively for processing by another undertaking;

d) the maintenance of a fixed place of business solely for the purpose of purchasing goods or collecting information for the undertaking;

e) the maintenance of a fixed establishment solely for the purpose of carrying on any other activity preparatory or auxiliary to the business;

f) the maintenance of a fixed establishment exclusively for the purpose of carrying on any combination of the activities referred to in points (a) to (e) of this paragraph, provided that all the activities of the fixed establishment resulting from that combination are of a preparatory or auxiliary character.

*Paragraph 5.* Notwithstanding the provisions of paragraphs 1 and 2, where a person - other than an independent representative within the meaning of paragraph 6 - acts on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts in the name of the enterprise, the enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless that person's activities are limited to the activities mentioned in paragraph 4 which, if exercised through a permanent establishment, would not make that permanent establishment a permanent place of business under the provisions of that paragraph.

*Paragraph 6.* An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through an agent, commission agent or other independent representative, provided that such persons are acting as independent representatives in the ordinary course of their business.

*Paragraph 7.* The fact that a company which is a resident of a Contracting State controls or is controlled by a company which is a resident of the other Contracting State or which carries on business in that other State (whether through a permanent establishment or otherwise) shall not cause one of the two companies to be considered a permanent establishment of the other.

**Income** derived by a resident of a Contracting State from immovable property (including income from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

*Paragraph 2. The* term 'immovable property' shall have the meaning which it has in the law of the Contracting State in which the property is situated. The term shall in any case include appurtenances to immovable property, livestock and equipment used in agriculture and forestry, rights to which the provisions of private law respecting tenure of land apply, rights to use immovable property and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships, boats and aircraft shall not be regarded as immovable property.

*Paragraph 3.* The provisions of paragraph 1 shall apply to income derived from the direct use, letting or any other form of use of real property.

*Paragraph 4.* The provisions of paragraphs 1 and 3 shall also

apply to income from immovable property belonging to an
enterprise and to

income from immovable property used in the exercise of professional activities.

*Paragraph 5.* A resident of a Contracting State who is liable to tax in the other Contracting State on income from immovable property situated in that other Contracting State may elect for a taxable year to compute the tax on such income on the basis of the net profits as if such income were business profits attributable to a permanent establishment in that other State. Such election shall be binding for the taxable year so elected and for all subsequent taxable years unless the competent authority of the Contracting State in which the property is situated consents to the termination of the election.

Profits derived by an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. Where the enterprise carries on such an activity, the profits of the enterprise may be taxed in the other State but only so much of them as is attributable to that permanent establishment. *Subsection 2.* Subject to paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the profits which it might be expected to make if it were a free and independent enterprise engaged in the same or similar activities under the same or similar conditions. For this purpose, the profits attributable to the permanent establishment shall include only the profits earned by the permanent establishment.
assets or business of the permanent establishment.

*Subsection 3.* In determining the profits of a permanent establishment, there shall be allowed as deductions expenses incurred in respect of the permanent establishment, including a reasonable proportion of management and administrative expenses, research and development expenses, interest and other expenses incurred for the benefit of the enterprise as a whole (or that part thereof which includes the permanent establishment), whether incurred in the State in which the permanent establishment is situated or elsewhere.

*Subsection 4.* No profits from business activities shall be attributable to a permanent establishment merely because the permanent establishment has made purchases of goods for the enterprise.

*Paragraph 5.* For the purposes of the preceding paragraphs, the profits attributable to the permanent establishment shall be determined by the same method each year unless there is good and sufficient reason to apply a different method.

*Paragraph 6.* Where profits from business activities include income dealt with separately in other Articles of this Agreement, the provisions of those other Articles shall not be affected by the provisions of this Article.

*Paragraph 7.* For the purposes of this Agreement, the term "profits from business" means income derived from any trade or business, including income derived by an enterprise from the rendering of services and from the rental of movable property.

*Paragraph 8.* For the purposes of paragraphs 1 and 2 of Article 7 (Business Profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Article 11 (Interest), paragraph 3 of Article 12 (Royalties), paragraph 3 of Article 13 (Capital Gains), paragraph 3 of Article 14 (Independent Business) and paragraph 2 of Article 21 (Other Income), any income or gains attributable to a permanent establishment or fixed base during its existence shall be taxable in the Contracting State in which such permanent establishment

or fixed place of business is situated, even if the payments are deferred until such permanent establishment or fixed place of business has ceased to exist.

Profits derived by an enterprise of a Contracting State from the operation of ships or aircraft in international traffic may be taxed only in that State.

*Subsection 2.* For the purposes of this Article, profits from shipping or aviation activities include profits derived from the rental of manned ships or aircraft (on a time or voyage basis). It also includes profits from the rental of unmanned ships or aircraft if they are used in international traffic by the hirer or if the rental income is linked to profits from shipping or aviation activities in international traffic. Profits derived by an enterprise from the domestic transportation of goods or passengers in each of the Contracting States shall be deemed to be profits from the operation of ships or aircraft in international traffic if such transportation is performed as a part of international traffic.

*Paragraph 3.* Profits derived by an enterprise of a Contracting State from the use, supply or hire of containers (including trailers, barges and similar equipment for the transport of containers) used in international traffic may be taxed only in that State.

*Paragraph 4.* The provisions of paragraphs 1 and 3 shall also apply to profits from participation in a consortium, pool, business community or international operating organization.

*Paragraph 5.* Notwithstanding the provisions of paragraphs 2(f) and 3 (Permanent establishment) of Article 5, profits derived by an enterprise of a Contracting State from the transportation by ship or aircraft of supplies or personnel to a place where, in the other Contracting State, off-shore activities connected with the exploration or exploitation of natural resources or the operation of tugboats and similar vessels in connection with such activities are carried on may be taxed only in the first-mentioned State.

### Article 9. - Related undertakings(9)In cases where

a) an enterprise of a Contracting State participates directly or indirectly in the management, control or capital of an enterprise of the other Contracting State; or

b) the same persons participate directly or indirectly in the management, control or capital of an enterprise of one Contracting State and an enterprise of the other Contracting State,

and in any such case conditions have been agreed or fixed between the two enterprises concerning their commercial or financial relations which differ from those which would have been agreed between independent enterprises, any profits which would, but for those conditions, have accrued to one of those enterprises but, by reason of those conditions, have not so accrued may be included in the profits of that enterprise and taxed accordingly.

*Paragraph 2. Where* a Contracting State includes in the profits of an enterprise of that State and taxes accordingly profits on which an enterprise of the other Contracting State has been taxed in that other State and the other Contracting State agrees that the profits so included are profits which would have accrued to the enterprise of the first-mentioned State if the conditions between the two enterprises had been the same as those which would have been agreed upon between independent enterprises, then that other State shall make a corresponding adjustment to the amount of tax computed therein on the profits. In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

**Article 10. - Dividends** (10) Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

a) 5 percent of the gross amount of the dividend if the beneficial owner is a company that directly owns at least 10 percent of the share capital of the company paying the dividend;

b) 15 percent of the gross amount of the dividend in all other cases. This paragraph shall not affect the right to tax the company on the profits out of which the dividend is paid.

*Paragraph 3.* Notwithstanding the provisions of paragraph 2, such dividends may not shall be taxed in the Contracting State of which the company paying the dividends is a resident, if the beneficial owner is:

a) a company which is a resident of the other Contracting State and which has owned, directly or indirectly through one or more persons who are residents of one of the Contracting States, shares representing 80 percent or more of the voting power in the company paying the dividend for a period of 12 months ending on the day on which the right to the dividend is determined, and

(i) meets the conditions of Article 22(2)(c)(i), (ii) or (iii) (Limitation of benefits);

(ii) meets the conditions laid down in Article 22(2)(f)(i) and (ii), provided that the company meets the conditions laid down in paragraph 4 of that Article in respect of the dividend;

(iii) is entitled to benefits in respect of the proceeds under Article 22(3); or

b) a qualified public entity resident in the other Contracting State that does not control the payer of the dividends; or

c) a pension fund referred to in Article 22, paragraph 2(e) (Limitation of benefits) which is a resident of the other Contracting State, provided that such dividends do not arise from the carrying on of business by the pension fund or through an associated enterprise.

*Stk. 4.*

a) Paragraphs 2(a) and 3(a) shall not apply to dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). In the case of dividends paid by a Regulated Investment Company, paragraphs 2(b) and 3(b) and (c) shall apply. However, in the case of dividends paid by a Real Estate Investment Trust, paragraphs 2(b) and 3(b) and (c) shall apply only if:

i) the beneficial owner of the proceeds is a natural person or a pension fund which in each case owns a share of not more than 10% in the Real Estate Investment Trust concerned;

ii) the dividend is paid in respect of a class of units that is publicly traded and the beneficial owner of the dividend is a person who owns an interest of not more than 5% in any class of the units of that Real Estate Investment Trust; or

iii) the beneficial owner of the proceeds is a person who owns an interest of not more than 10% in the Real Estate Investment Trust concerned and the Real Estate Investment Trust is a diversified investment trust.

The provisions of this paragraph shall also apply to dividends paid by companies resident in Denmark which are equivalent to the United States companies referred to in this paragraph. Whether companies resident in Denmark are equivalent to U.S. companies referred to in this paragraph shall be determined by mutual agreement of the competent authorities.

b) For purposes of this paragraph, a Real Estate Invest- ment Trust shall be deemed to have diversified investments if the value of no single interest in real property exceeds 10 percent of its total interests in real property. For purposes of this rule, foreclosure property shall not be considered a real estate interest. Where a real estate investment trust owns an interest in a partnership, it shall be deemed to own directly a portion of the partnership's interest in real property equal to its interest in the partnership.

*Paragraph 5. The* term "dividends" as used in this Article means income from shares or other rights not constituting debt-claims participating in profits as well as income which is subjected to the same taxation treatment as income from shares by the laws of the State of which the payer is a resident.

*Paragraph 6.* The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State in which the company paying the dividends is a resident through a permanent establishment situated therein, or performs in that other State professional services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business Profits) or Article 14 (Independent Business), respectively, shall apply.

*Paragraph 7.* A Contracting State shall not impose any tax on dividends paid by a company which is not a resident of that State unless the dividends are paid to a resident of that Contracting State or the dividends are attributable to a permanent establishment or a fixed base situated in that State, or impose tax on the undistributed profits of a company, except as provided in paragraph 8, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

*Paragraph 8.* A company which is a resident of a Contracting State and which has a permanent establishment in the other Contracting State or which is liable to tax in the other Contracting State on net income which may be taxed in that other State in accordance with Article 6 (Income from Real Property) or Article 13, paragraph 1 (Capital Gains) may be subjected to tax in that other Contracting State in addition to the tax chargeable under the other provisions of this Convention. However, such tax may be imposed only on that part of the profits of the company attributable to the permanent establishment and that part of the income referred to in the preceding sentence which is taxable under Article 6 (Income from Real Property) or Article 13, paragraph 1 (Capital Gains) which, in the case of the United States, is an amount equal to the proceeds of such profits or income and, in the case of Denmark, is an amount equal to the proceeds.

*Paragraph 9.* The tax referred to in paragraph 8 may not be charged at a rate exceeding the rate referred to in paragraph 2(a).

In any case, it cannot be imposed on a company that

a) meets the conditions set out in Article 22(2)(c)(i), (ii) or (iii) (Limitation of collective bargaining benefits);

b) meets the conditions set out in points (i) and (ii) of Article 22(2)(f) provided that the company meets the conditions set out in paragraph 4 of that Article in respect of income, profits or gains referred to in paragraph 8 of that Article;

c) is entitled to benefits under Article 22(3) in respect of income, profits or gains referred to in paragraph 8 of this Article; or

d) has received a decision pursuant to Article 22(7) with regard to this paragraph.

**Article 11. - Interest**(11)Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State may be taxed only in that other State.

*Paragraph 2. The* term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds, including premiums and prizes attaching to such securities and bonds, and any other income which is subjected to the same taxation treatment as income from money lent under the taxation laws of the Contracting State in which the income arises. Income referred to in Article 10 (Dividends) and surcharges for late payment shall not be regarded as interest for the purposes of this Article.

*Paragraph 3.* The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the interest is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) and Article 14 (Independent Business), respectively, shall apply.

*Paragraph 4.* Where a special relationship between the payer and the beneficial owner or between them and a third person causes the interest to exceed, in relation to the indebtedness for which it is paid, the amount which would have been agreed between the payer and the beneficial owner in the absence of that relationship, the provisions of this Article shall apply only to the latter amount. In that case, the excess amount shall be taxable according to the laws of each State, due regard being had to the other provisions of this Convention.

*Paragraph 5.* Notwithstanding the provisions of paragraph 1, the following shall apply:

a) interest paid by a resident of a Contracting State which is determined by reference to the income, turnover, income, profits or other cash flow of the debtor or a connected person, to any change in the value of the assets of the debtor or a connected person or to any dividend, partnership distribution or similar payment, made by the debtor to a connected person and paid to a resident of the other State may also be taxed in the Contracting State in which they arise and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate provided for in Article 10(2)(b) (Dividends); and

b) Excess inclusion relating to residual interest in a US Real Estate Mortgage Investment Conduit (REMIC) may be taxed in each state in accordance with the domestic law of that state.

**Article 12 - Royalties**(12)Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State may be taxed only in that other State.

*Paragraph 2.* The term "royalties" in this Article means:

a) any consideration received for the use of, or the right to use, any copyright in any literary, artistic, scientific or other work (including computer software, motion pictures, audio or video tapes or disks and other means of reproducing images and sounds), any patent, trademark, design or model, drawing, secret formula or process, or other similar right or asset, or for information concerning industrial, commercial or scientific experience; and

b) profits acquired on the disposal of any asset referred to in point (a), provided that such profits are dependent on the productivity, use or resale of the asset.

*Paragraph 3.* The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the royalties are attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business Profits) and Article 14 (Independent Business), respectively, shall apply.

*Paragraph 4.* Where a special relationship between the payer and the beneficial owner or between them and some other person has the effect that, having regard to the use, right or information for which it is paid, the amount of the royalty exceeds the amount which would have been agreed between the payer and the beneficial owner in the absence of the said relationship, the provisions of this Article shall apply only to the latter amount. In that case, the excess amount shall be taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Agreement.

**Capital gains**(13)Gains derived by a resident of a Contracting State from the alienation of immovable property situated in the other Contracting State may be taxed in that other State.

*Paragraph 2.* The term "immovable property situated in the other Contracting State" in this Article shall include:

a) real estate as referred to in Article 6 (Income from real estate);

b) United States real property interest (United States real property interest); and

c) a corresponding participation in real estate located in Denmark.

*Paragraph 3.* Gains from the alienation of immovable property, other than real property, which is attributable to a permanent establishment which an enterprise of a Contracting State has in the other Contracting State or which is attributable to a fixed base available to a resident of a Contracting State for the purpose of performing professional services in the other Contracting State, and gains from the alienation of such a permanent establishment (separately or together with the whole of the real property) shall be exempt from tax.

enterprise) or of such permanent establishment may be taxed in that other State.

*Paragraph 4.* Notwithstanding the provisions of paragraph 3, gains derived by an enterprise of a Contracting State from the alienation of ships, boats, aircraft or containers operated or used in international traffic or property other than real property pertaining to the operation or use of such ships, boats, aircraft or containers may be taxed only in that State.

*Paragraph 5.* Profits derived by an enterprise which is a resident of a Contracting State in a case where an installation, drilling rig or ship used in the other Contracting State in the exploration or exploitation of oil and gas deposits is deemed to be disposed of may be taxed in that other State in accordance with the laws of that State, but only to the extent of any depreciation taken in that other State.

*Paragraph 6.* Gains from the alienation of any assets other than those referred to in paragraphs 1 to 5 shall be taxable only in the Contracting State of which the alienator is a resident.

*Paragraph 7.* Where a resident of a Contracting State is liable to income tax in both Contracting States on the disposal of assets and is treated as if he had disposed of assets for which a gain is determined under the income tax laws of the other Contracting State, he may, notwithstanding any requirement to the contrary not otherwise required, may elect in his return of income for the year of the disposal to be taxable in his State of residence in that year as if he had immediately before that time sold and re-purchased such asset for an amount equal to the fair market value of the asset at that time. Such election shall apply to any asset referred to in this paragraph when disposed of by him in the taxable year for which the election is made or at any time thereafter.

*Paragraph 8.* Where a resident of a Contracting State disposes of assets in connection with a company formation, reorganization, merger, demerger or similar transaction and the profits, gains or income in respect of such disposal are not determined for tax purposes in that State, the competent authority of the other Contracting State may, at the request of the person acquiring the asset, agree to defer taxation on the profits, gains or acquiring the asset, in order to avoid double taxation and subject to terms and conditions satisfactory to that competent authority, may agree to defer the taxation of the profits, gains or income in respect of such asset for taxation in that other State until such time and in such manner as may be agreed in the agreement.

Income derived by an individual who is a resident of a Contracting State in respect of professional services may be taxed only in that State unless the individual has a fixed base permanently available to him in the other Contracting State for the purpose of carrying on his business. If he has such a fixed base, income attributable to that fixed base derived from the performance of functions in that other State may also be taxed in that other State.

*Paragraph 2.* For the purposes of paragraph 1, the income which may be taxed in the other Contracting State shall be determined according to the principles of paragraph 3 of Article 7 (Business Profits).

Unless the provisions of Article 16 (Directors' fees), Article 18 (Pensions, social security, annuities, alimony and child support) and Article 19 (Governmental functions) provide otherwise, salaries, wages and other remuneration derived by a resident of a Contracting State in respect of personal services shall be taxable only in that State unless the services are performed in that State.

another Contracting State. Where the services are performed in that other Contracting State, remuneration derived therefrom may be taxed in that other State.

*Paragraph 2.* Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of personal services performed in the other Contracting State may be taxed in the first-mentioned State only if:

a) the recipient is present in the other State for one or more periods not exceeding in the aggregate 183 days in any twelve-month period beginning or ending in that taxable year; and

b) the remuneration is paid by or for an employer who is not a resident of the other state; and

c) the remuneration is not paid by a permanent establishment or fixed base which the employer has in the other State.

*Paragraph 3.* Notwithstanding the preceding provisions of this Article, remuneration referred to in paragraph 1 derived by a resident of a Contracting State in respect of personal services as a member of the regular crew of a ship or aircraft operated in international traffic may be taxed only in that State.

### Article 16. - Directors' fees(16)

Directors' fees and other similar remuneration derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other State.

### Article 17. - Artists and Sportsmen(17)

Income derived by a resident of a Contracting State as a performing artist, such as a theater, motion picture, radio or television artiste or musician, or as a sportsman from personal activities as such exercised in the other Contracting State, and which would be exempt from tax in that other Contracting State under the provisions of Article 14 (Independent Activities) and Article 15 (Employment), may be taxed in that other State unless the gross income derived by such performer or sportsman, including reimbursed expenses or expenses incurred on his behalf, from such activities does not exceed twenty thousand dollars ($20.000) or its equivalent in Danish Kroner for the taxable year in question.

*Subsection 2.* Where income in respect of an activity exercised by a performing artist or sportsman in his capacity as such accrues not to the artist or sportsman himself but to another person, that income may, notwithstanding the provisions of Article 7 (Profits from Business Activities) and Article 14 (Independent Activities), be taxed in the Contracting State in which the activities of the artist or sportsman are exercised, unless the artist or sportsman proves that neither the artist or sportsman nor any person connected with him participates directly or indirectly in any profits, including the receipt of deferred remuneration, bonus, fees, dividends, partnership distributions or other distributions, of that other person.

### Article 18. - Pensions, social security, annuities, alimony and child support (18)

Unless the provisions of Article 19, paragraph 2 (Public office) provide otherwise, the following shall apply:

a) except as provided in subparagraph (b), pensions arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in the State in which they arise;

b) if, before the entry into force of this Agreement, a person was a resident of a Contracting State and was receiving a pension derived from the other Contracting State, that person may

person shall be taxed only in the first-mentioned State on the pensions referred to in subparagraph (a);

c) pensions shall be deemed to arise in a Contracting State only if they are paid from a pension scheme established in that State;

d) pensions in this paragraph means pensions and other similar remuneration, whether paid on an ongoing or lump sum basis.

*Paragraph 2.* Notwithstanding the provisions of paragraph 1, payments made by a Contracting State under the provisions of the social security or similar legislation of that Contracting State to a resident of the other Contracting State or to a national of the United States may be taxed only in the first-mentioned State.

*Paragraph 3.* Annuities derived and beneficially owned by an individual who is a resident of a Contracting State may be taxed only in that State. The term "annuity" as used in this paragraph means a fixed sum payable continuously at stated times for a stated number of years or for life under an obligation to make such payments for fair and full consideration (other than services rendered).

*Paragraph 4.* Maintenance paid by a resident of a Contracting State which is deductible in that State to a resident of the other Contracting State shall be taxable only in that other Contracting State. The term "maintenance" as used in this paragraph means current payments under a written separation order or a divorce decree, alimony or mandatory support, which payments are taxable to the recipient under the laws of the State of which the recipient is a resident.

*Paragraph 5.* Current payments, other than those referred to in paragraph 4, for the maintenance of a child under a written separation order or a divorce decree, alimony or maintenance, paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed only in the first-mentioned Contracting State.

**Article 19 - Public office** (19)Notwithstanding the provisions of Article 14 (Free profession), Article 15 (Personal work in an official capacity), Article 16 (Directors' fees) and Article 17 (Artists and sportsmen), the following shall apply:

a) salaries, wages and other similar remuneration, other than a pension, paid out of the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual for the discharge of duties for that State, subdivision or authority in the exercise of functions of a public authority shall, except as otherwise provided in subparagraph (b), be taxable only in that State;

b) However, such remuneration shall be taxable only in the other Contracting State if the employment is exercised in that State and the individual concerned is a resident of that State who

(i) is a national of that state; or

(ii) did not become a resident of that State solely for the purpose of performing the duties of the office.

*Stk. 2.*

a) Any pension paid out of the public funds of a Contracting State, a political subdivision or a local authority thereof to an individual for the performance of duties for that State, subdivision or authority in the exercise of functions of a public authority (other than payments

referred to in paragraph 2 of Article 18 (Pensions, social security, annuities, alimony and child support)) may, subject to the provisions of subparagraph (b), be taxed only in that State;

b) However, such pension may be taxed in the other Contracting State only if the recipient is an individual who is a resident and a national of that State.

*Paragraph 3.* The provisions of Article 15 (Personal Services), Article 16 (Directors' Fees), Article 17 (Artists and Sportsmen) and Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support) shall apply to salaries and pensions paid for the performance of duties in connection with a business carried on by a Contracting State, one of its political subdivisions or local authorities.

**Article 20. - Students and trainees**(20)Amounts received by a student, apprentice or trainee who is or was immediately before visiting a Contracting State a resident of the other Contracting State and who is present in the first-mentioned State for the purpose of full-time studies in an officially recognized educational institution or for the purpose of full-time education shall not be taxed in that State provided that such amounts arise from sources outside that State and are received for maintenance, study or training. The exemption under this Article shall apply to an apprentice or trainee only for a period not exceeding three years from the date of his first arrival in the first-mentioned Contracting State for training purposes. The provisions of this paragraph shall not apply to income from research where such research is not undertaken in the public interest but principally for the personal benefit of a specific person or persons.

**Article 21. - Other income** (21)Income derived by a resident of a Contracting State and not dealt with in the foregoing Articles of this Convention, wherever arising, may be taxed only in that State.

*Subsection 2.* The provisions of paragraph 1 shall not apply to income, other than income from immovable property as defined in paragraph 2 of Article 6 (Income from immovable property), if the beneficial owner of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the income is attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business Profits) and Article 14 (Independent Business), respectively, shall apply.

**Article 22. - Limitation of benefits under the Agreement**(22)A resident of a Contracting State shall be entitled to the benefits otherwise provided by the Agreement to residents of a Contracting State only to the extent provided in this Article.

*Paragraph 2.* A resident of a Contracting State shall be entitled to all the benefits of this Agreement only if that person is:

a) a natural person;

b) a State Party, a political subdivision or local authority thereof, or a government office or agency of that State, subdivision or authority;

c) a company whose

(i) its principal class of shares (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges, and either

business).

A)   its principal class of shares is principally traded on a recognized stock exchange located in the Contracting State in which the company is resident (or, in the case of a company resident in Denmark, on a recognized stock exchange located in the European Union or in another state of the European Economic Area, or, in the case of a company resident in the United States, on a recognized stock exchange located in another state covered by the North American Free Trade Agreement); or

B)   the company's principal place of management and control is in the Contracting State in which it is resident;

(ii)   in the case of a company resident in Denmark, one or more taxable funds entitled to benefits under subparagraph (g) holds shares representing more than 50 percent of the voting rights in the company and all other shares are listed on a recognized stock exchange and traded principally on a recognized stock exchange situated in the European Union or another state in the European Economic Area; or

(iii)   at least 50 percent of the total voting power and value of the shares (and at least 50 percent of any class of shares) in the company is owned directly or indirectly by five or fewer companies entitled to benefits under subparagraphs (i) - (ii), or a combination thereof, provided that in the case of indirect ownership each link in the chain of ownership is resident in one of the Contracting States;

d)   a charitable organization or other legal person referred to in Article 4(1)(b)(i) (Tax residence);

e)   a legal person, whether exempt from tax or not, organized under the laws of a Contracting State for the purpose of providing pensions or similar benefits under a defined plan to employees, including self-employed persons, provided that more than 50 per cent of the beneficiaries, members or participants of such person are individuals who are residents of one of the Contracting States; or

f)   a person, other than a natural person, if

(i)   at least 50 percent of each class of shares or other participating interest in the person is owned, directly or indirectly, for at least half of the taxable year by persons who are residents of the Contracting State in which that person is a resident and who are entitled to benefits under this Convention by reason of subparagraph (a), subparagraph (b), subparagraph (c)(i), subparagraph (d) or subparagraph (e) of this paragraph, provided that in the case of indirect ownership each member of the chain of ownership is a resident of that Contracting State; and

(ii)   less than 50 percent of the gross income of the individual for the taxable year, as determined in the State of residence of the individual, is paid or attributed, directly or indirectly, to persons who are not residents of a Contracting State and who are entitled to benefits under this Convention by reason of subparagraph (a), (b), (c)(i), (d) or (e) of this paragraph in the form of payments deductible in the State of residence of the individual in respect of taxes covered by this Convention (but not including arm's length payments in the ordinary course of

business to services or movable property and payments for financial obligations to a bank that is not related to the payer);

g) in the case of Denmark, a taxable fund if

    (i)   the amount paid or credited by way of deductible payments (but not including arm's length payments in the ordinary course of its charitable activities and in accordance with Danish law for taxable foundations (Act on Business Foundations and Act on Foundations and Certain Associations) for services or movable property) in the tax year and in each of the three preceding tax years, directly or indirectly, to persons who are not entitled to benefits under paragraph (a), (b), (c)(i), (d) or (e) of this paragraph does not exceed 50 percent of its gross income as determined under Danish law (excluding its tax-exempt income); and

    (ii)  the amount paid or attributed in the form of both deductible payments (but not including arm's length payments in the ordinary course of its charitable activities and in accordance with Danish legislation on taxable foundations (Act on Business Foundations and Act on Foundations and Certain Associations) for services or movable property) and non-deductible payments in the tax year and in each of the previous three tax years, directly or indirectly, to persons not entitled to benefits under paragraph (a), (b), (c)(i), (d) or (e) of this paragraph, do not exceed 50 percent of its total income as determined under Danish law (including its tax-exempt income).

*Paragraph 3.* A company resident in a Contracting State shall also be entitled to benefits under the Agreement if:

a) at least 95% of the total voting rights and value of its shares (and at least 50% of any disproportionate class of shares) are owned, directly or indirectly, by seven or fewer persons who are corresponding beneficiaries; and

b) less than 50 percent of the gross income of the company, as determined in the State of residence of the company, for the taxable year has been paid or accrued, directly or indirectly, to persons who are not corresponding beneficiaries, in the form of payments (but not including arm's length payments in the ordinary course of business for services or tangible property and payments for financial obligations to a bank not connected with the payer) which are deductible in the State of residence of the company in respect of taxes covered by this Convention.

*Stk. 4.*

a) A resident of a Contracting State shall be entitled to benefits under the Agreement in respect of income derived from the other State, whether the person is entitled to benefits under paragraph 2 or 3, if the person is engaged in the active conduct of a trade or business in the first-mentioned State (other than an activity consisting in making or managing investments for the person's own account, unless the business is banking, insurance or securities business carried on by a bank, insurance company or registered broker) and the income derived from the other Contracting State is derived in connection with or related to that trade or business.

b) Where a resident of a Contracting State derives income from a trade or business in the other Contracting State or derives income arising in the other Contracting State from a related enterprise, then subparagraph (a) of this paragraph shall apply to such income only if the trade or business in the first-mentioned State is substantial in relation to the trade or business in the other State. Whether the trade or business is substantial for the purposes of this paragraph shall be determined on the basis of all the facts and circumstances.

c) In determining whether a person is "engaged in the active conduct of a trade or business" in a Contracting State under subparagraph (a) of this paragraph, activities of persons associated with that person shall be deemed to be activities of that person. A person is associated with another if one holds at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the total votes and at least 50 percent of the total value of the shares of the company or of the beneficial interests in the company), or if another person holds, directly or indirectly, at least 50 percent of the beneficial interest in such person (or, in the case of a company, at least 50 percent of the total votes and at least 50 percent of the total value of the shares in the company or of the dividend-bearing shares in the company) in each person. In any event, one person shall be deemed to be associated with another if, on the basis of all the facts and circumstances, one controls the other or both are controlled by the same person or persons.

*Paragraph 5.* A resident of a Contracting State who derives income from the other Contracting State referred to in Article 8 (Shipping and Aircraft) and who is not entitled to benefits under this Agreement by reason of the preceding paragraphs shall nevertheless be entitled to benefits under this Agreement in respect of such income if at least 50 percent of the beneficial interest in such person (or in the case of a company, at least 50 percent of the total votes and the total value of the shares in such company) is owned directly or indirectly

a) by persons referred to in paragraph 2(a), (b), (c)(i), (d) or (e), or by nationals of the United States, or by natural persons who are residents of a third State; or

b) of a company or combination of companies whose shares are principally and regularly traded on a recognized securities market in a third State,

provided that such third State grants relief for profits in the same manner as provided in Article 8 (Shipping and Aircraft) of this Agreement to nationals and companies of the other Contracting State either under its domestic law or by mutual agreement with that other Contracting State or an agreement between the third State and the other Contracting State.

*Paragraph 6.* Notwithstanding the preceding paragraphs, where an enterprise of Denmark derives interest or royalties from the United States and the income in the form of such interest and royalties is exempt from taxation in Denmark because it is attributable to a permanent establishment which that enterprise has in a third State, tax advantages which would otherwise apply under other provisions of the Convention shall not apply to such income if the tax actually paid in respect of such income in the third State is less than 60 percent. of the tax which would be payable in Denmark if the income had been earned in Denmark by the enterprise and was not

attributable to the permanent establishment in the third State. Any interest or royalty to which the provisions of this paragraph apply may be taxed in the United States at a rate not exceeding 15 percent of the gross amount thereof. The provisions of this paragraph shall not apply if:

a) in the case of interest, the income derived from the United States is derived in connection with or related to the active conduct of a trade or business carried on in the permanent establishment in the third State (other than the business of making, managing, or merely holding investments for the person's own account, unless that business is banking or securities activities carried on by a bank or registered broker); or

b) in the case of royalties, those royalties are received as consideration for the use of, or the right to use, intangible property produced or developed in the permanent establishment itself.

*Paragraph 7.* A resident of a Contracting State who is not entitled to benefits under the provisions of the preceding paragraphs shall nevertheless be granted benefits under the Agreement if the competent authority of the other Contracting State determines that the establishment, acquisition or maintenance of such person and the conduct of its business did not have as one of its principal purposes the obtaining of benefits under the Agreement. The competent authority of the other Contracting State shall consult with the competent authority of the first-mentioned State before denying the benefits of the Agreement under this paragraph.

*Paragraph 8.* In this Article, the following expressions have the meanings set out below:

a) the term "principal class of shares" means the ordinary or common shares of the corporation, provided that such class of shares represents a majority of the voting rights and value of the corporation. If no single class of ordinary or common shares represents a majority of the total voting rights and value of the corporation, the "principal class of shares" is the class or classes which together represent a majority of the voting rights and value of the corporation;

b) the term "disproportionate class of shares" means any class of shares of a corporation which is a resident of one of the States which entitles the shareholder to a disproportionately larger share, through dividends, payment on redemption or otherwise, in earnings derived in the other State from particular assets or activities of the corporation;

c) The term "shares" includes depositary receipts thereof;

d) the term "recognized exchange" means

i) The NASDAQ System, owned by the National Associ- ation of Securities Dealers, Inc. and any exchange registered with the U.S. Securities and Exchange Commission as a domestic securities dealer under the Securities Exchange Act of 1934;

ii) Copenhagen Stock Exchange;

iii) Amsterdam, Brussels, Frankfurt, Hamburg, Helsinki, London, Oslo, Paris, Paris, Stockholm, Sydney, Tokyo and Toronto; and

iv) any other exchange agreed upon by the competent authorities of the Contracting States;

e) the term "taxable fund" as used in paragraph 2 means a fund that is taxable pursuant to section 1(1) of the Danish Foundation Taxation Act;

f) i)    For the purposes of paragraph 2, shares of a class of shares shall be deemed to be regularly traded on one or more recognized stock exchanges during a tax year if

   A)    trading in such class is conducted on one or more such exchanges other than in de minimis quantities throughout each quarter; and

   B)    the total number of shares or units of that class traded on such exchange or exchanges during the preceding taxable year is at least 6% of the average number of outstanding shares or units of that class (including shares held by taxable funds) during that taxable year; and

   ii)    In determining whether a corporation meets the requirements of paragraph 2(c)(ii), clause (i) of this subparagraph shall be applied as if all the shares issued by the corporation were one class of shares, and shares held by taxable trusts shall not be counted as outstanding shares for purposes of determining whether 6 percent of the outstanding shares have been traded within a taxable year;

g) the primary seat of management and control of a corporation is solely in the State in which it is domiciled if persons in executive or senior management positions exercise ongoing responsibility for decisions about the strategic, financial and operating policies of the corporation (including its directly and indirectly owned subsidiaries) to a greater extent in that State than in any other State, and personnel perform ongoing work necessary to prepare and make those decisions to a greater extent in that State than in any other State;

h) the term "corresponding beneficiary" means a resident of a Member State of the European Union or of another state of the European Economic Area or of a state party to the North American Free Trade Agreement or of Switzerland, but only if such person:

i) A)    would be entitled to all benefits under a full double tax treaty between a Member State of the European Union or another State of the European Economic Area or a State party to the North American Free Trade Agreement or Switzerland and the State from which benefits are claimed under that treaty under provisions analogous to paragraph 2(a), (b), (c), (i), (d) or (e) of this Article. If such agreement does not contain a full article on limitation of benefits, it is a prerequisite that the person concerned is

   the person would be entitled to benefits under this Convention by reason of paragraph 2(a), (b), (c), (i), (d) or (e) of this Article if such person were a resident of one of the States under Article 4 (Tax Residence) of this Convention; and

B) i n  r e s p e c t  of income referred to in Article 10 (Dividends), Article 11 (Interest), or Article 12 (Royalties) of this Convention, would be entitled under such Convention to a rate of tax with respect to the particular class of income for which benefits are claimed under this Convention which is at least equal

as low as the rate applicable under this Agreement; or

(ii) is a resident of a Contracting State who is

entitled to benefits under this Agreement by reason of paragraph 2(a), (b), (c), (i), (d) or (e) of this Article.

For the purposes of Article 10(3) (Dividends), in determining whether a person who owns shares, directly or indirectly, in the company claiming benefits under this Agreement is a corresponding beneficiary, such person shall be deemed to have the same voting rights in the company paying the dividend as the company claiming benefits has in such company;

i)    with respect to dividends, interest or royalties arising in Denmark and beneficially owned by a company resident in the United States, a

corporation that is a resident of a Member State of the European Union shall be treated as meeting the conditions of subparagraph (h)(i)(B) in determining whether such United States resident is entitled to benefits under this paragraph if a payment of dividends, interest, or royalties arising in Denmark and paid directly to such resident of a Member State of the European Union would be exempt from taxation under any European Union Directive, notwithstanding that the double tax treaty between Denmark and the other Member State of the European Union would impose a higher rate of tax on such payment than the rate of tax applicable to such United States corporation under Article 10 (Dividends), Article 11 (Interest) or Article 12 (Royalties) of that treaty.

In accordance with the provisions and subject to the limitations of the laws of the United States (as the same may be amended from time to time without changing the general principles thereof)

per) the United States shall grant a person who is a resident of the United States

resident or citizen of the United States a credit against United States income tax:

a) by an amount equal to the income tax paid or payable to Denmark by or on behalf of such resident or citizen: and

b) in cases where a company resident in the United States owns at least 10 percent of the voting shares in a company resident in Denmark from which it receives dividends, with an amount equal to the income tax paid or payable to Denmark by or on behalf of the payer of the dividends in respect of the

profit of which the dividend has been paid.

c) (i)    Except as otherwise provided in subparagraph (c)(ii) and taking into account the taxes imposed under the Hydrocarbon Tax Act referred to in Article 2(1)(b)(iv) (Taxes Covered by the Agreement), the United States shall allow a resident or citizen of the United States a credit against United States tax on income in an amount equal to the tax paid or payable to Denmark by or on behalf of such resident or citizen under the Hydrocarbon Tax Act on income from the production of oil and gas from sources in Denmark. The amount,

allowed as an abatement, however, shall not exceed the result of the highest rate of tax allowed in the United States for such resident individual or citizen for such taxable year multiplied by the income separately assessed for tax under the Hydrocarbon Tax Act.

(ii)    The credit allowed shall also be subject to any limitations of the laws of the United States, as the same may be amended from time to time, applicable to taxes for which credit is allowed under section 901 or 903 of the Internal Revenue Code to persons claiming benefits under this Agreement. Any amount of income tax separately assessed for tax under the Hydrocarbon Tax Act in excess of the amount of such tax may be applied as a credit only in another taxable year, and only against United States tax on income separately assessed under the Hydrocarbon Tax Act.

(iii)    The provisions of subparagraphs (c)(i) and (ii) likewise apply separately to the tax paid or payable to Denmark under the Danish Hydrocarbon Tax Act on (1) Danish oil-related income not referred to in subparagraph (c)(i); and (2) other income from Danish sources.

For the purposes of this Article, the Danish taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes Covered by the Agreement) shall be treated as income taxes and shall be allowed as credits against the income tax paid in the United States, subject to all the provisions and limitations of this paragraph.

*Paragraph 2.* In cases where a citizen of the United States is a resident of Denmark:

a)    With respect to income derived by a resident of Denmark who is not a citizen of the United States and which is exempt from taxation in the United States under this Agreement or is subject to tax therein at a reduced rate of tax Denmark shall allow a credit against the Danish tax only in an amount equal to the amount of any tax paid which the United States may impose under the provisions of this Agreement, other than taxes which may be imposed solely by reason of citizenship under the exception provided for in paragraph 4 of Article 1 (Scope of the Agreement);

b)    For the purpose of computing the United States tax on income referred to in subparagraph (a), the United States shall allow a credit against United States tax in an amount equal to the income tax paid to Denmark after the credit referred to in subparagraph (a); the credit so allowed shall not reduce the portion of the United States tax from which a credit may be allowed against Danish tax in accordance with subparagraph (a); and

c)    the income referred to in subparagraph (a) shall, solely for the purpose of eliminating double taxation in the United States under subparagraph (b), be deemed to arise in Denmark to the extent necessary to avoid double taxation of such income under subparagraph (b).

*Paragraph 3.* As regards Denmark, double taxation shall be eliminated in the following manner:

a)    In the case of income derived by a resident of Denmark which is taxable in the United States under the provisions of this Convention, Denmark shall

mark shall allow a deduction from that person's tax on income in an amount equal to the income tax paid in the United States;

b)    However, in no case shall the deduction exceed the portion of the income tax computed before the deduction is given that is attributable to income taxable in the United States;

c)    in the case of income derived by a resident of Denmark which, under the provisions of this Convention, is taxable only in the United States, Denmark may include such income in the basis of taxation but shall allow as a deduction from the income tax a credit equal to the portion of the income tax attributable to the income arising in the United States.

For the purposes of this paragraph, the taxes of the United States referred to in paragraphs 1(a) and 2 of Article 2 (Taxes covered by the Agreement) shall be considered taxes on income and shall be allowed as a credit against the Danish income tax.

**Article 24. - Non-discrimination** (24)Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith which is more burdensome than the taxation and connected requirements to which nationals of that other State in the same circumstances, in particular as regards the taxation of global income, are or may be subjected. This provision shall also apply to persons who are not residents of one or both of the Contracting States.

*Paragraph 2. The* taxation on a permanent establishment or fixed base which an enterprise of a Contracting State has in the other Contracting State shall not be less favorably levied in that other State than the taxation levied on enterprises or individuals who are residents of that other State in respect of the same activities. Nothing in this paragraph shall be construed as obliging a Contracting State to grant to residents of the other Contracting State the personal tax preferences, reliefs and reductions which it grants to residents of its own territory by reason of marital status or family responsibilities.

*Paragraph 3.* Except where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 4 of Article 11 (Interest) or paragraph 4 of Article 12 (Royalties) apply, interest, royalties and other payments paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, in the determination of the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts owed by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of such enterprise in the first-mentioned State, be deductible under the same conditions as if they had been owed to a resident of the first-mentioned State.

*Paragraph 4.* Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more persons who are residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith which is different or more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

*Paragraph 5.* Nothing in this Article shall be construed to preclude any Contracting State from imposing tax under paragraph 8 of Article 10 (Dividends).

*Paragraph 6.* The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes Covered by the Convention), apply to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof.

**Article 25. - Procedure for the conclusion of reciprocal agreements** (25)Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Agreement, he may, irrespective of the remedies and time limits prescribed by the domestic laws of those States, present his case to the competent authority of the Contracting State of which he is a resident or a national.

*Paragraph 2.* The competent authority shall, if the objection appears to it to be justified and if it cannot itself arrive at a reasonable solution, endeavor to resolve the case by mutual agreement with the competent authority of the other Contracting State with a view to the avoidance of taxation not in accordance with the Agreement. Any agreement reached shall be implemented without regard to the time limits set out in the domestic laws of the Contracting States. Assessment and collection procedures shall be suspended during the implementation of any reciprocal agreement.

*Paragraph 3.* The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of this Agreement. The competent authorities of the Contracting States may make special arrangements:

a) the same attribution of income, withholding, allowance or deduction of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

b) the same apportionment of income, withholding, allowances or deductions between persons;

c) the same designation of special income, including the same designation of income assimilated to income from shares by the laws of one of the Contracting States and treated as a different kind of income in the other State;

d) the same term for people;

e) the same application of source rules with regard to special incomes;

f) A common understanding of terms;

g) pre-approvals for transfer pricing; and

h) applying the provisions of domestic law relating to penalties, fines and interest in a manner consistent with the purposes of this Agreement.
They may also consult each other regarding the elimination of double taxation in cases not covered by this Agreement.

*Paragraph 4.* The competent authorities may also agree increases in any specific dollar amount referred to in the Agreement to reflect economic or currency developments.

*Paragraph 5.* The competent authorities of the Contracting States may communicate directly with each other for the purpose of concluding an agreement in accordance with the preceding paragraphs.

The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of this Agreement or of the domestic laws of the Contracting States concerning taxes covered by the Agreement insofar as such taxation is not contrary to the Agreement, including information concerning the assessment and collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to the taxes covered by the Agreement**.** The exchange of information is not limited by Article 1 (Scope of the Agreement). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative authorities) engaged in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Agreement or the supervision of the above. Such persons or authorities may use the information only for the purposes stated. They may disclose the information in the course of public proceedings or in court decisions.

*Paragraph 2.* Nothing in paragraph 1 shall be construed as imposing on a Contracting State an obligation to:

a) to carry out administrative acts contrary to the laws and administrative practices of this or the other Contracting State;

b) to communicate information which cannot be obtained under the laws or normal administrative practice of this or the other Contracting State;

c) to disclose any information which would divulge any trade, business, industrial, commercial or professional secret or trade process, or information the disclosure of which would be contrary to the public interest (ordre public).

*Paragraph 3.* Notwithstanding the provisions of paragraph 2, the competent authority of the requested State shall be authorized to obtain and provide information from financial institutions, nominal owners, or persons acting as directors or trustees, or representing an interest in a person. If the competent authority of a Contracting State requests information under this Article, the other Contracting State shall provide such information in the same manner and to the same extent as if the taxes of the first-mentioned State were taxes of that other State and were imposed by that other State, notwithstanding that the other State may not at that time need such information for its own taxes. If the competent authorities of a Contracting State specifically request information, the other Contracting State shall provide information under this Article in the form of statements of witnesses and certified copies of original documents (including books, memoranda, reports, minutes, accounts and other written materials) not publicly available, to the extent that such statements and documents can be obtained under the laws and administrative practices of that other State in respect of its own taxes.

*Paragraph 4.* Notwithstanding the provisions of Article 2 (Taxes Covered by the Agreement), the Agreement shall, for the purposes of this Article, apply to taxes of every kind imposed by a Contracting State

**Article 27. - Administrative assistance** (27)The Contracting States undertake to assist each other in the collection of the taxes referred to in Article 2 (Taxes covered by the Convention), together with interest and costs, surcharges on those taxes

and civil penalties referred to in this Article as a "revenue claim".

*Paragraph 2.* A request for assistance in the recovery of a tax claim shall include certification by the competent authorities of the requesting State that the tax claim has been finally determined. For the purposes of this Article, a tax claim is finally determined when the requesting State is entitled under the laws of that State to recover the tax claim and any administrative and legal right of the taxpayer to prevent recovery in the requesting State has lapsed or been exhausted.

*Paragraph 3.* A tax claim which has been finally determined in the requesting State may, subject to the provisions of paragraph 7, be accepted for recovery by the competent authority of the requesting State and, subject to its acceptance, shall be recovered in that State as if such tax claim were its own tax claim finally determined in accordance with the law applicable to the collection of its own taxes.

*Paragraph 4.* In cases where a request for collection of tax claims in respect of a taxpayer has been approved

a) of the United States, the tax claim shall be treated by the United States as an assessment under the laws of the United States against the taxpayer at the time the request is received;

b) of Denmark, the tax claim shall be treated in Denmark as an assessment under Danish law against the taxpayer at the time of receipt of the request.

*Paragraph 5.* Nothing in this Article shall be construed to permit the requested State to create or establish rights of administrative or judicial control over the tax claim finally determined by the requesting State on the basis of any such right that may exist under the laws of either State. In the event that the State making the request under this provision loses the right under its domestic law to collect the tax claim at any time during the conduct of a pending recovery, the requesting State shall immediately withdraw the request for collection assistance.

*Paragraph 6.* For the purposes of this paragraph, amounts collected by the State receiving the request under this Article shall be sent to the competent authority of the requesting State. Unless otherwise agreed by the competent authorities of the Contracting States, the ordinary costs of providing collection assistance shall be borne by the State receiving the request for assistance and any extraordinary costs in this regard shall be borne by the requesting State.

*Paragraph 7.* A request for the recovery of a tax claim shall not, in the State receiving the request, have any priority over its own tax claims.

*Paragraph 8.* The assistance provided for in this Article shall not be applied against a taxpayer in so far as that taxpayer can prove,

a) where the taxpayer is a natural person, that the tax claim relates to a taxable period during which the taxpayer was a national of the State receiving the request; and

b) where the taxpayer is an entity that is a company, estate or trust, that the tax claim relates to a taxable period during which the taxpayer derived its status as such an entity from the law of the State receiving the request.

*Paragraph 9.* Each Contracting State shall endeavor to collect on behalf of the other State such sums as may be necessary to ensure that deductions allowed under the Agreement from taxes imposed by that other State shall not operate for the benefit of persons not entitled thereto.

*Paragraph 10.* Nothing in this Article shall be construed as imposing on any Contracting State an obligation to perform administrative acts which are different from those applied in the collection of its own taxes or which would be contrary to public policy.

*Paragraph 11. The* competent authorities of the States Parties shall agree on the procedure for the application of this Article, including ensuring comparable levels of assistance for each State Party.

*Paragraph 12.* The State receiving the request shall not be obliged to comply with the request of the requesting State:

a) if the requesting State has not pursued all due process in its own jurisdiction; or

b) in cases where the administrative burden of these proceedings on the requesting State is disproportionate to the benefit gained by the requesting State.

### Article 28. - Members of diplomatic and consular representations(28)

Nothing in this Agreement shall affect any fiscal advantages which members of diplomatic and consular missions may enjoy by virtue of the general rules of international law or special agreements.

### Article 29. - Entry into force(29)

The Governments of the Contracting States shall notify each other when the conditions for the entry into force of this Agreement have been fulfilled.

*Paragraph 2.* This Agreement shall enter into force upon receipt of the last of these notifications and its provisions shall take effect:

a) in respect of withholding tax, on amounts paid or credited as from the first day of the second month following the date on which the Agreement enters into force;

b) in respect of other taxes, for taxable periods beginning on or after January 1 following the date on which the Agreement enters into force.

*Paragraph 3.* Unless paragraph 4 applies, the Convention between Denmark and the United States for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington, D.C., on May 6, 1948 (hereinafter referred to as the "1948 Convention"), shall cease to have effect when the provisions of this Convention enter into force in accordance with paragraphs 2 and 4. *Paragraph 4.* In cases where the 1948 Convention would have afforded greater relief to any person than this Convention, a person who was entitled to benefits under the earlier Convention may elect that the 1948 Convention shall continue to have effect for one year after the date on which the provisions of this Convention would otherwise have had effect in pursuant to paragraph 2 of this Article.

*(5)* The 1948 Agreement shall terminate on the last day on which it has effect in accordance with the preceding provisions of this Article.

### Article 30. - Termination (30)

This Agreement shall remain in force until terminated by a Contracting State. Either Contracting State may terminate this Agreement by giving notice of termination through diplomatic channels. In that event, this Agreement shall cease to have effect:

   a) in respect of withholding tax, on amounts paid or credited after the end of the 6-month period ending on the date on which notice of termination was given; and

   b) in respect of other taxes for taxable periods beginning from and including the end of the 6-month period beginning on the date on which notice of termination was given.

In witness whereof the undersigned, being duly authorized thereto by their respective Governments, have signed this Agreement.
Done at Washington, August 19, 1999 in the English language.
For the Government of the Kingdom of Denmark:
L. Møller
For the Government of the United States of America:
Donald C. Lubick

## Protocol

By signing the Convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income concluded today between the Government of the United States of America and the Government of the Kingdom of Denmark (the Convention), the undersigned have agreed upon the following provisions, which shall form an integral part of the Convention.

   1. Scandinavian Airlines System (SAS) is a consortium within the meaning of Article 8 (Shipping and Aviation) in which the participating members are SAS Danmark A/S, SAS Norge ASA and SAS Sve- rige AB. In order to avoid the problems associated with operating in the United States through a consortium, the members of the consortium formed a New York corporation, Scandinavian Airlines System, Inc. (SAS, Inc.), in 1946 to act on their behalf in the United States in accordance with an agency agreement dated

September 18, 1946. A similar agreement was entered into between SAS and SAS, Inc. on March 14, 1951. Under the agency agreement, SAS, Inc. is authorized to perform only such functions as SAS assigns to it, all in connection with international air services. Under this agreement, all revenues collected by SAS, Inc. are automatically credited to SAS. Operating expenses incurred by SAS, Inc. will be charged to SAS in accordance with the provisions of the Agency Agreement. SAS is obligated under the terms of the Agency Agreement to reimburse SAS, Inc. for all of its expenses without regard to the revenues of SAS, Inc. SAS, Inc. will not perform any functions other than those associated with or incidental to that business,

exercised by SAS in the actual operation of aircraft in international traffic.

  Taking into account the special nature of the SAS Consortium and taking into account the agency agreement referred to above, for purposes of Article 8 (Shipping and Aviation) of the Agreement, the United States shall treat all income earned by SAS, Inc. from the operation of aircraft in international traffic as income of the SAS Consortium.

  2. This Agreement may be extended, either in its entirety or with any necessary modifications, to any part of Denmark to which this Agreement does not apply and which imposes taxes substantially similar in character to those to which this Agreement applies. Such extension shall take effect from such time and shall be subject to such modifications and conditions as may be laid down in a supplementary agreement concluded between the Contracting States and shall enter i n t o  f o r c e i n  a c c o r d a n c e  w i t h  their respective constitutional requirements.

  3. Article 7 (Business Profits) and Article 24 (Non-Discrimination) shall not prevent Denmark from continuing to tax permanent establishments of United States insurance companies in accordance with Section 12(3) of the Danish Corporation Tax Act, nor shall they prevent the United States from continuing to tax permanent establishments of Danish insurance companies in accordance with Section 842(b) of the Internal Revenue Code.

  4. (a) A payment shall be deemed to be a pension within the meaning of paragraph 1 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support) in cases where it is paid under a pension plan that is recognized for tax purposes in the Contracting State in which the pension plan is established.

  (b) For this purpose, tax-qualified pension schemes shall include the following schemes and any scheme of the same or substantially the same nature introduced after the date of signature of the Agreement:

   a) Under United States law, plans qualified for tax purposes under Section 401(a) of the Internal Revenue Code, individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that complies with Section 408(k), individual retirement accounts, individual retirement annuities, Section 408(p) accounts, and Roth IRAs under Section 408A), Section 403(a) qualified annuity plans, and Section 403(b) plans.

   b) Under Danish law, pension schemes under Title I of the Pension Taxation Act.

  In witness whereof the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

(*)

**Notes of August 2023 to the double tax treaty with the United States relating to taxes on income**

The double taxation agreement with the USA was signed on August 19, 1999. A protocol is attached, which is also dated August 19, 1999 August 19, 1999.

The agreement was submitted to the Danish Parliament as bill no. 84 of November 3, 1999 (Folketingstidende Supplement A, 2215; Parliamentary year 1999/2000) and has been adopted as Act no. 167 of March 15, 2000. It replaces the previous agreement, the agreement of 6/5 1948, cf. BEK no. 1 of 11/1 1949.

In accordance with Art. 29(1), the two states have n o t i f i e d  each other that the constitutional conditions for the entry into force of the treaty (in Denmark the adoption of the law by the Danish Parliament) have occurred on 31/3 2000, and thus the treaty will, according to Art. 29(2), take effect for the income year 2001, but the treaty already took effect from 1/5 2000 for paid or credited income subject to source state taxation - as examples can be mentioned royalties, dividends and certain qualified interest.

By protocol concluded on June 2, 2006, adopted by the Danish Parliament as Act No. 1574 of December 20, 2006, the United States and Denmark have agreed on amendments to Articles 1, 10, 19 and 22 of the Agreement. The Act entered into force the day after its announcement in the Danish Official Gazette. Pursuant to Article V, the Protocol entered into force on December 28, 2007 with effect from January 1, 2008, however postponed to February 1, 2008 with respect to withholding taxes.

The treaty is drafted in English only. It has been translated into Danish as part of the Danish Parliament's consideration, but it is the English text that shall b e  decisive in case of discrepancy between the two texts, cf. Article 30 of the double taxation agreement.

The treaty is largely based on an older version of the OECD model and the comments thereto, although it also includes some elements from the United States' own "model treaty" called "The U.S. Model Income Tax Convention". The following notes refer to a certain extent to the OECD Model Tax Convention and the comments thereto. The websites mentioned below contain information about the Danish-American double tax treaty. Reference can also be made to the Tax Administration's Legal Guide, Sections C.F.8.2 and C.F.9.2, USA.

The OECD Model Tax Convention, on which the Danish-US double taxation t r e a t y  i s  partly based, was last updated in 2017.

When dealing with international tax matters, you should generally be aware of the avoidance clause in section 3 of the Danish Taxation Act. The provision was introduced in 2015 and the scope of the provision was expanded in 2019. In its current wording, arrangements or series of arrangements that are organized with the main purpose - or that have as one of their main purposes - to obtain a tax advantage that works against the purpose and intent of the tax law and that are not genuine taking into account all relevant f a c t s  and circumstances, must be disregarded when calculating income and tax. The 2019 provision thus has a significantly broader scope of application than the 2015 provision, as it is intended to prevent abuse not only of the directives, but of corporate taxation in general. It was also clarified in 2019 that the new anti-avoidance clause takes precedence over the anti-avoidance clause in LL § 3(5) regarding double taxation l a w s . The 2019 provision is effective as of January 1, 2019. Please note that the 2019 provision may have effect for events that have commenced before January 1, 2019. If a payment is thus legally acquired after January 1, 2019 regarding an event that started before January 1, 2019, then benefits in relation to this payment cannot be claimed if the payment is considered covered by the 2019 provision. Conversely, if the payment is a c q u i r e d  before January 1, 2019, the new circumvention clause should not apply.

In connection with or in addition to the double taxation agreement, a social security agreement was signed between Denmark and the USA on June 13, 2007. The agreement

on social security was promulgated by Executive Order no. 34 of October 30, 2008 and entered into force on October 1, 2008.

In addition, on November 15, 2012, Denmark and the United States entered into an agreement on the exchange of information regarding US citizens' accounts abroad (the so-called FATCA regime), which was announced by Executive Order No. 8 of March 4, 2013 and entered into force on January 1, 2013.

With BKI no. 28 of December 7, 2017, an agreement has been entered into with the USA on the exchange of country-by-country reports (CbC reports), SKL §§ 47-52. The agreement i s  effective as of June 21, 2017. The agreement relates to article 26 of the agreement. It does not change the national requirements in Denmark and the US for the preparation of CbC reports, but establishes the detailed rules for the exchange o f  t h e reports, for confidentiality/data protection and finally it establishes special rules for consultations between the competent a u t h o r i t i e s  if a person/enterprise believes that an adjustment of the taxable income of a group entity based on further inquiries based on information in the CbC report has resulted in a taxation for this person/enterprise that is not in accordance with the p r o v i s i o n s  o f  t h e  agreement. The competent authorities shall then e n d e a v o r  t o  resolve the matter in accordance with Article 25 of the Agreement.

Executive Order of the Agreement of October 21, 2020 between Denmark and the United States of America to update Annex II of the Agreement between Denmark and the United S t a t e s  o f  America to improve the facilitation of international taxation and to implement legislation on facilitation of taxation of accounts held abroad. BKI no. 9 of 16.06.2021 (FATCA).

You can refer to the following internet addresses:

www.skm.dk (Ministry of Taxation)

www.skat.dk (Tax Administration)

www.folketinget.dk (Danish Parliament)

ec.europa.eu/taxation_customs/taxation/company_tax/transfer_pricing/forum/index_en.htm (EU Joint Transfer Pricing Forum)

www.retsinfo.dk (Legal information)

http://www.treasury.gov (U.S. Treasury Department)

The 1948 agreement - American version: http://www.irs.gov/pub/irs-trty/denmark.pdf

Technical Explanation (2001): http://www.irs.gov/pub/irs-trty/dentech.pdf

Agreement from 2001 - US version: http://www.irs.gov/pub/irs-trty/denmark2.pdf

Minutes of May 2, 2006: http://www.irs.gov/pub/irs-trty/denmarkprot06.pdf

Technical Explanations to the minutes of May 2, 2006: http://www.irs.gov/pub/irs-trty/denmarkte07.pdf

Implementation of FATCA - US version: http://www.treasury.gov/resource-center/tax-policy/treaties/Documents/FATCA-Agreement-Denmark-11-19-2012.pdf

www.irs.gov (Internal Revenue Service)

www.oecd.org/(OECD tax pages)

**The Multilateral Convention (MLI)**

It is    is noted    that the Tax Agency has    issued       SKM2020.298.SKTST on Covid-19 regarding clarification of administrative practice regarding the tax residence of natural persons and the seat of management (Article 4 of the OECD Model Tax Convention), permanent establishments (Article 5 of the OECD Model Tax Convention) and taxation of earned income for persons performing work in several states (Article 15 of the OECD Model Tax Convention). The Multilateral Convention (MLI) was developed as part of the OECD and G20 countries' project to prevent tax erosion and profit shifting, the so-called Base Erosion and Profit Shifting (BEPS) project. Part of this project is the development of a multilateral convention under which existing double tax treaties can be easily amended to prevent tax erosion and profit shifting when agreed by the countries concerned. The MLI makes it possible to revise/update existing double tax treaties in specified areas

without the need to negotiate amending protocols. The Convention will provide the necessary legal basis for such amendments. The fact that amendments to already existing double taxation treaties

within the framework of the Convention will in future be possible solely on the basis of the Convention, however, does not prevent countries from continuing to make changes i n t h e form of individual protocols of amendment if they prefer to do so.

The MLI was signed by Denmark and a number of countries and jurisdictions on June 7, 2017. Subsequently, the Convention has been signed by a number of additional countries. The Convention entered into force on July 1, 2018 after the deposit of the fifth instrument of ratification, cf. Article 34(1) of the MLI. Denmark will be covered by the Convention three months after the deposit of the Danish instrument of ratification, cf. Article 34(2) of the MLI.

The majority of the States Parties have now deposited their ratification i n s t r u c t i o n s . See current overview at Signatories and Parties (MLI Positions) (oecd.org).

Ratification of the MLI means that existing double taxation treaties are amended. Double taxation treaties are implemented in Denmark by law, and amendments to double taxation treaties are also implemented by law. Implementation of the multilateral convention in Danish law therefore requires a legal basis. This legal basis is available with the adoption of Act no. 327 of March 30, 2019 on the application of the multilateral convention for the implementation of measures in double taxation agreements to prevent tax erosion and profit shifting. The preparatory work c a n b e found in bill no. L 160 of February 6, 2019.

https://www.oecd.org/tax/treaties/mli-matching-database.htm The ratification process differs from state to state. On its website, the OECD has published an excellent overview showing the status of the MLI process both in the individual states that have acceded to the MLI and in relation to the double taxation treaties at state level. See the link above.

Denmark's election under the provisions of the MLI is set out in Annex 2 of Act no. 327 of March 30, 2019 on the application of the multilateral convention for the implementation of measures in double taxation agreements to prevent tax erosion and profit shifting. The list of covered double taxation t r e a t i e s i s set out in Appendix 3 of Act no. 327 of March 30, 2019 on the application of a multilateral convention for the implementation of measures in double taxation t r e a t i e s to prevent tax erosion and profit shifting. S u b s e q u e n t l y , by Act no. 1224 of December 29, 2020, some changes have been made to the connection to the arbitration clause.

Denmark's election under the provisions of the MLI is set out in Annex 2 of Act no. 327 of March 30, 2019 on the application of the multilateral convention for the implementation of measures in double taxation agreements to prevent tax erosion and profit shifting. The list of covered double taxation t r e a t i e s i s set out in Appendix 3 of Act no. 327 of March 30, 2019 on the application of a multilateral convention for the implementation of measures in double taxation t r e a t i e s to prevent tax erosion and profit shifting. S u b s e q u e n t l y , by Act no. 1224 of December 29, 2020, some changes have been made to the connection to the arbitration clause.

Changes have been agreed individually with the Netherlands. Changes have been agreed individually with Switzerland. Changes have been agreed individually with Germany.

Changes have been agreed individually with the Nordic countries.

See also section 1(1) of the Act regarding the application of the MLI to the double taxation agreement between Denmark and Armenia.

The double tax treaty between Denmark and the US is covered by the Danish implementation of the MLI

**(1)**

### Article 1 Scope of application of the Agreement

Paragraph 1 of the article deviates from Article 1 of the OECD Model Convention.

Paragraph 1 deviates from paragraph 1 of the Model Convention. The treaty applies to natural or legal persons who are resident (i.e. fully taxable) in one or both states, unless otherwise provided in the treaty.

Typically, the situation will be that a person is fully liable to tax in one state (the state of residence) and limitedly liable to tax in the other state on income from it (the source state). It follows from Article 3(1)(a) of the Double Taxation Convention that when the Convention uses the term "person", it includes both natural and legal persons and

Copyright © 2024 Karnov Group Denmark A/S

any other association of persons. The term "resident" is defined in Article 4. A particular question is whether partnerships, limited partnerships and similar associations of persons are covered by the double taxation treaties. These associations of persons are treated by some states as independent tax subjects, while in other states - including Denmark - they are not r e c o g n i z e d  as independent tax subjects. See the rulings via the link below. When a partnership or limited partnership is not itself taxable in the home state, the individual participants will be able to i n v o k e  the treaty individually. However, if a partnership or similar is taxed as an independent legal entity, it is the partnership etc. that can invoke the treaty as such.

The individual members of a limited partnership may thus invoke the provisions of the Convention even if the limited partnership as such is not subject to tax. According to the commentaries, the state of residence, which taxes the participant on his share of the partnership's income, is obliged to g r a n t  credit relief for the tax that the source state has collected from t h e  p a r t n e r s h i p . See also the Tax Administration's Legal Guide, section C.F.8.2.2.2.1.2 Partnerships, limited partnerships and similar p a r t n e r s h i p s .

The comments to the OECD Model Tax Convention contain in sections 6.8-6.39 a description of the application of double taxation treaties to c o l l e c t i v e  investment undertakings/instruments. Danish national law does not use the Model Tax Convention's concept of "collective investment vehicles". In Danish law they are referred to as investment companies and investment funds. Investment funds exist as distributing, accumulating and account-holding investment funds.

In TfS 2000, 394 TSS, the Ministry of Taxation stated that pension funds and accumulating and distributing investment funds can be c o n s i d e r e d  tax resident in Denmark and are therefore covered by the agreements.

The term collective investment vehicle is used in the Model Tax Convention, but not usually in national Danish tax law. A number of other states have legislated on the situation where several investors join together and jointly invest through a so-called collective investment vehicle. In Denmark, for example, investment companies and investment companies will presumably be designated as collective investment vehicles.

It is the opinion of the Tax Administration that in the case of a foreign collective investment instrument, it must be assessed according to Danish rules whether the investment instrument can be considered to be covered by the agreement, see the Tax Administration's Legal Guide, section C.F.8.2.2.2.1.3.

According to the commentary to the OECD Model Tax Convention, if the foreign collective investment vehicle is a separate taxable entity u n d e r  t h e  tax law of the other state (the state where the foreign collective investment vehicle is established) and meets the definition of a "company" in Article 3, it will be a person for the purposes of the Convention. If, on the other hand, the foreign collective investment vehicle is tax transparent under the tax law of the other state, so t h a t  i t  i s  t h e  participants and not the collective investment vehicle that is t a x e d , it may in principle be a person for the purposes of the Convention (if it meets the definition of a "company" in Art. 3), but it will not meet the requirements for being a resident under Art. 4.

The state, its political subdivisions and local authorities are included i n  t h e  definition of resident. Therefore, the collective agreement also applies to them. In Denmark, municipalities and regions are covered by the collective agreement.

In practice, doubts may arise with regard to wholly owned entities, institutions and the like that are owned by the state, etc. but are not part of the state itself. An example of this is Danmarks Nationalbank. If the ownership o f  a foreign entity is sufficiently clear to establish that it is a wholly owned entity, the collective agreement applies to it. This applies even if the entity is exempt from taxation in the state of residence.

In general, it follows from the comments that States are not obliged to grant collective bargaining benefits in cases where there is abuse of

the provisions of the agreement. See also section 3(5) of the Income Tax Act on abuse of double taxation treaties. See also section 3(5) of the Tax Assessment Act on abuse of double taxation treaties.

**Note 2:**

Article 1(2) of the double taxation agreement establishes the view known in Denmark that a double taxation agreement can never increase an already existing taxation.

**Note 3:**

Paragraph 3 deals, among other things, with the question of the interaction between the agreement and other agreements, e.g. the GATT agreement. The principle is that only the provisions of the Agreement shall apply to disagreements between the two states on whether a measure is w i t h i n the scope of the Agreement. Similarly, only the non-discrimination provision of the Agreement shall apply, with an exception for national treatment or obligations under the GATT Agreement.

**Note 4:**

Art. 1(4) is only inserted due to US legislation. The US can tax US citizens and former US citizens regardless of where they are resident at the time of taxation - a global income principle based on national affiliation is applied. Persons who have been US citizens within the last 10 years are also considered citizens. Reference can also be made to the article "Personal taxation in the USA" by Anne-Mette Drucker and Lars Thorvald Kiær (SU 2012, 312). In the protocol to the double taxation treaty concluded on June 2, 2006, paragraph 4 has been amended so that it is no longer a condition for a Danish-resident former US citizen to invoke the double taxation treaty that the US citizenship has been abandoned mainly for tax reasons. See the mitigating consequences of this in article 23(2) of the double taxation treaty on limitation of access to invoking t h e  benefits of the double taxation treaty.

**Note 5:**

However, under subsection 5, the US cedes the right to tax US citizens resident in Denmark for certain specified types of income.

See selected judgments and decisions related to Article 1.

**(2)**

## Article 2 Taxes covered by the Agreement

Article 2(1) corresponds in content to Article 2(3) of the Model Tax Convention and thus contains the description of the types of taxes covered by the double taxation convention. The double taxation treaty between Denmark and the United States does not cover wealth taxes.

**Note 1:**

Article 2(1) lists the taxes to which the Agreement applies. In the case of Denmark, the hydrocarbon tax is expressly listed as "Danish tax", cf. paragraph 1(b)(iv).

For the United States, the agreement covers federal income taxes imposed under the Internal Revenue Code, whereas Social Security Taxes are not covered, while federal taxes imposed on private foundations are covered. Taxes levied by individual states and municipalities are not included. However, some states and municipalities in the US have chosen to fully or partially recognize the treaty.

**Note 2:**

Paragraph 2, which corresponds to paragraph 4 of the OECD Model, states that the agreement shall also apply to taxes of the same or substantially the same kind imposed after the signature of the agreement. The double taxation agreement states that the competent authorities shall notify e a c h other of any significant changes that have been made in their respective tax laws since the entry into force of the agreement. This obligation to notify is hardly always observed in practice, but the notification is not a validity condition for a given tax to be covered by the double taxation agreement and the notification is therefore mostly of a ceremonial nature.

Penalties or interest imposed under the domestic laws of the two States relating to taxes are usually not included in the term taxes. The

means that the state in question, when relieving double taxation under the agreement, is not obliged to grant relief for percentage surcharges under KSL § 61(2) and control law surcharges and default interest.

When granting relief under the agreement, Denmark is not obliged to set off the above-mentioned surcharges and default interest and is not obliged to grant relief for similar surcharges and default interest in the other state. If it is not a question of taxes covered by a treaty, but rather duties and s i m i l a r ,  commercial persons and enterprises resident in Denmark will be able to deduct such foreign taxes from an operating cost point of view.

For Denmark, the agreement covers both state and municipal income taxes. Previously, the labor market contribution was considered a tax in line with income tax, without being an income tax, cf. TfS 2007, 1116. As of 1/1 2011, the labor market contribution is considered an income tax in every respect.

The double taxation agreement does not cover wealth taxes - and thus the property value tax, which is not an income tax, but rather a property tax on the residential value of an owner-occupied dwelling, and t h e  pension yield tax, cf. TfS 1999, 799, are not covered by the double taxation agreement. Pension yield taxes are covered by the agreement, cf. TfS 1999, 799, while taxes under the Pension Taxation Act are not covered by the agreement, cf. SKDM 1977.41.45.

-TfS 1993, 594

SU 1994, 5

-TfS 1999, 799

-TfS 2000, 546

SU 2007, 5

See selected judgments and decisions related to Article 2 of the OECD Model Law.

**(3)**

## Article 3 General definitions

Art. 3(1) contains the definitions of the commonly used terms in the agreement. However, certain terms are defined in other articles.

**Note 1:**

For the purposes of this Agreement, the term "person" includes a natural person, a company and any other association of persons. The term "company" includes any association of persons treated as a legal person for tax purposes.

An "association of persons" must be a separate taxable entity to be a "company" within the meaning of the treaty, but not to be c o v e r e d b y  t h e  concept of "a person" within the meaning of the treaty.

A Danish partnership or limited partnership is thus an "a s s o c i a t i o n  o f persons", but not an independent tax entity. This means that Danish partnerships and limited partnerships are covered by the treaty concept of "person", but not by the treaty concept of "company". See also the notes to article 1 in relation to the a p p l i c a t i o n  o f  the  treaty to limited partnerships and investment associations etc.

When applying the agreement in Denmark, it is always an interpretation according to Danish rules that determines whether a foreign "association of persons" should be regarded as an independent legal entity and thus as a company. This affects whether it is the association as such (a legal entity) or the individual participants (the natural persons) who can invoke the agreement.

**Note 2:**

The definition of an "enterprise" means the carrying on of any business activity, and an "enterprise of a Contracting State" means that the activity is carried on by a person (natural or legal) who is a r e s i d e n t  o f  o n e of the Contracting States. Since the term "b u s i n e s s "  is expressly defined to include the exercise of a liberal profession and other activities of an independent character, it is made clear that the exercise of a liberal profession and other activities of an independent character shall be deemed to constitute an enterprise without regard to the meaning which may be given to the term by national law. In Denmark, one will most often refer to

Copyright © 2024 Karnov Group Denmark A/S

it as the pursuit of a "professional activity". This corresponds to Article 3(1)(c) and (d) of the Model Law.

**Note 3:**

The purpose of Art. 8(1), which deals with profits from shipping or aviation activities in international traffic, is to ensure that such profits are taxed in only one State regardless of the fact that the profits are actually earned from activities in several States. The provision in Art. 8 is based on the principle that the right of taxation shall be left to the Contracting State in which the enterprise is resident. Art. 3(1)(d) defines the term "international traffic". The definition differs from the Model Agreement. In this Convention, international traffic means any carriage by ship or aircraft, except where such carriage is performed solely between places in a Contracting State.

The definition of "international traffic" here does not apply if a ship or aircraft is used between two places in one of the Contracting States. The OECD Model provision that the enterprise using the ship or aircraft must not be a resident of that State, even if part of the transportation takes place outside that State, is not included in this A g r e e m e n t .

**Note 4:**

The definition of the term "competent authority" takes into account the fact t h a t  in some OECD member states the administration of double tax treaties is not the exclusive competence of the highest tax authorities, but that certain matters are reserved or delegated to other authorities. The definition now allows each Contracting State t o  designate one or more authorities as competent.

The tasks assigned to the Customs and Tax Administration by section 1 of the SFL are handled by the Tax Administration, cf. Executive Order no. 804 of June 20, 2018 The Tax Administration is a single authority consisting of the Administration and Service Agency, the Debt Agency, the Danish Motor Vehicle Agency, the Tax Agency, the Customs Agency, the Development and Simplification Agency and the Assessment Agency. According to Executive Order no. 1029 of 24 October 2005, the Customs and Tax Administration is authorized to make d e c i s i o n s  under double taxation agreements as "the competent authority", and the same order states that such decisions made by the Customs and Tax Administration cannot be appealed to another administrative authority. See also Article 25.

According to Article 3(1)(ef), "the competent authority" in Denmark means the Minister of Taxation or his authorized deputy. According to section 1 of the SFL, the Customs and Tax Administration administers the legislation on taxes and the Act on Assessment of Real Estate. It follows from section 64 of the SFL that the Minister of Taxation may lay down detailed rules for the implementation of the Act. The tasks assigned to the Customs and Tax Administration by section 1 of the SFL are handled by the Tax Administration, cf. BEK no. 804 from June 20, 2018. The Tax Administration is a single authority consisting of the Administration and Service Agency, the Debt Agency, the Danish Motor Vehicle Agency, the Tax Agency, the Danish Customs Agency, the Development and Simplification Agency and the Assessment Agency. According to BEK no. 1029 of 24/10 2005, the Customs and Tax Administration is authorized to make d e c i s i o n s  under double taxation agreements as "the competent authority", and it appears from the same order that such decisions made by the Customs and Tax Administration cannot be appealed to another administrative authority. See also art. 25

The competent authority under Article 25 (MAP) is for both natural and legal persons:

- For cases concerning article 7 and article 9 of the Model Agreement: Skattestyrel- sen Store Selskaber - Competent Authority, Copenhagen Towers 1, Hanne- manns Allé 25, 2300 Copenhagen S.

- **Other cases:** SkattestyrelsenJura - Competent Authority, Copenhagen Towers 1, Hannemanns Allé 25, 2300 Copenhagen S.

When it comes to cross-border exchanges of information under Article 26, the competent authority is Skattestyrelsen, Special Control, CEBIS 2

- Competent authority, Lyseng Allé 1, 8270 Højbjerg.

When it comes to assistance in the recovery of tax claims under Article 27, the competent authority is Gældsstyrelsen, International Inddrivelse, Pionér Allé 1, 6270 Tønder

The decisions of the Danish Tax Agency cannot be appealed to a higher administrative a u t h o r i t y , cf. BEK no. 1029 of 24/10 2005 § 2 BEK no. , but can be brought before the ordinary courts within 3 months, cf. SFL § 48(3). The competent US tax authority is the Minister of Finance or his/her authorized deputy.

**Note 5:**

The definition of the term 'national' merely states that, with respect t o  a Contracting State, the term includes all natural persons having the nationality or citizenship of that Contracting State. Although the term nationality also includes citizenship, the latter t e r m  was included in 2002 as it is the most frequently used term in some States. It is obvious that, in determining what is meant by 'nationals' in relation to natural persons, reference must be made to the sense in which the term is commonly used and to the specific rules of each State governing the acquisition or loss of nationality or citizenship.

**Note 6:**

The meaning of the term "national" is expanded in paragraph 1(g). All legal persons, partnerships and associations existing under the laws in force in a Contracting State shall be deemed to be "nationals" within the meaning of the Convention. By applying this definition, the determination of the nationality of companies becomes straightforward. The fact that p a r t n e r s h i p s  a r e  separately mentioned in paragraph 1(g) is not inconsistent with t h e  partnership having the status of a person under paragraph 1(a). Under the national legislation of some Member States, it is possible for an entity to be a 'person' without being a 'legal person' for tax p u r p o s e s . It is necessary to state this explicitly in order to avoid c o n f u s i o n  b e t w e e n  t h e  concepts.

See selected judgments and decisions related to Article 3 of the OECD Model Law.

See the guidance SKM2020.298.SKTST on Covid-19 regarding clarification o f  administrative practice regarding the tax residence of natural persons and the seat of management (Article 4 of the OECD Model Tax Convention), permanent establishments (Article 5 of the OECD Model Tax Convention) and taxation of earned i n c o m e  for persons performing work in several states (Article 15 of the OECD Model Tax Convention).

**(4)**

**Article 4 Tax residence**

Article 4 corresponds to Article 4 of the OECD Model Convention and determines when a person is deemed to be resident in one of the two states for tax purposes.

**Note 1:**

The term "resident" means a person (natural or legal person) who is fully taxable to one state by reason of residence, domicile, seat of management or the like. A person may well be fully taxable to both States under their respective domestic laws (for example, in one because of residence and in the other because of the duration of a temporary physical p r e s e n c e ), in which case it will be necessary to determine in which of the States he or she will then be considered a "resident" for the purposes of the Convention. Only when it is established where the person is resident for the purposes of the Convention do the concepts of State of residence/domicile and source State become meaningful. For the purposes of the Convention, a person can only b e  resident in one of the States at any one time.

**Note 2:**

Art. 4(1)(d) concerns fiscally transparent entities. Under this provision, income, profits or gains derived through an entity that is fiscally transparent under the laws of one of the Contracting States shall be deemed to be derived by a resident of a State to the extent that such income, profits or gains are treated as income, profits or gains of a

resident under the tax laws of such Contracting State. An interes-

Copyright © 2024 Karnov Group Denmark A/S

Thus, a partner in a Danish partnership resident in Denmark will be entitled to apply the provisions of the treaty if he is deemed to have received such income, profits or gains under Danish tax law.

**Note 3:**

For natural persons, the question shall be determined in accordance with the criteria set out in paragraph 2(a)

a) - d). The criteria are applied in the order in which they are listed in the agreement and they correspond to the OECD model agreement.

**Note 4:**

The Article gives priority to the Contracting State in which the natural person has a fixed abode at his disposal. This criterion will frequently be s u f f i c i e n t to resolve the conflict, e.g. when a natural person has a habitual residence in one Contracting State and has only resided for a certain length of time in the other Contracting State. This therefore means that for the purposes of the Agreement (i.e. where there is a conflict between the laws of the two states), the residence is deemed to be the place where the individual owns or controls a dwelling. This residence must be of a permanent character, i.e. the individual must have established and maintained it for continuous use, as opposed to residing in a particular place under such conditions that it is apparent that the stay is intended to b e o f short duration.

**Note 5:**

Regarding the concept of "dwelling", it should be noted that any type of dwelling can be considered (house or flat belonging to or rented by the natural person, rented furnished room). However, the permanent nature of the accommodation is essential: this means that the person must have arranged it so that the accommodation is at his/her disposal continuously at all times, and not o c c a s i o n a l l y for a stay which, by its very nature, is short-term (holiday, business trip, educational trip, participation in a school course, etc.). For example, a house owned by an individual cannot be considered to be at the disposal of the individual when the house is rented out and effectively transferred to a third party so that the individual is no longer in possession of or able to occupy the house.

**Note 6:**

If the individual has a habitual residence in both Contracting States, paragraph 2 gives preference to the State with which the individual has the strongest personal and economic ties, understood as the center of his vital interests. Where domicile cannot be determined by reference to this rule, paragraph 2 provides a subsidiary criterion which is first habitual residence and then nationality.

**Note 7:**

If the person concerned is a national of both States - or neither of them - agreement must be sought by negotiation with the competent tax a u t h o r i t i e s of the States pursuant to the mutual agreement provision in Article 25.

**Note 8:**

A legal entity's full tax liability to Denmark will be based on its official registration. However, the legal entity may alternatively be fully taxable here due to the seat of management. A non-physical person who is fully taxable to both states will then be considered to be resident in the state where the real management of the company etc. has its registered office. Whether a company can be said to have its seat of management in this country depends on a specific assessment of the facts in connection with the decision-making in the company. In this regard, emphasis is primarily placed on d e c i s i o n s related to the day-to-day management of the company. The company will therefore often be considered resident in Denmark when the executive board has its seat or when the company's head office is located here. To the extent that the board of directors is responsible for the actual day-to-day management of the company, the location of the board of directors' registered office will be of significant importance in determining whether the company is resident here. In that case, it is the place where the board's decisions are actually made that determines the location of the seat of management. This may be relevant in cases where, for example, the chairman of the board is actually

responsible for the day-to-day management of the company, or in cases where decisions are made prior to the formal holding of a   board meeting. If a company has a supervisory board, the location of the supervisory board's decisions etc. will, as a clear starting point, not be of significance, as a supervisory board meeting is

supervisory councils have very limited management skills. See Poul Erik Lytken and Louise Dyrup Jensen: "Hvorfor Tilsynsråd?" in Signatur no. 3, September 2013, p. 30ff. Decisions that are generally made at general meeting level are generally not decisive for whether the company can be considered resident in Denmark. Shareholding will therefore generally not be decisive for the assessment. It may be given weight where decisions are made on how rights based on shareholding should be exercised. Similarly, weight may be given to where the financing of the company's activities is negotiated. This means that if the decisions in a holding company or an investment company incorporated abroad are actually made in Denmark, the company will be domiciled in Denmark. If all meetings and decisions regarding the company's affairs take place abroad, the starting point will be that the company does not have a seat of management in Denmark. However, it is a prerequisite that these decisions are actually made abroad and not in this country. If the nature of the company's business is such that there is no actual daily management, e.g. because the company's only activity is to hold shares in other companies, then the place where the other decisions regarding the company's management are made must be considered. This means that if the majority of the management activity takes place in Denmark, the management will be considered to be based in Denmark. In this context, emphasis is also placed on an assessment of where decisions are actually made.

**Note 9:**

Also regarding paragraph 3, if the tax authorities of the two states cannot agree on an interpretation of the resident concept of the treaty according to these criteria, agreement must be sought by negotiation with the competent tax authorities of the states in accordance with the mutual agreement provision in Article 25

**Note 10:**

Paragraph 4 includes a provision that a US citizen or a foreign national who has been granted a residence work permit in the US (e.g. a so-called green card holder) is considered a resident of the US and thus covered by the agreement, but only if the person concerned has a special qualified connection to the US.

See selected judgments and decisions related to Article 4 of the OECD Model Law.

See the guidance SKM2020.298.SKTST on Covid-19 regarding clarification of administrative practice regarding the tax residence of natural persons and the seat of management (Article 4 of the OECD Model Tax Convention), permanent establishments (Article 5 of the OECD Model Tax Convention) and taxation of earned i n c o m e  for persons performing work in several states (Article 15 of the OECD Model Tax Convention).

**(5)**

**Article 5 Permanent establishment**

The methodology of the double tax treaties is that in one state, the resident state, there is presumably a b u s i n e s s  (the "head office") and that this business can then carry out activities in the other state, which thus becomes the source state. At some point, these activities will become so sophisticated that they will constitute a so-called permanent establishment, which means that the source state will have a right to tax the part o f  t h e  business profits attributable to the source state. The allocation of profits between the principal place of business and the permanent establishment is mentioned in Article 7, while a permanent establishment is defined in Article 5.

Art. 5 has from the 2017 model changed quite significantly and the changes do not have retroactive effect. This collective agreement is based on the 2014 model.

Art. 5(1) and (2) correspond to Art. 5(1) and (2) of the OECD Model Convention (2014 Model).

**Note 1:**

Art. 5(1) corresponds to Art. 5(1) of the OECD Model Tax Convention

and contains a general definition of the term "permanent establishment". The definition contains the following conditions: (1) there must exist a "place of business", i.e .  facilities such as premises or in some cases machinery or equipment; (2) this place of business must be "fixed", i.e. it must be established

at a given place with a certain degree of permanence and (3) the activities of the enterprise must be carried out through that permanent establishment. This usually means that persons dependent in one way or another on the enterprise (personnel) carry out the activities of the enterprise in the State where the fixed place of business is situated. The term "place of business" covers any premises, fixtures or fittings used for the conduct of the enterprise's business, whether or not they are used exclusively for that purpose. An establishment may also exist where no premises exist or are necessary for the conduct of the enterprise's business and it simply has a certain area at its d i s p o s a l . It is irrelevant whether the premises, fixtures or fittings are owned or leased by or otherwise made available to the enterprise. A place of business may thus consist of a stall at a market or certain permanently used areas in an open-air warehouse (e.g. for the storage of dutiable goods). Furthermore, the place of business can be located within the territory of another company. This may be the case, for example, when the foreign establishment has for permanent use certain premises or parts thereof that are owned by the other establishment. As stated above, it is sufficient to constitute a permanent establishment that an enterprise has a certain area at its disposal when the area is u s e d  for business activities. No formal legal right to use the space is required. Thus, for example, a permanent e s t a b l i s h m e n t  may exist in cases where an organization illegally disposes of a certain area of land from which the business is carried on. The words "through which" are to be understood broadly and apply in any situation where a business activity is carried out in a specific location that is at the disposal of the enterprise for the purpose of carrying out the activity. For example, if an enterprise is paving a street, the enterprise would be considered to be carrying on its business "through" the location where the work is performed. According to the definition, the place of business must be "fixed". Thus, there must usually be a link between the place of business and a particular geographical location. It is immaterial how long an enterprise resident in one Contracting State carries on business in the other Contracting State if it does not do so at a fixed place, but this does not mean that the equipment constituting the place of business must actually be fixed to the land on which it stands. It is enough that t h e  equipment remains in a given location. Since the place of business must be fixed, it follows that a fixed establishment can only be presumed to exist if the place of business has a certain degree of permanence, that is, it is not merely temporary in nature. However, a place of business may constitute a permanent establishment even if it actually only exists for a very short time due to the nature of the activity being such that it only lasts a short time. It is sometimes difficult to determine whether this is the case. According to the OECD, the practice of member states with regard to the time period has not been uniform, but experience has shown that a permanent establishment is normally not considered to exist if an activity in a state is carried on through a permanent establishment maintained for less than six months. An exception has been where the business has been of a continuous nature; in these cases, each period of time during which the place of business is used must be considered in the context of the number of times the place of business is used (which may extend over a number of years). Another exception is made in c a s e s  w h e r e  the business was carried on exclusively in that State; in this situation, the business may by its nature be of short d u r a t i o n , but since it is carried on exclusively in that State, the connection with that S t a t e  is strongest. Conversely, practice shows that there have been many cases where a permanent establishment has been deemed to exist if the place of business has been maintained for a period exceeding six months. For ease of a d m i n i s t r a t i o n , States may be encouraged to refer to the above when d e t e r m i n i n g  whether a place of business that exists for only a short period of time constitutes a  permanent establishment. A permanent establishment arises as soon as the enterprise begins to carry on business through a fixed place of business. This is the case as soon as the enterprise prepares at the place of business the activities that the place of business will serve on a permanent basis. The period during which the permanent establishment itself is set up by the enterprise shall not be counted,

p r o v i d e d  t h a t  this activity is substantially different from the activity which the establishment is to serve on a permanent basis. The permanent establishment is set up

ceases to exist with the winding up of the permanent establishment or the cessation of all activities through it, that is, when all acts and measures relating to the previous activities of the permanent establishment have ceased (winding up of ongoing business and cessation of maintenance and repair of the facilities). However, a temporary interruption of activities cannot be considered a closure. If the fixed place of business is leased to another b u s i n e s s , it will normally only serve the business of that business instead of the lessor. In general, the lessor's permanent establishment will cease to exist, except in cases where he continues to carry on his own business activities through the permanent establishment.

In the comments to Article 5 regarding e-commerce etc. it appears, among other things, that websites cannot in themselves give rise to a permanent establishment because there i s no place of business in the form of facilities, such as premises or in some cases machinery or equipment. The website is a medium that can best be compared to an advertisement in a newspaper. The website is located on a server. A server can be a permanent place of business. Through the physical presence of the server, it is assumed that the server can constitute a place of business for the business conducted through the server.

An organization can operate in several ways. In most cases, the a c t i v i t i e s o f an organization are carried out by the operator or by persons in an employment relationship with the organization (staff). These personnel include employees and other persons who receive instructions from the organization (e.g. a dependent representative). The authority of such personnel in their relationship with third parties is irrelevant. It makes no difference whether the representative is authorized to conclude contracts or not if he works at the permanent establishment of the enterprise. However, there may be cases where natural persons formally employed by one undertaking will actually carry out t h e activities of another undertaking and therefore the first undertaking should not be considered to be carrying out its own activities at the place where those natural persons c a r r y out the work. In a multinational group, it is relatively common for employees of one company to be temporarily seconded to another company in the group t o carry out business activities that are clearly part of the other company's business. In such cases, a change of employment c o n t r a c t will often be avoided for administrative reasons (e.g. the desire to preserve seniority or pension rights).

An enterprise may also carry out its activities through subcontractors acting on their own or together with its employees. In that case, there will only be a permanent establishment of the enterprise if the other conditions of Article 5 are met. For the purposes of paragraph 1, the existence of a permanent establishment in these circumstances requires that these subcontractors perform work for the enterprise at a fixed place of business at the disposal of the enterprise. However, if the organization has no employees, it will be necessary t o show that the location is at the organization's disposal because of other factors that demonstrate that the organization clearly has effective authority to use the location, for example, because the organization owns or has legal possession of the location and controls access to and use of the location. For example, an organization that owns a small hotel and rents out the hotel rooms on the Internet may have subcontracted the practical operation of the hotel to a fee-for-service company.

A permanent establishment may also exist if the business of the enterprise is carried on principally with automatic equipment and the activities of the personnel are limited to the installation, operation, control and maintenance of such equipment. Thus, whether gaming machines, vending machines and the like installed by an enterprise of one State in the other State constitute a permanent establishment depends on whether the enterprise carries on business activities in addition to the original installation of the machines. There is no permanent establishment if the enterprise merely sets up t h e machines and then rents them out to other enterprises. However, a permanent establishment may exist if the business that installs the vending machines also operates and maintains them at its own expense.

This also applies if the vending machines are operated and maintained by a dependent representative.

It follows from the definition of "enterprise of a Contracting State" in Art. 3 that this term, as used in Art. 7, and the term "enterprise" as used in Art.

5 refers to any form of enterprise carried on by a resident of a Contracting State, whether legally constituted a s a company, partnership, sole proprietorship or other legal form of enterprise. Different entities may cooperate on the same project. Whether their collaboration constitutes an independent enterprise (e.g. a partnership) depends on the facts and the national law of each state. If two persons, each running their own independent enterprise, decide to form a company with these two persons as shareholders, the company constitutes a legal entity that runs what becomes another independent enterprise. However, it will often be the case that different undertakings simply agree each to carry out a separate part of the same project and that these undertakings will not carry out commercial activities j o i n t l y, will not share the profits thereof and will not be liable for each other's activities in connection with the project, even if they share the total profits of the project or the remuneration for the activities carried out in connection with the project. In this case, it may be difficult to conclude that an independent undertaking has been established. Although such an arrangement will be referred to as a "joint venture" in many states, the meaning of "joint venture" depends on national law and in many states the term "joint venture" may therefore refer to a particular type of enterprise.

Where an enterprise is a fiscally transparent partnership, the enterprise is carried on by each partner and is therefore, for the purposes of the partners' respective shares of the profits, an enterprise of each Contracting State in which a partner is resident. Therefore, if such a partnership has a permanent establishment in a Contracting State, the share of each partner in the profits attributable to the permanent establishment will, under Article 7, be regarded as profits of an enterprise of the C o n t r a c t i n g S t a t e o f w h i c h that partner is a resident.

**Note 2:**

Paragraph 2, which corresponds in content to Article 5(2) of the Model Agreement, contains a non-exhaustive list of examples which, in particular, may be considered to constitute a permanent establishment. It should be noted that the examples listed in paragraph 2 can only be considered to constitute a permanent establishment if they meet the requirements of paragraph 1, i.e. that an enterprise's business must be wholly or partly carried on from that permanent establishment.

**Note 3:**

Building, construction, assembly or installation work constitutes a permanent establishment under subsection 3 if it extends over a period of more than 12 months. It should be noted that under national Danish legislation, building, construction and assembly work is considered to constitute a permanent establishment from day one, SEL § 2(2) and KSL § 2(3)

**Note 4:**

Drilling rigs and vessels used in the exploration of natural resources - but not in the subsequent extraction - only a permanent establishment if t h e w o r k  e x t e n d s  o v e r  more than 12 months. If the work is carried out by associated enterprises, the periods are added together. The provision is not found in the OECD Model Tax Convention.

**Note 5:**

This paragraph lists a number of business activities which are treated as exceptions to the general definition contained in paragraph 1 and which are not permanent establishments, even though the business is carried on from a fixed establishment. The common feature of these types of activities is that they are generally of a preparatory or auxiliary nature. This is explicitly stated in the exception under point (e), which in fact constitutes a general limitation of the scope of the definition in paragraph 1. In addition, point (f) provides that combinations of activities referred to in points (a) to (e) in the same permanent establishment shall not be regarded as a permanent establishment, provided that the general activities of the permanent establishment resulting from such c o m b i n a t i o n  a r e  o f  a preparatory or auxiliary character.

The provisions of paragraph 4 are thus designed to prevent an enterprise of one State from being taxed in the other State if it carries on in that other State activities which are merely preparatory or auxiliary.

Subparagraph (a) refers only to the case where an enterprise acquires the right t o use facilities for the storage, display or distribution of its own goods. Subparagraph (b) refers to the warehouse itself and provides that the warehouse as such shall not be treated as a permanent establishment if it is maintained e x c l u s i v e l y for storage, display or distribution. Subparagraph (c) covers the case w h e r e a stock of goods belonging to one undertaking is processed by another undertaking on behalf of or for the account of the first undertaking. T h e reference to the collection of information in point (d) is intended to cover a news agency whose sole purpose is to act as one of several "antennae" of the main establishment. To exclude such an agency is merely to broaden the concept of 'procurement only'.

Point (e) provides that a fixed establishment through which the undertaking carries on only activities which are preparatory or auxiliary in character for the undertaking shall not be regarded as a permanent establishment. The wording of this point makes it unnecessary to provide an exhaustive list of exceptions.

It is often difficult to distinguish between activities that are preparatory or auxiliary in nature and those that are not. The decisive criterion is whether the permanent establishment in itself constitutes a substantial and significant part of the undertaking's activities as a whole. Each case must be examined on its own merits. In all cases, a fixed establishment is not engaged in a preparatory or auxiliary activity if its general purpose is identical to the general purpose of the whole enterprise. For example, where the servicing of patents and know-how is the purpose of an enterprise, a permanent establishment of such an enterprise carrying on such activities cannot obtain the benefits of subparagraph (e). A permanent establishment whose function is to manage an enterprise or a mere part of an enterprise or group within the group cannot be considered as carrying out a preparatory or auxiliary activity, because such a managing activity exceeds that level.

Where enterprises with international ramifications establish a so-called "management office" in States where they have subsidiaries, permanent establishments, agents or licensees, such office has controlling and coordinating functions for all the branches of the enterprise located in that region, and a permanent establishment will normally be presumed to exist because the management office is considered an office within the meaning of paragraph 2.

Subparagraph (f) shall not apply where an enterprise maintains several fixed places of business within the meaning of subparagraphs (a) to (e), provided that they are physically and organizationally separate from each other, in which case each place of business shall be considered separately and in isolation in determining whether there i s a permanent establishment. Establishments are not "organizationally separate" when each of them in a state has complementary functions such as receiving and storing goods at one location, distributing those goods from another location, etc. An organization cannot divide a continuous business into several smaller units and claim that each unit performs only i n t e r m e d i a r y or auxiliary activities

The fixed establishments referred to in paragraph 4 cannot be regarded as constituting permanent establishments as long as their activities are limited to those functions which are the necessary preconditions for assuming that the fixed establishment is not a permanent establishment. This would be the case even if the contracts concluded for the establishment and operation of the establishment were concluded by the managers of the permanent establishments themselves. The employees of establishments within the meaning of paragraph 4 who are authorized to conclude such contracts shall not be regarded as agents within the meaning of paragraph 5.

If a permanent establishment referred to in paragraph 4 is not considered to be a permanent establishment, this exception shall also apply to the disposal of movable property forming part of the business assets of the establishment on the cessation of the enterprise's activities there.

Note 6:

Paragraphs 5 and 6 deal with activities carried on through an agent in the source State. It is a generally accepted principle that an enterprise should be regarded as having a permanent establishment in a State if there is a person acting on its behalf under certain conditions, even if the enterprise does not have a permanent establishment in that State within the meaning of paragraphs 1 and 2. This provision is intended to

intention to confer the right of taxation on that State in such cases. Paragraph 5 thus sets out the conditions under which an enterprise shall be deemed to have a permanent establishment in respect of any act performed by a person a c t i n g  on behalf of the enterprise.

However, this does not apply in cases where the activities are carried out through a permanent establishment, which according to paragraph 4 is not qualified as a permanent establishment. Paragraph 5 corresponds to paragraph 5 of the OECD Model Tax Convention on D e p e n d e n t Agents (2014 version).

Persons whose activities may result in a permanent establishment of the enterprise are so-called dependent representatives, that is, persons who, whether or not they are employees, are not independent representatives covered by paragraph 6. S u c h  persons may be either natural persons or companies and need not be resident or have a place of business in the State in which they perform work for the enterprise

Paragraph 5 therefore assumes that only persons authorized to enter into contracts can lead to a permanent establishment of the enterprise using them. In that case, the person has sufficient authority to bind the enterprise to engage in business activities in that State. The use of the term "permanent establishment" in this context presupposes that this person uses this authorization repeatedly and not only in isolated cases. Furthermore, the phrase "authority to contract in the name of the enterprise" does not limit the application of the paragraph to cases where a representative literally contracts in the name of the enterprise; the paragraph applies equally to a representative who enters into contracts that are binding on the enterprise, even if those contracts are not actually entered into in the name of the enterprise. An organization's failure to engage in transactions may be an indication that an agent has been authorized. For example, an agent may be considered to have actual authority to enter into contracts when, without formally entering into a binding agreement, it takes orders that are sent directly to a warehouse from which the goods are delivered and where the foreign organization routinely approves the transaction. The authorization to conclude contracts must cover contracts relating to acts that constitute the enterprise's actual business activity. For example, it would be irrelevant if the individual had the authority to hire personnel for the organization to assist that person's business for the organization, or if the individual had the authority to enter into similar contracts in the name of the organization for internal matters only. In addition, the authority must ordinarily be exercised in the other state.

The requirement that an agent must "habitually" enter into contracts reflects the underlying principle in Art. 5 that an enterprise's presence in a State must be more than merely transient for the enterprise to be considered to have a permanent establishment and thus be subject to tax in that State. The extent and frequency of the activity necessary to establish that the agent "habitually exercises" an authority to contract in the name of the enterprise depends on the nature of the contracts and the nature of the enterprise being worked for. It is not possible to specify exactly how frequently the power of attorney should be u s e d .

Where the conditions set out in paragraph 5 are met, a permanent establishment of the undertaking exists to the extent that the person acts for the latter, that is to say, not merely to the extent that such a person exercises an authority to conclude contracts in the name of the undertaking.

**Note 7:**

Paragraph 7 of the agreement corresponds to paragraph 6 of the model agreement on i n d e p e n d e n t  representatives. If the business in the source state is not carried on through a tied agent but through an independent representative, it will b e  a n  additional condition for a permanent establishment that the independent representative's transactions are outside the scope of his own normal business activities.

**Note 8:**

It is generally accepted that the existence of a subsidiary does not in itself c r e a t e  a  permanent establishment for the parent company. It follows from the principle that such a subsidiary is an independent legal person for

tax purposes. Even the fact that the trade or business activity,

Copyright © 2024 Karnov Group Denmark A/S

carried on by the subsidiary is managed by the parent company does not make t h e subsidiary a permanent establishment of the parent company.

However, a parent company may, subject to the provisions of paragraphs 1 and 5 of the Article, be deemed to have a permanent establishment in a State in which a subsidiary has a place of business. Thus, any land or premises belonging to the subsidiary and available to, and constituting a fixed place of business from which the parent company carries on its own activities will constitute a permanent establishment of the parent company within the meaning of paragraph 1 of the Article, subject to the proviso that paragraphs 3 and 4 of the Article shall not apply. Under paragraph 5, a parent company will also be deemed to have a permanent establishment in a State in respect of any business carried on for it by its subsidiary if the conditions of that paragraph are satisfied, unless paragraph 6 of the Article applies.

The same principles shall apply to any company forming part of a multinational group so that such a company may be deemed t o  have a permanent establishment in a State in which it has the use and enjoyment of premises belonging to another company of the group or if the first-mentioned company is deemed to have a permanent establishment under paragraph 5 of this Article. However, the determination of the existence of a permanent establishment within the meaning of paragraph 1 or 5 of this Article shall be made separately for each company in the group. The existence in a State of a permanent establishment of a company in the group will have no bearing on the question whether another company in the group itself has a permanent establishment in that State.

Although premises belonging to a company forming part of a multinational group may be made available to another company in the group and, subject to the other conditions of Art. 5 may constitute a permanent establishment of that other company if the activities of that other company are carried out from that location, it is important to distinguish this case from the frequently occurring situation where a company forming part of a multinational group provides services (e.g. consultancy) to another company in the group as part of its own activities carried out at locations not belonging to the other company and using its own employees. In this case, the place where the services are provided is not at the disposal of the latter company and it is not the activity of that company that is carried out from that place. That place cannot therefore be considered to be a permanent establishment of the company for which the services are provided. The fact that a company's own activities at a given location may bring an economic advantage to another company does not mean that the latter company carries out its activities through that location. A company that merely purchases parts produced by, or services provided by, another company in another State will clearly not have a permanent establishment as a result, even if it derives an advantage from the production of those parts or the provision of those services.

See selected judgments and decisions related to Article 5 of the OECD Model Law

(6)

### Article 6 Income from real estate

Article 6 corresponds, with the exception of paragraph 5, to Article 6 of the OECD Model Convention.

6. According to the article, income from immovable property (including income from agriculture and forestry) may always be taxed in the state where the property is situated (the source state). This applies even if there is no permanent establishment in the source state. According to the wording of the OECD model, the article, as c a n  b e  s e e n , also includes income from agriculture and forestry, which can be considered a slightly broader definition of income from immovable property, but it appears from the comments to the model that individual states are free to agree that profits from agriculture and forestry should instead be attributed to Article 7.

**Note 1:**

The Article covers only the situation where a resident of one State derives income from immovable property situated in the other Contracting State. Thus it does not cover the situation where the property is situated in the same State of which the owner is a resident, n o r  d o e s  it cover the situation where the property is situated in a third State. In the latter case, Art. 21 applies.

**Note 2:**

Paragraph 2 defines what the term "immovable property" shall in all cases include. The term shall have the meaning which it has under the law of the State in which the property is situated. In Danish law, the concept of immovable property is not unambiguously defined. Normally, one would say that the core understanding of the term includes a delimited piece of land, a parcel, with the erected buildings, permanent trees and shrubs as well as underground utility lines.

**Note 3:**

In all cases, the term also includes appurtenances to real estate, livestock and equipment used in agriculture and forestry, rights governed b y  t h e general law of real estate, rights to use real e s t a t e , as well as rights to variable or fixed payments for the use of, or the right to use, mineral deposits, springs (Note 6) and other natural resources.

**Note 4:**

If a tenant sublets the property or parts of it or a person with hunting rights makes these hunting rights available to others, the consideration for this will be covered by Article 6. This means that also persons who have a (partial) right to use a property will be covered by Article 6.

**Note 5:**

For example, income from gravel digging.

**Note 6:**

For example, exploiting a right to extract spring water. art.

**Note 7:**

Income from real estate is income from direct use of the property, but also income from indirect use, such as income from renting/leasing the property, is included, as is income from other forms of (partial) use of the property (e.g. income from hunting rights or exploitation of natural resources). Distributions from Real Estate Investment Trusts (REITs) are discussed in paragraphs 67.1-7 of the commentary to Article 10 of the OECD Model. The property value tax is not covered by Art. 6 as it is considered a partial wealth tax and is therefore only covered by treaties that include both income and wealth taxes. In order to avoid double taxation for homes located in treaty states where, as here, the treaty does not cover wealth taxes, there is a relaxation rule in section 12 of the EVSL, according to which a reduction can be granted for foreign taxes corresponding to the property value tax. See also SKM2008.565.SKAT/TfS 2008, 901 on the calculation of property value tax for foreign properties. Real property taxes of the same nature as the municipal property tax in Denmark are not covered by the agreement.

Real property taxes of the same nature as the municipal property tax (Grundskyld) in Denmark are not covered by the agreement. For tax purposes, income from real estate is calculated according to the net principle. This means that mortgage interest must be taken into account. Limited taxpayers who own real estate in Denmark, in addition to actual mortgage loans, can also deduct interest on unsecured loans if the limited t a x p a y e r  "can document that the loan relates solely to the acquisition, operation or improvement of the property." The net principle is discussed in the comments section 40, 43 and 63 to art. 23 on relief rules and in LL § 33 F. Income consisting o f  interest income on mortgage loans in real estate is not income from real estate, but instead covered by art. 11. Profits obtained from the sale or other disposal of real estate are not considered income from real estate within t h e  meaning of the agreement, but are instead covered by Article 13.

**Note 8:**

It follows from paragraph 4 that if a business enterprise (personal or c o r p o r a t e ) has real property - exclusively or merely as one of several different types of business assets - the result of the real property will be attributed to Article 6(4), while the result of any other activity will be attributed to Article 7, unless this is specifically provided for in the A g r e e m e n t  (see the introductory remarks above to Article 6). As this Agreement includes an Article 14 on the exercise of a liberal profession, Article 6(4) is worded so that real property used in the exercise of a liberal profession is also covered by Article 6.

**Note 9:**

Paragraph 5 does not exist in the OECD model. It must be seen in the context of national US taxation rules (Treas. Reg. section 1.871-10(d)(2)), and is therefore only relevant to a resident of Denmark who owns property in the US. Under the provision, a resident of Denmark may elect to have the profits of a property located in the United States determined on a net basis rather than on a gross basis. The election to b e  taxed on a net basis is usually binding for the future.

If Denmark is the source state, i.e. in cases where the property is located in Denmark, there is national Danish authority to tax the operating profit in KSL § 2(1)(5) and in SEL § 2(1)(b).

See selected judgments and decisions related to Article 6.

SKDM 1976, 37

-TfS 1997, 15

See selected judgments and decisions related to Article 6 of the OECD Model Law.

**(7)**

**Article 7 Profits from professional activities**

If the enterprise has a permanent establishment in a State, cf. Art. 5, the question arises as to how income is determined in that permanent establishment. Art. 7 deals w i t h  the rules to be applied in determining the income of the permanent establishment.

Note that Danish legal entities generally do not have to include income from foreign permanent establishments.

It follows from SEL § 2(7) that income in a permanent establishment in Denmark is calculated according to the arm's length principle. This means that the income must be calculated as the income the permanent establishment could have obtained, including from its internal transactions with other parts of the enterprise of w h i c h  it is a part, if it had been a separate and independent enterprise.

However, it also appears from SEL section 2(7) that if a double taxation agreement has been concluded with the foreign state, the Faroe Islands or Greenland, and this agreement's article on profits from business activities is not formulated in accordance with SEL section 2(2), 1st sentence, the income of the place of business must instead be calculated in accordance with the r e l e v a n t  article. In practice, this means all the treaties based on the 2008 edition of the OECD Model Tax Convention or earlier editions, and t h i s  i s  t h e  case for this treaty. Art. 7 deviates from Art. 7 of the OECD Model Convention as formulated up to and including the 2008 model.

**Note 1:**

Paragraph 1 establishes the general rule that business profits may be taxed only in the State in which the enterprise is resident unless the business is carried on through a permanent establishment in the other State, the source State. If this is the case, the source state may tax the part of the profits attributable to the permanent establishment. However, the source state's right to tax does not extend to any other profits that the enterprise (in the resident state) may acquire from the source state but which are not attributable to the permanent establishment. In other words, no "force of attraction" principle applies. **Note 2:**

This paragraph contains the central rule which is intended to be the basis for attributing profits to a permanent establishment. The paragraph takes the view that the profits to be attributed to the permanent establishment are t h o s e  w h i c h  the permanent establishment would have earned if, instead of dealing with the rest of the enterprise, it had dealt with a free and independent enterprise under conditions and at prices which would prevail in n o r m a l  markets. This corresponds to the arm's length principle discussed in the commentary to Art. 9. The profit so determined would normally be t h e  same profit that one would expect to be determined in the ordinary course of trade.

Paragraph 2 requires this principle to be applied by each of the Contracting States. This does not, of course, mean that the amount on which the enterprise is taxed in the source State in a given period will correspond exactly to the amount for which the other State must grant relief under Articles 23. Differences in the

Copyright © 2024 Karnov Group Denmark A/S

The domestic laws of the two States regarding matters such as depreciation rates, accrual and non-recognition of deductions for certain expenses that comply with paragraph 3 of this Article will normally result in different taxable income in the two States.

In the vast majority of cases, the accounts of the permanent establishment - which are usually available, if for no other reason than that a well-run business organization is usually interested in knowing the profitability of its various divisions - will be used to determine the amount of profit reasonably attributable to that establishment. Where such accounts exist, they will naturally form the starting point for any adjustment where an adjustment is necessary to determine the amount of profit reasonably attributable to the permanent establishment under the guidelines s e t  out in paragraph 2.

In order to determine whether an adjustment to the books of account is necessary under paragraph 2, it is necessary to determine the profits that would have been realized if the permanent establishment had been a separate and d i s t i n c t  enterprise engaged in the same or similar activities, under the same or similar conditions and dealing wholly independently with the rest of the business. Paragraphs D-2 and D-3 of Part I of the report "Attribution of Profits to Permanent Establishments" describe the two-step approach to be used in making this determination. This approach allows the determination of the profits attributable to the entire business carried on by the permanent establishment, including transactions with other unrelated parties, transactions with related enterprises, and business transactions (e.g. internal transfers of capital or assets or the provision of services) with other parts of the enterprise (under the second step described above) in accordance with the guidelines in paragraph 2.

In cases where, under Article 5(5), a permanent establishment of a c o m p a n y  resident in a Contracting State is deemed to exist in the other Contracting State as a result of the activities of a so-called dependent agent, the same principles applied for the purpose of attributing profits to other types of permanent establishments will apply for the purpose of attributing profits to that permanent establishment. As step 1, the activities undertaken b y  the dependent agent for the enterprise will be identified by means of a functional analysis which will map the functions performed by the dependent agent both on its own account and on behalf of the enterprise. The dependent agent and the enterprise on whose behalf he acts are two separate potential taxpayers. On the one hand, the dependent agent derives his own income or profits from the activities which he carries on for his own account for the enterprise; if the agent is himself a resident of one of the Contracting States, the provisions of the Convention (including Article 9 if the agent is an enterprise associated with the enterprise on whose behalf he acts) are relevant for the taxation of that income or profits. On the other hand, the permanent establishment that t h e  enterprise is deemed to have will be attributed those assets and risks of the enterprise that relate to the functions performed by the dependent agent on behalf of the enterprise (i.e. the activities undertaken by the agent for the enterprise) together with sufficient capital to support those assets and risks. Profits will then be attributed to the permanent establishment on the basis of these assets, risks and capital; these profits will be separate from and not include the income or profits properly attributable to the d e p e n d e n t  agent (see section D-5 of Part I of the report "Attribution of Profits to Permanent Establishments".

**Note 3:**

This paragraph clarifies the main rule set out in paragraph 2 concerning the costs of a permanent establishment.

The paragraph clearly recognizes that, in calculating the profits of a permanent establishment, deductions must be allowed for costs, wherever incurred, when incurred for the benefit of the permanent establishment. In some cases, it will clearly be necessary to estimate the amount of costs to be taken into account or to calculate it by conventional methods. For example, in the case of administrative overheads for the head office of the enterprise

it would be appropriate to take a proportionate share based on the ratio of the turnover (or possibly gross profit) o f  the permanent establishment to that of the whole enterprise.

This agreement also mentions research and development expenses, interest and other expenses incurred for the benefit of the organization as a whole.

In view of this, it is considered that the amount of costs to be taken into account as incurred by the permanent establishment should be t h e  actual costs so incurred. The deduction allowed to the permanent establishment for any of its costs attributable to it is not conditional on such costs actually being reimbursed by the permanent establishment.

It has sometimes been argued that the need for consistency between paragraphs 2 and 3 created practical difficulties, since paragraph 2 required that prices between the permanent establishment and the head office should normally be determined on an arm's length basis - attributing to the transferring entity the profits which it could be expected to have made if it carried on business with an independent enterprise - whereas the wording of paragraph 3 implied that the deduction for expenses incurred for the benefit of the permanent establishment should be the actual cost amounts without adding any profit element. While the application of paragraph 3 may indeed raise some practical d i f f i c u l t i e s , particularly in relation to the 'separate enterprise' and the arm's length p r i n c i p l e s u n d e r l y i n g  paragraph 2, there is no difference in principle between the two paragraphs. Paragraph 3 states that in determining the profits of a permanent e s t a b l i s h m e n t , deduction of certain expenses shall be allowed, whereas paragraph 2 provides that the profits determined in accordance with the rule in paragraph 3 relating to the deduction of expenses shall be those which an independent enterprise carrying on the same or similar activities under the same or similar conditions would have made. Thus, while paragraph 3 sets out a rule to be applied for the purpose of determining the profit of the permanent establishment, paragraph 2 requires that the profit so determined must correspond to the profit which an independent enterprise would have made

Furthermore, paragraph 3 only determines the expenses to be attributed to the permanent establishment for the purpose of determining the profit attributable to that permanent establishment. The paragraph does not address the question of whether the expenses once attributed are deductible in calculating the taxable income of the permanent establishment, as the conditions for deduction of expenses are to be determined by national law.

In the practical application of these principles, when determining the profit of an establishment, the question may arise as to whether a given cost incurred by an enterprise can properly be regarded as an expense incurred for the benefit of the permanent establishment, taking into account the 'independent enterprise' principle in paragraph 2. While independent u n d e r t a k i n g s  will normally seek to make a profit in their business dealings with each other and will, when transferring goods or services to each other, charge prices which the open market can bear, there are nevertheless also situations where it cannot be assumed t h a t  a particular good or service could have been acquired from an independent undertaking or where independent undertakings can agree to apportion costs between themselves in respect of some activity carried out jointly for their mutual benefit. In these particular circumstances it may be right to treat all relevant costs incurred by the enterprise as an expense incurred for the permanent establishment. The difficulty lies in distinguishing these cases from those where a cost incurred by an enterprise is not to be regarded as an expense of the permanent establishment and t h e  relevant asset or service is, on the basis of the "independent enterprise" p r i n c i p l e ,  to be regarded as having been transferred between the head office and the permanent establishment at a price which includes a profit. The question must be whether the internal transfer of goods and services, whether temporary or permanent, is of the same nature as those which, in the ordinary course of business, the undertaking would have charged an arm's length price to a third party, that is to say, by normally i n c l u d i n g  an appropriate profit in the selling price.

Copyright © 2024 Karnov Group Denmark A/S

The treatment of interest expenses raises particular problems. Firstly, there may be amounts charged by the head office to the permanent establishment for internal 'loans' from the former to the latter under the heading of 'interest'. With the exception of financial institutions such as banks, there is general agreement that such internal interest should not be taken into account. Secondly, there may be a question of deducting interest on external debt actually incurred by the enterprise. Such debts may relate in whole or in part to the business of the permanent establishment; in reality, loans incurred by an enterprise will either benefit the head office, the permanent establishment or both. The question that arises in the case of such debts is how to determine the part of the interest to be deducted when calculating the profit attributable to the permanent establishment. Consequently, the majority of Member States are of the opinion that it would be preferable to reach a practical solution that would take into account a capital structure appropriate to both the business and the functions performed. This capital structure takes into account the fact that in order to carry out its activities, the permanent establishment requires a certain amount of financing consisting of "free" capital and interest-bearing loans. The objective is therefore to allocate an arm's length amount of interest to the permanent establishment after a reasonable amount of "free" capital has been allocated to maintain the functions, assets and risks of the permanent establishment. Under the arm's length principle, a permanent establishment must have sufficient capital to maintain the functions it performs, the assets it owns and the risks it assumes. In the financial sector, regulations set a minimum amount of capital that must be present in the event that some of the risks associated with the business result in financial losses. Capital provides a similar safeguard against financial loss in the non-financial sector.

It is recognized that the different acceptable methods of attributing 'free' capital to a permanent establishment, which are consistent with the arm's length principle, may give rise to double taxation problems. The main concern of particular relevance to financial companies is that if the national rules of the State in which the permanent establishment is situated and the State in which the enterprise is resident require different acceptable methods to be used to attribute an arm's length "free" capital to the permanent establishment, the profit determined by the State in which the permanent establishment is situated may be higher than the profit determined by the State in which the enterprise is resident and which must grant relief for double taxation.

The solution is not straightforward. However, OECD member states have agreed to accept - for the purpose of determining the deductible amount of interest that will be used in the calculation of double taxation relief - the attribution of capital (endowment capital) resulting from the application of the method used by the state in which the permanent establishment is l o c a t e d , if the following two conditions are met: first, if the difference in the attribution of capital between that State and the State in which the enterprise i s resident results from different choices of methods of attribution of capital under the domestic laws of the two States; and second, if it is agreed that the State in which the permanent establishment is situated has applied an approved method of attribution and it is also agreed that the method produces a result that is consistent with t h e arm's length principle. OECD Member States consider that they are able to reach this result either under their domestic law, through their interpretation of Articles 7 and 23 or by using the mutual agreement procedure under Article 25, and in particular through the possibility provided by this Article to resolve any question concerning the application or interpretation of their tax treaties

**Note 4:**

This includes, for example, costs incurred in the head office, but which cover functions etc. that can also be attributed to the permanent establishment. Examples include management costs, costs for IT, HR and legal assistance.

**Note 5:**

In Art. 5(4) there is a list of examples of activities which, although carried out at a fixed place of business, are not considered to be covered by the term "permanent establishment". When considering the rules for the allocation of profits to a permanent establishment, the most important of these examples is undoubtedly the activity mentioned in paragraph 5 of this article, that is, the purchasing office

Paragraph 4, of course, does not deal with an organization established for the sole purpose of procurement. Such an organization is not a permanent e s t a b l i s h m e n t , and the profit-sharing provisions of this Article therefore do not apply. Paragraph 4, on the other hand, deals with a permanent establishment which, notwithstanding that it carries on other business, also makes purchases for its head office. In such a case, paragraph 4 provides that the profits of the permanent establishment shall not be increased by adding to them a notional figure for profits from purchases. Consequently, any costs arising from purchasing activities will of course also be excluded when calculating the taxable profits of the permanent establishment.

**Note 6:**

A method of apportionment once used cannot be changed simply because a different method in a given year produces more favorable results. One of the purposes of a double tax treaty is to provide an enterprise of a C o n t r a c t i n g S t a t e w i t h a degree of certainty as to the tax treatment that will b e accorded both to its permanent establishment in the other Contracting State and to that part of it in its home State which deals with that permanent establishment. For this reason, paragraph 5 provides an assurance of continuous and consistent tax treatment.

**Note 7:**

Paragraph 6 states that if the income from the permanent establishment includes income that is positively mentioned in other articles of the Convention, that income shall be taxed according to those other rules.

The term 'profits' is to be understood as having a broad meaning encompassing any income derived from the carrying on of an a c t i v i t y . If there were no provision, the interpretation of the term "profits" could give rise to some uncertainty in the application of the Agreement. If an enterprise's profits include types of income t h a t a r e dealt with separately in other articles of the Agreement, such as dividends, the question may arise as to which article should be applied to such income, f o r e x a m p l e , i n t h e c a s e o f dividends, this article or article 10

To the extent that the application of this Article and the relevant other Article result in the same tax treatment, the issue has little practical significance. Moreover, some Articles of the Convention specifically address this issue with respect to some types of income (e.g., Art. 6(4), Art. 10(4), Art. 11(4), Art. 12(3), Art. 17(1) and (2), and

Art. 21, paragraph 2.

However, the question may arise with respect to other types of income and it has therefore been decided to include a rule of interpretation to ensure that Articles applied to particular types of income take precedence over Article 7. It follows from this rule that Article 7 applies to professional income which does not fall within the categories of income covered by these other articles. Furthermore, income covered by Articles 10(4), 11(4), 12(3) and 21(2) falls within the scope of Art.

7. However, this rule does not determine the manner in which income is classified under domestic law; thus, if a Contracting State taxes income under other Articles of this Convention, that State may, in applying its domestic law, characterize that income as it wishes (i.e. as business income or as a specific category of income). However, it is a condition that t h e treatment of such income is in accordance with the provisions of the Agreement. It is also noted that where an enterprise of a Contracting State derives income from immovable property through a permanent establishment situated in the other State, the other State may not tax that income if it arises from immovable property situated in the first-mentioned State or in a third State.

Finally, it should be noted that two categories of profits previously (in the OECD models) covered by other articles of the Agreement are now covered by Article 7. Firstly, while the definition of "royalties" in Art. 12, para. 2 in the 1963 Draft Agreement and t h e 1977 Model Agreement included payments "for the use of, or the right to use, industrial, commercial or scientific equipment", the reference to these payments was subsequently removed from the definition to ensure that income from the rental of industrial, commercial or scientific equipment, including income from the rental of containers, falls under either Art. 7 or Art. 8 (see paragraph 9 of the commentary to this Article) rather than under Art. 12.

Secondly, before 2000, income from self-employment and other activities of an independent c h a r a c t e r was dealt with in a separate Article, namely Article 14. The provisions of this Article were similar to those applicable to business income, but Article 14 used the term "fixed place" instead of "permanent establishment", as it had originally been thought that the latter term was reserved for commercial and industrial activities. However, it was not always clear which activities fell under Art. 14 and which fell under Art. 7. The omission of Art. 14 in 2000 reflected the fact that no differences were intended between the concepts of "permanent establishment" as used in Art. 7 and "fixed place of business" as used in Art. 14, or between how profits should be determined and tax calculated depending on whether Art. 7 or 14 was used. The effect of the omission of Art. 14 is that income from self-employment and other activities of an independent character is now treated under Art. 7 as business income.

Denmark, as a source state with limited tax liability, has national authority to tax such income in KSL § 2(1)(4) and SEL § 2(1)(a). a However, the results from foreign permanent establishments of Danish e n t e r p r i s e s a r e not included in an enterprise's income statement outside international joint taxation.

Profits from the sale or other disposal of (fixed) assets forming part of the permanent establishment are not covered by Article 7, but are instead covered by Article 13.

**Note 8:**

Defines "Profits from business activities". According to the Technical Explanation, the provision should be seen as an expression of a US practice, according to which a company's provision of services should be considered covered by Art. 7 and not by Art. 14. It is also emphasized that rental income from the rental of movable property is covered.

**Note 9:**

Under domestic rules, the US may tax permanent establishments after they have ceased to exist. As a result, a provision has been included whereby income or gain attributable to a permanent establishment may be taxed in the state in which the permanent establishment is located, even if the payments are deferred to a time when the permanent establishment no longer exists.

Art. 7 is supplemented by point 3 of the Protocol, according to which Art. 7 shall not prevent Denmark and the US, respectively, from continuing to tax permanent establishments of insurance companies according to internal rules.

Denmark, as a source state with limited tax liability, has national authority to tax such income in KSL § 2(1)(4) and SEL § 2(1), litra

a. On the other hand, profits from foreign permanent establishments of Danish companies are not included in an enterprise's income statement outside international joint taxation.

Profits from the sale or other disposal of (fixed) assets forming part of the permanent establishment are not covered by Article 7, but are instead covered by Article 13.

See selected judgments and decisions related to Article 7 of the OECD Model Law Agreement.

**(8)**

**Article 8 Shipping and aviation**

Article 8 deviates from Article 8 of the OECD Model Convention.

**Note 1:**

According to Art. 8(1), profits from the operation of ships and aircraft in international traffic may be taxed only in the State in which the enterprise is resident. The distribution of the right of taxation will thus be significantly different from that under the rules in Articles 5 and 7. Secondly, there is an elimination of the permanent establishment principle, cf. Art. 5 and Art. 7(1). The state in which the enterprise is resident is, pursuant to Art. 8, assigned the right to tax the enterprise's worldwide income from the operation of ships and aircraft in international traffic.

**Note 2:**

The term "international traffic" is defined in Article 3(1)(d). According to the definition, "international traffic" means any carriage by ship or a i r c r a f t , except where such carriage is performed solely between places in a Contracting State. The Article thus covers both the hire of manned and unmanned ships and aircraft. It also includes profits from domestic transportation connected with international traffic.

The profits in question consist primarily of profits directly derived by the enterprise from the transportation of passengers or goods by ships or aircraft in international traffic (whether t h e ships or aircraft are owned or leased by the enterprise or otherwise made available t o t h e enterprise). As international traffic has developed, shipping and aviation companies inevitably carry out a wide range of activities related to their international shipping and aviation activities. The provision also covers profits from activities directly related to such activities as well as profits from activities that are not directly related to the international shipping and aviation business but which can be characterized as activities of an auxiliary nature. Any activity carried on principally in connection with the transport of passengers or goods by ship or aircraft in international traffic by the undertaking shall be considered to be directly related to that transport.

An activity which the enterprise need not carry on in connection with its operation of ships and aircraft in international traffic, but which makes a minor contribution thereto and is so closely connected with that operation that it is not to be regarded as a separate business or source of income for the enterprise, shall be regarded as an activity ancillary to t h e operation of ships and aircraft in international traffic.

Profits from leasing ships and aircraft that are chartered with full equipment, crew and supplies must be treated as profits from the transportation of passengers or goods. Otherwise, many shipping or aviation activities would not f a l l w i t h i n t h e scope of the provision. However, Art. 7, and not Art. 8, applies to profits from the leasing of ships or aircraft on a bareboat charter basis, except where it is an ancillary activity of an enterprise engaged in international shipping or aviation.

However, it may be covered by Article 8 if, exceptionally, it is an auxiliary activity in relation to the primary operation of ships or aircraft in i n t e r n a t i o n a l traffic. See point 5 in the commentary to Article 8 of the Model Convention. Profits from the operation of ships and aircraft are not covered by Article 8. See point 12 in the commentary to Article 8.

Profits derived by an enterprise from the transportation of passengers or goods otherwise than by the operation of ships or aircraft in international traffic are covered by the provision to the extent that such transportation is directly related to the enterprise's operation of ships or aircraft in international traffic or can be characterized as an auxiliary activity. An example would be an enterprise engaged in international transportation that has some of its passengers or cargo transported internationally by the ships or aircraft of other enterprises, e.g. under code sharing or slot charter agreements, or to take advantage of an earlier sailing. Another example is an airline that operates a bus service between a city and its airport primarily to provide transportation to and from that airport for its passengers on international routes.

A further example is an enterprise that transports passengers or goods by ship or aircraft in international traffic and undertakes to pick up the passengers or goods in the state where transportation begins, or to transport the passengers or deliver the goods at destination, using any form of domestic transportation provided by other enterprises.

In such a case, any profits derived by the first-mentioned enterprise from arranging the transportation carried out by other enterprises are covered by the provision, even if the profits derived by the other enterprises c a r r y i n g  out the domestic transportation are not covered by the provision. If, in addition to the operation of ships and aircraft in international traffic, an enterprise also carries on other business activities, these other activities are taxed according to Articles 5 and 7. Comments no. 20 and 21 to article 8 of the Model Tax Convention explain some of the issues that may arise when income is to be allocated between ordinary activities and activities in the form of international traffic.

As mentioned, Art. 8 deals primarily with profits made b y  the undertaking from the carriage of passengers or goods in international traffic. However, it also covers profits from activities which, by their nature, are closely related to the transportation of passengers or goods by the enterprise. According to the commentary, the following auxiliary enterprises are also considered to be covered by t h e  provision:

- Rental of a ship or aircraft with full equipment, crew and supplies as well as rental on a bareboat basis.

- selling tickets on behalf of other entities.

- Operating a bus service between a city and its airport.

- profits obtained by arranging the transportation of passengers or goods to or from a port or airport, even when the transportation itself is carried out by another c o m p a n y .

- advertising and commercial propaganda for other companies at points of sale or in magazines distributed on board ships or aircraft.

- Truck transportation of goods between a warehouse and a port or airport.

- container leasing when the containers are transported on board ship or aircraft in international traffic, including profits relating to the part of the leasing period when the container is in domestic transportation to or from the port or airport, as well as storage at the port or airport.

- Profits derived from the provision of support facilities or personnel, m a i n t a i n e d  primarily for own international traffic, to other entities, including participation in a pool, joint venture or international operating organization.

- operating a hotel for the sole purpose of providing overnight accommodation for transit passengers, if the cost of such service is included in the ticket price.

The comments also state that the following activities are not included in t h e provision: Profits from fishing, dredging and towing are not covered by Article 8 of the Model Convention unless the parties insert a special provision to that effect in the double taxation convention. See section 17.1. in the commentary to Article 8. Denmark does not include such special provisions in its treaties. See SKM2004.117.ØL/TfS 2004, 312 on fishing rights.

Profits from the sale or other disposal of ships or aircraft used in international traffic are not covered by Article 8, but are instead covered by Article 13.

**Note 3:**

Paragraph 2 defines profits from shipping and aviation activities. The article thus covers both the rental of manned and unmanned ships and aircraft.

**Note 4:**

The article also covers profits from domestic transportation that are linked t o  international traffic.

**Note 5:**

In addition to profits from the operation of ships and aircraft, the provisions of subsection (3) also cover income from the use, provision and leasing of containers used in international traffic. This ensures in particular that Danish owners' profits from container traffic or container rental can only be taxed in Denmark.

**Note 6:**

Paragraph 4 includes a provision stating that paragraphs 1 and 3 also apply to consortia etc. The provision is particularly important in relation to SAS.

In this connection, paragraph 1 of the Protocol contains a reference to SAS and its

special structure, including the American SAS, Inc. It provides that SAS Danmarks A/S' share of SAS' total income is referred to in Article 8.

**Note 7:**

Under paragraph 5, profits from supply activities or the operation of tugboats etc. relating to the exploration and exploitation of natural resources off the coast of the other Contracting State may be taxed only in the State in which the enterprise is resident.

See selected judgments and decisions related to Article 8 of the OECD Model Law Agreement.

Art. 9

**(9)**

**Article 9 Interconnected undertakings**

Article 9 corresponds to Article 9 of the OECD Model Tax Convention. The article concerns transfer pricing, i.e. price fixing - or rather adjustment of price fixing - of cross-border, intra-group trade. The Article s t a t e s   t h a t  where so-called associated enterprises (typically parent/subsidiary companies) agree between themselves or set terms concerning their commercial or financial relations which differ from what independent parties would have agreed in a similar situation, the tax authorities of each State may adjust the resulting profits as if they had been made under normal market conditions. The state making the first adjustment (usually an increase in income) has thus made what is technically known as the primary income adjustment. The principle applied to any adjustment of income by the tax authorities is known as the arm's length principle. If one state, based on the application of the arm's length principle, increases a company's income, there will be so-called economic double taxation (when two states tax the same income of two different taxpayers), unless the other group company in the transaction receives a corresponding reduction in its income (alternatively in its income tax). The so-called economic double taxation here in Article 9 differs from legal double taxation, where two states tax a person on the same income). Please note that there is an extended assessment period for transfer pricing adjustments, SFL § 26(5)

**Note 1:**

The arm's length principle is defined nationally in LL § 2(1). However, the scope of Article 9(1) is broader than the national legal basis, as Article 9(1) defines associated enterprises as all situations in which an enterprise or persons participate directly or indirectly in the management, control or capital of an enterprise in the other state or in both states. The national legal basis in LL § 2(1), on the other hand, requires direct or indirect control of more than 50 percent of the capital or votes in order for there to be an adjustment of profits. Art. 9 will only be applicable if the Danish definition of the arm's length principle - and correspondingly that the other contracting state's definition of the arm's length principle is also met. Art. 9(1)(a) refers to "an enterprise". This term is defined in Art. 3(1)(c) of the Agreement and means "the carrying on of any commercial activity", regardless of the form of enterprise.

**Note 2:**

When Art. 9(1)(b) refers to "persons", it should be noted that the term "person" here, cf. Art. 3(1)(a), includes "a natural person, a company and any other body of persons". Section 2(1) of the Act also covers the controlling influence of natural persons.

Paragraph 2 of the article concerns the so-called corresponding regulation of p r o f i t s  regulated in accordance with paragraph 1.

**Note 3:**

If the tax authorities of one state have increased the income of the e n t i t y  in that state, a primary income adjustment occurs.

**Note 4:**

An enterprise in the group will then usually apply to the tax authorities in the other state for a corresponding reduction of income there, referred to as the corresponding adjustment, so that

The arm's length principle applies to both associated enterprises. According to section 2(6) of the Danish Income Tax Act, it is a prerequisite for such an adjustment in Denmark, the corresponding adjustment, that there has been a corresponding increase in the tax assessment abroad (the primary adjustment) - either in a group company or in the relationship between head office/branch. The corresponding adjustment also requires that the tax authorities of the two countries agree on the calculation of the income according to the arm's length principle. If no agreement can be reached on a changed income assessment between the tax authorities of the two states, the matter will have to b e  resolved under the mutual agreement provision in Art. 25. In addition to the primary and the corresponding adjustment (a given increase in income in one company and a corresponding reduction in the other trading c o m p a n y ), there may be further income adjustments in the form of so-called secondary adjustments. Secondary adjustments is a term used to describe adjustments to the values transferred from one entity to the other entity through the transfer pricing transaction. The treaty does not address these secondary adjustments and Article 9(2) does not prevent tax administrations from making secondary adjustments.

As the US is not a member of the EU, double taxation regarding transfer pricing cannot be resolved according to the rules of the EU Arbitration Convention/EU Arbitration Directive.

The Article states that where so-called associated enterprises agree between themselves, or lay down terms concerning their commercial or financial relations, which differ from what independent parties would have agreed in a similar situation, the tax authorities of each State may regulate the resulting profits as if they had been made under normal market conditions. The state making the first adjustment (usually an increase in income) has thus made what is technically referred to as the primary adjustment. The principle applied to any adjustment of income by the tax authorities is known as the arm's length principle.

See selected judgments and decisions related to Article 9 of the OECD Model Law Agreement.

**(10)**

### Article 10 Dividends

The main rule is that the right to tax dividends is divided between the state of residence and the source state. In practice, however, national rules mean that if the recipient of the dividends is a company, the payer of the dividends will in many cases still be tax exempt. It is the so-called beneficial owner of the dividends who can claim the benefits of the treaty. The term "beneficial owner" should not be understood in a narrow theoretical context, but rather based on a purposive interpretation of the treaty, including the need to avoid or evade taxation. An agent or nominee is not a beneficial owner. The same applies to a conduit company ("flow-through entity") or so-called fiduciaries, which are persons who are formally owners of an asset, but where the return accrues to a "beneficiary", which is someone other than the formal owner.

The concept of beneficial owner is described in the comments to the model agreement

The Supreme Court has in (cases 69/2021, 79/2021 and 70/2021 Judgment handed down on January 9, 2023) - among other things taken a position on the interpretation of the concept.

The Supreme Court held that under Article 10(2), dividends paid by a company resident in a Contracting State to a resident of the other Contracting State may be taxed in the f i r s t - m e n t i o n e d  State only at a certain percentage of the gross amount of the dividends if the recipient is the "beneficial owner" of the dividends. According to paragraph 2 of Article 3, any term not defined in the C o n v e n t i o n  shall have the meaning which it has in the law of the Contracting State concerning the taxes to which the Convention applies. The term "beneficial owner" is not defined in the conventions. As the term delimits the taxing jurisdiction of the contracting states, the Supreme Court finds that it follows from the context that the meaning cannot depend on the respective laws of the contracting states. The Supreme Court therefore agrees that the term "beneficial owner" must be understood in the light of the OECD Model Tax

Convention.

including the OECD's relevant comments thereon on countering abuse.

In Danish law, there has been doubt as to whether the meaning of the terms beneficial owner and beneficial income recipient are the same.

The parties to the case argued that the legislative history of a 2001 amendment t o section 2(1)(c) of SEL states that the legislator has assumed an understanding of the term "beneficial owner" which is not based on the OECD model definitions, but rather on the term "rightful income recipient" in Danish tax law.

In this regard, the Supreme Court stated that the purpose of the aforementioned amendment was to prevent the abuse of the previously applicable tax exemption for dividend payments resulting from the establishment of Danish holding companies with the sole purpose of avoiding taxation in other countries and at the same time take into account the exceptions t o t h e general rule on withholding tax that Denmark is obliged to have under e.g. double taxation treaties. Against this background, it must be clearly presumed that the amendment of the Act was based on a different understanding of the term "beneficial owner" in the relevant double taxation treaties than the one set out in the OECD Model Tax Convention with comments, so that tax exemption would be granted to a greater extent than required under the treaties. As stated by the High Court, the legislative history of the 2001 amendment does not contain any mention of the term "rightful owner" (or "rightful income recipient"). Against this background, the Supreme Court found that there is no other evidence for a different understanding o f t h e term "rightful owner" than the one stated. What the Minister of Taxation stated in answers to the Danish Parliament about the possibilities of, among other things, restructuring and contribution of intermediate holding companies cannot be understood to mean that t h e intention was to allow abuse in the form of "artifice" etc. which, according to the Model Tax Convention and the related comments, justifies that there is no tax exemption.

Article 10 of this Agreement differs from Article 10 of the OECD Model Agreement.

**Note 1:**

Art. 10(1) states that dividends may be taxed in the State of residence of the recipient, whether the recipient is a natural or legal person. The provision corresponds to Art. 10(1) of the Model Convention. The rules on tax liability of dividends and distributions are set out in LL § 16 A. For companies, there are special exemption rules for dividends in SEL § 13. The limited tax liability also includes masked dividends. The Minister of Taxation has decided that no withholding tax on dividends will be withheld when an exemption from dividend taxation is obtained under section 16 A(3)(2) of the Danish Income Tax Act, see TfS 1992, p. 1013. The provision in section 2(1)(c) of the Danish Corporation Tax Act on tax exemption for subsidiary dividends must be interpreted as meaning that it is sufficient that the dividend payment is covered by the agreement. This means that the Danish taxation must be reduced (or waived), regardless of whether the Danish taxation is higher or lower than the rate stipulated in the treaty. A f o r e i g n parent company will therefore be able to receive tax-free dividends from Denmark when it is the beneficial owner of the dividends and the dividend payment is covered by the treaty, even if Denmark is entitled under the treaty t o withhold tax exceeding the current Danish tax rate on the dividends and the treaty thus does not require a reduction of the Danish taxation. However, the rules in the treaty must always be compared with the purely national Danish rules on taxation of dividends. If the payment of dividends is already tax-free under national rules, the tax exemption in the treaty is of no independent significance. Conversely, the treaty will apply if it places the taxpayer in a more favorable position than the purely national rules. See KSL section 65(4) and BEK no. 2104 of 23/11/2021, section 30. E x c e s s withheld dividend tax can be recovered digitally via skat.dk.

There is a 5-year limitation period for Danish dividend tax, cf. section 67A of the Danish Withholding Tax Act and its preparatory works (LFF 2010 75). However, the Danish Tax Agency has announced in SKM2016.263.SKAT that, with effect from refund requests received after 9 September 2016, the Danish Tax Agency only considers the 5-year limitation period to apply to the

Tax Administration's claims for withholding tax, while taxpayers' claims for refund of withholding tax are subject to a 3-year limitation period

**Note 2:**

According to Art. 10(2) of the treaty, dividends may in certain cases also be t a x e d in the source state (the state in which the paying company is resident). The generally applicable rule is according to KSL § 65 that companies covered by SEL § 1, subsection 1, no. 1, 2, 2e, 2h, 4 and 5a, in connection with the distribution of dividends must usually withhold 27% in dividend tax. According to Art. 10(2)(a) of the treaty, 5% dividend withholding tax must be withheld if the dividend recipient is a company that directly owns at least 10% of the dividend-paying company. There is no minimum ownership period. **Note 3:**

In all other cases, 15% can be withheld.

Pursuant to section 65(5) of KSL, no withholding tax on dividends shall be withheld when the recipient is a company resident abroad that is not subject to limited tax liability on dividends pursuant to SEL section 2(1)(c). It is a precondition for exemption from withholding tax on dividends that a dividend certificate is submitted. In the opposite situation, where the dividend recipient is resident in D e n m a r k and the other state has withheld a higher dividend tax than the double taxation treaty indicates, the tax authorities in the state in question must be contacted, and the detailed rules for the recovery m u s t  b e informed from there.

**Note 4:**

There is no corresponding provision in the OECD model. Paragraph 3 modifies the right of the source state to tax under paragraph 2. If the condition set out in paragraph 3 is met, the source state is still not entitled to withhold taxes at source under paragraph 2.

If the receiving company owns, directly or indirectly, through one or more persons resident in the United States or Denmark, shares representing 80 percent or more of the voting rights in the company paying the dividend for a 12-month period ending on the date on which the right to the dividend is determined and also meets certain specified criteria, the source country may not withhold any withholding tax, notwithstanding the provisions of Article 10(2). However, it is a requirement that certain specified parts of Art. 22 (Limitation of Benefits) are also fulfilled.

**Note 5:**

The exemption under paragraph 3 also covers cases where the recipient of the dividends is a qualified public entity that is resident in the other Contracting State and does not control the payer of the dividends. The term "a qualified public entity" is defined in Art. 3(1)(i) of the Convention.

**Note 6:**

Finally, paragraph 3 includes a pension fund referred to in Article 22(2)(e) (Limitation of Benefits) that is a resident of the other Contracting S t a t e , provided that such profits do not arise from the carrying on of activities by the pension fund or through an associated enterprise.

It will depend on the internal rules of the source state whether the right of taxation is exercised. See Denmark's internal rules for taxation of dividends in company s t r u c t u r e s  and the concept of beneficial owner and LL § 3.

**Note 7:**

According to paragraph 4, special rules apply if the dividend is paid by a US Regulated Investment Company (RIC) or a US Real Estate Investment Trust (REIT). Dividends from RICs can always be taxed at a maximum of 15%, while dividends from REITs can be taxed at a maximum of 15% when certain conditions related to, among other things, ownership and diversification of investments are met. RICs that primarily invest in securities and REITs that invest in real e s t a t e  are typically characterized by the fact that they are not taxed on distributed profits. The provision in paragraph 3 is inserted at the request of the United States to prevent unintended benefits from investing in RICs and REITs through companies instead of directly.

**Note 8:**

Article 10(5) defines what is meant by proceeds. The content l a r g e l y corresponds to Art. 10(3) of the OECD model. If Denmark is the source state, it is Danish law that qualifies what is meant by proceeds. In the comments to the OECD Model Tax Convention, Denmark reserves the right

in certain cases to consider the sale price arising from the sale of shares,

to be dividends covered by Article 10. See, for example, the provision in SEL § 2 D.

**Note 9:**

According to Art. 10(6) of the Double Taxation Convention, which roughly corresponds to Art. 10(4) of the OECD Model Convention, the rules on the limited dividend tax in Art. 10 do not apply to dividends received b y a permanent establishment or a fixed base in the source state if the shareholding is directly connected with the permanent establishment or fixed base. Instead, the dividends are treated according to the rules of Art. 7 (permanent establishment) or Art. 14 (permanent establishment).

**Note 10:**

Paragraph 7 prohibits one of the Contracting States from taxing dividends paid by a company resident in the other Contracting State on t h e ground that the major part of the profits of the company were derived in the first-mentioned State. Of course, the provision does not prevent dividends received by shareholders in the first-mentioned State from being taxed there. The rule should be seen in the light of the fact that certain states not only tax distributions from resident companies, but also distributions from non-resident companies if the distributions are attributable to profits acquired in their territory. In terms of content, the provision corresponds roughly to **Article 10**(5) of the OECD Model Tax Convention

**Note 11:**

The provision enables US taxation of a permanent establishment in Denmark in the form of a branch profits tax (see Technical explanation). Art. 10(8) and (9) are thus irrelevant to Danish taxation. Note that the Ministry of Taxation in TfS 2000, 394 has stated that the tax authorities, upon request, must also carry out certification for pension funds and d i s t r i b u t i n g  investment funds, regardless of the fact that they are tax exempt under SEL § 3

See selected judgments and decisions related to Article 10 of the OECD Model Law Agreement.

**(11)**

**Article 11 Interest**

Art. 11 regulates the same matters as Art. 11 of the OECD Model Convention, i.e. the allocation of the taxation of interest income. According to Art. 11(1) and (2) of the Model Convention, the right to tax interest belongs to both the source state (the state in which the interest accrues or from which it is paid) and the state in which the "beneficial owner" (the interest recipient) is r e s i d e n t .

It is the so-called rightful owner of the interest who can claim the benefits of the agreement.

The concept of beneficial owner is described in the comments to t h e model agreement.

In (cases 69/2021, 79/2021 and 70/2021 Judgment delivered on January 9, 2023) the Supreme Court has, among other things, considered the interpretation of the concept.

The Supreme Court held that under Article 10(2), dividends paid by a company resident in a Contracting State to a resident of the other Contracting State may be taxed in the f i r s t - m e n t i o n e d  State only at a certain percentage of the gross amount of the dividends if the recipient is the "beneficial owner" of the dividends. Art. 3(2) provides that any term not defined in the Convention shall have the meaning which it has in the law of the Contracting State concerning the taxes to which the Convention applies. The term "b e n e f i c i a l  owner" is not defined in the conventions. As the term delimits the taxing jurisdiction of the contracting states, the Supreme Court finds that it follows from the context that the meaning cannot depend on the respective legislation of the contracting states. The Supreme Court therefore agrees that t h e term "beneficial owner" must be understood in the light of the OECD Model Tax Convention, including the OECD's relevant comments thereon on the prevention of abuse. According to Article 11(1) and (2) of

the OECD Model Tax Convention, the right to tax interest belongs to both the source state (the state in which the interest is attributed or from which it is paid) and the state in which the "beneficial owner" (t h e  interest recipient) is resident.

In Danish law, there has been doubt as to whether the meaning of the terms beneficial owner and beneficial income recipient are the same.

The parties to the case argued that it appears from the preparatory works to an amendment in 2001 t o SEL § 2(1)(c) that the legislator has assumed an understanding of the term "beneficial owner" which is not based on the OECD model definitions, but rather on the term "rightful income recipient" in Danish tax law.

In this regard, the Supreme Court stated that the purpose of the aforementioned amendment was to prevent the abuse of the previously applicable tax exemption for dividend payments resulting from the establishment of Danish holding companies with the sole purpose of avoiding taxation in other countries and at the same time take into account the exceptions t o t h e  general rule on withholding tax that Denmark is obliged to have under e.g. double taxation treaties. Against this background, it must be clearly presumed that the amendment of the Act was based on a different understanding of the term "beneficial owner" in the relevant double taxation treaties than the one set out in the OECD Model Tax Convention with comments, so that tax exemption would be granted to a greater extent than required under the treaties. As stated by the High Court, the legislative history of the 2001 amendment does not contain any mention of the term "rightful owner" (or "rightful income recipient"). Against this background, the Supreme Court found that there is no other evidence for a different understanding o f t h e  term "rightful owner" than the one stated. What the Minister of Taxation stated in answers to the Danish Parliament about the possibilities of, among other things, restructuring and contribution of intermediate holding companies cannot be understood to mean that t h e  intention was to allow abuse in the form of "artifice" etc. which, according to the Model Tax Convention and the related comments, justifies that there is no tax exemption.

**Note 1:**

Art. 11(1) corresponds to the OECD Model Convention, according to which interest paid from one state, the source state, to a recipient in the other state may be taxed in the state in which the recipient is resident. According to Art. 11(2) of the OECD Model, the source state (the state from which the interest is paid) may also tax the interest. Such a provision is not included in the Danish-US treaty.

**Note 2:**

Article 11(2) defines the term "interest". The wording is slightly different than in the OECD model.

The term "interest" generally means income from debt-claims of every kind, whether or not secured by mortgage and whether or not carrying a right to participate in profits. The term "debt-claims of every kind" clearly includes cash deposits and security in the form of money, as well as treasury bills, bonds and debentures (the term comes from "debentures", which can be translated as a financial instrument used by a borrower, such as a business to raise capital for the business), although the last three are expressly mentioned because of their importance and certain peculiarities they may present. On the one hand, it is recognized that mortgage interest falls within the category of income from assets other than immovable property ("movable capital", "revenus de capitaux mobiliers"), although some States treat it as income from immovable property. On the other hand, debt claims, bonds and, in particular, advances containing a right to share in the debtor's profits are nevertheless considered to be loans if the general nature of the agreement clearly i n d i c a t e s  t h a t  i t  i s  a n interest-bearing loan.

Interest on participating bonds is normally not considered a dividend, and the same applies to interest on convertible b o n d s  until the time when the bonds are actually converted into shares. However, the interest on such debentures should be considered a dividend if the loan effectively participates in the risk incurred by the debtor company. In s i t u a t i o n s where thin capitalization is presumed to exist, it is sometimes difficult to distinguish between dividends and interest, and in order to avoid a possible partial overlap between the categories of income dealt with in Art. 10 and Art. 11 respectively, it should be noted that the term "interest", as

Copyright © 2024 Karnov Group Denmark A/S

used in Article 11, does not include the types of income dealt with in Article 10.

With particular reference to treasury bills, bonds and debentures, the text provides that premiums and gains relating thereto are interest. Generally s p e a k i n g , what constitutes interest which is granted under a secured loan and which may properly be taxed as such in the source State is anything paid by the lending institution in excess of the amount paid by the borrower, that i s , the current interest plus any premium paid on redemption or issue. It follows that when a bond or note is issued at a premium, the excess amount paid by the borrower over and above what has been paid to him may constitute negative interest, which may be deducted from the interest payable when determining what the taxable interest is. On the other h a n d , the definition of interest does not cover any gain or loss that is not attributable to a difference between what the issuer received and paid (e.g. a gain or loss not attributable to the issuer). a gain or loss that does not represent accrued interest or an issue price below par or a premium that the holder of s e c u r i t i e s , such as bonds or debentures, obtains on the sale of them to another person or on the repayment of the principal of a security that he has acquired from a previous owner for an amount different from t h e  amount received by the issuer of the security). Depending on the specific case, such gain or loss may be considered either business income or loss, capital gain or loss or income subject to Article 21.

The amount received by the seller of the bond will typically include interest accrued, but not yet due, at the time of the sale of the bond. In most cases, the source state will not seek to tax such accrued interest at the time of the disposition and will only tax the transferee of the bond or note on the full amount of interest subsequently paid (it is generally assumed in such cases that the price paid by the buyer for the bonds takes into account the future tax payment by the buyer of the interest accrued in favor of the seller at the time of the d i s p o s i t i o n ). However, in certain cases, some states tax the seller of the bonds on the accrued interest at the time of disposition (e.g. when a bond is sold to a tax-exempt entity). Such accrued interest is covered by the definition of interest and can therefore be taxed in the source state. In that case, that state will not tax the same amount in the hands of the buyer of the b o n d s  when the interest becomes due.

The definition of interest in the first sentence of paragraph 2 is in principle exhaustive. The definition of interest in the first sentence of paragraph 23 does not normally apply to payments made under certain types of non-traditional financial instruments where there is no underlying debt (e.g. interest rate swaps). However, the definition applies to the extent that a loan is deemed to exist under a substance over form rule, an abuse of rights principle or any similar doctrine

The second sentence of paragraph 2 excludes penalty charges for late payment from the definition of interest, but Contracting States are free to omit this sentence and to treat penalty charges as interest in their bilateral conventions. Penalty charges payable by agreement, custom or discretion are either payments calculated by reference to time or as fixed amounts. In some cases, they can combine both payment methods. Although they are prorated, they are not so much property income as a special form of compensation for the loss suffered by the creditor due to the debtor's d e l a y  in fulfilling its obligations. In addition, considerations of legal certainty and practical considerations make it advisable to treat all penalties of this kind, regardless of the form in which they are payable, e q u a l l y  i n  terms of their tax treatment. On the other hand, two Contracting States may exclude from the scope of Article 11 any interest which they prefer to treat as dividends.

Finally, the question arises whether annuities should be equated with interest. The view is that they should not. On the one hand, annuities paid in respect of past employment are referred to in Article 18 and are subject to the rules applicable to pensions. While it is true that the individual benefits from a purchased annuity include an interest element in relation to the purchase amount as well as

Copyright © 2024 Karnov Group Denmark A/S

a repayment element and that such benefits are "fruits civils" with daily accrual, on the other hand, it would be difficult for many states to distinguish between the element representing property income and the element representing property repayment for the sole purpose of taxing the income element in the same manner as income from assets other than real property. Tax laws often contain special provisions that classify annuities as wages, salaries and pensions and tax them accordingly.

**Note 3:**

If interest is included in the income of a permanent establishment in the source State and the debt-claim on which the interest income is based is directly connected with the permanent establishment, such interest shall be taxed under Article 11(5), which corresponds t o Article 11(4) of the OECD Model Convention, as profits f r o m t h e conduct of a trade or business, see Article 7.

Certain States consider that dividends, interest and royalties arising from sources within their territory and paid to individuals or legal entities resident in other States fall outside the scope of the regime designed to prevent them from being taxed both in the source State and in the State of the beneficial owner when the beneficial owner has a permanent establishment in the former State. Paragraph 4 is not based on such an assumption, sometimes referred to as "the force of attraction of the permanent establishment". The paragraph does not provide that interest accruing to a resident of a Contracting State from a source in the other State shall, by some kind of legal presumption or even fiction, be attributed to a permanent establishment which that resident may have in the latter State, so that State will not be required to limit its taxation in such a case. The paragraph merely provides that in the source State the interest is taxable as part of the profits of the permanent establishment owned by the beneficial owner resident in the other State if it is paid in respect of debt-claims forming part of the assets of the permanent establishment or connected directly with that establishment.

A debt-claim in respect of which interest is paid is directly connected with a permanent establishment and will therefore form part of its business assets if the "economic" ownership of the debt-claim is allocated to the permanent establishment in accordance with the principles developed in the Committee Report "Attribution of Profits to Permanent Establishments" (see in particular paragraphs 72-97 of Part I of the Report), for the purposes of applying Article 7(2). For the purposes of this paragraph, "economic" ownership of a debt-claim corresponds to ownership by a separate enterprise for income tax purposes, with the associated benefits and risks (e.g. the right to interest linked to the ownership of the debt-claim and the possibility of profit or loss from the increase or decrease in value of the debt-claim).

**Note 4:**

If there is a special relationship between the debtor and the creditor, or between both of them and a third party, and as a result an excessive amount of interest has been agreed in the debt relationship, the provisions of this Article shall only apply to the actual amount of interest. The excess amount shall be taxed in accordance w i t h the type of income it qualifies as.

The purpose of this paragraph is to limit the effect of the provisions relating to the taxation of interest in cases where, by reason of a special relationship between the payer and the person e n t i t l e d t o r e c e i v e t h e interest or between both of them and some other person, the amount of interest paid exceeds the amount which would have been agreed between the payer and the beneficial owner in the absence of that relationship. It is provided that in such a case the provisions of this Article shall apply only to the latter amount and that the excess part of the interest shall remain taxable according to the laws of the two Contracting States, due regard being had to the other provisions of this Convention. It is clear from the text that for this provision to apply, the interest considered as excess must arise from a special relationship between the payer and the person entitled to r e c e i v e t h e interest or between both of them and a third person. Examples include cases where interest is paid to a natural or legal

person who is entitled to receive

person who directly or indirectly controls the payer, or who is directly or indirectly controlled by him or is subordinate to a group that has a common interest with him. These examples are also similar or analogous to the cases covered by Article 9.

On the other hand, the concept of "special relationship" also covers blood relatives or relatives by marriage and, in general, any community of interests different from the legal relationship giving rise to the payment of the interest.

With respect to the tax treatment of the excess interest, the exact nature of such excess shall be determined taking into account the circumstances of each case in order to establish the category of income to which it belongs for the purpose of applying the tax laws of the States concerned and the provisions of the Convention. This paragraph allows only an adjustment of the rate at which interest is calculated and not a reclassification of the loan a s  a  contribution to equity. For such an adjustment to be possible under Article 11(64), it would be necessary, as a minimum, to remove the qualifying phrase "in relation to the debt claim for which it is paid". If it is considered necessary to clarify this further, the words 'for whatever reason' could be inserted after the word 'exceeds'. This paragraph may nevertheless have implications not only for the recipient but also for the payer of the excess interest; if the law of the source State so permits, deduction of the excess amount may be denied, t a k i n g   i n t o   a c c o u n t   t h e other provisions of the Agreement. Should the two Contracting States have difficulty in determining which other provisions of the Convention may apply to the excess interest in a particular case, nothing prevents them from including further clarifying provisions in the last sentence of paragraph 64, provided that the general purpose is not changed.

The national Danish legal basis for taxing certain interest paid from Denmark appears from SEL section 2(1)(d). It follows from the provision that the limited tax liability only applies to companies and associations etc. as mentioned in SEL § 1(1), which are domiciled abroad, insofar as they receive interest from sources in Denmark regarding debt that a company or an association etc. covered by SEL § 1 or SEL § 2(1)(a) has to legal persons as mentioned in SKL chapter 4 (controlled debt). However, this does not apply to interest on receivables that are linked to a permanent establishment covered by SEL § 2(1)(a). The tax liability does not include interest if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalties paid between associated companies in different Member States, or under a double taxation agreement with the Faroe Islands, Greenland or the state where the receiving company etc. is resident. However, this only applies if the paying company and the receiving company are associated as mentioned in this Directive for a c o n t i n u o u s  period of at least one year, within which the time of payment must lie. The tax liability lapses if a Danish parent company etc. itself directly or indirectly has a controlling influence in the receiving company etc., cf. SEL § 31 C, for a continuous period of at least 1 year, within w h i c h   t h e  time of payment must lie. The tax liability also lapses if the receiving company etc. is under the controlling influence of a parent company etc. resident in the Faroe Islands, Greenland or a state that has a double taxation treaty with Denmark, if this company etc. under the rules in the Faroe Islands, Greenland or this state can be exempted f r o m  CFC taxation of the interest if the conditions for this under these rules are met. The tax liability also lapses if the receiving company etc. proves that the foreign corporate taxation of the interest i s  a t  least ¾ of the Danish corporate taxation, and that it does not pay the interest to another foreign company etc. that is subject to a corporate taxation of the interest that is less than ¾ of the Danish corporate taxation. There is a 5-year statute of limitations for Danish interest tax, cf. KSL § 67A and the legislative history (LFF 2010 75). However, in the ruling SKM2016.263.SKAT, the Danish Tax Agency has announced that the Tax Agency only considers the 5-year period to apply to the Tax Administration's claims for withholding tax, while

Copyright © 2024 Karnov Group Denmark A/S

taxpayers' claims for refund of withholding taxes are subject to a 3-year limitation p e r i o d . In TfS 2000, 394, the Danish Ministry of Taxation has stated that Danish tax authorities must, upon request, certify that pension funds and distributing investment associations that reclaim excessive interest tax withheld abroad are tax resident in Denmark, regardless of whether they are tax exempt according to SEL § 3

**Note 5:**

Paragraph 5 contains derogations from the principle of residence state taxation in paragraph 5.

1. Thus, interest that is dependent on turnover, profits, etc. can be taxed in the source state at 15 percent, corresponding to the general rate on dividends set out in Article 10(2)(b). An additional exception, which specifically concerns US law, has been introduced on US initiative as a result of American legislation on the taxation of returns on investments in REMICs (Real Estate Mortgage Investment Conduits). A REMIC has ordinary and residual shares. Returns in the form of excess interest to non-US residents who hold residual s h a r e s   a r e  taxed according to special rules in the US. The provision is inserted to equalize Danish and American investors.

See selected judgments and decisions related to Article 11 of the OECD Model Law

**(12)**

**Article 12 Royalties**

According to the OECD Model Tax Convention, royalties can only be taxed in the state where the recipient is resident. It is the so-called beneficial owner of royalties who can claim the benefits of the treaty

The concept of beneficial owner is described in the comments to t h e  model agreement.

In (cases 69/2021, 79/2021 and 70/2021 Judgment delivered on January 9, 2023) the Supreme Court has, among other things, considered the interpretation of the concept.

The Supreme Court held that under Article 10(2), dividends paid by a company resident in a Contracting State to a resident of the other Contracting State may be taxed in the f i r s t - m e n t i o n e d  State only at a certain percentage of the gross amount of the dividends if the recipient is the "beneficial owner" of the dividends. According to paragraph 2 of Article 3, any term not defined in the C o n v e n t i o n  shall have the meaning which it has in the law of the Contracting State concerning the taxes to which the Convention applies. The term "beneficial owner" is not defined in the conventions. Since the term delimits the taxing jurisdiction of the contracting states, the Supreme Court finds that it follows from the context that the meaning cannot depend on the respective laws of the contracting states. The Supreme Court therefore agrees that the term "beneficial owner" must be understood in the light of t h e  OECD Model Tax Convention, including the OECD's relevant comments thereon on countering abuse.

In Danish law, there has been doubt as to whether the meaning of the terms beneficial owner and beneficial income recipient are the same

The parties to the case argued that the legislative history of a 2001 amendment t o  section 2(1)(c) of SEL.. 1(c) in 2001, it appears that the legislator has assumed an understanding of the term "beneficial owner" which is not based on the OECD model definitions, but on the term "rightful income recipient" in Danish tax law, that the purpose of the aforementioned amendment was to p r e v e n t  the abuse of the previously applicable tax exemption for dividend payments resulting from the establishment of Danish holding companies, the sole purpose of which was to avoid taxation in other countries, and at the same time take into account the exceptions t o   t h e  main rule on withholding tax, which Denmark is obliged to have according to e.g. double taxation treaties.e.g. double taxation treaties. Against this background, it must be clearly presumed that the amendment of the Act was based on a different understanding of the term "beneficial owner" in the relevant double taxation treaties than the one set out in the OECD Model Tax Convention with comments, so that tax exemption would be granted to a greater extent than required under the treaties. As stated by the High Court,

the legislative history of the 2001 amendment does not contain any mention of the term "rightful owner" (or "rightful income recipient"). The Supreme Court found this on

Copyright © 2024 Karnov Group Denmark A/S

background that there is no other evidence for a different understanding o f t h e term "beneficial owner" than the one stated. What the Minister of Taxation stated in answers to the Danish Parliament about the possibilities of, among other things, restructuring and contribution of intermediate holding companies cannot be understood to mean that t h e intention was to allow abuse in the form of "artifice" etc. which, according to the Model Tax Convention and the associated comments, justifies that there is no tax exemption.

**Note 1:**

Article 12 of this treaty is formulated in accordance with Article 12 of the OECD Model Tax Convention, whereby royalties can only be taxed in the state where the recipient is resident.

If the royalty recipient documents that he is resident in a foreign state with which Denmark has entered into a DBO, t h e withholding of royalty tax in Denmark will be waived or reduced in accordance with the provisions of the treaty. When Denmark's waiver of taxation is conditional on the royalty being taxable in the contracting state, the recipient must present the necessary documentation. Form 06.015 has been prepared for this purpose. The form must be certified by the US authorities. T h e US authorities must certify that the recipient is a resident of a US state and that the payments are taxable there. After this certification, the form must be submitted electronically to the Danish Tax Agency, which must be done via the Danish Tax Agency's website. The Danish Tax Agency will then decide whether withholding of royalty tax can be reduced or waived. The decision is notified to the taxpayer and the withholding agent, cf. section 2 of BEK no. 1442 of December 20, 2005, and the excess royalty tax withheld in Denmark can be refunded. There is a 5-year limitation period for Danish royalty tax, cf. KSL § 67A and the legislative history (LFF 2010 75). However, t h e D a n i s h Tax Agency has announced in SKM2016.263.SKAT that the Danish Tax A g e n c y , with effect from recovery requests received after September 9, 2016, only considers the 5-year limitation period to apply to the Tax Administration's claims for withholding tax, while taxpayers' claims for refund of withholding tax are subject to a 3-year limitation period. If a certified form 06.015 (see above) is already available at the time o f payment/credit, and the residence and tax liability of the recipient(s) concerned are unchanged, no Danish royalty tax must be withheld. According to KSL § 66 A, in connection with any payment/credit of royalty tax from D e n m a r k , a report must be made to the tax authorities (form 06.013). In the opposite situation, where the royalty recipient is resident in Denmark, the request for refund of excess royalty tax withheld must be s u b m i t t e d to the tax authorities in the relevant state and the detailed rules for the refund must be informed there.

Where a foreign recipient of royalties from sources in this country carries on business through a permanent establishment in this country and where the exclusive right for which the royalty is paid is linked to this permanent establishment, there is no limited tax liability of the royalty per se, but the permanent establishment will be subject to limited tax liability

Note that the Ministry of Taxation in TfS 2000, 394 has stated that the tax authorities, upon request, must also carry out certification for pension funds and d i s t r i b u t i n g investment funds, regardless of whether they are tax exempt under SEL § 3.

**Note 2:**

The term royalties is defined in paragraph 2. The provision differs from the Fashion Law Agreement. According to paragraph 2(a), royalties include payments of any kind received as consideration for the use of, or the right to use, any copyright in a literary, artistic, scientific or other work (including computer software, motion pictures, audio or video tapes or disks and other means of reproducing images and sounds), any patent, trademark, design or model, drawing, secret formula or process, or other similar right or asset, or for information concerning industrial, commercial or scientific experience. As can be seen, royalties here also include the rights to computer software, motion pictures, audio and video tapes, as well as disks and other media for the reproduction of images and sounds.

**Note 3:**

Copyright © 2024 Karnov Group Denmark A/S

In point (b) a provision is inserted which is not included in the OECD model. Art. 12 now also covers profits from the disposal of any asset referred to in Art. 12(2)(a), provided that such profits are dependent on the productivity, use or resale of the asset. Profits not covered by Article 12 will instead be covered by Article 13.

Payments made solely as consideration for the exclusive right to sell a product or perform a service in a given territory do not constitute royalties, as they are not made as consideration for the use of, or the right to use, a capital good covered by the definition. These payments, which can best be considered as payments made to increase sales revenue, should rather be classified under Art. 7 or Art. 14. An example of such a payment is a clothing distributor resident in one Contracting State paying a certain amount of money to a manufacturer resident in the other Contracting State who produces shirts of a well-known brand as consideration for the exclusive right to sell those shirts in the former State. In this example, the distributor does not pay for the right to use the name or trademark under which the shirts are sold; he merely obtains the exclusive right to sell in his State of residence shirts which he buys from the manufacturer. A payment cannot be said to be "for the use of or the right to u s e " a design, model or drawing if the payment is for t h e  development of a design, model or drawing that does not already exist. In this case, the payment is remuneration for services that will result in the development of that design, model or drawing and will thus fall under Art. 7 / Art. 14. This will be the case even if the designer of the design (e.g. an architect) reserves all rights, including the copyright to the design. However, if the owner of the copyright in already executed drawings merely grants someone the right to modify or reproduce those drawings without actually doing any further work, the payment received by the owner as consideration for transferring the right to such use of the drawings will be royalties. In a know-how contract, one of the parties agrees to share its special knowledge and experience, which remains unknown to the public, with the other party so that it can use it for its own benefit. It is recognized that the assignor does not have to participate in the application of the formulas made available to the licensee and that he does not guarantee the result of the application. This type of contract thus differs from contracts for the provision of services, where one of the parties undertakes to use the usual skills of its profession to carry out work for the other party. Payments made under such contracts are g e n e r a l l y  c o v e r e d  by Art. 7 / Art. 14.

The need to distinguish between two types of payments, i.e. payments for know-how and payments for the provision of services, sometimes gives rise to difficulties in practice. The following criteria are relevant in order t o  make this distinction:

- Contracts for the supply of know-how concern information of the kind described in paragraph 11 of the commentary on Article 12 which already exists or concern the supply of such information after the basis for its creation has been established and contain specific provisions on the confidentiality of the information.

- In contracts for the provision of services, the supplier undertakes to provide services which may involve the use of special knowledge, skill or expertise by the supplier but which do not involve the transfer of such special knowledge, skill or expertise to the other party.

- In most cases, when supplying know-how, there will generally be very little that needs to be done by the supplier under t h e  contract beyond passing on existing information or reproducing e x i s t i n g  material. A contract for the provision of services, on the o t h e r  h a n d ,  w i l l  i n  most cases involve much higher costs for the supplier to fulfill its obligations under the contract. For example, depending on the nature of t h e  services, it may be necessary for the supplier to incur salary costs for employees engaged in research, design, testing, drawing or other similar work, or to incur costs for s u b c o n t r a c t o r s  for the performance of similar services.

Examples of payments that should therefore not be considered to be received as payment for the provision of know-how, but rather for the provision of services, include

- payments received for after-sales services.

- payments for services provided by the seller to the buyer under a warranty.

- payments for a list of potential customers where such a list has been prepared specifically for use by the payer on the basis of generally available information (however, a payment for a confidential list of customers to whom t h e  payee has provided a particular product or service constitutes a payment for know-how as it relates to commercial experience gained by the payee in doing business with those customers).

- payments for an opinion given by an engineer, lawyer or accountant; and

- payments for advice transmitted electronically, for communicating electronically with technicians or for accessing, via computer networks, a troubleshooting d a t a b a s e ,  s u c h  a s  a  database that provides software users with non-confidential information in response to frequently asked questions or provides suggested solutions to commonly encountered problems.

It's important to keep in mind that the national taxing authority in KSL § Section 2(1)(8) and SEL Section 2(1)(g) , contrary to Article 12 of the Convention, do not cover the use of or the right to use any copyright in literary, artistic or scientific work, such as e.g. author's royalties and royalties for the use of music, feature films, etc., just as the n a t i o n a l  Danish taxing authority does not cover the use of or the right to use industrial, commercial or scientific equipment. It should be noted that when there is no national authority to tax a given type of payments as royalties, it is irrelevant whether the a g r e e m e n t  i n  question contains a provision on withholding taxes on royalties.

A particular issue is the qualification of payments received as remuneration for computer software. Almost all OECD countries protect software under copyright law. A distinction must be made between royalties on the one hand and payment for goods on the other. The rights h o l d e r  g e n e r a l l y  has the exclusive right to:

- making copies of the copyrighted work

- making the protected work available to the public in its original or modified form.

If others wish to obtain the right holder's consent to use the copyrighted work in one of the described ways, and this use is against payment, this is a royalty payment. The notes to Article 12 of the OECD Model Convention mention three situations that have been taken into consideration:

1. Where payments are made for a transfer that does not include all rights to the software in question. Such a case exists when the transferor is the author of the software in question and has made part of his rights available to another person t o  e n a b l e  him to develop and commercially exploit the software in question. In such situations, the remuneration seems to be considered royalty only in very limited cases.

2. Where the consideration is paid for the transfer of rights associated with t h e  software in question. This does not mean a complete transfer, but a comprehensive, albeit partial, transfer involving an exclusive right of use for a specific period of time or within a limited geographical area;

- additional remuneration proportionate to usage;

- remuneration in the form of a substantial lump sum.

Generally speaking, in these situations it will be business income covered by Art. 7 / Art. 14.

3. Where payments are made under mixed contracts, for example, the sale of computer hardware with embedded software and grants of the right to use software, combined with the provision of services. In such situations, the contract may need to be split into its individual parts.

**Note 4:**

---

According to paragraph 3, which corresponds to paragraph 3 of the OECD Model Convention, the provision does not apply if the so-called beneficial owner of the royalty carries on business through a permanent establishment in the source state and the right underlying the royalty payments relates to that permanent establishment. In that case, the provisions of Art. 7 / Art. 14 on profits from business activities apply.

Certain States consider that dividends, interest and royalties arising from sources within their territory and payable to individuals or legal entities resident in other States fall outside the scope of the regime designed to prevent them from being taxed both in the source State and in the State of the beneficial owner when the beneficial owner has a permanent establishment in the former State. Paragraph 3 is not based on such an assumption, sometimes referred to as "the force of attraction of the permanent establishment". The paragraph does not provide that royalties accruing to a resident o f a  Contracting State from a source in the other State are to be attributed by a kind of legal presumption, or even a fiction, to a permanent establishment which that resident may have in the latter S t a t e , so that that State will not be bound to limit its taxation in such a case. The paragraph merely provides that royalties are taxable in the source State as part of the profits of the permanent establishment owned by the beneficial owner resident in the other S t a t e  if they are paid for rights or property forming part of the assets of the permanent establishment or otherwise directly connected with that establishment. In such case, paragraph 3 shall exempt the source State from which the royalties are paid from all restrictions under the Article. The preceding explanations are i n a c c o r d a n c e  w i t h  t h e  explanations in the commentary to Article 7.

It has been argued that the paragraph may give rise to abuse by transferring rights or assets to permanent establishments set up solely f o r  that purpose in countries that tax royalty income particularly favorably. Apart from the fact that the provisions of Art. 29 (and in particular Art. 29(8)) and the principles in the section "Abuse of the Agreement" in the commentary to Art. 1 will typically prevent such abusive transactions, it should be recalled that a particular location can only constitute a permanent establishment if business is carried on at that location and that, as explained below, the requirement that a right or property must have a "direct connection with" such a location involves more than the right or property merely being recorded in the books of the permanent establishment.

A right or property in respect of which royalties are paid is directly connected with a permanent establishment and will therefore form part of its business assets if the "economic" ownership of the right or property is allocated to the permanent establishment in accordance with t h e principles developed in the Committee Report "Attribution of Profits to Permanent Establishments" (see in particular paragraphs 72-97 of Part I of the Report) for the p u r p o s e s  o f  Article 7(2). For the purposes of this paragraph, "economic" ownership of a right or asset corresponds to ownership by a separate enterprise for income tax purposes, with the associated benefits and risks (e.g. the right to royalties attached to the ownership of the right or asset, the right to depreciate and the possibility of profit or loss from the increase or decrease in value of the right or asset).

**Note 5:**

Paragraph 4 repeats the arm's length principle from Article 9. If there is a special relationship, i.e. a community of interest, between the debtor and the creditor - and possibly also with a third party - and this community of interest has manifested itself in an agreement on an excessive royalty amount, Article 12 shall only apply to the part of the royalty payments that would have been agreed between independent parties. The excess amount shall then be treated a c c o r d i n g  t o  how it is qualified, cf. paragraph 4.

The purpose of this paragraph is to limit the effect of the provisions relating to the taxation of royalties in cases where, as a result of a special relationship between the payer and the beneficial owner or between both of them and a third person, the amount of royalties paid exceeds the amount

which would have been agreed between the payer and the beneficial owner,

if the said connection had not existed. It is provided that in such case the provisions of the Article shall apply only to the latter amount and that the excess part of the royalties shall remain taxable according to the laws of the two Contracting States, taking into account the other provisions of this Convention. The paragraph only allows adjustment of the royalty amount and not reclassification of the royalty amount so that it changes character, e.g. to a contribution to equity.

It is clear from the text that in order for this provision to apply, the royalties considered as excess must result from a special relationship between the payer and the beneficial owner or between one of them and a third person. An example would be cases where royalties are paid to a natural or legal person who directly or indirectly c o n t r o l s  the payer or is directly or indirectly controlled by him or is subordinate to a group which has a common interest with him. These examples are also similar or analogous to the cases covered by Article 9.

On the other hand, the concept of "special relationship" also covers blood relatives or relatives by marriage and, in general, any community of interest different from the legal relationship that gives rise to the payment of royalties.

With respect to the tax treatment of the excess royalties, the exact nature of such excess shall be determined taking into account the circumstances of each case for the purpose of determining the category of income to which it belongs for the application of the tax laws of the States concerned and the provisions of the Convention.

If the laws of the two Contracting States lay down principles and rules which oblige them to apply different articles for the purpose of taxing the excess, it will be necessary to use the m u t u a l  agreement procedure provided for in the Convention to resolve the difficulty.

See selected judgments and decisions related to Article 12 of the OECD Model Law

**(13)**

**Article 13 Capital gains**

The article deals with gains on the disposal of all types of assets. The article deviates from Article 13 of the OECD Model Tax Convention. The article does not contain Article 13(4) of the Model Tax Convention on source country taxation of gains f r o m  t h e  sale of shares in real estate companies. This profit is therefore instead covered by Art. 13(6).

**Note 1:**

The OECD model is structured in such a way that the right to tax capital gains from an asset of a given kind is attributed to the State that is also entitled under the treaty to tax both the asset and the income derived from it. The right to tax a g a i n  from the alienation of a business asset shall be given to the same State, irrespective of whether such gain is a capital gain or a business profit. Consequently, there is no distinction between capital gains and business profits, nor is it necessary to have specific provisions on whether the Article on capital gains or Article 7 on business profits should apply. The Article does not provide a detailed definition of the concept of capital gains. The term 'disposal of property' is used in particular to cover capital gains arising from the sale or exchange o f  property and also from a partial disposal, expropriation, transfer to a company in exchange for shares, sale of a right, gift transfer and even transfer of property on death. Special circumstances can lead to taxation on the increase in value of an asset that has not been disposed of. This may be the case if t h e  value of an asset has increased in such a way that the owner starts to write up this asset in his books. A number of states levy special taxes on such book profits, amounts set aside as reserves, an increase in paid-up capital and other revaluations resulting from fair market value.

of the book value of a capital asset to its real value. These taxes on capital appreciation (value added taxes) are covered by the Agreement under Article 2.

**Note 2:**

Paragraph 1 corresponds to Art. 13(1) of the Model Convention and states that the State in which the immovable property is situated may tax gains from the disposal of the immovable property. The right of taxation also extends to recaptured depreciation. Therefore, paragraph 1 shall not apply to gains f r o m  the alienation of immovable property situated in the Contracting State of which the alienator is a resident or which is situated in a third State; in such cases the provision of paragraph 5 of Article 13 shall apply.

**Note 3:**

There is no provision in the OECD Model that corresponds to paragraph 2 of this Agreement. In addition to real property as described in Art. 6(2), it also includes participation in United States real property interests, including shares in US companies with real property i n v e s t m e n t s  that are subject to a special set of rules known as Foreign Investment in Real Property (FIRPTA).

**Note 4:**

Paragraph 3 corresponds to Article 13(2) of the Model Convention. Gains from the alienation of movable property forming part of the business property of a permanent establishment or a fixed place of business and gains from the alienation of the permanent establishment or fixed place itself may be taxed in the State in which the permanent establishment is situated (the source State). The provision also covers intangible assets such as goodwill, licenses, emission allowances. For t h e  p u r p o s e s  of paragraph 3, property will form part of the business assets of a permanent establishment if the "economic" ownership of the property has been allocated to the permanent establishment in accordance with the principles set out in the Committee Report "Attribution of Profits to Permanent Establishments" (see in particular paragraphs 72-97 of the Part I Association Report), for the purposes of the application of Article 7(3) of the Convention.

2. For the purposes of this paragraph, "economic" ownership of capital assets is equivalent to ownership by a separate enterprise for income tax purposes, with the associated benefits and risks (e.g., the right to the income associated with ownership of the a s s e t s , the right to depreciate and the possibility of profit or loss from appreciation or depreciation of the assets). Therefore, the mere fact t h a t  the assets have been recorded for accounting purposes in the books of the permanent establishment is not sufficient to conclude that they are effectively connected with the permanent establishment

**Note 5:**

Under paragraph 4, gains from the sale of ships, boats, aircraft and containers used in international traffic (see definition in Art. 3(1)(de)) and movable property connected with the use of these assets may be taxed only in the State of residence of the enterprise. Real property is not included. Paragraph 4 shall apply where the enterprise disposing of the property uses the ships or aircraft referred to in that paragraph either to carry out the transport a c t i v i t y  itself or by leasing the ships or aircraft fully equipped, manned and supplied. However, the paragraph does not apply in cases where the enterprise that owns the ships or aircraft does not use t h e m  itself (e.g. if the enterprise leases the asset to another person - e x c e p t  i n  t h e  case of occasional bare boat leasing, see paragraph 5 of the commentary to Art. 8). In this case, profits acquired by the beneficial owner of the property, or of related assets other t h a n i m m o v a b l e  p r o p e r t y ,  will be covered by paragraph 3 or by paragraph 6.

**Note 6:**

Profits on such installations, drilling rigs and ships used for exploration and exploitation of natural resources which - e.g. in connection with relocation - are deemed to have been disposed of, are taxed corresponding to the value of recovered depreciation. The provision is inserted at Danish

request

**Note 7:**

Paragraph 6 establishes as a kind of catch-all provision that the right to tax gains on the disposal of all assets other than those mentioned in paragraphs 1 to 5 belongs exclusively to the State of residence. The provision corresponds to Art. 13(5) of the OECD Model Tax Convention. It should be noted that Art. 13 is not intended to apply to

reversed on lottery winnings and redemption gains from premium bonds etc., see commentary no. 19 to Art. 13.

**Note 8:**

The provision, which should be read in conjunction with Art. 5, deals with a situation where a person is liable to tax on the disposal of assets in both the state of residence and the source state, the asset being deemed alienated in one state in a given year, while the other state does not tax in that year, but later. To ensure access to relief, the individual in this s i t u a t i o n  may elect to be treated for tax purposes in the state of residence in the same year as if the asset had been disposed of and reacquired. The election must be made collectively for all relevant assets.

**Note 9:**

Paragraph 8 deals with the coordination of taxation of gains on disposal in connection with restructuring etc. and provides the possibility of deferring the time of taxation in the source country. The application of the provision presupposes agreement on the deferral and the specific conditions for this between the competent authorities. The situation may, for example, be relevant in the event of a merger between two companies in one state that both have a permanent establishment in the other state, and where the merger immediately triggers taxation in one state, but only later in the other state, whereby there is a risk that double taxation cannot be alleviated.

See selected judgments and decisions related to Article 13 of the OECD Model Law

**(14)**

**Article 14 Free profession Note 1:**

Article 14 should be methodologically considered in conjunction with the following articles: Article 15 (income from employment), Article 16 (directors' fees), Article 17 (artists and sportsmen), Article 18 (pensions, social security and annuities and alimony), Article 19 (public office) and Article 20 (students and trainees).

Art. 14 has been deleted from the OECD Model Tax Convention, but a partly corresponding text remains in the UN Model. The OECD decision reflects the fact t h a t  no differences were intended between the concepts of "permanent establishment" as used in Art. 7 and "fixed place" as used in Art. 14, or between how profit and tax should be calculated in Art. 7 and Art. 14 respectively. Moreover, it was not always clear which activities fell under Article 14 and which fell under Article 7. In agreements where Article 14 is omitted, this means that income earned from the exercise of a liberal profession or from other activities of an independent nature is now instead treated under Article 7 as profits from commercial activities.

**Note 2:**

Paragraph 1 of the article corresponds to Article 14(1) of the OECD Model Tax Convention as it was drafted before 2000. Art. 14 was deleted from the OECD Model Convention when it was revised in 2000. The article concerns the exercise of a profession by natural persons. Hereafter, the exercise of a free (i.e. liberal) profession will generally be taxed in the state of residence. Free profession means in particular self-employed scientific, literary, educational or teaching activities and self-employed activities within the liberal professions. However, if the liberal profession is exercised in the other State, the source State, through a so-called "fixed base", the part of the income attributable thereto may be taxed in the source State. The term "fixed place" is not defined in the treaty itself or in t h e  Model Law, but it would include, for example, a doctor's or dentist's consulting room or an architect's, lawyer's, engineer's or accountant's office.

**Note 3:**

Paragraph 2 of the article differs from Article 14(2) of the then OECD Model Convention. Whereas paragraph 2 of the OECD model described and exemplified the scope of the provision, it appears here that the

income must be calculated according to the principles in Article 7(3). Although paragraph 2 of the model is not included, the article deals with such activities that would normally be described as a liberal profession. Thus, excluded from being covered by the provision are, for example, industrial and commercial activities, as well as liberal professions,

Copyright © 2024 Karnov Group Denmark A/S

practiced in an employment relationship. For example, a doctor employed as a company doctor at a company would not be covered.

In order for a person to be covered by Article 14, it is required that, according to Danish national rules, the person in question is considered to be self-employed in relation to the specific work performed in the country. Denmark has, by limited tax liability, national authority to tax in KSL § 2(1)(4) and SEL § 2(1)(a).

See selected judgments and decisions related to Article 14 of the OECD Model Law

**(15)**

**Article 15 Personal work in an official capacity**

Article 15 establishes the general rule for the taxation of employment income (other than pensions), namely that such income may be taxed in the State in which the work connected with the employment is actually carried out. Work in an employment relationship shall be deemed to be performed at the place where the e m p l o y e e  i s  physically present at the time when the work for which remuneration is paid is performed. Art. 15(1) and (2) correspond to Art. 15 of the OECD Model, while (3) differs.

**Note 1:**

The only exceptions to the general rule just mentioned are r e m u n e r a t i o n  acquired by crew members of ships or aircraft in international traffic (Article 15(3)), pensions (Article 18) and remuneration and pensions in connection with public office (Article 19). Remuneration outside e m p l o y m e n t  for directors of companies falls under Article 16.

**Note 2:**

The article applies to salary and other remuneration, holiday pay, severance pay, employee benefits, life insurance coverage a n d  stock options. See BEK no. 2104 of 23/11/2021, chapter 5, as well as SKM2006.507.SR/TfS 2006, 848 and SKM2010.50.SR/TfS 2010, 189 on Stock options. Any remuneration paid after the termination of an employment relationship but for work performed before the termination of the employment relationship (for example, salary or bonus for the last period of work or commission for sales made during that period) will be deemed to have been earned in the state in which the r e l e v a n t  work activities have been performed.

A payment for unused vacation or sick days earned during the last year of work is the part of the remuneration for the work period that triggered the right to receive vacation and sick pay. An employee may also be entitled to receive payment for unused vacation and sick days several years in arrears at the end of the employment relationship. Unless the specific circumstances indicate otherwise, payments received after the termination of the employment relationship as compensation for unused vacation days and sick days several years back in time shall be considered as a benefit to which the person concerned has been entitled as a result of the last 12 months of employment, distributed proportionally according to where the work has been performed during the period in question. In some cases, the employer is obliged (by law or by contract) t o  t e r m i n a t e  t h e  e m p l o y e e  with a certain notice period. If the employee is t o l d  t h a t  he no longer has to perform his work but is simply paid the remuneration for the notice period, the remuneration has clearly been paid by virtue of the employment relationship and, as a result, the remuneration "derives" from it, see paragraph 1. In such cases, the remuneration shall be deemed to arise in the State where it is reasonable to assume that the employee would have worked during the notice period.

Certain payments may, subject to various specified agreements, be made after the termination of the employment relationship. Such payments shall be deemed to b e  covered by Article 15 and to the extent that these payments relate t o  a specific period of employment in a given State, they shall be deemed to be remuneration for work activities performed in that State. As many states will not accept a deferral of tax on employment income, even in cases w h e r e  the payment is made afterwards, it is important that states taxing such remuneration received after termination of employment also ensure that double taxation is avoided.

See the OECD Model Tax Convention's comments section 2.3-2.16 on how to deal with various forms of remuneration for personal work when the remuneration is not paid until after the termination of the employment relationship.

**Note 3:**

It may in some cases be difficult to determine whether work performed in one State by an individual resident in another State for an enterprise resident in the first State (or which has a permanent establishment in that State) is employment where Article 15 applies or services performed by a separate enterprise where Article 7 applies, or more generally whether the exception applies. However, according to paragraph 8.4 of the Commentary, in many States, different rules and criteria have been developed in legislation or case law (e.g. substance over form rules) to distinguish between cases where services provided by a natural person to an enterprise are to be considered to be provided in an employment relationship and cases where such services are to be considered to be provided under a contract between two separate enterprises. This distinction is important in connection w i t h   t h e application of the provisions of Article 15, in particular those of paragraph 2(b) and (c).

It appears from the comments to article 15 of the model agreement, among other things, point

8.4 and point 8.7 that, as a starting point, it is the national law of the working state that determines the boundaries of what constitutes an employment relationship. It also follows from the commentary to Article 3(2) that if a term is not defined directly in the Model Tax Convention, it is the internal law of the state that wishes to impose taxes that must be used for interpretation. On this basis, in SKM2021.211.SR, the income from some international experts was not considered to be income from employment, as the international experts were not in employment under internal Danish law.

In the comments, the OECD has described various types of benefits that are to be regarded as remuneration in an employment relationship, even if the benefit is paid after the termination of the employment relationship. See points 2.3 to 2.16 in the commentary to Article 15 of t h e   Model Law.

**Note 4:**

: Article 15(1) lays down the main rule for the taxation of income from personal services, namely that salaries, wages and other similar remuneration from employment derived by a resident of a Contracting State shall be taxable only in that State (the resident State) unless the work is performed in the other Contracting State (the working State/source State). For example, if the work is performed in Denmark and the person is a resident of D e n m a r k ,   the right to tax is of course vested solely in Denmark. If the person is a resident of Denmark, but performs work in the United States, t h e   starting point, cf. Art. 15(1), is that the right of taxation is transferred from Denmark to the United States (source state), unless all the conditions in paragraph 2 are met. If all the conditions in paragraph 2 are met, the employee is taxed in his or her resident state, even if the work is performed in the other state. This is in accordance with Article 15(1) of the OECD Model Tax Convention

**Note 5:**

The right of taxation of the source state (the state of employment) is conditional on the remuneration relating to work performed in that state. Remuneration relating to periods during which the employee does not actually work is also regarded as remuneration for personal work in an employment relationship. It is assumed that the remuneration is related to an employment relationship covered by Article 15.

**Note 6:**

Article 15(2), like Article 15(2) of the OECD Model Tax Convention, contains an exception to the main rule in paragraph 1. When a person resident in one state, e.g. Denmark, performs work in the other state, here the United States (working state = source state), the United States, despite the starting point in paragraph 1, will not be entitled to tax the salary income if the 3 conditions listed in paragraph 2 are all met. The taxation is then made exclusively in the resident state, here presumably Denmark.

The meaning and intent of Art. 15(2)(b) and (c) is to avoid withholding tax

in connection with short-term employment relationships to the extent that the income from the employment is not considered a deductible expense in the withholding tax.

Copyright © 2024 Karnov Group Denmark A/S

State because the employer is not subject to tax in that State as the employer is neither resident nor has a permanent establishment in that State. These exceptions can also be justified by the fact that it would be a very significant administrative burden to require withholding tax to be deducted at source for short-term employment relationships in cases where the employer is neither resident nor has a permanent establishment in that State.

The conditions for the right of taxation not to pass to the source state, the US, from the first day of work are as follows:

**Note 7:**

(1) The employee may not reside in the US (or in Denmark) for more than 183 days in a 12-month period beginning or ending in the relevant tax year, see SKM2001.26.LSR/TfS 2001, 160. The reference to "the tax year in question" must be interpreted as a reference to the tax year of the state in which a resident of the other state has performed his work and where the relevant services have been performed.

Although Member States have used different methods to calculate t h e 183-day period, there is only one way that is compatible with the wording of this paragraph: the method that looks at the 'number of days the person is physically present'. The application of this method is simple and clear in that the natural person is either present in a state or not present. Presence can also be relatively easily documented by the taxpayer when the tax authorities require proof. Under this method, the following days must be included in the calculation: part of a day, the day of arrival, the day of departure and all other days spent in the state where the work is performed, such as Saturdays and S u n d a y s , national holidays, holidays before, during and after the work is performed, short-term interruptions of work (training, strikes, lockouts, delays in deliveries), sick days (unless they prevent the person from leaving the working state and he would otherwise be entitled to exemption from taxation) and death or illness in the family. However, days spent in the State of employment in transit during a journey between two places outside the State of employment must be disregarded in the calculation. It follows from these principles that any full day spent outside the State of work, whether on vacation, business travel or otherwise, should not be taken into account. A day during which any part, however brief, of the taxpayer is present in a state counts as a day in that state for purposes of computing the 183-day period.

Days during which the taxpayer may be resident in the source state/working state shall not be included in the calculation of the 183 days.

**Note 8:**

(2) The remuneration must not be paid by an employer. The application of t h e second condition to fiscally transparent partnerships creates difficulties, as such partnerships are not considered a resident of a Contracting State for the purposes of Article 4 (see paragraph 8.8 of the commentary on Article 4). While it is clear that such a partnership may qualify as an "employer" (especially according to the definition of this term in the laws of some States, e.g. when an employer is defined as a person subject to withholding tax), the application of the condition at partnership level without regard to the situation of the partners would therefore render the condition completely meaningless and

**Note 9:**

(3) The remuneration may not be paid by a permanent establishment that the employer has in the United States (Denmark)

**Note 10:**

The wording of paragraph 3 differs from the 2017 version of the OECD model. Previously, the right of taxation was typically attributed either to the state in which the effective management of the enterprise (employer) was located or the state in which the enterprise (employer) was resident. According to the wording of this Convention, remuneration for work performed as a crew member on board a ship/aircraft in international traffic (see definition in Art. 3(1)(e)) can only be taxed in the State in which the employee is resident. The OECD Model's additional criterion that: "... unless it is performed on board a ship or aircraft used exclusively for

transportation in the other Contracting State" is not included in this agreement.

The definition of international traffic in this Agreement also applies to carriage by a ship or aircraft used by an enterprise resident in a third State. This amended definition allows the application of Article 15(3) to a resident of a Contracting State who receives remuneration for employment on a ship or aircraft used by an enterprise resident in a third State.

Paragraph 3 applies to crew members on ships and aircraft. This is clear from the reference to work "performed as a member of the crew of a ship or aircraft". These words are broad enough to cover all forms of work performed as part of the normal operation of the ship or aircraft, including, for example, work performed by employees in restaurants on a cruise ship or work performed by a stewardess flying her last flight before r e t i r i n g . However, they do not include work that can be performed on a ship or aircraft but is not related to its operation (e.g. an employee of an insurance company selling house and car insurance to passengers on a cruise ship.

Denmark, as a source state with limited tax liability, has national authority t o  tax earned income in KSL § 2, paragraph 1, no. 1.

See selected judgments and decisions related to Article 15 of the OECD Model Law

**(16)**

**Article 16 Directors' fees**

Article 16 corresponds to Article 16 of the OECD Model Convention.

**Note 1:**

The remuneration is attributed to Article 16, regardless of the form in which it is paid (cash, free benefits, etc.). See SKM2013.700.HR/TfS 2013, 630 on share options. Remuneration in the form of stock options is only covered by Article 16 until the option is exercised. If the shares are acquired and if they are later disposed of at a profit, the profit will be covered by Article 13.

**Note 2:**

The article implies that if an individual resident in one state receives fees and/or other similar remuneration as a director of a company resident in the other state (the source state), the source state may tax the fees. If the director also performs other work for the company (e.g. as a consultant or lawyer), the remuneration for this will usually be covered by Art. 15 or by Art. 7.

According to the text of the agreement, it also covers board remuneration received by legal entities. However, in Denmark, board members must be natural persons.

**Note 3:**

It is irrelevant where the board meetings etc. are held. The decisive factor is where the company is domiciled. The provision only covers actual board members. Remuneration of assistants is covered by Art. 15

**Note 4:**

The provision does not generally cover fees or remuneration for participation in public companies' boards of directors, committees, boards, councils, etc. Such remuneration must instead be included under article 19 of the collective agreement, unless it concerns the performance of duties in connection with business activities as mentioned in article 19(3). It is unclear whether the provision also covers remuneration received by a member of a company's supervisory board. Comment No. 3 to Article 16 of the OECD Model Tax Convention states that the provision only applies to boards of directors, but not comparable corporate bodies, unless otherwise agreed in the convention. See Poul Erik Lytken and Louise Dyrup Jensen: "Hvorfor Tilsynsråd?" in Signatur no. 3, September 2013, p. 30ff.

**Note 5:**

In Denmark, there is a national legal basis for taxing such remuneration in KSL

§ Section 2(1)(2) when Denmark is the source state (for limited tax liability). There is no corresponding provision in the Danish Corporation Tax Act

See selected judgments and decisions related to Article 16 of the OECD

Model Law

**(17)**

**Article 17 Artists and athletes**

Art. 17(1) and (2) deviate from Art. 17 of the OECD Model Tax Convention. Basically, the source state (the state in which the activity is c a r r i e d  out) taxes the remuneration of an entertainer (in the 2014 update of the OECD Model Tax Convention the term "entertainer" was used instead of "artist") and a sportsman, including if the remuneration accrues to someone other than the entertainer himself, e.g. a company controlled by him. It should be noted that Article 19 takes precedence over Article 17, unless the services are provided in connection with a business carried on by the State, a political subdivision or a local authority. It should also be noted that it is not decisive whether the artist or sportsperson is an employee or s e l f - e m p l o y e d . Article 17 is a special rule that derogates from both Article 7 and Article 15.

**Note 1:**

Paragraph 1 mentions examples of what artists can be. It is clear that it includes theater actors, film actors and actors in commercials. The article also includes income received for activities of a political, social, religious or charitable nature if there is an entertainment element. On the other hand, the provision does not extend to a lecturer (e.g. a former politician who receives a fee for a lecture), a model working as such (e.g. a model presenting clothes as part of a fashion show or photo shoot) rather than as a performer, or administrative or support staff (e.g. camera operators, producers, film directors, choreographers, technical staff, the traveling staff of a pop group etc.) In between, there is a gray area where it is necessary to make an overall assessment of the activities of the persons concerned. A natural person can both direct a show and participate in it, or they can direct and produce a television program or film and have a role themselves. In these cases, it is necessary to look at what the person actually does in the State in which the performance in question takes place. If his activities in that State are p r e d o m i n a n t l y  o f  a  performing nature, the Article applies to the total income received by him in that State. However, if the performing element is an insignificant part of what he does in that State, the whole of the income falls outside the scope of the Article. In other cases, a split will be necessary. The article also applies to income from other activities that are generally considered to be of an entertainment nature, such as billiards and snooker, chess and bridge tournaments.

Whether the amount is paid directly to the artist or via an impresario is i r r e l e v a n t  to the application of the provision. For example, an orchestra member may be paid a salary instead of receiving payment for each individual performance. In addition to fees for actual performance, both artists and sportsmen often receive royalties. Generally, other articles (typically Article 12) will apply to the taxation of royalties when there is no direct connection between the royalty income and a performance. Advertising and sponsorship income that cannot be directly linked to a performance will be treated under Art. 7 or 15. Several examples of this are mentioned in the comments to the article.

**Note 2:**

Although there is no precise definition of the term 'athletes', it is not limited to participants in traditional athletic events (e.g. r u n n e r s , high jumpers, swimmers). It also includes, for example, golfers, j o c k s , soccer players, cricketers, tennis players and racing drivers.

**Note 3:**

As a source state with limited tax liability, Denmark has only limited opportunity to utilize this right of taxation, as under national Danish law, taxation can only occur if the specific engagement is of such a nature that an actual employee relationship arises, cf. section 2(1)(1) of the KSL in c o n j u n c t i o n  with section 43(1) of the KSL. Remuneration to publicly employed artists and athletes is not covered by this provision, but rather by Art. 19, unless it concerns the performance of duties in connection with a business a c t i v i t y  as mentioned in Art. 19(3).

**Note 4**

Income received by impresarios etc. for arranging a performance by a performer or sportsperson falls outside the s c o p e  o f  the Article, but any income received by them on behalf of the p e r f o r m e r  or sportsperson is of course covered by the Article. This Agreement includes an additional provision which is not found in the OECD model. The provision in paragraph 2 applies unless the artist or sportsperson proves that neither the artist or sportsperson nor persons associated with them share in any way, directly or indirectly, in the profits of that other person. To understand the provision,  t h e  U.S. Technical Explanations (see link at the top of the note to the agreement) gives the following example: "Assume, for example, that a circus owned by a U.S. corporation performs in Denmark, and promoters of the performance in Denmark pay the circus, which, in turn, pays salaries to the circus performers. The circus is determined to have no permanent establishment in Denmark. Since the circus performers do not participate in the profits of the circus, but merely receive their salaries out of the circus' gross receipts, the circus is protected by Article 7 and its income is not subject to host-country tax. Whether the salaries of the circus performers are subject to host-country tax under this Article depends on whether they exceed the

$20,000 threshold in paragraph 1."

See selected judgments and decisions related to Article 17 of the OECD Model Law

**(18)**

**Article 18 Pensions, social security, annuities, alimony and child support**

**Note 1:**

The article deals with taxation of private pensions (including employer schemes), social pensions, annuities, alimony and child support. The provision must be applied in conjunction with paragraph 4 of the Protocol to the Double Taxation Convention. For public pensions, the rules in Article 19 apply. The provision is far more comprehensive than the OECD model. PBL tax is not covered by the treaty, while the added value o f  a  life insurance policy must be assumed to be covered by Article 21 rather than Article 18. Severance pay is covered by Art. 15 or Art. 19 and is not considered a pension. The demarcation between severance pay and pension can in some cases be difficult to make.

**Note 2:**

As a general rule, pensions can only be taxed in the state of payment (t h e  source state). Both regular payments and (taxable) one-off benefits are covered by the provision.

**Note 3:**

As a transitional provision, a provision has been included in paragraph 2(b) according to which a person who was resident in one State on the date of entry into force of the Convention (31 March 2000) and who received a pension from the other State in that State may continue to be taxed only in the State of residence on the p e n s i o n s  mentioned in paragraph 2(a).

**Note 4:**

In practical terms, the pension is deemed to arise in the State where it is established. It must be a so-called tax-qualified scheme (otherwise it will usually be "other income"), and according to paragraph 4 of the Protocol, such schemes are considered to be "pension schemes". 4 of the Protocol, pension plans covered by Title I of the Pension Tax Act in the case of Denmark and, in the case of the United States, plans that are tax-qualified under section 401(a) of the Internal Revenue Code, individual pension plans (including individual pension plans, that are part of a simplified employee plan that complies with section 408(k), individual retirement accounts, i n d i v i d u a l  retirement annuities, section 408(p) accounts, and Roth IRAs under section 408(a), section 403(a) qualified annuity plans, and section 403(b) arrangements), as defined in the the protocol thereto

**Note 5:**

The term "pension" only includes purchasing payments, but lump sum payments are instead considered to be covered by the term "other similar

Copyright © 2024 Karnov Group Denmark A/S

remuneration".

**Note 6:**

Social benefits can generally only be taxed in the state of payment (source state). Both ongoing payments and (taxable) one-off benefits are covered by the provision. "Social security can only be taxed in the source state. Pension benefits from the United States of America Railroad Retirement Board are considered a public pension, LSRM 1976, 94. Social pensions can only be taxed in the source state. In practice, doubts may arise as to what is considered to be payments under social legislation; in any case, this includes state pension, disability pension and the like. Reference can also be made to TfS 1998, 306: "Taxation of social benefits under double taxation agreements" by the Ministry of Taxation. ATP payments are covered by Art. 18 (former private employment) or Art. 19 (former employment in a state, its political subdivision or local authority.

**Note 7:**

Special annuity schemes not covered by PBL Title I shall, according to paragraph 3, be taxed in the state of residence.

**Note 8:**

Paragraph 4 provides that deductible maintenance payments paid by a provider in one State may be taxed only in the State of residence of the recipient. Maintenance payments are further defined in this paragraph by requiring a special basis; in this respect, it is a requirement that the amounts in question are t a x a b l e  to the recipient in the State of residence.

**Note 9:**

Paragraph 5 states that current payments not covered by paragraph 4 for the maintenance of children can only be taxed in the source State. These are current contributions that are either not deductible for the provider or not taxable for the recipient. Here too, a special basis is required for t h e contributions to be covered by the provision.

Regarding civil servant pensions, reference is made to Art. 19. Denmark has national authority as a source state, by limited tax liability, to tax these benefits in KSL § 2(1)(9).

See selected judgments and decisions related to Article 18.

**(19)**

**Article 19 Public office**

The article deviates from the OECD Model Agreement. It is amended by Protocol of May 2, 2006, Art. III. This is a correction of an error.

The application of Article 19 is narrowed compared to the OECD Model L a w  Article 19, as it must be "the exercise of functions of a regulatory nature".

Remuneration of performing artists and sportsmen who are public servants is c o v e r e d  by Article 19, unless it is a public business activity. See Article 19(3)

The provisions of Art. 19 establish the principle that salaries and wages (i n c l u d i n g  benefits such as free car, housing and health or life insurance coverage) for the performance of public functions, as well as pensions for previous performance of public functions, as a general rule can only be taxed in the State that pays the benefits. This differs from Articles 15 and 18, which would otherwise have been applied. Remuneration paid by the state, the regions and the municipalities are covered

**Note 1:**

Art. 19 deviates from Art. 19 of the OECD Model Convention. The difference i s  t h a t ,  u n l i k e  Article 19 of the OECD Model, the provision requires that salaries, wages and similar remuneration paid "by a public authority" to be covered by Article 19 must be paid for the performance of functions of an official nature. The US technical explanations give the following example: If, for example,  a public authority sponsors a basketball team in an international tournament and the athletes are paid with public funds as a result, the amounts would be covered by Article 17 and not by Article 19, as the athletes are not performing functions of an official nature in this context. This means that salaries, wages and other similar remuneration from public authorities are only taxed in the paying state unless the recipient is both resident and a

citizen of the state of residence or has not become resident there solely for the purpose of performing the function. The provision has implications for e.g. embassy

staff, but also includes DANIDA expatriates, PhD students sent to foreign educational institutions, certain persons sent by the Ministry of Defense, etc. The question is when an institution can be qualified as being part of the public administration. In the assessment, emphasis can be placed on factors such as:

- whether the institution is established by law or pursuant to law and whether t h e  law must be interpreted as meaning that the institution is a public administrative authority; or

- whether the institution is allocated resources via an operating grant in the state budget or via a grant in the municipal budgets, where the grant is listed either under the heading "own" institutions or under the heading "other public authorities".

Examples of institutions that, as employers, are considered public in the Danish view include the Royal Danish Theatre, Odense U n i v e r s i t y , the University of Copenhagen and Danmarks Radio. Other examples include the National Bank of Denmark, ATP and the Pilotage Service, including the Pilotage Pension Fund. See SKM2002.55.LSR/TfS 2002, 311 and SKM2004.64.LR/TfS 2004, 224 on

taxation of doctors from Denmark working in other Nordic countries. The rule also covers remuneration paid during maternity leave, see SKM2008.679.VLR/TfS 2008, 1072 VLD. Denmark has national taxing authority in KSL § 2(1), no. 1, 2 and 4 and in KSL § 2(1), no. 1, 9, 12.

**Note 2**

Art. 19(2) corresponds to Art. 19(2) of the OECD Model Tax Convention and concerns pensions and other similar remuneration paid for the performance of a public function. Such pensions can only be taxed in the paying State unless the recipient is a resident and national of the other State. The provision concerning pensions covers almost exclusively civil service pensions, but it must be pointed out that pension payments from schemes established by the State, a political subdivision or a local authority may be covered even if they are privately administered. Thus, pensions from self-governing institutions have in several cases been considered to be covered by Article 19.

On the other hand, pensions from Juristernes og Økonomernes Pensionskasse (SKDM 1979, 28), Lægernes Pensionskasse, Dyrlægernes Pensionskasse (SKDM 1978, 99), Forst- og Agronomforbundets Pensionskasse and Apote- kervæsenets Pensionskasse (TfS 1985, 534) are not covered by Article 19(2), as the pension is considered to be paid by private companies and institutions, regardless of whether the pension beneficiary has been employed by a public authority that has contributed to the scheme. The same applies to benefits paid by HMN Naturgas I/S and Nationalbankens Pensionskasse, as this is a pension fund under the supervision of the Danish Financial Supervisory Authority and covered by the Act on Company Pension Funds. Such pensions are instead treated in accordance with Article 18. Danish state pension is not covered by Article 19, as it is not earned as a result of work performed. ATP for former civil servants is considered a social security benefit that is treated as a pension. It is covered by Article 19(2) if the work to which the pension relates was performed for the State, a political subdivision or a local authority. See paragraph 25 of the commentary o n  Article 18.

When the provision in subsection (2) also includes "other similar remuneration", this means that it also includes non-periodic payments. Whether such non-periodic payments are to be regarded as pension under subsection 2 or as remuneration under subsection 1 depends on a specific assessment.

**Note 3:**

If a State pays remuneration to a person for the performance of functions in connection with the exercise of a professional activity carried on by the paying State, the rules of Article 19(1) and (2) do not a p p l y  according to Article 19(3). Instead, Article 15 (personal services), Article 16 (directors' fees), Article 17 (artists and sportsmen) and Article 18 (p e n s i o n s )  apply. Thus, if a State acts as a trader, it is subject to the same rules on the taxability of salaries, directors' fees and pensions a s apply to employees of private traders.

See selected judgments and decisions related to Article 19. **(20)**

Copyright © 2024 Karnov Group Denmark A/S

**Article 20 Students and trainees**

Art. 20, deviates from Art. 20 of the OECD Model Convention.

Students who reside in Denmark for the purpose of study and who, immediately prior to the commencement of their stay in Denmark, were residents of the United States, will not be taxed in Denmark on amounts derived from sources outside D e n m a r k  f o r  t h e  student's maintenance, education or training. The same applies to apprentices and trainees who are in Denmark for the purpose of participating in a full-time education.

The provision also covers cases where a student has already completed a higher education, cf. LSRM 1978, 28 LSR. However, see the opposite result in R&R 1978 SM 6, TfS 1984, 265 LSR and in TfS 1985, 44 DEP. A completed HF- or studentereksamen or similar education is not an obstacle to being covered by Article 20, see TfS 1992, 297 TSS.

There is no "professor rule" in this collective agreement. In the previous a g r e e m e n t ,  the professor rule was found in article 14.

According to Art. 29(4), it was possible to apply the 1948 agreement until the end of the income year 2001 if it is more advantageous than the new agreement.

Students from the US are not eligible for the so-called guest student deduction (previously known as the Faroe Islands deduction).

**Note 1 and 2:**

The scope of Article 20 is not defined in the OECD Model Agreement or its commentary. In contrast to the OECD model, this agreement states that the person must be a full-time student at an officially recognized educational institution or alternatively a full-time education. The term student in relation to Article 20 must be understood broadly. It includes any person who is registered as a student at all types of educational institutions in the host State (primary, secondary, university, etc.). It therefore also includes persons who have completed their qualifying education and wish to acquire or extend knowledge in a specialized field. Art. 20 therefore covers a wider range of persons than the Withholding Tax Act

§ Section 8(2). Thus, for example, trainees, apprentices and PhD students are covered by Art. 20, see below. According to its wording, Art. 20 of the Model Agreement expressly includes benefits to cover maintenance and education expenses for apprentices who are resident in one State and stay in t h e  other State to work as a trainee. The provision does not define the terms "apprentice" and "trainee" further.

Until 2019, the legal guidance, section C.F.8.2.2.20.1, Art. 20: Students etc. stated that "With regard to trainees, the Danish Immigration Service's criteria can be used to determine whether it is education that falls under Art. 20. This means, among other things, that the trainee must be between 18 and 35 years old. The purpose of the traineeship must be to supplement any training already begun or acquired in the home country, and it must be professionally and temporally relevant to the training in the home country. See more at www.nyidanmark.dk".

However, this interpretation was changed by the Danish Tax Agency in a control signal dated February 21, 2019 (STY2019.18.-0702087/SKM2019.100.SKTST/TfS 2019, 184).

As the group of persons covered by Article 20 is not the same in all double tax treaties, a specific assessment of the article on students (including trainees and apprentices) in the individual double tax treaty must instead be made.

The change in practice in 2019 was that the Danish Immigration Service's criteria should not be used to determine whether an education falls under Article 20, as these criteria do not fully reflect the tax rules in the double taxation treaties.

The consequence of this is that from 2019, for example, you can no longer require the trainee to be between the ages of 18 and 35 if this requirement is not stated in the relevant double taxation treaty.

As far as SU is concerned, it will usually be the case in treaties with an Art. 20 that Denmark has the right of taxation if a Dane is temporarily

studying in the other state. However, this does not apply if the student was already a resident of the other state at the start of the studies. If in

Copyright © 2024 Karnov Group Denmark A/S

a collective agreement does not contain an article on students, SU amounts will be covered by the article on other income, see TfS 1992, 503 TSS

The state in which the studies etc. take place cannot tax amounts paid to the student by e.g. the student's parents, foreign scholarships or foreign p u b l i c authorities to cover maintenance, study or education. These amounts must not exceed the expenses that are likely to be incurred to ensure the recipient's maintenance, study or education. The provision does not apply if the student moves to the study state before the commencement of the study/education.

If the foreign PhD student is paid by the Danish university or similar, it is an employee relationship where the person in question cannot be considered covered by the article on students in t h e Model Law.

A participant in a normal PhD program in Denmark, where the person in question receives full salary from a university in Denmark, will thus not be covered by Article 20. This applies regardless of the scope and size of other Danish or foreign scholarships.

PhD students are otherwise considered to be covered by the article on students in the MoU when the stay is mainly financed by scholarships from abroad or Denmark. This means that the scholarships must constitute at least 50
% of the person's income base.

In SKM2017.495.SR, the Danish Tax Council found that the scholarship the questioner received from a foundation in Germany was covered by t h e double taxation agreement with Germany, Article 20, as the questioner exclusively financed his studies with this scholarship.

In SKM2017.496.SR, the Danish Tax Council also found that the questioner's PhD scholarship, which was paid out from Germany, was covered by Article 20 of the double taxation agreement. The Tax Council could therefore confirm that no tax was payable in Denmark on the scholarship.

The consequence of being covered by Article 20 is that scholarships from abroad are not taxed in Denmark.

In TfS1985, 44, the then Department of Taxation stated that a British researcher w h o was on a "postdoctoral" stay in Denmark could not be considered a foreign student under Article 20 of the double taxation agreement with the UK. People who have a postdoctoral stay in Denmark are thus not covered by Art. 20 on students. Their income from sources outside the study period is thus not exempt from Danish taxation, and they are not e l i g i b l e  f o r  t h e  visiting student deduction.

**Note 3:**

It is a condition for the student to be eligible for the benefits of the collective agreement t h a t  t h e y  a r e  following a so-called full-time study program. The Danish Tax Agency has not prepared separate Danish guidelines for the interpretation of this, but the Danish Agency for Higher Education and Science has defined on its website what they understand by full-time education.

The U.S. Technical Explanation (see link above in the note to the title of the agreement) states that, at least in the United States, this p r o v i s i o n  will be interpreted in accordance with the rules of the educational institution at which he is studying...).

**Note 4:**

On the website of the Ministry of Higher Education and Science there is an explanation o f  when institutions are considered accredited/recognized.

**Note 5:**

Similarly, an apprentice or trainee who visits Denmark for the purpose of participating in a full-time education but who also receives salary or similar from an employment relationship will not be covered by the exemption provision.

**Note 6:**

There is a time limit of 3 years from the date of first arrival for apprentices and trainees.

**Note 7:**

Finally, it is stated that the tax exemption should not apply to income from research if such research is not carried out in public

interest, but mainly for the personal benefit of a specific person or persons. For a more detailed explanation of the content of the rule as understood under Danish rules, please refer to the article by Benedicte Wiberg in -SU 1997, 301, Reglen om studerende i de danske dobbeltbeskatningsoverenskomster.

See selected judgments and decisions related to Article 20.

**(21)**

**Article 21 Other income**

Art. 21 corresponds to Art. 21 of the OECD Model Tax Convention. 21. The provision determines how types of income that are not expressly mentioned in the p r e c e d i n g articles (Art. 6-20) shall be treated. The article must also be read in the context of the rest of the agreement.

**Note 1:**

Income covered by the Article shall be taxed only in the State of residence of t h e recipient. The right of taxation is attributed to the state of residence, regardless of whether it has the authority to exercise this right of taxation. In practice, doubts may arise about the delimitation to payments under the social security l e g i s l a t i o n, which according to this convention is attributed to Art. 18. Reference can be made to SKM2011.254.SKAT/TfS 2011, 446, taxation of social benefits and other public benefits under double taxation treaties.

The added value of a life insurance policy covered by section 53 A of PBL must be assumed to be covered by Article 21. The added value of a life insurance policy belonging to a person who moved to Denmark in the middle of an income year could only be taxed in D e n m a r k for the part earned in the period after the move, see SKM2003.179.LSR/TfS 2003, 386 LSR. In SKM2005.411.DEP/TfS 2005,

842, the Ministry has expressed that severance pay (in employment relationships) is considered to be covered by Article 15, and thus not covered by Article 21.

**Note 2:**

Income from third countries is also covered. Note, however, that income from a fixed base/place of business in a third State is covered by Art. 21(2). If a person is a resident of both Contracting States according to the rules of the domestic laws, but is considered a resident of only one Contracting State by virtue o f Art. 4(2) and (3) of the Convention, only the Contracting State in which that person is then considered a resident may tax income from a third State.

**Note 3:**

Paragraph 2 modifies the right of taxation of the State of residence in cases where such income is directly connected with a permanent establishment or fixed base in the other State. In that case the other state, the source state, has t h e right of taxation. As for all other provisions of the Convention, Danish taxation under this Article also requires that there is also a domestic Danish taxing authority for the type of income in question. Paragraph 2 also includes income from third countries. In this case the right of taxation shall be given to the Contracting State in which the permanent establishment is situated. Paragraph 2 shall not apply to the taxation of immovable property. Therefore, immovable property situated in one State (A) which forms part of the business property of a permanent establishment (situated in State B) but belongs to an enterprise of State ( A) may be taxed only in State (A) in which the property is situated and of which the recipient of the income is a resident. Paragraph 2 shall also include cases not covered by the preceding Articles of the Agreement where the recipient and the payer of the income are both residents of the same Contracting State and the income is connected with a permanent establishment which the recipient of the income has in the other Contracting State. In such cases the right of taxation is given to the Contracting State in which the permanent establishment is situated. Where double taxation arises, the State of residence shall grant relief according to the provisions of Article 23. For the purposes of paragraph 2 of Article 7, a right or p r o p e r t y in respect of which income is derived shall be deemed for the purposes of this paragraph to be directly connected with a permanent establishment if the "economic" ownership of the r i g h t or

property is allocated to the permanent establishment in accordance with the principles set out in the Report of the Committee "Attribution of Profits to Permanent Establishments".

See selected judgments and decisions related to Article 21.

**(22)**

**Article 22 Limitation of collective agreement benefits**

Art. 22 was originally a special feature of the Danish-American double taxation treaty - a similar article is only included in the 2017 edition of the OECD model treaty, but it was included in the American model treaty from 1996, and the American comments to the model provision are important for understanding the provision. Both the model and the comments can be found on t h e  Internal Revenue Service's website at http://www.irs.gov/Businesses/International-Businesses/Uni-     ted-States-Model---Tax-Treaty-Documents.

The provision was inserted by Protocol of May 2, 2006, Art. IV at the request of the USA. Reference is made to the comments to L 30 of October 4, 2006 (Act no. 1574 of December 20, 2006) and a thorough review o f  t h e  content of the provision in -SU 1999, 212 in the article: "Dividends, interest, royalties, capital gains and limitation on benefits in the new DBO between Denmark and the USA" by Niels Josephsen and in the article: "Limitation on benefits in the double taxation agreement between Denmark and the USA" by Mogens Rasmussen and Dennis Dalsgaard Bernhardt in SR-Skat 2000, no. 4.L

The purpose of the very difficult to access Art. 22, k n o w n  in the US as Limitations of Benefits, is to limit the application of certain treaty provisions (benefits) to specially qualified persons/companies. Methodologically, the provision is structured in such a way that if a taxpayer does not meet the first test regarding ownership, one proceeds to the second test regarding cash flows and active business activities, etc. and finally, presumably, ends up in paragraph 7, which allows application to still obtain treaty benefits.

For shipping and aviation activities in international traffic, there is a special provision in paragraph 5, which means that collective agreement protection can p r e s u m a b l y  be obtained even if the other conditions of the article are not met

**Note 1:**

Under paragraph 1, a person who is a resident of one of the two States is entitled to the benefits of the Agreement only if that person meets the conditions of Article 22. The term "person" includes an individual, an estate, a trust, a partnership, a company and any other body of persons.

**Note 2:**

: Under paragraph 2, a resident of one of the two states is entitled to all the benefits of the Agreement if that person meets the objective tests in paragraphs (a) - (g). Article 22(8) provides definitions of terms used in Article 22, including "principal class of shares", "disproportionate class of shares", "shares", "recognized stock exchanges", "taxable fund", as well as defining "r e g u l a r l y  traded" and "seat of management and control".

**Note 3:**

Subparagraph (a): An individual who is a resident of Denmark or the United States, respectively, is entitled to all benefits under the Agreement under subparagraph (a). However, there may be individual cases where an individual resident in Denmark receives interest or royalties from the United States, and this income is attributable to a permanent establishment which the individual has in a third country and which i s thus exempt from Danish taxation under Denmark's double taxation agreement with the third country. In that case, the person will only be able to obtain benefits under Articles 11 and 12 of the treaty if the conditions in Article 22(6) are met.

**Note 4:**

Paragraph (b): Denmark and the United States and their political subdivisions and local authorities, etc. are entitled to all benefits under the Agreement.

**Note 5:**

Subparagraph (c): A company is entitled to all the benefits of the Agreement under subparagraph (c) if it meets the conditions of any of

subparagraphs (i), (ii) or (iii).

**Note 6:**

The conditions in point (i) are that the principal class of shares in the company (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges and that the company meets either condition A or B. Under A, the company's principal class of shares must be principally traded on a r e c o g n i z e d  stock exchange in its country of incorporation (or, in the case of Danish companies, in an EU or EEA (European Economic A r e a ) country or, in the case of US companies, in a North American Free Trade Agreement (NAFTA) country). After B, the company's principal place of management and control must be in the country where the company is domiciled. **Note 7:**

The conditions in point (ii), which only applies to Danish companies, are that one or more taxable foundations own shares in the company representing more than 50 percent of the voting rights of the company and that all other shares in the company are listed on a recognized stock exchange and are principally traded on a recognized stock exchange in an EU or EEA country. The fund in question must itself meet the c o n d i t i o n s  in point (g) to be entitled to benefits under the agreement.

**Note 8:**

The conditions in (iii) are that at least 50 percent of the total voting power and value of the shares (and at least 50 percent of each disproportionate class of shares) in the company is owned directly or indirectly by no more than five companies which are themselves entitled to benefits under (i) or (ii) or a combination thereof. In the case of indirect ownership, each intermediate link must be resident in one of the two states.

**Note 9:**

Subparagraph (d): Eligible for all benefits under the Agreement is also a charitable organization or other legal person referred to in Article 4(1)(b)(i). This provision covers institutions established and maintained exclusively for religious, charitable, educational, scientific or other similar purposes.

**Note 10:**

Subparagraph (e): Eligible for all benefits under the Agreement is also a legal entity organized under the laws of a Contracting State to provide pension or similar benefits to employees, including self-employed persons, under a plan, whether or not the entity is exempt from taxation. It is a condition that more than 50% of the legal entity's beneficiaries, members or participants are natural persons resident in Denmark or the US.

**Note 11:**

Subparagraph (f): A person other than a natural person is entitled to all the benefits of the Agreement under subparagraph (f) if it meets the conditions of both s u b p a r a g r a p h s  ( i) and (ii).

**Note 12:**

Subparagraph (i) relates to who owns the company or other entity in question. At least half of each class of shares or other participating interest in that e n t i t y  shall be owned directly or indirectly for at least half of the taxable year by persons who are residents of the State in which the entity is r e s i d e n t . In addition, such persons must be entitled to benefits under paragraph 2(a), (b), (c), (i), (d) or (e). In the case of indirect ownership, each intermediate link must be a resident of the State in which the c l a i m a n t  i s  resident.

**Note 13:**

Point (ii) relates to who receives payments from the company or other entity in question. Less than one-half of the individual's gross income for the taxable year may be paid or attributed in the form of deductible amounts, directly or indirectly, to persons who are not residents of either Denmark or the United States and are not entitled to benefits under paragraph 2(a), (b), (c), (i), (d) or (e). The term "gross income" is defined by the tax court of the state in which the individual is a resident. The term 'deductible payments' includes payments which are deductible under the tax laws of that State in respect of taxes covered by the Agreement. However, such payments shall not include amounts paid i n  t h e  ordinary course of a trade or business at arm's length for the supply of

services.

services or tangible assets and payments regarding financial o b l i g a t i o n s  to a bank that is not affiliated with the payer.

**Note 14:**

Point (g): A Danish fund is entitled to all benefits under the Agreement if it meets the conditions in both points (i) and (ii). Only criteria relating to cash flows are used here, as ownership requirements cannot be used.

**Note 15:**

Under paragraph (i), a fund is entitled to treaty benefits in a tax year if not more than half of the fund's gross income (other than its exempt income) in that year and each of the preceding three years is paid or attributed by way of deductible amounts, directly or indirectly, to persons who are not entitled to benefits under paragraph 2(a), (b), (c), (i), (ii) or (iii).

d) or point e). The gross income of the foundation is calculated in accordance with Danish law. In determining the amount to be taken into account, amounts paid by the foundation in connection with the ordinary exercise of its charitable activities and as authorized by Danish legislation on taxable foundations (Act on Business Foundations and Act on Foundations and Certain Associations) for services and tangible property are not included, provided that the payments correspond to what would be agreed on the free market.

**Note 16:**

Under point (ii), it is an additional condition that less than half of the total income of the foundation (including its tax-exempt income) in t h e  tax year in question and in each of the preceding three years has been paid or attributed in the form o f  deductible amounts and non-deductible distributions, directly or indirectly, to persons who are not entitled to benefits under paragraph 2(a), (b), (c), (i), (d) or (e). When calculating the deductible amount to be taken into account, payments made in the ordinary course of the foundation's charitable activities and as authorized by Danish legislation on taxable foundations (Act on B u s i n e s s  Foundations and Act on Foundations and Certain Associations) for services and material assets are not included, provided that the payments correspond to what would be agreed on the free market:

**Note 17:**

According to subsection (3), a company resident in Denmark or the United States is also entitled to benefits under the agreement if it meets t h e  conditions in both (a) and (b). The provision provides treaty protection for companies owned by persons resident in countries covered by the EU, EEA or NAFTA or in Switzerland. In order to obtain this p r o t e c t i o n ,  t h e  company must meet criteria regarding ownership, erosion of tax base and benefits under another double tax treaty.

**Note 18:**

Under subparagraph (a), a company that is a resident of Denmark or the United States, respectively, is entitled to benefits under the Agreement if at least 95 percent of the total voting power and value of its shares (and at least 50 percent of any disproportionate class of shares) is owned, directly or indirectly, by not more than seven persons who are corresponding beneficiaries. The term "corresponding beneficiaries" is defined in Article 22(8)(h). The purpose of the term is that persons resident in another EU, EEA or NAFTA country or in Switzerland are treated in the same way as persons resident in Denmark or the USA.

**Note 19:**

Under subparagraph (b) it is a further condition that less than half of the gross income of the company for the relevant income year has been paid o r  a t t r i b u t e d ,  directly or indirectly, to persons who are not corresponding beneficiaries, in the form of payments deductible for tax purposes under the double taxation convention of the country in which the company is resident. In determining the amount to be taken into account, amounts paid b y  the company in the ordinary course of business for services or tangible property and payments in consideration of financial obligations to a bank which is not affiliated with the company concerned shall not be taken into account, provided that the payments correspond to what would be agreed on the open market.

**Note 20:**

Copyright © 2024 Karnov Group Denmark A/S

The provision of Article 22(4) deals with a person who is a resident of a Contracting State and who carries on an active trade or business and who is not otherwise entitled to the benefits of the Agreement. Under subparagraph (a), the carrying on of an active commercial or business activity shall entitle that person to the benefits of the Agreement but only in respect of income derived from or connected with that activity. An active commercial or business activity does not include the activity of making or administering investments for the individual's own account, with the exception of banking, insurance or securities activities carried on by a bank or insurance company or a registered stockbroker.

**Note 21:**

Where a resident of one State derives income from a trade or business in the other State (or derives income from the other State from a related enterprise), subparagraph (a) shall apply only if the trade or business in the State of residence of the person is substantial in relation to the trade or business carried on by the person in the other State. Whether the trade or business i s substantial within the meaning of this paragraph shall be determined on the basis of all the f a c t s and circumstances.

**Note 22:**

In determining whether a person carries on an active commercial or business activity, activities carried on by p e r s o n s connected with that person shall be taken into account under point (c). A person shall be deemed to be associated with another person if one holds at least 50 percent of the beneficial interest in the other, or in the case of a company, at least 50 percent of the total voting rights and at least 50 percent of the total value of the shares or the beneficial interest in the company. Furthermore, a person is deemed to be associated with another person if a third person holds, directly or indirectly, at least 50 percent of the beneficial interest in each person, or in the case of a company, at least 50 percent of the total voting rights and 50 percent of the total value of the shares or of the beneficial interest in the company. In any event, a person shall be deemed to be associated with another person if, on the basis of all relevant facts and circumstances, it can be established that one person controls the other or both are under the control of the same person or persons.

**Note 23:**

Article 22(5) concerns shipping and aviation activities in international traffic, as covered by Article 8. The provision provides an alternative way of obtaining the benefits of the agreement, however, so that the protection here only covers this type of income.

**Note 24**

Article 22(6) regulates the case where a Danish enterprise receives i n c o m e from the United States and this income is exempt from Danish taxation because the income is attributable to a permanent establishment which the Danish enterprise has in a third country. In that case, the Danish enterprise can only obtain the benefits of t h e treaty if the actual tax on the income in question in the third country is at least 60 percent of the tax that would be payable in Denmark if the income were earned in Denmark by the enterprise and not attributable to a permanent establishment abroad. Interest or royalties covered by Article 22(6) may be taxed in the United States, but the tax m a y not exceed 15 percent of the gross amount. However, Art. 22(6) does not apply to interest arising in the United States that is derived in connection with or connected with an active trade or business carried on from the permanent establishment in the third country (other than the business of making or managing investments for its own account, except for banking or securities activities carried on by a bank or a registered broker). Article 22(6) also does not apply to royalties acquired as consideration for the use of, or the right to use, intangible assets produced or developed by the permanent establishment in the third country.

**Note 25**

Article 22(7) concerns discretionary decisions in cases where a person is not entitled to benefits under the preceding provisions.

The provision means that a person resident in a Contracting State may be granted benefits of the Agreement by decision of the competent authority of the other Contracting State. This presupposes that the competent authority considers that the incorporation, acquisition or maintenance of that person and the carrying on of its activities are not for the principal purpose of obtaining benefits under the Agreement. If the competent authority wishes to deny treaty benefits, it shall first consult the competent authority of the State in which the person concerned is resident.

**Note 26**

Paragraph 8 defines what is meant by a number of terms for the purposes of Article 22.

**(23)**

**Article 23 Relief for double taxation**

Art. 23 contains the method provisions for the elimination o f double taxation, but the relief provision in this treaty deviates from Art. 23 B of the OECD model. As a starting point, relief is granted according to t h e credit principle.

Basically, the state in which a person (natural or legal) is d o m i c i l e d will have the full/general right of taxation (based on that state's national taxation rules). In Denmark, t h e global income principle applies to natural persons, according to which a given income is taxable here regardless of whether it is acquired in Denmark or abroad. The US taxes US citizens according to the global income principle.

**Note 1:**

Double tax treaties allocate the right of taxation between the resident state and the state in which the income i s acquired (the source state). The allocation provisions can either be formulated in such a way that one state (either the resident state or the source state) can only tax a given income (the exclusive right of taxation is then attributed to this state) or instead be formulated in such a way that a given income can be taxed in the source state. In the latter case, the resident State must then relax its taxation of the same income under Article 23.

Art. 23 relieves so-called juridical double taxation, where the same person (natural or legal) is taxed in more than one state on the same i n c o m e . This situation is different from so-called economic double taxation, i.e. where two different persons are taxed on the same income (typically transfer pricing). If two states want to resolve the issue of economic double taxation, this must be done through bilateral negotiations. International juridical double taxation can arise in the following three ways: (a) If each contracting state imposes tax on the same person on his worldwide income (simultaneous full tax liability in both states), (b) If a person (natural or legal) is a resident of a contracting state (resident state) and acquires income from the other contracting state (source state or state, in which a permanent establishment is situated) and both States tax that income; or (c) if each Contracting State taxes a person (individual or legal e n t i t y ) who is not a resident of either State on income d e r i v e d from one of the Contracting States; This can e.g.For example, this may occur in cases where a non-resident person has a permanent establishment in a Contracting State (A) through which he acquires income from the other Contracting State (B) (referred to as simultaneous limited tax liability).

**Note 2:**

Paragraph 1 contains the US method provision, i.e. the relief provision for a US resident or citizen. The p r e a m b l e t o this provision states that relief is granted in the United States in a c c o r d a n c e w i t h t h e provisions and subject to the limitations o f U n i t e d S t a t e s law (as it may be amended from time to time without changing its general principles).

**Note 3:**

Pursuant to paragraph 1(a), relief is granted on a credit basis. Relief is granted to a US resident or citizen. Unlike the Danish method provision in paragraph 3, this credit provision does not contain any maximum. However, the credit relief is limited by the US tax rules.

Copyright © 2024 Karnov Group Denmark A/S

perhaps internal rules as mentioned above. If these contain a maximum, this will apply.

**Note 4:**

Paragraph (b) provides relief from the underlying corporate income tax when dividends are distributed from a company resident in Denmark to a company resident in the United States. The receiving company must own at least 10 percent of t h e  voting shares in the distributing company.

**Note 5:**

Paragraph (c) contains a number of limitations on the relief a US resident or citizen can obtain for tax paid under the Hydrocarbon Tax Act on income from the extraction of oil and gas from sources in Denmark. The limitations are due to the fact that the Danish hydrocarbon tax amounted to 70 percent of the taxable hydrocarbon income at the t i m e   o f   t h e  conclusion of the Danish-US double tax treaty (currently 52 percent). Furthermore, the US rules do not contain a maximum for the relief in the same way as the Danish rules. The US relief rules only contain a limitation so that relief can only be obtained within a given income category. For example, if a US resident company had oil-related income from Denmark and a number of other countries, the US would, without the rules in (c), have to grant relief for the Danish hydrocarbon tax in the tax on income from other countries.

**Note 6:**

: According to point (c)(iii), the limitations on the relief also apply in respect of: (1) Danish oil-related income not referred to in point

c) (i); and 2) other income from Danish sources. The last two categories mentioned are in reality without content, but were inserted at the request of the US A to be on the safe side in case Denmark should introduce special taxation rules with hydrocarbon tax or ringfencing of other income than from direct e x t r a c t i o n   o f  hydrocarbons under section 4 of the Hydrocarbon Tax Act. The relief shall be subject to the following limitations: The relief shall not exceed the result of the highest allowable United States tax rate for such resident or citizen for such taxable year multiplied by the amount of income separately assessed under the Hydrocarbon Tax Act, see paragraph (c)(i). The relief is further subject to any other limitations of the l a w s   o f  the United States, as they may be amended from time to time, applicable to taxes for which credits are allowed under section 901 or 903 of the Internal Revenue Code to persons claiming benefits under this Agreement. In other words, the relief is subject to any other limitation under U.S. law applicable to taxes eligible for relief under section 901 or 903 of the Internal Revenue Code, see paragraph (c)(ii). With respect to taxes in excess of the creditable amount, such taxes may only be carried forward to another taxable year and offset against U.S. tax on income separately assessed under the Hydrocarbon Tax Act, see paragraph (c)(ii).

**Note 7:**

Paragraph 2 deals with the situation where a US citizen is resident in Denmark. The US taxes the global income of US citizens.

**Note 8:**

However, under subparagraph (a), Denmark is only obliged to grant relief for the tax that the United States is entitled to collect under the treaty from residents of Denmark who are not US citizens.

**Note 9:**

Points (b) and (c) aim to eliminate the double taxation that may then arise.

**Note 11:**

Points (a) and (b) state that Denmark must generally apply the credit principle. Denmark must thus grant a deduction from the Danish income tax by an amount corresponding to the tax paid in the US. However, the deduction may not exceed the part of the income tax calculated before the deduction is granted that is attributable to the income that can be taxed in the US. The relief m e t h o d  is general credit corresponding to LL § 33.

Paragraph 3 provides relief to a "person resident in D e n m a r k ". According to Art. 1(1)(a), a "person" includes an individual, an estate, a trust, a partnership, a company and any other association of persons. "Resident" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, registration or any other criterion of a similar nature. In the case of a partnership, relief shall be allowed to each partner in accordance with his share of ownership. R e l i e f  is only granted to partners resident in Denmark, cf. Article 4(1)(d). **Note 12:**

However, according to point c), Denmark must grant relief under the exemption principle in cases where an income can only be taxed in the United States. In the case of exemption relief, the tax in Denmark is reduced by the part of the US tax that proportionally falls on the foreign income. The relief is thus independent of the US tax. For example, a pensioner moves to Denmark after the new treaty comes into force, but receives private pension payments from the US. Exemption relief means that Denmark does not tax the pension payments at all. Whether the US actually taxes the pension payments is irrelevant for the relief in Denmark. By inserting point c), Denmark has made a progression reservation. For example, if the pensioner owns a rental property located in Denmark or has other income in Denmark, the pension payment from the US must be taken into account when calculating the tax on this possible income.

See selected judgments and decisions related to Article 23.

**(24)**

**Article 24 Non-discrimination**

Art. 24 differs from Art. 24 of the OECD Model Convention It should be noted t h a t  paragraph 2 of the Model Convention on the rights of stateless persons is not included in this Convention. In general, it can be stated that the requirements that the non-discrimination article imposes on a state are mainly directed at the way the state in question organizes its tax rules. The requirements rarely have a direct impact on the way the state must administer its rules. The principle of non-discrimination is therefore rarely applied when deciding specific cases. The prohibition of discrimination applies to taxes of every kind and description, cf. paragraph 6, and not only to the taxes covered by the Agreement, cf. Article 2.

Article 24 does not contain a general prohibition of discrimination, but lists some situations where states may not discriminate: (1) Citizenship etc.; (2) Permanent establishment; (3) Interest and royalty payments and the like to the other state; and (4) Businesses owned or controlled from the other state.

**Note 1:**

Paragraph 1 establishes the principle that discrimination in taxation on the ground of nationality is prohibited and that, subject to reciprocity, nationals of one Contracting State shall not be treated less favorably in the other Contracting State than nationals and others of the latter State in the same circumstances. Article 3(1) states that the term "national" includes (i) any natural person having the nationality or citizenship of a Contracting State and (ii) any legal person, partnership or association existing by virtue of the law in force in that Contracting S t a t e .

**Note 2:**

The term "similarly situated" refers to taxpayers who, for t h e  purposes of the application of the ordinary tax laws and regulations, are in substantially the same position, both in law and in fact. The term

"in the same circumstances" should in itself be sufficient to establish that a taxpayer resident in a Contracting State and one not resident in that State are not in the same circumstances, unless, for the purposes of the relevant domestic provision, the place of residence is completely irrelevant. Reference can a l s o   b e  made to the more detailed comments in the OECD Model Tax C o n v e n t i o n .

**Note 3:**

There is no corresponding provision in the OED model. The wording used: "in particular with respect to the taxation of global income" ensures that the US global taxation of US citizens does not violate the non-discrimination provision. The Article covers any tax, regardless of which authorities imposed it.

**Note 4:**

The provision also applies to persons who are not r e s i d e n t  in one or both States.

**Note 5:**

Paragraph 2, which corresponds to Art. 24(3) of the OECD Model Convention, begins by stating that it is not discrimination to tax non-residents differently from residents as long as this does not result in the former being taxed more heavily than the latter. A permanent establishment shall not be taxed less favorably in that State than an enterprise resident in that State. The purpose of this provision is to eliminate any discrimination in the treatment of permanent establishments as compared with enterprises resident therein carrying on the same activities with respect to taxes based on industrial or commercial activities and in particular taxes on profits from business activities. The application of national transfer pricing rules based on the arm's length principle to transfers between a head office and a permanent establishment is not contrary to Article 24, even if such rules do not apply within an enterprise of the same State.

**Note 6:**

This paragraph is designed to eliminate a particular form of discrimination arising from the fact that in certain States the deduction of interest, royalties and other payments is allowed without limitation when the recipient is a resident of that State, but limited or even prohibited when the recipient i s  a  non-resident. The same situation can also be found with regard t o  property taxation in respect of debts owed to a non-resident creditor. Contracting States are free to modify this provision in bilateral treaties to avoid its use for tax avoidance purposes.

Paragraph 4 does not prohibit the State in which the borrower is resident from applying its domestic thin capitalization law to the extent that it is compatible with Article 9(1) or Article 11(6). M e a n w h i l e , if such treatment results from rules which are not compatible with those Articles and which apply only to non-resident creditors (to the exclusion of resident creditors), such treatment is not possible under paragraph 4.

Further, paragraph 4 does not prohibit enhanced disclosure requirements with respect to payments to non-residents, as these requirements are intended to ensure uniform tax treatment of payments whether made to residents or non-residents of the State.

**Note 7:**

Paragraph 5 shall prohibit a Contracting State from granting less favorable treatment t o  an enterprise the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more persons who are residents of the other Contracting State. This provision and the discrimination i t  e l i m i n a t e s  relate solely to the taxation of enterprises and not to the persons who own or control their capital. Its purpose is therefore to ensure equal treatment of taxpayers resident in the same State, but not to subject foreign capital owned by partners and shareholders t o  t h e  same treatment as that accorded to domestic capital.

Since the paragraph deals only with the taxation of resident enterprises and not with the taxation of the persons who own or control their capital, i t  follows that the paragraph cannot be interpreted as also covering the benefits of rules that take into account the relationship between a resident enterprise and other resident enterprises (e.g. rules allowing consolidation, loss transfer or tax-free contributions of assets between companies under common ownership). For example, if a state's national law allows a resident company to consolidate its income with the income of a resident parent company, paragraph 5 does not compel the State to allow such consolidation between a resident company and a non-resident parent company. This would require comparing the combined treatment of a resident enterprise and the non-resident enterprise that owns its capital with that of a resident company and the resident company that owns its capital, which clearly goes beyond t h e  taxation of the resident company alone.

Since paragraph 5 is intended to ensure that all resident companies are treated equally regardless of who owns or controls their capital and does not ensure that distributions to resident and non-resident shareholders are treated in the same way, it follows that withholding tax obligations imposed on a resident company in respect of dividends distributed to non-resident shareholders but not in respect of dividends distributed to resident shareholders will not be considered a breach of paragraph 5.

5. In this case, the discrimination does not depend on whether the company's capital is owned or controlled by non-resident shareholders, but rather on the fact that dividends distributed to non-residents are taxed differently. A similar example is a state that levies tax on resident corporations that make distributions to their shareholders without regard to whether the shareholders are residents or non-residents of the state, but which, to avoid the tax being imposed repeatedly, does not tax distributions to related resident corporations that are themselves t a x a b l e  o n  their distributions. The fact that the latter exception does not apply to distributions to non-resident companies is not considered a violation of paragraph 5. In this case, it is not because the capital of the resident company is owned or controlled by non-resident shareholders that the treatment is different; it is because distributions are made to companies which, under the provisions of the treaty, are not subject to the same tax when they redistribute the dividends received from the resident company. In this example, all resident companies are treated in the same way, regardless of who owns or controls their capital, and the different treatment is limited to cases where the tax on distributions can be avoided.

Because the paragraph prevents discrimination against a resident enterprise based solely on who owns or controls the enterprise's capital, it is not directly relevant to rules that provide differential treatment of corporations based on whether the enterprise pays interest to resident or nonresident creditors. The paragraph does not deal with rules based on debtor/creditor relationships as long as the differential treatment resulting from the rules is not based on whether n o n - r e s i d e n t  persons, in whole or in part, directly or indirectly, own or control the capital of the enterprise. For example, if, under a State's thin capitalization rules, a resident enterprise may not deduct interest paid to a non-resident associated enterprise, that rule does not violate paragraph 5 even when it applies to interest payments to a creditor that owns or controls the enterprise's capital. This is on the understanding that the treatment is the same if the interest is paid to a non-resident related enterprise which does not itself own or control any of the capital o f  t h e  paying enterprise. Such a rule in national law may be contrary to paragraph 4 to the extent that there are different conditions attached to the deduction of interest payments to residents and to non-residents and it is therefore important to determine whether the application of the rule is compatible with the provisions of Article 9(1) or Article 11(6). This will also be important when applying paragraph 5 in the context of thin capitalization rules that apply only to enterprises in a State whose capital is wholly or partly, directly or indirectly, owned or controlled by non-resident persons. Since the provisions of Article 9(1) or Article 11(6) are part of the context in which paragraph 5 is to be read (as required by Article 31 of the Vienna Convention on the Law of Treaties), adjustments that are compatible with those provisions cannot be considered contrary to the provisions o f  paragraph 5.

When it comes to transfer pricing investigations, almost all member states are of the opinion that additional information requirements that are more stringent

than the normal requirements, or even the application of a reversed burden of proof, does not constitute discrimination within the meaning of the Article.

**Note 8:**

There is no corresponding provision in the OECD model. Paragraph 5 states that Art. does not preclude any of the Contracting States from imposing tax under Art. 10(8), where "branch profits tax" is described.

**Note 9:**

There is no corresponding provision in the OECD model. Paragraph 5 states that Art. does not preclude any of the Contracting States from imposing tax under Art. 10(8), where "branch profits tax" is described.

See selected judgments and decisions related to Article 24 of the OECD Model Law Agreement.

**(25)**

**Article 25 Procedure for the conclusion of reciprocal agreements**

Article 25 differs from Article 25 of the OECD Model.

**Note 1:**

If a person (including a legal entity) believes that he (it) is or will be taxed in contravention of the rules of the treaty, an objection must be raised with the competent tax authority of the state of residence. Such a case is usually referred to as either a "mutual agreement procedure" or a "mutual agreement procedure". The Agreement uses the generic term "measures". The mutual agreement procedure, unlike the complaints procedure under national law, can be initiated by the taxpayer without him having to wait until the tax he considers not to be "in accordance with the Agreement" has been levied or he has been notified of it. In order to initiate the procedure, he must demonstrate, and this is sufficient, that "measures taken by one or both of the Contracting States" will result in such taxation and that such taxation appears as a risk that is not only possible but probable. Such measures mean any act or decision, whether legislative or administrative in nature and whether generally applicable or not, which as a direct and necessary consequence for the complainant involves the levying of tax contrary to the p r o v i s i o n s  o f  the Agreement. The mutual agreement procedure can also be used even if there is no double taxation in violation of the treaty, as long as the disputed taxation is in direct contravention of a rule of the treaty. This is the case when a State taxes a particular income to which the treaty gives the other State an exclusive right of taxation, even though the latter State is unable to exercise the right due to a lack of domestic legal authority. Whether the measures taken by one or both of the Contracting States will result in taxation not i n  a c c o r d a n c e  w i t h the Convention will have to be determined from the perspective of the taxpayer, as also stated in the introduction to paragraph 1. The taxpayer's belief that such taxation will occur must be justified and based on facts that can be substantiated, but tax authorities cannot refuse to consider a request under paragraph 1 merely because they are of the opinion that it has not been proved that such taxation will occur.

**Note 2:**

Nothing in the Agreement prevents a taxpayer from simultaneously bringing a case under Article 25 also using the usual national appeal bodies (e.g. the National Tax Tribunal). The application of the mutual agreement procedure does not suspend the national time limits for appeals.

**Note 3:**

It follows from Article 3(1)(f) that the "competent authority" in Denmark is the Minister of Taxation or his authorized deputy. According to the SFL

§ Section 1, the Customs and Tax Administration administers the legislation on taxes and the Act on the valuation of the country's real estate, and it follows from the SFL

§ Section 64 states that the Minister of Taxation may lay down the detailed rules for the implementation o f  the Act. The tasks assigned to the Customs and Tax Administration by section 1 of the SFL are handled by the Tax Administration, cf. BEK no. 804 of June 20, 2018. According to BEK no. 1029 of 24 October 2005, the Customs and Tax Administration is authorized to make decisions under double taxation agreements as

"the competent authority", and the same decree states that such decisions made by the Customs and Tax Administration cannot be appealed to another administrative authority. All cases of double taxation concerning transfer pricing etc. (Art. 7 and Art. 9 of the Model Tax Convention), whether they concern natural or legal persons, are handled by the Danish Tax Agency, Large Companies - Competent Authority, Hannemanns Allé 25, 2300 C o p e n h a g e n  S. All other cases of double taxation are handled by the Danish Tax Agency, Law - Competent Authority, Hannemanns Allé 25, 2300 Copenhagen S. The OECD website contains a periodically updated overview of the relevant national competent authorities in a number of countries, including contact persons, and a description of a number of questions in relation to both MAP and APA procedures in the specific countries. The overview is available at https://www.oecd.org/tax/dispute/country-map- profiles.htm. Decisions made by the competent authority cannot be appealed to another administrative authority, but can be appealed to the courts within 3 months, cf. BEK no. 1029 of October 24, 2005 and SFL § 48,

STK. 3.

**Note 4:**

This agreement does not contain an explicit time limit for bringing an action. In practice, however, the 3-year time limit as formulated in Art. 25(1) of the OECD Model is used.

The OECD has prepared a Manual on Effective Mutual Agreement Procedures (MEMAP) that explains the application, the process etc. The link  to  the  MEMAP  i s :  http://www.oecd.org/datao-ecd/19/35/38061910.pdf

**Note 5:**

If the problem cannot be solved by the competent tax authority, the problem must be solved by mutual agreement (via a mutual agreement procedure) with the competent authority in the other state.

If the competent authorities reach an agreement on the resolution of the case, the taxpayer will be informed of the agreement and must then confirm in writing that he agrees to the outcome of the case. At the same time, the taxpayer must agree to refrain from pursuing any other appeals or litigation concerning the same issue and income year.

If the taxpayer does not accept the agreement concluded between the two competent a u t h o r i t i e s ,  it will lapse. The taxpayer can then only invoke national rules - limited by applicable deadlines - to avoid double taxation.

**Note 6:**

Any agreement concluded between the competent authorities of the two states on the r e a s s e s s m e n t  o f  an income assessment must be implemented without regard to any national reopening and limitation periods, as the agreement contains a suspension rule, see comment 39 to the Model Tax Convention. **Note 7:**

It encourages and authorizes the competent authorities to resolve difficulties in the interpretation and application of the Agreement by mutual agreement where possible. These are essentially difficulties of a general nature which concern, or may concern, a group of taxpayers, even if they arise in connection with a specific case normally covered by the procedure provided for in paragraphs 1 and 2.

This provision makes it possible to resolve difficulties arising from t h e application of the Agreement. Such difficulties are not only difficulties of a practical nature which may arise in determining and applying the procedure for the reduction of the tax on dividends, interest and royalties in the State in which they arise, but also difficulties the solution of which is not dependent on a prior agreement on the interpretation of the Agreement and which may prevent or complicate the normal application of the provisions of the A g r e e m e n t  a s  the negotiators have understood them.

Under this provision, according to the OECD comments, competent authorities may in particular:

- Complete or clarify a definition to avoid any awkwardness when a term is incompletely or ambiguously defined in the collective agreement.

- To settle any difficulty which, when the law of a State has been changed without impairing the balance or affecting the substance of the Agreement, may arise from the new rules of taxation resulting from such changes.

- Determine whether, and if so under what circumstances, interest may be treated as a dividend under the thin capitalization rules of the borrower's resident states and trigger double taxation relief in the lender's resident state in the same manner as for dividends (e.g. relief under a parent-subsidiary regime where such relief is provided for in the relevant bilateral double tax treaty).

- Enter into bilateral Advance Pricing Agreements (APAs) and multilateral APAs with the competent authorities of third countries with which each of the Contracting States has concluded a bilateral double taxation convention, in cases where there are difficulties or doubts regarding the interpretation or application of the conventions (particularly in cases where inaction by the Contracting States is likely to result in taxation not in accordance w i t h  t h e  provisions of the convention). A multilateral APA can be concluded either by negotiating a single agreement between all the competent authorities of the states concerned or by negotiating separate but consistent bilateral reciprocal agreements.

- Establish appropriate procedures, conditions and methods for the application of paragraphs 1 and 2 and the second sentence of this paragraph in the context of multilateral cases (see paragraphs 38.1-38.5 above and 55-55.2 below) and for the involvement of third countries in the mutual agreement procedure where the outcome of a case may affect or be affected by taxation in third countries.

- But beyond that, this agreement explicitly contains some matters that the competent authorities can agree on the basis of Article 25.

**Note 8:**

There is no similar provision in the model agreement. The rule ensures that developments in economic or currency conditions can be taken into account when concluding a mutual agreement.

**Note 9:**

This paragraph sets out how the competent authorities may c o n s u l t
e a c h  o t h e r  w i t h  a  view to settling by mutual agreement either a specific case falling within the procedure set out in paragraphs 1 and 2 or general problems concerning in particular the interpretation or
a p p l i c a t i o n  o f  t h e  Agreement referred to in paragraph 3. The competent authorities may address each other directly. It is therefore not necessary to use diplomatic channels. As regards this joint commission, paragraph 4 leaves it to the competent authorities of the Contracting S t a t e s  t o  determine the number of members and the rules of procedure of this body. This option is very rarely used in practice.

See selected judgments and decisions related to Article 25 of the OECD Model Law Agreement.

**(26)**

**Article 26 Exchange of information**

Article 26 deviates from Article 26 of the OECD Model Convention. According to the article, Denmark and the US have undertaken to exchange such information that the objectives of the agreement can be realized. The article does not limit the exchange of information to persons or companies resident i n  the two states. Note the concluded FATCA agreement, BEK no. 8 of March 14, 2013.

**Note 1:**

The competent authority in Denmark referred to in article 26 is Skattestyrelsen, Særlig Kontrol, CEBI 2 - Competent Authority, Lyseng Alle 1, 8270 Højbjerg. However, when it comes to the automatic exchange of information, the competent authority according to article 26 is Skattestyrelsen, Person, Udland, Kompetent Myndighed Udland 13, Toldbodgade 3, 8900 Randers. It is the competent authority for the exchange of information that is solely responsible for the exchange of information with foreign countries. Only information exchanged

between the competent authorities of the States (u n d e r  Art. 26) will certainly have legal force.

**Note 2:**

The exchange of information can take place in several different ways. The following types are usually distinguished: (1) Automatic exchange of information,

(2) Spontaneous exchange of information, (3) Simultaneous investigations (also referred to as simultaneous audits), (4) Presence of officials in the other party's territory, and (5) Sectoral exchange of information.

In exceptional cases, a State may need to request sworn written testimony or legalized copies of original documents. As far as possible, the other State shall comply with such requests.

**Note 3:**

More recent versions of the OECD model use the phrase "foreseeably relevant" and the intention here is that a state is not free to request information that is unlikely to be relevant to a taxpayer's case.

However, according to the Danish-US agreement, information can be exchanged that is "relevant" as opposed to the wording used in the OECD model at the time the Danish-US agreement was concluded, which mentioned "necessary" information.

"Relevant" has been inserted instead to ensure that it does not have to be proved that the country in question would be unable to, for example, collect a tax without the information. It has also been clarified that information can be exchanged regarding the assessment and collection, recovery, etc. of taxes covered by the agreement.

Information may be obtained only to the extent that taxation is not contrary to the Agreement. The exchange of information relating to taxes must be carried out to the f u l l e s t  extent possible, while clarifying that Contracting States are not entirely free to undertake "fishing expeditions" or request information that i s  unlikely to be relevant to a particular taxpayer's case. The commentary to the current OECD model states that
t h e  exchange of information upon request requires that at the time the request is made, there is a reasonable likelihood that the information requested will be relevant. Whether the information provided actually turns out to be relevant is irrelevant. Therefore, a request cannot be refused in cases where a specific assessment of the relevance of the information for an ongoing case can only be m a d e  after receipt of the information. Competent authorities shall consult with each other in situations where the content of the request, or the circumstances that led to the making of the request, or the foreseeable relevance of the request are not clear to the requesting State. Once the requesting State has explained the relevance of the i n f o r m a t i o n  requested, the requested State may not refuse a request or withhold the information because it believes it is not relevant to the underlying investigation. If the requested State becomes aware of circumstances that give reason to doubt the relevance of parts of the
i n f o r m a t i o n  requested, the competent authorities should
c o n s u l t  w i t h  e a c h  other and the requested State may ask the requesting State to explain the relevance in light of those circumstances. Similarly, paragraph 1 does not oblige the requested State to provide information upon request in the case of a "fishing expedition", i.e. theoretical requests that have no apparent connection with an ongoing
i n v e s t i g a t i o n .

A request for information does not constitute a "fishing expedition" simply because it does not provide the name or address (or both) of the taxpayer under investigation. The same applies in cases where names are spelled differently or where the information on names and addresses i s  presented in different ways. However, in cases where the requesting state does not provide the name or address (or both) of the taxpayer under
i n v e s t i g a t i o n ,  t h e  requesting state must provide other information sufficient to identify the taxpayer.

The information that can be obtained is not limited to specific information about taxpayers. It can also be sensitive information related to the administration of taxation and improvements in tax control.

There is nothing to prevent the article from applying to exchanges of information that existed before the agreement/new agreement came into force.

Information under subsection 1 can be exchanged in one of three ways (possibly in combination): on request, automatically or spontaneously. However, no information can be requested that is contrary to a state's legislation or administrative practice (see SKL § 66), or that would reveal trade secrets or be contrary to the public interest. Thus, only information that is already in the possession of the tax authorities or that can be obtained during a normal assessment or control procedure will be obtained. There will usually be a n (implied) requirement of potential reciprocity, i.e. the other state will presumably be prepared to provide the same type of information that it has requested. The information exchanged must be treated as confidential. In special cases, the disclosure of financial information may risk revealing a professional, commercial or other form of s e c r e c y . The protection of such information may also extend to information held by third parties. For example, a bank may be in possession of a patent application or similar. In such cases, information of a professional, commercial or other type of secrecy must be removed from the documents before they are disclosed.

**Note 4:**

The wording of the Article makes it clear that the exchange of information is not limited by Article 1 and may concern the administration or collection of taxes not covered by Article 2.

**Note 5:**

Mutual assistance between tax administrations is only possible if each administration is confident that the other administration will treat the i n f o r m a t i o n it receives during the cooperation with due confidentiality. The confidentiality rules set out in paragraph 1 shall a p p l y t o all types of information received under paragraph 1, including both information contained in the request and information transmitted upon request. Therefore, the rules on confidentiality cover, for example, correspondence between competent a u t h o r i t i e s , including the letter in which the request is made. At the same time, i t i s understood that the requested State may disclose a minimum of the information contained in a letter exchanged between the competent authorities (but not the letter itself) when the information is necessary for the requested State to be able to obtain or provide the requested information to the requesting State without prejudice to the interests of the requesting State. However, if judicial or similar proceedings under the national law of the requested State require the production of the letter from the competent a u t h o r i t y itself, the competent authority of the requested S t a t e may produce that letter unless the requesting State determines otherwise. The maintenance of secrecy in the Contracting State receiving the information is subject to its national law. Accordingly, paragraph 1 provides that information communicated under the provisions of the Agreement shall be treated as secret in the receiving State in the same manner as information obtained under the domestic law of that State. Penalties for breach of this obligation of secrecy in that State shall be governed by the administrative and criminal law of that State. In situations where the requested State determines that the requesting State is not complying with its obligations r e g a r d i n g t h e confidentiality of information exchanged under this Article, the requested State may suspend assistance under this Article until the requesting State has provided due assurance that the obligations will be complied with. If necessary, the competent authorities may conclude specific agreements or a memorandum of understanding concerning the confidentiality of information exchanged under this Article.

Subject to the OECD Model Commentary Section 12.3 and Section 12.4 to Article 26, information received may only be disclosed to persons and authorities

Copyright © 2024 Karnov Group Denmark A/S

engaged in the assessment, collection, enforcement, prosecution, litigation or arbitration of appeals in respect of the taxes on which information may be exchanged pursuant to the first sentence of paragraph 1, or in the supervision thereof. This means that the information may also be communicated to the taxpayer, his agent or to witnesses. This also means that the information may be provided to governmental or judicial authorities charged with determining whether such information may be communicated to the t a x p a y e r , his agents or to witnesses. The information received by a Contracting State may be used by such persons or authorities only for the purposes referred to in paragraph 1. Furthermore, the information c o v e r e d  by paragraph 1, whether or not it relates to a particular taxpayer, shall not be d i s c l o s e d  to persons or authorities not mentioned in paragraph 1, n o t w i t h s t a n d i n g any national legislation, such as legislation on the openness of government and other legislation granting greater access to public documents, which may provide for such disclosure.

**Note 6:**

This provision is a restriction compared to the OECD model text.

**Note 7:**

This paragraph contains certain limitations to the general rule in favor of the requested State. The paragraph first clarifies that a Contracting State is not obliged to act contrary to its national law and administrative practice when it has to provide information to the other Contracting State. However, national provisions on professional secrecy in tax matters shall not be interpreted as constituting an obstacle to the exchange of information under this Article. As mentioned above, the authorities of the requesting State are obliged to observe professional secrecy with respect to the information received u n d e r  this Article.

The State to which a request for information is made need not go so far as to take administrative measures contrary t o  t h e  law or practice of the requesting State or to provide information that cannot be obtained under the law or general administrative practice of the requesting State. It follows that a Contracting State cannot take advantage of the other State's information system if it is more extensive than its own system. Thus, a State may refuse to provide information in cases where the requesting State would be precluded by its law from receiving or providing the information, or in cases where the requesting State's administrative practices (e.g. lack o f  administrative resources) result in a lack of reciprocity).

The principle of reciprocity does not apply in cases where, under the law or administrative practice of only one of the States, a specific procedure applies. For example, a State requested to provide information cannot refuse to provide information about advance tax rulings it has given on the grounds of reciprocity on the b a s i s  t h a t  t h e r e  is no system for advance tax rulings in the requesting State.

Information cannot be obtained from a person if that person invokes the prohibition against self-incrimination. A requested State may therefore refuse to provide the information if the requesting State would be precluded by its own rules on self-incrimination from obtaining the information in similar circumstances. In practice, however, the prohibition on self-incrimination has little or no bearing on most requests for information. The prohibition of self-incrimination is personal and cannot be invoked by a natural person who is not himself at risk of criminal pros e c u t i o n . T h e  vast majority of information requests involve obtaining information from third parties such as banks, intermediaries and a contracting party, and not from the person under investigation. Furthermore, the prohibition of self-incrimination generally only applies to natural persons.

The requested State is free to refuse to provide information in the cases permitted by Article 26. However, if the State does provide the information requested, this will be within the limits of the

agreed framework for the exchange of information. Consequently, it cannot be claimed t h a t  that State has breached its duty of confidentiality.

In addition to the restrictions referred to in points (a) and (b), paragraph 2(c) contains a reservation regarding the disclosure of certain confidential information. The secrets mentioned should not be given an overly broad meaning. Before invoking this provision, a Contracting State should carefully weigh whether the interests of the taxpayer actually justify its application. Otherwise, it is clear that an overly broad interpretation would in many cases render the exchange of information provided for in the Convention ineffective. In order to protect the interests of its taxpayers, the requested State has a certain discretion to refuse to provide the information requested, but if it provides the information voluntarily, the taxpayer cannot c l a i m  a  b r e a c h  of confidentiality.

In most cases, the exchange of information will not raise questions of professional, commercial or other types of secrecy. Commercial or business secrecy is generally understood to mean matters that are of significant economic importance and can be exploited practically, and where the unauthorized use could cause serious harm (e.g. could result in a significant financial loss). The assessment, levying or collection of taxes cannot in itself be considered to cause serious harm. Information about financial matters, including accounting books and records, does not inherently constitute a trade, business or other form of secrecy. However, in certain limited circumstances, t h e  disclosure of financial information may reveal a trade, b u s i n e s s  or other secret. A request for information on certain purchasing records may be an example of this if the disclosure of this information would reveal production methods used in the m a n u f a c t u r e  o f  a product. The protection of such information may also extend to information held by third parties. For example, a bank may b e  i n  possession of a pending patent application for s a f e k e e p i n g ,  or a secret formula or manufacturing method may be described in a loan application or contract in its possession. In such cases, details of a trade, business or other secret must be removed from the documents and the r e m a i n i n g  financial information can then be disclosed.

A requested State may refuse to disclose information relating to confidential communications between lawyers and others similarly authorized to represent and their clients to the extent that the communications must be treated as confidential under national law. However, the scope of the p r o t e c t i o n  afforded to such confidential communications must be narrowly defined. The protection does not apply to documents and attachments that have been provided to a lawyer or others with similar powers of representation in an attempt to avoid statutory disclosure. Furthermore, information about the identity of a person, such as a director or the beneficial owner of a company, is typically not considered confidential. The extent of protection afforded to confidential communications may vary from state to state, but should not be interpreted too broadly so as to impede the effective exchange of information. Communications between attorneys or others with similar authority and their clients are confidential only if and to the extent that such representatives are acting in their capacity as attorneys or others with similar authority and not in another capacity such as nominee shareholders, trustees, fiduciaries, directors of corporations, or pursuant to a power of attorney to represent a corporation in its business affairs. A claim that information is protected as a privileged communication between a lawyer or others with similar powers of representation and their client is to be decided exclusively in the Contracting State under whose law it is asserted. Thus, it is not intended that the courts of the requested State should decide on claims based on the law of the requesting State.

Paragraph 2 also contains a restriction with regard to information concerning the State's own vital interests. It is thus provided that Contracting States are not obliged to provide information the disclosure of which would be contrary to the public interest (ordre public). However, this restriction is

Copyright © 2024 Karnov Group Denmark A/S

only applicable in very specific cases. Such a case could be, for example, if a tax investigation in the requesting state was motivated by political, racial or religious persecution. The restriction can also be invoked when the information constitutes a state secret, such as sensitive information held by the intelligence services, the disclosure of which would be contrary to the vital interests of the requested state. Thus, issues of public interest (ordre public) rarely arise in the exchange of information between contracting parties.

**Note 8:**

Paragraph 1 imposes an express obligation on a Contracting State to exchange all types of information. Paragraph 3 is intended to ensure that t h e restrictions in paragraph 2 cannot be used to prevent the exchange of information held by banks, other financial institutions, nominees, representatives and trustees, as well as ownership information. The provision added to the Model in 2005 changes the structure of Article 26, but should not be understood to mean that the previous version of Article 26 did not allow for the exchange of such information. The vast majority of OECD member states already exchanged such information under the previous version of Art. 26 and the addition of the paragraph in question merely reflects current practice.

A Contracting State may not refuse to provide information to a Contracting Party solely because the information is held by a bank or other financial institution. Thus, paragraph 3 prevails over paragraph 2 to the e x t e n t t h a t paragraph 2 would otherwise allow a requested Contracting State to refuse to provide information on grounds of bank secrecy. Paragraph 3 also provides that a Contracting State may not refuse to provide information solely because the information is held by persons acting in an agency or fiduciary capacity. For example, if a Contracting State has legislation under which any information held by a fiduciary i s treated as a "trade secret" solely because it is held by a fiduciary, that State cannot use such legislation as a basis for refusing to provide information to the other Contracting State. A person is generally said to be acting as a fiduciary when the business carried on by the person, or the money or other assets held by the person, does not belong to the person or is not for the benefit of the person, but is for the benefit of another person with whom the fiduciary has a relationship involving and necessitating, on the one hand, confidentiality and trust, and, on the other hand, loyalty, for example, a trustee of restricted capital. The term "representative" is very broad and includes all kinds of advisors, such as company founders, management companies and lawyers.

Finally, paragraph 3 states that a Contracting State may not refuse to provide information solely because the information relates to ownership interests in a person, including companies and partnerships, trusts and similar structures. Requests for information cannot be refused merely because national law or practice may treat information on ownership interests as a trade or other secret.

Paragraph 3 shall not preclude a Contracting State from invoking paragraph 2 and refusing to provide information held by a bank, financial institution or person acting in a representative or fiduciary capacity or information relating to ownership interests. However, such a refusal to provide information must be justified by circumstances unrelated to the person's status as a bank, financial institution, representative, asset manager or nominee, or by the fact that the information relates to ownership interests. For example, a legal representative of a client may act as a representative, but in the case of information protected as confidential communications between lawyers or others with similar powers of representation and their clients, Article 26(2) still allows for a refusal t o provide the information.

**Note 9:**

A text similar to paragraph 3 was added to paragraph 4 of the Model in 2005 in order to explicitly state the obligation to exchange information in cases where the requested State does not need this information for its own tax purposes. Prior to the insertion of paragraph 4 of the Model, it was stated

Copyright © 2024 Karnov Group Denmark A/S

this obligation was not explicitly stated in the Article, but it was clearly implied in the practice followed by the Member States. This practice showed that Contracting States, when collecting information requested by a treaty partner, often use the specific procedures allowed by their legislation for the assessment of their own taxes, even if they do not need the information themselves for this purpose. This is also stated in the report "Improving Access to Bank Information for Tax Purposes".

Paragraph 3 states that information may be exchanged even if it is not necessary for the making of a tax assessment in that State. Thus, a State cannot refuse to provide information in cases where its domestic law requires that the provision of information (only) be relevant for the current domestic taxation. Thus, no limitation on the ability of the requested State to obtain information from a person for its own tax purposes at the time of the request (e.g. because statutes o f limitation under the domestic law of the requested State have expired or because a tax audit must be completed beforehand) may limit the ability of that State to use its information gathering capabilities for the purpose of exchange of information. The term "information gathering capabilities" means the legislative, a d m i n i s t r a t i v e or judicial measures that enable a Contracting State to obtain and provide the requested information. Paragraph 34 does not obligate a requested State Party to provide information in circumstances where it has attempted to obtain the requested information but has determined that the information no longer exists because the obligation to retain it under i t s domestic law has expired. However, if the requested information i s still available regardless of the expiration of the retention period, the requested State cannot refuse to exchange the information that is available. Contracting States should ensure that accurate records are kept for at least five years.

**Note 10:**

Paragraph 3 states that the obligation in paragraph 34 is subject to the limitations in paragraph 3, but also provides that such limitations shall not be construed to provide a basis for refusing to provide information where the law or practice of a State requires that the information be relevant to domestic taxation. Thus, a requested State cannot invoke paragraph 3 and claim that its domestic law or practice requires it to provide only information that is relevant for its own tax purposes, but it may, for example, refuse to provide information if it would reveal a trade secret.

In exceptional cases, a State may need to request sworn written testimony or legalized copies of original documents. As far as possible, the other State shall comply with such requests.

The intention behind the use of the term "relevant" is that a State is not free to request information that is unlikely to be relevant to the consideration of a taxpayer's case. Information can only be obtained to the extent that the taxation is not contrary to the treaty. The comments to Article 26 of the Model Convention have been significantly expanded with t h e 2014 update, which, among other things, directly states that the requested state is not obliged to respond in the case of so-called "fishing expeditions" from the requesting state, and time limits have been set for how long the competent a u t h o r i t i e s should take to respond to requests under Article 26.

The information that can be obtained is not limited to specific information about taxpayers. It can also be sensitive information related to the administration of taxation and improvements in tax control.

Exchange of information on customs and excise duties is not covered by Article 26. Information can be exchanged in one of three ways (possibly in combination): upon r e q u e s t , automatically or spontaneously. It is common practice to agree that a request for assistance must be accompanied by such documentation as is required by the laws of the requested State or agreed by the States and is necessary for the recovery of tax claims or for taking action to secure tax claims. It is possible that the request relates to a tax that does not exist in the requested State. The requesting State should indicate, as appropriate, the nature of the tax claim, how

the composition of the claim, the time of limitation of the claim and the assets in which the claim can be collected. The requested State will then follow t h e procedure applicable to claims for its own taxes similar to those of the requesting State, or an appropriate procedure if n o equivalent tax exists.

Paragraph 3 does not exist in the OECD model.

Notwithstanding the definition of taxes in Article 2, Article 26(4) states that information may be exchanged on any kind of taxes, including taxes not covered by the Agreement.

However, no information can be requested that is contrary to a state's legislation or administrative practice (see section 8 Y of the Tax Control Act), or that would reveal business secrets or be contrary to the public interest. Thus, only information that is already in the possession of the tax authorities or can be obtained during a normal assessment or control p r o c e d u r e will be obtained. There will usually be an (implied) requirement of potential r e c i p r o c i t y , i.e. that the other state will presumably be prepared to provide the same type of information that it has requested. The information exchanged must be treated as confidential. In special cases, the disclosure of financial information may risk revealing a trade, b u s i n e s s or other secret. The protection of such information may also extend to information held by third p a r t i e s . For example, a bank may be in possession of a patent application or s i m i l a r . In such cases, information of a professional, business or other form of secrecy must be removed from the documents before they are disclosed.

Information cannot be obtained from a person if that person invokes the prohibition against self-incrimination. Information obtained under Article 26 may not be used for purposes other than tax purposes unless the following approximate text is included: "Notwithstanding the foregoing, information obtained by a Contracting State may be used for other purposes where such information may be used for such other purposes under the laws of both States and provided that the competent authority of the State providing the information so authorizes." However, the information obtained may be disclosed in public hearings or in judicial decisions containing the name of the taxpayer.

The competent authority in relation to article 26 is the Danish Tax Agency, Special Control, Complex Fraud 1 - Competent Authority, Lyseng Alle 1, 8270 Højbjerg. Only information exchanged between the competent authorities will with certainty have legal force.

Reference can also be made to SU 2000, 161, where the Minister of Taxation has explained the difference between the p r o v i s i o n s on exchange of information in the previous and the current agreement.

SU 2000, 161

**(27)**

**Article 27 Administrative assistance**

The article differs from Article 27 (Assistance in the collection o f taxes) of the OECD Model. It provides that the Contracting States to the Convention shall assist each other in the collection of all kinds of taxes. States shall assist each other in the collection of taxes to the extent necessary to ensure that tax exemptions or reductions in the rate of tax granted under the Convention are not available to persons not entitled to such benefits. The competent authorities of the Contracting States may by mutual agreement lay down the detailed rules for the implementation of this kind. In terminology, the State requesting assistance shall be referred to as the "requesting State", while the State requested shall be referred to as the "requested State".

In no case shall the provisions of this article be interpreted as imposing an obligation on one of the States:

a) to perform administrative acts contrary to the laws and administrative practices of that State or the other State,

b) taking actions that would be contrary to the public interest (public policy).

**Note 1:**

The article covers assistance with the recovery of tax claims covered by **Article 2 of** the agreement, but only claims that are final in the sense that they cannot be appealed to another/higher administrative unit or brought before a court for legislative reasons. According to the OECD model's corresponding provision, it covers all tax claims - not only tax claims covered by Article 2 as in the Danish-American treaty.

**Note 2:**

For each State, the tax claims of one State under this Article shall be recovered in accordance with the rules a p p l i c a b l e  to the tax claims of the other State and the recovery shall be accepted by the authorities of the other State.

**Note 3:**

Paragraph 3 sets out the conditions that must be met for a request f o r collection assistance to be made. The tax claim must be enforceable under the law of the requesting State and be owed by a person who cannot, at that time, under the law of that State, prevent the collection of the amount. This will be the case when the requesting State is entitled under its domestic law to recover the tax claim and the person owing the amount has no legal or administrative means to prevent its recovery. It is possible that the request relates to a tax that does not exist in the requested State. The requesting state should indicate, as appropriate, the nature of the tax claim, the c o m p o s i t i o n  o f  t h e  claim, the limitation period for the claim and the assets in which the claim can be collected. The requested State will then follow the procedure a p p l i c a b l e  to claims for its own taxes similar to those of the requesting State, or an appropriate procedure if no similar tax exists.

**Note 4:**

An approved US tax claim must be treated in the same way as i f  it had been based on a Danish income assessment.

**Note 5:**

If, at any time after a request is made by a Contracting State and before the other State has collected and transmitted the tax claim to the first-mentioned State, the claim ceases to exist, the requesting State shall promptly withdraw the request for collection assistance.

**Note 6:**

Is a cost allocation provision.

**Note 7:**

Such a request from the other Contracting State shall not have priority.

**Note 8:**

The provision mentions here some situations where it cannot be a p p l i e d . Where the taxpayer is an individual and the relevant tax claim relates to a taxable period during which the taxpayer was a national of the requested State, as well as in cases where the taxpayer is an entity that is a company, estate or trust and the relevant tax claim relates to a taxable period during which that entity obtained its status as such an entity from the laws of the requested State, Article 27 will not apply.

**Note 9:**

Is an anti-abuse provision.

**Note 10:**

The paragraph first clarifies that a Contracting State is not obliged to act contrary to its own or the other State's national law and administrative practice to fulfill its obligations under the article. Thus, if the requesting State is not able under its national law to take measures to secure the claim, the requested State may refuse to take such measures on behalf of the requesting State. Similarly, if the seizure of assets to satisfy the obligation to recover a tax claim is not permitted in the requested State, that State is not required to seize assets when providing collection assistance under the provisions of this Article. Administrative measures authorized for the purpose of collection by the requested State

taxes, however, must be implemented even if they are used solely to assist in the collection of taxes due to the requesting State. Furthermore, it contains a restriction on carrying out a c t s  c o n t r a r y  t o  t h e public interest (ordre public).

**Note 11:**

No such agreement has been concluded bilaterally, but the US has acceded to the OECD and Council of Europe Convention on Administrative Assistance in Tax Matters with effect from April 1, 1995, whereas the US has not acceded to the Protocol of Amendment to the Convention.

**Note 12**

The provision corresponds to Art. 27(8)(c) and (d) of the Model. According to the provision, a Contracting State is not obliged to grant the request if the other State has not taken all reasonable measures available under the law or administrative practice of that State t o  collect or secure the claim and finally, the requested State may also d i s r e g a r d  the request for practical considerations, for example, if the costs that would be incurred in collecting the tax claim of the requesting State exceed the tax claim.

**(28)**

**Article 28 Members of diplomatic and consular representations**

The article corresponds to Article 28 of the OECD Model Convention.

**Note 1**

Thus, the treaty does not affect the tax benefits of diplomats and similar persons under international conventions and agreements.

The purpose of Article 28 is to ensure that members of diplomatic and consular representations shall not be subjected to treatment less favorable than that to which they are entitled under rules of international law or other special international agreements.

**Note 2:**

For diplomats, the Vienna Convention of 18/4 1961 on Diplomatic R e l a t i o n s , cf. Act no. 252 of 18/6 1968, BKI no. 355 of 18 October 1968 (entry into force) and BKI no. 107 of 11 November 1968, is particularly r e l e v a n t , while the Vienna Convention of 24. April 1963 on consular relations, cf. Act no. 67 of March 8, 1972 and BKI no. 83 of December 11, 1972 and BKI no. 511 of November 28, 1972 (entry into force), regulates the relationship for consular officials and representations. In addition, there are a number of special agreements and conventions on international organizations, etc. to which Denmark has granted special rights under Act no. 567 of 30 November 1983.

The national legislation of many states contains provisions according to which members of diplomatic and consular representations during the period of posting are to be considered resident in the state from which they are posted for tax purposes. See section 1(1)(1)(1), (2) and (4) of the Withholding Tax Act. Special rules may also be included in the treaty stating that the State sending members of diplomatic delegations and consular missions shall be d e e m e d  t o  b e  t h e  State of residence of the persons concerned.

By virtue of Art. 4(1) of the OECD Model, members of diplomatic and consular missions accredited by a third State to a Contracting State are not deemed to be residents of the receiving State if they are only subject to limited tax liability in that State (see paragraph 8 of the commentary to Art. 4). The above also applies to international organizations in a Contracting State and their representatives, since they normally enjoy certain tax advantages, either under the convention or treaty u n d e r w h i c h  t h e  organization is constituted or under a treaty between the organization and the State in which it is constituted.

This means that international organizations, bodies or officials who are taxable in a contracting state only on income from sources in that state cannot benefit from the treaty, see KM2006.486.HR/TfS 2006, 286.

See selected judgments and rulings related to Article 28 of the OECD Fashion Law Agreement.

**(29)**

**Article 29 Entry into force**

**Note 1:**

Art. 31 and Art. 32 of the OECD Model concerning the procedure for entry into force, ratification and termination are formulated for bilateral agreements and correspond to the rules usually contained in international treaties.

Instead, the wording is that the two states must mutually inform each other when the constitutional conditions for the entry into force of the agreement have been met. This will usually be the case after the states' p a r l i a m e n t s  have approved the agreement.

The notification that the conditions for the entry into force of the agreement have been met is made via diplomatic notes from the states' foreign ministries.

**Note 2:**

The collective agreement came into force on March 31, 2000

**Note 3:**

It is thus effective from the income year starting on or after and for taxes at source (dividends/interest/royalties) from May 1, 2000, while for other taxes it is effective from January 1, 2001

**(30)**

**Article 30 Termination**

**Note 1:**

The Agreement shall remain in force until terminated by one of the Contracting States through diplomatic channels.

# Bekendtgørelse 2000-04-14 nr. 13
# af overenskomst af 19. august 1999 mellem regeringen i Kongeriget Danmark og regeringen i Amerikas Forenede Stater til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter

(*)

som ændret ved bki 2008-02-18 nr. 1

Den 19. august 1999 undertegnedes i Washington en overenskomst mellem regeringen i Kongeriget Danmark og regeringen i Amerikas Forenede Stater til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter.

Overenskomsten og en dertil knyttet protokol har følgende ordlyd: Konsolideret udgave af OVERENSKOMST MELLEM REGE-RINGEN I KONGERIGET DANMARK OG REGERINGEN I AMERIKAS FORENEDE STATER TIL UNDGÅELSE AF DOBBELTBESKATNING OG FORHINDRING AF SKATTE-UNDDRAGELSE FOR SÅ VIDT ANGÅR INDKOMSTSKAT-TER

som ændret ved protokol nr. 1 af 2006-05-02

Regeringen i Kongeriget Danmark og regeringen i Amerikas Forenede Stater, der ønsker at indgå en overenskomst til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter, er blevet enige om følgende:

**Artikel 1. - Overenskomstens anvendelsesområde**(1)Denne overenskomst skal, medmindre andet er bestemt i overenskomsten, finde anvendelse på personer, der er hjemmehørende i en af eller begge de kontraherende stater.

*Stk. 2.* Denne overenskomst skal ikke på nogen måde begrænse nogen fordel, der for tiden eller senere indrømmes:

a)  i henhold til enhver af de kontraherende staters lovgivning; eller

b)  ved enhver anden aftale mellem de kontraherende stater.

*Stk. 3.* Uanset bestemmelserne i stykke 2, litra b) skal følgende gælde:

a)  udelukkende bestemmelserne i artikel 25 (Fremgangsmåden ved indgåelse af gensidige aftaler) i denne overenskomst skal finde anvendelse på enhver uoverensstemmelse om, hvorvidt en foranstaltning ligger inden for rammerne af denne overenskomst, og udelukkende procedurerne i henhold til denne overenskomst skal finde anvendelse på denne uoverensstemmelse; og

b)  medmindre de kompetente myndigheder beslutter, at en skattemæssig foranstaltning ikke ligger inden for rammerne af denne overenskomst, skal det udelukkende være bestemmelserne om ikke-diskrimination i denne overenskomst, der finder anvendelse på denne foranstaltning, bortset fra sådan nationalbehandling eller forpligtelser til at anvende mestbegunstigelsesprincippet, der måtte gælde for varehandel i henhold til Den almindelige overenskomst om told og udenrigshandel (GATT-aftalen). Ingen nationalbehandling eller forpligtelse til at anvende mestbegunstigelsesprincippet under nogen anden aftale skal finde anvendelse for så vidt angår denne foranstaltning.

c)  Ved anvendelsen af dette stykke betyder udtrykket »foranstaltning« en lov, forskrift, regel, procedure, afgørelse, administrativ handling eller lignende bestemmelse eller handling.

*Stk. 4.* I det omfang andet ikke fremgår af stykke 5, skal denne overenskomst ikke berøre en kontraherende stats beskatning af personer, der er hjemmehørende i denne stat (som fastsat i artikel 4 (Skattemæssigt hjemsted)) og dens statsborgere. Uanset de andre bestemmelser i denne overenskomst kan en tidligere statsborger eller person, der har været hjemmehørende i en kontraherende stat i en længere periode (long-term resident), blive beskattet i overensstemmelse med lovgivningen i denne kontraherende stat i perioden på ti år efter opgivelsen af sådan status.

*Stk. 5.* Bestemmelserne i stykke 4 skal ikke berøre:

a)  de fordele, der er indrømmet af en kontraherende stat i henhold til artikel 9, stykke 2, (Indbyrdes forbundne foretagender), artikel 13, stykke 7 og 8 (Kapitalgevinster), artikel 18, stykke 1, litra c), stykke 2 og 5 (Pensioner, social sikring, livrenter, underholdsbidrag og bidrag til børn), artikel 23 (Lempelse for dobbeltbeskatning), artikel 24 (Ikke-diskriminering) og artikel 25 (Fremgangsmåden ved indgåelse af gensidige aftaler); og

b)  de fordele, der er indrømmet af en kontraherende stat i henhold til artikel 19 (Offentligt hverv), artikel 20 (Studerende og praktikanter), og artikel 28 (Medlemmer af diplomatiske og konsulære repræsentationer) til fysiske personer, som hverken er statsborgere eller har fået tilladelse til fast bopæl i denne stat.

**Artikel 2. - De af overenskomsten omfattede skatter**(2)De gældende skatter, som denne overenskomst skal finde anvendelse på, er:

a)  i De Forenede Stater:

    (ii)  de føderale indkomstskatter, som pålignes i henhold til De Forenede Staters indkomstskattelov (Internal Revenue Code) (men ikke »social security taxes«); og

    (ii)  de føderale skatter (excise taxes), som pålignes private fonde (private foundations);

b)  i Danmark:

    (i)  indkomstskatten til staten;

    (ii)  den kommunale indkomstskat;

    (iii)  den amtskommunale indkomstskat; og

    (iv)  skatter i henhold til kulbrinteskatteloven.

*Stk. 2.* Overenskomsten skal også finde anvendelse på alle skatter af samme eller af væsentligt samme art, der efter datoen for denne overenskomsts undertegnelse pålignes som tillæg til eller i stedet for de gældende skatter. De kompetente myndigheder i de kontraherende stater skal give hinanden underretning om væsentlige ændringer, som er foretaget i deres respektive skattelovgivning eller anden lovgivning, der har indflydelse på deres forpligtelser i henhold til overenskomsten, og om alt officielt, offentliggjort materiale

vedrørende anvendelsen af denne overenskomst, herunder kommentarer, forskrifter, tilkendegivelser eller retsafgørelser.

**Artikel 3. - Almindelige definitioner**(3)Medmindre andet fremgår af sammenhængen, har følgende udtryk i denne overenskomst den nedenfor angivne betydning:

a) udtrykket »person« omfatter en fysisk person, et dødsbo, en fond (trust), et interessentskab, et selskab og enhver anden sammenslutning af personer;

b) udtrykket »selskab« betyder enhver juridisk person eller enhver enhed, der i skattemæssig henseende behandles som en juridisk person i henhold til lovgivningen i den stat, i hvilken den er oprettet;

c) udtrykkene »foretagende i en kontraherende stat« og »foretagende i den anden kontraherende stat« betyder henholdsvis et foretagende, der drives af en person, som er hjemmehørende i en kontraherende stat, og et foretagende, der drives af en person, som er hjemmehørende i den anden kontraherende stat; udtrykkene omfatter også et foretagende, der drives af en person, der er hjemmehørende i en kontraherende stat, gennem en enhed, der anses for at være skattemæssigt transparent i denne kontraherende stat;

d) udtrykket »international trafik« betyder enhver transport med skib eller luftfartøj, bortset fra tilfælde, hvor sådan transport udelukkende finder sted mellem pladser i en kontraherende stat;

e) udtrykket »kompetent myndighed« betyder:

(i) i De Forenede Stater: finansministeren eller dennes befuldmægtigede stedfortræder; og

(ii) i Danmark: skatteministeren eller dennes befuldmægtigede stedfortræder;

f) udtrykket »De Forenede Stater« betyder Amerikas Forenede Stater og omfatter staterne samt District of Columbia ; udtrykket omfatter også De Forenede Staters territorialfarvand, havbunden og undergrunden i områder under vandet, der støder op til dette territorialfarvand, inden for hvilket De Forenede Stater udøver suverænitetsrettigheder i overensstemmelse med folkeretten; udtrykket omfatter dog ikke Puerto Rico, Jomfruøerne, Guam eller nogen anden besiddelse eller noget andet territorium under De Forenede Stater;

g) udtrykket »Danmark« betyder Kongeriget Danmark, herunder ethvert område uden for Danmarks territorialfarvand, som i overensstemmelse med folkeretten i dansk lovgivning er eller senere måtte blive betegnet som et område, inden for hvilket Danmark kan udøve suverænitetsrettigheder med hensyn til efterforskning og udnyttelse af naturforekomster på havbunden eller i dens undergrund og de overliggende vande og med hensyn til anden virksomhed med henblik på efterforskning og økonomisk udnyttelse af området; udtrykket »Danmark« omfatter ikke Færøerne eller Grønland;

h) udtrykket »statsborger i en kontraherende stat« betyder:

(i) enhver fysisk person, der er statsborger i denne stat; og

(ii) enhver juridisk person, interessentskab eller sammenslutning, der består i kraft af den gældende lovgivning i denne stat;

i) udtrykket »kvalificeret offentlig enhed« betyder:

(i) enhver person eller sammenslutning af personer, der udgør en myndighed i en kontraherende stat eller en af dens politiske underafdelinger eller lokale myndigheder;

(ii) en person, der direkte eller indirekte ejes fuldt ud af en kontraherende stat eller en af dens politiske underafdelinger eller lokale myndigheder, forudsat at personen er oprettet i henhold til lovgivningen i den kontraherende stat, at dens indtjening tilfalder den selv, således at ingen del af dens indkomst bliver til fordel for nogen privat person, og at dens aktiver efter en opløsning tilfalder den kontraherende stat, politisk underafdeling eller lokale myndighed; og

(iii) en pensionstrust eller -fond tilhørende en person som beskrevet i (i) eller (ii), der er oprettet og drevet udelukkende for at administrere eller yde de i artikel 19 (Offentligt hverv) nævnte pensioner;

forudsat at en enhed som nævnt i punkt (ii) eller (iii) ikke driver erhvervsvirksomhed.

*Stk. 2.* Ved anvendelsen til enhver tid af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, eller de kompetente myndigheder bliver enige om en fælles betydning i overensstemmelse med bestemmelserne i artikel 25 (Fremgangsmåden ved indgåelse af gensidige aftaler), ethvert udtryk, som ikke er defineret i overenskomsten, tillægges den betydning, som det på det tidspunkt har i denne stats lovgivning vedrørede de skatter, hvorpå overenskomsten finder anvendelse, idet enhver betydning i henhold til denne stats gældende skattelove skal have forrang frem for en betydning i henhold til anden lovgivning i denne stat.

**Artikel 4. - Skattemæssig hjemsted**(4)Medmindre andet fremgår af dette stykke, betyder i denne overenskomst udtrykket »en person, der er hjemmehørende i en kontraherende stat« enhver person, som i henhold til lovgivningen i denne stat er skattepligtig dér på grund af hjemsted, bopæl, statsborgerskab, ledelsens sæde, registrering eller ethvert andet lignende kriterium.

a) Udtrykket »en person, der er hjemmehørende i en kontraherende stat« omfatter ikke en person, som er skattepligtig til denne stat udelukkende af indkomst fra kilder i denne stat eller af fortjeneste, der kan henføres til et fast driftssted i denne stat.

b) En juridisk person, der er oprettet i henhold til lovgivningen i en kontraherende stat, og som generelt er fritaget for beskatning i denne stat og er oprettet og opretholdt i denne stat, enten

(i) udelukkende med henblik på religiøse, velgørende, uddannelsesmæssige, videnskabelige eller andre lignende formål; eller

(ii) med henblik på at yde pension eller andre lignende ydelser til ansatte, herunder selvstændige erhvervsdrivende, i henhold til en ordning

skal ved anvendelsen af dette stykke anses for hjemmehørende i denne kontraherende stat.

c) En kvalificeret offentlig enhed skal anses for at være hjemmehørende i den kontraherende stat, i hvilken den er oprettet.

d) En indkomst, fortjeneste eller gevinst, der er oppebåret gennem en enhed, der er skattemæssigt transparent i henhold til lovgivningen i den ene af de kontraherende stater, skal anses for at være oppebåret af en person, der er hjemmehørende i en stat, i det omfang denne indkomst, fortjeneste eller gevinst efter skattelovgivningen i en sådan kontraherende stat behandles som indkomst, fortjeneste eller gevinst for en hjemmehørende person.

Copyright © 2024 Karnov Group Denmark A/S

*Stk. 2.* I tilfælde, hvor en fysisk person efter bestemmelserne i stykke 1 er hjemmehørende i begge de kontraherende stater, bestemmes den pågældendes status således:

a) personen skal anses for at være hjemmehørende i den stat, i hvilken han har en fast bolig til sin rådighed; såfremt en sådan person har en fast bolig til sin rådighed i begge stater, skal han anses for at være hjemmehørende i den stat, med hvilken han har de stærkeste personlige og økonomiske forbindelser (midtpunkt for sine livsinteresser);

b) såfremt det ikke kan afgøres, i hvilken af staterne personen har midtpunktet for sine livsinteresser, eller hvis han ikke har en fast bolig til sin rådighed i nogen af staterne, skal han anses for at være hjemmehørende i den stat, i hvilken han sædvanligvis har ophold;

c) såfremt personen sædvanligvis har ophold i begge stater, eller hvis han ikke sædvanligvis har ophold i nogen af dem, skal han anses for at være hjemmehørende i den stat, i hvilken han er statsborger;

d) såfremt personen er statsborger i begge stater eller ikke er statsborger i nogen af dem, skal de kompetente myndigheder i de kontraherende stater søge at afgøre spørgsmålet ved gensidig aftale.

*Stk. 3.* I tilfælde, hvor en ikke-fysisk person efter bestemmelserne i stykke 1 er hjemmehørende i begge de kontraherende stater, skal de kompetente myndigheder i de kontraherende stater ved gensidig aftale søge at afgøre spørgsmålet og bestemme, hvorledes overenskomsten skal finde anvendelse på en sådan person.

*Stk. 4.* En statsborger i De Forenede Stater eller en udlænding, der retmæssigt har fået tilladelse til fast bopæl i De Forenede Stater, er hjemmehørende i De Forenede Stater, men kun såfremt en sådan person har en betydelig tilstedeværelse, en fast bolig eller sædvanligvis har ophold i De Forenede Stater.

**Artikel 5. - Fast driftssted**(5)I denne overenskomst betyder udtrykket »fast driftssted« et fast forretningssted, gennem hvilket et foretagendes virksomhed udøves helt eller delvis.

*Stk. 2.* Udtrykket »fast driftssted« omfatter navnlig:

a) et sted, hvorfra et foretagendet ledes;

b) en filial;

c) et kontor;

d) en fabrik;

e) et værksted; og

f) en mine, en olie- eller gaskilde , et stenbrud eller ethvert andet sted, hvor naturforekomster udvindes.

*Stk. 3.* En byggeplads eller et anlægs- eller monteringsarbejde, eller en installation, en borerig eller et skib, der anvendes til efterforskning af naturforekomster, udgør kun et fast driftssted, såfremt det varer, eller virksomheden vedvarer i mere end 12 måneder. Ved anvendelsen af dette stykke skal virksomhed, der udøves af et foretagende, der er forbundet med et andet foretagende, som fastlagt i artikel 9 (Indbyrdes forbundne foretagender), anses for udøvet af det foretagende, med hvilket det er forbundet, såfremt den pågældende virksomhed:

a) er væsentligt den samme som den virksomhed, der udøves af sidstnævnte foretagende; og

b) vedrører samme projekt eller operation;

dog undtagen i den udstrækning, disse aktiviteter udøves samtidig.

*Stk. 4.* Uanset de foranstående bestemmelser i denne artikel skal udtrykket »fast driftssted« anses for ikke at omfatte:

a) anvendelsen af indretninger udelukkende med henblik på oplagring, udstilling eller udlevering af varer tilhørende foretagendet;

b) opretholdelsen af et varelager tilhørende foretagendet udelukkende med henblik på oplagring, udstilling eller udlevering;

c) opretholdelsen af et varelager tilhørende foretagendet udelukkende med henblik på forarbejdning hos et andet foretagende;

d) opretholdelsen af et fast forretningssted udelukkende med henblik på at foretage indkøb af varer eller indsamle oplysninger for foretagendet;

e) opretholdelsen af et fast forretningssted udelukkende med henblik på at udøve enhver anden virksomhed af forberedende eller hjælpende karakter for foretagendet;

f) opretholdelsen af et fast forretningssted udelukkende med henblik på at udøve enhver kombination af de i litra a) til e) i dette stykke nævnte former for virksomhed, forudsat at det faste forretningssteds samlede virksomhed, der er et resultat af denne kombination, er af forberedende eller hjælpende karakter.

*Stk. 5.* Uanset bestemmelserne i stykke 1 og 2 skal et foretagende i tilfælde, hvor en person - der ikke er en uafhængig repræsentant som omhandlet i stykke 6 - handler på et foretagendes vegne og har og sædvanligvis udøver i en kontraherende stat en fuldmagt til at indgå aftaler i foretagendets navn, anses for at have et fast driftssted i denne stat med hensyn til enhver virksomhed, som denne person påtager sig for foretagendet, medmindre denne persons virksomhed er begrænset til sådanne forhold, som er nævnt i stykke 4, og som, hvis de var udøvet gennem et fast forretningssted, ikke ville gøre dette faste forretningssted til et fast driftssted efter bestemmelserne i nævnte stykke.

*Stk. 6.* Et foretagende skal ikke anses for at have et fast driftssted i en kontraherende stat, blot fordi det driver erhvervsvirksomhed i denne stat gennem en mægler, kommissionær eller en anden uafhængig repræsentant, forudsat at disse personer inden for sædvanlige repræsentanter inden for de sædvanlige rammer af deres erhvervsvirksomhed.

*Stk. 7.* Den omstændighed, at et selskab, der er hjemmehørende i en kontraherende stat, kontrollerer eller kontrolleres af et selskab, der er hjemmehørende i den anden kontraherende stat, eller som (enten gennem et fast driftssted eller på anden måde) udøver erhvervsvirksomhed i denne anden stat, skal ikke medføre, at et af de to selskaber anses for et fast driftssted for det andet.

**Artikel 6. - Indkomst af fast ejendom**(6)Indkomst, som en person, der er hjemmehørende i en kontraherende stat, oppebærer af fast ejendom (herunder indkomst af land- eller skovbrug), der er beliggende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Udtrykket »fast ejendom« skal tillægges den betydning, som det har i lovgivningen i den kontraherende stat, i hvilken ejendommen er beliggende. Udtrykket skal i alle tilfælde omfatte tilbehør til fast ejendom, besætning og redskaber, der anvendes i land- og skovbrug, rettigheder på hvilke bestemmelserne i privatretten om jordbesiddelser finder anvendelse, brugsret til fast ejendom samt retten til variable eller faste betalinger som vederlag for udnyttelsen af eller retten til at udnytte mineralforekomster, kilder og andre naturforekomster; skibe, både og luftfartøjer skal ikke anses for fast ejendom.

*Stk. 3.* Bestemmelserne i stykke 1 skal finde anvendelse på indkomst, der hidrører fra direkte brug, udlejning eller enhver anden form for benyttelse af fast ejendom.

*Stk. 4.* Bestemmelserne i stykke 1 og 3 skal også finde anvendelse på indkomst af fast ejendom, der tilhører et foretagende, og på

indkomst af fast ejendom, der anvendes ved udøvelsen af frit erhverv.

*Stk. 5.* En person, der er hjemmehørende i en kontraherende stat, og som er skattepligtig i den anden kontraherende stat af indkomst af fast ejendom beliggende i denne anden kontraherende stat, kan for et skatteår vælge at beregne skatten af sådan indkomst på grundlag af nettofortjenesten, på samme måde som hvis sådan indkomst var fortjeneste ved erhvervsvirksomhed, der kunne henføres til et fast driftssted i denne anden stat. Et sådant valg skal være bindende for det valgte skatteår og for alle følgende skatteår, medmindre den kompetente myndighed i den anden kontraherende stat, i hvilken ejendommen er beliggende, er indforstået med, at valget bringes til ophør.

**Artikel 7. - Fortjeneste ved erhvervsvirksomhed**(7)Fortjeneste, der oppebæres af et foretagende i en kontraherende stat, kan kun beskattes i denne stat, medmindre foretagendet driver erhvervsvirksomhed i den anden kontraherende stat gennem et dér beliggende fast driftssted. Såfremt foretagendet driver en sådan virksomhed, kan dets fortjeneste beskattes i den anden stat, men dog kun for så vidt angår den del deraf, som kan henføres til dette faste driftssted.

*Stk. 2.* Under iagttagelse af stykke 3 skal der i tilfælde, hvor et foretagende i en kontraherende stat driver erhvervsvirksomhed i den anden kontraherende stat gennem et dér beliggende fast driftssted, i hver kontraherende stat til dette faste driftssted henføres den fortjeneste, som det kunne forventes at ville have opnået, såfremt det havde været et frit og uafhængigt foretagende, som udøvede samme eller lignende virksomhed på samme eller lignende vilkår. Med henblik herpå skal den fortjeneste, der henføres til det faste driftssted, kun omfatte den fortjeneste, der oppebæres ved det faste driftssteds aktiver eller virksomhed.

*Stk. 3.* Ved fastsættelsen af et fast driftssteds fortjeneste skal det være tilladt at fradrage omkostninger, som er afholdt for det faste driftssted, herunder en rimelig andel af omkostninger til ledelse og administration, udgifter til forskning og udvikling, renter og andre udgifter afholdt til fordel for foretagendet som helhed (eller den del deraf, der omfatter det faste driftssted), hvad enten de er afholdt i den stat, i hvilken det faste driftssted er beliggende, eller andre steder.

*Stk. 4.* Ingen fortjeneste ved erhvervsvirksomhed skal kunne henføres til et fast driftssted, blot fordi det faste driftssted har foretaget indkøb af varer for foretagendet.

*Stk. 5.* Ved anvendelsen af de foranstående stykker skal den fortjeneste, der henføres til det faste driftssted, fastsættes efter samme metode hvert år, medmindre der er god og fyldestgørende grund til at anvende en anden fremgangsmåde.

*Stk. 6.* I tilfælde, hvor fortjeneste ved erhvervsvirksomhed omfatter indkomst, som er omhandlet særskilt i andre artikler i denne overenskomst, skal bestemmelserne i disse andre artikler ikke berøres af bestemmelserne i denne artikel.

*Stk. 7.* I denne overenskomst betyder udtrykket »fortjeneste ved erhvervsvirksomhed« indkomst hidrørende fra enhver handels- eller forretningsvirksomhed, herunder indkomst oppebåret af et foretagende ved udøvelse af tjenesteydelser og fra lejeindtægt af rørlig formue.

*Stk. 8.* Ved anvendelsen af artikel 7, stykke 1 og 2 (Fortjeneste ved erhvervsvirksomhed), artikel 10, stykke 6 (Udbytte), artikel 11, stykke 3 (Renter), artikel 12, stykke 3 (Royalties), artikel 13, stykke 3 (Kapitalgevinster), artikel 14 (Frit erhverv) og artikel 21, stykke 2 (Anden indkomst) skal enhver indkomst eller gevinst, der kan henføres til et fast driftssted eller fast sted, mens det består, beskattes i den kontraherende stat, i hvilken et sådant fast driftssted

eller fast sted er beliggende, selv om betalingerne udskydes, indtil et sådant fast driftssted eller fast sted er ophørt med at bestå.

**Artikel 8. - Skibs- og luftfart**(8)Fortjeneste, som et foretagende i en kontraherende stat oppebærer ved skibs- eller luftfartsvirksomhed i international trafik, kan kun beskattes i denne stat.

*Stk. 2.* I denne artikel omfatter fortjeneste ved skibs- eller luftfartsvirksomhed fortjeneste oppebåret ved udleje af bemandede skibe eller luftfartøjer (på tid eller pr. rejse). Den omfatter også fortjeneste ved udleje af ubemandede skibe eller luftfartøjer, hvis de anvendes i international trafik af lejeren, eller hvis lejeindtægten er knyttet til fortjeneste ved skibs- eller luftfartsvirksomhed i international trafik. Fortjeneste oppebåret af et foretagende ved indenlandsk transport af gods eller passagerer i hver af de kontraherende stater skal anses som fortjeneste ved skibs- eller luftfartsvirksomhed i international trafik, hvis en sådan transport foretages som en del af international trafik.

*Stk. 3.* Fortjeneste, som et foretagende i en kontraherende stat oppebærer ved brug, rådighedsstillelse eller udleje af containere (herunder anhængere, pramme og lignende udstyr til transport af containere), der anvendes i international trafik, kan kun beskattes i denne stat.

*Stk. 4.* Bestemmelserne i stykke 1 og 3 skal også finde anvendelse på fortjeneste ved deltagelse i et konsortium, en pool, et forretningsfællesskab eller en international driftsorganisation.

*Stk. 5.* Uanset bestemmelserne i artikel 5, stykke 2 , litra f) og stykke 3 (Fast driftssted) kan fortjeneste oppebåret af et foretagende i en kontraherende stat ved transport med skib eller luftfartøj af forsyninger eller mandskab til et sted, hvor der i den anden kontraherende stat drives virksomhed uden for kysten i forbindelse med udforskning eller udnyttelse af naturforekomster eller ved drift af bugserbåde og lignende fartøjer i forbindelse med sådan virksomhed, kun beskattes i den førstnævnte stat.

**Artikel 9. - Indbyrdes forbundne foretagender**(9)I tilfælde, hvor

a)  et foretagende i en kontraherende stat direkte eller indirekte har del i ledelsen af, kontrollen af eller kapitalen i et foretagende i den anden kontraherende stat, eller

b)  de samme personer direkte eller indirekte deltager i ledelsen af, kontrollen af eller kapitalen i et foretagende i den ene kontraherende stat og et foretagende i den anden kontraherende stat,

og der i noget af disse tilfælde mellem de to foretagender er aftalt eller fastsat vilkår vedrørende deres kommercielle eller finansielle forbindelser, der afviger fra de vilkår, som ville være aftalt mellem uafhængige foretagender, kan enhver fortjeneste, som, hvis disse vilkår ikke havde foreligget, ville være tilfaldet et af disse foretagender, men som på grund af disse vilkår ikke er tilfaldet dette, medregnes til dette foretagendes fortjeneste og beskattes i overensstemmelse hermed.

*Stk. 2.* I tilfælde, hvor en kontraherende stat til fortjenesten i et foretagende i denne stat medregner og i overensstemmelse hermed beskatter fortjeneste, som et foretagende i den anden kontraherende stat er blevet beskattet af i denne anden stat, og den anden kontraherende stat er enig i, at den således medregnede fortjeneste er fortjeneste, som ville være tilfaldet foretagendet i den førstnævnte stat, hvis vilkårene mellem de to foretagender havde været de samme, som ville være aftalt mellem uafhængige foretagender, skal denne anden stat foretage en dertil svarende justering af det skattebeløb, som er beregnet dér af fortjenesten. Ved fastsættelsen af en sådan justering skal der tages hensyn til de øvrige bestemmelser i denne overenskomst, og de kompetente myndigheder i de kontraherende stater skal om nødvendigt rådføre sig med hinanden.

Copyright © 2024 Karnov Group Denmark A/S

**Artikel 10. - Udbytte**(10)Udbytte, som udbetales af en person, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan dog også beskattes i den kontraherende stat, hvor det selskab, der udbetaler udbyttet, er hjemmehørende, og efter lovgivningen i denne stat, men hvis den retmæssige ejer af udbyttet er hjemmehørende i den anden kontraherende stat, må den skat, der pålignes, ikke overstige:

a)   5 pct. af bruttobeløbet af udbyttet, såfremt den retmæssige ejer er et selskab, der direkte ejer mindst 10 pct. af aktiekapitalen i det selskab, der udbetaler udbyttet;

b)   15 pct. af bruttobeløbet af udbyttet i alle andre tilfælde.

Dette udbytte berører ikke adgangen til at beskatte selskabet af den fortjeneste, hvoraf udbyttet udbetales.

*Stk. 3.* Uanset bestemmelserne i stykke 2 kan sådan udbytte ikke beskattes i den kontraherende stat, hvori det selskab, der udbetaler udbyttet, er hjemmehørende, såfremt den retmæssige ejer er:

a)   et selskab, som er hjemmehørende i den anden kontraherende stat, og som har ejet, direkte eller indirekte gennem en eller flere personer, der er hjemmehørende i en af de kontraherende stater, aktier, der repræsenterer 80 pct. eller mere af stemmerettighederne i det selskab, som udbetaler udbyttet, i en 12 måneders periode, der udløber den dag, hvor retten til udbyttet er besluttet, og

   (i)    opfylder betingelserne i artikel 22, stykke 2, litra c, punkt i), ii) eller iii) (Begrænsning af overenskomstfordele);

   (ii)   opfylder betingelserne i artikel 22, stykke 2, litra f, punkt i) og ii), forudsat at selskabet opfylder betingelserne i den nævnte artikels stykke 4 med hensyn til udbyttet;

   (iii)  er berettiget til fordele med hensyn til udbyttet efter artikel 22, stykke 3; eller

b)   en kvalificeret offentlig enhed, som er hjemmehørende i den anden kontraherende stat, og som ikke kontrollerer den, der udbetaler udbyttet; eller

c)   en pensionskasse, som omtalt i artikel 22, stykke 2, litra e (Begrænsning af overenskomstfordele), der er hjemmehørende i den anden kontraherende stat, forudsat at sådan udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

*Stk. 4.*

a)   Stykke 2, litra a, og stykke 3, litra a, skal ikke finde anvendelse på udbytte, der udbetales af et amerikansk "Regulated Investment Company" (RIC) eller en amerikansk "Real Estate Investment Trust" (REIT). I tilfælde, hvor udbytte udbetales af et "Regulated Investment Company", skal stykke 2, litra b, og stykke 3, litra b og c, finde anvendelse. I tilfælde, hvor udbytte udbetales af en "Real Estate Investment Trust", skal stykke 2, litra b, og stykke 3, litra b og c, dog kun finde anvendelse, såfremt:

   i)     den retmæssige ejer af udbyttet er en fysisk person eller en pensionskasse, som i hvert tilfælde ejer en andel på ikke over 10 pct. i den pågældende "Real Estate Investment Trust";

   ii)    udbyttet udbetales vedrørende en klasse af andele, der handles offentligt, og den retmæssige ejer af udbyttet er en person, der ejer en andel på ikke over 5 pct. af nogen klasse af andelene i den pågældende "Real Estate Investment Trust"; eller

   iii)   den retmæssige ejer af udbyttet er en person, der ejer en andel på ikke over 10 pct. i den pågældende "Real Estate Investment Trust", og der er tale om en "Real Estate Investment Trust" med bredt sammensatte investeringer (diversified).

Bestemmelserne i dette stykke skal også finde anvendelse på udbytte, der udbetales af selskaber, som er hjemmehørende i Danmark, og som svarer til de amerikanske selskaber, der er omtalt i dette stykke. Hvorvidt selskaber, der er hjemmehørende i Danmark, svarer til amerikanske selskaber, som omtalt i dette stykke, skal afgøres ved gensidig aftale mellem de kompetente myndigheder.

b)   Ved anvendelsen af dette stykke skal en "Real Estate Investment Trust" anses for at have bredt sammensatte investeringer (diversified), hvis værdien af ingen enkelt andel i fast ejendom overstiger 10 pct. af dens samlede andele i fast ejendom. Ved anvendelsen af denne regel skal tvangsrealiseret ejendom (foreclosure property) ikke anses som andel i fast ejendom. I tilfælde, hvor en "Real Estate Investment Trust" ejer en andel i et interessentskab, skal det anses for at eje direkte en andel af interessentskabets andel i fast ejendom, der svarer til dets andel i interessentskabet.

*Stk. 5.* Udtrykket "udbytte" betyder i denne artikel indkomst af aktier eller andre rettigheder, som ikke er gældsfordringer, og som giver ret til andel i fortjeneste, såvel som indkomst, der er undergivet samme skattemæssige behandling som indkomst af aktier i henhold til lovgivningen i den stat, i hvilken den, der udbetaler udbyttet, er hjemmehørende.

*Stk. 6.* Bestemmelserne i stykke 2 og 3 skal ikke finde anvendelse, hvis udbyttets retmæssige ejer, der er hjemmehørende i en kontraherende stat, driver erhvervsvirksomhed i den anden kontraherende stat, hvor det udbyttebetalende selskab er hjemmehørende, gennem et dér beliggende fast driftssted, eller udøver frit erhverv i denne anden stat fra et dér beliggende fast sted, og udbyttet kan henføres til sådant fast driftssted eller fast sted. I så fald skal bestemmelserne i henholdsvis artikel 7 (Fortjeneste ved erhvervsvirksomhed) eller artikel 14 (Frit erhverv) finde anvendelse.

*Stk. 7.* En kontraherende stat må ikke påligne nogen skat på udbytte, der udbetales af et selskab, der ikke er hjemmehørende i denne stat, medmindre udbyttet udbetales til en person, der er hjemmehørende i denne kontraherende stat, eller udbyttet kan henføres til et fast driftssted eller et fast sted, der er beliggende i denne stat, eller pålægge skat på et selskabs ikke-udloddede fortjeneste, undtagen som bestemt i stykke 8, selv om det udloddede udbytte eller den ikke-udloddede fortjeneste helt eller delvis består af fortjeneste eller indkomst, der hidrører fra denne stat.

*Stk. 8.* Et selskab, som er hjemmehørende i en kontraherende stat, og som har et fast driftssted i den anden kontraherende stat, eller som er skattepligtig i den anden kontraherende stat på grundlag af nettoindkomst, der kan beskattes i den anden stat efter artikel 6 (Indkomst af fast ejendom) eller artikel 13, stykke 1 (Kapitalgevinster), kan undergives beskatning i denne anden kontraherende stat ud over den skat, der kan pålignes efter andre bestemmelser i denne overenskomst. En sådan skat kan dog kun pålignes den del af selskabets fortjeneste, som kan henføres til det faste driftssted, og den del af indkomsten, der er henvist til i den foranstående sætning, som er skattepligtig efter artikel 6 (Indkomst af fast ejendom) eller artikel 13, stykke 1 (Kapitalgevinster), der, for så vidt angår De Forenede Stater, udgør et beløb, der svarer til udbyttet af sådan fortjeneste eller indkomst, og for så vidt angår Danmark, er et beløb, der modsvarer det beløb, der svarer til udbyttet.

*Stk. 9.* Den skat, der er henvist til i stykke 8, kan ikke pålægges med en sats, der overstiger satsen, der er anført i stykke 2, litra a.

Under alle omstændigheder kan den ikke pålægges på et selskab, der

a) opfylder betingelserne i artikel 22, stykke 2, litra c, punkt i), ii) eller iii) (Begrænsning af overenskomstfordele);
b) opfylder betingelserne i artikel 22, stykke 2, litra f, punkt i) og ii), forudsat at selskabet opfylder betingelserne i den nævnte artikels stykke 4 med hensyn til indkomst, fortjeneste eller gevinst, som omtalt i denne artikels stykke 8;
c) er berettiget til fordele efter artikel 22, stykke 3, med hensyn til indkomst, fortjeneste eller gevinst, som omtalt i denne artikels stykke 8; eller
d) har modtaget en afgørelse i henhold til artikel 22, stykke 7, med hensyn til dette stykke.

**Artikel 11. - Renter**(11)Renter, der hidrører fra en kontraherende stat og retmæssigt ejes af en person, der er hjemmehørende i den anden kontraherende stat, kan kun beskattes i denne anden stat.

*Stk. 2.* Udtrykket »renter« betyder i denne artikel indkomst af gældsfordringer af enhver art, hvad enten de er sikret ved pant i fast ejendom eller ikke, og hvad enten de indeholder en ret til andel i skyldnerens fortjeneste eller ikke, og især indkomst af statsgældsbeviser og indkomst af obligationer, herunder agiobeløb og gevinster, der knytter sig til sådanne gældsbeviser og obligationer, og enhver anden indkomst, der i henhold til skattelovgivningen i den kontraherende stat, fra hvilken indkomsten hidrører, er undergivet samme skattemæssige behandling som indkomst af pengelån. Indkomst som omhandlet i artikel 10 (Udbytte) og tillæg ved for sen betaling skal ikke anses for renter i denne artikel.

*Stk. 3.* Bestemmelserne i stykke 1 skal ikke finde anvendelse, såfremt renternes retmæssige ejer, der er hjemmehørende i en kontraherende stat, driver erhvervsvirksomhed i den anden kontraherende stat, hvorfra renterne hidrører, gennem et dér beliggende fast driftssted eller udøver frit erhverv i denne anden stat fra et dér beliggende fast sted, og renterne kan henføres til et sådant fast driftssted eller fast sted. I så fald skal bestemmelserne i henholdsvis artikel 7 (Fortjeneste ved erhvervsvirksomhed) og artikel 14 (Frit erhverv) finde anvendelse.

*Stk. 4.* I tilfælde, hvor en særlig forbindelse mellem den, der betaler renterne, og den retmæssige ejer, eller mellem disse og en tredje person, bevirker, at renterne set i forhold til den gældsfordring, for hvilken de betales, overstiger det beløb, som ville være aftalt mellem den, der betaler renterne, og den retmæssige ejer, såfremt den nævnte forbindelse ikke havde foreligget, skal bestemmelserne i denne artikel kun finde anvendelse på det sidstnævnte beløb. I så fald skal det overskydende beløb kunne beskattes i overensstemmelse med lovgivningen i hver af staterne under hensyntagen til de øvrige bestemmelser i denne overenskomst.

*Stk. 5.* Uanset bestemmelserne i stykke 1 gælder følgende:

a) renter, der betales af en person, der er hjemmehørende i en kontraherende stat, og som er fastsat med henvisning til skyldners eller en tilknyttet persons indtægter, omsætning, indkomst, fortjeneste eller anden pengestrøm, til enhver ændring i værdien af skyldners eller en tilknyttet persons aktiver eller til ethvert udbytte, interessentskabsudlodning eller lignende betaling, der foretages af skyldner til en tilknyttet person og som betales til en person, der er hjemmehørende i den anden stat, kan også beskattes i den kontraherende stat, hvorfra de hidrører, og i overensstemmelse med lovgivningen i denne stat, men hvis den retmæssige ejer er hjemmehørende i den anden kontraherende stat, kan bruttobeløbet af renterne beskattes med en sats, der ikke overstiger den sats, der er fastsat i artikel 10, stykke 2, litra b) (Udbytte); og

b) overrente (excess inclusion), som vedrører øvrige andele (residual interest) i et amerikansk »Real Estate Mortgage Investment Conduit« (REMIC) kan beskattes i hver af staterne i overensstemmelse med den interne lovgivning i den enkelte stat.

**Artikel 12. - Royalties**(12)Royalties, der hidrører fra en kontraherende stat, og som retmæssigt ejes af en person, der er hjemmehørende i den anden kontraherende stat, kan kun beskattes i denne anden stat.

*Stk. 2.* Udtrykket »royalties« betyder i denne artikel:

a) ethvert vederlag, der modtages for anvendelsen af eller retten til at anvende enhver ophavsret til et litterært, kunstnerisk, videnskabeligt eller andet arbejde (herunder computer software, spillefilm, lyd- eller videobånd eller disketter og andre midler til gengivelse af billede og lyd), ethvert patent, varemærke, mønster eller model, tegning, hemmelig formel eller fremstillingsmetode, eller anden lignende rettighed eller aktiv, eller for oplysninger om industrielle, kommercielle eller videnskabelige erfaringer; eller

b) fortjeneste erhvervet ved afhændelse af ethvert aktiv som nævnt i litra a), forudsat at en sådan fortjeneste er afhængig af produktivitet, anvendelse eller videresalg af aktivet.

*Stk. 3.* Bestemmelserne i stykke 1 skal ikke finde anvendelse, såfremt royaltybeløbets retmæssige ejer, der er hjemmehørende i en kontraherende stat, driver erhvervsvirksomhed i den anden kontraherende stat, hvorfra royaltybeløbet hidrører, gennem et dér beliggende fast driftssted eller udøver frit erhverv i denne anden stat fra et dér beliggende fast sted, og royaltybeløbet kan henføres til et sådant fast driftssted eller fast sted. I så fald skal bestemmelserne i henholdsvis artikel 7 (Fortjeneste ved erhvervsvirksomhed) og artikel 14 (Frit erhverv) finde anvendelse.

*Stk. 4.* I tilfælde, hvor en særlig forbindelse mellem den, der betaler royaltybeløbet, og den retmæssige ejer eller mellem disse og en tredje person, har bevirket, at royaltybeløbet, set i forhold til den anvendelse, rettighed eller oplysning, for hvilken det betales, overstiger det beløb, som ville være aftalt mellem den, der betaler royaltybeløbet, og den retmæssige ejer, såfremt den nævnte forbindelse ikke havde foreligget, skal bestemmelserne i denne artikel kun finde anvendelse på det sidstnævnte beløb. I så fald skal det overskydende beløb kunne beskattes i overensstemmelse med lovgivningen i hver af de kontraherende stater under hensyntagen til de øvrige bestemmelser i denne overenskomst.

**Artikel 13. - Kapitalgevinster**(13)Fortjeneste, som oppebæres af en person, der er hjemmehørende i en kontraherende stat, og som kan henføres til afhændelse af fast ejendom, der er beliggende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Udtrykket »fast ejendom beliggende i den anden kontraherende stat« skal i denne artikel omfatte:

a) fast ejendom som omhandlet i artikel 6 (Indkomst af fast ejendom);
b) deltagelse i fast ejendom i USA (United States real property interest); og
c) en tilsvarende deltagelse i fast ejendom beliggende i Danmark.

*Stk. 3.* Fortjeneste ved afhændelse af formuegoder bortset fra fast ejendom, der kan henføres til et fast driftssted, som et foretagende i en kontraherende stat har i den anden kontraherende stat, eller som kan henføres til et fast sted, som en person, der er hjemmehørende i en kontraherende stat, har til rådighed ved udøvelse af frit erhverv i den anden kontraherende stat, samt fortjeneste ved afhændelse af sådant fast driftssted (særskilt eller sammen med hele

Copyright © 2024 Karnov Group Denmark A/S

foretagendet) eller af et sådant fast sted, kan beskattes i denne anden stat.

*Stk. 4.* Uanset bestemmelserne i stykke 3 kan fortjeneste, der erhverves af et foretagende i en kontraherende stat ved afhændelse af skibe, både, luftfartøjer eller containere drevet eller anvendt i international trafik eller formuegoder bortset fra fast ejendom, der hører til driften eller anvendelsen af sådanne skibe, både, luftfartøjer eller containere, kun beskattes i denne stat.

*Stk. 5.* Fortjeneste, som et foretagende, der er hjemmehørende i en kontraherende stat, erhverver i tilfælde, hvor en installation, borerig eller et skib anvendt i den anden kontraherende stat ved efterforskning eller udnyttelse af olie- og gasforekomster anses for afhændet, kan beskattes i denne anden stat i overensstemmelse med denne stats lovgivning, men kun i et omfang svarende til afskrivninger foretaget i denne anden stat.

*Stk. 6.* Fortjeneste ved afhændelse af alle andre aktiver end de i stykke 1-5 omhandlede kan kun beskattes i den kontraherende stat, i hvilken afhænderen er hjemmehørende.

*Stk. 7.* Såfremt en person, der er hjemmehørende i kontraherende stat, er indkomstskattepligtig i begge de kontraherende stater ved råden over aktiver og behandles, som om han havde afhændet aktiver, for hvilke en fortjeneste fastsættes i henhold til indkomstskattelovgivningen i den anden kontraherende stat, kan denne person, uanset at der ikke i øvrigt stilles krav herom, vælge i sin selvangivelse af indkomst for afhændelsesåret at være skattepligtig i den stat, hvori han er hjemmehørende, i det år, som om han umiddelbart inden da havde solgt og atter købt et sådant aktiv til et beløb, der svarer til aktivets handelsværdi på dette tidspunkt. Et sådant valg skal anvendes på alle aktiver, der er omhandlet i dette stykke, når de er afhændet af den pågældende i det skatteår, for hvilket valget er foretaget, eller til enhver tid derefter.

*Stk. 8.* I tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, afhænder aktiver i forbindelse med selskabsstiftelse, omstrukturering, fusion, spaltning eller lignende, og fortjeneste, gevinst eller indkomst med hensyn til en sådan afhændelse ikke fastsættes med henblik på beskatning i denne stat, kan den kompetente myndighed i den anden kontraherende stat efter anmodning fra den person, der erhverver aktivet, for at undgå dobbeltbeskatning og under forudsætning af, at vilkår og betingelser er tilfredsstillende for denne kompetente myndighed, aftale at udskyde beskatningen af fortjenesten, gevinsten eller indkomsten vedrørende et sådant aktiv med henblik på beskatning i denne anden stat til et sådant tidspunkt og på en sådan måde, som der opnås enighed om i aftalen.

**Artikel 14. - Frit erhverv**(14)Indkomst ved frit erhverv oppebåret af en fysisk person, der er hjemmehørende i en kontraherende stat, kan kun beskattes i denne stat, medmindre personen har et fast sted, som til stadighed står til rådighed for ham i den anden kontraherende stat med henblik på udøvelsen af hans virksomhed. Såfremt han har et sådant fast sted, kan indkomst, der kan henføres til det faste sted, og som hidrører fra udøvelse af hverv i denne anden stat, også beskattes i denne anden stat.

*Stk. 2.* Ved anvendelsen af stykke 1 skal den indkomst, der kan beskattes i den anden kontraherende stat, opgøres i henhold til principperne i artikel 7, stykke 3 (Fortjeneste ved erhvervsvirksomhed).

**Artikel 15. - Personligt arbejde i tjenesteforhold**(15)Såfremt bestemmelserne i artikel 16 (Bestyrelseshonorarer), artikel 18 (Pensioner, social sikring, livrenter, underholdsbidrag og bidrag til børn) og artikel 19 (Offentligt hverv) ikke medfører andet, kan gage, løn og andet vederlag for personligt arbejde i tjenesteforhold oppebåret af en person, der er hjemmehørende i en kontraherende stat, kun beskattes i denne stat, medmindre arbejdet udføres i den

anden kontraherende stat. Er arbejdet udført dér, kan vederlag, som oppebæres herfor, beskattes i denne anden stat.

*Stk. 2.* Uanset bestemmelserne i stykke 1 kan vederlag, som en person, der er hjemmehørende i en kontraherende stat, oppebærer for personligt arbejde udført i den anden kontraherende stat, kun beskattes i den førstnævnte stat, såfremt:

a) modtageren opholder sig i den anden stat i en eller flere perioder, der tilsammen ikke overstiger 183 dage inden for en tolv måneders periode, der begynder eller slutter i det pågældende skatteår; og

b) vederlaget betales af eller for en arbejdsgiver, der ikke er hjemmehørende i den anden stat; og

c) vederlaget ikke udredes af et fast driftssted eller fast sted, som arbejdsgiveren har i den anden stat.

*Stk. 3.* Uanset de foranstående bestemmelser i denne artikel kan vederlag som omhandlet i stykke 1, der oppebæres af en person, der er hjemmehørende i en kontraherende stat, for personligt arbejde som medlem af den faste besætning på et skib eller luftfartøj, der anvendes i international trafik, kun beskattes i denne stat.

**Artikel 16. - Bestyrelseshonorarer**(16)
Bestyrelseshonorarer og andre lignende vederlag, som oppebæres af en person, der er hjemmehørende i en kontraherende stat, i egenskab af medlem af bestyrelsen i et selskab, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

**Artikel 17. - Kunstnere og sportsfolk**(17)Indkomst, som en person, der er hjemmehørende i en kontraherende stat, oppebærer som optrædende kunstner, såsom teater-, film-, radio- eller fjernsynskunstner eller musiker eller som sportsmand ved personlig virksomhed som sådan udøvet i den anden kontraherende stat, og som ville være fritaget for beskatning i denne anden kontraherende stat i henhold til bestemmelserne i artikel 14 (Frit erhverv) og artikel 15 (Personligt arbejde i tjenesteforhold), kan beskattes i denne anden stat, medmindre bruttobeløbet oppebåret af en sådan optrædende kunstner eller sportsmand, herunder godtgjorte udgifter eller udgifter afholdt på dennes vegne, fra sådan virksomhed ikke overstiger tyve tusinde dollars ($ 20.000) eller et tilsvarende beløb i danske kroner for det pågældende skatteår.

*Stk. 2.* I tilfælde, hvor indkomst ved den virksomhed, som udøves af en optrædende kunstner eller sportsmand i hans egenskab som sådan, ikke tilfalder kunstneren eller sportsmanden selv, men en anden person, kan denne indkomst, uanset bestemmelserne i artikel 7 (Fortjeneste ved erhvervsvirksomhed) og artikel 14 (Frit erhverv) beskattes i den kontraherende stat, i hvilken kunstnerens eller sportsmandens virksomhed udøves, medmindre kunstneren eller sportsmanden godtgør, at hverken kunstneren eller sportsmanden eller personer, der er knyttet til ham, direkte eller indirekte på nogen måde har del i denne anden persons fortjeneste, herunder modtagelse af udskudt vederlag, bonus, honorar, udbytte, interessentskabsudlodning eller anden udlodning.

**Artikel 18. - Pensioner, social sikring, livrenter, underholdsbidrag og bidrag til børn**(18)Såfremt bestemmelserne i artikel 19, stykke 2 (Offentligt hverv) ikke medfører andet, gælder følgende:

a) medmindre andet fremgår af litra b), kan pensioner, der hidrører fra en kontraherende stat og som retmæssigt oppebæres af en person, der er hjemmehørende i den anden kontraherende stat, kun beskattes i den stat, hvorfra de hidrører;

b) hvis en person, før denne overenskomsts ikrafttræden, var hjemmehørende i en kontraherende stat og modtog pension, der hidrører fra den anden kontraherende stat, kan denne

person kun beskattes af de i litra a) omhandlede pensioner i den førstnævnte stat;

c) pensioner skal alene anses for at hidrøre fra en kontraherende stat, såfremt de udbetales fra en pensionsordning, der er oprettet i denne stat;

d) pensioner betyder i dette stykke pensioner og andre lignende vederlag, uanset om de udbetales løbende eller som engangsbeløb.

*Stk. 2.* Uanset bestemmelserne i stykke 1 kan betalinger, der udbetales af en kontraherende stat i henhold til bestemmelser i lovgivningen om social sikring eller lignende lovgivning i denne kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, eller til en statsborger i De Forenede Stater, kun beskattes i den førstnævnte stat.

*Stk. 3.* Livrenter, der oppebæres og retmæssigt ejes af en fysisk person, der er hjemmehørende i en kontraherende stat, kan kun beskattes i denne stat. Udtrykket »livrenter« betyder i dette stykke en fastsat sum, der betales løbende på fastsatte tidspunkter i et bestemt antal år eller for livstid i henhold til en forpligtelse til at yde disse betalinger mod rimeligt og fuldt vederlag (bortset fra udførte hverv).

*Stk. 4.* Underholdsbidrag, der betales af en person, der er hjemmehørende i en kontraherende stat, og som er fradragsberettiget i denne stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan kun beskattes i denne anden kontraherende stat. Udtrykket »underholdsbidrag« betyder i dette stykke løbende betalinger i henhold til en skriftlig separationsbevilling eller en skilsmissedom, underholdsbidrag eller pligtig understøttelse, hvilke betalinger er skattepligtige for modtageren i henhold til lovgivningen i den stat, i hvilken modtageren er hjemmehørende.

*Stk. 5.* Løbende betalinger, der ikke er omhandlet i stykke 4, til underhold af et barn i henhold til en skriftlig separationsbevilling eller en skilsmissedom, underholdsbidrag eller pligtig understøttelse, og som betales af en person, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan kun beskattes i den førstnævnte kontraherende stat.

**Artikel 19. - Offentligt hverv**(19)Uanset bestemmelserne i artikel 14 (Frit erhverv), artikel 15 (Personligt arbejde i tjenesteforhold), artikel 16 (Bestyrelseshonorarer) og artikel 17 (Kunstnere og sportsfolk) skal følgende gælde:

a) gage, løn og lignende vederlag, bortset fra pensioner, der udbetales af offentlige midler i en kontraherende stat eller en af dens politiske underafdelinger eller lokale myndigheder til en fysisk person for udførelse af hverv for denne stat, underafdeling eller myndighed under udøvelse af funktioner af myndighedskarakter, kan, medmindre andet fremgår af bestemmelserne i litra b), kun beskattes i denne stat;

b) et sådant vederlag kan dog kun beskattes i den anden kontraherende stat, såfremt hvervet er udført i denne stat, og den pågældende er en i denne stat hjemmehørende fysisk person, som

(i)   er statsborger i denne stat; eller

(ii)  ikke blev hjemmehørende i denne stat alene med det formål at udføre hvervet.

*Stk. 2.*

a) Enhver pension, som udbetales af offentlige midler i en kontraherende stat, en af dens politiske underafdelinger eller lokale myndigheder til en fysisk person for udførelse af hverv for denne stat, underafdeling eller myndighed under udøvelse af funktioner af myndighedskarakter (bortset fra udbetalinger

som omhandlet i artikel 18, stykke 2 (Pensioner, social sikring, livrenter, underholdsbidrag og bidrag til børn)) kan, medmindre andet fremgår af bestemmelserne i litra b), kun beskattes i denne stat;

b) en sådan pension kan dog kun beskattes i den anden kontraherende stat, hvis modtageren er en fysisk person, der er hjemmehørende og statsborger i denne stat.

*Stk. 3.* Bestemmelserne i artikel 15 (Personligt arbejde i tjenesteforhold), artikel 16 (Bestyrelseshonorarer), artikel 17 (Kunstnere og sportsfolk) og artikel 18 (Pensioner, social sikring, livrenter, underholdsbidrag og bidrag til børn) skal finde anvendelse på vederlag og pensioner, der udbetales for udførelse af hverv i forbindelse med erhvervsvirksomhed, der drives af en kontraherende stat, en af dens politiske underafdelinger eller lokale myndigheder.

**Artikel 20. - Studerende og praktikanter**(20)Beløb, som en studerende, lærling eller praktikant, der er eller umiddelbart inden sit besøg i en kontraherende stat var hjemmehørende i den anden kontraherende stat, og som opholder sig i den førstnævnte stat med henblik på fuldtidsstudier på en officielt godkendt uddannelsesinstitution eller med henblik på en fuldtidsuddannelse, skal ikke beskattes i denne stat under forudsætning af, at sådanne beløb hidrører fra kilder uden for denne stat og modtages til underhold, studium eller uddannelse. Skattefritagelsen i henhold til denne artikel skal for en lærling eller praktikant alene gælde i en periode på ikke over tre år fra datoen for hans første ankomst til den førstnævnte kontraherende stat i uddannelsesøjemed. Bestemmelserne i dette stykke skal ikke finde anvendelse på indkomst fra forskning, såfremt sådan forskning ikke foretages i offentlig interesse, men hovedsagelig til personlig fordel for en specifik person eller personer.

**Artikel 21. - Andre indkomster**(21)Indkomster, der retmæssigt oppebæres af en person, der er hjemmehørende i en kontraherende stat, og som ikke er omhandlet i de foranstående artikler i denne overenskomst, kan, uanset hvorfra de hidrører, kun beskattes i denne stat.

*Stk. 2.* Bestemmelserne i stykke 1 skal ikke finde anvendelse på indkomst, bortset fra indkomst af fast ejendom som defineret i artikel 6, stykke 2 (Indkomst af fast ejendom), såfremt den i en kontraherende stat hjemmehørende retmæssige ejer af sådan indkomst driver erhvervsvirksomhed i den anden kontraherende stat gennem et der beliggende fast driftssted, eller udøver frit erhverv i denne anden stat fra et der beliggende fast sted, og indkomsten kan henføres til et sådant fast driftssted eller fast sted. I så fald finder bestemmelserne i henholdsvis artikel 7 (Fortjeneste ved erhvervsvirksomhed) og artikel 14 (Frit erhverv) anvendelse.

**Artikel 22. - Begrænsning af overenskomstfordele**(22)En person, der er hjemmehørende i en kontraherende stat, skal alene være berettiget til fordele, som overenskomsten i øvrigt giver til personer, der er hjemmehørende i en kontraherende stat, i det omfang, det er fastsat i denne artikel.

*Stk. 2.* En person, der er hjemmehørende i en kontraherende stat, skal alene være berettiget til alle fordele efter denne overenskomst, hvis denne person er:

a) en fysisk person;

b) en kontraherende stat, en politisk underafdeling eller lokal myndighed heraf, eller et regeringskontor eller organ af denne stat, underafdeling eller myndighed;

c) et selskab, hvis

(i)   dets vigtigste aktieklasse (og enhver uforholdsmæssig aktieklasse) regelmæssigt handles på en eller flere anerkendte børser, og enten

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                                2000-03-31

A) dets vigtigste aktieklasse hovedsageligt handles på en anerkendt børs beliggende i den kontraherende stat, i hvis selskabet er hjemmehørende (eller for så vidt angår et selskab, hjemmehørende i Danmark, på en anerkendt børs beliggende i Den Europæiske Union eller i en anden stat i Det Europæiske Økonomiske Område, eller for så vidt angår et selskab, hjemmehørende i De Forenede Stater, på en anerkendt børs beliggende i en anden stat, der er omfattet af Den Nordamerikanske Frihandelsaftale (North American Free Trade Agreement); eller

B) selskabets primære sæde for ledelse og kontrol findes i den kontraherende stat, hvor det er hjemmehørende;

(ii) for så vidt angår et selskab, hjemmehørende i Danmark, en eller flere skattepligtige fonde, der er berettiget til fordele efter litra g, ejer aktier, der repræsenterer mere end 50 pct. af stemmerettighederne i selskabet, og alle andre aktier er noteret på en anerkendt børs og hovedsagelig handlet på en anerkendt børs, som er beliggende i Den Europæiske Union eller en anden stat i Det Europæiske Økonomiske Område; eller

(iii) mindst 50 pct. af de samlede stemmerettigheder og værdi af aktierne (og mindst 50 pct. af enhver uforholdsmæssig aktieklasse) i selskabet er ejet direkte eller indirekte af fem eller færre selskaber, der er berettiget til fordele efter punkt i) - ii), eller en kombination heraf, forudsat at i tilfælde af indirekte ejerskab hvert led i ejerkæden er hjemmehørende i en af de kontraherende stater;

d) en velgørende organisation eller anden juridisk person, som omtalt i artikel 4, stykke 1, litra b, punkt i) (Skattemæssigt hjemsted);

e) en juridisk person, hvad enten fritaget for beskatning eller ikke, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende, forudsat at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater;

f) en person, bortset fra en fysisk person, såfremt

(i) gennem mindst halvdelen af skatteåret mindst 50 pct. af hver aktieklasse eller anden udbyttegivende andel i personen er ejet, direkte eller indirekte, af personer, som er hjemmehørende i den kontraherende stat, hvor denne person er hjemmehørende, og som er berettiget til fordele efter denne overenskomst efter dette stykkes litra a, litra b, litra c, punkt i), litra d eller litra e, forudsat at i tilfælde af indirekte ejerskab hvert led i ejerkæden er hjemmehørende i denne kontraherende stat; og

(ii) mindre end 50 pct. af personens bruttoindkomst i skatteåret, som bestemt i personens bopælsstat, er betalt eller tilskrevet, direkte eller indirekte, til personer, der ikke er hjemmehørende i en af de kontraherende stater og berettiget til fordele efter denne overenskomst efter dette stykkes litra a, litra b, litra c, punkt i), litra d eller litra e, i form af betalinger, der er fradragsberettiget i personens bopælsstat, for så vidt angår skatter, der er omfattet af denne overenskomst, (men ikke omfattende arms længde betalinger ved sædvanlig er-

hvervsudøvelse til tjenesteydelser eller rørlige formuegoder og betalinger for finansielle forpligtelser til en bank, som ikke er forbundet med den, der betaler);

g) for så vidt angår Danmark, en skattepligtig fond, såfremt

(i) det beløb, der er betalt eller tilskrevet i form af fradragsberettigede betalinger (men ikke omfattende arms længde betalinger ved sædvanlig udøvelse af dens virksomhed af velgørende art og i overensstemmelse med dansk lovgivning for skattepligtige fonde (lov om erhvervsmæssige fonde og lov om fonde og visse foreninger) til tjenesteydelser eller rørlige formuegoder) i skatteåret og i hvert af de foregående tre skatteår, direkte eller indirekte, til personer, der ikke er berettiget til fordele efter dette stykkes litra a, litra b, litra c, punkt i), litra d eller litra e, ikke overstiger 50 pct. af dens bruttoindkomst, som bestemt efter dansk lovgivning (undtagen dens skattefritagne indkomst); og

(ii) det beløb, der er betalt eller tilskrevet i form af både fradragsberettigede betalinger (men ikke omfattende arms længde betalinger ved sædvanlig udøvelse af dens virksomhed af velgørende art og i overensstemmelse med dansk lovgivning om skattepligtige fonde (lov om erhvervsmæssige fonde og lov om fonde og visse foreninger) til tjenesteydelser eller rørlige formuegoder) og ikke-fradragsberettigede betalinger i skatteåret og i hvert af de foregående tre skatteår, direkte eller indirekte, til personer, der ikke er berettiget til fordele efter dette stykkes litra a, litra b, litra c, punkt i), litra d eller litra e, ikke overstiger 50 pct. af dens samlede indkomst, som bestemt efter dansk lovgivning (herunder dens skattefritagne indkomst).

Stk. 3. Et selskab, der er hjemmehørende i en kontraherende stat, skal også være berettiget til fordele efter overenskomsten, såfremt:

a) mindst 95 pct. af de samlede stemmerettigheder og værdi af dets aktier (og mindst 50 pct. af enhver uforholdsmæssig aktieklasse) ejes, direkte eller indirekte, af syv eller færre personer, der er tilsvarende begunstigede; og

b) mindre end 50 pct. af selskabets bruttoindkomst, som bestemt i selskabets bopælsstat, for skatteåret er betalt eller tilskrevet, direkte eller indirekte, til personer, der ikke er tilsvarende begunstigede, i form af betalinger (men ikke omfattende arms længde betalinger ved sædvanlig erhvervsudøvelse til tjenesteydelser eller rørlige formuegoder og betalinger for finansielle forpligtelser til en bank, som ikke er forbundet med den, der betaler), der er fradragsberettiget i selskabets bopælsstat, for så vidt angår skatter, der er omfattet af denne overenskomst.

Stk. 4.

a) En person, der er hjemmehørende i en kontraherende stat, er berettiget til fordele efter overenskomsten med hensyn til indkomst oppebåret fra den anden stat, uanset om personen er berettiget til fordele efter stykke 2 eller 3, hvis personen er beskæftiget med aktiv drift af handels- eller forretningsvirksomhed i den førstnævnte stat (bortset fra virksomhed, der består i at foretage eller administrere investeringer for personens egen regning, medmindre virksomheden er bank- eller forsikringsvirksomhed eller virksomhed med værdipapirer, som udøves af en bank, et forsikringsselskab eller en registreret børsmægler), og indkomsten oppebåret fra den anden kontraherende stat er oppebåret i forbindelse med eller knyttet til denne handel eller forretning.

Copyright © 2024 Karnov Group Denmark A/S                                                                side 9

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

b) Hvis en person, der er hjemmehørende i en kontraherende stat, oppebærer indkomst fra handels- eller forretningsvirksomhed i den anden kontraherende stat, eller oppebærer indkomst, der hidrører fra den anden kontraherende stat fra et forbundet foretagende, skal dette stykkes litra a alene finde anvendelse på sådan indkomst, såfremt handels- eller forretningsvirksomheden i den førstnævnte stat er væsentlig i forhold til handels- eller forretningsvirksomheden i den anden stat. Hvorvidt handels- eller forretningsvirksomhed er væsentlig ved anvendelsen af dette stykke, bestemmes på grundlag af alle faktiske forhold og omstændigheder.

c) Ved afgørelsen af om en person er "beskæftiget med aktiv drift af handels- eller forretningsvirksomhed" i en kontraherende stat efter dette stykkes litra a, skal virksomhed, som udøves af personer, der er forbundet med denne person, anses for at være udøvet af denne person. En person er forbundet med en anden, hvis den ene besidder mindst 50 pct. af den udbyttegivende andel i den anden (eller, for så vidt angår et selskab, mindst 50 pct. af de samlede stemmer og mindst 50 pct. af den samlede værdi af aktierne i selskabet eller af de udbyttegivende andele i selskabet), eller hvis en anden person besidder, direkte eller indirekte, mindst 50 pct. af den udbyttegivende andel (eller, for så vidt angår et selskab, mindst 50 pct. af de samlede stemmer og mindst 50 pct. af den samlede værdi af aktierne i selskabet eller af de udbyttegivende andele i selskabet) i hver person. Under alle omstændigheder skal en person anses for forbundet med en anden, såfremt på grundlag af alle faktiske forhold og omstændigheder den ene har kontrol af den anden eller begge er under kontrol af samme person eller personer.

*Stk. 5.* En person, som er hjemmehørende i en kontraherende stat, og som oppebærer indkomst fra den anden kontraherende stat som omtalt i artikel 8 (Skibs- og luftfart) og som ikke er berettiget til fordele efter denne overenskomst på grund af de foregående stykker, skal alligevel være berettiget til fordele efter denne overenskomst med hensyn til sådan indkomst, hvis mindst 50 pct. af den udbyttegivende andel i en sådan person (eller i tilfælde af et selskab, mindst 50 pct. af de samlede stemmer og den samlede værdi af aktierne i et sådant selskab) er ejet direkte eller indirekte

a) af personer, som nævnt i stykke 2, litra a, litra b, litra c, punkt i), litra d eller litra e, eller af statsborgere i De Forenede Stater, eller af fysiske personer, der er hjemmehørende i en tredje stat, eller

b) af et selskab eller en kombination af selskaber, hvis aktier hovedsageligt og regelmæssigt handles på et anerkendt værdipapirmarked i en tredje stat,

forudsat at en sådan tredje stat giver lempelse for fortjeneste på samme måde som nævnt i denne overenskomsts artikel 8 (Skibs- og luftfart) til statsborgere og selskaber i den anden kontraherende stat enten efter dens nationale lovgivning eller i fælles aftale med denne anden kontraherende stat eller en overenskomst mellem den tredje stat og den anden kontraherende stat.

*Stk. 6.* Uanset de foregående stykker, såfremt et foretagende i Danmark oppebærer renter eller royalties fra De Forenede Stater, og indkomsten i form af sådanne renter og royalties er fritaget for beskatning i Danmark, fordi den kan henføres til et fast driftssted, som dette foretagende har i en tredje stat, skal skattemæssige fordele, som ellers ville finde anvendelse efter overenskomstens andre bestemmelser, ikke finde anvendelse for sådan indkomst, hvis skatten, som faktisk betales vedrørende sådan indkomst i tredjestaten, er mindre end 60 pct. af den skat, som skulle betales i Danmark, hvis indkomsten var optjent i Danmark af foretagendet og ikke blev

henført til det faste driftssted i tredjestaten. Enhver rente eller royalty, som bestemmelserne i dette stykke finder anvendelse på, kan beskattes i De Forenede Stater, med en sats, der ikke må overstige 15 pct. af bruttobeløbet heraf. Bestemmelserne i dette stykke skal ikke finde anvendelse, såfremt:

a) for så vidt angår renter, indkomsten, der er oppebåret fra De Forenede Stater, er oppebåret i forbindelse med eller knyttet til aktiv drift af handels- eller forretningsvirksomhed, som er udøvet i det faste driftssted i tredjestaten (bortset fra virksomhed, der består af at foretage, administrere eller blot eje investeringer for personens egen regning, medmindre denne virksomhed er bankvirksomhed eller virksomhed med værdipapirer udøvet af en bank eller en registreret børsmægler); eller

b) for så vidt angår royalties, disse royalties er modtaget som vederlag for brugen af, eller retten til at bruge, immaterielle formuegoder, der er fremstillet eller udviklet i det faste driftssted selv.

*Stk. 7.* En person, som er hjemmehørende i en kontraherende stat, og som ikke er berettiget til fordele efter bestemmelserne i de foregående stykker, skal alligevel indrømmes fordele efter overenskomsten, hvis den kompetente myndighed i den anden kontraherende stat beslutter, at etableringen, anskaffelsen eller opretholdelsen af sådan person og udøvelsen af dennes drift ikke havde som et af dets hovedformål at opnå fordele efter overenskomsten. Den kompetente myndighed i den anden kontraherende stat skal rådføre sig med den kompetente myndighed i den førstnævnte stat, før den nægter overenskomstens fordele efter dette stykke.

*Stk. 8.* I denne artikel har følgende udtryk den nedenfor angivne betydning:

a) udtrykket "vigtigste aktieklasse" betyder de ordinære eller fælles aktier i selskabet, forudsat at sådan aktieklasse repræsenterer flertallet af stemmerettighederne og værdien af selskabet. Hvis ingen enkelt klasse af ordinære eller fælles aktier repræsenterer flertallet af de samlede stemmerettigheder og værdi af selskabet, er "vigtigste aktieklasse" den eller de klasser, som sammenlagt repræsenterer flertallet af stemmerettighederne og værdien af selskabet;

b) udtrykket "uforholdsmæssig aktieklasse" betyder enhver aktieklasse i et selskab, der er hjemmehørende i en af staterne, som berettiger aktionæren til en uforholdsmæssig højere andel, gennem udbytte, betaling ved indløsning eller på anden måde, i indtjening, som er frembragt i den anden stat ved særlige aktiver eller virksomhed i selskabet;

c) udtrykket "aktier" omfatter depotbevis deraf;

d) udtrykket "anerkendt børs" betyder

    i) NASDAQ-systemet, der ejes af "the National Association of Securities Dealers, Inc" (den nationale sammenslutning af værdipapirforhandlere) og enhver børs, der er registreret hos "the U.S. Securities and Exchange Commission" som en indenlandsk værdipapirforhandler i henhold til "the Securities Exchange Act" fra 1934;

    ii) Københavns Fondsbørs;

    iii) børserne i Amsterdam, Bruxelles, Frankfurt, Hamburg, Helsinki, London, Oslo, Paris, Stockholm, Sydney, Tokyo og Toronto; og

    iv) enhver anden børs, som der er opnået enighed om af de kompetente myndigheder i de kontraherende stater;

Copyright © 2024 Karnov Group Denmark A/S

e) udtrykket "skattepligtig fond" som anvendt i stykke 2 betyder en fond, der er skattepligtig i henhold til § 1, stykke 1, i den danske fondsbeskatningslov;

f) i) ved anvendelsen af stykke 2, skal aktier i en aktieklasse anses for regelmæssigt at blive handlet på en eller flere af anerkendte børser i et skatteår, såfremt

    A) handel i en sådan klasse er foretaget på en eller flere sådanne børser udover i minimalt (de minimis) kvantum gennem hvert kvartal; og

    B) det samlede antal af aktier eller enheder af den klasse, der er handlet på en sådan børs eller børser gennem det foregående skatteår er mindst 6 pct. af det gennemsnitlige antal af cirkulerende aktier eller enheder i denne klasse (herunder aktier ejet af skattepligtige fonde) gennem dette skatteår; og

ii) ved afgørelsen af om et selskab opfylder betingelserne i stykke 2, litra c, punkt ii), skal dette litras punkt i) anvendes, som om alle de af selskabet udstedte aktier var én aktieklasse, og aktier ejet af skattepligtige fonde medregnes ikke som cirkulerende aktier med henblik på at afgøre, om 6 pct. af de cirkulerende aktier er blevet handlet inden for et skatteår;

g) et selskabs primære sæde for ledelse og kontrol er alene i den stat, hvor det er hjemmehørende, hvis personer i direktørstilling eller højere ansættelse i ledelsen udøver et løbende ansvar for beslutninger om selskabets strategiske, finansielle og driftsmæssige politik (herunder dets direkte og indirekte ejede datterselskaber) i større omfang i denne stat end i nogen anden stat, og personale udfører løbende arbejde, som er nødvendigt for at forberede og træffe disse beslutninger, i større omfang i denne stat end i nogen anden stat;

h) udtrykket "tilsvarende begunstiget" betyder en person, der er hjemmehørende i en medlemsstat i Den Europæiske Union eller i en anden stat i Det Europæiske Økonomiske Område eller en stat, der er omfattet af Den Nordamerikanske Frihandelsaftale (North American Free Trade Agreement), eller i Schweiz, men alene hvis en sådan person:

i) A) ville være berettiget til alle fordele efter en fuld dobbeltbeskatningsoverenskomst mellem en medlemsstat i Den Europæiske Union eller en anden stat i Det Europæiske Økonomiske Område eller en stat, der er omfattet af Den Nordamerikanske Frihandelsaftale (North American Free Trade Agreement), eller i Schweiz, og den stat, hvorfra der kræves fordele efter denne overenskomst, efter bestemmelser, analoge til denne artikels stykke 2, litra a, litra b, litra c, punkt i), litra d eller litra e. Hvis sådan overenskomst ikke indeholder en fuld artikel om begrænsning af overenskomstfordele, er det en forudsætning, at personen ville være berettiget til fordele efter denne overenskomst på grund af denne artikels stykke 2, litra a, litra b, litra c, punkt i), litra d eller litra e, hvis sådan person var hjemmehørende i en af staterne efter denne overenskomsts artikel 4 (Skattemæssigt hjemsted); og

    B) for så vidt angår indkomst, som omtalt i denne overenskomsts artikel 10 (Udbytte), artikel 11 (Renter) eller artikel 12 (Royalties), ville være berettiget efter sådan overenskomst til en skattesats med hensyn til den særlige indkomstklasse, for hvilken der kræves fordele efter denne overenskomst, der er mindst lige så lav som satsen, der finder anvendelse efter denne overenskomst; eller

ii) er en person, hjemmehørende i en kontraherende stat, der er berettiget til fordele efter denne overenskomst på grund af denne artikels stykke 2, litra a, litra b, litra c, punkt i), litra d eller litra e.

Ved anvendelsen af artikel 10, stykke 3 (Udbytte), skal - ved afgørelsen af, om en person, der ejer aktier, direkte eller indirekte, i det selskab, der kræver fordele efter denne overenskomst, er en tilsvarende begunstiget - sådan person anses for at råde over samme stemmerettighederne i det selskab, der udbetaler udbyttet, som det selskab, der kræver fordele, råder over i sådant selskab;

i) for så vidt angår udbytter, renter eller royalties, der hidrører fra Danmark, og retmæssigt ejes af et selskab, der er hjemmehørende i De Forenede Stater, vil et selskab, der er hjemmehørende i en medlemsstat i Den Europæiske Union blive behandlet som opfyldende betingelserne i litra h), punkt i, B, ved afgørelsen af, om en sådan person hjemmehørende i De Forenede Stater er berettiget til fordele efter dette stykke, hvis in betaling af udbytte, renter eller royalties, der hidrører fra Danmark og betales direkte til sådan person hjemmehørende i en medlemsstat i Den Europæiske Union ville være fritaget for beskatning i henhold til ethvert direktiv i den Europæiske Union, uanset at dobbeltbeskatningsoverenskomsten mellem Danmark og den anden medlemsstat i Den Europæiske Union ville medføre en højere skattesats vedrørende sådan betaling end skattesatsen, der skal anvendes til et sådan selskab i De Forenede Stater efter denne overenskomsts artikel 10 (Udbytte), artikel 11 (Renter) eller artikel 12 (Royalties).

**Artikel 23. - Lempelse for dobbeltbeskatning**(23)I overensstemmelse med bestemmelserne og under hensyntagen til begrænsningerne i De Forenede Staters lovgivning (som denne måtte blive ændret fra tid til anden uden forandringer i dens generelle principper) skal De Forenede Stater indrømme en person, der er hjemmehørende i eller statsborger i De Forenede Stater et nedslag i De Forenede Staters skat af indkomst:

a) med et beløb svarende til den indkomstskat, der er betalt eller skyldig til Danmark af eller på vegne af en sådan hjemmehørende person eller statsborger: og

b) i tilfælde hvor et selskab, der er hjemmehørende i De Forenede Stater, ejer mindst 10 pct. af de stemmeberettigede aktier i et selskab, der er hjemmehørende i Danmark, og hvorfra det modtager udbytte, med et beløb svarende til den indkomstskat, der er betalt eller skyldig til Danmark af eller på vegne af den, der betaler udbyttet, for så vidt angår den fortjeneste, hvoraf udbyttet er betalt.

c) (i) Medmindre bestemmelserne i litra c)(ii) medfører andet og under hensyntagen til de skatter, som er pålagt i henhold til Kulbrinteskatteloven, der er omhandlet i artikel 2, stykke 1, litra b)(iv) (De af overenskomsten omfattede skatter), skal De Forenede Stater indrømme en person, der er hjemmehørende i eller statsborger i De Forenede Stater, nedslag i De Forenede Staters skat på indkomst med et beløb svarende til den skat, der er betalt eller skyldig til Danmark af eller på vegne af en sådan hjemmehørende person eller statsborger i henhold til Kulbrinteskatteloven om indkomst fra indvinding af olie og gas fra kilder i Danmark. Det beløb,

der tillades som nedslag, kan imidlertid ikke overstige resultatet af den højest tilladte skattesats i De Forenede Stater for en sådan hjemmehørende person eller statsborger i et sådant skatteår, multipliceret med den indkomst, der er ansat særskilt til skat i henhold til Kulbrinteskatteloven.

(ii)   Det nedslag, der gives, er også undergivet enhver anden begrænsning i De Forenede Staters lovgivning, som denne måtte blive ændret fra tid til anden, der anvendes på skatter, for hvilke der gives nedslag, i henhold til section 901 eller 903 i Forbundsskatteloven (Internal Revenue Code), på personer, der gør krav på fordele i henhold til denne overenskomst. Ethvert indkomstskattebeløb, der er ansat særskilt til skat i henhold til Kulbrinteskatteloven, udover det pågældende de skattebeløb, kan kun anvendes som nedslag i andet skatteår, og kun i De Forenede Staters skat på indkomst, der er ansat særskilt i henhold til Kulbrinteskatteloven.

(iii)   Bestemmelserne i litra c)(i) og (ii) skal på samme måde finde anvendelse særskilt på den skat, der er betalt eller skyldig til Danmark i henhold til Kulbrinteskatteloven, af (1) dansk olierelateret indkomst, der ikke er omhandlet i litra c)(i); og (2) andre indkomster fra dansk kilde.

Ved anvendelsen af denne artikel skal danske skatter, der er omhandlet i artikel 2, stykkerne 1(b) og 2 (De af overenskomsten omfattede skatter), anses for indkomstskatter og skal indrømmes som nedslag i den indkomstskat, der er betalt i henhold til Kulbrinteskatteloven, under hensyntagen til alle bestemmelser og begrænsninger i dette stykke.

*Stk. 2.* I tilfælde, hvor en statsborger i De Forenede Stater er hjemmehørende i Danmark:

a)   For så vidt angår indkomst, som er oppebåret af en i Danmark hjemmehørende person, der ikke er statsborger i De Forenede Stater, og som i henhold til denne overenskomst er fritaget for beskatning i De Forenede Stater eller pålægges skat der efter en nedsat skattesats, skal Danmark kun indrømme nedslag i den danske skat med et beløb svarende til den eventuelt betalte skat, som De Forenede Stater kan pålægge i henhold til bestemmelserne i denne overenskomst, bortset fra skatter, der måtte blive pålagt alene på grund af statsborgerskab i henhold til undtagelsesbestemmelsen i artikel 1, stykke 4 (Overenskomstens anvendelsesområde);

b)   Med henblik på beregning af De Forenede Staters skat på indkomst omhandlet i litra a), skal De Forenede stater indrømme et nedslag i De Forenede Staters skat med et beløb svarende til den indkomstskat, der er betalt til Danmark efter det i litra a) omhandlede nedslag; det således tilladte nedslag skal ikke nedsætte den andel af De Forenede Staters skat, hvori der kan indrømmes nedslag i dansk skat i overensstemmelse med litra a); og

c)   den under litra a) omhandlede indkomst skal, udelukkende med henblik på ophævelse af dobbeltbeskatning i De Forenede stater i henhold til litra b), anses for at hidrøre fra Danmark i det omfang, der er nødvendigt for at undgå dobbeltbeskatning af sådan indkomst i henhold til litra b).

*Stk. 3.* For så vidt angår Danmark skal dobbeltbeskatning ophæves på følgende måde:

a)   I tilfælde, hvor en person, der er hjemmehørende i Danmark, oppebærer indkomst, som ifølge bestemmelserne i denne overenskomst kan beskattes i De Forenede Stater, skal Dan-

mark indrømme fradrag i den pågældende persons skat på indkomst med et beløb svarende til den indkomstskat, som er betalt i De Forenede Stater;

b)   fradraget skal imidlertid ikke i noget tilfælde kunne overstige den del af indkomstskatten beregnet inden fradraget er givet, der kan henføres til den indkomst, som kan beskattes i De Forenede Stater;

c)   i tilfælde, hvor en person, der er hjemmehørende i Danmark, oppebærer indkomst, som ifølge bestemmelserne i denne overenskomst, kun kan beskattes i De Forenede Stater, kan Danmark medregne denne indkomst i beskatningsgrundlaget, men skal i indkomstskatten tillade et fradrag svarende til den del af indkomstskatten, som kan henføres til den indkomst, der hidrører fra De Forenede stater.

Ved anvendelsen af dette stykke, skal De Forenede Staters skatter, der er omhandlet i artikel 2, stykkerne 1 a) og 2 (De af overenskomsten omfattede skatter), anses for indkomstskatter, og skal indrømmes som et nedslag i de danske indkomstskat.

**Artikel 24. - Ikke-diskriminering**(24)Statsborgere i en kontraherende stat skal ikke i den anden kontraherende stat kunne undergives nogen beskatning eller dermed forbundne krav, som er mere byrdefulde end den beskatning og dermed forbundne krav, som statsborgere i denne anden stat under samme forhold, især med hensyn til beskatning af globalindkomsten, er eller måtte blive undergivet. Denne bestemmelse skal også finde anvendelse på personer, der ikke er hjemmehørende i en af eller begge de kontraherende stater.

*Stk. 2.* Beskatningen af et fast driftssted eller fast sted, som et foretagende i en kontraherende stat har i den anden kontraherende stat, må ikke være mindre fordelagtig i denne anden stat end beskatningen af foretagender eller personer, der er hjemmehørende i denne anden stat, ved udøvelse af samme virksomhed. Bestemmelserne i dette stykke skal ikke kunne fortolkes som forpligtende en kontraherende stat til at indrømme personer, der er hjemmehørende i den anden kontraherende stat, de personlige skattemæssige begunstigelser, lempelser og nedsættelser, som den som følge af ægteskabelig stilling eller forsørgerpligt over for familie indrømmer personer, der er hjemmehørende inden for dens eget område.

*Stk. 3.* Medmindre bestemmelserne i artikel 9, stykke 1 (Forbundne foretagender), artikel 11, stykke 4 (Renter), eller artikel 12, stykke 4 (Royalties), finder anvendelse, skal renter, royalties og andre udbetalinger, der betales af et foretagende i en kontraherende stat til en person, der er hjemmehørende i den anden kontraherende stat, ved ansættelsen af sådant foretagendes skattepligtige fortjeneste være fradragsberettigede under samme betingelser, som hvis de var blevet betalt til en person, der er hjemmehørende i den førstnævnte stat. Ligeledes, skal enhver gæld, som et foretagende i en kontraherende stat har til en person, der er hjemmehørende i den anden kontraherende stat, ved ansættelsen af et sådant foretagendes skattepligtige kapital i den førstnævnte stat, være fradragsberettigede under samme betingelser, som hvis de var blevet skyldig til en person, der er hjemmehørende i den førstnævnte stat.

*Stk. 4.* Foretagender i en kontraherende stat, hvis kapital helt eller delvis ejes eller kontrolleres, direkte eller indirekte, af en eller flere personer, der er hjemmehørende i den anden kontraherende stat, skal ikke i den førstnævnte stat kunne undergives nogen beskatning eller dermed forbundne krav, som er anderledes eller mere byrdefulde end den beskatning og dermed forbundne krav, som andre tilsvarende foretagender i den førstnævnte stat er eller måtte blive undergivet.

*Stk. 5.* Intet i denne artikel skal blive skal kunne fortolkes således, at den udelukker nogen af de kontraherende stater fra at pålægge skat i henhold til artikel 10, stykke 8 (Udbytte).

*Stk. 6.* Bestemmelserne i denne artikel skal, uanset bestemmelserne i artikel 2 (De af overenskomsten omfattede skatter) finde anvendelse på skatter af enhver art og beskrivelse, der pålægges af en kontraherende stat eller en politisk underafdeling eller lokal myndighed heraf.

**Artikel 25. - Fremgangsmåden ved indgåelse af gensidige aftaler**(25)I tilfælde, hvor en person mener, at foranstaltninger truffet af en af eller begge de kontraherende stater, for ham medfører eller vil medføre en beskatning, som ikke er i overensstemmelse med bestemmelserne i denne overenskomst, kan han, uanset hvilke retsmidler og tidsfrister der måtte være foreskrevet i disse staters interne lovgivning, indbringe sin sag for den kompetente myndighed i den kontraherende stat, hvor han er hjemmehørende eller hvori han er statsborger.

*Stk. 2.* Den kompetente myndighed skal, hvis indsigelsen forekommer den at være berettiget, og hvis den ikke selv kan nå frem til en rimelig løsning, søge at løse sagen ved gensidig aftale med den kompetente myndighed i den anden kontraherende stat med henblik på at undgå en beskatning, der ikke er i overensstemmelse med overenskomsten. Enhver indgået aftale skal gennemføres uden hensyn til, hvilke tidsfrister der er fastsat i de kontraherende staters interne lovgivning. Lignings- og opkrævningsprocedurer skal indstilles under gennemførelse af enhver indgåelse af gensidige aftaler.

*Stk. 3.* De kontraherende staters kompetente myndigheder skal søge ved gensidig aftale at løse vanskeligheder eller tvivlsspørgsmål, der måtte opstå med hensyn til fortolkningen eller anvendelsen af overenskomsten. De kompetente myndigheder i de kontraherende stater kan specielt aftale:

a)  den samme tilskrivning af indkomst, indeholdelse, nedslag eller fradrag for et foretagende i en kontraherende stat til dets faste driftssted, der er beliggende i den anden kontraherende stat;

b)  den samme fordeling af indkomst, indeholdelse, nedslag eller fradrag mellem personer;

c)  den samme betegnelse af specielle indkomster, herunder den samme betegnelse af indkomst, der i henhold til lovgivningen i den ene af de kontraherende stater ligestilles med indkomst fra skatter, og som er behandlet som en anden type indkomst i den anden stat;

d)  den samme betegnelse for personer;

e)  den samme anvendelse af kilderegler med hensyn til specielle indkomster;

f)  en fælles opfattelse af udtryk;

g)  forhåndsgodkendelser for fastsættelse af afregningspriser; og

h)  anvendelse af bestemmelserne i den interne lovgivning vedrørende straf, bøder og renter på en måde, der er i overensstemmelse med overenskomstens formål.

De kan også rådføre sig med hinanden vedrørende udelukkelse af dobbeltbeskatning i tilfælde, der ikke er omhandlet i denne overenskomst.

*Stk. 4.* De kompetente myndigheder kan også aftale stigninger i ethvert konkret dollarbeløb, der er omhandlet i overenskomsten for at afspejle økonomiske eller valutariske udviklinger.

*Stk. 5.* De kontraherende staters kompetente myndigheder kan træde i direkte forbindelse med hinanden med henblik på indgåelse af en aftale i overensstemmelse med de foregående stykker.

**Artikel 26. - Udveksling af oplysninger**(26)De kontraherende staters kompetente myndigheder skal udveksle sådanne oplysninger, som er relevante for at gennemføre bestemmelserne i denne overenskomst eller i de kontraherende staters interne lovgivning med hensyn til skatter, der omfattes af overenskomsten, for så vidt som denne beskatning ikke strider mod overenskomsten, herunder oplysninger vedrørende påligning og opkrævning af, inddrivelse eller retsforfølgning med hensyn til, eller klageafgørelser i forbindelse med de skatter, der er omfattet af overenskomsten. Udvekslingen af oplysninger er ikke begrænset af artikel 1 (Overenskomstens anvendelsesområde). Alle oplysninger, der modtages af en kontraherende stat, skal behandles som hemmelige på samme måde som oplysninger, der er opnået i henhold til denne stats interne lovgivning og må kun meddeles til personer eller myndigheder (herunder domstole og forvaltningsmyndigheder), der er beskæftiget med ligning, opkrævning, eller administration af, inddrivelse eller retsforfølgning med hensyn til, eller klageafgørelser i forbindelse med de skatter, der er omfattet af overenskomsten eller tilsyn med det ovennævnte. Sådanne personer eller myndigheder må kun benytte oplysningerne til de nævnte formål. De kan meddele oplysningerne under offentlige retshandlinger eller i retsafgørelser.

*Stk. 2.* Bestemmelserne i stykke 1 skal i intet tilfælde kunne fortolkes således, at der pålægges en kontraherende stat en pligt til:

a)  at udføre forvaltningsakter, der strider mod denne eller den anden kontraherende stats lovgivning og forvaltningspraksis;

b)  at meddele oplysninger, som ikke kan opnås i henhold til denne eller den anden kontraherende stats lovgivning eller normale forvaltningspraksis;

c)  at meddele oplysninger, som ville røbe nogen erhvervsmæssig, forretningsmæssig, industriel, kommerciel eller faglig hemmelighed eller fremstillingsmetode, eller oplysninger, hvis offentliggørelse ville stride mod almene interesser (ordre public).

*Stk. 3.* Uanset bestemmelserne i stykke 2, skal den kompetente myndighed i den stat, der anmodes om oplysninger, være bemyndiget til at opnå og tilvejebringe oplysninger fra finansielle institutioner, nominelle ejere eller personer, der fungerer som styrelse eller formynder, eller repræsenterer en interesse i en person. Såfremt den kompetente myndighed i en kontraherende stat anmoder om oplysninger i henhold til denne artikel, skal den anden kontraherende stat tilvejebringe disse oplysninger på samme måde og i samme omfang, som hvis den førstnævnte stats skatter var denne anden stats skatter og var pålignet af denne anden stat, uanset at den anden stat måske ikke på dette tidspunkt, har brug for sådanne oplysninger til dets egne skatter. Såfremt de kompetente myndigheder i en kontraherende stat specielt anmoder om oplysninger, skal den anden kontraherende stat tilvejebringe oplysninger i henhold til denne artikel i form af vidneforklaringer og bekræftede eksemplarer af ikke offentligt tilgængelige originale dokumenter (herunder bøger, notater, beretninger, protokollater, regnskaber og andet skriftligt materiale) i det omfang sådanne forklaringer og dokumenter kan tilvejebringes i henhold til lovgivningen og den administrative praksis i denne anden stat for så vidt angår dens egne skatter.

*Stk. 4.* Uanset bestemmelserne i artikel 2 (De af overenskomsten omfattede skatter) skal overenskomsten for så vidt angår denne artikel finde anvendelse på skatter af enhver art, der pålægges af en kontraherende stater

**Artikel 27. - Administrativ bistand**(27)De kontraherende stater påtager sig at yde hinanden bistand med hensyn til opkrævningen af skatter i henhold til artikel 2 (De af overenskomsten omfattede skatter) tillige med renter og omkostninger, tillæg til disse skatter

og civilretlige bøder, der er omhandlet i denne artikel som et »skattekrav« (»revenue claim«).

*Stk. 2.* En anmodning om bistand ved opkrævning af skattekrav skal indeholde attestation fra de kompetente myndigheder i den stat, der fremsætter anmodningen, om at skattekravet er blevet endeligt fastsat. For så vidt angår denne artikel er et skattekrav endelig fastsat, når den stat, der fremsætter anmodningen, er berettiget i henhold til denne stats lovgivning til at inddrive skattekravet og enhver administrativ og juridisk rettighed for skatteyderen til at forhindre inddrivelse i den stat, der fremsætter anmodningen, er bortfaldet eller udtømt.

*Stk. 3.* Et skattekrav, som er blevet endeligt fastsat i den stat, der fremsætter anmodningen, kan, under iagttagelse af bestemmelserne i stykke 7, blive godkendt til inddrivelse af den kompetente myndighed i den stat, der modtager anmodningen, og skal, forudsat det kan godkendes, inddrives i denne stat, som om et sådant skattekrav var denne stats egne skattekrav, der var endelig fastsat i overensstemmelse med de lovregler, der finder anvendelse ved opkrævningen af denne stats egne skatter.

*Stk. 4.* I tilfælde hvor en anmodning om opkrævning af skattekrav for så vidt angår en skatteyder er godkendt

a)    af De Forenede stater, skal skattekravet behandles af De Forenede Stater som en ligning i henhold til De Forenede Staters lovgivning mod skatteyderen på tidspunktet for modtagelsen af anmodningen;

b)    af Danmark, skal skattekravet behandles i Danmark som en ligning i henhold til dansk lovgivning mod skatteyderen på tidspunktet for modtagelsen af anmodningen.

*Stk. 5.* Intet i denne artikel skal kunne fortolkes således, at den stat, der modtager anmodningen, kan stifte eller fastsætte rettigheder af administrativ eller juridisk kontrol over det skattekrav, der er endelig fastsat af den stat, der fremsætter anmodningen, på grundlag af enhver sådan rettighed, der måtte foreligge i henhold til lovgivningen i nogen af staterne. I det tilfælde, at den stat, der fremsætter anmodningen i henhold til denne bestemmelse, på noget tidspunkt under udførelsen af en verserende inddrivelse, mister retten i henhold til dens interne lovgivning til at opkræve skattekravet, skal den stat, der fremsætter anmodningen, omgående tilbagekalde anmodningen om bistand ved opkrævning.

*Stk. 6.* For så vidt angår dette stykke, skal beløb, der er opkrævet af den stat, der modtager anmodningen i henhold til denne artikel, sendes til den kompetente myndighed i den stat, der fremsætter anmodningen. Medmindre de kompetente myndigheder i de kontraherende stater bliver enige om andet, skal sædvanlige omkostninger ved ydelsen af bistand ved opkrævning afholdes af den stat, der modtager anmodningen om bistand, og enhver ekstraordinær omkostning i denne forbindelse skal afholdes af den stat, der anmoder om bistand.

*Stk. 7.* En anmodning om opkrævning af skattekrav skal ikke i den stat, der modtager anmodningen, have nogen fortrinsret fremfor denne stats egne skattekrav.

*Stk. 8.* Den i denne artikel foreskrevne bistand skal ikke bringes i anvendelse over for en skatteyder, for så vidt denne skatteyder kan bevise,

a)    i tilfælde hvor skatteyderen er en fysisk person, at skattekravet vedrører en skattepligtig periode i hvilken, skatteyderen var statsborger i den stat, der modtager anmodningen, og

b)    i tilfælde hvor skatteyderen er en enhed, der er et selskab, et dødsbo eller en trust, at skattekravet vedrører en skattepligtig periode i hvilken, skatteyderen oppebar sin status som en sådan enhed fra lovgivningen i den stat, der modtager anmodningen.

*Stk. 9.* Hver af de kontraherende stater skal bestræbe sig på af opkræve på den anden stats vegne sådanne beløb, som måtte være nødvendige til at sikre, at fradrag, der er indrømmet i henhold til overenskomsten, på skatter, der er pålagt af denne anden stat, ikke får virkning som fordel for personer, der ikke er berettiget dertil.

*Stk. 10.* Intet i denne artikel skal kunne fortolkes således, at nogen af de kontraherende stater bliver pålagt en forpligtelse til at udføre administrative handlinger, der er anderledes end de handlinger, der anvendes ved opkrævning at dens egne skatter eller som ville stride mod almene interesser (ordre public).

*Stk. 11.* De kompetente myndigheder i de kontraherende stater skal aftale fremgangsmåden ved anvendelsen af denne artikel, herunder sikre sammenlignelige niveauer af bistand for hver af de kontraherende stater.

*Stk. 12.* Den stat, der modtager anmodningen, skal ikke være forpligtet til at efterkomme anmodningen fra den stat, der fremsætter anmodningen:

a)    såfremt den stat, der fremsætter anmodningen, ikke har foretaget alle behørige søgsmål i dens egen jurisdiktion; eller

b)    i de tilfælde, hvor den administrative byrde ved disse sager for den stat, der modtager anmodningen, er ude af proportioner i forhold til den fordel, der opnås af den stat, der fremsætter anmodningen.

### Artikel 28. – Medlemmer af diplomatiske og konsulære repræsentationer(28)

Intet i denne overenskomst berører de skattemæssige begunstigelser, som medlemmer af diplomatiske og konsulære repræsentationer måtte nyde i kraft af folkerettens almindelige regler eller særlige aftaler.

### Artikel 29. – Ikrafttræden(29)De kontraherende staters regeringer skal underrette hinanden, når betingelserne for denne overenskomsts ikrafttræden er opfyldt.

*Stk. 2.* Denne overenskomst skal træde i kraft ved modtagelsen af den seneste af disse underretninger, og dens bestemmelser skal have virkning:

a)    for så vidt angår kildebeskatning, på beløb, der er udbetalt eller godskrevet fra og med den første dag af den anden måned, der følger efter den dato, på hvilken overenskomsten træder i kraft;

b)    for så vidt angår andre skatter, for skattepligtige perioder, der begynder fra og med den 1. januar, der følger efter den dato, på hvilken overenskomsten træder i kraft.

*Stk. 3.* Medmindre stykke 4 finder anvendelse, skal overenskomsten mellem Danmark og De Forenede Stater til undgåelse af dobbeltbeskatning og til forhindring af beskatningsunddragelse for så vidt angår indkomstskat, underskrevet i Washington, D.C., den 6. maj 1948 (herefter omtalt som »1948-overenskomsten«), ophøre at have virkning, når bestemmelserne i denne overenskomst træder i kraft i overensstemmelse med stykkerne 2 og 4.

*Stk. 4.* I tilfælde, hvor 1948-overenskomsten for nogen person ville have frembudt mulighed for større skattefritagelse end denne overenskomst, kan en person, der var berettiget til fordele i henhold til den tidligere overenskomst, vælge, at 1948-overenskomsten skal fortsætte med at have virkning i et år efter den dato, på hvilken denne overenskomsts bestemmelser ellers ville have virkning i henhold til denne artikels stykke 2.

*Stk. 5.* 1948-overenskomsten ophører den sidste dag, på hvilken den har virkning i henhold til de foranstående bestemmelser i denne artikel.

### Artikel 30. – Opsigelse(30)

---

Denne overenskomst skal forblive i kraft, indtil den opsiges af en kontraherende stat. Hver af de kontraherende stater kan opsige overenskomsten ved ad diplomatisk vej at give meddelelse om opsigelsen. I så fald skal overenskomsten ophøre at have virkning:

a) for så vidt angår kildebeskatning, på beløb udbetalt eller godskrevet efter udløbet af den 6-måneders periode, der begynder på den dato, på hvilken meddelelse om opsigelsen blev givet; og

b) for så vidt angår andre skatter for skattepligtige perioder, der begynder fra og med udløbet af den 6-måneders periode, der begynder på den dato, på hvilken meddelelse om opsigelsen blev givet.

Til bekræftelse heraf har de undertegnede, dertil behørigt befuldmægtigede af deres respektive regeringer, underskrevet denne overenskomst.

Udfærdiget i Washington, den 19. august 1999 i det engelske sprog.

For Kongeriget Danmarks regering:

L. Møller

For Amerikas Forenede Staters regering:

Donald C. Lubick

## Protokol

Ved undertegnelsen af den overenskomst, som i dag er indgået mellem Regeringen i Amerikas Forenede Stater og Regeringen i Kongeriget Danmark til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter (Overenskomsten), er undertegnede blevet enige om følgende bestemmelser, som skal udgøre en integrerende del af overenskomsten.

1. Scandinavian Airlines System (SAS) er et konsortium, som omhandlet i artikel 8 (Skibs- og luftfart), hvori de deltagende medlemmer er SAS Danmark A/S, SAS Norge ASA og SAS Sverige AB. Med henblik på at undgå problemerne i forbindelse med drift i De Forenede Stater gennem et konsortium har medlemmerne af konsortiet i 1946 stiftet et New York selskab, Scandinavian Airlines System, Inc. (SAS, Inc.), til at handle på deres vegne i De Forenede Stater i overensstemmelse med en agenturaftale dateret 18. september 1946. En lignende aftale blev indgået mellem SAS og SAS, Inc. den 14. marts 1951. I henhold til agenturaftalen er SAS, Inc. kun autoriseret til at udføre sådanne funktioner, som SAS overdrager til det, alle i forbindelse med international lufttrafik. I henhold til denne aftale bliver alle indtægter, oppebåret af SAS, Inc. automatisk krediteret SAS. Driftsudgifter afholdt af SAS, Inc. bliver debiteret SAS i overensstemmelse med bestemmelserne i agenturaftalen. SAS er i henhold til bestemmelserne i agenturaftalen forpligtet til at godtgøre SAS, Inc. alle dets udgifter uden hensyntagen til indtægterne i SAS, Inc. SAS, Inc. udfører ingen funktioner udover dem, som er forbundet med eller tilknyttet den virksomhed, som SAS udøver ved selve driften af luftfartøjer i international trafik.

Under hensyntagen til SAS konsortiets specielle natur og under hensyntagen til den ovenfor nævnte agenturaftale skal De Forenede Stater for så vidt angår artikel 8 (Skibs- og luftfart) i overenskomsten, anse al indkomst, oppebåret af SAS, Inc., som hidrører fra driften af luftfartøjer i international trafik som SAS konsortiets indkomst.

2. Denne overenskomst kan enten i sin helhed eller med de nødvendige ændringer udvides til enhver del af Danmark, som denne overenskomst ikke finder anvendelse på, og som pålægger skatter af væsentlig samme karakter som de skatter, på hvilke overenskomsten finder anvendelse. Sådan udvidelse skal have virkning fra det tidspunkt og skal være undergivet sådanne ændringer og betingelser, som måtte blive fastsat i en supplerende overenskomst, indgået mellem de kontraherende stater, og skal træde i kraft i overensstemmelse med deres forfatningsmæssige regler.

3. Artikel 7 (Fortjeneste ved erhvervsvirksomhed) og artikel 24 (Ikke-diskriminering) skal ikke forhindre Danmark i fortsat at beskatte faste driftssteder tilhørende amerikanske forsikringsselskaber i overensstemmelse med § 12, stykke 3 i den danske selskabsskattelov, ej heller skal de forhindre De Forenede Stater i fortsat at beskatte faste driftssteder tilhørende danske forsikringsselskaber i overensstemmelse med sektion 842(b) i Internal Revenue Code (Forbundsskatteloven).

4. a) En betaling skal anses som en pension i henhold til artikel 18, stykke 1 (Pensioner, social sikring, livrenter, underholdsbidrag og børnebidrag), i tilfælde, hvor den udbetales i henhold til en pensionsordning, der er skattemæssigt godkendt i den kontraherende stat, i hvilken pensionsordningen er oprettet.

b) Med henblik herpå skal pensionsordninger, der er skattemæssigt godkendt, omfatte følgende ordninger og enhver ordning af samme eller væsentlig samme art, der er indført efter datoen for undertegnelse af overenskomsten:

a) I henhold til De Forenede Staters lovgivning, ordninger, der er skattemæssigt godkendt i henhold til sektion 401(a) i forbundsskatteloven, individuelle pensionsordninger (herunder individuelle pensionsordninger, der er en del af en forenklet lønmodtagerpensionsordning, der er i overensstemmelse med sektion 408(k), individuelle pensionskonti, individuelle pensionslivrenter, sektion 408(p) konti, og Roth IRAs i henhold til sektion 408A), sektion 403(a) godkendte livrenteplaner, og sektion 403(b) ordninger.

b) I henhold til Danmarks lovgivning, pensionsordninger i henhold til pensionsbeskatningslovens afsnit I.

Til bekræftelse heraf har de undertegnede, dertil behørigt befuldmægtigede af deres respektive regeringer, underskrevet denne protokol.

Copyright © 2024 Karnov Group Denmark A/S

(*)

**Noter af august 2023 til dobbeltbeskatningsoverenskomsten med USA vedrørende skatter af indkomst**

Dobbeltbeskatningsoverenskomsten med USA blev underskrevet den 19. august 1999. Der knytter sig en protokol hertil, som ligeledes er dateret den 19. august 1999.

Overenskomsten blev forelagt Folketinget som lovforslag nr. 84 af 3/11 1999 (Folketingstidende Tillæg A, 2215; Folketingsåret 1999/2000) og er blevet vedtaget som lov nr. 167 af 15/3 2000. Den afløser den hidtil gældende aftale, overenskomst af 6/5 1948, jf. BEK nr. 1 af 11/1 1949.

De to stater har i overensstemmelse med art. 29, stk. 1, givet hinanden underretning om, at de forfatningsmæssige betingelser for overenskomstens ikrafttræden (i Danmark Folketingets vedtagelse af loven) er indtrådt den 31/3 2000, og dermed får overenskomsten ifølge art. 29, stk. 2, virkning for indkomståret 2001, men overenskomsten fik dog virkning allerede fra den 1/5 2000 for udbetalte eller godskrevne indkomster undergivet kildestatsbeskatning – som eksempler kan nævnes royalties, udbytter og visse kvalificerede renter.

Ved protokol indgået den 2/6 2006, vedtaget af Folketinget som lov nr. 1574 af 20/12 2006, er USA og Danmark blevet enige om ændringer til overenskomstens art. 1, 10, 19 og 22. Loven er trådt i kraft dagen efter bekendtgørelsen i Lovtidende. Protokollen er i medfør af artikel V trådt i kraft den 28. december 2007 med virkning fra 1. januar 2008, dog udskudt til 1. februar 2008 for så vidt angår kildeskatter.

Overenskomsten er alene udfærdiget på engelsk. Den er oversat til dansk som led i Folketingets behandling, men det er den engelske tekst, som skal være afgørende i tilfælde af uoverensstemmelse mellem de to tekster, jf. dobbeltbeskatningsoverenskomstens art. 30.

Overenskomsten baserer sig i vidt omfang på en ældre udgave af OECD-modellen og kommentarerne hertil, om end der også indgår en del elementer fra USA's egen "modeloverenskomst" benævnt "The U.S. Model Income Tax Convention". De efterfølgende noter henviser i en vis udstrækning til OECD-modeloverenskomsten og kommentarerne hertil. På de nedenfor nævnte hjemmesider findes oplysninger om den dansk-amerikanske dobbeltbeskatningsoverenskomst. Der kan endvidere henvise til Skatteforvaltningens Juridiske Vejledning, Afsnit C.F.8.2 og C.F.9.2, USA.

OECD-modeloverenskomsten, som den dansk-amerikanske dobbeltbeskatningsoverenskomst delvist bygger på, er senest opdateret i 2017.

Ved håndteringen af internationale skatteforhold skal man generelt være opmærksom på omgåelsesklausulen i Ligningslovens § 3. Bestemmelsen blev indført i 2015 og bestemmelsens anvendelsesområde blev udvidet i 2019. I dens nuværende udformning skal der ved indkomstopgørelsen og skatteberegningen bortses fra arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål – eller der som et af hovedformålene har – at opnå en skattefordel, som virker mod formålet og hensigten med skatteretten, og som ikke er reelle under hensyn til alle relevante faktiske forhold og omstændigheder. 2019-bestemmelsen har således et væsentligt bredere anvendelsesområde end 2015-bestemmelsen, idet den skal hindre misbrug ikke blot af direktiverne, men af selskabsbeskatningen generelt. Det blev også i 2019 præciseret, at den nye omgåelsesklausul har forrang over for omgåelsesklausulen i LL § 3, stk. 5 vedrørende dobbeltbeskatningsoverenskomsterne. 2019-bestemmelsen har virkning fra og med 1. januar 2019. Bemærk, at 2019-bestemmelsen kan have virkning for arrangementer, der er påbegyndt før 1. januar 2019. Er en betaling således retserhvervet efter den 1. januar 2019 vedrørende et arrangement, der er påbegyndt før 1. januar 2019, da kan fordele i forhold til denne betaling ikke påberåbes, hvis betalingen anses for omfattet af 2019-bestemmelsen. Er betalingen omvendt retserhvervet for 1 januar 2019, bør den nye omgåelsesklausul ikke kunne finde anvendelse.

I tilknytning eller tillæg til dobbeltbeskatningsoverenskomsten er der mellem Danmark og USA den 13. juni 2007 indgået aftale om social sikring. Aftalen

om social sikring er bekendtgjort ved bekendtgørelse nr. 34 af 30. oktober 2008 og trådte i kraft per 1.oktober 2008.

Herudover indgik Danmark og USA den 15. november 2012 en aftale om informationsudveksling vedrørende amerikanske statsborgeres konti i udlandet (det såkaldte FATCA-regime), som blev bekendtgjort ved bekendtgørelse nr. 8 af 4. marts 2013 og som trådte i kraft 1. januar 2013.

Med BKI nr. 28 af den 7/12 2017 er der indgået en aftale med USA om udveksling af land-for-land rapporter (CbC reports), SKL §§ 47-52. Aftalen har virkning fra og med den 21/6 2017. Aftalen etablerer sig til overenskomsten art. 26. Den ændrer ikke ved de nationale krav i DK og USA til udarbejdelse af CbC reports, men fastlægger de nærmere regler for udveksling af rapporterne, for fortrolighed/databeskyttelse ligesom den endelig fastlægger særlige regler for konsultationer mellem de kompetente myndigheder, såfremt en person/et foretagende mener, at en justering af den skattepligtige indkomst for en koncernenhed på baggrund af yderligere forespørgsler baseret på oplysninger i CbC-rapporten har resulteret i en beskatning for denne person/dette foretagende, som ikke er i overensstemmelse med bestemmelserne i overenskomsten. De kompetente myndigheder skal da bestræbe sig på at løse sagen i henhold til art. 25 i overenskomsten.

Bekendtgørelse af aftale af 21. oktober 2020 mellem Danmark og Amerikas Forenede Stater om at opdatere bilag II i aftalen mellem Danmark og Amerikas Forenede Stater til forbedring af efterrettelighed vedrørende international beskatning og til gennemførelse af lovgivning om efterrettelighed vedrørende beskatning af konti i udlandet. BKI nr. 9 af 16.06.2021 ( FATCA).

Der kan henvises til følgende internetadresser:

www.skm.dk (Skatteministeriets Departement)

www.skat.dk (Skatteforvaltningen)

www.folketinget.dk (Folketinget)

ec.europa.eu/traxation_customs/taxation/company_tax/transfer_pricing/forum/index_en.htm (EU's Joint Transfer Pricing Forum)

www.retsinfo.dk (Retsinformation)

http://www.treasury.gov (U.S. Treasury Department)

Overenskomsten fra 1948 - amerikansk udgave: http://www.irs.gov/pub/irs-trty/denmark.pdf

Technical Explanation (2001): http://www.irs.gov/pub/irs-trty/dentech.pdf

Overenskomst fra 2001 - amerikansk udgave: http://www.irs.gov/pub/irs-trty/denmark2.pdf

Protokol fra 2. maj 2006: http://www.irs.gov/pub/irs-trty/denmarkprot06.pdf

Technical Explanations til protokollen fra 2. maj 2006: http://www.irs.gov/pub/irs-trty/denmarkte07.pdf

Implementation of FATCA - amerikansk udgave: http://www.treasury.gov/resource-center/tax-policy/treaties/Documents/FATCA-Agreement-Denmark-11-19-2012.pdf

www.irs.gov (Internal Revenue Service)

www.oecd.org/(OECD's skatte- og afgiftssider)

**Den multilaterale konvention (MLI)**

Det bemærkes, at Skattestyrelsen har udsendt styresignalet SKM2020.298.SKTST om Covid-19 vedrørende præcisering af administrativ praksis for så vidt angår fysiske personers skattemæssige hjemsted og ledelsens sæde (OECD-modeloverenskomstens art. 4), faste driftssteder (OECD-modeloverenskomstens art. 5) og beskatning af lønindkomst for personer, der udfører arbejde i flere stater (OECD-modeloverenskomstens art. 15).

Den multilaterale konvention (MLI'en) er udarbejdet som led i OECD's og G20-landenes projekt om forhindring af skatteudhuling og overskudsflytning, det såkaldte BEPS-projekt (Base Erosion and Profit Shifting). En del af dette projekt er udviklingen af en multilateral konvention, hvorefter allerede gældende dobbeltbeskatningsoverenskomster på en enkel måde vil kunne ændres med henblik på forhindring af skatteudhuling og overskudsflytning, når der er enighed mellem de berørte lande herom. MLI'en gør det muligt at revidere/opdatere gældende dobbeltbeskatningsoverenskomster på nærmere angivne områder, uden at det vil være nødvendigt at forhandle ændringsprotokoller. Konventionen vil udgøre den fornødne hjemmel til sådanne ændringer. Det forhold, at ændringer af allerede gældende dobbeltbeskatningsoverenskomster

inden for konventionens rammer fremover vil kunne ske alene på grundlag af konventionen, forhindrer dog ikke landene i fortsat at foretage ændringer i form af individuelle ændringsprotokoller, hvis de foretrækker dette.

MLI'en blev undertegnet af Danmark og en række lande og jurisdiktioner den 7. juni 2017. Senere er konventionen blevet undertegnet af yderligere et antal lande. Konventionen trådte i kraft den 1. juli 2018 efter deponeringen af det femte ratifikationsinstrument, jf. MLI'ens artikel 34, stk. 1. Danmark bliver omfattet af konventionen tre måneder efter deponeringen af det danske ratifikationsinstrument, jf. MLI'ens artikel 34, stk. 2.

Flertallet af de deltagende stater har nu deponeret deres ratifikationsinstrumenter. Se aktuel oversigt på Signatories and Parties (MLI Positions) (oecd.org).

Ratifikation af MLI'en indebærer, at allerede gældende dobbeltbeskatningsoverenskomster ændres. Dobbeltbeskatningsoverenskomster implementeres i Danmark ved lov, og ændringer af dobbeltbeskatningsoverenskomster implementeres ligeledes ved lov. Implementering af den multilaterale konvention i dansk ret kræver derfor et lovgrundlag. Dette lovgrundlag foreligger med vedtagelsen af lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning. Forarbejderne finder man i lovforslag lovforslag nr. L 160 af 6. februar 2019.

https://www.oecd.org/tax/treaties/mli-matching-database.htm

Ratifikationsprocessen er forskellig fra stat til stat. OECD har på sin hjemmeside offentliggjort en udmærket oversigt, der viser status for MLI-processen både i de enkelte stater der har tiltrådt MLI'en og i relation til dobbeltbeskatningsoverenskomsterne på statsligt niveau. Se linket ovenfor.

Danmarks valg efter MLI'ens bestemmelser fremgår af bilag 2 i lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning. Listen over omfattede dobbeltbeskatningsoverenskomster fremgår af bilag 3 i lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning. Efterfølgende, ved lov nr. 1224 af den 29. december 2020, er der foretaget nogle ændringer til tilslutningen til voldgiftsbestemmelserne.

Danmarks valg efter MLI'ens bestemmelser fremgår af bilag 2 i lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning. Listen over omfattede dobbeltbeskatningsoverenskomster fremgår af bilag 3 i lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning. Efterfølgende, ved lov nr. 1224 af den 29. december 2020, er der foretaget nogle ændringer til tilslutningen til voldgiftsbestemmelserne.

Der er aftalt ændringer individuelt med Holland.

Der er aftalt ændringer individuelt med Schweiz.

Der er aftalt ændringer individuelt med Tyskland.

Der er aftalt ændringer individuelt med de nordiske lande.

Se også lovens § 1, stk. 1 vedr. anvendelse af MLI'en på dobbeltbeskatningsoverenskomsten mellem Danmark og Armenien.

Dobbeltbeskatningsoverenskomsten mellem Danmark og USA er omfattet af den danske implementering af MLI'en

**(1)**

**Artikel 1 Overenskomstens anvendelsesområde**

Artiklens stk. 1 afviger fra til OECD-modeloverenskomstens art. 1.

Stk. 1 afviger fra modeloverenskomstens stk. 1. Overenskomsten omfatter fysiske eller juridiske personer, der er hjemmehørende (det vil sige fuldt skattepligtige) i en eller begge stater, med mindre andet er bestemt i overenskomsten. Typisk vil situationen være den, at en person er fuldt skattepligtig til den ene stat (bopælsstaten) og begrænset skattepligtig til den anden stat af indkomster fra denne (kildestaten). Det følger af dobbeltbeskatningsoverenskomstens art. 3, stk. 1, litra a, at når overenskomsten anvender udtrykket "person", omfatter det både fysiske og juridiske personer samt

enhver anden sammenslutning af personer. Udtrykket "hjemmehørende" er defineret i art. 4.

Et særligt spørgsmål er, om interessentskaber, kommanditselskaber og lignende sammenslutninger er omfattet af dobbeltbeskatningsoverenskomsterne. Disse personsammenslutninger behandles af nogle stater som selvstændige skattesubjekter, medens de i andre stater – heriblandt Danmark – ikke anerkendes som selvstændige skattesubjekter. Se afgørelserservia linket nedenfor. Når et interessentskab eller kommanditselskab ikke i selv er skattepligtigt i hjemmehørendestaten, vil de enkelte deltagere individuelt kunne påberåbe sig overenskomsten. Beskattes et interessentskab eller lignende derimod som en selvstændig juridisk enhed, er det interessentskabet m.v., der som sådant kan påberåbe sig overenskomsten.

De enkelte deltagere i et kommanditselskab kan således påberåbe sig overenskomstens bestemmelser, uanset om kommanditselskabet som sådant ikke er skattepligtigt. Ifølge kommentarerne er bopælsstaten, som beskatter deltageren af hans andel af interessentskabets indkomst, forpligtet til at indrømme creditlempelse for den skat, kildestaten har opkrævet hos interessentskabet. Se i øvrigt Skatteforvaltningens Juridiske Vejledning, afsnit C.F.8.2.2.1.2 Interessentskaber, kommanditselskaber og lignende sammenslutninger.

Kommentarerne til OECD's modeloverenskomst indeholder i pkt. 6.8-6.39 en beskrivelse af anvendelse af dobbeltbeskatningsoverenskomster på kollektive investeringsinstitutter/instrumenter. National dansk ret anvender ikke modeloverenskomstens begreb "kollektive investeringsinstrumenter". I dansk ret betegnes de som investeringsselskaber og investeringsforeninger. Investeringsforeninger findes som udloddende, akkumulerende og kontoførende investeringsforeninger.

I –TfS 2000, 394 TSS, har Skatteministeriets Departement udtalt, at pensionskasser samt akkumulerende og udloddende investeringsforeninger kan betragtes skattemæssigt hjemmehørende i Danmark og derfor er omfattet af overenskomsten.

Begrebet kollektivt investeringsinstrument anvendes i modeloverenskomsten, men sædvanligvis ikke i national dansk skatteret. En del andre stater har lovgivet om den situation, hvor flere investorer slutter sig sammen og fællesskab investerer gennem et såkaldt kollektivt investeringsinstrument. I Danmark vil man fortrinsvist bruge betegnelserne investeringsselskaber og investeringsselskaber som kollektive investeringsinstrumenter.

Det er Skatteforvaltningens opfattelse, at såfremt der er tale om et udenlandsk kollektivt investeringsinstrument, skal det vurderes efter danske regler, om investeringsinstrumentet kan anses for at være omfattet af overenskomsten, jf. Skatteforvaltningens Juridiske Vejledning, afsnit C.F.8.2.2.1.3.

Efter kommentarerne til OECD's modeloverenskomst gælder det, at hvis det udenlandske kollektive investeringsinstrument er et selvstændigt skattesubjekt i henhold til skattelovgivningen i den anden stat (den stat, hvor det udenlandske kollektive investeringsinstrument er etableret), og opfylder det definitionen af et »selskab« i art. 3, vil det være en person i overenskomstens forstand. Hvis det udenlandske kollektive investeringsinstrument derimod er skattemæssigt transparent i henhold til skattelovgivningen i den anden stat, således at det er deltagerne og ikke det kollektive investeringsinstrument, der beskattes, kan det i princippet være en person i overenskomstens forstand (hvis det opfylder definitionen af et »selskab« i art. 3), men det opfylder i så fald ikke kravene til at være hjemmehørende ifølge art. 4.

Staten, dens politiske underafdelinger og lokale myndigheder er omfattede af definitionen hjemmehørende. Dermed gælder overenskomsten også for dem. I Danmark er kommuner og regioner omfattet af overenskomsten.

Der kan i praksis opstå tvivl med hensyn til helejede enheder, institutioner og lignende, som er ejet af staten m.v., men som ikke er en del af selve staten mv. Som eksempel kan nævnes Danmarks Nationalbank. Hvis ejerforholdet til en udenlandsk enhed er tilstrækkeligt klarlagt til, at man kan fastslå, at det er en helejet enhed, så gælder overenskomsten for den. Det gælder, selv om enheden er fritaget for beskatning i bopælsstaten.

HHelt generelt følger det af kommentarerne, at staterne ikke er forpligtede til at indrømme overenskomstfordele i tilfælde, hvor der sker misbrug af

overenskomstens bestemmelser. Se også LL § 3, stk. 5 om misbrug for dobbeltbeskatningsoverenskomster. Se også ligningslovens § 3, stk. 5 om misbrug af dobbeltbeskatningsoverenskomster.

**Note 2:**

Dobbeltbeskatningsoverenskomstens art. 1, stk. 2 fastslår det i Danmark kendte synspunkt, at en dobbeltbeskatningsoverenskomst aldrig kan skærpe en i forvejen eksisterende beskatning.

**Note 3:**

Stk. 3 behandler bl.a. spørgsmålet om samspillet mellem overenskomsten og andre aftaler, f.eks. GATT -aftalen. Princippet er, at alene overenskomstens bestemmelser skal finde anvendelse på uoverensstemmelser mellem de to stater om, hvorvidt en foranstaltning ligger inden for overenskomstens rammer, Ligeledes gælder, at alene ikke-diskrimineringsbestemmelsen i overenskomsten skal anvendes, idet der dog gælder en undtagelse for nationalbehandling eller forpligtelser i henhold til GATT-aftalen.

**Note 4:**

Art. 1, stk. 4 er alene indsat på grund af amerikansk lovgivning. USA kan beskatte amerikanske statsborgere og personer, der har været amerikanske statsborgere, uanset hvor de er hjemmehørende på beskatningstidspunktet – der anvendes et globalindkomstprincip baseret på nationalt tilhørsforhold. Som statsborgere anses også personer, der har været amerikanske statsborgere inden for de sidste 10 år. Der kan i øvrigt henvises til artiklen "Personbeskatning i USA" af Anne-Mette Drucker og Lars Thorvald Kiær (SU 2012, 312). I protokollen til dobbeltbeskatningsoverenskomsten indgået 2/6 2006 er stk. 4 ændret således, at det ikke længere er en betingelse for en dansk-bosiddende tidligere amerikansk statsborgers påberåbelse af dobbeltbeskatningsoverenskomsten, at statsborgerskabet til USA er opgivet hovedsageligt af skattemæssige årsager. Se de lempelsesmæssige konsekvenser heraf i dobbeltbeskatningsoverenskomstens art. 23, stk. 2, om begrænsning i adgang til påberåbelse af dobbeltbeskatningsoverenskomstens fordele.

**Note 5:**

Efter stk. 5 afgiver USA dog retten til at beskatte amerikanske statsborgere bosiddende i Danmark for nogle nærmere opremsede indkomsttyper.

Se udvalgte domme og afgørelser med relation til artikel 1.

**(2)**

**Artikel 2 De af overenskomsten omfattede skatter**

Art. 2, stk. 1, svarer indholdsmæssigt til modeloverenskomstens art. 2, stk. 3, og indeholder således beskrivelsen af, hvilke typer skatter, der er omfattet af dobbeltbeskatningsoverenskomsten. Dobbeltbeskatningsoverenskomsten mellem Danmark og USA omfatter ikke formueskatter.

**Note 1:**

Art. 2, stk. 1, opregner de skatter, som overenskomsten finder anvendelse på. For Danmarks vedkommende er kulbrinteskatten udtrykkeligt anført som "dansk skat", jf. stk. 1, litra b), (iv).

For USA's vedkommende omfatter aftalen føderale indkomstskatter, som pålignes i henhold til Internal Revenue Code, hvorimod Social Security Taxes ikke er omfattet, mens de føderale skatter, som pålignes private fonde (private foundations), er omfattet. Skatter opkrævet af enkeltstater og af kommuner er ikke omfattet. Visse stater og kommuner i USA har dog valgt helt eller delvist at anerkende overenskomsten.

**Note 2:**

I stk. 2, der svarer til OECD-modellens stk. 4, nævnes, at overenskomsten også skal finde anvendelse på skatter af samme eller væsentlig samme art, der udskrives efter overenskomstens undertegnelse. Det fremgår af dobbeltbeskatningsoverenskomsten, at de kompetente myndigheder skal give hinanden underretning om alle væsentlige ændringer, som er blevet foretaget i deres respektive skattelovgivninger siden overenskomstens ikrafttræden. Denne underretningspligt overholdes næppe altid i praksis, men underretningen er ikke en gyldighedsbetingelse for at en given skat omfattes af dobbeltbeskatningsoverenskomsten og underretningen er derfor mest af ceremoniel karakter.

Straftillæg eller renter, som pålægges ifølge de to staters nationale lovgivning vedrørende skatter, er sædvanligvis ikke omfattet af udtrykket skatter. Det

betyder, at den pågældende stat ved lempelse af dobbeltbeskatning efter overenskomsten ikke er forpligtet til at give lempelse for procenttillæg efter KSL § 61, stk. 2, og kontrollovstillæg samt for morarenter.

Danmark er ved lempelse efter overenskomsten ikke forpligtet til at modregne de nævnte tillæg og morarenter og er ikke forpligtet til at give lempelse for tilsvarende tillæg og morarenter i den anden stat. Hvis der ikke er tale om skatter omfattet af en overenskomst, men derimod afgifter og lignende, vil erhvervsdrivende personer og foregænder hjemmehørende i Danmark, kunne fratrække sådanne udenlandske afgifter ud fra et driftsomkostningssynspunkt.

For Danmarks vedkommende omfatter overenskomsten såvel statslige som kommunale indkomstskatter. Tidligere blev arbejdsmarkedsbidraget betragtet som en skat på linje med indkomstskatten, uden dog at være en indkomstskat, jf. TfS 2007, 1116. Fra og med 1/1 2011 anses arbejdsmarkedsbidraget i enhver henseende for en indkomstskat.

Dobbeltbeskatningsoverenskomsten omfatter ikke formueskatter – og således er heller ikke ejendomsværdiskatten, der ikke er en indkomstskat, men derimod en ejendomsskat på boligværdien af en ejerbolig, samt pensionsafkastskatten, jf. TfS 1999, 799, omfattet af dobbeltbeskatningsoverenskomsten.

Pensionsafkastskatter er omfattet af overenskomsten, jf. TfS 1999, 799, mens afgifter efter pensionsbeskatningsloven ikke omfattet af overenskomsten, jf. SKDM 1977.41.45.

–TfS 1993, 594

SU 1994, 5

–TfS 1999, 799

TfS 2000, 546

SU 2007, 5

Se udvalgte domme og afgørelser med relation til art. 2 I OECD-modeloverenskomsten.

**(3)**

**Artikel 3 Almindelige definitioner**

Art. 3, stk. 1, indeholder definitionerne af de almindeligt anvendte udtryk i overenskomsten. Visse begreber er dog definieret I andre artikler.

**Note 1:**

Udtrykket »person« omfatter i overenskomsten såvel en fysisk person, et selskab samt enhver anden sammenslutning af personer. Udtrykket »selskab« omfatter enhver sammenslutning af personer, der i skattemæssig henseende behandles som en juridisk person.

En »sammenslutning af personer« skal være et selvstændigt skattesubjekt for at være et »selskab« i overenskomstens forstand, men ikke for at være omfattet af begrebet »en person« i overenskomstens forstand.

Et dansk interessentskab eller kommanditselskab er således en "sammenslutning af personer", men ikke et selvstændigt skattesubjekt. Det betyder, at danske interessentskaber og kommanditselskaber er omfattet af overenskomstens begreb "person", men ikke af overenskomstens begreb "selskab". Se i øvrigt noterne til art. 1 i forhold til overenskomstens anvendelse på kommanditselskaber og investeringsforeninger m.fl.

Det er altid en fortolkning efter danske regler, der ved anvendelsen af overenskomsten her i landet afgør, om en udenlandsk "sammenslutning af personer" skal betragtes som en selvstændig juridisk person og dermed som et selskab. Dét har betydning for, om det er sammenslutningen som sådan (en juridisk person) eller de enkelte deltagere (de fysiske personer), der kan påberåbe sig overenskomsten.

**Note 2:**

Definitionen af et »foretagende« betyder udøvelsen af enhver form for forretningsmæssig virksomhed, og et »foretagende i en kontraherende stat« betyder, at virksomheden udøves af en person (fysisk eller juridisk) , der er hjemmehørende i en af de kontraherende stater. Da udtrykket "forretningsmæssig virksomhed" ikke udtrykkeligt er defineret således, at det omfatter udøvelse af frit erhverv og anden virksomhed af selvstændig karakter, er det tydeliggjort, at udøvelse af frit erhverv og anden virksomhed af selvstændig karakter skal anses for at udgøre et foretagende uden hensyn til den betydning af udtrykket, der eventuelt følger af national lovgivning. I Danmark vil man oftest betegne

det som udøvelse af "erhvervsmæssig virksomhed". Det svarer til modeloverenskomstens art. 3, stk. 1, litra c og d.

**Note 3:**

Hensigten med art. 8, stk. 1, der omhandler fortjeneste ved skibs- eller luftfartsvirksomhed i international trafik, er at sikre, at sådan fortjeneste kun bliver beskattet i én stat uanset at fortjenesten reelt optjenes ved aktiviteter i flere stater. Bestemmelsen i art. 8 bygger på det princip, at beskatningsretten skal overlades til den kontraherende stat, hvor foretagendet er hjemmehørende. I art. 3, stk. 1, litra d, defineres begrebet »international trafik«. Definitionen afviger fra modeloverenskomsten. International trafik betyder i denne overenskomst enhver transport med skib eller luftfartøj, bortset fra tilfælde, hvor sådan transport udelukkende finder sted mellem pladser i en kontraherende stat.

Definitionen her af "international trafik" finder ikke anvendelse, hvis et skib eller luftfartøj anvendes mellem steder i den ene af de kontraherende stater. OECD-modellens bestemmelse om, at det foretagende, der anvender skibet eller luftfartøjet, ikke må være hjemmehørende i denne stat, selv om en del af transporten foregår uden for denne stat, er ikke medtaget i denne overenskomst.

**Note 4:**

Definitionen af udtrykket "kompetent myndighed" tager hensyn til det faktum, at administrationen af dobbeltbeskatningsoverenskomster i nogle OECD-medlemsstater ikke udelukkende henhører under de øverste skattemyndigheders kompetence, men at visse sagsområder er forbeholdt eller delegeret til andre myndigheder. Definitionen tillader nu hver af de kontraherende stater at udpege en eller flere myndigheder som kompetente.

De opgaver, der ved SFL § 1 er tillagt told- og skatteforvaltningen, varetages af Skatteforvaltningen, jf. BEK nr. 804 fra den 20/6 2018 Skatteforvaltningen er én myndighed, der består af Administrations- og Servicetyrelsen, Gældsstyrelsen, Motorstyrelsen, Skattestyrelsen, Toldstyrelsen, Udviklings- og Forenklingsstyrelsen samt af Vurderingsstyrelsen. Ifølge BEK nr. 1029 fra den 24/10 2005 bemyndiges told- og skatteforvaltningen til at træffe afgørelser efter dobbeltbeskatningsoverenskomster som »den kompetente myndighed«, og det fremgår af samme bekendtgørelse, at sådanne afgørelser truffet af told- og skatteforvaltningen ikke påklages til anden administrativ myndighed. Se i øvrigt art. 25.

Ifølge art. 3, stk. 1, litra ef, betyder »den kompetente myndighed« i Danmark skatteministeren eller dennes befuldmægtigede stedfortræder. Ifølge SFL § 1 udøver told- og skatteforvaltningen forvaltningen af lovens gennemførelse og lov om vurdering af landets faste ejendomme. Det følger af SFL § 64 , at skatteministeren kan fastsætte de nærmere regler for lovens gennemførelse. De opgaver, der ved SFL § 1 er tillagt told- og skatteforvaltningen, varetages af Skatteforvaltningen, jf. BEK nr. 804 fra den 20/6 2018. Skatteforvaltningen er én myndighed, der består af Administrations- og Serviceetyrelsen, Gældsstyrelsen, Motorstyrelsen, Skattestyrelsen, Toldstyrelsen, Udviklings- og Forenklingsstyrelsen samt af Vurderingsstyrelsen. Ifølge BEK nr. 1029 fra den 24/10 2005 bemyndiges told- og skatteforvaltningen til at træffe afgørelser efter dobbeltbeskatningsoverenskomster som »den kompetente myndighed«, og det fremgår af samme bekendtgørelse, at sådanne afgørelser truffet af told- og skatteforvaltningen ikke påklages til anden administrativ myndighed. Se i øvrigt art. 25

Den kompetente myndighed efter art. 25 (MAP) er for såvel fysiske som juridiske personer:

- For sager, der vedrører modeloverenskomstens art. 7 og art. 9: Skattestyrelsen Store Selskaber - Kompetent Myndighed, Copenhagen Towers 1, Hannemanns Allé 25, 2300 København S.

- **Øvrige sager: Skattestyrelsen**Jura - Kompetent Myndighed, Copenhagen Towers 1, Hannemanns Allé 25, 2300 København S.

Når det drejer sig om grænseoverskridende udveksling af oplysninger efter art 26 er den kompetente myndighed Skattestyrelsen, Særlig Kontrol, CEBIS 2 - Kompetent Myndighed, Lyseng Alle 1, 8270 Højbjerg.

Når det drejer sig om bistand ved inddrivelse af skattekrav efter art. 27 er den kompetente myndighed Gældsstyrelsen, International Inddrivelse, Pionér Allé 1, 6270 Tønder

Skattestyrelsens afgørelser kan ikke påklages til højere administrativ myndighed, jf. BEK nr. 1029 af den 24/10 2005 § 2 BEK nr. , men kan indbringes for de ordinære domstole inden 3 måneder, jf. SFL § 48, stk. 3. Den kompetente amerikanske skattemyndighed er finansministeren eller dennes befuldmægtigede stedfortræder.

**Note 5:**

Definitionen af udtrykket "statsborger" fastslår blot, at udtrykket med hensyn til en kontraherende stat omfatter alle fysiske personer, der har statsborgerskab eller indfødsret i denne kontraherende stat. Selv om udtrykket statsborgerskab (nationality) også omfatter indfødsret (citizenship), blev det sidstnævnte udtryk medtaget i 2002, da det i nogle stater er det hyppigst anvendte udtryk. Det er indlysende, at der ved afgørelsen af, hvad der for fysiske personers vedkommende forstås ved "statsborgere", skal tages udgangspunkt i den betydning, i hvilken udtrykket sædvanligvis anvendes, og til hver stats særlige regler for erhvervelse eller fortabelse af statsborgerskab eller indfødsret.

**Note 6:**

Betydningen af begrebet "statsborger" udvides i stk. 1, litra g). Alle juridiske personer, interessentskaber og sammenslutninger, der består i kraft af den gældende lovgivning i en kontraherende stat, anses for at være "statsborgere" i overenskomstens betydning. Ved at anvende denne definition bliver bestemmelsen af selskabers nationalitet enkel at foretage. Det forhold, at interessentskaber særskilt er nævnt i stk. 1, litra g), er ikke i uoverensstemmelse med, at interessentskabet har status som en person i henhold til stk. 1, litra a). I henhold til den nationale lovgivning i nogle medlemsstater er det muligt for en enhed at være en "person" uden at være en "juridisk person" i skattemæssig henseende. Det er nødvendigt udtrykkeligt at fastslå dette for at undgå sammenblanding af begreberne .

Se udvalgte domme og afgørelser med relation til art. 3 i OECD-modeloverenskomsten.

Se styresignalet SKM2020.298.SKTST om Covid-19 vedrørende præcisering af administrativ praksis for så vidt angår fysiske personers skattemæssige hjemsted og ledelsens sæde (OECD-modeloverenskomstens art. 4), faste driftssteder (OECD-modeloverenskomstens art. 5) og beskatning af lønindkomst for personer, der udfører arbejde i flere stater (OECD-modeloverenskomstens art. 15).

**(4)**

**Artikel 4 Skattemæssigt hjemsted**

Art. 4 svarer til OECD-modeloverenskomstens art. 4, og den fastlægger, hvornår en person i skattemæssig henseende anses for at være hjemmehørende i en af de to stater.

**Note 1:**

Begrebet »hjemmehørende« betyder en person (fysisk eller juridisk person), der er fuldt skattepligtig til den ene stat på grund af bopæl, hjemsted, ledelsens sæde eller lignende. En person kan godt være fuldt skattepligtig til begge stater i henhold til hver deres nationale lovgivning (i den ene f.eks. på grund af bopæl og i den anden på grund af varigheden af et midlertidigt fysisk ophold), og det vil i et sådant tilfælde være nødvendigt at fastslå, i hvilken af staterne den pågældende i overenskomstens forstand da skal anses for at være "hjemmehørende". Først når det er fastslået, hvor den pågældende i overenskomstens forstand er hjemmehørende, får begreberne bopælsstat/domicilstat og kildestat mening. I overenskomstens forstand kan en person kun være hjemmehørende i én af staterne på én og samme tid.

**Note 2:**

Art. 4, stk. 1, litra d), vedrører skattemæssigt transparente enheder. Efter bestemmelsen anses indkomst, fortjeneste eller gevinst, der er oppebåret gennem en enhed, der er skattemæssigt transparent i henhold til lovgivningen i den ene af de kontraherende stater, for at være oppebåret af en person, der er hjemmehørende i en stat, i det omfang denne indkomst, fortjeneste eller gevinst efter skattelovgivningen i en sådan kontraherende stat behandles som indkomst, fortjeneste eller gevinst for en hjemmehørende person. En interes-

sent i et dansk interessentskab, der er hjemmehørende i Danmark, vil således være berettiget til at anvende overenskomstens bestemmelser, såfremt han efter dansk skattelovgivning må anses for at have modtaget denne indkomst, fortjeneste eller gevinst.

**Note 3:**

For fysiske personer afgøres spørgsmålet i henhold til kriterierne i stk. 2, litra a) - d). Kriterierne anvendes i den rækkefølge, de står anført i overenskomsten, og de svarer til OECD-modeloverenskomsten.

**Note 4:**

Artiklen giver forrang til den kontraherende stat, i hvilken den fysiske person har en fast bolig til sin rådighed. Dette kriterium vil hyppigt være tilstrækkeligt til at løse konflikten, f.eks. når en fysisk person har en fast bolig i den ene kontraherende stat og kun har gjort ophold af en vis længde i den anden kontraherende stat. Det betyder derfor, at ved anvendelse af overenskomsten (dvs. hvor der er en konflikt mellem lovene i de to stater) anses bopælen for at være det sted, hvor den fysiske person ejer eller råder over en bolig. Denne bolig skal være af vedvarende karakter, dvs. den fysiske person skal have etableret og bibeholdt den til stadig brug, i modsætning til det at opholde sig et bestemt sted under sådanne vilkår, at det er åbenbart, at opholdet er tilsigtet at være af kort varighed.

**Note 5:**

Med hensyn til begrebet "bolig" skal det bemærkes, at enhver form for bolig kan tages i betragtning (hus eller lejlighed, som tilhører eller er lejet af den fysiske person, lejet møbleret værelse). Men boligens varige karakter er væsentlig. Dette betyder, at personen skal have arrangeret det således, at boligen er til vedkommendes rådighed kontinuerligt til enhver tid, og ikke lejlighedsvis med henblik på et ophold, som efter årsagen til det i sagens natur er af kort varighed (ferierejse, forretningsrejse, uddannelsesrejse, deltagelse i kursus på en skole osv.). Et hus, som ejes af en fysisk person, kan f.eks. ikke anses for at være til rådighed for den fysiske person, når huset er udlejet og reelt overdraget til en udenforstående part, således at den fysiske person ikke længere er i besiddelse af eller har mulighed for at bebo huset.

**Note 6:**

Hvis den fysiske person har en fast bolig i begge kontraherende stater, giver stk. 2 forrang til den stat, med hvilken vedkommendes personlige og økonomiske forbindelser er stærkest, forstået som centrum for vedkommendes livsinteresser. Når bopæl ikke kan afgøres under henvisning til denne regel, giver stk. 2 et subsidiært kriterium, der først er sædvanligt ophold og dernæst statsborgerskab.

**Note 7:**

Er den pågældende person statsborger i begge stater – eller ingen af dem, må enighed søges opnået ved forhandling mellem staternes kompetente skattemyndigheder i medfør af mutual agreement-bestemmelsen i art. 25.

**Note 8:**

En juridisk persons fulde skattepligt til Danmark vil være baseret på dennes officielle registrering. Den juridiske person kan dog alternativt være fuldt skattepligtig hertil grundet ledelsens hjemmehørende sæde. En ikke-fysisk person, som er fuldt skattepligtig til begge stater, vil herefter blive anset for at være hjemmehørende i den stat, hvor den virkelige ledelse for selskabet m.v. har sit sæde. Om et selskab kan siges at have sin ledelses sæde her i landet, beror på en konkret vurdering af de faktiske forhold i forbindelse med beslutningstagningen i selskabet. Der lægges herved først og fremmest vægt på beslutninger forbundet med den daglige ledelse af selskabet. Selskabet vil derfor ofte blive anset for hjemmehørende i Danmark, hvis direktionen har sæde eller når selskabets hovedsæde er beliggende her. I det omfang bestyrelsen forestår den reelle daglige ledelse af selskabet, vil stedet for bestyrelsens sæde være af væsentlig betydning for vurderingen af, om selskabet er hjemmehørende her. I så fald er det stedet, hvor bestyrelsens beslutninger reelt træffes, der er afgørende for ledelsens sædes placering. Dette kan være aktuelt i tilfælde, hvor f.eks. bestyrelsesformanden reelt forestår den daglige ledelse af selskabet, eller i tilfælde, hvor beslutningerne er truffet forud for den formelle afholdelse af bestyrelsesmøde. Hvis et selskab har et tilsynsråd, vil stedet for tilsynsrådets beslutninger m.v. som klart udgangspunkt ikke være af betydning, da et til-

synsråd har meget begrænsede ledelseskompetencer. Se hertil Poul Erik Lytken og Louise Dyrup Jensen: »Hvorfor Tilsynsråd?« i Signatur nr. 3, september 2013, s. 30ff. Beslutninger, der almindeligvis træffes på generalforsamlingsniveau, er som udgangspunkt ikke afgørende for, om selskabet kan anses for hjemmehørende her i landet. Aktiebesiddelse vil derfor som udgangspunkt ikke være afgørende for vurderingen. Det vil kunne tillægges vægt, hvor der træffes beslutninger om, hvordan rettigheder baseret på aktiebesiddelse skal udøves. Tilsvarende vil der kunne lægges vægt på, hvorfra der forhandles om finansiering af selskabets aktiviteter. Det vil sige, at hvis beslutningerne i et holdingselskab eller et investeringsselskab, der er indregistreret i udlandet, reelt træffes i Danmark, så vil selskabet være hjemmehørende her i landet. Hvis alle møder og beslutninger vedrørende selskabets forhold foregår i udlandet, vil udgangspunktet være, at selskabet ikke har ledelsens sæde her i landet. Det er dog en forudsætning, at disse beslutninger reelt træffes i udlandet og ikke her i landet. Hvis selskabets virksomhed er af en sådan karakter, at der ikke er en faktisk daglig ledelse, f.eks. fordi selskabets eneste aktivitet er at besidde aktier i andre selskaber, så må stedet, hvor de øvrige beslutninger vedr. selskabets ledelse tages, lægges til grund. Dette medfører, at hvis hovedparten af den ledelsesmæssige aktivitet, der foregår, sker i Danmark, så vil ledelsen blive anset for at have sæde her i landet. Der lægges også i denne sammenhæng vægt på en vurdering af, hvor beslutningerne reelt træffes.

**Note 9:**

Også vedrørende stk. 3 gælder det, at såfremt de to staters skattemyndigheder ikke kan nå til enighed om en fortolkning af overenskomstens hjemmehørende begreb efter disse kriterier, må enighed søges opnået ved forhandling med staternes kompetente skattemyndigheder i medfør af mutual agreement-bestemmelsen i art. 25

**Note 10:**

I stk. 4 er indføjet en bestemmelse om, at en amerikansk statsborger eller en udlænding, der har fået opholdsarbejdstilladelse i USA (f.eks. en såkaldt green card holder) anses for hjemmehørende i USA og dermed omfattet af overenskomsten, dog kun såfremt den pågældende har en særlig kvalificeret tilknytning til USA.

Se udvalgte domme og afgørelser med relation til art. 4 i OECD-modeloverenskomsten.

Se styresignalet SKM2020.298.SKTST om Covid-19 vedrørende præcisering af administrativ praksis for så vidt angår fysiske personers skattemæssige hjemsted og ledelsens sæde (OECD-modeloverenskomstens art. 4), faste driftssteder (OECD-modeloverenskomstens art. 5) og beskatning af lønindkomst for personer, der udfører arbejde i flere stater (OECD-modeloverenskomstens art. 15).

**(5)**

**Artikel 5 Fast driftssted**

Metodikken i dobbeltbeskatningsoverenskomsterne er den, at der i den ene stat, hjemmehørende staten, forudsætningsvis befinder sig en erhvervsvirksomhed ("hovedkontoret"), og at denne erhvervsvirksomhed da kan udøve aktiviteter i den anden stat, som dermed bliver kildestat. På et tidspunkt får disse aktiviteter et så kvalificeret præg, at de vil statuere et såkaldt fast driftssted, hvilket medfører, at kildestaten får en beskatningsret til den del af erhvervsvirksomhedens overskud, der kan henføres til kildestaten. Indkomstfordelingen mellem hovedvirksomheden og det faste driftssted er omtalt i art. 7, mens et fast driftssted er defineret i art. 5.

Art. 5 er fra 2017-modellen ændret ganske væsentligt, og ændringerne har ikke virkning bagud. Denne overenskomst er baseret på 2014-modellen.

Art. 5, stk. 1 og stk. 2, svarer til OECD-modeloverenskomstens art. 5, stk. 1 og stk. 2 (2014-modellen).

**Note 1:**

Art. 5, stk. 1, svarer til OECD-modeloverenskomstens art. 5, stk. 1, og den indeholder en generel definition af udtrykket »fast driftssted«. Definitionen indeholder følgende betingelser: (1) Der skal eksistere et »forretningssted«, det vil sige indretninger såsom lokaler eller i visse tilfælde maskineri eller udstyr; (2) dette forretningssted skal være »fast«, dvs. det skal være etableret

på et givet sted med en vis grad af varighed og (3) virksomhedsudøvelse for foretagendet skal ske gennem dette faste driftssted. Det vil sædvanligvis sige, at personer, som på den ene eller den anden måde er afhængige af foretagendet (personale), udfører foretagendets virksomhed i den stat, hvor det faste sted er beliggende. Udtrykket »forretningssted« dækker alle lokaler, indretninger eller installationer, der benyttes til at udøve virksomhed, hvad enten de udelukkende bruges til dette formål eller ej. Et forretningssted kan også eksistere, hvor der ingen lokaler findes eller er fornødne til udøvelsen af foretagendets virksomhed, og det simpelthen har et vist areal til sin rådighed. Det er uden betydning, om lokalerne, indretningerne eller installationerne ejes eller lejes el eller på anden måde stilles til rådighed for foretagendet. Et forretningssted kan således bestå i en stadeplads på et marked eller visse permanent benyttede områder i et frilager (f.eks. til oplagring af toldpligtige varer). Videre kan forretningsstedet befinde sig inden for et andet foretagendes område. Det kan f.eks. være tilfældet, når det udenlandske foretagende til stadig anvendelse har visse lokaler eller dele deraf, der er ejet af det andet foretagende. Som anført ovenfor er det tilstrækkeligt til at konstituere et fast driftssted, at et foretagende har et vist areal til sin rådighed, når arealet anvendes til forretningsmæssig virksomhed. Der kræves ikke nogen formel juridisk ret til at anvende arealet. Således kan der f.eks. foreligge et fast driftssted i tilfælde, hvor et foretagende ulovligt disponerer over et vist areal, hvorfra virksomheden udøves. Ordene »gennem hvilket« skal forstås bredt og finder anvendelse i enhver situation, hvor forretningsvirksomhed udøves på en bestemt lokalitet, der er til foretagendets disposition med henblik på udøvelsen af aktiviteten. Hvis et foretagende f.eks. udfører brolægning af en gade, vil foretagendet blive anset for at udøve sin virksomhed »gennem« lokaliteten, hvor arbejdet udføres. I henhold til definitionen skal forretningsstedet være »fast«. Der skal således sædvanligvis være en forbindelse mellem forretningsstedet og en særligt geografisk bestemt lokalitet. Det er uden betydning, hvor længe et foretagende, der er hjemmehørende i en kontraherende stat, driver virksomhed i den anden kontraherende stat, hvis det ikke gør det på et bestemt sted, men dette betyder ikke, at det udstyr, der udgør forretningsstedet, faktisk skal være fastgjort til den jord, det står på. Det er nok, at udstyret forbliver på et givet sted. Eftersom forretningsstedet skal være fast, følger det heraf, at et fast driftssted kun kan antages at foreligge, hvis forretningsstedet har en vis grad af varighed, det vil sige, at det ikke blot er af midlertidig karakter. Et forretningssted kan imidlertid udgøre et fast driftssted, selvom det rent faktisk kun eksisterer i meget kort tid som følge af, at virksomheden er af en sådan art, at dens udøvelse kun varer kort tid. Det er undertiden vanskeligt at afgøre, om dette er tilfældet. Den praksis, som medlemsstaterne har haft med hensyn til tidsperioden, har ifølge OECD ikke været ensartet, men erfaringen har vist, at et fast driftssted normalt ikke er anset for at foreligge, hvis en virksomhed i en stat er udøvet gennem et forretningssted, der blev opretholdt i mindre end seks måneder. En undtagelse har været de tilfælde, hvor virksomheden har været af stadig tilbagevendende karakter; i disse tilfælde skal hver tidsperiode, i hvilken forretningsstedet er benyttet, ses i sammenhæng med det antal gange, forretningsstedet er benyttet (hvilket kan strække sig over et antal år). En anden undtagelse er gjort i tilfælde, hvor virksomhedsudøvelsen udelukkende fandt sted i denne stat; i denne situation kan virksomheden som følge af sin natur være af kort varighed, men da den udelukkende udøves i denne stat, er tilknytningen til denne stat stærkest. Omvendt viser praksis, at der har været mange tilfælde, hvor et fast driftssted er anset for at foreligge, hvis forretningsstedet har været opretholdt i en periode, der overstiger seks måneder. For at lette administrationen, kan stater være tilskyndet til at hense til foranstående ved stillingtagen til, hvorvidt et forretningssted, der kun eksisterer i et kortere tidsrum, udgør et fast driftssted. Et fast driftssted opstår, så snart foretagendet begynder at udøve sin forretningsvirksomhed gennem et fast forretningssted. Dette er tilfældet, så snart foretagendet på forretningsstedet forbereder den virksomhed, som forretningsstedet skal tjene permanent. Den periode, under hvilken selve det faste forretningssted oprettes af foretagendet, skal ikke medregnes, under forudsætning af, at denne virksomhed adskiller sig væsentligt fra den virksomhed, som forretningsstedet skal tjene permanent. Det faste driftssted op-

hører med at eksistere med det faste forretningssteds afvikling eller ved ophør af al virksomhed gennem det, det vil sige, når alle handlinger og forholdsregler i forbindelse med det faste driftssteds tidligere virksomhed er bragt til ophør (afvikling af løbende forretninger og ophør af indretningernes vedligeholdelse og reparation). En midlertidig afbrydelse af aktiviteterne kan imidlertid ikke anses som en lukning. Hvis det faste forretningssted udlejes til et andet foretagende, vil det normalt kun tjene dette foretagendes virksomhed i stedet for udlejers. I almindelighed ophører udlejers faste driftssted, bortset fra tilfælde, hvor han fortsat udøver egen forretningsvirksomhed gennem det faste forretningssted.

I kommentarerne til art. 5 vedrørende e-handel m.v. fremgår det blandt andet, at hjemmesider ikke i sig selv kan medføre fast driftssted, fordi der ikke er tale om et forretningssted i form af indretninger, såsom lokaler eller i visse tilfælde maskineri eller udstyr. Hjemmesiden er et medie, som bedst kan sammenlignes med en annonce i en avis. Hjemmesiden befinder sig på en server. En server kan godt udgøre et fast driftssted. Via serverens fysiske tilstedeværelse antages det, at serveren kan udgøre et forretningssted for den virksomhed, der udøves gennem serveren.

Et foretagende kan udøve virksomhed på flere måder. Et foretagendes virksomhed udføres i de fleste tilfælde af driftsherren eller af personer, der er i et ansættelsesforhold hos foretagendet (personale). Dette personale omfatter ansatte og andre personer, der modtager instruktioner fra foretagendet (f.eks. en afhængig repræsentant). Sådant personales beføjelser i dets forhold til tredjepart er uden betydning. Det gør ingen forskel, om repræsentanten er befuldmægtiget til at indgå kontrakter eller ej, hvis han arbejder på foretagendets faste forretningssted. Der kan der dog være tilfælde, hvor fysiske personer, der formelt er ansat i et foretagende, faktisk vil udøve et andet foretagendes virksomhed, og hvor det første foretagende derfor ikke bør anses for at udøve sin egen virksomhed på den lokalitet, hvor disse fysiske personer udfører arbejdet. I en multinational koncern er det forholdsvis almindeligt for ansatte i et selskab at blive midlertidigt udlånt til et andet selskab i koncernen og udøve forretningsmæssig virksomhed, der tydeligvis indgår i det andet selskabs virksomhed. I sådanne tilfælde vil en ændring af ansættelseskontrakten ofte blive undgået af administrative årsager (f.eks. ønsket om at bevare anciennitet eller pensionsrettigheder).

Et foretagende kan også udøve sin virksomhed gennem underleverandører, der optræder på egen hånd eller sammen med foretagendets ansatte. I det tilfælde vil der kun foreligge et fast driftssted for foretagendet, hvis de andre betingelser i art. 5 er opfyldt. I relation til stk. 1 kræves eksistensen af et fast driftssted under disse omstændigheder, at disse underleverandører udfører arbejde for foretagendet på et fast forretningssted, der er til foretagendets disposition. Hvis foretagendet ikke har ansatte, vil det dog være nødvendigt at vise, at det pågældende sted er til foretagendets disposition på grund af andre faktorer, der viser, at foretagendet tydeligvis har reelle beføjelser til at anvende stedet, f.eks. fordi foretagendet ejer eller er i lovlig besiddelse af stedet og kontrollerer adgangen til og anvendelsen af stedet. Et eksempel kunne være, hvor et foretagende, der ejer et lille hotel og udlejer hotelværelserne på internettet, har givet den praktiske drift af hotellet i underentreprise til et selskab, der aflønnes efter regning.

Et fast driftssted kan også foreligge, hvis foretagendets virksomhed hovedsagelig udføres med automatisk udstyr, og personalets virksomhed er begrænset til at opstille, betjene, kontrollere og vedligeholde sådant udstyr. Om spilleautomater, salgsautomater og lignende, som af et foretagende i en stat er opstillet i den anden stat, udgør et fast driftssted, afhænger således af, om foretagendet udfører forretningsmæssig virksomhed ud over den oprindelige opstilling af automaterne. Der er ikke fast driftssted, hvis foretagendet blot opstiller automaterne og så udlejer dem til andre foretagender. Et fast driftssted kan imidlertid foreligge, hvis det foretagende, som opstiller automaterne, også betjener og vedligeholder dem for egen regning. Dette gælder også, hvis automaterne betjenes og vedligeholdes af en af foretagendet afhængig repræsentant.

Det følger af definitionen af "foretagende i en kontraherende stat" i art. 3, at dette udtryk, som anvendt i art. 7, og udtrykket "foretagende" anvendt i art.

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

5 henviser til enhver form for foretagende drevet af en person hjemmehørende i en kontraherende stat, uanset om foretagendet i juridisk henseende er stiftet som et selskab, et interessentskab, en enkeltmandsvirksomhed eller en anden juridisk virksomhedsform. Forskellige foretagender kan samarbejde om det samme projekt. Hvorvidt deres samarbejde udgør et selvstændigt foretagende (f.eks. et interessentskab) afhænger af de faktiske forhold og den nationale lovgivning i den enkelte stat. Hvis to personer, der driver hver deres selvstændige foretagende, beslutter at stifte et selskab med disse to personer som aktionærer, udgør selskabet en juridisk person, der driver det, der bliver et andet selvstændigt foretagende. Det vil dog ofte være tilfældet, at forskellige foretagender blot aftaler hver især at udøve en særskilt del af det samme projekt, og at disse foretagender ikke vil udøve forretningsmæssig virksomhed i fællesskab, ikke vil dele fortjenesten heraf og ikke vil være ansvarlige for hinandens virksomhed i forbindelse med projektet, selv om de deler det samlede udbytte af projektet eller vederlaget for den udførte virksomhed i forbindelse med projektet. I dette tilfælde kan det være vanskeligt at konkludere, at der er blevet etableret et selvstændigt foretagende. Selv om en sådan ordning vil blive omtalt som et "joint venture" i mange stater, afhænger betydningen af "joint venture" af den nationale lovgivning, og i mange stater kan udtrykket "joint venture" derfor henvise til en særlig type foretagende.

Når et foretagende er et skattemæssigt transparent interessentskab, drives foretagendet af den enkelte interessent og er derfor, hvad angår interessenternes respektive andele af fortjenesten, et foretagende i hver af de kontraherende stater, hvor en interessent er hjemmehørende. Hvis et sådant interessentskab har et fast driftssted i en kontraherende stat, vil hver enkelt interessents andel af den fortjeneste, der kan henføres til det faste driftssted, derfor efter art. 7 være at betragte som fortjeneste erhvervet af et foretagende i den kontraherende stat, hvor den pågældende interessent er hjemmehørende.

**Note 2:**

Stk. 2, der indholdsmæssigt svarer til modeloverenskomstens art. 5, stk. 2, indeholder en ikke-udtømmende liste over eksempler, som navnlig kan anses for at udgøre et fast driftssted. Det bemærkes, at de eksempler, der er opregnet i stk. 2, kun kan anses for at udgøre et fast driftssted, såfremt de opfylder kravene efter stk. 1, det vil sige, at et foretagendes virksomhed helt eller delvist skal udøves fra det pågældende faste forretningssted.

**Note 3:**

Bygnings-, anlægs-, samle- eller monteringsarbejde udgør efter stk. 3 et fast driftssted, såfremt det strækker sig over en periode på mere end 12 måneder. Det bemærkes, at efter national dansk lovgivning, anses et bygge-, anlægs- og monteringsarbejde for at udgøre et fast driftssted fra første dag, SEL § 2, stk. 2 og KSL § 2, stk. 3

**Note 4:**

Borerigge og skibe, der anvendes ved efterforskning efter naturforekomster – men ikke ved den efterfølgende udvinding – kun et fast driftssted, hvis arbejdet strækker sig over mere end 12 måneder. Hvis arbejdet foretages af forbundne foretagender, lægges perioderne sammen. Bestemmelsen findes ikke i OECD's modeloverenskomst.

**Note 5:**

Dette stykke opregner et antal forretningsaktiviteter, som behandles som undtagelser fra den generelle definition, indeholdt i stk. 1, og som ikke er faste driftssteder, selv om virksomheden udøves fra et fast forretningssted. Disse virksomhedsarters fællestræk er, at de i almindelighed er af forberedende eller hjælpende karakter. Dette fastlægges udtrykkeligt i undtagelsen under litra e, som faktisk indebærer en almindelig indskrænkning af anvendelsesområdet for definitionen i stk. 1. Derudover bestemmes under litra f, at kombinationer af aktiviteter nævnt i litra a)-e) i samme faste forretningssted ikke skal betragtes som fast driftssted, under forudsætning af, at det faste forretningssteds almindelige virksomhed, der er resultatet af en sådan kombination, er af forberedende eller hjælpende art.

Stk. 4's bestemmelser er således udformet med henblik på at forhindre, at et foretagende i en stat beskattes i den anden stat, hvis det i denne anden stat udøver virksomhed udelukkende af forberedende eller hjælpende art.

Litra a) refererer kun til det tilfælde, hvor et foretagende erhverver sig retten til anvendelse af indretninger til oplagring, udstilling eller udlevering af egne varer. Litra b) refererer til selve varelagret og bestemmer, at lageret som sådant ikke skal behandles som fast driftssted, hvis det opretholdes udelukkende til oplagring, udstilling eller udlevering. Litra c dækker det tilfælde, hvor et varelager, der tilhører et foretagende, bearbejdes af et andet foretagende på det førstnævnte foretagendes vegne eller for dettes regning. Henvisningen til indsamling af oplysninger i litra d har til hensigt at omfatte et avisbureau, som kun har til formål at optræde som en af flere "antenner" på hovedvirksomheden. Det at udelukke et sådant bureau er blot at udvide begrebet "udelukkende indkøb".

Litra e) bestemmer, at et fast forretningssted, igennem hvilket foretagendet udelukkende udøver virksomhed, som for virksomheden er af forberedende eller hjælpende karakter, ikke skal betragtes som et fast driftssted. Ordlyden af dette punkt gør det unødvendigt at fremkomme med en udtømmende liste af undtagelser.

Det er ofte vanskeligt at sondre mellem virksomhed, som er af forberedende eller hjælpende karakter, og virksomhed, som ikke er det. Det afgørende kriterium er, om det faste forretningssted i sig selv udgør en væsentlig og betydningsfuld del af foretagendets virksomhed i sin helhed. Hvert enkelt tilfælde skal undersøges på grundlag af dets egne forhold. I alle tilfælde udøver et fast forretningssted ikke forberedende eller hjælpende virksomhed, hvis dets almindelige formål er identisk med hele foretagendets almindelige formål. Hvor f.eks. betjening af patenter og knowhow er et foretagendes formål, kan et fast forretningssted for et sådant foretagende, der udøver sådan virksomhed, ikke opnå litra e's fordele. Et fast forretningssted, hvis funktion er at styre et foretagende eller blot en del af et foretagende eller en gruppe i koncernen, kan ikke betragtes som udøvende en forberedende eller hjælpende virksomhed, for en sådan styrende virksomhed oversitger dette niveau.

Hvis foretagender med internationale forgreninger opretter et såkaldt "ledelsseskontor" i stater, hvor de har datterselskaber, faste driftssteder, agenter eller licenshavere, har et sådant kontor kontrollerende og samordnende funktioner for alle de af foretagendets afdelinger, der findes i vedkommende region, og der vil normalt blive antaget at foreligge et fast driftssted, fordi ledelseskontoret må betragtes som et kontor i stk. 2's forstand.

Litra f) er uden betydning i tilfælde, hvor et foretagende opretholder flere faste forretningssteder i litra a-e's forstand under forudsætning af, at de er adskilt fra hinanden stedligt og organisatorisk, idet hvert forretningssted i dette tilfælde skal betragtes for sig og isoleret ved afgørelsen af, om der foreligger et fast driftssted. Forretningssteder er ikke "adskilt organisatorisk", når hvert af dem i en stat har komplementære funktioner såsom at modtage og opbevare varer på et sted, distribuere disse varer fra et andet sted osv. Et foretagende kan ikke opsplitte en sammenhængende virksomhed i flere mindre enheder og påstå, at hver enhed kun udfører virksomhed af forberedende eller hjælpende karakter

De faste forretningssteder, der nævnes i stk. 4, kan ikke betragtes som udgørende faste driftssteder, så længe deres virksomhed begrænses til de funktioner, der er de nødvendige forudsætninger for at antage, at det faste forretningssted ikke er et fast driftssted. Dette ville være tilfældet, selv hvis de for forretningens oprettelse og drift indgåede kontrakter er indgået af dem, der leder selve de faste forretningssteder. De af de ansatte ved forretningssteder i stk. 4's forstand, der har bemyndigelse til at indgå sådanne kontrakter, skal ikke betragtes som agenter i stk. 5's forstand.

Hvis et fast forretningssted i stk. 4 ikke betragtes som et fast driftssted, finder denne undtagelse ligeledes anvendelse på afhændelse af rørlig formue, der udgør en del af forretningsstedets erhvervsaktiver, ved ophør af foretagendets virksomhed dér.

**Note 6:**

Stk. 5 og 6 omhandler virksomhed udøvet gennem en agent i kildestaten.

Det er et almindeligt accepteret princip, at et foretagende skal betragtes som havende fast driftssted i en stat, hvis der er en person, som under visse betingelser handler på dettes vegne, selv om foretagendet ikke skulle have et fast driftssted i denne stat i stk. 1 og 2's forstand. Denne bestemmelse har til

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

hensigt at give den pågældende stat beskatningsretten i sådanne tilfælde. Stk. 5 fastsætter således de betingelser, under hvilke et foretagende skal antages at have et fast driftssted i henseende til enhver handling, udført af en person, der handler på foretagendets vegne.

Dette gælder dog ikke i de tilfælde, hvor aktiviteterne er udøvet gennem et fast forretningssted, som iht. stk. 4 alligevel ikke bliver kvalificeret som et fast driftssted. Stk. 5 svarer til OECD-modeloverenskomstens stk. 5 om afhængige agenter (2014-udgaven).

Personer, hvis aktiviteter kan medføre et fast driftssted for foretagendet, er såkaldte afhængige repræsentanter, det vil sige personer, der uanset om de er ansatte eller ej, ikke er uafhængige repræsentanter omfattet af stk. 6. Sådanne personer kan være enten fysiske personer eller selskaber og behøver ikke være hjemmehørende i, eller have et forretningssted i den stat, i hvilken de udfører arbejde for foretagendet

Stk. 5 går derfor ud fra, at kun personer, der har fuldmagt til at indgå kontrakter, kan føre til fast driftssted for det foretagende, der benytter dem. I så fald har personen tilstrækkelig fuldmagt til at forpligte foretagendets deltagelse i forretningsvirksomhed i vedkommende stat. Anvendelsen af udtrykket "fast driftssted" i denne sammenhæng forudsætter, at denne person benytter denne fuldmagt gentagne gange og ikke blot i isolerede tilfælde. Endvidere begrænser vendingen "fuldmagt til at indgå kontrakter i foretagendets navn" ikke anvendelsen af stykket til tilfælde, hvor en repræsentant rent bogstaveligt indgår kontrakter i foretagendets navn; stykket finder ligeledes anvendelse på en repræsentant, der indgår kontrakter, der er bindende for foretagendet, selvom disse kontrakter rent faktisk ikke er indgået i foretagendets navn. Et foretagendes manglende engagement i transaktioner kan være et tegn på, at en agent har fået fuldmagt. F.eks. kan en agent anses for at besidde en aktuel fuldmagt til at indgå kontrakter, når han, uden formelt at indgå en bindende aftale, optager ordrer, der direkte sendes til et lager, hvorfra varer leveres og hvor det udenlandske foretagende rutinemæssigt godkender transaktionen. Fuldmagten til at afslutte kontrakter skal dække kontrakter vedrørende handlinger, der udgør foretagendets egentlige forretningsvirksomhed. Det ville f.eks. være irrelevant, hvis personen havde fuldmagt til at ansætte personale for foretagendet til at bistå denne persons virksomhed for foretagendet, eller hvis personen havde fuldmagt til i foretagendets navn at afslutte lignende kontrakter alene vedrørende interne anliggender. Derudover skal fuldmagten sædvanligvis udøves i den anden stat.

Kravet om, at en agent "sædvanligvis" skal indgå kontrakter, afspejler det tilgrundliggende princip i art. 5, at et foretagendes tilstedeværelse i en stat skal være mere end blot kortvarig, for at foretagendet skal anses for at have et fast driftssted og således være skattepligtig i denne stat. Omfanget og hyppigheden af den virksomhed, der er nødvendig for at kunne fastslå, at agenten "sædvanligvis udøver" en fuldmagt til at indgå aftaler i foretagendets navn, afhænger af kontrakternes art og arten af den virksomhed, der arbejdes for. Det er ikke muligt at angive præcist, hvor hyppigt fuldmagten skal anvendes.

Hvor betingelserne i stk. 5 er opfyldt, eksisterer der fast driftssted for foretagendet, for så vidt personen handler for sidstnævnte, det vil sige ikke blot i den udstrækning, en sådan person udøver fuldmagt til at afslutte kontrakter i foretagendets navn.

**Note 7:**
Overenskomstens stk. 7 svarer til modeloverenskomstens stk. 6 om uafhængige repræsentanter. Hvis virksomheden i kildestaten ikke udøves gennem en tilknyttet agent, men derimod gennem en uafhængig repræsentant, vil det være en yderligere betingelse for fast driftssted, at den uafhængige repræsentants dispositioner ligger uden for rammerne af hans egen sædvanlige erhvervsvirksomhed.

**Note 8:**
Det er almindeligt accepteret, at eksistensen af et datterselskab ikke i sig selv medfører fast driftssted for moderselskabet. Det følger af det princip, at et sådant datterselskab i beskatningsmæssig henseende er en uafhængig juridisk person. Selv det faktum, at den handel eller forretningsmæssige virksomhed,

som udøves af datterselskabet, er ledet af moderselskabet, gør ikke datterselskabet til et fast driftssted for moderselskabet.

Et moderselskab kan imidlertid, i henhold til bestemmelserne i artiklens stk. 1 og 5, anses for at have et fast driftssted i en stat, hvor et datterselskab har et forretningssted. Arealer eller lokaler, der tilhører datterselskabet og er til rådighed for, og som udgør et fast forretningssted, hvorfra moderselskabet udøver sin egen virksomhed, vil således udgøre et fast driftssted for moderselskabet i henhold til artiklens stk. 1, med forbehold af at artiklens stk. 3 og 4 ikke finder anvendelse. I henhold til stk. 5 vil et moderselskab også blive anset for at have et fast driftssted i en stat med hensyn til enhver virksomhed, som dets datterselskab udøver for det, hvis betingelserne i stykket er opfyldt, medmindre artiklens stk. 6 finder anvendelse.

De samme principper finder anvendelse på ethvert selskab, der udgør en del af en multinational koncern, således at et sådant selskab kan blive anset for at have et fast driftssted i en stat, hvor det kan disponere over og benytter lokaliteter, der tilhører et andet selskab i koncernen, eller hvis det førstnævnte selskab anses for at have et fast driftssted i henhold til artiklens stk. 5. Vurderingen af, om der foreligger et fast driftssted i henhold til bestemmelserne i artiklens stk. 1 eller 5, skal imidlertid træffes særskilt for hvert enkelt selskab i koncernen. Eksistensen i en stat af et fast driftssted for et selskab i koncernen vil ikke have nogen betydning for spørgsmålet om, hvorvidt et andet selskab i koncernen selv har et fast driftssted i denne stat.

Selv om lokaliteter, der tilhører et selskab, der udgør en del af en multinational koncern, kan stilles til disposition for et andet selskab i koncernen og med forbehold af de andre betingelser i art. 5 kan udgøre et fast driftssted for dette andet selskab, hvis dette andet selskabs virksomhed udøves fra denne lokalitet, er det vigtigt at adskille dette tilfælde fra den hyppigt forekommende situation, hvor et selskab, der udgør en del af en multinational koncern, leverer tjenesteydelser (f.eks. rådgivning) til et andet selskab i koncernen som en del af dets egen virksomhed, der udføres på lokaliteter, der ikke tilhører det andet selskab, og ved hjælp af egne ansatte. I dette tilfælde er det sted, hvor tjenesteydelserne udføres, ikke til disposition for det sidstnævnte selskab, og det er ikke dette selskabs virksomhed, der udøves fra dette sted. Dette sted kan derfor ikke anses for at være et fast driftssted for det selskab, for hvilket tjenesteydelserne udføres. Det faktum, at et selskabs egen virksomhed på et givet sted kan medføre en økonomisk fordel for et andet selskab, betyder ikke, at det sidstnævnte selskab udøver sin virksomhed gennem dette sted. Et selskab, der alene køber dele, der er produceret af, eller tjenesteydelser, der leveres af et andet selskab i en anden stat, vil klart ikke have et fast driftssted som følge heraf, selv om det opnår en fordel fra produktionen af disse dele eller leveringen af disse tjenesteydelser.

Se udvalgte domme og afgørelser med relation til art. 5 i OECD-modeloverenskomsten

**(6)**
**Artikel 6 Indkomst af fast ejendom**
Art. 6 svarer, med undtagelse af stk. 5, til OECD-modeloverenskomstens art. 6. Efter artiklen kan indkomst fra fast ejendom (herunder indkomst fra landbrug og skovbrug) altid beskattes i den stat, hvor ejendommen er beliggende (kildestaten). Det gælder også, selvom der ikke er noget fast driftssted i kildestaten. Ifølge OECD-modellens formuleringer omfatter artiklen, som det ses, også indkomst fra landbrug og skovbrug, hvilket kan betragtes som en lidt bredere definition af indkomst af fast ejendom, men det fremgår af kommentarerne til modellen, at det står de enkelte stater frit for at aftale, at overskud af landbrug og skovbrug i stedet skal henføres til art. 7

**Note 1:**
Artiklen omfatter udelukkende den situation, hvor en person, der er hjemmehørende i den ene stat oppebærer indkomst fra en fast ejendom beliggende i den anden aftalestat. Den omfatter således ikke situationen, vor ejendommen er beliggende i samme stat, som ejeren er hjemmehørende i, og den omfatter heller ikke situationen, hvor ejendommen er beliggende i en tredje stat. I sidstnævnte tilfælde finder art. 21 anvendelse.

**Note 2:**

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

Stk. 2 definerer, hvad udtrykket »fast ejendom« i alle tilfælde skal omfatte. Udtrykket skal tillægges den betydning, som det har i henhold til lovgivningen i den stat, hvor ejendommen er beliggende. I dansk ret er begrebet fast ejendom ikke entydigt defineret. Normalt vil man sige, at kerneforståelsen af begrebet omfatter et afgrænset jordstykke, en parcel, med de opførte bygninger, faste træer og buske samt stikledninger i jorden.

**Note 3:**

Begrebet omfatter i alle tilfælde også tilbehør til fast ejendom, besætning og redskaber, der anvendes i landbrug og skovbrug, rettigheder, som er omfattet af den almindelige lovgivning om fast ejendom, brugsrettigheder til fast ejendom, såvel som rettigheder til varierende eller faste ydelser, der betales for udnyttelsen af eller retten til at udnytte mineralforekomster, kilder (Note 6) og andre naturforekomster.

**Note 4:**

Såfremt en forpagter viderudlejer ejendommen eller dele af den eller en person med jagtrettigheder stiller disse jagtrettigheder til rådighed for andre, vil vederlaget for dette omfattet af art. 6. Det vil sige, at også personer, der har en (delvis) brugsret til en fast ejendom vil være omfattet af art. 6.

**Note 5:**

For eksempel indkomst fra grusgravning.

**Note 6:**

For eksempel udnytter en ret til at udvinde kildevand. art.

**Note 7:**

Som indkomst af fast ejendom anses indkomst fra direkte brug af ejendommen, men også indkomst fra indirekte brug, som for eksempel indkomst fra udlejning/forpagtning af ejendommen, er omfattet, ligesom indkomst fra andre former for (del-)udnyttelse af ejendommen (eksempelvis indkomst fra jagtrettigheder eller udnyttelse af naturforekomster) er det. Udlodninger fra "Real Estate Investment Trusts" (REITs) er omtalt i pkt. 67.1-7 i kommentaren til OECD-modellens art. 10. Ejendomsværdiskatten er ikke omfattet af art. 6, idet den betragtes som en partiel formueskat, og den er derfor kun omfattet af overenskomsten, der såvel omfatter indkomst- og formueskatter. For at undgå dobbeltbeskatning for boliger beliggende i overenskomststater, hvor overenskomsten som her ikke omfatter formueskatter, er der en lempelsesregel i EVSL § 12, hvorefter der kan gives nedslag for udenlandske skatter, der svarer til ejendomsværdiskatten. Se i øvrigt SKM2008.565.SKAT/TfS 2008, 901 om opgørelse af ejendomsværdiskatten for udenlandske ejendomme. Egentlige grundskatter af samme karakter som den kommunale grundskyld i Danmark er ikke omfattet af overenskomsten.

Egentlige grundskatter af samme karakter som den kommunale ejendomsskat (grundskyld) i Danmark er ikke omfattet af overenskomsten. Skattemæssigt opgøres indkomst af fast ejendom efter nettoprincippet. Det vil sige, at der skal tages hensyn til prioritetsrenter. Begrænset skattepligtige, der ejer fast ejendom i Danmark, har ud over egentlige prioritetslån også mulighed for at få fradrag for renter af ikke-pantesikrede lån, hvis den begrænset skattepligtige »kan dokumentere, at lånet alene vedrører ejendommens anskaffelse, drift eller forbedring.« Nettoprincippet er omtalt i kommentarernes pkt. 40, 43 og 63 til art. 23 om lempelsesregler og I LL § 33 F. Indkomst, der består i renteindtægt på prioritetslån i fast ejendom, er ikke indkomst af fast ejendom, men i stedet omfattet af art. 11. Fortjeneste, opnået ved salg eller anden afståelse af fast ejendom, betragtes ikke indkomst af fast ejendom i overenskomstens forstand, men er i stedet omfattet af art. 13.

**Note 8:**

Det følger af stk. 4, at såfremt en erhvervsvirksomhed (personlig eller i selskabsform) har fast ejendom – udelukkende eller blot som et af flere forskellige typer forretningsaktiver – vil resultatet af den faste ejendom skulle henføres til art. 6, stk. 4, mens resultatet af en eventuel øvrig aktivitet skal henføres til art. 7, med mindre der er taget særlig stilling til dette i overenskomsten (se de indledende bemærkninger overfor til art. 6). Da der i denne overenskomst er medtaget en art. 14 om udøvelse af frit erhverv, er art. 6, stk. 4 formuleret således, at også fast ejendom, der anvendes ved udøvelsen af frit erhverv er omfattet af art. 6.

**Note 9:**

Stk. 5 findes ikke i OECD-modellen. Den skal ses i sammenhæng med nationale amerikanske beskatningsregler (Treas. Reg. section 1.871-10(d)(2)), og har derfor kun betydning for en person, der er bosiddende i Danmark, og som ejer en ejendom i USA. Efter bestemmelsen kan en person bosiddende i Danmark vælge at lade overskuddet af en ejendom beliggende i USA opgøre efter et såkaldt nettoprincip i stedet for efter et bruttoprincip. Valget af overgang til beskatning efter et nettoprincip er sædvanligvis bindende for fremtiden.

Er Danmark kildestat, det vil sige i tilfælde, hvor ejendommen er beliggende i Danmark, er der national dansk hjemmel til at beskatte driftsoverskuddet i KSL § 2, stk. 1, nr. 5, og i SEL § 2, stk. 1, litra b.

Se udvalgte domme og afgørelser med relation til artikel 6.

SKDM 1976, 37

–TfS 1997, 15

Se udvalgte domme og afgørelser med relation til art. 6 i OECD-modeloverenskomsten.

**(7)**

### Artikel 7 Fortjeneste ved erhvervsvirksomhed

Såfremt foretagendet har et fast driftssted i en stat, jf. art. 5, opstår spørgsmålet om, hvordan indkomst opgøres i dette faste driftssted. Art. 7 beskæftiger sig med de regler, der skal anvendes ved opgørelsen af indkomsten i det faste driftssted.

Bemærk at danske juridiske personer som hovedregel ikke skal medregne indkomst fra udenlandske faste driftssteder.

Det følger af SEL § 2, stk. 7, at indkomst i et fast driftssted her i Danmark opgøres efter armslængdeprincippet. Det vil sige, at indkomsten skal opgøres som den indkomst driftsstedet kunne have opnået, herunder ved dets interne transaktioner med andre dele af det foretagende, som driftsstedet er en del af, hvis det havde været et særskilt og uafhængigt foretagende.

Det fremgår imidlertid også af SEL § 2, stk. 7, at hvis der er indgået en dobbeltbeskatningsoverenskomst med den fremmede stat, Færøerne eller Grønland, og denne overenskomsts art. om fortjeneste ved erhvervsvirksomhed ikke er formuleret i overensstemmelse med SEL § 2, stk. 2, 1. pkt., skal indkomsten i driftsstedet i stedet opgøres i overensstemmelse med den pågældende art.. Det vil i praksis sige alle de overenskomster, der er baseret på 2008 udgaven af OECD-modeloverenskomsten eller tidligere udgaver, og det er tilfældet for denne overenskomst.

Art. 7 afviger OECD-modeloverenskomstens art. 7, således som denne er formuleret til og med 2008-modellen.

**Note 1:**

Stk. 1 fastslår den hovedregel, at fortjeneste ved erhvervsvirksomhed kun kan beskattes i den stat, hvori virksomheden er hjemmehørende, medmindre virksomheden udøves gennem et fast driftssted i den anden stat, kildestaten. Er dette tilfældet, kan kildestaten beskatte den del af fortjeneste, der kan henføres til det faste driftssted. Kildestatens ret til at beskatte udstrækker sig dog ikke til en eventuel anden indkomst, som foretagendet (i hjemmehørende staten) måtte erhverve fra kildestaten, men som ikke kan henføres til det faste driftssted. Der gælder med andre ord ikke noget "force of attraction" princip.

**Note 2:**

Dette stykke indeholder den centrale regel, der tilsigtes at skulle være grundlag for henføring af fortjeneste til et fast driftssted. Stykket anlægger det synspunkt, at de fortjenester, der skal henføres til det faste driftssted, er sådanne, som det faste driftssted ville have opnået, hvis det i stedet for at handle med resten af foretagendet havde handlet med et frit og uafhængigt foretagende under vilkår og til priser, som ville være gældende på de sædvanlige markeder. Dette svarer til det armslængdeprincip, der er diskuteret i kommentaren til art. 9. Den således fastsatte fortjeneste ville normalt være den samme fortjeneste, som man ville forvente fastsat ved sædvanligt godt handelsregnskab.

Stk. 2 kræver, at dette princip anvendes af hver af de kontraherende stater. Dette betyder naturligvis ikke, at det beløb, som foretagendet beskattes af i kildestaten i en given periode, vil svare nøjagtig til det beløb, som den anden stat skal indrømme lempelse for i henhold til artikelen 23. Forskelle i den

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

nationale lovgivning i de to stater vedrørende forhold som afskrivningssatser, periodeafgrænsning og ikke-anerkendelse af fradrag for visse udgifter, som er i overensstemmelse med stk. 3 i denne art., vil normalt resultere i en forskellig skattepligtig indkomst i de to stater.

I langt de fleste tilfælde vil det faste driftssteds driftsregnskaber - som normalt er tilgængelige, om ikke af andre grunde, så fordi en veldrevet forretningsorganisation normalt er interesseret i at kende sine forskellige afdelingers lønsomhed - blive benyttet til at fastslå den fortjeneste, der med rette kan henføres til dette driftssted. Hvor der er sådanne regnskaber, vil disse naturligvis udgøre udgangspunktet for enhver korrektion i tilfælde, hvor korrektion er fornøden for at fastsætte størrelsen af den fortjeneste, der med rimelighed kan henføres til det faste driftssted i henhold til de retningslinjer, der er indeholdt i stk. 2.

For at afgøre, om en korrektion i forhold til forretningsbøgerne er nødvendig i henhold til stk. 2, er det nødvendigt at fastsætte den fortjeneste, der ville være blevet realiseret, hvis det faste driftssted havde været et særskilt og tydeligt adskilt foretagende, der var beskæftiget med den samme eller lignende virksomhed, under samme eller lignende vilkår, og som handlede helt uafhængigt med resten af virksomheden. Afsnit D-2 og D-3 i Del I i rapporten "Attribution of Profits to Permanent Establishments" beskriver den to-trins fremgangsmåde, der skal anvendes ved afgørelsen heraf. Denne fremgangsmåde tillader opgørelsen af den fortjeneste, der kan henføres til den samlede virksomhed, der er udøvet af det faste driftssted, inklusive transaktioner med andre uafhængige parter, transaktioner med forbundne foretagender og forretningsvirksomhed (f.eks. intern overførsel af kapital eller aktiver eller udførelsen af tjenesteydelser) med resten af foretagendet (i henhold til det andet trin, der er beskrevet ovenfor) i overensstemmelse med retningslinjerne i stk. 2.

I tilfælde hvor, i henhold til art. 5, stk. 5, et fast driftssted, tilhørende et foretagende, der er hjemmehørende i en kontraherende stat, anses for at foreligge i den anden kontraherende stat som følge af en såkaldt afhængig agents virksomhed, vil de samme principper, der anvendes med henblik på at henføre fortjeneste til andre typer af faste driftssteder, finde anvendelse med hensyn til at henføre fortjeneste til dette faste driftssted. Som trin 1 vil de aktiviteter, som den afhængige agent påtager sig for virksomheden, blive identificeret ved hjælp af en funktionsanalyse, som vil kortlægge de funktioner, som den afhængige agent udfører såvel for egen regning som på vegne af foretagendet. Den afhængige agent og det foretagende, på vegne af hvilket han handler, er to adskilte potentielle skatteydere. På den ene side erhverver den afhængige agent sin egen indkomst eller fortjeneste fra den virksomhed, som han udøver for egen regning for foretagendet; hvis agenten selv er hjemmehørende i en af de kontraherende stater er bestemmelserne i overenskomsten (inkl. art. 9, hvis agenten er et foretagende, der er forbundet med det foretagende, på hvis vegne han handler) relevante med hensyn til beskatningen af denne indkomst eller fortjeneste. På den anden side vil der til det faste driftssted, som foretagendet anses for at have, blive henført de af foretagendets aktiver og risici, der vedrører de funktioner, som udføres af den afhængige agent på foretagendets vegne (dvs. den virksomhed, som agenten påtager sig for foretagendet) sammen med tilstrækkelig kapital til at understøtte disse aktiver og risici. Fortjeneste vil herefter blive henført til det faste driftssted på grundlag af disse aktiver, risici og kapital; denne fortjeneste vil være adskilt fra og ikke inkludere den indkomst eller fortjeneste, der rettelig kan henføres til den afhængige agent (se sektion D-5 i Del I i rapporten "Attribution of Profits to Permanent Establishments".

**Note 3:**
Dette stykke tydeliggør den i stk. 2 anførte hovedregel vedrørende et fast driftssteds omkostninger.

Stykket anerkender klart, at der ved beregningen af et fast driftssteds fortjeneste skal gives fradrag for omkostninger, uanset hvor de er påløbet, når de er afholdt til fordel for det faste driftssted. Det vil i nogle tilfælde klart være nødvendigt at skønne over det omkostningsbeløb, der skal tages i betragtning, eller at beregne det ved konventionelle metoder. F.eks. i spørgsmålet om generalomkostninger til administration for foretagendets hovedkontor kan

det være passende at tage en forholdsmæssig del, baseret på det forhold, der består mellem det faste driftssteds omsætning (eller muligvis bruttofortjeneste) og hele foretagendets.

I denne overenskomst nævnes også udgifter til forskning og udvikling, renter og andre udgifter, der er afholdt til fordel for foretagendet som helhed.

Under hensyn hertil er det opfattelsen, at det omkostningsbeløb, der skal tages i betragtning som afholdt for det faste driftssted, skal være den således afholdte faktiske omkostning. Det fradrag, som det tillades det faste driftssted at foretage for enhver af foretagendets omkostninger, som kan henføres til det, er ikke betinget af, at sådanne omkostninger faktisk tilbagebetales af det faste driftssted.

Det er undertiden blevet anført, at nødvendigheden af at få overensstemmelse mellem stk. 2 og 3 skabte praktiske vanskeligheder, idet stk. 2 stillede krav om, at priser mellem det faste driftssted og hovedkontoret normalt skulle fastsættes på armslængdebasis - hvorefter der til den overførende enhed blev henført den fortjeneste, som den kunne forventes at ville have haft, hvis den afsluttede forretninger med et uafhængigt foretagende - medens ordlyden af stk. 3 indebar, at fradraget for udgifter, afholdt til fordel for det faste driftssted, skulle være de faktiske omkostningsbeløb uden tillæg af noget avancelement. Medens anvendelsen af stk. 3 rent faktisk kan rejse nogle praktiske vanskeligheder, særlig i relation til "det separate foretagende" og armslængdeprincipperne, der ligger til grund for stk. 2, er der ingen forskel i princippet mellem de to stykker. Stk. 3 angiver, at der ved fastsættelsen af et fast driftssteds fortjeneste skal tillades fradrag for visse udgifter, medens stk. 2 bestemmer, at den fortjeneste, der fastsættes i overensstemmelse med reglen i stk. 3, det vedrører fradrag for udgifter, skal være den, som et uafhængigt foretagende, der udøvede den samme eller lignende virksomhed på samme eller lignende betingelser, ville have opnået. Medens stk. 3 således angiver en regel, der anvendes med henblik på at fastsætte det faste driftssteds fortjeneste, kræver stk. 2, at den således fastsatte fortjeneste svarer til den fortjeneste, som et uafhængigt foretagende ville have opnået

Stk. 3 bestemmer endvidere kun, hvilke udgifter der skal henføres til det faste driftssted med henblik på at fastsætte den fortjeneste, der kan henføres til dette faste driftssted. Stykket behandler ikke spørgsmålet om, hvorvidt de udgifter, der en gang er henført, er fradragsberettigede ved beregningen af det faste driftssteds skattepligtige indkomst, da betingelserne for fradrag for udgifter skal afgøres af den nationale lovgivning.

I forbindelse med den praktiske anvendelse af disse principper kan, ved fastsættelsen af et driftssteds fortjeneste, det spørgsmål opstå, om en given omkostning, der er afholdt af et foretagende, med rette kan anses for at være en udgift, der er afholdt til fordel for det faste driftssted under hensyntagen til det "uafhængige foretagende"-princip i stk. 2. Medens uafhængige foretagender i deres indbyrdes forretningsvirksomhed almindeligvis vil søge at opnå en fortjeneste og i forbindelse med overførsel af formuegoder eller tjenesteydelser til hinanden vil forlange de priser, som det åbne marked kan bære, er der ikke desto mindre også situationer, hvor det ikke kan antages, at et bestemt formuegode eller en bestemt tjenesteydelse ville kunne være erhvervet fra et uafhængigt foretagende, eller hvor uafhængige foretagender kan enes om at fordele omkostningerne mellem sig i forbindelse med en eller anden virksomhed, der udøves i fællesskab til fordel for begge. Under disse særlige omstændigheder kan det være rigtigt at behandle alle relevante omkostninger, der er afholdt af foretagendet, som en udgift, der er afholdt for det faste driftssted. Vanskeligheden består i at sondre mellem disse tilfælde og de tilfælde, hvor en omkostning, der er afholdt af et foretagende, ikke skal anses som en udgift for det faste driftssted, og det relevante formuegode eller den relevante tjenesteydelse på grundlag af det "uafhængige foretagende"-princip skal anses for at være blevet overført mellem hovedkontoret og det faste driftssted til en pris, der inkluderer en fortjeneste. Spørgsmålet må være, om den interne overførsel af formuegoder og tjenesteydelser, være sig af midlertidig eller af endelig karakter, er af samme art som dem, som foretagendet ved udøvelse af normal forretningsvirksomhed ville have debiteret en tredje part med en armslængdepris, dvs. ved normalt i salgsprisen at indregne en passende fortjeneste.

Copyright © 2024 Karnov Group Denmark A/S

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

Behandlingen af renteudgifter rejser særlige problemer. For det første kan der være tale om beløb, der under betegnelsen "renter" opkræves af hovedkontoret hos det faste driftssted for interne "lån" fra det førstnævnte til det sidstnævnte. Med undtagelse af finansforetagender så som banker er der almindelig enighed om, at sådanne interne renter ikke skal tages i betragtning. For det andet kan der være et spørgsmål om fradrag for renter af ekstern gæld, som foretagendet rent faktisk har stiftet. Sådan gæld kan helt eller delvist angå virksomheden i det faste driftssted; i virkeligheden vil lån, der er optaget af et foretagende, enten være til fordel for hovedkontoret, det faste driftssted eller begge. Spørgsmålet, der rejser sig i forbindelse med sådan gæld, er, hvordan man skal fastsætte den del af renten, der skal fratrækkes ved beregningen af den fortjeneste, der kan henføres til det faste driftssted. Følgelig er flertallet af medlemsstater af den opfattelse, at det ville være at foretrække at nå til en praktisk løsning, der ville tage en kapitalstruktur i betragtning, der passer til både virksomheden og de udførte funktioner. Denne kapitalstruktur tager hensyn til det faktum, at det faste driftssted for at kunne udføre dets virksomhed, kræver et vist finansieringsbeløb, der består af "fri" kapital og af rentebærende lån. Målet er derfor at henføre et armslængderentebeløb til det faste driftssted, efter at der er henført et rimeligt beløb i form af "fri" kapital til at opretholde det faste driftssteds funktioner, aktiver og risici. I henhold til armslængdeprincippet skal et fast driftssted have tilstrækkelig kapital til at opretholde de funktioner, som det udøver, de aktiver, som det ejer og de risici, som det påtager sig. Inden for den finansielle sektor fastsætter regulativer en minimumskapital, der skal være til stede for det tilfælde, at nogle af de risici, som er forbundet med virksomheden, udmønter sig i økonomiske tab. Kapital giver en lignende sikkerhed mod økonomiske tab inden for den ikke-finansielle sektor.

Det erkendes, at de forskellige acceptable metoder til at henføre "fri" kapital til et fast driftssted og som er i overensstemmelse med armslængdeprincippet, kan medføre problemer med dobbeltbeskatning. Den væsentligste bekymring, der især er af betydning for finansielle virksomheder er, at hvis de nationale regler i den stat, hvori det faste driftssted er beliggende, og i den stat, hvori foretagendet er hjemmehørende, kræver, at der anvendes forskellige acceptable metoder til at henføre en armslængde "fri" kapital til det faste driftssted, kan den fortjeneste, der fastsættes af den stat, hvori det faste driftssted er beliggende, være højere end den fortjeneste, der fastsættes af den stat, hvori foretagendet er hjemmehørende og som skal indrømme lempelse for dobbeltbeskatning.

Løsningen er ikke lige til. OECD-medlemsstaterne er imidlertid blevet enige om at acceptere - med henblik på at fastsætte det fradragsberettigede rentebeløb, der vil blive anvendt ved beregningen af dobbeltbeskatningslempelse - den henføring af kapital (dotationskapital), der hidrører fra anvendelsen af den metode, der anvendes af den stat, i hvilken det faste driftssted er beliggende, hvis følgende to betingelser er opfyldt: for det første, såfremt forskellen i henføringen af kapital mellem denne stat og den stat, i hvilken foretagendet er hjemmehørende, er en følge af forskellige valg af metoder til henføring af kapital i henhold til den interne lovgivning i de to stater og for det andet, såfremt der er enighed om, at den stat, hvori det faste driftssted er beliggende, har anvendt en godkendt henføringsmetode, og der også er enighed om, at metoden giver et resultat, der er i overensstemmelse med armslængdeprincippet. OECD-medlemsstaterne er af den opfattelse, at de er i stand til at nå til dette resultat enten i henhold til deres interne lovgivning, gennem deres fortolkning af art. 7 og 23 eller ved anvendelse af den gensidige aftaleprocedure i henhold til art. 25, og især gennem den mulighed, som denne art. giver for at løse ethvert spørgsmål, der vedrører anvendelsen af eller fortolkningen af deres skatteaftaler

**Note 4:**
Der tænkes her f.eks. på omkostninger, der er afholdt i hovedkontoret, men som dækker funktioner m.v., der også kan henføres til det faste driftssted. Der kan eksempelvis være tale om ledelsesomkostninger, omkostninger til IT, HR og juridisk assistance.

**Note 5:**

I art. 5, stk. 4, findes der en liste med eksempler på virksomhed, som, skønt udført på et fast forretningssted, ikke betragtes som omfattet af udtrykket "fast driftssted". Når man betragter reglerne for fordeling af fortjeneste til et fast driftssted, er det vigtigste af disse eksempler udtvivlsomt den virksomhed, der er nævnt i stk. 5 i denne art., det vil sige indkøbskontoret

Stk. 4 beskæftiger sig selvfølgelig ikke med en organisation, der alene er oprettet med henblik på indkøb. En sådan organisation er ikke et fast driftssted, og overskudsfordelingsbestemmelserne i denne art. kommer derfor ikke til anvendelse. Stk. 4 beskæftiger sig dermed med et fast driftssted, som, uagtet det udfører andre forretninger, også foretager indkøb for dets hovedkontor. I et sådant tilfælde bestemmer stk. 4, at det faste driftssteds fortjeneste ikke skal forøges ved, at der til den lægges et fiktivt tal for fortjeneste fra indkøb. Følgelig vil naturligvis enhver omkostning, der hidrører fra indkøbsvirksomhed, også blive udelukket ved beregning af det faste driftssteds skattepligtige fortjeneste.

**Note 6:**

En én gang benyttet fordelingsmetode kan ikke forandres, blot fordi en anden metode i et givet år viser mere fordelagtige resultater. Et af formålene med en dobbeltbeskatningsoverenskomst er at give et foretagende i en kontraherende stat en vis grad af vished vedrørende den skattebehandling, som vil blive såvel dets faste driftssted i den anden kontraherende stat som den del af det i dets hjemstat, som handler med det faste driftssted, til del. Af denne grund giver stk. 5 en forsikring om kontinuerlig og sammenhængende skattemæssig behandling.

**Note 7:**

I stk. 6 anføres det, at såfremt der i indkomsten fra det faste driftssted indgår indkomst, der positivt er nævnt i andre af overenskomstens artikler, skal den pågældende indkomst beskattes efter disse andre regler.

Udtrykket "fortjeneste" skal forstås således, at det har en bred betydning, der omfatter enhver form for indkomst, der erhverves ved udøvelsen af en virksomhed.

Hvis bestemmelse ikke fandtes, kunne fortolkningen af udtrykket "fortjeneste" give anledning til en vis usikkerhed i forbindelse med anvendelsen af overenskomsten. Hvis et foretagendes fortjeneste indbefatter arter af indkomst, som separat er behandlet i andre artikler i overenskomsten, f.eks. udbytte, kan det spørgsmål rejses, hvilken art. der skal anvendes på sådan indkomst, f.eks. hvis der er tale om udbytte, denne art. eller art. 10

I det omfang, anvendelsen af denne art. og af den relevante anden art. resulterer i den samme skattemæssige behandling, har spørgsmålet kun ringe praktisk betydning. Desuden omhandler nogle af overenskomstens artikler specifikt dette spørgsmål for så vidt angår nogle typer indkomst (f.eks. art. 6, stk. 4, art. 10, stk. 4, art. 11, stk. 4, art. 12, stk. 3, art. 17, stk. 1 og 2, og art. 21, stk. 2.

Spørgsmålet kan imidlertid opstå med hensyn til andre arter af indkomst, og det er derfor blevet besluttet at medtage en fortolkningsregel, der skal sikre, at artikler, der anvendes vedrørende særlige arter af indkomst, har forrang i forhold til art. 7. Det følger af denne regel, at art. 7 finder anvendelse på erhvervsmæssig indkomst, der ikke henhører under de arter af indkomst, der er omfattet af disse andre artikler. Endvidere falder indkomst, der er omfattet af art. 10, stk. 4, art. 11, stk. 4, art. 12, stk. 3, og art. 21, stk. 2, ind under art. 7. Denne regel bestemmer imidlertid ikke den måde, på hvilken indkomsten klassificeres ifølge den nationale lovgivning; hvis en kontraherende stat således beskatter en indkomst i henhold til andre artikler i denne overenskomst, kan denne stat, ved anvendelsen af sin nationale lovgivning, karakterisere denne indkomst, som den ønsker (dvs. som en erhvervsmæssig indkomst eller som en specifik indkomstkategori). Det er imidlertid en betingelse, at behandlingen af en sådan indkomst sker i overensstemmelse med bestemmelserne i overenskomsten. Det bemærkes også, at i tilfælde, hvor et foretagende i en kontraherende stat erhverver indkomst fra fast ejendom gennem et fast driftssted beliggende i den anden stat, kan den anden stat ikke beskatte denne indkomst, hvis den hidrører fra fast ejendom, der er beliggende i den førstnævnte stat eller i en tredjestat.

Copyright © 2024 Karnov Group Denmark A/S

Endelig skal det bemærkes, at to kategorier af fortjeneste, der tidligere (i OECD-modellerne) var omfattet af andre artikler i overenskomsten, nu er omfattet af art. 7. For det første er det sådan, at mens definitionen af "royalties" i art. 12, stk. 2, i overenskomstudkastet fra 1963 og modeloverenskomsten fra 1977 inkluderede betalinger "for anvendelsen af, eller retten til at anvende, industrielt, kommercielt eller videnskabeligt udstyr", blev henvisningen til disse betalinger efterfølgende fjernet fra definitionen for at sikre, at indkomst fra udlejning af industrielt, kommercielt eller videnskabeligt udstyr, herunder indkomst fra udlejning af containere, falder ind under enten art. 7 eller art. 8 (jf. pkt. 9 i kommentaren til denne art.) frem for under art. 12.

For det andet blev indkomst fra frit erhverv og anden virksomhed af selvstændig karakter før 2000 behandlet i en særskilt art., nærmere bestemt art. 14. Bestemmelserne i denne art. svarede til dem, der fandt anvendelse på erhvervsmæssig indkomst, men art. 14 anvendte udtrykket "fast sted" i stedet for "fast driftssted", da det oprindeligt havde været tanken, at det sidstnævnte udtryk var forbeholdt kommerciel og industriel virksomhed. Det var imidlertid ikke altid klart, hvilken virksomhed der faldt ind under art. 14, og hvilken der faldt ind under art. 7. Udeladelsen af art. 14 i 2000 afspejlede det faktum, at der ikke var tilsigtet forskelle mellem begreberne "fast driftssted", som anvendt i art. 7, og "fast sted", som anvendt i art. 14, eller mellem, hvorledes fortjeneste skulle opgøres og skatten beregnes, alt efter om art. 7 eller 14 blev anvendt. Virkningen af udeladelsen af art. 14 er, at indkomst fra frit erhverv og anden virksomhed af selvstændig karakter nu behandles under art. 7 som erhvervsmæssig indkomst.

Danmark har, som kildestat med begrænset skattepligt, national hjemmel til at beskatte sådan indkomst i KSL § 2, stk. 1, nr. 4, og SEL § 2, stk. 1, litra. a Derimod indgår resultatet fra udenlandske faste driftssteder af danske foretagender ikke i et foretagendes indkomstopgørelse uden for international sambeskatning.

Fortjeneste, opnået ved salg eller anden afståelse af (anlægs)aktiver, der indgår i det faste driftssted, er ikke omfattet af art. 7, men er i stedet omfattet af art. 13.

**Note 8:**
Definerer "Fortjeneste ved erhvervsvirksomhed". Ifølge Technical Explanation skal bestemmelsen ses som udtryk for en amerikansk praksis, hvorefter en virksomheds levering af tjenesteydelser skal betragtes som omfattet af art. 7 og ikke af art. 14. Det fremhæves også, at lejeindtægt fra udlejning af rørlig formue er omfattet.

**Note 9:**
USA kan iflg. interne regler beskatte faste driftssteder, efter de er ophørt med at eksistere. Som følg heraf er der medtaget en bestemmelse, hvorefter indkomst eller gevinst, der kan henføres til et fast driftssted, kan beskattes i den stat, hvor det faste driftssted er beliggende, selv om betalingerne er udskudt til et tidspunkt, hvor det faste driftssted ikke længere eksisterer.

Art. 7 suppleres af pkt. 3 i protokollen, hvorefter art. 7 ikke skal forhindre henholdsvis Danmark og USA i fortsat at beskatte faste driftssteder tilhørende forsikringsselskaber efter interne regler.

Danmark har, som kildestat med begrænset skattepligt, national hjemmel til at beskatte sådan indkomst i KSL § 2, stk. 1, nr. 4, og SEL § 2, stk. 1, litra a. Derimod indgår resultatet fra udenlandske faste driftssteder af danske foretagender ikke i et foretagendes indkomstopgørelse uden for international sambeskatning.

Fortjeneste, opnået ved salg eller anden afståelse af (anlægs)aktiver, der indgår i det faste driftssted, er ikke omfattet af art. 7, men er i stedet omfattet af art. 13.

Se udvalgte domme og afgørelser med relation til artikel 7 I OECD-modeloverenskomsten.

**(8)**
**Artikel 8 Skibs- og luftfart**
Art. 8 afviger fra OECD-modeloverenskomstens art. 8.
**Note 1:**

Ifølge art. 8, stk. 1, kan fortjeneste ved drift af skibe og fly i international trafik kun beskattes i den stat, hvori foretagendet er hjemmehørende. Fordelingen af beskatningsretten bliver dermed væsentligt anderledes end den, der sker efter reglerne i art. 5 og 7. Dernæst er der tale om en borteliminering af fast driftsstedsprincippet, jfr. art. 5 og art. 7, stk. 1. Den stat, hvori foretagendet er hjemmehørende, er i medfør af art. 8 tildelt beskatningsretten til foretagendets globale indkomst fra drift af skibe og luftfartøjer i international trafik.
**Note 2:**
Udtrykket »international trafik« er defineret i art. 3, stk. 1, litra d. Ifølge definitionen betyder "international trafik" enhver transport med skib eller luftfartøj, bortset fra tilfælde, hvor sådan transport udelukkende finder sted mellem pladser i en kontraherende stat. Artiklen omfatter således både udleje af bemandede og ubemandede skibe og fly. Artiklen omfatter også fortjeneste ved indenlandsk transport, der er knyttet til den internationale trafik.

Den omhandlede fortjeneste består først og fremmest af fortjeneste, som foretagendet direkte har opnået ved transport af passagerer eller gods med skibe eller luftfartøjer i international trafik (uanset om skibene eller luftfartøjerne ejes eller lejes af foretagendet eller på anden måde stilles til rådighed for foretagendet). Således som international trafik har udviklet sig udfører skibs- og luftfartsforetagender uvægerligt en lang række aktiviteter, der har forbindelse med deres internationale skibs- og luftfartsvirksomhed. Bestemmelsen dækker også fortjeneste fra aktiviteter, der er direkte forbundet med sådan virksomhed, såvel som fortjeneste fra aktiviteter, der ikke er direkte forbundet med den internationale skibs- og luftfartsvirksomhed, men som kan betegnes som virksomhed af hjælpende karakter.

Enhver virksomhed, der udøves primært i forbindelse med foretagendets transport af passagerer eller gods med skib eller luftfartøj i international trafik, skal anses for at være direkte forbundet med denne transport.

En virksomhed, som foretagendet ikke behøver at udøve i forbindelse med dets drift af skibe og luftfartøjer i international trafik, men som yder et mindre bidrag hertil, og som er så nært forbundet med driften, at virksomheden ikke skal anses som et særskilt forretningsområde eller en særskilt indkomstkilde for foretagendet, skal anses for at være en virksomhed af hjælpende karakter for driften af skibe og luftfartøjer i international trafik.

Fortjeneste ved leasing af skibe og fly, der er chartret med fuld udrustning, bemanding og forsyning, skal behandles som fortjeneste ved transport af passagerer eller gods. Ellers vil megen skibs- eller luftfartsvirksomhed ikke være omfattet af bestemmelsens anvendelsesområde. Art. 7, og ikke art. 8, finder imidlertid anvendelse på fortjeneste ved leasing af skibe eller fly på bareboat charter-basis, undtagen hvor der er tale om en hjælpevirksomhed i et foretagende, der driver international skibs- eller luftfartsvirksomhed.

Den kan dog være omfattet af art. 8, hvis den undtagelsesvis er tale om en hjælpevirksomhed i forhold til den primære drift af skibe eller fly i international trafik. Se pkt. 5 i kommentaren til modeloverenskomstens art. 8. Fortjeneste ved drift af et skibsværft er ikke omfattet af art. 8. Se pkt. 12 i kommentaren til art. 8.

Fortjeneste erhvervet af et foretagende ved transport af passagerer eller gods på anden måde end ved drift af skibe eller luftfartøjer i international trafik er omfattet af bestemmelsen i det omfang, denne transport er direkte knyttet til foretagendets drift af skibe eller luftfartøjer i international trafik eller kan betegnes som virksomhed af hjælpende karakter. Et eksempel kan være et foretagende beskæftiget med international transport, der får nogle af dets passagerer eller noget af dets gods transporteret internationalt af andre foretagenders skibe eller luftfartøjer, f.eks. i henhold til "code sharing"- eller "slot charter"-aftaler, eller for at drage fordel af en tidligere afsejling. Et andet eksempel er et luftfartsselskab, der driver en busforbindelse mellem en by og dens lufthavn fortrinsvis for at stille transport til rådighed til og fra denne lufthavn for dets passagerer på internationale ruter.

Et yderligere eksempel er et foretagende, der transporterer passagerer eller gods med skibe eller luftfartøjer i international trafik og påtager sig at hente passagererne eller godset i den stat, hvor transporten begynder, eller efter at transportere passagererne eller levere godset på bestemmelsesstedet, ved hjælp af enhver form for indenlandsk transport udført af andre foretagender.

I et sådant tilfælde er enhver fortjeneste, der opnås af det førstnævnte foretagende ved at arrangere transporten, der udføres af andre foretagender, omfattet af bestemmelsen, selv om den fortjeneste, der opnås af de andre foretagender, der udfører den indenlandske transport, ikke er omfattet af bestemmelsen.

Såfremt et foretagende ud over drift af skibe og fly i international trafik også driver anden erhvervsvirksomhed, bliver denne anden virksomhed beskattet efter art. 5 og 7. Kommentarerne nr. 20 og 21 til art. 8 i modeloverenskomsten redegør for nogle af de problemstillinger, der kan opstå, når indkomst skal fordeles mellem almindelig virksomhed og virksomhed i form af international trafik.

Art. 8 omhandler som nævnt først og fremmest fortjeneste, som foretagendet har opnået ved transport af passagerer eller gods i international trafik. Den omhandler dog også fortjenester på aktiviteter, som efter deres karakter har nær tilknytning til foretagendets transport af passagerer eller gods. Følgende hjælpevirksomheder anses efter kommentaren også for omfattet af bestemmelsen:

- udlejning af skib eller fly med fuld udrustning, besætning og forsyninger samt udlejning på bareboat basis.

- salg af billetter på andre foretagenders vegne.

- drift af busforbindelse mellem en by og dens lufthavn.

- fortjeneste opnået ved at arrangere transport af passagerer eller gods til eller fra havn eller lufthavn, også når selve transporten foretages af et andet foretagende.

- reklame og kommerciel propaganda for andre foretagender på salgssteder eller i blade der omdeles ombord på skibe eller fly.

- lastbiltransport af varer mellem et lager og en havn eller lufthavn.

- containerleasing når containere transporteres ombord på skib eller fly i international trafik, herunder også fortjeneste vedrørende den del af leasingperioden, hvor containeren er i indenlandsk transport til eller fra havn eller lufthavn, samt opbevaring ved havn eller lufthavn.

- Fortjeneste opnået ved, at støttefaciliteter eller personel, der primært opretholdes af hensyn til egen international trafik, stilles til rådighed for andre foretagender, herunder deltagelse i en pool, et forretningsfællesskab eller en international driftsorganisation.

- drift af et hotel udelukkende med det formål at yde overnatningsmulighed for transitpassagerer, hvis omkostningerne ved sådan service er indbefattet i billetprisen.

Af kommentarerne fremgår også, at følgende aktiviteter ikke indgår i bestemmelsen: Fortjeneste ved fiskeri, sandsugning og bugsering er ikke omfattet af modeloverenskomstens art. 8, medmindre parterne indsætter en særlig bestemmelse om det i dobbeltbeskatningsoverenskomsten. Se pkt. 17.1. i kommentaren til art. 8. Danmark medtager ikke sådanne særlige bestemmelser i sine overenskomster. Se SKM2004.117.ØL/TfS 2004, 312 om fiskeri.SKM2004.117.ØL/TfS 2004, 312

Fortjeneste, opnået ved salg eller anden afståelse af skibe eller fly, der anvendes i international trafik, er ikke omfattet af art. 8, men er i stedet omfattet af art. 13.

**Note 3:**

I stk. 2 defineres fortjeneste ved skibs- og luftfartsvirksomhed. Artiklen omfatter således både udleje af bemandede og ubemandede skibe og fly.

**Note 4:**

Artiklen omfatter også fortjeneste ved indenlandsk transport, der er knyttet til den internationale trafik.

**Note 5:**

Ud over fortjeneste ved drift af skibe og fly omfatter bestemmelserne efter stk. 3 også indkomst ved anvendelse, rådighedsstillelse og udleje af containere, der anvendes i international trafik. Herved sikres især, at danske rederiers fortjeneste ved containertrafik eller containerudleje kun kan beskattes i Danmark.

**Note 6:**

I stk. 4 er optaget en bestemmelse, om at stk. 1 og 3 også gælder for konsortier m.v. Bestemmelsen har navnlig betydning i relation til SAS. I den forbindelse indeholder punkt 1 i protokollen en omtale af SAS og dettes

særlige konstruktion, herunder det amerikanske SAS, Inc. Heri bestemmes, at SAS Danmarks A/S' andel af SAS' samlede indkomst er omhandlet af artikel 8.

**Note 7:**

Efter stk. 5 kan fortjeneste i relation til supplyvirksomhed eller drift af bugserbåde e.l., der vedrører efterforskning og udnyttelse af naturforekomster uden for kysten i den anden kontraherende stat kun beskattes i den stat, hvor foretagendet er hjemmehørende.

Se udvalgte domme og afgørelser med relation til artikel 8 I OECD-modeloverenskomsten.

art. 9

(9)

### Artikel 9 Indbyrdes Forbundne foretagender

Art. 9 svarer til OECD-modeloverenskomstens art. 9. Artiklen vedrører transfer pricing, det vil sige prisfastsættelse – eller rettere justering af prisfastsættelsen – af grænseoverskridende, koncerninternt handel. Artiklen fastslår, at såfremt såkaldt forbundne foretagender (typisk moder-/datterselskaber) indbyrdes aftaler eller fastsætter vilkår vedrørende deres kommercielle eller finansielle forbindelser, som afviger fra, hvad uafhængige parter ville have aftalt i en lignende situation, kan hver stats skattemyndigheder regulere den heraf flydende fortjeneste som om, der havde været handlet på almindelige markedsvilkår. Den stat, der foretager den første regulering (almindeligvis en indkomstforhøjelse), har dermed foretaget det, som teknisk set betegnes som den primære indkomstregulering. Det princip, der anvendes ved skattemyndighedernes eventuelle regulering af indkomsten, betegnes som armslængdeprincippet. Hvis den ene stat, begrundet i anvendelse af armslængdeprincippet, forhøjer et foretagendes indkomst, vil der komme til at foreligge en såkaldt økonomisk dobbeltbeskatning (når to stater beskatter samme indkomst hos to forskellige skattesubjekter), med mindre det andet koncernselskab i transaktionen får en modsvarende lempelse i sin indkomst (alternativt i sin indkomstskat). Den såkaldt økonomiske dobbeltbeskatning (her i art. 9 adskiller sig fra den juridiske dobbeltbeskatning, hvor to stater beskatter en person af samme indkomst). Opmærksomheden henledes på, at der en forlænget ligningsperiode for transfer pricing reguleringer, SFL § 26, stk. 5

**Note 1:**

Armslængdeprincippet er nationalt defineret i LL § 2, stk. 1. Anvendelsesområdet for art. 9, stk. 1, er dog bredere end den nationale hjemmel, idet artiklens stk. 1 definerer forbundne foretagender som alle situationer, hvori et foretagende eller personer direkte eller indirekte deltager i ledelsen af, i kontrollen med eller i kapitalen i et foretagende i den anden stat eller i begge stater. Den nationale hjemmel i LL § 2, stk. 1, forudsætter derimod direkte eller indirekte kontrol af mere end 50 pct. af kapitalen eller stemmerne, for at der kan ske en regulering af fortjenesten. Art. 9 vil alene kunne finde anvendelse, såfremt den danske definition af armslængdeprincippet – og tilsvarende at den anden aftalestats definition af armslængdeprincippet også er opfyldt. Art. 9, stk. 1, litra a, taler om "et foretagende". Dette begreb er defineret i overenskomstens art. 3, stk. 1, litra c, og betyder "udøvelsen af enhver forretningsmæssig virksomhed", uanset virksomhedsform.

**Note 2:**

Når art. 9, stk. 1, litra b, taler om "personer", skal man være opmærksom på, at begrebet "person" her, jf. art. 3, stk. 1, litra a, omfatter "en fysisk person, et selskab og enhver anden sammenslutning af personer". LL § 2, stk. 1, omfatter også fysiske personers bestemmende indflydelse.

Artiklens stk. 2 vedrører den såkaldt korresponderende regulering af fortjenester reguleret i henhold til stk. 1.

**Note 3:**

Såfremt den ene stats skattemyndigheder har forhøjet indkomsten hos foretagendet i denne stat, opstår der en primær indkomstjustering.

**Note 4:**

Herefter vil et foretagende i koncernen sædvanligvis anmode skattemyndighederne i den anden stat om at få foretaget en modsvarende nedsættelse af indkomsten dér, betegnet som den korresponderende regulering, således at

Copyright © 2024 Karnov Group Denmark A/S

armslængdeprincippet finder anvendelse for begge de forbundne foretagender.

Ifølge LL § 2, stk. 6, er det en forudsætning for at kunne foretage en sådan regulering her i landet, den korresponderende regulering, at der er sket en hertil svarende forhøjelse af skatteansættelsen i udlandet (den primære regulering) – enten hos et koncernforbundet selskab eller i forholdet mellem hovedkontor/filial. Den korresponderende regulering forudsætter i øvrigt, at de to staters skattemyndigheder er enige om opgørelsen af indkomsterne efter armslængdeprincippet. Såfremt der ikke kan opnås enighed om en ændret indkomstansættelse mellem de to staters skattemyndigheder, vil sagen skulle søges løst efter mutual agreement-bestemmelsen i art. 25. Ud over den primære og den korresponderende regulering (en given indkomstforhøjelse i det ene selskab og en hertil svarende nedsættelse i det andet handlende selskab), kan der blive tale om yderligere indkomstreguleringer i form af såkaldte sekundære justeringer. Sekundære reguleringer er en betegnelse for regulering af de værdier, der er overført fra det ene foretagende det andet foretagende via transfer pricing transaktionen. Overenskomsten omhandler ikke disse sekundære reguleringer og art. 9, stk. 2 hindrer ikke skatteadministrationerne i at foretage sekundære reguleringer.

Da USA ikke er medlem af EU, vil en dobbeltbeskatning vedrørende transfer pricing ikke kunne løses efter reglerne I EU-Voldgiftskonventionen/EU-voldgiftsdirektivet.

Artiklen fastslår, at såfremt såkaldt forbundne foretagender indbyrdes aftaler eller fastsætter vilkår vedrørende deres kommercielle eller finansielle forbindelser, som afviger fra, hvad uafhængige parter ville have aftalt i en lignende situation, kan hver stats skattemyndigheder regulere den heraf flydende fortjeneste som om, der havde været handlet på almindelige markedsvilkår. Den stat, der foretager den første regulering (almindeligvis en indkomstforhøjelse), har dermed foretaget det, som teknisk set betegnes som den primære regulering. Det princip, der anvendes ved skattemyndighedernes eventuelle regulering af indkomsten, betegnes som armslængdeprincippet.

Se udvalgte domme og afgørelser med relation til artikel 9 i OECD-modeloverenskomsten.

**(10)**

**Artikel 10 Udbytte**

Hovedreglen er den, at beskatningsretten til udbytter er fordelt mellem bopælsstaten og kildestaten. I praksis betyder nationale regler imidlertid, at såfremt udbyttemodtageren er et selskab, vil der i mange tilfælde alligevel være skattefrihed for betaleren af udbytterne. Det er den såkaldt retmæssige ejer/beneficial owner af udbytterne, der kan påberåbe sig overenskomstens fordele. Begrebet »retmæssig ejer« skal ikke forstås i en snæver te,0,knisk sammenhæng, men snarere ud fra en formålsfortolkning af overenskomsten, herunder hensynet til at undgå eller omgå beskatning. En agent eller nominee er ikke retmæssige ejer. Det samme gælder in conduitselskab (»gennemstrømningsenhed«) eller såkaldte fiduciaries, som er personer, der formelt er ejere af et aktiv, men hvor afkastet tilkommer en »beneficiary«, som er en anden end den formelle ejer.

Begrebet beneficial owner er beskrevet i kommentarerne til modeloverenskomsten

Højesteret har i (sagerne 69/2021, 79/2021 og 70/2021 Dom afsagt den 9. januar 2023) – bl.a. taget stilling fortolkningen af begrebet.

Højesteret anfører, at efter art. 10, stk. 2, kan udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, alene kan beskattes i den førstnævnte stat med en vis procent af bruttobeløbet af udbyttet, såfremt modtageren er udbyttets "retmæssige ejer" ("beneficial owner"). Efter art. 3, stk. 2, gælder det, at ethvert udtryk, som ikke er defineret i overenskomsten, skal tillægges den betydning, som det har i den kontraherende stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse. Udtrykket "retmæssig ejer" er ikke defineret i overenskomsterne. Da udtrykket afgrænser de kontraherende staters indbyrdes beskatningskompetence, finder Højesteret, at det følger af sammenhængen, at betydningen ikke kan bero på de kontraherende staters respektive lovgivninger. Højesteret tiltræder derfor, at udtrykket "retmæssig ejer" må forstås i lyset af OECD-modeloverenskom-

sten, herunder OECD's relevante kommentarer hertil om imødegåelse af misbrug.

I dansk ret har der været tvivl om, hvorvidt betydningen af begreberne retmæssig ejer/beneficial owner og rette indkomstmodtager er ens.

Sagens parter gjorde gældende, at det af forarbejderne til en ændring i 2001 af SEL § 2, stk. 1, litra c), fremgår, at lovgiver har forudsat en forståelse af begrebet "retmæssig ejer" som ikke bygger på OECD-modellens definitioner, men derimod på udtrykket "rette indkomstmodtager" i dansk skatteret.

Højesteret udtalte hertil, at formålet med den nævnte lovændring var at forhindre det misbrug af den hidtil gældende skattefrihed for udbyttebetaling, der fulgte af etablering af danske holdingselskaber, som alene havde til formål at omgå andre landes beskatning, og samtidig tage højde for de undtagelser til hovedreglen om kildebeskatning, som Danmark er forpligtet til at have efter f.eks. dobbeltbeskatningsoverenskomster. Det må på den baggrund have formodningen klart imod sig, at der ved lovændringen skulle være forudsat en anden forståelse af udtrykket "retmæssig ejer" i skatteretlige dobbeltbeskatningsoverenskomster end den, der fremgår af OECD's modeloverenskomst med kommentarer, således at der skulle ske skattefritagelse i videre omfang end påkrævet efter overenskomsten. Som anført at landsretten indeholder forarbejderne til lovændringen i 2001 ikke nogen omtale af udtrykket "retmæssig ejer" (eller "rette indkomstmodtager"). Højesteret fandt på denne baggrund, at der heller ikke i øvrigt er holdepunkter for en anden forståelse af udtrykket "retmæssig ejer" end den anførte. Det, som skatteministeren i besvarelser til Folketinget anførte om muligheder for bl.a. omstrukturering og indskydelse af mellemholdingselskaber, kan ikke forstås på den måde, at det var hensigten at tillade misbrug i form af "kunstgreb" mv., som efter modeloverenskomsten og de tilknyttede kommentarer netop begrunder, at der ikke er skattefritagelse.

Art. 10 i denne overenskomst afviger fra OECD-modeloverenskomstens art. 10.

**Note 1:**

Art. 10, stk. 1, fastslår, at udbytte kan beskattes i den stat, hvor modtageren er hjemmehørende, hvad enten modtageren er en fysisk eller juridisk person. Bestemmelsen svarer til modeloverenskomstens art. 10, stk. 1. Reglerne om skattepligt af udbytter og udlodninger fremgår af LL § 16 A. For selskaber er der særlige fritagelsesregler for udbytter iSEL § 13. Den begrænsede skattepligt omfatter også maskeret udbytte. Skatteministeren har besluttet, at der ikke skal ske indeholdelse af udbytteskat, når der opnås dispensation fra udbyttebeskatningen efter LL § 16 A, stk. 3, nr. 2, jf. TfS 1992, s. 1013. Bestemmelsen i selskabsskattelovens § 2, stk. 1, litra c, om skattefrihed for datterselskabsudbytter skal fortolkes således, at det er tilstrækkeligt, at udbyttebetalingen er dækket af overenskomsten. Det vil sige, at der skal ske nedsættelse (eller frafald) af den danske beskatning, uanset om den danske beskatning er højere eller lavere end satsen fastsat i overenskomsten. Et udenlandsk moderselskab vil derfor kunne modtage skattefri udbytter fra Danmark, når det er retmæssig ejer af udbyttet, og udbyttebetalingen er dækket af overenskomsten, selvom Danmark i henhold til overenskomsten har ret til at indeholde skat, der overstiger den aktuelle danske skattesats af udbytterne, og overenskomsten således ikke kræver reduktion af den danske beskatning. Reglerne i overenskomsten skal imidlertid altid sammenholdes med de rent nationale danske regler om beskatning af udbytter. Såfremt udbetaling af udbytter allerede er skattefrie efter nationale regler, er skattefriheden i overenskomsten uden selvstændig betydning. Omvendt vil overenskomsten finde anvendelse, hvis den stiller den skattepligtige gunstigere end de rent nationale regler. Se KSL § 65, stk. 4, og BEK nr. 2104 af 23/11/2021, § 30. For meget indeholdt udbytteskat tilbagesøges digitalt via skat.dk.

Der er en 5-årig forældelsesfrist for dansk udbytteskat, jf. KSL § 67A og forarbejderne dertil (LFF 2010 75). Skattestyrelsen har dog ved styresignalet SKM2016.263.SKAT meddelt, at Skattestyrelsen med virkning fra tilbagesøgningsanmodning modtaget efter den 9/9 2016 alene anser den 5-årige frist for at gælde for Skatteforvaltningens krav på kildeskat, mens skatteydernes krav på refusion af kildeskatter et undergivet en 3-årig forældelse

**Note 2:**

Efter overenskomstens art. 10, stk. 2, kan udbyttet i visse tilfælde tillige beskattes i kildestaten (den stat, hvori det udbetalende selskab har hjemme). Den almindeligt gældende regel er ifølge KSL § 65 den, at selskaber omfattet af SEL § 1, stk. 1, nr. 1, 2, 2e, 2h, 4 og 5a, i forbindelse med udlodning af udbytte sædvanligvis skal indeholde 27 pct. i udbytteskat. Efter overenskomstens art. 10, stk. 2, litra a, skal der indeholdes 5 pct. i udbytteskat, hvis udbyttemodtageren er et selskab, som direkte ejer mindst 10 pct. I det udbytteudbetalende selskab. Der er ikke fastsat nogen minimums ejerperiode.

**Note 3:**

I alle andre tilfælde kan der indeholdes 15%.

I medfør af KSL § 65, stk. 5, skal der ikke indeholdes udbytteskat, når modtageren er et selskab hjemmehørende i udlandet, der ikke er begrænset skattepligtig af udbyttet i medfør af SEL § 2, stk. 1, litra c. Det er en forudsætning for fritagelse for indeholdelse af udbytteskat, at der afgives en udbytteattest. I den modsatte situation, hvor udbyttemodtageren er hjemmehørende i Danmark, og den anden stat har indeholdt en højere udbytteskat end dobbeltbeskatningsoverenskomsten anviser, skal der rettes henvendelse til skattemyndighederne i den pågældende stat, og de nærmere regler for tilbagesøgningen må oplyses derfra.

**Note 4:**

Der findes ikke en hertil svarende bestemmelse i OECD-modellen. Stk. 3 modificerer kildestatens beskatningsret efter stk. 2. Såfremt betingelsen anført i stk. 3 opfyldes, har kildestaten alligevel ikke ret til at indeholde kildeskatter efter stk. 2.

Såfremt det modtagende selskab ejer, direkte eller indirekte, gennem en eller flere personer, der er hjemmehørende i USA eller i Danmark, aktier, der repræsenterer 80 pct. eller mere af stemmerettighederne i det selskab, som udbetaler udbyttet, igennem en 12 måneders periode, der udløber den dag, hvor retten til udbyttet er besluttet, og samtidig opfylder nærmere bestemte kriterier, kan kildelandet ikke indeholde nogen udbytteskat, uanset bestemmelserne i art. 10, stk. 2. Det er dog et krav, at nogle nærmere bestemte dele af art. 22 (Limitation of Benefits) også er opfyldte.

**Note 5:**

Skattefriheden efter stk. 3 omfatter også tilfælde, hvor udbyttemodtageren er en kvalificeret offentlig enhed, som er hjemmehørende i den anden kontraherende stat, og som ikke kontrollerer den, der udbetaler udbyttet. Begrebet "en kvalificeret offentlig enhed" er defineret i overenskomstens art. 3, stk. 1, litra i).

**Note 6:**

Endelig omfatter stk. 3 en pensionskasse, som omtalt i art. 22, stk. 2, litra e) (Limitation of Benefits), der er hjemmehørende i den anden kontraherende stat, forudsat at sådan udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

Det vil afhænge af kildestatens interne regler, om beskatningsretten udnyttes. Se om Danmarks interne regler for beskatning af udbytte i selskabskonstruktioner samt om begrebet retmæssig ejer samt LL § 3.

**Note 7:**

Efter stk. 4 gælder der særlige regler, hvis udbyttet udbetales af et amerikansk "Regulated Investment Company" (RIC) eller af en amerikansk "Real Estate Investment Trust" (REIT). Udbytter fra RICs kan altid beskattes med højst 15 pct., mens udbytter fra REITs kan beskattes med højst 15 pct., når visse betingelser i relation til bl.a. ejerskab og spredning af investeringer er opfyldt. RICs, der især investerer i værdipapirer og REITs, der investerer i fast ejendom, er typisk kendetegnet ved, at de ikke beskattes af udloddet fortjeneste. Bestemmelsen i stk. 3 er indsat efter ønske fra USA for at undgå, at der opnås ikke tilsigtede fordele ved at investere i RICs og REITs gennem selskaber i stedet for direkte.

**Note 8:**

Art. 10, stk. 5, fastlægger, hvad der skal forstås ved udbytte. Indholdet svarer stort set til OECD-modellens art. 10, stk. 3. Såfremt Danmark er kildestat, er det dansk lovgivning, som kvalificerer, hvad der skal forstås ved udbytte. Danmark forbeholder sig i kommentarerne til OECD-modeloverenskomsten retten til i visse tilfælde at anse salgsprisen, der hidrører fra salg af aktier,

for t være udbytte omfattet af art. 10. Se hertil f.eks. bestemmelsen I SEL § 2 D.

**Note 9:**

Ifølge dobbeltbeskatningsoverenskomstens art. 10, stk. 6, der nogenlunde svarer til OECD-modeloverenskomstens art. 10, stk. 4, finder reglerne om den begrænsede udbytteskat i art. 10 ikke anvendelse på udbytte, der indgår i et fast driftssted eller i et fast sted i kildestaten, såfremt aktiebesiddelsen har direkte forbindelse med det faste driftssted eller det faste sted. Udbytterne behandles i stedet efter reglerne i art. 7 (fast driftssted) eller art. 14 (frit erhverv).

**Note 10:**

Stk. 7 indeholder et forbud imod, at den ene af overenskomststaterne beskatter udbytte, som udbetales af et selskab hjemmehørende i den anden aftalestat, under påberåbelse af, at hovedparten af selskabets fortjeneste er opnået i førstnævnte stat. Bestemmelsen er selvfølgelig ikke til hinder for, at udbytte, der modtages af aktionærer i førstnævnte stat, beskattes dér. Reglen skal ses på baggrund af det faktum, at visse stater ikke blot beskatter udlodninger fra dér hjemmehørende selskaber, men også udlodninger fra ikke-hjemmehørende selskaber, såfremt udlodningerne kan henføres til fortjenester, der er erhvervet på deres territorium. Bestemmelsen svarer indholdsmæssigt nogenlunde til OECD-modeloverenskomstens **art. 10**, stk. 5

**Note 11:**

Bestemmelsen muliggør amerikansk beskatning af et fast driftssted her i landet i form af en branch profits tax (se nærmere i Technical explanation). Art. 10, stk. 8, og stk. 9, er dermed uden betydning for dansk beskatning. Bemærk, at Skatteministeriet i TfS 2000, 394 har udtalt, at skattemyndighederne på begæring også skal foretage attestation for pensionskasser og udloddende investeringsforeninger, uanset at de er skattefritaget efter SEL § 3 Se udvalgte domme og afgørelser med relation til artikel 10 I OECD-modeloverenskomsten.

**(11)**

**Artikel 11 Renter**

Art. 11 regulerer de samme forhold som OECD-modeloverenskomstens art. 11, det vil sige fordelingen af beskatningen af renteindtægter. Ifølge modeloverenskomstens art. 11, stk. 1 og 2, tilkommer beskatningsretten til renter såvel kildestaten (den stat, hvori renterne tilskrives, eller hvorfra de udbetales) som den stat, hvori den »retmæssige ejer« (rentemodtageren) er hjemmehørende.

Det er den såkaldt retmæssige ejer af renterne, der kan påberåbe sig overenskomstens fordele.

Begrebet beneficial owner er beskrevet i kommentarerne til modeloverenskomsten.

Højesteret har i (sagerne 69/2021, 79/2021 og 70/2021 Dom afsagt den 9. januar 2023) bl.a. taget stilling fortolkningen af begrebet.

Højesteret anfører, at efter art. 10, stk. 2, kan udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, alene kan beskattes i den førstnævnte stat med en vis procent af bruttobeløbet af udbyttet, såfremt modtageren er udbyttets "retmæssige ejer" ("beneficial owner"). Efter art. 3, stk. 2, gælder det, at ethvert udtryk, som ikke er defineret i overenskomsten, skal tillægges den betydning, som det har i den kontraherende stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse. Udtrykket "retmæssig ejer" er ikke defineret i overenskomsterne. Da udtrykket afgrænser de kontraherende staters indbyrdes beskatningskompetence, finder Højesteret, at det følger af sammenhængen, at betydningen ikke kan bero på de kontraherende staters respektive lovgivninger. Højesteret tiltræder derfor, at udtrykket "retmæssig ejer" må forstås i lyset af OECD-modeloverenskomsten, herunder OECD's relevante kommentarer hertil om imødegåelse af misbrug. Ifølge OECD-modeloverenskomstens art. 11, stk. 1 og 2, tilkommer beskatningsretten til renter såvel kildestaten (den stat, hvori renterne tilskrives, eller hvorfra de udbetales) som den stat, hvori den "retmæssige ejer" (rentemodtageren) er hjemmehørende.

I dansk ret har der været tvivl om, hvorvidt betydningen af begreberne retmæssig ejer/beneficial owner og rette indkomstmodtager er ens.

Sagens parter gjorde gældende, at det af forarbejderne til en ændring i 2001 af SEL § 2, stk. 1, litra c) fremgår, at lovgiver har forudsat en forståelse af begrebet "retmæssig ejer" som ikke bygger på OECD-modellens definitioner, men derimod på udtrykket "rette indkomstmodtager" i dansk skatteret.

Højesteret udtalte hertil, at formålet med den nævnte lovændring var at forhindre det misbrug af den hidtil gældende skattefrihed for udbyttebetaling, der fulgte af etablering af danske holdingselskaber, som alene havde til formål at omgå andre landes beskatning, og samtidig tage højde for de undtagelser til hovedreglen om kildebeskatning, som Danmark er forpligtet til at have efter f.eks. dobbeltbeskatningsoverenskomster. Det må på den baggrund have formodningen klart imod sig, at der ved lovændringen skulle være forudsat en anden forståelse af udtrykket "retmæssig ejer" i de relevante dobbeltbeskatningsoverenskomster end den, der fremgår af OECD's modeloverenskomst med kommentarer, således at der skulle ske skattefritagelse i videre omfang end påkrævet efter overenskomsterne. Som anført at landsretten indeholder forarbejderne til lovændringen i 2001 ikke nogen omtale af udtrykket "retmæssig ejer" (eller "rette indkomstmodtager"). Højesteret fandt på denne baggrund, at der heller ikke i øvrigt er holdepunkter for en anden forståelse af udtrykket "retmæssig ejer" end den anførte. Det, som skatteministeren i besvarelser til Folketinget anførte om muligheder for bl.a. omstrukturering og indskydelse af mellemholdingselskaber, kan ikke forstås på den måde, at det var hensigten at tillade misbrug i form af "kunstgreb" mv., som efter modeloverenskomsten og de tilknyttede kommentarer netop begrunder, at der ikke er skattefritagelse.

**Note 1:**

Art. 11, stk. 1, svarer til OECD-modeloverenskomsten, hvorefter renter udbetalt fra en stat, kildestaten, til en modtager i den anden stat, kan beskattes i den stat, hvori modtageren er hjemmehørende. Ifølge OECD-modellens art. 11, stk. 2, kan kildestaten (den stat, hvorfra renterne udbetales) også beskatte renterne. En sådan bestemmelse er ikke medtaget i den dansk-amerikanske overenskomst.

**Note 2:**

I art. 11, stk. 2, defineres udtrykket »rente«. Formuleringen er lidt anderledes end i OECD-modellen.

Udtrykket "renter" betyder i almindelighed indkomst fra gældsfordringer af enhver art, uanset om de er sikret ved pant i fast ejendom eller ikke, og hvad enten de indeholder en ret til andel i fortjeneste eller ikke. Udtrykket "gældsfordringer af enhver art" omfatter klart kontantindskud og sikkerhedsstillelse i form af penge, såvel som statsgældsbeviser, obligationer og forskrivninger (begrebet kommer fra det engelske "debentures", der kan oversættes som et finansielt redskab brug af en låntager, hvilket f.eks. kan være en erhvervsvirksomhed, når der skal rejses kapital til virksomheden), selv om de tre sidste udtrykkeligt nævnes på grund af deres betydning og visse særegenheder, de kan frembyde. Det anerkendes på den ene side, at pantebrevsrenter falder inden for kategorien indkomst fra aktiver bortset fra fast ejendom ("movable capital", "revenus de capitaux mobiliers"), selv om visse stater sidestiller dem med indkomst fra fast ejendom. På den anden side betragtes gældsfordringer, obligationer og i særdeleshed forskrivninger, som indeholder en ret til andel i debitors fortjeneste, ikke desto mindre som lån, hvis aftalen efter sin almindelige karakter klart peger i retning af, at der er tale om et rentebærende lån.

Renter af udbyttegivende gældsbreve ("participating bonds") skal normalt ikke anses for udbytte, og det samme gælder for renter af konvertible obligationer indtil det tidspunkt, hvor obligationerne rent faktisk konverteres til aktier. Renterne af sådanne gældsbreve skal imidlertid anses som udbytte, hvis lånet effektivt tager del i den risiko, som debitorselskabet løber. I situationer, hvor der må antages at foreligge tynd kapitalisering, er det undertiden vanskeligt at sondre mellem udbytte og renter, og for at undgå et muligt delvist sammenfald mellem de indkomstkategorier, der er behandlet i henholdsvis art. 10 og art. 11, skal det bemærkes, at udtrykket "renter", som

anvendt i art. 11, ikke omfatter de arter af indkomst, der er behandlet i art. 10.

Hvad særligt angår statsgældsbeviser, obligationer og forskrivninger bestemmer teksten, at overkurs og gevinster, der knytter sig dertil, er renter. Generelt kan det siges, at hvad der er renter, som er ydet i henhold til sikret lån, og som korrekt kan beskattes som sådanne i kildestaten, er alt det, som den långivende institution betaler ud over det beløb, som er betalt af låntager, det vil sige de indeløbne renter plus enhver overkurs betalt ved indfrielse eller udstedelse. Det følger heraf, at når en obligation eller et gældsbrev er udstedt til overkurs, kan det overskydende beløb, som låntager betaler ud over, hvad der er betalt til ham, udgøre en negativ rente, som kan fradrages i den pålydende rente, når det fastslås, hvad de skattepligtige renter udgør. På den anden side dækker definitionen af renter ikke enhver fortjeneste eller ethvert tab, der ikke kan henføres til en forskel mellem, hvad udsteder modtog og betalte (f.eks. en fortjeneste eller et tab, der ikke repræsenterer påløbne renter eller en emissionskurs under pari eller en overkurs, som indehaveren af værdipapirer, såsom obligationer eller forskrivninger, opnår ved salget af dem til en anden person, eller ved tilbagebetalingen af hovedstolen på et værdipapir, som han har erhvervet fra en tidligere ejer for et beløb, der er forskelligt fra det beløb, som udsteder af værdipapiret har modtaget). Afhængigt af det konkrete tilfælde kan en sådan fortjeneste eller et sådant tab anses enten erhvervsindkomst eller -tab, kapitalgevinst eller -tab eller indkomst, der er omfattet af art. 21.

Beløbet, som sælgeren af obligationen modtager, vil typisk indeholde påløbne, men endnu ikke forfaldne, renter på tidspunktet for salget af obligationen. I de fleste tilfælde vil kildestaten ikke forsøge at beskatte sådanne påløbne renter på tidspunktet for afhændelsen og vil kun beskatte erhververen af obligationen eller forskrivningen af det fulde rentebeløb, som efterfølgende betales (det antages almindeligvis i sådanne tilfælde, at den pris, som køberen betaler for obligationerne, tager højde for den fremtidige skattebetaling hos køberen af de renter, der er påløbet i sælgers favør på tidspunktet for afhændelsen). I visse tilfælde er det imidlertid således, at nogle stater sælgeren af obligationerne af de påløbne renter på tidspunktet for afhændelsen (f.eks. når en obligation er solgt til en skattefritaget enhed). Sådanne påløbne renter er dækket af definitionen af renter og kan derfor beskattes i kildestaten. I så fald skal denne stat ikke beskatte det samme beløb hos køberen af obligationerne, når renterne forfalder til betaling.

Definitionen af renter i stk. 2, første punktum, er i princippet udtømmende. Definitionen af renter i stk. 23, første punktum, finder normalt ikke anvendelse på betalinger, der ydes i henhold til visse arter af utraditionelle finansielle instrumenter, hvor der ikke er underliggende gæld (f.eks. rentesways). Definitionen finder imidlertid anvendelse i den udstrækning, hvor et lån anses for at eksistere i henhold til en "substance over form"-regel, et "abuse of rights"-princip eller enhver lignende doktrin

Stk. 2, andet punktum, undtager straftillæg som følge af for sen betaling fra definitionen af renter, men kontraherende stater er frit stillet med hensyn til at udelade dette punktum og til at behandle straftillæg som renter i deres bilaterale overenskomster. Straftillæg, der skal betales i henhold til aftale, sædvane eller skøn, er enten betaling, der beregnes i forhold til tid eller som faste beløb. I visse tilfælde kan de kombinere begge betalingsmåder. Selv om de beregnes i forhold til tid, er de ikke så meget formueindkomst som en særlig form for kompensation for det tab, kreditor lider ved debitors forsinkelse med at opfylde sine forpligtelser. Derudover gør overvejelser med hensyn til juridisk sikkerhed og praktiske hensyn det tilrådeligt at behandle alle straftillæg af denne slags, uanset den form, hvori de skal betales, på lige fod i henseende til deres skattemæssige behandling. På den anden side taler sagen mod, at to kontraherende stater fra anvendelsesområdet for art. 11 udelukke alle former for renter, som de foretrækker at behandle som udbytte.

Endelig opstår det spørgsmål, om livrenter bør ligestilles med renter. Det er opfattelsen, at det bør de ikke. På den ene side omtales livrenter, der udbetales vedrørende tidligere ansættelsesforhold, i art. 18 og omfattes af de regler, der gælder for pensioner. Selv om det er rigtigt, at de enkelte ydelser fra en købt livrente indbefatter et renteelement i forhold til købsbeløbet såvel som

et tilbagebetalingselement, og at sådanne ydelser er "fruits civils" med daglig tilvækst, ville det på den anden side være vanskeligt for mange stater at sondre mellem det element, der repræsenterer formueindkomst, og det element, der repræsenterer formuetilbagebetaling, alene med henblik på at beskatte indkomstelementet på samme måde som indkomst fra aktiver bortset fra fast ejendom. Skattelove indeholder ofte særlige bestemmelser, der klassificerer livrente som gage, løn og pensioner, og beskatter den i overensstemmelse hermed.

**Note 3:**

Såfremt der indgår renter i indkomsten af et fast driftssted i kildestaten, og den fordring, der ligger til grund for renteindtægten, har direkte forbindelse med det faste driftssted, skal sådanne renter efter art. 11, stk. 5, som svarer til OECD-modeloverenskomstens art. 11, stk. 4, beskattes som fortjeneste indvundet ved udøvelse af erhvervsvirksomhed, jf. art. 7.

Visse stater mener, at udbytter, renter og royalties, der hidrører fra kilder på deres territorium, og som betales til fysiske eller juridiske personer, der er hjemmehørende i andre stater, falder uden for anvendelsesområdet for den ordning, der er truffet for at forhindre dem i at blive beskattet både i kildestaten og i den stat, hvori den retmæssige ejer er hjemmehørende, når den retmæssige ejer har et fast driftssted i den førstnævnte stat. Stk. 4 er ikke baseret på en sådan antagelse, som undertiden betegnes som "det faste driftssteds tiltrækningskraft" ("the force of attraction of the permanent establishment"). Stykket bestemmer ikke, at renter, som tilfalder en person hjemmehørende i en kontraherende stat fra en kilde beliggende i den anden stat, ved en art juridisk formodningsregel, eller endog en fiktion, skal henføres til et fast driftssted, som denne hjemmehørende person måtte have i den sidstnævnte stat, således at denne stat ikke vil være forpligtet til at begrænse sin beskatning i et sådant tilfælde. Stykket bestemmer blot, at i kildestaten er renterne skattepligtige som en del af fortjenesten i det derværende faste driftssted ejet af den retmæssige ejer, der er hjemmehørende i den anden stat, hvis de betales i forbindelse med fordringer, der er en del af det faste driftssteds aktiver eller har direkte forbindelse med dette driftssted.

En fordring, i relation til hvilken der betales renter, har direkte forbindelse med et fast driftssted og vil derfor udgøre en del af dets erhvervsmæssige aktiver, hvis den "økonomiske" ejerskab af fordringen er allokeret til det faste driftssted i henhold til de principper, der er udarbejdet i komitéens rapport "Attribution of Profits to Permanent Establishments" (jf. især pkt. 72-97 i Del I i rapporten), med henblik på anvendelsen af art. 7, stk. 2. I dette stykke svarer "økonomisk" ejerskab af en fordring til et separat foretagendes ejerskab i indkomstskattemæssig henseende, med de dertil knyttede fordele og risici (f.eks. retten til renter knyttet til ejerskabet af fordringen og muligheden for fortjeneste eller tab fra værdistigning eller værdinedgang af fordringen).

**Note 4:**

Hvis der er en særlig forbindelse mellem debitor og kreditor, eller mellem dem begge og tredjemand, og der som følge heraf er aftalt for høj en rente i gældsforholdet, skal bestemmelserne i denne art. kun finde anvendelse på det reelle rentebeløb. Det overskydende beløb beskattes i overensstemmelse med den indkomsttype, det kvalificeres som.

Formålet med dette stykke er at begrænse virkningen af bestemmelserne vedrørende beskatning af renter i tilfælde, hvor det betalte rentebeløb som følge af en særlig forbindelse mellem den, der erlægger renterne, og den, der er berettiget til at modtage renterne, eller mellem begge disse og en tredje person, overstiger det beløb, som ville være blevet aftalt mellem betaleren og den retmæssige ejer, hvis den nævnte forbindelse ikke havde foreligget. Det bestemmes, at i et sådant tilfælde skal artiklens bestemmelser kun finde anvendelse på det sidstnævnte beløb, og at den overskydende del af renterne fortsat skal være skattepligtig i henhold til lovgivningen i de kontraherende stater under hensyntagen til de øvrige bestemmelser i denne overenskomst.

Det fremgår klart af teksten, at for at denne bestemmelse skal finde anvendelse, skal de renter, der betragtes som overskydende, skyldes en særlig forbindelse mellem den, der erlægger renterne, og den, der er berettiget til at modtage renterne, eller mellem dem begge og en tredje person. Som eksempler kunne anføres tilfælde, hvor der betales renter til en fysisk eller juridisk

person, som direkte eller indirekte kontrollerer betaleren, eller som direkte eller indirekte er kontrolleret af ham eller er underordnet en gruppe, som har en fælles interesse med ham. Disse eksempler er desuden svarende til eller analoge med de tilfælde, som art. 9 tager sigte på.

På den anden side dækker begrebet "særlig forbindelse" også blodsbeslægtede eller beslægtede ved ægteskab og i, almindelighed, ethvert interessefællesskab afvigende fra den juridiske forbindelse, der giver anledning til betalingen af renterne.

Med hensyn til den skattemæssige behandling af den overskydende del af renterne skal den nøjagtige karakter af sådan overskydende del bestemmes under hensyntagen til omstændighederne i hvert enkelt tilfælde med henblik på at fastsætte den indkomstkategori, hvorunder den henhører, med henblik på anvendelsen af de pågældende staters skattelove og overenskomstens bestemmelser. Dette stykke tillader kun regulering af den sats, ud fra hvilken renterne beregnes, og ikke omklassifikation af lånet, således at det får karakter af et bidrag til egenkapitalen. For at en sådan justering skal være mulig i henhold til art. 11, stk. 64, vil det være nødvendigt som et minimum at fjerne det indsnævrende udtryk "set i forhold til den gældsfordring, for hvilken det er betalt". Hvis der skønnes at være behov for at tydeliggøre dette yderligere, kan der efter ordet "overstiger" indsættes udtrykket "uanset af hvilken grund". Dette stykke kan ikke desto mindre have betydning ikke alene for modtageren, men også for betaleren af den overskydende rente; hvis lovgivningen i kildestaten tillader det, kan han søge at give fradrag for det overskydende beløb, idet der herved skal tages hensyn til de øvrige bestemmelser i overenskomsten. Hvis de to kontraherende stater skulle have vanskeligheder ved at fastslå, hvilke andre bestemmelser i overenskomsten der i det enkelte tilfælde måtte finde anvendelse på den overskydende del af renterne, er der intet, der forhindrer dem i at indføje yderligere tydeliggørende bestemmelser i stk. 64, sidste punktum, når blot det generelle sigte ikke ændres.

Den nationale danske hjemmel til at beskatte visse renter udbetalt fra Danmark fremgår af SEL § 2, stk. 1, litra d). Det følger af bestemmelsen, at den begrænsede skattepligt alene påhviler selskaber og foreninger mv. som nævnt i SEL § 1, stk. 1, der har hjemsted i udlandet, for så vidt de oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab eller en forening m.v. omfattet af SEL § 1 eller SEL § 2, stk. 1, litra a), har til juridiske personer som nævnt i SKL kap. 4 (kontrolleret gæld). Dette gælder dog ikke for renter af fordringer, som er knyttet til et fast driftssted omfattet af SEL § 2, stk. 1 litra a. Skattepligten omfatter ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende. Dette gælder dog kun, hvis det betalende selskab og det modtagende selskab er associeret som nævnt i dette direktiv i en sammenhængende periode på mindst 1 år, inden for hvilken betalingstidspunktet skal ligge. Skattepligten bortfalder, hvis et dansk moderselskab m.v. selv direkte eller indirekte har bestemmende indflydelse i det modtagende selskab m.v., jf. SEL § 31 C, i en sammenhængende periode på mindst 1 år, inden for hvilken betalingstidspunktet skal ligge. Skattepligten bortfalder desuden, hvis det modtagende selskab m.v. er under bestemmende indflydelse af et moderselskab m.v., der er hjemmehørende på Færøerne, i Grønland eller en stat, som har en dobbeltbeskatningsoverenskomst med Danmark, hvis dette selskab m.v. efter reglerne på Færøerne, i Grønland eller denne stat kan undergives CFC-beskatning af renterne, hvis betingelserne herfor efter disse regler er opfyldt. Skattepligten bortfalder endvidere, hvis det modtagende selskab m.v. godtgør, at den udenlandske selskabsbeskatning af renterne udgør mindst ¾ af den danske selskabsbeskatning, samt at det ikke betaler renterne videre til et andet udenlandsk selskab m.v., som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning. Der er en 5-årig forældelsesfrist for dansk renteskat, jf. KSL § 67A og forarbejderne dertil (LFF 2010 75). Skattestyrelsen har dog ved styresignalet SKM2016.263.SKAT meddelt, at Skattestyrelsen alene anser den 5-årige frist for at gælde for Skatteforvaltningens krav på kildeskat, mens

Copyright © 2024 Karnov Group Denmark A/S

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                                    2000-03-31

skatteydernes krav på refusion af kildeskatter er undergivet en 3-årig forældelse. Skatteministeriet har i TfS 2000, 394 udtalt, at danske skattemyndigheder på begæring skal attestere, at pensionskasser og udloddende investeringsforeninger, der tilbagesøger for meget indeholdt renteskat i udlandet, er skattemæssigt hjemmehørende i Danmark, uanset de er skattefritaget efter SEL § 3

**Note 5:**

Stk. 5 indeholder afvigelser fra princippet om bopælsstatsbeskatning i stk. 1. Således kan renter, der er afhængige af omsætning, fortjeneste m.v., beskattes i kildestaten med 15 pct. svarende til den generelle sats på udbytte, der er fastsat i art. 10, stk. 2, litra b). En yderligere undtagelse, der specielt vedrører amerikansk ret, er indsat på amerikansk initiativ som følge af amerikansk lovgivning om beskatning af afkast af investeringer i REMICs (Real Estate Mortgage Investment Conduits). Et REMIC har almindelige og øvrige andele (ordinary og residual shares). Afkast i form af overrente til personer, der er hjemmehørende uden for USA, og som har øvrige andele (residual shares) beskattes efter særlige regler i USA. Bestemmelsen er indsat for at ligestille danske og amerikanske investorer.

Se udvalgte domme og afgørelser med relation til art. 11 i OECD-modeloverenskomsten

**(12)**

**Artikel 12 Royalties**

Ifølge OECD-modeloverenskomsten kan royalties alene beskattes i den stat, hvori modtageren er hjemmehørende. Det er den såkaldt retmæssige ejer af royalties, der kan påberåbe sig overenskomstens fordele

Begrebet beneficial owner er beskrevet i kommentarerne til modeloverenskomsten.

Højesteret har i (sagerne 69/2021, 79/2021 og 70/2021 Dom afsagt den 9. januar 2023) bl.a. taget stilling fortolkningen af begrebet.

Højesteret anfører, at efter art. 10, stk. 2, kan udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, alene kan beskattes i den førstnævnte stat med en vis procent af bruttobeløbet af udbyttet, såfremt modtageren er udbyttets "retmæssige ejer" ("beneficial owner"). Efter art. 3, stk. 2, gælder det,, at ethvert udtryk, som ikke er defineret i overenskomsten, skal tillægges den betydning, som det har i den kontraherende stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse. Udtrykket "retmæssig ejer" er ikke defineret i overenskomsten. Da udtrykket afgrænser de kontraherende staters indbyrdes beskatningskompetence, finder Højesteret, at det følger af sammenhængen, at betydningen ikke kan bero på de kontraherende staters respektive lovgivninger. Højesteret tiltræder derfor, at udtrykket "retmæssig ejer" må forstås i lyset af OECD-modeloverenskomsten, herunder OECD's relevante kommentarer hertil om imødegåelse af misbrug.

I dansk ret har der været tvivl om, hvorvidt betydningen af begreberne retmæssig ejer/beneficial owner og rette indkomstmodtager er ens

Sagens parter gjorde gældende, at det af forarbejderne til en ændring i 2001 af SEL § 2, stk. 1, litra c) fremgår, at lovgiver har forudsat en forståelse af begrebet "retmæssig ejer" som ikke bygger på OECD-modeloverenskomstens definitioner, men derimod på udtrykket "rette indkomstmodtager" i dansk skatteret

Højesteret udtalte hertil, at formålet med den nævnte lovændring var at forhindre det misbrug af den hidtil gældende skattefrihed for udbyttebetaling, der fulgte af etablering af danske holdingselskaber, som alene havde til formål at omgå andre landes beskatning, og samtidig tage højde for de undtagelser til hovedreglen om kildebeskatning, som Danmark er forpligtet til at have efter f.eks. dobbeltbeskatningsoverenskomster. Det må på den baggrund have formodningen klart imod sig, at der ved lovændringen skulle være forudsat en anden forståelse af udtrykket "retmæssig ejer" i de relevante dobbeltbeskatningsoverenskomster end den, der fremgår af OECD's modeloverenskomst med kommentarer, således at der skulle ske skattefritagelse i videre omfang end påkrævet efter overenskomsterne. Som anført af landsretten indeholder forarbejderne til lovændringen i 2001 ikke nogen omtale af udtrykket "retmæssig ejer" (eller "rette indkomstmodtager") Højesteret fandt på denne

baggrund, at der heller ikke i øvrigt er holdepunkter for en anden forståelse af udtrykket "retmæssig ejer" end den anførte. Det, som skatteministeren i besvarelser til Folketinget anfører om muligheder for bl.a. omstrukturering og indskydelse af mellemholdingselskaber, kan ikke forstås på den måde, at det var hensigten at tillade misbrug i form af "kunstgreb" mv., som efter modeloverenskomsten og de tilknyttede kommentarer netop begrunder, at der ikke er skattefritagelse.

**Note 1:**

Art. 12 i denne overenskomst er formuleret i overensstemmelse medafviger fra OECD-modeloverenskomstens art. 12, hvorved royalty alene kan beskattes i den stat, hvori modtageren er hjemmehørende.

Hvis royaltymodtager dokumenterer at være hjemmehørende i en fremmed stat, som Danmark har indgået en DBO med, bortfalder eller nedsættes indeholdelsen af royaltyskat her i Danmark i overensstemmelse med overenskomstens bestemmelser. Når Danmarks afkald på beskatning er betinget af, at royaltyen er skattepligtig i aftalestaten, skal modtageren fremvise fornøden dokumentation herfor. Der er udarbejdet blanket 06.015 til brug herfor. Blanketten skal attesteres af myndighederne i USA. Myndighederne I USA skal attestere for, at modtageren er hjemmehørende i en stat i USA, og at udbetalingerne er skattepligtige dertil. Efter denne attestation skal blanketten indsendes til elektronisk Skattestyrelsen, hvilket skal ske via Skattestyrelsens hjemmeside. Skattestyrelsen træffer herefter afgørelse om, hvorvidt indeholdelse af royaltyskat kan nedsættes eller bortfalde. Afgørelsen meddeles den skattepligtige og den indeholdelsespligtige, jf. § 2 i BEK nr. 1442 af den 20. december 2005, og den her i landet for meget tilbageholdte royaltyskat kan tilbagebetales. Der er en 5-årig forældelsesfrist for dansk royaltyskat, jf. KSL § 67A og forarbejderne dertil (LFF 2010 75). Skattestyrelsen har dog ved styresignalet SKM2016.263.SKAT anerkendt, at Skattestyrelsen med virkning fra tilbagesøgningsanmodning modtager efter den 9. september 2016 alene anser den 5-årige frist for at gælde for Skatteforvaltningens krav på kildeskat, mens skatteydernes krav på refusion af kildeskatter er undergivet en 3-årig forældelse. Såfremt der ved udbetalingen/godskrivningen allerede foreligger en attesteret blanket 06.015 (se lige ovenfor), og bopæls- og skattepligtsforhold for den/de pågældende modtagere er uændrede, skal der ikke ske indeholdelse af dansk royaltyskat. Efter KSL § 66 A skal der i forbindelse med enhver udbetaling/godskrivning af royaltyskat fra landet ske en indberetning til skattemyndighederne (blanket 06.013). I den modsatte situation, hvor royaltymodtageren er hjemmehørende i Danmark, må anmodningen om tilbagebetaling af for meget indeholdt royaltyskat indgives til skattemyndighederne i den pågældende stat og de nærmere regler for tilbagesøgningen må oplyses derfra.

Hvor en udenlandsk modtager af royalty fra kilder her i landet udøver virksomhed gennem et fast driftssted her i landet, og hvor den eneret, som royaltyen betales for, er knyttet til dette faste driftssted er der ikke begrænset skattepligt af royaltien i sig selv, men det faste driftssted vil være begrænset skattepligtigt

Bemærk, at Skatteministeriet i TfS 2000, 394 har udtalt, at skattemyndighederne på begæring også skal foretage attestation for pensionskasser og udloddende investeringsforeninger, uanset de er skattefritaget efter SEL § 3 .

**Note 2:**

Begrebet royalties er defineret i stk. 2. Bestemmelsen adskiller sig fra modeloverenskomsten. Royalties omfatter ifølge stk. 2, litra a), betalinger af enhver art, der modtages som vederlag for anvendelsen af eller retten til at anvende enhver ophavsret til et litterært, kunstnerisk, videnskabeligt eller andet arbejde (herunder computer software, spillefilm, lyd- eller videobånd eller disketter og andre midler til gengivelse af billede og lyd), ethvert patent, varemærke, mønster eller model, tegning, hemmelig formel eller fremstillingsmetode, eller anden lignende rettighed eller aktiv, eller for oplysninger om industrielle, kommercielle eller videnskabelige erfaringer. Som det ses, omfatter royalty her også rettighederne til computersoftware, spillefilm, lyd- og videobånd samt disketter og andre medier til gengivelse af billede og lyd.

**Note 3:**

I litra b) er der indsat en bestemmelse, som ikke indgår i OECD-modellen. Art. 12 omfatter herefter også fortjeneste erhvervet ved afhændelse af ethvert aktiv som nævnt i art. 12, stk. 2, litra a), forudsat at en sådan fortjeneste er afhængig af produktivitet, anvendelse eller videresalg af aktivet. Fortjenester, der ikke er omfattet af art. 12, vil i stedet være omfattet af art. 13.

Betalinger, der alene er erlagt for at opnå eksklusiv ret til at sælge et produkt eller udføre en tjenesteydelse inden for et givent område, udgør ikke royalties, da de ikke er erlagt som vederlag for anvendelsen af eller for retten til at anvende et formuegode, der er omfattet af definitionen. Disse betalinger, der bedst kan betragtes som erlagt for at øge salgsindtægter, skal rettere henføres under art. 7 eller art. 14. Et eksempel på sådan betaling er en distributør af tøj, der er hjemmehørende i en kontraherende stat, og som betaler et vist beløb til en producent hjemmehørende i den anden kontraherende stat, der fremstiller skjorter af et kendt mærke som vederlag for enretten til at sælge de pågældende skjorter i den førstnævnte stat. I dette eksempel betaler distributøren ikke for retten til at anvende navnet eller varemærket, under hvilket skjorterne sælges; han opnår blot eneretten til i den stat, hvori han er hjemmehørende, at sælge skjorter, som han køber af producenten.

En betaling kan ikke siges at være "for anvendelsen af eller retten til at anvende" et mønster, en model eller en tegning, hvis betalingen er for udviklingen af et mønster, en model eller en tegning, der ikke allerede eksisterer. I dette tilfælde er betalingen vederlag for tjenesteydelser, der vil resultere i udviklingen af dette mønster, denne model eller denne tegning, og vil således henhøre under art. 7 / art. 14. Dette vil være tilfældet, selv om producenten af mønsteret, modellen eller tegningen (f.eks. en arkitekt) forbeholder sig alle rettigheder, inklusive ophavsretten til mønsteret, modellen eller tegningen. Hvis ejeren af ophavsretten til allerede udførte tegninger blot giver nogen retten til at modificere eller reproducere disse tegninger uden reelt at udføre yderligere arbejde, vil betalingen, der modtages af ejeren som vederlag for at overdrage retten til sådan brug af tegningerne, imidlertid være royalties.

I en know how-kontrakt erklærer den ene af parterne sig villig til at delagtiggøre den anden part i sin særlige viden og erfaring, som forbliver ukendt for offentligheden, og således, at denne kan benytte den til sin egen fordel. Det er anerkendt, at overdrageren ikke selv behøver at deltage i anvendelsen af de formler, der er stillet til rådighed for licenshaveren, og at han ikke garanterer for anvendelsens resultat. Denne kontrakttype adskiller sig således fra kontrakter om levering af tjenesteydelser, hvor en af parterne påtager sig at benytte sit fags sædvanlige færdigheder til selv at udføre arbejde for den anden part. Betalinger, der erlægges i henhold til sådanne kontrakter, er almindeligvis omfattet af art. 7 / art. 14.

Nødvendigheden af at sondre mellem to typer af betalinger, dvs. betalinger for know how og betalinger for levering af tjenesteydelser, giver undertiden anledning til vanskeligheder i praksis. De følgende kriterier er relevante for at kunne foretage denne sondring:

- Kontrakter om levering af know how vedrører oplysninger af den art, der er beskrevet i pkt. 11 i kommentaren til art. 12, og som allerede eksisterer, eller angår levering af sådanne oplysninger, efter at grundlaget for deres tilvejebringelse er skabt, og indeholder konkrete bestemmelser om oplysningernes fortrolighed.

- I kontrakter om levering af tjenesteydelser påtager leverandøren sig at levere tjenesteydelser, der kan indebære, at leverandøren anvender særlig viden, dygtighed eller ekspertise, men som ikke indebærer overførsel af sådan særlig viden, dygtighed eller ekspertise til den anden part.

- I de fleste tilfælde i forbindelse med levering af know how vil der almindeligvis være meget lidt, der skal udføres af leverandøren i henhold til kontrakten, ud over at videregive eksisterende oplysninger eller reproducere eksisterende materiale. En kontrakt om levering af tjenesteydelser indebærer på den anden side i de fleste tilfælde meget større udgifter for leverandøren for at kunne opfylde sine forpligtelser i henhold til kontrakten. Afhængigt af arten af tjenesteydelserne kan det f.eks. være nødvendigt for leverandøren at afholde lønudgifter til ansatte, der er beskæftiget med research, design, testning, tegning eller andet lignende arbejde, eller at afholde udgifter til underleverandører for udførelsen af lignende tjenesteydelser.

Som eksempler på betalinger, der derfor ikke skal anses for modtaget som betaling for levering af know how, men snarere for levering af tjenesteydelser, kan nævnes:

- betalinger modtaget for eftersalgsydelser.

- betalinger for service, som sælger yder til køber i henhold til en garanti.

- betalinger for en liste over potentielle kunder, når en sådan liste er udarbejdet specielt til brug for betaleren på grundlag af generelt tilgængelig information (en betaling for en fortrolig liste over kunder, til hvem modtageren af betalingen har leveret et særligt produkt eller særlig tjenesteydelse, udgør imidlertid en betaling for know how, da den relaterer sig til en kommerciel erfaring, som betalingsmodtageren har opnået i forbindelse med forretninger med disse kunder).

- betalinger for en udtalelse afgivet af en ingeniør, en advokat eller en revisor, og

- betalinger for rådgivning overført elektronisk, for elektronisk kommunikation med teknikere eller for, via computernetværk, at få adgang til en fejlfindings-database, som f.eks. en database, der giver brugere af software ikkefortrolige oplysninger som svar på ofte stillede spørgsmål eller giver løsningsforslag på generelle problemer, der ofte opstår.

Det er vigtigt at holde sig for øje, at den nationale beskatningshjemmel i KSL § 2, stk. 1, nr. 8, og SEL § 2, stk. 1, litra g) , i modsætning til overenskomstens art. 12, ikke omfatter anvendelsen af eller retten til at anvende enhver ophavsret til litterært, kunstnerisk eller videnskabeligt arbejde, såsom f.eks. forfatterroyalty samt royalty for brug af musik, spillefilm m.v., ligesom den nationale danske beskatningshjemmel heller ikke omfatter anvendelse af eller retten til at anvende industrielt, kommercielt eller videnskabeligt udstyr. Det bemærkes, at når der ikke er national hjemmel til at beskatte en given type betalinger som royalties, er det uden betydning, om den pågældende overenskomst indeholder en bestemmelse om kildeskatter af royalties.

En særlig problemstilling består i kvalificeringen af betalinger, der modtages som vederlag for computer-software. Størst set alle OECD-stater beskytter software under copyright-lovgivningen. Det, der skal sondres mellem, er på den ene side royalties og på anden side betaling for varer. Rettighedshaveren har som udgangspunkt eneret til:

- at fremstille eksemplarer af det ophavsretligt beskyttede værk

- at gøre det beskyttede værk tilgængeligt for almenheden i oprindelig eller ændret skikkelse.

Ønsker andre at opnå rettighedshaverens samtykke til at benytte det ophavsretsbeskyttede værk på en af de beskrevne måder, og sker denne benyttelse mod betaling, er der tale om royaltybetaling. Bemærkningerne til OECD-modeloverenskomstens art. 12 nævner tre situationer, der er taget under overvejelse:

1. Hvor betalinger erlægges for en overførsel, der ikke omfatter samtlige rettigheder til den pågældende software. Et sådan tilfælde foreligger, når overdrageren er ophavsmanden til den pågældende software, og vedkommende har stillet en del af sine rettigheder til disposition for en anden person for at sætte denne i stand til at udvikle og udnytte den pågældende software kommercielt. I sådanne situationer synes vederlaget kun at kunne anses for royalty i meget begrænsede tilfælde.

2. Hvor vederlaget erlægges for afhændelsen af rettigheder, der er knyttet til den pågældende software. Der tænkes ikke på en fuldstændig afhændelse, men en omfattende dog delvis overdragelse, der indebærer en udelukkende brugsret i et specifikt tidsrum eller inden for et afgrænset geografisk område:

- yderligere vederlag sat i forhold til brugen;

- vederlag i form af betydelig samlet sum.

Generelt set vil der i disse situationer være tale om erhvervsmæssig indkomst omfattet af art. 7 / art. 14.

3. Hvor betalinger erlægges i henhold til blandede kontrakter, eksempelvis salg af computerhardware med indbygget software og idrømmelser af retten til at bruge softwaren, kombineret med ydelse af service. I sådanne situationer må kontrakten eventuelt deles op i de enkelte dele.

**Note 4:**

I henhold til stk. 3, der svarer til OECD-modeloverenskomstens stk. 3, finder bestemmelsen ikke anvendelse, såfremt den såkaldt retmæssige ejer af royaltyen driver erhvervsvirksomhed via et fast driftssted i kildestaten, og den rettighed, der ligger til grund for royaltybetalingerne, relaterer sig til dette faste driftssted. I så fald finder bestemmelserne i art. 7 / art. 14 om fortjeneste ved erhvervsvirksomhed anvendelse.

Visse stater mener, at udbytte, renter og royalties, der hidrører fra kilder på deres territorium, og som skal betales til fysiske eller juridiske personer, der er hjemmehørende i andre stater, falder uden for anvendelsesområdet for den ordning, der er truffet for at forhindre dem i at blive beskattet både i kildestaten og i den stat, hvori den retmæssige ejer er hjemmehørende, når den retmæssige ejer har et fast driftssted i den førstnævnte stat. Stk. 3 er ikke baseret på en sådan antagelse, som undertiden betegnes som "det faste driftssteds tiltrækningskraft" ("the force of attraction of the permanent establishment"). Stykket bestemmer ikke, at royalties, der tilfalder en person, hjemmehørende i en kontraherende stat, fra en kilde beliggende i den anden stat, ved en art juridisk formodningsregel, eller endog en fiktion, skal henføres til et fast driftssted, som denne hjemmehørende person måtte have i den sidstnævnte stat, således at denne stat ikke vil være forpligtet til at begrænse sin beskatning i et sådant tilfælde. Stykket bestemmer blot, at royalties er skattepligtige i kildestaten som en del af den fortjeneste, der er erhvervet af det dervænrede faste driftssted ejet af den retmæssige ejer, der er hjemmehørende i den anden stat, hvis den betales for rettigheder eller formuegoder, som udgør en del af det faste driftssteds aktiver eller på anden måde har direkte forbindelse med dette driftssted. I så fald fritager stk. 3 kildestaten, hvorfra royalties betales, for alle begrænsninger i henhold til artiklen. De forudgående forklaringer er i overensstemmelse med forklaringerne i kommentaren til art. 7.

Det er blevet hævdet, at stykket kan give anledning til misbrug ved at overføre rettigheder eller formuegoder til faste driftssteder, der er etableret alene med dette formål i lande, der beskatter royaltyindtægter særlig gunstigt. Bortset fra, at bestemmelserne i art. 29 (og navnlig artiklens stk. 8) samt principperne i afsnittet "Misbrug af overenskomsten" i kommentaren til art. 1 typisk vil forhindre sådanne transaktioner, hvis formål er misbrug, skal der erindres om, at en bestemt lokalitet kun kan udgøre et fast driftssted, hvis der udøves forretningsmæssig virksomhed på lokaliteten, og at, som forklaret nedenfor, kravet om, at en rettighed eller et formuegode skal have "direkte forbindelse med" en sådan lokalitet indebærer mere, end at rettigheden eller formuegodet blot er registreret i det faste driftssteds regnskabsbøger.

En rettighed eller et formuegode, i relation til hvilken eller hvilket der betales royalties, har direkte forbindelse med et fast driftssted og vil derfor udgøre en del af dets erhvervsmæssige aktiver, hvis det "økonomiske" ejerskab af rettigheden eller formuegodet er allokeret til det faste driftssted i henhold til de principper, der er udarbejdet i komitéens rapport "Attribution of Profits to Permanent Establishments" (jf. især pkt. 72-97 i Del I hos rapporten) med henblik på anvendelsen af art. 7, stk. 2. I dette stykke svarer "økonomisk" ejerskab af en rettighed eller et formuegode til et separat foretagendes ejerskab i indkomstskattemæssig henseende, med de tilknyttede fordele og risici (f.eks. retten til royalties knyttet til ejerskabet af rettigheden eller formuegodet, rettigheden til at afskrive og mulighederne for fortjeneste eller tab fra værdistigning eller værdinedgang af rettigheden eller formuegodet).

**Note 5:**

Stk. 4 gentager armslængdeprincippet fra art. 9. Såfremt der måtte være en særlig forbindelse, altså et interessefællesskab, mellem debitor og kreditor – og eventuelt tillige med en tredjemand – og dette interessefællesskab har manifesteret sig i en aftale om et for højt royaltybeløb, skal art. 12 kun finde anvendelse på den del af royaltybetalingerne, som ville være blevet aftalt mellem uafhængige parter. Det overskydende beløb skal herefter behandles alt efter, hvorledes det kvalificeres, jf. stk. 4.

Formålet med dette stykke er at begrænse virkningen af bestemmelserne vedrørende beskatning af royalties i tilfælde, hvor det betalte royaltybeløb som følge af en særlig forbindelse mellem den, der betaler royalties, og den retmæssige ejer eller mellem begge disse og en tredje person, overstiger det beløb, som ville være blevet aftalt mellem betaleren og den retmæssige ejer,

hvis den nævnte forbindelse ikke havde foreligget. Det bestemmes, at i et sådant tilfælde skal artiklens bestemmelser kun finde anvendelse på det sidstnævnte beløb, og at den overskydende del af royalties fortsat skal være skattepligtig i henhold til lovgivningen i de to kontraherende stater under hensyntagen til de øvrige bestemmelser i denne overenskomst. Stykket tillader kun regulering af royaltybeløbet og ikke omklassifikation af royaltybeløbet, således at det ændrer karakter, f.eks. til et bidrag til egenkapitalen.

Det fremgår klart af teksten, at for at denne bestemmelse skal finde anvendelse, skal de royalties, der betragtes som overskydende, skyldes en særlig forbindelse mellem betaleren og den retmæssige ejer eller mellem en af dem og en tredje person. Som eksempel kunne anføres tilfælde, hvor der betales royalties til en fysisk eller juridisk person, som direkte eller indirekte kontrollerer betaleren, eller som direkte eller indirekte er kontrolleret af ham eller er underordnet en gruppe, som har en fælles interesse med ham. Disse eksempler er desuden svarende til eller analoge med de tilfælde, som art. 9 tager sigte på.

På den anden side dækker begrebet "særlig forbindelse" også blodsbeslægtede eller beslægtede ved ægteskab og, i almindelighed, ethvert interessefællesskab afvigende fra den juridiske forbindelse, der giver anledning til betalingen af royalties.

Med hensyn til den skattemæssige behandling af den overskydende del af royalties skal den nøjagtige karakter af sådan overskydende del bestemmes under hensyntagen til omstændighederne i hvert enkelt tilfælde med henblik på at fastsætte den indkomstkategori, hvorunder den henhører, med henblik på anvendelsen af de pågældende staters skattelove og overenskomstens bestemmelser.

Hvis de kontraherende staters lovgivning fastsætter principper og regler, som forpligter dem til at anvende forskellige artikler med det formål at beskatte det overskydende beløb, vil det være nødvendigt at anvende den gensidige aftaleprocedure, som overenskomsten indeholder bestemmelser om, for at løse vanskelighederne .

Se udvalgte domme og afgørelser med relation til art. 12 i OECD-modeloverenskomsten

**(13)**

**Artikel 13 Kapitalgevinster**

Artiklen omhandler avance ved afhændelse af alle former for aktiver. Artiklen afviger fra OECD-modeloverenskomstens art. 13. Artiklen indeholder ikke modeloverenskomstens art. 13, stk. 4, om kildelandsbeskatning af fortjeneste ved salg af aktier i ejendomsaktieselskaber. Denne fortjeneste er derfor i stedet omfattet af art. 13, stk. 6.

**Note 1:**

OECD-modellen er bygget op på den måde, at beskatningsretten til formuegevinster fra en formuegenstand af en given art henføres til den stat, der i henhold til overenskomsten også er berettiget til at beskatte såvel formuegenstanden som indkomsten, der hidrører derfra. Retten til at beskatte en fortjeneste fra afståelsen af et erhvervsaktiv skal gives til den stat, under hensyn til spørgsmålet om, hvorvidt sådan fortjeneste er formuegevinst eller fortjeneste ved forretningsmæssig virksomhed. Følgelig sondres der ikke imellem formuegevinster og erhvervsmæssig fortjeneste, og det er ej heller nødvendigt at have særlige bestemmelser om, hvorvidt artiklen om formuegevinster eller art. 7 om fortjeneste ved forretningsmæssig virksomhed skal finde anvendelse. Artiklen giver ikke en detaljeret definition af begrebet formuegevinster. Udtrykket "afståelse af formuegenstande" er anvendt især med henblik på at omfatte formuegevinster, der hidrører fra salg eller bytte af formuegenstande og ligeledes fra en delvis afståelse, ekspropriation, overdragelse til et selskab til gengæld for aktier, salg af en rettighed, gaveoverdragelse og endog overgang af formuegenstande i forbindelse med dødsfald. Særlige omstændigheder kan føre til beskatning af værdistigning på et aktiv, der ikke er blevet afstået. Dette kan være tilfældet, hvis værdien af en formuegenstand er steget på en sådan måde, at ejeren går over til at opskrive dette aktiv i sine regnskabsbøger. Det kan også være tilfældet, når en stat opkræver særlige skatter af sådan regnskabsmæssig fortjeneste, beløb henlagt som reserve, en forøgelse af den indbetalte kapital og andre opskrivninger, der følger af juste-

ring af en formuegenstands bogførte værdi til dets reelle værdi. Disse skatter på formuestigning (værditilvækstbeskatning) er omfattet af overenskomsten i henhold til art. 2.

**Note 2:**

Stk. 1 svarer til modeloverenskomstens art. 13, stk. 1, og fastslår, at den stat, hvori den faste ejendom er beliggende, kan beskatte avance opnået ved afhændelse af den faste ejendom. Beskatningsretten omfatter også genvundne afskrivninger. Stk. 1 finder derfor ikke anvendelse på fortjeneste, der hidrører fra afståelsen af fast ejendom, der er beliggende i den kontraherende stat, som afhænderen er hjemmehørende i, eller som er beliggende i en tredjestat; i disse tilfælde finder bestemmelsen i art. 13, stk. 5, anvendelse.

**Note 3:**

Der findes ikke en bestemmelse i OECD-modellen, der svarer til denne overenskomsts stk. 2. Ud over fast ejendom som beskrevet i art. 6, stk. 2, omfatter det også deltagelse i fast ejendom i USA (United States real property interest), herunder også aktier i amerikanske selskaber med ejendomsinvesteringer, der er undergivet et specielt regelsæt kendt som Foreign Investment in Real Property (FIRPTA).

**Note 4:**

Stk. 3 svarer til modeloverenskomstens art. 13, stk. 2. Fortjeneste opnået ved afhændelse af rørlig formue, der udgør en del af erhvervsformuen i et fast driftssted eller et fast sted, samt fortjeneste opnået ved afhændelse af selve det faste driftssted eller selve det faste sted, kan beskattes i den stat, hvor det faste driftssted er beliggende (kildestaten). Bestemmelsen omfatter også immaterielle aktiver som f.eks. goodwill, licenser, emissionskvoter. Ved anvendelsen af stk. 3 vil formuegenstande udgøre en del af erhvervsformuen i et fast driftssted, hvis det "økonomiske" ejerskab til formuegenstandene er tildelt til det faste driftssted i henhold til de principper, der fremgår af komitéens rapport "Attribution of Profits to Permanent Establishments" (jf. især pkt. 72-97 i Del I Forening rapporten), med henblik på anvendelsen af art. 7, stk. 2. I dette stykke svarer "økonomisk" ejerskab til formuegenstande til et separat foretagendes ejerskab i indkomstskattemæssig henseende, med de tilknyttede fordele og risici (f.eks. retten til indkomsten, knyttet til ejerskabet af formuegenstanden, retten til at afskrive og muligheden for fortjeneste eller tab fra værdistigning eller værdinedgang af formuegenstanden). Det blotte faktum, at formuegenstandene er blevet registreret regnskabsmæssigt i det faste driftssteds regnskabsbøger, er derfor ikke tilstrækkeligt til at konkludere, at de er effektivt knyttet til det faste driftssted

**Note 5:**

Efter stk. 4 kan fortjeneste ved salg af skibe, både, luftfartøjer og containere, der anvendes i international trafik (se definition i art. 3, stk. 1, litra de) samt løsøre, der er knyttet til anvendelsen af disse aktiver, kun beskattes i den stat, hvor foregandet er hjemmehørende. Fast ejendom er ikke omfattet. Stk. 4 finder anvendelse, hvor foretagendet, der afstår formuegodet, anvender de i stykket nævnte skibe eller luftfartøjer enten til selv at udføre transportvirksomhed eller ved at lease skibene eller luftfartøjerne med fuld udrustning, bemanding og forsyning. Stykket finder imidlertid ikke anvendelse i tilfælde, hvor foretagendet, der ejer skibene eller luftfartøjerne, ikke selv anvender dem (f.eks. hvis foretagendet udlejer formuegodet til en anden person – bortset fra tilfælde, hvor der er tale om lejlighedsvis bare boat-leasing, jf. pkt. 5 i kommentaren til art. 8). I dette tilfælde vil fortjeneste, der erhverves af den virkelige ejer af formuegodet, eller af dertil knyttede aktiver, bortset fra fast ejendom, være omfattet af stk. 3 eller af stk. 6.

**Note 6:**

Fortjeneste på sådanne installationer, borerigge samt skibe anvendt til efterforskning og udnyttelse af naturforekomster, der - f.eks. i forbindelse med fraflytning - anses for afhændet, beskattes svarende til værdien af genvundne afskrivninger. Bestemmelsen er indsat efter dansk ønske

**Note 7:**

Stk. 6 fastslår som en slags opsamlingsbestemmelse, at beskatningsretten til gevinst ved afståelse af alle andre aktiver end dem, der er nævnt i stk. 1-5, udelukkende tilkommer bopælsstaten. Bestemmelsen svarer til OECD-modeloverenskomstens art. 13, stk. 5. Det bemærkes, at art. 13 ikke er tænkt an-

vendt på lotterigevinste og indfrielsesgevinster fra præmieobligationer m.fl., jf. kommentar nr. 19 til art. 13.

**Note 8:**

Bestemmelsen, der skal ses i sammenhæng med art. 5, omhandler en situation, hvor en person er skattepligtig i forbindelse med afhændelse af aktiver i både bopælsstaten og kildestaten, idet aktivet anses for afstået (deemed alienation) i en stat i et givet år, mens den anden stat ikke beskatter i det pågældende år, men senere. For at sikre adgang til lempelse kan den pågældende i denne situation vælge i samme år i bopælsstaten at blive behandlet skattemæssigt, som om aktivet var afhændet og atter købt. Valget skal foretages samlet for alle relevante aktiver.

**Note 9:**

Stk. 8 omhandler koordinering af beskatning af fortjeneste ved afhændelse i forbindelse med omstruktureringer o.l. og giver mulighed for at udskyde beskatningstidspunktet i kildelandet. Anvendelsen af bestemmelsen forudsætter enighed om udskydelsen og de nærmere vilkår herfor mellem de kompetente myndigheder. Situationen kan f.eks. være aktuel ved en fusion mellem to selskaber i den ene stat, der begge har et fast driftssted i den anden stat, og hvor fusionen umiddelbart udløser beskatning i den ene stat, men først senere i den anden stat, hvorved der opstår risiko for, at en dobbeltbeskatning ikke vil kunne lempes.

Se udvalgte domme og afgørelser med relation til art. 13 i OECD-modeloverenskomsten

**(14)**

**Artikel 14 Frit erhverv**

**Note 1:**

Art. 14 skal metodisk ses i sammenhæng med de følgende artikler: art. 15 (indkomst fra ansættelsesforhold), art. 16 (bestyrelseshonorarer), art. 17 (kunstnere og sportsudøvere), art. 18 (pensioner, socialsikring og livrenter samt underholdsbidrag), art. 19 (offentlige hverv) og art. 20 (studerende og praktikanter).

Art. 14 er udgået af OECD-modeloverenskomsten, men en delvis tilsvarende tekst findes fortsat i UN-modellen. OECDs beslutning afspejler det faktum, at der ikke var tilsigtet forskelle mellem begreberne "fast driftssted", som anvendt i art. 7, og "fast sted", som anvendt i art. 14, eller mellem, hvorledes fortjeneste og skat skulle beregnes i henholdsvis art. 7 og art. 14. Tilmed var det ikke altid klart, hvilken virksomhed der faldt ind under art. 14, og hvilken der faldt ind under art. 7. I overenskomster, hvor art. 14 er udeladt, betyder det, at indkomst, der oppebæres fra udøvelsen af frit erhverv eller fra anden virksomhed af selvstændig karakter, nu i stedet behandles under art. 7 som fortjeneste ved forretningsmæssig virksomhed.

**Note 2:**

Artiklens stk. 1 svarer til OECD-modeloverenskomstens art. 14, stk. 1. som den var forfattet før 2000. Art. 14 er udgået af OECD-modeloverenskomsten ved revisionen i 2000. Artiklen vedrører erhvervsudøvelse af fysiske personer. Herefter vil udøvelse af frit (dvs. liberalt) erhverv som udgangspunkt blive beskattet i bopælsstaten. Ved frit erhverv forstås især selvstændig videnskabelig, litterær, uddannende eller undervisende virksomhed samt selvstændig virksomhed inden for de liberale erhverv. Såfremt det liberale erhverv udøves i den anden stat, kildestaten, gennem et såkaldt »fast sted«, kan den del af indkomsten, som kan henføres dertil, imidlertid beskattes i kildestaten. Begrebet »fast sted« er ikke defineret i selve overenskomsten eller i modeloverenskomsten, men det vil for eksempel omfatte en læges eller en tandlæges konsultationsværelse eller et arkitekt-, et advokat-, et ingeniør- eller et revisorkontor.

**Note 3:**

Artiklens stk. 2 adskiller sig fra den daværende OECD-modeloverenskomstens art. 14, stk. 2,. Hvor OECD-modellens stk. 2 beskrev og eksemplificerede bestemmelsens anvendelsesområde fremgår det her, at indkomsten skal opgøres efter principper i art. 7, stk. 3. Uanset modellens stk. 2 ikke er medtaget, omhandler artiklen sådanne aktiviteter, som normalt vil blive betegnet som liberalt erhverv. Udelukket fra at være omfattet af bestemmelsen er således for eksempel industriel og handelsmæssig virksomhed, ligesom frit erhverv,

der udøves i et ansættelsesforhold. For eksempel vil en læge, der er ansat som bedriftslæge på en virksomhed, ikke være omfattet.

For at en person kan blive omfattet af art. 14, kræves det, at den pågældende efter danske nationale regler anses for at udøve selvstændig virksomhed vedrørende det specifikke arbejde, der udføres i landet.

Danmark har, ved begrænset skattepligt, national hjemmel til at beskatte i KSL § 2, stk. 1, nr. 4, og i SEL § 2, stk. 1, litra a.

Se udvalgte domme og afgørelser med relation til art. 14 i OECD-modeloverenskomsten

**(15)**

**Artikel 15 Personligt arbejde i tjenesteforhold**

Art. 15 fastsætter hovedreglen med hensyn til beskatning af indkomst fra ansættelsesforhold (undtagen pensioner), nemlig, at sådan indkomst kan beskattes i den stat, hvori det med ansættelsen forbundne arbejde faktisk er udført. Arbejde i et ansættelsesforhold anses for at være udført på det sted, hvor den ansatte fysisk er til stede på det tidspunkt, hvor det arbejde, for hvilket arbejdsvederlaget betales, udføres. Art. 15, stk. 1 og stk. 2, svarer til OECD-modellens art. 15, mens stk. 3 afviger.

**Note 1:**

Fra den netop omtalte hovedregel gøres kun undtagelse med hensyn til vederlag erhvervet af besætningsmedlemmer på skibe eller luftfartøjer i international trafik (art. 15, stk. 3), pensioner (art. 18) og med hensyn til vederlag og pensioner i forbindelse med offentligt hverv (art. 19). Vederlag uden for ansættelsesforhold til bestyrelsesmedlemmer i selskaber henhører under art. 16.

**Note 2:**

Artiklen finder anvendelse på løn og andet vederlag, på feriegodtgørelse, på fratrædelsesgodtgørelser, på personalegoder, på livsforsikringsdækning og på aktieoptioner. Se BEK nr. 2104 af 23/11/2021, kap. 5, samt SKM2006.507.SR/TfS 2006, 848 og SKM2010.50.SR/TfS 2010, 189 om aktieoptioner. Ethvert vederlag, som er udbetalt efter et ansættelsesforholds ophør, men for arbejde udført før ansættelsesforholdets ophør (for eksempel gage eller bonus for den sidste arbejdsperiode eller kommission for salg udført i den periode), vil blive anset for at være erhvervet i den stat, hvori de relevante arbejdsaktiviteter har været udført.

En udbetaling for ikke-afholdte feriedage eller sygedage, som er optjent gennem det sidste arbejdsår, er den del af vederlaget for arbejdsperioden, der udløste retten til at modtage ferie- og sygedagpenge. En ansat kan også være berettiget til ved ansættelsesforholdets ophør at modtage betaling for ikke-afholdte feriedage og sygedage flere år bagud i tid. Medmindre de konkrete omstændigheder tilsiger noget andet, skal betalinger modtaget efter ansættelsesforholdets ophør som kompensation for ikke-afholdte feriedage og sygedage flere år bagud i tid anses som en ydelse, som den pågældende har været berettiget til som følge af de sidste 12 måneders beskæftigelse, fordelt forholdsmæssigt efter, hvor arbejdet har været udført i den pågældende periode. I nogle tilfælde er arbejdsgiveren forpligtet (af lovgivning eller af en kontrakt) til at opsige den ansatte med et vist varsel. Såfremt den ansatte får besked på, at han ikke længere skal udføre sit arbejde, men blot får vederlaget for opsigelsesperioden udbetalt, er vederlaget tydeligvis blevet udbetalt i kraft af ansættelsesforholdet, og som følge deraf "hidrører" vederlaget derfra, jf. stk. 1. Vederlaget skal i sådanne tilfælde anses for at hidrøre fra den stat, hvor det er rimeligt at antage, at den ansatte ville have arbejdet i opsigelsesperioden.

Visse udbetalinger kan, under hensyn til forskellige nærmere indgåede aftaler, ske efter ansættelsesforholdets ophør. Sådanne betalinger skal anses for at være omfattet af art. 15, og i den udstrækning disse betalinger relaterer sig til en specifik ansættelsesperiode i en given stat, skal de anses for at være vederlag for arbejdsaktiviteter udført i denne stat. Da mange stater ikke vil acceptere en udskydelse af skatten på arbejdsindkomst, selv ikke i tilfælde, hvor betalingen først finder sted efterfølgende, er det vigtigt, at stater, som beskatter sådanne vederlag modtaget efter ansættelsesforholdets ophør, også sikrer sig, at dobbeltbeskatning undgås.

Se OECD-modeloverenskomstens kommentarer pkt. 2.3-2.16 om, hvorledes der skal forholdes til diverse former for vederlag for personligt arbejde, når vederlaget først udbetales efter arbejdsforholdets ophør.

**Note 3:**

Det kan i visse tilfælde kan være vanskeligt at afgøre, om det arbejde, der udføres i en stat af en fysisk person, der er hjemmehørende i anden stat, og som udføres for et foretagende, der er hjemmehørende i den første stat (eller som har et fast driftssted i denne stat), er arbejde i ansættelsesforhold, hvor art. 15 finder anvendelse, eller tjenesteydelser, der udføres af et separat foretagende, hvor art. 7 finder anvendelse, eller mere generelt, om undtagelsen finder anvendelse. Ifølge punkt 8.4 i kommentarerne er der imidlertid i mange stater udviklet forskellige regler og kriterier i lovgivningen eller i retspraksis (f.eks. "substance over form"-regler) med det formål at sondre mellem tilfælde, hvor tjenesteydelser, der leveres af en fysisk person til et foretagende, skal anses for at være leveret i et ansættelsesforhold, og tilfælde, hvor sådanne tjenesteydelser skal anses for at være leveret i henhold til en kontrakt mellem to separate foretagender. Denne sondring er vigtig i forbindelse med anvendelsen af bestemmelserne i art. 15, især bestemmelserne i stk. 2, litra b) og c).

Det fremgår af kommentarerne til modeloverenskomstens art. 15, bl.a. punkt 8.4 og punkt 8.7., at det i udgangspunktet er arbejdsstatens nationale lovgivning, der fastlægger grænserne for, hvornår der er tale om et tjenesteforhold. Det følger desuden af kommentarerne til art. 3, stk. 2, at hvis et udtryk ikke er defineret direkte i modeloverenskomsten, så er det intern ret i den stat, som ønsker at pålægge skatter, som skal anvendes til fortolkning. På denne baggrund anså man i SKM2021.211.SR ikke indkomsten fra nogle internationale eksperter for at være indkomst i tjenesteforhold, da de internationale eksperter ikke var i tjenesteforhold efter intern dansk ret.

OECD har i kommentarerne beskrevet forskellige former for ydelser, der skal anses for at være vederlag i tjenesteforhold, selvom ydelsen betales efter tjenesteforholdets ophør. Se punkt 2.3 til 2.16 i kommentaren til modeloverenskomstens art. 15.

**Note 4:**

: Art. 15, stk. 1, fastsætter hovedreglen med hensyn til beskatning af indkomst ved personligt arbejde, nemlig at gage, løn og andet lignende vederlag fra ansættelsesforhold erhvervet af en person, som er hjemmehørende i en kontraherende stat kun beskattes i denne stat (hjemmehørende staten), medmindre arbejdet er udført i den anden kontraherende stat (arbejdsstaten/kildestaten). Er arbejdet f.eks. udført i Danmark, og er personen hjemmehørende i Danmark, tilkommer beskatningsretten selvsagt alene Danmark. Er personen hjemmehørende i Danmark, men udfører han arbejde i USA, er udgangspunktet, jf. art. 15, stk. 1, at beskatningsretten overgår fra Danmark til USA (kildestat), med mindre alle betingelserne i stk. 2 er opfyldte. Er alle betingelserne i stk. 2 opfyldte, beskattes arbejdstageren i sin hjemmehørende stat, selvom arbejdet er udført i den anden stat. Det er i overensstemmelse med OECD-modeloverenskomstens art. 15, stk. 1

**Note 5:**

Kildestatens (arbejdsstatens) beskatningsret er betinget af, at vederlaget relaterer sig til arbejde, der er udført i denne stat. Vederlag, der vedrører perioder, hvor lønmodtageren rent faktisk ikke arbejder, anses også for vederlag for personligt arbejde i tjenesteforhold. Det forudsættes, at vederlaget står i forbindelse med et ansættelsesforhold, der er omfattet af art. 15.

**Note 6:**

Art. 15, stk. 2, indeholder i lighed med OECD-modeloverenskomstens art. 15, stk. 2, en undtagelse fra hovedreglen i stk. 1. Når en person, der er hjemmehørende i den ene stat, f.eks. Danmark, udfører arbejde i den anden stat, her USA (arbejdsstat = kildestat), vil USA, på trods af udgangspunktet i stk. 1, ikke være berettiget til at beskatte lønindkomsten, såfremt de 3 betingelser, der er anført i stk. 2, alle er opfyldte. Beskatningen foretages da udelukkende i hjemmehørende staten, her forudsætningsvis Danmark.

Meningen og hensigten med art. 15, stk. 2, litra b) og c), er at undgå kildebeskatning i forbindelse med kortvarige ansættelsesforhold, i det omfang indkomsten fra ansættelsen ikke anses for en fradragsberettiget udgift i kildesta-

ten, fordi arbejdsgiveren ikke er skattepligtig i denne stat, da arbejdsgiveren hverken er hjemmehørende eller har et fast driftssted i denne stat. Disse undtagelser kan også retfærdiggøres af det faktum, at det ville være forbundet med en meget betydelig administrativ belastning at kræve indeholdelse af kildeskat ved kortvarige ansættelsesforhold i de tilfælde, hvor arbejdsgiveren hverken er hjemmehørende i eller har et fast driftssted i denne stat.

Betingelserne for, at beskatningsretten ikke overgår til kildestaten, USA, fra første arbejdsdag, er følgende:

**Note 7:**

(1) arbejdstageren må ikke opholde sig i USA (eller i Danmark) i flere end 183 dage i en 12-måneders periode, der begynder eller slutter i det pågældende skatteår se SKM2001.26.LSR/TfS 2001, 160. Henvisningen til "det pågældende skatteår" skal fortolkes som en reference til skatteåret i den stat, hvori en hjemmehørende person i den anden stat har udført sit arbejde, og hvor de relevante arbejdsydelser er blevet udført.

Selv om medlemsstaterne har anvendt forskellige metoder ved beregningen af 183-dagesperioden, er der kun én måde, der er forenelig med ordlyden i dette stykke: metoden, der ser på "antallet af dage, hvor personen er fysisk til stede". Anvendelsen af denne metode er enkel og klar, idet den fysiske person enten er til stede i en stat eller ikke er til stede. Tilstedeværelsen kan også relativt let dokumenteres af skatteyderen, når skattemyndighederne kræver bevis herfor. Ifølge denne metode skal følgende dage medtages ved beregningen: en del af en dag, ankomstdagen, afrejsedagen og alle andre dage, der tilbringes i den stat, hvor arbejdet udføres, såsom lørdage og søndage, nationale helligdage, ferier før, under og efter arbejdets udførelse, kortvarige afbrydelser af arbejdet (uddannelse, strejker, lockout, forsinkelser af leverancer), sygedage (medmindre de forhindrer personen i at forlade arbejdsstaten, og han ellers ville være berettiget til fritagelse for beskatning) og dødsfald eller sygdom i familien. Der skal imidlertid ved beregningen bortses fra dage, der tilbringes i arbejdsstaten i transit under en rejse mellem to steder uden for arbejdsstaten. Det følger af disse principper, at enhver hel dag, der tilbringes uden for arbejdsstaten, hvad enten der er tale om ferie, forretningsrejser eller andet, ikke skal tages i betragtning. En dag, i løbet af hvilken en del, uanset hvor kort, skatteyderen er til stede i en stat, tæller som en dag i denne stat i relation til beregningen af 183-dagesperioden.

Dage, i hvilke skatteyder måtte være hjemmehørende i kildestaten/arbejdsstaten, skal ikke medregnes ved opgørelsen af de 183 dage.

**Note 8:**

(2) arbejdsvederlaget må ikke udbetales af en arbejdsgiver. Anvendelsen af den anden betingelse på skattemæssigt transparente interessentskaber skaber vanskeligheder, da sådanne interessentskaber ikke anses for en person, der er hjemmehørende i en kontraherende stat i henhold til art. 4 (jf. pkt. 8.8 i kommentaren til art. 4). Mens det er klart, at et sådant interessentskab kan betegnes som en "arbejdsgiver" (især i henhold til definitionen af dette udtryk i nogle staters lovgivning, f.eks. når en arbejdsgiver defineres som en person, der er indeholdelsespligtig), vil anvendelsen af betingelsen på interessentskabsniveau uden hensyn til interessenternes situation derfor gøre betingelsen helt meningsløs og

**Note 9:**

(3) arbejdsvederlaget må heller ikke udbetales af et fast driftssted, som arbejdsgiveren har i USA (Danmark)

**Note 10:**

Formuleringen af stk. 3 afviger fra 2017-udgaven af OECD-modellen. Tidligere blev beskatningsretten typisk henført enten til stat, hvori foretagendets (arbejdsgiverens) virkelige ledelse havde sit sæde eller den stat, hvori foretagendet (arbejdsgiveren) var hjemmehørende. Efter formuleringen i denne overenskomst kan vederlag udført for arbejde som besætningsmedlem ombord på et skib/i et fly i international trafik (se definition i art. 3, stk. 1 litra e)) alene beskattes i den stat, hvori arbejdsgiveren er hjemmehørende. OECD-modellens supplerende kriterium om, at: "… medmindre det sker om bord på et skib eller luftfartøj, der udelukkende benyttes til transport i den anden kontraherende stat" er ikke medtaget i denne overenskomst.

Definitionen af international trafik i denne overenskomst finder også finder anvendelse på transport med et skib eller luftfartøj, der benyttes af et foretagende, der er hjemmehørende i en tredjestat. Denne ændrede definition giver mulighed for at anvende art. 15, stk. 3, på en person, der er hjemmehørende i en kontraherende stat, og som modtager vederlag for ansættelse på et skib eller luftfartøj, der anvendes af et foretagende, der er hjemmehørende i en tredjestat.

Stk. 3 finder anvendelse på besætningsmedlemmer på skibe og luftfartøjer. Dette fremgår klart af henvisningen til arbejde "udført som besætningsmedlem på et skib eller luftfartøj". Disse ord dækker bredt nok til at omfatte alle former for arbejde udført som led i skibets eller luftfartøjets sædvanlige drift, herunder f.eks. arbejde udført af ansatte i restauranter på et krydstogtskib eller arbejde udført af en stewardesse, som flyver sin sidste tur, før hun fratræder. De omfatter derimod ikke arbejde, som kan udføres på et skib eller fly, men som ikke har relation til driften af dette (f.eks. en ansat i et forsikringsselskab, der sælger hus- og bilforsikringer til passagererne på et krydstogtskib.

Danmark har, som kildestat med begrænset skattepligt, national hjemmel til at beskatte lønindkomst i KSL § 2, stk. 1, nr. 1.

Se udvalgte domme og afgørelser med relation til art. 15 i OECD-modeloverenskomsten

**(16)**

## Artikel 16 Bestyrelseshonorar

Art. 16 svarer til OECD-modeloverenskomstens art. 16.

**Note 1:**

Vederlaget henføres til art. 16, uanset hvilken form de udbetales i (kontanter, frie goder m.v.). Se SKM2013.700.HR/TfS 2013, 630 om aktiekøberetter. Vederlag i form af aktieoptioner er kun omfattet af art. 16, indtil optionen udnyttes. Hvis aktierne bliver erhvervet, og hvis de senere afstås med fortjeneste, vil fortjenesten være omfattet af art. 13

**Note 2:**

Artiklen indebærer, at såfremt en fysisk person, der er hjemmehørende i den ene stat, modtager honorar og/eller andre lignende vederlag som bestyrelsesmedlem i et selskab hjemmehørende i den anden stat (kildestaten), kan kildestaten beskatte honoraret. Udfører bestyrelsesmedlemmet også andet arbejde for selskabet (kunne f.eks. være som konsulent eller advokat), vil honoraret for dette sædvanligvis være omfattet af art. 15 eller af art. 7.

Ifølge overenskomstens tekst omfatter den også bestyrelsesvederlag modtaget af juridiske personer. I Danmark skal bestyrelsesmedlemmer dog være fysiske personer.

**Note 3:**

Det er uden betydning, hvor bestyrelsesmøderne m.v. afholdes. Det afgørende er, hvor selskabet er hjemmehørende. Bestemmelsen omfatter alene egentlige bestyrelsesmedlemmer. Medhjælperes vederlag omfattes af art. 15

**Note 4:**

Bestemmelsen omfatter som udgangspunkt ikke honorar eller vederlag for deltagelse i offentlige selskabers bestyrelser, udvalg, nævn, råd m.fl. Et sådant vederlag skal i stedet henføres under overenskomstens art. 19, med mindre der er tale om udførelse af hverv i forbindelse med erhvervsvirksomhed som nævnt i art. 19, stk. 3. Det er uafklaret, om bestemmelsen også omfatter vederlag, som oppebæres af et medlem af et selskabs tilsynsråd. Af kommentar nr. 3 til OECD-modeloverenskomstens art. 16 fremgår, at bestemmelsen kun finder anvendelse på bestyrelser, men ikke sammenlignelige selskabsorganer, medmindre andet er aftalt i overenskomsten. Se hertil Poul Erik Lytken og Louise Dyrup Jensen: »Hvorfor Tilsynsråd?« i Signatur nr. 3, september 2013, s. 30ff.

**Note 5:**

I Danmark er der national hjemmel til at beskatte sådant vederlag i KSL § 2, stk. 1, nr. 2, når Danmark er kildestat (ved begrænset skattepligt). Der findes ikke en tilsvarende bestemmelse i selskabsskatteloven

Se udvalgte domme og afgørelser med relation til art. 16 i OECD-modeloverenskomsten

**(17)**

**Artikel 17 Kunstnere og sportsfolk**

Art. 17stk. 1 og 2, afviger fra OECD-modeloverenskomstens art. 17.

Grundlæggende er det således, at kildestaten (den stat, hvori aktiviteten udføres) beskatte an entertainers (i 2014-opdateringen af OECD-modeloverenskomsten benyttedes udtrykket »entertainer« i stedet for »kunstner« og en sportsudøvers vederlag, herunder også såfremt vederlaget tilfalder en anden end entertaineren selv, f.eks. et af ham behersket selskab. Det bemærkes, at art. 19 går forud for art. 17, med mindre tjenesteydelserne er udført i forbindelse med erhvervsvirksomhed, der drives af staten, en politisk underafdeling eller en lokal myndighed. Det bemærkes ligeledes, at det ikke er afgørende, om kunstneren eller sportsudøveren er lønmodtager eller driver selvstændig erhvervsvirksomhed. Art. 17 er en særregel, der fraviger både art. 7 og art. 15.

**Note 1:**

Stk. 1 nævner eksempler på, hvad kunstnere kan være. Det er klart, at det omfatter teaterskuespillere, filmskuespillere og skuespillere i reklameindslag. Artiklen omfatter også indkomst, der er modtaget for virksomhed af politisk, social, religiøs eller velgørende art, hvis der er indeholdt et underholdningselement. På den anden side udstrækker bestemmelsen sig ikke til at omfatte en foredragsholder (f.eks. en forhenværende politiker, der modtager et honorar for et foredrag), en model, der arbejder som sådan (f.eks. en model, der præsenterer tøj som led i et modeshow eller en fotosession) frem for som udøvende kunstner, eller administrativt eller assisterende personale (f.eks. kamerafolk, producere, filminstruktører, koreografer, teknisk personale, den medrejsende stab for en popgruppe osv.). Herimellem er der et gråzoneområde, hvor det er nødvendigt at foretage en samlet vurdering af de pågældende personers virksomhed. En fysisk person kan både instruere et show og deltage i det, eller vedkommende kan instruere og producere et fjernsynsprogram eller en film og selv have en rolle. I disse tilfælde er det nødvendigt at se på, hvad personen rent faktisk foretager sig i den stat, hvori den pågældende optræden finder sted. Hvis vedkommendes virksomhed i denne stat overvejende er af udøvende karakter, finder artiklen anvendelse på den samlede indkomst, som vedkommende modtager i denne stat. Hvis det udøvende element imidlertid er en ubetydelig del af det, som vedkommende foretager sig i staten, falder hele indkomsten uden for artiklens anvendelsesområde. I andre tilfælde vil det være nødvendigt med en opdeling. Artiklen finder endvidere anvendelse på indkomst fra anden virksomhed, der sædvanligvis anses for at være af underholdningsmæssig karakter, såsom billard- og snooker-, skak- og bridgeturneringer.

Om beløbet udbetales direkte til kunstneren eller via en impresario er uden betydning for bestemmelsens anvendelse. F.eks. kan et orkestermedlem få udbetalt løn i stedet for at modtage betaling for hver enkelt forestilling. Ud over honorarer for faktisk optræden modtager såvel kunstnere som sportsudøvere ofte royalties. Almindeligvis vil andre artikler (typisk art. 12) finde anvendelse på beskatningen af royaltyen, når der ikke er nogen direkte forbindelse mellem royaltyindkomsten og en optræden. Reklame- og sponsorindtægter, der ikke kan knyttes direkte til en optræden, behandles efter art. 7 eller 15. Der er omtalt flere eksempler på dette i kommentarerne til artiklen.

**Note 2:**

Selv om der ikke er givet en præcis definition af udtrykket "sportsfolk", er det ikke begrænset til deltagere i traditionelle atletikbegivenheder (f.eks. løbere, højdespringere, svømmere). Det omfatter også f.eks. golfspillere, jockeyer, fodboldspillere, cricketspillere, tennisspillere og racerkørere.

**Note 3:**

Danmark kan som kildestat ved begrænset skattepligt kun beskeden mulighed for at udnytte denne beskatningsret, da der efter national dansk ret først kan ske beskatning, såfremt det konkrete engagement har en sådan karakter, at der opstår et egentligt lønmodtagerforhold, jf. KSL § 2, stk. 1, nr. 1, sammenholdt med KSL § 43, stk. 1. Vederlag til offentligt ansatte kunstnere og sportsfolk er ikke omfattet af denne bestemmelse, men derimod af art. 19, med mindre der er tale om udførelse af hverv i forbindelse med erhvervsvirksomhed som nævnt i art. 19, stk. 3.

**Note 4**

Indkomst, der modtages af impresarier osv. for at arrangere en optræden af en udøvende kunstner eller sportsudøver, falder uden for artiklens anvendelsesområde, men enhver indkomst, som disse modtager på den udøvende kunstners eller sportsudøverens vegne, er naturligvis omfattet af artiklen. I denne overenskomst er der medtaget en tillægsbestemmelse, som ikke findes i OECD-modellen. Bestemmelsen i stk. 2 finder anvendelse medmindre kunstneren eller sportsmanden godtgør, at hverken kunstneren eller sportsmanden eller personer, der er knyttet til ham, direkte eller indirekte på nogen måde har del i denne anden persons fortjeneste. Til forståelse af bestemmelsen er der i de amerikanske Technical Explanations (se link øverst i note til overenskomsten) givet følgende eksempel: " Assume, for example, that a circus owned by a U.S. corporation performs in Denmark, and promoters of the performance in Denmark pay the circus, which, in turn, pays salaries to the circus performers. The circus is determined to have no permanent establishment in Denmark. Since the circus performers do not participate in the profits of the circus, but merely receive their salaries out of the circus' gross receipts, the circus is protected by Article 7 and its income is not subject to host-country tax. Whether the salaries of the circus performers are subject to host-country tax under this Article depends on whether they exceed the $20,000 threshold in paragraph 1."

Se udvalgte domme og afgørelser med relation til art. 17 i OECD-modeloverenskomsten

**(18)**

**Artikel 18 Pensioner, social sikring, livrenter, underholdsbidrag og bidrag til børn**

**Note 1:**

Artiklen omhandler beskatning af private pensioner (herunder arbejdsgiverordninger), sociale pensioner, livrenter, underholdsbidrag og bidrag til børn. Bestemmelsen skal anvendes i sammenhæng med pkt. 4 i protokollen til dobbeltbeskatningsoverenskomsten. For offentlige pensioner gælder reglerne i artikel 19. Bestemmelsen er langt mere omfattende end OECD-modellen. Afgift efter PBL er ikke omfattet af overenskomsten, mens værditilvæksten på en livsforsikring må antages at være omfattet af art. 21 fremfor art. 18. Fratrædelsesgodtgørelser er omfattet af art. 15 eller art. 19 og anses ikke som pension. Afgrænsningen mellem fratrædelsesgodtgørelse og pension kan i visse tilfælde være vanskelig at foretage.

**Note 2:**

Pensioner kan som udgangspunkt kun beskattes i udbetalingsstaten (kildestaten). Både løbende udbetalinger og (skattepligtige) engangsydelser er omfattet af bestemmelsen.

**Note 3:**

Som en overgangsbestemmelse er i stk. 2, litra b, medtaget en bestemmelse, hvorefter en person, der på overenskomstens ikrafttrædelsestidspunkt (31/3 2000) var hjemmehørende i den ene stat, og som dér modtog pension fra den anden stat, også fremover kun vil kunne beskattes i bopælsstaten af de pensioner, der er nævnt i stk. 2, litra a.

**Note 4:**

Rent praktisk anses pensionen for at hidrøre fra den stat, hvor den er etableret. Der skal være tale om en såkaldt skattemæssigt godkendt ordning (ellers vil der sædvanligvis være tale om "anden indkomst"), og som sådanne ordninger anses ifølge protokollens stk. 4 for Danmarks vedkommende pensionsordninger omfattet af pensionsbeskatningslovens afsnit I og for USA's vedkommende ordninger, der er skattemæssigt godkendt i henhold til sektion 401 (a) i forbundsskatteloven, individuelle pensionsordninger (herunder individuelle pensionsordninger, der er en del af en forenklet lønmodtagerordning, som er i overensstemmelse med sektion 408 (k), individuelle pensionskonti, individuelle pensionslivrenter, sektion 408 (p) konti, og Roth IRAs i henhold til sektion 408 A), sektion 403 (a) godkendte livrenteplaner og sektion 403 (b) ordninger), jf. protokollen hertil

**Note 5:**

Begrebet "pension" omfatter kun købende udbetalinger, men sumudbetalinger anses i stedet for omfattet af udtrykket "andre lignende vederlag".

**Note 6:**

Sociale ydelser kan som udgangspunkt kun beskattes i udbetalingsstaten (kildestaten). Både løbende udbetalinger og (skattepligtige) engangsydelser er omfattet af bestemmelsen. "Social security" kan kun beskattes i kildestaten. Pensionsydelser fra "United States of America Railroad Retirement Board" betragtes som en offentlig pension, LSRM 1976, 94. Sociale pensioner kan kun beskattes i kildestaten. I praksis kan der opstå tvivl om, hvad der betragtes som udbetalinger i henhold til socialllovgivningen; omfattet er i hvert fald folkepension, førtidspension og lignende. Der kan i øvrigt henvises til –TfS 1998, 306: "Beskatning af sociale ydelser efter dobbeltbeskatningsoverenskomsten" af Skatteministeriet, Departementet. ATP-udbetalinger er omfattet af art. 18 (tidligere privat ansættelse) eller art. 19 (tidligere ansættelse i en stat, dens politiske underafdeling eller lokal myndighed.

**Note 7:**

Specielle livrenteordninger, der ikke er omfattet af PBL afsnit I, skal if. stk. 3 beskattes i bopælsstaten.

**Note 8:**

Efter stk. 4 kan fradragsberettigede underholdsbidrag betalt af en yder i den ene stat kun beskattes i den stat, hvor modtageren er hjemmehørende. Underholdsbidrag er nærmere defineret i dette stykke, idet der kræves et særligt grundlag; det er i den forbindelse et krav, at de pågældende beløb er skattepligtige for modtageren i bopælslandet.

**Note 9:**

Det fremgår af stk. 5, at løbende betalinger, der ikke er omfattet af stk. 4, til underhold af børn kun kan beskattes i kildestaten. Der er tale om løbende bidrag, der enten ikke er fradragsberettigede for yderen eller som ikke skattepligtige for modtageren. Også hver kræves et særligt grundlag, for at bidragene er omfattet af bestemmelsen.

Vedrørende tjenestemandspensioner henvises til art. 19. Danmark har national hjemmel til som kildestat, ved begrænset skattepligt, at beskatte disse ydelser i KSL § 2, stk. 1, nr. 9.

Se udvalgte domme og afgørelser med relation til artikel 18.

**(19)**

**Artikel 19 Offentligt hverv**

Artiklen afviger fra OECD's modeloverenskomst. Den er ændret ved protokol af 2. maj 2006, art. III. Der er tale om rettelse af en fejl.

Anvendelse af artikel 19 er indsnævret i forhold til OECD's modeloverenskomst artikel 19, idet der skal være tale om "udøvelse af funktioner af myndighedskarakter".

Vederlag til optrædende kunstnere og sportsfolk, der er offentligt ansat, er omfattet af artikel 19, medmindre der er tale om offentlig erhvervsvirksomhed. Se artikel 19, stk. 3

Bestemmelserne i art. 19 fastlægger det princip, at løn og vederlag (herunder også personalegoder såsom fri bil, bolig og syge- eller livsforsikringsdækning) for udførelse af offentlige hverv, samt pension for tidligere udførelse af offentlige hverv, som altovervejende hovedregel kun kan beskattes i den stat, der udbetaler ydelserne. Den adskiller sig derved fra art. 15 og 18, som ellers ville være blevet anvendt. Omfattet er vederlag udbetalt at staten, regionerne og af kommunerne

**Note 1:**

Art. 19 afviger fra OECD-modeloverenskomstens art. 19. Afvigelsen består i, at bestemmelsen, i modsætning til OECD-modellen art. 19, kræver, at gage, løn og lignende vederlag udbetalt "fra det offentlige" for at være omfattet af art. 19, er betalt for udøvelse af funktioner af myndighedskarakter. I de amerikanske, tekniske forklaringer er givet følgende eksempel: Hvis f.eks. en offentlig myndighed sponserer et basketball team I en international turnering, og atleterne som følge heraf bliver betalt med offentlige midler, vil de beløb være omfattede art. 17 og ikke af art. 19, idet atleterne i denne forbindelse ikke udfører funktioner af myndighedskarakter. Det betyder, at gage, løn og andet lignende vederlag fra offentlige myndigheder kun beskattes i udbetalerstaten, medmindre modtageren både er hjemmehørende og statsborger i bopælsstaten eller ikke er blevet hjemmehørende dér alene med det formål at udføre hvervet. Bestemmelsen har betydning for f.eks. ambassade-

personale, men omfatter også DANIDA-udsendte, ph.d.-studerende udsendt til udenlandske uddannelsesinstitutioner, visse personer udsendt af Forsvarsministeriet m.fl. Spørgsmålet er, hvornår en institution kan kvalificeres som værende en del af den offentlige forvaltning. Der kan ved vurderingen lægges vægt på forhold som:

- om institutionen er oprettet ved lov eller i henhold til lov, og om lovgivningen må fortolkes således, at institutionen er en offentlig forvaltningsmyndighed, eller,

- om institutionen tildeles ressourcer via en driftsbevilling på statens finanslov eller via en bevilling på de kommunale budgetter, hvor bevillingen er opført enten under overskriften »egne« institutioner eller under overskriften »andre offentlige myndigheder«.

Som eksempler på institutioner, der som arbejdsgiver efter dansk opfattelse anses for offentlige, kan f.eks. nævnes Det Kongelige Teater, Odense Universitet, Københavns Universitet og Danmarks Radio. Der kan endvidere nævnes Nationalbanken, ATP og Lodsvæsenet herunder Lodspensionskassen. Se SKM2002.55.LSR/TfS 2002, 311 og SKM2004.64.LR/TfS 2004, 224 om beskatning af læger fra Danmark, der arbejder i andre nordiske stater. Reglen omfatter også vederlag udbetalt under barsel, se SKM2008.679.VLR/TfS 2008, 1072 VLD. Danmark har national beskatningshjemmel i KSL § 2, stk. 1, nr. 1, 2 og 4 og i KSL § 2, stk. 1, nr. 1, 9, 12.

**Note 2**

Art. 19, stk. 2, svarer til OECD-modeloverenskomstens art. 19, stk. 2, og vedrører pensioner og andet lignende vederlag udbetalt for udførelse af et offentligt erhverv. Sådanne pensioner kan alene beskattes i udbetalerstaten, medmindre modtageren er hjemmehørende og statsborger i den anden stat. Bestemmelsen vedrørende pensioner omfatter stort set udelukkende tjenestemandspensioner, men det må dog pointeres, at pensionsudbetalinger fra ordninger, der er oprettet af staten, en politisk underafdeling eller en lokal myndighed kan være omfattet, selv om de administreres privat. Således er pensioner fra selvejende institutioner i flere tilfælde blevet anset for omfattet af art. 19.

Derimod er f.eks. pensioner fra Juristernes og Økonomernes Pensionskasse (SKDM 1979, 28), Lægernes Pensionskasse, Dyrlægernes Pensionskasse (SKDM 1978, 99), Forst- og Agronomforbundets Pensionskasse og Apotekervæsenets Pensionskasse (TfS 1985, 534) ikke er omfattet af art. 19, stk. 2, idet pensionen, uanset at den pensionsberettigede har været ansat hos en offentlig myndighed, der har bidraget til ordningen, anses for udbetalt af private virksomheder og institutioner. Tilsvarende gælder for ydelser udbetalt fra HMN Naturgas I/S og fra Nationalbankens Pensionskasse, idet der her er tale om en pensionskasse under tilsyn af Finanstilsynet og omfattet af lov om firmapensionskasser. Sådanne pensioner behandles i stedet efter art. 18. Dansk folkepension er ikke omfattet af art. 19, da den ikke optjenes som følge af udført arbejde. ATP til tidligere offentligt ansatte betragtes som en social sikringsydelse, der behandles som pension. Den er omfattet af art. 19, stk. 2, hvis arbejdet, som pensionen knytter sig til, er udført for staten, en politisk underafdeling eller lokal myndighed. Se pkt. 1 i kommentaren til art. 18.

Når bestemmelsen i stk. 2 også omfatter »andet lignende vederlag« ligger heri, at den tillige omfatter ikke-periodiske udbetalinger. Om sådanne ikke-periodiske udbetalinger skal betragtes som pension efter stk. 2 eller som vederlag efter stk. 1 afhænger af en konkret vurdering.

**Note 3:**

Hvis en stat udbetaler vederlag til en person for varetagelse af hverv i forbindelse med udøvelse af en erhvervsvirksomhed, som udbetalerstaten driver, finder reglerne i art. 19, stk. 1 og stk. 2 ifølge art. 19, stk. 3, ikke anvendelse. I stedet anvendes art. 15 (personligt arbejde i tjenesteforhold), art. 16 (bestyrelseshonorarer), art. 17 (kunstnere og sportsfolk) og art. 18 (pensioner). Hvis en stat således optræder som erhvervsdrivende, er den undergivet de samme regler om beskatningsret til løn, bestyrelseshonorarer og pensioner, der gælder for private erhvervsdrivendes ansatte.

Se udvalgte domme og afgørelser med relation til artikel 19.

**(20)**

**Artikel 20 Studerende og praktikanter**

Art. 20, afviger fra OECD-modeloverenskomstens art. 20.

Studerende, der i studieøjemed opholder sig i Danmark, og som umiddelbart før påbegyndelsen af opholdet i Danmark var hjemmehørende i USA, skal ikke beskattes i Danmark af de beløb, der hidrører fra kilder uden for Danmark, ydet til den studerendes underhold, undervisning eller uddannelse. Det samme gælder for lærlinge og praktikanter, der opholder sig i Danmark med henblik på at deltage i en fuldtidsuddannelse.

Bestemmelsen omfatter også tilfælde, hvor en studerende allerede har gennemført en højere uddannelse, jf. LSRM 1978, 28 LSR. Se dog modsat resultat i R&R 1978 SM 6, TfS 1984, 265 LSR og i TfS 1985, 44 DEP. En gennemført HF- eller studentereksamen eller lignende uddannelser er ikke til hinder for at blive omfattet af art. 20, se TfS 1992, 297 TSS.

Der er ingen "professor-regel" i denne overenskomst. I den tidligere overenskomst fandtes professor-reglen i art. 14.

Efter art. 29, stk. 4, var der mulighed for at anvende 1948-overenskomsten til og med udgangen af indkomståret 2001, såfremt den er mere fordelagtig end den nye overenskomst.

De studerende fra USA er ikke berettiget til at få det såkaldte fradrag for gæstestuderende (tidligere betegnet som førufradraget).

**Note 1 og 2:**

Personkredsen i art. 20 er ikke defineret i OECD's modeloverenskomst eller i kommentarerne hertil. I modsætning til OECD-modellen fremgår det af denne overenskomst, at der skal være tale fuldtidsstudier på en officielt godkendt uddannelsesinstitution eller alternativt en fuldtidsuddannelse. Begrebet studerende i relation til art. 20 skal forstås bredt. Det omfatter enhver person, som er registreret som studerende på alle typer af uddannelsesinstitutioner i værtsstaten (folkeskole, gymnasium/hf, universiteter mv.). Begrebet omfatter derfor også personer, som har gennemført deres kompetencegivende uddannelse og ønsker at erhverve eller udvide viden indenfor et specialiseret område. Art. 20 omfatter derfor en bredere personkreds end kildeskattelovens § 8, stk. 2. Således er fx praktikanter, lærlinge og ph.d.-studerende omfattet af art. 20, se nedenfor. Modeloverenskomstens art. 20 omfatter efter sin ordlyd udtrykkeligt også ydelser til dækning af underholds- og uddannelsesudgifter til lærlinge, der er hjemmehørende i den ene stat og opholder sig i den anden stat for at arbejde som praktikant. Bestemmelsen definerer ikke begreberne "lærling" og "praktikant" nærmere.

Indtil og med 2019 fremgik det af den juridiske vejledning, afsnit C.F.8.2.2.20.1, Art. 20: Studerende m.m. at "Med hensyn til praktikanter kan Udlændingestyrelsens kriterier lægges til grund for, om der er tale om uddannelse, der falder ind under art. 20. Heri ligger bl.a., at praktikanten skal være mellem 18 og 35 år. Praktikopholdet skal have til formål at supplere en allerede påbegyndt eller erhvervet uddannelse i hjemlandet, og det skal være fagligt og tidsmæssigt relevant for uddannelsen i hjemlandet. Se mere på www.nyidanmark.dk".

Denne udlægning blev imidlertid ændret af Skattestyrelsen ved styresignal af den 21. februar 2019 (STY2019.18.-0702087/SKM2019.100.SKTST/TfS 2019, 184).

Da den personkreds, der er omfattet af art. 20, ikke er den samme i alle dobbeltbeskatningsoverenskomster, skal der i stedet foretages en konkret vurdering af artiklen om studerende (herunder praktikanter og lærlinge) i den enkelte dobbeltbeskatningsoverenskomst.

Praksisændringen i 2019 bestod i, at Udlændingestyrelsens kriterier fremover ikke skal lægges til grund for, om der er tale om en uddannelse, der falder ind under art. 20, da disse kriterier ikke i fuldt omfang afspejler de skattemæssige regler i dobbeltbeskatningsoverenskomsterne.

Konsekvensen heraf er, at man f.eks. fra 2019 ikke længere kan stille krav om, at praktikanten skal være mellem 18 og 35 år, hvis dette krav ikke fremgår af den pågældende dobbeltbeskatningsoverenskomst.

For så vidt angår SU vil det i overenskomster med en art. 20 sædvanligvis være sådan, at Danmark har beskatningsretten, hvis en dansker midlertidigt studerer i den anden stat. Dette gælder dog ikke, hvis den studerende allerede ved studiets påbegyndelse var hjemmehørende i den anden stat. Hvis der i

en overenskomst ikke findes en art. om studerende, vil SU-beløb være omfattet af artiklen om anden indkomst, se TfS 1992, 503 TSS

Den stat, hvori studierne m.v. foregår, kan altså ikke beskatte beløb, som f.eks. den studerendes forældre, udenlandske legater, eller udenlandske offentlige myndigheder betaler til vedkommende til dækning af underhold, studium eller uddannelse. Disse beløb skal ikke overstige de udgifter, som det er sandsynligt påløber for at sikre modtagerens underhold, studium eller uddannelse. Bestemmelsen finder ikke anvendelse, såfremt den studerende flytter til studiestaten før påbegyndelsen af studiet/uddannelsen.

Hvis den udenlandske ph.d.-studerende er lønnet af det danske universitet eller lignende, er der tale om et lønmodtagerforhold, hvor den pågældende person ikke kan anses for omfattet af artiklen om studerende i modeloverenskomsten.

En deltager i et sædvanligt ph.d.-forløb i Danmark, hvor den pågældende modtager fuld løn fra et universitet her i landet, vil således ikke være omfattet af art. 20. Dette gælder uanset omfanget af andre danske eller udenlandske stipendier.

Ph.d.-studerende i øvrigt anses for omfattet af artiklen om studerende i modeloverenskomsten, når opholdet overvejende finansieres af stipendier fra udlandet eller Danmark. Det vil sige at stipendierne skal udgøre mindst 50 % af den pågældendes indkomstgrundlag.

I SKM2017.495.SR fandt Skatterådet således, at det stipendium, spørger modtog fra en fond i Tyskland, var omfattet af dobbeltbeskatningsoverenskomsten med Tyskland, art. 20, da spørger udelukkede finansierede sit studium med dette stipendium.

I SKM2017.496.SR fandt Skatterådet ligeledes, at spørgers ph.d.-legat, som var udbetalt fra Tyskland, var omfattet af dobbeltbeskatningsoverenskomstens art. 20. Skatterådet kunne derfor bekræfte, at der ikke skulle betales skat i Danmark af legatet.

Konsekvensen af at være omfattet af art. 20 er, at stipendier fra udlandet ikke beskattes i Danmark.

I TfS1985, 44 udtalte det daværende Skattedepartement, at en britisk forsker, som var på et "postdoctoralt" ophold her i landet, ikke kunne anses for udenlandsk studerende efter art. 20 i dobbeltbeskatningsoverenskomsten med Storbritannien. Personer, der har et postdoc-ophold i Danmark, er dermed ikke omfattet af art. 20 om studerende. Deres indtægter fra kilder udenfor studiestarten er således ikke undtaget fra dansk beskatning, og de har ikke mulighed for at få gæstestuderendefradrag.

**Note 3:**

Det er en betingelse for, at den studerende kan opnå overenskomstfordelene, at der er tale om at følge et såkaldt heltidsstudie. Skattestyrelsen har ikke udarbejdet særskilte danske retningslinjer for fortolkningen heraf, men Uddannelses- og Forskningsstyrelsen har på sin hjemmeside defineret, hvad de forstår ved heltidsuddannelser.

I de amerikanske Technical Explanation (se link ovenfor i note til overskriften for overenskomsten), står der, at man, i hvert fald i USA, vil fortolke bestemmelsen her i overensstemmelse med reglerne i den uddannelsesinstitution "..will be determined by the rules of the educational institution at which he is studying.."), hvor den studerende følger undervisningen.

**Note 4:**

På Uddannelses- og Forskningsministeriets hjemmeside er der en forklaring på, hvornår institutioner betegnes som akkrediterede/anerkendte.

**Note 5:**

På tilsvarende måde gælder det, at lærling eller en praktikant, som gæster Danmark med henblik på at deltage I en fuldtidsuddannelse, men som også modtager løn eller lignende fra et ansættelsesforhold, ikke vil være omfattet af fritagelsesbestemmelsen.

**Note 6:**

Der er sat en tidsmæssig begrænsning på 3 år fra datoen for første ankomst for lærlinge og praktikanter.

**Note 7:**

Afslutningsvis anføres det, at skattefritagelsen ikke skal finde anvendelse på indkomst fra forskning, såfremt sådan forskning ikke foretages i offentlig

Copyright © 2024 Karnov Group Denmark A/S

interesse, men hovedsagelig til personlig fordel for en specifik person eller personer.

For nærmere belysning af reglens indhold forstået efter danske regler kan i øvrigt henvises til artiklen af Benedicte Wiberg i –SU 1997, 301, Reglen om studerende i de danske dobbeltbeskatningsoverenskomster.

Se udvalgte domme og afgørelser med relation til artikel 20.

**(21)**

**Artikel 21 Andre indkomster**

Art. 21 svarer til OECD-modeloverenskomstsart. 21. Bestemmelsen fastsætter, hvorledes indkomsttyper, som ikke er udtrykkeligt nævnt i de forudgående artikler (art. 6-20), skal behandles. Artiklen skal endvidere læses i sammenhæng med overenskomsten i øvrigt.

**Note 1:**

Indkomster omfattet af artiklen skal alene beskattes i den stat, hvori modtageren er hjemmehørende. Beskatningsretten er henført til bopælsstaten, uanset om den har hjemmel til at udnytte denne beskatningsret. I praksis kan der opstå tvivl om afgrænsningen over til udbetalinger i henhold til socialdovgivningen, som efter denne overenskomst henføres til art. 18. Der kan henvises til SKM2011.254.SKAT/TfS 2011, 446, beskatning af sociale ydelser og andre offentlige ydelser efter dobbeltbeskatningsoverenskomster.

Værditilvæksten på en livsforsikring omfattet af PBL § 53 A må antages at være omfattet af art. 21. Værditilvæksten på en livsforsikring tilhørende en person, der tilflyttede Danmark midt i et indkomstår kunne kun beskattes i Danmark for den del, der var optjent i perioden efter tilflytningen, se SKM2003.179.LSR/TfS 2003, 386 LSR. I SKM2005.411.DEP/TfS 2005, 842 har Departementet givet udtryk for, at fratrædelsesgodtgørelser (i ansættelsesforhold) anses for omfattet af art. 15, og dermed ikke omfattet af art. 21.

**Note 2:**

Indkomst fra tredjestater er også omfattet. Bemærk dog, at indkomst fra et fast sted/driftssted i en tredjestat er omfattet af art. 21, stk. 2. Hvis en person efter reglerne i de nationale lovgivninger er hjemmehørende i begge de to aftalestater, men kun anses for hjemmehørende i den ene aftalestat i medfør af overenskomstens art. 4, stk. 2 og stk. 3, kan kun den aftalestat, som den pågældende person herefter anses for hjemmehørende i, beskatte indkomst fra en tredjestat.

**Note 3:**

Stk. 2 modificerer bopælsstatens beskatningsret i de tilfælde, hvor en sådan indkomst har direkte forbindelse med et fast driftssted eller fast sted i den anden stat. I så fald er det den anden stat, kildestaten, der har beskatningsretten. Som for alle andre bestemmelser i overenskomsten kræver en dansk beskatning efter denne art. tillige, at der også findes en national dansk beskatningshjemmel til den pågældende indkomsttype. Stk. 2 indbefatter også indkomst fra tredjestater. I dette tilfælde gives beskatningsretten til den kontraherende stat, i hvilken de faste driftssted er beliggende. Stk. 2 finder ikke anvendelse på beskatningen af fast ejendom. Derfor kan fast ejendom, der er beliggende i den ene stat (A), og som udgør en del af erhvervsformuen i et fast driftssted (beliggende i stat B), men tilhørende et foretagende i stat (A), kun beskattes i stat (A), hvori ejendommen er beliggende, og i hvilken modtageren af indkomsten er hjemmehørende. Stk. 2 omfatter også tilfælde, der ikke er omfattet af de foregående artikler i overenskomsten, hvor den berettigede og udbetaleren af indkomsten begge er hjemmehørende i den samme kontraherende stat, og indkomsten er knyttet til et fast driftssted, som den berettigede til indkomsten har i den anden kontraherende stat. I sådanne tilfælde er beskatningsretten givet til den kontraherende stat, i hvilken det faste driftssted er beliggende. Når dobbeltbeskatning opstår, skal bopælsstaten give lempelse i henhold til bestemmelserne i art. 23. For så vidt angår anvendelsen af art. 7, stk. 2, anses i nærværende stykke en rettighed eller et formuegode, i relation til hvilke der erhverves indkomst, for at have direkte forbindelse med et fast driftssted, hvis det "økonomiske" ejerskab af rettigheden eller formuegodet er allokeret til det faste driftssted i henhold til de principper, der er udarbejdet i komitéens rapport "Attribution of Profits to Permanent Establishments".

Se udvalgte domme og afgørelser med relation til artikel 21.

**(22)**

**Artikel 22 Begrænsning af overenskomstfordele**

Art. 22 var oprindeligt et særkende i den dansk-amerikanske dobbeltbeskatningsoverenskomst - en lignende artikel er først medtaget i 2017-udgaven af OECD-modeloverenskomsten, men den fandtes derimod i den amerikanske modeloverenskomst fra 1996, og for forståelsen af bestemmelsen er de amerikanske kommentarer til modelbestemmelsen vigtige. Såvel modellen som kommentarerne kan findes på The Internal Revenue Service's hjemmeside på adressen http://www.irs.gov/Businesses/International-Businesses/United-States-Model---Tax-Treaty-Documents.

Bestemmelsen er indsat ved protokol af den 2. maj 2006, art. IV på foranledning af USA. Der kan henvises til bemærkningerne til L 30 af den 4. oktober 2006 (Lov nr. 1574 af den 20. december 2006) samt en grundig gennemgang af bestemmelsens indhold i –SU 1999, 212 i artiklen: "Udbytte, renter, royalty, kapitalgevinster og limitation on benefits i den nye DBO mellem Danmark og USA" af Niels Josephsen og i artiklen: "Limitation on benefits i dobbeltbeskatningsoverenskomsten mellem Danmark og USA" af Mogens Rasmussen og Dennis Dalsgaard Bernhardt i SR-Skat 2000, nr. 4.L

Formålet med den meget vanskeligt tilgængelige art. 22, på amerikansk betegnet som Limitations of Benefits, er at begrænse anvendelsen af visse af overenskomstens bestemmelser (begunstigelser) til særligt kvalificerede personer/selskaber. Metodisk er bestemmelsen opbygget på den måde, at såfremt et skattesubjekt ikke opfylder den første test vedrørende ejerforhold, går man videre til den anden test vedrørende betalingsstrømme og aktiv erhvervsudøvelse m.v. for til slut, forudsætningsvis, at havne i stk. 7, der tillader ansøgning om alligevel at opnå overenskomstfordele.

For skibs- og luftfartsvirksomhed i international trafik findes en særlig bestemmelse i stk. 5, som medfører, at overenskomstbeskyttelse forudsætningsvis vil kunne opnås, selv om artiklens øvrige betingelser ikke er opfyldt

**Note 1:**

Efter stk. 1 er en person, der er hjemmehørende i en af de to stater, alene berettiget til fordele efter overenskomsten, hvis den pågældende opfylder betingelserne i art. 22. Udtrykket "person" omfatter en fysisk person, et dødsbo, en fond (trust), et interessentskab, et selskab samt enhver anden sammenslutning af personer.

**Note 2:**

: Efter stk. 2 er en person, der er hjemmehørende i en af de to stater, berettiget til alle fordele efter overenskomsten, hvis den pågældende opfylder de objektive test i litra a) – g). Art. 22, stk. 8, har definitioner af udtryk, der anvendes i art. 22, herunder "vigtigste klasse af aktier", "uforholdsmæssig klasse af aktier", "aktier", "anerkendte børser", "skattepligtig fond", ligesom "regelmæssigt handlet" og "hovedsæde for ledelse og kontrol" afgrænses.

**Note 3:**

Litra a): En fysisk person, der er hjemmehørende i Danmark, henholdsvis USA, er efter litra a) berettiget til alle fordele efter overenskomsten. Der kan dog være enkelte tilfælde, hvor en fysisk person, der er hjemmehørende i Danmark, modtager renter eller royalties fra USA, og denne indkomst skal henføres til et fast driftssted, som personen har i et tredjeland og som dermed er fritaget for dansk beskatning efter Danmarks dobbeltbeskatningsoverenskomst med tredjelandet. I så fald vil personen alene kunne opnå fordele efter overenskomsten, hvis betingelserne i art. 22, stk. 6, er opfyldt.

**Note 4:**

Litra b): Danmark og USA samt deres politiske underafdelinger og lokale myndigheder m.v. er ifølge litra b) berettigede til alle fordele efter overenskomsten.

**Note 5:**

Litra c): Et selskab er efter litra c berettiget til alle fordele efter overenskomsten, hvis det opfylder betingelserne i et af punkterne i), ii) eller iii.

**Note 6:**

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                    2000-03-31

Betingelserne i punkt i) er, at den vigtigste klasse af aktier i selskabet (og enhver uforholdsmæssig klasse af aktier) regelmæssigt handles på en eller flere anerkendte børser, og at selskabet opfylder enten betingelse A eller B. Efter A skal selskabets vigtigste aktieklasse hovedsageligt handles på en anerkendt børs i det land, hvor det er hjemmehørende (eller for danske selskabers vedkommende i et land i EU eller EØS (Det Europæiske Økonomiske Område) eller for amerikanske selskabers vedkommende i et land omfattet af Den Nordamerikanske Frihandelsaftale (NAFTA). Efter B skal selskabets hovedsæde for ledelse og kontrol være i det land, hvor selskabet er hjemmehørende.

**Note 7:**

Betingelserne i punkt ii), som kun angår danske selskaber, er, at en eller flere skattepligtige fonde ejer aktier i selskabet, der repræsenterer mere end 50 pct. af stemmerettighederne af selskabet, og at alle andre aktier i selskabet er noteret på en anerkendt børs og hovedsageligt handles på en anerkendt børs i et EU- eller EØS-land. Den pågældende fond skal selv opfylde betingelserne i litra g) for at være berettiget til fordele efter overenskomsten.

**Note 8:**

Betingelserne i punkt iii) er, at mindst 50 pct. af den samlede stemmeret og værdi af aktierne (og mindst 50 pct. af hver uforholdsmæssig aktieklasse) i selskabet er ejet direkte eller indirekte af højst fem selskaber, som selv er berettiget til fordele efter punkt i) eller ii) eller en kombination heraf. Ved indirekte ejerskab skal hvert mellemliggende led være hjemmehørende i en af de to stater.

**Note 9:**

Litra d): Berettiget til alle fordele efter overenskomsten er desuden en velgørende organisation eller en anden juridisk person, som omtalt i art. 4, stk. 1, litra b), punkt i). Bestemmelsen omfatter institutioner, der er oprettet og opretholdes udelukkende med henblik på religiøse, velgørende, uddannelsesmæssige, videnskabelige eller andre lignende formål.

**Note 10:**

Litra e): Berettiget til alle fordele efter overenskomsten er endvidere en juridisk person, der er organiseret efter en kontraherende stats lovgivning til at yde pension eller lignende fordele til ansatte, herunder selvstændige, efter en ordning – uanset om den pågældende er fritaget for beskatning eller ikke. Det er en betingelse, at mere end 50 pct. af den juridiske persons begunstigede, medlemmer eller deltagere er fysiske personer, der er hjemmehørende i Danmark eller USA.

**Note 11:**

Litra f): En anden person end en fysisk person er efter litra f) berettiget til alle fordele efter overenskomsten, hvis den opfylder betingelserne både i punkt i) og ii).

**Note 12:**

Pkt. i) angår, hvem der ejer det pågældende selskab eller anden enhed. Mindst halvdelen af hver aktieklasse eller anden udbyttegivende andel i den pågældende skal i mindst halvdelen af skatteåret være ejet direkte eller indirekte af personer, der er hjemmehørende i den stat, hvor den pågældende er hjemmehørende. Desuden skal disse personer være berettiget til fordele efter stk. 2, litra a), litra b), litra c), punkt i, litra d) eller litra e). Ved indirekte ejerskab skal hvert mellemliggende led være hjemmehørende i den stat, hvor den pågældende er hjemmehørende.

**Note 13:**

Pkt. ii) angår, hvem der modtager betalinger fra det pågældende selskab eller anden enhed. Mindre end halvdelen af den pågældendes bruttoindkomst i skatteåret må være betalt eller tilskrevet i form af fradragsberettigede beløb, direkte eller indirekte, til personer, som hverken er hjemmehørende i Danmark eller USA og ikke er berettiget til fordele efter stk. 2, litra a), litra b), litra c), punkt i, litra d) eller litra e). Udtrykket "bruttoindkomst" afgrænses af skatteretten i den stat, hvor den pågældende er hjemmehørende. Udtrykket "fradragsberettigede betalinger" omfatter betalinger, som efter skatteretten i denne stat kan fratrækkes med hensyn til skatter, der er omfattet af overenskomsten. Disse betalinger omfatter dog ikke beløb, der betales som led i almindelig erhvervsudøvelse på almindelige markedsvilkår for tjeneste-

ydelser eller materielle formuegoder samt betalinger vedr. finansielle forpligtelser til en bank, som ikke er koncernforbundet med betaleren.

**Note 14:**

Litra g): En dansk fond er berettiget til alle fordele efter overenskomsten, hvis den opfylder betingelserne i både punkt i) og ii). Her anvendes alene kriterier vedrørende betalingsstrømme, idet ejerkrav ikke kan anvendes.

**Note 15:**

Efter punkt i) er en fond berettiget til overenskomstfordele i et skatteår, hvis højst halvdelen af fondens bruttoindkomst (undtagen dens skattefri indkomst) i det pågældende år og hvert af de foregående tre år er betalt eller tilskrevet i form af fradragsberettigede beløb, direkte eller indirekte, til personer, som ikke er berettiget til fordele efter stk. 2, litra a), litra b), litra c), punkt i, litra d) eller litra e). Fondens bruttoindkomst er opgjort efter dansk lovgivning. Ved opgørelsen af det beløb, som tages i betragtning, medregnes ikke beløb, som fonden i forbindelse med den sædvanlige udøvelse af dens virksomhed af velgørende art og som godkendt af dansk lovgivning om skattepligtige fonde (lov om erhvervsmæssige fonde og lov om fonde og visse foreninger) betaler til tjenesteydelser og materielle formuegoder, forudsat at betalingerne svarer til, hvad der ville blive aftalt på det fri marked.

**Note 16:**

Efter punkt ii) er det en yderligere betingelse, at mindre end halvdelen af fondens samlede indkomst (herunder dens skattefri indkomst) i det pågældende skatteår og i hvert af de foregående tre år er betalt eller tilskrevet i form af fradragsberettigede beløb og ikke-fradragsberettigede udlodninger, direkte eller indirekte, til personer, som ikke er berettiget til fordele efter stk. 2, litra a), litra b), litra c), punkt i, litra d) eller litra e). Ved opgørelsen af det fradragsberettigede beløb, som tages i betragtning, medregnes ikke betalinger ved den sædvanlige udøvelse af fondens virksomhed af velgørende art og som godkendt af dansk lovgivning om skattepligtige fonde (lov om erhvervsmæssige fonde og lov om fonde og visse foreninger) til tjenesteydelser og materielle formuegoder, forudsat at betalingerne svarer til, hvad der ville blive aftalt på det fri marked:

**Note 17:**

Efter stk. 3 er et selskab, der er hjemmehørende i Danmark, henholdsvis USA, også berettiget til fordele efter overenskomsten, hvis det opfylder betingelserne i både litra a) og litra b). Bestemmelsen giver overenskomstbeskyttelse for selskaber, der ejes af personer, hjemmehørende i lande, der er omfattet af EU, EØS eller NAFTA eller i Schweiz. For at opnå denne beskyttelse skal selskabet opfylde kriterier vedrørende ejerskab, udhuling af skattegrundlag og fordele efter en anden dobbeltbeskatningsoverenskomst.

**Note 18:**

Efter litra a er et selskab, der er hjemmehørende i Danmark, henholdsvis USA, berettiget til fordele efter overenskomsten, hvis mindst 95 pct. af den samlede stemmeret og værdi af dets aktier (og mindst 50 pct. af enhver uforholdsmæssig aktieklasse) ejes, direkte eller indirekte, af højst syv personer, som er tilsvarende begunstigede. Udtrykket "tilsvarende begunstigede" er defineret i art. 22, stk. 8, litra h). Udtrykket har til formål, at personer, der er hjemmehørende i andet land i EU, EØS eller NAFTA eller i Schweiz, sidestilles med personer, hjemmehørende i Danmark eller USA.

**Note 19:**

Efter litra b) er det en yderligere betingelse, at mindre end halvdelen af selskabets bruttoindkomst for det pågældende indkomstår er betalt eller tilskrevet, direkte eller indirekte, til personer, som ikke er tilsvarende begunstigede, i form af betalinger, der kan fratrækkes ved beskatning, omfattet af dobbeltbeskatningsoverenskomsten, i det land, hvor selskabet er hjemmehørende. Ved opgørelsen af det beløb, som tages i betragtning, medregnes ikke beløb, som selskabet i forbindelse med den sædvanlige udøvelse af virksomhed betaler for tjenesteydelser eller materielle formuegoder, samt betalinger som vederlag for finansielle forpligtelser til en bank, som ikke er koncernforbundet med det pågældende selskab, forudsat at betalingerne svarer til, hvad der ville blive aftalt på det fri marked.

**Note 20:**

Bestemmelsen i art. 22, stk. 4, omhandler en person, som er hjemmehørende i en kontraherende stat og udøver aktiv handels- eller forretningsvirksomhed, og som ikke på anden måde er berettiget til overenskomstens fordele. Efter litra a) medfører udøvelse af aktiv handels- eller forretningsvirksomhed, at den pågældende får adgang til fordele efter overenskomsten, men kun for så vidt angår indkomst, der er opnået i forbindelse med eller er knyttet til denne virksomhed. Aktiv handels- eller forretningsvirksomhed omfatter ikke virksomhed, som består i at foretage eller administrere investeringer på den pågældendes egen regning, dog undtaget bank- eller forsikringsvirksomhed eller virksomhed med værdipapirer, som udøves af en bank eller et forsikringsselskab eller en registreret børsmægler.

**Note 21:**

I tilfælde, hvor en person, der er hjemmehørende i den ene stat, oppebærer indkomst fra handels- eller forretningsvirksomhed i den anden stat (eller oppebærer indkomst fra den anden stat fra et forbundet foretagende), gælder litra a kun, hvis handels- eller forretningsvirksomheden i personens bopælsstat er væsentlig i forhold til den handels- eller forretningsvirksomhed, som den pågældende udøver i den anden stat. Om handels- eller forretningsvirksomhed er væsentlig i dette stykkes forstand, afgøres på baggrund af alle faktiske forhold og omstændigheder.

**Note 22:**

Ved afgørelsen af, om en person udøver aktiv handels- eller forretningsvirksomhed, skal der efter litra c medregnes virksomhed, der udøves af personer, der er forbundet med denne person. En person anses for forbundet med en anden person, hvis den ene besidder mindst 50 pct. af den udbyttegivende andel i den anden, eller for så vidt angår et selskab, mindst 50 pct. af de samlede stemmerettigheder og mindst 50 pct. af den samlede værdi af aktierne eller den udbyttegivende andel i selskabet. Endvidere anses en person for forbundet med en anden person, hvis en tredje person besidder, direkte eller indirekte, mindst 50 pct. af den udbyttegivende andel i hver person, eller for så vidt angår et selskab, mindst 50 pct. af de samlede stemmerettigheder og mindst 50 pct. af den samlede værdi af aktierne eller af den udbyttegivende andel i selskabet. Under alle omstændigheder anses en person for forbundet med en anden person, hvis det på grundlag af alle relevante forhold og omstændigheder kan konstateres, at den ene har kontrol over den anden eller begge er under kontrol af samme person eller personer.

**Note 23:**

Art. 22, stk. 5, vedrører skibs- og luftfartsvirksomhed i international trafik, som omfattet af art. 8. Bestemmelsen medfører en alternativ mulighed for at opnå overenskomstens fordele, dog således at beskyttelsen her alene omfatter denne type indkomst.

**Note 24**

Art. 22, stk. 6, regulerer det tilfælde, at et dansk foretagende oppebærer indkomst fra USA, og denne indkomst er fritaget for dansk beskatning, fordi indkomsten kan henføres til et fast driftssted, som det danske foretagende har i et tredje land. I så fald kan det danske foretagende alene opnå de fordele, som overenskomsten ellers medfører, hvis den faktiske skat af den pågældende indkomst i tredjelandet er mindst 60 pct. af den skat, som skulle betales i Danmark, såfremt indkomsten var optjent i Danmark af det danske foretagende og ikke skulle henføres til et fast driftssted i udlandet. Renter eller royalties, som omfattet af art. 22, stk. 6, kan beskattes i USA, men skatten må ikke overstige 15 pct. af bruttobeløbet. Art. 22, stk. 6, gælder dog ikke for renter, som hidrører fra USA og som er erhvervet i forbindelse med eller knyttet til aktiv handel eller forretning, som drives fra det faste driftssted i tredjelandet (undtagen virksomhed i form af at foretage eller administrere investeringer for egen regning, medmindre der er tale om bankvirksomhed eller virksomhed med værdipapirer, som udøves af en bank eller en registreret børsmægler). Art. 22, stk. 6, gælder heller ikke for royalties, som erhverves som vederlag for udnyttelse af eller retten til at udnytte immaterielle aktiver, som er produceret eller udviklet ved det faste driftssted i tredjelandet.

**Note 25**

Art. 22, stk. 7, vedrører skønsmæssige afgørelser i tilfælde, hvor en person ikke er berettiget til overenskomstfordele efter de foranstående bestemmelser.

Bestemmelsen medfører, at en person, hjemmehørende i en kontraherende stat, kan indrømmes overenskomstfordele efter beslutning fra den kompetente myndighed i den anden kontraherende stat. Det forudsætter, at den kompetente myndighed finder, at stiftelsen, erhvervelsen eller opretholdelsen af denne person samt udøvelsen af dens virksomhed ikke har som hovedformål at opnå fordele efter overenskomsten. Hvis den kompetente myndighed vil afvise overenskomstfordele, skal den forinden konsultere den kompetente myndighed i den stat, hvor den pågældende person er hjemmehørende.

**Note 26**

Stk. 8 definerer, hvad der forstås ved en række udtryk ved anvendelsen af art. 22.

**(23)**

## Artikel 23 Lempelse for dobbeltbeskatning

Art. 23 indeholder metodebestemmelserne for ophævelse af dobbeltbeskatning, men lempelsesbestemmelsen i denne overenskomst afviger fra OECD-modellens art. 23 B. Som udgangspunkt gives der lempelse efter creditprincippet.

Grundlæggende vil den stat, hvori en person (fysisk eller juridisk) er hjemmehørende have den fulde/almindelige beskatningsret (baseret på dén stats nationale beskatningsregler). I Danmark gælder således globalindkomstprincippet for fysiske personer, hvorefter en given indkomst er skattepligtig hertil uanset om den erhverves i Danmark eller i udlandet. USA beskatter amerikanske statsborgere efter globalindkomstprincippet.

**Note 1:**

Dobbeltbeskatningsoverenskomsterne fordeler beskatningsretten mellem den stat, hvori personen er hjemmehørende og den stat, hvori indkomsten erhverves fra (kildestaten). Fordelingsbestemmelserne kan enten være formuleret på den måde, at den ene stat (kan enten være hjemmehørende staten eller kildestaten) kun kan beskatte en given indkomst (den udelukkende beskatningsret er da henført til denne stat eller i stedet være formuleret på den måde, at en given indkomst kan beskattes i kildestaten. I sidstnævnte tilfælde skal hjemmehørende staten da lempe sin beskatning af samme indkomst efter art. 23.

Art. 23 lemper for den såkaldte juridiske dobbeltbeskatning, hvor den samme person (fysisk eller juridisk) beskattes i mere end én stat af den samme indkomst. Denne situation er forskellig fra den såkaldte økonomiske dobbeltbeskatning, dvs. hvor to forskellige personer beskattes af den samme indkomst (typisk transfer pricing). Hvis to stater ønsker at løse problemet omkring økonomisk dobbeltbeskatning, må dette ske gennem bilaterale forhandlinger. International juridisk dobbeltbeskatning kan opstå på følgende tre måder: (a) Hvis hver kontraherende stat pålægger den samme person skat af hans globale indkomst (samtidig fuld skattepligt i begge stater), (b) Hvis en person (fysisk eller juridisk) er hjemmehørende i en kontraherende (hjemmehørende staten) og erhverver indkomst fra den anden kontraherende stat (kildestaten eller staten, hvori et fast driftssted er beliggende), og begge stater beskatter denne indkomst eller (c) Hvis hver stat beskatter en person (fysisk eller juridisk), der ikke er hjemmehørende i nogen af staterne, af indkomst, der erhverves fra en af aftalestaterne; dette kan f.eks. forekomme i tilfælde, hvor en ikke-hjemmehørende person har et fast driftssted i en kontraherende stat (A), gennem hvilket han erhverver indkomst fra den anden kontraherende stat (B) (betegnet som samtidig begrænset skattepligt)?

**Note 2:**

Stk. 1 indeholder den amerikanske metodebestemmelse, dvs. lempelsesbestemmelsen for en i USA hjemmehørende person eller statsborger. Af indledningen til denne bestemmelse fremgår, at der gives lempelse i USA i overensstemmelse med bestemmelserne og under hensyntagen til begrænsningerne i USA's lovgivning (som denne måtte blive ændret fra tid til anden uden forandringer i dens generelle principper).

**Note 3:**

I medfør af stk. 1, litra a), lempes efter creditprincippet. Der gives lempelse til en i USA hjemmehørende person eller statsborger. I modsætning til den danske metodebestemmelse i stykke 3, indeholder denne creditbestemmelse ikke noget maksimum. Creditlempelsen er imidlertid begrænset af de ameri-

kanske interne regler som ovenfor nævnt. Såfremt disse indeholder et maksimum, vil dette finde anvendelse.

**Note 4:**

Litra b) indeholder en lempelse for den underliggende selskabsskat ved udlodning af udbytte fra et selskab, hjemmehørende i Danmark, til et selskab hjemmehørende i USA. Det modtagende selskab skal eje mindst 10 pct. af de stemmeberettigede aktier i det udloddende selskab.

**Note 5:**

Litra c) indeholder en række begrænsninger for den lempelse en i USA hjemmehørende person eller statsborger kan opnå for skat betalt i henhold til kulbrinteskatteloven om indkomst fra indvinding af olie og gas fra kilder i Danmark. Begrænsningerne skyldes, at den danske kulbrinteskat på tidspunktet for indgåelsen af den dansk-amerikanske dobbeltbeskatningsoverenskomst udgjorde 70 pct. af den skattepligtige kulbrinteindkomst (i dag 52 pct.). Endvidere indeholder de amerikanske regler ikke et maksimum for lempelsen i lighed med de danske regler. De amerikanske lempelsesregler indeholder alene en afgrænsning, således at man kun kan opnå lempelse indenfor en given indkomstkategori. Såfremt et selskab hjemmehørende i USA eksempelvis havde olierelateret indkomst fra Danmark og en række andre lande, ville USA uden reglerne i litra c) skulle give lempelse for den danske kulbrinteskat i skatten af indkomst fra andre lande.

**Note 6:**

: Ifølge litra c) (iii) finder begrænsningerne i lempelsen endvidere anvendelse for så vidt angår: 1) dansk olierelateret indkomst, der ikke er omhandlet i litra c) (i); og 2) andre indkomster fra dansk kilde. De to sidst nævnte kategorier er i realiteten uden indhold, men blev indsat efter US As ønske for at være på den sikre side, såfremt Danmark skulle indføje særlige beskatningsregler med kulbrinteskat eller ringefencing af andre indtægter end ved direkte udvinding af kulbrinter efter § 4 i kulbrinteskatteloven. Lempelsen undergives følgende begrænsninger: Lempelsen kan ikke overstige resultatet af den højest tilladte skattesats i De Forenede Stater for en sådan hjemmehørende person eller statsborger i et sådant skatteår, multipliceret med den indkomst, der er ansat særskilt i henhold til kulbrinteskatteloven, jf. litra c) (i). Lempelsen er endvidere undergivet enhver anden begrænsning i De Forenede Staters lovgivning, som denne måtte blive ændret fra tid til anden, der anvendes på skatter, for hvilke der gives nedslag i henhold til section 901 eller 903 i Forbundsskatteloven (Internal Revenue Code), på personer, der gør krav på fordele i henhold til denne overenskomst. Lempelsen er med andre ord begrænset af enhver anden begrænsning ifølge amerikanske regler, der anvendes på lempelsesberettigede skatter i henhold til section 901 eller 903 i Forbundsskatteloven, jf. litra c), (ii). For så vidt angår skatter, der overstiger det lempelsesberettigede beløb, kan disse alene fremføres til et andet indkomstår og modregnes i amerikansk skat af indkomst ansat særskilt i henhold til kulbrinteskatteloven, jf. litra c) (ii).

**Note 7:**

Stk. 2 omhandler den situation, hvor en statsborger i USA er hjemmehørende i Danmark. USA beskatter amerikanske statsborgeres global indkomst.

**Note 8:**

Efter litra a) er Danmark imidlertid alene forpligtet til at give lempelse for den skat, som USA i henhold til overenskomsten har ret til at opkræve af personer, der er hjemmehørende i Danmark, og som ikke er amerikanske statsborgere.

**Note 9:**

Litra b) og litra c) tilsigter at ophæve den dobbeltbeskatning, der herefter kan opstå.

**Note 11:**

Af litra a) og litra b) fremgår, at Danmark som udgangspunkt skal lempe efter creditprincippet. Danmark skal således give fradrag i den danske indkomstskat med et beløb, svarende til den skat, der er betalt i USA. Fradraget kan dog højst udgøre den del af indkomstskatten beregnet inden fradraget er givet, der kan henføres til den indkomst, som kan beskattes i USA. Lempelsesmetoden er almindelig credit svarende til LL § 33.

Efter stk. 3 gives der lempelse til en »person, der er hjemmehørende i Danmark«. Efter art. 1, stk. 1, litra a), omfatter en »person« en fysisk person, et dødsbo, en fond (trust), et interessentskab, et selskab og enhver anden sammenslutning af personer. »Hjemmehørende« er enhver person, som i henhold til lovgivningen i denne stat er skattepligtig dér på grund af hjemsted, bopæl, statsborgerskab, ledelsens sæde, registrering eller ethvert andet lignende kriterium. For så vidt angår et interessentskab gives der lempelse til de enkelte interessenter i overensstemmelse med deres ejerandel. Der gives alene lempelse til interessenter hjemmehørende i Danmark, jf. art. 4, stk. 1, litra d).

**Note 12:**

Efter litra c) skal Danmark imidlertid give lempelse efter eksemptionsprincippet i de tilfælde, hvor en indkomst kun kan beskattes i USA. Ved eksemptionslempelse lempes skatten i Danmark med den del af USAs skat, der forholdsmæssigt falder på den udenlandske indkomst. Lempelsen er således uafhængig af den amerikanske skat. En pensionist flytter eksempelvis til Danmark efter den nye overenskomsts ikrafttræden, men modtager private pensionsudbetalinger fra USA. Lempelse efter eksemptionsprincippet betyder, at Danmark helt undlader at beskatte pensionsudbetalingen. Hvorvidt USA faktisk beskatter pensionsudbetalingen er uden betydning for lempelsen i Danmark. Ved at indsætte litra c) har Danmark taget progressionsforbehold. Såfremt pensionisten eksempelvis ejer en udlejningsejendom, beliggende i Danmark, eller har andre indtægter i Danmark, skal man ved beregningen af skatten af disse eventuelle indtægter tage hensyn til pensionsudbetalingen fra USA.

Se udvalgte domme og afgørelser med relation til artikel 23.

**(24)**

**Artikel 24 Ikke-diskriminering**

Art. 24 afviger fra OECD-modeloverenskomstens art. 24 Det kan nævnes, at modellens stk. 2 om statsløse personers rettigheder ikke er medtaget i denne overenskomst. Overordnet kan man fastslå, at de krav, som ikke-diskrimineringsartiklen stiller til en stat, hovedsagelig retter sig mod den måde, den pågældende stat indretter sine skatteregler på. Kravene har sjældent direkte indflydelse på den måde, staten skal administrere sine regler på. Ikke-diskrimineringsprincippet er derfor sjældent anvendt ved afgørelsen af konkrete sager. Diskriminationsforbuddet vedrører skatter af enhver art og betegnelse, jf. stk. 6, og ikke kun skatter, der er omfattet af overenskomsten, jf. art. 2.

Art. 24 indeholder ikke et generelt forbud mod diskriminering, men nævner nogle situationer, hvor staterne ikke må diskriminere: (1) Statsborgerskab mv., (2) Fast driftssted, (3) Rente- og royaltybetalinger og lignende til den anden stat samt (4) Foretagender, der ejes eller kontrolleres fra den anden stat.

**Note 1:**

Stk. 1 fastlægger det princip, at diskriminering i beskatningsmæssig henseende på grund af statsborgerskab er forbudt, og at, under forbehold af gensidighed, statsborgere fra den ene kontraherende stat ikke må behandles mindre fordelagtigt i den anden kontraherende stat end statsborgere m.fl. i den sidstnævnte stat under samme forhold. Det fremgår af art. 3, tk. 1, at begrebet "statsborger" omfatter (i) enhver fysisk person, der har statsborgerskab eller indfødsret i en kontraherende stat, og (ii) enhver juridisk person, ethvert interessentskab og enhver sammenslutning, der består i kraft af den i denne kontraherende stat gældende lovgivning.

**Note 2:**

Udtrykket »under samme forhold« refererer til skattepligtige, der, i henseende til anvendelsen af de almindelige skattelove og regler, befinder sig under i det væsentlige samme forhold, både i retlig og faktisk henseende. Udtrykket »under samme forhold« skulle i sig selv være tilstrækkeligt til at fastslå, at en skatteyder, der er hjemmehørende i en kontraherende stat, og en, der ikke er hjemmehørende i denne stat, ikke befinder sig under samme forhold, medmindre det under anvendelsen af den relevante nationale bestemmelse er helt uden betydning, hvor den pågældende er hjemmehørende. Der kan i øvrigt henvises til de mere udførlige kommentarer i OECD-modeloverenskomsten.

**Note 3:**

En hertil svarende bestemmelse findes ikke i OED-modellen. Med den anvendte formulering: "især med hensyn til beskatning af globalindkomsten" er det sikret, at den amerikanske globalbeskatning af amerikanske statsborgere ikke er i strid med ikke-diskrimineringsbestemmelsen. Artiklen omfatter enhver skat, uanset hvilke myndigheder, der har pålagt den.

**Note 4:**

Bestemmelsen finder også anvendelse på personer, der hverken er hjemmehørende i den ene eller i begge stater.

**Note 5:**

Ifølge stk. 2, der svarer til OECD-modeloverenskomstens art. 24, stk. 3, kan det indledningsvist fastslås, at det ikke er diskriminering at beskatte ikke-hjemmehørende personer anderledes end hjemmehørende personer, så længe dette ikke resulterer i en mere byrdefuld beskatning af de førstnævnte end af de sidstnævnte. Et fast driftssted må ikke beskattes mindre fordelagtigt i den pågældende stat end foretagender hjemmehørende i denne stat. Formålet med denne bestemmelse er at bringe al diskriminering til ophør med hensyn til behandlingen af faste driftssteder sammenlignet med foretagender, der er hjemmehørende dér, og som udfører samme virksomhed, for så vidt angår skatter, baseret på industriel eller kommerciel virksomhed, og især skatter af fortjeneste ved forretningsvirksomhed. Anvendelse af nationale transfer pricing-regler baserede på armslængdeprincippet, ved overførsler mellem hovedkontor og et fast driftssted, er ikke i strid med art. 24, selvom sådanne regler ikke gældende inden for et foretagende i samme stat.

**Note 6:**

Dette stykke er affattet for at bringe en særlig form for diskriminering til ophør, der opstår som følge af det faktum, at fradrag for renter, royalties og andre udbetalinger i visse stater er tilladt uden begrænsning, når modtageren er hjemmehørende dér, men begrænset eller endog forbudt, når modtageren er ikke-hjemmehørende. Den samme situation kan også genfindes med hensyn til formuebeskatning, hvad angår skyldig gæld til en ikke-hjemmehørende kreditor. Det står kontraherende stater frit for at ændre denne bestemmelse i bilaterale overenskomster for at undgå, at den anvendes til skatteunddragende formål.

Stk. 4 forbyder ikke den stat, hvori låntageren er hjemmehørende, at anvende sin interne lovgivning om tynd kapitalisering, for så vidt som denne er forenelig med art. 9, stk. 1, eller art. 11, stk. 6. Hvis en sådan behandling imidlertid følger af regler, der ikke er forenelige med de nævnte artikler, og som kun finder anvendelse på ikke-hjemmehørende kreditorer (med udelukkelse af hjemmehørende kreditorer), er denne behandling ikke mulig i henhold til stk. 4.

Stk. 4 forbyder endvidere ikke skærpede krav til oplysninger med hensyn til betalinger til ikke-hjemmehørende personer, da hensigten med disse krav er at sikre ens skattemæssig behandling af betalinger, hvad enten de foretages til personer, der er hjemmehørende eller ikke-hjemmehørende i staten.

**Note 7:**

Stk. 5 forbyder en kontraherende stat at give mindre fordelagtig behandling til et foretagende, hvis formue helt eller delvist, direkte eller indirekte, ejes eller kontrolleres af en eller flere personer, der er hjemmehørende i den anden kontraherende stat. Denne bestemmelse og den diskriminering, som den bringer til ophør, angår alene beskatningen af foretagender, og ikke af de personer, der ejer eller kontrollerer disses formue. Dens formål er derfor at sikre ligelig behandling af skatteydere, der er hjemmehørende i den samme stat, men ikke at gøre udenlandsk kapital, der ejes af partnere og aktionærer, til genstand for samme behandling som den, der gives hjemlig kapital.

Da stykket kun omhandler beskatning af hjemmehørende foretagender og ikke beskatning af de personer, der ejer eller kontrollerer deres kapital, følger det, at stykket ikke kan fortolkes således, at det tillige omfatter fordele ved regler, der tager hensyn til relationen mellem et hjemmehørende foretagende og andre hjemmehørende foretagender (f.eks. regler, der tillader konsolidering, overførsel af tab eller skattefri tilførsel af aktiver mellem selskaber under fælles ejerskab). Hvis f.eks. en stats nationale lovgivning tillader, at et hjemmehørende selskab konsoliderer sin indkomst med indkomsten et

hjemmehørende moderselskab, tvinger stk. 5 ikke staten til at tillade en sådan konsolidering mellem et hjemmehørende selskab og et ikke-hjemmehørende moderselskab. Dette ville kræve, at man sammenlignede den kombinerede behandling af et hjemmehørende foretagende og det ikke-hjemmehørende foretagende, som ejer dets kapital, med et hjemmehørende selskab og det hjemmehørende selskab, der ejer dets kapital, hvilket klart er mere vidtgående end beskatningen af kun det hjemmehørende selskab.

Da hensigten med stk. 5 er at sikre, at alle hjemmehørende selskaber behandles ens uden hensyn til, hvem der ejer eller kontrollerer deres kapital, og ikke sikrer, at udlodninger til hjemmehørende og ikke-hjemmehørende aktionærer behandles på samme måde, følger det, at forpligtelser med hensyn til kildeskat, som er pålagt et hjemmehørende selskab vedrørende udbytter, der udloddes til ikke-hjemmehørende aktionærer, men ikke vedrørende udbytter, der udloddes til hjemmehørende aktionærer, ikke anses som en overtrædelse af stk. 5. I dette tilfælde er forskelsbehandlingen ikke afhængig af, om selskabets kapital ejes eller kontrolleres af ikke-hjemmehørende aktionærer, men snarere af det faktum, at udbytter, der udloddes til ikke-hjemmehørende, beskattes anderledes. Et tilsvarende eksempel er en stat, der opkræver skat hos hjemmehørende selskaber, der foretager udlodninger til deres aktionærer uden hensyn til, om aktionærerne er hjemmehørende eller ikke-hjemmehørende i staten, men som for at undgå, at skatten pålignes gentagne gange, ikke beskatter udlodninger til forbundne hjemmehørende selskaber, der selv er skattepligtige af deres udlodninger. Det faktum, at den sidstnævnte undtagelse ikke finder anvendelse på udlodninger til ikke-hjemmehørende selskaber, anses ikke for en overtrædelse af stk. 5. I dette tilfælde er det ikke, fordi kapitalen i det hjemmehørende selskab ejes eller kontrolleres af ikke-hjemmehørende aktionærer, at behandlingen er forskellig; det er, fordi der udloddes til selskaber, som i henhold til bestemmelserne i overenskomsten ikke pålægges den samme skat, når de genudlodder de udbytter, der er modtaget fra det hjemmehørende selskab. I dette eksempel behandles alle hjemmehørende selskaber på samme måde, uanset hvem der ejer eller kontrollerer deres kapital, og den forskellige behandling er begrænset til tilfælde, hvor skatten på udlodninger kan undgås.

Da stykket forhindrer diskriminering af et hjemmehørende foretagende, der alene er baseret på, hvem der ejer eller kontrollerer foretagendets kapital, er det ikke umiddelbart relevant med hensyn til regler, der angiver en forskellig behandling af selskaber baseret på, om foretagendet betaler renter til hjemmehørende eller til ikke-hjemmehørende kreditorer. Stykket beskæftiger sig ikke med regler, der er baseret på debitor/kreditor-forhold, så længe forskelsbehandlingen, der følger af reglerne, ikke er baseret på, om ikke-hjemmehørende personer, helt eller delvist, direkte eller indirekte, ejer eller kontrollerer foretagendets kapital. Hvis f.eks. et hjemmehørende foretagende i henhold til en stats regler om tynd kapitalisering ikke må fratrække renter, der betales til et ikke-hjemmehørende forbundet foretagende, er denne regel ikke i strid med stk. 5, selv når den finder anvendelse på rentebetalinger til kreditor, der ejer eller kontrollerer foretagendets kapital. Det er herved forudsat, at behandlingen er den samme, hvis renten betales til et ikke-hjemmehørende forbundet foretagende, der ikke selv ejer eller kontrollerer noget af kapitalen i det betalende foretagende. En sådan regel i en stats nationale lovgivning kan være i strid med stk. 4, i det omfang der er forskellige betingelser knyttet til fradraget for rentebetalinger til hjemmehørende og til ikke-hjemmehørende personer, og det er derfor vigtigt at afgøre, om anvendelsen af reglen er forenelig med bestemmelserne i art. 9, stk. 1, eller art. 11, stk. 6. Dette vil også være vigtigt ved anvendelsen af stk. 5 i forbindelse med regler om tynd kapitalisering, der kun finder anvendelse på foretagender i en stat, hvis kapital, helt eller delvist, direkte eller indirekte, ejes eller kontrolleres af ikke-hjemmehørende personer. Da bestemmelserne i art. 9, stk. 1, eller art. 11, stk. 6, er en del af den sammenhæng, i hvilken stk. 5 skal læses (som krævet af art. 31 i Wienerkonventionen om traktatretten), kan justeringer, der er forenelige med disse bestemmelser, ikke anses for at være i strid med bestemmelserne i stk. 5.

Hvad angår undersøgelser omkring transfer pricing er næsten alle medlemsstater af den opfattelse, at yderligere krav om oplysninger, der er strengere

end de normale krav, eller endog anvendelsen af en omvendt bevisbyrde, ikke indebærer diskriminering i artiklens forstand.

**Note 8:**

En hertil svarende bestemmelse findes ikke i OECD-modellen. Det fremgår af stk. 5, at art. ikke udelukker nogen af de kontraherende stater fra at pålægge skat i henhold til art. 10, stk. 8, hvor »branch profits tax« er beskrevet.

**Note 9:**

En hertil svarende bestemmelse findes ikke i OECD-modellen. Det fremgår af stk. 5, at art. ikke udelukker nogen af de kontraherende stater fra at pålægge skat i henhold til art. 10, stk. 8, hvor »branch profits tax« er beskrevet.

Se udvalgte domme og afgørelser med relation til artikel 24 I OECD-modeloverenskomsten.

**(25)**

**Artikel 25 Fremgangsmåden ved indgåelse af gensidige aftaler**

Art. 25 afviger fra OECD-modellens art. 25.

**Note 1:**

Hvis en person (herunder juridisk person) mener, at han (det) er eller vil blive beskattet i modstrid med overenskomstens regler, skal indsigelse rejses over for den kompetente skattemyndighed i bopælsstaten. En sådan sag betegnes sædvanligvis enten som en "gensidig myndighedsforhandling" eller som en "mutual agreement sag". Overenskomsten anvender det generiske begreb "foranstaltninger". Den gensidige aftaleprocedure kan, i modsætning til klageproceduren ifølge national lovgivning, sættes i gang af skatteyderen, uden at denne behøver at afvente, at den beskatning, han mener for ikke at være "i overensstemmelse med overenskomsten", er blevet opkrævet, eller han har fået underretning herom. For at kunne sætte proceduren i gang, må han, og dette er tilstrækkeligt, godtgøre, at "foranstaltninger, truffet af en af eller begge de kontraherende stater" vil resultere i en sådan beskatning, og at denne beskatning fremstår som en risiko, der ikke blot er mulig, men sandsynlig. Sådanne foranstaltninger betyder alle handlinger eller beslutninger, hvad enten disse er af lovgivningsmæssig eller administrativ art, og hvad enten de finder generel anvendelse eller ej, der som en direkte og nødvendig konsekvens for klageren indebærer opkrævning af skat i strid med bestemmelserne i overenskomsten. Den gensidige aftaleprocedure kan også anvendes, selv om der ikke foreligger dobbeltbeskatning i strid med overenskomsten, blot den omstridte beskatning er i direkte strid med en regel i overenskomsten. Dette er tilfældet, når en stat beskatter en særlig indkomst, som overenskomsten giver den anden stat en udelukkende beskatningsret til, selv om den sidstnævnte stat er ude af stand til at gøre brug af retten på grund af manglende national lovhjemmel. Uanset om foranstaltningerne truffet af en af eller begge de kontraherende stater vil resultere i en beskatning, der ikke er i overensstemmelse med overenskomsten, vil dette skulle afgøres ud fra skatteyderens perspektiv, således som det også fremgår af indledningen til stk. 1. Skatteyderens tro på, at der vil indtræde sådan beskatning, skal være begrundet og baseret på kendsgerninger, der kan godtgøres, men skattemyndighederne kan ikke nægte at tage hensyn til en anmodning i henhold til stk. 1, blot fordi de af den opfattelse, at der ikke er blevet bevist, at en sådan beskatning vil finde sted.

**Note 2:**

Intet af overenskomsten forhindrer en skatteyder i samtidigt med at en sag indbringes efter art. 25 også at anvende de sædvanlige nationale klageinstanser (f.eks. landsskatteretten). Anvendelsen af den gensidige aftaleprocedure udskyder ikke de nationale klagefrister.

**Note 3:**

Det følger af art. 3, stk. 1, litra f, at »den kompetente myndighed« i Danmark er skatteministeren eller dennes befuldmægtigede stedfortræder. Ifølge SFL § 1 udøver told- og skatteforvaltningen forvaltningen af lovgivning om skatter og lov om vurdering af landets faste ejendomme, og det følger af SFL § 64, at skatteministeren kan fastsætte de nærmere regler for lovens gennemførelse. De opgaver, der ved SFL § 1 er tillagt told- og skatteforvaltningen, varetages af Skatteforvaltningen, jf. BEK nr. 804 fra den 20. juni 2018. Ifølge BEK nr. 1029 af 24. oktober 2005 bemyndiges told- og skatteforvaltningen til at træffe afgørelser efter dobbeltbeskatningsoverenskomster som

»den kompetente myndighed«, og det fremgår af samme bekendtgørelse, at sådanne afgørelser truffet af told- og skatteforvaltningen ikke påklages til anden administrativ myndighed. Alle sager om dobbeltbeskatning, der vedrører transfer pricing mv. (modeloverenskomstens art. 7 og art. 9), hvad enten de vedrører fysiske eller juridiske personer, behandles af Skattestyrelsen, Store Selskaber- Kompetent Myndighed, Hannemanns Allé 25, 2300 København S. Alle andre sager om dobbeltbeskatning behandles af Skattestyrelsen, Jura – Kompetent Myndighed, Hannemanns Allé 25, 2300 København S. På OECD's hjemmeside findes en oversigt, der opdateres periodisk, over de relevante nationale kompetente myndigheder i en række stater, inklusive kontaktpersoner, ligesom der i oversigtsform gives en beskrivelse af en række spørgsmål i relation til såvel MAP som APA-procedurer i de konkrete stater. Oversigten findes på https://www.oecd.org/tax/dispute/country-map-profiles.htm. Afgørelser truffet af den kompetente myndighed kan ikke indbringes for anden administrativ myndighed, men kan indbringes for domstolene inden 3 måneder, jf. BEK nr. 1029 af 24. oktober 2005 og SFL § 48, STK. 3.

**Note 4:**

Denne overenskomst indeholder ingen eksplicit indbringelsesfrist. I praksis anvendes dog 3 års fristen, som formuleret i OECD-modellens art. 25, stk. 1.

OECD har udarbejdet en Manual on Effective Mutual Agreement Procedures (MEMAP), der forklarer nærmere om ansøgningen, processen m.v. Der er følgende link til MEMAP'en: http://www.oecd.org/dataoecd/19/35/38061910.pdf

**Note 5:**

Såfremt problemet ikke kan løses af den kompetente skattemyndighed, skal problemet søges løst ved gensidig myndighedsaftale (via en »mutual agreement procedure«) med den kompetente myndighed i den anden stat.

Hvis de kompetente myndigheder når til enighed om sagens løsning, gøres skatteyderen bekendt med aftalen og skal herefter skriftligt tilkendegive, at han er indforstået med sagens resultat. Samtidig skal skatteyderen acceptere, at han afstår fra at udnytte andre klagemuligheder eller sagsanlæg vedrørende samme emne og indkomstår.

Hvis skatteyderen ikke vil godkende aftalen indgået mellem de to kompetente myndigheder, falder den bort. Skatteyderen kan herefter kun påberåbe sig nationale regler - begrænset af gældende frister - til undgåelse af dobbeltbeskatning.

**Note 6:**

Enhver aftale indgået mellem de to staters kompetente myndigheder om regulering af en indkomstansættelse skal gennemføres uden hensyntagen til eventuelle nationale genoptagelses- og forældelsesfrister, idet overenskomsten indeholder en suspensionsregel, jf. kommentar 39 til modeloverenskomsten.

**Note 7:**

Her opfordres og bemyndiges de kompetente myndigheder til om muligt at løse vanskeligheder i forbindelse med fortolkning og anvendelse af overenskomsten ved gensidig aftale. Disse er i det væsentlige vanskeligheder af generel karakter, der angår, eller som kan angå, en gruppe af skatteydere, også selv om de er opstået i forbindelse med en konkret sag, der normalt er omfattet af den i stk. 1 og stk. 2 omhandlede procedure.

Denne bestemmelse gør det muligt at løse vanskeligheder, der opstår i forbindelse med anvendelsen af overenskomsten. Sådanne vanskeligheder er ikke blot vanskeligheder af praktisk art, som kan opstå i forbindelse med fastsættelsen og gennemførelsen af fremgangsmåden med hensyn til nedsættelse af den skat, der pålignes udbytter, renter og royalties i den stat, i hvilken de opstår, men også vanskeligheder, hvis løsning ikke er gjort afhængig af en forudgående aftale om fortolkningen af overenskomsten, og som kan hindre eller besværliggøre den normale anvendelse af bestemmelserne i overenskomsten, således som forholdene har forstået dem.

I henhold til denne bestemmelse kan de kompetente myndigheder ifølge OECDs kommentarer især:

- Fuldstændiggøre eller tydeliggøre en definition for at undgå enhver vanskelighed, når et udtryk er mangelfuldt eller flertydigt defineret i overenskomsten.

- Afgøre enhver vanskelighed, som, når lovgivningen i en stat er blevet ændret uden at svække balancen eller påvirke indholdet i overenskomsten, kan opstå som følge af de nye beskatningsregler, der fremkommer ved sådanne ændringer.

- Afgøre, om og i bekræftende fald under hvilke omstændigheder renter kan behandles som udbytte i henhold til regler om "tynd kapitalisering" i de stater, hvori låntageren er hjemmehørende, og foranledige lempelse af dobbeltbeskatning i den stat, hvori långiveren er hjemmehørende, på samme måde som for udbytte (f.eks. lempelse i henhold til en moder-/datterselskabsordning, når der er taget højde for sådan lempelse i den relevante bilaterale dobbeltbeskatningsoverenskomst).

- Indgå bilaterale forhåndsgodkendte prisfastsættelsesordninger (APA'er) samt indgå multilaterale APA'er med de kompetente myndigheder i tredjestater, med hvilke hver af de kontraherende stater har indgået en bilateral dobbeltbeskatningsoverenskomst, i tilfælde, hvor der er vanskeligheder eller tvivlsspørgsmål med hensyn til fortolkningen eller anvendelsen af overenskomsterne (navnlig i tilfælde, hvor passivitet fra de kontraherende staters side formodes at medføre beskatning, der ikke er i overensstemmelse med bestemmelserne i overenskomsten). En multilateral APA kan indgås enten ved at forhandle en enkelt aftale mellem alle de kompetente myndigheder i de pågældende stater eller ved at forhandle særskilte, men konsistente, bilaterale gensidige aftaler.

- Fastlægge egnede procedurer, vilkår og metoder for anvendelsen af stk. 1 og 2 samt andet punktum i dette stykke i forbindelse med multilaterale sager (jf. pkt. 38.1-38.5 ovenfor og pkt. 55-55.2 nedenfor) og for inddragelsen af tredjestater i den gensidige aftaleprocedure, hvis afgørelsen af en sag kan påvirke eller blive påvirket af beskatning i tredjestater.

- Men ud over det indeholder denne overenskomst eksplicit nogle forhold, som de kompetente myndigheder kan aftale med hjemmel i art. 25.

**Note 8:**

Der findes ikke en tilsvarende bestemmelse i modeloverenskomsten. Reglen sikrer, at der ved indgåelsen af en mutual agreement kan tages højde for udviklinger i økonomiske eller valutariske forhold.

**Note 9:**

Dette stykke fastsætter, hvordan de kompetente myndigheder kan rådføre sig med hinanden med henblik på ved gensidig aftale at afgøre enten en konkret sag, der falder ind under den procedure, der er angivet i stk. 1 og stk. 2, eller løse de generelle problemer, der især angår fortolkningen eller anvendelsen af overenskomsten, og som er omhandlet i stk. 3. De kompetente myndigheder kan henvende sig direkte til hinanden. Det er derfor ikke nødvendigt at anvende diplomatiske kanaler. Hvad angår denne fælles kommission, overlader stk. 4 det til de kompetente myndigheder i de kontraherende stater at fastsætte antallet af medlemmer og forretningsordenen for dette organ. Denne mulighed ses kun meget sjældent anvendt i praksis.

Se udvalgte domme og afgørelser med relation til artikel 25 i OECD-modeloverenskomsten.

**(26)**

**Artikel 26 Udveksling af oplysninger**

Art. 26 afviger fra OECD-modeloverenskomstens art. 26. Ifølge artiklen har Danmark og USA forpligtet sig til at udveksle sådanne oplysninger, at overenskomstens målsætninger kan realiseres. Artiklen begrænser ikke udvekslingen af oplysninger til personer eller selskaber, der er hjemmehørende i de to stater. Bemærk den indgåede FATCA aftale, BEK nr. 8 af den 14. marts 2013.

**Note 1:**

Den kompetente myndighed i Danmark omtalt her i art. 26 er Skattestyrelsen, Særlig Kontrol, CEBI 2 - Kompetent myndighed, Lyseng Alle 1, 8270 Højbjerg. Når det drejer sig om automatisk udveksling af oplysninger er den kompetente myndighed efter art. 26 dog Skattestyrelsen, Person, Udland, Kompetent Myndighed Udland 13, Toldbodgade 3, 8900 Randers. Det er den kompetente myndighed vedrørende udveksling af oplysninger, der alene forestår udveksling af oplysninger med udlandet. Kun oplysninger udveksl

mellem staternes kompetente myndigheder (i henhold til art 26) vil med sikkerhed have retsgyldighed.

**Note 2:**

Udveksling af oplysninger kan foregå på flere forskellige måder. Der sondres normalt mellem følgende typer: (1) Automatisk udveksling af oplysninger, (2) Spontan udveksling af oplysninger, (3) Samtidige undersøgelser (også betegnet som simultane revisioner), (4) Tilstedeværelse af embedsmænd på den anden parts område og (5) Sektoropdelt udveksling af oplysninger.

I særlige tilfælde vil en stat være nødsaget til at anmode om beedigede skriftlige vidneudsagn eller legaliserede kopier af originale dokumenter. Så vidt muligt skal den anden stat imødekomme sådanne ønsker.

**Note 3:**

I nyere udgaver af OECD-modellen anvendes formuleringen »forudsigeligt relevant« og hensigten her den, at en stat ikke frit kan anmode om oplysninger, der sandsynligvis ikke vil være relevante for behandlingen af en skatteyders sag.

Ifølge den dansk-amerikanske overenskomst kan der imidlertid udveksles oplysninger, der er »relevante« i modsætning til den formulering, der blev anvendt i OECD-modellen på det tidspunkt, hvor den dansk-amerikanske overenskomst blev indgået, hvori der blev nævnt »nødvendige« oplysninger. »Relevante« er indsat i stedet for at sikre, at det ikke skal godtgøres, at det pågældende land ville være ude af stand til eksempelvis at opkræve en skat foruden oplysningerne. Det er endvidere præciseret, at der kan udveksles oplysninger vedrørende påligning og opkrævning, inddrivelse m.v. af skatter, der er omfattet af overenskomsten.

Der kan kun indhentes oplysninger, for så vidt beskatningen ikke strider mod overenskomsten. Udveksling af oplysninger vedrørende skatter skal ske i videst muligt omfang, og samtidig at præcisere, at de kontraherende stater ikke helt frit kan iværksætte "fiskeekspeditioner" eller anmode om oplysninger, der sandsynligvis ikke vil være relevante for en given skatteyders sag. I kommentarerne til den nuværende OECD-model står der, at i forbindelse med udveksling af oplysninger efter anmodning kræves det, at der på det tidspunkt, hvor anmodningen fremsættes, er en rimelig sandsynlighed for, at de oplysninger, der anmodes om, vil være relevante. Om de oplysninger, der afgives, rent faktisk viser sig at være relevante, er uden betydning. En anmodning kan derfor ikke afslås i tilfælde, hvor en bestemt vurdering af relevansen af oplysningerne til brug for en igangværende sag kun kan foretages efter modtagelsen af oplysningerne. De kompetente myndigheder skal rådføre sig med hinanden i situationer, hvor indholdet af anmodningen, eller hvor de omstændigheder, der førte til fremsættelsen af anmodningen, eller hvor den forudsigelige relevans af anmodningen ikke står klart for den anmodede stat. Når den anmodede stat har redegjort for relevansen af de oplysninger, der anmodes om, kan den anmodede stat ikke afslå en anmodning eller tilbageholde oplysningerne, fordi den mener, at de ikke er relevante for den underliggende undersøgelse. Hvis den anmodede stat bliver opmærksom på omstændigheder, der giver anledning til at betvivle, om dele af de oplysninger, der er anmodet om, er relevante, bør de kompetente myndigheder rådføre sig med hinanden, og den anmodede stat kan bede den anmodende stat om at redegøre for relevansen i lyset af disse omstændigheder. På samme måde forpligter stk. 1 ikke den anmodede stat til at afgive oplysninger efter anmodning, når der er tale om en "fiskeekspedition", dvs. teoretiske anmodninger, der ikke har nogen åbenbar forbindelse med en igangværende undersøgelse.

En anmodning om oplysninger udgør ikke en "fiskeekspedition" alene fordi den ikke angiver navnet eller adressen (eller begge dele) på den skatteyder, der er genstand for undersøgelsen. Det samme gælder i tilfælde, hvor navne er stavet forskelligt, eller hvor informationen om navne og adresser præsenteres på forskellig måde. I tilfælde, hvor den anmodende stat ikke angiver navnet eller adressen (eller begge dele) på den skatteyder, der er genstand for undersøgelsen, skal den anmodede stat dog anføre anden information, der er tilstrækkelig til at identificere skatteyderen.

De oplysninger, der kan indhentes, er ikke begrænset til specifikke oplysninger om skatteydere. Det kan også være følsomme oplysninger vedrørende administrationen af beskatningen og forbedringer af skattekontrollen.

Der er intet til hinder for, at artiklen kan finde anvendelse på udveksling af informationer, der eksisterede før overenskomsten/den nye overenskomst trådte i kraft.

Oplysninger efter stk. 1 kan udveksles på en af tre måder (evt. i kombination): efter anmodning, automatisk eller spontant. Der kan dog ikke kræves udleveret oplysninger, som strider mod en stats lovgivning eller forvaltningspraksis (se SKL § 66), eller som vil røbe forretningshemmelighedre eller stride mod almene interesser. Der vil således kun indhentes oplysninger, som allerede er i skattemyndighedernes besiddelse eller som kan indhentes under en normal lignings- eller kontrolprocedure. Der vil sædvanligvis være (underforstået) et krav om potentiel gensidighed, altså at den anden stat forudsætningsvist vil være indstillet på at udlevere samme type oplysninger, som den selv har anmodet om. De udvekslede oplysninger skal behandles som fortrolige. I særlige tilfælde kan videregivelsen af økonomiske oplysninger risikere at afsløre en erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed. Beskyttelsen af sådanne oplysninger kan også udstrække sig til oplysninger, der indehaves af tredjemand. En bank kan f.eks. være i besiddelse af en patentansøgning eller lignende. I sådanne tilfælde skal oplysninger om erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed fjernes fra dokumenterne førend de videregives.

**Note 4:**

Artiklens formulering gør det klart, at udvekslingen af oplysninger ikke er begrænset af art. 1 og den kan vedrøre administrationen eller inddrivelsen af skatter, der ikke er omfattet af art. 2.

**Note 5:**

Gensidig bistand mellem skatteadministrationer er kun mulig, hvis hver administration er sikker på, at den anden administration vil behandle de oplysninger, som den modtager under samarbejdet, med behørig fortrolighed. Reglerne i stk. 1 om, at oplysninger skal behandles fortroligt, finder anvendelse på alle former for oplysninger, der er modtaget i henhold til stk. 1, herunder såvel oplysninger, der fremgår af anmodningen, som oplysninger, der fremsendes efter anmodning. Derfor omfatter reglerne om, at oplysninger skal behandles fortroligt, f.eks. brevveksling mellem de kompetente myndigheder, herunder også det brev, hvori anmodningen fremsættes. Samtidig er det underforstået, at den anmodede stat kan videregive et minimum af de oplysninger, der er indeholdt i et brev udvekslet mellem de kompetente myndigheder (men ikke selve brevet), når oplysningerne er nødvendige, for at den anmodede stat er i stand til at indhente eller afgive de ønskede oplysninger til den anmodende stat, uden at modarbejde den anmodende stats interesser. Hvis retshandlinger eller lignende i henhold til den nationale lovgivning i den anmodede stat nødvendiggør, at selve brevet fra den kompetente myndighed fremlægges, kan den kompetente myndighed i den anmodede stat dog fremlægge dette brev, medmindre den anmodede stat bestemmer andet. Opretholdelse af hemmeligholdelse i den kontraherende stat, der modtager oplysningerne, er underlagt statens nationale lovgivning. Det er derfor bestemt i stk. 1, at oplysninger meddelt i henhold til bestemmelserne i overenskomsten skal behandles som hemmelige i den stat, der modtager oplysningerne, på samme måde som oplysninger indhentet i henhold til den nationale lovgivning i denne stat. Sanktioner som følge af krænkelse af denne hemmeligholdelsespligt i den pågældende stat reguleres af denne stats forvaltningsretlige og strafferetlige lovgivning. I situationer, hvor den anmodede stat fastslår, at den anmodende stat ikke overholder sine forpligtelser vedrørende fortrolighed med hensyn til de oplysninger, der udveksles i henhold til denne art., kan den anmodede stat sætte bistanden i henhold til denne art. i bero, indtil den anmodende stat har givet behørig sikkerhed for, at forpligtelserne vil blive iagttaget. Om nødvendigt kan de kompetente myndigheder indgå særlige aftaler eller et "memorandum of understanding" vedrørende fortroligheden af de oplysninger, der udveksles i henhold til denne art.

Med forbehold for OECD-modellens kommentar pkt. 12.3 og pkt. 12.4 til art. 26 må modtagne oplysninger kun meddeles til personer og myndigheder,

der er beskæftiget med påligning, opkrævning eller tvangsinddrivelse af, retsforfølgning i forbindelse med eller afgørelse af ankesager vedrørende de skatter, om hvilke der kan udveksles oplysninger i henhold til stk. 1, første punktum, eller med tilsyn hermed. Dette betyder, at oplysningerne også kan meddeles til skatteyderen, hans befuldmægtigede eller til vidner. Dette betyder også, at oplysningerne kan gives til statslige eller retslige myndigheder, der har til opgave at afgøre, om sådanne oplysninger kan meddeles til skatteyderen, hans befuldmægtigede eller til vidner. De oplysninger, der er modtaget af en kontraherende stat, må af disse personer eller myndigheder kun benyttes til de formål, der er nævnt i stk. 1. Endvidere må de oplysninger, der er omfattet af stk. 1, hvad enten de vedrører en bestemt skatteyder eller ej, ikke meddeles til personer eller myndigheder, der ikke er nævnt i stk. 1, uanset om den nationale lovgivning, såsom lovgivning om offentlighed i forvaltningen og gøren lovgivning, der giver større aktindsigt i offentlige dokumenter, måtte give mulighed herfor.

**Note 6:**

Denne bestemmelse er en indskrænkning i forhold til OECD-modellens tekst.

**Note 7:**

Dette stykke indeholder visse begrænsninger i hovedreglen til fordel for den stat, der er anmodet om oplysninger. Stykket præciserer først, at en kontraherende stat ikke er forpligtet til at handle i strid med sin nationale lovgivning og forvaltningspraksis, når den skal stille oplysninger til rådighed for den anden kontraherende stat. Nationale bestemmelser om tavshedspligt i skattesager skal imidlertid ikke fortolkes således, at de udgør en hindring for udveksling af oplysninger i henhold til nærværende art.. Som nævnt ovenfor er myndighederne i den stat, der anmoder om oplysninger, forpligtet til at iagttage tavshedspligt med hensyn til de oplysninger, der modtages i henhold til denne art.

Den stat, over for hvilken en anmodning om oplysninger fremsættes, behøver ikke at gå så vidt som til at træffe administrative foranstaltninger, der strider mod lovgivningen eller praksis i den stat, der anmoder om oplysningerne, eller at afgive oplysninger, der ikke kan indhentes i henhold til lovgivningen eller almindelig forvaltningspraksis i den anmodende stat. Det følger heraf, at en kontraherende stat ikke kan drage fordel af den anden stats oplysningssystem, hvis det er mere vidtgående end dens eget system. En stat kan således nægte at give oplysninger i tilfælde, hvor den anmodende stat som følge af sin lovgivning ville være udelukket fra at modtage eller give oplysninger, eller i tilfælde, hvor den anmodede stats forvaltningspraksis (f.eks. manglende administrative ressourcer) resulterer i mangel på gensidighed.

Gensidighedsprincippet finder ikke anvendelse i tilfælde, hvor der i henhold til lovgivningen eller forvaltningspraksis i kun én af staterne gælder en særlig procedure. F.eks. kan en stat, der er anmodet om at give oplysninger, ikke under henvisning til, at der ikke eksisterer en ordning vedrørende forhåndstilsagn i skattesager i den stat, der anmoder om oplysninger, nægte at give oplysninger om forhåndstilsagn, den har givet, ud fra en argumentation om gensidighed.

Oplysninger kan ikke indhentes fra en person, hvis den pågældende påberåber sig forbudtet mod selvinkriminering. En stat, der er anmodet om oplysninger, kan derfor nægte at give oplysningerne, hvis den anmodede stat på grund af sine egne regler om selvinkriminering ville være udelukket fra at indhente oplysningerne under lignende omstændigheder. I praksis har forbudtet mod selvinkriminering imidlertid ringe eller ingen betydning i forbindelse med de fleste anmodninger om oplysninger. Forbudtet mod selvinkriminering er personligt og kan ikke påberåbes af en fysisk person, der ikke selv risikerer en strafferetlig tiltale. Langt størsteparten af anmodninger om oplysninger omhandler indhentelse af oplysninger fra tredjeparter såsom banker, formidlere og en kontraktpart, og ikke fra den person, som undersøgelsen vedrører. Endvidere gælder forbudtet mod selvinkriminering generelt kun for fysiske personer.

Det står den stat, der anmodes om oplysninger, frit for at nægte at give disse i de tilfælde, som art. 26 giver mulighed for. Hvis staten imidlertid alligevel afgiver de ønskede oplysninger, vil dette være inden for de i overenskomsten

Copyright © 2024 Karnov Group Denmark A/S

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)    2000-03-31

aftalte rammer for udveksling af oplysninger. Det kan følgelig ikke hævdes, at denne stat har tilsidesat sin tavshedspligt.

Foruden de begrænsninger, der er henvist til i litra a) og b), indeholder stk. 2, litra c), et forbehold angående videregivelse af visse fortrolige oplysninger. De hemmeligheder, der er nævnt, bør ikke tillægges en alt for bred betydning. Før denne bestemmelse påberåbes, bør en kontraherende stat omhyggeligt afveje, om skatteyderens interesser reelt berettiger dens anvendelse. I modsat fald er det klart, at en for fortolkning i mange tilfælde ville gøre den udveksling af oplysninger, der er foreskrevet i overenskomsten, ineffektiv. Den stat, der anmodes om oplysninger, er for at kunne beskytte sine skatteyderes interesser indrømmet et vist skøn til at nægte at give de ønskede oplysninger, men hvis den frivilligt afgiver oplysningerne, kan skatteyderen ikke påberåbe sig, at der er sket brud på reglerne om tavshedspligt.

I de fleste tilfælde vil der i forbindelse med udveksling af oplysninger ikke opstå spørgsmål om erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed. Ved en erhvervsmæssig eller forretningsmæssig hemmelighed forstås almindeligvis forhold, der er af væsentlig økonomisk betydning, og som kan udnyttes praktisk, og hvor den uautoriserede brug kan medføre alvorlig skade (f.eks. kan medføre et betydeligt økonomisk tab). Fastsættelse, pålignig eller opkrævning af skatter kan ikke i sig selv anses for at medføre alvorlig skade. Oplysninger om økonomiske forhold, herunder regnskabsbøger og bilag, udgør i sagens natur ikke en erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed. I visse begrænsede tilfælde kan videregivelsen af økonomiske oplysninger dog afsløre en erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed. En anmodning om oplysninger om bestemte indkøbsoversigter kan være et eksempel herpå, hvis videregivelsen af disse oplysninger ville afsløre produktionsmetoder anvendt ved fremstillingen af et produkt. Beskyttelsen af sådanne oplysninger kan også udstrække sig til oplysninger, der indehaves af tredjemand. En bank kan f.eks. være i besiddelse af en verserende patentansøgning med henblik på sikker opbevaring, eller en hemmelig formel eller fremstillingsmetode kan være beskrevet i en låneansøgning eller kontrakt, som banken er i besiddelse af. I sådanne tilfælde skal detaljer om en erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed fjernes fra dokumenterne, hvorefter de tilbageværende økonomiske oplysninger kan videregives.

En anmodet stat kan nægte at videregive oplysninger vedrørende fortrolig kommunikation mellem advokater og andre med lignende repræsentationsfuldmagt og deres klienter i det omfang, kommunikationen skal behandles som fortrolig i henhold til den nationale lovgivning. Omfanget af den beskyttelse, der gives sådan fortrolig kommunikation, skal dog defineres snævert. Beskyttelsen gælder ikke dokumenter og bilag, der er udleveret til en advokat eller andre med lignende repræsentationsfuldmagt i et forsøg på at undgå lovpligtig videregivelse heraf. Endvidere gælder, at oplysninger om en persons identitet, såsom en direktør eller den retmæssige ejer af et selskab, typisk ikke anses som fortrolige. Omfanget af den beskyttelse, der gives fortrolig kommunikation, kan variere fra stat til stat, men skal ikke fortolkes alt for bredt, således at en effektiv udveksling af oplysninger hindres. Kommunikation mellem advokater eller andre med lignende repræsentationsfuldmagt og deres klienter er kun fortrolig, hvis, og i det omfang, sådanne repræsentanter handler i deres egenskab af advokater eller andre med lignende repræsentationsfuldmagt og ikke i en anden egenskab såsom stedfortrædere for aktionærer ("nominee shareholders"), formueforvaltere, båndlæggere, direktører for selskaber, eller i henhold til en fuldmagt til at repræsentere et selskab i dets forretningsanliggender. En påstand om, at oplysninger er beskyttet som fortrolig kommunikation mellem en advokat eller andre med lignende repræsentationsfuldmagt og deres klient, skal udelukkende afgøres i den kontraherende stat, i henhold til hvis lovgivning den gøres gældende. Det er således ikke hensigten, at domstolene i den anmodede stat skal træffe afgørelse vedrørende krav, der er baseret på lovgivningen i den anmodende stat.

Stk. 2 indeholder også en begrænsning med hensyn til oplysninger, der vedrører statens egne vitale interesser. Det er således bestemt, at kontraherende stater ikke er forpligtet til at afgive oplysninger, hvis offentliggørelse ville stride mod almene interesser (ordre public). Denne begrænsning er imidlertid

kun aktuel i ganske særlige tilfælde. Et sådant tilfælde kunne f.eks. være, hvis en skatteundersøgelse i den anmodende stat var motiveret af politisk, racemæssig eller religiøs forfølgelse. Begrænsningen kan også påberåbes, når oplysningerne udgør en statshemmelighed, f.eks. følsomme oplysninger, som efterretningstjenesten er i besiddelse af, og hvor videregivelsen af disse ville stride mod den anmodede stats vitale interesser. Spørgsmål vedrørende almene interesser (ordre public) opstår således sjældent i forbindelse med udveksling af oplysninger mellem overenskomstpartnere.

**Note 8:**
Stk. 1 pålægger en kontraherende stat en udtrykkelig forpligtelse til at udveksle alle former for oplysninger. Hensigten med stk. 3 er at sikre, at begrænsningerne i stk. 2 ikke kan bruges til at hindre udvekslingen af oplysninger, der indehaves af banker, andre finansielle institutioner, stedfortrædere, repræsentanter og formueforvaltere, såvel som oplysninger om ejerforhold. Bestemmelsen, der blev tilføjet til modellen i 2005, indebærer en ændring af opbygningen af art. 26, men skal ikke forstås således, at den tidligere udformning af art. 26 ikke gav ret til at udveksle sådanne oplysninger. Langt de fleste OECD-medlemsstater udvekslede allerede sådanne oplysninger i henhold til den tidligere udformning af art. 26, og tilføjelsen af det pågældende stykke afspejler blot gældende praksis.

En kontraherende stat ikke må nægte at give oplysninger til en overenskomstpartner, alene fordi oplysningerne indehaves af en bank eller en anden finansiel institution. Stk. 3 har således forrang frem for stk. 2 i den udstrækning, at stk. 2 ellers ville tillade en anmodet kontraherende stat at nægte at give oplysninger på grund af bankhemmelighed. Stk. 3 bestemmer også, at en kontraherende stat ikke kan nægte at give oplysninger, alene fordi oplysningerne indehaves af personer, der handler som repræsentanter eller formueforvaltere. Hvis f.eks. en kontraherende stat har en lovgivning, i henhold til hvilken alle oplysninger, der indehaves af en formueforvalter, behandles som en "forretningsmæssig hemmelighed", alene fordi de indehaves af en formueforvalter, kan denne stat ikke anvende sådan lovgivning som grundlag for at nægte at give oplysninger til den anden kontraherende stat. En person siges almindeligvis at handle som formueforvalter, når den virksomhed, som personen udøver, eller de penge eller andre aktiver, som personen forvalter, ikke tilhører personen selv eller ikke er til fordel for personen, men er til fordel for en anden person, som formueforvalteren har en relation til, der indebærer og nødvendiggør, på den ene side, fortrolighed og tillid, og, på den anden side, loyalitet, f.eks. en bestyrer af båndlagt kapital. Udtrykket "repræsentant" er meget bredt og omfatter alle former for rådgivere, f.eks. selskabsstiftere, administrationsselskaber og advokater.

Endelig fastslås det i stk. 3, at en kontraherende stat ikke kan nægte at give oplysninger, alene fordi oplysningerne vedrører ejerinteresser i en person, herunder selskaber og interessentskaber, fonde og tilsvarende strukturer. Anmodninger om oplysninger kan ikke nægtes, blot fordi den nationale lovgivning eller praksis måtte behandle oplysninger om ejerforhold som en erhvervsmæssig eller anden form for hemmelighed.

Stk. 3 udelukker ikke en kontraherende stat fra at påberåbe sig stk. 2 og nægte at give oplysninger, der indehaves af en bank, en finansiel institution eller en person, der handler som repræsentant eller formueforvalter, eller oplysninger, der vedrører ejerinteresser. En sådan afvisning af at give oplysninger skal imidlertid være begrundet i forhold, der ikke har relation til personens status som bank, finansiel institution, repræsentant, formueforvalter eller stedfortræder, eller i den omstændighed, at oplysningerne vedrører ejerinteresser. F.eks. kan en juridisk repræsentant for en klient handle som repræsentant, men for så vidt angår oplysninger, der er beskyttet som fortrolig kommunikation mellem advokater eller andre med lignende repræsentationsfuldmagt og deres klienter, giver art. 26, stk. 2, fortsat mulighed for at nægte at give oplysningerne.

**Note 9:**
En tekst svarende til stk. 3, blev indsat i modellens stk. 4 i 2005 med henblik på udtrykkeligt at fastslå forpligtelsen til at udveksle oplysninger i tilfælde, hvor den anmodede stat ikke behøver disse oplysninger til brug for sine egne beskatningsmæssige formål. Før indsættelsen af modellens stk. 4 fremgik

Copyright © 2024 Karnov Group Denmark A/S

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                                    2000-03-31

denne forpligtelse ikke udtrykkeligt af artiklen, men den var klart forudsat i den praksis, der blev fulgt af medlemsstaterne. Denne praksis viste, at kontraherende stater, når de indsamler oplysninger, som en overenskomstpartner har anmodet om, ofte bruger de særlige fremgangsmåder, som deres lovgivning tillader i forbindelse med påligningen af deres egne skatter, selv om de ikke selv behøver oplysningerne til dette formål. Dette er også fastslået i rapporten "Improving Access to Bank Information for Tax Purposes".

Stk. 3 fastslår, at oplysninger skal kunne udveksles, selvom de ikke er nødvendige for foretagelsen af en skatteansættelse i den stat. En stat kan således ikke nægte at afgive oplysninger i de tilfælde, hvor dens nationale lovgivning forudsætter, at afgivelse af oplysninger (kun) skal være relevante for den derværende nationale beskatning. Således må ingen begrænsning i den anmodede stats mulighed for at indhente oplysninger fra en person til egne beskatningsmæssige formål på tidspunktet for anmodningen (f.eks. fordi forældelsesfrister i henhold til den anmodede stats nationale lovgivning er udløbet eller fordi en skatterevision skal være færdiggjort forinden) begrænse den pågældende stats adgang til at gøre brug af sine muligheder for indsamling af oplysninger med henblik på udveksling af oplysninger. Udtrykket "muligheder for indsamling af oplysninger" betyder de lovmæssige og forvaltningsmæssige retslige tiltag, der gør det muligt for en kontraherende stat at indhente og afgive de ønskede oplysninger. Stk. 34 forpligter ikke en anmodet kontraherende stat til at give oplysninger under omstændigheder, hvor den har forsøgt at indhente de ønskede oplysninger, men har konstateret, at oplysningerne ikke længere eksisterer, fordi opbevaringspligten efter den pågældende stats nationale regler er udløbet. Hvis de ønskede oplysninger stadigvæk er tilgængelige, uanset udløbet af opbevaringspligten, kan den anmodede stat imidlertid ikke nægte at udveksle de oplysninger, der er tilgængelige. Kontraherende stater bør sikre sig, at der opbevares retvisende regnskabsmateriale i mindst fem år.

**Note 10:**
Stk. 3 fastslår, at forpligtelsen i stk. 34 er underlagt begrænsningerne i stk. 3, men bestemmer også, at sådanne begrænsninger ikke skal fortolkes således, at de danner grundlag for at kunne nægte at give oplysninger i tilfælde, hvor en stats lovgivning eller praksis indeholder et krav om, at oplysningerne skal være relevante for den nationale beskatning. En stat, der anmodes om oplysninger, kan således ikke påberåbe sig stk. 3 og hævde, at den i henhold til sin nationale lovgivning eller praksis kun giver oplysninger, som er relevante for dens egne beskatningsmæssige formål, men den kan f.eks. nægte at give oplysninger, hvis disse ville røbe en erhvervsmæssig hemmelighed.

I særlige tilfælde vil en stat være nødsaget til at anmode om beedigede skriftlige vidneudsagn eller legaliserede kopier af originale dokumenter. Så vidt muligt skal den anden stat imødekomme sådanne ønsker.

Hensigten med anvendelsen af udtrykket "relevant" er den, at en stat ikke frit kan anmode om oplysninger, der sandsynligvis ikke vil være relevante for behandlingen af en skatteyders sag. Der kan kun indhentes oplysninger, for så vidt beskatningen ikke strider mod overenskomsten. Kommentarerne til modeloverenskomstens art. 26 er væsentligt udbygget med 2014-opdateringen, der blandt andet anfører direkte, at den anmodede stat ikke er forpligtet til at svare i tilfælde af såkaldte "fishing expeditions" fra den anmodende stat, ligesom der er sat tidsgrænser for, hvor lang tid de kompetente myndigheder bør være om at besvare henvendelser efter art. 26.

De oplysninger, der kan indhentes, er ikke begrænset til specifikke oplysninger om skatteydere. Det kan også være følsomme oplysninger vedrørende administrationen af beskatningen og forbedringer af skattekontrollen.

Udveksling af oplysninger om told og afgifter er ikke omfattet af art. 26.

Oplysninger kan udveksles på en af tre måder (evt. i kombination): efter anmodning, automatisk eller spontant. Det er almindelig praksis at aftale, at en anmodning om bistand skal være vedlagt en sådan dokumentation, som er krævet i lovgivningen i den anmodede stat, eller som staterne er blevet enige om og som er nødvendig for at foretage inddrivelse af skattekrav eller for at foretage handlinger til sikring af skattekrav. Det er muligt, at anmodningen vedrører en skat, der ikke eksisterer i den anmodede stat. Den anmodede stat skal efter omstændighederne anføre arten af skattekravet, hvorledes

kravet er sammensat, tidspunktet for forældelse af kravet og de aktiver, i hvilke kravet kan kræves. Den anmodede stat vil så følge den procedure, der finder anvendelse vedrørende krav på dens egne skatter, der svarer til den anmodende stats, eller en passende procedure, hvis der ikke eksisterer nogen tilsvarende skat.

Stk. 3 findes ikke i OECD-modellen.

Uanset afgrænsningen af skatter i art. 2 fremgår det af art. 26, stk. 4, at udveksling af oplysninger kan ske om enhver form for skatter, herunder skatter, der ikke er omfattet af overenskomsten.

Der kan dog ikke kræves udleveret oplysninger, som strider mod en stats lovgivning eller forvaltningspraksis (se skattekontrollovens § 8 Y), eller som vil røbe forretningshemmeligheder eller stride mod almene interesser. Der vil således kun indhentes oplysninger, som allerede er i skattemyndighedernes besiddelse eller kan indhentes under en normal lignings- eller kontrolprocedure. Der vil sædvanligvis være (underforstået) et krav om potentiel gensidighed, altså at den anden stat forudsætningsvist vil være indstillet på at udlevere samme type oplysninger, som den selv har anmodet om. De udvekslede oplysninger skal behandles som fortrolige. I særlige tilfælde kan videregivelsen af økonomiske oplysninger risikere at afsløre en erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed. Beskyttelsen af sådanne oplysninger kan også udstrække sig til oplysninger, der indehaves af tredjemand. En bank kan f.eks. være i besiddelse af en patentansøgning eller lignende. I sådanne tilfælde skal oplysninger om erhvervsmæssig, forretningsmæssig eller anden form for hemmelighed fjernes fra dokumenterne førend de videregives.

Oplysninger kan ikke indhentes fra en person, hvis den pågældende påberåber sig forbuddet mod selvinkriminering. Oplysninger indhentet i medfør af art. 26 må ikke anvendes til andre formål end skattemæssige medmindre følgende ordrentlige tekst er medtaget: "Uanset det foran anførte kan oplysninger, som en kontraherende stat har modtaget, anvendes til andre formål, når disse oplysninger kan anvendes til sådanne andre formål i henhold til lovgivningen i begge stater og forudsat, at den kompetente myndighed i den stat, der giver oplysningerne, giver tilladelse hertil." De indhentede oplysninger må dog videregives i offentlige retsmøder eller i retsafgørelser, der indeholder skatteyderens navn.

Den kompetente myndighed i relation til art. 26 er Skattestyrelsen, Særlig Kontrol, Kompleks Svig 1 - Kompetent myndighed, Lyseng Alle 1, 8270 Højbjerg. Kun oplysninger udvekslet mellem de kompetente myndigheder vil med sikkerhed have retsgyldighed.

Der kan i øvrigt henvises til SU 2000, 161, hvor skatteministeren har redegjort for forskellen mellem den tidligere og den nuværende overenskomsts bestemmelser om udveksling af oplysninger.

SU 2000, 161

**(27)**

**Artikel 27 Administrativ bistand**

Artiklen adskiller sig fra OECD-modellens art. 27 (Bistand med opkrævning af skatter). Den bestemmer, at overenskomstens kontraherende stater skal yde hinanden bistand med opkrævning af alle former for skatter. Staterne skal yde hinanden bistand med opkrævning af skat i det omfang, det er nødvendigt for at sikre, at skattefritagelse eller nedsættelse af skattesatsen indrømmet i henhold til overenskomsten ikke kommer personer, der ikke er berettiget til sådanne fordele, til gode. De kontraherende staters kompetente myndigheder kan ved gensidig aftale fastsætte de nærmere regler for gennemførelsen af denne art. Terminologisk benævnes den stat, der anmoder om bistand »den anmodende stat«, medens den stat, der anmodes om bistand, benævnes »den anmodede stat«.

I intet tilfælde skal bestemmelserne i denne art. kunne fortolkes således, at den pålægger en af staterne pligt til:

a) at udføre forvaltningsakter, der strider mod denne stats eller den anden stats lovgivning og forvaltningspraksis,

b) at udføre handlinger, der ville stride mod almene interesser (ordre public).

**Note 1:**

Artiklen omfatter bistand med inddrivelse af skyldige skattekrav omfattet af overenskomstens **art. 2**, men kun krav, der er endelige i den forstand, at de af lovgivningsmæssige årsager hverken kan påklages til anden/højere administrativ enhed eller indbringes for en domstol. Ifølge OECD-modellens tilsvarende bestemmelse omfatter dén alle skattekrav – altså ikke kun skattekrav omfattet af art. 2 som i den dansk-amerikanske overenskomst.

**Note 2:**

For hver af staterne gælder det, at den ene stats skattekrav i henhold til denne artikel skal inddrives i overensstemmelse med de regler, som finder anvendelse for den anden stats skattekrav, og at inddrivelsen skal accepteres af myndighederne i den anden stat.

**Note 3:**

Stk. 3 fastsætter de betingelser, der skal være opfyldte, for at en anmodning om bistand med opkrævning kan fremsættes. Skattekravet skal være eksigibelt i henhold til lovgivningen i den anmodende stat og være skyldigt af en person, der på dette tidspunkt ikke, i henhold til lovgivningen i denne stat, kan hindre opkrævningen af beløbet. Dette vil være tilfældet, når den anmodende stat ifølge sin nationale lovgivning er berettiget til at inddrive skattekravet, og personen, der skylder beløbet, ikke har juridiske eller administrative muligheder for at hindre inddrivelsen. Det er muligt, at anmodningen vedrører en skat, der ikke eksisterer i den anmodede stat. Den anmodede stat skal efter omstændighederne anføre arten af skattekravet, hvorledes kravet er sammensat, tidspunktet for forældelse af kravet og de aktiver, i hvilke kravet kan opkræves. Den anmodede stat vil så følge den procedure, der finder anvendelse vedrørende krav på dens egne skatter, der svarer til den anmodende stats, eller en passende procedure, hvis der ikke eksisterer nogen tilsvarende skat.

**Note 4:**

Et godkendt amerikansk skattekrav skal her behandles på samme måde, som hvis det havde været baseret på en dansk indkomstansættelse.

**Note 5:**

Hvis kravet – på noget tidspunkt efter at en anmodning er fremsat af en kontraherende stat, og før den anden stat har opkrævet og sendt skattekravet til den førstnævnte stat – ophører med at eksistere skal den stat, der fremsætter anmodningen, omgående tilbagekalde anmodningen om bistand ved opkrævning.

**Note 6:**

Er en bestemmelse om omkostningsfordeling.

**Note 7:**

En sådan anmodning fra den anden aftalestat skal ikke have fortrinsret.

**Note 8:**

Bestemmelsen omtaler her nogle situationer, hvor den ikke kan finde anvendelse. Hvis skatteyderen er en fysisk person og det relevante skattekrav vedrører en skattepligtig periode, hvori skatteyderen var statsborger i den stat, der modtager anmodningen, samt i tilfælde hvor skatteyderen er en enhed, der er et selskab, et dødsbo eller en trust og det relevante skattekrav vedrører en skattepligtig periode, hvori den pågældende enhed oppebar sin status som en sådan enhed fra lovgivningen i den stat, der modtager anmodningen, vil art. 27 ikke kunne finde anvendelse.

**Note 9:**

Er en anti-misbrugsbestemmelse.

**Note 10:**

Stykket præciserer først, at en kontraherende stat ikke er forpligtet til at handle i strid med sin egen eller den anden stats nationale lovgivning og forvaltningspraksis for at opfylde sine forpligtelser i henhold til artiklen. Hvis den anmodende stat således ikke ifølge sin nationale lovgivning har mulighed for at træffe foranstaltninger til sikring af kravet, kan den anmodede stat afslå at træffe sådanne foranstaltninger på vegne af den anmodede stat. Tilsvarende gælder det, at hvis beslaglæggelse af aktiver for at opfylde forpligtelsen til at inddrive et skattekrav ikke er tilladt i den anmodede stat, er denne stat ikke forpligtet til at beslaglægge aktiver, når den anden stat med opkrævning i henhold til bestemmelserne i artiklen. Administrative foranstaltninger, der er tilladt med henblik på opkrævning af den anmodede stats

skatter, skal dog iværksættes, selv om de alene bringes i anvendelse for at yde bistand med opkrævningen af skatter, der er skyldige til den anmodede stat. Endvidere indeholder en begrænsning med hensyn til at udføre handlinger, der strider mod almene interesser (ordre public).

**Note 11:**

Der er ikke indgået en sådan aftale på bilateralt niveau, men USA har tiltrådt OECD's og Europarådets konvention om administrativ bistand i skattesager med virkning fra den 1. april 1995, hvorimod USA ikke har tiltrådt ændringsprotokollen til konventionen.

**Note 12**

Bestemmelsen svarer til modellens art. 27, stk. 8, litra c og litra d. Efter bestemmelsen er en kontraherende stat ikke forpligtet til at imødekomme anmodningen, hvis den anden stat ikke har truffet alle rimelige foranstaltninger, der er mulige i henhold til denne stats lovgivning eller forvaltningspraksis, for at opkræve eller sikre kravet og endelig kan den anmodede stat også se bort fra anmodningen ud fra praktiske overvejelser, f.eks. hvis de omkostninger, der vil påløbe ved opkrævningen af den anmodede stats skattekrav, overstiger skattekravet.

**(28)**

**Artikel 28 Medlemmer af diplomatiske og konsulære repræsentationer**

Artiklen svarer til OECD-modeloverenskomstens art. 28.

**Note 1**

Overenskomsten berører således ikke diplomaters og lignende personers skattemæssige begunstigelser i henhold til internationale konventioner og aftaler.

Formålet med art. 28 er at sikre, at medlemmer af diplomatiske og konsulære repræsentationer ikke skal underkastes en mindre fordelagtig behandling end den, som de er berettiget til ifølge folkeretlige regler eller andre særlige internationale overenskomster.

**Note 2:**

For diplomater er Wienerkonventionen af 18/4 1961 om diplomatiske forbindelser, jf. lov nr. 252 af 18/6 1968, BKI nr. 355 af 18. oktober 1968 (ikrafttrædelsesbestemmelser) og BKI nr. 107 af 11. november 1968, særligt relevant, mens Wienerkonventionen af 24. april 1963 om konsulære forbindelser, jf. lov nr. 67 af 8. marts 1972 og BKI nr. 83 af 11. december 1972 og BKI nr. 511 af 28. november 1972 (ikrafttræden), regulerer forholdet for konsulære embedsmænd og repræsentanter. I tillæg hertil findes et antal særlige aftaler og konventioner om internationale organisationer m.v., som Danmark har indrømmet særlige rettigheder iht. lov nr. 567 af 30. november 1983.

I mange staters nationale lovgivning findes bestemmelser, hvorefter medlemmer af diplomatiske og konsulære repræsentationer i udsendelsesperioden i beskatningsmæssig henseende skal anses for hjemmehørende i den stat, hvorfra de er udsendt. Se kildeskattelovens § 1, stk. 1, nr. 1, 2 og 4. Der kan tillige indsættes særlige regler i overenskomsten, der fastslår, at den stat, der udsender medlemmer af diplomatiske delegationer og konsulære missioner, anses for at være de pågældendes bopælsstat.

I kraft af OECD-modellens art. 4, stk. 1, anses medlemmer af diplomatiske og konsulære repræsentationer, der af en tredjestat er akkrediteret en kontraherende stat, ikke for at være hjemmehørende i modtagerstaten, hvis de alene er undergivet begrænset skattepligt i denne stat (jf. pkt. 8 i kommentaren til art. 4). Det anførte gælder også for internationale organisationer i en kontraherende stat og disses repræsentanter, da disse normalt nyder fordel af visse skattemæssige begunstigelser, enten ifølge den konvention eller traktat, i henhold til hvilken organisationen er oprettet, eller i henhold til en traktat mellem organisationen og den stat, i hvilken den er oprettet.

Dette betyder, at internationale organisationer, organer eller embedsmænd, der i en kontraherende stat alene er skattepligtige af indkomst fra kilder i denne, ikke kan drage fordel af overenskomsten, se KM2006.486.HR/TfS 2006, 286.

Se udvalgte domme og afgørelser med relation til artikel 28 i OECD modeloverenskomsten.

**(29)**

**Artikel 29 Ikrafttræden**

Dobbeltbeskatningsoverenskomst mellem Danmark og USA (BKI 2000 13)                                                      2000-03-31

**Note 1:**

OECD-modellens art. 31 og art. 32 om fremgangsmåden i forbindelse med ikrafttræden, ratifikation og opsigelse er formuleret med henblik på bilaterale overenskomster og svarer til de regler, der sædvanligvis indeholdes i internationale traktater.

I stedet er formuleringen, at de to stater gensidigt skal underrette hinanden om, hvornår de forfatningsmæssige betingelser for overenskomstens ikrafttræden er blevet. Det vil sædvanligvis være tilfældet efter staternes parlamenter har godkendt aftalen.

Orienteringen om, at betingelserne for overenskomsten ikrafttræden er opfyldte, foregår via diplomatiske noter fra staternes udenrigsministerier.

**Note 2:**

Overenskomsten trådte i kraft den 31. marts 2000

**Note 3:**

Den har dermed virkning fra det /indkomstår, der starter den eller senere og for skatter ved kilden (udbytter/renter/royalties) fra den 1. maj 2000, mens den for øvrige skatter har virkning fra den 1. januar 2001

**(30)**

**Artikel 30 Opsigelse**

**Note 1:**

Overenskomsten forbliver i kraft indtil den opsiges af en af de kontraherende stater ad de diplomatiske kanaler.

Copyright © 2024 Karnov Group Denmark A/S