# Exhibit 9, Part 2 of 15

Pension plans' description of,

- that the trustee should *"manage all transactions on a daily basis,"* (...),
- the pension plans had *"no direct or indirect connection or knowledge of all the other pension plans'* or *'knowledge of the identity of all the other pension plans with a similar investment strategy,"* (...); and
- the custodian was not authorized to trade stocks on behalf of the pension plans, (...),

is in no way related to the *collective* and *coordinated* investment strategy of pension plans, as illustrated by the alleged stock trades.

**6.11    Two pension plans forgot to apply for reimbursement (new)**

Two pension plans represented by TVC Law Firm apparently forgot to seek re-merger of dividend tax for their alleged stock holdings.

This is [Pension Plan Q], which has not claimed reimbursement for stocks acquired in 2015:

| Stock | Number of stocks | Dividend tax withheld |
|---|---|---|
| A.P. Møller Maersk A/S – B | 8,094 | DKK 4,307,383.98 |
| Carlsberg A/S – B | 179,556 | DKK 436,321.08 |
| Coloplast A/S – B | 294,759 | DKK 358,132.19 |
| Danske Bank A/S | 3,578,514 | DKK 5,314,093.29 |
| DSV A/S | 823,723 | DKK 355,848.23 |
| FLSmidth & Co A/S | 80,747 | DKK 196,215.21 |
| GN Store Nord A/S | 630,605 | DKK 153,237.02 |
| Novo Nordisk A/S – B | 6,717,867v | DKK 9,069,120.45 |
| Novozymes A/S – B | 822,009 | DKK 665,827 |
| Pandora A/S | 492,896 | DKK 1,197,737.28 |
| TDC A/S (March) | 3,090,704 | DKK 834,490.08 |
| Tryg A/S | 35,072 | DKK 274,613.76 |
| A/S | 378,092 | DKK 398,130.88 |
| A.P. Møller Maersk A/S – A | 7,894 | DKK 4,200,949.98 |
| TDC A/S (August) | 1,092,245 | DKK 294,906.15 |
| **Sum** | | **DKK 28,057,006.87** |

In addition, [Pension Plan E] has not applied for reimbursement of a stockholding of 1,475,613 Coloplast stocks acquired in 2015, which would have included DKK 1,792,869.80 in the custody statement (...).

It makes no sense that the pension plans could miss out on being paid such substantial amounts, which were allegedly used to cover significant costs associated with this arrangement (Paragraph 5.8, above), or which the pension plans should in any event believe they are entitled to if they maintain that they are entitled to the reimbursements at issue in this case.

On the other hand, it makes sense that a single pension plan or accounting entry can disappear into the crowd in a fraud that at the Solo Group has been around DKK 9 billion and involved well over 100 pension plans and many thousands of alleged stock traders.

Pension plans claim they have very small gains, as the gains are eaten up by undocumented expenses. If this is true, then the two pension plans are missing a significant amount of money and thus have a significant outstanding balance that has not been paid. The alleged counterparties would discover this. The fact that they have apparently not discovered it merely shows that the whole thing is a paper exercise – and does not reflect real cash flows.

## 7. FORMALITIES

### 7.1 Burden of proof

It is the pension plans that have requested reimbursement of withheld dividend tax and it is thus also the pension plans that have the burden of proof that the conditions for reimbursement of dividend tax are fulfilled, cf. *e.g.,* UfR 2003.2312/3H. The pension plans do not dispute this, (...).

It is irrelevant whether the pension plans have submitted documents at the time of application, which – if they had been correct – were sufficient documentation according to the Danish Tax Agency's working procedures in 2015, cf. (...). What matters is whether, on the basis of the information in the case, the Danish National Tax Tribunal considers that the pension plans have proved that they met the conditions for reimbursement of dividend tax.

The pension plans' explanation of the transactions that should have entitled to dividend distribution is not transparent, see § 2.4, above, and the burden of proof is therefore increased, see *e.g.,* UfR 1998.898 H.

In addition, the pension plans' supporting material is flawed and deficient and their explanations and pleas incoherent and shifting to such an extent that the burden of proof must be *further* increased, see Paragraphs 3-6, above, and Paragraph 8, below, and *e.g.,* SKM2019.250.ØLR. The pension plans, on the other hand, argue that the burden of proof has shifted so that the Danish Tax Administration Authority is most likely to bear the risk of doubt due to the passage of time and the tribulations of reimbursement. In this context, the pension plans are hiding behind the fact that the Danish and English authorities have seized material from their custodians (...) and that the Danish Tax Agency should obtain material from the SØIK (...).

The Danish Tax Agency disputes that the burden of proof can be reversed in this way, even taking into account the nature of the cases. The pension plans have claimed reimbursements in the period 2012–2015 on the basis of very large alleged stockholdings. Each of the pension plans has thus made investments worth many millions of kroner – and in many cases even several billion kroner. The cases were (in the lead cases) commenced by the issuance of proposed rulings on March 23 and 24, 2017, and thus a few years after the payouts – and at times when accounting records should still be filed under both Danish and U.S. law.

TVC Law Firm represents more than 100 pension plans. It is simply not true that <u>all</u> these pension plans have been so reckless as to not even have any physical or electronic documentation of their past stockholdings (which formed the basis of their reimbursement claims).

It is striking that the pension plans have failed to provide, in 5 submissions and over 4,000 pages of supporting material, relevant material which *must* be in their possession if, as they claim, stock dealing has taken place:

- The pension plans have not provided their own statements. Statements of account have not been provided for either the cash or the equity holdings of the pension plans. It goes without saying that the pension plans are in possession of this material.

- There is no evidence that the pension plans have received the alleged net dividends or dividend distribution, (...).

- There is no evidence of cash flows, including cash collateral and payment for stocks. There is therefore no evidence that settlement has taken place, *i.e.,* that the alleged stock transactions have actually been carried out.

- According to the pension plans' own information, they have earned millions of kroner from the transactions. An example of this is [Pension Plan B] (...). In 19 cases [Pension Plan B] has, according to its own statement, traded stocks and thereby earned an amount which 'by chance' is almost as large as the dividend distribution, (...). The pension plans have not even attempted to provide the Danish National Tax Tribunal with an answer as to where their very large profits have gone. This is an example of how unrealistic the pension plans' attempts at argumentation are. When the story doesn't add up, well, that's just because it's wrong.

- Only a few of the GMSLAs invoked (...) have been provided and these are undated, unsigned and incomplete. In addition, in most cases the pension plans are not contractual parties.

- There is no evidence of the alleged pledge of the arbitrage proceeds (and the additional funds of the pension plans) to the GMSLA co-contractors and/or the custodian/Solo Capital, pursuant to the TTC clause.

Instead, pension plans have emerged with a series of shifting explanations and a significant volume of documents. When the pension plans' explanations are compared with the documents submitted by the pension plans during the preparation of the cases before the Danish Tax Appeals Agency, it appears that the pension plans have never owned Danish stocks. The available information, however, points in the opposite direction, cf. UfR 2003.2313/3 H. The "documentation" is in fact flawed to an unnaturally large extent.

There is no doubt in the matter; there is no evidence of the alleged stock deals and there are too many errors in the evidence provided by the pension plans to support their "story." In the National Tax Tribunal's view, if there is any doubt, it is only because the pension plans have failed to produce documents that *must* be in their possession. This must be to their evidential detriment and is contrary to their statement that they would disclose the files, (...).

**7.2      Annulment or revocation – invalid decisions can be revoked**

In (...), the pension plans claim that the Danish Tax Agency should have revoked its original, <u>valid</u> dividend tax reimbursement decisions, (...), even though no <u>new facts</u> have emerged in the cases since the payment decisions, (...). This is a misunderstanding of both the facts and the law.

The pension plans now correctly state in (...) that the legal circumstances must be understood as meaning that the Danish Tax Agency's revocation decisions amount to an annulment of the original decisions on the ground that they were *unlawful* and therefore *invalid*.

Thus, the decisions for [Pension Plan C], [Pension Plan B] and [Pension Plan F] state that (...):

> *"[Name] has therefore not demonstrated that [name] qualifies for a reimbursement of Danish withholding tax under Article 10 of the Double Taxation Treaty between Denmark and the United States.*
>
> *(...)*
>
> *The Danish Tax Agency's decisions to reimbursement dividend tax to [name] are therefore wrongly based.*
>
> *The Danish Tax Agency therefore revokes the previous decisions on reimbursement of dividend taxes."*

Similar wording appears in the Danish Tax Agency's decisions in the other drivers' cases.

As can be seen, the decisions state that the conditions for reimbursement were not met and that the decisions to pay were taken on *an erroneous* basis. The Danish Tax Agency's decisions are therefore *not* a recall of a *valid* decision. It is therefore incorrect for the pension schemes to state that "*The Danish Tax Agency itself considered that the original decisions on the payment of the dividend tax reimbursement were legally valid, since otherwise the Danish Tax Agency would have had to take a decision to annul these earlier decisions,*" (...).

It is irrelevant whether the Danish Tax Agency has called the decision "revocation' or 'annulment," (...). The financial plans cannot rely on the heading. In addition, the terms "revocation" and 'annulment' are not used consistently. In SKM2011.501.HR, the Supreme Court ruled that the Danish Tax Agency could "*revoke*" (not cancel) a license because it lacked a legal basis, *i.e.,* because it was invalid. The judgment illustrates how the concepts are (to some extent) used synonymously.

Since the pension plans never owned the stocks claimed, nor were they entitled to the dividends, the Danish Tax Agency's original dividend tax reimbursement decisions are invalid and the Danish Tax Agency was therefore both entitled and obliged to annul the decisions. For invalid decisions, the *clear starting point is that* such decisions cannot be upheld, see *e.g.,* SKM2011.501.HR. This is also clear from Administrative Law – General Topics, 6th edition, Chapter 8, pp. 517-518, to which the pension plans refer (...). The considerations on revocation referred to by the pension plans are thus of no relevance to the present case.

The facts are set out above and in (...). As can be seen, the Danish Tax Agency now has a number of items of information that were not available at the time of payment. It is therefore incorrect for the pension schemes to state that in the present case the Danish Tax Agency "*does not appear to be in possession of any genuinely new factual information in the matter,*" (...). When the Danish Tax Agency paid dividends to the pension plans' agent, the Danish Tax Agency was not aware of the large-scale reimbursement fraud. Nor did the Danish Tax Agency have any reason to believe that the basis for the requests was without substance.

The conditions for annulment/revocation of the earlier decisions are thus met, since the decisions are irremediable.

Even if the Danish Tax Agency can be blamed for not having carried out a proper check of each individual request for reimbursement, this does not alter the fact that the pension plans have not provided evidence that the pension plans *actually* owned the stocks claimed. Therefore, the Danish Tax Agency is also not prevented from revoking/cancelling the reimbursement decisions as a consequence, see *e.g.,* UfR 2003.2312/3H and UfR 2007.3052 H.

The fact remains that there is no evidence that the pension plans actually owned the alleged stocks and received the alleged net proceeds, and therefore they were not entitled to the reimbursements paid.

## 8. PENSION PLANS CONSIDERATIONS

### 8.1 Pension plans' money machine

The pension plans have stated in (...), that

> *"the elimination of financial risks [...] is a standard routine for any DIV-Arb transaction"*

and that

> *"every Div-Arb transaction is profitable."*

According to the pension plans, they have therefore been able to use an investment vehicle without any financial risk and which always pays off.

Indeed, the pension plans state in (...) that *"Div-Arb is a money-making machine."*

No such (legal) money machine exists.

### 8.2 One stock can have several owners

According to the pension plans, *"a stock may have more than one owner,"* (...).

That's not true.

This would imply that the issuing company would have to distribute dividends to more than 100% of its stockholders. This is not the case. Any doubt as to who owns a stock does not of course imply that there are several owners of the same stock at the same time.

If there could be multiple owners of the same stock, it would also mean that more than 100% of stockholders could attend and vote at the company's AGM.

### 8.3 Short-selling means that there are more stocks on the market than issued by the company

Pension plans claim that short-selling typically results in *"more stocks being available on the market than were originally issued,"* (...).

That's not true.

No more stocks may be traded than issued by the company – not even by short-selling. The chain in short-selling can be set up as follows:

Owner/stock lender → stock borrower/short-seller → short-buyer

Short-selling must be *covered*. In other words, the stock borrower must have borrowed the stock before selling it to the short buyer, and this sale agreement must of course respect the terms of the stock borrower's loan agreement with the stock lender – otherwise there is a default. Thus, one cannot (legally) duplicate either the stock or the right to dividend distribution by short-selling.

**8.4        1 dividend tax can lead to 2 reimbursements**

The pension plans claim that their setup *"results in two parallel dividend mergers, even though the Treasury has received only one dividend tax payment from the company."* (...).

This is patently false.

The reimbursements are, of course, the *repayment of* an amount that has been withheld. The payment of 1 withholding tax cannot therefore lead to 2 (legitimate) reimbursements. This would cause enormous losses to the Treasury. Any doubt as to who owns a stock and is therefore entitled to dividends and reimbursements does not, of course, mean that the Treasury has to reimbursement more dividend tax than has been withheld. After all, the State does not have to bear the risk (or the cost) that a trade was unlawful.

**8.5        The case is about law**

Pension plans try to wrap their *"money machine" in* a variety of legal considerations.

Ownership cannot be achieved through legal considerations. Rather, whether the pension plans acquired the alleged stocks is a question of fact. And the fact is that the pension plans cannot provide any concrete evidence of having owned the stocks. It is particularly noteworthy that none of the more than 100 pension plans has provided so much as one page of their own accounts.

This case does not concern the clarification of a legal grey area for the ownership of stocks. The case is about fact. Therefore, the pension plans' considerations of *bona fide ownership* and beneficial ownership are not relevant.

The right to a reimbursement of withheld dividend tax depends on whether you have owned stocks and received net dividends from them. If no stocks have been traded or if there are fictitious stock trades, the pension plans have not owned the stocks and are therefore not entitled to a reimbursement. This goes without saying. And it is irrelevant whether the pension plans were acting in good faith. *Ex tuto*, it should be noted that it is the Danish Tax Agency's view that the pension plans were acting in bad faith.

If these were *not* merely fictitious stock transactions, there would be firm and unequivocal evidence that the pension plans had purchased and owned the stocks and received the net proceeds therefrom.

**8.6    It's impossible to cheat with stock trades**

According to the pension plans, stock transactions are subject to such strict regulation that fictitious stock transactions cannot occur at all, (...). It is also – according to the pension plans – impossible for a custodian to issue documents without reality.

At the same time, however, the pension plans acknowledge that there are errors in (...) (custody statements and broker confirmations), which, according to the pension plans, *'appear to be due to simple human input errors in the computers'*, (...). In addition, some of the written trade notes from (...) (broker) contain *'deviations from the electronic instructions for settling the trade'*, (...).

These errors and anomalies illustrate the obvious fact that it *is* possible to cheat on stock trades if you have the will to do so.

Indeed, as this post shows, there are several clear errors in the material presented by the pension plans.

**8.7    Alternate explanations 1: Pension plans' "conclusive" evidence changes character**

The Pension Plans have previously claimed that the *Credit Advices* provided by the Shah-controlled custodians were "legal evidence" that the Pension Plans purchased the alleged stocks, (...). It is even stated in (...) – in general terms – that in addition to the Credit Advices

> *"there is no other evidence of receipt of a benefit."*

It is simply wrong that the pension plans – if they had actually received the alleged benefits – should not be able to provide any objective evidence of this.

Subsequently, the pension plans have taken the view that *the trade receipts* (...) are *"the decisive proof that the purchase of stocks has taken place,"* (...), since the presentation of a trade receipt is *"the only way of proving that one is the legal owner of stocks,"* (...).

Neither Credit Advices nor Trading Notes (...) document ownership of stocks. Credit Advices are just words on paper and trade notes do not prove that trades have actually been executed. In addition, the pension plans state in (...) that *'This allegation is materially incorrect. A broker confirmation is a trade note that can only be issued [...] when a trade has been <u>executed</u>."* (my emphasis).

Conversely, the pension plans state in (...) that *"the trading note from a broker [constitutes] evidence of a final and binding agreement to purchase stocks. As far as <u>settlement is concerned, the trade note from the broker does not prove that settlement has taken place.</u>"* (my emphasis).

It is therefore agreed that the broker confirmations submitted (...) <u>do not</u> prove that the transaction has been carried out.

Pension plans have also previously argued that a custody statement has *"the same substantive value as supporting documentation as a bank statement."* (...). The pension plans have maintained that the custody statements provided (...) showed *daily* account movements, (...).

However, the custody statements provided (...) are only annual statements which – without underlying account statements – show a number of internal accounting entries at the custodian.

The (...) also states that the custody statements submitted (...) are merely *'account statements produced at the end of each year and therefore only show a summary of all transactions. Each transaction, be it a purchase, sale, forward hedge or stock loan, was entered in the custodian's systems on an ongoing basis and each trustee was able to view each transaction in the account on an ongoing basis through online access."*

The pension plans' comments further state that *"the trustee had online access via Solo's web portal to view and manage all transactions on a daily basis."*

It is also striking in this light that *none* of the pension plans provide statements of account of any kind. And it is remarkable that the pension plans now so radically change the explanation of the content of (...), which the pension plans in (...), referred to as *"legal evidence of ownership of stock positions."*

**8.8        Alternate explanations 2: Inconsistencies in explanations of guarantee and payment of reimbursement**

According to the pension plans, the GMSLAs involve a *"pledge of all assets (present and future),"* (...), the pension plans state that the financial result of the alleged stock transactions and forwards was *"pledged as security under the GMSLA."* No evidence of such pledging of the pension plans' assets to the GMSLA co-contractors has been provided.

Moreover, this pledge is not linked to the fact that the pension plans in (...), have indicated that the Div- Arb result (including net dividends and reimbursement) was pledged to the respective *custodian*. According to (...), the ownership rights to all the pension plans' funds was transferred to the custodian as security for the payment of the stock transactions under the TTC clause (point 4.3 of the Custody Agreement, (...)). This collateral has not been documented either.

The pension plans have in (...), changed the explanation that the ownership rights for the funds (including net-two dividends and reimbursement) was *always* transferred to *Solo Capital*. However, this is not consistent with the TTC clause in the Custody Agreement submitted (...), which refers to the "Custodian." It is – or at least has been so far – undisputed that Solo Capital is only one of 4 Shah-controlled custodians used by the pension plans represented by TVC Law Firm. It is obvious that this information from the pension plans is contradictory.

In addition, it is undisputed that the reimbursements were not paid to either the GMSLA co-contractors or the custodian (or Solo Capital), but to the pension plans' agents.

If the result is pledged, it does not make sense that the reimbursements are paid to the pension plan agents instead of to the pledgee.

**8.9        Alternate explanations 3: Pension plans accounts**

The pension plans have stated at the office meetings that all their money was deposited in Solo Capital's account, (...), and that all the alleged stock transactions as well as the receipt of net dividends and reimbursement were made through this account, (...). No evidence of this has been provided. It is also contrary to the pension plans' earlier statement that the pension plans did not need separate accounts in addition to the account with their respective custodian (which in far from all cases was Solo Capital), (...).

If the pension plans' money was in Solo Capital's account, it also seems odd that custody statements – which the pension plans themselves compare to bank statements, (...) – prepared by West Point, Telesto and Old Park Lane are widely available.

In any event, none of the pension plans provided any account statements at all.

**8.10        Alternate explanations 4: Lack of evidence**

It is stated in (...) – in general terms – that in addition to Credit Advices

> *"there is no other evidence of receipt of a benefit."*

It is simply wrong that the pension plans – if they had actually received the alleged dividends – should not be able to provide any kind of objective evidence of this, *e.g.,* in the form of a dividend note, account statement, fund/deposit statement or similar, cf. the Supporting Document, § 2.2, on the examples of evidence now available on the Danish Tax Agency website.

**8.11        Lack of connection to VP Securities and settlement netting**

The pension plans state in many places in (...) that VP Securities does not have an accurate ownership register (...) and that stock trades are not necessarily executed by delivery of stocks between custodians, as trades are first settled by transfers of stocks internally (accounting-wise) at each custodian (...).

Such pleas cannot lead to the pension plans' complaint being upheld. Data from VP Securities must be taken into account in the assessment of evidence. It is therefore relevant whether the pension plans or their custodians held deposits in VP Securities – or whether they can show through which sub-custodians they allegedly held stocks.

It is the pension plans that must prove that they have owned stocks in Danish companies at the time of distribution, cf. § 7.1, above. If pension plans cannot prove ownership, they are not entitled to dividend distribution.

Through contact with VP Securities, the Danish Tax Agency has attempted to confirm whether the custodians listed by the pension plans have held stockholdings. VP Securities was unable to confirm this. The purpose of the Danish Tax Agency's contact with VP Securities was to clarify the cases. This does not alter the fact that the pension plans have the burden of proving ownership.
The same applies to netting procedures. There is no evidence that pension plan custodians have held stocks in Danish companies at any time. Where the Shah-related custodians (Solo Capital, Telesto, West Point and Old Park Lane) do not hold any stocks prior to delivery, they of course receive stocks upon execution of the pension plans' "trades." It is up to the pension plans to prove that such delivery of stocks has occurred. The burden of proof cannot, of course, be discharged by reference to general considerations of netting.

The pension plans apparently claim that it is *impossible* to prove ownership of Danish stocks. This is of course not true.

**8.12        Stock borrower will provide collateral at market value**

As regards the alleged collateral provided by the stock borrower, the pension plans claim that

> *"However, it is customary in the stock lending industry to value the collateral to be provided mark-to-market (i.e., on a market basis) without any haircut. The main risk for the lender in a stock lending transaction is default by the borrower. It is therefore important that the value of the collateral (at least) corresponds to the market price (mark-to-market)."* (...)

This is not consistent with the fact that the collateral was *not the* market price at the time of the conclusion of the specific stock lending agreement, but rather the market price at the time of the conclusion of the purchase agreement, see § 3.2.2 above.

By extension, the pension plans refer to Nordnet requiring *more than* 100% of the market value in collateral.

Pension plans, however, distort the facts.

Nordnet is a large and established player in the market, with assets worth €92 billion according to its 2018 annual report. SEK, a gross profit of 1.3 billion SEK. SEK and equity of approximately SEK 2 billion. SEK.

The clipping from Nordnet (...) shows that a capital-intensive party, Nordnet, demands more than 100% collateral for shorting, so that Nordnet is sure to get the lent stocks back – and otherwise the collateral is high enough to make cover purchases.

Unlike Nordnet, the pension plans have neither equity nor assets. Consequently, it is the counterparty – namely the stock borrower, who must be capital strong and provide a me- sure significant amount of millions – who will be concerned about whether he will get his money back. And therefore, it is *very* unlikely that the borrower will agree to provide 100% security.

The example of Nordnet shows that the strong party will demand a "margin" in the security position in its favor.

The pension plans' invocation of the Nordnet example illustrates once again that the pension plans are invoking facts and evidence that are completely beside their situation. And it underlines how bad a case they have.

### 8.13        Speculation as to whether Pinsent Masons has advised Solo Capital

The pension plans refer to the fact that Pinsent Masons advised Solo Group in connection with the transactions carried out (...). However, this is undocumented and does not appear from the invoice and e-mail correspondence submitted (...), which do not concern advice relevant to the cases pending before the Danish Tax Appeals Agency.

In addition, any advice or opinion given by Pinsent Masons is, of course, irrelevant to the assessment of whether the pension schemes have owned stocks. This is true whether or not Pinsent Masons represents the Inland Revenue in England.

The pension plans' emphasis on this fact only looks like an attempt to muddy the picture.

What is most interesting about the pension plans' presentation of (...) is where the pension plans got the part of (...) that relates to advising Sanjay Shah and his companies. The pension plans' possession of (...) in its entirety suggests that the pension plans have contact with Sanjay Shah."

**Supporting document from the Danish Tax Agency dated August 09, 2019:**

"The Danish Tax Agency's <u>Supporting Appendix</u>

Table of contents

| | | |
|---|---|---|
| 1. | ACTORS | 2 |
| 1.1 | Custodian | 2 |
| 1.2 | Agents | 3 |
| 1.3 | U.S. pension plans | 4 |
| 1.4 | Brokers | 6 |
| 2. | REIMBURSEMENT APPLICATIONS | 7 |
| 2.1 | Period 2012-2015 | 7 |
| 2.1.1 | Forms | 8 |
| 2.1.2 | Credit Advice | 8 |
| 2.1.3 | Form 6166 | 8 |
| 2.1.4 | Power Attorney | 9 |
| 2.2 | New application process from 2017 onwards | 9 |
| 3. | TYPES OF CONTRACT | 9 |
| 3.1 | Global Master Securities Lending Agreement (GMSLA) | 9 |
| 3.2 | Forwards | 10 |
| 4. | CIVIL ACTION | 11 |
| 4.1.1 | Germany: Arrest of around 2.2 billion euros | 11 |
| 4.1.2 | USA: Litigation worth some €5.4 billion brought – and not dismissed | 12 |
| 4.1.3 | Settlement: repayment of DKK 10 million and DKK1.6 billion respectively | 13 |
| 5. | TREASURY DATA ANALYSIS | 13 |
| 5.1.1 | The basis of the Danish Agency's analysis | 14 |
| 5.1.2 | The result of the analysis | 16 |

(...)

**1.    ACTORS**

The complex of cases relating to the reimbursement of dividend tax concerns a total of 306 pension plans and companies from various foreign jurisdictions that, through agents, have *unjustifiably* requested the Danish Tax Agency to reimbursement dividend tax totaling approximately DKK 12.7 billion in the period from 2012 to 2015 inclusive. On the basis of the reimbursement requests, the Danish Tax Agency has paid the requested amounts in total approximately 12.7 billion in the corresponding period. Payments were made to foreign bank accounts designated by – and belonging to – the agents.

Of the total of 306 pension plans and companies that have asked the Danish Tax Agency for dividend tax reimbursements, 277 pension plans are domiciled in the United States.

The various key actors and documents can be illustrated as follows:



## 1.1  Custodian

Generally, a custodian is a financial institution that holds clients' stocks and other securities.

The Credit Advices submitted in the case, which alone constitute the alleged "proof" of ownership of the stocks and receipt of dividends, have been produced by 12 different international custodian firms, listed below.

The distribution of the claim amounts for which each custodian has provided claimed "evidence" (Credit Advices) can be calculated as follows (in proportion to the 12.7 billion DKK *unduly* paid):

| Custodian | Total (DKK) |
|---|---|
| Solo Capital Partners LLP | 5,442,113,750 |
| Old Park Lane Capital PLC | 1,776,763,390 |
| (...) | 1,135,775,342 |
| Telesto Markets LLP | 925,443,359 |
| (...) | 920,721,387 |
| West Point Derivatives Ltd | 880,884,044 |
| (...) | 688,383,335 |
| (...) | 582,830,675 |
| (...) | 320,758,845 |
| (...) | 33,748,380 |
| (...) | 1,863,000 |
| (...) | 810,000 |
| Grand total | 12,710,095.50 |

The custodians involved are all domiciled in England except for (…) and (…), which are domiciled in (…) and (…) respectively.

**1.2  Agents**

All 306 pension plans and companies in the case applied for dividend tax reimbursements via a form system regulated by the Danish Tax Agency. The 306 entities used six international external advisory firms, so-called "agents," which forwarded the requesting entities' application for reimbursement of withheld dividend tax to the Danish Tax Agency.

The distribution of reimbursement requests between the six agents has been as follows:

| Agent | Paid (DKK) |
|-------|-----------:|
| (…) | 4,549,985,549 |
| (…) | 3,610,468,065 |
| (…) | 3,043,663,066 |
| (…) | 1,220,975,179 |
| (…) | 262,207,548 |
| (…) | 22,796,100 |
| | |
| Grand total | 12,710,095,507 |

(…) has played the largest role as an agent in the complex, having been involved in making requests for reimbursement of dividend tax for approximately DKK 4.5 billion out of the DKK 12.7 billion defrauded.

