# Exhibit 9, Part 3 of 15

The Danish Tax Agency doubts that the terms of the stock loans are negotiated between the partners, simply because (1) the same terms can be seen in the e-mails provided and (2) the agreed interest rate should not be exceeded.

Had the tax authorities looked more closely, they would have seen that no loan period was stipulated (Term: open). This means that the pension plan and the professional intermediary in stock loans could terminate the loan at any time if the counterparty did not agree to changed, new market conditions. The fact that the interest rate was constantly changing between the parties is shown by the fact that one cannot calculate backwards, as the Danish Tax Agency attempts in § 4.5, page 28. As this is a regular exercise, it is often done by telephone. We have provided as Appendix 79 some examples of e-mails sent in connection with the agreement on a 're-rating'.

The interest rate agreed at any time was respected. The interest rate was just not the same all the time.

As regards the fact that at any given time the same interest rate was agreed for all the stock loans, this is a natural consequence of the fact that (1) all the pension plans worked with the same five stock loan intermediaries, who therefore, when concluding the agreements, naturally applied the market interest rate applicable at the time, and (2) that other interest rates were subsequently agreed informally by means of a so-called "re-rating."

As mentioned above, whether pension plans were able to negotiate different interest rates in their ongoing negotiations with the intermediaries in stock lending depended on the current market and the negotiating power of the pension plans.

### 7.2 Lack of documentation

In the following, we will explain the documentation that the Danish Tax Appeals Agency claims is missing in this case.

### 7.2.1 The purchase contract for the stocks

Pension plans cannot directly document the actual contract by which the stocks were purchased, as this contract is electronic. It is concluded when the purchase and stock orders are matched.

### 7.2.2 Cash flow and bank statements

### 7.2.2.1 Money flow

The tax authorities require documentation of a cash flow to the pension plans. Such a cash flow is not required to become an owner of a stock. Ownership is acquired even before the payment of the stock.

However, as the settlement of purchases (and sales) of stocks is on a delivery versus payment basis, the payment flow for the stocks must necessarily be from a cash account with the custodian. Otherwise, the custodian cannot ensure that payment is made at the same time as the stocks are delivered to the buyer's account.

As the payment is to be made from a cash account with the custodian, the cash collateral during the stock lending is also paid into this account with the custodian. This also ensures that the stock borrower receives the stocks at the same time as he pays the cash collateral.

Also, the receipt of the net proceeds can only have occurred in the pension plan's account with its custodian, as the flow of funds from the company down the sub-custody chain can only reach the custodian, not any other bank or financial institution.

Since the pension plans used an online system to view the cash flows to their own accounts, without the computer from their custodian, they cannot document all these cash flows. The only thing the pension plans can show are the cash account statements from their own custodians, which they still kept in paper form, see Appendix 90.

All pension plan funds were held under a TTC clause in Solo Capital's account at one or more commercial banks.

As none of the four custodians in the Solo group had a banking license allowing them to hold cash, all cash was held in Solo Capital's account in a regular commercial bank. According to the pension plans' latest investigations, Solo Capital was thereby acting as sub custodian for its three subsidiaries (the other three custodians) and was thus holding not only its own customers' funds but also the funds of the three subsidiaries and their respective customers. All money transactions between customers within the Solo group could be carried out without any movement on Solo Capital's account at its bank. This was fully in line with the European CSD Directive 909/2014 Chapter IV Article 9 on internalized settlement.

Which commercial bank Solo Capital used, the pension plans do not know for sure. However, from Sanjay Shah's pleading to the High Court in London, it appears that Solo Capital held the pension plans' cash in an account at Barclays.

The pension plans all established an account in the United States at the time of their formation (see, for example, the account statements submitted as Appendix 91 to the appellant's leading cases), yet these accounts were not used to effect the stock transactions and cash flows related thereto. Account statements from other banks showing payments from Solo to the pension plans cannot be produced as they had not yet received their profits from their custodian to another bank when Solo Capital was closed down and put into administration by PwC in the summer of 2015.

The pension plans had no reason to have the gains from the dividend arbitrage transactions paid into another account in the United States, as a payment to the beneficiaries was not imminent. In any event, however, the gains in the lead cases were below an amount that would result in a reporting obligation to the IRS.

The reason why the gain retained by the pension plans was less than USD 250,000 is the high transaction costs described in § 2. Not least, the Solo group invoiced significant amounts to the pension plans (see § 2.3.4.) for their services and for the fact that the Solo group ultimately had to act as guarantor that the stocks would be paid if a stock borrower was not found in time.

**7.2.2.2 Stream of stocks**

Evidence of a flow of stocks (or dividends) through the chain of custodians cannot be provided by the pension plans, as no custodian informed the pension plans who their respective sub custodian is. However, when the settlement of a stock trade is not necessary to be the owner of a Danish stock, and the only at the settlement of a trade that a "flow of stocks" through the chain of custodians may occur (namely if there is no internalized settlement), such a flow of stocks through the custody chain is even without probative value.

Finally, it should be noted that the netting procedures used by all clearing and settlement agents lead to the impossibility of following any stock through the chain of sub custodians.

### 7.2.3 TTC clauses

The tax authorities claim that the pension plans have not documented the TTC clause. As explained at the meetings, the TTC clause was originally a component of the custody agreements. In 2014, this clause was taken out of the custody agreements and put into the general terms and conditions to be accepted online.

For the Pegasus Fox 23 LLC Solo 401K Plan, a custody agreement containing the TTC clause was submitted in the lead cases. In addition, an example of a printout from the terms and conditions was submitted for online approval. The pension plans are unable to provide proof of this approval, as SØIK has obtained the computers from the Solo group. However, the pension plans have provided evidence that the pension plans have decided to approve the general terms and conditions.

### 7.2.4 Single account opening documents and transaction documents

For some of the pension plans, the above-mentioned documentation concerning the transactions and the account opening procedure is missing. This is mainly because the trustees of the respective pension plans no longer have access to the e-mail account through which all transactions were settled. However, it can be assumed that all transactions for all pension plans represented by the TVC Law Firm/Schaffelhuber Müller & Kollegen S.à r.l., which were clients of the Solo Group, were carried out in the same way. The documentation provided by the other pension plans can therefore be used by analogy.

### 7.2.5 Documentation in 2014 and 2015

More documents are available for trades executed in 2014 than for trades executed in 2015. This is simply because trading was automated in 2015 with the introduction of the Octave, and BrokerMesh software systems to handle order (algo trading), trade, clearing and settlement tasks. It is only regrettable that the Danish Tax Agency denies the existence of algo trading. The pension plans refer the Danish Tax Agency to § 3, No 18 and No 20 of the Capital Markets Act, which regulates algo trading.

In fact, the algo trader made the choice of stocks to buy (knowing the dividend schedule and the dividend expected to be paid), as well as the number that each pension plan would buy. This was done on the basis of programmed aspects of the funding possibilities of each pension plan, risk profile and risk diversification, etc.

The Danish Tax Agency's claim with regard to algo trading (see the summary pleading of August 09, 2019, page 44), according to which

> *"If there is an algorithm used by pension plans, it must have been used solely*
> *to disguise the alleged stock traders' lack of reality"*

is completely absurd. It is not at all the purpose of algo trading to obscure stock trades and their reality.

All stock trades, including those cleared by the Solo Group, were duly reported to the London authorities (FCA and Stock Exchange) (daily trade and transaction reports), as documented by the FSA statistics already provided. These reports would be confirmed by the Danish Tax Agency to the SØIK if the Agency would simply request the SØIK to do so. Such confirmation could in no way prejudice any criminal investigations which, after 3½ years, are allegedly still ongoing.

The real purpose of algo trading is to increase trading volume with less risk of error, eliminating human interference as much as possible.

Algo trading cannot disguise stock trading either, as it is reported to the FCA and the LSE in London.

As a result of these reports, the Interministerial Working Group has also noted in its progress note of 27 June 2016:

> "In connection with the work of the inter-ministerial working group, the Committee has received information on trading statistics from the Danish Financial Supervisory Authority for the years 2012-2015, showing stock trades for selected listed Danish companies. This shows that, among other things, there are remarkably large stock trades around the time of dividend distribution. The working group has not at this stage uncovered the reason for this, including whether the trades may be tax-motivated. Danish Tax Agency will investigate this further."

**7.3 Responsibility for missing documentation**

The tax authorities claim that

> "In this context, the pension plans are largely hiding behind the fact that Danish and British authorities have seized material from their custodians"

It should be noted at the outset that there is no question of "hiding" behind the simple fact that the material has indeed been seized. It is unfortunately a fact of the case that the authorities have seized the computer systems which handled the stock trades. The pension plans therefore have no way of verifying all the electronic transactions that took place after the orders to buy the stocks were placed.
Matching of buy and sell orders was done electronically, clearing and settlement was done electronically, and the actual record-keeping and existence of the stocks was electronic. Dematerialized stocks now exist only in electronic form.

Any documentation issued is therefore no more than a physical reflection of what took place electronically. Without access to the electronic transactions, pension plans are limited to presenting paper documentation that does not constitute the acts themselves, but merely reflects the fact that acts have been executed. Of course, when these statements of transactions are issued by humans, they also include the very common human errors such as typing errors in dates or ISIN numbers, the use of wrong templates (showing purchases instead of sales) and fields that are too small to show the many numbers and therefore only print "####."

The computer systems are the main evidence in the case, as the electronic acts were carried out here. These computer systems have been in the possession of SØIK for years, without this leading to any positive evidence that the pension plans did not own the Danish stocks. This must indicate that the SØIK has indeed found electronic evidence of the settlement of the stock trades. Since the settlement took place only _after_ a final agreement on the purchase of the stocks had been concluded, transferring ownership of the stocks to the buyer, the proof that ownership had been transferred by matching purchase and sale orders.

**8 OVERPAYMENT DIVIDEND TAX**

**8.1 Sum of all reimbursements**

In several of its submissions, the Danish Tax Agency presents various statistics which allegedly show that Danish Tax Agency paid out more in reimbursements than it received in dividend tax.

These statistics, produced by Danish Tax Agency itself, contradict the publicly available statistics.

According to the SIR report of September 24, 2015 (Tax Committee 2014-15 2nd session) SAU Alm del), page 16, Danish Tax Agency has not paid out more in reimbursements than received:

Page 16 states:

Graph 7.2 below shows the revenue, reimbursements and number of reimbursement applications for the years 2005 to June 2015.



Graph 7.2.

This graphical representation is supported by Table 7.1, page 15, of the same SIR report:

Table 7.1 includes revenue (dividend tax), reimbursements and the number of reimbursements per year from 2005 to June 2015.

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 Jan - juni |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue in bil. DKK | 6,69 | 9,36 | 9,94 | 11,1 | 8,06 | 6,36 | 9,65 | 8,71 | 11,69 | 13,2 | 18,51 |
| Reimbursements in bil. DKK | 1,18 | 1,88 | 1,07 | 0,75 | 0,75 | 0,68 | 1,12 | 1,45 | 2,79 | 6,06 | 8,73 |
| Number of Reimbursement | 16.617 | 18.618 | 15.687 | 16.655 | 21.284 | 21.451 | 24.292 | 30.765 | 33.861 | 41.764 | 34.850 |

**Tabel 7.1.**

More recent figures are presented in the report of the Interministerial Working Group 2016/2017. These too show that no more was paid out in reimbursements than was received from the Danish authorities. From this report comes the table below, showing Denmark's net receipts from dividend tax on stocks:

| Table 2.1. Revenue from withholding tax on dividends | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mia. kr. (current prices) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Gross revenue from dividend tax | 6,7 | 9,4 | 10,0 | 11,1 | 8,1 | 6,4 | 9,7 | 8,7 | 11,7 | 13,2 | 22,2 |
| Offset against corporation tax (1) | -1,2 | -1,6 | -1,8 | -2,1 | -0,8 | -0,6 | -0,9 | -1,1 | -1,6 | -1,7 | -3,6 |
| Reimbursements (2) | -1,2 | -1,9 | -1,1 | -0,8 | -0,8 | -0,7 | -1,1 | -1,5 | -2,8 | -6,1 | -10,9 |
| of which economic crime | 0,0 | 0,0 | 0,0 | 0,0 | 0,0 | 0,0 | 0,0 | -0,1 | -0,7 | -3,8 | -7,8 |
| Net revenue from dividend tax | 4,3 | 5,9 | 7,0 | 8,3 | 6,5 | 5,1 | 7,6 | 6,2 | 7,9 | 9,3 | 15,5 |

It is therefore disputed in principle that Danish Tax Agency should have paid out more in reimbursements than was paid in.

The only thing that can be seen from the statistics provided is that the number of reimbursements has increased considerably. But selling the stocks before the dividend date to a stockholder who is eligible for a reimbursement is also the motivation for the seller of the stocks - and the fact that puts the derivatives market (forwards and futures) out of balance with the spot market. The statistics thus simply show that investors interested in dividend arbitrage turned to the Danish stock market in earnest from 2014 onwards.

The Danish Tax Agency thus also appears in the summary of the preliminary proceedings of August 9, 2019, to abandon this manifestly false allegation of overpayment of dividends, since the argument put forward in all previous submissions is now abandoned.

**8.2 Total reimbursements per distributing company**

The Danish Tax Agency now refers in the summary statement in § 2.1 only to all reimbursements made under TRYG A/S. The Danish Tax Agency wishes to reject the pension plans' claim for reimbursement on the grounds that a total of approximately DKK 151 million has been claimed. TRGY A/S had for the year tax year (2015) only withheld approximately DKK 123 million in dividend tax. Of the DKK 151 million, U.S. pension plans had received DKK 136 million.

In this respect, the Danish Tax Agency notes in § 2.1, page 6, that

> "far more has been claimed (and paid out) in reimbursements than has been withheld. It goes without saying that there can never be a claim for reimbursement of more than has been withheld."

However, the Danish Tax Agency is not in a position to document who specifically would not be entitled to a reimbursement. A pension scheme's claim for reimbursement cannot be denied on the grounds that another recipient of reimbursement may not have been entitled to receive it.

By citing this example, the Danish Tax Agency has chosen (voluntarily or accidentally) to demonstrate that the exchange tax system suffers from a systemic malfunction and that there is no fraud. The Tax Agency has no explanation as to why approximately DKK 151 million has been paid out in reimbursements while only approximately DKK 136 million has been paid in by Tryg A/S.

Although the Danish Tax Agency claims that all applications from customers in the Solo group amounting to DKK 136 million were fraudulent, which is clearly disputed, there is still a difference of DKK 15 million that has been overpaid (the difference between DKK 136 million and DKK 151 million). There must therefore clearly be another explanation for the discrepancies. The most obvious is that not too much dividend tax has been paid, but rather too little.

If the beneficial owner of a stock on the dividend date is not correctly identified, the dividend tax payable is also incorrectly calculated.

### 8.3 Malfunctions in the administration of dividend tax

Although it is not the task of the pension plan to analyze the Danish dividend tax system and explain how it can happen that more is paid out in dividend distribution for a certain company than this company has paid in dividend tax, we would nevertheless like to make our offer on the most obvious explanations for this discrepancy:

1       The banking scheme (the spreadsheet solution) has led to dividend payments to banks without any evidence of ownership of the stocks or receipt of dividends. Since the payments to the banks were not registered by Danish Tax Agency's own "3-S" platform - see the Bech-Bruun report, page 92 et seq., and the SIR report of September 24, 2015, point 11.4 - the banks' applications could lead to the same stock being reimbursed several times. One via the bank scheme and another via the form scheme. The banking scheme was stopped in 2015 when the problems became known, but only with the official explanation that there was no legal basis for the solution. The fact was, however, that the banks had received reimbursements of withheld dividend tax without sufficient evidence of legal ownership of the stocks. An investigation into the banking system has therefore now also been launched by the Ministry of Taxation, and rightly so.

2       If, on the dividend date, a stockholder sells his stocks to a buyer with a different tax status and the transaction is settled with a longer deadline than the one used by VP Securities (i.e. now longer than T+3), VP Securities will apply the wrong tax rate when calculating the dividend tax. For example, if the seller is exempt from tax and this is registered with VP Securities, no dividend tax is calculated on the dividend (see the Danish Tax Agency's Appendix AO) which is immediately sent to the seller of the stocks (because he is still registered as the owner on the record day). Since the buyer of the stocks cannot know that the seller is registered as tax exempt with VP Securities, the buyer expects to receive only a net dividend. Only net proceeds are circulated during the market claims process between the various custodians and sub custodians.The purchaser (pension plan) receiving a net dividend is entitled to a reimbursement as he was the legal owner of the stock on the dividend date. However, VP Securities has not calculated the 27% dividend tax. The seller of the stock has run away with them.

3       The dividend tax is calculated on the basis of the registrations with VP Securities. However, VP Securities does not know the beneficial owners of Danish stocks. In the case of stock lending, for example, the beneficial owner may be someone else with a completely different tax status than the registered civil law owner.

4       The errors in the way the tax authorities have administered the reimbursement of withheld dividend tax are even more obvious in the case of short selling. The main problem with short selling, which is triggered by stock lending by banks, asset managers and not least hedge funds, is that it leads to an increase in the free-float of stocks - i.e. stocks available on the market - beyond 100 percent of all stocks issued by a company through VP Securities, and that this allows for more than one legal owner of a single stock.

This is, in our view, the most obvious explanation as to why more could have been paid in dividend tax reimbursements than the amounts received by the Danish tax authorities from the companies, if this claim by the Danish Tax Agency were correct.

The example that the Danish Tax Agency wants to use as evidence to deny the pension plans dividend distribution simply confirms that a dividend tax administration system based on the VP Securities regulations suffers from serious flaws. The beneficial owners entitled to the reimbursement cannot be identified by these records.

As demonstrated above, under the applicable law, the owner of the stocks is entitled to the dividend reimbursement if he is the legal owner of the stocks on the dividend date and has received the net dividend. The beneficial owner of the stocks has no obligation to investigate or document whether other beneficial owners are also claiming reimbursement. This is also quite impossible for an owner of a stock (or for any other person).

As already shown above, there may be more beneficial owners of Danish stocks than the number of stocks issued by a Danish company.

Despite the very clear "Early Warning" of 2015, the Ministry of Taxation has not solved the problem of stock loans and short selling, but at least the Ministry acknowledges in the status note of June 26, 2016, that Denmark simply does not have a system or rules to identify the rightful owner of Danish stocks (page 6).

**9 PENSION PLAN FINANCIAL TRANSACTIONS**

**9.1 Financing of stock purchases**

The Pension Plan has demonstrated, by means of the Master Stock Lending Agreements (GMSLAs) and the e-mails provided, by which the individual stock loans are drawn under the GMSLA, that it had the necessary financial resources to pay for the stocks at the time the loan was made. The pension plan was thus able to pay for the stocks on the date of delivery.

A retention of title which meant that ownership of the stocks first passed to the pension plan (cf. § 188(1) of the Capital Markets Act) had not been asserted by the seller when the purchase contract was concluded. The pension plan thus became the civil law owner of the stocks even before payment for them. This ownership was subsequently secured by registration with his custodian. This act of security meant that the pension scheme could receive the dividend to which it was entitled as the purchaser of the stocks under Article 19(1) of the Danish Sale of Goods Act.

The Danish Tax Agency has raised doubts as to whether a stock borrower would provide an amount as security corresponding to the market value of the stocks on the day before the stock loan, i.e. before the ex-date.

The pension plan has documented that it is normal practice for the stock borrower to provide a larger amount in cash collateral than the market value on the date of the loan by providing documentation of how much Nordnet, for example, requires in collateral.

Help



Stocks that can be shorted

Read more about short selling

Stocks that can be shorted

Currency   DKK ∨

Hvis du vil shorte aktier som ikke findes med

If you want to short stocks that are not on the list of the day, you can contact
Nordnet's brokers by phone on 70 20 66 85

| Name | Short name | Security requirement |
|---|---|---|
| - Mærsk A A/S | | |
| A.P. Møller - Mærsk B A/S | MAERSK B | 125o |
| ALK-Abelló B A/S | ALK B | 150o |
| Alm. Brand A/S | ALMB | 140o |
| Ambu A/S | AMBU B | 150o |
| Bavarian Nordic A/S | BAVA | 160o |
| Carlsberg B A/S | CARL B | 115o |
| Chr. Hansen Holding A/S | CHR | 125o |
| Coloplast B A/S | COLO B | 120o |
| DFDS A/S | DFDS | 130o |
| DSV A/S | DSV | 115o |
| Danske Bank A/S | DANSKE | 120o |
| FLSmidth & Co. A/S | FLS | 125o |
| GN Store Nord A/S | GN | 120o |
| Genmab A/S | GEN | 170o |
| H. Lundbeck A/S | LUN | 130o |
| ISS A/S | ISS | 120o |
| Jyske Bank A/S | JYSK | 130o |
| Matas A/S | MATAS | 125o |
| Nordea Bank Abp | NDA DK | 120o |

https://www.nordnet.dk/mux/page/blankninginl.html                    17.02.2019

In the Agency's summary submission of August 9, 2019, at Paragraph 8.12, page 74, the Da 2.17.2019
attempts to distort the roles in a stock loan by claiming that it is the equity of the stock ler
role in determining the amount of cash collateral required for a stock loan. Of course, it is not. The purpose
of the cash collateral is to secure a possible cover purchase if the borrower does not return the stocks.
In its description of Nordnet, the Danish Tax Agency fails to mention that it is not the bank's capital strength
that determines how much cash security they can demand from their customers.

The fact is that when Nordnet lends stocks to their customers, the bank itself has to borrow the stocks
elsewhere. Nordnet must therefore provide collateral of the same amount as the bank itself requires from
its customers if it wants to operate competitively in the market.

Where the capital strength of the borrower and lender is expressed is in the ongoing negotiations about the interest the pension plan has to pay for the cash collateral and the loan fee the borrower has to pay to borrow the stocks. The stronger the capital strength of the equity borrower relative to the equity lender (the pension plan), the better the equity lender can impose a higher interest rate and a lower equity loan fee. The combined result of the interest rate payable on the cash and the fee payable on the equity loan is referred to in the industry as the "rebate."

As regards the consequences of a possible price drop on the stock market, reference is made to the standard terms under the GMSLA, which already foresee how the parties should deal with this.

**9.2 The possibility of carrying out the financial transactions in question**

The IRS believes it would be like a con game to have all three transactions occur simultaneously, namely (1) find a stock seller willing to sell to the pension plan, (2) find a stock borrower who would need the stock and was willing to put up the purchase price as cash collateral for the stock loan, and (3) find a forward counterparty who could bear any price loss on the stock.

The tax authorities are trying to make it seem impossible. However, this is by no means the case.

Contrary to what the Danish Tax Agency claims, these are not coincidences, but underline normal transactions on international financial markets. Agreements are concluded with brokers to arrange the purchase and sale of stocks and derivatives and framework agreements with intermediaries in stock loan intermediaries long before a single transaction is settled. All individual transactions are thus recorded long before they are executed. The financial industry is different from any other industry in this respect. Everywhere, all the components of what is to be produced (cars, houses, bread or structured financial products like dividend arbitrage) must be planned and coordinated in advance so that everything is present at the right moment in the machinery. If just one ingredient is missing, the final product will not work.

As for the challenge of finding a seller who will sell to a pension plan, the answer is quite simple: The seller to the pension plan was not the previous owner of the stock, but the pension plan's fund broker, who conducted the transactions as an owner-matching trader. In other words, he sold the stocks to the pension plan himself. He obtained the stocks from another fund broker, who himself obtained them from the original stockholder. This is how owner-matching trades take place.

