# Exhibit 9, Part 8 of 15

- én forward-aftalepart,

der vil handle disse helt abnormt store aktieposter til *netop* de beløb, som pensionsplanen har "ønsket". Det gælder disse meget betydelige aktieposter – og i alle tilfælde.

Det betyder, at pensionsplanerne på *intet* tidspunkt er fejlet med at finde medkontrahenter til de store transaktioner. Og det betyder, at pensionsplanen på *intet* tidspunkt er blevet nødt til at splitte transaktionen i to eller alene gennemføre transaktionen delvist.

Det kan ikke lade sig gøre for bare én pensionsplan. Det kan heller ikke lade sig gøre i så mange tilfælde.
Pensionsplanernes påstand er derfor virkelighedsfjern i anden potens.

**6.3    Pensionsplaner har næsten ens aktieporteføljer (nyt)**

Ifølge pensionsplanernes custody statements (…) havde de pensionsplaner, der handlede aktier i 2015, præcis den samme aktieportefølje og handlede med de samme 14 danske aktier i 2015.

Det drejer sig om 77 pensionsplaner ud af de over 100 pensionsplaner, som TVC Advokatfirma indgav klager på vegne af i 2018. Som eksempel vises her seks pensionsplaners investeringer i 2015, herunder førersagen [Pensionsplan C]:

| Navn ("pension plan") | [Pensionsplan C] | [Pensionsplan I] | [Pensionsplan J] | [Pensionsplan K] | [Pensionsplan L] | [Pensionsplan M] |
|---|---|---|---|---|---|---|
| *SANST j.nr.* | *(…)* | *(…)* | *(…)* | *(…)* | *(…)* | *(…)* |
| A.P. Møller Mærsk A/S - A | 7.880 | 7.865 | 7.849 | 7.851 | 7.892 | 7.871 |
| A.P. Møller Mærsk A/S - B | 7.884 | 7.871 | 7.864 | 8.069 | 7.893 | 8.079 |
| Carlsberg A/S - B | 18.0314 | 178.346 | 178.352 | 178.402 | 181.135 | 177.618 |
| Coloplast A/S - B | 292.365 | 294.517 | 295.956 | 293.038 | 295.514 | 295.238 |
| Danske Bank A/S | 3.026.108 | 3.399.185 | 3.080.069 | 3.332.339 | 3.293.014 | 2.978.112 |
| DSV A/S | 824.244 | 685.834 | 759.755 | 726.245 | 776.849 | 804.456 |
| FLSmidth & Co A/S | 81.040 | 80.155 | 80.283 | 80.292 | 81.548 | 79.791 |
| GN Store Nord A/S | 588.285 | 552.691 | 626.259 | 588.941 | 581.185 | 591.435 |
| Novo Nordisk A/S - B | 6.267.033 | 5.887.844 | 6.671.570 | 6.274.023 | 6.191.398 | 6.300.588 |
| Novozymes A/S - B | 688.545 | 686.764 | 686.991 | 776.240 | 797.000 | 814.004 |
| Pandora A/S | 416.809 | 468.196 | 424.241 | 458.988 | 453.572 | 410.198 |
| TDC A/S | 3.092.779 | 3.296.713 | 2.766.412 | 2.886.717 | 2.957.050 | 3.205.055 |
| Tryg A/S | 34.618 | 34.976 | 34.540 | 34.742 | 35.067 | 34.793 |
| Vestas Wind Systems A/S | 375.802 | 374.281 | 373.968 | 376.685 | 374.009 | 378.845 |
| **Hovedtotal** | **15.883.706** | **15.955.238** | **15.994.109** | **16.022.572** | **16.033.126** | **16.086.083** |

(…)

For aktiehandler foretaget i 2014 kan det konstateres, at pensionsplanerne handlede blandt de samme 12 aktier. I 2013 handlede alle pensionsplanerne blandt de samme to aktier.

Også dette er særdeles besynderligt, hvis pensionsplanerne, som TVC Advokatfirma påstår, alle er uafhængige af hinanden. Tværtimod giver det god mening, når der er tale om en skrivebordsøvelse, der har til formål at formå den danske stat til at foretage uberettigede udbetalinger.

### 6.4    Alle pensionsplaner handler med de samme parter (nyt)

En gennemgang af pensionsplanernes custody statements (…) viser, at aktiehandler, der blev foreta-get i foråret (februar til maj) 2014, blev indgået med præcis samme aftaleparter. Dette gælder for alle transaktioner for samtlige pensionsplaner repræsenteret af TVC Advokatfirma, hvor der er ind-givet klage i 2018 og fremlagt custody statement og/eller broker confirmations (…).

Som (…) fremlægges en oversigt, der illustrerer pensionsplanernes aftaleparter ved påståede køb af A.P. Møller Mærsk A/S A-aktier i 2014, herunder ét af pensionsplanerne fra førersagerne (markeret med rød i bilaget).

Som det fremgår, varetager brokeren (…) alle transaktioner, der vedrører køb af aktier. Videre frem-går det, at brokeren (…) varetager salget af aktier, at (…) er aftalepart til forwards, og at (…) er afta-lepart til GMSLA'en. For en del af de påståede aktiehandler er der dog ikke oplysninger om pensions-planernes aftaleparter på forwards og GMSLA'er.

Det er helt usandsynligt, at "uafhængige" pensionsplaner foretager aktiehandler for mange millioner kroner med præcis de samme aftaleparter. Også dette viser, at de fiktive aktiehandler er konstrueret fra centralt hold.

*Dertil* kommer, at det er helt usandsynligt, at de samme parter kan levere likviditet og risikoafdæk-ning i det efterspurgte ekstremt store omfang. Det er i forvejen til fulde udokumenteret og usand-synligt, at aktielåntageren skulle kunne skaffe finansiering til bare én pensionsplans ekstraordinært store aktiekøb. Det er umuligt, at aktielåntageren skulle kunne skaffe finansiering til *mange* pensi-onsplaner på én gang.

Det samme gør sig gældende omkring forward-aftaleparten. Det er usandsynligt (og udokumenteret), at ét selskab (hjemhørende i skattely) skulle kunne kurssikre en lang række pensionsplaners handler for millioner af kroner.

### 6.5    Salgstidspunkt er systematiseret (nyt)

For aktiehandlerne i 2013 og 2014 anvendes *enten* samme salgsdato for alle handler af en specifik aktie på tværs af pensionsplanerne, *eller* også sælger alle pensionsplanerne deres aktieposter i løbet af fire dage

F.eks. påstår 20 pensionsplaner, herunder førersagen [Pensionsplan N], at de alle i perioden 16.-19. juni 2014 solgte deres Novozymes-aktier, der var blevet købt den 26. februar 2014 (…). Det er påfal-dende, at 20 pensionsplaner, som påstår at være uafhængige af hinanden, hver for sig når frem til, at Novozymes-aktierne skulle "ejes" i næsten 4 måneder og så pludselig afhændes inden for ganske få dage.

Et andet eksempel er 23 pensionsplaner, der solgte Coloplast-aktier den 17. december 2014 (sammenstilling af data fra pensionsplanernes (…) – førersagerne er fremhævet):

| Shareholder (Pension Plan) | Antal aktier (Coloplast) | Salg (Handelsdato) |
|---|---|---|
| [Pensionsplan O] | 997.679 | 17. december 2014 |
| [Pensionsplan P] | 919.162 | 17. december 2014 |
| [Pensionsplan Q] | 1.063.104 | 17. december 2014 |
| [Pensionsplan B] | 998.992 | 17. december 2014 |
| [Pensionsplan E] | 1.016.175 | 17. december 2014 |
| [Pensionsplan R] | 928.526 | 17. december 2014 |
| [Pensionsplan S] | 950.518 | 17. december 2014 |
| [Pensionsplan T] | 1.002.630 | 17. december 2014 |
| [Pensionsplan U] | 1.074.214 | 17. december 2014 |
| [Pensionsplan V] | 1.020.078 | 17. december 2014 |
| [Pensionsplan D] | 1.046.892 | 17. december 2014 |
| [Pensionsplan W] | 997.586 | 17. december 2014 |
| [Pensionsplan X] | 1.015.159 | 17. december 2014 |
| [Pensionsplan Y] | 1.095.426 | 17. december 2014 |
| [Pensoinsplan Z] | 990.463 | 17. december 2014 |
| [Pensionsplan Æ] | 930.208 | 17. december 2014 |
| [Pensionsplan Ø] | 907.165 | 17. december 2014 |
| [Pensionsplan Å] | 933.555 | 17. december 2014 |
| [Pensionsplan AA] | 1.073.342 | 17. december 2014 |
| [Pensionsplan H] | 1.087.680 | 17. december 2014 |
| [Pensionsplan AB] | 931.267 | 17. december 2014 |
| [Pensionsplan AC] | 998.148 | 17. december 2014 |
| [Pensionsplan AD] | 975.440 | 17. december 2014 |

I alle disse tilfælde gør pensionsplanerne gældende, at de havde købt aktieposten den 4. december. Det er påfaldende, at 23 uafhængige pensionsplaner alle skulle beslutte sig for at "eje" aktieposten i *netop* 13 dage.

Eksemplerne viser, hvordan de påståede aktiebeholdninger er systematiseret på tværs af pensionsplanerne.

_____

I 2015 er der tilsyneladende anvendt en anden systematik for afvikling af "aktiebesiddelserne". Mønsteret ændrer sig, så pensionsplanerne i stedet for at sælge på samme dag eller i løbet af meget få dage begynder at afhænde deres aktier over en periode på cirka to måneder.

Imidlertid er det fortsat tydeligt, at handlerne er systematiseret fra centralt sted. Fordelingen af salgene tyder nærmere på, at handlernes størrelser søges maskeret.

Der er således en skarp opdeling mellem de fire custodians i Solo-gruppen. Der er på intet tidspunkt to custodians, der sælger samme aktier samme dag.

Dette kan illustreres med (…), der viser, at Mærsk A-aktier, der påstås købt den 31. marts 2015, angiveligt sælges på forskellige datoer afhængigt af, hvilken custodian der er tale om. F.eks. sælger Old Park Lane aktier den 2. juni 2015, mens Telesto sælger aktier den 3. juni 2015, og Solo Capital sælger aktier den 8. juni 2015.

Det er altså koordineret fra centralt hold, hvornår de Shah-kontrollerede custodians skal sælge aktierne, hvilket understøtter, at aktiehandlerne alene er en fiktiv konstruktion skabt med henblik på at opnå uberettigede refusioner af udbytteskat.

### 6.6    Sanjay Shah kontrollerede pensionsplanernes custodians (Solo-gruppen)

Pensionsplanerne repræsenteret af TVC Advokatfirma har alle – bortset fra én ([Pensionsplan G]) – anvendt en eller flere af fire custodians: Old Park Lane, Solo Capital, Telesto og West Point. Disse fire custodians udgør tilsammen Solo-gruppen.

Solo-gruppen er kun kendt af Skattestyrelsen fra dette sagskompleks.

De fire selskaber er alle i vidt omfang kontrolleret af Sanjay Shah, der efterforskes af det danske, engelske og tyske politi i forbindelse med udbyttesagen som en af de formodede hovedbagmænd, der har orkestreret svindlen.

Solo Capital Partners LLP, selskabsnummer OC367979, blev grundlagt i september 2011. Selskabet blev stiftet af Sanjay Shah og Solo Capital Limited. Solo Capital Partners LLP er aktuelt taget under konkursbehandling og behandles som under "Special Administration" i England på grund af den formodede kriminalitet begået i selskabet. Selskabet har tidligere været ejet af det luxembourgske selskab, Aesa SARL, der er ejet af Sanjay Shah, ligesom Sanjay Shah tidligere har været administrerende direktør for selskabet. En lang række af de Credit Advices, der er indsendt af Solo Capital, er underskrevet af Sanjay Shah personligt (…).

