# Exhibit 9, Part 10 of 15

Strømmen af aktier til brokerne ind til en stor pulje kan illustreres, som følger:



"Den aktie" – af ubestemmelig herkomst – som pensionsplanen efterfølgende fik leveret til sin depotkonti hos sin custodian, var heller ikke nødvendigvis den selv samme aktie, som dens køb blev matchet med ved brokeren. Det er i og for sig også irrelevant, da dematerialiserede aktier er genusvarer: Pensionsplanen skal bare have leveret en aktie, af samme klasse og fra samme selskab som den har købt.

Skattemæssigt gør det kun en forskel, hvis man vil undersøge, om den aktie, som pensionsplanen købte og fik leveret, stammede fra en short seller eller en long owner. Vil man behandle disse aktier forskelligt (skattemæssigt betragtet), støder man på det problem, at pensionsplanen kan have købt en aktie, der stammer fra en long owner (der allerede har aktien i sit depot på salgstidspunktet) hos sin broker, men når leveringen sker, modtager pensionsplanen en aktie, der stammer fra en short seller – eller omvendt. Og ingen er i stand til at skelne disse aktier fra hinanden, i kredsløbet af aktier der konstant blandes sammen i puljer. Ville man betragte aktier fra short sellere som koldt vand og aktier fra long ownere som varmt vand, er det, der opstår hos såvel brokerne som hos custodians, lunkent vand, som man ikke kan skille ad igen.

Brokerens honorar afhænger af, om han kan skaffe sin kunde det ønskede antal aktier.

Derfor er pensionsplanens betaling af brokernes honorarer dokumentation for, at pensionsplanens ordrer til køb eller salg af aktier blev matchet med tilsvarende ordrer, som brokerne skaffede fra markedet.

De brokere, som traderne for pensionsplanen placerede ordrerne til køb- og salg af danske aktier hos, var finansielle virksomheder, der var uafhængige af Solo- gruppen. Brokeren Novus blev ganske vist købt af Sanjay Shah, dog skete det først, efter pensionsplanerne var ophørt med at benytte Novus som

broker. Det var kun i 2013 – altså før Sanjay Shah overtog Novus – at Novus var broker for pensionsplaner, der benyttede sig af Solo-gruppen som clearer og custodian.

### 2.3.2 Aktielåntagere og deres mellemmænd (Stock Loan Intermediaries)

Pensionsplanen, der var kunde i Solo-gruppen, anvendte et begrænset antal professionelle mellemmænd (Stock Loan Intermediaries) som modparter i forbindelse med aktieudlån. Inden pensionsplanen startede sin forretningsaktivitet, indgik den rammeaftaler om aktieudlån (såkaldte GMSLA'er) med mellemmænd (Stock Loan Intermediaries). I en GMSLA fastsættes kun de generelle vilkår for lånene.

At ikke alle pensionsplaner har gemt kopier af de underskrevne GMSLA'er er af den simple grund, at det drejer sig om standardaftaler, der er identiske for samt- lige pensionsplaner.

Hvert enkelt konkrete aktieudlån blev indgået ved de e-mails, som trustee'en udvekslede med mellemmanden i aktielån, efter at købsordren til aktierne var placeret og matchet ved brokeren. Det er først disse e-mails, der indeholder de for indgåelsen at en retligt bindende aftale om aktieudlån nødvendige konkrete informationer: Hvilke og hvor mange aktier lånes ud, beløbet for den kontante sikkerhedsstillelse samt gebyrets og rentens størrelse samt aktieudlånets løbetid.

Pensionsplanen og dens trustee kendte og kender stadig ikke de ultimative låntagere af aktierne, idet aktielånsmellemmændene var imellem dem. Pensionsplanen kender derfor heller ikke de endelige aktielåntageres motivation for at låne aktierne.

Inden pensionsplanen købte en given aktiepost, forhørte pensionsplanen sig telefonisk hos mellemmændene om, hvor mange aktier mellemmændene havde brug for at låne, dvs. kunne formidle til en endelig låntager. Dette med henblik på at sikre, at pensionsplanen kun købte et antal aktier, som pensionsplanen efterfølgende kunne låne ud. De i sagerne fremlagte e-mails fra mellemmanden til pensionsplaner, hvori pensionsplaner spørges til, om de har et givent antal aktier, er således sendt, efter at pensionsplanerne allerede havde været i kontakt med mellemmanden.

Der er således ikke tale om, at aftalerne om aktielån er "indgået baglæns", således som det hævdes af Skattestyrelsen.

Der er heller ingen "brikker der skal falde på plads", eller en "kabale, der skal gå op" for at kunne finansiere aktiekøbet, sådan som Skattestyrelsen påstår. Skattestyrelsens påstande hviler på manglende kendskab til praktikken i udbyttearbitrage.

### 2.3.3 Forward counterparties og intermediaries

Pensionsplanen har ikke haft kendskab til de ultimative forwardmodparters identitet, idet forwardkontrakterne er handlet gennem mellemmænd. Mellemmændene træder derved (ligesom ved en ejermatchinghandel) selv ind i kontrakten og er selv umiddelbar forward counterpart til pensionsplanen.

Den ultimative forward counterparts motivation kan pensionsplanen derfor heller ikke kende.

Pensionsplanen har ikke lovet køberen af forwarden (hverken intermediarien eller den ultimative forward counterpart) noget som helst således som påstået af Skattestyrelsen i det sammenfattende indlæg i førersagerne af den 9. august 2019, afsnit 2.3 (side 10). Mindst af alt har pensionsplanen lovet modparten til forwarden en kursstigning. Den ultimative modpart til forwarden har simpelthen en modsat- rettet interesse i forhold til pensionsplanen: Han ønsker at eje aktien på en bestemt dato efter generalforsamlingsdatoen. Om det er, fordi den ultimative modpart af <u>egen motivation </u>forventer en kursstigning, eller fordi modparten af (skattemæssige årsager) simpelthen ikke ønsker at eje aktien på

udbyttedatoen, men vil sikre sig købet af aktien til en bestemt pris på en senere dato, kan pensionsplanen som uafhængig part ikke udtale sig om.

