# Exhibit 10, Part 1 of 2

**U.2023.1575**
**U.2023.1575**

***Assessment of dividends distributed by Danish companies to foreign parent companies under the Danish Corporation Tax Act, EU directives and double taxation treaties. Further questions on withholding obligation and interest on dividends***
***Tax requirements.***

*EU law 2 - International law 5 - Money etc. 5.7 - Taxes 311.1, 311.2 and 72.1.*

The cases concerned in particular whether the Danish subsidiaries N ApS and T A/S were obliged to withhold dividend tax on distributions to foreign parent companies. The cases were to be assessed under Danish tax legislation, including section 2 of the Danish Corporation Tax Act, paragraph 1, point c,[1] as well as the EU Directive on a common system of taxation for parent companies and subsidiaries from different Member States[2] and double taxation treaties between Denmark and Cyprus, Luxembourg and the USA, respectively.[3] In the judgment, the Supreme Court decided when a foreign parent company is a "beneficial owner" under the double taxation treaties and when there is an abuse of rights under the EU Directive. The Supreme Court then made a specific assessment of the individual distributions from N ApS and T ApS. After this assessment, the tax authorities had a claim against N ApS for not having withheld[4] withholding tax on distributions in 2005 to a newly established parent company in Cyprus. The amounts were transferred from Cyprus to a company in Bermuda and a company in the USA. The Supreme Court found that interest and compound interest should be added to the claim under the Collection Act, even though N ApS had not been able to deposit the disputed amounts and avoid interest because the company had been successful in the National Tax Court and partly in the High Court, while the case

**1576**

pending before the courts. The Supreme Court stated that there is reason for the legislature to consider whether this consequence of the Collection Act is desirable.[5] The Supreme Court also found that T ApS was liable to withhold withholding tax on dividends that the company distributed to a parent company in Luxembourg in August 2011.

**H.D. January 9, 2023** *in cases 69/2021 and 79/2021 and 70/2021 (1. afd.)*

(Jens Peter Christensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Anne Louise Bormann and Jørgen Steen Sørensen).

*Ministry of Taxation (adv. Søren Horsbøl Jensen and adv. Tim Holmager, both Copenhagen)*
against
*NetApp Denmark ApS (adv. Lasse Esbjerg Christensen and adv. Søren Lehmann Nielsen, both Copenhagen)*
and
*NetApp Denmark ApS (adv. Lasse Esbjerg Christensen and adv. Søren Lehmann Nielsen, both Copenhagen)*
against
*Ministry of Taxation (adv. Søren Horsbøl Jensen and adv. Tim Holma- ger, both Copenhagen)*
and
*TDC A/S (attorney Arne Møllin Ottosen, Copenhagen)*
against
*Ministry of Taxation (adv. Søren Horsbøl Jensen and adv. Tim Holma- ger, both Copenhagen)*

## Eastern High Court's judgment of May 3, 2021 (13th district), B-1980-12 and B-2173-12 [SKM2021.304.ØLR]

(Judges Anne Birgitte Fisker, Kristian Porsager Seierøe and Michael de Thurah).

### I. The claims made and the background of the cases

*B-1980-12 Skatteministeriet v NetApp Denmark ApS*

On September 17, 2010, SKAT decided that NetApp Denmark ApS (NetApp Denmark) pursuant to section 65(1), cf. section 2(1)(c) of the Danish Withholding Tax Act was obliged to withhold dividend tax of DKK 158,450,880 on dividends of DKK 565,896,000 and DKK 25,763,360 on dividends of DKK 92,012,000 paid in 2005 and 2006 respectively to the company's parent company in Cyprus.

In a ruling dated December 16, 2011, the National Tax Tribunal ruled in favor of NetApp Denmark that the dividends are not taxable.

On March 14, 2012, the ruling was brought before the District Court in Glostrup by the Danish Ministry of Taxation, claiming that NetApp Denmark should be considered obliged to withhold the dividend tax. By order of June 7, 2012, the District Court referred the case to the Eastern High Court pursuant to section 226(1) of the Danish Administration of Justice Act.

The Danish Ministry of Taxation has finally claimed that the defendant, NetApp Denmark, must acknowledge that it is obliged to withhold dividend tax of DKK 158,450,880, corresponding to 28% of the dividend of DKK 565,896,000, which was distributed by the defendant on September 28, 2005, and DKK 25,763,360, corresponding to 28% of the dividend of DKK 92,012,000, which was distributed by the defendant on October 13, 2006, and that the defendant is responsible for payment of the amounts not withheld.

*The defendant, NetApp Denmark,* has finally claimed acquittal. By order of January 14, 2021, the High Court, at the parties' joint request pursuant to sections 253 and 366 of the Danish Administration of Justice Act, separated the parties' claims regarding any business of the dividend tax for subsequent, separate decision on a written basis.

*B-2173-12 Skatteministeriet v. TDC A/S*

---

1    FT 2000-01, till A, bill no. L 99, general comment, and answers to questions 1, 2, 16 and 23, FT 2003-04, til. A, bill no. L 119, bem. to § 10, as well as answer to question 53, FT 2004-05, till. A, bill no. L 27, alm. bem. pkt. 2 and bem. to § 1, no. 1, 2 and 4, FT 2005-06, till. A, bill no. L 43, p. 1160, the Minister for Taxation's answer to question no. S 474 (2006-418-0333), the Tax Committee's report of May 18, 2008 to bill no. L 202, FT 2008-09, bem. to no. 1, as well as the Taxation Guidelines, section D.D. chap. III, art. 10, of July 14, 2003.

2    CJEU judgments of February 21, 2006 (C-255/02), July 5, 2007 (case C-321/05), November 22, 2017 (C-251/16), February 26, 2019 (C-116/16

Copyright © 2023 Karnov Group Denmark A/S                                                                                                                                                      page 1

and C-117/16), and U 2017.824H (Ajos).

3   OECD comments from 1977 (art. 1, s. 7-10 and art. 10, s. 12 and 22) and from 2003 (art. 10, s. 12) to the OECD Model Double Taxation Convention.

4   U 2018.3119H, U 2018.3845H and U 2022.2799H.

5   U 2023.307H.

On June 21, 2011, the Danish Tax Council issued binding answers to two questions submitted by TDC A/S (TDC) regarding tax exemption of an intended distribution of dividends from TDC to the parent company NTC Holding G.P. & Cie S.C.A. registered in Luxembourg.

The Danish Tax Council answered "No" to TDC's question 1 on whether a distribution was tax-free and thus exempt from Danish withholding tax pursuant to section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act, according to which the tax liability does not include dividends received by participants in parent companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which are considered to be transparent entities for taxation in Denmark.

The Tax Council also answered "No" to TDC's question 2 on whether a distribution was tax-free and thus exempt from Danish withholding tax pursuant to section 2(1)(c)(3) of the Danish Corporation Tax Act, according to which the tax liability does not include dividends on subsidiary shares when the taxation of dividends from the subsidiary must be waived or reduced under the Parent-Subsidiary Directive or under a double taxation agreement with the state where the parent company is resident.

In an order dated March 13, 2012, the National Tax Tribunal upheld the Tax Board's answer to question 1, but agreed with TDC that question 2 must be answered with a "Yes".

On April 23, 2012, the order was brought before the Copenhagen City Court, , which referred the case to the Court of Frederiksberg as the proper venue. By order of June 27, 2012, the Court of Frederiksberg referred the case to

**1577**

processing at the Eastern High Court pursuant to section 226(1) of the Danish Administration of Justice Act.

The Ministry of Taxation has submitted a main claim that TDC must acknowledge that question 2 in the Danish National Tax Tribunal's decision of March 13, 2012 is answered with a "No", and a subsidiary claim that TDC must acknowledge that question 2 in the Danish National Tax Tribunal's decision of March 13, 2012 is rejected.

TDC has claimed acquittal of the Ministry of Taxation's claims and a separate claim that the Ministry of Taxation must acknowledge that question 1 in the National Tax Tribunal's decision of March 13, 2013 is answered with a "Yes".

*The Ministry of Taxation* has claimed acquittal against TDC's independent claim.

*Common issues*

Pursuant to section 254(1) of the Danish Administration of Justice Act, the cases are heard in connection with each other.

The two cases both concern the question of whether a company domiciled in another EU Member State with which Denmark has concluded a double taxation treaty, according to the Danish Corporation Tax Act § Section 2(1)(c) is taxable on dividends distributed by a Danish subsidiary.

The Ministry of Taxation's overall view in both cases is that the companies in question, domiciled in Cyprus and Luxembourg respectively, are so-called "flow-through companies" that are not the beneficial owners of the dividends, with the consequence that the rules on tax exemption under the Parent-Subsidiary Directive and the rules on tax reduction under the double taxation treaties with the mentioned EU countries do not apply.

Both cases raise questions about the interpretation of Council Directive 90/435/EEC of 23 July 1990 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, as amended by Directive 2003/123/EC of 22 December 2003 (Parent-Subsidiary Directive), and about the interpretation of the two identical double tax treaties.

By orders of February 19, 2016, the Eastern High Court decided under Article 267 of the Treaty on the Functioning of the European Union to ask questions in both cases on the interpretation of the Parent-Subsidiary Directive in particular. On February 26, 2019, the European Court of Justice ruled on the cases.

It has been reported that SKAT has brought a number of similar cases against other Danish companies that have distributed dividends or paid interest to their parent companies resident in other EU countries or countries with which Denmark has concluded a double taxation treaty (so-called "beneficial owner" cases) without withholding tax. The courts have ruled in one of these cases, cf. Østre Landsret's judgment of December 20, 2011, B-2152-10, published in SKM2012.121ØLR.

## II. Case presentation

*B-1980-12 Skatteministeriet v NetApp Denmark ApS*
*Landsskatteretten's ruling*

The National Tax Tribunal's ruling of December 16, 2011 states, among other things:

"*Facts of the case*

NetApp Denmark ApS (the Company), founded in March 2000, is part of a large multinational group that designs, develops, manufactures and sells hardware and software for network systems etc. The ultimate owner of the group is Network Appliance Inc. which is a publicly listed American company. The Group operates in more than 40 countries and has more than 9,500 employees worldwide, including 5,900 employees in the US and 1,500 employees in Europe, of which 250 are employed in the Netherlands to coordinate sales activities etc. NetApp Denmark ApS employs approx. 20 employees.

NetApp Denmark ApS only performs sales and support activities and reports to Network Appliance B.V. in the Netherlands, which is responsible for global sales outside the US, Canada and Mexico. Until September 16, 2005, the company was owned by Network Appliance Global Ltd (Bermuda).

Network Appliance Global Ltd. (Bermuda) incorporated a Cypriot company, NetApp Holdings Ltd. on September 5, 2005 with a capital of USD 20,000, of which only USD 2,000 was paid in.

On September 16, 2005, the Cypriot company NetApp Holdings Ltd. was transferred between NetApp Denmark ApS and the previous parent company in Bermuda. The transfer agreement states that the purchase price was agreed at EUR 90,000,000 to be paid no later than April 30, 2006. Converted at the current exchange rate of 7.45, this corresponds to approximately DKK 670.5 million.

The group structure is now as follows:



Copyright © 2023 Karnov Group Denmark A/S

**1578**

Regarding the reorganization in 2005, it was stated that it was not appropriate that the total European activities were controlled by the Danish sales and support company, whose employees were only employees involved in sales and support functions in the Danish market, and who therefore had no skills or expertise in relation to ownership of the underlying subsidiaries. This is stated in more detail:

*1. European subsidiaries contributed against shares*

On July 28, 2000, the Danish company NetApp Denmark ApS acquired the shares in Network Appliance B.V. by contribution in kind from Network Appliance Global Ltd (Bermuda). According to the company, this was done to minimize tax, cf. the current rules on taxation of dividends.

The shares in Network Appliance B.V. were valued at DKK 90,891,475 and were contributed to NetApp Denmark ApS at a price of DKK 920.42, corresponding to an increase in capital of DKK 9,875,000. The share capital for the company then amounted to DKK 10,000,000.

*2. Transfer/sale of European subsidiaries*

On October 25, 2005, the shares in Network Appliance B.V. were sold to Network Appliance Holding & Manufacturing B.V., Holland, which is a sister company to NetApp Denmark ApS, also owned by NetApp Holdings Ltd.

The shares were sold at a price of EUR 14 million and NetApp Den- mark ApS recorded a receivable for the sales price with Network Appliance Holding & Manufacturing B.V. According to the sales agreement, payment for the shares must be made by April 30, 2006. On September 28, 2005, the Company decided to distribute a dividend of DKK 565,896,000 to NetApp Holdings Ltd (Cyprus).

The dividend payment was made on October 27, 2005. According to the Company, the dividend received by NetApp Holdings Ltd. (Cyprus) was used by this company to pay the debt to the parent company Network Appliance Global Ltd. (Bermuda) arising from the acquisition of the shares in NetApp Denmark ApS, see above.

On October 13, 2006, the Company declared another dividend to NetApp Holdings Ltd. (Cyprus) - this time of DKK 92,012,000. This distribution was also passed on from NetApp Holdings Ltd. (Cyprus) to Network Appliance Global Ltd. (Bermuda).

The financial statements of NetApp Holdings Ltd. (Cyprus) for the first financial years ended April 28, 2006 (signed on September 1, 2008) and April 28, 2006 (signed on September 1, 2008) are as follows 2007 (signed on October 20, 2008) that the main function of the company in those years was to own shares in the Company. The company had neither premises nor staff at its disposal.

Regarding Network Appliance Global Ltd. (Bermuda), SKAT was informed in an inquiry of April 17, 2009 that the company owns all the intangible assets necessary to produce and market the products outside the US and related markets. The activities outside the US are thus organized under the company.

*SKAT's decision*

SKAT has considered the Company liable to withhold dividend tax, cf. section 2(1)(c) of the Danish Corporation Tax Act, cf. section 65 of the Danish Withholding Tax Act, of DKK 158,450,880 in 2005 and DKK 25,763,360 in 2006.

According to section 2(1)(c)(1) of the current Danish Corporation Tax Act, companies domiciled abroad are generally liable to pay tax to Denmark on dividends received from sources in Denmark. The conditions for imposing limited tax liability on the dividends

are thus present. An exception to the taxation is if it is to be waived under a double taxation treaty or under the Parent-Subsidiary Directive 90/435/EEC, cf. section 2(1)(c) of the current Danish Corporation Tax Act, 4. pkt.

The taxation shall not be waived pursuant to the Danish-Cypriot double taxation treaty.

The Danish-Cypriot Double Taxation Convention of May 26, 1981, cf. Order No. 15 of February 11, 1983, provides that dividends may be taxed in the Contracting State in which the company paying the dividend is resident, but that the tax imposed if the recipient is the beneficial owner of the dividend may not exceed specified limits, cf. Article 10, paragraph 2.

According to the wording of the double taxation agreement, it is thus a condition for the exclusion of Denmark's right to tax dividends as a source state that the Cypriot recipient of the dividends is its

"rightful owner".

SKAT is of the opinion that NetApp Holdings Ltd. (Cyprus), which

- at best - has had very narrow powers in relation to the dividend payments from NetApp Denmark ApS, cannot be considered a "beneficial owner" in relation to the dividends from NetApp Denmark ApS, cf. Article 10 of the Double Taxation Convention. The term "beneficial owner" has been used in the OECD Model Convention and the comments thereto since the revision of the Model Convention in 1977. The comments contained in the commentaries on the term "beneficial owner" have gradually been clarified, but there is no basis for claiming that this has resulted in material changes in relation to what is meant by the term, which is also assumed by Winther-Sørensen and Bundgaard, SR-SKAT 2007, p. 398.

In the Commentary to the Model Convention, the question of the meaning of the term "beneficial owner" is now addressed in particular in points 12, 12.1 and 12.2, to Article 10.

**1579**

The comments state that a double taxation treaty does not in itself prevent/limit source state taxation unless the beneficial owner is resident in a state with which the source state has concluded a treaty. Decisive for the determination of the "beneficial owner" is, according to the comments, among other things, whether the formal recipient of the dividend merely acts as a "conduit for another person who actually receives the income in question".

When the formal recipient's real power to decide how to dispose of the amounts received is very narrow or non-existent, the right to invoke the double tax treaty can thus be cut off. This means that dividends that the underlying owner(s) have decided in advance to direct to where it is desired, without the intermediate company having any real opportunity to influence this decision, do not have the intermediate company as "beneficial owner".

The comments refer to the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs, which gives a number of examples of the problems created by the use of conduit companies. The report mentions a number of possibilities for direct regulation in the double taxation conventions to try to eliminate the unintended opportunities for tax evasion created by the use of conduit companies. As regards the possibility of preventing unintentional tax evasion without special rules, it is stated in point 14.b. of the report that the Model Convention in articles 10-12 requires that the recipient of dividends, interest and royalties is a "beneficial owner" (at that time the comments did not specifically mention "conduit companies"). It goes on to state:

"Thus, the limitation is not available when, economically, it would benefit a person not entitled to it who interposed the

conduit com- pany as an intermediary between himself and the payer of the inco- me [...] Thus a conduit company can normally not be regarded as

the beneficial owner if, though the formal owner of certain assets, it has very narrow powers which render it a mere fiduciary or ad- ministrator acting on account of the interested parties (most likely the shareholders of the conduit company)"

It is the second part of this conclusion that is reproduced in the comments to the model agreement.

In this case, immediately after NetApp Holding Ltd. (Cyprus) had been incorporated as an intermediary in the group, dividends were distributed up through the group. The Cypriot company was incorporated in the group in an attempt to avoid withholding tax on distributions to the parent company in Bermuda. Thus, the company has not substantiated or documented that there was a commercial purpose for the restructuring.

The Cypriot company has only served the function of being used as part of an attempt to acquire tax advantages for the group. The company has not actually been authorized to make independent management decisions on how to dispose of the dividends derived from the Danish company. This is supported by the fact that the company is without any real substance.

When the share capital in the Danish company was transferred from the Bermuda company to the Cypriot company on September 16, 2005, it was agreed that the purchase price of EUR 90,000,000 would be paid by April 30, 2006. The distributions from the Danish company, which were made on October 27, 2005 and October 13, 2006, totaled DKK 657,908,000. The Cypriot company could only pay the purchase price by passing on the distributions from the Danish company to the Bermuda company, which was done. In SKAT's opinion, it is a given that the persons/companies controlling the group had decided in advance that the distributions from the Danish company should be passed on to the Bermuda company. Thus, there has been a flow-through of dividends from the Danish company to the Bermuda company. The Cypriot company has not paid tax on the dividends in Cyprus.

It must then be incumbent on the Danish company to prove that the Cypriot company was not merely a pure flow-through company in relation to the dividends, which it has not done.

It is noted that the view that the group did not want to maintain an ownership structure where the Danish company acted as the parent company of the Dutch company does not reasonably explain why it should (suddenly) be necessary to insert an intermediary in Cyprus rather than - still - letting the Bermuda company act as the parent company of the European part of the group. The ownership of the Dutch company could thus simply have been transferred to the Bermuda company.

It is SKAT's opinion that it cannot be given decisive weight that no formal legal obligation can be demonstrated for the Cypriot company to pay dividends received from the Danish company to the Bermuda company. The fact that the relationship between the Danish company and the Cypriot company involves the distribution of dividends and the relationship between the Cypriot company and the Bermuda company involves the repayment of debt does not change the fact that flow-through has occurred.

It is irrelevant to the issue of withholding tax on dividends where the funds distributed originate. The limited tax liability thus also arises where a Danish company distributes funds received as dividends etc. from subsidiaries.

**1580**

This also helps to avoid Denmark being used as a transit country for "laundering" withholding tax. The company's comments on the source of the "dividend capacity" are thus irrelevant. Similarly, it is irrelevant whether the group could have chosen debt financing.

A debt financing would, moreover

have other tax effects, including in relation to withholding tax on interest etc. However, the decisive factor is the circumstances that actually exist.

As far as internal case law is concerned, reference is made to the decision of the National Tax Tribunal published in (SKM2011.57), which concerned interest tax on interest paid from a Danish company to a company in Jersey via two contributed Swedish companies. The question was whether the Danish company's Swedish parent company was the rightful owner of the interest. The National Tax Tribunal did not find this to be the case and ruled that the Danish company was liable to withhold interest tax on the interest paid to the Swedish parent company.

In SKAT's opinion, the two decisions from the National Tax Tribunal (SKM2010.268 and SKM2010.729) to which the representative has referred are not comparable with the facts of the present case.

With regard to international case law, reference is made to the Prévost case from 2009, which concerned withholding tax on dividends paid from a Canadian company to a Dutch holding company owned by a Swedish and an English company. The issue was whether the Dutch company was the beneficial owner in relation to the dividends. The Canadian Federal Court of Appeal found this to be the case.

The judgment seems to assume that the formal income recipient is the "beneficial owner" unless the income recipient is legally obliged to dispose in a particular respect. Thus, it was not sufficient that there was no practical likelihood that the dividend would not be paid on. Such a requirement that the formal income recipient must be legally obliged to dispose in a certain respect does not appear to be supported by the Model Law, the comments thereto or elsewhere.

Furthermore, reference is made to the Indofood case from 2006, which concerned withholding tax on interest paid by an Indonesian company to a Mauritius company. The question was whether the withholding tax could be avoided by a contribution of a Dutch company between the Indonesian company and the Mauritius company. Rather, the question was whether the Dutch company would be considered to be the beneficial owner of the interest payments so that these payments would be recognized for the purposes of the Dutch-Indonesian double tax treaty. The UK Court of Appeal held that the Dutch company would not be the beneficial owner of the interest income under the Indo-Dutch treaty.

The Indofoods case and the present case are comparable in the sense that the amounts received necessarily had to be channeled in order to comply with the obligations towards the parent company. Furthermore, in both cases, there is no legal obligation to further pay the amounts received, but rather that in practice the income has been disposed of in such a way that it will not actually be subject to the immediate payee's disposal.

*Taxation shall not be waived under the Parent-Subsidiary Directive 90/435/EEC.*

It follows from Article 5 of the Parent-Subsidiary Directive that profits distributed by a subsidiary to its parent company are exempt from withholding tax. The starting point is thus that no withholding tax can be imposed on dividend distributions to companies resident in another Member State when the parent company meets the capital requirement and the ownership period requirement of the directive.

However, this starting point can be derogated from. Article 1(2) of the Directive states that the Directive does not preclude the application of national provisions or agreements necessary

to prevent fraud and abuse.

The use of the term "beneficial owner" in the double taxation conventions serves precisely to combat fraud or abuse within the meaning of Article 1(2) of the Directive. The Directive is therefore not

preclude the imposition of withholding tax when the beneficial owner is not covered by a double taxation treaty with Denmark.

Section 2(1)(c) of the Danish Corporation Tax Act clearly implies that Denmark must not waive withholding tax unless there is an actual obligation to do so under the Parent-Subsidiary Directive. To the extent that EU law does not prevent withholding tax from being withheld, withholding tax on dividends must thus be withheld.

As section 2(1)(c) of the Danish Corporation Tax Act provides that the limited tax liability shall only be waived if the Directive and/or a DBO leads to SKAT having to waive or reduce taxation, this provision in itself contains a clear utilization of the right to maintain the limited tax liability in order to counteract abuse. It is in accordance with the general EU law concept of abuse that EU law rights cannot be invoked with regard to purely artificial arrangements whose main purpose is to obtain an unintended tax advantage.

Furthermore, Article 10 of the Danish-Cypriot double tax treaty is precisely a treaty provision which, with the reservation of the rightful owner, combats fraud or abuse. According to the wording of Article 1(2) , the Directive does not preclude Denmark from using the right to withhold tax at source that Denmark has pursuant to Article 10 of the Danish-Cypriot double taxation agreement.

**1581**

It follows from EU law that benefits under EU law cannot be obtained in the case of transactions covered by the general EU law concept of abuse. The case law of the European Court of Justice shows that there is nothing to prevent companies established in another Member State from relying on EU law - including the harmonized rules resulting from, inter alia, the Parent-Subsidiary Directive - when it must be assumed that the establishment of a holding company in another Member State "aims to avoid withholding tax on payments to non-European entities if such a construction serves no commercial purpose", cf. The Commission's interpretation of "Purely artificial arrangements" in the Commission Communication on: The application of anti-abuse measures in the field of direct taxation - in the EU and in relation to third countries (Com (2007)785).

From the European Court of Justice's case law on the concept of abuse, reference is made to the Cadbury Schweppes judgment (case C-196/04), the Halifax judgment (case C-255/02) and the Part Service judgment (case C-425/06).

When assessing the main purpose of the establishment, the CJEU has paid particular attention to whether there is substance in the company's country of domicile or whether it is a purely artificial arrangement, which implies not only formal establishment, but also the actual exercise of economic activity.

SKAT is therefore of the opinion that EU law cannot to a greater extent than the double taxation agreements based on the Model Convention be considered to prevent Denmark from implementing a source state taxation of dividends on the basis that the beneficial owners of the amounts in question are resident outside the EU. The company has stated that the background for the introduction of provisions on intermediate holding companies (Act no. 525 of June 12, 2009) must be that national Danish tax legislation has not previously provided for the setting aside of legally valid ownership structures.

The company's comments are misleading. Thus, it is explicitly stated in the legislative history that the legislator - as a consequence of the provisions on "beneficial owner" - did not include certain foreign parent companies in the amendment. In connection with the parliamentary consideration of the bill, the

Minister of Taxation proposed, among other things, an amendment to the bill's

§ The amendment, which was adopted by the Danish Parliament, aimed to

on the situation where more than 50% of the share capital in an intermediate holding company was owned by foreign companies. In the comments to the amendment, the Tax Committee's report states (to § 1, no. 1):

"It is proposed that the proposed safeguard rule against so-called "reversed Christmas trees" is limited to situations where the parent company's corporate shareholders are taxable in Denmark.

The background for this amendment is that under current law (rules which are continued with section 14, no. 5 of the bill) there is already protection in cases where dividends are distributed to foreign companies that are not the beneficial owner of the dividend. The proposal in section 4 A(3) of the Danish Capital Gains Tax Act to consider the shares to be directly owned by companies that are shareholders in the dividend-receiving foreign company is therefore not necessary. Under current law and the bill, exemption from withholding tax under section 2(1)(c) of the Danish Corporation Tax Act will only be granted when the taxation of the dividend is to be waived or reduced under the Parent-Subsidiary Directive or under a double taxation treaty. In other words, withholding tax must be levied when such taxation is not prevented under the directive or double taxation treaties."

*The decision is not contrary to the "freedoms of the EU" (Article 43 of the EC Treaty).*

In the complaint, the company has stated that withholding tax on dividends in a situation such as this case constitutes a restriction of the freedom of establishment which is not acceptable.

SKAT does not agree with this. There is only a restriction on freedom of movement (including freedom of establishment, cf. Article 43) if there is discrimination consisting of applying different provisions to comparable situations or applying the same provision to different situations.

The fact that interest is subject to withholding tax when paid to a non-resident company does not constitute a restriction on free movement, if only because there is no tax discrimination between comparable situations.

*SKAT's decision does not constitute a change in practice with retroactive effect.*

In the complaint, the company has claimed that SKAT's decision constitutes a tightening of practice with retroactive effect.

SKAT does not agree with this. There is no administrative practice that the decision in this case changes. Not a single decision has been made according to which it has been determined in cases similar to the present case that no withholding tax can be withheld under section 2(1)(d) of the Danish Corporation Tax Act, and the reality is that the complainant's claim of the existence of a "fixed administrative practice" is groundless.

*The company has not demonstrated that NetApp Holdings Ltd. (Cyprus) is not the beneficial owner of the dividends.*

The company has argued that if the Cypriot company is not considered the beneficial owner of the dividends, the US company must be considered the beneficial owner.

The burden of proof that no withholding tax should be withheld in this case is on the company. It must then be proved that it is not the Bermuda company that is

**1582**

rightful owner, but that it is the US company. The company has not met this burden of proof.

On the present basis, it is thus not possible to determine whether the amounts in question have been transferred to the US

company. There is no consistency between the amounts distributed by the Danish company and the amounts which, according to the company, should have been transferred as dividends from Bermudaselskabet - and possibly other of the company's many subsidiaries - to the US company.

The dividends transferred to the US company are highly variable and have in common that the total amounts are significantly larger than the dividends distributed by the Danish company. For example, in its "Income Tax Return", the US company has stated "Dividends" at 458,606,705 euros for the period April 30, 2005 - April 28, 2006. Even if part of this is financed by loans, as claimed by the representative, these amounts significantly exceed the amounts distributed by the Danish company.

According to the Danish company, the dividends in question, which were transferred to the Bermuda company, were used both to distribute dividends to the US company and to pay the Bermuda company's debt. The company has not explained in detail - and documented - to what extent the dividend distributions were used for payment of dividends, respective debt, time of payment, etc.

Furthermore, it is unclear to what extent dividend payments to the US company originate from the Bermuda company or from the group's other subsidiaries. In the representative's submission of February 7, 2011, page 4, 5th paragraph, it is stated that the dividend distributions from the Danish company "ultimately (have) ended up with the US parent company as part of a total dividend distribution from the group's subsidiaries."

There is also no detailed information about the Bermuda company that would make it possible to assess whether the company was not the rightful owner of the dividends.

*NetApp Denmark ApS is liable for payment of interest tax.*

Regarding the Company's alternative claim that the Company is not liable for the interest tax not withheld pursuant to section 69 of the Withholding Tax Act, it is noted that the wording of section 69 of the Withholding Tax Act states that it is the withholding agent who must prove that there has been no negligence on his part. The starting point in section 69 of the Withholding Tax Act is that a company that fails to fulfill its obligation to withhold tax is directly liable for the payment of missing amounts. This principle is deviated from if the company proves that there has been no "negligence" on its part. The company's view that the company was in ignorance of the legal position must be rejected, already because the person(s) who organized the event must necessarily have had full knowledge of the purpose etc. and the person(s) in control of the company must therefore have been in possession of all relevant information.

In addition, the use of the concept of beneficial owner in the double taxation agreement, as well as the abuse provision in Article 1(2) of the Parent-Subsidiary Directive. 2 of the Parent-Subsidiary Directive and the case law on the general EU law concept of abuse is inherently a safeguard against abuse of the double taxation agreement and the Parent-Subsidiary Directive, respectively, and that in relation to the assessment of whether there has been negligence, cf. section 69 of the Withholding Tax Act, special requirements must be made for due diligence when it comes to compliance with safeguard rules.

By attempting to secure advantages to which neither the Parent-Subsidiary Directive nor the Danish-Cypriot double taxation scheme aims to provide access and by knowingly participating in an arrangement without any commercial justification, the company has taken on a risk that it has not clarified or sought to clarify.

Thus, it should be emphasized that the starting point is that withholding must be made, that no further investigations have been carried out by the company in order to clarify whether the conditions for non-withholding were met, and that, due to the common interest, stricter requirements must be imposed on the company's due diligence.

Furthermore, the company cannot have been in uncertainty as to the facts.

It is therefore SKAT's opinion that the company is liable for the payment of dividend tax.

*The company's claim and arguments*

The Company's representative has principally claimed that the Company's withholding obligation regarding dividends to the parent company is repealed, cf. section 2(1)(c) of the Danish Corporation Tax Act, cf. section 65 of the Danish Withholding Tax Act. In the alternative, it is claimed that the Company has not been negligent, cf. section 69 of the Withholding Tax Act.

The Parent/Subsidiary Directive.

In support of the primary claim, it is stated that dividend distributions to the Cypriot company must be exempt from Danish taxation of dividends, cf. the Parent-Subsidiary Directive.

The exemption from withholding tax on dividends follows from Article 5 of the Directive, which is based solely on objective criteria regarding ownership of the shares giving rise to the dividend distribution. Thus, the Directive does not contain specific requirements, e.g. requirements for beneficial ownership, etc.

Article 1(2) of the Directive allows Member States to introduce national safeguards against fraud and abuse.

Danish tax legislation has not implemented any specific rules against abuse in connection with dividend distributions and the prevention of abuse of the benefits that

**1583**

follows from the Parent-Subsidiary Directive. Abuse can therefore only be based on the application of the principles that can be derived from the doctrine of the right recipient of income as well as specific factual assessments.

As far as the right income recipient is concerned, it follows from a long-standing practice that income from capital must be attributed to and taxed in the hands of the owner of the asset from which the capital income is derived. In the situation in this case, this means that dividend income from the Danish company must be attributed to the owner of the shares, i.e. the Cypriot company. Based on the Supreme Court's judgments referred to in SKM2006.749 and SKM2003.482, it must be concluded that legally valid transactions, which, however, entail advantageous tax consequences, cannot for that reason be set aside for tax purposes, and that there are neither specific nor general rules against abuse in Danish tax legislation in relation to e.g. taxation of dividend distributions.

This is also supported by the fact that, with effect from the 2010 income year, a specific protective rule against intermediate holding companies has been introduced in section 4A(3) of the Danish Capital Gains Tax Act. The background for this rule must thus be that national Danish tax legislation has so far not authorized a disregard of legally valid ownership structures, regardless of the fact that the structures may have been established for the sole purpose of reducing taxation of dividends. Thus, it appears from the comments to L202 2008/09, section 3.1, that the bill adds "... a safeguard provision to prevent circumvention of the 10 percent limit by several portfolio shareholdings placing their shareholdings in a joint (parent) holding company, which thus comes to own more than 10 percent of the share capital." Such a protective rule does not seem necessary if there is already a general legal basis under Danish tax law to "look through" legally established companies on the basis of a "rightful owner assessment".

In the specific case, the Cypriot company was the owner of the shares in the Danish company at the time the dividend was determined/determined, and the dividend distributions were actually received by this company.

The dividend distributions 2005 and 2006 from the Danish company to the Cypriot company thus represent valid legal

transactions/dispositions which cannot be set aside, and it is then only necessary to establish that the Cypriot company meets the objective criteria for the application of the Parent-Subsidiary Directive. The dividend distributions from the Danish company to the Cypriot company must therefore be exempt from Danish withholding tax in accordance with the rules of the Parent-Subsidiary Directive

*Abuse of EU law.*

The CJEU has held that Member States' powers under the application of directives must be exercised in accordance with EU law. Article 1(2) of the Parent-Subsidiary Directive must therefore be interpreted and applied in accordance with Article 49 on freedom of establishment of the Treaty on the Functioning of the European Union (TFEU - former Article 43 TEC).

Danish withholding tax on dividends distributed to parent companies within the EU therefore entails a prima facie restriction on the freedom of establishment, as similar taxation is not imposed on dividend distributions to Danish parent companies.

It appears from SKAT's decision that taxation of dividend distributions to the Cypriot company is justified by the need to prevent circumvention of Danish taxation of dividends. Such justification can in principle be accepted under EU law. However, SKAT must also demonstrate a subjective intention on the part of the taxpayer to obtain the given tax advantage.

Reference is made to the fact that the group did not obtain any tax benefits as a result of the dividend distributions, as the group is ultimately owned and controlled by the US listed company. Thus, the dividend distributions would also have been exempt from Danish dividend taxation if the dividends had been paid directly to the US parent company.

At the same time, Danish withholding tax on dividends could also have been avoided if the group - instead of a Cypriot holding company - had chosen to establish a Danish holding company instead. It has been pointed out that dividends received by the Cypriot company have to a large extent been used to repay debt. If the group had chosen to establish a Danish holding company, the Danish company could thus have made tax-free distribution of dividends to the Danish holding company, which could subsequently have used the dividends received to repay debt, which would not be subject to Danish withholding tax.

It is thus difficult to see how a completely similar dividend distribution - only to a Cypriot holding company - can be subject to Danish taxation when the corresponding Danish situation would not have triggered any Danish tax.

The argument about preventing or hindering abuse can therefore not be used to justify the discrimination to which the companies are exposed, as there is no abuse or circumvention of Danish taxation in this specific case. Reference is made to the EU court cases in C-168/01 (Bosal Holding BV), paragraph 26, 79/85 (Segers) and C-212/97 (Centros), paragraph 29, C-196/04 (Cadbury-Schweppes), paragraphs 47 and 64, C-524/04 (Test Claimants in the Thin Cap Group Litigation), paragraph 74. *The double tax treaty between Denmark and Cyprus and the concept of "beneficial owner".*

In support of the main claim, it is also stated that dividend payments to the Cypriot company must

**1584**

exempt from Danish taxation of dividends, cf. the double taxation agreement between Denmark and Cyprus.

The Cypriot company must thus be considered to be the "legal owner" of the dividend distributions and cannot be considered to be exclusively a "flow-through company" established to avoid Danish dividend taxation.

The company has all the powers etc. in relation to decisions concerning the shareholding in the Danish company and decisions concerning the use of dividends received from the company. The dividends received from the Danish company have to a large extent been used to repay debt. The dividends have therefore not simply been "channeled" to other group companies as dividends.

In general, there is considerable uncertainty regarding the interpretation of the term "beneficial owner", including in particular whether the term "beneficial owner" can be used as a protective rule against flow-through companies and treaty shopping. Thus, it must be noted that neither Danish nor international case law provides an unambiguous interpretation of the concept, and both Danish and international tax law literature seems to indicate considerable difficulties in connection with the use of the concept as a protective rule. The concept of "beneficial owner" is thus not known in internal Danish tax law, but appears in most Danish double taxation treaties as a prerequisite for reduction or waiver of taxation of e.g. dividends, interest, royalties etc. The requirement for
"Beneficial owner" also appears in the Interest/Royalty Directive (Directive 2003/49/EC).

The double tax treaty between Denmark and Cyprus also contains a provision on "beneficial owner" in connection with taxation of dividends, cf. article 10. In this connection, no detailed guidelines are given for the interpretation of "beneficial owner" and the requirements that may be imposed in this connection.

It is therefore obvious to interpret the term "beneficial owner" in accordance with the meaning that must be expected to be attributed to the term in national Danish tax law, cf. Article 3(2) of the double taxation agreement. Reference is made to the article by Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395. Accordingly, it must be considered most likely that the Danish courts will be inclined to consider the company, which under Danish law is considered the rightful income recipient, to also be the "rightful owner".

In this case, the Cypriot company is considered to be the proper recipient of the dividend distributions received from the Company in 2005 and 2006.

However, in the international tax law literature, many also seem to argue that the concept of "beneficial owner" must be interpreted based on an international tax law meaning, i.e. based on an autonomous interpretation.

Reference is made to the Canadian decision in the Prévost case, in which the Canadian court ruled that a Dutch company, which was considered by the tax authorities to be a "flow-through" company, was the "beneficial owner" of dividends paid. Finally, reference is made to Aage Michelsen, International Tax Law, 2003, and to Philip Baker "Progress Report of Subcommittee on Improper Use of Tax Treaties: Beneficial Ownership" of October 17, 2008. SKAT's interpretation of "beneficial owner" and the resulting limited tax liability for dividend distributions from the company, cf. section 2(1)(c) of the Danish Corporation Tax Act, therefore seems to be based on an incomplete analysis and interpretation of the concept of "beneficial owner" as applied in the double taxation agreement between Denmark and Cyprus.

The provisions on withholding tax on dividends in the agreement between Denmark and Cyprus correspond in principle to the provisions on withholding tax on dividends in the OECD Model Tax Convention. In the comments to the 1977 model treaty, it is stated about "beneficial owner" in section 12 that:

"Under paragraph 2, the limitation of taxation in the source State shall not apply in cases where an intermediary, such as an agent or a specially appointed person, is interposed between the recipient and the payer, unless the beneficial owner is a resident of the other Contracting State. States wishing to clarify this are free to do so during bilateral negotiations."

In connection with the 2003 revision of the OECD Model Tax Convention, the comments on the meaning of "beneficial owner"

are expanded, according to which the term should not be used in
a narrow technical sense

importance, but must be seen in the context and in light of the intent and purpose of the agreement, including avoiding double taxation and preventing tax evasion and tax avoidance.

"... it would also be inconsistent with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax in cases where a resident of a Contracting State acts, otherwise than as agent or intermediary, merely as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "conduit company" cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties."

**1585**

The Cypriot company cannot be regarded as a flow-through company, which is merely incorporated for the purpose of avoiding Danish withholding tax on dividends. The company has thus in all respects retained the usual powers under company law in relation to both the ownership of the shares in the Danish company and in relation to the dividends received in 2005 and 2006.

The Cypriot company was not used to avoid Danish taxation through an abuse of the double taxation treaty between Denmark and Cyprus ("treaty shopping"). The dividend distributions were ultimately received as taxable dividends by the ultimate US parent company, Network Appliance, Inc.

Dividend distributions directly from NetApp Danmark ApS to the US ultimate parent company would have been exempt from Danish withholding tax under the double tax treaty between Denmark and the US, and the use of the Cypriot company in the specific group structure therefore does not give rise to a more lenient Danish taxation than what would otherwise have been the case. It is therefore difficult to see how a payment of dividends to the Cypriot company could be considered an abuse of the double taxation agreement between Denmark and Cyprus.

An interpretation of "beneficial owner" in the context of the intent and purpose of the double tax treaty between Denmark and Cyprus must therefore lead to the Cypriot company being considered the "beneficial owner".

It is then concluded that the dividend distributions from the Danish company to the Cypriot company will be exempt from Danish taxation under the double taxation agreement between Denmark and Cyprus, cf. section 2(1)(c) of the Corporation Tax Act.

In the event that SKAT's interpretation of the term "beneficial owner" may be considered applicable law, it is claimed that the Danish company will be exempt from withholding tax as a result of the double taxation treaty between Denmark and the USA. The Group is ultimately owned and controlled by the listed US company, Network Appliance Inc. The dividends from the Danish company in 2005 and 2006 ultimately end up with the American parent company, which has also been taxed in the US on the dividends received.

If the Cypriot company cannot be considered the "beneficial owner" of the dividend distributions, it is up to the tax authorities to determine which tax entity can be considered the "beneficial owner" of the dividend distributions.

The only company that meets the conditions used by the tax authorities to assess "beneficial ownership" will be the ultimate US parent company.

As documentation that the dividends have been transferred to the US company, reference is made to a copy of the "Domestic Reinvestment Plan" of March 22, 2006, and to the tax return for the company for the 2005 income year, which contains dividends from the Group's subsidiaries, including dividends from the Danish company. Reference is also made to the overview of the Group's dividend capacity for the financial year 2005/06, which shows the total dividend capacity in relation to dividends to the American company and the available funds, including dividends from the Company. The statement also calculates the need for additional debt to finance the dividend distribution to the US company totalling USD 550 million. The need for debt financing was USD 300 million, which was raised via JP Morgan Bank. The debt has subsequently been repaid, partly through the dividend distribution from the Danish company in 2006.

The dividend distribution is described in more detail in supplementary submissions. It appears that of the dividend distribution in 2005 from the Bermuda company to the US company totalling USD 550 million, the dividend distribution from subsidiaries etc. for 2005/2006 totalled USD 300,595,651. The amount is not further specified, but it is stated that the amount includes the distribution from the Danish company with the 91,450,000 USD for 2005 and with the 15,334,239 USD for 2006. The fact that the distribution for 2006 can be included in the amount is due to special US rules.

The dividend distributions from the Danish company to the Cypriot company in 2005 and 2006 were thus ultimately part of the dividend distribution to the US company.

The consequence of the US company being considered the "beneficial owner" of the dividends is that the dividend distributions from the Danish company are exempt from taxation in Denmark as a result of the double tax treaty between Denmark and the US.

SKAT has previously rejected the application of the double taxation agreement between Denmark and the USA in relation to the dividend distributions from the Danish company on the grounds that the concept

"beneficial owner" is an auxiliary concept and that the question of who is considered "beneficial owner" has no bearing on who is considered to be a limited taxpayer.

In the representative's opinion, such an interpretation is in direct conflict with both Danish and international case law and tax law literature.

Reference is made to Jakob Bundgaard's and Niels Winther-Sørensen's article in SR-SKAT 2007.195, and to the decision in the Prévost case, where the question of "beneficial ownership" was decisive for whether dividends distributed from a Canadian company to a holding company in the Netherlands were covered by

**1586**

the double tax treaty between Canada and the Netherlands, or whether dividends were instead covered by the double tax treaties between Canada and the home states of the ultimate owners, Sweden and the UK.

Furthermore, reference is made to the English commentary to article 10, section 12.2 of the Model Law, which states:

"the limitation of the tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other contracting State"

Particular attention is drawn to the word: "an intermediary", which refers to those persons (agent, nominee and conduit) who

U.2023.1575H

cannot be a beneficial owner under clause 12.1. Clause 12.1 reads as follows:

 "Where an item of income is received by a resident of a Contrac- ting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the

State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled Double Taxation Conventions and the Use of Conduit Companies" concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduci- ary or administrator acting on account of the interested parties." The real reasons behind the comments also speak for the result. The source country thus has no legitimate interest in taxing the dividend in question if there has not - at least - been treaty shopping that is likely to give the beneficial owner a tax advantage.

Finally, reference is made to Klaus Vogel's commentary on the Model Law, 5th edition, 2008, p. 861:

"(f) recipient of the dividend. Paragraph (i) shall apply only to dividends paid to a resident of the other Contracting State. ... If the payment is made to an intermediary but for the benefit of the beneficial owner of an interest in the capital, it shall be "Payment" also to the authorized user, who is also

"If the intermediary is resident in a third State, the relationship between the source State of the dividend and the State of residence of the beneficial owner is a case of Article 10 ..."

It is therefore the representative's opinion that both the double taxation treaty with Cyprus and the double taxation treaty with the USA entail that the dividend distributions must be exempt from Danish taxation, cf. section 2(1)(c) of the Danish Corporation Tax Act.

*SKAT's decision represents a change in practice.*

SKAT's decision to impose withholding tax on dividends reflects a new and changed practice of the tax authorities, which did not apply in 2005 and 2006 at the time of the distribution of dividends in the specific case.

The National Tax Tribunal's decision of March 3, 2010 (SKM2010.268LSR) was thus the first case on dividend tax.

In addition to the fact that no cases concerning dividend taxation and beneficial ownership were published in 2005 and 2006, it also appears from various statements from the Minister of Taxation in connection with L30 2006/07 that the Danish tax authorities have never previously disregarded foreign dividend recipients on the basis of beneficial ownership requirements. Reference is made to question 10 of November 21, 2006 and to a statement from SKAT in Jyllandsposten on September 14, 2010.

Reference is made to Hans Severin Hansen's article of June 6, 2011, The great hypocrisy - About the "beneficial owner" cases.

*Substance considerations and the source of dividend income.*

The dividend distributions from NetApp Denmark ApS to NetApp Holdings Ltd. consisted of dividends and sales proceeds regarding the shares in Network Appliance B.V.

The dividend distributions in 2005 and 2006 from NetApp Denmark ApS to NetApp Holdings Ltd. therefore did not relate to income earned in Denmark, and the dividend distributions were only possible as a result of income earned in the European subsidiaries.

If SKAT's interpretation of the term "beneficial owner" should be considered applicable law, it is claimed that NetApp Denmark ApS in this case also cannot be considered the beneficial owner of dividends and sales proceeds regarding the shares in Network Appliance B.V. Thus, NetApp Denmark ApS cannot be considered to have more substance etc. in relation to the shareholding than what is the case for NetApp Holdings Ltd. in relation to the shareholding in NetApp Denmark ApS.

*Liability for taxes not withheld - negligence. In the* alternative, it is argued that the company has not shown negligence by not withholding

**1587**

withholding tax and that the company cannot therefore in any case be liable for missing withholding tax - even in the event that the Cypriot company subsequently proves to have been liable to pay tax on the dividends received, cf. section 69(1) of the Withholding Tax Act.

In relation to the interpretation of the concept of negligence, negligence must constitute an omission that could have been avoided if the dividend-distributing company had exercised due care and diligence. See also SKAT's guidelines withholding of A-tax and AM contributions; 2010-2, K.2.2: "Regardless of the fact that the provisions have reversed the burden of proof, case law has shown that it is the customs and tax administration that must prove that the withholding agent has acted negligently."

In TfS2002, 844, the Eastern High Court concluded that uncertainty about the legal basis for the obligation to withhold tax in itself meant that there was no negligence in not withholding tax. It is therefore up to SKAT to lift the burden of proof that the Danish company has acted negligently by not withholding dividend tax in connection with the dividend distributions in 2005 and 2006, where the legal basis, as stated above, has been subject to significant uncertainties in relation to an interpretation such as that on which SKAT bases the decision to impose withholding tax.

It should also be noted that in the first case on beneficial owner and withholding tax on dividends published in SKM2010.268, the National Tax Tribunal ruled that there was no withholding obligation regarding dividend distributions to a parent company in Luxembourg. The case has subsequently been appealed by the tax authorities, but the fact that the highest administrative appeal body for tax cases decided that there was no withholding obligation at least documents that the legal basis in the area is not unambiguous - and that in relation to the withholding obligation for dividend distributions in 2005 and 2006 there has at least been significant uncertainty about the interpretation of the legal basis used by SKAT.

Thus, the Danish company cannot be considered to have acted negligently in 2005 and 2006 by not having withheld dividend tax in connection with the dividend distributions to the Cypriot company, and the Danish company is therefore not liable for any dividend tax not withheld, cf. section 69(1) of the Withholding Tax Act.

*The National Tax Tribunal's comments and reasoning*

According to section 2(1)(c) of the Danish Corporation Tax Act, companies domiciled abroad are generally subject to limited tax liability on dividends, cf. sentence 1. However, this does not apply to dividends received by a company that owns at least 20% of the share capital (in 2005 and 2006) in the dividend-paying company for a continuous period of at least one year, within which period the dividend distribution date must be within, cf. sentences 2 and 3. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the

provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or

a double taxation treaty with the state where the company is resident, cf. sentence 4.

According to the double taxation agreement between Denmark and Cyprus of February 11, 1983, Article 10(1), dividends may be taxed in the source state. However, the tax imposed may not exceed 10% of the gross amount of the dividend if the recipient is the beneficial owner of the dividend and is a company that directly owns at least 25% of the capital of the distributing company.

The provision corresponds to Article 10 of the OECD Model Tax Convention. The commentary to Article 10(12) of the Model Tax Convention states, among other things, that the beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid to a resident person" as used in paragraph 1 of the article. The term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in the light of the intent and purpose of the treaty, including to avoid double taxation and prevent tax evasion and avoidance. Clause 12.1 states that a person acting in the capacity of agent or intermediary cannot be considered a beneficial owner. It also states that a person who, other than as an agent or intermediary, merely acts as a conduit for another person who actually receives the income in question cannot be considered a beneficial owner either. Reference is made to the report of the Committee on Fiscal Affairs which states that a conduit company cannot normally be regarded as the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or trustee acting on behalf of other parties. Paragraph 12.2 states that the limitation on the source state's right of taxation cannot be used when an agent or an intermediary resident in a Contracting State or in a third state is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State.

The concept of "rightful owner" cannot be assumed to coincide with the principle of "rightful income recipient" in Danish tax law.

The Cypriot company NetApp Holdings Ltd. incorporated on September 5, 2005 and directly owned by Network Appliance Global Ltd. (Bermuda) and ultimately owned by Network Appliance Inc. (USA), acquired on September 16, 2005 the Danish sister company, NetApp

**1588**

Denmark ApS, by the parent company in Bermuda for EUR 90 million. The acquisition was financed by loans from the parent company. On October 25, 2005, the Danish company sold its Dutch subsidiary, Net- work Appliance BV, to its Dutch sister company, Network Appliance Holding & Manufacturering BV. On September 28, 2005 and October 13, 2006, the Danish company distributed DKK 565.9 million and DKK 92.0 million respectively to the parent company in Cyprus, which used the amount, among other things, to pay the company's debt to the parent company in Bermuda.

In these circumstances, where several interdependent transactions have been made within a short period of time between related parties, including parties resident in countries outside the EU, and with which no double taxation agreement has been concluded, it is incumbent on the Danish company to accept that the benefits of the treaty on elimination of Danish withholding tax shall apply.

According to the Company's information, the Company's distribution in 2005 to the Cypriot company was used to pay off this company's debt to the parent company in Bermuda. The

distribution was also included in

together with the distribution in 2006 in the parent company's distribution in 2005 to this company's parent company in the USA.

It is thus undisputed that the Company's distributions to the parent company in Cyprus were transferred to the company in Bermuda. The Cypriot company, which was established immediately prior to the acquisition of the shares in the Danish company, was in the years in question without its own premises or staff and had only very modest operating expenses.

It is therefore not established that the Cypriot company can be considered the "beneficial owner" of the dividends received.

The Cypriot company is thus not entitled to the treaty's tax exemption for dividends, cf. Article 10.

It should be noted that the Cypriot company to which the dividends from the Danish subsidiary are paid is legally incorporated and registered in Cyprus, where it is also subject to tax etc. The company is therefore

- regardless of the company not being considered the "rightful owner" of the dividends - "rightful income recipient" of the dividends under Danish law. It follows - regardless of the possible transfer of the dividends to the US company

- that it is the Danish-Cypriot double taxation treaty that must be applied when assessing any withholding tax, cf. section 2(1)(c) of the Danish Corporation Tax Act. Neither the Danish-Cypriot treaty, the comments thereto nor the comments to the model law seem to allow for the application of another treaty.

According to Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, Article 5, dividends distributed by a subsidiary to its parent company are exempt from withholding tax.

The general provisions of the Parent-Subsidiary Directive do not include a reservation on abuse. Article 1(2), on the other hand, allows Member States to derogate from the Directive in the event of tax abuse, etc.

Article 1(2) of the Directive states that the Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse.

Denmark has not adopted statutory provisions to this effect, but the authority to disregard formally legal and correct transactions in case of abuse follows from general legal principles, including case law. However, the Supreme Court has found no basis for disregarding an otherwise legally incorporated company solely on the grounds that the incorporation was made for tax-saving purposes, cf. the Supreme Court's judgments in SKM2003.482 (the Overhold case) and SKM2006.749 (the Finwill case).

The legally established and functioning Cypriot company, which is the owner of the shares in the Danish company, is thus the proper recipient of the dividends distributed by the Danish company. The fact that the Cypriot company's only - or essentially only - activity is to own shares in the Danish company does not mean that the company does not have commercial operations and thus not a different result, cf. the Supreme Court's judgment in TfS2004.542 (Johnson Holding case).

As a result, the dividend is exempt from withholding tax pursuant to Article 5 of the Directive.

As the taxation of the dividend must then be waived pursuant to Directive 90/435/EEC, it follows from section 2(1)(c) of the Danish Corporation Tax Act that the dividend is not covered by the limited tax liability.

The company has then not been obliged to withhold dividend tax on the dividend, cf. section 65(5) of the Withholding Tax Act."

*Additional information about the companies and the two dividend distributions*

*NetApp Denmark*

From NetApp Denmark's annual report for 2004/2005, which was approved at the company's general meeting on September 28, 2005,

shows that the company had a net turnover of DKK 10,776,000 and a profit of DKK 3,000,000 from the company's activities in Denmark. The annual report also states that a dividend distribution of DKK 565,896,000 is proposed. The company's annual report for 2005/2006, which was approved at the company's general meeting on October 13, 2006, states that a dividend distribution of DKK 92,012,000 is proposed, corresponding to the profit for the year of DKK 62,012,000 plus retained earnings of DKK 30,000,000.

It is undisputed that the two dividends were not earned in Denmark, but in the NetApp Group's other European companies.

**1589**

*NetApp Holdings Ltd (NetApp Cyprus)*

The annual report for the period September 5, 2005 to April 28, 2006 for NetApp Cyprus shows that the company had income of USD 1,076,348 during this period, mainly from foreign exchange gains on foreign currency. The Company's expenses, which consisted solely of administrative expenses, amounted to USD 41,608. The Company's assets at 28 April 2006 consisted of cash of USD 4,700 and the Company's investments in NetApp Denmark and NetApp Hol- ding & Manufacturing B.V. (Netherlands) stated at USD 18,582,252 in total.

NetApp Cyprus' annual report for the period April 29, 2006 to April 28, 2007 includes a dividend income item of USD 15,959,481 (equivalent to approximately DKK 92 million) in the income statement. However, it appears from the *cash* flow *statement* in the annual report that the amount was not received in this financial year.

*NetApp Global Ltd Inc (NetApp Bermuda)*

A 2005/2006 income statement for NetApp Bermuda shows that the company had revenues of $315,449,592 at April 28, 2006 and interest income of $11,150,752. In addition, dividends of $91,450,000 were recognized. The expenses for the period consisted mainly of an item under the category "Cost of Sales" of USD 105,461,906. It is undisputed that this amount covers reimbursement of the parent company's, NetApp Inc. (NetApp USA), expenses for research and development relating to the part of the Group's IP rights for software etc, which was owned by NetApp Bermuda. Furthermore, an expense item called "General and Administration" of USD 23,500,682 is included, which is stated to be a payment to NetApp USA as reimbursement of the parent company's expenses relating to participation in the Group's share incentive programs for employees in the Group's European companies.

The balance sheet as of April 28, 2006 shows that NetApp Bermuda's total assets amounted to USD 281,147,141, of which USD 136,708,710 consisted of short-term bonds and USD 104,443,296 of long-term bonds. The capital shares in the subsidiaries were stated at USD 55,363. Furthermore, it appears that the company had a total debt obligation of USD 300,113,134, that a dividend distribution of USD 550,000,000 had been declared and that the company's equity after distribution would be negative by an amount of USD 18,965,993.

The debt obligation of approximately USD 300 million related to a medium-term loan taken out by NetApp Bermuda to finance the dividend payment. The company had pledged a bond of USD 241 million as security for the loan. It is undisputed that all of the bonds pledged as collateral were acquired by NetApp Bermuda prior to receiving the dividend of USD 91.5 million on October 28, 2015.

No financial statements have been presented for NetApp Bermuda for the financial year 2006/2007.

*NetApp Inc (NetApp USA)*

Note 7 to the annual report of NetApp USA for the period May 1, 2004 to April 30, 2005, signed by the company's management on July 8, 2005, states:

"...

U.S. income taxes are not provided on a cumulative total of approximately $355,000 of undistributed earnings for non-U.S. subsidiaries. We currently intend to reinvest these earnings in operations outside the U.S. The American Jobs Creation Act of 2004 (the Jobs Act) creates a temporary incentive for U.S. corpora- tions to repatriate accumulated income earned abroad by providing an 85% dividend-received deduction for certain dividends from certain non-U.S. subsidiaries. The deduction is subject to a number of limitations, and we are currently considering recently issued Treasury and IRS guidance on the application of the deduction. We are not yet in a position to decide whether, and to what extent, foreign earnings that have not yet been remitted to the U.S. might be repatriated. Based on the analysis to date, however, it is reaso- nably possible that as much as $355,000 might be repatriated, with a respective tax liability of up to $15,000. We expect to be in a position to finalize our analysis during the third quarter of fiscal 2006. ..."

In a document entitled "Section 965 Domestic Reinvestment Plan" for the tax year ending April 30, 2006, signed on March 22, 2006 by Daniel J. Warmenhoven, CEO of NetApp USA, states that the company expected to receive a special dividend of USD 404,500,000 on or about April 7, 2006 from NetApp Bermuda. The document also details how the company would invest the dividend in the United States in accordance with the scheme established by the American Jobs Crea- tion Act.

In the annual report for NetApp USA for the period May 1, 2005 to April 30, 2006, signed by the company's management on July 11, 2006, it is stated on page 39, paragraph 4:

"...

Prior to fiscal year 2006, our current effective tax rate assumed that U.S. income taxes were not provided for undistributed earnings of certain non-U.S. subsidiaries. However, pursuant to the one-time incentive created under Section 965 of The American Jobs Creation Act of 2004 ... our foreign subsidiaries remitted approximately

$405.5 million in accumulated earned income on which we incurred approximately $22.5 million in federal and state income taxes in the fourth quarter of fiscal year 2006...."

Note 8 "Income Taxes" in the annual report further states:

"...During the fourth quarter of 2006, the Company incurred a charge of approximately $22,482 for federal and state income taxes related to the repatriation of approximately $405.548 of accumulated income earned

**1590**

by its foreign subsidiaries. As a result of this dividend, there were no significant unremitted earnings held by our foreign subsidiaries at April 30, 2006."

In NetApp USA's tax return to the US authorities, dated January 10, 2007, for the period April 30, 2005 to April 28, 2006, the company reported receiving dividends of USD 458,606,705.

*The two dividend distributions*

On October 25, 2005, Network Appliance B.V. (Netherlands) transferred

91,450,533 USD to NetApp Denmark. The amount was transferred from NetApp Denmark to NetApp Cyprus on October 27, 2005, which the next day, October 28, 2005, transferred the amount to NetApp Bermuda. During November 2005, the proceeds were invested in highly marketable bonds. The bonds were sold again in the period up to April 3, 2006.

On April 3, 2006, NetApp Bermuda transferred $550 million to NetApp USA.

It is undisputed that only approximately USD 405 million of the USD 550 million received by NetApp USA from NetApp Bermuda was a taxable dividend under US tax rules. The remainder of the amount was considered a tax-free return of base under US tax rules, i.e. a return of contributed capital.

NetApp Denmark has stated that the second dividend of DKK 92,012,000 remained with NetApp Denmark for approx. 4 years as a loan, and that NetApp Cyprus received interest income from the loan during this period. In this connection, SKAT has brought a case against NetApp Denmark regarding liability for failure to withhold tax at source on the interest. In 2010, the dividend was paid to NetApp Cyprus, which also transferred the dividend to NetApp Bermuda in 2010 as further repayment of debt.

*B-2173-12 Skatteministeriet v TDC A/S*

*Landsskatteretten's ruling*

The National Tax Tribunal's ruling of March 13, 2012 states, among other things:

"The question to SKAT was the following:

1. Are dividends distributed from TDC A/S ("TDC") to NTC Holding

G.P. & Cie S.C.A. ('NTC') tax-free pursuant to section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act and thus exempt from Danish withholding tax?

2. Is the dividend distributed from TDC to NTC tax-free according to section 2(1)(c)(3) of the Danish Corporation Tax Act and thus exempt from Danish withholding tax?

Skat has answered the questions as follows:

Question 1: No

Question 2: No

*The National Tax Tribunal's decision* The National Tax Tribunal changes the answer as follows: Question 1: No, see answer Question 2: Yes, see the answer

...

*Case details*

NTC Holding G.P. & Cie S.C.A. ("NTC") is a company incorporated in Luxembourg and was founded by NTC Parent S.á.r.l., Luxembourg, in 2009. NTC Parent S.á.r.l. owns the majority of the capital of NTC. The remaining part of the capital (less than 1%) is owned by NTC Holding G.P. S.á.r.l., Luxembourg.

According to the Representative, it must be assumed that NTC, NTC Parent S.á.r.l. and NTC Holding G.P. S.á.r.l. are validly incorporated and existing under the rules applicable to the companies in Luxembourg.

NTC is a Luxembourg company of the 'societe en commandite par actions' type and is thus one of the companies included in the list of companies referred to in Article 2(1)(a) [of the] parent law. /Subsidiary Directive. Under Luxembourg domestic tax law, NTC is considered an independent tax entity and the company is subject to Luxembourg corporate income tax ("impot sur le revenu des col- lectives"). Under internal Danish tax law, the company, which in all material respects corresponds to a Danish limited partnership, must be considered a transparent company.

In 2010, NTC acquired a major shareholding in TDC and NTC owns

currently 59.1% of the shares in TDC. The shares in TDC are also owned by more than 38,000 shareholders.

The TDC Group is the leading provider of communication and entertainment solutions in Denmark with a position and presence in all the Nordic countries. TDC is listed on NASDAQ OMX.

The group structure now looks like this [looks]:



Prior to its acquisition by NTC, TDC was owned by NTC SA, which was owned by NTC Parent S.á.r.l., which in turn is owned by the private equity funds: Permira, Apax, Blackstone, Providence and KKR. TDC (or part of it) was thus acquired in 2005 by the private equity funds via various companies, the acquisition being partly financed by loans

**1591**

from the private equity funds. In this connection, NTC Parent S.á.r.l.'s loans to the private equity funds etc. amounted to approximately DKK 14.3 billion at December 31, 2006. The size of the loan at the time of the request for a binding response was approximately EUR 2.0 billion. The difference compared to December 31, 2006 is attributable to interest.

The representative has stated that TDC A/S intends to distribute dividends to NTC corresponding to DKK 2.18 per share in Q3 2011, corresponding to a total distribution of approximately DKK 6 billion.

Furthermore, it has been stated that as NTC is an independent entity with independent management and decision-making authority, it cannot be known in advance and with certainty whether and how the management of NTC will actually decide to dispose of the dividends received from TDC. As the Ministry of Taxation has stated that, in the opinion of the Ministry, the questions asked cannot be answered if it cannot be stated how NTC is assumed to dispose of the dividend received from TDC, it has been stated that the following can be used as a basis for the binding answer:

It is assumed that the majority of the dividends will be distributed as dividends by NTC to its owners NTC Holding G.P. and NTC Parent S.á.r.l. and that the majority of the dividends distributed by NTC to NTC Holding G.P. will be distributed as dividends to NTC Holding G.P's owner NTC Parent S.á.r.l. A minor part of the dividend (probably between 3% and 5%) is assumed to be used by NTC, NTC Holding G.P. and NTC Parent S.á.r.l. to pay costs or set aside to pay expected costs. It is further assumed that dividends distributed to NTC Parent S.á.r.l. will be paid (as dividends and/or interest and/or repayment of debt) to companies controlled by the individual private equity funds or creditors of NTC Parent S.á.r.l. It is also assumed that amounts paid by NTC Parent S.á.r.l. to companies controlled by the individual private equity funds will be transferred to the ultimate investors in the private equity funds, but it is not known in what manner such transfers will be made or how they will be treated for tax

Copyright © 2023 Karnov Group Denmark A/S

U.2023.1575H

purposes.

  The tax authorities in Luxembourg have confirmed that NTC is "rightful owner" of dividends from TDC, and, thus, there is presented

Copyright © 2023 Karnov Group Denmark A/S

certificate from the tax authorities in Luxembourg, Certificate of Residence (Luxembourg), dated May 5, 2011, in which it is stated:

"The Tax Authorities of Luxembourg - Corporate Tax Office 6 - certify that, to the best of their knowledge and in conformity with the income tax regulations applicable in Luxembourg,

NTC Holding G.P. & CTE S.C.A:

-Is a company within the meaning of Article 2, paragraph I of the Council Directive of 23 July 1990 (90/435EEC)

-Is effectively managed in Luxembourg within the meaning of Paragraph 15(1) and (3) of the "Loi d' adaptation fiscale" of 16 October 1934 and has its central administration in Luxembourg within the meaning of Article 159 of the Luxembourg Income Tax Law,

-Is resident in the Grand-Duchy of Luxembourg within the meaning of Article 4 of the Tax Convention between Luxembourg and Denmark,

-Is subject to corporate tax without any possibility of an option or being exempt

-Is the beneficial owner of any dividend paid on its shares held in TDC A/S or any other income derived there from." *The Tax Council's decision*

The Tax Council has answered the questions asked in the negative.

*Question 1:*

The current provision in section 2(1)(c)(5) of the Danish Corporation Tax Act was introduced by Act no. 1375 of December 20, 2004. The purpose of this law was to implement the changes to the parent company

/Subsidiaries Directive (2003/23/EEC).

One of the changes to the Directive was the inclusion in the list of types of companies covered by the Directive of companies that are considered liable to corporation tax in the Member State where they are resident, but are considered fiscally transparent in other Member States. Therefore, at the time of implementation in Denmark, special rules were adopted with regard to dividends accruing to companies resident in an EU country (but considered to be fiscally transparent in Denmark) from a Danish subsidiary, so that these (under Danish rules) transparent companies - under the same conditions - were granted the same tax exemption as other parent companies covered by the Directive.

The adopted wording of the provision by Act No. 1375 of December 20, 2004 was as follows:

"Furthermore, the tax liability shall not apply to dividends received by shareholders of parent companies as mentioned in the second sentence which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which are considered to be transparent entities for tax purposes in this country. It is a condition that the shareholder is not resident in this country."

It was thus clear that the transparent parent companies had to be parent companies as mentioned in the second sentence of the provision. Section 2(1)(c) of the Danish Corporation Tax Act was thus worded as follows:

"(c) receives dividends covered by section 16 A(1) of the Danish Tax Assessment Act, except for distributions from bond-based investment funds as mentioned in section 2 d(3) of the Danish Capital Gains Tax Act, or receives disposal sums covered by section 16 B of the Danish Tax Assessment Act. The tax liability does not include dividends received by

a company etc. (the parent company) that owns at least 10 percent of the share capital in the dividend-generating company (the subsidiary) for a continuous period of at least one year, within which period the time of the dividend distribution must lie. For dividend distributions

**1592**

However, in the calendar years 2005 and 2006, the ownership share mentioned in the second sentence shall be 20 percent, and for dividend distributions in the calendar years 2007 and 2008, the ownership share mentioned in the second sentence shall be 15 percent. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on a common system of taxation for parent and subsidiary companies of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the company is domiciled. Furthermore, the tax liability does not include dividends received by participants in parent companies as mentioned in the second sentence which are included in the list of companies referred to in Article 2(1)(a) Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which are considered to be transparent entities for tax purposes in this country. It is a condition that the shareholder is not resident in this country,"

A parent company was (and is) only a "parent company as mentioned in the second sentence" if the taxation of the dividend is to be waived or reduced in accordance with the provisions of Directive 90/435/EEC on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or in accordance with a double taxation agreement with the Faroe Islands, Greenland or the state where the company is resident, cf. the fourth sentence.

The transparent companies had to meet the same conditions as other parent companies that were not taxable on dividends from Danish subsidiaries. Thus, it was not the intention that the transparent companies should be better placed than other parent companies.

L 202 (Act no. 525 of June 12, 2009) amended the Corporate Tax Act

§ Section 2(1)(c) was rewritten so that the former second sentence (which had now become the third sentence) instead read as follows:

"The tax liability does not include dividends on subsidiary shares, cf. section 4 A of the Danish Capital Gains Tax Act when the taxation of dividends from the subsidiary is to be waived or reduced pursuant to the provisions of Directive 90/435/EEC on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or pursuant to a double taxation agreement with the Faroe Islands, Greenland or the state where the parent company is domiciled."

At the same time, sentence 5 was changed as a result of the rewriting of sentence 3, as the reference to "as mentioned in sentence 3" was deleted. According to the comments to the amendment, this is only a "consequential change". Thus, no substantive changes are intended with the deletion of the reference to "3rd sentence".

The term "parent company" in the fifth sentence must therefore be understood as a parent company referred to in the preceding bullet points in section 2(1)(c).

The amendments to the Parent-Subsidiary Directive (2003/123/EEC) thus extended the list of companies included in the list of types of companies covered by the Directive to include companies that are considered liable to corporation tax in their Member State of residence but are considered fiscally transparent in other Member States.

When implementing the amending directive[t] and introducing the

In section 2(1)(e), item 5 of the Danish Corporation Tax Act,

the transparent companies are now equated with other foreign companies listed in the Parent-Subsidiary Directive (2003/23/EEC), and there is thus no extended protection of transparent companies. They will simply be equated with foreign companies, which under Danish law are considered to be independent tax subjects.

It must therefore be examined whether the withholding tax on a distribution to NTC should be waived or reduced according to the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or according to a double taxation agreement.

tax treaty with the Faroe Islands, Greenland or the state where the company is domiciled. This means that it must be investigated whether NTC is the beneficial owner of the dividend distribution.

According to the Ministry of Taxation's answer to question 2 below, the Ministry of Taxation does not find that NTC can be considered

"beneficial owner" of the proposed dividend distributions. The intended dividend from TDC to NTC is not considered to be dividends subject to a waiver or reduction of taxation under the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under the double taxation agreement between Denmark and Luxembourg. The Danish Tax Council therefore finds that the taxation of dividends from TDC to NTC is not exempt from withholding tax under section 2(1)(c)(5) of the Danish Corporation Tax Act.

The Tax Council has then answered question 1 with a no.

*Question 2:*

It follows from section 2(1)(c) of the Danish Corporation Tax Act that dividends paid to foreign companies are subject to limited tax liability in Denmark, unless such taxation is to be waived under the EU Parent-Subsidiary Directive, Directive 90/435/EEC or a double taxation treaty.

When using a holding company in another EU country, the group generally achieves that there is no

**1593**

Withholding tax can be withheld on dividends from Denmark due to provisions in the Parent-Subsidiary Directive or double taxation treaties.

*Rightful owner*

However, it is the opinion of the Ministry of Taxation that neither the parent company

/The Danish-Subsidiary Directive or the Danish-Luxembourg Double Taxation Treaty precludes Denmark from withholding tax on the dividend amount if the Luxembourg company cannot be considered the "beneficial owner" of the dividend amount. The term "beneficial owner" has been used in the OECD Model Convention and the comments thereto since the revision of the Model Convention in 1977.

The Model Convention's comments on the beneficial owner have been clarified on an ongoing basis, and in the opinion of the Ministry of Taxation, there is no basis for claiming that there have been material changes in relation to what is meant by the term.

In the Commentary to the Model Convention, the question of the meaning of the term "beneficial owner" is addressed in particular in paragraphs 12, 12.1 and 12.2 to Article 10 where it is stated:

"12. The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid ... to a resident person" as used in paragraph 1 of the Article. This makes it clear that the source State is not obliged to waive its right to tax dividend income merely because the income was paid directly to a resident of a State with which the source State has concluded a treaty. The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including to avoid double taxation and to prevent tax avoidance and evasion.

12.1 Where income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax solely on the

basis of the status of the immediate recipient of the income as a resident o f t h e other Contracting State. The immediate recipient of the income in this situation is a resident of the other State, but no double taxation arises as a result since the income is not taxed in the other Contracting State.

Copyright © 2023 Karnov Group Denmark A/S

the recipient is not regarded as the owner of the income for tax purposes in the State in which he is resident. Similarly, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State, other than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a conduit company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or ad- ministrator acting on behalf of other parties.

12.2 Subject to the other conditions of the Article, the limitation on the source State's right of taxation shall continue to exist where an agent or intermediary resident in a Contracting State or in a third State is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is consistent with the understanding of all Member States). States wishing to express this more clearly are free to do so during bilateral negotiations."

In the opinion of the Ministry of Taxation, there are good arguments for understanding these comments to mean that it is the dividend recipient's (real) lack of right of disposal that is an important pivotal point for determining whether the dividend recipient should be considered the beneficial owner, so that withholding tax must be waived/reduced.

It is emphasized in the comments to the Model Convention that the term "beneficial owner" in the agreements is not used in a narrow technical sense, but must be seen in the context and in light of the intention and purpose of the agreement, including to prevent tax evasion and tax avoidance.

In the opinion of the Ministry of Taxation, it is thus a basic prerequisite for the imposition of withholding tax on dividends distributed to a parent company in a DBO country that has limited or even non-existent (real) powers to dispose of the dividend amount that it can be demonstrated or made probable that the transaction has tax avoidance or evasion (or "abuse") as a purpose or consequence.

The commentary states that the double tax treaty does not in itself preclude/limit source state taxation of dividends unless the "beneficial owner" of the dividends is a resident of the other contracting state. Decisive for the determination of "beneficial owner" is, according to the comments, whether the formal transferee merely "acts as a conduit for another person who actually receives the income in question".

It is the opinion of the Tax Council that the comments to the Model Convention must be understood to mean that it is not in itself decisive whether the dividend amounts immediately

**1594**

passed on to the underlying owners, the decisive factor being the formal recipient's lack of authority to dispose of the amounts paid out, as the underlying owners completely determine how to deal with the amounts received. This interpretation is also confirmed by the report of the Committee of Fiscal Affairs mentioned in the comments.

When using a holding company in another EU country, the group generally achieves that no withholding tax can be withheld on dividends from Denmark due to provisions in the parent/subsidiary tax law.

Companies Directive. Furthermore, double taxation treaties contain provisions to this effect.

The Danish Tax Council has not found that holding company structures must always be respected, so that a dividend-receiving holding company cannot invoke a double taxation treaty concluded with the source country for the purpose of exemption from or limitation of source country taxation.

However, in the opinion of the Danish Tax Council, a double taxation treaty does not preclude source state taxation when the underlying owners - who are not themselves resident in a country with which a double taxation treaty has been concluded - in advance or

"automatically" disposed of the amounts, or it must otherwise be assumed that the holding company has no practical possibility of disposing of the amounts in any other way than determined by the owners, and when it appears that the holding company in relation to the specific transactions is used to enable tax evasion - here to avoid withholding tax on dividends.

Regarding the specific transaction, TDC intends to distribute approximately DKK 6 billion in Q3 2011 to its shareholders. NTC (Luxembourg) will receive approximately DKK 3.5 billion as a result of its 59% ownership of TDC's shares.

In response, the representative of the questioner has stated that it can be assumed that the majority of the dividends will be distributed as dividends by TDC to its owners NTC and that the majority of the dividends distributed from NTC to NTC Holding GP will be distributed as dividends to NTC Holding GP's owner NTC Parent S.á.r.l. A small portion of the dividend (presumably between 3% and 5%) is assumed to be used by [N]TC, NTC Holding GP and NTC Parent S.á.r.l. to pay costs or set aside to pay anticipated costs. The questioner further assumes that dividends distributed to NTC Parent S.á.r.l. will be paid (as dividends and/or interest and/or repayment of debt) to companies controlled by the respective private equity funds or creditors of NTC Parent S.á.r.l. The questioner also assumes that amounts paid by NTC Parent S.á.r.l. to companies controlled by the individual private equity funds will be transferred to the ultimate investors in the private equity funds, but the questioner is not aware of the manner in which such transfers will take place or how they will be treated for tax purposes.

Based on the information provided, the Danish Tax Council finds that the dividend must be considered to flow through the two holding companies in Luxembourg, and that the holding companies cannot invoke the double taxation treaty between Denmark and Luxembourg or the Parent-Subsidiary Directive, as the dividend distribution will actually be disposed of in advance, which the holding companies will have no independent financial interest in receiving. Thus, the holding companies cannot be considered the "rightful owner" of the dividend distribution of just over DKK 3.5 billion.

This means that TDC must withhold tax at source on the dividend distribution to NTC, cf. section 2(1)(c)(3) of the Danish Corporation Tax Act. It is not considered decisive that NTC is recognized as an independent legal and tax entity in Luxembourg.

Furthermore, it is not considered decisive that NTC has premises in Luxembourg, employs one person and has bank account deposits

etc. However, the decisive factor is whether the NTC in connection with the intended distribution can be considered to be the "beneficial owner" of the amount or must actually be considered to be a flow-through entity for someone else.

*EU law*

It is the opinion of the Danish Tax Council that there is nothing

to prevent the company established in another Member State from invoking EU law - including the harmonized rules resulting from, among other things, the Parent/Subsidiary Directive - when it must be assumed that the establishment of a holding company in another Member

State "aims to avoid withholding tax on payments to non-European entities if such a construction serves no commercial purpose", cf. the European Commission's interpretation of "Purely artificial arrangements" published in OJ 2008, C 116/13. Article 1(2) of the Parent-Subsidiary Directive also states that "this Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse".

In the opinion of the Danish Tax Council, this interpretation is also supported by case law from the European Court of Justice, see e.g. the Cadbury Schweppes judgment (case C-196/04, Cadbury Schweppes, [2006] ECR 1-7995) and the Halifax judgment (case C-25 5102, Halifax, [2006] ECR 1-1609). The Danish Tax Council is therefore of the opinion that EU law cannot to a greater extent than the double taxation treaties based on the Model Convention be considered to prevent Denmark from implementing a source state taxation of interest and dividends when the beneficial owners of the amounts in question are persons resident outside the EU.

**1595**

*Supplementary posts:*

In a supplementary submission to the complaint, it is stated that when submitting a request for a binding reply, it is incumbent on the party seeking such a reply to state all relevant facts in an unambiguous manner. The facts must therefore be established.

TDC's request for a binding answer and the company's subsequent submissions to the Danish Tax Council, as well as the complaint to the National Tax Tribunal, contain only sparse information regarding the relevant facts.

For example, there are no financial statements, board meeting minutes etc. for the Luxembourg companies. There is also no information about which agreements have been entered into regarding the treatment of returns that the private equity funds regularly receive from the target company (here the complainant).

Nor has the complainant unambiguously explained in detail in which way(s), at which time(s) and to which subject(s) the amount intended to be distributed will be channeled further up through the group of owners, and whether and, if so, how the amounts involved will be taxed at the relevant recipients. In the assessment of whether the company's question 2 should be answered with "yes" or "no", such information will in SKAT's opinion necessarily be included.

The factual uncertainty is illustrated by the information in the binding response, page 2, last paragraph, where the complainant "assumes" a number of circumstances regarding redistribution etc. of the intended dividend distribution. The complainant acknowledges that the majority of the amount distributed will "presumably" be paid to underlying owners or creditors, but the complainant has not provided any further information about the background for this assumption.

In SKAT's opinion, however, it must be taken into account that the companies in Luxembourg have no other activities than acting as holding companies in relation to the complainant and that it is inherent in the capital fund structure itself that holding companies of this nature will pass on current returns to the underlying group of owners, unless the holding companies have assumed or must be expected to assume obligations which mean that the holding companies "yourself" must use the amount in whole or in part.

Already in view of the amounts involved, SKAT considers it completely unrealistic that there is no prior decision, or at least at the time of distribution, on how the intended distribution (of

approximately DKK 6 billion) will be used - including in relation to where the money will be channeled, for what purpose(s) and at what time(s). Even if it is assumed that such an explicit decision will not be made, it is, however, on the

The Ministry believes that it must be considered a foregone conclusion - which the complainant in fact also acknowledges - that the amount will be immediately channeled to the underlying ownership group.

The information about the facts of the case - and in particular that, according to the complainant's own information, it can be assumed that the distributed amount, possibly after deduction of a small amount to cover costs, will be passed on to the underlying group of owners in immediate continuation of the distribution - means, in the Ministry's opinion, that the Tax Board was right to answer "no" to question 2.

The complainant has stated that a "small part of the dividend (probably between 3% and 5%) is assumed to be used by NTC, NTC Holding GP and NTC Parent S.á.r.l. to pay costs or set aside to pay expected costs".

In SKAT's opinion, it is not decisive for the assessment of whether there is tax exemption under section 2(1)(c)(3) of the Danish Corporation Tax Act that the group may choose to let a small part of the distributed amount be used by the intermediary companies - which are otherwise without operations - to pay current or expected costs.

On the contrary, it must be noted that any costs incurred by the holding companies will simply be a consequence of the underlying group of owners' use of intermediate holding companies as a tool to avoid withholding tax when paying interest and dividends. Therefore, the incurrence of such costs does not fundamentally change the fact that the distributed amount immediately flows on to the underlying group of owners.

In any case, the fact that a small part of the distributed amount does not actually flow out of Luxembourg can at most justify that no withholding tax should be levied on this (undisclosed) small part of the distribution, which obviously cannot justify a change of the binding answer.

The complainant has further referred to the fact that the Luxembourg tax authorities have certified that NTC "to the best of their knowledge is the beneficial owner of any dividend paid on his shares held in TDC or any other income derived there from". This is irrelevant to the present case. The assessment of whether there is tax exemption under section 2(1)(c)(3) of the Danish Corporation Tax Act must of course be made by the Danish tax authorities.

Moreover, the certificate presented has a standardized character and nothing indicates that the tax authorities in Luxembourg have made an assessment of the intended transaction to which the binding reply relates (or any other transactions etc.).

In a decision published in SKM2010.268, the National Tax Tribunal has stated, among other things, that Danish law does not

**1596**

legal basis to deny a company the benefits resulting from the parent company's
/Subsidiaries Directive when the company is the rightful recipient of the dividend and when the transactions made cannot be set aside based on considerations of reality.

In contrast, the court has in its case law recognized that it is not contrary to the Interest/Royalty Directive to withhold withholding tax when the EU resident company to which the interest is initially paid is not the "beneficial owner" of the interest. In this connection, the court has emphasized that the exemption from withholding tax according to the wording of the directive presupposes that the recipient is the "beneficial owner" of the interest. In SKAT's opinion, there is no basis for treating dividends differently from interest in relation to the possibility of withholding tax when the formal recipient of the amount is

resident in the EU, but is not the "beneficial owner" of the amount. There are a number of reasons for this:

Copyright © 2023 Karnov Group Denmark A/S

Firstly, it follows from the case law of the CJEU that the benefits of EU law cannot be obtained in the case of transactions covered by the general EU law concept of abuse. EU law rules that entail harmonization of the laws of the Member States must be interpreted in this light.

It is therefore also the Ministry's opinion that the case law of the European Court of Justice shows that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from i.a. the Parent-Subsidiary Directive - when it must be assumed that the establishment of a holding company in another Member State "aims to avoid withholding tax on payments to non-European companies if such a construction serves no commercial purpose", cf. the Commission's interpretation of "Purely artificial arrangements" in the Commission Communication on the application of anti-abuse measures in the area of direct taxation - in the EU and in relation to third countries (COM 2007.785).

From the case law of the European Court of Justice on the concept of abuse, reference is made to the Cadbury Schweppes judgment (Case C-196/04, Cadbury Schweppes, [2006] ECR I-7995), the Halifax judgment (Case C-255/02, Halifax, [2006] ECR I-1609) and the Part Service judgment (Case C-425/06, Part Service Srl.).

When assessing the main purpose of the establishment, the EU Court of Justice has paid particular attention to whether there is substance in the company's country of domicile or whether it is a purely artificial arrangement that involves not only formal establishment, but also the actual exercise of economic activity.

SKAT is therefore of the opinion that EU law cannot to a greater extent than the double taxation agreements based on the Model Convention be considered to prevent Denmark from implementing a source state taxation of dividends based on a consideration that the "beneficial owners" of the amounts in question are resident outside the EU. This applies even though the Parent-Subsidiary Directive, unlike the later Interest/Royalty Directive, does not explicitly use the term "beneficial owner".

Secondly, it should be noted that the principle that no withholding tax can be imposed according to the express wording of the parent/subsidiary can be derogated from. Thus, Article 1(2) of the Directive states that the Directive does not preclude the application of national provisions or conventions necessary to prevent fraud and abuse.

The use of the term "beneficial owner" in the double taxation treaties serves precisely to combat fraud or abuse, as referred to in Article 1(2) of the Directive. Thus, the Directive does not prevent withholding tax from being imposed when the "beneficial owner" is not covered by a double taxation agreement with Denmark.

As section 2(1)(c) of the Danish Corporation Tax Act provides that the limited tax liability shall only be waived if the Directive and/or a DBO leads to the Danish authorities having to waive or reduce taxation, this provision in itself contains a clear utilization of the right to maintain the limited tax liability in order to prevent abuse.

In addition, Article 10 of the Danish-Luxembourg double tax treaty is a treaty provision which, with the reservation of "beneficial owner", combats fraud or abuse. According to the wording of Article 1(2), the Directive does not preclude Denmark from using the right to withhold tax at source that Denmark has pursuant to Article 10 of the double taxation agreement.

SKAT therefore does not agree with the National Tax Tribunal's finding in the ruling of March 3, 2010, according to which there can only be legal basis

to deny the benefits of the Directive on the basis of the court-created case law on the right income recipient or on the basis of considerations of reality.

However, SKAT is of the opinion that there is a legal basis for denying the benefits of the Directive both on the basis of the court-created case law on the general EU law concept of abuse, which the EU law rules must be interpreted in the light of, and on the basis of the abuse provision in Article 1(2) of the Directive.

It is therefore SKAT's overall opinion that dividends distributed from TDC to NTC will not be tax-free under section 2(1)(c) of the Danish Corporation Tax Act and thus exempt from Danish withholding tax. Question 2 is therefore answered in the negative.

*The company's claim and arguments*

The company's representative requests that the binding reply be amended so that both questions are answered in the affirmative.

**1597**

*Question 1:*

Section 2(1)(c)(5) of the Danish Corporation Tax Act reads as follows:

"Furthermore, the tax liability shall not extend to dividends received by shareholders of parent companies which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States but which are considered to be transparent entities for the purposes of taxation in this country."

The following appears from the legislative history of the provision (L27 2003/2004):

"Transparent companies are not covered by the limited tax liability of dividends from Danish companies pursuant to section 2(1)(c) of the Danish Corporation Tax Act, as the tax liability under this provision is incumbent on companies and associations etc. as mentioned in section 1(1) of the Danish Corporation Tax Act. Thus, there is no need for a provision stating that transparent companies covered by the Parent-Subsidiary Directive are not subject to limited tax liability in Denmark on dividends from Danish subsidiaries.

According to Danish rules, the tax liability of dividends accruing to a transparent company is the responsibility of the shareholders.

It is therefore proposed that foreign shareholders in a transparent company covered by the Parent-Subsidiary Directive should not have limited tax liability in Denmark on dividends from the transparent company's Danish subsidiary. This must apply regardless of whether the shareholder is a company or a natural person and regardless of the shareholder's ownership interest in the transparent company." As can be seen, neither the clear wording nor the corresponding clear preparatory works make it a requirement for tax exemption under section 2(1)(c)(5) of the Danish Corporation Tax Act that taxation must be waived or reduced under the Parent-Subsidiary Directive or a double taxation treaty.

According to the wording of the provision, the only relevant criteria in relation to section 2(1)(c), fifth sentence, are thus whether the parent company, here NTC, is included in the list of companies covered by the Parent-Subsidiary Directive, and whether the parent company is considered a transparent entity for taxation in Denmark.

NTC is a Luxembourg company of the 'societe en commandite par actions' type and is thus one of the companies included in the list of companies referred to in Article 2(1)(c) of the Parent/Subsidiary Directive. Furthermore, under Luxembourg domestic

tax law, NTC is considered a separate taxable entity and is subject to Luxembourg corporate income tax ("impot sur le revenu des collectives").

Consequently, dividends distributed from TDC to NTC are tax-free pursuant to section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act if NTC is considered a transparent company under Danish domestic tax law. It appears from the articles of association of NTC that the company essentially corresponds to a Danish limited partnership.

It follows from article 8 of the articles of association that the company's participants consist of "the Unlimited Shareholder", who has unlimited liability for the company's debts (corresponding to the general partner's liability in a Danish limited partnership), and "Limited Shareholders", who are only liable with their contributions (corresponding to the limited partners' liability in a Danish limited partnership)".

The articles of association further state that the company is managed by NTC Holding G.P. (which is also the Unlimited Shareholder) and that NTC Holding GP in its capacity as manager handles both the internal affairs of the company and represents the company externally, while "Limited Shareholders" influence is limited. The management structure of NTC is thus comparable to the management structure of a Danish limited partnership.

As both the liability and management conditions in NTC correspond to the liability and management conditions in a Danish limited partnership, it is the representative's opinion that NTC must be considered a transparent company under internal Danish tax law.

Consequently, dividends distributed from TDC to NTC are tax-free pursuant to section 2(1)(c)(5) of the Danish Corporation Tax Act. It should be noted that section 2(1)(c)(5) of the Danish Corporation Tax Act does not require Denmark to be obliged to waive or reduce the taxation of dividends under the rules of a double taxation treaty or the Parent-Subsidiary Directive.

It is therefore not relevant whether the Parent-Subsidiary Directive or a double taxation treaty prevents Denmark from taxing dividends. Thus, it is also not relevant whether NTC is a "beneficial owner" or not.

With regard to SKAT's decision, it is noted that it neither directly nor indirectly follows from the current wording that the provision only applies if taxation of dividends is to be waived or reduced under the provisions of a double taxation agreement or the Parent-Subsidiary Directive.

The wording of section 2(1)(c)(5) of the Danish Corporation Tax Act was amended in 2009, where the words "as mentioned in section 3" were deleted. At the same time, the wording of section 3 was changed so that the provision that taxation of dividends must be waived or reduced in accordance with the provision of a double taxation agreement or the parent/subsidiary was technically moved to this section.

If it originally should have been a condition for the application of section 2(1)(c), 5th sentence of the Danish Corporation Tax Act that taxation of dividends should be waived or

**1598**

is reduced according to the provisions of a double taxation treaty or the Parent-Subsidiary Directive, it would have been extremely misleading to delete the reference to section 3 when the provision on waiver or reduction was moved to section 3.

The connection between the 2009 amendment to the wording of section 2(1)(c)(5) of the Danish Corporation Tax Act and the simultaneous amendment to section 2(1)(c)(3) therefore also indicates that there is no requirement that taxation of dividends must be waived or reduced in accordance with the provisions of a double taxation treaty or the Parent-Subsidiary Directive in relation to section 5.

Thus, neither the wording nor the preparatory work for section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act provides a legal basis for setting such a requirement.

It is therefore the representative's opinion that NTC is covered by the Parent-Subsidiary Directive and must be considered a transparent entity under Danish tax law, which is why dividends distributed from TDC to NTC are tax-free pursuant to section 2(1)(c)(5) of the Danish Corporation Tax Act. This applies regardless of whether NTC is considered the beneficial owner or not, and question 1 must therefore be answered with a "yes".

*Question 2:*

It is a condition for the application of section 2(1)(c), third sentence, of the Danish Corporation Tax Act that dividends are distributed to a company that is either entitled to the benefits resulting from a double taxation treaty with Denmark or to the benefits resulting from the Parent-Subsidiary Directive.

*The double taxation treaty between Denmark and Luxembourg*

Whether NTC is to be considered a taxable person under the double taxation treaty between Denmark and Luxembourg depends on whether NTC is considered an independent taxable person in Luxembourg, cf. the comments to the OECD Model Convention under Article 1, point 5. This states:

"Where a partnership is treated as a company or taxed in the same manner, a resident of the Contracting State taxes the partnership on the basis referred to in paragraph 1 of Article 4 and it is therefore entitled to the benefits of the Convention."

This also follows from practice, cf. the Danish Tax Council's decision published in SKM2008.491, where the Tax Council found that a foreign entity that was transparent under internal Danish tax law was entitled to collective agreement benefits.

In determining whether NTC is entitled to the benefits of the double tax treaty between Denmark and Luxembourg, Denmark is thus obliged to accept Luxembourg's tax qualification of NTC as an independent taxable person and thus a taxable person covered by the double tax treaty.

The representative then referred to Article 10 of the double tax treaty. The question is then whether the NTC is the "beneficial owner" of the dividend.

The concept of "beneficial owner" has been part of the OECD Model Law and its commentary since 1977. In the commentary to the OECD Model Tax Convention, the issue of beneficial ownership is primarily discussed in point 12 to Article 10. From these comments it can be deduced that agents and intermediaries, as well as flow-through companies, are not beneficial owners of dividends. However, in the case of flow-through companies, it is an additional express condition that the company has such narrow powers to dispose of the dividend that it is effectively a nullity or administrator in relation to the dividend.

NTC is recognized in Luxembourg as an independent legal and tax entity and NTC is the civil law owner of the shares in TDC. NTC has premises in Luxembourg, employs one person and deposits in the company's bank account have generated significant interest income for NTC.

The reason why the original holding structure was established in Luxembourg is that in the specific case, where five private equity funds agreed to jointly acquire the majority of the shares in TDC, a common holding structure offered a number of advantages in relation to the financing of the acquisition, the submission of a joint tender offer and the possibility of compulsory redemption. Once it had been decided to establish a common holding structure, it had to be decided in which countries the individual holding companies should be established, and the reason for the decision to establish the original holding companies in Luxembourg was not to avoid Danish withholding tax on dividends. Firstly, private equity funds and other foreign investors have historically made their investments via Luxembourg, primarily because Luxembourg is legally, regulatory, financially and politically considered an attractive and stable country through which to invest, and secondly, it is not normally part of the business plan of private equity funds to distribute dividends. As a natural extension o f t h e  fact that the original holding structure is

established in Luxembourg, NTC was also established in Luxembourg. In connection with the sale of shares in TDC at the end of 2010, NTC entered into a so-called "lock-up" agreement whereby NTC has committed to a number of banks not to sell shares in TDC for a period of 180 days from November 25, 2010.

In relation to the right of disposal over dividends received by NTC from TDC, it is stated that the shares in TDC owned by NTC until the beginning of 2011 were pledged in favor of a number of external lenders who have provided clear loans to TDC. In the

**1599**

To the extent that NTC received dividends from TDC, these dividends would have to be deposited in an account in a bank, which was also pledged in favor of the external lenders. As long as there was no default on the loans to which the pledge related, NTC was entitled in relation to the external lenders to dispose of the balance in the pledged account. In the event of default, the external lenders could deprive NTC of this right of disposal and claim the balance in the account. Pledging of the shares in TDC owned by NTC ceased at the beginning of 2011. There are no agreements on the right of disposal of dividends received by NTC from TDC. The decision to dispose of dividends received can only be made by NTC's management.

NTC currently has no material debt that is expected to be paid with dividends received from TDC. In general, NTC's management may therefore decide in whole or in part (i) to use the dividends received to repay the relevant loan, (ii) not to dispose of the dividends received but simply leave them in the company's bank account, (iii) to invest the dividends received or (iv) to distribute the dividends received to the company's owners.

Based on the above, it is the representative's opinion that NTC must be considered the "beneficial owner" of dividends received from TDC. If the opinion is that NTC is not entitled to the benefits resulting from the double taxation treaty between Denmark and Luxembourg and/or cannot be considered "beneficial owner" of dividends received from TDC, it is the representative's opinion that NTC Parent S.á.r.l. and NTC Holding GP S.á.r.l. in that case must be considered entitled to the benefits resulting from the double taxation treaty between Denmark and Luxembourg and must be considered "beneficial owner".

"beneficial owners" of their respective shares of the proceeds.

In further submissions to the Tax Council, it has been stated that the vast majority of the ultimate investors in NTC are resident for tax purposes in countries that are members of the EU and/or has concluded a double taxation treaty with Denmark, that NTC has no significant debt and is thus mainly financed with equity, and that it is expected that the management of NTC will decide to dispose of the dividend received from TDC by distributing it as dividend to its shareholders.

As NTC is an independent entity with independent management and decision-making authority, it cannot be known in advance and with certainty whether the management of NTC will actually decide to dispose of the dividend received from TDC by distributing it as dividend. Regardless of the expectation that the management of NTC will dispose as stated, the final decision will depend on the circumstances at the time of the management's decision, including, for example, whether such a distribution at this time is considered prudent by the management.

*Parent/Subsidiary Directive*

As NTC is one of the companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary

U.2023.1575H

Directive and as NTC is subject to Luxembourg corporation tax ("impot sur le revenu des collectives"), it follows directly from the Parent-Subsidiary
/Subsidiaries Directive that NTC is entitled to the benefits of the Directive.

There is no requirement in the Parent-Subsidiary Directive that the dividend recipient is the "beneficial owner" of the dividends.

It follows from the wording of the provision as well as from the ruling of the National Tax Court published in SKM2010.268 that the benefits of the directive can only be denied to the extent that national legislation contains a separate and specific legal basis for this.

As mentioned above, NTC is recognized in Luxembourg as an independent legal and tax entity and NTC is the civil law owner of shares in TDC. As a consequence, NTC must be considered the proper income recipient of dividends distributed on its shares in TDC. Even if one were to take the - in the representative's opinion incorrect - view that NTC cannot be considered the rightful owner of the dividend under the double taxation treaty between Denmark and Luxembourg, NTC is therefore entitled to the benefits resulting from the Parent-Subsidiary Directive.

It cannot be assumed that the dividend distribution will actually be disposed of in advance. It is correct, as stated by SKAT, that it is expected that NTC will decide to distribute dividends, but this is only an expectation and in no way expresses that it will "actually be disposed of" in advance.

The fact that NTC had to make a decision to distribute dividends to its owners in continuation of the receipt of dividends from the questioner does not in itself mean that NTC cannot be considered to have real control over the dividends received from the questioner, cf. the OECD's "discussion draft" regarding "Clarification of the meaning of "beneficial owner" in the OECD model tax convention", which among other things proposes a number of clarified comments to Article 11, including the following:

"The recipient of dividend is the "beneficial owner" of that dividend where he has the full right to use and enjoy the dividend un- constrained by a contractual or legal obligation to pass the payment received to another person."

It can be assumed that NTC is not subject to any contractual or other legal obligation to pay on dividends received from the questioner, and as a result, NTC must be considered the "beneficial owner".

**1600**

The Parent-Subsidiary Directive states that the Directive does not prevent the application of national provisions or agreements necessary to prevent fraud and abuse. Thus, rules to combat abuse can be introduced in national law.

By National Tax Court's ruling published i SKM 2010.268.LSR, together with the European Court of Justice's judgment in case C-321/05 (the Kofoed judgment), it appears that there must be internal Danish rules if SKAT is to deny relief under the directive. In Denmark, it is the court-created practice on the correct income recipient and considerations of reality that could possibly be invoked, and it is undisputed that this practice does not lead to NTC being denied tax exemption of the dividend, cf. the Danish National Tax Tribunal in SKM 2010.268.LSR.

SKAT's argument that the double taxation treaty introduces the necessary "legal basis" for Denmark not to be obliged to waive the withholding tax under the parent tax treaty.

/Subsidiaries Directive, it is argued that this is manifestly contrary to "the golden rule", according to which double taxation treaties cannot independently authorize taxation, and the view has also been set aside by the National Tax Tribunal in SKM 2010.268.

*The legislator has been aware of the possibility of holding companies.*

It also follows from internal Danish law that SKAT cannot claim

withholding tax on the dividend distribution. Thus, attention has been paid to

the possibility of using holding companies for the taxation of withholding tax on dividends.

In case law, emphasis is placed on whether the legislator has been aware of such possibilities. Reference is made to the Supreme Court's judgment published in U.2004.174H.

Furthermore, case law emphasizes whether the legislator has introduced recent legislation concerning the area in which the taxpayer acts, and the Supreme Court does not interpret a provision expansively if the legislator has been close to the problem without specifically reacting, cf. TfS 2006, 1062 and U.2004.174H.

In the present case, the legislator has, at least since 1998, been aware of structures such as in the present case, cf. Act no. 1026 of December 23, 1998, which abolished the limited tax liability for dividends and the explanatory notes thereto (L 53 of October 21, 1998). It appears from this that the legislator was aware that the withholding tax could be avoided by incorporating an intermediate holding company as in the present case.

Act no. 282 of April 25, 2001 reintroduced the limited tax liability for dividends. The legislative history, including explanatory notes (L 99 of November 10, 2000I and various ministerial responses etc. (Appendix 22, question 16, Appendix 24 and Appendix 25, question 15) show that the Ministry of Taxation and the legislator were aware that the dividend withholding tax could be avoided by using intermediate holding companies and that no special rules were established to counteract this. Accordingly, an expanded beneficial owner concept cannot be implied, as the legislator has been aware of the problem without specifically amending the law.

*The rejection claim.*

It is the Company's opinion that the case is sufficiently informed. SKAT also assumes in its main claim that the questions can be answered.

This is also stated in section 24(1) of the Tax Administration Act:

"A request for a binding answer must be in writing and contain all the information relevant to the answer that is available to the questioner. If the customs and tax administration or the Danish Tax Council, respectively, considers that the question is not sufficiently informed, the questioner may be asked for further information or documentation. If the request is not complied with within a reasonable period of time, the question may be rejected or the answer may be limited to the matters deemed to be sufficiently informed."

The facts and documentation of the case were discussed at a meeting on May 18, 2011, attended by SKAT, the Attorney General and the company, and in subsequent correspondence. It was then agreed which information should form the basis for the binding response, and that the Tax Board had the necessary basis for giving a response.

Therefore, the request cannot be rejected under section 24(1) of the Tax Administration Act.

There is therefore no basis for rejecting the answer to question 2, which must be answered with a "yes".

*The National Tax Tribunal's comments and reasoning*

Re question 1:

It is stated that the Luxembourg company, NTC Holding G.P. & Cie S.C.A., was founded in 2009 by the Luxembourg parent company, NTC Parent S.á.r.l., which in turn is owned by 5 private equity funds etc. and that in 2010 the company acquired 59.1% of the share capital in TDC A/S. The remaining shares in TDC A/S are owned by more than 38,000 shareholders.

It is assumed that the Luxembourg company, NTC Holding G.P. & Cie S.C.A in Luxembourg is considered a taxable entity,

while in Denmark it is considered transparent. NTC Holding G.P. & Cie S.C.A. is such a company, which is included in the list of

companies referred to in Article 2(1) of the Parent-Subsidiary Directive.

According to section 2(1)(c) of the Danish Corporation Tax Act (Act no. 1376 of 7 December 2010), companies domiciled abroad are generally subject to limited tax liability on dividends, cf. the first sentence. However, this does not apply

**1601**

dividends received by a company owning at least 10% of the share capital of the company distributing the dividend for a continuous period of at least one year, within which period the date of distribution of the dividend must fall, cf. sentences 2 and 3. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a double taxation agreement with the state in which the company is resident, cf. clause 4. Point 4 does not include dividends received by participants in parent companies included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which are considered to be transparent entities for tax purposes in Denmark. It is a condition that the shareholder is not resident in Denmark, cf. section 5.

The amendments to the Parent-Subsidiary Directive (2003/123/EEC) extended the list of companies included in the list of types of companies covered by the Directive, including companies that are considered liable to corporation tax in their Member State of residence but are considered fiscally transparent in other Member States.

The amending directive was implemented in Denmark by Act no. 1375 of December 20, 2004 (L 27 2004/2005), and in this connection the 5th sentence of section 2(1)(c) of the Corporation Tax Act was added.

Neither the wording of the provision nor its preparatory works provide sufficient evidence to assume that the provision implies that foreign companies that are covered by the Parent-Subsidiary Directive and are considered taxable abroad but are considered transparent in Denmark are treated differently from other foreign companies that are covered by the Parent-Subsidiary Directive and are considered taxable abroad and are also considered taxable in Denmark. According to the purpose of the provision, the presumption must, on the contrary, be that the two types of companies are treated equally.

The decisive factor will then be whether there will be exemption from withholding tax on dividends under the provision in general, see question 2. SKAT's answer to question 1 is hereby confirmed.

Re question 2:

According to section 2(1)(c)(3) of the Danish Corporation Tax Act, it is a condition for not having to withhold dividend tax that the dividend is paid to a company that is either entitled to the benefits resulting from a double taxation agreement with Denmark or to the benefits resulting from the Parent-Subsidiary Directive.

According to Article 10(1) of the double taxation treaty between Denmark and Luxembourg, dividends may be taxed in the source state. However, the tax imposed may not - if the recipient is the beneficial owner of the dividend and the recipient is a company that directly owns at least 25 % of the capital of the distributing company - not exceed 5% of the gross amount of the dividend.

The provision corresponds to Article 10 of the OECD Model Tax Convention. The commentary to Article 10(12) of the Model

Tax Convention states, among other things, that the requirement of beneficial ownership was inserted in Article 10(2) to clarify the meaning of the words "paid to a resident person" as used in paragraph 1 of the article. The term 'beneficial owner' has not been used in a

narrow technical meaning, but must be viewed in the context and in light of the intent and purpose of the treaty, including avoiding double taxation and preventing tax avoidance and tax evasion. Clause 12.1 states that a person acting in the capacity of agent or intermediary cannot be considered a beneficial owner. It also states that a person who, other than as an agent or intermediary, merely acts as a conduit for another person who actually receives the income in question cannot be considered a beneficial owner either. Reference is made to the report of the Committee on Fiscal Affairs which states that a conduit company cannot normally be regarded as the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or an administrator acting on behalf of other parties. Paragraph 12.2 states that the limitation on the source state's right of taxation cannot be used when an agent or an intermediary resident in a Contracting State or in a third state is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State.

The concept of "rightful owner" cannot be assumed to coincide with the principle of "rightful income recipient" in Danish tax law.

According to Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, Article 5, dividends distributed by a subsidiary to its parent company are exempt from withholding tax.

The general provisions of the Parent-Subsidiary Directive do not include a reservation on abuse. Article 1(2), on the other hand, allows Member States to derogate from the directive in the event of tax abuse, etc.

Article 1(2) of the Directive states that the Directive does not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse.

The Danish National Tax Tribunal's ruling of December 16, 2011 (TfS 2012.26), which concerns a company's

**1602**

withholding tax on dividends paid to the parent company in Cyprus, the company was not considered liable to withhold tax on dividends. The decision emphasized that Denmark has not adopted legislative provisions aimed at preventing fraud and abuse, cf. Article 1(2) of the Directive. The legally established and functioning Cypriot company was, despite the fact that the company's only - or essentially only - activity was to own shares in the Danish company, considered to be the rightful income recipient of the dividend. The dividend was then exempt from withholding tax, cf. Article 5 of the Directive, and was thus not subject to the limited tax liability, cf. section 2(2)(c) of the Companies Tax Act.

Accordingly, and as the dividend in question is transferred from the Danish company to a company in Luxembourg which is included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which is considered transparent for tax purposes in Denmark, and as such companies are treated as other companies included in the list, see question 1, the dividend will be exempt from tax liability, see Article 5. The dividend will then not be covered by the limited tax liability, see the Danish Corporation Tax Act § Section 2(2)(c), 5th sentence.

Accordingly, no decision has been made as to whether the Luxembourg companies can be considered "beneficial owners" of the dividends received under the double taxation treaty, whereby it is noted that a decision in this respect cannot be made on the present basis as the documentation presented is not considered sufficiently satisfactory.

Question 2 can therefore be answered in the affirmative."

*Additional information in the case*

In the "recommended offer" to TDC's shareholders of December 2, 2005, the NTC Group's acquisition of TDC is stated, among other things:

"*Offeror.*

The Offeror is a limited liability company incorporated on October 21, 2005 in accordance with Danish law, with its registered office at Langelinie Allé 35, 2100 Copenhagen Ø, registered under the name Nordic Telephone Company ApS with the Danish Commerce and Companies Agency under CVR no. 29146780. The Offeror has had no commercial activities since its incorporation, except in connection with the Offer and other transactions contemplated in connection therewith, including as described below in this section. The Offeror was incorporated for the purpose of acquiring and holding all TDC Securities.

The Offeror is an indirect wholly-owned subsidiary of the following investment companies or entities: Apax Europe VI-A, L.P., Apax Europe VI-1, L.P., Blackstone Family Communications Partnership (Cayman) L.P., Blackstone Capital Partners (Cayman) IV L.P., Blackstone Family Investment Partnership (Cayman) IV- A L.P., Blackstone Participation Partnership (Cayman) IV L.P., Blackstone NSS Communications Partners (Cayman) L.P., Blackstone Capital Partners (Cayman) IV L.P., KKR Millennium Fund (Overseas), Limited Partnership, Permira Europe III GmbH & Co. KG, Permira Europe III L.P. 1, Permira Europe III L.P. 2, Permira Europe III Co-Investment Scheme, Permira Investments Limited and Providence Equity Offshore Partners V L.P. (together with any other affiliated funds that may become indirect shareholders of the Offeror, the "Funds"). The Funds are advised or managed directly or indirectly by Apax Partners Worldwide LLP, The Bla- ckstone Group International Limited, Kohlberg Kravis Roberts & Co. L.P., Permira Advisers KB and Providence Equity Partners Limited. KKR European Fund II, Limited Partnership, KKR Partners (International), Limited Partnership, Providence Equity Offshore Partners IV L.P., Providence Equity Operating Partners IV L.P., Permira Europe II L.P.1, Permira Europe II L.P.2, Permira Europe II CV3, Permira Europe II CV4, Permira Europe II Co-Investment Scheme and Schroder Ventures Investments Limited are expected to become indirect shareholders of the Offeror on or before completion of the Offer.

The Offeror is a wholly-owned subsidiary of Nordic Telephone Company Holding ApS, a limited liability company incorporated on November 10, 2005 in accordance with Danish law, with registered office at Langelinie Allé 35, 2100 Copenhagen Ø, registered with the Danish Commerce and Companies Agency under CVR no. 29174202. Nordic Telephone Company Holding ApS has not had any commercial activities since its incorporation, except in connection with the Offer and other transactions contemplated in connection therewith.

Nordic Telephone Company Holding ApS is a wholly owned subsidiary of Nordic Telephone Company Finance ApS, a limited liability company incorporated on November 10, 2005 in accordance with Danish law, with registered office at Langelinie Allé 35, 2100 Copenhagen Ø, registered with the Danish Commerce and Companies Agency under CVR number 29173265. Nordic Telephone Company Finance ApS has not had any commercial activities since its incorporation, except in connection with the Offer and other transactions contemplated in connection therewith.

Nordic Telephone Company Finance ApS is a 100%-owned indirect subsidiary of Nordic Telephone Company Investment

ApS, a limited liability company incorporated on November 10, 2005 in accordance with Danish law, with registered office at Langelinie Allé 35, 2100 Copenhagen Ø, registered with the Danish Commerce and Companies Agency under CVR number 29173141. Nordic Telephone Company Investment ApS has not had any commercial activities since its incorporation, except in

in connection with the Offer and other transactions contemplated in connection therewith.

**1603**

Nordic Telephone Company Investment ApS is a subsidiary that is 100% owned through intermediate holding companies by the Funds.

The Funds have guaranteed all capital contributions necessary to complete the Offer but have agreed that they may syndicate a portion of their Capital Contributions commitments or shares during or after the Offer Period."

During the main hearing, it was orally stated that after the submission of the offer, the NTC Group acquired a total shareholding of approximately 87% of TDC, of which a shareholding of approximately 28% was divested in December 2010. Thereafter, the ownership interest amounted to approximately 59.1%. It is furthermore stated that after 2005 - but before the submission of the request for a binding reply in 2011 - the group underwent a number of structural changes, which among other things meant that the series of Danish holding companies, originally incorporated between the NTC Group in Luxembourg and TDC in Denmark, were replaced by NTC SA, domiciled in Luxembourg.

TDC's request of March 16, 2011 for a binding response, which, apart from a group diagram corresponding to that stated in the National Tax Tribunal's decision, was not accompanied by appendices, states, in addition to the above quoted from the National Tax Tribunal's decision on

"Background information", in the section of the request entitled "Arguments", inter alia:

"It appears from the articles of association of NTC that the company essentially corresponds to a Danish limited partnership.

It follows from Article 8 of the articles of association that the company's participants consist of the Unlimited Shareholder, who has unlimited liability for the company's debt (corresponding to the general partner's liability in a Danish limited partnership), and the Limited Shareholders, who are only liable with their contributions (corresponding to the limited partners' liability in a Danish limited partnership). The articles of association also state that the company is managed by NTC Holding G.P. (which is also the Unlimited Shareholder) and that NTC Holding G.P. in its capacity as manager handles both the internal affairs of the company and represents the company externally, while the Limited Shareholders' influence is limited. The management structure of NTC is thus comparable to the management structure of a Danish limited partnership. As both the liability and management conditions in NTC correspond to the liability and management conditions in a Danish limited partnership, it is our opinion that NTC must be considered a transparent company under internal Danish tax law.

The reason why the original holding structure was established in Luxembourg is that in the specific case, where five private equity funds had agreed to jointly acquire the majority of the shares in TDC, a common holding structure offered a number of advantages in relation to the financing of the acquisition, the submission of a joint tender offer and the possibilities for compulsory redemption. Once it had been decided to establish a common holding structure, it had to be decided in which countries the individual holding companies should be established; and the reason for the decision to establish the original holding companies in Luxembourg was not to avoid Danish withholding tax on dividends. Firstly, private equity funds and other foreign investors have historically made their investments via Luxembourg, primarily because Luxembourg is

legally, regulatory, financially and politically considered an attractive and stable country through which to invest, and secondly, it is not normally part of the business plan of private equity funds to distribute dividends. As a natural extension of the original holding structure being established in Luxembourg, NTC was also established in Luxembourg.

U.2023.1575H

There are no agreements on the right to dispose of dividends received by NTC from TDC. A decision to dispose of dividends can only be made by NTC's management.

TDC has stated that the company expects to distribute a dividend of DKK 2.18 per share of DKK 1 in August 2011.

NTC currently has no significant debt that is expected to be paid with dividends received from TDC. As mentioned above, it is expected that NTC (alternatively NTC Parent S.à.r.l.) in the near future will have to raise an external loan in order to pay certain disputed tax claims to SKAT. In general, NTC's management may therefore decide, in whole or in part, to (i) use the dividends received to repay the relevant loan, (ii) not to dispose of the dividends received, but simply leave them in the company's bank account, (iii) invest the dividends received or (iv) distribute the dividends received to the company's owners."

A letter dated May 31, 2011 from lawyer Arne Møllin Ottosen to SKAT, Koncerncenteret, states, among other things:

"AD FACTS.

For the sake of good order, we repeat the following regarding the restructuring of NTC S.A. by way of introduction and in continuation of the meeting with the Ministry of Taxation:

In 2010, a large number of shares in TDC A/S were sold through a public offering. A significant part of the ultimate investors in the private equity funds that indirectly control TDC A/S are resident in the US, and to ensure that the sale of shares in TDC A/S was taxed as capital gains under US tax rules, a so-called "US tax free reorganization" of NTC S.A. was carried out in connection with the sale of shares in TDC A/S. As part of this reorganization, it was decided to liquidate NTC S.A. and to distribute the company's assets, including the shares in TDC A/S, to NTC S.A.'s parent company NTC Holding G.P. & Cie S.C.A. NTC S.A. entered liquidation in December 2010 and at the same time NTC S.A.'s shares in TDC A/S were transferred to NTC Holding G.P. & Cie S.C.A. The liquidation of NTC S.A. is now completed. The transfer of the TDC shares to

**1604**

NTC Holding G.P. & Cie S.C.A. thus has nothing to do with the planned dividend distribution in August 2011.

Regarding *the expected further disposition of dividends distributed from TDC A/S*:

As NTC Holding G.P. & Cie S.C.A. is an independent entity with independent management and decision-making authority, it cannot be known in advance and with certainty whether and how the management of NTC Holding G.P. & Cie S.C.A. will actually decide to dispose of the dividend received from TDC A/S. As the Ministry of Taxation has stated that, in the opinion of the Ministry, the questions asked cannot be answered if it cannot be stated how NTC Holding G.P. & Cie S.C.A. is assumed to dispose of the dividend received from TDC A/S, states that the following can be used as a basis for the binding answer:

The questioner assumes that the majority of the dividends will be distributed as dividends by NTC Holding G.P. & Cie S.C.A. to its owners NTC Holding G.P. and NTC Parent S.à r.l. and that the majority of the dividends distributed by NTC Holding G.P. & Cie S.C.A. to NTC Holding G.P. will be distributed as dividends to NTC Holding G.P's owner NTC Parent S.á r.l. A small part of the dividend (probably between 3% and 5%) is assumed to be used by NTC Holding G.P. & Cie S.C.A., NTC Holding G.P. and NTC Parent S.á r.l. for the payment of costs or provision for the payment of expected costs. The questioner further assumes that dividends distributed to NTC Parent S.á r.l. will be paid (as dividends and/or interest and/or repayment of debt) to companies controlled by the

respective private equity funds or creditors of NTC Parent S.á r.l. The questioner also assumes that amounts paid by NTC Parent S.á r.l. to companies,

Copyright © 2023 Karnov Group Denmark A/S

U.2023.1575H

controlled by the individual private equity funds will be transferred to the ultimate investors in the private equity funds, but the questioner is not aware of the manner in which such transfers will take place or how they will be treated for tax purposes."

Regarding TDC's dividend policy at the time of the distribution relevant to the present case, it is undisputed that 80-85% of the Equity Free Cash Flow in a given year was to be paid out as dividend.

It is agreed that the dividend payment was made on August 10, 2011, and that NTC Holding G.P. & Cie S.C.A. with an ownership share of 59.1% effectively received approximately DKK 1,050,000,000 in dividends, as TDC on the basis of the Tax Council's decision of June 21, 2011 withheld and paid withholding tax regarding the dividend payment, which the Danish Tax Agency paid to NTC Holding G.P. & Cie S.C.A. after the Danish National Tax Tribunal's decision of March 13, 2012.

It appears from TDC's statement of defence of June 25, 2012 that on March 14, 2012, TDC carried out another dividend distribution, and TDC has stated during the main hearing that this distribution corresponded to DKK 2.17 per share.

In section 4.5 of TDC's pleading C of April 21, 2020, it is stated, inter alia:

"Each of the above-mentioned private equity funds has prepared detailed statements of the underlying investors in the funds, including name, identification information, type of investor, percentage holding in the fund, whether there is a double taxation agreement with Denmark, etc. The statements have been prepared on the basis of underlying documentation for the circumstances in question. The complete statements of the investors contain strictly confidential and personally sensitive information, which is why the complete statements are not presented in their entirety. However, these will be made available to the Ministry of Taxation upon closer agreement.

The statements of the underlying investors in the private equity funds generally show that between 58% and 81% of these are covered by a double taxation treaty with Denmark. The vast majority of the underlying investors are domiciled in the USA, but there are also a small number of investors domiciled in Canada, various EU Member States, Cayman Island, Japan, etc.

The private equity funds' statements also contain information about each investor's tax identification number ("US Tax ID") and whether a double tax treaty has been concluded between the country in which an investor in the private equity funds is resident and Denmark. As mentioned above, the private equity funds' statements have been made on the basis of underlying documentation for the information stated in the statements, and it must therefore be considered documented in which country the investor in question is resident and also whether this country has concluded a double taxation treaty with Denmark."

It is undisputed that NTC Holding G.P. & Cie S.C.A., both at the time of the distribution and currently, has premises in Luxembourg, employs at least one person, has a positive bank deposit which has generated significant interest income for NTC Holding G.P. & Cie S.C.A. and has no significant debt.

## III. The CJEU's answers to questions referred for a preliminary ruling

In the judgment of the European Court of Justice (Grand Chamber) of February 26, 2019 in the joined cases C-116/16 and C-117/16, the Court answered a number of questions referred for a preliminary ruling by the Eastern High Court in orders of February 19, 2016 in both cases. The judgment states,

among other things:

*'As regards the first to third questions and points (a) to (c) of the fourth question in the main proceedings*

68 By the first to third questions and the fourth question, (a) to (c), in the main proceedings, it seeks

**1605**

In particular, the referring court asks whether the fight against fraud or abuse permitted by Article 1(2) of Directive 90/435 requires the existence of a national or contractual anti-abuse provision within the meaning of that article. Secondly, it asks whether a double taxation convention, drawn up in accordance with the OECD Model Tax Convention and containing the concept of double taxation, is

'beneficial owner' may constitute a contractual anti-abuse clause within the meaning of Article 1(2) of Directive 90/435. Third, the referring court asks whether the concept of 'beneficial owner' [in French, 'bénéficiaire effectif'] is a concept of EU law which must be understood in the same way as the concept of 'beneficial owner' [in French, 'bénéficiaire'] contained in Article 1(1) of Directive 2003/49 and whether Article 10 of the 1977 OECD Model Tax Convention can be taken into account in interpreting that provision. In particular, the referring court asks whether a provision containing the concept of 'beneficial owner' can be regarded as constituting a legal basis for combating fraud or abuse of rights. 69 As a preliminary point, it is necessary to examine the first question in the main proceedings, by which the referring court asks whether, in order to combat abuse of rights in the context of the application of Directive 90/435, a Member State must have adopted a specific national provision implementing that directive or whether it may refer to national or contractual anti-abuse principles or provisions.

70 In this regard, it follows from settled case law that there is a general principle of EU law that citizens must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse (judgment of 9.3.1999, Centros, C-212/97, EU:C:1999:126, paragraph 24 and the case law cited therein, of 21.2.2006, Halifax and Others, C-255/02, EU:C:2006:121, paragraph 68,

of 12.9.2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 35, of 22.11.2017, Cussens and others, C-251/16, EU:C:2017:881, paragraph 27, and of 11.7.2018,

Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

71 It is incumbent on citizens to comply with this general principle of law. The application of EU law cannot therefore be extended to cover acts carried out with the aim of benefiting, by fraud or abuse, from advantages conferred by EU law (see, to that effect, judgments of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraph 38; of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 27, and of 11.7.2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

72 It follows from that principle that a Member State must refuse to grant the benefits of provisions of EU law where those provisions have not been invoked in order to achieve the objectives of those provisions but in order to benefit from an advantage under EU law, even if the conditions for granting that advantage are only formally met.

73 This is the case, for example, where the implementation of customs formalities was not carried out in the ordinary course of trade but was purely formal and had the sole purpose of unlawfully profiting from monetary compensation (see, to that effect, judgment of 27 October 1981, Schumacher and Others, 250/80, EU:C:1981:246, paragraph 16, and judgment of 3 March 1993, General Milk Products, C-8/92, EU:C:1993:82, paragraph

21) or export refunds (see, to that effect, judgment of 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, paragraph 59).

74 The principle of prohibition of abuse of rights also applies in areas as diverse as the free movement of goods (judgment of 10 January 1985, Association des Centres distributeurs Leclerc and Thouars Distribution, 229/83, EU:C:1985:1, paragraph 27), the freedom to provide services (judgment of 3.2.1993, Veronica Omroep Organisatie, C-148/91, EU:C:1993:45, paragraph 13), public service contracts (judgment of 11.12.2014, Azienda sanitaria locale n. 5 "Spezzino" and Others, C-113/13, EU:C:2014:2440, paragraph 62), freedom of establishment (judgment of 9.3.1999, Centros, C-212/97, EU:C:1999:126, paragraph 24), company law (judgment of 23.3.2000, Diamantis, C-373/97, EU:C:2000:150, paragraph 33), social security (judgment of 2.5.1996, Paletta, C-206/94, EU:C:1996:182, paragraph 24, of 6.2.2018, Altun and others, C-359/16, EU:C:2018:63, paragraph 48, and of 11.7.2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99), transport (judgment of 6.4.2006, Agip Petroli, C-456/04, EU:C:2006:241, paragraphs 19-25), social policy (judgment of 28.7.2016, Kratzer, C-423/15, EU:C:2016:604, paragraphs 37-41), restrictive measures (judgment of 21.12.2011, Afrasiabi and Others, C-72/11, EU:C:2011:874, paragraph 62) and value added tax (VAT) (judgment of 21.2.2006, Halifax and others, C-255/02, EU:C:2006:121, paragraph 74).

75 In the latter area, the Court of Justice has repeatedly stated that although combating fraud, tax evasion and possible abuse is an objective recognized and supported by the Sixth Council Directive 77/388/EEC of 17 May 1977 on the harmonization of the laws of the Member States relating to turnover taxes - Common system of value added tax: uniform basis of assessment (OJ 1977 L 145, p. 1), the principle of prohibition of abuse is a general principle of EU law which applies irrespective of whether the rights that have been abused have a basis in the Treaties, a regulation or a directive. 1), the principle of prohibition of abuse is a general principle of EU law which applies irrespective of whether the rights and advantages that have been abused are based on the Treaties, a regulation or a directive (see, to that effect, judgment of 22.11.2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraphs 30 and 31).

**1606**

76 It follows that the general principle of prohibition of abuse must be applied against a person where that person relies on certain rules of European Union law which confer an advantage in a manner which is not consistent with the objectives of those rules. The Court has thus held that that principle may be relied on against a taxable person in order, in particular, to deny him the right to exemption from VAT, even in the absence of provisions of national law providing for such a denial (see, to that effect, judgment of 18 December 2014, Schoenimport "Italmoda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 62, and of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 33).

77 Although Article 1(2) of Directive 90/435 provides that it does not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse, that provision cannot be interpreted as precluding the application of the general principle of EU law prohibiting abuse referred to in paragraphs 70 to 72 of the present judgment. The transactions alleged by SKAT to be abusive fall within the scope of EU law (see, to that effect, judgment of 22 December 2010, Weald Leasing, C-103/09, EU:C:2010:804, paragraph 42) and may prove to be incompatible with the objective pursued by that directive.

78 As the first and third recitals in the preamble to Directive 90/435 make clear in this respect, the purpose of the Directive is to facilitate the merger of companies at Community level by establishing competition-neutral tax rules for such mergers of companies from different Member States in order to enable companies to

**1607**

to adapt to the requirements of the internal market, increase their productivity and strengthen their competitive position at international level. 79 However, if the creation of financial arrangements were permitted for the sole purpose of benefiting from the tax advantages resulting from the application of Directive 90/435, that would not be consistent with such objectives but, on the contrary, would be detrimental to the functioning of the internal market, since it would distort competition. As the Advocate General essentially states in point 51 of his Opinion in Case C-116/16, the same applies even if the transactions at issue do not pursue exclusively such an objective, since the Court has held that the principle of the prohibition of abuse applies in the tax field where the obtaining of a tax advantage is the main purpose of the transaction at issue (see, to that effect, judgment of 21 February 2008, Part Service, C-425/06, EU:C:2008:108, paragraph 45, and of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 53).

80 Moreover, the right of taxpayers to benefit from tax competition between Member States as a result of the lack of harmonization of income taxes does not preclude the application of the general principle prohibiting abuse. In that regard, it should be noted that Directive 90/435 was intended to achieve harmonization in the field of direct taxation by laying down competition-neutral tax rules and that it was not intended to prevent Member States from taking appropriate measures to combat fraud and abuse. 81 Although the fact that the taxpayer seeks the tax regime which is most advantageous to him cannot in itself give rise to a general presumption of fraud or abuse (see, to that effect, the judgment in judgments of 12 September 2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 50, of 29 November 2011, National Grid Indus, C-371/10, EU:C:2011:785, paragraph 84, and of 24 November 2016, SECIL, C-464/14, EU:C:2016:896, paragraph 60), it is nevertheless the case that such a taxable person cannot be granted a right or advantage under EU law if the transaction in question is, in economic terms, a purely artificial arrangement intended to circumvent the legislation of the Member State concerned (cf. judgment of 12 September 2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 51, of 7 November 2013, K, C-322/11, EU:C:2013:716, paragraph 61, and of 25.10.2017, Polbud - Wykonawstwo, C-106/16, EU:C:2017:804, paragraphs 61-63).

82 It follows that it is for the national authorities and courts to refuse to grant the advantages provided for in Directive 90/435 where they are invoked in order to facilitate fraud or abuse.

83 In the context of the general principle of non-abuse in European Union law and the need to respect that principle in the implementation of European Union law, the absence of national or contractual anti-abuse provisions is irrelevant to the obligation on national authorities to refuse to grant the rights provided for in Directive 90/435 which are relied on to prevent fraud or abuse.

84 The defendants in the main proceedings rely on the judgment of 5 July 2007, Kofoed (C-321/05, EU:C:2007:408), which concerned the grant of a tax exemption provided for in Council Directive 90/434/EEC of 23. July 1990 on the common system of taxation applicable to mergers, divisions, transfers of assets and exchanges of shares concerning companies of different Member States (OJ 1990 L 225, p. 1), seeking to establish that it follows from Article 1(2) of Directive 90/435 that the tax exemption in question

Member State may refuse to grant the advantages provided for in this Directive only if national legislation provides a separate and specific legal basis in this respect.

85 However, this argument cannot be accepted.

86 The Court did note in paragraph 42 of the judgment of July 5, 2007, Kofoed (C- 321/05, EU:C:2007:408) that the principle of legal certainty precludes directives per se from creating obligations for individuals and that they cannot therefore be relied on as such by Member States against individuals.

87 The Court further noted that such a finding is without prejudice to the obligation on all the authorities of a Member State, when applying national law, to interpret it as far as possible in the light of the wording and purpose of directives in order to achieve the result intended by those directives, since those authorities are thus able to rely on a consistent interpretation of national law against individuals (see, to that effect, judgment of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraph 45 and the case-law cited therein).

88 It was on the basis of those considerations that the Court called on the referring court to examine whether Danish law contained a general rule or principle prohibiting abuse of rights or other provisions on tax fraud or tax evasion which could be interpreted in conformity with the provision of Directive 90/434, under which a Member State may essentially refuse to grant the right of deduction provided for by that directive in the case of a transaction which has as its principal purpose such fraud or evasion and then, if appropriate, to examine whether the conditions for applying those national provisions were essentially satisfied (see judgment of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraphs 46 and 47).

89 Even if it were to transpire in the main proceedings that national law does not contain rules which can be interpreted in accordance with Article 1(2) of Directive 90/435, it cannot - notwithstanding what the Court stated in its judgment of 5. July 2007, Kofoed (C-321/05, EU:C:2007:408) - it cannot, however, be inferred that national authorities and courts are precluded from refusing to grant the benefit of the right to exemption provided for in Article 5 of that directive in cases of fraud or abuse of rights (see, by analogy, judgment of 18 December 2014, Schoenim- port 'Italmoda' Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 54).

90 A refusal applied in such circumstances to a taxable person cannot fall within the situation referred to in paragraph 86 of the present judgment, since such a refusal is consistent with the general principle of EU law that no one may rely on EU law for the purpose of enabling fraud or abuse (see, by analogy, judgment of 18 December 2014, Schoenimport "Italmoda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraphs 55 and 56 and the case law cited therein).

91 In so far as matters of fraud or abuse cannot give rise to a right under the EU legal order, as stated in paragraph 70 of the present judgment, the denial of a benefit under a directive, such as Directive 90/435, does not impose an obligation on the citizen concerned under that directive, but is merely the consequence of the finding that the objective conditions for obtaining the benefit sought, laid down in that directive for the purposes of that right, are satisfied only formally (see, by analogy, Schoenimport 'Italmoda' Mariano Previti v judgment of 18.12.2014, by analogy, Scho- enimport "Italmoda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 57 and the case-law cited therein).

U.2023.1575H

92 In such circumstances, Member States must therefore refuse to grant the advantage resulting from Directive 90/435, in accordance with the general law principle of prohibition of abuse, according to which EU law cannot cover unlawful transactions by traders (see, to that effect, judgment of 11 July 2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99 and the case-law cited therein).

93 Having regard to the finding in paragraph 72 of this judgment, it is unnecessary to answer the second question referred by the referring court in those two cases, which concerns, in particular, whether a provision of a double taxation convention which refers to the concept of 'beneficial owner' may constitute a legal basis for combating fraud and abuse in the context of Directive 90/435. 94 In those circumstances, it is also unnecessary to answer the third question and the fourth questions (a) to (c) in the two cases concerning the interpretation of the same concept of 'beneficial owner', since those questions are referred only in the event that the answer to the second question in the two cases is affirmative. 95 In the light of all those factors, the answer to the first question in the two cases must be that the general principle of EU law that individuals may not rely on provisions of EU law for the purpose of enabling fraud or abuse must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxable person the exemption from withholding tax on dividends distributed by a subsidiary to its parent company, provided for in Article 5 of Directive 90/435, even if there is no

**1608**

there are national or collective agreement provisions prescribing such a refusal.

*Questions 4(d) and (e), 5 and 8 in the main proceedings*

96 By its fourth questions (d) and (e) and its fifth and eighth questions in the main proceedings, the referring court asks, in particular, which elements constitute an abuse of rights and how the existence of those elements can be established. In that regard, the referring court asks, in particular, whether a company may be regarded as having actually received dividends from its subsidiary where that company is required, under a contractual or legal obligation, to redistribute those dividends to third parties or where it is apparent from the facts that, without being bound by such a contractual or legal obligation, that company does not 'substantially' have the rights to 'use and enjoy those funds' within the meaning of the comments on the 1977 OECD Model Tax Convention adopted in 2014. It also wants to know whether there could be an abuse of rights if the beneficial owner of dividends transferred by flow-through companies is ultimately a company resident in a third country with which the Member State concerned has concluded a double taxation treaty. By the eighth question in the two cases, the referring court also asks, more specifically, whether a Member State which refuses to recognize a company of another Member State as the beneficial owner of dividends is required to determine which company it considers to be the beneficial owner, if any.

*The question of which elements constitute an abuse of rights and the related evidence*

97 As is clear from the case-law of the Court of Justice, proof of abuse requires, on the one hand, a combination of objective circumstances showing that the objective pursued by the EU legislation has not been achieved even though the conditions laid down in that legislation have been formally complied with and, on the other, a subjective element consisting in an intention to take advantage of the EU legislation by

artificially create the conditions necessary to obtain that advantage (judgments of 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, paragraphs 52 and 53, and of 12.3.2014, O. and B., C-456/12, EU:C:2014:135, paragraph 58).

98 It is therefore the examination of those coinciding circumstances which makes it possible to verify the existence of the elements constituting abuse and, in particular, whether the economic operators concerned have carried out purely formal or artificial transactions, lacking any economic and commercial justification, with the principal aim of obtaining an undue advantage (see, to that effect, judgment of 20 June 2013, Newey, C-653/11, EU:C:2013:409, paragraphs 47-49; judgment of 13 March 2014, SICES a n d Others, C-155/13, EU:C:2014:145, paragraph 33, and of 14.4.2016, Cervati and Malvi, C-131/14, EU:C:2016:255, paragraph 47).

99 It is not for the Court to assess the facts of the main proceedings. However, in a reference for a preliminary ruling, the Court may, where appropriate, provide the national court with detailed information in order to guide it in its assessment of the specific cases before it. Although in the cases in the main proceedings there are a number of factors from which it could be concluded that there has been an abuse of rights, it is nevertheless for the national court to ascertain whether those factors are objective and consistent and whether the defendants in the main proceedings have had an opportunity to present evidence to the contrary.

100 A group which is not organized for reasons reflecting economic reality, which has a purely formal structure and which has as its main purpose or as one of its main purposes the obtaining of a tax advantage which is contrary to the object and purpose of the applicable tax legislation may be considered an artificial arrangement. This is particularly the case when the payment of dividend tax is avoided by including in the group structure a flow-through entity between the company distributing the dividend and the company which is the beneficial owner of the dividend.

101 The fact that all or virtually all of those dividends are redistributed shortly after their receipt by the company which received them to entities which do not satisfy the conditions for the application of Directive 90/435 constitutes evidence of an arrangement intended to take undue advantage of the exemption provided for in Article 5 of Directive 90/435, either because those entities are not resident in a Member State, because they are not constituted in one of the forms covered by that directive, because they are not subject to one of the taxes listed in Article 2(c) of that directive or because they are not 'parent companies' and do not satisfy the conditions laid down in Article 3 of that directive.

102 Thus, entities whose tax residence is outside the European Union, as appears to be the case with the companies referred to in Case C-117/16 or the capital funds referred to in Case C-116/16, do not satisfy the conditions for the application of Directive 90/435. If the dividends in those cases had been paid directly by the Danish company which was to pay them to the entities which, according to the Ministry of Taxation, were the beneficial owners of the dividends, the Kingdom of Denmark would have been able to levy withholding tax.

103 The artificial nature of an arrangement can also be supported by the fact that the group in question

**1609**

is structured in such a way that the company which receives the dividends paid by the debtor company must itself redistribute those dividends to a third company which does not satisfy the

U.2023.1575H

conditions for the application of Directive 90/435, with the result
that that company receives negligible taxable income only when
it acts as a conduit company to enable the cash flow from

U.2023.1575H

the debtor company to the entity that is the beneficial owner of the transferred amounts.

104 The fact that a company operates as a flow-through company can be established if the only activity of the company is to receive the dividends and redistribute them to the beneficial owner or to other flow-through companies. In this regard, the lack of actual economic activity must, in the light of the specific characteristics of the economic activity in question, be deduced from an examination of all relevant elements relating, inter alia, to the operation of the company, its accounts, the structure of its costs and the expenses actually incurred, the staff it employs and the premises and equipment at its disposal.

105 Evidence of the existence of an artificial arrangement can also be found in the existence of different contracts between the companies involved in the financial transactions in question, which give rise to intra-group cash flows, as well as in the method of financing the transactions, in the assessment of the equity capital of the intermediate companies and in the lack of power of the flow-through companies to dispose financially of the dividends received. In that regard, it is not only the contractual or legal obligation of the company receiving the dividends to redistribute them to third parties which may constitute such a factor, but also the fact that, without being bound by such a contractual or legal obligation, that company does not 'substantially', as the referring court states, have the rights to use and enjoy those dividends.

106 Such evidence may, moreover, be corroborated in cases of coincidence or proximity in time between, on the one hand, the entry into force of important new tax legislation, such as the Danish legislation at issue in the main proceedings or the US legislation referred to in paragraph 51 of this judgment and, on the other hand, the implementation of complex financial transactions and the granting of loans within the same group.

107 The referring court also asks specifically whether there may be an abuse of rights where the beneficial owner of dividends transferred by flow-through companies is ultimately a company resident in a third State with which the source State has concluded a double taxation convention under which no withholding tax would have been levied on the dividends if they had been distributed directly to the company resident in that third State.

108 In that regard, the fact that some of the beneficial owners of the dividends transferred by flow-through companies are resident for tax purposes in a third State with which the source State has concluded a double taxation convention is irrelevant when examining the group structure. It must therefore be held that the mere existence of such a convention does not preclude the existence of an abuse of rights. Thus, the existence of such a convention cannot call into question the existence of an abuse of rights if it is duly established on the basis of all the facts which show that the traders carried out purely formal or artificial transactions, without any economic or commercial justification, with the principal aim of taking undue advantage of the exemption from withholding tax provided for in Article 5 of Directive 90/435. 109 In that regard, it must be added that, while taxation must correspond to an economic reality, the existence of a double taxation convention cannot in itself establish the reality of a payment made to recipients resident in the third State with which that convention has been concluded. If the debtor company wishes to benefit from such a treaty in respect of the dividend, it is possible for the company to distribute the

dividends directly to the entities that are resident for tax purposes in a state with which the source state has concluded a double tax treaty.

110 Having said that, if there is a situation where the dividend would have been exempt if it had been distributed directly to the company domiciled in a third State, it cannot be excluded that the objective of the group structure is not an abuse of rights. In such a case, the group's choice of such a structure instead of direct distribution of the dividend to that company cannot be challenged.

111 Moreover, where the beneficial owner of a dividend distribution is resident for tax purposes in a third State, the refusal of the exemption provided for in Article 5 of Directive 90/435 is in no way subject to a finding of fraud or abuse of rights. the third recital in its preamble, the purpose of that directive is to eliminate, through the establishment of a common system of taxation, any discrimination between cooperation between companies from different Member States as compared with cooperation between companies from the same Member State and thus to facilitate company mergers at EU level (judgment of 8 March 2017, Wereldhave Belgium and Others, C-448/15, EU:C:2017:180, paragraph 25 and the

**1610**

case-law). As stated in paragraph 78 of the present judgment, the directive thus seeks to ensure the tax neutrality of dividends distributed by a subsidiary established in a Member State to its parent company established in another Member State, since it is apparent from Article 1 of the directive that it applies only to profits received by companies of a Member State as dividends from their subsidiaries established in other Member States (see, to that effect, order of 4 June 2009 in Case C-439/07 KBC Bank and Beleg order of 4 June 2009, KBC Bank and Beleg- gen, Risicokapitaal, Beheer, C-439/07 and C-499/07, EU:C:2009:339, paragraph 62 and the case-law cited therein).

113 The mechanisms of Directive 90/435, in particular Article 5 thereof, are therefore designed to deal with situations in which the exercise by Member States of their power of taxation could lead, if the mechanisms did not apply, to double taxation of dividends distributed by a subsidiary to its parent company (judgment of 8 March 2017, Wereldhave Belgium and Others, C-448/15, EU:C:2017:180, paragraph 39). However, such mechanisms cannot apply if the beneficial owner of the dividends is a company whose tax residence is outside the EU, since the exemption from withholding tax on those dividends in the Member State from which the dividends are distributed may in such a case result in the dividends not being effectively taxed within the EU.

114 In the light of all those factors, the answer to Question 4(d) and (e) in the main proceedings must be that, in order to prove an abuse of rights, there must be, first, a combination of objective circumstances showing that the objective pursued by the European Union legislation has not been achieved despite formal compliance with the conditions laid down by that legislation and, second, a subjective element consisting in an intention to take advantage of the European Union legislation by artificially creating the conditions necessary to obtain that advantage. The existence of a number of elements may establish an abuse of rights, provided that those elements are objective and consistent. Such evidence may include, inter alia, the existence of flow-through companies that have no economic justification and the purely formal nature of a group's structure, financial arrangements and loans. *The burden of proof for the existence of abuse of rights*

115 It should be noted that Directive 90/435 does not contain

provisions on who bears the burden of proof of abuse.

116 However, as the Danish and German Governments have submitted, it is for companies wishing to benefit from the exemption from withholding tax on dividends provided for in Article 5 of Directive 90/435 to prove that they satisfy the objective conditions laid down by that directive. There is therefore nothing to prevent the tax authorities concerned from requiring the taxpayer to provide the evidence which they consider necessary for a specific assessment of the taxes in question and, where appropriate, from refusing a requested exemption if such evidence is not provided (see, to that effect, judgment of 28 February 2013, Petersen and Petersen, C-544/11, EU:C:2013:124, paragraph 51 and the case-law cited).

117 On the other hand, where a tax authority of the source State intends to refuse the exemption provided for in Article 5 of Directive 90/435 to a company which has distributed dividends to a company established in another Member State on the ground of abuse of rights, it is for that authority to establish the existence of the elements constituting such abuse by taking account of all relevant factors, including the fact that the company to which the dividends were distributed is not the beneficial owner of the dividends.

118 In that regard, it is not for such an authority to determine the beneficial owner of those proceeds, but to establish that the alleged beneficial owner is merely a conduit company through which an abuse of rights has taken place. Such a determination may prove impossible, particularly since the potential beneficial owners are unknown. National tax authorities do not necessarily have the necessary information to identify those beneficial owners, given the complexity of certain financial arrangements and the possibility that the intermediate companies involved in the arrangement are established outside the EU. Thus, those authorities cannot be required to provide evidence which it would be impossible for them to obtain.

119 Moreover, even if the potential beneficial owners are known, it is not necessarily established which of them are or will be the beneficial owners. In the present case, the referring court in Case C-117/16 stated that, although the parent company of Y Cyprus is Y Bermuda, domiciled in Bermuda, the latter's parent company is Y USA, domiciled in the United States. If the referring court were to find that Y Cyprus is not the beneficial owner of the dividends, it would therefore, in all likelihood, be impossible for the tax authorities and the courts of the Member State from which the dividends originate to determine which of those two parent companies is or will be the beneficial owner of the dividends. In particular, a decision on the use of these dividends could be taken following the findings of the tax authorities concerning the flow-through company.

120 The answer to the eighth question in the main proceedings must therefore be that, in order to refuse to recognize a company as the beneficial owner of dividends or in order to establish that there is a

**1611**

there is an abuse of rights, is not obliged to determine which entity or entities it considers to be the beneficial owner of those proceeds."

## IV. Legal basis Corporation Tax Act

*Consolidated Act no. 585 of August 7, 1991 of the Act on income taxation of limited liability companies etc. (Corporation Tax)*
Section 2(1)(c) of the Consolidated Act was worded as follows:
"*§ 2.* Tax liability under this Act shall also apply to companies and associations etc. as mentioned in section 1(1) and (2) which are domiciled abroad, insofar as they

...
c) receives dividend income etc. in which withholding tax must be withheld pursuant to section 65 of the Withholding Tax Act, receives dividends otherwise covered by section 16 A(1) of the Danish Taxation Act or receives disposal sums covered by section 16 B(2) or (5) of the Danish Taxation Act,"
*Implementation of the Parent/Subsidiary Directive, 1992*
Council Directive of 23 July 1990 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (90/435/EEC) (Parent-Subsidiary Directive) provides:
"*Article 1*
1.    Each Member State shall apply this Directive:
      -    on profits received by companies in that Member State as dividends from their subsidiaries in other Member States
      -    on profits distributed by companies of that Member State to companies of other Member States of which they are subsidiaries.
2.    This Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse.

*Article 2*
For the purposes of this Directive, the term 'company of a Member State' means any company: (a) organized in one of the forms listed in the Annex to this Directive
...

*Article 3*
1. In this Directive:
a)    any company of a Member State which satisfies the conditions laid down in Article 2 and whose share in the capital of a company of another Member State satisfying the same conditions is at least 25 % shall be regarded as the parent company
b)    subsidiary shall mean a company in whose capital another company has the holding referred to in point (a).
...

*Article 5*
1. Dividends distributed by a subsidiary to its parent company are exempt from withholding tax, at least when the parent company has a capital share in the subsidiary of at least 25%.
...

*Article 9*
This Directive is addressed to the Member States."
The Directive was implemented in Danish law by Act no. 219 of April 3, 1992, so that section 2 of the Corporation Tax Act was inserted after paragraph 4:
"*Paragraph 5.* The tax liability pursuant to subsection (1)(c) shall not apply to dividends received by a company resident in a state that is a member of the European Communities from a company resident in this country. It is a condition that the company receiving the dividend - the parent company - has owned at least 25 percent of the share capital of the company paying the dividend - the subsidiary - either throughout the income year in which the dividend is received or for a continuous period of at least two years up to the time the dividend is received. It is also a condition that both the parent company and the subsidiary are covered by the concept of company of a Member State in Article 2 of Directive 90/435/EEC."
The general comments to the bill (bill no. L 20 of October 3, 1991), which formed the basis for this, state, among other things:
"3. ...
The Parent-Subsidiary Directive was adopted by the Council of

Economic and Finance Ministers on July 23, 1990. On June 6, 1990, the Danish Parliament's Tax Committee submitted an opinion to the Danish Parliament's

election on, among other things, the Parent-Subsidiary Directive (General Annex 243). The directive is printed as an annex to this bill.

The Parent-Subsidiary Directive aims to harmonize Member States' tax rules to avoid economic double taxation of the part of a subsidiary's profits distributed as dividends to its parent company in another Member State.

The Directive is based on the basic principle that the profits of a subsidiary are taxed only in the subsidiary and in the state where the subsidiary is resident.

The Directive therefore provides that when dividends are distributed from a subsidiary to a parent company in another Member State, the state where the subsidiary is resident may not levy withholding tax on the dividends. The directive also contains rules stating that the parent company is not taxed on the dividends from the subsidiary.

The State in which the parent company is resident may either not tax the dividend or tax the dividend but allow a deduction from the parent company's tax for the portion of the subsidiary's tax relating to the dividend.

a) Under the current rules of the Danish Corporation Tax Act and the Danish Withholding Tax Act, a parent company resident in another EC Member State has limited tax liability in Denmark on dividends from a Danish subsidiary. The tax is 30 percent of the dividend.

**1612**

It is proposed that the limited tax liability of dividends is repealed in this situation.

Similarly, it is proposed that no withholding tax should be withheld on dividends that a parent company in another EC Member State receives from its Danish subsidiary.

However, the existing double taxation treaties with the other EC Member States already prevent or limit Denmark's access to taxation of dividends.

...

4. Revenue implications.

...

The proposal to exempt dividends from a subsidiary in Denmark to a parent company domiciled in another Member State from taxation is estimated on the basis of Danmarks Nationalbank's currency statistics to result in a loss of revenue of up to DKK 20 million annually. DKK 20 million annually."

The special notes to the bill (bill no. L 20 of October 3, 1991), which formed the basis for this, state, among other things:

"The proposed provisions in section 3, no. 1 and sections 6-8 concern the implementation of the Parent-Subsidiary Directive in Danish tax legislation.

To #1.

According to section 2(1)(c) of the Danish Corporation Tax Act, a parent company resident abroad has limited tax liability insofar as it receives dividend income etc. in which withholding tax must be withheld pursuant to section 65 of the Danish Withholding Tax Act, receives dividends otherwise covered by section 16 A(1) of the Danish Assessment Act or receives disposal sums covered by section 16 B(2) or (5) of the Danish Assessment Act.

...

According to Article 5(1) of the Parent-Subsidiary Directive, dividends distributed by a subsidiary to its parent company shall be exempt from withholding tax, at least when the parent company has a holding of at least 25 percent.

...

It is therefore proposed that a new subsection 5 be added to

section 2 of the Danish Corporation Tax Act stating that the tax liability under section 2(1)(c) does not include dividends received by a parent company resident in an EC Member State as dividends from a company resident in Denmark. It shall be a condition that the parent company throughout the income year in which the dividends are

received, has owned at least 25% of the share capital in the subsidiary. It must also be a condition that both the parent company and the subsidiary are covered by the Parent-Subsidiary Directive, i.e. that they are covered by the concept of "company in a Member State" in Article 2 of the Parent-Subsidiary Directive.

The term "company of a Member State" is defined in Article 2 of the Directive as any company,

a)   which takes one of the forms mentioned in an annex to the Directive,

b)   which, according to the tax laws of a Member State, is considered to be resident in that State for tax purposes and which is not considered to be resident outside the Community under a double taxation convention with a third country,

c)   which is also subject, without option and without exemption, to one of the taxes referred to in Article 2(c) of the Directive or to any other tax which replaces one of those taxes.

For Denmark, only limited liability companies and private limited companies that are taxable under section 1(1)(1) of the Danish Corporation Tax Act will be able to meet the conditions for being a "company in a Member State".

According to Article 1(2) of the Parent-Subsidiary Directive, the Directive does not prevent the application of internal provisions or agreements necessary to prevent fraud and abuse. It is therefore proposed in *section 3(1) of* the bill that the provision in section 16 B(5), third sentence, of the Danish Income Tax Act is amended so that it also includes dividends as referred to in section 2(5) of the Danish Corporation Tax Act. Reference is made to the comments to section 3(1). It is proposed in *section 7 that* a new subsection (5) be added to section 65 of the Withholding Tax Act stating that, when the same conditions are met, no dividend tax shall be withheld on dividends received by a parent company resident in an EC Member State from a company resident in Denmark."

The above-mentioned comments to section 3(1) of the bill regarding section 16 B(5) of the Danish Tax Assessment Act state, among other things:

"When disposing of subsidiary shares, parent companies may be covered by section 16 B(5) of the Danish Taxation Act, whereby the disposal sum is taxed as dividends at the parent company, even though a dividend distribution from subsidiary to parent company would be tax-free under section 13(1)(2) and (3) of the Danish Corporation Tax Act.

The rule is intended to prevent a company's shareholders from circumventing dividend taxation by, for example, allowing the company to transfer its business to a subsidiary, after which the subsidiary shares are transferred to a holding company controlled by the same shareholder group as the selling company. Without section 16 B of the Tax Assessment Act, the shareholders would be able to withdraw funds from the company in the event of a subsequent sale or liquidation of the parent company without giving up influence over the business.

If a Danish parent company disposes of shares so that the parent company must include the disposal sum in the taxable income pursuant to section 16 B(5) of the Danish Tax Assessment Act, the subsidiary cannot under current rules

**1613**

distribute tax-free dividends to a Danish parent company pursuant to section 13(1)(2) and (3) of the Danish Corporation Tax Act in the year in question and in the two preceding income years prior to the transfer of shares. The distributed dividends must instead be included in the calculation of the receiving

company's taxable income for the years in which the distributions have taken place.

The reason for the rule is that the parent company selling the shares should not be able to reduce taxation according to section 16 B(2) of the Tax Assessment Act.

5, by emptying the subsidiary through tax-free dividends prior to the share sale.

According to Article 1(2) of the Parent-Subsidiary Directive, the Directive does not prevent the application of internal provisions or agreements necessary to prevent fraud and abuse. As a result of the Directive, a new provision on tax-free dividends is introduced in section 2(5) of the Danish Corporation Tax Act. The rationale for taxing parent companies on disposal sums according to section 16 B(5) of the Danish Income Tax Act, even where a dividend distribution from the subsidiary would be tax-free, applies equally to limited taxable parent companies (with Danish shareholders) and fully taxable parent companies. It is therefore proposed that the new rule on tax-free dividends received by a parent company resident in an EC state from a Danish subsidiary should also not apply in the relevant income year and in the two most recent income years preceding the transfer of shares, if this is covered by section 16 B of the Danish Tax Assessment Act."

*Abolition of dividend taxation regarding e.g. distribution of dividends from Danish subsidiaries to foreign parent companies, 1998*

By Act no. 1026 of December 23, 1998 amending various tax acts (International taxation of dividends and share profits etc.), section 2(1)(c) of the Danish Corporation Tax Act was amended to read as follows:

"Tax liability under this Act shall also apply to companies and associations etc. as mentioned in section 1(1) and (2) that are domiciled a b r o a d , i n s o f a r a s they

...

c) receives dividends covered by section 16 A(1) of the Tax Assessment Act or transfer sums covered by section 16 B of the Tax Assessment Act. The tax liability does not apply to dividends received by a company etc. (the parent company) that owns at least 25 percent of the share capital in the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must fall. It is a condition that the subsidiary is covered by the concept of company of a Member State in Article 2 of Directive 90/435/EEC,

...".

§ Section 2(5) was repealed at the same time.

At the same time, *section 13 of the Danish* Corporation Tax Act was worded as follows:

"Section 13. The taxable income shall not include:

...

2.   Dividends which the companies and associations etc. mentioned in section 1, subsection 1, no. 1-2 d, 3a-5 and 5b, receive from shares or units in companies covered by section 1, subsection 1, no. 1 and 2, or companies resident abroad. However, this only applies if the dividend-receiving company, the parent company, owns at least 25 percent of the share or share capital of the dividend-paying company, the subsidiary, for a continuous period of at least one year, within which period the dividend distribution date must lie. ...

The general comments to the bill (bill no. L 53 of October 21, 1998), which formed the basis for this, state, among other things:

"It is proposed to restructure the taxation of dividends and share dividends received by Danish parent companies and individual shareholders from companies abroad, and it is proposed to abolish the Danish withholding tax on dividends paid by Danish subsidiaries to foreign parent companies. ...

It is proposed [...] to abolish withholding tax on dividends paid to foreign parent companies when the Danish subsidiary is covered by the EU Parent-Subsidiary Directive, so that EU companies and non-EU companies are treated equally for tax purposes. This withholding tax

can largely be avoided by depositing holding companies in countries in relation to which Denmark is wholly or partially exempt from withholding tax.

...

*Revenue remarks*

Regarding the tax exemption of dividends from Danish subsidiaries to foreign parent companies and dividends from foreign subsidiaries to Danish parent companies, the change will not affect dividends from and to another EU country, as these are already tax-free, but only in relation to countries outside the EU.

There is no firm basis for an assessment of the revenue effect. Among other things, there is no information about foreign parent companies' dividends from Denmark or about Danish parent companies' subsidiary dividends from non-EU countries. On the other hand, it must be taken into account in the assessment that the current taxation can be circumvented by redirecting the dividends to companies in third countries, so that the dividends are not taxed in Denmark."

The comments to the individual provisions of the bill state, among other things: "To § 1, no. 1 and 2.

Dividends paid from a Danish subsidiary to a foreign parent company are subject to limited tax liability to Denmark, cf. section 2(1)(c) of the Danish Corporation Tax Act. The tax liability is fulfilled by the dividend-paying Danish company withholding tax of 25 percent.

**1614**

of the dividends paid to the foreign shareholder. This applies whether the foreign shareholder is a natural person or a company, and regardless of whether or not there is a parent/subsidiary relationship.

However, there are two very important exceptions in parent-subsidiary relationships, namely the exceptions resulting from the EU Parent-Subsidiary Directive.

/Directive, cf. section 2(5), and the double taxation treaties that Denmark has entered into.

The Parent-Subsidiary Directive (Directive 90/435/EEC) stipulates, among other things, that a Member State may not levy withholding tax when dividends are paid from a subsidiary in one Member State to a parent company in another. The threshold for the ownership share in parent-subsidiary relationships is set in the Directive at 25%, and a company must be covered by one of the types of companies listed in an annex to the Directive before the Directive applies. However, the Directive does not prevent a Member State from setting an ownership limit lower than 25 percent or from not levying withholding tax on the payment of dividends from companies other than those listed in the Annex to the Directive. In such cases, there is of course no obligation for the parent company state to apply the provisions of the Directive.

The double tax treaties each set an upper limit for how high a withholding tax the two states can impose on dividend payments. In parent-subsidiary relationships, this will typically be a maximum withholding tax rate of 5-10%, but there is nothing to prevent either state from taxing at a lower rate or not taxing at all. The limit for the ownership share in the parent

/The most commonly used rate is 25%, but 10% is used in some collective agreements.

It is generally proposed to abolish withholding tax on dividends paid to foreign parent companies when the Danish subsidiary is covered by the EU Parent-Subsidiary Directive, so that EU companies and non-EU companies are treated equally."

*Reintroduction of dividend taxation regarding e.g. distribution*

*of dividends from Danish subsidiaries to parent companies in non-EU countries without a double taxation agreement with Denmark, 2001* By Act no. 282 of April 25, 2001 amending the Corporation Tax Act, *section 2*(1)(c), third sentence, was amended so that the provision was worded as follows:

"Tax liability under this Act shall also apply to companies and associations etc. as mentioned in section 1(1) and (2) that are domiciled a b r o a d , i n s o f a r a s they

...

c) receives dividends covered by section 16 A(1) of the Tax Assessment Act or transfer sums covered by section 16 B of the Tax Assessment Act. The tax liability does not apply to dividends received by a company etc. (the parent company) that owns at least 25 percent of the share capital of the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must fall. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC or under a double tax treaty with the Faroe Islands, Greenland or the state where the company is resident."

In the original bill no. L 99 of November 10, 2000, section 2(1)(c), third sentence, had the following wording:

"It is a condition that the parent company is resident in a state that is a member of the EU, in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2 of Directive 90/435/EEC."

The general comments to the bill state, among other things:

"Act no. 1026 of December 23, 1998 therefore repealed the taxation of dividends received by a foreign parent company from its Danish subsidiary, regardless of where the parent company is domiciled. ...

However, experience has shown that the new rules opened up for the establishment of Danish holding companies with the sole purpose of avoiding taxation in other countries, and that this possibility has been marketed by Danish tax advisors abroad. In cases where a subsidiary in e.g. an EU country is owned by a parent company in a tax haven without double taxation treaties, the group can often avoid the taxation that the former country would implement by directly distributing dividends from the subsidiary in that country to its foreign parent company by incorporating a Danish holding company. The bill to reintroduce the dividend tax for parent companies in non-EU countries without a double tax treaty with Denmark is also a contribution to the international efforts to counteract harmful tax competition or harmful tax practices, both within the EU and the OECD.

...

The Danish holding rules differ from the corresponding rules in other countries in that the Danish rules entail tax exemption both for dividend payments from a foreign subsidiary and for dividend payments to a foreign parent company. As mentioned, this means that the Danish rules can be used to undermine other countries' taxation. Other countries that tax dividends from companies in these countries to parent companies in tax havens are therefore unhappy that their taxation can be circumvented by using the Danish holding rules.

It is therefore proposed as a Danish contribution to counteract the use of tax havens and to meet the

**1615**

foreign criticism to reintroduce the 25% tax on dividend payments from a Danish subsidiary to its foreign parent company, but only in cases where the parent company is domiciled in a country outside the EU or in a country that does not have a double tax treaty with Denmark."

On November 24, 2000, the Minister of Taxation responded to an inquiry from Ernst & Young to the Danish Parliament's Tax Committee as follows:

"Question 1: Please confirm that a company or other legal person is considered to be resident in an EU or DBO country, cf. the proposed provision in SEL § 2(1)(c), if it is resident in an EU or DBO country either under the tax legislation or under the company/fund legislation in that country.

Question 2: Please confirm that in relation to the proposed provision in section 2(1)(c) of the SEL, it is irrelevant whether a company resident in an EU country, cf. the answer to question 1, is covered by the concept of a company in Article 2 of the EU Parent/Data Company Directive.

Answer:

...

However, the abolition of dividend withholding tax from a Danish subsidiary to a foreign parent company was abused by the establishment of Danish holding companies with the sole purpose of avoiding taxation in other countries.

The purpose of bill L 99 is thus to prevent this abuse while at the same time taking into account the exceptions to the main rule of 25% withholding tax that Denmark is obliged to have under the Parent-Subsidiary Directive or a double taxation treaty.

In relation to SEL section 2(1)(c), a foreign parent company can thus only avoid the general withholding tax of 25 percent if it is covered by the term "a company in a Member State" in the parent company's

/The taxpayer is resident abroad in accordance with Article 2 of the Income Tax Directive or under a Danish double taxation treaty, insofar as the dividends are covered by the double taxation treaty. The domicile under company law is not decisive for the definition of the concept of domicile in SEL § 2(1)(c).

Of course, it is still a requirement to avoid the ordinary dividend withholding tax that the other conditions in SEL section 2(1)(c) are also met. This means that the parent company owns at least 25 percent of the share capital in the subsidiary for a continuous period of at least 12 consecutive months, and that the subsidiary is covered by Article 2 of the Parent-Subsidiary Directive."

On November 28, 2000, the Minister of Taxation replied to an inquiry from A to the Danish Parliament's Tax Committee as follows:

"In a letter dated November 21, 2000, Mr. A contacted the Tax Committee to present his views on the proposed legislation's condition that the parent company is domiciled in a state with which Denmark has a double taxation treaty.

...

As stated in my comments to an inquiry from Ernst & Young regarding the bill, it is crucial whether the dividend from the Danish subsidiary is covered by a double taxation treaty with the country where the foreign parent company is domiciled."

On January 10, 2001, the Minister of Taxation answered an inquiry from the Association of State Authorized Public Accountants to the Danish Parliament's Tax Committee as follows:

"The Association of State Authorized Public Accountants has in a letter of

On November 28, 2000, the tax committee was again contacted to comment on the answer to some questions in Ernst & Young's referral.

According to the answer in question (L 99 - Appendix 5), a foreign parent company can only avoid Danish taxation of dividends from a subsidiary in Denmark if the parent company is covered by the concept

"a company in a Member State" in Article 2 of the Parent-Subsidiary Directive, or according to a Danish double taxation agreement is resident abroad insofar as the dividend is covered by the agreement.

In the association's view, there is no support for this interpretation either in the wording of the proposed provision or in the comments to it. However, the association agrees that the delimitation in the answer is an extension of the bill.

I should note that responses to the tax committee on a proposed provision are contributions to the interpretation of the provision in the same way as the comments to the provision.

The proposed provision must therefore be interpreted in accordance with that answer.

To make this absolutely clear, I will propose an amendment that clarifies the proposed provision."

On January 10, 2001, the Minister of Taxation sent the following amendments to the Danish Parliament's Tax Committee: (Clarification of conditions for tax exemption of dividends - postponement of entry into force)

To § 1

1. point 1 is replaced by the following:

"In section 2(1)(c), the third sentence is replaced by the following:

"It is a condition that the taxation of the dividends must be waived or reduced in accordance with the provisions of Directive 9O/435/E0F or under a double tax treaty with the Faroe Islands, Greenland or the state where the company is resident,"

...

**1616**

To 1)

The amendment aims to clarify the proposed provision.

The proposed provision is that only dividends distributed by a Danish subsidiary to its foreign parent company resident in the Faroe Islands, Greenland, another EU state or a state with which Denmark has a double taxation treaty are tax-free. When Danish subsidiaries distribute dividends to other foreign parent companies, however, the dividends are taxed at 28%.

It is proposed to clarify that it is a condition for the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent-Subsidiary Directive or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the provisions of the double taxation agreement with the Faroe Islands, Greenland or the other state concerned."

Also on January 10, 2001, the Minister of Taxation sent the following comments on a newsletter to the Parliamentary Tax Committee:

"Cyprus IBCs [International Business Companies] gain importance as a result of developments in Denmark":

"...

The purpose of the bill is to counter the circumvention of other countries' taxation, for example for a parent company in the British Virgin Islands that has a subsidiary in Ireland.

If the Irish subsidiary is directly owned by the parent company in the Virgin Islands, Ireland will tax the dividend payment from subsidiary to parent company.

Irish taxation can currently be circumvented by incorporating a Danish holding company so that the Irish subsidiary distributes dividends to the Danish holding company, which in turn distributes the dividends to the parent company in the Virgin Islands. Under the EU Parent-Subsidiary Directive, Ireland is not allowed to tax the dividends, and under the current Danish rules, Denmark does not tax the dividends either.

The bill counters this construction, as Denmark will in the future tax dividends distributed by a Danish company to a parent company in the Virgin Islands.

It is correct that the parent company in the Virgin Islands can still avoid Danish taxation of the dividends from the Irish company

by transferring the shares in the Danish company to an intermediate holding company in Cyprus. In that case, Denmark will not tax the dividend as the parent company in Cyprus is covered by the Danish-Cypriot double taxation treaty.

However, as mentioned in the article, the parent company in the Virgin Islands can also avoid the dividend tax by replacing the Danish holding company with a holding company in Cyprus, so that the Irish subsidiary distributes the dividend to the company in Cyprus.

The example shows that it is no longer the Danish rules, but rather the favorable rules of Cyprus that are the prerequisite for the parent company in the Virgin Islands to circumvent the Irish taxation of dividends."

On January 11, 2001, the Minister of Taxation sent the following reply to the Danish Parliament's Tax Committee:

*"Question 3:*

Can the statement in the comments "Against this background, the additional revenue generated by the proposal is estimated to be limited" be clarified? What is estimated to be involved?

*Answer:*

The bill assumes that foreign parent companies domiciled in non-EU countries without a double tax treaty with Denmark will abandon the Danish subsidiaries established solely as part of an international tax structure. In these situations, the proposed dividend tax will not generate any revenue.

However, if parent companies in these non-EU countries without a double taxation treaty with Denmark have Danish subsidiaries with an actual business activity, these companies could be directly affected by the proposal.

However, the companies will be able to restructure themselves so that the shares in the Danish subsidiary are transferred to a subsidiary in a country to which dividend payments are still exempt from Danish dividend tax. This is advantageous if the dividends can be distributed to the actual parent company with a lower tax rate than the Danish tax rate, possibly without taxation at all. Therefore, the revenue from such companies is estimated to be limited. There is no basis for a numerical estimate of this."

Also on January 11, 2001, the Minister of Taxation sent the following reply to the Parliamentary Tax Committee:

"Ole Bjørn [chairman of the Danish Tax Assessment Board and professor of tax law at the University of Southern Denmark]

...

Furthermore, he believes that the bill's rules are not very effective, as the proposed taxation can be avoided by depositing an intermediate holding company.

Comment:

...

It is argued that the proposed rules are not particularly effective as they can be avoided by an intermediate holding company in another country that is a member of the EU or has a double taxation treaty with Denmark and which has favorable tax rules.

I would note that in this case, it is a case of the parent company in the tax haven country avoiding taxation by using the favorable rules in the other country."

On February 26, 2001, the Minister of Taxation sent the following reply to the Danish Parliament's Tax Committee:

"*The inquiry:* It is the opinion of the Danish Association of State Authorized Public Accountants that it is inappropriate that the internal Danish dividend taxation rules for

**1617**

foreign companies are linked to the DBO in the manner described in the amendment, including whether the company in

question is fiscally transparent in the home country. The Minister for Taxation is invited to

therefore to consider whether the aim of the bill can be achieved without the internal Danish rules depending on whether the DBO applies. *Comment:* I do not believe that the purpose of the bill can be achieved without the internal Danish rules depending on whether the dividend is waived or reduced under the provisions of the Parent-Subsidiary Directive or a double taxation treaty. It is essential that the Danish withholding tax on dividends is only waived when the dividends are received by a company that is taxed according to the general rules for companies in the country in question."

On March 26, 2001, the Minister of Taxation sent the following reply to the Danish Parliament's Tax Committee:

"*Question 23:* The Minister is asked to comment on the attached article of March 23, 2001 from Børsen: "Tax exemption for dividends eroded". *Answer:* Børsen's article of 23 March 2001 criticizes my proposed amendment to the bill on holding companies, as the proposal erodes the tax exemption for dividends. The bill limits the current rule whereby Denmark does not tax dividends paid by a Danish subsidiary to its foreign parent company. According to the bill, the rule will in future only apply if the parent company is resident in an EU country or a country that has a double taxation treaty with Denmark. In other cases, Denmark will be required to levy a tax of 28% of the dividend.

...

During the consideration of the bill, Ernst & Young made a referral (L 99 - Appendix 2) to the tax committee and asked about the effect of the bill on companies that are domiciled in another EU country or in another country that has a double taxation agreement with Denmark, but which are nevertheless not protected by the directive or the agreement. In a reply to the tax committee (L 99 -Appendix 5), I stated that these companies cannot receive dividends from a Danish subsidiary without the proposed taxation.

In a communication to the tax committee (L 99 - Appendix 10), the Danish Association of State Authorized Public Accountants stated that, in the association's opinion, this delimitation is in line with the bill, but lacks the necessary support in the wording of the proposed provision.

Against this background, I proposed an amendment which clarifies that the decisive condition for tax exemption for dividends is that Denmark must waive or reduce the taxation of the dividend under the Parent-Subsidiary Directive or a Danish double taxation treaty.

..."

It appears from the report on the proposal to amend the Danish Corporation Tax Act (Tax Committee L99, Appendix 43) that the Minister of Taxation proposed the following amendments during the committee's consideration:

"In *section 2(1)(c)*, the *third sentence* is replaced by the following:

"It is a condition that the taxation of the dividends must be waived or reduced in accordance with the provisions of Directive 90/435/EEC or under a double tax treaty with the Faroe Islands, Greenland or the state where the company is resident".

[Clarification of conditions for tax exemption of dividends]

Remarks

...

The amendment aims to clarify the proposed provision.

The proposed provision is that only dividends distributed by a Danish subsidiary to its foreign parent company resident in the Faroe Islands, Greenland, another EU state or a state with which Denmark has a double taxation treaty are tax-free. When Danish

subsidiaries distribute dividends to other foreign parent companies, however, the dividends are taxed at 28%.

It is proposed to clarify that it is a condition for the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent-Subsidiary Directive or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the provisions of the double taxation agreement with the Faroe Islands, Greenland or the other state concerned."

*Concerning taxation of participants in transparent parent companies* In Act no. 1375 of 20 December 2004 amending the Companies Tax Act and the Withholding Tax Act (Implementation of amendments to the Parent-Subsidiary Directive), a fourth sentence was inserted after section 2(1)(c), after the third sentence, with the following wording:

"Furthermore, the tax liability shall not apply to dividends received by shareholders of parent companies as mentioned in the second sentence which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States but which are considered to be transparent entities for the purposes of taxation in this country. It is a condition that the shareholder is not resident in this country."

The bill (no. L 27 of October 7, 2004) on which this is based states, among other things:

"*General comments Background and purpose of the bill*

On December 22, 2003, the Council adopted a directive (2003/123/EC) amending the Parent-Subsidiary Directive (90/435/EEC).

...

**1618**

*2.1.1. ...*

The amending directive is printed as annex 1 to this bill. Annex 2 to the bill compares the provisions of the Parent-Subsidiary Directive with the provisions of the Amending Directive.

The amending directive entails,

- that the Parent-Subsidiary Directive can apply to a larger number of legal entities etc. than before, including the European Company (SE) and the European Cooperative Society (SCE),

...

2.2.2.5 Transparent companies

The new companies included in the list of companies referred to in Article 2(1)(a) are subject to corporate tax in their Member State of residence, but some of them, due to their legal characteristics, are considered by other Member States as fiscally transparent. According to the recitals to the amending Directive, Member States that treat non-resident taxpaying companies as fiscally transparent on this basis should provide appropriate tax relief in respect of income that is part of the tax base of the parent company.

...

*3.2.5 Transparent companies*

...

Transparent companies are not covered by the limited tax liability on dividends from Danish companies pursuant to section 2(1)(c) of the Danish Corporation Tax Act, as the tax liability under this provision is for companies and associations etc. as mentioned in section 1(1) of the Danish Corporation Tax Act. Thus, there is no need for a provision stating that transparent companies that are covered by the parent company's /The Danish tax authorities are not subject to limited tax liability in Denmark on dividends from Danish subsidiaries.

According to Danish rules, the tax liability of dividends accruing to a transparent company is the responsibility of the shareholders.

It is therefore proposed that foreign shareholders in a transparent company covered by the Parent-Subsidiary Directive,

not be subject to limited tax liability in Denmark on dividends from the transparent company's Danish subsidiary. This should apply regardless of whether the shareholder is a company or a natural person and regardless of the shareholder's ownership interest in the transparent company.

...

*Comments on the individual provisions For point 4*

Please refer to the general comments, section 3.2.5.

According to section 2(1)(c), second sentence, of the Danish Corporation Tax Act, dividends received from foreign companies, associations etc. are tax-free if the dividend-receiving company etc. (the parent company) owns at least 20 percent (15 percent, 10 percent, cf. the amendments proposed under nos. 1 and 2) of the share capital in the dividend-giving company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive or under a double taxation treaty with the Faroe Islands, Greenland or the state where the company is resident.

According to the proposal, the tax liability shall also not apply to dividends received by participants in parent companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which are considered to be transparent entities for tax purposes in Denmark.

It must be a condition that the shareholder is not resident in Denmark.

This means that foreign shareholders in a transparent parent company that is covered by the Parent-Subsidiary Directive will not be subject to limited tax liability in Denmark on dividends from the transparent company's Danish subsidiary. This shall apply regardless of whether the shareholder is a company or a natural person and regardless of the shareholder's ownership interest in the transparent company." Section 2(1)(c) of the Danish Corporation Tax Act was at the time of the rulings in the NetApp case on September 28, 2005 and October 13, 2006 as follows (Consolidated Act no. 111 of February 19 2004, as last amended by Act No. 1375 of December 20, 2004):

"§ 2. Tax liability under this Act shall also apply to companies and associations, etc. as mentioned in section 1(1), which are domiciled abroad, insofar as they

...

receives dividends covered by section 16 A(1) of the Danish Tax Assessment Act, except for distributions from bond-based investment funds as mentioned in section [...] of the Danish Capital Gains Tax Act, or receives disposal sums covered by section 16 B of the Danish Tax Assessment Act. The tax liability does not include dividends received by a company etc. (the parent company) that owns at least 10 percent of the share capital in the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie. However, for dividend distributions in the calendar years 2005 and 2006, the shareholding referred to in the second sentence shall be 20%, and for dividend distributions in the calendar years 2007 and 2008, the shareholding referred to in the second sentence shall be 15%. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a

double taxation treaty with the Faroe Islands, Greenland or the state where the company is resident. Furthermore, the tax liability does not apply to dividends received by participants in parent companies as mentioned in the second sentence which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which, when taxed in Denmark

1619

U.2023.1575H

are considered to be transparent entities. It is a condition that the shareholder is not resident in this country,"

By Act no. 525 of June 12, 2009, the Danish Corporation Tax Act

§ Section 2(1)(c), 3rd-6th sentences, changed to read as follows:

"The tax liability does not include dividends on subsidiary shares, cf. *section 4 A of the Danish Capital Gains Tax Act,* when the taxation of dividends from the subsidiary is to be waived or reduced under the provisions of Directive 90/435/EEC on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the parent company is resident. Furthermore, the tax liability does not include dividends from group company shares, cf. *section 4 B of the Danish Shareholding Tax Act,* which are not subsidiary shares when the group company receiving the dividend is resident in a state that is a member of the EU/EEA and the taxation of dividends would have been waived or reduced under the provisions of Directive 90/435/EEC or the double taxation agreement with the state in question if they had been subsidiary shares. Furthermore, the tax liability does not apply to dividends received by members of parent companies which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which are considered to be transparent entities for tax purposes in Denmark. It is a condition that the shareholder is not resident in this country,"

By the same act, section 4 A of the Capital Gains Tax Act was worded as follows:

"*Definition of subsidiary shares*

*§ 4 A.* Subsidiary shares are shares owned by a company that owns at least 10% of the share capital in the subsidiary, cf. however, subsections 2-4.

*Subsection 2.* It is a condition under subsection (1) that the subsidiary is covered by section 1(1), no. 1-2 a, 2 d-2 h and 3 a-5 b of the Danish Corporation Tax Act or that the taxation of dividends from the subsidiary is waived or reduced in accordance with the provisions of Directive 90/435/EEC on a common system of taxation for parent companies and subsidiaries from different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the subsidiary is resident.

*Subsection 3.* The subsidiary shares are considered to be owned directly by the parent company's corporate shareholders covered by section 1 or section 2(1)(a) of the Danish Corporation Tax Act in cases where

1) the parent company's primary function is ownership of subsidiary shares and group company shares, cf. section 4 B,

2) the parent company does not exercise real economic activity in relation to the shareholding and

3) more than 50 percent of the share capital in the parent company is directly or indirectly owned by companies covered by section 1 of the Danish Corporation Tax Act, or

§ Section 2(1)(a) that would not be able to receive dividends tax-free through direct ownership of the shares in the individual subsidiary, and

4) the shares in the parent company are not admitted to trading on a regulated market or a multilateral trading facility.

*Paragraph 4. ...*"

From the bill (no. L 202 of April 22, 2009) on which the amendment is based, the comments to the individual provisions of the bill regarding the proposed wording of section 2(1)(c)(3)

(5) of the Danish Corporation Tax Act state, inter alia:

"To #5...

In addition, the provision is proposed to be simplified so that the dividends that are tax-free are instead defined with reference to the definition of subsidiary shares and group company shares proposed to be inserted in the Danish Capital Gains Tax Act, cf. section 1(6) of the bill. However, it is a condition that the dividend-receiving group company

are resident in the Faroe Islands, Greenland or a state that is a member of the EU/EEA and which exchanges data with Denmark. The rewording only entails minor substantive changes.

Reference can also be made to the comments to the bill's § Section 1, no. 10 on tax exemption for profits on subsidiary shares.

The 4th sentence of section 2(1)(c) of the Danish Corporation Tax Act is proposed to be repealed, as the content is no longer relevant.

To no. 6 [In section 2(1)(c), 6th sentence, which becomes the 5th sentence, is deleted: "as mentioned in the 3rd sentence."]

This is a consequential change as a result of the bill's § 14, no. 5."

*Equation guides*

From the tax assessment guidelines, section D.D., chapter III, article 10 on exchanges, published on January 29, 2003, it appears, among other things:

"Dividends paid by a company shall, as a general rule, be taxable in the State of which the beneficial owner of the dividends is a resident. However, the Contracting States may agree that, subject to certain specified limitations, dividends may also be taxed in the State of which the company is a resident. ...

When a Danish company covered by SEL section 1(1), no. 1, 2, 2e and 4 distributes dividends, the company must according to

**1620**

The main rule in KSL section 65(1) is to withhold dividend tax at 28%. The rule also applies to the distribution of dividends to companies that are resident abroad for tax purposes."

According to the tax guide section D.D, chapter III, article 10 on dividends, published on July 14, 2003, among other things:

"Dividends paid by a company shall, as a general rule, be taxable in the State of which the beneficial owner of the dividends is a resident. However, the Contracting States may agree that, subject to certain specified limitations, dividends may also be taxed in the State of which the company is a resident.

In the 2003 update, the commentary now clarifies that the term "beneficial owner" should not be understood in a narrow technical context, but rather in the context of the purpose of the treaty, including the avoidance or evasion of taxation. An agent or nominee is not a beneficial owner, nor is a conduit company ("straw man") or so-called fiduciaries, which are persons who are formally owners of an asset, but where the return accrues to a beneficiary. A beneficial owner in a contracting state can invoke the treaty regardless of the presence of an intermediary."

The legal guidance version 2010-2 section A.A.7.1.5 states, inter alia:

"Notification of change with future effect

It is a fundamental principle of administrative law that it is only possible to implement an aggravating change in practice with effect for the future and after announcing an appropriate notice that gives citizens the opportunity to adapt to the changed legal situation.

...

What constitutes adequate notice depends entirely on the specific circumstances, i.e. the amount of time citizens are deemed to need to adapt to the change in practice. A change in practice must be published in an appropriate manner, e.g. in the form of a SKM notification (control signal) or by special news marking in the legal guidelines."

*Shedding light on administrative practices*

The Minister of Taxation's answer of November 6, 2006 to question S 474 to the Parliamentary Law Secretariat states, among other things:

"*Question:* Can the Minister confirm that dividends from Danish companies, if the ownership share exceeds 20 percent, can be paid tax-free to a parent company in e.g. Luxembourg and then transferred to a tax haven country?

*Answer:*

...

The limited tax liability - and the derogation - applies to the company that actually *receives* the dividend. The limited tax liability is therefore only waived if the foreign company that actually receives the dividend is covered by the Directive or a double tax treaty. However, if the dividend is actually received by a company in a tax haven country, the dividend payment is not exempt from withholding tax.

The "beneficial owner" principle must therefore be applied to determine who "receives" the interest. The term "beneficial owner" is considered to be very similar to the term "beneficial owner" used in the double tax treaties. In the double tax treaties, withholding tax shall only be waived or reduced if the beneficial owner of the dividends is a resident of the other state.

The provision is a safeguard against an ordinary taxed company being inserted as a conduit company between the dividend-paying Danish company and the final receiving foreign tax haven company. The provision applies even if several intermediate ordinary taxed companies are incorporated. The decisive factor is who is the correct income recipient/beneficial owner.

"Conduit" companies include, inter alia, companies which, although being the formal owner, actually have very narrow powers in relation to the income in question. In relation to the dividend, the company is a "nominee" or trustee acting on behalf of other parties, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

A pure flow-through holding company in e.g. Luxembourg will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.2). It should be noted that the Swiss Supreme Court has concluded that a pure flow-through holding company in Denmark was not the beneficial owner of dividend payments under the Danish-Swiss treaty.

It should be mentioned that the Parent-Subsidiary Directive does not imply that dividend payments to flow-through companies must be recognized.

In conclusion, it should be noted that there is no taxation of dividends when dividends are paid to, for example, a parent company covered by the Parent-Subsidiary Directive if this company is the beneficial owner of the dividend, even if the parent company is owned by a company resident in a tax haven. Who is the beneficial owner of the dividend is determined based on a specific assessment."

In continuation of this, on November 27, 2006, the Minister of Taxation gave the following answer to the Danish Parliament's Tax Committee:

"*Question 5:...*

*Answer:...*

The lapse of limited tax liability is conditional on the foreign company in question being the beneficial owner of the dividend.

**1621**

A pure flow-through company resident abroad, e.g. Luxembourg, will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

However, the limited tax liability will lapse if the beneficial owner of the flow-through company is resident in another country and Denmark, according to the Parent-Subsidiary Directive or a double tax treaty with that country, must reduce or waive taxation of the dividend.

...

*Question 6: ...*

*Answer:* I cannot provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies.

...

*Question 10:* To what extent and how does SKAT check when dividends are distributed to flow-through holding companies where no withholding tax is withheld due to double tax treaties or the EU Parent-Subsidiary Directive? whether the relevant flow-through holding company must be approved as the rightful income recipient of the dividend, or whether the dividend recipient is the shareholder of the flow-through holding company and - if this shareholder is resident in a tax haven country - whether the Danish subsidiary must withhold dividend tax from the dividend distribution?

*Answer:* ...

It is part of the tax assessment process to ensure that the conditions for not withholding dividend tax are met, including whether a foreign company is the rightful owner of the dividend.

A memo of March 20, 2007 to the Danish Parliament's Tax Committee on status of SKAT's control efforts regarding the takeover of 7 Danish groups by private equity funds states, among other things:

In recent years, takeovers of Danish companies by private equity funds have accounted for a larger and larger share of total business transfers. SKAT has obtained information that more than 80 Danish companies have been acquired by Danish or foreign private equity funds in recent years.

A private equity fund is usually a limited partnership where a number of investors have provided capital. With the investors' equity as a basis, significant sums are borrowed from banks and other financial entities for the acquisition of Danish companies.

A typical model will show that investors set up a Danish holding company that is responsible for the acquisition of the Danish company. The holding company, which buys the Danish company from the previous shareholders, receives the money for the acquisition via loans from banks and investors in the private equity fund.

In general, SKAT focuses on company transactions, as experience shows that there is often a risk of errors when calculating taxable income in this area. As the private equity funds' share of the Danish market for company transactions has been increasing, and especially in 2005 they have proved to constitute a significant number with a large volume, SKAT has focused on this type of takeovers. Based on SKAT's information on takeovers of Danish companies by private equity funds, seven acquisitions of Danish companies were selected for closer inspection. In the selection, emphasis was placed on representing different private equity funds, different types of companies and differences in volume. The purpose was, among other things, to subsequently assess whether the tax treatment of the acquisition at the individual company depended on which private equity fund had acquired the company.

In SKAT, a working group was initially set up whose purpose was to create an overview of the theoretical basis for a tax assessment of the private equity funds' acquisitions with a view to the subsequent specific control of the 7 acquisitions.

...

Based on this, it is investigated who is the final recipient - the 'rightful income recipient' - of interest and dividends. The aim is to determine whether this recipient is liable to pay tax to Denmark (limited tax liability), so that withholding tax can be withheld from the payments. This can normally only be done if the recipient is resident in a country with which Denmark has not

concluded a double tax treaty.

However, the cash flow often leaves Denmark to recipients in countries with which Denmark has concluded a double tax treaty - DBO countries. This means that there is no need for

limited tax liability to Denmark and that no withholding tax should be withheld. However, if the first recipient of the payments is not the final recipient - the "rightful income recipient" - of the payments, but only a flow-through company, there may still be limited tax liability for the final ("rightful") recipient.

Therefore, SKAT is looking for information that can document who is the last and final link in the chain, and whether this link is located in a non-DBO country. With the latter countries, Denmark typically does not have agreements on assistance or exchange of information.

Just as importantly, SKAT must also seek documentation that the recipients located between Denmark and the final recipient of dividends or interest / capital gains can be considered flow-through companies, so that the final ("correct") recipient in the non-DBO country can be subject to limited tax liability to Denmark as mentioned.

From the Minister of Taxation's answer of May 15, 2007 (questions 75-77) to the Danish Parliament's Tax Committee regarding

**1622**

Bill no. L 213 on amendment of the Corporation Tax Act and various other tax acts (CFC taxation and measures against capital funds etc.) states, among other things:

*Question 75:*

Has Skat still not implemented dividend taxation of so-called flow-through companies?

*Answer:*

In a special control effort, SKAT has focused on the takeover of Danish groups by private equity funds. In this connection, SKAT is working to obtain information about the recipients of the cash flows leaving Denmark in the form of dividends and interest, as SKAT wants documentation that it is the "final recipient" who is also the correct income recipient of the dividends and interest income. Only when this is clarified can it be assessed whether Denmark is entitled to withholding tax on the amounts paid out.

This investigation has not yet led to dividend taxation of distributions to flow-through entities."

The Minister of Taxation's reply of May 22, 2007 to the Danish Parliament's Tax Committee regarding bill no. L 213 on amendment of the Corporation Tax Act and various other tax laws (CFC taxation and measures against capital funds etc.) states, among other things:

"*The individual elements of the bill*

...

§ 1, no. 1 - Withholding tax on interest

It is proposed that the provision on withholding tax on interest in SEL section 1(d) be adjusted to take into account the amendment of the CFC rules. ...

...

*Tax Minister's comment:*

...

It should be noted that if the immediate recipient of the interest payment passes on the amount via a distribution, repayment of loans or similar, it must be assessed whether the immediate recipient is the beneficial owner. If the ultimate recipient is deemed to be the beneficial owner, the conditions in section 2(1)(d) apply directly to the ultimate recipient.

...

§ 1, no. 6 - Incoming interest from subsidiaries

It appears from the comments that incoming dividends will not be tax-free even if the dividends are distributed by a company within the EU/E0S or a country which has a double taxation

treaty with Denmark, if this company is a "flow-through company" between the Danish parent company and the subsidiary which is a resident company.

located outside the EU/E0S or in a country that does not have a double tax treaty with Denmark. The Ministry is asked to elaborate on what is decisive for a company to be considered a "flow-through company". FSR does not understand the idea that a dividend by "flowing through" a group can be re-qualified when there is no doubt that the dividend has passed through the individual companies, which is unquestionable when the dividend is declared.

...

Tax Minister's comment:

The beneficial owner principle is a safeguard against an ordinary taxed company being inserted as a conduit company between the dividend paying company and the final receiving foreign tax shelter company. The protection applies even if several intermediate ordinary taxed companies are inserted.

What matters is who is the legal owner of the proceeds.

"Conduit" companies include companies that. although it is the formal owner, has in fact very narrow powers in relation to the income in question. In relation to the dividend, the company is a "nominee" or trustee acting on behalf of other parties, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

A pure flow-through holding company in e.g. an EU country will therefore not be the beneficial owner of the dividend. In this connection, it should be mentioned that the Parent-Subsidiary Directive does not imply that dividend payments through flow-through companies must be recognized."

The Minister of Taxation's reply of May 22, 2007 to the Danish Parliament's Tax Committee regarding the same bill states, among other things:

*Question 86:*

Should the answer to question 75 be understood to mean that SKAT has not previously examined the basis for tax exemption for dividends transferred to so-called flow-through companies, despite the fact that the Minister for Taxation has referred several times previously - e.g. during the consideration of Bill L 30 from the current session - to the fact that there will be taxation in such cases?

...

*Answer: ...*

I have explained SKAT's action strategy to the Tax Committee on several previous occasions, and I can inform you that the 2007 action plan states that companies that either do not pay tax or pay very little tax are a special focus area. The special TP assessment centres established in 2005 - and the units that control the largest companies in Denmark - are thus obliged to prioritize this particular area.

...

This procedure ensures that an agent or an intermediary (e.g. a bank) of a person in a third country will not be entitled to a reduction of the withholding tax even if the agent or intermediary is resident in a contract country. This follows from the fact that the agent or

**1623**

the intermediary is not considered to be the owner of the income for tax purposes in the State in which he is resident.

However, a flow-through (holding) company cannot be equated with an agent or an intermediary. Such a company is registered and fully taxable in the country in which it is domiciled and the starting point is clearly that a holding company is entitled to contract protection.

When the OECD model was updated in 2005, a new point 12.1 in the commentary to Article 10 (dividends) referred to an OECD

report according to which a holding company should not be considered to be the beneficial owner of the dividend under very special circumstances. It must be the case that the holding company actually has very

narrow powers which, in relation to the income in question, make it a "nullity" or an administrator acting on behalf of other parties.

Thus, there are very narrow limits for when Danish tax authorities can override a duly registered and fully taxable foreign company and as stated in the answer to question 6 regarding bill L 30, there are no examples of Danish tax authorities refusing to recognize a foreign holding company and thus considering it a nullity.

The Minister of Taxation clarified the above answer in a revised answer to the Danish Parliament's Tax Committee on May 29, 2007 as follows:

"A holding company cannot be equated with an agent or an intermediary. Such a company is registered and fully taxable in the country in which it is domiciled - and the starting point is that a holding company is entitled to contractual protection.

However, it follows from paragraph 12.1 of the commentary to Article 10 of the OECD Model (dividends) that pure flow-through companies should not be considered to be the beneficial owner of the dividend.

Pass-through companies effectively have very narrow powers in relation to the income in question, making it a "nullity" or an administrator acting on behalf of other parties.

It depends on a specific assessment whether a holding company is a flow-through company."

*Legislation on taxation of interest and royalties*

Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States states, inter alia:

*"Article 1*
*Scope and procedure*

1. Payments of interest or royalties arising in a Member State shall be exempt from any form of tax in that State, whether collected by deduction at source or by assessment, provided that the beneficial owner of such interest or royalties is a company of another Member State or a permanent establishment situated in another Member State of a company of a Member State.

...

4. A company of a Member State shall be considered the beneficial owner of interest or royalties only if it receives such payments for its own use and not as an intermediary, including as agent, mandatary or authorized signatory for another person.

...

*Article 5*
*Fraud and*
*abuse*

1. This Directive shall not preclude the application of national or collective provisions to combat fraud or abuse.

2. Member States may revoke benefits under this Directive or refuse to apply this Directive in the case of transactions for which tax evasion, avoidance or abuse is the principal motive or one of the principal motives." By bill no. L 119 of December 17, 2003, the Minister of Taxation proposed an amendment to, among other things, section 2(1) of the Danish Corporation Tax Act by inserting a point d with the following wording:

"receives interest from sources in this country concerning debt which a company or an association etc. covered by section 1 or point a has to foreign legal persons as mentioned in section 3 B of the Tax Control Act (controlled debt). However, this does not apply to interest on receivables linked to a permanent establishment covered by point a. The tax liability does not include interest if the taxation of the interest is to be waived or

reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalties paid between associated companies in different Member States, or under a double taxation agreement.

agreement with the Faroe Islands, Greenland or the state in which the receiving company etc. is resident. However, this only applies if the paying company and the receiving company are associated as mentioned in this Directive for a continuous period of at least 1 year, within which the time of payment must fall."

The comments to the bill state that the purpose was, among other things, to limit the possibilities for tax planning by deducting intra-group interest when the receiving group company pays no or very little tax on the interest that is deducted.

when calculating Danish taxable income, however, so that the limited tax liability would not include interest covered by the Interest/Royalty Directive or a double taxation agreement.

On 17 February 2004, the Minister of Taxation submitted comments to the Danish Parliament's Tax Committee regarding a request from the Association of State Authorized

**1624**

Auditors on the proposed provision. This states, among other things:

*"Comment:*

...

However, it is necessary to limit the possibilities for tax planning by reducing Danish taxation on interest payments to a foreign group company that pays no or very low tax on the interest received.

The proposed withholding tax on interest is therefore targeted so that it does not cover all interest payments abroad. The withholding tax only applies to interest payments to certain financial companies in countries that are not covered by the EU Interest/Royalty Directive or do not have a double tax treaty that requires Denmark to reduce Danish tax on interest payments to that country. ...

Admittedly, this opens up the risk that, for example, a Danish company may seek to avoid the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation treaty, which does not have withholding tax on interest payments to foreign interest recipients, after which this company pays the interest to the company in the low-tax country.

In such cases, however, the Danish tax authorities will, after a specific assessment of the facts, be able to assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest payment is not covered by the EU Interest/Royalty Directive or the double taxation treaty.

According to Article 5(2) of the Interest/Royalty Directive, an EU country may refuse to apply the Directive in the case of transactions which have tax evasion, avoidance or abuse as a significant motive.

The notes to the OECD Model Double Taxation Conventions also allow a state not to apply a treaty in special cases, see the section on treaty abuse in the notes to Article 1 of the Model."

On March 8, 2004, the Minister of Taxation submitted a response to the Danish Parliament's Tax Committee regarding the proposed legislation. This states, among other things:

*"Question 47:* Will the Minister state how many holding companies of the type mentioned in Jan Larsen's inquiry are governed in Denmark, i.e. holding companies that are owned by foreign companies and that own subsidiaries abroad, while there is no actual business activity in Denmark?

*Answer.*

Since the study was initiated in 2000, the holding rules have been changed. The change was made by law no. 282 of April 25, 2001 (L 99, 2000/01).

...

The method to avoid the dividend tax was to incorporate a Danish holding company (a flow-through company).

...

The change ensures that the Danish holding rules no longer provide tax exemption for distributions to countries outside the EU with which Denmark does not have a double taxation agreement (including tax shelter countries).

...

Thus, there no longer seems to be the same need for the study as when it was initiated. This is because the legislative amendment has to a significant extent removed the exploitation opportunities that formed the basis for the criticism of the Danish holding rules.

...

Finally, there aren't many corrections to be gained from an equation or audit of the flow-through companies.

The need for a new investigation is less than when the original investigation was initiated. This is because the rules have been changed so that the opportunities for abuse have been significantly reduced, cf. the above-mentioned changes to the law in 2001. Furthermore, a renewed investigation will - like the investigation that has now been completed - require considerable resources. Resources that will be diverted from the control resources.

In addition, based on the experience gained from the investigation, it must be assumed that there is no guarantee that a credible result could be obtained if the investigation continued. It is therefore my opinion that a reinvestigation should not be initiated."

On March 22, 2004, the Minister of Taxation submitted a reply to the Parliamentary Tax Committee regarding the proposed legislation. This states, among other things:

*"Question 54.* Can the Minister confirm that even after the latest changes to the rules for holding companies, and after the adoption of this bill, it will be the case that distributions and interest payments to holding companies in Cyprus will be tax-free (i.e. without Danish dividend tax), even though interest and dividends will not be taxed in Cyprus?

*Answer:* As far as dividends are concerned, the Corporation Tax Act

§ Section 2(1)(c) states that, as a general rule, Denmark taxes a foreign company on dividends from a Danish company at 28% of the gross amount of the dividend. However, according to the same rule, Denmark does not tax a foreign parent company on dividends if the taxation is to be waived or reduced under the EU Parent-Subsidiary Directive or a double taxation treaty.

According to Article 10 of the Danish-Cypriot double tax treaty, Denmark may tax dividends distributed by a Danish company to a company in Cyprus. If the Cypriot company owns at least 25 percent of the

**1625**

Danish company, the Danish tax may not exceed 10 percent of the gross amount of the dividend. In other cases, the tax may not exceed 15%.

The double taxation treaty thus entails that Denmark must reduce the taxation of dividends from a Danish company to a parent company in Cyprus. Section 2(1)(c) of the Danish Corporation Tax Act then means that Denmark does not tax the dividend.

This bill does not affect section 2(1)(c) of the Danish Corporation Tax Act.

The double taxation treaty means that Denmark must reduce the taxation of interest received by a company in Cyprus

Copyright © 2023 Karnov Group Denmark A/S

receives from sources in Denmark. The proposed rules in section 2(1)(d) of the Danish Corporation Tax Act means that Denmark does not tax the interest.

Cyprus will become a member of the EU in the near future. This will mean that Denmark will have to waive the taxation of dividends and interest according to the Parent/Subsidiary Directive and the Interest Directive.

/In accordance with the Royalties Directive, Denmark will not collect withholding tax, even if Denmark wishes to do so. Finally, it should be noted that, as far as I can see, the Danish treasury does not suffer any loss of revenue from the fact that flow-through companies are located in Denmark."

*Double taxation treaties*

*The agreements with Cyprus, Luxembourg and the US*

The agreement of May 26, 1981 with Cyprus for the avoidance of double taxation with respect to taxes on income and capital states, inter alia:

*"Article 3.*
*Common definitions*

...

*Paragraph 2. As* regards the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

...

*Article 10.*
*Dividends*

Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the dividends, exceed:

a) 10 percent of the gross amount of the dividend if the beneficial owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b) 15% of the gross amount of the proceeds in all other cases."

The Convention of November 17, 1980 with Luxembourg for the avoidance of double taxation and the establishment of provisions for mutual administrative assistance in respect of taxes on income and capital states, inter alia:

*"Article 3.*
*Common definitions*

...

*Paragraph 2.* As regards the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

...

*Article 10.*
*Dividends*

Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the

dividends, exceed:

a) 5 percent of the gross amount of the dividend if the beneficial owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b) 15% of the gross amount of the proceeds in all other cases."

The Convention of August 19, 1999 with the United States of America for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income states, inter alia:

*"Article 3.*
*Common definitions*

...

*Paragraph 2.* As regards the application at any time of this Agreement in a Contracting State, unless the context otherwise requires or the competent authorities agree on a common meaning in accordance with the provisions of Article 25 (Procedure for the conclusion of reciprocal agreements), any term not defined in the Agreement shall have the meaning which it has at that time under the laws of that State concerning the taxes to which the Agreement applies, any meaning under the applicable tax laws of that State prevailing over a meaning under other laws of that State.

...

**1626**

*Article*
*10.*
*Dividen*
*ds*

*Paragraph 1.* Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

a) 5 percent of the gross amount of the dividend if the beneficial owner is a company that directly owns at least 10 percent of the share capital of the company paying the dividend;

b) 15% of the gross amount of the dividend in all other cases."

*OECD model double tax treaty with countries*

The OECD Model Double Taxation Convention on Income and Capital (1977) states, among other things:

"Article 3
Common definitions...

2. As regards the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies. ...

*Article*
*10*
*Dividen*
*ds*

Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the dividends, exceed:

a) 5 percent of the gross amount of the dividend if the

beneficial owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b) 15 % of the gross amount of the proceeds in all other cases." The English wording of Article 10 was as follows:

"Dividends

1    Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the low of that

1 State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed:

a)    ...

b)    ....

The OECD's comments on this state, among other things:

"*ABUSE OF THE COLLECTIVE AGREEMENT*

7. The purpose of double taxation conventions is to facilitate, through the elimination of international double taxation, the exchange of goods and services and the movement of capital and natural and legal persons. However, they should not assist tax avoidance or evasion. While it is true that, apart from double taxation conventions, taxpayers have the possibility of taking advantage of differences in tax levels between States and the tax advantages resulting from the tax laws of different countries, it is up to the States concerned to adopt provisions in their national legislation to counteract possible artifices. Consequently, such States will want to maintain the application of such provisions in their domestic laws in their bilateral double tax treaties.

8. In addition, the expansion of the network of double taxation treaties reinforces the effect of such artifices by making it possible, through the creation of usually elaborate legal constructions, to benefit both from the advantages resulting from certain national laws and from the tax reductions resulting from double taxation treaties.

9. This would be the case, for example, where a person (whether a resident of a Contracting State or not) disposes through a legal association formed in a State primarily to obtain benefits under the agreement that could not be obtained by the person directly. Another case would be where an individual in a Contracting State has both a permanent home and all his economic interests, including a substantial interest in a company in that State, and essentially to sell the interest and avoid taxation of capital gains in that State on the sale (as a result of Article 13(4)), transferred his permanent home to the other Contracting State where such gains were subject to low or no taxation.

10. Some of these situations are addressed in the Agreement, e.g. by introducing the concept of "beneficial owner" (in Articles 10, 11 and 12) and special provisions for the so-called performers' societies (Article 17(2)). Such problems are also mentioned in the comments on Articles 10 (points 17 and 22), 11 (point 12) and 12 (point 7). It may be appropriate for Contracting States to agree in bilateral negotiations that

**1627**

tax relief does not apply in certain cases, or to agree that the application of national anti-avoidance laws is not affected by the agreement.

...

*COMMENT ON ARTICLE 10*
*REGARDING TAXATION OF DIVIDENDS*
...

12. Under paragraph 2, the limitation on the source State's right of taxation cannot be applied when an intermediary, such as an agent or nominee, is interposed between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. States that wish to express this more clearly are free to do so during bilateral negotiations.

...

22. Attention is generally drawn to the following cases: The beneficial owner of dividends arising in a Contracting State is a company which is a resident of the other Contracting State. All or part of its capital is owned by shareholders resident outside that other State. Its practice is not to distribute its profits in the form of dividends and it enjoys favorable tax treatment (private investment company, basic company). The question may arise whether, in the case of such a company, it is justified in the source State of the dividends to grant the restriction on taxation provided for in paragraph 2. It seems advisable, when bilateral negotiations are conducted, to agree on specific exceptions to the taxation rule laid down in this Article in order to determine the treatment to be applied to such companies."

The OECD Model Agreement of 2003 reads as follows:

"Article 3
Common definitions
...

2. As regards the application of the Agreement at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has at that time under the law of that State concerning the taxes to which the Agreement applies. Any meaning in the tax laws applicable in that State shall prevail over any meaning which that term may have under the other laws of that State. ...

Article 10
Dividends

1. Dividends paid by a company which is a resident of one of the Contracting States to a resident of the other Contracting State may be taxed in that State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State the tax imposed shall not exceed

a) 5 percent of the gross dividend if the eligible recipient is a company (other than a partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b) 15% of the gross yield in all other cases."

...

Comments on the OECD Model Agreement

...

*Abuse of the collective agreement*

9.6 The possibility to apply general anti-abuse provisions does not mean that there is no need for tax treaties to include specific provisions aimed at preventing particular forms of tax avoidance. Where particular techniques of tax avoidance have been identified or where the use of such techniques is particularly problematic, it will often be useful to include provisions in the agreement that focus directly on the relevant avoidance strategy. This will also be necessary in cases where a State advocating the view described in paragraph 9.2 above considers that its domestic law lacks the anti-abuse rules or principles necessary to properly address such a strategy.

10. For example, some forms of tax avoidance are already explicitly addressed in the agreement, such as the introduction of the concept of

"beneficial owner" (in Articles 10, 11 and 12) and in specific provisions such as Article 17(2), which deals with the so-called artist companies. Such problems are also mentioned in the comments to Art. 10 (points 17 and 22), Art. 11 (point 12) and Art. 12 (point 7).

...

OECD commentary on Article 10 on taxation of dividends

...

12. The requirement of beneficial ownership was inserted in Article 10(2) to clarify the meaning of the words "paid....to a resident person" as used in paragraph 2 of the article.

1. This makes it clear that the source state is not obliged to waive its right to tax dividend income merely because the income was paid directly to a resident of a state with which the source state has concluded a treaty. The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including the avoidance of double taxation and the prevention of tax avoidance and evasion.

12.1 Where income is paid to a resident of a Contracting State who is acting

**1628**

in its capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption solely on the basis of the immediate recipient's status as a resident of the other Contracting State. The immediate recipient of the income in this situation is a resident of the other State, but no double taxation arises as a result since the recipient is not considered the owner of the income for tax purposes in the State of which he is a resident. It would also be inconsistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State, other than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report prepared by the Committee on Fiscal Affairs concludes

"Double Taxation Conventions and the Use of Conduit Companies" that a "conduit company" cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

12.2 Subject to the other conditions of the Article, the limitation on the taxing rights of the source State continues to exist when an agent or an intermediary, resident in a Contracting State or in a third State, is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is consistent with the understanding of all member States). States wishing to express this more clearly are free to do so in bilateral acts.

The English version of clause 12.2 reads as follows:

"Subject to the other conditions imposed by the Article, the limitation of tax in the State of source remains available when an inter- mediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State...".

The OECD's comments of 2014 to Article 10 of the Model Agreement state, among other things:

"12.4 In these various examples (agent, intermediary, conduit company in its capacity as nominee or trustee), the direct recipient of dividends is not the "beneficial owner" because the recipient's right to use and enjoy the dividends is limited by contractual or legal obligations to pass on the payments received to another person. Such an obligation will usually be evidenced by relevant legal documents, but may also be present by virtue of factual circumstances that clearly show that the recipient substantially does not have the rights to use and enjoy the proceeds without being bound by a contractual or legal obligation to pass on the payments received to another person. This type of obligation does not include contractual or legal obligations that are not conditional on the onward payment by the direct recipient, such as an obligation that is not dependent on the receipt of such payment and that the direct recipient has as a debtor or as a party to financial transactions, or customary distribution obligations under a pension agreement or to collective investment entities that would be entitled to collective bargaining benefits under the principles set out in paragraphs 6.8 to 6.34 of the commentary to Art.

1. Where the recipient of a dividend has the right to use and enjoy the dividend, without being bound by contractual or legal obligations to pass on the payments he has received to another person, the recipient is the "beneficial owner" of those dividends. It should also be noted that Art. 10 refers to the beneficial owner of the dividends as opposed to the owner of the shares and they may be different in certain situations.

12.5 However, the fact that the recipient of a dividend is deemed to be the beneficial owner of such dividend does not mean that the provisions of paragraph 2 shall automatically apply. The benefits of these provisions should not be granted in case of abuse (see also paragraphs 17 and 22 below). As explained in the section "Abuse of the treaty" in the commentary to Article 1, there are many ways to treat a conduit company, and generally treaty shopping situations. These include specific anti-abuse provisions in agreements, general anti-abuse provisions, and content-over-form or economic-substance approaches. While

While the "beneficial owner" concept includes some forms of tax avoidance (i.e. the type involving the insertion of a recipient who is obliged to pass on the royalties to another person), there are other types that are not covered; it does not include other forms of treaty shopping, and therefore it must not be regarded as a concept that in any way limits the application of other principles concerning such matters."

*Relevant legislation implemented after the decisions of the National Tax Tribunal Council Directive 2015/121/EU of 27 January 2015 amending Directive 2011/96/EU on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States*

**1629**

The directive states, among other things:

"Whereas:

...

(9) This Directive should in no way affect the possibility for Member States to apply their domestic provisions or conventions aimed at preventing tax evasion, tax fraud or abuse.

...

*Article 1*

In Directive 2011/96/EU, Article 1(2) is replaced by the following paragraphs:

"2. Member States shall not grant the benefits of this Directive to arrangements or series of arrangements which are designed for the principal purpose, or which have as one of their principal purposes, of obtaining a tax advantage which would operate against the content or purpose of this Directive and which are not genuine in the light of all the relevant facts and circumstances.

An event can include multiple steps or parts.

3. For the purposes of paragraph 2, events or series of events shall be considered not to be genuine to the extent that they are not organized for well-founded commercial reasons reflecting economic reality.

4. This Directive shall not prevent the application of domestic provisions or agreements necessary to prevent tax evasion, tax fraud and abuse."

The directive amendment was implemented in Danish law by Act no. 540 of April 29, 2015 amending the Tax Assessment Act as follows:

"*1.* In the *footnote* to the title of the Act, the following *second* and *third sentences are* added: "The Act contains provisions implementing parts of Council Directive 2011/96/EU of 30 November 2011 on a common taxation regime for parent companies and subsidiaries of different Member States, Official Journal of the EU 2011, No L 345, page 8, as amended. The Act contains provisions implementing parts of Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States, Official Journal of the EU 2003, no. L 157, page 49, as amended."

*2.* After § 2 is inserted:

"*§ 3.* Taxpayers do not enjoy the benefits resulting from Directive 2011/96/EU on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States and Directive 2009/133/EC on the common system of taxation applicable to mergers, divisions, partial divisions, transfers of assets and exchanges of shares concerning companies of different Member States and on the transfer of the registered office of an SE or SCE between Member States as implemented in Danish law, to arrangements or series of arrangements which are designed with the principal purpose or one of the principal purposes of obtaining a tax advantage which is contrary to the content or purpose of the Directives and which are not genuine taking into account all relevant facts and circumstances. An arrangement may comprise several steps or parts.

*Paragraph 2.* For the purposes of subsection (1), events or series of events are considered not real to the extent that they are not organized for well-founded commercial reasons that reflect economic reality. *Paragraph 3.* A taxpayer shall not benefit from a double taxation convention if it is reasonable to conclude, taking into account all relevant facts and circumstances, that the obtaining of the benefit is one of the essential purposes of any arrangement or transaction which directly or indirectly gives rise to the benefit, unless it is established that the granting of the benefit in those circumstances would be consistent with the substance and purpose of the relevant provision of the convention.

*Paragraph 4.* Notwithstanding paragraph 3, paragraphs 1 and 2 shall apply when assessing whether a taxpayer is excluded from the benefit of a provision of a double taxation agreement with an EU Member State if the taxpayer could alternatively claim a benefit under one of the Directives on direct taxation."

The underlying bill (bill no. L 167 of March 20, 2015) states,

among other things:

"*3.3.4. Applicable law*

There is no general statutory anti-abuse rule in Danish tax legislation. According to Danish (legal) practice, taxation takes place after an assessment has been made of what has actually happened. This means that empty and artificial tax-related transactions can be set aside, so that taxation is instead based on the opposite reality. Danish tax law is thus fundamentally in line with internationally applicable principles of "substance over form".

The adopted amendment of the Parent-Subsidiary Directive implies that a generally worded provision on combating abuse of the Parent-Subsidiary Directive must be included in tax legislation. It is assessed that the new provision in the directive could have a broader scope of application than the current (legal) practice. ...

*3. 3.5. The proposed legislation*

It is proposed that an international anti-avoidance clause be introduced in Danish tax legislation to combat abuse in connection with cross-border transactions covered by the Parent-Subsidiary Directive.

The circumvention clause is an implementation of an amendment to the directive adopted at the EU Council meeting on January 27, 2015.

**1630**

...

Finally, it is proposed that the entry into force must take place before the deadline set out in the Parent-Subsidiary Directive. It is proposed that both avoidance clauses will take effect for transactions, arrangements or series of arrangements as of May 1, 2015.

The introduction of a circumvention clause does not limit the existing possibilities to override or re-qualify on other grounds.

...

*Comments on the individual provisions of the bill*

...

On November 25, 2013, the European Commission has in a published memo given the following example where the circumvention clause will apply:

Parent company in country C (non-

EU) Subsidiary in country B (EU)

Subsidiary in country A (EU)

According to internal rules in country A, withholding tax must be withheld on dividends to parent companies domiciled outside the EU. This means that if the company in country A is directly owned by the company in country C, any dividend distribution must be taxed at source in country A.

In country B, there is no similar rule on withholding tax on dividends to non-EU parent companies.

If the parent company in country C contributes a holding company in country B, i.e. between A and C, it is possible to avoid the withholding tax on dividends to country C, as the Parent-Subsidiary Directive does not allow withholding tax on dividends between subsidiaries and parent companies resident in the EU, i.e. between countries A and B.

If the main purpose or one of the main purposes of the incorporation of the company in country B has been to avoid withholding tax on dividends from the subsidiary in country A, e.g. because the subsidiary in country B is a so-called "mailbox company" without much substance, country A will be able to deny the subsidiary the benefits of the Parent-Subsidiary Directive and withhold tax on the distribution with reference to the avoidance clause.

In relation to the above example, it should be noted that this is basically a classic flow-through example, which is already

covered by the rule in section 2(1)(c) of the Danish Corporation Tax Act, as the subsidiary in country B cannot be considered to be the beneficial owner of the dividend. It should be noted that there are a number of cases pending before the courts on this very issue.

U.2023.1575H

If the objective analysis of all relevant facts and circumstances instead shows that an event or parts thereof are organized for well-founded commercial reasons reflecting economic reality, this will be a genuine arrangement and the circumvention clause will therefore not apply, cf. paragraph 2.

Paragraph 3 further proposes that the benefits of a double tax treaty shall be lost if it is reasonable to conclude, taking into account all relevant facts and circumstances, that the obtaining of the benefit is one of the essential purposes of any arrangement or transaction which directly or indirectly gives rise to the benefit, unless it is established that the granting of the benefit in those circumstances would be consistent with the substance and purpose of the relevant provision of the treaty."

*Council Directive 2016/1164/EU of 12 July 2016 laying down rules for combating tax avoidance practices that directly affect the functioning of the internal market*

The directive states, among other things:

"*Article 1*
*Scope of application*

This Directive shall apply to all taxable persons liable to corporate tax in one or more Member States, including permanent establishments in one or more Member States of entities resident for tax purposes in a third country.

...

*Article 3 Minimum level*
*of protection*

This Directive shall not preclude the application of national or treaty-based provisions aimed at ensuring a higher level of protection for national corporate tax bases.

...

*Article 6*
*General anti-abuse rule*

1. When calculating the corporate tax liability, a Member State shall disregard arrangements or series of arrangements which are designed with the main purpose, or which have as one of their main purposes, the obtaining of a tax advantage which defeats the object and purpose of the applicable tax law and which are not genuine taking into account all relevant facts and circumstances. An arrangement may include several steps or parts.

2. For the purposes of paragraph 1, events or series of events shall be considered not to be genuine to the extent that they are not organized for well-founded commercial reasons reflecting economic reality.

3. If events or series of events referred to in paragraph 1 are disregarded, the tax liability shall be calculated in accordance with national law.

*Act no. 327 of March 30, 2019 on the application of the multilateral convention for the implementation of measures in double taxation laws to prevent tax erosion and profit shifting* By this Act, the provisions of the multilateral convention of November 24, 2016 for the implementation of measures in double taxation treaties to

**1631**

Prevention of Tax Erosion and Profit Shifting, cf. Annex 1 of the Act, with effect from July 1, 2019, made applicable to, inter alia, the double taxation agreements mentioned in Annex 3 of the Act, including the agreement of October 11, 2010 between the Kingdom of Denmark and the Republic of Cyprus for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income. It is stated that Cyprus has acceded to the Convention.

Article 7 of the Convention states:

'Article            7(11)
Prevention of abuse of contracts

1. Notwithstanding any other provision of a covered tax treaty, no benefit shall be given under the covered tax treaty with respect to income or capital if, having regard to all relevant facts and circumstances, it is reasonable to assume that the obtaining of that benefit was one of the main purposes of any arrangement or transaction which directly or indirectly gave rise to that benefit, unless it is shown that the obtaining of that benefit in those circumstances would be consistent with the object and purpose of the relevant provisions of the covered tax treaty."

## V. Requester

*B-1980-12 Skatteministeriet v NetApp Denmark ApS* In its summary pleading of January 11, 2021, the *Ministry of Taxation* has stated, inter alia:

"*NetApp Cyprus was taxable on the dividends*

According to section 2(1)(c) of the Danish Corporation Tax Act, companies and associations etc. as mentioned in the Act are liable for tax under the Act

§ Section 1(1), which are domiciled abroad, insofar as they receive dividends covered by section 16 A(1) of the Danish Tax Assessment Act, to which the dividends at issue in the case can be attributed. The tax liability does not (however) include dividends received by a company etc. (the parent company) that owns at least 20 percent (now 10 percent.) of the share capital in the dividend-giving company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie, on the "condition" that "the taxation of the dividend shall be waived or reduced under the provisions of the [Parent/Subsidiary Directive] or under a double taxation treaty with the Faroe Islands, Greenland or the state where the company is resident."

Thus, it appears from the wording of the provision that the exemption from tax liability is only applicable if there is an unconditional obligation to waive or reduce taxation under the Parent-Subsidiary Directive or a double taxation treaty. In other words, if such an obligation does not follow from the directive or a double taxation treaty, the parent company is liable to tax in Denmark on the dividend. The legislative history of the provision does not provide any basis for a different understanding of the provision - on the contrary. According to the proposed bill [...], an exemption from tax liability was only conditional on "the parent company being resident in a state that is a member of the EU, a state with which Denmark has a double taxation treaty, the Faroe Islands or Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2 of the [Parent-Subsidiary Directive]."

As can be seen, according to the proposed bill - in addition to the subsidiary being a company in a Member State - it would be sufficient if the parent company was domiciled in the EU or in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland. However, the bill was not adopted in its proposed form on this point. Therefore, NetApp Denmark's invocation of the Minister of Taxation's reply of January 10, 20001 to the Danish Parliament's Tax Committee, Appendix 22 to Bill No. 99 of November 10, 2000 [...] and the Minister's reply of January 11, 2001, Appendix 24 to the proposed bill [...] are also irrelevant, as the questions answered were asked in connection with the (originally) proposed, but on this point not adopted bill.

After the Danish Parliament had considered the submitted bill, the Minister of Taxation submitted the (amendment) proposal that was actually adopted [...].

The comments to the amendment state that the amendment aimed to clarify that it is a "condition" for the proposed tax exemption that Denmark "shall" waive the taxation of the dividend in question under the provisions of the Parent-Subsidiary Directive or that Denmark "shall" waive or reduce the taxation of the dividend in question under the provisions of a double taxation treaty [...].

The bottom line is that neither the wording of section 2(1)(c) of the Corporation Tax Act nor the comments on the proposal that was actually adopted leave any doubt that the parent company is only entitled to an exemption from tax liability if the company either meets the conditions of the parent company/division. 1(c) of the Danish Corporation Tax Act or the comments to the proposal that was actually adopted leave any doubt that the parent company is only entitled to an exemption from tax liability if the company either meets the conditions in the Parent-Subsidiary Directive for exemption from withholding tax or meets the conditions in a double taxation agreement with the Faroe Islands, Greenland or the state where the company is resident in order for Denmark to waive or reduce taxation. Thus, it is not sufficient that the parent company is resident in a state that is a member of the EU, a state with which Denmark has a double taxation treaty, the Faroe Islands or Greenland.

As will be explained below, Denmark has either been obliged to waive the taxation of the dividends referred to in this case under the Parent-Subsidiary Directive or been obliged to waive or reduce the taxation under the Danish-Cypriot double taxation treaty.

**1632**

[...] *Taxation shall not be reduced or waived pursuant to the Parent-Subsidiary Directive*

The taxation of the dividends at issue in the case must not be waived under the Parent-Subsidiary Directive, since NetApp Cyprus cannot rely on the advantage of exemption from withholding tax provided for in Article 5(1) of the Directive, if only because there is an abuse of rights.

*[...] There is a legal basis for countering abuse of rights*

Article 1(2) of the Parent-Subsidiary Directive provides that the Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse [...].

A national provision such as section 2(1)(c) of the Danish Corporation Tax Act is precisely such an internal provision within the meaning of Article 1(2) of the Directive, according to which a benefit under the Directive may be refused if the benefit is sought to be obtained by fraud or abuse.

The wording of section 2(1)(c) of the Danish Corporation Tax Act explicitly states that it is a condition for waiving withholding tax that Denmark is obliged to do so under the Parent-Subsidiary Directive or a double taxation treaty, cf. the word "must". Such an obligation to waive taxation does not exist in cases of abuse. The Court of Justice has long established that EU law (then referred to as "Community law") cannot be invoked for the purpose of enabling abuse, see, for example, the judgment in Case C-212/97, Centros, paragraph 24 and case law cited therein [...]. Therefore, section 2(1)(c) of the Danish Corporation Tax Act contains, according to its wording, a legal basis for denying the benefit of the Parent-Subsidiary Directive in the form of exemption from taxation in the source state if there is an abuse of law, as the Directive in such a case does not entail that the source state "must" waive the taxation.

In addition, Article 10(2) of the Danish-Cypriot Double Taxation Treaty [...] is a treaty provision to combat abuse, as the source country shall only reduce the taxation of a dividend if the

"legal owner of the dividend" is resident in the other contracting state, and as the application of this criterion for the allocation of taxing rights serves precisely to combat abuse of rights, see further below.

Finally, Danish case law has developed general principles to counteract abuse that apply in cases that fall outside the practice which, according to the legal literature, expresses the application of a so-called "reality principle". Thus, it follows from Supreme Court case law that transactions which - as in the present case - have been formally arranged in such a way that an intended, favorable tax rule applies, can be set aside for tax purposes when the granting of the benefit would be improper and when the transactions, in the words of the Supreme Court, for example "do not have the character of normal commercial transactions", cf. U.1998.254H [...], "have no commercial purpose", cf. U.2005.649H [...] or "have no commercial justification", cf. U.2015.2277H [...]. The Supreme Court has also set aside tax arrangements without using similar terms, see for example U.1999.1714H [...].

Against this background, there is ample legal basis in national law to counteract abuse, but a decision on the case does not necessitate a position on this contentious issue.

The judgment of the Court of Justice in this case [...It is apparent from the judgment of the Court of Justice in this case that, in response to the first question referred for a preliminary ruling by the High Court, the Court of Justice stated that the general principle of EU law that individuals may not rely on provisions of EU law in order to enable fraud or abuse must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxpayer the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of the Parent-Subsidiary Directive, even in the absence of national or treaty provisions providing for such a refusal, cf. See, to that effect, paragraph 95 of the judgment and paragraphs 75-94, on which the answer is based.

It is not a question of the Court of Justice having created a (new) legal position with its answer to the High Court's first question for a preliminary ruling that did not apply prior to the judgment, or of the Court of Justice having changed its previous practice, as expressed in, inter alia, Case C-321/05 Kofoed, see the judgment in the present case, paragraphs 84-90. With this judgment, however, the Court has - within the framework of the jurisdiction conferred on it by Article 267 TFEU - clarified the meaning and scope of the principle of prohibition of abuse of rights, as that principle must be applied to the present case.

Furthermore, it is not the case that the Court of Justice, with its judgment, has established an interpretation of the Parent-Subsidiary Directive which means that the Directive - in itself - creates obligations for citizens, which would have been incompatible with the principle of legal certainty. In cases where there is an abuse of rights and the citizen is denied a benefit under EU law for this reason, it is thus not a case of an obligation being imposed on the citizen under EU law. Rather, the objective conditions for obtaining an advantage under EU law are not fulfilled because the advantage is sought through abuse of rights (paragraph 90 of the judgment).

It also follows from the Court's judgment that the EU law principle of legal certainty does not prevent

**1633**

to deny the benefit of the Parent-Subsidiary Directive in the form of exemption from withholding tax where there is an abuse of rights, which is also expressly stated in the judgment of the Court of Justice in case C-251/16, Cussens, paragraph 43 [...].

With regard to NetApp Denmark's reliance on Article 43 of the EC Treaty (now Article 49 TFEU), it should be noted that, in a situation where the withholding tax exemption scheme for

dividends under the Parent-Subsidiary Directive is not applicable as a result of a finding of fraud or abuse, the application of the freedoms guaranteed by the Treaty cannot (also) be invoked for

to challenge the legislation of the source state governing the taxation of dividends (paragraphs 121-123 of the judgment and point 5 of the operative part of the judgment).

Finally, it is not contrary to the Act on Denmark's accession to the European Union to deny the benefits of the Parent-Subsidiary Directive with reference to the general EU law principle of prohibition of abuse of rights. The present situation is thus not comparable to the situation that gave rise to the Supreme Court's judgment reproduced in U.2017.824H, Ajos [...], on which NetApp Denmark relies.

[...]

In order to decide the case, the Supreme Court referred questions for a preliminary ruling to the Court of Justice, which ruled, inter alia, that the general principle of non-discrimination on grounds of age, of which Council Directive 2000/78/EC (establishing a general framework for equal treatment in employment and occupation) is a concrete expression, must be interpreted as meaning that it - also in a dispute between private individuals - precludes national legislation corresponding to section 2a(3) of the Danish Salaried Employees Act.

In the premises for its judgment, the Supreme Court stated that the legal position resulting from section 2a(3) of the Danish Salaried Employees Act - as the provision had been interpreted in case law and which interpretation had been used by the legislature in subsequent amendments to the Act - was clear, and that it is not possible, using the interpretation methods recognized in Danish law, to interpret the provision in accordance with the Employment Directive, as interpreted by the Court of Justice. In the words of the Supreme Court, there was thus a "contra legems situation".

As such a situation existed, the Supreme Court had to decide whether the general EU law principle of non-discrimination on the grounds of age could be given effect in Danish law to the effect that it prevails over a conflicting national provision, including in disputes between private parties. According to the Supreme Court, a decision on this question depended on an interpretation of the Act on Denmark's accession to the European Union. The Supreme Court concluded that the Act of Accession does not contain a legal basis - in a dispute between private parties - to allow the unwritten principle of prohibition of discrimination on the basis of age to supersede the current provision in section 2a(3) of the Danish Salaried Employees Act to the extent that the provision is contrary to the prohibition.

The present case is fundamentally different from Ajos, since there is no 'contra legem situation'.

The Parent-Subsidiary Directive has been implemented in Danish law in the simplest way imaginable, namely by reference to the Directive. Thus, as described above, it follows from the wording of section 2(1)(c) of the Danish Corporation Tax Act that dividends are subject to a tax liability unless "the taxation of the dividends shall be waived or reduced in accordance with the provisions of the [Parent-Subsidiary Directive]". By virtue of this reference to the Directive, it is clear that the issue of exemption from taxation of dividends falls within the scope of EU law.

An exemption from tax liability is thus conditional on the directive obliging Denmark to waive taxation in the given case. Whether such an obligation exists therefore depends on an interpretation of EU law. As the Supreme Court also held in the Ajos case, such an interpretation falls within the jurisdiction of the Court of Justice pursuant to Article 267 TFEU.

The fact that the implementation of the Parent-Subsidiary Directive as regards taxation of dividends is solved by a simple reference to the Directive in section 2(1)(c) of the Danish

Corporation Tax Act has as a logical consequence that the existence of a "contra legem situation" is excluded. The reference thus makes it unproblematic to apply an interpretation of the

Section 2(1)(c) of the Danish Corporation Tax Act, which is in accordance with the Parent-Subsidiary Directive and the general principle of prohibition of abuse of rights, as the Directive and the principle are to be interpreted according to the judgment of the Court in the present case.

Against that background, section 2(1)(c) of the Danish Corporation Tax Act must be interpreted as meaning that the exemption from taxation of dividends which otherwise follows from the Parent-Subsidiary Directive must be refused if, in the given case, the exemption is sought to be obtained by abuse of rights. Since there is thus no 'contra legem situation', the present case - unlike the Ajos case - does not raise any question as to the relationship between the general EU law principle of prohibition of abuse of rights, on the one hand, and the Act of Accession of Denmark to the European Union, on the other. *[...] There is an abuse of rights*

According to the Court's judgment, in order to prove abuse, there must be a coincidence of objective circumstances showing that the objective pursued by the EU legislation has not been achieved,

**1634**

even if the conditions laid down in that legislation are formally fulfilled, and a subjective element consisting of an intention to benefit from EU law by artificially creating the conditions required to obtain that benefit (paragraph 97 of the judgment).

In the judgment, the Court has indicated the detailed principles for such an examination and made a - non-exhaustive - enumeration and description of evidence that the parent/subsidiary directive's advantage in the form of exemption from taxation of dividends in a given case is sought to be obtained by abuse.

According to the Court, in cases such as the present one, a group must be regarded as an artificial arrangement where it is not established for reasons which reflect economic reality, where it has a purely formal structure and where its main purpose or one of its main purposes is to obtain a tax advantage which is contrary to the object and purpose of the applicable tax legislation. That applies in particular where the payment of withholding tax is avoided by introducing into the group structure a flow-through entity between the company transferring the dividends and the company which is the beneficial owner of the dividends (paragraph 100).

According to the Court, the fact that a dividend is redistributed in its entirety or substantially in its entirety very shortly after receipt by the company which received it to entities which do not satisfy the conditions for the application of the Parent-Subsidiary Directive is thus evidence of an arrangement intended to take undue advantage of the exemption from taxation resulting from the Directive (paragraph 101 of the judgment).

According to the Court's judgment, the artificial nature of an arrangement can also be supported by the fact that the group in question is structured in such a way that the company receiving the dividend must itself redistribute that dividend to a third company which does not meet the conditions for application of the Parent-Subsidiary Directive, with the result that the company only receives negligible taxable income when it acts as a conduit company to enable the flow of funds from the subsidiary to the entity which is the 'beneficial owner' of the amounts transferred (paragraph 103 of the judgment).

A company can be considered a flow-through company if the company's only activity is to receive the dividend and redistribute it to the beneficial owner or to other flow-through companies, see paragraph 104 of the judgment. The (lack of)

actual economic activity must be assessed on the basis of all relevant elements concerning, inter alia, the operation of the company, its accounts, the structure of the company's costs and the expenses actually incurred,

the personnel employed by the company and the premises and equipment at its disposal.

Evidence of the existence of an artificial arrangement in a given case may also be found (1) in the existence of different contracts between the companies involved in the financial transactions in question which give rise to intra-group flows of funds, (2) in the method of financing the transactions, (3) in the assessment of the equity of the intermediate companies and (4) in the lack of power of the flow-through companies to dispose financially of the dividends received. In this context, it is not only a contractual or legal obligation for the company receiving the dividend to distribute it to a third party that may constitute such an indication. There is also a basis for abuse if, after an assessment of the facts of the case, the company has not "substantially" had the rights to use and enjoy the proceeds (paragraph 105). Circumstances such as those mentioned above may be considered to be established if there is a coincidence or close temporal connection between, on the one hand, the entry into force of new tax legislation, such as section 2(1)(c) of the Corporation Tax Act or the American Jobs Creation Act of 2004 at issue in this case, and, on the other hand, the initiation of complex financial transactions and the granting of loans within the same group (paragraph 106). Such a coincidence or close temporal connection, on the other hand, is not a necessary condition for establishing an abuse, but may, however, corroborate other evidence of the existence of an abuse.

Finally, it is irrelevant for the determination of whether there is an abuse of rights whether Denmark has concluded a double taxation treaty with the state where the beneficial owner of the dividends is resident, according to which no withholding tax would have been withheld on the dividends if they had been paid directly to the beneficial owner, cf. premises 107 ff.

When the Court's instructions are coupled with the circumstances of the present case, it must be concluded that there has been an abuse of rights.

The information available is fully sufficient to establish that the restructuring at issue in this case, whereby NetApp Cyprus was merged between NetApp Denmark and NetApp Bermuda, was not commercially motivated but had tax avoidance as one of its main purposes.

Until September 16, 2005, NetApp Denmark was, as described above, directly owned by NetApp Bermuda, which was domiciled in Bermuda. Without the restructuring, NetApp Denmark would have been subject to withholding tax on the dividends in question as Bermuda was not a member of the EU and as Denmark had not entered into a double taxation treaty with Bermuda.

**1635**

No plausible business rationale has been provided for NetApp Cyprus being split between NetApp Denmark and NetApp Bermuda. The restructuring was allegedly done because the Group did not want to maintain an ownership structure where NetApp Denmark acted as the parent company of NetApp Netherlands. However, no plausible explanation has been given as to why it - suddenly - became necessary to insert an intermediary in Cyprus rather than - continuing - to let NetApp Bermuda act as the parent company for the European part of the group. The ownership of the Dutch company could simply have been transferred to NetApp Bermuda, which would have been a much simpler way of proceeding. In that case, the group would not have had to establish and subsequently incur expenses for the administration and accounting of a company in Cyprus.

NetApp Cyprus did not engage in any activities other than holding shares in NetApp Denmark and later in NetApp Netherlands. NetApp Cyprus had - apart from an insignificant cash balance - no assets other than the shares, and the company did not have its own premises, but merely had a postal address with a management company. Finally, NetApp Cyprus had no employees, and the company did not incur any expenses other than administrative expenses of an otherwise modest amount.

While the restructuring had no business justification, it did have an obvious tax advantage. NetApp Cyprus was a 'company in a Member State' in the parent country.

/the meaning of the Parent-Subsidiary Directive. The company could therefore - unlike NetApp Bermuda - invoke the benefit of the Parent-Subsidiary Directive in the form of exemption from taxation of dividends in the source state, if one disregards the issue of abuse and the "rightful owner" of the dividends.

NetApp Cyprus had no real power to dispose financially of the dividends in question. The company could - in fact - only pay off the purchase price for the acquisition of NetApp Denmark by transferring the dividends from NetApp Denmark to NetApp Bermuda, which is what actually happened. In this respect, it speaks for itself that NetApp Cyprus transferred the amount to NetApp Bermuda as installments on the purchase price the day after receiving the dividend of more than DKK 565 million from NetApp Denmark. NetApp Denmark has not claimed or made it likely that NetApp Cyprus had other options to pay the installments to NetApp Bermuda than by transferring the amounts that the company received in dividend payments from NetApp Denmark.

Against the above background, there is therefore no doubt that the main purpose of the restructuring, whereby NetApp Cyprus was inserted between NetApp Denmark and NetApp Bermuda, was to give the latter company the benefit of the Parent-Subsidiary Directive, which it could not claim itself. As the dividends were channeled to Bermuda as repayment of the debt relationship established by the restructuring, the amount that would have been subject to withholding tax without the restructuring was made tax-free.

The fact that the restructuring was not commercially motivated but had tax avoidance as one of its main purposes is confirmed by the close temporal connection between the first and by far the largest distribution and the restructuring, which thus took place less than 14 days before the distribution was adopted at a general meeting in NetApp Denmark.

When these circumstances are considered in conjunction with the Court's guidance on the assessment of abuse, it must be concluded that there was an arrangement whose main purpose was to take undue advantage of the exemption provided for in Article 5 of the Parent-Subsidiary Directive.

The Court has thus also found (paragraph 99 of the judgment) that in this case there are "a number of indications" which provide a basis for concluding that there is an abuse of rights, but in accordance with the division of jurisdiction between the Court and the High Court as the referring court, the Court has left it to the High Court to "verify" whether these indications are objective and consistent, and whether NetApp Denmark has had the opportunity to provide counter-evidence.

Such a review must lead to a conclusion that there has been an abuse of rights. All circumstances relevant to the abuse assessment were disclosed to the Court of Justice and no other circumstances have since been established which indicate that the Court's (preliminary) assessment cannot stand up to review.

Since there is thus an abuse of rights, NetApp Cyprus is - for that reason alone - precluded from benefiting from the exemption from withholding tax provided for in Article 5 of the Parent-Subsidiary Directive. Thus, the provisions of the Directive do not lead to the dividends in question being exempt from a tax liability under the Corporation Tax Act

§ Section 2(1)(c).

*[...] The taxation shall not be reduced pursuant to the Danish-Cypriot double taxation agreement*

According to Article 10(2) of the Danish-Cypriot Double Taxation Convention, dividends may be taxed in the Contracting State in which the company paying the dividends is resident, but the tax imposed may not exceed specified limits,

"if the recipient is the beneficial owner of the dividend" [...]. According to the wording of this provision, Denmark is thus only obliged to reduce the taxation of dividends that

**1636**

is paid by a Danish company if the recipient is the "legal owner" of the dividend.

In the absence of evidence to the contrary, although Cyprus is not a member of the OECD, this concept must be interpreted in accordance with the corresponding concept in the OECD Model Tax Convention, as Article 10(2) of the Danish-Cypriot Double Taxation Convention corresponds to Article 10(2) of the Model Convention [...].

The fact that the benefit of Article 10(2) of the Model Convention can only be claimed by the beneficial owner of the dividend was introduced as an express condition when the Model Convention was revised in 1977. The condition was introduced to make it clear that the source State is not obliged to waive its right to tax dividend income merely because the income is paid directly to a resident of a State with which the source State has concluded a treaty, see the 2003 Commentary, paragraph 12 to Article 10 of the Model Convention [...].

Thus, it also follows from the 1977 Commentary, paragraphs 7-10 to Article 1 of the Model Tax Convention that the concept of "beneficial owner" is intended to curb abuses in the form of "artful legal constructions", more specifically the "artifice" whereby a person disposes, through a legal association formed in a Contracting State, primarily to obtain benefits under the Convention which could not be obtained by the person directly [...]. Accordingly, it further follows from the 1977 Commentary, paragraph 12 to Article 10, that a recipient of profits may not invoke the limitation of the right of taxation of the source State under Article 10(2) of the Model Tax Convention if the person concerned is a resident of the source State. 2 of the Model Convention if he is merely an "intermediary", such as an agent or nominee, interposed between the beneficial owner of the dividends and the payer of the dividends, unless the beneficial owner is resident in the same State as the formal recipient of the dividends [...].

The Eastern High Court has already established that the term "beneficial owner" is an autonomous concept, i.e. that it has an independent content independent of the internal legislation of the contracting states, see SKM2012.121.ØLR [...]. The term "beneficial owner" must therefore not be interpreted in accordance with the term "rightful income recipient", which in Danish tax law is used as a term for the person who is deemed to be taxable on a given income.

With the aforementioned judgment, the Eastern High Court has also already established that the tax authorities in cases such as the present case have been entitled - as happened - to include the comments to the OECD Model Tax Convention from 2003 when

determining what is to be understood by the term "beneficial owner". The later commentaries from 2014 and 2017 must similarly be considered to constitute relevant interpretative contributions, as these commentaries - like the 2003 commentaries - do not imply a changed understanding of the model agreement.

Article 10(2) of the partial agreement, but are merely clarifications.

The 2003 Commentary, paragraph 12.1 to Article 10(2) of the Model Convention states [...] that it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax "where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question." Thus, a "conduit" will not be considered the beneficial owner "if, although it is the formal owner, it has in fact very narrow powers which, in relation to the income in question, make it a 'nullity' or administrator acting on behalf of other parties."

In the 2014 Commentary, paragraph 12.4, which has been retained unchanged in the 2017 Commentary, it is clarified that the immediate recipient of the proceeds may be denied the benefit of the agreement under Article 10(2) of the Model Agreement if the facts clearly show that the recipient - without being bound by a contractual or legal obligation to pass on the payments received to another person - "substantially" does not have the rights to use and enjoy the proceeds received [...].

In the present case, the facts show with sufficient clarity that NetApp Cyprus had no or only very narrow powers to dispose of the dividend payments at issue, which it received from NetApp Denmark.

In this regard, it must be emphasized that NetApp Cyprus - without any valid business reason - was contributed between NetApp Denmark and NetApp Bermuda immediately prior to the adoption of the first and largest of the dividend distributions in question, that NetApp Cyprus did not engage in any other activities than merely holding shares in NetApp Denmark and later in NetApp Nether- lands, that NetApp Cyprus - apart from an insignificant cash holding - had no assets other than the said shares and that, as described above, the company could in reality only pay off the purchase price for the acquisition of the shares in NetApp Denmark by passing on the dividends from NetApp Denmark to NetApp Bermuda, which in fact also happened.

The circumstances set out above demonstrate that the restructuring by which NetApp Cyprus was contributed between NetApp Denmark and NetApp Bermuda was completed

**1637**

with the (main) purpose that the former company should act as "flow-through unit" for the dividends in question, which would have been taxable under section 2(1)(c) of the Danish Corporation Tax Act in the absence of the restructuring, and that the company was substantially unable to dispose of the dividends, which were intended in advance to be paid to NetApp Bermuda, which actually happened. In this respect, it speaks for itself that NetApp Cyprus transferred the amount to NetApp Bermuda as installments on the purchase price the day after receiving the dividend of more than DKK 565 million from NetApp Denmark. Against this background, it must be established that NetApp Cyprus cannot be considered the beneficial owner of the dividends in question within the meaning of Article 10(2) of the Danish-Cypriot double taxation treaty. The taxation of the dividends should therefore not be reduced under this provision. Thus, the double taxation treaty does not lead to the dividends in question being exempted from a tax liability under section 2(1)(c) of the Danish Corporation Tax Act.

*[...] The taxation shall not be reduced or waived under the Danish-US double taxation treaty*

Copyright © 2023 Karnov Group Denmark A/S

The Danish-US double taxation treaty does not provide a basis for Denmark to waive taxation of the dividends distributed by NetApp Denmark to NetApp Cyprus. According to the wording of section 2(1)(c) of the Danish Corporation Tax Act, only a double taxation treaty with the state in which the parent company is resident can lead to an exemption from tax liability. As a tax liability under the aforementioned provision is NetApp Cyprus, it is therefore only the Danish-Cypriot double taxation treaty that can lead to the dividends in question being exempt from tax liability, provided that the treaty conditions for Denmark to reduce the taxation are met.

However, in determining whether the benefit of Article 10(2) of this Convention can be invoked, it may be relevant whether the income in question has been channelled to a company resident in a State with which Denmark has concluded a double tax treaty that may oblige Denmark to grant a similar benefit.

This is because the concept of "beneficial owner" is a concept which, as mentioned, is intended to prevent abuse consisting of a person disposing through a legal person resident in a Contracting State with the main purpose of obtaining a treaty benefit which could not be obtained by the person directly. In situations where there are no indications of such abuse, because there is no withholding tax advantage associated with the intermediate company, a treaty benefit in the form of an exemption or a limitation of a tax liability to the source state should not be denied.

In the present situation, however, the dividend-receiving company (NetApp Cyprus) is merely a "flow-through entity" through which the dividends are directed to this company's parent company (NetApp Bermuda), which is resident in a state with which Denmark has not concluded a double taxation treaty and which would therefore not be able to claim a treaty benefit itself. If NetApp Cyprus had not been incorporated between NetApp Denmark and NetApp Bermuda, NetApp Bermuda would thus have been taxable to Denmark on the dividends distributed by NetApp Denmark. The situation thus differs significantly from the example invoked by NetApp Denmark in the Minister of Taxation's answer to a question about the Danish-Cypriot double taxation treaty, where the Cypriot company is assumed to be owned by a company domiciled in Russia, Belarus or Ukraine, all of which have concluded a double taxation treaty with Denmark [...].

In a situation such as the present one, where there are clear indications that the arrangement established is aimed at abusing the Danish-Cypriot double taxation treaty, the abuse cannot be refuted by referring to the fact that the dividends in question would have been redistributed to a company, resident in a state (in this case the United States) with which the source country (Denmark) has concluded a double taxation treaty and that this company - if it had been the direct recipient of the dividends - could have invoked this double taxation treaty in order to obtain an exemption from paying withholding tax.

In such a situation, strict requirements must be imposed on the proof that the arrangement (nevertheless) has not had an abuse of the Danish-Cypriot double taxation treaty as a main purpose. It is therefore incumbent on NetApp Denmark to prove that NetApp Bermuda - like NetApp Cyprus - has merely been a flow-through entity for the dividends in question. Thus, the company must provide documentation that it was decided in advance that the dividends from NetApp Denmark were to be redistributed by NetApp Bermuda, and strict requirements must be imposed on the evidence that the dividends were actually redistributed,

and that the latter had no possibility to dispose of the amount from NetApp Cyprus.

In this regard, it must be taken into account that NetApp Denmark - if in fact a prior determination had been made that a redistribution from NetApp Bermuda should take place - could easily provide evidence that such determinations were made when NetApp Denmark adopted the decisions on the

**1638**

dividends. Similarly, the company has every opportunity to document that the dividends were actually redistributed and that NetApp Bermuda had no opportunity to dispose of the dividends, if this was actually the case. NetApp Denmark has not met this burden of proof.

With respect to the dividend that NetApp Denmark declared on September 28, 2005 to NetApp Cyprus, the company has not documented that NetApp Bermuda was contractually or legally obligated to channel this dividend to NetApp USA at the time of this declaration.

Furthermore, NetApp Denmark has not in any other way demonstrated, let alone proved with certainty, that NetApp Bermuda substantially did not have the rights to use and enjoy the amount of USD 91.45 million, which NetApp Cyprus forwarded to NetApp Bermuda on October 28, 2005 - the day after receiving the amount from NetApp Denmark. Thus, there was no question of NetApp Bermuda immediately forwarding the amount to NetApp USA.

There are no general meeting minutes, board meeting minutes or other original documentation showing that on September 28, 2005, when the dividend distribution from NetApp Denmark was approved, it was decided that NetApp Bermuda should pass the money on to NetApp USA.

From the time NetApp Bermuda received the amount from NetApp Cyprus, more than 5 months passed before NetApp Bermuda distributed an amount of USD 550 million to NetApp USA and there is no evidence that NetApp Bermuda was without authority to dispose of the amount it received from NetApp Cyprus during that very long period of time.

It goes without saying that NetApp Bermuda's ownership of NetApp Denmark until September 2005 was not intended to avoid Danish withholding tax on dividends. Unlike NetApp Cyprus, NetApp Bermuda was undoubtedly not interposed between NetApp Denmark and NetApp USA for the sole purpose of acting as a

"flow-through unit" for dividends from NetApp Denmark to NetApp USA.

Unlike NetApp Cyprus, NetApp Bermuda was also not a company without real substance. NetApp Bermuda was the ultimate parent company of the entire group outside the United States, and it owned the intangible assets necessary to operate the group's activities outside the United States.

Unlike NetApp Cyprus, which, apart from the dividend in question of approximately USD 91.45 million, did not actually generate any income, NetApp Bermuda had a very significant turnover and significant interest income (approximately USD 315 million and approximately USD 11 million in 2005/2006) and, unlike NetApp Cyprus, which had only marginal administrative expenses, NetApp Bermuda did not generate any income.

- had a significant expense side (USD 132.7 million in 2005/2006). Finally, NetApp Cyprus - unlike NetApp Cyprus which, apart from its holdings in NetApp Denmark and NetApp Holding BV, held only a negligible cash balance - had very significant assets with a book value in excess of USD 280

U.2023.1575H

million and undoubtedly even significantly higher than the book value.

   Given the combination of the circumstances of the case, where, as mentioned above, more than 5 months elapsed from NetApp Berm-

uda received the amount of USD 91.45 million from NetApp Cyprus until it distributed an amount of USD 550 million to NetApp USA, where NetApp Bermuda was not a company contributed to the chain and where the company had a very significant economic substance, there is no evidence - let alone any certain proof

- that NetApp Bermuda had no real power to dispose of the amount it received from NetApp Cyprus.

As for the dividend that NetApp Denmark decided to distribute on October 13, 2006, this dividend cannot - under the circumstances - be considered to have been "flowed through" to NetApp USA as part of the USD 550 million dividend, as this dividend had already been distributed to the company on April 3, 2006.

Against this background, it can be concluded that NetApp Denmark has not disproved that the arrangement with the establishment of NetApp Cyprus had an abuse of the Danish-Cypriot double taxation treaty as a main purpose. The fact that NetApp USA could have invoked the double tax treaty between the United States and Denmark if it had been the immediate owner of the shares in NetApp Denmark does not, as mentioned, refute that the arrangement had an abuse of the Danish-Cypriot double tax treaty as a main purpose.

In any event, the assessment of abuse, particularly in a situation such as the present one, must be made on the basis of the facts and not on the basis of counterfactual circumstances.

This is because it is - undoubtedly - no coincidence that the NetApp Group chose the more complicated restructuring that was actually implemented rather than the less complicated restructuring that would have been to transfer NetApp Bermuda's shares in NetApp Denmark back to NetApp USA, which would also have led to the simplest distribution structure of all, namely a direct distribution from NetApp Denmark to NetApp USA. The Group could have avoided having to establish a company in Cyprus and spend resources on establishing a management

**1639**

with local participation and to manage the company on an ongoing basis, including submitting audited annual reports.

Given that a transfer of the shares back to NetApp USA could have avoided withholding tax on dividends from NetApp Denmark, there must therefore necessarily have been other - weighty

- tax and/or business reasons why this simple solution was rejected in favor of the far more complicated restructuring and distribution structure, which with the formation and incorporation of a Cypriot company made the road from Denmark to the US (even) longer than it already was.

Under these circumstances, it must in all cases be assumed that the arrangement with NetApp Cyprus has had an abuse of the Danish-Cypriot double taxation agreement as a main purpose, and when this is the case, the tax authorities have been entitled to deny an exemption from withholding tax on the dividends in question from NetApp Denmark to NetApp Cyprus. Thus, the Danish-US double tax treaty cannot lead to a different result.

By invoking the Danish-US double tax treaty, NetApp Denmark claims that the NetApp Group - at the same time - must be entitled to enjoy the benefits that must necessarily have been the motive for the choice of the most complicated restructuring and the tax advantage that NetApp USA could have claimed by virtue of the Danish-US double tax treaty had it not been for the Group's rejection of this particular restructuring model. A

Such a claim, i.e. that the group will be entitled to benefit from both reality and a counterfactual reality, cannot be recognized by the legal system.

*[...] The tax liability is not contrary to a binding, established administrative practice*

In determining whether a tax liability in respect of the dividends in question would be contrary to a binding, established administrative practice, it must - as the High Court would otherwise have no reason to consider the issue - be assumed that the taxation must not be waived under Article 5(1) of the Parent-Subsidiary Directive because of abuse and that the taxation of the dividends must not be reduced under Article 10(2) of the Danish-Cypriot Double Taxation Convention because of NetApp Cyprus. 1, because there is abuse, and that the taxation of the dividends should not be reduced under Article 10(2) of the Danish-Cypriot Double Taxation Convention because NetApp Cyprus cannot be considered the rightful owner of the dividends.

In other words, it is therefore a case of NetApp Denmark claiming that the dividends in question should be considered exempt from a tax liability, even though the Danish Corporation Tax Act

§ Section 2(1)(c)'s express condition for the dividends to be exempt from tax is not met.

Since a principle of equality under administrative law cannot justify a claim for a legal position that is contrary to law, see U.2003.2005H [...], it is excluded that NetApp Denmark's invocation of an administrative practice can lead to the exemption of the dividends in question from a tax liability, already because such an exemption would thus be contrary to section 2(1)(c) of the Corporation Tax Act's express condition for an exemption to be granted.

In addition, SKAT's decision of September 10, 2010 does not represent a tightening of practice, as it did not change any established administrative practice at all.

It is incumbent on NetApp Denmark to prove the existence of the claimed practice which, according to the company, the decision should deviate from, see e.g. U.2011.3305H [...], but the company has not met this burden of proof. NetApp Denmark has thus not demonstrated the existence of any previous decision according to which the tax authorities have considered a dividend to be exempt from a tax liability, even if the given circumstances - as in the present case - otherwise provided evidence to establish that the parent company had not had or had had such narrow powers to dispose of the dividend that the company could not be considered its rightful owner.

Nor has NetApp Denmark demonstrated any cases where the tax authorities - since section 2(1)(c) of the Danish Corporation Tax Act came into force on April 27, 2001 (with effect for dividends declared distributed or paid on July 1, 2001) - have failed to take corrective action in cases such as the present one. Moreover, such failure to intervene, if it had actually taken place, could not have been equated with a positive decision, see e.g. U.2017.2960H and U.2017.2979H [...].

Nor has NetApp Denmark demonstrated in any other way that the tax authorities, after the entry into force of section 2(1)(c) of the Danish Corporation Tax Act and until SKAT's decision in the present case, should have followed a practice according to which dividends have been considered exempt from the tax liability resulting from the provision, even though the given circumstances otherwise provided evidence to establish that the parent company had not had or had had such narrow powers to dispose of the dividends that the company could not be considered its rightful owner.

U.2023.1575H

The Minister of Taxation's reply of January 10, 2001 to the Danish Parliament's Tax Committee, Annex 22 to Bill No. 99 of November 10, 2000 [...] and his reply of January 11, 2001, Annex 24 to Bill [...], which NetApp Denmark invokes, do not constitute evidence of the existence of such a practice, already because the questions answered, as described above, were asked in connection with the

Legislation (originally) proposed but not adopted at this point .

**1640**

The answers invoked by NetApp Denmark, which the Minister for Taxation has given in various contexts [...] after the entry into force of section 2(1)(c) of the Danish Corporation Tax Act [...], do not constitute evidence that, at the time of SKAT's decision, a practice had been established according to which dividends - in circumstances such as in the present case - were considered to be exempt from a tax liability under this provision.

These are abstract answers to abstract questions. The answers provide

- just as the referenced memo on the status of SKAT's control efforts regarding the takeover of 7 Danish groups by private equity funds [...]

- no evidence that SKAT should have made a positive decision to follow a practice according to which dividends were considered exempt from a tax liability, even if, after information and a specific assessment of the given circumstances, there would be evidence to establish that the parent company had not had or had had such narrow powers to dispose of the dividends that the company could not be considered its rightful owner.

Prior to SKAT's decision in this case, the Minister of Taxation had, on the other hand, submitted several answers stating that a parent company would not be able to claim the benefits of a double tax treaty if it was a "pure flow-through holding company" [...], a "pure flow-through company" [...], a "conduit" company [...], or a "flow-through company" [...]. In all but the first of these responses, reference is even made to paragraph 12.1 of the comments to Article 10 (on dividends) of the OECD Model Tax Convention, and in the last four responses it is furthermore described in the responses themselves that "conduit" companies/"flow-through" companies include companies that "effectively have very narrow powers in relation to the income concerned".

Against the above background, it must be established that SKAT's decision in this case did not change any binding, established administrative practice that NetApp Denmark can rely on under an administrative law principle of equality.

*[...] NetApp Denmark is responsible for the missing content*

As the dividends in question are subject to tax liability, cf. section 2(1)(c) of the Danish Corporation Tax Act, NetApp Denmark should have withheld dividend tax in connection with its decision to pay the dividends, cf. section 65(1) of the Danish Withholding Tax Act.

Section 69(1) of the Withholding Tax Act states that a person who fails to fulfill his obligation to withhold tax or who withholds too little tax is directly liable to the public authorities for payment of the missing amount unless he proves that he has not been negligent in complying with the provisions of the Withholding Tax Act.

According to established Supreme Court case law, the withholding agent is liable for payment of the missing amount if he is aware of the actual basis for the withholding obligation, see U.2004.362H [...], U.2008.2243H [...] and U.2016.2898H [...].

It is undisputed that NetApp Denmark has been aware of the circumstances which lead to the conclusion that NetApp Cyprus cannot be considered to have been the beneficial owner of the dividends within the meaning of the Danish-Cypriot double taxation treaty and that the benefit in the form of the exemption from withholding tax resulting from the Parent/Data Company Directive must be denied because EU law cannot be invoked to enable abuse of rights.

In this respect, NetApp Denmark has not demonstrated

circumstances that gave the company reason to assume that the dividends could be distributed without withholding tax.

Copyright © 2023 Karnov Group Denmark A/S

In determining whether NetApp Denmark has rebutted the statutory presumption of negligence, it must thus - as the High Court would otherwise have no reason to consider the issue - be assumed that there has been no binding established administrative practice according to which the dividends in question must be deemed to be exempt from the tax liability that otherwise follows from section 2(1)(c) of the Danish Corporation Tax Act. For this reason alone, it is untenable for NetApp Denmark to claim that there was an administrative practice which gave the company reason to assume that the distributions could be made without withholding tax on dividends.

The alleged "great uncertainty as to how the term 'beneficial owner' is to be interpreted" [...] has not encouraged NetApp Denmark to make such an assumption - on the contrary.

From point 12.1 of the comments to Article 10 (on dividends) of the OECD Model Tax Convention, which existed at the time of the company's decision to pay the dividends in question, and to which Article 10 of the Danish-Cypriot Double Taxation Convention corresponds, states as described above, "a "flow-through" company cannot normally be regarded as the beneficial owner if, although it is the formal owner, it has in fact very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of others". If NetApp Denmark was in doubt as to what exactly was meant by "beneficial owner", it cannot be considered excusable that the company chose to take the risk and decided to pay the dividends without withholding dividend tax. It goes without saying.

Nor has NetApp Denmark had any reason to assume that the advantage in the form of the withholding tax exemption resulting from the Parent-Subsidiary Directive could be invoked for the purpose of enabling abuse of rights. As stated above, the Parent-Subsidiary Directive, as regards the exemption from

**1641**

withholding tax, implemented with a simple reference in section 2(1)(c) of the Danish Corporation Tax Act to the Parent-Subsidiary Directive, and at the time of the company's decision to pay the dividends in question, it was, as described above, established in the case law of the Court of Justice that EU law (then called "Community law") could not be invoked for the purpose of enabling abuse, see e.g. the Court's judgment in case C-212/97, Centros, paragraph 24 and the case law mentioned therein.

When - as in the present case - there is a basis for denying a tax benefit in the form of exemption from withholding tax because the benefit was sought to be obtained by abuse of law and the withholding agent is aware of this basis, the failure to withhold the withholding tax must in any case - per se - be imputed to the withholding agent as being of a negligent nature.

As NetApp Denmark has thus not rebutted the statutory presumption that the company has been negligent with regard to the failure to withhold dividend tax, the company is, pursuant to section 69(1) of the Withholding Tax Act, directly liable to the public authorities for payment of the dividend taxes not withheld, totaling DKK 184,214,240."

In its summary pleading of January 11, 2021, *NetApp Denmark* has stated, inter alia:

"In support of [the claim for acquittal], it is principally argued that NetApp Cyprus does not have limited tax liability to Denmark on the dividends distributed to the company, cf. section 2(1)(c) of the SEL in conjunction with Article 10 of the DBO between Denmark and Cyprus and the Parent-Subsidiary Directive (90/435/EEC), and that NetApp Denmark has therefore not been obliged to withhold dividend tax, cf. section 65(5) of

the Withholding Tax Act.

In this regard, it is submitted that NetApp Cyprus is "rightful income recipient" and "rightful owner" of the

dividends within the meaning of the DBO (see section 7 below), and that NetApp Cyprus has an unconditional right to tax exemption of the dividends under the Parent/Subsidiary Directive (see section 8 below).

It is further argued that - even in the event that the courts find that NetApp Cyprus cannot be considered to be the "beneficial owner" of the dividends in question - there is still no basis for levying withholding tax on the dividends in question under section 2(1)(c) of the SEL, as the ultimate recipient of the distributed funds, NetApp USA, must then be considered the "beneficial owner" instead (with the consequence that a reduction will be required under the DBO between Denmark and the USA). This plea is dealt with below in section 7.7.

Furthermore, it is submitted that there is no abuse of rights under Danish law, under the Danish-Cypriot DBO or under EU law. This plea [...] is dealt with [...] below in section 7.6 (concerning the DBO) and in section 8.7 (concerning the Directive). Alternatively, it is claimed that SKAT's decision of September 17, 2010 is an aggravation of an established administrative practice with retroactive effect, and that it is therefore not legal. This is dealt with in section 9.

More alternatively, it is claimed that NetApp Danmark is not liable for any withholding tax under section 69 of the Withholding Tax Act, as NetApp Danmark has not acted "negligently" by not withholding tax in connection with the dividend distributions. Reference is made to section 10 below.

*6. SEL § 2(1)(C) DOES NOT LEAD TO LIMITED TAX LIABILITY OF THE DIVIDENDS*

It appears from SEL section 2(1)(c) [...] that the limited tax liability does not apply to dividends received by a parent company holding at least 20% (2005 and 2006) of the share capital in a subsidiary in a period of at least one year, within which period the date of the dividend distribution must fall. These conditions, which correspond to the conditions that must be met for a Danish parent company to receive tax-free dividends, are - undisputedly - met in this case.

In addition, it is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of a double taxation treaty or the Parent-Subsidiary Directive (90/435/EEC). If only the taxation of dividends is to be reduced in accordance with one of these legal provisions, there is thus no limited tax liability to Denmark for the foreign dividend recipient.

This case is therefore primarily concerned with whether this condition is met.

NetApp Denmark claims that the taxation of dividends must be waived or reduced under both the DBO between Denmark and Cyprus (alternatively the DBO between Denmark and the USA) and under the Parent-Subsidiary Directive, which is why NetApp Cyprus is not subject to limited tax liability to Denmark on the dividends in question. For this reason, there is no basis for levying withholding tax.

[...]

*7. CLAIM FOR REDUCTION UNDER THE DANISH-CYPRIOT DOUBLE TAXATION TREATY - NETAPP CYPRUS IS THE "RIGHTFUL OWNER" OF THE DIVIDENDS*

*7.1. General about the double taxation agreement* It follows from Article 10 of the current Danish-Cypriot double taxation agreement of 26 May 1981 [...] that the source state - in this case Denmark - has the right to tax dividends, but that there must be a reduction (to 10 or 15%) if the recipient of the dividend is the dividend's "beneficial owner" - in the English text "beneficial owner".

**1642**

It is submitted that NetApp Cyprus is the 'rightful owner' of the dividends in question and that NetApp Cyprus is therefore entitled to

reduction under Article 10 of the Danish-Cypriot DBO. As a reduction is to be made, there is no limited tax liability to Denmark, cf. section 2(1)(c) of the Danish Corporation Tax Act.

Article 10 of the Danish-Cypriot DBO corresponds in principle to Article 10 of the OECD Model Convention of 1977 [...] "Rightful owner" is a translation of "beneficial owner".

The term "beneficial owner" is neither defined in the Danish-Cypriot DBO nor in the Model Agreement, and the main issue in this complex of cases concerns the interpretation of this term.

In the OECD's comments to the 1977 Model Agreement, point 12 - which were the comments applicable at the time of the conclusion of the DBO between Denmark and Cyprus in 1981 - it is stated [...]:

"Subject to paragraph 2, the limitation on the taxing rights of the source State shall not apply where an intermediary, such as an agent or nominee, is interposed between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. States wishing to express this more clearly are free to do so during bilateral negotiations." [...].

As NetApp Cyprus is neither an "agent" nor a "nominee" [...] of the parent company, NetApp Bermuda, nor the ultimate parent company, NetApp USA, it is clear from the 1977 comments that NetApp Cyprus is the "beneficial owner" under the DBO.

In 2003, the OECD expanded the comments to include so-called flow-through units.

The comments were thus supplemented in section 12.1 with the following [...]:

"It would also be inconsistent with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax in cases where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Com- mittee on Fiscal Affairs concludes that a "conduit company" cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties." [...].

The tax authorities' interpretation of "beneficial owner" in the present case is based on these extended comments, which has been accepted by the National Tax Tribunal in the ruling [...].

In the present case, the Ministry also bases its interpretation on later comments to Article 10, namely those issued in 2014, i.e. 9 years after the first dividend in this case

*7.2 "Beneficial owner" shall be interpreted in accordance with Danish domestic law*

It is argued that the term "beneficial owner" must be interpreted in accordance with Danish domestic tax law.

In Danish law, it will be the court-created principle of "rightful income recipient" that applies, as the Minister of Taxation has repeatedly confirmed [...].

It can easily be established that NetApp Cyprus under Danish law is

"rightful income recipient" of the dividends in question, which the Ministry of Taxation also recognizes, cf. paragraph 25 [...] and paragraph 59 [...] of the order for reference. This is also what the National Tax Tribunal has assumed (E 38, penultimate paragraph). For this reason alone, NetApp Cyprus is also the "beneficial owner" of the dividends in question.

Copyright © 2023 Karnov Group Denmark A/S

When the Minister of Taxation has explained to the Danish Parliament prior to the adoption of SEL that the tax exemption is dependent on NetApp Cyprus being
"rightful income recipient" is binding for the interpretation of the SEL, regardless of what the correct interpretation of the DBO is. However, it also follows from the DBO that the term "beneficial owner" must be interpreted as Danish law has defined "beneficial owner"
- and here, as mentioned, they have undoubtedly equated "rightful owner" and "rightful income recipient".

Article 3(2) of Denmark's DBO with Cyprus [...] - and the corresponding provision in the 1977 Model Agreement [...] - contains the following rule of interpretation:

"2. In the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies."

"Beneficial owner" is not defined in the collective agreement. The term must therefore be interpreted in accordance with Danish domestic law,
"unless the context requires otherwise".

It is argued that nothing else follows from the context and that the concept must therefore be interpreted in accordance with domestic Danish law, i.e. in accordance with the principle and case law on "rightful income recipient".

This result is in accordance with the interpretation adopted by the Danish tax authorities - prior to the start of the beneficial owner cases - [...].

**1643**

In Festskrift til Ole Bjørn [...], Aage Michelsen expresses the following general opinion:

"Domestic law must be applied in all cases where an international tax issue is not resolved in a double taxation agreement that Denmark has concluded with another country."

It is undeniable that the precise understanding of "beneficial owner" is not resolved in the agreement.

The interpretation also makes sense in view of the introductory remark in paragraph 12 of the 2003 comments [...]:

"The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid ... to a resident" as used in paragraph 1 of that Article."

The purpose of the provision has thus been to determine who is the real recipient of the dividend, and this is precisely what the principle of "rightful income recipient" in Danish tax law is about [...].

Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395 are in line with this [...]:

"Based on the aforementioned Danish case law on domestic interpretation of concepts from double taxation treaties, it must probably be assumed that the Danish courts will be inclined, at least to a certain extent, to interpret the beneficial owner concept in accordance with domestic Danish tax law. In other words, the Danish courts will be inclined to consider the company that, according to a Danish tax law assessment, is considered the right income recipient, to also be the beneficial owner." [...].

The case law referred to is U 1994.284 H [...] and TfS 2003.222 H [...].

The view is repeated by Jakob Bundgaard in SU 2011.31 [...]. Jens Wittendorff in SR-SKAT 2010.212, is also of the opinion that a domestic law interpretation based on the principle of "right income recipient" must be made [...]. It appears there that the authorities in several other states, including the United States, the United Kingdom, the Netherlands and Italy, apply a domestic law

interpretation.

Furthermore, it should be mentioned that in U.2012.2337 H [...] the Supreme Court also applies internal Danish law when interpreting a DBO.

The defendant is aware that the Eastern High Court in the first court decision in the "beneficial owner" case complex (SKM 2012.121 (the ISS case) [...]) - supported by the Indofood judgment (...) - has found that an autonomous interpretation must be applied, but the defendant does not agree with this. In particular, it is surprising that the Eastern High Court has placed more emphasis on the Indofood judgment, which is an English civil law decision assessing the meaning of the term in a case concerning the interpretation of a loan agreement in Indonesian law, than on the later Prévost case [...], which is a tax case decided by the competent court in the source state (Canada).

Firstly, it is a fact that there is no consensus in the international literature on what an autonomous interpretation - if any - should be.

A review of the available literature thus shows that there is total uncertainty as to what is meant by "beneficial owner" in an autonomous interpretation. There is simply no consensus on an "international fiscal meaning".

Secondly, there is also no consensus in the international literature as to whether a domestic law interpretation or an autonomous (international) interpretation should be applied.

Vogel [...] and Baker [...] are thus of the opinion that an "international fiscal meaning" should be sought, but they recognize that there is no such "inter- national fiscal meaning" - nor is there agreement on it.

Baker, however, is of the opinion that an interpretation must first be made on the basis of international law and that this should only be rejected if it is not consistent with the context of the agreement [...] Jiménez [...], on the other hand, is of the opinion that an interpretation must be made on the basis of domestic law.

Thirdly, the (modest) international case law is not unambiguous either. The Indofood judgment [...] seems, as mentioned, to emphasize an international, autonomous interpretation, while the Prévost case [...] seems to be in favor of a domestic interpretation.

In its public discussion draft of April 29, 2011 [...], the OECD has proposed to include in the comments to Article 10 that "beneficial owner" should be subject to an international interpretation, but the consultation responses from The City of London Law Society [...] and IBFD [...] dispute that this position is supported by Article 3(2). Based on the responses received, the OECD issued on October 19, 2012 [...] a new proposal for revised comments on "beneficial owner" in which the OECD - taking into account that a majority of the responses to the consultation have endorsed this view - maintained its proposal that the concept be subject to an autonomous interpretation. This in itself shows that the OECD is on "thin ice" and that - regardless of the OECD's political wishes - there was and still is considerable disagreement on the issue.

The fact that section 12.1 [...] of the 2014 comments and section 12.1 [...] of the 2017 comments, as a result of political considerations by the officials who prepare the comments, point towards the concept being interpreted autonomously does not change the fact that at least in 2005 and 2006 there was not (and has not been since) the necessary international consensus on the understanding of the concept for an autonomous interpretation to make sense at that time.

**1644**

Furthermore, interpreting the concept of "beneficial owner" in accordance with the Danish legal concept of "rightful income recipient" is a necessity when, as here, it is not actually a question of interpreting the treaty, but of interpreting Danish

law (SEL § 2(1)(c)), which refers to the treaty, as it is not actually a question of sharing a taxing right with Cyprus, but of defining a tax exemption that exclusively concerns Denmark's internal taxation relations. This is particularly obvious when the drafting of section 2(1)(c) of the SEL unambiguously confirms that the

The Danish term "rightful income recipient" is synonymous with the term "beneficial owner".

Even if it were evident that the wording of the preparatory works to SEL section 2(1)(c) in 2001 was mistaken about the meaning of the concept in the model agreement, the Danish preparatory works would still take precedence over the agreement, as it was this understanding that the Danish Parliament based on when adopting SEL
§ Section 2(1)(c).

Convention-compliant interpretation is also not relevant, as Denmark has not promised Cyprus to make its internal tax exemption of dividends dependent on the interpretation of the DBO. This is a choice that Denmark has made on its own, and it does not owe Cyprus under treaty law to adjust the interpretation of its internal legislation according to the agreement. The only decisive factor is what the Danish Parliament has assumed when adopting SEL § 2(1)(c).

It is thus argued that domestic law must at least be applied when - as in this case - no other international understanding of the concept can be pointed to. This is particularly true at the time of the dividend distributions in 2005 and 2006 at issue in the case and even more so when it is taken into account that the Danish-Cypriot DBO was concluded in 1981.

As it is agreed that NetApp Cyprus is the "rightful income recipient" under Danish law, the company is thus also the "rightful owner".

*7.3 The OECD's extended comments from 2003 cannot be included in the interpretation*

It is a fact that the Ministry of Taxation's changed interpretation of "beneficial owner" is directly caused by
- and originally based solely on - the extended comments to the 2003 model agreement (on "flow-through companies"). Since then, the Ministry has also relied on even later comments, including from 2014, cf. section 7.5 below.

Denmark's DBO with Cyprus [...] is from 1981 and art. 10 of the agreement corresponds to the OECD Model Agreement. When Denmark and Cyprus entered into the agreement, only the OECD's comments from 1977 to the Model Agreement [...] were available.

It is generally assumed - nationally and internationally - that the OECD's comments to the model agreement can be included in the interpretation of specific DBOs.

As far as the legal source value of the OECD's comments is concerned, reference is made to Aage Michelsen's article in Festskrift til Ole Bjørn [...], and Michael Lang [...], both with references to a number of international authors. It follows that if later comments represent a *change in* relation to earlier versions - and not merely a *clarification* - these comments cannot be given weight, see also Vogel, 3rd edition (...). It is clear that what is being discussed by these authors is the problem of interpretation of treaty law in a dispute between two states. The authors do not address the legal issues that arise when an OECD commentary clarifies or amends a DBO, which - as is the case in Denmark - through domestic legislation has given taxpayers the opportunity to invoke a DBO provision. The taxpayer's protection against retroactive legislation and statutory interpretation depends on domestic (constitutional) law and is a fundamentally different issue than the interpretation of a treaty between two states.

Danish case law has accepted that only clarifying comments may be relevant for the interpretation of a DBO, see e.g. U.1993.143H (Texaco) [...], U.1994.284H (the professor rule) [...] and U.2003.988H (Halliburton) [...]. Reference is also made to the court settlement of February 3, 2000 concluded before the

Eastern High Court between the Ministry of Taxation and Casino Copenhagen. The settlement is reproduced in SU 2000.241 [...].

It is argued that the expanded comments from 2003 invoked by the plaintiff - at least as they are claimed by the plaintiff to be understood - represent a significant change compared to the comments from 1977, as they lead to the exact opposite result of what the Ministry assumed in the preparatory works to SEL § Section 2(1)(c) of 2001. Therefore, they cannot be included in the interpretation of the Danish-Cypriot DBO from 1981.

The reason why subsequent comments cannot be given weight is that they have not been approved by the parliaments of the Member States and therefore lack democratic legitimacy.

In a legal system such as the Danish one, where a double taxation agreement only becomes part of Danish law when the Danish Parliament has passed a law on it, this is particularly clear. It would quite simply be contrary to the prohibition on delegation in section 43 of the Danish Constitution to leave legislative competence to the officials, including officials from the tax administrations of the individual countries, who formulate the comments.

The fact that the interpretation of a DBO has the wider significance that it is decisive for,

**1645**

whether there is a limited tax liability under section 2(1)(c) of the Income Tax Act at all, further emphasizes that the clear legislative history of this provision cannot be overridden by an amendment of the OECD comments. Since SEL section 2(1)(c) is an internal legal basis which defines its *internal* scope by reference to an international treaty, even duly agreed amendments to the treaty could not be given effect to domestic law *unless* the treaty amendment and its impact on domestic law was endorsed by the Danish Parliament, since a change of domestic Danish law solely through the government's accession to a treaty amendment would constitute a clear violation of the prohibition on delegation in section 43 of the Constitution. It is all the more evident that internal Danish law is not changed by some officials joining an amendment to the comments to the OECD Model Convention through the OECD.

The significance of OECD comments made after the date of conclusion of the relevant agreement cannot be determined in isolation from the effect of the comment on the case under adjudication. To the extent that a subsequent comment results in the outcome of a case being reversed, there will clearly be a change and no weight can be given to the comment.

In the ISS case (SKM2012.121.ØLR), the Eastern High Court assessed in the premises [...] that the OECD's comments from 2003 only constituted a clarification, but also stated that the comments did not affect the outcome of the case in question (cf. the words "In this case it is unnecessary to decide on...", [...].

When Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395 similarly assume [...] that the comments from 2003 are "clarifications" is because they also assume that the comments "cannot be considered particularly far-reaching", as the authors assume [...] that "beneficial owner" - in accordance with the tax authorities' previous interpretation - must be interpreted in accordance with the principle of "proper income recipient" under Danish law. Under this assumption, the new comments do not, of course, represent a change.

It would also be contrary to Articles 31 and 32 of the Vienna Convention [...] to give weight to subsequent comments.

In particular, these cannot serve as a "subsequent agreement" within the meaning of Article 31(3)(a), see Michael Lang [...]:

"However, under certain circumstances, the VCLT [Vienna Convention on the Law of Treaties of 23 May 1969 - MS 377, our

addition] attributes special significance to any "subsequent agreement"

or "subsequent practice" set out in Article 31 paragraph 3 of the VCLT. But the decision of the OECD CFA [OECD Committee of Fiscal Affairs, our addition] to amend or change the Commentary cannot qualify as an "agreement" within the meaning of Article 31 paragraph 3 subparagraph (a) of the VCLT."

Subsequent comments are also not "supplementary means of interpretation" within the meaning of Article 32, see Michael Lang [...]:

"Another question is whether a new version of the Commentary could qualify as "supplementary means of interpretation", mentioned in Article 32 of the VCLT. ... Therefore, material may be taken into account which indicates the intention of the parties upon con- clusion of a treaty. Again, the new version of the Commentary cannot be of relevance."

It should be emphasized that Cyprus is not a member of the OECD. Cyprus thus has no influence on the wording of the comments or the possibility to make reservations. It is thus particularly obvious that subsequent comments cannot affect the interpretation of a DBO with Cyprus.

The fact that the OECD officials themselves have stated in paragraph 35 of the Introduction to the 2003 OECD Model Agreement [...] that amendments to the commentaries are to be applied when interpreting previous agreements does not change the above conclusion, see Michael Lang [...]:

"The mere fact that the CFA takes this position is not enough, the CFA is not a law-making authority. It cannot decide on the relevan- ce of its own statements."

See also Aage Michelsen with references [...]

In line with this, subsequent comments in Danish case law have only been used as a contribution to interpretation when it has been a matter of clarification, cf. the already mentioned Supreme Court judgments in UfR 1993.143 H (Texaco) [...] and TfS 2003.222 H (Halliburton) [...].

The conclusion is therefore that the extended comments from 2003 are not a relevant contribution to the interpretation of the treaty with Cyprus. NetApp Cyprus is therefore - for this reason alone - a "beneficial owner", and there is therefore no limited tax liability.

*7.4 NetApp Cyprus is also the "rightful owner" of the dividends after the 2003 comments*

However, in the event that the extended comments from 2003 are considered to be only a clarification of the concept of "beneficial owner", it is further argued that NetApp Cyprus - also according to these - must be considered "beneficial owner" of the interest in question. Thus, NetApp Denmark also in this case claims that

The "rightful owner" concept must be interpreted in accordance with the principle of "rightful income recipient" in Danish law, see e.g. Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395 [...].

However, even if an autonomous interpretation of the concept is made, it is submitted that NetApp Cyprus must

**1646**

is considered the "beneficial owner" of the dividends in question under the 2003 comments.

In the 2003 revision, paragraph 12 of the commentary was expanded with the remark that the term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in light of the intent and purpose of the treaty, including avoiding double taxation and preventing tax avoidance and tax evasion.

This is elaborated in paragraph 12.1 by stating that, firstly, it

would not be consistent with the intent and purpose of the treaty if the source country were to grant relief on payment to an "agent or nominee" as the agent or nominee is not the owner of the income and thus not taxed in its country of residence.

country, which is why no double taxation occurs. This corresponds to the commentary to the 1977 Model Convention.

Secondly, something new is stated about "flow-through companies" in section 12.1:

"It would also be inconsistent with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Com- mittee on Fiscal Affairs concludes that a "conduit company" cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties." [...].

In this set of cases, the Ministry of Taxation generally argues that point 12.1 of the extended comments from 2003 must be understood to mean that, when determining whether the formal recipient is

"beneficial owner", emphasis must be placed solely on the extent of the actual powers of the formal recipient in relation to deciding how to dispose of the amounts received. According to this view, the formal recipient will thus not be considered a "beneficial owner" if, in relation to the income in question, he cannot actually make dispositions that deviate from the will of the ultimate owners (that an amount received must be disposed of).

"directed to where it is desired").

In this context, it should be noted that the wording of paragraph 12.1 clearly states that there are 3 situations in which a recipient of dividends is not a "beneficial owner", namely if it is (1) an "agent", (2) an "intermediary" or (3) a "conduit for another person who actually receives the income in question". In the latter situation, it is further required that the conduit entity has "very narrow powers which, in relation to the income in question, make it a

"nullity" or administrator acting on behalf of other parties". Thus, as stated in the comments, the extent of the right of disposal is an essential element in determining whether a passthrough entity is the "beneficial owner" of the income.

The point of the comments is thus that if the dividend-receiving company has channeled the received dividends to the underlying owners, when assessing whether the company is a "beneficial owner", emphasis must be placed on whether this is a result of the underlying owners having restricted the company's disposal of the dividends.

It is submitted that NetApp Cyprus *does not* have "very narrow powers which, in relation to the income in question, make it a 'nullity' or 'administrator acting on behalf of other parties'. On the contrary, NetApp Cyprus has, on the whole, had the same powers as any other holding company in any other group of companies would normally have.

Thus, in particular, there has been no legal obligation for NetApp Cyprus to pay the dividends received to NetApp Bermuda as repayment of debt, see further below in the next section. As stated in the section in question, it is a condition for not considering a dividend recipient as "beneficial owner" that the recipient has assumed a legal obligation to pass on the dividends received.

In this connection, it is disputed that the mere fact that the underlying owners or their representatives may have made the overall decision on the dividend distributions in advance,

should be decisive for NetApp Cyprus not to be considered "rightful owner" of the dividends.

All major decisions in any group - such as the acquisition of companies, major distributions, the establishment of a financing structure, etc. - are usually initially made by the top management of the group.

The decisions are then implemented by the relevant corporate bodies of the respective companies. Neither the individual companies as such nor the individual board members are generally obliged to implement the planned decisions, but refusal to do so can of course lead to the members in question being replaced in accordance with the rules of the Companies Act.

There is no evidence that section 12.1 of the comments should be interpreted to mean that what is a customary decision-making procedure in any group automatically disqualifies the group's subsidiaries from being "beneficial owners" of dividends received.

**1647**

The reality is that the Ministry of Taxation's interpretation of section 12.1 of the comments is so restrictive that it is difficult - if not impossible - to identify an intermediate holding company that the Ministry would accept as the "beneficial owner" of dividends.

Accordingly, the only (real) condition that, in the opinion of the Tax Ministry, must be met in order to deny an intermediate holding company the status of "beneficial owner" is that it must be demonstrated or probable that the transaction has tax avoidance or evasion (or "abuse") as its purpose or consequence.

In reality, the Ministry of Taxation's view is that if an abuse can be demonstrated, an intermediate holding company will never be a "beneficial owner", and thus - according to the Ministry of Taxation's own interpretation - there is no real content in the requirement for "narrow powers". The Ministry of Taxation's interpretation of the concept of "beneficial owner" must therefore be rejected as meaningless.

The Ministry of Taxation's interpretation is also clearly contrary to the Minister of Taxation's answer to question 86 regarding L 213 of May 22, 2007 [...]]

In summary, it is thus submitted that NetApp Cyprus cannot be considered a "nullity or administrator".

The defendant's understanding is supported by the Eastern High Court's judgment of December 20, 2011 in the ISS case, where the High Court stated [...]:

"In order for such an intermediate holding company not to be considered a legal owner, it must be required that the owner exercises a control over the company that goes beyond the planning and management at group level that usually occurs in international groups".

The Ministry of Taxation has not demonstrated the existence of such special qualified control by the owners in this case.

The defendant's understanding is further supported by recent international case law, including the Canadian Federal Court of Appeal's judgment of February 26, 2009 in the leading case, Prévost [...], although it is acknowledged that the international case law on the understanding of the "beneficial owner" concept is not unambiguous.

[...]

The Prévost case shows that in a situation *where* an intermediate holding company in a third jurisdiction was set up between the ultimate owners and the dividend-distributing company for the primary purpose of benefiting from a favorable tax rate agreed with that jurisdiction, *where there was in* fact a flow-through of dividends to the ultimate owners, *where* the ultimate owners had

decided in advance that dividends would be distributed up through the companies, and where the intermediate holding company had no activity and physical framework other than those resulting from being a pure holding company, then the intermediate holding company in question was "beneficial owner" of dividends from its subsidiary.

Applied to the present case, NetApp Cyprus is also clearly the "beneficial owner" of the dividends at issue in the case.

On February 24, 2012, the Tax Court of Canada decided a related "beneficial owner" case regarding royalties in Velcro Canada Inc. [...]. As in the Prévost case, the court found that an intermediate holding company was the "beneficial owner" of the income received, even though there was an obligation to pass on a significant part of it, as the court, among other things The court emphasized that there was a commingling of funds at the intermediate holding company, and it found that - in order to break the corporate veil - it was required that the intermediate holding company had "absolutely no discretion" in relation to the funds received (which was not the case).

The Canadian courts have thus established that it is a necessary - but not sufficient - condition for denying the recipient of a given income the status of "beneficial owner" that there is a legal obligation to pay the income in question.

This has subsequently been clearly cemented in point 12.4 in the latest comments from 2014 to the model agreement, see section 7.5 below.

In this context, the Ministry of Taxation refers in particular to the judgment of the English Court of Appeal in the so-called Indofood case [...] and the judgment of the French Conseil d'Etat in the so-called Bank of Scotland case [...], both from 2006.

In its decision in the ISS case [...], the Eastern High Court also refers to the Indofood judgment, although it is noted that it concerned the question of whether to apply a domestic or autonomous interpretation of the concept of "rightful owner".

[...]

*7.5 2014 comments - there must be a legal obligation for onward payment*

While this case has been pending, new comments from the OECD, namely in 2014 [...], have been issued, which are also relied upon by the Ministry of Taxation to support that NetApp Cyprus companies are not the "beneficial owner" of the dividends in question.

NetApp Denmark claims that it is now explicitly stated in section 12.4 of the 2014 comments that, as a starting point, it is a condition for denying a dividend recipient the status of "beneficial owner" under the model agreement that there is an obligation to pass on the dividend to another person. Thus, it states [...]:

"12.4 In these various examples (agent, intermediary, conduit company in its capacity as nominee or trustee), the direct recipient of dividends is

**1648**

not the "beneficial owner" because the recipient's right to use and enjoy the proceeds is limited by contractual or legal obligations to pass on the payments received to another person. Such an obligation will usually be evidenced by relevant legal documents, but may also be present by virtue of the facts which clearly show that the recipient does not substantively have the rights to use and enjoy the proceeds without being bound by a contractual or legal obligation to pass on the payments received to another person. ... Where the recipient of a dividend has the right to use and enjoy the dividend without being bound by any contractual or legal obligation to pass on the payments he has received to another person, the recipient is the "beneficial owner" of those dividends. ..." [...].

In NetApp Denmark's view, it has always been clear that it is a necessary - but not sufficient - condition for

deny a dividend recipient the status of "beneficial owner" under the Model Tax Convention that there is a legal obligation to pass on the dividend. The 2014 Commentaries thus do not add anything on this point that was not already applicable. This is also confirmed in the leading judgment, Prévost, from 2009 [...], discussed above in section 7.4.

An "agent or intermediary", as mentioned in the 1977 comments, is thus clearly obliged to pass on the dividends received. It is already inherent in the very fact that he is an "agent or intermediary". The same applies to a "flow-through company" in the 2003 comments.

In the opinion of the Ministry of Taxation, it is irrelevant on which basis the obligation exists, but the term "obligation" (to disseminate) cannot be graded. Either the obligation exists or it does not. The relevant test is whether the obligation is enforceable in the national courts. Thus, if someone other than the recipient of the proceeds has a legally enforceable claim to receive the proceeds that can be enforced in the courts, there is an obligation on the recipient of the proceeds to pass on the proceeds.

In this case, there was no legal obligation for NetApp Cyprus to pass on the dividends.

The Ministry of Taxation refers to the 2014 comments that the recipient - without having been bound by a contractual or legal obligation to pass on the received dividends to another person - "substantially" did not have the rights to "use and enjoy" the dividends.

On the other hand, NetApp Denmark claims that the 2014 comments on this point - if they are to be understood as claimed by the Ministry of Taxation - *completely change* the previous comments to the provision - 9 years after the first dividend distribution in this case
- and are thus undoubtedly an extension - and not a clarification - of the concept of "beneficial owner" in the 1977 Commentaries. Therefore, they cannot be applied when interpreting DBOs concluded before 2014. The DBO between Denmark and Cyprus relevant in this case was concluded in 1981.

Finally, it is argued that it is completely uncertain what is meant by this statement in the comments and that it would therefore in any case be contrary to general principles of legal certainty to attach importance to the statement in question.

*7.6 There is no abuse of the collective agreement* In the "beneficial owner" case, the Danish Ministry of Taxation generally argues that there must be an abuse for a dividend-receiving company to be denied collective agreement protection. NetApp Denmark agrees with this.

However, NetApp Denmark disputes that there is an abuse of the Danish-Cypriot DBO in this case.

Countering abuse requires a legal basis in *Danish law.*

The parties to the present case agree that in 2005 and 2006 there were two court-created anti-abuse rules, namely *the principle of reality* and the *principle of "rightful income recipients*", see paragraphs 56-59 of the order for reference [...].

The parties agree that the principle of substance does not provide a basis for setting aside the transactions made in this case, see paragraph 57. Similarly, the parties agree that the dividend recipient, NetApp Cyprus, is the "proper recipient of income" under Danish law, cf. paragraph 59.

In pleading 2 of January 10, 2020, the Ministry of Taxation has submitted a new plea that Danish case law has developed general principles for countering abuse that go beyond the principle of reality (and - it must be understood - the principle of "rightful income recipient") [...]. NetApp Denmark has below in section

8.4.1.3 refuted this plea.

It is thus a fact that Danish law had rules to counteract abuse, and that these rules mean that there is no abuse under Danish law in this case. Moreover, it is settled Supreme Court practice that there can be no abuse if it appears from the legislative history that the legislator has been fully aware of the disputed issue (which is the case in this case), see U.2004.174H (Over-Hold ApS) [...] and U.2007.736H (Finwill ApS -"the elevator case") [...].

There were no relevant anti-abuse rules in the Danish-Cypriot DBO.

On the other hand, Article 10 of the DBO contains the provision that the dividend recipient must be the "beneficial owner", see sections 7.1 - 7.5 above.

**1649**

That there is no abuse of the agreement is confirmed, among other things, by the fact that the chosen structure - where NetApp Cyprus acts as a holding company for NetApp Denmark - is directly indicated by the Minister of Taxation in connection with the answer to question 16 to L 99 of
November 10, 2000 as a legitimate structure for the distribution of dividends [...].

This is fully in accordance with Mogens Rasmussen and Dennis Bernhardt, both Danish Customs and Tax Agency, in SR-SKAT 2000.315 (...):

"It is thus generally accepted among OECD member countries that a double tax treaty that follows the OECD model does not contain a legal basis to counter "treaty-shopping". ...

A company incorporated in a contracting country should thus be entitled to treaty protection, i.e. be considered the "beneficial owner", even if, as is the case with the many new holding companies in Denmark, it is obvious that the purpose is tax minimization." There was general agreement among Danish authors on these points of view.

In addition, the purpose of the dividend distributions in question was to redistribute the funds to the ultimate parent company, NetApp USA, as part of the temporary tax relief under the American Jobs Creation Act. No part of the distributions were to be deposited in NetApp Bermuda. If there had been any reason to believe that Denmark would levy withholding tax on the dividends in question under the chosen structure, the Group could have chosen to let NetApp Bermuda sell the shares in the defendant to NetApp USA as an adequate alternative solution, after which the dividends could have been distributed without withholding tax (under the Danish-American DBO). It is therefore also claimed in the alternative that NetApp USA is the "beneficial owner".

Thus, there is no basis for an assumption that NetApp has abused the Danish-Cypriot DBO.

Incidentally, it should be noted that the OECD first started the BEPS project ("Base Erosion and Profit Shifting Project") in 2013 and the release of Action 6 in 2015,

"Preventing the Granting of Treaty Benefits in Inappropriate Circumstances" (...), proposed the introduction of a general abuse rule in the states' DBOs to actually counteract treaty shopping. This involved the introduction of a so-called LOB provision ("limitation on benefits") and a so-called PPT ("Principal Purpose Test"), i.e. a general anti-avoidance clause. This initiative was followed by a large number of member states, including Denmark, entering into the Multilateral Convention ("MLI") in 2016, whereby the participating states were given the opportunity to amend their existing DBOs in several areas, including by inserting these anti-treaty shopping rules. In Denmark, the MLI was adopted by the Danish

Parliament in 2019 [...].

Copyright © 2023 Karnov Group Denmark A/S

Thus, it is only in 2019 that general anti-abuse rules have been inserted into the existing Danish DBOs.

*7.7 Alternatively, NetApp USA is the "beneficial owner" of the dividends - claim for reduction under the Danish-US double tax treaty*

In the event that the High Court finds that NetApp Cyprus cannot be considered the "rightful owner" of the dividends in question, NetApp Denmark claims that NetApp USA must instead be considered the "rightful owner" thereof, according to which the DBO between Denmark and the USA applies. [...]

As a reduction must be made under the DBO, NetApp USA is exempt from limited tax liability under section 2(1)(c) of the SEL, and thus the basis for collecting Danish withholding tax lapses.

In this connection, it is noted that it is a condition for considering NetApp Cyprus as a "flow-through company" and thus as a limited taxpayer that the "flow-through" has been made to investors in countries with which Denmark has not concluded a DBO.

In its judgment of 20 December 2011 (the ISS judgment ...), the Eastern High Court clearly established that it is a prerequisite for not recognizing the immediate recipient as the "rightful owner" that the funds have actually flowed on to such persons.

The Eastern High Court's verdict states (...):

"Against this background, it must be assumed that violation of a treaty limitation in the withholding tax presupposes that the payment has been passed on or is at least certain to be passed on to persons in third countries without a double taxation treaty."

[...] the funds [...] actually also "flowed through" NetApp Bermuda, as they were passed on to NetApp USA (where the funds are taxed), and thus not to "persons in third countries without a double tax treaty".

It is therefore submitted that if NetApp Cyprus is to be considered a 'flow-through' company, then NetApp Bermuda - which has no more substance and decision-making power than NetApp Cyprus - must also be considered a 'flow-through' company in relation to the dividends in question, in which case NetApp USA - which made the decision to repatriate the dividends, which actually received the dividends and which has been taxed on the dividends

- instead be considered the "beneficial owner" of the dividends. The Danish Ministry of Taxation agrees with NetApp Denmark that a reduction of the withholding tax requirement under the Danish-US DBO must be made if NetApp Denmark

**1650**

provides "conclusive evidence that NetApp Bermuda (also) is not the beneficial owner of the exchangers, but is just another pass-through entity and that NetApp USA is the beneficial owner". [...] In this connection, the Ministry of Taxation has listed 3 main points that NetApp Denmark, in the Ministry's opinion, must document in order for NetApp USA to be considered the "beneficial owner" of the dividends instead of NetApp Bermuda [...]:

1. That the dividends in question from NetApp Denmark have been predetermined to flow from NetApp Bermuda to NetApp USA.

2. That NetApp Bermuda has not (actually) been able to dispose of the dividends.

3. That the dividends have actually flowed through NetApp Bermuda and on to NetApp USA, see [the ISS judgment].

NetApp Denmark claims that the company has fully demonstrated that the three points are met in this case with the documentation presented in the case.

The Ministry of Taxation disputes this.

*Re 1. The dividends in question from NetApp Denmark were predetermined to flow from NetApp Bermuda to NetApp USA*

This is fully documented by the fact that the sole purpose of the dividend distributions in question from NetApp Denmark to NetApp Cyprus - and further to NetApp Bermuda - was precisely that the funds were to be transferred to the ultimate parent company, NetApp USA, as part of the so-called American Jobs Creation Act and taxed there. This temporary tax regime created a one-time opportunity for the group to repatriate profits earned abroad as dividends at a favorable US tax rate. The normally applicable US tax rules regarding dividends during the case period were otherwise in practice prohibitive for the repatriation of dividends from abroad, as taxation was at the applicable US corporate tax rate of (up to) 35%, which meant significant double taxation of profits earned outside the US. NetApp USA therefore decided to repatriate the largest possible amount of dividends relating to the profits generated abroad, which amounted to USD 550 million (including approximately USD 113 million - subsequently increased to approximately USD 197 million - in previously paid-in capital).

The entire transaction process started with the decision in NetApp USA to repatriate the proceeds.

It also appears from NetApp USA's financial statements as of April 30, 2005 (TE 18), i.e. six months before the dividend distributions from NetApp Denmark to NetApp Cyprus, that the US company was in the process of determining the extent of the possible dividend distribution to the US from the Group's foreign subsidiaries. At that time, the expected (taxable) dividend amounted to USD 355 million (which ended up being USD 405.5 million).

Thus, there is no doubt whatsoever as to the purpose of the dividends (which in reality came from NetApp Denmark's subsidiary and thus also flowed through Denmark) from NetApp Denmark and that they were intended *in advance* to flow on to NetApp USA.

*Re 2. NetApp Bermuda has not (actually) been able to dispose of the dividends*

NetApp Bermuda has not (actually) been able to dispose of the dividends, as the dividends were imperative for NetApp Bermuda to be able to make the dividend distribution of USD 550 million under the American Jobs Creation Act to NetApp USA. NetApp Ber- muda therefore had no other option to dispose of the dividends than to redistribute them to NetApp USA, which also corresponded to the decision that NetApp USA had made in advance.

Thus, it follows from the presented internal accounts for 2005/06 for NetApp Bermuda [...] that the company had an income ("divi- dends received") of USD 91.45 million (DKK 565,896,000) corresponding to the dividend from NetApp Denmark via NetApp Cy- pern, and that this income contributed to creating free reserves in NetApp Bermuda to distribute and pay the dividend of USD 550 million to the parent company, NetApp USA.

In fact, the dividend distribution resulted in a negative equity of USD 18.9 million. [...]. The reason why more could be distributed than the equity "on the books" was, among other things, that an additional dividend of USD 16 million (DKK 92 million) was on its way from Denmark for the 2005/06 financial year. Both dividend amounts are thus included in the dividend distribution of USD 550 million shown in the financial statements.

The Ministry of Taxation disputes the probative value of the internal accounts. In addition, it should be noted that the financial statements comply with applicable local accounting legislation. In addition, and more importantly, the figures contained in the financial statements are prepared on the basis of consolidated financial statements that are subject to the US Securities and Exchange

ring. The accounting figures presented are thus an integral part of the listed US parent company's consolidated financial statements for the entire group - audited by Deloitte - for the period 2005/06 [...]. NetApp Denmark has provided documentation that the figures were included in the basis for these audited financial statements, including that significant parts of the Group's balance sheet items were located in NetApp Bermuda, so it is inconceivable that the Group's auditors from Deloitte, who provided the consolidated financial statements for 2005/06 for NetApp USA with a clean audit opinion, should not also have audited the figures from NetApp Bermuda. This will be documented during the main hearing.

**1651**

It is also quite clear from these financial statements [...] that NetApp USA (under Section 965 of the previously mentioned American Jobs Creation Act) has received dividends from its foreign subsidiaries to such an extent that there are no longer any earned - distributable - reserves of significance in the group's foreign subsidiaries. NetApp USA has thus "emptied" the underlying subsidiaries, including NetApp Bermuda, of free reserves - i.e. earned profits - which is why the Danish dividends necessarily constituted part of the USD 550 million that was distributed and paid in cash to NetApp USA.

In connection with the question of whether NetApp Bermuda should be considered a "flow-through company" for the dividends at issue in the case, the Ministry of Taxation has during the preparation of the case attached great importance to the substance and other activities of NetApp Bermuda [...].

Thus, the Ministry attaches importance, inter alia, to the fact that "NetApp Bermuda was a well-established company that had operated for many years as a central and integral part of the group, owning both the data companies outside the United States and intangible assets, and had a very substantial financial position" [...]. The Ministry even goes so far as to say that NetApp Bermuda had "real" substance [...]. In addition to disputing that NetApp Bermuda had any substance in the form of daily activity with employees etc. the view is noteworthy, as it completely contradicts The Ministry of Taxation's general view in the "beneficial owner" case complex of what determines whether a company should be considered a "flow-through company" in relation to a dividend received (or interest received). The Ministry of Taxation's own submission in a similar case states [...]:

"When assessing whether a company is the rightful owner of an interest income, the assessment must be made in relation to the interest income in question and the circumstances relating to it. It is therefore irrelevant to the assessment whether the company in question may have other income and activities. The decisive factor is an assessment of the specific transaction ..." Thus, a so-called "transaction-based assessment" must be made, i.e. a specific assessment of the funds that may flow through the company in question, and not of the company's activity in general. The Ministry of Taxation notes that NetApp Bermuda has had full disposal of the received dividend of USD 91.45 million, as the company has used the funds to purchase bonds. Like other companies, the NetApp Group does not keep large cash balances in a regular bank account for long periods of time. After receiving the amount on October 28, 2005, the Group therefore temporarily invested it in highly marketable bonds. These bonds were sold again before the dividend distribution to NetApp USA on April 3, 2006, so that the cash could be paid out to NetApp USA. Whether the funds remain in a bank account or are placed in highly marketable bonds (in order to obtain a better return) is

irrelevant to the question of the company's disposal of the funds. The company could - with ministe-

the company's own words - did not have "substantial control" over the funds as they were to be transferred to the USA. Moreover, the aforementioned transactions were made in the US by the US parent company. As mentioned, NetApp Bermuda had no employees etc.

In summary, it can thus be concluded that the Danish dividends were imperative for the distribution of USD 550 million from NetApp Bermuda to NetApp USA and that NetApp Bermuda therefore could not dispose of the dividends in any other way.

*Re 3. the dividends actually flowed through NetApp Bermuda and on to NetApp USA*

It appears [...] that the proceeds flowed through NetApp Bermuda and on to NetApp USA.

As money is genus, in NetApp Denmark's view, the only requirement is that USD 550 million was actually distributed from NetApp Bermuda to NetApp USA and that the Danish dividends were necessary for the distribution in question, as documented above. However, it can also be documented that the dividends in question were actually included in the actual cash flow to NetApp USA.

As mentioned, NetApp Bermuda received the amount of USD 91.45 million from NetApp Cyprus on October 28, 2005. And as also mentioned, the NetApp Group does not hold large cash balances in a regular bank account for an extended period of time, and therefore the Group made a temporary investment in highly marketable bonds. Prior to the dividend distribution to NetApp USA on April 3, 2006, these bonds were sold again so that the cash could be paid out to NetApp USA. The amount was thus included in the total transfer to NetApp USA and was taxed there.

The dividend of USD 91.45 million (DKK 565,896,000) has thus actually flowed through NetApp Bermuda and on to NetApp USA.

As regards the second dividend of USD 16 million (DKK 92,012,000), it is noted that it is a fact that the amount was included in the dividend of USD 550 million [...] and that this amount was raised temporarily by taking out the USD 300 million loan. [In fact, the dividend of USD 16 million (DKK 92,012,000) was not paid from NetApp Cyprus to NetApp Bermuda until a later income year, which, however, according to the Ministry's own view, is not decisive for whether "flow-through" has occurred. Thus, the other dividends have also flowed

**1652**

through NetApp Bermuda and on to NetApp USA (and taxed there).

The Ministry of Taxation has noted that there was "no temporal or monetary connection between NetApp Bermuda receiving the money from NetApp Cyprus and the dividend distribution on April 3, 2006 of USD 550 million to NetApp USA" [...].

Firstly, it is, of course, irrelevant whether the amount in question is only a part of a larger amount that is (re)paid. The decisive factor is thus whether the amount under assessment has been paid on (i.e. here included in the larger amount distributed). In this complex of cases, the Danish Ministry of Taxation would hardly take a similar view towards an alleged "flow-through company" in another EU country.

Finally, for the record, it should be noted that NetApp USA is not itself a flow-through entity, as appears to be agreed. Thus, after receiving the dividend of USD 550 million, NetApp USA has used the funds in the company in accordance with the so-called "Section 965 Domestic Re-investment Plan" as submitted to the US tax authorities under the American Jobs Creation Act [...].

As stated above, there is nothing in this case to suggest that NetApp Bermuda is the "rightful owner" of the proceeds.

On the contrary, the above has fully demonstrated that the conditions set to the Ministry of Taxation to consider NetApp USA as the "beneficial owner" of the dividends instead of NetApp Bermuda are met.

And thus, as mentioned, the entire basis for the collection of Danish withholding tax according to SEL section 2(1)(c) lapses.

8. TAX MUST BE WAIVED AFTER THE PARENT/DATE TER- COMPANY DIRECTIVE

*8.1 The objective conditions for exemption in the Directive are met* The second sub- plea to NetApp Denmark's main plea that the company has not been obliged to withhold dividend tax is, as mentioned, that NetApp Cyprus has an unconditional claim that the dividend tax must be waived under the Parent-Subsidiary Directive.

The Parent-Subsidiary Directive (90/435/EEC) [...] introduced a common system of taxation for parent and subsidiary companies from different Member States. The purpose of the directive is to exempt dividends and other distributions of profits paid by subsidiaries to their parent companies from withholding tax. The Directive was amended by Council Directive 2003/123/EC [...].

The provision that no withholding tax may be imposed on dividends is contained in Article 5(1) (as amended in 2003) [...].

The Directive sets out both a capital requirement and a holding period requirement. The capital requirement is laid down in Article 3(1) (as amended in 2003) [...] and amounted to 20% in 2005.

According to Article 3(2) [...], each Member State may introduce a maximum holding period of 2 years. The ownership period requirement in SEL section 2(1)(c) is 1 year, and the only requirement is that the distribution must be within this period.

It is claimed that NetApp Cyprus, which undisputedly fulfills both the capital requirement and the ownership period requirement in the Parent-Subsidiary Directive, has an unconditional claim to be exempt from withholding tax on the dividends from NetApp Denmark.

This has been accepted by the National Tax Tribunal in its ruling of December 16, 2011 [...].

*8.2 No "rightful owner" condition in the directive*

It is a fact that the Parent-Subsidiary Directive - unlike the Interest/Royalty Directive (2003/49/EC) [...] - does not contain a condition that the parent company must be the "beneficial owner" of the dividends received.

This is not an error or omission, but rather an opt-out. In this regard, it should be noted that the 'beneficial owner' requirement has been included in the Model Tax Convention since 1977, that the extension of the OECD commentary on this concept appeared in early 2003, that the Interest/Royalty Directive was adopted by the Council on 3. The Interest/Royalty Directive was adopted by the Council on June 3, 2003 and contains a "beneficial owner" requirement (while granting Member States the right to introduce domestic anti-abuse provisions), and the Parent-Subsidiary Directive was amended by the Council on December 22, 2003 without the Council finding reason to include a "beneficial owner" provision. Thus, the EU legislator has - in addition to the fact that Article 1(2) gives Member States the possibility to introduce domestic anti-abuse provisions - considered the capital requirement and the ownership period requirement of 2 years as sufficient conditions for obtaining tax exemption for dividends.

This is also confirmed by the Commission in its submission to the European Court of Justice [...].

Similarly, the opinion of Advocate General Kokott [paragraph 86]

states

This has also been applied by the National Tax Tribunal in its ruling of December 16, 2011 [...].

*8.3 Countering abuse requires national legal basis, cf. Article 1(2) - Kofoed judgment (C-321/05)*

The EU legislator has left it up to each Member State to determine any provisions on abuse of the Parent-Subsidiary Directive. Article 1(2) (from 1990), which was in force in 2005 and 2006, states (...):

"2. This Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse.

**1653**

As can be seen, this is an enabling provision. Thus, each Member State may introduce or maintain whatever national anti-abuse rules it deems appropriate. However, national anti-abuse rules must in themselves be compatible with EU law, including the freedoms guaranteed by the Treaty as established in the case law of the European Court of Justice and not least the principle of proportionality. The CJEU thus ensures that the anti-abuse rules do not go too far.

NetApp Denmark argues that it follows directly from the wording of Article 1(2) of the Directive that a denial of the benefits of the Directive requires a legal basis in national law. That a legal basis in national law is required also follows from the fact that a directive is directed at the Member States (and not at citizens), and that citizens must be able to read their legal position in the national legislation.

The European Court of Justice's judgment of July 5, 2007 in the Kofoed case (C-321/05) [...], which concerned the corresponding provision in Article 11 of the Merger Tax Directive, is consistent with this.

[...]

The European Court of Justice expressly states that only internal Danish legislation on abuse of rights, tax fraud or tax evasion can justify a derogation from the directive's tax exemption provisions. Thus, it is stated in the conclusion of the judgment [...]:

"Consequently, Article 8(1) of Directive 90/434 precludes, in principle, the taxation of such an exchange of shares, unless national legislation on abuse of rights, tax fraud or tax avoidance can be interpreted in accordance with Article 11(1)(a) of that directive and thus justify taxation of the exchange."

These national legal provisions do not have to consist of legislation, but can also be unwritten legal principles (such as in Danish law the principle of realities and the principle of "right income receipt"), see paragraphs 44-46.

In paragraphs 38-42, the CJEU expressly rejects that the "general Community law principle of prohibition of abuse of rights" as reflected in Article 11(1)(a) can be invoked against individuals in the absence of a national legal basis. The reasoning is that "the principle of legal certainty precludes directives per se from creating obligations for citizens. Directives as such cannot therefore be relied on by Member States against citizens', see paragraph 42.

The CJEU followed Advocate General Kokott's Opinion of February 8, 2007, paragraphs 66 and 67 of which state [...]:

"66. Only a direct application of Article 11(1)(a) of Directive 90/434 to the detriment of Hans Markus Kofoed and Niels Toft would be excluded for the Danish authorities. Thus, a Member State cannot rely on a provision of a directive which it has not itself implemented against an individual. According to established case law, a directive cannot in itself create obligations for citizens, and a directive provision cannot therefore be invoked as such against citizens.

67. Similarly, the competent authorities cannot rely directly on any general principle of Community law prohibiting abuse of rights in relation to individuals. In cases falling within the scope of Directive 90/434, such a principle has found specific expression and has been given concrete expression in Article 11(1)(a) of that directive. ..."

The Kofoed judgment thus confirmed what already appears from the wording of Article 1(2) of the Parent-Subsidiary Directive, namely that countering abuse requires a national legal basis.

It also appears from the Ministry of Taxation's comment on the Kofoed judgment in TfS 2008.45 DEP [...] that the Ministry subsequently responded affirmatively in the main case.

In its decision of December 16, 2011 [...] case, the National Tax Tribunal applied the Kofoed judgment.

*8.4 There is no abuse according to the Danish anti-abuse rules applicable in 2005 and 2006*

As stated in section 1.3, a Member State's invocation of Article 1(2) of the Directive on "internal provisions" presupposes that the Member State in question has either adopted a specific national provision to implement this provision in its legal system or that there are general provisions or principles in national law on fraud, abuse, etc. that can be interpreted in accordance with Article 1(2). It is therefore entirely up to each Member State to decide whether and - if so - to what extent it wishes to have anti-abuse rules.

The question is therefore what anti-abuse rules were available to the tax authorities in 2005 and 2006 when the distributions took place.

In connection with the implementation of the Parent-Subsidiary Directive in Danish law by Act no. 219 of April 3, 1992, a specific protective rule was inserted in section 16 B(5) of the Danish Tax Assessment Act regarding the then applicable so-called "holding rules", which was thus extended to also apply to parent companies with limited tax liability. It is explicitly stated in the comments to the bill's

§ 3 [...] and § 6 [...] that the safeguard rule was inserted with reference to Article 1(2) of the Directive on national anti-abuse rules. The actual content of the specific safeguard rule is irrelevant to the present case. This was the only specific safeguard introduced together with the Parent-Subsidiary Directive.

The Danish legislator has thus found that there was otherwise the necessary protection against abuse in the

**1654**

court-created case law on the reality principle and the 'rightful income recipient' principle [...].

The parties agree that the legal position regarding anti-abuse rules in Danish law in 2005 and 2006 was as set out in paragraphs 55-59 of the order for reference [...].

This shows that in 2005 and 2006 there was no general statutory anti-abuse rule. Denmark only introduced such an anti-abuse provision with effect from May 1, 2015 - as a result of the obligation for Member States to introduce such a measure adopted in Directive 2015/121/EU (paragraph 55), see also below in section 8.5.

On the other hand, the so-called reality principle (paragraph 56) and the principle of "rightful income recipients" (paragraph 58) have been developed in case law.

Jakob Bundgaard and Niels Winther-Sørensen, SR-SKAT 2007.508, is in accordance with this. The opinion concerns the corresponding abuse provision in Article 5 of the Interest/Royalty Directive [...].

The Danish tax authorities thus have two court-created instructions available to deal with cases of abuse, namely the principle of "rightful income recipient" and the principle of reality ("sub-

Copyright © 2023 Karnov Group Denmark A/S

stance-over-form"). Both of these instruments are central to this case. Partly because they both address the problem at hand, and partly because the Danish Ministry of Taxation (and the Danish legislator), right up to the start of this complex of cases in 2008, has been of the opinion that these instruments provided the necessary (desired) protection against cases of abuse, [...].

As stated in paragraphs 25 [...] and 59 [...] of the order for reference, the Ministry of Taxation acknowledges that the recipient of the dividends, NetApp Cyprus, is the "proper recipient of income" of the dividends in question.

Similarly, the Ministry of Taxation acknowledges in paragraph 57 of the referral ruling [...] that the principle of reality does not provide a basis for setting aside the transactions made in the case. SKAT originally tried to deny exemption from taxation in the "beneficial owner cases" on the basis of substantive considerations, but had to recognize that there was no basis for this, cf. the judgments in TfS 2003.889 H (Over- Hold ApS) [...] and TfS 2006.1062 H (Finwill ApS - "Elevatorsa- gen") [...].

Thus, the parties agree that neither the principle of "rightful income recipient" nor the principle of reality can be invoked in support of the Ministry of Taxation's claim.

There is thus no abuse according to the Danish anti-abuse rules applicable in 2005 and 2006.

This has been accepted by the National Tax Tribunal in the ruling [...].

*8.4.1 The Ministry of Taxation's three arguments that in 2005 and 2006 there was a specific legal basis in Danish law to deny the benefits of the directive due to abuse are not sustainable*

The Ministry of Taxation has put forward three arguments in support of the claim that there should be a legal basis in Danish law to specifically deny the benefits of the Directive due to abuse. The three arguments are discussed below in sections 8.4.1.1 - 8.4.1.3.

As will be shown, none of these arguments are sustainable.

*8.4.1.1 SEL § 2(1)(c) is not a specific national provision within the meaning of Article 1(2) of the Directive (question 1.1 to EUD)*

The Ministry of Taxation argues that section 2(1)(c) of the SEL in itself contains the necessary internal legal basis to deny the benefits of the Directive in case of abuse. The view is based on the following sentence in the provision [...]:

"It is a condition [for tax exemption] that the taxation of the dividends must be waived ... in accordance with the provisions of Directive 90/435/EEC ..."

The view is rather that Denmark does not "must" waive withholding tax unless there is an obligation to do so under the Directive, which - according to the view - does not exist if there is an abuse. The mere reference to the directive should thus - according to the view

- imply an exercise of the authorization in Article 1(2) and thus that a national anti-abuse rule is (automatically) introduced in Danish law.

It should be obvious that the Ministry of Taxation's artificial attempt to "create" a statutory anti-abuse rule is not sustainable. For many reasons.

Not even the logic is in place, because the postulated result is included as a precondition for the reasoning. Thus, when the Ministry of Taxation claims that there is no obligation to waive withholding tax if there is abuse, this is only a correct premise if Denmark has (already) chosen to implement an anti-abuse provision in accordance with Article 1(2), but this is not the case. The first premise of the argumentation thus presupposes the result, and the argumentation is thus circular.

The general reference to the Directive thus implies an

implementation of the Directive as it stands, including with the authorization to

the provision in Article 1(2), but it does not imply a decision on whether the authorization should be used, and thus not an implementation of an anti-abuse rule in Danish law. The mere reference to the Directive suggests nothing whatsoever about Denmark's intention to introduce an (optional) national anti-abuse rule when introducing the statutory rule in 2001, let alone what such a rule - if any - should consist of.

On the contrary, it is a fact that the Danish Ministry of Taxation and the Danish legislator, when introducing section 2(1)(c) of the Danish Corporation Tax Act in 2001, did not specifically find the need and therefore did not want to introduce a

**1655**

The interpretation of section 2(1)(c) of the Danish Corporation Tax Act, which the Ministry of Taxation now applies and which is invented for this case, is thus in direct conflict with the legislative history of this provision from 2001.

As can be seen [...], the legislator was also fully aware that if additional abuse rules beyond the generally applicable ones (the reality principle and the "rightful recipient" principle) were desired, this should, according to Article 1(2) of the Directive, be done by supplementary legislation, as was also done in connection with the original implementation of the Directive by Act No. 219 of April 3, 1992 [...].

[...]

In the Commission's submission, the Ministry's argument in point 9 (...) states: *"In the Commission's view, this line of reasoning cannot be accepted"*, which is substantiated in the following points. And in the Commission's proposed answer to question 1.1, it states [...] that SEL § 2(1)(c) "cannot be considered to be a specific national provision within the meaning of Article 1(2) of the Directive".

Similarly, point 106 of the Advocate General's proposal states [...]:

"For this reason, the answer to questions 1.1 and 2 is that neither § Section 2(2) [now (1)](c) of the Danish Corporation Tax Act or a provision in a double taxation treaty which, as regards the taxation of distributed dividends, is based on the beneficial owner, are sufficient to be regarded as implementing Article 1(2) of the Parent-Subsidiary Directive." The CJEU has not answered question 1.1, as the Court instead chose to introduce the "general EU law principle of prohibition of abuse", which is discussed below in section 8.6.

As can be seen, the Ministry of Taxation's plea has no merit whatsoever.

The National Tax Tribunal also rejected this plea in the ruling [...].

*8.4.1.2 The "beneficial owner" condition in a DBO is not such a contractual anti-abuse provision covered by Article 1(2) of the Directive [...].*

The Ministry of Taxation further argues that the condition of "beneficial owner" in the double taxation agreement between Denmark and Cyprus (from 1981) is a treaty-based anti-abuse provision which is covered by Article 1(2) of the Directive. In this view, it is therefore irrelevant that the Directive itself does not set out a requirement for "beneficial owner".

This artificial attempt to "create" an internal anti-abuse rule is not sustainable either. As mentioned above in section 8.2, it was an opt-out when the EU legislator did not include a "beneficial owner" condition in the Directive, as confirmed by the Commission and the Advocate General. Therefore, this condition cannot (automatically) be included "by the back door".

NetApp Denmark also argues that the model agreement's condition of "rightful owner" cannot be considered a provision,

"necessary to prevent fraud and abuse" within the meaning of Article 1(2). Thus, the condition is not an anti-abuse measure, but rather a rule that only the person who is the taxpayer of the proceeds (the "beneficial owner") can claim relief under the treaty. This is explicitly stated in paragraph 12 of the 1977 Commentary to the OECD Model Convention [...], which was in force at the time of the conclusion of the Danish-Cypriot Double Taxation Convention in 1981. In the Directive, this consideration is instead taken care of by the capital and ownership period requirement.

It is widely recognized in the international tax literature that the Model Tax Convention's "beneficial owner" condition is not an anti-abuse provision. For example, Professor Adolfo Martin Jiménez, World Tax Journal, 2010 [...], is of the opinion that "beneficial owner" is an "attribution-of-income rule" - like the principle of "rightful income recipient" in Danish law - and not an "anti-avoidance rule". Therefore, it is not an "economic interpretation", but a "legal interpretation", and the intention of the parties is therefore irrelevant [...]]

Philip Baker, QC, Double Taxation Conventions, 2010 [...], who states generally on the concept of "beneficial owner" that "unfortunately, the meaning of the phrase still remains less than fully clear" (...), agrees, suggesting that the determination of who is the "beneficial owner" depends on who is entitled to the amount in the event of bankruptcy of the recipient.

It is further submitted that the term 'conventions' in Article 1(2) must be interpreted as meaning that it presupposes that the Member State may rely on the double taxation convention to the detriment of the taxpayer under its domestic law, which is not possible under Danish law.

The view of the Ministry of Taxation leads, among other things, to the contradictory result that a recipient of dividends will have less protection under the directive in the case where there is a double taxation agreement (whose purpose is to reduce taxes) between the countries involved than in the case where there is no such agreement. For example, Denmark has not had double taxation treaties with France and Spain since 2009. If the view were correct, NetApp Cyprus (and thus NetApp Denmark as withholding agent) for the period after 2009 would thus have been better off if

**1656**

NetApp Cyprus would have been based in France or Spain instead.

In addition, there is no basis for assuming that the Ministry of Taxation and the Danish legislator when introducing SEL § Section 2(1)(c) in 2001 had no desire whatsoever to extend the meaning of the OECD Model Convention on "beneficial owner" to apply to the Parent-Subsidiary Directive as an independent anti-abuse rule. On the contrary, it is clear that the legislator assumed that an intermediate holding company could be inserted above the Danish company, which was the "beneficial owner" of the exchange [...].

Also, the Ministry of Taxation's argument that the condition of "beneficial owner" is a treaty anti-abuse provision w i t h i n  t h e meaning of Article 1(2), with the effect that NetApp Cyprus can be denied exemption under the Directive, is thus in direct conflict with the legislative history of SEL § 2(1)(c).

[...]

In paragraphs 18 to 25 of its observations, the Commission rejects in its entirety the plea raised by the applicant and concludes in paragraph 25 [...]:

'In the Commission's view, a provision in a double tax treaty concluded between two Member States and drafted in accordance

U.2023.1575H

with the OECD Model Tax Convention, according to which the taxation of dividends depends on whether the dividends are

Copyright © 2023 Karnov Group Denmark A/S

the transferee is considered the rightful owner of the proceeds or not, does not constitute a "contractual anti-abuse provision" within the meaning of Article 1(2) of the Directive." (...).

As stated in the Advocate General's Opinion, point 106 [...], the Advocate General came to the same conclusion.

The CJEU has not answered question 2 either, as the Court instead chose to introduce the "general EU law principle of prohibition of abuse".

Thus, this plea is not sustainable either. The National Tax Tribunal has also rejected this plea in the appealed order [...].

*8.4.1.3 There are no general principles in Danish law to counter abuse outside of the reality principle (and the principle of "rightful income recipient")*

In pleading 2 of January 10, 2020 [...], the Ministry of Taxation has submitted a new plea that general principles have been developed in Danish case law to counteract abuse that go beyond the reality principle (and - it must be understood - the principle of "rightful income recipient").

Three Supreme Court rulings (U.1998.245H [...], U.2005.649H [...] and U.2015.2277H [...]) are mentioned as examples, where transactions that had been "formally" arranged in such a way that a certain favorable tax rule applied have been set aside for tax purposes on the grounds that the transactions had no "business purpose" or similar. There is also an example of a Supreme Court judgment (U.1999.1714.H, [...]) that has overruled a tax arrangement without using a corresponding reversal.

After the parties' lawyers had jointly advised the High Court in connection with the preparation of the Eastern High Court's order for reference of February 19, 2016 that the legal position in Denmark in 2005 and 2006 was such that there was no general statutory rule on combating abuse, but that there were two court-created instruments that could form the basis for taking action against abuse, namely the principle of reality and the principle of "right income recipient", the Ministry of Taxation now believes that other general principles to counteract abuse apply alongside this.

First of all, it should be noted that all four judgments were available when the parties' lawyers advised the Eastern High Court. Nevertheless, the Ministry of Taxation did not find reason to inform the High Court that the representation of the legal position in the referral order was incorrect, which the Ministry certainly did not believe it was.

In this regard, reference is made to the preparatory works to Act no. 540 of April 29, 2015 regarding the introduction of an anti-abuse clause concerning the Parent-Subsidiary Directive in section 3 of the Danish Taxation Act (LL). In the bill (L 167 2014/15), the Ministry of Taxation has reproduced the applicable law prior to the adoption of the new abuse clause, and thus also in 2005 and 2006. It states herein [...]:

"There is no general statutory anti-abuse rule in Danish tax legislation. According to Danish (legal) practice, taxation takes place after an assessment has been made of what has actually happened. This means that empty and artificial tax-related transactions can be set aside, so that taxation is instead based on the opposite reality. Danish tax law is therefore fundamentally in line with the international principles of 'substance over form'."

As can be seen, the Ministry's presentation of applicable law in the bill corresponds to the presentation in the preliminary ruling [...], whereby it is recalled that the principle of "rightful income recipient" stems from the principle of reality. Thus, there is no mention of other general principles to counter abuse, as the Ministry of Taxation now claims on the basis of a number of

older judgments.

It is therefore unthinkable to assume that the Ministry of Taxation's new plea is a view invented for the occasion. The reality is that the Ministry has regretted its acknowledgement in paragraph 57 of the order for reference [...] that "the principle of reality does not provide a basis for setting aside the arguments presented in this case".

**1657**

dispositions", and now instead tries to qualify the existing case law in a different way.

The new viewpoint has no support - neither in case law nor in literature.

The three first-mentioned judgments are perfect examples of the reality principle being used to set aside the arrangements in question, while the last-mentioned judgment, U.1999.1714.H on Hadsten Bank, is an example of an interpretation of section 3 of the Danish Capital Gains Tax Act (on business shares).

The reality principle covers many different problems. For illustration, see Jon Stokholm in "Højesteret 350 år" [...]]

In all three cases, the taxpayers tried to "set the stage" so that the events appear as "viable tax arrangements", but were seen through by the courts.

The Ministry of Taxation's only reason for these cases not being covered by the reality principle is that it has been included in the courts' premises for setting aside the arrangements that the transactions had no "business purpose" or similar.

However, this is rather a sign that the judgments are an expression of an application of the reality principle. It is thus the general rule that the Ministry of Taxation in cases concerning the reality principle claims that the transactions lack "commercial purpose". This is also confirmed by Jon Stokholm's article [...] The Ministry of Taxation also fails to explain how the Ministry can believe that NetApp Cyprus is the "right income recipient", cf. paragraph 59 of the preliminary ruling [...], and that the transactions cannot be set aside according to the principle of substance, cf. paragraph 57 of the preliminary ruling, which means that there is no question of "empty and artificial tax-related transactions" and that the substance corresponds to the form, cf. paragraph 56 of the order for reference, while the Ministry claims that the transactions must be set aside because they lack "commercial purpose".

It simply doesn't make any sense.

The Ministry of Taxation also fundamentally fails to explain how there could be an abuse at all, when the legislator in the preparatory works to SEL section 2(1)(c) has clearly stated that the incorporation of a Cypriot intermediate holding company between a Danish company and its parent company in a non-DBO country and a subsequent dividend distribution via the intermediate holding company to the company in the non-DBO country does not constitute an abuse.

As can be seen, there are no general principles in Danish law to counteract abuses that go beyond the principle of reality (and "rightful income recipient") and which may lead to NetApp Cyprus being denied exemption from taxation under the Parent-Subsidiary Directive.

*8.4.1.4 To summarize the Ministry of Taxation's three claimed legal bases in Danish law to counter abuse of the Parent-Subsidiary Directive: the legal bases do not exist*

As stated in sections 8.4.1.1.1 - 8.4.1.3 above, none of the three specific legal bases claimed by the Ministry of Taxation exist in Danish law to counteract abuse of the Parent-Subsidiary Directive.

The conclusion is therefore - as it also appears from the Eastern High Court's referral order - that abuse can only be countered

with the principle of reality and the principle of "right income recipient",

and here the parties agree that these anti-abuse rules are not applicable in this case.

Thus, there is no abuse of the Directive under Danish law. The Landsskatteretten's ruling [...] is in accordance with this.

*8.5 The 2015 amendment to the Parent-Subsidiary Directive (and its preparatory work) confirms that countering abuse of the directive still requires a national legal basis*

On December 6, 2012, the Commission published "An Action Plan to strengthen the fight against tax fraud and tax evasion", COM(2012) 722 [...].

Prior to this, the Commission (and the European Court of Justice) had, in relation to the abuse of EU legal acts, mostly focused on the fact that Member States' internal anti-abuse rules must not go too far in relation to excluding the benefits resulting from EU legal acts, cf. COM(2007) 785 on "The application of anti-abuse measures in the area of direct taxation - in the EU and in relation to third countries" [,...]. The conclusion of this Communication states that (...):

"The Court has delivered a number of important judgments in this area, clarifying the limitations on the lawful application of anti-cat evasion rules. The judgments will undoubtedly have a significant impact on existing rules which are not designed with these limitations in mind. In particular, it is clear that the rules must not be drafted too broadly, but must be aimed at situations where there is no real establishment or, more generally, where there is no commercial basis." (...). With the action plan of December 6, 2012 [...], however, "the tone changed". The EU joined the fight against tax fraud and tax evasion in earnest. This happened at the same time as the G20 countries and the OECD launched the so-called BEPS project (Base Erosion and Profit Shifting). At this time, there was a significant international build-up in the fight against tax fraud and tax evasion.

The action plan contains a number of proposals, recommendations and initiatives. [...].

**1658**

Thus, the Commission felt that there was a need for concerted action. It states this under the heading "A review of EU anti-abuse legislation" [...]:

"The Commission will also review the anti-abuse provisions of the Interest and Royalties, Mergers and Parent-Subsidiary Directives with a view to implementing the underlying principles of the Commission Recommendation on aggressive tax planning."

Finally, the conclusion states [...]:

"Tax fraud and tax evasion is a multifaceted problem that requires a coordinated and multidimensional response. Aggressive tax planning is also a problem that requires urgent attention. These are global challenges that no single Member State can tackle alone.

This action plan identifies a number of specific measures that can be developed now and in the coming years. It also represents a general contribution to further international debate on taxation and aims to support G20 countries in their ongoing work in this area. The Commission believes that the combination of these actions can provide a comprehensive and effective response to the various challenges posed by tax fraud and evasion and thus contribute to increasing the fairness of Member States' tax systems, to securing much-needed tax revenues and ultimately to encouraging the smooth functioning of the internal market." [...].

In line with the Action Plan, on 23 November 2013 the Commission presented a proposal to amend the Parent-Subsidiary Directive, COM(2013) 814 [...], which included a proposal

on a general anti-abuse rule that was mandatory for Member States to implement in their national law. [...] The proposal further states [...]:

"Anti-abuse provision

The current Parent-Subsidiary Directive allows Member States to apply internal rules or agreements that are necessary to prevent fraud and abuse.

...

When all these factors are taken into account, it is clear that action by Member States individually will not be as effective as action by the EU."

At the same time as the proposed amendment to the Directive, the Commission issued a Memo entitled "Questions and Answers on the Parent Subsidiary Directive" [...]. Under the heading "Which companies would be affected by the new proposal? it states [...]:

"Example 1: anti-abuse rule

Member State A has withholding taxes on dividend payments to parent companies resident in a non-EU-country X. Member State B has no withholding taxes on dividend payments to parent compa- nies in country X.

If a subsidiary in Member State A is owned directly from country X, there will be withholding taxes on profit distributions.

If the parent company in country X sets up an intermediate subsidiary in MS B, the withholding tax in Member State A can be avoided. Member State A cannot have withholding taxes on profit distributions to a parent company in another Member State under the PSD.

The anti-abuse rule could be applicable in Member State A if the set-up is a wholly artificial arrangement where the essential purpose for the insertion of the intermediate company in Member State B is to avoid the withholding taxes in MS A, e.g. a letterbox company with no substance. As a consequence of the application of the anti- abuse rule, the benefits of the Directive (including the non-applica- tion of the withholding) would be denied." [...].

It is clear from the example that under the Parent-Subsidiary Directive as it stood before the addition of the mandatory anti-abuse rule in 2015 ("Current situation"), it was not possible to deny exemption from withholding tax on the distribution from MS A to MS B - even if MS B may be a "Artificial Intermediate subsidiary".

With the adoption of Directive 2015/121/EU by the Council on January 27, 2015, Article 1(2) of the Parent-Subsidiary Directive was amended to require Member States to implement the general anti-abuse clause.

The preamble of the amending directive states, among other things, [...]:

'(2) It is necessary to ensure that Directive 2011/96/EU is not misused by taxpayers falling within its scope.

(3) Some Member States apply domestic provisions or conventions aimed at tackling tax evasion, tax fraud and abuse in a general or more specific way.

(4) However, these provisions may have different degrees of severity and are in any case designed to reflect the specificities of each Member State's tax system. Finally, there are Member States that do not have internal rules or conventions to prevent abuse.

(5) Therefore, the introduction of a common minimum anti-abuse rule in Directive 2011/96/EU would be very useful in order to prevent abuse of this Directive and ensure greater consistency in its application in the different Member States.

...

(9) This Directive should in no way affect the possibility for Member States to apply their internal

**1659**

provisions or agreements aimed at preventing tax evasion, tax fraud or abuse." (...).

Article 1 of the amending directive reads as follows [...]:

'In Directive 2011/96/EU, Article 1(2) is replaced by the following paragraphs:

"2. Member States shall not grant the advantages provided for in this Directive to arrangements or series of arrangements which are designed to obtain, or have as one of their main purposes, a tax advantage contrary to the content or purpose of this Directive and which are not genuine in the light of all the relevant facts and circumstances.

An event can include multiple steps or parts.

3. For the purposes of paragraph 2, events or series of events shall be considered not to be genuine to the extent that they are not organized for well-founded commercial reasons reflecting economic reality.

4. This Directive shall not preclude the application of domestic provisions or agreements necessary to prevent tax evasion, tax fraud and abuse." [...].

By Act no. 540 of April 29, 2015, the new general anti-abuse rule has been implemented in Danish law as section 3 of the Danish Taxation Act (LL) [...]. The Danish legislator has taken the opportunity to apply the provision not only to the Parent-Subsidiary Directive, but also to the Interest/Royalty Directive and the Merger Tax Directive. A general anti-abuse rule concerning double taxation treaties has also been inserted in section 3(2) of the Danish Income Tax Act.

The law came into effect for transactions from as of May 1, 2015.

As can be seen, the Commission, the Council and the European Parliament have always assumed that countering abuse of the Parent-Subsidiary Directive requires a national legal basis in the Member State invoking the abuse. This follows directly from the wording of the provision in Article 1(2) of the Directive applicable until 2015, which authorizes Member States to introduce anti-abuse rules, as confirmed by the European Court of Justice in the Kofo- ed case (C-321/05). For the period after May 1, 2015, it appears from Article 1, paragraphs 2 - 4, and from section 3 of LL.

For Denmark, this means that until 2015, the tax authorities had two instruments available to counter abuse: the principle of fairness and the "right income recipient" principle. From May 1, 2015, Denmark can also apply the mandatory abuse rule in LL § 3.

From an EU perspective, this means that the EU legislator has ensured that from 2015 all Member States have implemented what the EU legislator considers to be the ideal anti-abuse rule regarding the Parent-Subsidiary Directive.

Just for the sake of completeness, it should be noted that on July 12, 2016, the Council adopted Directive (EU) 2016/1164 (the so-called Tax Avoidance Directive), which among other things contains a general anti-abuse rule (Article 6), similar to the new anti-abuse rule in the Parent-Subsidiary Directive, but which applies in all areas. The rule has been implemented in Denmark through an amendment to LL § 3.

The final reports on the 15 OECD anti-BEPS measures were published on October 5, 2015, and a large number of initiatives have subsequently been implemented both at the OECD and EU level. The G20/OECD and EU driven process against international tax abuse over the last decade has not only led to the adoption of a large number of new anti-abuse rules, but has also changed the political view on what constitutes an abuse in the first

place.

It is therefore important to realize that the question of whether abuse has occurred at a given time must be assessed in

in relation to the understanding of the anti-abuse rules applicable at the time.

*8.6 The general EU law principle of prohibition of abuse proposed by the CJEU has not - as claimed by the CJEU*

*- Direct impact for citizens*

*8.6.1 Background information*

In this case, the Eastern High Court asked 15 questions to the EU Court of Justice.

Advocate General Kokott, who was also Advocate General in the Kofoed case (C321/05), suggested that all the questions should be answered in NetApp Denmark's favor, while the CJEU came to the opposite conclusion.

Question 1 concerned whether countering abuse of the Parent-Subsidiary Directive requires a national legal basis under Article 1(2) of the Directive.

Advocate General Kokott suggested in his opinion of March 1, 2018

- in accordance with the CJEU's answer to the corresponding question in the Kofoed judgment - that the question should be answered that national legal basis is required [...].

In its judgment of February 26, 2019, the European Court of Justice came - most surprisingly - to the exact opposite conclusion, namely that no national legal basis is required, cf. paragraph 2 of the judgment [...]

As can be seen, the Court bases its finding on the existence of a "general principle of EU law prohibiting abuse" that can be applied directly to citizens.

In his opinion, points 99 and 100 [...], the Advocate General had denied that the general EU law principle of prohibition of abuse could be invoked directly against citizens, but the EU Court of Justice did not agree.

The Advocate General had made exactly the same point about the rejection of the general EU law

**1660**

principle of prohibition of abuse in its opinion in the Kofoed case, paragraphs 66 and 67 [...], but at that time the CJEU followed the Advocate General.

It is thus a fact that the European Court of Justice in its decision of February 26, 2019 in this case has overturned the Kofoed judgment and thus changed practice retroactively - at least to 2005.

NetApp Denmark argues that the said principle is not directly applicable to citizens, as the European Court of Justice does not have jurisdiction to make this decision, as Denmark has not ceded sovereignty.

*8.6.2 More about the CJEU's judgment of February 26, 2019*

The CJEU's conclusion is the result of a longer line of argumentation in the grounds.

The CJEU starts by stating in paragraph 70 [...] that it

"it follows ... from settled case-law that there is a general principle of EU law that citizens must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse". [...].

It is further stated in paragraph 71 that "It is incumbent on citizens to comply with this general principle of law". [...].
Reference is made to the Kofoed judgment, paragraph 38 of which states: "Citizens may not rely on Community provisions fraudulently or with intent to abuse them". The Court then states the content of the principle of abuse in paragraph 72:

[...]

According to paragraph 75, "the principle of prohibition of abuse is a general principle of EU law which applies irrespective of the question whether the rights and benefits

which have been

abused, has a legal basis in the Treaties, in a regulation or in a directive
...". [...].

This "general principle of EU law" is thus floating in the air, has a higher legal source value than even the treaties and does not require anchoring in national law. A concrete application of the principle does not depend on an interpretation of the relevant legal act, but solely on the existence and higher rank of the principle, which, so to speak, precedes the content of the legal act. The principle is created by the CJEU and can only be interpreted by the CJEU, cf. the conclusion of the judgment above.

In paragraph 76, the Court mentions that the general prohibition of abuse has been applied with direct effect to individuals in the field of VAT law and refers to the two well-known precedents Italmoda (C-131/13 and Others) [...] and Cussens and Others (C-251/16) [...].

However, according to the CJEU, the principle also applies to the (few) directives that exist in the area of direct taxes (which are not harmonized), and this applies even though these directives expressly presuppose that abuse can only be countered if there is a legal basis for this in national law. Thus, it is stated in paragraph 77: [...] Or to put it another way. The general principle of EU law trumps the content of the specific legal act.

Against that background, the Court concludes in paragraph 83 [...] The following paragraphs 84-92 contain the Court's attempt to explain away that the Kofoed case (C-321/05), in which the Court came to the opposite conclusion, namely that national jurisdiction is required, should have any bearing on the outcome of the present case.

Let it be said right away. It does not succeed, and the Court ends up "throwing in the towel". Because it cannot be explained away.

The Court starts in paragraph 86 by faithfully reporting that the principle of legal certainty was very decisive for the outcome of the Kofoed case: [...]]

The Court attempts to circumvent this earlier reasoning by making a semantic rewriting of the problem. Thus, in paragraph 91, it states that the refusal of a benefit under a directive does not (any longer) entail the imposition of an obligation on the citizen concerned under that directive "but is merely the consequence of the finding that the objective conditions for obtaining the benefit sought, which are laid down in that directive in respect of that right, are satisfied only formally ...". Hocus pocus. In this way, an obligation for the citizen has become a failure to fulfill a condition. But the problem remains exactly the same for the citizen. The citizen does not know the conditions (i.e. the content of the anti-abuse rules). They are still not stated in national law, but (now) float in a general principle of EU law that cannot even be read in the directive. The legal certainty concerns are therefore the same - or actually even greater with a general principle of EU law.

This justification for abandoning the previous practice does not seem convincing and, for lack of better arguments, the Court of Justice has also chosen to make its position clear in paragraph 89: [...].

Thus, no other credible reason can be given for why the CJEU has changed its practice than that the Court of Justice - under the impression of the moral arming by the OECD and the EU since 2012 - has regretted the Kofoed judgment. On the other hand, the CJEU has at the same time disregarded any consideration for legal certainty for EU citizens.

See, for example, Niels Winther-Sørensen in SR.2019.174 [...].

*8.6.3 Reactions to the verdict - surprise and criticism*

The European Court of Justice's ruling of February 26, 2019 has

obviously come as a huge surprise to everyone. No one

**1661**

was aware of the existence of a general EU law principle prohibiting abuse, directly applicable to citizens, in the field of direct taxation (which did not exist before the judgment was delivered).

The Commission was thus unaware of this principle. If the principle had applied, it would not have been necessary for the Commission to propose the insertion of a mandatory general anti-abuse clause in the Parent-Subsidiary Directive in 2015. The example in the Commission memo of November 25, 2013 [...] also assumed that no such principle applied. Similarly, it would not have been necessary to insert a general anti-abuse clause in the Tax Avoidance Directive in 2016.

For the same reason, the Commission also proposed in its observations that the Court should answer Question 1 in accordance with the Kofoed judgment [...].

The EU legislator - the Council and Parliament - who adopted these directives were similarly unaware of the general unwritten principle.

Advocate General Kokott, who was also the Advocate General in the Kofoed case, was also unaware of the existence of this principle with the above content. She therefore suggested that the Court follow the Kofoed case and advised the Court against extending the principle to the field of direct taxation [...].

The National Tax Tribunal was not aware of the new principle either and therefore relied on the Kofoed judgment in its decision of November 16, 2011 [...].

Both Danish and international literature has been surprised and critical of the verdict.

See, for example, Erik Banner-Voigt in RR.2019.7.58 [...].

Haslehner and Kofler write in Kluwer International Tax Blog about the Court of Justice's introduction of the new principle [...]:

"This finding is not only an unwelcome surprise, it also rests on a weak doctrinal foundation and may only be explained on account of the specificities of Danish legislation."

The Kofoed judgment states [...]:

"The Court's precedent in Kofoed has made it (seemingly) clear that national tax authorities are precluded from relying directly, against a taxpayer, on the anti-abuse reservation of Art 15 of the Merger Directive (unless there is some way to interpret Danish law to that effect)."

This is stated by Joachim Engli[s]h in Common Market Law Review under the heading "The Danish tax avoidance cases: New milestones in the Court's anti-abuse doctrine" [...]:

"The Danish cases are landmark rulings, also because the court unambiguously held the general principle of prohibition of abuse of EU law to be directly applicable, irrespective of the nature of EU law that is allegedly being abused.

...

However, the author finds the reasoning of the Court regarding direct applicability of the general principle in the context of EU directives, as is at issue in the six Danish cases, unconvincing on several grounds."

It is difficult to understand what motivated the Court to make the change in practice.

At the time of the judgment in 2019, the EU legislator had long since introduced the general anti-abuse rules desired by the EU, both in the Parent/Subsidiary Directive (2015) and in the Tax Avoidance Directive (2016).

Thus, the Court did not add anything to the legal position that did not already apply under these rules - apart from the retroactive effect. It is therefore a realistic assumption that the Court made the change in practice because it appeared from

paragraphs 57 and 59 of the order for reference that the parties agreed that the national rules on abuse available in 2005 and 2006 - on substantive grounds - were not applicable.

sentence and the principle of "rightful income recipient" - led to the conclusion that there was no abuse under Danish law. Only by giving the judgment retroactive effect could the Court come to the rescue of the Ministry of Taxation.

There is hardly any national legal system in the civilized world that would accept that a change in practice can have a 14-year retroactive effect.

The European Court of Justice usually prides itself on the principle of legal certainty. It has simply not been applied in these cases. On the contrary.

This is law-making (political) activity on the part of the EU Court of Justice. The Court of Justice itself has invented the 'general EU law principle of prohibition of abuse', determines its scope, is the only court that can interpret the principle and - as it now turns out - can give it retroactive effect as it sees fit. The democratic process is short-circuited. Both the EU legislator and the Danish legislator are disconnected from the process, and the Danish courts are obliged to execute the CJEU's judgment, the content of which is miles away from the principle of legality and Section 43 of the Danish Constitution. If it is up to the European Court of Justice.

Add to this the fact that the Court has taken no interest whatsoever in the Danish legislation on limited tax liability (SEL § 2(1)(c)) and the preparatory works to this provision. In the opinion of the CJEU, it is completely irrelevant what the legal position was in Denmark in 2005 and 2006. The Danish courts must simply comply with how the CJEU today (after the change in practice in 2019) believes that the legal position should have been in Denmark in 2005 and 2006.

Apart from the Danish tax authorities' start-up of the beneficial owner cases in 2008 based on a change in practice that took place in 2008, which is contrary to

**1662**

the preparatory works to SEL § 2(1)(c), the European Court of Justice's decision in these cases is the greatest assault on the affected companies that has taken place in this entire complex of cases.

Neither the Danish state nor the companies have had any opportunity to adapt to what the European Court of Justice today claims to be applicable EU law back in 2005 and 2006.

*8.6.4 Danish courts are not obliged to follow the orders of the European Court of Justice*

The question is then whether the Danish courts are obliged to follow the CJEU's order to apply the unwritten "general EU law principle of prohibition of abuse". The answer to this question does not fall within the jurisdiction of the CJEU, as otherwise assumed by the Court in paragraphs 82 and 83. Instead, it is a question of Danish constitutional law as to whether Denmark has ceded sovereignty to the CJEU to establish such a "general principle of EU law" that overrides and takes precedence over all adopted EU law norms and which must have direct effect on citizens, and this question can only be decided by the Danish courts.

The question is whether it is okay for the European Court of Justice - contrary to the wording of the directive - to try to throw a 'lifeline' to those Member States that may not have adopted (in the Court's view) 'sufficient' national anti-abuse rules. Of course, it is not.

The reality is that the Court of Justice is thereby assuming a competence that belongs to the Danish Parliament and which completely upsets the balance between the European Court of Justice and the national courts, and this is only at the expense of the citizens, who are left lawless because they have no way of

predicting their legal position.

At the same time, by introducing such a "general principle of EU law", the European Court of Justice is short-circuiting the democratic legislative process in the EU.

It follows from the Supreme Court's judgment in U.2017.824H (Ajos judgment) [...] that an unwritten general principle of EU law - in that case the general EU law principle of equal treatment - is not directly applicable to a citizen unless there is express legal basis for this in the Danish Act of Accession, which there was not. NetApp Denmark argues that the unwritten general EU law principle of prohibition of abuse at issue in this case does not have direct effect against a citizen either, as there is no express legal basis for this in the Danish Act of Accession.

*8.6.4.1 General about directives*

The third paragraph of Article 288 TFEU provides that a directive is addressed to the Member States [...].

It follows that a directive can only apply to a Danish citizen in the form in which it is implemented in Danish law. In other words, the citizen must be able to read their legal position in Danish law. It also follows that a directive cannot create obligations for citizens. In a report of July 1972 on certain issues of constitutional law, the Ministry of Justice expressed it thus [...]:

"Directives and decisions addressed to the Member States can therefore at most give citizens direct rights. They can never create direct obligations for citizens." [...].

In several judgments, the European Court of Justice has stated that "the principle of legal certainty precludes directives per se from creating obligations for citizens and that they cannot therefore as such be relied on by the Member State against citizens", cf. the Kofoed judgment, paragraph 42 [...] and the judgment in this case, paragraph 86 [...].

The same must all the more apply to an unwritten "general principle of EU law" that hovers over the directives. When the European Court of Justice has semantically rewritten this problem to mean that the denial of a benefit in this situation is merely "a consequence of the finding that the objective conditions for obtaining the intended benefit ... are only formally fulfilled", this is a specious argument. The decisive factor for the legal certainty assessment is whether the citizen has had the opportunity to know his legal position, and here the citizen is even worse off in relation to an unwritten "general principle of EU law".

Article 289(1) TFEU provides that a directive shall be adopted jointly by the European Parliament and the Council on a proposal from the Commission [...].

On the other hand, the interpretation of a directive falls within the competence of the CJEU, cf. Article 267(1) TFEU [...].

*8.6.4.2 This is not an interpretation of the Parent-Subsidiary Directive*

The Ministry of Taxation argues that the Court has merely exercised its competence to interpret the Parent-Subsidiary Directive pursuant to Article 267 TFEU.

NetApp Denmark does not agree with this. Instead, the Court has developed an independent, unwritten "general principle of EU law which applies irrespective of the question whether the rights and advantages that have been abused are based on the Treaties, a regulation or a directive ...", see paragraph 75 [...].

A concrete application of the principle is thus not based on a pre-interpretation of the relevant legal act, but solely on the existence and higher rank of the principle, which, so to speak, precedes the content of the legal act. The specific content of the Parent-Subsidiary Directive has therefore had no bearing whatsoever on the application of the principle. This is also confirmed by the operative part of the judgment (paragraph 2), which states that it is "the general principle of EU law" - and not the directive - that is "interpreted" [...].

**1663**

The reason why the Court of Justice has introduced the general principle of EU law is certainly because the Court has recognized that an interpretation of the directive could not lead to the desired result. Or to put it another way: the interpretation of the directive in the Kofoed case was correct. Therefore, in order to achieve the desired result, the Court has had to resort to a

"general principle of EU law", which ranks higher than the Directive.

In this way, the Court of Justice has moved into the competence of the EU legislator. This is particularly evident in this case, where in 2015 the EU legislator inserted a general anti-abuse rule in the parent

/Directive and in 2016 inserted a similar general anti-abuse rule (for all other areas of EU law) in the Tax Avoidance Directive. Thus, with its judgment, the Court has only added the retroactive effect of these rules to 2005, which the Court has obviously not found to be contrary to the principle of legal certainty.

*8.6.4.3 Denmark has not ceded sovereignty to the CJEU to establish an abuse principle with direct effect on citizens - Supreme Court ruling in the Ajos case*

The Supreme Court's premises in the Ajos case on the issue of direct effect on citizens state, among other things [...].

As stated, a general principle of EU law can only have direct effect on Danish citizens if Denmark has ceded sovereignty under Section 20 of the Danish Constitution in the Accession Act for this to happen. It is argued that "the general EU law principle of prohibition of abuse" is not foreseen in the Act of Accession, and that this principle therefore does not have direct effect on citizens. For the same reason, the Eastern High Court can disregard this.

It should also be noted in this context that Denmark has not ceded sovereignty to the EU since joining the Amsterdam Treaty in 1998.

Furthermore, it is argued that the burden of proof that Denmark has ceded sovereignty to the EU to adopt this principle with direct effect for citizens lies with the Danish state.

*8.6.4.4 The existence of a contra legem situation* The Skatteministeriet submits that the present case differs from the Ajos case because there is no *contra* legem *situation* in the present case.

"contra legem" situation. The Ministry thus believes that an interpretation of section 2(1)(c) of SEL can be applied that is in accordance with both the Parent-Subsidiary Directive and the general EU law principle of prohibition of abuse, and in this connection seems to be of the opinion that the simple reference in the provision to the fact that the tax liability does not apply if taxation is to be waived under the Directive means that any interpretation of the Directive or EU law must be applied.

NetApp Danmark does not agree with this. There is also a "contra legem" situation in this case, and moreover, it is not just about how SEL section 2(1)(c) should be interpreted. Instead, the issue is whether a direct application of the principle will impose obligations on citizens that they do not already have under Danish law - i.e. whether citizens will be placed at a disadvantage compared to Danish law if the principle is applied. This depends not only on an interpretation of SEL section 2(1)(c) (taking into account its predecessors), but also on the scope of the Danish anti-abuse rules back in 2005.

It is necessary to look at the directive and the EU law principle separately.

There is no dispute that Denmark has implemented the Directive correctly (and continues to do so), which was

confirmed by the Kofoed judgment in 2007. The parties thus agree that Danish law contains rules to counter abuse as referred to in Article 1(2) of the Directive (i.e. substantive grounds for refusal).

sentence and the principle of "rightful income recipient"), and that these rules specifically mean that there is no abuse under Danish law, see paragraphs 55-59 of the order for reference. It is also a fact that the preparatory works to SEL section 2(1)(c) in 2001 expressly state that the legislator believed that these anti-abuse rules were sufficient and that the establishment of flow-through companies did not constitute an abuse.

With regard to the principle of EU law introduced by the Court of Justice, the situation is different. If a direct application of this principle of abuse against citizens with retroactive effect to 2005 were to lead to the result that - still back in 2005
- If there was abuse, it would be a "contra legem" situation, because the Danish rules and Danish practice at that time clearly led to the absence of abuse and could not be interpreted differently based on the EU law principle of abuse developed 14 years later. In that case, an obligation would be introduced for citizens that did not follow from Danish law - a change in the legal situation.

There is thus a "contra-legem" situation in relation to the EU law principle of abuse if its application would lead to an abuse. The Danish courts must therefore simply refrain from applying this principle.

It constitutes an independent constitutional problem that this principle did not apply at all in 2005. Also for this reason, the Danish courts must refrain from applying the principle.

*8.6.4.5 Conclusion*

As mentioned above, Denmark has not ceded sovereignty to the CJEU to establish a general principle of abuse with direct effect on citizens.

For this reason alone, the Danish courts must refrain from applying this principle.

**1664**

The same result follows from the principle of legal certainty. According to this principle, a Danish citizen must be able to expect that the rules that apply to the citizen under a given directive are stated in Danish law, and not in an unwritten general principle of EU law, which is not part of Danish law and which the citizen has not had the opportunity to adapt to.

This is all the more so when the general principle of EU law contradicts the wording of the directive and when neither the general counsel, the Commission nor the EU legislator knew of the existence of this principle.

Applying the abuse principle would also violate the principle of legality in Danish law and section 43 of the Danish Constitution.

Niels Fenger and Morten Broberg have in U.2020B.277 commented on the Ajos judgment [...]]

Against this background, it is argued that the Danish courts must disregard the CJEU's order to refuse exemption under the Directive, even if there are no national or collective agreement provisions prescribing such a refusal.

*8.7 There is also no abuse according to the concept of abuse outlined by the European Court of Justice*

In the event that the Eastern High Court were to find that the general EU law principle of prohibition of abuse has direct effect on citizens and therefore applies in this case, it is submitted that there is no abuse under this principle in the circumstances of this case.

As the other conditions of the Parent-Subsidiary Directive are fulfilled, NetApp Cyprus is therefore entitled to exemption under the Directive and - also for this reason - there is no limited tax liability to Denmark of the dividends in question.

Copyright © 2023 Karnov Group Denmark A/S

It should be noted that it is the plaintiff, the Danish Ministry of Taxation, which has the burden of proof that in this case there is an abuse of the directive in accordance with the general EU law anti-abuse principle established by the European Court of Justice.

NetApp Denmark argues that the Ministry of Taxation has not - and cannot - lift this burden of proof.

The general EU law anti-abuse principle established by the CJEU is further defined in paragraphs 97 and 98 of the judgment [...].

The general concept of abuse means that EU law cannot be invoked in cases where there is a purely artificial arrangement that is not based on an economic reality and whose purpose is to obtain unintended tax advantages.

This general concept of abuse corresponds to the Danish principle of reality, according to which empty and artificial, tax-related provisions can be set aside and replaced with reality, cf. paragraph 56 of the referral order [...].

It is therefore not credible when the Ministry of Taxation, which recognizes that there is no abuse under the Danish substantive principle, cf. paragraph 57 of the order for reference [...], invokes that there is an abuse under the general abuse provisions of EU law.

As stated above in section 8.4.1.3, the Danish Ministry of Taxation has - after the CJEU's judgment - made a new plea that Danish law contains general principles for countering abuse outside the reality principle. In the same section, NetApp Denmark has refuted this new plea.

As the CJEU also states in paragraph 99 [...], it is not for the Court of Justice to assess the facts of the main cases - it is for the national court, here Østre Landsret - However, the Court has chosen to provide some guidance in the form of a number of factors that may point to the existence of an abuse under the principle, see paragraphs 100-106 [...]. However, in this context, it is important to realize that the CJEU has made a general statement, i.e. without taking into account the subjective circumstances that may exist in the specific situations. It is therefore up to the national courts to make the final assessment in light of the subjective and national specific circumstances that may exist.

And this is crucial in this case when the High Court is to make its assessment of whether there is an abuse of the directive.

NetApp Denmark thus argues that, taking into account the very special circumstances of this case, there can be no abuse. The condition that the main purpose of the transactions is to obtain an undue advantage is thus not met in this case.

Firstly, as stated above, including in [...].

7.8 - the whole purpose of the structure and of the dividend distributions in question was always that the funds would end up with the ultimate parent company, NetApp USA, as part of the US temporary tax regime under the American Jobs Creation Act. This is what happened, as NetApp USA's subsidiary, NetApp Bermuda, distributed its total dividend capacity, totaling USD 550 million, to NetApp USA. The two dividends from NetApp Denmark were included in the dividend to USA. The intention was that all funds would end up in the US and be taxed there, which in fact happened. In particular, it was not intended that any part of the dividends would be deposited in NetApp Bermuda, which did not happen.

For this reason, among others, NetApp Denmark also claims that NetApp USA must alternatively be regarded as the

"beneficial owner" of the dividends, if NetApp Cyprus is not considered as such, see above in section 7.8.

If there had been any reason whatsoever to believe that Denmark would collect withholding tax on the dividends in question by the chosen construction, e.g. by refusing directive protection - which there was no reason to believe, e.g. as unconditional tax advice had been obtained in this regard - the Group could have chosen to let NetApp Bermuda sell the shares in NetApp Denmark directly to NetApp USA as an adequate alternative solution. as unconditional tax advice had been obtained in this regard - then the group could, as a perfectly adequate alternative solution, have chosen to let NetApp Bermuda sell the shares in NetApp Denmark directly to NetApp USA (instead of to the newly established NetApp Cyprus), after which the dividends (in that case from Denmark to the US) would have been exempt from withholding tax under SEL section 2(1)(c).

In response to question 5 to the Court of Justice of the European Union in this case, the Court stated in its judgment [in paragraphs 107-110] [...] Niels Winther-Sørensen has in his commentary to the judgment in SR.2019.174 (...) noted the following in this regard [...]:

"Read in the context of the following sentence in paragraph 110 of the Dividend Judgment ... one must, however, probably understand the Court's reasoning to mean that it will normally not be possible to establish abuse of rights and thereby deny the benefit under the Parent-Subsidiary Directive or the Interest/Royalty Directive if a direct payment from the Danish company to the company in question (which is assumed to be the beneficial owner of the payment) would have been tax-free." Secondly, and just as importantly, there is the whole history of the Danish implementation and interpretation of the Directive, as described above in sections 1 and 2, and the unreserved position on the tax exemption of dividends distributed to a Cypriot intermediate holding company. When the Danish legislator and the tax authorities interpret a directive in such a way that - if the other conditions are met - there is an unconditional right to exemption from withholding tax if the recipient of the dividend is the "beneficial owner" of the dividend, then there can of course be no abuse of the directive when the tax authorities subsequently change their opinion. And in this case, the Minister of Taxation has even directly instructed the "construction" with a Cypriot intermediary company to avoid Danish withholding tax.

Under these circumstances, it obviously makes no sense to say that the main purpose of the transactions was to obtain an undue advantage.

The coincidence of these two very special circumstances makes it obvious that there is no abuse in this case.

As will appear from sections 9 and 10 immediately below, the circumstances just described are also included as weighty arguments in support of NetApp Denmark's claims that there is an (illegal) change of practice with retroactive effect and that NetApp Denmark cannot have acted negligently by not withholding tax.

9 THE TAX AUTHORITIES' DECISIONS ARE AN AGGRAVATING (ILLEGAL) CHANGE IN PRACTICE WITH RETROACTIVE EFFECT

In the event that the Danish Ministry of Taxation is successful in its claim that there is limited tax liability under section 2(1)(c) of SEL on the dividends in question, NetApp Danmark argues in support of its claim for acquittal that SKAT's decision (and the views that have subsequently been asserted by the tax authorities) is a tightening of practice with retroactive effect, and

U.2023.1575H

that such tightening of practice cannot lawfully be implemented. Thus, a tightening of practice can only take place with prospective effect and with an appropriate notice with regard to the new views that SKAT will consider decisive for this new practice, see e.g. U.1983.8 H [...].

The legal guidance 2010-2 is in accordance with this [...]:

Copyright © 2023 Karnov Group Denmark A/S

"Notification of change with future effect

It is a fundamental principle of administrative law that it is only possible to implement an aggravating change in practice with effect for the future and after giving adequate notice to allow citizens to adapt to the changed legal situation.

...

A practice clarification must be published in a relevant manner, e.g. in the form of a SKM notification (control signal) or by special news marking in the legal guidelines."

A notice of stricter practice must - both in form and content - explicitly state that the practice is being tightened and what the new practice is about.

CNT

As SKAT has not notified the tightening of practice, SKAT has not been entitled to collect dividend tax.

NetApp Denmark claims that there is a change in practice in relation to both the Double Taxation Convention and the Parent-Subsidiary Directive. These issues are dealt with separately below.

If NetApp Denmark is successful on just one of these issues, NetApp Denmark must fully succeed in its claim of acquittal.

*9.1 Practice clarification in relation to the double taxation treaty*

...[It] appears [...] unambiguously from the preparatory works to SEL § 2(1)(c) from 2001 that a (Cypriot) intermediate holding company can be incorporated through a Danish subsidiary, through which the dividends are channeled, with the effect that the dividend tax that would otherwise be triggered is avoided. The intermediate holding company is thus the "beneficial owner". It is clear that this is a case of pure

**1666**

flow-through companies, and the tax minister's response does not contain reservations of any kind. At the time, there was thus free access to treaty shopping. As long as the intermediary holding company was the civil law owner of the shares in the subsidiary - and thus was not an agent or straw man, or there was a pro forma - the intermediary holding company was the "rightful owner". This was not a Danish special position. This was the global view.

The Ministry of Taxation has claimed that the text of the law was changed during the committee process and that the preparatory works mentioned do not concern the final wording. [...] [T]his is based on a misunderstanding on the part of the Ministry.

The High Court can thus assume that the preparatory works from 2001 have the content mentioned here.

In 2005, NetApp disposed in reliance on these preparatory works by establishing a Cypriot intermediate holding company and making distributions to it.

The preparatory works were based on a domestic interpretation of the concept of

"rightful owner", i.e. an interpretation where "rightful owner" is interpreted in accordance with the principle of "rightful income recipient" in Danish law. [...] The [L]egislator and the tax authorities [have] uninterruptedly [...] maintained the internal law interpretation in the period 1977-2008, as evidenced by a large number of statements especially from the Ministry of Taxation.

[...] The Ministry of Taxation [had] - after the "beneficial owner" cases had started in 2008 - had to recognize that a dividend-receiving intermediate holding company clearly had to be considered a "beneficial owner" under Danish tax law, and that the previously invoked interpretation of "beneficial owner" could therefore not lead to the desired result (taxation of dividends).

The Ministry of Taxation therefore changed its practice and instead switched to an autonomous (international law) interpretation of "beneficial owner", where "beneficial owner" is

no longer equated with "rightful owner"

and "right income recipient". On the contrary, they are two completely different concepts that have nothing to do with each other.

With the new autonomous interpretation of "beneficial owner", the Ministry of Taxation has - with reference to the comments to the Model Law Agreement of 2003 regarding "flow-through companies" - introduced a very broad interpretation of the term "flow-through company", which affects any ordinary holding company, which is in stark contrast to the previous practice.

It is thus a fact that the new practice of the tax authorities is in direct contradiction with the express legislative history of this 2001 provision, which explicitly states that a Cypriot intermediate holding company established for the sole purpose of channeling dividends to its parent company is the "beneficial owner" of the dividends and therefore enjoys protection under the Convention.

The new practice is thus also contrary to SKAT's own previous interpretation of "beneficial owner", which was only abandoned in 2008 when the first "beneficial owner" cases were raised.

This is a significant tightening of the practice regarding the interpretation of "rightful owner", which leads to the exact opposite result of what was intended in the legislative history from 2001, even though the legal basis is unchanged.

The Ministry of Taxation disputes that there has been a tightening of practice and argues that there has been no established administrative practice because there are no court decisions documenting the previous practice.

When - as in the preparatory works to SEL section 2(1)(c) from 2001

- However, if there is an explicit statement from the Minister of Taxation on what the legal position is, and when the tax authorities subsequently administer accordingly, this is sufficient documentation of a fixed practice that taxpayers can rely on.

When the Minister of Taxation states that intermediate holding companies are to be regarded as "beneficial owners" (and "rightful income recipients"), it is clear that there are no court decisions documenting this practice. SKAT agrees with taxpayers that no dividend tax should be withheld, and SKAT has therefore had no reason to raise cases about this. This has been the case for 30 years.

The Ministry of Taxation further argues that a possible (erroneous) lack of tax assessment intervention and correction cannot constitute practice and cannot create any administrative practice binding on SKAT not to impose withholding tax on dividends.

The defendant naturally agrees with this general statement. However, the point is that the fact that no cases have previously been raised in this regard is not due to incomplete control by SKAT, but rather to a perception that there was no basis for conducting these cases.

The Minister of Taxation's position in the preparatory works on the specific issue is thus just as good a documentation of the legal position as a court decision would have been, and it goes without saying that SKAT has followed the Minister of Taxation's statement.

Moreover, it is baroque to discuss whether SKAT has changed its practice when everyone knows that this is the case. This was also confirmed in Jyllandspo- sten on September 14, 2010 by the official who at the time was the spokesperson for SKAT in the "beneficial owner" cases [...]:

"We don't know if we will be successful. Our view is fairly new in tax practice, so we'll have to see what the Supreme Court says when it comes to make a decision." [...]

The change in practice is also confirmed by the fact that while

SKAT in the period 1977-2008, where SKAT

**1667**

used the internal law interpretation of "rightful owner", has not raised a single case of denial of relief on the grounds that the recipient was not the "rightful owner", while SKAT - after switching to the autonomous interpretation in 2008 - has raised a very large number of cases all at once. In this complex of cases, decisions have been made in 150 cases with claims for payment of withholding tax of just over DKK 6.8 billion.

Against the above background, it is thus claimed that there is a tightening of an established administrative practice which should have been notified and that this changed practice cannot therefore be applied in the present case.

*9.2 Practice clarification in relation to the Parent-Subsidiary Directive* As stated in section 8.6 above, the European Court of Justice in its judgment of February 26, 2019 in this case [...] - most surprisingly

- to the conclusion that countering abuse of the Parent-Subsidiary Directive does not require a national legal basis.

The Court bases its finding on the fact that there should be an unwritten

"general EU law principle of prohibition of abuse" that has direct effect on citizens.

This "general principle of EU law" is floating in the air, has a higher legal source value than even the treaties and does not require anchoring in national law. A concrete application of the principle thus does not depend on an interpretation of the relevant legal act, but solely on the existence and higher rank of the principle, which, so to speak, precedes the content of the legal act.

According to the judgment, national authorities and courts are obliged to apply this principle in the present case, and the CJEU also provides guidance on which concept of abuse the authorities should apply.

The conclusion of the judgment states [...]:

'The general principle of European Union law, according to which individuals must not be able to rely on provisions of European Union law for the purpose of enabling fraud or abuse, must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxable person the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of Council Directive 90/435/EEC of 23. July 1990 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, as amended by Council Directive 2003/123/EC of 22 December 2003, even if there are no national provisions or collective agreements providing for such a refusal." [...].

One of the reasons why the judgment was so surprising is that the requirement for a national legal basis appears directly from Article 1(2) of the Parent-Subsidiary Directive and that in the Kofoed judgment (C321/05) of July 5, 2007, the European Court of Justice had maintained that the corresponding provision in the Merger Tax Directive required a national legal basis. The EU Court of Justice thus rejected - in accordance with the Advocate General's proposal - that such a general principle of EU law existed in the area of direct taxes.

It is therefore a fact that the European Court of Justice, with its decision of February 26, 2019, has overturned the Kofoed judgment and thus changed practice retroactively.

In its decision of December 16, 2011 [...], the National Tax Tribunal, which ruled in NetApp's favor that NetApp Cyprus is entitled to exemption from dividend tax under the Parent-Subsidiary Directive, has almost certainly applied the Kofoed judgment.

It is documented above in section 8.6.3 that neither the

Commission, the EU legislator (Council and Parliament) nor the Advocate General were aware that a general principle of EU law with this content applied. In the same place, it is shown that both the Danish and international literature has been surprised and critical of the judgment.

At the time of the judgment in 2019, the EU legislator had long since introduced the mandatory general anti-abuse rules desired by the EU in both the Parent-Subsidiary Directive (2015) and the Tax Avoidance Directive (2016). Thus, with the general EU law principle of prohibition of abuse, the CJEU did not add anything to the legal situation that did not already apply under these anti-abuse rules - except for the retroactive effect to 2005 (i.e. to a time when the principle notoriously did not apply, cf. the Kofo- ed judgment).

There is hardly any national legal system in the civilized world that would accept that a change in practice can have a 14-year retroactive effect.

In the case, NetApp Denmark argues that the aforementioned principle does not have direct effect on citizens, as the European Court of Justice does not have jurisdiction to make this decision, as Denmark has not ceded sovereignty. Reference is made to section 8.6.4, where this viewpoint is explained in detail.

As stated in section 8.6.4.4, it would be a "contra legem" situation if a direct application of this abuse principle to citizens with retroactive effect to 2005 were to lead to the result that - still back in 2005 - there was abuse, because the Danish rules and Danish practice at that time clearly led to there being no abuse, and could not be interpreted differently on the basis of the EU law principle of abuse developed 14 years later. In that case, an obligation would be introduced for citizens that did not follow from Danish law and which would lead to a change in the legal situation.

NetApp therefore argues that the Danish courts should refrain from applying this principle.

In the event that NetApp is not successful that the general principle of EU law does not have direct effect on the

**1668**

effect on citizens, so that the principle can in principle be applied in Danish law, it is argued that under Danish administrative law the principle can only be applied with future effect. Thus, the principle cannot be applied in the present case, which concerns 2005 and 2006, because it would represent a significant tightening of practice with retroactive effect.

It has thus been documented in section 2 above that the Danish administrative practice back in 2005 and 2006 was not based on a general EU law principle prohibiting abuse that had a direct effect on citizens. On the contrary, it was the general view both in Denmark and in the EU at the time that treaty and directive shopping could be done freely. The fact that the principle did not even apply in the EU is documented by the fact that the Kofoed judgment in 2007 came to the conclusion that countering abuse required a national legal basis.

Just for the sake of good order, it should be noted that the application of a directive in a Member State is always an expression of the application of national law. This applies whether it is the application of the Member State's own legislation or general principles of law developed by the courts of the Member State, or whether - as in the present case - the European Court of Justice has laid down a principle with direct effect for citizens, if this is otherwise approved by the courts of the Member State. Therefore, it is also the Member State's procedural and administrative law rules that must be applied in the judicial review.

Since an application of the general EU law prohibition against abuse under the above-mentioned conditions would constitute a retroactive change in practice, this principle cannot be used as a basis for the decision of the case.

*9.3 More about the case law*

As mentioned, since 1983, there has been no doubt about the existence of the principle of administrative law according to which the tax authorities are prevented from changing their practice in an aggravating direction with retroactive effect, cf. U.1983.8 H [...] and Den juridiske vejledning [...], cited above.

The High Court's judgment in U.2012.2337 H [...] is a textbook example of the minimum requirements that must be imposed on the tax authorities in order for an aggravating change in practice to take effect for citizens. In the case, the Eastern High Court agreed that the Danish tax authorities were entitled to change practice in connection with the hiring out of work to Denmark by Dutch butchers, as the concept of hiring out work was to be interpreted according to internal Danish law. The change in practice was published on May 5, 1997 in Tidsskrift for Skatteret and was also mentioned in Skat Udland in May 1997. It was also published in Retsinformation on September 25, 1997. The High Court found that the change in practice could only be considered to have been published in such a way that it could be given legal effect against companies that, like the plaintiff, had used hired labor. However, the High Court found that the company should be granted a certain shorter notice to initiate the withholding of A-tax, which is why the plaintiff was not considered liable for the lack of payment of A-tax until November 1, 1997. Before the Supreme Court, the Ministry of Taxation did not dispute that the change in practice could only take effect from November 1, 1997.

Most of the case law following the Supreme Court's judgment in U.1983.8 H [...] is mainly about the evidence of what the tax authorities' practice actually amounted to. This specific assessment of evidence is, of course, decided on a case-by-case basis according to the facts. In the present case, the evidence in the form of the Minister of Taxation's own statements to the Danish Parliament is overwhelming.

U.2000.1509 H [...] is thus an evidentiary case that is not prejudicial to the present case. The Supreme Court did not find it proven that the alleged practice existed. On the contrary, the Supreme Court emphasizes in its premises [...] that the disputed interpretation appeared from preparatory works and administrative guidelines before the disputed income years. In this case, it is evident that the tax authorities only adjusted the description of administrative practice in accordance with the view now claimed after the tax authorities in 2008 initiated the control action that has led to, among other things, this case against NetApp Denmark.

In U.2011.3305 H [...] it is frankly difficult to see what constituted the taxpayers' alleged evidence of contrary practice. Neither the High Court nor the Supreme Court could see it.

In U.2015.915 H [...], U.2017.2960 H [...] and U.2017.2979 H [...] the taxpayers tried to prove the practice by referring to a long period of non-intervention by the tax authorities, which the Supreme Court did not accept. It is not NetApp Denmark's view that the proof of the tax authorities' practice consists of a long period of non-intervention. Another thing is that when the Minister of Taxation explains a practice to the Danish Parliament and how a legal provision is to be understood, the tax authorities naturally follow the Minister's statement. It would be peculiar if there were previous decisions that showed that the tax authorities actually had a different practice than the one stated in the tax minister's statements. In NetApp Denmark's case, however, it is the Ministry of Taxation that claims that the tax authorities' practice in the period up to 2008 was different from what the Minister of Taxation had told the Danish Parliament in 2001.

**1669**

In U.2020.1923 H, the alleged evidence consisted mainly of a number of unpublished decisions from subordinate tax authorities that supported the taxpayer's view. The Supreme Court referred to the fact that the decisions were contrary to clear statements in the preparatory works, and

that the unpublished decisions did not constitute a binding administrative practice. The case is therefore not comparable to NetApp Denmark's situation.

Another thing is that the tax authorities in this case are not entitled to tighten their practice at all.

The legal position claimed by the plaintiff, which is contrary to the express preparatory works to SEL § 2(1)(c), can thus only be brought about through legislation.

## 10 NETAPP DANMARK IS NOT LIABLE FOR ANY DIVIDEND TAX - SECTION 69 OF THE WITHHOLDING TAX ACT

### 10.1 The regulatory framework and introductory remarks

In the event that the plaintiff is successful in its claim that the dividends in question are subject to limited tax liability to Denmark, it is claimed - most alternatively - that NetApp Denmark is not liable for the withholding tax not withheld.

The question of whether the withholding tax can be collected from NetApp Denmark is based on the provision in section 69 of the Withholding Tax Act, which reads [...]:

"§ 69. Any person who fails to fulfill his obligation to withhold tax or who withholds it in an understated amount shall be directly liable to the public authorities for payment of the deficiency, unless he proves that he has not been negligent in complying with the provisions of this Act." [...].

It is also stated in SKAT's Guidelines on withholding A-tax and AM contributions 2005-1 [...]:

"Notwithstanding that the provisions have reversed the burden of proof, case law has shown that it is the customs and tax administration that must prove that the withholding agent has acted negligently." Already because the defendant's understanding of the relevant rules is in accordance with the administrative practice that the tax authorities have continuously followed over the years, including that both the National Tax Tribunal's professional office (...) and the National Tax Tribunal [...] have agreed with NetApp Danmark that there is no withholding obligation, it is obvious that NetApp Danmark has not shown "negligence".

Jakob Bundgaard is in SU 2010.387 [...] in line with this.

### 10.2 More details about the conditions for the withholding obligation under section 69 of the Withholding Tax Act

Section 69 of the Withholding Tax Act applies not only to liability for dividend withholding tax, but also to liability for non-withheld A-tax, work rental tax

etc. Therefore, reference can be made to case law on failure to withhold taxes other than withholding tax on dividends when assessing what is meant by negligence giving rise to liability.

It appears from e.g. UfR 1977.844 H (non-liability ...), SKM2002.470.ØLR Ø (non-liability ...) and UfR 2018.3119 H (liability ...) that misconception of the correct legal interpretation and subsumption can also exempt from liability. Nor is there anything in the wording of the provision that suggests that it is only ignorance of the relevant facts that is of importance. In UfR 1977.844 H, the Supreme Court found that the potential withholding agent had had "such a sense" to be able to assume that there was no withholding obligation that there was no negligence. In SKM2002.470.ØLR, the High Court used the expression that the relevant circular in the situation in question did not lead to "an unambiguous result" and acquitted the taxpayer of liability. Therefore, if the position of the potential withholding agent has been an expression of a reasonably justified understanding of the legal basis and a reasonably justified subsumption, there will be no negligence - even if it ultimately turns out that the position of the potential withholding agent was not tenable.

In UfR 2018.3119 H, the question of tax liability depended on whether the right income recipient of the dividend was a Dutch foundation or the founder of the foundation who was resident in the UK. The Supreme Court ruled

in the premises [...] that there was liability and referred, inter alia, to the fact that it appeared from the Taxation Guidelines prior to the adoption of the exchange that foreign foundations were not proper income recipients if the foundation did not meet the Danish conditions for considering a foundation an independent legal entity in relation to the founder.

The defendant's understanding of the legal basis must therefore - of course - be judged according to the legal sources available at the time of the distribution. After all, that was what the defendant and its advisors had to go by.

As far as can be seen, there are no factual disagreements of importance to the assessment of negligence. The disagreement is whether the defendant company acted negligently by not realizing at the time of distribution that the dividends were taxable (if they turn out to be so), regardless of the fact that the dividends were received by NetApp Cyprus, which was undisputedly the correct income recipient. (U.2016.2898H - RF Holding [...] concerned a situation where the Supreme Court found that the distributed funds were diverted around the right income recipient, which was obviously negligent. This case is therefore irrelevant to the issue of negligence in the present case).

When assessing negligence, it may be useful to remind that the cases arose as a result of a coordinated action by the tax authorities, initially raising 31 cases and later a total of 150

**1670**

cases of liability for withholding tax not withheld as part of the "The Danish Tax Agency's Capital Fund and Withholding Tax Project", cf. the Ministry of Taxation's response to the Danish Parliament's Tax Committee of October 28, 2019 [...], even though there had been no previous Danish cases at all on the obligation to withhold dividend tax with reference to the recipient company being a flow-through company.

As previously mentioned, in 2010, the responsible head of office at the Danish Tax Agency stated - appreciatively honestly - about the upcoming showdown in the courts [...]:

"We don't know if we will be successful. Our point of view is fairly new in tax practice, so we'll have to see what the Supreme Court says when it comes to make a decision."

The background is thus undoubtedly that the Danish Tax Agency has sought to break new ground with the implementation of this complex of cases. They had not found it necessary to notify the potential withholding agents of the action and the new views that the tax authorities wanted to test beforehand.

*10.3 NetApp Danmark has not acted negligently in connection with the dividend distributions in 2005 and 2006, among other things in* view of,

*that* the defendant's understanding of the relevant rules is in accordance with the administrative practice that the tax authorities have continuously followed over the years, [...] including that the specific situation is identical to the Minister of Taxation's instruction in his answer to question 16 to the Danish Parliament's Tax Committee during the consideration of L 99/2000 (reintroduction of taxation of dividends for parent companies - [...]) *that* it follows directly from the wording of the Parent-Subsidiary Directive [...] that dividends are exempt from withholding tax, including that the Directive does not require the parent company to be the "beneficial owner",

that Danish literature is in line with the tax authorities' previous practice,

*that* there is great uncertainty at international level as to how the term "beneficial owner" should be interpreted, cf. e.g. the OECD's draft comments from spring 2011 [...], where it appears from the consultation responses [...] that not even the proposal

for the new (clarifying) comments contributes to reducing the uncertainty about the interpretation, and

*that* prior to the transactions, the NetApp Group obtained advice from a leading tax advisory firm, PwC, which indicated the relevant solution with the establishment of a Cypriot intermediary.

holding company without reserving any risk of withholding tax in connection with the intended dividend distributions, it is clear that NetApp Denmark has not been "negligent".

However, as mentioned, this becomes quite obvious when one also considers that both the National Tax Tribunal's specialist office [...] and the National Tax Tribunal [...] have agreed with NetApp Danmark that there is no withholding obligation. The National Tax Tribunal's interpretation of EU law, which had a positive result for the defendant, was also supported by the Advocate General of the European Court of Justice, [...].

The fact that the ECJ, in a - in the opinion of most commentators - highly surprising and problematic judgment more than 13 years after the dividend distribution in this case, has deviated from its established practice that directive provisions do not have effect for citizens if they have not been implemented in national law, see also the Kofoed judgment [...], does not change the answer to the question of whether there is negligence.

The case is thus that the legal sources available at the time of the distribution clearly indicate that the distribution was tax-free. The plaintiff argues that the defendant should have conducted further investigations in order to clarify whether the conditions for non-deduction were met - or at least that it has not been established that such investigations were conducted.

Such investigations have of course been carried out, as also mentioned, and they led to - and could lead to no other result than - that no withholding tax should be withheld. The tax manager for NetApp Denmark's European activities confirmed with Dutch and Danish advisors that one of the undoubtedly legal ways to avoid the Danish dividend tax was to establish a Cypriot intermediate holding company. As this was precisely the method that the Ministry of Taxation itself had indicated to the Danish Parliament, the sustainability of the chosen scheme was so obvious that neither NetApp nor the advisors found it necessary to prepare written statements.

As the distributable funds were in any case going to the US - and could have been distributed without Danish tax directly from NetApp Denmark to the ultimate US parent company, NetApp USA - it also goes without saying that had there been the slightest reason to doubt whether the dividend distribution to NetApp Cyprus would have triggered Danish withholding tax, one would not have run the risk of triggering such a considerable tax as discussed in this case - especially not when other indisputably tax-free solutions were also possible, see below.

An inquiry to SKAT in 2005 and 2006 would - based on the legislative history of the provision on limited tax liability in 2001 - undoubtedly have led to the same result. And if SKAT had been of the opinion that dividend tax should be withheld, an appeal to the highest administrative tax assessment authority - the National Tax Tribunal - would have led to a change of SKAT's decision, cf. the appealed decision.

It is not surprising that the Supreme Court in the decisions UfR 2004.362 H [...] and UfR 2008.2243 H [...] ruled in favor of the Ministry of Taxation that

**1671**

"negligently". That seems reasonably clear in both cases. Neither of these judgments is therefore prejudicial to the present case.

The fact that the Supreme Court mentioned in the grounds of the cases that the withholding agent was "aware" of the facts that led to the withholding obligation cannot - as assumed by the plaintiff - be taken as an indication that this should be the decisive premise. On the contrary, the withholding agent's knowledge of the facts is the first condition for establishing

"negligence", and the Supreme Court goes on to state that the withholding agent "did not have the sense" to assume that there was no withholding obligation.

Copyright © 2023 Karnov Group Denmark A/S

It is disputed that NetApp Danmark should be subject to a heightened diligence assessment because there was allegedly circumvention of a protective rule. Firstly, it is disputed that SEL section 2(1)(c) on limited tax liability is a protective rule. In addition, the reality was that the disputed funds were to be transferred (and were transferred) from the Danish company to ultimately the American parent company. Alternatively, this could have been done by the US parent company acquiring the shares in the Danish company, after which the dividend could have passed tax-free directly from Denmark to the US. The establishment of NetApp Cyprus and the dividend distribution to the parent company in the US via NetApp Bermuda therefore did not appear as an option that was "too good to be true", but simply as a more practical alternative to the already tax-free solution, which would have been obvious if the advisors had not proposed the NetApp Cyprus solution.

It does not make any sense to talk about a heightened due diligence assessment because the parties were connected in interest when the due diligence assessment is about the legal subsumption. The legal assessment of whether an intermediate holding company such as NetApp Cyprus can invoke the DBO or the Directive is not affected by whether NetApp Cyprus was a minority or majority shareholder in NetApp Denmark.

Against this background, it is claimed that there is no basis for considering NetApp Denmark to have acted 'decently'."

The parties have essentially proceeded in accordance with what is stated in their pleadings.

During the main hearing concerning the exchange in 2006 of DKK 92,012,000, *NetApp Denmark* has further claimed:

"... In the alternative, it is submitted that there is no basis for claiming that NetApp Cyprus is not the "rightful owner" of this dividend, as the funds have been lent back to NetApp Denmark, cf. the ISS case [...]. NetApp Cyprus - which has had not insignificant interest income thereon - has thus had the "full benefit" of the dividend.

... In any case, NetApp Cyprus must be considered the "rightful owner" thereof, if the Eastern High Court agrees with the Ministry of Taxation that it is "disqualifying" to be considered a "flow-through company" that a dividend has been held for 5 months in the claimed "flow-through company". Here, the dividend has - as demonstrated - been in NetApp Denmark/NetApp Cyprus for 4 years."

*B-2173-12 Skatteministeriet v. TDC A/S*

In its summary pleading of January 11, 2021, *the Ministry of Taxation* has stated the following, among other things:

"4.1 The dividend is not exempt from withholding tax pursuant to section 2(1)(c), 3rd sentence of the Danish Corporation Tax Act.

According to section 2(1)(c), first sentence, [...], companies and associations etc. as mentioned in section 1(1) of the Danish Corporation Tax Act, which are domiciled abroad, are liable to pay tax under the Act if they receive dividends covered by section 16 A(1) of the Danish Tax Assessment Act, to which the dividends at issue in the case can be attributed. According to the third sentence, the tax liability does not (however) include dividends from subsidiary shares, cf. section 4 A of the Danish Capital Gains Tax Act, when the taxation of dividends from the subsidiary "shall" be waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive or a double taxation treaty with the Faroe Islands, Greenland or the state where the parent company is domiciled.

It is therefore clear from the wording of the provision that the exemption from tax liability is only applicable if there is an unconditional obligation to waive or reduce taxation under the Parent-Subsidiary Directive or a double taxation treaty. In other words, if such an obligation does not follow from the directive or a double taxation treaty, the dividend is subject to a tax liability.

The preparatory works to the provision do not provide evidence for such an understanding of the provision - on the contrary.

According to the proposed bill (bill no. L99 of November 10, 2000, [...]), an exemption from tax liability was only conditional on "that the parent company is resident in a state that is a member of the EU, a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2 of [the Parent-Subsidiary Directive]."

As can be seen, according to the proposed bill - in addition to the subsidiary being a company in a Member State - it would be sufficient if the parent company was domiciled in the EU or in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland. However, the bill on this point was not adopted in its proposed form. Therefore, TDC's invocation of the Minister of Taxation's reply of January 10, 2001 to the Danish Parliament's Tax Committee (Appendix 22 to Bill No. 99 of November 10, 2000, [...]) and the Minister's

**1672**

reply of January 11, 2001 (Annexes 24 and 25 to the bill, [...]) also irrelevant, since the questions answered were asked in connection with the (originally) proposed, but on this point not adopted, bill.

After the Danish Parliament had considered the proposed legislation, the Minister of Taxation presented the (amendment) proposal that was actually adopted.

The comments to the amendment state that the amendment aimed to clarify that it is a "condition" for the proposed tax exemption that Denmark "shall" waive the taxation of the dividend in question under the provisions of the Parent-Subsidiary Directive or that Denmark "shall" waive or reduce the taxation of the dividend in question under the provisions of a double taxation treaty [...].

The bottom line is that neither the wording of section 2(1)(c) of the Corporation Tax Act nor the comments on the proposal that was actually adopted leave any doubt that the parent company is only entitled to an exemption from tax liability if the company either meets the conditions of the parent company/division or if the parent company meets the conditions for exemption. 1(c) of the Danish Corporation Tax Act or the comments to the proposal that was actually adopted leave any doubt that the parent company is only entitled to an exemption from tax liability if the company either meets the conditions in the Parent-Subsidiary Directive for exemption from withholding tax or meets the conditions in a double taxation agreement with the Faroe Islands, Greenland or the state where the company is resident in order for Denmark to waive or reduce taxation. Thus, it is not sufficient that the parent company is resident in a state that is a member of the EU, a state with which Denmark has a double taxation treaty, the Faroe Islands or Greenland.

As will be explained below, Denmark has neither been obliged to waive the taxation of the dividends at issue in this case under the Parent-Subsidiary Directive nor been obliged to waive or reduce the taxation under the Convention of 17 November 1980 between Denmark and Luxembourg for the avoidance of double taxation with respect to taxes on income and capital (the Danish-Luxembourg Double Taxation Convention).

*4.1.1 Taxation should not be reduced or waived under the Parent-Subsidiary Directive*

The taxation of the dividends at issue in this case must not be waived under the Parent-Subsidiary Directive, since neither NTC nor the other Luxembourg intermediate holding companies can rely on the advantage of exemption from withholding tax

provided for in Article 5(1) of the Directive, if only because there is an abuse of rights.

*4.1.1.1 There is a legal basis for countering legal abuse*

According to Article 1(2) of the Parent-Subsidiary Directive, the Directive does not preclude the application of internal provisions or

agreements necessary to prevent fraud and abuse [...].

A national provision such as section 2(1)(c) of the Danish Corporation Tax Act is precisely such an internal provision within the meaning of Article 1(2) of the Directive, according to which a benefit under the Directive may be refused if the benefit is sought to be obtained by fraud or abuse.

The wording of section 2(1)(c) of the Danish Corporation Tax Act explicitly states that it is a condition for waiving withholding tax that Denmark is obliged to do so under the Parent-Subsidiary Directive or a double taxation treaty, cf. the word "must". Such an obligation to waive taxation does not exist in cases of abuse. The Court of Justice has long since established that EU law (then referred to as "Community law") cannot be invoked for the purpose of enabling abuse, see, for example, the Court's judgment in case C-212/97, Centros, paragraph 24 and the case law cited therein [...]. Therefore, section 2(1)(c) of the Danish Corporation Tax Act contains, according to its wording, a legal basis for denying the benefit of the Parent-Subsidiary Directive in the form of exemption from taxation in the source state if there is an abuse of law, as the Directive in such a case does not entail that the source state "must" waive the taxation.

In addition, Article 10(2) of the Danish-Luxembourg Double Taxation Convention [...] is a treaty-based anti-abuse provision, as the source country shall only reduce the taxation of a dividend if the "legal owner of the dividend" is resident in the other contracting state, and as the application of this criterion for the allocation of taxing rights serves precisely to combat abuse of rights, see further below. Finally, Danish case law has developed general principles to counteract abuse that apply in cases that fall outside the practice which, according to the legal literature, expresses the application of a so-called "reality principle". Thus, it follows from Supreme Court case law that transactions which - as in the present case - have been formally arranged in such a way that an intended, favorable tax rule applies, can be set aside for tax purposes when the granting of the benefit would be improper and when the transactions, in the words of the Supreme Court, for example "do not have the character of normal commercial transactions", cf. U.1998.254H [...], "have no commercial purpose", cf. U.2005.649H [...] or "have no commercial justification", cf. U.2015.2277H [...]. The Supreme Court has also set aside tax arrangements without using similar terms, see for example U.1999.1714H [...].

Against this background, there is ample legal basis in national law to counteract abuse, but a decision on the case does not necessitate a position on this contentious issue.

The judgment of the Court of Justice in this case [...] shows that, in response to the first question referred for a preliminary ruling by the High Court, the Court of Justice stated that general EU law

**1673**

The principle that individuals must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxpayer the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of the Parent-Subsidiary Directive, even in the absence of national or contractual provisions providing for such a refusal, see See, to that effect, paragraph 95 of the judgment and paragraphs 75-94, on which the answer is based.

There is no question of the Court having created a (new) legal position with its answer to the first question referred by the High Court that did not apply prior to the judgment or of the Court

having changed its

previous case-law, as expressed, inter alia, in Case C-321/05 Kofoed, see the judgment in the present case, paragraphs 84-90. With this judgment, however, the Court has - within the framework of the jurisdiction conferred on it by Article 267 TFEU [...] - clarified the meaning and scope of the principle of prohibition of abuse of rights, as that principle must be applied to the present case.

Furthermore, it is not the case that the Court of Justice, with its judgment, has established an interpretation of the Parent-Subsidiary Directive which means that the Directive - in itself - creates obligations for citizens, which would have been incompatible with the principle of legal certainty. In cases where there is an abuse of rights and the citizen is denied a benefit under EU law for this reason, it is thus not a case of an obligation being imposed on the citizen under EU law. Rather, the objective conditions for obtaining an advantage under EU law are not fulfilled because the advantage is sought through abuse of rights (paragraph 90 of the judgment).

Thus, it also follows from the Court's judgment that the EU law principle of legal certainty does not preclude denying the benefit of the Parent-Subsidiary Directive in the form of exemption from withholding tax where there is an abuse of rights, which is also expressly stated in the Court's judgment in case C-251/16, Cussens, paragraph 43 [...].

Finally, it is not contrary to the Act on Denmark's Accession to the European Union to deny the benefits of the Parent-Subsidiary Directive with reference to the general EU law principle of prohibition of abuse of rights. The present situation is thus not similar to the situation that gave rise to the Supreme Court's judgment reproduced in U.2017.824H, Ajos [...], on which TDC relies. The Ajos case arose from the fact that in 2009, Ajos dismissed an employee who would have met the conditions in section 2a of the Danish Salaried Employees Act for severance pay if it had not been for subsection 3 of the provision, which prevented the employee from receiving severance pay because he could have received a retirement pension upon resignation. The employee brought a claim for compensation against Ajo, invoking the general EU law principle of non-discrimination on grounds of age.

In order to decide the case, the Supreme Court referred questions for a preliminary ruling to the Court of Justice, which ruled, inter alia, that the general principle of non-discrimination on grounds of age, of which Council Directive 2000/78/EC (establishing a general framework for equal treatment in employment and occupation) is a concrete expression, must be interpreted as precluding - also in a dispute between private parties - national legislation similar to section 2a(3) of the Danish Civil Servants Act.

In the premises for its judgment, the Supreme Court stated that the legal position resulting from section 2a(3) of the Danish Salaried Employees Act - as the provision had been interpreted in case law and which interpretation had been used by the legislature in subsequent amendments to the Act - was clear, and that it is not possible, using the interpretation methods recognized in Danish law, to interpret the provision in accordance with the Employment Directive, as interpreted by the Court of Justice. In the words of the Supreme Court, there was thus a "contra legems situation".

As such a situation existed, the Supreme Court had to decide whether the general EU law principle of non-discrimination on the grounds of age could be given effect in Danish law to the effect that it prevails over a conflicting national provision, including in disputes between private parties. According to the

Supreme Court, a decision on this question depended on an interpretation of the Act on Denmark's accession to the European Union. The Supreme Court concluded that the Act of Accession does not contain a legal basis - in a dispute between private parties - to allow the unwritten principle of prohibition of pre-

discrimination due to age replace the current provision in section 2a(3) of the Danish Salaried Employees Act to the extent that the provision is in conflict with the prohibition.

The present case is fundamentally different from Ajos, since there is no 'contra legem situation'.

The Parent-Subsidiary Directive has been implemented in Danish law in the simplest way imaginable, namely by reference to the Directive. Thus, as described above, it follows from the wording of section 2(1)(c) of the Danish Corporation Tax Act that dividends are subject to a tax liability unless "the taxation of the dividend shall be waived or reduced in accordance with the provisions of the [Parent-Subsidiary Company Directive]". By virtue of this reference to the Directive, it is clear that the question of

**1674**

exemption from taxation of dividends is within the scope of EU law.

An exemption from tax liability is thus conditional on the directive obliging Denmark to waive taxation in the given case. Whether such an obligation exists therefore depends on an interpretation of EU law. As the Supreme Court also held in the Ajos case, such an interpretation falls within the jurisdiction of the Court of Justice pursuant to Article 267 TFEU.

The fact that the implementation of the Parent-Subsidiary Directive as regards taxation of dividends is solved by a simple reference to the Directive in section 2(1)(c) of the Danish Corporation Tax Act has as a logical consequence that the existence of a "contra legem situation" is excluded. The reference thus makes it unproblematic to apply an interpretation of section 2(1)(c) of the Danish Corporation Tax Act that is in accordance with the Parent-Subsidiary Directive and the general principle of prohibition of abuse of rights, as the Directive and the principle must be interpreted according to the Court's judgment in the present case.

Against that background, section 2(1)(c) of the Danish Corporation Tax Act must be interpreted as meaning that the exemption from taxation of dividends which otherwise follows from the Parent-Subsidiary Directive must be refused if, in the given case, the exemption is sought to be obtained by abuse of rights. Since there is thus no "contra legem situation", the present case - unlike the Ajos case - does not raise any question about the relationship between, on the one hand, the general EU law principle of prohibition of abuse of rights and, on the other hand, the Act on Denmark's accession to the European Union. For U.2012.3564H [...], on which TDC also relies [...], it also applies that this judgment is not relevant to the decision of the present case. The case that gave rise to the Supreme Court judgment did not - just as little as the present case - raise any question about the primacy of EU law.

*4.1.1.2 There is an abuse of rights*

According to the Court's judgment, the proof of abuse requires, on the one hand, a combination of objective circumstances showing that the objective pursued by the EU legislation has not been achieved, even though the conditions laid down in that legislation have been complied with, and, on the other, a subjective element consisting of an intention to take advantage of the EU legislation by artificially creating the conditions necessary to obtain that advantage (paragraph 97 of the judgment).

In the judgment, the Court has indicated the detailed principles for such an examination and made a - non-exhaustive - list and description of evidence that the parent/subsidiary directive's advantage in the form of exemption from taxation of dividends in a given case is sought to be obtained by abuse.

According to the Court, in cases such as the present one, a group must be regarded as an artificial arrangement where it is not established for reasons reflecting economic reality, where it has a purely formal structure and where its main purpose or purpose is to

as one of its main purposes to obtain a tax advantage which defeats the object and purpose of the applicable tax legislation. That applies in particular where the payment of withholding tax is avoided by introducing into the group structure a flow-through entity between the company transferring the dividends and the company which is the beneficial owner of the dividends (paragraph 100).

According to the Court, the fact that a dividend is redistributed in its entirety or substantially in its entirety very shortly after receipt by the company which received it to entities which do not satisfy the conditions for the application of the Parent-Subsidiary Directive is thus evidence of an arrangement intended to take undue advantage of the exemption from taxation resulting from the Directive (paragraph 101 of the judgment).

According to the Court's judgment, the artificial nature of an arrangement can also be supported by the fact that the group in question is structured in such a way that the company receiving the dividend must itself redistribute that dividend to a third company which does not meet the conditions for application of the Parent-Subsidiary Directive, with the result that the company only receives negligible taxable income when it acts as a conduit company to enable the flow of funds from the subsidiary to the entity which is the 'beneficial owner' of the amounts transferred (paragraph 103 of the judgment).

A company can be considered a flow-through company if the company's only activity is to receive the dividend and redistribute it to the beneficial owner or to other flow-through companies, see paragraph 104 of the judgment. The (lack of) actual economic activity must be assessed on the basis of all relevant elements concerning, inter alia, the operation of the company, its accounts, the structure of the company's costs and the expenses actually incurred, the staff employed by the company and the premises and equipment at its disposal.

Evidence of an artificial arrangement in a given case can also be found (1) in the existence of different contracts between the companies involved in the financial transactions in question which give rise to intra-group flows of funds, (2) in the method of financing the transactions, (3) in the assessment of the equity of the intermediate companies and (4) in the lack of power of the flow-through companies to dispose financially of the dividends received. In this context, it is not only a contractual or legal obligation for the company receiving the dividend to

**1675**

redistribute it to a third party, which may constitute such a ground. There is also a ground for abuse if, after an assessment of the facts of the case, the company has not "substantially" had the rights to use and enjoy the proceeds (paragraph 105).

Elements such as those mentioned above may be regarded as corroborated if there is a coincidence or close temporal connection between, on the one hand, the entry into force of new tax legislation, such as section 2(1)(c) of the Corporation Tax Act, and, on the other hand, the initiation of complex financial transactions and the granting of loans within the same group (paragraph 106). Such a coincidence or close temporal connection is not, however, a necessary condition for establishing abuse, but may support other indications of abuse.

Finally, it is irrelevant for the determination of whether there is an abuse of rights whether Denmark has concluded a double taxation treaty with the state where the beneficial owner of the dividends is resident, under which no tax would have been withheld

withholding tax on the dividend if it had been paid directly to the beneficial owner, cf. premises 107 ff.

When the Court's instructions are coupled with the circumstances of the present case, it can be concluded that there has been an abuse of rights.

TDC was controlled, through companies domiciled in Luxembourg, by a number of private equity funds domiciled in the Cayman Islands and the like. It is undisputed that none of these funds can be considered a company of a Member State within the meaning of the Parent-Subsidiary Directive.

During the administrative proceedings, TDC stated that it intended to distribute a dividend to NTC, and for the purposes of the Tax Council's response to the request for a binding answer, the company stated, as described in section 3, that it assumed that the "majority" of the dividend would be redistributed from NTC to NTC Parent S.á.r.l. (for a marginal part via NTC Holding G.P.), which would presumably pay amounts received to companies controlled by the individual private equity funds or to its creditors, with NTC (and NTC Holding G.P.) using a smaller portion of the dividends ("probably between 3% and 5%") to cover costs. On August 10, 2011, according to the company, DKK 1.781 billion was actually distributed. With NTC's 59.1% ownership share, the share of the dividend amounted to DKK 1.05 billion. Given the size of the amount, it is inconceivable that there was no plan in place at the time of distribution at the latest for how the dividend from TDC would be disposed of in the Group.

As long as TDC does not provide evidence to the contrary, it must - taking into account the above - be assumed that the dividends from TDC (except for a marginal amount) were intended in advance to flow up through the Luxembourg companies to the private equity funds and actually did so.

Furthermore, it must be assumed - as long as TDC does not provide evidence to the contrary - that NTC did not carry out significant activities other than being the parent company of TDC and that NTC Parent S.á.r.l. did not carry out significant activities other than being the parent company of NTC and NTC Holding G.P.

It must also be concluded that the Luxembourg companies had no or only very narrow powers to dispose of the dividends. The Ministry of Taxation does not claim that the Luxembourg companies were contractually obliged to redistribute dividends from TDC, but in group relationships such as the present one, such a legal obligation is unnecessary and therefore superfluous. The private equity funds had chosen to structure their ownership of TDC in such a way that the Luxembourg intermediate holding companies were to redistribute dividends to the private equity funds, which, as mentioned, could not invoke the benefits of the Parent-Subsidiary Directive, with the result that the intermediate holding companies only received negligible taxable income.

The established ownership structure with the insertion of the Luxembourg intermediate holding companies had no credible business justification. The request for a binding reply was not accompanied by any information to support a business justification for the ownership structure, and a business justification was

- and is - also not to be seen. As described above, there is no information that the Luxembourg intermediate holding companies engaged in any significant activity other than merely (indirectly) holding shares in TDC, nor is there any information to suggest that - in order to exercise active ownership influence over TDC - it was necessary to establish an ownership structure with intermediate companies in Luxembourg.

On the other hand, the chosen ownership structure had an obvious tax advantage, as NTC - in contrast to what must be assumed to have

was a "company in a member state" and therefore - if there had been no abuse of rights - could invoke the benefits of the directive, including the exemption from taxation of dividends in the source state.

If an intermediate holding company is indeed commercially motivated, it is a simple matter to explain what the commercial justification is, but TDC has - still - not provided an explanation that gives any reason to assume that the established ownership structure with the introduction of the

**1676**

Luxembourg intermediate holding companies was mainly commercially motivated and thus did not have as (one of its) main purposes to obtain a tax advantage.

The Ministry of Taxation does not dispute that the private equity funds may have needed to establish a holding company for the acquisition of the shares in TDC, but such a holding company was already established in Denmark, as the private equity funds acquired the shares in TDC in 2005 through a number of holding companies established in Denmark, cf. the offer to the shareholders of TDC made on December 2, 2005 by Nordic Telephone Company ApS [...]. No credible business justification has been provided for the need to also have intermediate holding companies in Luxembourg.

TDC's abstract invocation that private equity funds and other foreign investors "historically" should have made their investments via Luxembourg, among other things because Luxembourg is considered an attractive and stable country in legal, regulatory, financial and political terms [...], says nothing about what the business rationale was for establishing intermediate holding companies in Luxembourg in this case, especially when a holding structure had already been established in Denmark.

TDC has not provided a description of the business-related "deficiencies" in the Danish holding companies, which the establishment of the holding structure in Luxembourg should remedy.

It makes no difference in this regard that, according to TDC, the first holding companies in Luxembourg were established in the summer and fall of 2005, .... It must be assumed that the establishment in 2005 of intermediate holding companies in Luxembourg for the purpose of acquiring the shares in TDC (see paragraph 37 of the judgment of the Court of Justice in the present case and also the names of the companies established, "Nordic Telephone Company"), had as (one of its) main purposes to obtain a tax advantage in that the structure with intermediate holding companies in Luxembourg made it possible - apart from the question of beneficial ownership and abuse of rights - to transfer dividends from TDC to the capital funds without having to pay withholding tax thereon.

Considering the absence of a credible business justification, it is unreasonable to assume that the established ownership structure with the introduction of the Luxembourg holding structure had as its main purpose or as one of its main purposes to obtain a tax advantage, namely to make dividends from TDC tax-free, in that the intermediate Luxembourg holding companies, unlike the underlying capital funds - apart from the issue of beneficial ownership and abuse - could invoke the Parent-Subsidiary Directive and the double taxation treaty between Denmark and Luxembourg.

Against the above background, there is thus sufficient evidence to assume that NTC and the other Luxembourg intermediate holding companies in fact merely acted as flow-through companies in relation to the dividends that were intended to be

distributed and actually were distributed from TDC to NTC, because it was in fact decided in advance by the underlying owners that the dividends would be channeled further up through the group to the underlying capital funds, without the Luxembourg companies having any real opportunity to influence this decision. The Luxembourg intermediate

holding companies did nothing more than receive and redistribute dividends to other flow-through companies and ultimately to the rightful owner - whoever that was, cf. further details under section 4.1.3.

In this respect, it must be incumbent on TDC to disprove that NTC and the other Luxembourg intermediate holding companies were not merely pure flow-through companies in relation to the dividend in question. TDC has not met this burden of proof.

For example, there is no information about the management of NTC and NTC Parent S.á.r.l. and about the decisions made by this management in relation to the dividend in question that provides a basis for assuming that NTC and NTC Parent S.á.r.l. had a real opportunity to independently decide how to dispose of the dividend from TDC. There are also no accounts, board meeting minutes etc. for the Luxembourg companies or information about what agreements had been made between e.g. the private equity funds and their investors regarding the treatment of returns from the target company (TDC). It is not decisive for the assessment of whether there is abuse that the group - possibly - may have chosen to let a marginal part of the distributed amount be used by the intermediate holding companies to pay current or expected costs. The holding companies' expenses have merely been a consequence of the underlying owners' use of the holding companies as a tool to avoid withholding tax on dividends. Therefore, the incurrence of such costs does not change the fact that the intermediate holding companies must be considered flow-through entities.

When these circumstances are considered in conjunction with the Court's guidance on the assessment of abuse, it must be concluded that there was an arrangement whose main purpose was to take undue advantage of the exemption provided for in Article 5 of the Parent-Subsidiary Directive.

The Court has thus also found (paragraph 99 of the judgment) that in this case there are "a number of indications" which provide a basis for concluding that there is an abuse of rights, but in accordance with the division of jurisdiction between the Court and the High Court as the referring court, the Court has left it to the High Court to "verify" whether those indications are objective and consistent, and whether TDC has had the opportunity to provide counter-evidence.

**1677**

Such a review should lead to a conclusion that there is a case of abuse of rights. All circumstances relevant to the abuse assessment were disclosed to the Court, and TDC has not since demonstrated any other circumstances which indicate that the Court's (preliminary) assessment cannot stand up to review.

Since there is thus an abuse of rights, NTC is already for that reason precluded from benefiting from the exemption from withholding tax provided for in Article 5 of the Parent-Subsidiary Directive. Thus, the provisions of the Directive do not lead to the dividend in question being exempt from a tax liability under section 2(1)(c) of the Danish Corporation Tax Act.

*4.1.2 Taxation shall not be reduced or waived pursuant to the Danish-Luxembourg double tax treaty*

According to Article 10(2) [...] of the Danish-Luxembourg Double Taxation Convention, dividends may be taxed in the Contracting State in which the company paying the dividends is resident, but the tax imposed may not exceed specified limits "if the recipient is the beneficial owner of the dividends". According to the wording of this provision, Denmark is thus only obliged to reduce the taxation of dividends paid by a Danish company if the recipient is the "beneficial owner" of the dividends.

This concept must be interpreted in accordance with the corresponding concept in Article 10(2) of the OECD Model Tax Convention [...], as the Danish-Luxembourg Double Taxation Convention was concluded on the basis of the Model Convention.

The fact that the benefit of Article 10(2) of the Model Convention can only be claimed by the beneficial owner of the dividend was introduced as an express condition when the Model Convention was revised in 1977. The condition was introduced to make it clear that the source State is not obliged to waive its right to tax dividend income merely because the income is paid directly to a resident of a State with which the source State has concluded a treaty, see the 2003 Commentary, paragraph 12 to Article 10 of the Model Convention [...].

Thus, it also follows from the 1977 Commentary, paragraphs 7-10 to Article 1 of the Model Tax Convention that the concept of "beneficial owner" is intended to curb abuses in the form of "artful legal constructions", more specifically the "artifice" whereby a person disposes, through a legal association formed in a Contracting State, primarily to obtain benefits under the Convention which could not be obtained by the person directly (...). Accordingly, it further follows from the 1977 Commentary, paragraph 12 to Article 10, that a recipient of profits may not invoke the limitation of the source State's right of taxation under Article 10(2) of the Model Tax Convention if the person concerned is a resident of a Contracting State. 2 of the Model Convention if he is merely an "intermediary", such as an agent or nominee, interposed between the beneficial owner of the dividends and the payer of the dividends, unless the beneficial owner is resident in the same State as the formal recipient of the dividends (...).

The Eastern High Court has already established that the term "beneficial owner" is an autonomous concept, i.e. that it has an independent content independent of the internal legislation of the contracting states, see SKM2012.121.ØLR [...]. The term "beneficial owner" must therefore not be interpreted in accordance with the term "rightful income recipient", which in Danish tax law is used as a term for the person who is deemed to be taxable on a given income.

With the aforementioned judgment, the Eastern High Court has also already established that the tax authorities in cases such as the present case have been entitled - as happened - to include the comments to the OECD Model Tax Convention from 2003 when determining what is to be understood by the term "beneficial owner". The later commentaries from 2014 and 2017 must similarly be considered to constitute relevant interpretative contributions, as these commentaries - like the 2003 commentaries - do not imply a changed understanding of Article 10(2) of the Model Convention, but are merely clarifications.

The 2003 Commentary, paragraph 12.1 to Article 10(2) of the Model Convention states [...] that it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax "where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question." Thus, a "conduit" will not be considered the beneficial owner "if, although it is the formal owner, it has in fact very narrow powers which, in relation to the income in question, make it a 'nullity' or administrator acting on behalf of other parties".

In the 2014 Commentary, section 12.4, which on this point has been continued unchanged in the 2017 Commentary, it is clarified that the immediate recipient of the proceeds may be denied the

U.2023.1575H

benefit of the agreement under Article 10(2) of the Model
Agreement if the facts clearly show that

Copyright © 2023 Karnov Group Denmark A/S

the recipient - without being bound by a contractual or legal obligation to pass on the payments received to another person - "substantially" does not have the rights to use and enjoy the proceeds received [...].

**1678**

In the present case, the facts show with sufficient clarity that NTC and the other Luxembourg companies had no or only very limited powers to dispose of the proceeds from TDC.

As explained in more detail under the previous point, it must therefore be assumed that NTC and the other Luxembourg intermediate holding companies were contributed between the capital funds and TDC for no commercial reason, that it was planned in advance that the dividends in question would flow through NTC and the other Luxembourg intermediate holding companies to the capital funds and that this actually happened.

The circumstances demonstrate that the group structure with NTC and the other Luxembourg intermediate holding companies was established with the (main) objective that the companies should act as

"flow-through units" for dividends from TDC which, without the group structure with the Luxembourg intermediate holding companies, would have been taxable pursuant to section 2(1)(c) of the Corporation Tax Act, as the private equity funds - undisputedly - could not have claimed a treaty advantage themselves and that neither NTC nor the other Luxembourg intermediate holding companies could substantively dispose of the dividends which were intended in advance to be paid to the private equity funds.

Against this background, it must be established that neither NTC nor the other Luxembourg intermediate holding companies within the meaning of Article 10(2) of the Danish-Luxembourg Double Taxation Convention can be considered the beneficial owner of the dividend in question. Therefore, the taxation of the dividends shall not be reduced under this provision. Accordingly, the double taxation treaty does not result in the dividends in question being exempt from a tax liability pursuant to section 2(1)(c), third sentence, of the Danish Corporation Tax Act.

This conclusion is not inconsistent with the Eastern High Court's premises for the judgment in SKM2012.121.ØLR, according to which, in order for an intermediate holding company not to be considered the rightful owner of dividends, "it must [...] be required that the owner exercises control over the company that goes beyond the planning and management at group level that usually occurs in international groups."

It follows from this that - in order for a dividend-receiving intermediate holding company not to be considered the beneficial owner of the dividend

- is not in itself sufficient to establish that the intermediate holding company is controlled by a company resident in a state without a double taxation treaty with Denmark.

There must be concrete evidence to assume that the dividend-receiving intermediate holding company has no or only very narrow powers to dispose of the dividends, with the result that the company cannot be considered the rightful owner of the dividends. Such specific circumstances must be considered to exist, inter alia, if the intermediate holding company is without any presumed commercial justification and the dividend in question has actually flowed through the intermediate holding company and on to the underlying owner(s).

In such a situation, a person or company is acting through a legal association formed in a Contracting State with the main purpose of obtaining a contractual advantage which that person or company could not have obtained itself. It is precisely this

type of abuse that the 'beneficial owner' criterion aims to counter, as explained above.

*4.1.3 TDC's invocation of "ultimate owners'" right to exemption from withholding tax*

In support of its claim for acquittal, TDC argues "that a very large proportion of the ultimate owners [...] were entitled to protection under double taxation treaties" [...]. Because the identity and domicile of these "ultimate owners" is undisclosed and undocumented, TDC's argument is unsustainable.

4.2 The tax liability is not contrary to a binding, established administrative practice

When deciding whether a tax liability with respect to the dividends in question would be contrary to a binding, established administrative practice, it must - as the High Court would otherwise have no reason to consider the issue - be assumed that the taxation must not be waived under Article 5(1) of the Parent-Subsidiary Directive because of abuse and that the taxation of the dividends must not be reduced under Article 10(2) of the Danish-Luxembourg Double Taxation Convention because neither the NTC nor the NTC nor the Danish tax authorities are entitled to reduce the tax liability. 1, because there is abuse, and that the taxation of the dividend should not be reduced under Article 10(2) of the Danish-Luxembourg Double Taxation Convention because neither NTC nor the other Luxembourg intermediate holding companies can be considered the rightful owner of the dividend.

In other words, it is therefore a case of TDC claiming that the dividends in question should be considered exempt from tax liability, even though section 2(1)(c) of the Danish Corporation Tax Act's express condition for the dividends to be exempt from tax liability is not met.

Since a principle of equality under administrative law cannot justify a claim for a legal position that is contrary to law, see U.2003.2005H [...], it is excluded that TDC's invocation of an administrative practice can lead to the exemption of the dividend in question from a tax liability, already because such an exemption would be contrary to section 2(1)(c) of the Danish Corporation Tax Act's express condition for an exemption to be granted.

In addition, the Tax Council's binding answer of June 21, 2011 does not represent a tightening of practice,

**1679**

as it did not change any established administrative practice at all. It is incumbent on TDC to prove the existence of the claimed practice, which the decision, according to the company, should deviate from, cf. e.g. U.2011.3305H [...], but the company has not met this burden of proof. Thus, TDC has not demonstrated the existence of any previous decision according to which the tax authorities have considered a dividend to be exempt from a tax liability, even if the given circumstances - as in the present case - otherwise provided evidence to establish that the parent company had not had or had had such narrow powers to dispose of the dividend that the company could not be considered its legal owner.

The decision of the Danish National Tax Tribunal (TfS 2012, 126, [...]), which TDC invokes [...], is the decision under review in the High Court's case B-1980-12, which is the main hearing in connection with the present case. The appealed decision has thus been brought before the courts by the Ministry of Taxation pursuant to section 49 of the Tax Administration Act, according to which the Ministry of Taxation may bring issues decided by the National Tax Tribunal before the courts no later than 3 months after the National Tax Tribunal has made its decision. It therefore goes without saying that the appealed decision cannot establish a binding administrative practice on which TDC can rely.

Furthermore, TDC has not demonstrated any cases where the tax

authorities
- since section 2(1)(c) of the Danish Corporation Tax Act came into force on
27 April 2001 (with effect for dividends declared distributed or paid on or after 1 July 2001) - should have failed to take corrective action in cases such as the present one. Moreover, such failure to intervene, if it had actually taken place, could not have been equated with a positive decision, see e.g. U.2017.2960H and U.2017.2979H [...].

Nor has the company demonstrated in any other way that the tax authorities after the entry into force of section 2(1)(c) of the Danish Corporation Tax Act and until the Tax Council's decision in the present case should have followed a practice according to which dividends have been considered exempt from the tax liability resulting from the provision, even though the circumstances otherwise provided evidence to establish that the parent company had not had or had had such narrow powers to dispose of the dividends that the company could not be considered its rightful owner.

The two answers [...] invoked by TDC, which the Minister for Taxation issued after the entry into force of Section 2(1)(c) of the Corporation Tax Act, thus do not constitute evidence of such a practice.

The answers provide no evidence that SKAT should have made a positive decision to follow a practice according to which dividends were considered exempt from a tax liability, even if, after information and a specific assessment of the given circumstances, there would be evidence to establish that the parent company had not had or had had such narrow powers to dispose of the dividends that the company could not be considered its rightful owner.

Prior to the Tax Council's decision in this case, however, the Ministry of Taxation had issued several answers stating that a parent company would not be able to claim the benefits of a double tax treaty if it was a "pure flow-through holding company" (...), a "pure flow-through company" (...), a "conduit" company (...), or a "flow-through" company (...). In all but the first of these responses, reference is even made to paragraph 12.1 of the comments to Article 10 (on dividends) of the OECD Model Tax Convention, and in the 4 latter responses it is furthermore described in the responses themselves that "conduit" companies/"flow-through" companies include companies that "effectively have very narrow powers in relation to the income concerned".

Against the above background, it must be established that the Tax Board's decision in this case did not change any binding, established administrative practice on which TDC can rely under an administrative law principle of equality.

Finally, it is - in any case - irrelevant to the tax liability with respect to the dividend at issue in this case whether SKAT had previously had an administrative practice that no withholding tax should be withheld in a case such as the present one. Even if such a practice had existed, TDC became aware, by virtue of the Danish Tax Council's answer to question 2 regarding the dividend distribution contemplated at the time, that such a practice had been set aside by the Council's decision. In this connection, it is noted that TDC withheld dividend tax in connection with the distribution that was actually made in August 2011, after the Tax Council had made its decision in the case.

4.3 The Ministry's alternative claim for refusal to answer TDC's question 2

A request for a binding answer must contain all information relevant to the answer that is available to the questioner, cf. section 24(1), first sentence of the Tax Administration Act. If a question is not sufficiently informed, the question may be rejected, cf. section 24(1), third sentence and (2) of the Tax Administration Act. When an administrative appeal or judicial review concerns a case where the transaction to which the request for a binding answer relates has been carried out, new information may, in accordance with the generally applicable principles of nova, be included to clarify the circumstances of the transaction carried out.

TDC has therefore not been prevented from providing information about the distribution carried out, including

**1680**

information on how NTC and the other Luxembourg holding companies actually disposed of the proceeds. As a

As a logical consequence, TDC's refusal to provide such information can of course also be of significance when considering whether question 2 in the company's request for a binding response should be answered in the negative or the affirmative.

In the opinion of the Ministry of Taxation, there is sufficient evidence on the present basis to establish that taxation of the dividend in question should not be waived under Article 5(1) of the Parent-Subsidiary Directive because of abuse of rights and that taxation of the dividend should not be reduced under Article 10(2) of the Danish-Luxembourg Double Taxation Convention because neither the NTC nor the Danish-Luxembourg Double Taxation Convention applies. 1, because there is an abuse of rights, and that taxation of the dividend should not be reduced under Article 10(2) of the Danish-Luxembourg Double Taxation Convention, because neither NTC nor the other Luxembourg intermediate holding companies can be regarded as the rightful owner of the dividend, and that question 2 in TDC's request for a binding answer should therefore be answered in the negative.

However, should the High Court find that the case cannot be considered sufficiently informed for such a conclusion to be drawn on the present basis, the High Court should, if appropriate, accept the Ministry's alternative claim.

4.4 The dividend is not exempt from a tax liability under section 2(1)(c)(5) of the Danish Corporation Tax Act.

It follows from section 2(1)(c)(5) of the Danish Corporation Tax Act that the tax liability does not include dividends received by participants in parent companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which for the purposes of taxation in Denmark are considered to be transparent entities.

Although there is no reference to the first sentence of the provision, it is clear that the "tax liability" in the fifth sentence refers to the tax liability resulting from the first sentence of the provision.

Contrary to what TDC claims, the rule in the 5th sentence provides

- There is no legal basis for exemption from this tax liability in a situation where the taxation of the dividend is neither waived nor reduced under the provisions of the Parent-Subsidiary Directive or under a double taxation treaty with the Faroe Islands, Greenland or the state in which the parent company is resident, cf. the third sentence of this provision. In other words, an exemption shall not be granted if only the parent company is included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive and is considered to be a transparent entity when taxed in Denmark.

On the other hand, TDC takes the position that transparent foreign parent companies and their foreign participants should be in a better tax position than foreign parent companies, which under Danish law are considered independent tax subjects, as transparent parent companies and their participants should be able to claim a tax exemption, even though such an exemption under the Parent-Subsidiary Directive in the given case would be excluded due to abuse of rights.

This odd position is not supported by the wording of section 2(1)(c) of the Danish Corporation Tax Act or the history of the creation of section 5 - on the contrary.

The rule in the 5th sentence was introduced by Act no. 1375 of December 20, 2004 (...), according to which section 2(1)(c) of the Corporation Tax Act read as follows:

"Tax liability under this Act also applies to companies and associations, etc. as mentioned in section 1(1), which are domiciled abroad, insofar as they

[...]

c) receives dividends covered by section 16 A(1) of the Danish Taxation Act, except for distributions from bond-based investment funds as mentioned in section 2 d(3) of the Danish Capital Gains Tax Act, or receives transfer sums covered by section 16 B of the Danish Taxation Act. The tax liability does not include dividends received by a company

etc. (the parent company) that owns at least 10 percent of the share capital of the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must fall. However, for dividend distributions in the calendar years 2005 and 2006, the ownership share mentioned in the second sentence shall be 20 percent, and for dividend distributions in the calendar years 2007 and 2008, the ownership share mentioned in the second sentence shall be 15 percent. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on a common system of taxation for parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the company is domiciled. Furthermore, the tax liability does not apply to dividends received by members of parent companies as mentioned in the second sentence which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which are considered to be transparent entities for tax purposes in this country. [...]"

The reference in sentence 5 to sentence 2 meant that an exemption from the tax liability in sentence 1 was conditional on the taxation of the dividend being waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive, since the term "parent company" mentioned in sentence 2 only included companies for which taxation of the dividend was waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive. The term "parent company" referred to in the second sentence only included companies for which it applied that taxation of the given dividend should be waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive or in accordance with a double belt taxation agreement with the Faroe Islands, Greenland or the state where the company is domiciled, cf. the condition expressly applicable in the fourth sentence.

**1681**

The introduction of section 5 thus implied a tax equality between, on the one hand, foreign parent companies, which under Danish law were considered independent tax subjects, and, on the other hand, transparent, foreign parent companies and their foreign participants.

This understanding is also clearly supported by the legislative history of the above-mentioned amending law, which aimed to implement Directive (2003/123/EC) amending the Parent-Subsidiary Directive.

One of the changes introduced by this amending Directive was to include in the list of types of companies covered by the Parent-Subsidiary Directive companies which were considered liable to corporation tax in their Member State of residence but which were considered fiscally transparent by other Member States, as Member States which treated non-resident taxable companies as fiscally transparent should grant appropriate tax relief in respect of income forming part of the tax base of the parent company, cf, Recital 6 of the amending Directive [...].

According to the legislative history of the above-mentioned amending act, this change was implemented by the fact that foreign participants in foreign parent companies, which under Danish law were considered transparent for tax purposes, would in future not be limited tax liable in Denmark on dividends from the transparent company's Danish subsidiary, "regardless of whether the shareholder [was] a company or a natural person, and regardless of the shareholder's ownership interest in the

transparent company" [...].

Thus, it is clear from the preparatory works that there should (only) be an equal treatment of, on the one hand, foreign parent companies that were considered independent tax subjects under Danish law and, on the other hand, foreign parent companies that were considered transparent for tax purposes under Danish law and their participants, as the participants' ownership interest in the transparent company and their status as either a natural person or a company should (only) be disregarded.

On the other hand, the preparatory works do not provide any evidence that foreign parent companies, which under Danish law were considered transparent for tax purposes, and their foreign shareholders should be better placed than foreign parent companies, which under Danish law were considered independent tax subjects, so that foreign shareholders in a transparent foreign parent company could claim exemption from a tax liability, even if the conditions of the Parent-Subsidiary Directive were not otherwise met.

By Act no. 525 of June 12, 2009 (section 14, no. 5), section 2(1)(c) of the Danish Corporation Tax Act was rewritten, among other things so that the former

The 2nd sentence (which in the meantime had become the 3rd sentence) was written together with the 4th sentence, in which connection the word "parent company" was deleted from the then applicable 3rd sentence, as the tax exemption was linked to the definition of the concept of subsidiary shares, which was introduced in the Capital Gains Tax Act with the same amendment act. At the same time, the fifth sentence of section 2(1)(c) of the Danish Corporation Tax Act was amended, as the reference "as mentioned in the third sentence" This was natural, as the word "parent company" was no longer included in the third sentence. The preparatory works (...) stated that this was "a consequential amendment as a result of section 14(5) of the proposal". This was clearly a consequential amendment of a technical nature. Thus, the legislative history provides no evidence that the deletion of "as mentioned in the 3rd sentence" had the consequence that foreign parent companies, which under Danish law were considered transparent for tax purposes, and their participants - now - were to be better placed than foreign parent companies, which under Danish law were considered independent tax subjects and which were still only entitled to a tax exemption when the taxation of dividends was to be waived or reduced under the provisions of the Parent-Subsidiary Directive or under a double taxation agreement with the Faroe Islands, Greenland or the state where the company was domiciled.

The exemption from a tax liability resulting from the Corporation Tax Act

§ Section 2(1)(c)(5) has thus - at all times - been conditional on the dividend being waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive, which is not the case if - as in the present case - the provisions are invoked to make an abuse of rights possible.

Against this background, the Ministry of Taxation must be acquitted of TDC's independent claim."

In its summary pleading of January 11, 2021, *TDC* has stated, inter alia:

"5.1 The defendant's independent claim (answer to question 1) Section 2(1)(c), fifth sentence, of the Corporation Tax Act clearly sets out the conditions that must be met for dividends not to be subject to tax liability.

The provision was introduced in connection with the implementation of the amendment to the Parent-Subsidiary Directive and it is stated in the preparatory works for the provision [...]:

*'The new companies included in the list of companies referred to in Article 2(1)(a) are subject to corporate tax in their Member State of residence, but some of them are considered by other Member States as fiscally transparent because of their legal characteristics. According to the recitals of the amending Directive, Member States that treat non-resident taxpaying companies as fiscally transparent on this basis should provide a*

**1682**

*appropriate tax relief with respect to income that is part of the tax base of the parent company.*"

*Transparent companies are not covered by the limited tax liability on dividends from Danish companies pursuant to section 2(1)(c) of the Danish Corporation Tax Act, as the tax liability pursuant to this provision is*

*The provision is incumbent on companies and associations etc. as mentioned in section 1(1) of the Danish Corporation Tax Act. Thus, there is no need for a provision stating that transparent companies that are covered by the*
/The Danish tax authorities are not subject to limited tax liability in Denmark on dividends from Danish subsidiaries.

*According to Danish rules, the tax liability of dividends accruing to a transparent company is the responsibility of the shareholders.*

*It is therefore proposed that foreign shareholders in a transparent company that is covered by the Parent-Subsidiary Directive shall not have limited tax liability in Denmark on dividends from the transparent company's Danish subsidiary. This shall apply regardless of whether the shareholder is a company or a natural person and regardless of the shareholder's ownership interest in the transparent company"* The provision thus expressly states that the tax liability does not apply to dividends received by shareholders in a parent company included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC if the parent company is considered to be a transparent entity for tax purposes in Denmark [...]. According to the wording and legislative history of the provision, these are the only relevant criteria in relation to section 2(1)(c), fifth sentence. It is therefore not relevant in this context to assess whether NTC is the beneficial owner of dividends from the defendant.

However, the Ministry of Taxation has stated that, despite the very clear wording of the provision and the corresponding clear preparatory works, an additional condition applies. According to the Ministry of Taxation, a company can only be considered a "parent company" under the Danish Corporation Tax Act § Section 2(1)(c), 5th sentence, if the taxation is to be waived or reduced under the Parent-Subsidiary Directive or a double taxation treaty.

The Ministry of Taxation has stated that such a condition should appear from the words "parent company as mentioned in the second sentence" in the original wording of section 2(1)(c) of the Danish Corporation Tax Act.

However, such a condition was clearly not stated in the second sentence, which read as follows [...]:

*"The tax liability does not apply to dividends received by a company*
etc. (parent company) that owns at least 20 percent of the share capital of the dividend-paying company (subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie."

It is also explicitly stated in the preparatory works to the provision quoted above that parent companies in the form of transparent entities had at no time been taxable on dividends distributed from Danish companies, as the tax liability was incumbent on the participants in the parent company. Furthermore, the wording of the provision expressly stated that it was the participants in the parent company (and not the parent company) who were deemed to receive the dividend for tax purposes. Against this background, it seems strange and unbelievable that it should originally have been a condition for the application of the provision that a waiver or reduction of the taxation of the parent company under a double taxation treaty or the Parent-Subsidiary Directive should occur.

The parent company was not taxable in Denmark at all. The wording of section 2(1)(c)(5) of the Danish Corporation Tax Act was amended in 2009, where the words "as mentioned in section 3" were deleted [...]. At the same time, the wording of sentence 3 was changed so that the condition that taxation of dividends must be waived or reduced under the provisions of a double taxation

treaty or the Parent-Subsidiary Directive was technically moved to this point.

If it originally should have been a condition for the application of section 2(1)(c)(5) of the Danish Corporation Tax Act that taxation of dividends should be waived or reduced in accordance with the provision of a double taxation treaty or parent/subsidiary directive

tive, it would have been extremely misleading to delete the reference to section 3 when the condition of waiver or reduction was also moved to section 3.

The connection between the 2009 amendment to the wording of section 2(1)(c)(5) of the Danish Corporation Tax Act and the simultaneous amendment to section 2(1)(c)(3) therefore also indicates that there is no requirement that taxation of dividends must be waived or reduced in accordance with the provisions of a double taxation treaty or the Parent-Subsidiary Directive in relation to section 5.

The Ministry of Taxation's view therefore appears to be pure rationalization, which of course cannot change the fact that neither the wording nor the preparatory work for section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act provides the authority to set such a requirement.

According to the wording of the provision, the only relevant criteria in relation to section 2(1)(c), fifth sentence, are thus whether the parent company (in this case NTC) is included in the list of companies covered by the Parent-Subsidiary Directive and whether the parent company is considered to be a transparent entity for taxation in Denmark. It is not relevant in this context to assess whether NTC is the beneficial owner of dividends from the defendant.

**1683**

The parent company - NTC - is undisputedly a Luxembourg company of the 'société en commandite par actions' type and thus one of the companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive [...].

Dividends distributed from TDC to NTC are thus tax exempt under section 2(1)(C)(5) of the Danish Corporation Tax Act if NTC is considered a transparent company under Danish domestic tax law.

In the order of the National Tax Tribunal, it is assumed and is also undisputed by the plaintiff [...] that NTC must be considered a transparent company under internal Danish tax law.

As a result, dividends distributed from TDC to NTC are tax-free pursuant to section 2(1)(c)(5) of the Danish Corporation Tax Act.

Question 1 must therefore be answered with "yes" based on the current wording of section 2(1)(c) of the Danish Corporation Tax Act,

5. pkt.

5.2 The applicant's claim (answer to question 2)

The plaintiff claims that NTC is subject to the tax liability in section 2(1)(c) of the Danish Corporation Tax Act, as NTC neither has access to the benefits of the Parent-Subsidiary Directive nor can it be considered the beneficial owner of the dividends under the Danish-Luxembourg double taxation treaty.

The Ministry of Taxation's argumentation cannot be accepted. Specifically, the NTC has access to the benefits in both the Parent-Subsidiary Directive (section 5.2.1) and the Danish-Luxembourg Double Taxation Act (section 5.2.2), and the Ministry of Taxation has no authority to deny the NTC access to the benefits (section 5.2.3).

In addition, the tax authorities' changed argumentation and change in practice - both Danish and EU law - is problematic in terms of legal certainty and raises questions about Denmark's surrender of sovereignty to the EU (sections 5.2.4 and 5.2.5).

Finally, in any case, there is no actual abuse (section 5.2.6).

The above arguments individually and collectively indicate that question 2 should continue to be answered with "yes" and

that the defendant's claim for acquittal should be upheld.

5.2.1 Access to benefits under the Parent-Subsidiary Directive NTC is undisputedly one of the companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive and is subject to Luxembourg corporation tax ("impot sur le revenu des collectives"). It follows directly from the Parent-Subsidiary Directive that NTC is entitled to the benefits of the Directive.

There is no requirement in the Parent-Subsidiary Directive that the dividend recipient is the "beneficial owner" of the dividends. The Directive is based solely on objective criteria of ownership of the shares giving rise to the dividend distribution [...]. It is therefore incorrect for the Ministry of Taxation to link the taxation of dividends under the Directive with the beneficial ownership requirement in the Double Taxation Treaty and the Interest/Royalty Directive. Even if such a claim is recognized, NTC also meets the conditions for this, as NTC is recognized in Luxembourg as an independent legal and fiscal entity, is the civil law owner of the shares in NTC and had the power to dispose financially of the dividends received, see Case C-116/16 ("EU Judgment") at 105 ([...] - further section 5.2.6 below). The NTC thus has access to Article 5 of the Parent-Subsidiary Directive, which provides that the profits distributed by a subsidiary to its parent company are exempt from withholding tax [...].

5.2.2 Access to benefits under the double tax treaty between Denmark and Luxembourg

In determining whether NTC is entitled to the benefits of the double tax treaty between Denmark and Luxembourg, Denmark is obliged to accept Luxembourg's tax qualification of NTC as a separate taxable entity and thus a taxable person covered by the double tax treaty.

The decisive factor in determining whether Denmark is obliged under the Double Taxation Convention to waive or reduce taxation of dividends from the defendant when NTC is the "beneficial owner" of the dividends, cf. Article 10 of the Double Taxation Convention [...].

In the 2003 Commentary to the OECD Model Tax Convention, the issue of beneficial ownership of dividends is primarily discussed in paragraph 12 to Article 10. The commentary reads as follows [...] From the commentary to the OECD Model Tax Convention it can be inferred that agents and intermediaries and flow-through companies are not beneficial owners of dividends. In the case of flow-through companies, however, it is a condition that the company has such narrow powers to dispose of the dividends that it is effectively a nullity or an administrator in relation to the dividends.

NTC is recognized in Luxembourg as an independent legal and tax entity and NTC is the civil law owner of the shares in NTC. NTC has premises in Luxembourg, employs one person and deposits in the company's bank account have generated significant interest income for NTC. NTC is therefore neither a flow-through company nor a nullity in relation to the proceeds from the defendant, but rather its beneficial owner.

This is also stated in the "Certificate of Residence" from the Luxembourg tax authorities [...].

NTC thus also has access to the benefits under the double tax treaty.

5.2.3 No national legal basis for denial of directive benefits

**1684**

Article 1(2) of the Directive reads as follows [...].

In Danish law, it follows from the wording of the provision and the ruling of the Danish National Tax Tribunal in this case [...], as well as the ruling of the Danish National Tax Tribunal in SKM2012.26.LSR [...] that the benefits of the Directive can only be denied to the extent that national legislation contains separate and specific legal authority for this.

It also follows from EU law, as established in C-321/05, Kofoed (the "Kofoed judgment") (sections 5.2.3 and 5.2.5.1 below), that there must be internal Danish rules if NTC is to be denied exemption from dividend tax under the Parent-Subsidiary Directive. Without a national legal basis and in the absence of a general safeguard rule, the Ministry of Taxation thus only has the possibility to deny tax exemption.

with reference to the principle of reality or to the principle of rightful income recipient.

However, there is agreement in the case that the principle of reality does not provide a basis for setting aside the transactions made in this case, and that NTC is the correct income recipient of the proceeds [...].

As the objective conditions under both the Parent-Subsidiary Directive and the Double Taxation Treaty are fulfilled, the Ministry of Taxation has no right to deny the tax exemption.

The National Tax Tribunal therefore also states the following in the ruling SKM2012.26.LSR [...]:

"*Article 1(2) of the Directive states that the Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse.*

*Denmark has not adopted statutory provisions to this effect, but the authority to disregard formally legal and correct transactions in case of abuse follows from general principles of law, including case law. However, the Supreme Court has found no basis for disregarding an otherwise legally incorporated company solely on the grounds that the incorporation was made for tax-saving purposes, cf. the Supreme Court's judgments in SKM 2003.482 (the Overhold case) and SKM 2006.749 (the Finwill case).*

*The legally established and functioning Cypriot company, which is the owner of the shares in the Danish company, is thus the proper income recipient of the dividends distributed by the Danish company. The fact that the Cypriot company's only or essentially only activity is to own the shares in the Danish company does not mean that the company does not have commercial operations and thus not a different result, cf. the Supreme Court's judgment in TfS2004.542 (Johnson Holding case).*

*As a result, the dividend is exempt from withholding tax pursuant to Article 5 of the Directive.*"

The sole activity of the Cypriot company in the case in question was to own the shares in the mentioned Danish company and had neither premises nor staff available.

Accordingly, the National Tax Tribunal in its decision of March 13, 2012 [...], states in the present case:

"*In the Danish National Tax Tribunal's decision of December 16, 2011 (TfS 2012.26), which concerns a company's withholding tax liability for dividends paid to a parent company in Cyprus, the company was not considered liable to withhold dividend tax. The decision emphasized that Denmark has not adopted legislative provisions aimed at preventing fraud and abuse, cf. Article 1(2) of the Directive. The legally established and functioning Cypriot company was, despite the fact that the company's only - or essentially only - activity was to own shares in the Danish company, considered to be the proper recipient of the dividend. The dividend was then exempt from withholding tax, cf. Article 5 of the Directive, and was thus not subject to the limited tax liability, cf. section 2(2)(c) of the Danish Corporation Tax Act. Accordingly, as the dividend in question is transferred from the Danish company to a company in Luxembourg which is included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which is considered to be transparent for tax purposes in Denmark, and as such companies are treated as other companies included in the list, see question 1, the dividend will be exempt from tax liability, cf. Article 5. The dividend will then not be subject to the limited tax liability, cf.*
*§ Section 2(1)(c), 5th sentence.*"

Thus, the National Tax Tribunal has already determined that

there is no legal basis in Danish law to deny NTC the benefits of the Directive. The Ministry of Taxation continues to argue that Article 10 of the Danish-Luxembourg Double Taxation Convention and the Company Law Directive

Section 2(1)(c) of the Danish Tax Act constitutes such "domestic provisions or agreements necessary to prevent fraud and abuse" as stated in Article 1(2) of the Parent-Subsidiary Directive, so that Denmark is not obliged to waive the withholding tax under the Parent-Subsidiary Directive.

This remains meaningless.

The plaintiff's position is clearly contrary to the "golden rule" according to which double taxation treaties cannot independently authorize taxation, which has been confirmed by the National Tax Tribunal in SKM 2010.268LSR (now SKM2012.121.ØLR [...]).

The mere rule of limited tax liability in the Corporation Tax Act § Section 2(1)(c) obviously does not constitute such an internal legal basis for the prevention of fraud and abuse either. NTC is undisputedly recognized as an independent legal and tax entity in Luxembourg, and NTC is the undisputed civil law owner of shares in the defendant. As a result, NTC is the rightful income recipient of dividends on its shares in the defendant. Even if one were to assume that

**1685**

in the defendant's view incorrect - view that NTC is not the beneficial owner of the dividend under the double taxation agreement between Denmark and Luxembourg, NTC is therefore entitled to the benefits of the Parent-Subsidiary Directive and the defendant is thus unconditionally entitled to exemption from withholding tax on the dividends paid under the Parent-Subsidiary Directive.

As also explained in the Eastern High Court's referral order to the Court, paragraphs 53-55, there was no general statutory anti-abuse rule in 2011 either [...]. Such a protective rule was only adopted by Law No. 540 of April 29, 2015 [...]. In addition, it is also agreed that the principle of substance does not provide a basis for setting aside the transactions in this case, cf. the Eastern High Court's referral order to the Court, paragraph 55 [...].

The EU law interpretation of the above questions should have been clarified when the Court of Justice answered questions 1.1 and 2 in the order for reference [...]. However, the Court chose to make a change in practice (see section 5.2.5 below), which meant that the Court did not take a direct position on the questions.

However, both the Commission and the Advocate General contributed their interpretation. In its written observations to the Court of Justice, see paragraphs 8 et seq. and 22 [...], the Commission clearly stated that neither section 2(1)(c) of the Corporation Tax Act nor Article 10 of the Double Taxation Convention can be regarded as an implementation of the provision in Article 1(2) of the Parent-Subsidiary Directive. Likewise, the Advocate General concluded in paragraph 106 of his Opinion that (...):

"*106. For this reason, the answer to questions 1.1 and 2 must be that neither section 2(2)(c) of the Danish Corporation Tax Act nor a provision in a double taxation treaty which, as regards the taxation of distributed dividends, is based on the beneficial owner is sufficient to be regarded as implementing Article 1(2) of the Parent-Subsidiary Directive.*" Both the Commission and the Advocate General thus supported the defendant's arguments.

However, as mentioned above, the Court of Justice implemented a change in practice, according to which EU directives "now" can be invoked by a Member State against citizens without the requirement of national transposition of the relevant provisions.

In line with the EU ruling, the Ministry of Taxation has expressed the view that even if there were no national or collective agreement rules to combat abuse at the time, the general EU law principle of prohibition of abuse of rights would

apply.

This viewpoint is directly based on the Court's new case law and also constitutes a break with current Danish administrative

practice. As further described in section 5.2.5 below, the principle of legal certainty precludes the Ministry's view.

5.2.4 Change of Danish practice on tax liability on dividends and beneficial owner

When assessing whether the Ministry of Taxation's argumentation reflects a change in practice, it is not only relevant to look at the tax authorities' practice, but also relevant to take a closer look at the legislator and the Ministry of Taxation's (changing) views on the issue. In Denmark, foreign companies have had limited tax liability on dividends since January 1, 1970 [...].

In 1992, the Parent-Subsidiary Directive was implemented in Danish law [...], according to which dividends distributed by e.g. a Danish subsidiary to its EU parent company are exempt from withholding tax under certain conditions, cf. also Article 5 of the Parent-Subsidiary Directive [...].

In 1998, non-EU companies were also covered by the exemption from dividend tax (...). It appears from the preparatory works to the provision that [...] (...):

"*It is also proposed to abolish withholding tax on dividends paid to foreign parent companies when the Danish subsidiary is covered by the EU Parent-Subsidiary Directive, so that EU companies and non-EU companies are treated equally for tax purposes. This withholding tax can largely be avoided by incorporating holding companies in countries in relation to which Denmark is wholly or partially exempt from withholding tax. According to the proposal, income in a Danish subsidiary will thus only be subject to Danish corporation tax in Denmark, and the foreign parent company will in this respect be treated for tax purposes in Denmark in the same way as a Danish parent company.*"

It appears from the notes on revenue that [...] (...):

"With regard to *the tax exemption of dividends from Danish subsidiaries to foreign parent companies and dividends from foreign subsidiaries to Danish parent companies, the change will not affect dividends from and to another EU country, as these are already tax-free, but only in relation to countries outside the EU. There is no firm evidence for an assessment of the revenue impact. For example, there is no information about foreign parent companies' dividends from Denmark or about Danish parent companies' subsidiary dividends from non-EU countries. On the other hand, it must be included in the assessment that the current taxation can be circumvented by redirecting dividends to companies in third countries, so that the dividends are not taxed in Denmark.*"

The comments must be understood to mean that in 1998 the Ministry of Taxation believed that the incorporation of holding companies in other EU countries was a simple and legal use of the rules, and that the administrative burden of the rules could therefore just as well be removed.

**1686**

In 2000, however, the Danish Ministry of Taxation had second thoughts. Under the auspices of ECOFIN, a special code of conduct group had examined 271 tax schemes in the EU countries and, as a result, expressed criticism of the Danish rules.

On November 10, 2000, bill no. 99 was therefore introduced to reintroduce taxation of dividends for parent companies in non-EU countries without a double taxation agreement with Denmark.

The bill states that the change is due to external criticism, especially since [...]:

"(...) *that the Danish rules can be used to undermine other countries' taxation. Other countries that tax dividends from*

companies in these countries to parent companies in tax haven countries are therefore unhappy that their taxation can be circumvented using the Danish holding rules.

It is therefore proposed as a Danish contribution to counteract the use of tax havens and to meet foreign criticism to introduce the tax of 25 percent of dividend payments, from a Danish data source.*"

*company to its foreign parent company, but only in cases where the parent company is resident in a country outside the EU or in a country that does not have a double taxation treaty with Denmark.*"

Upon adoption of the bill, the Danish holding rules will thus be back to the situation in 1998, i.e. a legal situation where withholding tax could (again) largely be avoided by incorporating holding companies in countries in relation to which Denmark was wholly or partly prevented from withholding tax, cf. the above quoted preparatory works to the 1998 amendment. For the same reason, the legislator also expected that the additional revenue from the proposal would be limited [...].

This situation gave rise to a number of questions during the bill's consideration.

In its answer to Committee Question 16 [...], used the example of a parent company in the British Virgin Islands with a subsidiary in Ireland.

If the Irish subsidiary is directly owned by the parent company in the Virgin Islands, Ireland will tax the dividend payment from the subsidiary to the parent company. The reintroduction of dividend taxation would mean that the Irish taxation could no longer be circumvented by incorporating a Danish holding company so that the Irish subsidiary distributes dividends to the Danish holding company, which in turn distributes the dividends to the parent company in the Virgin Islands.

According to the bill, the Danish holding company will no longer be able to pay dividends tax-free to the parent company in the Virgin Islands. However, the Ministry of Taxation also confirms that [...] (...):

"*It is correct that the parent company in the Virgin Islands can still avoid Danish taxation of the dividends from the Irish company by transferring the shares in the Danish company to an intermediate holding company in Cyprus. In that case, Denmark will not tax the dividends as the parent company in Cyprus is covered by the Danish-Cypriot double taxation treaty.*"

In response to committee question 3 on the additional revenue [...], the Minister of Taxation replied:

"*However, the companies will be able to restructure themselves so that the shares in the Danish subsidiary are transferred to a subsidiary in a country to which dividend payments are still exempt from Danish dividend tax. This is advantageous if the dividends from here can be distributed to the actual parent company with a lower tax rate than the Danish tax rate, possibly without taxation at all.*

*Therefore, the revenue from such companies is estimated to be limited.*"

In response to committee question 15, which points out that the rules of the bill are not effective due to the possibility of using an intermediate holding company [...], the Minister of Taxation replied [...]:

"*It is argued that the proposed rules are not particularly effective as they can be avoided by an intermediate holding company in another country that is a member of the EU or has a double taxation treaty with Denmark and which has favorable tax rules.*

*I would like to note that in this case it is a case of the parent company in the tax haven country avoiding taxation by using the favorable rules in the other country.*"

Overall, there is no doubt that the Ministry of Taxation, when removing and reintroducing the dividend tax, was fully aware of the possibility of using intermediate holding companies in EU or DBO countries and the possibility for Danish companies to pay tax-free dividends to such companies. No special rules were laid down to counteract this, and there is no mention whatsoever that

there may be an issue regarding the "rightful owner" of the dividend in this connection. This is despite the fact that the Minister of Taxation's answers obviously deal with pure flow-through companies.

This legal position was again confirmed by the Minister of Taxation in 2004 when implementing the Interest/Royalty Directive in Danish law and answering question 54 [...].

In case law, emphasis is placed on whether the legislator has been aware of opportunities to circumvent rules, cf. e.g. U.2004.174 [...], where the Supreme Court concluded that it was a legal exploitation of a set of rules. Furthermore, the case law emphasizes whether the legislator has introduced recent legislation concerning the area in which the taxpayer acts, and the Supreme Court does not interpret a provision expansively if the legislator has been close to the problem without specifically reacting, cf. U.2007.736H [...] and U.2004.174H [...]. As described by Professor Anders Nørgaard Laursen in RR.SM.2020.0006 [...], it will be crucial in such situations if it can be shown that the legislator failed to react to a recognized circumvention opportunity. I

**1687**

In such a case, it must be out of the question for the courts to intervene and "save" the tax authorities.

The legislator has been aware of the issue without specifically amending the law or inserting provisions to prevent the use of EU intermediate holding companies, and at no time prior to the beneficial ownership case has an expanded "beneficial owner" concept under the directive or the double taxation treaty been addressed.

This is supported by a statement from office manager B to Jyllandsposten on September 14, 2009 (...) [...]:

*"Even if the money has not flowed through immediately in all cases, the same reasoning applies, namely that a company in Luxembourg without the right to dispose of the funds is not the rightful owner. They are the underlying owners, and therefore withholding tax must be levied. Whether we will be successful, we do not know. Our view is fairly new in tax practice, so we'll have to see what the Supreme Court says when it comes to make a decision."* The Ministry of Taxation's (current) view on the use of EU intermediate holding companies thus also constitutes a change of Danish practice as stated in the Danish National Tax Court's ruling of March 13, 2012 [...]. With reference to the Danish National Tax Tribunal's ruling of 16 December 2011 (TfS 2012.26) [...], the National Tax Tribunal also emphasized that Denmark has not adopted legislative provisions aimed at preventing fraud and abuse, cf. Article 1(2) of the Parent-Subsidiary Directive.

If it is now no longer relevant whether Denmark has adopted legislative provisions aimed at preventing fraud and abuse, cf. Article 1(2) of the Directive, this is obviously a change of the practice established by Denmark's highest administrative body in the tax area. Such a change in practice cannot legally be implemented without prior notice, cf. e.g. U.1965.399.H [...] and U.1983.8.H [...], which is also described in the legal guidance [...].

This should also be seen in the context of the fact that, as far as is known, the tax authorities have not in a single case prior to these cases considered a foreign company to have limited tax liability on dividends on the basis that the company was not the rightful owner of the income, as this concept is now interpreted by the Danish Tax Agency. And not at all with reference to the fact that in this respect it was irrelevant whether Denmark had adopted legislative provisions aimed at preventing fraud and abuse.

In connection with the consideration of L 30 (2006/2007), the Minister of Taxation was thus asked to what extent and how the Danish Tax Agency checks whether a flow-through company

should be recognized as the correct income recipient (question 10 of 21 November 2006). The Minister of Taxation states that (...):

"*It is part of the tax assessment process to ensure that the conditions for not withholding dividend tax are met, including whether a foreign company is the beneficial owner of the dividend.*"

According to the Minister of Taxation, there has historically been a focus on the area, as it is part of the general tax assessment work to ensure that foreign companies are entitled to benefits under the double taxation treaties, including that the companies are the rightful owners of the dividends.

It is inherently not possible to show examples of a "negative decision" where the tax authorities choose not to intervene. Instead, it must be assumed that the Minister of Taxation had the necessary insight in the area to provide the following answer in connection with the same legislative process (answer to question 6 of November 21, 2006), where he [...]:

"... cannot provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies." The above quote should be seen in the context of the focus on flow-through companies in connection with the legislative changes in 1998-2001, and that the Ministry of Taxation in 2003 specifically failed to conduct an investigation of flow-through companies, as the legislative amendment in 2001 had significantly removed the exploitation possibilities that had been criticized by the EU [...]. The same legislative amendment, in which the Minister of Taxation confirmed the possibility of depositing intermediate holding companies in committee questions. Similarly, in 2002, the Danish Tax Agency was of the opinion that an assessment of flow-through companies would not lead to many corrections [...].

The previous practice is probably due to the fact that the Ministry of Taxation originally considered the concept of "beneficial owner" to be very similar to the Danish concept of "rightful income recipient".

In an answer of November 6, 2006 to question S 474, the Minister of Taxation expressed the relationship between the rightful owner and the rightful income recipient as follows (...):

"*The starting point is that foreign companies that receive dividends from Danish companies have limited tax liability on the dividends. The tax liability is fulfilled by withholding 28 percent dividend tax. The principle is waived if the dividends are received by a company that owns at least 20 percent of the share capital in the dividend-paying company. The ownership requirement must be met for a continuous period of at least one year, within which period the dividend distribution must take place. It is a condition for the derogation that the taxation must be waived or reduced under the Parent-Subsidiary Directive or under a double tax treaty with the state where the recipient of the dividend is resident.*

**1688**

*[cited under Legal basis]*

The Minister of Taxation reiterates this view in connection with the handling of L 116 (Act no. 308 of April 19, 2006) where he states in response to an inquiry from FSR (...):

"*The limited tax liability for interest under the Corporation Tax Act*

*§ Section 2(1)(d) covers foreign companies that receive intra-group interest from Denmark. This limited tax liability lapses if the taxation is to be waived or reduced under the Interest/Royalty Directive or under a double taxation treaty.*

*In this connection, it should be noted that in relation to section 2(1)(d) of the Danish Corporation Tax Act, it must be determined based on the principle of the right income recipient who receives the interest.*

*The withholding tax on the interest is only waived under the agreements if the rightful owner of the interest is a resident of the country.*

*in the other state. The same applies in the Interest/Royalty Directive, cf. Article 1(1) of the Directive. The benefits of the Directive may also be denied in the case of transactions that have tax evasion, tax avoidance or abuse as the main motive or one of the main motives.*

*If the private equity funds make equity and loan investments via holding companies, it will have to be assessed whether the holding company is the right income recipient/rightful owner of the interest income. In my opinion, a pure flow-through company in, for example, Luxembourg can hardly be the rightful income recipient/rightful owner of the interest income. The Swiss Supreme Court has concluded that a pure flow-through holding company in Denmark was not the beneficial owner of dividend payments under the Danish-Swiss treaty.*"

The Ministry of Taxation once again reiterates this position in a memo issued on March 20, 2007 regarding "Status på SKATs kontro- lindsats vedrørende kapitalfondes overtagelse af 7 danske koncer- ner". The press release states, among other things (...) [cited under Legal basis]

In this case, as mentioned above, it is agreed that NTC is considered the proper income recipient of the proceeds from TDC [...].

Accordingly, in the decision on the binding answer, the Danish National Tax Tribunal - in accordance with the Ministry of Taxation's (previous) understanding of the rules - concluded that NTC as the rightful income recipient had access to the benefits under the Directive, as the conditions for this were met. It was then not relevant to consider whether NTC could be considered a "beneficial owner" under the double tax treaty.

5.2.5 Changes in EU law

It is settled case-law of the Court of Justice that an interpretation of a rule of EU law given by the Court in the exercise of its jurisdiction under Article 267 TFEU elucidates and clarifies, to the extent necessary, the meaning and scope of that rule as it must be understood and applied or should have been understood and applied from its entry into force.

This approach, whereby the Court gives retroactive effect to its decisions, leads to peculiar situations where the Court over time has chosen to assess the same issues with different results. In these cases, the Court does not consider the new assessment as a change in practice, since in principle the interpretation should always have been understood and applied in this way. However, this consideration does not change the fact that the Court does indeed make changes in practice based on developments in both the legal and political system.

An example of this can be seen by comparing cases C-18/11, Philips and C-28/17, NN.

In the Philips case, which was decided on September 6, 2012, it had to be decided, among other things, whether the avoidance of double deduction of losses qualifies as an overriding reason in the public interest. This was answered in the negative by both the Advocate General [...] and the Court [...].

6 years later, on July 4, 2018, the Court of Justice decided the NN case, where the identical question was to be assessed. However, without articulating the change, the Court came to a different result [...]. The Advocate General also reached this different result. However, in the draft decision he put the change in slightly more words [...] (...):

"*3. The subject of this reference for a preliminary ruling is again the conflict between Danish tax legislation and freedom of establishment. The Eastern High Court has doubts as to the interpretation of the Philips Electronics judgment (7), the facts of which are so similar to those in the main proceedings that, at*

*first sight, the solutions in that judgment could be applied without further ado.*

(...)

*63. Based on the Philips Electronics judgment, it thus seems difficult to qualify the avoidance of double deduction of losses as an overriding reason in the public interest. In the same judgment, it was rejected that this objective could be so qualified, "even if it was assumed that such a justification could be invoked independently" (26).*

*64. However, it may be time to moderate these remarks in the Philips Electronics judgment, as the EU legislator has become particularly attentive to the fight against double deduction since that judgment was handed down."*

The Advocate General then referred to an EU directive from 2016 on hybrid mismatches and the possibilities of denying deductions under the directive in connection with double deductions. In continuation thereof, he stated (...):

**1689**

*"70. I do not, of course, propose to apply in this case provisions from a directive whose transposition deadline has not yet expired (32). Nevertheless, I am of the view that Directive 2016/1164 reflects a far-reaching concern, the extent of which was probably not apparent - and, of course, not explicitly stated in the legislation - at the time the Philips Electronics judgment was delivered."* Thus, the development of the EU legislator's view on and fight against tax avoidance led to a directly opposite conclusion on the same question. The remarkable nature of the Court's "new" practice in this area is also described in the legal literature [...]. It is also assumed in the practice of the Supreme Court and the Ministry of Taxation and also in the literature on legal (sovereignty-absorbing) activism that the Court from time to time establishes new stricter EU requirements, see for example the Supreme Court's judgment reproduced in U.2017.824 H (Ajos) [...] and the minutes of the 9th European Parliament Committee meeting held on Friday, November 26, 2010, p. 351 (ambi) etc. [...]. In such cases, the Court's retroactive interpretation cannot be accepted for reasons of legal certainty.

If the EU judgment is to be read as meaning that EU directives or the EU law principle of abuse can "now" in itself be invoked by a Member State against citizens, this is a new and stricter legal position, detrimental to citizens, which the Court has previously considered to be incompatible with the principle of legal certainty, cf. the Kofoed judgment [...].

The Danish Ministry of Taxation, on the other hand, has argued that it is not a question of the Court of Justice having created a new legal position with the EU ruling that did not apply prior to the EU ruling, or that the Court has changed its previous practice, but that the Court has merely clarified and clarified the meaning and scope of the principle of prohibition of abuse of rights.

5.2.5.1 Case C-321/05, Kofoed and others

In case C-321/05, Kofoed, the Court had to decide, among other things, whether the general EU law principle of abuse of rights could be applied directly against a taxpayer if it [...] is not implemented in national law.

Specifically, the Court had to decide on a share exchange and whether the Danish tax authorities could react to a possible abuse of the rules, even though Denmark had not adopted specific measures to implement Article 11 of Directive 90/434.

The answer from the Court was "no".

The general EU law principle of abuse of rights cannot be applied directly against a taxpayer if it [...] has not been implemented in national law. The Opinion in Kofoed was drafted by the same Advocate General as in the EU judgment, Juliane Kokott, who stated [...]:

*"66. Only a direct application of Article 11(1)(a) of Directive 90/434 to the detriment of Hans Markus Kofoed and Niels Toft*

*would*

*be excluded for the Danish authorities. Thus, a Member State cannot invoke a provision of a directive that it has not itself implemented against a citizen. According to established case law, a directive cannot in itself create obligations for citizens, and a directive provision cannot therefore as such be invoked against citizens.*

*67. Similarly, the competent authorities cannot rely directly on any general principle of Community law prohibiting the abuse of rights in relation to individuals. In cases falling within the scope of Directive 90/434, such a principle has found specific expression and has been given concrete expression in Article 11(1)(a) of that directive. If, in addition, direct application of a general legal principle, the content of which is much less clear and precise, were permitted, there would be a danger that the harmonization objective of Directive 90/434 would be undermined and the legal certainty sought by that directive in the restructuring of capital companies would be jeopardized. In addition, the aforementioned prohibition on the direct application of non-transposed provisions of directives to the detriment of citizens would also be undermined.*"

The Court delivered the Kofoed judgment in accordance with the proposed decision and thus ruled that, although the Article 11(1)(a) referred to reflected the general Community law principle of prohibition of abuse of rights and that there were indications of such abuse in the case, the 1(a) of Directive 90/434 reflected the general Community law principle of prohibition of abuse of rights and that there were indications of such abuse in the case, the Danish tax authorities could not apply the principle of abuse without the provision having been transposed into Danish law or without Danish law containing a principle prohibiting abuse of rights or other provisions on tax fraud or tax evasion which could be interpreted in accordance with Article 11, see paragraphs 38 and 40-42 of the Kofoed judgment [...].

The Danish tax authorities then had to acknowledge that there was no legal basis in Danish law to tax the share exchange.

The Kofoed judgment is the starting point for a firm and long-standing practice of the Court of Justice. This practice has been repeatedly confirmed in EU case law, as the Commission has also explained in its written observations to the Court, point 13 et seq [...]. Nor is there a single example in the case law cited in the EU judgment of an EU judgment that deviates from the Kofoed judgment in this respect.

In point 99 of his Opinion on the EU judgment, Advocate General Kokott has again set out the current practice as it has developed since the Opinion and subsequent judgment in C-321/05, Kofoed in 2007 (footnotes 57, 58 and 59 are all references to the Kofoed judgment and the Opinion in Kofoed) [...]:

**1690**

"*99. Only a direct application of Article 1(2) of the Parent-Subsidiary Directive to the detriment of the applicant would - for reasons of legal certainty (57) - be excluded for the Danish authorities. Thus, a Member State cannot rely on a provision of a directive which it has not itself implemented against an individual (58). According to settled case law, a directive cannot in itself create obligations for private individuals and cannot therefore as such be relied on against them (59). In that case, the Member State would itself engage in conduct that is 'abusive'. On the one hand, the Member State would (even if it had the possibility to do so) fail to transpose a directive addressed to it and, on the other hand, invoke a possibility to combat abuse contained in the directive that has not been transposed.*"

In direct connection with this, the Advocate General also emphasizes in point 100 why the same case-law leads to the conclusion that the principle of prohibition of abuse of rights cannot be applied in this case either (footnotes 60 and 61 are also references to the Kofoed judgment and the Opinion in Kofoed) [...]:

"100. Similarly, the competent authorities in the main proceedings cannot rely directly on the general principle of EU law that the abuse of rights is prohibited. At least in the cases falling within the scope of the Parent-Subsidiary Directive, such a principle has found specific expression and has been given concrete expression in Article 1(2) of the Directive (60). If, on the other hand, direct application of a general legal principle, the content of which is much less clear and precise, there would be a danger that the harmonization objective of the Parent-Subsidiary Directive

- and also all other directives containing concrete anti-abuse provisions (e.g. Article 6 of Directive 2016/1164) - would be undermined. In addition, the aforementioned prohibition on the direct application of non-transposed directive provisions to the detriment of citizens would also be undermined (61)."

Points 99 and 100 of the Advocate General's Opinion are virtually identical to points 66 and 67 of the Advocate General's Opinion in the Kofoed judgment submitted 11 years earlier. In other words, in his proposed decision, the Advocate General has maintained and confirmed EU practice as it has been from the Kofoed judgment in 2007 until the EU judgment in 2019. This is the same account of practice that was also put forward by the Commission and which has been put forward by the defendant and the Ministry of Taxation's counterparts in the other cases in the case complex regarding beneficial ownership.

Just as in the Kofoed judgment, the answer to the question - prior to the EU judgment - was still no when assessing whether the general EU law principle of abuse of rights can be applied directly against a taxpayer if it has not been implemented in national law, or if Danish law did not at that time contain a principle prohibiting abuse of rights, or other provisions on tax fraud or tax evasion that could be interpreted in accordance with the provision. The Ministry of Taxation has merely stated that the Court is not bound by either the Advocate General's or the Commission's submissions [...].

However, the purpose of highlighting both the Advocate General's and the Commission's submissions has nothing to do with their binding effect. The purpose is to emphasize that the Advocate General reaffirmed his position in Kofoed, thereby endorsing the very same interpretation of EU law and practice that the Lands[s]katteretten, the defendant and also the European Commission adopted. Prior to the EU judgment, the Ministry of Taxation was thus completely and utterly alone with its interpretation.

5.2.5.2 The Court of Justice's decision in case C-116/16 etc., T Denmark In the EU judgment - in direct contradiction with previous EU practice, the Commission's statement and the Advocate General's proposal for a decision - the Court concluded that the general EU law principle of abuse of rights applies, even without national implementation of Article 1(2) of the Parent-Subsidiary Directive, cf. EU judgment no. 89 [...].

The fact that this is a decision contrary to previous EU practice is also emphasized by the fact that the Court found it necessary in the same paragraph to distance itself directly from its own decision in the Ko- foed judgment (...) [...]

The Court then concluded in paragraph 2 of the operative part of the judgment that (...):

'The general principle of European Union law that individuals must not be able to rely on provisions of European Union law for the purpose of enabling fraud or abuse must be interpreted as meaning that, in cases of fraud or abuse, national authorities and courts must refuse to grant a taxable person the exemption from withholding tax on dividends distributed by a subsidiary to its

parent company provided for in Article 5 of Council Directive 90/435/EEC of 23 July 1990 on the common system of taxation applicable in

from different Member States, as amended by Council Directive 2003/123/EC of 22 December 2003, even if there are no national or collective provisions providing for such a refusal."

In the Kofoed judgment, however, the Court's conclusion was (...) [...]:

'Consequently, Article 8(1) of Directive 90/434 precludes, in principle, the taxation of such an exchange of shares, unless national legislation on abuse of rights, tax fraud or tax avoidance can be interpreted in accordance with that directive

**1691**

Article 11(1)(a), thereby justifying that the exchange is taxed."

It is this legal position, where the result of the EU ruling is the diametric opposite of the Kofoed ruling and previous practice, and where the Court itself recognizes that it is necessary to disregard the Kofoed ruling, which the Ministry of Taxation considers merely the Court's clarification and clarification of the legal position.

Obviously, this cannot be accepted. The EU ruling represents a clear change in practice from the Kofoed ruling and subsequent EU practice. Regardless of the premises of the Kofoed judgment, the EU abuse principle can now be invoked against a taxpayer without national implementation.

The Ministry of Taxation finds no support in either the national or international legal literature, where it is widely regarded as new practice and a sensational and landmark decision [...].

It can best be summarized by attorney, dr. jur. Niels Winther-Sorensen in SR.2019.0174 [...]:

"The CJEU must therefore now be considered to have abandoned the opinion that was so clearly formulated in the Kofoed judgment."

5.2.5.3 Application of the new case law of the Court of Justice

In the first place, the Court of Justice has no jurisdiction to introduce this new practice. The question of the direct application of an unwritten, ubiquitous and general principle of EU law, which does not require national provisions but can always have direct effect on citizens, must be a question of sovereignty. Whether Denmark has specifically ceded sovereignty that gives the EU Court of Justice such broad access to trump national and EU legal provisions can only be decided by the Danish courts.

Upon Denmark's accession to the EU in 1972, the Ministry of Justice explained that parts of EU law were directly applicable with direct effect for citizens [...] and such provisions became part of Danish law in the Accession Act [...]. However, in U.2017.824H [...], the Supreme Court [...] ruled that it was (...) [...]:

"(...) it is well known and also foreseen in the Act of Accession that the European Court of Justice may develop and establish general principles originating in the European Convention on Human Rights and similar treaties and in the common constitutional traditions of the Member States. However, such general principles are not directly applicable in Denmark under the Act of Accession and thus cannot be invoked in disputes between private parties.

The EU judgment states that the general EU law principle of abuse invoked by the Ministry of Taxation can be derived from settled case law in a number of different areas (para. 70 et seq., [...]). However, the principle has no basis in a specific treaty provision.

This was the same situation in the Supreme Court's decision in U.2017.824H [...], where the majority of the Supreme Court stated (...) on the principle of non-discrimination on the grounds of age:

"Following the judgments of the Court of Justice of the

European Union in Mangold, Kücükdeveci and the present case, we consider that the principle of non-discrimination on grounds of age is a general principle of EU law which, according to the Court of Justice of the European Union, has its origin in

*in various international conventions and in the common constitutional traditions of the Member States. The CJEU does not refer to provisions of the treaties covered by the Act of Accession as a basis for the principle.*

*Although the principle is derived from legal sources outside the EU treaties, it is obvious to understand the three mentioned judgments as an unwritten principle that applies at treaty level. However, according to these judgments, the principle cannot be considered to have a basis in a specific treaty provision.*

*Such a situation, where a principle at treaty level under EU law must have direct (obligatory) effect and be given precedence over opposing Danish law in a dispute between private parties, without the principle having a basis in any specific treaty provision, is not foreseen in the Accession Act."*

The Supreme Court concluded that the Accession Act did not contain sufficient legal authority to apply a general principle of EU law with binding effect on private parties.

On this basis, the defendant submits that, in this case, there is also not the required express legal basis in the Danish Act of Accession to invoke the unwritten, general EU law principle of prohibition of abuse with direct effect against a citizen.

Second, the principle of legal certainty also prevents the application of this new practice in this case, and the denial of benefits under the Directive and the invocation of the general EU law principle of abuse must therefore continue to require a legal basis in national law in this case. The principle of legal certainty is a fundamental principle of EU law which requires that a system which denies a taxpayer rights or imposes burdens on a taxpayer must be clear and unambiguous in order for him to be in no doubt as to his rights and obligations so that he can act accordingly, see C-143/93, Van Es Douanen Agenten [...].

In the same way that the Court in the NN case a number of years after the Phillips case had to decide on the same issue, the Court in this case in 2019 had to assess the practice that the Court itself established in the Kofoed judgment. In the time between Kofoed and the EU judgment, in 2012 the European Commission presented its action plan to strengthen the fight against tax fraud and tax evasion [...], which in the coming years

**1692**

was to develop specific measures against tax fraud, including a recommendation to introduce general anti-abuse rules [...]. In 2016, the EU also introduced a specific anti-tax avoidance directive, Article 6 of which included a general anti-abuse rule [...]. General anti-abuse rules were thus widespread in EU law in 2019 and were also introduced in Denmark in 2015. The bill for the Danish rule also refers to a memo published by the European Commission on countering the introduction of an EU intermediate holding company [...].

It is an obvious thought that the Court's new interpretation on the application of the general EU law abuse principle - as in the NN case - was driven by a perception that developments in the EU regarding tax avoidance are not reflected in the Kofoed judgment, and that it was therefore time to change practice.

In such circumstances, however, the consideration of legal certainty outweighs the primacy of EU law, see for comparison the assessments made by the Supreme Court in U.2012.3564H [...] and U.2017.824H [...].

5.2.6 There is no abuse

The defendant disputes that there is "abuse" in this case, see also above in section 5.2.4.

5.2.6.1 Subjective and objective requirement

In paragraph 97 of case C-116/16, the CJEU states that [cited under Legal basis]

It is thus a condition for establishing abuse that there are both objective circumstances and a subjective element intended to take unjustified advantage of EU law.

It is maintained that, in any event, there has been no specific abuse of rights. This already follows from the fact that NTC Holding G.P. & Cie S.C.A. was not subject to any contractual or other legal obligation to pay dividends received from TDC (which is undisputed by the Ministry of Taxation), that there is no evidence under Danish law to support setting aside the transactions made in this case based on a principle of reality which is agreed not to apply at all, and that the dividend recipient in the assessment of the Ministry of Taxation is also the correct income recipient.

At the end of 2010, NTC S.A. and NTC Holding G.P. & Cie S.C.A.

- companies ultimately owned by the investors in the private equity funds that then owned TDC A/S - a large number of shares in TDC A/S through a public offering. A significant part of the ultimate investors of the private equity funds were resident in the US, and in order to ensure that the sale of shares in TDC A/S was taxed as capital gains under US tax rules, a "US tax free reorganization" of NTC S.A. was carried out in connection with the sale of shares in TDC A/S.

As part of this reorganization, it was decided to liquidate NTC S.A. and to distribute the company's assets, including the shares in TDC A/S, to NTC S.A.'s parent company NTC Holding G.P. & Cie S.C.A. NTC S.A. entered liquidation in December 2010 and at the same time NTC S.A.'s shares in TDC A/S were transferred to NTC Holding G.P. & Cie S.C.A. The liquidation of NTC S.A. has been completed. The transfer of the TDC shares to NTC Holding G.P. & Cie S.C.A. thus had nothing to do with the intended dividend distribution in August 2011, and there is no meaningful intention to abuse the transfer.

Of course, there is no evidence to support that the establishment of the original holding companies in Luxembourg in the summer and fall of 2005 was justified by the fact that a dividend distribution from the listed company TDC A/S might be adopted six years later - as part of a general distribution to the many thousands of shareholders in TDC A/S and as part of the company's dividend policy adopted after the IPO in 2010.

The Ministry of Taxation has not proved, cf. paragraph 117 of the EU judgment [...] on the distribution of the burden of proof, that the structure is "without commercial justification", including which alternative scenario the Ministry considers commercially more rational in relation to the composition of the capital funds, financing opportunities etc. in connection with the investment in Denmark.

5.2.6.2 Joint establishment in Luxembourg

If - as here - several private equity funds jointly invest in the same company, there is a natural need to gather the investors in a common holding company. The investors thus need to have a common platform to make the investment through.

The reason for the original holding structure is that in the specific case where five private equity funds agreed to jointly acquire the majority of the shares in TDC A/S, a joint holding structure offered a number of advantages in relation to the financing of the acquisition, the submission of a joint purchase offer and the possibilities for unified implementation of the acquisition and in general the handling of the funds' joint investment.

Once it had been decided to establish a common holding structure, it had to be decided in which countries the individual holding companies should be established. The reason for the

decision to establish the original holding companies in Luxembourg was not to avoid Danish withholding tax on dividends.

 Private equity funds and other foreign investors have historically made their investments in Europe via Luxembourg, primarily due to the legal, regulatory, financial and political

is considered an attractive and stable country to invest through. As a natural extension of the original holding structure being established in Luxembourg, NTC was also established in Luxembourg.

Thus, it is still disputed that there is no credible business reason for NTC to

**1693**

contributed to the group and that the reason for this was solely to provide the group with tax benefits.

Such a holding structure is well-known and commercially well-founded, as also found by the court, for example in the Canadian Federal Court of Appeals judgment of April 26, 2009 regarding Prévost Car Inc. [...]. In the case, Volvo (Sweden) and Henleys (UK) had established a joint holding company, Prévost Holding BV, in the Netherlands, which owned shares in a joint venture. Dividends were distributed from the Canadian Prévost Car Inc. through the Dutch holding company and on to the companies in Sweden (Volvo) and England (Henleys), which owned 51% and 49% of the shares in the Dutch holding company respectively.

The ruling states that the Canadian dividend tax was 5% under the double tax treaty with the Netherlands, while the dividend tax was 15% and 10% under the double tax treaties with Sweden and England, respectively. Prévost Holding was a pure holding company and had no employees or offices in the Netherlands.

Both the Canadian Tax Court and the Federal Court of Appeal found in the case that the Dutch holding company could be considered the beneficial owner of the dividend for OECD purposes. The fact that Prévost Holding was a pure holding company did not change the fact that it was the beneficial owner of the dividend. A holding company was a legitimate vehicle and would inherently have no other functions than being a holding company.

5.2.6.3 The right to dispose of the proceeds belongs to NTC

There were and are no agreements on the right to dispose of dividends received by NTC from the defendant TDC A/S. The decision to dispose of dividends received could only be made by NTC's management. NTC had no significant debt that was expected to be paid with dividends received from the defendant and was thus essentially financed with equity.

NTC was an independent entity with an independent management and decision-making authority and it could therefore not be known in advance and with certainty whether and how the management of NTC would actually decide to dispose of the proceeds received from the defendant.

However, as stated in connection with the processing of the case in the National Tax Court, the presumption was that the majority of the dividend would be distributed as dividends by NTC to the company's owners NTC Holding

G.P. and NTC Parent S.à.r.l. and that the majority of the dividends distributed by NTC to NTC Holding G.P. would be distributed as dividends to NTC Holding G.P.'s owner NTC Parent S.à.r.l. A minor part of the dividend (presumably between 3% and 5%) is assumed to be used by NTC, NTC Holding G.P. and NTC Parent S.à.r.l. to pay costs or set aside to pay expected costs. It is further assumed that dividends distributed to NTC Parent S.à.r.l. will be paid (as dividends and/or interest and/or repayment of debt) to companies controlled by the individual private equity funds or creditors of NTC Parent S.à.r.l. It is also assumed that amounts paid by NTC Parent S.à.r.l. to companies controlled by the individual private equity funds will be transferred to the ultimate investors in the private equity funds, but it is not known in what manner such transfers will take place or how they will be treated for tax purposes. On this basis, it cannot

be assumed that the dividend distribution will actually be disposed of in advance. It should also be noted that the fact that the NTC may decide to distribute dividends is not a

to its owners following the receipt of dividends from the defendant, does not in itself imply that NTC cannot be considered to have real control over the dividends received from the defendant, cf. the OECD's

"discussion draft" regarding "Clarification of the meaning of "beneficial owner" in the OECD model tax convention", in which a number of clarifying comments to Article 10 are proposed, including the following [...]:

  *The recipient of a dividend is the "beneficial owner" of that dividend where he has the full right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass the payment received to another person.*"

  It can be assumed that NTC is not subject to any kind of contractual or other legal obligation to pay on dividends received from the defendant. The Eastern High Court also states in SKM 2012.121 ØLR [...]:

  "*... it cannot be assumed that dividend-receiving holding companies whose management is authorized under company law to dispose of companies, including dividends from underlying subsidiaries, should not normally be considered beneficial owners. This must also apply in cases where one or more intermediate holding companies are incorporated in a state with which Denmark has concluded a double taxation treaty, while the underlying owner(s) of the intermediate holding company are resident in a third country without a double taxation treaty. In order for such an intermediate holding company not to be considered a beneficial owner, it must be required that the owner exercises control over the company that goes beyond the planning and management at group level that usually occurs in international groups.*"

  The above thus confirms and documents that NTC is the beneficial owner of dividends received from the defendant, which is why the dividends distributed from the defendant to NTC are tax-free pursuant to Article 10 of the Double Taxation Convention concluded between Denmark and Luxembourg, and the dividends will therefore be exempt from Danish withholding tax pursuant to section 2(1)(C)(3) of the Danish Corporation Tax Act.

  In support of its plea alleging abuse of rights, the Ministry of Taxation has argued that the NTC

  **1694**

as an intermediate holding company only has limited activity.

  It is disputed that the level of activity is of decisive importance to whether NTC is the rightful owner. In this connection, it is noted that the physical framework and activity of any company is naturally adapted to the nature of the business carried out by the company in question.

  At the time of the distribution of the dividend referred to in this case, the purpose of NTC was to own shares in TDC A/S. By its very nature, the activity of a holding company will be limited in scope, as one or a few annual general meetings and a few annual board meetings must be held to make the relevant and necessary decisions for the holding company. As mentioned in the introduction, NTC has both premises in Luxembourg, and the company employs one person and also has deposits in the company's bank accounts, which have generated significant interest income for the company.

  NTC's activity thus corresponds to the activity of thousands of Danish and foreign holding companies, which the Danish tax authorities according to established practice (previously) - and rightly so - have considered as beneficial owners of dividends distributed from subsidiaries.

  In continuation of the above, it is argued that a company must

be recognized as beneficial owner also when it operates as a holding company, cf. the considerations in the Prévost judgment discussed above in section 5.2.6.2.

  It should also be noted that in TfS 2004.542 H (Johnson Holding A/S) [...] the Supreme Court ruled that a holding company whose business consists solely of holding shares in one or more subsidiaries [...

creator, must be considered a trader for the purposes of the tax law rules.

If the plaintiff was successful in its claim that a more specific description of the purpose of the dividend distribution can be required than that given in the defendant's request for a binding answer, it would be impossible to obtain a binding answer regarding distributions to holding companies. The reality is that NTC carries out the business that every holding company does, namely holding ownership interests in one or more other companies and receiving dividends therefrom and otherwise disposing of the ownership interests - all in accordance with the decisions made by the holding company's management on an ongoing basis.

5.2.6.4 General distribution on a historical dividend share

As stated above, 80-85% of the Equity Free Cash Flow in a given year was to be paid out as dividends according to TDC's dividend policy, just as it was common knowledge that TDC was a "dividend stock". Many of the investors in TDC had invested to have a good alternative to bonds, as the annual dividend was advantageous compared to the poor returns available in the bond market.

As mentioned above, on August 10, 2011, the defendant paid a dividend to its shareholders of DKK 2.18 per share, totaling DKK 1,781,000,000. Dividends were also paid on March 14, 2012.

The distribution of dividends was for the benefit of all the company's shareholders, including NTC as one of several thousand shareholders in TDC. It was thus a general distribution made for the benefit of all shareholders.

5.2.7 Ultimate owners

The defendant maintains that NTC is the beneficial owner of the dividends received under the Danish-Luxembourg double tax treaty.

Furthermore, it is maintained that there is no abuse of rights in this case, which is why NTC has an unconditional claim for exemption from dividend tax under the Parent/Subsidiary Directive.

As described above, the Ministry of Taxation has not demonstrated why the structure is "without commercial justification", including which alternative scenario the Ministry considers commercially more rational in relation to the composition of the private equity funds, financing options etc. in connection with the investment in Denmark. In the event that the High Court finds that NTC is a flow-through company, the Ministry of Taxation's argumentation must therefore lead to NTC Parent S.àr.l and its owners also being considered as flow-through companies, so that it is then the underlying ultimate investors who must be considered the beneficial owners of the dividends under the relevant double taxation treaty, where one has been concluded between Denmark and the relevant country where the ultimate owner is resident. For the majority of ultimate investors, the relevant double tax treaty will be the Danish-US double tax treaty.

In that case, the calculation of withholding tax on the dividends in question must be made in accordance with the relevant double taxation treaty and thus reduced in relation to the requirements of the Ministry of Taxation.

The Ministry of Taxation has argued that additional conditions can be imposed for relief from withholding tax, which the defendant disputes, as such additional conditions are not supported by Danish domestic tax law or international tax law principles.

Even if NTC cannot be considered the beneficial owner of the dividends distributed from TDC - which is disputed - the ultimate owners resident in a state with which Denmark has concluded a double tax treaty are thus in any case entitled to a waiver or reduction of the Danish withholding tax.

A different outcome would result in no recognition of any "rightful owner" to the proceeds at all, which is inherently meaningless."

**1695**

The parties have essentially proceeded in accordance with what is stated in the final pleadings.

## VI. Reasons and result of the High

**Court** *B-1980-12 Skatteministeriet v NetApp*

*Section 2(1)(c) of the Corporation Tax Act*

This follows from the current section 2(1)(c) of the Danish Corporation Tax Act,

as amended by Act no. 282 of April 25, 2001, that a company as mentioned in section 1(1) with its registered office abroad is liable to tax on dividends covered by section 16 A(1) of the Danish Tax Assessment Act.

It is undisputed that NetApp Cyprus is covered by the provision and that the two dividends at issue in this case are dividends covered by section 16 A(1) of the Tax Assessment Act.

However, according to the provision, the tax liability does not include dividends received by a company that meets certain specified requirements for ownership share and ownership period in relation to the dividend-paying subsidiary. The wording of the Act also states that it is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC (the Parent-Subsidiary Directive) or under a double taxation treaty with the state in which the company is resident.

It is undisputed that NetApp Cyprus in the distributions in 2005 and 2006 fulfilled the conditions of ownership interest and ownership period in relation to the subsidiary NetApp Denmark.

The main issue in this case is whether the parent/subsidiary directive or the Danish-Cypriot double taxation treaty imposes an obligation to waive or reduce taxation.

*Parent/Subsidiary Directive*

Initially, it should be noted that the Parent-Subsidiary Directive has been implemented in Danish law by Act no. 219 of April 3, 1992, as subsequently amended by Act no. 282 of April 25, 2001, in such a way that section 2(1)(c) of the Danish Corporation Tax Act refers to the provisions of the Directive.

Accordingly, the provisions of the Directive apply to dividends covered by section 2(1)(c) of the Danish Corporation Tax Act.

It is undisputed that NetApp Cyprus and NetApp Denmark are covered by the Parent-Subsidiary Directive as parent company and subsidiary respectively. Article 5(1) of the Directive provides that the profits distributed by a subsidiary to its parent company are exempt from withholding tax.

The Ministry of Taxation has argued that NetApp Cyprus cannot claim tax exemption under the Parent-Subsidiary Directive because there is an abuse of rights. The Ministry of Taxation's plea raises questions of interpretation of the Parent-Subsidiary Directive. In the judgment of the European Court of Justice (Grand Chamber) of 26. February 2019 in this case and case B-2173-12, joined cases C-116/16 and C-117/16, the Court states that the general principle of EU law, according to which citizens must not be able to rely on EU law provisions in order to enable fraud or abuse, must be interpreted as follows, that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxpayer the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of Council Directive 90/435/EEC of 23. July 1990 on the common system of taxation applicable in

the case of parent companies and subsidiaries of different Member States, as amended by Council Directive 2003/123/EC of 22 December 2003, even if

there are no national or collective agreement provisions providing for such a refusal.

As a preliminary remark, the High Court notes that the competence to decide on questions concerning the interpretation of EU law lies with the Court of Justice of the European Union, cf. Article 267 TFEU.

However, NetApp Denmark has argued that an interpretation as stated by the CJEU is contrary to the Danish Corporation Tax Act § Section 2(1)(c) so that tax exemption must be granted regardless of whether there may be an abuse of the Directive.

The High Court notes that the wording of the Danish Corporation Tax Act

§ Section 2(1)(c), which refers to tax exemption only to the parent company

/Subsidiary Directive, is not in conflict with the interpretation of the CJEU. The High Court also finds that there is no evidence in the legislative history of the Act to assume that section 2(1)(c) is to be understood as providing for tax exemption also in cases that can be characterized as abuse of law, as described by the European Court of Justice. Thus, it appears from the legislative history of Act no. 282 of April 25, 2001, which reintroduced dividend tax for parent companies in non-EU countries without a double taxation agreement, that the purpose was to counteract circumvention of other EU countries' rules on taxation of dividends from subsidiaries in the EU to parent companies outside the EU. Thus, it would no longer be possible to avoid such taxation by establishing a subsidiary/holding company ("intermediate holding company") in Denmark. The statements made by the Minister of Taxation in connection with the creation of the Act about the possibility of establishing an additional "intermediate holding company", for example in Cyprus, which at that time was not a member of the EU and therefore not covered by the Directive, and thereby avoid Danish taxation, are found to be of such a general, explanatory nature that they cannot be regarded as statements that the Danish tax authorities would accept an abuse of law, as described by the European Court of Justice. Reference is made to the Minister of Taxation's

**1696**

comment to a newsletter sent to the Danish Parliament's Tax Committee on January 10, 2001 and the Minister of Taxation's answer to the Danish Parliament's Tax Committee of January 11, 2001 to question 3 reproduced above. An interpretation of the Parent-Subsidiary Directive as stated by the European Court of Justice is therefore not in conflict with section 2(1)(c) of the Danish Corporation Tax Act.

*Article 10(2) of the Double Taxation Convention*

It follows from Article 10(2) of the Double Taxation Convention of May 26, 1981 between Denmark and Cyprus that dividends paid by a company resident in a Contracting State to a resident of the other Contracting State may be taxed in the first-mentioned State only at the rate of 10% or 15% of the gross amount of the dividends, provided that the recipient is a resident of the other Contracting State.

"beneficial owner".

If NetApp Cyprus is the beneficial owner of the two dividends in question, the tax under the double taxation treaty must be reduced from the tax percentage of 28% stipulated in section 65(1) of the Tax Assessment Act to 10%. It follows from section 2(1)(c) of the Danish Corporation Tax Act that in that case there is no tax liability on the dividends.

The Ministry of Taxation has argued that NetApp Cyprus cannot be considered to be the beneficial owner of the dividends in question.

The question is then how the term "rightful owner" in the double tax treaty should be understood.

The Agreement does not contain a definition of the term "beneficial owner". According to Article 3(2) of the Agreement, terms not defined in the Agreement shall, unless the context otherwise requires, have the meaning which they have in the law of the Contracting State concerning taxes covered by the Agreement.

Danish tax legislation does not appear to use the term "beneficial owner", which is also not a defined term in Danish law. By Act no. 282 of April 25, 2001, which reintroduced withholding tax on dividends, section 2(1)(c) of the Danish Corporation Tax Act was worded as stated above, including that it is a condition for tax exemption that the taxation must be reduced under a double taxation treaty or under the Parent-Subsidiary Directive. The term "beneficial owner" is not mentioned in the legislative history of the provision.

There is no information about the negotiations with Cyprus prior to the conclusion of the double taxation agreement. When interpreting the term "beneficial owner" in Article 10(2) of the Double Taxation Convention, the High Court therefore finds it relevant to include interpretations of the corresponding provision in the OECD Model Tax Convention, which has used the term "beneficial owner" since 1977.

The OECD Model Convention does not contain a definition of the term "beneficial owner". In the commentary to the 1977 Model Convention, it is stated about "abuse of the convention" that the double taxation convention should not assist in tax avoidance or tax evasion, and that the concept of "beneficial owner" in e.g. Article 10 counters certain abusive situations. Abusive situations are referred to as artificial legal constructions, and as an example, the fact that a person disposes through a legal association formed in a State mainly to obtain benefits under a double tax treaty that could not be obtained by the person directly is mentioned. The commentary to Article 10 further states that the limitation on taxation cannot be applied when an intermediary is inserted between the beneficiary and the payer. Examples of an intermediary are an agent or a nominee.

Accordingly, the Commentary to the 2003 OECD Model Tax Convention states that the term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in the light of the intent and purpose of the Convention, including avoiding double taxation and preventing tax avoidance and evasion. In addition, the commentary to Article 10, in line with the 1977 comments on "artificial legal structures" and "intermediaries", states that it is not consistent with the purpose of the Convention to grant exemption from tax where a person, other than as agent or intermediary ("nominee relationship"), merely acts as a conduit for another person who actually receives the income in question. Finally, also in accordance with the 1977 Commentaries, it is mentioned that the OECD Committee on Fiscal Affairs has concluded on this basis that a "conduit" cannot normally be regarded as the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

The High Court notes that there is no basis for stating that an understanding of the term "legal owner", as stated above, would be contrary to section 2(1)(c) of the Danish Corporation Tax Act. Neither the wording of the provision nor its preparatory works provide any basis for a different interpretation, cf. what has been stated above about the preparatory works to Act no. 282 of 25 April 2001. The statements made by the Minister of Taxation in connection with the creation of this Act on the possibility of contributing a holding company and thereby avoiding Danish taxation cannot be regarded as an indication that the tax authorities will in all cases regard the contributed company as the rightful owner of the dividend in accordance with

**1697**

the double taxation agreement. The fact that the concepts "rightful owner" and "rightful income recipient" are not used in a linguistically stringent manner in the preparatory works is also not found to lead to a different result.

On this basis, an assessment must then be made of the specific dividend distributions in the case.

*1. Dividend distribution - DKK 565,896,000.*

It appears from the case that on September 28, 2005, NetApp Denmark decided to distribute a dividend of DKK 565,896,000, corresponding to approximately USD 91.45 million, to its parent company NetApp Cyprus.

On October 25, 2005, NetApp Denmark received a corresponding dividend from its Dutch subsidiary, Network Appliance B.V. NetApp Denmark then paid the dividend on October 27, 2005 to its parent company, NetApp Cyprus, which on October 28, 2005 transferred a corresponding amount to its parent company, NetApp Bermuda. On April 3, 2006, NetApp Bermuda transferred USD 550 million as a dividend distribution to its parent company, NetApp USA.

NetApp Cyprus was incorporated on September 5, 2005 by NetApp Bermuda. The share capital was reportedly USD 20,000, of which only USD 2,000 was paid in.

It is undisputed that NetApp Cyprus was contributed between NetApp Denmark and NetApp Bermuda for the purpose of enabling NetApp Denmark to redistribute the dividends received without triggering Danish withholding tax.

This was accomplished by the newly founded NetApp Cyprus acquiring NetApp Bermuda's shares in NetApp Denmark by agreement of On September 16, 2005, NetApp Cyprus was obliged to pay the purchase price of EUR 90 million, corresponding to approximately DKK 670 million, to NetApp Bermuda by April 30, 2006.

The activities of NetApp Cyprus show that from its incorporation on September 5, 2005 to April 28, 2006, the company had revenues of approximately USD 1.076 million, mainly from foreign exchange gains on foreign currency. The Company's expenses consisted solely of administrative expenses of approximately USD 41,600. Assets at April 28, 2006 consisted of cash of USD 4,700 and the Company's investments in NetApp Denmark and NetApp Holding & Manufac- turing B.V., Netherlands. NetApp Cyprus had neither its own premises nor its own staff.

According to the information about NetApp Cyprus' financial circumstances, it must therefore be assumed that the company was only able to pay its debt to NetApp Bermuda by virtue of receiving dividends from NetApp Denmark. Thus, NetApp Cyprus had no real control over the dividends received, and the purpose of the transactions was undisputedly to avoid Danish taxation of the dividends. Therefore, NetApp Cyprus cannot be considered the rightful owner of the dividends, cf. Article 10(2) of the double taxation agreement, which is why the tax should not be reduced according to the rules of the agreement.

An overall assessment of the aforementioned circumstances is also found as a starting point to lead to the conclusion that tax exemption under the Parent-Subsidiary Directive cannot be invoked, as NetApp Cyprus must be considered a flow-through company which has no independent economic justification, and thus must be characterized as an artificial arrangement whose purpose has been to obtain tax exemption under the Directive.

*The significance of the Danish-US double taxation agreement*

However, if it can be established with certainty that the beneficial owner of the proceeds is resident in a country other than the country where the member is resident, and the country where the beneficial owner is resident has concluded a double taxation agreement with Denmark, the beneficial

rely on the rules of this double tax treaty as a basis for a tax reduction, cf. also section

12.2 in the commentary to the OECD Model Tax Convention from 2003. This means that in such a situation there cannot be said to be an abuse, as the dividend could have been distributed tax-free by the Danish subsidiary directly to the beneficial owner in the applicable country. The fact that the beneficial owner is resident in a country with which Denmark has concluded a double taxation treaty must also be included in the assessment of whether there is an abuse of rights under the Parent-Subsidiary Directive, as also expressed in the CJEU judgment in this case (paragraph 110).

The income statement and balance sheet of NetApp Bermuda as of April 28, 2006 shows that the amount received of approximately $91.45 million was included in the $550 million distribution to NetApp USA. It is stated and not disputed that NetApp Bermuda's "internal accounts" have been prepared in accordance with applicable accounting principles and can be reconciled to NetApp USA's consolidated financial statements. The High Court therefore f i n d s that the dividend from NetApp Denmark was included in the amount transferred to NetApp USA on April 3, 2006.

The parties have stated that it can be assumed that the dividend of USD 550 million was received by NetApp USA and taxed according to applicable US tax rules.

Based on the 2004/2005 annual report of NetApp USA, which stated that the company was considering repatriating dividends from its foreign subsidiaries under the American Jobs Creation Act, and the company's March 22, 2006 statement on a Domestic Reinvestment Plan,

**1698**

which explained in detail how the repatriated dividends would be reinvested in the United States, the High Court finds it established that the distribution from NetApp Denmark to NetApp Cyprus took place as part of the group's planned repatriation of dividends to the group's parent company in the United States.

As it would have been possible to distribute the dividend directly from NetApp Denmark to NetApp USA without triggering Danish withholding tax, and as it has been established that the distribution took place as part of a planned dividend repatriation to the group's American parent company, the High Court finds that there is no abuse of the Danish-Cypriot double taxation law or of the Parent-Subsidiary Directive.

The fact that NetApp Bermuda disposed of the dividends in question by investing them in bonds for a period of approximately five months until April 3. The fact that NetApp Bermuda invested the dividends in bonds for a period of approximately five months until April 3, 2006, or that it hypothetically would have been possible for NetApp Bermuda not to transfer the dividends to NetApp USA, and that this would have been an abuse of the Directive and the Danish-Cypriot double taxation treaty, cannot lead to a different result in the present situation where the dividends were transferred to NetApp USA within a foreseeable time and as planned.

On this basis, the High Court finds that the dividend distribution in 2005 of DKK 565,896,000 does not trigger withholding tax under section 2(1)(c) of the Danish Corporation Tax Act.

*2. Dividend distribution - DKK 92,012,000.*

In NetApp Denmark's annual report for 2005/2006 it is proposed to distribute DKK 92,012,000, corresponding to approximately USD 16 million.

NetApp Cyprus' annual report for 2006/2007 shows an income

in the form of dividends of approximately USD 16 million. However, the annual report's cash flow statement also shows that the amount was not received in the financial year in question.

Regarding the subsequent transactions concerning the amount, it is only stated that the amount was first transferred to NetApp Cyprus in 2010, and

that the amount was then transferred to NetApp Bermuda as additional debt repayment.

According to the information provided, the amount thus remained with NetApp Denmark for approximately four years, and NetApp Cyprus received interest income from the amount during the period. In its pleadings, NetApp Denmark has referred to the matter as a loan, which, however, has not been clarified.

According to the information available, the dividend was paid from NetApp Denmark to NetApp Cyprus at an unspecified time in 2010 and then transferred to NetApp Bermuda at an equally unspecified time in 2010 on the basis of a dividend decision made in 2006.

There is no real reason why the dividend was paid to NetApp Cyprus other than that the NetApp Group wanted to avoid Danish withholding tax.

Given the temporal connection between the payment from NetApp Denmark to NetApp Cyprus and the transfer to NetApp Bermuda, together with the above-mentioned information about NetApp Cyprus' activities, NetApp Cyprus cannot be considered the rightful owner of the dividend under the double taxation agreement with Cyprus, Therefore, as a starting point, tax reduction cannot be granted under the agreement, just as tax exemption under the Parent-Subsidiary Directive cannot be invoked, as NetApp Cyprus must be considered a flow-through company whose purpose of existence has been to obtain tax exemption under the Directive.

*The significance of the Danish-US double taxation agreement*

NetApp Denmark has claimed that the dividend of DKK 92,012,000 was included in the dividend of USD 550 million that NetApp Bermuda transferred to NetApp USA on April 3, 2006. In support of this, it is stated that this is evident from NetApp Bermuda's balance sheet as of April 28, 2006, which shows that the company's equity became negative by USD 18,965,993 as a result of the distribution of USD 550 million.

According to NetApp Denmark, this is an indication that it expected to receive the dividend of USD 16 million from NetApp Denmark and therefore included it in the dividend to the US parent company. In this connection, NetApp Denmark has referred to the fact that the annual report for NetApp USA for 2005/2006 also states that after the repatriation of the dividend under the American Jobs Creation Act as of April 30, 2006, there were no longer any unremitted earnings in the Group's subsidiaries domiciled outside the USA.

The High Court finds that it has not been established that the dividend on

DKK 92,012,000 was included in the distribution in April 2006 of USD 550 million from NetApp Bermuda to NetApp USA. The High Court has emphasized that the annual report from NetApp Denmark, from which the distribution appears, was not approved until October 2006, and that the amount was not paid to NetApp Cyprus until 2010 and then transferred to NetApp Bermuda. The High Court also emphasized that no annual reports or similar have been presented for NetApp Bermuda for the period after 28 April 2006 showing whether and, if so, how the dividend has been accounted for by the company.

Against this background, the High Court finds that the dividend distribution of

DKK 92,012,000 generally triggers taxation under section 2(1)(c) of the Danish Corporation Tax Act.

*Administrative practices*

NetApp Denmark has argued that an interpretation of the parent company's

/Subsidiaries Directive, as above

**1699**

and thus of section 2(1)(c) of the Danish Corporation Tax Act and an understanding of the term "legal owner" in the double taxation agreement as stated above, constitutes a tightening of administrative

retroactive practice which, according to the principles of administrative law, cannot be applied to the dividends in question, which were distributed in 2005 and 2006.

The High Court finds that the preparatory works, including the Minister of Taxation's answers to questions to the Tax Committee, to the Corporation Tax Act § Section 2(1)(c), as amended by Law No 219 of April 3, 1992, by Law No 1026 of December 23, 1998 and by Law No 282 of April 25, 2001, cannot be regarded as an indication that the Danish tax authorities would accept an abuse of law, as described by the European Court of Justice, or would grant a tax reduction under a double taxation convention, notwithstanding that the recipient of the dividends could not be regarded as the beneficial owner thereof.

In particular, it is noted that the statements made by the Minister of Taxation in connection with the creation of Act No. 282 of April 25, 2001 on the possibility of incorporating a holding company, for example in Cyprus, and thereby avoiding Danish taxation, are considered to be of such a general nature that they cannot be regarded as an indication that the Danish tax authorities would accept circumvention or abuse, as described by the European Court of Justice.

The fact that the Minister of Taxation in some of his answers regarding the financial consequences of the reintroduction of the dividend tax in 2001 mentioned that the companies would "be able to restructure themselves" and thus avoid Danish dividend tax, is also not found to contain an indication of acceptance of an abuse.

Regarding the administrative practice of the tax authorities, the Minister of Taxation stated in a reply to the Parliamentary Law Secretariat of November 27, 2006 that the Minister could not provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as legal owners of dividends from Danish companies. In continuation of this, it is stated that it is part of the tax assessment process to ensure that the conditions for not withholding dividend tax are met, including whether a foreign company is the legal owner of the dividend.

It also appears from the Ministry of Taxation's memo of March 20, 2007 to the Danish Parliament's Tax Committee on the status of SKAT's control efforts that the acquisition of Danish companies by private equity funds in recent years has accounted for a larger and larger share of total business transfers, that the number, especially in 2005, proved to be a significant number with a large volume, and that SKAT has therefore focused on this type of transfer. It also appears that SKAT on this basis has initiated a control of a number of transfers in order to investigate who is the final recipient, the "right income recipient", of interest and dividends. On May 15, 2007, the Minister of Taxation stated that these investigations had not yet led to taxation of dividends distributed to flow-through companies.

Against this background, where there is no administrative practice involving acceptance of arrangements such as the present one, the High Court finds that NetApp Denmark had no reason to assume that NetApp Cyprus was tax-exempt in a situation such as the present one with respect to the second dividend distribution of 92,012,000 kr.

*Preliminary conclusion*

Pursuant to section 2(1)(c) of the Danish Corporation Tax Act, NetApp Cyprus is not liable to pay tax on the dividend of DKK 565,896,000.

NetApp Cyprus is taxable on the dividend of DKK 92,012,000.
*Section 69(1) of the Withholding Tax Act*

It follows from section 65(1) of the Danish Withholding Tax Act that NetApp Denmark is responsible for withholding tax of DKK 92,012,000. In a case such as the present, where NetApp Denmark has not fulfilled its withholding obligation, it follows from the Withholding Tax Act § 69(1) that NetApp Denmark is immediately liable to the public authorities for payment of the missing amount unless

NetApp Denmark proves that there has been no negligence on the part of the company in complying with the provisions of the Withholding Tax Act.

According to the available information, NetApp Denmark must have been aware of the actual circumstances of the dividend distribution, including that the purpose of contributing NetApp Cyprus as a member was solely to avoid Danish withholding tax as explained above.

Under these circumstances, the fact that in 2006 there was no final clarification of the legal question of whether there was sufficient authority to counter such abuse of law cannot lead to NetApp Denmark being exempt from liability pursuant to section 69(1) of the Withholding Tax Act.

NetApp Denmark is then liable to the public authorities for the payment of DKK 92,012,000 in dividend tax.

*Conclusion*

NetApp Denmark is acquitted of the Danish Ministry of Taxation's claim that the company must acknowledge that it is obliged to withhold dividend tax of DKK 158,450,880, corresponding to 28% of the dividend of DKK 565,896,000, and that NetApp Denmark is liable for payment of the amount not withheld.

NetApp Denmark must acknowledge that there is an obligation to withhold dividend tax of DKK 25,763,360 corresponding to 28% of the dividend of

92,012,000 kr. that on October 13

**1700**

2006 was decided to be distributed from NetApp Denmark and that NetApp Denmark is responsible for the payment of the amount not withheld. *Legal costs*

The parties have not submitted any comments regarding the amount of the legal costs.

Following the outcome of the case, the Ministry of Taxation must pay legal costs to NetApp Denmark ApS totaling DKK 2,500,000. In determining the amount, which is to cover legal expenses including VAT, account has been taken of the amount won and the scope, importance and course of the case, including that the case has been brought before the European Court of Justice.

*B-2173-12 Skatteministeriet v. TDC A/S*

*Question 1 about tax exemption under section 2(1)(c), 5th sentence of the Danish Corporation Tax Act.*

The case before the High Court concerns binding answers to two questions posed by TDC. The first question concerns whether dividends distributed by TDC to NTC Holding G.P. & Cie S.C.A. are tax-free pursuant to section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act and thus exempt from withholding tax.

The National Tax Tribunal has answered the question in the negative.

This follows from the current section 2(1)(c) of the Danish Corporation Tax Act,

5, cf. Consolidation Act no. 1376 of December 7, 2010, as last amended by Act no. 254 of March 30, 2011, that the tax liability under the first sentence of the provision does not include dividends received by participants in parent companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which are considered transparent entities when taxed in Denmark. However, according to the current 6th sentence, the tax exemption presupposed that the shareholder was not resident in Denmark.

The parties agree that NTC Holding G.P. & Cie. S.C.A. is included in the group of companies listed in the Annex to the Directive and that this company must be considered a fiscally transparent entity under Danish law.

The question is then whether, as claimed by the Danish Ministry of Taxation, it is also a condition for the granting of NTC Holding G.P. & Cie S.C.A. tax exemption under the 5th sentence of the provision, that Denmark must waive or reduce the taxation of the dividend under

the provisions of the Parent-Subsidiary Directive or the double taxation treaty between Denmark and Luxembourg, cf. the current section 2(1)(c), 3rd sentence of the Danish Corporation Tax Act.

TDC has argued that there is no support for such a claim in the wording of section 2(1)(c) of the Danish Corporation Tax Act or in the preparatory works. The High Court notes that the current fifth sentence of section 2(1)(c) of the Danish Corporation Tax Act was inserted by Act No. 1375 of December 20, 2004. The legislative history of the Act (bill no. L 27 of October 7, 2004) shows that the insertion of the provision was based on the expansion of the circle of companies covered by the Parent-Subsidiary Directive by the amending directive of December 22, 2003, which meant that companies that were considered transparent entities under Danish tax law were also covered.

It also appears that the purpose of the insertion was to ensure tax equality between foreign parent companies, which under Danish law were independent tax subjects and tax exempt under the Parent-Subsidiary Directive, and shareholders in transparent parent companies, so that such shareholders were granted the same tax exemption as the parent company would have had if it had not been a tax transparent company under Danish law.

There is no evidence in the legislative history that the purpose of the amendment was also to reduce the taxation of dividend distributions to shareholders in transparent foreign parent companies beyond the existing tax exemption for other foreign parent companies.

Nor can the fact that the fifth sentence of the provision does not, as previously, refer to the second sentence of the provision, cf. the wording of the provision in Act no. 525 of June 12, 2009, lead to a different result. The second sentence of the provision thus only concerned the requirements for the parent company's ownership share and ownership period in relation to the subsidiary, and not the condition that the taxation should be waived or reduced under the Parent-Subsidiary Directive or under a double taxation treaty. As stated in the legislative history of the Act (bill no. L 202 of April 22, 2009), the second sentence was deleted and replaced by a reference to the definition of subsidiary shares in section 4 A of the Capital Gains Tax Act.

Against this background, the High Court finds that tax exemption under the current section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act requires that the condition in the current third sentence of the provision that the taxation of dividends from the subsidiary must be waived or reduced under the Parent-Subsidiary Directive or under a double taxation treaty is also met.

The Ministry of Taxation has argued that neither the conditions in the Parent-Subsidiary Directive nor in the Double Taxation Convention with Luxembourg for waiving and reducing taxation, respectively, are met, as there is an abuse of rights in relation to the Parent-Subsidiary Directive, and as NTC Holding G.P. & Cie S.C. A. cannot be considered to be the beneficial owner of the dividends under Article 10(2) of the Double Taxation Convention.

Regarding the general understanding of the Parent/Subsidiary Directive, reference is made to what the High Court has stated in

**1701**

the premise regarding case B-1980-12, Skatteministeriet v Net-App Denmark ApS.

Section 24(1) of the Tax Administration Act states that a request for a binding answer must contain all the information relevant to

the answer that is available to the questioner. If the Customs and Tax Administration or the Danish Tax Council considers that the question has not been sufficiently clarified, the questioner may be requested to provide additional information or documentation. If the request is not complied with within a reasonable period of time, the question may be rejected or the answer may be limited to the matters deemed to be sufficiently informed.

In order to answer the questions posed, TDC has stated that in 2005 a Danish subsidiary in the NTC Group acquired approximately 87% of the shares in TDC and after divestment held approximately 59.1% of the shares. It is stated that the Danish subsidiary was owned through a chain of Danish holding companies, which "100% through intermediate holding companies" were owned by a number of private equity funds. It is furthermore stated that NTC Holding G.P. & Cie S.C. A. acquired the shareholding in TDC in 2010 from a subsidiary, NTC SA, domiciled in Luxembourg, now in liquidation.

There is very little information about the circumstances prior to and after the NTC Group's purchase of the TDC shares. However, it has been stated that the consortium of private equity funds behind the purchase of TDC shares established a group structure consisting of companies in both Luxembourg and Denmark for this purpose already in 2005. There is no further documentation of the activities of the Luxembourg companies. Regarding the Danish companies in the NTC Group, it appears from the presented extract of the purchase offer of
2 December 2005 that the immediate bidder, Nordic Telephone Company ApS, was the "bottom layer" in a group structure containing at least five layers of Danish holding companies, all of which had been founded for the purpose in the fall of 2005, and all of which had been without commercial activity since their foundation, except in connection with the tender offer. It is also stated that after the acquisition of the shares in 2005, a restructuring took place so that the Danish companies were replaced by NTC SA, domiciled in Luxembourg, and now in liquidation.

Regarding the background for the consortium's choice of Luxembourg as the country where the original holding structure was established, TDC has only provided information of a very general and overall nature. TDC has stated that NTC Holding G.P. & Cie S.C.A. is an independent entity with an independent management and decision-making authority, that the decision to dispose of received dividends can only be made by the management of this company, and that it can be assumed for the purpose of the binding response that the majority of the dividends will be distributed via the two owners of NTC Holding G.P. & Cie S.C.A. to the capital funds and ultimately to the investors.

However, there is no detailed documentation on the financial and commercial situation of the NTC Group. In particular, it should be noted that there is no documentation concerning the financial and commercial situation of NTC SA and NTC Holding G.P. & Cie S.C.A. and that there is no precise information on - or even documentation of - decisions concerning the redistribution of the dividends in question. Against this background, the certificate from the Luxembourg authorities stating that NTC Holding G.P. & Cie S.C.A. *"to the best of their knowledge*
*... is the beneficial owner of any dividend paid on its shares held in TDC..." is* not given independent significance.

Based on the very sparse information provided by TDC, the High Court finds that it must be assumed that the dividend via NTC Holding G.P. & Cie S.C.A. was merely channeled to the private equity funds and possibly ultimately to the investors, and that NTC Holding G.P. & Cie S.C.A. had no other independently justified function.

The High Court notes that TDC has not claimed that the capital funds would have been able to obtain tax exemption of the dividend if TDC had instead distributed the dividend directly to them.

TDC can therefore neither claim tax exemption under the

Parent-Subsidiary Directive nor under the double taxation agreement with Luxembourg, and the dividend is therefore not tax exempt under section 2(1)(c)(3) of the current Danish Corporation Tax Act. The Ministry of Taxation is therefore dismissed for TDC's independent claim that the Ministry must acknowledge that question 1 in the National Tax Tribunal's decision of 13 March 2012 is answered "Yes".

Copyright © 2023 Karnov Group Denmark A/S

*Question 2 about tax exemption under section 2(1)(c), 3rd sentence of the Danish Corporation Tax Act.*

The second question to which TDC has requested a binding answer is whether dividends distributed by TDC to NTC Holding G.P. & Cie

S.C. A. is tax-exempt pursuant to section 2(1)(c), third sentence of the Danish Corporation Tax Act and thus exempt from withholding tax.

The National Tax Tribunal has answered the question in the affirmative.

As stated above, considering the present circumstances, there is no basis for establishing that the distribution fulfills the conditions for obtaining tax exemption under the third sentence of section 2(1)(c) of the Danish Corporation Tax Act.

Accordingly, and as the High Court also finds reason to note that a separate answer to question 2 in the request for a binding answer in any event seems to be irrelevant as the parties agree that NTC Holding G.P. & Cie S.C.A. is

**1702**

tax transparent and thus not an independent tax sub- ject under Danish law, the High Court upholds the Ministry of Taxation's main claim.

TDC must thus acknowledge that question 2 in the Danish National Tax Tribunal's decision of March 13, 2012 is answered with "No".

*Legal costs*

The parties have not submitted any comments regarding the amount of the legal costs.

Following the outcome of the case, TDC A/S must pay a total of DKK 2,504,000 in legal costs to the Ministry of Taxation. DKK 2,500,000 of the amount is to cover legal fees including VAT and DKK 4,000 is to cover court fees. When determining the amount to cover the costs of legal assistance, account has been taken of the value of the case and the scope, importance and progress of the case, including that the case has been submitted to the European Court of Justice.

## For it is recognized as right

NetApp Denmark ApS is acquitted of the Danish Ministry of Taxation's claim that the company must acknowledge that it is obliged to withhold dividend tax in the amount of DKK 158,450,880, corresponding to 28% of the dividend of DKK 565,896,000, which was distributed from NetApp Denmark ApS on September 28, 2005, and that NetApp Denmark ApS is liable for payment of the amount not withheld.

NetApp Denmark ApS must acknowledge that it is obliged to withhold dividend tax in the amount of DKK 25,763,360 corresponding to 28% of the dividend of DKK 92,012,000 distributed by NetApp Denmark ApS on October 13, 2006, and that NetApp Denmark ApS is responsible for payment of the amount not withheld.

The Ministry of Taxation is acquitted of TDC A/S' claim that the Ministry must acknowledge that question 1 in the Danish National Tax Tribunal's decision of March 13, 2012 (case no. 11-02359) is answered with "Yes".

TDC A/S must acknowledge that question 2 in the Danish National Tax Tribunal's decision of March 13, 2012 (case no. 11-02359) is answered with "No". The Danish Ministry of Taxation shall within 14 days pay the following costs

DKK 2,500,000 to NetApp Denmark ApS.

TDC A/S must pay DKK 2,504,000 in legal costs to the Danish Ministry of Taxation within 14 days.

The legal costs are subject to interest according to section 8a of the Interest Act.

## Supreme Court ruling

In previous instances, judgments were handed down by the 13th division of the Eastern High Court on May 3, 2021 (B-1980-12 and B-2173-12) and July 2, 2021 (B-1980-12). The judgment of July 2, 2021 only concerns the issue of interest on the tax authorities' claim against NetApp Denmark ApS, which was separated for subsequent decision.

Pursuant to section 254(1) of the Danish Administration of Justice Act, the cases are heard in connection with each other.

Six judges participated in the adjudication: Jens Peter Christensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Anne Louise Bormann and Jørgen Steen Sørensen.

## Claims

*Case 69/2021*

*The appellant, the Ministry of Taxation,* has claimed the following:

1.  The respondent, NetApp Denmark ApS, must acknowledge that it was obliged to withhold dividend tax of DKK 158,450,880, corresponding to 28% of the dividend of DKK 565,896,000, which was distributed from NetApp Denmark on September 28, 2005, and that the company is liable for payment of the amount not withheld.

2.  The judgment of the High Court is set aside as regards the provision on acquittal of NetApp Denmark, and the case is remitted to the High Court for the High Court to decide on the separate claims for interest.

3.  The High Court's judgment is otherwise upheld.

4.  NetApp Denmark must pay DKK 2,500,000 with process interest from May 28, 2021.

*NetApp Denmark* has claimed that the Danish Ministry of Taxation's claim 1 should be upheld and claim 2-4 should be acquitted.

NetApp Denmark has further claimed that the Danish Ministry of Taxation must recognize that NetApp Denmark was not obliged to withhold dividend tax of DKK 25,763,360 corresponding to 28% of the dividend of 92,012,000 DKK that was decided to be distributed from NetApp Denmark on October 13, 2006, and - in any case - that NetApp Denmark is not liable for the payment of the amount not withheld.

*Case 79/2021*

*The appellant, NetApp Denmark ApS,* has claimed that the respondent, the Ministry of Taxation, must acknowledge (i) that there shall be no interest on the withholding tax claim of DKK 25,763,360 in the period from 17 December 2011 until 17 May 2021, and (ii) that there shall be no interest on the withholding tax claim of DKK 158,450,880 in the period from 17. December 2011 and until 14 days after the delivery of a judgment from the Supreme Court, which may uphold the Ministry of Taxation's main claim in case 69/2021, alternatively that to the extent that interest on withholding tax claims for the period after August 1, 2013, interest must be paid exclusively in accordance with section 7 of the Collection Act (alternatively the Interest Act), and thus that the claim must not be included in the tax account under the rules on one tax account in chapter 5 of the Collection Act.

*The Ministry of Taxation* has claimed confirmation, alternatively that the amount for which NetApp Denmark is liable for payment shall be subject to interest pursuant to section 7 of the Collection Act.

**1703**

with effect from October 1, 2010 until the time when the Supreme Court finds that no interest can be claimed under section 7 of the Danish Collection of Taxes Act, from which time interest will be added under section 8(1) of the Danish Interest Act, and more alternatively that the amount for which NetApp Denmark is liable for payment will be subject to interest under section 8(1) of the Danish Interest Act from the institution of the case on March 14, 2012. In the event that the Supreme Court finds that NetApp Denmark's claim in principle (ii) can be upheld, the Ministry of Taxation has claimed that the amount of DKK 158,450,880 shall be subject to interest under section 7 of the Danish Collection of Taxes Act with effect from October 1, 2010, alternatively that the amount for which NetApp Denmark is liable for payment shall be subject to interest under section 7 of the Danish Collection of Taxes Act with effect from October 1, 2010. October 2010 until the time when the Supreme Court finds that no interest can be claimed under section 7 of the Danish Debt Collection Act, from which time interest will be added under section 8(1) of the Danish Interest Act, and in the further alternative, that the amount for which NetApp Denmark is liable for

payment of, shall be added procedural interest according to section 8(1) of the Interest Act from the commencement of the case on March 14, 2012.

*Case 70/2021*

*The appellant, TDC A/S,* has alleged the following:

1.   The Respondent, the Danish Ministry of Taxation, must acknowledge that question 1 in the Danish National Tax Tribunal's order of March 13, 2012 must be answered "yes", alternatively that question 2 in the order must be answered "yes", more alternatively that dividends distributed from TDC to NTC Holding G.P. & Cie S.C.A. is only taxable to the extent that the dividend has been passed on to shareholders who are liable to pay tax in Denmark on the dividend, and that the tax liability is then calculated in relation to each shareholder, and most alternatively that the case is referred to the Danish Tax Agency for calculation of the shares of the dividend that are taxable.

2.   The Ministry of Taxation must pay DKK 2,504,000 with process interest from May 31, 2021.

With respect to TDC's main and subsidiary claim 1, *the Ministry of Taxation* has claimed confirmation, alternatively that TDC must acknowledge that questions 1 and 2 in the National Tax Tribunal's decision of March 13, 2012 are rejected. With respect to TDC's more subsidiary claim 1, the Tax Ministry has claimed rejection, alternatively acquittal, and with respect to the most subsidiary claim 1, acquittal.

With regard to TDC's claim 2, the Ministry of Taxation has claimed acquittal.

## Supplementary case presentation

*Cases 69/2021 and 79/2021*

New information has been presented to the Supreme Court.

An October 2005 presentation prepared by NetWork Appliance Inc.'s (NetApp USA's) finance department states, among other things:

*"Foreign Cash Repatriation Opportunity*

-    The American Jobs Creations Act of 2004 permits NetApp to repatriate foreign earnings to the US at a significantly re- duced tax rate ... - Cash repatriation must occur by end of fiscal 2006

...

*Next Steps*

-    Finalize decision on whether or not to borrow in order to take advantage of the entire repatriation opportunity (model of EPS impact in Appendix)

-    Dividend Reinvestment Plan to be finalized to reflect fol- lowing intended uses of re-patriated cash:

-    R&D
-    Acquisitions
-    Capital and infrastructure investments
-    Marketing and advertising
-    Non-executive employee compensation and training

-    Dan and Board approval of repatriation and Dividend Rein- vestment Plan would occur during Q3 or Q4 (after Q2 ear- nings release and after December 12 Deloitte Signoff on Q)

-    Actual cash repatriation would occur during Q3 and Q4 after approval of repatriation and Dividend Reinvestment Plan by Dan and Board

The minutes of the board meeting in NetApp USA on March 22, 2006 state, among other things:

"3. Mr. Moore provided an update of the special meeting of the

Audit Committee convened to discuss repatriation of foreign ear- nings and associated borrowing. The Committee recommended and the Board unanimously approved a repatriation dividend of $550,000,000,000 and the borrowing by the Company of $300,000,000 to pay such dividend."

Excerpts from the accounting for net disclosure in official financial reporting as of April 27, 2007 for NetApp USA state

the figure "0" as "Cumulative FY06" for NetApp Denmark ApS. A note states:

"Because of the section 965 repatriation in FY06, no prior cumulative earnings

Transfer vouchers from Nordea Bank Danmark A/S show that the bank transferred USD 18,630,759 from NetApp Denmark to NetApp Holdings Ltd., Cyprus (NetApp Cyprus) on May 3, 2010.

Transfer vouchers from JPMorgan Chase Bank N.A. show that NetApp Cyprus received USD 18,630,759 from NetApp Denmark ApS on May 3, 2010, and that the bank transferred a corresponding amount from NetApp Cyprus to Network Appliance Global Ltd (NetApp Bermuda) the same day.

NetApp Denmark's audit report for the annual report for 2009/10 states, among other things:

"NetApp Denmark proposed a dividend of DKK 92 million in 2005/06 to NetApp Holdings Ltd, Cyprus. The

**1704**

dividend could not be paid before NetApp Holding and Manufacturing BV paid a consideration of EUR 14 million for the shares in NetApp BV, which has happened in 2009/10. An interest of 3.2 percent has been charged in 2009/10."

*Case 70/2021*

New information has been submitted to the Supreme Court, including lists of investors in the private equity funds behind the companies in question in Luxembourg.

## Explanations

*X* has explained, among other things, that he was European Tax Manager for NetApp USA from 2004 to 2019. He has a background in international tax and studied tax at the University of Amsterdam. Today, he works in Volvo's North American division.

NetApp had a "check the box" structure, which meant that foreign companies were seen as one company for tax purposes from a US perspective. This was needed because otherwise payments would be "caught" in the US tax system before they were actually paid to the US company. They chose to use the scheme so that the US company's tax position was not affected by payments in foreign companies.

NetApp USA owned a foreign low-taxed company, NetApp Bermuda. NetApp Bermuda did not operate itself, but instead entered into a license agreement with two Dutch companies, NetApp Holding and Manufacturing B.V. and NetApp B.V. NetApp Bermuda was a

"top holding company".

The American tax system was structured in such a way that it was a

"credit system" and not an "exemption system" as known in most European systems. The credit system meant that if NetApp Bermuda distributed a dividend to NetApp USA, it would be taxed at 37% and then underlying corporate taxes could be credited against that tax. Any dividends in a normal period would therefore be taxed at a very high percentage.

The Bermuda company was run and managed by a management company in Bermuda, which provided an address and ensured that all formalities were complied with and that the company complied with local legislation. Basic decisions such as paying out dividends were made in the US company.

It was quite common to use the "check the box" scheme. Every publicly traded company in the US had a similar or nearly similar scheme. The effect of the scheme was that all the funds ended up in NetApp Bermuda. If all the funds in NetApp Bermuda went to the US company, they would be taxed at 37%. Therefore, the

funds were accumulated in NetApp Bermuda. The reason why the Danish NetApp company was just below NetApp Bermuda was

App Bermuda, was that the European dividends could be paid to the company in Bermuda without taxation. That was the rule at the time, regardless of where the dividends were paid to.

In 2004, the American Jobs Creation Act was passed. The problem in the US was that companies never brought their profits back to the US because of the high taxes. Therefore, the legislation was changed so that American companies could temporarily repatriate their foreign profits at a low tax rate of 5 or 6% and invest them in the US. NetApp USA had a lot of profits in Bermuda and other companies, so they decided to repatriate. He wasn't so involved in the decision to repatriate profit, but he was involved in executing it. It was a one-off opportunity to repatriate. He is convinced that the vast majority of companies used the repatriation opportunity.

His job at NetApp was to manage the European part of the business, including the repatriation project. To do this, he had two weekly calls with his PwC partner in the Netherlands. NetApp Denmark was in the wrong place in their structure, so they were considering options, including putting a company in one place to avoid changing the entire structure, which would be cumbersome. The simpler it could be done, the better. The structure they had was very good in all other areas.

He received advice from PwC in the Netherlands and a Danish specialist in PwC Luxembourg. They talked about what needed to be done to complete the repatriation. The advice they received was that the repatriation should be possible if a new holding company was used.

The problem with paying directly to NetApp Bermuda from the Danish company was that a practice had emerged that a company could only waive withholding tax on dividends if it was a treaty country. Therefore, the owner of the Danish company had to be changed to a company in another country, and that's what they ended up doing. They had some telephone meetings with the PwC specialists, and they were told that the legislative history had some examples that allowed them to transfer the shares in the Danish company to a new company in Cyprus. A scheme similar to the one they wanted to introduce had been discussed during the reading of the bill.

The general advice they received from PwC was enough for them to believe that they could make the arrangement that they used to complete the repatriation. It was advice that was given over a period of emails back and forth, and it was probably in writing. He has not been able to find anything in writing in his archives about the advice, and his mailbox at the company has been deleted.

**1705**

They considered whether the Danish company should be owned directly by the US company so that the dividends could be transferred directly. If they had changed the ownership to the Danish company, there would have been no international obstacles. However, from the US company's perspective, such a change would involve a lot of work. The structure they already had with NetApp Bermuda worked. Therefore, they wanted to keep the structure.

It was the finance department that decided how much to transfer in dividends to the American company. His department gathered material and then the task was to transfer as much as possible to the US company. When profits were repatriated to the US as part of the scheme, certain investment conditions had to be met. A plan had been drawn up that had to be signed by an accountant, but he had nothing to do with that. Planning when and how the transfers would be made was not his area. If taxes were to be withheld, it was beyond his control.

table so that it was done correctly, but the actual payments were handled by the accounting department.

About the second dividend payment in 2006, he knows it was not part of a larger strategy, but he does not know why it was made. He thinks it was more of a stand-alone action by the European accountants. He was not involved in the payout and since it was not that big, no one really cared about it. He sees no other possibility than that the dividend was paid to NetApp Cyprus, which must have paid it to NetApp Bermuda. He was only involved in whether the payment could be made, and he agreed to it. There was not much interest in finalizing the payment. The paperwork for the actual payout had already been done, so he was not surprised that it could sit for so long without being taken care of.

## Additional legal basis

*Administrative practices etc.*

By Act No. 1184 of 12 December 2005 on the application of the double taxation agreement concluded between the Danish business organizations' office in Taipei and Taipei's representative office in Denmark, section 1(1) states that the double taxation agreement applies in Denmark.

Article 26 of the double taxation agreement reads as follows:

"Article 26

*Limitation of contract benefits...*

2. Notwithstanding the provisions of Articles 10, 11 and 12, a territory may, according to its applicable law, tax dividends, interest and royalties paid by a company which is a resident of that territory to a company, foundation or partnership or any other legal person which is a resident of the other territory where

a) more than 50 percent of the capital or votes of the company, foundation or partnership or any other legal person receiving the dividends, interest or royalties is directly or indirectly owned or controlled by a person or by associated companies, foundations or partnerships or other legal persons not resident in one of the territories or in the European Union or the European Economic Area, and

b) the dividends, interest and royalties would not be entitled to a reduced rate of tax or an exemption from tax in the territory from which they arise under the provisions of any double taxation convention or other agreement concluded between that territory and other territories or jurisdictions if they were paid directly by the company in the first-mentioned territory to any person or associated companies, trusts or partnerships or any other body corporate which participates directly or indirectly in the ownership or control of the company to which the dividends, interest or royalties are paid.

..."

The legislative history of the Act states about the provision (Danish Official Gazette 2005-06, Appendix A, bill no. L 43, p. 1160):

"The purpose of [paragraph 2] is to prevent Taiwan from being used as a tax-free "transit camp" for payments between a Danish company and one or more persons resident in a country with which Denmark does not have a double taxation agreement. It should be noted that dividends from a Danish subsidiary to a foreign parent company are not taxed under Danish domestic law if the tax is to be waived or reduced under a double tax treaty."

Act no. 308 of April 19, 2006 amended section 2(1)(d), first sentence, of the Danish Corporation Tax Act on the tax liability of companies etc. as mentioned in section 1(1) of the Act with a registered office abroad that receive interest from sources in Denmark. From a refer-

The letter of February 24, 2006 to the Danish Parliament's Tax Committee from the Association of State Authorized Public Accountants regarding the bill (bill no. L 116 of December 14, 2005) and the Minister of Taxation's comments on it of March 3, 2006 states, among other things:

"The *Association of State Authorized Public Accountants* (FSR) has in a letter of

On February 24, 2006, the Danish Parliament's Tax Committee was contacted. The inquiry concerns the part of the bill L 116, which concerns adjustment of the group definition in various protection rules.

...

*FSR:* FSR is aware that a few other countries have withholding tax on interest. In these cases

**1706**

Equity and loan investments by private equity funds via holding companies in other EU countries, such as Luxembourg.

This will probably also be the situation if Denmark introduces withholding tax on interest. The consequence will then be that interest payments will be subject to thin capitalization. Furthermore, the consequence will be that dividends can be distributed on an ongoing basis, which does not happen today because Denmark has a withholding tax on dividends.

*Comment:* The limited tax liability for interest under section 2(1)(d) of the Danish Corporation Tax Act covers foreign companies that receive intra-group interest from Denmark. This limited tax liability lapses if the taxation of the interest is to be waived or reduced under the Interest/Royalty Directive or under a double taxation treaty.

In this connection, it should be noted that in relation to section 2(1)(d) of the Danish Corporation Tax Act, it must be determined based on the principle of the rightful income recipient who receives the interest. The withholding tax on the interest will only be waived under the treaties if the beneficial owner of the interest is a resident of the other state. The same applies in the Interest/Royalty Directive, cf. Article 1(1) of the Directive. The benefits of the Directive may also be denied in the case of transactions that have tax avoidance, tax evasion or abuse as the principal motive or one of the principal motives.

If the private equity funds make equity and loan investments via holding companies, it will have to be assessed whether the holding company is the right income recipient/rightful owner of the interest income. In my opinion, a pure flow-through holding company in, for example, Luxembourg can hardly be the rightful income recipient/rightful owner of the interest income. The Swiss Supreme Court has concluded that a pure flow-through holding company in Denmark was not the beneficial owner of dividend payments under the Danish-Swiss treaty."

*Interest calculation etc.*

The Danish Parliament's Tax Committee's question no. 527 of May 3, 2022 (alm. del) to the Minister of Taxation states:

"*Question.*

There is currently no legal basis for a taxpayer who has been fully upheld in a complaint processed by the National Tax Tribunal or Tax Appeals Board, and which the Ministry of Taxation has brought before the courts, to pay the disputed tax claim to the tax administration while the case is pending before the courts. There is also no legal basis for the disputed claim to be paid if the taxpayer has won the case in court and the Ministry of Taxation then chooses to appeal the judgment to a higher court. Against this background, the Minister is asked to answer the following questions:

A. Does the Minister agree that the inability to pay is a

U.2023.1575H

significant difference from civil cases where a debtor can always choose to pay a claim under protest to avoid interest charges while the case is pending?

Copyright © 2023 Karnov Group Denmark A/S

B. Does the Minister agree that the inability to pay the debtor means that an interest risk is transferred from the Ministry of Taxation as creditor to the taxpayer as debtor, noting that in civil cases a creditor cannot refuse to accept payment from the debtor and must accept that it must repay with interest if the claim raised by the creditor itself turns out not to exist?

C. Does the Minister agree that the lack of interest risk for the Ministry of Taxation entails a risk that more cases will be brought than if it cost the Ministry of Taxation interest to lose the case again in the next instance?

D. Does the Minister agree that the taxpayer is at a disadvantage in terms of interest in situations where the taxpayer has lost the case and brings it compared to cases where the taxpayer has won and the Ministry brings it?

E. Does the Minister agree or disagree that there are concerns about legal certainty if the government charges interest after the taxpayer has offered to pay the disputed claim to the tax administration while the case is pending before the courts?

F. Will the Minister state whether the Minister intends to propose legislation that makes it possible to pay the tax that the Ministry of Taxation believes the taxpayer should pay?"

The tax minister's response of May 24, 2022 states, among other things:

"A.

I can only comment on lawsuits within the Ministry of Taxation's area of responsibility. In this regard, I can state that the High Courts have in several judgments agreed that there is no legal basis for the taxpayer to voluntarily pay the disputed amount in order to avoid business while the lawsuit is pending if the taxpayer has previously been successful in the administrative system or at a lower court instance.

Most recently, however, in a judgment of March 31, 2022 regarding Heavy Transport Holding ApS, the Eastern High Court ruled that the Tax Ministry was precluded from claiming interest on the disputed amount in the period from the taxpayer was successful at the National Tax Court and until the verdict of the High Court, because during this period the company did not have the opportunity to voluntarily deposit the amount in order to avoid interest.

It should be noted that the verdict has been appealed to the Supreme Court by both parties, and that I generally do not comment on pending litigation.

B. and C.

A taxpayer may pay a disputed amount to the Tax Administration even if the taxpayer disputes the Tax Administration's decision. The question that has been

**1707**

submitted to the High Courts, however, concerns the special situation where an administrative decision has been made stating that the claim does not exist.

...

D.

I do not believe that this question can be answered unequivocally. If a taxpayer is unsuccessful in a tax case, the taxpayer can either pay the disputed amount or request the Tax Administration for a deferral in connection with the case being brought before the courts. A deferral request will generally be granted. During the deferral period, interest will continue to be paid on the disputed tax claim, but the deferral will also include the accrued interest. However, as mentioned, the taxpayer can also choose to pay the disputed tax claim, whereby no interest is added, which is important if the taxpayer is not successful in the case. In this case, a taxpayer has two options - to pay to avoid interest

accrual or to request a deferral.

If, on the other hand, a taxpayer has been successful, for example in a case before the National Tax Tribunal, and the Ministry of Taxation chooses to bring the case

In the opinion of the Ministry of Taxation, the taxpayer will not be able to pay the disputed amount because the tax administration in this situation does not have the authority to receive the payment. Therefore, interest will accrue from the time of the last timely payment of the disputed tax claim until the final judgment.

E. and F.

I fully understand the considerations that may speak in favor of introducing a possibility to voluntarily pay or deposit the disputed amount. On the other hand, it must be considered, among other things, whether a deposit scheme that makes it possible to suspend the current interest on the disputed amount will entail derived consequences for public finances."

## Supplementary attachments

*Cases 69/2021 and 79/2021*

*The Ministry of Taxation* has additionally stated, among other things, that the dividends from NetApp Denmark have been channeled via NetApp Cyprus, which is a flow-through company, to NetApp Bermuda, which is a tax haven company. Therefore, strict requirements must be set for the proof that the main purpose has not been to abuse the Danish-Cypriot double taxation treaty and the Parent-Subsidiary Directive, cf. paragraph 110 of the European Court of Justice's judgment of February 26, 2019. Here, the Court states, among other things, that it cannot be "excluded" that there is no abuse of rights in cases where the dividend would have been exempt from tax if it had been distributed directly to a company in a third country. There is now documentation that NetApp USA had not made a decision on repatriation when NetApp Denmark on September 28, 2005 approved the distribution of dividends of DKK 565,896,000 to NetApp Cyprus, as repatriation was not decided until NetApp USA's board meeting on March 22, 2006. This is evident from the presentation from NetApp USA's finance department in October 2005 and from the minutes of the board meeting on March 22, 2006. As for the dividend of DKK 92,012,000, there is no documentation that the amount was channeled to NetApp USA at all, and X has explained to the Supreme Court that the distribution was not part of a larger strategy, that he does not know why it was made, and that he believes that it was more an independent action by the European bookkeepers. NetApp Denmark has therefore in any event not met its burden of proof.

NetApp Denmark has still not demonstrated that this is a retroactive tightening of the tax authorities' practice. In this connection, the legislative history of the 2005 Act on a double taxation agreement between the Danish business organizations' office in Taipei and Taipei's representative office in Denmark cannot be emphasized, as the legislative history cannot be taken as evidence that ordinary double taxation agreements do not contain safeguards against abuse. Nor can the legislative history of the 2006 amendment to section 2(1)(d) of the Danish Corporation Tax Act be emphasized, as it is precisely stated that a pure flow-through holding company in e.g. Luxembourg can hardly be the right income recipient/beneficial owner of the interest income in question.

It is not contrary to principles of administrative law or other rules that the tax authorities rejected NetApp Denmark's request for voluntary payment of the disputed amount, cf. UfR 2023.307 H, and the request can therefore not be attributed significance for the calculation of the amount of interest due. The addition of interest is also not contrary to Article 6 of the European Convention on Human Rights, as tax cases are not covered by the provision, and the addition of interest does not imply a charge of

a crime in the sense of the provision. Nor can Article 47 of the EU Charter of Fundamental Rights be applied in a case such as the present one, where fraud and abuse are involved. Moreover, there is no

There is no evidence that a system according to which interest on late payment is added from the due date until payment is made in accordance with a binding decision or admission of liability would contravene the provision.

*NetApp Denmark* has additionally stated, inter alia, that according to X's explanation to the Supreme Court, it must be assumed that the reason for establishing NetApp Cyprus as an intermediate holding company was to find a structure that enabled repatriation of dividends to NetApp USA under the favorable tax conditions under the

**1708**

American Jobs Creation Act. It must be assumed that the established structure was considered to be the simplest, and there is no basis for assuming that an abuse of the Parent-Subsidiary Directive or the Danish-Cypriot Double Taxation Treaty was intended.

As regards the distribution of DKK 565,896,000 to NetApp Cypern, it must be considered proven that the amount was transferred to NetApp USA and that this had been planned all along. It must also be considered proven that NetApp Bermuda did not have actual control over the amount, as the amount was necessary for NetApp Bermuda to contribute to the total repatriation in NetApp USA. It is therefore irrelevant that the final decision on repatriation to NetApp USA was not made until NetApp USA's board meeting on March 22, 2006.

As regards the distribution of DKK 92,012,000, it can be assumed that the amount was included in the total transfer of USD 550 million from NetApp Bermuda to NetApp USA on April 3, 2006. The amount was derived from NetApp Denmark's sale of shares in the Netherlands in 2005, and the negative equity of approximately USD 18 million that arose in NetApp Bermuda from the transfer in April 2006 to NetApp USA was only possible because NetApp Bermuda knew long beforehand that the sale of the Dutch shares had created additional free reserves in NetApp Denmark that could be transferred. This is also supported by the fact that the official financial reporting as of April 27, 2007 for NetApp USA states that there were "no prior cumulative earnings". The distribution amount could have been transferred immediately to NetApp Cyprus and then to NetApp Bermuda and NetApp USA, but this was not necessary as NetApp Bermuda already had to take out substantial loans to finance the transfer of the USD 550 million to NetApp USA. It is not clear what happened to the amount after it was transferred in 2010 from NetApp Denmark to NetApp Cyprus and then to NetApp Bermuda, as the amount was simply to offset the negative equity in NetApp Bermuda.

There is now further evidence of the tax authorities' practice until 2008. For example, it appears from the legislative history of the 2005 Act on a double taxation agreement between the Danish business organizations' office in Taipei and Taipei's representative office in Denmark that there is no protection in the term "beneficial owner" in the ordinary double taxation treaties. The drafting of the 2006 amendment to section 2(1)(d) of the Corporation Tax Act shows that the tax authorities at that time still equated the terms "beneficial owner" in the double taxation treaties and "rightful income recipient" in Danish tax law.

The Ministry of Taxation's claim for interest means that the total interest claim as of January 31, 2023 will be approximately DKK 362 million, and of this amount, approximately DKK 155 million will be due to the provision on compound interest in section 16 c, paragraph 1 of the Collection Act. This should be seen in relation to the Ministry of Taxation's total tax claim of approximately DKK 184 million. This is a disproportionately

large amount of interest, which seriously hinders a party's access to bring a case against the tax authorities, and this must be compared to the fact that NetApp Denmark has not been given the opportunity

to deposit the disputed amounts with the tax authorities. This is a violation of Article 6 of the European Convention on Human Rights and Article 47 of the EU Charter of Fundamental Rights. The scope of Article 47 of the Charter, unlike Article 6 of the European Convention on Human Rights, does not depend on the fact that there is a dispute about civil rights and obligations or that there is an accusation of a crime.

*Case 70/2021*

*TDC* has additionally stated, inter alia, that the High Court's judgment correctly noted that TDC did not claim before the High Court that the capital funds behind NTC Holding and the other companies in Luxembourg could obtain tax exemption of the dividend if TDC had instead transferred the dividend to them. However, in the nature of things, there must be beneficial owners of the dividend, and the Supreme Court has now been presented with lists of the ultimate investors. Against this background, it must at least be established that the dividend is only taxable to the extent that it has been transferred to shareholders who are liable to pay tax on the dividend to Denmark, so that the tax liability is calculated in relation to each individual shareholder separately.

Alternatively, the matter should be referred to the tax authorities for a determination of the dividend shares that are taxable.

*The Ministry of Taxation* has additionally stated, among other things, that after the EU Court's judgment of February 26, 2019, TDC had a special opportunity to provide information about what happened to the dividend after the transfer in 2011 to NTC Holding, but TDC has not done so. It must therefore still be assumed that the main purpose of NTC Holding and the other companies in Luxembourg was to redistribute the dividends from TDC to, among others, private equity funds in the Cayman Islands. There is no documentation that the beneficial owners of the dividends are resident in countries with which Denmark has concluded a double taxation treaty and that these owners would be exempt from tax liability under section 2(1)(c) of the Danish Corporation Tax Act.

TDC's more subsidiary claim should be rejected as it lacks clarity and precision and is therefore unsuitable for inclusion in a judgment.

## The Supreme Court's reasoning and result

*1. Case background and issues*

The present cases concern the taxation of dividend distributions from Danish subsidiaries to

**1709**

foreign parent companies. The cases will be assessed according to Danish tax legislation, the EU Directive on a common system of taxation for parent companies and subsidiaries from different Member States and double taxation treaties between Denmark and Cyprus, Luxembourg and the USA.

In Supreme Court cases *69/2021* and *79/2021,* SKAT ruled on September 17, 2010 that NetApp Denmark ApS was obliged to withhold tax on dividends of DKK 565,896,000 pursuant to section 65(1), cf. section 2(1)(c) of the Danish Corporation Tax Act, and

DKK 92,012,000, which NetApp Denmark distributed to NetApp Holdings Ltd., Cyprus (NetApp Cyprus) on September 28, 2005 and October 13, 2006, respectively.

On December 16, 2011, the National Tax Tribunal ruled that NetApp Denmark was not obliged to withhold tax on the dividends.

The cases concern whether NetApp Denmark was obliged to withhold tax. If so, the cases also concern questions about

NetApp Denmark's liability for payment of the amounts subject to withholding tax, cf. section 69(1) of the Withholding Tax Act, and about interest on the tax authorities' claims against NetApp Denmark, cf. in particular sections 7(1) and 16c(1) of the Collection Act.

On June 21, 2011, in the Supreme Court case *70/2021, the Danish* Tax Council gave binding answers to two questions from TDC A/S regarding taxation of a proposed distribution of dividends from TDC to the parent company NTC Holding G.P. & Cie S.C.A., Luxembourg (NTC Holding). The Tax Council answered "No" to the distribution being tax-free under section 2(1)(c)(3) and (5) of the Danish Corporation Tax Act. On 13 March 2012, the National Tax Tribunal upheld the Tax Council's answer regarding section 2(1)(c)(5) of the Danish Corporation Tax Act, but agreed with TDC that the distribution was tax-free under section 3.

The case concerns what is the correct answer to TDC's question.

The cases involve general issues concerning section 2(1)(c) of the Danish Corporation Tax Act, Directive 90/435/EEC on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (the Parent-Subsidiary Directive), double taxation treaties between Denmark and Cyprus, Luxembourg and the USA, and the tax authorities' practice in this area (section 2 below).

In addition, there are special questions regarding NetApp Denmark (item 3) and TDC (item 4). The Supreme Court's conclusion is set out in section 5.

*2. General issues regarding the rules on taxation of dividends*
*2.1. Section 2(1)(c) of the Danish Corporation Tax Act*

At the time of NetApp Denmark's distributions to NetApp Cyprus and the Tax Council's binding answer to TDC about the intended distribution to NTC Holding, it followed from section 2(1)(c), first sentence, of the Danish Corporation Tax Act that the distributions would generally trigger tax liability for NetApp Cyprus and NTC Holding. This would mean that NetApp Denmark and TDC would be obliged to withhold the relevant tax under section 65(1) of the Withholding Tax Act.

At the same time, the provision stated that there were exceptions to the principle of tax liability. Among other things, it was a condition for tax exemption that taxation should be waived or reduced under the Parent-Subsidiary Directive or under a double taxation treaty with the state in which the parent company was resident, cf. sentence 4 of the provision (sentence 3 in 2011). It also appeared from the 5th sentence of the provision that the tax liability did not include participants in certain parent companies included in the list of companies referred to in Article 2(1)(a) of the Directive.

For the reasons stated by the High Court, the Supreme Court agrees that section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act must be understood to mean that exemption from tax liability presupposes that the condition that taxation must be waived or reduced under the Parent-Subsidiary Directive or a double taxation treaty is also met.

The general issues then concern what the reference in section 2(1)(c) to the Parent-Subsidiary Directive and double taxation treaties with other states means (sections 2.2 and 2.3). In this connection, the significance of the tax authorities' practice in this area is a question (section 2.4).

*2.2. The Parent-Subsidiary Directive and the case law of the European Court of Justice* According to Article 1(1) of the Parent-Subsidiary Directive, each Member State applies the Directive to, inter alia, profits distributed by companies in that Member State to companies in other Member States of which they are subsidiaries. According to paragraph 2, the Directive does not prevent the application of domestic provisions or agreements necessary to prevent fraud and abuse. Article 5(1) provides that dividends distributed by a subsidiary to its parent company shall be exempt from withholding tax.

The directive is implemented in Danish law by the Danish Corporation Tax Act
§ Section 2(1)(c) requires, as a condition for tax exemption, that taxation must be waived or reduced in accordance with the provisions of

Directive. According to the Danish Corporation Tax Act, it depends on the directive whether tax exemption should be granted.

In its judgment of 26 February 2019 (Joined Cases C-116/16 and C-117/16), the European Court of Justice ruled that the general principle of EU law, according to which citizens must not be able to rely on provisions of EU law in order to

**1710**

enable fraud or abuse to be committed must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxable person the exemption from withholding tax provided for in Article 5 of the Directive, and that this applies even in the absence of national or collective agreement provisions providing for such a refusal (paragraph 95). In this connection, the Court refers to previous case law concerning the above-mentioned principle, including the judgment of July 5, 2007 in case C-321/05, Kofoed, on the EU Merger Directive (paragraphs 86-89).

NetApp Denmark and TDC have argued that the European Court of Justice's judgment of February 26, 2019 cannot be given significance in Danish law for the understanding of the Directive and thus of section 2(1)(c) of the Danish Corporation Tax Act. With reference to the aforementioned judgment of July 5, 2007 in the Kofoed case, the companies have stated that regardless of the European Court of Justice's judgment of 26. February 2019, it must be a prerequisite for establishing fraud or abuse that Danish law contains rules as mentioned in Article 1(2) of the Directive, that there were no such rules at the relevant times, and that the principle of prohibition of fraud and abuse, as stated in the judgment, cannot have direct effect on citizens and companies. In this connection, the companies have referred to the Supreme Court's judgment of December 6, 2016 in the so-called Ajos case (UfR 2017.824) and to the Act on Denmark's accession to the European Union.

As stated by the High Court, under Article 267 of the Treaty on the Functioning of the European Union, it is for the Court of Justice of the European Union to rule on questions of interpretation of EU law, including parent law. /Subsidiaries Directive. Danish courts must therefore enforce the interpretation of the directive and thus of section 2(1)(c) of the Danish Corporation Tax Act, which appears from the European Court of Justice's judgment of February 26, 2019, unless otherwise - as in the Ajos case - may follow from the Act on Denmark's accession to the European Union, because Danish courts, by following the European Court of Justice's judgment, would act outside the scope of their judicial power.

In the Ajos case, the starting point for the issue was that there was a contra legem situation, as it was not possible to interpret the relevant provision in Danish legislation (the previous provision in section 2a(3) of the Danish Salaried Employees Act) in accordance with the relevant EU rules (the EU Employment Directive). In the present cases, it follows directly from section 2(1)(c) of the Danish Corporation Tax Act that tax exemption can only be granted if taxation of dividends is to be waived or reduced under the Parent-Subsidiary Directive. The Danish Corporation Tax Act thus refers to the Directive, and consequently, there is no conflict between Danish legislation and the Directive as interpreted by the European Court of Justice. There is therefore no contra legem situation.

According to the above, Danish courts must apply section 2(1)(c) of the Danish Corporation Tax Act in accordance with the Parent-Subsidiary Directive as interpreted by the EU Court of Justice's judgment of February 26, 2019. Against this

background, it is irrelevant whether - as stated by the Ministry of Taxation - there were Danish provisions on fraud and abuse as mentioned in Article 1(2) of the Directive at the relevant times in the present cases.

*2.3. The double taxation treaties with Cyprus, Luxembourg and the USA*

The Danish double taxation treaties with Cyprus, Luxembourg and the USA are similar with regard to provisions of a similar nature.

Copyright © 2023 Karnov Group Denmark A/S

The interpretation of the present cases is essentially based on the OECD Model Convention of 1977.

The Conventions contain in Article 10(2) broadly similar provisions according to which dividends paid by a company resident in a Contracting State to a resident of the other Contracting State may be taxed in the first-mentioned State only at a certain percentage of the gross amount of the dividends if the recipient is the "beneficial owner" of the dividends. The Conventions also contain in Article 3(2) broadly similar provisions providing that, unless the context otherwise requires, any term not defined in the Convention shall have the meaning which it has in the law of the Contracting State concerning the taxes to which the Convention applies.

The term "beneficial owner" is not defined in the treaties. As the term delimits the taxing jurisdiction of the contracting states, the Supreme Court finds that it follows from the context that the meaning cannot depend on the respective legislation of the contracting states.

The Supreme Court agrees that the term "beneficial owner" must be understood in the light of the OECD Model Tax Convention, including the OECD's comments from 1977 on the prevention of abuse. According to these comments, the purpose of the term is to ensure that double tax treaties do not facilitate tax avoidance or evasion through

"artifice" and "elaborate legal constructions" that make it "possible to take advantage both of the benefits of certain domestic laws and of the tax reliefs provided by double tax treaties." The 2003 Revised Commentary elaborated and clarified this, stating, inter alia, that it would not be "consistent with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax in cases where a resident of a Contracting State acts, other than as agent or intermediary, merely as a 'conduit' for a

**1711**

other person who actually receives the income in question." NetApp Denmark and TDC have argued that the legislative history of the 2001 amendment to section 2(1)(c) of the Danish Corporation Tax Act shows that the legislature has assumed an understanding of the term "beneficial owner" which is not based on the OECD Model Tax Convention and related comments, but on the expression

"proper income recipient" in Danish tax law.

The purpose of the aforementioned amendment was to prevent the abuse of the previously applicable tax exemption for dividend payments resulting from the establishment of Danish holding companies for the sole purpose of avoiding taxation in other countries and at the same time take into account the exceptions to the general rule on withholding tax which Denmark is obliged to have under e.g. double taxation treaties, cf. the Minister of Taxation's answer of November 24, 2000 to a question from the Parliamentary Tax Committee (L 99 - Appendix 2). Against this background, it must be clearly presumed that the amendment of the Act presupposes a different understanding of the term

"beneficial owner" in the relevant double tax treaties than the one stated in the OECD Model Tax Convention with comments, so that there would be tax exemption to a greater extent than required by the treaties.

As stated by the High Court, the legislative history of the 2001 amendment contains no mention of the term "rightful owner" (or "rightful income recipient"). The Supreme Court finds that there is no other evidence for a different understanding of the term "rightful owner" than that stated. What the Minister of Taxation stated in answers to the Danish Parliament about the possibilities

of, among other things, restructuring and

of intermediate holding companies cannot be understood in the sense that the intention was to allow abuse in the form of "artifice" etc. which, according to the Model Tax Convention and the associated comments, is precisely the reason why there is no tax exemption.

*2.4. Administrative practices etc.*

NetApp Denmark and TDC have argued that the interpretation of section 2(1)(c) of the Danish Corporation Tax Act, the Parent-Subsidiary Directive and the double taxation treaties relied on by the Ministry of Taxation reflects a change in administrative practice with retroactive effect, inter alia, because until 2008 the tax authorities considered the term "beneficial owner" in the double taxation treaties to coincide with the term "rightful income recipient" in Danish tax law. NetApp Denmark and TDC have argued that the evidence for this change in practice is not that the tax authorities have not previously intervened in cases such as the present, but in the statements made by the Ministry of Taxation to the Danish Parliament until 2008, including in connection with the amendment in 2001 of section 2(1)(c) of the Danish Corporation Tax Act.

As stated in section 2.3, the Supreme Court finds that there is no evidence in the legislative history of the 2001 amendment that a different understanding of the term "beneficial owner" in the relevant double taxation treaties than that which follows from the commentaries to the OECD Model Tax Convention has been assumed.

After the legislative amendment in 2001, the Ministry of Taxation has in some cases given answers to the Danish Parliament which can be understood to mean that, in the Ministry's opinion, there is an overlap between the terms "rightful owner" in the double taxation treaties and "rightful income recipient" in Danish tax law. The Supreme Court finds that such statements that are contrary to the understanding stated above cannot be given decisive importance. The Supreme Court adds that in the period in question, there are a number of conflicting statements, e.g. in the tax assessment guidelines from July 2003, where it is stated with reference to the OECD's 2003 comments that the term "beneficial owner" should not be understood in a narrow technical context, but rather on the basis of an interpretation of the purpose of the treaties, including the intention to avoid or evade taxation.

*3. Special about NetApp Denmark*

*3.1. First distribution - 565,896,000 kr.*

For the reasons stated by the High Court, the Supreme Court agrees that, as a starting point, there is no tax exemption under the double taxation treaty between Denmark and Cyprus or under the Parent-Subsidiary Directive. The Supreme Court thus finds that NetApp Cyprus in relation to the subsidiary NetApp Denmark and the parent company NetApp Bermuda must be considered a flow-through company that does not enjoy protection under the treaty or the directive. The question is whether it can lead to a different result that NetApp Denmark - if the parent company at the time of the distribution had been NetWork Appliance Inc. (NetApp USA) and not NetApp Cyprus - could have distributed the dividend to NetApp USA with the effect that the dividend would have been exempt from tax under the double tax treaty between Denmark and the USA.

The CJEU's judgment of February 26, 2019, states on this issue that, when examining the group structure, it is irrelevant that some of the beneficial owners of the dividends transferred by flow-through companies are resident for tax purposes in a third country with which the source country has concluded a double taxation treaty. According to the judgment, the existence of such

a convention cannot in itself preclude the existence of an abuse of rights and cannot therefore cast doubt on the existence of an abuse of rights if it is duly established by all the facts which show that the economic operators have carried out purely formal or

**1712**

artificial transactions, devoid of any economic and commercial justification, with the main purpose of taking undue advantage of the exemption from withholding tax provided for in Article 5 of the Parent-Subsidiary Directive (paragraph 108). It also appears that, having said that, in a situation where the dividends would have been exempt had they been distributed directly to the company resident in a third State, it cannot be excluded that the objective of the group structure is not an abuse of rights. In such a case, the group's choice of such a structure instead of distributing the dividend directly to that company cannot be challenged (paragraph 110).

The Supreme Court then notes:

There is no further information about the background for the decision in 2005 to establish a corporate structure according to which NetApp Cyprus was to be established as a new parent company for NetApp Denmark - and then be included in a total dividend transaction from NetApp Denmark to NetApp Bermuda and NetApp USA - instead of making NetApp USA the parent company of NetApp Denmark so that the dividend could be distributed directly to NetApp USA. No information has been provided about the advice from PwC which, according to X's statement to the Supreme Court, formed the basis for the decision. Under these circumstances, in the opinion of the Supreme Court, it must require clear evidence to assume that the distribution to NetApp Cyprus - where the tax liability under the Corporation Tax Act

§ Section 2(1)(c) as a starting point arose - there was an abuse of rights under the Directive. The Supreme Court finds that there is no such evidence and emphasizes that the final decision on repatriation to NetApp USA was not made until 22 March 2006, that the dividends were held in NetApp Bermuda for approximately 5 months prior to this, where they were invested in bonds, and that it must be assumed that during this period the NetApp group could have freely decided to use the dividends for other purposes than repatriation to NetApp USA.

Based on the above regarding the amount of dividends remaining in NetApp Bermuda after the distribution from NetApp Denmark and NetApp Cyprus, the Supreme Court further finds that NetApp USA cannot be considered the beneficial owner of the amount under the double tax treaty between Denmark and the USA, cf. Article 10(2) of the treaty.

Accordingly, the Supreme Court finds that NetApp Cyprus is liable to pay tax on the dividend under section 2(1)(c) of the Danish Corporation Tax Act, and that NetApp Denmark was consequently obliged to withhold tax on the amount under section 65(1) of the Withholding Tax Act.

*3.2. Other distribution - DKK 92,012,000.*

By agreement dated October 25, 2005, NetApp Denmark sold its shares in NetApp B.V., Holland (NetApp Holland) to NetApp Holding & Manufacturing B.V. (NetApp Holding Holland) for EUR 14 million. According to the agreement, the purchase price was payable by April 30, 2006. NetApp Denmark's annual report for 2005/06 of October 13, 2006 (the financial year ended April 30, 2006) states that a dividend of approximately DKK 92 million was proposed for the financial year. In connection with this, it appears from NetApp Denmark's audit report for the annual report for 2009/10 that NetApp Denmark in its annual report for 2005/06 proposed a distribution of approximately DKK 92 million to NetApp Cyprus, but that this distribution could not be paid until NetApp Holland had paid the purchase price of EUR 14 million for the shares in NetApp Holland, which happened in the financial year 2009/10. An amount of approximately USD 18.6 million corresponding to the dividend of approximately DKK 92

million was transferred to NetApp Cyprus on May 3, 2010 and reportedly from there to NetApp Bermuda.

NetApp Denmark has claimed that the dividend of approximately DKK 92 million from NetApp Denmark to NetApp Cyprus was included in the dividend of USD 550 million that NetApp Bermuda transferred to NetApp USA on April 3, 2006. According to NetApp Denmark, this means that the dividend

of approximately DKK 92 million is exempt from taxation under section 2(1)(c) of the Danish Corporation Tax Act in conjunction with the Danish-Ame rican double taxation treaty.

The Supreme Court then notes:

On 22 March 2006, the Board of Directors of NetApp USA decided to distribute a dividend of USD 550 million from NetApp Bermuda to NetApp USA, including by NetApp Bermuda taking out a loan of USD 300 million. According to information received, the reason was that the American Jobs Creation Act 2004 allowed US companies to repatriate dividends from foreign subsidiaries at a special low tax rate against a commitment to use the dividends for specific purposes in the US. The dividends had to be repatriated no later than the end of the 2006 fiscal year, which for NetApp USA was the April 30, 2006. The dividend was distributed on April 3, 2006 and taxed in the US. NetApp Bermuda's financial statements for 2005/06 show that a dividend of USD 550 million was declared.

NetApp USA's consolidated financial statements for 2005/06 state that "as a result of this dividend, there was no significant unremitted earnings held by our foreign subsidiaries at April 30, 2006". Accordingly, NetApp USA's accounting for net disclosure in official financial reporting as of April 27, 2007 indicates that after repatriation of dividends from NetApp Denmark in 2006, there were no unrestricted earnings in the Danish subsidiary.

Against the above background, the Supreme Court finds it established that the dividend of approximately DKK 92 million from NetApp Denmark was included in the dividend of USD 550 million that NetApp Bermuda transferred to NetApp USA on April 3, 2006. The Supreme Court further finds that the only

**1713**

The rightful owner of this dividend has been NetApp USA, where the dividend has also been taxed. This applies regardless of the fact that an amount of approximately DKK 92 million - corresponding to the dividend - was not transferred to NetApp Cyprus and from there to NetApp Bermuda until 2010. As mentioned above, NetApp Bermuda had taken out the loan that provided the basis for distributing approximately DKK 92 million to NetApp USA in dividends from NetApp Denmark in 2006.

According to the above, the dividend of approximately DKK 92 million is exempt from taxation under section 2(1)(c) of the Danish Corporation Tax Act in conjunction with the Danish-American double taxation treaty. NetApp Denmark has therefore not been obliged to withhold dividend tax under section 65(1) of the Withholding Tax Act.

*3.3. Liability under section 69 of the Withholding Tax Act*

NetApp Denmark was aware of the basis for the distribution on September 28, 2005 to NetApp Cyprus being taxable under section 2(1)(c) of the Danish Corporation Tax Act. No circumstances have been disclosed to justify NetApp Denmark having had sufficient reason to believe that the dividend was not taxable.

Accordingly, the Supreme Court finds that NetApp Denmark is liable for payment of tax on the dividend under section 69(1) of the Withholding Tax Act.

*3.4. Interest rate issues*

According to what is stated in sections 3.1 and 3.2, there is only a question of interest with regard to NetApp Denmark's obligation to withhold tax regarding the distribution of DKK 565,896,000 on September 28, 2005.

In the High Court's judgment of May 3, 2021, NetApp Denmark was acquitted with regard to this distribution, and in the judgment of July 2, 2021, the High Court therefore did not

consider the question of interest on the amount subject to retention. Both judgments have been appealed to the Supreme Court, and the Supreme Court can now decide on the issue.

For the reasons stated by the High Court regarding the interpretation of sections 5(1) and 7(1) of the Collection Act, the Supreme Court finds that the latest timely payment date for the amount due was 14 days after SKAT's demand for payment of September 17, 2010, i.e. October 1

2010. The Ministry of Taxation's claim must bear interest from this date, and in this connection it is not contrary to principles of administrative law or other rules that the tax authorities refused NetApp Denmark's request of December 4, 2015 to deposit the disputed amounts, cf. the Supreme Court's judgment of October 18, 2022 (UfR 2023.307). Chapter 5 of the Collection Act contains the rules on a single tax account. Section 16a(4) of the Act states that claims for payments from companies affect (are debited) the balance statement from the latest timely payment date for the amount, and the Supreme Court agrees that the latest timely payment date also according to this provision was October 1, 2010. Section 16c(1) of the Act states that a debit balance on the account bears interest at the rate stipulated in section 7(1), cf. section 7(2), and that the interest is calculated daily and added monthly, i.e. with compound interest. The rules on a single tax account came into force on August 1, 2013.

According to the wording of the law, the amount owed must then bear interest as claimed by the Ministry of Taxation.

The Supreme Court is aware that an understanding of the Collection Act in accordance with its wording implies that the tax authorities' total interest claim against NetApp Denmark is very large in relation to the amount to be withheld. A significant part of the claim is due to the aforementioned provisions in section 16a(4) of the Act and

§ Section 16c(1) on compound interest. This should be seen in the context of the fact that NetApp Denmark - due to the fact that the company has been successful in the National Tax Tribunal and partly in the High Court - has not been able to deposit the disputed amounts, e.g. by depositing them in the tax account, and thereby avoid interest until the time when the courts may find in favor of the Ministry of Taxation in the present cases.

The Supreme Court finds that there is no sufficient basis in the preparatory works of the Collection Act for an understanding of the Act contrary to the wording of Section 16a(4) and Section 16c(1). Nor is there any basis for assuming that interest under the provision entails a violation of NetApp Denmark's rights under Article 6 of the European Convention on Human Rights or Article 47 of the EU Charter of Fundamental Rights.

The Supreme Court then finds that the tax authorities' claim against NetApp Denmark must bear interest as claimed by the Ministry of Taxation. The Supreme Court also finds that there is reason for the legislature to consider whether consequences of the Collection Act such as the present, which must be seen in connection with the issue of the right to deposit disputed amounts, are desirable.

*4. Special about TDC*

As stated in section 2.1, the provision in section 2(1)(c), fifth sentence, of the Danish Corporation Tax Act must be understood to mean that exemption from tax liability presupposes that the condition that taxation must be waived or reduced under the Parent-Subsidiary Directive or a double taxation treaty is also met.

TDC has not provided the Supreme Court with information on what has happened to the dividend to which the request for a binding answer related and which TDC distributed to NTC Holding in Luxembourg in August 2011. Accordingly, and for the reasons stated by the High Court, the Supreme Court agrees that questions 1 and 2 in the Danish National Tax Tribunal's ruling of March 13, 2012 must both be answered "no".

The Supreme Court finds that the content of TDC's most alternative claim is too unclear to be admissible. Furthermore, there is no basis for upholding TDC's most alternative claim.

*5. Main conclusions and legal costs*

NetApp Denmark has an obligation to withhold withholding tax on the distribution of DKK 565,896,000 to NetApp Cyprus on September 28, 2005.

**1714**

NetApp Denmark is not liable to withhold withholding tax on the distribution of DKK 92,012,000 to NetApp Cyprus on October 13, 2006. The Supreme Court then reverses the High Court's judgment of July 2, 2021 on interest.

NetApp Denmark must, with regard to the amount subject to retention, with effect from October 1, 2010, pay interest in accordance with section 7 of the Collection Act and, with effect from August 1, 2013, also in accordance with chapter 5 of the Act on a single tax account.

The Ministry of Taxation has complied with the decision on costs in the High Court's judgment of May 3, 2021, and after the outcome of the case before the Supreme Court, the amount must be repaid by NetApp Denmark.

Questions 1 and 2 in the National Tax Tribunal's ruling regarding TDC must both be answered "no".

In the cases concerning NetApp Denmark, legal costs for the High Court and Supreme Court have been set at DKK 3.5 million for legal fees and

DKK 10,000 to cover court fees, totaling DKK 3,510,000. The Supreme Court has emphasized the outcome, scope and nature of the case. The amount also includes legal costs regarding the High Court's judgment of July 2, 2021 on interest.

## For it is recognized as right

NetApp Denmark ApS must acknowledge that it is obliged to withhold dividend tax of DKK 158,450,880, corresponding to 28% of the dividend of DKK 565,896,000, which was distributed from NetApp Denmark ApS on September 28, 2005, and that the company is responsible for payment of the amount not withheld.

NetApp Denmark ApS must acknowledge that the withheld amount of DKK 158,450,880 shall be subject to interest according to the Danish Collection Act.
§ 7 with effect from October 1, 2010.

The Ministry of Taxation must acknowledge that NetApp Denmark ApS was not obliged to withhold dividend tax in the amount of DKK 25,763,360 corresponding to 28% of the dividend of DKK 92,012,000 distributed by NetApp Denmark ApS on October 13, 2006.

NetApp Denmark ApS must pay DKK 2,500,000 to the Danish Ministry of Taxation with process interest from May 28, 2021.

The High Court's judgment of July 2, 2021 is set aside.

The High Court's judgment of May 3, 2021 is upheld as regards TDC A/S.

TDC A/S' more subsidiary claim 1 is rejected.

The Danish Ministry of Taxation is dismissed for TDC A/S' most alternative claim 1 and claim 2.

NetApp Denmark ApS must pay DKK 3,510,000 in legal costs before the High Court and the Supreme Court to the Ministry of Taxation.

TDC A/S must pay DKK 500,000 in legal costs to the Danish Ministry of Taxation.

The sums ordered must be paid within 14 days of the judgment of this Supreme Court.

The legal costs are subject to interest in accordance with section 8a of the Interest Act.

U.2023.1575

**U.2023.1575**

*Vurdering efter selskabsskatteloven, EU-direktiv og dob-beltbeskatningsoverenskomster af udbytter udloddet af danske selskaber til udenlandske moderselskaber. Endvide-re spørgsmål om indeholdelsespligt og rentes rente af skattekrav.*

EU-ret 2 - International ret 5 - Pengevæsen m.v. 5.7 - Skatter 311.1, 311.2 og 72.1.

Sagerne angik navnlig, om de danske datterselskaber N ApS og T A/S havde pligt til at indeholde udbytteskat af udlodninger til udenlandske moderselskaber. Sagerne skulle bedømmes efter dansk skattelovgivning, herunder selskabsskattelovens § 2, stk. 1, litra c,[1] samt efter EU's direktiv om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater[2] samt dobbeltbeskatningsoverenskomster mellem Danmark og henholdsvis Cypern, Luxembourg og USA.[3] I dommen tog Højesteret stilling til, hvornår et udenlandsk moderselskab er »retmæssig ejer« (»beneficial owner«) efter dobbeltbeskatningsoverenskomsterne, og hvornår der foreligger retsmisbrug efter EU-direktivet. Højesteret foretog herefter en konkret vurdering af de enkelte udlodninger fra N ApS og T ApS. Efter denne vurdering havde skattemyndighederne et krav mod N ApS for ikke at have indeholdt[4] udbytteskat af udlodning i 2005 til et nystiftet moderselskab på Cypern. Beløbene var videreført fra Cypern til et selskab på Bermuda og et selskab i USA. Højesteret fandt, at kravet efter opkrævningsloven skulle tillægges renter og rentes rente, selv om N ApS som følge af, at selskabet havde fået mulighed i Landsskatteretten og til dels i landsretten, ikke havde haft mulighed for at deponere de omstridte beløb og undgå forrentning, mens sagen

**1576**

verserede ved domstolene. Højesteret udtalte, at der er anledning for lovgivningsmagten til at forholde sig til, om denne følge af opkrævningsloven er ønskelig.[5] Højesteret fandt endvidere, at T ApS skulle indeholde udbytteskat af udbytte, som dette selskab i august 2011 udloddede til et moderselskab i Luxembourg.

**H.D. 9. januar 2023 i sag 69/2021 og 79/2021 og 70/2021 (1. afd.)**

(Jens Peter Christensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Anne Louise Bormann og Jørgen Steen Sørensen).

Skatteministeriet (adv. Søren Horsbøl Jensen og adv. Tim Holmager, begge Kbh.)
mod
NetApp Denmark ApS (adv. Lasse Esbjerg Christensen og adv. Søren Lehmann Nielsen, begge Kbh.)
og
NetApp Denmark ApS (adv. Lasse Esbjerg Christensen og adv. Søren Lehmann Nielsen, begge Kbh.)
mod
Skatteministeriet (adv. Søren Horsbøl Jensen og adv. Tim Holmager, begge Kbh.)
og
TDC A/S (adv. Arne Møllin Ottosen, Kbh.)
mod
Skatteministeriet (adv. Søren Horsbøl Jensen og adv. Tim Holmager, begge Kbh.)

## Østre Landsrets dom 3. maj 2021 (13. afd.), B-1980-12 og B-2173-12 [SKM2021.304.ØLR]

(Landsdommerne Anne Birgitte Fisker, Kristian Porsager Seierøe og Michael de Thurah).

### I. De nedlagte påstande og sagernes baggrund

*B-1980-12 Skatteministeriet mod NetApp Denmark ApS*

SKAT traf den 17. september 2010 afgørelse om, at NetApp Denmark ApS (NetApp Denmark) efter kildeskattelovens § 65, stk. 1, jf. selskabsskattelovens § 2, stk. 1, litra c, havde pligt til at indeholde udbytteskat med 158.450.880 kr. af udbytte på 565.896.000 kr. og med 25.763.360 kr. af udbytte på 92.012.000 kr. udbetalt i henholdsvis 2005 og 2006 til selskabets moderselskab på Cypern.

Landsskatteretten gav i en kendelse af 16. december 2011 NetApp Denmark medhold i, at udbytterne ikke er skattepligtige.

Kendelsen blev den 14. marts 2012 af Skatteministeriet indbragt for Retten i Glostrup med påstand om, at NetApp Denmark skulle anses for forpligtet til at indeholde udbytteskatten. Byretten henviste ved kendelse af 7. juni 2012 sagen til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

Skatteministeriet har nedlagt endelig påstand om, at sagsøgte, NetApp Denmark, skal anerkende, at der er pligt til at indeholde udbytteskat med 158.450.880 kr., svarende til 28 % af udbyttet på 565.896.000 kr., der den 28. september 2005 blev besluttet udloddet fra sagsøgte, og med 25.763.360 kr., svarende til 28 % af udbyttet på 92.012.000 kr., der den 13. oktober 2006 blev besluttet udloddet fra sagsøgte, samt at sagsøgte er ansvarlig for betalingen af de ikke indeholdte beløb.

*Sagsøgte, NetApp Denmark,* har endeligt påstået frifindelse.

Landsretten har ved kendelse af 14. januar 2021 efter parternes fælles anmodning i medfør af retsplejelovens §§ 253 og 366 udskilt parternes påstande vedrørende eventuel forrentning af udbytteskatten til efterfølgende, særskilt afgørelse på skriftligt grundlag.

*B-2173-12 Skatteministeriet mod TDC A/S*

---

1  FT 2000-01, till A, lovforslag nr. L 99, alm. bem., samt besvarelse af spørgsmål 1, 2, 16 og 23, FT 2003-04, till. A, lovforslag nr. L 119, bem. til § 10, samt svar på spørgsm. 53, FT 2004-05, till. A, lovforslag nr. L 27, alm. bem. pkt. 2 og bem. til § 1, nr. 1, 2 og 4, FT 2005-06, till. A, lovforslag nr. L 43, s. 1160, Skatteministerens besvarelse af spørgsmål nr. S 474 (2006-418-0333), Skatteudvalgets betænkning af 18. maj 2008 til lovforslag nr. L 202, FT 2008-09, bem. til nr. 1, samt Ligningsvejledningen pkt. D.D. kap. III, art. 10, af 14. juli 2003.

2  EU-Domstolens domme af 21. februar 2006 (C-255/02), af 5. juli 2007 (sag C-321/05), af 22. november 2017 (C-251/16), af 26. februar 2019 (C-116/16 og C 117/16), samt U 2017.824H (Ajos).

3  OECD's kommentarer fra 1977 (art. 1, pkt. 7-10 og art. 10, pkt. 12 og 22) og fra 2003 (art. 10, pkt. 12) til OECD's modeloverenskomst til dobbelt-beskatningsoverenskomst.

4  U 2018.3119H, U 2018.3845H og U 2022.2799H.

5  U 2023.307H.

Copyright © 2023 Karnov Group Denmark A/S

Skatterådet afgav den 21. juni 2011 bindende svar på to spørgsmål indgivet af TDC A/S (TDC) vedrørende skattefrihed af en påtænkt udlodning af udbytte fra TDC til moderselskabet NTC Holding G.P. & Cie S.C.A. registreret i Luxembourg.

Skatterådet svarede »Nej« til TDC's spørgsmål 1 om, hvorvidt en udlodning var skattefri og dermed fritaget for dansk kildeskat i medfør af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., hvorefter skattepligten ikke omfatter udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over selskaber, der er omhandlet i moder-/datterselskabsdirektivets artikel 2, stk. 1, litra a, men som ved beskatning her i landet anses for at være transparente enheder.

Skatterådet svarede ligeledes »Nej« til TDC's spørgsmål 2 om, hvorvidt en udlodning var skattefri og dermed fritaget for dansk kildeskat i medfør af selskabsskattelovens § 2, stk. 1, litra c, 3. pkt., hvorefter skattepligten ikke omfatter udbytte af datterselskabsaktier, når beskatningen af udbytter fra datterselskabet skal frafaldes eller nedsættes i henhold til moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor moderselskabet er hjemmehørende.

Landsskatteretten stadfæstede i en kendelse af 13. marts 2012 Skatterådets svar på spørgsmål 1, men gav TDC medhold i, at spørgsmål 2 skal besvares med et »Ja«.

Kendelsen blev den 23. april 2012 indbragt for Københavns Byret, der henviste sagen til Retten på Frederiksberg som rette værneting. Retten på Frederiksberg henviste ved kendelse af 27. juni 2012 sagen til

**1577**

behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

Skatteministeriet har nedlagt principal påstand om, at TDC skal anerkende, at spørgsmål 2 i Landsskatterettens kendelse af 13. marts 2012 besvares med et »Nej«, og subsidiær påstand om, at TDC skal anerkende, at spørgsmål 2 i Landsskatterettens kendelse af 13. marts 2012 afvises.

TDC har nedlagt påstand om frifindelse over for Skatteministeriets påstande samt selvstændig påstand om, at Skatteministeriet skal anerkende, at spørgsmål 1 i Landsskatterettens kendelse af 13. marts 2013 besvares med et »Ja«.

*Skatteministeriet* har påstået frifindelse over for TDC's selvstændige påstand.

*Fælles problemstillinger*

Sagerne er i medfør af retsplejelovens § 254, stk. 1, hovedforhandlet i forbindelse med hinanden.

De to sager angår begge spørgsmålet om, hvorvidt et selskab med hjemsted i en anden EU-medlemsstat, som Danmark har indgået en dobbeltbeskatningsoverenskomst med, efter selskabsskattelovens § 2, stk. 1, litra c, er skattepligtig af udbytter udloddet af et dansk datterselskab.

Skatteministeriets overordnede synspunkt i begge sager er, at de omhandlede selskaber med hjemsted i henholdsvis Cypern og Luxembourg er såkaldte »gennemstrømningsselskaber«, der ikke er de reelle ejere af udbytterne, med den konsekvens, at reglerne om skattefritagelse efter moder-/datterselskabsdirektivet og reglerne om skattenedsættelse efter dobbeltbeskatningsoverenskomsterne med de nævnte EU-lande ikke finder anvendelse.

Begge sager rejser spørgsmål om fortolkningen af Rådets direktiv 90/435/EØF af 23. juli 1990 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, som ændret ved direktiv af 2003/123/EF af 22. december 2003 (moder-/datterselskabsdirektivet), og om fortolkningen af de til enslydende dobbeltbeskatningsoverenskomster.

Ved kendelser af 19. februar 2016 besluttede Østre Landsret i henhold til artikel 267 i Traktaten om Den Europæiske Unions Funktionsmåde at stille spørgsmål i begge sager om fortolkningen af navnlig moder-/datterselskabsdirektivet. EU-Domstolen afsagde den 26. februar 2019 dom i sagerne.

Det er oplyst, at SKAT har rejst en række lignende sager mod andre danske selskaber, som uden at indeholde kildeskat har udloddet udbytte eller betalt renter til deres moderselskaber, der er hjemmehørende i andre EU-lande eller lande, med hvilke Danmark har indgået en dobbeltbeskatningsoverenskomst (såkaldte »beneficial owner« sager). Domstolene har afsagt dom i én af disse sager, jf. Østre Landsrets dom af 20. december 2011, B-2152-10, offentliggjort i SKM2012.121ØLR.

## II. Sagsfremstilling

*B-1980-12 Skatteministeriet mod NetApp Denmark ApS*
  *Landsskatterettens kendelse*

Af Landsskatterettens kendelse af 16. december 2011 fremgår bl.a.:

»*Sagens oplysninger*

NetApp Denmark ApS (Selskabet), der blev stiftet i marts 2000, er en del af en stor multinational koncern, som designer, udvikler, producerer og sælger hardware og software til netværkssystemer osv. Koncernens ultimative ejer er Network Appliance Inc., som er et børsnoteret amerikansk selskab. Koncernen har aktiviteter i mere end 40 lande, og har mere end 9.500 ansatte på verdensplan, heraf 5.900 ansatte i USA og 1.500 ansatte i Europa, af hvilke 250 er ansat i Holland til koordination af salgsaktivitet mv. NetApp Denmark ApS beskæftiger ca. 20 medarbejdere.

NetApp Denmark ApS udfører alene salgs- og supportaktivitet, og selskabet reporterer til Network Appliance B.V. i Holland, som er ansvarlig for det globale salg uden for USA, Canada og Mexico. Selskabet var indtil den 16. september 2005 ejet af Network Appliance Global Ltd. (Bermuda).

Network Appliance Global Ltd. (Bermuda) stiftede den 5. september 2005 et cypriotisk selskab, NetApp Holdings Ltd., med en kapital på 20.000 USD, hvoraf alene 2.000 USD blev indbetalt.

Den 16. september 2005 blev det cypriotiske selskab NetApp Holdings Ltd. indskudt mellem NetApp Denmark ApS og det hidtidige moderselskab på Bermuda. Af overdragelsesaftalen fremgår, at købesummen blev aftalt til 90.000.000 euro som skulle betales senest den 30. april 2006. Omregnet med den dagældende kurs 7,45 svarer dette til ca. 670,5 mio. kr.

Koncernstrukturen ser herefter således ud:



**1578**

Det er om reorganiseringen i 2005 anført, at det ikke var hensigtsmæssigt, at de samlede europæiske aktiviteter var kontrolleret af det danske salgs- og supportselskab, hvis ansatte alene var medarbejdere involveret i salgs- og supportfunktioner på det danske marked, og som derfor ikke havde kompetencer eller ekspertise i relation til ejerskab af de underliggende datterselskaber. Det er nærmere anført:

*1. Europæiske datterselskaber indskydes mod aktier*

Det danske selskab NetApp Denmark ApS erhvervede den 28. juli 2000 aktierne i Network Appliance B.V. ved apportindskud fra Network Appliance Global Ltd. (Bermuda). Dette skete ifølge Selskabet for at minimere skat, jf. de dagældende regler om udbyttebeskatning.

Aktierne i Network Appliance B.V. blev værdisat til 90.891.475 kr. og blev indskudt i NetApp Denmark ApS til kurs 920,42, svarende til en forhøjelse af kapitalen med 9.875.000 kr. Anpartskapitalen for selskabet udgør herefter 10.000.000 kr.

*2. Overførsel/salg af europæiske datterselskaber*

Den 25. oktober 2005 blev aktierne i Network Appliance B.V. solgt til Network Appliance Holding & Manufacturing B.V., Holland, som er et søsterselskab til NetApp Denmark ApS, der også ejes af NetApp Holdings Ltd., Cypern.

Aktierne blev solgt til en pris på 14 mio. euro, og NetApp Denmark ApS bogførte et tilgodehavende for salgsprisen hos Network Appliance Holding & Manufacturing B.V. I henhold til salgsaftalen skal betalingen for aktierne foretages senest den 30. april 2006.

Den 28. september 2005 vedtog Selskabet at udlodde udbytte med 565.896.000 kr. til NetApp Holdings Ltd. (Cypern).

Udbetalingen af udbytte skete den 27. oktober 2005. Ifølge Selskabet er det udbytte, som blev modtaget af NetApp Holdings Ltd. (Cypern), anvendt af dette selskab til betaling af gælden til moderselskabet Network Appliance Global Ltd. (Bermuda), som hidrørte fra købet af anparterne i NetApp Denmark ApS, jf. ovenfor.

Den 13. oktober 2006 deklarerede Selskabet endnu et udbytte til NetApp Holdings Ltd. (Cypern) - denne gang på 92.012.000 kr.

Også denne udlodning blev videreført fra NetApp Holdings Ltd. (Cypern) til Network Appliance Global Ltd. (Bermuda).

Om NetApp Holdings Ltd. (Cypern) fremgår af selskabets regnskaber for de første regnskabsår, som udløb henholdsvis den 28. april 2006 (underskrevet den 1. september 2008) og den 28. april 2007 (underskrevet den 20. oktober 2008), at den væsentligste funktion for selskabet i disse år var at eje aktier i Selskabet. Selskabet havde hverken lokaler eller personale til rådighed.

Om Network Appliance Global Ltd. (Bermuda) er i henvendelse af 17. april 2009 til SKAT oplyst, at selskabet ejer alle de immaterielle aktiver, som er nødvendige for at producere og markedsføre produkterne udenfor USA og forbundne markeder. Aktiviteterne uden for USA er således organiseret under selskabet.

*SKATs afgørelse*

SKAT har anset Selskabet for indeholdelsespligtigt af udbytteskat, jf. selskabsskattelovens § 2, stk. 1, litra c, jf. kildeskattelovens § 65, i 2005 med 158.450.880 kr. og i 2006 med 25.763.360 kr.

Efter den dagældende selskabsskattelovs § 2, stk. 1, litra c, 1. pkt., er selskaber, der har hjemsted i udlandet, som udgangspunkt skattepligtige til Danmark af udbytte, der oppebæres fra kilder her i landet. Betingelserne for, at der som udgangspunkt pålægges begrænset skattepligt af udbyttet og således til stede. En undtagelse fra beskatningen er, hvis denne skal frafaldes efter en dobbeltbeskatningsoverenskomst eller efter moder-/datterselskabsdirektivet 90/435/EØF, jf. dagældende selskabsskattelovs § 2, stk. 1, litra c, 4. pkt.

Beskatningen skal ikke frafaldes i medfør af den dansk-cypriotiske dobbeltbeskatningsoverenskomst.

Den dansk-cypriotiske dobbeltbeskatningsoverenskomst af 26. maj 1981, jf. bekendtgørelse nr. 15 af 11. februar 1983, fastsætter, at udbytter kan beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, men at den skat der pålignes, såfremt modtageren er udbyttets retmæssige ejer, ikke må overstige nærmere fastsatte grænser, jf. art. 10, stk. 2.

Efter dobbeltbeskatningsoverenskomstens ordlyd er det således en betingelse for afskæringen af Danmarks ret til som kildestat at beskatte udbytter, at den cypriotiske modtager af udbyttet er dets »retmæssige ejer«.

Det er SKATs opfattelse, at NetApp Holdings Ltd. (Cypern), der - i bedste fald -har haft meget snævre beføjelser i relation til udbyttebetalingerne hidrørende fra NetApp Denmark ApS, ikke kan anses som »retmæssig ejer« i relation til udbytterne hidrørende fra NetApp Denmark ApS, jf. dobbeltbeskatningsoverenskomstens artikel 10.

Udtrykket »retmæssig ejer« (på engelsk »beneficial owner«) har været benyttet i OECD's Modelkonvention og kommentarerne hertil siden revisionen af modelkonventionen i 1977. De i kommentarerne indeholdte bemærkninger om udtrykket »beneficial owner« er gradvist blevet præciseret, men der er ikke grundlag for at hævde, at der herved er sket materielle ændringer i relation til, hvad der forstås ved udtrykket, hvilket også lægges til grund hos Winther-Sørensen og Bundgaard, SR-SKAT 2007, s. 398.

I kommentarerne til Modelkonventionen er spørgsmålet om forståelsen af udtrykket »retmæssig ejer« nu navnlig behandlet i punkt 12, 12.1 og 12.2, til artikel 10.

**1579**

Af kommentarerne fremgår det, at en dobbeltbeskatningsoverenskomst ikke i sig selv afskærer/begrænser kildestatsbeskatning, medmindre den retmæssige ejer er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Afgørende for fastlæggelsen af »den retmæssige ejer« er efter kommentarerne bl.a., om den formelle udbyttemodtager blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst«.

Når den formelle beløbsmodtagers reelle beføjelser til at træffe afgørelse om, hvorledes der skal disponeres over modtagne beløb, er meget snævre eller ikke-eksisterende, kan adgangen til at påberåbe sig dobbeltbeskatningsoverenskomsten således afskæres. Dette indebærer, at udbytte, som de(n) bagvedliggende ejer(e) på forhånd har besluttet at dirigere derhen, hvor det ønskes, uden at det mellemliggende selskab får nogen reel mulighed for at påvirke denne beslutning, ikke har det mellemliggende selskab som »retmæssig ejer«.

I kommentarerne henvises der til den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, hvori der gives en række eksempler på de problemstillinger, som brugen af »conduit companies« skaber. I rapporten nævnes en række muligheder for ved direkte regulering i dobbeltbeskatningsoverenskomsterne at søge at eliminere de utilsigtede muligheder for skatteunddragelse, som anvendelse af »conduit companies« skaber. Hvad angår mulighederne for uden særlige regler at forhindre utilsigtede skatteunddragelser, anføres det i rapportens punkt 14.b., at modelkonventionen i artikel 10-12 stiller krav om, at modtageren af udbytter, renter og royalties er »beneficial owner« (dengang nævnte kommentarerne ikke udtrykkeligt »conduit companies«). Herefter anføres:

»Thus, the limitation is not available when, economically, it would benefit a person not entitled to it who interposed the conduit company as an intermediary between himself and the payer of the income […] Thus a conduit company can normally not be regarded as

the beneficial owner if, though the formal owner of certain assets, it has very narrow powers which render it a mere fiduciary or administrator acting on account of the interested parties (most likely the shareholders of the conduit company)«

Det er det andet led i denne konklusion, der er gengivet i kommentarerne til modeloverenskomsten.

I nærværende sag blev umiddelbart efter, at NetApp Holding Ltd. (Cypern) var blevet indskudt som mellemled i koncernen, udloddet udbytte op gennem koncernen. Det cypriotiske selskab blev indskudt i koncernen i forsøg på at undgå kildeskat ved udlodninger til moderselskabet på Bermuda. Selskabet har således ikke sandsynliggjort eller dokumenteret, at der var et kommercielt formål med omstruktureringen.

Det cypriotiske selskab har alene skullet tjene den funktion at blive anvendt som led i et forsøg på at tilegne koncernen skattemæssige fordele. Selskabet har reelt ikke været beføjet til at træffe selvstændige ledelsesbeslutninger om, hvorledes der skulle disponeres over udbytterne, der hidrørte fra det danske selskab. Dette understøttes af, at selskabet er uden nogen reel substans.

Da anpartskapitalen i det danske selskab den 16. september 2005 blev overdraget fra Bermuda-selskabet til det cypriotiske selskab blev det samtidig aftalt, at købesummen på 90.000.000 euro skulle betales senest den 30. april 2006. Udlodningerne fra det danske selskab, som blev foretaget den 27. oktober 2005 og den 13. oktober 2006, udgjorde i alt 657.908.000 kr. Det cypriotiske selskab kunne kun betale købesummen ved, at udlodningerne fra det danske selskab blev videreført til Bermuda-selskabet, hvilket også skete. Det er efter SKATs opfattelse givet, at de personer/selskaber, som kontrollerede koncernen, på forhånd havde besluttet, at udlodningerne fra det danske selskab skulle føres videre til Bermudaselskabet. Der er således sket en gennemstrømning af udbytterne fra det danske selskab til Bermuda-selskabet. Det cypriotiske selskab har ikke betalt skat af udbytterne på Cypern.

Det må herefter påhvile det danske selskab at godtgøre, at det cypriotiske selskab ikke blot var et rent gennemstrømningsselskab i relation til udbytterne, hvilket selskabet ikke har gjort.

Det er bemærket, at synspunktet om, at koncernen ikke ønskede at bevare en ejerstruktur, hvor det danske selskab fungerede som moderselskab for det hollandske selskab, ikke på fornuftig vis forklarer, at det (pludselig) skulle være nødvendigt at indskyde et mellemled på Cypern frem for - fortsat - at lade Bermuda-selskabet fungere som moderselskab for den europæiske del af koncernen. Ejerskabet til det hollandske selskab kunne således blot være overført til Bermuda-selskabet.

Det er SKATs opfattelse, at det ikke kan tillægges afgørende vægt, at der ikke kan påvises en formel retlig forpligtelse for det cypriotiske selskab til at betale modtagne udbytter fra det danske selskab videre til Bermuda-selskabet. Den omstændighed, at der i forholdet mellem det danske selskab og det cypriotiske selskab er tale om udlodning af udbytte og i forholdet mellem det cypriotiske selskab og Bermuda-selskabet er tale om afdrag på gæld, ændrer ikke ved, at der er sket gennemstrømning.

Det er uden betydning for spørgsmålet om kildeskat på udbytter, hvor de midler, som udloddes, stammer fra. Den begrænsede skattepligt indtræder således også, hvor der er tale om, at et dansk selskab udlodder midler, der er modtaget som udbytte m.v. fra datterselskaber.

**1580**

Dette medvirker i øvrigt til at undgå, at Danmark benyttes som transitland til »afvaskning« af kildeskat. Selskabets bemærkninger om kilden til »udbyttekapaciteten« er således uden relevans. Tilsvarende er det uden betydning, om koncernen kunne have valgt en gældsfinansiering irrelevante. En gældsfinansiering ville i øvrigt

have andre skattemæssige virkninger, herunder i relation til eventuel kildeskat på renter mv. Afgørende er imidlertid de forhold, som faktisk foreligger.

For så vidt angår intern retspraksis er henvist til Landsskatterettens afgørelse offentliggjort i (SKM2011.57), der drejer sig om renteskat på renter betalt fra et dansk selskab til et selskab på Jersey via 2 indskudte svenske selskaber. Spørgsmålet var om det danske selskabs svenske moderselskab var retmæssig ejer af renterne. Dette fandt Landsskatteretten ikke, og fastslog derpå at det danske selskab var indeholdelsespligtig af renteskat vedrørende de renter, der var blevet udbetalt til det svenske moderselskab.

Efter SKATs opfattelse er der to afgørelser fra Landsskatteretten (SKM2010.268 og SKM2010.729), som repræsentanten har henvist til, ikke sammenlignelige med de faktiske omstændigheder i nærværende sag.

Med hensyn til international retspraksis er henvist til Prévost-sagen fra 2009, der drejede sig om udbytteskat på udbytter betalt fra et canadisk selskab til et hollandsk holdingselskab, der var ejet af et svensk og et engelsk selskab. Spørgsmålet var om, det hollandske selskab var »beneficial owner« i relation til udbyttet. Dette fandt den canadiske Federal Court of Appeal var tilfældet.

Dommen synes at antage, at den formelle indkomstmodtager er den »retmæssige ejer« medmindre indkomstmodtageren er retligt forpligtet til at disponere i en bestemt henseende. Det var således ikke tilstrækkeligt, at der ikke var nogen praktisk sandsynlighed for, at udbyttet ikke blev betalt videre. Et sådant krav om, at den formelle indkomstmodtager skal være retligt forpligtet til at disponere i en bestemt henseende, ses hverken at have støtte i modeloverenskomsten, kommentarerne hertil eller andetsteds.

Endvidere er henvist til Indofood sagen fra 2006, der drejede sig om kildeskat på renter betalt af et indonesisk selskab til et Mauritius selskab. Spørgsmålet var om kildeskatten kunne undgås ved indskud af et hollandsk selskab mellem det indonesiske selskab og Mauritius selskabet. Spørgsmålet var nærmere om, det hollandske selskab ville blive anset for at være »beneficial owner« af rentebetalingerne, således at disse betalinger ville blive anerkendt i forhold til den hollandsk-indonesiske dobbeltbeskatningsoverenskomst. Den britiske Court of Appeal fandt, at det hollandske selskab ikke ville være »beneficial owner« af renteindtægterne i medfør af den indonesisk-hollandske overenskomst.

Indofoods-sagen og nærværende sag er sammenlignelige i den forstand, at de beløb, som blev modtaget, nødvendigvis skulle viderekanaliseres for, at forpligtelserne over for moderselskabet kunne overholdes. Endvidere er der i begge tilfælde tale om en retlig forpligtelse til viderebetaling af de modtagne beløb, men i stedet at der i praksis er disponeret på en sådan måde over indkomsten, at denne reelt ikke vil være undergivet den umiddelbare betalingsmodtagers rådighed.

*Beskatningen skal ikke frafaldes i medfør af moder-/datterselskabsdirektivet 90/435/EØF.*

Det følger af artikel 5 i moder/datterselskabsdirektivet, at det overskud, som et datterselskab udlodder til sit moderselskab, fritages for kildeskat. Udgangspunktet er dermed, at der ikke kan pålægges kildeskat ved udbytteudlodninger til selskaber hjemmehørende i en anden medlemsstat, når moderselskabet opfylder kapitalkravet og ejertidskravet i direktivet.

Dette udgangspunkt kan dog fraviges. Det er således anført i direktivets artikel 1, stk. 2, at direktivet ikke er til hinder for anvendelsen af nationale bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Anvendelsen af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne tjener netop til bekæmpelse af svig eller misbrug, som omhandlet i direktivets art. 1, stk. 2. Direktivet er således ikke

Copyright © 2023 Karnov Group Denmark A/S

til hinder for, at der pålægges kildeskat, når den retmæssige ejer ikke er omfattet af en dobbeltbeskatningsoverenskomst med Danmark.

Selskabsskattelovens § 2, stk. 1, litra c, indebærer efter sin klare ordlyd, at Danmark ikke skal frafalde kildeskat, medmindre det efter moder-/datterselskabsdirektivet består en egentlig pligt hertil. I det omfang, EU-retten ikke er til hinder for indeholdelse af kildeskat, skal der således ske indeholdelse af udbytteskat.

Da selskabsskattelovens § 2, stk. 1, litra c, fastsætter, at den begrænsede skattepligt kun skal frafaldes, hvis direktivet og/eller en DBO fører til, at SKAT skal frafalde eller nedsætte beskatning, indeholder denne bestemmelse i sig selv en klar udnyttelse af adgangen til at fastholde den begrænsede skattepligt med henblik på at imødegå misbrug. Det er i overensstemmelse med det almindelige EU-retlige misbrugsbegreb, at EU-retlige rettigheder ikke kan påberåbes med hensyn til rent kunstige arrangementer, hvis hovedformål er at opnå en utilsigtet skattefordel.

Derudover er artikel 10 i den dansk-cypriotiske dobbeltbeskatningsoverenskomst netop en overenskomstmæssigt fastsat bestemmelse, der med forbeholdet om retmæssig ejer bekæmper svig eller misbrug. Direktivet udelukker efter ordlyden af artikel 1, stk. 2, netop ikke, at Danmark anvender den adgang til at indeholde kildeskat, som Danmark har i medfør af artikel 10 i den dansk-cypriotiske dobbeltbeskatningsoverenskomst.

**1581**

Det følger af EU-retten, at fordele efter EU-retten ikke kan opnås, når der er tale om transaktioner omfattet af det generelle EU-retlige misbrugsbegreb. EU-Domstolens praksis viser, at der ikke er noget til hinder for at afskære selskaber etableret i en anden medlemsstat fra at påberåbe sig EU- retten - herunder de harmoniserede regler, der følger af bl.a. moder/datterselskabsdirektivet - når der må lægges til grund, at etableringen af et holdingselskab i en anden medlemsstat »tager sigte på at undgå kildeskat på betalinger til ikke-europæiske foretagender, hvis en sådan konstruktion ikke tjener noget kommercielt formål«, jf. Kommissionens fortolkning af »Rent kunstige arrangementer« i Kommissionens meddelelse om: Anvendelsen af foranstaltninger til bekæmpelse af misbrug indenfor direkte beskatning - i EU og i relation til tredjelande (Kom (2007)785).

Fra EU-Domstolens praksis om misbrugsbegrebet er henvist til Cadbury Schweppes-dommen (sag C-196/04), Halifax-dommen (sag C-255/02) og Part Service-dommen (sag C-425/06).

Ved vurdering af hovedformålet med etableringen har EU-Domstolen lagt særlig vægt på, om der er substans i selskabets domicilland, eller om der er tale om et rent kunstigt arrangement, hvilket ikke kun indebærer formel etablering, men også faktisk udøvelse af økonomisk virksomhed.

SKAT er derfor af den opfattelse, at EU-retten ikke i videre omfang end de på Modelkonventionen baserede dobbeltbeskatningsaftaler kan anses for at afskære Danmark fra at gennemføre en kildestatsbeskatning af udbytter ud fra en betragtning om, at de pågældende beløbs retmæssige ejere er hjemmehørende uden for EU.

Selskabet har anført, at baggrunden for indførelse af bestemmelser om mellemholdingselskaber (lov nr. 525 af 12. juni 2009) må være, at national dansk skattelovgivning ikke hidtil har hjemlet en tilsidesættelse af juridisk gyldige ejerstrukturer.

Selskabets bemærkninger er misvisende. Det fremgår således udtrykkeligt af lovens forarbejder, at lovgiver - som konsekvens af bestemmelserne om »beneficial owner«/»retmæssig ejer« - undlod at lade visse udenlandske moderselskaber være omfattet af lovændringen. I forbindelse med folketingets behandling af lovforslaget foreslog skatteministeren bl.a. en ændring af lovforslagets § 1. Ændringsforslaget, som blev vedtaget af Folketinget, tog sigte

på den situation, hvor mere end 50 % af aktiekapitalen i et mellemholdingselskab var ejet af udenlandske selskaber. I bemærkningerne til ændringsforslaget anføres i Skatteudvalgets betænkning (til § 1, nr. 1):

»Det foreslås, at den foreslåede værnsregel mod såkaldte »omvendte juletræer« begrænses til situationer, hvor moderselskabets selskabsaktionærer er skattepligtige i Danmark.

Baggrunden for dette ændringsforslag er, at der allerede efter gældende ret (regler som videreføres med lovforslagets § 14, nr. 5) findes et værn i de tilfælde, hvor udbyttet er udloddes til udenlandske selskaber, som ikke er udbyttets retmæssige ejer (beneficial owner). Forslaget i aktieavancebeskatningslovens § 4 A, stk. 3, om at anse aktierne for direkte ejet af selskaber, der er aktionær i det udbyttemodtagende udenlandske selskab, er derfor ikke nødvendigt.

Der skal efter gældende ret og lovforslaget alene ske fritagelse for kildebeskatning efter selskabsskattelovens § 2, stk. 1, litra c, når beskatningen af udbyttet skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst. Der skal med andre ord ske kildebeskatning, når denne beskatning ikke er afskåret efter direktivet eller dobbeltbeskatningsoverenskomsterne.«

*Afgørelsen ikke er i strid med »EU's frihedsrettigheder« (EF-traktatens art. 43).*

Selskabet har i klagen anført, at kildeskat på udbytter i en situation som her i sagen udgør en restriktion af etableringsfriheden, som ikke er acceptabel.

SKAT er ikke enig heri. Der foreligger kun en restriktion i den frie bevægelighed (herunder etableringsfriheden, jf. art. 43), hvis der sker en forskelsbehandling bestående i, at der på sammenlignelige situationer anvendes forskellige bestemmelser, eller at den samme bestemmelse anvendes på forskellige situationer.

Den omstændighed, at der indeholdes kildeskat på renter, når de betales til et ikke-hjemmehørende selskab, udgør ikke en restriktion i den frie bevægelighed, allerede fordi der ikke sker en skattemæssig forskelsbehandling af sammenlignelige situationer.

*SKATs afgørelse udgør ikke en praksisændring med tilbagevirkende kraft.*

Selskabet har i klagen gjort gældende, at SKATs afgørelse udgør en praksisskærpelse med tilbagevirkende kraft.

SKAT er ikke enig heri. Der foreligger ikke nogen administrativ praksis, som afgørelsen i nærværende sag ændrer på. Der er ikke truffet en eneste afgørelse, hvorefter det i tilfælde, der minder om nærværende sag, er fastslået, at der ikke kan indeholdes kildeskat efter selskabsskattelovens § 2, stk. 1, litra d, og realiteten er, at klagerens påstand om eksistensen af en »fast administrativ praksis«, er grundløs.

*Selskabet har ikke godtgjort, at NetApp Holdings Ltd. (Cypern) ikke er retmæssig ejer af udbytterne.*

Selskabet har gjort gældende, at såfremt det cypriotiske selskab ikke anses for retmæssig ejer af udbytterne, må USA-selskabet anses for retmæssig ejer heraf.

Bevisbyrden for, at der i så tilfælde ikke skal indeholdes kildeskat, påhviler selskabet. Det skal herefter godtgøres, at det ikke er Bermuda-selskabet, der er

**1582**

retmæssig ejer, men at det er USA-selskabet. Selskabet har ikke løftet denne bevisbyrde.

På det foreliggende grundlag er det således ikke muligt at konstatere, om de omhandlede beløb er videreoverført til USA-selskabet. Der er ikke overensstemmelse mellem de beløb, der er udloddet fra det danske selskab og de beløb, der ifølge selskabet skulle være overført som udbytte fra Bermudaselskabet - og eventuelt andre af selskabets mange datterselskaber - til USA-selskabet.