# Exhibit 10, Part 2 of 2

De overførte udbytter til USA-selskabet er meget varierende og har det tilfælles, at der samlet er tale om beløb, som er væsentligt større end de udbytter, der er udloddet fra det danske selskab. Fx har USA-selskabet i sin »Income Tax Return«, anført »Dividends« til 458.606.705 euro for perioden 30. april 2005 - 28. april 2006. Selv hvis en del heraf er finansieret ved lån, som hævdet af repræsentanten, er der tale om beløb, som væsentligt overstiger de beløb, der er udloddet fra det danske selskab.

Ifølge det danske selskab er de omhandlede udbytter, som er overført til Bermudaselskabet, anvendt både til udlodning af udbytte til USA-selskabet og til betaling af Bermuda-selskabets gæld. Selskabet har ikke redegjort nærmere for - og dokumenteret - i hvilket omfang udbytteudlodningerne medgik til betaling af udbytte, henholdsvis gæld, betalingstidspunkt mv.

Endvidere er det uvist, i hvilket omfang udbyttebetalinger til USA-selskabet hidrører fra Bermuda-selskabet, henholdsvis fra koncernens øvrige datterselskaber. I repræsentantens indlæg 7. februar 2011, side 4, 5. afsnit, er anført, at udbytteudlodningerne fra det danske selskab »ultimativt (er) endt hos det amerikanske moderselskab som en del af en samlet udbytteudlodning fra koncernens datterselskaber.«

Der foreligger heller ikke nærmere oplysninger om Bermuda-selskabet, som ville gøre det muligt at vurdere, om selskabet ikke var retmæssig ejer af udbytterne.

*NetApp Denmark ApS hæfter for betaling af renteskat.*

Til Skattens subsidiære påstand om, at selskabet ikke hæfter for den ikke indeholdte renteskat i medfør af kildeskattelovens § 69, er bemærket, at det fremgår af ordlyden af kildeskattelovens § 69, at det er den indeholdelsespligtige, der skal godtgøre, at der ikke er udvist forsømmelighed fra hans side. Udgangspunktet i kildeskattelovens § 69 er, at et selskab, der undlader at opfylde sin pligt til at indeholde skat, er umiddelbart ansvarlig for betalingen af manglende beløb. Dette udgangspunkt fraviges, hvis selskabet godtgør, at der ikke er udvist »forsømmelighed« fra selskabets side.

Selskabets synspunkt om, at selskabet var i uvished om retstilstanden må afvises, allerede fordi den/de person(er), der har tilrettelagt arrangementet, nødvendigvis må have haft fuld viden om formålet mv., og de(n) pågældende, der har haft kontrol over selskabet, har derfor været i besiddelse af al relevant information.

Hertil kommer, at anvendelsen af begrebet retmæssig ejer i dobbeltbeskatningsoverenskomsten, ligesom misbrugsbestemmelsen i moder-/datterselskabsdirektivets artikel 1, stk. 2 og den domstolsskabte praksis om det generelle EU-retlige misbrugsbegreb i sagens natur er udtryk for et værn mod misbrug af henholdsvis dobbeltbeskatningsoverenskomsten og moder-/datterselskabsdirektivet, og at der i relation til vurderingen af, om der er handlet forsømmeligt, jf. kildeskattelovens § 69, må stilles særlige krav til agtpågivenheden, når der er tale om overholdelse af værnsregler.

Selskabet har ved at forsøge at sikre sig fordele, som hverken moder-/datterselskabsdirektivet eller den dansk-cypriotiske dobbeltbeskatningsordning tilsigter adgang til og ved bevidst at have deltaget i et arrangement uden nogen forretningsmæssig begrundelse, indladt sig på en risiko, som selskabet ikke har afklaret eller søgt afklaret.

Der bør således lægges vægt på, at udgangspunktet er, at indeholdelse skal ske, at der ikke af selskabet er foretaget nærmere undersøgelser med henblik på at afklare, om betingelserne for manglende indeholdelse var opfyldt, samt der som følge af interessefællesskabet må stilles skærpede krav til selskabets agtpågivenhed.

Endvidere kan selskabet ikke have været i uvished med hensyn til de faktiske forhold.

Det er derfor SKATs opfattelse, at selskabet hæfter for betalingen af udbytteskat.

*Selskabets påstand og argumenter*

Selskabets repræsentant har principalt nedlagt påstand om, at selskabets indeholdelsespligt vedrørende udbytte til moderselskabet ophæves, jf. selskabsskattelovens § 2, stk. 1, litra c, jf. kildeskattelovens § 65. Subsidiært er nedlagt påstand om, at Selskabet ikke har udvist forsømmelighed, jf. kildeskattelovens § 69.

Moder-/datterselskabsdirektivet.

Til støtte for den primære påstand er anført, at udbytteudlodninger til det cypriotiske selskab skal fritages for dansk udbyttebeskatning, jf. moder-/datterselskabsdirektivet.

Fritagelsen fra kildeskat på udbytter følger af direktivets artikel 5, som alene bygger på objektive kriterier om ejerskab af de kapitalandele, som giver anledning til udbytteudlodningen. Direktivet indeholder således ikke specifikke krav, f.eks. krav om retmæssig ejer mv.

Direktivets art. 1, stk. 2, giver medlemsstaterne mulighed for at indføre nationale værnsregler mod svig og misbrug.

Der er ikke i dansk skattelovgivning implementeret specifikke regler mod misbrug i forbindelse med udbytteudlodninger og hindring af misbrug af de fordele, som

**1583**

følger af moder-/datterselskabsdirektivet. Misbrug kan derfor alene bero på anvendelse af de principper, som kan udledes af læren om rette indkomstmodtager samt konkrete realitetsvurderinger.

For så vidt angår rette indkomstmodtager følger det af en langvarig praksis, at indkomst fra kapital skal henføres til og beskattes hos ejeren af det aktiv, som kapitalindkomsten stammer fra. I situationen her i sagen medfører dette, at udbytteindtægter fra det danske selskab skal henføres til ejeren af aktierne, dvs. det cypriotiske selskab.

Bl.a. på baggrund af Højesterets domme refereret i SKM2006.749 og SKM2003.482 må konkluderes, at juridisk gyldige transaktioner, som dog medfører fordelagtige skattemæssige konsekvenser, ikke af den grund kan tilsidesættes skattemæssigt, og at der ikke findes hverken specifikke eller generelle regler mod misbrug i dansk skattelovgivning i forhold til f.eks. beskatning af udbytteudlodninger.

Dette understøttes også af, at der med virkning for indkomståret 2010 er indført en specifik værnsregel mod mellemholdingselskaber i aktieavancebeskatningslovens § 4A, stk. 3. Baggrund for denne regel må således være, at national dansk skattelovgivning ikke hidtil har hjemlet en tilsidesættelse af juridisk gyldige ejerstrukturer, uanset om strukturerne måtte være oprettet med det ene formål at nedsætte udbyttebeskatning. Det fremgår således af bemærkninger til L202 2008/09, pkt. 3.1, at der med lovforslaget indsættes »... en værnsbestemmelse for at hindre omgåelse af 10 pct. grænsen ved, at flere porteføljeaktionærer lægger deres aktiebesiddelser i et fælles (moder)holdingselskab, der dermed kommer til at eje mere end 10 pct. af aktiekapitalen.« En sådan værnsregel synes ikke nødvendig, hvis der allerede efter dansk skatteret skulle eksistere en generel hjemmel til at »se igennem« lovligt stiftede selskaber på baggrund af en »retmæssig ejer-vurdering«.

I den konkrete sag var det cypriotiske selskab ejer af aktierne i det danske selskab på det tidspunkt, hvor udbyttet blev fastlagt/betalt, ligesom udbytteudlodningerne rent faktisk blev modtaget af dette selskab.

Udbytteudlodninger 2005 og 2006 fra det danske selskab til det cypriotiske selskab repræsenterer hermed gyldige juridiske transaktioner/dispositioner, som ikke kan tilsidesættes, og det er herefter alene nødvendigt at konstatere, at det cypriotiske selskab, opfylder de objektive kriterier for anvendelsen af moder-/datterselskabsdirektivet. Udbytteudlodningerne fra det danske selskab til det cypriotiske selskab skal derfor fritages for dansk kildeskat i overensstemmelse med reglerne i moder-/ datterselskabsdirektivet

*Misbrug af EU-retten.*

EU-Domstolen har gjort gældende, at medlemsstaters beføjelser i henhold til anvendelse af direktiver skal udøves i overensstemmelse med EU lovgivningen. moder-/datterselskabsdirektivets artikel 1, stk. 2, skal derfor fortolkes og anvendes i overensstemmelse med artikel 49 om etableringsfrihed i Traktaten om den Europæiske Unions Funktionsområde (TFEU - tidligere artikel 43 TEF).

Dansk kildeskat på udbytter udloddet til moderselskaber inden for EU medfører derfor en prima facie restriktion for etableringsfriheden, da en lignende beskatning ikke pålægges udbytteudlodninger til danske moderselskaber.

Af SKATs afgørelse fremgår, at beskatning af udbytteudlodninger til det cypriotiske selskab er begrundet i behovet for at forhindre omgåelse af dansk udbyttebeskatning. En sådan begrundelse kan i princippet accepteres i henhold til EU-lovgivningen. SKAT skal dog tillige påvise en subjektiv intention hos skatteyderen om at opnå den givne skattemæssige fordel.

Der er herved henvist til, at koncernen ikke opnåede nogen skattefordele som følge af udbytteudlodningerne, idet koncernen er ultimativt ejet og kontrolleret af det amerikanske børsnoterede selskab. Udbytteudlodningerne ville således også have været fritaget for dansk udbyttebeskatning, hvis udbytterne var blevet betalt direkte til det amerikanske moderselskab.

Samtidig kunne dansk kildeskat på udbytte også være undgået, hvis koncernen - i stedet for et cypriotisk holdingselskab - i stedet havde valgt at stifte et dansk holdingselskab. Der er påpeget, at udbytte, som er modtaget af det cypriotiske selskab i vid udstrækning er anvendt til tilbagebetaling af gæld. Såfremt koncernen havde valgt at etablere et dansk holdingselskab, kunne det danske selskab således have foretaget skattefri udlodning af udbytte til det danske holdingselskab, der efterfølgende kunne have anvendt det modtagne udbytte til tilbagebetaling af gæld, hvilket ikke ville være undergivet dansk kildebeskatning.

Det er således vanskeligt at se, hvordan en helt tilsvarende udbytteudlodning - blot til et cypriotisk holdingselskab - kan undergives dansk beskatning, når den tilsvarende danske situation ikke vil have udløst nogen dansk skat.

Argumentet om forebyggelse eller hindring af misbrug kan derfor ikke anvendes som begrundelse for den forskelsbehandling, som selskaberne udsættes for, idet der jo netop ikke i den konkrete situation er tale om noget misbrug eller omgåelse af dansk beskatning

Der er henvist til EU domstolens sager i C-168/01 (Bosal Holding BV), præmis 26, 79/85 (Segers) og C-212/97 (Centros), præmis 29, C-196/04 (Cadbury-Schweppes), præmis 47 og 64, C-524/04 (Test Clairmants in the Thin Cap Group Litigation), præmis 74.

*Dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern og begrebet »retmæssig ejer«.*

Til støtte for den primære påstand er tillige anført, at udbytteudlodninger til det cypriotiske selskab skal

**1584**

fritages for dansk udbyttebeskatning, jf. dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern.

Det cypriotiske selskab må således anses for at være »den retmæssige ejer« af udbytteudlodningerne og kan ikke anses for udelukkende at være et »gennemstrømningsselskab«, som er etableret for at omgå dansk udbyttebeskatning.

Selskabet har alle de beføjelser mv. i forhold til beslutninger vedrørende aktiebesiddelsen i det danske selskab, samt beslutninger vedrørende anvendelse af de udbytter, som modtages fra selskabet.

De modtagne udbytter fra det danske selskab er i vid udstrækning blevet anvendt til at tilbagebetale gæld. Udbyttet er derfor ikke blot blevet »kanaliseret« til andre koncernselskaber som udbytte.

Generelt hersker der betydelig usikkerhed omkring fortolkning af begrebet »retmæssig ejer«, herunder særligt om begrebet »retmæssig ejer« kan anvendes som værnsregel mod gennemstrømningsselskaber og treaty shopping. Det må således konstateres, at der hverken af dansk eller international retspraksis kan udledes nogen entydig fortolkning af begrebet, ligesom både dansk og international skatteretlig litteratur synes at indikere betydelige vanskeligheder i forbindelse med begrebets anvendelse som værnsregel.

Begrebet »retmæssig ejer« kendes således ikke i intern dansk skatteret, men fremgår imidlertid af de fleste danske dobbeltbeskatningsoverenskomster som en forudsætning for nedsættelse eller frafald af beskatning af bl.a. udbytte, rente, royalty mv. Kravet om »retmæssig ejer« fremgår desuden af rente/royaltydirektivet (direktiv 2003/49/EF).

Dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern indeholder også en bestemmelse om »retmæssig ejer« (»beneficial owner«) i forbindelse med beskatning af udbytteudlodninger, jf. art. 10. Der angives ikke i den forbindelse nærmere retningslinjer for fortolkningen af »retmæssig ejer« og de krav, som der eventuelt kan opstilles i forbindelse hermed.

Det er derfor nærliggende at fortolke begrebet »retmæssig ejer« i overensstemmelse med den betydning, som udtrykket må forventes at skulle tillægges i national dansk skatteret, jf. dobbeltbeskatningsoverenskomstens artikel 3, stk. 2. Der er henvist til artikel af Jakob Bundgaard og Niels Winther-Sørensen i SR-SKAT 2007.395. Herefter må det anses for mest sandsynligt, at de danske domstole vil være tilbøjelig til at anse det selskab, der efter en dansk skatteret anses for rette indkomstmodtager, for også at være »retmæssig ejer«.

I nærværende sag anses det cypriotiske selskab for den rette indkomstmodtager af de udbytteudlodninger, som i 2005 og 2006 blev modtaget fra Selskabet.

I den internationale skatteretlige litteratur synes flere dog også at hævde, at begrebet »retmæssig ejer« må skulle fortolkes ud fra en international skatteretlig betydning, dvs. ud fra en autonom fortolkning.

Der er henvist til den canadiske afgørelse i Prévost-sagen, hvori den canadiske domstol afgjorde, at et hollandsk selskab, som af skattemyndighederne var anset for at være et gennemstrømningsselskab«, var den »retmæssige ejer« af udbetalte udbytter. Endvidere er henvist til Aage Michelsen, International Skatteret, 2003, og til Philip Baker »Progress Report of Subcommittee on Improper Use of Tax Treaties: Beneficial Ownership« af 17. oktober 2008.

SKATs fortolkning af »retmæssig ejer« og den deraf følgende begrænsede skattepligt for udbytteudlodninger fra selskabet, jf. selskabsskattelovens § 2, stk. 1, litra c, synes derfor at bygge på en ufuldstændig analyse og fortolkning af begrebet »retmæssig ejer«, sådan som det finder anvendelse i dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern.

Bestemmelserne om kildebeskatning af udbytte i overenskomsten mellem Danmark og Cypern svarer principielt til de bestemmelser om kildebeskatning af udbytte, som fremgår af OECD modeloverenskomsten. I kommentarerne til modeloverenskomsten fra 1977 anføres det om »retmæssig ejer« i pkt. 12, at:

»efter stk. 2 finder begrænsningen af beskatningen i kildestaten ikke anvendelse i tilfælde, hvor en mellemmand, såsom en agent eller en særligt udpeget person, er indskudt mellem modtager og betaler, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. Stater, der ønsker at gøre dette klarere, kan frit gøre det under bilaterale forhandlinger.«

I forbindelse med 2003-revisionen af OECD's modeloverenskomst udbygges kommentarerne omkring betydningen af »retmæssig ejer«, hvorefter begrebet ikke skal anvendes i en snæver teknisk

betydning, men skal ses i sammenhæng med og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

»… ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.«

### 1585

Det cypriotiske selskab kan ikke anses for et gennemstrømningsselskab, som blot er indsat med det formål at undgå dansk kildeskat på udbytte. Selskabet har således i alle henseender bevaret de sædvanlige selskabsretlige beføjelser i forhold til både ejerskabet af aktierne i det danske selskab og i forhold til det udbytte, som er modtaget i 2005 og 2006.

Det cypriotiske selskab er ikke anvendt for at undgå dansk beskatning via et misbrug af dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern (»treaty shopping«). Udbytteudlodningerne er i sidste ende modtaget som skattepligtige udbytter hos det ultimative amerikanske moderselskab, Network Appliance, Inc.

Udbytteudlodninger direkte fra NetApp Danmark ApS til det amerikanske ultimative moderselskab ville have været fritaget for dansk udbytteskat i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og USA, og anvendelsen af det cypriotiske selskab i den konkrete koncernstruktur giver derfor ikke anledning til en mere lempelig dansk beskatning, end hvad der ellers ville have været tilfældet. Det er derfor vanskeligt at se, hvordan en betaling af udbytter til det cypriotiske selskab skulle kunne anses for misbrug af dobbeltbeskatningsaftalen mellem Danmark og Cypern.

En fortolkning af »retmæssig ejer« i sammenhæng med hensigten og formålet med dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern må derfor føre til, at det cypriotiske selskab skal anses for »den retmæssige ejer«.

Det er herefter konkluderet, at udbytteudlodningerne fra det danske selskab til det cypriotiske selskab vil være fritaget for dansk beskatning i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern, jf. selskabsskattelovens § 2, stk. 1, litra c.

*Dobbeltbeskatningsoverenskomsten mellem Danmark og USA.*

For det tilfælde, at SKATs fortolkning af begrebet »retmæssig ejer« eventuelt måtte anses for gældende ret er gjort gældende, at det danske selskab vil være fritaget for kildeskat som følge af dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Koncernen er ultimativt ejet og kontrolleret af det børsnoterede amerikanske selskab, Network Appliance Inc. Udbytterne fra det danske selskab i 2005 og 2006 er ultimativt endt hos det amerikanske moderselskab, der tillige er blevet beskattet i USA af de modtagne udbytter.

Såfremt det cypriotiske selskab ikke kan anses for »den retmæssige ejer« af udbytteudlodningerne, er det op til skattemyndighederne at fastlægge, hvilket skattesubjekt der i så fald kan anses for »den retmæssige ejer« af udbytteudlodningerne.

Det eneste selskab, der opfylder de betingelser, som af SKAT lægges til grund for vurdering af »retmæssigt ejerskab«, vil være det ultimative amerikanske moderselskab.

Som dokumentation for at udbytterne er videreført til USA-selskabet er henvist til kopi af »Domestic Reinvestment Plan« af 22. marts 2006, og til selvangivelse for selskabet for indkomståret 2005, som indeholder udbytter fra koncernens datterselskaber, herunder udbytter fra det danske selskab. Endvidere er henvist til oversigt over koncernens udbyttekapacitet for regnskabsåret 2005/06, som viser den samlede udbyttekapacitet i relation til udlodning til det amerikanske selskab, samt de disponible midler, herunder udbytteudlodning fra Selskabet. Oversigten beregner ligeledes behovet for yderligere gæld for at finansiere udbytteudlodningen til USA-selskabet på i alt 550 mio. USD. Behovet for gældsfinansiering var 300 mio. USD, som blev tilvejebragt via JP Morgan Bank. Gælden er efterfølgende blevet tilbagebetalt, delvist via udbytteudlodningen fra det danske selskab i 2006.

I supplerende indlæg er nærmere redegjort for udbytteudlodningen. Det fremgår heraf, at udbytteudlodningen i 2005 fra Bermudaselskabet til USA-selskabet på i alt 550 mio. USD, udgør udbytteudlodningen fra datterselskaber mv. for 2005/2006 i alt 300.595.651 USD. Beløbet er ikke nærmere specificeret, men det er anført, at i beløbet indgår udlodningen fra det danske selskab med de 91.450.000 USD for 2005 og med de 15.334.239 USD for 2006. Når udlodningen for 2006 kan indgå i beløbet skyldes det særlige amerikanske regler herom.

Udbytteudlodningerne fra det danske selskab til det cypriotiske selskab i 2005 og 2006 var hermed i sidste ende en del af udbytteudlodningen til USA-selskabet.

Konsekvensen af, at det amerikanske selskab anses for »retmæssig ejer« af udbyttet er, at udbytteudlodningerne fra det danske selskab er fritaget for beskatning i Danmark som følge af dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

SKAT har tidligere afvist anvendelsen af dobbeltbeskatningsoverenskomsten mellem Danmark og USA i relation til udbytteudlodningerne fra det danske selskab med begrundelsen, at begrebet »retmæssig ejer« er et hjælpebegreb, og at spørgsmålet om, hvem der anses for »retmæssig ejer« ikke har betydning for hvem, der anses for at være begrænset skattepligtig.

Efter repræsentantens opfattelse er en sådan fortolkning i direkte modstrid med både dansk og international retspraksis og skatteretlig litteratur.

Der er i herved henvist til Jakob Bundgaards og Niels Winther-Sørensens artikel i SR-SKAT 2007.195, og til afgørelsen i Prévost sagen, hvor spørgsmålet om »beneficial ownership« var afgørende for, om udbytte, der udloddes fra et canadisk selskab til et holdingselskab i Holland, var omfattet af

### 1586

dobbeltbeskatningsoverenskomsten mellem Canada og Holland, eller om udbytte i stedet var omfattet af dobbeltbeskatningsoverenskomsterne mellem Canada og hjemstaterne for de ultimative ejere, Sverige og UK.

Endvidere er henvist til den engelske kommentarer til modeloverenskomstens artikel 10, pkt. 12.2, hvoraf fremgår:

»the limitation of the tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other contracting State«

Opmærksomheden er særligt henledt på ordet: »an intermediary«, som henviser til de personer (agent, nominee og conduit), der efter punkt 12.1 ikke kan være »beneficial owner«. Punkt 12.1 lyder således:

»Where an item of income is received by a resident of a Contracting State acting in the capacity of agent or nominee it would be inconsistent with the object and purpose of the Convention for the

State of source to grant relief or exemption merely on account of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation qualifies as a resident but no potential double taxation arises as a consequence of that status since the recipient is not treated as the owner of the income for tax purposes in the State of residence. It would be equally inconsistent with the object and purpose of the Convention for the State of source to grant relief or exemption where a resident of a Contracting State, otherwise than through an agency or nominee relationship, simply acts as a conduit for another person who in fact receives the benefit of the income concerned. For these reasons, the report from the Committee on Fiscal Affairs entitled Double Taxation Conventions and the Use of Conduit Companies« concludes that a conduit company cannot normally be regarded as the beneficial owner if, though the formal owner, it has, as a practical matter, very narrow powers which render it, in relation to the income concerned, a mere fiduciary or administrator acting on account of the interested parties.«

Også de reale grunde bag kommentarerne taler for resultatet. Kildelandet har således ingen legitim interesse i at beskatte det pågældende udbytte, hvis der ikke - i det mindste - har været tale om treaty shopping, der er egnet til at give den retmæssige ejer en skattemæssig fordel.

Endelig er henvist til Klaus Vogels kommentar til modeloverenskomsten, 5 udg., 2008, s. 861:

»f) Empfänger des Dividenden. Abs. i gilt nur für Dividenden, die an eine im anderen Vertragsstaat ansässige Person gezahlt werden. … Wird an eine Mittelsperson, jedoch zugunsten des an der Kapitalbeteiligung Nutzungsberechtigten geleistet, so ist dies »Zahlung« auch an den Nutzungsberechtigten, auch dieser ist »Empfänger« … Ist die Mittelsperson in einem dritten Staat ansässig, so handelt es sich im Verhältnis zwischen dem Quellenstaat der Dividende und dem Wohnsitzstaat des Nutzungsberechtigten um einen Fall des Art. 10 …«

Det er herefter repræsentantens opfattelse, at både dobbeltbeskatningsoverenskomsten med Cypern og dobbeltbeskatningsoverenskomsten med USA medfører, at udbytteudloddningerne skal fritages for dansk beskatning, jf. selskabsskattelovens 2, stk. 1, litra c.

*SKATs afgørelse er udtryk for en ændring af praksis.*

SKATs afgørelse om pålæg af kildeskat på udbytter er udtryk for en ny og ændret praksis hos skattemyndighederne, som ikke var gældende i 2005 og 2006 på tidspunkterne for udlodning af udbytte i den konkrete sag.

Landsskatterettens afgørelse af 3. marts 2010 (SKM2010.268LSR) var således den første sag om udbytteskat.

Ud over det faktum, at der i 2005 og 2006 var offentliggjort nogen sager vedrørende udbyttebeskatning og retmæssig ejer, fremgår det også af forskellige udtalelser fra skatteministeren i forbindelse med L30 2006/07, at de danske skattemyndigheder aldrig tidligere har tilsidesat udenlandske udbyttemodtagere på grundlag af krav om retmæssig ejer. Der er henvist til spørgsmål 10 af 21. november 2006 og til en udtalelse fra SKAT i Jyllandsposten den 14. september 2010.

Der er henvist til Hans Severin Hansens artikel af 6. juni 2011, Det store hykleri -Om »beneficial owner« sagerne.

*Substansbetragtninger og udbytteindkomstens kilde.*

Udbytteudloddningerne fra NetApp Denmark ApS til NetApp Holdings Ltd. bestod af udbytte og salgsprovenu vedrørende aktierne i Network Appliance B.V.

Udbytteudloddningerne i 2005 og 2006 fra NetApp Denmark ApS til NetApp Holdings Ltd. vedrørte derfor ikke indkomst optjent i Danmark, og udbytteudloddningerne var alene mulige som følge af indkomst optjent i de europæiske datterselskaber.

Såfremt SKATs fortolkning af begrebet »retmæssig ejer« eventuelt måtte anses for gældende ret, gøres gældende, at NetApp Denmark ApS i dette tilfælde ligeledes ikke kan anses for den retmæssige ejer af udbytte og salgsprovenu vedrørende aktierne i Network Appliance B.V. NetApp Denmark ApS kan således ikke i relation til aktiebesiddelsen anses for at have mere substans mv., end hvad der er tilfældet for NetApp Holdings Ltd. i relation til aktiebesiddelsen i NetApp Denmark ApS.

*Hæftelse for ikke-indeholdte skatter - forsømmelighed.*

Subsidiært er gjort gældende, at selskabet ikke har udvist forsømmelighed ved ikke at indeholde

**1587**

udbytteskat, og at selskabet derfor ikke i noget tilfælde kan hæfte for manglende udbytteskat - selv for det tilfælde, at det cypriotiske selskab efterfølgende måtte vise alligevel at have været skattepligtig af de modtagne udbytter, jf. kildeskattelovens § 69, stk. 1.

I forhold til fortolkning af begrebet forsømmelighed må forsømmelighed udgøre en undladelse, som kunne have været undgået, hvis det udbytteudloddende selskab havde udvist den fornødne omhu og agtpågivenhed. Se hertil også SKATs vejledning Indeholdelse af A-skat og AM-bidrag; 2010-2, K.2.2:»Uanset at bestemmelserne har omvendt bevisbyrde, har det i retspraksis vist sig, at det er told- og skatteforvaltningen, der skal bevise, at den indeholdelsespligtige har handlet forsømmeligt.«

Østre Landsret har i TfS2002, 844 konkluderet, at usikkerhed om retsgrundlaget for pligten til at indeholde skat i sig selv bevirkede, at der ikke blev udvist forsømmelighed ved ikke at indeholde skat.

Det er derfor op til SKAT at løfte bevisbyrden for, at det danske selskab har optrådt forsømmeligt ved ikke at have indeholdt udbytteskat i forbindelse med udbytteudloddningerne i 2005 og 2006, hvor retsgrundlaget, som det fremgår af ovenstående, har været behæftet med væsentlige usikkerheder i relation til en fortolkning som den, SKAT lægger til grund for afgørelsen om pålæg af kildeskat.

Hertil skal det endvidere bemærkes, at Landsskatteretten i den første sag om retmæssig ejer og kildeskat på udbytte offentliggjort i SKM2010.268 jo netop afgjorde, at der ikke bestod en indeholdelsespligt vedrørende udbytteudloddninger til et moderselskab i Luxembourg. Sagen er efterfølgende appelleret af skattemyndighederne, men det faktum, at den højeste administrative klageinstans for skattesager afgør, at der ikke har bestået en pligt til indeholdelse dokumenterer i det mindste, at retsgrundlaget på området ikke er entydigt - og at der i relation til indeholdelsespligten for udbytteudloddninger i 2005 og 2006 i det mindste har været væsentlig usikkerhed om fortolkning af det retsgrundlag, som SKAT sager at anvende.

Det danske selskab kan således ikke anses for at have handlet forsømmeligt i 2005 og 2006 ved ikke at have foretaget indeholdelse af udbytteskat i forbindelse med udbytteudloddningerne til det cypriotiske selskab, og det danske selskab hæfter derfor ikke for eventuel ikke-indeholdt udbytteskat, jf. kildeskattelovens § 69, stk. 1.

*Landsskatterettens bemærkninger og begrundelse*

Ifølge selskabsskattelovs § 2, stk. 1, litra c, er selskaber, der har hjemsted i udlandet, som udgangspunkt begrænset skattepligtige af udbytte, jf. 1. pkt. Dette gælder dog ikke udbytte, som oppebæres af et selskab, der ejer mindst 20 % af aktiekapitalen (i 2005 og 2006) i det udbyttegivende selskab i en sammenhængende periode på mindst 1 år, inden for hvilken periode udbytteudloddningstidspunktet skal ligge, jf. 2. og 3. pkt. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter

Copyright © 2023 Karnov Group Denmark A/S

en dobbeltbeskatningsoverenskomst med den stat, hvor selskabet er hjemmehørende, jf. 4. pkt.

Ifølge dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern af 11. februar 1983 artikel 10, stk. 1, kan udbytte beskattes i kildestaten. Den skat, der pålægges, må dog - såfremt modtageren er udbyttets retsmæssige ejer, og denne er et selskab, der direkte ejer mindst 25 % af kapitalen i det udloddende selskab - ikke overstige 10 % af bruttobeløbet af udbyttet.

Bestemmelsen svarer til artikel 10 i OECDs modeloverenskomst. Af kommentar til modeloverenskomstens artikel 10 punkt 12 fremgår blandt andet, at kravet om retmæssig ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Udtrykket »retmæssig ejer« er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse. Af punkt 12.1 fremgår, at en person, der handler i sin egenskab af agent eller mellemmand, ikke kan anses som retmæssig ejer. Endvidere fremgår, at en person, der på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst, ligeledes heller ikke kan anses for retmæssig ejer. Der er henvist til rapport fra Committee on Fiscal Affairs, hvoraf fremgår, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter. Af punkt 12.2 fremgår, at begrænsningen i kildestatens beskatningsret ikke kan benyttes, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og betaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat.

Begrebet »retmæssig ejer« kan herefter ikke uden videre antages at være sammenfaldende med princippet om »rette indkomstmodtager« i dansk skatteret.

Det cypriotiske selskab NetApp Holdings Ltd., der blev stiftet den 5. september 2005 og er direkte ejet af Network Appliance Global Ltd. (Bermuda) og ultimativt ejet af Network Appliance Inc. (USA), købte den 16. september 2005 det danske søsterselskab, NetApp

**1588**

Denmark ApS, af moderselskabet på Bermuda for 90 mio. euro. Købet blev finansieret ved lån fra moderselskabet. Den 25. oktober 2005 solgte det danske selskab sit hollandske datterselskab, Network Appliance BV, til sit hollandske søsterselskab, Network Appliance Holding & Manufacturering BV. Det danske selskab udloddede herefter den 28. september 2005 og den 13. oktober 2006 henholdsvis 565,9 mio. kr. og 92,0 mio. kr. til moderselskabet på Cypern, som anvendte beløbet bl.a. til betaling af selskabets gæld til moderselskabet på Bermuda.

Under disse omstændigheder, hvor der indenfor en kortere periode er foretaget flere af hinanden afhængige transaktioner mellem interesseforbundne parter, herunder parter hjemmehørende i lande, som er beliggende udenfor EU, og hvormed der ikke er indgået dobbeltbeskatningsaftale, påhviler det det danske selskab at godtgøre, at overenskomstens fordele om bortfald af dansk kildeskat skal finde anvendelse.

Efter Selskabets oplysninger blev selskabets udlodning i 2005 til det cypriotiske selskab anvendt til betaling af dette selskabs gæld til moderselskabet på Bermuda. Udlodningen indgik endvidere

sammen med udlodningen i 2006 i moderselskabets udlodning i 2005 til dette selskabs moderselskab i USA.

Det er således ubestridt, at Selskabets udlodninger til moderselskabet på Cypern efter overførslen hertil blev videreoverført til selskabet på Bermuda. Det cypriotiske selskab, som var stiftet umiddelbart forud for erhvervelsen af anparterne i det danske selskab, var i de pågældende år uden egne lokaler eller eget personale, og havde kun meget beskedne driftsudgifter.

Det findes herefter ikke godtgjort, at det cypriotiske selskab kan anses for »den retmæssige ejer« af det modtagne udbytte.

Det cypriotiske selskab er dermed ikke berettiget til overenskomstens skattefrihed for udbytter, jf. artikel 10.

Det bemærkes, at det cypriotiske selskab, hvortil udbytterne fra det danske datterselskab er betalt, er lovligt stiftet og indregistreret på Cypern, hvortil det også er skattepligtigt mv. Selskabet er derfor - uanset at selskabet ikke anses for »retmæssig ejer« af udbyttet - efter dansk ret »rette indkomstmodtager« af udbytterne. Det følger heraf - uanset den evt. videreoverførsel af udbyttet til USA-selskabet - at det er den dansk-cypriotiske dobbeltbeskatningsoverenskomst, der skal anvendes ved vurderingen af evt. kildeskat, jf. selskabsskattelovens § 2, stk. 1, litra c. Hverken den dansk-cypriotiske overenskomst, kommentarerne hertil eller kommentarerne til modeloverenskomsten ses at åbne mulighed for anvendelse af anden overenskomst.

Ifølge direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, artikel 5, fritages udbytte, som et datterselskab udlodder til sit moderselskab, for kildeskat.

I moder-/datterselskabsdirektivets almindelige bestemmelser kan der ikke indlæses et misbrugsforbehold. I artikel 1, stk. 2 gives medlemsstaterne derimod mulighed for at fravige direktivet i tilfælde af skattemisbrug mv.

Af direktivets artikel 1, stk. 2 fremgår, at direktivet ikke [er] til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Danmark har ikke vedtaget lovbestemmelser med dette sigte, men hjemmel til at bortse fra formelt lovlige og korrekte dispositioner i tilfælde af misbrug følger af almindelige retsgrundsætninger, herunder retspraksis. Højesteret har imidlertid ikke fundet grundlag for at tilsidesætte et i øvrigt lovligt stiftet selskab alene med henvisning til, at stiftelsen er foretaget af skattebesparelseshensyn, jf. herved Højesterets domme i SKM2003.482 (Overhold-sagen) og SKM2006.749 (Finwill-sagen).

Det her i sagen lovligt stiftede og fungerende cypriotiske selskab, som er ejer af anparterne i det danske selskab, er således rette indkomstmodtager af udbyttet, som er udloddet fra det danske selskab. Den omstændighed, at det cypriotiske selskabs eneste - eller i det væsentligste eneste - aktivitet er at eje anparter i det danske selskab, medfører ikke at selskabet ikke har erhvervsmæssig drift og herved ikke et andet resultat, jf. herved Højesterets dom i TfS2004.542 (Johnson Holding-sagen).

Som følge heraf er udbyttet i medfør af direktivets artikel 5 fritaget for kildeskat.

Idet beskatningen af udbyttet herefter skal frafaldes efter direktiv 90/435/EØF, følger det af selskabsskattelovens § 2, stk. 1, litra c, at udbyttet ikke er omfattet af den begrænsede skattepligt.

Selskabet har herefter ikke været pligtigt til at indeholde udbytteskat af udbyttet, jf. kildeskattelovens § 65, stk. 5.«

*Supplerende oplysninger om selskaberne og de to udbytteudlodninger*

*NetApp Denmark*

Af NetApp Denmarks årsrapport for 2004/2005, som blev godkendt på selskabets generalforsamling den 28. september 2005,

fremgår, at selskabet havde en nettoomsætning på 10.776.000 kr. og et resultat på 3.000.000 kr. hidrørende fra selskabets aktiviteter i Danmark. Det fremgår endvidere af årsrapporten, at der foreslås en udbytteudlodning på 565.896.000 kr. Af selskabets årsrapport for 2005/2006, som blev godkendt på selskabets generalforsamling den 13. oktober 2006, fremgår, at der foreslås en udbytteudlodning på 92.012.000 kr. svarende til årets resultat på 62.012.000 kr. med tillæg af overført resultat på 30.000.000 kr.

Det er ubestridt, at de to udbyttebeløb ikke var optjent i Danmark, men i NetApp-koncernens øvrige europæiske selskaber.

**1589**

*NetApp Holdings Ltd. (NetApp Cypern)*

Af årsrapporten for perioden 5. september 2005 til 28. april 2006 for NetApp Cypern fremgår, at selskabet i denne periode havde indtægter på 1.076.348 USD, som hovedsagelig hidrørte fra kursgevinster på udenlandsk valuta. Selskabets udgifter, der alene bestod i administrationsudgifter, udgjorde 41.608 USD. Selskabets aktiver pr. 28. april 2006 bestod i en kontantbeholdning på 4.700 USD samt selskabets kapitalandele i NetApp Denmark og NetApp Holding & Manufacturing B.V. (Holland) anført til samlet 18.582.252 USD.

Af NetApp Cyperns årsrapport for perioden 29. april 2006 til 28. april 2007 er der i resultatopgørelsen medtaget en indtægtspost af udbytte på 15.959.481 USD (svarende til ca. 92 mio. kr.). Det fremgår dog af *cash flow*-opgørelsen i årsrapporten, at beløbet ikke blev modtaget i dette regnskabsår.

*NetApp Global Ltd. Inc. (NetApp Bermuda)*

Af en resultatopgørelse for 2005/2006 for NetApp Bermuda fremgår, at selskabet havde en omsætning på 315.449.592 USD pr. 28. april 2006 og renteindtægter på 11.150.752 USD. Desuden er der indtægtsført udbytte på 91.450.000 USD. Periodens udgifter bestod hovedsageligt af en post under kategorien »Cost of Sales« på 105.461.906 USD. Det er ubestridt, at dette beløb dækker over refusion af moderselskabets, NetApp Inc. (NetApp USA), udgifter til forskning og udvikling vedrørende den del af koncernens IP-rettigheder til software mv., som var ejet af NetApp Bermuda. Endvidere er der medtaget en udgiftspost benævnt »General and Administration« på 23.500.682 USD, som er oplyst at være en betaling til NetApp USA som refusion af moderselskabets udgifter vedrørende deltagelse i koncernens aktieincitamentsprogrammer for medarbejdere i koncernens europæiske selskaber.

Af balancen pr. 28. april 2006 fremgår, at NetApp Bermudas aktiver udgjorde i alt 281.147.141 USD, hvoraf 136.708.710 USD bestod af obligationer med kort løbetid og 104.443.296 USD af obligationer med lang løbetid. Kapitalandelene i datterselskaberne var angivet til 55.363 USD. Endvidere fremgår det, at selskabet havde en samlet gældsforpligtelse på 300.113.134 USD, at der var deklareret en udbytteudlodning på 550.000.000 USD, og at selskabets egenkapital efter udlodning ville være negativ med et beløb på 18.965.993 USD.

Gældsforpligtelsen på ca. 300 mio. USD relaterede sig til et midlertidigt lån, som NetApp Bermuda havde optaget til finansiering af udbytteudbetalingen. Selskabet havde stillet en obligationsbeholdning på 241 mio. USD til sikkerhed for lånet. Det er ubestridt, at samtlige obligationer, som blev stillet til sikkerhed, var erhvervet af NetApp Bermuda forud for, at selskabet modtog udbyttet på 91,5 mio. USD den 28. oktober 2015.

Der er ikke fremlagt regnskab for NetApp Bermuda for regnskabsåret 2006/2007.

*NetApp Inc. (NetApp USA)*

I note 7 til årsrapporten for NetApp USA for perioden 1. maj 2004 til 30. april 2005, underskrevet af selskabets ledelse den 8. juli er anført:

»…

U.S. income taxes are not provided on a cumulative total of approximately $355,000 of undistributed earnings for non-U.S. subsidiaries. We currently intend to reinvest these earnings in operations outside the U.S. The American Jobs Creation Act of 2004 (the Jobs Act) creates a temporary incentive for U.S. corporations to repatriate accumulated income earned abroad by providing an 85% dividend-received deduction for certain dividends from certain non-U.S. subsidiaries. The deduction is subject to a number of limitations, and we are currently considering recently issued Treasury and IRS guidance on the application of the deduction. We are not yet in a position to decide whether, and to what extent, foreign earnings that have not yet been remitted to the U.S. might be repatriated. Based on the analysis to date, however, it is reasonably possible that as much as $355,000 might be repatriated, with a respective tax liability of up to $15,000. We expect to be in a position to finalize our analysis during the third quarter of fiscal 2006. ….«

I et dokument betegnet »Section 965 Domestic Reinvestment Plan« for skatteåret med slutning 30. april 2006, underskrevet den 22. marts 2006 af CEO i NetApp USA, Daniel J. Warmenhoven, fremgår, at selskabet forventede at modtage ekstraordinært udbytte på 404.500.000 USD omkring den 7. april 2006 fra NetApp Bermuda. Dokumentet indeholder desuden en nærmere beskrivelse af, hvordan selskabet ville investere udbyttet i USA i overensstemmelse med den ordning, som var etableret med The American Jobs Creation Act.

I årsrapporten for NetApp USA for perioden 1. maj 2005 til 30. april 2006, underskrevet af selskabets ledelse den 11. juli 2006, anføres på side 39, 4. afsnit:

»…

Prior to fiscal year 2006, our current effective tax rate assumed that U.S. income taxes were not provided for undistributed earnings of certain non-U.S. subsidiaries. However, pursuant to the one-time incentive created under Section 965 of The American Jobs Creation Act of 2004 … our foreign subsidiaries remitted approximately $405.5 million in accumulated earned income on which we incurred approximately $22.5 million in federal and state income taxes in the fourth quarter of fiscal year 2006….«

I årsrapportens note 8 »Income Taxes« anføres videre:

»…During the fourth quarter of 2006, the Company incurred a charge of approximately $22,482 for federal and state income taxes related to the repatriation of approximately $405.548 of accumulated income earned

**1590**

by its foreign subsidiaries. As a result of this dividend, there were no significant unremitted earnings held by our foreign subsidiaries at April 30, 2006.«

I NetApp USA's selvangivelse til de amerikanske myndigheder, dateret 10. januar 2007, for perioden 30. april 2005 til 28. april 2006, har selskabet angivet at have modtaget udbytte på 458.606.705 USD.

*De to udbytteudlodninger*

Den 25. oktober 2005 overførte Network Appliance B.V. (Holland) 91.450.533 USD til NetApp Denmark. Beløbet blev den 27. oktober 2005 videreoverført fra NetApp Denmark til NetApp Cypern, som dagen efter, den 28. oktober 2005, videreoverførte beløbet til NetApp Bermuda. Her blev udbyttet i løbet af november 2005 anbragt i letomsættelige obligationer. Obligationerne blev solgt igen i perioden op til den 3. april 2006 med tab.

Den 3. april 2006 overførte NetApp Bermuda 550 mio. USD til NetApp USA.

Det er ubestridt, at det kun var ca. 405 mio. USD ud af de 550 mio. USD, som NetApp USA modtog fra NetApp Bermuda, som var skattepligtigt udbytte efter de amerikanske skatteregler. Den resterende del af beløbet skulle ifølge de amerikanske skatteregler anses for skattefri »return of base«, dvs. tilbagebetaling af indskudt kapital.

NetApp Denmark har oplyst, at det andet udbytte på 92.012.000 kr. henstod hos NetApp Denmark i ca. 4 år som et lån, og at NetApp Cypern oppebar renteindtægter af lånet i denne periode. SKAT har i den forbindelse rejst en sag mod NetApp Denmark om hæftelse for manglende indeholdelse af kildeskat vedrørende renterne. Udbyttet blev i 2010 betalt til NetApp Cypern, som ligeledes i 2010 videreoverførte udbyttet til NetApp Bermuda som yderligere afdrag på gæld.

*B-2173-12 Skatteministeriet mod TDC A/S*

*Landsskatterettens kendelse*

Af Landsskatterettens kendelse af 13. marts 2012 fremgår bl.a.: »Spørgsmålet til SKAT var følgende:

1. Er udbytte udloddet fra TDC A/S (»TDC«) til NTC Holding G.P. & Cie S.C.A. (NTC«) skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., og dermed fritaget for dansk kildeskat?

2. Er udbyttet udloddet fra TDC til NTC skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 3. pkt. og dermed fritaget for dansk kildeskat?

Skat har besvaret de stillede spørgsmål således:

Spørgsmål 1: Nej

Spørgsmål 2: Nej

*Landsskatterettens afgørelse*

Landsskatteretten ændrer besvarelsen således:

Spørgsmål 1: Nej, se svaret

Spørgsmål 2: Ja, se svaret

…

*Sagens oplysninger*

NTC Holding G.P. & Cie S.C.A. (»NTC«) er i Luxembourg registreret selskab, der blev stiftet af NTC Parent S.á.r.l., Luxembourg, i 2009. NTC Parent S.á.r.l. ejer størstedelen af kapitalen i NTC. Den resterende del af kapitalen (mindre end 1 %) ejes af NTC Holding G.P. S.á.r.l., Luxembourg.

Ifølge repræsentanten skal det lægges til grund, at NTC, NTC Parent S.á.r.l. og NTC Holding G.P. S.á.r.l. er gyldigt stiftede og eksisterende i henhold til de for selskaberne gældende regler i Luxembourg.

NTC er et luxembourgsk selskab af typen »societe en commandite par actions« og er således et af de selskaber, der er optaget på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a [i] moder-/datterselskabsdirektivet. Efter intern luxembourgsk skatteret betragtes NTC som et selvstændigt skattesubjekt og selskabet er underlagt luxembourgsk selskabsskat (»impot sur le revenu des collectives«). Efter intern dansk skatteret anses selskabet, der i alt væsentlighed svarer til et dansk kommanditselskab, derimod anses for et transparent selskab.

I 2010 erhvervede NTC en større aktiepost i TDC, og NTC ejer p.t. 59.1 % af aktierne i TDC. Aktierne i TDC er herudover ejet af mere end 38.000 aktionærer.

TDC koncernen er den førende leverandør af kommunikations- og underholdnings-løsninger i Danmark med en position og tilstedeværelse i alle de nordiske lande. TDC er noteret på NASDAQ OMX.

Koncernstrukturen ser herefter således [ud]:



TDC var forud for NTC's overtagelse af selskabet ejet af NTC SA., der var ejet af NTC Parent S.á.r.l., der igen er ejet af kapital-fondene: Permira, Apax, Blackstone, Providence og KKR. TDC (eller en andel heraf) blev således i 2005 overtaget af kapitalfondene via diverse selskaber, idet erhvervelsen blev delvis finansieret ved lån

**1591**

fra kapitalfondene. I den forbindelse udgjorde NTC Parent S.á.r.l.'s lån til kapitalfondene mv. pr. 31. december 2006 i alt ca. 14,3 mia. kr. Størrelsen af lånet ved indgivelsen af anmodningen om bindende svar var ca. 2,0 mia. Euro. Forskellen i forhold til 31. december 2006 kan henføres til renter.

Repræsentanten har oplyst, at TDC A/S påtænker at udlodde udbytte til NTC svarende til 2,18 kr. pr. aktie i 3. kvartal 2011 svarende til en samlet udlodning på ca. 6 mia. kr.

Videre er oplyst, at da NTC er en selvstændig enhed med selvstændig ledelse og beslutningskompetence, kan det i sagens natur ikke på forhånd og med sikkerhed vides, om og hvordan ledelsen i NTC rent faktisk vil træffe beslutning om at disponere over det modtagne udbytte fra TDC. Da Skatteministeriet har oplyst, at der efter ministeriets opfattelse ikke kan svares på de stillede spørgsmål, hvis det ikke kan oplyses, hvordan NTC antages at ville disponere over det modtagne udbytte fra TDC, er oplyst, at følgende kan lægges til grund for det bindende svar:

Det antages, at størstedelen af udbyttet vil blive udloddet som udbytte af NTC til selskabets ejere NTC Holding G.P. og NTC Parent S.á.r.l., og at størstedelen af udbyttet udloddet fra NTC til NTC Holding G.P. vil blive udloddet som udbytte til NTC Holding G.P's ejer NTC Parent S.á.r.l. En mindre del af udbyttet (formentlig mellem 3 % og 5 %) antages at ville blive anvendt af NTC, NTC Holding G.P. og NTC Parent S.á.r.l til betaling af omkostninger eller hensat til betaling af forventede omkostninger. Det antages videre, at udbytte udloddet til NTC Parent S.á.r.l vil blive betalt (som udbytte og/eller renter og/eller afdrag på gæld) til selskaber, der er kontrolleret af de enkelte kapitalfonde eller NTC Parent S.á.r.l. 's kreditorer. Det antages tillige, at beløb betalt af NTC Parent S.á.r.l til selskaber, der er kontrolleret af de enkelte kapitalfonde, vil blive overført til de ultimative investorer i kapitalfondene, men det vides ikke på hvilken måde sådanne overførsler vil finde sted, eller hvordan de vil blive behandlet skattemæssigt.

Skattemyndighederne i Luxembourg har bekræftet, at NTC er »retmæssig ejer« af udbytte fra TDC, og, der er således fremlagt

certifikat fra skattemyndighederne i Luxembourg, Certificate of Residence (Luxembourg), dateret 5. maj 2011, og hvori det er udtalt:

»The Tax Authorities of Luxembourg - Corporate Tax Office 6 - certify that, to the best of their knowledge and in conformity with the income tax regulations applicable in Luxembourg,

NTC Holding G.P. & CTE S.C.A.:

•Is a company within the meaning of Article 2, paragraph I of the Council Directive of 23 July 1990 (90/435EEC)

•Is effectively managed in Luxembourg within the meaning of Paragraph 15(1) and (3) of the »Loi d' adaptation fiscale« of 16 October 1934 and has its central administration in Luxembourg within the meaning of Article 159 of the Luxembourg lncome Tax Law,

•Is resident in the Grand-Duchy of Luxembourg within the meaning of Article 4 of the Tax Convention between Luxembourg and Denmark,

•Is subject to corporate tax without any possibility of an option or being exempt

•Is the beneficial owner of any dividend paid on its shares held in TDC A/S or any other income derived there from.«

*Skatterådets afgørelse*

Skatterådet har besvaret de stillede spørgsmål med nej.

*Spørgsmål 1:*

Den nuværende bestemmelse i selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., er indført med lov nr. 1375 af 20. december 2004. Formålet med denne lov var at implementere ændringerne af moder-/datterselskabsdirektivet (2003/1 23/EØF).

En af ændringerne i direktivet var, at der på listen over selskabstyper omhandlet i direktivet blev optaget selskaber, der anses for selskabsskattepligtige i den medlemsstat, hvor de er hjemmehørende, men anses for skattemæssigt transparente i andre medlemsstater.

Der blev derfor ved implementeringen i Danmark vedtaget særlige regler for så vidt angår udbytter, der tilfalder selskaber hjemmehørende i et EU-land (men som anses for at være skattemæssigt transparent i Danmark) fra dansk datterselskab, således at disse (efter danske regler) transparente selskaber - under de samme betingelser - blev tildelt den samme skattefritagelse som andre moderselskaber omhandlet af direktivet.

Den vedtagne ordlyd af bestemmelsen ved lov nr. 1375 af 20. december 2004 var følgende:

»Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber som nævnt i 2. pkt., der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet.«

Det fremgik således klart, at de transparente moderselskaber skulle være moderselskaber som nævnt i bestemmelsens 2. pkt. Selskabsskattelovens § 2, stk. 1, litra c, fik dermed følgende udformning:

»c) oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, bortset fra udlodninger fra obligationsbaserede investeringsforeninger som nævnt i aktieavancebeskatningslovens § 2 d, stk. 3, eller oppebærer afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af

**1592**

et selskab m. v. (moderselskabet), der ejer mindst 10 pct. af aktiekapitalen i det udbytte-givende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Ved udbytteudlodninger

i kalenderårene 2005 og 2006 udgør den i 2. pkt. nævnte ejerandel dog 20 pct., og ved udbytteudlodninger i kalenderårene 2007 og 2008 udgør den i 2. pkt. nævnte ejerandel 15 pct. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller en stat, hvor selskabet er hjemmehørende. Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber som nævnt i 2. pkt., der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet,«

Et moderskab var (og er) alene et »moderselskab som nævnt i 2. pkt.«, hvis beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende, jf. således 4. pkt.

De transparente selskaber skulle således opfylde de samme betingelser som andre moderselskaber, der ikke var skattepligtige af udbytter fra danske datterselskaber. Det var således ikke hensigten, at de transparente selskaber skulle stilles bedre end andre moderselskaber.

Ved L 202 (lov nr. 525 af 12. juni 2009) blev selskabsskattelovens § 2, stk. 1, litra c, omskrevet, således at det tidligere 2. pkt. (var i mellemtiden blevet 3. pkt.) i stedet fik følgende udformning:

»Skattepligten omfatter ikke udbytte af datterselskabsaktier, jf. aktieavancebeskatningslovens § 4 A, når beskatningen af udbytter fra datterselskabet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor moderselskabet er hjemmehørende.«

Samtidigt blev 5. pkt. ændret som følge af omskrivningen af 3. pkt., idet henvisningen til »som nævnt i 3. pkt.« bortfaldt. Efter bemærkningerne til ændringen er der alene tale om en »konsekvensændring«. Der er således ikke tiltænkt materielle ændringer med sletningen af henvisningen til 3. pkt.«.

Udtrykket »moderselskab« i 5. pkt. skal derfor forstås som et moderselskab omhandlet af de forudgående punktummer i § 2, stk. 1, litra c.

Ved ændringerne af moder-/datterselskabsdirektivet (2003/123/EØF), skete der således en udvidelse af de selskaber, der var optaget på listen over selskabstyper omhandlet af direktivet, og herunder med selskaber, der anses for selskabsskattepligtige i den medlemsstat, hvor de er hjemmehørende, men anses for skattemæssigt transparente i andre medlemsstater.

Ved implementeringen af ændringsdirektive[t] og indførelsen af 5. pkt., i selskabsskattelovens § 2, stk. 1, litra e, er de transparente selskaber nu sidestillet med øvrige udenlandske selskaber optaget på listen i moder-/datterselskabsdirektivet (2003/1 23/EØF), og der er altså ikke tale om en udvidet beskyttelse af transparente selskaber. De bliver blot sidestillet med udenlandske selskaber, der efter dansk ret anses for at være selvstændige skattesubjekter.

Det skal derfor undersøges, om kildeskatningen ved en udlodning til NTC skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dob-

beltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende. Dette medfører, at det skal undersøges, om NTC er retmæssig ejer af udbytteudlodningen.

I henhold til Skatteministeriets nedenstående besvarelse af spørgsmål 2, finder Skatteministeriet ikke, at NTC kan anses for »retmæssig ejer« af de påtænkte udbytteudlodninger. Det påtænkte udbytte fra TDC til NTC anses ikke for at være udbytte, hvor der skal ske frafald eller nedsættelse af beskatningen efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter dobbeltbeskatningsoverenskomst mellem Danmark og Luxembourg.

Skatterådet finder derfor, at beskatningen af udbytter fra TDC til NTC ikke er fritaget for kildeskat efter selskabsskattelovens § 2, stk. 1, litra c, 5. pkt.

Skatterådet har herefter besvaret spørgsmål 1 med et nej.

*Spørgsmål 2:*

Det følger af selskabsskattelovens § 2, stk. 1, litra c, at udbytter fra danske selskaber, der udbetales til udenlandske selskaber, er begrænset skattepligtige her i landet, medmindre en sådan beskatning skal frafaldes efter EU's moder-/datterselskabsdirektiv, direktiv 90/435 EØF eller en dobbeltbeskatningsoverenskomst.

Når der anvendes et holdingselskab i et andet EU-land, opnår koncernen som udgangspunkt, at der ikke

**1593**

kan indeholdes kildeskat på udbytter fra Danmark på grund af bestemmelser i moder-/datterselskabsdirektivet eller dobbeltbeskatningsoverenskomsterne.

*Retmæssig ejer*

Det er imidlertid Skatteministeriets opfattelse, at hverken moder-/datterselskabsdirektivet eller den dansk-luxembourgske dobbeltbeskatningsoverenskomst afskærer Danmark fra at indeholde kildeskat af udbyttebeløbet, såfremt det luxembourgske selskab ikke kan anses for retmæssig ejer (»beneficial owner«) af udbyttebeløbet.

Udtrykket »retmæssig ejer« har været benyttet i OECD's Modelkonvention og kommentarerne hertil siden revisionen af modelkonventionen i 1977.

Modelkonventionens kommentarer om retmæssig ejer er løbende blevet præciseret, og der er efter Skatteministeriets opfattelse ikke grundlag for at hævde, at der herved er sket materielle ændringer i relation til, hvad der forstås ved udtrykket.

I kommentarerne til Modelkonventionen er spørgsmålet om forståelsen af udtrykket »retmæssig ejer« navnlig behandlet i punkt 12, 12.1 og 12.2 til artikel 10, hvori der er anført:

»12. Kravet om retmæssigt ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt.. til en person, der er hjemmehørende », således som de anvendes i artiklens stk. 1. Det gøres herved klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

12.1 Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kilde-staten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men dobbeltbeskatning opstår som følge heraf da ind-

komstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies », at et »gennemstrømnings-selskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

12.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kilde-statens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og betaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.«

Der er efter Skatteministeriets opfattelse gode argumenter for at forstå disse kommentarer således, at det er udbyttemodtagerens (reelle) manglende dispositionsret, der er et væsentligt omdrejningspunkt for fastlæggelsen at om udbyttemodtageren skal anses for retmæssig ejer, således at kildeskat skal frafaldes/nedsættes.

Det er i kommentarerne til Modelkonventionen understreget, at begrebet »retmæssig ejer« i overenskomserne ikke anvendes i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at forhindre skatteunddragelse og skatteundgåelse.

Efter Skatteministeriets opfattelse er det således en grundlæggende forudsætning for pålæggelse af kildeskat på udbytter, der udloddes til et moderselskab i et DBO-land, og som har begrænsede eller endog ikke-eksisterende (reelle) beføjelser til at disponere over udbyttebeløbet, at det konkret kan påvises eller sandsynliggøres, at transaktionen har skatteundgåelse eller -unddragelse (eller »misbrug«) som formål eller konsekvens.

Af kommentarerne fremgår, at dobbeltbeskatningsoverenskomsten ikke i sig selv afskærer/begrænser kildestatsbeskatning af udbytte, medmindre »den retmæssige ejer« af udbyttet er hjemmehørende i den anden kontraherende stat. Afgørende for fastlæggelsen af »beneficial owner« er efter kommentarerne, om den formelle udbyttemodtager blot »fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst«.

Det er Skatterådets opfattelse, at kommentarerne til modelkonventionen må forstås således, at det ikke i sig selv er afgørende, om udbyttebeløbene umiddelbart

**1594**

videreføres til de bagvedliggende ejere, idet det afgørende er den formelle beløbsmodtagers manglende beføjelse til selv at råde over de udbetalte beløb, idet de bagvedliggende ejere fuldstændigt afgør, hvordan der skal forholdes med indkomne beløb. Denne fortolkning bekræftes også af den i kommentarerne omtalte rapport fra Committee of Fiscal Affairs.

Når der anvendes et holdingselskab i et andet EU-land, opnår koncernen som udgangspunkt, at der ikke kan indeholdes kildeskat på udbytter fra Danmark på grund af bestemmelser i moder-/datter-

selskabsdirektivet. Endvidere indeholder dobbeltbeskatningsoverenskomster bestemmelser herom.

Skatterådet har ikke fundet, at holdingselskabskonstruktioner aldrig skal respekteres, således at et udbyttemodtagende holdingselskab ikke kan påberåbe sig en dobbeltbeskatningsoverenskomst indgået med kildelandet med henblik på fritagelse for eller begrænsning af kildelandsbeskatning.

Efter Skatterådets opfattelse afskærer en dobbeltbeskatningsoverenskomst dog ikke kildestatsbeskatning, når de bagvedliggende ejere - som ikke selv er hjemmehørende i et land, hvormed der er indgået en dobbeltbeskatningsoverenskomst - på forhånd eller »automatisk« har disponeret over beløbene, eller det i øvrigt må lægges til grund, at holdingselskabet ikke har nogen praktisk mulighed for at disponere på anden måde end fastlagt af ejerne, og når det fremgår, at holdingselskabet i relation til de konkrete transaktioner anvendes for at muliggøre skatteunddragelse - her for at undgå kildeskat på udbytter.

Om den konkrete transaktion er oplyst, at TDC påtænker at udlodde ca. 6 mia. kr. i 3. kvartal 2011 til dets aktionærer. NTC (Luxembourg) vil som følge af dets ejerskab på 59 % af TDC's aktier modtage godt 3,5 mia. kr.

Ved besvarelsen har spørgers repræsentant oplyst, at det kan lægges til grund, at størstedelen af udbyttet vil blive udloddet som udbytte af TDC til selskabets ejere NTC, og at størstedelen af udbyttet udloddet fra NTC til NTC Holding GP vil blive udloddet som udbytte til NTC Holding GP's ejer NTC Parent S.á.r.l. En mindre del af udbyttet (formentligt mellem 3 % og 5 %) antages at ville blive anvendt af [N]TC, NTC Holding GP og NTC Parent S.á.r.l til betaling af omkostninger eller hensat til betaling af forventede omkostninger. Spørger antager endvidere, at udbytte udloddet til NTC Parent S.á.r.l. vil blive betalt (som udbytte og/eller renter og/eller afdrag på gæld) til selskaber, der er kontrolleret af de enkelte kapitalfonde eller NTC Parent S.á.r.l.'s kreditorer. Spørger antager tillige, at beløb betalt af NTC Parent S.á.r.l. til selskaber, der er kontrolleret af de enkelte kapitalfonde, vil blive overført til de ultimative investorer i kapitalfondene, men spørger er ikke bekendt med på hvilken måde, sådanne overførsler vil finde sted, eller hvordan de vil blive behandlet skattemæssigt.

Skatterådet finder på baggrund af det oplyste, at udbyttet må anses for at ville strømme igennem de to holdingselskaber i Luxembourg, og at holdingselskaberne hverken kan påberåbe sig dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg eller moder-/datterselskabsdirektivet, idet der på forhånd reelt vil være disponeret over udbytteudlodningen, som holdingselskaberne ikke vil have nogen selvstændig økonomisk interesse i at oppebære. Holdingselskaberne kan dermed ikke anses for »retmæssig ejer« af udbytteudlodningen på godt 3,5 mia. kr.

Dette indebærer, at TDC skal indeholde kildeskat af udbytteudlodningen til NTC, jf. selskabsskattelovens § 2, stk. 1, litra c, 3. pkt.

Det er herved ikke fundet afgørende, at NTC i Luxembourg anerkendes som et selvstændigt rets- og skattesubjekt.

Endvidere er det ikke fundet afgørende, at NTC råder over lokaler i Luxembourg, har en person ansat og har indestående på bankkonto m.v. Det afgørende er derimod, om NTC i forbindelse med den påtænkte udlodning kan anses for at være »retmæssig ejer« (beneficial owner) af beløbet, eller reelt må anses for at være en gennemstrømningsenhed for en anden.

*EU-retten*

Det er Skatterådets opfattelse, at der ikke er noget til hinder for at afskære selskabet, som er etableret i en anden medlemsstat fra at påberåbe sig EU-retten - herunder de harmoniserede regler, der følger af bl.a. moder-/ datterselskabsdirektivet - når det må lægges til grund, at etableringen af et holdingselskab i en anden medlems-

stat »tager sigte på at undgå kildeskat på betalinger til ikke-europæiske foretagender, hvis en sådan konstruktion ikke tjener noget kommercielt formål «, jf. Europa-kommissionens fortolkning af »Rent kunstige arrangementer« offentliggjort i EUT 2008, C 116/13.

I moder-/datterselskabsdirektivets artikel 1, stk. 2, er det da også fastsat, at »dette direktiv ikke er til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug«.

Denne fortolkning har efter Skatterådets opfattelse tillige støtte i retspraksis fra Domstolen, jf. bl.a. Cadbury Schweppes-dommen (sag C-196/04, Cadbury Schweppes, Saml. 2006, s. 1-7995) og Halifax-dommen (sag C-25 5102, Halifax, Saml. 2006, s. 1-1609).

Skatterådet er derfor af den opfattelse, at EU-retten ikke i videre omfang end de på Modelkonventionen baserede dobbeltbeskatningsoverenskomster kan anses for at afskære Danmark fra at gennemføre en kildestatsbeskatning af renter og udbytter, når de pågældende beløbs »beneficial owners« er personer hjemmehørende uden for EU.

**1595**

*Supplerende indlæg:*

I et supplerende indlæg til klagen er anført, at ved indgivelse af en anmodning om et bindende svar påhviler det den, der ønsker et sådant svar, at oplyse alle relevante forhold på en entydig måde. Faktum skal altså ligge fast.

TDC's anmodning om at opnå et bindende svar og selskabets efterfølgende indlæg til Skatterådet, samt klagen til Landsskatteretten indeholder kun sparsomme oplysninger vedrørende de relevante faktiske omstændigheder.

Der foreligger f.eks. ingen regnskaber, bestyrelsesmødereferater m.v. for de luxembourgske selskaber. Der foreligger heller ingen oplysninger om, hvilke aftaler der er indgået vedrørende behandlingen af afkast, som kapitalfondene løbende opnår fra target-selskabet (her klageren).

Klageren har heller ikke på en entydig måde redegjort nærmere for, på hvilke(n) måde(r) på hvilke(t) tidspunkt(er) og til hvilke(t) subjekt(er) det beløb, der påtænkes udloddet, vil blive kanaliseret videre og gennem ejerkredsen, samt om og i givet fald, hvordan de involverede beløb vil blive beskattet hos de relevante beløbsmodtagere. Ved bedømmelsen af, om selskabets spørgsmål 2 skal besvares med »ja« eller »nej«, vil sådanne oplysninger efter SKATs opfattelse nødvendigvis skulle indgå.

Den faktuelle usikkerhed illustreres bl.a. af oplysningerne i det bindende svar, side 2, sidste afsnit, hvor klageren »antager« en række forhold vedrørende videreudlodning mv. af den påtænkte udbytteudlodning. Klageren anerkender, at hovedparten af det udloddede beløb »antagelig« vil blive betalt videre til bagvedliggende ejere eller kreditorer, men nærmere oplysninger om baggrunden for denne antagelse er klageren altså ikke fremkommet med.

Efter SKATs opfattelse må det imidlertid lægges i betragtning, at selskaberne i Luxembourg ikke har andre aktiviteter end at fungere som holdingselskaber i forhold til klageren, og at det ligger i selve kapitalfondskonstruktionen, at holdingselskaber af denne karakter vil videreføre løbende afkast til den bagvedliggende ejerkreds, medmindre holdingselskaberne har påtaget sig eller må forventes at påtage sig forpligtelser, som indebærer, at holdingselskaberne »selv« skal bruge beløbet helt eller delvis.

SKAT anser det allerede af hensyn til de involverede beløb for helt urealistisk, at der ikke på forhånd foreligger, eller i hvert fald på udlodningstidspunkt vil foreligge, en stillingtagen til, hvordan den påtænkte udlodning (på ca. 6 mia. kr.) skal anvendes - herunder i relation til, hvor pengene skal kanaliseres hen, til hvilke(t) formål samt på hvilke(t) tidspunkt(er). Selv hvis det antages, at en sådan udtrykkelig stillingtagen ikke vil foreligge, er det imidlertid på det

Copyright © 2023 Karnov Group Denmark A/S

anførte baggrund ministeriets opfattelse, at det må anses for på forhånd at være givet - hvilket klageren jo reelt også anerkender - at beløbet umiddelbart vil blive viderekanaliseret til den bagvedliggende ejerkreds.

Oplysningerne om sagens faktiske omstændigheder - og navnlig altså, at det efter klagerens egne oplysninger kan lægges til grund, at det udloddede beløb, muligvis efter fradrag af et mindre beløb til dækning af omkostninger, i umiddelbar forlængelse af udlodningen vil blive videreført til den bagvedliggende ejerkreds - indebærer efter ministeriets opfattelse, at det er med rette, at Skatterådet har svaret »nej« på spørgsmål 2.

Klageren har oplyst, at en »mindre del af udbyttet (formentlig mellem 3 % og 5 %) antages at ville blive anvendt af NTC, NTC Holding GP og NTC Parent S.á.r.l. til betaling af omkostninger eller hensat til betaling af forventede omkostninger«.

Det er efter SKATs opfattelse ikke afgørende for bedømmelsen af, om der er skattefrihed efter selskabsskattelovens § 2, stk. 1, litra c, 3. pkt., at man i koncernen - eventuelt - måtte vælge at lade en mindre del af det udloddede beløb blive anvendt hos de mellemliggende selskaber - som i øvrigt er uden drift - til at betale aktuelle eller forventede omkostninger.

Det må konstateres, at holdingselskabernes eventuelle omkostninger tværtimod blot vil være en følge af den bagvedliggende ejerkreds' anvendelse af mellemliggende holdingselskaber som redskab til at søge at undgå kildeskat ved betaling af renter og udbytter. Afholdelsen af sådanne omkostninger ændrer derfor ikke grundlæggende på, at det udloddede beløb umiddelbart strømmer videre til den bagvedliggende ejerkreds.

Under alle omstændigheder kan det forhold, at en mindre del af det udloddede beløb ikke faktisk strømmer videre ud af Luxembourg, højst begrunde, at der ikke skal indeholdes kildeskat af denne (uoplyste) mindre del af udlodningen, hvilket selvsagt ikke kan begrunde en ændring af det bindende svar.

Klageren har endvidere henvist til, at skattemyndighederne i Luxembourg har attesteret, at NTC »to the best of their knowledge is the beneficial owner of any dividend paid on his shares held in TDC or any other income derived there from ». Dette er uden betydning for nærværende sag. Bedømmelsen af, om der er skattefrihed efter selskabsskattelovens § 2, stk. 1. litra c, 3. pkt., skal selvsagt foretages af de danske skattemyndigheder.

I øvrigt kan den fremlagte attest og standardiseret præg, og intet tyder på, at skattemyndighederne i Luxembourg har foretaget en bedømmelse af den påtænkte disposition, som det bindende svar omhandler (eller nogen som helst andre dispositioner mv.).

Landsskatteretten har i en afgørelse offentliggjort i SKM2010.268, bl.a. anført, at der ikke i dansk ret er

**1596**

hjemmel til at nægte et selskab de fordele, der følger af moder-/datterselskabsdirektivet, når selskabet er rette indkomstmodtager af udbyttet, og når der foretagne dispositioner ikke kan tilsidesættes ud fra realitetsbetragtninger.

I modsætning hertil har retten i sin praksis anerkendt, at der ikke strider mod rente-/royaltydirektivet at indeholde kildeskat, når det i EU hjemmehørende selskab, hvortil renterne i første omgang betales, ikke er renternes »retmæssige ejer«. Retten har i den forbindelse lagt vægt på, at fritagelsen for kildeskat efter direktivets ordlyd forudsætter, at modtageren er renternes »retmæssige ejer«.

Efter SKATs opfattelse er der ikke grundlag for at behandle udbytter anderledes end renter i relation til muligheden for indeholdelse af kildeskat, når den formelle modtager af beløbet er hjemmehørende i EU, men ikke er beløbets »retmæssige ejer«. Dette er der en række grunde til:

For det første følger det af EU-Domstolens praksis, at de fordele, der følger af EU-retten, ikke kan opnås, når der er tale om transaktioner omfattet af det generelle EU-retlige misbrugsbegreb. EU-retlige regler, der indebærer en harmonisering af medlemsstaternes lovgivning, skal fortolkes i lyset heraf.

Det er derfor også ministeriets opfattelse, at EU-Domstolens praksis viser, at der ikke er noget til hinder for at afskære selskaber etableret i en anden medlemsstat fra at påberåbe sig EU-retten - herunder de harmoniserede regler, der følger af bl.a. moder-/datterselskabsdirektivet - der må lægges til grund, at etableringen af et holdingselskab i en anden medlemsstat »tager sigte på at undgå kildeskat på betalinger til ikke-europæiske foretagender, hvis en sådan konstruktion ikke tjener noget kommercielt formål », jf. Kommissionens fortolkning af »Rene kunstige arrangementer« i Kommissionens meddelelse om Anvendelsen af foranstaltninger til bekæmpelse af misbrug inden for direkte beskatning - i EU og i relation til tredjelande (Kom 2007.785).

Fra EU-Domstolens praksis om misbrugsbegrebet er henvist til Cadbury Schweppes-dommen (sag C- 196/04, Cadbury Schweppes, Saml. 2006, s.I-7995), Halifax-dommen (sag C-255/02, Halifax, Saml. 2006, s. I-1609) og Part Servicedommen (sag C-425/06, Part Service Srl.).

Ved vurderingen af hovedformålet med etableringen har EU-Domstolen her lagt særlig vægt på, om der er substans i selskabets domicilland, eller om der er tale om et rent kunstigt arrangement, som ikke kun indebærer formel etablering, men også faktisk udøvelse af økonomisk virksomhed.

SKAT er derfor af den opfattelse, at EU-retten ikke i videre omfang end de af Modelkonventionen baserede dobbeltbeskatningsaftaler kan anses for at afskære Danmark fra at gennemføre en kildestatsbeskatning af udbytter ud fra en betragtning om, at de pågældende beløbs »retmæssige ejere« er hjemmehørende uden for EU. Dette gælder, selv om moder-/datterselskabsdirektivet i modsætning til det senere rente-/royaltydirektiv ikke udtrykkeligt anvender begrebet »retmæssig ejer«.

For det andet bemærkes, at udgangspunktet om, at der ikke kan pålægges kildeskat efter moder-/datterselskabets udtrykkelige ordlyd, kan fraviges. Det er således anført i direktivets artikel 1, stk. 2, at direktivet ikke er til hinder for anvendelsen af nationale bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Anvendelsen af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne tjener netop til bekæmpelse af svig eller misbrug, som omhandlet i direktivets art. 1, stk. 2. Direktivet er således ikke til hinder for, at der pålægges kildeskat, når »den retmæssige ejer« ikke er omfattet af en dobbeltbeskatningsoverenskomst med Danmark.

Da selskabsskattelovens § 2, stk. 1, litra c, fastsætter, at den begrænsede skattepligt kun skal frafaldes, hvis direktivet og/eller en DBO fører til, at de danske myndigheder skal frafalde eller nedsætte beskatningen, indeholder denne bestemmelse i sig selv en klar og nyttelse af adgangen til at fastholde den begrænsede skattepligt med henblik på at imødegå misbrug.

Derudover er artikel 10 i den dansk-luxembourgske dobbeltbeskatningsoverenskomst netop en overenskomstmæssigt fastsat bestemmelse, der med forbeholdet om »retmæssig ejer« bekæmper svig eller misbrug. Direktivet udelukker efter ordlyden af artikel 1, stk. 2, netop ikke, at Danmark anvender den adgang til at indeholde kildeskat, som Danmark har i medfør af artikel 10 i dobbeltbeskatningsoverenskomsten.

SKAT er derfor ikke enig i Landsskatterettens konstatering i kendelsen af 3. marts 2010, hvorefter der alene kan være hjemmel

til at nægte direktivets fordele ud fra den domstolsskabte praksis om rette indkomstmodtager eller ud fra realitetsbetragtninger.

Derimod er det SKATs opfattelse, at der er hjemmel til at nægte direktivets fordele både på grundlag af den domstolsskabte praksis om det generelle EU-retlige misbrugsbegreb, som de EU-retlige regler skal fortolkes i lyset af, og på grundlag af misbrugsbestemmelsen i direktivets artikel 1. stk. 2.

Det er herefter SKATs samlede opfattelse, at udbytte udloddet fra TDC til NTC ikke vil være skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, og dermed fritaget for dansk kildeskat.

Spørgsmål 2 er derfor besvaret ved nej.

*Selskabets påstand og argumenter*

Selskabets repræsentant har nedlagt påstand om, at det bindende svar ændres, så begge spørgsmål besvares bekræftende.

### 1597

*Spørgsmål 1:*

Selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. har følgende ordlyd:

»Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder.«

Følgende fremgår af forarbejderne til bestemmelsen (L27 2003/2004):

»Transparente selskaber er ikke omfattet af den begrænsede skattepligt af udbytte fra danske selskaber i henhold til selskabsskattelovens 2, stk. 1, litra c, idet skattepligten i henhold til denne bestemmelse påhviler selskaber og foreninger m.v. som nævnt i selskabsskattelovens 1, stk. 1. Der er således ikke behov for en bestemmelse om, at transparente selskaber, der er omfattet af moder-/datterselskabsdirektivet, ikke er begrænset skattepligtige i Danmark af udbytte fra danske datterselskaber.

Efter de danske regler påhviler skattepligten af udbytte, der tilfalder et transparent selskab, selskabsdeltagerne.

Det foreslås derfor, at udenlandske selskabsdeltagere i et transparent selskab, der er omfattet af moder-/datterselskabsdirektivet, ikke skal være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab. Dette skal gælde, uanset om selskabsdeltageren er et selskab eller en fysisk person og uanset selskabsdeltagerens ejerandel i det transparente selskab.«

Som det fremgår, er der hverken efter den helt klare ordlyd eller de tilsvarende klare forarbejder et krav for skattefrihed efter selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., at beskatning skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst.

Efter ordlyden af bestemmelsen er de eneste relevante kriterier i forhold til § 2, stk. 1, litra c, 5. pkt., således hvorvidt moderselskabet, her NTC, er optaget på listen over de selskaber, der er omhandlet af moder-/datterselskabsdirektivet, samt om moderselskabet ved beskatning her i landet anses for en transparent enhed.

NTC er et luxembourgsk selskab af typen »societe en commandite par actions« og er således er af de selskaber, der er optaget på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra [c] i moder-/datterselskabsdirektivet. Efter intern luxembourgsk skatteret betragtes NTC endvidere som et selvstændigt skattesubjekt og selskabet er underlagt luxembourgsk selskabsskat (»impot sur le revenu des collectives«).

Som følge heraf er udbytte udloddet fra TDC til NTC skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., hvis NTC efter intern dansk skatteret må anses for et transparent selskab.

Det fremgår af vedtægterne for NTC, at selskabet i alt væsentligt svarer til et dansk kommanditselskab.

Det følger således af vedtægternes artikel 8, at selskabets deltagere består af »the Unlimited Shareholder«, der hæfter ubegrænset for selskabets gæld (svarende til komplementarens hæftelse i et dansk kommanditselskab), og »Limited Shareholders«, der alene hæfter med deres indskud (svarende til kommanditisternes hæftelse i et dansk kommanditselskab)«.

Det fremgår endvidere af vedtægterne, at selskabet ledes af NTC Holding G.P. (som også er »the Unlimited Shareholder«), og at NTC Holding GP i egenskab af »manager« varetager både selskabets indre anliggender og repræsenterer selskabet udadtil, mens »Limited Shareholders« indflydelse er begrænset. Ledelsesstrukturen i NTC er således sammenlignelig med ledelsesstrukturen i et dansk kommanditselskab.

Da såvel hæftelses- som ledelsesforholdene i NTC svarer til hæftelses- og ledelsesforholdene i et dansk kommanditselskab, er det repræsentantens opfattelse, at NTC efter intern dansk skatteret må anses for et transparent selskab.

Som følge heraf er udbytte udloddet fra TDC til NTC skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. Det bemærkes hertil, at selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. ikke stiller krav om, at Danmark skal være forpligtet til at frafalde eller nedsætte beskatningen af udbytte efter reglerne i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirektivet.

Det er herefter ikke relevant om, hvorvidt moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst afskærer Danmark fra at beskatte udbytte. Dermed er det heller ikke relevant om, hvorvidt NTC er »retmæssig ejer« eller ej.

Til SKATs afgørelse er bemærket, at det hverken direkte eller indirekte følger af den nugældende formulering, at bestemmelsen alene finder anvendelse, hvis beskatning af udbytte skal frafaldes eller nedsættes efter bestemmelserne i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirektivet.

Formuleringen af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. blev ændret i 2009, hvor ordene »som nævnt i pkt. 3« udgik. Samtidig hermed blev formuleringen af pkt. 3 ændret, således at betingelsen om, at beskatning af udbytte skal frafaldes eller nedsættes efter bestemmelserne i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabet, lovteknisk blev flyttet til dette pkt.

Hvis det oprindeligt skulle have været en betingelse for anvendelse af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., at beskatning af udbytte skulle frafaldes eller

### 1598

nedsættes efter bestemmelserne i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirektivet, ville det have været særdeles misvisende at slette henvisningen til pkt. 3, når betingelsen om frafald eller nedsættelse samtidig blev flyttet til netop pkt. 3.

Også sammenhængen mellem den i 2009 gennemførte ændring af formuleringen af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. og den samtidige ændring af bestemmelsens 3. pkt. tilsiger derfor, at der ikke i forhold til 5. pkt. gælder noget krav om, at beskatning af udbytte skal frafaldes eller nedsættes efter bestemmelserne i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirektivet.

Der er således hverken i ordlyd eller forarbejder til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. hjemmel til at opstille et sådant krav.

Det er herefter repræsentantens opfattelse, at NTC er omfattet af moder-/datterselskabsdirektivet og efter dansk skatteret må anses for en transparent enhed, hvorfor udbytte udloddet fra TDC til NTC er skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. Dette gælder, uanset om NTC må anses for retmæssig ejer eller ej, og spørgsmål 1 skal derfor besvares med et »ja«.

*Spørgsmål 2:*

Det er en betingelse for anvendelse af selskabsskattelovens § 2, stk. 1, litra c, 3. pkt., at der er tale om udlodning af udbytte til et selskab, der enten er berettiget til de fordele, der følger af en dobbeltbeskatningsoverenskomst med Danmark eller til de fordele, der følger af moder-/datterselskabsdirektivet.

*Dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg*

Om NTC skal anses for en skattepligtig person i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg afhænger af, om NTC i Luxembourg anses for et selvstændigt skattesubjekt, jf. således kommentarerne til OECD's model-overenskomst under artikel 1, pkt. 5. Heraf fremgår:

»I tilfælde hvor et interessentskab behandles som et selskab eller beskattes på samme måde, er det en person, der er hjemmehørende i den kontraherende stat, der beskatter interessentskabet på det grundlag, der er nævnt i artikel 4, stk., 1, og det er derfor berettiget til overenskomstens fordele.«

Dette følger tilsvarende af praksis, jf. Skatterådets afgørelse offentliggjort i SKM2008.491, hvor Skatterådet fandt, at en udenlandsk enhed, der var transparent efter intern dansk skatteret, var berettiget til overenskomstfordele.

Ved afgørelsen af, om NTC er berettiget til de fordele, der følger af dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, er Danmark således forpligtet til at acceptere Luxembourgs skattemæssige kvalifikation af NTC som et selvstændigt skattesubjekt og dermed en skattepligtig person omfattet af dobbeltbeskatningsoverenskomsten.

Repræsentanten har dernæst henvist til art. 10 i dobbeltbeskatningsoverenskomsten. Spørgsmålet er herefter om, om NTC er »retmæssig ejer« af udbyttet.

Begrebet »retmæssig ejer« har været en del af OECD modeloverenskomsten og kommentarerne hertil siden 1977. I kommentaren til OECD modeloverenskomsten er problematikken omkring retmæssig ejer primært omtalt under punkt 12 til artikel 10. Af disse kommentarer kan det udledes, at agenter og mellemmænd, samt gennemstrømningsselskaber ikke er retmæssige ejere af udbytte. For så vidt angår gennemstrømningsselskaber er det dog yderligere en udtrykkelig betingelse, at selskabet har så snævre beføjelser til at råde over udbyttet, at det reelt i relation til udbyttet er en nullitet eller administrator.

NTC anerkendes i Luxembourg som et selvstændigt rets- og skattesubjekt, og NTC er civilretlig ejer af aktierne i TDC. NTC råder over lokaler i Luxembourg, har en person ansat og indeståender på selskabets bankkonto har genereret betydelige renteindtægter for NTC.

Baggrunden for, at den oprindelige holdingstruktur er etableret i Luxembourg er, at i den konkrete sag, hvor fem kapitalfonde var enige om tilsammen at erhverve majoriteten af aktierne i TDC, indebar en fælles holdingstruktur en række fordele i forhold til finansieringen af erhvervelsen, fremsættelse af samlet købstilbud og mulighederne for gennemførelse af tvangsindløsning. Efter at det var besluttet, at der skulle etableres en fælles holdingstruktur, skulle der tages stilling til, i hvilke lande de enkelte holdingselskaber skulle etableres, og baggrunden for beslutningen om etablering af de oprindelige holdingselskaber i Luxembourg var ikke at undgå dansk kildeskat på udbytte. Der for første har kapitalfonde og andre udenlandske investorer historisk foretaget deres investeringer via Luxembourg, primært som følge af, at Luxembourg juridisk, regulatorisk, finansielt og politisk anses for et attraktivt og stabilt land at investere igennem, og for det andet er der normalt ikke en del af kapitalfondes forretningsplan at gennemføre udlodninger af udbytte. I naturlig forlængelse af, at den oprindelige holdingstruktur er

etableret i Luxembourg, blev NTC ligeledes etableret i Luxembourg. I forbindelse med salg af aktier i TDC i slutningen af 2010 indgik NTC en såkaldt »lock-up« aftale, hvor NTC i forhold til en række banker har forpligtet sig til ikke at sælge aktier i TDC i en periode på 180 dage fra den 25. november 2010.

I forhold til råderetten over udbytte modtaget af NTC fra TDC er det oplyst, at aktierne i TDC ejet af NTC indtil starten af 2011 var pantsat til fordel for en række eksterne långivere, der har ydet betydelig lån til TDC. I det

**1599**

omfang NTC modtog udbytte fra TDC ville dette udbytte skulle indsættes på en konto i en bank, som tilsvarende var pantsat til fordel for de eksterne långivere. Så længe der ikke forelå misligholdelse af de lån, som pantsætningen vedrørte, var NTC i forhold til de eksterne långivere berettiget til at disponere over indeståendet på den pantsatte konto. I tilfælde af misligholdelse kunne de eksterne långivere fratage NTC denne dispositionsret og søge sig fyldestgjort i indeståendet på kontoen. Pantsætning af aktierne i TDC ejet af NTC er bortfaldet i starten af 2011. Der foreligger ikke aftaler om råderetten over udbytte modtaget af NTC fra TDC. Beslutning om at disponere over modtaget udbytte vil alene kunne træffes af NTC's ledelse.

NTC har p.t. ikke væsentlig gæld, der forventes betalt med udbytte modtaget fra TDC. Overordnet set kan NTC's ledelse derfor beslutte helt eller delvist (i) at anvende det modtagne udbytte til at tilbagebetale det pågældende lån, (ii) ikke at disponere over det modtagne udbytte, men blot lade dette stå på selskabets bankkonto, (iii) at investere det modtagne udbytte eller (iv) at udlodde det modtagne udbytte til selskabets ejere.

Det er på baggrund af ovenstående repræsentantens opfattelse, at NTC må anses for »retmæssig ejer« af udbytte modtaget fra TDC.

Såfremt opfattelsen er, at NTC ikke er berettiget til de fordele, der følger af dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, og/eller ikke kan anses for »retmæssig ejer« af udbytte modtaget fra TDC, er der repræsentantens opfattelse, at NTC Parent S.á.r.l. og NTC Holding GP S.á.r.l. i så fald må anses for berettiget til de fordele, der følger af dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, og må anses for »retmæssige ejere« af deres respektive andele af udbyttet.

I yderligere indlæg til sagen i Skatterådet er oplyst, at langt flertallet at de ultimative investorer i NTC er skattemæssigt hjemmehørende i lande, der er medlem af EU og/eller har indgået en dobbeltbeskatningsoverenskomst med Danmark, at NTC ikke har væsentlig gæld og således i det væsentligste er finansieret med egenkapital, og at det er forventningen, at ledelsen i NTC vil træffe beslutning om at disponere over det modtagne udbytte fra TDC ved at udlodde dette som udbytte til sine aktionærer.

Da NTC er en selvstændig enhed med selvstændig ledelse og beslutningskompetence, kan det i sagens natur ikke på forhånd og med sikkerhed vides, om ledelsen i NTC rent faktisk vil træffe beslutning om at disponere over det modtagne udbytte fra TDC ved at udlodde dette som udbytte. Uanset det er forventningen, at ledelsen i NTC vil disponere som anført, vil den endelige beslutning afhænge af omstændighederne på tidspunktet for ledelsens beslutning, herunder eksempelvis om en sådan udlodning på dette tidspunkt af ledelsen anses for forsvarlig.

*Moder-/datterselskabsdirektivet*

Da NTC er et af de selskaber, der er optaget på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a moder-/datterselskabsdirektivet, og da NTC er underlagt Luxembourgsk selskabsskat (»impot sur le revenu des collectives«) følger det direkte af moder-/datterselskabsdirektivet, at NTC er berettiget til direktivets fordele.

Der er ikke i moder-/datterselskabsdirektivet et krav om, at udbyttemodtageren er »retmæssig ejer« af udbytterne.

Det følger af såvel bestemmelsens ordlyd som af Landsskatterettens kendelse offentliggjort i SKM2010.268, at direktivets fordele alene kan nægtes i det omfang, national lovgivning indeholder særskilt og specifik hjemmel hertil.

Som nævnt ovenfor anerkendes NTC i Luxembourg som et selvstændigt rets- og skattesubjekt, og NTC er civilretlig ejer af aktier i TDC. Som følge heraf må NTC anses for rette indkomstmodtager af udbytte udloddet på selskabets aktier i TDC. Selv hvis man måtte indtage det - efter repræsentantens opfattelse forkerte synspunkt - at NTC ikke kan anses for retmæssig ejer af udbyttet i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, er NTC derfor berettiget til de fordele, der følger af moder-/datterselskabsdirektivet.

Det kan ikke lægges til grund, at der reelt på forhånd vil være disponeret over udbytteudlodningen. Det er korrekt, som anført af SKAT, at det forventes, at NTC vil træffe beslutning om at udlodde udbytte, men dette er alene en forventning og på ingen måde udtryk for, at der »reelt vil være disponeret« på forhånd.

Det forhold, at NTC måtte træffe beslutning om at udlodde udbytte til sine ejere i forlængelse af modtagelsen af udbytte fra spørger, indebærer ikke i sig selv, at NTC ikke kan anses for at have reel råderet over det fra spørger modtagne udbytte, jf. hertil senest OECD's »discussion draft« vedrørende »Clarification of the meaning of »beneficial owner« in the OECD model tax convention«, hvori der bl.a. foreslås indsat en række præciserede kommentarer til artikel 11, herunder bl.a. følgende:

»The recipient of dividend is the »beneficial owner »of that dividend where he has the full right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass the payment received to another person.«

Det kan lægges til grund, at NTC ikke er underlagt nogen form for kontraktmæssig eller anden form for juridisk pligt til at viderebetale udbytte modtaget fra spørger, og som følge heraf må NTC anses for »retmæssig ejer«.

**1600**
Det fremgår af moder-/datterselskabsdirektivet, at direktivet ikke er til hinder for anvendelsen af nationale bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug. Der kan således i national ret indføres regler til bekæmpelse af misbrug.

Af Landsskatterettens kendelse offentliggjort i SKM 2010.268.LSR, sammen med EU-domstolens dom i sag C-321/05, (Kofoed-dommen), fremgår, at der skal foreligge interne danske regler, såfremt SKAT skal kunne nægte lempelse efter direktivet.

I Danmark er det den domstolsskabte praksis om rette indkomstmodtager og realitetsbetragtninger, der eventuelt kunne påberåbes, og det er ubestridt, at denne praksis ikke fører til, at NTC kan nægtes skattefritagelse af udbyttet, jf. hertil udtrykkeligt Landsskatteretten i SKM 2010.268.LSR.

Til SKATS argumentation for, at dobbeltbeskatningsoverenskomsten indfører den nødvendige »hjemmel«, der skal til for at Danmark ikke er forpligtet til at frafalde kildeskatten i henhold til moder-/datterselskabsdirektivet, er anført, at dette strider åbenlyst mod »den gyldne regel«, hvorefter dobbeltbeskatningsoverenskomster ikke selvstændigt kan hjemle beskatning, og synspunktet er da også tilsidesat af Landsskatteretten i SKM 2010.268.

*Lovgiver har været opmærksom på muligheden for holdingselskaber.*

Også af intern dansk ret følger, at SKAT ikke kan kræve kildeskat af udbytteudlodningen. Man har således været opmærksom på

muligheden for anvendelsen af holdingselskaber i forbindelse med beskatning af kildeskat på udbytter.

I retspraksis lægges der vægt på, om lovgiver har været opmærksom på sådanne muligheder. Der er henvist til Højesterets dom offentliggjort i U.2004.174H.

Endvidere lægges i retspraksis vægt på, om lovgiver har indført nyere lovgivning vedrørende det område, som skatteyderen agerer indenfor, og Højesteret fortolker ikke en bestemmelse udvidende, såfremt lovgiver har været tæt på problemstillingen uden specifikt at reagere, jf. TfS 2006, 1062 og U.2004.174H.

I nærværende sag har lovgiver i hvert fald siden 1998 været opmærksom på strukturer som i nærværende sag, jf. herved lov nr. 1026 af 23. december 1998, hvormed den begrænsede skattepligt for udbytter blev afskaffet (lovbemærkningerne i forbindelse hermed (L 53 af 21. oktober 1998). Heraf fremgår, at lovgiver var opmærksom på, at kildeskatten kunne undgås ved at indskyde et mellemliggende holdingselskab som sket i nærværende sag.

Med lov nr. 282 af 25. april 2001 blev den begrænsede skattepligt for udbytter genindført. Af lovforarbejderne, herunder lovbemærkninger (L 99 af 10. november 2000I og diverse ministersvar mv. (bilag 22, spørgsmål 16, bilag 24 og bilag 25, spørgsmål 15) fremgår, at Skatteministeriet og lovgiver var klar over, at udbyttekildeskatten kunne undgås ved brug af mellemholdingselskaber, og at der ikke blev fastsat særlige regler for at modvirke dette. Der kan herefter ikke indfortolkes et udvidende beneficial owner-begreb, da lovgiver netop har været opmærksom på problemstillingen uden specifikt at ændre loven.

*Afvisningspåstanden.*

Det er Selskabets opfattelse, at sagen er tilstrækkeligt oplyst. SKAT lægger da også til grund i sin principale påstand, at spørgsmålene kan besvares.

Det fremgår endvidere af skatteforvaltningslovens § 24, stk. 1:
»En anmodning om et bindende svar skal være skriftlig og indeholde alle de oplysninger af betydning for svaret, som står til rådighed for spørgeren. Skønner told- og skatte forvaltningen respektive Skatterådet, at spørgsmålet ikke er tilstrækkeligt oplyst, kan spørgeren anmodes om yderligere oplysninger eller dokumentation. Efterkommes anmodningen ikke inden for en rimelig frist, kan spørgsmålet afvises eller svaret begrænses til de forhold, der skønnes tilstrækkeligt oplyst.«

Sagens faktum og dokumentation er drøftet på et møde den 18. maj 2011, hvor SKAT, Kammeradvokaten og selskabet deltog, samt i efterfølgende korrespondance. Der var herefter enighed om, hvilke oplysninger, der skulle lægges til grund for det bindende svar, samt at Skatterådet havde fornødent grundlag for at afgive svar.

Anmodningen kan derfor ikke afvises ifølge skatteforvaltningslovens § 24, stk. 1.

Der er således ikke grundlag for at afvise besvarelse af spørgsmål 2, som skal besvares med et »ja«.

*Landsskatterettens bemærkninger og begrundelse*

Ad spørgsmål 1:
Det er oplyst, at det luxembourgske selskab, NTC Holding G.P. & Cie S.C.A., blev stiftet i 2009 af det luxembourgske moderselskab, NTC Parent S.á.r.l., der igen ejes af 5 kapitalfonde mv., og at selskabet i 2010 erhvervede 59,1 % af aktiekapitalen i TDC A/S. Den resterende andel af aktierne i TDC A/S ejes af mere end 38.000 aktionærer.

Det lægges til grund, at det luxembourgske selskab, NTC Holding G.P. & Cie S.C.A i Luxembourg anses for en skattepligtig enhed, medens det i Danmark anses som transparent. NTC Holding G.P. & Cie S.C.A. er et sådant selskab, som er optaget på listen over

selskaber, der er omhandlet i moder-/datterselskabsdirektivet, artikel 2, stk. 1.

Ifølge selskabsskattelovens § 2, stk. 1, litra c (lbkg. nr. 1376 af 7. december 2010) er selskaber, der har hjemsted i udlandet, som udgangspunkt begrænset skattepligtige af udbytte, jf. 1. pkt. Dette gælder dog ikke

**1601**

udbytte, som oppebæres af et selskab, der ejer mindst 10 % af aktiekapitalen i det udbyttegivende selskab i en sammenhængende periode på mindst 1 år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge, jf. 2. og 3. pkt. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor selskabet er hjemmehørende, jf. 4. pkt. Skattepligten omfatter ikke udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet, jf. pkt. 5.

Ved ændringerne af moder-/datterselskabsdirektivet (2003/123/EØF) skete der en udvidelse af de selskaber, der var optaget på listen over selskabstyper, der er omhandlet af direktivet, herunder med selskaber, der anses for selskabsskattepligtige i den medlemsstat, hvor de er hjemmehørende, men anses for skattemæssigt transparente i andre medlemsstater.

Ændringsdirektivet blev implementeret her i landet ved lov nr. 1375 af 20. december 2004 (L 27 2004/2005), og i den forbindelse blev 5. pkt. i selskabsskattelovens § 2, stk. 1, litra c indsat.

Der er hverken efter bestemmelsens ordlyd eller dens forarbejder tilstrækkelige holdepunkter for at antage, at bestemmelsen indebærer, at udenlandske selskaber, som er omfattet af moder-/datterselskabsdirektivet og i udlandet anses som skattepligtige, men som her i landet anses som transparente, behandles forskelligt fra andre udenlandske selskaber, som er omfattet af moder-/datterselskabsdirektivet og som i udlandet anses som skattepligtige, og som også her i landet anses som skattepligtige. Efter formålet med bestemmelsen må formodningen tværtimod være for, at de to typer selskaber behandles ens.

Afgørende vil herefter være, om der vil være fritagelse for kildeskat på udbytter efter bestemmelsen i øvrigt, jf. ad spørgsmål 2.

SKATs svar på spørgsmål 1 stadfæstes hermed.

Ad spørgsmål 2:

Efter selskabsskattelovens § 2, stk. 1, litra c, 3. pkt., er det en betingelse for ikke at skulle indeholde udbytteskat, at der er tale om udbytte til et selskab, der enten er berettiget til de fordele, der følger af en dobbeltbeskatningsoverenskomst med Danmark eller til de fordele, der følger af moder-/datterselskabsdirektivet.

Ifølge dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg artikel 10, stk. 1, kan udbytte beskattes i kildestaten. Den skat, der pålægges, må dog - såfremt modtageren er udbyttets retsmæssige ejer, og denne er et selskab, der direkte ejer mindst 25 % af kapitalen i det udloddende selskab - ikke overstige 5 % af bruttobeløbet af udbyttet.

Bestemmelsen svarer til artikel 10 i OECDs modeloverenskomst. Af kommentar til modeloverenskomstens artikel 10 punkt 12 fremgår blandt andet, at kravet om retsmæssigt ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Udtrykket »retsmæssig ejer« er ikke anvendt i en

snævre teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse. Af punkt 12.1 fremgår, at en person, der handler i sin egenskab af agent eller mellemmand, ikke kan anses som retsmæssig ejer. Endvidere fremgår, at en person, der på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst, ligeledes heller ikke kan anses for retsmæssig ejer. Der er henvist til rapport fra Committee on Fiscal Affairs, hvoraf fremgår, at et »gennemstrømningsselskab« normalt ikke kan anses for den retsmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter. Af punkt 12.2 fremgår, at begrænsningen i kildestatens beskatningsret ikke kan benyttes, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og betaleren, medmindre den retsmæssige ejer er hjemmehørende i den anden kontraherende stat.

Begrebet »retmæssig ejer« kan herefter ikke uden videre antages at være sammenfaldende med princippet om »rette indkomstmodtager« i dansk skatteret.

Ifølge direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, artikel 5, fritages udbytte, som et datterselskab udlodder til sit moderselskab, for kildeskat.

I moder-/datterselskabsdirektivets almindelige bestemmelser kan der ikke indlæses et misbrugsforbehold. I artikel 1, stk. 2, gives medlemsstaterne derimod mulighed for at fravige direktivet i tilfælde af skattemisbrug mv.

Af direktivets artikel 1, stk. 2, fremgår, at direktivet ikke er til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Ved Landsskatterettens kendelse af 16. december 2011 (TfS 2012.26), som vedrører et selskabs

**1602**

indeholdelsespligt af udbytteskat for udbytte udbetalt til moderselskab på Cypern, blev selskabet ikke anset for indeholdelsespligtigt af udbytteskat. Ved afgørelsen blev lagt vægt på, at Danmark ikke har vedtaget lovbestemmelser med sigte på at hindre svig og misbrug, jf. direktivets artikel 1, stk. 2. Det lovligt stiftede og fungerende cypriotiske selskab blev, uanset at selskabets eneste - eller i det væsentligste eneste - aktivitet var at eje anparter i det danske selskab, derpå anset for rette indkomstmodtager af udbyttet. Udbyttet var herefter fritaget for kildeskat, jf. direktivets artikel 5, og var dermed ikke omfattet af den begrænsede skattepligt, jf. selskabsskattelovens § 2, stk. 2, litra c.

Herefter, og idet det omhandlede udbytte overføres fra det danske selskab til et selskab i Luxembourg, der er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivet, artikel 2, stk. 1, litra a, men som ved beskatningen her i landet anses for at være transparent, og da sådanne selskaber behandles som andre selskaber optaget på listen, jf. ad spørgsmål 1, vil udbyttet være fritaget for skattepligt, jf. artikel 5. Udbyttet vil herefter ikke være omfattet af den begrænsede skattepligt, jf. selskabsskattelovens § 2, stk. 2. litra c, 5. pkt.

Der er herefter ikke taget stilling til, om de luxembourgske selskaber efter dobbeltbeskatningsaftalen kan anses for »retmæssig ejer« af det modtagne udbytte, hvorved bemærkes, at afgørelse herom ikke vil kunne træffes på det foreliggende grundlag, da den fremlagte dokumentation ikke anses for tilstrækkelig fyldestgørende hertil.

Spørgsmål 2 kan således besvares bekræftende.«

*Supplerende oplysninger i sagen*

I »anbefalet købstilbud« til TDC's aktionærer af 2. december 2005 er om NTC-koncernens køb af TDC oplyst bl.a.:

»*Tilbudsgiver*

Tilbudsgiver er et anpartsselskab stiftet den 21. oktober 2005 i overensstemmelse med dansk ret, med hjemstedet Langelinie Allé 35, 2100 København Ø, registreret under navnet Nordic Telephone Company ApS hos Erhvervs- og Selskabsstyrelsen under CVR-nr. 29146780. Tilbudsgiver har ikke haft kommercielle aktiviteter siden stiftelsen, undtagen i forbindelse med Købstilbuddet og øvrige transaktioner, der på tænkes i forbindelse hermed, herunder som beskrevet nedenfor i dette afsnit. Tilbudsgiver blev stiftet med det formål at erhverve og eje samtlige TDC Værdipapirer.

Tilbudsgiver er indirekte 100%-ejet datterselskab af følgende investeringsselskaber eller -foretagender: Apax Europe VI-A, L.P., Apax Europe VI-1, L.P., Blackstone Family Communications Partnership (Cayman) L.P., Blackstone Capital Partners (Cayman) IV L.P., Blackstone Family Investment Partnership (Cayman) IV-A L.P., Blackstone Participation Partnership (Cayman) IV L.P., Blackstone NSS Communications Partners (Cayman) L.P., Blackstone Capital Partners (Cayman) IV L.P., KKR Millennium Fund (Overseas), Limited Partnership, Permira Europe III GmbH & Co. KG, Permira Europe III L.P. 1, Permira Europe III L.P. 2, Permira Europe III Co-Investment Scheme, Permira Investments Limited og Providence Equity Offshore Partners V L.P. (sammen med eventuelle andre tilknyttede fonde, der måtte blive indirekte anpartshavere i Tilbudsgiver, »Fondene«). Fondene rådgives eller forvaltes direkte eller indirekte af Apax Partners Worldwide LLP, The Blackstone Group International Limited, Kohlberg Kravis Roberts & Co. L.P., Permira Advisers KB og Providence Equity Partners Limited. KKR European Fund II, Limited Partnership, KKR Partners (International), Limited Partnership, Providence Equity Offshore Partners IV L.P., Providence Equity Operating Partners IV L.P., Permira Europe II L.P.1, Permira Europe II L.P.2, Permira Europe II CV3, Permira Europe II CV4, Permira Europe II Co-Investment Scheme og Schroder Ventures Investments Limited forventes at blive indirekte anpartshavere i Tilbudsgiver ved eller før gennemførelse af Købstilbuddet.

Tilbudsgiver er et 100%-ejet datterselskab af Nordic Telephone Company Holding ApS, et anpartsselskab stiftet den 10. november 2005 i overensstemmelse med dansk ret, med hjemsted på adressen Langelinie Allé 35, 2100 København Ø, registreret hos Erhvervs- og Selskabsstyrelsen under CVR-nr. 29174202. Nordic Telephone Company Holding ApS har ikke haft kommercielle aktiviteter siden stiftelsen, undtagen i forbindelse med Købstilbuddet og øvrige transaktioner, der på tænkes i forbindelse hermed.

Nordic Telephone Company Holding ApS er et 100% ejet datterselskab af Nordic Telephone Company Finance ApS, et anpartsselskab stiftet den 10. november 2005 i overensstemmelse med dansk ret, med hjemsted på adressen Langelinie Allé 35, 2100 København Ø registreret hos Erhvervs- og Selskabsstyrelsen under CVR-nr. 29173265. Nordic Telephone Company Finance ApS har ikke haft kommercielle aktiviteter siden stiftelsen, undtagen i forbindelse med Købstilbuddet og øvrige transaktioner, der på tænkes i forbindelse hermed.

Nordic Telephone Company Finance ApS er et 100%-ejet indirekte datterselskab af Nordic Telephone Company Investment ApS, et anpartsselskab stiftet den 10. november 2005 i overensstemmelse med dansk ret, med hjemsted på adressen Langelinie Allé 35, 2100 København Ø, registreret hos Erhvervs- og Selskabsstyrelsen under CVR-nr. 29173141. Nordic Telephone Company Investment ApS har ikke haft kommercielle aktiviteter siden stiftelsen, undtagen i

forbindelse med Købstilbuddet og øvrige transaktioner, der påtænkes i forbindelse hermed.

**1603**

Nordic Telephone Company Investment ApS er et datterselskab, der er 100% ejet gennem mellemliggende holdingselskaber af Fondene.

Fondene har stillet garanti for alle de kapitalindskud, der er nødvendige til brug for at gennemføre Købstilbuddet, men har aftalt, at de kan syndikere en del af deres Kapitalindskudstilsagn eller - andele i eller efter Tilbudsperioden.«

Det er under hovedforhandlingen mundtligt oplyst, at NTC-koncernen efter afgivelsen af købstilbuddet erhvervede en samlet ejerandel på ca. 87 % af TDC, hvoraf en aktiepost på ca. 28 % blev frasolgt i december 2010. Herefter androg ejerandelen ca. 59,1 %.

Det er endvidere oplyst, at koncernen efter 2005 - men før indgivelsen i 2011 af anmodningen om bindende svar - undergik en række strukturændringer, der bl.a. indebar, at rækken af danske holdingselskaber, der oprindelig var indskudt mellem NTC-koncernen i Luxembourg og TDC i Danmark, blev erstattet af NTC SA, hjemmehørende i Luxembourg.

Af TDC's anmodning af 16. marts 2011 om bindende svar, der bortset fra et koncerndiagram svarende til det, der fremgår af Landsskatterettens afgørelse, ikke var vedlagt bilag, fremgår, ud over det ovenfor citerede fra Landsskatterettens kendelse om »Baggrundsoplysninger«, af anmodningens rubrik benævnt »Argumentation« bl.a.:

»Det fremgår af vedtægterne for NTC, at selskabet i alt væsentligt svarer til et dansk kommanditselskab.

Det følger således af vedtægternes artikel 8, at selskabets deltagere består af »the Unlimited Shareholder«, der hæfter ubegrænset for selskabets gæld (svarende til komplementarens hæftelse i dansk kommanditselskab), og »Limited Shareholders«, der alene hæfter med deres indskud (svarende til kommanditisternes hæftelse i et dansk kommanditselskab). Det fremgår endvidere af vedtægterne, at selskabet ledes af NTC Holding G.P. (som også er »the Unlimited Shareholder«) og at NTC Holding G.P. i egenskab af »manager« varetager både selskabets indre anliggende og repræsenterer selskabet udadtil, mens »Limited Shareholders« indflydelse er begrænset. Ledelsesstrukturen i NTC er således sammenlignelig med ledelsesstrukturen i et dansk kommanditselskab. Da såvel hæftelses- som ledelsesforholdene i NTC svarer til hæftelses- og ledelsesforholdene i et dansk kommanditselskab, er det vores opfattelse, at NTC efter intern dansk skatteret må anses for et transparent selskab.

Baggrunden for, at den oprindelige holdingstruktur er etableret i Luxembourg er, at i den konkrete sag, hvor fem kapitalfonde var enige om tilsammen at erhverve majoriteten af aktierne i TDC, indebar en fælles holdingstruktur en række fordele i forhold til finansieringen af erhvervelsen, fremsættelse af samlet købstilbud og mulighederne for gennemførelse af tvangsindløsning. Efter at det var besluttet, at der skulle etableres en fælles holdingstruktur, skulle der tages stilling til, i hvilke lande de enkelte holdingselskaber skulle etableres; og baggrunden for beslutningen om etablering af de oprindelige holdingselskaber i Luxembourg var ikke at undgå dansk kildeskat på udbytte. For det første har kapitalfonde og andre udenlandske investorer historisk foretaget deres investeringer via Luxembourg, primært som følge af, at Luxembourg juridisk, regulatorisk, finansielt og politisk anses for et attraktivt og stabilt land at investere igennem, og for det andet er det normalt ikke en del af kapitalfondes forretningsplan at gennemføre udlodninger af udbytte. I naturlig forlængelse af, at den oprindelige holdingstruktur er etableret i Luxembourg, blev NTC ligeledes etableret i Luxembourg.

Der foreligger ikke aftaler om råderetten over udbytte modtaget af NTC fra TDC. Beslutning om at disponere over udbytte vil alene kunne træffes af NTC's ledelse.

TDC har oplyst, at selskabet i august 2011 forventer at udlodde et udbytte på kr. 2,18 pr. aktie af kr. 1.

NTC har p.t. ikke væsentlig gæld, der forventes betalt med udbytte modtaget fra TDC. Som nævnt ovenfor er det forventningen, at NTC (alternativt NTC Parent S.à.r.l.) i den nærmeste fremtid vil skulle optage et eksternt lån med henblik på betaling til SKAT af visse bestridte skattekrav. Over- ordnet set kan NTC's ledelse derfor beslutte helt eller delvist (i) at anvende det modtagne udbytte til at tilbagebetale det pågældende lån (ii) ikke at disponere over de modtage udbytte, men blot lade dette stå på selskabets bankkonto, (iii) at investere det modtagne udbytte eller (iv) at udlodde det modtagne udbytte til selskabets ejere..«

Af brev af 31. maj 2011 fra advokat Arne Møllin Ottosen til SKAT, Koncerncenteret, fremgår bl.a.:

»AD FAKTUM

For god ordens skyld gentager vi indledningsvist og i fortsættelse af mødet hos Skatteministeriet følgende vedrørende omstruktur1eringen af NTC S.A.:

I 2010 blev der solgt et stort antal aktier i TDC A/S via et offentligt udbud. En væsentlig del af de ultimative investorer i de kapitalfonde, der indirekte kontrollerer TDC A/S, er hjemmehørende i USA, og for at sikre, at salget af aktier i TDC A/S blev beskattet som aktieavance efter amerikanske skatteregler, gennemførtes der i forbindelse med salget af aktier i TDC A/S en såkaldt »US tax free reorganization« af NTC S.A. Som led i denne »reorganization« blev det besluttet at likvidere NTC S.A. og at udlodde selskabets aktiver, herunder aktierne i TDC A/S, til NTC S.A.'s moderselskab NTC Holding G.P. & Cie S.C.A. NTC S.A. trådte i likvidation i december 2010 og samtidig blev NTC S.A.'s aktier i TDC A/S overført til NTC Holding G.P. & Cie S.C.A. Likvidationen af NTC S.A. er nu afsluttet. Overførslen af TDC-aktierne til

**1604**

NTC Holding G.P. & Cie S.C.A. har således intet med den påtænkte udbytteudlodning i august 2011 at gøre.

For så vidt angår *den forventede videre disponering af udbytte udloddet fra TDC A/S:*

Da NTC Holding G.P. & Cie S.C.A. er en selvstændig enhed med selvstændig ledelse og beslutningskompetence, kan det i sagens natur ikke på forhånd og med sikkerhed vides, om og hvordan ledelsen i NTC Holding G.P. & Cie S.C.A. rent faktisk vil træffe beslutning om at disponere over det modtagne udbytte fra TDC A/S. Da Skatteministeriet har oplyst, at der efter ministeriets opfattelse ikke kan svares på de stillede spørgsmål, hvis det ikke kan oplyses, hvordan NTC Holding G.P. & Cie S.C.A. antages at ville disponere over det modtagne udbytte fra TDC A/S, oplyser spørger at følgende kan lægges til grund for det bindende svar:

Spørger antager, at størstedelen af udbyttet vil blive udloddet som udbytte af NTC Holding G.P. & Cie S.C.A. til selskabets ejere NTC Holding G.P. og NTC Parent S.à r.l., og at størstedelen af udbyttet udloddet fra NTC Holding G.P. & Cie S.C.A. til NTC Holding G.P. vil blive udloddet som udbytte til NTC Holding G.P's ejer NTC Parent S.á r.l. En mindre del af udbyttet (formentligt mellem 3% og 5%) antages at ville blive anvendt af NTC Holding G.P. & Cie S.C.A., NTC Holding G.P. og NTC Parent S.á r.l. til betaling af omkostninger eller hensat til betaling af forventede omkostninger. Spørger antager endvidere, at udbytte udloddet til NTC Parent S.á r.l. vil blive betalt (som udbytte og/eller renter og/eller afdrag på gæld) til selskaber, der er kontrolleret af de enkelte kapitalfonde eller NTC Parent S.á r.l.'s kreditorer. Spørger antager tillige, at beløb betalt af NTC Parent S.á r.l. til selskaber,

der er kontrolleret af de enkelte kapitalfonde, vil blive overført til de ultimative investorer i kapitalfondene, men spørger er ikke bekendt med på hvilken måde sådanne overførsler vil finde sted eller hvordan de vil blive behandlet skattemæssigt.«

Om TDC's udbyttepolitik på tidspunktet for den udlodning, der er relevant for den foreliggende sag, kan det som ubestridt lægges til grund, at 80-85 % af »Equity Free Cash Flow« i et givent år skulle udbetales som udbytte.

Der er enighed om, at udbytteudbetalingen blev gennemført den 10. august 2011, og at NTC Holding G.P. & Cie S.C.A. med en ejerandel på 59,1 % effektivt modtog ca. 1.050.000.000 kr. i udbytte, idet TDC på baggrund af Skatterådets afgørelse af 21. juni 2011 tilbageholdt og indbetalte kildeskat vedrørende udbytteudlodningen, som Skattestyrelsen efter Landsskatterettens afgørelse af 13. marts 2012 udbetalte til NTC Holding G.P. & Cie S.C.A.

Det fremgår af TDC's svarskrift af 25. juni 2012, at TDC den 14. marts 2012 gennemførte endnu en udbytteudlodning, og TDC har under hovedforhandlingen oplyst, at denne udlodning svarede til 2,17 kr. pr. aktie.

I afsnit 4.5 i TDC's processkrift C af 21. april 2020 er anført bl.a.:

»Hver af ovennævnte kapitalfonde har udarbejdede detaljerede opgørelser over de bagvedliggende investorer i fondene, herunder navn, identifikationsoplysninger, typen af investor, procentvis investering i fonden, om der består en dobbeltbeskatningsoverenskomst med Danmark mv. Opgørelserne er udarbejdet på baggrund af bagvedliggende dokumentation for de pågældende forhold.

De fuldstændige opgørelser over investorerne indeholder strengt fortrolige og personfølsomme oplysninger, hvorfor de fuldstændige opgørelser ikke fremlægges i sin helhed. Disse vil dog efter nærmere aftale blive stillet til rådighed for Skatteministeriet.

Opgørelserne af de bagvedliggende investorer i kapitalfondene viser overordnet set, at mellem 58 % og 81 % af disse er omfattet af en dobbeltbeskatningsoverenskomst med Danmark. Langt hovedparten af de bagvedliggende investorer er hjemmehørende i USA, dog er der herudover også en mindre række investorer, som er hjemmehørende i Canada, diverse EU-medlemsstater, Cayman Island, Japan m.fl.

Kapitalfondenes opgørelser indeholder desuden oplysninger om hver investors skatteidentifikationsnummer (»US Tax ID«) og om, hvorvidt der mellem landet i hvilket den enkelte investor er hjemmehørende og Danmark er indgået en dobbeltbeskatningsoverenskomst. Kapitalfondenes opgørelser er, som nævnt ovenfor, foretaget på baggrund af bagvedliggende dokumentation for de i opgørelserne angivne oplysninger, hvorfor der således må anses for dokumenteret, i hvilket land den pågældende investor er hjemmehørende og desuden, om dette land har indgået en dobbeltbeskatningsoverenskomst med Danmark.«

Det kan som ubestridt lægges til grund, at NTC Holding G.P. & Cie S.C.A. såvel på tidspunktet for udlodningen som på nuværende tidspunkt råder over lokaler i Luxembourg, har mindst én person ansat, har et positivt bankindestående, der har genereret betydelige renteindtægter for NTC Holding G.P. & Cie S.C.A., og ikke har gæld af betydning.

### III. EU-Domstolens besvarelse af præjudicielle spørgsmål

Ved EU-Domstolens (Store Afdeling) dom af 26. februar 2019 i de forenede sager C-116/16 og C-117/16 besvarede Domstolen en række præjudicielle spørgsmål, som Østre Landsret ved kendelse af 19. februar 2016 havde stillet i begge sager. Af dommen fremgår bl.a.:

»Om det første til det tredje spørgsmål og det fjerde spørgsmål, litra a)-c), i hovedsagerne

U.2023.1575H

68 Med det første til det tredje spørgsmål og det fjerde spørgsmål, litra a)-c), i hovedsagerne ønsker den

**1605**

forelæggende ret nærmere bestemt oplyst, om den bekæmpelse af svig eller misbrug, der er tilladt i medfør af artikel 1, stk. 2, i direktiv 90/435, forudsætter, at der findes en national eller overenskomstmæssig anti-misbrugsbestemmelse som omhandlet i nævnte artikel. For det andet ønsker den oplyst, om en dobbeltbeskatningsoverenskomst, der er udfærdiget i overensstemmelse med OECD's modelbeskatningsoverenskomst og indeholder begrebet »retmæssig ejer«, kan udgøre en overenskomstmæssig anti-misbrugsbestemmelse som omhandlet i artikel 1, stk. 2, i direktiv 90/435. For det tredje ønsker den forelæggende ret oplyst, om det nævnte begreb »retmæssig ejer« [på fransk »bénéficiaire effectif«] er et EU-retligt begreb, som skal forstås på samme måde som begrebet »retmæssig ejer« [på fransk »bénéficiaire«], der er indeholdt i artikel 1, stk. 1, i direktiv 2003/49, og om det med henblik på fortolkningen af denne bestemmelse er muligt at tage hensyn til artikel 10 i OECD's modelbeskatningsoverenskomst af 1977. Den forelæggende ret ønsker navnlig oplyst, om en bestemmelse, der indeholder begrebet »retmæssig ejer«, kan anses for at udgøre et retsgrundlag, der gør det muligt at bekæmpe svig eller retsmisbrug.

69 Indledningsvis skal hovedsagernes første spørgsmål undersøges, hvormed den forelæggende ret ønsker oplyst, om en medlemsstat for at bekæmpe retsmisbrug inden for rammerne af anvendelsen af direktiv 90/435 skal have vedtaget en specifik national bestemmelse til gennemførelse af direktivet, eller om medlemsstaten kan henvise til nationale eller overenskomstmæssige anti-misbrugsprincipper eller -bestemmelser.

70 I denne henseende følger det af fast retspraksis, at der findes et almindeligt EU-retligt princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug (dom af 9.3.1999, Centros, C-212/97, EU:C:1999:126, præmis 24 og den deri nævnte retspraksis, af 21.2.2006, Halifax m.fl., C-255/02, EU:C:2006:121, præmis 68, af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 35, af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 27, og af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99).

71 Det påhviler borgerne at overholde dette almindelige retsprincip. Anvendelsen af EU-retten kan således ikke udvides til at dække handlinger, der gennemføres med det formål ved svig eller misbrug at drage nytte af de fordele, der er hjemlet i EU- retten (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 38, af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 27, og af 11.7.2018, Kommissionen mod Belgien, C- 356/15, EU:C:2018:555, præmis 99).

72 Det følger således af dette princip, at en medlemsstat skal nægte at indrømme fordelene i EU-retlige bestemmelser, såfremt disse ikke er blevet påberåbt med henblik på at gennemføre målene med disse bestemmelser, men med henblik på at drage nytte af en EU-retlig fordel, selv om betingelserne for indrømmelse af denne fordel alene er opfyldt formelt.

73 Dette er f.eks. tilfældet, såfremt gennemførelsen af toldformaliteter ikke har fundet sted som led i en almindelig handel, men er rent formel og alene har haft til formål retsstridigt at profitere af monetære udligningsbeløb (jf. i denne retning dom af 27.10.1981, Schumacher m.fl., 250/80, EU:C:1981:246, præmis 16, og af 3.3.1993, General Milk Products, C-8/92, EU:C:1993:82, præmis 21) eller eksportrestitutioner (jf. i denne retning dom af 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, præmis 59).

74 Princippet om forbud mod retsmisbrug finder desuden anvendelse på så vidt forskellige områder som de frie varebevægelser (dom af 10.1.1985, Association des Centres distributeurs Leclerc og Thouars Distribution, 229/83, EU:C:1985:1, præmis 27), den frie udveksling af tjenesteydelser (dom af 3.2.1993, Veronica Omroep Organisatie, C-148/91, EU:C:1993:45, præmis 13), offentlige tjenesteydelseskontrakter (dom af 11.12.2014, Azienda sanitaria locale n. 5 »Spezzino« m.fl., C-113/13, EU:C:2014:2440, præmis 62), etableringsfriheden (dom af 9.3.1999, Centros, C-212/97, EU:C:1999:126, præmis 24), selskabsretten (dom af 23.3.2000, Diamantis, C-373/97, EU:C:2000:150, præmis 33), social sikring (dom af 2.5.1996, Paletta, C-206/94, EU:C:1996:182, præmis 24, af 6.2.2018, Altun m.fl., C-359/16, EU:C:2018:63, præmis 48, og af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99), transport (dom af 6.4.2006, Agip Petroli, C-456/04, EU:C:2006:241, præmis 19-25), socialpolitikken (dom af 28.7.2016, Kratzer, C-423/15, EU:C:2016:604, præmis 37- 41), restriktive foranstaltninger (dom af 21.12.2011, Afrasiabi m.fl., C-72/11, EU:C:2011:874, præmis 62) og merværdiafgift (moms) (dom af 21.2.2006, Halifax m.fl., C-255/02, EU:C:2006:121, præmis 74).

75 Hvad angår sidstnævnte område har Domstolen gentagne gange udtalt, at selv om bekæmpelse af svig, afgiftsunddragelse og muligt misbrug er et formål, som anerkendes og støttes i Rådets sjette direktiv 77/388/EØF af 17. maj 1977 om harmonisering af medlemsstaternes lovgivning om omsætningsafgifter - Det fælles merværdiafgiftssystem: ensartet beregningsgrundlag (EFT 1977, L 145, s. 1), udgør princippet om forbud mod misbrug et generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet misbrugt, har hjemmel i traktaterne, i en forordning eller i et direktiv (jf. i denne retning dom af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 30 og 31).

**1606**

76 Det følger heraf, at det generelle princip om forbud mod misbrug skal gøres gældende over for en person, såfremt denne påberåber sig visse EU-retlige regler, som fastsætter en fordel, på en måde, der ikke er i overensstemmelse med de mål, som disse regler har. Domstolen har således udtalt, at dette princip kan gøres gældende over for en afgiftspligtig person for navnlig at nægte vedkommende retten til momsfritagelse, også selv om der ikke findes bestemmelser i national ret, som foreskriver en sådan nægtelse (jf. i denne retning dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C- 164/13, EU:C:2014:2455, præmis 62, og af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 33).

77 Selv om artikel 1, stk. 2, i direktiv 90/435 bestemmer, at direktivet ikke er til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug, kan denne bestemmelse ikke fortolkes således, at den udelukker anvendelsen af det generelle EU-retlige princip om forbud mod misbrug, som er omtalt i nærværende doms præmis 70-72. De transaktioner, som af SKAT hævdes at være udtryk for misbrug, er nemlig omfattet af EU-rettens anvendelsesområde (jf. i denne retning dom af 22.12.2010, Weald Leasing, C-103/09, EU:C:2010:804, præmis 42) og kan vise sig at være uforenelige med det formål, som dette direktiv forfølger.

78 Som det i denne henseende fremgår af første og tredje betragtning til direktiv 90/435, har direktivet til formål at lette sammenslutningen af selskaber på EU- plan ved at fastsætte konkurrenceneutrale beskatningsregler for disse sammenslutninger af selskaber fra forskellige medlemsstater, så virksomhederne får mulighed for

at tilpasse sig det indre markeds krav, øge deres produktivitet og styrke deres konkurrencemæssige position på internationalt plan.

79 Såfremt det imidlertid var tilladt at skabe finansielle konstruktioner alene med det formål at kunne drage nytte af de fordele, der følger af anvendelsen af direktiv 90/435, ville dette ikke være i overensstemmelse med sådanne formål, men ville derimod være til skade for det indre markeds funktion, idet det ville fordreje konkurrencevilkårene. Som generaladvokaten i det væsentlige har anført i punkt 51 i forslaget til afgørelse i sag C-116/16, gør det samme sig gældende, selv hvis de omhandlede transaktioner ikke udelukkende forfølger et sådant formål, idet Domstolen har fastslået, at princippet om forbud mod misbrug finder anvendelse på skatteområdet, når opnåelse af en skattefordel er hovedformålet med den omhandlede transaktion (jf. i denne retning dom af 21.2.2008, Part Service, C-425/06, EU:C:2008:108, præmis 45, og af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 53).

80 Den ret, som skattepligtige personer har til at drage fordel af den indbyrdes skattekonkurrence medlemsstaterne imellem på grund af den manglende harmonisering af indkomstskatterne, er i øvrigt ikke til hinder for anvendelsen af det generelle princip om forbud mod misbrug. I denne henseende bemærkes, at direktiv 90/435 havde til formål at foretage en harmonisering på området for direkte skatter ved at fastsætte konkurrenceneutrale beskatningsregler, og at det ikke tilsigtede at afskære medlemsstaterne fra at træffe passende foranstaltninger til bekæmpelse af svig og misbrug.

81 Selv om den omstændighed, at den skattepligtige person søger den skatteordning, der er den mest fordelagtige for personen, ganske vist ikke i sig selv kan danne grundlag for en generel formodning for svig eller misbrug (jf. i denne retning dom af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 50, af 29.11.2011, National Grid Indus, C-371/10, EU:C:2011:785, præmis 84, og af 24.11.2016, SECIL, C-464/14, EU:C:2016:896, præmis 60), forholder det sig ikke desto mindre således, at en sådan skattepligtig person ikke kan indrømmes en ret eller en fordel, der følger af EU-retten, såfremt den omhandlede transaktion økonomisk set er et rent kunstigt arrangement, hvis formål er at omgå den pågældende medlemsstats lovgivning (jf. i denne retning dom af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 51, af 7.11.2013, K, C-322/11, EU:C:2013:716, præmis 61, og af 25.10.2017, Polbud - Wykonawstwo, C-106/16, EU:C:2017:804, præmis 61-63).

82 Det følger af disse forhold, at det påhviler de nationale myndigheder og domstole at nægte at indrømme de fordele, der er fastsat i direktiv 90/435, såfremt påberåbelsen heraf sker for at muliggøre svig eller misbrug.

83 I forhold til det generelle EU-retlige princip om forbud mod misbrug og nødvendigheden af at overholde dette princip inden for rammerne af gennemførelsen af EU-retten er det uden betydning for de nationale myndigheders forpligtelse til at nægte at indrømme de i direktiv 90/435 fastsatte rettigheder, der påberåbes for at muliggøre svig eller misbrug, at der ikke findes nationale eller overenskomstmæssige anti-misbrugsbestemmelser.

84 De sagsøgte i hovedsagerne har påberåbt sig dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408), som vedrørte indrømmelsen af en skattefritagelse fastsat i Rådets direktiv 90/434/EØF af 23. juli 1990 om en fælles beskatningsordning ved fusion, spaltning, tilførsel af aktiver og ombytning af aktier vedrørende selskaber i forskellige medlemsstater (EFT 1990, L 225, s. 1), med henblik på at gøre gældende, at det følger af artikel 1, stk. 2, i direktiv 90/435, at den omhandlede

1607

medlemsstat kun kan nægte at indrømme de fordele, som er fastsat i dette direktiv, såfremt den nationale lovgivning indeholder et særskilt og specifikt retsgrundlag i denne henseende.

85 Denne argumentation kan imidlertid ikke tiltrædes.

86 Domstolen bemærkede ganske vist i præmis 42 i dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408), at retssikkerhedsprincippet er til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgerne, og at de derfor ikke som sådan kan påberåbes af medlemsstaten over for borgerne.

87 Domstolen bemærkede endvidere, at en sådan konstatering ikke berører forpligtelsen for alle myndigheder i en medlemsstat til ved anvendelsen af national ret i videst muligt omfang at fortolke denne i lyset af direktivers ordlyd og formål for at fremkalde det med direktiverne tilsigtede resultat, idet disse myndigheder således har mulighed for at gøre en overensstemmende fortolkning af national ret gældende over for borgerne (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 45 og den deri nævnte retspraksis).

88 Det var på grundlag af disse betragtninger, at Domstolen opfordrede den forelæggende ret til at undersøge, om der i dansk ret fandtes en almindelig bestemmelse eller grundsætning, hvorefter der gjaldt et forbud mod retsmisbrug, eller andre bestemmelser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med bestemmelse i direktiv 90/434, hvorefter en medlemsstat i det væsentlige kan nægte at indrømme den fradragsret, der er fastsat i dette direktiv, såfremt der er tale om en transaktion, der som sit væsentligste formål har en sådan svig eller unddragelse, og dernæst i givet fald at undersøge, om betingelserne for at anvende disse nationale bestemmelser var opfyldt i hovedsagen (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 46 og 47).

89 Selv hvis det i hovedsagerne skulle vise sig, at national ret ikke indeholder regler, der kan fortolkes i overensstemmelse med artikel 1, stk. 2, i direktiv 90/435, kan det - uanset hvad Domstolen udtalte i dom af 5. juli 2007 (C-321/05, EU:C:2007:408) - imidlertid ikke heraf udledes, at de nationale myndigheder og domstole er forhindret i at nægte at indrømme den fordel, der følger af den ret til fritagelse, der er fastsat i dette direktivs artikel 5, i tilfælde af svig eller retsmisbrug (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 54).

90 En nægtelse, der under sådanne omstændigheder gøres gældende over for en skattepligtig person, kan ikke henføres til den situation, som er omhandlet i nærværende doms præmis 86, idet en sådan nægtelse stemmer overens med det generelle EU-retlige princip om, at ingen kan gøre EU-retten gældende med henblik på at muliggøre svig eller misbrug (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 55 og 56 og den deri nævnte retspraksis).

91 For så vidt som forhold, der har karakter af svig eller misbrug, ikke kan danne grundlag for en ret i henhold til Unionens retsorden, således som det er anført i nærværende doms præmis 70, indebærer nægtelsen af en fordel i henhold til et direktiv, såsom direktiv 90/435, ikke, at den berørte borger pålægges en forpligtelse i medfør af dette direktiv, men er blot en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel, som er fastsat i det nævnte direktiv for så vidt angår denne ret, alene er opfyldt formelt (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 57 og den deri nævnte retspraksis).

92 Under sådanne omstændigheder skal medlemsstaterne derfor nægte at indrømme den fordel, der følger af direktiv 90/435, i overensstemmelse med det generelle princip om forbud mod misbrug, hvorefter EU-retten ikke kan dække erhvervsdrivendes retsstridige transaktioner (jf. i denne retning dom af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99 og den deri nævnte retspraksis).

93 Henset til konstateringen i nærværende doms præmis 72 er det ufornødent at besvare den forelæggende rets andet spørgsmål i de to sager, der nærmere vedrører spørgsmålet om, hvorvidt en bestemmelse i en dobbeltbeskatningsoverenskomst, som henviser til begrebet »retmæssig ejer«, kan udgøre et retsgrundlag til bekæmpelse af svig og misbrug inden for rammerne af direktiv 90/435.

94 På denne baggrund er det ligeledes ufornødent at besvare det tredje spørgsmål i de to sager og det tredje spørgsmål, litra a)-c), i de to sager, der vedrører fortolkningen af samme begreb om den »retmæssige ejer«, eftersom disse spørgsmål alene er forelagt for det tilfælde, at de to sagers andet spørgsmål måtte blive besvaret bekræftende.

95 Henset til samtlige disse forhold skal det første spørgsmål i de to sager besvares med, at det generelle EU-retlige princip, hvorefter borgerne ikke må påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i direktiv 90/435, selv om der ikke

**1608**

findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

*Om det fjerde spørgsmål, litra d) og e), og det femte og det ottende spørgsmål i hovedsagerne*

96 Med det fjerde spørgsmål, litra d) og e), og det ottende spørgsmål i hovedsagerne ønsker den forelæggende ret nærmere bestemt oplyst, hvilke elementer der udgør retsmisbrug, og på hvilken måde det kan påvises, at disse elementer foreligger. I denne henseende ønsker den forelæggende ret navnlig oplyst, om et selskab kan anses for reelt at have modtaget udbytte fra sit datterselskab, såfremt dette selskab i henhold til en kontraktuel eller juridisk forpligtelse skal videreudlodde dette udbytte til tredjemand, eller såfremt det fremgår af de faktiske omstændigheder, at dette selskab, uden at være bundet af en sådan kontraktuel eller juridisk forpligtelse, »substantielt« ikke har rettighederne til at »bruge og nyde disse midler« som omhandlet i de kommentarer til OECD's modelbeskatningsoverenskomst af 1977, der blev vedtaget i 2014. Den ønsker også oplyst, om der kan foreligge retsmisbrug, såfremt den retmæssige ejer af udbytte, der overføres af gennemstrømningsselskaber, i sidste ende er et selskab med hjemsted i en tredjestat, med hvilken den pågældende medlemsstat har indgået en dobbeltbeskatningsoverenskomst. Med det ottende spørgsmål i de to sager ønsker den forelæggende ret endvidere nærmere bestemt oplyst, om en medlemsstat, der nægter at anerkende et selskab i en anden medlemsstat som retmæssig ejer af udbytte, er forpligtet til at fastlægge, hvilket selskab medlemsstaten i givet fald anser for den retmæssige ejer.

*Spørgsmålet om, hvilke elementer der udgør retsmisbrug, og de dertil hørende beviser*

97 Som det fremgår af Domstolens praksis, kræves der med henblik på at bevise, at der foreligger misbrug, dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved

kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (dom af 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, præmis 52 og 53, og af 12.3.2014, O. og B., C-456/12, EU:C:2014:135, præmis 58).

98 Det er således undersøgelsen af disse sammenfaldende omstændigheder, som gør det muligt at efterprøve, om de elementer, der udgør misbrug, foreligger, og navnlig om de pågældende erhvervsdrivende har foretaget rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål at opnå en uretmæssig fordel (jf. i denne retning dom af 20.6.2013, Newey, C-653/11, EU:C:2013:409, præmis 47-49, af 13.3.2014, SICES m.fl., C-155/13, EU:C:2014:145, præmis 33, og af 14.4.2016, Cervati og Malvi, C-131/14, EU:C:2016:255, præmis 47).

99 Det tilkommer ikke Domstolen at vurdere de faktiske omstændigheder i hovedsagerne. Domstolen kan i en præjudiciel forelæggelsessag imidlertid i givet fald give den nationale domstol nærmere oplysninger med henblik på at vejlede den ved bedømmelsen af de konkrete sager, som den skal pådømme. Selv om der i hovedsagerne foreligger en række holdepunkter, på baggrund af hvilke det ville kunne konkluderes, at der foreligger retsmisbrug, påhviler det ikke desto mindre den forelæggende ret at efterprøve, om disse holdepunkter er objektive og samstemmende, og om de sagsøgte i hovedsagerne har haft mulighed for at føre modbevis.

100 En koncern, som ikke er tilrettelagt af grunde, der afspejler den økonomiske realitet, som har en struktur, der er rent formel, og som har til hovedformål eller som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse, kan anses for et kunstigt arrangement. Dette er navnlig tilfældet, når betalingen af udbytteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som udlodder udbyttet, og det selskab, der er udbyttets retmæssige ejer.

101 Det udgør således et holdepunkt for at antage, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse, der er fastsat i artikel 5 i direktiv 90/435, at dette udbytte i sin helhed eller stort set i sin helhed ganske kort tid efter modtagelsen heraf videreudloddes af det selskab, som har modtaget det, til enheder, som ikke opfylder betingelserne for anvendelse af direktiv 90/435, enten fordi disse enheder ikke er hjemmehørende i en medlemsstat, fordi de ikke er stiftet under en af de former, som er omfattet af nævnte direktiv, fordi de ikke er omfattet af en af de skatter, der er opregnet i nævnte direktivs artikel 2, litra c), eller fordi de ikke har karakter af »moderselskab« og ikke opfylder de betingelser, der er fastsat i samme direktivs artikel 3.

102 Enheder, hvis skattemæssige hjemsted er beliggende uden for EU, sådan som det synes at være tilfældet for de selskaber, der er omhandlet i sag C-117/16, eller de kapitalfonde, der er omhandlet i sag C-116/16, opfylder således ikke betingelserne for anvendelse af direktiv 90/435. Såfremt udbyttet i disse sager var blevet betalt direkte af det danske selskab, der skulle udbetale dem, til de enheder, som ifølge Skatteministeriet var udbyttets retmæssige ejere, ville Kongeriget Danmark have kunnet opkræve kildeskat.

103 Den kunstige karakter af et arrangement kan ligeledes underbygges ved, at den pågældende koncern

**1609**

er tilrettelagt således, at det selskab, der modtager det udbytte, der betales af debitorselskabet, selv skal videreudlodde dette udbytte til et tredje selskab, som ikke opfylder betingelserne for anvendelse af direktiv 90/435, hvilket medfører, at dette selskab alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som gennemstrømningsselskab for at muliggøre pengestrømmen fra

debitorselskabet til den enhed, som er de overførte beløbs retmæssige ejer.

104 Den omstændighed, at et selskab opererer som gennemstrømningsselskab, kan godtgøres, såfremt selskabets eneste aktivitet er at modtage udbyttet og videreudlodde det til den retmæssige ejer eller til øvrige gennemstrømningsselskaber. Den manglende faktiske økonomiske aktivitet skal i denne henseende i lyset af de særlige kendetegn ved den pågældende økonomiske aktivitet udledes af en undersøgelse af samtlige relevante elementer vedrørende bl.a. driften af selskabet, dets regnskab, strukturen af selskabets omkostninger og de reelt afholdte udgifter, det personale, som selskabet beskæftiger, og de lokaler og det udstyr, som det råder over.

105 Der kan endvidere findes holdepunkter for, at der foreligger et kunstigt arrangement, i den omstændighed, at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, samt i fremgangsmåden for transaktionernes finansiering, i vurderingen af de mellemliggende selskabers egenkapital og i gennemstrømningsselskabernes manglende beføjelser til at råde økonomisk over det modtagne udbytte. I denne henseende er det ikke alene en kontraktuel eller juridisk forpligtelse for det selskab, der modtager udbyttet, til at videreudlodde det til tredjemand, der kan udgøre et sådant holdepunkt, men ligeledes den omstændighed, at dette selskab, uden at være bundet af en sådan kontraktuel eller juridisk forpligtelse, »substantielt«, således som den forelæggende ret har anført det, ikke har rettighederne til at bruge og nyde dette udbytte.

106 Sådanne holdepunkter kan i øvrigt bestyrkes i tilfælde af sammenfald eller tidsmæssig nærhed mellem på den ene side ikrafttrædelsen af ny vigtig skattelovgivning, såsom den i hovedsagerne omhandlede danske lovgivning eller den i nærværende doms præmis 51 nævnte amerikanske lovgivning, og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern.

107 Den forelæggende ret ønsker ligeledes nærmere bestemt oplyst, om der kan foreligge retsmisbrug, såfremt den retmæssige ejer af udbytte, der overføres af gennemstrømningsselskaber, i sidste ende er et selskab med hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af udbyttet, såfremt det var blevet udloddet direkte til det selskab, der er hjemmehørende i denne tredjestat.

108 I denne henseende er det ved undersøgelsen af koncernstrukturen uden betydning, at visse af de retmæssige ejere af udbytte, som er blevet overført af gennemstrømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst. Det skal således fastslås, at den omstændighed, at der findes en sådan overenskomst, ikke i sig selv kan udelukke, at der foreligger retsmisbrug. En overenskomst af denne art kan dermed ikke rejse tvivl om, at der foreligger et retsmisbrug, hvis dette er behørigt godtgjort på grundlag af samtlige de faktiske omstændigheder, som bevidner, at de erhvervsdrivende har udført rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål uretmæssigt at drage fordel af den fritagelse for kildeskat, der er fastsat i artikel 5 i direktiv 90/435.

109 Det skal hertil tilføjes, at mens en beskatning skal svare til en økonomisk realitet, kan den omstændighed, at der findes en dobbeltbeskatningsoverenskomst, ikke som sådan godtgøre realiteten af en betaling, der er foretaget til modtagere, som er hjemmehørende i den tredjestat, med hvilken denne overenskomst er indgået. Såfremt debitorselskabet for udbyttet ønsker at drage fordel af en sådan overenskomst, er det muligt for selskabet at udlodde dette udbytte direkte til de enheder, som har deres skattemæssige hjemsted i en stat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst.

110 Når dette er sagt, kan der heller ikke udelukkes, såfremt der foreligger en situation, hvor udbyttet ville have været fritaget, hvis det var blevet udloddet direkte til det selskab, som har sit hjemsted i en tredjestat, at målet med koncernstrukturen ikke er udtryk for retsmisbrug. I et sådant tilfælde kan koncernens valg af en sådan struktur i stedet for direkte udlodning af udbyttet til nævnte selskab ikke anfægtes.

111 Såfremt den retmæssige ejer af en udbytteudlodning har sit skattemæssige hjemsted i en tredjestat, er nægtelsen af den fritagelse, der er fastsat i artikel 5 i direktiv 90/435, i øvrigt på ingen måde underlagt en konstatering af, at der foreligger svig eller retsmisbrug.

112 Dette direktiv har, således som det bl.a. fremgår af tredje betragtning hertil, til formål ved indførelse af en fælles beskatningsordning at fjerne enhver forskelsbehandling af samarbejde mellem selskaber fra forskellige medlemsstater i forhold til samarbejde mellem selskaber fra samme medlemsstat og således lette sammenslutninger af selskaber på EU-plan (dom af 8.3.2017, Wereldhave Belgium m.fl., C-448/15, EU:C:2017:180, præmis 25 og den deri nævnte

**1610**

retspraksis). Som det er fremhævet i nærværende doms præmis 78, tilsigter direktivet således at sikre den skattemæssige neutralitet af udbytteudlodning fra et datterselskab, der er beliggende i en medlemsstat, til dettes moderselskab, der er hjemmehørende i en anden medlemsstat, idet der fremgår af direktivets artikel 1, at det alene omfatter overskud, som selskaber i en medlemsstat modtager som udbytte fra deres datterselskaber med hjemsted i andre medlemsstater (jf. i denne retning kendelse af 4.6.2009, KBC Bank og Beleggen, Risicokapitaal, Beheer, C-439/07 og C-499/07, EU:C:2009:339, præmis 62 og den deri nævnte retspraksis).

113 Mekanismerne i direktiv 90/435, navnlig direktivets artikel 5, er derfor udformet med henblik på de situationer, hvor medlemsstaternes udøvelse af deres beskatningsbeføjelse kunne føre til - såfremt mekanismerne ikke fandt anvendelse - at udbytte, som et datterselskab udlodder til sit moderselskab, undergives dobbeltbeskatning (dom af 8.3.2017, Wereldhave Belgium m.fl., C-448/15, EU:C:2017:180, præmis 39). Sådanne mekanismer kan derimod ikke finde anvendelse, såfremt udbyttets retmæssige ejer er et selskab, hvis skattemæssige hjemsted er beliggende uden for EU, eftersom fritagelsen for kildeskat af nævnte udbytte i den medlemsstat, hvorfra udbyttet udloddes, i et sådant tilfælde risikerer at medføre, at udbyttet ikke beskattes effektivt inden for EU.

114 Henset til samtlige disse forhold skal hovedsagernes fjerde spørgsmål, litra d) og e), besvares med, at der med henblik på at bevise, at der foreligger retsmisbrug, kræves dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel. Den omstændighed, at en række holdepunkter foreligger, kan godtgøre, at der foreligger retsmisbrug, forudsat at disse holdepunkter er objektive og samstemmende. Sådanne holdepunkter kan bl.a. være, at der findes gennemstrømningsselskaber, som ikke har nogen økonomisk begrundelse, og den rent formelle karakter af en koncerns struktur, af den finansielle konstruktion og af lån.

*Bevisbyrden for, at der foreligger retsmisbrug*

115 Det bemærkes, at direktiv 90/435 ikke indeholder bestemmelser om, hvem der bærer bevisbyrden for, at der er tale om misbrug.

116 Som den danske og den tyske regering har gjort gældende, påhviler det imidlertid de selskaber, som ønsker at opnå den fritagelse for kildeskat af udbytte, der er fastsat i artikel 5 i direktiv 90/435, at godtgøre, at de opfylder de objektive betingelser, som direktivet fastsætter. Der er således intet til hinder for, at de berørte skattemyndigheder afkræver den skattepligtige de beviser, som de finder nødvendige for at foretage en konkret ansættelse af de pågældende skatter og afgifter, og i givet fald afslår en anmodet fritagelse, hvis sådanne beviser ikke fremlægges (jf. i denne retning dom af 28.2.2013, Petersen og Petersen, C-544/11, EU:C:2013:124, præmis 51 og den deri nævnte retspraksis).

117 Såfremt en skattemyndighed i kildestaten har til hensigt at nægte et selskab, som har udbetalt udbytte til et selskab med hjemsted i en anden medlemsstat, den fritagelse, der er fastsat i artikel 5 i direktiv 90/435, med den begrundelse, at der foreligger retsmisbrug, påhviler det derimod denne myndighed at godtgøre, at de elementer, som udgør et sådant misbrug, foreligger ved at tage hensyn til samtlige relevante forhold, bl.a. den omstændighed, at det selskab, til hvilket udbyttet er blevet udloddet, ikke er udbyttets retmæssige ejer.

118 I denne henseende påhviler det ikke en sådan myndighed at fastlægge dette udbyttes retmæssige ejer, men at godtgøre, at den hævdede retmæssige ejer blot er et gennemstrømningsselskab, hvorigennem et retsmisbrug har fundet sted. Det kan nemlig vise sig umuligt at foretage en sådan fastlæggelse, navnlig eftersom de potentielle retmæssige ejere er ukendte. De nationale skattemyndigheder har ikke nødvendigvis de fornødne oplysninger med henblik på at kunne fastlægge disse retmæssige ejere, henset til kompleksiteten af visse finansielle konstruktioner og muligheden for, at de mellemliggende selskaber, der er involveret i konstruktionen, er hjemmehørende uden for EU. Det kan således ikke kræves, at disse myndigheder fremlægger beviser, som det vil være umuligt for dem at føre.

119 Selv hvis de potentielle retmæssige ejere er kendte, er det desuden ikke nødvendigvis fastlagt, hvilke af disse der er eller vil blive de reelle retmæssige ejere. I det foreliggende tilfælde har den forelæggende ret vedrørende sag C- 117/16 således anført, at selv om Y Cyprus' moderselskab og Y Bermuda, der er hjemmehørende på Bermuda, er sidstnævntes moderselskab Y USA, der er hjemmehørende i De Forenede Stater. Såfremt den forelæggende ret måtte finde, at Y Cyprus ikke er udbyttets retmæssige ejer, vil det dermed med al sandsynlighed være umuligt for skattemyndighederne og domstolene i den medlemsstat, hvorfra udbyttet hidrører, at fastlægge, hvilket af disse to moderselskaber der er eller vil blive udbyttets retmæssige ejer. Der vil navnlig kunne blive truffet beslutning om anvendelsen af dette udbytte efter skattemyndighedernes konstateringer vedrørende gennemstrømningsselskabet.

120 Det ottende spørgsmål i hovedsagerne skal følgelig besvares med, at en national myndighed med henblik på at nægte at anerkende det et selskab som retmæssig ejer af udbytte eller med henblik på at fastslå, at der

**1611**

foreligger retsmisbrug, ikke er forpligtet til at fastlægge, hvilken enhed eller hvilke enheder myndigheden anser for dette udbyttes retmæssige ejer.

## IV. Retsgrundlag Selskabsskatteloven

*Lovbekendtgørelse nr. 585 af 7. august 1991 af lov om indkomstbeskatning af aktieselskaber m.v. (Selskabsskat)*

Lovbekendtgørelsens § 2, stk. 1, litra c, var affattet således:

»*§ 2.* Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1 og 2, der har hjemsted i udlandet, for så vidt de

…

c) oppebærer udbytteindtægter m.v., i hvilke der i henhold til kildeskattelovens § 65 skal foretages indeholdelse af udbytteskat, modtager udbytter i øvrigt omfattet af ligningslovens § 16 A, stk. 1, eller modtager afståelsessummer omfattet af ligningslovens § 16 B, stk. 2 eller 5,«

*Implementering af moder-/datterselskabsdirektivet, 1992*

Rådets direktiv af 23. juli 1990 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater (90/435/EØF) (moder-/datterselskabsdirektivet) bestemmer:

»*Artikel 1*

1.    Hver medlemsstat anvender dette direktiv:

-       på overskud, som selskaber i denne medlemsstat modtager som udbytte fra deres datterselskaber i andre medlemsstater

-       på overskud, som selskaber i denne medlemsstat udlodder til selskaber i andre medlemsstater, som de er datterselskaber af.

2.    Dette direktiv er ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

*Artikel 2*

Ved udtrykket »selskab i en medlemsstat« forstås i dette direktiv ethvert selskab: a) der er organiseret i en af de former, der er anført i bilaget til dette direktiv

…

*Artikel 3*

1. I dette direktiv:

a)    betegnes som moderselskab mindst ethvert selskab i en medlemsstat, der opfylder betingelserne i artikel 2, og hvis andel i kapitalen i et selskab i en anden medlemsstat, der opfylder de samme betingelser, er på mindst 25 %

b)    forstås ved datterselskab et selskab, i hvis kapital et andet selskab har den i litra a) omhandlede andel.

…

*Artikel 5*

1. Det udbytte, som et datterselskab udlodder tir sit moderselskab, fritages for kildeskat, i det mindste når moderselskabet har en kapitalandel i datterselskabet på mindst 25 %.

*Artikel 9*

Dette direktiv er rettet til medlemsstaterne.«

Direktivet blev implementeret i dansk ret ved lov nr. 219 af 3. april 1992, således at der i selskabsskattelovens § 2 efter stk. 4, blev indsat:

»*Stk. 5.* Skattepligten i medfør af stk. 1, litra c, omfatter ikke udbytte, som et selskab, der er hjemmehørende i en stat, der er medlem af De Europæiske Fællesskaber, modtager i udbytte fra et selskab, der er hjemmehørende her i landet. Det er en betingelse, at det udbyttemodtagende selskab - moderselskabet - har ejet mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab - datterselskabet - enten i hele det indkomstår, hvori udbyttet er modtaget, eller i en sammenhængende periode på mindst ½ år frem til det tidspunkt, hvor udbyttet modtages. Det er endvidere en betingelse, at såvel moderselskabet som datterselskabet er begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF.«

Af de generelle bemærkninger til lovforslaget (lovforslag nr. L 20 af 3. oktober 1991), der lå til grund herfor, fremgår bl.a.:

»3. …

Moder-/datterselskabsdirektivet blev vedtaget af Rådet af økonomi- og finansministre den 23. juli 1990. Folketingets Skatteudvalg har den 6. juni 1990 afgivet udtalelse til Folketingets Markedsud-

valg om bl.a. moder-/datterselskabsdirektivet (Alm. del bilag 243). Direktivet er optrykt som bilag til dette lovforslag.

Moder-/datterselskabsdirektivet går ud på at harmonisere medlemsstaternes skatteregler for at undgå økonomisk dobbeltbeskatning af den del af et datterselskabs overskud, der udloddes som udbytte til dets moderselskab i en anden medlemsstat.

Direktivet går ud fra det grundprincip, at overskuddet i et datterselskab alene skal beskattes i datterselskabet og i den stat, hvor datterselskabet er hjemmehørende.

Direktivet har derfor regler om, at ved udlodning af udbytte fra et datterselskab til et moderselskab i en anden medlemsstat må den stat, hvor datterselskabet er hjemmehørende, ikke opkræve udbytteskat af udbyttet. Direktivet har endvidere regler om, at moderselskabet ikke skal beskattes af udbyttet fra datterselskabet.

Den stat, hvor moderselskabet er hjemmehørende, kan enten undlade at beskatte udbyttet eller beskatte udbyttet, men give fradrag i moderselskabets skat for den del af datterselskabets skat, der vedrører udbyttet.

a) Efter de gældende regler i selskabsskatteloven og kildeskatteloven er et moderselskab, der er hjemmehørende i en anden EF-medlemsstat, begrænset skattepligtig i Danmark af udbytte fra et dansk datterselskab. Skatten udgør 30 pct. af udbyttet.

### 1612

Det foreslås, at den begrænsede skattepligt af udbytte ophæves i denne situation.

Det foreslås tilsvarende, at der ikke skal indeholdes udbytteskat i udbytte, som et moderselskab i en anden EF-medlemsstat modtager fra dets danske datterselskab.

De gældende dobbeltbeskatningsoverenskomster med de andre EF-medlemsstater afskærer eller begrænser imidlertid allerede nu Danmarks adgang til udbyttebeskatningen.

…

4. Provenumæssige konsekvenser.

…

Forslaget om at fritage udbytte fra et datterselskab her i landet til et moderselskab hjemmehørende i en anden medlemsstat fra beskatning skønnes på grundlag af Nationalbankens valutastatistik at medføre et provenutab på op mod 20 mill. kr. årligt.«

Af de specielle bemærkninger til lovforslaget (lovforslag nr. L 20 af 3. oktober 1991), der lå til grund herfor, fremgår bl.a.:

»De foreslåede bestemmelser i § 3, nr. 1 og §§ 6-8 vedrører gennemførelsen af moder-/datterselskabsdirektivet i dansk skattelovgivning.

Til nr. 1.

Ifølge selskabsskattelovens § 2, stk. 1, litra c, er et moderselskab, der er hjemmehørende i udlandet, begrænset skattepligtig for så vidt det modtager udbytteindtægter m.v., i hvilke der i henhold til kildeskattelovens § 65 skal foretages indeholdelse af kildeskat, modtager udbytter i øvrigt omfattet af ligningslovens § 16 A, stk. 1, eller modtager afståelsessummer omfattet af ligningslovens § 16 B, stk. 2 eller stk. 5.

…

Ifølge moder-/selskabsdirektivets artikel 5, stk. 1, skal udbytte, som et datterselskab udlodder til sit moderselskab, fritages for kildeskat, i hvert fald når moderselskabet har en kapitalandel på mindst 25 pct.

Det foreslås derfor, at der i selskabsskattelovens § 2 som nyt stk. 5 indsættes i bestemmelse om, at skattepligten i medfør af § 2, stk. 1, litra c, ikke omfatter udbytte, som et moderselskab, der er hjemmehørende i en EF-medlemsstat, modtager i udbytte fra et selskab, der er hjemmehørende her i landet. Det skal være en betingelse, at moderselskabet i hele det indkomstår, hvori udbyttet er

modtaget, har ejet mindst 25 pct. af aktiekapitalen i datterselskabet. Det skal endvidere være en betingelse, at såvel moderselskabet som datterselskabet er omfattet af moder-/datterselskabsdirektivet, det vil sige, at de er omfattet af begrebet »selskab i en medlemsstat« i moder-/datterselskabsdirektivets artikel 2.

Begrebet »selskab i en medlemsstat« er i direktivets artikel 2 defineret som ethvert selskab,

a)    der antager en af de former, der er nævnt i et bilag til direktivet,

b)    som ifølge skattelovgivningen i en medlemsstat anses for at være hjemmehørende i denne stat i skatteretlig forstand, og som i henhold til en overenskomst om dobbeltbeskatning med tredieland ikke anses for at være hjemmehørende uden for Fællesskabet,

c)    som desuden uden valgmulighed og uden fritagelse er omfattet af en af de former for skat, der er nævnt i direktivets artikel 2, litra c, eller enhver anden form for skat, der træder i stedet for en af de nævnte former for skat.

For Danmarks vedkommende vil alene aktieselskaber og anpartsselskaber, der er skattepligtige efter selskabsskattelovens § 1, stk. 1, nr. 1, kunne opfylde betingelserne for at være »selskab i en medlemsstat«.

Ifølge moder-/datterselskabsdirektivets artikel 1, stk. 2, er direktivet ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig eller misbrug. Det foreslås derfor i lovforslagets *§ 3, nr. 1*, at bestemmelsen i ligningslovens § 16 B, stk. 5, 3. punktum, også kommer til at omfatte udbytte som omhandlet i selskabsskattelovens § 2, stk. 5. Der henvises til bemærkningerne til § 3, nr. 1.

Det foreslås i *§ 7*, at der i kildeskattelovens § 65 som et nyt stk. 5 indsættes en bestemmelse om, at der, når de samme betingelser er opfyldte, ikke skal indeholdes udbytteskat af udbytte, som et moderselskab, der er hjemmehørende i en EF-medlemsstat, modtager fra et selskab, der er hjemmehørende her i landet.«

Af de nævnte bemærkninger til lovforslagets § 3, nr. 1, vedrørende ligningslovens § 16 B, stk. 5, fremgår bl.a.:

»Moderselskaber kan ved afståelse af datterselskabsaktier være omfattet af ligningslovens § 16 B, stk. 5, hvorved afståelsessummen beskattes som udbytte hos moderselskabet, selvom en udbytteudlodning fra datter- til moderselskab ville være skattefri efter selskabsskattelovens § 13, stk. 1, nr. 2, og stk. 3.

Reglen skal hindre, at et selskabs aktionærer omgår udbyttebeskatningen ved for eksempel at lade selskabet overdrage sin virksomhed til et datterselskab, hvorefter datterselskabsaktierne afstås til et holdingselskab, som kontrolleres af samme aktionærkreds som det sælgende selskab. Uden ligningslovens § 16 B ville aktionærerne ved efterfølgende salg eller likvidation af moderselskabet kunne tage midler ud af selskabet uden at afgive indflydelse på virksomheden.

Afstår et dansk moderselskab aktier, således at moderselskabet skal medregne afståelsessummen i den skattepligtige indkomst efter ligningslovens § 16 B, stk. 5, kan datterselskabet efter gældende regler ikke

### 1613

udlodde skattefrit udbytte til et dansk moderselskab efter selskabsskattelovens § 13, stk. 1, nr. 2, og stk. 3, i det pågældende samt i de to forudgående indkomstår forud for aktieafståelsen. De udloddede udbytter skal i stedet medregnes ved opgørelsen af det modtagende selskabs skattepligtige indkomst for de år, hvor udlodningerne har fundet sted.

Reglen er begrundet i, at moderselskabet, der afstår aktierne, ikke skal kunne nedsætte beskatningen efter ligningslovens § 16 B, stk.

5, ved forud for aktieafståelsen at tømme datterselskabet gennem skattefri udbytter.

Moder-/datterselskabsdirektivet er efter direktivets artikel 1, stk. 2, ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug. Som følge af direktivet indføres der en ny bestemmelse om skattefri udbytte i selskabsskattelovens § 2, stk. 5. Begrundelsen for efter ligningslovens § 16 B, stk. 5, at beskatte moderselskaber af afståelsessummer, også hvor en udbytteudlodning fra datterselskabet ville være skattefri, gælder i samme grad begrænset skattepligtige moderselskaber (med danske aktionærer) som fuldt skattepligtige moderselskaber. Det foreslås derfor, at den nye regel om skattefri udbytter, som et moderselskab hjemmehørende i en EF-stat modtager fra et dansk datterselskab, heller ikke skal finde anvendelse i det pågældende samt i de to senest forudgående indkomstår forud for aktieafståelsen, hvis denne er omfattet af ligningslovens § 16 B.«

*Afskaffelse af udbyttebeskatning vedrørende bl.a. udlodning af udbytte fra danske datterselskaber til udenlandske moderselskaber, 1998*

Ved lov nr. 1026 af 23. december 1998 om ændring af forskellige skattelove (International beskatning af udbytter og aktieavancer m.v.) fik selskabsskattelovens § 2, stk. 1, litra c, følgende ordlyd:

»Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1 og 2, der har hjemsted i udlandet, for så vidt de

…

c)      oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, eller afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Det er en betingelse, at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF,

…«.

§ 2, stk. 5, blev samtidig ophævet.

Selskabsskattelovens *§ 13* blev samtidig affattet således:

»§ 13. Til den skattepligtige indkomst medregnes ikke:

…

2.      Udbytte, som de i § 1, stk. 1, nr. 1-2 d, 3 a-5 og 5 b, nævnte selskaber og foreninger m.v. modtager af aktier eller andele i selskaber omfattet af § 1, stk. 1, nr. 1 og 2, eller selskaber hjemmehørende i udlandet. Dette gælder dog kun, hvis det udbyttemodtagende selskab, moderselskabet, ejer mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab, datterselskabet, i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. …

Af de almindelige bemærkninger til lovforslaget (lovforslag nr. L 53 af 21. oktober 1998), der lå til grund herfor, fremgår bl.a.:

»Det foreslås at omlægge beskatningen af udbytter og aktieavancer, som oppebæres af danske moderselskaber og personaktionærer fra selskaber i udlandet, ligesom det foreslås at afskaffe den danske kildeskat på udbytter betalt af danske datterselskaber til udenlandske moderselskaber. …

Det foreslås […] at afskaffe kildeskatten på udbytter betalt til udenlandske moderselskaber, når det danske datterselskab er omfattet af EU's moder-/datterselskabsdirektiv, således at EU-selskaber og ikke-EU-selskaber skattemæssigt behandles ens. Denne kildeskat

kan i vidt omfang undgås ved at indskyde holdingselskaber i lande, i forhold til hvilke Danmark helt eller delvist er afskåret fra at indeholde kildeskat.

…

*Provenumæssige bemærkninger*

M.h.t. skattefritagelsen af udbytter fra danske datterselskaber til udenlandske moderselskaber og udbytter fra udenlandske datterselskaber til danske moderselskaber vil ændringen ikke have betydning for udbytte fra og til et andet EU-land, da disse i forvejen er skattefri, men alene i forhold til lande uden for EU.

Der er ikke faste holdepunkter for en bedømmelse af provenuvirkningen. Bl.a. er der ikke oplysninger om udenlandske moderselskabers udbytter fra Danmark eller om danske moderselskabers datterselskabsudbytte fra ikke-EU-lande. På den anden side må det inddrages i vurderingen, at den gældende beskatning kan omgås ved omdirigering af udbytterne til selskaber i 3. lande, således at udbytterne ikke beskattes her i landet.«

Af bemærkningerne til lovforslagets enkelte bestemmelser fremgår bl.a.: »Til § 1, nr. 1 og 2.

Udbytte, som betales fra et dansk datterselskab til et udenlandsk moderselskab, er undergivet begrænset skattepligt til Danmark, jf. selskabsskattelovens § 2, stk. 1, litra c. Skattepligten opfyldes ved, at det udbyttebetalende danske selskab indeholder en kildeskat på 25 pct.

**1614**

af det udbytte, der betales til den udenlandske aktionær. Dette gælder, hvad enten den udenlandske aktionær er en fysisk person eller et selskab, og uanset om der er tale om moder-/datterselskabsforhold eller ej.

Imidlertid findes der to meget vigtige undtagelser i moder-/datterselskabs-forhold, nemlig de undtagelser, der følger af EU's moder-/datterselskabsdirektiv, jf. § 2, stk. 5, og af de dobbeltbeskatnings-overenskomster, som Danmark har indgået.

Moder/datterselskabsdirektivet (direktiv 90/435/EØF) bestemmer bl.a., at en medlemsstat ikke må opkræve kildeskat, når udbytte betales fra et datterselskab i en medlemsstat til et moderselskab i en anden. Grænsen for ejerandelen i moder-/datterselskabsforhold er i direktivet fastsat til 25 pct., og et selskab skal være omfattet af en af de selskabstyper, der er opregnet i et bilag til direktivet, før direktivet finder anvendelse. Direktivet hindrer dog ikke en medlemsstat i at fastsætte en grænse for ejerandel, som er lavere end 25 pct., eller i at undlade at opkræve kildeskat ved udbetaling af udbytte fra andre selskaber end de, der er opregnet i direktivets bilag. I sådanne tilfælde er det selvsagt ikke noget, der forpligter moderselskabsstaten til at anvende direktivets bestemmelser.

Dobbeltbeskatningsoverenskomsterne fastsætter hver især en overgrænse for, hvor høj en kildeskat de to stater kan lægge på udbyttebetalinger. I moder-/datterselskabsforhold vil der typisk være tale om en maximal kildestatsbeskatning på 5-10 pct., men der er intet, der forhindrer en af staterne i at beskatte med en lavere sats eller helt undlade at beskatte. Grænsen for ejerandelen i moder-/datterselskabsforhold sættes oftest til 25 pct., men 10 pct. anvendes dog i visse overenskomster.

Det foreslås generelt at afskaffe kildeskatten på udbytter betalt til udenlandske moderselskaber, når det danske datterselskab er omfattet af EU's moder-/datterselskabsdirektiv, således at EU-selskaber og ikke-EU-selskaber ligestilles.«

*Genindførelse af udbyttebeskatning vedrørende bl.a. udlodning af udbytte fra danske datterselskaber til moderselskaber i ikke-EU-lande uden dobbeltbeskatningsoverenskomst med Danmark, 2001*

Ved lov nr. 282 af 25. april 2001 om ændring af selskabsskatteloven blev *§ 2*, stk. 1, litra c, 3. pkt., ændret, således at bestemmelsen fik følgende ordlyd:

»Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1 og 2, der har hjemsted i udlandet, for så vidt de

…

c)    oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, eller afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende,«.

I det oprindeligt fremsatte lovforslag nr. L 99 af 10. november 2000, havde § 2, stk. 1, litra c, 3. pkt., følgende ordlyd:

»Det er en betingelse, at moderselskabet er hjemmehørende i en stat, som er medlem af EU, i en stat, som Danmark har en dobbelt-beskatningsoverenskomst med, på Færøerne eller i Grønland, samt at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF,«.

Af de almindelige bemærkninger til lovforslaget fremgår bl.a.:

»Lov nr. 1026 af 23. december 1998 ophævede derfor beskatningen af udbytte, som et udenlandsk moderselskab modtog fra dets danske datterselskab, uanset hvor moderselskabet er hjemmehørende. …

Erfaringen har imidlertid vist, at de ny regler åbnede op for etablering af danske holdingselskaber, som alene har til formål at omgå andre landes beskatning, og at denne mulighed er blevet markedsført af danske skatterådgivere i udlandet. I tilfælde, hvor et datterselskab i f.eks. et EU-land er ejet af et moderselskab i et skattely uden dobbeltbeskatningsoverenskomst, kan koncernen erbe undgå den beskatning, som det førstnævnte land ville gennemføre ved direkte udlodning af udbytter fra datterselskabet i dette land til dets udenlandske moderselskab ved at indskyde et dansk holdingselskab.

Lovforslaget om at genindføre udbytteskatten for moderselskaber i ikke-EU-lande uden en dobbeltbeskatningsoverenskomst med Danmark er også et bidrag til de internationale bestræbelser på at modvirke skadelig skattekonkurrence eller skadelig skattepraksis, som foregår både i EU-regi og i OECD-regi.

…

De danske holdingregler adskiller sig fra andre landes tilsvarende regler derved, at de danske regler medfører skattefritagelse både for udbyttebetalinger fra et udenlandsk datterselskab og for udbyttebetalinger til et udenlandsk moderselskab. Det medfører som nævnt, at de danske regler kan anvendes til at udhule andre landes beskatning. Andre lande, som beskatter udbytter fra selskaber i disse lande til moderselskaber i skattelylande, er derfor utilfreds med, at deres beskatning kan omgås ved hjælp af de danske holdingregler.

Det foreslås derfor som et bidrag fra dansk side til at modvirke brugen af skattely og for at imødekomme

**1615**

udenlandsk kritik at genindføre skatten på 25 pct. Af udbyttebetalinger fra et dansk datterselskab til dets udenlandske moderselskab, men kun i tilfælde, hvor moderselskabet er hjemmehørende i et land uden for EU eller i et land, som ikke har en dobbeltbeskatningsoverenskomst med Danmark.«

Den 24. november 2000 besvarede skatteministeren en henvendelse fra Ernst & Young til Folketingets Skatteudvalg således:

»*Spørgsmål 1:* Det ønskes bekræftet, at et selskab eller en anden juridisk person anses at være hjemmehørende i et EU- eller DBO-land, jf. den foreslåede bestemmelse i SEL § 2, stk. 1, litra c, såfremt det er hjemmehørende i et EU- eller DBO-land enten efter skattelovgivningen eller efter selskabs-/fondslovgivningen i det pågældende land.

*Spørgsmål 2:* Det ønskes bekræftet, at det i relation til den foreslåede bestemmelse i SEL § 2, stk. 1, litra c, er uden betydning for, om et selskab, der er hjemmehørende i et EU-land, jf. svaret på spørgsmål 1, er omfattet af begrebet et selskab i EU's moder-/datterselskabsdirektivs artikel 2.

*Svar:*

…

Afskaffelsen af udbyttekildeskatten fra et dansk datterselskab til et udenlandske moderselskab blev imidlertid misbrugt ved etablering af danske holdingselskaber, som alene havde til formål at omgå andre landes beskatning.

Formålet med lovforslag L 99 er således at forhindre dette misbrug samtidig med, at lovbestemmelsen tager højde for de undtagelser til hovedreglen om 25 pct. kildeskat, som Danmark er forpligtet til at have efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst.

I relation til SEL § 2, stk. 1, litra c, kan et udenlandsk moderselskab således kun undgå den udenlandige kildeskat på 25 pct., hvis det er omfattet af begrebet »et selskab i en medlemsstat« i moder-/datterselskabsdirektivets artikel 2, eller i henhold til en dansk dobbeltbeskatningsoverenskomst er hjemmehørende i udlandet, for så vidt udbyttet er omfattet af dobbeltbeskatningsoverenskomsten. Det selskabsretlige hjemsted er ikke afgørende for definitionen af hjemstedsbegrebet i SEL § 2, stk. 1, litra c.

Det er selvfølgelig stadig et krav for at undgå den almindelige udbyttekildeskat, at de andre betingelser i SEL § 2, stk. 1, litra c, også er opfyldt. Det vil sige, at moderselskabet ejer mindst 25 pct. af aktiekapitalen i datterselskabet i en sammenhængende periode på mindst 12 fortløbende måneder, og at datterselskabet er omfattet af moder-/datterselskabsdirektivets artikel 2.«

Den 28. november 2000 besvarede skatteministeren en henvendelse fra A til Folketingets Skatteudvalg således:

»A har i en henvendelse af 21. november 2000 rettet henvendelse til Skatteudvalget for at fremsætte nogle synspunkter vedr. lovforslagets betingelse om, at moderselskabet er hjemmehørende i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med.

…

Som oplyst i mine bemærkninger til en henvendelse fra Ernst & Young til lovforslaget er det afgørende, om udbyttet fra det danske datterselskab er omfattet af en dobbeltbeskatningsoverenskomst med det land, hvor det udenlandske moderselskab er hjemmehørende.«

Den 10. januar 2001 besvarede skatteministeren en henvendelse fra Foreningen af Statsautoriserede Revisorer til Folketingets Skatteudvalg således:

»Foreningen af Statsautoriserede Revisorer har i en skrivelse af 28. november 2000 påny rettet henvendelse til skatteudvalget for at kommentere svaret på nogle spørgsmål i Ernst & Young's henvendelse.

Efter det pågældende svar (L 99 - bilag 5) kan et udenlandsk moderselskab kun undgå dansk beskatning af udbytte fra et datterselskab her i landet, hvis moderselskabet er omfattet af begrebet »et selskab i en medlemsstat« i moder-/datter-selskabsdirektivets artikel 2, eller i henhold til en dansk dobbeltbeskatningsoverenskomst er hjemmehørende i udlandet, for så vidt udbyttet er omfattet af overenskomsten.

Efter foreningens opfattelse er der ikke støtte for denne fortolkning hverken i den foreslåede bestemmelses ordlyd eller i bemærkningerne hertil. Men foreningen er enig i, at afgrænsningen i svaret ligger i forlængelse af lovforslaget.

Jeg skal hertil bemærke, at besvarelse til skatteudvalget om en foreslået bestemmelse er bidrag til fortolkning af bestemmelsen på samme måde som bemærkningerne til bestemmelsen.

Den foreslåede bestemmelse skal derfor fortolkes i overensstemmelse med det nævnte svar.

For at gøre dette helt klart vil jeg fremsætte et ændringsforslag, som tydeliggør den foreslåede bestemmelse.«

Den 10. januar 2001 sendte Skatteministeren til Folketingets Skatteudvalg følgende ændringsforslag til lovforslaget:

(Tydeliggørelse af betingelser for skattefrihed af udbytter - udsættelse af ikrafttrædelsen)

Til § 1

1. Nr. 1 affattes således:

»I § 2, stk. 1, litra c, affattes 3. pkt. således:

»Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 9O/435/E0F eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende,«

…

**1616**

Til 1)

Ændringsforslaget går ud på at tydeliggøre den foreslåede bestemmelse.

Den foreslåede bestemmelse går ud på, at der kun gælder skattefrihed for udbytter, som et dansk datterselskab udlodder til dets udenlandske moderselskab, der er hjemmehørende på Færøerne, i Grønland, i en anden EU-stat eller i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med. Når danske datterselskaber udlodder udbytte til andre udenlandske moderselskaber, skal udbyttet derimod beskattes med 28 pct.

Det foreslås at præcisere, at det er en betingelse for den foreslåede skattefrihed, at Danmark skal frafalde beskatningen af det pågældende udbytte efter bestemmelserne i moder-/datterselskabsdirektivet, eller at Danmark skal frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i dobbeltbeskatningsoverenskomsten med Færøerne, Grønland eller den pågældende anden stat.«

Ligeledes den 10. januar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende kommentarer til et »newsletter«:

»Cyprus IBCs [International Business Companies] gain importance as a result of developments in Denmark«:

»…

Lovforslagets formål er at imødegå omgåelse af andre landes beskatning, f.eks. for et moderselskab på De Britiske Jomfruøer, som har et datterselskab i Irland.

Hvis det irske datterselskab er ejet direkte af moderselskabet på Jomfruøerne, vil Irland beskatte udbyttebetaling fra datterselskab til moderselskab.

Den irske beskatning kan i dag omgås ved at indskyde et dansk holdingselskab, så det irske datterselskab udlodder udbytte til det danske holdingselskab, der videreudlodder udbyttet til moderselskabet på Jomfruøerne. Efter EU's moder-/datterselskabsdirektiv må Irland ikke beskatte udbytterne, og efter de nuværende danske regler beskatter Danmark heller ikke.

Lovforslaget imødegår denne konstruktion, idet Danmark i fremtiden vil beskatte udbytte, som et dansk selskab udlodder til et moderselskab på Jomfruøerne.

Det er korrekt, at moderselskabet på Jomfruøerne fortsat kan undgå den danske beskatning af udbytterne fra det irske selskab

ved at overdrage aktierne i det danske selskab til et mellem-holdingselskab på Cypern. I så fald vil Danmark ikke beskatte udbyttet, da moderselskabet på Cypern er omfattet af den danskcypriotiske dobbeltbeskatning[s]overenskomst.

Men som nævnt i artiklen kan moderselskabet på Jomfruøerne også undgå udbyttebeskatningen ved at erstatte det danske holdingselskab med et holdingselskab på Cypern, så det irske datterselskab udlodder udbyttet til selskabet på Cypern.

Eksemplet viser altså, at det ikke længere er de danske regler, men derimod Cyperns gunstige regler, der er forudsætningen for, at moderselskabet på Jomfruøerne kan omgå den irske beskatning af udbyttet.«

Den 11. januar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Spørgsmål 3:

Kan udtrykket i bemærkningerne »På denne baggrund skønnes merprovenuet ved forslaget at være begrænset« uddybes? Hvad skønnes der at blive tale om?

Svar:

I lovforslaget er det antaget, at udenlandske moderselskaber, som er hjemmehørende i lande uden for EU uden dobbeltbeskatningsoverenskomst med Danmark, vil opgive de danske datterselskaber, der alene er etableret som led i en international skattekonstruktion. I disse situationer vil den foreslåede udbytteskat ikke indbringe noget provenu.

Er der derimod tale om, at moderselskaber i disse lande udenfor EU uden dobbeltbeskatningsoverenskomst med Danmark har danske datterselskaber med en egentlig erhvervsaktivitet, vil disse selskaber umiddelbart kunne blive berørt af forslaget.

Selskaberne vil imidlertid kunne omstrukturere sig, således at aktierne i det danske datterselskab overdrages til et datterselskab i et land, hvortil udbyttebetalinger fortsat er fritaget for dansk udbytteskat. Dette er fordelagtigt, hvis udbyttet herfra kan videreudloddes til det egentlige moderselskab med en beskatning, som er lavere end den danske, eventuelt helt uden beskatning. Derfor skønnes provenuet fra sådanne selskaber at blive begrænset. Der er ikke holdepunkter for et talmæssigt skøn herover.«

Ligeledes den 11. januar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Ole Bjørn [formanden for Ligningsrådet og professor i skatteret ved Syddansk Universitet] …

Desuden mener han, at lovforslagets regler ikke er særligt effektive, idet den foreslåede beskatning kan undgås ved at indskyde et mellem-holdingselskab.

Kommentar:

…

Det anføres, at de foreslåede regler ikke er særligt effektive, idet de kan undgås ved et mellem-holdingselskab i et andet land, som er med i EU eller har en dobbeltbeskatningsoverenskomst med Danmark, og som har gunstige skatte regler.

Jeg vil hertil bemærke, at der i så fald er tale om, at moderselskabet i skattelylandet omgår beskatningen ved hjælp af de gunstige regler i det andet land.«

Den 26. februar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Henvendelsen: Det er Foreningen af Statsautoriserede Revisorers opfattelse, at det er uhensigtsmæssigt, at de interne danske udbyttebeskatningsregler for

**1617**

udenlandske selskaber på den i ændringsforslaget beskrevne måde knyttes til DBO'en, herunder hvorvidt det pågældende selskab i hjemlandet er skattemæssigt transparent. Skatteministeren opfordres

derfor til at overveje, om lovforslagets sigte kan opnås, uden at de interne danske regler beror på, hvorvidt DBO'en finder anvendelse.

*Kommentar:* Jeg mener ikke, at lovforslagets sigte kan opnås, uden at de interne danske regler beror på, om udbyttet frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst. Det er centralt, at den danske kildeskat på udbytter kun frafaldes, når udbyttet oppebæres af et selskab, der beskattes efter de almindelige regler for selskaber i det pågældende land.«

Den 26. marts 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»*Spørgsmål 23:* Ministeren bedes kommentere vedlagte artikel af 23. marts 2001 fra Børsen: »Skattefrihed for udbytte udhules«.

*Svar:* Børsens artikel den 23. marts 2001 kritiserer mit ændringsforslag til lovforslaget om holdingselskaber, idet forslaget udhuler skattefriheden for udbytter. Lovforslaget begrænser den nuværende regel, hvorefter Danmark ikke beskatter udbytter, som et dansk datterselskab betaler til dets udenlandske moderselskab. Efter det fremsatte lovforslag skal reglen i fremtiden alene gælde, hvis moderselskabet er hjemmehørende i et EU-land eller i et land, som har en dobbeltbeskatningsoverenskomst med Danmark. I andre tilfælde skal Danmark efter forslaget opkræve en skat på 28 pct. af udbyttet.

…

Under behandlingen af lovforslaget rettede Ernst & Young henvendelse (L 99 -bilag 2) til skatteudvalget og spurgte om forslagets virkning for de selskaber, som nok er hjemmehørende i et andet EU-land eller i andet land, der har en dobbeltbeskatningsoverenskomst med Danmark, men som alligevel ikke er beskyttet af direktivet eller overenskomsten. I et svar til skatteudvalget (L 99 -bilag 5) oplyste jeg, at disse selskaber ikke kan modtage udbytter fra et dansk datterselskab uden den foreslåede beskatning.

Foreningen af Statsautoriserede Revisorer udtalte i en henvendelse til skatteudvalget (L 99 - bilag 10), at denne afgrænsning efter foreningens opfattelse ligger i forlængelse af lovforslaget, men savner fornøden støtte i den foreslåede beskatnings-ordlyd.

På den baggrund fremsatte jeg et ændringsforslag, som præciserer, at den af gørende betingelse for skattefrihed for udbytte er, at Danmark skal frafalde eller nedsætte beskatningen af udbyttet efter moder-/datterselskabsdirektivet eller en dansk dobbeltbeskatningsoverenskomst.

…«

Det fremgår af betænkning over forslaget til lov om ændring af selskabsskatteloven (Skatteudvalget L99 bilag 43), at skatteministeren under udvalgets behandling fremsatte følgende ændringsforslag:

»I *§ 2, stk. 1, litra c,* affattes *3. pkt.* således:

»Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes bestemmelserne i direktiv 90/435/EØF eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende«.

[Tydeliggørelse af betingelser for skattefrihed af udbytter]

Bemærkninger

…

Ændringsforslaget går ud på at tydeliggøre den foreslåede bestemmelse.

Den foreslåede bestemmelse går ud på, at der kun gælder skattefrihed for udbytter, som et dansk datterselskab udlodder til dets udenlandske moderselskab, der er hjemmehørende på Færøerne, i Grønland, i en anden EU-stat eller i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med. Når danske datterselskaber udlodder udbytte til andre udenlandske moderselskaber, ska udbyttet derimod beskattes med 28 pct.

Det foreslås at præcisere, at det er en betingelse for den foreslåede skattefrihed, at Danmark skal frafalde beskatningen af det pågældende udbytte efter bestemmelserne i moder-/datterselskabsdirektivet, at Danmark skal frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i dobbeltbeskatningsoverenskomsten med Færøerne, Grønland eller den pågældende anden stat.«

*Vedrørende beskatning af deltagere i transparente moderselskaber*

Ved lov nr. 1375 af 20. december 2004 om ændring af selskabsskatteloven og kildeskatteloven (Implementering af ændring af moder-/datterselskabsdirektivet) blev der efter § 2, stk. 1, litra c, efter 3. pkt., indsat et 4. pkt. med følgende ordlyd:

»Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber som nævnt i 2. pkt., der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet.«

Af det til grund herfor fremsatte lovforslag (nr. L 27 af 7. oktober 2004) fremgår bl.a.:

»*Almindelige bemærkninger*

*Lovforslagets baggrund og formål*

Rådet har 22. december 2003 vedtaget et direktiv (2003/123/EF) om ændring af moder-/datterselskabsdirektivet (90/435/EØF).

…

**1618**

*2.1.1.* …

Ændringsdirektivet er optrykt som bilag 1 til dette lovforslag. I bilag 2 til lovforslaget er moder-/datterselskabsdirektivets bestemmelser sammenholdt med ændringsdirektivets bestemmelser.

Ændringsdirektivet indebærer,

- at moder-/datterselskabsdirektivet kan finde anvendelse på et større antal juridiske personer m.v. end hidtil, herunder det europæiske selskab (SE) og det europæiske andelsselskab (SCE),

…

2.2.2.5. Transparente selskaber

De nye virksomheder, der medtages på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a, er selskabsskattepligtige i den medlemsstat, hvor de er hjemmehørende, men nogle af dem betragtes på grund af deres juridiske karakteristika af andre medlemsstater som skattemæssigt transparente. Ifølge betragtningerne til ændringsdirektivet bør medlemsstater, der behandler ikke-hjemmehørende skattepligtige selskaber som skattemæssigt transparente på dette grundlag, give en passende skattelettelse med hensyn til indtægter, der er en del af moderselskabets beskatningsgrundlag.

…

3.2.5. Transparente selskaber

…

Transparente selskaber er ikke omfattet af den begrænsede skattepligt af udbytte fra danske selskaber i henhold til selskabsskattelovens § 2, stk. 1, litra c, idet skattepligten i henhold til denne bestemmelse påhviler selskaber og foreninger m.v. som nævnt i selskabsskattelovens § 1, stk. 1. Der er således ikke behov for en bestemmelse om, at transparente selskaber, der er omfattet af moder-/datterselskabsdirektivet, ikke er begrænset skattepligtige i Danmark af udbytte fra danske datterselskaber.

Efter de danske regler påhviler skattepligten af udbytte, der tilfalder et transparent selskab, selskabsdeltagerne.

Det foreslås derfor, at udenlandske selskabsdeltagere i et transparent selskab, der er omfattet af moder-/datterselskabsdirektivet,

ikke skal være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab. Dette skal gælde, uanset om selskabsdeltageren er et selskab eller en fysisk person og uanset selskabsdeltagerens ejerandel i det transparente selskab.
…

*Bemærkninger til de enkelte bestemmelser*
*Til nr. 4*
Der henvises til de almindelige bemærkninger, afsnit 3.2.5.

Ifølge selskabsskattelovens § 2, stk. 1, litra c, 2. pkt., er udbytte modtaget af udenlandske selskaber, foreninger m.v. skattefrit, hvis det udbyttemodtagende selskab m.v. (moderselskabet) ejer mindst 20 pct. (15 pct., 10 pct., jf. de under nr. 1 og 2 foreslåede ændringer) af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende.

Efter forslaget skal skattepligten heller ikke omfatte udbytte, som modtages af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivets artikel 2, stk. 1, litra a, men som ved beskatningen her i landet anses for at være transparente enheder.

Det skal være en betingelse, at selskabsdeltageren ikke er hjemmehørende i Danmark.

Det vil sige, at udenlandske selskabsdeltagere i et transparent moderselskab, der er omfattet af moder-/datterselskabsdirektivet, ikke skal være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab. Dette skal gælde, uanset om selskabsdeltageren er et selskab eller en fysisk person og uanset selskabsdeltagerens ejerandel i det transparente selskab.«

Selskabsskattelovens § 2, stk. 1, litra c, var på tidspunktet for udlodningerne i NetApp-sagen den 28. september 2005 og den 13. oktober 2006 sålydende (lovbekendtgørelse nr. 111 af 19. februar 2004, som senest ændret ved lov nr. 1375 af 20. december 2004):

»§ 2. Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1, der har hjemsted i udlandet, for så vidt de
…

oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, bortset fra udlodninger fra obligationsbaserede investeringsforeninger som nævnt i aktieavancebeskatningslovens § […], eller oppebærer afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 10 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Ved udbytteudlodninger i kalenderårene 2005 og 2006 udgør den i 2. pkt. nævnte ejerandel dog 20 pct., og ved udbytteudlodninger i kalenderårene 2007 og 2008 udgør den i 2. pkt. nævnte ejerandel 15 pct. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en

**1619**

dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende. Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet

anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet,«

Ved lov nr. 525 af 12. juni 2009 blev bl.a. selskabsskattelovens § 2, stk. 1, litra c, 3.- 6. pkt., ændret til at have følgende ordlyd:

»Skattepligten omfatter ikke udbytte af datterselskabsaktier, jf. *aktieavancebeskatningslovens § 4 A,* når beskatningen af udbytter fra datterselskabet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor moderselskabet er hjemmehørende. Skattepligten omfatter endvidere ikke udbytte af koncernselskabsaktier, jf. *aktieavancebeskatningslovens § 4 B,* der ikke er datterselskabsaktier, når det udbyttemodtagende koncernselskab er hjemmehørende i en stat, der er medlem af EU/EØS, og udbyttebeskatningen skulle være frafaldet eller nedsat efter bestemmelserne i direktiv 90/435/EØF eller dobbeltbeskatningsoverenskomsten med den pågældende stat, hvis der havde været tale om datterselskabsaktier. Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet,«

Ved samme lov blev aktieavancebeskatningsloven § 4 A affattet således:

»*Definition af datterselskabsaktier*
*§ 4 A.* Ved datterselskabsaktier forstås aktier, som ejes af et selskab, der ejer mindst 10 pct. af aktiekapitalen i datterselskabet, jf. dog stk. 2-4.

*Stk. 2.* Det er en betingelse efter stk. 1, at datterselskabet er omfattet af selskabsskattelovens § 1, stk. 1, nr. 1-2 a, 2 d-2 h og 3 a-5 b, eller at beskatningen af udbytter fra datterselskabet frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber for forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor datterselskabet er hjemmehørende.

*Stk. 3.* Datterselskabsaktierne anses for ejet direkte af moderselskabets selskabsaktionærer omfattet af selskabsskattelovens § 1 eller § 2, stk. 1, litra a, i tilfælde, hvor
1) moderselskabets primære funktion er ejerskab af datterselskabsaktier og koncernselskabsaktier, jf. § 4 B,
2) moderselskabet ikke udøver reel økonomisk virksomhed vedrørende aktiebesiddelsen og
3) mere end 50 pct. af aktiekapitalen i moderselskabet direkte eller indirekte ejes af selskaber omfattet af selskabsskattelovens § 1 eller § 2, stk. 1, litra a, der ikke ville kunne modtage udbytter skattefrit ved direkte ejerskab af aktierne i det enkelte datterselskab, og
4) aktierne i moderselskabet ikke er optaget til handel på et reguleret marked eller en multilateral handelsfacilitet.

*Stk. 4.* …«

Af det til grund for lovændringen fremsatte lovforslag (nr. L 202 af 22. april 2009) fremgår af bemærkningerne til lovforslagets enkelte bestemmelser vedrørende forslaget til affattelsen af selskabsskattelovens § 2, stk. 1, litra c, 3.-5. pkt., bl.a.:

»Til nr. 5 …
Derudover foreslås bestemmelsen forenklet, således at de udbytter, der er skattefri, i stedet defineres med en henvisning til den definition af datterselskabsaktier og koncernselskabsaktier, der foreslås indsat i aktieavancebeskatningsloven jf. lovforslagets § 1, nr. 6. Det er dog en betingelse, at det udbyttemodtagende koncernselskab

er hjemmehørende på Færøerne, i Grønland eller en stat, der er medlem af EU/EØS, og som udveksler oplysninger med Danmark.

Omformuleringen medfører alene mindre realitetsændringer.

Der kan endvidere henvises til bemærkningerne til lovforslagets § 1, nr. 10 om skattefrihed for avancer på datterselskabsaktier.

4. pkt. i selskabsskattelovens § 2, stk. 1, litra c, foreslås ophævet, da indholdet ikke længere er aktuelt.

Til nr. 6 [I § 2, stk. 1, litra c, 6. pkt., der bliver 5. pkt., udgår: »som nævnt i 3. pkt.]

Der er tale om en konsekvensændring som følge af lovforslagets § 14, nr. 5.«

*Ligningsvejledninger*

Af ligningsvejledningen pkt. D.D., kapitel III, artikel 10 om udbytter, offentliggjort den 29. januar 2003 fremgår bl.a.:

»Udbytte, der udbetales fra et selskab, beskattes som udgangspunkt i den stat, hvor den retmæssige ejer af udbyttet er hjemmehørende. De kontraherende stater kan dog aftale, at udbyttet under visse nærmere begrænsninger også beskattes i den stat, hvor selskabet er hjemmehørende. …

Når et dansk selskab omfattet af SEL § 1, stk. 1, nr. 1, 2, 2e og 4 udlodder udbytte, skal selskabet efter

**1620**

hovedreglen i KSL § 65, stk. 1 indeholde udbytteskat med 28 pct. Reglen gælder tillige for udlodning af udbytte til selskaber, der er skattemæssigt hjemmehørende i udlandet.«

Af ligningsvejledningen pkt. D.D, kapitel III, artikel 10 om udbytter, offentliggjort den 14. juli 2003 fremgår bl.a.:

»Udbytte, der udbetales fra et selskab, beskattes som udgangspunkt i den stat, hvor den retmæssige ejer af udbyttet er hjemmehørende. De kontraherende stater kan dog aftale, at udbyttet under visse nærmere begrænsninger også beskattes i den stat, hvor selskabet er hjemmehørende.

I 2003-opdateringen er det i kommentaren nu præciseret, at begrebet »retmæssig ejer« ikke skal forstås i en snæver teknisk sammenhæng, men snarere skal forstås ud fra en formålsfortolkning af overenskomsten, herunder hensynet til at undgå eller omgå beskatning. En agent eller nominee er ikke retmæssige ejere, det samme gælder et conduitselskab (»stråmand«) eller såkaldte fiduciares, som er personer, der formelt er ejere af et aktiv, men hvor afkastet tilkommer en »beneficiary«. En retmæssig ejer i en kontraherende stat kan påberåbe sig overenskomsten, uanset at en mellemmand er indskudt.«

Af den juridiske vejledning version 2010-2 pkt. A.A.7.1.5 fremgår bl.a.:

»Varsling af ændring med fremtidig virkning

Det er et grundlæggende forvaltningsretligt princip, at det kun er muligt at iværksætte en skærpende praksisændring med virkning for fremtiden og efter udmelding af et passende varsel, der giver borgerne mulighed for at indrette sig efter den ændrede retstilstand. …

Hvad der skal forstås som et passende varsel afhænger helt af de konkrete omstændigheder, dvs. hvilket tidsrum borgerne skønnes at have behov for til at kunne indrette sig efter praksisskærpelsen.

En praksisskærpelse skal offentliggøres på relevant måde, fx. I form af en SKM-meddelelse (styresignal) eller ved særlig nyhedsmarkering i de juridiske vejledninger.«

*Belysning af administrativ praksis*

Af skatteministerens svar af 6. november 2006 på spørgsmål S 474 til Folketingets Lovsekretariat fremgår bl.a.:

»*Spørgsmål:* Kan ministeren bekræfte, at udbytte fra danske selskaber, såfremt ejerandelen overstiger 20 pct., kan udbetales skattefrit til et moderselskab i f.eks. Luxembourg og herfra overføres til et egentligt skattelyland?

*Svar:*

…

Den begrænsede skattepligt - og fravigelsen - gælder for det selskab, der reelt *oppebærer* udbyttet. Den begrænsede skattepligt fraviges derfor kun, hvis det udenlandske selskab, der reelt oppebærer udbyttet, er omfattet af direktivet eller en dobbeltbeskatningsoverenskomst. Oppebæres skattepligt derimod reelt af et selskab i et skattelyland, er udbyttebetalingen ikke undtaget fra kildebeskatningen.

Princippet om rette indkomstmodtager må således anvendes for at fastslå, hvem der »oppebærer« renterne. Udtrykket »rette indkomstmodtager« må anses for at være meget lig udtrykket »beneficial owner«, som anvendes i dobbeltbeskatningsoverenskomsten. I dobbeltbeskatningsoverenskomsterne skal kildebeskatningen kun frafaldes eller nedsættes, hvis udbyttemes retmæssige ejer (beneficial owner) er hjemmehørende i den anden stat.

Bestemmelsen er et værn mod, at et almindeligt beskattet selskab indskydes som »conduit« selskab mellem det udbyttebetalende danske selskab og det endeligt modtagende udenlandske skattelyselskab. Bestemmelsen finder anvendelse, selvom der indskydes flere mellemliggende almindeligt beskattede selskaber. Det afgørende er, hvem der er den rette indkomstmodtager/ retmæssige ejer. »Conduit« selskaber omfatter bl.a. selskaber, der, skønt det er den formelle ejer, reelt har meget snævre beføjelser i relation til den pågældende indkomst. Selskabet er i relation til udbyttet en »nullitet« eller administrator, der handler på vegne af andre parter, jf. kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.1).

Et rent gennemstrømningsholdingselskab i eksempelvis Luxembourg vil ikke være rette indkomstmodtager /beneficial owner af udbyttet, jf. således kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.2). Det kan bemærkes, at den schweiziske højesteret er kommet frem til, at et rent gennemstrømningsholdingselskab i Danmark ikke var retmæssig ejer til udbyttebetalinger efter den dansk-schweiziske overenskomst.

Det skal nævnes, at moder-/datterselskabsdirektivet ikke indebærer, at udbyttebetalinger til gennemstrømnings selskaber skal anerkendes.

Afslutningsvis skal det bemærkes, at der ikke sker udbyttebeskatning, når udbytte udbetales til f.eks. et moderselskab omfattet af moder-/datterselskabsdirektivet, hvis dette selskab er den reelle modtager af udbyttet, selvom moderselskabet er ejet af et selskab hjemmehørende i et skattely. Hvem der er udbyttets reelle modtager, afgøres ud fra en konkret vurdering.«

I forlængelse heraf afgav skatteministeren den 27. november 2006 til Folketingets Skatteudvalg bl.a. følgende svar:

»*Spørgsmål 5:*…

*Svar:*…

Bortfaldet af begrænset skattepligt er betinget af, at det pågældende udenlandske selskab er den retmæssige ejer af udbyttet.

**1621**

Et rent gennemstrømningsselskab, som er hjemmehørende i udlandet, f.eks. Luxembourg, vil ikke være retmæssig ejer af udbyttet, jf. bemærkningerne til artikel 10 i OECDs modeloverenskomsten (afsnit 12.1).

Den begrænsede skattepligt bortfalder dog alligevel, hvis den retmæssige ejer dog selv gennemstrømningsselskabet er hjemmehørende i et andet land, og Danmark efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst med dette land skal nedsætte eller undlade beskatning af udbyttet.

…

*Spørgsmål 6:* …

*Svar:* Jeg kan ikke oplyse eksempler på udenlandske gennemstrømningsselskaber, som danske skattemyndigheder ikke har accepteret som retmæssig ejer af udbytte fra danske selskaber.

…

*Spørgsmål 10:* I hvilket omfang og hvorledes kontrollerer SKAT, når der udloddes udbytte til gennemstrømningsholdingselskaber, hvor der ikke er indeholdt udbytteskat på grund af dobbeltbeskatningsoverenskomster eller EU's moder-/datterselskabsdirektiv, om det pågældende gennemstrømningsholdingselskab skal godkendes som rette indkomstmodtager af udbyttet, eller om udbyttemodtager er aktionæren i gennemstrømningsholdingselskab, og - hvis denne aktionær er hjemmehørende i et skatteland - om det danske datterselskab skal indeholde udbytteskat i udbytteudlodningen?

*Svar:* …

Det indgår i den ligningsmæssige behandling at påse, at betingelserne for ikke at indeholde udbytteskat er opfyldt, herunder om et udenlandsk selskab er retmæssig ejer af udbyttet.

Af notat af 20. marts 2007 til Folketingets Skatteudvalg om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner fremgår bl.a.:

Kapitalfondes overtagelse af danske virksomheder har gennem de senere år udgjort en større og større andel af de samlede virksomhedsoverdragelser. SKAT har indhentet informationer om, at mere end 80 danske virksomheder gennem de senere år er blevet overtaget af danske eller udenlandske kapitalfonde.

En kapitalfond er normalt et kommanditselskab, hvor en række investorer har stillet kapital til rådighed. Med investorernes egenkapital som basis, lånes der betydelige summer i banker og andre finansielle enheder til købet af danske virksomheder.

En typisk model vil vise at investorer opretter et dansk holdingselskab, som står for opkøbet af den danske virksomhed. Holdingselskabet, som opkøber det danske selskab af den hidtidige aktionærkreds, får pengene til opkøbet via lån fra banker og investorer i kapitalfonden.

Helt generelt har SKAT fokus på virksomhedshandler, idet erfaringen viser, at der ofte er risiko for fejl ved opgørelse af den skattepligtige indkomst på dette område. Da kapitalfondenes andel af det danske marked for virksomhedshandler har været stigende, og specielt i 2005 har vist sig at udgøre et betydeligt antal med en stor volumen, har SKAT rettet fokus på denne type overtagelser.

På basis af SKATs informationer om kapitalfondes overtagelse af danske virksomheder er der udvalgt 7 opkøb af danske virksomheder til nærmere kontrol. Ved udvælgelsen lagde man vægt på, at få repræsenteret forskellige kapitalfonde, forskellige virksomhedstyper og forskel i volumen. Formålet var bl.a. efterfølgende at vurdere, om den skattemæssige behandling af opkøbet hos det enkelte selskab, var afhængig af hvilken kapitalfond der havde købt virksomheden.

I SKAT blev der indledningsvis nedsat en arbejdsgruppe. hvis formål var at skabe overblik over det teoretiske grundlag for en skattemæssig vurdering af kapitalfondenes overtagelser og med henblik på den efterfølgende konkrete kontrol af de 7 opkøb.

…

På grundlag heraf undersøges det hvem, der er den endelige modtager - »rette indkomst modtager' - af renter og udbytter. Formålet er at fastslå, om denne modtager er skattepligtig til Danmark (begrænset skattepligtig), således at der kan tilbageholdes kildeskat i udbetalingerne. Dette kan normalt kun ske, hvis modtageren er hjemmehørende i et land hvormed Danmark ikke har indgået dobbeltbeskatningsoverenskomst.

Imidlertid forlader pengestrømmen oftest Danmark netop til modtagere i lande, hvormed Danmark har indgået dobbeltbeskatningsoverenskomst - DBO-lande. Det betyder, at der ikke er be-

grænset skattepligt til Danmark, og at der ikke skal indeholdes kildeskat. Hvis den første modtager af betalingerne imidlertid ikke er den endelige modtager - »rette indkomstmodtager« - af betalingerne, men derimod kun et gennemstrømningsselskab, kan der alligevel være tale om begrænset skattepligt for den endelige (»rette«) modtager.

Derfor leder SKAT efter oplysninger, som kan dokumentere, hvem der er det sidste og endelige led i kæden, og om dette led ligger i et ikke-DBO-land. Med sidstnævnte lande uden overenskomst har Danmark typisk ikke aftaler om bistand eller udveksling af oplysning.

Nok så vigtigt er det, at SKAT også skal søge dokumentation for, at de modtagere, der ligger mellem Danmark og den endelige modtager af udbytter eller renter/kursgevinster, kan betragtes som gennemstrømningsselskaber, således at den endelige (»rette«) modtager i ikke-DBO-landet som nævnt kan pålægges begrænset skattepligt til Danmark.

Af skatteministerens svar af 15. maj 2007 (spørgsmål 75-77) til Folketingets Skatteudvalg vedrørende

**1622**

lovforslag nr. L 213 om ændring af selskabsskatteloven og forskellige andre skattelove (CFC-beskatning og indgreb mod kapitalfonde m.v.) fremgår bl.a.:

*Spørgsmål 75:*

Har Skat fortsat ikke gennemført udbyttebeskatning af såkaldte gennemstrømningsselskaber?

*Svar:*

Ved en særlige kontrolindsats har SKAT sat fokus på kapitalfondes overtagelse af danske koncerner. I den forbindelse arbejder SKAT med at fremskaffe oplysninger om modtagere af de pengestrømme, der forlader Danmark i form af udbytter og renter, idet SKAT vil have dokumentation for, at det er den »endelige modtager«, der også er rette indkomstmodtager til udbytterne og renteindtægterne. Først når dette er afklaret, kan det vurderes om Danmark har krav på kildeskat af de udbetalte beløb.

Denne undersøgelse har endnu ikke ført til udbyttebeskatning af udlodninger til gennemstrømningsselskaber.«

Af skatteministerens svar af 22. maj 2007 til Folketingets Skatteudvalg vedrørende lovforslag nr. L 213 om ændring af selskabsskatteloven og forskellige andre skattelove (CFC-beskatning og indgreb mod kapitalfonde m.v.) fremgår bl.a.:

*»Lovforslagets enkelte elementer*

…

§ 1, nr. 1 - Kildeskat på renter

Det foreslås, at bestemmelsen om kildeskat på renter i SEL § stk. 1, litra d, justeres under hensyn til ændringen af CFC-reglerne. …

…

Skatteministerens kommentar:

…

Det skal bemærkes, at hvis den umiddelbare modtager af rentebetalingen viderebetaler beløbet via en udlodning, tilbagebetaling af lån eller lignende skal det vurderes, om den umiddelbare modtager er den rette indkomstmodtager (beneficial owner). Hvis den endelige beløbsmodtager må anses for at være beneficial owner, finder betingelserne i § 2, stk. 1, litra d, umiddelbar anvendelse på den endelige beløbsmodtager.

§ 1, nr. 6 - Indgående renter fra datterselskaber

Det fremgår af bemærkningerne, at indgående udbytter ikke vil være skattefrit, selvom udbytterne udloddes af et selskab inden for EU/EØS eller et land, som har en dobbeltbeskatningsoverenskomst med Danmark, hvis dette selskab er et »gennemstrømningsselskab« mellem det danske moderselskab og datterselskab der er hjemme-

hørende uden for EU/E0S eller i et land, som ikke bar dobbeltbeskatningsoverenskomst med Danmark. Ministeriet bedes uddybe, hvad der er afgørende for, at et selskab anses for et »gennemstrømningsselskab«. FSR er uforstående overfor tankegangen om, at et udbytte ved at »gennemstrømme« en koncern kan om kvalificeres, når der ikke er tvivl om, at udbyttet har passeret de enkelte selskaber, hvilket er utvivlsomt, nar udbyttet deklareres.

…

Skatteministerens kommentar:

Princippet om beneficial owner (retmæssig ejer) er et værn mod, at et almindeligt beskattet selskab indskydes som »conduit« selskab mellem det udbyttebetalende selskab og det endeligt modtagende udenlandske skattelyselskab. Værnet finder anvendelse, selvom der indskydes flere mellemliggende almindeligt beskattede selskaber.

Det afgørende er, hvem der er den retsmæssige ejer af udbyttet. »Conduit« selskaber omfatter bl.a. selskaber, der. skønt det er den formelle ejer, reelt har meget snævre beføjelser i relation til den pågældende indkomst. Selskabet er i relation til udbyttet en »nullitet« eller administrator, der handler på vegne af andre parter, jf. kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.1).

Et rent gennemstrømningsholdingselskab i f.eks. et EU-land vil derfor ikke være beneficial owner af udbyttet. Det skal i den forbindelse nævnes, at moder-/datterselskabsdirektivet ikke indebærer, at udbyttebetalinger gennem gennemstrømningsselskaber skal anerkendes.«

Af skatteministerens svar af 22. maj 2007 til Folketingets Skatteudvalg vedrørende samme lovforslag fremgår bl.a.:

Spørgsmål 86:

Skal besvarelsen af spørgsmål 75 forstås således, at SKAT ikke tidligere har undersøgt grundlaget for skattefrihed for udbytte overført til såkaldte gennemstrømningsselskaber, på trods af at skatteministeren flere gange tidligere - f.eks. under behandlingen af lovforslag L 30 fra indeværende samling - har henvist til, at der vil ske beskatning i sådanne tilfælde?

…

Svar: …

Jeg har flere gange tidligere overfor skatteudvalget redegjort for SKATs indsatsstrategi og kan oplyse, at det af indsatsplanen 2007 fremgår, at et særligt indsatspunkt er selskaber, der enten ikke betaler skat eller kun betaler meget lidt skat. De særlige TP-lignings-centre, som blev etableret i 2005 - og de enheder, der kontrollerer de største selskaber i Danmark - er således forpligtet til at prioritere netop dette område.

…

Denne procedure sikrer, at en agent eller en mellemmand (f.eks. en bank) for en person i et tredjeland ikke vil være berettiget til nedsættelse af udbytteskatten selvom agenten eller mellemmanden er hjemmehørende i et aftaleland. Dette følger af, at agenten eller

**1623**

mellemmanden ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende.

Et gennemstrømningsselskab (holdingselskab) kan imidlertid ikke sidestilles med en agent eller en mellemmand. Et sådant selskab er indregistreret og fuldt skattepligtigt i det land, hvor der er hjemmehørende og udgangspunktet er helt klart, at et holdingselskab har krav på aftalebeskyttelse.

Ved opdateringen af OECD-modellen i 2005 blev der i et nyt punkt 12.1 i kommentaren til artikel 10 (udbytter) omtalt en OECD-rapport, ifølge hvilken et holdingselskab under ganske særlige omstændigheder ikke bør anses for at være den retmæssige ejer af udbyttet. Der blev tale om, at holdingselskabet reelt har meget

snævre beføjelser, som i relation til den pågældende indkomst gør det til en »nullitet« eller en administrator, der handler på vegne af andre parter.

Der er således meget snævre grænser for hvornår danske skattemyndigheder kan tilsidesætte et behørigt indregistreret og fuldt skattepligtigt udenlandsk selskab og som anført i svaret til spørgsmål 6 vedrørende lovforslag L 30 er der heller ikke eksempler på, at danske skattemyndigheder har nægtet at anerkende et udenlandsk holdingselskab og således anset det for en nullitet.

Skatteministeren præciserede ovenstående svar ved et revideret svar til Folketingets Skatteudvalg den 29. maj 2007 bl.a. således:

»Et holdingselskab kan ikke sidestilles med en agent eller en mellemmand. Et sådant selskab er indregistreret og fuldt skattepligtigt i det land, hvor det er hjemmehørende, - og udgangspunktet er, at et holdingselskab har krav på aftalebeskyttelse.

Det følger imidlertid af punkt 12.1 i kommentaren til OECD modellens artikel 10 (udbytter), at rene gennemstrømningsselskab bør ikke anses for at være den retmæssige ejer af udbyttet.

Gennemstrømningsselskaber har reelt meget snævre beføjelser i relation til den pågældende indkomst, hvilket gør det til en »nullitet« eller en administrator, der handler på vegne af andre parter.

Det beror på en konkret vurdering, om et holdingselskab er et gennemstrømningsselskab.«

*Lovgivning om beskatning af renter og royalties*

Af Rådets direktiv 2003/49/EF af 3. juni 2003 om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, fremgår bl.a.:

»Artikel 1
*Anvendelsesområde og procedure*

1. Betalinger af renter eller royalties, der opstår i en medlemsstat, fritages for enhver form for skat i denne stat, hvad enten den opkræves ved indeholdelse ved kilden eller ved skatteansættelse, forudsat at den retmæssige ejer af de pågældende renter eller royalties er et selskab i anden medlemsstat eller et fast driftssted beliggende i en anden medlemsstat og tilhørende et selskab i en medlemsstat.

…

4. Et selskab i en medlemsstat anses kun for at være den retmæssige ejer af renter eller royalties, hvis det modtager disse betalinger til eget brug og ikke som formidler, herunder som agent, mandatar eller bemyndiget signatar for en anden person.

…

*Artikel 5*
*Svig og misbrug*

1. Dette direktiv udelukker ikke anvendelse af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug.

2. Medlemsstaterne kan tilbagekalde fordele i henhold til dette direktiv eller nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.«

Ved lovforslag af L 119 af 17. december 2003 foreslog skatteministeren ændring af bl.a. selskabsskattelovens § 2, stk. 1, ved indsættelse af et litra d med følgende ordlyd:

»oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab eller en forening m.v. omfattet af § 1 eller litra a har til udenlandske juridiske personer som nævnt i skattekontrollovens § 3 B (kontrolleret gæld). Dette gælder dog ikke for renter af fordringer, som er knyttet til et fast driftssted omfattet af litra a. Skattepligten omfatter ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, eller efter en dobbeltbeskat-

ningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende. Dette gælder dog kun, hvis det betalende selskab og det modtagne selskab er associeret som nævnt i dette direktiv i en sammenhængende periode på mindst 1 år, inden for hvilken betalingstidspunktet skal ligge.«

Af bemærkningerne til lovforslaget fremgår, at formålet hermed bl.a. var at begrænse mulighederne for skatteplanlægning ved fradrag for koncerninterne renter, når det modtagende koncernselskab betaler ingen eller meget lidt i skat af de renter, der er fratrukket

ved opgørelsen af dansk skattepligtig indkomst, dog således at den begrænsede skattepligt ikke skulle omfatte renter, som er omfattet af rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst.

Den 17. februar 2004 afgav skatteministeren bemærkninger til Folketingets Skatteudvalg vedrørende en henvendelse fra Foreningen af Statsautoriserede

**1624**

Revisorer om den foreslåede bestemmelse. Heraf fremgår bl.a.:
»*Kommentar:*
…

Imidlertid er det nødvendigt at begrænse mulighederne for skatteplanlægning ved, at dansk beskatning nedsættes ved koncerninte[r]ne rentebetalinger til et udenlandsk koncernselskab, som betaler ingen eller meget lav skat af de modtagne renter.

Den foreslåede kildeskat på renter er derfor målrettet, så den ikke omfatter alle rentebetalinger til udlandet. Kildeskatten gælder kun for rentebetalinger til visse finansielle selskaber i lande, som ikke er omfattet af EU's rente-/royaltydirektiv eller ikke har en dobbeltbeskatningsoverenskomst, der pålægger Danmark at nedsætte dansk skat af rentebetalinger til det pågældende land. …

Det åbner ganske vist risiko for, at f.eks. et dansk selskab kan søge at omgå kildeskatten på rentebetalinger til et finansielt selskab i et lavskatte-land ved at betale renterne til et selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller en dansk dobbeltbeskatningsoverenskomst, og som ikke har kildeskat på rentebetalinger til udenlandske rentemodtagere, hvorefter dette selskab betaler renterne videre til selskabet i lavskatte-landet.

I sådanne tilfælde vil de danske skattemyndigheder imidlertid efter en konkret realitetsbedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskatte-landet, således at rentebetalingen hverken er omfattet af EU's rente-/royaltydirektiv eller dobbeltbeskatningsoverenskomsten.

Efter rente-/royaltydirektivets artikel 5, stk. 2, kan et EU-land nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteomgåelse eller misbrug som en væsentlig bevæggrund.

Bemærkningerne til OECD-modellen til dobbeltbeskatningsoverenskomster giver også en stat mulighed for at undlade at anvende en overenskomst i særlige tilfælde, jf. afsnittet om misbrug af overenskomsten i bemærkningerne til modellens artikel 1.«

Den 8. marts 2004 afgav skatteministeren et svar til Folketingets Skatteudvalg vedrørende den foreslåede lovgivning. Heraf fremgår bl.a.:
»*Spørgsmål 47:* Vil ministeren oplyse, hvor mange holdingselskaber af den art, der er anført i Jan Larsens henvendelse, der er registreret i Danmark, dvs. holdingselskaber, der er ejet af udenlandske selskaber, og som ejer datterselskaber i udlandet, medens der ikke er nogen egentlig forretningsmæssig aktivitet i Danmark?
*Svar:* …

Holdingreglerne er siden undersøgelsen blev igangsat i 2000 blevet ændret. Ændringen er foretaget ved lov nr. 282 af 25. april 2001 (L 99, 2000/01).
…

Metoden til undgåelse af udbytteskatten var at indskyde et dansk holdingselskab (et gennemstrømningsselskab).
…

Ved ændringen er det sikret at de danske holdingregler ikke længere giver skattefrihed ved udlodning til lande udenfor EU, som Danmark ikke har dobbeltbeskatningsoverenskomst med (herunder skattelylande).
…

Der synes dermed ikke længere at være samme behov for undersøgelsen, som da den blev igangsat. Dette skyldes, at lovændringen i væsentligt omfang har fjernet de udnyttelsesmuligheder, som dannede grundlag for kritikken af de danske holdingregler.
…

Endelig er der ikke mange korrektioner at hente ved en ligning eller revision af gennemstrømningsselskaberne.

Behovet for en fornyet undersøgelse er mindre, end da den oprindelige undersøgelse blev igangsat. Dette skyldes, at reglerne er ændret, således at misbrugsmulighederne er blevet væsentligt reduceret, jf. således det ovenfor anførte om lovændringen i 2001. En fornyet undersøgelse vil endvidere - i lighed med den nu afsluttede undersøgelse - kræve store ressourcer. Ressourcer, som i givet vil fragå kontrolressourcerne.

Hertil kommer, at det på baggrund af de erfaringer, der er indhentet ved undersøgelsen, må antages, at der ikke er nogen garanti for, at der kunne opnås et troværdigt resultat, hvis undersøgelsen fortsatte.

Det er derfor min opfattelse, at der ikke bør igangsættes en fornyet undersøgelse.«

Den 22. marts 2004 afgav skatteministeren et endnu svar til Folketingets Skatteudvalg vedrørende den foreslåede lovgivning. Heraf fremgår bl.a.:
»*Spørgsmål 54.* Kan ministeren bekræfte, at også efter de seneste ændringer i reglerne for holdingselskaber, og efter vedtagelsen af nærværende lovforslag, vil det være sådan, at udlodninger og rentebetalinger til holdingselskaber på Cypern vil være skattefri (det vil sige uden dansk udbytte skat), selv om der ikke på Cypern vil ske beskatning af renter og udbytte?
*Svar:* For så vidt angår udbytter, medfører selskabsskattelovens § 2, stk. 1, litra c, at Danmark som hovedregel beskatter et udenlandsk selskab af udbytte fra et dansk selskab med 28 pct. af udbyttets bruttobeløb. Efter samme regel beskatter Danmark dog ikke et udenlandsk moderselskab af udbyttet, hvis beskatningen skal frafaldes eller nedsættes efter EU's moder-/datterselskabsdirektiv eller en dobbeltbeskatningsoverenskomst.

Efter den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10 kan Danmark beskatte udbytte, som et dansk selskab udlodder til et selskab på Cypern. Hvis det cypriotiske selskab ejer mindst 25 pct. af det

**1625**

danske selskab, må den danske skat dog ikke overstige 10 pct. af udbyttets bruttobeløb. I andre tilfælde må skatten ikke overstige 15 pct.

Dobbeltbeskatningsoverenskomsten medfører altså, at Danmark skal nedsætte beskatningen af udbytte fra et dansk selskab til et moderselskab på Cypern. Selskabsskattelovens § 2, stk. 1, litra c, medfører så, at Danmark ikke beskatter udbytte.

Nærværende lovforslag påvirker ikke selskabsskattelovens § 2, stk. 1, litra c. …

Dobbeltbeskatningsoverenskomsten medfører altså, at Danmark skal nedsætte beskatningen af renter, som et selskab på Cypern

modtager fra kilder her i landet. Den foreslåede regler i selskabs-skattelovens § 2, stk. 1, litra d, medfører så, at Danmark ikke beskatter renterne.

Cypern bliver i den nærmeste fremtid medlem af EU. Dette vil medføre, at Danmark vil skulle frafalde beskatningen af udbytter og renter efter dels moder-/datterselskabsdirektivet og dels rente-/royaltydirektivet, herefter vil Danmark ikke opkræve kildeskat, selvom Danmark måtte ønske at gøre dette. Endelig skal det bemærkes, at den danske statskasse så vidt jeg kan se ikke lider noget provenutab ved, at der er placeret gennemstrømningsselskaber i Danmark.«

*Dobbeltbeskatningsoverenskomster*

*Overenskomsterne med Cypern, Luxembourg og USA*

Af overenskomst af 26. maj 1981 med Cypern til undgåelse af dobbeltbeskatning for så vidt angår indkomst- og formueskatter fremgår bl.a.:

»*Artikel 3.*
*Almindelige definitioner*

…

*Stk. 2.* Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

…

*Artikel 10.*
*Udbytte*

Udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, og i henhold til lovgivningen i denne stat, men den skat der pålignes må, såfremt modtageren er udbyttets retmæssige ejer, ikke overstige:

a) 10 pct. af bruttobeløbet af udbyttet, hvis den retmæssige ejer er et selskab (bortset fra et interessentskab og et kommanditselskab), der direkte ejer mindst 25 pct. Af kapitalen i det selskab, som udbetaler udbyttet;

b) 15 pct. af bruttobeløbet af udbyttet i alle andre tilfælde.«

Af overenskomst af 17. november 1980 med Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter fremgår bl.a.:

»*Artikel 3.*
*Almindelige definitioner*

…

*Stk. 2.* Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

…

*Artikel 10.*
*Udbytte*

Udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, og i henhold til lovgivningen i denne stat, men den skat, der pålægges, må, såfremt modtageren er udbyttets retsmæssige ejer, ikke overstige:

a) 5 pct. af bruttobeløbet af udbyttet, hvis den retsmæssige ejer er et selskab (bortset fra et interessentskab og et kommanditselskab), der direkte ejer mindst 25 pct. af kapitalen i det selskab, som udbetaler udbyttet;

b) 15 pct. af bruttobeløbet af udbyttet i alle andre tilfælde.«

Af overenskomst af 19. august 1999 med Amerikas Forenede Stater til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter fremgår bl.a.:

»*Artikel 3.*
*Almindelige definitioner*

…

*Stk. 2.* Ved anvendelsen til enhver tid af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, eller de kompetente myndigheder bliver enige om en fælles betydning i overensstemmelse med bestemmelserne i artikel 25 (Fremgangsmåden ved indgåelse af gensidige aftaler), ethvert udtryk, som ikke er defineret i overenskomsten, tillægges den betydning, som det på det tidspunkt har i denne stats lovgivning vedrørende de skatter, hvorpå overenskomsten finder anvendelse, idet enhver betydning i henhold til denne stats gældende skattelove skal have forrang frem for en betydning i henhold til anden lovgivning i denne stat.

…

**1626**

*Artikel 10.*
*Udbytte*

*Stk. 1.* Udbytte, som udbetales af en person, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan også beskattes i den kontraherende stat, i hvilken det selskab, der udbetaler udbyttet, er hjemmehørende og i henhold til lovgivningen i denne stat, men hvis den retmæssige ejer af udbyttet er hjemmehørende i den anden kontraherende stat, må den skat, der pålignes, ikke overstige:

a) 5 pct. af bruttobeløbet af udbyttet, såfremt den retsmæssige ejer er et selskab, der direkte ejer mindst 10 pct. af aktiekapitalen i det selskab, der udbetaler udbyttet;

b) 15 pct. af bruttobeløbet af udbyttet i alle andre tilfælde.«

*OECD's model for dobbeltbeskatningsoverenskomst med kommentarer*

Af OECD's model for dobbeltbeskatningsoverenskomst vedrørende indkomst og formue (1977) fremgår bl.a.:

»Artikel 3
Almindelige definitioner …

2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse. …

Artikel 10
Udbytte

Udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, og i henhold til lovgivningen i denne stat, men den skat, der pålægges, må, såfremt modtageren er udbyttets retmæssige ejer, ikke overstige:

a) 5 pct. af bruttobeløbet af udbyttet, hvis den retmæssige ejer er et selskab (bortset fra et interessentskab og et kommanditselskab), der direkte ejer mindst 25 pct. Af kapitalen i det selskab, som udbetaler udbyttet;

b) 15 % af bruttobeløbet af udbyttet i alle andre tilfælde.«

Den engelske ordlyd af artikel 10 var sålydende:

»Dividends

1    Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the low of that

1 State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed:

a)    …

b)    ….

Af OECD's kommentarer hertil fremgå bl.a.:

»*MISBRUG AF OVERENSKOMSTEN*

7. Formålet med dobbeltbeskatningsoverenskomster er, ved fjernelse af international dobbeltbeskatning, at fremme udvekslingen af varer og tjenesteydelser og kapitalens og fysiske og juridiske personers bevægelighed. De bør imidlertid ikke hjælpe til skatteunddragelse eller skatteflugt. Det er vel rigtigt, at skatteydere, bortset fra dobbeltbeskatningsoverenskomster, har den mulighed at udnytte forskelle i skatteniveauer mellem staterne og de skattefordele, der følger af forskellige landes skattelove, men det tilkommer de berørte stater at vedtage bestemmelser i deres nationale lovgivning for at modvirke mulige kunstgreb. Sådanne stater vil følgelig i deres tosidede dobbeltbeskatningsoverenskomster ønske at bevare anvendelsen af sådanne bestemmelser i deres nationale love.

8. Derudover forstærker udvidelsen af netværket af dobbeltbeskatningsoverenskomster sådanne kunstgrebs virkning ved gennem dannelse af sædvanligvis kunstfærdige juridiske konstruktioner at gøre det muligt at drage fordel både af de fordele, der følger af visse nationale love, og af de skattelempelser, der følger af dobbeltbeskatningsoverenskomster.

9. Dette ville f.eks. være tilfældet, hvis en person (uanset om denne er hjemmehørende i en kontraherende stat eller ej) disponerede via en juridisk sammenslutning, der er dannet i en stat, væsentligst for at opnå fordele i henhold til overenskomsten, som ikke ville kunne opnås af personen direkte. Et andet tilfælde ville være, hvor en fysisk person i en kontraherende stat har såvel fast bolig som alle sine økonomiske interesser, herunder væsentlig andel i et selskab i denne stat, og som, væsentligst for at sælge andelen og undgå beskatning af kapitalgevinster i denne stat ved salget (som følge af artikel 13, stk. 4), overførte sin faste bolig til den anden kontraherende stat, hvor sådanne gevinster var undergivet lav eller ingen beskatning.

10. Nogle af disse situationer behandles i overenskomsten, f.eks. ved at indføre begrebet »retmæssig ejer« (i artiklerne 10, 11 og 12) og særlige bestemmelser for de såkaldte artistselskaber (artikel 17, stk. 2). Sådanne problemer nævnes også i kommentarerne til artikel 10 (pkt. 17 og 22), artikel 11 (pkt. 12) og artikel 12 (pkt. 7). Det kan være hensigtsmæssigt for kontraherende stater, at de i tosidede forhandlinger opnår enighed om, at

**1627**

skattelempelse ikke finder anvendelse i visse tilfælde, eller at opnå enighed om, at anvendelsen af nationale love mod skatteunddragelse ikke berøres af overenskomsten.

*KOMMENTAR TIL ARTIKEL 10*
*VEDRØRENDE BESKATNING AF UDBYTTE*
…

12. I henhold til stk. 2 kan begrænsningen i kildestatens beskatningsret ikke benyttes, når et mellemled, såsom en agent eller en udpeget person, skydes ind mellem den berettigede og udbetaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.

…

22. Opmærksomheden henledes i al almindelighed på følgende tilfælde: Den retmæssige ejer til udbytte, der hidrører fra en kontraherende stat, er et selskab, der er hjemmehørende i den anden kontraherende stat. Hele kapitalen eller dele deraf ejes af aktionærer, der er hjemmehørende uden for denne anden stat. Selskabets praksis er ikke at udbetale sin fortjeneste i form af udbytte, og det nyder en begunstigende skattemæssig behandling (privat investeringsselskab, basisselskab). Der kan stilles det spørgsmål, om det for et sådant selskab er berettiget i udbyttets kildestat at indrømme den beskatningsbegrænsning, der er fastsat i stk. 2. Det synes formålstjenligt, når der føres bilaterale forhandlinger at træffe aftale om særlige undtagelser fra den beskatningsregel, der er fastlagt i denne artikel, for at fastsætte den behandling, der skal anvendes på sådanne selskaber.«

OECD's modeloverenskomst af 2003 har følgende ordlyd:

»Artikel 3
Almindelige definitioner

…

2. Ved anvendelsen af overenskomsten til enhver tid af en kontraherende stat skal ethvert udtryk, som ikke er defineret deri, medmindre andet følger af sammenhængen, tillægges den betydning, som det har på dette tidspunkt i henhold til denne stats lovgivning om de skatter, på hvilke overenskomsten finder anvendelse. Enhver betydning i de skattelove, der anvendes i denne stat, skal gå forud for den betydning, dette udtryk måtte være tillagt i denne stats anden lovgivning. …

Artikel 10
Udbytter

1. Udbytte, som udbetales af et selskab, der er hjemmehørende i en af de kontraherende stater, til en person, som er hjemmehørende i den anden kontraherende stat, kan beskattes i denne stat.

2. Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, i hvilken det selskab, der udbetaler udbyttet, er hjemmehørende, og i overensstemmelse med lovgivningen i denne stat, men hvis den retmæssige ejer af udbyttet er hjemmehørende i den anden kontraherende stat, må den skat, der pålægges, ikke overstige:

a) 5 pct. af bruttoudbyttet, hvis den berettigede modtager er et selskab (bortset fra et interessentskab), som direkte ejer mindst 25 pct. af kapitalen i det selskab, som udbetaler udbyttet;

b) 15 pct. af bruttoudbyttet i alle andre tilfælde.«

…

Kommentarer til OECD's modeloverenskomst

…

*Misbrug af overenskomsten*

9.6 Muligheden for at anvende generelle anti-misbrugsbestemmelser betyder ikke, at der ikke i skatteaftaler er behov for indsættelsen af specifikke bestemmelser, der har til formål at hindre særlige former for skatteundgåelse. Når særlige teknikker for skatteundgåelse er identificeret eller hvor anvendelsen af sådanne teknikker er særlig problemfyldt, vil det ofte være nyttigt i overenskomsten at indsætte bestemmelser, der fokuserer direkte på den relevante undgåelsesstrategi. Dette vil også være nødvendigt i tilfælde, hvor en stat, der går ind for det synspunkt, der er beskrevet i pkt. 9.2 ovenfor, er af den opfattelse, at dens nationale lovgivning mangler de anti-misbrugsregler eller principper, der er nødvendige for på rette måde at imødegå en sådan strategi.

10. Nogle former for skatteundgåelse er f.eks. allerede udtrykkeligt behandlet i overenskomsten, f.eks. ved indførelsen af begrebet »retmæssig ejer« (i art. 10, 11 og 12) og i særlige bestemmelser såsom art. 17, stk. 2, der omhandler de såkaldte artistselskaber. Sådanne problemer nævnes også i kommentarerne til art. 10 (pkt. 17 og 22), art. 11 (pkt. 12) og art. 12 (pkt. 7).

…

OECD's kommentar til artikel 10 om beskatning af udbytte

…

12. Kravet om retmæssigt ejerskab blev indsat i »art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt….til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Det gøres herved klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

12.1 Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler

**1628**

i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men ingen dobbeltbeskatning opstår som følge heraf, da indkomstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

12.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret til eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og udbetaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.

Den engelske version af punkt 12.2 er sålydende:
»Subject to the other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State …«.

Af OECD's kommentarer af 2014 til artikel 10 i modeloverenskomsten fremgår bl.a.:

»12.4 I disse forskellige eksempler (agent, mellemmand, conduit selskab i dets egenskab af bemyndiget eller administrator), er den direkte modtager af udbytte ikke »den retmæssige ejer«, fordi modtagerens ret til at bruge og nyde udbytterne er begrænset af kontraktuelle eller juridiske forpligtelser til at videreformidle de modtagne betalinger til en anden person. En sådan forpligtelse vil sædvanligvis fremgå af relevante, juridiske dokumenter, men kan eventuelt også være til stede allerede i kraft af de faktiske omstændigheder, som ganske klart viser, at modtageren substantielt ikke har rettighederne til at bruge og nyde de udbytter, dog uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person. Denne type af forpligtelse omfatter ikke kontraktuelle eller juridiske forpligtelser, som ikke er betingede af viderebetalingen fra den direkte modtager, såsom en forpligtelse, der ikke er afhængig af modtagelsen af en sådan betaling, og som den direkte modtager har som debitor eller som part i finansielle transaktioner, eller sædvanlige fordelingsforpligtelser i henhold til en pensionsaftale eller til kollektive investerings ordninger, som vil være berettigede til overenskomstfordele efter principperne angivet i pkt. 6.8 til 6.34 i kommentaren til art. 1. Hvor modtageren af et udbytte har retten til at bruge og nyde udbyttet, uden at være bundet af kontraktuelle eller juridiske forpligtelser til at videreformidle de betalinger, som han har modtaget, til en anden person, er modtageren »den retmæssige ejer« af disse udbytter. Det bør også bemærkes, at art. 10 henviser til den retmæssige ejer af udbytterne i modsætning til ejeren af de aktier, og de kan være forskellige i visse situationer.

12.5 Det forhold, at modtageren af et udbytte anses for være den retmæssige ejer af disse udbytter, betyder imidlertid ikke, at bestemmelserne i stk. 2 automatisk skal finde anvendelse. Fordelene ved disse bestemmelser skal ikke indrømmes i tilfælde af misbrug (se også pkt. 17 og 22 nedenfor). Således som det forklares i afsnittet »Misbrug af overenskomsten« i kommentaren til art. 1, er der mange måder at behandle en conduit selskab på, og generelt treaty shopping situationer. Disse omfatter specifikke anti-misbrugsbestemmelser i overenskomster, generelle anti-misbrugs bestemmelser og indhold-over-form eller økonomisk-substans anskuelser. Mens »retmæssig ejer« konceptet omfatter nogle former for skatteundragelse (dvs. den type, der involverer indsættelse af en modtager, som er forpligtet til at videreformidle royaltierne til en anden person), er der andre typer, som ikke er omfattet; det omfatter således ikke andre former for treaty shopping, og det må derfor ikke blive betragtet som et koncept, der på nogen måde begrænser anvendelsen af andre principper vedrørende sådanne forhold.«

*Relevant lovgivning gennemført efter Landsskatterettens afgørelser*
*Rådets direktiv 2015/121/EU af 27. januar 2015 om ændring af direktiv 2011/96/EU om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater*

**1629**

Af direktivet fremgår bl.a.:

»ud fra følgende betragtninger:

…

9) Dette direktiv bør på ingen måde berøre medlemsstaternes mulighed for at anvende deres interne bestemmelser eller overenskomster, der tager sigte på at hindre skatteunddragelse, skattesvig eller misbrug.

…

*Artikel 1*
I direktiv 2011/96/EU erstattes artikel 1, stk. 2, af følgende stykker:

»2. Medlemsstaterne giver ikke de fordele, der er ved dette direktiv, til arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål, eller der som et af hovedformålene har, at opnå en skattefordel, som virker mod indholdet af eller formålet med dette direktiv, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder.

Et arrangement kan omfatte flere trin eller dele.

3. Med hensyn til stk. 2 betragtes arrangementer eller serier af arrangementer som ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

4. Dette direktiv er ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre skatteunddragelse, skattesvig og misbrug.««

Direktivændringen blev implementeret i dansk ret ved lov nr. 540 af 29. april 2015 om ændring af ligningsloven således:

»1. I *fodnoten* til lovens titel indsættes som *2.* og *3. pkt.*: »Loven indeholder bestemmelser, der gennemfører dele af Rådets direktiv 2011/96/EU af 30. november 2011 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, EU-Tidende 2011, nr. L 345, side 8, med senere ændringer. Loven indeholder bestemmelser, der gennemfører dele af Rådets direktiv 2003/49/EF af 3. juni 2003 om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, EU-Tidende 2003, nr. L 157, side 49, med senere ændringer.«

*2.* Efter § 2 indsættes:

»*§ 3.* Skattepligtige har ikke de fordele, der følger af direktiv 2011/96/EU om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater og direktiv 2009/133/EF om en fælles beskatningsordning ved fusion, spaltning, partiel spaltning, tilførsel af aktiver og ombytning af aktier vedrørende selskaber i forskellige medlemsstater og ved flytning af et SE's eller SCE's vedtægtsmæssige hjemsted mellem medlemsstater som implementeret i dansk lovgivning, til arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål eller der som et af hovedformålene har at opnå en skattefordel, som virker mod indholdet af eller formålet med direktiverne, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

*Stk. 2.* Ved anvendelsen af stk. 1 betragtes arrangementer eller serier af arrangementer som ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed. *Stk. 3.* Skattepligtige har ikke fordel af en dobbeltbeskatningsoverenskomst, hvis det er rimeligt at fastslå under hensyn til alle relevante faktiske forhold og omstændigheder, at opnåelsen af fordelen er et af de væsentligste formål i ethvert arrangement eller enhver transaktion, som direkte eller indirekte medfører fordelen, medmindre det godtgøres, at indrømmelsen af fordelen under disse omstændigheder vil være i overensstemmelse med indholdet af og formålet med den pågældende bestemmelse i overenskomsten.

*Stk. 4.* Uanset stk. 3 skal stk. 1 og 2 anvendes ved vurderingen af, om en skattepligtig er udelukket fra fordelen i en bestemmelse i en dobbeltbeskatningsoverenskomst med et land, der er medlem af EU, hvis den skattepligtige alternativt kunne påberåbe sig en fordel i et af direktiverne om direkte beskatning.««

Af det til grund herfor fremsatte lovforslag (lovforslag nr. L 167 af 20. marts 2015) fremgår bl.a.:

»*3.3.4. Gældende ret*

Der findes ikke en generel lovbestemt regel om bekæmpelse af misbrug i dansk skattelovgivning. Efter dansk (rets)praksis sker beskatningen efter der er foretaget en bedømmelse af, hvad der faktisk er sket. Det betyder, at tomme og kunstige skattebetingede dispositioner kan tilsidesættes, således at beskatningen i stedet foretages i forhold til den modstående realitet. Dansk skatteret er altså grundlæggende bygget på linje med internationalt gældende principper om »substance over form«.

Den vedtagne ændring af moder-/datterselskabsdirektivet indebærer, at der skal indsættes en generelt formuleret bestemmelse om bekæmpelse af misbrug af moder-/ datterselskabsdirektivet i skattelovgivningen. Det vurderes, at den nye bestemmelse i direktivet vil kunne have et bredere anvendelsesområde end den nuværende (rets)praksis. …

*3.3.5. Lovforslaget*

Det foreslås, at der i dansk skattelovgivning indføres en international omgåelsesklausul til bekæmpelse af misbrug i forbindelse med grænseoverskridende transaktioner omfattet af moder-/datterselskabsdirektivet.

Omgåelsesklausulen er en gennemførsel af en ændring af direktivet, der er vedtaget på EU-rådsmødet den 27. januar 2015.

**1630**

…

Endelig foreslås det, at ikrafttræden skal ske før den tidsfrist, der er fastsat i moder-/datterselskabsdirektivet. Det foreslås, at begge omgåelsesklausuler får virkning for transaktioner, arrangementer eller serier af arrangementer fra og med den 1. maj 2015.

Indførelsen af en omgåelsesklausul begrænser ikke de gældende muligheder for at tilsidesætte eller omkvalificere på andet grundlag. …

*Bemærkninger til lovforslagets enkelte bestemmelser*

…

EU-kommissionen har den 25. november 2013 i et offentliggjort memo angivet følgende eksempel, hvor omgåelsesklausulen vil finde anvendelse:

Moderselskab i land C (uden for EU)

Datterselskab i land B (EU)

Datterdatterselskab i land A (EU)

Efter interne regler i land A skal der indeholdes kildeskat på udbytter til moderselskaber, der er hjemmehørende uden for EU. Dette indebærer, at hvis selskabet i land A er ejet direkte af selskabet i land C, skal en eventuel udbytteudlodning kildebeskattes i land A.

I land B er der ikke en tilsvarende regel om indeholdelse af kildeskat på udbytter til moderselskaber uden for EU.

Hvis moderselskabet i land C indskyder et holdingselskab i land B, dvs. mellem A og C, så er det muligt at undgå kildeskatten på udbytter til land C, da moder-/datterselskabsdirektivet ikke tillader kildeskat på udbytter mellem datterselskaber og moderselskaber hjemmehørende i EU, dvs. mellem land A og B.

Hvis hovedformålet eller et af hovedformålene med indskydelsen af selskabet i land B har været at undgå kildeskat på udbytter fra datterdatterselskabet i land A, f.eks. fordi datterselskabet i land B er et såkaldt »postkasseselskab« uden større substans, vil land A kunne nægte datterdatterselskabet fordelene i moder-/datterselskabsdirektivet og indeholde kildeskat på udlodningen med henvisning til omgåelsesklausulen.

Til ovenstående eksempel bemærkes, at der grundlæggende er tale om et klassisk gennemstrømningseksempel, som allerede er dækket af reglen i udbyttebeskatningslovens § 2, stk. 1, litra c, da datterselskabet i land B ikke kan anses for at være den retmæssige ejer af udbyttet. Det bemærkes, at der verserer en række sager ved domstolene om netop dette forhold.

Hvis den objektive analyse af alle relevante faktiske forhold og omstændigheder i stedet viser, at et arrangement eller dele heraf er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed, vil der være tale om en reel disposition, og omgåelsesklausulen vil derfor ikke kunne finde anvendelse, jf. stk. 2.

Det foreslås desuden i stk. 3, at fordelene ved en dobbeltbeskatningsoverenskomst bortfalder, hvis det er rimeligt at fastslå under hensyn til alle relevante faktiske forhold og omstændigheder, at opnåelsen af fordelen er et af de væsentligste formål i ethvert arrangement eller enhver transaktion, som direkte eller indirekte medfører fordelen, medmindre det godtgøres, at indrømmelsen af fordelen under disse omstændigheder vil være i overensstemmelse med indholdet af og formålet med den pågældende bestemmelse i overenskomsten.«

*Rådets direktiv 2016/1164/EU af 12. juli 2016 om regler til bekæmpelse af metoder til skatteundgåelse, der direkte indvirker på det indre markeds funktion*

Af direktivet fremgår bl.a.:

»*Artikel 1*
*Anvendelsesområde*

Dette direktiv finder anvendelse på alle skattesubjekter, som er selskabsskattepligtige i en eller flere medlemsstater, herunder faste driftssteder i en eller flere medlemsstater for enheder, der er skattemæssigt hjemmehørende i et tredjeland.

…

*Artikel 3*
*Minimumsniveau af beskyttelse*

Dette direktiv er ikke til hinder for anvendelsen af nationale eller aftalebaserede bestemmelser, der har til formål at sikre et højere beskyttelsesniveau for nationale selskabsskattegrundlag.

…

*Artikel 6*
*Generel regel om bekæmpelse af misbrug*

1. Ved beregning af selskabsskattetilsvaret ser en medlemsstat bort fra arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål, eller der som et af hovedformålene har, at opnå en skattefordel, som virker mod formålet og hensigten med gældende skatteret, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

2. Med hensyn til stk. 1 betragtes arrangementer eller serier af arrangementer som værende ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

3. Hvis der ses bort fra arrangementer eller serier af arrangementer, jf. stk. 1, beregnes skattetilsvaret i overensstemmelse med national ret.«

*Lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning*

Ved denne lov blev bestemmelserne i multilateral konvention af 24. november 2016 til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til

**1631**

forhindring af skatteudhuling og overskudsflytning, jf. lovens bilag 1, med virkning fra 1. juli 2019 gjort anvendelig på bl.a. de dobbeltbeskatningsoverenskomster, der er nævnt i lovens bilag 3, herunder aftale af 11. oktober 2010 mellem Kongeriget Danmark og Republikken Cypern til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter. Det er oplyst, at konventionen er tiltrådt af Cypern.

Af konventionens artikel 7 fremgår:

»Artikel 7(11)
Forhindring af misbrug af aftaler

1. Uanset de øvrige bestemmelser i en omfattet skatteaftale gives der ikke fordele efter den omfattede skatteaftale med hensyn til indkomst eller formue, hvis det i betragtning af alle relevante fakta og omstændigheder er rimeligt at antage, at opnåelse af denne fordel var et af hovedformålene med noget arrangement eller nogen transaktion, som direkte eller indirekte medførte denne fordel, medmindre det godtgøres, at opnåelse af denne fordel under disse omstændigheder ville være i overensstemmelse med genstanden for og formålet med de relevante bestemmelser i den omfattede skatteaftale.«

# V. Anbringender

*B-1980-12 Skatteministeriet mod NetApp Denmark ApS*

*Skatteministeriet* har i sit sammenfattende processkrift af 11. januar 2021 anført bl.a.:

»*NetApp Cypern var skattepligtig af udbytterne*

Ifølge selskabsskattelovens § 2, stk. 1, litra c), påhviler skattepligt i henhold til loven selskaber og foreninger m.v. som nævnt i lovens § 1, stk. 1, der har hjemsted i udlandet, for så vidt de oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, hvortil de i sagen omhandlede udbytter kan henregnes. Skattepligten omfatter (dog) ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 20 pct. (nu 10 pct.) af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge, på »betingelse« af, »at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i [moder-/datterselskabsdirektivet] eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende.«

Det fremgår altså af bestemmelsens ordlyd, at fritagelsen for skattepligt alene kommer på tale, hvis der efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst består en ubetinget pligt til at frafalde eller nedsætte beskatningen. Følger en sådan pligt ikke af direktivet eller en dobbeltbeskatningsoverenskomst er moderselskabet med andre ord skattepligtig her til landet af udbyttet. Forarbejderne til bestemmelsen giver ikke holdepunkter for en anden forståelse af bestemmelsen - tværtimod.

Ifølge det fremsatte lovforslag […] var en fritagelse for skattepligtig alene betinget af, at »at moderselskabet er hjemmehørende i en stat, som er medlem af EU, en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland, samt at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i [moder-/datterselskabsdirektivet].«

Som det fremgår, ville det ifølge det fremsatte lovforslag - udover at datterselskabet skulle være et selskab i en medlemsstat - være nok, hvis bare moderselskabet var hjemmehørende i EU eller i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland. Lovforslaget blev imidlertid på dette punkt ikke vedtaget i den fremsatte form. Derfor er NetApp Denmarks påberåbelse af skatteministerens svar af 10. januar 20001 til Folketingets Skatteudvalg, bilag 22 til lovforslag nr. 99 af 10. november 2000 […] og ministerens svar af 11. januar 2001, bilag 24 til det fremsatte lovforslaget […] også irrelevante, eftersom spørgsmålene, der blev besvaret, blev stillet i tilknytning til det (oprindeligt) fremsatte, men på dette punkt ikke-vedtagne lovforslag.

Efter at Folketinget havde behandlet det fremsatte lovforslag, fremsatte skatteministeren det (ændrings)forslag, som faktisk blev vedtaget […].

Af bemærkningerne til ændringsforslaget fremgår, at ændringen tog sigte på at præcisere, at det er en »betingelse« for den foreslåede skattefrihed, at Danmark »skal« frafalde beskatningen af det pågældende udbytte efter bestemmelserne i moder-/datterselskabsdirektivet, eller at Danmark »skal« frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i en dobbeltbeskatningsoverenskomst [...].

Det korte af det lange er, at hverken ordlyden af selskabsskattelovens § 2, stk. 1, litra c), eller bemærkningerne til det forslag, som faktisk blev vedtaget, efterlader nogen tvivl om, at moderselskabet kun har krav på en fritagelse for skattepligt, hvis selskabet enten opfylder betingelserne i moder-/datterselskabsdirektivet for fritagelse af kildeskat eller opfylder betingelserne i en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller en stat, hvor selskabet er hjemmehørende, for at Danmark skal frafalde eller nedsætte beskatningen. Det er således ikke tilstrækkeligt, at moderselskabet er hjemmehørende i en stat, som er medlem af EU, en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland.

Som der vil blive redegjort for i det følgende, har Danmark hverken været forpligtet til at frafalde beskatningen af de i denne sag omhandlede udbytter efter moder-/datterselskabsdirektivet eller været forpligtet til at frafalde eller nedsætte beskatningen efter den dansk-cypriotiske dobbeltbeskatningsoverenskomst.

**1632**

[...] *Beskatningen skal ikke nedsættes eller frafaldes i medfør af moder-/datterselskabsdirektivet*

Beskatningen af de i sagen omhandlede udbytter skal ikke frafaldes efter moder-/datterselskabsdirektivet, eftersom NetApp Cypern ikke kan påberåbe sig den i direktivets artikel 5, stk. 1, fastsatte fordel i form af fritagelse for kildeskat, allerede fordi der foreligger retsmisbrug.

*[...] Der er hjemmel til imødegåelse af retsmisbrug*

Ifølge moder-/datterselskabsdirektivets artikel 1, stk. 2, er direktivet ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig eller misbrug [...].

En national bestemmelse som selskabsskattelovens § 2, stk. 1, litra c), er netop en sådan intern bestemmelse som omhandlet i direktivets artikel 1, stk. 2, hvorefter den fordel i henhold til direktivet kan nægtes, hvis fordelen søges opnået ved svig eller misbrug.

Af selskabsskattelovens § 2, stk. 1, litra c)'s ordlyd følger nemlig som nævnt udtrykkeligt, at det er en betingelse for at frafalde kildebeskatning, at Danmark er forpligtet hertil efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst, jf. ordet »skal«. En sådan forpligtelse til at frafalde beskatningen foreligger netop ikke i misbrugstilfælde. Domstolen har længst fastslået, at EU-retten (dengang benævnt »fællesskabsretten«) ikke kan gøres gældende med henblik på at muliggøre misbrug, jf. f.eks. Domstolens dom i sag C-212/97, Centros, præmis 24 og den deri nævnte retspraksis [...]. Derfor indeholder selskabsskattelovens § 2, stk. 1, litra c), efter sin ordlyd en hjemmel til, at moder-/datterselskabsdirektivets fordel i form af fritagelse for beskatning i kildestaten kan nægtes, hvis der foreligger retsmisbrug, al den stund at direktivet i et sådant tilfælde ikke medfører, at kildestaten skal« frafalde beskatningen.

Hertil kommer, at artikel 10, stk. 2, i den dansk-cypriotiske dobbeltbeskatningsoverenskomst [...] er en overenskomstmæssig fastsat bestemmelse til bekæmpelse af misbrug, da kildelandet kun skal nedsætte beskatningen af et udbytte, hvis »udbyttets retsmæssige ejer« er hjemmehørende i den anden kontraherende stat, og da anvendelsen af dette kriterium for beskatningsrettens fordeling netop tjener til bekæmpelse af retsmisbrug, jf. nærmere nedenfor.

Endelig er der i dansk retspraksis udviklet almindelige principper til imødegåelse af misbrug, der finder anvendelse i tilfælde, der falder uden for den praksis, som ifølge den juridiske litteratur er udtryk for anvendelsen af en såkaldt »realitetsgrundsætning«. Det følger således af højesteretspraksis, at dispositioner, der - som i det foreliggende tilfælde - formelt er blevet indrettet sådan, at en bestemt, gunstig skatteregel finder anvendelse, kan tilsidesættes i skattemæssig henseende, når indrømmelsen af fordelen vil være formålsstridig, og når dispositionerne med Højesterets ord eksempelvis »ikke [har] karakter af normale forretningsmæssige dispositioner«, jf. U.1998.254H [...], »ikke [har] noget forretningsmæssigt formål«, jf. U.2005.649H [...] eller »ikke [har] nogen forretningsmæssig begrundelse«, jf. U.2015.2277H [...]. Højesteret har også uden at bruge tilsvarende vendinger tilsidesat skattearrangementer, jf. eksempelvis U.1999.1714H [...].

Der er på den anførte baggrund rigeligt med hjemmel i national ret til at imødegå misbrug, men en afgørelse af sagen nødvendiggør ikke en stillingtagen til dette stridsspørgsmål.

Af Domstolens dom i denne sag [...] fremgår nemlig, at Domstolen som svar på landsrettens første præjudicielle spørgsmål har anført, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i moder-/datterselskabsdirektivets artikel 5, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der forskriver en sådan nægtelse, jf. hertil dommens præmis 95 og præmisserne 75-94, som svaret er baseret på.

Der er ikke er tale om, at Domstolen med svaret på landsrettens første præjudicielle spørgsmål har skabt en (ny) retsstilling, der ikke gjaldt forud for dommen, eller at Domstolen har ændret sin hidtidige praksis, således som den er kommet til udtryk i bl.a. sag C-321/05, Kofoed, jf. hertil dommen i den foreliggende sag, præmis 84-90. Med denne dom har Domstolen derimod - inden for rammerne af den kompetence, som tilkommer Domstolen i medfør af artikel 267 TEUF - belyst og præciseret betydningen og rækkevidden af princippet om forbud mod retsmisbrug, således som dette princip skal anvendes på den foreliggende sag.

Der er endvidere ikke tale om, at Domstolen med sin dom har fastslået en fortolkning af moder-/datterselskabsdirektivet, som indebærer, at direktivet - i sig selv - skaber forpligtelser for borgerne, hvad der i givet fald ville have været uforeneligt med retssikkerhedsprincippet. I tilfælde, hvor der foreligger retsmisbrug, og hvor borgeren af denne grund nægtes en fordel i henhold til EU-retten, er der således ikke tale om, at borgeren pålægges en forpligtelse efter EU-retten. Der er derimod tale om, at de objektive betingelser for at opnå en fordel i henhold til EU-retten ikke er opfyldt, fordi fordelen søges opnået ved retsmisbrug (dommens præmis 90).

Af Domstolens dom følger således også, at det EU-retlige retssikkerhedsprincip heller ikke er til hinder for

**1633**

at nægte moder-/datterselskabsdirektivets fordel i form af fritagelse for kildeskat, når der foreligger retsmisbrug, hvad der også udtrykkeligt er fastslået i Domstolens dom i sag C-251/16, Cussens, præmis 43 [...].

Til NetApp Denmarks påberåbelse af EF-traktatens artikel 43 (nu TEUF artikel 49) bemærkes, at i en situation, hvor ordningen med kildeskattefritagelse for udbytter i medfør af moder-/datterselskabsdirektivet ikke finder anvendelse som følge af, at det konstateres, at der foreligger svig eller misbrug, kan anvendelsen af de friheder, der er sikret ved traktaten, (heller) ikke gøres gældende med henblik

på at anfægte den lovgivning i kildestaten, som regulerer beskatningen af udbytte (dommens præmis 121-123 og domskonklusionens pkt. 5).

Endelig strider det ikke imod loven om Danmarks tiltrædelse af den Europæiske Union at nægte moder-/datterselskabsdirektivets fordele med henvisning til det generelle EU-retlige princip om forbud mod retsmisbrug. Den foreliggende situation er således usammenlignelig med situationen, der gav anledning til Højesterets dom gengivet i U.2017.824H, Ajos […], som NetApp Denmark påberåber sig.

[…]

Til brug for sin afgørelse af sagen stillede Højesteret præjudicielle spørgsmål til Domstolen, der i den anledning fastslog bl.a., at det almindelige princip om forbud mod forskelsbehandling på grund af alder, som Rådets direktiv 2000/78/EF (om generelle rammebestemmelser om ligebehandling med hensyn til beskæftigelse og erhverv) er et konkret udtryk for, skal fortolkes således, at det - også i en tvist mellem private - er til hinder for en national lovgivning svarende til funktionærlovens § 2 a, stk. 3.

I præmisserne for sin dom fastslog Højesteret, at den retsstilling, der fulgte af funktionærlovens § 2 a, stk. 3 (dagældende) - således som bestemmelsen var blevet fortolket i retspraksis, og hvilken fortolkning var blevet lagt til grund af lovgivningsmagten ved senere ændringer af funktionærloven - var klar, og at det ikke er muligt ved anvendelse af de fortolkningsmetoder, som er anerkendt i dansk ret, at anlægge en fortolkning af bestemmelsen i overensstemmelse med beskæftigelsesdirektivet, således som direktiv er blevet fortolket af Domstolen. Med Højesterets egne ord forelå der dermed en »contra legem-situation«.

Da der forelå en sådan situation, måtte Højesteret herefter tage stilling til, om det almindelige EU-retlige princip om forbud mod forskelsbehandling på grund af alder kan tillægges den virkning i dansk ret, at det har forrang for en modstående national bestemmelse, herunder også i tvister mellem private. Ifølge Højesteret beroede en stillingtagen til dette spørgsmål på en fortolkning af loven om Danmarks tiltrædelse af Den Europæiske Union. Højesteret kom frem til, at tiltrædelsesloven ikke indeholder hjemmel til - i en tvist mellem private - at lade det uskrevne princip om forbud mod forskelsbehandling på grund af alder fortrænge den dagældende bestemmelse i funktionærlovens § 2 a, stk. 3, i det omfang bestemmelsen er i strid med forbuddet.

Den foreliggende sag adskiller sig på afgørende vis fra Ajos-sagen, eftersom der ikke foreligger en »contra legem-situation«.

Moder-/datterselskabsdirektivet er i dansk ret blevet gennemført på den mest enkle måde, der tænkes kan, nemlig ved en henvisning til direktivet. Det følger således, som det også er beskrevet ovenfor, af selskabsskattelovens § 2, stk. 1, litra c)'s ordlyd, at udbytte er omfattet af en skattepligt, medmindre »beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i [moder-/datterselskabsdirektivet]«. I kraft af denne henvisning til direktivet er det klart, at spørgsmålet om fritagelse for beskatning af udbytte er omfattet af EU-rettens anvendelsesområde.

En fritagelse for skattepligt er således betinget af, at direktivet i det givne tilfælde forpligtigier Danmark til at frafalde beskatningen. Om en sådan forpligtelse består, beror derfor på en fortolkning af EU-retten. Som det også blev fastslået af Højesteret i Ajos-sagen, henhører det i medfør af artikel 267 TEUF under Domstolens kompetence at foretage en sådan fortolkning.

At gennemførelsen af moder-/datterselskabsdirektivet, hvad angår beskatning af udbytter, er løst ved en simpel henvisning til direktivet i selskabsskattelovens § 2, stk. 1, litra c), har som en logisk følge, at eksistensen af en »contra legemsituation« er udelukket. Henvisningen gør det således uproblematisk at anlægge en fortolkning af

selskabsskattelovens § 2, stk. 1, litra c), der er i overensstemmelse med moder-/datterselskabsdirektivet og det almindelige princip om forbud mod retsmisbrug, således som direktivet og princippet skal fortolkes ifølge Domstolens dom i den foreliggende sag.

På den anførte baggrund må selskabsskattelovens § 2, stk. 1, litra c), fortolkes således, at den fritagelse for beskatning af udbytter, der ellers følger af moder-/datterselskabsdirektivet, skal nægtes, hvis fritagelsen i det givne tilfælde søges opnået ved retsmisbrug.

Da der altså ikke foreligger en »contra legem-situation«, rejser den foreliggende sag - i modsætning til Ajos-sagen - ikke noget spørgsmål om forholdet mellem på den ene side det almindelige EU-retlige princip om forbud mod retsmisbrug og på den anden side loven om Danmarks tiltrædelse af Den Europæiske Union.

*[…] Der foreligger retsmisbrug*

Ifølge Domstolens dom kræves der med henblik på at bevise, at der foreligger misbrug, dels et sammenfald af objektive omstændigheder, hvoraf fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået,

**1634**

selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i et hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (dommens præmis 97).

Domstolen har i dommen anvist de nærmere principper for en sådan undersøgelse og foretaget en - ikke-udtømmende - opregning og beskrivelse af holdepunkter for, at moder-/datterselskabsdirektivets fordel i form af fritagelse for beskatning af udbytter i et givent tilfælde søges opnået ved misbrug.

Ifølge Domstolen må en koncern i sager som den foreliggende anses for et kunstigt arrangement, når den ikke er etableret af grunde, der afspejler den økonomiske realitet, når den har en struktur, der er rent formel, og når den har til hovedformål eller som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse. Det gælder navnlig, når betalingen af udbytteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som overfører udbytterne, og det selskab, som er udbytternes retmæssige ejer (præmis 100).

Den omstændighed, at et udbytte i dets helhed eller stort set i dets helhed ganske kort tid efter modtagelsen videreudloddes af det selskab, som har modtaget det, til enheder, som ikke opfylder betingelserne for en anvendelse af moder-/datterselskabsdirektivet, er således ifølge Domstolen et holdepunkt for, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse for beskatning, der følger af direktivet (dommens præmis 101).

Ifølge Domstolens dom kan den kunstige karakter af et arrangement ligeledes underbygges ved, at den pågældende koncern er struktureret på en sådan måde, at det selskab, der modtager udbyttet, selv skal videreudlodde dette udbytte til et tredje selskab, som ikke opfylder betingelserne for en anvendelse af moder-/[datter]selskabsdirektivet, med den følge at selskabet alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som gennemstrømningsselskab for at muliggøre pengestrømmen fra datterselskabet til den enhed, som er de overførte beløbs »retmæssige ejer« (dommens præmis 103).

Et selskab kan anses for et gennemstrømningsselskab, hvis selskabets eneste aktivitet er at modtage udbyttet og videreudlodde det til den retmæssige ejer eller til øvrige gennemstrømningsselskaber, jf. dommens præmis 104. Den (manglende) faktiske økonomiske aktivitet skal bedømmes på grundlag af samtlige relevante elementer vedrørende bl.a. driften af selskabet, dets regnskaber, strukturen af selskabets omkostninger og de reelt afholdte udgifter,

det personale, som selskabet beskæftiger, og de lokaler og det udstyr, som det råder over.

Holdepunkter for, at der i et givent tilfælde er tale om et kunstigt arrangement, kan også findes 1) i den omstændighed, at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, 2) i fremgangsmåden for transaktionernes finansiering, 3) i vurderingen af de mellemliggende selskabers egenkapital og 4) i gennemstrømningsselskabernes manglende beføjelser til at råde økonomisk over de modtagne udbytter. Det er i den forbindelse ikke kun en kontraktuel eller juridisk forpligtelse for det selskab, der modtager udbyttet, til at viderudlodde det til tredjemand, der kan udgøre et sådant holdepunkt. Der foreligger også et holdepunkt for misbrug, hvis selskabet efter en bedømmelse af sagens faktiske omstændigheder »substantielt« ikke har haft rettighederne til at bruge og nyde udbyttet (præmis 105).

Holdepunkter som de ovenfor nævnte kan anses for bestyrkede, hvis der er et sammenfald eller en nær tidsmæssig sammenhæng mellem på den ene side ikrafttrædelsen af ny skattelovgivning som for eksempel selskabsskattelovens § 2, stk. 1, litra c), eller den i denne sag omhandlede American Jobs Creation Act of 2004, og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern (præmis 106). Et sådant sammenfald eller en sådan nær tidsmæssig sammenhæng er omvendt ikke en nødvendig betingelse for at godtgøre et misbrug, men kan altså bestyrke andre holdepunkter for, at der foreligger et misbrug.

Endelig er det for konstateringen af, om der foreligger et retsmisbrug, uden betydning, om Danmark med den stat, hvor udbytternes retmæssige ejer er hjemmehørende, har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af udbyttet, hvis det var blevet betalt direkte til den retmæssige ejer, jf. hertil præmisserne 107 ff.

Når Domstolens anvisninger kobles med den foreliggende sags omstændigheder, må det fastslås, at der foreligger et tilfælde af retsmisbrug.

De foreliggende oplysninger giver fuldt tilstrækkeligt grundlag for at fastslå, at den i sagen omhandlede omstrukturering, hvorved NetApp Cypern blev indskudt mellem NetApp Denmark og NetApp Bermuda, ikke var forretningsmæssig begrundet, men havde skatteundgåelse som et af dens hovedformål.

Frem til den 16. september 2005 var NetApp Denmark som beskrevet ovenfor direkte ejet af NetApp Bermuda, som var hjemmehørende på Bermuda. Uden omstruktureringen skulle NetApp Denmark have indeholdt kildeskat af de omhandlede udbytter, da Bermuda ikke var medlem af EU, og da Danmark ikke havde indgået en dobbeltbeskatningsoverenskomst med Bermuda.

**1635**

Der er ikke oplyst en plausibel forretningsmæssig begrundelse for, at NetApp Cypern blev indskudt mellem NetApp Denmark og NetApp Bermuda. Omstruktureringen skulle angiveligt være blevet foretaget, fordi koncernen ikke ønskede at bevare en ejerstruktur, hvor NetApp Denmark fungerede som moderselskab for NetApp Netherlands. Der er imidlertid ikke givet en antagelig forklaring på, hvorfor det - pludselig - blev nødvendigt at indskyde et mellemled på Cypern frem for - fortsat - at lade NetApp Bermuda fungere som moderselskab for den europæiske del af koncernen. Ejerskabet til det nederlandske selskab kunne blot være overført til NetApp Bermuda, hvilket ville have været en langt mere enkel fremgangsmåde. Koncernen havde i givet fald ikke behøvet at stifte og efterfølgende afholde udgifter til administration af og regnskabsaflæggelse for et selskab på Cypern.

NetApp Cypern udøvede da heller ikke andre aktiviteter end blot at besidde kapitalandele i NetApp Denmark og sidenhen i NetApp Netherlands. NetApp Cypern havde - bortset fra en ubetydelig kontantbeholdning - ikke andre aktiver end kapitalandelene, ligesom selskabet ikke rådede over egne lokaler, men blot havde postadresse hos et administrationsselskab. Endelig havde NetApp Cypern heller ingen ansatte, og selskabet afholdt ikke andre udgifter end administrationsudgifter af en i øvrigt beskeden størrelsesorden.

Medens omstruktureringen ikke havde nogen forretningsmæssig begrundelse, havde den til gengæld en åbenlys skattemæssig fordel. NetApp Cypern var nemlig et »selskab i en medlemsstat« i moder-/datterselskabsdirektivets forstand. Selskabet kunne derfor - i modsætning til NetApp Bermuda - påberåbe sig moder-/datterselskabsdirektivets fordel i form af fritagelse for beskatning af udbytte i kildestaten, hvis man altså ser bort fra spørgsmålet om misbrug og udbytternes »retmæssige ejer«.

NetApp Cypern var uden reelle beføjelser til at råde økonomisk over de omhandlede udbytter. Selskabet kunne - rent faktisk - kun afdrage på købesummen for erhvervelsen af NetApp Denmark ved, at udbytterne fra NetApp Denmark blev videreført til NetApp Bermuda, hvilket rent faktisk også skete. Det taler i så henseende for sig selv, at NetApp Cypern dagen efter at have modtaget udbyttet på godt og vel 565 mio. kr. fra NetApp Denmark, videreoverførte beløbet til NetApp Bermuda som afdrag på købesummen. NetApp Denmark har da heller ikke gjort gældende endsige sandsynliggjort, at NetApp Cypern havde andre muligheder for at betale afdragene til NetApp Bermuda end ved at videreoverføre de beløb, som selskabet modtog i udbyttebetalinger fra NetApp Denmark.

På den anførte baggrund er der altså ingen tvivl om, at omstruktureringen, hvorved NetApp Cypern blev skudt ind imellem NetApp Denmark og NetApp Bermuda, havde som et hovedformål at skaffe sidstnævnte selskab den fordel af moder-/datterselskabsdirektivet, som selskabet ikke selv kunne gøre gældende. Da udbytterne blev viderekanaliseret til Bermuda som afdrag på det ved omstruktureringen etablerede gældsforhold, blev det beløb, hvoraf der uden omstruktureringen skulle have været indeholdt kildeskat, gjort skattefrit.

At omstruktureringen ikke var forretningsmæssigt begrundet, men havde skatteundgåelse som et af sine hovedformål, bestyrkes af den nære tidsmæssige sammenhæng mellem den første og jagt største udlodning og omstruktureringen, der således fandt sted mindre end 14 dage før, at udlodningen blev vedtaget på en generalforsamling i NetApp Denmark.

Når de nævnte omstændigheder sammenholdes med Domstolens anvisninger for misbrugsvurderingen, må det fastslås, at der foreligger et arrangement, der havde som et hovedformål uretmæssigt at drage fordel af den fritagelse, der er fastsat i moder-/datterselskabsdirektivets artikel 5.

Domstolen har således også fastslået (dommens præmis 99), at der i denne sag er »en række holdepunkter«, som giver grundlag for at konkludere, at der foreligger retsmisbrug, men i overensstemmelse med kompetencefordelingen mellem Domstolen og landsretten som den forelæggende ret, har Domstolen over- ladt det til landsretten at »efterprøve«, dels om disse holdepunkter er objektive og samstemmende, dels om NetApp Denmark har haft mulighed for at føre modbevis.

En sådan efterprøvelse må munde ud i en konklusion om, at der foreligger et tilfælde af retsmisbrug. Alle omstændigheder af relevans for misbrugsvurderingen var oplyst over for Domstolen, og der er ikke siden godtgjort andre omstændigheder, som giver belæg for, at Domstolens (foreløbige) vurdering ikke kan holde for en efterprøvelse.

Da der altså foreligger et retsmisbrug, er NetApp Cypern - allerede af den grund - afskåret fra at drage fordel af den fritagelse for kildeskat, der er fastsat i moder-/datterselskabsdirektivets artikel 5. Bestemmelserne i direktivet fører dermed ikke til, at de indeholdte udbytter skal fritages for en skattepligt efter selskabsskattelovens § 2, stk. 1, litra c).

*[...] Beskatningen skal ikke nedsættes i medfør af den dansk-cypriotiske dobbeltbeskatningsoverenskomst*

Ifølge den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2, kan udbytte beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, men den skat, der pålignes, må ikke overstige nærmere fastsatte grænser, »såfremt modtageren er udbyttets retsmæssige ejer« […]. Efter ordlyden af denne bestemmelse er Danmark altså kun forpligtet til at nedsætte beskatningen af udbytte, der

**1636**

udbetales af et dansk selskab, hvis modtageren er udbyttets »retsmæssige ejer«.

I mangel af holdepunkter for andet må dette begreb, selvom Cypern ikke er medlem af OECD, fortolkes i overensstemmelse med det tilsvarende begreb i OECD's modeloverenskomst, idet den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2, svarer til artikel 10, stk. 2, i modeloverenskomsten […].

At fordelen, der følger af modeloverenskomstens artikel 10, stk. 2, alene kan påberåbes af udbyttets retsmæssige ejer, blev indført som en udtrykkelig betingelse, da modeloverenskomsten blev revideret i 1977. Betingelsen blev indført for at gøre det klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart bliver betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst, jf. 2003-kommentaren, pkt. 12 til modeloverenskomstens artikel 10 […].

Det fremgår således også af 1977-kommentaren, pkt. 7-10 til modeloverenskomstens artikel 1, at begrebet »retmæssig ejer« tager sigte på at dæmme op over for misbrug i form af »kunstfærdige juridiske konstruktioner«, nærmere bestemt det »kunstgreb«, hvor en person disponerer via en juridisk sammenslutning, der er dannet i en kontraherende stat, væsentligst for at opnå fordele i henhold til overenskomsten, som ikke ville kunne opnås af personen direkte […]. I overensstemmelse hermed følger det videre af 1977-kommentarerne, pkt. 12 til artikel 10, at en udbyttemodtager ikke kan påberåbe sig den begrænsning af kildestatens beskatningsret, der følger af modeloverenskomstens artikel 10, stk. 2, hvis den pågældende blot er et »mellemled«, såsom en agent eller udpeget person, der er skudt ind mellem den, der reelt er berettiget til udbytterne, dvs. den retmæssige ejer, og udbyttebetaleren, medmindre den retmæssige ejer er hjemmehørende i samme stat som den formelle udbyttemodtager […].

Østre Landsret har allerede fastslået, at begrebet »retmæssig ejer« er et autonomt begreb, dvs. at det har et selvstændigt indhold uafhængigt af de kontraherende staters interne lovgivning, jf. SKM2012.121.ØLR […]. Begrebet »retmæssig ejer« skal derfor ikke fortolkes i overensstemmelse med begrebet »rette indkomstmodtager«, der i dansk skatteret bruges som betegnelse for den, der må anses for at være skattepligtig af en given indtægt.

Med den nævnte dom har Østre Landsret også allerede fastslået, at skattemyndighederne i sager som den foreliggende har været berettiget til - som sket - at inddrage kommentarerne til OECD's modeloverenskomst fra 2003 ved fastlæggelsen af, hvad der nærmere skal forstås ved begrebet »retmæssig ejer«. De senere kommentarer fra 2014 og 2017 må anses for på tilsvarende vis at udgøre relevante fortolkningsbidrag, eftersom disse kommentarer - ligesom 2003-kommentarerne - ikke indebærer en ændret forståelse af mo-

deloverenskomstens artikel 10, stk. 2, men alene har karakter af præciseringer.

Af 2003-kommentarerne, pkt. 12.1 til modeloverenskomstens artikel 10, stk. 2, følger […], at det ikke vil være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skal indrømme lempelse eller fritagelse for skat »i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden vis end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.« Et »gennemstrømningsselskab« vil således ikke kunne anses for den retmæssige ejer, »hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.«

I 2014-kommentareren, pkt. 12.4, som på dette punkt er blevet videreført uden ændringer i 2017-kommentareren, er det præciseret, at den umiddelbare modtager af udbyttet vil kunne nægtes den overenskomstmæssige fordel, der følger af modeloverenskomstens artikel 10, stk. 2, hvis de faktiske omstændigheder klart viser, at modtageren - uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person - »substantielt« ikke har rettighederne til at bruge og nyde det modtagne udbytte[…].

I den foreliggende sag viser de faktiske omstændigheder med tilstrækkelig klarhed, at NetApp Cypern ikke havde eller kun havde meget snævre beføjelser til at disponere over de omhandlede udbyttebetalinger, som selskabet modtog fra NetApp Denmark.

Der må herved lægges vægt på, at NetApp Cypern - uden nogen gyldig forretningsmæssig begrundelse - blev indskudt mellem NetApp Denmark og NetApp Bermuda umiddelbart før vedtagelsen af den første og største af de omhandlede udbytteudlodninger, at NetApp Cypern ikke udøvede andre aktiviteter end blot at besidde kapitalandele i NetApp Denmark og sidenhen i NetApp Netherlands, at NetApp Cypern - bortset fra en ubetydelig kontantbeholdning - ikke havde andre aktiver end de modtagne kapitalandele, og at selskabet som beskrevet ovenfor i realiteten alene kunne afdrage på købesummen for erhvervelsen af kapitalandelene NetApp Denmark ved, at udbytterne fra NetApp Denmark blev videreført til NetApp Bermuda, hvilket rent faktisk også skete.

De anførte omstændigheder godtgør, at omstruktureringen, hvorved NetApp Cypern blev indskudt mellem NetApp Denmark og NetApp Bermuda, blev gennemført

**1637**

med det (hoved-)formål, at førstnævnte selskab skulle virke som »gennemstrømningsenhed« for de omhandlede udbytter, som uden omstruktureringen ville have været skattepligtige i medfør af selskabsskattelovens § 2, stk. 1, litra c), og at selskabet substantielt ikke kunne disponere over udbytterne, der på forhånd var bestemt til at blive viderebetalt til NetApp

Bermuda, hvilket faktisk også skete. I så henseende taler det som nævnt for sig selv, at NetApp Cypern dagen efter at have modtaget udbyttet på godt og vel 565 mio. kr. fra NetApp Denmark videreoverførte beløbet til NetApp Bermuda som afdrag på købesummen.

På denne baggrund må det fastslås, at NetApp Cypern i den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2's forstand ikke kan anses for de omhandlede udbytters retmæssige ejer. Beskatningen af udbytterne skal derfor ikke nedsættes efter denne bestemmelse. Dobbeltbeskatningsover- enskomsten fører dermed ikke til, at de omhandlede udbytter skal fritages for en selskabsskattelovens § 2, stk. 1, litra c).

*[...] Beskatningen skal ikke nedsættes eller frafaldes efter den dansk-amerikanske dobbeltbeskatningsoverenskomst*

Copyright © 2023 Karnov Group Denmark A/S

Den dansk-amerikanske dobbeltbeskatningsoverenskomst giver ikke grundlag for, at Danmark skal frafalde en beskatning af udbytterne, som NetApp Denmark udloddede til NetApp Cypern. Efter ordlyden af selskabsskattelovens § 2, stk. 1, litra c), er det kun en dobbeltbeskatningsoverenskomst med den stat, hvori moderselskabet er hjemmehørende, som kan føre til en fritagelse for skattepligt. Da en skattepligt efter den nævnte bestemmelse påhviler NetApp Cypern, er det derfor alene den dansk-cypriotiske dobbeltbeskatningsoverenskomst, der kan føre til, at de omhandlede udbytter er fritaget for en skattepligtig, forudsat at overenskomstens betingelser for, at Danmark skal nedsætte beskatningen, er opfyldt.

Ved afgørelsen af, om fordelen af denne overenskomsts artikel 10, stk. 2, kan påberåbes, vil det dog kunne tillægges betydning, om den givne indkomst er blevet viderekanaliseret til et selskab, som er hjemmehørende i en stat, hvormed Danmark har indgået en dobbeltbeskatningsoverenskomst, der kan forpligte Danmark til at indrømme en tilsvarende fordel.

Det skyldes, at begrebet »retmæssig ejer« er et begreb, der som nævnt tager sigte på at hindre misbrug, der består i, at en person disponerer via en juridisk person, der er hjemmehørende i en kontraherende stat, med det hovedformål at opnå en overenskomstmæssig fordel, som ikke ville kunne opnås af personen direkte. I situationer, hvor der ikke er indikationer på et sådant misbrug, fordi der ikke i relation til kildebeskatning er nogen fordel forbundet med det mellemliggende selskab, bør en overenskomstmæssig fordel i form af en fritagelse eller en begrænsning af en skattepligt til kildestaten ikke nægtes.

I den foreliggende situation er der imidlertid tale om, at det udbyttemodtagende selskab (NetApp Cypern) blot udgør en »gennemstrømningsenhed«, hvorigennem udbyttet ledes til dette selskabs moderselskab (NetApp Bermuda), der er hjemmehørende i en stat, hvormed Danmark ikke har indgået en dobbeltbeskatningsoverenskomst, og som derfor ikke selv ville kunne påberåbe sig en overenskomstmæssig fordel. Hvis NetApp Cypern ikke var blevet indskudt mellem NetApp Denmark og NetApp Bermuda, ville NetApp Bermuda således have været skattepligtig til Danmark af de udbytter, som NetApp Denmark udloddede. Situationen adskiller sig dermed afgørende fra det af NetApp Denmark påberåbte eksempel i skatteministerens svar på et spørgsmål om den dansk-cypriotiske dobbeltbeskatningsoverenskomst, hvor det cypriotiske selskab forudsættes ejet af et selskab, der er hjemmehørende i Rusland, Hviderusland eller Ukraine, som alle har indgået en dobbeltbeskatningsoverenskomst med Danmark […].

I en situation som den foreliggende, hvor der er klare holdepunkter for at fastslå, at det etablerede arrangement tager sigte på et misbrug af den dansk-cypriotiske dobbeltbeskatningsoverenskomst, kan misbruget ikke afkræftes med henvisning til, at de omhandlede udbytter skulle være blevet videreudloddet til et selskab, der er hjemmehørende i en stat (i dette tilfælde USA), som kildelandet (Danmark) har indgået en dobbeltbeskatningsoverenskomst med, og at dette selskab - hvis det havde været den direkte modtager af udbyttet - kunne have påberåbt denne dobbeltbeskatningsoverenskomst med henblik på en fritagelse for at betale kildeskat.

Der må i en sådan situation stilles strenge krav til beviset for, at arrangementet (alligevel) ikke har haft et misbrug af den dansk-cypriotiske dobbeltbeskatningsoverenskomst som et hovedformål. Det påhviler derfor NetApp Denmark at føre et sikkert bevis for, at NetApp Bermuda - ligesom NetApp Cypern - blot har været en gennemstrømningsenhed for de omhandlede udbytter. Selskabet må således fremlægge dokumentation for, at der på forhånd var truffet bestemmelse om, at udbytterne fra NetApp Denmark skulle videreudloddes af NetApp Bermuda, ligesom der må stilles strenge krav til beviserne for, at udbytterne faktisk blev videreudloddet,

og at sidstnævnte ikke havde mulighed for at råde over beløbet fra NetApp Cypern.

Det må herved tages i betragtning, at NetApp Denmark - hvis der faktisk på forhånd var truffet bestemmelse om, at der skulle ske videreudlodning fra NetApp Bermuda - nemt ville kunne fremlægge dokumentation for, at sådanne bestemmelser var truffet, da NetApp Denmark vedtog beslutningerne om de omhandlede

## 1638

udbytter. Selskabet har på samme vis alle muligheder for at dokumentere, at udbytterne faktisk blev videreudloddet, og at NetApp Bermuda ingen muligheder havde for at råde over udbytterne, hvis det da rent faktisk har forholdt sig sådan. NetApp Denmark har ikke løftet denne bevisbyrde.

Hvad angår udbyttet, som NetApp Denmark den 28. september 2005 vedtog at udlodde til NetApp Cypern, har selskabet ikke dokumenteret, at NetApp Bermuda på tidspunktet for denne vedtagelse var kontraktuelt eller juridisk forpligtet til at kanalisere dette udbytte videre til NetApp USA.

NetApp Denmark har endvidere ikke på anden vis godtgjort endsige ført et sikkert bevis for, at NetApp Bermuda substantielt ikke havde rettighederne til at bruge og nyde beløbet på 91,45 mio. USD, som NetApp Cypern den 28. oktober 2005 - dagen efter at have modtaget beløbet fra NetApp Denmark - videresendte til NetApp Bermuda. Der var således ikke tale om, at NetApp Bermuda umiddelbart viderebetalte beløbet til NetApp USA.

Der foreligger ingen generalforsamlingsprotokollater, bestyrelsesmødereferater eller anden oprindelig dokumentation, som viser, at det den 28. september 2005, hvor udbytteudlodningen fra NetApp Denmark blev vedtaget, var bestemt, at NetApp Bermuda skulle føre pengene videre til NetApp USA.

Fra NetApp Bermuda modtog beløbet fra NetApp Cypern, gik der mere end 5 måneder, førend NetApp Bermuda udloddede et beløb på 550 mio. USD til NetApp USA, og der foreligger ingen dokumentation for, at NetApp Bermuda i det meget lange tidsrum skulle have været uden beføjelser til at råde over beløbet, som det modtog fra NetApp Cypern.

Det siger sig selv, at NetApp Bermudas ejerskab af NetApp Denmark frem til september 2005 ikke havde til formål at undgå dansk kildebeskatning af udbytter. I modsætning til NetApp Cypern blev NetApp Bermuda utvivlsomt ikke indskudt mellem NetApp Denmark og NetApp USA med henblik på blot at fungere som en »gennemstrømningsenhed« for udbytter fra NetApp Denmark til NetApp USA.

I modsætning til NetApp Cypern var NetApp Bermuda heller ikke et selskab uden reel substans. NetApp Bermuda var øverste moderselskab for hele den del af koncernen, der hørte til uden for USA, og selskabet ejede de immaterielle aktiver, der var nødvendige for at drive koncernens aktiviteter uden for USA.

I modsætning til NetApp Cypern, der bortset fra det omhandlede udbytte på ca. 91,45 mio. USD reelt ingen indtægter genererede, havde NetApp Bermuda en meget betydelig omsætning og betydelige rente- indtægter (ca. 315 mio. USD henholdsvis ca. 11 mio. USD i 2005/2006), ligesom selskabet også - i modsætning til NetApp Cypern, der kun havde marginale udgifter til administration - havde en betydelig udgiftsside (132,7 mio. USD i 2005/2006).

Endelig havde NetApp Bermuda - i modsætning til NetApp Cypern, der bortset fra kapitalandelene i NetApp Denmark og NetApp Holding BV kun ejede en ubetydelig kontantbeholdning - meget betydelige aktiver, der havde en bogført værdi på over 280 mio. USD, og som endog utvivlsomt havde en betydeligt højere værdi end den bogførte.

Henset til kombinationen af de foreliggende omstændigheder, hvor der som nævnt gik mere end 5 måneder fra, at NetApp Berm-

Copyright © 2023 Karnov Group Denmark A/S

uda modtog beløbet på 91,45 mio. USD fra NetApp Cypern, indtil selskabet udloddede et beløb på 550 mio. USD til NetApp USA, hvor NetApp Bermuda ikke var et selskab, der til lejligheden blev indskudt i kæden, og hvor selskabet havde en meget betydelig økonomisk substans, er der intet belæg - endsige noget sikkert bevis - for, at NetApp Bermuda var uden reelle beføjelser til at råde over beløbet, som det modtog fra NetApp Cypern.

Hvad angår udbyttet, som NetApp Denmark den 13. oktober 2006 vedtog at udlodde, kan dette udbytte - under de i øvrigt foreliggende omstændigheder - ikke anses for at være »videregennemstrømmet« til NetApp USA som en del af udbyttet på 550 mio. USD, eftersom dette udbytte allerede var blevet udloddet til selskabet den 3. april 2006.

På den anførte baggrund kan det fastslås, at NetApp Denmark ikke har afkræftet, at arrangementet med etableringen af NetApp Cypern havde et misbrug af den dansk-cypriotiske dobbeltbeskatningsoverenskomst som hovedformål. Den omstændighed, at NetApp USA kunne have påberåbt sig dobbeltbeskatningsoverenskomsten mellem USA og Danmark, hvis selskabet havde været den umiddelbare ejer af kapitalandelene i NetApp Denmark, afkræfter som nævnt ikke, at arrangementet havde et misbrug af den dansk-cypriotiske dobbeltbeskatningsoverenskomst som hovedformål.

Under alle omstændigheder må misbrugsbedømmelsen, navnlig i en situation som den foreliggende, foretages på grundlag af de faktiske forhold og ikke på grundlag af kontrafaktiske omstændigheder.

Det skyldes nemlig - utvivlsomt - ikke en ren tilfældighed, at NetApp-koncernen valgte den mere komplicerede omstrukturering, der faktisk blev gennemført, frem for den mindre komplicerede omstrukturering, det ville have været at tilbageoverdrage NetApp Bermudas kapitalandele i NetApp Denmark til NetApp USA, hvilket ydermere ville have ført til den simpleste udloddningsstruktur af alle, nemlig en direkte udlodning fra NetApp Denmark til NetApp USA. Koncernen kunne i givet fald have undgået at skulle etablere et selskab på Cypern og bruge ressourcer på at etablere en ledelse

**1639**

med lokal deltagelse og løbende at skulle administrere selskabet, herunder aflægge reviderede årsrapporter.

Givet at der ved en tilbageoverdragelse af anparterne til NetApp USA kunne være undgået kildeskat på udbytte fra NetApp Denmark, må der derfor nødvendigvis have været andre - tungtvejende - skattemæssige og/eller forretningsmæssige grunde til, at denne simple løsning blev fravalgt til fordel for den langt mere komplicerede omstrukturering og udlodningsstruktur, der med stiftelsen og indskydelsen af et cypriotisk selskab gjorde vejen fra Danmark til USA (endnu) længere, end den allerede var.

Under disse omstændigheder må det for sagens afgørelse i alle tilfælde lægges til grund, at arrangementet med NetApp Cypern har haft et misbrug af den danskcypriotiske dobbeltbeskatningsoverenskomst som et hovedformål, og når det er situationen, har skattemyndighederne været berettiget til at nægte en fritagelse for kildeskat af de omhandlede udbytter fra NetApp Denmark til NetApp Cypern. Den dansk-amerikanske dobbeltbeskatningsoverenskomst kan således ikke føre til et andet resultat.

Med sin påberåbelse af den dansk-amerikanske dobbeltbeskatningsoverenskomst gør NetApp krav på, at NetApp-koncernen - på én og samme tid - skal have ret til at nyde de fordele, der nødvendigvis må have været motivet for valget af den mest komplicerede omstrukturering, og den skattemæssige fordel, som NetApp USA i kraft af den dansk-amerikanske dobbeltbeskatningsoverenskomst kunne have gjort gældende, havde det ikke været for koncernens fravalg af netop denne omstruktureringsmodel. Et

sådan krav, der altså går ud på, at koncernen vil have ret til at høste fordele af både virkeligheden og af en kontrafaktisk virkelighed, kan ikke nyde retsordenens anerkendelse.

*[…] Skattepligten strider ikke imod en bindende, fast administrativ praksis*

Ved afgørelsen af, om en skattepligt med hensyn til de omhandlede udbytter vil stride imod en bindende, fast administrativ praksis, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at beskatningen ikke skal frafaldes efter moder-/datterselskabsdirekti- vets artikel 5, stk. 1, fordi der foreligger misbrug, og at beskatningen af udbytterne ej heller skal nedsættes efter den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2, fordi NetApp Cypern ikke kan anses for udbytternes retmæssige ejer.

Der er derfor med andre ord tale om, at NetApp Denmark med sit praksissynspunkt gør krav på, at de omhandlede udbytter skal anses for undtaget fra en skattepligt, selv om selskabsskattelovens § 2, stk. 1, litra c)'s udtrykkelige betingelse for, at udbytterne er undtaget fra skattepligten, ikke er opfyldt.

Da en forvaltningsretlig lighedsgrundsætning ikke kan begrunde et krav om en retsstilling, der strider imod loven, jf. hertil U.2003.2005H […], er det udelukket, at NetApp Denmarks påberåbelse af en administrativ praksis kan føre til, at de omhandlede udbytter undtages fra en skattepligt, allerede fordi en sådan undtagelse altså ville stride imod selskabsskattelovens § 2, stk. 1, litra c)'s udtrykkelige betingelse for, at en undtagelse kan indrømmes.

Hertil kommer, at SKATs afgørelse af 10. september 2010 ikke er udtryk for en praksisskærpelse, eftersom den slet ikke ændrede på nogen fast administrativ praksis.

Det påhviler NetApp Denmark at føre bevis for eksistensen af den hævdede praksis, som afgørelsen ifølge selskabet skulle fravige, jf. f.eks. U.2011.3305H […], men selskabet har ikke løftet denne bevisbyrde. NetApp Denmark har således ikke påvist eksistensen af nogen tidligere afgørelse, hvorefter skattemyndighederne har anset et udbytte for at være undtaget fra en skattepligt, selvom de givne omstændigheder - ligesom i den foreliggende sag - ellers gav belæg for at fastslå, at moderselskabet ikke havde haft haft så snævre beføjelser til at disponere over udbyttet, at selskabet ikke kunne anses for dets retmæssige ejer.

NetApp Denmark har heller ikke påvist tilfælde, hvor skattemyndighederne - siden selskabsskattelovens § 2, stk. 1, litra c)'s ikrafttrædelse den 27. april 2001 (med virkning for udbytter, der vedtages udloddet eller udbetalt den 1. juli 2001) - skulle have forsømt at gribe korrigerende ind i tilfælde som det foreliggende. En sådan manglende indgriben ville, hvis den faktisk havde fundet sted, i øvrigt heller ikke kunne være blevet sidestillet med en positiv afgørelse, jf. f.eks. U.2017.2960H og U.2017.2979H […].

NetApp Denmark har heller ikke på anden vis godtgjort, at skattemyndighederne efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra c) og ind til SKATs afgørelse i den foreliggende sag skulle have fulgt en praksis, hvorefter udbytte er blevet anset for at være undtaget fra den skattepligt, der følger af bestemmelsen, selvom de givne omstændigheder ellers gav belæg for at fastslå, at moderselskabet ikke havde haft haft så snævre beføjelser til at disponere over udbyttet, at selskabet ikke kunne anses for dets retmæssige ejer.

Skatteministerens svar af 10. januar 2001 til Folketingets Skatteudvalg, bilag 22 til lovforslag nr. 99 af 10. november 2000 […] og hans svar af 11. januar 2001, bilag 24 til lovforslaget […], som NetApp Denmark påberåber sig, udgør ikke noget bevis for eksistensen af en sådan praksis, allerede fordi de spørgsmål, der blev besvaret, som beskrevet ovenfor, blev stillet i tilknytning til det

Copyright © 2023 Karnov Group Denmark A/S

(oprindeligt) fremsatte, men på dette punkt ikke-vedtagne lovfor-slag.

**1640**

De af NetApp Denmark påberåbte svar, som skatteministeren efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra c) har afgivet i forskellige sammenhænge [...], udgør heller ikke et bevis for, at der på tidspunktet for SKATs afgørelse var etableret en praksis, hvorefter udbytter - under omstændigheder som i denne sag fore-liggende - blev betragtet som værende undtaget fra en skattepligt efter denne bestemmelse.

Der er tale om abstrakte svar på abstrakte spørgsmål. Svarene giver - ligesom det påberåbte notat om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner [...] - intet belæg for, at SKAT positivt skulle have truffet en beslutning om at følge en praksis, hvorefter udbytte blev anset for undtaget fra en skattepligt, selv om der efter en oplysning og en konkret vurdering af de givne omstændigheder ville være belæg for at fastslå, at moderselskabet ikke havde haft eller havde haft så snævre beføjelser til at disponere over udbyttet, at selskabet ikke kunne anses for dets retmæssige ejer.

Forud for SKATs afgørelse i denne sag havde skatteministeren derimod afgivet adskillige svar, hvoraf fremgår, at et moderselskab ikke ville kunne påberåbe sig fordelene af en dobbeltbeskatnings-overenskomst, hvis det var et »rent gennemstrømningsholdingsel-skab« [...], et »rent gennemstrømningsselskab« [...], et »conduit-selskab [...], eller et »gennemstrømningsselskab« [...]. I alle de nævnte svar, bortset fra det første, er der endog henvist til pkt. 12.1 i bemærkningerne til artikel 10 (om udbytte) i OECD's modelove-renskomst, og i de 4 sidstnævnte svar er det ydermere beskrevet i selve svarene, at »conduit« selskaber/»gennemstrømningsselskaber« omfatter selskaber, der »reelt har meget snævre beføjelser i relation til den pågældende indkomst«.

Det må på den anførte baggrund fastslås, at SKATs afgørelse i denne sag ikke ændrede på nogen bindende, fast administrativ praksis, som NetApp Denmark i medfør af en forvaltningsretlig lighedsgrundsætning kan støtte ret på.

*[...] NetApp Denmark er ansvarlig for den manglende indeholdel-se*

Da de omhandlede udbytter er omfattet af skattepligten, jf. sel-skabsskattelovens § 2, stk. 1, litra c), skulle NetApp Denmark i forbindelse med dets vedtagelse om udbetaling af udbytterne have indeholdt udbytteskat heraf, jf. kildeskattelovens § 65, stk. 1.

Af kildeskattelovens § 69, stk. 1, følger, at den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i kildeskatteloven.

Efter fast højesteretspraksis er den indeholdelsespligtige ansvarlig for betaling af det manglende beløb, hvis den pågældende er be-kendt med det faktiske grundlag for indeholdelsespligten, jf. U.2004.362H [...], U.2008.2243H [...] og U.2016.2898H [...].

Det er ubestridt, at NetApp Denmark har været bekendt med de omstændigheder, som fører til, dels at NetApp Cypern ikke kan anses for at have at været udbytternes retsmæssige ejer i den dansk-cypriotiske dobbeltbeskatningsoverenskomsts forstand, dels at fordelen i form af kildeskattefritagelsen, der følger af moder-/dat-terselskabsdirektivet, skal nægtes, fordi EU-retten ikke kan påberå-bes med henblik på at muliggøre retsmisbrug.

Heroverfor har NetApp Denmark ikke godtgjort omstændigheder, som gav selskabet føje til at antage, at udbytterne kunne udloddes uden indeholdelse af udbytteskat.

Ved afgørelsen af, om NetApp Denmark har afkræftet den lovbe-stemte formodning for forsømmelighed, må det således - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at der ikke har været nogen bindende fast, administrativ praksis, hvorefter de omhandlede udbytter skal anses for at være undtaget fra den skattepligtig, der ellers følger af selskabsskattelovens § 2, stk. 1, litra c). Allerede af den grund er det uholdbart, når NetApp Denmark gør gældende, at der forelå en administrativ praksis, som gav selskabet føje til at antage, at udlod-ningerne kunne foretages uden indeholdelse af udbytteskat.

Den påberåbte »stor[e] usikkerhed om, hvorledes begrebet 'bene-ficial owner' skal fortolkes« [...], har heller ikke givet NetApp Denmark føje til en sådan antagelse - tværtimod.

Af pkt. 12.1 i bemærkningerne til artikel 10 (om udbytte) i OECD's modeloverenskomst, der forelå på tidspunktet for sel-skabets beslutning om udbetaling af de omhandlede udbytter, og som artikel 10 i den dansk-cypriotiske dobbeltbeskatningsove-renskomst svarer til, fremgår som beskrevet ovenfor, at et »gen-nemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre«. Hvis NetApp Denmark var i tvivl, om hvad der nærmere skulle forstås ved »retmæssig ejer«, kan det ikke anses for undskyldeligt, at selskabet valgte at løbe risikoen og traf beslutning om udbetaling af udbytterne uden at indeholde udbytteskat. Det siger sig selv.

NetApp Denmark har heller ikke haft nogen føje endsige rimelig føje til at antage, at fordelen i form af den kildeskattefritagelse, der følger af moder-/dattersselskabsdirektivet, skulle kunne påberåbes med henblik på at muliggøre retsmisbrug. Som anført ovenfor er moder-/dattersselskabsdirektivet, hvad angår fritagelse for

**1641**

kildeskat, gennemført med en simpel henvisning i selskabsskatte-lovens § 2, stk. 1, litra c), til moder-/dattersselskabsdirektivet, og på tidspunktet for selskabets beslutning som at udbetale de omhand-lede udbytter var det, som beskrevet ovenfor, fastslået i Domstolens praksis, at EU-retten (dengang benævnt »fællesskabsretten«) ikke kunne gøres gældende med henblik på at muliggøre misbrug, jf. f.eks. Domstolens dom i sag C-212/97, Centros, præmis 24 og den deri nævnte retspraksis.

Når der - som i den foreliggende sag - er grundlag for at nægte en skattemæssig fordel i form af kildeskattefritagelse, fordi fordelen er søgt opnået ved retsmisbrug, og den indeholdelsespligtige er bekendt med dette grundlag, må den manglende indeholdelse af kildeskatten under alle omstændigheder - per se - tilregnes den in-deholdelsespligtige som værende af en forsømmelig karakter.

Da NetApp Denmark altså ikke har afkræftet den lovbestemte formodning for, at der fra selskabets side er udvist forsømmelighed med hensyn til den manglende indeholdelse af udbytteskat, er sel-skabet i medfør af kildeskattelovens § 69, stk. 1, over for det offent-lige umiddelbart ansvarlig for betaling af de ikke-indeholdte udbyt-teskatter, i alt 184.214.240 kr.«

*NetApp Denmark* har i sit sammenfattende processkrift af 11. ja-nuar 2021 anført bl.a.:

»Til støtte for [påstanden om frifindelse] gøres det principalt gældende, at NetApp Cypern ikke er begrænset skattepligtig til Danmark af de udbytter, der er udloddet til selskabet, jf. SEL § 2, stk. 1, litra c, sammenholdt med artikel 10 i DBO'en mellem Dan-mark og Cypern og moder-/dattersselskabsdirektivet (90/435/EØF), og at NetApp Danmark derfor ikke har været pligtig at indeholde udbytteskat, jf. kildeskattelovens § 65, stk. 5.

Det gøres i denne forbindelse gældende, at NetApp Cypern er »rette indkomstmodtager« og »retmæssig ejer« af de omhandlede

Copyright © 2023 Karnov Group Denmark A/S

udbytter i DBO'ens forstand (jf. afsnit 7 nedenfor), og at NetApp Cypern har et ubetinget krav på skattefrihed af udbytterne i medfør af moder-/datterselskabsdirektivet (jf. afsnit 8 nedenfor).

Det gøres endvidere gældende, at der - selv i det tilfælde, at domstolene måtte finde, at NetApp Cypern ikke kan anses for at være »retmæssig ejer« af de omhandlede udbytter - alligevel ikke er grundlag for at opkræve kildeskat af de omhandlede udbytter efter SEL § 2, stk. 1, litra c, eftersom den endelige modtager af de udloddede midler, NetApp USA, i så fald må anses som »retmæssig ejer« i stedet (med den konsekvens, at der vil skulle ske nedsættelse efter DBO'en mellem Danmark og USA). Dette anbringende behandles nedenfor i afsnit 7.7.

Endvidere gøres det gældende, at der hverken foreligger et retsmisbrug efter dansk ret, efter den dansk-cypriotiske DBO eller efter EU-retten. Dette anbringende […] behandles […] nedenfor i afsnit 7.6 (vedrørende DBO'en) og i afsnit 8.7 (vedrørende direktivet).

Subsidiært gøres det gældende, at SKATs afgørelse af 17. september 2010 er udtryk for en skærpelse af en fast administrativ praksis med tilbagevirkende kraft, og at den derfor ikke er lovlig. Dette behandles i afsnit 9.

Mere subsidiært gøres det gældende, at NetApp Danmark ikke hæfter for en eventuel kildeskat efter kildeskattelovens § 69, eftersom NetApp Danmark ikke har handlet »forsømmeligt« ved ikke at indeholde kildeskat i forbindelse med udbytteudlodningerne. Herom henvises til afsnit 10 nedenfor.

### 6. SEL § 2, STK. 1, LITRA C, FØRER IKKE TIL BEGRÆNSET SKATTEPLIGT AF UDBYTTERNE

Det fremgår af SEL § 2, stk. 1, litra c […], at den begrænsede skattepligt ikke omfatter udbytte, som oppebæres af et moderselskab, der ejer mindst 20% (2005 og 2006) af aktiekapitalen i et datterselskab i en sammenhængende periode på mindst 1 år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Disse betingelser, der svarer til de betingelser, som skal være opfyldt, for at et dansk moderselskab kan modtage skattefrit udbytte, er - ubestridt - opfyldt i nærværende sag.

Det er herudover en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i en dobbeltbeskatningsoverenskomst eller i moder-/datterselskabsdirektivet (90/435/EØF). Hvis blot udbyttebeskatningen skal lempes efter én af disse retsforskrifter, foreligger der således ikke begrænset skattepligt til Danmark for den udenlandske udbyttemodtager.

Denne sag drejer sig derfor i første række om, hvorvidt denne betingelse er opfyldt.

NetApp Danmark gør gældende, at udbyttebeskatningen skal frafaldes eller nedsættes såvel efter DBO'-en mellem Danmark og Cypern (alternativt DBO'en mellem Danmark og USA) som efter moder-/datterselskabsdirektivet, hvorfor NetApp Cypern ikke er begrænset skattepligtig til Danmark af de pågældende udbytter. Der er dermed af denne grund ikke noget grundlag for opkrævning af kildeskat.

[…]

### 7. KRAV PÅ NEDSÆTTELSE EFTER DEN DANSK-CYPRIOTISKE DOBBELTBESKATNINGS-OVERENSKOMST - NETAPP CYPERN ER »RETMÆSSIG EJER« AF UDBYTTERNE

#### 7.1. Generelt om dobbeltbeskatningsoverenskomsten Det følger af artikel 10 i den dagældende dansk-cypriotiske dobbeltbeskatningsoverenskomst af 26. maj 1981 […], at kildestaten - i denne sag Danmark - har ret til at beskatte udbytter, men at der skal ske nedsættelse (til 10 eller 15%), hvis udbyttemodtageren er udbyttets »retmæssige ejer« - i den engelske tekst »beneficial owner«.

**1642**

Det gøres gældende, at NetApp Cypern er »retmæssig ejer« af det omhandlede udbytte, og at NetApp Cypern derfor har krav på

nedsættelse efter artikel 10 i den dansk-cypriotiske DBO. Da der skal ske nedsættelse, foreligger der ikke begrænset skattepligt til Danmark, jf. selskabsskattelovens § 2, stk. 1, litra c.

Artikel 10 i den dansk-cypriotiske DBO svarer i princippet til artikel 10 i OECD's modeloverenskomst fra 1977 […] »Retmæssige ejer« er en oversættelse af »beneficial owner«.

Begrebet »retmæssig ejer« er hverken defineret i den dansk-cypriotiske DBO eller i modeloverenskomsten, og hovedproblemstillingen i dette sagskompleks vedrører netop fortolkningen af dette begreb.

I OECD's kommentarer til 1977-modeloverenskomsten, punkt 12 - som var de gældende kommentarer på tidspunktet for indgåelsen af DBO'en mellem Danmark og Cypern i 1981 - er det om begrebet anført […]:

»I henhold til stk. 2 kan begrænsningen i kildestatens beskatningsret ikke benyttes, når et mellemled, såsom en agent eller en udpeget person, skydes ind mellem den berettigede og udbetaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. Stater, der ønsker at ud-trykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.« […].

Da NetApp Cypern hverken er »agent« eller en »udpeget person« (på engelsk: »nominee« […]) for moderselskabet, NetApp Bermuda, eller det ultimative moderselskab, NetApp USA, er det efter 1977-kommentarerne klart, at NetApp Cypern er »retmæssig ejer« efter DBO'en.

I 2003 udvidede OECD kommentarerne til at omfatte såkaldte gennemstrømningsenheder.

Kommentarerne blev således bl.a. i punkt 12.1 suppleret med følgende […]:

»Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.« […].

Skattemyndighedernes fortolkning af »retmæssig ejer« i nærværende sag støttes på disse udvidede kommentarer, hvilket er tiltrådt af Landsskatteretten in den indbragte kendelse […].

Under nærværende sag støtter ministeriet også sin fortolkning på senere udarbejdede kommentarer til artikel 10, nemlig dem, der kom i 2014, dvs. 9 år efter det første udbytte i nærværende sag.

#### 7.2 »Retmæssig ejer« skal fortolkes i overensstemmelse med intern dansk ret

Det gøres gældende, at begrebet »retmæssig ejer« skal fortolkes i overensstemmelse med intern dansk skatteret.

I dansk ret vil det være det domstolsskabte princip om »rette indkomstmodtager«, der finder anvendelse, således som også skatteministeren gentagne gange har bekræftet […].

Det kan uden videre fastslås, at NetApp Cypern efter dansk ret er »rette indkomstmodtager« af de omhandlede udbytter, hvad Skatteministeriet også anerkender, jf. foreelæggelseskendelsens punkt 25 […] og punkt 59 […]. Dette er også, hvad Landsskatteretten har lagt til grund (de E 38, næstsidste afsnit). Allerede af den grund er NetApp Cypern også »retmæssig ejer« af de pågældende udbytter.

Når skatteministeren har forklaret Folketinget forud for vedtagelsen af SEL, at skattefriheden er afhængig af, at NetApp Cypern er »rette indkomstmodtager« er det bindende for fortolkningen af SEL, uanset hvad den rette fortolkning af DBO'en er. Imidlertid følger det også af DBO'en, at begrebet »retmæssig ejer« skal fortolkes, sådan som dansk lovgivning har defineret »retmæssig ejer« - og her har man, som nævnt, utvivlsomt sat lighedstegn mellem »retmæssig ejer« og »rette indkomstmodtager«.

Artikel 3, stk. 2, i Danmarks DBO med Cypern [...] - og den tilsvarende bestemmelse i modeloverenskomsten fra 1977 [...] - indeholder følgende fortolkningsregel:

»2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.«

Retmæssig ejer« er ikke defineret i overenskomsten. Begrebet skal derfor fortolkes i overensstemmelse med intern dansk ret, »medmindre andet følger af sammenhængen«.

Det gøres gældende, at andet ikke følger af sammenhængen, og at begrebet derfor skal fortolkes i overensstemmelse med intern dansk ret, dvs. i overensstemmelse med princippet og retspraksis om »rette indkomstmodtager«.

Dette resultat er i overensstemmelse med den af de danske skattemyndigheder -forud for starten på »beneficial owner«-sagerne - anlagte fortolkning [...].

**1643**

Aage Michelsen giver i Festskrift til Ole Bjørn [...] udtryk for følgende generelle opfattelse:

»Anvendelsen af intern ret må ske i alle de tilfælde, hvor et internationalt skattespørgsmål ikke er løst i en dobbeltbeskatningsoverenskomst, som Danmark har indgået med et andet land.«

Det er ubestrideligt, at den nærmere forståelse af »retmæssig ejer« eller »beneficial owner« ikke er løst i overenskomsten.

Fortolkningen giver også god mening, når henses til den indledende bemærkning i punkt 12 i 2003-kommentarerne [...]:

»Kravet om retmæssigt ejerskab blev indsat i artikel 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt … til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1.«

Sigtet med bestemmelsen har således været at fastslå, hvem der er den reelle modtager af udbyttet, og det er netop, hvad princippet om »rette indkomstmodtager« i dansk skatteret går ud på [...].

Jakob Bundgaard og Niels Winther-Sørensen er i SR-SKAT 2007.395 på linje hermed [...]:

»På baggrund af den nævnte danske retspraksis om internretlig fortolkning af begreber fra dobbeltbeskatningsoverenskomster må det formentlig antages, at de danske domstole vil være tilbøjelige til i hvert fald i en vis udstrækning at fortolke beneficial owner-begrebet i overensstemmelse med intern dansk skatteret. Eller med andre ord, at de danske domstole vil være tilbøjelige til at anse det selskab, der efter en dansk skatteretlig vurdering anses for rette indkomstmodtager, for også at være beneficial owner.« [...].

Den retspraksis, der henvises til, er U 1994.284 H [...] og TfS 2003.222 H [...].

Synspunktet gentages af Jakob Bundgaard i SU 2011.31 [...].

Også Jens Wittendorff i SR-SKAT 2010.212, er af den opfattelse, at der skal foretages en internretlig fortolkning baseret på princippet om »rette indkomstmodtager« [...]. Det fremgår sammesteds, at myndighederne i flere andre stater, herunder USA, Storbritannien, Holland og Italien, anvender en internretlig fortolkning.

Yderligere skal nævnes, at Højesteret også i U.2012.2337 H [...] anvender intern dansk ret ved en fortolkning af en DBO.

Sagsøgte er opmærksom på, at Østre Landsret ganske vist i den første domstolsafgørelse i »beneficial owner«-sagskomplekset (SKM 2012.121 (ISS-sagen) [...]) - med støtte i Indofood-dommen (...) - har fundet, at der skal anvendes en autonom fortolkning, men sagsøgte er altså ikke enig heri. Navnlig undrer det, at Østre Landsret har lagt mere vægt på Indofood-dommen, som er en civilretlig engelsk afgørelse, som skulle vurdere begrebets betydning i en sag om fortolkning af en låneaftale i indonesisk ret, end på den senere Prévost-sag [...], som er en skattesag afgjort af den kompetente domstol i kildestaten (Canada).

For det første er det et faktum, at der i den internationale litteratur ikke er enighed om, hvad en autonom fortolkning - i givet fald - skal gå ud på.

En gennemgang af den foreliggende litteratur viser således, at usikkerheden om, hvad der skal forstås ved »retmæssig ejer« ved en autonom fortolkning, er total. Der er ganske enkelt ikke nogen konsensus om en »international fiscal meaning«.

For det andet er der heller ikke i den internationale litteratur enighed om, hvorvidt der bør anvendes en internretlig fortolkning eller en autonom (international) fortolkning.

Vogel [...] og Baker [...] er således af den opfattelse, at der skal tilstræbes en »international fiscal meaning«, men de erkender, at der ikke eksisterer - og heller ikke er enighed om - en sådan »international fiscal meaning«.

Baker er dog af den opfattelse, at der først skal foretages en internretlig fortolkning, og at denne kun skal forkastes, hvis den ikke er i overensstemmelse med overenskomstens sammenhæng [...]

Jiménez [...] er derimod af den opfattelse, at der skal foretages en fortolkning på grundlag af intern ret.

For det tredje er den (beskedne) internationale retspraksis heller ikke entydig. Indofood-dommen [...] synes, som nævnt, at lægge vægt på en international, autonom fortolkning, medens Prévost-sagen [...] synes at være i favør af en internretlig fortolkning.

OECD har i sit public discussion draft af 29. april 2011 [...], foreslået, at det indføjes i kommentarerne til artikel 10, at »beneficial owner« skal underkastes en international fortolkning, men høringssvarene fra The City of London Law Society [...] og IBFD [...] bestrider, at der er dækning i artikel 3, stk. 2, for dette standpunkt.

På baggrund af de modtagne høringssvar udsendte OECD den 19. oktober 2012 [...] et nyt forslag til reviderede kommentarer vedrørende »retmæssig ejer«, hvori OECD - under hensyntagen til, at et flertal af høringssvarene har tilsluttet sig denne opfattelse - fastholdt sit oplæg til, at begrebet underkastes en autonom fortolkning. Dette viser i sig selv, at OECD er på »tynd is«, og at der - uanset OECD's politiske ønsker - fortsat var og er betydelig uenighed om spørgsmålet.

At 2014-kommentarernes pkt. 12.1 [...] og 2017-kommentarernes pkt. 12.1 [...] som følge af politiske overvejelser hos de embedsmænd, som udarbejder kommentarerne, peger i retning af, at begrebet skal fortolkes autonomt, ændrer ikke på, at der i hvert fald ikke i 2005 og 2006 var (og for så vidt heller ikke sidenhen er kommet) den nødvendige internationale konsensus om begrebets forståelse, til at autonom fortolkning dengang gav mening.

**1644**

At fortolke begrebet »beneficial owner« - »retmæssig ejer« - i overensstemmelse med dansk retsbegreb »rette indkomstmodtager«, er endvidere en nødvendighed, når der her rent faktisk ikke er tale om at fortolke overenskomsten, men tale om at fortolke dansk ret (SEL § 2, stk. 1, litra c), som henviser til overenskomsten, eftersom der reelt ikke er tale om at dele en beskatningsret med Cypern, men om at definere en skattefrihed, som udelukkende angår Danmarks interne beskatningsforhold. Dette er særligt oplagt, når forarbejderne til SEL § 2, stk. 1, litra c, entydigt bekræfter, at det

danske begreb »rette indkomstmodtager« er ensbetydende med begrebet »beneficial owner«.

Selv hvis det var åbenbart, at man ved affattelsen af forarbejderne til SEL § 2, stk. 1, litra c, i 2001 tog fejl af begrebets betydning i modeloverenskomsten, ville de danske forarbejder stadig have forrang frem for overenskomsten, eftersom det var denne forståelse, som det danske Folketing lagde til grund ved vedtagelsen af SEL § 2, stk. 1 litra c.

Konventionskonform fortolkning er heller ikke relevant, da Danmark ikke har lovet Cypern at gøre sin interne skattefrihed af udbytter afhængig af forståelsen af DBO'en. Det er et valg, som Danmark egenhændigt har truffet, og man skylder ikke Cypern traktatretligt at rette forståelsen af sin interne lovgivning til efter overenskomsten. Afgørende er alene, hvad det danske Folketing har forudsat ved vedtagelsen af SEL § 2, stk. 1, litra c.

Det gøres således gældende, at intern ret i hvert fald må anvendes, når der - som i denne sag - ikke kan peges på en anden international forståelse af begrebet. Og dette er i særlig grad gældende på tidspunktet for de af sagen omhandlede udbytteudlodninger i 2005 og 2006 og endnu mere klart, når der tages i betragtning, at den dansk-cypriotiske DBO er indgået i 1981.

Da der er enighed om, at NetApp Cypern er »rette indkomstmodtager« efter dansk ret, er selskabet dermed også »retmæssig ejer«.

### 7.3 OECD's udvidede kommentarer fra 2003 kan ikke inddrages ved fortolkningen

Det er en kendsgerning, at Skatteministeriets ændrede fortolkning af »beneficial owner« (»retmæssig ejer«) er direkte foranlediget af - og oprindeligt udelukkende støttedes på - de udvidede kommentarer til modeloverenskomsten fra 2003 (om »gennemstrømningsselskaber«). Siden har ministeriet også påberåbt sig endnu senere tilkomne kommentarer, herunder fra 2014, jf. herom afsnit 7.5 nedenfor.

Danmarks DBO med Cypern […] er fra 1981 og art. 10 i overenskomsten svarer til OECD's modeloverenskomst. Da Danmark og Cypern indgik overenskomsten forelå alene OECD's kommentarer fra 1977 til modeloverenskomsten […].

Det er almindeligt antaget - nationalt som internationalt - at OECD's kommentarer til modeloverenskomsten kan inddrages ved fortolkningen af konkrete DBO'er.

For så vidt angår retskildeværdien af OECD's udvidede kommentarer henvises til Aage Michelsens artikel i Festskrift til Ole Bjørn […], og Michael Lang […], begge med henvisninger til en række internationale forfattere. Det fremgår heraf, at såfremt senere kommentarer er udtryk for en ændring i forhold til tidligere versioner - og ikke blot en præcisering - kan disse kommentarer ikke tillægges vægt, jf. tilsvarende Vogel, 3. udgave (…). Det er klart, at det som drøftes hos disse forfattere, er det traktatretlige fortolkningsproblem i en tvist mellem to stater. Forfatterne forholder sig ikke til de retssikkerhedsmæssige problemstillinger, som opstår, når en OECD-kommentar præciserer eller ændrer en DBO, der - som tilfældet er i Danmark - gennem intern lovgivning har givet skatteyderne mulighed for at påberåbe sig en DBO-bestemmelse. Skatteydernes værn mod lovgivning og lovfortolkning med tilbagevirkende kraft afhænger af intern (forfatnings-)ret og er et fundamentalt andet spørgsmål end fortolkningen af en traktat mellem to stater.

Dansk retspraksis har accepteret, at alene præciserende kommentarer kan være i strid med fortolkningen af en DBO, jf. bl.a. U.1993.143H (Texaco) […], U.1994.284H (professorreglen) […] og U.2003.988H (Halliburton) […]. Endvidere henvises til retsforlig af 3. februar 2000 indgået for Østre Landsret mellem Skatteministeriet og Casino Copenhagen. Forliget er gengivet i SU 2000.241 […].

Det gøres gældende, at de af sagsøger påberåbte udvidede kommentarer fra 2003 -i hvert fald således som de af sagsøger hævdes at skulle forstås - er udtryk for en markant ændring i forhold til kommentarerne fra 1977, eftersom de fører til det stik modsatte resultat af, hvad ministeriet lagde til grund i forarbejderne til SEL § 2, stk. 1, litra c, i 2001. De kan derfor ikke inddrages ved fortolkningen af den dansk-cypriotiske DBO fra 1981.

Baggrunden for, at efterfølgende kommentarer ikke kan tillægges vægt, er, at disse ikke er godkendt af medlemsstaternes parlamenter og følgelig savner demokratisk legitimitet.

I et retssystem som det danske, hvor en dobbeltbeskatningsoverenskomst først bliver en del af dansk ret, når Folketinget har vedtaget en lov herom, er dette særligt klart. Det vil ganske enkelt være i strid med delegationsforbuddet i grundlovens § 43 at overlade lovgivningskompetence til de embedsmænd, herunder embedsmænd fra de enkelte landes skatteadministrationer, som formulerer kommentarerne.

Den omstændighed, at fortolkningen af en DBO har den videregående betydning, at den er afgørende for,

### 1645

om den overhovedet foreligger begrænset skattepligt efter SEL § 2, stk. 1, litra c, er yderligere med til at understrege, at de klare forarbejder til denne bestemmelse ikke kan tilsidesættes ved en ændring af OECD's kommentarer. Eftersom SEL § 2, stk. 1, litra c, er en intern hjemmel, som definerer sit interne anvendelsesområde via en henvisning til en international traktat, vil selv behørigt aftalte ændringer af traktaten ikke kunne tillægges virkning for intern ret, medmindre traktatændringen og dens betydning for intern ret blev tiltrådt af Folketinget, eftersom en ændring af intern dansk ret alene gennem regeringens tiltrædelse af en traktatændring vil indebære en åbenlys tilsidesættelse af delegationsforbuddet i grundlovens § 43. Så meget desto mere tydeligt er det, at intern dansk ret ikke ændres, ved at nogle embedsmænd gennem OECD tiltræder en ændring af kommentarerne til OECD's modeloverenskomst.

Betydningen af OECD-kommentarer, som er fremkommet efter det tidspunkt, hvor den relevante overenskomst er indgået, kan ikke afgøres løsrevet fra den effekt, som kommentaren har på den sag, som er til pådømmelse. I det omfang en efterfølgende kommentar fører til, at udfaldet af en sag får det modsatte resultat, vil der klart være tale om en ændring, og der kan ikke lægges vægt på kommentaren.

I ISS-sagen (SKM2012.121.ØLR) vurderede Østre Landsret i præmisserne [...], at OECD's kommentarer fra 2003 alene udgjorde en præcisering, men fastslog samtidig, at kommentarerne ikke havde betydning for udfaldet af den pågældende sag (jf. ordene »I denne sag er det ufornødent at tage stilling til…«, [...].

Når Jakob Bundgaard og Niels Winther-Sørensen i SR-SKAT 2007.395 tilsvarende antager […], at kommentarerne fra 2003 er »præciseringer«, skyldes det, at de samtidig lægger til grund, at kommentarerne »ikke kan anses som særligt vidtgående«, idet forfatterne antager […], at »beneficial owner« - i overensstemmelse med skattemyndighedernes tidligere fortolkning - skal fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« efter dansk ret. Under denne forudsætning er de nye kommentarer naturligvis ikke udtryk for en ændring.

Det vil også være i strid med Wienerkonventionens artikel 31 og 32 […] at tillægge efterfølgende kommentarer vægt.

Navnlig kan disse ikke tjene som en »efterfølgende aftale« i artikel 31, stk. 3, litra (a)'s forstand, jf. Michael Lang […]:

»However, under certain circumstances, the VCLT [Wienerkonventionen af 23. maj 1969 om traktatretten - MS 377, vores tilføjelse] attributes special significance to any »subsequent agreement«

or »subsequent practice« set out in Article 31 paragraph 3 of the VCLT. But the decision of the OECD CFA [OECD Committee of Fiscal Affairs, vores tilføjelse] to amend or change the Commentary cannot qualify as an »agreement« within the meaning of Article 31 paragraph 3 subparagraph (a) of the VCLT.«

Efterfølgende kommentarer er heller ikke »supplerende fortolkningsmidler« i artikel 32's forstand, jf. Michael Lang […]:

»Another question is whether a new version of the Commentary could qualify as »supplementary means of interpretation«, mentioned in Article 32 of the Commentary. … Therefore, material may be taken into account which indicates the intention of the parties upon conclusion of a treaty. Again, the new version of the Commentary cannot be of relevance.«

Det skal her fremhæves, at Cypern ikke er medlem af OECD. Cypern har således ingen indflydelse på udformningen af kommentarerne eller mulighed for at tage forbehold. Det er således særligt åbenbart, at efterfølgende kommentarer ikke for så vidt angår en DBO med Cypern kan påvirke fortolkningen.

Den omstændighed, at OECD's embedsmænd i punkt 35 i introduktionen til OECD-model-overenskomsten for 2003 […] selv har givet udtryk, at ændringer i kommentarerne skal anvendes ved fortolkningen af tidligere overenskomster, ændrer ikke konklusionen ovenfor, jf. Michael Lang […]:

»The mere fact that the CFA takes this position is not enough, the CFA is not a law-making authority. It cannot decide on the relevance of its own statements.«

Se også Aage Michelsen med henvisninger […]

På linje hermed er efterfølgende kommentarer i dansk retspraksis alene blevet anvendt som et fortolkningsbidrag, når der har været tale om præciseringer, jf. de allerede nævnte Højesterets domme i UfR 1993.143 H (Texaco) […] og TfS 2003.222 H (Halliburton) […].

Konklusionen er altså, at de udvidede kommentarer fra 2003 ikke er noget relevant bidrag til fortolkningen af overenskomsten med Cypern. NetApp Cypern er derfor - allerede af denne grund - »retmæssig ejer«, og der foreligger derfor ikke begrænset skattepligt.

*7.4 NetApp Cypern er også »retmæssig ejer« af udbytterne efter 2003-kommentarerne*

For det tilfælde, at de udvidede kommentarer fra 2003 imidlertid måtte blive anset for kun at være en præcisering af begrebet »retmæssig ejer«, gøres det videre gældende, at NetApp Cypern - også efter disse - må anses for »retmæssig ejer« af de omhandlede renter.

NetApp Danmark gør således også i dette tilfælde gældende, at »retmæssig ejer«-begrebet skal fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« i dansk ret, jf. således bl.a. Jakob Bundgaard og Niels Winther-Sørensen i SR-SKAT 2007.395 […].

Men selv hvis der foretages en autonom fortolkning af begrebet, gøres det gældende, at NetApp Cypern må

**1646**

anses for »retmæssig ejer« af de omhandlede udbytter efter 2003-kommentarerne.

Ved revisionen i 2003 blev punkt 12 i kommentarerne bl.a. udvidet med bemærkningen om, at udtrykket »retmæssig ejer« ikke er anvendt i en snæver teknisk betydning, men skal ses i sammenhæng med og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

Dette uddybes i punkt 12.1 med, at det for det første ikke ville være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildelandet skulle give lempelse ved betaling til en »agent eller mellemmand« (»agent or nominee«), da denne ikke er ejer af indkomsten og dermed ikke beskattes i sit domicil-

land, hvorfor der ikke opstår dobbeltbeskatning. Dette svarer til kommentaren til 1977-modeloverenskomsten.

For det andet udtales - som noget nyt - om »gennemstrømningsselskaber« i punkt 12.1:

»Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at en »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.« […].

Skatteministeriet gør i dette sagskompleks generelt gældende, at punkt 12.1 i de udvidede kommentarer fra 2003 skal forstås således, at der ved fastlæggelsen af, om den formelle beløbsmodtager er »retmæssig ejer«, alene skal lægges vægt på omfanget af den formelle beløbsmodtagers reelle beføjelser i relation til at træffe afgørelse om, hvorledes der skal disponeres over modtagne beløb. Efter dette standpunkt vil den formelle beløbsmodtager således ikke kunne anses som »retmæssig ejer«, såfremt denne i relation til den pågældende indkomst reelt ikke kan foretage dispositioner, der afviger fra de ultimative ejeres vilje (om at et modtaget beløb skal »dirigeres derhen, hvor det ønskes«).

Det bemærkes i denne forbindelse, at det af ordlyden af punkt 12.1 klart fremgår, at der opregnes 3 situationer, hvor en udbyttemodtager ikke er »retmæssig ejer«, nemlig hvis den pågældende er (1) »agent«, (2) »mellemmand« eller (3) »gennemstrømningsenhed (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst«. I den sidstnævnte situation kræves det yderligere, at gennemstrømningsenheden har »meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter«.

Som det fremgår af kommentarerne, er omfanget af rådighedsretten således et væsentligt element i vurderingen af, om et gennemstrømningsselskab er den »retmæssige ejer« af indkomsten.

Pointen i kommentarerne er altså, at hvis det udbyttemodtagende selskab har viderekanaliseret det modtagne udbytte til de bagvedliggende ejere, skal der - ved vurderingen af, om selskabet er »retmæssig ejer« - lægges vægt på, om dette er et udslag af, at de bagvedliggende ejere har indskrænket selskabets rådighed over udbyttet.

Det gøres gældende, at NetApp Cypern *ikke* har »meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller »administrator, der handler på vegne af andre parter«. Tværtimod, har NetApp Cypern i det hele haft de samme beføjelser, som et hvilket som helst andet holdingselskab i en hvilken som helst anden koncern normalt har.

Der har således navnlig ikke foreligget en retlig forpligtelse for NetApp Cypern til at viderebetale de modtagne udbytter til NetApp Bermuda som afdrag på gæld, jf. nærmere nedenfor i næste afsnit. Som det bl.a. fremgår af det pågældende afsnit, er det en betingelse for ikke at anse en udbyttemodtager som »retmæssig ejer«, at den pågældende har påtaget sig en retlig forpligtelse til at videreformidle de modtagne udbytter.

Det bestrides i den forbindelse, at alene den omstændighed, at de bagvedliggende ejere eller disses repræsentanter på forhånd måtte have truffet den overordnede beslutning om udbytteudlodningerne,

skulle være afgørende for, at NetApp Cypern ikke kan anses for »retmæssig ejer« af udbytterne.

Alle større beslutninger i en hvilken som helst koncern - f.eks. om køb af selskaber, større udlodninger, etablering af finansieringsstruktur mv. - træffes sædvanligvis i første omgang af topledelsen i koncernen.

Herefter gennemføres beslutningerne af de relevante selskabsorganer i de respektive selskaber. Hverken de enkelte selskaber som sådan eller de enkelte ledelsesmedlemmer er som udgangspunkt forpligtede til at gennemføre de planlagte beslutninger, men vægring herved kan naturligvis føre til, at de pågældende medlemmer udskiftes i overensstemmelse med selskabslovenes regler.

Det er ingen holdepunkter for, at kommentarernes punkt 12.1 skal fortolkes således, at det, der er en sædvanlig beslutningsprocedure i enhver koncern, automatisk diskvalificerer koncernens datterselskaber fra at være »retmæssige ejere« af modtagne udbytter.

**1647**

Realiteten er, at Skatteministeriets fortolkning af kommentarernes punkt 12.1 er så restriktiv, at det er vanskeligt - for ikke at sige umuligt - at pege på et mellemliggende holdingselskab, som ministeriet vil kunne acceptere som »retmæssig ejer« af udbytter.

Herefter synes den eneste (reelle) betingelse, der efter Skatteministeriets opfattelse skal stilles for at frakende et mellemholdingselskab status som »retmæssig ejer«, at være, at det skal kunne påvises eller sandsynliggøres, at transaktionen har skatteundgåelse eller - unddragelse (eller »misbrug«) som formål eller konsekvens.

Skatteministeriets synspunkt er altså i realiteten, at hvis der kan påvises et misbrug, vil et mellemholdingselskab aldrig være »retmæssig ejer«, og dermed er der - efter Skatteministeriets egen fortolkning - ikke noget reelt indhold i kravet om »snævre beføjelser«.

Skatteministeriets fortolkning af begrebet »retmæssig ejer« må derfor i det hele afvises som indholdsløs.

Skatteministeriets fortolkning er da også klart i strid med Skatteministerens svar på spørgsmål 86 vedrørende L 213 af 22. maj 2007 […]

Sammenfattende gøres det således gældende, at NetApp Cypern ikke kan anses for en »nullitet eller administrator«.

Sagsøgtes forståelse støttes af Østre Landsrets dom af 20. december 2011 i ISS-sagen, hvor landsretten udtalte […]:

»For at et sådant mellemholdingselskab ikke kan anses for retmæssig ejer, må det kræves, at ejeren udøver en kontrol med selskabet, som ligger ud over den planlægning og styring på koncernplan, som sædvanligvis forekommer i internationale koncerner«.

Skatteministeriet har ikke godtgjort, at der foreligger en sådan særlig kvalificeret kontrol fra ejernes side i nærværende sag.

Sagsøgtes forståelse støttes endvidere af nyere international praksis, herunder af Canadas Federal Court of Appeals dom af 26. februar 2009 i den ledende sag, Prévost […], selv om det anerkendes, at den internationale domspraksis om forståelsen af »retmæssig ejer«-begrebet ikke er éntydig.

[…]

Prévost-sagen viser, at i en situation, *hvor* der mellem de ultimative ejere og det udbytteudloddende selskab var indskudt et mellemholdingselskab i en tredje jurisdiktion med det primære formål at drage fordel af en med denne jurisdiktion aftalt, fordelagtig skattesats, *hvor* der rent faktisk var en gennemstrømning af udbytte til de ultimative ejere, *hvor* de ultimative ejere på forhånd havde truffet beslutning om, at der skulle udloddes udbytte op igennem selskaberne, og hvor mellemholdingselskabet ikke havde anden aktivitet og fysiske rammer end dem, der følger af at være et rent holdingselskab, så var det pågældende mellemholdingselskab »retmæssig ejer« af udbytter fra sit datterselskab.

Overført til nærværende sag er NetApp Cypern tillige klart »retmæssig ejer« af de af sagen omhandlede udbytter.

Den 24. februar 2012 afgjorde The Tax Court of Canada en tilsvarende sag om »retmæssig ejer« vedrørende royalties i sagen Velcro Canada Inc. […]. Her fandt retten på samme måde som i Prévost-sagen, at et mellemliggende holdingselskab var den »retmæssige ejer« af den modtagne indkomst, også selv om der var en forpligtelse til at viderebetale en betydelig del heraf, idet domstolen bl.a. lagde vægt på, at der skete en sammenblanding af midler hos det mellemliggende holdingselskab, ligesom den fandt, at der - for at bryde den selskabsretlige barriere (corporate veil) - måtte stilles krav om, at mellemholding-selskabet havde »absolutely no discretion« i forhold til de modtagne midler (hvad der således ikke var tale om).

De canadiske domstole har således slået fast, at det er en nødvendig - men ikke tilstrækkelig - betingelse for at frakende modtageren af en given indkomst status som den »retmæssige ejer« heraf, at der foreligger en retlig forpligtelse til at viderebetale den pågældende indkomst.

Dette er efterfølgende klart cementeret i punkt 12.4 i de seneste kommentarer fra 2014 til modeloverenskomsten, jf. afsnit 7.5 nedenfor.

Skatteministeriet henholder sig i denne sammenhæng navnlig til den engelske Court of Appeal's dom i den såkaldte Indofood-sag […] og den franske Conseil d'Etat's dom i den såkaldte Bank of Scotland-sag […], begge fra 2006.

Østre Landsret henviser også i sin afgørelse i ISS-sagen […] til Indofood-dommen, idet det dog bemærkes, at det var vedrørende spørgsmålet, om der skal anvendes en internretlig eller autonom fortolkning af begrebet »retmæssig ejer«:

[…]

*7.5 2014-kommentarerne - der skal foreligge en retlig forpligtelse til viderebetaling*

Mens denne sag har verseret er der kommet nye kommentarer fra OECD, nemlig i 2014 […], som også påberåbes af Skatteministeriet til støtte for, at NetApp Cypern selskaber ikke er »retmæssige ejere« af de omhandlede udbytter.

NetApp Danmark gør gældende, at det nu eksplicit af 2014-kommentarernes punkt 12.4 fremgår, at det som udgangspunkt er en betingelse for at frakende en udbyttemodtager status som »retmæssig ejer« efter modeloverenskomsten, at der foreligger en forpligtelse til at videreformidle udbyttet til en anden person. Det hedder således […]:

»12.4 I disse forskellige eksempler (agent, mellemmand, conduit selskab i dets egenskab af bemyndiget eller administrator), er den direkte modtager af udbytte

**1648**

ikke »den retmæssige ejer«, fordi modtagerens ret til at bruge og nyde udbytterne er begrænset af kontraktuelle eller juridiske forpligtelser til at videreformidle de modtagne betalinger til en anden person. En sådan forpligtelse vil sædvanligvis fremgå af relevante, juridiske dokumenter, men kan eventuelt også være til stede allerede i kraft af de faktiske omstændigheder, som ganske klart viser, at modtageren substantielt ikke har rettighederne til at bruge og nyde de udbytter, dog uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person. … Hvor modtageren af et udbytte har retten til at bruge og nyde udbyttet, uden at være bundet af kontraktuelle eller juridiske forpligtelser til at videreformidle de betalinger, som han har modtaget, til en anden person, er modtageren »den retmæssige ejer« af disse udbytter. …« […].

Efter NetApp Danmarks opfattelse har det stedse været klart, at det er en nødvendig - men ikke tilstrækkelige - betingelse for at

frakende i udbyttemodtager status som »retmæssig ejer« efter modeloverenskomsten, at der foreligger en retlig forpligtelse til at viderebetale udbyttet. 2014-kommentarerne tilføjer således på dette punkt ikke noget, som ikke var gældende i forvejen. Det er også bekræftet i den ledende dom, Prévost, fra 2009 […], der er omtalt ovenfor i afsnit 7.4.

En »agent eller mellemmand«, som nævnt i 1977-kommentarerne, er således klart forpligtet til at videreformidle de modtagne udbytter. Det ligger allerede i, at han netop er »agent eller mellemmand«. Det samme gælder for et »gennemstrømningsselskab« i 2003-kommentarerne.

Efter Skatteministeriets opfattelse er det uden betydning, på hvilket grundlag forpligtelsen består, men udtrykket »forpligtelse« (til at videreformidle) kan ikke gradbøjes. Enten består forpligtelsen, eller også består den ikke. Den relevante test er, om forpligtelsen kan gennemtvinges ved de nationale domstole. Hvis en anden end udbyttemodtageren således har et retskrav på at få udbyttet udleveret, som kan gennemtvinges ved domstolene, består der en forpligtelse for udbyttemodtageren til at videreformidle udbyttet.

I nærværende sag har der ikke bestået en retlig forpligtelse for NetApp Cypern til at videreformidle udbytterne.

Skatteministeriet henholder sig til 2014-kommentarernes bemærkninger om, at modtageren - uden at have været bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne udbytte til en anden person - »substantielt« ikke havde rettighederne til at »bruge og nyde« udbyttet.

Heroverfor gør NetApp Danmark gældende, at 2014-kommentarerne på dette punkt - hvis de skal forstås som hævdet af Skatteministeriet - *fuldstændigt ændrer* de hidtidige kommentarer til bestemmelsen - 9 år efter den første udbytteudlodning i nærværende sag - og er dermed utvivlsomt udtryk for en udvidelse - og ikke en præcisering - af »retmæssig ejer«-begrebet i 1977-kommentarerne. De kan derfor ikke finde anvendelse ved fortolkningen af DBO'er, der er indgået før 2014. Den i nærværende sag relevante DBO mellem Danmark og Cypern er indgået i 1981.

Endelig gøres det gældende, at det er aldeles usikkert, hvad der ligger i dette udsagn i kommentarerne, og at det derfor under alle omstændigheder ville være i strid med almindelige principper om retssikkerhed at tillægge det pågældende udsagn betydning.

### 7.6 Der foreligger ikke et misbrug af overenskomsten

Skatteministeriet gør i »beneficial owner«-sagskomplekset generelt gældende, at der skal foreligge et misbrug, for at et udbyttemodtagende selskab kan nægtes overenskomstbeskyttelse. Heri er NetApp Danmark enig.

NetApp Danmark bestrider imidlertid, at der i nærværende sag foreligger et misbrug af den dansk-cypriotiske DBO.

Imødegåelse af misbrug kræver, at der er hjemmel hertil i *dansk ret.*

Parterne i nærværende sag er enige om, at der i 2005 og 2006 fandtes to domstolsskabte regler til imødegåelse af misbrug, nemlig *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*, jf. forelæggelseskendelsens punkt 56-59 […].

Der er mellem parterne enighed om, at realitetsgrundsætningen ikke giver grundlag for at tilsidesætte de i nærværende sag foretagne dispositioner, jf. punkt 57. Tilsvarende er der mellem parterne enighed om, at udbyttemodtageren, NetApp Cypern, er »rette indkomstmodtager« efter dansk ret, jf. punkt 59.

Skatteministeriet har i processkrift 2 af 10. januar 2020 fremsat et nyt anbringende om, at der i dansk retspraksis skulle være udviklet almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen (og - må det forstås - princippet om »rette indkomstmodtager«) […]. NetApp Danmark har nedenfor i afsnit 8.4.1.3 tilbagevist dette anbringende.

Det er således en kendsgerning, at der i dansk ret fandtes regler til imødegåelse af misbrug, og at disse regler fører til, at der i denne sag ikke foreligger et misbrug efter dansk ret. I øvrigt er det fast højesteretspraksis, at der ikke kan foreligge misbrug, hvis det fremgår af forarbejderne, at lovgiver har været fuldt opmærksom på den omtvistede problemstilling (hvilket er tilfældet i nærværende sag), jf. U.2004.174H (Over-Hold ApS) […] og U.2007.736H (Finwill ApS -»elevatorsagen«) […].

Der fandtes ikke relevante anti-misbrugsregler i den dansk-cypriotiske DBO.

Derimod indeholder DBO'ens artikel 10 bestemmelsen om, at udbyttemodtageren skal være »retmæssig ejer«, hvorom henvises til afsnit 7.1 - 7.5 ovenfor.

### 1649

At der ikke foreligger misbrug af overenskomsten bekræftes bl.a. af, at den valgte struktur - hvor NetApp Cypern fungerer som holdingselskab for NetApp Danmark - er direkte anvist af skatteministeren i forbindelse med besvarelsen af spørgsmål 16 til L 99 af 10. november 2000 som en legitim struktur i forbindelse med udlodning af udbytter […].

Dette er helt i overensstemmelse med Mogens Rasmussen og Dennis Bernhardt, begge Told- og Skattestyrelsen, i SR-SKAT 2000.315 (…):

»Det er således blandt OECD's medlemslande generelt antaget, at en dobbeltbeskatningsoverenskomst, der følger OECD-modellen, ikke indeholder hjemmel til at imødegå »treaty-shopping«. …

Et selskab, der er stiftet i et aftaleland, bør således være berettiget til aftalebeskyttelse, dvs. betragtes som den »retmæssig ejer«, selvom det, som det f.eks. er tilfældet med de mange nye holdingselskaber i Danmark, er oprettet af danske, at formålet er skatteminimering.«

Der var generel enighed blandt danske forfattere om disse synspunkter.

Hertil kommer, at formålet med de omhandlede udbytteudlodninger var at videreudlodde midlerne til det øverste moderselskab, NetApp USA, som led i den amerikanske midlertidige lempelige beskatningsordning under American Jobs Creation Act. Ingen del af udlodningerne skulle således aflejres i NetApp Bermuda. Såfremt der havde været nogen som helst grund til at tro, at Danmark ville opkræve kildeskat på de omhandlede udbytter ved den valgte konstruktion, kunne koncernen som en fuldgod alternativ løsning have valgt at lade NetApp Bermuda sælge aktierne i sagsøgte til NetApp USA, hvorefter udbytterne uden videre kunne udloddet uden indeholdelse af kildeskat (efter den danskamerikanske DBO). Det gøres derfor også subsidiært gældende, at NetApp USA er »retmæssig ejer«.

Der er således ikke noget grundlag for en antagelse om, at NetApp skulle have misbrugt den dansk-cypriotiske DBO.

I øvrigt bemærkes, at OECD først med BEPS-projektet (»Base Erosion and Profit Shifting Project«), der blev opstartet i 2013, og udgivelsen i 2015 af Action 6,

»Preventing the Granting of Treaty Benefits in Inappropriate Circumstances« (…), fremkom med et forslag til indførelsen af en generel misbrugsregel i staternes DBO'er til egentlig imødegåelse af treaty shopping. Der var således tale om indførelse af en såkaldt LOB-bestemmelse (»limitation on benefits«) samt en såkaldt PPT (»Principal Purpose Test«), dvs. en generel anti-avoidance klausul.

Dette initiativ blev fulgt op med, at en række efterfølgende medlemsstater, herunder Danmark, i 2016 indgik den Multilaterale Konvention (»MLI«), hvorved de deltagende stater fik muligheden for at ændre deres bestående DBO'er på flere områder, herunder ved at indsætte disse anti-treaty-shopping regler. I Danmark blev MLI'en vedtaget af Folketinget i 2019 […].

Det er således først i 2019, at der er blevet indsat generelle anti-misbrugsregler i de bestående danske DBO'er.

*7.7 Subsidiært er NetApp USA »retmæssig ejer« af udbytterne - krav på nedsættelse efter den dansk-amerikanske dobbeltbeskat-ningsoverenskomst*

For det tilfælde, at landsretten måtte finde, at NetApp Cypern ikke kan anses som »retmæssig ejer« af de omhandlede udbytter, gør NetApp Danmark gældende, at NetApp USA i stedet må anses som den »retmæssige ejer« heraf, hvorefter DBO'en mellem Danmark og USA finder anvendelse. […]

Da der skal ske nedsættelse efter DBO'en, er NetApp USA fritaget for begrænset skattepligt efter SEL § 2, stk. 1, litra c, og dermed er bortfalder grundlaget for opkrævning af dansk kildeskat.

Det bemærkes i denne forbindelse, at det er en betingelse for at anse NetApp Cypern som et »gennem-strømningsselskab« og dermed som begrænset skattepligtig, at »gennemstrømningen« er sket til investorer i lande, med hvilke Danmark ikke har indgået en DBO.

Østre Landsret har således i sin dom af 20. december 2011 (ISS-dommen …) klart fastslået, at det er en forudsætning for ikke at anerkende den umiddelbare beløbsmodtager som »retmæssig ejer«, at midlerne faktisk er strømmet videre til sådanne personer.

I Østre Landsrets dom hedder det således (…):

»Det må på den baggrund antages, at tilsidesættelse af en overenskomstmæssig begrænsning i kildeskatten forudsætter, at udbetalingen er ført videre eller i hvert fald med sikkerhed er bestemt til at blive ført videre til personer i tredjelande uden dobbelt-beskatningsoverenskomst.«

[…] midlerne […] rent faktisk også »gennemstrømmet« NetApp Bermuda, idet de er ført videre til NetApp USA (hvor midlerne er beskattet), og dermed ikke til »personer i tredjelande uden dobbelt-beskatningsoverenskomst«.

Det gøres derfor gældende, at hvis NetApp Cypern må anses som et »gennemstrømningsselskab«, så må også NetApp Bermuda - der ikke har mere substans og beslutningskompetence end NetApp Cypern - ligeledes anses for et »gennemstrømningsselskab« i relation til de omhandlede udbytter, og i så fald må NetApp USA - der har truffet beslutningen om at hjemtage udbytterne, som rent faktisk har modtaget udbytterne, og som er blevet beskattet af udbytterne - i stedet anses som »retmæssig ejer« af udbytterne.

Skatteministeriet er enig med NetApp Danmark i, at der skal ske nedsættelse af kildeskattekravet efter den dansk-amerikanske DBO, såfremt NetApp Danmark

**1650**

fører »et sikkert bevis for«, at NetApp Bermuda (heller) ikke er udbytternes retmæssige ejer, men blot er endnu et gennemstrømnings-selskab, og at NetApp USA er den retmæssige ejer«. […]

Skatteministeriet har i denne forbindelse opstillet 3 hovedpunkter, som NetApp Danmark, efter ministeriets opfattelse, skal dokumentere, for at NetApp USA kan anses som den »retmæssige ejer« af udbytterne i stedet for NetApp Bermuda […]:

1. At de omhandlede udbytter fra NetApp Danmark på forhånd har været bestemt til at strømme videre fra NetApp Bermuda til NetApp USA.

2. At NetApp Bermuda ikke (reelt) har kunnet råde over udbytterne.

3. At udbytterne faktisk er strømmet gennem NetApp Bermuda og videre til NetApp USA, jf. herved [ISS-dommen].

NetApp Danmark gør gældende, at selskabet med den i sagen fremlagte dokumentation til fulde har godtgjort, at de tre punkter er opfyldt i denne sag.

Skatteministeriet bestrider dette.

*Ad 1. De omhandlede udbytter fra NetApp Danmark var på for-hånd bestemt til at strømme videre fra NetApp Bermuda til NetApp USA*

Dette er fuldt dokumenteret derved, at det eneste formål med de omhandlede udbytteudlodninger fra NetApp Danmark til NetApp Cypern - og videre til NetApp Bermuda - netop var, at midlerne skulle videreføres til det øverste moderselskab, NetApp USA, som led i den såkaldte American Jobs Creation Act og beskattes der.

Denne midlertidige beskatningsordning skabte nemlig en engangs-mulighed for, at koncernen kunne hjemtage overskud optjent i udlandet som udbytte til en favorabel amerikansk beskatning. De normalt gældende amerikanske skatteregler vedrørende udbytte i sagsperioden var ellers i praksis prohibitive for hjemtagning af udbytter fra udlandet, idet beskatningen skete med den gældende amerikanske selskabsskattesats på (op til) 35 %, hvilket indebar en betydelig dobbeltbeskatning af overskud optjent uden for USA.

NetApp USA besluttede sig derfor for at hjemtage det størst mulige udbytte vedrørende de i udlandet skabte overskud, hvilket beløb altså udgjorde USD 550 mio. (inkl. ca. USD 113 mio. - efterfølgende forhøjet til USD ca. 197 mio. - i tidligere indskudt kapital).

Hele transaktionsforløbet startede altså med beslutningen i NetApp USA om at hjemtage udbyttet.

Det fremgår endvidere af NetApp USA's regnskab pr. 30. april 2005 (TE 18), dvs. et halvt år før udbytteudlodningerne fra NetApp Danmark til NetApp Cypern, at det amerikanske selskab var i færd med at tage stilling til omfanget af den mulige udbytteudlodning til USA fra koncernens udenlandske datterselskaber. På dette tidspunkt udgjorde det forventede (skattepligtige) udbytte USD 355 mio. (og det endte altså med at være USD 405,5 mio.).

Der er således ingen som helst tvivl om, hvad formålet med udbytterne (der jo i virkeligheden kom fra NetApp Danmarks datterselskaber og dermed også strømmede gennem Danmark) fra NetApp Danmark var, og at de *på forhånd* var bestemt til at strømme videre til NetApp USA.

*Ad 2. NetApp Bermuda har ikke (reelt) kunnet råde over udbytterne*

NetApp Bermuda har ikke (reelt) kunnet råde over udbytterne, eftersom udbytterne var bydende nødvendige for, at NetApp Bermuda selv kunne foretage udbytteudlodningen på USD 550 mio. under American Jobs Creation Act til NetApp USA. NetApp Bermuda havde derfor ikke anden mulighed for at råde over udbytterne end ved at videreudlodde disse til NetApp USA, hvilket jo også svarede til den beslutning, som NetApp USA havde truffet på forhånd.

Det følger således af det fremlagte interne regnskab for 2005/06 for NetApp Bermuda […], at selskabet havde en indtægt (»dividends received«) på USD 91,45 mio. (DKK 565.896.000) svarende til det pågældende udbytte fra NetApp Danmark via NetApp Cypern, og at denne indtægt medvirkede til at skabe frie reserver i NetApp Bermuda til at kunne udlodde og betale udbyttet på USD 550 mio. til moderselskabet, NetApp USA.

Faktisk resulterede udbytteudlodningen i en negativ egenkapital på USD 18,9 mio. […]. Grunden til, at der kunne udloddes mere end den egenkapital, der var »i bøgerne«, var bl.a., at der var et yderligere udbytte på USD 16 mio. (DKK 92 mio.) på vej fra Danmark vedrørende regnskabsåret 2005/06. Begge udbyttebeløb er således indeholdt i udbytteudlodningen på de USD 550 mio., der fremgår af regnskabet.

Skatteministeriet bestrider bevisværdien af det interne regnskab. Hertil bemærkes, at regnskabet opfylder gældende lokal regnskabs-lovgivning. Herudover - og hvad vigtigere er - er der i regnskabet indeholdte til udarbejdet på baggrund af koncernregnskabsmateriale, der er undergivet den amerikanske børs- og regnskabsregule-

ring. De fremlagte regnskabstal indgår således som en integreret del af det børsnoterede amerikanske moderselskabs for hele koncernen konsoliderede - og af Deloitte reviderede - regnskab for perioden 2005/06 […]. NetApp Danmark har hertil fremlagt dokumentation for, at tallene er indgået i grundlaget for dette reviderede regnskab, herunder at væsentlige dele af koncernens balanceposter var placeret i NetApp Bermuda, hvorfor det er utænkeligt, at koncernens revisorer fra Deloitte, der forsynede koncernregnskabet for 2005/06 for NetApp USA med blank revisionserklæring, ikke også skulle have revideret tallene fra NetApp Bermuda. Dette vil blive dokumenteret under hovedforhandlingen.

**1651**

Det fremgår videre ganske klart af dette regnskab […], at NetApp USA (under Section 965 i den tidligere omtalte American Jobs Creation Act) har modtaget udbytte fra sine udenlandske datterselskaber i et sådant omfang, at der ikke længere findes optjente - udlodningsberettigede - reserver af betydning i koncernens udenlandske datterselskaber. NetApp USA har således »tømt« de underliggende datterselskaber, herunder NetApp Bermuda, for frie reserver - dvs. optjent overskud - hvorfor de danske udbytter nødvendigvis udgjorde en del af de USD 550 mio., der blev udloddet og betalt i kontanter til NetApp USA.

I forbindelse med spørgsmålet om, hvorvidt NetApp Bermuda skal anses for at være et »gennemstrømningsselskab« for de i sagen omhandlede udbytter, har Skatteministeriet under forberedelsen af sagen tillagt det stor betydning, hvilken substans og anden aktivitet NetApp Bermuda havde […].

Minister[i]et tillægger det således bl.a. betydning, at »NetApp Bermuda var et veletableret selskab, der i mange år havde fungeret som en central og integreret del af koncernen over længere dels af datterselskaberne uden for USA, dels af immaterielle aktiver, og som havde en meget betydelig økonomi« […]. Ministeriet går endda så vidt som til at sige, at NetApp Bermuda havde »reel« substans […].

Ud over det bestrides, at NetApp Bermuda havde nogen substans i form af daglig aktivitet med ansatte mv., så er synspunktet bemærkelsesværdigt, idet det fuldstændigt strider mod Skatteministeriets generelle opfattelse i »beneficial owner«-sagskomplekset af, hvad der er afgørende for, om et selskab skal anses som et »gennemstrømningsselskab« i forhold til det modtagne udbytte (eller modtagne renter). Det hedder således i Skatteministeriets eget indlæg i en tilsvarende sag […]:

»Når det skal vurderes, om et selskab er retmæssig ejer af en renteindtægt, er det en vurdering, der skal foretages netop i relation til den pågældende renteindtægt og de omstændigheder, der knytter sig hertil. Det har altså ingen betydning for vurderingen, om det pågældende selskab i øvrigt måtte have indtægter og aktiviteter. Det afgørende er en bedømmelse af den konkrete transaktion …«

Der skal således foretages en såkaldt »transaktionsbaseret vurdering«, dvs. en konkret vurdering af de midler, der evt. gennemstrømmer det pågældende selskab, og ikke af selskabets aktivitet i øvrigt.

Skatteministeriet bemærker, at NetApp Bermuda har haft fuld rådighed over det modtagne udbytte på USD 91,45 mio., eftersom selskabet har anvendt midlerne til køb af obligationer. Som andre virksomheder, har NetApp-koncernen ikke større kontantbeholdninger stående på en almindelig konto i banken i længere tid. Efter modtagelsen af beløbet den 28. oktober 2005 foretog koncernen derfor en midlertidig anbringelse heraf i letomsættelige obligationer. Disse obligationer blev forinden udbytteudlodningen til NetApp USA den 3. april 2006 solgt igen, således at likviderne kunne udbetales til NetApp USA. Om midlerne henstår på en bankkonto eller er placeret i letomsættelige obligationer (med henblik på bedre forrentning) spiller ingen rolle i forhold til spørgsmålet om selskabets rådighed over midlerne. Selskabet kunne - med ministe-

riets egne ord - ikke »substantielt råde over« midlerne, da de skulle videre til USA. I øvrigt er de nævnte dispositioner foretaget i USA af det amerikanske moderselskab. Som nævnt, havde NetApp Bermuda ingen ansatte mv.

Sammenfattende kan det således konkluderes, at de danske udbytter var bydende nødvendige for den pågældende udlodning på USD 550 mio. fra NetApp Bermuda til NetApp USA, og at NetApp Bermuda derfor ikke kunne råde over udbytterne på anden måde.

*Ad 3. Udbytterne strømmede rent faktisk gennem NetApp Bermuda og videre til NetApp USA*

Det fremgår […], at udbytterne er strømmet gennem NetApp Bermuda og videre til NetApp USA.

Da penge er genus, kræves efter NetApp Danmarks opfattelse alene, at der rent faktisk er udloddet USD 550 mio. fra NetApp Bermuda til NetApp USA, og at de danske udbytter var nødvendige for den pågældende udlodning, hvilket er dokumenteret ovenfor. Det kan dog tillige dokumenteres, at de omhandlede udbytter også rent faktisk var indeholdt i den faktiske pengestrøm til NetApp USA.

NetApp Bermuda modtog, som nævnt, beløbet på USD 91,45 mio. fra NetApp Cypern den 28. oktober 2005. Og som ligeledes nævnt, har NetApp-koncernen ikke større kontantbeholdninger stående på en almindelig konto i banken i længere tid, hvorfor koncernen foretog en midlertidig anbringelse heraf i letomsættelige obligationer. Disse obligationer blev forinden udbytteudlodningen til NetApp USA den 3. april 2006 solgt igen, således at likviderne kunne udbetales til NetApp USA. Beløbet indgik altså i den samlede overførsel til NetApp USA, og blev beskattet der.

Udbyttet på USD 91,45 mio. (DKK 565.896.000) er dermed rent faktisk strømmet gennem NetApp Bermuda og videre til NetApp USA.

For så vidt angår det andet udbytte på USD 16 mio. (DKK 92.012.000), bemærkes, at det er en kendsgerning, at beløbet var indeholdt i udbyttet på USD 550 mio. […], og at dette beløb var tilvejebragt midlertidigt ved optagelse af lånet på DKK 300 mio. Rent faktisk blev udbyttet på USD 16 mio. (DKK 92.012.000) først betalt fra NetApp Cypern til NetApp Bermuda i et senere indkomstår, hvilket imidlertid ikke er, jf. også ministeriets egen opfattelse, er afgørende for, om der er sket »gennemstrømning«. Også det andet udbytte er således strømmet

**1652**

gennem NetApp Bermuda og videre til NetApp USA (og beskattet der).

Skatteministeriet har bemærket, at der ikke var »nogen tidsmæssig eller beløbsmæssig sammenhæng mellem, at NetApp Bermuda modtog pengene fra NetApp Cypern og udbytteudlodningen den 3. april 2006 af USD 550 mio. til NetApp USA« […].

For det første er det naturligvis uden betydning, om det pågældende beløb, der er under pådømmelse, alene udgør en andel af et større beløb, der (videre)betales. Det afgørende er således, om det beløb, der er under pådømmelse, er viderebetalt (dvs. her indeholdt i det større udloddede beløb). Skatteministeriet ville i dette sagskompleks næppe gøre et tilsvarende synspunkt gældende over for et af skattemyndighederne påstået »gennemstrømningsselskab« i et andet EU-land.

Det skal endelig for god ordens skyld bemærkes, at NetApp USA ikke selv er et gennemstrømningsselskab, hvilket der vist er enighed om. Efter modtagelsen af udbyttet på USD 550 mio. har NetApp USA således anvendt midlerne i selskabet i overensstemmelse med den såkaldte »Section 965 Domestic Re-investment Plan« som indsendt til de amerikanske skattemyndigheder under American Jobs Creation Act […].

Copyright © 2023 Karnov Group Denmark A/S

Som det er fremgået af ovenstående, er der er intet som helst i denne sag, der taler for, at NetApp Bermuda skulle være »retmæssig ejer« af udbytterne.

Tværtimod er det med ovenstående til fulde påvist, at de betingelser, som Skatteministeriet opstiller for at anse NetApp USA som den »retmæssige ejer« af udbytterne i stedet for NetApp Bermuda, er opfyldt.

Og dermed bortfalder, som nævnt, hele grundlaget for opkrævning af dansk kildeskat efter SEL § 1, stk. 1, litra c.

### 8. SKATTEN SKAL FRAFALDES EFTER MODER-/DATTER-SELSKABSDIREKTIVET

*8.1 De objektive betingelser for fritagelse i direktivet er opfyldt*

Det andet underanbringende til NetApp Danmarks principale anbringende om, at selskabet ikke har været forpligtet til at indeholde udbytteskat, går, som nævnt, ud på, at NetApp Cypern har et ubetinget krav på, at udbytteskatten skal frafaldes efter moder-/datterselskabsdirektivet.

Med moder-/datterselskabsdirektivet (90/435/EØF) […] blev der indført en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater. Formålet med direktivet er at fritage udbytte og andre udlodninger af overskud, som datterselskaber betaler til deres moderselskaber, for kildeskat. Direktivet er ændret ved Rådets direktiv 2003/123/EF […].

Bestemmelsen om, at der ikke kan pålægges kildeskat på udbytte findes i artikel 5, stk. 1, (som ændret i 2003) […]

Direktivet opstiller såvel et kapitalkrav som et ejertidskrav.

Kapitalkravet er fastlagt i artikel 3, stk. 1, (som ændret i 2003) […] og udgjorde i 2005 20%.

Ifølge artikel 3, stk. 2, […] kan den enkelte medlemsstat indføre et ejertidskrav på højst 2 år. Ejertidskravet i SEL § 2, stk. 1, litra c, er på 1 år, og kravet er blot, at udlodningen skal ligge inden for denne periode.

Det gøres gældende, at NetApp Cypern, der ubestridt opfylder såvel kapitalkravet som ejertidskravet i moder-/datterselskabsdirektivet, har et ubetinget krav på at blive fritaget for kildeskat på udbytterne fra NetApp Danmark.

Dette er tiltrådt af Landsskatteretten i kendelsen af 16. december 2011 […].

*8.2 Ikke betingelse om »retmæssig ejer« i direktivet*

Det er en kendsgerning, at moder-/datterselskabsdirektivet - i modsætning til rente-/royaltydirektivet (2003/49/EF) […] - ikke indeholder en betingelse om, at moderselskabet skal være »retmæssig ejer« af det modtagne udbytte.

Det er ikke en fejl eller forglemmelse, men derimod et fravalg. I den forbindelse bemærkes, at kravet om »retmæssig ejer« har været indeholdt i modeloverenskomsten siden 1977, at udviklingen af OECD's kommentarer til dette begreb fremkom i begyndelsen af 2003, at rente-/royaltydirektivet blev vedtaget af Rådet den 3. juni 2003, og at dette direktiv indeholder et krav om »retmæssig ejer« (samtidig med at det tillægger medlemsstaterne en ret til at indføre internretlige anti-misbrugsbestemmelser), samt at moder-/datterselskabsdirektivet blev ændret af Rådet den 22. december 2003, uden at Rådet fandt anledning til at medtage en bestemmelse om »retmæssig ejer«. EU-lovgiver har således - ud over at der ved artikel 1, stk. 2, er tillagt medlemsstaterne en mulighed for at indføre internretlige anti-misbrugsbestemmelser - anset kapitalkravet og ejertidskravet på 2 år som tilstrækkelige betingelser for at opnå skattefrihed for udbytter.

Dette bekræftes også af Kommissionen i indlægget til EU-Domstolen […].

Tilsvarende hedder det i generaladvokat Kokotts udtalelse [præmis 86]:

Dette er også lagt til grund af Landsskatteretten i kendelsen af 16. december 2011 […].

*8.3 Imødegåelse af misbrug kræver national hjemmel, jf. artikel 1, stk. 2 - Kofoed-dommen (C-321/05)*

EU-lovgiver har overladt det til de enkelte medlemsstater at fastsætte eventuelle bestemmelser om misbrug af moder-/datterselskabsdirektivet. Det hedder således i artikel 1, stk. 2 (fra 1990), der var gældende i 2005 og 2006 (…):

»2. Dette direktiv er ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.«

**1653**

Som det fremgår, er der tale om en bemyndigelsesbestemmelse. Hver enkelt medlemsstat kan således indføre eller opretholde præcis de nationale regler til bekæmpelse af misbrug, som den pågældende medlemsstat finder passende. Nationale anti-misbrugsregler skal dog i sig selv være forenelige med EU-retten, herunder de traktatsikrede frihedsrettigheder som fastlagt i EU-Domstolens praksis og ikke mindst proportionalitetsprincippet. EU-Domstolen påser altså, at anti-misbrugsreglerne ikke går for vidt.

NetApp Danmark gør gældende, at det fremgår direkte af ordlyden af direktivets artikel 1, stk. 2, at en nægtelse af direktivets fordele kræver hjemmel i national ret. At der kræves hjemmel i national ret følger også af, at direktiv er rettet mod medlemsstaterne (og ikke mod borgerne), og at borgerne skal kunne aflæse deres retsstilling i den nationale lovgivning.

EU-Domstolens dom af 5. juli 2007 i Kofoed-sagen (C-321/05) […], der drejede sig om den tilsvarende bestemmelse i fusionsskattedirektivets artikel 11, er i overensstemmelse hermed.

[…]

EU-Domstolen fastslår udtrykkeligt, at det alene er interne danske retsforskrifter om retsmisbrug, skattesvig eller skatteunddragelse, der kan begrunde en fravigelse af direktivets skattefritagelsesbestemmelser. Det hedder således i domskonklusionen […]:

»Følgelig er artikel 8, stk. 1, i direktiv 90/434 principielt til hinder for, at en sådan ombytning af selskabsandele beskattes, medmindre nationale retsforskrifter om retsmisbrug, skattesvig eller skatteunddragelse kan fortolkes i overensstemmelse med nævnte direktivs artikel 11, stk. 1, litra a), og dermed begrunde at ombytningen beskattes.«

Disse nationale retsforskrifter behøver ikke at bestå i lovgivning, men kan også være uskrevne retsgrundsætninger (såsom i dansk ret realitetsgrundsætningen og princippet om »rette indkomstmodtager«), jf. præmis 44-46.

I præmis 38-42 afviser EU-Domstolen udtrykkeligt, at det »almindelige fællesskabsretlige princip om forbud mod retsmisbrug« som afspejlet i artikel 11, stk. 1, litra a) kan gøres gældende over for borgeren, hvis der ikke består en national hjemmel hertil. Begrundelsen er, at retssikkerhedsprincippet [er] til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgeren. Direktiver kan derfor ikke som sådan påberåbes af medlemsstaten over for borgeren, jf. præmis 42.

EU-Domstolen fulgte generaladvokat Kokotts forslag til afgørelse af 8. februar 2007, hvor det i punkt 66 og 67 hedder […]:

»66. Kun en direkte anvendelse af artikel 11, stk. 1, litra a), i direktiv 90/434 til skade for Hans Markus Kofoed og Niels Toft ville være udelukket for de danske myndigheder. Således kan en medlemsstat ikke over for en borger påberåbe sig en direktivbestemmelse, som den ikke selv har gennemført. Ifølge fast retspraksis kan et direktiv ikke i sig selv skabe forpligtelser for borgerne, og en direktivbestemmelse kan derfor ikke som sådan påberåbes over for borgerne.

67. Lige så lidt kan de kompetente myndigheder i øvrigt over for borgerne direkte påberåbe sig et eventuelt almindeligt fællesskabsretligt princip om, at retsmisbrug er forbudt. For så vidt angår tilfælde, som er omfattet af anvendelsesområdet for direktiv 90/434 har et sådant princip fundet specifikt udtryk og er blevet konkretiseret i direktivets artikel 11, stk. 1 litra a). …«

Kofoed-dommen bekræftede altså det, der allerede fremgår af ordlyden af moder-/datterselskabsdirektivets artikel 1, stk. 2, nemlig at imødegåelse af misbrug kræver national hjemmel.

Det fremgår i øvrigt af Skatteministeriets kommentar til Kofoeddommen i TfS 2008.45 DEP […], at ministeriet efterfølgende tog bekræftende til genmæle i hovedsagen.

Landsskatteretten har i sin kendelse af 16. december 2011 […] sag lagt Kofoeddommen til grund.

*8.4 Der foreligger ikke misbrug efter de danske anti-misbrugsregler gældende i 2005 og 2006*

Som det fremgår af afsnit 1.3, forudsætter en medlemsstats påberåbelse af direktivets artikel 1, stk. 2, om »interne bestemmelser«, at den pågældende medlemsstat enten har vedtaget en specifik national bestemmelse til gennemførelse af denne bestemmelse i medlemsstatens retssystem, eller at der i national ret findes almindelige bestemmelser eller grundsætninger om svig, misbrug m.v., der kan fortolkes i overensstemmelse med artikel 1, stk. 2. Det er altså helt op til den enkelte medlemsstat at afgøre, om og - i bekræftende fald - i hvilket omfang den ønsker at have anti-misbrugsregler.

Spørgsmålet er derfor, hvilke anti-misbrugsregler der var til rådighed for skattemyndighederne i 2005 og 2006, da udlodningerne fandt sted.

I forbindelse med implementeringen af moder-/datterselskabsdirektivet i dansk ret ved lov nr. 219 af 3. april 1992 blev der indsat en specifik værnsregel i ligningslovens § 16 B, stk, 5, vedrørende de dengang gældende såkaldte »holdingregler«, der udermed blev udstrakt til også at gælde for begrænset skattepligtige moderselskaber. Det fremgår udtrykkeligt af bemærkningerne til lovforslagets § 3 […] og § 6 […], at værnsreglen blev indsat med henvisning til direktivets artikel 1, stk. 2, om nationale anti-misbrugsregler. Selve indholdet af den specifikke værnsregel er uden betydning for nærværende sag. Dette var den eneste specifikke værnsregel, der blev indført sammen med moder-/datterselskabsdirektivet.

Den danske lovgiver har således fundet, at der i øvrigt var den fornødne beskyttelse mod misbrug i dan

**1654**

domstolsskabte praksis om realitetsgrundsætningen og princippet om »rette indkomstmodtager« […].

Parterne er enige om, at retsstillingen vedrørende anti-misbrugsregler i dansk ret i 2005 og 2006 var som gengivet i foreliggelsesskendelsens punkt 55-59 […].

Det fremgår heraf, at der ikke i 2005 og 2006 fandtes en generel lovbestemt regel om bekæmpelse af misbrug. Danmark har først med virkning fra den 1. maj 2015 indført en sådan anti-misbrugsbestemmelse - som følge af den med direktiv 2015/121/EU vedtagne forpligtelse for medlemsstaterne til at indføre en sådan foranstaltning (punkt 55), jf. også nedenfor i afsnit 8.5.

Derimod er der i domstolspraksis udviklet den såkaldte realitetsgrundsætning (punkt 56) og princippet om »rette indkomstmodtager« (punkt 58).

Jakob Bundgaard og Niels Winther-Sørensen, SR-SKAT 2007.508, er i overensstemmelse hermed. Udtalelsen vedrører den tilsvarende misbrugsbestemmelse i rente-/royaltydirektivets artikel 5 […]

De danske skattemyndigheder har altså to domstolsskabte instrumenter til rådighed over for misbrugstilfælde, nemlig princippet om »rette indkomstmodtager« og realitetsgrundsætningen (»sub-

stance-over-form«). Begge disse instrumenter er helt centrale for denne sag. Dels fordi de begge adresserer den fo-religgende problemstilling, og dels fordi Skatteministeriet (og den danske lovgiver) helt frem til opstarten af dette sagskompleks i 2008 har været af den opfattelse, at netop disse instrumenter gav den fornødne (ønskede) beskyttelse over for misbrugstilfælde, […].

Som det fremgår af forelæggelseskendelsens punkt 25 […] og punkt 59 […], anerkender Skatteministeriet, at udbyttemodtageren, NetApp Cypern, er »rette indkomstmodtager« af de omhandlede udbytter.

Tilsvarende anerkender Skatteministeriet i forelæggelsesskendelsens punkt 57 […], at realitetsgrundsætningen ikke giver grundlag for at tilsidesætte de i sagen foretagne dispositioner. SKAT forsøgte oprindeligt at nægte fritagelse for beskatning i »beneficial ownersagerne« ud fra realitetsbetragtninger, men måtte erkende, at der ikke var grundlag herfor, jf. bl.a. dommene i TfS 2003.889 H (OverHold ApS) […] og TfS 2006.1062 H (Finwill ApS - »Elevatorsagen«) […].

Der er altså mellem parterne enighed om, at hverken princippet om »rette indkomstmodtager« eller realitetsgrundsætningen kan anføres til støtte for Skatteministeriets påstand.

Der foreligger således ikke misbrug efter de danske anti-misbrugsregler gældende i 2005 og 2006.

Dette er tiltrådt af Landsskatteretten ved den indbragte kendelse […].

*8.4.1 Skatteministeriets tre anbringender om, at der i 2005 og 2006 konkret var hjemmel i dansk ret til at nægte direktivets fordele på grund af misbrug, er ikke bæredygtige*

Skatteministeriet har gjort tre anbringender gældende til støtte for, at der skulle være hjemmel i dansk ret til konkret at nægte direktivets fordele på grund af misbrug. De tre anbringender er omtalt nedenfor i afsnit 8.4.1.1 - 8.4.1.3.

Som det vil fremgå, er ingen af disse anbringender bæredygtige.

*8.4.1.1 SEL § 2, stk. 1, litra c, er ikke en sådan specifik national bestemmelse som omhandlet i direktivets artikel 1, stk. 2 (spørgsmål 1.1 til EUD)*

Skatteministeriet gør gældende, at SEL § 2, stk. 1, litra c, i sig selv indeholder den fornødne interne hjemmel til at nægte direktivets fordele i tilfælde af misbrug. Synspunktet støttes på følgende sætning i bestemmelsen […]:

»Det er en betingelse [for skattefritagelse], at beskatningen af udbyttet skal frafaldes … efter bestemmelserne i direktiv 90/435/EØF …«

Synspunktet går nærmere ud på, at Danmark ikke »skal« frafalde kildeskat, medmindre der efter direktivet består en pligt hertil, og det gør der - efter synspunktet - ikke, hvis der foreligger et misbrug. Den blotte henvisning til direktivet skulle således - efter synspunktet - indebære en udnyttelse af bemyndigelsen i artikel 1, stk. 2, og dermed, at der (automatisk) er indført en national anti-misbrugsregel i dansk ret.

Det turde være åbenbart, at Skatteministeriets kunstige forsøg på at »skabe« en lovbestemt anti-misbrugsregel ikke er holdbar. Af mange grunde.

End ikke logikken er på plads, fordi det postulerede resultat indgår som en forudsætning for ræsonnementet. Når Skatteministeriet således hævder, at der ikke er pligt til at frafalde kildeskat, hvis der foreligger misbrug, er dette kun en korrekt forudsætning, hvis Danmark i overensstemmelse med artikel 1, stk. 2, (allerede) har valgt at implementere en anti-misbrugsbestemmelse, men det er jo ikke tilfældet. Den første præmis i argumentationen forudsætter således resultatet, og argumentationen er dermed cirkulær.

Den generelle henvisning til direktivet indebærer altså en implementering af direktivet, som det ser ud, herunder med bemyndigel-

sesbestemmelsen i artikel 1, stk. 2, men den indebærer ikke en stillingtagen til, om bemyndigelsen skal udnyttes, og dermed heller ikke en implementering af en anti-misbrugsregel i dansk ret. Den blotte henvisning til direktivet antyder intet som helst om, at Danmark ved indførelsen af lovreglen i 2001 skulle have haft til hensigt at indføre en (fakultativ) national anti-misbrugsregel, endsige, hvad en sådan regel - i givet fald - skulle gå ud på.

Tværtimod er det en kendsgerning, at Skatteministeriet og den danske lovgiver ved indførelsen af selskabsskattelovens § 2, stk. 1, litra c, i 2001 konkret ikke fandt behov for og derfor heller ikke ønskede at indføre en

**1655**

anti-misbrugsregel, jf. ovenfor afsnit 2. Den forståelse af selskabs-skattelovens § 2, stk. 1, litra c, som Skatteministeriet nu gør gældende, og som er opfundet til denne sag, er således i direkte strid med forarbejderne til denne bestemmelse fra 2001.

Som det fremgår [...], var lovgiver også helt opmærksom på, at hvis der ønskedes yderligere misbrugsregler end de almindeligt gældende (realitetsgrundsætningen og princippet om »rette indkomstmodtager«), skulle dette i henhold til direktivets artikel 1, stk. 2, ske ved supplerende lovgivning, således som det også skete i forbindelse med direktivets oprindelige implementering ved lov nr. 219 af 3. april 1992 [...].

[...]

I Kommissionens indlæg hedder det om ministeriets anbringende i punkt 9 (...): »Denne tankegang kan efter kommissionens opfat-telse ikke accepteres«, hvilket begrundes i de efterfølgende punkter. Og i Kommissionens forslag til besvarelse af spørgsmål 1.1 hedder det [...], at SEL § 2, stk. 1, litra c, »ikke [kan] anses for at være en specifik national bestemmelse som omhandlet i direktivets artikel 1, stk. 2«.

Tilsvarende hedder det i generaladvokatens forslag, punkt 106 [...]:

»Af denne grund skal spørgsmål 1.1 og 2 besvares med, at hverken § 2, stk. 2 [rettelig stk. 1], litra c, i den danske selskabsskattelov eller en bestemmelse i en dobbeltbeskatningsoverenskomst, der for så vidt angår beskatning af udloddet udbytte tager udgangspunkt i den retmæssige ejer, er tilstrækkelige til at kunne betragtes som gennemførelse af moder-/datterselskabsdirektivet artikel 1, stk. 2.«

EU-Domstolen har ikke besvaret spørgsmål 1.1, da Domstolen i stedet valgte at introducere det »generelle EU-retlige princip om forbud mod misbrug«, som omtales nedenfor i afsnit 8.6.

Som det fremgår, har Skatteministeriets anbringende intet som helst for sig.

Landsskatteretten har da også i den indbragte kendelse [...] afvist dette anbringende.

*8.4.1.2 Betingelsen om »retmæssig ejer« i en DBO er ikke en så-dan overenskomstmæssig anti-misbrugsbestemmelse, som er omfat-tet af direktivets artikel 1, stk. 2 [...]*

Skatteministeriet gør endvidere gældende, at betingelsen om »retmæssig ejer« i dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern (fra 1981) er en sådan overenskomstmæssig anti-misbrugsbestemmelse, som er omfattet af direktivets artikel 1, stk. 2. Efter dette synspunkt er det altså uden betydning, at direktivet ikke selv opstiller et krav om »retmæssig ejer«.

Heller ikke dette kunstige forsøg på at »skabe« en intern anti-misbrugsregel er holdbart. Som nævnt ovenfor i afsnit 8.2, var det udtryk for et fravalg, når EU-lovgiver ikke medtog en betingelse om »retmæssig ejer« i direktivet, hvilket er bekræftet af Kommissionen og generaladvokaten. Denne betingelse kan derfor heller ikke (automatisk) komme ind »ad bagvejen«.

NetApp Danmark gør i øvrigt gældende, at modeloverenskomstens betingelse om »retmæssig ejer« ikke er en betingelse om,

»som er nødvendig for at hindre svig og misbrug« i artikel 1, stk. 2's forstand. Betingelsen er således ikke en anti-misbrugsforanstalt-ning, men derimod en regel om, at kun den person, der er skat-tepligtssubjektet for udbyttet (den »retmæssige ejer«), kan påberåbe sig lempelse efter overenskomsten. Dette fremgår udtrykkeligt af punkt 12 i 1977-kommentarerne til OECD's model-overenskomst [...], der var gældende på tidspunktet for indgåelsen af den dansk-cypriotiske dobbeltbeskatningsoverenskomst i 1981. Dette hensyn varetages i direktivet i stedet af kapital- og ejertidskravet.

Det er almindeligt anerkendt i den internationale skattelitteratur, at modeloverenskomstens betingelse om »retmæssig ejer« ikke er en anti-misbrugsbestemmelse. Som eksempel kan nævnes, at pro-fessor Adolfo Martin Jiménez, World Tax Journal, 2010 [...], er af den opfattelse, at »retmæssig ejer« er en »attribution-of-income rule« (indkomst-allokeringsregel) - ligesom princippet om »rette indkomstmodtager« i dansk ret - og ikke en »anti-avoidance rule« (anti-misbrugsregel). Der skal derfor ikke foretages en »economic interpretation«, men derimod en »legal interpretation«, og parternes hensigt er derfor uden betydning [...]

Også Philip Baker, QC, Double Taxation Conventions, 2010 [...], der generelt om begrebet »retmæssig ejer« udtaler, at »unfortuna-tely, the meaning of the phrase still remains less than fully clear« (...), er på linje hermed, idet han foreslår, at afgørelsen af, hvem der er den »retmæssige ejer«, beror på, hvem der har krav på beløbet i tilfælde af modtagerens konkurs.

Det gøres endvidere gældende, at udtrykket »overenskomsten« i artikel 1, stk. 2, skal fortolkes således, at det har som forudsætning, at medlemsstaten efter sin interne ret kan påberåbe sig dobbeltbe-skatningsoverenskomsten til skade for skatteyderen, hvilket ikke er muligt efter dansk ret.

Skatteministeriets synspunkt fører bl.a. til det selvmodsigende resultat, at udbyttemodtager vil have en ringere beskyttelse efter direktivet i det tilfælde, hvor der findes en dobbeltbeskatningsove-renskomst (hvis mål er at lempe skatter) mellem de involverede lande, end i det tilfælde, hvor der ikke findes en sådan. F.eks. har Danmark siden 2009 ikke haft dobbeltbeskatningsoverenskomster med Frankrig og Spanien. Hvis synspunktet var rigtigt, ville NetApp Cypern (og dermed NetApp Danmark som indeholdelsespligtig) for perioden efter 2009 således have været bedre stillet, såfremt

**1656**

NetApp Cypern i stedet havde været hjemmehørende i Frankrig eller Spanien.

Hertil kommer, at der ikke er noget grundlag for at antage, at Skatteministeriet og den danske lovgiver ved indførelsen af SEL § 2, stk. 1, litra c, i 2001 havde noget som helst ønske om, at betin-gelsen i OECD's modeloverenskomst om »retmæssig ejer« skulle udstrækkes til at gælde for moder-/datterselskabsdirektivet som en selvstændig anti-misbrugsregel. Tværtimod ligger det klart, at lovgiver lagde til grund, at der over det danske selskab kunne ind-skydes et mellemholdingselskab, som var »retmæssig ejer« af ud-byttet [...].

Også Skatteministeriets anbringende om, at betingelsen om »ret-mæssig ejer« er en overenskomstmæssig anti-misbrugsbestemmelse i artikel 1, stk. 2's forstand, med den virkning at NetApp Cypern kan nægtes fritagelse i henhold til direktivet, er således i direkte strid med forarbejderne til SEL § 2, stk. 1, litra c.

[...]

Kommissionen afviser i sit indlæg, punkt 18-25, i det hele mini-steriets anbringende og konkluderer i punkt 25 [...]:

»Efter Kommissionens opfattelse kan en bestemmelse i en dob-beltbeskatningsoverenskomst indgået mellem to medlemsstater og udformet i overensstemmelse med OECD's modeloverenskomst, i henhold til hvilken beskatningen af udbytte afhænger af, om ud-

byttemodtageren anses for den retmæssige ejer af udbyttet eller ej, således ikke udgøre en »overenskomstmæssig anti-misbrugsbestemmelse« som omhandlet i direktivet artikel 1, stk. 2.« (…).

Som det fremgår af generaladvokatens forslag, punkt 106 […], kom generaladvokaten til det samme resultat.

EU-Domstolen har heller ikke besvaret spørgsmål 2, da Domstolen i stedet valgte at introducere det »generelle EU-retlige princip om forbud mod misbrug«.

Heller ikke dette anbringende er således bæredygtigt.

Landsskatteretten har da også i den indbragte kendelse […] afvist dette anbringende.

*8.4.1.3 Der findes ikke i dansk ret almindelige principper til imødegåelse af misbrug uden for realitetsgrundsætningen (og princippet om »rette indkomstmodtager«)*

Skatteministeriet har i processkrift 2 af 10. januar 2020 […] fremsat et nyt anbringende om, at der i dansk retspraksis skulle være udviklet almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen (og - må det forstås - princippet om »rette indkomstmodtager«).

Der nævnes som eksempler herpå 3 højesteretsdomme (U.1998.245H […], U.2005.649H […] og U.2015.2277H […]), hvor dispositioner, der »formelt« var blevet indrettet sådan, at en bestemt, gunstig skatteregel fandt anvendelse, er blevet tilsidesat i skattemæssig henseende med den begrundelse, at dispositionerne ikke havde noget »forretningsmæssigt formål« eller lignende. Der er også et eksempel på en højesteretsdom (U.1999.1714.H, […]), der har tilsidesat et skattearrangement uden at bruge en tilsvarende vending.

Efter at parternes advokater i forbindelse med udarbejdelsen af Østre Landsrets forelæggelseskendelse af 19. februar 2016 i fællesskab har rådgivet landsretten om, at retsstillingen i Danmark i 2005 og 2006 var således, at der ikke fandtes en generel lovbestemt regel om bekæmpelse af misbrug, men at der derimod var to domstolsskabte instrumenter, der kunne danne grundlag for at gribe over for misbrug, nemlig realitetsgrundsætningen og princippet om »rette indkomstmodtager«, mener Skatteministeriet altså nu, at der ved siden heraf gælder andre almindelige principper til imødegåelse af misbrug.

Indledningsvis bemærkes, at alle 4 domme forelå, da parternes advokater rådgav Østre Landsret. Desuagtet fandt Skatteministeriet ikke anledning til at orientere landsretten om, at gengivelsen af retsstillingen i forelæggelseskendelsen var forkert, hvad ministeriet givetvis heller ikke mente, at den var.

Der henvises i så henseende til forarbejderne til lov nr. 540 af 29. april 2015 vedrørende indførelsen af en anti-misbrugsklausul vedrørende moder-/datterselskabsdirektivet i ligningslovens (LL) § 3. I lovforslaget (L 167 2014/15) har Skatteministeriet gengivet gældende ret forud for vedtagelsen af den anti-misbrugsklausul, og dermed også i 2005 og 2006. Det hedder heri […]:

»Der findes ikke en generel lovbestemt regel om bekæmpelse af misbrug i dansk skattelovgivning. Efter dansk (rets)praksis sker beskatningen efter der er foretaget en bedømmelse af, hvad der faktisk er sket. Det betyder, at tomme og kunstige skattebetingede dispositioner kan tilsidesættes, således at beskatningen i stedet foretages i forhold til den modståede realitet. Dansk skatteret er altså grundlæggende helt på linje med international gældende principper om »substance over form«.«

Som det fremgår, svarer ministeriets gengivelse af gældende ret i lovforslaget til gengivelsen i forelæggelseskendelsen […], hvorved erindres om, at princippet om »rette indkomstmodtager« udspringer af realitetsgrundsætningen. Der er altså ikke nævnt andre almindelige principper til imødegåelse af misbrug, som Skatteministeriet nu hævder på basis af en række ældre domme.

Det er derfor ubetænkeligt at antage, at Skatteministeriets nye anbringende er et til lejligheden opfundet synspunkt. Realiteten er, at ministeriet har fortrudt sin anerkendelse i forelæggelseskendelsens punkt 57 […] af, »at realitetsgrundsætningen ikke giver grundlag for at tilsidesætte de i nærværende sag fore-tagne

**1657**

dispositioner«, og nu i stedet forsøger at kvalificere den eksisterende retspraksis på en anden måde.

Det nye synspunkt har da heller ikke støtte - hverken i retspraksis eller litteratur.

De 3 førstnævnte domme er fuldgode eksempler på, at realitetsgrundsætningen er blevet anvendt til at tilsidesætte de pågældende arrangementer, mens den sidstnævnte dom, U.1999.1714.H om Hadsten Bank, er et eksempel på en fortolkning af aktieavancebeskatningslovens § 3 (om næringsaktier).

Realitetsgrundsætningen dækker over mange forskellige problemstillinger. Til illustration kan henvises til Jon Stokholm i »Højesteret 350 år« […]

I alle de tre sager har skatteyderne forsøgt at »opstille kulisser«, så arrangementerne fremstår som »gangbare skattemæssige dispositioner«, men er blevet gennemskuet af domstolene.

Skatteministeriets eneste begrundelse for, at disse sager ikke skulle være omfattet af realitetsgrundsætningen, er, at det er indgået i domstolenes præmisser for at tilsidesætte arrangementerne, at dispositionerne ikke havde noget »forretningsmæssigt formål« eller lignende.

Dette er imidlertid snarere et kendetegn på, at dommene er udtryk for en anvendelse af realitetsgrundsætningen. Det er således hovedreglen, at Skatteministeriet i sager om realitetsgrundsætningen gør gældende, at dispositionerne savner »forretningsmæssigt formål«. Dette bekræftes også af Jon Stokholms artikel […]

Skatteministeriet mangler også at forklare, hvordan ministeriet kan mene, at NetApp Cypern er »rette indkomstmodtager«, jf. forelæggelseskendelsens punkt 59 […], og at dispositionerne ikke kan tilsidesættes efter realitetsgrundsætningen, jf. forelæggelseskendelsens punkt 57, hvilket altså betyder, at der ikke er tale om »tomme og kunstige, skattebetingede dispositioner«, og at substansen svarer til formen, jf. forelæggelseskendelsens punkt 56, samtidig med, at ministeriet hævder, at dispositionerne skal tilsidesættes, fordi de savner »forretningsmæssigt formål«.

Det giver ganske enkelt ikke nogen mening.

Skatteministeriet mangler også helt grundlæggende at forklare, hvordan der overhovedet skulle kunne foreligge et misbrug, når lovgiver i forarbejderne til SEL § 2, stk. 1, litra c, har givet klart udtryk for, at indskydelsen af et cypriotisk mellemholdingselskab mellem et dansk selskab og dets moderselskab i et ikke-DBO land og en efterfølgende udbytteudlodning via mellemholdingselskabet til selskabet i ikke-DBO landet ikke udgør et misbrug.

Som det fremgår, findes der ikke i dansk ret almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen (og »rette indkomstmodtager«), og som kan føre til, at NetApp Cypern nægtes fritagelse for beskatning i henhold til moder-/datterselskabsdirektivet.

*8.4.1.4 Sammenfattende om Skatteministeriets tre hævdede hjemler i dansk ret til imødegåelse af misbrug af moder-/datterselskabsdirektivet: hjemlerne findes ikke*

Som det fremgår af afsnit 8.4.1.1 - 8.4.1.3 ovenfor, findes ingen af de af Skatteministeriet hævdede tre konkrete hjemler i dansk ret til imødegåelse af misbrug af moder-/datterselskabsdirektivet.

Konklusionen er derfor - som det også fremgår af Østre Landsrets forelæggelseskendelse - at misbrug alene kan imødegås med realitetsgrundsætningen og princippet om »rette indkomstmodtager«,

og her er parterne enige om, at disse anti-misbrugsregler ikke kan finde anvendelse i denne sag.

Der foreligger således ikke misbrug af direktivet efter dansk ret. Landsskatterettens kendelse [...] er i overensstemmelse hermed.

*8.5 Ændringen af moder-/datterselskabsdirektivet i 2015 (og forarbejderne hertil) bekræfter, at imødegåelse af misbrug af direktivet fortsat kræver national lovhjemmel*

Kommissionen offentliggjorde den 6. december 2012 »En handlingsplan til styrkelse af bekæmpelsen af skattesvig og skatteunddragelse«, KOM(2012) 722 [...].

Forud herfor havde Kommissionen (og EU-Domstolen) i relation til misbrug af EU's retsakter mest fokuseret på, at medlemsstaternes interne anti-misbrugsregler ikke måtte gå for vidt i relation til at udelukke de fordele, der fulgte af EU's retsakter, jf. således KOM(2007) 785 om »Anvendelsen af foranstaltninger til bekæmpelse af misbrug inden for direkte beskatning - i EU og i relation til tredjelande« [,...]. Det hedder således i konklusionen i denne meddelelse (...):

»Domstolen har afsagt en række vigtige domme på dette område, hvor den har præciseret begrænsningerne i den lovlige anvendelse af regler til bekæmpelse af katteunddragelse. Dommene vil uden tvivl få betydelig indflydelse på de eksisterende regler, som ikke er udformet med tanke på disse begrænsninger. Det fremgår især tydeligt, at reglerne ikke må udformes alt for bredt, men skal være rettet mod situationer, hvor der ikke er nogen reel etablering, eller mere generelt, hvor der mangler et kommercielt grundlag.« (...).

Med handlingsplanen af 6. december 2012 [...] »fik piben imidlertid en anden lyd«. EU meldte sig for alvor ind i kampen mod skattesvig og skatteunddragelse. Det skete samtidig med, at G20-landene og OECD påbegyndte det såkaldte BEPS-projekt (Base Erosion and Profit Shifting). Der skete således på dette tidspunkt en markant international oprustning i kampen mod skattesvig og skatteunddragelse.

Handlingsplanen indeholder en række forslag, henstillinger og initiativer. [...].

**1658**

Kommissionen mente således, at der var behov for en samordnet indsats. Det hedder herom under overskriften »En gennemgang af EU's lovgivning om bekæmpelse af misbrug« [...]:

»Kommissionen vil også gennemgå bestemmelserne om bekæmpelse af misbrug i direktiverne om renter og royalties, fusioner og moder- og datterselskaber med henblik på at gennemføre de underliggende principper for Kommissionens henstilling vedrørende aggressiv skatteplanlægning.«

Endelig hedder det i konklusionen [...]:

»Skattesvig og skatteunddragelse er et problem med mange facetter, som kræver et koordineret og multidimensionelt modsvar. Aggressiv skatteplanlægning er ligeledes et problem, der kræver akut opmærksomhed. Der er tale om globale udfordringer, som ingen enkelt medlemsstat kan imødegå alene.

Denne handlingsplan udpeger en række specifikke foranstaltninger, som kan blive udviklet nu og i de kommende år. Den repræsenterer også et generelt bidrag til videre international debat om beskatning og har til formål at støtte G20-landene i det løbende arbejde på dette område. Kommissionen mener, at kombinationen af disse handlingstiltag kan udgøre et vidtrækkende og effektivt modsvar til de forskellige udfordringer, som skattesvig og unddragelse udgør, og dermed bidrage til at øge retfærdigheden i medlemsstaternes skattesystemer, at sikre højst tiltrængte skatteindtægter og i sidste ende at tilskynde til et velfungerende indre marked.« [...].

I overensstemmelse med handlingsplanen fremsatte Kommissionen den 23. november 2013 et forslag til ændring af moder-/datterselskabsdirektivet, KOM(2013) 814 [...], der bl.a. indeholdt et forslag om en generel anti-misbrugsregel, som det var obligatorisk for medlemsstaterne at indføre i deres nationale ret. [...] Det hedder endvidere i forslaget [...]:

»Bestemmelse om bekæmpelse af misbrug

Det nuværende moder-/datterselskabsdirektiv giver medlemsstaterne mulighed for at anvende interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug. ...

Når alle disse faktorer bliver taget i betragtning, er det klart, at et tiltag fra medlemsstaterne hver for sig ikke vil være så effektivt som et tiltag fra EU.«

Samtidig med fremsættelsen af ændringsforslaget til direktivet udsendte Kommissionen et Memo benævnt »Questions and Answers on the Parent Subsidiary Directive« [...]. Under overskriften »Which companies would be affected by the new proposal? hedder det [...]:

»Example 1: anti-abuse rule

Member State A has withholding taxes on dividend payments to parent companies resident in a non-EU-country X. Member State B has no withholding taxes on dividend payments to parent companies in country X.

If a subsidiary in Member State A is owned directly from country X, there will be withholding taxes on profit distributions.

If the parent company in country X sets up an intermediate subsidiary in MS B, the withholding tax in Member State A can be avoided. Member State A cannot have withholding taxes on profit distributions to a parent company in another Member State under the PSD.

The anti-abuse rule could be applicable in Member State A if the set-up is a wholly artificial arrangement where the essential purpose for the insertion of the intermediate company in Member State B is to avoid the withholding taxes in MS A, e.g. a letterbox company with no substance. As a consequence of the application of the anti-abuse rule, the benefits of the Directive (including the non-application of the withholding) would be denied.« [...].

Det fremgår med al ønskelig tydelighed af eksemplet, at der efter moder-/datterselskabsdirektivet, således som det så ud før tilføjelsen af den obligatoriske anti-misbrugsregel i 2015 (»Current situation«), ikke var muligt for at nægte fritagelse for kildeskat på udlodningen fra MS A til MS B - heller ikke selv om MS B måtte være et »Artificial Intermediate subsidiary«.

Med Rådets vedtagelse den 27. januar 2015 af direktiv 2015/121/EU blev artikel 1, stk. 2, i moder-/datterselskabsdirektivet ændret, således at medlemsstaterne blev forpligtet til at implementere den generelle anti-misbrugsklausul.

Det hedder i ændringsdirektivets præambel bl.a. [...]:

»(2) Det er nødvendigt at sikre, at direktiv 2011/96/EU ikke misbruges af skatteydere, der er omfattet af dets anvendelsesområde.

(3) Nogle medlemsstater anvender interne bestemmelser eller overenskomster, der tager sigte på at imødegå skatteunddragelse, skattesvig og misbrug på en generel eller mere specifik måde.

(4) Disse bestemmelser kan imidlertid have forskellige grader af strenghed og er under alle omstændigheder udformet til at afspejle de særlige forhold i den enkelte medlemsstats skattesystem. Endvidere er der medlemsstater, som ikke har interne bestemmelser eller overenskomster til at hindre misbrug.

(5) Derfor vil indførelsen af en fælles minimumsregel om bekæmpelse af misbrug i direktiv 2011/96/EU være af stor nytte med henblik på at hindre misbrug af dette direktiv og sikre større sammenhæng i anvendelsen heraf i de forskellige medlemsstater.

...

(9) Dette direktiv bør på ingen måde berøre medlemsstaternes mulighed for at anvende deres interne

**1659**

bestemmelser eller overenskomster, der tager sigte på at hindre skatteunddragelse, skattesvig eller misbrug.« (…).

Ændringsdirektivets artikel 1 er sålydende […]:

»I direktiv 2011/96/EU erstattes artikel 1, stk. 2, af følgende stykker:

»2. Medlemsstaterne giver ikke de fordele, der er ved dette direktiv, til arrangementer eller serier af arrangementer, der er tilrettelagt med hovedformål, eller der som et af hovedformålene har, at opnå en skattefordel, som virker mod indholdet af eller formålet med dette direktiv, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder.

Et arrangement kan omfatte flere trin eller dele.

3. Med hensyn til stk. 2 betragtes arrangementer eller serier af arrangementer som ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

4. Dette direktiv er ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre skatteunddragelse, skattesvig og misbrug.«« […].

Ved lov nr. 540 af 29. april 2015 er den nye generelle anti-misbrugsregel blevet implementeret i dansk ret som ligningslovens (LL) § 3 […]. Den danske lovgiver har benyttet lejligheden til ikke blot at lade bestemmelsen gælde for moder-/datterselskabsdirektivet, men også for rente-/royaltydirektivet og fusionsskattedirektivet. Der er også i LL § 3, stk. 2, indsat en generel anti-misbrugsregel vedrørende dobbeltbeskatningsoverenskomster.

Loven trådte i kraft med virkning for transaktioner fra og med den 1. maj 2015.

Som det fremgår, har Kommissionen, Rådet og Europa-Parlamentet stedse forudsat, at imødegåelse af misbrug af moder-/datterselskabsdirektivet kræver national hjemmel i den medlemsstat, som påberåber sig misbruget. Dette fremgår direkte af ordlyden af den indtil 2015 gældende bestemmelse i direktivets artikel 1, stk. 2, der indeholder en bemyndigelse til medlemsstaterne til at indføre anti-misbrugsregler, ligesom det er bekræftet af EU-Domstolen i Kofoed-sagen (C-321/05). For perioden efter den 1. maj 2015 fremgår det af artikel 1, stk. 2 - 4, samt af LL § 3.

For Danmark betyder det, at skattemyndighederne indtil 2015 havde to instrumenter til rådighed til imødegåelse af misbrug: realitetsgrundsætningen og princippet om »rette indkomstmodtager«. Fra den 1. maj 2015 kan Danmark tillige anvende den obligatoriske misbrugsregel i LL § 3.

Set fra EU's side betyder det, at EU-lovgiver har sikret sig, at samtlige medlemsstater fra 2015 har fået implementeret den efter EU-lovgivers opfattelse isolerede anti-misbrugsregel vedrørende moder-/datterselskabsdirektivet.

Blot for fuldstændighedens skyld bemærkes, at Rådet den 12. juli 2016 vedtog direktiv (EU) 2016/1164 (det såkaldte skatteundgåelsesdirektiv), der bl.a. indeholder en generel anti-misbrugsregel (artikel 6), svarende til den nye anti-misbrugsregel i moder-/datterselskabsdirektivet, men som gælder på alle områder. Reglen er implementeret i Danmark ved en ændring af LL § 3.

De endelige rapporter om de 15 OECD-tiltag til bekæmpelse af BEPS blev offentliggjort den 5. oktober 2015, og der er efterfølgende gennemført et stort antal initiativer både i OECD- og EU-regi.

Den af G20/OECD og EU drevne proces rettet mod internationalt misbrug af skatteregler i det seneste årti har ikke blot ført til vedtagelsen af et stort antal nye anti-misbrugsregler, men har også ændret den politiske holdning til, hvornår der i det hele taget foreligger et misbrug.

Det er derfor vigtigt at gøre sig klart, at spørgsmålet om, hvorvidt der på et givent tidspunkt har foreligget misbrug, skal vurderes i

forhold til forståelsen af de anti-misbrugsregler, der var gældende på det pågældende tidspunkt.

*8.6 Det af EU-Domstolen foreslåede generelle EU-retlige princip om forbud mod misbrug har ikke - som hævdet af EU-Domstolen - direkte virkning for borgerne*

*8.6.1 Baggrund*

Østre Landsret stillede i nærværende sag 15 spørgsmål til EU-Domstolen.

Generaladvokat Kokott, der også var generaladvokat i Kofoed-sagen (C321/05), foreslog, at alle spørgsmålene skulle besvares i NetApp Danmarks favør, mens EU-Domstolen kom til det modsatte resultat.

Spørgsmål 1 drejede sig om, hvorvidt imødegåelse af misbrug af moder-/datterselskabsdirektivet kræver national hjemmel i medfør af direktivets artikel 1, stk. 2.

Generaladvokat Kokott foreslog i sin udtalelse af 1. marts 2018 - i overensstemmelse med EU-Domstolens besvarelse af det tilsvarende spørgsmål i Kofoed-dommen - at spørgsmålet skulle besvares med, at der kræves national hjemmel […]

EU-Domstolen kom i sin dom af 26. februar 2019 - højst overraskende - til det stik modsatte resultat, nemlig at der ikke kræves national hjemmel, jf. domskonklusionens punkt 2 […]

Som det kan ses, støtter Domstolen sit resultat på, at der skulle gælde et »generelt EU-retligt princip om forbud mod misbrug«, der kan anvendes direkte over for borgerne.

Generaladvokaten havde i sin udtalelse, punkt 99 og 100 […], afvist, at det generelle EU-retlige princip om forbud mod misbrug kunne påberåbes direkte over for borgerne, men heri var EU-Domstolen altså ikke enig.

Generaladvokaten havde gjort nøjagtigt det samme synspunkt om afvisning af det generelle EU-retlige

**1660**

princip om forbud mod misbrug gældende i sin udtalelse i Kofoed-sagen, punkt 66 og 67 […], men på daværende tidspunkt fulgte EU-Domstolen altså generaladvokaten.

Det er således en kendsgerning, at EU-Domstolen i sin afgørelse af 26. februar 2019 i nærværende sag har underkendt Kofoed-dommen og dermed ændret praksis med tilbagevirkende kraft - i hvert fald til 2005.

NetApp Danmark gør gældende, at det nævnte princip ikke er umiddelbart anvendeligt over for borgerne, eftersom EU-Domstolen ikke har kompetence til at træffe denne afgørelse, da Danmark ikke har afgivet suverænitet hertil.

*8.6.2 Nærmere om EU-Domstolens dom af 26. februar 2019*

EU-Domstolens konklusion er resultatet af en længere argumentationsrække i præmisserne.

EU-Domstolen starter med i præmis 70 at fastslå […], at det »følger … af fast retspraksis, at der findes et almindeligt EU-retligt princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug«. […].

Det fremgår videre af præmis 71, at »Det påhviler borgerne at overholde dette almindelige retsprincip«. […]. Der henvises i denne forbindelse til Kofoeddommen, hvor det i præmis 38 tilsvarende hedder: »Borgerne kan ikke på svigagtig vis eller med henblik på misbrug gøre fællesskabsbestemmelserne gældende.«

Domstolen fastslår herefter misbrugsprincippets indhold i præmis 72:

[…]

Ifølge præmis 75 »udgør princippet om forbud mod misbrug et generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet

misbrugt, har hjemmel i traktaterne, i en forordning eller i et direktiv …«. […].

Dette »generelle EU-retlige princip« er altså frit i luften svævende, har en højere retskildeværdi end selv traktaterne og kræver ikke forankring i national ret. En konkret anvendelse af princippet beror således ikke på en fortolkning af den relevante retsakt, men alene på princippets eksistens og højere rang, der så at sige går forud for indholdet af retsakten. Princippet er skabt af EU-Domstolen og kan kun fortolkes af EU-Domstolen, jf. domskonklusionen ovenfor.

I præmis 76 nævner Domstolen, at det generelle forbud mod misbrug er blevet anvendt med direkte virkning over for borgerne inden for momsretten, og Domstolen henviser til de velkendte præjudikater Italmoda (C-131/13 m.fl.) […] og Cussens m.fl. (C-251/16) […].

Ifølge EU-Domstolen gælder princippet imidlertid også for de (få) direktiver, der findes på området for de direkte skatter (der ikke er harmoniseret), og dette gælder, selv om disse direktiver udtrykkeligt forudsætter, at misbrug kun kan imødegås, hvis der er hjemmel hertil i national ret. Det hedder således i præmis 77: […]

Eller sagt på en anden måde. Det generelle EU-retlige princip overtrumfer indholdet af den konkrete retsakt.

På den anførte baggrund konkluderer Domstolen i præmis 83 […]

De efterfølgende præmisser 84-92 indeholder Domstolens forsøg på at bortforklare, at Kofoed-sagen (C-321/05), hvor Domstolen kom til det modsatte resultat, nemlig at der kræves national hjemmel, skulle have betydning for udfaldet af nærværende sag.

Lad det være sagt med det samme. Det lykkes ikke, og Domstolen ender da også med at »kaste håndklædet i ringen«. Det kan nemlig ikke bortforklares.

Domstolen starter i præmis 86 med loyalt at referere, at retssikkerhedsprincippet var meget afgørende for udfaldet af Kofoed-sagen: […]

Domstolen forsøger at komme uden om denne tidligere begrundelse ved at foretage en semantisk omskrivning af problemstillingen. Det hedder således i præmis 91, at en fordel i henhold til et direktiv ikke (længere) indebærer, at den berørte borger pålægges en forpligtelse i medfør af dette direktiv, »men er blot en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel, som er fastsat i det nævnte direktiv for så vidt angår denne ret, alene er opfyldt formelt …«.

Hokus pokus. På denne måde er en forpligtelse for borgeren blevet til en manglende opfyldelse af en betingelse. Men problemet er og bliver jo nøjagtigt det samme for borgeren. Borgeren kender ikke betingelserne (dvs. indholdet af anti-misbrugsreglerne). De fremgår stadig ikke af national ret, men svæver (nu) i et generelt EU-retligt princip, der end ikke kan aflæses i direktivet. De retssikkerhedsmæssige betænkeligheder er altså de samme - eller faktisk endnu større ved et generelt EU-retligt princip.

Denne begrundelse for at forlade den tidligere praksis forekommer ikke overbevisende, og i mangel af bedre argumenter har Domstolen da også valgt at helgardere sit synspunkt i præmis 89: […]

Der kan således ikke peges på nogen anden troværdig begrundelse for, at EU-Domstolen har ændret praksis, end at Domstolen - under indtryk af den moralske oprustning fra OECD's og EU's side siden 2012 - har fortrudt Kofoed-dommen. Til gengæld har EU-Domstolen samtidig tilsidesat ethvert hensyn til retssikkerheden for EU's borgere.

Se således f.eks. Niels Winther-Sørensen i SR.2019.174 […]

*8.6.3 Reaktioner på dommen - overraskelse og kritik*
EU-Domstolens dom af 26. februar 2019 er selvsagt kommet som en kæmpe overraskelse for alle. Ingen

vidste, at der eksisterede et generelt EU-retligt princip om forbud mod misbrug, som var direkte anvendeligt over for borgerne, på området for de direkte skatter (hvad der heller ikke gjorde før afsigelsen af dommen).

Kommissionen var således uvidende om dette princip. Hvis princippet havde været gældende, havde det jo ikke været nødvendigt for Kommissionen at foreslå indsættelsen af en obligatorisk generel anti-misbrugsklausul i moder-/datterselskabsdirektivet i 2015. Også eksemplet i Kommissionens memo af 25. november 2013 […] forudsatte, at der ikke gjaldt et sådant princip. Tilsvarende havde det heller ikke været nødvendigt at indsætte en generel anti-misbrugsklausul i skatteundgåelsesdirektivet i 2016.

Af samme grund foreslog Kommissionen også i sit indlæg, at Domstolen skulle besvare spørgsmål 1 i overensstemmelse med Kofoed-dommen […].

EU's lovgiver - Rådet og Parlamentet - der vedtog disse direktiver, var tilsvarende uvidende om det generelle uskrevne princip.

Generaladvokat Kokott, som også var generaladvokat i Kofoedsagen, kendte heller ikke til eksistensen af dette princip med det ovennævnte indhold. Hun foreslog derfor Domstolen at følge Kofoed-sagen og frårådede Domstolen at udvide princippet til området for de direkte skatter […].

Heller ikke Landsskatteretten kendte til det nye princip og forlod sig derfor i sin afgørelse af 16. november 2011 […] på Kofoeddommen.

Både den danske og den internationale litteratur har været overrasket og kritisk over for dommen.

Se således f.eks. Erik Banner-Voigt i RR.2019.7.58 […]

Haslehner og Kofler skriver i Kluwer International Tax Blog om Domstolens introduktion af det nye princip […]:

»This finding is not only an unwelcome surprise, it also rests on a weak doctrinal foundation and may only be explained on account of the specificities of Danish legislation.«

Om Kofoed-dommen hedder det […]:
»The Court's precedence in Kofoed has made it (seemingly) clear that national tax authorities are precluded from relying directly, against a taxpayer, on the anti-abuse reservation of Art 15 of the Merger Directive (unless there is some way to interpret Danish law to that effect).«

Det hedder hos Joachim Engli[s]h i Common Market Law Review under overskriften »The Danish tax avoidance cases: New milestones in the Court's anti-abuse doctrine« […]:

»The Danish cases are landmark rulings, also because the court unambiguously held the general principle of prohibition of abuse of EU law to be directly applicable, irrespective of the nature of EU law that is allegedly being abused.«

…

However, the author finds the reasoning of the Court regarding direct applicability of the general principle in the context of EU directives, as is at issue in the six Danish cases, unconvincing on several grounds.«

Det er vanskeligt at forstå, hvad der har motiveret Domstolen til at foretage praksisændringen.

På tidspunktet for afsigelsen af dommen i 2019 havde EU-lovgiver for længst indført de af EU ønskede generelle anti-misbrugsregler, såvel i moder-/datterselskabsdirektivet (2015) som i skatteundgåelsesdirektivet (2016).

Domstolen føjede således ikke noget til retsstillingen, som ikke allerede gjaldt i henhold til disse regler - bortset fra den tilbagevirkende kraft. Det er vel derfor også et realistisk bud, at Domstolen foretog praksisændringen, fordi det af forelæggelseskendelsens punkt 57 og 59 fremgik, at parterne var enige om, at de i 2005 og 2006 til rådighed værende nationale misbrugsregler - realitetsgrund-

**1661**

sætningen og princippet om »rette indkomstmodtager« - førte til, at der ikke forelå noget misbrug efter dansk ret. Kun ved at give dommen tilbagevirkende kraft kunne Domstolen således komme Skatteministeriet til undsætning.

Der findes næppe noget nationalt retssystem i den civiliserede verden, der vil acceptere, at en praksisændring kan have 14 års tilbagevirkende kraft.

EU-Domstolen roser da normalt også sig selv af retssikkerhedsprincippet. Det har blot ikke fundet anvendelse i disse sager. Tværtimod.

Der er tale om retsskabende (politisk) virksomhed fra EU-Domstolens side. Domstolen har selv fundet på »det generelle EU-retlige princip om forbud mod misbrug«, bestemmer selv rækkevidden heraf, er den eneste domstol, der kan fortolke princippet og - viser det sig nu - kan give princippet tilbagevirkende kraft efter forgodtbefindende. Den demokratiske proces er kortsluttet. Såvel EU-lovgiver som den danske lovgiver er koblet af processen, og de danske domstole er forpligtede til at eksekvere EU-Domstolens dom, hvis indhold ligger milevidt fra legalitetsprincippet og Grundlovens § 43. Hvis det da ellers står til EU-Domstolen.

Læg hertil, at Domstolen overhovedet ikke har interesseret sig for den danske lovgivning om begrænset skattepligt (SEL § 2, stk. 1, litra c) og forarbejderne til denne bestemmelse. Det er nemlig - efter EU-Domstolens opfattelse -fuldstændigt ligegyldigt, hvordan retsstillingen var i Danmark i 2005 og 2006. De danske domstole skal blot rette ind efter, hvordan EU-Domstolen i dag (efter praksisændringen i 2019) mener, at retsstillingen burde have været i Danmark i 2005 og 2006.

Bortset fra de danske skattemyndigheders opstart af »beneficial owner«-sagerne i 2008 baseret på en praksisændring, der fandt sted i 2008, og som er i strid med

**1662**

forarbejderne til SEL § 2, stk. 1, litra c, er EU-Domstolens afgørelse i disse sager det største overgreb over for de berørte virksomheder, der har fundet sted i hele dette sagskompleks.

Hverken de danske stat eller virksomhederne har haft nogen mulighed for at indrette sig efter det, der af EU-Domstolen i dag hævdes at skulle være gældende EU-ret tilbage i 2005 og 2006.

*8.6.4 De danske domstole er ikke forpligtede til at følge EU-Domstolens pålæg*

Spørgsmålet er herefter, om de danske domstole er forpligtede til at følge EU-Domstolens pålæg om at anvende det omhandlede uskrevne »generelle EU-retlige princip om forbud mod misbrug«.

Dette spørgsmåls besvarelse henhører ikke under EU-Domstolens kompetence, som ellers forudsat af Domstolen i præmis 82 og 83.

Der er derimod tale om et dansk forfatningsretligt spørgsmål om, hvorvidt Danmark har afgivet suverænitet til, at EU-Domstolen kan fastsætte et sådant »generelt EU-retligt princip«, der svæver over og har prioritet forud for alle vedtagne EU-retlige normer, og som skal have direkte virkning for borgerne, og dette spørgsmål kan alene afgøres af de danske domstole.

Spørgsmålet er, om det er i orden, at EU-Domstolen - i strid med direktivets ordlyd - forsøger at kaste en »redningskrans« til de medlemsstater, der ikke måtte have vedtaget (efter Domstolens opfattelse) »tilstrækkelige« nationale anti-misbrugsregler. Det er det naturligvis ikke.

Realiteten er nemlig, at Domstolen herved tiltager sig en kompetence, der tilkommer det danske folketing, og som fuldstændigt forrykker balancen mellem EU-Domstolen og de nationale domstole, og dette sker alene på bekostning af borgere, som efterlades retsløse, fordi de ikke har mulighed for at forudse deres retsstilling.

Samtidig kortslutter EU-Domstolen ved at indføre et sådant »generelt EU-retligt princip« den demokratiske lovgivningsproces i EU.

Det følger af Højesterets dom i U.2017.824H (Ajos-dommen) [...], at et uskrevent generelt EU-retligt princip - i den nævnte sag det generelle EU-retlige ligebehandlingsprincip - ikke er umiddelbart anvendeligt over for en borger, medmindre der er udtrykkelig hjemmel hertil i den danske tiltrædelseslov, hvilket der ikke var.

NetApp Danmark gør gældende, at heller ikke det i nærværende sag omhandlede uskrevne generelle EU-retlige princip om forbud mod misbrug har direkte virkning over for en borger, eftersom der ikke er udtrykkelig hjemmel hertil i den danske tiltrædelseslov.

*8.6.4.1 Generelt om direktiver*

Det fremgår af TEUF artikel 288, stk. 3, at et direktiv er rettet til medlemsstaterne [...]

Det følger heraf, at et direktiv alene kan finde anvendelse over for en dansk borger i den form, som det er implementeret i dansk ret. Borgeren skal altså kunne aflæse sin retsstilling i dansk ret.

Det følger også heraf, at et direktiv ikke kan skabe forpligtelser for borgerne. Justitsministeriet har i en redegørelse af juli 1972 for visse statsretlige spørgsmål udtrykt det således [...]:

»Direktiver og beslutninger rettet til medlemsstaterne vil derfor i det højeste kunne give borgerne umiddelbare rettigheder. De kan aldrig medføre umiddelbare pligter for borgerne.« [...].

EU-Domstolen har i flere domme udtrykt det således, »at retssikkerhedsprincippet er til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgerne, og at de derfor ikke som sådan kan påberåbes af medlemsstaten over for borgerne«, jf. således Kofoeddommen præmis 42 [...] og dommen i nærværende sag præmis 86 [...].

Det samme må så meget desto mere gælde et uskrevet »generelt EU-retligt princip«, som svæver over direktiverne. Når EU-Domstolen har foretaget en semantisk omskrivning af denne problemstilling til, at nægtelsen af en fordel i denne situation blot er »en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel ... alene er opfyldt formelt«, er der tale om et skinargument. Det afgørende for retssikkerhedsvurderingen er, om direktivet har haft mulighed for at kende sin retsstilling, og her er borgeren endnu værre stillet i relation til et uskrevet »generelt EU-retligt princip«.

Det fremgår af TEUF artikel 289, stk. 1, at et direktiv vedtages af Europa-Parlamentet og Rådet i fællesskab på forslag af Kommissionen [...].

Derimod hører det under EU-Domstolens kompetence at fortolke et direktiv, jf. TEUF artikel 267, stk. 1 [...].

*8.6.4.2 Der er ikke tale om en fortolkning af moder-/datterselskabsdirektivet*

Skatteministeriet gør gældende, at Domstolen blot har udnyttet sin kompetence til at fortolke moder-/datterselskabsdirektivet i medfør af TEUF artikel 267.

Heri er NetApp Danmark ikke enig. Domstolen har derimod udviklet et selvstændigt, uskrevent »generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet misbrugt, har direkte traktatne, i en forordning eller i et direktiv ...«, jf. præmis 75 [...].

En konkret anvendelse af princippet beror således ikke på en fortolkning af den relevante retsakt, men alene på principppets eksistens og højere rang, der så at sige går forud for indholdet af retsakten. Det konkrete indhold af moder-/datterselskabsdirektivet har derfor ikke haft nogen som helst betydning for princippets anvendelse. Dette bekræftes også af domskonklusionen (punkt 2), hvoraf det fremgår, at der er »det generelle EU-retlige princip« - og ikke direktivet - der »fortolkes« [...].

**1663**

Når Domstolen har introduceret det generelle EU-retlige princip skyldes det ganske givet, at Domstolen har erkendt, at en fortolkning af direktivet ikke kunne føre til det ønskede resultat. Eller sagt på en anden måde: direktivfortolkningen i Kofoed-sagen var korrekt. For at nå det ønskede resultat har Domstolen derfor måttet ty til et »generelt EU-retligt princip«, der er højere rangerende end direktivet.

På denne måde har Domstolen bevæget sig ind på EU-lovgivers kompetenceområde. Dette er særligt tydeligt i denne sag, hvor EU-lovgiver i 2015 indsatte en generel anti-misbrugsregel i moder-/datterselskabsdirektivet og i 2016 indsatte en tilsvarende generel anti-misbrugsregel (for alle andre områder af EU-retten) i skatteundgåelsesdirektivet. Domstolen har således med sin dom alene tilføjet den tilbagevirkende kraft af disse regler til 2005, hvilket Domstolen åbenbart ikke har fundet var i strid med retssikkerhedsprincippet.

*8.6.4.3 Danmark har ikke overladt suverænitet til EU-Domstolen til at fastsætte et misbrugsprincip med direkte virkning for borgerne - Højesterets dom i Ajos-sagen*

Det hedder i Højesterets præmisser i Ajos-sagen om spørgsmålet om direkte virkning for borgerne bl.a. […]

Som det fremgår, kan et generelt EU-retligt princip kun have direkte virkning for danske borgere, hvis Danmark i tiltrædelsesloven har afgivet suverænitet efter Grundlovens § 20 til, at dette kan ske.

Det gøres gældende, at heller ikke »det generelle EU-retlige princip om forbud mod misbrug« er forudset i tiltrædelsesloven, og at dette princip derfor ikke har direkte virkning over for borgerne. Af samme grund kan Østre Landsret se bort herfra.

Det bemærkes i øvrigt i denne sammenhæng, at Danmark ikke har overladt suverænitet til EU siden tiltrædelsen af Amsterdam-traktaten i 1998.

I øvrigt gøres det gældende, at bevisbyrden for, at Danmark har afgivet suverænitet til EU til at vedtage dette princip med direkte virkning for borgerne påhviler den danske stat.

*8.6.4.4 Der foreligger en »contra legem«-situation*

Skatteministeriet er gældende, at nærværende sag adskiller sig fra Ajos-sagen, fordi der ikke i nærværende sag foreligger en »contra legem«-situation. Ministeriet mener således, at der kan anlægges en fortolkning af SEL § 2, stk. 1, litra c, der er i overensstemmelse med både moder-/datterselskabsdirektivet og det generelle EU-retlige princip om forbud mod misbrug, og synes i den forbindelse at være af den mening, at den simple henvisning i bestemmelsen til, at skattepligten ikke gælder, hvis beskatningen skal frafaldes efter direktivet, betyder, at en hvilken som helst fortolkning af direktivet eller EU-retten herved skal lægges til grund.

NetApp Danmark er ikke enig heri. Der foreligger også i nærværende sag om »contra legem«-situation, og i øvrigt drejer det sig ikke blot om, hvorledes SEL § 2, stk. 1, litra c, skal fortolkes. Temaet er derimod, om en direkte anvendelse af det nævnte princip, vil påføre borgerne forpligtelser, som de efter dansk ret ikke allerede har - altså om borgerne vil blive stillet ringere end efter dansk ret, hvis princippet finder anvendelse. Dette beror ikke blot på en fortolkning af SEL § 2, stk. 1, litra c (under hensyntagen dens forarbejder), men også på rækkevidden af de danske anti-misbrugsregler tilbage i 2005.

Det er nødvendigt at se på direktivet og det EU-retlige princip hver for sig.

Der er ubestrideligt, at Danmark har foretaget en implementering af direktivet, der var (og fortsat er) korrekt, hvilket blev bekræftet af Kofoed-dommen i 2007. Parterne er således enige om, at der i dansk ret findes sådanne regler til imødegåelse af misbrug, som der henvises til i direktivets artikel 1, stk. 2, (nemlig realitetsgrund-

sætningen og princippet om »rette indkomstmodtager«), og at disse regler konkret fører til, at der ikke foreligger et misbrug efter dansk ret, jf. forelæggelseskendelsens punkt 55-59. Det er også en kendsgerning, at det af forarbejderne til SEL § 2, stk. 1, litra c, i 2001 udtrykkeligt fremgår, at lovgiver mente, at disse anti-misbrugsregler var tilstrækkelige, og at etableringen af gennemstrømningsselskaber ikke udgjorde et misbrug.

For så vidt angår det EU-retlige princip, som Domstolen har introduceret, forholder det sig anderledes. Hvis en direkte anvendelse af dette misbrugsprincip over for borgerne med tilbagevirkende kraft til 2005 måtte føre til det resultat, at der - stadig tilbage i 2005 - forelå misbrug, vil der være tale om en »contra legem«-situation, fordi de danske regler og den danske praksis på dette tidspunkt klart førte til, at der ikke forelå misbrug, og heller ikke vil kunne fortolkes anderledes på grundlag af det EU-retlige misbrugsprincip, som er udviklet 14 år efter. I givet fald ville der altså blive indført en forpligtelse for borgerne, der ikke fulgte af dansk ret - en ændring af retstilstanden.

Der foreligger altså også en »contra-legem« situation i forhold til det EU-retlige misbrugsprincip, hvis dets anvendelse måtte føre til, at der foreligger et misbrug. De danske domstole skal derfor blot undlade at lægge dette princip til grund.

Det udgør et selvstændigt forfatningsretligt problem, at dette princip slet ikke gjaldt i 2005. Også af den grund, skal de danske domstole undlade at lægge princippet til grund.

*8.6.4.5 Konklusion*

Som ovenfor nævnt, har Danmark ikke overladt suverænitet til EU-Domstolen til at fastsætte et generelt misbrugsprincip med direkte virkning for borgerne.

Allerede af denne grund skal de danske domstole undlade at lægge dette princip til grund.

**1664**

Samme resultat følger af retssikkerhedsprincippet. Ifølge dette princip skal en dansk borger kunne regne med, at de regler, der gælder for borgeren i henhold til et givent direktiv, fremgår af dansk ret, og ikke af et ukrevent generelt EU-retligt princip, som ikke er en del af dansk ret, og som borgeren ikke har haft mulighed for at indrette sig efter.

Dette gælder så meget desto mere, når det generelle EU-retlige princip strider mod ordlyden af direktivet, og når hverken generaladvokaten, Kommissionen eller EU-lovgiver kendte til eksistensen af dette princip.

En anvendelse af misbrugsprincippet vil også være i strid med legalitetsprincippet i dansk ret og grundlovens § 43.

Niels Fenger og Morten Broberg har i U.2020B.277 kommenteret Ajos-dommen […]

På den anførte baggrund gøres det gældende, at de danske domstole skal bortse fra EU-Domstolens pålæg om at nægte fritagelse efter direktivet, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

*8.7 Der foreligger heller ikke et misbrug efter det af EU-Domstolen skitserede misbrugsbegreb*

For det tilfælde, at Østre Landsret måtte fastslå, at det generelle EU-retlige princip om forbud mod misbrug har direkte virkning over for borgerne og derfor finder anvendelse i nærværende sag, gøres det gældende, at der ikke foreligger noget misbrug efter dette princip under de i nærværende sag konkret foreliggende omstændigheder.

Da de øvrige betingelser i moder-/datterselskabsdirektivet er opfyldt, har NetApp Cypern derfor krav på fritagelse efter direktivet, og der foreligger - også af denne grund - ikke begrænset skattepligt til Danmark af de omhandlede udbytter.

Det bemærkes, at det er sagsøger, Skatteministeriet, der har bevisbyrden for, at der i nærværende sag foreligger et misbrug af direktivet i henhold til det af EU-Domstolen opstillede generelle EU-retlige anti-misbrugsprincip.

NetApp Danmark gør gældende, at Skatteministeriet ikke har løftet - og heller ikke kan løfte - denne bevisbyrde.

Det af EU-Domstolen opstillede generelle EU-retlige anti-misbrugsprincip er defineret nærmere i dommens præmisser 97 og 98 […]

Det generelle misbrugsbegreb går altså ud på, at EU-retten ikke kan påberåbes i de tilfælde, hvor der er tale om et rent kunstigt arrangement, der ikke bygger på en økonomisk realitet, og hvis formål er at opnå utilsigtede skattemæssige fordele.

Dette generelle misbrugsbegreb svarer til den danske realitetsgrundsætning, hvorefter tomme og kunstige, skattebetingede dispositioner kan tilsidesættes og erstattes med realiteten, jf. foreslæggelseskendelsen punkt 56 […].

Det er derfor ikke troværdigt, når Skatteministeriet, der anerkender, at der ikke foreligger et misbrug efter den danske realitetsgrundsætning, jf. foreslæggelseskendelsens punkt 57 […], påberåber sig, at der foreligger et misbrug efter EU-rettens generelle misbrugsbegreb.

Som det fremgår ovenfor i afsnit 8.4.1.3, har Skatteministeriet - efter EU-Domstolens dom - fremsat et nyt anbringende om, at der i dansk ret findes almindelige principper til imødegåelse af misbrug uden for realitetsgrundsætningen. NetApp Danmark har i samme afsnit tilbagevist dette nye anbringende.

Som EU-Domstolen også anfører i præmis 99 […], tilkommer det ikke Domstolen at vurdere de faktiske omstændigheder i hovedsagerne - det tilkommer den nationale domstol, her Østre Landsret - men Domstolen har dog valgt at give en vis vejledning i form af en række faktorer, der vil kunne pege i retning af, at der foreligger et misbrug efter princippet, se således præmisserne 100-106 […].

Det er imidlertid i denne forbindelse væsentligt at gøre sig klart, at EU-Domstolen herved har udtalt sig helt generelt, dvs. uden at inddrage de subjektive forhold, der måtte foreligge i de konkrete situationer. Det er således op til de nationale domstole at foretage den endelige vurdering i lyset af de subjektive og nationale særlige omstændigheder, der måtte foreligge.

Og dette er helt afgørende i nærværende sag, når landsretten skal foretage sin bedømmelse af, om der foreligger et misbrug af direktivet.

NetApp Danmark gør således gældende, at der under hensyntagen til de helt særlige omstændigheder i nærværende sag ikke kan foreligge et misbrug. Betingelsen om, at hovedformålet med transaktionerne er at opnå en uretmæssig fordel er således ikke opfyldt i nærværende sag.

For det første har - som det er fremgået ovenfor, herunder i […] 7.8 - hele formålet med strukturen og med de omhandlede udbytteudlodninger stedse været, at midlerne skulle ende hos det øverste moderselskab, NetApp USA, som led i den amerikanske midlertidige beskatningsordning under American Jobs Creation Act. Dette skete således også, idet NetApp USA's datterselskab, NetApp Bermuda, udloddede sin samlede udbyttekapacitet, i alt USD 550 millioner, til NetApp USA. De to udbytter hidrørende fra NetApp Danmark indgik i udbyttet til USA. Sigtet var således, at alle midler skulle ende i USA og beskattes dér, hvilket rent faktisk også skete. Det har således navnlig ikke været meningen, at nogen del af udbyttet skulle aflejres i NetApp Bermuda, hvilket altså heller ikke skete.

Bl.a. af den grund gør NetApp Danmark også gældende, at NetApp USA subsidiært må anses som den

»retmæssige ejer« af udbytterne, såfremt NetApp Cypern ikke anses som sådan, jf. ovenfor i afsnit 7.8.

Såfremt der havde været nogen som helst grund til at tro, at Danmark ville opkræve kildeskat af de omhandlede udbytter ved den valgte konstruktion, bl.a. ved at nægte direktivbeskyttelse - hvad der altså ikke var grund til, bl.a. da der var indhentet uforbeholden skatterådgivning herom - så kunne koncernen som en fuldgod alternativ løsning have valgt at lade NetApp Bermuda sælge aktierne i NetApp Danmark direkte til NetApp USA (i stedet for til det nystiftede NetApp Cypern), hvorefter udbytterne (i så fald fra Danmark til USA) uden videre havde været fritaget for kildeskat efter SEL § 2, stk. 1, litra c.

Foranlediget af spørgsmål 5 til EU-Domstolen i nærværende sag, har Domstolen i sin dom udtalt [i præmisserne 107-110] […]

Niels Winther-Sørensen har i sin kommentar til dommen i SR.2019.174 (…) bemærket følgende herom […]:

»Læst i sammenhæng med den efterfølgende sætning i Udbyttedommens præmis 110 … må man dog formentligt forstå Domstolens ræsonnement således, at man normalt ikke vil kunne statuere retsmisbrug og derved nægte fordelen efter moder-/datterselskabsdirektivet eller rente/royaltydirektivet, hvis en direkte betaling fra det danske selskab til det pågældende selskab (som forudsættes at være den retmæssige ejer af betalingen) ville have været skattefri.«

Hertil kommer for det andet - og hvad der er lige så vigtigt - hele forhistorien omkring den danske implementering og fortolkning af direktivet, således som den er beskrevet ovenfor i afsnit 1 og 2, og den uforbeholdne stillingtagen til skattefrihed ved udlodning af udbytte til et cypriotisk mellemholdingselskab. Når den danske lovgiver og skattemyndighederne fortolker et direktiv på den måde, at der - hvis de øvrige betingelser er opfyldt - er et ubetinget krav på fritagelse for kildeskat, hvis udbyttemodtageren er »rette indkomstmodtager« af udbyttet, så kan der naturligvis ikke være tale om et misbrug af direktivet, når skattemyndighederne efterfølgende ændrer sin opfattelse. Og i dette tilfælde har skatteministeren endda selv direkte anvist »konstruktionen« med et cypriotisk mellemholdingselskab for at undgå dansk kildeskat.

Under disse omstændigheder giver det selvsagt ikke mening at tale om, at hovedformålet med transaktionerne har været at opnå en uretmæssig fordel.

Sammenfaldet af disse to ganske særlige forhold gør det åbenbart, at der ikke foreligger et misbrug i nærværende sag.

Som det vil fremgå nedenfor af afsnit 9 og 10 umiddelbart nedenfor, indgår de netop beskrevne omstændigheder også som vægtige argumenter til støtte for NetApp Danmarks anbringender om, at der foreligger en (ulovlig) praksisændring med tilbagevirkende kraft, og at NetApp Danmark ikke kan have handlet forsømmeligt ved ikke at indeholde kildeskat.

9 SKATS AFGØRELSER ER UDTRYK FOR EN SKÆRPENDE (ULOVLIG) PRAKSISÆNDRING MED TILBAGEVIRKENDE KRAFT

For det tilfælde, at Skatteministeriet måtte få medhold i, at der foreligger begrænset skattepligt efter SEL § 2, stk. 1, litra c, af de omhandlede udbytter, gør NetApp Danmark til støtte for frifindelsespåstanden subsidiært gældende, at SKATs afgørelse (og de synspunkter, der efterfølgende er blevet gjort gældende af skattemyndighederne) er udtryk for en skærpelse af praksis med tilbagevirkende kraft, og at en sådan praksisskærpelse ikke lovligt kan gennemføres. En praksisskærpelse kan således alene ske med fremadrettet virkning og med et passende varsel, for så vidt angår de nye synspunkter, som SKAT vil anse for afgørende for denne nye praksis, jf. således f.eks. U.1983.8 H […].

Den juridiske vejledning 2010-2 er i overensstemmelse hermed […]:

»Varsling af ændring med fremtidig virkning

Det er et grundlæggende forvaltningsretligt princip, at det kun er muligt at iværksætte en skærpende praksisændring med virkning for fremtiden og efter udmelding af et passende varsel, der giver borgerne mulighed for at indrette sig efter den ændrede retstilstand.

…

En praksisskærpelse skal offentliggøres på relevant måde, fx i form af en SKM-meddelelse (styresignal) eller ved særlig nyhedsmarkering i de juridiske vejledninger.«

En meddelelse om praksisskærpelse skal - såvel i form som indhold - udtrykkeligt angive, at der er tale om en skærpelse af praksis, og hvad den nye praksis går ud på.«

NTC

Da SKAT ikke har varslet praksisskærpelsen, har SKAT ikke været berettiget til at opkræve udbytteskat.

NetApp Danmark gør gældende, at der foreligger en praksisskærpelse såvel i relation til dobbeltbeskatningsoverenskomsten som i relation til moder-/datterselskabsdirektivet. Disse spørgsmål behandles hver for sig nedenfor.

Hvis NetApp Danmark får medhold vedrørende blot et af disse spørgsmål, skal NetApp Danmark have fuldt medhold i frifindelsespåstanden.

*9.1 Praksisskærpelse i relation til dobbeltbeskatningsoverenskomsten*

…[Det] fremgår […] utvetydigt af forarbejderne til SEL § 2, stk. 1, litra c, fra 2001, at der over et dansk datterselskab kan indskydes et (cypriotisk) mellemholdingselskab, hvorigennem udbyttet viderekanaliseres, med den virkning, at den udbytteskat, der ellers ville blive udløst, undgås. Mellemholdingselskabet er altså »retmæssig ejer«. Det fremgår klart, at der er tale om reel

**1666**

gennemstrømningsselskaber, og skatteministerens svar indeholder ikke forbehold af nogen art. Der var altså på daværende tidspunkt fri adgang til »treaty shopping«. Så længe mellemholdingselskabet var civilretlig ejer af aktierne i datterselskabet - og dermed ikke var agent eller stråmand, eller der forelå pro forma - var mellemholdingselskabet »retmæssig ejer«. Der var ikke tale om et dansk særstandpunkt. Dette var den globale opfattelse.

Skatteministeriet har gjort gældende, at lovteksten blev ændret under udvalgsbehandlingen, og at de nævnte forarbejder ikke drejer sig om den endelige ordlyd. […] [D]ette beror på en misforståelse fra ministeriets side.

Landsretten kan således lægge til grund, at forarbejderne fra 2001 har det her nævnte indhold.

NetApp disponerede i 2005 i tillid til disse forarbejder ved at etablere et cypriotisk mellemholdingselskab og foretage udlodning hertil.

Forarbejderne var baseret på en internretlig fortolkning af begrebet »retmæssig ejer«, dvs. en fortolkning hvor »retmæssig ejer« fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« i dansk ret. […] [L]ovgiver og skattemyndigheder [har] ubrudt […] fastholdt den internretlige fortolkning i perioden 1977-2008, hvilket fremgår af et stort antal udsagn navnlig fra Skatteministeriet.

[…] Skatteministeriet [måtte] - efter at »beneficial owner«-sagerne var startet op i 2008 - erkende, at et udbyttemodtagende mellemholdingselskab klart måtte anses for »rette indkomstmodtager« efter dansk skatteret, og den hidtil påberåbte fortolkning af »retmæssig ejer« derfor ikke kunne føre til det ønskede resultat (udbyttebeskatning).

Skatteministeriet ændrede derfor praksis og gik i stedet over til en autonom (internationalretlig) fortolkning af »retmæssig ejer«, hvor der nu ikke længere er lighedstegn mellem »retmæssig ejer«

og »rette indkomstmodtager«. Det er tværtimod to vidt forskellige begreber, der ikke har noget som helst med hinanden at gøre.

Med den nye autonome fortolkning af »retmæssig ejer« har Skatteministeriet -under henvisning til kommentarerne til modeloverenskomsten fra 2003 vedrørende »gennemstrømningsselskaber« - introduceret en meget bred fortolkning af begrebet »gennemstrømningsselskab«, der rammer ethvert ganske almindeligt mellemholdingselskab, hvilket står i skærende kontrast til den tidligere praksis.

Det er således en kendsgerning, at skattemyndighedernes nye praksis er i direkte strid med de udtrykkelige forarbejder til denne bestemmelse fra 2001, hvoraf det udtrykkeligt fremgår, at et cypriotisk mellemholdingselskab, der alene etableres for at viderekanalisere udbytter til sit moderselskab, er »retmæssig ejer« af udbytterne og derfor nyder beskyttelse efter overenskomsten.

Den nye praksis er således også i strid med SKATs egen tidligere fortolkning af »retmæssig ejer«, som først blev forladt i 2008, da de første udbytte-»owner«-sager blev rejst.

Der er dermed tale om en betydelig skærpelse af praksis vedrørende fortolkningen af »retmæssig ejer«, der fører til det stik modsatte resultat af det, der er forudsat i forarbejderne fra 2001, selv om lovgrundlaget er uændret.

Skatteministeriet bestrider, at der foreligger en praksisskærpelse, og gør til støtte herfor gældende, at der ikke har foreligget en fast administrativ praksis, fordi der ikke findes retsafgørelser, der dokumenterer den hidtidige praksis.

Når der - som i forarbejderne til SEL § 2, stk. 1, litra c, fra 2001 - foreligger en udtrykkelig udtalelse fra Skatteministeren om, hvorledes retsstillingen er, og når skattemyndighederne efterfølgende administrerer i overensstemmelse hermed, er det imidlertid fuldgod dokumentation for en fast praksis, som skatteyderne kan indrette sig i tillid til.

Når Skatteministerens udtalelse går ud på, at mellemholdingselskaber skal anses som »retmæssige ejere« (og »rette indkomstmodtagere«), er det klart, at der ikke findes retsafgørelser, der dokumenterer denne praksis. SKAT er jo enig med skatteyderne i, at der ikke skal indeholdes udbytteskat, og SKAT har derfor ikke haft nogen anledning til at rejse sager herom. Sådan har det været i 30 år.

Skatteministeriet gør videre gældende, at en eventuel (fejlagtig) manglende ligningsmæssig indgriben og korrektion ikke kan konstituere praksis og ikke kan skabe nogen for SKAT bindende administrativ praksis om ikke at pålægge kildeskat af udbytter.

Sagsøgte er naturligvis enig i dette generelle udsagn. Pointen er imidlertid, at den omstændighed, at der ikke tidligere er rejst sager herom, ikke beror på en ufuldstændig kontrol fra SKATs side, men derimod på en opfattelse af, at der ikke var grundlag for at føre disse sager.

Skatteministerens stillingtagen i forarbejderne til den konkrete problemstilling er dermed nøjagtig lige så god en dokumentation for retsstillingen, som en retsafgørelse ville have været, og det giver sig selv, at SKAT har fulgt skatteministerens udmelding.

I øvrigt er det barokt at drøfte, om SKAT har ændret praksis, når alle ved, at det er tilfældet. Dette er da også bekræftet i Jyllandsposten den 14. september 2010 af den embedsmand, som på daværende tidspunkt var talsmand for SKAT i »beneficial owner«-sagerne […]:

»Om vi så får medhold, ved vi ikke. Vores synspunkt er ret nyt i skattepraksis, så vi må se, hvad Højesteret siger, når den kommer til at tage stilling engang.« […].

Praksisændringen bekræftes også af den omstændighed, at mens SKAT i perioden 1977-2008, hvor SKAT

**1667**

benyttede den internretlige fortolkning af »retmæssig ejer«, ikke har rejst en eneste sag om nægtelse af overenskomstlempelse med den begrundelse, at modtageren ikke var »retmæssig ejer«, mens SKAT - efter at have skiftet til den autonome fortolkning i 2008 - på en gang har rejst et meget stort antal sager. Der er således i dette sagskompleks truffet afgørelse i 150 sager med krav om betaling af kildeskat på godt 6,8 mia. kr.

På den anførte baggrund gøres det således gældende, at der foreligger en skærpelse af en fast administrativ praksis, som burde have været varslet, og denne ændrede praksis derfor ikke kan finde anvendelse i nærværende sag.

*9.2 Praksisskærpelse i relation til moder-/datterselskabsdirektivet*

Som det fremgår af afsnit 8.6 ovenfor, kom EU-Domstolen i sin dom af 26. februar 2019 i nærværende sag […] - højst overraskende - til det resultat, at imødegåelse af misbrug af moder-/datterselskabsdirektivet ikke kræver national hjemmel.

Domstolen støtter sit resultat på, at der skulle gælde et uskrevet »generelt EU-retligt princip om forbud mod misbrug«, der har direkte virkning for borgerne.

Dette »generelle EU-retlige princip« er frit i luften svævende, har en højere retskildeværdi end selv traktaterne og kræver ikke forankring i national ret. En konkret anvendelse af princippet beror således ikke på en fortolkning af den relevante retsakt, men alene på princippets eksistens og højere rang, der så at sige går forud for indholdet af retsakten.

Ifølge dommen er de nationale myndigheder og domstole i nærværende sag forpligtede til at anvende dette princip, og EU-Domstolen giver også anvisninger på, hvilket misbrugsbegreb myndighederne skal anvende.

Det hedder således i domskonklusionen […]:

»Det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i Rådets direktiv 90/435/EØF af 23. juli 1990 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, som ændret ved Rådets direktiv 2003/123/EF af 22. december 2003, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.« […].

Når dommen var så overraskende skyldes det bl.a., at kravet om national lovhjemmel fremgår direkte af moder-/datterdirektivets artikel 1, stk. 2, og at EU-Domstolen i Kofoed-dommen (C321/05) af 5. juli 2007 havde fastholdt, at den tilsvarende bestemmelse i fusionsskattedirektivet stillede krav om national hjemmel. EU-Domstolen afviste således - i overensstemmelse med generaladvokatens forslag - at der fandtes et sådant generelt EU-retligt princip på området for de direkte skatter.

Det er altså en kendsgerning, at EU-Domstolen med sin afgørelse af 26. februar 2019 har underkendt Kofoed-dommen og dermed ændret praksis med tilbagevirkende kraft.

Landsskatteretten, der i sin kendelse af 16. december 2011 […] har givet NetApp medhold i, at NetApp Cypern har krav på fritagelse for udbytteskat efter moder-/datterselskabsdirektivet, har naturligvis lagt Kofoed-dommen til grund.

Det er ovenfor i afsnit 8.6.3 dokumenteret, at hverken Kommissionen, EU-lovgiver (Rådet og Parlamentet) eller generaladvokaten vidste, at der gjaldt et generelt EU-retligt princip med det nævnte indhold. Samme sted er det påvist, at både den danske og den internationale litteratur har været overrasket og kritisk over for dommen.

På tidspunktet for afsigelsen af dommen i 2019 havde EU-lovgiver for længst indført de af EU ønskede obligatoriske generelle anti-misbrugsregler såvel i moder-/datterselskabsdirektivet (2015) som i skatteundgåelsesdirektivet (2016). EU-Domstolen føjede således med det generelle EU-retlige princip om forbud mod misbrug ikke noget til retstilstanden, som ikke allerede gjaldt i henhold til disse anti-misbrugsregler - bortset fra den tilbagevirkende kraft til 2005 (altså til et tidspunkt, hvor princippet notorisk ikke gjaldt, jf. Kofoed-dommen).

Der findes næppe noget nationalt retssystem i den civiliserede verden, der vil acceptere, at en praksisændring kan have 14 års tilbagevirkende kraft.

NetApp Danmark gør i sagen gældende, at det nævnte princip ikke har direkte virkning for borgerne, eftersom EU-Domstolen ikke har kompetence til at træffe denne afgørelse, da Danmark ikke har afgivet suverænitet hertil. Der henvises til afsnit 8.6.4, hvor der detaljeret er redegjort dette synspunkt.

Som det fremgår af afsnit 8.6.4.4, vil der være tale om en »contra legem«-situation, hvis en direkte anvendelse af dette misbrugsprincip over for borgerne med tilbagevirkende kraft til 2005 måtte føre til det resultat, at der - stadig tilbage i 2005 - forelå misbrug, fordi de danske regler og den danske praksis på dette tidspunkt klart førte til, at der ikke forelå misbrug, og heller ikke vil kunne fortolkes anderledes på grundlag af det EU-retlige misbrugsprincip, som er udviklet 14 år efter. I givet fald ville der altså blive indført en forpligtelse for borgerne, der ikke følge af dansk ret, og som ville medføre en ændring af retstilstanden.

NetApp gør derfor gældende, at de danske domstole skal undlade at lægge dette princip til grund.

For det tilfælde, at NetApp ikke måtte få medhold i, at det generelle EU-retlige princip ikke har direkte

**1668**

virkning for borgerne, således at princippet principielt kan finde anvendelse i dansk ret, gøres det gældende, at princippet efter dansk forvaltningsret ikke kan finde anvendelse med fremtidig virkning.

Princippet kan således ikke finde anvendelse i nærværende sag, der drejer sig om 2005 og 2006, fordi det ville være udtryk for en betydelig praksisskærpelse med tilbagevirkende kraft.

Det er således i afsnit 2 ovenfor dokumenteret, at den danske administrative praksis tilbage i 2005 og 2006 ikke baserede sig på, at der gjaldt et generelt EU-retligt princip om forbud mod misbrug, der havde direkte virkning over for borgerne. Tværtimod, var det den almindelige opfattelse både i Danmark og i EU på daværende tidspunkt, at der frit kunne foretages treaty- og direktivshopping. At princippet ikke engang gjaldt i EU, dokumenteres af, at Kofoed-dommen i 2007 kom til det resultat, at imødegåelse af misbrug krævede national lovhjemmel.

Blot for den gode ordens skyld bemærkes, at anvendelse af et direktiv i en medlemsstat altid er udtryk for anvendelse af national ret. Dette gælder, hvad enten der er tale om anvendelse af medlemsstatens egen lovgivning eller almindelige retsgrundsætninger udviklet af medlemsstatens domstole, eller om der - som i nærværende sag - er tale om, at EU-Domstolen har fastsat et princip med direkte virkning for borgerne, hvis dette ellers måtte blive godkendt af medlemsstatens domstole. Derfor er det også medlemsstatens processuelle og forvaltningsretlige regler, der skal benyttes ved retsanvendelsen.

Da en anvendelse af det generelle EU-retlige forbud mod misbrug under de nævnte forudsætninger vil være udtryk for en praksisskærpelse med tilbagevirkende kraft, kan dette princip således ikke lægges til grund for afgørelsen af sagen.

*9.3 Nærmere om retspraksis*

U.2023.1575H

Som nævnt har der ikke siden 1983 været tvivl om eksistensen af det forvaltningsretlige princip, hvorefter skattemyndighederne er afskåret fra at ændre deres praksis i skærpende retning med tilbagevirkende kraft, jf. U.1983.8 H […] og Den juridiske vejledning […], som er citeret ovenfor.

Landsrettens dom i U.2012.2337 H […] er et skoleeksempel på, hvilke minimumskrav der må stilles til skattemyndighederne for, at en skærpende praksisændring kan få virkning for borgerne. Østre Landsret tiltrådte i sagen, at de danske skattemyndigheder var berettigede til at ændre praksis i forbindelse med arbejdsudleje til Danmark af hollandske slagtere, eftersom arbejdsudlejebegrebet skulle fortolkes efter intern dansk ret. Praksisændringen blev offentliggjort den 5. maj 1997 i Tidsskrift for Skatteret og blev også i maj 1997 omtalt i Skat Udland. Den blev endvidere offentliggjort i Retsinformation den 25. september 1997. Landsretten fandt, at praksisændringen først ved offentliggørelsen i Retsinformation måtte anses for offentliggjort på en sådan måde, at den kunne tillægges retsvirkning over for virksomheder, der som sagsøgeren havde anvendt arbejdsudlejet arbejdskraft. Landsretten fandt dog, at der burde indrømmes virksomheden et vist kortere varsel til at iværksætte indeholdelse af A-skat, hvorfor sagsøger først fra og med den 1. november 1997 blev anset for ansvarlig for den manglende afregning af A-skat. For Højesteret bestred Skatteministeriet ikke, at praksisændringen først kunne få virkning fra den 1. november 1997.

Størstedelen af retspraksis efter Højesterets dom i U.1983.8 H […] handler navnlig om beviset for, hvad skattemyndighedernes praksis så rent faktisk gik ud på. Denne konkrete bevisvurdering afgøres selvsagt efter de faktiske omstændigheder fra sag til sag. I nærværende sag er beviset i form af skatteministerens egne redegørelser til Folketinget overvældende.

U.2000.1509 H […] er således en bevissag, der ikke er præjudicerende for nærværende sag. Højesteret fandt det ikke bevist, at der forelå den hævdede praksis. Højesteret fremhæver tværtimod i sine præmisser […], at den bestridte fortolkning fremgik af forarbejder og administrative retningslinjer inden de omtvistede indkomstår. I nærværende sag er det evident, at skattemyndighederne først har tilrettet beskrivelsen af administrativ praksis i overensstemmelse med den opfattelse, som man nu gør gældende, efter at skattemyndighederne i 2008 indledte den kontrolaktion, som har ført til bl.a. denne sag mod NetApp Danmark.

I U.2011.3305 H […] er det ærligt talt svært at se, hvad der udgjorde skatteydernes påståede bevis for modgående praksis. Heller ikke landsretten eller Højesteret kunne se det.

I U.2015.915 H […], U.2017.2960 H […] og U.2017.2979 H […] forsøgte skatteyderne at føre beviset for praksis ved at henvise til lang tids ikke-indgriben fra skattemyndighedernes side, hvilket Højesteret ikke godtog. Det er ikke NetApp Danmarks synspunkt, at beviset for skattemyndighedernes praksis udgøres af lang tids ikke-indgriben. Noget andet er, at når skatteministeren overfor Folketinget redegør for en praksis og gør, hvordan en lovbestemmelse skal forstås, så følger skattemyndighederne naturligvis ministerens udmelding. Det ville da være besynderligt, hvis der forelå datidige afgørelser, som viste, at skattemyndighederne reelt havde en anden praksis, end den som fremgik af skatteministerens redegørelse. I NetApp Danmarks sag er der imidlertid Skatteministeriet, som hævder, at skattemyndighedernes praksis i tiden indtil 2008 var en anden, end skatteministeren havde fortalt Folketinget i 2001.

**1669**

I U.2020.1923 H bestod det angivelige bevis navnlig i et antal ikke offentliggjorte afgørelser fra underordnede ligningsmyndigheder, som støttede skatteyderens synspunkt. Højesteret henviste til, at afgørelserne var i strid med klare udtalelser i forarbejderne, og

at de ikke offentliggjorte afgørelser ikke udgjorde en bindende administrativ praksis. Sagen er derfor ikke sammenlignelig med NetApp Danmarks situation.

Noget helt andet er, at skattemyndighederne i nærværende sag slet ikke er berettiget til at foretage en praksisskærpelse.

Den af sagsøger hævdede retstilstand, der strider mod de udtrykkelige forarbejder til SEL § 2, stk. 1, litra c, kan således kun tilvejebringes ad lovgivningsvejen.

## 10 NETAPP DANMARK HÆFTER IKKE FOR EN EVENTUEL UDBYTTESKAT - KILDESKATTELOVENS § 69

### 10.1 Regelgrundlaget og indledende bemærkninger

For det tilfælde, at der måtte gives sagsøger medhold i, at de omhandlede udbytter er undergivet begrænset skattepligt til Danmark, gøres det - mest subsidiært - gældende, at NetApp Danmark ikke hæfter for den ikke indeholdte kildeskat.

Spørgsmålet om, hvorvidt kildeskatten kan opkræves hos NetApp Danmark, beror på bestemmelsen i kildeskattelovens § 69, der er sålydende […]:

»§ 69. Den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, er over for det offentlige umiddelbart ansvarlig for betaling af manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i denne lov.« […].

Det hedder endvidere i SKATs Vejledning om indeholdelse af A-skat og AM-bidrag 2005-1 […]:

»Uanset at bestemmelserne har omvendt bevisbyrde, har det i retspraksis vist sig, at det er told- og skatteforvaltningen, der skal bevise, at den indeholdelsespligtige har handlet forsømmeligt.«

Allerede fordi sagsøgtes forståelse af de relevante regler er i overensstemmelse med den administrative praksis, som skattemyndighederne ubrudt har fulgt gennem årene, herunder at såvel Landsskatterettens fagkontor (…) som Landsskatteretten […] har givet NetApp Danmark medhold i, at der ikke er indeholdelsespligt, er det åbenbart, at NetApp Danmark ikke har udvist »forsømmelighed«.

Jakob Bundgaard er i SU 2010.387 […] på linje hermed.

### 10.2 Nærmere om betingelserne for indeholdelsespligt efter Kildeskattelovens § 69

Kildeskattelovens § 69 gælder ikke kun hæftelse for udbyttekildeskat, men også hæftelse for ikke-indeholdt A-skat, arbejdsudlejeskat m.v. Der kan derfor henses til retspraksis om manglende indeholdelse af andre skatter end udbyttekildeskat, når det skal bedømmes, hvad der forstås ved hæftelsespådragende forsømmelighed.

Det fremgår af bl.a. UfR 1977.844 H (ikke-hæftelse …), SKM2002.470.ØLR Ø (ikke-hæftelse …) og UfR 2018.3119 H (hæftelse …), at også vildfarelse om den korrekte retlige fortolkning og subsumption kan fritage for hæftelsesansvar. Der er heller ikke noget i ordlyden af bestemmelsen, som antyder, at det kun er ukendskab til de relevante faktiske forhold, som er af betydning.

Højesteret vurderede i UfR 1977.844 H, at den potentielt indeholdelsespligtige havde haft »en sådan føje« til at kunne gå ud fra, at der ikke var indeholdelsespligt, at der ikke var handlet forsømmeligt. Landsretten brugte i SKM2002.470.ØLR det udtryk, at det relevante cirkulære i den pågældende situation ikke førte til »et entydigt resultat« og grifandt skatteyderen for hæftelse. Hvis den potentielt indeholdelsespligtiges standpunkt derfor har været udtryk for en rimeligt begrundet forståelse af retsgrundlaget og en rimeligt begrundet subsumption, vil der derfor ikke være handlet forsømmeligt - heller ikke selvom det til syvende og sidst viser sig, at den potentielt indeholdelsespligtiges standpunkt ikke var holdbart.

I UfR 2018.3119 H afhang spørgsmålet om skattepligt af, om rette indkomstmodtager af udbyttet var en hollandsk fond eller fondens stifter, som var bosat i Storbritannien. Højesteret fastslog

i præmisserne […], at der forelå hæftelse og henviste bl.a. til, at det fremgik af Ligningsvejledningen forud for vedtagelsen af udbyttet, at udenlandske fonde ikke var rette indkomstmodtagere, hvis fonden ikke opfyldte de danske betingelser for at anse en fond for et i forhold til stifteren uafhængigt retssubjekt.

Sagsøgtes forståelse af retsgrundlaget må derfor - selvfølgelig - bedømmes efter de tilgængelige retskilder på udlodningstidspunktet. Det var jo, hvad sagsøgte og dets rådgivere havde at gå ud fra.

Så vidt ses, er der ikke faktuelle uenigheder af betydning for forsømmelighedsbedømmelsen. Uenigheden går på, om det sagsøgte selskab handlede forsømmeligt ved på udlodningstidspunkterne ikke at indse, at udbytterne var skattepligtige (hvis de altså viser sig at være det), uanset at udbytterne blev oppebåret af NetApp Cypern, der ubestridt var rette indkomstmodtager. (U.2016.2898H - RF Holding […] handlede om en situation, hvor Højesteret lagde til grund, at de udloddede midler blev ledt uden om rette indkomstmodtager, hvilket indlysende var forsømmeligt. Denne sag er derfor uden betydning for forsømmelighedsspørgsmålet i nærværende sag).

Ved forsømmelighedsvurderingen kan det være nyttigt at erindre om, at sagerne er opstået som følge af en koordineret aktion fra skattemyndighedernes side, hvor man har rejst i første omgang 31 sager, senere i alt 150

### 1670

sager om hæftelse for ikke-indeholdt udbytteskat som en del af »Skattestyrelsens Kapitalfonds- og kildeskatteprojekt«, jf. Skatteministeriets svar til Folketingets Skatteudvalg af 28. oktober 2019 […], selvom der ikke tidligere havde været danske sager overhovedet om pligt til indeholdelse af udbytteskat under henvisning til, at det modtagende selskab var et gennemstrømningsselskab.

Som tidligere nævnt, udtalte den ansvarlige kontorchef i Skattestyrelsen - påskønnelsesværdigt ærligt - i 2010 om det kommende opgør ved domstolene […]:

»Om vi i så får medhold, ved vi ikke. Vores synspunkt er ret nyt i skattepraksis, så vi må se, hvad Højesteret siger, når den kommer til at tage stilling engang.«

Baggrunden er således utvivlsomt, at Skattestyrelsen med iværksættelsen af dette sagskompleks har søgt at pløje ny jord. Man havde ikke fundet det fornødent forinden at varsle de potentielt indeholdelsespligtige om aktionen og de nye synspunkter, som skattemyndighederne ønskede at afprøve.

*10.3 NetApp Danmark har ikke handlet forsømmeligt ved udbytteudlodningerne i 2005 og 2006* Bl.a. henset til,

*at* sagsøgtes forståelse af de relevante regler er i overensstemmelse med den administrative praksis, som skattemyndighederne udbrudt har fulgt gennem årene, […] herunder at den konkrete situation er identisk med skatteministerens anvisning i sit svar på spørgsmål 16 til Folketingets Skatteudvalg under behandlingen af L 99/2000 (genindførelsen af udbyttebeskatningen for moderselskaber - […]),

*at* det følger direkte af ordlyden af moder-/datterselskabsdirektivet […], at udbyttet er fritaget for kildeskat, herunder at direktivet ikke stiller krav om, at moderselskabet skal være »retmæssig ejer«,

*at* dansk litteratur er på linje med skattemyndighedernes tidligere praksis,

*at* der på internationalt plan er stor usikkerhed om, hvorledes begrebet »beneficial owner« skal fortolkes, jf. bl.a. OECD's forslag til kommentarer fra foråret 2011 […], hvor det af høringssvarene […] fremgår, at end ikke forslaget til de nye (præciserende) kommentarer bidrager til at mindske den usikkerhed, der hersker om fortolkningen, og

*at* NetApp-koncernen forinden transaktionerne indhentede rådgivning hos et førende skatterådgivningsfirma, PwC, der anviste den pågældende løsning med etableringen af et cypriotisk mellem-

holdingselskab uden at tage forbehold om nogen risiko for kildeskat i forbindelse med de påtænkte udbytteudlodninger, er det klart, at NetApp Danmark ikke har udvist »forsømmelighed«.

Dette bliver imidlertid, som nævnt, helt åbenbart, når der endvidere henses til, at såvel Landsskatterettens fagkontor […] som Landsskatteretten […] har givet NetApp Danmark medhold i, at der ikke er indeholdelsespligt. Landsskatterettens EU-retlige fortolkning, der bar det for sagsøgte positive resultat, blev endvidere støttet af EU-Domstolens generaladvokat, […].

At EU-domstolen ved en - efter de fleste kommentatorers opfattelse - højst overraskende og problematisk dom mere end 13 år efter udbytteudlodningen i nærværende sag har fraveget sin faste praksis om, at direktivbestemmelser ikke har virkning for borgerne, hvis de ikke er implementeret i national ret, jf. også Kofoed-dommen […], ændrer ikke ved svaret på spørgsmålet om, hvorvidt der foreligger forsømmelighed.

Sagen er således, at de retskilder, som var tilgængelige på udlodningstidspunktet, entydigt taler for, at udlodningen var skattefri.

Sagsøger gør vist nok gældende, at sagsøgte burde have foretaget nærmere undersøgelser med henblik på at afklare, om betingelserne for manglende indeholdelse var opfyldt - eller i hvert fald at det ikke er godtgjort, at der er foretaget sådanne undersøgelser.

Sådanne undersøgelser er naturligvis foretaget, som også nævnt, og de førte til - og gav i denne henseende et klart resultat end - at der ikke skulle indeholdes udbytteskat. Den skatteansvarlige for NetApp Danmarks europæiske aktiviteter fik bekræftet hos hollandske og danske rådgivere, at en af de utvivlsomt lovlige måder at undgå den danske udbytteskat var at oprette et cypriotisk mellemholdingselskab. Da det netop var den metode, som Skatteministeriet selv havde anvist over for Folketinget, var holdbarheden af den valgte ordning så åbenbar, at hverken NetApp eller rådgiverne fandt anledning til at udfærdige skriftlige redegørelser.

Da de udlodningsparate midler under alle omstændigheder skulle til USA - og kunne være udloddet uden dansk skat direkte fra NetApp Danmark til det ultimative amerikanske moderselskab, NetApp USA - siger det også sig selv, at havde der været den mindste anledning til tvivl om, hvorvidt udbytteudlodnin-gen til NetApp Cypern ville have udløst dansk kildeskat, ville man ikke have løbet risikoen for at udløse en så anseelig skat, som er omtvistet i sagen her - navnlig ikke når andre ubestrideligt skattefrie løsninger også var mulige, jf. nedenfor.

En forespørgsel til SKAT i 2005 og 2006 ville - på baggrund af forarbejderne til bestemmelsen om begrænset skattepligt i 2001 - utvivlsomt have ført til samme resultat. Og hvis SKAT havde været af den opfattelse, at der skulle indeholdes udbytteskat, ville en klage til den øverste administrative lignings-myndighed - Landsskatteretten - have ført til en ændring af SKATs afgørelse, jf. den indbragte afgørelse.

Det kan ikke undre, at Højesteret i afgørelserne UfR 2004.362 H […] og UfR 2008.2243 H […] har givet Skatteministeriet medhold i, at der var handlet

### 1671

»forsømmeligt«. Det forekommer rimeligt klart i begge sager. Ingen af disse domme er derfor præjudicerende for nærværende sag.

Den omstændighed, at Højesteret i præmisserne i sagerne har nævnt, at den indeholdelsespligtige var »bekendt« med de faktiske forhold, der førte til, at der forelå indeholdelsespligt, kan ikke - som antaget af sagsøger - tages som udtryk for, at dette skulle være den afgørende præmis. Tværtimod, er den in-deholdelsespligtiges kendskab til de faktiske forhold den første betingelse for at statuere »forsømmelighed«, og Højesteret fortsætter da også med at konsta-tere, at den indeholdelsespligtige »ikke har haft føje« til at antage, at der ikke var indeholdelsespligt.

Det bestrides, at NetApp Danmark skulle være underlagt en skærpet agtsomhedsbedømmelse, fordi der angiveligt var tale om omgåelse af en værnsregel. For det første bestrides det, at SEL § 2, stk. 1, litra c, om begrænset skattepligt er en værnsregel. Hertil kommer, at realiteten var, at de omtvistede midler skulle overføres (og blev overført) fra det danske selskab til ultimativt det amerikanske moderselskab. Dette kunne alternativt være sket ved, at det amerikanske moderselskab havde erhvervet aktierne i det danske selskab, hvorefter udbyttet kunne have passeret skattefrit direkte fra Danmark til USA. Etableringen af NetApp Cypern og udbytteudlodningen til moderselskabet i USA via NetApp Bermuda, fremstod derfor ikke som en mulighed, der »var for god til at være sand«, men blot som et mere praktisk alternativ til den i forvejen skattefrie løsning, som ellers lå lige for, såfremt rådgiverne ikke havde foreslået løsningen med NetApp Cypern.

Det giver ikke nogen mening at tale om en skærpet agtsomhedsbedømmelse, fordi parterne var interesseforbundne, når agtsomhedsvurderingen drejer sig om den juridiske subsumption. Den juridiske bedømmelse af, om et mellemholdingselskab som NetApp Cypern kan påberåbe sig DBO'en eller direktivet er jo upåvirket af, om NetApp Cypern var minoritetsaktionær eller majoritetsaktionær i NetApp Danmark.

På den anførte baggrund gøres det samlet gældende, at der ikke er grundlag for at anse NetApp Danmark for at have handlet »forsømmeligt«.«

Parterne har i det væsentlige procederet i overensstemmelse med det anførte i deres påstandsdokumenter.

*NetApp Denmark* har under hovedforhandlingen vedrørende udbyttet i 2006 på 92.012.000 kr. yderligere gjort gældende:

»… Subsidiært gøres det gældende, at der er grundlag for at hævde, at NetApp Cypern ikke er »retmæssig ejer« af dette udbytte, eftersom midlerne er tilbagelånt til NetApp Danmark, jf. ISS-sagen […]. NetApp Cypern - som har haft ikke uvæsentlige renteindtægter herpå - har dermed haft den »fulde glæde« af udbyttet.

… Under alle omstændigheder må NetApp Cypern anses som den »retmæssige ejer« heraf, såfremt Østre Landsret måtte være enig med Skatteministeriet i, at det er »diskvalificerende« for at blive anset som et »gennemstrømningsselskab«, at et udbytte har ligget i 5 måneder i det hævdede »gennemstrømningsselskab«. Her har udbyttet - som påvist - ligget i NetApp Danmark/NetApp Cypern i 4 år.«

*B-2173-12 Skatteministeriet mod TDC A/S*

*Skatteministeriet* har i sit sammenfattende processkrift af 11. januar 2021 anført bl.a. følgende:

»4.1 Udbyttet er ikke fritaget for kildeskat efter selskabsskattelovens § 2, stk. 1, litra c), 3. pkt.

Ifølge selskabsskattelovens § 2, stk. 1, litra c), 1. pkt. […], påhviler skattepligt i henhold til loven selskaber og foreninger m.v. som nævnt i lovens § 1, stk. 1, der har hjemsted i udlandet, for så vidt de oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, hvortil det i sagen omhandlede udbytte kan henregnes. Skattepligten omfatter (dog) ifølge 3. pkt. ikke udbytte af datterselskabsaktier, jf. aktieavancebeskatningslovens § 4 A, når beskatningen af udbytter fra datterselskabet »skal« frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor moderselskabet er hjemmehørende.

Det fremgår altså af bestemmelsens ordlyd, at fritagelsen for skattepligt alene kommer på tale, hvis der efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst består en ubetinget pligt til at frafalde eller nedsætte beskatningen. Følger en sådan pligt ikke af direktivet eller af en dobbeltbeskatningsoverenskomst, er udbyttet med andre ord omfattet af en skattepligt.

Forarbejderne til bestemmelsen giver ikke holdepunkter for en anden forståelse af bestemmelsen - tværtimod.

Ifølge det fremsatte lovforslag (lovforslag nr. L99 af 10. november 2000, […]) var en fritagelse for skattepligt alene betinget af, »at moderselskabet er hjemmehørende i en stat, som er medlem af EU, en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland, samt at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i [moder-/datterselskabsdirektivet].«

Som det fremgår, ville det ifølge det fremsatte lovforslag - udover at datterselskabet skulle være et selskab i en medlemsstat - være nok, hvis bare moderselskabet var hjemmehørende i EU eller i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland. Lovforslaget blev imidlertid på dette punkt ikke vedtaget i den fremsatte form. Derfor er TDC's påberåbelse af skatteministerens svar af 10. januar 2001 til Folketingets Skatteudvalg (bilag 22 til lovforslag nr. 99 af 10. november 2000, […]) og ministerens

**1672**

svar af 11. januar 2001 (bilag 24 og 25 til lovforslaget, […]) også irrelevante, eftersom spørgsmålene, der blev besvaret, blev stillet i tilknytning til det (oprindeligt) fremsatte, men på dette punkt ikke-vedtagne lovforslag.

Efter at Folketinget havde behandlet det fremsatte lovforslag, fremsatte skatteministeren det (ændrings)forslag, som faktisk blev vedtaget.

Af bemærkningerne til ændringsforslaget fremgår, at ændringen tog sigte på at præcisere, at det er en »betingelse« for den foreslåede skattefrihed, at Danmark »skal« frafalde beskatningen af det pågældende udbytte efter bestemmelserne i moder-/datterselskabsdirektivet, eller at Danmark »skal« frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i en dobbeltbeskatningsoverenskomst […].

Det korte af det lange er, at hverken ordlyden af selskabsskattelovens § 2, stk. 1, litra c), eller bemærkningerne til det forslag, som faktisk blev vedtaget, efterlader nogen tvivl om, at moderselskabet kun har krav på en fritagelse for skattepligt, hvis selskabet enten opfylder betingelserne i moder-/datterselskabsdirektivet for fritagelse af kildeskat eller opfylder betingelserne i en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende, for at Danmark skal frafalde eller nedsætte beskatningen. Det er således ikke tilstrækkeligt, at moderselskabet er hjemmehørende i en stat, som er medlem af EU, en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland.

Som der vil blive redegjort for i det følgende, har Danmark hverken været forpligtet til at frafalde beskatningen af det i denne sag omhandlede udbytte efter moder-/datterselskabsdirektivet eller været forpligtet til at frafalde eller nedsætte beskatningen efter overenskomsten af 17. november 1980 mellem Danmark og Luxembourg til undgåelse af dobbeltbeskatning for så vidt angår indkomst- og formueskatter (den dansk-luxembourgske dobbeltbeskatningsoverenskomst).

*4.1.1 Beskatningen skal ikke nedsættes eller frafaldes i medfør af moder-/datterselskabsdirektivet*

Beskatningen af det i sagen omhandlede udbytte skal ikke frafaldes efter moder-/datterselskabsdirektivet, eftersom hverken NTC eller de andre luxembourgske mellemholdingselskaber kan påberåbe sig den i direktivets artikel 5, stk. 1, fastsatte fordel i form af fritagelse for kildeskat, allerede fordi der foreligger retsmisbrug.

*4.1.1.1 Der er hjemmel til imødegåelse af retsmisbrug*

Ifølge moder-/datterselskabsdirektivets artikel 1, stk. 2, er direktivet ikke til hinder for anvendelsen af interne bestemmelser eller

overenskomster, som er nødvendige for at hindre svig og misbrug […].

En national bestemmelse som selskabsskattelovens § 2, stk. 1, litra c), er netop en sådan intern bestemmelse som omhandlet i direktivets artikel 1, stk. 2, hvorefter en fordel i henhold til direktivet kan nægtes, hvis fordelen søges opnået ved svig eller misbrug.

Af selskabsskattelovens § 2, stk. 1, litra c)'s ordlyd følger nemlig som nævnt udtrykkeligt, at det er en betingelse for at frafalde kildebeskatning, at Danmark er forpligtet hertil efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst, jf. ordet »skal«. En sådan forpligtelse til at frafalde beskatningen foreligger netop ikke i misbrugstilfælde. Domstolen har for længst fastslået, at EU-retten (dengang benævnt »fællesskabsretten«) ikke kan gøres gældende med henblik på at muliggøre misbrug, jf. f.eks. Domstolens dom i sag C-212/97, Centros, præmis 24 og den deri nævnte retspraksis […]. Derfor indeholder selskabsskattelovens § 2, stk. 1, litra c), efter sin ordlyd en hjemmel til, at moder-/datterselskabsdirektivets fordel i form af fritagelse for beskatning i kildestaten kan nægtes, hvis der foreligger retsmisbrug, al den stund at direktivet i et sådant tilfælde ikke medfører, at kildestaten »skal« frafalde beskatningen.

Hertil kommer, at artikel 10, stk. 2, i den dansk-luxembourgske dobbeltbeskatningsoverenskomst […] er en overenskomstmæssig fastsat bestemmelse til bekæmpelse af misbrug, da kildelandet kun skal nedsætte beskatningen af et udbytte, hvis »udbyttets retsmæssige ejer« er hjemmehørende i den anden kontraherende stat, og da anvendelsen af dette kriterium for beskatningsrettens fordeling netop tjener til bekæmpelse af retsmisbrug, jf. nærmere nedenfor.

Endelig er der i dansk retspraksis udviklet almindelige principper til imødegåelse af misbrug, der finder anvendelse i tilfælde, der falder uden for den praksis, som ifølge den juridiske litteratur er udtryk for anvendelsen af en såkaldt »realitetsgrundsætning«. Det følger således af højesteretspraksis, at dispositioner, der - som i det foreliggende tilfælde - formelt er blevet indrettet sådan, at en bestemt, gunstig skatteregel finder anvendelse, kan tilsidesættes i skattemæssig henseende, når indrømmelsen af fordelen vil være formålsstridig, og når dispositionerne med Højesterets ord eksempelvis »ikke [har] karakter af normale forretningsmæssige dispositioner«, jf. U.1998.254H […], »ikke [har] noget forretningsmæssigt formål«, jf. U.2005.649H […] eller »ikke [har] nogen forretningsmæssig begrundelse«, jf. U.2015.2277H […]. Højesteret har også uden at bruge tilsvarende vendinger tilsidesat skattearrangementer, jf. eksempelvis U.1999.1714H […].

Der er på den anførte baggrund rigeligt med hjemmel i national ret til at imødegå misbrug, men en afgørelse af sagen nødvendiggør ikke en stillingtagen til dette stridsspørgsmål.

Af Domstolens dom i denne sag […] fremgår nemlig, at Domstolen som svar på landsrettens første præjudicielle spørgsmål har anført, at de generelle EU-retlige

**1673**

princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i moder-/datterselskabsdirektivet artikel 5, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse, jf. hertil dommens præmis 95 og præmisserne 75-94, som svaret er baseret på.

Der er ikke en tale om, at Domstolen med svaret på landsrettens første præjudicielle spørgsmål har skabt en (ny) retsstilling, der ikke gjaldt forud for dommen, eller at Domstolen har ændret sin

hidtidige praksis, således som den er kommet til udtryk i bl.a. sag C-321/05, Kofoed, jf. hertil dommen i den foreliggende sag, præmis 84-90. Med denne dom har Domstolen derimod - inden for rammerne af den kompetence, som tilkommer Domstolen i medfør af artikel 267 TEUF […] - belyst og præciseret betydningen og rækkevidden af princippet om forbud mod retsmisbrug, således som dette princip skal anvendes på den foreliggende sag.

Der er endvidere ikke tale om, at Domstolen med sin dom har fastslået en fortolkning af moder-/datterselskabsdirektivet, som indebærer, at direktivet - i sig selv - skaber forpligtelser for borgerne, hvad der i givet fald ville have været uforeneligt med retssikkerhedsprincippet. I tilfælde, hvor der foreligger retsmisbrug, og hvor borgeren af denne grund nægtes en fordel i henhold til EU-retten, er der således ikke tale om, at borgeren pålægges en forpligtelse efter EU-retten. Der er derimod tale om, at de objektive betingelser for at opnå en fordel i henhold til EU-retten ikke er opfyldt, fordi fordelen søges opnået ved retsmisbrug (dommens præmis 90).

Af Domstolens dom følger således også, at det EU-retlige retssikkerhedsprincip heller ikke er til hinder for at nægte moder-/datterselskabsdirektivets fordel i form af fritagelse for kildeskat, når der foreligger retsmisbrug, hvad der også udtrykkeligt er fastslået i Domstolens dom i sag C-251/16, Cussens, præmis 43 […].

Endelig strider det ikke imod loven om Danmarks tiltrædelse af den Europæiske Union at nægte moder-/datterselskabsdirektivets fordele med henvisning til det generelle EU-retlige princip om forbud mod retsmisbrug. Den foreliggende situation er således usammenlignelig med situationen, der gav anledning til Højesterets dom gengivet i U.2017.824H, Ajos […], som TDC påberåber sig.

Ajos-sagen udspring af, at Ajos i 2009 opsagde en medarbejder, der ville have opfyldt betingelserne i funktionærlovens § 2 a for fratrædelsesgodtgørelse, hvis det da ikke havde været for bestemmelsens stk. 3, som afskar medarbejderen fra at få godtgørelsen, fordi han ved fratrædelsen kunne have oppebåret alderspension. Medarbejderen rejste over for Ajos krav om godtgørelse og påberåbte sig i den forbindelse det almindelige EU-retlige princip om forbud mod forskelsbehandling på grund af alder.

Til brug for sin afgørelse af sagen stillede Højesteret præjudicielle spørgsmål til Domstolen, der i den anledning fastslog bl.a., at det almindelige princip om forbud mod forskelsbehandling på grund af alder, som Rådets direktiv 2000/78/EF (om generelle rammebestemmelser om ligebehandling med hensyn til beskæftigelse og erhverv) er et konkret udtryk for, skal fortolkes således, at det - også i en tvist mellem private - er til hinder for national lovgivning svarende til funktionærlovens § 2 a, stk. 3.

I præmisserne for sin dom fastslog Højesteret, at den retsstilling, der fulgte af funktionærlovens § 2 a, stk. 3 (dagældende) - således som bestemmelsen var blevet fortolket i retspraksis, og hvilken fortolkning var blevet lagt til grund af lovgivningsmagten ved senere ændringer af funktionærloven - var klar, og at det ikke er muligt ved anvendelse af de fortolkningsmetoder, som er anerkendt i dansk ret, at anlægge en fortolkning af bestemmelsen i overensstemmelse med beskæftigelsesdirektivet, således som dette direktiv er blevet fortolket af Domstolen. Med Højesterets egne ord forelå der dermed en »contra legem-situation«.

Da der forelå en sådan situation, måtte Højesteret herefter tage stilling til, om det almindelige EU-retlige princip om forbud mod forskelsbehandling på grund af alder kan tillægges den virkning i dansk ret, at det har forrang for en modstående national bestemmelse, herunder også i tvister mellem private. Ifølge Højesteret beroede en stillingtagen til dette spørgsmål på en fortolkning af loven om Danmarks tiltrædelse af Den Europæiske Union. Højesteret kom frem til, at tiltrædelsesloven ikke indeholder hjemmel til - i en tvist mellem private - at lade det uskrevne princip om forbud mod for-

skelsbehandling på grund af alder fortrænge den dagældende bestemmelse i funktionærlovens § 2 a, stk. 3, i det omfang bestemmelsen er i strid med forbuddet.

Den foreliggende sag adskiller sig på afgørende vis fra Ajos-sagen, eftersom der ikke foreligger en »contra legem-situation«.

Moder-/datterselskabsdirektivet er i dansk ret blevet gennemført på den mest enkle måde, der tænkes kan, nemlig ved en henvisning til direktivet. Det følger således, som det også er beskrevet ovenfor, af selskabsskattelovens § 2, stk. 1, litra c)'s ordlyd, at udbytte er omfattet af en skattepligt, medmindre »beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i [moder/datterselskabsdirektivet]«. I kraft af denne henvisning til direktivet er det klart, at spørgsmålet om

### 1674

fritagelse for beskatning af udbytte er omfattet af EU-rettens anvendelsesområde.

En fritagelse for skattepligt er således betinget af, at direktivet i det givne tilfælde forpligtiger Danmark til at frafalde beskatningen. Om en sådan forpligtelse består, beror derfor på en fortolkning af EU-retten. Som det også blev fastslået af Højesteret i Ajos-sagen, henhører det i medfør af artikel 267 TEUF under Domstolens kompetence at foretage en sådan fortolkning.

At gennemførelsen af moder-/datterselskabsdirektivet, hvad angår beskatning af udbytter, er løst ved en simpel henvisning til direktivet i selskabsskattelovens § 2, stk. 1, litra c), har som logisk følge, at eksistensen af en »contra legemsituation« er udelukket. Henvisningen gør det således uproblematisk at anlægge en fortolkning af selskabsskattelovens § 2, stk. 1, litra c), der er i overensstemmelse med moder-/datterselskabsdirektivet og det almindelige princip om forbud mod retsmisbrug, således som direktivet og princippet skal fortolkes ifølge Domstolens dom i den foreliggende sag.

På den anførte baggrund må selskabsskattelovens § 2, stk. 1, litra c), fortolkes således, at den fritagelse for beskatning af udbytter, der ellers følger af moder-/datterselskabsdirektivet, skal nægtes, hvis fritagelsen i det givne tilfælde søges opnået ved retsmisbrug.

Da der altså ikke foreligger en »contra legem-situation«, rejser den foreliggende sag - i modsætning til Ajos-sagen - ikke noget spørgsmål om forholdet mellem på den ene side det almindelige EU-retlige princip om forbud mod retsmisbrug og på den anden side loven om Danmarks tiltrædelse af Den Europæiske Union.

For U.2012.3564H […], som TDC også påberåber sig […], gælder det også, at denne dom er uden relevans for afgørelsen af den foreliggende sag. Sagen, der gav anledning til højesteretsdommen, rejste - lige så lidt som den foreliggende sag - noget spørgsmål om EU-rettens forrang.

#### 4.1.1.2 Der foreligger retsmisbrug

Ifølge Domstolens dom kræves der med henblik på at bevise, at der foreligger misbrug, dels et sammenfald af objektive omstændigheder, hvoraf fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (dommens præmis 97).

Domstolen har i dommen anvist de nærmere principper for en sådan undersøgelse og foretaget en - ikke-udtømmende - opregning og beskrivelse af holdepunkter for, at moder-/datterselskabsdirektivets fordel i form af fritagelse for beskatning af udbytte i et givet tilfælde søges opnået ved misbrug.

Ifølge Domstolen må en koncern i sager som den foreliggende anses for et kunstigt arrangement, når den ikke er etableret af grunde, der afspejler den økonomiske realitet, når den har en struktur, der er rent formel, og når den har til hovedformål eller

som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse. Det gælder navnlig, når betalingen af udbytteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som overfører udbytterne, og det selskab, som er udbytternes retmæssige ejer (præmis 100).

Den omstændighed, at et udbytte i dets helhed eller stort set i dets helhed ganske kort tid efter modtagelsen videreudloddes af det selskab, som har modtaget det, til enheder, som ikke opfylder betingelserne for en anvendelse af moder-/datterselskabsdirektivet, er således ifølge Domstolen et holdepunkt for, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse for beskatning, der følger af direktivet (dommens præmis 101).

Ifølge Domstolens dom kan den kunstige karakter af et arrangement ligeledes underbygges ved, at den pågældende koncern er struktureret på sådan måde, at det selskab, der modtager udbyttet, selv skal videreudlodde dette udbytte til et tredje selskab, som ikke opfylder betingelserne for en anvendelse af moder-/datterselskabsdirektivet, med den følge at selskabet alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som gennemstrømningsselskab for at muliggøre pengestrømmen fra datterselskabet til den enhed, som er de overførte beløbs »retmæssige ejer« (dommens præmis 103).

Et selskab kan anses for et gennemstrømningsselskab, hvis selskabets eneste aktivitet er at modtage udbyttet og videreudlodde det til den retmæssige ejer eller til øvrige gennemstrømningsselskaber, jf. dommens præmis 104. Den (manglende) faktiske økonomiske aktivitet skal bedømmes på grundlag af samtlige relevante elementer vedrørende bl.a. driften af selskabet, dets regnskaber, strukturen af selskabets omkostninger og de reelt afholdte udgifter, det personale, som selskabet beskæftiger, og de lokaler og det udstyr, som det råder over.

Holdepunkter for, at der i et givent tilfælde er tale om et kunstigt arrangement, kan også findes 1) i den omstændighed, at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, 2) i fremgangsmåden for transaktionernes finansiering, 3) i vurderingen af de mellemliggende selskabers egenkapital og 4) i gennemstrømningsselskabernes manglende beføjelser til at råde økonomisk over de modtagne udbytter. Det er i den forbindelse ikke kun en kontraktuel eller juridisk forpligtelse for det selskab, der modtager udbyttet, til at

### 1675

videreudlodde det til tredjemand, der kan udgøre et sådant holdepunkt. Der foreligger også et holdepunkt for misbrug, hvis selskabet efter en bedømmelse af sagens faktiske omstændigheder »substantielt« ikke har haft rettighederne til at bruge og nyde udbyttet (præmis 105).

Holdepunkter som de ovenfor nævnte kan anses for bestyrkede, hvis der er et sammenfald eller en nær tidsmæssig sammenhæng mellem på den ene side ikrafttrædelsen af ny skattelovgivning som for eksempel selskabsskattelovens § 2, stk. 1, litra c), og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern (præmis 106). Et sådant sammenfald eller en sådan nær tidsmæssig sammenhæng er omvendt ikke en nødvendig betingelse for at godtgøre et misbrug, men kan altså bestyrke andre holdepunkter for, at der foreligger et misbrug.

Endelig er det for konstateringen af, om der foreligger et retsmisbrug, uden betydning, om Danmark med den stat, hvor udbytternes retmæssige ejer er hjemmehørende, har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt

Copyright © 2023 Karnov Group Denmark A/S

U.2023.1575H

kildeskat af udbyttet, hvis det var blevet betalt direkte til den retmæssige ejer, jf. hertil præmisserne 107 ff.

Når Domstolens anvisninger kobles med den foreliggende sags omstændigheder, kan det konstateres, at der foreligger et tilfælde af retsmisbrug.

TDC var via selskaber hjemmehørende i Luxembourg kontrolleret af en række kapitalfonde, som er hjemmehørende på Caymanøerne og lignende. Det er ubestridt, at ingen af disse fonde kan anses for et selskab i en medlemsstat i moder-/datterselskabsdirektivets forstand.

Under sagens administrative behandling oplyste TDC, at selskabet påtænkte at udlodde og udbytte til NTC, og til brug for Skatterådets besvarelse af anmodningen om et bindende svar oplyste selskabet som beskrevet i afsnit 3, at selskabet antog, at »størstedelen« af udbyttet ville blive videreudloddet fra NTC til NTC Parent S.à.r.l. (for en marginal dels vedkommende til NTC Holding G.P.), der antageligt ville betale modtagne beløb videre til selskaber, der var kontrolleret af de enkelte kapitalfonde, eller til dets kreditorer, idet NTC (og NTC Holding G.P.) ville anvende en mindre del af udbyttet (»formentlig mellem 3% og 5%«) til dækning af omkostninger.

Den 10. august 2011 blev der ifølge selskabet faktisk udloddet 1,781 mia. kr. Med NTC's ejerandel på 59,1 % udgjorde andelen af udbyttet 1,05 mia. kr. Allerede henset til beløbets størrelse er det utænkeligt, at der alene på udlodningstidspunktet forelå en plan for, hvorledes der i koncernen skulle disponeres over udbyttet fra TDC.

Så længe TDC ikke fremlægger dokumentation for det modsatte, må det - under hensyn til det ovenfor anførte - lægges til grund, at udbyttet fra TDC (bortset fra et marginalt beløb) på forhånd var bestemt til at strømme op igennem de luxembourgske selskaber til kapitalfondene og faktisk også gjorde det.

Desuden må der - så længe TDC ikke fremlægger dokumentation for noget andet - lægges til grund, at NTC ikke udøvede andre væsentlige aktiviteter end at være moderselskab for TDC, og at NTC Parent S.à.r.l. ikke udøvede andre væsentlige aktiviteter end at være moderselskab for NTC og NTC Holding G.P.

Det må endvidere konkluderes, at kapitalfondene selskaber ikke havde nogen eller kun havde meget snævre beføjelser til at råde over udbyttet. Skatteministeriet gør ikke gældende, at de luxembourgske selskaber var kontraktuelt forpligtede til at videreudloddede udbytte fra TDC, men i koncernforhold som det foreliggende er en sådan retlig forpligtelse upåkrævet og derfor overflødig.

Kapitalfondene havde valgt at strukturere deres ejerskab af TDC på en sådan måde, at de luxembourgske mellemholdingselskaber skulle videreudlodde udbytte til kapitalfondene, der som nævnt ubestridt ikke kunne påberåbe sig moder-/datterselskabsdirektivets fordele, med den følge at mellemholdingselskaberne alene opbar ubetydelige skattepligtige indkomster.

Den etablerede ejerstruktur med indskydelsen af de luxembourgske mellemholdingselskaber havde ingen troværdig forretningsmæssig begrundelse. Anmodningen om et bindende svar var ikke ledsaget af oplysninger, som gav belæg for at anse ejerstrukturen for forretningsmæssigt begrundet, og en forretningsmæssig begrundelse var - og er - heller ikke til at få øje på. Som beskrevet ovenfor foreligger der ingen oplysninger om, at de luxembourgske mellemholdingselskaber udøvede nogen anden væsentlig aktivitet end blot (indirekte) at besidde kapitalandele i TDC, ligesom der heller ikke foreligger nogen oplysninger, som giver belæg for at fastslå, at det - for at der kunne udøves en aktiv ejerindflydelse på TDC - var nødvendigt at etablere en ejerstruktur med mellemliggende selskaber i Luxembourg.

Den valgte ejerstruktur havde til gengæld en åbenlys skattemæssig fordel, idet NTC - i modsætning til, hvad der må antages at have været gældende for kapitalfondene - var et »selskab i en medlemsstat« og derfor - hvis der ikke havde været tale om retsmisbrug - kunne påberåbe sig direktivets fordele, herunder fritagelsen for udbyttebeskatning i kildestaten.

Hvis et mellemholdingselskab faktisk er forretningsmæssigt begrundet, er det en enkel sag at forklare, hvori den forretningsmæssige begrundelse består, men TDC er imidlertid - fortsat - ikke kommet med en forklaring, som giver nogen grund til at antage, at den etablerede ejerstruktur med indskydelsen af de

**1676**

luxembourgske mellemholdingselskaber hovedsageligt var forretningsmæssigt begrundet og dermed ikke havde som (et af sine) hovedformål at opnå en skattefordel.

Skatteministeriet bestrider ikke, at kapitalfondene kan have haft et behov for at etablere et holdingselskab til brug for erhvervelsen af aktierne i TDC, men et sådant holdingselskab var allerede etableret i Danmark, idet kapitalfondene erhvervede aktierne i TDC i 2005 via en række af holdingselskaber etableret i Danmark, jf. købstilbud til aktionærerne i TDC fremsat den 2. december 2005 af Nordic Telephone Company ApS […]. Der er ikke oplyst nogen troværdig forretningsmæssig begrundelse for, at det også var nødvendigt at have mellemholdingselskaber i Luxembourg.

TDC's abstrakte påberåbelse af, at kapitalfonde og andre udenlandske investorer »historisk« skulle have foretaget deres investeringer via Luxembourg, blandt andet som følge af at Luxembourg juridisk, regulatorisk, finansielt og politisk anses for et attraktivt og stabilt land […], siger intet om, hvad den forretningsmæssige begrundelse var for i det foreliggende tilfælde at etablere mellemholdingselskaber i Luxembourg, navnlig når der allerede var etableret en holdingstruktur i Danmark.

TDC er ikke kommet med en beskrivelse af de forretningsmæssige »mangler« ved de danske holdingselskaber, som etableringen af holdingstrukturen i Luxembourg skulle afhjælpe.

Det gør i den forbindelse ikke nogen forskel, at den første holdingselskaber i Luxembourg ifølge TDC blev stiftet i sommeren og efteråret 2005, …. Det må lægges til grund, at etableringen i 2005 af mellemholdingselskaber i Luxembourg, der skete med henblik på opkøb af aktierne i TDC (jf. præmis 37 i Domstolens dom i den foreliggende sag og i øvrigt også de etablerede selskabers navne, »Nordic Telephone Company«), havde som (et af sine) hovedformål at opnå en skattefordel, derved at strukturen med mellemholdingselskaber i Luxembourg gjorde det muligt - bortset fra spørgsmålet om retmæssig ejer og retsmisbrug - at føre udbytter fra TDC op til kapitalfondene uden at skulle betale kildeskat heraf.

Taget fraværet af en troværdig forretningsmæssig begrundelse i betragtning er det ubetænkeligt at lægge til grund, at den etablerede ejerstruktur med indskydelsen af den luxembourgske holdingstruktur havde som hovedformål eller som et af sine hovedformål at opnå en skattefordel, nemlig at gøre udbytter fra TDC skattefrie, ved at de mellemliggende luxembourgske holdingselskaber modsat de bagvedliggende kapitalfonde - bortset fra spørgsmålet om retmæssig ejer og misbrug - kunne påberåbe sig moder-/datterselskabsdirektivet og dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg.

På den anførte baggrund er der således de fornødne holdepunkter for at antage, at NTC og de andre luxembourgske mellemholdingselskaber reelt blot fungerede som gennemstrømningsselskaber i relation til det udbytte, som blev påtænkt udloddet og faktisk blev udloddet fra TDC til NTC, fordi det i realiteten på forhånd har været besluttet af de bagvedliggende ejere, at udbyttet skulle kanaliseres videre op igennem koncernen til de bagvedliggende kapitalfonde, uden at de luxembourgske selskaber havde nogen reel mulighed for at påvirke denne beslutning. De luxembourgske mellem-

holdingselskaber foretog sig ikke andet end at modtage og videre-udlodde udbytte til andre gennemstrømningsselskaber og i sidste ende til den retmæssige ejer - hvem end det så var, jf. nærmere herom under pkt. 4.1.3.

Det må heroverfor påhvile TDC at afkræfte, at NTC og de andre luxembourgske mellemholdingselskaber ikke blot var rene gennem-strømningsselskaber i relation til det omhandlede udbytte. Denne bevisbyrde har TDC ikke løftet.

Der foreligger f.eks. ikke oplysninger om ledelsen i NTC og NTC Parent S.á.r.l. og om de af denne ledelse trufne beslutninger i rela-tion til det omhandlede udbytte, der giver grundlag for at antage, at NTC og NTC Parent S.á.r.l. havde en reel mulighed for selvstæn-digt at beslutte, hvordan der skulle rådes over udbyttet fra TDC. Der foreligger heller ingen regnskaber, bestyrelsesmødereferater mv. for de luxembourgske selskaber eller oplysninger om, hvilke aftaler der var indgået mellem f.eks. kapitalfondene og deres inve-storer vedrørende behandlingen af afkast fra target-selskabet (TDC).

Det er ikke afgørende for bedømmelsen af, om der er tale om misbrug, at man i koncernen - eventuelt - måtte have valgt at lade en marginal del af det udloddede beløb blive anvendt af de mellem-liggende holdingselskaber til at betale aktuelle eller forventede omkostninger. Holdingselskabernes udgifter har blot været en følge af den bagvedliggende ejerkreds' anvendelse af holdingselskaberne som redskab til at søge at undgå kildeskat ved udbytter. Afholdelsen af sådanne omkostninger ændrer derfor ikke på, at mellemholdings-elskaberne må anses for gennemstrømningsenheder.

Når de nævnte omstændigheder sammenholdes med Domstolens anvisninger for misbrugsvurderingen, må det fastslås, at der fore-ligger et arrangement, der havde som hovedformål uretmæssigt at drage fordel af den fritagelse, der er fastsat i moder-/dattersel-skabsdirektivets artikel 5.

Domstolen har således også fastslået (dommens præmis 99), at der i denne sag er »en række holdepunkter«, som giver grundlag for at konkludere, at der foreligger retsmisbrug, men i overenss-temelse med kompetencefordelingen mellem Domstolen og landsret-ten som den forelæggende ret, har Domstolen overladt det til landsretten at »efterprøve«, dels om disse holdepunkter er objektive og sammenstemmende, dels om TDC har haft mulighed for at føre modbevis.

**1677**

En sådan efterprøvelse bør munde ud i en konklusion om, at der foreligger et tilfælde af retsmisbrug. Alle omstændigheder af rele-vans for misbrugsvurderingen var oplyst over for Domstolen, og TDC har ikke siden godtgjort andre omstændigheder, som giver belæg for, at Domstolens (foreløbige) vurdering ikke kan holde for en efterprøvelse.

Da der altså foreligger et retsmisbrug, er NTC allerede af den grund afskåret fra at drage fordel af den fritagelse for kildeskat, der er fastsat i moder-/datterselskabsdirektivets artikel 5. Bestem-melserne i direktivet fører dermed ikke til, at det omhandlede ud-bytte skal fritages for en skattepligt efter selskabsskattelovens § 2, stk. 1, litra c).

*4.1.2 Beskatningen skal ikke nedsættes eller frafaldes i medfør af den danskluxembourgske dobbeltbeskatningsoverenskomst*

Ifølge den dansk-luxembourgske dobbeltbeskatningsove-renskomsts artikel 10, stk. 2 […], kan udbytte beskattes i den kon-traherende stat, hvori det selskab, der betaler udbyttet, er hjemme-hørende, men den skat, der pålignes, må ikke overstige nærmere fastsatte grænser, »såfremt modtageren er udbyttets retmæssige ejer«. Efter ordlyden af denne bestemmelse er Danmark altså kun forpligtet til at nedsætte beskatningen af udbytte, der udbetales af et dansk selskab, hvis modtageren er udbyttets »retsmæssige ejer«.

Dette begreb må fortolkes i overensstemmelse med det tilsvarende begreb i OECD's modeloverenskomsts artikel 10, stk. 2 […], idet den danskluxembourgske dobbeltbeskatningsoverenskomst er indgået på grundlag af modeloverenskomsten.

At fordelen, der følger af modeloverenskomstens artikel 10, stk. 2, alene kan påberåbes af udbyttets retmæssige ejer, blev indført som en udtrykkelig betingelse, da modeloverenskomsten blev revi-deret i 1977. Betingelsen blev indført for at gøre det klart, at kilde-staten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart bliver betalt til en person, der er hjemmehørende i en stat, med hvilken kildesta-ten har indgået en overenskomst, jf. 2003-kommentaren, pkt. 12 til modeloverenskomstens artikel 10 […].

Det fremgår således også af 1977-kommentaren, pkt. 7-10 til modeloverenskomstens artikel 1, at begrebet »retmæssig ejer« tager sigte på at dæmme op over for misbrug i form af »kunstfærdige juridiske konstruktioner«, nærmere bestemt det »kunstgreb«, hvor en person disponerer via en juridisk sammenslutning, der er dannet i en kontraherende stat, væsentligst for at opnå fordele i henhold til overenskomsten, som ikke ville kunne opnås af personen direkte (…). I overensstemmelse hermed følger det videre af 1977-kom-mentarerne, pkt. 12 til artikel 10, at en udbyttemodtager ikke kan påberåbe sig den begrænsning af kildestatens beskatningsret, der følger af modeloverenskomstens artikel 10, stk. 2, hvis den pågæl-dende blot er mellemled«, såsom en agent eller udpeget person, der er skudt ind mellem den, der reelt er berettiget til udbytterne, dvs. den retmæssige ejer, og udbyttebetaleren, medmindre den retmæssige ejer er hjemmehørende i samme stat, som den formelle udbyttemodtager (…).

Østre Landsret har allerede fastslået, at begrebet »retmæssig ejer« er et autonomt begreb, dvs. at det har et selvstændigt indhold uaf-hængigt af de kontraherende staters interne lovgivning, jf. SKM2012.121.ØLR […]. Begrebet »retmæssig ejer« skal derfor ikke fortolkes i overensstemmelse med begrebet »rette indkomst-modtager«, der i dansk skatteret bruges som betegnelse for den, der må anses for at være skattepligtig af en given indtægt.

Med den nævnte dom har Østre Landsret også allerede fastslået, at skattemyndighederne i sager som den foreliggende har været berettiget til - som sket - at inddrage kommentarerne til OECD's modeloverenskomst fra 2003 ved fastlæggelsen af, hvad der nær-mere skal forstås ved begrebet »retmæssig ejer«. De senere kom-mentarer fra 2014 og 2017 må anses for på tilsvarende vis at udgøre relevante fortolkningsbidrag, eftersom disse kommentarer - ligesom 2003-kommentarerne - ikke indebærer en ændret forståelse af mo-deloverenskomstens artikel 10, stk. 2, men alene har karakter af præciseringer.

Af 2003-kommentarerne, pkt. 12.1 til modeloverenskomstens ar-tikel 10, stk. 2, følger […], at det ikke vil være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skal indrømme lempelse eller fritagelse for skat »i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden vis end som agent eller mellemmand, blot fungerer som 'gennem-strømningsenhed' (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.« En »gennemstrømningssel-skab« vil således ikke kunne anses for den retmæssige ejer, »hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en 'nulitet' eller administrator, der handler på vegne af andre parter«.

I 2014-kommentaren, pkt. 12.4, som på dette punkt er blevet videreført uden ændringer i 2017-kommentareren, er det præciseret, at den umiddelbare modtager af udbyttet vil kunne nægtes den overenskomstmæssige fordel, der følger af modeloverenskomstens artikel 10, stk. 2, hvis de faktiske omstændigheder klart viser, at

modtageren - uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person - »substantielt« ikke har rettighederne til at bruge og nyde det modtagne udbytte […].

**1678**

I den foreliggende sag viser de faktiske omstændigheder med tilstrækkelig klarhed, at NTC og de andre luxembourgske selskaber ikke havde eller kun havde meget snævre beføjelser til at disponere over udbyttet fra TDC.

Som der er nærmere redegjort for under det foregående punkt, må det således lægges til grund for sagens afgørelse, at NTC og de andre luxembourgske mellemholdingselskaber uden nogen forretningsmæssig grund var indskudt mellem kapitalfondene og TDC, at det på forhånd var planlagt, at det omhandlede udbytte skulle strømme igennem NTC og de andre luxembourgske mellemholdingselskaber til kapital-fondene, og at det faktisk skete.

De anførte omstændigheder godtgør, at koncernstrukturen med NTC og de andre luxembourgske mellemholdingselskaber blev etableret med det (hoved-)formål, at selskaberne skulle virke som »gennemstrømningsenheder« for udbytter fra TDC, som uden koncernstrukturen med mellemholdingselskaberne i Luxembourg ville have været skattepligtige i medfør af selskabsskattelovens § 2, stk. 1, litra c), da kapitalfondene - ubestridt - ikke selv kunne have påberåbt sig en overenskomstmæssig fordel, og at hverken NTC eller de andre luxembourgske mellemholdingselskaber substantielt kunne disponere over udbytterne, der på forhånd var bestemt til at blive viderebetalt til kapitalfondene.

På denne baggrund må det fastslås, at hverken NTC eller de andre luxembourgske mellemholdingselskaber i den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2's forstand kan anses for det omhandlede udbyttes retmæssige ejer. Beskatningen af udbyttet skal derfor ikke nedsættes efter denne bestemmelse. Dobbeltbeskatningsoverenskomsten fører dermed ikke til, at det omhandlede udbytte skal fritages for en skattepligt i medfør af selskabsskattelovens § 2, stk. 1, litra c), 3. pkt.

Denne konklusion er ikke uforenelig med Østre Landsrets præmisser for dommen i SKM2012.121.ØLR, hvorefter det, for at et mellemholdingselskab ikke kan anses for at være retmæssig ejer af udbytte, »må […] kræves, at ejeren udøver kontrol med selskabet, som ligger ud over den planlægning og styring på koncernplan, som sædvanlig vis forekommer i internationale koncerner.«

Heraf følger ikke andet, end at det - for at et udbyttemodtagende mellemholdingselskab ikke kan anses for udbyttets retmæssige ejer - ikke i sig selv er tilstrækkeligt at konstatere, at mellemholdingselskabet er kontrolleret af et selskab, som er hjemmehørende i en stat uden en dobbeltbeskatningsoverenskomst med Danmark.

Der skal være konkrete holdepunkter for at antage, at det udbyttemodtagende mellemholdingselskab er uden eller kun har meget snævre beføjelser til at råde over udbyttet, med den følge at selskabet ikke kan anses for udbyttets retmæssige ejer. Sådanne konkrete omstændigheder må anses at foreligge bl.a., hvis mellemholdingselskabet er uden nogen antagelig forretningsmæssig begrundelse, og det omhandlede udbytte faktisk er strømmet igennem mellemholdingselskabet og videre til de(n) bagvedliggende ejer(e).

I en sådan situation er der nemlig tale om, at en person eller et selskab disponerer via en juridisk sammenslutning, der er dannet i en kontraherende stat, med det hovedformål at opnå en overenskomstmæssig fordel, som den pågældende person eller det pågældende selskab ikke selv kunne have opnået. Det er netop denne form for misbrug, som kriteriet »retmæssig ejer« tager sigte på at imødegå, jf. ovenfor.

*4.1.3 TDC's påberåbelse af »ultimative ejeres« ret til fritagelse for kildeskat*

Til støtte for sin frifindelsespåstand gør TDC gældende, »at en meget stor andel af de ultimative ejere […] var berettiget til beskyttelse i henhold til dobbeltbeskatningsoverenskomster« […]. Allerede fordi identiteten på og hjemstedet for disse »ultimative ejere« er uoplyst og udokumenteret, er TDC's anbringende uden nogen bærekraft.

*4.2 Skattepligten strider ikke imod en bindende, fast administrativ praksis*

Ved afgørelsen af, om en skattepligt med hensyn til det omhandlede udbytte vil stride imod en bindende, fast administrativ praksis, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at beskatningen ikke skal frafaldes efter moder-/datterselskabsdirektivets artikel 5, stk. 1, fordi der foreligger misbrug, og at beskatningen af udbyttet ej heller skal nedsættes efter den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2, fordi hverken NTC eller de andre luxem-bourgske mellemholdingselskaber kan anses for udbyttets retmæssige ejer.

Der er derfor med andre ord tale om, at TDC med sit praksissynspunkt gør krav på, at det omhandlede udbytte skal anses for undtaget fra en skattepligt, selv om selskabsskattelovens § 2, stk. 1, litra c)'s udtrykkelige betingelse for, at udbyttet er undtaget fra skattepligten, ikke er opfyldt.

Da en forvaltningsretlig lighedsgrundsætning ikke kan begrunde et krav om en retsstilling, der strider imod loven, jf. hertil U.2003.2005H […], er det udelukket, at TDC's påberåbelse af en administrativ praksis kan føre til, at det omhandlede udbytte undtages fra en skattepligt, allerede fordi en sådan undtagelse altså vil stride imod selskabsskattelovens § 2, stk. 1, litra c)'s udtrykkelige betingelse for, at en undtagelse kan indrømmes.

Hertil kommer, at Skatterådets bindende svar af 21. juni 2011 ikke er udtryk for en praksisskærpelse,

**1679**

eftersom den slet ikke ændrede på nogen fast administrativ praksis.

Det påhviler TDC at føre bevis for eksistensen af den hævdede praksis, som afgørelsen ifølge selskabet skulle fravige, jf. f.eks. U.2011.3305H […], men selskabet har ikke løftet denne bevisbyrde. TDC har således ikke påvist eksistensen af nogen tidligere afgørelse, hvorefter skattemyndighederne har anset en udbytte for at være undtaget fra en skattepligt, selvom de givne omstændigheder - som i den foreliggende sag - ellers gav belæg for at fastslå, at moderselskabet ikke havde haft eller havde haft så snævre beføjelser til at disponere over udbyttet, at selskabet ikke kunne anses for dets retmæssige ejer.

Landsskatteretskendelsen (TfS 2012, 126, […]), som TDC påberåber sig […], er afgørelsen, som er til prøvelse i landsrettens sag B-1980-12, der hovedforhandles i forbindelse med den foreliggende sag. Den påberåbte kendelse er altså indbragt for domstolene af Skatteministeriet i medfør af skatteforvaltningslovens § 49, hvorefter Skatteministeriet kan indbringe spørgsmål, som er afgjort af Landsskatteretten, for domstolene senest 3 måneder efter, at Landsskatteretten har truffet afgørelse. Det siger derfor sig selv, at den indbragte kendelse ikke kan etablere en bindende administrativ praksis, som TDC kan støtte ret på.

TDC har endvidere ikke påvist tilfælde, hvor skattemyndighederne - siden selskabsskattelovens § 2, stk. 1, litra c)'s ikrafttrædelse den 27. april 2001 (med virkning for udbytter, der vedtages udloddet eller udbetalt den 1. juli 2001) - skulle have forsømt at gribe korrigerende ind i tilfælde som det foreliggende. En sådan manglende indgriben ville, hvis den faktisk havde fundet sted, i øvrigt heller ikke kunne være blevet sidestillet med en positiv afgørelse, jf. f.eks. U.2017.2960H og U.2017.2979H […].

Selskabet har heller ikke på anden vis godtgjort, at skattemyndighederne efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra c), og ind til Skatterådets afgørelse i den foreliggende sag skulle have fulgt en praksis, hvorefter udbytte er blevet anset for at være undtaget fra den skattepligt, der følger af bestemmelsen, selvom de givne omstændigheder ellers gav belæg for at fastslå, at moderselskabet ikke havde haft eller havde haft så snævre beføjelser til at disponere over udbyttet, at selskabet ikke kunne anses for dets retmæssige ejer.

De af TDC to påberåbte svar […], som skatteministeren har afgivet efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra c), udgør således ikke et bevis for en sådan praksis.

Svarene giver intet belæg for, at SKAT positivt skulle have truffet en beslutning om at følge en praksis, hvorefter udbytte blev anset for undtaget fra en skattepligt, selvom der efter en oplysning og en konkret vurdering af de givne omstændigheder ville være belæg for at fastslå, at moderselskabet ikke havde haft eller havde haft så snævre beføjelser til at disponere over udbyttet, at selskabet ikke kunne anses for dets retmæssige ejer.

Forud for Skatterådets afgørelse i denne sag havde skatteministeren derimod afgivet adskillige svar, hvoraf fremgår, at et moderselskab ikke ville kunne påberåbe sig fordelene af en dobbeltbeskatningsoverenskomst, hvis det var et »rent gennemstrømningsholdingselskab« (…), et »rent gennemstrømningsselskab« (…), et »conduit« selskab (…), eller et »gennemstrømningsselskab« (…). I alle de nævnte svar, bortset fra det første, er der endog henvist til pkt. 12.1 i bemærkningerne til artikel 10 (om udbytte) i OECD's modeloverenskomst, og i de 4 sidstnævnte svar er det ydermere beskrevet i selve svarene, at »conduit« selskaber/»gennemstrømningsselskaber« omfatter selskaber, der »reelt har meget snævre beføjelser i relation til den pågældende indkomst«.

Det må på den anførte baggrund fastslås, at Skatterådets afgørelse i denne sag ikke ændrede på nogen bindende, fast administrativ praksis, som TDC i medfør af en forvaltningsretlig lighedsgrundsætning kan støtte ret på.

Endelig er det - under alle omstændigheder - uden betydning for skattepligten med hensyn til det i denne sag omhandlede udbytte, om SKAT tidligere måtte have haft en administrativ praksis om, at der ikke skulle indeholdes kildeskat i et tilfælde som det foreliggende. Selvom en sådan praksis havde eksisteret, blev TDC jo i kraft af Skatterådets svar på spørgsmål 2 vedrørende den på det tidspunkt påtænkte udbytteudlodning bekendt med, at en sådan praksis i givet fald var blevet tilsidesat med rådets afgørelse. Det bemærkes i tilknytning hertil, at TDC indeholdt udbytteskat i forbindelse med den udlodning, som faktisk blev foretaget i august 2011, efter at Skatterådet havde truffet afgørelse i sagen.

**4.3 Ministeriets subsidiære påstand om afvisning af at besvare TDC's spørgsmål 2**

En anmodning om bindende svar skal indeholde alle oplysninger af betydning for svaret, som står til rådighed for spørgeren, jf. skatteforvaltningslovens § 24, stk. 1, 1. pkt. Hvis et spørgsmål ikke er tilstrækkeligt oplyst, kan spørgsmålet afvises, jf. skatteforvaltningslovens § 24, stk. 1, 3. pkt., og stk. 2. Når en administrativ klagebehandling eller domstolsprøvelse angår et tilfælde, hvor dispositionen, som anmodningen om et bindende svar vedrører, er gennemført, kan der efter de almindeligt gældende principper om nova inddrages nye oplysninger til belysning af omstændighederne for den gennemførte disposition.

TDC har derfor ikke været afskåret fra at fremlægge oplysninger om den gennemførte udlodning, herunder

**1680**

oplysninger om, hvorledes NTC og andre luxembourgske mellemholdingselskaber faktisk disponerede over udbyttet. Som en

logisk følge heraf kan TDC's fravalg af at fremlægge sådanne oplysninger, naturligvis også tillægges betydning ved prøvelsen af, om spørgsmål 2 i selskabets anmodning om et bindende svar skal besvares benægtende eller bekræftende.

Efter Skatteministeriets opfattelse er der tilstrækkeligt belæg for på det foreliggende grundlag at fastslå, at en beskatning af det omhandlede udbytte ikke afkaldes efter moder-/datterselskabsdirektivets artikel 5, stk. 1, fordi der foreligger retsmisbrug, og at en beskatning af udbyttet ej heller skal nedsættes efter den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2, fordi hverken NTC eller de andre luxembourgske mellemholdingselskaber kan anses for udbyttets retmæssige ejer, og at spørgsmål 2 i TDC's anmodning om bindende svar derfor skal besvares benægtende.

Skulle landsretten dog finde, at sagen ikke kan anses for tilstrækkeligt oplyst til, at en sådan konklusion kan drages på det foreliggende grundlag, bør landsretten i givet fald tage ministeriets subsidiære påstand til følge.

**4.4 Udbyttet er ikke fritaget for en skattepligt efter selskabsskattelovens § 2, stk[.] 1, litra c), 5. pkt.**

Det følger af selskabsskattelovens § 2, stk. 1, litra c), 5. pkt., at skattepligten ikke omfatter udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivets artikel 2, stk. 1, litra a, men som ved beskatningen her i landet anses for at være transparente enheder.

Selvom der ikke er en henvisning til bestemmelsens 1. pkt., er det klart, at der med »skattepligten« i 5. pkt. sigtes til den skattepligt, der følger af bestemmelsens 1. pkt.

Reglen i 5. pkt. giver - i modsætning til hvad TDC gør gældende - ikke hjemmel til, at der kan ske en fritagelse fra denne skattepligt i en situation, hvor beskatningen af udbyttet hverken skal frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor moderselskabet er hjemmehørende, jf. hertil bestemmelsens 3. pkt. En fritagelse skal med andre ord ikke indrømmes, hvis bare moderselskabet er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivets artikel 2, stk. 1, litra a, og ved beskatningen her i landet anses for at være en transparent enhed.

Heroverfor indtager TDC det standpunkt, at transparente, udenlandske moderselskaber og deres udenlandske deltagere skattemæssigt skulle være bedre stillet end udenlandske moderselskaber, der efter dansk ret anses for selvstændige skattesubjekter, idet transparente moderselskaber og deres deltagere skulle kunne gøre krav på en skattefritagelse, selv om en sådan fritagelse efter moder-/datterselskabsdirektivet i det givne tilfælde ville være udelukket, fordi der foreligger retsmisbrug.

Dette aparte standpunkt har hverken støtte i ordlyden af selskabsskattelovens § 2, stk. 1, litra c), eller 5. pkt.'s tilblivelseshistorie - tværtimod.

Reglen i 5. pkt. blev indført med lov nr. 1375 af 20. december 2004 (…), hvorefter selskabsskattelovens § 2, stk. 1, litra c), lød som følger:

»Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger mv. som nævnt i § 1, stk. 1, der har hjemsted i udlandet, for så vidt de

[…]

c) oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, bortset fra udlodninger fra obligationsbaserede investeringsforeninger som nævnt i aktieavancebeskatningslovens § 2 d, stk. 3, eller oppebærer afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab

mv. (moderselskabet), der ejer mindst 10 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Ved udbytteudlodninger i kalenderårene 2005 og 2006 udgør den i 2. pkt. nævnte ejerandel dog 20 pct., og ved udbytteudlodninger i kalenderårene 2007 og 2008 udgør den i 2. pkt. nævnte ejerandel 15 pct. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende. Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber som nævnt i 2. pkt., der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. […]«

Henvisningen i 5. pkt. til 2. pkt. indebar, at en fritagelse fra skattepligten i 1. pkt. var betinget af, at beskatningen af udbyttet skulle frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet, eftersom det i 2. pkt. nævnte begreb »moderselskab« alene omfattede selskaber, for hvilke det gjaldt, at en beskatning af det givne udbytte skulle frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende, jf. den i 4. pkt. udtrykkeligt gældende betingelse herom.

**1681**

Indførelsen af 5. pkt. indebar altså en skattemæssig ligestilling mellem på den ene side udenlandske moderselskaber, der efter dansk ret ansås for selvstændige skattesubjekter, og de på den anden side transparente, udenlandske moderselskaber og deres udenlandske deltagere.

Denne forståelse har også entydig støtte i forarbejderne til den ovennævnte ændringslov, der tog sigte på at gennemføre direktiv (2003/123/EF) om ændring af moder-/datterselskabsdirektivet.

En af ændringerne ifølge dette ændringsdirektiv gik ud på, at der på listen over selskabstyper omfattet af moder-/datterselskabsdirektivet blev medtaget selskaber, der ansås for selskabsskattepligtige i den medlemsstat, hvor de var hjemmehørende, men som af andre medlemsstater betragtedes som skattemæssigt transparente, idet medlemsstater, som behandlede ikke-hjemmehørende skattepligtige selskaber som skattemæssigt transparente burde give en passende skattelettelse mht. indtægter, der var en del af moderselskabets beskatningsgrundlag, jf., herved ændringsdirektivets betragtning 6 […].

Denne ændring blev ifølge forarbejderne til ovennævnte ændringslov gennemført ved, at udenlandske deltagere i udenlandske moderselskaber, der efter dansk ret blev betragtet som skattemæssigt transparente, fremover ikke skulle være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab, »uanset om selskabsdeltageren [var] et selskab eller fysisk person, og uanset selskabsdeltagerens ejerandel i det transparente selskab« […].

Det fremgår således tydeligt af forarbejderne, at der (alene) skulle ske en ligestilling af på den ene side udenlandske moderselskaber, der efter dansk ret blev betragtet som selvstændige skattesubjekter, og på den anden side udenlandske moderselskaber, som efter dansk ret blev betragtet som skattemæssigt transparente, og disses deltagere, idet der altså (kun) skulle ses bort fra deltagernes ejerandel i det transparente selskab og deres status som enten en fysisk person eller et selskab.

Forarbejderne giver derimod ingen holdepunkter for, at udenlandske moderselskaber, som efter dansk ret blev betragtet som skattemæssigt transparente, og disses udenlandske deltagere skulle stilles bedre end udenlandske moderselskaber, som efter dansk ret blev anset for selvstændige skattesubjekter, således at udenlandske deltagere i et transparent udenlandsk moderselskab skulle kunne gøre krav på fritagelse fra en skattepligt, selv om moder-/datterselskabsdirektivets betingelser herfor i øvrigt ikke var opfyldt.

Ved lov nr. 525 af 12. juni 2009 (§ 14, nr. 5) blev selskabsskattelovens § 2, stk. 1, litra c), omskrevet, bl.a. således at det tidligere 2. pkt. (som i mellemtiden var blevet til 3. pkt.) blev skrevet sammen med 4. pkt., i hvilken forbindelse ordet »moderselskab« udgik af det herefter gældende 3. pkt., idet skattefritagelsen blev knyttet op på definitionen af begrebet datterselskabsaktier, der med samme ændringslov blev indført i aktieavancebeskatningsloven.

Samtidig blev 5. pkt. i selskabsskattelovens § 2, stk. 1, litra c) ændret, idet henvisningen »som nævnt i 3. pkt.« bortfaldt, hvilket var naturligt, eftersom ordet »moderselskab« ikke længere indgik i 3. pkt. Af forarbejderne (…) fremgik, at der var »tale om en konsekvensændring som følge af forslagets § 14, nr. 5«. Der var tydeligvis tale om en konsekvensændring af en teknisk karakter.

Forarbejderne giver således ingen holdepunkter for, at bortfaldet af »som nævnt i 3. pkt.« havde som følge, at udenlandske moderselskaber, som efter dansk ret blev betragtet som skattemæssigt transparente, og disses deltagere - nu - skulle stilles bedre end udenlandske moderselskaber, som efter dansk ret blev anset for selvstændige skattesubjekter, og som fortsat kun havde krav på en skattefritagelse, når beskatningen af udbyttet skulle frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet var hjemmehørende.

Den fritagelse for en skattepligt, der følger af selskabsskattelovens § 2, stk. 1, litra c), 5. pkt., har altså - til stadighed - været betinget af, at udbyttet skal frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet, hvad beskatningen ikke skal, hvis der - som i det foreliggende tilfælde - er tale om, at bestemmelserne påberåbes for at gøre et retsmisbrug muligt.

På den anførte baggrund må Skatteministeriet frifindes for TDC's selvstændige påstand.«

*TDC* har i sit sammenfattende processkrift af 11. januar 2021 anført bl.a.:

»5.1 Sagsøgtes selvstændige påstand (besvarelse af spørgsmål 1) Selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. fastsætter klart hvilke betingelser, der skal opfyldes for at udbytte ikke er omfattet af skattepligten.

Bestemmelsen blev indført i forbindelse med implementeringen af ændringen af moder-/datterselskabsdirektivet, og det anføres i forarbejderne til bestemmelsen […]:

»*De nye virksomheder, der medtages på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a, er selskabsskattepligtige i den medlemsstat, hvor de er hjemmehørende, men nogle af dem betragtes på grund af deres juridiske karakteristika af andre medlemsstater som skattemæssigt transparente. Ifølge betragtningerne til ændringsdirektivet bør medlemsstater, der behandler ikke-hjemmehørende skattepligtige selskaber som skattemæssigt transparente på dette grundlag, give en*

**1682**

*passende skattelettelse med hensyn til indtægter, der er en del af moderselskabets beskatningsgrundlag.«*

*(...)*

*Transparente selskaber er ikke omfattet af den begrænsede skattepligt af udbytte fra danske selskaber i henhold til selskabsskattelovens § 2, stk. 1, litra c, idet skattepligten i henhold til denne be-*

Copyright © 2023 Karnov Group Denmark A/S

stemmelse påhviler selskaber og foreninger m.v. som nævnt i sel- skabsskattelovens § 1, stk. 1. Der er således ikke behov for en be- stemmelse om, at transparente selskaber, der er omfattet af moder- /datterselskabsdirektivet, ikke er begrænset skattepligtige i Danmark af udbytte fra danske datterselskaber.

*Efter de danske regler påhviler skattepligten til udbytte, der tilfal- der et transparent selskab, selskabsdeltagerne.*

*Det foreslås derfor, at udenlandske selskabsdeltagere i et trans- parent selskab, der er omfattet af moder-/datterselskabsdirektivet, ikke skal være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab. Dette skal gælde, uanset om selskabsdeltageren er et selskab eller en fysisk person og uanset selskabsdeltagerens ejerandel i det transparente selskab«*

Bestemmelsen fastsætter altså udtrykkeligt, at skattepligten ikke omfatter udbytte oppebåret af deltagerne i et moderselskab, der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF, hvis moderselskabet ved be- skatningen i Danmark anses for at være en transparent enhed [...].

Dette er efter ordlyden af og forarbejderne til bestemmelsen de eneste relevante kriterier i forhold til § 2, stk. 1, litra c, 5. pkt. Det er derfor heller ikke relevant i denne sammenhæng at vurdere, hvorvidt NTC er retmæssig ejer af udbytte fra sagsøgte.

Skatteministeriet har imidlertid anført, at der til trods for den helt klare ordlyd af bestemmelsen og de tilsvarende klare forarbejder gælder en yderligere betingelse. Ifølge Skatteministeriet kan et selskab alene anses for et »moderselskab« efter selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., såfremt beskatningen skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller en dobbeltbe- skatningsoverenskomst.

Skatteministeriet har anført, at en sådan betingelse skulle fremgå af ordene »moderselskab som nævnt i 2. pkt.« i den oprindelige formulering af selskabsskattelovens § 2, stk. 1, litra c.

En sådan betingelse fremgår dog klart ikke af 2. pkt., der havde følgende ordlyd [...]:

*»Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskab), der ejer mindst 20 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlod- ningstidspunktet skal ligge.«*

Det fremgår ligeledes udtrykkeligt af de ovenfor citerede forarbej- der til bestemmelsen, at moderselskaber i form af transparente en- heder på intet tidspunkt havde været skattepligtige af udbytte ud- loddet fra danske selskaber, idet skattepligten påhvilede deltagerne i moderselskabet. Endvidere fremgår det udtrykkeligt af bestemmel- sens ordlyd, at det var deltagerne i moderselskabet (og ikke moder- selskabet), som skatteretligt skulle anses for at oppebære udbyttet.

Det forekommer på denne baggrund besynderligt og utroværdigt, at det oprindeligt skulle have været en betingelse for anvendelse af bestemmelsen, at der efter en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirektivet skulle ske frafald eller nedsæt- telse af beskatningen af moderselskabet.

Moderselskabet var jo slet ikke skattepligtigt i Danmark.

Formuleringen af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. blev ændret i 2009, hvor ordene »som nævnt i pkt. 3« udgik [...]. Samtidig hermed blev formuleringen af 3. pkt. ændret, således at betingelsen om, at beskatning af udbytte skal frafaldes ellers ned- sættes efter bestemmelsen i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirektivet, lovteknisk blev flyttet til dette punkt.

Hvis den oprindeligt skulle have været en betingelse for anvendelse af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. at beskatning af udbytte skulle frafaldes eller nedsættes efter bestemmelsen i en dobbeltbeskatningsoverenskomst eller moder-/datterselskabsdirek-

tivet, ville det have været særdeles misvisende at slette henvisningen til pkt. 3, når betingelsen om frafald eller nedsættelse samtidig blev flyttet til netop pkt. 3.

Også sammenhængen mellem den i 2009 gennemførte ændring af formuleringen af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. og den samtidige ændring af 3. pkt. tilsiger derfor, at der ikke i forhold til 5. pkt. gælder noget krav om, at beskatning af udbytte skal frafaldes eller nedsættes efter bestemmelserne i en dobbeltbe- skatningsoverenskomst eller moder-/datterselskabsdirektivet.

Skatteministeriets synspunkt forekommer derfor at være en efter- rationalisering, som naturligvis ikke kan ændre ved, at der hverken i ordlyd eller forarbejder til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt. er hjemmel til at opstille et sådant krav.

Efter ordlyden af bestemmelsen er de eneste relevante kriterier i forhold til § 2, stk. 1, litra c, 5. pkt., således, hvorvidt moderselska- bet (i dette tilfælde NTC) er optaget på listen over de selskaber, der er omhandlet af moder-/datterselskabsdirektivet samt om mo- derselskabet ved beskatning her i landet anses for at være en transparent enhed. Det er ikke relevant i denne sammenhæng at vurdere, hvorvidt NTC er retmæssig ejer af udbytte fra sagsøgte.

**1683**

Moderselskabet - NTC - er ubestridt et luxembourgsk selskab af typen »société en commandite par actions« og dermed et af de selskaber, der er optaget på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i moder-/datterselskabsdirektivet [...].

Udbytte udloddet fra TDC til NTC er således skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra C, 5. pkt., hvis NTC efter intern dansk skatteret må anses for et transparent selskab.

Det er i Landsskatterettens kendelse lagt til grund og er tillige ubestridt af sagsøger [...], at NTC efter intern dansk skatteret må anses for et transparent selskab.

Som følge heraf er udbytte udloddet fra TDC til NTC skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt.

Spørgsmål 1 skal dermed besvares med »ja« på baggrund af den dagældende formulering af selskabsskattelovens § 2, stk. 1, litra c, 5. pkt.

**5.2 Sagsøgers påstand (besvarelse af spørgsmål 2)**

Sagsøger gør gældende, at NTC er omfattet af skattepligten i sel- skabsskattelovens § 2, stk. 1, litra c, idet NTC hverken har adgang til fordelene i moder-/datterselskabsdirektivet eller kan anses for den retmæssige ejer af udbyttet under den dansk-luxembourgske dobbeltbeskatningsoverenskomst.

Skatteministeriets argumentation kan ikke tiltrædes. NTC har helt konkret adgang til fordelene i både moder-/datterselskabsdirektivet (afsnit 5.2.1) og den danskluxembourgske dobbeltbeskatningsove- renskomst (afsnit 5.2.2), og Skatteministeriet har ingen hjemmel til at nægte NTC adgang til fordelene (afsnit 5.2.3).

I tillæg hertil er Skattemyndighedernes skiftede argumentation og praksisændring - både dansk og EU-retligt - retssikkerhedsmæs- sigt problematisk og rejser spørgsmål om Danmarks suverænitets- afgivelse til EU (afsnit 5.2.4 og 5.2.5).

Endelig er der under alle omstændigheder konkret ikke tale om misbrug (afsnit 5.2.6).

Ove[n]stående taler hver for sig og samlet set for, at spørgsmål 2 dermed fortsat skal besvares med »ja« og at sagsøgtes frifindelses- påstand skal tages til følge.

5.2.1 Adgang til fordele under moder-/datterselskabsdirektivet

NTC er ubestridt et af de selskaber, der er optaget på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i moder-/dat- terselskabsdirektivet og er underlagt luxembourgsk selskabsskat (»impot su le revenu des collectives«). Det følger herefter direkte af moder-/datterselskabsdirektivet, at NTC er berettiget til direkti- vets fordele.

Copyright © 2023 Karnov Group Denmark A/S

Der er ikke i moder-/datterselskabsdirektivet et krav om at udbyttemodtageren er »retmæssig ejer« af udbytterne. Direktivet bygger alene på objektive kriterier om ejerskab af de kapitalandele, som giver anledning til udbytteudlodningen [...]. Det er derfor ikke korrekt, når Skatteministeriet sammenkobler udbyttebeskatningen efter direktivet med krav om status som retmæssig ejer i dobbeltbeskatningsoverenskomsten og rente-/royaltydirektivet. Selv hvis et sådan krav indregnes, opfylder NTC også betingelserne hertil, idet NTC anerkendes i Luxembourg som et selvstændigt rets- og skattesubjekt, er civilretlig ejer af aktierne i NTC og havde beføjelser til at råde økonomisk over det modtagne udbytte, jf. sag C-116/16 (»EU-Dommen«) pr. 105 ([...] - yderligere afsnit 5.2.6 nedenfor).

NTC har således adgang til moder-/datterselskabsdirektivets artikel 5, der fastsætter at det overskud, som et datterselskab udlodder til sit moderselskab er fritaget for kildeskat [...].

5.2.2 Adgang til at fordele under dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg

Ved afgørelsen af, om NTC er berettiget til de fordele, der følger af dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, er Danmark forpligtet til at acceptere Luxembourgs skattemæssige kvalifikation af NTC som et selvstændigt skattesubjekt og dermed en skattepligtig person omfattet af dobbeltbeskatningsoverenskomsten.

Det afgørende for besvarelsen af, hvorvidt Danmark i henhold til dobbeltbeskatningsoverenskomsten er forpligtet til at frafalde eller nedsætte beskatning af udbytte fra sagsøgte, er om NTC er »retmæssig ejer« af udbyttet, jf. artikel 10 i dobbeltbeskatningsoverenskomsten [...].

I 2003-kommentarerne til OECD modeloverenskomsten er problematikken omkring retmæssig ejer af udbytte primært omtalt under punkt 12 til artikel 10. Kommentarerne har følgende ordlyd [...]

Af kommentarerne til OECD's overenskomst kan det udledes, at agenter og mellemmænd samt gennemstrømningsselskaber ikke er retmæssige ejere af udbytte. For så vidt angår gennemstrømningsselskaber er det dog en betingelse, at selskabet har så snævre beføjelser til at råde over udbyttet, at det reelt i relation til udbyttet er en nullitet eller administrator.

NTC anerkendes i Luxembourg som et selvstændigt rets- og skattesubjekt, og NTC er civilretlig ejer af aktierne i NTC. NTC råder over kapitalen i Luxembourg, har en person ansat og indestående på selskabets bankkonto har genereret betydelige renteindtægter for NTC. NTC er derfor hverken et gennemstrømningsselskab eller en nullitet i forhold til udbyttet fra sagsøgte, men derimod dets retmæssige ejer.

Dette fremgår ligeledes af »Certificate of Residence« fra de luxembourgske skattemyndigheder [...]

NTC har dermed også adgang til fordelene under dobbeltbeskatningsoverenskomsten.

5.2.3 Ingen national hjemmel til nægtelse af direktivfordele

**1684**

Direktivets artikel 1, stk. 2, har følgende ordlyd [...]

I dansk ret følger det af bestemmelsens ordlyd samt af Landsskatterettens kendelse i denne sag [...], samt Landsskatterettens kendelse i SKM2012.26.LSR [...], at direktivets fordele alene kan nægtes i det omfang national lovgivning indeholder særskilt og specifik hjemmel hertil.

Det følger ligeledes af EU-retten, som fastsat i C-321/05, Kofoed (»Kofoed-dommen«) (afsnit 5.2.3 og 5.2.5.1 nedenfor), at der skal foreligge interne danske regler, såfremt NTC skal kunne nægtes fritagelse for udbytteskat efter moder-/datterselskabsdirektivet.

Uden national hjemmel og i fraværet af en generel værnsregel har Skatteministeriet dermed alene mulighed for at nægte skattefrita-

gelsen med henvisning til realitetsgrundsætningen eller til princippet om rette indkomstmodtager.

Der er i sagen imidlertid enighed om, at realitetsgrundsætningen ikke giver grundlag for at tilsidesætte de i denne sag foretagne dispositioner, samt at NTC er rette indkomstmodtager af udbyttet [...].

Idet de objektive betingelser under såvel moder-/datterselskabsdirektivet som under dobbeltbeskatningsoverenskomsten er opfyldt, har Skatteministeriet dermed ingen adgang til at nægtelse af fritagelsen for skat.

Landsskatteretten udtaler derfor også følgende i kendelsen SKM2012.26.LSR [...]:

»Af direktivets artikel 1, stk. 2 fremgår, at direktivet ikke er til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Danmark har ikke vedtaget lovbestemmelser med dette sigte, men hjemmel til at bortse fra formelt lovlige og korrekte dispositioner i tilfælde af misbrug følger af almindelige rets grundsætninger, herunder retspraksis. Højesteret har imidlertid ikke fundet grundlag for at tilsidesætte et i øvrigt lovligt stiftet selskab alene med henvisning til, at stiftelsen er foretaget af skattebesparelseshensyn, jf. herved Højesterets domme i SKM 2003.482 (Overhold-sagen) og SKM 2006.749 (Finwill-sagen).

Det her i sagen lovligt stiftede og fungerende cypriotiske selskab, som er ejer af anparterne i det danske selskab, er således rette indkomstmodtager af udbyttet, som er udloddet fra det danske selskab. Den omstændighed, at det cypriotiske selskabs eneste- eller i det væsentligste eneste-aktivitet er at eje anparterne i det danske selskab, medfører ikke at selskabet ikke har erhvervsmæssig drift og herved ikke et andet resultat, jf. herved Højesterets dom i TfS2004.542 (Johnson Holding-sagen).

Som følge heraf er udbyttet i medfør af direktivets artikel 5 fritaget for kildeskat.«

Det cypriotiske selskab i den omtalte sag havde som sin eneste aktivitet at eje anparterne i det anførte danske selskab og havde hverken lokaler eller personale til rådighed.

I overensstemmelse hermed anfører Landsskatteretten i sin kendelse af 13. marts 2012 [...], i nærværende sag:

»Ved Landsskatterettens kendelse af 16. december 2011 (TfS 2012.26), som vedrører et selskabs indeholdelsespligt af udbytteskat for udbytte udbetalt til et moderselskab på Cypern, blev selskabet ikke anset for indeholdelsespligtigt af udbytteskat. Ved afgørelsen blev der lagt vægt på, at Danmark ikke har vedtaget lovbestemmelser med sigte på at hindre svig og misbrug, jf. direktivets artikel 1, stk. 2. Det lovligt stiftede og fungerende cypriotiske selskab blev, uanset at selskabets eneste - eller i det væsentligste eneste - aktivitet var at eje anparter i det danske selskab, derpå anset for rette indkomstmodtager af udbyttet. Udbyttet var herefter fritaget for kildeskat, jf. direktivets artikel 5, og var dermed ikke omfattet af den begrænsede skattepligt, jf. selskabsskattelovens § 2, stk. 2, litra c.

Herefter og idet det omhandlede udbytte overføres fra det danske selskab til et selskab i Luxembourg, der er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivet, artikel 2, stk. 1, litra a, men som ved beskatningen her i landet anses for at være transparent, og da sådanne selskaber behandles som andre selskaber optaget på listen, jf. ad spørgsmål 1, vil udbyttet være fritaget for skattepligt, jf. artikel 5. Udbyttet vil herefter ikke være omfattet af den begrænsede skattepligt, jf. selskabsskattelovens § 2, stk. 1, litra c, 5. pkt.«

Landsskatteretten har således allerede fastlagt, at der ikke i dansk ret er hjemmel til at nægte NTC de fordele, der følger af direktivet.

Skatteministeriet argumenterer fortsat for, at den dansk-luxembourgske dobbeltbeskatningsoverenskomst artikel 10 og saksabs-

skattelovens § 2, stk. 1, litra c udgør sådanne »interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug« som anført i moder-/datterselskabsdirektivets artikel 1, stk. 2, således at Danmark ikke er forpligtet til at frafalde kildeskatten i henhold til moder-/datterselskabsdirektivet.

Dette er fortsat meningsløst.

Sagsøgers holdning strider åbenlyst mod »den gyldne regel«, hvorefter dobbeltbeskatningsoverenskomster ikke selvstændigt kan hjemle beskatning, hvilket er bekræftet af Landsskatteretten i SKM 2010.268LSR (nu SKM2012.121.ØLR […]).

Den blotte regel om begrænset skattepligt i selskabsskattelovens § 2, stk. 1, litra c udgør selvsagt heller ikke en sådan intern hjemmel til hindring af svig og misbrug. NTC anerkendes ubestridt som et selvstændigt rets- og skattesubjekt i Luxembourg, og NTC er ubestridt civilretlig ejer af aktier i sagsøgte. Som følge heraf er NTC rette indkomstmodtager af udbytte på selskabets aktier i sagsøgte. Selv hvis man måtte indtage det -

**1685**

efter søgsøgtes opfattelse forkerte - synspunkt, at NTC ikke er retmæssig ejer af udbyttet i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, er NTC derfor berettiget til de fordele, der følger af moder-/datterselskabsdirektivet og sagsøgte har dermed et ubetinget krav på fritagelse for kildeskat på det udbetalte udbytte efter moder-/datterselskabsdirektivet.

Som der også blev redegjort for i Østre Landsrets forelæggelseskendelse til Domstolen, pkt. 53-55, fandtes der heller ikke i 2011 en generel værnsregel mod bekæmpelse af misbrug […]. En sådan værnsregel blev først vedtaget ved lov nr. 540 af 29. april 2015 […]. Derudover er der også enighed om, at realitetsgrundsætningen ikke giver grundlag for at tilsidesætte de i sagen foretagne dispositioner, jf. Østre Landsrets forelæggeseskendelse til Domstolen, pkt. 55 […].

Ovenstående spørgsmåls EU-retlige fortolkning skulle have været afklaret ved Domstolens besvarelse af spørgsmål 1.1 og 2 i forelæggelseskendelsen […]. Domstolen valgte imidlertid at foretage en praksisændring (se afsnit 5.2.5 nedenfor), der medførte at Domstolen ikke tog direkte stilling til spørgsmålene.

Både Kommission og generaladvokaten bidrog dog med deres fortolkning. Kommissionen har i sit skriftlige indlæg til Domstolen, jf. pkt. 8 ff. og pkt. 22 […], klart anført, at hverken selskabsskattelovens § 2, stk. 1, litra c eller dobbeltbeskatningsoverenskomstens artikel 10 kan anses som en gennemførelse af bestemmelsen i moder-/datterselskabsdirektivet artikel 1, stk. 2. Ligeledes kom generaladvokaten i pkt. 106 i sit forslag til afgørelse frem til, at (…):

*»106. Af denne grund skal spørgsmål 1.1 og 2 besvares med, at hverken § 2, stk. 2, litra c, i den danske selskabsskattelov eller en bestemmelse i en dobbeltbeskatningsoverenskomst, der for så vidt angår beskatning af udloddet udbytte tager udgangspunkt i den retmæssige ejer, er tilstrækkelige til at kunne betragtes som gennemførelse af moder-/datterselskabsdirektivets artikel 1, stk. 2.«*

Både Kommissionen og generaladvokaten støttede således sagsøgtes anbringender.

Som nævnt gennemførte Domstolen imidlertid ved afgørelsen en praksisændring, hvorefter EU-direktiver »nu« i sig selv kan påberåbes af en medlemsstat over for borgerne uden krav om national gennemførelse af de relevante bestemmelser.

Skatteministeriet har på linje med EU-Dommen fremsat et synspunkt om, at selv hvis der på tidspunktet ikke fandtes nationale eller overenskomstmæssige regler til bekæmpelse af misbrug, ville det generelle EU-retlige princip om forbud mod retsmisbrug finde anvendelse.

Dette synspunkt tager direkte afsæt i Domstolens nye praksis og udgør samtidig også et brud med gældende dansk administrativ

praksis. Som nærmere beskrevet i afsnit 5.2.5 nedenfor er retssikkerhedsprincippet til hinder for ministeriets synspunkt.

5.2.4 Ændring af dansk praksis om skattepligt på udbytter og retmæssig ejer

Ved vurderingen af, om Skatteministeriets argumentation er udtryk for en praksisændring, er det ikke alene relevant at se på skattemyndighedernes praksis, men ligeledes relevant at se nærmere på lovgiver og Skatteministeriets (skiftende) syn på problemstillingen.

I Danmark har udenlandske selskaber været begrænset skattepligtige af udbytter siden 1. januar 1970 […].

I 1992 blev moder-/datterselskabsdirektivet implementeret i dansk ret […], hvorefter udbytte som f.eks. et dansk datterselskab udlodder til sit EU-moderselskab, fritages for kildeskat under visse betingelser, jf. også artikel 5 i moder-/datterselskabsdirektivet […].

I 1998 blev også ikke-EU-selskaber omfattet af fritagelsen for udbytteskat (…). Det fremgår af forarbejderne til bestemmelsen, at […] (…):

*»Det foreslås endvidere at afskaffe kildeskatten på udbytter betalt til udenlandske moderselskaber, når det danske datterselskab er omfattet af EU's moder-/datterselskabsdirektiv, således at EU-selskaber og ikke-EU-selskaber skattemæssigt behandles ens. Denne kildeskat kan i vidt omfang undgås ved at indskyde holdingselskaber i lande, i forhold til hvilke Danmark helt eller delvist er afskåret fra at indeholde kildeskat. Indkomst i et dansk datterselskab vil efter forslaget således i Danmark alene blive pålagt dansk selskabsskat, og det udenlandske moderselskab vil i den henseende skattemæssigt i Danmark blive behandlet på samme made som et dansk moderselskab.«*

Af de provenumæssige bemærkninger fremgår det, at […] (…):

*»M.h.t. skattefritagelsen af udbytter fra danske datterselskaber til udenlandske moderselskaber og udbytter fra udenlandske datterselskaber til danske moderselskaber vil ændringen ikke have betydning for udbytte fra og til et andet EU-land, da disse i forvejen er skattefri, men alene i forhold til lande uden for EU. Der er ikke faste holdepunkter for en bedømmelse af provenuvirkningen. Bl.a. er der ikke oplysninger om udenlandske moderselskabers udbytter fra Danmark eller om danske moderselskabers datterselskabsudbytte fra ikke-EU-lande. På den anden side må det inddrages i vurderingen, at den gældende beskatning kan omgås ved omdirigering af udbytte[rn]e til selskaber i 3. lande, således at udbytterne ikke beskattes her i landet.«*

Bemærkningerne må forstås således, at Skatteministeriet i 1998 mente, at indskydelse af holdingselskaber i andre EU-land var en simpel og lovlig udnyttelse af regelsættet, og at man derfor ligeså godt kunne fjerne den administrative byrde ved reglerne.

**1686**

I 2000 kom Skatteministeriet imidlertid på andre tanker. En særlig adfærdskodeks-gruppe havde i ECOFIN-regi undersøgt 271 skatteordninger i EU-landene og i forlængelse heraf udtrykt kritik af det danske regelsæt.

Den 10. november 2000 blev lovforslag nr. 99 derfor fremsat om genindførelse af udbyttebeskatning for moderselskaber i ikke-EU-lande uden dobbeltbeskatningsoverenskomst med Danmark.

Af lovforslaget fremgår det, at ændringen skyldes kritik udefra, navnlig idet […]:

*»(…), at de danske regler kan anvendes til at udhule andre landes beskatning. Andre lande, som beskatter udbytter fra selskaber i disse lande til moderselskaber i skattely-lande, er derfor utilfreds med, at deres beskatning kan omgås ved hjælp af de danske holdingregler.*

*Det foreslås derfor som et bidrag fra dansk side til at modvirke brugen af skattely og for at imødekomme udenlandsk kritik at genindføre skatten på 25 pct. af udbyttebetalinger, fra et dansk dat-*

U.2023.1575H

terselskab til dets udenlandsk moderselskab, men kun i tilfælde, hvor moderselskabet er hjemmehørende i et land uden for EU eller i et land, som ikke har en dobbeltbeskatningsoverenskomst med Danmark.«

Ved vedtagelsen af lovforslaget vil de danske holdingregler således være tilbage til situationen i 1998, dvs. en retstilstand, hvor kildeskat (igen) i vidt omfang kunne undgås ved at indskyde holdingselskaber i lande, i forhold til hvilke Danmark helt eller delvist var afskåret fra at indeholde kildeskat, jf. de ovenfor citerede forarbejder til 1998-ændringen. Af samme årsag forventede lovgiver også, at merprovenuet ved forslaget ville være begrænset […].

Netop denne situation affødte en del spørgsmål under lovforslaget behandling.

I sin besvarelse af udvalgsspørgsmål 16 […] anvendte skatteministeren et eksempel med et moderselskab på De Britiske Jomfruøer, som har et datterselskab i Irland.

Hvis det irske datterselskab er ejet direkte af moderselskabet på Jomfruøerne, vil Irland beskatte udbyttebetaling fra datterselskab til moderselskab. Genindførelsen af udbyttebeskatning ville medføre, at den irske beskatning ikke længere kunne omgås ved at indskyde et dansk holdingselskab, så det irske datterselskab udloder udbytte til det danske holdingselskab, der videreudlodder udbyttet til moderselskabet på Jomfruøerne.

Det danske holdingselskab vil efter lovforslaget ikke længere kunne udbetale udbytte skattefri til moderselskabet på Jomfruøerne. Skatteministeriet bekræfter imidlertid også, at […] (…):

»Det er korrekt, at moderselskabet på Jomfruøerne fortsat kan undgå den danske beskatning af udbytterne fra det irske selskab ved at overdrage aktierne i det danske selskab til et mellemholdingselskab på Cypern. I så fald vil Danmark ikke beskatte udbyttet, da moderselskabet på Cypern er omfattet af den danskcypriotiske dobbeltbeskatningsoverenskomst.«

Til besvarelse af udvalgsspørgsmål 3 om merprovenuet […], svarede skatteministeren:

»Selskaberne vil imidlertid kunne omstrukturere sig, således at aktierne i det danske datterselskab overdrages til et datterselskab i et land, hvortil udbyttebetalinger fortsat er fritaget for dansk udbytteskat. Dette er fordelagtigt, hvis udbyttet herfra kan videreudloddes til det egentlige moderselskab med en beskatning, som er lavere end den danske, eventuelt helt uden beskatning.

Derfor skønnes provenuet fra sådanne selskaber at blive begrænset.«

Til besvarelse af udvalgsspørgsmål 15, hvor der påpeges, at lovforslagets regler ikke er effektive på grund af muligheden for anvendelse af et mellemholdingselskab […], svarede skatteministeren […]:

»Det anføres, at de foreslåede regler ikke er særligt effektive, idet de kan undgås ved et mellemholdingselskab i et andet land, som er med i EU eller har en dobbeltbeskatningsoverenskomst med Danmark, og som har gunstige skatteregler.

Jeg vil hertil bemærke, at der i så fald er tale om, at moderselskabet i skattelylandet omgår beskatningen ved hjælp af de gunstige regler i et andet land.«

Samlet set er der altså ingen tvivl om, at Skatteministeriet ved fjernelsen og genindførelsen af udbytteskatten har været fuldt ud opmærksom på muligheden for at anvende mellem-holdingselskaber i EU eller DBO-lande og på danske selskabers mulighed for at udbetale skattefrit udbytte til sådanne selskaber. Der ikke blev fastsat særlige regler for at modvirke dette, og der nævnes ikke på nogen måde, at der i den forbindelse kan være en problemstilling vedrørende den »retmæssige ejer« af udbyttet. Dette til trods for, at Skatteministerens besvarelse helt åbenbart omhandler rene gennemstrømningsselskaber.

Denne retstilstand blev igen bekræftet af Skatteministeren i 2004 ved implementeringen af rente-/royaltydirektivet i dansk ret og svar på spørgsmål 54 […].

I retspraksis lægges der vægt på, om lovgiver har været opmærksom på muligheden for at omgå regelsæt, jf. bl.a. U.2004.174 […], hvor Højesteret kom frem til, at der var tale om lovlig udnyttelse af et regelsæt. Endvidere lægges i retspraksis vægt på, om lovgiver har indført nyere lovgivning vedrørende det område, som skatteyderen agerer indenfor, og Højesteret fortolker ikke en bestemmelse udvidende, såfremt lovgiver har været tæt på problemstillingen uden specifikt at reagere, jf. U.2007.736H […] og U.2004.174H […]. Som det også er beskrevet af professor Anders Nørgaard Laursen i RR.SM.2020.0006 […] vil det få afgørende betydning i sådanne situationer, hvis det kan påvises, at lovgiver undlod at reagere på en erkendt omgåelsesmulighed. I

**1687**

et sådan tilfælde må det være udelukket for domstolene at gribe ind og »rede« skattemyndighederne.

Lovgiver har været opmærksom på problemstillingen uden specifikt at ændre loven eller indsætte bestemmelser til at hindre anvendelsen af EU mellemholdingselskaber, ligesom den på intet tidspunkt før sagskomplekset om beneficial ownership har været anvendt et udvidende »retmæssig ejer«-begreb under direktivet eller dobbeltbeskatningsoverenskomsten.

Dette understøttes af en udtalelse fra kontorchef B til Jyllandsposten den 14. september 2009 (…) […]:

»Selv om pengene ikke er strømmet igennem med det samme i alle sager, så gælder den samme begrundelse, nemlig at et selskab i Luxembourg uden råderet og dispositionsret over midlerne, ikke er de retmæssige ejere. Det er de bagvedliggende ejere, og derfor skal der opkræves kildeskat. Om vi så får medhold, ved vi ikke. Vores synspunkt er ret nyt i skattepraksis, så vi må se hvad Højesteret siger, når den kommer til at tage stilling engang.«

Skatteministeriets (nuværende) synspunkt om anvendelsen af EU mellemholdingselskaber udgør dermed også en ændring af dansk praksis som gengivet i [L]ands[s]katterettens kendelse af 13. marts 2012 […]. Med henvisning til Landsskatterettens kendelse af 16. december 2011 (TfS 2012.26) […] lagde Lands[s]katteretten som nævnt også vægt på, at Danmark ikke har vedtaget lovbestemmelser med sigte på at hindre svig og misbrug, jf. moder-/datterselskabsdirektivets artikel 1, stk. 2.

Såfremt det nu ikke længere er af betydning, om Danmark har vedtaget lovbestemmelser med sigte på at hindre svig og misbrug, jf. direktivets artikel 1, stk. 2, er der selvsagt tale om ændring af den praksis, som Danmarks højeste administrative instans på skatteområdet har fastsat. En sådan praksisændring kan ikke lovligt gennemføres uden forudgående varsel, jf. bl.a. U.1965.399.H […] og U.1983.8.H […], hvilket også er beskrevet i den juridiske vejledning […].

Dette skal også ses i sammenhæng med, at skattemyndighederne så vidt vides ikke i et eneste tilfælde forud for disse sager har anset et udenlandsk selskab for at være begrænset skattepligtig af udbytter ud fra en betragtning om, at selskabet ikke var den retmæssige ejer af indkomsten, sådan som dette begreb nu fortolkes af Skattestyrelsen. Og slet ikke med henvisning til, at det i henseende var uden betydning om Danmark havde vedtaget lovbestemmelser med sigte på at hindre svig og misbrug.

I forbindelse med behandlingen af L 30 (2006/2007) blev skatteministeren således spurgt om, i hvilket omfang og hvorledes Skattestyrelsen kontrollerer, om et gennemstrømningsselskab skal anerkendes som rette indkomstmodtager (spørgsmål 10 af 21. november 2006). Skatteministeren udtaler, at (…):

»Det indgår i den ligningsmæssige behandling at påse, at betingelserne for ikke at indeholde udbytteskat er opfyldt, herunder om et udenlandsk selskab er retmæssig ejer af udbyttet.«

Ifølge skatteministeren har der således historisk været fokus på området, idet indgår som en del af det almindelige ligningsarbejde at påse, at udenlandske selskaber er berettiget til fordele efter dobbeltbeskatningsoverenskomsterne, herunder om selskaberne er retmæssige ejere af udbytterne.

Det er i sagens natur ikke muligt at fremvise eksempler på en »negativ afgørelse«, hvor skattemyndighederne vælger ikke at gribe ind. I stedet må det lægges til grund, at skatteministeren havde den fornødne indsigt på området til at fremkomme med følgende besvarelse i forbindelse med samme lovbehandling (svar på spørgsmål 6 af 21. november 2006), hvor han [...]:

»... ikke kan oplyse eksempler på udenlandske gennemstrømningsselskaber, som de danske skattemyndigheder ikke har accepteret som retmæssig ejer af udbytte fra danske selskaber.«

Ovenstående citat skal navnlig ses i sammenhæng med den fokus, der var på gennemstrømningsselskaber i forbindelse med lovændringerne i 1998-2001, samt at Skatteministeriet i 2003 specifikt undlod at gennemføre en undersøgelse af gennemstrømningsselskaber, idet lovændringen i 2001 i væsentlig omfang havde fjernet udnyttelsesmulighederne, som var blevet kritiseret i EU [...]. Den selvsamme lovændring, hvor Skatteministeren i udvalgsspørgsmål bekræftede muligheden for at indskyde mellemholdingselskaber. Ligeledes var det i 2002 Skattestyrelsens opfattelse, at en ligning af gennemstrømningsselskaber ikke ville føre til mange korrektioner [...].

Den tidligere praksis hænger antagelig sammen med, at Skatteministeriet oprindeligt betragtede begrebet retmæssig ejer/»beneficial owner« som værende meget lig det danske begreb »rette indkomstmodtager«.

Skatteministeren har således i et svar af 6. november 2006 på spørgsmål S 474 udtrykt forholdet mellem retmæssig ejer og rette indkomstmodtager som følger (...):

»Udgangspunktet er, at udenlandske selskaber, der oppebærer udbytter fra danske selskaber, er begrænset skattepligtige af udbytterne. Skattepligten opfyldes ved indeholdes af 28 pct. udbytteskat.

Udgangspunktet fraviges, hvis udbytterne oppebæres af et selskab, der ejer mindst 20 pct. af aktiekapitalen i det udbyttegivende selskab. Ejerskabskravet skal være opfyldt i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningen skal ligge. Det er en betingelse for fravigelsen, at beskatningen skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor udbyttemodtageren er hjemmehørende.

**1688**

[citeret under Retsgrundlag]

Skatteministeren gentager denne opfattelse i forbindelse med behandlingen af L 116 (lov nr. 308 af 19. april 2006) hvor han som svar på en henvendelse fra FSR udtaler (...):

»Den begrænsede skattepligt for renter efter selskabsskattelovens § 2, stk. 1, litra d, omfatter udenlandske selskaber, der oppebærer koncerninterne renter fra Danmark. Denne begrænsede skattepligt bortfalder, hvis beskatningen skal frafaldes eller nedsættes efter rente-/royaltydirektivet eller efter en dobbeltbeskatningsoverenskomst.

I den forbindelse skal man være opmærksom på, at i forhold til selskabsskattelovens § 2, stk. 1, litra d, må det afgøres ud fra princippet om rette indkomstmodtager, hvem der oppebærer renterne.

Kildebeskatning af renterne skal nemlig kun frafaldes efter overenskomsterne, hvis renternes retmæssige ejer er hjemmehøren-

de i den anden stat. Tilsvarende gælder i rente-/royaltydirektivet, jf. direktivets artikel 1, stk. 1. Direktivets fordele kan endvidere nægtes anvendt i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.

Hvis kapitalfondene foretager aktie- og låneinvesteringer via holdingselskaber, vil det skulle vurderes, om holdingselskabet er rette indkomstmodtager/retmæssig ejer af renteindkomsten. Et rent gennem-strømningsselskab i eksempelvis Luxembourg kan efter min opfattelse næppe være rette indkomstmodtager/retmæssig ejer af renteindkomsten. Den schweiziske højesteret er kommet frem til, at et rent gennemstrømningsholdingselskab i Danmark ikke var retmæssig ejer til udbyttebetalinger efter den dansk - schweiziske overenskomst.«

Skatteministeren gentager endnu engang denne holdning i et notat udsendt den 20. marts 2007 vedrørende »Status på SKATs kontrollindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner«. I pressemeddelelsen hedder det blandt andet (...) [citeret under Retsgrundlag]

I denne sag er der som nævnt enighed om, at NTC anses for den rette indkomstmodtager af udbyttet fra TDC [...].

I overensstemmelse hermed kom Lands[s]katteretten i afgørelsen om det bindende svar - helt i overensstemmelse med Skatteministeriets (tidligere) forståelse af regelsættet - frem til, at NTC som rette indkomstmodtager havde adgang til fordelene efter direktivet, idet betingelserne herfor var opfyldt. Det var herefter ikke relevant at se på, om NTC kunne betragtes som »retmæssig ejer« under dobbeltbeskatningsoverenskomsten.

5.2.5 EU-retlige ændringer

Det fremgår af Domstolens faste praksis, at en fortolkning, som Domstolen foretager af en EU-retlig regel under udøvelse af sin kompetence i henhold til artikel 267 TEUF, i nødvendigt omfang belyser og præciserer betydningen og rækkevidden af den pågældende regel, således som den skal forstås og anvendes, henholdsvis burde have været forstået og anvendt fra sin ikrafttræden.

Denne tilgang, hvor Domstolen tillægger sine afgørelser tilbagevirkende kraft, fører til særegne situationer, når Domstolen over tid har valgt at bedømme samme problemstillinger med forskellige resultater. Domstolen betragter i disse tilfælde ikke den nye bedømmelse som en praksisændring, idet fortolkningen principielt altid burde have været forstået og anvendt på denne måde. Denne betragtning ændrer dog ikke på det faktum, at Domstolen rent faktisk gennemfører praksisændringer baseret på udviklingen i både det juridiske og politiske system.

Et eksempel på dette kan ses ved at sammenholde sagerne C-18/11, Philips og C-28/17, NN.

I Philips-sagen, der blev afsagt den 6. september 2012, skulle der bl.a. tages stilling til, om undgåelse af dobbelt fradrag af samtlige kvalificeres som et tvingende almen hensyn. Dette blev besvaret benægtende af både generaladvokaten [...] og Domstolen [...].

6 år senere, den 4. juli 2018, afgjorde Domstolen NN-sagen, hvor det identiske spørgsmål skulle vurderes. Uden at italesætte ændringen kom Domstolen dog frem til et andet resultat [...]. Generaladvokaten kom ligeledes frem til dette andet resultat. I forslaget til afgørelse satte han dog lidt flere ord på ændringen [...] (...):

»3. Genstanden for denne præjudicielle forelæggelse er ret modsætningen mellem den danske skattelovgivning og etableringsfriheden. Østre Landsret nærer tvivl med hensyn til fortolkningen af Philips Electronics-dommen (7), hvis faktiske omstændigheder minder så meget om den i hovedsagen foreliggende, at nævnte doms løsninger ved første øjekast ville kunne overføres uden videre.

(...)

*63. Med udgangspunkt i Philips Electronics-dommen forekommer det således vanskeligt, at undgåelse af dobbelt fradrag af underskud kvalificeres som et tvingende alment hensyn. I samme dom blev det afvist, at dette formål kunne kvalificeres således, »selv om det antoges, at en sådan begrundelse kunne påberåbes selvstændigt« (26).*

*64. Det er måske alligevel på tide at moderere disse bemærkninger i Philips Electronics-dommen, eftersom EU-lovgiver er blevet særligt opmærksom på bekæmpelsen af dobbelt fradrag, efter at nævnte dom blev afsagt.«*

Generaladvokaten henviste herefter til et EU direktiv fra 2016 om hybride mismatch, og mulighederne for at nægte fradrag efter direktivet i anledning af dobbelt fradrag. I forlængelse heraf anførte han (...):

**1689**

*»70. Jeg foreslår naturligvis ikke, at der i denne sag anvendes bestemmelser fra et direktiv, hvis gennemførelsesfrist endnu ikke er udløbet (32). Jeg er ikke desto mindre af den opfattelse, at direktiv 2016/1164 afspejler en vidtrækkende bekymring, hvis omfang formentlig ikke var synligt - og naturligvis ikke fremgik udtrykkeligt af lovgivningen - da Philips Electronics-dommen blev afsagt.«*

Udviklingen i EU-lovgivers syn på og bekæmpelse af skatteundgåelse førte altså til en direkte modsat konklusion på samme spørgsmål. Det opsigtsvækkende ved Domstolens »nye« praksis på dette område er også beskrevet i den juridiske litteratur [...].

Det antages også i praksis fra Højesteret og Skatteministeriet og i øvrigt også i litteraturen om retlig (suverænitetsabsorberende) aktivisme, at Domstolen fra tid til anden opstiller nye skærpede EU-krav, jf. eksempelvis Højesterets dom gengivet i U.2017.824 H (Ajos) [...] samt referat af 8. Europaudvalgsmøde afholdt fredag den 26. november 2010, s. 351 (ambi) mv. [...]. I sådanne tilfælde kan Domstolens fortolkning med tilbagevirkende kraft ikke accepteres af hensyn til retssikkerheden.

Såfremt EU-Dommen skal læses således, at EU-direktiver eller det EU-retlige misbrugsprincip »nu« i sig selv kan påberåbes af en medlemsstat over for borgerne, er der tale om en ny og skærpet retsstilling, forringende for borgerne, som Domstolen hidtil har anset for værende uforeneligt med retssikkerhedsprincippet, jf. Kofoed-dommen [...].

Skatteministeriet har modsat gjort gældende, at der er ikke tale om, at Domstolen med EU-Dommen har skabt en ny retsstilling, der ikke gjaldt forud for EU-dommen, eller at Domstolen har ændret sin hidtidige praksis, men at Domstolen derimod blot har belyst og præciseret betydningen og rækkevidden af princippet om forbud mod retsmisbrug.

**5.2.5.1 Sag C-321/05, Kofoed og frem**

I sag C-321/05, Kofoed skulle Domstolen bl.a. tage stilling til, om det almindelige EU-retlige princip om retsmisbrug kunne anvendes direkte over for en skatteyder, hvis der [...] ikke er gennemført i national ret.

Konkret skulle Domstolen tage stilling til en aktieombytning, og om de danske skattemyndigheder kunne reagere på et eventuelt retsmisbrug af reglerne, selv om Danmark ikke havde vedtaget specifikke foranstaltninger til gennemførelse af artikel 11 i direktiv 90/434.

Svaret fra Domstolen var »nej«.

Det almindelige EU-retlige princip om retsmisbrug kan ikke anvendes direkte over for en skatteyder, hvis der [...] ikke er gennemført i national ret. Forslaget til afgørelse i Kofoed-dommen blev udfærdiget af samme generaladvokat som i EU-Dommen, Juliane Kokott, der anførte [...]:

*»66. Kun i direkte anvendelse af artikel 11, stk. 1, litra a), i direktiv 90/434 til skade for Hans Markus Kofoed og Niels Toft ville*

være udelukket for de danske myndigheder. Således kan en medlemsstat ikke over for en borger påberåbe sig en direktivbestemmelse, som den ikke selv har gennemført. Ifølge fast retspraksis kan et direktiv ikke i sig selv skabe forpligtelser for borgerne, og en direktivbestemmelse kan derfor ikke som sådan påberåbes over for borgerne.

*67. Lige så lidt kan de kompetente myndigheder i øvrigt over for borgerne direkte påberåbe sig et eventuelt almindeligt fællesskabsretligt princip om, at retsmisbrug er forbudt. For så vidt angår tilfælde, som er omfattet af anvendelsesområdet for direktiv 90/434, har et sådant princip fundet specifikt udtryk og er blevet konkretiseret i direktivets artikel 11, stk. 1, litra a). Hvis man herudover tillod en direkte anvendelse af en almindelig retsgrundsætning, hvis indhold er langt mindre klart og præcist, ville der være fare for, at harmoniseringsformålet med direktiv 90/434 ville blive undermineret, og den med direktivet tilstræbte retssikkerhed i forbindelse med omstrukturering af kapitalselskaber ville blive bragt i fare. Desuden ville det tidligere omtalte forbud mod en direkte anvendelse af ikke-gennemførte direktivbestemmelser til skade for borgerne herved også blive undermineret.«*

Domstolen afsagde Kofoed-dommen i overensstemmelse med forslaget til afgørelsen og fastslog dermed, at selvom den omhandlede artikel 11, stk. 1, litra a), i direktiv 90/434 afspejlede det almindelige fællesskabsretlige princip om forbud mod retsmisbrug, og at der i sagen forelå indicier på et sådant misbrug, kunne de danske skattemyndigheder ikke anvende misbrugsprincippet uden at bestemmelsen var gennemført i dansk ret, eller uden at dansk ret indeholdt en grundsætning med et forbud mod retsmisbrug eller andre bestemmelser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med artikel 11, jf. Kofoed-dommens pr. 38 og 40-42 [...].

De danske skattemyndigheder måtte herefter anerkende, at der ikke i dansk ret var hjemmel til at beskatte aktieombytningen.

Kofoed-dommen er startpunktet for en fast og langvarig praksis fra Domstolen. Denne praksis er gentagne gange bekræftet i EU-praksis, som Kommissionen også har redegjort for i sit skriftlige indlæg til Domstolen, pkt. 13 ff [...]. Der er heller ikke i den praksis, som nævnes i EU-Dommen, ét eneste eksempel på en EU-dom, der afviger fra Kofoed-dommen i denne henseende.

I pkt. 99 i sit forslag til afgørelse vedrørende EU-Dommen har generaladvokat Kokott igen redegjort for gældende praksis, som den har set ud siden forslaget og efterfølgende dom i C-321/05, Kofoed i 2007 (fodnoterne 57, 58 og 59 er alle henvisninger til Kofoed-dommen og forslag til afgørelse i Kofoed-dommen) [...]:

**1690**

*»99. Kun en direkte anvendelse af moder-/datterselskabsdirektivets artikel 1, stk. 2, til skade for sagsøgeren ville - af hensyn til retssikkerheden (57) - være udelukket for de danske myndigheder. En medlemsstat kan således ikke over for en borger påberåbe sig en direktivbestemmelse, som den ikke selv har gennemført (58). Ifølge fast retspraksis kan et direktiv nemlig ikke i sig selv skabe forpligtelser for private og kan derfor ikke som sådant påberåbes over for sådanne (59). Medlemsstaten ville i så fald selv udvise en adfærd, »der er udtryk for misbrug«. På den ene side ville medlemsstaten (selv om den havde mulighed for det) undlade at gennemføre et direktiv, der er rettet mod denne, og på den anden side påberåbe sig en mulighed for bekæmpelse af misbrug, der er indeholdt i det direktiv, der ikke er blevet gennemført.«*

I direkte sammenhæng hermed understreger generaladvokaten i pkt. 100 også, hvorfor samme retspraksis fører til, at princippet om forbud mod retsmisbrug heller ikke kan anvendes i denne sag (fodnoterne 60 og 61 er ligeledes henvisninger til Kofoed-dommen og forslag til afgørelse i Kofoed-dommen) [...]:

»100. Lige så lidt kan de kompetente myndigheder i hovedsagen over for borgerne direkte påberåbe sig det almindelige EU-retlige princip om, at retsmisbrug er forbudt. I fald i de tilfælde, som er omfattet af anvendelsesområdet for moder-/datterselskabsdirektivet, har et sådant princip fundet specifikt udtryk og er blevet konkretiseret i direktivets artikel 1, stk. 2 (60). Hvis man derudover tillod en direkte anvendelse af en almindelig retsgrundsætning, hvis indhold er langt mindre klart og præcist, ville der være fare for, at harmoniseringsformålet med moder-/datterselskabsdirektivet - og ligeledes alle andre direktiver, der indeholder konkrete bestemmelser om bekæmpelse af misbrug (f.eks. artikel 6 i direktiv 2016/1164) - ville blive undermineret. Desuden ville det tidligere omtalte forbud mod en direkte anvendelse af ikke-gennemførte direktivbestemmelser til skade for borgerne herved også blive undermineret (61).«

Generaladvokatens pkt. 99 og 100 er i stort set identiske med generaladvokatens pkt. 66 og 67 i forslaget til afgørelse i Kofoed-dommen fremsat 11 år tidligere. Ved sit forslag til afgørelse har generaladvokaten med andre ord fastholdt og bekræftet EU-praksis, som den har været fra Kofoed-dommen i 2007 frem til EU-Dommen i 2019. Det er den samme redegørelse for praksis, som også blev fremført af Kommissionen, og som er fremført af sagsøgte og Skatteministeriets modparter i de øvrige sager i sagskomplekset vedrørende beneficial ownership.

Præcis som i Kofoed-dommen var svaret på spørgsmålet - forud for EU-Dommen - fortsat nej, når det skulle vurderes, om det almindelige EU-retlige princip om retsmisbrug kan anvendes direkte overfor en skatteyder, hvis det er ikke er gennemført i national ret, eller hvis dansk ret på daværende tidspunkt indeholdt en grundsætning med et forbud mod retsmisbrug, eller andre bestemmelser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med bestemmelsen. Skatteministeriet har hertil blot anført, at Domstolen ikke er bundet af hverken generaladvokatens eller Kommissionens indlæg […].

Formålet med at fremhæve både generaladvokatens og Kommissionens indlæg har dog intet med deres bindende virkning at gøre. Formålet er at understrege, at generaladvokaten igen bekræftede sin stillingtagen i Kofoed, og dermed tilsluttede sig den selvsamme fortolkning af EU-retten og praksis som Lands[s]katteretten, sagsøgte og også EU-kommissionen anlagde. Forud for EU-Dommen stod Skatteministeriet dermed helt og aldeles alene med sin fortolkning.

5.2.5.2 Domstolens afgørelse i sag C-116/16 mv., T Danmark

Domstolen kom ved EU-Dommen - i direkte modstrid med tidligere EU-praksis, Kommissionens redegørelse og generaladvokatens forslag til afgørelse - frem til, at det almindelige EU-retlige princip om retsmisbrug finder anvendelse, selv uden national gennemførelse af moder-/datterselskabsdirektivets artikel 1, stk. 2, jf. EU-Dommens pr. 89 […].

At der er tale om en afgørelse i modstrid med tidligere EU-praksis understreges da også af, at Domstolen fandt det nødvendigt selv-samme præmis at tage direkte afstand fra sin egen afgørelse i Kofoed-dommen (…) […]

Domstolen kom herefter i domskonklusionens pkt. 2 frem til, at (…):

»Det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i Rådets direktiv 90/435/EØF af 23. juli 1990 om en fælles beskatningsordning for moder- og dattersel-

skaber fra forskellige medlemsstater, som ændret ved Rådets direktiv 2003/123/EF af 22. december 2003, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.«

I Kofoed-dommen var Domstolens konklusion derimod (…) […]:

»Følgelig er artikel 8, stk. 1, i direktiv 90/434 principielt til hinder for, at en sådan ombytning af selskabsandele beskattes, medmindre nationale retsforskrifter om retsmisbrug, skattesvig eller skatteunddragelse kan fortolkes i overensstemmelse med nævnte direktivs

**1691**

artikel 11, stk. 1, litra a), og dermed begrunde, at ombytningen beskattes.«

Der er denne retstilling, hvor resultatet i EU-Dommen er det diametralt modsatte af Kofoed-dommen og tidligere praksis, og hvor Domstolen selv anerkender, at det er nødvendigt at se bort fra Kofoed-dommen, som Skatteministeriet anser blot Domstolens belysning og præcisering af retstilstanden.

Dette kan selvsagt ikke tiltrædes. EU-Dommen er udtryk for en klar praksisændring fra Kofoed-dommen og efterfølgende EU-praksis. Uanset Kofoeddommens præmisser, kan det EU-retlige misbrugsprincip nu påberåbes overfor en skatteyder uden national gennemførelse.

Skatteministeriet finder da heller ingen støtte i hverken den nationale eller internationale juridiske litteratur, hvor det vidt og bredt betragtes som ny praksis og en opsigtsvækkende og skelsættende afgørelse […].

Bedst kan det vel opsummeres af advokat, dr. jur. Niels Winther-Sørensen i SR.2019.0174 […]:

»EU-Domstolen må således nu anses at have forladt den udtalelse, der så klart blev formuleret i Kofoed-dommen.«

5.2.5.3 Anvendelse af Domstolens nye praksis

Denne nye praksis har Domstolen for det første ikke haft kompetence til at indføre. Spørgsmålet om den direkte anvendelse af et uskrevet, allestedsgældende og generelt EU-retlig princip, der ikke kræver nationale bestemmelser, men til stadighed kan have direkte virkning for borgerne, må være et spørgsmål om suverænitet. Hvorvidt Danmark konkret har afgivet suverænitet, der giver EU-Domstolen en sådan vid adgang til at overtrumfe nationale og EU-retlige bestemmelser, kan alene afgøres af de danske domstole.

Ved Danmarks tiltrædelse til EU i 1972 redegjorde Justitsministeriet for at dele af EU-retten var umiddelbart anvendelig med direkte virkning for borgerne […] og sådanne bestemmelser blev i tiltrædelsesloven en del af dansk ret […]. Højesteret har dog i U.2017.824H […] fastslået, at det var (…) […]:

»(...) velkendt og også forudset i tiltrædelsesloven, at EU-Domstolen kan udvikle og fastslå generelle principper, der har deres oprindelse i Den Europæiske Menneskerettighedskonvention og tilsvarende traktater og i medlemsstaternes fælles forfatningsmæssige traditioner. Sådanne generelle principper er imidlertid efter tiltrædelsesloven ikke umiddelbart anvendelige i Danmark, og de kan således ikke påberåbes i tvister mellem private.[«]

I EU-Dommen anføres det, at det almindelige EU-retlige misbrugsprincip, som Skatteministeriet påberåber, kan udledes af fast retspraksis på række forskellige områder (pr. 70 ff., […]). Princippet har imidlertid ikke grundlag i en nærmere bestemt traktatbestemmelse.

Dette var den samme situation i Højesterets afgørelse i U.2017.824H […], hvor Højesterets flertal om princippet om forbud mod forskelsbehandling på grund af alder udtaler (…):

»Efter EU-Domstolens domme i Mangold-sagen, Kücükdeveci-sagen og i den foreliggende sag lægger vi til grund, at princippet om forbud mod forskelsbehandling på grund af alder er et almindeligt EU-retligt princip, der ifølge EU-Domstolen har sin oprin-

Copyright © 2023 Karnov Group Denmark A/S

U.2023.1575H

*delse i forskellige internationale konventioner og i medlemssstaternes fælles forfatningsmæssige traditioner. EU-Domstolen henviser ikke til bestemmelser i de traktater, der er omfattet af tiltrædelsesloven, som grundlag for princippet.*

*Selv om princippet er udledt af retskilder uden for EU-traktaterne, er det nærliggende at forstå de tre nævnte domme på den måde, at der er tale om et uskrevet princip, som gælder på traktatniveau. Princippet kan imidlertid efter de nævnte domme ikke anses for at have grundlag i en nærmere bestemt traktatbestemmelse.*

*En sådan situation, hvor et princip på traktatniveau efter EU-retten skal have direkte (pligtskabende) virkning og tillægges forrang for modstående dansk lov i en tvist mellem private, uden at princippet har grundlag i nogen bestemt traktatbestemmelse, er ikke forudset i tiltrædelsesloven.«*

Højesterets konklusion var herefter, at tiltrædelsesloven ikke indeholdt den tilstrækkelige hjemmel til at anvende et almindeligt EU-retligt princip med forpligtende virkning over for private.

Med afsæt heri gøres det af sagsøgte gældende, at der heller ikke i denne sag er den påkrævede udtrykkelige hjemmel i den danske tiltrædelseslov til at påberåbe det omhandlede uskrevne, generelle EU-retlige princip om forbud mod misbrug med direkte virkning over for en borger.

For det andet forhindrer retssikkerhedsprincippet også anvendelsen af denne nye praksis i sagen, og nægtelse af fordele efter direktivet og påberåbelse af det almindelige EU-retlige misbrugsprincip må i denne sag derfor fortsat kræve hjemmel i national ret. Retssikkerhedsprincippet er grundlæggende EU-retligt princip, som kræver, at en ordning, der nægter en skattepligtig rettigheder eller pålægger en skattepligtig byrder, er klar og utvetydig, for at han ikke skal være i tvivl om sine rettigheder og pligter, således at han kan handle derefter, jf. C-143/93, Van Es Douanne Agenten […].

På samme måde som Domstolen i NN-sagen en årrække efter Phillips-sagen skulle tage stilling til selvsamme problemstilling, skulle Domstolen i denne sag i 2019 foretage en bedømmelse af den praksis, som Domstolen selv fastslog i Kofoed-dommen. I tiden fra Kofoed til EU-dommen fremførte EU-kommissionen i 2012 sin handlingsplan til styrkelse af bekæmpelsen af skattesvig og skatteunddragelse […], der i de kommende år

**1692**

skulle udvikle specifikke foranstaltninger mod skattesvig, herunder en anbefaling om indførelse af generelle anti-misbrugsregler […]. I 2016 indførte EU da også et særligt direktiv til bekæmpelse af skatteunddragelse, der i artikel 6 netop indeholdt en generel regel om bekæmpelse af misbrug […]. Generelle værnsregler var i 2019 således udbredt i EU-retten og blev i 2015 også indført i Danmark. I lovforslaget til den danske regel henvises der også til et memo offentliggjort af EU-kommissionen om imødegåelse af netop indskydelse af et EU mellem-holding selskab […].

Det er en oplagt tanke, at Domstolens nye fortolkning om anvendelsen af det almindelige EU-retlige misbrugsprincip - som i NN-sagen - var drevet af en opfattelse af, at udviklingen i EU omkring skatteunddgåelse ikke er afspejlet i Kofoed-dommen, og at det i Domstolens optik derfor var på tide at ændre praksis.

Under sådanne omstændigheder vejer hensynet til retssikkerhed imidlertid højere end EU-rettens forrang, jf. til sammenligning de vurderinger som Højesteret foretog i U.2012.3564H […] og U.2017.824H […].

5.2.6 Der foreligger ikke misbrug

Sagsøgte bestrider, at der i nærværende sag foreligger »misbrug«, jf. tillige ovenfor i punkt 5.2.4.

5.2.6.1 Subjektivt og objektivt krav

I præmis 97 i sag C-116/16 udtaler EU-domstolen, at [citeret under Retsgrundlag]

Det er således en betingelse for at statuere misbrug, at der foreligger både objektive omstændigheder og et subjektivt element, der har til hensigt uberettiget at drage fordel af EU-retten.

Det fastholdes, at der under alle omstændigheder konkret ikke er sket retsmisbrug. Dette følger allerede af, at NTC Holding G.P. & Cie S.C.A. ikke var underlagt nogen form for kontraktmæssig eller anden form for juridisk pligt til at viderebetale udbytte modtaget fra TDC (hvilket er ubestridt af Skatteministeriet), at der ikke efter dansk ret er holdepunkter til støtte for at tilsidesætte de i denne sag foretagne dispositioner ud fra en realitetsgrundsætning, som der er enighed om slet ikke findes anvendelse, og at udbyttemodtager efter Skatteministeriets vurdering også er rette indkomstmodtager.

Ultimo 2010 udbød NTC S.A. og NTC Holding G.P. & Cie S.C.A. - selskaber ultimativt ejet af investorerne i de kapitalfonde, der dengang ejede TDC A/S - et stort antal aktier i TDC A/S via et offentligt udbud. En væsentlig del af kapitalfondens ultimative investorer var hjemmehørende i USA, og for at sikre, at salget af aktier i TDC A/S blev beskattet som aktieavance efter amerikanske skatteregler, gennemførtes det i forbindelse med salget af aktier i TDC A/S en »US tax free reorganization« af NTC S.A.

Som led i denne »reorganization« blev det besluttet at likvidere NTC S.A. og at uddolde selskabets aktiver, herunder aktierne i TDC A/S, til NTC S.A.'s moderselskab NTC Holding G.P. & Cie S.C.A. NTC S.A. trådte likvidation i december 2010, og samtidig blev NTC S.A.'s aktier i TDC A/S overført til NTC Holding G.P. & Cie S.C.A. Likvidationen af NTC S.A. er afsluttet. Overførslen af TDC-aktierne til NTC Holding G.P. & Cie S.C.A. havde således intet med den påtænkte udbytteudlodning i august 2011 at gøre, og der kan ikke meningsfuldt tales om en misbrugshensigt i overførslen.

Der er selvsagt heller ikke holdepunkter til støtte for, at stiftelsen af de oprindelige holdingselskaber i Luxembourg i sommeren og efteråret 2005 var begrundet i, at der eventuelt 6 år senere måtte blive vedtaget en udbytteudlodning fra det børsnoterede selskab TDC A/S - som led i en generel udlodning til de mange tusinde aktionærer i TDC A/S og som led i selskabets udbyttepolitik vedtaget efter børsnoteringen i 2010.

Skatteministeriet har ikke ført bevis for, jf. EU-dommens præmis 117 […] om bevisbyrdefordelingen, at strukturen er »uden forretningsmæssig begrundelse«, herunder hvilket alternativt scenarie ministeriet anser for kommercielt mere rationelt i forhold til kapitalfondens sammensætning, finansieringsmuligheder mv. i forbindelse med investeringen i Danmark.

5.2.6.2 Fælles etablering i Luxembourg

Såfremt - som her - flere kapitalfonde i fællesskab investerer i samme selskab, er det naturligt behov for at samle investorerne i et fælles holdingselskab. Investorerne har således behov for at have en fælles platform til at foretage investeringen igennem.

Baggrunden for, at den oprindelige holdingstruktur er at i den konkrete sag, hvor fem kapitalfonde var enige om tilsammen at erhverve majoriteten af aktierne i TDC A/S, indebar en fælles holdingstruktur en række fordele i forhold til finansieringen af erhvervelsen, fremsættelse af samlet købstilbud og mulighederne for endelig gennemførelse af købet og i det hele håndteringen af fondenes fælles investering.

Efter at det var besluttet, at der skulle etableres en fælles holdingstruktur, skulle der tages stilling til, i hvilke lande de enkelte holdingselskaber skulle etableres. Baggrunden for beslutningen om etablering af de oprindelige holdingselskaber i Luxembourg var ikke at undgå dansk kildeskat på udbytte.

Kapitalfonde og andre udenlandske investorer har historisk foretaget deres investeringer i Europa via Luxembourg, primært som følge af, at Luxembourg juridisk, regulatorisk, finansielt og politisk

anses for et attraktivt og stabilt land at investere igennem. I naturlig forlængelse af, at den oprindelige holdingstruktur er etableret i Luxembourg, blev NTC ligeledes etableret i Luxembourg.

Det bestrides således forsat, at der ikke er en troværdig forretningsmæssig begrundelse for, at NTC skulle

**1693**

indskydes i koncernen og at baggrunden herfor alene skulle være at tilegne koncernen skattemæssige fordele.

En sådan holdingstruktur er velkendt og forretningsmæssigt velbegrundet, som det også er lagt til grund af retten fx i den canadiske Federal Court of Appeals dom af 26. april 2009 vedrørende Prévost Car Inc. […]. I sagen havde Volvo (Sverige) og Henleys (UK) stiftet et fælles holdingselskab, Prévost Holding BV, i Holland, hvilket ejede aktier i et joint venture. Der foretoges udlodning af udbytte fra det canadiske Prévost Car Inc. gennem det hollandske holdingselskab og videre til selskaberne i Sverige (Volvo) og Englan[d] (Henleys), der ejede henholdsvis 51 % og 49 % af aktierne i det hollandske holdingselskab.

Af dommen fremgår, at den canadiske udbytteskat udgjorde 5 % i henhold til dobbeltbeskatningsoverenskomsten med Holland, mens udbytteskatten udgjorde henholdsvis 15 % og 10 % i henhold til dobbeltbeskatningsoverenskomserne med Sverige og England.

Prévost Holding var et rent holdingselskab og havde hverken medarbejdere eller kontorer i Holland.

Både The Canadian Tax Court og The Federal Court of Appeal fandt i sagen, at det hollandske holdingselskab kunne anses som beneficial owner (retmæssig ejer) af udbyttet i OECD-regi. At Prévost Holding var et rent holdingselskab ændrede ikke på, at selskabet var den retmæssige ejer af udbyttet. Et holdingselskab var et legitimt redskab og ville i sagens natur ikke have andre funktioner end at være holdingselskab.

**5.2.6.3 Råderetten over udbyttet tilkommer NTC**

Der forelå og foreligger ikke aftaler om råderetten over udbytte modtaget af NTC fra sagsøgte TDC A/S. Beslutning om at disponere over modtaget udbytte kunne alene træffes af NTC's ledelse.

NTC havde ikke væsentlig gæld, der forventedes betalt med udbytte modtaget fra sagsøgte, og var således i det væsentlige finansieret med egenkapital.

NTC var er en selvstændig enhed med en selvstændig ledelse og beslutningskompetence og det kunne derfor ikke på forhånd og med sikkerhed vides, om og hvordan ledelsen i NTC rent faktisk ville træffe beslutning om at disponere over det modtagne udbytte fra sagsøgte.

Som oplyst i forbindelse med sagens behandling i Landsskatteretten var formodningen dog, at størstedelen af udbyttet ville blive udloddet som udbytte af NTC til selskabets ejere NTC Holding G.P. og NTC Parent S.à.r.l., at størstedelen af udbyttet udloddet fra NTC til NTC Holding G.P. ville blive udloddet som udbytte til NTC Holding G.P.'s ejer NTC Parent S.à.r.l. En mindre del af udbyttet (formentlig mellem 3 % og 5 %) antages at ville blive anvendt af NTC, NTC Holding G.P. og NTC Parent S.à.r.l. til betaling af omkostninger eller hensat til betaling af forventede omkostninger. Det antages endvidere, at udbytte udloddet til NTC Parent S.à.r.l. vil blive betalt (som udbytte og/eller renter og/eller afdrag på gæld) til selskaber, der er kontrolleret af de enkelte kapitalfonde eller NTC Parent S.à.r.l.'s kreditorer. Det antages tillige, at beløb betalt af NTC Parent S.à.r.l. til selskaber, der er kontrolleret af de enkelte kapitalfonde, vil blive overført til de ultimative investorer i kapitalfondene, men det vides ikke på hvilken måde sådanne overførsler vil finde sted eller hvornår de bliver behandlet skattemæssigt.

Det kan ikke herudfra lægges til grund, at der reelt på forhånd vil være disponeret over udbytteudlodningen. Det bemærkes i øvrigt, at det forhold, at NTC måtte træffe beslutning om at udlodde udbyt-

te til sine ejere i forlængelse af modtagelsen af udbytte fra sagsøgte, ikke i sig selv indebærer, at NTC ikke kan anses for at have reel råderet over det fra sagsøgte modtagne udbytte, jf. hertil OECD's »discussion draft« vedrørende »Clarification of the meaning of »beneficial owner« in the OECD model tax convention«, hvori der bl.a. foreslås indsat en række præciserende kommentarer til artikel 10, herunder bl.a. følgende […]:

*»The recipient of a dividend is the »beneficial owner« of that dividend where he has the full right to use and enjoy the dividend unconstrained by a contractual or legal obligation to pass the payment received to another person.«*

Det kan lægges til grund, at NTC ikke er underlagt nogen form for kontraktmæssig eller anden form for juridisk pligt til at viderebetale udbytte modtaget fra sagsøgte. Østre Landsret udtaler ligeledes i SKM 2012.121 ØLR […]:

*»… kan det ikke antages, at udbyttemodtagende holdingselskaber, hvis ledelse selskabsretligt er beføjet til at råde over selskaber og herunder over udbytter fra underliggende datterselskaber, ikke normalt skal anses for retmæssige ejere. Dette må også gælde i tilfælde, hvor der indskydes et eller flere mellemholdingselskaber i en stat, med hvilken Danmark har indgået en dobbeltbeskatningsoverenskomst, medens den/de bagvedliggende ejere af mellemholdingselskabet er hjemmehørende i et tredjeland uden dobbeltbeskatningsoverenskomst. For at et sådant mellemholdingselskab ikke kan anses for at være retmæssig ejer, må det kræves, at ejeren udøver kontrol med selskabet, som ligger ud over den planlægning og styring på koncernplan, som sædvanligvis forekommer i internationale koncerner.«*

Ovenstående bekræfter og dokumenterer således, at NTC er retmæssig ejer af udbytte modtaget fra sagsøgte, hvorfor udbyttet udloddet fra sagsøgte til NTC er skattefrit i henhold til den mellem Danmark og Luxembourg indgåede dobbeltbeskatningsoverenskomst art. 10, og udbyttet vil derfor være fritaget for dansk kildeskat efter selskabsskattelovens § 2, stk. 1, litra C, 3. pkt.

Skatteministeriet har til støtte for sit anbringende om, at der foreligger retsmisbrug gjort gældende, at NTC

**1694**

som mellemholdingselskab alene har begrænset aktivitet.

Det bestrides, at aktivitetsniveauet har afgørende betydning for, om NTC er retmæssig ejer. I den forbindelse bemærkes, at de fysiske rammer og aktiviteten i ethvert selskab naturligvis er afpasset efter karakteren af den virksomhed, som det pågældende selskab varetager.

NTC havde på tidspunktet for udlodningen af udbyttet omhandlet i nærværende sag til formål at eje aktier i TDC A/S. I sagens natur vil et holdingselskabs aktivitet have begrænset omfang, idet der dog skal afholdes en enkelt eller få årlige generalforsamlinger og få årlige bestyrelsesmøder for at træffe de for holdingselskabet relevante og nødvendige beslutninger. Som nævnt indledningsvist råder NTC over både lokaler i Luxembourg, ligesom selskabet har en person ansat og desuden har indestående på selskabets bankkonto, som har genereret betydelige renteindtægter for selskabet.

NTCs aktivitet svarer således til den aktivitet, der er i tusindvis af danske og udenlandske holdingselskaber, som de danske skattemyndigheder efter fast praksis (tidligere) - og med rette - har anset som retmæssige ejere af udbytter udloddet fra datterselskaber.

Det gøres i forlængelse af ovenstående gældende, at et selskab skal anerkendes som retmæssig ejer, også når det driver virksomhed som holdingselskab, jf. hertil betragtningerne i Prévost-dommen behandlet ovenfor i punkt 5.2.6.2.

Det bemærkes endvidere, at Højesteret i TfS 2004.542 H (Johnson Holding A/S) […] har fastslået, at et holdingselskab, hvis virksomhed alene består i at besidde kapitalandele i et eller flere dattersel-

Copyright © 2023 Karnov Group Denmark A/S

skaber, må anses for erhvervsdrivende ved anvendelsen af de skatteretlige regler.

Hvis sagsøger fik medhold i, at der kan kræves en mere specifik beskrivelse af, hvad udbytteudlodningen skal anvendes til, end givet i sagsøgtes anmodning om bindende svar, ville det reelt blive umuligt at opnå bindende svar vedrørende udlodninger til holdingselskaber. Realiteten er jo, at NTC udøver den virksomhed, som ethvert holdingselskab gør, nemlig besiddelse af ejerandele i et eller flere andre selskaber og modtagelse af udbytter heraf og i disponering i øvrigt over ejerandelene - alt i overensstemmelse med de beslutninger, som holdingselskabets ledelse løbende træffer.

5.2.6.4 Generel udlodning på en historisk udbytteaktie

Som anført ovenfor skulle 80-85 % af Equity Free Cash Flow i et givent år udbetales som udbytte ifølge TDC's udbyttepolitik, ligesom det var almindeligt kendt, at TDC var en »udbytteaktie«. Mange af investorerne i TDC havde netop investeret for at have et godt alternativ til obligationer, idet det årlige udbytte var fordelagtigt, sammenlignet det med det ringe afkast, der kunne opnås på obligationsmarkedet.

Som nævnt ovenfor udbetalte sagsøgte den 10. august 2011 udbytte til sine aktionærer med 2,18 kr. pr. aktie, i alt DKK 1.781.000.000. Der blev ligeledes udbetalt udbytte den 14. marts 2012.

Udlodningen af udbytte skete til fordel for samtlige selskabets aktionærer, herunder til NTC som én ud af flere tusinde aktionærer i TDC. Der var altså tale om en generel udlodning foretaget til fordel for alle aktionærer.

5.2.7 Ultimative ejere

Sagsøgte fastholder, at NTC er retmæssig ejer af de modtagne udbytter i henhold til den dansk-luxembourgske dobbeltbeskatningsoverenskomst.

Det fastholdes endvidere at der ikke i nærværende sag foreligger retsmisbrug, hvorfor NTC har et ubetinget krav på fritagelse for udbytteskat efter moder-/datterselskabsdirektivet.

Som beskrevet ovenfor har Skatteministeriet heller ikke godtgjort, hvorfor strukturen er »uden forretningsmæssig begrundelse«, herunder hvilket alternativt scenarie ministeriet anser for kommercielt mere rationelt i forhold til kapitalfondenes sammensætning, finansieringsmuligheder mv. i forbindelse med investeringen i Danmark.

I det tilfælde, at Landsretten måtte finde, at NTC er et gennemstrømningsselskab, må Skatteministeriets argumentation derfor føre til at NTC Parent S.àr.l og dettes ejere også anses som gennemstrømningsselskaber, således at det herefter er de bagvedliggende ultimative investorer, der skal anses som de retmæssige ejere af udbytterne efter den pågældende dobbeltbeskatningsoverenskomst, hvor der er indgået en sådan mellem Danmark og det pågældende land, hvori den ultimative ejer er hjemmehørende. For størstedelen af de ultimative investorers vedkommende vil den relevante dobbeltbeskatningsoverenskomst være den dansk-amerikanske dobbeltbeskatningsoverenskomst.

I så fald skal beregning af kildeskat af de omhandlede udbytter ske efter den pågældende dobbeltbeskatningsoverenskomst og dermed nedsættes i forhold til Skatteministeriets krav.

Skatteministeriet har gjort gældende, at der kan opstilles yderligere betingelser for lempelse af kildeskat, hvilket sagsøgte bestrider, idet sådanne yderligere betingelser hverken har støtte i intern dansk skatteret eller internationale skatteretsprincipper.

Selv hvis NTC ikke kan anses som retmæssig ejer af udbyttet udloddet fra TDC -hvilket bestrides - er de ultimative ejere, der er hjemmehørende i en stat, med hvilken Danmark har indgået en dobbeltbeskatningsaftale, altså under alle omstændigheder berettiget til frafald eller nedsættelse af den danske kildeskat.

Et andet resultat ville medføre, at der ikke anerkendes nogen »retmæssig ejer« overhovedet til udbytterne, hvilket i sagens natur er meningsløst.«

**1695**

Parterne har i det væsentlige procederet i overensstemmelse med det anførte i de afsluttende processkrifter.

# VI. Landsrettens begrundelse og resultat

*B-1980-12 Skatteministeriet mod NetApp*

*Selskabsskattelovens § 2, stk. 1, litra c*

Det følger af selskabsskattelovens dagældende § 2, stk. 1, litra c, som affattet ved lov nr. 282 af 25. april 2001, at et selskab som nævnt i § 1, stk. 1, med hjemsted i udlandet er skattepligtig af udbytter omfattet af ligningslovens § 16 A, stk. 1.

Det er ubestridt, at NetApp Cypern er omfattet af bestemmelsen, og at de to udbytter, som denne sag omhandler, er udbytter omfattet af ligningslovens § 16 A, stk. 1.

Efter bestemmelsen omfatter skattepligten dog ikke udbytte, som oppebæres af et selskab, der opfylder nogle nærmere angivne krav til ejerandel og ejertid i forhold til det udbyttegivende datterselskab. Af lovens ordlyd fremgår endvidere, at det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF (moder-/datterselskabsdirektivet) eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor selskabet er hjemmehørende.

Det er ubestridt, at NetApp Cypern ved udlodningerne i 2005 og 2006 opfyldte betingelserne om ejerandel og ejertid i forhold til datterselskabet NetApp Denmark.

Denne sag drejer sig herefter i første række om, hvorvidt der i medfør af moder-/datterselskabsdirektivet eller den dansk-cypriotiske dobbeltbeskatningsoverenskomst er pligt til at frafalde eller nedsætte beskatningen.

*Moder-/datterselskabsdirektivet*

Indledningsvist bemærkes, at moder-/datterselskabsdirektivet er implementeret i dansk ret ved lov nr. 219 af 3. april 1992, som senere er ændret ved lov nr. 282 af 25. april 2001, på den måde, at selskabsskattelovens § 2, stk. 1, litra c, henviser til bestemmelserne i direktivet.

Direktivets bestemmelser finder herefter efter deres indhold anvendelse på udbytter omfattet af selskabsskattelovens § 2, stk. 1, litra c.

Det er ubestridt, at NetApp Cypern og NetApp Denmark er omfattet af moder-/datterselskabsdirektivet som henholdsvis moderskab og datterselskab. Direktivets artikel 5, stk. 1, bestemmer, at det overskud, som et datterselskab udlodder til sit moderselskab, fritages for kildeskat.

Skatteministeriet har gjort gældende, at NetApp Cypern ikke kan påberåbe sig skattefritagelse efter moder-/datterselskabsdirektivet, fordi der foreligger retsmisbrug. Skatteministeriets anbringende rejser spørgsmål om fortolkning af moder-/datterselskabsdirektivet. I EU-Domstolens (Store Afdeling) dom af 26. februar 2019 i denne sag og sag B-2173-12, forenede sager C-116/16 og C-117/16, udtaler Domstolen, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i Rådets direktiv 90/435/EØF af 23. juli 1990 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, som ændret ved Rådets direktiv 2003/123/EF af 22. december 2003, selv om

der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

Landsretten bemærker indledningsvist, at kompetencen til at afgøre spørgsmål om fortolkningen af EU-retten henhører under EU-Domstolen, jf. TEUF artikel 267.

NetApp Denmark har imidlertid gjort gældende, at en fortolkning som fastslået af EU-Domstolen strider mod selskabsskattelovens § 2, stk. 1, litra c, således at der skal indrømmes skattefritagelse, uanset om der måtte foreligge et retsmisbrug af direktivet.

Landsretten bemærker herom, at ordlyden af selskabsskattelovens § 2, stk. 1, litra c, der om skattefritagelse blot henviser til moder-/datterselskabsdirektivet, ikke er i modstrid med EU-Domstolens fortolkning. Landsretten finder ligeledes, at der ikke i lovens forarbejder er holdepunkter for at antage, at § 2, stk. 1, litra c, skal forstås således, at der hjemles skattefritagelse også i tilfælde, der kan karakteriseres som retsmisbrug, som beskrevet af EU-Domstolen.

Det fremgår således af forarbejderne til lov nr. 282 af 25. april 2001, hvorved man genindførte udbytteskatten for moderselskaber i ikke-EU-lande uden en dobbeltbeskatningsoverenskomst, at formålet var at imødegå omgåelse af andre EU-landes regler om beskatning af udbytter fra datterselskaber i EU til moderselskaber uden for EU. Det ville således ved lovændringen ikke længere være muligt at undgå en sådan beskatning ved at etablere et datterselskab/holdingselskab (»mellemholdingselskab«) i Danmark. Skatteministerens udtalelser i forbindelse med lovens tilblivelse om muligheden for at indskyde et yderligere »mellemholdingselskab« eksempelvis på Cypern, der på daværende tidspunkt ikke var medlem af EU og derfor ikke omfattet af direktivet, og derved undgå dansk beskatning, findes at være af en sådan generel, forklarende, karakter, at de ikke kan anses for tilkendegivelser om, at de danske skattemyndigheder ville acceptere et retsmisbrug, som beskrevet af EU-Domstolen. Der henvises til skatteministerens

**1696**

kommentar til et »newsletter« sendt til Folketingets Skatteudvalg den 10. januar 2001 og skatteministerens svar til Folketingets Skatteudvalg af 11. januar 2001 på spørgsmål 3 gengivet ovenfor.

En fortolkning af moder-/datterselskabsdirektivet, som anført af EU-Domstolen, er derfor ikke i strid med selskabsskattelovens § 2, stk. 1, litra c.

*Dobbeltbeskatningsoverenskomstens artikel 10, stk. 2*

Det følger af artikel 10, stk. 2, i dobbeltbeskatningsoverenskomsten af 26. maj 1981 mellem Danmark og Cypern, at udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, alene kan beskattes i den førstnævnte stat med enten 10 % eller 15 % af bruttobeløbet af udbyttet, såfremt modtageren er udbyttets »retmæssige ejer« (»beneficial owner«).

Såfremt NetApp Cypern er retmæssig ejer af de to omhandlede udbytter, skal skatten således efter dobbeltbeskatningsoverenskomsten nedsættes fra den i ligningslovens § 65, stk. 1, fastsatte skatteprocent på 28 % til 10 %. Det følger af selskabsskattelovens § 2, stk. 1, litra c, at der i så fald ikke er skattepligt af udbyttet.

Skatteministeriet har gjort gældende, at NetApp Cypern ikke kan anses for at være retmæssig ejer af de omhandlede udbytter.

Spørgsmålet er herefter, hvordan begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsten skal forstås.

Overenskomsten indeholder ikke en definition af begrebet »retmæssig ejer«. Ifølge overenskomstens artikel 3, stk. 2, skal begreber, der ikke er defineret i overenskomsten, med mindre andet følger af sammenhængen, tillægges den betydning, som det har i den kontraherende stats lovgivning om skatter omfattet af overenskomsten.

Dansk skattelovgivning ses ikke at anvende begrebet »retmæssig ejer«, der heller ikke er et nærmere defineret begreb i dansk ret.

Ved lov nr. 282 af 25. april 2001, hvorved kildebeskatningen af udbytter blev genindført, blev selskabsskattelovens § 2, stk. 1, litra c, affattet som ovenfor anført, herunder således at det er en betingelse for skattefritagelse, at beskatningen skal nedsættes efter en dobbeltbeskatningsoverenskomst eller efter moder-/datterselskabsdirektivet. Begrebet »retmæssig ejer« er ikke omtalt i forarbejderne til bestemmelsen.

Der foreligger ikke oplysninger om forhandlingerne med Cypern forud for indgåelsen af dobbeltbeskatningsoverenskomsten. Ved fortolkningen af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomstens artikel 10, stk. 2, finder landsretten det derfor relevant at inddrage fortolkningsbidrag vedrørende den tilsvarende bestemmelse i OECD's modeloverenskomst, der har anvendt begrebet »retmæssig ejer« siden 1977.

OECD's modeloverenskomst indeholder ikke en definition af begrebet »retmæssig ejer«. I kommentarerne til modeloverenskomsten fra 1977 er om »misbrug af overenskomsten« anført bl.a., at dobbeltbeskatningsoverenskomsten ikke bør hjælpe til skatteunddragelse eller skatteflugt, og at begrebet »retmæssig ejer« i bl.a. artikel 10 imødegår visse misbrugssituationer. Som misbrug omtales kunstfærdige juridiske konstruktioner, og som eksempel nævnes det forhold, at en person disponerer via en juridisk sammenslutning, der er dannet i en stat, væsentligst for at opnå fordele i henhold til en dobbeltbeskatningsoverenskomst, som ikke ville kunne opnås af personen direkte. Af kommentarerne til artikel 10 fremgår endvidere, at begrænsningen i beskatningen ikke kan benyttes, når et mellemled (»intermediary«) skydes ind mellem den berettigede og udbetaleren. Som eksempler på et mellemled nævnes en agent eller en udpeget person (»nominee«).

I kommentarerne til OECD's modeloverenskomst fra 2003 anføres i overensstemmelse hermed, at udtrykket »retmæssig ejer« ikke er anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse. Det anføres herudover i kommentaren til artikel 10, i tråd med 1977-kommentarerne om »kunstfærdige juridiske konstruktioner« og »mellemled«, at det ikke er i overensstemmelse med formålet med overenskomsten at indrømme fritagelse for skat, hvor en person, på anden måde end som agent eller mellemmand (»nominee relationship«) blot fungerer som gennemstrømningsenhed (»conduit«) for en anden person, der rent faktisk modtager den pågældende indkomst. Endelig nævnes, tillige i overensstemmelse med 1977-kommentarerne, at OECD's Committee on Fiscal Affairs på denne baggrund har konkluderet, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

Landsretten bemærker, at der er grundlag for at statuere, at en forståelse af begrebet »retmæssig ejer«, som anført ovenfor, skulle være i strid med selskabsskattelovens § 2, stk. 1, litra c. Der ses hverken i ordlyden af bestemmelsen eller i forarbejderne hertil grundlag for en anden fortolkning, jf. det ovenfor anførte om forarbejderne til lov nr. 282 af 25. april 2001. Skatteministerens udtalelser i forbindelse med denne lovs tilblivelse om muligheden for at indskyde et holdingselskab og derved undgå dansk beskatning findes således heller ikke at kunne anses for en tilkendegivelse om, at skattemyndighederne i alle tilfælde vil anse det indskudte selskab som udbyttets retmæssige ejer efter

**1697**

Copyright © 2023 Karnov Group Denmark A/S

dobbeltbeskatningsoverenskomsten. Det forhold, at begreberne »retmæssig ejer« og »rette indkomstmodtager« ikke anvendes sprogligt stringent i forarbejderne findes ligeledes ikke at kunne føre til et andet resultat.

På dette grundlag skal der herefter foretages en vurdering af de konkrete udbytteudlodninger i sagen.

*1. udbytteudlodning - 565.896.000 kr.*

Det fremgår af sagen, at NetApp Denmark den 28. september 2005 vedtog at udlodde et udbytte på 565.896.000 kr., svarende til ca. 91,45 mio. USD, til sit moderselskab NetApp Cypern.

Den 25. oktober 2005 modtog NetApp Denmark et udbytte svarende hertil fra sit hollandske datterselskab, Network Appliance B.V. NetApp Denmark udbetalte herefter den 27. oktober 2005 udbyttet til sit moderselskab, NetApp Cypern, der den 28. oktober 2005 videreoverførte et tilsvarende beløb til sit moderselskab, NetApp Bermuda. Den 3. april 2006 overførte NetApp Bermuda 550 mio. USD som udbytteudlodning til sit moderselskab, NetApp USA.

NetApp Cypern var stiftet den 5. september 2005 af NetApp Bermuda. Selskabskapitalen var efter det oplyste 20.000 USD, hvoraf alene 2.000 USD blev indbetalt.

Det er ubestridt, at NetApp Cypern blev indskudt mellem NetApp Denmark og NetApp Bermuda med det formål at sætte NetApp Denmark i stand til at videreudlodde det modtagne udbytte, uden at dette ville udløse dansk kildebeskatning.

Dette blev gennemført ved, at det nystiftede NetApp Cypern købte NetApp Bermudas anparter i NetApp Denmark ved aftale af 16. september 2005, således at NetApp Cypern var forpligtet til at betale købesummen på 90 mio. euro, svarende til ca. 670 mio. kr., til NetApp Bermuda senest den 30. april 2006.

Om aktiviteterne i NetApp Cypern fremgår, at selskabet fra sin stiftelse den 5. september 2005 til den 28. april 2006 havde indtægter på ca. 1,076 mio. USD, som hovedsageligt hidrørte fra kursgevinster på udenlandsk valuta. Selskabets udgifter bestod alene af administrationsudgifter på ca. 41.600 USD. Aktiverne pr. 28. april 2006 bestod af en kontantbeholdning på 4.700 USD samt selskabets kapitalandele i NetApp Denmark og NetApp Holding & Manufacturing B.V., Holland. NetApp Cypern havde hverken egne lokaler eller eget personale.

Efter oplysningerne om NetApp Cyperns økonomiske forhold må det derfor lægges til grund, at selskabet alene var i stand til at betale sin gæld til NetApp Bermuda i kraft af, at selskabet modtog udbytte fra NetApp Denmark. NetApp Cypern havde således ingen reel råderet over det modtagne udbytte, og formålet med transaktionerne har ubestridt været at undgå dansk beskatning af udbytterne. NetApp Cypern kan derfor ikke anses som retmæssig ejer af udbyttet, jf. dobbeltbeskatningsoverenskomsten artikel 10, stk. 2, hvorfor skatten som udgangspunkt ikke skal nedsættes efter overenskomstens regler.

En samlet vurdering af de nævnte forhold findes også som udgangspunkt at føre til, at skattefritagelse efter moder-/datterselskabsdirektivet ikke kan påberåbes, idet NetApp Cypern må anses for et gennemstrømningsselskab, som ikke har nogen selvstændig økonomisk begrundelse, og dermed må karakteriseres som et kunstigt arrangement, hvis formål har været at opnå skattefritagelse efter direktivet.

*Betydningen af den dansk-amerikanske dobbeltbeskatningsoverenskomst*

Såfremt det med sikkerhed kan fastslås, at den retmæssige ejer af udbyttet er hjemmehørende i et andet land end det land, hvor mellemleddet er hjemmehørende, og det land, hvor den retmæssige ejer er hjemmehørende, har indgået en dobbeltbeskatningsoverenskomst med Danmark, kan den retmæssige ejer imidlertid på-

beråbe sig reglerne i denne dobbeltbeskatningsoverenskomst som grundlag for skattenedsættelse, jf. herved også pkt. 12.2 i kommentaren til OECD's modeloverenskomst fra 2003. Dette indebærer, at der i en sådan situation ikke kan siges at foreligge et misbrug, idet udbyttet ville kunne være udloddet skattefrit af det danske datterselskab direkte til den retmæssige ejer i det pågældende land. Den omstændighed, at den retmæssige ejer er hjemmehørende i et land, som Danmark har indgået en dobbeltbeskatningsoverenskomst med, må også inddrages ved vurderingen af, om der foreligger retsmisbrug efter moder-/datterselskabsdirektivet, således som det også er udtrykt i EU-Domstolens dom i denne sag (præmis 110).

Det fremgår af resultatopgørelsen og balancen pr. 28. april 2006 for NetApp Bermuda, at det modtagne beløb på ca. 91,45 mio. USD indgik i udlodningen på 550 mio. USD til NetApp USA.

Det er oplyst og ikke bestridt, at NetApp Bermudas »interne regnskab« er udarbejdet efter gældende regnskabsmæssige principper og kan afstemmes til NetApp USA's konsoliderede koncernregnskab. Landsretten lægger herefter til grund, at udbyttet fra NetApp Denmark indgik i det beløb, som den 3. april 2006 blev overført til NetApp USA.

Parterne har oplyst, at det kan lægges til grund, at udbyttet på 550 mio. USD er modtaget af NetApp USA og beskattet efter gældende amerikanske skatteregler.

På baggrund af den fremlagte årsrapport for 2004/2005 for NetApp USA, hvori det anføres, at selskabet overvejede at hjemtage udbytte fra sine udenlandske datterselskaber under den såkaldte »American Jobs Creation Act«-ordning, samt selskabets erklæring af 22. marts 2006 om en »Domestic Reinvestment Plan«,

**1698**

hvori der er nærmere redegjort for, hvordan det hjemtagne udbytte ville blive geninvesteret i USA, finder landsretten det godtgjort, at udlodningen fra NetApp Denmark til NetApp Cypern skete som led i koncernens planlagte hjemtagning af udbytte til koncernens moderselskab i USA.

Idet det ville have været muligt at udlodde udbyttet direkte fra NetApp Denmark til NetApp USA, uden at dette ville have udløst dansk kildeskat, og da det findes godtgjort, at udlodningen skete som led i en planlagt udbyttehjemtagning til koncernens amerikanske moderselskab, finder landsretten, at der hverken foreligger retsmisbrug af den danskcypriotiske dobbeltbeskatningsoverenskomst eller af moder-/datterselskabsdirektivet.

Den omstændighed, at NetApp Bermuda disponerede over det omhandlede udbytte ved i en periode på ca. fem måneder frem til den 3. april 2006 at anbringe udbyttet i obligationer, eller at det hypotetisk set havde været muligt for NetApp Bermuda at undlade at overføre udbyttet til NetApp USA, og at dette i givet fald ville have været et retsmisbrug af direktivet og den dansk-cypriotiske dobbeltbeskatningsoverenskomst, kan ikke føre til et andet resultat i den foreliggende situation, hvor udbyttet er videreført til NetApp USA inden for en overskuelig tid og som planlagt.

På den baggrund finder landsretten, at udbytteudlodningen i 2005 på 565.896.000 kr. ikke udløser kildebeskatning efter selskabsskattelovens § 2, stk. 1, litra c.

*2. udbytteudlodning - 92.012.000 kr.*

I NetApp Denmarks årsrapport for 2005/2006 foreslås det at udlodde 92.012.000 kr., svarende til ca. 16 mio. USD.

Af NetApp Cyperns årsrapport for 2006/2007 fremgår i form af udbytte på ca. 16 mio. USD. Det fremgår dog samtidig af årsrapportens »cash flow«- opgørelse, at beløbet ikke blev modtaget i det omhandlede regnskabsår.

Om de efterfølgende transaktioner vedrørende beløbet er det alene oplyst, at beløbet først blev overført til NetApp Cypern i 2010, og

at beløbet herefter blev videreoverført til NetApp Bermuda som yderligere afdrag på gæld.

Efter det oplyste henstod beløbet således i ca. fire år hos NetApp Denmark, og NetApp Cypern oppebar renteindtægter af beløbet i perioden. NetApp Denmark har i sine anbringender omtalt forholdet som et lån, hvilket dog ikke er nærmere belyst.

Som sagen foreligger oplyst, er udbyttet på et ikke nærmere oplyst tidspunkt i 2010 udbetalt fra NetApp Denmark til NetApp Cypern og herefter på et ligeledes ikke nærmere oplyst tidspunkt i 2010 overført til NetApp Bermuda på grundlag af en beslutning om udlodning truffet i 2006.

Der er ikke oplyst om reale grunde til, at udbyttet blev udbetalt til NetApp Cypern, ud over at NetApp-koncernen ønskede at undgå dansk kildebeskatning.

Henset til den tidsmæssige sammenhæng mellem udbetalingen fra NetApp Denmark til NetApp Cypern og overførslen til NetApp Bermuda, sammenholdt med de ovenfor anførte oplysninger om NetApp Cyperns aktiviteter, findes NetApp Cypern ikke at kunne anses for retmæssig ejer af udbyttet efter dobbeltbeskatningsoverenskomsten med Cypern, hvorfor skattenedsættelse som udgangspunkt ikke kan ske efter overenskomsten, ligesom skattefritagelse efter moder-/datterselskabsdirektivet som udgangspunkt heller ikke kan påberåbes, idet NetApp Cypern må anses for et gennemstrømningsselskab, hvis eksistensformål har været at opnå skattefritagelse efter direktivet.

*Betydningen af den dansk-amerikanske dobbeltbeskatningsoverenskomst*

NetApp Denmark har gjort gældende, at udbyttet på 92.012.000 kr. indgik i udbyttet på 550 mio. USD, som NetApp Bermuda overførte til NetApp USA den 3. april 2006. Til støtte herfor er anført, at dette fremgår af den fremlagte balance pr. 28. april 2006 for NetApp Bermuda, som viser, at selskabets egenkapital blev negativ med 18.965.993 USD som følge af udlodningen på 550 mio. USD.

Ifølge NetApp Denmark er dette udtryk for, at man forventede at modtage udbyttet på 16 mio. USD hidrørende fra NetApp Denmark og derfor lod det indgå i udbyttet til det amerikanske moderselskab. NetApp Denmark har i den forbindelse henvist til, at det tillige i årsrapporten for NetApp USA for 2005/2006 er anført, at der efter hjemtagningen af udbyttet under »the American Jobs Creation Act«-ordningen pr. 30. april 2006 ikke længere henstod ikke-udloddet indtjening (»unremitted earnings«) i koncernens datterselskaber hjemmehørende uden for USA.

Landsretten finder, at det ikke er godtgjort, at udbyttet på 92.012.000 kr. indgik i udlodningen i april 2006 på 550. mio. USD fra NetApp Bermuda til NetApp USA. Landsretten har herved lagt vægt på, at årsrapporten fra NetApp Denmark, hvoraf udlodningen fremgår, først blev godkendt i oktober 2006, og at beløbet først blev betalt til NetApp Cypern i 2010 og derefter videreoverført til NetApp Bermuda. Landsretten har endvidere lagt vægt på, at der ikke er fremlagt årsrapporter eller lignende for NetApp Bermuda for tiden efter 28. april 2006, som viser, om og i givet fald hvordan udbyttet er behandlet regnskabsmæssigt hos selskabet.

På denne baggrund finder landsretten, at udbytteudlodningen på 92.012.000 kr. som udgangspunkt udløser beskatning efter selskabsskattelovens § 2, stk. 1, litra c.

*Administrativ praksis*

NetApp Denmark har gjort gældende, at en fortolkning af moder-/datterselskabsdirektivet, som ovenfor

**1699**

anført, og dermed af selskabsskattelovens § 2, stk. 1, litra c, og en forståelse af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsten som ovenfor anført, udgør en skærpelse af administrativ

praksis med tilbagevirkende kraft, der efter forvaltningsretlige principper ikke kan finde anvendelse på de omhandlede udbytter, der blev udloddet i 2005 og 2006.

Landsretten finder, at forarbejderne, herunder skatteministerens besvarelser af spørgsmål til Skatteudvalget, til selskabsskattelovens § 2, stk. 1, litra c, som affattet ved lov nr. 219 af 3. april 1992, ved lov nr. 1026 af 23. december 1998 og ved lov nr. 282 af 25. april 2001 ikke kan anses som en tilkendegivelse om, at danske skattemyndigheder ville acceptere et retsmisbrug, som beskrevet af EU-Domstolen, eller ville indrømme skattenedsættelse i henhold til en dobbeltbeskatningsoverenskomst, uanset at modtageren af udbyttet ikke kunne anses som retmæssig ejer heraf.

Navnlig bemærkes, at de udtalelser, som skatteministeren fremkom med i forbindelse med tilblivelsen af lov nr. 282 af 25. april 2001 om muligheden for at indskyde et indskuds- og holdingselskab eksempelvis på Cypern og derved undgå dansk beskatning, findes at være af en sådan generel karakter, at de ikke kan anses for en tilkendegivelse om, at de danske skattemyndigheder ville acceptere omgåelse eller misbrug, som beskrevet af EU-Domstolen.

Det forhold, at skatteministeren i visse af sine besvarelser vedrørende de økonomiske konsekvenser af genindførelse af udbyttebeskatningen i 2001 omtalte, at selskaberne ville »kunne omstrukturere sig« og dermed undgå dansk udbytteskat, findes ligeledes ikke at indeholde en tilkendegivelse af accept af et misbrug.

Vedrørende skattemyndighedernes administrative praksis har skatteministeren i et svar til Folketingets Lovsekretariat af 27. november 2006 meddelt, at ministeren ikke kunne oplyse eksempler på udenlandske gennemstrømningsselskaber, som de danske skattemyndigheder ikke har accepteret som retmæssig ejer af udbytte fra danske selskaber. I forlængelse heraf er anført, at det indgår i den ligningsmæssige behandling at påse, at betingelserne for ikke at indeholde udbytteskat er opfyldt, herunder om et udenlandsk selskab er retmæssig ejer af udbyttet.

Det fremgår endvidere af Skatteministeriets notat af 20. marts 2007 til Folketingets Skatteudvalg om status på SKATs kontrolindsats, at kapitalfondes overtagelse af danske virksomheder gennem de senere år har udgjort en større og større andel af de samlede virksomhedsoverdragelser, at antallet specielt i 2005 har vist sig at udgøre et betydeligt antal med en stor volumen, og at SKAT derfor har rettet fokus på denne type overdragelser. Det fremgår endvidere, at SKAT på denne baggrund har indledt en kontrol af en række overdragelser med henblik på at undersøge, hvem der er den endelige modtager, »rette indkomstmodtager«, af renter og udbytter. Skatteministeren oplyste den 15. maj 2007, at disse undersøgelser endnu ikke havde ført til udbyttebeskatning af udlodningerne til gennemstrømningsselskaber.

På denne baggrund, hvor der ikke foreligger en administrativ praksis, der indebærer accept af arrangementer som det foreliggende, finder landsretten, at NetApp Denmark ikke har haft føje til at antage, at NetApp Cypern i en situation som den foreliggende var skattefritaget, for så vidt angår den anden udbytteudlodning på 92.012.000 kr.

*Foreløbig konklusion*

I henhold til selskabsskattelovens § 2, stk. 1, litra c, er NetApp Cypern ikke skattepligtig af udbyttet på 565.896.000 kr.

NetApp Cypern er skattepligtig af udbyttet på 92.012.000 kr.

*Kildeskattelovens § 69, stk. 1*

Det følger af kildeskattelovens § 65, stk. 1, at NetApp Denmark er ansvarlig for at indeholde kildeskatten på 92.012.000 kr.

I et tilfælde som det foreliggende, hvor NetApp Denmark ikke har opfyldt sin indeholdelsespligt, følger det af kildeskattelovens § 69, stk. 1, at NetApp Denmark over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre

NetApp Denmark godtgør, at der ikke er udvist forsømmelighed fra selskabets side ved iagttagelse af kildeskattelovens bestemmelser.

NetApp Denmark må efter de foreliggende oplysninger have været bekendt med de faktiske omstændigheder ved udbytteudlodningen, herunder at formålet med at indskyde NetApp Cypern som et mellemled alene var at undgå dansk kildebeskatning som redegjort for ovenfor.

Under disse omstændigheder kan det forhold, at der i 2006 ikke forelå en endelig afklaring af det retlige spørgsmål, om der var fornøden hjemmel til at imødegå et sådant retsmisbrug, ikke føre til, at NetApp Denmark bliver ansvarsfri i medfør af kildeskattelovens § 69, stk. 1.

NetApp Denmark hæfter herefter over for det offentlige for betalingen af 92.012.000 kr. i udbytteskat.

*Konklusion*

NetApp Denmark frifindes for Skatteministeriets påstand om, at selskabet skal anerkende, at der er pligt til at indeholde udbytteskat med 158.450.880 kr. svarende til 28 % af udbyttet på 565.896.000 kr., og at NetApp Denmark er ansvarlig for betalingen af det ikke indeholdte beløb.

NetApp Denmark skal anerkende, at der er pligt til at indeholde udbytteskat med 25.763.360 kr. svarende til 28 % af udbyttet på 92.012.000 kr., der den 13. oktober

**1700**

2006 blev besluttet udloddet fra NetApp Denmark, og at NetApp Denmark er ansvarlig for betalingen af det ikke indeholdte beløb.

*Sagsomkostninger*

Parterne er ikke fremkommet med bemærkninger vedrørende sagsomkostningernes størrelse.

Efter sagens udfald skal Skatteministeriet betale sagsomkostninger til NetApp Denmark ApS med i alt 2.500.000 kr. Ved fastsættelsen af beløbet, der er til dækning af udgifter til advokatbistand inkl. moms, er der taget hensyn til det vundne beløbs størrelse samt sagens omfang, betydning og forløb, herunder at sagen har været forelagt EU-Domstolen.

*B-2173-12 Skatteministeriet mod TDC A/S*

*Spørgsmål 1 om skattefrihed efter selskabsskattelovens dagældende § 2, stk. 1, litra c, 5. pkt.*

Sagen for landsretten vedrører bindende svar på to spørgsmål stillet af TDC. Det første spørgsmål angår, om udbytte udloddet fra TDC til NTC Holding G.P. & Cie S.C.A. er skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., og dermed skal fritages for kildeskat.

Landsskatteretten har besvaret spørgsmålet benægtende.

Det følger af selskabsskattelovens dagældende § 2, stk. 1, litra c, 5. pkt., jf. lovbekendtgørelse nr. 1376 af 7. december 2010, som senest ændret ved lov nr. 254 af 30. marts 2011, at skattepligten efter bestemmelsens 1. pkt. ikke omfatter udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivets artikel 2, stk. 1, litra a, men som ved beskatning i Danmark anses for transparente enheder. Efter det dagældende 6. pkt. forudsatte skattefriheden dog, at selskabsdeltagerne ikke var hjemmehørende i Danmark.

Der er mellem parterne enighed om, at NTC Holding G.P. & Cie S.C.A. er omfattet af gruppen af selskaber på listen i bilaget til direktivet, og at dette selskab skal anses som en skattemæssigt transparent enhed efter dansk ret.

Spørgsmålet er herefter, om det, som påstået af Skatteministeriet, tillige er en betingelse for, at der skal indrømmes NTC Holding G.P. & Cie S.C.A. skattefrihed efter bestemmelsens 5. pkt., at Danmark skal frafalde eller nedsætte beskatningen af udbyttet efter

bestemmelserne i moder-/datterselskabsdirektivet eller dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, jf. selskabsskattelovens dagældende § 2, stk. 1, litra c, 3. pkt.

TDC har gjort gældende, at der hverken i selskabsskattelovens § 2, stk. 1, litra c's ordlyd eller forarbejder er støtte for et sådant krav.

Landsretten bemærker, at det dagældende 5. pkt. i selskabsskattelovens § 2, stk. 1, litra c, blev indsat ved lov nr. 1375 af 20. december 2004. Af lovens forarbejder (lovforslag nr. L 27 af 7. oktober 2004) fremgår, at indsættelsen af bestemmelsen havde baggrund i den udvidelse af kredsen af selskaber omfattet af moder-/datterselskabsdirektivet, der skete ved ændringsdirektivet af 22. december 2003, og som indebar, at også selskaber, der efter dansk skatteret anses for transparente selskaber, blev omfattet.

Det fremgår endvidere, at formålet med indsættelsen var at sikre skattemæssig ligestilling mellem udenlandske moderselskaber, der efter dansk ret var selvstændige skattesubjekter og skattefritaget efter moder-/datterselskabsdirektivet, og selskabsdeltagere i transparente moderselskaber, således at sådanne selskabsdeltagere blev indrømmet samme skattefritagelse, som moderselskabet ville have haft, hvis det ikke havde været et skatteretligt transparent selskab efter dansk ret.

Der er i forarbejderne ikke holdepunkter for, at ændringen tillige havde til formål at gennemføre en lempelse af beskatningen af udbytteudlodninger til selskabsdeltagerne i transparente, udenlandske moderselskaber, der gik videre end den eksisterende skattefritagelse for andre udenlandske moderselskaber.

Heller ikke det forhold, at bestemmelsens 5. pkt. ikke, som tidligere, henviste til bestemmelsens 2. pkt., jf. affattelsen af bestemmelsen ved lov nr. 525 af 12. juni 2009, kan føre til et andet resultat. Bestemmelsens 2. pkt. angik således alene kravene til moderselskabets ejerandel og ejertid i forhold til datterselskabet, og ikke betingelsen om, at beskatningen skulle frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst. Som det fremgår af forarbejderne til loven (lovforslag nr. L 202 af 22. april 2009) udgik 2. pkt. og blev erstattet af en henvisning til definitionen af datterselskabsaktier i aktieavancebeskatningslovens § 4 A.

På den anførte baggrund finder landsretten, at skattefrihed efter selskabsskattelovens dagældende § 2, stk. 1, litra c, 5. pkt., forudsætter, at betingelsen i bestemmelsens dagældende 3. pkt. om, at beskatningen af udbytte fra datterselskabet skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst, tillige er opfyldt.

Skatteministeriet har gjort gældende, at hverken betingelserne i moder-/datterselskabsdirektivet eller i dobbeltbeskatningsoverenskomsten med Luxembourg for henholdsvis at frafalde og nedsætte beskatningen er opfyldt, idet der foreligger et retsmisbrug i relation til moder-/datterselskabsdirektivet, og idet NTC Holding G.P. & Cie S.C. A. ikke kan anses for at være retmæssig ejer af udbyttet efter dobbeltbeskatningsoverenskomstens artikel 10, stk. 2.

Om den generelle forståelse af moder-/datterselskabsdirektivet henvises til det, som landsretten har anført i

**1701**

præmissen vedrørende sag B-1980-12, Skatteministeriet mod NetApp Denmark ApS.

Af skatteforvaltningslovens § 24, stk. 1, fremgår, at en anmodning om et bindende svar skal indeholde alle de oplysninger af betydning for svaret, som står til rådighed for spørgeren. Skønner told- og skatteforvaltningen respektive Skatterådet, at spørgsmålet ikke er tilstrækkeligt oplyst, kan spørgeren anmodes om yderligere oplysninger eller dokumentation. Efterkommes anmodningen ikke inden for en rimelig frist, kan spørgsmålet afvises eller svaret begrænses til de forhold, der skønnes tilstrækkeligt oplyst.

Copyright © 2023 Karnov Group Denmark A/S

TDC har til brug for besvarelsen af de stillede spørgsmål oplyst, at et dansk datterselskab i NTC-koncernen i 2005 erhvervede ca. 87 % af aktierne i TDC, og efter frasalg besad ca. 59,1 % af aktierne. Det er oplyst, at det danske datterselskab var ejet gennem en kæde af danske holdingselskaber, der »100 % gennem mellemliggende holdingselskaber« var ejet af en række kapitalfonde. Det er endvidere oplyst, at NTC Holding G.P. & Cie S.C. A. i 2010 erhvervede aktieposten i TDC fra et datterselskab, NTC SA, hjemmehørende i Luxembourg, nu i likvidation.

Om de nærmere omstændigheder forud for og efter NTC-koncernens køb af TDC-aktierne foreligger særdeles sparsomme oplysninger. Det er dog oplyst, at det konsortium af kapitalfonde, der stod bag opkøbet af TDC-aktier, til brug herfor allerede i 2005 etablerede en koncernstruktur bestående af selskaber i både Luxembourg og Danmark. Der er intet nærmere dokumenteret om aktiviteterne i de luxembourgske selskaber. Om de danske selskaber i NTC-koncernen fremgår det fremlagte uddrag af købstilbud af 2. december 2005 bl.a., at den umiddelbare tilbudsgiver, Nordic Telephone Company ApS, var »nederste lag« i en koncernstruktur indeholdende i hvert fald fem lag af danske holdingselskaber, der alle var stiftet til formålet i efteråret 2005, og som alle havde været uden kommerciel aktivitet siden stiftelsen, undtagen i forbindelse med købstilbuddet. Det er endvidere oplyst, at der efter købet af aktierne i 2005 skete en omstrukturering, således at danske selskaber blev erstattet af NTC SA, hjemmehørende i Luxembourg, og nu i likvidation.

Om baggrunden for konsortiets valg af Luxembourg som det land, hvor den oprindelige holdingstruktur blev etableret, har TDC udelukkende givet oplysninger af helt generel og overordnet karakter.

TDC har oplyst, at NTC Holding G.P. & Cie S.C.A. er en selvstændig enhed med en selvstændig ledelse og beslutningskompetence, at beslutning om at disponere over modtaget udbytte alene vil kunne træffes af dette selskabs ledelse, og at det til brug for det bindende svar kan lægges til grund, at størstedelen af udbyttet via de to ejere af NTC Holding G.P. & Cie S.C.A. vil blive videreudloddet til kapitalfondene og ultimativt til investorerne.

Der foreligger imidlertid ikke nærmere dokumentation for de økonomiske og forretningsmæssige forhold i NTC-koncernen. Navnlig bemærkes, at der ikke foreligger nogen dokumentation for NTC SA's og NTC Holding G.P. & Cie S.C.A.'s økonomiske og forretningsmæssige forhold, ligesom der ikke foreligger præcise oplysninger om - endsige dokumentation for - beslutninger vedrørende videredisponering af det omhandlede udbytte. På denne baggrund kan attesten fra de luxembourgske myndigheder om, at NTC Holding G.P. & Cie S.C.A. »to the best of their knowledge ... is the beneficial owner of any dividend paid on its shares held in TDC...« ikke tillægges selvstændig betydning.

På grundlag af de meget sparsomme oplysninger, som TDC har afgivet, finder landsretten, at det må lægges til grund, at udbyttet via NTC Holding G.P. & Cie S.C.A. blot er kanaliseret videre til kapitalfondene og eventuelt ultimativt til investorerne, og at NTC Holding G.P. & Cie S.C.A. ikke herudover har haft en selvstændigt begrundet funktion.

Landsretten bemærker, at TDC ikke har gjort gældende, at kapitalfondene ville kunne opnå skattefrihed af udbyttet, såfremt TDC i stedet havde udloddet udbyttet direkte til dem.

TDC kan herefter hverken påberåbe sig skattefritagelse efter moder-/datterselskabsdirektivet eller efter dobbeltbeskatningsoverenskomsten med Luxembourg, og udbyttet er derfor ikke skattefritaget efter den dagældende selskabsskattelovs § 2, stk. 1, litra c, 3. pkt.

Skatteministeriet frifindes derfor for TDC's selvstændige påstand om, at ministeriet skal anerkende, at spørgsmål 1 i Landsskatterettens kendelse af 13. marts 2012 besvares med »Ja«.

*Spørgsmål 2 om skattefrihed efter selskabsskattelovens § 2, stk. 1, litra c, 3. pkt.*

Det andet spørgsmål, som TDC har anmodet om et bindende svar på, er, om udbytte udloddet fra TDC til NTC Holding G.P. & Cie S.C. A. er skattefrit i henhold til selskabsskattelovens § 2, stk. 1, litra c, 3. pkt., og dermed fritaget for kildeskat.

Landsskatteretten har besvaret spørgsmålet bekræftende.

Som fastslået ovenfor er der under hensyn til de foreliggende omstændigheder ikke grundlag for at fastslå, at udlodningen opfylder betingelserne for at opnå skattefritagelse efter 3. pkt. i selskabsskattelovens § 2, stk. 1, litra c.

Herefter, og idet landsretten i øvrigt finder anledning til at bemærke, at en selvstændig besvarelse af spørgsmål 2 i anmodningen om bindende svar under alle omstændigheder synes at savne relevans, da parterne er enige om, at NTC Holding G.P. & Cie S.C.A. er

**1702**

skattemæssigt transparent og således ikke et selvstændigt skattesubjekt efter dansk ret, tager landsretten Skatteministeriets principale påstand til følge.

TDC skal således anerkende, at spørgsmål 2 i Landsskatterettens kendelse af 13. marts 2012 besvares med »Nej«.

*Sagsomkostninger*

Parterne er ikke fremkommet med bemærkninger vedrørende sagsomkostningernes størrelse.

Efter sagens udfald skal TDC A/S betale sagsomkostninger til Skatteministeriet med i alt 2.504.000 kr. 2.500.000 kr. af beløbet er til dækning af udgifter til advokatbistand inkl. moms og 4.000 kr. er til dækning af retsafgift. Ved fastsættelsen af beløbet til dækning af udgifterne til advokatbistand er der taget hensyn til sagens værdi samt sagens omfang, betydning og forløb, herunder at sagen har været forelagt EU-Domstolen.

## Thi kendes for ret

NetApp Denmark ApS frifindes for Skatteministeriets påstand om, at selskabet skal anerkende, at der er pligt til at indeholde udbytteskat med 158.450.880 kr. svarende til 28 % af udbyttet på 565.896.000 kr., der den 28. september 2005 blev besluttet udloddet fra NetApp Denmark ApS, og at NetApp Denmark ApS er ansvarlig for betalingen af det ikke indeholdte beløb.

NetApp Denmark ApS skal anerkende, at der er pligt til at indeholde udbytteskat med 25.763.360 kr. svarende til 28 % af udbyttet på 92.012.000 kr., der den 13. oktober 2006 blev besluttet udloddet fra NetApp Denmark ApS, og at NetApp Denmark ApS er ansvarlig for betalingen af det ikke indeholdte beløb.

Skatteministeriet frifindes for TDC A/S' påstand om, at ministeriet skal anerkende, at spørgsmål 1 i Landsskatterettens kendelse af 13. marts 2012 (sag nr. 11-02359) besvares med »Ja«.

TDC A/S skal anerkende, at spørgsmål 2 i Landsskatterettens kendelse af 13. marts 2012 (sag nr. 11-02359) besvares med »Nej«.

I sagsomkostninger skal Skatteministeriet inden 14 dage betale 2.500.000 kr. til NetApp Denmark ApS.

I sagsomkostninger skal TDC A/S inden 14 dage betale 2.504.000 kr. til Skatteministeriet.

Sagsomkostningerne forrentes efter rentelovens § 8 a.

## Højesterets dom

I tidligere instans er afsagt domme af Østre Landsrets 13. afdeling den 3. maj 2021 (B-1980-12 og B-2173-12) og den 2. juli 2021 (B-1980-12). Dommen af 2. juli 2021 angår alene spørgsmålet om forrentning af skattemyndighedernes krav mod NetApp Denmark ApS, som var udskilt til efterfølgende afgørelse.

Sagerne er i medfør af retsplejelovens § 254, stk. 1, hovedforhandlet i forbindelse med hinanden.

I pådømmelsen har deltaget seks dommere: Jens Peter Christensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Anne Louise Bormann og Jørgen Steen Sørensen.

## Påstande

*Sag 69/2021*

*Appellanten, Skatteministeriet,* har påstået følgende:

1. Indstævnte, NetApp Denmark ApS, skal anerkende, at der var pligt til at indeholde udbytteskat med 158.450.880 kr., svarende til 28 % af udbyttet på 565.896.000 kr., der den 28. september 2005 blev besluttet udloddet fra NetApp Denmark, samt at selskabet er ansvarlig for betalingen af det ikke indeholdte beløb.

2. Landsrettens dom ophæves for så vidt angår bestemmelsen om frifindelse af NetApp Denmark, og sagen hjemvises til landsretten med henblik på landsrettens stillingtagen til de udskilte påstande om forrentning.

3. Landsrettens dom stadfæstes i øvrigt.

4. NetApp Denmark skal betale 2.500.000 kr. med procesrente fra den 28. maj 2021.

*NetApp Denmark* har over for Skatteministeriets påstand 1 påstået stadfæstelse og over for påstand 2-4 frifindelse.

NetApp Denmark har endvidere påstået, at Skatteministeriet skal anerkende, at NetApp Denmark havde pligt til at indeholde udbytteskat med 25.763.360 kr. svarende til 28 % af udbyttet på 92.012.000 kr., der den 13. oktober 2006 blev besluttet udloddet fra NetApp Denmark, og - under alle omstændigheder - at NetApp Denmark ikke er ansvarlig for betalingen af det ikke indeholdte beløb.

*Sag 79/2021*

*Appellanten, NetApp Denmark ApS,* har påstået, at indstævnte, Skatteministeriet, skal anerkende, (i) at der ikke skal ske forrentning af kildeskattekravet på 25.763.360 kr. i perioden fra den 17. december 2011 og indtil den 17. maj 2021, og (ii) at der ikke skal ske forrentning af kildeskattekravet på 158.450.880 kr. i perioden fra den 17. december 2011 og indtil 14 dage efter afsigelsen af en dom fra Højesteret, der måtte give Skatteministeriet medhold i Skatteministeriets principale påstand i sag 69/2021, subsidiært at i det omfang der skal ske forrentning af kildeskattekrav for perioden efter den 1. august 2013, skal forrentningen udelukkende ske efter opkrævningslovens § 7 (alternativt renteloven), og dermed at kravet ikke skal indgå på skattekontoen efter reglerne om én skattekonto i opkrævningslovens kapitel 5.

*Skatteministeriet* har påstået stadfæstelse, subsidiært at det beløb, som NetApp Denmark er ansvarlig for betaling af, tillægges renter efter opkrævningslovens § 7

**1703**

med virkning fra den 1. oktober 2010 indtil det tidspunkt, hvor Højesteret finder, at der ikke kan kræves renter efter opkrævningslovens § 7, fra hvilket tidspunkt der tillægges procesrente efter rentelovens § 8, stk. 1, og mere subsidiært, at det beløb, som NetApp Denmark er ansvarlig for betaling af, tillægges procesrente efter rentelovens § 8, stk. 1, fra sagens anlæg den 14. marts 2012.

For det tilfælde, at Højesteret finder, at NetApp Denmarks principale påstand (ii) kan pådømmes, har Skatteministeriet påstået, at beløbet på 158.450.880 kr. skal tillægges renter efter opkrævningslovens § 7 med virkning fra den 1. oktober 2010, subsidiært at det beløb, som NetApp Denmark er ansvarlig for betaling af, tillægges renter efter opkrævningslovens § 7 med virkning fra den 1. oktober 2010 indtil det tidspunkt, hvor Højesteret finder, at der ikke kan kræves renter efter opkrævningslovens § 7, fra hvilket tidspunkt der tillægges procesrente efter rentelovens § 8, stk. 1, og mere subsidiært, at det beløb, som NetApp Denmark er ansvarlig for

betaling af, tillægges procesrente efter rentelovens § 8, stk. 1, fra sagens anlæg den 14. marts 2012.

*Sag 70/2021*

*Appellanten, TDC A/S,* har påstået følgende:

1. Indstævnte, Skatteministeriet, skal anerkende, at spørgsmål 1 i Landsskatterettens kendelse af 13. marts 2012 skal besvares med »ja«, subsidiært at spørgsmål 2 i kendelsen skal besvares med »ja«, mere subsidiært at udbytte udloddet fra TDC til NTC Holding G.P. & Cie S.C.A. alene er skattepligtigt, i det omfang udbyttet er videreført til aktionærer, som er skattepligtige til Danmark af udbyttet, og således at skattepligten da opgøres i forhold til hver aktionær, og mest subsidiært at sagen hjemvises til Skattestyrelsen til opgørelse af de udbytteandele, som er skattepligtige.

2. Skatteministeriet skal betale 2.504.000 kr. med procesrente fra den 31. maj 2021.

*Skatteministeriet* har over for TDC's principale og subsidiære påstand 1 påstået stadfæstelse, subsidiært at TDC skal anerkende, at spørgsmål 1 og 2 i Landsskatterettens kendelse af 13. marts 2012 afvises. Over for TDC's mere subsidiære påstand 1 har Skatteministeriet påstået afvisning, subsidiært frifindelse, og over for den mest subsidiære påstand 1 frifindelse.

Over for TDC's påstand 2 har Skatteministeriet påstået frifindelse.

## Supplerende sagsfremstilling

*Sagerne 69/2021 og 79/2021*

Der er for Højesteret fremlagt nye oplysninger.

Af en præsentation fra oktober 2005 udarbejdet af NetWork Appliance Inc.'s (NetApp USA's) finansafdeling fremgår bl.a.:

»*Foreign Cash Repatriation Opportunity*

- The American Jobs Creations Act of 2004 permits NetApp to repatriate foreign earnings to the US at a significantly reduced tax rate … - Cash repatriation must occur by end of fiscal 2006

…

*Next Steps*

- Finalize decision on whether or not to borrow in order to take advantage of the entire repatriation opportunity (model of EPS impact in Appendix)
- Dividend Reinvestment Plan to be finalized to reflect following intended uses of re-patriated cash:
  - R&D
  - Acquisitions
  - Capital and infrastructure investments
  - Marketing and advertising
  - Non-executive employee compensation and training
- Dan and Board approval of repatriation and Dividend Reinvestment Plan would occur during Q3 or Q4 (after Q2 earnings release and after December 12 Deloitte Signoff on Q)
- Actual cash repatriation would occur during Q3 and Q4 after approval of repatriation and Dividend Reinvestment Plan by Dan and Board

Af referat af bestyrelsesmøde i NetApp USA den 22. marts 2006 fremgår bl.a.:

»3. Mr. Moore provided an update of the special meeting of the Audit Committee convened to discuss repatriation of foreign earnings and associated borrowing. The Committee recommended and the Board unanimously approved a repatriation dividend of $550,000,000 and the borrowing by the Company of $300,000,000 to pay such dividend.«

Af udtrag af bogføring vedrørende nettooplysning i officiel regnskabsrapportering pr. 27. april 2007 for NetApp USA fremgår

tallet »0« som »Cumulative FY06« for NetApp Denmark ApS. Af en note hertil fremgår:

»Because of the section 965 repatriation in FY06, no prior cumulative earnings«

Af overførselsbilag fra Nordea Bank Danmark A/S fremgår, at banken den 3. maj 2010 overførte 18.630.759 USD fra NetApp Denmark til NetApp Holdings Ltd., Cypern (NetApp Cypern).

Af overførselsbilag fra JPMorgan Chase Bank N.A. fremgår, at NetApp Cypern den 3. maj 2010 modtog 18.630.759 USD fra NetApp Denmark ApS, og at banken samme dag overførte et tilsvarende beløb fra NetApp Cypern til Network Appliance Global Ltd. (NetApp Bermuda).

Af NetApp Denmarks revisionsprotokollat til årsrapport for 2009/10 fremgår bl.a.:

»NetApp Denmark proposed a dividend of DKK 92 million in 2005/06 to NetApp Holdings Ltd, Cyprus. The

**1704**

dividend could not be paid before NetApp Holding and Manufacturing BV paid a consideration of EUR 14 million for the shares in NetApp BV, which has happened in 2009/10. An interest of 3.2 percent has been charged in 2009/10.«

*Sag 70/2021*

Der er for Højesteret fremlagt nye oplysninger, herunder oversigter over investorer i kapitalfondene bag de omhandlede selskaber i Luxembourg.

## Forklaringer

*X* har forklaret bl.a., at han fra 2004 til 2019 var europæisk skattechef for NetApp USA. Han har en baggrund i international skat og har studeret skat på universitetet i Amsterdam. I dag arbejder han i Volvos nordamerikanske afdeling.

NetApp havde en struktur, hvor man brugte »check the box-ordningen«, som gik ud på, at udenlandske virksomheder fra amerikansk perspektiv blev set som ét selskab i skattemæssig henseende. Dette var der behov for, fordi betalinger ellers ville blive »fanget« i det amerikanske skattesystem, inden de rent faktisk blev betalt til det amerikanske selskab. De valgte at bruge ordningen, så det amerikanske selskabs skatteposition ikke blev påvirket af betalinger i udenlandske selskaber.

NetApp USA ejede et udenlandsk lavt beskattet selskab, NetApp Bermuda. NetApp Bermuda havde ikke selv drift, men indgik i stedet en licensaftale med to hollandske selskaber, NetApp Holding and Manufacturing B.V. og NetApp B.V. NetApp Bermuda var et »top holding-selskab«.

Det amerikanske skattesystem var bygget op sådan, at det var et »kreditsystem« og ikke et »fritagelsessystem«, som det kendes i de fleste europæiske systemer. Kreditsystemet gjorde, at hvis NetApp Bermuda udloddede udbytte til NetApp USA, ville det blive beskattet med 37 %, og så kunne man kreditere underliggende selskabsskatter imod denne skat. Ethvert udbytte i en normal periode ville derfor blive beskattet med en meget høj procentsats.

Selskabet i Bermuda blev drevet og ledet af et managementfirma på Bermuda, der stod for en adresse og sørgede for, at alle formaliteter blev overholdt, og at selskabet overholdt den lokale lovgivning. Grundlæggende beslutninger om f.eks. at udbetale udbytte blev truffet i det amerikanske selskab.

Det var helt almindeligt at bruge »check the box-ordningen«. Ethvert børsnoteret selskab i USA havde en tilsvarende eller næsten tilsvarende ordning. Virkningen af ordningen var, at alle midlerne endte i NetApp Bermuda. Hvis alle de midler, der lå i NetApp Bermuda, skulle til det amerikanske selskab, ville de blive beskattet med 37 %. Derfor blev midlerne akkumuleret i NetApp Bermuda. Baggrunden for, at det danske NetApp-selskab var lige under Net-

App Bermuda, var, at det europæiske udbytte kunne udbetales til selskabet i Bermuda uden beskatning. Sådan var reglerne dengang, uanset hvor udbyttet blev betalt til.

I 2004 kom American Jobs Creation Act. Problemet i USA var, at selskaber aldrig hentede deres profit hjem til USA på grund af den høje skattebetaling. Derfor ændrede man lovgivningen, så amerikanske selskaber i en midlertidig periode kunne hjemtage deres udenlandske profitter til en lav skattebetaling på 5 eller 6 % og investere dem i USA. NetApp USA havde meget profit i Bermuda og andre selskaber, så man besluttede at hjemtage. Han var ikke så involveret i beslutningen om at hjemtage profit, men han var involveret i at udføre den. Der var tale om en enkeltstående mulighed for at hjemtage. Han er overbevist om, at langt de fleste virksomheder brugte muligheden for at hjemtage.

Hans opgave i NetApp var at bestyre den europæiske del af forretningen, og han skulle bl.a. tage sig af hjemtagelsesprojektet. I den forbindelse havde han to ugentlige opkald med sin PwC-partner i Holland. NetApp Denmark var placeret det forkerte sted i dens struktur, og derfor overvejede de mulighederne, herunder at indskyde et selskab et sted, så man kunne undgå at ændre hele strukturen, hvilket ville være besværligt. Jo mere simpelt det kunne gøres, desto bedre var det. Den struktur, de havde, var på alle andre områder rigtig god.

Han fik rådgivning fra PwC i Holland og en dansk specialist i PwC Luxembourg. De talte om, hvad der skulle gøres for at gennemføre hjemtagningen. Den rådgivning, de fik, var, at hjemtagningen skulle være mulig at gennemføre, hvis man brugte et nyt holdingselskab.

Problemet ved at udbetale direkte til NetApp Bermuda fra det danske selskab var, at der var kommet en praksis om, at et selskab kun kunne undlade at indeholde udbytteskat, hvis der var tale om lande, som der var indgået overenskomster med. Derfor måtte ejeren af det danske selskab ændres til et selskab i et andet land, og det var det, de endte med at gøre. De havde nogle telefonmøder med PwC-specialisterne, og de fik at vide, at de lovgivningsmæssige forarbejder havde nogle eksempler, der gjorde, at de godt kunne overføre aktierne i det danske selskab til et nyt selskab på Cypern. En ordning svarende til den, de gerne ville indføre, havde været diskuteret under behandlingen af lovforslaget.

Den generelle rådgivning, de fik fra PwC, var nok til, at de mente, at de kunne lave den ordning, som de brugte til at gennemføre hjemtagningen. Der var tale om rådgivning, der strakte sig over en periode med mails frem og tilbage, og den har formentlig været på skrift. Han har ikke kunnet finde noget på skrift i sine arkiver om rådgivningen, og hans mailboks i selskabet er blevet slettet.

**1705**

De overvejede, om det danske selskab skulle ejes direkte af det amerikanske selskab, så udbyttet kunne overføres direkte. Hvis de havde ændret ejerskabet til det danske selskab, ville der ikke have været noget internationalt til hinder for det. Fra det amerikanske selskabs perspektiv ville en sådan ændring dog medføre en masse arbejde. Den struktur, de havde i forvejen med NetApp Bermuda, fungerede. Derfor ville de gerne beholde strukturen.

Det var finansafdelingen, der besluttede, hvor stort et beløb der skulle overføres i udbytte til det amerikanske selskab. Hans afdeling samlede materiale, og var opgaven at overføre så meget som muligt til det amerikanske selskab. Når der blev hjemtaget profit til USA som led i ordningen, skulle visse betingelser om investering opfyldes. Der var blevet udarbejdet en plan, som skulle underskrives af en revisor, men det havde han ikke noget at gøre med. Planlægningen af, hvornår og hvordan overførslerne skulle ske, var ikke hans område. Hvis der skulle indeholdes skat, kom det forbi hans

bord, så det blev gjort korrekt, men selve betalingerne stod bogholderiet for.

Om den anden udbytteudbetaling i 2006 ved han, at den ikke var del af en større strategi, men han ved ikke, hvorfor den blev foretaget. Han tror, at det mere var en selvstændig handling fra de europæiske bogholderiers side. Han var ikke involveret i udbetalingen, og da den ikke var så stor, var der ikke rigtig nogen, der bekymrede sig om den. Han kan ikke se anden mulighed, end at udbyttet blev betalt til NetApp Cypern, som må have betalt det til NetApp Bermuda. Han var involveret i, om man kunne foretage udbetalingen, og det sagde han ja til. Der var ikke den store interesse i at få færdiggjort udbetalingen. Papirarbejdet omkring selve udbetalingen var allerede foretaget, så det overrasker ham ikke, at den kunne stå så længe, uden at der blev taget hånd om den.

## Supplerende retsgrundlag

*Administrativ praksis mv.*

Ved lov nr. 1184 af 12. december 2005 om anvendelse af dobbeltbeskatningsaftale indgået mellem de danske erhvervsorganisationers kontor i Taipei og Taipeis repræsentationskontor i Danmark blev det i § 1, stk. 1, bestemt, at dobbeltbeskatningsaftalen finder anvendelse i Danmark.

Artikel 26 i dobbeltbeskatningsaftalen har denne ordlyd:

»Artikel 26

*Begrænsning af aftalefordele …*

2. Uanset bestemmelserne i artikel 10, artikel 11 og artikel 12 kan et område i henhold til sin gældende lovgivning beskatte udbytter, renter og royalties, som betales af et selskab, som er hjemmehørende i dette område til et selskab, en fond eller et interessentskab eller nogen anden juridisk person, som er hjemmehørende i det andet område, når

a) mere end 50 pct. af kapitalen eller stemmerne i selskabet, fonden eller interessentskabet eller nogen anden juridisk person, som modtager udbytterne, renter eller royaltybeløbene, direkte eller indirekte ejes eller kontrolleres af en person eller af forbundne selskaber, fonde eller interessentskaber eller andre juridiske personer, som ikke er hjemmehørende i et af områderne eller i den Europæiske Union eller det Europæiske Økonomiske Samarbejdsområde, og

b) udbytterne, renterne og royaltybeløbene ikke ville have været omfattet af en nedsat skattesats eller en skattefritagelse i det område, hvorfra de hidrører, i medfør af bestemmelserne i nogen dobbeltbeskatningsaftale eller anden aftale, som er indgået mellem dette område og andre områder eller jurisdiktioner, hvis de blev betalt direkte fra selskabet i det førstnævnte område til nogen person eller forbundne selskaber, fonde eller interessentskaber eller nogen anden juridisk person, som direkte eller indirekte har del i ejerskabet eller kontrollen med det selskab, til hvilket udbytterne, renterne eller royaltybeløbet bliver betalt.

…«

Af forarbejderne til loven fremgår om bestemmelsen bl.a. (Folketingstidende 2005-06, tillæg A, lovforslag nr. L 43, s. 1160):

»Formålet med [stk. 2] er at hindre, at Taiwan anvendes som en skattefri »gennemgangslejr« for betalinger mellem et dansk selskab og en eller flere personer hjemmehørende i et land, som Danmark ikke har en dobbeltbeskatningsaftale med. Det bemærkes, at udbytter fra et dansk datterselskab til et udenlandsk moderselskab efter intern lovgivning i Danmark ikke beskattes, hvis skatten skal frafaldes eller nedsættes efter en dobbeltbeskatningsaftale.«

Ved lov nr. 308 af 19. april 2006 blev der foretaget en ændring af selskabsskattelovens § 2, stk. 1, litra d, 1. pkt., om skattepligt for selskaber mv. som nævnt i lovens § 1, stk. 1, med hjemsted i udlandet, der oppebærer renter fra kilder her i landet. Af en henvendelse af 24. februar 2006 til Folketingets Skatteudvalg fra Foreningen af Statsautoriserede Revisorer vedrørende lovforslaget (lovforslag nr. L 116 af 14. december 2005) og skatteministerens kommentar hertil af 3. marts 2006 fremgår bl.a.:

»Foreningen af Statsautoriserede Revisorer (FSR) har i brev af 24. februar 2006 henvendt sig til Folketingets Skatteudvalg. Henvendelsen drejer sig om den del af lovforslaget L 116, der vedrører justering af koncerndefinitionen i diverse værnsregler.

…

*FSR:* FSR er bekendt med, at nogle få andre lande har kildeskat på renter. I disse tilfælde foretages

### 1706

kapitalfondenes aktie- og låneinvesteringer via holdingselskaber i andre EU-lande, f.eks. Luxembourg.

Dette vil antageligt også blive situationen, hvis Danmark indfører kildeskat på renter. Konsekvensen vil herefter være, at rentebetalinger vil være omfattet af tynd kapitalisering. Yderligere vil konsekvensen være, at det løbende kan udloddes udbytter, hvilket i dag netop ikke sker, fordi Danmark har kuponskat på udbytter.

*Kommentar:* Den begrænsede skattepligt for renter efter selskabsskattelovens § 2, stk. 1, litra d, omfatter udenlandske selskaber, der oppebærer koncerninterne renter fra Danmark. Denne begrænsede skattepligt bortfalder, hvis beskatningen af renterne skal frafaldes eller nedsættes efter rente-/royalty direktivet eller efter en dobbeltbeskatningsoverenskomst.

I den forbindelse skal man være opmærksom på, at i forhold til selskabsskattelovens § 2, stk. 1, litra d, må det afgøres ud fra princippet om rette indkomstmodtager, hvem der oppebærer renterne.

Kildebeskatningen af renterne skal nemlig kun frafaldes efter overenskomsterne, hvis renternes retmæssige ejer er hjemmehørende i den anden stat. Tilsvarende gælder i rente-/royalty direktivet, jf. direktivets artikel 1, stk. 1. Direktivets fordele kan endvidere nægtes anvendt i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.

Hvis kapitalfondene foretager aktie- og låneinvesteringer via holdingselskaber, vil det skulle vurderes, om holdingselskabet er rette indkomstmodtager/retmæssig ejer af renteindkomsten. Et rent gennemstrømningsholdingselskab i eksempelvis Luxembourg kan efter min opfattelse næppe være rette indkomstmodtager/retmæssig ejer af renteindkomsten. Den schweiziske højesteret er kommet frem til, at et rent gennemstrømningsholdingselskab i Danmark ikke var retmæssig ejer til udbyttebetalinger efter den danskschweiziske overenskomst.«

*Renteberegning mv.*

Af Folketingets Skatteudvalgs spørgsmål nr. 527 af 3. maj 2022 (alm. del) til skatteministeren fremgår:

»Spørgsmål

Der er aktuelt ikke lovhjemmel til, at en skatteyder, som har fået fuldt medhold i en klage behandlet ved Landsskatteretten eller Skatteankenævn, og som Skatteministeriet har indbragt for domstolene, kan indbetale det omtvistede skatte- eller afgiftskrav til skatteforvaltningen imens, at sagen er verserende ved domstolene. Der er ligeledes ikke lovhjemmel til, at det omtvistede krav kan indbetales, såfremt at skatteyderen har vundet sagen ved en domstol og Skatteministeriet derefter vælger at anke dommen til en højere instans. Ministeren bedes på den baggrund besvare følgende spørgsmål:

A. Er ministeren enig i, at den manglende adgang til at betale, udgør en væsentlig forskel fra civile sager, hvor en debitor altid kan vælge at betale et krav under protest for at undgå rentetilskrivninger, mens sagen verserer?

U.2023.1575H

B. Er ministeren enig i, at den manglende adgang til at betale indebærer, at der flyttes en renterisiko fra Skatteministeriet som kreditor til skatteyderen som debitor, hvorved det bemærkes, at i civile sager kan en kreditor ikke nægte at modtage betaling fra debitor, og må finde sig i at skulle tilbagebetale med renter, hvis det krav, som kreditor selv har rejst, viser sig ikke at eksistere?

C. Er ministeren enig i, at den manglende renterisiko for Skatteministeriet indebærer en risiko for, at flere sager vil blive ført, end hvis det kostede Skatteministeriet renter at tabe sagen i næste instans?

D. Er ministeren enig i, at skatteyderen rentemæssigt stilles dårligere i situationer, hvor skatteyderen har tabt sagen og indbringer den i forhold til sager, hvor skatteyderen har vundet og ministeriet indbringer den?

E. Er ministeren enig eller uenig i, at det er retssikkerhedsmæssigt betænkeligt såfremt, at staten opkræver renter efter, at skatteyderen har tilbudt at indbetale det omtvistede krav til skatteforvaltningen imens, sagen er verserende ved domstolene?

F. Vil ministeren oplyse, om ministeren har tænkt sig at fremsætte lovforslag, der gør det muligt skal betale den skat, som skatteministeriet mener, skatteyderen skal betale?«

Af skatteministerens svar af 24. maj 2022 fremgår bl.a.:

»A.

Jeg kan alene udtale mig om søgsmål inden for Skatteministeriets ansvarsområde. Jeg kan herom oplyse, at landsretterne i flere domme har tiltrådt, at der ikke er hjemmel til, at skatteyderen frivilligt kan indbetale det omtvistede beløb med henblik på at undgå forretning, mens retssagen verserer, hvis skatteyderen tidligere har fået medhold i det administrative system eller ved en lavere retsinstans.

Senest er Østre Landsret imidlertid i dom af 31. marts 2022 vedrørende Heavy Transport Holding ApS nået frem til, at Skatteministeriet var afskåret fra at kræve renter af det omtvistede beløb i perioden fra skatteyder fik medhold ved Landsskatteretten og indtil domsafsigelsen ved landsretten, fordi selskabet i denne periode ikke havde mulighed for frivilligt at deponere beløbet med henblik på at undgå forrentning.

Det bemærkes, at dommen er anket til Højesteret af begge parter, og at jeg generelt ikke kommenterer på verserende retssager.

B. og C.

En skatteyder kan indbetale et omtvistet beløb til Skatteforvaltningen, selv om skatteyder bestrider Skatteforvaltningens afgørelse. Det spørgsmål, der har været

**1707**

forelagt landsretterne, vedrører derimod den særlige situation, at der er truffet en administrativ afgørelse, der fastslår, at kravet ikke består.

…

D.

Jeg mener ikke, at der kan svares entydigt på dette spørgsmål. Hvis en skatteyder ikke får medhold i en skattesag, kan skatteyderen enten betale det omtvistede beløb eller anmode Skatteforvaltningen om henstand i forbindelse med sagens indbringelse for domstolene. En henstandsanmodning vil som udgangspunkt blive imødekommet. I henstandsperioden vil der fortsat ske forrentning af det omtvistede skattekrav, men henstanden vil også omfatte de påløbne renter. Skatteyderen kan dog som nævnt også vælge at betale det omtvistede skattekrav, hvorved der ikke tilskrives renter, hvilket får betydning, hvis skatteyderen ikke får medhold i sagen. En skatteyder har således her to muligheder - at betale for at undgå rentetilskrivning eller anmode om henstand.

Hvis en skatteyder derimod har fået medhold, fx i en sag ved Landsskatteretten, og Skatteministeriet vælger at indbringe sagen

for domstolene, vil skatteyderen efter Skatteministeriets opfattelse ikke have mulighed for at betale det omtvistede beløb, fordi Skatteforvaltningen i denne situation ikke har hjemmel til at modtage betalingen. Der vil derfor påløbe renter, der er akkumuleret fra tidspunktet for den seneste rettidige betaling fra det omtvistede skattekrav frem til den endelige domsafsigelse.

E. og F.

Jeg forstår udmærket de hensyn, som kan tale for at indføre en mulighed for frivilligt at indbetale eller deponere det omtvistede beløb. Omvendt skal det bl.a. overvejes om en deponeringsordning, der gør det muligt at berostille den nuværende forrentning af det omtvistede beløb, vil indebære afledte konsekvenser for de offentlige finanser.«

## Supplerende anbringender

*Sagerne 69/2021 og 79/2021*

Skatteministeriet har supplerende anført bl.a., at udbytterne fra NetApp Denmark er kanaliseret via NetApp Cypern, der er et gennemstrømningsselskab, til NetApp Bermuda, der er et skattelyselskab. Der må derfor stilles strenge krav til beviset for, at hovedformålet ikke har været at misbruge den dansk-cypriotiske dobbeltbeskatningsoverenskomst og moder-/datterselskabsdirektivet, jf. præmis 110 i EU-Domstolens dom af 26. februar 2019. Her udtaler Domstolen bl.a., at det ikke kan »udelukkes«, at der ikke er tale om retsmisbrug i tilfælde, hvor udbyttet ville have været fritaget for skat, hvis det var udloddet direkte til et selskab i en tredjestat.

Der foreligger nu dokumentation for, at NetApp USA ikke havde truffet beslutning om hjemtagelse, da NetApp Denmark den 28. september 2005 vedtog udlodningen af udbytte på 565.896.000 kr. til NetApp Cypern, idet hjemtagelse først blev besluttet på NetApp USA's bestyrelsesmøde den 22. marts 2006. Dette fremgår af præsentationen fra NetApp USA's finansafdeling i oktober 2005 og af referatet af bestyrelsesmødet den 22. marts 2006. For så vidt angår udbyttet på 92.012.000 kr. foreligger der ingen dokumentation for, at beløbet overhovedet er viderekanaliseret til NetApp USA, og X har for Højesteret forklaret, at udlodningen ikke var en del af en større strategi, at han ikke ved, hvorfor den blev foretaget, og at han tror, at det mere var en selvstændig handling fra de europæiske bogholderiers side. NetApp Denmark har derfor under alle omstændigheder ikke løftet sin bevisbyrde.

NetApp Denmark har fortsat ikke godtgjort, at der er tale om en skærpelse af skattemyndighedernes praksis med tilbagevirkende kraft. Der kan i den forbindelse ikke lægges vægt på forarbejderne til loven fra 2005 om en dobbeltbeskatningsaftale mellem de danske erhvervsorganisationers kontor i Taipei og Taipeis repræsentationskontor i Danmark, idet forarbejderne ikke kan tages til indtægt for, at almindelige dobbeltbeskatningsaftaler ikke indeholder værn mod misbrug. Der kan heller ikke lægges vægt på forarbejderne til ændringen i 2006 af selskabsskattelovens § 2, stk. 1, litra d, idet det netop er anført, at et rent gennemstrømningsholdingselskab i f.eks. Luxembourg næppe kan være rette indkomstmodtager/retmæssig ejer af den pågældende renteindkomst.

Det er ikke i strid med forvaltningsretlige principper eller andre regler, at skattemyndighederne afviste NetApp Denmarks anmodning om frivillig indbetaling af det omtvistede beløb, jf. UfR 2023.307 H, og anmodningen kan derfor ikke tillægges betydning for beregningen af det skyldige rentebeløb. Rentetilskrivningen er heller ikke i strid med artikel 6 i Den Europæiske Menneskerettighedskonvention, idet skattesager ikke er omfattet af bestemmelsen, ligesom rentetilskrivning ikke i bestemmelsens forstand indebærer en anklage om en forbrydelse. Heller ikke artikel 47 i EU's Charter om grundlæggende rettigheder kan anvendes i en sag som den foreliggende, hvor der er tale om svig eller misbrug. Der er i øvrigt ikke

Copyright © 2023 Karnov Group Denmark A/S

holdepunkter for, at en ordning, hvorefter morarenter tilskrives fra forfaldstidspunktet, indtil betaling sker i henhold til en bindende afgørelse eller erkendelse af ansvar, skulle stride mod bestemmelsen.

*NetApp Denmark* har supplerende anført bl.a., at det efter X' forklaring for Højesteret må lægges til grund, at baggrunden for at stifte NetApp Cypern som mellemholdingselskab var, at der skulle findes en struktur, som muliggjorde hjemtagning af udbytter til NetApp USA under de gunstige skattebetingelser i henhold til

**1708**

American Jobs Creation Act. Det må lægges til grund, at den etablerede struktur blev anset for den enkleste, og der er ikke grundlag for at antage, at der skulle være tilsigtet et misbrug af moder-/datterselskabsdirektivet eller den dansk-cypriotiske dobbeltbeskatningsoverenskomst.

For så vidt angår udlodningen af 565.896.000 kr. til NetApp Cypern må det anses for godtgjort, at beløbet blev overført til NetApp USA, og at dette hele tiden havde været planlagt. Det må også anses for godtgjort, at NetApp Bermuda ikke havde reel råderet over beløbet, idet beløbet var nødvendigt for, at NetApp Bermuda kunne bidrage til den samlede hjemtagning i NetApp USA. Det er herefter uden betydning, at endelig beslutning om hjemtagning til NetApp USA først blev truffet på NetApp USA's bestyrelsesmøde den 22. marts 2006.

For så vidt angår udlodningen af 92.012.000 kr. kan det lægges til grund, at beløbet indgik i den samlede overførsel af 550 mio. USD fra NetApp Bermuda til NetApp USA den 3. april 2006. Udlodningsbeløbet stammede fra NetApp Denmarks salg af aktier i Holland i 2005, og den negative egenkapital på ca. 18 mio. USD, som opstod i NetApp Bermuda ved overførslen i april 2006 til NetApp USA, var kun mulig, fordi NetApp Bermuda længe forinden vidste, at der i NetApp Denmark ved salget af de hollandske aktier var skabt yderligere frie reserver, som man kunne få overført. Dette underbygges også af, at det af den officielle regnskabsrapportering pr. 27. april 2007 for NetApp USA fremgår, at der var »no prior cumulative earnings«. Udlodningsbeløbet kunne have været overført med det samme til NetApp Cypern og derefter til NetApp Bermuda og NetApp USA, men det var ikke nødvendigt, da NetApp Bermuda i forvejen skulle optage betydelige lån for at finansiere overførslen af de 550 mio. USD til NetApp USA. Det er underordnet, hvad der skete med beløbet efter, at det i 2010 blev overført fra NetApp Denmark til NetApp Cypern og herefter til NetApp Bermuda, idet beløbet blot skulle udligne den negative egenkapital i NetApp Bermuda.

Der foreligger nu yderligere dokumentation for skattemyndighedernes praksis indtil 2008. Det fremgår f.eks. af forarbejderne til loven fra 2005 om en dobbeltbeskatningsaftale mellem de danske erhvervsorganisationers kontor i Taipei og Taipeis repræsentationskontor i Danmark, at der ikke er noget værn i udtrykket »retmæssig ejer« i de almindelige dobbeltbeskatningsoverenskomster. Af forarbejderne til ændringen i 2006 af selskabsskattelovens § 2, stk. 1, litra d, fremgår, at skattemyndighederne på det tidspunkt fortsat satte lighedstegn mellem udtrykkene »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne og »rette indkomstmodtager« i dansk skatteret.

Skatteministeriets krav om forrentning indebærer, at det samlede rentekrav pr. 31. januar 2023 vil være ca. 362 mio. kr., og af dette beløb vil ca. 155 mio. kr. skyldes bestemmelsen om rentes rente i opkrævningslovens § 16 c, stk. 1. Dette skal ses i forhold til Skatteministeriets samlede skattekrav på ca. 184 mio. kr. Der er tale om uforholdsmæssigt store rentebeløb, som alvorligt hindrer en parts adgang til at føre sag mod skattemyndighederne, og dette skal sammenholdes med, at NetApp Denmark ikke har fået mulighed

for at deponere de omtvistede beløb hos skattemyndighederne. Der er tale om en krænkelse af artikel 6 i Den Europæiske Menneskerettighedskonvention og artikel 47 i EU's Charter om grundlæggende rettigheder. Anvendelsesområdet for chartrets artikel 47 afhænger i modsætning til artikel 6 i Menneskerettighedskonventionen ikke af, at der er strid om borgerlige rettigheder og forpligtelser, eller at der er tale om en anklage for en forbrydelse.

*Sag 70/2021*

*TDC* har supplerende anført bl.a., at det i landsrettens dom korrekt er bemærket, at TDC ikke for landsretten gjorde gældende, at de kapitalfonde, der står bag NTC Holding og de øvrige selskaber i Luxembourg, ville kunne opnå skattefrihed af udbyttet, hvis TDC i stedet havde overført udbyttet til dem. Der må imidlertid i sagens natur findes retmæssige ejere af udbyttet, og der er nu for Højesteret fremlagt oversigt over de ultimative investorer. Det må på den baggrund i hvert fald kunne fastslås, at udbyttet alene er skattepligtigt i det omfang, det er videreført til aktionærer, som er skattepligtige af udbyttet til Danmark, således at skattepligten opgøres i forhold til hver enkelt aktionær for sig.

Alternativt bør sagen hjemvises til skattemyndighederne til opgørelse af de udbytteandele, der er skattepligtige.

*Skatteministeriet* har supplerende anført bl.a., at TDC efter EU-Domstolens dom af 26. februar 2019 har haft særlig anledning til at fremlægge oplysninger om, hvad der er sket med udbyttet efter overførslen i 2011 til NTC Holding, men det har TDC ikke gjort. Det må derfor fortsat lægges til grund, at NTC Holding og de øvrige selskaber i Luxembourg havde som hovedformål at videreudlodde udbyttet fra TDC til bl.a. kapitalfonde på Caymanøerne. Der er ingen dokumentation for, at de retmæssige ejere af udbytterne er hjemmehørende i lande, som Danmark har indgået dobbeltbeskatningsoverenskomst med, og at disse ejere ville være fritaget for skattepligt efter selskabsskattelovens § 2, stk. 1, litra c.

TDC's mere subsidiære påstand bør afvises, da den mangler klarhed og præcision og derfor er uegnet til at indgå i en domskonklusion.

## Højesterets begrundelse og resultat

*1. Sagernes baggrund og problemstillinger*

De foreliggende sager drejer sig om beskatning af udbytteudlodning fra danske datterselskaber til

**1709**

udenlandske moderselskaber. Sagerne skal bedømmes efter dansk skattelovgivning, EU's direktiv om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater samt dobbeltbeskatningsoverenskomster mellem Danmark og henholdsvis Cypern, Luxembourg og USA.

I Højesterets sager *69/2021* og *79/2021* traf SKAT den 17. september 2010 afgørelse om, at NetApp Denmark ApS efter kildeskattelovens § 65, stk. 1, jf. selskabsskattelovens § 2, stk. 1, litra c, havde pligt til at indeholde skat af udbytter på 565.896.000 kr. og 92.012.000 kr., som NetApp Denmark henholdsvis den 28. september 2005 og 13. oktober 2006 udloddede til NetApp Holdings Ltd., Cypern (NetApp Cypern).

Landsskatteretten traf den 16. december 2011 afgørelse om, at NetApp Denmark ikke havde pligt til at indeholde skat af udbytterne.

Sagerne angår, om NetApp Denmark havde pligt til at indeholde skat. Hvis det er tilfældet, angår sagerne endvidere spørgsmål om NetApp Denmarks ansvar for betaling af de indeholdelsespligtige beløb, jf. kildeskattelovens § 69, stk. 1, og om forrentning af skattemyndighedernes krav mod NetApp Denmark, jf. navnlig opkrævningslovens § 7, stk. 1, og § 16 c, stk. 1.

I Højesterets sag *70/2021* afgav Skatterådet den 21. juni 2011 bindende svar på to spørgsmål fra TDC A/S vedrørende beskatning af en påtænkt udlodning af udbytte fra TDC til moderselskabet NTC Holding G.P. & Cie S.C.A., Luxembourg (NTC Holding). Skatterådet svarede »Nej« til, at udlodning ville være skattefri efter selskabsskattelovens § 2, stk. 1, litra c, 3. pkt., henholdsvis 5. pkt.

Landsskatteretten stadfæstede den 13. marts 2012 Skatterådets svar vedrørende selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., men gav TDC medhold i, at udlodning ville være skattefri efter 3. pkt.

Sagen angår, hvad der er den rigtige besvarelse af TDC's spørgsmål.

Der foreligger i sagerne generelle problemstillinger om selskabsskattelovens § 2, stk. 1, litra c, direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater (moder-/datterselskabsdirektivet), dobbeltbeskatningsoverenskomster mellem Danmark og henholdsvis Cypern, Luxembourg og USA samt skattemyndighedernes praksis på området (pkt. 2 nedenfor).

Herudover foreligger der særlige spørgsmål vedrørende NetApp Denmark (pkt. 3) og TDC (pkt. 4). Højesterets konklusion fremgår af pkt. 5.

*2. Generelle problemstillinger vedrørende reglerne om udbyttebeskatning*

*2.1. Selskabsskattelovens § 2, stk. 1, litra c*

På tidspunkterne for NetApp Denmarks udlodninger til NetApp Cypern og Skatterådets bindende svar til TDC om påtænkt udlodning til NTC Holding fulgte det af selskabsskattelovens § 2, stk. 1, litra c, 1. pkt., at udlodningerne som udgangspunkt ville udløse skattepligt for NetApp Cypern og NTC Holding. Det ville indebære, at NetApp Denmark og TDC efter kildeskattelovens § 65, stk. 1, havde pligt til at indeholde den pågældende skat.

Det fremgik samtidig af bestemmelsen, at der gjaldt undtagelser til udgangspunktet om skattepligt. Det var herunder en betingelse for skattefritagelse, at beskatning skulle frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor moderselskabet var hjemmehørende, jf. bestemmelsens 4. pkt. (3. pkt. i 2011). Det fremgik videre af bestemmelsens 5. pkt., at skattepligten ikke omfattede deltagere i visse moderselskaber, der var optaget på listen over de selskaber, der er omhandlet i direktivets artikel 2, stk. 1, litra a.

Af de grunde, som landsretten har anført, tiltræder Højesteret, at selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., må forstås således, at fritagelse for skattepligt forudsætter, at også betingelsen om, at beskatning skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst, er opfyldt.

De generelle problemstillinger angår herefter, hvad henvisningen i § 2, stk. 1, litra c, til moder-/datterselskabsdirektivet og dobbeltbeskatningsoverenskomster med andre stater nærmere indebærer (pkt. 2.2 og 2.3). Det er i den forbindelse et spørgsmål, hvilken betydning skattemyndighedernes praksis på området har (pkt. 2.4).

*2.2. Moder-/datterselskabsdirektivet og EU-Domstolens praksis*

Efter artikel 1, stk. 1, i moder-/datterselskabsdirektivet anvender hver medlemsstat direktivet på bl.a. overskud, som selskaber i denne medlemsstat udlodder til selskaber i andre medlemsstater, som de er datterselskaber af. Efter bestemmelsens stk. 2 er direktivet ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Efter artikel 5, stk. 1, skal det udbytte, som et datterselskab udlodder til sit moderselskab, fritages for kildeskat.

Direktivet er implementeret i dansk ret ved, at selskabsskattelovens § 2, stk. 1, litra c, som betingelse for skattefritagelse kræver, at beskatning skal frafaldes eller nedsættes efter bestemmelserne i

direktivet. Efter selskabsskatteloven beror således på direktivet, om der skal ske skattefritagelse.

EU-Domstolen har i dom af 26. februar 2019 (forenede sager C-116/16 og C-117/16) udtalt, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at

**1710**

muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat, der er fastsat i direktivets artikel 5, og at dette gælder, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse (præmis 95). Domstolen forholder sig i den forbindelse til tidligere praksis vedrørende det nævnte princip, herunder dom af 5. juli 2007 i sag C-321/05, Kofoed, om EU's fusionsdirektiv (præmis 86-89).

NetApp Denmark og TDC har gjort gældende, at EU-Domstolens dom af 26. februar 2019 ikke i dansk ret kan tillægges betydning for forståelsen af direktivet og dermed af selskabsskattelovens § 2, stk. 1, litra c. Selskaberne har med henvisning til den nævnte dom af 5. juli 2007 i Kofoed-sagen anført, at det uanset EU-Domstolens dom af 26. februar 2019 må være en forudsætning for at statuere svig eller misbrug, at der i dansk ret er regler som nævnt i direktivets artikel 1, stk. 2, og at der ikke på de relevante tidspunkter var sådanne regler, og at det princip om forbud mod svig og misbrug, som fremgår af dommen, ikke kan have direkte virkning for borgere og virksomheder. Selskaberne har i den forbindelse henvist til Højesterets dom af 6. december 2016 i den såkaldte Ajos-sag (UfR 2017.824) og til loven om Danmarks tiltrædelse af Den Europæiske Union.

Som anført af landsretten henhører det efter artikel 267 i Traktaten om Den Europæiske Unions Funktionsmåde under EU-Domstolen at afgøre spørgsmål om fortolkning af EU-retten, herunder moder-/datterselskabsdirektivet. Danske domstole skal derfor håndhæve den forståelse af direktivet og dermed af selskabsskattelovens § 2, stk. 1, litra c, der fremgår af EU-Domstolens dom af 26. februar 2019, medmindre andet - som i Ajos-sagen - måtte følge af lov om Danmarks tiltrædelse af Den Europæiske Union, fordi danske domstole ved at følge EU-Domstolens dom ville handle uden for rammerne af deres beføjelse som dømmende magt.

I Ajos-sagen var udgangspunktet for problemstillingen, at der forelå en contra legem-situation, idet det ikke var muligt at fortolke den relevante bestemmelse i dansk lovgivning (den tidligere bestemmelse i funktionærlovens § 2 a, stk. 3) i overensstemmelse med de relevante EU-regler (EU's beskæftigelsesdirektiv). I de foreliggende sager følger det som nævnt direkte af selskabsskattelovens § 2, stk. 1, litra c, at der kun kan ske skattefritagelse, hvis udbyttebeskatning skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet. Selskabsskatteloven henviser således til direktivet, og der er som følge heraf ikke nogen modstrid mellem dansk lovgivning og direktivet som fortolket af EU-Domstolen. Der foreligger derfor ikke en contra legem-situation.

Danske domstole skal efter det anførte anvende selskabsskattelovens § 2, stk. 1, litra c, i overensstemmelse med moder-/datterselskabsdirektivet, således som direktivet er fortolket ved EU-Domstolens dom af 26. februar 2019. Det er på den baggrund uden betydning, om der - som anført af Skatteministeriet - på de relevante tidspunkter i de foreliggende sager forelå danske bestemmelser om svig og misbrug som nævnt i direktivets artikel 1, stk. 2.

*2.3. Dobbeltbeskatningsoverenskomsterne med Cypern, Luxembourg og USA*

De danske dobbeltbeskatningsoverenskomster med Cypern, Luxembourg og USA svarer for så vidt angår bestemmelser af be-

tydning for de foreliggende sager i det væsentlige til OECD's modeloverenskomst fra 1977.

Overenskomsterne indeholder i artikel 10, stk. 2, stort set enslydende bestemmelser, hvorefter udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, alene kan beskattes i den førstnævnte stat med en vis procent af bruttobeløbet af udbyttet, såfremt modtageren er udbyttets »retmæssige ejer« (»beneficial owner«). Overenskomsterne indeholder endvidere i artikel 3, stk. 2, stort set enslydende bestemmelser, hvorefter det, medmindre andet følger af sammenhængen, gælder, at ethvert udtryk, som ikke er defineret i overenskomsten, skal tillægges den betydning, som det har i den kontraherende stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

Udtrykket »retmæssig ejer« er ikke defineret i overenskomsterne. Da udtrykket afgrænser de kontraherende staters indbyrdes beskatningskompetence, finder Højesteret, at det følger af sammenhængen, at betydningen ikke kan bero på de kontraherende staters respektive lovgivning.

Højesteret tiltræder, at udtrykket »retmæssig ejer« må forstås i lyset af OECD-modeloverenskomsten, herunder OECD's kommentarer fra 1977 om imødegåelse af misbrug. Ifølge disse kommentarer har udtrykket til formål at sikre, at dobbeltbeskatningsoverenskomster ikke hjælper til skatteunddragelse eller skatteflugt gennem »kunstgreb« og »kunstfærdige juridiske konstruktioner«, der gør det »muligt at drage fordel både af de fordele, der følger af visse nationale love, og af de skattelempelser, der følger af dobbeltbeskatningsoverenskomster.« I de reviderede kommentarer fra 2003 er dette uddybet og præciseret, og det er bl.a. anført, at det ikke vil være »i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand blot fungerer som 'gennemstrømningsenhed' (conduit) for en

**1711**

anden person, der rent faktisk modtager den pågældende indkomst.«

NetApp Denmark og TDC har gjort gældende, at det af forarbejderne til ændringen i 2001 af selskabsskattelovens § 2, stk. 1, litra c, fremgår, at lovgivningsmagten har forudsat en forståelse af begrebet »retmæssig ejer«, som ikke bygger på OECD-modeloverenskomsten med tilknyttede kommentarer, men på udtrykket »rette indkomstmodtager« i dansk skatteret.

Formålet med de nævnte lovændring var at forhindre det misbrug af den hidtil gældende skattefrihed for udbyttebetaling, der fulgte af etablering af danske holdingselskaber, som alene havde til formål at omgå andre landes beskatning, og samtidig tage højde for de undtagelser til hovedreglen om kildebeskatning, som Danmark er forpligtet til at have efter f.eks. dobbeltbeskatningsoverenskomster, jf. skatteministerens besvarelse af 24. november 2000 af et spørgsmål fra Folketingets Skatteudvalg (L 99 - bilag 2). Det må på den baggrund have formodningen klart imod sig, at der ved lovændringen skulle være forudsat en anden forståelse af udtrykket »retmæssig ejer« i de relevante dobbeltbeskatningsoverenskomster end den, der fremgår af OECD's modeloverenskomst med kommentarer, således at der skulle ske skattefritagelse i videre omfang end påkrævet efter overenskomsterne.

Som anført af landsretten indeholder forarbejderne til lovændringen i 2001 ikke nogen omtale af udtrykket »retmæssig ejer« (eller »rette indkomstmodtager«). Højesteret finder, at der heller ikke i øvrigt er holdepunkter for en anden forståelse af udtrykket »retmæssig ejer« end den anførte. Det, som skatteministeren i besvarelser anførte om muligheder for bl.a. omstrukturering og

indskydelse af mellemholdingselskaber, kan ikke forstås på den måde, at det var hensigten at tillade misbrug i form af »kunstgreb« mv., som efter modeloverenskomsten og de tilknyttede kommentarer netop begrunder, at der ikke er skattefritagelse.

*2.4. Administrativ praksis mv.*

NetApp Denmark og TDC har gjort gældende, at den forståelse af selskabsskattelovens § 2, stk. 1, litra c, moder-/datterselskabsdirektivet og dobbeltbeskatningsoverenskomsterne, som Skatteministeriet påberåber sig, er udtryk for en ændring af administrativ praksis med tilbagevirkende kraft, bl.a. fordi skattemyndighederne indtil 2008 har anset udtrykket »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne for sammenfaldende med udtrykket »rette indkomstmodtager« i dansk skatteret. NetApp Denmark og TDC har anført, at beviset for en sådan praksisændring ikke består i, at skattemyndighederne ikke tidligere har grebet ind i sager som de foreliggende, men i Skatteministeriets tilkendegivelser over for Folketinget indtil 2008, herunder i forbindelse med ændringen i 2001 af selskabsskattelovens § 2, stk. 1, litra c.

Som anført i pkt. 2.3 finder Højesteret, at der ikke i forarbejderne til lovændringen i 2001 er holdepunkter for, at der har været forudsat en anden forståelse af udtrykket »retmæssig ejer« i de relevante dobbeltbeskatningsoverenskomster end den, der følger af kommentarerne til OECD's modeloverenskomst.

Efter lovændringen i 2001 har Skatteministeriet i nogle tilfælde afgivet svar til Folketinget, som kan forstås således, at der efter ministeriets opfattelse er sammenfald mellem udtrykkene »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne og »rette indkomstmodtager« i dansk skatteret. Højesteret finder, at sådanne tilkendegivelser, der er i strid med det ovenfor anførte forståelse, ikke kan tillægges afgørende betydning. Højesteret tilføjer, at der i den omhandlede periode foreligger en række modstående tilkendegivelser, bl.a. i ligningsvejledningen fra juli 2003, hvor det med henvisning til OECD's 2003-kommentarer er anført, at begrebet »retmæssig ejer« ikke skal forstås i snæver teknisk sammenhæng, men snarere ud fra en formålsfortolkning af overenskomsterne, herunder hensynet til at undgå eller omgå beskatning.

*3. Særligt om NetApp Denmark*

*3.1. Første udlodning - 565.896.000 kr.*

Af de grunde, som landsretten har anført, tiltræder Højesteret, at der som udgangspunkt ikke er skattefritagelse efter dobbeltbeskatningsoverenskomsten mellem Danmark og Cypern eller efter moder-/datterselskabsdirektivet. Højesteret finder således, at NetApp Cypern i forhold til datterselskabet NetApp Denmark og moderselskabet NetApp Bermuda må anses for et gennemstrømningsselskab, der ikke nyder beskyttelse efter overenskomsten eller direktivet.

Spørgsmålet er, om det kan føre til et andet resultat, at NetApp Denmark - hvis moderselskabet på tidspunktet for udlodningen havde været NetWork Appliance Inc. (NetApp USA) og ikke NetApp Cypern - kunne have udloddet udbyttet til NetApp USA med den virkning, at udbyttet som følge af dobbeltbeskatningsoverenskomsten mellem Danmark og USA havde været fritaget for skattepligt.

Af EU-Domstolens dom af 26. februar 2019 fremgår om denne problemstilling, at det ved undersøgelsen af koncernstrukturen er uden betydning, at visse af de retmæssige ejere af det udbytte, som er blevet overført af gennemstrømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, som kildestaten har indgået en dobbeltbeskatningsoverenskomst med. Den omstændighed, at der findes en sådan overenskomst, kan således efter dommen ikke i sig selv udelukke, at der foreligger retsmisbrug, og kan dermed ikke rejse tvivl om, at der foreligger retsmisbrug, hvis dette er behørigt godtgjort af samtlige de faktiske omstændigheder, som bevidner, at de erhvervsdrivende har udført rent formelle eller

**1712**

kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål uretmæssigt at drage fordel af den fritagelse for kildeskat, der er fastsat i artikel 5 i moder-/datterselskabsdirektivet (præmis 108). Det fremgår også, at når dette er sagt, kan det heller ikke udelukkes, såfremt der foreligger en situation, hvor udbyttet ville have været fritaget, hvis det var blevet udloddet direkte til det selskab, som har sit hjemsted i en tredjestat, at målet med koncernstrukturen ikke er udtryk for retsmisbrug. I et sådant tilfælde kan koncernens valg af en sådan struktur i stedet for direkte udlodning af udbyttet til det nævnte selskab ikke anfægtes (præmis 110).

Højesteret bemærker herefter:

Der foreligger ikke nærmere oplysninger om baggrunden for, at det i 2005 blev besluttet at etablere en selskabsstruktur, hvorefter NetApp Cypern skulle stiftes som nyt moderselskab for NetApp Denmark - og herefter indgå i en samlet udbyttetransaktion fra NetApp Denmark til NetApp Bermuda og NetApp USA - i stedet for at gøre NetApp USA til moderselskab for NetApp Denmark, således at udbyttet kunne udloddes direkte til NetApp USA. Der er herunder ikke fremlagt oplysninger om den rådgivning fra PwC, som efter X ' forklaring for Højesteret lå til grund for beslutningen.

Under disse omstændigheder må det efter Højesterets opfattelse kræve klare holdepunkter at antage, at der ikke ved udlodningen til NetApp Cypern - hvor skattepligten efter selskabsskattelovens § 2, stk. 1, litra c, som udgangspunkt opstod - forelå retsmisbrug efter direktivet. Højesteret finder, at sådanne holdepunkter ikke foreligger, og lægger vægt på, at endelig beslutning om hjemtagning til NetApp USA først blev truffet den 22. marts 2006, at udbyttebeløbet forud for dette henstod i NetApp Bermuda i ca. 5 måneder, hvor det blev investeret i obligationer, og at det må lægges til grund, at NetApp-koncernen i denne periode frit kunne have besluttet at anvende udbyttet til andet end hjemtagelse til NetApp USA.

Efter det anførte om udbyttebeløbets henståen i NetApp Bermuda efter udlodningen fra NetApp Denmark og NetApp Cypern finder Højesteret endvidere, at NetApp USA ikke efter dobbeltbeskatningsoverenskomsten mellem Danmark og USA kan anses for retmæssig ejer af beløbet, jf. overenskomstens artikel 10, stk. 2.

Højesteret finder herefter, at NetApp Cypern efter selskabsskattelovens § 2, stk. 1, litra c, er skattepligtig af udbyttet, og at NetApp Denmark som følge heraf efter kildeskattelovens § 65, stk. 1, havde pligt til at indeholde skat af beløbet.

*3.2. Anden udlodning - 92.012.000 kr.*

Ved aftale af 25. oktober 2005 solgte NetApp Denmark sine aktier i NetApp B.V., Holland (NetApp Holland) til NetApp Holding & Manufacturing B.V. (NetApp Holding Holland) for 14 mio. euro. Ifølge aftalen skulle købesummen betales senest den 30. april 2006.

Af NetApp Denmarks årsrapport for 2005/06 af 13. oktober 2006 (regnskabsåret sluttede den 30. april 2006) fremgår, at der blev foreslået et udbytte for regnskabsåret på ca. 92 mio. kr. I tilknytning hertil fremgår det af NetApp Denmarks revisionsprotokollat til årsrapport for 2009/10, at NetApp Denmark i sin årsrapport for 2005/06 foreslog en udlodning på ca. 92 mio. kr. til NetApp Cypern, men at denne udlodning ikke kunne blive betalt, før NetApp Holding Holland havde betalt købesummen på 14 mio. euro for aktierne i NetApp Holland, hvilket skete i regnskabsåret 2009/10. Et beløb på ca. 18,6 mio. USD svarende til udbyttet på ca. 92 mio. kr. blev den 3. maj 2010 overført til NetApp Cypern og efter det oplyste derfra til NetApp Bermuda.

NetApp Denmark har gjort gældende, at udbyttet på ca. 92 mio. kr. fra NetApp Denmark til NetApp Cypern indgik i det udbytte på 550 mio. USD, som NetApp Bermuda den 3. april 2006 overførte til NetApp USA. Det indebærer ifølge NetApp Denmark, at udbyttet

på ca. 92 mio. kr. er fritaget for beskatning i henhold til selskabsskattelovens § 2, stk. 1, litra c, sammenholdt med den dansk-amerikanske dobbeltbeskatningsoverenskomst.

Højesteret bemærker herefter:

Den 22. marts 2006 traf bestyrelsen i NetApp USA beslutning om udlodning af et udbytte på 550 mio. USD fra NetApp Bermuda til NetApp USA, herunder ved at NetApp Bermuda skulle optage et lån på 300 mio. USD. Efter det oplyste var grunden, at American Jobs Creation Act 2004 gav amerikanske selskaber mulighed for at hjemtage udbytter fra udenlandske datterselskaber til en særlig lempelig beskatning mod at forpligte sig til at anvende udbytterne til særlige formål i USA. Udbyttet skulle hjemtages senest ved udgangen af regnskabsåret 2006, hvilket for NetApp USA var den 30. april 2006. Udbyttet blev udloddet den 3. april 2006 og beskattet i USA. Af regnskabet for NetApp Bermuda for 2005/06 fremgår, at der blev deklareret et udbytte på 550 mio. USD.

Af NetApp USA's konsoliderede årsregnskab for 2005/06 fremgår, at »as a result of this dividend, there was no significant unremitted earnings held by our foreign subsidiaries at April 30, 2006«. I overensstemmelse hermed fremgår det af NetApp USA's bogføring vedrørende nettooplysning i officiel regnskabsrapportering pr. 27. april 2007, at der efter hjemtagning af udbytte fra NetApp Denmark i 2006 ikke var frie midler i det danske datterselskab.

På den anførte baggrund finder Højesteret det godtgjort, at udbyttet på ca. 92 mio. kr. fra NetApp Denmark var indeholdt i det udbytte på 550 mio. USD, som NetApp Bermuda den 3. april 2006 overførte til NetApp USA. Højesteret finder endvidere, at den eneste

**1713**

retmæssige ejer af dette udbytte har været NetApp USA, hvor udbyttet også er blevet beskattet. Dette gælder, uanset at et beløb på ca. 92 mio. kr. - svarende til udbyttet - først i 2010 blev overført til NetApp Cypern og derfra til NetApp Bermuda. NetApp Bermuda havde således som nævnt ovenfor optaget den lån, der gav grundlag for i 2006 at udlodde ca. 92 mio. kr. til NetApp USA i udbytte fra NetApp Denmark.

Efter det anførte er udbyttet på ca. 92 mio. kr. fritaget for beskatning efter selskabsskattelovens § 2, stk. 1, litra c, sammenholdt med den dansk-amerikanske dobbeltbeskatningsoverenskomst. NetApp Denmark har derfor ikke været forpligtet til at indeholde udbytteskat efter kildeskattelovens § 65, stk. 1.

*3.3. Ansvar efter kildeskattelovens § 69*

NetApp Denmark var bekendt med grundlaget for, at udlodningen den 28. september 2005 til NetApp Cypern er skattepligtig efter selskabsskattelovens § 2, stk. 1, litra c. Der er ikke heroverfor oplyst forhold, som kan begrunde, at NetApp Denmark har haft tilstrækkelig føje til at tro, at udbyttet ikke var skattepligtigt.

Højesteret finder herefter, at NetApp Denmark efter kildeskattelovens § 69, stk. 1, er ansvarlig for betaling af skat vedrørende udlodningen.

*3.4. Rentespørgsmål*

Efter det, der er anført i pkt. 3.1 og 3.2, er der alene spørgsmål om forrentning med hensyn til NetApp Denmarks pligt til at indeholde skat vedrørende udlodningen den 28. september 2005 af 565.896.000 kr.

Ved landsrettens dom af 3. maj 2021 blev NetApp Denmark frifundet for så vidt angår denne udlodning, og landsretten tog derfor i dommen af 2. juli 2021 ikke stilling til spørgsmålet om forrentning af det indeholdelsespligtige beløb. Begge domme er anket til Højesteret, og Højesteret kan nu tage stilling til spørgsmålet.

Af de grunde, som landsretten har anført vedrørende forståelsen af opkrævningslovens § 5, stk. 1, og § 7, stk. 1, finder Højesteret, at seneste rettidige betalingsdag for det skyldige beløb var 14 dage efter SKAT's påkrav af 17. september 2010, dvs. den 1. oktober

Copyright © 2023 Karnov Group Denmark A/S

U.2023.1575H

2010. Skatteministeriets krav skal forrentes fra denne dato, og det er i den forbindelse ikke i strid med forvaltningsretlige principper eller andre regler, at skattemyndighederne afslog NetApp Denmarks anmodning af 4. december 2015 om deponering af de omstridte beløb, jf. Højesterets dom af 18. oktober 2022 (UfR 2023.307).

Opkrævningsloven indeholder i kapitel 5 reglerne om én skattekonto. Det fremgår herunder af lovens § 16 a, stk. 4, at krav på indbetalinger fra virksomheder påvirker (debiteres) saldoopgørelsen fra den seneste rettidige indbetalingsdag for beløbet, og Højesteret tiltræder, at seneste rettidige indbetalingsdag også efter denne bestemmelse var den 1. oktober 2010. Af lovens § 16 c, stk. 1, fremgår, at en debetsaldo på kontoen forrentes med den rente, der er fastsat i § 7, stk. 1, jf. stk. 2, og at renten beregnes dagligt og tilskrives månedligt, dvs. med rentes rente. Reglerne om én skattekonto trådte i kraft den 1. august 2013.

Efter lovens ordlyd skal det skyldige beløb herefter forrentes som påstået af Skatteministeriet.

Højesteret er opmærksom på, at en forståelse af opkrævningsloven i overensstemmelse med dens ordlyd indebærer, at skattemyndighedernes samlede rentekrav mod NetApp Denmark er meget stort i forhold til det indeholdelsespligtige beløb. En væsentlig del af kravet skyldes de nævnte bestemmelser i lovens § 16 a, stk. 4, og § 16 c, stk. 1, om rentes rente. Dette skal ses i sammenhæng med, at NetApp Denmark - som følge af, at selskabet har fået medhold i Landsskatteretten og til dels i landsretten - ikke har haft mulighed for at deponere de omstridte beløb, f.eks. ved indsættelse på skattekontoen, og herved undgå forrentning indtil det tidspunkt, hvor domstolene måtte give Skatteministeriet medhold i de foreliggende sager.

Højesteret finder, at der ikke i opkrævningslovens forarbejder er tilstrækkeligt grundlag for en forståelse af loven i strid med ordlyden af § 16 a, stk. 4, og § 16 c, stk. 1. Der er heller ikke grundlag for at antage, at forrentning efter bestemmelsen indebærer en krænkelse af NetApp Denmarks rettigheder efter artikel 6 i Den Europæiske Menneskerettighedskonvention eller artikel 47 i EU's Charter om grundlæggende rettigheder.

Højesteret finder herefter, at skattemyndighedernes krav mod NetApp Denmark skal forrentes som påstået af Skatteministeriet.

Højesteret finder samtidig, at der er anledning for lovgivningsmagten til at forholde sig til, om konsekvenser af opkrævningsloven som de foreliggende, der må ses i sammenhæng med spørgsmålet om ret til deponering af omstridte beløb, er ønskelige.

*4. Særligt om TDC*

Som anført i pkt. 2.1 må bestemmelsen i selskabsskattelovens § 2, stk. 1, litra c, 5. pkt., forstås således, at fritagelse for skattepligt forudsætter, at også betingelsen om, at beskatning skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst, er opfyldt.

TDC har ikke for Højesteret fremlagt oplysninger om, hvad der er sket med det udbytte, som anmodningen om bindende svar angik, og som TDC i august 2011 udloddede til NTC Holding i Luxembourg. Herefter og i øvrigt af de grunde, som landsretten har anført, tiltræder Højesteret, at spørgsmål 1 og 2 i Landsskatterettens kendelse af 13. marts 2012 begge skal besvares med »nej«.

Højesteret finder, at TDC's mere subsidiære påstand efter sit indhold er for uklar til at kunne tages under påkendelse. Der er endvidere ikke grundlag for at tage TDC's mest subsidiære påstand til følge.

**1714**

*5. Hovedkonklusioner og sagsomkostninger*

NetApp Denmark har indeholdelsespligt for så vidt angår udbytteskat af udlodningen den 28. september 2005 af 565.896.000 kr. til NetApp Cypern.

NetApp Denmark har ikke indeholdelsespligt for så vidt angår udbytteskat af udlodningen den 13. oktober 2006 af 92.012.000 kr. til NetApp Cypern. Højesteret ophæver herefter landsrettens dom af 2. juli 2021 om forrentning.

NetApp Denmark skal for så vidt angår det indeholdelsespligtige beløb med virkning fra den 1. oktober 2010 betale renter efter opkrævningslovens § 7 og med virkning fra den 1. august 2013 også efter lovens kapitel 5 om én skattekonto.

Skatteministeriet har opfyldt sagsomkostningsafgørelsen i landsrettens dom af 3. maj 2021 og skal efter sagens udfald for Højesteret have tilbagebetalt beløbet af NetApp Denmark.

Spørgsmål 1 og 2 i Landsskatterettens kendelse vedrørende TDC skal begge besvares med »nej«.

I sagerne vedrørende NetApp Denmark er sagsomkostninger for landsret og Højesteret fastsat til 3,5 mio. kr. til advokatudgift og 10.000 kr. til dækning af retsafgift, i alt 3.510.000 kr. Højesteret har lagt vægt på sagens udfald, omfang og karakter. Beløbet omfatter også sagsomkostninger vedrørende landsrettens dom af 2. juli 2021 om forrentning.

## Thi kendes for ret

NetApp Denmark ApS skal anerkende, at der er pligt til at indeholde udbytteskat med 158.450.880 kr., svarende til 28 % af udbyttet på 565.896.000 kr., der den 28. september 2005 blev besluttet udloddet fra NetApp Denmark ApS, og at selskabet er ansvarlig for betalingen af det ikke indeholdte beløb.

NetApp Denmark ApS skal anerkende, at det ikke indeholdte beløb på 158.450.880 kr. skal tillægges renter efter opkrævningslovens § 7 med virkning fra den 1. oktober 2010.

Skatteministeriet skal anerkende, at NetApp Denmark ApS ikke havde pligt til at indeholde udbytteskat med 25.763.360 kr. svarende til 28 % af udbyttet på 92.012.000 kr., der den 13. oktober 2006 blev besluttet udloddet fra NetApp Denmark ApS.

NetApp Denmark ApS skal betale 2.500.000 kr. til Skatteministeriet med procesrente fra den 28. maj 2021.

Landsrettens dom af 2. juli 2021 ophæves.

Landsrettens dom af 3. maj 2021 stadfæstes for så vidt angår TDC A/S.

TDC A/S' mere subsidiære påstand 1 afvises.

Skatteministeriet frifindes for TDC A/S' mest subsidiære påstand 1 og påstand 2.

I sagsomkostninger for landsret og Højesteret skal NetApp Denmark ApS betale 3.510.000 kr. til Skatteministeriet.

I sagsomkostninger for Højesteret skal TDC A/S betale 500.000 kr. til Skatteministeriet.

De idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.

Sagsomkostningsbeløbene forrentes efter rentelovens § 8 a.