(…) is domiciled in England, as are (…), Syntax GIS and (…). The agents (…) and (…) are established in (…) and (…) respectively.

The agents were responsible not only for the dissemination of material but also for direct communication with the Danish Tax Agency and for sending the documentation for the reimbursement applications.

In their requests to the Danish Tax Agency, the agents indicated, on behalf of the 306 pension plans and companies, the foreign bank accounts to which they wanted the reimbursement amounts transferred. All the bank accounts indicated by the agents were accounts of the agents and the Danish Tax Agency, on the basis of a review of the requests, paid all the amounts relating to the requests into the bank accounts indicated by the agents.

**1.3 U.S. pension plans**

The vast majority of the 277 U.S. pension plans have been "401(k) plans," according to the information provided to the Danish Tax Agency. The designation refers to the fact that the pension plans have been established under the terms of § 401(a) of the U.S. Internal Revenue Code ("IRC").

A 401(k) plan is established by an employer for the benefit of its employees. It is a prerequisite for setting up a pension plan that the employer has an Employer Identification Number (ENI), which is assigned by the U.S. tax authorities, the IRS. Furthermore, it is a condition for the creation of 401(k) plans that there is a formally adopted *plan document* and that there is a separate agreement with a trustee. The *plan document* must govern the terms of the retirement plan, including compliance with the IRC and, if applicable, the Employee Retirement Income Security Act ("ERISA"), as well as other applicable laws. The agreement with the trustee shall govern how the plan assets are invested and managed.

Contributions to 401(k) plans can be made by both employees and the employer according to the retirement plan's *plan document* and the limits set by the IRC. Except for exceptions regarding the accrual of contributions at year-end changes, contributions to a 401(k) plan for each participant (both employer and employees) cannot exceed the lesser of 1) an amount limit that is periodically adjusted for inflation ($53,000 in 2016 or $59,000 for participants age 55 or older) and 2) 100% of the participant's compensation from the employer that year. The amount limit is lower for certain types of 401(k) plans.

Generally, 401(k) plans can only make distributions to participants or to cover allowable expenses of the pension plan. Distributions to participants can only be made under certain circumstances, such as termination of employment, financial hardship, death, disability, age (59½) or termination of the pension plan without succession. Such distributions must be reported to the IRS on Form 1099-R. It should be noted that other forms may be required if the distribution is made to a non-resident of the United States.

Contributions to 401(k) plans must be held in a separate fund managed by one or more trustees who, with certain exceptions, have the exclusive right to manage the pension assets, including the right to invest the funds.

In the present case, the trustees concerned have acted as trustees of the pension plans at a general level. The Trustee has signed powers of attorney on behalf of the pension plan *and* on behalf of the employer that established the plan. There are about 70 different trustees involved in the complex of cases. The vast majority are based in the United States. Of the 70 trustees, 4 trustees represent a total of 156 of the 277 U.S. pension plans.

The vast majority of the 401(k) plans involved in the case are of the "One-participant plans" type, as is also evident from the Danish Tax Agency's revocation decisions where this is the case. "One-participant plans are pension plans for business owners who do not have employees in the associated business (except for the owner's spouse, if any). These pension plans are thus, as the wording suggests, composed solely of the owner (and possibly his/her spouse). The pension plan is otherwise subject to the same rules and requirements as other 401(k) plans, except ERISA.

"One-participant plans are not required to file financial information (Form 5500) with the U.S. authorities when they have assets of $250,000 or less at the end of the *fiscal year*.

If one-participant plans have assets in excess of $250,000, they are required to file financial statements (Form 5500) with the U.S. authorities. This obligation is normally fulfilled by filing a Form 5500-EZ, but may in some cases be fulfilled instead by using a Form 5500-SF.

Of the 277 pension plans in the case, the vast majority have not filed Form 5500. It must be assumed that the other pension plans have not had assets of more than $250,000 at the end of their *plan year*.

401(k) plans offer a number of tax advantages in the United States. Thus, the employer is entitled to deduct contributions to the pension plan, the employee is tax-exempt for contributions to the pension plan, and the pension plan's funds/income are exempt from income taxation. In addition, in double tax treaties with the US, 401(k) plans are granted some tax advantages, including the right to a reimbursement of dividend tax on foreign stocks. When these benefits are claimed in other countries, the pension plan must prove that it is domiciled in the United States.

**1.4        Brokers**

Generally, a broker is a middleman between investors who want to buy and sell securities. The broker is typically paid a fee for his role.

The broker arranges for the matching of the buyer and seller and thus the conclusion of the purchase agreement (executing broker) and/or for the completion of the transaction (clearing broker), *i.e.,* the exchange of the parties' services.

The pension plans represented by the TVC Law Firm have allegedly used their custodian for the clearing (execution) of the trades (...). They have thus used only executing brokers.

This means that the broker has been responsible for finding a buyer/seller. After matching, the broker has issued a broker confirmation (...) setting out the terms of the trade.

However, these trade notes are flawed to an extent that they have no probative value in themselves in the relationship of two parties having found each other in a stock trade (Summary Statement, § 5.4). The use of executing brokers is therefore at most a part of Sanjay Shah's cover-up of the fraud.

In addition, executing brokers do not execute the trades (clearing) and therefore have no knowledge of whether the parties actually exchange services – and whether the parties actually held the stocks that are allegedly bought/sold.

**REIMBURSEMENT APPLICATIONS**

**2.1        Period 2012–2015**

From 2012 to 2015, the pension plans have requested the Danish Tax Agency to reimbursement withheld dividend tax, referring to double taxation agreements between Denmark and the country in which each pension plan was resident.

The reimbursement requests were submitted by a number of international agent companies via the form system. The agents acted on behalf of the pension plans.

The requests were accompanied by the following:

1.    Form 6.003 ENG – Claim to Relief from Danish Dividend Tax (§ 2.1.1, below),
2.    Certificate issued by a custodian in the form of, for example, a "Credit Advice" for the ownership of the stocks in question and the receipt of dividends on the stocks (§ 2.1.2, below).
3.    IRS Form 6166 (for the 277 U.S. pension plans) (§ 2.1.3, below); and
4.    Power of Attorney from the Pension Plan (§ 2.1.4, below),

On the basis of the pension plans' requests, the Danish Tax Agency paid the amounts requested into the agents' accounts, provided that the appropriate documents were attached. The Danish Tax Agency did not actually process the payments.

In the cases where the Danish Tax Agency has decided in 2018 to revoke the previous decisions to reimbursement withheld dividend tax, it is the Danish Tax Agency's opinion that the submitted documents are invalid and that the reimbursement has been wrongly unpaid.

### 2.1.1       Forms

The claim forms shall specify, inter alia, the amount of the reimbursement sought by the agent – on behalf of the pension plan – and the amount to be paid to the agent's bank account. Furthermore, the agent declares that the pension plan is the beneficial owner of the stocks in question.

Requests submitted in the specific driver cases are discussed below in § 6.

### 2.1.2       *Credit Advice*

As the only "evidence" of the pension plans' claim for reimbursement of withheld dividend tax, the requests were accompanied by Credit Advices issued by various custodians. These Credit Advices have been issued and submitted as "evidence" that the pension plans have owned stocks in Danish C20 companies, that the pension plans have received dividends from these companies and that dividends received have been subject to withholding tax.

All Credit Advices issued by the Solo Group are provided with an ID number.

These Credit Advices show – apparently – which Danish stocks the pension plans owned, which dividends had been distributed to the pension plans, and which dividend taxes had been withheld in connection with the distributions.

However, in the cases where the Danish Tax Agency has decided in 2018 to revoke the previous decisions to reimbursement withheld dividend tax, it is the Danish Tax Agency's view that the Credit Advices submitted are without substance.

### 2.1.3       *Form 6166*

Form 6166 (Certification of U.S. Tax Residency) is a certificate issued by the United States Treasury Department as evidence that an individual or business is domiciled in the United States for U.S. tax purposes. The certificate is issued by the Treasury Department on the basis of the financial plan's filing of Form 8802 (Application for United States Residency Certification).

The information on Form 8802 is furnished under responsibility and is not verified by the Treasury Department in issuing Form 6166. All of the 277 U.S. 401(k) retirement plans at issue in this case have attached Form 6166 to their applications.

The Form 6166 certificate certifies that a legal entity is domiciled in the United States for U.S. tax purposes. It should be noted that the certificate does not document whether the other conditions for receiving a reimbursement of withholding tax on foreign stocks are met under a double tax treaty, including whether the applicant is the beneficial owner of the stocks on which the reimbursement is sought.

To meet the requirements to receive the certificate, the retirement plan must submit a copy of the signed Form 5500 or an IRS determination letter or a statement (made under penalty of law) as to why the retirement plan is not required to file Form 5500 and why the retirement plan does not have an IRS determination letter.

**2.1.4**      *Power of Attorney*

The Power of Attorney submitted authorizes the agent to apply on behalf of the pension plan, inter alia, for a reimbursement of withheld dividend tax and to receive reimbursement amounts from the Danish Tax Agency.

**2.2**      **New application process from 2017 onwards**

In early 2017, the Danish Tax Agency launched a new IT solution for reporting dividend tax reimbursement requests. The IT solution functions as "TastSelv," where the reimbursement request is uploaded with the corresponding documentation.

The Danish Tax Agency website states that it is a condition for dividend reimbursement that Danish dividend tax is withheld from the dividend for which reimbursement is sought ("condition 3") and that the stockholder is the legal owner of the stocks at the time of the adoption of the dividend ("condition 4"), (...).

According to the Danish Tax Agency's website, evidence of compliance with conditions 3 and 4 may include a dividend note or notification from the custodian bank of the dividend received, an account statement, a securities account statement showing, among other things, the stockholding at the time the dividend was declared and a purchase receipt, (...).

**3.**      **TYPES OF AGREEMENT**

**3.1**      **Global Master Securities Lending Agreement (GMSLA)**

A GMSLA is a standard for loan agreements developed by ISLA (The International Securities Lending Association). The standard agreement allows securities, such as stocks, to be lent across national borders.

The GMSLA contains a number of standard terms and conditions, and in addition there is various information that the parties must fill in specifically.

The GMSLA is thus a *framework agreement*. This means that the GMSLA sets the framework in terms of the stock lending. However, the GMSLA has no effect unless the parties *actually* enter into equity loan agreements, in which case the terms of the GMSLA will apply.

The pension plans have submitted a number of GMSLAs as (...) in the respective cases. The GMSLAs submitted are in many cases not signed by (all) parties to the agreement.

**3.2**      **Forwards**

A forward is a forward contract. It can be a binding agreement for the future delivery of a currency or commodity at a pre-agreed date and price. The forward contract thus constitutes a hedge against the time of future delivery, since the parties to the contract know in advance at what price the commodity/currency will be traded.

The pre-shipment agreement *need* not be tied to physical delivery of the asset, but can also be settled by *difference settlement*. This means that at the end of the forward contract, instead of delivering the currency/asset (*e.g.,* a stock), the parties settle the difference between the market price and the price agreed in the forward contract.

In the case of netting, it is not necessary for the parties to actually hold the asset to which the forward contract is linked, as the asset does not have to be delivered, but is only used to establish a payment obligation.

<u>Example</u>
A and B enter into a forward on August 1, 2019. The agreement is that on September 1, 2019 A will acquire B's Novo Nordisk stocks, which on August 1st have a market value of DKK 1 million, for DKK 1.01 million.

On September 1, 2019, the agreement will be settled. For example, the market value of the stock is assumed to have increased to DKK 1.2 million.

The settlement can then *either* be made by A buying the stockholding from B for DKK 1,01 million. *Or* the settlement can be made by difference settlement:

The parties had agreed to trade the stock for DKK 1.01 million, but the stock has a value of DKK 1.2 million (the market price, also called the spot price). The stock is therefore worth DKK 190,000 more than the price agreed by the parties. B must then pay A DKK 190,000, which is the difference between the agreed price and the market price on the expiry date.

**4.      CIVIL LEGAL ACTION**

The tax authorities have taken a number of civil actions in several jurisdictions, including the US, Germany and the UK. The aim is to recover financial losses incurred by the State amounting to more than DKK 12.7 billion, which were wrongly paid into the accounts designated by the agents. The Tax Agency has thus brought both recovery and compensation claims against a number of different actors in the case in order to establish their respective payment obligations.

In particular, all the pension plans represented by TVC Law Firm have been sued in the United States for payment.

No final decisions on the merits of the case have yet been taken.

However, there are a number of cases where foreign courts have ruled on (parts of) the complex of cases and where the decisions are not subject to confidentiality:

***4.1.1      Germany: Arrest for approximately DKK 2.2 billion***

In June 2018, civil seizures and arrests were carried out in various jurisdictions, including Germany. In connection with the arrests, the Danish Tax Agency described and provided evidence of the alleged fraud in the case.

To be successful in an application for arrest in Germany, three conditions must be met:

5.  there must be a legal basis for the claim against the owners,
6.  there must be a preponderant probability that the assets in question actually belong to funds disbursed by the Danish Tax Agency; and
7.  there must be a risk that the assets will be moved or lose their value to the detriment of the Danish Tax Agency if the arrest is not carried out.

The Tax Agency has carried out arrests in Germany for approximately DKK 2.2 billion.

**4.1.2    USA: Lawsuits worth around €5.4 billion filed – and not dismissed**

In the U.S., the Danish Tax Agency has retained a U.S. law firm to advise on the possibility of pursuing the Danish Tax Agency's recovery and damages claims in the U.S. against the U.S. pension plans involved. A total of 155 lawsuits have been filed in a number of U.S. courts, primarily in New York, in the period up to June 15, 2018 against pension plans, management members and trustees of these pension plans and, in some cases, third parties related to the pension plans and the applications. In total, litigation has been brought for approximately DKK 5.4 billion.

All pension plans represented by TVC Law Firm have been subpoenaed.

The first hearing in a series of the lawsuits was held on June 26, 2018 in New York.

The pension plans filed a motion to dismiss the cases with the Court of the Southern District of New York. The pension plans argued, inter alia, that the court did not have jurisdiction because, according to the pension plans, the Danish Tax Agency's claims were governed by the common law doctrine of the revenue rule, which provides that U.S. courts do not have jurisdiction over cases directly or indirectly seeking enforcement of foreign tax laws. In other words, the rule means that foreign tax authorities cannot bring claims that can be directly or indirectly characterized as tax claims before U.S. courts.

On January 9, 2019, the Court dismissed the pension plans' application for a declaration of inadmissibility in its entirety (...). It follows, inter alia, from the order of the Court (...) that

> "If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied."

In this regard, the Court of First Instance emphasizes, among other things, that in its summons the Danish Tax Agency has alleged that there is fraud ("*commercial fraud*") (...), and that a position on the case does not require an interpretation of the concept of "*beneficial ownership*" in Danish tax law. The tax authorities have thus (without distinguishing between beneficial and beneficial ownership) claimed that the pension plans have not owned the stocks and the pension plans have not provided any evidence to the contrary (...).

**4.1.3    Settlement: repayment of DKK 10 million and DKK 1.6 billion respectively**

The IRS has reached two settlements with a total of 63 U.S. pension plans and related individuals and companies:

In the fall of 2018, the Danish Tax Agency settled with 2 U.S. pension plans. The two pension plans had previously filed complaints with the Danish Tax Appeals Agency and were represented by TVC Law Firm during the complaints. When the cases were settled in autumn 2018, the complaints were withdrawn. The settlements implied that the two pension plans repaid the reimbursement amounts, see the press release of the Ministry of Taxation of November 1, 2018 (...) and the press release of May 29, 2019 (...).

In May 2019, the Danish Tax Agency reached a new settlement agreement. The new settlement agreement was reached with 61 American pension plans and a number of related persons and companies. The 61 pension plans had received approximately DKK 2.9 billion in the period 2012–2015. Of this, the pension plans themselves had received approximately DKK 1.6 billion. The settlement was that the pension plans and their associated persons and companies would repay approximately DKK 1.6 billion. The Tax Agency is still pursuing the remainder with other responsible parties (...).

So far, 63 U.S. pension plans have settled the case, covering more than a fifth of the total suspected fraud.

**5.        DANISH TAX AGENCY DATA ANALYSIS**

The Danish Tax Agency has reviewed the reimbursement requests submitted and compared these with the Danish C20 companies' distributions, stock capital, etc. On this basis, the Danish Tax Agency has carried out an overall analysis of whether the reimbursement requests *may* be correct overall.

The analysis resulted in two partial conclusions, which are discussed in more detail below:

> too much was reimbursed in relation to what was withheld
> In some cases, *more than* the amount of dividend tax withheld has been reimbursed. This suggests that (part of) the reimbursement requests are fraudulent, as the reimbursement cannot exceed the amount withheld.

> Reimbursement claims based on unlikely large investments in and ownership of Danish companies

> It is *quite unlikely* that very significant stocks of Danish C20 companies would be owned by unknown pension plans etc., which often have only one owner and which have at most a very modest capital base.

The partial conclusions of the analysis show that there has been significant fraud.

### *5.1.1      Basis for the Danish Tax Agency's analysis*

The Danish Tax Agency has analyzed a number of distributions from selected Danish companies where the pension plans etc. have subsequently applied for a reimbursement of alleged withheld dividend tax. The Danish Tax Agency's analysis has concentrated on the distributions where the largest proceeds have accrued to the pension plans, etc., and where SØIK has obtained material from VP Securities. The analysis has thus covered approximately DKK 12.4 billion out of the total fraud of DKK 12.7 billion.

### *5.1.1.1      The legal basis*

When companies distribute dividends, they are generally required to withhold 27% dividend tax on all dividends. However, withholding may be applied at, for example, 0% or 15% instead, depending on the circumstances and information about the recipient of the dividend, cf. §§ 65-67 A of the Withholding Tax Act.

Withholding at rates other than 27 % indicates that the taxpayer is covered by an exemption provision, see for example § 65(11) of the Withholding Tax Act and § 31(1)(2) of the Withholding Tax Order. In such cases, no (legitimate) claim for reimbursement of dividend tax can be made under double taxation conventions, as the recipient of the dividend does not meet the requirements of the exemption provisions if he is a foreigner under tax law. It is therefore only when 27% dividend tax is withheld that a reimbursement can be claimed.

In addition, the requests must be supported by a double taxation agreement. It is therefore a requirement that the applicant is not resident in Denmark, in which case the person would not be covered by a double taxation agreement.

A reimbursement of dividend tax can thus only (legitimately) be claimed if the withholding tax has been withheld at the rate of 27% from a (tax) foreigner.

### 5.1.1.2     The facts

For Danish listed companies, VP Securities registers the taxation to be paid to each of the registered owners when dividends are distributed. VP Securities also handles the actual distribution. VP Securities then informs the company of the distributions, inter alia so that the company can fulfil its obligation to provide information to the Danish Tax Agency.

Indeed, companies are obliged to declare to the Danish Tax Agency what has been distributed in total and what has been withheld in dividend tax at each of the given percentages (inter alia 15% and 27%). On this basis, the Danish Tax Agency is aware of (...):

> Amount distributed
> Withholding tax – both total and broken down by respective percentage

The Danish Tax Agency also has information on all reimbursement requests, as these have been sent to the Danish Tax Agency (...). The information has been recorded in the IT system 3S for applications under the blanket scheme.

When the Danish Tax Agency became aware that reimbursement requests for dividend tax might have been fraudulent, the Danish Tax Agency manually made a calculation of the total amount of reimbursement requested for each distribution. In addition, the Danish Tax Agency manually calculated how much the pension plans, etc. had claimed per distribution. The Danish Tax Agency thus currently has knowledge of the total:

> Total reimbursement requests for each distribution (...) Reimbursement requests from pension plans, etc. for each distribution (...)

In addition, the Danish Tax Agency has received additional information from VP Securities, which SØIK has obtained. This information has been extracted directly from VP Securities' records relating to a number of specific distributions. This includes the total number of stocks (in each stock class) outstanding at the time of the distribution and the name and address of each registered owner at the time of the distribution.

The ownership information recorded in VP Securities is not complete. A significant proportion of the stocks of listed companies are recorded as being owned by, for example, banks that have a single securities account for their customers (called an omnibus securities account). Here the bank is registered as the owner with VP Securities, even though it is a client who actually owns the stockholding. Omnibus securities accounts are registered with the nationality/address of the securities account holder (typically the bank) – without knowledge of the nationality of the underlying owner. In addition, addresses registered in VP Securities may not have been updated when the stockholder moved.

The Danish Tax Agency has used the address information from VP Securities to determine whether the owner (for tax purposes) is a foreigner (...). Given that a very significant proportion of Danish C20 stocks are held in omnibus deposits, the proportion of foreign stockholders *may* be different from what appears from VP Securities' records. Nevertheless, the statement gives an indication of the proportion of stocks held by residents of countries other than Denmark.

On the basis of the companies' reports and the data obtained from VP Securities, the Danish Tax Agency has obtained knowledge of (...):

> Total number of stocks outstanding at dividend date
> Percentage of stocks registered as owned by foreigners on the date of dividend

Finally, the Danish Tax Agency has collected a number of publicly available information on, among other things, stock prices and dividends per stock.

### 5.1.2    The result of the analysis

#### 5.1.2.1    Excessive reimbursement in relation to what is withheld.

The Danish Tax Agency has compared the reimbursement requests with the withheld dividend tax for the distributions in the period 2012–2015 from Danish C20 companies where there has been the most extensive fraud with reimbursement requests (...). Thus, not all distributions have been included in the analysis, but rather a number of selected distributions.

The analysis has shown that across the distributions analyzed, 76.9% of the amount withheld has been paid out as a dividend reimbursement.

Looking at the individual distributions separately, it appears that in 11 cases *more was reimbursed than was withheld* (...) and that fraud accounted for a very large proportion of the reimbursement requests. In three cases, *the pension plans etc. alone* were reimbursed more than the amount withheld.

When more is reimbursed than is withheld, it goes without saying that some of the reimbursement requests have been unjustified. There can be no claim to "reimburse" something that has never been withheld.

 - - - - - - -

The Danish Tax Agency then carried out an even more in-depth analysis (...). As discussed, dividend reimbursements are only available if dividend tax is withheld at the rate of 27% *and* the dividend recipient is a foreigner (for tax purposes).

The analysis shows that 91.7 % of the dividend withheld at the rate of 27% has been reimbursed. When taking into account *that* not all stocks with a dividend tax rate of 27% are owned by foreigners, *that* far from all foreigners are eligible for reimbursement at all and *that* many foreigners will be eligible for partial reimbursement at most, it is clear that (part of) the reimbursement requests have been unjustified.

This is particularly true for the individual distributions. In 14 cases, *more than the dividend* withholding *tax* contained in the records of VP Securities *at the rate of 27 %* was *reimbursed* (...). This is *not* (legally) possible.

Furthermore, in 23 cases, *more than* the *dividend tax* withheld *from foreigners at the rate of 27%* according to VP Securities' records was *reimbursed* (...).

#### 5.1.2.2    Reimbursement requests reflect unlikely investments and ownership

The Danish Tax Agency has also compared the information on the number of stocks at the time of the dividend with the official stock prices on that date (...). In this way it has been possible to calculate the total investment for the pension plans etc. in each C20 company at the time of the distribution.

As can be seen, the total investment for the pension plans etc. has been around DKK 910 billion during March 2015.

However, given the different distribution dates of the different companies, the investments have not necessarily been simultaneous, even if they are within the same month. For example, just on March 19, 2015, investments amounted to DKK 445 billion in Novo Nordisk (B) and DKK 13.2 billion in GN Store Nord, for a total of DKK 458.2 billion.

Finally, the Danish Tax Agency compared the number of stocks requested with the total stock capital of the companies (...). From this, it was calculated what proportion of the companies' total stock capital should have been held by the pension plans, etc. This has been compared with the proportion of company stocks available for such investment.

As can be seen, the pension plans etc. would have owned, inter alia, 51.4% of the A.P. Møller stocks in 2014, 59.5% of the Novo Nordisk B stocks in 2014 and 66.9% of the FL Smidth & Co. stocks in 2015.

Overall, it is _quite unlikely_ that stockholders/players unknown on the Danish market would have made _such large_ investments and hold such significant stocks. The figures thus support the view that a large proportion of reimbursement requests must be unjustified.

In particular, in relation to the A.P. Møller stocks, it is noted that four known major Danish stockholders together owned 52.82% of the stock capital in 2014 (...), making it _impossible_ for the pension plans etc. to own 51.4%.

(...)"

**The appellant's summary statement**
The appellant's summary and closing submissions are as follows:

"As you know, the Danish Tax Appeals Agency has recommended, in a proposal for a decision dated July 3, 2019 in the six leading cases, that the Danish Tax Agency's decisions of April 6, 2018 and May 4, 2018 be upheld.

Since the purpose of the leading cases is to form the basis for the other cases represented by TVC and SMK, it must be assumed that the Danish Tax Appeals Agency will argue in the same way in this case.

On the other hand, the pension plan maintains in general terms that the Danish Tax Agency is not entitled to annul the original decisions on the payment of dividend reimbursements.

Thus, the Pension Plan maintains generally that the Pension Plan was entitled to receive the dividend distributions at issue in the cases, including that the Pension Plan owned the stock and dividend amounts at issue in the cases.

The Danish Tax Appeals Agency's proposed decision of July 3, 2019 in the six leading cases and the Danish Tax Agency's summary of August 9, 2019 give the Pension Plan cause to submit the present summary.

It is a feature of the present case that the pension plan has provided a very extensive supporting documentary evidence of the disputed transactions and the pension plans' ownership of the disputed stocks and dividends.

It is also a feature of the case that the Danish Tax Agency bases its views on assumptions made several years after the Danish Tax Agency decision on the disputed dividend tax reimbursements, and that the doubts which the Danish Tax Agency has sought to raise are to a large extent attributable to the Danish Tax Agency's own inadequate information on the case.

... ...

The pension plan maintains, as stated, that it was both the civil and tax owner of the stocks at issue and that the pension plan was entitled to receive the dividends at issue, with the effect that the pension plan was entitled to receive a reimbursement of the withheld dividend tax.

It is therefore maintained that there are now no grounds for revoking or annulling the Danish Tax Agency's original decision on the reimbursement of withheld dividend tax.

In this summary, we will provide our comments on the Danish Tax Appeals Agency's proposed decision of July 3, 2019 in the lead cases. In addition, we will discuss the views expressed by the Danish Tax Agency in its summary submission of August 9, 2019 in the lead cases.

For the sake of clarity, we have also chosen to incorporate the above in subsequent posts, so that the present post serves as a summary post.

In the first part of this paper, we describe in detail the investment strategy followed by the pension plan and the related dispositions.

In doing so, we will explain why the pension plan both civilly and fiscally owned the disputed stocks and dividends.

In the second part of this submission, we will comment on the Danish Tax Agency's views in the case, in particular the Danish Tax Agency's views in relation to the documentation and content of the disputed transactions.

In addition, we will comment on the documentation requirements set by the Danish Tax Appeals Agency, as well as the Danish Tax Agency's own lack of information.

In the third part of this submission, we will present our comments on the Danish Tax Appeals Agency's proposed decision of July 3, 2019 in the lead cases, including the points made by the Danish Tax Appeals Agency in relation to the documentation of the transactions in question and their substance.