The pension plan's fund broker knew that the pension plan had entered into a master stock lending agreement and that the pension plan therefore had a constant stock loan intermediary whose sole job was to procure stock loans. The intermediary therefore knew that, even before the purchase of the stocks, the pension plan would contact the stock loan intermediary to see if he could arrange a loan against the necessary cash collateral if the pension plan wanted to purchase the stocks.

The fund broker also received acceptance from the pension plan's clearing agent that the trade would re-clear and settle. The clearing agent thereby assumed the risk that payment would be made on the sale of the stock. This risk could be assumed by the clearing agent in its capacity as prime broker, since the clearing agent would itself receive the stocks if the pension plan failed to pay.

Finding a seller is therefore absolutely no challenge in practice, once all business relations have been established.

As can be seen from the e-mails provided as Appendix 78, despite all the preparation, not all pension planners managed to place an order to buy stocks in every single case. This could theoretically be because there was no corresponding supply of stocks on the market or because the clearing agent had not given its commitment to guarantee the settlement of the trade. Which of the two scenarios was actually the case is, in this respect, irrelevant. The fact is, however, that the pension plans did not always "unravel the cabal," as the tax authorities again allege, without any evidence whatsoever.

The same goes for the challenge of finding a forward counterpart. A forward is also brokered by brokers. The ultimate counterparty to the forward contract may have many different reasons for entering into the contract. One of them may be to speculate on how much the stock price will fall when the dividend is paid. Another may be that the forward counterparty wants to secure the price at which he can buy the stocks back from the market after he has originally sold his stocks to the market before the distribution of the dividend. This may be a purely speculative transaction or, as mentioned above, a foreigner who would lose the 27% dividend tax if he owned the stocks on the dividend date.

Finally, there is the equity borrower, whose motivation has already been described in this post. Also, the stock borrower is found through professional stock loan intermediaries. The GMSLA framework agreement concluded in advance ensures that the pension plan can lend the stocks when the need arises. A brief conversation with the intermediary prior to the stock purchase ensures the pension plan that the specific loan can be made in time to pay for the stocks.

Finding all these counterparties is certainly not something that can be done in a short time. That is why the account opening procedure with the various professional operators takes so long. All contracts must be in place before trading can begin.

The best evidence that this is possible in the real world and behaves exactly as described in our post is that all the trade and transaction reports were filed with the respective responsible (regulatory) authorities in London (FCA and LSE). This is further supported by the voluminous documentation of the transactions (custody statements, electronic custody records, trade notes from the fund brokers, audited financial statements of the custodians, etc.).

It is further noted that the following statistics from the Danish Financial Supervisory Authority on the turnover of Danish stocks, which have been presented in the cases, confirm that in reality the situation is as stated:

**Figure 2.3. Stock turnover in selected companies - 2015**



Note: The dividend date indicated is the first day on which the share is traded without the dividend (the so-called x-day - the day after the day of the General Meeting. The dividend itself is not paid to shareholders until a few days later. The figures are based on Mi-FID data, which aims to investigate market abuse cases. It means that for one transaction there may be 1, 2, 3, 4 or in some cases more MiFID reports. The reported turnover is therefore not necessarily fully accurate. However, whether or not there is a risk of multiple reporting based on the same transaction cannot explain the large around dividend dates. SOURCE: Financial Supervision

The fact that there is a daily trading volume of Danish stocks of more than DKK 100 trillion means that countless investors trade stocks in the same companies at the same time every day. Many investors choose to trade a particular stock just when a dividend payment is about to be made. All this is not a sign of fraud.

Had there been real evidence of fraud in the cases, there would also have to be suspicions on the part of the prosecution of a strength that would lead to the indictment of the pension plans or their trustees. The court in Lyngby has indicated by order of March 18, 2019 that this is not the case for Doston Bradley or any of the pension plans managed by him (including the Pegasus Fox 23 LLC Solo 401K Plan trial). The order is provided as Appendix 92.

In line with this, in November 2019 the English prosecutors also decided to stop their own investigations into the case. They will only provide Denmark with the assistance required under international agreements, cf. the Ministry of Justice's communication to the Folketing's Judicial Committee quoted in the article of November 16, 2019, which is presented here as Appendix 93. Also attached as Appendix 94 is a letter from the UK Crown Prosecution Service stating that they are no longer pursuing investigations against former Solo Group employees on their own initiative.

Despite this, the Danish Tax Agency continues to claim that the pension plans' arbitrage transactions

*"only act as accounting entries without real transactions"*
(summary post of August 09, 2019, page 28)

However, all trading in dematerialized stocks today takes the form of electronic book-keeping records only, as there are no longer any paper documents being transferred. Pension plans placed electronic orders with their brokers, just as any other customer would do with his broker. The broker electronically matched the pension plans' buy orders with sell orders in accordance with applicable rules and under the supervision of the UK FCA. After the matching of the orders, clearing instructions were electronically given to the clearing and settlement agent. Both clearing and settlement instructions and their execution are now always electronic, as dematerialized stocks cannot be cleared, settled and stored in any form other than electronic.

Thus, a stock trade today only manifests itself electronically and is real when these electronic records are based on real transactions, which today are also electronic. The trades carried out by the pension schemes via the UK brokers and clearing and settlement agents are thus no different from trades carried out by any other Danish bank. Here, too, everything is done entirely electronically by book-keeping entries.

The purchase of an e-book is also today nothing more than accounting entries and electronic transactions. Nevertheless, both the purchases of the dematerialized stocks made by the pension plans are as real as any online purchase of an e-book.

**9.3 Registrations in VP Securities are without meaning**

**9.3.1 The importance of a registration with VP Securities**

The Danish Tax Agency has repeatedly argued throughout its submissions that "*the Pension Plans were not the owners of the stocks at issue in the case.*" Whether the tax authorities mean civil or tax ownership is consistently avoided and instead a legally unknown concept of 'beneficial' ownership is insisted upon.

The tax authorities claim that the pension plan was not the "owner" of the stocks because it did not purchase any stocks. It seems that the Danish Tax Agency is referring to the fact that the pension plan should not be the civil law owners of the stocks and thus not the tax owners, simply because they cannot be found in the VP Securities register.

Finally, the Danish Tax Agency admits in the lead cases in the submission of May 9, 2019, Paragraph 4.10, and in the summary submission of August 9, 2019, Paragraph 8.11, that a registration with VP Securities is not necessary to be the owner of a stock. Otherwise, the Danish Tax Agency would not have retreated to a statement that

> *"Data from VP Securities must be included in the evidentiary assessment."*

It is clear from this that registrations with VP Securities are only one of several possible proofs of ownership. Finally, the IRS seems to recognize that omnibus depositories make it impossible for VP Securities to prove that a person is NOT a stockholder. VP Securities can only confirm that a person is a stockholder when and if such person has a securities account with VP Securities.

The Danish Tax Agency considers in its summary submission of August 09, 2019, Paragraph 8.11, that it should be

> *"relevant, whether the pension plans or their custodians have held deposits in*
> *VP Securities - or whether they can show through which sub-custodians they*
> *reportedly have held stocks."*

That an existing registration with VP Securities unambiguously proves civil law ownership has never been questioned by the pension plans. After all, the very purpose of registering ownership with a custodian is to protect ownership against extinction. But protection is not the same as "existence or non-existence." Ownership may well exist without this protection.

However, under current EU law, the tax authorities cannot discriminate against other custodians in relation to VP Securities. This would be a clear breach of fundamental rules on the free movement of capital and the guarantee of freedom to provide services within the EU. The tax authorities cannot therefore require stockholders who hold their securities account with a foreign custodian to provide a chain of custodians and sub-custodians up to VP Securities as the only acceptable proof of ownership. No stockholder of a company has access to these sub-custody chains. These chains can at most be enforced by the tax authorities, as part of the public administration, through the coercive power of the State, from the various custodians in the chain of custodians. However, the Danish Tax Agency has not done so. In the present case, this must be to the detriment of the tax authorities under the official power.

The registration of stockholding with any authorized and supervised CSD (custodian) in the EU must have the same evidential value. The tax authorities cannot make English custodians second class compared to the Danish CSD VP Securities.

As the Danish National Tax Tribunal's decision has correctly noted, pension plans have stated in many places that VP Securities does not have an accurate ownership register and that stock trades are not necessarily executed by the transfer of stocks between custodians, as trades are first settled by transfers of stocks internally (book-keeping-wise) at each custodian.

This fact, which results from the liberalization of capital markets by EU legislation, the Danish Tax Agency tries to eradicate by the simple assertion:

> *"Such pleas cannot lead the pension plans to succeed in their complaint."*

The Danish Tax Agency does not provide any legal justification why the Danish National Tax Tribunal's decision should disregard the applicable EU rules on trading in securities, simply because the result implies that VP Securities can be used as the only legally valid source to document ownership of Danish stocks, or that the documentation of chains of custodians and money respectively stocks is not a practically possible proof of ownership under the EU rules.

The Danish Tax Agency simply refuses to accept the fact in the case that ownership is a legal concept and that its acquisition is determined by legal rules. Legal rules which are partly Danish and partly European and even international (The Hague Convention).

### 9.3.2 Evidence that the Solo Group has held stocks

The Danish Tax Agency requires in the lead cases the summary submission of August 9, 2019, § 5.1, page 31, that evidence must be provided that the Solo Group has "owned" the stocks that the pension plans have owned and for which the Solo Group has certified ownership.

The chain of custodians and sub-custodians required by the Danish Tax Agency cannot be provided by any client of any bank. Therefore, neither can the pension plans. Since it is technically impossible for any client of the international custodians behind a long chain of sub-custodians, Directive 98/26/EC of the European Parliament and of the Council of May 19, 1998, on settlement finality in payment and securities settlement systems (Settlement Finality Directive) already recognizes the uniqueness (and hence the legally binding effect) of the registration of a securities settlement effected by an authorized clearing agent and the custody of the securities by a custodian. A re-registration with the CSD where the stocks were originally issued or the documentation of a chain of custodians is not required by the Directive for the recognition of ownership, even vis-à-vis third parties. On the contrary, recital 11 of the Directive explicitly states that:

> "transfer orders and the netting of such orders should have legal effect in the legal systems of all Member States and be binding on third parties."

Article 3 further states that:

> "Transfer orders and netting have legal effect and are binding on third parties even in the event of insolvency proceedings against a participant if the transfer orders were entered into the system at the time of the opening of insolvency proceedings"

The tax administration's requirement for a chain of ownership is thus in direct contravention of EU law. The Finality Directive equates settlement with any authorized and regulated clearing agent and custodian with settlement of a securities trade with the CSD where the stocks were issued.

### 9.3.3 Letters from SØIK and VP Securities

The Danish Tax Agency states in the preamble to the summary submission of August 9, 2019, that, following an inquiry to SØIK on November 23, 2017, it was informed that SØIK could not confirm at that time that the pension plans had received dividends from the Danish stocks.

This is quite natural. As mentioned above, no one can confirm this.

What is remarkable here is that SØIK does not write that it can exclude that the pension plan members have received dividends. No one can do that either.

The same applies to SØIK's opinion on the ownership of Danish stocks. SØIK does not exclude that the pension plans have been owners of the stocks. They can only say that they cannot confirm it. This is, however, quite natural when the computer systems of the Solo group have not been examined. That SØIK has not done so is clear from the very fact that SØIK has asked VP Securities to confirm whether the pension plans have owned the Danish stocks. If the computers had been examined, the SØIK could have made its own statement and did not have to approach VP Securities.

But VP Securities knows nothing about stockholders who hold their stocks with sub custodians throughout the world. Therefore, VP Securities does not positively confirm in Appendix N that it can exclude pension ownership. Thus, in VP Securities' letter of August 13, 2019, VP also explicitly points out that it has not kept securities accounts registered in the names of the pension plans, but that the stocks may have been held in omnibus securities accounts.

Equally misleading is the letter from VP Securities dated August 13, 2019, forwarded as Appendix AO of August 17, 2019. Pursuant to this letter, the Government Lawyer has requested VP Securities to confirm the amount of gross profit calculations attributed to securities accounts registered in VP Securities. To this end, the Government Lawyer has provided VP Securities with the amounts of various gross dividends declared by pension plans for tax recovery purposes in relation to dividend payments from various listed companies. VP Securities was asked to explain whether the amounts are consistent with the allocation of gross dividends to VP Securities securities accounts, where 27% tax is withheld.

The question itself is misleadingly worded. As noted above, VP Securities would not have withheld 27% dividend tax on the stocks purchased by the pension plans if, on the record date, those stocks were in the custody of a person with a tax status other than the 27%. In addition, if the seller was one of the tax-exempt stockholders mentioned in the VP Securities letter, no dividend tax was paid at all on the dividends received by the pension plans through the market claim process. Such an error can only be attributed to the Danish dividend tax system.

The question to VP Securities also documents the Danish Tax Agency's complete ignorance of the market claim process and the effect of short selling on the dividend date, introducing additional dividends into the custody chain than those originally originated by the company itself.

Thus, the Danish Tax Agency does not document with Appendix AO anything other than the malfunctioning of the system for the administration of dividend tax.

The tax authorities should rather have asked VP Securities whether a registration of ownership acquired by matching a buy and a sell order, which is then settled by an authorized clearing agent and settled in an account with a foreign custodian, is evidence of a genuine settled stock trade. This question is of course not asked by the Danish Tax Agency, as VP Securities would confirm this. VP Securities could also have confirmed on this occasion that the 'statement of account' requested by the Danish Tax Agency on page 32 is nothing more than the custody statements submitted and that such a statement does not show the increase and decrease in the number of stocks and the calculation of the price gain or loss. A custody statement shows the stockholding - the name of the stocks, the number and the price at which they are traded. Custody statements also show whether the stocks are being bought or sold. Finally, the custody statements provided show the date of each transaction.

The custody statement fulfils everything that a securities account statement should show. And that's all it needs. The tax authorities can calculate the gain or loss themselves by taking the purchase price and the sale price of the respective stock. This is what we have done in the published statements submitted, which the Danish Tax Agency does not wish to accept, see the Agency's summary submission of August 9, 2019, § 5.3, page 33. Unfortunately, if the Agency does not want to do this, they will have to make their own effort and calculate the gains and losses. That is not what a bank statement shows.

### 9.4 The pension plan received dividends

When the pension plan purchased the stocks on the day it was decided to pay a dividend, the pension plan was not yet registered as the owner of the stocks on the record date. The dividend was therefore immediately, initially attributed to the seller's custodian.

However, as trades on the date of the AGM are marked as "cum ex" in the clearing systems, the clearing agents and custodians ensure that the dividend from the company is taken from the seller as soon as the

buyer has been registered as the new owner of the stock. The dividend is automatically passed on to the buyer during the market claim process. As the buyer can only be identified by his account with his custodian, the dividend is routed to the buyer's cash account with the custodian.

Thus, what the pension plan received was the dividend itself from the Danish company, even though the buyer was not registered as owner on record day.

As already mentioned above, neither the pension plan nor anyone else can rule out the possibility that among the crowns received by the pension plan through the chain of custodians there were some crowns which originated from a short seller and were thus in fact a compensation payment. As outlined in section 3.3.2.2.1 shows, the crowns and ears originating from a short seller are irrevocably mixed with the crowns and ears originating from the company itself. No one in the chain of custodians can separate the total pay-received from his own custodian into the individual sub-sums consisting of real dividends and compensation payments.

The pension plan must therefore assume in good faith that all the Danish kroner it received came from the Danish companies. However, the pension plan has no access to its custodian's account and therefore obviously cannot document whether the custodian has received the dividend or a compensation payment from a short seller, as the Danish Tax Agency requires in the August 9, 2019, page 31.

Because of the seizure of all documents from their custodians, the pension plans can only refer to Sanjay Shah's statement of claim to the High Court in London, also filed on behalf of the individual custodians.

As can be seen from pages 18 and 19 of this pleading, the Solo Group had omnibus accounts with financial institutions, which had their deposits with Danske Bank, among others. Danske Bank itself has an omnibus account with VP Securities. Even Sanjay Shah does not know whether the other custodian banks used by the Solo group also had an account with VP Securities, as he was apparently not a director of the four custodians in the Solo group.

Since neither the pension plan nor its custodians can know how much of the net dividends received for the pension plan actually came from the Danish companies and how much came from short sellers, the requirement set by the Danish Tax Agency (in the summary submission of August 9, 2019, page 31) for documentation of the receipt of the dividends is unrealistic. No one can document how much dividend and how much compensation payment they have received.

**9.5 Withholding tax was withheld in the pension plan dividend payment**

Since Danish companies are obliged to withhold dividend tax, and the pension plan is no more able than anyone else to distinguish between crowns originally derived from a compensation payment and crowns derived from the company itself, the pension plan can legitimately assume that companies in Denmark have fulfilled their obligation to pay dividend tax.

This view is also supported by the fact that the pension plan received only a net dividend.

Ex tuto, it is noted that it is of no consequence to the stockholder's claim for reimbursement whether the dividend-paying company has failed to pay the dividend tax as it should.

Thus, the failure of the dividend-paying company to pay the withheld dividend tax in breach of its obligations does not prejudice the pension plan or its right to dividend distribution.

According to Article 69(1) of the Withholding Tax Act, it is a condition for the reimbursement of dividend tax to the dividend recipient that the dividend-paying company has withheld the dividend tax for which a reimbursement is sought.

As stated in the first Paragraph of the provision, it is a condition that *"under §§ 65-65 D, withholding tax is withheld which exceeds the final tax under a double taxation agreement [..]."*

As follows from the above quotation, it is a condition for the reimbursement of dividend taxes that the dividend-paying company has withheld the dividend tax from the dividend in question.

If the dividend-paying companies have withheld but not paid the dividend tax as they should have, it follows from the case law on non-settlement of withheld but not paid dividend taxes that the dividend recipient is in principle not liable for the non-payment of the dividend tax.

In this respect, reference can be made to the practice concerning the resetting of dividend taxes, see the Supreme Court's judgment of 26 May 1981, published in U 1981.473H, and the Supreme Court's judgment of 22 March 2013, published in SKM2013.294.HR. On the background of the reset institution, reference should also be made to the article by Signe Wesenberg-Lund and Winnie Smidt Pålsson in TfS 2011.618, and the article published in TfS 2011.170.

Further to the above, it should be highlighted that, according to practice, it is a condition for such liability for unpaid dividend taxes that the dividend recipient is particularly closely linked to the dividend-paying company, see Legal Guide 2019-2, § A.D.6 (Reset and liability).

In the present case, there is no basis for denying the pension plan reimbursement of the dividend taxes at issue, thereby effectively holding the pension plan liable for the non-payment of dividend taxes by the dividend-paying companies.

Thus, as the above-mentioned case law shows, there is no legal basis to make the pension plan liable for a non-payment of dividend taxes.

It should be pointed out in this connection that the pension scheme in question had no particular link with the dividend-paying companies, all of which are large listed companies.

The pension plan has of course had no influence - either direct or indirect - on the decisions of the dividend-paying companies regarding the payment of dividend taxes.

It would therefore be totally unjustified in the present case to deny the pension plan reimbursement of the dividend taxes at issue on the grounds that the dividend-paying companies have not paid the dividend taxes as they should.

### 9.6 The pension plan received the reimbursement

Since the tax agent engaged was responsible not only for the request for the reimbursement but also for monitoring it, the reimbursement had to be paid from Danish Tax Agency to the tax agent.

The pension plan had engaged a professional tax reclaim firm (tax agent) to verify that all the conditions for obtaining a reimbursement from Denmark were met and duly documented. The tax agent informed the pension plan about the receipt of the respective reimbursement and transferred all reimbursement amounts to Solo Capital's cash account. This had a discharging effect on the pension plan, as the pension

plan had its account with the Solo Group. In the Solo Group, the receipt of each reimbursement was booked to the account of each pension plan, as were all other transactions (purchase and sale of stocks, receipt and repayment of the cash collateral and payments under the forward contracts). The Solo Group was obliged to do this in its capacity as custodian.

Like the dividend, the reimbursement also fell under the TTC clause, however, without a debt to the custodian, the pension plan was free to dispose of the reimbursement received.

Upon receipt of the reimbursement, the liquidity loss incurred by the pension plan when it purchased the stocks including the gross dividend but received only a net dividend was offset. The gain that the pension plan had realized on the stock trade or forward transaction now also manifested itself in a corresponding liquidity. The pension plan had just closed all positions, as the gain realized so far was now only equal to the amount of the reimbursement. The profit on the stock trade could then cover the loss on the dividend tax if, against all expectations, the pension plan did not receive the reimbursement. At the moment the reimbursement was received, the gain from the stock deal or forward transaction would no longer cover this cash loss and appeared for accounting purposes as a gain. A gain that had the same size as the reimbursement. However, the gain was not the reimbursement.

The realized gain available as cash after the reimbursement was used by the pension plan to pay various services. However, the fact that bills had to be paid for services rendered did not limit the pension plan's ability to dispose of the gain, which was equal to the amount of the reimbursement. The pension plan was responsible for who was paid, when and how much. It was within the pension plans' own discretion whether or not to pay for services received (i.e. to keep the contracts with the service providers).

Moreover, there was nothing to prevent the pension plan from deducting the gain corresponding to the reimbursement amount from the Solo group. For example, if the pension plan wanted to switch to another custodian, it was free to transfer all the assets, including the gain, to another custodian/bank.

However, the pension plan did not manage to withdraw the profit to another bank before the Solo group's business activity was stopped in the summer of 2015. Unable to do business without its servers, Solo Group had to file for bankruptcy and PwC was appointed as trustee. All funds held in the Solo Group accounts were placed under the administration of PwC, which to date has not paid the pension plan its stock of the funds.

However, it is a deprivation of the funds that PWC first wrongly imposed on the pension plan. Until then, the pension plan was unlimited in its powers of disposal over the funds.

### 9.7 Security under custody agreement

Paragraph 5.1 of the custody agreement submitted in the main proceedings, see Appendix 21, states that the pension plan was to transfer an amount immediately to the pension plan's account with the custodians (minimum cash balance) as security for the pension plan's obligations when the agreement was concluded.

This obligation was not foreseen in all versions of the custody agreements used. The custody agreements that Solo Capital started to use did not foresee this condition.

Taking into account that MIFID II _would_ soon enter into force, this minimum deposit requirement was introduced. This was to ensure that all clients could be considered as (semi-)professionals. The introduction of a minimum deposit was not justified to pension plans on the grounds that there should be risks associated with the trading of dividend arbitrage. The risk associated with dividend arbitrage is in fact also very limited, as a forward hedge is entered into on the same day as the stocks are acquired. The pension

plan - and its custodian - ensures through the forward hedge that the stocks can be sold at a fixed price. The price that the forwarder maintains.

The four custodians did not need to enforce a prepayment of a certain minimum deposit as, as specialists in dividend arbitrage, they knew how to manage risks by realizing all the transactions (stock purchases, forward hedges and stock loans) simultaneously.

The Custodian also effectively only incurred a (limited) financial risk until the net proceeds from the stocks were received and thus stood as collateral under the Custody Agreement and the TTC clause.

Since the money is held by Solo Capital under the TTC clause, it is no longer a component of the pension plan's own assets that must be reported to the IRS. "Title Transfer" means precisely that the ownership of the cash is transferred to Solo Capital. The pension plan has thus not breached any reporting obligation in the United States, as the IRS would like to make it appear in its summary statement in the lead cases on page 46.

When and if a pension plan changed custodian (within the Solo group) from one year to the next, the minimum deposit remained with Solo Capital as the parent company and the new custody statements showed an "opening cash balance" of DKK 1,000. This fact has also been established by the Danish Tax Agency itself, which claims that 'the money disappears':

> *"An apparent exception to the lack of profit is Jump Group (SANST j.nr. 18-0004756, Appendix 10, p. 2), whose account with Old Park Lane in 2014 was credited with cash payment/receipts of 927.100,27 DKK and debited with 19.952,02 USD. It is undocumented what these items cover. At the end of 2014, these amounts were apparently in the account of Old Park Lane. However, the amounts disappeared from 2014 to 2015, when Jump Group used a different Shah custodian, namely Solo Capital."*

### 9.8 "Fictitious transactions"

The tax authorities repeatedly refer to the fact that the allegation of fictitious activity is the result of investigations into the records of VP Securities. The pension plan has repeatedly denied that VP Securities is a suitable source of evidence of beneficial ownership of Danish stocks, including the identification of fictitious or real activity.