Old Park Lane Capital PLC var på udbetalingstidspunkterne ejet af en række aktionærer, hvoraf en af de største aktionærer er Aesa Holdings (UK) Limited, der efterfølgende har ændret navn til Solo Group Holdings Limited og er ejet af Aesa SARL, der ejes af Sanjay Shah.

Telesto Markets LLP var i 2015 ejet af Solo Group Holdings Limited, der som nævnt oven for er ejet af Aesa SARL, der som nævnt ejes af Sanjay Shah.

West Point Derivatives Ltd var i 2014 b.l.a. ejet af Hooloomooloo Holdings Limited, som ejes af Sanjay Shah.

Tidligere påstod pensionsplanerne, at de ikke havde noget kendskab til, om disse 4 custodians *"tilhørte samme gruppe af selskaber"*. Dette beroede på Skattestyrelsens *antagelse*, (…).

Senere har pensionsplanerne *radikalt* ændret deres forklaring om disse 4 custodians.

På (…) oplyste pensionsplanerne således som noget nyt, at *"Solo Capital var overordnet custodian i forhold til Old Park Lane, Telesto og West Point"*, og at alle pensionsplanernes penge indestod på Solo

Capitals bankkonto, (…), og (…). Og i (…) omtaler pensionsplanerne konsekvent de 4 custodians som *"Solo-gruppen"*.

De fire custodians Old Park Lane, Solo Capital, Telesto og West Point udgør således tilsammen Solo-gruppen og har været kontrolleret af Sanjay Shah.

**6.7    Custodian: Sanjay Shahs "univers"**

De fire custodians i Solo-gruppen (Solo Capital, Old Park Lane, Telesto og West Point) har tilsammen produceret dokumentation, som er blevet anvendt til at få udbetalt over 9 milliarder kroner i udbytterefusion fra den danske stat. Dokumentationen dækker over påståede aktiebesiddelser til en kursværdi (på udlodningstidspunkterne på samlet ca. 1.354 mia. kr. De producerede dokumenter skal vise, at Solo-gruppen holdt meget betydelige aktieposter for sine kunder, dvs. pensionsplanerne, og at der for de pågældende aktieposter var blevet udbetalt udbytte og indeholdt udbytteskat, som pensionsplanerne derefter krævede refunderet fra SKAT.

Efterfølgende kontrol har imidlertid afdækket, at selvom Solo-gruppen har attesteret at holde aktier, hvoraf der er udbetalt bruttoudbytte på i alt 33,4 milliarder kroner, er der ingen objektiv dokumentation for – eller blot spor af – at Solo-gruppen skulle have besiddet én eneste aktie (afsnit 5.1, ovenfor). Den eneste "dokumentation" for aktiebesiddelserne er de dokumenter, som Solo-gruppen selv har fremstillet.

En gennemgang af de dokumenter, som pensionsplanerne har fremlagt fra Solo-gruppen, forstærker da også indtrykket af, at Solo-gruppen ikke har besiddet aktier på vegne af pensionsplanerne, men derimod alene har fremstillet dokumentation med det ene formål at få udbetalt udbytterefusion:

<u>Credit Advices</u> er nummereret fortløbende på tværs af 4 custodians, selvom der er tale om uafhængige juridiske personer (afsnit 6.8, nedenfor). Credit Advices, der passer ind *tidligt* i nummerrækken, er desuden blevet forsøgt anvendt til at opnå refusion *sent* i forløbet (i 2017) (afsnit 6.9, nedenfor), hvilket illustrerer, at det er skuffedokumenter uden nogen realitet.

Påståede <u>aktiebesiddelser</u> er – som det fremgår af afsnit 6.1-6.5 – systematiseret på tværs af Solo-gruppen. Det er nøje afstemt, hvor store aktiebesiddelser der attesteres af hver custodian, hvilket kun kan have til formål at sløre systematikken og sammenhængen over for skattemyndighederne. I nogle tilfælde ses desuden, at størrelsen af pensionsplanernes aktiebesiddelser er "fortløbende"; dvs. at hver pensionsplan på listen ejer én aktie mere end den foregående.

<u>Aftalegrundlaget</u> mellem custodian og pensionsplan (Custody Agreement) er ikke blevet overholdt, idet pensionsplanerne ikke på noget tidspunkt har indbetalt den krævede Minimum Cash Balance (afsnit 5.9, ovenfor). Custodian har dermed ikke haft nogen sikkerhed, hvilket ville være uacceptabelt, hvis der faktisk blev handlet aktier (jf. også afsnit 3.2, ovenfor), idet custodian angiveligt skulle indestå for gennemførsel af transaktionerne.

<u>Custody statements</u> (…) viser ikke daglige bevægelser på hverken almindelige pengekonti eller på aktiedepoter (og -beholdninger) (afsnit 5.2, ovenfor). Uanset betegnelsen udgør de som (…) fremlagte bilag dermed ikke egentlige custody statements, og de dokumenterer ikke aktiebesiddelser.

<u>Oversigter over bogføringer</u> er udarbejdet efterfølgende af pensionsplanernes repræsentant til brug for denne sag (afsnit 5.3, ovenfor). De er fejlbehæftede og indeholder oplysninger, som ikke fremgår af sagens bilag. Oversigterne har derfor ingen bevisværdi.

Samlet set er fejlene og manglerne sammenholdt med systematikkerne i pensionsplanernes doku-menter fra Solo-gruppen klare indikatorer for, at pensionsplanerne på intet tidspunkt har ejet aktier, men at det derimod har været et samlet og komplekst svindelnummer.

### 6.8    Credit Advices er nummereret fortløbende på tværs af Solo-gruppen

I forbindelse med at SKAT har truffet afgørelser om dels tilbagekaldelse af tidligere afgørelser om refusion af indeholdt udbytteskat og dels afslag på nye refusionsanmodninger, har SKAT registreret alle Credit Advices indsendt med refusionsanmodningerne, herunder Credit Advices som er udstedt af Solo-gruppen. SKATs registrering af Credit Advices fra de omtalte fire custodians omfatter ca. 3.400 Credit Advices, der har dannet grundlag for refusionsanmodninger på samlet ca. 9 mia. kr.

SKATs registrering viser, at Credit Advices fra de fire Shah-kontrollerede custodians – som er juridisk uafhængige enheder – er nummereret af de respektive custodians selv, og at nummereringen er *fort-løbende*. Registreringen viser også, at der ikke er nogen dubletter i Credit Advice ID-numrene fra disse fire custodians. Der er enkelte "huller" i nummereringen, dvs. Credit Advice ID-numre, som tilsynela-dende ikke er benyttet.

Den fortløbende nummerering af de udstedte Credit Advices fra Solo Capital, Old Park Lane, Telesto og West Point "hopper" mellem disse fire custodians. Det kan som eksempel illustreres med følgende uddrag fra SKATs registrering (…):

> Credit Advice ID 2533-2578: Telesto
> Credit Advice ID 2579-2619: West Point
> Credit Advice ID 2620-2659: Solo Capital
> Credit Advice ID 2660-2701: Old Park Lane
> Credit Advice ID 2702-2746: Solo Capital
> Credit Advice ID 2747-2788: Old Park Lane
> Credit Advice ID 2789-2830: Telesto
> Credit Advice ID 2831-2871: West Point

Som konkrete (anonymiserede) eksempler på den fortløbende nummerering kan nævnes følgende, (…):

Eksempel 1:
Credit Advice ID 2788: Old Park Lane                17. marts 2015
Credit Advice ID 2789: Telesto                      17. marts 2015

Eksempel 2:
Credit Advice ID 2904: Solo Capital                 23. marts 2015
Credit Advice ID 2905: Old Park Lane                23. marts 2015
Credit Advice ID 2906: Solo Capital                 23. marts 2015

Eksempel 3:
Credit Advice ID 2935: Solo Capital                 23. marts 2015
Credit Advice ID 2936: Telesto                      23. marts 2015

Eksempel 4:
Credit Advice ID 2955: Old Park Lane                23. marts 2015
Credit Advice ID 2956: Telesto                      23. marts 2015
Credit Advice ID 2957: West Point                   23. marts 2015

Uanset om disse 4 custodians (til trods for, at de benyttede forskelligt brevpapir) skulle have benyttet samme back office, (…), giver det ikke nogen mening, at de i alt ca. 3.400 Credit Advices er fortløbende nummereret på tværs af selskaberne.

Og *hvis* de fire custodians har haft samme back office (…), giver det ikke mening, at de har anvendt et så forskelligt layout til deres Credit Advices:

(…)

Der er netop tale om fire juridisk uafhængige enheder. Den fortløbende nummerering giver ikke mening – heller ikke selvom det er inden for samme koncern. Og *hvis* der var tale om et legitimt set-up med koncernforbundne selskaber, giver forskellene i layout ikke mening.

Det understreger således, at opsætningen for så vidt angår udstedelsen af Credit Advices er orkestreret fra centralt hold. De udstedte Credit Advices er ikke udtryk for realiteter, men indgår alene som et element i den bevidste produktion af anmodninger om at få udbytterefusion uden at have ejerskab til aktier.

I en række tilfælde har pensionsplaner, der uberettiget har fået refunderet udbytteskat, og andre nystiftede pensionsplaner *efterfølgende* (dvs. efter at svindlen blev opdaget) indsendt yderligere refusionsanmodninger for flere hundrede millioner kr., som imidlertid blev afslået af SKAT med henvisning til manglende dokumentation for ejerskab til aktier og modtagelse af nettoudbytte. Også i forbindelse med disse efterfølgende anmodninger har pensionsplanerne henvist til Credit Advices fra Solo-gruppe

Mere centralt er det, at de indsendte Credit Advices passer ind i det fortløbende nummersystem (…), uanset at disse er indsendt senere.

Denne fortløbende nummerering af Credit Advices udstedt af de 4 Shah-custodians er en ganske markant illustration af den systematiske svindel med refusionerne.

### 6.9     Credit Advices fra Solo-gruppen blev anvendt til forsøg på svindel i 2017

Den 1. februar 2017 modtog SKAT via den nuværende IT-løsning 34 anmodninger om refusion af udbytteskat, som alle blev identificeret som mistænkelige af SKATs udbytteafdeling. Anmodningerne blev derfor oversendt til Særlig Kontrol.

De 34 anmodninger fra amerikanske pensionsplaner blev alle indgivet af agenten (…), der var ukendt for SKAT. Anmodningerne blev indgivet på vegne af 34 amerikanske pensionsplaner og løb på mellem 290.835 kr. og 1.479.587 kr. Der blev sammenlagt anmodet om refusion af mere end 25 mio. kr. Af de 34 pensionsplaner er de 29 navngivet efter (…).

En gennemgang af den vedlagte "dokumentation" viste, at de pågældende Credit Advices var udstedt af Telesto (8 stk.), West Point (8 stk.), Old Park Lane (9 stk.) og Solo Capital (9 stk.). Disse Credit Advices var nummereret således, at de passede ind i de "huller" i den fortløbende nummerering af Credit Advices, jf. ovenfor, men også sådan, at der fortsat ikke var nogen dubletværdier.

Det giver ingen mening, at nye (ukendte) pensionsplaner 1½ år senere indsender yderligere Credit Advices, som passer ind midt i kronologien af Credit Advice-numre. Det indikerer meget kraftigt, at der er tale om præfabrikerede "skuffe-dokumenter", der passer ind i et stort, overordnet system.