Et vigtigt aspekt i nærværende sag er, at de købte aktier aldrig blev leveret under forward hedgen, idet pensionsplanen altid differenceafregnede mellemværendet med forwardmodparterne, dvs. udlignede forskellen mellem den aftalte forwardpris og spotprisen (markedsprisen) på tidspunktet for udløbet af forwardkontrakten. Derved undgik pensionsplanen, at forwardkontrakterne i skattemæssig henseende kunne anses for en afståelse af de erhvervede aktier.

Det var væsentligt for såvel pensionsplanen som også de ultimative modparter til forwardkontrakterne, at forwardkontrakten ville være omfattet af kursgevinstloven, således at indgåelsen af forwarden IKKE er at betragte som afståelse af aktierne. Som det fremgår af forarbejderne til kursgevinstloven (bemærkningerne til lov nr. 439 af den 10. juni 1997, punkt n) kommer det for spørgsmålet om, hvorvidt en kontrakt kun kan opfyldes ved levering, eller om differenceafregning er mulig, an på, om kontrakten rent faktisk er blev afviklet ved differenceafregning. Er dette rent faktisk sket, kommer det ikke an på, om det var forudset i kontrakten.

### 2.3.4 Custodians og clearing-agenter

Custodians og clearing-agenterne har en dobbeltrolle. På den ene side har custodian til opgave at opbevare pensionsplanernes værdipapirer (aktier). Denne rolle kan custodian først opfylde, når aktierne er overført fra sælgers custodian til købers custodian. Det sker ved settlementprocessen (afvikling). Ved afviklingen af aktiehandlen skal købsprisen betales mod levering af aktier (payment versus delivery). Der skal med andre ord udveksles penge og værdipapirer mellem de involverede custodians. Dette kan enten ske på brutto- eller på nettobasis.

Sker afviklingen på bruttobasis, udveksles den konkrete aktiepost, der blev solgt fra den ene custodian til den anden mod overførslen af den konkrete købesum.

Afvikling på bruttobasis kan illustreres, som følger:



Sker afviklingen på nettobasis, modregnes først alle aktietransaktioner i den pågældende afviklingsperiode (hvilket ikke nødvendigvis er en hel dag) mellem de pågældende custodians, inden nettobalancen overdrages mellem sælgers og købers custodian.

Afvikling på nettobasis kan illustreres, som følger:



Ved clearingen opgøres forpligtelserne, der skal udveksles. Sker clearingen under anvendelse af netting, om- og modregnes flere overførselsordrer mellem de involverede custodians til en nettofordring, således at kun nettoforpligtelsen overdrages mellem de to custodians (jf. kapitalmarkedslovens § 3, stk. 1, nr. 29).

Har køber og sælger samme custodian, afvikles aktietransaktionen internt jf. CSD- direktivets artikel 9 (afviklingsinternalisatorer), således at ingen aktier sendes fra custodian til custodian. Clearingen og afviklingen af transaktionerne er ikke desto mindre reel – og i tiltagende omfang nøje reguleret af EU.

Custodians og clearing-agenterne bliver principielt først aktive, efter at den endelige og bindende aftale om overdragelse af ejerskab til aktierne er indgået.

Idet clearing-agenten dog indestår for opfyldelsen af en indgået aftale om køb og salg af aktier – som garant for betaling af købssummen og levering af aktierne – skal brokeren og traderen begge informere clearing-agenten om hensigten om at indgå en aktiehandel, som først matches når clearing-agenten har givet tilsagn om, at de kontraktuelle forpligtelser vil blive opfyldt.

Som følge af denne risiko, som clearing-agenten overtager ved afviklingen af handler indgået af en pensionsplan uden tilstrækkelig egenkapital til at betale for de købte aktier, og nødvendigheden af at skaffe en aktielåntager til det specifikke antal aktier, som pensionsplanen køber, forlanger clearing-agenten et betragteligt honorar. Et honorar, som clearing-agenten enten forlanger udbetalt til sig selv eller (af skattemæssige årsager) til en forbunden virksomhed.

På grund af den høje risiko for at skulle indestå for betalingen af købesummer i så betragtelig størrelsesorden som i de omtalte aktiehandler, var honoraret, som Solo-gruppen forlangte for sine

tjenesteydelser som custodian og clearing-agent også ganske væsentligt. Honorarer i en størrelsesorden, omkring 70-80 pct. af gevinsten, er normale inden for branchen og blev også betalt af pensionsplanerne.

Disse honorarer blev trukket fra pensionsplanernes cash-konto hos deres custodian. Idet pengene under TTC-klausulen allerede befandt sig på Solo Capitals konto, viste betalingen af honoraret sig kun ved en bogføring på pensionsplanernes cash-konto hos deres egen custodian. TTC-klausulen i Custody Agreements var en sikkerhed for Solo-gruppen, for det tilfælde at clearing-agenten/custodian måtte træde til og betale købssummen i en given aktietransaktion.

### 2.3.5 Tax agents

Anmodningerne om refusion blev indsendt af en professionel tax agent på vegne af pensionsplanen. Den engagerede tax agent havde til opgave at verificere, at samtlige forudsætninger for at få udbetalt refusion fra Danmark var opfyldt og behørigt dokumenteret.

Den pågældende tax agent modtog honorar for sine ydelser.

Eftersom den engagerede tax agent ikke kun var ansvarlig for anmodningen om refusion, men også for overvågningen heraf, skulle refusionen udbetales fra SKAT til tax agenten. Tax agenten informerede pensionsplanen om modtagelsen om den respektive refusion og overførte samtlige refusionsbeløb til Solo Capitals kontant-konto, jf. bilag 76, som her fremlægges. Dette skete med frigørende virkning for den pågældende tax agent, idet pensionsplanen havde sin konto hos Solo Capital gruppen. I Solo-gruppen blev modtagelsen af hvert refusionsbeløb bogført på hver pensionsplans konto.

Solo Capital var berettiget til at modtage refusionsbeløbene, som tilkom pensionsplanen, idet pensionsplanen havde overdraget ejendomsretten til alle sine kontante midler til sikkerhed til sin custodian. Denne overdragelse til sikkerhed af kontante midler skete under TTC-klausulen i Custody Agreement.