1.**INTRODUCTION**-------------------------------------------------------------------------------------------------------------------------------**8**
**PART 1: THE PENSION PLAN WAS THE BENEFICIAL OWNER OF STOCKS AND DIVIDENDS FOR TAX PURPOSES**

2 DESCRIPTION OF FINANCIAL OPERATIONS AND RELEVANT EXTERNAL ACTORS ----------------------------------9
2.1      About the pension plan that acquired Danish stocks ----------------------------------------------------9
2.1.1    Dispositions on behalf of the pension plan ------------------------------------------------------------11
2.2      Financial instruments used -------------------------------------------------------------------------------12
2.2.1    Stock purchase/sale ---------------------------------------------------------------------------------------13
2.2.2    Forwards ----------------------------------------------------------------------------------------------------14
2.2.3    Stock lending-----------------------------------------------------------------------------------------------14
2.3      The external actors involved ----------------------------------------------------------------------------16
2.3.1    Brokers ------------------------------------------------------------------------------------------------------16
2.3.2    Stock Loan Intermediaries  ------------------------------------------------------------------------------18
2.3.3    Forward counterparties and intermediaries ----------------------------------------------------------19
2.3.4    Custodians and clearing agents -------------------------------------------------------------------------20
2.3.5    Tax agents --------------------------------------------------------------------------------------------------23
2.3.6    Introducing brokers ---------------------------------------------------------------------------------------24
2.3.7    Arrangers ---------------------------------------------------------------------------------------------------24
2.3.8    Summary remarks on the external actors involved --------------------------------------------------24
2.4      Pension Plan Business Model and Operations --------------------------------------------------------25
2.4.1    Introduction to dividend arbitrage ---------------------------------------------------------------------25
2.4.2    Transactions -----------------------------------------------------------------------------------------------27
2.4.2.1  Onboarding -------------------------------------------------------------------------------------------------27
2.4.2.2  Purchase of stocks and sale of forwards ---------------------------------------------------------------27
2.4.2.2.1 Procedure for buying and selling forward  ------------------------------------------------------------27
2.4.2.2.2 Business justification of the pension plan and the stock seller for stock purchase/sale ------------------------29
2.4.2.2.3 Business rationale of the pension plan and the forward purchaser for sale/purchase of forward -------------------------31
2.4.2.3  Stock lending and financing of stock purchases -----------------------------------------------------32
2.4.2.3.1 Stock lending procedure --------------------------------------------------------------------------------32
2.4.2.3.2 Business justification of the pension plan and the stock borrower for stock lending------------------------33
2.4.2.3.3 Other comments on the financing of stock purchases -----------------------------------------------34
2.4.2.4  Settlement of transactions ------------------------------------------------------------------------------35
2.4.2.6  Positions are closed ---------------------------------------------------------------------------------------38
2.4.2.7  Profit realized ----------------------------------------------------------------------------------------------38
2.4.2.8  Summary comments on the business model and transactions --------------------------------------39
2.4.2.9  Examples of dividend arbitrage transactions ---------------------------------------------------------43
         3. THE PENSION PLAN BECAME THE CIVIL AND TAX LAWFUL
         OWNER OF THE STOCKS  -------------------------------------------------------------------------------------46
3.1      The pension plan became the civil law owner of the stocks -------------------------------------------46
3.2      Trading in large stocks – short selling------------------------------------------------------------------48
3.2.1    Introduction to short selling ----------------------------------------------------------------------------49
3.2.2    Short selling creates more stocks until the trades are settled ------------------------------------------52
3.2.2.1  The Tax Agency's views on the "short buyer" ---------------------------------------------------------55
3.2.2.2  Impact of multiple stocks due to short selling (until settlement) -------------------------------------57
3.2.2.1  Missing withholding tax on compensation payments -----------------------------------------------58
3.2.2.3  Fiscal beneficial ownership in stock lending – dual ownership in addition to settlement ----------------------60
3.2.2.3.1 Case law on beneficial ownership for tax purposes stock lending ----------------------------------61

3.2.2.3.2 Danish Tax Agency on tax ownership of stock lending ------------------------------------------------------ 63
3.2.2.3.3 Ministry of Taxation on the beneficial ownership for tax purposes of stock lending ------------------------- 64
3.2.2.3.1 Stock lending without resale to third parties --------------------------------------------------------------- 64
3.2.2.3.2 Stock lending with resale to third parties ----------------------------------------------------------------- 65
3.2.2.3.3 Comments on the view of the Ministry of Taxation ----------------------------------------------------------- 65
3.2.2.3.4 The literature on beneficial ownership for tax purposes by stock lending ----------------------------------- 66
3.2.2.4     Conclusion: short selling has an impact on the tax beneficial ownership of the pension plan ----------------- 71
**4. LEGAL ASPECTS OF DIVIDEND TAX** ------------------------------------------------------------------------------- **72**
4.1        Dividend tax is withheld according to the rules of the withholding tax law------------------------------------- 73
4.2        Rules of the Withholding Tax Order on exemption from withholding tax ----------------------------------------- 73
4.3        Limited tax liability of dividends ---------------------------------------------------------------------------- 74
4.4        Determining the correct percentage -------------------------------------------------------------------------- 74
4.5        Compensation payments -------------------------------------------------------------------------------------- 74
**5. PROOF OF LEGAL OWNERSHIP FOR TAX PURPOSES** ----------------------------------------------------------------- **75**
5.1        The evidence available in practice for a tax law ownership -------------------------------------------------- 76
5.1.1      Broker confirmations ---------------------------------------------------------------------------------------- 76
5.1.2      Custody statements and DCA --------------------------------------------------------------------------------- 78
5.2        Evidence of beneficial ownership of the pension plan for tax purposes --------------------------------------- 79
**CONCLUSION OF THE FIRST PART** -------------------------------------------------------------------------------------- **82**
**PART 2: THE TAX ADMINISTRATION'S VIEWS ARE BASED ON AN UNDOCUMENTED**
**AND WRONG BASIS – NO BASIS FOR REVOCATION** --------------------------------------------------------------------- **82**
**6. THE TAX AUTHORITIES' FAILURE TO PROVIDE INFORMATION** ------------------------------------------------------- **82**
**7. PRESENTED AND MISSING DOCUMENTATION** ----------------------------------------------------------------------- **84**
7.1        Tax Agency's unsubstantiated claim of false documentation -------------------------------------------------- 84
7.1.1      Errors in documentation from brokers ------------------------------------------------------------------------ 85
7.1.1.1    Different trade dates on broker confirmations and custody statements --------------------------------------- 85
7.1.1.2    Commercial notes confuse buying and selling ------------------------------------------------------------------ 87
7.1.1.3    Commercial note indicates price as "#####" ------------------------------------------------------------------ 87
7.1.1.4    Commercial invoices do not take public holidays into account ----------------------------------------------- 88
7.1.1.5    Errors in other commercial notes ----------------------------------------------------------------------------- 89
7.1.3      Compliance with the GMSLA ----------------------------------------------------------------------------------- 91
7.1.4      Stock lending rate------------------------------------------------------------------------------------------- 92
7.2        Lack of documentation --------------------------------------------------------------------------------------- 92
7.2.1      The contract of sale of the stocks --------------------------------------------------------------------------- 93
7.2.2      Cash flow and bank statements ------------------------------------------------------------------------------- 93
7.2.2.1    Money flow -------------------------------------------------------------------------------------------------- 93
7.2.2.2    Flow of stocks----------------------------------------------------------------------------------------------- 94
7.2.3      TTC clauses ------------------------------------------------------------------------------------------------- 94
7.2.4      Single account opening documents and transaction documents ---------------------------------------------- 95
7.2.5      Documentation in 2014 and 2015 ----------------------------------------------------------------------------- 95
7.3        Responsibility for lack of documentation -------------------------------------------------------------------- 96
**8.        OVERPAYMENT OF DIVIDEND TAX** --------------------------------------------------------------------------- **97**
8.1        Sum of all reimbursements----------------------------------------------------------------------------------- 97
8.2        Total reimbursements per distributing company ---------------------------------------------------------------- 99
8.3        Error functions in dividend tax administration --------------------------------------------------------------100

9.       PENSION PLAN FINANCIAL TRANSACTIONS --------------------------------------------------------------102
9.1      Financing of stock purchases ------------------------------------------------------------------------102
9.2      The possibility of carrying out the financial operations in question ------------------------------104
9.3      Registrations in VP Securities are of no significance ------------------------------------------------108
9.3.1    Benefit of a registration with VP Securities --------------------------------------------------------108
9.3.2    Documentation that the Solo Group has held stocks ---------------------------------------------109
9.3.3    Letters from SØIK and VP Securities -----------------------------------------------------------------110
9.4      The pension plan received dividends -----------------------------------------------------------------112
9.5      Withholding tax was withheld in the pension plan dividend payment ------------------------------113
9.6      The pension plan received the reimbursement -----------------------------------------------------115
9.7      Security under custody agreement-------------------------------------------------------------------116
9.8      "Fictitious transactions"------------------------------------------------------------------------------117
9.8.1    Definition of "fictitious transaction" ----------------------------------------------------------------118
9.8.1.1  Fictitious trade ---------------------------------------------------------------------------------------118
9.8.1.1  Purchase of short sellers ----------------------------------------------------------------------------118
9.8.1.1.2 Delivery of stocks bought by short sellers --------------------------------------------------------119
9.8.1.1.3 Adoption of dividends (market claim) -------------------------------------------------------------119
9.8.1.2  Fictitious agreements --------------------------------------------------------------------------------119
9.8.2    Trading organized by Solo ---------------------------------------------------------------------------120
9.8.3    Fictitious  stocks – short selling --------------------------------------------------------------------122
9.9      The Tax Agency's erroneous assumptions about the process -------------------------------------123
9.10     Stock purchases were completed --------------------------------------------------------------------124
9.11     Longer settlement period than VP Securities ------------------------------------------------------126
9.12     Not just a desk-top exercise ------------------------------------------------------------------------128
9.12.1   All pension plans buy on the same day and at the same price ----------------------------------128
9.12. 2  The size of stockholdings ---------------------------------------------------------------------------130
9.12.3   Nearly equal equity portfolios ---------------------------------------------------------------------131
9.12.4   All pension plans have dealt with the same parties -----------------------------------------------132
9.12.5   Same time of sale ------------------------------------------------------------------------------------132
9.12.6   Sanjay Shah controlled the custodians of the pension plans (Solo Group) ---------------------133
9.12.7   Shah's "Universe" ------------------------------------------------------------------------------------134
9.12.8   Consecutive numbering of Credit Advices across the Solo Group, which was also used in 2017 --------------------------135
9.12.9   Pension plans are not centrally managed------------------------------------------------------------136
9.12.10  Non-submitted claims for reimbursement ----------------------------------------------------------137
9.13     One dividend tax can lead to two reimbursements ------------------------------------------------138
9.15     It's impossible to cheat on stock trades -----------------------------------------------------------141
9.16     Pension plans do not change explanation ----------------------------------------------------------142
9.16.1   Broker confirmations and custody statements------------------------------------------------------142
9.16.2   Security -----------------------------------------------------------------------------------------------143
9.16.3   Pension scheme accounts ---------------------------------------------------------------------------144
9.16.4    Documentation for receipt of dividends -----------------------------------------------------------144
9.17     Pinsent Masons ---------------------------------------------------------------------------------------145
10.      BURDEN OF PROOF AND FORMALITY----------------------------------------------------------------146
         CONCLUSION OF THE SECOND PART -----------------------------------------------------------------149
         PART 3: THE TAX ADMINISTRATION'S POSITION IN THE LEAD CASES – THE
         COMPLETED TRADES HAD REALITY ------------------------------------------------------------------150
11.      RECOGNITION OF THE IMPLEMENTATION OF THE STOCK DEALERS -------------------------150
12.      THE TAX AUTHORITIES' DISREGARD OF TAX OWNERSHIP IN THE DRIVERS' CASES ---------151
12.1     Knowledge of the Transaction Documents ---------------------------------------------------------151

12.2      Documentation------------------------------------------------------------------------------151
12.2.1    Documentation for the ownership of the stocks------------------------------------152
12.2.2    Documentation of receipt of proceeds-----------------------------------------------153
12.2.3    Documentation for receipt of dividend reimbursement ---------------------------155
12.3      No basis to contest the merits---------------------------------------------------------155
12.3.1    Civil law governs the assessment of tax ownership -----------------------------------156
12.3.2    General on the principle of reality----------------------------------------------------156
12.3.3    The principle of reasonableness in case law ------------------------------------------160
12.3.4    The principle of reality in the legal literature ---------------------------------------180
12.3.5    The principle of reasonability applied to pension plan cases ------------------------182
12.3.5.1  Documentation of the link to the pension plan's finances --------------------------183
12.3.5.2  The reality principle – agreements with independent parties on market conditions -------------------------------------184
12.3.5.3  The principle of reality – acting effectively implemented on
12.3.5.4  Pension plans, including right of disposal --------------------------------------------184
12.3.5.4.1 Transfers from custodian ------------------------------------------------------------184
12.3.5.4.2 Custodians' actions on behalf of pension plans --------------------------------------188
12.4      Otherwise, no basis for disregarding the tax ownership of the pension plan----------188
12.4.1    Other documentation-----------------------------------------------------------------189
          **Final conclusion**------------------------------------------------------------------**190**
          Text mark not defined
          **Appendix** ---------------------------------------------------------------------------**191**
          **Further development of the case** ----------------------------------------------------**194**

## 1    INTRODUCTION

In this case, there is little agreement between the Danish Tax Agency and the appellant – with one exception: the subject matter of the case.

As the Danish Tax Agency rightly points out in the summary of the
August 9, 2019 in the lead cases, § 2, page 5, all these cases concern the question of whether the pension plans were eligible for a reimbursement of withheld dividend tax.

The cases are thus not, at their core, about formalities (revocation or cancellation) or about stock trading and the actors involved in a stock trade.

Contrary to the Danish Tax Agency's claim, the cases do not concern the financing of stock transactions or errors in documentation.

The cases in fact concern the question of how to become the legal owner of a Danish dematerialized stock, whether the pension plans have really received a dividend, short slinging, which results in more Danish stocks being in circulation than issued by the Danish companies, and shortcomings in Danish tax legislation, which results in underpayment of dividend tax.

All these questions are triggered by the investment strategy of dividend arbitrage, which found its way to the Danish market in earnest in 2012.

**PART 1: THE PENSION PLAN WAS THE BENEFICIAL OWNER OF STOCKS AND DIVIDENDS FOR TAX PURPOSES**

It is maintained that the pension plan was the civil and tax owner of the stocks at issue and the civil and tax owner of the dividends at issue.

The stocks were acquired through the implementation of dividend arbitrage.

**2    DESCRIPTION OF FINANCIAL TRANSACTIONS AND RELEVANT EXTERNAL ACTORS**

It should be pointed out at the outset that the transactions underlying the disputed dividend reimbursements are very complex.

The underlying transactions are so complex that, in our view, there is a real risk that the present complex of cases will be decided on the wrong basis as a result of misunderstandings about the actors involved, the transactions and the investment strategy itself, *i.e.,* dividend arbitrage.

Therefore, in the following we will explain in detail the financial instruments used, the actors involved, the underlying transactions and the investment strategy applied.

Thus, below – in § 2.1 – the pension plan involved that owned the traded stocks and dividends is explained.

In this context, the trader who carried out the stock transactions in question on behalf of the pension plan is described.

As indicated, the stock transactions in question were used as part of the implementation of the investment strategy commonly known as dividend arbitrage.

§ 2.2 explains the financial instruments used in the implementation of the dividend contribution.

The implementation of this investment strategy has required the involvement and assistance of a large number of actors. In § 2.3 we have described each group of actors involved, including their role and the business rationale for their involvement in the transactions.

In § 2.4, we have also explained the investment strategy in question and, in this context, we have detailed the individual steps in the implementation of the investment strategy.

**2.1  About the pension plan that acquired Danish stocks**

In the present case, the stock transactions in question were all carried out by a U.S. "single-employer" pension plan, a so-called Solo 401K pension plan.

As stated, the pension plan owned the stocks and exchange mergers in question.

The pension plan has the character of a tax-advantaged plan in the United States, in that the pension plan income is not taxed until it is distributed to the beneficiary(ies). The purpose of the pension plan is to generate income/gains through investments and accumulate them until they can be distributed to the beneficiary(ies). In this way, the rules for tax-advantaged pension plans can be aligned with the Danish rules for annuities, which are also taxed only when paid out.

Solo 401K pension plans are established by sole proprietorships that are either incorporated (LLC) or personally owned. The beneficiaries are the business owners themselves and/or their spouses. The beneficiaries (participants) are also called "plan participants."

There are companies, such as the U.S. company Broad Financial, that specialize in providing assistance in setting up pension plans, including **401K pension plans** and **Solo 401K retirement plans**.

Standardized forms are typically used to set up pension plans. These forms are standardized so that the same forms can be used both for the establishment of small Solo 401K pension plans and for the establishment of large pension plans with many participants. For this reason, the forms refer in most cases to administrative committees appointed by the employer's board of directors, even though no such committee exists in a Solo 401K pension plan, since such small pension plans are administered by a trustee appointed by the company owner when the pension plan and the underlying trust are established.

Contributions to a 401K pension plan are held in a trust (set up for the purpose) designed to accumulate, manage and invest these contributions for the benefit of plan participants and beneficiaries. The establishment of a trust separates the pension plan's assets from the business owner's own assets. The trust manages the assets through the actions of the subscribing trustee or other agent.

The Texas Rocco LLC 401K Plan is a (relatively) newly established Solo 401K plan managed by a trust and its trustee.

The actors involved in the pension plan itself can be outlined as follows:



The establishment is thus done by an LLC (the employer = sole proprietorship) establishing a trust (see *e.g.* JEB5 Investment Trust) and the 401k retirement plan (The Texas Rocco LLC 401K Plan). The Solo 401K Pension Plan is the legal owner of the assets and the trust trustee is the subscriber manager thereof.

### 2.1.1 Operations on behalf of the pension plan

As stated, the pension plan in question is a separate legal entity.

It may act only through its trustee in the corresponding trust or a person authorized by the trustee. The so-called trader was thus either the trustee himself or an authorized professional trustee.

In the majority of the cases where SMK and TVC Law Firm are the representatives (the TVC cases), it was the trustees themselves who placed the orders to buy and sell the stocks and entered into the forward hedges and stock loans under the GMSLAs. All the skills and knowledge that the trustees concerned have and use for the benefit of the pension plans must be attributed to the pension plans concerned.

Since the trader must be able to identify the stocks where the price of the derivative (the future or the forward) is out of line with the spot price, and at the same time be able to obtain the necessary financing through a stock loan, a considerable degree of specialist knowledge and business relationships are required to execute dividend arbitrage trades.

### 2.2 Financial instruments used

In the following, we will describe the financial instruments used by the pension plan to implement the investment strategy.

In general, three types of financial transactions are used: a purchase (and sale) of stocks, a forward and a stock loan.

As indicated, the pension plan bought Danish stocks on the dividend date, held them for a period (on average 45 days) and then sold them again. The basic motivation for buying the stocks at that particular time was tax-related: the pension plan was entitled to a reimbursement under the Double Taxation Convention between Denmark and the United States. Unlike others with a less favorable tax status, the pension plan could thus receive the gross proceeds - and not only the net proceeds.

To hedge against the risk of price falls, the pension plan also entered into a forward hedge.

The financing of the stock purchases was done by a stock loan, after the stocks were purchased but before the stocks had to be paid.

These three transactions may at first glance resemble a "puzzle to be solved," as the Danish Tax Agency puts it (see the Danish Tax Agency's summary submission in the lead cases of August 09, 2019, page 12). However, they are nothing more than the expression of well-prepared, financial, structured transactions. In this respect, the financial industry is no different from any other industry: everything must be prepared in advance for the end result to fall into place. Just as the car factory has to have hundreds of individual parts

on the assembly line at the right time for the end result to be a working car, so too financial transactions consisting of many links have to be prepared in advance. Just as the car manufacturer enters into framework agreements with subcontractors for the supply of parts, the pension plan enters into framework agreements with Stock Loan Intermediaries who can provide the necessary financing, as well as agreements with brokers who can provide the stocks and forward contracts, and clearing agents/custodians who ultimately ensure that the agreements entered into will be settled.

These preparatory agreements are called "pre-trade" or on-boarding in the financial industry.

**2.2.1 Stock purchase/sale**

The dividend arbitrage investment strategy assumed that the pension plan purchased the stocks on which the dividends in question are paid.

In this context, it is important to highlight that the stocks in question were traded through OTC transactions.

Stocks are bought and sold not only through the stock exchange. Large-volume stock transactions are typically carried out over the counter (OTC). This prevents large price swings that would be triggered by trading large volumes of stocks on public exchanges.

An OTC market is a decentralized virtual market without a physical location. Trading takes place between market participants via the Internet, telephone, e-mail and similar communication systems (messaging systems). In OTC markets, trading between two parties is anonymous, just like on stock exchanges. This means that you can only see how much was traded at what price, but not who bought or sold exactly how much. It is the traders who control the OTC market and it is they who set the price of what they buy and sell for. To trade on an OTC market, you need a broker. The broker can carry out a so-called owner matching trade. The broker then acts as a seller to his client. The broker buys the stock from the market (from another broker or another client). Where the broker obtains the stock, which he sells OTC, the customer cannot know. In many cases, the broker cannot even identify where the individual stock he is selling comes from, as the broker buys many stocks from many different sources. At the broker, all the stocks bought are mixed.

The stock transactions carried out by the pension plan were concluded OTC with its brokers as owner brokers.

Proprietary trading, as defined in § 71(3) of the Capital Markets Act, is the execution of client orders against own funds. The broker - who is precisely not the operator of a regulated market - enters into the trade and acts as a seller to the pension plan wishing to purchase the stocks. The broker obtains the stocks from the market.

The settlement deadline for OTC trades may differ from the "market-conform" settlement deadline. The main feature of OTC trades is that they are not standardized as on the stock exchange. OTC trades are tailor-made.

What exchange trades and OTC trades have in common is that they are immediate trades (spot markets). They take place here and now. Ownership of the stocks is transferred with immediate effect. If you do not want to buy the stocks until a later date, but at a price agreed now, you enter into a forward contract.

**2.2.2 Forwards**

A forward is a bespoke forward contract between two parties to buy or sell an asset at a specific price at a specific time (a future date). A forward is terminated either by physical delivery of the asset or by difference settlement, whereby the parties settle at expiration the difference between the agreed forward price and the spot price (i.e. the current market price) at expiration.

The conclusion of a forward contract is not to be regarded as a disposal of the stocks when/if the forward contract is covered by the Danish Capital and Exchange Gains Tax Act.

It follows from the last sentence of Article 33(1) of the Danish Capital Gains Tax Act that the asset transferred is deemed to have been acquired or disposed of on the settlement date and at its market value on the settlement date if the contract is settled by delivery.

A forward contract falls under the Danish Capital Gains Tax Act if one of the following conditions is **not** fulfilled:

- The contract can only be fulfilled by delivery of the stocks (i.e. not by difference settlement)
- The contract is not transferable
- No counter contract has been concluded.

The question whether the contract can be fulfilled only by delivery or whether difference settlement is possible depends on whether the contract was actually settled by delivery or difference settlement (see the explanatory memorandum to the Danish Capital Gains Tax Act, comments on Act No. 439 of June 10, 1997, point n). If this has actually happened, it does not matter whether it was foreseen in the contract.

### 2.2.3 Stock lending

A stock loan is, as the name suggests, an agreement to lend stocks. As a general rule, the stocks lent will be listed stocks, which makes the stocks easily tradable. The stocks lent would therefore be considered a "commodity."

A traditional equity loan is defined by an agreement between a counterparty, the lender (A), and a counterparty, the borrower (B), whereby A lends stocks listed on a regulated market to B for a consideration (fee) and possibly collateral. On transfer of the loaned stocks, ownership rights pass to B, so that B can subsequently dispose of the stocks in full. As a result, B has the right to vote at general meetings, to receive dividends and to sell the stocks.

At the same time as the loan, B agrees to return the same number of stocks to A at a later agreed time. When lending the stocks, it will usually be agreed that A will/should be compensated for the dividends paid on the stocks during the lending period.

Key to below graphic:

Figure 2.4 illustrates a stock loan



Tax qualification and treatment of REPO and stock loans – Master's thesis July 17, 2013 by Nils Panum Thisted

Tax qualification and treatment of REPO and stock loans – Master's thesis July 17, 2013 by Nils Panum Thisted

If B provides collateral to A in the form of cash, this cash collateral will be linked to an obligation on A to pay interest to B. The value of the collateral for a stock loan is typically above the current market price of the stocks.

In this respect, stock lending is fundamentally different from a repurchase agreement or collateralized loan agreement. Repurchase agreements and collateralized loans are similar to stock lending against cash collateral. In all cases, stocks are transferred from one person to another in return for the payment of a sum of money, and in both cases the parties are obliged to return the stocks or the money.

However, the side on which a haircut is applied differs for stock lending and for repos/loans with a pledge on stocks. The Danish Tax Agency seems to overlook this fact in the summary of the preliminary rulings of August 09, 2019 in Paragraph 8.12.

In this context, it should be stressed that a stock loan is made in the interest of the stock borrower. It is therefore the stock borrower who must provide collateral higher than the current market price. Stock borrowers are typically short sellers. Repos and loans against collateral in stocks, on the other hand, are in the interest of the stockholder. The stockholder asks the lender for a loan and puts up his stocks as collateral for the loan.

The transactions can be very difficult to separate, however, circumstantial evidence such as (1) who is making the request and (2) the value of the stocks exceeds the amount paid helps.

If the recipient of the money asks for a loan and provides stocks whose value exceeds the amount he receives as collateral, this is a repo or a loan with a pledge of stocks. A haircut is applied to the value of the collateral he provides to borrow the money.

If, on the other hand, the recipient of the stocks requests a loan and provides cash collateral whose value exceeds the current market value of the stocks, this constitutes a stock loan. In this case, the stockholder is

protected against the risk that the stock borrower does not return the stocks (which he wanted to borrow), and therefore the stock borrower must provide a higher amount of cash collateral than the current market value of the stocks.

For further explanations on stock loans and repos, please refer to Katja Joo Dyppel, Taxation of stock loans and repos, SR.2013.0053, see Appendix 2c, and Nils Panum Thisted, Tax qualification and treatment of REPO and stock loans, which is presented here as Appendix 75.

**2.3 The external actors involved**

In order to realize the many structured financial transactions, it is necessary that a number of financial firms participate. These are fund brokers, custodians and clearing houses, as well as stock borrowers and their intermediaries, forward intermediaries, and introducing brokers and arrangers.

As will be seen below, a very large number of players were involved in the completion of the transactions in question, each of whom had special knowledge and/or special contacts or who were exposed to not insignificant risks in the completion of the transactions in question.

**2.3.1 Brokers**

All orders for the purchase and sale of stocks were submitted by the trustee/trader to a professional, authorized and controlled broker in London.

The broker's job is to match a buy order with a sell order. This matching creates the legally binding agreement on the purchase of stocks which, under Danish law, immediately leads to the transfer of civil law ownership to the buyer.

The broker's primary task is to place the order on the market, seeking in his network of brokers and on the exchange to find one (or more) sell orders that match the buy order he has received from his client. The broker himself describes the task as "providing liquidity" for an order. He does not mean that he has to find cash to pay for a certain number of stocks that his client wants to buy.

The liquidity that the broker must provide to his client consists of sufficient stocks to match the client's buy order with the sell order.

The brokers with whom the pension plan traded usually included the equity traders as owner-matching traders. The broker working for the seller thus bought the stocks from the seller himself and sold them on to another broker acting for the ultimate buyer (the pension plan). In other words, the pension plan bought the stocks from its own broker, not from the ultimate seller.

When the broker obtains the stocks from the market, he can do this by buying stocks from several different sources. All the stocks bought by the broker are part of a large pool where it is no longer possible to distinguish which "specific stock" came from which source. Dematerialized stocks are only numbers on securities accounts, which differ as little from each other as monetary funds.