The pension schemes represented in the lead cases have asked an English expert - Simon Bird - to investigate whether the activity of the Solo companies could be "fictitious." The expert's report - presented here as Appendix 95 - concludes that the claim of "fictitious" activity is not tenable. He also points out that his investigations into the concept of 'fictitious activity' show that this is not a legally unambiguous concept.

The tax authorities claim, without any evidence, that the pension plan did not become the owner of the stocks. It must be for the Danish Tax Agency to prove this allegation of a negative fact (no ownership), since the pension plan has provided not only the evidence of ownership originally requested, but also subsequently all the documents now requested in support of a claim for reimbursement, which is more than can be presented. The pension plan is the only one not to have provided documentation on ownership chains and cash flow, which no stockholder holding its stocks in an omnibus securities account can provide. The pension plan has lifted the burden of proof several years ago. In this context, reference is also made to the above-mentioned burden of proof in these cases.

### 9.8.1 Definition of "notional transaction"

### 9.8.1.1 Fictitious Trade

The Danish Tax Agency claims in the Agency's summary submission of August 9, 2019, pages 5, 12, 50, 52, 54 and 70, as in all of the Agency's previous submissions, that the stock transactions carried out by the pension plans should be fictitious - and should not have led to the pension plans actually becoming the owners of the stocks in question.

While the Danish Tax Agency's submissions in Denmark do not provide many clues as to what is meant by "fictitious transactions" and "beneficial owners," the Danish Tax Agency's submissions in other countries during the civil compensation cases provide more clues as to what the Danish Tax Agency's actual claim may be.

The tax authorities seem to deny the reality of the transactions by assuming that the pension plans must have bought the large stockholdings from short sellers who never delivered stocks to the pension plans' securities accounts, so that the pension plans could not have received a dividend (in the form of a market claim) and were therefore not entitled to a reimbursement.

This starting point is supported by the following assumptions:

1    Pension plans bought stocks from short sellers
2    The stocks were never delivered to the pension plans
3    The pension plans did not receive any dividends (any market claim).

### 9.8.1.1.1 Purchase of short sellers

As will be seen in more detail in the § above (on short selling), no buyer knows whether he is buying from a short seller or a long owner. The pension plan has no contact with the ultimate seller. Moreover, all stocks sold by all the broker's clients are unambiguously mixed together at the broker's premises, so that it is not possible to trace which "stock" came from which seller. Dematerialized stocks are commodities that cannot be individually identified and traced. Finally, the owner-matching trades carried out by brokers mean that pension plans always buy from a long owner. None of the brokers sold the stocks short. They were not market makers.

### 9.8.1.1.2 Delivery of stocks bought by short sellers

Even if some of the stocks purchased by the pension plans ultimately originated from one or more short sellers, all stocks were delivered to the pension plans' securities account in the Solo group. At the latest at the time of delivery, only one civil law owner of the stocks remains.

For tax purposes, the pension plans are also the beneficial owners of the stocks, because the pension plans did not know whether - and if so, which - of the stocks purchased the short seller had borrowed in order to deliver.

Furthermore, upon delivery to the pension plans, the legal ownership of (and right to repurchase) the stocks by the stock lenders ends and the pension plans become the sole legal owners of the stocks.

### 9.8.1.1.3 Receipt of dividends (market claim)

As the pension plans received the stocks in their securities account and were also the last buyers of the stocks on the date of issue (the date of the General Meeting), the pension plans also received the dividends from the companies. Whether the dividend received by the pension plans was a compensation payment

from a short seller or the dividend originally paid by the company itself is not known. Least of all the pension plans themselves.

Therefore, the pension plans cannot be required to prove that the amounts they received were not compensation payments, but original dividends from the Danish companies.

### 9.8.1.2 Fictitious agreements

The Danish Tax Agency's theory of fictitious transactions can also be interpreted to mean that the Agency believes that the pension plans either did not issue any orders to purchase stocks or, if they were issued, they were not directed to a purchase of stocks but directed to making it appear that the pension plan intended to purchase stocks.

With such a definition, the Danish Tax Agency would be guided by the concept of "Scheingeschäft" as defined in Germany. In the European database eur-lex.europa.eu and on the European Parliament's home page, europarl.europa.eu, the German term "Scheingeschäft" is translated precisely as "fictitious transactions," "financial operations," "phantom operations" or "supposed transactions" which are not based on factual circumstances (are not the result of the actual intentions of the parties concerned).

Considering that Germany, after many years of experience in the investigation of ex-trading, must be considered as a leader in Europe, it can be assumed that the tax authorities are influenced by the language of the German authorities.

The Danish Tax Agency does not only encounter the problem that German law differs substantially from Danish law as regards the conditions for acquiring ownership of stocks (see above). The Tax Agency is also led by the German allegations that the cum ex transactions are so-called "Scheingeschäfte," without a similar concept existing in Danish language and much less legally defined.

Under German law, "Scheingeschäft" is defined both in tax law (§ 41 Abs. 2 AO), and in civil law § 117 BGB (cf. BFH BStBl 1985, 33; 2004, 622; Klein, AO, 13. edition p. 42 Nr. 42). According to this, a 'sham transaction' is one in which the contracting parties, by common agreement, merely make it appear that a legal transaction has taken place, but the parties do not intend, by common agreement, to give effect to the legal effects normally associated with the legal transaction (BGH NJW 1982, 569; 2002, 1963). This is particularly so in view of the fact that they agree not to intend what they declare and that declarations are only made in order to pretend that what one declares corresponds to one's real intention (BFH BStBl 1997, 655; BFH/NV 1988,151; 2007, 2233).

In the cases in question, however, there are no external circumstances (circumstantial evidence) to suggest that the pension plans have reservations about not wanting the legal effects of the agreements (purchase contracts, forward contracts and stock loans). On the contrary. The pension plans would acquire ownership of the stocks and thus fulfil the conditions of the double taxation agreement with Denmark. The pension plans and the respective contractual counterparties wanted all the legal effects associated with the agreements concluded. These legal effects were also realized as the stocks were registered in the securities accounts of the pension plans.

Where a person makes a declaration of intent which has certain legal effects and the person intends both to give effect to those effects and also to the possibility of doing so, there cannot be fictitious acts or agreements. If the will to produce the effects is present and the person has the power to cause the effects to be produced, the agreement concerning those effects is also final and binding and produces the effects intended by the agreement.

### 9.8.2 Trade organized by Solo

The tax authority's claim of fictitious trading arranged and controlled by a clearing agent (Solo) turns the reality and rules of stock trading on their head, as:

- The fund broker receives an order (instructions) from his client (the pension plan)
- The fund broker sends instructions to the clearing and settlement agent on clearing the trade
- The Clearing and Settlement Agent is a mere recipient of instructions from the Fund Broker and cannot thereby arrange, cause or control the transaction. Clearing and custody comes last in the chain of services.

The tax authorities' allegations about internal bookkeeping and a lack of flow of stocks and money are untenable, as these allegations refer to the post-trade process (i.e. clearing and settlement), which only takes place after the buyer has become the owner of the stocks. Ownership is transferred by the final and binding purchase agreement. Clearing and settlement are thus in principle irrelevant for the acquisition of ownership of the stocks, as they are processes leading to a registration of the already acquired ownership with a custodian.

In this context, it should be noted that the entity exclusively responsible for clearing and settlement is subject to the following prohibition under Article 37(3) of the CSD Regulation: "*Overdrafts on securities, debit balances and securities creation are [...] not permitted in a securities settlement system operated by a CSD.*" This also applies to an investor CSD such as the companies in the Solo group, pursuant to Article 192(2) of the Capital Markets Act. It is therefore impossible for a regulated and controlled UK investor CSD to have credited Danish stocks to the account of a pension scheme without having debited the same to another securities account. This would have been detected and prevented by regular supervision of the firm under FCA regulations.

Even if the FCA's ongoing monitoring of the Solo group had not revealed a lack of cover for the transactions in the accounts, the thorough investigation of the Solo group's servers after 2015 by the FCA, the UK prosecutors and SØIK would have produced evidence of this and led to corresponding criminal proceedings.

The trade and transaction reports submitted and received by the FCA and the LSE respectively further demonstrate that the brokers, clearing agents and custodians were not simply carrying out "internal bookkeeping." The records of the stock transactions in electronic form were reported to the competent authorities as required by the relevant legislation.

The clearing agent and the custodian, contrary to what the Danish Tax Agency claims, settled the purchase contract concluded by the independent broker and thereby secured the ownership of the stocks already acquired by the pension plan. The solo group did not carry out any fictitious transactions but ensured that the excess number of owners of Danish stocks which might have arisen from the purchase of stocks from short sellers was brought back into line with the number of stocks issued by the Danish companies.

### 9.8.3 Fictitious stocks - short selling

As explained above in § 7, short selling leads to multiple civil law owners of Danish stocks, from the time the purchase contract is concluded to the time the stocks are delivered during the settlement of the trade.

If the Danish Tax Agency cannot approve the concept of multiple owners of the same stocks, the Danish Tax Agency will necessarily come to the conclusion that there must be more stocks outstanding than issued by the companies.

However, these stocks are far from fictitious, as the Danish Tax Agency claims in the summary submission of August 9, 2019, page 21. They are real, they are traded, and they give entitlement to registration in the purchaser's securities account and entitlement to dividends (provided the purchaser is the last purchaser on the dividend date). They are no different in fact, in reality or in law from stocks issued by the companies themselves. They suffer only from a single defect: They are not (yet) protected against third parties, as they are not yet registered in a securities account. However, stocks issued by companies themselves also suffer from this deficiency in the period between the sale of the stocks (by a long owner) and the registration of the transfer of ownership on the securities account.

Stocks sold by short selling are also effectively indistinguishable from stocks sold by a long owner seller. The only person who can see the difference between the stocks is the short seller's custodian and clearing agent, who can see that the short seller does not have the stock at the time of the sale and the clearing agent therefore guarantees that the stock sold will also be delivered. However, the stock that the custodian posts to the buyer's account is always a genuine stock issued by the company. The excess number of stocks held in the trade cannot be re-registered in a securities account.

However, short selling may result in there being more than one legal owner of the stocks, as the stock lender cannot know whether the stock borrower is selling the stocks to a third party buyer who is acting in good faith and thus does not know that the stocks he is buying are only borrowed. In many cases, the beneficial owner does not even know that his stocks are on loan, since many banks have (or had) included in their general terms and conditions the right to lend or even sell the stocks to third parties without informing the depositary. In this case, it is the bank that compensates its customer for the dividends received. The stocks which the buyer receives on his securities account are also in this case the stocks issued by the company itself. Other stocks cannot themselves be registered in a securities account.

At the moment when the pension plan's stock purchases were all settled and the stocks were registered in its account, they were undoubtedly genuine stocks issued by the Danish companies owned by the pension plan.

**9.9 The Tax Agency's erroneous assumptions about the process**

In its summary of August 9, 2019, the Danish Tax Agency describes in § 5.4, pages 34-35, how it believes the process for purchasing stocks should be, thereby reproducing - again erroneously - what the pension plans in the lead cases have previously written.

The Danish Tax Agency thus claims:

> *The pension plan claims (5th submission, page 12, point 3 and § I.1.1.7) that a purchase order has been placed with the custodian/clearing agent, which is part of the Solo group. No evidence of these purchase orders has been provided. Once the custodian has approved the order, the order has been placed with an executing broker.*

This quote is wrong.

The Pension Plan has never alleged that the purchase order is placed with the custodian/clearing agent. The purchase order is, of course, placed with the broker. The clearing agent is simply informed that the order has been placed so that the clearing agent can give a pre-commitment to settle the trade if it is matched. Once the clearing agent has given its settlement commitment, the broker matches the order that he already has from the pension plan.

The trade note actually documents that the trade has been matched, and since no one can prevent the settlement after the matching has taken place, a broker confirmation is also a confirmation of the settlement

("execution," as the Danish Tax Agency wants to call it). Therefore, a broker confirmation also contains information about the settlement date.

On page 35, the Danish Tax Agency continues with an incorrect description of how a trade takes place:

> 1. *"The pension plan places an order (e.g. for purchase) - possibly after approval by the custodian*
> 2. *The broker matches the pension plan with a co-contractor (e.g. a seller)*
> 3. *The broker makes a trade note (broker confirmation)*
> 4. *The transaction is carried out 8settlement) in accordance with the agreement"*

This is not correct.

The broker does not match a pension plan with a counterparty. What is matched are the respective orders.

Should the Danish Tax Agency have thought that it was the orders that were matched and simply forgot to write the word "order," we must now note that clerical errors also happen to the Danish Tax Agency itself. When this happens to the Danish Tax Agency itself in a post of "only" 76 pages, it is all the more natural that typing errors also occur in thousands of pages of broker confirmations.

The Danish Tax Agency continues on page 35:

> *"If everything had been done nicely and properly, the trade should be executed (settlement) on the terms indicated in the trade note (unless there is an error in execution). In other words, the trade note (for real trades) should determine the terms of the trade."*

The fundamental mistake made by the Danish Tax Agency here is that settlement is not made on the basis of a broker confirmation, but on the basis of a separate electronic settlement instruction issued by the trading platform where the orders were matched. It does not matter what is written on a broker confirmation for the settlement of a trade. The clearing agent does not see the broker confirmation. It is sent as documentation from the broker to the client (the pension plans).

The example constructed by the Danish Tax Agency, where "you book a train ticket to Aarhus, get on a train to Malmö and still get taken to Aarhus," is as wrong as the rest of the Danish Tax Agency's claims about broker confirmations. A broker confirmation is neither to be compared with a train ticket nor to be compared with getting on the wrong train. If you want to compare a stock purchase with a train journey, a broker confirmation can at most be compared to a handwritten receipt for the train ticket to Aarhus. However, you still get on the right train and have the right ticket.

**9.10 Stock purchases were completed**

The Danish Tax Agency's claim that it has not been proven that the pension plan's stock transactions were settled, i.e. that the stock transactions were carried out by exchanging the parties' services (stocks and money), is incorrect.

The documentation for settlement is the custody statements provided.

It can be ruled out that the seller was not entitled to sell the stocks purchased by the pension plan and that there could therefore be a disqualification, since the pension plan in fact received the stocks in its securities account. This is precisely what the custody statement shows.

In its summary of August 9, 2019, the Danish Tax Agency points out in point 5.5 on page 42 that

> *"there is no evidence that at any time stocks were held in a custodian of the pension plans."*

This is a simple unsubstantiated claim by the Danish Tax Agency.

The custodian of the pension plans did not have its own omnibus account with VP Securities. For the same reason, VP Securities also confirms that it cannot confirm that the pension plans have been owners of Danish stocks.

However, VP Securities <u>does not</u> confirm that it can exclude that the pension plans have been the owners of the Danish stocks. This is precisely because of the omnibus accounts and the settlement of stock transactions during the application of netting.

Admittedly, VP Securities has confirmed that the pension plan custodians did not themselves have an account with VP Securities. However, this does not automatically mean that the custodians in question did not hold any stocks in custody. Whether they held stocks in custody can only be confirmed by the four custodians themselves, because only they know for sure where they held their respective securities accounts - with which they sub custodian.

If SØIK had not found any stock deposits for the four custodians on the computers seized in 2015, it must be assumed that SØIK would have documented this to the Danish Tax Agency. Such documentation could in no way prejudice the criminal investigations.

The absence of such confirmation must be interpreted as meaning that SØIK has in fact found all the necessary stock deposits.

A custody statement and a dividend credit advice (DCA) are not just, as claimed by the Danish Tax Agency, "words on paper." Rather, they are documents issued as a result of an irreversible process that is set in motion when a buy order is matched with a sell order. The electronic trading platforms then provide an automatic signal for settlement and the result of the settlement is a custody settlement and a CDA when the exchange is received. Under the control of the UK FSA, trading systems cannot be set up that do not actually trade in stocks. The required "trade reports" and "transaction reports" to the London authorities would have revealed any "fictitious activity."

There is absolutely no reason to suppose that the documentation is just words on paper and the whole thing a "desk exercise" - as claimed in the Danish Tax Agency's summary submission in § 6, page 47. For if it were indeed as alleged by the Danish Tax Agency, then one must seriously question why the Solo Capital Group/Sanjay Shah even bothered to onboard so many customers. If Solo Capital simply printed false papers, there would be no need for any money plans.

That the Danish Tax Agency also takes this view is demonstrated by the fact that, from June 2015 until the civil summons in the case in the summer of 2018, it was constantly denied that the pension plans existed at all. The Tax Minister and Danish Tax Agency spoke publicly about "fictitious pension plans."

With the civil suits, the Danish Tax Agency necessarily had to admit the existence of the pension plans, but now retreats on equally untenable claims of "fictitious trades" or "fictitious actions."

**9.11 Longer settlement period than VP Securities**

First of all, the representatives of the pension plans would like to point out that the confusion that has arisen in the previous cases regarding which settlement period was used is solely due to the representatives' own lack of information at the time when the individual submissions had to be sent to the Danish Tax Appeals Agency.

As the Treasury correctly points out, and as described above in § 2, OTC trades were generally settled with a day's longer delay than VP Securities - and other national CSDs - use.

However, a longer settlement period does not mean that a trade is not "market-conform." Even less is it evidence of fraud.

The only consequence of a longer settlement period is the internationally recognized and well-functioning "market claim": the proceeds are passed on from the seller's custodian to the buyer's custodian when the stock trade marked "cum ex" is settled in the custody system. None of the international securities settlement systems has problems settling equity trades with any settlement deadline. Were it otherwise, regulators - not least from the EU - would have introduced a mandatory settlement deadline.

The absence of such a statutory winding-up period means that the parties are free to agree on the winding-up period. There is nothing fraudulent or risky about this.

If you check the websites of the major clearing agents (e.g. Euroclear: ttps://www.luxcsd.com/luxcsd-en/products-and-services/market-coverage/europe-t2s/belgium/settlement-services-belgium-euro-clear-belgium-- 1279750 or Clearstream https://www.clearstream.com/re-source/blob/1316782/08a424c5b61fe77d19385e550a56a842/compensation-hand- book-cata-en-data.pdf), one sees that they have incorporated a flagging system that allows them to handle trades around the dividend date correctly (namely marked "cum ex"), no matter how long a settlement period is agreed.

There is no "risk," as the Danish Tax Agency claims in the summary in § 5.6, page 43, that pension plans "exploit the timing" of distributions in the Danish market. All world stock markets operate with long settlement periods and deal with this by transferring the dividend as a "market claim" to the buyer. All custodians can handle this.

Even VP Securities knows the market claim process and can handle it. Better disclosure by the Danish Tax Agency, by informing VP Securities about the "market claim process, could save us all from these untenable allegations that stem solely from the Danish Tax Agency's own ignorance of how the stock market works.

The problem faced by the Danish Tax Agency is not a settlement deadline that is not "market compliant," but rather a tax law that cannot handle the market claim process when dealing with net dividends.

When the dividend is sent out of VP Securities and further into the settlement system as a net dividend, this will always mean that the market claim procedure may result in the dividend being received by a person who has a completely different tax status than the one VP Securities used when calculating the dividend tax.

So, there is nothing wrong with a long settlement period. The problem lies in the market claim procedure, which the Danish Tax Agency cannot handle. Presumably because the tax authorities (or the legislator) do not understand this process.

The market claim process also involves no additional risk for the buyer of the stocks, as the dividend is automatically passed on by the custodians involved from the seller to the buyer. The risk of the seller not transferring the dividend to them, as pointed out by the Danish Tax Agency, does not exist at all. The seller himself has no influence on this. The settlement systems take care of this fully automatically.

We recommend that the tax authorities inquire with VP Securities about how real stock trading is done in the real world and how it is handled. Then everything that "makes no sense" (see pages 17, 23, 27, 30, 35, 36, 38, 44, 45, 47, 50, 52, 58, 60, 61, 63 and 72) would become clear to the Danish Tax Agency. It is simply too simplistic to claim that financial transactions carried out every day by hundreds of operators around the world - including the world's largest banks - should not give rise to any misunderstanding. Of course, they make no sense to anyone who does not understand financial transactions. Nor does Chinese make sense to anyone who has never learned the language. Yet Chinese is spoken by some 1.1 billion people. And that is how these transactions are carried out.

As evidence of this, reference can be made to ESMA's report of July 02, 2019 (see Appendix 83), which demonstrates the existence of dividend arbitrage and the threat that these trades pose to countries whose legislation does not match the realities of equity markets as created by the EU's own harmonized legislation.

**9.12 Not just a desk-top exercise**

The Danish Tax Agency considers that it can conclude in the preliminary cases that all stock transactions should be a desk exercise, simply because they have observed a certain systematicity.

In reality, the system observed is nothing more than an expression of genuine profit arbitrage.

**9.12.1 All pension plans buy for the same day and at the same price**

The Tax Agency considers that it is a sign of fraud that all pension plans have purchased stocks on the same day and at the same price, see the Danish Tax Agency's submission of August 09, 2019, § 4.1.

This is obviously not true.

It is a matter of course for all investors in dividend arbitrage to buy stocks at the latest on the dividend date. There is certainly nothing remarkable about this, but it is an indication of genuine dividend arbitrage at market conditions. The sellers of stocks, who do not have access to a double taxation agreement, do not sell their stocks until the dividend date.

As described above, it is also necessary to trade huge amounts of stocks to realize any gain at all when the difference between spot and forward prices is as minimal as it is in dividend arbitrage. Such large volumes of stocks can only be traded OTC to avoid the risk of spot price movements and allegations of market manipulation.

Setting the OTC price as the market closing price, as the Danish Tax Agency correctly acknowledges in the summary submission of August 9, 2019, page 48, is only logical if the price is to be fair to both parties and

not risk being undercut as not fair. Thus, the Danish National Tax Tribunal's decision also admits on page 49 that it is not unusual to use the closing price for stock trades.

It is therefore unclear what the Danish Tax Agency actually wants to claim when it is established that the stocks have been traded at the same price, namely the market closing price.

The fact that in 15 cases out of about 1,400 a different exchange rate was used also confirms that this is not a centrally organized fictitious trade.

It is striking that the Danish Tax Agency considers both the use of the same rate and the use of different rates to be signs of fraud. That cannot be right. It must be either/or. The Danish Tax Agency must decide what is to be regarded as an indication of fraud: the same price or different prices. It cannot possibly be both.

This shows how desperately the Inland Revenue is trying to drag out every aspect of the stock transactions to claim that no matter how the pension plans had traded, the Inland Revenue believes it is fraud. This shows that the tax authorities have decided in advance that fraud is involved, - regardless of how the pension plans have acted. The IRS is impossible to please. The tax authorities have decided that the pension plans must be guilty, but they just don't know in what.

There is therefore nothing striking in the fact that the pension plans, which all invested in dividend-paying securities, had similar trading patterns. After all, many of them had the same trustees.

In addition, the automation of trades in 2015 with the introduction of algo trading leads to harmonized trading. There is nothing suspicious about this.

The Treasury rightly recognizes that it takes quite a lot of work to gain access to stockholdings of such significant size. This work is also done, months before the actual trade is concluded, by entering into contracts with brokers who can provide what they call "liquidity," i.e. enough stocks to match the trades.