Endelig var det – grundet den nuværende elektroniske ansøgningsprocedure – muligt for SKAT at tjekke det "digitale fodspor" for de enkelte uploadede dokumenter, hvilket ikke var muligt med den tidligere fysiske ansøgningsprocedure (støttebilaget, afsnit 2). En gennemgang af de uploadede dokumenter vedrørende de 34 pensionsplaner viste, at Sanjay Shah var anført som forfatter på alle credit advices udstedt af både Solo Capital og Old Park Lane (i alt 18 dokumenter) (…).

SKAT, Særlig Kontrol, udsendte forslag til afgørelse i de 34 sager. Forslaget lød i alle tilfælde på, at anmodningen ville blive afslået, idet pensionsplanerne ikke havde dokumenteret ejerskab til aktierne og modtagelse af nettoudbytte. Forslagene blev sendt i kopi til agenten (…).

(…) indsendte i forlængelse heraf 35 skrivelser med indsigelser mod SKATs forslag til afgørelse. Der er med andre ord fremsendt indsigelser i en *ikke-eksisterende* sag, dvs. en sag, hvor der aldrig er fremsat nogen anmodning om refusion over for SKAT, og hvor SKAT derfor ikke har lavet noget forslag til afgørelse (…).

SKAT traf afgørelse om afvisning af anmodningerne den 1. juni 2018. Afgørelserne er blevet påklaget.

Når der – som det fremgår – fortsat anmodes om refusion efter samme metode og på samme grundlag som anvendt i nærværende sagskompleks, bliver det tydeligt, at den systematiske svindel med refusion af udbytteskatter ikke alene er historisk, men også af fremadrettet betydning.

**6.10    Pensionsplanerne har fastholdt, at handlerne ikke blev styret centralt**

Pensionsplanerne har igennem hele sagsforløbet fastholdt, at der ikke er tale om noget sagskompleks, og at pensionsplanerne har været fuldkommen uafhængige af hinanden.

Dette standpunkt fremgår f.eks. af (…):

> *"Vores generelle svar på disse påstande er, at <u>den enkelte [pensionsplan] ikke har nogen direkte eller indirekte forbindelse eller kendskab til alle de øvrige pensionsplaner,</u> der tilsyneladende også har købt danske børsnoterede aktier under en tilsvarende investeringsstrategi. <u>[Pensionsplanen] har på intet tidspunkt haft kendskab til identiteten af alle de andre pensionsplaner med en lignende investeringsstrategi på samme eller andre handelsplatforme udført af samme eller andre mæglere, investeringsforvaltere mv."</u>*
> (mine understregninger)

Videre har pensionsplanerne beskrevet, hvordan det var pensionsplanerne selv, der købte og solgte aktierne. TVC Advokatfirma har bemærket, at pensionsplanernes trustee *"havde en onlineadgang via Solos web-portal til at have indblik i og styre samtlige transaktioner på daglig basis"*, (…).

På (…) har pensionsplanerne også fremlagt en liste over tegningsberettigede ("Authorised Signatories of Trust"), (…), og en liste over personer, som var berettigede til at handle på vegne af pensionsplanerne ("Authorised Traders of Trust"), (…). Begge lister skulle efter sigende angå [Pensionsplan B], og den eneste person på listerne er (…) – [Pensionsplan B's] trustee.

Endelig har pensionsplanerne også fremlagt korrespondance mellem <u>(…)</u>, der må tilhøre [Pensionsplan B], og brokeren (…) vedrørende aktiekøb, (…), ligesom pensionsplanerne også har bemærket, at custodian ikke var bemyndiget til at handle på vegne af pensionsplanerne, (…).

Pensionsplanernes beskrivelse af,

- at trustee'en skulle *"styre samtlige transaktioner på daglig basis"*, (…),
- at pensionsplanerne ikke havde *"nogen direkte eller indirekte forbindelse eller kendskab til alle de øvrige pensionsplaner"* eller *"kendskab til identiteten af alle de andre pensionsplaner med en lignende investeringsstrategi"*, (…), og
- at custodian ikke var bemyndiget til at foretage aktiehandler på vegne af pensionsplanerne, (…),

hænger på ingen måde sammen med pensionsplanernes *kollektive* og *koordinerede* investeringsstrategi, som de påståede aktiehandler illustrerer.

### 6.11   To pensionsplaner har glemt at ansøge om refusion (nyt)

To pensionsplaner, der er repræsenteret af TVC Advokatfirma, har tilsyneladende glemt at søge refusion af udbytteskat for deres påståede aktiebesiddelser.

Det drejer sig om [Pensionsplan Q], der ikke har søgt refusion for aktier erhvervet i 2015:

| Aktienavn | Antal aktier | Indeholdt udbytteskat |
|---|---|---|
| A.P. Møller Mærsk A/S - B | 8.094 | 4.307.383,98 kr. |
| Carlsberg A/S - B | 179.556 | 436.321,08 kr. |
| Coloplast A/S - B | 294.759 | 358.132,19 kr. |
| Danske Bank A/S | 3.578.514 | 5.314.093,29 kr. |
| DSV A/S | 823.723 | 355.848,23 kr. |
| FLSmidth & Co A/S | 80.747 | 196.215,21 kr. |
| GN Store Nord A/S | 630.605 | 153.237,02 kr. |
| Novo Nordisk A/S - B | 6.717.867 | 9.069.120,45 kr. |
| Novozymes A/S - B | 822.009 | 665.827,29 kr. |
| Pandora A/S | 492.896 | 1.197.737,28 kr. |
| TDC A/S (marts) | 3.090.704 | 834.490,08 kr. |
| Tryg A/S | 35.072 | 274.613,76 kr. |
| Vestas Wind Systems A/S | 378.092 | 398.130,88 kr. |
| A.P. Møller Mærsk A/S - A | 7.894 | 4.200.949,98 kr. |
| TDC A/S (august) | 1.092.245 | 294.906,15 kr. |
| **Sum** | | **28.057.006,87 kr.** |

Derudover drejer det sig om [Pensionsplan E], der ikke har søgt refusion for en i custody statement (…) medtaget aktiebesiddelse på 1.475.613 Coloplast-aktier erhvervet i 2015, hvor der ville være blevet indeholdt 1.792.869,80 kr.

Det giver ingen mening, at pensionsplanerne skulle kunne glemme at få udbetalt så betydelige beløb, som angiveligt skulle være anvendt til at dække betydelige omkostninger forbundet med dette set-up (afsnit 5.8, ovenfor), eller som pensionsplanerne under alle omstændigheder burde mene at have krav på, hvis de fastholder, at de har krav på de refusioner, som denne sag omhandler.

Det giver på den anden side god mening, at en enkelt pensionsplan eller en enkelt bogføringsmæssig postering kan forsvinde i mængden i et svindelnummer, der hos Solo-gruppen har været på cirka 9 milliarder kroner og omfattede langt over 100 pensionsplaner og mange tusinde påståede aktiehandler.

Pensionsplanerne hævder, de har meget små gevinster, da gevinsten ædes op af udokumenterede udgifter. Hvis det er rigtigt, så mangler de to pensionsplaner et betydeligt beløb og har dermed et betydeligt udestående, som ikke er blevet betalt. Det ville de påståede medkontrahenter opdage. Når de øjensynligt ikke har opdaget det, er det blot udtryk for, at det hele er papirmanøvrer – og ikke udtryk for reelle pengestrømme.

## 7.    FORMALIA

### 7.1    Bevisbyrde

Det er pensionsplanerne, der har anmodet om refusion af indeholdt udbytteskat, og det er dermed også pensionsplanerne, der har bevisbyrden for, at betingelserne for refusion af udbytteskat er opfyldt, jf. f.eks. UfR 2003.2312/3H. Dette bestrider pensionsplanerne da heller ikke, (…).

Det er irrelevant, om pensionsplanerne på ansøgningstidspunktet har fremlagt dokumenter, som – hvis de havde været korrekte – var tilstrækkelig dokumentation efter SKATs arbejdsgange i 2015, cf. (…). Det afgørende er, om Landsskatteretten på baggrund af sagens oplysninger finder, at pensionsplanerne har bevist, at de opfyldte betingelserne for refusion af udbytteskat.

Pensionsplanernes forklaring om transaktionerne, der skulle have givet ret til udbytterefusion, er usandsynlig, jf. afsnit 2.4, ovenfor, og bevisbyrden er derfor skærpet, jf. f.eks. UfR 1998.898 H.

Dertil kommer, at pensionsplanernes bilagsmateriale er fejlbehæftet og mangelfuld og deres forklaringer og anbringender usammenhængende og skiftende i en sådan grad, at bevisbyrden må skærpes *yderligere*, jf. afsnit 3-6, ovenfor, og afsnit 8, nedenfor, og f.eks. SKM2019.250.ØLR.

Pensionsplanerne gør omvendt gældende, at bevisbyrden har flyttet sig, således at Skatteforvaltningen er nærmest til at bære risikoen for bevistvivl som følge af den passerede tid og de trufne afgørelser om refusion. Pensionsplanerne gemmer sig i den sammenhæng i vidt omfang bag, at danske og engelske myndigheder har beslaglagt materiale fra deres custodians (…), og at Skattestyrelsen bør indhente materiale fra SØIK (…).

Skattestyrelsen bestrider, at bevisbyrden på den måde kan vendes, også når der henses til sagernes karakter. Pensionsplanerne har i perioden 2012-2015 anmodet om refusion på baggrund af meget store påståede aktiebesiddelser. Pensionsplanerne har således hver især foretaget investeringer for mange millioner kroner – og i mange tilfælde endda for flere milliarder kroner. Sagerne blev (i førersagerne) startet ved udsendelse af forslag til afgørelse den 23. og 24. marts 2017 og dermed få år efter udbetalingerne – og på tidspunkter, hvor bogføring fortsat burde være gemt efter både dansk og amerikansk ret.

TVC Advokatfirma repræsenterer mere end 100 pensionsplaner. Det kan simpelthen ikke passe, at alle disse pensionsplaner har været så letsindige, at de ikke selv har været i besiddelse af nogen form for fysisk eller elektronisk dokumentation for deres tidligere aktiebesiddelser (som udgjorde grundlaget for deres refusionsanmodninger).

Det er påfaldende, at pensionsplanerne ved 5 indlæg og over 4.000 siders bilagsmateriale har undladt at fremlægge relevant materiale, som *må* være i deres besiddelse, hvis der – som de påstår – er foregået aktiehandler:

- Pensionsplanerne har ikke fremlagt deres egne kontoudtog. Der er ikke fremlagt kontoudtog vedrørende hverken pensionsplanernes kontantbeholdninger eller aktiebeholdninger. Det siger sig selv, at pensionsplanerne er i besiddelse af dette materiale.

- Det er ikke dokumenteret, at pensionsplanerne har modtaget de påståede nettoudbytter eller udbytterefusion, (…).

- Der er ingen dokumentation for pengestrømme, herunder kontante sikkerhedsstillelser og betaling for aktier. Det er dermed heller ikke dokumenteret, at der er sket settlement, altså at de påståede aktiehandler faktisk er blevet gennemført.

- Ifølge pensionsplanernes egne oplysninger har de tjent millioner af kroner ved transaktionerne. Som eksempel herpå kan henvises til [Pensionsplan B] (…). I 19 tilfælde har [Pensionsplan B] ifølge eget udsagn handlet aktier og derved tjent et beløb, der "tilfældigvis" er næsten lige så stor som udbytterefusionen, (…). Pensionsplanerne har end ikke forsøgt at give Landsskatteretten et svar på, hvor deres meget store fortjenester er blevet af. Dette er et eksempel på, hvor virkelighedsfjerne pensionsplanernes forsøg på argumentation er. Når historien ikke hænger sammen, ja, så er det blot, fordi den er forkert.