Overdragelse af ejendomsretten til refusionsbeløbet står ikke i modstrid med GMSLA'en som påstået af Skattestyrelsen i styrelsens sammenfattende indlæg i førersagerne af den 9. august 2019, idet GMSLA'en kun pantsætter de aktiver, der tilhører pensionsplanen. De kontante midler tilhører kun pensionsplanen i "et logisk sekund", hvorefter de i henhold til TTC-klausulen umiddelbart overdrages til custodianens ejerskab.

Samtlige pengemidler, der tilkom pensionsplanerne, blev dog bogført på separate konti hos Solo-gruppen, således at de enkelte pensionsplaners midler til enhver tid kunne identificeres og fritages fra sikkerhedsstillelsen. Dette skete i øvrigt på bag- grund af rådgivning modtaget fra advokatfirmaet Pinsent Masons, der som bekendt er Skattestyrelsens eget advokatfirma i England.

Såfremt pensionsplanen ikke havde noget udestående med sin custodian, dvs. hvis custodian ikke havde måttet betale en aktiehandel på vegne af pensionsplanen, kunne pensionsplanen på ethvert tidspunkt opsige kontrakten med sin custodian og forlange såvel pengemidler som også aktiedepoter overført til en anden custodian/bank. Den pågældende custodian havde på intet tidspunkt nogen rettigheder til aktiedepoterne, og overdragelsen af ejendomsretten til pengemidlerne skete kun til sikkerhed.

### 2.3.6   Introducing brokere

Eftersom det ikke er let at finde alle de her beskrevne finansielle virksomheder, der er villige til at acceptere en nystiftet enkeltmandspensionsplan som kunde til at investere i store danske aktieposter

uden selv at råde over tilstrækkelig egenkapital, er såkaldte introducing brokere nødvendige. En introducing broker introducerer kunder til de forskellige finansielle virksomheder mod honorar.

### 2.3.7 Arrangers

Endelig havde pensionsplanen brug for en såkaldt arranger. En arranger er en agent med eksklusiv adgang til bestemte netværk, firmaer eller forretningskoncepter (immaterielle rettigheder). Også en arranger fakturerer pensionsplanen for sine tjenesteydelser.

### 2.3.8 Sammenfattende bemærkninger om de involverede eksterne aktører

Aflønningen af det store antal medvirkende finansielle virksomheder, der rådede over særlig viden og særlige kontakter, eller som overtog visse finansielle risici i forbindelse med gennemførelsen af aktietransaktionerne, efterlod pensionsplanen med en mindre del af det samlede provenu ved den omhandlede udbyttearbitrage. Dette svarer til markedspraksis og er intet tegn på, at de diverse aktører ikke skulle være uafhængige af hinanden, eller at pensionsplanen blot skulle have ageret som "stråmand" for andre involverede parter, sådan som Skattestyrelsen lader til at ville antyde.

Pensionsplanen var ikke undergivet Sanjay Shahs kontrol og kunne på ethvert tidspunkt også skifte til en anden finansiel virksomhed. Dette dokumenteres netop også, ved at en del pensionsplaner først var klienter hos Solo Capital og efterfølgende hos North Channel Bank. Pensionsplanen kender ikke de konkrete navne på de pensionsplaner, der skiftede clearer og custodian, men ved, at det skete.

Skattestyrelsen er i en bedre position til at kunne navngive de pensionsplaner, der har indgivet anmodninger om refusion på basis af et DCA udstedt af Solo Capital og senere af North Channel Bank.

**2.4 Pensionsplanens forretningsmodel og transaktioner**

**2.4.1 Introduktion til udbyttearbitrage**

Pensionsplanen anvendte den investeringsstrategi, der kaldes udbyttearbitrage. Udbyttearbitrage er helt grundlæggende en investering i aktier omkring udbyttedatoen.

Forretningsmodellen er mulig som følge af det forhold, at ikke alle aktionærer har samme skattestatus. Nogle betaler mere i udbytteskat end andre. Enkelte er – ligesom pensionsplanen – helt fritaget for at betale udbytteskat. Aktionærer der er (helt eller delvist) fritaget for at betale udbytteskat, modtager således en højere indkomst fra udbytteudlodningen end andre aktionærer, der er mindre gunstigt stillet.

Aktionærer der ikke har adgang til en dobbeltbeskatningsoverenskomst, ved med sikkerhed, at de på udbyttedatoen mister 27 pct. af udbyttet. Disse 27 pct. mister en amerikansk pensionsplan ikke. Aktionærer, der skattemæssigt set ikke står så godt som pensionsplanen, vil derfor gerne sælge aktierne hen over udbyttedatoen. Dette gør de i reglen ved at sælge aktierne kort før eller på selve udbyttedatoen til den aktuelle markedspris (som stadig indeholder hele bruttoudbyttet) og købe aktier tilbage fra markedet ved at købe en forwardkontrakt.

Dagen efter udbyttedatoen falder aktierne i pris, idet selskabet jo har mistet værdi pga. udlodningen af udbyttet. Teoretisk set skulle aktierne dagen efter udbyttedatoen – også kaldet ex-datoen, idet det er den første dag hvor, aktierne handles udenret til udbytte – falde med samme beløb som bruttoudbyttet. Det er jo den værdi, som selskabet mister i kroner og ører ved selve udlodningen.

I praksis falder prisen dog stort set aldrig med nøjagtig samme beløb som brutto- udbyttet. Allerede dette faktum tilskynder spekulationer i prisudviklingen omkring udbyttedatoen og dermed en øget handelsaktivitet på netop dette tidspunkt.

Spekulationsforretningen bliver til en arbitrageinvestering ved den parallelle investering i en forward-kontrakt.

Arbitrage er et økonomisk fagudtryk for handel med ensartede varer (og tjenesteydelser) på adskilte markeder. Handlens formål er at udnytte synlige prisforskelle på forskellige markeder. Handles den samme varer på to forskellige markeder til en forskellig pris, opstår arbitragemuligheden: Den samme vare købes og sælges samtidig på forskellige markeder, og arbitragøren kan umiddelbart se, hvilken gevinst han vil realisere.

De forskellige "markeder", der herved er tale om, kan ikke kun være forskellige børser. En og samme aktie handles ikke nødvendigvis til helt samme pris på samtlige børser. De forskellige markeder, som en arbitragør kan rette sig mod, kan også være selve aktiemarkedet og derivatmarkedet som fx forward-markedet. Prisen på en aktie, der straks købes på det såkaldte "spotmarked," er ikke den samme som prisen for samme aktie, der handles over en forwardkontrakt.