The flow of stocks to the brokers into a large pool can be illustrated as follows:



Nor was the "stock" - of indeterminate origin - that the pension plan subsequently had delivered to its custodial account with its custodian necessarily the very same stock with which its purchase was matched at the broker. This in itself is also irrelevant, as dematerialized stocks are commodities: the pension plan simply needs to be delivered a stock, of the same class and from the same company as it purchased.

For tax purposes, it only makes a difference if you want to check whether the stock that the pension plan bought and was delivered came from a short seller or a long owner. If you want to treat these stocks differently (from a tax point of view), you run into the problem that the pension plan may have bought a stock originating from a long owner (who already has the stock in his custody at the time of sale) from his broker, but when the delivery takes place, the pension plan receives a stock originating from a short seller - or vice versa. And no one is able to distinguish these stocks from each other, in the cycle of stocks that constantly mixed together in pools. If stocks from short sellers were regarded as cold water and stocks from long owners as hot water, what arises for both brokers and custodians is lukewarm water that cannot be separated again.

The broker's fee depends on whether he can get his client the desired number of stocks.

Therefore, the pension plan's payment of the brokers' fees is evidence that the pension plan's orders to buy or sell stocks were matched with corresponding orders that the brokers obtained from the market.

The brokers with whom the traders for the pension plan placed the orders for the purchase and sale of Danish stocks were financial undertakings independent of the Solo group. The broker Novus was indeed

bought by Sanjay Shah, but only after the pension plans had stopped using Novus as a broker. It was only in 2013 (before Sanjay Shah took over Novus) that Novus was a broker for pension plans that used the Solo group as a clearing house and custodian.

**2.3.2 Stock Loan Intermediaries**

The pension plan, which was a client of the Solo Group, used a limited number of professional intermediaries (Stock Loan Intermediaries) as counterparties for stock lending. Prior to commencing business, the pension plan entered into Master Stock Lending Agreements (so-called GMSLAs) with Stock Loan Intermediaries. A GMSLA sets out only the general terms of the loans.

Not all pension plans have kept copies of the signed GMSLAs for the simple reason that these are standard agreements that are identical for all pension plans.

Each specific stock loan was concluded by the emails exchanged by the trustee with the stock loan intermediary after the purchase order for the stocks was placed and matched by the broker. It is only these e-mails that contain the concrete information necessary for the conclusion of a legally binding stock lending agreement: which and how many stocks are lent, the amount of the cash collateral, the amount of the fee and interest and the term of the stock loan.

The pension plan and its trustee did not and still do not know the ultimate borrowers of the stocks, the stock lending intermediaries being between them. The pension plan therefore also does not know the motivation of the ultimate stock borrowers to borrow the stocks.

Before the pension plan purchased a given stock, the pension plan inquired by telephone with the intermediaries how many stocks the intermediaries needed to lend, i.e. could convey to a final borrower. This was to ensure that the pension plan only purchased a number of stocks that the pension plan could subsequently lend. Thus, the e-mails from the intermediary to pension plans, presented in the cases, in which pension plans are asked whether they have a certain number of stocks, were sent after the pension plans had already been in contact with the intermediary.

Thus, the stock loan agreements are not "backdated" as claimed by the Danish Tax Agency.

Nor is there a "piece to fall into place" or a "puzzle to unravel" in order to finance the stock purchase, as the Danish Tax Agency claims. The Danish Tax Agency's allegations rest on a lack of knowledge of the practice of dividend arbitrage.

**2.3.3 Forward counterparties and intermediaries**

The Pension Plan has not been aware of the identity of the ultimate forward counterparties, as the forward contracts have been traded through intermediaries. The intermediaries thereby enter into the contract themselves (as in the case of an owner trade) and are themselves the immediate forward counterparty of the pension plan.

The ultimate forward counterpart motivation is therefore also unknown to the pension plan.

The Pension Plan has not promised the purchaser of the Forward (neither the Intermediary nor the Ultimate Forward Counterparty) anything as alleged by the Danish Tax Agency in the Summary Submission in the Lead Cases dated August 09, 2019, Paragraph 2.3 (page 10). At the very least, the pension plan has promised the counterparty to the forward a price increase. The ultimate counterparty to the forwarder simply has a conflicting interest with respect to the pension plan: He wants to own the stock on a certain date after the date of the stockholders' meeting. Whether this is because the ultimate counterparty, for <u>his own motivation,</u> expects a price increase, or because the counterparty, for (tax) reasons, simply does not

want to own the stock on the dividend date, but wants to secure the purchase of the stock at a certain price on a later date, the pension plan as an independent party cannot say.

An important aspect of the present case is that the stocks purchased were never delivered under the forward hedge, as the pension plan always settled the forward transaction with the forward counterparties on a contractual basis, i.e. settled the difference between the agreed forward price and the spot price (market price) at the time of the expiry of the forward contract. In this way, the pension plan avoided that the forward contracts could be considered as a disposal of the acquired stocks for tax purposes.

It was essential for both the pension plan and the ultimate counterparties to the forward contracts that the forward contract would be covered by the Danish Capital Gains Tax Act, so that the conclusion of the forward contract is NOT to be considered as a disposal of the stocks. As stated in the preparatory works to the Danish Capital Gains Tax Act (comments to Act No. 439 of June 10, 1997, point n), the question whether a contract can only be fulfilled by delivery or whether difference settlement is possible depends on whether the contract has actually been settled by difference settlement. If this has in fact happened, it does not matter whether it was foreseen in the contract.

### 2.3.4 Custodians and clearing agents

Custodians and clearing agents have a dual role. On the one hand, the custodian has the task of maintaining the pension plans' securities (stocks). This role can only be fulfilled by the custodian once the stocks have been transferred from the seller's custodian to the buyer's custodian. This is done through the settlement process. At the settlement of the stock trade, the purchase price must be paid against the delivery of stocks (payment versus delivery). In other words, money and securities must be exchanged between the custodians involved. This can be either on a gross or net basis.

If settlement is on a gross basis, the specific stock sold is exchanged from one custodian to another against the transfer of the specific purchase price.

Settlement on a gross basis can be illustrated as follows:



If settlement is on a net basis, all equity transactions in the settlement period (which is not necessarily a full day) are first netted between the custodians concerned before the net balance is transferred between the seller's and buyer's custodians.

Settlement on a net basis can be illustrated as follows:



At the time of clearing, the obligations to be exchanged are determined. If the clearing takes place using nets, several transfer orders between the custodians involved are rearranged and offset to form a net claim, so that only the net obligation is transferred between the two custodians (cf. Article 3(1)(29) of the Capital Markets Act).

If the buyer and seller have the same custodian, the stock transaction is settled internally in accordance with Article 9 of the CSD Directive (settlement internalizers), so that no stocks are sent from custodian to custodian. The clearing and settlement of transactions is nevertheless real, and increasingly closely regulated by the EU.

Custodians and clearing agents will in principle only become active after the final and binding agreement on the transfer of ownership of the stocks has been concluded.

However, as the clearing agent guarantees the performance of a concluded agreement for the purchase and sale of stocks (as guarantor for the payment of the purchase sum and the delivery of the stocks) the broker and the trader must both inform the clearing agent of the intention to conclude a stock trade, which is only matched once the clearing agent has given an undertaking that the contractual obligations will be fulfilled.

Because of this risk, which the clearing agent assumes in settling trades entered into by a pension plan without sufficient equity to pay for the stocks purchased, and the need to obtain a stock borrower for the specific number of stocks purchased by the pension plan, the clearing agent charges a substantial fee. A fee that the clearing agent either demands to be paid to itself or (for tax reasons) to an affiliated company.

Because of the high risk of having to guarantee the payment of purchase sums of such a considerable order as in the stock transactions in question, the fee charged by the Solo group for its services as custodian and

clearing agent was also quite substantial. Fees in the order of 70-80% of profits are normal in the industry and were also paid by the pension plans.

These fees were deducted from the pension plans' cash account with their custodian. As the money under the TTC clause was already in Solo Capital's account, the payment of the fees only appeared by an entry in the pension plans' cash account with their own custodian. The TTC clause in the Custody Agreements was a security for the Solo group in case the clearing agent/custodian had to step in and pay the purchase price in a given stock transaction.

### 2.3.5 Tax agents

The reimbursement requests were submitted by a professional tax agent on behalf of the pension plan. The task of the hired tax agent was to verify that all conditions for obtaining a reimbursement from Denmark were met and duly documented.

The tax agent in question received a fee for his services.

Since the tax agent engaged was responsible not only for requesting the reimbursement but also for monitoring it, the reimbursement had to be paid from Danish Tax Agency to the tax agent. The tax agent informed the pension plan of the receipt of the respective reimbursement and transferred all reimbursement amounts to Solo Capital's cash account, as shown in Appendix 76, which is presented here. This had a discharging effect on the tax agent in question, as the pension plan had its account with the Solo Capital group. In the Solo group, the receipt of each reimbursement was booked to the account of each pension plan.

Solo Capital was entitled to receive the reimbursement amounts due to the pension plan, as the pension plan had assigned the ownership of all its cash as collateral to its custodian.

This assignment as security for cash was made under the TTC clause of the Custody Agreement.

The transfer of ownership rights to the reimbursement amount does not contradict the GMSLA as alleged by the Danish Tax Agency in the Agency's summary submission in the lead cases dated August 09, 2019, as the GMSLA only pledges the assets belonging to the pension plan. The cash only belongs to the pension plan for "a logical second," after which it is immediately transferred to the custodian's ownership under the TTC clause.

However, all funds accruing to the pension plans were recorded in separate accounts at the Solo- Group, so that the funds of each pension plan could be identified and released from the guarantee at any time. This was done on the basis of advice received from the law firm Pinsent Masons, which, as you know, is the Inland Revenue's own law firm in England.

If the pension plan had no outstanding balance with its custodian, i.e. if the custodian had not had to pay a stock deal on behalf of the pension plan, the pension plan could at any time terminate the contract with its custodian and request both funds and stock deposits to be transferred to another custodian/bank. The custodian in question had no rights to the stock deposits at any time and the transfer of ownership of the funds was for security purposes only.

### 2.3.6    Introducing brokers

Since it is not easy to find all the financial companies described here that are willing to accept a newly founded single man pension plan as a customer to invest in large Danish stockholdings without having

sufficient equity capital themselves, so-called introducing brokers are necessary. An introducing broker introduces clients to the various financial companies for a fee.

**2.3.7**      **Arrangers**

Finally, the pension plan needed a so-called arranger. An arranger is an agent with exclusive access to certain networks, companies or business concepts (intellectual property rights). An arranger also invoices the pension plan for its services.

**2.3.8**      **Summary remarks on the external actors involved**

The remuneration of the large number of financial institutions involved, who had special knowledge and contacts or who assumed certain financial risks in the execution of the stock transactions, left the pension plan with a smaller stock of the total proceeds of the dividend arbitrage. This corresponds to market practice and is no indication that the various actors were not independent of each other or that the pension scheme merely acted as a 'front man' for other parties involved, as the Danish Tax Agency seems to suggest.

The pension plan was not under the control of Sanjay Shah and could also switch to another financial company at any time. This is also evidenced by the fact that some pension plans were first clients of Solo Capital and subsequently of North Channel Bank. The pension plan does not know the specific names of the pension plans that changed clearer and custodian, but knows that it happened.

The tax authorities are in a better position to name the pension plans that have filed reimbursement claims on the basis of a DCA issued by Solo Capital and later by North Channel Bank.

**2.4 Pension plan business model and transactions**

**2.4.1 Introduction to dividend arbitrage**

The pension plan used the investment strategy known as dividend arbitrage. Dividend arbitrage is basically investing in stocks around the dividend date.

The business model is possible due to the fact that not all stockholders have the same tax status. Some pay more dividend tax than others. Some (like the pension plan) are exempt from paying dividend tax altogether. Stockholders who are (fully or partially) exempt from paying dividend tax thus receive a higher income from the dividend distribution than other stockholders who are less favorably treated.

Stockholders who do not have access to a double tax treaty know with certainty that on the dividend date they will lose 27% of the dividend. A U.S. pension plan does not lose this 27%. Stockholders who are not in the same tax position as the pension plan will therefore want to sell the stocks over the dividend date. They usually do this by selling the stocks shortly before or on the dividend date itself at the current market price (which still includes the entire gross dividend) and buying back stocks from the market by buying a forward contract.

The day after the dividend date, the stocks fall in price, as the company has lost value due to the dividend payment. Theoretically, the day after the dividend date (also called the ex-date, as this is the first day on which the stocks are traded ex-dividend) the stocks should fall by the same amount as the gross dividend. After all, this is the value that the company loses in dollars and cents on the dividend itself.

In practice, however, the price almost never falls by exactly the same amount as the gross dividend. This fact alone encourages speculation on price movements around the dividend date and hence increased trading activity at that particular time.

The speculative transaction becomes an arbitrage investment by the parallel investment in a forward contract.

Arbitrage is an economic term for the trading of similar goods (and services) in separate markets. The purpose of trading is to exploit visible price differences in different markets. If the same good is traded in two different markets at a different price, the arbitrage opportunity arises: The same good is bought and sold simultaneously in different markets and the arbitrageur can immediately see which profit he will realize.

The different "markets" in question cannot be just different stock exchanges. One and the same stock is not necessarily traded at exactly the same price on all exchanges. The different markets that an arbitrageur can target can also be the stock market itself and the derivatives market such as the forward market. The price of a stock bought immediately on the so-called "spot market" is not the same as the price of the same stock traded over a forward contract.

The price of a stock traded over a forward contract already differs from the actual purchase price of the stock because of the interest factor: if one agrees over a forward contract to buy a stock at a certain point in time in the future at a certain price, the interest itself on the purchase price will be included in the price of the forward contract and thus differ from the stock price on the spot market.

However, the price of the forward contract may also differ from the spot price for many other reasons. One reason for the forward price to be out of balance with the forward price (as it would be if only the return on the purchase price were factored in) may be demand from "former stockholders" who sell their stocks to the market by the dividend date to avoid the loss of the 27 percent dividend tax. Since the original stockholder without a double taxation agreement knows that he will lose the 27% dividend tax when the dividend is distributed, the dividend and therefore the stock itself has a lower value for him than for a pension plan entitled to a reimbursement. This subjective difference in value, caused by discrimination against some stockholders compared with others, sets the market in motion. The loss of value that occurs on the ex-date is smaller for tax-advantaged pension plans than for other stockholders. The pension plan can therefore resell the stocks to the former owners under a forward agreement at a higher price than the forward price would have been, as the buyer of the forward will still be financially better off than if he had kept the stock, received a net dividend and suffered a loss in value of his stock on the ex-date in the order of the gross dividend.

The pension plan suffers an immediate "loss" on the ex-date, as the stock also in his possession loses value. The gross proceeds are deducted from the market value of the stock. However, in the case of the pension plan, this loss is fully offset upon receipt of the net proceeds and the reimbursement. This leaves the pension plan with the gains it can realize on the arbitrage transaction: the purchase of the stock on the spot market and the sale of the stock on the derivatives market (forward contract).

Although the gain realized by the pension plan was equivalent to the reimbursement of the dividend tax, the gain itself did not consist in the reimbursement as claimed by the Danish Tax Agency. The gain realized stemmed from the arbitrage transaction itself. The pension scheme could not risk losing this in the event of market movements and therefore had to close all positions once the arbitrage gain had fallen to the amount of the reimbursement.

That dividend arbitrage is a perfectly legitimate investment strategy is shown in the brochure of the FCA from June 2017, which is provided as Appendix 77.

**2.4.2 Transactions**

The following § describes the business process of dividend arbitrage in practice, highlighting each step.

**2.4.2.1   Onboarding**

Prior to the launch of the pension plan's trading activity, the pension plan has gone through extensive account opening procedures with all of the financial institutions involved, including the broker (fund broker), the intermediaries for the forward contracts and the stock loans, as well as the clearing and settlement agent and the custodian.

The necessary contractual framework had to be in place before the pension plan could implement the business activity, including the framework agreements with the equity loan intermediaries (GMSLA agreements). This ensured that a concrete agreement for the lending of a concrete number of stocks on a concrete date could be concluded by e-mail and at short notice.

**2.4.2.2   Buying stocks and selling forward**

**2.4.2.2.1 Procedure for buying and selling stocks of forward**

The first step in the actual dividend arbitrage transactions has been to place a buy order with the fund broker. Once the pension plan trustee (or the trustee-Authorized Trader) has identified a particular stock where the price of the derivative (future/forward) is out of line with the price of the stock itself on the spot market, the trustee inquires by telephone with its stock loan intermediary whether there is an interest in borrowing stocks in the company concerned. If the stock lending intermediary indicates that there is a general demand in the market to borrow a particular stock, the pension plan trustee places an order to purchase a certain number of stocks with the broker (execution broker).

The broker then contacts his network to identify one (or more) suitable sales orders on the market. Trading does not necessarily take place on the stock exchange. Large volumes of stocks, such as those needed to make dividend arbitrage profitable (since the price differential between the spot and derivatives markets is so minimal), are generally traded OTC, i.e. outside the exchange. This is to prevent the risk of (illegal) market manipulation. See above under § 2.2.1.

If the broker identifies one or more suitable sell orders in his network of brokers, he communicates this to the pension plan trader, who is asked to obtain the clearing agent's agreement that settlement will take place. In parallel, the seller's clearing agent is asked to agree that settlement will take place. Thus, the buyer's clearing agent guarantees that the purchase price will be paid and the seller's clearing agent guarantees that the stocks will be delivered. If the clearing agents receive these messages about the dividend date and can see that the settlement date is after the record day, the transaction is flagged in the computer systems (as "cum ex trade") so that the respective custodians are aware that a market claim occurs when the dividend is paid.

"Record day" is the date on which the company (VP Securities) verifies who is registered as the owner of the Danish stocks. The dividend will be sent by VP Securities to the person registered as the owner of a stock on the "record day." If a stock trade has not yet been settled on the record day, VP Securities will immediately send the dividend to the wrong recipient, namely the seller. For example, if the seller has his securities account in Nordea and the buyer has his securities account in Danske Bank, VP Securities will send the dividend to Nordea. However, Nordea can see that the stocks have been transferred to Danske Bank after the record day. Nordea is therefore obliged under the so-called "market claim process" to forward the dividend to Danske Bank, where the rightful owner of the stock has his securities account.

Thus, during the market claim process, the respective custodians are obliged to debit the net proceeds received by the seller in the first place because he was still registered as owner on record day and transfer these net proceeds to the buyer of the stock.

If the broker does not find a suitable sell order in the market, the buy order cannot be fulfilled and the money plan does not become the owner of Danish stocks. Examples of purchase orders that were not matched are presented as Appendix 78. Unfortunately, not all pension plans have kept copies of the purchase orders that were not matched, as they had no legal or financial consequences.

Since the pension plan will only buy the stocks if it can simultaneously sell the same number of stocks via a forward, the pension plan's trader sends in parallel with the order to buy stocks also an order to sell the same number of stocks via a forward contract.

These two orders (buying stocks and selling a forward) are not necessarily sent to the same broker. If the broker can identify another broker (in its network) who has a client who wants to buy the stocks over a forward, the pension plan's broker communicates this to the pension plan, which in turn is invited to obtain the clearing agent's commitment to guarantee the settlement.

The pension plan then asks its clearing agent for a commitment to settle the stock purchase and forward sale. If the clearing agent agrees, this is communicated to the pension plan and the brokers, who then match the trades. All this happens within seconds/minutes over electronic communication systems.

The brokers carry out the trades as so-called owner-matching trades. This means that it is the respective brokers who enter into the purchase agreement as a party. There is no direct contact between the pension plan and the ultimate sellers of the stocks. The seller of the stocks is and therefore remains unknown to the pension plan. There is no contractual link between them.

As a broker simultaneously enters into several owner matching trades with different brokers over stocks issued by the same company, it is not possible to subsequently identify the original owner of the stocks purchased by the pension plan. At the broker, all the stocks are thus mixed together in a pool where it is subsequently no longer possible to trace a particular stock back to a particular original seller.

The moment the brokers match the trades, the pension plan becomes the owner of the stocks. Within three seconds of the orders being matched, a trade report is automatically sent to the London Stock Exchange (LSE) and the settlement of the trade is simultaneously initiated by settlement instructions sent automatically to the clearing agent. In addition to this trade report, which is addressed to the public, a transaction report is also sent to the FCA (via the LSE's Una- vista MIFIR Reporting Portal - see Sanjay Shah's pleading to the High Court in London, Paragraph 56.9). This "transaction report" is used in the supervisory authorities' control and monitoring of stock transactions. Both reports are sent electronically and fully automatically from the trading systems (computers) where the traders were matched.

After the matching of the buy and sell order, the time limit for the settlement of the trade starts to run. Trades that were to be settled through Solo Group companies, like many other OTC trades, were settled with a day longer deadline than VP Securities (as the national CSD) settles trades. Clearing agents have a duty (also under FCA rules) to ensure that the risk of a fail is avoided - i.e. that a trade cannot be settled - and a longer settlement period is used for this purpose, particularly when dealing with such large pools of stocks as those at issue in this case. Thus, until 2015, stock trades were settled four days after the orders were matched (T+4), and from 2015 onwards, stock trades were settled three days after the match (T+3).

**2.4.2.2.2 Business rationale for the purchase/sale of stocks by the pension plan and the stock seller**

The main actors in a dividend arbitrage transaction are, of course, the buyer and the seller of the stocks. These have conflicting interests: while the seller does not want to own the stocks at the date of legal acquisition of the dividend (the dividend date), the buyers have precisely the interest of being the legal owner of the stocks at that date.

The ultimate seller's motivations for not wanting to own the stocks on the dividend date may be many, as indicated. As a result of the ineligibility for a reimbursement under the double taxation treaty to which the seller is subject, the seller may have an interest in selling the stock, if possible, at a price that includes 100 percent of the value of the gross dividend. He would then be in a financial position as if he were subject to a double taxation agreement which entitled him to a reimbursement of the full dividend tax. The seller may also wish to be taxed on a stock profit - rather than being taxed on the stock dividend. In this situation, the seller will seek to sell the stock (including dividends) at a higher price than the repurchase price of the stocks after the dividend date (i.e. excluding dividends).

Furthermore, speculators may of course speculate that the market price of a stock will not fall in line with the value of the dividend. Such speculators may also act as sellers of stocks before the dividend date. There are, of course, many other real economic incentives to sell stocks before the dividend date. The pension plan cannot know what has been the incentive of a given ultimate seller to sell before the dividend date. However, it is noted that there may notoriously be many different incentives to do so.

The pension plan bought the stocks with the aim of realizing a profit by buying the stocks on the spot market and selling the stocks through a forward or a future.
The pension plan trustee/trader can simultaneously view both the spot market price and the forward market/futures market and thereby immediately calculate the profit to be realized by buying the stocks on the spot market and selling them through a forward or a future. The only condition for this gain to be realized in reality is (1) that the dividend tax reimbursement is paid and (2) that the pension plan can bear the cost of the stock lending that finances the purchase price of the stocks.

The pension plan's calculation of investment profitability is based on the assumption that the pension plan does not lose the dividend tax on the ex-date, but is entitled to receive a reimbursement. Otherwise, the pension plan would be at the same disadvantage as a seller who does not have access to the dividend reimbursement. Without a reimbursement, the pension plan has overpaid for the stocks before the ex-date.

The acquisition of the stocks in question by the pension plan was financed by the collateral provided by the stockholders. While stock borrowers have to pay a fee for the stock loan, the pension plan has to pay interest on the cash collateral. The fee and interest rate are variable amounts which are constantly renegotiated between the parties depending on current market conditions. This creates uncertainty for the pension plan in terms of funding costs, which may force the pension plan to sell the stocks before the maturity date of the forward or cause the pension plan to extend the stock loan and the hedge beyond the initial maturity.

In the event that Danish Tax Agency did not want to pay the reimbursement to which the pension plan was entitled, the pension plan did not have sufficient equity capital to immediately survive this loss of dividend reimbursement, which corresponded to 27% of the dividend. In order to counter this risk, the pension plan had to sell the stocks on the spot market and call back the stock loan when the financing costs of the

transaction reached an amount equal to the <u>previous gain without the</u> dividend tax. The pension plan would then still reach a zero result if Danish Tax Agency did not have to pay the reimbursement. This is therefore also the reason why the gain realized on the transactions is equal to the amount of the dividend tax. However, the reimbursement of the dividend tax is only a reimbursement of the profit lost by the pension plan, as the pension plan had bought the stock the day before the ex-date for a price including gross profit, but only received a net profit from the Danish company during the settlement of the market claim process.

**2.4.2.2.3 Business justification of the pension plan and the forward buyer for the sale/purchase of the forward**

The business rationale for entering into a forward is essentially to hedge a risk position: if you have a stock position, you can hedge the risk of price fluctuations by selling a forward contract. This is an agreement to sell the stocks at a certain time in the future at a certain price.

The buyer of the forward contract also hedges against price fluctuations by buying the stocks under a forward contract: He knows at what price he can buy the stocks in the future. This can be an important argument for a short seller or for a stockholder who sells his stocks before the dividend date to avoid the dividend tax.

As it had no direct contact with the counterparties to the forward contracts, the financial plan cannot comment on their specific motivation. There was always an intermediary between the pension plan itself and the ultimate forward counterparty.

The ultimate counterparty to a forward hedge may have had numerous reasons for entering into an agreement with the pension plan.

Thus, the ultimate buyer of a forward can hope that the stock price will rise again quickly after the date on which the stock is no longer traded with dividend rights (ex-dividend date). Empirical studies thus show that the stock price on the ex-dividend date does not always fall by exactly the same amount as the gross dividend, and that the stock price rises faster than usual after the ex-dividend date.

The ultimate counterparty to a forward may also be a foreigner who sells his stock before the dividend date in order not to lose the dividend tax for which he is not entitled to a reimbursement. He may wish to secure the right to repurchase an equivalent amount of stocks in the company from the market at a specified price. He may give the arbitrageur an incentive to buy the stocks in-between the dividend date and sell stocks after the dividend date by pricing the forwarder high. The counterparty to the forwarder can thereby bring the price of the forwarder out of equilibrium with the spot market.

**2.4.2.3 Stock lending and financing of stock purchases**

**2.4.2.3.1 The procedure for stock lending**

The pension plan finances the purchase of the stocks by lending the stocks and paying the stock seller with the cash collateral received from the stock borrower.

The ex-dividend date, which is the first day on which the stocks are traded without entitlement to dividends, occurs between the trade date and the lending date and settlement date. Thus, even if the value of the stocks is lower on the lending date than on the trading date, the stock borrower provides cash collateral equal to the purchase price on the trading date. This is normal market practice, as the stock

lender normally always pledges more collateral for the stock loan than the current market value of the stocks, see § 8.1 of this document. This is precisely what distinguishes a stock loan from a loan against a pledge of stocks. Here, it is the value of the stocks that exceeds the value of the loan.

In the case of stock loans, however, it is the stock lender who is protected against the risk that the stock borrower (who in many cases is a short seller) cannot return the stocks borrowed. Therefore, the cash collateral exceeds the current market value of the stocks.

As stated above, prior to the purchase of the stocks in question, the pension plan had already concluded a GMSLA framework agreement with the stock lending intermediary, which contains the general terms and conditions for the stock lending. The pension plan and the stock lending intermediary then agree on the specific terms as to which stocks, the number of stocks, the loan fee, the interest rate, etc. These agreements are concluded by e-mail. Once the stock loan intermediary and pension plan agree on the loan terms, the stock loan is communicated to the clearing agent and custodian. They check that the stock lending message received from the stock lender corresponds to the message received from the stock lending intermediary. If this is the case, the stock lending is confirmed.