Pension plans must recognize that brokers are also likely to enter into agreements with short sellers who wish to speculate on price movements around the dividend date. How many, and which stocks bought by pension plans, in the end really came from short sellers, and how many came from long owners, pension plans cannot know.

Nor do the pension plans have any reason to "close the deal" with the sellers as soon as possible in order to "retain" the sellers, as the Treasury claims in the summary, page 49, because the seller's clearing agent and custodian are liable for the stocks also being delivered on the settlement date at the agreed price. These are market conditions for all stock trading throughout the world, about which the Danish Tax Agency is apparently unconvinced.

### 9.12.2 The size of the stockholdings

The pension plans have never denied that their stock trades were systematic. Systematic, however, does not mean fraud or deskilling, as the tax authorities would like to call it. "Systematic' means no more and no less than a well-organized trading desk, such as exists in every other bank.

The fact that the algo trader did not suggest that all trustees buy the same number of stocks for the same client is not to "cover up" anything. It is done to give all the actors involved (clearing agents, custodians,

brokers and arrangers etc.) a better opportunity to distinguish between the different orders placed on behalf of the different pension plans. This reduces the risk of errors.

Of course, in 2012-2014, each trustee himself used similar techniques to ensure that he did not confuse the stockholdings belonging to the various pension plans.

Since the dividend date triggers the purchase of the stocks, and as explained above, this occurs at the same price, the different numbers of stocks are neither more nor less than an element to ensure the management of such large stock portfolios for so many pension plans. After all, it was more the exception than the rule for a trustee to manage only one pension plan.

Once again, the Danish Tax Agency is distorting the facts of the case to suit its argumentation: if all pension plans had bought the same number of stocks, this would have been used against them as well.

The Danish Tax Agency notes in the Agency's summary at the bottom of page 50, by the way, completely outside the other systematics of the submission and unrelated to the number of stocks purchased by each pension plan:

*"In all cases, pension plans manage to find*

- *one seller,*

- *one buyer,*

- *one stock borrower and*

- *one forward contracting party,*

*who will trade these quite abnormally large stockholdings for precisely the amounts that the pension plan has "wanted." This applies to these very substantial stockholdings - and in all cases.*

*This means that pension plans have never failed to find co-contractors for large transactions. And it means that at no time has the pension plan had to split the transaction in two or only partially complete the transaction.*

*It can't be done for just one pension plan. Nor can it be done in so many cases. The pension plans' claim is therefore unrealistic to the second degree."*

Again, an example of how little the tax authorities still understand about dividend arbitrage and how arrogantly they present their ignorance.

Firstly, the tax authorities can only see those orders that have been matched and where the pension plans have therefore acquired ownership of the stocks. Stocks that the pension plans have not purchased do not give rise to a dividend claim, much less a reimbursement claim. It is therefore only natural that the tax authorities cannot see transactions that have not been realized.

At no time did the pension plans claim that all of their purchase orders were matched. Examples of purchase orders that were not matched are provided as Appendix 78.

As regards the Danish Tax Agency's repeated assertion that it does not believe it is possible to find a seller, a buyer for the forwarder and a borrower for the stocks, reference can only be made to the above, which describes the number of intermediaries with whom contracts are concluded before the actual transaction starts.

Pension plans knew that by becoming clients of the Solo Group, they had access to highly specialized brokers, clearing agents and custodians who had access to the contractual counterparties necessary for transactions to succeed. This was the high price they paid.

### 9.12.3  Almost identical stock portfolios

The fact that the Danish Tax Agency in the first cases in the summary in § 6.3 can state that the pension plans have had almost similar portfolios is a logical consequence of (1) their strategy was dividend-paying, which is why they all just bought stocks in companies that distributed a dividend, and (2) the algo trader, who in 2015 suggested which and how many stocks each pension plan should buy. The computer was programmed to do that. That doesn't mean the trades didn't happen.

The 12 stocks bought in 2014 and the two traded in 2012 are also a clear indication of dividend arbitrage. The trader (trustee) chooses which of the stocks to buy on behalf of the pension plans that specifically pay dividends.

The tax authorities' findings are not evidence of a desk exercise, but documentation of real stock transactions.

### 9.12.4    All pension plans have dealt with the same parties

Few comments are needed to answer why the pension plans traded with the same partners: since these are owner-matching transactions, the sellers (and later the buyers) of the stocks are always the pension plans' brokers.

The counterparty to the forward contract was also a professional intermediary, like the stock borrowers.

All counterparties were not the ultimate counterparties but professional intermediaries in their respective industries.

In order for the clearing agent to be able to guarantee the financial risk of a failure (i.e. that the necessary capital would not be available to pay for the stocks on the settlement date), it was of course a condition that all parties - i.e. the pension plans and all intermediaries to the various transactions - were clients of the Solo group. By having all parties as customers, the Solo-group did not need so much capital under the Basel 2 requirements (international requirements for a minimum capitalization of financial institutions).

### 9.12.5    Same time of sale

The fact that all pension plans sold their stocks at almost the same time is also not evidence of fraud, but rather evidence of the reality of the individual components of dividend arbitrage.

The pension plans bought the stocks at the same time and thus had almost the same financing conditions - as they depend on current market conditions. In other words, the cost of funding at the same time has absorbed the previous gain on the transactions. The evolution of the market is the same for all pension plans and therefore has the same consequences for all pension plans. They more or less simultaneously reach a zero return on investment and have to close all positions (see above).

**9.12.6   Sanjay Shah controlled the custodians of the pension plans (Solo- group)**

The tax authorities state in the summary submission of August 09, 2019 in § 6.6, page 55, that the pension plans should have changed their explanation about the four custodians.

This is not correct. The pension plans have not changed their explanations, they have added additional information that they have received between the various submissions. The pension plans have - as a result of the fact that the tax authorities have now for several years been making assumptions and accusations against the pension plans - been forced to investigate the links between the custodians used more closely. In order to carry out dividend arbitrage, it is completely irrelevant to the pension plans which company belongs to whom and what their relationship is.

By consulting an expert in London (Simon Bird), who has prepared a report, see Appendix 95, the pension plans in the lead cases have been informed that Solo Capital was already established in 2009 and not, as claimed by the Danish Tax Agency, in 2011. Solo Capital then acquired the specialist firms Telesto, Old Park Lane and West Point Derivatives in the period 2012-2015. These companies already existed and were each authorized by the UK FSA to act as clearing agents and custodians. After they became subsidiaries of Solo Capital, they held their omnibus accounts with Solo Capital and no longer directly with external custodians. The external omnibus securities accounts for the whole group were, according to Simon Bird, established in the name of Solo Capital.

Pension plans did not know this in 2014 and 2015, nor did they need to know it.

It is a feature of all the Danish Tax Agency's submissions that irrelevant claims and unsubstantiated allegations are constantly being made, which the pension schemes are having to take great pains to comply with. When they succeed, the Danish Tax Agency turns around and claims that the pension plans contradict themselves - with the new knowledge they have acquired thanks to the investigations carried out under pressure from the Danish Tax Agency. Alternatively, the Danish Tax Agency claims that the pension plans have not met the burden of proof or have failed to respond to a request if the document provided by the Danish Tax Agency cannot be produced - for purely practical reasons, or simply because what the Danish Tax Agency requires to be documented cannot be documented by any human being on earth.

It is also striking that the Danish Tax Agency is again trying to discredit the credibility of pension schemes and the evidential value of their documentation by referring to investigations by the Danish, British and German police. However, an investigation by so many authorities over so many years with no apparent result does not exactly support the Danish Tax Agency's assumption that there is something illegal in Sanjay Shah's companies. If his companies had not settled stock transactions, but merely drawn up false documents, it must be assumed that the prosecuting authorities in three countries could have detected this after four years. Not least because they are in possession of all the documentation that the pension plans lack: the computers on which the transactions were recorded.

**9.12.7 Shah's "Universe"**

The Danish National Tax Tribunal's decision presents a long history of the "Shah's Universe" in the summary post of August 9, 2019.

In this regard, it should first be noted that these cases do not concern Sanjay Shah and his company. He is a party to the civil actions in London and Dubai and is himself defending his case there. It is not for the pension plans to answer questions about the owners of the companies of which they were merely clients.

Nor can they do so without the Treasury again making claims that any information or corrections the pension plans would retrieve regarding the Treasury's fabricated stories about a "Shah universe" would be evidence that the pension plans and their custodians were acting as a conspiratorial "gang."

However, the Pension Schemes have obtained from the High Court in London Sanjay Shah's own 204 page pleading dated May 2019, in which he sets out in detail his position on all the claims made by the Inland Revenue, see Appendix 85. Further, the pension plans have nothing to add to this voluminous document.

As detailed as Sanjay Shah describes every step his companies took in settling the equity transactions on behalf of the pension plans, the pension plans cannot even describe the post-trade process. The pension plans only know that they have given instructions for settlement, but how this is done they cannot describe. The pension plans must therefore rely entirely on the evidence presented by Sanjay Shah in London.

As can be seen, the conduct of business of the four custodians in the Solo group was organized so as to comply strictly with European and English laws and regulations on stock dealing.

It is further seen that the business conduct of the Solo group is similar to the typical dividend arbitrage as described by ESMA.

As described by Sanjay Shah, the clearing/settlement, custody of the stock traders was carried out in full compliance with the Unidroit guidelines laid down in the Geneva Securities Convention - presented here as Appendix 96, which is the applicable law - also for Denmark, which has been a member of Unidroit since 1940. According to this Convention, the electronic registration of stock entries with a custodian evidencing ownership of the stocks cannot be false (see Articles 10, 16 and 18). The most central rules of this Convention are also found in EU rules, in particular in the CSD Directive and the Finality Directive, thus ensuring legal certainty in the settlement of stock transactions within the EU.

### 9.12.8 Consecutive numbering of Credit Advices across the Solo group, which was also reversed in 2017

The tax authorities state that the four custodians belonging to the Solo group have issued DCAs with consecutive numbers. As the Danish Tax Agency has correctly stated, there are no duplicates in the numbers of these four custodians. The Danish Tax Agency has also found "gaps" in the numbering, which apparently were not used, but which the Danish Tax Agency notes must have been issued to the 34 pension plans that filed dividend tax reimbursement claims in February 2017.

This fact *does not suggest that* Credit Advices is centrally orchestrated. Nor does it indicate a lack of reality or fraud.

It is only evidence that the four companies belonging to the same group of companies used the same "back office" to issue DCAs for the four companies. It is evidence that the four custodians worked together with regard to various administrative tasks such as issuing documentation to the clients. This is an expression of work rationalization and cost savings.

The fact that no duplicates have been issued and that the DCAs submitted by Alpine Consultancy in 2017 fit into the "gaps" identified by the Danish Tax Agency is precisely evidence that the four custodians must have used the same IT service provider or software to issue the DNAs and that this software or IT service provider worked flawlessly. No DCAs with the same number were issued for the four custodians (hence no duplicates) and all numbers were issued without "gaps."

It is logical that the DCAs submitted in February 2017 fit into the numbering, as the 34 pension plans must have traded the Danish stocks at the same time as the other pension plans that had previously submitted claims for reimbursement - and had them granted.

Since the pension plans are not part of the Solo group, they cannot, of course, provide the internal agreements required by the Danish Tax Agency on a central administration to issue all DCAs. If the pension schemes were able to provide these internal agreements, the Danish Tax Agency would use this as indicative evidence of the pension schemes' lack of independence from their custodians.

However, there is nothing strange in the fact that the central administration issues DCAs on each of the four custodians' own letterheads and that each custodian has its own layout. They were, after all, independent companies each with its own distinctive character. They had absolutely no reason to use the same layout, and certainly no reason to use a common name, when 'ordering' or 'withdrawing' their DCAs from the central administration.

The use of consecutive numbering, on the other hand, demonstrates that an additional safeguard was built into the Solo group to ensure that two pension plans could not receive a DCA for the same asset item. Each stock item had its own number across all four companies.

Moreover, the pension plans have never claimed that the four custodians are four independent companies. It is the pension plans themselves that have introduced the concept of the 'Solo Group'.

**9.12.9 Pension plans are not managed centrally**

The tax authorities claim in the summary statement, page 61, that the pension plans should have claimed that they were all *completely* independent of each other.

This is not correct.

Pension plans have never claimed to be **all** completely independent of each other.

The pension plans knew that they had contact with <u>some of</u> the other pension plans through the same trustee.

However, they were not and are not all in contact with each other, and much less are TVC Law Firm's clients in contact with other pension plans that were clients of other brokers, custodians, clearers, etc. and similarly invested in dividend arbitrage. The pension plans have noted with surprise how many other U.S. pension plans that have followed the same investment strategy in dividend arbitrage in Danish stocks, when the IRS went out and subpoenaed 470 individuals and companies worldwide in connection with this activity.

The fact that 110 pension plans have all engaged the same lawyer is far less a sign of their lack of independence from one another - least of all for their alleged dependence on their custodian. TVC Law Firm is not engaged by the pension plans' custodian. TVC Law Firm is engaged by the pension plans' trustee. That 110 pension plans find the same lawyer is more a sign of how complex a case this is, and thus how difficult it is to find Danish lawyers who can explain dividend arbitrage. A business that the tax authorities themselves and their lawyer to this day quite obviously still do not understand.

Moreover, the public campaign in all media does not make it easy to find lawyers willing to get involved in these cases in which it seems that pension plans are "doomed" in advance. A fair trial is virtually impossible with the public mood against the pension plans. Not many lawyers are willing to litigate such a case.

Finally, it should be noted that the Danish Tax Agency's reference to the pension plans submitting identical letters in the appeal cases (see the Danish Tax Agency's summary of August 09, 2019, page 48) is merely a logical consequence of the fact that Danish Tax Agency itself started by sending identical letters to all pension plans to inform them that Danish Tax Agency intended to revoke their previous decisions and that the revocations of the decisions themselves were also identical. Danish Tax Agency even sent identical letters to all pension schemes, irrespective of the custodian they had used. Logically, an administrator would reply to all identical letters from Danish Tax Agency with identical letters.

**9.12.10 Non-submitted applications for reimbursement**

The Danish Tax Agency states in the summary submission dated August 09, 2019, § 6.11, page 62, that two pension plans represented by U.S.(The Sanford Villa Pension Plan, the Danish Tax Appeals Agency Case No. 18- 0004776, and The Patrick Partners Conglomerate Pension Plan, the Danish Tax Appeals Agency Case No. 18- 0004361) "apparently failed to seek dividend tax reimbursements" for their stock holdings.

In this respect, the Danish Tax Agency considers that it should not give

> *"an opinion that the pension plans could miss out on being paid such substantial amounts,*
> *which allegedly were used to cover significant costs associated with this arrangement, or*
> *which the pension plans should in any event believe they are entitled to if they maintain*
> *that they are entitled to the reimbursements at issue in this case."*

We can inform you that this is by no means an oversight.

Sanford Villa Pension Plan had simply not yet received its U.S. tax certificate 6166 in August 2015, when Danish Tax Agency stopped all reimbursements with allegations of fraud, see <u>Appendix 97</u>.

As the pension plan had closed all positions in time to realize only a zero result without reimbursements, the pension plan decided not to submit further claims for reimbursements for reasons of prudence. The Danish press was already full of the unconfirmed allegations of fraud.

As the Treasury press briefing shows, when individual pension plans decided in 2017 to request the remaining reimbursements to which they were legally entitled before they would have lapsed, pension plan fears about the public narrative they would invent regarding their requests were well-founded. The 2017 requests were widely reported as "further attempts at fraud." Again, without any form of evidence to support this.

As for The Patrick Partners Conglomerate Pension Plan, the pension plan has not forgotten to apply for reimbursement. This pension plan had handed over all documents to Syntax to request re-merger. Syntax has confirmed by email to Roger Lehman (which is presented here as <u>Appendix 98</u>) that the reimbursement request including the DCA, see <u>Appendix 99</u>, was submitted to Danish Tax Agency on May 19th 2015.

As described above, the investment strategy ensured that a lack of reimbursement would not result in a loss if the reimbursement was not paid. The trustee closely monitored price movements and also that he could close the positions before a failure to reimburse would result in a loss without the merger.

The other service providers, who received the majority of the gain realized from the arbitrage, were compensated based on the gain. This was 0 without the reimbursement. Therefore, the pension plans could easily survive the non-payment of a reimbursement.

**9.13 A dividend tax can lead to two reimbursements**

As explained earlier in this post, the shortcomings of Danish tax law may result in the Treasury receiving only one dividend tax payment, but there being two beneficial owners of the same stock and therefore two recipients of a net dividend and consequently two beneficiaries.

The losses that this rightly imposes on the Treasury are not a consequence of any doubts as to who is the owner of a stock, as alleged in the Agency's submission of August 09, 2019, Paragraph 8.4, page 69. There is no doubt who the owner is and that there can be two owners of the same stock as a result of Danish legislation and case law.

These shortcomings are not the responsibility of the pension plans, and the losses that it incurs for the State must also be borne by the State itself. It is the responsibility of the State to legislate properly and to ensure that it collects enough tax to match the amount it has to pay out.

**9.14 The case is about law**

The Danish Tax Agency argues in the summary submission of August 09, 2019 in § 8.5, page 69, that this case is not about law.

This is obviously wrong.

Ownership is a purely legal concept invented and shaped by legal texts and case law, and how it is acquired, protected and transferred is determined by law alone. The facts of the case can only provide indications as to whether ownership has been acquired or not.

In the case of trading in dematerialized stocks, however, the fact is limited to relatively few aspects, since

•      There are no stocks in paper form that can be followed in physical form. Dematerialized stocks exist only as electronic accounting records or records

•      Payment for the stocks is not required to acquire ownership, so a cash flow for that reason alone cannot be followed to prove the transfer of ownership. Moreover, neither a cash flow nor a stock flow can be traced through the clearing systems

•      Settlement of a stock purchase is not necessary to acquire ownership of stocks

•      Netting in the settlement of stock trades makes it impossible to follow individual "stocks" through the settlement system.

•      Dematerialized stocks cannot be identified as "individual specific stocks," so a buyer of "a stock" will never receive the specific stock he bought from "his seller."

The fact of trading in dematerialized stocks is that ownership is transferred by a final and binding agreement to purchase the stock, and that the existence of such an agreement, provided purely electronically by matching a buy and a sell order, is evidenced in the first line by the subsequent trade note issued after the trade has also settled.

In addition to the trade note, a custody statement documents that the acquired ownership has also obtained protection from third parties by being registered in a securities account (the acquired right is made public and thus protected). When the owner of the stock receives a dividend, the custodian issues a dividend credit advice, which is a document proving that ownership has been acquired, that ownership has

been registered and that the dividend has been received. Since a dividend credit advice contains all the information that Danish Tax Agency needs to assess the pension plan's entitlement to a reimbursement, it was this document that Danish Tax Agency itself required from anyone wishing to claim a reimbursement.

As stock transfers are purely electronic, only the parties involved can prove that the transaction has taken place.

This has been done in the present cases.

Just because the Danish Tax Agency is now requesting additional information and documentation does not mean that the pension plan did not own the stocks, did not receive a reimbursement and was not entitled to a reimbursement.

The Pension Plan has provided such evidence as may exist of ownership. The fact that an independent third party, who was not involved in the stock transfer, cannot confirm the ownership is a fact that applies to all dematerialized stocks. It cannot therefore be concluded, under the rules on the burden of proof, that the pension plan has not proven its ownership of the stocks. The pension plan has provided the best legal evidence of ownership of a stock.

The considerations of bona fide purchase and beneficial ownership put forward by the pension plan are paramount in this case, where the Danish Tax Agency mainly justifies its doubts about the ownership of the pension plan by considerations of overpaid dividend tax. However, Danish Tax Agency has itself argued in the Early Warning of 2015 to the Ministry of Taxation that situations may arise with two beneficial owners of the same stock. It is only natural that the Danish Tax Agency would rather be without this documentation, because the Danish Tax Appeals Agency knows that it is the problems of stock lending, short selling to the bona fide purchaser and dual beneficial ownership under Danish law and case law that this case is really about. Understandably, the Danish Tax Agency would like to be provided with evidence that even in 2015 the Danish Tax Agency agreed with the pension plan's argument regarding dual beneficial ownership of a stock. Far worse for the Danish Tax Appeals Agency in this context is that even if it were to follow the Ministry of Taxation's view - which differs from the Danish Tax Agency's own, which in 2015 argued that there were two beneficial owners of the same stock - and were to assume that the stock lender loses its beneficial ownership when the stock borrower sells the stock on to a bona fide purchaser, the pension plans would be entitled to a reimbursement. This would, in accordance with the Ministry of Taxation, impede the two rightful owners of the same stock, but the one who was then not entitled to reimbursement would, according to this interpretation, be the (ultimate) stock lender. The pension plan, as a bona fide purchaser, would be the legal owner and thus eligible for reimbursement.

Whatever the Danish Tax Agency thinks, this case is precisely about the problems of obtaining stock ownership and clarifying the legal "grey areas" left by previous case law, which Danish Tax Agency itself clearly pointed out in the Early Warning of 2015.

The tax authority notes ex tuto that the pension plans were in bad faith. This is precisely what the whole case of the Danish Tax Agency is based on: the Danish Tax Agency has decided, following the so-called "whistleblower," that all U.S. pension plans that have traded Danish stocks are pure fraudsters and that they acted in bad faith, but has nothing but undocumented allegations to support this.

By shifting the burden of proof back onto the pension plans, the Danish Tax Appeals Agency is again trying to escape its dilemma of not being able to prove so much as a single word of its untenable claims against the pension plans. The pension plans, however, have carried the burden of proving the legal claim for reimbursement more than once. Everything about trading in dematerialized stocks is documented to the extent possible. What no human being in the world can document, the pension plans cannot be required to document.

Evidence of ownership of dematerialized stocks held in sub-custody cannot be verified in any other way than the pension plans have done.

### 9.15  It's impossible to cheat with stock trades

The Pension Plan continues to maintain that under the current EU rules, which are essentially based on the Geneva Securities Convention of the United Nations, see Appendix 96, it is not possible to defraud the registration of dematerialized stocks. The Convention states that the electronic registration of stockholdings with a custodian, evidencing ownership of the stocks, cannot be false (see Articles 10, 16 and 18). The most central rules of this Convention are found in the EU CSD Directive and the Finality Directive. These two Directives ensure legal certainty in the settlement of stock transactions in the EU. No distinction is made between registrations with the CSD where the stocks were originally issued ("issuer CSD") and registrations of the stocks with any other custodian ("investor CSD").

In the commentaries by Dan Moalem, David Moalem, Peer Schaumburg-Müller and Erik Werlauff to the Capital Markets Act of 2018, it is also stated in § 3, No. 34 (page 197) that:

> *"a fund asset shall be deemed to be registered in a CSD both (i) when that CSD acts as issuer CSD and carries out the initial registration of a fund asset and (ii) when the CSD acts as investor CSD and carries out a technical registration in its systems of a security issued by another CSD"*

The Capital Markets Act thereby confirms that there is no legal basis for discriminating between registration of a security with an investor CSD and registration with a national CSD (such as VP Securities).

The European Commission's Directorate-General for Internal Market and Services, under the authority of the European Economic and Social Committee, conducted a public consultation from January 05, 2010 to January 21, 2011 on the Legislation on Legal Certainty of Securities Holding and Dispositions, as set out in Appendix 100, which is presented here. As it makes clear, EU law protects any purchaser of a dematerialized stock, who will have it registered in **his securities account**. He is undoubtedly the civil law owner of a stock. No distinction is made between protection obtained by registration with an issuer CSD and protection obtained by registration with an investor CSD. The two are equivalent.

### 9.16 Pension plans don't change explanation

The Danish Tax Agency alleges in the summary submission of August 09, 2019, Paragraph 8.7, page 70, that the money plans in the drivers' cases were supposed to switch explanations.