- Der er kun fremlagt enkelte af de påberåbte GMSLA'er (…), og disse er udaterede, uden underskrift og ufuldstændige. Derudover er pensionsplanerne i de fleste tilfælde ikke aftalepart.

- Der er ingen dokumentation for den påståede pantsætning af arbitragegevinsten (og pensionsplanernes yderligere midler) til GMSLA-medkontrahenterne og/eller custodian/Solo Capital, jf. TTC-klausulen.

Pensionsplanerne er i stedet fremkommet med en række skiftende forklaringer og en betydelig mængde dokumenter. Når pensionsplanernes forklaringer sammenholdes med de dokumenter, som pensionsplanerne har fremlagt under sagernes forberedelse for Skatteankestyrelsen, fremgår det tydeligt, at pensionsplanerne aldrig har ejet danske aktier. De foreliggende oplysninger peger derimod i den modsatte retning, jf. UfR 2003.2313/3 H. "Dokumentationen" er nemlig i et unaturligt stort omfang fejlbehæftet.

Der er ikke bevistvivl i sagen; der er nemlig ingen dokumentation for de påståede aktiehandler, og der er alt for mange fejl i det materiale, som pensionsplanerne har fremlagt for at underbygge deres "historie". Hvis den efter Landsskatterettens opfattelse foreligger bevistvivl, skyldes det alene, at pensionsplanerne har undladt at fremlægge dokumenter, der *må* være i deres besiddelse. Dette skal komme dem bevismæssigt til skade og er i modstrid med deres udsagn om, at de ville oplyse sagerne, (…).

### 7.2     Annullation eller tilbagekaldelse – ugyldige afgørelser kan tilbagekaldes

Pensionsplanerne har i (…) gjort gældende, at SKAT skulle have tilbagekaldt sine oprindelige, <u>gyldige</u> afgørelser om refusion af udbytteskat, (…), selvom der ikke er fremkommet <u>nye faktiske oplysninger</u> i sagerne siden afgørelserne om udbetaling, (…). Det anførte er udtryk for en misforståelse af både de faktiske og retlige omstændigheder.

Pensionsplanerne anfører nu korrekt i (…), at de <u>retlige omstændigheder</u> skal forstås således, at SKATs afgørelser om tilbagekaldelse er udtryk for en <u>annullation</u> af de oprindelige afgørelser som følge af, at disse var *ulovhjemlede* og derfor *ugyldige*.

Følgende fremgår således af afgørelserne til [Pensionsplan C], [Pensionsplan B] og [Pensionsplan F], (…):

> *"[Navn] har derfor ikke dokumenteret, at [navn] opfylder betingelserne for at få refunderet indeholdte af danske aktier, jf. artikel 10 i dobbeltbeskatningsoverens-komsten mellem Danmark og USA.*
>
> *(…)*
>
> *SKATs afgørelser om at refundere udbytteskat til [navn] hviler dermed på et urigtigt grundlag.*
>
> *SKAT tilbagekalder derfor de tidligere afgørelser om refusion af udbytteskatter."*

Tilsvarende formulering fremgår af Skattestyrelsens afgørelser til de øvrige førersager.

Som det fremgår, fastslås det i afgørelserne, at betingelserne for refusion ikke var opfyldt, og at af-gørelserne om udbetaling er truffet på *urigtigt* grundlag. SKATs afgørelser er således *ikke* en tilbage-kaldelse af en *gyldig* afgørelse. Det er derfor forkert, når pensionsplanerne skriver, at "*SKAT selv har lagt til grund, at de oprindelige afgørelser om udbetaling af refusion af udbytteskat var juridisk gyl-dige, da SKAT i modsat fald skulle have truffet afgørelse om at annullere disse tidligere afgørelser*", (…).

Det er irrelevant, om SKAT har benævnt afgørelsen "tilbagekaldelse" eller "annullation", (…). Pensi-onsplanerne kan ikke støtte ret på overskriften. Dertil kommer, at begreberne tilbagekaldelse og an-nullation ikke anvendes konsekvent. I SKM2011.501.HR fastslog Højesteret således, at SKAT kunne "*tilbagekalde*" (ikke annullere) en tilladelse, idet tilladelsen savnede hjemmel, dvs. pga. ugyldighed. Dommen illustrerer, hvordan begreberne (til en vis grad) anvendes synonymt.

Idet pensionsplanerne på intet tidspunkt har ejet de hævdede aktier, endsige haft ret til udbyttet heraf, er SKATs oprindelige afgørelser om refusion af udbytteskat ugyldige, og SKAT var derfor såvel berettiget som forpligtet til at annullere afgørelserne. For ugyldige afgørelser er det *klare udgangs-punkt*, at sådanne ikke kan opretholdes, jf. f.eks. SKM2011.501.HR. Det fremgår da også af Forvalt-ningsret Almindelige Emner, 6. udgave, kapitel 8, s. 517-518, hvortil pensionsplanerne henviser (…). De af pensionsplanerne anførte betragtninger om tilbagekaldelse er dermed uden betydning for nær-værende sag.

<u>De faktiske omstændigheder</u> er gennemgået nærmere ovenfor og i (…). Som det fremgår heraf, har Skattestyrelsen en række oplysninger nu, der ikke forelå på udbetalingstidspunktet. Det er således ikke rigtigt, når pensionsplanerne skriver, at Skattestyrelsen i nærværende sag "*ikke ses at være kom-met i besiddelse af reelt nye faktiske oplysninger i sagen*", (…). Da SKAT udbetalte udbytterefusioner til pensionsplanernes agent, havde SKAT ikke kendskab til den omfattende svindel med refusionsan-modninger. SKAT havde heller ikke grundlag for at antage, at grundlaget for anmodningerne var uden realitet.

Betingelserne for annullation/tilbagekaldelse af de tidligere afgørelser er således opfyldt, idet afgø-relserne er uhjemlede.

Selv hvis det kan bebrejdes SKAT, at der ikke blev foretaget en egentlig kontrol af hver enkelt refusi-onsanmodning, ændrer det ikke på, at pensionsplanerne ikke har fremlagt dokumentation for, at pensionsplanerne *faktisk* har ejet de påstående aktier. Skattestyrelsen er derfor heller ikke som følge heraf afskåret fra at tilbagekalde/annullere afgørelserne om refusion, jf. f.eks. UfR 2003.2312/3H og UfR 2007.3052 H.

Tilbage står nemlig, at der ikke er nogen dokumentation for, at pensionsplanerne faktisk har ejet de påstående aktier og modtaget det påstående nettoudbytte, hvorfor de ikke har været berettiget til de udbetalte refusioner.

## 8.     PENSIONSPLANERNES BETRAGTNINGER

### 8.1     Pensionsplanernes pengemaskine

Pensionsplanerne har i (…), anført, at

   *"elimineringen af de økonomiske risici […] er en standardrutine for enhver DIV-Arbtrans-aktion"*

og, at

   *"hver Div-Arb-transaktion er profitabel".*

Ifølge pensionsplanerne har de altså uden at have nogen penge kunnet benytte en investeringsmo-del, som er uden nogen form for økonomisk risiko, og som altid giver gevinst.

Pensionsplanerne anfører da også i (…), at *"Div-Arb er en pengemaskine".*

En sådan (lovlig) pengemaskine eksisterer ikke.

### 8.2     Én aktie kan have flere ejere

Ifølge pensionsplanerne *"kan en aktie have mere end én ejer"*, (…).

Det er ikke rigtigt.

Det ville indebære, at det aktieudstedende selskab skulle udlodde udbytte til mere end 100 % aktio-nærer. Det er ikke tilfældet. En eventuel tvivl om, hvem der ejer en aktie, indebærer selvfølgelig ikke, at der er flere ejere af samme aktie på samme tidspunkt.

Hvis der kunne være flere ejere af samme aktie, ville det også betyde, at mere end 100 % aktionærer kunne møde og stemme på selskabets generalforsamling.

### 8.3     Short-selling medfører, at der er flere aktier på markedet end udstedt af selskabet

Pensionsplanerne påstår, at short-selling har som typisk konsekvens, at *" der er flere aktier til rådig-hed på markedet end der oprindeligt er udstedt."*, (…).

Det er ikke rigtigt.

Der kan ikke handles et større antal aktier end udstedt af selskabet – heller ikke ved short-selling. Kæden i short-selling kan opstilles således:

Ejer/aktielångiver → aktielåntager/short-seller → short-buyer

Short-selling skal være *dækket*. Aktielåntageren skal med andre ord have lånt aktien, inden han sælger den til short-buyer, og denne salgsaftale skal naturligvis ske med respekt af vilkårene i aktielåntagers låneaftale med aktielångiver – ellers foreligger der vanhjemmel. Man kan altså ikke (lovligt) duplikere hverken aktien eller retten til udbytterefusion ved short-selling.

**8.4     1 udbytteskat kan føre til 2 refusioner**

Pensionsplanerne hævder, at deres setup *"resulterer i to parallelle udbytterefusioner, selvom statskassen kun har modtaget en enkelt indbetaling af udbytteskat fra selskabet."*, (…).

Det er åbenlyst forkert.

Refusionerne er jo udtryk for *tilbagebetaling* af et beløb, som er blevet indeholdt. Betaling af 1 udbytteskat kan derfor ikke føre til 2 (retmæssige) refusioner. Det ville jo påføre statskassen enorme tab. En eventuel tvivl om, hvem der ejer en aktie og dermed er berettiget til udbytte og refusion, indebærer selvfølgelig ikke, at statskassen skal refundere mere udbytteskat, end der er blevet indeholdt. Staten skal jo ikke bære risikoen for (eller udgifterne ved), at der ved en handel forelå vanhjemmel.

**8.5     Sagen handler om jura**

Pensionsplanerne forsøger at pakke deres *"pengemaskine"* ind i en lang række juridiske betragtninger.

Ejerskab kan ikke opnås gennem juridiske betragtninger. Hvorvidt pensionsplanerne har erhvervet de påståede aktier, er tværtimod et spørgsmål om faktum. Og faktum er, at pensionsplanerne ikke kan fremlægge noget konkret bevis for at have ejet aktierne. Bemærkelsesværdigt er det især, at ingen af de mere end 100 pensionsplaner har fremlagt så meget som én side af deres egne kontoudtog.

Denne sag vedrører ikke afklaring af en juridisk gråzone for ejerskab af aktier. Sagen handler om faktum. Derfor er pensionsplanernes betragtninger om *bona fide*-ejerskab og *retmæssigt ejerskab* (beneficial ownership) ikke relevante.

Retten til refusion af indeholdt udbytteskat afhænger af, om man har ejet aktier og modtaget nettoudbytte heraf. Hvis der ikke er handlet nogen aktier, eller hvis der er tale om fiktive aktiehandler, har pensionsplanerne ikke ejet aktierne, og de er derfor heller ikke berettiget til refusion. Det siger sig selv. Og så er det uden betydning, om pensionsplanerne var i god tro. Ex tuto skal det bemærkes, at det er Skattestyrelsens opfattelse, at pensionsplanerne har været i ond tro.

Hvis der *ikke* blot var tale om fiktive aktiehandler, ville der foreligge håndfast og utvetydigt bevis for, at pensionsplanerne havde købt og ejet aktierne og modtaget nettoudbytterne herfra.

**8.6    Det er umuligt at svindle med aktiehandler**

Ifølge pensionsplanerne er aktiehandler underlagt så streng regulering, at fiktive aktiehandler slet ikke kan forekomme, (…). Det er også – ifølge pensionsplanerne – umuligt for en custodian at udstede dokumenter uden realitet.