Prisen for en aktie, der handles over en forwardkontrakt, afviger allerede pga. rentefaktoren fra selve købsprisen for aktien: Hvis man over en forwardkontrakt aftaler at købe en aktie på et bestemt tidspunkt i fremtiden til en bestemt pris, vil selve forrentningen af købsprisen blive medregnet i prisen på forwardkontrakten og derved afvige fra aktieprisen på spotmarkedet.

Prisen på forwardkontrakten kan dog også afvige fra spotprisen af mange andre grunde. En årsag, til at forwardprisen kommer ud af balance med forwardprisen – sådan som den skulle ligge hvis kun forrentningen af købsprisen ville blive indkalkuleret – kan være efterspørgsel fra "tidligere aktionærer" der inden udbyttedatoen sælger deres aktier til markedet for at undgå tabet af de 27 pct. udbytteskat. Da den oprindelige aktionær uden dobbeltbeskatningsoverenskomst ved, at han ved udlodningen af udbyttet mister de 27 pct. af udbytteskatten, har udbyttet og dermed selve aktien en mindre værdi for ham, end for en pensionsplan der har ret til refusion. Denne subjektive værdiforskel, der forårsages af, at nogle aktionærer diskrimineres i forhold til andre, bringer markedet i bevægelse. Værditabet, der sker på ex-datoen, er mindre for skattebegunstigede pensionsplaner end for andre aktionærer. Pensionsplanen kan derfor sælge aktierne igen til de tidligere ejere under en forwardaftale til en højere pris, end forwardprisen skulle være, da køberen af forwarden stadig vil stå finansielt bedre, end hvis han havde beholdt aktien, modtaget et nettoudbytte og lidt en værditab på sin aktie på ex-datoen i en størrelsesorden af bruttoudbyttet.

Pensionsplanen lider et umiddelbart "tab" på ex-datoen, da aktien også i hans besiddelse mister i værdi. Bruttoudbyttet trækkes fra aktiens markedsværdi. Dette tab udlignes i pensionsplanens tilfælde dog fuldt ud ved modtagelsen af nettoudbyttet og refusionen. Tilbage bliver for pensionsplanen gevinsten, som denne kan realisere på arbitragetransaktionen: købet af aktien på spotmarkedet og salget af akten på derivatmarkedet (forwardkontrakten).

Selvom gevinsten, som pensionsplanen realiserede, udgjorde samme værdi som refusionen af udbytteskatten, bestod selve gevinsten dog ikke i refusionen som påstået af Skattestyrelsen. Den realiserede gevinst stammede fra selve arbitrageforretningen. Denne kunne pensionsplanen ikke risikere at miste ved markedsbevægelser og var derfor nødt til at lukke samtlige positioner, når arbitragegevinsten var faldet til refusionsbeløbet.

At udbyttearbitrage er en fuldkommen legitim investerignsstrategi, fremgår af den som bilag 77 fremlangte brochure fra det engelste finanstilsyn FCA fra juni 2017.

Sagsnr. 18-0004312                    Side 101/229

**2.4.2 Transaktioner**

I det følgende beskrives forretningsgangen ved udbyttearbitrage i praksis, idet hvert enkelt trin belyses nærmere.

**2.4.2.1   Onboarding**

Forud for iværksættelsen af pensionsplanens handelsaktivitet har pensionsplanen været igennem udførlige kontoåbningsprocedurer hos samtlige af de implicerede finansielle virksomheder, herunder broker (fondsmægler), mellemmændene til forwardkontrakterne og aktielånene samt clearing- og settlement-agenten og custodian.

Det nødvendige aftalegrundlag skulle være på plads, førend pensionsplanen kunne gennemføre handelsaktiviteten, herunder rammeaftalerne med aktielåns-mellemmændene (GMSLA-aftaler). Herved sikredes, at der pr. e-mail og med kort varsel kunne indgås en konkret aftale om udlån af et konkret antal aktier på en helt konkret dato.

**2.4.2.2   Køb af aktier og salg af forward**

**2.4.2.2.1 Fremgangsmåden ved aktiekøb og salg af forward**

Første trin i selve udbyttearbitrage-transaktionerne har bestået i at placere en købsordre til fondsmægleren. Når pensionsplanens trustee (eller den af trustee autoriserede trader) har identificeret en bestemt aktie, hvor prisen på derivatet (future/forward) er ude af balance med prisen for selve aktien på spotmarkedet, forhører trustee'en sig telefonisk hos sin aktielånsmellemmand, om der på markedet er en interesse for at låne aktier i det pågældende selskab. Giver aktielånsmellemmanden udtryk for, at der eksisterer generel forespørgsel på markedet efter at låne en bestemt aktie, placerer pensionsplanens trustee en ordre om at købe et bestemt antal aktier hos broker (fondsmægler = execution broker).

Brokeren kontakter herefter sit netværk for at identificere en (eller flere) passende salgsordrer på markedet. Handlerne sker ikke nødvendigvis ved børsen. Store mængder aktier, som dem der er nødvendige, for at udbyttearbitrage kan betale sig (idet prisforskellen mellem spotmarkedet og derivatmarkedet er så minimal), handles generelt OTC, dvs. udenom børsen. Dette med henblik på at forhindre risikoen for (illegal) markedsmanipulation. Der henvises til det anførte ovenfor under afsnit 2.2.1 .

Identificerer brokeren en eller flere passende salgsordrer i sit netværk af brokere, meddeler han dette til pensionsplanens trader, som anmodes om at indhente tilsagn fra clearing-agenten om, at denne vil indestå for, at afvikling vil ske. Parallelt hermed anmodes sælgers clearing-agent om at indestå for, at afviklingen vil ske. Således indestår købers clearing-agent for, at købesummen betales, og sælgerens clearing-agent indestår for, for at aktierne leveres. Modtager clearing- agenterne disse meldinger omkring udbyttedatoen, og kan de se, at afviklingsdatoen ligger efter "record day", markeres transaktionen i computersystemerne (som "cum ex- trade"), så de respektive custodians er opmærksomme på, at der opstår en såkaldt "market claim", når udbyttet udbetales.