As the pension plan uses the cash collateral from the stock borrower to pay the purchase price of the stocks, the stock lending must be settled on the same day with the clearing agent and custodian as the stock purchase itself. Without payment of the purchase price, the stocks are not delivered to the pension plan's custodial account with the custodian.

The settlement of the stock purchase will take place in parallel with the settlement of the stock lending. The stocks are thus registered three or four days after the purchase of the stocks, first in the pension plan securities account and then in the stock-borrower securities account. This registration in the pension plan's account is crucial for the correct settlement of the pension plan's market claim and for the pension plan's receipt of the proceeds that were initially wrongly sent by VP Securities to the seller's account.

Even if all the conditions are agreed by e-mail when the stock loan itself is concluded, this does not mean that the conditions for the stock loan are fixed. As the stock loans did not have a fixed term (see: "*term: open*"), they were open to constant renegotiation, i.e. the pension plan could demand a different fee at any time and the stock borrower could demand a different interest rate at any time by threatening to terminate the loan immediately. If the pension scheme had an interest in continuing the stock loan, it would accept the changed conditions. The same was true for the stock borrower.

As an example of these e-mails, by which the stock loan terms were continuously modified, is provided Appendix 79.

The formula stated by the Danish Tax Agency in the summary submission of August 09, 2019 in the lead cases, Paragraph 4.5, page 28, is therefore quite correct, but it cannot be used to arrive at the exact amount that the total Stock Lending Fee constituted. Without knowing the exact interest rate applicable on each day at any given time, it is not possible to calculate backwards, as the Danish Tax Agency attempts to do on page 29.

Since the Danish Tax Agency applies the wrong interest rate to all calculations of all stock loans for all pension plans, the Agency naturally also arrives at the same "calculation error" in all cases. When the Agency reaches the conclusion that there is an error in all the cases, the Agency should instead come to the conclusion that there must be an error in the Agency's approach and take into account variable interest rates for the different days.

The fact that the Danish Tax Agency cannot make its own calculations add up is not a sign of fraud, but a sign that the Agency does not know how the stock lending industry works in reality.

**2.4.2.3.2 Business justification for stock lending by the pension plan and the stock borrower**

The pension plan needs cash to pay for the stocks purchased. These are obtained by lending the stocks and receiving a cash collateral for the stocks equal to the purchase price. The financial services industry refers to these as "cash-neutral transactions."

The stock borrower may have many reasons for wanting to borrow the stocks.

It is therefore incorrect for the Danish Tax Agency to claim that the sole purpose of the stock borrower was short selling.

The stock borrower may thus need the borrowed stocks for hedging purposes. The stock borrower may also be a bank wishing to dispose of large cash balances in order to have a different, more valuable asset on its balance sheet than cash. A stock borrower may also be an investment firm that needs to respect a certain asset allocation (risk diversification) and therefore needs more stocks in its portfolio at the accounting date.

The European Central Bank also explicitly refers on its website (https://www.ecb.eu- ropa.eu/explai-ners/tell-me-more/html/securities_lending.de.html) to the existence of many years to borrow a stock: If you only need a stock temporarily for a day or a few weeks, it is often cheaper, quicker and less risky to borrow the stocks rather than buy them. Many different strategies used in the financial markets rely on stock lending. The borrowed stocks can be used for trading (taking a risk to realize a gain), arbitrage (realizing a risk-free gain from price differences) or hedging purposes (reducing risk). If, for whatever reason, stocks are delivered late, stock lending may be an option to obtain the missing stocks on time.

It should be noted in this context that the world's largest national banks themselves act as borrowers of securities as a means of realizing their monetary policy. This allows national banks to pump additional liquidity into the market in order to increase the money supply and thereby raise inflation.
Thus, it is also common knowledge that the Swiss and Japanese national banks are registered as the world's largest owners of listed stocks - whether these are bought or borrowed.

The size of the global equity lending industry is USD 10 trillion, so it is obviously impossible to account for all the possible motivations that an equity borrower might have.

The stock borrower will therefore not necessarily have the expectation that the stock price will fall, as claimed by the Danish Tax Agency in the submission.

The stock borrower and the pension plan have conflicting interests: while the pension plan has stocks and needs cash, the stock borrower (who has cash) needs the stocks. Both parties in a stock loan charge for their services: the stock borrower charges interest on the cash collateral he has to provide, and the pension plan charges a fee for lending the stocks. Who thereby realizes a loss and who realizes a gain depends on current market conditions and the bargaining skills of the parties involved.

**2.4.2.3.3 Other comments on the financing of stock purchases**

Pension plans that do not have enough equity to pay for the stocks themselves trade under what is known as "margin trading" or leverage. This allows a huge number of stocks (or other assets) to be traded without using equity. All the investor needs is a prime broker to provide the investor with the necessary capital.

Arbitrage transactions (not just those made around the dividend date) can be financed without equity when the gain from buying a stock on the spot market and simultaneously selling the derivative on the forward market can be determined immediately. As a rule, the price difference between the spot and forward markets is minimal. It therefore takes a huge volume of trading to generate enough profit for the strategy to pay for all the services involved.

Prime brokers, who in the present cases were custodians, and clearing agents do not necessarily have to directly fund the investor themselves in the form of a credit.
The prime broker can also simply act as a guarantor that payment for the stocks will be made. If the pension plan obtains the necessary financial means to pay for the stocks by lending them against a constant collateral, the role of the prime broker is limited to that of guarantor.

**2.4.2.4 Settlement of transactions (settlement)**

The actual settlement of the stock purchases was carried out four days until 2015 and three days after the stock purchases and forward sales from 2015. The stock purchases were settled by clearing and settlement (settlement). It was the clearing agent's task to calculate the total amount of money going from the buyer's custodian to the broker (and from there on to the ultimate seller), and the total number of stocks going from the custodian's securities account to the pension plan's securities account.

These settlements may be on a gross or net basis. This means that each trade can either be accounted for separately and each number of stocks transferred separately to the pension plan custodian (gross settlement). Alternatively, all purchases and sales to be settled between the broker's (= seller's) custodian and the buyer's custodian can be netted against each other, and all acquisitions and sales of stocks are netted (offset) so that only one net sum of money is transferred and only one net total of stocks is transferred between the buyer's and seller's custodians (net settlement after netting).

If netting is used during the clearing and settlement procedure, a stock can never be traced from the ultimate seller to the pension plan that bought the stock. After netting all purchases and sales, the pension plan will most likely not receive a stock that was at one time in the custody of the broker or the ultimate seller, but a stock that was previously in the custody of another client of the same custodian. This is precisely the purpose of netting: Fewer stocks are transferred between different custodians.

If, on the day of settlement of the trade, the pension plan has not yet received the cash collateral for the stock lending, the clearing agent is liable to the broker (seller) for the payment of the purchase price. Once the buy and sell orders have been matched, the settlement of the trade can no longer be stopped.
The clearing agent is obliged to pay for the stocks himself if the buyer does not have sufficient funds.

It should be noted that in none of the transactions carried out by the pension plan did the clearing agent have to pay the purchase price until a stock loan was in place.

The pension plan settled the stock purchase, the forward and the stock lending on the same day. The pension plan was thereby registered as the owner of the stocks four and three days respectively after the purchase. The pension plan was thus the owner of the stocks for a period of four and three days respectively, without this being registered with the custodian. Registration with the custodian only occurred when the pension plan paid for the stocks and had them delivered to its custodial account. This meant that for the first four or three days after the conclusion of the purchase agreement, the original owner was still registered as the owner of the stocks, even though he was no longer the legal owner of the stocks.

After the pension plan had been the legal owner of the stocks for several days, the pension plan lent the stocks so that the purchase price could be paid. The stock borrower was then registered as the new civil law owner.

However, registration of ownership of the stocks is not a prerequisite for acquiring ownership under Danish law. Registration is only declaratory and serves to secure the rights as owner against third parties. In this respect, Danish law differs fundamentally from German law. It is therefore fatal for the Danish Tax Agency to base its entire reasoning in the case on German case law.

The tax authorities attribute to the registration of ownership with the custodian a significance for ownership which the custodian does not have. The ownership of the pension plan does not start with the registration of the purchase with the custodian, which is why there is no "review ownership" of the stocks for a few minutes when the pension plan is first registered as the owner and the stock borrower is then immediately registered as the civil law owner during the stock lending. The pension plan was the owner of the stocks already from the matching of the purchase order.

**2.4.2.5 Maturity of transactions**

As stated above, the stocks purchased were never delivered under the forward hedge as the pension plan always settled the difference with the forward counterparties.

The pension plan never held the stocks for the exact same period as the forward contract term. On average, 90 days elapsed between the purchase and sale of the stocks by the pension plan. This maturity was achieved either by (1) extending the forward contracts (so-called "roll-over"), (2) purchasing another forward from the market with the same settlement date as the originally sold forward contract or (3) by an earlier difference settlement of the sold forward contract. That the maturity of the forward was generally not respected is proof that the transactions are genuine, since they are subject to market movements.

Thus, the Danish Tax Agency's claim that the pension plan traded the stocks in such quick succession that it was not possible to identify the beneficial owner is clearly incorrect. When 90 days elapse between the purchase and sale of the stocks, it makes no sense to talk about 'looping' the stocks.

The claim of "looping" put forward by the Danish Tax Agency seems to be a claim uncritically taken over from the German "cum ex cases." This, despite the fact that the Danish Tax Agency and the Ministry of Taxation are both of the opinion that (1) cum ex-trading is not possible in Denmark and that (2) none of the pension plans should allegedly have bought any Danish stocks at all. If the Danish Tax Agency really wants to rely on the German argumentation, the Danish Tax Agency must first admit that (1) this is a cum ex case and (2) all the pension plans really bought and sold Danish stocks. The Germans, in all the years they have fought to change the law to prevent cum ex-trading, have never claimed that no trading took place at all. The Germans also admit that there existed a flawed legal framework.

The pension plan was able to pass 90 days before selling the stocks again because the financing was secured by a stock loan. As long as the pension plan realized a positive result from the stock lending (i.e. as long as the stock lending fee exceeded the interest on the cash collateral), or at least the pension plan did not realize a loss exceeding the arbitrage gain, the pension plan could hold on to the stocks and let the stock loan run its course.

Where the stock lending fee exceeded the interest payable by the pension plan on the cash collateral, and the pension plan thus realized a gain on maintaining the stock lending, either the receipt of the merger or the evolution of prices on the stock markets caused the pension plan to close all positions. As the forward contract was sold at a price out of balance with the current stock market, the normal price development of both the stock market and the forward market could cause the pension plan to realize the gains made so far and not to run any further risks.

The calculated gain to be realized by the pension plans was at the same level as the dividend tax, and when it was reached, the targeted gain was realized and the positions closed.

**2.4.2.6    The positions are closed**

Like all pension plans, a solo 401K pension plan aims to generate a profit, and in any case avoid realizing losses.

Dividend arbitrage is an obvious form of investment here, as by closely monitoring the investment, the trader can close positions in time to avoid realizing a loss.

The pension plan knows, at the moment the stocks are purchased and the forward contract is sold, what gain can be realized (purchase and sale prices are both known). The only uncertainties associated with the transaction are (1) whether and when the reimbursement is paid and (2) the cost of the stock lending and hence of financing the stock purchase.

The pension plan knows that the sale price of the forwarder is below the purchase price of the stocks. This is also normal as the dividend is due between the purchase date of the stocks and the expiry date of the forward contract. If the selling price of the forward plus the gross dividend is above the purchase price of the stocks (on the spot market), the pension plan expect to realize a gain. From this gain, the pension plan only has to deduct the cost of the stock lending.

The terms of the stock loan (= the interest on the cash collateral and the stock loan fee) are constantly subject to renegotiation, as both the stock lender and the stock borrower can terminate the stock loan at any time. This means in practice that the current market conditions for stock lending constantly have a direct impact on the cost of the transaction. If the cost of the stock lending increases to the point where the pension plan can no longer realize a profit if the reimbursement is not received, the pension has to close all positions: terminate the stock loan, sell the stocks and buy a forward.

The stock loan can be cancelled at one day's notice.

The forward contract can either be bought back or the pension plan can enter into a similar forward contract to buy the same number of stocks it has previously sold, with the same settlement date as the original sale.

The sale of the stocks will follow exactly the same procedure as the purchase of the stocks described above. Now the pension plan is just the seller not the buyer.

**2.4.2.7    Profits realized**

The pension plan starts the whole transaction with a liquidity loss: the pension plan has bought the stocks for their full value - including the gross dividend - and the next day (on the ex-date) the stocks are traded at a lower value. Theoretically, this lower value should be equal to the gross dividend. However, the markets react differently from theory. Sometimes the stock price falls more, sometimes less than the gross dividend.

The fact is, however, that the market price of the stocks bought by the pension plan already falls the day after the purchase. This "loss" is offset by two payments: the net dividend and the reimbursement. This means that the loss on the highly liquid stock value is replaced by two less liquid asset items: the net

dividend claim and the reimbursement claim. While the net dividend is usually received a few days after the stock purchase, it takes several months before the reimbursement is received.

From an accounting point of view, the pension plan did not realize a loss the day after the purchase either, despite the fact that the market price of the stocks fell, because the pension plan sold a forward at the same time. The sum of the value of the forward, the net proceeds and the dividend distribution was always at least equal to the purchase price of the stocks. The purpose of a forward hedge is precisely to offset the loss in the value of the stocks by a corresponding increase in the value of the hedge.

Thus, the gain realized by the pension plan does not derive from the reimbursement. The reimbursement only covers the loss in stock value. Instead, the gain arises either from a profit realized on the stock lending (if the stock lending fee exceeded the interest payable on the cash collateral), from the sale of the stocks or from the settlement of the forward contract.

The reason why the accounting gives the impression that the benefit of the pension plan was the reimbursement (see the Danish Tax Agency's summary submission in the
August 09, 2019, § 4.2, page 24), is that the pension plan in principle closed its positions when the gain that the pension plan could realize under the stock lending, stock sale and/or forward contract was equal to the value of the reimbursement. If the pension plan would let the investment run its course, the pension plan could risk realizing a loss: namely, in the event that the reimbursement would not be paid out.

**2.4.2.8 Summary of the business model and transactions**

In the present case, the pension plan purchased the Danish stocks before the ex-dividend date, i.e. before the dividend was deducted from the stock. It became the owner of the stocks and the dividend on the basis of a final and binding agreement to purchase the stocks.

This agreement was reached by electronically matching the pension plan's purchase order with a sales order from a broker. The pension plan paid 100 percent of the current market price before the dividend was deducted from the value of the stock. The purchase price thus included 100 percent of the gross dividend.

Since the pension plan had access to a double tax treaty entitling it to a dividend tax reimbursement, the stocks also had this value for the pension plan, even though it only received the net dividend on its account with its custodian on a first-name basis.

The stocks were paid three and four days after purchase by lending the stocks after the dividend date and thereby receiving a cash collateral equal to the purchase price of the stocks. The individual stock loans were drawn under the GMSLA, which was concluded prior to the stock deal as a framework agreement. The terms of each stock loan were determined by e-mail correspondence. The e-mail correspondence is attached as Appendix 80.

The economic risk associated with the transaction was managed using a forward hedge (in 2012 futures were used for the same purpose). On the same day as the stocks were purchased, a forward hedge was entered into on the sale of the stocks at a later date at a fixed price. However, in neither case were the stocks delivered under the forward hedge. The forward hedge was always offset. This eliminated the risk of losing ownership of the stocks when the hedge was entered into.

To illustrate the progress of the transactions in the dividend arbitrage carried out by the pension plan, please refer to the timeline below. The timeline further illustrates that the pension plan could not possibly have sold the "same" stocks under a forward contract that they had just purchased that day, even ignoring

the fact that the forward was generally settled by difference settlement and that stocks were never delivered under the forward contract.



It was the difference between the price of the stock on the spot market and the price of the stock on the forward market that prompted the pension plan to buy the stocks immediately before the dividend payment. The trader of the pension plan could see that the selling price on the forward market was not as far below the spot market price as the gross dividend would mathematically be. This may be due, among other things, to the fact that sellers who wish to buy back the stocks after the dividend date are offering more than normal for the stocks, as the dividend on their stocks is taxed at 27 %, and these sellers may therefore offer a higher price for the forward than other buyers. The reason for this is an increased demand from the market to buy stocks after the dividend date (e.g. from those who have sold the stocks before the dividend date).

By buying the stock, receiving the net dividend and a reimbursement of the withheld dividend tax, and selling the stock again at a lower price (the stock price falls after the dividend payment), the pension plan could realize a gain. It was this gain that was the purpose of the whole transaction - and what created the financial profit. The purpose of the transactions was thus not simply to obtain a reimbursement of dividend tax from the Danish tax authorities, as claimed by the Danish Tax Agency. On the contrary, the subsequent reimbursement of withheld dividend tax merely ensured that the transaction was tax neutral for the pension plan.

Dividend arbitrage is thus nothing more than a normal arbitrage transaction. The only special feature of dividend arbitrage is that it is carried out around the date of the distribution of the dividend. It is precisely the fact that the company intends to pay a dividend that upsets the markets (spot and forward).

Foreign investors who are not eligible for dividend distribution seek to sell their stocks before the dividend is distributed in order to buy them back from the markets after the distribution. (Danish) stockholders who would rather realize a profit that is taxable under the rules of capital gains tax than receive a stock dividend also seek to sell their stocks to the market before the distribution of the dividend. These stockholders may also buy back stocks from the market after the dividend date. And finally, there are pure speculators who believe that the stock price will not fall by the very amount paid in dividends which bring stocks to the

market just before the dividend date. All these groups of investors cause movements in the market just around the dividend date. These movements are not identical in the spot and forward markets. The spot market price for the same stock may move differently from the forward market price. This creates the possibility of an arbitrage trade.

The only reason that dividend arbitrage is called dividend arbitrage is that this arbitrage is undertaken precisely when the distribution of dividends brings particularly large movements into the market.

Similar arbitrage trades are made throughout the year, as the spot and futures markets do not only diverge around the dividend date.

However, the tax authorities are only interested in dividend arbitrage because it is carried out around the date of distribution of the dividend and thereby triggers dividend income for the arbitrageur with a resulting right to a reimbursement of withheld dividend tax under the applicable rules.

After the pension plan had already described the dividend arbitrage in detail to the Danish Tax Agency in its 2nd submission, it was the Danish Tax Agency itself that, in its 2nd submission of 18 January 2019, for the first time described dividend arbitrage as a "money machine." This concept is not that of pension plans, as the Danish Tax Agency again claims in the Agency's summary submission in the preliminary proceedings of August 08, 2019, § 8.1.

Incredibly, the Danish Tax Agency continues to deny the existence of profit arbitrage throughout its submissions (most recently in the summary submission in the Lead Cases of August 09, 2019, § 4.3, page 26). This, despite the much publicity this investment strategy has received under the term "cum ex" not only in the Danish but also in the international press, and the thorough study conducted by ESMA at the request of the European Parliament, see the European Parliament's proposal for a resolution on a common solution of November 2018, presented here as Appendix 81. When the Danish Tax Appeals Agency submitted its summary submission in the lead cases on August 09, 2019, ESMA's report on dividend arbitrage was already available. It therefore does not help the Danish Tax Agency's case to deny the facts.

It is also naïve to think that it is only the pension plans that realize a profit from the dividend contributions. However, it is only visible to the pension plans what profit they themselves realized from the business. After all, it is their business. Pension plans cannot possibly account for the business models and profits of independent third parties.

Of course, pension plans do not have to stock their gains with the counterparties to the stock loan and the forwarder. That would have meant illegal cooperation between these independent market participants. The stock lender and the forward counterparty have commercial interests which are the opposite of those of the pension plans. They obviously do not co-operate and do not stock profits.

After so many pages of descriptions of dividend arbitrage throughout the previous posts, it is also unfathomable that the Treasury still cannot or will not understand the role of pension plans. In its submission of August 09, 2019, § 4.3, page 27, the Danish Tax Agency lists the various actors without understanding the role of the pension plan.

Thus, the partners are listed as follows:

| Party | Service |
|---|---|
| Seller | Supplies the stocks |
| Pension plan | ? |
| Buyer | Receives the stocks |
| Stock borrower | Supply financing |
| Forward purchase/sale | Hedges exchange rate risks |
| Custodian | Guarantees the solvency and completion of the transaction. |

The Tax Agency notes:

> "As can be seen, each party - apart from the pension plan - is reportedly offering whatever is necessary for the transactions to be carried out with the desired result. It goes without saying, therefore, that all parties must have a share in the benefit before it makes sense for them to engage in arbitration. Otherwise, there is no business rationale for them to participate in this arrangement, which of course entails a number of risks, such as default by co-contractors and insolvency of co-contractors."

What the tax authorities refuse to accept is that the pension plan is the buyer of the stocks. There is no reason for the question mark next to the pension plan. The pension plan is the buyer of the stocks, since the pension plan has a favorable tax status which it uses to realize its gain.

The other parties' business is not profit arbitrage. There is therefore no reason why they should share in the profit-sharing gains of the pension plan. It makes absolutely no sense that the buyer and seller of stocks or the buyer and seller of a forward contract should stock the gain realized on the transactions. Buyers and sellers never do.

### 2.4.2.9 Examples of transactions at dividend arbitrage

To illustrate the economics of the dividend arbitrage transactions undertaken by the pension plan, the following is a transaction undertaken by the pension plan. It concerns the purchase of an item of stocks in TDC A/S in 2015.

A review of all pension plan transactions would show that the pension plan sometimes realizes a gain on the purchase and sale of the stocks, as in any other speculative investment.
Sometimes, however, the gain was realized on the forward hedge. Here, the hedge worked precisely as intended: to offset the losses on the equity transaction itself. The fact that the gain occurred in such different ways is evidence of the reality of the transactions and that they were in no way centrally organized or controlled.

Appendix 1 also shows a summary of all stock transactions carried out by the pension plan. It shows how it varies where the gain is realized: on the stock trade or the forward hedge. This is typical for dividend arbitrage transactions.

A dividend arbitrage transaction can be divided into three transactions: a stock trade, a forward contract and a stock lending.

Purchase/sale of stocks and the forward contract:

On March 05, 2015, the pension plan issued a purchase order for 2,358,808 TDC A/S stocks at a price of DKK 54.00 per stock, totaling DKK 127,375,632.00. Payment, delivery of stocks and registration were scheduled to take place on March 10, 2015. As the purchase is concluded on the same date as the dividend distribution is decided, the trade is marked in the clearing system as a so-called "cum ex trade." This indicates to the custodians involved that a market claim will be realized after the settlement of the stock trade. This ensures that there are not two persons who both receive the dividend, receive a DCA and can thereby request reimbursement.

Also on March 05, 2015, the pension plan entered into a forward contract (a financial contract) for the sale of 2,358,808 TDC A/S stocks at a price of DKK 53.00 per stock for settlement on June 19, 2015.

On June 02, 2015, the pension plan entered into a new forward contract with the same settlement date, namely
June 19, 2015 regarding the purchase of 2,358,808 TDC A/S stocks at a price of DKK 49.68 per stock. It therefore closed the open position and had a total gain on the forward of DKK 3.56 per stock.

On June 02, 2015, the pension plan sold the stocks with a value date of June 04, 2015 at a price of DKK 49.69 per stock, totaling DKK 117,209,169.52. The pension plan thus had a net loss of DKK -4.31 per stock, totaling DKK -10,166,462.48.

The stock traders and the forward contracts together resulted in a total loss of DKK 1.5 billion. 0.75 per stock, for a total loss of DKK 1,774,059.50.

Stock Lending

On March 09, 2015, the pension plan issued an order for settlement on March 10, 2015 to lend 2,358,808 TDC A/S stocks against cash collateral of DKK 54.00 per stock, totaling DKK 127,375,632.00. The pension plan thus received DKK 127,375,632.00 as security for the return of the stocks.

The stock loan was terminated on June 02, 2015 with an effective date of June 04, 2015. This had the consequence that the stocks had to be returned. The stocks then had a market value of DKK 49.69 per stock, totaling DKK 117,209,169.52.

This amount, plus the total amount of the current valuation adjustment, MTM, which amounted to DKK -10,166,462.48, had to be repaid to the stock borrower, totaling DKK 127,375,632.00.

The stock borrower was thus guaranteed to receive the full amount of the cash collateral he had provided for the stock loan.

In addition, the pension plan had to pay interest on the stock loan of DKK -213,000.36 and receive a fee for the stock loan of DKK 265,130.02, in total paying a net amount of DKK 52,129.66.

Dividend and reimbursement payment

The interim dividend had been adopted on March 05, 2015.

The stocks were traded without dividend from March 06, 2015 (ex-date).

Pay day, i.e. the day on which the dividend is paid, was March 10, 2015.

The pension plan received the net proceeds in the form of a market claim, as the seller of the stocks was still registered as the owner of the stocks on the record date. The pension plans were not yet registered as owners of the stocks on the record date (March 09, 2015), as the settlement of the purchase did not take place until March 10, 2015.

Record day is in Denmark the day before pay day. VP Securities therefore immediately paid the dividend to the former owner, who was still registered as owner of the stock with VP Securities, on March 09, 2015. In accordance with the so-called "market claim process," the seller's custodian is obliged to debit the dividend from the seller and credit the dividend to the buyer (or forward the dividend to the buyer's custodian so that he can credit the buyer's account). It is therefore the buyer of the stocks who receives the dividend and is entitled to a reimbursement.

The gross dividend paid by TDC A/S was DKK 1.00, in total DKK 2,358,808.00 for the pension plan stocks. The net dividend amounted to DKK 1,721,929.84 and the dividend tax to DKK 636,878.16.

The payment of these two amounts to the pension plan merely offset the loss incurred by the pension plan on the ex-date, as the stocks lost the corresponding amount in value on that date. The reimbursement was therefore not the driving force behind the investments in the Danish stocks. The reason for investing in the Danish stocks was the price difference on the spot and forward markets triggered by the distribution of a dividend.

**3 THE PENSION PLAN BECAME THE LEGAL AND TAXABLE OWNER OF THE STOCKS**

**3.1 The pension plan became the civil law owner of the stocks**

In principle, tax law is governed by civil law. This also applies to the question of acquiring ownership of stocks.

It is a fundamental principle of the law of obligations in Danish law that ownership of a given asset is acquired when a final and binding agreement has been concluded between the parties, which is legally valid. This principle also applies to the acquisition of stocks.

Ownership is acquired regardless of whether the buyer defaults on the obligation to pay the purchase price. For the same reason, there are rules allowing the seller to rescind the sale afterwards if the agreed purchase price is not paid, unless only an insignificant amount remains to be paid. These rules on subsequent rescission of a sale if the buyer does not pay the purchase price illustrate very clearly that payment of the purchase price is not a precondition for the transfer of ownership. If this were the case, there would be no need for rules on subsequent rescission in cases where the buyer does not pay the agreed purchase price.

As the payment of the purchase price is not a condition for acquiring ownership, stocks are delivered (in the settlement process called settlement) only when the payment is made (according to the principle of "Payment versus Delivery" - DvP).

The consequence is that:

- <u>Settlement of</u> a stock trade, which takes place with the clearing and settlement agent, is not a prerequisite for acquiring ownership of a stock.
- Evidence of a <u>flow of funds</u> from buyer to seller is not evidence that a buyer has acquired ownership of a Danish stock.
- Evidence of a <u>transfer of</u> a stock from the seller's <u>to the buyer's securities account</u> is not evidence that a buyer has acquired ownership of a Danish stock.
- The buyer of a stock is already the owner <u>before the stock is registered</u> in his deposit.

- If a stock is sold so shortly before the dividend date that the stock is not yet registered in the buyer's securities account, the dividend will be paid to the wrong party via VP Securities and the underlying sub custodians. It is against this background that Article 19(1) of the Danish Sale of Goods Act declares the buyer of a stock entitled to receive the dividend (and thus to a reimbursement).