This is not correct.

### 9.16.1 Broker confirmations and custody statements

The pension plans do not change their explanations regarding the documentation provided, but comply with the Danish Tax Agency's insatiable demands for more and more documents with the utmost care. The documents provided by the pension schemes are those which, unlike the documents requested by the Danish Tax Agency, actually prove ownership. What the Danish Tax Agency wants to see - such as bank accounts with someone other than the Solo group - in no way documents ownership of Danish stocks.

Ownership is acquired as explained by the pension plans by an electronic transaction. This is reflected in a broker confirmation, a custody statement and finally a DCA. The pension plans have constantly confirmed this from day one.

It is also a characteristic of the Danish Tax Agency to require documentation without specifying what this documentation should be and how it could be provided by pension plans. Thus, for example, on page 70, the Danish Tax Agency claims that there must be 'some form of objective evidence of the receipt of the proceeds'. The Danish Tax Agency does not specify what this objective evidence should be. After all, the dividend is received by all stockholders worldwide precisely in a cash account with their custodian. If the money was deposited in an account with a bank other than the custodian, this would indicate that the dividend was not paid.

As already highlighted numerous times, pension plans as clients also cannot provide documentation for the inflow of money to their custodian. Only the custodian can document the inflow of money.

However, in the present cases, the custodian is prevented from assisting its clients - the pension plans - in providing evidence of receipt of the proceeds through the custody chain, as all records of all custodians have been seized by the authorities.

It is also fundamentally wrong for the Danish Tax Agency to state on page 71 that a commercial invoice does not mean that a transaction has been carried out. The trade note is issued by the broker only after settlement instructions have been given. The clearing and settlement instructions set in motion a settlement process that nobody can stop. This is why the clearing agent is responsible for the payment of the money (and the delivery of the stock).

The fact that the Danish Tax Agency does not understand sufficient English to understand that a custody statement is a statement of account (see the Danish Tax Agency's summary statement, page 71) is a regrettable fact, however, does not change the facts of the case. A custody statement is a statement of account for a securities account. Whether this is issued daily, weekly, monthly or annually. They show all assets - stocks, forwards, contracts as well as stock loans that the pension plans have taken out.

### 9.16.2 Guarantee

The Danish Tax Agency believes in its summary submission in § 8.8, page 72, that there should be a contradiction between the statement of a pledge under the GMSLAs and the transfer of ownership of the cash under the TTC clause.

This is again not the case.

The pension plans had both transferred ownership of their cash to their custodian under the TTC clause and pledged their (other assets) under the GMSLA.

The transfer of ownership as security for the funds precedes a simple pledge. The pledge covers only the assets belonging to the pension plans. Immediately after receipt, the funds no longer belong to the pension plans, as ownership has already been transferred to the custodian.

A pledge gives fewer rights over an asset than a transfer by way of security. Even the tax authorities should know that. The pledgor is still the owner of his asset. This is not the case when there is a transfer of ownership for security (as happens under a TTC clause).

In its summary in § 8.8, page 72, the Danish Tax Agency also considers that it does not make sense that the reimbursements were paid to the pension plan agents when the results of the transactions are pledged.

In doing so, the Danish National Tax Tribunal's decision overlooks the fact that under the TTC clause, the pension plans have transferred ownership of cash only to the custodian. They have not transferred ownership of the stocks and therefore not the claim for reimbursement. Therefore, the Custodian could not claim reimbursement at all. Only the pension plans, as owners of the stocks, could ask the tax agents to submit claims for reimbursement on behalf of the pension plans.

However, because of the TTC clause, the funds were deposited directly into the custodian's or sub-custodian's account (Old Park Lane, West Point Derivatives and Telesto themselves had their cash in their parent company's cash account.) This shows - again - the pension plans' subsequent investigations.

### 9.16.3 Pension plans accounts

The tax authorities incorrectly state that the pension plans should have provided conflicting information about their accounts.

This is not the case.

The pension plans, as is true, have indicated that they themselves had their accounts immediately with their custodians. In addition to these accounts, they had only one account in the United States for the Foundation - as presented here as Appendix 91.

The pension plans held their Danish stocks in a securities account with their custodian. If their immediate custodian was not Solo Capital but one of the three subsidiaries, the immediate custodian held the stocks in their omnibus account with Solo Capital. Solo Capital in turn held the stocks in omnibus accounts with their custodian. The location of the omnibus accounts of these custodians who held the stocks for Solo Capital cannot be disclosed to the pension plans.

As for the funds, it is quite true that they were deposited in Solo Capital's own account at Barclays Bank. It was given as security to Solo.

Nevertheless, it was of course recorded with the respective custodian how much money accrued to each pension plan (dividends, sale price of stocks, forward sale price, reimbursement, etc.) and which was transferred as collateral to the custodian. All custodians in the group held the funds pledged to them by the pension plans in Solo Capital's bank account at Barclays Bank.

Evidence that the custodians correctly recorded all funds in the pension plan accounts is provided as Appendix 90.

### 9.16.4 Proof of receipt of dividends

The Danish Tax Agency again demonstrates its lack of understanding of English in its summary submission in § 8.10, page 73. The Agency demands to see a "dividend receipt" for the receipt of the dividend. But these are the Dividend Credit Advices provided. This is why Danish Tax Agency also requested these Dividend Credit Advices at the time when Acupay asked Lisbeth Rømer which documents should be submitted with the application for reimbursement, see Acupay System LLC's submission to the Court of London of 1 April 2019, which is submitted here as Appendix 102. Lisbeth Rømer seems to understand more English than the Danish Tax Agency's lawyers.

The additional bank statements and fund/deposit statements requested have also been provided.

Of course, a pension plan that has your account with Solo Capital (or one of its three subsidiaries) can only provide statements from there and not from another bank.

A customer in Vendsyssel Bank cannot present an account statement from Nordea to prove that he has stocks in his securities account in Vendsyssel Bank. Not even if Vendsyssel Bank has its omnibus account in Nordea.

**9.17 Pinsent Masons**

In the summary submission of August 09, 2019 in Paragraph 8.13, page 75, the Danish Tax Agency alleges that the pension schemes in the lead cases attempt to muddy the picture by referring to the fact that the Danish Tax Agency's own lawyer in England advised the Solo group.

This is obviously not the case.

The one who is trying to muddy the picture is the tax authorities with all their unsubstantiated allegations about Sanjay Shah and his "universe," which is not a party to these cases at all.

Nor is it a simple claim by the pension schemes that the Inland Revenue's own London lawyer, Pinsent Masons, has been advising the Solo group. It is a fact that is clearly apparent from Sanjay Shah's pleading in the High Court in London (see page 52 and Appendix 1, No 24, pages 54 and 55 of the pleading) that no fewer than 44 lawyers at Pinsent Masons have advised Solo Capital, which was set up to provide services to the dividend arbitrage industry, Sanjay Shah's apparent specialism when one considers his publicly available CV and his pleading. This is further confirmed by numerous press releases, which are attached hereto as Appendices 103-106, and by email correspondence provided to the Pension Plans by Pinsent Mason, which is attached hereto as Appendix 107. Finally, the pension plans come into possession of the invoice dated December 29, 2011 from Pinsent Mason, which is provided as Appendix 108.

Solo Capital had absolutely no reason to hire and pay 44 lawyers at Pinsent Masons if the firm's intention was simply to print fictitious papers to make it look like stock trades were being settled. As Sanjay Shah's pleadings show, the Solo group took advice on numerous aspects of proper business conduct (including corporate government and legal compliance, clearing, settlement and custody). The custody agreements, which are so central and controversial today, were drawn up by the Inland Revenue's own English lawyers.

It is only logical that the former clients of the Solo Group seek help from their contractual partners (the Solo Group) in the fight against the unjustified allegations of fraud. The fact that Sanjay Shah provides what documentation he can to support his clients is evidence that he too is convinced that he has conducted a real and honest business. Were it otherwise, he would obviously not support the pension plans, which he would then have defrauded. For they gave the order to buy stocks.

There is absolutely nothing suspicious about the pension plans seeking contact with Sanjay Shah through their respective lawyers. If anyone is trying to muddy the picture, it is surely the Inland Revenue with allegations like these.

### 10.  BURDEN OF PROOF AND FORMALITY

The present decisions of Danish Tax Agency are very largely based on a large number of *assumptions and assumptions* concerning the facts, which together lead the Danish Tax Agency to conclude that there should be fraud.

The conditions for the revocation of the original decisions on the payment of the dividend tax reimbursement are not met in the present cases.

This has in fact also been confirmed in the Danish Tax Agency's own submissions, which must be read as meaning that the cases are not really about the revocation of the original decisions on the payment of reimbursements of withholding tax, but about whether these decisions can be annulled as unlawful. Thus, the Danish Tax Appeals Agency also emphasizes in the office submission that Danish Tax Agency should be entitled to annul the original decision to pay the reimbursement.

It is therefore agreed that Danish Tax Agency could not revoke the decisions. This leaves the question of whether the conditions for annulment are met.

It is maintained that the burden of proof to overturn the original dividend tax reimbursement decisions *now* lies with the tax authorities and that the tax authorities have not discharged this burden of proof.

Of course, it is not disputed that, as a general rule, the burden of proving that the conditions for such a payment are met lies with the taxpayer seeking the reimbursement of dividend tax.

In the present cases, a number of facts lead to the conclusion that this starting point does not apply in the present cases, which are in fact concerned with the question whether the original decisions on the payment of reimbursements of dividend tax can be annulled.

It is only now (several years after the submission and approval of the reimbursement requests by Danish Tax Agency) that the Danish Tax Agency questions the validity of the documentation attached to the requests, which actually documents the ownership of the stocks, the receipt of the net dividend and thus also the payment of the dividend tax. The fact that Danish Tax Agency initially approved the applications for payment of the dividend tax reimbursement has of course led the pension plans involved to position themselves in the confidence that they did not need to provide any further evidence that they were and are entitled to receive the dividend tax reimbursement applied for. If the pension plans had received an indication from Danish Tax Agency at the time they applied for the dividend reimbursement that they wanted additional documentation, they would have had the opportunity to seek it and would have been careful to keep relevant documents already in existence. The pension schemes' ability to rebut the Danish Tax Agency's new claims has been significantly impaired by the length of time taken and the fact that SØIK has now seized a large proportion of the documents in the case.

Furthermore, both incarnations of the Danish Tax Agency have failed to obtain relevant information from the many foreign professionals who have undoubtedly been involved in the transactions in question. Similarly, Danish Tax Agency has failed to obtain relevant information from foreign control and supervisory authorities.

The failure to obtain relevant information must be seen in the light of the fact that both incarnations of the Danish Tax Agency, through their powers of control, have - unlike the pension plans - a real possibility to obtain the information requested by the Danish Tax Agency.

In the light of the above, it is generally argued that Danish Tax Agency could and should have carried out a more effective investigation of the matters now problematized by the Danish Tax Agency at the time when it was dealing with the original applications, and that this has led to the pension schemes involved having a legitimate expectation that they would not have to provide further documentation.

It is thus Danish Tax Agency's conduct that has led to doubts being raised by the tax authorities, several years after the applications for payment of the dividend reimbursement were approved by Danish Tax Agency, as to whether the conditions for payment of this reimbursement were met. It follows that the tax authorities are most likely to bear the risk of such doubts, with the effect that any doubts as to factual matters which should have been further clarified in the original applications for dividend reimbursements are to the detriment of the tax authorities.

As already stated, the Danish Tax Agency based its subsequent opinion solely on undocumented assumptions about the pension plans' lack of ownership and lending of the stocks in question. The Danish Tax Agency has thus not provided any real evidence for the claim of lack of ownership etc. and the claim is thus completely unsubstantiated.

The evidentiary doubts concerning the facts which the Danish Tax Agency has now subsequently problematized must then be attributed to Danish Tax Agency's failure to carry out effective initial investigations, so that the conditions for annulling the initial decisions on the payment of reimbursements of dividend tax are not met. As a result, the pension plans' claims must be upheld.

... ...

In its submissions, the Danish Tax Agency has put forward a wide range of views on the issue of the burden of proof in the present case, including the burden of proof in cases of fraud as the Danish Tax Agency actually claims to exist.

However, it is very important to bear in mind that the tax authorities cannot, of course, simply turn the problem around by means of unsubstantiated allegations of fraud, so that the pension plans are "stuck with the monkey" in terms of the burden of proof. As stated above, there are undocumented assumptions about the lack of ownership of the pension plans, and the Danish Tax Agency has not provided any real evidence of this.

Furthermore, it seems that the Danish Tax Agency does not really want to contribute to the proper disclosure of cases, but that these should be decided on the basis of *assumptions*, combined with the *pretense that* the tax authorities have been trying to create since the late summer of 2015, that *everything* is simply an expression of criminal fraud.

The fact that something criminal may have been committed by other actors involved - of which the pension plans have no knowledge whatsoever - is not in itself decisive for whether Danish Tax Agency's original decisions on the payment of dividend tax reimbursements can now be annulled.

In this context, it is particularly important to note that the present cases are solely concerned with whether the pension plans involved are entitled to keep the requested reimbursement of withheld dividend tax as originally assumed and paid by Danish Tax Agency.

Pension plans cannot be required to provide additional and/or different documentation than that already provided. As stated above, the pension plans in the cases have provided extensive documentation proving the ownership of the stocks, the receipt of the net dividend and thus the payment also of the dividend tax.

At the same time, the records required by the Danish Tax Appeals Agency from VP Securities, money or stock flows are merely circumstantial, and not actual evidence, of ownership of the stocks in question. In this connection, reference is made to the above-mentioned problems with the documentation of ownership of dematerialized stocks.

**CONCLUSION OF THE SECOND PART**

All stock transactions were real and are documented, with all the supporting documents that in the real-world document real stock transactions and transfer of ownership of stocks. The fact that the tax authorities provide a wish list of documents which the tax authorities would like to see but which are not legally valid documentation of the ownership of stocks and the receipt of dividends cannot mean that the pension plan has not met its burden of proving its claim for reimbursement.

The Danish Tax Agency's unsubstantiated allegations of fraud against the custodians involved are not sufficient to overturn the documentation issued by those custodians for the transactions. In so doing, the tax authorities are attempting to evade the fact that the UK supervisory authorities have manifestly found no evidence of fraud on the part of the four custodians. Just like SØIK, which after four years of investigation has not come forward with so much as an accusation. The decision taken in November 2019 by the UK authorities to discontinue their criminal investigations into the case and leave this impossible undertaking to Denmark is further evidence of how unreliable the allegations of fraud really are.

Finally, requiring more documentation from a foreign custodian than from VP Securities means unjustified discrimination against UK custodians that does not hold up at the European Court of Justice.

The EU has established a set of rules (the CSD and Finality Directives) that guarantee that a buyer of a dematerialized stock actually becomes its owner and can prove this without any doubt in all EU countries by a statement from its own custodian, also called investor CSD.

The pension plan's evidence of ownership in the form of DCAs and custody statements cannot be rejected as evidence in the cases.

**PART 3: THE DANISH TAX APPEALS AGENCY ATTITUDE IN THE LEAD CASES - THE TRANSACTIONS CARRIED OUT HAD REALITY**

**11 RECOGNITION OF THE COMPLETION OF THE STOCK TRADES**

The Danish Tax Appeals Agency's office position in the lead cases supports the irrelevance of the Danish Tax Agency's views regarding errors in documentation and pure speculation regarding the veracity of what actually occurred. The Danish Tax Appeals Agency does not question that agreements for the purchase of stocks were concluded and that these were implemented.

The implementation of the dividend arbitrage investment strategy is as little questioned as all the individual stages of the operation (buying and selling stocks, concluding forward contracts and lending stocks against cash collateral).

The Danish Tax Appeals Agency also does not doubt in the preliminary cases that the pension plans could finance the purchase of stocks. The fact that the pension plans were predominantly - but not exclusively - newly established plays no role in the possibility of purchasing and financing the stocks. The stock purchases

were paid for by the cash collateral of a stock borrower, which was paid to the pension plans on the same day as the pension plans had to pay for the stocks.

The Danish Tax Appeals Agency also does not argue in the lead cases a registration of the pension plans with VP Securities as a condition of ownership. The Danish Tax Appeals Agency acknowledges the limited value of the registrations with VP Securities, which knows only a few civil law stockholders of the Danish C20 companies, but far from all (due to omnibus deposits), and does not know the legal owners of Danish stocks at all. Legal ownership is not registered anywhere.

The Danish Tax Appeals Agency expressly confirms in the preliminary cases that there is documentation relating to transactions concerning the purchase and sale of stocks, stock lending and the conclusion of forwards, including commercial notes, e-mails, etc. The Danish Tax Appeals Agency is simply of the opinion that this documentation does not

> " come to the "knowledge" of the Pension Plans, and for that reason they should not evidence the Pension Plans' ownership of the stocks."

However, this is not correct. The pension plans had full knowledge of all the documents, as they are provided by the pension plan trustees. The pension plans can only act through these trustees and their knowledge must be imputed to the pension plans. As legal persons, they can only have knowledge of the fact through natural persons. These natural persons are their trustees.

## 12 THE DANISH TAX APPEALS AGENCY DISREGARD OF TAX OWNERSHIP IN THE CASES

### 12.1 Knowledge of the transaction documents

The Danish Tax Appeals Agency's real reason for wanting to disregard the pension plans' tax ownership of the stocks in the lead cases seems to be that the pension plans should have been aware of all the documents that actually document the stock transactions.

It should be noted that a person can acquire rights (and obligations) through a legally binding agreement even without knowledge of that agreement. It is sufficient that the person has authorized the person to act and that the person has knowledge of the documents.

In the cases at hand, the pension plan's own trustee acted predominantly. The order to buy and sell stocks was placed by the trustee by e-mail, the forward hedge was sold by e-mail, the trade notes were sent to the trustee by e-mail - and subsequently to the pension plan trustee in hard copy together with the invoice. The stock lending based on a GMSLA was concluded by e-mail sent and received by the trustee.

The Trustee does not only have a power of attorney from the pension plan to act on its behalf. The Trustee is the pension plan's own acting body. When a pension plan wants to enter into a legal act, this can only be done by an act of the trustee.

If the Danish Tax Appeals Agency means by "pension plan" the beneficiaries of the pension plan, it should be noted that the beneficiaries of a given pension plan - which is not self-administered - never have knowledge of the individual acts by which the pension plan acquires and sells assets accruing to the beneficiaries under the pension plan. For example, when Danica or Nordea invest funds in a Danish pension scheme for their beneficiary policyholders, they do not send copies of the transaction documents to the policyholders every time. Danica and Nordea nevertheless acquire stocks on behalf of their pension policyholders.

There is no reason to consider an American solo 401K pension plan differently from Danica or Nordea when managing pension funds.

**12.2 Documentation**

The Danish Tax Appeals Agency recommends in the first cases to set aside the pension plans' legal claim for reimbursement, on the grounds that it has not been sufficiently proven that the pension plans (a) have been the owners of the stocks in question, (b) have received dividends on the stocks, or (c) have received exchange distributions.

**12.2.1 Proof of ownership of the stocks**

As all trading in dematerialized stocks is paperless, documentation is a fundamental problem. For stockholders who have their own securities account with VP Securities, it is relatively easy to document ownership. However, most foreign stockholders do not have their own securities account with VP Securities. They hold their stocks in foreign banks, which operate omnibus accounts in long chains of sub custodians.

If stocks are traded between clients of the same custodian, this is not seen either by VP Securities or by the next custodian in the chain of sub custodians. Buying and selling stocks offset each other during the netting procedure. The external trace of such a trade at the same custodian is limited to the two reports issued by the trading and settlement systems: trade reports sent to the stock exchange (here the LSE) and transaction reports sent to the financial regulator (here the FCA in London).

If the number of stocks bought or sold within a single custodian exceeds the number of stocks held by that custodian, a trace of the settlement process will lead to the next custodian in the chain of sub custodians, where netting of all transactions may again result in no stocks being transferred to or from that custodian's omnibus account.

The use of omnibus accounts in the chains of sub custodians and the application of netting thus erase the external traces of the settlement of the equity transactions.

This applies both to the trail of stocks settled through the systems and to the cash flows used to pay for the stocks.

Tracking stock traders by cash and stock flows is thus not possible.

Stock transactions can only be documented by the brokers and custodians involved. An external third party cannot prove a trade in dematerialized stocks.

Therefore, pension plans cannot be required to provide such documentation. The documentation for stock traders that can be requested is the documentation required by all authorities for a stock trade: a trade note, a custody statement and finally a DCA when a trade has been received.

These documents have been produced in all cases to the extent that they are still available. However, as in 2014 and 2015 Danish Tax Agency only requested a DCA as evidence of the ownership of the stocks and the receipt of the dividends, in all cases the pension plans did not keep any additional evidence of the ownership of the stocks and the receipt of the dividends.

All other processes are purely electronic and leave no "trace" that can be documented in paper form.

It is therefore not only unreasonable, but also unrealistic to require any other documentation from the pension plans than the provided commercial notes, custody statements and DCAs.

Nor can the value of the documents produced be undermined by the simple allegation that they originate from companies directly or indirectly linked to Sanjay Shah.

Firstly, after four years of (presumably and hopefully) intensive investigation of the so-called case complex by SØIK, to date no charges have been brought against Sanjay Shah, see also the Ministry of Justice's responses of 2017 and 2018, presented here as Appendices 109 and 110. The British prosecutors, who have also been investigating the case since 2015, have also not provided any evidence of wrongdoing. Indeed, the British have abandoned the arrest they had over Sanjay Shah's assets in November 2018, see the Crown Court in London's lifting of restrictions on Sanjay Shah's assets of December 10, 2018, submitted as Appendix 111. This is not done where there is strong circumstantial evidence of criminal activity. All allegations against Sanjay Shah and his companies are thus completely undocumented.

Second, the allegation against Sanjay Shah seems to be precisely that his companies issued false documents. Without proving this allegation, the tax authorities are thus arguing in circles to disqualify the available and only possible legally valid evidence of the stock deal. Viable proof that the documentation originating from Sanjay Shah's companies would be false is not provided by the Danish Tax Agency. The tax authorities argue only that the transactions are 'unrealistic' (15 times in the summary), 'unbelievable' (four times), 'unrealistic' (six times), 'improbable' (15 times), 'impossible' (10 times), 'fictitious' (11 times), 'have no commercial rationale' (six times). These allegations provide no basis for what would be 'false' about the documentation issued by the Solo Group. The only thing these allegations show is that the Treasury apparently does not understand stock lending and short selling and has no experience with stock trading to the significant extent that margin trading, dividend arbitrage and algorithmic trading do.

### 12.2.2  Proof of receipt of proceeds

Every stockholder receives the dividends on his stocks in an account with his custodian, as the money can only find its way from the company to the stockholder through the chain of custodians and sub custodians.

If a stock is bought so shortly before the ex-date that the buyer is not yet registered with his custodian as a stockholder, the dividend will not reach the seller's custodian until then. At the latest when the stock is booked out of the seller's account, the seller's custodian sees the date of sale and thus knows that the dividend in fact belonged to the buyer (cf. Article 19 of the Danish Sale of Goods Act). The seller's custodian therefore automatically withdraws the dividend from the seller and transfers it to the buyer's custodian, so that the latter can credit the amount to the buyer's account. This process is called the "market claim process."

The market claim process can only be carried out by the custodians involved, as only they can see that the exchange has to be passed on to the buyer, who was not yet registered on record day.

If there is a short seller on the dividend date, the short sale results in more owners of Danish stocks on the dividend date than the number of stocks issued by the company. The short seller therefore has to pay a compensation payment into the system of custodians and sub custodians, as the buyer of a stock cannot see whether the ultimate seller is a long owner or a short seller. However, all buyers of stocks are entitled to the net proceeds circulating in the system.