Samtidig anerkender pensionsplanerne dog, at der er fejl i (…) (custody statement og broker confirmations), hvilket ifølge pensionsplanerne *"lader […] til at bero på simple menneskelige inputfejl i computerne"*, (…). Derudover indeholder nogle af de skriftlige handelsnotaer fra (…) (broker) *"afvigelser fra de elektroniske instruktioner til afvikling af handlen"*, (…).

Disse fejl og afvigelser illustrerer det helt selvfølgelige, at det *er* muligt at svindle med aktiehandler, hvis man har viljen til det.

Som det fremgår af nærværende indlæg, er der da også flere steder tydelige fejl i det materiale, som pensionsplanerne har fremlagt.

**8.7    Skiftende forklaringer 1: Pensionsplanernes "afgørende" beviser ændrer karakter**

Pensionsplanerne har tidligere hævdet, at de fremlagte *Credit Advices* udstedt af de Shah-kontrollerede custodians var "legalt bevis" for, at pensionsplanerne har købt de påståede aktier, (…). Det er endda anført i (…) – i generelle vendinger – at der udover Credit Advices

*"ikke findes noget andet bevismateriale for modtagelse af et udbytte."*

Det er simpelthen forkert, at pensionsplanerne – hvis de faktisk havde modtaget de påståede udbytter – ikke skulle kunne fremlægge nogen form for objektiv dokumentation herfor.

Efterfølgende er det da også blevet pensionsplanernes opfattelse, at *handelsnotaerne* (…) er *"den afgørende dokumentation for, at aktiekøb har fundet sted"*, (…), idet fremlæggelse af en handelsnota er *"den eneste måde, hvorpå det kan dokumenteres, at man er juridisk ejer af aktier"*, (…).

Hverken Credit Advices eller handelsnotaer (…) dokumenterer ejerskab til aktier. Credit Advices er blot ord på papir, og handelsnotaer dokumenterer ikke, at handlerne faktisk er blevet gennemført.

Hertil anfører pensionsplanerne i (…), at *"Denne påstand er materielt forkert. En broker confirmation er en handelsnota, der kun kan udstedes […] når en handel er <u>gennemført</u>."* (min understregning).

Omvendt anfører pensionsplanerne i (…), at *"handelsnotaen fra en "broker" [udgør] dokumentation for, at der foreligger en endelig og bindende aftale om aktiekøb. <u>For så vidt angår afvikling (settlement), så dokumenterer handelsnotaen fra mægleren (brokeren) ikke, at afvikling har fundet sted.</u>"* (min understregning).

Der er altså enighed om, at de fremlagte broker confirmations (…) <u>ikke</u> dokumenterer, at handlen er blevet gennemført.

Pensionsplanerne har også tidligere hævdet, at en custody statement har *"den samme indholdsmæssige værdi som dokumentation som et kontoudtog."*, (…). Pensionsplanerne har fastholdt, at de fremlagte custody statements (…) viste *daglige* kontobevægelser, (…).

De fremlagte custody statements (…) er dog alene årsopgørelser, som – uden underliggende kontoudtog – viser en række interne bogføringsmæssige posteringer hos custodian.

I (…) oplyses da også om de fremlagte custody statements (…), at de blot er *"kontoudskrifter produceret ved hvert års udgang og viser derfor kun et resumé af samtlige transaktioner. Hvert enkelt transaktion, værende sig køb, salg, forward hedge eller aktielån, blev løbende bogført i custodians systemer, og hver trustee kunne ved onlineadgang løbende se hver enkelt transaktion på kontoen."*

Det fremgår videre af pensionsplanernes bemærkninger, at *"trustee havde en onlineadgang via Solos web-portal til at have indblik i og styre samtlige transaktioner på daglig basis."*

Det er også i det lys påfaldende, at *ingen* af pensionsplanerne fremlægger kontoudtog af nogen art. Og det er bemærkelsesværdigt, at pensionsplanerne nu så radikalt ændrer forklaring om indholdet af (…), som pensionsplanerne i (…), omtalte som *"juridisk bevis for ejerskab af aktiepositioner"*.

### 8.8     Skiftende forklaringer 2: Uoverensstemmelser i forklaringer om sikkerhedsstillelse og udbetaling af refusion

Ifølge pensionsplanerne indebærer GMSLA'erne en *"pantsætning af alle aktiver (nuværende og fremtidige)"*, (…), oplyser pensionsplanerne, at det økonomiske resultat af de påståede aktietransaktioner og forwards blev *"givet i sikkerhed under GMSLA'en"*. Der er ikke fremlagt dokumentation for en sådan pantsætning af pensionsplanernes aktiver til GMSLA-medkontrahenterne.

Denne pantsætning hænger i øvrigt ikke sammen med, at pensionsplanerne i (…), har oplyst, at Div-Arb-resultatet (herunder nettoudbytte og refusion) blev pantsat til den respektive *custodian*. Ifølge (…), blev ejendomsretten til alle pensionsplanernes pengemidler overdraget til custodian til sikkerhed for betalingen af aktietransaktionerne i henhold til TTC-klausulen (pkt. 4.3 i Custody Agreement, (…)). Denne sikkerhedsstillelse er heller ikke dokumenteret.

Pensionsplanerne har i (…), ændret forklaring til, at ejendomsretten til pengemidlerne (herunder nettoudbytte og refusion) *altid* blev overdraget til *Solo Capital*. Dette er dog ikke i overensstemmelse med TTC-klausulen i den fremlagte Custody Agreement (…), som henviser til "Custodian". Det er – eller har i hvert fald hidtil været – ubestridt, at Solo Capital blot er én blandt 4 Shah-kontrollerede custodians benyttet af pensionsplanerne repræsenteret af TVC Advokatfirma. Det er åbenlyst, at disse oplysninger fra pensionsplanerne er modstridende.

Dertil kommer, at refusionerne ubestridt ikke er blevet udbetalt til hverken GMSLA-medkontrahenterne eller custodian (eller Solo Capital), men til pensionsplanernes agenter.

Hvis resultatet er pantsat, giver det ikke mening, at refusionerne er udbetalt til pensionsplanernes agenter i stedet for til panthaver.

### 8.9     Skiftende forklaringer 3: Pensionsplanernes konti

Pensionsplanerne har på kontormøderne oplyst, at alle deres penge indestod på Solo Capitals konto, (…), og at alle de påståede aktietransaktioner samt modtagelse af nettoudbytte og refusion skete over denne konto, (…). Dette er der ikke fremlagt dokumentation for. Det er også i strid med pensionsplanernes tidligere oplysning om, at pensionsplanerne ikke havde brug for separate konti ud over kontoen hos deres respektive custodian (som i langt fra alle tilfælde var Solo Capital), (…).

Hvis pensionsplanernes penge indestod på Solo Capitals konto, forekommer det også besynderligt, at der i vidt omfang er fremlagt custody statements – som pensionsplanerne selv sammenligner med kontoudtog, (…) – som er udarbejdet af West Point, Telesto og Old Park Lane.

Under alle omstændigheder har ingen af pensionsplanerne fremlagt kontoudtog overhovedet.

### 8.10    Skiftende forklaringer 4: Manglende bevismateriale

Det anføres i (…) – i generelle vendinger – at der udover Credit Advices

*"ikke findes noget andet bevismateriale for modtagelse af et udbytte."*

Det er simpelthen forkert, at pensionsplanerne – hvis de faktisk havde modtaget de påståede udbytter – ikke skulle kunne fremlægge nogen form for objektiv dokumentation herfor, f.eks. i form af udbyttenota, kontoudtog, fonds-/depotoversigt eller lignende, jf. støttebilaget, afsnit 2.2, om de eksempler på dokumentation, der nu fremgår af SKATs hjemmeside.

### 8.11    Manglende forbindelse til VP Securities og settlement ved netting

Pensionsplanerne anfører mange steder i (…), at VP Securities ikke har et retvisende ejerregister (…), og at aktiehandler ikke nødvendigvis gennemføres ved levering af aktier mellem custodians, idet handler først afvikles ved overførsler af aktier internt (bogføringsmæssigt) hos hver enkelt custodian (…).

Sådanne anbringender kan ikke føre til, at pensionsplanerne skal have medhold i deres klage. Data fra VP Securities skal indgå i bevisvurderingen. Det er således relevant, om pensionsplanerne eller deres custodians har haft depoter i VP Securities – eller om de kan vise, gennem hvilke sub-custodians de efter sigende har ejet aktier.

Det er pensionsplanerne, som skal dokumentere, at de har ejet aktier i danske selskaber på udlodningstidspunktet, jf. afsnit 7.1, ovenfor. Hvis pensionsplanerne ikke kan bevise ejerskab, har de ikke ret til udbytterefusion.

Skattestyrelsen har gennem kontakt til VP Securities forsøgt at få bekræftet, om de af pensionsplanerne anførte custodians har haft aktiebeholdninger. Det kunne VP Securities ikke bekræfte. Formålet med Skattestyrelsens kontakt til VP Securities var at oplyse sagerne. Det ændrer ikke på, at pensionsplanerne har bevisbyrden for ejerskab.

Det samme gælder om netting-procedurer. Der er ingen beviser for, at pensionsplanernes custodians på noget tidspunkt har besiddet aktieposter i danske selskaber. Når de Shah-relaterede custodians (Solo Capital, Telesto, West Point og Old Park Lane) ikke har nogen aktier forud for levering, skal de selvfølgelig modtage aktier ved gennemførsel af pensionsplanernes "handler". Det er op til pensionsplanerne at bevise, at der er sket en sådan levering af aktier. Den bevisbyrde kan selvfølgelig ikke løftes ved at henvise til overordnede betragtninger om netting.

Pensionsplanerne gør tilsyneladende gældende, at det er *umuligt* at bevise ejerskab til danske aktieposter. Det er selvfølgelig ikke rigtigt.

### 8.12    Aktielåntager vil stille sikkerhed på markedsværdien

Pensionsplanerne gør omkring de påståede sikkerhedsstillelser fra aktielåntager gældende, at

> *"Det er imidlertid kutyme inden for aktie-udlånsbranchen at værdiansætte sikkerheden, der skal stilles mark-to-market (dvs. på markedsbasis) uden noget "hair-cut". Hovedrisikoen for långiveren i en aktieudlånstransaktion er misligholdelse fra*

*låntagers side. Det er derfor vigtigt, at værdien af sikkerheden (mindst) svarer til markedsprisen (mark-to-market)."* (…)

Det anførte stemmer ikke overens med, at sikkerhedsstillelsen *ikke* var markedsprisen på tidspunktet for indgåelse af den konkrete aktieudlånsaftale, men derimod markedsprisen på tidspunktet for indgåelse af købsaftalen, jf. afsnit 3.2.2, ovenfor.

I forlængelse heraf henviser pensionsplanerne til, at Nordnet forlanger *mere* end 100 % af markedsværdien i sikkerhedsstillelse.

Pensionsplanerne fordrejer imidlertid faktum.

Nordnet er en stor og etableret spiller på markedet, der ifølge årsrapporten for 2018 har aktiver til en værdi af 92 mia. SEK, en bruttofortjeneste på 1,3 mia. SEK og en egenkapital på cirka 2 mia. SEK.

Udklippet fra Nordnet (…) viser, at en kapitalstærk part, Nordnet, forlanger mere end 100 % sikkerhed ved shorting, således at Nordnet er sikker på at få de udlånte aktier hjem igen – og ellers er sikkerhedsstillelsen høj nok til at foretage dækningskøb.