"Record day" er datoen, hvor selskabet (VP Securities) verificerer, hvem der er registreret som ejere af de danske aktier. Udbyttet vil af VP Securities sendes, til den der på "record day" står registreret som ejer af en aktie. Er en aktiehandel ikke afviklet på record day endnu, vil VP Securities umiddelbart sende udbyttet til den forkerte modtager, nemlig sælgeren. Har sælger eksempelvis sit depot i Nordea, og køberen sit depot i Danske Bank, vil VP Securities sende udbyttet til Nordea. Nordea kan dog se, at aktierne efter record day er overført til Danske Bank. Nordea er derfor under den såkaldte "market

claim-proces" forpligtet til at sende udbyttet videre til Danske Bank, hvor den retmæssige ejer af aktien har sit depot.

Under market claim-processen er de respektive custodians således forpligtede til at debitere nettoudbyttet, som sælger i første omgang har modtaget, fordi han stadig stod registreret som ejer på "record day" og overføre dette nettoudbytte til køberen af aktien.

Finder brokeren ikke en passende salgsordre på markedet, kan købsordren ikke efterkommes, og pensionsplanen bliver ikke ejer af danske aktier. Eksempler på købsordrer, der ikke blev matchet, fremlægges som bilag 78. Desværre har ikke alle pensionsplaner gemt kopier af de købsordrer, der ikke blev matchet, da de jo ikke havde nogen juridiske eller finansielle konsekvenser.

Idet pensionsplanen kun vil købe aktierne, hvis den samtidig kan sælge det samme antal aktier via en forward, sender pensionsplanens trader parallelt med ordren til køb af aktier også en ordre til salg af samme antal aktier via en forward- kontrakt.

Disse to ordrer – køb af aktier og salg af en forward – sendes ikke nødvendigvis til den samme broker. Kan brokeren identificere en anden broker (i sit netværk), som har en klient, der ønsker at købe aktierne over en forward, meddeler pensionsplanens broker dette til pensionsplanen, som igen opfordres til at indhente tilsagn fra clearing-agenten om at ville indestå for afviklingen.

Pensionsplanen anmoder herefter sin clearing-agent om tilsagn til at afvikle aktiekøbet og forwardsalget. Giver clearing-agenten tilsagn, meddeles dette til pensionsplanen og brokerne, som så matches handlerne. Alt dette sker indenfor få sekunder/minutter over elektroniske kommunikationssystemer.

Brokerne gennemfører handlerne som såkaldte ejermatchinghandler. Det betyder, at det er de respektive brokere, der indtræder som part i købsaftalen. Der er ikke nogen direkte kontakt mellem pensionsplanen og de ultimative sælgere af aktierne. Sælgeren af aktierne er og forbliver derfor ukendt for pensionsplanen. Der er ingen kontraktuel forbindelse mellem dem.

Idet en broker samtidig indgår flere ejermatchinghandler med forskellige brokere over aktier udstedt af samme selskab, er det ikke muligt efterfølgende at identificere den oprindelige ejer af de aktier, pensionsplanen købte. Hos brokeren blandes alle aktierne således sammen i en pulje, hvor det efterfølgende ikke længere er muligt at spore en bestemt aktie tilbage til en bestemt oprindelig sælger.

I det øjeblik hvor brokerne matcher handlerne, bliver pensionsplanen ejer af aktierne. Indenfor tre sekunder efter at ordrerne er blevet matchet, sendes der automatisk en såkaldt "trade report" til børsen i London (LSE), og afviklingen af hand- len sættes samtidig i gang ved de afviklingsinstruktioner der automatisk sendes til clearing-agenten. Ud over denne "trade report", der er rettet mod offentligheden, sendes der ligeledes en såkaldt "transaction report" til det engelske finanstilsyn, FCA (via LSE's Unavista MIFIR Reporting Portal – jf. Sanjay Shahs processkrift til High Court i London, afsnit 56.9). Denne "transaction report" anvendes i tilsynsmyndighedernes kontrol og overvågning af aktietransaktionerne. Begge rapporter sendes elektronisk og fuldt automatisk fra handelssystemerne (computerne), hvor aktiehandlerne blev matchet.

Efter matchingen af købs- og salgsordre begynder fristen for afviklingen af handlen at løbe. Handler, der skulle afvikles gennem Solo-gruppens selskaber, blev, som mange andre OTC-handler, afviklet med en dags længere frist, end VP Securities (som den nationale CSD) afvikler handler. Clearing-agenter har (også i henhold til FCA's regler) pligt til at sørge for, at risikoen en "fail" undgås – dvs. at en handel ikke kan afvikles – og hertil anvendes en længere afviklingsperiode, især når der er tale om så store aktieposter som de i nærværende sag omtalte. Indtil 2015 blev aktiehandlerne således afviklet, fire dage efter

ordrerne blev matchet (T+4), og fra og med 2015 blev aktiehandlerne afviklet, tre dage efter matchingen (T+3).

**2.4.2.2.2 Pensionsplanens og aktiesælgers forretningsmæssige begrundelse for aktiekøb/-salg**

Hovedaktørerne i en udbyttearbitragetransaktion er naturligvis køber og sælger af aktierne. Disse har modsatrettede interesser: Mens sælgeren ikke ønsker at eje aktierne på retserhvervelsestidspunktet for udbyttet (udbyttedatoen), har køberne netop interesse i at være den retmæssig ejer af aktierne på denne dato.

Den ultimative sælgers motivationer for ikke at ville eje aktierne på udbyttedatoen kan som anført være mange. Som følge af manglende ret til refusion efter den dobbeltbeskatningsaftale, som sælger er underlagt, kan sælger have en interesse i om muligt at sælge aktien til en pris, der indeholder 100 pct. af værdien af bruttoudbyttet. Han vil derved økonomisk være stillet, som om han var underlagt en dobbeltbeskatningsoverenskomst, der gav ret til refusion af hele udbytteskatten. Sælgeren kan også have et ønske om at blive beskattet af en aktieavance – frem for at blive beskattet af aktieudbyttet. I denne situation vil sælgerens søge at sælge aktien (inklusive udbytte) til en højere pris end aktiernes tilbagekøbspris efter udbyttedatoen (dvs. eksklusive udbytte).