Accordingly, the comments on § 23 of the Danish Capital Gains Tax Act (L78 of 16 November 2005, see Appendix 12) also maintain this position:

> *"The decisive factor for determining the time of disposal is when there is a final and binding agreement on the disposal. For stocks traded on the stock exchange, the date of the stock exchange note (trade date) will be taken as the basis.*
>
> *In addition, the determination of the acquisition date may have an impact, e.g. in the context of new legislation. Here too, the decisive factor is when there is a final and binding agreement on the acquisition. For stocks traded on the stock exchange, the date of the stock exchange note (the trade date) will be taken as the basis."*

The same is stated in the Legal Guide, § C.B.2.1.6.1.

The trading date of a listed stock is thus the time at which buy and sell orders are "matched." This matching of buy and sell orders - which is done by an automated "handshake" on modern automated trading facilities - is referred to as the "execution of the trade."

Also, the National Tax Agency leaves no doubt that the civil law ownership is acquired on the trade date, which is precisely not the settlement date, since in the decision of March 20, 2007 (SKM2008.831.SR) it was established that the trade date is after the placing of an order for the purchase of stocks, but before the settlement of the transaction:

> *"An order cannot be equated with a purchase [...]*
>
> *[...] it is the trading date that must be taken into account when determining the time of purchase or sale of stocks. The date of exchange is therefore not decisive. [...] This is true even if the value date is only 1/4/2006 and even if the stocks were therefore not in the claimant's portfolio on 12/31/2005)."*

It is therefore clear, on the one hand, that a purchase order is not enough to become the owner of a stock. On the other hand, it is equally clear that the purchase need not yet be settled by entry in the purchaser's securities account. Payment for the stocks is therefore also not necessary in order to become the owner of the stocks, since the purchase price for the stocks must first be paid upon delivery (delivery versus payment) in accordance with § 72 of the Danish Securities Trading Act/§ 188 of the Capital Markets Act, i.e. upon entry of the stocks in the buyer's securities account.

In the present case, the pension plan issued a purchase order to its brokers for the purchase of stocks. These orders were matched with sell orders received from other brokers. This matching is the purchase agreement itself, which is final and binding. The payment and registration of the stocks, confirming that the agreement was final and binding, took place three to four days later.

It can thus be assumed in the decision that the pension plan was the civil law owner of the stocks at issue in this case.

This civil ownership also gives rise to tax ownership, unless one of the exceptions developed by case law applies.

In particular, in the context of stock loans, case law has held that the stock borrower becomes the civil law owner of the stock, but not the tax law owner of the stock. The stock lender continues to be the tax lawful owner of the stock until the stock is sold by the stock borrower to a third party.

At the date of the dividend, the pension plan had not lent the stocks. The lending did not take place until three to four days later. Whether the stock borrower subsequently lent the stocks, kept them or sold them on to a third party, the pension plan cannot know. The pension plan therefore remained the legal owner of the stocks for tax purposes, even though a stock lending followed three or four days later.

Similarly, the fact that the forward contract was entered into on the same day as the stocks were purchased does not mean that the pension plan lost its tax ownership of the stocks.

**3.2 Trading large stocks - short selling**

The Danish Tax Agency considers in the summary submission to the lead cases of August 9, 2019, § 4.1, pages 22-24, that unrealistically large stockholdings have been traded and that the pension plans cannot possibly have been the owners of the stocks in question for that reason. The Agency considers that it should be impossible to acquire such holdings in a single day. As an example, the Agency cites a sale of stocks worth DKK 3.9 billion that was sold through accelerated book building - not on the open market.

Thus, the Agency correctly notes that large stockholdings are precisely not traded on the stock exchange. Alternative OTC markets are sought for large caps.

If the tax authorities were to carry out a similar analysis of all trades made by, for example, Danske Bank, Deutsche Bank, Citibank or Blackrock, the tax authorities would arrive at similarly large trades in stocks. Unimaginably large amounts of stocks are traded every day by all major players in the market.

Since it can indeed be difficult to obtain large holdings of stocks, it is evident that among the stocks bought by pension plans there must logically have been a <u>number of</u> stocks sold by short sellers. Which and how many stocks came from long owners or short sellers is impossible to say. But this is true for any buyer of stocks. No one can know from whom he buys a stock. Neither by exchange trades nor by OTC trades.

**3.2.1 Introduction to short selling**

Short selling is not regulated in Denmark, with the exception of rules prohibiting uncovered short selling and some flagging rules.

According to a note dated April 10, 2018, from the Danish Financial Supervisory Authority regarding short selling in Denmark, which is presented as <u>Appendix 82</u>, short selling, according to the Danish Financial Supervisory Authority's own definition, means the sale of a stock that the seller does not own at the time of sale, as opposed to a regular securities trade, where the seller owns the security being sold.

It is internationally recognized that a short seller is considered covered if he only has a framework stock loan agreement in place at the time he sells the stocks he does not own. Such a framework agreement is a GMSLA. A person who wishes to sell stocks which he does not own simply has to ensure that he can deliver the stocks at the time of delivery. In the short selling industry, this is also known as a "localization agreement": the short seller must be able to locate the stocks covering his sale so that he can deliver at the time of settlement. In the words of the FSA, see Appendix 82, page 2, a short seller must

*"that is, before the sale, have been in a position to borrow the paper or have secured in some other way a transfer of ownership of the paper."*

"Being able" to borrow is not the same as already having borrowed. This is why the Financial Services Authority talks about the short seller simply having to ensure that he can transfer ownership.

In other words, the short seller does not have to enter into a **specific** agreement to borrow a certain number of stocks before the sale is made, as postulated by the Danish Tax Agency in its submission of August 9, 2019, as such an agreement would make the short seller the civil law owner of the stock. He would thus no longer be a short seller at all, but a "long owner seller." Short selling can therefore (legally) only occur in the form of sales under stock loan framework agreements (unless short selling is carried out by so-called "market makers" - banks authorized to engage in uncovered short selling).

Since a short seller only needs to be covered by the conclusion of a framework agreement for stock lending, short selling has the consequence that a short seller increases the number of stocks traded and thus the number of stocks for which final and binding agreements to purchase are concluded. All the buyers of these stocks become, under the general rules of the law of obligations, the owners of the stocks acquired.

Thus, the FSA also highlights in Appendix 82, page 6:

*"Similarly, short selling allows market makers to offer their clients (retail as well as institutional clients) to buy a security even if the **market maker cannot obtain the security** from its own inventory or through the market **at the time of the client's order**."* (our emphasis)

Short sellers can, in effect, sell an unlimited number of stocks as long as they have stock loan localization agreements (GMSLAs) that allow them to deliver the stocks sold. Thus, at the beginning of 2018, the value of short positions in Danish listed stocks was approximately DKK 25 billion, equivalent to about 1 percent of the total value of the Danish listed stock market. And these figures only include short positions, each of which was reportable. If the ultimate sellers of the stocks sold to the pension plans were in part short sellers, they do not necessarily need to appear in these statistics if each short seller's net position did not exceed 0.2 percent of the stock capital issued by the company.

**Figure 3: The value of net short positions in Danish listed shares has increased sixfold since 2103**



Note: The figure shows the market value in Danish kroner of net outstanding short positions above 0.2% of the issued share capital in Danish listed shares broken down by sector of the issuing company and the relative size compared to the total number of shares in the issuing company as against the total market. The sector breakdown is determined on the basis of GICS codes.
Source: FSA (Finanstilsynet)

No one can distinguish between stocks sold by a short seller and stocks sold by a real stockholder (long owner). The number of stocks available for trading thus increases (temporarily) in the case of short selling to a number exceeding 100 percent of the issued stocks. It is only at the settlement of the stock trades that this excess number of stocks traded is brought back to the actual number of stocks issued by the company. The total quantity of dematerialized stocks will always be correct at the time of settlement, when the short seller has to deliver the stocks sold, by drawing stocks under the stock loan or making a covering purchase on the market.

It is thus possible that more Danish stocks are traded on the market than the number originally issued by the companies. Short selling has precisely the typical - and also **often desired by central banks and financial supervisors (cf. the Financial Supervisory Authority's report on short selling, see Appendix 82, pages 5-6)** - consequence that there are more stocks available on the market than originally issued.

Under Danish law, the transfer of *ownership* is completely separate from the settlement of a stock deal. Moreover, it is irrelevant for the question of ownership whether (1) a stock trade is settled physically (by a "de-registration" of the seller and a "registration" of the buyer with VP Securities or another custodian) or whether the trade (2) is settled using netting (with the consequence that a net report may not be sent to VP Securities at all - if the net result is 0).

### 3.2.2 Short selling creates more stocks until the trades are settled (settlement)

When a short seller sells stocks under a Master Stock Lending Agreement (GMSLA), he either creates more stocks than the company has issued, or expressed differently, double ownership of one and the same stock arises: the stock lender who has not yet lent the stock under a specific stock lending agreement (but has only entered into a Master Agreement for a potential lending) is still the civil law owner of the stock. At the same time, the buyer acquires civil law ownership of a stock by the final and binding agreement with the short seller.

It is only at the settlement of the trades (which usually takes place two days after the trade has been concluded by a final and binding agreement) that the number of owners is brought back to the number of stocks issued by the company, as no more than one owner of the same stock can be registered. It is this fact that we have tried to outline with the following illustration.

The illustration shows an artificial world in which a company issues only a single stock. Thus, the owner can only sell a single stock.

However, the illustration shows 3 short sellers bringing the total number of stocks in circulation up to 4 stocks, even though only one stock can be delivered. The trade is still 4 stocks.

In the situation illustrated here, several stocks become the subject of a final and binding stock purchase agreement, and there are thus four buyers who become owners of the stocks even though only one can have the stock delivered. There is thus a temporary "inflation" of stocks, as Unidroit puts it, on the trade date which disappears again on the settlement date.



Thus, it is only until the liquidation of the stock dealers that there are more owners of Danish stocks than the number of stocks issued by the companies. Since no more stocks can be "physically" delivered than the company has issued, the double temporary ownership created by the short seller must cease when the stocks are to be delivered by electronic book-keeping (entries/registrations) with the custodian(s) involved. Whether settlement using netting can lead to an extension of the dual ownership beyond the time of settlement does not need to be discussed here, as the pension plan lent the stocks at the time the stock purchases had to be settled in order to pay the purchase price. The pension plan's civil ownership therefore also ceased with the settlement of the stock purchase, pursuant to the stock lending agreement they entered into by email. However, on the date of the dividend, the pension plan had civil law ownership of the stocks and was therefore also the proper recipient of the dividend, with the consequence that it was entitled to receive a reimbursement of the withheld dividend tax under the current rules on this subject.

Which stocks have more than one civil law owner cannot be identified, as short sellers act under one or more stock lending framework agreements. GMSLAs are often concluded between (long owner) stockholders and stock loan intermediaries on the one hand and short sellers and stock loan intermediaries on the other hand. The stockholder who lends his/her stock does therefore not necessarily know the short seller. The stock lender who makes his stock available for a potential or actual loan also does not know the ultimate stock borrower and his motivation, much less whether the ultimate borrower is a short seller at all.

The short seller only relies on the master agreement (GMSLA) - often only by e-mails that maintain the concrete terms of the specific stock loan - *if* and *when* he has to deliver the stocks during the clearing and settlement process. If the short seller buys stocks from the market again before he has to deliver the stocks he originally sold and he agrees a shorter delivery time for the stock purchase than for the stock sale

(in the case of OTC orders, the delivery period can be freely agreed), the short seller never has to withdraw any stocks under the GMSLA. He has nevertheless transferred ownership of the stocks to a buyer.

Thus, on the day of delivery, the short seller offsets the excess number of stocks over the number of stocks issued (free float is brought back to normal) by making a covering purchase so that no one "discovers" that the short seller has sold stocks he did not own. If the short seller did not succeed in making such a covering purchase, it would be obvious that there had been more owners of stocks than the number issued. He must therefore draw on the GMSLA, bringing the stock lender's ownership to an end. However, this does not alter the fact that there *have legally been two owners for a period of time*. Who continues to be the owner will be decided according to the rules of substantive law, including the rules on observance of security deeds and vindication/extinction. It is precisely in *this* context that the delivery of the stock plays a role under Danish law. The person who has the stock registered in his deposit has a secured legal position as owner. Until delivery, the ownership acquired by the buyer is not protected against extinction. The buyer has nevertheless acquired ownership of the stock.

In other words, during the period between the sale of the stocks he did not own and the cover purchase (or the loan of the stocks under a specific loan agreement), the short seller transferred ownership of the stocks by a simple purchase contract to a buyer who cannot know that the seller is a short seller. In doing so, the short seller de facto creates more owners of Danish stocks than the company has issued. This can only be prevented if the actual transfer of ownership of stocks requires delivery of the stocks.

However, such a requirement does not exist in Danish law. In Danish law, the delivery of the stocks, which takes place during the settlement process and which leads to the registration of the ownership with the custodian of the buyer, is merely declaratory.

In this respect, Danish legislation differs significantly from, for example, German legislation. Under German law, the delivery of the stock from the seller's depository to the buyer's depository is necessary for the buyer to become the owner. As this is not necessary under Danish law, Denmark - also according to German Prof. Dr. Christoph Spengel from the University of Mannheim - has made it extremely easy for short sellers to create more stocks than the number of Danish stocks issued by the companies.

The professor believes that Denmark is suffering from a legal problem that legislation and legal practice have created.

It is quite obvious that the tax authorities are trying to rely on German rules and case law on the acquisition of stocks to solve the problems arising from short selling. The tax authorities are trying to do this without any legal basis. There are no rules in Denmark requiring the delivery of stocks in order to acquire ownership, quite the contrary.

### 3.2.2.1  The Tax Agency's views on the "short buyer"

In its summary submission of August 09, 2019, the Danish Tax Agency presents in § 8.3, page 69, a chain that would reproduce short selling:

> *Owner/stock lender à Stock borrower/short seller à "Short buyer"*

This chain correctly represents how a stock is delivered. However, it does not represent how ownership is transferred.

In presenting this chain, the tax authorities seem to want to introduce the (new and fictitious) figure "short buyer." In reality, there is no such thing as a 'short buyer'. The introduction of dematerialized stocks and the anonymous way in which these are traded has made it impossible to follow a particular stock from a particular seller to a particular buyer. Stocks exist only as numbers in computers, and when these numbers can be netted against each other during the settlement process (called "netting"), so that each financial firm transfers only the net sum of all purchases and sales made by its customers to the next financial firm, it is impossible to follow a particular stock from seller to buyer. There is no "short buyer" equivalent to a short seller.

A short seller is only a short seller if he is <u>not</u> the civil owner of the stock. The civil owner of the stock is the long seller. At the moment the short seller enters into a <u>concrete stock loan</u> with the owner of the stock, the stock borrower becomes the civil law owner of the stock. In other words, the short seller is only "short" as long as he is either (1) uncovered (which is allowed for a so-called "market maker"), or (2) "only" covered by a GMSLA, but has not yet drawn (= borrowed) a concrete number of stocks under a GMSLA. When the stocks are drawn by a specific stock loan under the GMSLA, the short seller becomes the long owner. Short selling is therefore only possible as long as there is "only" a GMSLA under which no stocks have yet been drawn. When a short seller draws stocks under a GMSLA, he draws stocks that the company has issued. The existence of the GMSLA covers the short seller and makes his sale legal (since he is not "uncovered"), but at the same time this short selling results in more stocks being traded than have been issued by the company. There are more stocks on the market to trade than issued by the company.

If the Danish Tax Agency were correct in its argumentation, short selling would exist exclusively in the form of extended short selling (by market makers).

The reason why the short seller can transfer ownership of something he does not own (civil and legal ownership) is that the short seller can **legitimize** the transfer of ownership of the stocks by being able to exclude the risk of a "fail" of the trade, i.e. that the trade does not settle. The short seller can exclude a failure by (1) having a GMSLA that allows him to borrow stocks for delivery, and (2) have a clearing agent and custodian who - in case of emergency - is obliged to guarantee the delivery of the stocks during the settlement of the trade. The short seller's lack of title to the stocks still held by the stock lender at the time of the sale does not result in the buyer, acting in good faith on the seller's ownership, not acquiring ownership. Rather, ownership of the stocks by the stock lender is acquired by the purchaser acting in good faith. This exclusion is justified by the fact that the stock lender has exposed itself to the risk that the stock borrower disposes of the stocks by entering into a GMSLA.

How the buyer acts in good faith on the short seller's right to assign legitimate- right ownership to assets he only borrows later can be illustrated as follows:



The correct chain to illustrate the transfer of ownership should therefore look as follows:

> *Owner/lender à Bona fide purchaser*

If a non-owner seller could not transfer ownership, the rules on acquisition of ownership in good faith (vindication/extinction) would not exist at all. Since the dual ownership of the stocks ceases - or to put it another way: the number of stocks owned is brought back to the number of stocks issued by the company - when the stocks are delivered and registered in the buyer's securities account, short selling does not lead to problems of extinction. When the short seller enters into an agreement to borrow a **specified number of stocks** under a GMSLA, he becomes the owner of those stocks and delivers them to his purchaser of the stocks.

Increasing the number of stocks traded by short selling is precisely one of the effects of short selling desired by the FSA. Reference can therefore be made to both the FSA publication on short selling (see Appendix 82) and the ESMA report on dividend arbitrage (see Appendix 83). ESMA makes it quite clear that a legal claim for reimbursement should depend on the receipt of a net dividend and not on the ownership of a stock, as short selling has precisely the consequence that more stocks are traded than issued by the sellers. When the trade itself is sufficient to acquire ownership, short selling has fatal consequences for the tax system. ESMA makes no secret of the fact that a DCA (dividend credit advice) is the correct document with which to prove a legal claim for reimbursement, but that this DCA should not depend on the ownership of the stock, but on the receipt of the dividend.

The Danish Tax Agency seems to base its entire theory that there should be no "reality" in the stock transactions carried out on the fact that the stock transactions should have been carried out as short selling. In so doing, the Danish Tax Agency overlooks the fact that short sales are also real stock transactions and that the supply chain is not identical with the chain of transfer of ownership, as the supply chain only takes place several days after ownership is transferred. The tax authorities consistently overlook the fact that an unlimited number of stocks can be traded and that only the number of stocks that can be delivered is limited by the number of stocks issued by the companies

### 3.2.2.2 Consequence of multiple stocks as a result of short selling (until settlement)

The fact that short sellers may create more owners of stocks than the number of issued stocks in the period between the purchase agreement and the delivery of stocks only leads to problems if and when short selling occurs around the dividend date. The purchase contract then makes a person entitled to dividends even if he is not yet registered as an owner, cf. § 19(1) of the Danish Sale of Goods Act: the purchase of stocks includes the dividends which were not due at the time the purchase was concluded.

This has the consequence that the purchaser must be credited with the net dividend on the dividend payment date, irrespective of when the registration of the stocks takes place on his deposit. If the payment date is earlier than the registration date of the stock with the custodian, the seller of the stock must pay the net dividend to the buyer (the short seller pays a compensation payment during the "market claim process" to the buyer). This compensation payment is not subject to withholding tax under Danish tax law, even though it is in fact the payment of a dividend to the civil law owner of the stock. Since the buyer of the stock is the owner on the dividend date and receives the net dividend on the payment date, he is also entitled to a reimbursement.

If the payment date of the dividend is after the record date of the stock sale by a short seller, the stock lender is entitled to the compensation payment under the GMSLA. In this case, the stock buyer receives the dividend directly from the company (where dividend tax is also paid), but the stock lender receives the compensation payment from the short seller, on which Denmark does not levy withholding tax, despite the fact that it is considered a dividend for economic and tax purposes.

However, the temporary dual ownership of the stock between the sale and the delivery of the stock only has consequences for the payment of dividends and their taxation.

As cumulative legal ownership ends when the stocks are to be delivered, only one stockholder per stock will always be entitled to vote at the general meeting, the right to vote requiring that the registration of the stock be evidenced by a statement from the respective custodian.

The Danish Tax Agency's assertion in its summary submission in the drivers' cases of August 9, 2019, that

> *"If there could be multiple owners of the same stock, it would also mean that more than 100% stockholders could attend and vote at the company's AGM."*

is obviously not correct.

### 3.2.2.2.1 Lack of withholding tax on compensation payment

The Ministry of Taxation and the Danish Tax Agency have clearly identified short selling as one of the main problems in the dividend tax cases, as stated in the Early Warning issued in 2015.

As long as no dividend tax is levied on the compensation payment that a short seller has to pay to the person who buys the stock on the record date (the date on which the dividend is legally acquired and thus entitled to a reimbursement), but who only becomes registered as owner after the record date, there will be no dividend tax payment. Since the buyer of the stock (or any other person) cannot tell the difference between a stock bought by a short seller and a stock bought by a long owner, the short seller, who sells on

the date of the general meeting, will have to pay a compensation payment into the chain of custodians and finally down to the buyer equal to the net proceeds of the stocks. All purchasers of stocks, including those who purchase the excess number of stocks outstanding, receive a net dividend and a DCA and are eligible for reimbursement as owners of the stocks and recipients of a net dividend.

Since no one other than the short seller itself and its immediate custodian knows, can see or can recognize that a payment in fact does not come from the company itself, but from a short seller, it is necessary to tax the compensation payment. Already at the first sub-custodian in the chain of custodians, all net proceeds from the company itself are irrevocably mixed with the compensation payments from short sellers. No one in the chain of custodians is able to confirm to the buyer of the stock whether the amount credited to his account (the net proceeds) actually originates from a short seller or from the company.

This is also reflected in the fact that neither the buyer of a stock - nor any other human being - can tell whether the stock he has bought and is being delivered originates from a short seller or from a long owner. It is quite possible that the very "stock" that the buyer gets registered in his securities account due to netting in the settlement process was previously registered with a completely different customer as the same custodian. The buyer does not receive the specific stock sold to him by "his" seller, but any stock from the same company, as stocks are commodities.

At the office meeting, the following sketch was presented, showing this problem in graphic form:



The sketch shows that both stocks and also the dividend payment from the company itself (shown with black arrows) are mixed with stocks/compensation payments originating from a short seller (shown with red arrows). While the short seller can only fulfil its obligation to deliver stocks with stocks issued by the company, the "dividend" received by the buyer can just as well be a compensation payment from a short seller. Since the requirement to pay the dividend already arises with the purchase of the stocks, the short seller has to create a "dividend" - over and above what the company has paid. This dividend from the short seller is called the compensation payment.

Germany recognized the problems of compensation payments already in 1999 (by a BFH ruling) and introduced a withholding tax on compensation payments in 2007. In 2012, the withholding tax rules were changed again as it became clear that the debtor obliged to withhold and report withholding tax on dividends also had to be changed. To date, however, Denmark has done nothing to remedy this shortcoming. In Denmark, the withholding tax law (§ 65) is still in force, according to which it is the distributing company which is obliged to withhold and report the dividend tax, and the compensation payment from the short seller is not taxed at all.

### 3.2.2.3 Tax ownership of stock lending - double ownership in addition to settlement

In addition to the problems created by the fact that a purchaser acting in good faith may acquire ownership of stocks still held by a stock lender, the practical handling of stock lending and the case law on stock lending and beneficial ownership give rise to further problems concerning the identification of the beneficial owner for tax purposes and thus a risk of double reimbursement, as reimbursement may be paid to a stock lender who is no longer to be considered as the beneficial owner of the stocks for tax purposes.

### 3.2.2.3.1 Case law on beneficial ownership for tax purposes in stock lending

In the case of stock lending, the stock borrower is registered with VP Securities as the new owner of the stock. However, this civil law categorization of the stock loan, as expressed by VP Securities, does not correspond to the *tax law* categorizations of stock loans.

From a tax point of view, ownership of stock loans is *not* transferred from the lender to the borrower (cf. SKM2010.266.SR). Thus, there is *no* assignment in the case of stock loans concluded under the Danish standardized stock loan scheme, Morgan Stanley & Co International Limited - Overseas Securities Lender's Agreement or Overseas Securities Lenders Association, Global Master Securities Lending Agreement (GMSLA).

The lender retains all its rights, etc. arising from the stocks. However, the borrower has certain powers of disposal over the stocks, since the loan agreement generally requires only the return of the stocks at a certain time in the future. Until that time, the borrower may dispose of the stocks in full, including transferring them to third parties. However, the borrower must pay the lender an amount equal to the dividends paid by the company during the term of the stock loan (compensation payment). At the end of the loan period, the borrower must return stocks of the same quantity and type. The lender is thus placed in the same position as if the stocks had been in his possession throughout the period of the loan. He is therefore regarded, from an overall view of the stock loan arrangement, as the *owner of* the stocks *for tax purposes*. This result is reached by Danish Tax Agency, tax experts and the Danish National Tax Tribunal.

Since the stock lender does not lose the tax ownership of the stocks upon lending and, accordingly, he is also entitled to receive the dividend under the GMSLA, the stock lender is also entitled to the dividend reimbursement.

Since the sale of dematerialized stocks takes place anonymously (via brokers) and all the service providers involved in a transfer transaction mix all the stocks transferred between all their customers, a buyer of a stock cannot know whether he is *buying and receiving* a stock from a long owner (who has the stock in his securities account) or whether he is buying the stock from a short seller who has only been able to borrow the stock.

This is in itself for 364 days a year also not relevant. It is only at the moment when the company pays out a dividend that it becomes a problem, when the tax authorities, case law and literature consider the stock lender to be the tax owner of the stock.

When the buyer cannot know whether the seller is a short seller who is only borrowing the stock, the buyer must necessarily become not only the civil owner of the stock but also the tax owner upon purchase of the stock. Since the buyer of the stock will be registered with VP Securities or any other sub custodian, the buyer will also receive a net dividend and be eligible for a reimbursement.

Next to the stock lender, who has received a compensation payment from the stock borrower and is taxable as if he had received the dividend directly, there is the new owner of the stock, who also receives a dividend, is taxable and is entitled to a reimbursement.

The case law on stock loans has thus created two tax owners of the same stock at the time of distribution.



Since short selling must be covered by a stock loan, all the problems recognized by case law, tax experts (Katja Dyppel Joo, see Appendix 2c) and Danish Tax Agency Law and Large Companies (see Early Warning 2015 presented as Appendix 4a) lead to the problems mentioned in connection with short selling.

**3.2.2.3.2 Danish Tax Agency on tax ownership of stock lending**

As Danish Tax Agency Large Companies wrote to Danish Tax Agency Law in Early Warning on March 27, 2015, VP Securities registers the legal owner as a rule. In the case of stock loans, the borrower is registered as the owner, whereby the lender is no longer registered as the owner. Subsequently, it is stated that in the case of stock loans, the legal owner/beneficial owner must be determined for tax purposes, cf. SKM2010.266.SR. The ruling states that an *agreement to lend stocks cannot be qualified as a disposal for tax purposes*. A lender is considered the beneficial owner of the stocks for tax purposes. Dividends distributed during the loan period are deemed to accrue to the lender and are therefore taxable.

In the context of short selling, this has the consequence that the stock lender is still considered to receive a dividend, he is taxed on it, and consequently he must be eligible for reimbursement if he otherwise meets the conditions.

At the same time, a purchaser acting in good faith, and not knowing that he is buying from a short seller, acquires ownership of the stocks, receives the dividend and is taxable thereon, with the consequence that he is also entitled to a reimbursement of withheld dividend tax under the applicable rules in this respect.