It is therefore possible that the money that reaches the buyer of the stocks during the market claim process is in fact (in whole or in part) originally from a short seller and is a compensation payment. However,

whatever the original source of the payment, it can only reach the stockholder via his custodian, as only he knows that the stockholder owns the stocks.

Since the net proceeds from the companies are irrevocably mixed with the net compensation payments from the short sellers already at the first custodian in the chain, it is impossible to identify what it is that each stockholder receives during the market claim process.

The only person who can prove that the stockholder has received a dividend (or an indistinguishable compensation payment) is the individual stockholder's own custodian.

The legal documentation for the receipt of a dividend is a DCA. For this reason, Danish Tax Agency also originally required a DCA.

As stated in ESMA's report of July 2, 2019, the evidence of receipt of an exchange is a DCA. This must be issued by the custodian when a net dividend is credited to a stockholder's account. This, regardless of whether the source of the payment is the company itself or a short seller - as in the real world - no one can distinguish a real net dividend from a net compensation payment.

The tax administration's desire to follow a flow of funds from the company to every stockholder is - as ESMA documents it - pure utopia.

In addition to the DCA itself, a stockholder can of course also show by a bank statement that he has received a dividend. However, this statement is also issued by the custodian.

As long as the Danish Tax Agency, under undocumented allegations of fraud committed by the Solo Group, refuses to accept documentation received from the Solo Group, no evidence of receipt of proceeds can exist. The tax authorities cannot require pension plans to provide documentation that cannot exist.

### 12.2.3 Proof of receipt of dividend reimbursement

It is not disputed by the tax authorities that the Danish Tax Agency has paid a reimbursement.

Nor does the Danish Tax Agency seem to dispute that the pension plans have received the dividend tax, because why else would Danish Tax Agency have summoned all pension plans in the USA and England in June 2018? The tax authorities confirm in all the summonses that the pension plans have received the reimbursement from Danish Tax Agency.

The receipt of the reimbursement paid by Danish Tax Agency is also a logical consequence of the request for re-merger, which was properly documented, with everything that Danish Tax Agency requested.

As the reimbursement requests show, Danish Tax Agency paid the reimbursement immediately to the agents (Acupay, Goal Taxback, etc.). From there, the reimbursement was transferred to the pension plans' account with their custodian, where the funds were entrusted as security under the TTC clause of the custody agreement. The cash flow showing the inflow to the pension plans is therefore a transfer from the agents to the custodian respectively Solo Capital, which was the account manager for the other companies in the Solo group. The pension plans could see via their online access to their account that the reimbursement amounts were credited to their current account with their custodian. When pension plans had to pay fees for the services received, this was done via instructions to the custodian, who then withdrew the money from Solo Capital's cash account at Barclays Bank.

The Barclays Bank account statements are held only by Solo Capital's administrator (PwC), the SØIK and the English NCA.

The pension plans saw no need to produce a screen print of the accounting of the receipt of the exchange reimbursement on their account.

### 12.3 No basis to contest reality

In its summary submission of August 09, 2019, the Danish Tax Agency has challenged the civil reality of the transactions at issue in the main proceedings.

Moreover, in the event that the pension plans are successful in civil proceedings, the tax authorities also appear to contest the tax reality of the transactions in question.

In addition, the Danish Tax Appeals Agency has stated in the office recommendation that the stock transactions in question have not in fact passed through the pension plans' finances, so that in the Danish Tax Appeals Agency's view they are merely empty bookkeeping by custodians without any tax reality.

### 12.3.1 Civil law governs the assessment of tax ownership

As stated above, it must be assumed that the stock transactions in question were valid under civil law.

It is then argued that the transactions, including the disputed purchases and sales of stocks, stock lending and the conclusion of forwards, also had the requisite tax reality.

Thus, the pension plans were also the tax owners of the dividends paid to the pension plans, on which the underlying companies withheld dividend taxes. As a result, the pension plans also received the dividend tax reimbursements in question.

There is therefore no basis for disputing, for tax purposes, the civil law transactions between the pension plans and any short sellers who may have acted as ultimate sellers.

In this context, reference should be made to the starting point in Danish tax law: that civil law governs tax law.

It is thus the practical general rule that civil law is the governing law for tax law. See, among others, Søren Mørup in TfS 2002.665 and Jakob Bundgaard's Skatteret & civilret, 2006, page 187.

This approach also applies to the question of the acquisition of ownership of stocks and therefore to the question of the legal entitlement of pension plans to the reimbursements of withholding tax paid in the cases.

There is therefore no basis for a different assessment for tax purposes - in other words, the pension plans must also be regarded for tax purposes as the owners of the stocks in question, which have been transferred to them under civil law.

### 12.3.2 General reality principle

As stated above, the general starting point is that the tax qualification of fact is governed by the civil qualification of fact.

This starting point may - in exceptional cases - be derogated from. It is thus assumed in much of the theory and in practice that a general clause on the reality of tax law applies - often referred to as the reality clause.

The principle of reality is applied in cases where there is a clear discrepancy between the internal reality and the external formal appearance.

The principle of reality ensures that taxation of tax uses is linked to the real economy and the real substance of the dispositions in relation to which taxation is to be applied, rather than to the formal nature of the dispositions.

The reality principle was first formulated by Jan Pedersen, who has stated the following about the content of the reality principle in The Tax Law 1, 9. edition, 2019, page 124 ff:

> "The purpose of the general clause is to determine the legal distinction between tax evasion and tax avoidance. The General Clause is unlawful, but is created by the law-making activity of the Court.
>
> Its main feature is the requirement that taxation of taxable transactions be linked to the real economy and the real substance of the transactions in relation to which the taxation is to be levied, rather than to the formal nature of the transactions.
>
> The general clause applies in the event of a clear discrepancy between the internal reality and the external formal appearance. In practical legal life, of course, the assessment of reality may often give rise to doubts.
>
> This is because the reality principle is more an expression of a specific legal method to counter tax abuse than a limited legal rule to resolve individual issues.
>
> Consequently, the scope of the reality principle can only be determined on the basis of practice.
>
> As the principle is applied to the many and varied problems of tax law, it is obviously difficult to summarize the practice in anything other than procedural statements.
>
> [...]
>
> The general clause can be used to override empty and artificial tax dispositions, so that taxation is instead made in relation to the opposite reality. However, the General Clause is not an arbitrary norm which can be used for discretionary taxation.
>
> The clause presupposes an indisputable finding that ordinary and normal commercial dispositions have been disregarded in favor of empty and tax-related dispositions, so that the form of the dispositions is contrary to their real content."

To illustrate the content of the principle of reality, reference should also be made to what Jan Pedersen stated in TfS 2000, 142, from which the following, inter alia, appears:

*"It is characteristic that tax law is not directed at the economic content of taxpayers' dispositions. Rather, taxation is directed at the civil law characterization of those dispositions. The fact that a taxpayer has received an amount in specified circumstances is not of independent interest for the purposes of tax law. It is only when the transaction is classified for tax purposes as a wage, sale, gift, loan, purchase, business activity, etc., that the tax legislation can be applied to the civil events thus classified. Although income taxation is directed at private financial flows, from which specified proportions are sought to be withdrawn for the benefit of society, the income tax system is able to fulfil this task only by means of a prior civil law qualification. No distinction in tax law between the formality and reality of taxpayers' dispositions is therefore generally necessary.*

*It must be borne in mind, however, that the use of taxes is a misuse of civil law. By circumvention or even pro forma, the arrangements are organized in such a way that they appear in form to be advantageous from the point of view of tax law, but in such a way that the actual and real content of the arrangement differs from it.*

*A number of court decisions illustrate such a schism between formality and reality. For example, the famous Havnemøll judgment, UfR 1960, p. 535 H, in which double taxation under company tax law was sought to be avoided by the transfer of a branch of activity from the company to a partnership set up for the purpose by the stockholders. In principle, such a split cannot be criticized, but the assessment must be different where the split is made in such a way that the physical operation of the partnership continues to be carried out by the company, which at the same time bears all the risks. The sole purpose of the separation was to transfer part of the company's income to the partnership. In operational and economic terms, the situation was the status quo and the hive-off had no effect. The Supreme Court therefore considered the transferred income to be disguised profit, since it had actually been earned by the company and then distributed.*

*Thus, a characteristic feature of some of the tax exploits is that the civil law form is used as a backdrop in order to steer taxation in a prejudicial direction. The arrangements are characterized by an artificial and unusual form in which the taxpayer seeks only to obtain the resulting tax advantages but not the corresponding civil law consequences. Disposals are disguised as long-term loans or contracts of use in such a way that the "transferor" effectively gives up his property rights, loan agreements with corresponding interest deductions are set up without the borrower being subjected to any real financial burden, etc.*

*The essence of the principle of reality is therefore that, under certain conditions, taxation may be directed towards the actual economic reality at the expense of the opposing civil formality. This frees taxation from the control of civil law by depriving legal and valid dispositions of their fiscal significance.*

*The principle of reality does not pose any domestic problems, since the norm does not prescribe interpretations or analogical inferences beyond the clear word limit of the tax laws concerned. On the other hand, the principle of reality relates to the preliminary determination of the fact to which the tax laws must be applied. More specifically, the test is whether the civil law form claimed has a corresponding reality.*
*This is aptly described as the requirement that dispositions be "flesh and blood." The principle of reality thus relates to the determination of facts rather than the interpretation of the law.*

*It must of course be made clear that the principle of reality does not imply a total formlessness, where "the end justifies the means." It does not allow for arbitrary and unjustified taxation. This is ensured by the requirement that the civil law regime can only be set aside if the form claimed does not correspond at all to the real economic realities.*

*However, due to the nature of the reality principle, it is - unfortunately - not possible to give a more concrete and clear framework for the scope of the principle."*

### 12.3.3 The principle of reality in case law

As stated, the principle of reality does not allow the tax authorities to freely apply taxation - there are therefore limits to the application of the principle of reality.

To illustrate the application of the reality principle, a number of case law decisions are referred to below.

The highlighted decisions illustrate precisely that the principle of reality is <u>not</u> an arbitrary norm that can be applied to taxation at will.

From the case law, reference is first made to the Supreme Court's judgment of October 30, 2003, published in <u>TfS 2003, 889 H</u>.

The company in question (Over-Hold ApS) acquired a loss-making company and subsequently decided to convert it into a limited company and, at the same time, to increase its stock capital by DKK 120 million.

The capital increase was made through a loan in the parent company, and the capital increase was immediately lent to another group company, which used the amount for the purchase of stocks.

All transactions took place on the same day.

The acquired limited company received the same interest payment as the company provided for the loan from the parent company.

The company argued that the chosen approach was justified by a desire to establish a system whereby the limited partnership could take advantage of the possibility of carrying forward previous years' losses to offset against interest income under the current provisions of the Danish Tax Assessment Act

The Danish National Tax Tribunal upheld the local tax authorities' denial of the right to deduct interest. The Danish National Tax Tribunal considered that the loan did not involve a real risk for the companies and that

the company did not have free disposal rights over the loan proceeds. It was also considered that the company had not obtained any income from the disposal and that, subsequently

In the opinion of the Danish National Tax Tribunal, there was no business justification for placing the interest income in the Danish loss-making company Over-Trading A/S.

The Western High Court upheld the Danish National Tax Tribunal's decision. In this context, the Court considered that the loan did not involve a real risk for the companies and that the company had not had free disposal rights over the loan proceeds.

It had also been given weight that the company had not earned any income from the dispositions. In the contested decision, therefore, not attached to the borrowing.

On the other hand, the Supreme Court emphasized that the method of exploiting the possibility of carrying forward losses, which could have been established without loans having been granted between the companies belonging to the group, had to be characterized as a _lawful_ exploitation of the express provision for financial loss companies in the current § 15(7)(3) of the Tax Act.

The Supreme Court's reasoning is as follows:

> _"The Supreme Court's observations._
>
> _Over-Hold ApS received proceeds of DKK 120 million from the Cirrus AB loan and used it for a cash capital increase in Over-Trading ApS, which was a financially loss-making company, in order to make profits in that company. Over-Trading ApS lent the amount to Bonnier Information Services A/S, which used it to acquire stocks in A/S Børsen Holding._
>
> _The chosen approach was justified by a desire to establish a system which made it possible for Over-Trading ApS to take advantage of the right to carry forward losses from previous years for set-off against interest income, which existed under the current provisions of § 15(1) of the Danish Income Tax Act, cf. Paragraphs 5 and 7(3). Such an arrangement, which could have been established without loans being granted between the group companies, must be characterized as a lawful use of the express exemption for financial loss-making companies in § 15(7)(3) of the Danish Tax Assessment Act._
>
> _The circumstances invoked by the Ministry of Taxation do not, in the light of the foregoing, provide a basis for considering the loan from Cirrus AB to Over-Hold ApS to be without reality or for finding that there has been an arbitrary distortion of the companies' income base. The Supreme Court therefore upholds Over-Hold ApS's claim."_

The Supreme Court therefore upheld the company's claim for interest deduction.

Secondly, reference should be made to the Supreme Court's judgment of December 07, 2006, published in SKM2006.749 H.

The case concerned the question of whether there was a tax-free sale of stocks to the issuing company or in fact a transfer of stocks to a third party, so that the advance was taxable under the Stock Advance Tax Act §

2, in a situation where the issuing company did not finance the repurchase with free reserves accumulated in the company but by a simultaneous capital injection.

In February 1999, the limited company in question, Finwill ApS, had acquired 50 percent of the stock capital (nominal value DKK 750,000) in a limited company, Circuit Electric A/S. In April 1999, Circuit Electric A/S acquired all the stocks in Finwill ApS. Acceptance of this transaction was given on April 09, 1999.
An extraordinary general meeting of Circuit Electric A/S was held on the same date. It was decided to reduce the stock capital by a nominal amount of DKK 750,000 and at the same time to increase the stock capital by a nominal amount of DKK 750,000. The new stocks are subscribed by the company Hedeselskabet Miljø og Energi A/S.

It followed from the Companies Act that a capital reduction and a capital increase could be conducted simultaneously, cf. the Act § 46(1), first indent, and that a limit of 10 percent. For the acquisition of own stocks could be exceeded if the stocks were acquired for the purpose of a capital reduction, cf. § 48 B, no. 1 of the Act.

However, the tax authorities considered the transfer of stocks from Finwill ApS to Circuit Electric A/S as having been made directly to Hedeselskabet Miljø og Energi A/S, and therefore this profit, which had been established at Finwill ApS, was considered to be taxable in accordance with Article 2(1) of the Danish Capital Gains Tax Act. The reason for this was that the transfer of stocks from Finwill ApS to Hedeselskabet Miljø og Energi A/S was "camouflaged" as a capital increase and decrease. Finwill ApS, on the other hand, argued that there had been no pro forma legal transaction and that payments had actually been made in accordance with the decisions taken.

After an overall assessment, the Danish National Tax Tribunal held that there had in fact been a transfer of stocks from the limited company directly to Hedeselskabet Miljø og Energi A/S, and that the resulting profit was therefore taxable for the limited company under the rules of the Danish Capital Gains Tax Act (§ 2, Paragraph 1 of the Danish Capital Gains Tax Act). The reason given was that there was such a link between the transactions that the transfer of stocks had to be regarded as having been made to Hedeselskabet Miljø og Energi A/S.

The Western High Court upheld this decision with the following grounds:

> *"It must be assumed that A made the transfer to the company conditional on the sole purpose of obtaining tax exemption. The implemented model was thus preferred because it was assumed to lead to tax exemption.*
>
> *The company did not have the means to purchase the stocks. The transfer therefore required the raising of funds from outside. The purchase price was obtained by G1 Miljø og Energi A/S paying the purchase price to the company, which then paid it to A's company, when subscribing for a very similar stock. The transfer was conditional on a capital reduction, which was conditional on a simultaneous capital increase of the same amount, corresponding to the purchase price. The transfer therefore did not entail any change in the stock capital or the amount of equity.*
>
> *The legal consequences for G1 Miljø og Energi A/S and the company must therefore be assumed to have been essentially the same, irrespective of whether the transfer was made immediately to G1 Miljø og Energi A/S or to the company. The same applies to the company A. Moreover, there was no commercial justification for the sale to the company rather than to G1 Miljø og Energi A/S.*

> *In the circumstances described, the transfer appears to have been effectively made to G1 Energi og Miljø A/S, which after the transfer owned 100 % of the company, and the transfer to the issuing company must be considered to have been made for tax avoidance purposes only. It is therefore accepted that the transfer has been considered taxable.*
>
> *The transfer is thus not considered - notwithstanding the validity of the company law dispositions - to have the character of a transfer of stocks to the issuing company, which, under Paragraph 16 B(1) of the § 13, Paragraph 1, no. 2, according to Tax Assessment Guidelines 1999, S.C.1.2.4.3., can be made tax-free."*

The Danish National Tax Tribunal and the Western High Court thus applied the principle of reality.

However, the majority of the Supreme Court (five out of seven judges) came to a different conclusion. The Supreme Court's ruling reads as follows:

> *"The general rules on taxation on the disposal of stocks are set out in the Danish Capital Gains Tax Act. According to the rules of the current law on the taxation of profits on stocks, profits are taxable when the taxpayer has acquired the stocks at a time less than three years prior to the disposal. If the stockholder is a limited liability company, the gain is tax exempt if the period of ownership is three years or more, cf.*
>
> *However, § 16B of the Danish Tax Assessment Act provides that the entire amount of the disposal is taxable as a dividend if the stockholder disposes of stocks to the company that issued the stocks. This provision covers not only cases where the stockholder disposes of part of his stocks to the issuing company, but also cases where the stockholder disposes of all his stocks to the company. According to the preparatory works, the purpose of the provision is to prevent 'stockholders from obtaining a lower tax burden by having the company buy back its own stocks instead of making a distribution to the stockholders in the usual way', see Folketingstidende 1960- 61, supplement A, p. 836.*
>
> *According to the current provision in § 13(1)(2) of the Corporate Tax Act, dividends are exempt from tax if the company receiving the dividend (the parent company) owns at least 25% of the stock capital of the company paying the dividend (the subsidiary) for a continuous period of at least one year, within which period the date of distribution must fall. The provision is intended to alleviate the economic double taxation of distributed company income, cf. 1975-76, Supplement A, p. 4105.*
>
> *The interaction of the rules means that a parent company's gain on the sale of stocks in a subsidiary is tax-free on fulfilment of the one-year ownership requirement if the stocks are sold to the subsidiary, whereas the gain is tax-free only after three years of ownership if the stocks are sold to another party.*
>
> *Five judges - Torben Melchior, Per Sørensen, Lene Pagter Kristensen, Thomas Rørdam and Poul Dahl Jensen - then state: The concept of dividends in § 13(1)(2) of the Corporate Tax Act also covers the disposal sums which are treated as dividends under § 16B(1) of the Tax*

*Act, cf. Statements from the Injured Party 1982, decision No 2. It therefore follows from the wording of the provisions that Finwill ApS, which at the time of the disposal on April 09, 1999 had held 25% of the stock capital of Circuit Electric A/S for more than one year, was entitled to sell all its stocks in Circuit Electric to that company free of tax.*

*The question in the case is whether the sale is tax exempt also in the present situation, where Circuit Electric did not finance the buy-back with free reserves saved in the company, but where the buy-back (as part of a change in the company's stockholder base) was financed by a simultaneous capital contribution, which resulted from Hedeselskabet Miljø og Energi A/S subscribing for new stocks in the company as an incoming stockholder.*

*A change in the ownership of a limited company can be implemented by a stockholder selling stocks directly to another or a new stockholder. However, it follows from Article 44a(1)(2) and Article 48b(1) of the Companies Act that a change of ownership may also be effected by a reduction in capital which may be combined with a simultaneous increase in capital, cf. Article 46 of the Act. It must be assumed that the disposals made in connection with Finwill's withdrawal as a stockholder and Hedeselskabet Miljø og Energis' entry have been made in accordance with the rules of the Companies Act.*

*It is clear from the preparatory work on § 16 B of the Danish Income Tax Act that the provision was enacted in accordance with § 16 A, and that this was done out of a desire to ensure that there was no difference in the tax treatment of cases where a stockholder sells stocks to the issuing company and cases where a company redeems part of the stock capital by distribution to the stockholders, cf. Folketingstidende 1960-61, supplement B, sp. 852. According to the preparatory works for § 16 A, this provision covers any distribution by the company, irrespective of whether it derives from profits earned, increases in assets exempt from income tax or from the capital injected into the company, cf. Folketingstidende 1960-61, supplement A, p. 833. We consider that it must follow from this that § 16B must apply in the same way to any sum of money disposed of by the company, irrespective of whether it derives from profits earned, increases in assets exempt from income tax or - as here - from the capital contributed to the company. Such disposal sums are therefore tax-free where the conditions of Article 13(1)(2) of the Corporate Tax Act are met.*

*Against this background, we consider that the fact that the issuing company, Circuit Electric, financed the repurchase of the stocks from Finwill with the capital which Hedeselskabet Miljø og Energi at the same time injected into Circuit Electric, cannot lead to the disposal sum not being covered by § 16 B, Paragraph 1, of the Danish Income Tax Act, with the consequent possibility of tax exemption under § 13, Paragraph 1, point 2 of the Danish Corporate Tax Act.*

*In our view, the fact that Circuit Electric did not have sufficient funds to finance the acquisition prior to the capital increase cannot lead to a different result, since it must be assumed that Hedeselskabet Miljø og Energis' subscription of new stocks for an amount of DKK 17,460,000 was matched by real assets in Circuit Electric.*

*We therefore consider that there are no grounds for refusing to recognize that the disposal sum in Finwill's stock transfer to Circuit Electric is a dividend covered by § 16 B(1) of the Danish Income Tax Act and thus exempt from tax under § 13(1)(2) of the Danish Corporate Tax Act. In view of the above, we vote in favor of Finwill's claim.*

*Judges Asbjørn Jensen and Marianne Højgaard Pedersen state: As stated by the District Court, it was agreed that Hedeselskabet Miljø og Energi would purchase Finwill's 50% stock of the total stock capital in Circuit Electric. It must also be assumed that the agreed sales price was DKK 17,460,000. In order to avoid the sale being subject to the law on capital gains tax, it was subsequently agreed that the transfer of the business should be carried out as a capital reduction in the company and a simultaneous capital increase.*

*Under § 13(1)(2) of the Corporate Tax Act, cf. § 16B(1) of the Tax Assessment Act, a sale is exempt from tax if it qualifies as a dividend. The purpose of § 13(1)(2), according to the preparatory works, is solely to alleviate double taxation in the case of a distribution to a parent company of the income of the subsidiary, and the purpose of § 16B(1) of the Danish Income Tax Act, according to the preparatory works, is solely to prevent a more favorable taxation being obtained in the case of a sale to the company than in the case of a distribution of dividends.*

*As stated by the District Court, Circuit Electric did not have the means to purchase the stocks itself and the transactions did not involve any change in the stock capital or in the amount of equity. The agreed capital increase in Circuit Electric was not intended to inject capital into the company but was in fact payment by Hedeselskabet Miljø og Energis for Finwill's stocks. The transactions were organized solely in this way and not as a direct sale of the stocks, in order to allow Finwill to avoid being taxed on the proceeds of the sale. Apart from the tax saving, there was no business justification for the approach taken.*

*Under these circumstances, the sale amount cannot, in our view, be considered to be covered by § 13(1)(2) of the Corporate Tax Act. We therefore accept that the disposal sum of DKK 17,460,000 cannot be exempted from taxation, but must be taxed in accordance with the general rules on taxation of profits from the disposal of stocks in the Danish Capital Gains Tax Act.*

*The fact that the proposal to amend § 16B of the Danish Income Tax Act was withdrawn in the 1998-99 parliamentary year in Bill No. L 87 cannot, in our view, be taken as an indication that the legislature has subsequently accepted that the sale of stocks can be organized in a manner such as that at issue here, without the profit being subject to the basic rules on the taxation of profits in the Danish Capital Gains Tax Act.*

*We therefore vote to uphold the judgment. The decision will be taken by the number of votes."*

The Supreme Court judgment referred to above can thus be seen both as an expression of the great importance of the application of civil law concepts in tax law, cf. The judgment can also be seen as an expression of the fact that the principle of reality is not an arbitrary norm which allows tax authorities to tax at will.