I modsætning til Nordnet har pensionsplanerne hverken egenkapital eller aktiver. Derfor er det selvfølgelig medkontrahenten – nemlig aktielåntager, som skal være kapitalstærk og komme med et meget betydeligt millionbeløb – der vil være bekymret for, om denne får sine penge retur. Og derfor er det *meget* usandsynligt, at låntageren vil indvilge i at stille sikkerhed på 100 %.

Eksemplet med Nordnet viser jo *netop*, at den kapitalstærke part vil kræve en "margin" i sikkerhedsstillelsen i sin favør.

Pensionsplanernes påberåbelse af Nordnet-eksemplet illustrerer endnu engang, at pensionsplanerne påberåber sig forhold og beviser, der er helt ved siden af deres situation. Og det understreger, hvor dårlig en sag de har.

### 8.13    Spekulation om, hvorvidt Pinsent Masons har rådgivet Solo Capital

Pensionsplanerne henviser til, at Pinsent Masons har rådgivet Solo Gruppen i forbindelse med de gennemførte transaktioner (…). Det er imidlertid udokumenteret og fremgår ikke af den fremlagte faktura og mailkorrespondance (…), der ikke angår rådgivning af relevans for de for Skatteankestyrelsen verserende sager.

Dertil kommer, at rådgivning eller udtalelser fra Pinsent Masons selvfølgelig ikke har betydning for vurderingen af, om pensionsplanerne har ejet aktier. Det gælder, uanset om Pinsent Masons repræsenterer Skattestyrelsen i England.

Pensionsplanernes fremhævelse af dette forhold ligner alene et forsøg på at mudre billedet.

Det mest interessante ved pensionsplanernes fremlæggelse af (…) er, hvorfra pensionsplanerne har den del af (…), der vedrører rådgivning af Sanjay Shah og hans selskaber. Pensionsplanernes besiddelse af (…) i dets helhed tyder på, at pensionsplanerne har kontakt med Sanjay Shah."

**Skattestyrelsens støttebilag af 9. august 2019:**

"Skattestyrelsens <u>støttebilag</u>

Indholdsfortegnelse
1. AKTØRER                                                                                         2
    1.1    Custodian                                                                               2
    1.2    Agenter                                                                                 3
    1.3    Amerikanske pensionsplaner                                                              4
    1.4    Brokere                                                                                 6
2. REFUSIONSANSØGNINGER                                                                            7
    2.1    Perioden 2012-2015                                                                      7
            2.1.1    Blanketten                                                                    8
            2.1.2    Credit Advice                                                                 8
            2.1.3    Form 6166                                                                     8
            2.1.4    Power of Attorney                                                             9
    2.2    Ny ansøgningsproces fra 2017 og fremefter                                               9
3. AFTALETYPER                                                                                     9
    3.1    Global Master Securities Lending Agreement (GMSLA)                                       9
    3.2    Forwards                                                                                10
4. CIVILE RETSSKRIDT                                                                              11
            4.1.1    Tyskland: Arrest for ca. 2,2 milliarder kroner                               11
            4.1.2    USA: Retssager for ca. 5,4 milliarder kr. anlagt – og ikke afvist            12
            4.1.3    Forlig: Tilbagebetaling af hhv. 10 mio. kr. og 1,6 mia. kr.                   13
5. SKATS DATAANALYSE                                                                              13
            5.1.1    Grundlaget for SKATs analyse                                                 14
            5.1.2    Resultatet af analysen                                                       16
        (…)

**1.  AKTØRER**

Sagskomplekset vedrørende refusion af udbytteskat angår i alt 306 pensionsplaner og selskaber fra forskellige udenlandske jurisdiktioner, der via agenter *uberettiget* har anmodet SKAT (nu Skattestyrelsen) om refusion af udbytteskat på i alt ca. 12,7 milliarder kr. i perioden fra 2012 til og med 2015. SKAT har på grundlag af refusionsanmodningerne udbetalt de anmodede beløb i alt ca. 12,7 milliarder kr. i den tilsvarende periode. Udbetalingerne er sket til udenlandske bankkonti anvist af – og tilhørende – agenterne.

Af de i alt 306 pensionsplaner og selskaber, der har ansøgt SKAT om refusion af udbytteskat, er 277 pensionsplaner hjemmehørende i USA.

De forskellige centrale aktører og dokumenter kan illustreres som følger:



## 1.1    Custodian

Almindeligvis er en "custodian" (formueforvalter) et finansielt institut, der opbevarer kunders aktie-beholdninger og øvrige værdipapirer.

De i sagen indsendte Credit Advices, som alene udgør den påberåbte "dokumentation" for ejerskabet af aktierne og modtagelse af udbytte, er produceret af 12 forskellige internationale custodian-fir-maer, der oplistes nedenfor.

Fordelingen af de anmodningsbeløb, som hver custodian har leveret påberåbt "dokumentation" (Cre-dit Advices) til, kan opgøres således (i forhold til de 12,7 milliarder kr., som *uberettiget* er blevet udbetalt):

| Custodian | Total (DKK) |
|---|---|
| Solo Capital Partners LLP | 5.442.113.750 |
| Old Park Lane Capital PLC | 1.776.763.390 |
| (…) | 1.135.775.342 |
| Telesto Markets LLP | 925.443.359 |
| (…) | 920.721.387 |
| West Point Derivatives Ltd | 880.884.044 |
| (…) | 688.383.335 |
| (…) | 582.830.675 |
| (…) | 320.758.845 |
| (…) | 33.748.380 |
| (…) | 1.863.000 |
| (…) | 810.000 |
| Hovedtotal | 12.710.095.50 |

De involverede custodians har alle hjemsted i England bortset fra (…) og (…), der har hjemsted i henholdsvis (…) og (…).

**1.2 Agenter**

Alle de i sagen omhandlede 306 pensionsplaner og selskaber ansøgte om refusion af udbytteskat via en af SKAT reguleret blanketordning. De 306 enheder anvendte seks internationale eksterne rådgivningsfirmaer, såkaldte "agenter", der videreformidlede de anmodende enheders ansøgning om refusion af tilbageholdt udbytteskat til SKAT.

Fordelingen af refusionsanmodninger mellem de seks agenter har været som følger:

| Agent | Udbetalt (DKK) |
|---|---|
| (…) | 4.549.985.549 |
| (…) | 3.610.468.065 |
| Syntax GIS | 3.043.663.066 |
| (…) | 1.220.975.179 |
| (…) | 262.207.548 |
| (…) | 22.796.100 |
| Hovedtotal | 12.710.095.507 |

(…) har spillet den største rolle som agent i komplekset, idet agenten har været involveret i fremsættelse af anmodninger om refusion af udbytteskat for ca. 4,5 milliarder kr. ud af de svindlede 12,7 milliarder kr.

(…) har hjemsted i England, hvilket også er tilfældet for (…), Syntax GIS og (…). Agenterne (…) og (…) har hjemsted i henholdsvis (…) og (…).

Agenterne havde ikke alene til opgave at videreformidle materiale, men også at forestå selve den direkte kommunikation med SKAT, ligesom agenterne forestod fremsendelse af dokumentationen for refusionsanmodningerne.

Agenterne anviste i deres anmodninger til SKAT på vegne af de 306 pensionsplaner og selskaber de udenlandske bankkonti, som man ønskede refusionsbeløbene overført til. Alle de af agenterne anviste bankkonti var konti tilhørende agenterne, og SKAT udbetalte på baggrund af en gennemgang af anmodningerne alle beløb angående anmodningerne til de af agenterne anviste bankkonti.

**1.3 Amerikanske pensionsplaner**

Langt de fleste af de 277 amerikanske pensionsplaner har ifølge det for SKAT oplyste været "401 (k) plans". Betegnelsen henviser til, at pensionsplanerne har været oprettet i henhold til betingelserne i Section 401 (a) i US Internal Revenue Code ("IRC").

En 401(k) plan etableres af en arbejdsgiver til fordel for dennes medarbejdere. Det er en forudsætning for oprettelse af en pensionsplan, at arbejdsgiveren har et Employer Identification Number (ENI), som tildeles af de amerikanske skattemyndigheder, IRS. Videre er det en betingelse for oprettelse af 401 (k) planer, at der er et formelt vedtaget *plan document*, og at der er en separat aftale med en trustee. Det pågældende *plan document* skal regulere vilkårene for pensionsplanen,

herunder overholdelse af IRC og – hvis den finder anvendelse– the Employee Retirement Income Security Act ("ERISA"), samt anden gældende lovgivning. Aftalen med trustee'en skal regulere, hvordan pensionsplanens midler skal investeres og bestyres.

Indbetalinger til 401 (k) planer kan foretages af både arbejdstagere og arbejdsgiveren i henhold til pensionsplanens *plan document* og de grænser, der sættes af IRC. Når der bortses fra undtagelser om periodisering af bidrag ved årsskifter, kan indbetalingerne til en 401 (k) plan for hver deltager (både arbejdsgiver og arbejdstagere) ikke overstige det laveste af 1) en beløbsgrænse, der periodisk justeres for inflation ($53.000 i 2016 eller $59.000 for deltagere, der er 55 år eller ældre) og 2) 100 % af deltagerens kompensation fra arbejdsgiveren det pågældende år. Beløbsgrænsen er lavere for visse typer 401 (k) planer.

Generelt kan 401 (k) planer alene foretage udbetalinger som udlodning til deltagerne eller som dækning af tilladte udgifter for pensionsplanen. Udlodning til deltagerne kan kun ske under visse omstændigheder, f.eks. ved ophør af ansættelsesforhold, økonomisk hardship, død, invalidering, alder (59½ år) eller ophør af pensionsplanen uden succession. Sådanne udlodninger skal indberettes til IRS på Form 1099-R. Det bemærkes, at der kan være behov for andre formularer, hvis udlodningen sker til en person, der ikke er bosiddende i USA.

Bidrag til 401 (k) planer skal opbevares i en særskilt fond, der bestyres af en eller flere trustees, der - med visse undtagelser – har ekskl. ret til at bestyre pensionsformuen, herunder til at foretage investering af midlerne.

I nærværende sagskompleks har de omfattede trustees fungeret som bestyrere af pensionsplanerne på et overordnet niveau. Trustee'en har underskrevet fuldmagter på vegne af pensionsplanen *og* på vegne af den arbejdsgiver, der har oprettet planen. Der er omkring 70 forskellige trustees involveret i sagskomplekset. Langt de fleste er bosiddende i USA. Ud af de i alt 70 trustees repræsenterer 4 trustees samlet set 156 af de 277 amerikanske pensionsplaner.

Langt de fleste af de i sagen involverede 401 (k) planer er af typen "One-participant plans", hvilket også fremgår af SKATs afgørelser om tilbagekaldelse, hvor dette er tilfældet. "One-participant plans" er pensionsplaner for virksomhedsejere, der ikke har ansatte i den tilknyttede erhvervsvirksomhed (bortset fra eventuelt ejerens ægtefælle). Disse pensionsplaner består således, som ordlyden indikerer, udelukkende af ejeren (og eventuelt dennes ægtefælle). Pensionsplanen er i øvrigt undergivet samme regler og krav som øvrige 401 (k) plans, dog ikke ERISA.

"One-participant plans" er ikke forpligtede til at indsende regnskabsoplysninger (Form 5500) til de amerikanske myndigheder, når de har aktiver for højst $250.000 ved udgangen af pensionsplanens indkomstår (*plan year*).

Hvis "One-participant plans" har aktiver for over $250.000, har de pligt til at indsende regnskabsoplysninger (Form 5500) til de amerikanske myndigheder. Denne forpligtelse opfyldes normalt ved indsendelse af Form 5500-EZ, men kan i visse tilfælde i stedet opfyldes ved brug af Form 5500-SF.