Endvidere kan der naturligvis være tale om spekulanter, der spekulerer i, at markedsprisen for en aktie ikke falder svarende til udbyttets værdi. Sådanne spekulanter kan også optræde som sælgere af aktier inden udbyttedatoen. Der findes selvsagt også mange andre realøkonomiske incitamenter til salg af aktier inden udbyttedatoen. Pensionsplanen kan ikke vide, hvad der har været en given ultimativ sælgers incitament til at sælge inden udbyttedagen. Det bemærkes dog, at der notorisk kan være mange forskellige incitamenter hertil.

Pensionsplanen købte aktierne med henblik på at realisere en gevinst ved at købe aktierne på spotmarkedet og sælge aktierne gennem en forward eller en future.
Pensionsplanens trustee / trader kan samtidig se både prisen på spotmarkedet og prisen på forward-/futuremarkedet og derved øjeblikkeligt regne sig frem til, hvilken gevinst der kan realiseres ved at købe aktierne på spotmarkedet og sælge dem gennem en forward eller en future. Forudsætningen for at denne gevinst også realiseres i virkeligheden, er blot, (1) at refusionen af udbytteskatten udbetales, og (2) at pensionsplanen kan bære omkostningerne i forbindelse med aktieudlånet, der finansierer købsprisen af aktierne.

Pensionsplanens kalkulation af investeringens rentabilitet er baseret på den forudsætning, at pensionsplanen ikke mister udbytteskatten på ex-datoen, men har krav på at modtage refusion. I modsat fald ville pensionsplanen være lige så dårligt stillet som en sælger, der ikke har adgang til udbytterefusion. Uden refusion har pensionsplanen betalt for meget for aktierne inden ex-datoen.

Pensionsplanens erhvervelse af de i sagen omhandlede aktieposter har været finansieret af de kontante sikkerhedsstillelser fra aktielåntagere. Mens aktielåntagere skal betale et gebyr for aktielånet, skal pensionsplanen betale renter for den kontante sikkerhedsstillelse. Gebyr og rentesats er variable størrelser, der til stadighed genforhandles mellem parterne afhængig af de aktuelle markedsbetingelser. Dette medfører for pensionsplanen en usikkerhed med hensyn til finansieringsomkostningerne, som kan tvinge pensionsplanen til at sælge aktierne inden udløbsdatoen for forwarden eller foranledige pensionsplanen til at forlænge aktielånet og hedgen ud over den oprindelige løbetid.

For det tilfælde at SKAT ikke har villet udbetale den refusion, som pensionsplanen har haft retskrav på, har pensionsplanen ikke haft tilstrækkelig egenkapital til umiddelbart at overleve dette tab af udbytterefusion, der svarede til 27 pct. af ud- byttet. For at imødegå denne risiko har pensionsplanen generelt været nødt til at sælge aktierne på spotmarkedet og kalde aktielånet tilbage, når finansieringsom-

kostningerne i forbindelse med transaktionen nåede til et beløb svarende til den <u>hidtidige gevinst uden</u> udbytteskatten. Pensionsplanen ville da stadig nå et nulre- sultat, hvis SKAT ikke skulle udbetale refusi- onen. Dette er således også årsagen til, at gevinsten, der realiseres ved transaktionerne, svarer til samme beløb som udbytteskatten. Refusionen af udbytteskatten er dog kun tilbagebetaling af det be- løb, som pensionsplanen mistede, da pensionsplanen havde købt aktien dagen før ex-datoen for en pris inklusive bruttoudbytte, men kun modtog et nettoudbytte fra det danske selskab under afviklingen af market claim-processen.

### 2.4.2.2.3 Pensionsplanens og forwardkøberens forretningsmæssige begrun- delse for salg/køb af for- ward

Den forretningsmæssige begrundelse for at indgå en forward er i bund og grund at afdække en risiko- position: Har man en aktiepost, kan man afdække risikoen for kurssvingninger ved at sælge en forward- kontrakt. Heri aftales at sælge aktierne på et bestemt tidspunkt i fremtiden til en bestemt pris.

Også køberen af forwardkontrakten sikrer sig mod kurssvingninger ved at købe aktierne under en for- wardaftale: Han ved, til hvilken pris han kan købe aktierne i fremtiden. Dette kan være et væsentligt argument for en short seller eller for en aktionær, der sælger sine aktier inden udbyttedatoen for at undgå udbytteskatten.

Hvilken konkret motivation modparterne til forwardkontrakterne har haft, kan pen- sionsplanen ikke udtale sig om, da den ikke havde nogen direkte kontakt til dem. Der var altid en mellemmand imellem pensionsplanen selv og den ultimative forwardmodpart.

Den ultimative modpart til en forward hedge kan have haft utallige grunde til at indgå en aftale med pensionsplanen.

Således kan den ultimative køber af en forward håbe på, at aktieprisen hurtigt sti- ger igen, efter den dato hvor aktien ikke længere bliver handlet med ret til udbytte (ex dividend-datoen). Empiriske under- søgelser viser således, at aktieprisen på ex- dividend datoen ikke altid falder med nøjagtig samme værdi som bruttoudbyttet, samt at aktiekursen stiger hurtigere end normalt efter ex-dividend datoen.

Den ultimative modpart til en forward kan også være en udlænding, der inden udbyttedatoen sælger sin aktie for ikke at miste udbytteskatten, som han ikke er refusionsberettiget til. Han kan ønske at sikre sig retten til at igen købe en tilsvarende post aktier i selskabet fra markedet til en bestemt pris. Han kan ved en høj prisansættelse af forwarden give arbitrageuren et incitament til at købe aktierne inden udbyttedatoen og sælge aktier efter udbyttedatoen. Modparten til forwarden kan derved bringe prisen for forwarden ud af balance med spotmarkedet.

### 2.4.2.3 Aktieudlån og finansiering af aktiekøb

### 2.4.2.3.1 Fremgangsmåden ved aktieudlån

Pensionsplanen finansierer købet af aktierne ved at låne aktierne ud og betale aktiesælger med den kontante sikkerhedsstillelse modtaget fra aktielåntager.