Danish Tax Agency Jura's Early Warning of July 7, 2015, to the Ministry of Taxation is based on the Early Warning from Danish Tax Agency Large Companies. Danish Tax Agency Jura's Early Warning also states at the outset that the borrower is registered as the owner of the borrowed stocks under civil law, but that the stocks are not deemed to have been transferred in accordance with TfS 1999, 408. Thus, for tax purposes, the lender continues to be considered the owner of the loaned stocks. In SKM2010.266.SR, the National Tax Board agreed with Danish Tax Agency's recommendation that it is the lender who, according to the double taxation agreements concluded, is the beneficial owner of the dividends on the borrowed stocks *when these are not sold* by the borrower.

The problem that arises is that, in principle, the stock lender cannot know why the borrower is taking out a stock loan, much less whether the borrower is reselling the stock. The stock lender must therefore assume, on the basis of SKM2010.266.SR, that despite the lending of the stocks he remains the rightful recipient of the dividend, liable to tax and entitled to reimbursement. At the same time, the buyer of the stocks becomes the legal owner of the stocks, the dividend therefrom and thus also entitled to a reimbursement.

From a tax perspective, SKM2010.266.SR thus results in a double tax ownership of the same stocks. This, of course, only as long as the stock loan exists.

Danish Tax Agency Law rightly states in the Early Warning that the tax treatment of stock loans in Denmark differs from the tax treatment of stock loans in the rest of the world. This difference gives rise to problems when Danish lenders or borrowers enter into stock loans with foreign lenders or borrowers.

### 3.2.2.3.3 Ministry of Taxation on tax ownership of stock lending

In its response to the Early Warning in relation to stock loans of 23 September 2015, the Ministry of Taxation distinguishes between two different situations when it comes to stock loans: (1) stock loans without resale to third parties and (2) stock loans with resale to third parties.

**3.2.2.3.3.1** Stock lending without resale to third parties The Ministry of Taxation describes this as follows:

> *"In a stock loan agreement between lender and borrower, notwithstanding the lending of the stocks to the borrower, the lender will still be the beneficial owner of the stocks for tax purposes and therefore also of the dividends"*

The Ministry of Taxation relies on SKM2010.266.SR, according to which dividends on loaned stocks are taxable to the lender. In the case of a foreign lender, the latter will also be entitled to seek a reimbursement of the excess dividend tax (see Appendix 4a, memorandum of September 23, 2015, page 6).

When the Ministry of Taxation writes in the same memorandum that "*Danish tax law does not provide for the possibility of crediting or reimbursing withheld taxes on dividends to parties other than the party considered for tax purposes as the recipient of the money from a company under Danish law,*" this should be seen in the context that this only concerns cases of stock loans without resale to third parties.

The Ministry of Taxation leaves no doubt as to the applicable law when the loaned stocks are not sold to third parties:

*"It is the borrower who receives the dividend on the stocks. The borrower will usually compensate the lender for the dividend in the form of a so-called dividend compensation. If the gross dividend is transferred from the borrower to the lender as dividend compensation, the dividend compensation will generally have such a direct link to the dividends paid that the dividend compensation is taxed as dividends of the lender (cf. SKM2009.65.SR). Similarly, the borrower is not liable to tax on the dividends, as the borrower de facto merely receives the dividends on behalf of the lender. The distribution of the dividend thus has, as a rule, no tax consequences for the borrower."*

What the Treasury overlooks here is the fact that the borrower does not receive any gross proceeds at all, which he can pass on to the lender. Since the borrower only receives a net profit, it can also only be this amount that the borrower has to pass on to the lender. The reimbursement of the dividend tax must be claimed by the lender from the tax authorities on the basis of its tax ownership of the stocks. Such ownership is relatively difficult to prove as there is no register of stock loans. Only the borrower can prove his civil law ownership with a statement from his custodian.

**3.2.2.3.3.3**  Stock lending with resale to third parties

*"In the event of resale by the borrower to a third party, the stocks shall not be deemed to have been disposed of by the lender for the purposes of determining the amount of the advance. This has to be seen in the context that the loan agreement between the lender and the borrower agrees that the borrower shall sell back the stocks, as the loan remains in force. However, as the stocks are a non-cash item, the sale is, so to speak, irrelevant for the lender in terms of profit. There is therefore no transfer tax on the lender.*

*With the acquisition of the stocks by the third party from the borrower, the third party becomes the legal owner of the stocks and thus also of the dividend (see SKM2010.266.SR). The dividend is then taxed in the hands of the third party. It is thus the third party who is entitled to receive any reimbursement of dividend tax withheld.*

*In cases where the borrower still has to compensate the lender for dividends that the borrower has not received due to the sale to a third party, the cost of the compensation for the dividends qualifies as a loss covered by the State Tax Act."*

As a result of the sale of the stocks by the borrower to a third party, the Treasury is of the opinion that the lender is no longer considered a current stockholder, that the compensation payment no longer qualifies as a dividend and that the stock borrower is no longer eligible for reimbursement. The third party that acquired the stocks from the stock borrower is entitled to reimbursement.

**3.2.2.3.3.3**  Comments on the Treasury's view

The Treasury overlooks two fundamental aspects:

1      The stock lender cannot know if and when a stock borrower sells the stocks, as they do not necessarily have any immediate contact with each other. Stock loans are intermediated by so-called stock loan intermediaries.

2      The stock lender receives only the net proceeds from the stock borrower (this is fully in line with the GMSLA).

Making the legal position of the stock lender depend on circumstances of which he has no knowledge and no influence would result in legal uncertainty that would destroy the Danish market for stock lending. When a stock lender can in practice neither know whether a stock borrower sells the stocks (and if so, when), or

whether the amount he receives entitles him to reimbursement or not, even if he receives only a payment equal to the net proceeds, his legal position cannot possibly be altered by the unilateral dispositions of the stock-borrower. This would be contrary to every principle of the rule of law.

The position of the Ministry of Taxation is not legally tenable in case of resale of the stocks to a third party. When the case law under SKM2010.266.SR holds that the stock lender remains the tax owner of the stock, this must necessarily apply regardless of whether the stock borrower resells the stocks to a third party or not.

The inter-ministerial working group set up in 2015 under the Ministry of Taxation also seems to recognize the problem, stating both in the publication "Danish Tax Agency out of the crisis," see Appendix 4b, and also in the progress note of 26 June 2016, page 6, see Appendix 5a, that there is no set of rules *in Denmark* that ensures that it is possible to identify the beneficial owners for tax purposes.

### 3.2.2.3.4 Literature on tax ownership of stock lending

In the academic literature, Katja Joo Dyppel in particular has dealt with the consequences of stock lending, see Appendix 2a, in her article *"Taxation of stock loans and repos"* from 2013.

She maintains that stocks transferred by way of a stock loan are generally not considered to have been disposed of for tax purposes and that the loan of stocks does not therefore give rise to a disposal tax.

She also correctly notes that companies pay the dividend to the borrower of the stocks if the stocks are transferred to the borrower's securities account, or to a third party if the stocks are transferred to the borrower's securities account. However, under the standard loan agreements, the stock lender is entitled to any dividends distributed during the loan period and the borrower must compensate the lender for the dividends.

In order for a payment to be considered a dividend for tax purposes, it is a condition that the payment qualifies as a distribution and that the recipient is a stockholder of the company making the distribution. This follows from § 16A of the Tax Assessment Act, which defines dividends as *'anything distributed by the company to current stockholders'*. The decisive factor is therefore whether the lender or the borrower is a stockholder at the time of the distribution.

Katja Joo Dyppel then makes a thorough analysis of the case law, which looks as follows:

In TfS 2001, 146, the National Tax Assessment Council took a position on the tax qualification of dividends paid under a stock loan. Accordingly, the compensated dividend was to be taxed as ordinary income of the lender, regardless of whether the borrower continued to hold the stocks or had disposed of them. To the extent that the borrower received dividends from the company, these dividends were subject to dividend tax. If it is assumed for tax purposes that the stocks lent have not been transferred to the borrower and the lender's stockholder position has therefore not ceased, this **decision** is **difficult to explain**. Under § 16A of the Tax Assessment Act, the taxation of dividends presupposes the existence of a stockholder position, and the same applies in relation to § 4E of the State Tax Act. It seems reasonable to assume that a stockholder within the meaning of the Danish Capital Gains Tax Act is also a stockholder within the meaning of § 16A of the Income Tax Act, and since there is no disposal/acquisition under the Danish Capital Gains Tax Act, the practice seems difficult to justify.

The consequences of the National Tax Assessment Council's decision published in TfS 2001, 146 are set out in TfS 2001, 760, which considers whether compensated dividends from a stock loan are included in investment trusts' mini-major distributions. For investment funds which lend stocks, the lent stocks are still included in the investment fund's stockholding, but according to the National Tax Assessment Council,

reimbursements of dividends received other remuneration shall not be included in the minimum distribution. The argument was that the minimum distribution only includes interest, dividends earned under § 16A of the Danish Income Tax Act and gains on financial contracts under §§ 29-33 of the Danish Capital Gains Tax Act, cf. § 16A of the Danish Income Tax Act. Since the dividends transferred from the loan to the lender were taxable as ordinary income, the National Tax Assessment Council did not consider this amount to be covered by the minimum distribution in § 16 C of the Tax Assessment Act.

Later, in TfS 2002, 755, the National Tax Assessment Council took a position on the tax treatment of the borrower's right to deduct the payment of remuneration for the loan and compensatory dividends to the lender. With reference to Tfs 2001, 146, according to which remuneration and compensation for dividends are qualified in the case of the lender, irrespective of whether or not the stocks are sold on by the borrower, it is stated that similar considerations apply to the borrower. In this context, the National Tax Assessment Council notes that the **possible sale of** the stocks **is therefore irrelevant** for the borrower's ability to deduct the remuneration and compensation for dividends from taxable income.

In relation to the tax treatment of dividends and compensatory dividends on the loaned stocks, the Danish National Tax Tribunal amended the answer given by the National Tax Assessment Council in TfS 2002, 755 in an order published in TfS 2004, 152. According to the Danish National Tax Tribunal, the tax treatment depends on how the borrower disposes of the borrowed stocks during the loan period, and is addressed in three scenarios:

1     The borrower has resold the stocks and does not receive dividends, but must compensate the lender for dividends. The current consideration and the amount paid to the lender as compensation for the dividend are so directly related to the stock loan agreement that the expense must be included in the determination of the borrower's gain or loss on sale and purchase under the rules of § 4(f) of the State Tax Act.

2     The borrower does not resell the stocks and does not receive dividends and therefore has no gain recognized, but still has to pay a fee for borrowing the stocks. The cost of the consideration is therefore his loss on the agreement and this loss is not deductible under § 4F of the National Tax Act in determining taxable income, but only in any other gains on similar agreements in the same year.

3     The borrower has not resold the stocks but has received dividends for which he must compensate the lender. As the borrower has not become the owner of the stocks by virtue of the loan agreement or otherwise, he is not liable to pay tax on the dividends accruing to the lender under the GMSLA.

It can be inferred from the Danish National Tax Tribunal's ruling that the tax treatment of the **borrower's** expenditure on remuneration and compensatory dividends depends on how **the borrower** disposes of the stocks during the period. It follows that, to the extent that the borrower compensates the lender only for the dividends received by the borrower, the borrower is not taxed on the dividends received, so that the distribution has no tax consequences for the borrower. The argument is that the borrower has not become the owner of the stocks and is receiving the dividends solely on behalf of the lender.

In cases where the borrower has to compensate for dividends which he has not received, whether the stocks have been resold or not, the expenditure qualifies as a loss covered by the betting provision in § 4 F of the State Tax Act.

In TfS 2009, 283, a position is taken on how the **lender** is taxed on compensatory dividends. With reference to the National Tax Tribunal's ruling, the National Tax Agency states that **payments received for deficient dividends** on loaned stocks are taxable as **dividends** for the lender, provided that the dividends accrue to the lender.

However, for the compensatory dividend to be taxed as a dividend by the lender, it must be a condition that a distributed dividend is actually compensated. Thus, if no dividend is distributed, but the borrower has to pay a consideration, this can hardly be qualified as a dividend, since the consideration is not the claim

that a distribution has been made in accordance with § 16 A of the Tax Assessment Act has not been satisfied. In such a case, the income is presumably taxable under § 4 of the State Tax Act.

The decision of the National Tax Board in TfS 2009, 283 refers to situation 3 in the Danish National Tax Tribunal's order, which concerns the case where the borrower has not resold the stocks but has received dividends for which the lender must be compensated. Thus, the taxation of the **lender is** not addressed in the situation where the borrower has sold the borrowed stocks and is still obliged to compensate the lender for the lack of dividends.

Katja Joo Dyppel illustrates the situation as follows:

*Figure 4. Payment stream for compensatory dividend on resale*



What is different from the case where the borrower does not sell the borrowed stocks is that a third party (also) becomes the owner of the stocks, **which is why there is dual ownership** if the sale of the stocks by the borrower does not result in the lender being deemed to have given up its stockholder position.

The consequence of the lender continuing to be considered a stockholder may be that the lender continues to be taxed under § 16A of the Tax Assessment Act on compensatory dividends received by the borrower, notwithstanding that the borrower compensates the lender for dividends distributed without the borrower having received them. At the same time, a third party will also be taxed on the distributed dividends it receives from the distributing company, pursuant to § 16 A of the Danish Tax Assessment Act. This **dual ownership** may thus result in the undesirable consequence of a situation where a **larger amount is taxed on dividends than is actually distributed**.

Katja Joo Dyppel argues in her 2013 article that, alternatively, even if the lender is not considered to have disposed of its stocks at the time of the stock loan, the sale of the borrower results in the lender no longer being the current stockholder of specific stocks, but only having the right to receive in the future the same amount of stocks issued by the same company and with the same rights as those lent. This results in the **lender** no longer being considered a current stockholder and thus no longer eligible to receive dividends under § 16A of the Danish Tax Assessment Act, and the dividends are instead taxed under § 4 of the Danish State Tax Act**.** However, she believes that this may be correct, as it seems difficult to see how the lender can still be considered to be the actual stockholder under § 16 A of the Danish Tax Assessment Act when the stocks have been sold to a third party.

Katja Joo Dyppel's alternative argumentation has the following consequence: if the borrower (of the stocks) has to compensate the lender for dividends distributed during the lending period, the tax treatment depends on whether the borrower has (re)sold the stocks to a third party or not. If the stocks have not been sold to a third party, the lender is deemed to be the current stockholder and is thus taxed on the dividends in accordance with § 16 A of the Danish Tax Assessment Act, without the distribution having any tax

consequences for the borrower. However, if the stocks are sold to a third party, the lender can, in Katja Joo Dyppel's opinion, presumably not be considered a current stockholder, which is why the compensatory dividend is taxed under § 4 of the State Tax Act, while the borrower has a deduction for the compensatory dividend only under the betting provision in § 4(f) of the State Tax Act.

In this alternative argument, Katja Joo Dyppel overlooks the fact that in **practice** the lender cannot know what the borrower does with the stocks. Most stock loans are intermediated by stock loan intermediaries, who prevent any direct contact between the original stock lender and the final borrower. The stock loan intermediary is the contractual counterparty of the stock lender, and the stock loan intermediary can either lend the stock directly to another client or lend the stock to another stock loan intermediary. Whether and when a stock is sold on to a third party is in practice completely unclear to the original stock lender. In practice, the alternative model presented by Katja Joo Dyppel therefore does not work.

The practical consequences for a stock lender would be that he can never know whether he is still the tax owner of the stocks or not, how he should be taxed on the compensation payment and whether he is eligible for reimbursement. The risk for the stock lender is so significant that in practice he would never be prepared to lend his stocks, as he would constantly be at risk of breaching tax law because of the actions of a stock borrower with whom he is not familiar.

In a small national market where stock lender and borrower know each other, Katja Joo Dyppel's universal consideration model might work. In international stock markets, this model is doomed to fail.

### 3.2.2.4 Conclusion: short selling has no impact on the tax beneficial ownership of the pension plan

It is irrelevant to the pension plan's right to reimbursement whether a person who borrowed the stocks from the stock loan intermediary to whom the pension plan loaned their stocks resold the stocks, since the pension plan did not lend the stocks until after the vesting date of the dividend. Therefore, the tax lawful ownership of the pension plan cannot be affected by a resale to a third party.

The point in time at which the dividend is acquired and thus the right to claim reimbursement is the point in time at which the dividend is declared, cf. the Legal Guide, § C.B.3.1 (The concept of dividends for tax purposes). The declaration of dividends will usually take place at the company's ordinary or extraordinary general meeting. For tax purposes, dividends are thus understood to be anything distributed by a company to current stockholders (cf. § 16 A(2)(1) of the Danish Income Tax Act).

The pension plan purchased the Danish stocks at the latest on the day of the Annual General Meeting. It became the civil law and therefore also the tax owner of the stocks on the same day, since the stock purchase agreement is necessary for the transfer of ownership.

The dividend was paid by the company (VP Securities) to the former owner of the stocks, who was still registered as owner of the stocks on the so-called record day. The company may pay the dividend to the person registered as the owner on the record day (cf. the Danish Securities Trading Act, Article 71(2)), even if that person is not (any longer) the rightful recipient of the dividend, with discharging effect vis-à-vis the current civil and tax law owner of a stock.

The proceeds paid to the seller shall be debited from the seller's account and credited to the pension plan account. This is done through the custodians involved, who must settle this "market claim," as the buyer's claim to the transfer of the dividend is called. The seller has no influence on this forwarding of the dividend to the beneficiary (the buyer).

If the pension plan purchased the stock from a long owner seller, that seller is charged the dividend he received by virtue of his registration on record day from the company. The amount is credited to the pension plan's account as soon as it is registered as the new owner of the stock by its custodian. It is only at that point that it becomes apparent in the chain of custodians who the true beneficiary of the dividend was: the pension plan, which was the owner of the stock on the dividend date, despite the fact that it was still not registered as such.

However, if the pension plan purchased the stock from a short seller (which the pension plan cannot know) the short seller must compensate the pension plan for the dividend accruing to the pension plan as the legal owner of the stock on the dividend date. The actual dividend is paid by the company via VP Securities to the stockholder with whom the short seller covers its sale after the dividend date on the settlement date. The compensation payment from the short seller is in practice indistinguishable from the dividend itself, which originally came from the company, as both are mixed together in the cash flow passing through the various custodians. In practice, the buyer of a stock does not know who the seller is - even in OTC trading. The buyer therefore has no way of knowing whether the "market claim" credited to his account when the stock purchase is settled and the stocks are registered in his securities account with his custodian actually originates from a long owner seller or a short seller.

If the pension plan purchased from a short seller, the stockholder who <u>later</u> loaned the stock to the short seller to settle the trade was still the legal owner of the stock at the time of the dividend. At the same time, the pension plan became the owner of the stock by the purchase contract with the short seller.

The legal ownership of the stock acquired on the dividend date and thus the claim to payment of the dividend and reimbursement is lost by the pension plan under civil law only when the stock is lent to a third party. This loan is made between the date of the general meeting and the date of settlement of the stock purchase. Whether the pension plan also lost tax ownership of the stock and thus the claim to the dividend when the stocks were lent is irrelevant for the pension plan's right to the dividend and reimbursement that arose before the stock was lent.

The pension plan was the owner of the Danish stocks at the decisive moment, the day of the general meeting, which is the vesting date. This, despite the fact that the pension plan was not yet registered as owner with its custodian and therefore could not participate in the general meeting itself.

Since only registered owners of stocks can participate in the general meeting, the civil law dual ownership of a stock that exists between the purchase of a stock from a short seller and the settlement of the stock purchase also does not lead to more votes being cast at a general meeting than stocks issued.

**4 LEGAL MATTERS RELATING TO DIVIDEND TAX**

In the following, we will explain the reasons for the payment of the dividend tax reimbursement at issue in the case.

In the present case, the basis for the reimbursement is the withholding tax law and the corresponding withholding tax order, as well as the relevant double taxation agreement between Denmark and the United States.

**4.1 Dividend tax is withheld according to the rules of the withholding tax law.**

According to § 65(1) of the Danish Withholding Tax Act, dividend tax at a rate of 27 percent must be withheld from any decision to distribute dividends from companies based in Denmark.

According to § 65(6) of the Danish Withholding Tax Act, the dividend tax has been reduced to 22 percent for dividend distributions to companies and foundations that are taxable in Denmark under § 1 of the Danish Corporate Income Tax Act or the Danish Corporate Income Tax Act, with effect from the 2014 income year. Prior to that, the dividend tax rate for these companies and foundations was reduced to 25 percent, corresponding to the current corporate tax rate under § 17(1) of the Corporate Tax Act.

Article 66(1) of the Withholding Tax Act stipulates that companies subject to withholding tax must pay the withholding tax to Danish Tax Agency in the month following the dividend distribution, at the latest at the same time as the deadline for payment of the company's withholding tax and social security contributions.

§ 65(4) (until January 1, 2013, § 65(5)) of the Withholding Tax Act provides that no withholding tax shall be withheld from dividends if the recipient of the dividend is resident abroad and is not subject to limited tax liability under § 2(1)(c) of the Corporate Tax Act.

The starting point of § 2(1)(c) of the Corporate Tax Act is that foreign recipients of dividends from Denmark are subject to limited tax liability. However, this does not apply in particular to recipients of dividends on subsidiary stocks (i.e. ownership of at least 10 percent of the company making the distribution) or group stocks (i.e. where the foreign owner is jointly taxed with the Danish company paying the dividend or can be jointly taxed with it under § 31A of the Danish Corporate Tax Act), provided that the foreign recipient can rely on a double taxation convention or the EU Parent/Subsidiary Directive (Directive 2011/96/EU).

**4.2 Rules of the Withholding Tax Order on exemption from the withholding obligation**

Pursuant to § 65(3) (until January 1, 2013 § 65(4)) of the Withholding Tax Act, the Minister for Taxation may lay down rules on exemption from the obligation to withhold tax on dividends that are not taxable for the recipient. This option is used in Chapter 9 of the Withholding Tax Order, which deals with dividend and royalty taxes.

§ 31 of the Withholding Tax Statutory Order provides that, inter alia, no dividend tax shall be withheld when the recipient can receive the dividend tax-free under the rules on tax exemption for subsidiary/group company stocks in § 4 A or § 4 B of the Danish Capital Gains Tax Act, § 2(1) of the Act on Corporate Income Tax and § 4(2) of the Act on Corporate Income Tax. 1, c, § 13(1)(2) of the Corporate Tax Act or § 10(1) of the Fund Tax Act, unless the company making the distribution is an investment company exempt from Danish tax under § 13(1)(19) of the Corporate Tax Act.

**4.3 Limited tax liability of dividends**

Under § 2(1)(c) of the Danish Corporate Tax Act, foreign recipients of dividends from Denmark are generally subject to limited tax liability in Denmark on the dividends. The tax rate for the limited tax liability is 27%, corresponding to the dividend tax withheld according to § 65(1) of the Danish Withholding Tax Act when the dividend is paid to the foreign stockholder.

**4.4 Determining the correct percentage**

Thus, the same rate of dividend tax does not have to be withheld from all stockholders. If the tax status of the stockholder is not known, the highest tax rate (27%) is withheld. However, this does not necessarily mean that the Danish Tax Agency is on the safe side as regards collecting the same amount of dividend tax for which it is later entitled to a reimbursement. Trades made on the dividend date that have still not been settled on the record day will entail a risk of reimbursement claims from stock buyers who cannot know

how much they will have to pay. Their reimbursement claim would therefore always be against the 27% dividend tax, even if the ultimate seller had not been deducted for dividend tax.

**4.5 Compensation payments**

It must be assumed that dividend tax has been withheld in the dividends distributed by the Danish companies.

There is no provision for withholding tax on the compensation payments paid into the custody chain of short sellers and not in any way distinguishable in the chain from the dividends paid by the Danish companies. The rule introduced in Germany in 2006 to tax the dividend compensation payment from the short seller is missing in Denmark to date.

**4.6 Reimbursement of dividend tax**

§ 69B(1) of the Withholding Tax Act provides, inter alia, that *if a person* liable to tax under § 2 of the Withholding Tax Act or § 2 of the Corporate Tax Act has *received dividends*, royalties or interest which, under §§ 65 to 65D, *have deducted at source withholding tax in* excess of the final tax under a double taxation agreement, *the amount shall be repaid* within six months of receipt of the request for repayment by the Customs and the Danish Tax Agency.

The US-Denmark Double Tax Convention provides in Article 10(3)(c) that dividends from a company resident in Denmark are not taxable in Denmark if the *beneficial owner is a pension fund*, as defined in Article 22(2)(e), resident in the US. It is a condition that such profits do not arise from the carrying on of business by the pension fund or by any associated enterprise.

Article 22(2)(e) of the DTC provides that a person resident in a Contracting State shall be entitled to all the benefits of this Convention only if that person is a legal person, whether exempt from taxation or not, organized under the laws of a Contracting State for the purpose of providing retirement or similar benefits under a defined benefit scheme to employed persons, including self-employed persons. It shall be a condition that more than 50 percent of the beneficiaries, members or participants of such person are natural persons resident in one of the Contracting States.

Neither the Danish Tax Agency nor the Danish Tax Appeals Agency denied that the applicant for reimbursement was an American 401K pension plan organized under the laws of the United States for the purpose of providing pensions under a defined benefit plan to employees, including the self-employed.

Since, as stated above, it must be assumed that the pension plan in question was the owner of the stocks and dividends in question under both civil and tax law, it must therefore be assumed that the pension plan satisfies the conditions for reimbursement under the withholding tax law and the corresponding ordinance. As stated above, there are no grounds for refusing reimbursement on the grounds of inadequate withholding of dividend tax.

**5 EVIDENCE OF LEGAL OWNERSHIP FOR TAX PURPOSES**

There is no clear evidence of beneficial ownership for tax purposes. This has also been confirmed by the interministerial working group (see note of June 27, 2016, page 2, Appendix 5a):

> *"A survey of the civil law rules in force has revealed, among other things, that there*
> *are no rules ensuring that it is possible to identify the specific owners of securities."*

This is because tax ownership is not recorded anywhere. All that is recorded is civil ownership - and this is done by each investor-custodian under the EU CSD Directive and the Finality Directive.

The evidence available for civil law ownership will therefore be reviewed below.

**5.1 The practical evidence of beneficial ownership for tax purposes**

**5.1.1 Broker confirmations (trade notes)**

The final and binding agreement between the buyer and the seller of a stock, which results in the buyer becoming the immediate owner of the stock, is, for dematerialized stocks, concluded electronically through a broker.

Under the Capital Markets Act and the underlying EU legislation, listed stocks cannot be traded without the involvement of (authorized and controlled) fund brokerage firms. By brokers, buy and sell orders are brought together by an electronic transaction called "matching." In owner matching trades, the broker acts as the seller of the stock to his own client. The broker buys the stock from another client or another broker.

As the actual conclusion of the contract transferring the ownership of the stock to the buyer is a purely electronic process, the documentation of this can only be done by (1) examination of the computer where the buy and sell order were merged, or by (2) indirect evidence such as the trading note (= broker confirmations) which is subsequently issued as physical evidence that an electronic contract has been concluded.

It should be noted that the commercial paper itself is *not* the contract that transfers ownership of the stocks. Any human error (such as the use of the wrong template referring to a purchase ("BUY") instead of a sale ("SALE"), or wrong dates, amounts or similar typographical errors in a broker confirmation are of no relevance to the validity of the actual purchase contract concluded by the electronic matching. Indeed, official statistics from the U.S. show that approximately 10% of all broker confirmations are incorrect, see presentation from U.S. conference, see presentation from ACA Spring 2015 Compliance Conference, provided as Appendix 84.

The contract itself for the purchase of the dematerialized stocks is a pure electronic merger of purchase and sale order. Under EU law (Regulation 910/2015), such an electronic contract has the same legal effect and evidential value as a physical contract drawn up on paper.