Thirdly, to illustrate the principle of reality, reference is made from the case law to the minority opinion in the Supreme Court's judgment of August 24, 2007, published in TfS 2007, 752 H.

The case concerned whether a limited partner had a deduction for interest expenses incurred in connection with a limited partnership's participation in a real estate investment project.

The tender documents indicated that a negative operating result was budgeted over a period of 20 years.

The acquisition of the property, acquired with a right of repurchase to the original owner and at a high price, was financed, inter alia, by a "vendor's mortgage" without personal liability. The terms provided for the debt to be adjusted *"in proportion to the debtor's total income and expenditure in respect of the property."* In addition, the debt was to be repaid by DKK 350,000.

The question then was whether the limited partner had a deduction for the interest on the loan in question.

The majority of the Danish National Tax Tribunal upheld the tax authorities' denial of the right of deduction on the following grounds:

> *"The Danish National Tax  must pronounce:*
>
> *Two members of the Court, including the President, shall [...] agree, in respect of loans taken out with S A/S [...], that no deduction may be made in respect of interest thereon. These are loans granted on non-recourse terms in an arrangement without any real economic risk for the taxpayer and the loan was taken out solely for tax purposes. These two members of the court therefore vote in favor of not allowing the appellant to deduct interest expenses on debts to S A/S.*
>
> *A member of the court should note that the assumption of debt and interest obligations by K/S K cannot be considered to have real substance [...]."*

The Danish National Tax Tribunal's decision was subsequently upheld by the Eastern High Court) in a judgment of January 19 20007 [sic]. The reasons given by the District Court are as follows:

> *"The promissory note was without personal liability, but with specified security issued to the seller of the rental property in question. It formed part of a complex of agreements. No information has been provided to rebut the presumption that the purchase price of the property was much higher than the market value, and the Treasury has not commented on the basis for depreciation. In view of all the terms of the assignment, the security and the write-off, it is not established that the creditor would ever receive payment corresponding to the amount of the claim. Moreover, according to the tender documents, the investment was loss-making and could only yield a net benefit after tax.*
>
> *The payment obligation under the promissory note was limited in advance to an annual payment of DKK 1,296 per unit. No more was to be paid, because the seller had assumed the expenditure risk against his specified ability to pay and because the actualization of the personal liability for the credit union loan was hypothetical in view of the security and the agreed adjustment of the payment instalments.*
>
> *After an overall assessment of the arrangement, the District Court finds that A has not faced any real risk of having to repay and prepay its stocks of the credit balance under the promissory note. The posted interest expenses are therefore not deductible. The principal claim and the alternative claim are therefore inadmissible.*

*As he has not demonstrated that the arrangement, apart from the promissory note, was genuine, the expenses entered cannot be deducted as current service. Nor can the more subtle claim be upheld.*

*Dismisses the action;"*

In particular, the Court referred to the absence of personal liability and the purchase price exceeding the value of the goods, as well as to the fact that it had not been established - in the light of the specific terms of the vendor's mortgage - that the creditor would receive payment corresponding to the amount of the claim.

The Court also considered that the investment was loss-making and could only produce a net benefit after tax. In view of the absence of any real possibility of repayment and interest on the loan, the Court held that the interest costs were not deductible.

Nor could the District Court accept the limited partner's argument that the deduction was automatically permitted under the interest accrual provision in Paragraph 6(2) of the Business Tax Act. In view of the lack of reality, the court also held that no deduction could be granted for current payments. The Ministry of Taxation was therefore discharged in its entirety.

However, the Supreme Court split by a three-two vote. The majority of the Supreme Court, like the Court of Appeal, did not consider that a real debt obligation had been established, and therefore neither the interest paid nor the interest actually incurred was deductible.

In the present context, however, it is the reasoning of the minority of the Supreme Court that is interesting. The reasons given by the minority are as follows:

*" Judges Lene Pagter Kristensen and Niels Grubbe said:*

*It is not disputed that K acquired the property from S on December 31, 1992 by means of a transfer which was valid under civil law, and the tax authorities have acknowledged that the transfer is also taken into account for tax purposes, so that the company as owner was able to make tax depreciation allowances on the property. It is also undisputed that K carried on a business of letting the property and, in so doing, received rental income and incurred normal property expenses and interest on the credit association debt for tax purposes.*

*The case thus concerns only the question whether interest deductions should be denied, on the grounds that the promissory note did not express a real debt to S for tax purposes.*

*The promissory note was created as part of the settlement of the purchase and was intended in particular to cover the balance of the purchase price and K's current operating deficit on the property.*

*Mr. S. had himself acquired the property on May 01, 1990 by way of a purchase in the ordinary course of trade between independent parties for a cash consideration of DKK 27.2 million. The resale to K took place two and a half years later at a price corresponding to the purchase price, DKK 27.9 million, plus project and sales costs, totaling DKK 30.4 million. The property was then fully rented and the rent was somewhat higher than at the time of purchase. Furthermore, at the time of resale - but not at the time of acquisition - a 10-year guarantee was given for the current net rent with an annual cumulative increase of 3 % corresponding to the agreed rent adjustment. The guaranteed net rent of DKK 1,765,000 gave K an annual return before interest and tax of*

*5.8 % of the purchase price of DKK 30.4 million in the first year, increasing by 3% annually. On this basis, we consider that it is not likely that the purchase price exceeded the market value. This is the case irrespective of the available - summary - information on the disposal of the property in 2003 and irrespective of the public property valuation, S's perception of the market situation and the statistical evidence on cash prices for commercial property.*

*The obligation under the promissory note was secured, inter alia, by a pledge on a title deed of DKK 6 million secured on the property after the credit union loan and by a conveyance in the rental receipts. These assets constituted real assets for K, who thus - in addition to being liable for the debt - assumed a sacrifice of property by the collateral.*

*Although the project was organized in order to eliminate the risk of loss, K thus had a risk, but because of the limited partnership's articles of association and the loan agreement's limited liability provision (non-recourse terms), this did not entail a risk of the limited partners suffering losses in addition to their obligation to make deposits and ongoing payments. This risk limitation for the limited partners does not in itself prevent them from being entitled to deduct interest on the loan.*

*We find - contrary to the majority - that, notwithstanding the security for the promissory note and S's right of purchase and sale, K had real access to the legal and actual disposal of the property.*

*We also find - contrary to the majority - that K had a real opportunity to profit from the disposal of the property. This possibility also existed in the case of S's exercise of the right to buy, if the net rental income increased by more than the assumed 3% per annum, or the interest charge was reduced by reprioritizing the credit union loan or the loan with S.*

*Although the project was established for a 10-year project period, K was not bound to this period but could settle the debt to S beforehand or dispose of the property before the end of the period. If S did not exercise its right to purchase during the 10-year period, K could keep the property and, depending on the evolution of rents and interest rates, this was, in our view, not just a theoretical possibility.*

*In these circumstances, we find no basis for holding that the reality of the agreements concluded was merely that the limited partners bought into a temporary formal debt relationship in order to obtain, inter alia, the disputed interest deduction, and thus no basis for holding that the promissory note issued by K did not, for tax purposes, express a real debt to S. Accordingly, A is entitled to the interest deduction.*

*Under § 6(2) of the Corporate Tax Act, deductions for interest expenses, etc., are spread over the period to which the interest expenses relate. This provision derogates from the general rules in Article 5(1) and (2) of the Tax Assessment Act on the accrual of interest deductions, but its wording cannot be taken to derogate from the provision in the current Article 5(7) (now Article 5(8)) of the Tax Assessment Act, which limits the interest deduction in certain cases to interest paid. This understanding is also supported by the comments on Article 6(2) of the draft law on corporate tax (Folketingstidende 1985/86, Supplement A, sp. 2629).*
*It is undisputed that the provision of the current*
*§ Article 5(7)(1), taken in isolation, would lead in the present case to a limitation of the interest deduction to the amounts claimed in the alternative by A. We consider that A is not exempt from this limitation by virtue of the provision in sub§ (2) relating to payment or security for debts due. Nor does Paragraph 3 apply, if only because S does not belong to any of the categories of creditors to which that provision applies.*

*We then vote to uphold A's alternative claim."*

The reasoning of the minority of the Supreme Court thus reflects the fact that the tax law principle of reality cannot be used to override any inconsistency between form and substance, since the minority can be said to have upheld the formality of the case, see in particular the minority's observation that there was no basis for finding that the reality of the agreements concluded was merely that the limited partners bought into a temporary debt relationship in order to obtain, inter alia, the disputed interest deduction, so that there was no basis for finding that the promissory note did not represent a genuine debt for tax purposes.

Similarly, reference should be made to the minority's dissent in the Supreme Court's judgment of November 25 1999, published in TfS 1999, 950 H.

The case concerned the question whether a company (J.S. Ejendoms- og Investeringsselskab A/S (formerly Jysk Sengetøjslager A/S), which was part of the Jysk Sengetøjslager group, was entitled to deduct commission payments to the company Hobby Hall A/S, with which it was jointly taxed.

By agreement dated August 25, 1989, Jysk Sengetøjslager A/S and Hobby Hall A/S agreed that Hobby Hall A/S would carry out all the purchasing for Jysk Sengetøjslager A/S and that a commission would be paid by Jysk Sengetøjslager A/S to Hobby Hall A/S as remuneration for the work carried out. The commission was agreed at 5 % of the purchase.

The agreement was later supplemented by the auditor with the information that Hobby Hall A/S made all purchases for the group, including deliveries to foreign subsidiaries and business partners.

The product range was determined in cooperation between the purchasers and the employees of the complainant company. The control of the goods was carried out by the purchasers and Hobby Hall A/S bore the related costs.

This included salaries, allowances and travel, subsistence and administrative expenses. In addition to Jysk Sengetøjslager A/S's main stockholder, Hobby Hall A/S employed a director and four or five buyers.

The purchasing business was carried out from rented premises in Silkeborg.

The purchasing function was carried out in the name of Jysk Sengetøjslager A/S and for the account and risk of Jysk Sengetøjslager A/S.

The purchased goods were delivered and invoiced directly to Jysk Sengetøjslager A/S, and Jysk Sengetøjslager A/S invoiced foreign subsidiaries for any deliveries.

Hobby Hall A/S received a commission of 5% of Jysk Sengetøjslager A/S's total purchases.

In the period from September 01, 1989 to August 31, 1990, Jysk Sengetøjslager A/S paid Hobby Hall A/S a commission of DKK 21 884 788.

The local tax authorities, however, denied Jysk Sengetøjslager A/S a deduction for the majority of the commission paid and increased the assessment by DKK 18,468,059, since the expenses incurred for the purchasing function could, in the opinion of the tax authorities, be estimated at DKK 3 million, while the remainder of the commission was regarded as a non-deductible subsidy.

The Danish National Tax Tribunal upheld the tax authorities' decision, taking the view that the transfer of the purchasing function could not be recognized for tax purposes

In so doing, the Danish National Tax Tribunal held that Hobby Hall A/S was not exposed to any commercial risk, since it was acting in the name of Jysk Sengetøjslager A/S and at the latter's expense and risk.

The arrangement was therefore not found to be commercially justified, and in this connection the Danish National Tax Tribunal's decision referred to the company's auditor's letter of August 28, 1992, which stated that Hobby Hall A/S's function was solely to make purchases for Jysk Sengetøjslager A/S, the latter company invoicing subsidiaries etc. The scheme was then found to have been set up solely to transfer income to Hobby Hall A/S, and the National Tax Tribunal upheld the tax authorities' decision.

By judgment of December 11, 1997, the Western High Court upheld the Danish National Tax Tribunal's decision in the case on the grounds that the terms agreed between Hobby Hall A/S and the parent company could not be regarded as usual commercial terms.

Like the Western High Court, the majority of the Supreme Court also found that there was no basis for recognizing the separation of the purchasing function. Thus, the majority found that the agreement deviated from normal, commercially justified function splits, that the arrangement had to be disregarded for tax purposes.

In the present case, however, it is the reasoning of the minority of the Supreme Court that is interesting.

The minority acknowledged in principle the corporate construction, although the commission paid could not be acknowledged in terms of amount. The reasons given by the minority are as follows:

> *"Judges Walsøe and Jytte Scharling state:*
>
> *The purchasing function performed by Hobby Hall cannot be regarded as a normal agency activity, but is in the nature of the ongoing performance of purchasing tasks for J.S. Ejendoms- og Investeringsselskab, a company with a vested interest.*

*On the basis of the information on the nature and size of the Jysk Sengetøjslager group and the explanations given, we consider that the transfer of the purchasing function to an independent company within the group also served a regulatory purpose. We therefore consider that there are no grounds for disregarding the agreement of August 25, 1989 altogether for tax purposes.*

*However, the agreement is between parties in the same interest and, for the reasons given by the District Court, we consider that it is unlikely that the appellant would entrust procurement tasks on similar terms to an outside undertaking.*

*Hobby Hall bore the costs of staff, premises, driving and administration, and Hobby Hall's performance of the purchasing functions would be of some significance to the appellant's profits in terms of quality, prices, etc. Against this background, it must be assumed that it would also be normally commercially justifiable to charge a profit to an affiliated undertaking for the performance of the purchasing functions for the appellant.*

*However, taking into account the costs of Hobby Hall's purchasing business and the limited financial risk of the individual, the agreed commission of 5% of turnover significantly exceeds what could be achieved between independent parties.*

*In the light of the foregoing, we vote in favor of the parties' alternative submissions that the case be referred back to the tax authorities for reconsideration."*

As can be seen, the minority of the Supreme Court acknowledged in principle the split of the purchasing function - i.e. the corporate construction made.

The Supreme Court's judgment also illustrates the fact that the principle of reality does not apply to just any inconsistency.

Fifthly, reference can be made to the judgment of the Western High Court of June 27, 2002, published in TfS 2002, 760 V.

The case concerned whether a leasing business carried on by a leasing company ceased to exist before or, at the latest, at the same time as all the stocks in the leasing company ceased to exist on January 01, 2001. On September 01, 1992, the leasing company's stocks were transferred by Aktivbanken A/S to the applicant, Bilka Lavprisvarehus A/S, which was then jointly taxed with the leasing company, and whether the leasing company had at that time disposed of all its operating assets, with the consequence that the company's depreciation balance in respect of those assets had to be deducted for tax purposes in the 1992 financial year (the 1993/1994 tax year) in accordance with Paragraph 6 of the current Depreciation Law.

Aktivbanken, the sole stockholder in a leasing company, had sold the stocks in the leasing company to Bilka.

The leasing company had a large unused depreciation balance and the purchase price was set as the leasing company's equity plus a premium of DKK 49 million, calculated on the basis of an expected tax value of the leasing assets.

At the time of the transfer, the leasing company had no staff and no further contracts were concluded. The

Danish National Tax Tribunal upheld the decision of the tax authorities on the following grounds:

*"The Danish National Tax Tribunal must pronounce*

*Based on an overall assessment of the contractual material and the arrangements made in connection with Bilka's acquisition of the Leasing Company, the Danish National Tax*

*Tribunal finds in accordance with the tax authorities' view, that it must be assumed that all the assets of the leasing company - irrespective of the formal basis - must in fact be regarded as having been transferred before Bilka took over the company, and that the entire business activity to date had thus ceased at that time.*

*The Danish National Tax Tribunal's decision has taken into account the arguments put forward by the tax authorities in support of this view, emphasizing in particular that, following Bilka's acquisition of the leasing company, there was no actual activity in the company and that, by virtue of the agreements concluded, there was no economic risk or any possibility of additional income being generated by the leasing activity.*

*Since the Court agrees with the Government Lawyer that there was no conflict of interest between Bilka and Aktivbanken as regards the continued formal placement of a leasing activity in the Leasing Company in order to be able to exploit the depreciation base of the company for tax purposes, and since the Court also agrees with the Government Lawyer's statement concerning the principle of reality, the Court considers that the reclassification of the agreements concluded by the tax authorities was justified. Finally, since the Court agrees with the proposed amendments to the tax assessments in the circumstances set out, the assessments complained of are confirmed.*

The Treasury argued that the company's leasing activities were divested for tax purposes at the same time as the sale of the company, as the activities lacked reality after that date. Losses on the disposal of the assets should therefore be deducted in the same tax year. Since the joint taxation of the leasing company with the purchasing company was not established until the following tax year, the loss established could not, according to the Ministry of Taxation, be used for joint taxation with the purchasing company.

In support of the plea of lack of reality, the Ministry of Taxation argued that there had been a community of interests between the selling and the buying company on the basis of coinciding tax interests and, furthermore, that agreements had been concluded which eliminated the risk of loss and the possibility of gain linked to the leasing assets.

It was thereby argued that the selling company had in fact bought out the leasing assets, so that the leasing activities remained with the seller after the transfer of the stocks in the company.

The District Court considered that the sale of the company was conditional for tax purposes and that after the sale there was no real activity in the leasing company.

However, the District Court emphasized that leasing activities continued to be carried out on the basis of the leasing contracts, including with the assets which the leasing company continued to own, at least formally.

A common tax interest, the fact that the operating risk remained with the vendor and the fact that, after the sale, the vendor continued to appear to the lessees as the owner of the leasing activities could not justify an intention to change the ownership of the leasing assets.

By judgment of the District Court, the Ministry of Taxation was then ordered to recognize the reality of the arrangement.

Sixthly, as regards case-law, reference is made to the judgment of the Supreme Court of June 10, 1997, published in TfS 1997, 506 H.

The case concerned the taking out of loans by a major stockholder in a controlled tax company.

The taxpayer in question, who was resident in Belgium in 1980-92, was liable to tax in Denmark only on business income and business assets.

The taxpayer deducted interest on loans from his taxable income for 1985 and debts from his taxable assets for 1986 as a result of a loan of DKK 4 million granted by a Jersey company set up by him for his personally run business in Denmark.

The loan of DKK 4 million was granted by a company established by the taxpayer in Jersey on September 13, 1985 to the taxpayer-owned company in Denmark, Ejendomscenteret, which repaid this one-year loan on September 15, 1986. As lender, the taxpayer had signed on behalf of the Jersey company by power of attorney, and as borrower, Ejendomscentret/taxpayer had signed.

The taxpayer had received from the company an irrevocable power of attorney to make all dispositions of the company's securities, and the loan document in question was signed by the taxpayer for the lender under the power of attorney and by the taxpayer as borrower for the company.

The tax authorities did not allow these deductions, on the grounds that the taxpayer was in fact both the creditor and the debtor in the loan relationship. The formal existence of the loan was not contested.

The taxpayer appealed the tax authorities' decision to the Danish National Tax Tribunal, which upheld the proposed assessments.

The taxpayer then brought the case before the District Court, where the taxpayer requested that the Ministry of Taxation be ordered to recognize that the taxpayer's taxable assets in Denmark for the 1985 income year were reduced by DKK 4 million, and secondly, an order that the Ministry of Taxation recognize that the taxpayer was entitled to deduct interest of DKK 126,000 from his taxable income in Denmark for the 1985 income year and was entitled to deduct interest of DKK 229,556 for the 1986 fiscal year.

The taxpayer argued at trial that the Jersey company was a legally established and existing business under Jersey law. The company should therefore be recognized in Denmark as an independent taxable entity. The loan of DKK 4 million of September 10, 1985 had been concluded between two independent legal entities, with the Jersey company as creditor and the taxpayer as debtor, and the loan should therefore be recognized for tax purposes, since it had been concluded on normal commercial and undeniable terms. The taxpayer did not have a controlling influence in the Jersey company, which had an independent board of directors of which the taxpayer was not even a member.

Finally, the taxpayer argued that the terms of the loan were usual and normal market terms. There was no confusion of interests between the parties in relation to the loan, which was also repaid on time.

The District Court considered that the main purpose of the existence of the company and the transfer of the mortgages had been to obtain tax advantages.

The Court further held that the taxpayer had been the sole stockholder of the Jersey company (Zartok Ltd.) during the relevant period, which had its origin in Denmark, from where the company was also operated. The taxpayer had not, in the view of the District Court, documented or otherwise demonstrated any business justification for the operation and existence of Zartok Ltd. or for the loan which that company granted to the claimant's company, Ejendomscentret Nordbo Huse, which was personally run in Denmark.

Therefore, the District Court held that the taxpayer's borrowing of DKK 4 million from the Jersey company should be deprived of tax significance

However, the Supreme Court found that loans taken out with the Jersey company had the requisite reality and should therefore be recognized, and the Supreme Court ruled that the agreed interest rate corresponded to arm's length terms.

The Supreme Court's - brief - reasoning is as follows:
> *"The case concerns only the loan which Tage S. Nielsen's personal company,*
> *Ejendomscentret Nordbo Huse, took out in September 1985 with the Zartok Ltd.*

*company, and the loan, which replaced Danish bank loans, was granted on normal market terms.*

*The Supreme Court considers that the loan was in the nature of a normal commercial arrangement for financing the company's operations. There are therefore no grounds for depriving the loan of any tax significance.*

*The Supreme Court therefore upholds the appellant's claim."*

<u>Seventh,</u> as regards case law, reference is made to the judgment of the Supreme Court of April 16, 1997, published in TfS 1997, 392 H.

The case concerned a Danish company which had made part of its exports through a controlled establishment in Liechtenstein at a price equivalent to only 50 percent of the invoice price for sales directly from the parent company.

The tax authorities took the view that there was an interim invoice without independent economic reality, and the institution's income was therefore transferred back to the Danish parent company.

The Danish National Tax Tribunal upheld the tax authorities' decision. In this context, the Danish National Tax Tribunal considered that the sale of the goods in question through the company in Liechtenstein had been under-invoiced by approximately 50%, as demonstrated by the fact that the prices actually obtained on resale to the companies in the Netherlands and Germany were approximately double the prices invoiced to the company in Liechtenstein.

The Danish National Tax Tribunal's decision also emphasized that the company in Liechtenstein had no employees, premises or business activity, which meant that the company had to be regarded as a non-existent company for tax purposes.

The majority of the Supreme Court agreed with the applicant, considering that the sales through the Liechtenstein company were made at prices not significantly different from those applied to sales to other foreign customers. Whether those prices were approximately 50 percent lower than the prices applied to sales to Danish customers, and regardless of whether the prices were those applied to sales to intermediaries, there was no basis for finding that there had been a transfer of income to the company in Liechtenstein which should not be respected by the tax authorities.

The majority of the Supreme Court upheld the decision of the District Court, considering that the owner of the Danish company, through the company in Liechtenstein, was engaged in the business of reselling the traded products to Sweden and elsewhere to an extent not specified.

The majority of the Supreme Court also considered that the sale to the Liechtenstein company as an intermediary was made at prices which did not differ significantly from the prices charged to other foreign customers. Therefore, the majority of the Supreme Court considered that it was questionable to consider that it had been established that the sale to the Liechtenstein company had taken place on such terms that there was a transfer of income which was rightfully due to the Danish parent company.

The majority of the Supreme Court thus ruled that the intermediate sale had the necessary reality and also ruled that the intermediate invoice price fixed corresponded to the arm's length price, i.e. the value of the sale to a third party.

### 12.3.4 The Principle of Reality in the Legal Literature

As indicated above, the principle of reality has also been extensively discussed in the legal literature.