Ud af de 277 pensionsplaner i sagskomplekset har langt den overvejende del heraf ikke indsendt Form 5500. Det må lægges til grund, at de øvrige pensionsplaner ikke har haft aktiver for mere end $250.000 ved udgangen af deres regnskabsår (*plan year*).

401 (k) planer indebærer en række skatteretlige fordele i USA. Således har arbejdsgiveren fradragsret for indbetalinger til pensionsplanen, arbejdstageren er skattefritaget for indbetalinger til pensionsplanen, og pensionsplanens midler/indkomst er fritaget fra indkomstbeskatning. Derudover er 401(k)-planerne i dobbeltbeskatningsoverenskomster med USA tillagt nogle skattefordele, herunder

ret til refusion af udbytteskat fra udenlandske aktier. Når der i andre lande anmodes om disse fordele, skal pensionsplanen bevise, at den er hjemmehørende i USA.

**1.4 Brokere**

Almindeligvis er en broker en mægler, dvs. en mellemmand mellem investorer, der vil købe og sælge værdipapirer. Brokeren betales typisk et gebyr for sin rolle.

Brokeren sørger for matching af køber og sælger og dermed indgåelse af købsaftalen (executing broker) og/eller for gennemførsel af handlen (clearing broker), dvs. udveksling af parternes ydelser.

Pensionsplanerne repræsenteret af TVC Advokatfirma har angiveligt anvendt deres custodian til clearing (gennemførsel) af handlerne (…). De har dermed alene anvendt executing brokers.

Det betyder, at brokeren har haft ansvaret for at finde en køber/sælger. Efter matching har brokeren udstedt en handelsnota (broker confirmation – (…)), hvor vilkårene for handlen fremgår.

Disse handelsnotaer er imidlertid fejlbehæftede i et omfang, som i sig selv gør, at de ikke har nogen bevisværdi i den relation, at to parter har fundet hinanden i en aktiehandel (sammenfattende indlæg, afsnit 5.4). Anvendelsen af executing brokers er derfor højest et led i Sanjay Shahs cover-up af svindlen.

Dertil kommer, at executing brokers ikke forestår gennemførsel af handlerne (clearing), og at de derfor ikke har nogen viden om, hvorvidt parterne faktisk udveksler ydelser – og hvorvidt parterne faktisk har haft de aktieposter, som angiveligt købes/sælges.

**REFUSIONSANSØGNINGER**

**2.1      Perioden 2012-2015**

Fra 2012 til 2015 har pensionsplanerne med henvisning til dobbeltbeskatningsoverenskomster mellem Danmark og det land, hvori de enkelte pensionsplaner var hjemmehørende, anmodet SKAT om refusion af indeholdt udbytteskat.

Refusionsanmodningerne blev indgivet af en række internationale agentvirksomheder via blanketordningen. Agenterne handlede på pensionsplanernes vegne.

Anmodningerne var vedlagt følgende:

1. Blanket 6.003 ENG – Claim to Relief from Danish Dividend Tax (afsnit 2.1.1, nedenfor),
    2. Attest udarbejdet af en custodian i form af eksempelvis en "Credit Advice" for ejerskabet til de pågældende aktier og modtagelse af udbytte af aktierne (afsnit 2.1.2, nedenfor).
    3. Form 6166 fra IRS (for så vidt angår de 277 amerikanske pensionsplaner) (afsnit 2.1.3, nedenfor) og
4. Fuldmagt fra pensionsplanen (afsnit 2.1.4, nedenfor),

På baggrund af pensionsplanernes anmodninger udbetalte SKAT de ansøgte beløb til agenternes oplyste konti, såfremt de rette dokumenter var vedlagt. SKAT foretog ikke nogen egentlig sagsbehandling i forbindelse med udbetalingerne.

I de sager, hvor Skattestyrelsen (tidligere SKAT) i 2018 har truffet afgørelse om at tilbagekalde de tidligere afgørelser om at refundere indeholdt udbytteskat, er det Skattestyrelsens opfattelse, at de indsendte dokumenter er uden realitet, og at refusionen er blevet ubetalt med urette.

### 2.1.1    Blanketten

Af anmodningsblanketterne fremgår bl.a., hvilket beløb agenten – på pensionsplanens vegne – søger refunderet, og at beløbet skal udbetales til agentens bankkonto. Endvidere erklærer agenten, at pensionsplanen er "beneficial owner" af de pågældende aktier.

Anmodninger indsendt i de konkrete førersager omtales nedenfor i afsnit 6.

### 2.1.2    Credit Advice

Som eneste "dokumentation" for pensionsplanernes krav på refusion af indeholdt udbytteskat var anmodningerne vedlagt Credit Advices udstedt af forskellige custodians (formueforvaltere). Disse Credit Advices er udstedt og indsendt som "dokumentation" for, at pensionsplanerne har ejet aktier i danske C20-selskaber, at pensionsplanerne har modtaget udbytter fra disse selskaber, og at der er indeholdt udbytteskat i de modtagne udbytter.

Alle Credit Advices udstedt af Solo-gruppen er forsynet med et ID-nummer.

Disse Credit Advices viser – tilsyneladende – hvilke danske aktier pensionsplanerne var ejere af, hvilke udbytter der var blevet udloddet til pensionsplanerne, og hvilke udbytteskatter der var blevet indeholdt i forbindelse med udlodningerne.

I de sager, hvor Skattestyrelsen (tidligere SKAT) i 2018 har truffet afgørelse om at tilbagekalde de tidligere afgørelser om at refundere indeholdt udbytteskat, er det imidlertid Skattestyrelsens opfattelse, at de indsendte Credit Advices er uden realitet.

### 2.1.3    Form 6166

Form 6166 (Certificatation of US Tax Residency) er et certifikat, som udstedes af United States Treasury Department som dokumentation for, at et individ eller en virksomhed i amerikansk, skattemæssig henseende har hjemsted i USA. Certifikatet udstedes af Treasury Department på baggrund af pensionsplanens indsendelse af Form 8802 (Application for United States Residency Certification).

Oplysningerne i Form 8802 afgives under ansvar og efterprøves ikke af Treasury Department ved udstedelsen af Form 6166. Alle de i sagen omhandlede 277 amerikanske 401 (k) pensionsplaner har i deres anmodninger vedlagt Form 6166.

Form 6166-certifikatet bekræfter, at en juridisk person har domicil i USA i henhold til amerikansk skatteret. Det bemærkes, at certifikatet _ikke_ dokumenterer, hvorvidt de øvrige betingelser for at modtage refusion af indeholdt udbytteskat fra udenlandske aktier er opfyldt i henhold til en dobbeltbeskatningsoverenskomst, herunder om ansøgeren reelt er ejer af de aktier, der ansøges om tilbagebetaling på baggrund af.

For at opfylde kravene til at modtage certifikatet skal pensionsplanen indsende en kopi af den underskrevne Form 5500 eller et IRS determination letter eller en erklæring (afgivet under strafansvar) om, hvorfor pensionsplanen ikke er forpligtet til at indgive Form 5500, og hvorfor pensionsplanen ikke har et IRS determination letter.

#### 2.1.4    Power of Attorney

Den indsendte Power of Attorney giver agenten fuldmagt til på pensionsplanens vegne bl.a. at ansøge om refusion af indeholdt udbytteskat og modtage refunderede beløb fra SKAT.

#### 2.2    Ny ansøgningsproces fra 2017 og fremefter

I starten af 2017 idriftsatte SKAT en ny IT-løsning for indberetning af anmodninger om refusion af udbytteskat. IT-løsningen fungerer som "TastSelv", hvor refusionsanmodningen uploades med tilhørende dokumentation.

Af SKATs hjemmeside fremgår, at det bl.a. er en betingelse for at få udbytterefusion, at der er indeholdt dansk udbytteskat af det udbytte, der søges om refusion for ("betingelse 3"), og at aktionæren er den retmæssige ejer af aktierne på tidspunktet for vedtagelsen af udbyttet ("betingelse 4"), (…).

Som dokumentation for opfyldelse af betingelse 3 og 4 kan ifølge SKATs hjemmeside f.eks. fremlægges udbyttenota eller meddelelse fra depotbanken om modtaget udbytte, kontoudtog, depotoversigt med bl.a. oversigt over aktiebeholdningen på tidspunktet for vedtagelsen af udbyttet og købsbilag, (…).

#### 3.    AFTALETYPER

#### 3.1    Global Master Securities Lending Agreement (GMSLA)

En GMSLA er en standard for låneaftaler udarbejdet af ISLA (The International Securities Lending Association). Standardaftalen giver mulighed for at indgå aftaler om udlån af værdipapirer, f.eks. aktier, på tværs af landegrænser.

GMSLA rummer en række standardvilkår, og derudover er der forskellige oplysninger, som parterne skal udfylde konkret.

GMSLA'en er dermed en *rammeaftale*. Det betyder, at GMSLA'en sætter rammerne i form af vilkår for aktieudlånet. GMSLA'en har imidlertid ikke betydning, medmindre parterne *faktisk* indgår aktielånsaftaler, som i så fald vil være omfattet af GMSLA'ens vilkår.

Pensionsplanerne har fremlagt en række GMSLA'er som (…) i de respektive sager. De fremlagte GMSLA'er er i mange tilfælde ikke underskrevet af (alle) aftaleparter.

#### 3.2    Forwards

En forward er en terminskontrakt. Det kan være en bindende aftale om fremtidig levering af en valuta eller vare til en på forhånd aftalt dato og pris. Forwardaftalen udgør dermed en kurssikring frem mod det tidspunkt, hvor den fremtidige levering skal finde sted, idet aftaleparterne på forhånd ved, hvilken pris varen/valutaen vil blive handlet for.

Forwardaftalen *behøver* ikke være bundet op på fysisk levering af aktivet, men kan også afregnes ved *differenceafregning*. Det vil sige, at parterne ved forward-kontraktens udløb – i stedet for at levere valuta/aktiver (f.eks. en aktiepost) – afregner differencen mellem markedsprisen og den i forwarden aftalte pris.

Ved differenceafregning er det ikke nødvendigt for parterne faktisk at besidde det aktiv, som for-wardkontrakten er bundet til, da aktivet ikke skal leveres, men alene anvendes til at fastslå en beta-lingsforpligtelse.

Eksempel
A og B indgår en forward den 1. august 2019. Aftalen lyder på, at A den 1. september 2019 vil er-hverve B's Novo Nordisk-aktier, der pr. 1. august har en kursværdi på 1 mio. kr., til 1,01 mio. kr.

Den 1. september 2019 skal aftalen afregnes. Aktiepostens markedsværdi forudsættes for eksem-plets skyld at være steget til 1,2 mio. kr.

Afregningen kan herefter *enten* ske ved, at A køber aktieposten fra B for 1,01 mio. kr. *Eller* også kan afregningen ske ved differenceafregning:

Parterne havde aftalt at handle aktieposten til 1,01 mio. kr., men aktieposten har en værdi på 1,2 mio. kr. (markedsprisen, også kaldet spotprisen). Aktieposten er dermed 190.000 kr. mere værd end parternes aftalte pris. B skal i så fald betale A 190.000 kr., hvilket udgør forskellen på den aftalte pris og markedsprisen på udløbsdatoen.

## 4.    CIVILE RETSSKRIDT

Skattestyrelsen har foretaget en række civilretlige skridt i sagen i flere forskellige jurisdiktioner, her-under i USA, Tyskland og England. Dette sker med henblik på at inddrive statens økonomiske tab på over 12,7 milliarder kroner, der uberettiget er blevet udbetalt til de af agenterne anviste konti. Skat-testyrelsen har således rejst såvel tilbagesøgnings- og erstatningskrav over for en række forskellige aktører i sagen for at få fastslået deres respektive betalingsforpligtelser.