Ex dividend-datoen, der er den første dag, hvor aktierne handles uden krav på udbytte, indtræder mel- lem handelsdatoen og udlånsdatoen og afviklingsdatoen. Uanset at aktiernes værdi således er lavere på udlånsdatoen end på handelsdatoen, stiller aktielåntager en kontant sikkerhed svarende til købspri- sen på handelsdatoen. Dette er helt almindelig markedspraksis, idet aktielångiver i reglen altid forlan- ger mere i sikkerhed for aktielånet end den aktuelle markedsværdi af aktierne, jf. afsnit 8.1 i dette

indlæg. Dette adskiller netop et aktieudlån fra et lån mod håndpant i aktier. Her er det aktiernes værdi, der overstiger lånets værdi.

Ved aktielån er det dog aktieudlåner, der beskyttes, mod risikoen for at aktielåntager – som i mange tilfælde netop er en short seller – ikke kan levere de lånte aktier tilbage. Derfor overstiger den kontante sikkerhedsstillelse den aktuelle markedsværdi af aktierne.

Som anført ovenfor har pensionsplanen allerede forud for købet af de omhandlede aktier indgået en GMSLA-rammeaftale med aktielånsmellemmanden, der indeholder de generelle betingelser for aktieudlånet. Pensionsplanen og aktielånsmellemmanden aftaler herefter de konkrete vilkår om hvilke aktier, antallet af aktier, låne- gebyret, rentesats osv. Disse aftaler indgås via e-mail. Når aktielånsmellemmanden og pensionsplanen er enige om lånebetingelserne, meddeles aktieudlånet til clearing-agenten og custodian. Disse kontrollerer, at den fra aktielångiver modtagne besked om aktieudlån svarer til den fra aktielånsmellemmanden modtagne besked. Er dette tilfældet, bekræftes aktieudlånet.

Idet pensionsplanen anvender den kontante sikkerhedsstillelse fra aktielåntager til at betale købsprisen for aktierne, skal aktieudlånet afvikles samme dag hos clearing-agenten og custodian som selve aktiekøbet. Uden betaling af købsprisen leveres aktierne ikke til pensionsplanens depotkonto hos custodian.

Afviklingen af aktiekøbet sker parallelt med afviklingen af aktieudlånet. Aktierne registreres dermed tre henholdsvis fire dage efter købet af aktierne, først på pensionsplanens depotkonto og derefter på aktielånetagerens depotkonto. Denne registrering på pensionsplanens konto er af afgørende betydning for, at pensionsplanens market claim afvikles korrekt, og at pensionsplanen modtager udbyttet, der i første omgang var sendt forkert af sted af VP Securities til sælgerens konto.

Selvom samtlige betingelser aftales pr. E-mail, når selve aktielånet indgås, betyder det ikke, at betingelserne for aktielånet er fastlåst. Da aktielånene ikke havde en fast løbetid (se: "*term: open*") var de åbne for konstante genforhandlinger, dvs. at pensionsplanen på ethvert tidspunkt kunne forlange et andet gebyr, og at aktie- låntageren på ethvert tidspunkt kunne forlange en anden rente ved at true med straks at opsige lånet. Havde pensionsplanen interesse i at lade aktielånet løbe videre, ville denne acceptere de ændrede betingelser. Tilsvarende forholdt det sig for aktielåntageren.

Som eksempel på disse e-mails, ved hvilke aktielånsbetingelserne blev løbende ændres, fremlægges bilag 79.

Den af Skattestyrelsen i det sammenfattende indlæg af den 9. august 2019 i førersagerne, afsnit 4.5, side 28, anførte formel er derfor ganske rigtig, men den kan ikke anvendes til at nå frem til det nøjagtige beløb, som den samlede Stock Lending Fee udgjorde. Uden at kende den til enhver tid gældende nøjagtige rentesats, der fandt anvendelse hver enkelt dag, er det ikke muligt at regne baglæns, sådan som Skattestyrelsen forsøger på side 29. Den af Skattestyrelsen påståede "regnefejl" kan ikke konstateres.

Da Skattestyrelsen anvender den forkerte rentesats på samtlige beregninger af samtlige aktielån for alle pensionsplanerne, kommer styrelsen naturligvis også til samme "regnefejl" i alle sagerne. Når Styrelsen når den konklusion, at der forelig- ger en fejl i alle sagerne, burde Styrelsen nærmere komme til den konklusion, at der må være en fejl i styrelsens fremgangsmåde og tage variable rentesatser i betragtning for de forskellige dage.

At Skattestyrelsen ikke kan få styrelsens egne beregninger til at stemme, er ikke et tegn på svindel, men et tegn på at styrelsen ikke ved, hvordan aktielånsbranchen fungerer i realiteten.

**2.4.2.3.2 Pensionsplanens og aktielåntagers forretningsmæssige begrundelse for aktieudlån**

Pensionsplanen har til betaling af de købte aktier brug for kontante midler. Disse fremskaffes ved at låne aktierne ud og modtage en kontant sikkerhedsstillelse for aktierne, der svarer til købsprisen. Finansindustrien taler herved om såkaldte "cash-neutral-transactions".

Aktielåntageren kan have mange bevæggrunde for at ville låne aktierne.

Det er således ikke korrekt, når Skattestyrelsen påstår, at aktielåntageren alene har haft short selling som formål.

Aktielåntageren kan således have brug for de lånte aktier til hedging. Aktielåntageren kan også være en bank, der ønsker af komme af med store likvide pengemidler for at have et andet, mere værdifuldt aktiv i regnskabet end kontante pengemidler. En aktielåntager kan ligeledes være et investeringsselskab, der skal respektere en bestemt allokering af sine aktiver (risikospredning) og derfor har brug for flere aktier i sit depot på regnskabsdatoen.

Den Europæiske Centralbank henviser på sin internetside (https://www.ecb.eu- ropa.eu/explainers/tell-me-more/html/securities_lending.de.html) også udtrykkeligt til, at der eksisterer mange årsager til at låne en aktie: Hvis man kun midlertidigt har brug for en aktie en enkelt dag eller enkelte uger, så er det ofte billigere, hurtigere og mindre risikabelt at låne aktierne i stedet for at købe dem. Mange forskellige strategier, der bruges på de finansielle markeder, beror på aktielån. De lånte aktier kan bruges til handel (løbe en risiko for at realisere en gevinst), arbitrage (realisere en risikofri gevinst fra prisforskelle) eller hedgingformål (nedsætte risiko). Hvis aktier af en hvilken som helst grund leveres sent, kan aktielån være en mulighed for at fremskaffe de manglende aktier til tiden.