MIFID II, implemented in Denmark by the Capital Markets Act, has introduced rules for a market structure that ensures that trading takes place on regulated marketplaces. In order to achieve a better protection of investors, MIFID II has imposed a trading obligation on all stocks and other financial instruments on "regulated trading facilities" ("trade obligation," Article 23 of MIFID). This means that any order for the purchase of stocks placed by a client with a stockbroker - who must have access to a regulated trading facility - must lead to a matching, i.e. the conclusion of a final and binding agreement for the purchase of stocks. Stockbrokers are subject to a non-discretionary obligation to execute orders for stocks through a randomized, computerized "matching procedure."

Since both the stocks themselves and the contract transferring ownership of the stocks exist only in electronic form, the documentation for both is available only in electronic form. Physical evidence of the existence of the stocks and of the transfer of ownership is no more than documents subsequently issued for evidential purposes.

The commercial document is thus a piece of paper representing the fact that an electronic purchase contract has been concluded.

The trade note must not (as the Danish Tax Agency does in its summary submission of August 9, 2019) be confused with the electronic instruction from the trading platform (where matching has occurred) to the clearing agent and custodian to settle the trade.

The trade note is issued only after instructions have been given by the broker to the clearing agent to settle the final and binding purchase contract. These instructions initiate a settlement which cannot be stopped again. For this very reason, the clearing agent is liable for the payment and delivery of the stocks.

The individual steps involved in the purchase of a stock can be outlined as follows:



**5.1.2 Custody statements and DCA**

Despite the fact that clearing and settlement of a stock trade, leading to the registration of the stock in the buyer's securities account with its custodian, is not necessary to become the owner of a Danish stock, the pension plan's stock trades were cleared and settled and the stocks registered in its securities account with the custodian.

This is documented by the custody statements provided. The custody statement documents that a stock trade has been cleared and the stock transfer settled and that the dematerialized stock is in the securities account of the buyer.

There is no obligation to hold Danish securities in a securities account with VP Securities or in a Danish bank. The absence of a securities account statement from such an institution is therefore no indication that the investor does not own a Danish stock.

No stockholder shall be entitled to be informed by his custodian of the location of his sub-securities accounts. Sanjay Shah did not even disclose to the High Court in London (see his pleadings submitted as Appendix 85, Paragraphs 56.1.4 and 56.1.5) in which banks the Solo group had its sub-accounts. The lack of presentation of a chain of sub custodians from the stockholder's own securities account to a securities account with VP Securities cannot therefore be an indication that the stockholder is not the owner of a Danish stock.

In addition to a custody statement, the owner of a stock also receives the Dividend Credit Advice (DCA) initially requested by Danish Tax Agency. This is issued by the custodian once the stock trade has been settled and the dividend received.

The custody statements and the DCA thus document that the pension plan not only entered into a final and binding agreement to purchase stocks, but that these agreements were also "implemented" - as the Danish Tax Agency likes to put it in layman's terms. Correctly, the Danish Tax Agency would speak of the trades having been settled or settled.

Whether the trade in the stocks was settled (cleared and settled) by a "physical" delivery of the stocks by a "de-registration" by the seller and a "registration" by the buyer and a corresponding transfer of stocks between the seller's and the buyer's custodian, or whether the trade was settled by the use of netting (with the consequence that a net report may not be sent to VP Securities at all - if the net result is 0), is irrelevant in this context.

**5.2 Documentation of the tax ownership of the pension plan**

Documentation of each step in the execution of a complete dividend arbitrage transaction has been provided to the extent it is still available. The 12 individual steps can be summarized as follows:

1    Orders to purchase stocks are placed by e-mail to the broker, which is presented here as Appendix 86. At the same time, the clearing agent is informed that this order has been placed and the pension plan asks for a commitment to settle the purchase if it matches.

2    The clearing agent gives a commitment to the purchase of the stocks (which indirectly means a guarantee for the settlement and valuation of the stocks in the clearing agent's own prime broker position) - this commitment is itself given electronically and therefore cannot be provided in the form of a paper document, but it is also confirmed by e-mail, see Appendix 80.

3    The electronic matching of the purchase order and thereby the conclusion of a binding agreement on the purchase of the stocks is confirmed by the broker by e-mail. The matching itself is an electronic process, which cannot be documented per se, however the broker confirms the deal by e-mail, which is provided as Appendix 86. Later, the broker sends the trade note, which is presented as Appendix 11.

4    Invoice from the broker is received by e-mail. Presented as Appendix 11.

5     A broker confirmation (trade note) is received by e-mail, see Appendix 11.

6     Orders to sell stocks through a forward contract are placed by e-mail, see Appendix 86.

7     Confirmation of the forward contract will be received by e-mail, see Appendix 80.

8     Orders for stock lending are placed by e-mail, see Appendix 86.

9     Confirmation of stock lending is received by e-mail, example provided as per <u>Appendix 80</u>.

10    The individual steps to sell the stocks again are similar to those described under points 1-5 in connection with the purchase of the stocks.

11    The open forward contract is closed by placing an order to buy a forward contract (see points 6 and 7).

12    The stock lending will be recalled by e-mail, which was also confirmed by e-mail (see points 8 and 9).

As the actual agreement to transfer ownership of a stock is concluded purely electronically (by matching buy and sell orders in the computer systems), the broker confirmation issued after the trade is concluded is simply a confirmation of what has happened electronically. Therefore, clerical errors in a broker confirmation have <u>no</u> impact on the existence of a final and binding contract.

The clearing and settlement of stock trades is also done electronically on computer systems to which the clients (the pension plan) do not have access. The pension plan has access only to the e-mails it has sent and received and to the documentation issued as evidence after the trade: a broker confirmation (trading note), a DCA (Dividend Credit Advice) and a custody statement. The pension plan may not hold any other documents as proof of ownership.

The pension plan has provided the following documentation to demonstrate the purchase and ownership of the stocks, the financing of the stock purchases and the receipt of the dividends:

1     Orders to buy and sell stocks (e-mails). When such e-mails are matched, the contract to buy or sell stocks is concluded

2     Broker confirmations = trade notes showing that an electronic contract for the purchase or sale of stocks has been concluded

3     Dividend Credit Advice: shows not only ownership of stocks, but also receipt of a net dividend

4     Custody statements showing equity holdings, equity lending and forward hedging.

5     E-mails relating to the clearing and settlement of transactions

6     GMSLA framework agreements and e-mails specifying in each case the conditions of the individual stock lending. The pension plan has hereby produced "all correspondence concerning stock loans." The tax authority's statement on page 17 is incorrect. The Danish Tax Agency's request in the Agency's 3rd submission to provide all correspondence has been answered.

In addition, the pension plan has provided the documentation related to the account opening procedure with the various financial institutions involved in the stock transactions.

It is therefore incorrect for the Danish Tax Agency to claim that none of the pension plans has provided

> *"any physical or electronic evidence of their previous stockholdings (which formed the basis of their reimbursement applications)"* (submission of May 09, 2019, point 1)

On the one hand, the Danish Tax Agency demands that the Danish National Tax Tribunal's decision disregard the very documents which, on the other hand, the Danish Tax Agency claims do not exist. The documents in the possession of the pension plan and the additional documentation which it has produced, since the Danish Tax Appeals Agency was apparently not satisfied with the documentation already produced, have been submitted to the Danish Tax Appeals Agency.

In an attempt to discredit the documentation provided, the Danish Tax Agency alleges that the companies issuing the documentation were dishonest and issued false documentation. In so doing, the Danish Tax Agency completely ignores the fact that neither of the independent companies involved, nor the to date, any of the documents relied on in the case have been alleged or proved to be false.

Considering that electronic documents have general evidential value and the purchase contracts that immediately led to the pension plans becoming owners of the Danish stocks were concluded *electronically* with the fund brokers, it is this electronic matching that must be proven in this case. This electronic matching is not in the possession of the pension plan, as it takes place with the fund brokers, i.e. on the trading platform where the brokers act.

After the electronic matching, which constitutes the purchase contract itself, various documents are issued in physical form. These may contain typographical errors, which do not affect the validity of the contract, which was already concluded electronically.

Immediately after the electronic matching of the buy and sell order, instructions are passed on for clearing and settlement. The clearing and settlement of the trade is further evidence that a purchase contract had previously been concluded. However, the pension scheme cannot provide this additional proof as the Solo group's computers have been seized.

**CONCLUSION OF THE FIRST PART**

The pension plan became the beneficial owner of the stocks for tax purposes and received dividends from the Danish companies, since the compensation payment from a short seller must also be considered as dividends under Article 10 of the Danish-American Double Taxation Convention, since no owner of a stock can distinguish between stocks purchased by short sellers and stocks purchased by long owners.

If the compensation payment is not equated with a genuine dividend from the company itself, this would - in addition to the purely factual problems that arise when no one can distinguish between the compensation payment and tfeexploitation in the chain of custodians - also mean that the recipient of the compensation payment would not be liable to tax on it, since it would not then be covered by § 4 of the State Tax Act.

The pension plan's ownership of the stocks is also evidenced by all the documents of ownership required by EU law. No further documentation can be provided as proof of beneficial ownership for tax purposes.

**PART 2: THE TAX ADMINISTRATION'S VIEWS ARE BASED ON AN UNFOUNDED AND ERRONEOUS BASIS - NO GROUNDS FOR REVOCATION**

**6 LACK OF INFORMATION BY THE TAX AUTHORITIES**

In particular, the Danish Tax Agency - in line with all other authorities - had the responsibility to provide sufficient information before the Danish Tax Agency took a decision on the case.

This is a fundamental principle of Danish administrative law. The principle - known as the official principle or official maxim - is not enshrined in law, but is the expression of something so fundamental that in theory it can be taken to be the expression of a general principle of law.

The purpose of the principle of legality is to support the taking of decisions that are materially legal and correct.

The principle of officiality belongs to the so-called guarantee rules, and if a case is insufficiently informed, this may mean that the decision must be set aside as invalid. It may also mean that the case has to be reopened so that the missing investigations can be carried out.

In the present case, the Danish Tax Agency has largely failed to comply with the official principle. This is particularly objectionable in view of the extraordinarily large subject-matter and the very serious nature of the protection, and the consequent major impact on the pension plans and their owners.

In this context, the missing report of June 19, 2018, from Deloitte, which was prepared at the request of the Government Lawyer Boris Frederiksen, should be highlighted. The Deloitte report followed the complete flow of funds to the Solo Capital group's capital account at Barclays Bank, but the Danish Tax Agency did not, however, produce this report in the case.

In addition, the Danish Tax Agency has not received a copy from SØIK of the information relevant to the case, including in particular the information relevant to the documentation of the disputed stock transactions and the receipt of dividends, etc.

The tax administration has also failed to obtain relevant information from the many professional foreign operators and foreign control and supervisory authorities.

The Danish Tax Agency has apparently not even informed VP Securities about how the securities settlement takes place in practice, including what happens to the dividend when a stock purchase has not yet been settled on record day. This is particularly critical in view of the central importance of the settlement of the market claim process in the present case.

The failure to obtain relevant information must be seen in the light of the fact that Danish Tax Agency, through its powers of control, has a real possibility to obtain the information requested by Danish Tax Agency.

In the present case, however, Danish Tax Agency has based its view on undocumented assumptions about the non-ownership and lending of the stocks in question by the pension plans. Thus, Danish Tax Agency has not provided any real evidence to support its claim of lack of ownership, etc., and the claim is therefore entirely unfounded.

In deciding the present case, it is very important to bear in mind that a lack of adequate information cannot be detrimental to the pension plans. This is particularly the case when the Danish Tax Agency, which, as stated above, has a number of special tools for providing information on the case, is the closest to clarifying a number of the facts of the case.

The lack of information must therefore in all respects be prejudicial to the tax authorities.

**7 SUBMITTED AND MISSING DOCUMENTATION**

**7.1 The Tax Agency's unsubstantiated claim of false documentation**

While the Danish Tax Agency acknowledges that the documents submitted (agreements, e-mails, custody statements, DCNs) together prove that the pension plan was the owner of the stocks, received the net proceeds and was entitled to a reimbursement, the Danish Tax Agency tries to convince the Danish National Tax Tribunal's decision to disregard this documentation, claiming that it is allegedly "false."

The tax authorities are still reluctant to explicitly invoke forgery. This, probably against the background that none of the independent companies involved issued these documents, has not been charged with document fraud by the responsible auditors, financial supervisors or prosecutors. Not even the voluminous evidence presented by the hundreds of individuals sued in courts around the world, where the Treasury has launched an onslaught of civil suits, has produced any evidence of document fraud.

The Danish Tax Agency attempts to refute the probative value of the documentation provided and deny the reality of the transactions by highlighting typographical errors and other deficiencies in the documents provided. The Danish Tax Agency considers that these errors should be treated as suspicious.

It should be noted at the outset that this is not a case of typographical errors in various documents. It is a case about how to become the owner of a Danish stock and whether the pension plans have received a net dividend from their stocks.

An examination of the errors and shortcomings referred to shows that they are all human typing errors. These errors reflect the reality of the transaction and its documentation. Had the sole task and purpose of the brokers and the Solo group been to produce false documents (and not, as was in fact the case, to match buy and sell orders (the real task of the brokers) and to clear and settle real stock transactions (the real task of the Solo group)) it must be assumed that so many companies with so many employees would at least have been able to produce correct "false" documents without typographical errors or other defects. However, as the Solo group concentrated on clearing, settling and storing stocks, the traders concentrated on placing buy and sell orders and raising finance by finding borrowers for their stocks, and the fund brokers concentrated on matching buy and sell orders on the alternative marketplace, no one noticed the human typographical errors in the documentation, which are insignificant for the transactions themselves and which merely prove what the real world actors have done. Real people who make real transactions and have to document them make real mistakes. These are the errors identified by the Danish Tax Agency in the course of a major investigation. Perfect documentation without the errors that are normal in all stock trading would, on the other hand, indicate that the material was produced for the purpose and could not document real stock transactions.

### 7.1.1 Errors in documentation from brokers

The tax authorities seem to confuse human error - which occurs entirely without or, rather, against the will of the persons involved - and fraud, which requires intent. If the tax authorities are seriously of the opinion that a clerical error in the documentation of a stock deal renders the deal itself invalid or even fraudulent, then 10% of all deals worldwide are invalid or fraudulent. A position that the tax authorities cannot take seriously.

The documentation is not the transaction itself, but the Danish Tax Agency still does not seem to be able or willing to understand this, even in the summary of the preliminary proceedings of August 9, 2019, § 8.6, page 70. Clerical errors can and do happen de facto every day, also in the field of stock trading. However, the stock traders themselves are not affected by these clerical errors. Stock trading takes place properly and, being tied into such a strictly regulated system, there can be no fraud in stock trading. The EU has ensured this most recently with MIFID and MIFIR.

If the Danish Tax Agency is seriously of the opinion that human clerical errors cause the document containing a clerical error to be fictitious, fraudulent or non-existent, then the pension plans must concede that the Danish Tax Agency itself must face the fact that in that case the Danish Tax Agency has not sued anyone at all in the civil proceedings, since in those proceedings the Danish Tax Agency has consistently misidentified the appellant as "Danish Tax Agency." This error was challenged in the High Court in London by Pinsent Masons, the UK solicitor for the Inland Revenue.

**7.1.1.1 Different trade dates on broker confirmations and custody statements**

The Tax Agency highlights in its summary submission, § 5.4.3, page 36, that there should be

> *"several cases where the trade notes (Appendix 11) do not tally with the information provided in the custody statements (Appendix 10) and credit advices (Appendix Q)."*

It rightly follows that custody statements - which in fact document settlement - do not tally with the commercial notes in Appendix 11. However, the custody statements are consistent with the clearing statements submitted as Appendix 80.

Appendix 11 was an erroneous trade note attached to the invoice from the broker Sunrise, which was received long after the transactions.

The Danish Tax Agency further highlights that the pension plans have not provided any evidence as to how the settlement would have been done correctly, despite the fact that the trade notes were (allegedly) incorrectly endorsed.

It should be noted that settlement is not based on commercial invoices. Settlement takes place on the basis of the electronic **clearing and settlement instructions** which go from the trading venue, where the buy and sell orders are matched, to the clearing agent and custodian. Such electronic settlement instructions going from one computer to another cannot be provided by pension plans without access to these computers.

Only SØIK can provide this documentation as they are in possession of the computer systems.

The trade note is only issued by the broker (several weeks) after the settlement instructions have been given.

Having noted inconsistencies between the commercial notes - which show human typing errors - and the custody statements, the Danish Tax Agency analyses in § 5.4.3.1, page 37, the dates indicated as commercial date and as settlement date in the various appendices, and comes itself to the very correct conclusion that

> *"There are several factors that could indicate that the discrepancy between the custody statement and the commercial invoice is due to an error made by the broker"*

However, these clerical errors in a broker confirmation do not invalidate the actual stock trading that takes place through the electronic entry of buy and sell orders.

The significance that the pension plans refer to the commercial notes as evidence in the case is not a significance invented by the pension plans, as the Danish Tax Agency suggests. The legislator, unlike the Danish Tax Agency, has understood that when settlement of a trade - which in Danish usage is referred to as "settlement" or "afregning" - is not necessary to become the owner of a stock, the documentation one can find for the trade must be found elsewhere. The documentation must be found for the purchase contract, which is concluded electronically by matching the purchase and sale order.

One such document is the commercial invoice. However, if such a commercial document contains errors, this does not mean that the transaction has not taken place. The commercial document is merely an electronic record of what has happened.

When independent, authorized and supervised stockbrokers have issued these trade notes, it is an indication that they have executed a trade under their professional responsibility.

It should be noted that a trade is already completed when the buy and sell orders are matched. The Danish National Tax Tribunal's decision is wrong in the Agency's assertion that the pension plans have not documented that an agreement to purchase stocks has been consummated. Since ownership changes to the buyer when the contract is concluded, the conclusion of the contract itself also constitutes completion.

A broker confirmation is simply proof that an electronic agreement has been concluded. It is not the agreement itself. Where the substance of the agreement manifests itself is the recording of the number of stocks purchased in the securities account with the custodian. This appears in the custody statements.

Custody statements contain the correct dates and these are confirmed and supported by the trading emails provided in the cases. The trade was concluded by matching the orders evidenced by the emails.

The trade date in the emails provided matches the trade date in the custody statements and in the DCA. Only the broker made an error in the preparation of the documentation attached to his invoices.

### 7.1.1.2 Commercial invoices confuse buying and selling

The reference by the Danish Tax Agency to a purchase of stocks, while the custody statements show a sale, is also an expression of human error. The pension plan, which clearly concentrated on carrying out the stock transactions and verifying that the stocks ordered or sold were properly registered in the pension plan's securities account, did not notice this clerical error in the trading notes received from the pension plan's broker. The pension plan's order was consistent with the registration in the pension plan's securities account. Often, the pension plan also did not receive the trade notes until several weeks after a stock transaction had been executed.

The pension scheme has been in contact with the broker following the Danish Tax Agency's letter and can therefore inform you that it was clearly a human error on the part of the employee who had to issue the commercial invoice. The employee used the wrong template, which by default read "BUY," and not the template with "SALE."

### 7.1.1.3 Commercial note indicates price as "#####"

Also, the example of a trading note from the broker Bastion Capital London Ltd. where the price of the sale of 7,884 Mærsk stocks is indicated as *"#########"* (Appendix AA, page 57) is clearly a computer error.

As noted above, the Pension Plan has not previously noticed this typographical error either, as a broker confirmation is not received until long after the actual stock transaction has been completed.

The error has also been confirmed by the broker Bastion Capital London Ltd, as documented by emails dated January 7 and May 16, 2019, from Bastion Capital London Ltd, submitted as Appendices 88 and 89, stating that the field did not contain a number, but only *"####,"* as the size of the field was set with too few characters to reflect the correct amount. Bastion Capital London Ltd has subsequently issued a corrected broker confirmation. There is nothing "mysterious" about this, although the Inland Revenue would like to see mystery in everything that goes on in this case. The facts of the case have simply been explained and documented, as the Danish Tax Agency has requested.

Naturally, the representatives of the pension plans have asked the broker to issue a correct broker confirmation, now that the error has been discovered by the Danish Tax Agency's detective work.

The simple explanation for Adrian Mildne issuing the new broker confirmation, even though he no longer works for his brother's company, Bastion Capital London Ltd, is that he still has the form on his computer and it was his fault that the form was set with too few characters. Adrian Mildne was therefore able to confirm, even long after the transactions, that the field was simply set incorrectly, because he still had the original on his computer. The real, original transactions were recorded in his computer. Whether it is Adrian Mildne or his brother, Patrick Mildne, who signs a form which originally - in original - originates from a computer of which Adrian Mildne at least has a copy, is for that matter immaterial. This in no way weakens the credibility of the documentation presented.

### 7.1.1.4 Commercial invoices do not take public holidays into account

The Danish Tax Agency considers that the trading notes should erroneously have not taken into account public holidays and therefore that weekdays should be determined on the basis of the market in the country where the stock is traded. Whether this is true or not, why should an OTC trade conducted by foreigners through foreign brokers and settled by foreign clearing agents and custodians stick to Danish business days?
- is not of decisive importance.

The fact is, as the Danish Tax Agency itself states, that the trade was in fact settled T+3 according to the Danish public holiday calendar. The trading note from Sunrise Brokers was once again, as so often, erroneous, as it showed T+6. However, this typing error does not mean that the agreed terms were not respected. What was agreed was the content of the computer that SØIK seized.

### 7.1.1.5 Errors in other trade notes

The errors highlighted by the tax authorities in commercial notes from other, non-precedent cases, only confirm the pension plans' assertions about how many typographical errors there were in the confirmations of what had happened in reality, which were immaterial to the 'dividend arbitrage' business itself. The final and binding agreement is an electronic transaction and there were no errors in it. This is evidenced by the custody statements provided.

The pension plans were aware that they were engaging in dividend arbitrage and that because of the marginal profit they can realize on each stock they own, they have to acquire huge amounts of stocks. This can of course only be done by using service providers who offer the necessary services as a "manufactured good." As in any other factory, increasing production also means an increasing amount of errors.

Considering how many transactions are carried out by pension plans and how many individual steps are needed for this all to fall into place, what is really remarkable is not that there are errors in the subsequent documentation, but how few there really are.

### 7.1.2 Error in documentation from custodian - custody statement and account statement

The Danish Tax Agency seems to misunderstand the nature of the documentation presented at the office meetings with the Danish Tax Appeals Agency.

The Danish Tax Agency thus writes in its 3rd submission of May 09 2019, point 3.4, that,

> *"The summaries of accounts provided (Appendices 45-49 and PowerPoint presentation, p. 134) are not statements of account, but merely extracts from undated Excel sheets, which have no automatic character and whose origin is not documented."*

It should be noted that the table was prepared by Schaffelhuber Müller & Kollegen S.à r.l. for use in the office meetings to explain the transactions. This was also disclosed to the Danish Tax Appeals Agency at the meetings.

The summaries provided are only a summary of events prepared by Schaffelhuber Müller & Kollegen S.à r.l. on the basis of the trading records available to the pension plans. As the Danish National Tax Tribunal's decision should have noted, nowhere is it indicated that this is an account from the custodian's computer systems. In that case, the statements would have indicated the name of the individual custodian and would have been prepared on the custodian's letterhead.

The charts have been prepared as an aid for the Danish Tax Agency and the Danish National Tax Tribunal/Danish Tax Appeals Agency to understand the individual steps of a complete stock transaction, which consists of so many individual aspects. Thus, they make sense.

The Danish Tax Agency further comments on these summaries:

> *" The statements of accounts (Appendices 45-49 and PowerPoint presentation, p. 134, from the office meetings) do not contain all transactions for the given pension plan for a given period, but only extracts."*

That is quite true. As the Danish Tax Agency rightly points out, this is precisely an extract from the records of transactions. Extract means that not everything is included. For ease of understanding, we have only included transactions relating to a single stock. Otherwise, the overview would become confusing and complicated. The overview was only prepared as an explanation of a single example. The statement is not and should not be a formal statement of account from an account-holding institution.

The Danish Tax Agency does not understand why the receipt of the reimbursement appears in the statements prepared for the Danish Tax Appeals Agency, but not in the custody statements provided. The reason is relatively simple: as explained at the office meetings, some pages of the custody statements show stock purchases and sales. Others show loan transactions, and others show forward transactions. Custody statements therefore show all transactions relating to the equity positions. The dividend reimbursement was of course not booked to the stock accounts, but to a cash account. This cash account could be viewed online by the pension plans. Since the Danish Tax Agency attaches such importance to seeing the movements on the cash account as well, the pension plans have been able, with great effort, to obtain the statements of movements on their cash account as kept by their respective custodians, presented here as Appendix 90.

To date, the pension plans have not considered documentation of receipt of the dividend distribution to be material to the case, as the Danish Tax Agency is well aware of how much dividend distribution Danish Tax Agency has paid to the pension plans' agent on behalf of the pension plans. This is also clear from the Danish Tax Agency's own documents. Nor do any of the pension plans contest the receipt of the dividend payment.

If the Danish Tax Agency believes that the dividend reimbursement should not have gone to the pension plans, then the serious question arises as to why the Danish Tax Agency has sued all the pension plans in the U.S. for back-payment, thereby causing such enormous costs to Danish taxpayers.

The documentation requested by the Danish Tax Agency for payment of the broker, tax agent and custody fee appear on the cash account statements provided here.

The stock lending fee requested by the Treasury and shown in the table covers the total costs and interest associated with the stock lending. This is therefore the total of both items, which appear in the custody agreement as "stock lending fee" and "interest." The fact that the statement uses different terms from the custody statement is simply because the two are not prepared by the same persons. The summary is, as I said, a summary and therefore draws together different items.

Consequently, there are no errors in the custody statements provided. The inconsistencies noted are due to the simplifications made to the statements drawn up by Schaffelhuber Müller & Kollegen S.à r.l. in order to explain the transactions in a simple manner to the Danish Tax Appeals Agency.

Moreover, according to official U.S. statistics, the error rate in custody statements is 9:1, which means that 10% of all documents relating to stock transactions are incorrect. Errors do not mean that Danish stocks were not traded, on the contrary.

### 7.1.3 Compliance with GMSLA

The Danish Tax Agency states in the summary submission of August 9, 2019, in § 3.2.4, page 18, that GMSLAs should not be complied with.

In this respect, it is stated that the GMSLAs had to anticipate a so-called "Marking to Market" ("MTM") revaluation of the value of the stocks, and this corresponded to the cash collateral, in order to ensure that there was neither over- nor under-collateralization.

The question of over- or under-insurance has absolutely nothing to do with the question of whether the pension plans were owners of the Danish stocks and received dividends. The GMSLAs therefore foresee, both in § 5.4.b and in § 5.5.b, that the stock borrower and the stock lender will receive an additional payment of collateral or a repayment of the collateral already provided only upon request. It is therefore not relevant whether 5.4 or 5.5 applies.

However, from the custody statements provided, which are prepared to show all the transactions for the year, the Danish Tax Agency cannot see each entry of the daily MTM. The annual statement shows a summary amount at the end of the year.

Since we do not have access to the computer system "TAS" located on the Solo Group's computers, which performed these daily MTM calculations - see Paragraph 56.8.3, page 23, of Sanjay Shah's pleading - and do not have daily printouts from this system, we have also been unable to include these individual daily entries in the preparation of our supporting document for the clarification of the transactions. Moreover, they would have rendered the overview totally unmanageable, thus defeating the whole purpose of an explanatory supporting document.

As these daily MTM regulations are of no relevance to ownership, no further investigation of the MTM relationship has been undertaken.

### 7.1.4 Stock lending rate

The Danish Tax Agency states in the summary submission of August 09, 2019 in § 3.2.5 that the stock lending rate is set arbitrarily and that the agreed rate is not applied.