In its time, the reality principle was formulated by Professor Jan Pedersen in his doctoral thesis "Skatteudnyttelse" from 1989.

In his doctoral thesis, Jan Pedersen argued that <u>civil law is in principle the guiding principle for tax law</u>.

In principle, tax law is <u>not directed</u> against the economic content of the taxpayer's transactions, but against the civil law qualification of these transactions.

In other words, the fact that a taxpayer has, for example, received an amount in more precisely specified circumstances is not of independent interest for the purposes of tax law. Only when the disposition is qualified in civil law terms as a wage, sale, gift, loan, purchase, business activity, etc., can tax law be applied to the civil events thus classified.

The tax qualification thus presupposes a prior civil law qualification. There is therefore no need for a distinction in tax law between formality and reality in the taxpayer's dispositions.

However, there is a risk of abuse of the above civil law governance.

By circumvention or even pro forma, the dispositions can be organized in such a way that they appear in form in a way that is advantageous from a tax point of view, but in such a way that the actual and real content of the dispositions differs from this.

Thus, some of the tax exploits are characterized by the use of the civil law form as a backdrop in order to steer taxation in a favorable direction.

The arrangements are characterized by an artificial and unusual form, in that the taxpayer seeks only to obtain the resulting tax advantages, but not the corresponding civil law consequences. Disposals are disguised as long-term loans or contracts of use, in such a way that the "transferor" effectively gives up his property rights, loan agreements with corresponding interest deductions are set up without the borrower being subjected to any real financial burden, etc.

The essence of the principle of reality is therefore that, under certain conditions, taxation may be directed towards the actual economic reality at the expense of the opposing civil formality.

It is very important to bear in mind that the principle of reality is <u>not</u> an arbitrary norm allowing tax authorities to apply taxation at will.

It is therefore assumed that the above-mentioned civil law rule can be set aside only if the form claimed <u>does not correspond at all to the real economic realities, it not being</u> possible, however, to specify more specifically and clearly the scope of the principle. See Jan Pedersen in TfS 2000, 142, where the following is also stated:

> *"In its time, the principle of reality was formulated as a result of the judicial activity of the courts.*
>
> *It was stressed that the establishment of the practice fulfilled essential tax policy needs and that inaction against tax abuse posed a threat to income taxation itself and thus to society as a whole.*
>
> *In doing so, the courts assumed a significant legal policy responsibility, which gained broad support - also among taxpayers.*
>
> *Past legal developments have increased and reinforced the evidence for the very existence and specificity of the legal principle expressed by the principle of reality.*

*The concrete application of the law will always be difficult, as it involves a balancing of purely normative concepts.*

*The individual decisions and judgments can therefore give rise to discussion pro and contra. The decisive point, however, is that*

*The Supreme Court is diligently monitoring to ensure that the principle of reality is not abused to implement unfair taxation. This not only ensures that taxation is carried out on a lawful basis, but also safeguards the fundamental freedom of contract.*

*The Supreme Court has thus continued to exercise its responsibility in terms of legal policy and has contributed to ensuring that the legal position, from an overall point of view, continues to be considered fair and reasonable."*

### 12.3.5 Reality principle applied to pension plans cases

As stated, the principle of reality does not have the character of a free access for the tax authorities to a fiscal reclassification of a given fact.

It thus follows from the Supreme Court case law cited above that the principle of reality cannot simply be abused to implement unfair taxation, since according to the principle of reality - as stated by Jan Pedersen - taxation must continue to produce reasonable results.

In the present case, it is submitted that the principle of effectiveness cannot be relied upon to disregard the ownership of the stocks in question by the pension plans.

There is therefore no mismatch between the civil legal ownership of the pension plans and their tax ownership of the stocks in question, as required by the principle of sound administration.

There is therefore no basis for a different assessment for tax purposes - in other words, the pension plans must also be regarded for tax purposes as the owners of the stocks in question, which have been transferred to them under civil law.

Therefore, the pension plans were also the tax owners of the dividends paid to the pension plans, on which the underlying companies withheld dividend taxes. As a result, the pension plans are also entitled to the dividend tax reimbursements in question.

### 12.3.5.1 Documentation of the link to the pension plan economy

The necessary *link with the pension plans*, which proves that the stock transactions etc. have passed through the pension plans' *finances*, has been proven in the lead cases, as in the present case, by the presentation of custody statements and the accounting records prepared by Schaffelhuber Müller & Kollegen S.à r.l.

The stock transactions, the receipt of dividends and the dividend distribution are all recorded directly in the pension plans' accounts (cash and securities accounts) with their respective custodians.

The tax authorities themselves confirm in the civil proceedings before the High Court in London that they have paid reimbursements to three tax agents who have transferred the following amounts to Solo Capital's contact account in Barclays Bank (converted into Danish kroner):

- From Syntax to Solo Capital: DKK 2.746 billion.
- From Goal to Solo Capital: DKK 2.79 billion.
- From Acupay to Solo Capital DKK 2.961 billion

These amounts are all the pension plans' money according to the reimbursement requests.

As the pension plans had not been in existence for very long when SØIK initiated the seizure of all accounts belonging to the four custodians and Solo was transferred to PWC's administration, none of the pension plans that carried out stock transactions in 2014 and 2015 had yet had the opportunity to withdraw money from the Solo group.

The beneficiaries were/are also all still too young to have received pension payments from the pension plans.

Had the Danish Tax Appeals Agency and the Danish Tax Appeals Agency accepted a pension plan that had traded stocks in 2012 - such as The Sander Gerber Pension Plan - as the lead case, we could have documented payments from the Solo group to U.S. banks. This pension plan's transactions were far enough back in time to have had time to transfer money out of what the tax authorities like to describe as a "closed system."

However, the fact that all realized gains were still in the account of the Solo group does not mean that the transactions were unrelated to the finances of the pension plans.

### 12.3.5.2 The reality principle - agreements with independent parties on market terms

While the Danish Tax Appeals Agency has no doubt that the purchase and sale of stocks, the forward contracts and the stock loans were concluded between independent parties, the non-payment of the deposit to the custodian mentioned in the custody agreement, point 5.1, is for the Danish Tax Appeals Agency an indication of the lack of independence of the pension plans from the custodian.

The custody agreement that the pension plans signed with the Solo Group custodians included a standard requirement to deposit a margin of USD 500,000 before stock trading could start. However, the pension plans were informed that this condition was included for future transactions to take place under the MIFID II rules. However, MIFID II had not yet entered into force in 2014. The custodians in question allowed pension plans to wait until after the first trade(s) had taken place before paying the required margin if the pension plan wanted to buy the stocks on the last day before the ex-date of the dividend. This risk could be taken by the respective custodians, as the custodian could already take the initially required "initial margin" upon receipt of the net dividend.

However, the fact that the custodian did not immediately demand the predicted margin does not mean that the pension plans were not independent of their custodian. The profit made by the custodian on the transactions was large enough for it, as an independent service provider, to be willing to take the financial risk for a few days.

**12.3.5.3 Reality principle - acts effectively carried out on behalf of pension plans, including the right of disposal**

In its recommendation in the lead cases, the Danish Tax Appeals Agency puts forward no less than two arguments for its position that the transactions were not carried out by or on behalf of the pension plans:

1  No evidence of transfer of funds to the pension plan from the custodian or other actors involved in the stock transactions, etc. has been provided
2  The long series of agreements, account statements, trade notes, etc., produced with the custodian as the agent in the transactions should not - given the circumstances of the case - be sufficient to document that the custodian acted on behalf of the pension plans.

**12.3.5.3.1 Transfers from custodian**

Who the pension plans paid and how much to enable the transactions is irrelevant to the question of whether the pension plans acquired ownership of the stocks.

Since the pension plans themselves did not have the capital to fund the transactions, the clearing agent and custodian naturally ran a relatively high risk of having to step in and pay for the stocks if the pension plan could not find a stock borrower in time. The clearing agent and custodian were, of course, well compensated for this risk.

The persons who arranged the pension plans as clients of the Solo group also charged an "Introduction" or "Arrangement fee."

The pension plans were aware from the outset that these were necessary business transaction costs that they would have to pay after they had realized the gains from the transactions themselves as presented in Appendix 1.

The transfers were carried out electronically and therefore the pension plans cannot provide evidence of this. However, they are also not required to acquire ownership.

According to the Inland Revenue's own summons filed with the High Court in London, the Inland Revenue agrees that payments have been made from Solo Capital's account in Barclays Bank to various beneficiaries in quite significant amounts. The Inland Revenue is thereby aware that payments have been made from the Solo Capital account to service providers on behalf of the pension schemes who were the owners of the funds in the Solo Capital account.

The amount first invoiced by Solo Capital to the pension plans for services and then paid by Solo Capital itself to other service providers, and the amount paid by the pension plans themselves to other service providers, cannot be proven at this stage from the London subpoenas.

However, it appears that the following persons and companies have received the following amounts from Solo Capital's account in Barclays Bank to their respective accounts in Varengold Bank:

| Recipient | Amounts received from Solo Capital pursuant to the summonses in London | Conversion to DKK | Total |
|---|---|---|---|
| Ganymede Cayman | 200,624,137 EUR<br>57,319,077 GBP<br>5,308,011 USD | 1,496,644,478 DKK<br>459,131,688 DKK<br>35,356,626 DKK | 2.2 billion DKK |

| | | | |
|---|---|---|---|
| Colbrook Limited (Not "Coolbrook") | **8,666,663.93 EUR** | **64.6 million DKK** | **64.6 million DKK** |
| T&S Capital | 2,000,000 EUR | **14.9 million DKK** | 14.9 million DKK |
| Elysium Global Ltd (Virgin Islands) | 222,100,000 EUR<br>**14,999,983 GBP** | **Circa 1.80 billion DKK** | **1.8 billion DKK** |
| Ampersand Capital Limited | **13,763,641.37 EUR** | 102,675,967 DKK | **102.7 million DKK** |
| Elysium Global Dubai Ltd | 2,211,193 EUR<br>**1,574,970 USD**<br>**800,000 GBP** | 16,493,976 DKK<br>**10,539,397.29 DKK**<br>**6,463,998.36 DKK** | **33.5 million DKK** |
| Sanjay Shah | 11,100,000 USD<br>**4,500.00 EUR** | **74,294,828.64 DKK**<br>**33,566,549.87 DKK** | **108 million DKK** |
| Trillium Capital Sarl | 60,500,000 EUR | **Circa 451.3 million DKK** | **451.3 million DKK** |

From Barclays Bank, according to the subpoenas, the following payments were also made to other accounts:

| Recipient | Amounts received from Solo Capital pursuant to the summonses in London | Conversion to DKK | Total |
|---|---|---|---|
| Elysium Global Ltd (Virgin Islands) (or) Elysium Global Dubai Ltd | 111,000,000 EUR<br><br>22,000,000 GBP<br><br>96,000,000 USD | 820,495,951.55 DKK<br><br>177,836,721 DKK<br><br>642,623,757 DKK | 1.7 billion DKK |
| Ganymede Cayman | 9,000,000 EUR<br><br>18,000,000 GBP | 67,139,806.23 DKK<br><br>145,482,618.47 DKK | 212.6 million DKK |

| | | | |
|---|---|---|---|
| Sanjay Shah | 9,818,000 EUR<br>2,493,000 GBP<br>151,000 USD | 73,242,085.70 DKK<br>20,148,270 DKK<br>1,010,489.16 DKK | 94.4 million DKK |
| Edo Barac | 60,000 GBP<br>1,554,375 EUR | 480,606 DKK<br>11,595,548 DKK | 12 million DKK |
| Jaswinder Bains | 3.245 million GBP | 26 million DKK | 26 million DKK |
| Treefrog Capital Limited | 13,545,774 EUR<br>2,000,500 USD | 101,050,692 DKK<br>13,325,317 DKK | 114 million DKK |
| Darren Lui | 274,191 GBP | [illegible] | 2.2 million DKK |
| Rajan Shah | 6,596,000 GBP | 53.3 million DKK | 53.3 million DKK |
| Hooloomooloo | 24,180,000 JPY<br>950,000 GBP | 1,524,657 DKK<br>7,609,595 DKK | 9.1 million DKK |
| Solo Capital Limited | 1,152,700 GBP | | 9.3 million DKK |
| Agrius Capital Ltd | 531,000 GBP<br>17,000 GBP | 4,253,364.49 DKK<br>126,819.02 DKK | 4.4 million DKK |
| Aesa Sarl | 2,150,333 EUR | 16 million DKK | 16 million DKK |
| Anupe Dhorajiwala | 1,500,000 EUR | 11,190,027.63 DKK | 12 million DKK |
| Old Park Lane Capital Ltd | 206,099 GBP | 1,650,874.14 DKK | 1.7 million DKK |
| Telesto Markets LLP | 320,000 EUR<br>672.522 USD | 2,387,181.52 DKK<br>4,479,664.58 DKK | 7 million DKK |

**12.3.5.3.2 Custodians' actions on behalf of pension plans**

In fact, the evidence provided shows that the custodian did not act on behalf of the pension plans before the stock transactions entered into by the pension plans themselves were to be settled. Nor is this the role of a custodian. A custodian only becomes really active when the pension plans have already become owners of the Danish stocks, by their orders to buy Danish stocks being matched by the broker with sell orders.

Nor do custodians "act on behalf" of pension plans. They execute orders received from the pension plans: orders to settle the stock purchases made by the pension plans themselves.

The way stock trade settlement systems work, the settlement of a stock trade can no longer be stopped once a buy order has been matched with a sell order. Any clearing house/custodian authorized by an EU supervisory authority must have its computerized system for settling stock trades approved by supervisory authorities. This ensures that trades are settled correctly and that the settlement process cannot be interfered with manually.

The settlement is not triggered by the commercial invoice, as claimed by the Danish Tax Appeals Agency in its summary submission. Settlement is initiated by an electronic signal (the settlement instruction) automatically triggered by the trading system when the buy and sell orders have been matched.

**12.4 Otherwise, no basis for disregarding the tax ownership of the pension plan**

Moreover, the tax ownership of the pension plan cannot be disregarded on the grounds that the pension plan should have owned more stocks than were available on the market or that more has been paid out in reimbursement than received from the Danish companies.

The fact that the pension plan could own the large stockholdings is a natural consequence of the fact that ownership is acquired exclusively with the stock purchase agreement. Short selling will have this invisible consequence for any buyer of Danish stocks, that nobody knows whether they are buying a stock from a long owner or a short seller. Not even if you buy three stocks in Tryg A/S from your own bank. Especially when buying stocks through a bank that is authorized to act as a market maker, there is a high risk of buying a stock that the bank does not own - of the bank acting as an uncovered short seller, as the EU and the FSA want in order to increase liquidity in Danish stocks.

That the reimbursement payment MAY exceed the deposit may be a consequence either of short selling or simply of stockholders with one tax status selling to stockholders with another tax status on the exchange date with a settlement date after the record day.

However, it is disputed that Denmark should have paid out more in reimbursements than it received from the Danish companies.

The Danish Tax Appeals Agency acknowledges in the Leading Cases the consequences of short selling as presented by the representatives of the pension plans, and that this may lead in certain situations to the creation of more owners of Danish stocks than the number of stocks issued by the companies, but that this does not lead to a different result either

(...)

**FINAL CONCLUSION**

In the light of the above, it is concluded that there are no grounds for revoking the original decisions on the reimbursement of dividend tax.

The Danish Tax Agency's arguments in the present case are based on assumptions made several years after the dividend tax reimbursement decisions.

The doubts which the Danish Tax Agency has sought to raise are largely attributable to the Danish Tax Agency's own inadequate information. As stated above, these are undocumented assertions about the lack of ownership of the pension plans, for which the Danish Tax Agency has provided no real evidence. In addition, the Danish Tax Agency has not really wanted to contribute to the clarification of the cases, but has neglected to obtain a large amount of relevant information.

In the present case, it must be considered that the pension plan was the legal owner for tax purposes of the stockholdings and dividend payments at issue in the case and that, therefore, the pension plan was also entitled to the dividend payments in question, which it also received.

The pension plan has provided a very extensive body of evidence to support the reality of the traded transactions - both in relation to the stock trades, the stock loans and the forwards in question.

The evidence provided must of course be seen in the light of the fact that, as stated, the obtaining of the information is hampered by the fact that the information was sought several years after the original reimbursement applications, that a number of items of information are on the hard disks seized from the custodians, etc.

Nevertheless, the pension plan has provided adequate documentation of the traded stock transactions, including trade notes, custody statements and DCAs.

In the circumstances, it is not only unrealistic to require additional documentation
- it is also unfair. Particularly in view of the fact that the Danish Tax Agency itself has failed to obtain a number of the items of information.

Similarly, the pension plan has also provided DCAs from custodians that adequately document the receipt of net dividends.

DCAs, as indicated, are the only possible evidence of the receipt of net dividends.

As stated, it is both unrealistic and unreasonable to require documentation of the cash flow of dividends from the issuing company to the stockholder. Indeed, it is impossible to identify what part of the net dividends received during the market claim process resulted from ordinary dividends distributed by the issuing company and what part of the net dividends resulted from compensation payments by a short seller.

Nor, as stated, can the pension scheme be harmed by the fact that the Danish legislature has failed to take account of the special nature of short selling, which entails, inter alia, the intended phenomenon that a greater number of stocks may be offered than issued, and the resulting double ownership

The Danish National Tax Tribunal must therefore consider that the pension plan was the legal owner for tax purposes of the stockholdings and dividend payments at issue in the case and that the pension plan was therefore also entitled to the dividend payments in question, which it also received."

**The Danish National Tax Tribunal's decision**
§ 69b(1) of the Withholding Tax Act provides that if a person liable to tax under § 2 or § 2 of the Income Tax Act has received dividends, royalties or interest which, under §§ 65 to 65d, have deducted at source withholding tax in excess of the final tax under a double taxation agreement, the amount shall be repaid within six months of receipt of the request for repayment by the Customs and the Danish Tax Agency.

The Double Taxation Convention between the United States and Denmark provides in Article 10(3)(c) that dividends from a company resident in Denmark shall not be taxed in Denmark if the beneficial owner is a pension fund as referred to in Article 22(2)(e) which is domiciled in the United States. It is a condition that such profits are not derived from the carrying on of business by the pension fund or by any related undertaking.

Article 22(2)(e) of the DTC provides that a person resident in a Contracting State shall be entitled to all the benefits of this Convention only if that person is a legal person, whether exempt from taxation or not, organized under the laws of a Contracting State for the purpose of providing retirement or similar benefits under a defined benefit scheme to employed persons, including self-employed persons. It shall be a condition that more than 50 percent of the beneficiaries, members or participants of such person are natural persons resident in one of the Contracting States.

The reimbursement of dividend tax is therefore conditional on the Pension Plan having owned stocks and on the Pension Plan having received dividends on those stocks, where dividend tax has been withheld in the payment of the dividends.

The Danish National Tax Tribunal's decision considers that it is for the Pension Plan to prove that these conditions are met and that, on this basis, the Pension Plan was entitled to a reimbursement of dividend tax.

The Danish National Tax Tribunal does not consider that this burden of proof has been met.

In this respect, the Danish National Tax Tribunal has emphasized that the Pension Plan is a newly established pension fund which does not have the financial means to make the alleged stock purchases in question and that it is not documented that the Pension Plan has purchased and been the owner of the alleged stocks in question or has received dividends from the stocks. The documentation provided in respect of transactions involving the purchase and sale of stocks, stock lending and the conclusion of forwards is merely the presentation of a series of agreements, etc., which do not demonstrate the Pension Plan's ownership of the alleged stocks in question. Thus, there does not appear to be the requisite link to the Pension Plan to prove that there have been stock transactions etc. which have passed through the Pension Plan's finances. No evidence has been provided that the Pension Plan paid initial capital to the Custodian, and no evidence has been provided of other transfers of funds to the Pension Plan from the Custodian or other actors involved in the alleged stock transactions, etc. Only a large number of constructed agreements, account statements, trade notes, etc. with the Custodian as the agent in the alleged transactions have been provided, which, notwithstanding what has been provided, does not demonstrate that the Custodian traded stocks on behalf of the Pension Plan. Particular attention has been paid to the consecutive numbering of Credit Advices in the case, which indicates a systematic organization of the alleged transactions with a view to obtaining an unjustified reimbursement of dividend tax. Reference is also made to the Danish National Tax Tribunal's decision of December 19, 2019, SKM 2019.650 LSR.

The fact that a Tax Opinion of June 27, 2012 has been submitted cannot lead to a different result, as the conditions for dividend merger are not met in the specific case.

Since the Pension Plan is not considered to have owned stocks or received dividends as declared in the application for dividend reimbursement, the Danish National Tax Tribunal considers that Danish Tax Agency has paid the reimbursement on an incorrect basis on the basis of the Pension Plan's application. Danish Tax Agency was therefore entitled to annul the original decisions to pay the dividend reimbursement. The representative's comments on the burden of proof and the fact that Danish Tax Agency used the word "revocation" cannot lead to a different result.

The National Tax Tribunal hereby upholds the appealed decision.

[signature]
Eline Ringgard Kjeldsen, Office Manager                    Andreas Kiis, Case Worker

**Indicative assessment**

The Danish Tax Appeals Agency must give an opinion on the extent to which the complaint has been upheld.

The extent to which the appellant can obtain reimbursement of the costs of advice during the complaint procedure is determined by the assessment of whether the complaint has been upheld. The finding is indicative only. The application for reimbursement of costs must be sent to the Danish Tax Agency, which will take the decision.

The Danish Tax Appeals Agency states the following:

The facts complained of were not upheld.

**The decision is sent to**

The FWC Capital LLC Pension Plan, 31W 21 ST Street Apt 2N, NY 10010 New York, USA

The TVC Law Firm P/S, Søren Frichs Vej 42A, 8230 Åbyhøj

The Poul Schmith Law Firm, Kammeradvokaten I/S, Vester Farimagsgade 23, 1606 København V

Skatteankestyrelsen

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S
Vester Farimagsgade 23
1606 København V
Danmark
Att: Mikkel Isager-Sally

**Kontakt**
Send post til
Skatteankestyrelsen her

Telefon         3376 0909

**Sagsbehandler**
Andreas Kiis
Direkte telefon   33762417

Vores sagsnr.    18-0004312

Dit sagsnr.

16. juli 2020

**Post fra Skatteankestyrelsen**

Du får hermed en kopi af et brev fra Skatteankestyrelsen.

Vi beder dig henvise til Skatteankestyrelsens sagsnummer, hvis du kontakter os om dette brev.

Med venlig hilsen

Skatteankestyrelsen



Skatteankestyrelsen

The FWC Capital LLC Pension Plan
49 E 21st ST New York
NY 10010 New York
Amerikas Forenede Stater (USA)

**Kontakt**

Send post til
Skatteankestyrelsen her

Telefon       3376 0909

**Sagsbehandler**
Andreas Kiis
Direkte telefon   33762417

Vores sagsnr.   18-0004312

**Afgørelse**                                                    16. juli 2020

Der er klaget over SKATs afgørelse af 06-04-2018 for The FWC Capital LLC Pension Plan.

Landsskatteretten har nu truffet afgørelse i sagen. Afgørelsen vedlægges.

**Vejledning om sagsanlæg**

Afgørelsen kan indbringes for domstolene senest 3 måneder efter afgørelsens dato. Reglerne om domstolsprøvelse fremgår af skatteforvaltningslovens §§ 48-49.

Sagen skal indbringes for den byret, hvor den skattepligtige har hjemting. Stævningen skal udtages mod Skatteministeriet, Nicolai Eigtveds Gade 28, 1402 København K. Den nærmere vejledning om sagsanlæg fremgår af www.domstol.dk.

Med venlig hilsen

Tina Schrøder Lindsel