Herunder er alle de pensionsplaner, der er repræsenteret af TVC Advokatfirma, blevet sagsøgt i USA med krav om betaling.

Der er endnu ikke truffet nogen endelige realitetsafgørelser i sagskomplekset.

Der er dog en række tilfælde, hvor udenlandske domstole har taget stilling til (dele af) sagskomplek-set, og hvor afgørelserne ikke er underlagt tavshedspligt:

### 4.1.1    *Tyskland: Arrest for ca. 2,2 milliarder kroner*

I juni 2018 blev der gennemført civilretlige beslaglæggelser og arrester i forskellige jurisdiktioner, herunder i Tyskland. I forbindelse med arresterne har SKAT beskrevet og ført bevis for den formodede svindel i sagskomplekset.

For at få medhold i en arrestbegæring i Tyskland skal tre betingelser være opfyldt:

5.   der skal være et retligt grundlag for kravet mod ejerne,
6.   det skal være overvejende sandsynligt, at de pågældende aktiver reelt tilhører midler udbetalt af SKAT, og
7.   der skal være risiko for, at aktiverne flyttes eller taber deres værdi til skade for SKAT, såfremt arrest ikke gennemføres.

Skattestyrelsen har gennemført arrest i Tyskland for ca. 2,2 milliarder kr.

### 4.1.2    USA: Retssager for ca. 5,4 milliarder kr. anlagt – og ikke afvist

I USA har SKAT antaget et amerikansk advokatfirma til at rådgive om muligheden for at forfølge SKATs tilbagesøgnings- og erstatningskrav i USA mod de involverede amerikanske pensionsplaner. Der er ved en række amerikanske domstole, primært i New York, i perioden frem mod den 15. juni 2018 anlagt i alt 155 retssager mod pensionsplaner, ledelsesmedlemmer og trustees for disse pensionsplaner og i enkelte tilfælde tredjeparter med tilknytning til pensionsplanerne og ansøgningerne. Samlet set er der anlagt retssager for ca. 5,4 milliarder kr.

Herunder er alle pensionsplaner repræsenteret af TVC Advokatfirma blevet stævnet.

Første retsmøde i en række af de anlagte retssager blev gennemført den 26. juni 2018 i New York.

Pensionsplanerne fremsatte over for retten i Southern District of New York en begæring om afvisning af sagerne. Pensionsplanerne henviste herved bl.a. til, at retten ikke har jurisdiktion, idet Skattestyrelsens krav – ifølge pensionsplanerne – er omfattet af common law-doktrinen "the revenue rule", som indebærer, at amerikanske domstole ikke har jurisdiktion over sager, der direkte eller indirekte søger håndhævelse af fremmede landes skattelovgivning. Reglen indebærer med andre ord, at fremmede landes skattemyndigheder ikke kan indbringe krav, som direkte eller indirekte kan karakteriseres som skattekrav, for de amerikanske domstole.

Retten afviste den 9. januar 2019 pensionsplanernes begæring om afvisning i deres helhed (…). Det fremgår bl.a. af rettens kendelse (…), at

> *"If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied."*

Retten lægger herved bl.a. vægt på, at Skattestyrelsen i sin stævning har gjort gældende, at der er tale om svindel ("*commercial fraud*") (…), samt at stillingtagen til sagen ikke kræver en for- tolkning af begrebet "*beneficial ownership*" i dansk skattelovgivning. Skattestyrelsen har således – uden at sondre mellem faktisk og retmæssig ejerskab – påstået, at pensionsplanerne ikke har ejet aktierne, og pensionsplaner har ikke fremlagt dokumentation for det modsatte (…).

### 4.1.3    Forlig: Tilbagebetaling af hhv. 10 mio. kr. og 1,6 mia. kr.

Skattestyrelsen har i sagskomplekset indgået to forlig med i alt 63 amerikanske pensionsplaner og dertil knyttede personer og selskaber:

I efteråret 2018 indgik Skattestyrelsen forlig med 2 amerikanske pensionsplaner. De to pensionsplaner havde tidligere indgivet klager til Skatteankestyrelsen og var under klagesagerne repræsenteret af TVC Advokatfirma. Da sagerne blev forligt i efteråret 2018, blev klagerne tilbagekaldt. Forligene indebar, at de to pensionsplaner tilbagebetalte de refunderede beløb, jf. Skatteministeriets pressemeddelelse af 1. november 2018 (…) og pressemeddelelse af 29. maj 2019 (…).

I maj 2019 indgik Skattestyrelsen en ny forligsaftale. Den nye forligsaftale blev indgået med 61 amerikanske pensionsplaner og en række dertil knyttede personer og selskaber. De 61 pensionsplaner havde i perioden 2012-2015 fået udbetalt cirka 2,9 milliarder kroner. Heraf havde pensionsplanerne selv fået udbetalt cirka 1,6 milliarder kroner. Forliget lød på, at pensionsplanerne og de dertil

knyttede personer og selskaber skulle tilbagebetale cirka 1,6 milliarder kroner. Restbeløbet forfølger Skattestyrelsen fortsat hos andre ansvarlige parter (…).

Det kan således konstateres, at 63 amerikanske pensionsplaner ind til videre har indgået forlig i sags-komplekset, og at forligene omfatter mere end en femtedel af den samlede, formodede svindel.

**5.        SKATS DATAANALYSE**

SKAT har gennemgået de indgivne refusionsanmodninger og sammenholdt disse med de danske C20-selskabers udlodninger, aktiekapital, mv. På den baggrund har SKAT foretaget en samlet analyse af, om refusionsanmodningerne samlet set *kan* være korrekte.

Analysen resulterede i to delkonklusioner, der gennemgås nærmere i det følgende:

> Der er refunderet for meget i forhold til, hvad der er indeholdt
> I nogle tilfælde er der refunderet *større beløb,* end der er indeholdt af udbytteskat. Det dokumenterer, at (en del af) refusionsanmodningerne er svindel, idet refusionen ikke kan overstige det indeholdte beløb.

> Refusionsanmodningerne bygger på usandsynlig store investeringer i og ejerandele af danske selskaber

> Det er *helt usandsynligt*, at meget betydelige andele af danske C20-virksomheder skulle være ejet af ukendte pensionsplaner mv., der ofte alene har én ejer, og som højst har et meget beskedent kapitalgrundlag.

Analysens delkonklusioner viser, at der er svindlet i betydeligt omfang.

***5.1.1   Grundlaget for SKATs analyse***

SKAT har analyseret en række udlodninger fra udvalgte danske selskaber, hvor pensionsplanerne mv. efterfølgende har ansøgt om refusion af påstået indeholdt udbytteskat. SKATs analyse har været koncentreret om de udlodninger, hvor der er tilgået størst provenu til pensionsplanerne mv., og hvor SØIK har indhentet materiale fra VP Securities. Analysen har dermed omfattet cirka 12,4 mia. kr. ud af den samlede svindel på 12,7 mia. kr.

*5.1.1.1   Det retlige grundlag*

Når selskaber udlodder udbytte, har de som udgangspunkt pligt til at indeholde 27 % udbytteskat ved alt udbytte. Indeholdelse kan dog ske med f.eks. 0 % eller 15 % i stedet afhængigt af omstændigheder-ne og oplysninger om udbyttemodtageren, jf. kildeskattelovens §§ 65-67 A.

Indeholdelse med andre satser end 27 % er udtryk for, at skatteyderen er omfattet af en undtagelses-bestemmelse, jf. f.eks. kildeskattelovens § 65, stk. 11, og kildeskattebekendtgørelsens § 31, stk. 1, nr. 2. I sådanne tilfælde vil der ikke (retmæssigt) kunne anmodes om refusion af udbytteskat i henhold til dobbeltbeskatningsoverenskomster, idet udbyttemodtageren ikke opfylder undtagelses-bestemmelsernes krav, hvis denne er skatteretlig udlænding. Det er altså kun, når der er indeholdt 27 % udbytteskat, at der kan anmodes om refusion.

Herudover skal anmodningerne støttes på en dobbeltbeskatningsoverenskomst. Det er derfor et krav, at den, der fremsætter anmodning, ikke er hjemmehørende i Danmark, idet personen i et sådant tilfælde ikke vil være omfattet af en dobbeltbeskatningsoverenskomst.

Der kan således alene (retmæssigt) søges om refusion af udbytteskat, hvis indeholdelse er sket med satsen 27 % over for en (skattemæssig) udlænding.

*5.1.1.2   De faktiske oplysninger*

For danske børsnoterede selskaber sørger VP Securities for at registrere, hvilken beskatning der skal ske over for hver af de registrerede ejere, når der udloddes udbytte. Videre forestår VP Securities selve udlodningen. Herefter oplyser VP Securities selskabet om udlodningerne, bl.a. sådan at selskabet kan opfylde sin oplysningsforpligtelse over for SKAT.

Selskaber har nemlig pligt til at oplyse til SKAT, hvad der er udloddet i alt, og hvad der er indeholdt i udbytteskat med hver af de givne procentsatser (blandt andet 15 % og 27 %). På denne baggrund har SKAT kendskab til (…):

> Udloddet beløb
> Indeholdt udbytteskat – både samlet og fordelt på de respektive procentsatser

SKAT har desuden oplysninger om alle refusionsanmodningerne, idet disse har været stilet til SKAT (…). Oplysningerne har været registreret i IT-systemet 3S for så vidt angår ansøgninger fra blanket-ordningen.

Da SKAT fik kendskab til, at der kunne være svindlet med refusionsanmodninger vedrørende udbytteskat, lavede SKAT manuelt en opgørelse af, hvad der samlet er anmodet om refusion af for hver udlodning. Herudover opgjorde SKAT manuelt, hvor meget netop pensionsplanerne mv. har anmodet om refusion af pr. udlodning. Samlet har SKAT dermed på nuværende tidspunkt kendskab til:

> Samlede refusionsanmodninger for hver udlodning (…)
> Refusionsanmodningerne fra pensionsplanerne mv. for hver udlodning (…)

Herudover har SKAT modtaget en række supplerende oplysninger fra VP Securities, som SØIK har indhentet. Det er oplysninger, der er udtrukket direkte fra VP Securities' registre vedrørende en række specifikke udlodninger. Heraf fremgår bl.a. det samlede antal aktier (i hver aktieklasse) i omløb på udlodningstidspunktet og navn og adresse på hver enkelt registreret ejer på udlodningstidspunktet.

Oplysningerne om ejerskab registreret i VP Securities er ikke fuldstændige. En betydelig del af aktierne i børsnoterede selskaber er registreret som ejet af f.eks. banker, der har ét fælles depot for deres kunder (kaldet et omnibusdepot). Her står banken registreret som ejer hos VP Securities, selvom det er en kunde, der faktisk ejer aktiebeholdningen. Omnibusdepoter er registreret med depotindehaverens (typisk bankens) nationalitet/adresse – uden viden om den underliggende ejers nationalitet. Hertil kommer, at det *kan* være, at adresser registreret i VP Securities ikke er blevet opdateret ved aktieejerens flytning.

SKAT har anvendt adresseoplysningerne fra VP Securities til at fastlægge, om ejeren (skatteretligt) er udlænding (…). Henset til, at en meget betydelig andel af danske C20-aktier opbevares i omnibusdepoter, _kan_ andelen af udenlandske aktionærer være anderledes end det, der fremgår af VP Securities' registreringer. Opgørelsen giver dog alligevel en indikation af, hvor stor en andel af aktierne, der har været ejet af personer, som er hjemmehørende i andre lande end Danmark.