Det bør i dette sammenhæng bemærkes, at verdens største nationalbanker selv agerer som låntager af værdipapirer som middel til at realisere deres pengepolitik. Herved kan nationalbanker pumpe yderligere likviditet ind i markedet med henblik på at øge pengemængden og derigennem øge inflationen. Således er det også alment kendt, at den schweiziske og japanske nationalbank er registrerede som verdens største ejere af børsnoterede aktier – om disse nu er købt eller lånt.

Størrelsen af den globale aktieudlånsindustri udgør USD 10 billioner, hvorfor det selvsagt er umuligt at redegøre for alle de mulige bevæggrunde, som en aktielåntager kan have.

Aktielåntageren vil derfor ikke nødvendigvis have den forventning, at aktieprisen vil falde, således som Skattestyrelsen påstår i indlægget.

Aktielåntageren og pensionsplanen har modsatrettede interesser: Mens pensionsplanen har aktier og har brug for kontante pengemidler, har aktielåntageren – der råder over kontante pengemidler – brug for aktierne. Begge parter i et aktieudlån tager betaling for deres ydelser: Aktielåntager forlanger renter på den kontante sikkerhedsstillelse, som han skal stille, og pensionsplanen forlanger et gebyr for at låne aktierne ud. Hvem, der herved realiserer et tab, og hvem, der realiserer en gevinst, afhænger af de aktuelle markedsbetingelser og de involverede parters forhandlingsevner.

**2.4.2.3.3 Øvrige bemærkninger til finansiering af aktiekøb**

Pensionsplaner, der ikke har tilstrækkelig egenkapital til selv at betale for aktierne, handler, under det der er kendt som "margin trading" eller gearing. Herved kan handles et enormt antal aktier (eller andre aktiver) uden at anvende egenkapital. Alt, hvad investoren har brug for, er en prime broker, der forsyner investoren med den nødvendige kapital.

Arbitragetransaktioner (ikke blot dem, der foretages omkring udbyttedatoen) kan finansernes uden egenkapital, når gevinsten ved at købe en aktie på spotmarkedet og samtidig sælge derivativet på forwardmarkedet straks kan determineres. I reglen er prisforskellen mellem spot- og forwardmarked minimal. Der skal derfor et enormt handelsvolumen til for at skabe nok gevinst, til at strategien giver nok af- kast til at betale samtlige tjenesteydelser i denne forbindelse.

Prime brokere, der i nærværende sager var custodians, og clearing-agenterne behøver ikke nødvendigvis selv direkte at finansiere investoren i form af en kredit.
Prime brokeren kan også blot agere som garant for, at betalingen af aktierne vil ske. Skaffer pensionsplanen sig de nødvendige finansielle midler til at betale for aktierne ved at låne disse ud mod en kontant sikkerhedsstillelse, begrænser prime brokerens rolle sig til at være garant.

**2.4.2.4 Afvikling af transaktionerne (settlement)**

Selve afviklingen af aktiekøbene blev indtil 2015 gennemført fire dage og fra 2015 tre dage efter de omhandlede køb af aktier og salg af forwards. Aktiekøbene afvikledes ved clearing og afregning (settlement). Det var clearing-agentens opgave at beregne, hvilken sum penge der i alt skulle fra købers custodian til brokeren (og derfra videre til den ultimative sælger), og hvor mange aktier der i alt skulle fra custodians depotkonto til pensionsplanens depotkonto.

Disse afregninger kan ske på brutto- eller nettobasis. Det betyder, at hver eneste handel enten kan betales separat, og hver eneste antal aktier overdrages separat til pensionsplanens custodian (bruttoafvikling). Alternativt kan samtlige købs- og salgssummer, der skal udredes mellem brokerens (= sælgerens) custodian og køberens custodian, modregnes hinanden, og samtlige tilgange og salg af aktieposter nettes (modregnes), således at der kun overføres en enkelt nettosum penge, og der kun overdrages en samlet nettopost af aktier mellem købers og sælgers custodian (nettoafvikling efter netting).

Anvendes der netting under clearing- og settlementproceduren, kan en aktie aldrig spores fra den ultimative sælger, til den pensionsplan der købte aktien. Efter netting af alle køb og salg vil pensionsplanen med høj sandsynlighed netop ikke modtage en aktie, der på et tidspunkt lå i brokerens eller den ultimative sælgers depot, men en aktie, der tidligere lå i depotet for en anden kunde hos samme custodian. Dette er netop formålet med netting: Der overdrages færre aktier mellem diverse custodians.

Skulle pensionsplanen på dagen for afviklingen af handlen endnu ikke have modtaget den kontante sikkerhedsstillelse for aktieudlånet, hæfter clearing-agenten over for brokeren (sælgeren) for betalingen af købsprisen. Efter købs- og salgsordre er matchet, kan afviklingen af handlen ikke længere stoppes. Clearing-agenten har pligt til selv at betale aktierne, hvis køber ikke har tilstrækkelige midler.

Det bemærkes, at clearing-agenten i ingen af de af pensionsplanen gennemførte handler har måttet udrede købsprisen, indtil et aktielån var på plads.

Pensionsplanen fik samme dag <u>afviklet</u> aktiekøbet, forwarden og aktieudlånet. Pensionsplanen registreredes herved fire henholdsvis tre dage efter købet som ejer af aktierne. Pensionsplanen var således i en periode af fire henholdsvis tre dage ejer af aktierne, uden at dette var registreret hos custodian. Registreringen hos custodian skete først, når pensionsplanen betalte for aktierne og fik dem leveret til sin depotkonto. Dette betød, at den oprindelige ejer i de første fire henholdsvis tre dage efter købsaftalens indgåelse stadig var registreret som ejer af aktierne, selvom vedkommende ikke længere var den retmæssige ejer af aktierne.

Efter at pensionsplanen havde været retmæssig ejer af aktierne i flere dage, lånte pensionsplanen aktierne ud, således at købesummen kunne erlægges. Aktielåntager blev fra dette tidspunkt registreret som den nye civilretlige ejer.